# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-04390 (SMB) |
| v. | |
| BAM L.P., MICHAEL MANN, and MERYL MANN, | |
| Defendants. | |

## [PROPOSED] JOINT PRETRIAL ORDER

Plaintiff Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated estate of Bernard L. Madoff ("Madoff"), and defendants BAM L.P., Michael Mann, Meryl Mann (the "Defendants," and together with the Trustee, the "Parties")[1] have conferred among themselves

---

[1] Defendants have not consented to the entry of a final order by the Bankruptcy Court and timely requested a jury trial. As the Court is aware, the Defendants contend they have not waived their right to a jury trial as their claims have been disallowed and the Court lacks jurisdiction to enter a final order in this proceeding. Accordingly, the Defendants have prepared their responses and comments under protest and with a reservation of rights. In the event

and with the Court pursuant to Federal Rule of Civil Procedure 16, made applicable herein by Federal Rule of Bankruptcy Procedure 7016, and the following statements, directions, and agreements are adopted as the Joint Pretrial Order herein.

## I.    **NATURE OF THE CASE**

This adversary proceeding arises from a fraud perpetrated by Madoff through the investment advisory business of BLMIS (the "Investment Advisory" business) and its predecessor, the sole proprietorship, Madoff Securities. On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violating criminal securities statutes. On the same day, the United States Securities and Exchange Commission (the "SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against BLMIS and Madoff. On December 15, 2008, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"), the Trustee was appointed as trustee for the liquidation of the business of BLMIS under the Securities Investor Protection Act ("SIPA"), and the District Court removed the combined action (the "Liquidation Proceeding") to this Court.

On March 10, 2009, a Criminal Information was filed in Manhattan federal court charging Madoff with eleven charges. On March 12, 2010, Madoff pled guilty to eleven counts including securities fraud, investment adviser fraud, mail fraud, wire fraud, three counts of money laundering, false statements, perjury, false filings with the United States Securities and Exchange Commission ("SEC"), and theft from an employee benefit plan.

On November 30, 2010, the Trustee brought this adversary proceeding against Defendants initially seeking to avoid and recover fraudulent transfers totaling $9,678,157

---

the court grants a stay of the trial in this Court, the Defendants will abide by any order of Judge Broderick regarding the conduct of the trial. The Parties reserve their rights in the event that there is a trial in the District Court.

allegedly received by Defendants from three separate brokerage accounts during the six years prior to the Filing Date. Pursuant to the *Section 546(e) Decision* (defined below), the Trustee is limited to the Two-Year Transfers on two separate brokerage accounts.[2] *See* [Original] Complaint, *Picard v. BAM, L.P.,* Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Nov. 30, 2010), ECF No. 1. On January 25, 2012, the Trustee amended the Complaint to add claims to avoid obligations. *See* Amended Complaint (the "Complaint"), *Picard v. BAM, L.P.,* No. 11-cv-07667 (JSR) (S.D.N.Y. Jan. 25, 2012), ECF No. 9.

This adversary proceeding involves Account No. 1CM363 held in the name of Michael Mann and Meryl Mann JT WROS (the "Mann Account") and Account No. 1CM579 held in the name of BAM L.P. (the "BAM Account," together with the Mann Account, the "Accounts"). The Trustee now seeks to avoid and recover as fraudulent transfers withdrawals from the Mann Account totaling from and after December 11, 2006, $2,250,000 and from the BAM Account, in the amount of $563,000.[3] On April 16, 2014, the Defendants answered the Trustee's Complaint.[4]

The Trustee did not assert a section 502(d) claim in the Complaint. The Complaint, in fact, separates the claims resolution procedure from the adversary proceeding. Paragraph 55 of the Complaint states in its entirety:

> On December 23, 2008, this Court entered an Order on Application for an Order Approving Form and Manner of Publication and Mailing of Notice, Specifying Procedures for Filing, determination and Adjudication of Claims, and Providing Other Relief (the "Claims Procedures Order"; Docket 12). The Claims Procedures Order includes a process for

---

[2] The Two-Year Transfers at issue in this case consist of $2,250,000 transferred to the Mann Account (1CM363), and $563,000 transferred to the BAM Account (1CM579).

[3] The Complaint also asserted claims against Betsy Mann Polatsch and Adam Mann, who were subsequently dismissed from this action as set forth below.

[4] *See* Defendants' Answer To Amended Complaint And Affirmative Defenses (the "Answer"), *Picard v. BAM, L.P.,* Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. April 16, 2014), ECF No. 40.

> determination and allowance of claims under which the Trustee has been operating. The Trustee intends to resolve the Mann Customer Claim, BAM Customer Claim and Claims Objections to the determination of such claims through a separate hearing as contemplated by the Claims Procedures Order.

Complaint at ¶ 55.

On October 27, 2011, the Defendants filed a motion seeking to join a motion to withdraw the reference[5] that had been made to this Court on several issues, including: (i) whether the Defendants are entitled to protection under the safe harbor provision of 11 U.S.C. § 546(e) of the United States Bankruptcy Code ("Section 546(e)";[6] (ii) whether the Trustee properly sought to avoid transfers that BLMIS made in satisfaction of antecedent debt owed by BLMIS to the Defendants; and (iii) whether this Court has the constitutional and statutory authority to adjudicate the Trustee's avoidance claims against the Defendants. Through several consent orders entered by the District Court, the Defendants' Joinder was consolidated with hundreds of other similar motions in order to allow the District Court to decide each of the issues described above on a consolidated basis.[7]

On April 15, 2012, the District Court addressed the Section 546(e) issue, ruling that Section 546(e) applies in this and the other consolidated adversary proceedings, and dismissed all claims asserted by the Trustee therein except those made pursuant under Sections 548(a)(1)(A) and 550(a). On April 16, 2012, the District Court entered a Consent Order certifying the dismissal judgment pursuant to Fed R. Civ P. 54(b) to the Court of Appeals, which

---

[5] Joinder In Motion of Harold Hein For Mandatory Withdrawal Of The Reference Pursuant to 28 U.S.C. §§ 157(d), *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Oct. 27, 2011), ECF No. 20.

[6] Further references to the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, will be made in like fashion.

[7] *See* Order, *SIPC v. BLMIS*, No. 12 MC 115 (JSR) (S.D.N.Y. April 13, 2012) (ECF No. 4) (relating to the *Stern v. Marshall* issue); Consent Order Granting Certification Pursuant to Fed. R. Civ. P. 54(b) for Entry of Final Judgment Dismissing Certain Claims and Actions, *SIPC v. BLMIS*, No. 12 MC 115 (JSR) (S.D.N.Y. May 16, 2012) (ECF No. 109) (relating to the Section 546(e) issue); Order, *SIPC v. BLMIS*, No. 12 MC 115 (JSR) (S.D.N.Y. May 16, 2012) (ECF No. 107) (relating to the antecedent debt issue).

affirmed the decision. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, (*In re Madoff Sec.*), No. 12 MC 115 (JSR) 2013 WL 1609154, at *3 (S.D.N.Y. Apr. 15, 2013), *aff'd* 773 F.3d 411 (2d Cir. 2014); *cert. denied*, 135 S.Ct. 2859 (2015) (the "*Section 546(e) Decision*"). In the *Section 546(e) Decision*, the Second Circuit held "whether an agreement satisfies the definition of 'securities contract' does not depend on the broker's performance, because a breach of a contract neither changes nor nullifies the nature of the underlying agreement. The existence of a securities contract is not vitiated because a broker fails to make good on his commitment." *Id* at 420. The Second Circuit further held "In our earlier decision, we interpreted 'net equity' in a manner that would harmonize with the SIPA statutory framework as a whole . . . Section 546(e), however, is part of the Bankruptcy Code, not SIPA, and was not at issue in *In re BLMIS*." *Id.* at 423.

On January 4, 2013, the District Court ruled on the *Stern v. Marshall* issue, and held that the Bankruptcy Court generally lacks the authority to enter final judgment on the Trustee's avoidance actions and that in this case:

> Determining the amounts of customers' net equity claims does not require the Bankruptcy Court to conclusively resolve any of the issues that arise in an avoidance action, much less the action in its entirety. See generally 11 U.S.C. §§ 547, 548. In this liquidation proceeding, the Bankruptcy Court has rejected many customer claims simply because the customer, according to the Trustee's calculations, had no net equity. The Second Circuit has affirmed the Bankruptcy Court's decision and approved the Trustee's method for determining net equity claims. *See generally In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011). Nonetheless, these decisions have not resolved important issues that avoidance actions raise, and thus they have not bound the parties as res judicata. Accordingly, the fact that certain defendants have filed net equity claims, standing alone, does not empower the Bankruptcy Court to finally decide the Trustee's avoidance actions. As in Stern, the Court has no "reason to believe that the process of adjudicating" net equity claims "would necessarily resolve" the Trustee's avoidance actions. 131 S.Ct. at 2617.

*SIPC v. BLMIS*, 490 B.R. 46, 55 (S.D.N.Y. 2013) (the "*Stern Consolidated Decision*"). The Court noted expressly in passing that in only one circumstance could the Bankruptcy Court conceivably resolve an avoidance action in the process of deciding a claim over which it has jurisdiction—that is, "whenever the Bankruptcy Court must resolve a § 502(d) claim brought by the Trustee, it may also finally decide avoidance actions to the extent that those actions raise the same issues as the § 502(d) claim and thus would 'necessarily' be resolved by it." *Id.* at 55 and 58. The District Court further clarified that when a claim raises the same issues as an avoidance action and "where the Bankruptcy Court has independent authority to decide whether to disallow a defendant's claim to the estate, and a decision on that issue would bind the parties under normal principles of *res judicata* in a separate avoidance action, the Bankruptcy Court may resolve the avoidance action to the extent necessary to effectuate its independent authority." *Id.* at 54. In those actions where it cannot enter final judgment, the District Court opined that the Bankruptcy Court has the power to "to hear the [avoidance action] in the first instance and recommend proposed findings of fact and conclusions of law" to the District Court. *Id.* at 58.[8]

On October 15, 2013, in the context of a motion to dismiss, the District Court held that BLMIS customers are not entitled to retain avoidable transfers they received from BLMIS under Section 548(c) because such transfers did not constitute the "satisfaction of . . . antecedent debt" within the meaning of the statute. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, (*In re Madoff Sec.*), 499 B.R. 416, 423 (S.D.N.Y. 2013) (the "*Antecedent Debt Decision*"). This issue was also litigated in later proceedings involving avoidance actions. In *Picard v. Cohen*, the Bankruptcy Court extensively reviewed that history and extracted two rules regarding the determination of "value" given by a Ponzi scheme transferee. Post-Trial Proposed Findings of

---

[8] Moreover, the District Court "declined to withdraw the reference of these cases to the Bankruptcy Court 'for cause shown' before the Bankruptcy Court has issued appropriate findings of fact and conclusions of law." *Id.* at 58.

Fact and Conclusions of Law, *Picard v. Cohen,* Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5-10 (Bankr. S.D.N.Y. Apr. 25, 2016), ECF No. 90 (the *"Cohen Decision"*), *adopted,* No. 16 Civ. 05513 (LTS) (S.D.N.Y. Feb. 24, 2017), ECF No. 24 (Memorandum Order Adopting Proposed Findings of Fact and Conclusions of Law).   The Defendants were not parties to the Cohen proceedings.

The Bankruptcy Court held that "[a] transferee does not give value beyond his deposits of principal," *Cohen Decision,* 2016 WL 1695296, at *10–11 (discussing *Silverman v. Cullin (In re Agape World, Inc.),* 633 Fed. App'x. 16, 17 (2d Cir. Feb. 4, 2016)), and "[n]et winners cannot argue that the payment of fictitious profits satisfied an antecedent debt or obligation and provided value within the meaning of Bankruptcy Code § 548(c)." *Id.* at *11.   The Bankruptcy Court stated: "[p]ermitting a net winner to offset a non-net equity claim against the trustee's claim for the return of customer property effectively allows the net winner to recover his non–SIPA claim at the expense of net losers in violation of SIPA's priority rules." *Id.*

The Bankruptcy Court repeated these proposed finding and conclusions of law in subsequent motions for summary judgment.   *See Picard v. Lowrey (In re BLMIS),* Nos. 10–04387, 10–04488, 10–04350, 10–05110 (SMB), 2018 WL 1442312, at *8 (SMB) (Bankr. S.D.N.Y. Mar. 26, 2018) (articulating the two rules set forth in the *Cohen Decision*) (the "Lowrey Cases"); *Picard v. Goldenberg,* No. 10-04946 (SMB), 2018 WL 3078149, at *4 (Bankr. S.D.N.Y. June 19, 2018) (noting that the "value" argument "is not new and has been rejected by the District Court and this Court no less than six times.").   The *Lowrey* decision is subject to *de novo* review by the District Court. The Defendants are not party to either of these proceedings.

After the District Court returned the adversary proceedings to the Bankruptcy Court for

further proceedings consistent with the *Antecedent Debt Decision*, the Bankruptcy Court revisited the value issue when numerous other similarly-situated defendants in other adversary proceedings filed motions to dismiss (the "Motions to Dismiss") complaints or amended complaints filed against them by the Trustee. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 531 B.R. 439 (Bankr. S.D.N.Y. 2015) ("*Omnibus Good Faith Decision*") (in which the Defendants' counsel participated on behalf of defendants in at least 12 adversary proceedings). The Defendants were not parties to this Motion to Dismiss. On June 2, 2015, the Bankruptcy Court granted in part and denied in part the Motions to Dismiss, concluding that the District Court's prior rulings including the *Antecedent Debt Decision* were "consistent with the well-settled rule in Ponzi scheme cases that net winners must disgorge their winnings." *Id.* at 462-63 (collecting cases). The Bankruptcy Court explained that "the rationale for the rule is that the Ponzi scheme participant does not provide any value to the debtor in exchange for the fictitious profits it receives." *Id.* at 463 (citing *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) ("The paying out of profits to [the Ponzi scheme investor] not offset by further investments by him conferred no benefit on the [entities involved in the Ponzi scheme] but merely depleted their resources faster") (modifications in original)).

The Bankruptcy Court also ordered a dismissal with prejudice of counts seeking to avoid obligations pursuant to sections 548(a)(1) and 544 of the Bankruptcy Code (the "Obligations Counts") and a dismissal without prejudice of counts seeking to recover subsequent transfers from subsequent transferee defendants pursuant to section 550(a) of the Bankruptcy Code, applicable provisions of SIPA including section 78*fff*-2(c)(3) (the "Subsequent Transferee Counts").

While the Defendants were not part of the *Omnibus Good Faith Decision*, the Parties

entered into a Stipulation and Order dismissing the Obligations Counts against all Defendants with prejudice, and dismissing the Trustee's claims against defendants Betsy Mann Polatsch and Adam Mann (the "Dismissed Defendants") without prejudice.

The Trustee conducted discovery on all claims. During discovery, the Defendants Michael Mann and BAM L.P. admitted they made and received the transfers in connection with the Accounts, as identified in the Complaint's Exhibit B. Marked as trial exhibits TX00231-TX00232 are true and accurate copies of Defendant Michael Mann's and Defendant Meryl Mann's Responses and Objections to Trustee's First Set of Interrogatories, and their Responses to Trustee's First Set of Requests for Admission to each named defendant, in which Defendants Michael Mann and BAM L.P. admit to the accuracy of the transfers as reflected in Exhibit B to the Complaint, and having received the transfers. DX-0000X-DX00000X. The Parties concluded all discovery in December 2015. On March 22, 2016 and January 17, 2017, the Parties conducted a mediation before Deborah A. Reperowitz that was unsuccessful.[9]

On September 28, 2018, this Court entered its Order Setting Trial; scheduling it to begin December 3, 2018, and ordering the parties to exchange witness lists and pre-marked exhibits seven days in advance of trial, on or before November 26, 2018.[10] The order further provided that the Defendants shall file any motion to withdraw the reference within thirty days of the order's entry.[11] On October 26, 2018, the Defendants filed their motion to withdraw the reference of the Mann Action to the District Court for a jury trial (the "Motion To Withdraw"). The Mann Action was assigned to District Court Judge Vernon S. Broderick, who so ordered a

---

[9] *See* Mediator's Report, *Picard v. BAM, L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Jan. 24, 2017), ECF No. 63.

[10] Order Setting Trial, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Sept. 28, 2018), ECF No. 108.

[11] *Id.*

briefing schedule in which the Trustee shall file his opposition brief by November 30, 2018, and the Defendants shall file their reply brief by December 17, 2018.[12]

On November 16, 2018, the Defendants' counsel submitted a letter request to this Court seeking to continue the trial scheduled for December 3, 2018 pending the outcome of the Motion To Withdraw. On November 19, 2018, this Court denied the Defendants' request, noting that absent the Trustee's consent, the Defendants had to move for a stay pursuant to Rule 5011(c) of the Federal Rules of Bankruptcy Procedure.[13]    Thereafter, on November 20, 2018, the Defendants filed an motion seeking an (1) expedited determination of their motion for a stay of the trial pending the District Court's determination of the Motion To Withdraw, and (2) granting a stay of the trial (the "Motion For Stay").[14]  The Court subsequently entered an Order To Show Cause, ordering that any responses or objections to be filed and served by 12 noon on November 27, 2018, with the hearing scheduled for November 28, 2018.[15]

In accordance with the Court's order setting trial and Judge Bernstein's individual practices, also on November 19, 2018, the Trustee filed two motions *in limine*, seeking to admit certain criminal trial allocutions and to confirm that certain requests for admission are admitted at trial.[16]  These motions are set for hearing on the same date as the trial, December 3, 2018.  The Defendants filed objections to the motions *in limine* on November 26, 2018 and intend to object

---

[12] Endorsed Letter, *Picard v. BAM, L.P.*, Adv. Pro. No. 18-cv-09916 (VSB) (S.D.N.Y. Nov. 13, 2018), ECF No. 9.

[13] *See* So Ordered Letter, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Nov. 19, 2018), ECF No. 116.

[14] *See* Defendants' Memorandum Of Law In Support Of (A) An Expedited Hearing And (B) Motion For Stay Of Trial Pursuant To Rule 5011(c) Pending Ruling By The District Court On Defendants' Motion To Withdraw The Reference, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Nov. 20, 2018), ECF No. 121-1.

[15] *See* Order To Show Cause, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Nov. 20, 2018), ECF No. 123.

[16] *See* Notice of Trustee's Motion in Limine Numbers 1 and 2, *Picard v. BAM, L.P.*, Adv. Pro. 10-04390 (SMB) (Bankr. S.D.N.Y. Nov. 19, 2018), ECF No. 117, and corresponding declaration and memoranda of law.  ECF Nos. 118, 119, and 120.

further to the admission of the "expert" reports and testimony of Lisa Collura, Matthew Greenblatt and Bruce Dubinsky.

## II.    BASIS FOR JURISDICTION, WHETHER THE CASE IS CORE OR NON-CORE, AND WHETHER THE BANKRUPTCY COURT MAY ENTER FINAL ORDER OR JUDGMENT

The Trustee commenced this adversary proceeding in this Court before which the Liquidation Proceeding is also pending. This Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(b), 15 U.S.C. § 78eee(b)(2)(A) and (b)(4), and Order No. M 10-450 (S.D.N.Y. July 10, 1984), as amended by Amended Standing Order of Reference, No. M 10-468, 12 Misc. 0032 (S.D.N.Y. Jan. 31, 2012). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O). The fact that this matter is a core proceeding is not determinative of whether this Court has final adjudicative authority.

On December 23, 2008, the Bankruptcy Court entered the Claims Procedures Order,[17] which sets forth "a systematic framework for the filing, determination and adjudication of claims in the BLMIS liquidation proceeding." *Peskin v. Picard*, 413 B.R. 137, 143 (Bankr. S.D.N.Y. 2009). "The procedures therein have been consistently approved and utilized in SIPA proceedings since its enactment in 1970." *Id.* Pursuant to this order, customers were required to file claims with the Trustee by the statutory bar date. *See* Claims Procedures Order at *3; SIPA § 78fff–2(a)(2). The Trustee satisfies customer claims by allocating customer property supplemented by SIPC advances. *Id.* at *5 (citing SIPA § 78fff–2(b)). If BLMIS's books and records failed to support a claim or the claim was not otherwise established to the Trustee's satisfaction, the Trustee denied it and notified the claimant of the determination in writing (the

---

[17] *See* Order on Application For An Entry Of An Order Approving Form And Manner Of Publication And Mailing Of Notices, Specifying Procedures For Filing, Determination, And Adjudication Of Claims; And Providing Other Relief (the "Claims Procedures Order"), *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 12.

"Trustee Determination"). *Id.* at \*5-7 (citing SIPA § 78fff-2(b)).

In the present action, the Defendants filed customer claims in the BLMIS SIPA proceeding in June 2009, seeking to recover the purported balance in their BLMIS accounts as stated on their last account statements as of November 30, 2008. Specifically, on or about June 17, 2009, Defendants Michael Mann and Meryl Mann filed a customer claim for BLMIS Account No. 1CM363 based on an account balance as of the last statement in the amount of $7,192,467 , which the Trustee designated as Claim #009823 (the "Mann Customer Claim"), and Defendant Michael Mann filed claim #009822 on behalf of BAM L.P. for Account No. 1CM579 based on an account balance as of the last statement of $724,533.85 (the "BAM Customer Claim," and together with the Mann Customer Claim, the "Customer Claims"). *See* Answer ¶ 51-52. On or about August 28, 2009, the Trustee issued a Notice of Trustee's Determination of Claim with respect to the Mann Customer Claim (the "Mann Determination"). *Id.* ¶ 53. On or about October 19, 2009, the Trustee issued a Notice of Trustee's Determination of Claim with respect to the BAM Customer Claim (the "BAM Determination," and together with the Mann Determination, the "Determinations"). *Id.*

On or about September 25, 2009, Defendants Michael Mann and Meryl Mann filed an objection to the Mann Determination (the "Mann Objection"), and Defendant Michael Mann filed an objection to the BAM Determination on behalf of BAM L.P. (the "BAM Objection," and together with the Mann Objection, the "Objections"). *Id.* ¶ 54. In the Objections, the Mann Defendants argued, among other things, that the Trustee's use of the Net Investment Method was improper, his calculation of the money deposited less subsequent withdrawals is "completely unsubstantiated and incorrect," and goes "beyond any limitations period for avoidance of a claim under either state or federal law," and even if his methodology is adopted, the Trustee should

have adjusted his calculation to account for interest and damages caused by Madoff.  *Id.* ¶ 54.

On March 1, 2010, Judge Lifland entered His Memorandum Decision Granting Trustee's Motion For Order (1) Upholding Trustee's Determination Denying Customer Claims For Amount Listed On Last Customer Statement; (2) Affirming Trustee's Determination Of New Equity; And (3) Expunging Objection To Determinations Relating To New Equity.  See ECF No. 1999.  Consistent with that Memorandum Decision, the Bankruptcy Court entered an order, *inter alia,* that (a) "each customer's Net Equity with respect to their customer claims in this SIPA liquidation proceeding shall be calculated using the Net Investment Method rather than the balances listed on the Final Customer Statements," and (b) "the objections to the determinations of customer claims, as listed on Exhibit A to the Trustee's Motion [Dkt. No. 530], are expunged insofar as those objections are based upon using the Final Customer Statements rather than the Net Investment Method to determine Net Equity."  ECF No. 2020 (the "Net Equity Order").  Pursuant to the Net Equity Order, the claims of Michael and Meryl Mann were disallowed to the extent they exceed net equity and the portions of the objections based on last statement were expressly expunged.  The Defendants' remaining objections are pending and unresolved.  The Net Equity Order provided further that the Bankruptcy Court "shall retain jurisdiction with respect to the remainder of the claimants' objections" and "the Trustee shall in due course schedule a hearing or hearings regarding the remainder of the claimants' objections in accordance with the Claims Procedures Order."  *Id.*

On June 1, 2018, the Defendants filed notices to withdraw their Objections on June 1, 2018.[18]  On July 27, 2018, the Trustee moved to strike all the withdrawals, asserting that a

---

[18] *See* Notice of Withdrawal Of Objection To Determination Of Claim, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 1, 2018), ECF Nos. 17630, 17623. These notices were filed after the District Court denied motions to withdraw the reference to the Bankruptcy Court on their asserted

claimant may not unilaterally withdraw its claim or objection under Rule 3006 of the Federal Rules of Bankruptcy Procedure and Rule 41 of the Federal Rules of Civil Procedure.[19] The Bankruptcy Court agreed and, in granting the Trustee's motion, held the withdrawals were "stricken and have no legal effect."[20]

The Trustee has filed Omnibus Motions to Overrule Objections of Claimants Who Invested More Than They Withdrew (*see e.g.*. ECF Nos. 17908 and 18040) based solely on accordance with the decisions of the Second Circuit Court of Appeals in *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 234 (2d Cir. 2011) and *In re Bernard L. Madoff Inv. Sec. LLC*, 779 F.3d 74, 78-79 (2d Cir. 2015) and *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 522 B.R. 41, 54 n.9 (Bankr. S.D.N.Y. 2014). These decisions disposed of the claimants' assertions in their objections that (i) the Trustee improperly determined net equity based on the cash in/cash out method (the Net Investment Method"); (ii) the Trustee should have made adjustments to net equity to account for the length of time Claimants were invested with BLMIS (the "Time-Based Damages Adjustment"); and (iii) the Trustee should have made adjustments to net equity to account for Claimants' payments in compliance with the Internal Revenue Code (the "Tax-Based

---

right to a jury trial filed in three of the Trustee's other avoidance actions. *See Picard v. Saren-Lawrence*, No. 17 Civ. 5157 (GBD), 2018 WL 2383141 (S.D.N.Y. May 15, 2018), *recons. denied sub nom.*, 2018 WL 4659476 (S.D.N.Y. Sept. 11, 2018) (the "*Saren-Lawrence Action*"). Judge George B. Daniels ruled that because the defendants filed claims against the BLMIS estate and objections to the Trustee's determinations of those claims, for which "the Bankruptcy Court will have to determine whether the transfers to the [d]efendants are voidable on the grounds that they are actually or constructively fraudulent under 28 U.S.C. § 548. The resolution of that issue will also determine the result of the Adversary Proceedings, which seek the return of a portion of the funds transferred to the [d]efendants on the same grounds." *Id.* at *5. The Defendants were not parties to this proceeding.

[19] *See* Trustee's Motion To Strike The Notices Of Withdrawal Of Claim And Notices Of Withdrawal Of Objection To Determination Of Claim Filed By Chaitman LLP And Dentons US LLP, *In re: Bernard L. Madoff*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. July 27, 2018), ECF No. 17864

[20] Order Granting Trustee's Motion to Strike The Notices of Withdrawal of Claim and Notices of Withdrawal of Objection to Determination of Claim filed by Chaitman LLP and Dentons US LLP (the "Order Granting Motion To Strike"), *In re Bernard L. Madoff Inv. Sec., LLC*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. Oct. 4, 2018), ECF No. 18051.

Adjustment"). The Defendants claims were not subject to any of these omnibus motions and rulings.

## III.    **STIPULATED FACTS**

For purposes of the trial of this adversary proceeding, the parties hereby stipulate as follows:

### *BLMIS and Madoff*

1.      On the Filing Date, Madoff was arrested for violating numerous federal securities laws.  *See* Answer ¶ 12 (referring "the Court to the filings and pleadings in the various referenced actions relating to Madoff and BLMIS for the complete contents therein"). Contemporaneously, the SEC commenced proceedings against BLMIS and Madoff in the United States District Court for the Southern District of New York (the "District Court") in a case captioned *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791.  On December 15, 2008, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC") pursuant to Section 78eee(a)(4)(A) of the Securities Investor Protection Act, 15 U.S.C. § 78aaa, et seq. ("SIPA").  Pursuant to section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court asserting that BLMIS was not able to meet its obligations to securities customers as they became due and thus its customers needed the protections afforded by SIPA.

2.      On December 15, 2008, the District Court granted the SIPC application and entered an order pursuant to SIPA which, in relevant part, (i) appointed the Trustee the trustee for the liquidation of BLMIS pursuant to section 78eee(b)(3) of SIPA; (ii) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA, and (iii) removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.   The Trustee is

disinterested party in the Liquidation Proceeding and in this adversary proceeding, and is duly qualified to serve and act on behalf of the estate of BLMIS.

3.    During the relevant period in this adversary proceeding, BLMIS was headquartered in the Lipstick Building, located at 885 Third Avenue, New York, New York and operated its Investment Advisory business in that location.    At some point, BLMIS was registered with the Securities and Exchange Commission as a broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b).    *See* Answer ¶ 23.    In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration, which represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion.    *See* Answer ¶ 35 (referring the Court to the referenced Application "for the complete contents therein").

4.    On March 12, 2009, Madoff admitted to the fraudulent scheme and pled guilty to an eleven-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York., including securities fraud by the use of manipulative and deceptive devices in connection with the purchase or sale of a security pursuant to 15 U.S.C. §§78j (b) and 78  and C.F.R. Section 240.10b-5, and investment advisor fraud and on March 10, 2009, Madoff pled guilty to all counts.    *Id.* ¶¶ 1, 12 (referring the Court to the relevant transcript dated March 12, 2009, and "other filings and pleadings in that case for the complete contents therein").    At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."    Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009), ECF No. 50; *see also* Answer ¶17 (referring the Court to the plea allocution).    Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."    *Id.*    Madoff was

sentenced on June 29, 2009 to 150 years in prison. On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme, and admitted that the fictitious scheme had begun at BLMIS since at least the 1980s. or 1990's  Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), ECF No. 11; *see also* Answer ¶17 (referring the Court to the plea allocution).

### *Defendants*

5.    In December 1995, Defendants Michael Mann and BAM L.P. opened their first accounts at Bernard L. Madoff Investment Securities ("Madoff Securities"), organized as a sole proprietorship. The Mann Account was assigned account number 1CM363 in the name of "Michael Mann and Meryl Mann J/T Wros." (the "Mann Account"). Defendants Michael Mann and Meryl Mann are joint tenants of the "Michael Mann and Meryl Mann Joint Tenancy with Right of Survivorship" and beneficial owners of the Mann Account, with an account address in Great Neck, New York. *See* Answer ¶¶ 2, 8-9. Michael Mann subsequently opened another account at Madoff Securities in March 1999, assigned account number 1CM579 in the name of "BAM, L.P." (the "BAM Account, and together with the Mann Account, again the "Accounts"). Defendant Michael Mann opened both accounts, and is the sole general partner of BAM L.P. *See* Answer ¶¶ 2, 8. Marked as TX-00198-200; TX00208-210 are true and accurate copies of the Customer Agreement, Trading Authorization forms, and the Option Agreement executed by the Defendants in connection with the Accounts.

6.    In 2001, Madoff Securities was reorganized as a single member LLC with Bernard Madoff as the sole member. Marked as DX-0000X is a true and accurate copy of the New York State Department of Corporations filing report.

7.    The Defendants received monthly account statements, trade confirmations, quarterly portfolio management reports, and other communications from Madoff Securities and BLMIS for the Accounts. *See* Answer ¶¶ 26, 32.  Over the years, Defendant Michael Mann deposited money in the Accounts with Madoff Securities and BLMIS the and also withdrew funds from the Accounts, the complete transactional history for which is listed in Exhibit B to the Complaint. *Id.* ¶ 43. The Defendants continued to use the Accounts as their brokerage accounts through the time BLMIS ceased operations on or about December 11, 2008. Prior to BLMIS's collapse, the Defendants did not have any knowledge or notice of any wrongdoing or fraudulent intent on the part of BLMIS.

8.    As set forth in the Exhibit B to the Complaint, Defendant Michael Mann deposited a total of $14,850,000 into the Mann Account and withdrew a total of $20,650,000 from the Mann Account.  Of the withdrawals from the Mann Account, a $2,250,000 of these withdrawals (the "Mann Two-Year Transfers") took place within the two-year period prior to December 11, 2008 (the "Two-Year Period").  Columns 4 and 5 of Exhibit B to the Complaint accurately reflects all the deposits made into, and withdrawals from the Mann Account, and Defendant Michael Mann admits he has received all the withdrawals listed therein. *See* Exhibit B to the Complaint; *see also* TX-00231, No. 6 at p. 10, No. 5, at p. 9, No. 8 at p. 11; TX-00232, No. 5, at p. 8-9; TX-00233, No. 1-2 at p. 5; TX-00234, No. 1-2 at p. 4; TX-00261.

9.    For the BAM Account, between March 26, 1999 and December 11, 2008, Defendant Michael Mann, on behalf of BAM L.P., deposited a total of $1,920,007 into the BAM Account and withdrew a total of $3,551,000 from the BAM Account.  Of the withdrawals from the BAM Account, and $563,000 of these withdrawals (the "BAM Two-Year Transfers") took place within the Two-Year Period.  Columns 4 and 5 of Exhibit B to the Complaint accurately

reflects all the deposits made into, and withdrawals from the BAM Account, and Defendants Michael Mann and BAM L.P. have received all the withdrawals listed therein. *See* Exhibit B to the Complaint; *see also* TX-00233, No. 5-7 at p. 5; TX-00235, No. 1-2, at p. 4; TX-000262.

10.    On November 30, 2006, the Statement for the Mann Account showed securities with a stated value of $6,305,190. Thereafter, Michael Mann on January 4, 2007, Michael Mann deposited by wire transfer an additional $1,500,000 into the Mann Account. Marked as trial exhibits DX-0000X-DX-00000X is a true and accurate copy of the Account Statement for the Mann Account as of 11/30/2006. From December 11, 2006 through December 11, 2008, Michael Mann withdrew $2,250,000. The last withdrawal from the account was on October 24, 2007.

11.    On November 30, 2006, the statement for the BAM Account at BLMIS showed an account balance of $1,091,836. Thereafter, from December 11, 2006 through December 11, 2008, BAM L.P. withdrew $563,000. Marked as trial exhibits DX-0000X-DX-00000X is a true and accurate copy of the Statement Report for the BAM Account as of 11/31/2000.

12.    On June 17, 2009, Defendants Michael Mann and Meryl Mann filed the Customer Claims for their Accounts. *See* Answer ¶ 51-52. On August 28, 2009, the Trustee issued the Mann Determination, and on October 19, 2009, the BAM Determination. *Id.* ¶ 53. On September 25, 2009, Defendants Michael Mann and Meryl Mann filed their Objections to the Determinations. *Id.* ¶ 54. Marked as trial exhibits TX-00201-203, TX-00213-216 are true and accurate copies of the Customer Claims, Determinations, and Objections filed by the Defendants in connection with the Accounts.

13.    On June 1, 2018, the Defendants filed notices to withdraw their Objections, which the Trustee moved to strike on June 27, 2018. On October 4, 2018, the Bankruptcy Court granted

the Trustee's motion, striking the withdrawals of the Defendants' Objections as "hav[ing] no legal effect."[21]

## IV.    PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties.

### A.    The Trustee's Contentions

1.    For decades, Madoff operated a fraudulent scheme through BLMIS. BLMIS did not execute any of the trades reported on the monthly account statements for the Account. Throughout the two-year period preceding the Filing Date, BLMIS was insolvent.

2.    The Defendants' Customer Claims and Objections remain pending and therefore, the Bankruptcy Court has adjudicative authority to enter a final judgment on the Trustee's fraudulent transfer claim against the Defendants.

14.    As set forth in the Expert Report of Matthew B. Greenblatt, which has been marked as trial exhibit TX-00221, between January 2, 1996 and December 11, 2008, and Exhibit B to the Complaint, Defendant Michael Mann deposited a total of $14,850,000 into the Mann Account and withdrew a total of $20,650,000 from the Mann Account. Of the withdrawals from the Mann Account, a total of $5,800,000 was withdrawn by Defendant Michael Mann in excess of the principal, representing fictitious profits, and $2,250,000 of these withdrawals (the "Mann Two-Year Transfers") took place within the two-year period prior to December 11, 2008 (the "Two-Year Period"). Columns 4 and 5 of Exhibit B to the Complaint accurately reflects all the deposits made into, and withdrawals from the Mann Account, and Defendant Michael Mann agrees he has received all the withdrawals listed therein. *See* Exhibit B to the Complaint; *see*

---

[21] *See* Notice of Withdrawal Of Objection To Determination Of Claim, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 1, 2018), ECF Nos. 17630, 17623.

*also* TX-00221; TX-00231, No. 6 at p. 10, No. 5, at p. 9, No. 8 at p. 11; TX-00232, No. 5, at p. 8-9; TX-00233, No. 1-2 at p. 5; TX-00234, No. 1-2 at p. 4; TX-00261.

15.    For the BAM Account, between March 26, 1999 and December 11, 2008, Defendant Michael Mann, on behalf of BAM L.P., deposited a total of $1,920,007 into the BAM Account and withdrew a total of $3,551,000 from the BAM Account. Of the withdrawals from the BAM Account, a total of $1,135,993 was withdrawn by Defendant Michael Mann in excess of the principal, representing fictitious profits, and $563,000 of these withdrawals (the "BAM Two-Year Transfers"), took place within the Two-Year Period. Columns 4 and 5 of Exhibit B to the Complaint accurately reflects all the deposits made into, and withdrawals from the BAM Account, and Defendants Michael Mann and BAM L.P. have received all the withdrawals listed therein. *See* Exhibit B to the Complaint; *see also* TX-00221; TX-00233, No. 5-7 at p. 5; TX-00235, No. 1-2, at p. 4; TX-00262.

3.    As set forth in the Expert Report of Lisa Collura, which has been marked as trial exhibit TX-00220, all of the deposit and withdrawal cash transactions reflected in the monthly account statements for both Accounts actually took place as evidenced by, and reconciled through a review of, BLMIS bank records, records relating to the bank accounts that Defendants held at State Street[22] and Deutsche Bank Trust Company Americas, and/or the expert opinion reached by Lisa Collura.

4.    As further established by the analysis and findings set forth in the Expert Report of Lisa Collura relating to BLMIS bank records, BLMIS used monies deposited by its new customer monies to fund withdrawals taken by its older customers.

5.    As set forth in the Expert Report of Bruce G. Dubinsky, which has been marked

---

[22] In 2003, State Street acquired parts of Deutsche Bank's Global Securities Services business.

as trial exhibit TX-00223 (i) there was pervasive fraud at BLMIS, (ii) during all periods relevant in this adversary proceeding, BLMIS was operating a Ponzi scheme through its IA Business, and (iii) BLMIS was insolvent as of December 11, 2002.  The evidence – which establishes that the IA Business was a Ponzi scheme – includes, but is not limited to the following: (i) BLMIS utilized new customer monies to fund its operations, as well as to fund the withdrawal of fictitious profits and principal for its older customers; (ii) the IA Business was not generating any profits since no trading activity was taking place; (iii) the IA Business was not receiving financial support from the other business units of BLMIS in amounts to satisfy the cash requirement needs of the IA Business customer withdrawals; and (iv) the IA Business was not receiving any outside financial support vis-à-vis loans or others.  As a result, BLMIS made each of the Two-Year Transfers to the Defendants during the Two-Year Period with the actual intent to hinder, delay or defraud some or all of its then existing and/or future creditors within the meaning of Section 548(a)(1)(A) of the Bankruptcy Code.

6.    The Two-Year Transfers are all avoidable under Section 548(a)(1)(A) of the Bankruptcy Code.  BLMIS made each and every one of the Transfers with the actual intent to hinder, delay or defraud some or all of its then existing and/or future creditors.  *See, e.g., Omnibus Good Faith Decision*, 531 B.R. at 471 ("Once it is determined that a Ponzi scheme exists, all transfers made in furtherance of that Ponzi scheme are presumed to have been made with fraudulent intent."); *Picard v. Merkin (In re BLMIS)*, No. 11 MC 0012 (KMW), 2011 WL 3897970, at *4 (S.D.N.Y. Aug. 31, 2011); *Christian Bros. [High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)]*, 439 B.R. [284], 306 n.19 [(S.D.N.Y. 2010)]; *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007).").

7.      The Defendants did not provide any value, within the meaning of Section 548(c),

in return for any of the Two-Year Transfers, because each Two-Tear Transfer consisted of

fictitious profits from the Ponzi scheme and therefore was nothing more than the money of other

BLMIS customers. *See Antecedent Debt Decision*, 499 B.R. at 425-26; *Omnibus Good Faith*

*Decision*, 531 B.R. at 470-72.

### *Prejudgment Interest*

8.      Pursuant to Section 550(a), the Trustee is entitled to recover the Two-Year

Transfers, or the value thereof, from the Defendants.  The Trustee is additionally entitled to

prejudgment interest on each of the Transfers. *See, e.g., Savage & Associates, P.C. v. Mandl (In*

*re Teligent Inc.)*, 380 B.R. 324, 344 (Bankr. S.D.N.Y 2008) ("The award of pre-judgment

interest is discretionary, and absent a sound reason to deny it, it should be awarded."); Michael S.

Knoll, *A Primer on Prejudgment Interest*, Tex. L. Rev., Vol. 75, No. 2 (1997) (awarding of

prejudgment interest promotes settlement and prevents unjust enrichment).   In determining

whether to award prejudgment interest, the Second Circuit has directed the courts to consider

four factors:

> the need to fully compensate the wronged party for actual damages
> suffered, (ii) considerations of fairness and the relative equities of the
> award, (iii) the remedial purpose of the statute involved, and/or (iv) such
> other general principles as are deemed relevant by the court.

*Lowrey*, 2018 WL 1442312, at *15 (citing *McHale v. Boulder Capital LLC (In re 1031 Tax Grp.,*

*LLC* ), 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010) (quoting and applying the criteria set forth in

*Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955

F.2d 831, 833-34 (2d Cir. 1992) to an award of prejudgment interest in connection with an

avoided fraudulent transfer)).

9.     The Defendants have been on notice of the Ponzi scheme since the day BLMIS collapsed and Madoff was arrested on December 11, 2008. At the very latest, the Defendants knew they were "net winners," or in possession of funds that belonged to other people, or otherwise were recipients of avoidable transfers, when the Trustee filed his avoidance actions against the Defendants in 2010. Thus, at a minimum, the Defendants have known for ten years that the transfers they received (1) were sought by the Trustee as fraudulent transfers, and (2) were not generated from any purported securities investments, but rather were funds that Madoff took from other people to pay the Defendants and other net winners. Despite this knowledge, the Defendants have benefitted—and continue to benefit—from the fraudulent transfers in their possession for the entire duration of this litigation, to the clear detriment of the net loser BLMIS victims. Under these facts, the Trustee is entitled to an award of prejudgment interest on the fraudulent transfers received by the Defendants.

**B.     The Defendants' Contentions**

1.     Notwithstanding the characterization of adversary proceeding as a core proceeding, under Supreme Court precedent, the Court lacks jurisdiction to enter a final order in the proceeding absent consent of the parties as the Defendants have no pending claims.

2.     This is a securities fraud case brought within the administration of a statute (SIPA) that was expressly made an amendment to and part of the Securities Exchange Act of 1934 ("1934 Act").[23] Federal securities law and the admission of the Defendants' good faith provide a complete defense to the Trustee's avoidance claims. The Section 28(a)(2)[24] of the

---

[23] 15 U.S.C. §78bbb states: "Except as otherwise provided in this Act, the provisions of the Securities Exchange Act of 1934 (15 U.S.C., sec. 78a and fol.; hereinafter referred to as the "1934 Act") apply as if this Act constituted an amendment to, and was included as a section of, such Act.

[24] Section 28(a)(2) of the 1934 Act (15 U.S.C. §78bb) states: "Except as provided in subsection (f), the rights and

1934 Act preserves a customer's state law rights and remedies to their securities entitlements and tort remedies and Section 29(b) of the 1934 Act voids a contract against the person who violates securities laws, but preserves the right of enforcement by any person to or for whom any broker or dealer sells, or for whom any broker purchases, a security in violation of any rule or regulation governing the conduct of a broker/dealer. As the Second Circuit held in the *Section 546(e) Decision* in determining that the defense applied to the customer transactions in BLMIS "whether an agreement satisfies the definition of '"securities contract"' does not depend on the broker's performance, because a breach of a contract neither changes nor nullifies the nature of the underlying agreement. The existence of a securities contract is not vitiated because a broker fails to make good on his commitment. 773 F.3d at 420.

3.      The Second Circuit explicitly held that each payment sought to be avoided by the Trustee from an innocent customer of Madoff Securities constituted a valid "settlement payment" or a payment made "in connection with a securities contract" under Section 546(e) of the Bankruptcy Code even though the securities might never have been purchased. *Id* at 418. This decision sets the predicate for adjudicating this adversary proceeding as securities fraud case and the Defendants rights and remedies determined by securities laws.

4.      The necessary corollary of the Court's determination is that each such settlement payment or payment "in connection with a securities contract" from Madoff Securities satisfied the broker's legal obligation to the innocent customer established as matters of state and federal securities law, thereby establishing the customer's right to withdraw and retain any amount up to the total balance reported on the customer's statements and trade confirmations.

---

remedies provided by this chapter shall be in addition to all other rights and remedies that may exist at law or in equity."

5.       In the *Section 546(e) Decision*, the Court rejected the Trustee's contention that the

transfers should not be shielded from avoidance under section 546(e) because BLMIS may have

"never initiated executed, completed, or settled the securities transactions contemplated by the

customer agreements," that the transfers were not "made in connection with a securities contract"

or "settlement payment[s]" as those terms are defined in § 741, and that "permitting the

application of § 546(e) in this case would be tantamount to giving legal effect to Madoff's fraud.

*See In re BLMIS*, 654 F.3d 229, 235 (2d Cir. 2011)." *Id.* at 417.    The Second Circuit

held "whether an agreement satisfies the definition of 'securities contract' does not depend on

the broker's performance, because a breach of a contract neither changes nor nullifies the nature

of the underlying agreement. The existence of a securities contract is not vitiated because a

broker fails to make good on his commitment." *Id* at 420.    The Court further held "In our earlier

decision, we interpreted 'net equity' in a manner that would harmonize it with the SIPA statutory

framework as a whole....Section 546(e), however, is part of the Bankruptcy Code, not SIPA, and

was not at issue in *In re BLMIS.*" *Id.* at 423.

6.       At the time of the transfers, the Defendants held an enforceable state law right

against BLMIS to full payment of their securities entitlements under Section 8-501(b)(1)[25] of the

New York Uniform Commercial Code reported by BLMIS to them in their statements,

confirmations and other communications.  Defendants' state law rights were valid, unavoidable

obligations of BLMIS.  Thus, at the time of each withdrawal, BLMIS was indebted to each

Defendant for the reported amount of their securities even if the securities had not been

---

[25] Section 8-501(b) of the Uniform Commercial Code states: "...a person acquires a security entitlement if a
securities intermediary: (1) indicates by book entry that a financial asset has been credited to the person's securities
account. . . or . . . (3) becomes obligated under other law, regulation or rue to credit a financial asset to the person's
securities account."

purchased "Value," within the meaning of section 548(c), was provided by the satisfaction of that debt.

7.    The value defense under Section 548(c) is a limitation placed on the Trustee by SIPA, which has simply borrowed the bankruptcy avoidance provisions wholesale. See SIPA § 8(c)(3), 15 U.S.C. § 78fff– 2(c)(3) (SIPA trustee may recover customer property only "if and to the extent that such transfer is voidable or void under the provisions of title 11."); *Picard v. Greiff*, 476 B.R. 715, 722 n.7 (S.D.N.Y. 2012) ("SIPA expressly incorporates the limitations Title 11 places on [a] trustee's powers…."). Neither section 548(c) of the Bankruptcy Code or any provision of SIPA(or any reported decision under SIPA ) imports a Ponzi scheme construct that strips the Defendants of their defenses or their remedies under federal and state securities laws.

8.    Section 29(b) of the 1934 Act expressly permits an innocent victim of a fraud to elect to stand on his contractual rights even where they have been procured by the counterparty's fraud or, alternatively, to maintain an action for money damages against the counterparty—here, for example, based on Madoff Securities' fraudulent brokerage account statements and transfer confirmations. *See Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 388-89 (1970) (the aggrieved party may elect to sue for damages under section 29(b) rather than rescind the contract); *Freeman v. Marine Midland Bank-New York*, 419 F. Supp. 440 (E.D. N.Y. 1976) ("[Section 29(b)] make[s] [fraudulent] contracts voidable at the option of the innocent party. This interpretation has permitted the investor, at his option, to void the contract as a defense to a lender's suit, to sue on the contract for damages, to enforce the contract, or to seek rescission."); *Kardon v. National Gypsum Co.,* 69 F. Supp. 512, 514 (E.D. Pa. 1946) ("Congress meant the original statute to be interpreted as providing for civil suits under it. …. [And] such suits would

include not only actions for rescission but also for money damages."); *Cant v. A.G. Becker &*
*Co.*, 384 F. Supp. 814, 816 (N.D. Ill. 1974)(in lieu of the rescission remedy under Section 29(b),
the plaintiff is entitled to an award of monetary damages, interest, and costs to restore him to the
position he would have been had it not been for the defendant's wrongful activity, i.e., to be
"placed in a posture which assumes that he had the opportunity to utilize his funds in a
reasonable manner."). *See also Visconsi v. Lehman Bros.*, 244 F. Appx. 708 (6th Cir. 2007)
(Court upheld an arbitration award against Lehman for $10 million in excess of the amount
withdrawn, flatly rejecting the Lehman's arguments that plaintiffs could not recover more than
they invested or the amounts

9.    The account histories of the Mann Account and the BAM Account are at odds
with Trustee's characterization of the brokerage account as a classic Ponzi scheme. First, the
accounts were brokerage accounts, not an investment scheme that promised a high return at a
fixed time. The returns on the Accounts show that they were not induced to invest or stay
deposited by the promise of quick or exorbitant rates of return. The Defendants were free to
deposit and withdraw from their accounts at any time and did so. The Defendants are not early
depositors who were taken out by later depositors. They stayed in the Accounts from the initial
investment through the period when the fraud was uncovered. The Trustee has no evidence that
Madoff solicited new customers to pay off the old customers. It also appears that Madoff kept
billions of dollars in US Treasury Securities and other securities purchased with customer funds
and held in both proprietary accounts and BLMIS accounts to meet redemptions. These
securities match securities on customers' statements. In addition, JPM Chase statements reveal
that the so-called 703 account held billions of dollars that were invested and reinvested in
commercial paper and short term derivative as well as the treasuries. Until the market collapse in

- 28 -

late 2008, Madoff was always able to meet the customer redemptions.  Finally, the Trustee has admitted that the other parts of the BLMIS business were "largely involved in legitimate trading with institutional counterparties."  *See e.g.,* Declaration of Joseph Looby In Support of Trustee's Motion for Order Upholding Trustee's Determination Denying Customer Claims For Amounts Listed On Last Customer Statement, Affirming Trustee's Determination Of Net Equity, And Expunging Those Objections With Respect To the Determinations Relating to Net Equity at ¶ 28 *In re: Bernard L. Madoff*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. Oct. 16, 2009), ECF No. 524-1 ("The money making and proprietary trading business units appear to have been largely involved in legitimate trading with institutional counterparties and utilized live computer systems including House 5 AS/400 and trading platforms that interfaces with multiple third party feeds and outside data sources often necessary for trading. BLMIS employees a sizeable information technology staff to support and maintain these trading platforms, as well as other technology associated with these business units.").

10.    Virtually all of the withdrawals from the Mann Account and BAM Account were made by checks from the account of Bernard L. Madoff.  Michael Mann's last deposit in the Mann Account occurred in January 2007.  The last withdrawal from the Mann Account was in October 2007.

11.    According to the Portfolio Management Reports produced for the Mann Account, the annualized rate of interest earned on the deposits was not exorbitant and did not exceed 13.62% during the time the account was administered by BLMIS.  The average return did not significantly exceed the average return on the S & P 500 stocks for the same period.

12.    According to the Portfolio Management Reports produced for the BAM Account, the annualized rate of interest earned on the deposits was not exorbitant and did not exceed 14.4

% during the time the account was administered by BLMIS.  The average return did not significantly exceed the average return on the S & P 500 stocks for the same period.

13.    Pursuant to section 548(a) of the Bankruptcy Code, the Trustee cannot look back past the two years from the filing of the case to begin his avoidance calculation On November 30, 2006, the Statement for the Mann Account showed securities with a stated value of $6,305,190.  Thereafter, Michael Mann on January 5, 2007, Michael Mann deposited by wire transfer an additional $1,500,000 into the Mann Account.  Accordingly, as of December 11, 2008, BLMIS had outstanding, unavoidable obligations to the Mann Account holders of more than $7,800,000.  Marked as trial exhibits DX-0000X-DX-00000X is a true and accurate copy of the Account Statement for the Mann Account as of 11/30/2006 From December 11, 2006 through December 11, 2008, Michael Mann withdrew only $2,250,000.  The last withdrawal from the account was on October 24, 2007.  Based on the calculation, the Defendant would have a complete defense to the Trustee's claim.

14.    Pursuant to section 548(a) of the Bankruptcy Code, the Trustee cannot look back past the two years from the filing of the case to begin his avoidance calculation. On November 30, 2006, the statement for the BAM Account at BLMIS evidenced obligations to BAM L.P. of $1,091,836. Thereafter, from December 11, 2006 through December 11, 2008, BAM L.P. withdrew only $563,000. Marked as trial exhibits DX-0000X-DX-00000X is a true and accurate copy of the Statement Report for the BAM Account as of 11/31/2000. Based on the calculation, the Defendant would have a complete defense to the Trustee's claim.

15.    In sum, the characteristics that are cited as the essential features of Ponzi schemes:  (1) little or no legitimate underlying business; (2) the promise of exorbitant returns; (3) early scheduled payment of such returns to early (or "top") investors; (4) the need to attract new

money in order to pay the exiting top investors; and (5) the scheme's inevitable failure. *See Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.)*, 309 F.3d 1325, 1327 n. 2 (11th Cir. 2002);. *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 482-84 nn. 2 and 7 (D. Conn. 2002); *Balaber-Strauss v. Lawrence*, 264 B.R. 303, 305-06 (S.D.N.Y. 2001) are not essential features of the BLMIS fraud. Although the Trustee freely tosses around the Ponzi scheme label, there is little hard evidence of the factors that would justify calling a securities fraud, where the sole evidence is that customer statements were falsified, a Ponzi scheme.

16.    The Trustee cites certain decisions in the main case and in various adversary proceedings as evidence that the Ponzi scheme is well established. However, none of these decisions was presented with evidence of BLMIS operations or asked to determine whether BLMIS was a Ponzi scheme. In each case, the courts merely accepted the allegations of the trustee's complains as true in the context of a motion to dismiss, the defendants did not contest the label "Ponzi scheme" because there is no Ponzi scheme exception to section 548(c) defense or they adopted a public view of the BLMIS operations for purposes of administering the net equity.

17.    The "Ponzi scheme" label actually attached to this case well before law enforcement officials or the Trustee conducted any factual investigations. The initial criminal complaint alleging one count of securities fraud was based on an FBI report of a contentions by two senior employees of the proprietary trading company (Madoff's sons) that Madoff had confessed to running a "giant Ponzi scheme." *See* Complaint, 08 MAG 2735 (S.D.N.Y. Dec. 11, 2008). When Madoff used the term "Ponzi scheme," he invariably used it as the term is used to describe virtually every fraud, without any sense of the legal construct or implications behind the term. The Ponzi scheme label is essential for the Trustee to take the unprecedented step of using

the SIPA statute that was intended to protect innocent customers in the event of a broker fraud to pursue them.

18.    In addition to the defenses under section 548(c) of the Bankruptcy Code which forecloses the Trustee's recovery, the two-year statute of repose in Section 548(a)(1) bars the Trustee from avoiding or failing to honor and credit BLMIS's obligations to Defendants – *i.e.*, the debts for the securities entitlements positions owed to Defendants based on Madoff Securities' written crediting of securities to Defendants' accounts -- as they existed on December 10, 2006 as evidenced by the November 30, 2006 account statements and described above. *See Ogle v. JT Miller, Inc. (In re HDD Rotary Sales, LLC)*, 512 B.R. 877, 886 (Bankr. S.D. Tex. 2014) ("transfers [were] not avoidable because they were transfers made in satisfaction of unavoidable obligations").

19.    The Court's Findings of Fact and Conclusions of Law in the *Lowrey* Cases are subject to *de novo* review by the District Court. They are opposed by the defendants on the grounds, among others, that a SIPA proceeding is necessarily subject to the 1934 Securities Act (to which SIPA is expressly made part) and state securities law which preserves a broker's customers' rights. Section 548(c), like section 546(e) is a Bankruptcy Code defense that is not limited or defined by net equity calculation to determine allowance of claims. In addition, the defendants contend that Section 548(a)(1) is a statute of repose that limits the Trustee's calculation of avoidance exposure based upon unavoidable obligations to the two years prior to the commencement of the bankruptcy case. The Defendants concur with the defendants' objections to the Court's findings in the Lowrey cases.

20.    As shown above, if the calculation of the deposits and withdrawals begins at the December 2006, with the statements sent to Michael Mann and BAM, there is no over-

withdrawal for the Trustee to collect. While the Defendants are foreclosed from asserting a claim against the customer fund, the calculation from the 2006 account balance establishes a defense to the Trustee's avoidance claims.

21.    The Defendants do not agree that Mann and BAM Customer Claims are pending claims. First, the Mann SIPA claims for net equity were rejected by the Bankruptcy Court in the separate claims resolution process established by the Trustee. On March 1, 2010, Judge Lifland entered His Memorandum Decision Granting Trustee's Motion For Order (1) Upholding Trustee's Determination Denying Customer Claims For Amount Listed On Last Customer Statement; (2) Affirming Trustee's Determination Of New Equity; And (3) Expunging Objection To Determinations Relating To New Equity. *See* ECF No. 1999. Consistent with that Memorandum Decision, the Bankruptcy Court entered an order, *inter alia*, that (a) "each customer's Net Equity with respect to their customer claims in this SIPA liquidation proceeding shall be calculated using the Net Investment Method rather than the balances listed on the Final Customer Statements," and (b) "the objections to the determinations of customer claims, as listed on Exhibit A to the Trustee's Motion [Dkt. No. 530], are expunged insofar as those objections are based upon using the Final Customer Statements rather than the Net Investment Method to determine Net Equity." ECF No. 2020. Pursuant to that Order, long before the adversary proceeding was filed against the Defendants, the claims of Michael and Meryl Mann were determined by net equity and the objections based on last statement were expressly expunged.

22.    Second, the claims have been effectively disallowed by three separate final court orders. The orders in *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 234 (2d Cir. 2011) and *In re Bernard L. Madoff Inv. Sec. LLC*, 779 F.3d 74, 78-79 (2d Cir. 2015) and *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 522 B.R. 41, 54 n.9 (Bankr. S.D.N.Y. 2014)

form the basis for the Trustee's Omnibus Motions to disallow claims of customers and overrule objections in the separate claims proceedings. The disallowance pursuant to the Omnibus Motions is purely ministerial. The orders themselves prevent the assertion of the claim if the Defendants are successful in establishing a defense under federal and state securities laws. In other words, the outcome of the adversary proceeding has no impact on the allowance of a claim.

23.    Finally, the Trustee has severed the claims allowance process from the adversary by establishing the claims allowance procedure and pursuing the issues one by one outside the context of the adversary proceeding. The Trustee has been the beneficiary of the principle here that when the claims allowance process is severed from the adversary proceeding, a party's right to a jury trial is preserved. The District Court upheld the Trustee's right to a jury trial in the face of a similar waiver argument. See *Picard v. Katz*, 825 F. Supp. 2d 484, 486 (S.D.N.Y. 2011) ("Put differently, adjudication of the Trustee's fraudulent transfer claims occurs here apart from the larger regulatory scheme Congress has enacted for "allowance and disallowance" of claims. As a result, that regulatory scheme simply cannot take priority over the Trustee's Seventh Amendment right to a jury trial.... Accordingly, the Trustee's legal claims have not become equitable, and thus he has not waived his right to a jury trial.") (internal citation omitted).

24.    Matthew Greenblatt and Lisa Collura were tasked with validating the transactions in the account and reconciling the transactions to the bank records. Under Federal Rule of Evidence 702, to allow expert witness testimony, a court must also find that "'an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Lynch v. Trek Bicycle Corp,* 374 Fed. App'x 204, 206 (2d Cir. 2010) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir. 2002)); *See also Daubert v. Merrell Dow Pharms.,*

*Inc.,* 509 U.S. 579, 589, 1135 S. Ct. 2786, 2795 (1993). The transactions in the Accounts have been admitted, accordingly their reports and testimony are no longer relevant.

25.    The Expert Report of Bruce G. Dubinsky is a generic report that has nothing to do with the Mann and BAM Accounts. Dubinsky was retained by the Trustee and paid over $30 million to determine (1) whether fraud permeated BLMIS, which included the investment advisory business as well as the market making and proprietary trading business; (2) whether BLMIS was solvent as of December 11, 2002; and (3) whether Madoff Securities International Ltd. was used to facilitate the transfer of funds out of the IA Business. None of these are at issue in this adversary proceeding. Dubinsky does opine that the BLMIS IA Business was a Ponzi scheme. He does so by defining the elements of a classic Ponzi scheme: promises of high returns within a specified time period, proceeds from new investors used to repay and cash out the earlier investor: "Early investors who exit the scheme in time often escape with their principal and a substantial "phantom gain," so called because the gain is just a portion of other investors' principal. It is later investors, and those who have not withdrawn from the scheme, who suffer the fallout upon collapse." Dubinsky Report at 112. Then, Dubinsky finds the facts to support his contention.

26.    Dubinsky relied primarily on the Trustee's directions and select records of BLMIS' businesses. Dubinsky did not interview Bernard Madoff or any of the BLMIS employees. He did not review trading records that were recently produced by the Trustee or that have been referred to in this statement. He concluded there was no trading in any of the investment methods purportedly used by Bernard Madoff without taking into account over the counter trading practice, average market price and other common practices in the securities industry. His testimony is unreliable and should be excluded.

27.    The Trustee cannot avoid and recover the withdrawal payments made to the Defendants because the payments made during the Two year period were made on a bank account held in the name of Bernard L. Madoff not BLMIS.  The Trustee is not the Trustee of the individual or his business as a sole proprietorship and has not authority to avoid transactions of the individual property. *See In re BLMIS,* 557 B.R 89 (Bankr. S.D.N.Y. 2016).  In that case, the Court held that the "debtor" in a SIPA liquidation proceedings is "a member of SIPC with respect to whom an application for a protective decree has been filed under section 78eee(a)(3) of this title." SIPA § 78lll(5). SIPC filed an application for a protective decree against "Bernard L. Madoff Investment Securities LLC," and the District Court's order identifies the Defendant as "Bernard L. Madoff Investment Securities LLC." The predecessor business, which was not a defendant or even mentioned in the District Court's Order, was conducted in the name of Bernard L. Madoff. (Uniform Application for Broker-Dealer Registration (Form BD), dated Jan. 12, 2001, at 9.) The SIPA debtor was BLMIS, the limited liability company, and not Madoff's sole proprietorship, an entity that had no legal existence separate from Madoff.

### *Prejudgment Interest*

28.    The Second Circuit stated in *Wickham Contracting Co.*, 955 F.2d at 834 that although discretionary awards of prejudgment interest are permissible under federal law in certain circumstances, the award should be a function of (1) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other principles as are deemed relevant by the court. The Court cautioned that prejudgment interest should not result in over-compensation such as when the statute, as here, fixes damages deemed fully compensatory as a matter of law.   Prejudgment interest is inappropriate when the

defendants, like the Defendants here, acted innocently and had no reason to know the wrongfulness of their actions. *Id.*

29.    The Defendants are also victims.   The balances in their account in 2008, as reflected on their Claims, represent a substantial part of the money they would have earned had they invested with a legitimate broker.   The annualized rate return for S &P 500 stocks for the period of time that the accounts remained with BLMIS was greater than 10% even with the disastrous 2008 year.   .In effect, the remaining balances in the Accounts on December 11, 2008 represent the Defendants' loss as a result of the fraud by their broker. See DX-00000x (chart of annualized return for S &P 500.  In addition, the Defendants paid tax on their gains totaling more than $3,000,000 that was not recouped.  To add prejudgment interest in the face of real economic losses would be unnecessarily punitive. In sum, the factors outlined by the Second Circuit weigh against award of prejudgment interest in this case.

30.    The Defendants had no reasons to believe that their claims would not be allowed based on the precedent in other SIPC cases or that the Trustee would pursue innocent customers for the return of ordinary withdrawals.   Unlike the insiders and select BLMIS customers, including the four families, the Defendants had not received any special treatment for their accounts.    Moreover, the Defendants had no reason to believe that the Trustee would fundamentally ignore the policy and protections of SIPA to pursue them and saw no case law precedent where a SIPA trustee had pursued innocent customers.

## V.    **ISSUES TO BE TRIED**

The parties anticipate that the following issues will be tried before this Court:

1.    Whether Madoff operated a Ponzi scheme through the Investment Advisory business of BLMIS at all relevant times, and because of the Ponzi scheme:

a. BLMIS acted with the intent to hinder, delay, or defraud its creditors, as provided under 11 U.S.C. § 548(a)(1)(A) and SIPA § 78fff-2(c)(3), in connection with the transfers to the Defendants during the two years preceding the Liquidation Proceeding; and

b. in calculating the Defendants' fictitious profits, the Trustee properly determined that no credit should be given (or removed) for gains (or losses) from Madoff's purported purchases and sales of securities, as reflected on the Investment Advisory business customer statements.

2. Whether the Trustee is entitled to avoid each of the Transfers or Obligations pursuant to Section 548(a)(1)(A) of the Bankruptcy Code.

3. Whether the Trustee is entitled to recover the Two-Year Transfers, or the value thereof, from the Defendants pursuant to Section 550(a).

4. Whether the Mann Action should be tried as a securities fraud case because the Trustee has not established that the fraud is a Ponzi scheme.

5. Whether the Trustee and his experts fail to consider that Madoff conducted operations at BLMIS through various bank and securities accounts and trading units, including conducting valid trading with customer funds, that enabled him to meet all Defendants' redemptions.

6. Whether the Defendants have established a defense under section 548(c) of the Bankruptcy Code.

7. Whether the Trustee should be awarded prejudgment interest based on establishing the factors emphasized by courts in this District.

## VI. THE PARTIES' ANTICIPATED TRIAL EXHIBITS

Exhibit A to the Joint Pre-Trial Order reflects the Trustee's anticipated exhibits[26] in connection with the Parties' factual and legal stipulations as set forth in Section III above. Exhibit B reflects the Defendants' anticipated exhibits during their direct case-in-chief. The Trustee reserves the right to rely upon and introduce any of the Defendants' exhibits, identified in Exhibit B, and/or additional exhibits on the issue of whether the Trustee is entitled to an award of prejudgment interest. Similarly, the Defendants reserve the right to rely upon and introduce any of the Trustee's exhibits, identified in Exhibit A in defense of the Trustee's claims.

## VII.    STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

The parties stipulate to the authenticity and admissibility, respectively, under Federal Rules of Evidence 901 and 803(6), of all of their respective trial exhibits identified in Exhibit A and B.

## VIII.    THE TRUSTEE'S NON-EXPERT WITNESS

During his direct case-in-chief, the Trustee does not intend to call any non-expert witnesses.

## IX.    THE DEFENDANTS' NON-EXPERT WITNESSES

During their case-in-chief, the Defendants anticipate calling the following witness:

1.    Michael Mann

## X.    THE TRUSTEE'S EXPERT WITNESSES

During his case-in-chief, the Trustee call:

1.    Lisa M. Collura, who will testify on the Trustee's proof of transfers to the Defendants as set forth in her expert report dated June 12, 2015;

2.    Bruce G. Dubinsky, who will testify on the Ponzi scheme, BLMIS's insolvency,

---

[26] A description of each exhibit is provided followed by, where applicable, a parenthetical identifying the source of the document or documents.

- 39 -

and other issues as set forth in his expert report dated August 20, 2013; and

3.      Matthew B. Greenblatt, who will testify regarding (a) the principal balance calculations for all BLMIS Investment Advisory accounts as set forth in his expert report dated June 12, 2015, and (b) the principal balance calculation as applied to the Accounts as set forth in his expert report dated June 12, 2015.

## XI.      THE DEFENDANTS' EXPERT WITNESSES

The Defendants will not call any expert witnesses at trial and intend to dispute the admissibility of the Trustee's expert reports and witness testimony.

## XII.     RELIEF SOUGHT BY THE TRUSTEE

The Trustee seeks to avoid and recover from the Defendants $2,813,000.00 in fraudulent transfers, or the value thereof, pursuant to, *inter alia*, §§ 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code and various provisions of SIPA, including § 78fff-2(c)(3). The Trustee seeks, pursuant to federal common law and/or New York Civil Practice Laws and Rules §§ 5001 and 5004, prejudgment interest on the avoidable transfers. Finally, the Trustee seeks such other and further relief as the Court deems just, proper and equitable.

## XIII.    RELIEF SOUGHT BY THE DEFENDANTS

The Defendants seek dismissal of the Trustee's remaining avoidance claim. The Defendants also seek such other and further relief as the Court deems just, proper and equitable.

## XIV.     ESTIMATED TIME OF TRIAL

This Court scheduled the trial of this matter to commence at 11:00 a.m. on December 3, 2018, and continue over the course of the next two days, December 4 and December 5, if necessary. The Trustee estimates it will take two to six hours to present his case-in-chief. The Defendants estimate that it will take two to six hours to present their direct case-in-chief at trial

and to cross-examine the Trustee's witnesses.


Dated: DATE
    New York, New York

**BAKER & HOSTETLER LLP**                    **DENTONS US LLP**


By: /s/ _____                By: /s/ _____
45 Rockefeller Plaza                         Carole Neville
New York, New York 10111                     1221 Avenue of the Americas
Telephone:  212.589.4200                     New York, New York 10020
Facsimile:  212.589.4201                     Tel: (212) 768-6700
David J. Sheehan                             Fax: (212) 768-6800
Email:  dsheehan@bakerlaw.com                Email: carole.neville@dentons.com
Nicholas J. Cremona
Email:  ncremona@bakerlaw.com

                                             *Attorneys for Defendants*

and

811 Main Street, Suite 1100
Houston, Texas 77002-5018
Telephone: 713.751.1600
Facsimile: 713.751.1717
Dean D. Hunt
Email: dhunt@bakerlaw.com

*Attorneys for Plaintiff Irving H. Picard,*
*Trustee for the liquidation of Bernard L.*
*Madoff Investment Securities LLC and the*
*consolidated estate of Bernard L. Madoff*


Dated: _____

**IT IS SO ORDERED:**

                                             _____
                                             **STUART M. BERNSTEIN**
                                             **United States Bankruptcy Judge**