**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Attorneys for ABN AMRO Bank (Ireland) Ltd.*
*(f/k/a Fortis Prime Fund Solutions Bank*
*(Ireland) Ltd.) (n/k/a ABN AMRO Retained*
*Custodial Services (Ireland) Limited) and*
*ABN AMRO Custodial Services (Ireland) Ltd.*
*(f/k/a Fortis Prime Fund Solutions Custodial*
*Services (Ireland) Ltd.)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-05355 (SMB) |
| Plaintiff, | |
| v. | |
| ABN AMRO BANK (IRELAND), LTD, (f/k/a FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED) and | |
| ABN AMRO CUSTODIAL SERVICES (IRELAND), LTD (f/k/a FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO THE TRUSTEE'S MOTION
FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ................................................................................................4

    A.    Factual Background And Trustee's Allegations .....................................4

        1.    Madoff's Fraud ............................................................4
        2.    BLMIS's Bankruptcy And Appointment Of The Trustee ...........4
        3.    Non-Parties Tremont And The Rye Funds, And Their BLMIS-Related Activity .................................................................5
        4.    Defendants And Their Purported BLMIS-Related Activities......6
            a.    The Defendants ..............................................6
            b.    The Non-Defendant Fortis Entities ......................6
            c.    The Defendants And Non-Defendants' Purported BLMIS-Related Activities.......................................7
            d.    The Swap Transactions And The Transfers................8
            e.    Due Diligence Related To The Swap Transaction........10

    B.    Procedural History ..............................................................11

        1.    Good Faith Decision ......................................................11
        2.    546(g) Decision ............................................................12
        3.    Motion For Leave To Amend And Limited Discovery .............12

LEGAL STANDARD .........................................................................................12

ARGUMENT ...................................................................................................13

    A.    Section 550(b) Bars The Trustee's Claims ..........................................14

        1.    The Trustee Failed To Plead Willful Blindness Because The Defendants Did Not Subjectively Believe In A High Probability Of Madoff's Fraud ......................................................15
            a.    The Economic Realities Make The Trustee's Theory Implausible.................................................15
            b.    Allegations Regarding the Alleged State of Mind Years Earlier Does Not Establish The Defendants' State Of Mind At The Time Of The Subsequent Transfers...................17
            c.    The 2003 and 2004 Allegations Do Not Establish Any Belief That BLMIS Was Not Executing Trades Or Was A Ponzi Scheme.................................................18
            d.    The Trustee's Allegations Regarding MeesPierson, Fortis Multi Management And Cadogan Do Not Establish Knowledge .................................................22

i

        e.    Fortis USA Did Not Subjectively Believe BLMIS Was Not Trading Securities .................................................................25

    2.    The PSAC's Allegations Establish That Defendants Did Not Blind Themselves To Madoff's Fraud.................................................26

    3.    Defendants Provided Value For Both Transfers ........................................31

B.    The Trustee Is Barred From Recovering By Section 546 Safe Harbors Except Under Section 548(a)(1)(A), And Cannot Bring a Claim Under Section 548(a)(1)(A) Due To the Bar On Double Recovery ................................32

    1.    All Of the Trustee's Claims Against Tremont Were Barred By The Safe Harbors of Section 546(e) and 546(g) Unless They Were Actual Fraudulent Transfers Within Two Years........................................33

        a.    Section 546(g) Bars All Claims Other Than Those Under Section 548(a)(1)(A) ..................................................................33

        b.    Section 546(e) Bars All Claims Other Than Those Under Section 548(a)(1)(A) ..................................................................34

    2.    Section 550(d) Bars The Trustee From Recovering The Remaining Transfers ...........................................................................37

C.    The Trustee Cannot Avoid the Alleged Transfers Because The Transfers Did Not Deplete The BLMIS Estate ..................................................................39

CONCLUSION.................................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*4Kids Entm't, Inc. v. Upper Deck Co.*,
  797 F. Supp. 2d 236 (S.D.N.Y. 2011)......................................................................29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................13

*In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*,
  991 F. Supp. 2d 479 (S.D.N.Y. 2014)....................................................................23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................13, 37

*In re Brooke Corp.*,
  515 B.R. 632 (D. Kan. 2014)..................................................................................32

*CCED Asset Mgmt. v. Chem. Bank (In re Consol. Capital Equities Corp.)*,
  175 B.R. 629 (Bankr. N.D. Tex. 1994)...................................................................17

*In re Commercial Loan Corp.*
  496 B.R. 730 (N.D. Ill. 2008) ................................................................................32

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
  No. 12-cv-1667, 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014) ...............................23

*Defer LP v. Raymond James Fin., Inc.*,
  654 F. Supp. 2d 204 (S.D.N.Y. 2009).....................................................................25

*Devon Mobile Commc'ns Liquidating Tr. v. Adelphia Commc'ns Corp. (In re
  Adelphia Commc'ns Corp.)*,
  No. 02-41729 (REG), 2006 WL 687153 (Bankr. S.D.N.Y Mar. 6, 2006) ..............39

*Dzikowski v. N. Tr. Bank of Fla., N.A. (In re Prudential of Florida Leasing, Inc.)*,
  478 F.3d 1291 (11th Cir. 2007) ..............................................................................39

*Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund*,
  No. 08 CIV. 11117, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013)................ *passim*

*Ford Motor Credit Co. v. Weaver*,
  680 F.2d 451 (6th Cir. 1982) .............................................................................23, 25

*In re French*,
  440 F.3d 145 (4th Cir. 2006) ..................................................................................39

*Global-Tech Appliances, Inc. v. SEB S.A.,*
    563 U.S. 754 (2011) .......................................................................................................14, 27

*Gowan v. Wachovia Bank, N.A. (In re Dreier, LLP),*
    453 B.R. 499 (Bankr. S.D.N.Y. 2011) ...................................................................................13

*In re Harris,*
    464 F.3d 263 (2d Cir. 2006).....................................................................................................39

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
    Scotland Grp., PLC,*
    783 F.3d 383 (2d Cir. 2015).....................................................................................................12

*Intercontinental Metals Corp. v. Erlanger & Co., Inc.,*
    902 F.2d 1565, No. 89-2626, 1990 WL 64805 (4th Cir. May 1, 1990)...................................40

*Kapila v. SunTrust Mortg., Inc. (In re Pearlman),*
    515 B.R. 887 (Bankr. M.D. Fla. 2014) ...................................................................................38

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,*
    424 F.3d 195 (2d Cir. 2005).....................................................................................................25

*McDowell v. Morgan Stanley & Co.,*
    645 F. Supp. 2d 690 (N.D. Ill. 2009) ......................................................................................35

*Meridian Horizon Fund, LP v. KPMG (Cayman),*
    487 F. App'x 636 (2d Cir. 2012) .......................................................................................21, 22

*Oei v. Citibank, N.A.,*
    957 F. Supp. 492 (S.D.N.Y. 1997)...........................................................................................25

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand,
    LLP,*
    322 F.3d 147 (2d Cir 2003).....................................................................................................31

*In re Parmalat Sec. Litig.,*
    501 F. Supp. 2d 560 (S.D.N.Y. 2007)................................................................................23, 24

*Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.),*
    500 B.R. 371 (Bankr. S.D.N.Y. 2013) ....................................................................................39

*In re Picard, Tr. For Liquidation of Bernard L. Madoff Inv. Sec. LLC,*
    917 F.3d 85 (2d Cir. 2019).......................................................................................................11

*Picard v. Avellino (In re BLMIS),*
    557 B.R. 89 (Bankr. S.D.N.Y. 2016) ......................................................................................35

*Picard v. BNP Paribas, S.A.*,
   594 B.R. 167 (Bankr. S.D.N.Y. 2018)........................................................... *passim*

*Picard v. Ceretti (In re Madoff)* (*Kingate*),
   No. 08-99000 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015)........................37

*Picard v Greiff*,
   476 B.R. 715 (S.D.N.Y. 2012)............................................................................32

*Picard v. Katz*,
   462 B.R. 447 (S.D.N.Y. 2011)................................................................11, 21, 32

*Picard v. Legacy Capital*,
   548 B.R. 13 (Bankr. S.D.N.Y. 2016)........................................................... *passim*

*Picard v. Merkin*,
   581 B.R. 370 (S.D.N.Y. 2017)............................................................................32

*Rosenblum v. Thomson Reuters (Markets) LLC*,
   984 F. Supp. 2d 141 (S.D.N.Y. 2013)....................................................................9

*Scheidelman v. Henderson (In re Henderson)*,
   423 B.R. 598 (Bankr. N.D.N.Y. 2010) ................................................................13

*SIPC v. BLMIS*,
   2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)..............................................15, 34, 35

*SIPC v. BLMIS*,
   505 B.R. 135 (S.D.N.Y. 2013)................................................................12, 33, 34, 39

*SIPC v. BLMIS*,
   516 B.R. 18 (S.D.N.Y. 2014)...................................................................... *passim*

*SIPC v. BLMIS*,
   590 B.R. 200 (Bankr. S.D.N.Y. June 5. 2018) ....................................................12

*In re Tommy Hilfiger Secs. Litig.*,
   No. 04-civ-7678, 2007 WL 5581705 (S.D.N.Y. Jul. 20, 2007)..............................27

*United States v. GAF Corp.*,
   928 F.2d 1253 (2d Cir. 1991)..............................................................................13

*Valentini v. Citi Group, Inc.*,
   837 F. Supp. 2d 304 (S.D.N.Y. 2011)..................................................................25

*Walker v. Bozeman*,
   243 F. Supp. 2d 1298 (N.D. Fla. 2003)................................................................35

*In re Whitley*,
No. 10-10426, 2014 WL 6910837 (Bankr. M.D.N.C. Dec. 8, 2014) ......................................39

## STATUTES

11 U.S.C. § 101(22A)(A)..............................................................................................................34

11 U.S.C. § 544............................................................................................................................3

11 U.S.C. § 546(e) ............................................................................................................ *passim*

11 U.S.C. § 546(g) ............................................................................................................ *passim*

11 U.S.C. § 548(a) .......................................................................................................................3

11 U.S.C. § 548(a)(1)(A) .................................................................................................. *passim*

11 U.S.C. § 548(c) .....................................................................................................................11

11 U.S.C. § 550..........................................................................................................................17

11 U.S.C. § 550(b) ............................................................................................................ *passim*

11 U.S.C. § 550(b)(1)...........................................................................................................14, 31

11 U.S.C. § 550(d) ...........................................................................................................3, 13, 37, 38

15 U.S.C. § 78o(b)(1) ..................................................................................................................4

Investment Funds Act § 13(4).....................................................................................................28

Investment Funds Act § 68 ..........................................................................................................28

Mutual Funds Act, 1995 ..............................................................................................................27

## RULES

Fed. R. Bankr. P. 9017................................................................................................................27

Fed. R. Civ. P. 44.1 ....................................................................................................................27

SEC Rule 15b1-3 ..........................................................................................................................4

## TREATISES

5 Collier on Bankruptcy P 550.03...............................................................................................17

Michael Simmons, SECURITIES OPERATIONS: A GUIDE TO TRADE AND
POSITION MANAGEMENT 365 (John Wiley & Sons, Ltd. ed., 2002) ................................19

# REGULATIONS

Investment Funds Regulation § 17(1)(e) ........................................................................28

Investment Funds Regulation § 17(1)(f) ........................................................................28

Investment Funds Regulation § 17.1(1) .........................................................................28

Mutual Funds Regulation § 4(5) ....................................................................................28

Mutual Funds Regulation § 4(5)(b) ...............................................................................28

Mutual Funds Regulation § 4(5)(c) ................................................................................28

# OTHER AUTHORITIES

Presenting the New ABN AMRO (May 2010), available at
    https://www.abnamro.com/
    en/images/Documents/035_Social_Newsroom/Press_Releases/2010/20100531
    _Introducing_the_
    combination_of_ABN_AMRO_Bank_and_Fortis_Bank_Nederland.pdf...............................6

Press Release, Irving H. Picard, Madoff Trustee Reaches Recovery Agreement of
    $140 Million with Feeder Fund Plaza Investments International & Notz,
    Stucki Management (Bermuda) Limited (June 19, 2015),
    https://www.madofftrustee.com/document/news/000595-sipa-trustee-and-
    sipc-press-release-on-plaza-settlement.pdf.............................................................38

Defendants ABN AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Bank (Ireland) Ltd.) (n/k/a ABN AMRO Retained Custodial Services (Ireland) Limited) ("ABN Ireland") and ABN AMRO Custodial Services (Ireland) Limited (f/k/a Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.) ("ABN Custodial" and together with ABN Ireland, the "Defendants") respectfully submit this memorandum of law in opposition to the Trustee's Motion For Leave To File Second Amended Complaint.  ECF No. 165 ("Motion" or "Mot.").[1] The Trustee's Proposed Second Amended Complaint seeks to recover alleged subsequent transfers to Defendants from Rye Select Broad Market Fund L.P. ("Broad Market") and Rye Select Broad Market XL Fund ("Rye XL," and together with Broad Market, the "Rye Funds").  ECF No. 166 Ex. A ("Proposed Second Amended Complaint" or "PSAC"), in connection with a swap transaction (the "Swap Transaction").

## PRELIMINARY STATEMENT

It is not merely implausible, but incredible, to suggest that Defendants intentionally invested more than $700 million of their own money into the Rye Funds, despite suspecting that Bernard L. Madoff Investment Securities LLC ("BLMIS") was a massive Ponzi scheme.  By the time the dust from BLMIS's collapse had cleared, the Defendants had lost all $700 million they had invested, except for $235.5 million in collateral and $30 million from a single redemption of principal.  This almost $450 million loss made the Defendants among the biggest "net losers" in the Madoff saga.  Remarkably, the Trustee has added insult to injury by attempting to cast the Defendants as willing participants in the scheme that cost them hundreds of millions.  The paltry

---

[1] Unless otherwise specified, all ECF references refer to this action, Adv. Pro. No. 10-05355.

allegations that he has advanced in his newest proposed complaint proves that—despite access to pre-suit discovery—he has no factual basis for his outlandish theory.

First, the Trustee fails utterly to allege facts that (even if true) would establish that Defendants subjectively believed in a high probability that BLMIS was not actually engaging in trades.  It defies common sense that sophisticated financial institutions like the Defendants would willingly invest hundreds of millions of dollars of their own money into suspected Ponzi schemes—and they certainly would have redeemed more than four percent of that investment if they indeed had harbored such suspicions.  Instead, the Trustee's own allegations reveal that the only plausible explanation is that Defendants, like so many other victims, were deceived by Madoff's fraud.  Moreover, even putting aside the economic realities that make the Trustee's theory implausible, the Trustee cites no facts indicating that the Defendants believed BLMIS was not executing trades or was a Ponzi scheme.  Notably, the Trustee includes very few allegations that show *anything* about the Defendants' state of mind at the time of the Swap Transaction. Instead, he relies primarily on:

- emails from years before the relevant time period,
- most of it misleadingly described and excerpted,
- in nearly all cases, among employees of entities other than Defendants, and
- none of which express a belief that BLMIS was not actually trading securities or was a Ponzi scheme.

And beyond these flaws, the Trustee's allegations rely on the same type of red flag, hindsight pleading that this Court has previously held does not suffice to show willful blindness.  *See, e.g., Picard v. BNP Paribas, S.A.*, 594 B.R. 167, 196 (Bankr. S.D.N.Y. 2018).

Second, the PSAC's allegations disprove that Defendants "turned a blind eye."  According to the Trustee, a change in law prompted a non-defendant entity to move its administration of a different fund to avoid new duties to verify that the fund's custodian (BLMIS) was fit and that

BLMIS was executing trades.  But the new law imposed no such duties, and the contemporaneous documents cited reveal no concerns about duties to verify trades.  The only reasonable inference is that the entity sensibly sought to avoid, not a duty to investigate, but rather potential liability for the conduct (including conduct far more common than outright fraud) of multiple third parties outside of its control.  And the Trustee's focus on run-of-the-mill protections in the Swap Transaction documents against the risk of default or loss makes even less sense; these provisions had nothing to do with avoiding information, but with minimizing economic exposure.  More importantly, the PSAC admits that Defendants (and other Fortis entities) in fact engaged in extensive due diligence, asking the very questions the Trustee suggests they turned a blind eye towards.  Because the Defendants received these funds in good faith (and provided value, as discussed below), the Trustee's claims would fail under Section 550(b) of the Bankruptcy Code, and the Motion is futile.

The PSAC suffers from other deficiencies as well, which doom it to futility.  First, the Trustee flatly ignores that he has already recovered from Tremont Partners, Inc. ("Tremont") any funds subject to avoidance—the alleged actual fraudulent transfers within two years under Section 548(a)—and thus is barred by Section 550(d) from obtaining a duplicative recovery from Defendants.  The funds he did not recover—state law fraudulent transfer claims under Section 544 from outside the two year period—are barred under the statutory safe harbors codified in Sections 546(e) and 546(g).  Second, he is also barred from recovery because the transactions did not deplete the estate, given that Defendants invested almost three times the amount of those transfers back into the BLMIS estate in transactions the District Court has already held were an integrated whole.

For all of these reasons, the Trustee's attempt to amend the complaint is futile, and his motion for leave to amend must be denied.

# BACKGROUND

### A.    Factual Background And Trustee's Allegations

The facts set forth below are drawn from the allegations contained in the PSAC, as well as the Trustee's previous allegations in the Original Complaint, ECF No. 1 ("Orig. Compl."), and Amended Complaint ("Am. Compl."), ECF No. 42. These allegations are recited here solely for the purposes of this opposition. Defendants neither admit nor concede these allegations.

### 1.    Madoff's Fraud

Bernard L. Madoff founded BLMIS around 1960. PSAC ¶ 47. At all relevant times, BLMIS operated as a single broker-dealer in compliance with 15 U.S.C. § 78o(b)(1) and Securities and Exchange Commission ("SEC") Rule 15b1-3, and was registered as a securities broker dealer with the SEC. *Id.* ¶ 48. But BLMIS never actually traded any securities or options for its investment customers. *Id.* ¶ 59. Madoff lied to his customers, telling them that he carefully timed securities purchases to maximize value and would intermittently exit the market. *Id.* ¶ 69. Its customers received falsified backdated trade data, often reflecting substantial gains to the customers' principal investment. *Id.* ¶ 60. BLMIS used the funds to make distributions or payments to its other customers, thus avoiding detection and perpetuating the Ponzi scheme. *Id.* ¶ 59. Madoff's scheme finally unraveled in December 2008 when requests for redemptions exceeded the flow of new investments. *Id.* ¶ 75.

### 2.    BLMIS's Bankruptcy And Appointment Of The Trustee

On December 11, 2008, the SEC commenced proceedings against BLMIS. *Id.* ¶ 35. On December 15, 2008, the SEC consented to combine its action with an application by the Securities Investor Protection Corporation ("SIPC"). *Id.* ¶ 36. On December 15, 2008, upon an application by the SIPC, Judge Stanton appointed the Trustee to liquidate the business of BLMIS and removed the case to this Court. *Id.* ¶ 37.

### 3. Non-Parties Tremont And The Rye Funds, And Their BLMIS-Related Activity

Tremont is a Connecticut corporation that managed and controlled a number of feeder funds, including Rye Select Broad Market Prime Fund, L.P. ("Prime Fund") and Broad Market. *Id.* ¶¶ 86-89. Tremont was a "multi-billion dollar money management company" with no shortage of investors due to its perceived success. ECF No. 166 Ex. B ("Tremont Compl.") ¶¶ 2, 5. Both Prime Fund and Broad Market maintained direct accounts with BLMIS. *Id.* ¶¶ 88, 89, 245, 247. Tremont also managed and controlled a "synthetic" fund, Rye XL, which was designed to provide investors with returns equal to approximately three times those of Broad Market. *Id.* ¶ 90. In the six years before the petition date, BLMIS transferred approximately $252 million to Broad Market. *Id.* ¶ 245. Of that $252 million, $60 million was allegedly transferred in two years preceding the petition date. *Id.* Broad Market transferred $48,387,616 of this initial transfer from BLMIS to Rye XL. *Id.* ¶ 252. During those six years, BLMIS transferred approximately $945 million to Prime Fund, of which $495 million occurred within two years preceding the petition date. *Id.* ¶ 248. Prime Fund then allegedly transferred $292,472,765 to Rye XL, all within those two years. *Id.* ¶ 255.

On December 7, 2010, the Trustee filed a complaint against Tremont and feeder funds owned and managed by Tremont to recover alleged fraudulent transfers. *Id.* ¶ 268. On September 22, 2011, this Court approved a settlement between Trustee and Tremont, including Rye XL, Prime Fund, and Broad Market (the "Tremont Settlement"), in which the settling parties paid $1.025 billion. PSAC ¶ 269; *see also* ECF. No. 50 (dismissing claims against Rye Funds in this action).

#### 4.    Defendants And Their Purported BLMIS-Related Activities

##### a.    The Defendants

The Defendants are two financial institutions within the ABN AMRO corporate family. Defendant ABN Ireland is an Irish incorporated, indirect subsidiary of ABN AMRO Bank N.V. ("AA Bank").  PSAC ¶ 78.  At the times relevant to the PSAC, and until AA Bank merged with Fortis Bank (Nederland) N.V., it operated as Fortis Prime Fund Solutions Bank (Ireland) Limited. PSAC ¶ 78.[2]  Defendant ABN Custodial is also an Irish incorporated, indirect subsidiary of AA Bank.  PSAC ¶ 79.  At the times relevant to the PSAC, it operated as Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.  *Id.*[3]  Although the Defendants were just two of many distinct entities within the Fortis corporate family, the PSAC includes allegations pertaining to various Fortis entities spread across the globe.  *See, e.g.,* PSAC ¶ 94.  Throughout the PSAC, the Trustee refers to "Fortis" without specifying which entity is actually involved, clouding the differences between the many distinct corporate entities.

##### b.    The Non-Defendant Fortis Entities

In particular, the Trustee attempts to impute to Defendants the knowledge allegedly held by non-defendant MeesPierson N.V. ("MeesPierson"), an entity that was allegedly purchased by an undefined entity or entities the PSAC calls "Fortis" in 1997, and non-defendant Fortis Multi-Management Investments ("Fortis Multi-Management").  *Id.* ¶¶ 81, 84.  Both MeesPierson and Fortis Multi-Management were allegedly part of "Fortis's investment management arm[,]" which

---

[2] *See also* Presenting the New ABN AMRO (May 2010), available at https://www.abnamro.com/ en/images/Documents/035_Social_Newsroom/Press_Releases/2010/20100531_Introducing_the_ combination_of_ABN_AMRO_Bank_and_Fortis_Bank_Nederland.pdf (hereinafter "May 31, 2010 Announcement").

[3] *See also* May 31, 2010 Announcement.

the Trustee admits is an entirely different wing of "Fortis" than the "Merchant and Private Bank" group within which the Defendants reside. *Id.* ¶¶ 130, 224, 227.[4] MeesPierson was consolidated into Fortis Multi Management in 2006. PSAC ¶ 84. The Trustee has not alleged any specific relationship whatsoever between Fortis Multi-Management (and thus MeesPierson) and Defendants, which were separate entities housed within divisions of "Fortis." *Id.* ¶¶ 224, 227.

The PSAC also includes allegations related to several other Fortis entities featured in the PSAC, including Fortis Prime Fund Solutions (Bahamas) Ltd. ("Fortis Bahamas"), Fortis Prime Fund Solutions (Cayman) Ltd. ("Fortis Cayman"), Fortis Fund Services (Curaçao) NV ("Fortis Curacao"), Fortis Prime Fund Solutions (Isle of Man) ("Fortis (Isle of Man)"), and Fortis Prime Fund Solutions USA ("Fortis USA"). *See id.* ¶¶ 94, 234. The Trustee attempts to link these non-party entities to the Defendants through their alleged interactions with various intercompany credit committees, *see*, *e.g.*, *id.* ¶¶ 107, 166-67, 232-37, and through an alleged agency beginning in 2005 under an "Act as One" philosophy—even though the non-parties' concerns were from outside of this alleged agency period. *Id.* ¶¶ 224-25.

> c.    The Defendants And Non-Defendants' Purported BLMIS-Related Activities

The Trustee contends that Defendants were willfully blind to Madoff's fraud. *Id.* ¶ 4. In doing so, he relies heavily on allegations pertinent to non-defendant Fortis entities (and the

---

[4] In point of fact, the "Merchant Bank" and "Private Bank" were themselves separate business lines; Defendants were housed within the "Merchant Bank." This is apparent from the 2005 Annual Review, which the Trustee claims includes the chart of "Fortis's" risk management framework. PSAC ¶ 228. However, the Annual Review in question contains no such chart, and, indeed, contains a comparable chart that clearly shows that "Merchant Banking" was separate from "Commercial & Private Banking." *See* Giblin Decl., Ex. A at 61; *see also id.* at 3 (listing "Merchant Banking" and "Commercial & Private Banking" separately).

amorphous "Fortis").    In particular, the Trustee misinterprets and selectively quotes emails, memoranda, and transaction documents from:

- Fortis Bahamas and Fortis Cayman, in relation to their role as administrator for Harley International Limited ("Harley"), a BLMIS feeder fund, in 2003 and 2004, as well as related correspondence from Fortis (Isle of Man) (*id.* ¶¶ 98-109);

- MeesPierson, Fortis Multi-Management, and Cadogan Management ("Cadogan"), in relation to BLMIS and Tremont, between 2003 and 2007 (*id.* ¶¶ 130-65); and

- Fortis USA, in relation to the Swap Transaction, in 2006 and 2007 (*id.* ¶¶ 170-89).

As discussed *infra*, none of these documents evidences willful blindness to Madoff's fraud.

d.    The Swap Transactions And The Transfers

On May 2, 2007, Defendants entered the Swap Transaction with Rye XL, and invested with BLMIS through the Broad Market feeder fund.  *Id.* ¶¶ 193, 195.  Under the terms of the Swap Transaction, ABN Ireland was obligated to pay Rye XL returns based on a hypothetical investment in Broad Market equal to three times the amount of collateral Rye XL deposited with ABN Ireland. *Id.* ¶ 193.  The Swap Transaction was thus the economic equivalent of a leveraged investment in Broad Market, and thus BLMIS, since Broad Market was wholly or largely invested in BLMIS. *Id.* ¶¶ 1, 259.  ABN Ireland paid interest to Rye XL on the collateral, and collected various fees and interest.  Am. Compl. ¶ 64; PSAC ¶ 194.  Rye XL provided initial collateral of $10 million. PSAC ¶ 197.  The Trustee alleges that this $10 million was withdrawn from Prime Fund or Broad Market, who had withdrawn it from BLMIS.  *Id.*  Rye XL could increase or "upsize" the value of the Swap Transaction by providing additional collateral up to one third of the maximum equity notional value (the "ENV"), which was set at $750 million.  *Id.* ¶ 198; Orig. Compl. ¶ 109.

In order to hedge its exposure on the Swap Transaction—which was an obligation to pay Rye XL an amount equal to the returns generated by Broad Market—Defendants invested their own money to purchase shares of Broad Market equal to the notional amount of the swap (i.e. three times the amount of the collateral), so the shares would generate returns equal to the

8

obligations under the Swap Transaction. PSAC ¶ 195. Each time Rye XL increased the amount

of the swap, ABN Ireland would buy more shares of Broad Market to hedge the exposure. PSAC

¶198; Orig. Compl. ¶ 13. Rye XL was also free to decrease the value of the Swap Transaction,

which would trigger Defendants to return some of the collateral, and redeem some of the shares of

Broad Market no longer needed as a hedge.[5] *See* Giblin Decl. Ex. B at 17-18 ¶ 10(c).[6]

The Swap Transaction was amended on January 30, 2008, extending the Swap Transaction

to October 31, 2008. Orig. Compl. ¶ 109. Through 2007 and 2008, Rye XL upsized the swap to

over $700 million, and so provided collateral payments totaling $235,500,000. *Id.*¶ 120. As a

hedge ABN Ireland invested over $700 million—two-thirds of which was not protected by

collateral—into Broad Market, and thus BLMIS, by purchasing shares of Broad Market. *See*

PSAC ¶ 200; Am. Compl. ¶ 66. ABN Custodial allegedly held the shares of Broad Market for

ABN Ireland. PSAC ¶ 258.

The Swap Transaction included certain mechanisms designed to partially protect the

Defendants against the risk of loss. *Id.* ¶ 215. As noted above, Defendants received collateral

equal to one-third of the notional value of the Swap Transaction (thus leaving two thirds of ABN

Ireland's investment exposed). *Id.* ¶¶ 199-200. The Defendants also negotiated an indemnification

provision, *id.* ¶¶ 201-04, and a claw-back provision, *id.* ¶¶ 205-10. The Swap Transaction also

contained a priority redemption right, although that was not negotiated separately by Defendants;

---

[5] A diagram of the transaction is included in paragraph 196 and 267 of the PSAC.

[6] Except where expressly noted, each of the documents cited herein and attached to the Declaration of Thomas J. Giblin filed in support of this Memorandum of Law (the "Declaration"), are cited in the PSAC. "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *Rosenblum v. Thomson Reuters (Markets) LLC*, 984 F. Supp. 2d 141, 146 (S.D.N.Y. 2013). The specific paragraphs in which each Exhibit is cited are set forth in the Declaration.

it had been requested by a separate leverage provider, and included in the Swap Transaction only by way of a most favored nation provision. *Id.* ¶¶ 211-14. In December 2008, when BLMIS was discovered to be a fraud, ABN Ireland lost approximately $700 million, offset only by the $235.5 million of collateral and one $30 million redemption of principal. *See id.* ¶ 216.

e.     Due Diligence Related To The Swap Transaction

In his Original Complaint, the Trustee conceded that the Defendants pursued extensive due diligence into BLMIS prior to entering the Swap Transaction—allegations of diligence which he conspicuously omits from the PSAC. For example, the Trustee acknowledges that in a November 2006 credit proposal application for the Swap Transaction, Fortis employees noted "a due diligence review carried out at Madoff Securities in June 2006 gave us a favorable impression of the firm's execution capabilities and some insight into the source of their alpha generating capability in the context of the market timing strategy." Orig. Compl. ¶ 86.

Moreover, on January 18, 2007, the credit committee considering the Swap Transaction received an internal diligence memorandum which noted that Fortis had "carried out a due diligence review at Madoff in June 2006." *Id.* ¶ 91. The memo recommended allowing approximately $1.5 billion exposure to Madoff by the end of 2007. *Id.* It also concluded that:

- Madoff's "reputation for first-class execution is a source of enduring competitive advantage[,]"

- "there is a clearly discernable basis for the viability of Madoff's investment strategy over time[,]"

- "[o]ur review of the trades executed on behalf of Harley through 2006 indicates that the trading mandate has been implemented effectively and consistently;" and

- "Risk Management continues to monitor the trades and positions on a daily basis."

Giblin Decl. Ex. C at 5 (FPFS E 000009073) (hereinafter "Credit Committee Memo").

The Trustee also conceded that "Fortis Risk Management" in Ireland demanded Tremont provide daily copies of trade tickets on the BLMIS account in order to "provide Fortis with transparency and look-through to the underlying Madoff portfolio." Orig. Compl. ¶ 87.  Thus, Fortis USA was able to "look at [Madoff] trade tickets as much as daily to gauge what is happening."  *See* Giblin Decl. Ex. D (FPFS E 000010166) (hereinafter "Fortis USA Email").

### B.    Procedural History

The Trustee filed the Original Complaint on December 8, 2010, seeking to recover $267 million of subsequent transfers allegedly received by Defendants.  ECF No. 1.  On July 3, 2012, the Trustee filed his First Amended Complaint, which remains the operative complaint in this action.  ECF. No. 42.

### 1.    Good Faith Decision

In 2011, Defendants, along with other defendants in the adversary proceedings, moved to withdraw the reference as to whether the Trustee carried the burden of pleading lack of "good faith" under sections 548(c) and 550(b).  *See* ECF No. 19.  On April 28, 2014, the District Court reiterated that, consistent with its decision in *Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011), the burden of pleading lack of good faith, or willful blindness, fell upon the Trustee, and remanded for further proceedings.  *See SIPC v. BLMIS* (*the "Good Faith Decision"*), 516 B.R. 18, 21-22, 24 (S.D.N.Y. 2014).[7]

---

[7] The Defendants also moved to withdraw the reference to determine whether the Trustee's claims to recover subsequent transfers were barred by the presumption against extraterritoriality.  *See* ECF No. 19.  The District Court held that 11 U.S.C. § 550(b) does not apply extraterritorially, and as a result, on November 22, 2016, this Court dismissed the Trustee's claim based on subsequent transfers from a foreign entity (Count 4 of the Amended Complaint.)  *See* ECF 119. On February 25, 2019, the District Court's decision was reversed by a panel of the Second Circuit.  *See In re Picard, Tr. For Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85 (2d Cir. 2019).  The Defendants' petition for a rehearing *en banc* was denied on April 3, 2019.

2.      **546(g) Decision**

On May 15, 2012, the District Court withdrew the reference to decide whether Section

546(g) provided a "safe harbor" to Defendants, protecting their transfers in connection with a swap

agreement. *See* ECF No. 22.  The District Court ruled that the initial transfers at issue here were

all "in connection with" the Swap Transaction, that Section 546(g)'s safe harbor protected the

initial transfer that resulted in the $30 million redemption payment, and that the initial transfer that

resulted in the $235.5 million collateral payment was for the benefit of the Rye funds.  *SIPC v.*

*BLMIS*, 505 B.R. 135, 146 (S.D.N.Y. 2013) (the "546(g) Decision").

3.      **Motion For Leave To Amend And Limited Discovery**

In August 2014, the Trustee filed an Omnibus Motion for Leave to Replead Pursuant to

Federal Rule of Civil Procedure 15(a) and Court Order Authorizing Limited Discovery Pursuant

to Federal Rule of Civil Procedure 26(d)(1) (the "Omnibus Motion").  In September 2014, the

Bankruptcy Court stayed the proceedings on the Omnibus Motion pending other developments in

the case.  In July 2017, this Court ordered proceedings "solely on the Good Faith Limited

Discovery Issue" of the Omnibus Motion.  On June 5, 2018, this Court denied Trustee's Omnibus

Motion for additional discovery.  *SIPC v. BLMIS*, 590 B.R. 200, 208-10 (Bankr. S.D.N.Y. June 5.

2018).  The Trustee filed a new Motion for Leave to File Second Amended Complaint on February

22, 2019, attaching the PSAC.  ECF No. 165.

Because the PSAC fails to meet the standard for pleading willful blindness and otherwise

advances no new facts or cognizable legal theory, the Trustee's motion should be denied as futile.

## LEGAL STANDARD

"[T]he standard for denying leave to amend based on futility is the same as the standard

for granting a motion to dismiss."  *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund*

*v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).  "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Conclusory assertions and a "formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. Allegations contradicted by documents incorporated into the pleadings by reference need not be accepted as true. *Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 614 (Bankr. N.D.N.Y. 2010).

Furthermore, "[a] complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense if the defense appears on the face of the complaint." *Gowan v. Wachovia Bank, N.A. (In re Dreier, LLP)*, 453 B.R. 499, 515 (Bankr. S.D.N.Y. 2011) (dismissing a voidable preference claim where an affirmative defense to the claim appeared on the face of the complaint) (internal quotation marks and citation omitted).

Finally, the PSAC must be evaluated in conjunction with the Trustee's allegations in the Original Complaint and First Amended Complaint, which remain binding party admissions. *See United States v. GAF Corp.*, 928 F.2d 1253, 1259-60 (2d Cir. 1991) (a pleading, though amended or withdrawn, nevertheless remains an admission by a party).

## ARGUMENT

The Trustee's motion to amend is futile for at least three independent reasons. First, Section 550(b) bars the Trustee from recovering from the Defendants because they acted in good faith and provided value. Second, the initial transfers to the Rye Funds are protected by the Section 546(e) and Section 546(g) safe harbors, and to the extent they are not protected by the safe harbors, the Trustee has already recovered the avoidable initial transfers from the initial transferee itself, and under Section 550(d) may not recover the same monies as subsequent transfers. Third and finally, the Trustee cannot recover the transfers involving Defendants because those transfers did not deplete the BLMIS estate. For those reasons, the Trustee's Motion should be denied as futile.

A.      **Section 550(b) Bars The Trustee's Claims**

The Trustee cannot recover the subsequent transfers to Defendants because Defendants received those transfers in good faith and provided value.  Under the Bankruptcy Code, the Trustee cannot recover from subsequent transferees "that take[] for value . . ., in good faith, and without knowledge of the voidability of the transfer avoided."  11 U.S.C. § 550(b)(1).

The Trustee has the burden of pleading a subjective lack of good faith.  *Good Faith Decision*, 516 B.R. at 24 n. 4; *see also Picard v. BNP Paribas, S.A.*, 594 B.R. 167, 196 (Bankr. S.D.N.Y. 2018).  "To satisfy his burden of pleading a lack of good faith, the Trustee must allege that each Defendant willfully blinded itself to facts suggesting a high probability of fraud at BLMIS."  *BNP Paribas*, 594 B.R. at 197 (citing *Good Faith Decision*, 516 B.R. at 22-23).[8]  Under controlling law, willful blindness consists of two elements: "(1) the defendant must subjectively believe that there is a high probability that a fact exists *and* (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (emphasis added).  Here, the Trustee fails to adequately plead either element.  Because the Trustee failed to plead willful blindness, and because the Defendants provided value for the transfers in question, the Trustee's claims under Section 550(a) must fail.

---

[8] The Trustee also has the burden of pleading that the subsequent transferee lacked knowledge of the voidability of the initial transfer.  *BNP Paribas*, 594 B.R. at 196 (citing *Picard v. Legacy Capital*, 548 B.R. 13, 36 (Bankr. S.D.N.Y. 2016)).  This Court has explained that "[t]his standard essentially defines willful blindness which . . . is synonymous with lack of good faith." *Id.* (quoting *Legacy Capital*, 548 B.R. at 38).  Accordingly, the Trustee's failure to plead willful blindness means that this factor is not satisfied.

1.    **The Trustee Failed To Plead Willful Blindness Because The
Defendants Did Not Subjectively Believe In A High Probability Of
Madoff's Fraud**

The first prong of the willful blindness analysis focuses on the *subjective* beliefs of the

specific transferee. *Picard v. Legacy Capital*, 548 B.R. 13, 29 (Bankr. S.D.N.Y. 2016). Thus, it

is not enough to allege that the transferee was on inquiry notice or should have known that there

was a high probability of fraud. *See Good Faith Decision*, 516 B.R. at 21 (rejecting the Trustee's

"inquiry notice approach.").

Moreover, it is not enough to plead that Defendants had knowledge of anomalies or

idiosyncrasies that were well-known characteristics of BLMIS, or even concerns about a risk of

unspecified "fraud." Instead, "[l]ack of good faith, in the context of these cases, refers to

knowledge of Madoff's Ponzi scheme, *i.e.*, knowledge that BLMIS was not actually trading

securities." *BNP Paribas*, 594 B.R. at 193; *see also SIPC v. BLMIS*, 2013 WL 1609154, at *4

(S.D.N.Y. Apr. 15, 2013) ("[T]he Trustee must show, at a minimum, that the transferee has actual

knowledge that there were no actual securities transactions being conducted."). Thus, the Trustee

must plausibly plead that the Defendants subjectively believed that BLMIS was not executing

securities trades. *BNP Paribas*, 594 B.R. at 198.

a.    The Economic Realities Make The Trustee's Theory Implausible

As this Court recognized in *BNP Paribas*, the "ultimate question" is whether the PSAC

"allege[s] a plausible claim, *i.e.*, does it make sense, that the Defendants would have done what

the [proposed complaint] says they did if they subjectively believed that there was a high

probability that BLMIS was not trading securities, and the trades it was reporting to its customers,

including the Defendants' transaction counterparties, were fictitious?" 594 B.R. at 202. The

Trustee claims that Defendants subjectively believed that BLMIS was not trading securities and/or

was a Ponzi scheme as early as 2003. *See* PSAC ¶ 122. But this theory is as "preposterous" as

the one he advanced in *BNP Paribas*: that, while subjectively believing that there was a high risk

that BLMIS was a Ponzi scheme, Defendants invested over $700 million into that Ponzi scheme,

including over $450 million that was not protected by collateral. 594 B.R. at 202. That makes no

sense—sophisticated financial institutions like Defendants do not willingly throw money away

into Ponzi schemes.[9] "[I]t is implausible to suggest that the Defendants would . . . engage in the

transactions described in the [PSAC] if they subjectively believed that there was a high probability

that BLMIS was not actually trading securities." *Id.* Instead, the *only* plausible inference is that

Defendants chose to invest so much of their own money into BLMIS precisely *because* they

believed that BLMIS was a legitimate investment. *See Elendow Fund, LLC v. Rye Select Broad*

*Mkt. XL Fund*, No. 08 CIV. 11117, 2013 WL 5179064, at *6 (S.D.N.Y. Sept. 16, 2013) ("[T]he

more compelling inference is that [defendant] recognized that an investment with Madoff

presented a combination of risks and benefits and genuinely chose to continue its relationship with

Madoff."). For this reason alone, the Trustee has failed to plead willful blindness.

---

[9] The Trustee cannot save his claim by pointing to the fact that Defendants obtained collateral, because—as the Trustee concedes—it still left two-thirds of its investment, constituting hundreds of millions of dollars, exposed. Similar to *BNP Paribas*, the protections "represented a small fraction of the total exposure the Defendants faced with respect to BLMIS." 594 B.R. at 204 n. 19. As the Court found there, if Defendants had been aware of or suspected a high probability that BLMIS was a Ponzi scheme, they would have also understood that the scheme's collapse would also render the feeder funds insolvent; if so, Defendants would have secured far more than the $235.5 million alleged here, and certainly would not have invested over $700 million without more security. Nor do these collateral protections, discussed further *infra*, constitute proof of subjective belief of fraud, as "it is not uncommon to purchase hedges . . . to guard against the default of one's obligor." *Id.* Likewise, the relatively tiny fees and interest payments Defendants allegedly received, PSAC ¶ 194, do not change the economic realities here, as no rational entity would knowingly jeopardize hundreds of millions of dollars in a Ponzi scheme in order to obtain these relatively miniscule fees. *BNP Paribas*, 594 B.R. at 202.

b.    Allegations Regarding the Alleged State of Mind Years Earlier
Does Not Establish The Defendants' State Of Mind At The Time
Of The Subsequent Transfers

Even setting aside the economic realities that make the Trustee's claim implausible, the

Trustee alleges no facts that, if true, would establish Defendants' knowledge.  For one, the Trustee

improperly relies on allegations regarding the state of mind of "Fortis" (actually, several different

entities) from years before the relevant transfers.  But he ignores that the relevant inquiry under

Section 550 is the state of mind of the Defendants *at the time* of the transfer, not years prior.  *CCED*

*Asset Mgmt. v. Chem. Bank (In re Consol. Capital Equities Corp.)*, 175 B.R. 629, 637–38 (Bankr.

N.D. Tex. 1994); *see also* 5 Collier on Bankruptcy P 550.03 (noting that lack of good faith may

be found "where the transferee had knowledge of the transferor's unfavorable financial condition

at time of transfer"); *In re BLMIS*, Case No. 12-00115 (JSR) (Bankr. S.D.N.Y.) ECF No. 324

(Trustee's Brief on Good Faith Issues) at 31 (Trustee stating that "section 550(b) . . . expressly

provides for an examination of the transferee's 'knowledge'—what the transferee subjectively

knew *at the time of the transfer*.") (emphasis added).  Accordingly, his allegations regarding what

"Fortis" believed in 2003 and 2004 are not relevant to the good faith analysis, given that the

relevant transfers to Defendants occurred in 2007 and 2008 after years of subsequent diligence.

In fact, the evidence he cites from the time of the transfers—2007 and 2008—demonstrates

that whatever questions and concerns individuals may have had years earlier (and to be clear there

were no questions or concerns that BLMIS was not actually executing trades), at the time of the

transfers Defendants clearly did not suspect that BLMIS was not executing trades.  The Trustee

himself alleges that the individuals who raised questions in 2003 and 2004 were on the Credit

Committee who decided to approve the Swap Transaction.  PSAC ¶ 237.  And they also received

the Credit Committee's January 2007 due diligence memorandum, just a few months before the

Swap Transaction was executed, which not only recommended allowing a $1.5 billion exposure,

17

but also stated that "there is a clearly discernable basis for the viability of Madoff's investment strategy over time" and that "[o]ur review of the trades executed on behalf of Harley through 2006 indicates that the trading mandate has been implemented effectively and consistently.   Risk Management continues to monitor the trades and positions on a daily basis."   *See* Giblin Decl. Ex. C at 5 (Credit Committee Memo).   Similarly, Fortis USA stated in September 2007 that "we could reconstruct the portfolio two days after trade tickets are received.   However, in practice, we monitor the portfolio on a weekly basis, but do look at the trade tickets as much as daily to gauge what is happening."   *See* Giblin Decl. Ex. D (Fortis USA Email).   These documents illustrate—as the economic realities also make perfectly clear—that *at the time of the transfers*, Defendants believed that BLMIS was in fact making trades and executing on its strategy—the very opposite of a subjective belief in a high risk that BLMIS was a fraud.

        c.    <u>The 2003 and 2004 Allegations Do Not Establish Any Belief That BLMIS Was Not Executing Trades Or Was A Ponzi Scheme</u>

Even if concerns years before the relevant transactions were relevant, the Trustee alleges no facts indicating that those employees believed there was any risk, much less a high risk, that BLMIS was a Ponzi scheme and/or not actually trading securities.

First, the Trustee relies on a July 2003 email chain, in which a Fortis (Isle of Man) employee allegedly told an ABN Ireland employee[10] her concerns regarding with the lack of visibility into BLMIS's custody work and pricing information.   PSAC ¶ 103.   Addressing BLMIS's custody operations, the Fortis (Isle of Man) employee suggested engaging in "trade blotter

---

[10] For purposes of this motion, Defendants are not contesting the Trustee's allegation that this ABN Ireland employee's "knowledge," such as it is, can be imputed to ABN Ireland.   *See* PSAC ¶ 103.   Should this case proceed, however, Defendants reserve the right to contest this point, as well as any imputation between Fortis (Isle of Man) and Defendants.

matching" and that Fortis Bahamas should "consider the 'control' of the assets," including the use

of segregated accounts and insurance coverage "should the broker go bust."  Mot. at 16; PSAC

¶ 103.  But these selected excerpts do not demonstrate a concern that BLMIS was not actually

executing trades.  Parties of course seek trade verification for any number of reasons, including

internal record keeping, responding to audit requests, verifying pricing and profitability, and

monitoring compliance with investment strategies.[11]  There is no difference between this exchange

and similar instances in which a party acknowledged that it was unable to independently verify or

reconcile BLMIS's trades, and which this Court declined to equate with a subjective belief of

fraud.  *See BNP Paribas*, 594 B.R. at 199-200 (employee recognized "no opportunity to consider

the true validity of the orders").  And the omitted portions of the email chain show that a belief

that BLMIS was in fact actively engaging in securities trading.  After raising concerns, the Isle of

Man employee then confirmed that Harley actually "receive[s] trade tickets via MFACT and the

portfolio is also independently priced with the exception of over the counter options," that "there

is subsequently a further reconciliation as the trade tickets come in," and in fact asked what security

interest Fortis Bahamas would have in the funds' assets—all completely inconsistent with a belief

that in fact the fund had no assets.  *See* Giblin Decl. Ex. F (FPFS E 000009362).[12]

---

[11] It is well established that "reconciling positions and trades within internal books and records with the outside world is paramount to ensuring that [a securities trading organization] remains in control of its assets and liabilities."  Michael Simmons, SECURITIES OPERATIONS: A GUIDE TO TRADE AND POSITION MANAGEMENT 365 (John Wiley & Sons, Ltd. ed., 2002).  Reconciling trades also helps "equity and bond traders to execute new trades knowing that their trading positions are complete," securities lending and borrowing desks lend and borrow securities accurately, and "the accounting department to calculate accurate profit and loss."  Id. at 382-83.

[12] And the Trustee admits that the employee's statements about verifying the pricing of BLMIS's over-the-counter options trades reflected a concern about *valuing* (i.e. not the existence) of Harley's assets.  Mot. at 16; PSAC ¶¶ 105-06.

Second, the Trustee points to correspondence from September 2003 in which the ABN Ireland employee stated that she would be "uncomfortable" providing financing to a Harley investor without "some assurance of how the front and back office are separate in Madoff" and information streams "that would allow independent reconciliation of trades in Harley."  Mot. at 17-18; PSAC ¶¶ 114-15.  But again, the employee never raised a concern that BLMIS was not actually executing trades.  In fact, the employee actually concluded that Fortis Bahamas should consider "***pitch[ing] for the custodian work***"—entirely inconsistent with a belief that Madoff was operating a Ponzi scheme or that there were no assets to hold in custody.  PSAC ¶ 115 (emphasis added).

Third, the Trustee relies on a July 2004 email—involving no employees from a Defendant entity—forwarding an excerpt from a Compliance Committee meeting.  Mot. at 20.  Again, he selectively excerpts the email, pointing to the portion which reads:  "Madoff's double role implies that there is no guarantee that the trades and positions provided by Madoff to Fortis as Administrator are objective and it is not possible to obtain independent confirmation on trades and positions."  *Id.*¶ 126.  But again the concern on whether trades and positions are "objective," and "confirmation" of them relates to BLMIS's *valuation* of each security.  He also notes that a different Fortis entity, Fortis Curacao, had recommended against providing administrator/financing services to Harley.  *Id.* ¶ 127.  But the Trustee omits the latter part of this paragraph, which states "[o]n the other hand Curacao states that in the 1.5 years servicing the client *no problems have appeared*. Madoff, a large firm, enjoys a *reputable track record/standing* and it is noted that *Madoff is regulated by the SEC*, the NASD as well as by the FSA."  *See* Giblin Decl. Ex. G (FPFS E 000009372) (emphasis added).  Finally, the email nowhere raises any concern that BLMIS was not actually trading securities.  To the contrary, the email states that Harley's change

from "invest[ing] 100% in treasury bills" to "invest[ing] in 50 S&P 100 stocks hedged by synthetic short derivatives position . . . has changed the risk profile"—*i.e.*, the email reflects a belief that these trades have actually occurred.  *Id*.

At most, the alleged 2003 and 2004 concerns show an awareness of certain idiosyncracies in the way BLMIS and its feeder funds were structured, a so-called "red flag" which does not suffice to establish a subjective belief in Madoff's fraud.  *See, e.g.*, *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 640-41 (2d Cir. 2012) ("Many of the purported 'red flags' that plaintiffs contend should have put [defendants] on notice of the Madoff fraud, such as the lack of an independent third-party custodian, and BLMIS's dual role as both investment manager and administrator, were . . . disclosed to . . . investors in and auditors of other Madoff feeder funds, and the SEC, none of whom discovered the Madoff scheme."); *see also BNP Paribas*, 594 B.R. at 198-99 ("[T]he existence of the red flags supports the more compelling inference that Madoff fooled the Defendants as he did individual investors, financial institutions and the regulators"). This is nothing more than the assertion that Defendants "should have known" that Madoff was operating a Ponzi scheme, which is insufficient to satisfy the knowledge standard applicable here. *See Katz*, 462 B.R. at 455; *Good Faith Decision*, 516 B.R. at 21 (rejecting "the Trustee's central contention that all these defendants were sophisticated market participants who . . . failed to act in good faith because they were aware of suspicious circumstances that should have led them to investigate the possibility of such fraud").  Not one of these emails states in any way that anyone involved believed BLMIS was not actually trading securities, and to the contrary they repeatedly reflect a belief that the trades had occurred.

d.    The Trustee's Allegations Regarding MeesPierson, Fortis Multi
Management And Cadogan Do Not Establish Knowledge

Next, the Trustee points to alleged documents (notably not quoted) from MeesPierson,

Fortis Multi-Management and Cadogan.  However, the Trustee's allegations fail to establish that

even these entities, much less Defendants, believed that BLMIS was not actually trading securities.

Rather, the Trustee's allegations are based solely on the same so-called red flags, discussed

above, that were widely known and which courts have already ruled do not suffice to show a

subjective belief in Madoff's fraud.  The alleged 2003 MeesPierson memo "noted Madoff's

secrecy and 'zero transparency'; BLMIS's exceptionally stable returns; the fact that these returns

were inconsistent with the split strike conversion strategy Madoff purported to execute;" the fact

that Madoff left investor relations to feeder funds; and the fact that "BLMIS's trades and assets

could not be verified."  PSAC ¶ 132.  But notably nowhere, even according to the PSAC's

characterization, does this alleged memorandum raise a concern that BLMIS was not actually

executing trades.  Likewise, the "red flags" as to which Fortis Multi-Management questioned

Tremont covered much the same topics, including the volume of options trading, BLMIS's

simultaneous role as investment advisor/broker-dealer/custodian, and whether assets were

segregated. *See, e.g.*, *id.* ¶¶ 149-52. And the alleged Cadogan "red flag" list "looked substantially

the same" as the MeesPierson memo.  *See id.* ¶¶ 159-60.  Again, these lists of "red flags" have

consistently been found insufficient to allege willful blindness, *Good Faith Decision*, 516 B.R. at

21, and simply "amount[] to pleading fraud by hindsight." *Legacy Capital*, 548 B.R. at 33.  *See*

*also Meridian*, 487 F. App'x at 640-41; *BNP Paribas*, 594 B.R. at 198-200 (red flags include

"BLMIS option volumes were too high," that "returns of BLMIS feeder funds were too consistent"

and that "BLMIS was secretive about identities of counterparties.").  None of these documents

22

mention a concern, much less conclude there was a high probability, that BLMIS is not actually executing trades, and so they fall short here as well.

Moreover, even if the Trustee had established that these entities held a subjective belief that BLMIS was a fraud, the Trustee points to no evidence that anyone at Fortis Multi-Management, MeesPierson or Cadogan shared such concerns with Defendants. *See* Mot. at 26-27; PSAC ¶¶ 224-28.  At best the Trustee claims that the various Fortis entities shared a "global risk management framework," but makes nothing but conclusory allegations that alleged concerns—or any similar information of this type or at a similar level of detail—were shared between affiliates.  PSAC ¶ 165.  A plaintiff cannot rely upon group pleading, whereby allegations of knowledge are made against affiliated entities, without parsing specifically what each of the individual defendants themselves knew. *See Concord Assocs., L.P. v. Entm't Props. Tr.*, No. 12-cv-1667, 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014) ("Group pleading, by which allegations are made against families of affiliated entities[,] is simply insufficient to withstand review on a motion to dismiss."); *In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 991 F. Supp. 2d 479, 501 (S.D.N.Y. 2014) (same).  That is exactly the case here.  In short, any implication that these entities shared information about alleged red flags with Defendants simply amounts to inadequate "pleading by innuendo." *BNP Paribas*, 594 B.R. at 201.

Nor can knowledge be imputed between affiliated corporate entities unless an agency relationship can be established or the entities are joint venturers. *See In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 587, 590-91 (S.D.N.Y. 2007); *see also Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 457 (6th Cir. 1982).  But the Trustee has failed to plead that MeesPierson or Fortis

Multi-Management established an agency relationship or joint venture with Defendants.[13]  To the contrary, the Trustee admits that those entities resided in an entirely different segment of "Fortis"'s corporate structure from Defendants:  as alleged, Defendants were part of the "Merchant and Private Bank Division, which handled the bank's financial products and services[,]" while Fortis Multi-Management and MeesPierson were part of the "Investment Bank division . . . which provided wealth management services to high net worth individuals."  PSAC ¶¶ 224, 227.  The only specific allegations connecting Defendants to Fortis Multi-Management are *Tremont's* impressions of Fortis's internal operations.  PSAC ¶¶ 240-41.  That does not suffice.  Indeed, this corporate separateness is confirmed by the very November 2006 credit application that the Trustee alleges set forth the due diligence that Defendants conducted prior to entering into the Swap Transaction.  *Id.* ¶ 166.  That credit application noted that the relationship between Defendants and Tremont was a "new relationship"; nowhere within that credit application is Fortis Multi-Management's investment in Broad Market mentioned, a curious omission if indeed the entities were an indistinguishable entity.  *See* Giblin Decl. Ex. E (FPFS E 000016845) at 16846.[14]

Nor do the Trustee's other conclusory allegations regarding the purported structure of the Fortis corporate family, including that some groups within Fortis worked with one another in

---

[13] To establish an agency relationship, the Trustee must show that (1) there is an agreement between the principal and agent that the agent will act for the principal and (2) the principal retains a degree of control over the agent.  *Parmalat*, 501 F. Supp. 2d at 588.  To establish a joint venture relationship, the Trustee must show that the two entities (1) act manifesting the intent of the parties to be associated as joint venturers; (2) contribute jointly to undertakings through a combination of property, financial resources, effort, skill or knowledge; (3) have joint proprietorship and control of the enterprise; and (4) share profits and losses.  *See id.* at 590-91.  The Trustee fails to do so.

[14] And there is even less basis to impute knowledge from Cadogan, which the Trustee alleges "partnered with" Fortis Multi-Management in 2006.  PSAC ¶¶ 84, 133, 158.  The Trustee never explains what he means by "partnered," and even if he had, a partnership by definition is not an agency.  Moreover he fails to allege any relationship whatsoever between Cadogan and Defendants.

relation to Madoff-related transactions (*see* PSAC ¶ 85), create an agency relationship as needed

to support imputation. *See Ford Motor*, 680 F.2d at 458 (6th Cir. 1982) (holding that the

relationship of two affiliate entities working together was "essentially one of two siblings" which

"standing alone, does not support the imputation of notice or knowledge."); *Valentini v. Citi*

*Group, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011) ("[T]he mere existence of a parent-

subsidiary or affiliate relationship is not on its own sufficient to impute the scienter of the

subsidiary to the parent or affiliate.").[15]   Indeed, even if the PSAC had adequately alleged an

agency relationship beginning in 2005 (*see* PSAC ¶ 224), the alleged concerns of MeesPierson fall

outside of that alleged agency period and thus would not be imputed. *See id.* ¶ 132.

e.    Fortis USA Did Not Subjectively Believe BLMIS Was Not
Trading Securities

Finally, the Trustee tries to draw a bizarrely attenuated inference of willful blindness from

an inconsistency in the way Fortis USA described BLMIS's options trading in 2007 and the way

that other entities had described it in prior years.  Specifically, the Trustee seizes on a November

2006 Fortis USA credit application which lacked any details regarding how BLMIS options were

traded, a January 2007 credit application in which Fortis USA stated that BLMIS traded options

both in over-the-counter markets and on an exchange, and a September 2007 email noting that

BLMIS only traded exchange-listed options.  He then argues that Fortis USA knew that this

"critical piece of information" was "shifting and contradictory" because *Fortis Multi-Management*

---

[15] *See also LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 209 (2d Cir.
2005) (corporate relationship that "is essentially one of two siblings" "does not support the
imputation of notice or knowledge"); *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204,
218 (S.D.N.Y. 2009) (a subsidiary's knowledge is not generally imputed to a parent); *Oei v.
Citibank, N.A.*, 957 F. Supp. 492, 519 (S.D.N.Y. 1997) (to impute knowledge between "related"
entities requires evidence that the court "should pierce the corporate veil").

(again, a wholly separate entity) had previously been told that such trades only took place in the OTC market.    PSAC ¶¶ 177-80, 182-84; Mot. at 28-29.    This inference strains credulity, particularly in comparison to the far more plausible explanations:    that these employees had received updated information regarding these options trades and acted accordingly; that the drafters of the credit application did not consult with Fortis Multi-Management, which was an entirely separate entity; or that the drafters were simply mistaken.[16]  PSAC ¶¶ 173-187.  Moreover, this is nothing more than the type of "should have known" pleading that does not suffice under the *Good Faith Decision*.  *See Good Faith Decision*, 516 B.R. at 22-24.

In fact, the internal email[17] that Trustee selectively quotes reveals that these Fortis USA employees believed BLMIS was actually making trades.  Omitted from the PSAC is the statement from a Fortis USA employee that "we could reconstruct the portfolio two days after trade tickets are received.  However, in practice, we monitor the portfolio on a weekly basis, but do look at the trade tickets as much as daily to gauge what is happening."  *See* Fortis USA Email.  If anything, this email demonstrates that Fortis USA believed BLMIS was trading securities and that it was diligently following the records of those (apparent) trades.

### 2.    The PSAC's Allegations Establish That Defendants Did Not Blind Themselves To Madoff's Fraud

Even if Defendants subjectively believed that there was a high risk that Madoff was running a Ponzi scheme—and they did not—the Trustee must still plead that they took "deliberate

---

[16] The Trustee also alleges that Fortis Fund USA should have known that Madoff's trades were OTC due to the correspondence by a Fortis (Isle of Man) employee in 2003, again ignoring that Fortis Fund USA may have not have seen this correspondence, or received new information in the interceding years.

[17] While the Trustee implies that this email was a "response[] to AIG" (PSAC ¶ 184), the record does not reflect whether the email was sent to AIG as drafted.  *See* Fortis USA Email.

actions to avoid learning of that fact." *Global-Tech*, 563 U.S. at 769. Instead, the only two actions

the Trustee cites—moving administration of a fund to the Cayman Islands, and inserting deal

protection provisions into the Swap Transaction documents—are not attempts to avoid learning

information, but rather are on their face attempts to minimize potential liability and economic risks.

Moreover, and quite to the contrary, his complaints are replete with allegations of due diligence,

further disproving this element.

First, the Trustee argues that Fortis Bahamas's transfer of its duties as administrator of

Harley from the Bahamas to Fortis Cayman, due to a recent change in law, was a deliberate step

to avoid a new duty to verify that trades were actually occurring, and that the custodian (BLMIS)

was fit. Mot. at 33. But this theory is both legally and factually wrong.

Legally, the Trustee fundamentally misinterprets the regulations, which he tellingly does

not quote, cite, or attach. The then-newly passed Investment Funds Act ("IFA") and Investment

Funds Regulation ("IFR"), *see* PSAC ¶ 99; *see also* Mot. at 15, did not impose any duty to verify

that trades were being executed. *See* Giblin Decl. Ex. H, IFR; PSAC ¶¶ 99-102 (not describing

any duty to verify that trades had taken place).[18] Nor did they impose any new duty to "verify"

the conduct of a custodian; to the contrary, they *reduced* any such duty. Prior to the enactment of

the IFA and IFR, Fortis Bahamas, as administrator of Harley, was regulated by the Mutual Funds

Act, 1995 ("MFA") and Mutual Funds Regulations, 1995 ("MFR"). Under the MFA and MFR,

Fortis Bahamas *previously* had a duty to "ensure that the trustee/custodian of a unit trust or the

directors of an investment company . . . are meeting their obligations and complying with the Act

---

[18]  Because the Trustee raised the issue of foreign law in the PSAC, this Court "may consider any relevant material or source" in determining the issue of foreign law pursuant to Federal Rule of Civil Procedure 44.1 and Federal Rule of Bankruptcy Procedure 9017. *See In re Tommy Hilfiger Secs. Litig.*, No. 04-civ-7678, 2007 WL 5581705, at *5 (S.D.N.Y. Jul. 20, 2007).

and regulations." Giblin Decl. Ex. I, MFR § 4(5). That requirement was *eliminated* in the IFR and IFA. *See* Giblin Decl. Ex. H, IFR § 17.1(1).[19] And regarding the duties (i) to verify that the fund was not acting in a prejudicial manner towards investors or creditors, and (ii) to report to the Bahamas Securities Commission should the administrator know of such prejudicial action, those duties *already* existed in the MFR. *Compare* Giblin Decl. Ex. I, MFR § 4(5)(b), (c), *with* Giblin Decl. Ex. H, IFR § 17(1)(e), (f). This entire theory, that the move to the Cayman Islands was motivated by a new Bahamian law that would have imposed a new duty to investigate and verify, is simply incorrect.[20]

Further disproving this alleged motive, nowhere in the emails cited by the Trustee did anyone express a belief that the IFA/IFR imposed new duties to investigate or "verify" that Harley's custodian BLMIS was "fit", or that BLMIS was executing trades. *See*, *e.g.*, July 2003 Email. Instead, the emails reflect a concern that the new law could make an administrator "responsib[le] for the actions" of a wide range of third parties (such as Harley's operators, *i.e.*, its directors) outside of the administrator's control, which it is understandable that a sophisticated

---

[19] The Trustee's allegation that the IFA would have obligated Fortis Bahamas to "verify" that the fund's service providers (including BLMIS) were "fit and proper," PSAC ¶ 99, appears to be based on a misinterpretation of IFA § 13(4). Section 13(4) governs administrators of potential *new* funds, imposing a requirement only on an administrator at the time it applies to license a new fund: "An unrestricted licensing fund administrator may not license an investment fund *until* it has been satisfied by the *applicant* that . . . [the] custodian is 'fit and proper'" (emphasis added). Indeed, existing funds were expressly "deemed to have complied with the requirements for licensing under" the IFA. IFA § 68. But in 2003 Harley was not a new fund and so was not applying to be licensed by Fortis Bahamas; Harley had received its license years earlier, not in 2003. And so the newly-passed IFR Section 13(4) would not have imposed any obligations on Fortis Bahamas.

[20] The IFA and IFR made other favorable changes for Fortis Bahamas as an administrator. For example, the IFA and IFR clarified that the administrator's duty to ensure compliance required only "reasonable" acts. *See* Giblin Decl. Ex. H. Further, the IFA and IFR added a statutory defense for breaches of IFR 17(1). *See* Giblin Decl. Ex. H.

party would want to avoid.  *See* Giblin Decl. Ex. F (FPFS E 000009364).  Indeed, locating a fund

or company in its most favorable jurisdiction is hardly a controversial concept, as evidenced by

the numerous American corporations who choose Delaware as their state of incorporation for its

favorable corporate law.  This Court has very recently recognized that similar actions taken to

avoid risk and/or liability did not constitute a subjective belief in a high risk of Madoff's fraud.

*See BNP Paribas*, 594 B.R. at 200 ("The more plausible inference is that the Defendants shut down

the Oreades fund because of the risks associated with using the unregistered BLMIS as a sub-

custodian and investment advisor in violation of Luxembourg law.").  The similar actions taken

here likewise do not constitute turning a blind eye to fraud.

Moreover, as the Trustee admits, Fortis Bahamas did not turn a blind eye to the issues it

flagged.  Instead, it sent a letter to BLMIS regarding their concerns.  *See* PSAC ¶ 108.  And it

received a response stating that, in fact, "all security positions held are segregated for the exclusive

benefit of Harley International Limited."  *Id.* ¶ 109.

Second, the Trustee argues that Defendants' deal protections in the Swap Transaction

constitute an attempt to avoid confirming Madoff's fraud.  But this makes no sense; these

provisions have nothing to do with conducting diligence or obtaining information, but rather are

attempts to minimize economic exposure.  And even if they were relevant, they are ordinary deal

protection mechanisms, *i.e.*, an indemnification provision (PSAC ¶¶ 201-04),[21] a claw-back

provision (*id.* ¶¶ 205-10), and a priority redemption right (*id.* ¶¶ 211-14).[22]  This Court has

---

[21] Courts in this district recognize that indemnification provisions are ordinary deal provisions.
*See, e.g.*, *4Kids Entm't, Inc. v. Upper Deck Co.*, 797 F. Supp. 2d 236, 246 (S.D.N.Y. 2011)
(recognizing that "indemnifications" are a "provision[] one regularly finds in business contracts")

[22]  That the priority redemption provision was obtained by way of most favored nation clause,
PSAC ¶ 211, undermines, rather than supports, the Trustee's arguments.  The Trustee argues that
it put Defendants "on notice that another party anticipated that Madoff would come under

29

recognized that the use of deal protection mechanisms which are "not uncommon" does not even indicate a subjective belief in Madoff's fraud; given that, it is hard to see how they can constitute turning a blind eye to such a belief. *See BNP Paribas*, 594 B.R. at 204 n. 19.

More importantly, the PSAC is replete with allegations that Defendants, as well as other Fortis entities, performed extensive due diligence into BLMIS. An employee of Fortis (Isle of Man) inquired directly to BLMIS about its option counter-parties and to confirm whether Harley's funds were segregated from those of other customers. PSAC ¶¶ 108, 171. That BLMIS's responses were untruthful can hardly be held against the inquiring entities. Further, in the months leading up to the Swap Transaction, the relevant Fortis entities pursued extensive due diligence into Tremont and BLMIS, including the June 2006 review carried out at BLMIS, the successful request to receive daily trade tickets from BLMIS, and the receipt of private placement memoranda from Tremont regarding BLMIS. PSAC ¶¶ 171, 173; Orig. Compl. ¶¶ 86-87, 91.[23] And the relevant Fortis entities summarized their findings in a January 2007 due diligence memorandum which noted the "clearly discernable basis for the viability of Madoff's investment strategy" and that "our review of the trades executed on behalf of Harley through 2006 indicates that the trading mandate has been implemented effectively and consistently." Giblin Decl. Ex. C at 5 (Credit Committee Memo). As this Court has recognized, affirmative allegations of due diligence, even

investigation by federal regulators for security fraud or other illegal conduct." *Id.* ¶ 214. On the contrary, it only confirms that Defendants harbored no such suspicions themselves.

[23] To the extent this Court finds Fortis Multi-Management's knowledge should be imputed to Defendants, Fortis Multi-Management also performed extensive diligence on Tremont and BLMIS as well. *See* PSAC ¶¶ 134-155. Fortis Multi-Management asked to meet with BLMIS personnel (*id.* ¶ 134), asked questions about the BLMIS's "split strike conversion strategy" (*id.* ¶ 137), and asked detailed questions about BLMIS options trading (*id.* ¶¶ 138, 144-49). Fortis Multi-Management also requested—and received—full "due diligence questionnaires" for BLMIS from Tremont. *Id.* ¶ 152. It also asked for confirmation that customer assets were segregated. *Id.* ¶ 151.

if exceptions to the entity's due diligence practices are made, are the *opposite* of turning a blind eye. *BNP Paribas*, 594 B.R. at 205. Accordingly, the Trustee fails to sufficiently plead willful blindness.

### 3.    Defendants Provided Value For Both Transfers

Finally, Defendants provided value for both transfers.[24] "The value element that a subsequent transferee must provide is "'merely consideration sufficient to support a simple contract.'" *Legacy Capital*, 548 B.R. at 37 (internal citations omitted).

With respect to the collateral received from Rye XL, Defendants obligated themselves to pay three times the returns of that collateral investment back to Rye XL, giving Rye XL the levered synthetic investment it desired. PSAC ¶¶ 193, 196; Am. Compl. ¶ 63, Orig. Compl. ¶ 104. That is the exact consideration Rye XL desired and obtained. Rye XL also obtained the ability to upsize or downsize the transaction, an ability it exercised repeatedly. *See* PSAC ¶ 198; *See* Giblin Decl. Ex. B at 17-18 ¶ 10(c). Defendants also performed various services in relation to the Swap Transaction, and paid interest on the cash collateral received. Orig. Compl. ¶¶ 104, 114. These are more than sufficient consideration to support a simple contract. *See Legacy Capital*, 548 B.R. at 37.

Defendants also provided value with respect to the $30 million redemption of principal from Broad Market. As noted above, as a hedge, Defendants invested over $700 million with Broad Market, PSAC ¶ 259; Am. Compl. ¶ 66; Orig. Compl. ¶ 17; and on July 1, 2008, Defendants

---

[24] While the Trustee must plead lack of good faith, Defendants must demonstrate that they gave value for the subsequent transfers to establish a section 550(b)(1) defense. *See BNP Paribas*, 594 B.R. at 206. Although Defendants carry the burden of proof on value, the Court may consider an affirmative defense that is apparent on the face of the complaint. *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir 2003).

redeemed $30 million of that principal, when Rye XL decreased the swap.  PSAC ¶ 260; Am.

Compl. ¶ 75; Orig. Compl. ¶ 19.  This single redemption of principal is the only subsequent transfer

alleged to have come from Broad Market.  *See* PSAC ¶ 260.  As this Court has held repeatedly, a

return of principal is "for value."  *See Katz*, 462 B.R. at 453 ("It is clear that the principal invested

by any of Madoff's customers 'gave value to the debtor,' and therefore may not be recovered by

the Trustee absent bad faith."); *Picard v Greiff*, 476 B.R. 715, 725-26 (S.D.N.Y. 2012) (finding

that transfers that exceeded the return of principal was not "for value").  Consistent with this, this

Court has held that "a net loser . . . gave value for the purposes of Section 548(c)."  *Picard v.

Merkin*, 581 B.R. 370 (S.D.N.Y. 2017).[25]  As the Trustee admits, Defendants here were net losers.

*See* PSAC ¶ 218.  Because Defendants received the subsequent transfers in good faith, and for

value, the Trustee cannot recover them under Section 550(b).

B.       **The Trustee Is Barred From Recovering By Section 546 Safe Harbors Except
         Under Section 548(a)(1)(A), And Cannot Bring a Claim Under Section
         548(a)(1)(A) Due To the Bar On Double Recovery**

Further, the Trustee is barred from recovering the transfers at issue because he has already

recovered *every penny* of the monies that he could recover.  That is because Sections 546(e) and

546(g) each independently bar the recovery of any initial transfers to the Rye Funds made more

than two years before the December 11, 2008 petition date.  And because the Trustee has already

---

[25] Courts have also held that sale of stock constitutes value, even if that stock is of an insolvent
company.  *See In re Commercial Loan Corp.* 496 B.R. 730, 744 (N.D. Ill. 2008); *In re Brooke
Corp.*, 515 B.R. 632, 642 (D. Kan. 2014).  On this point, this case is distinguishable from *BNP
Paribas*, in which the Court found that it was not possible to determine from the pleadings whether
each of the fifty-nine subsequent transfers were the result of redemptions of principal or
distributions of fictitious profits to equity holders.  594 B.R. at 206.  Here, the Trustee admits that
the only subsequent transfer from Broad Market resulted from a redemption of principal.  PSAC
¶ 260.

recovered *all* initial transfers within that two year lookback period, the Trustee cannot recover from Defendants the subsequent transfers of those funds.

> 1.  **All Of the Trustee's Claims Against Tremont Were Barred By The Safe Harbors of Section 546(e) and 546(g) Unless They Were Actual Fraudulent Transfers Within Two Years**
>
>> a.  Section 546(g) Bars All Claims Other Than Those Under Section 548(a)(1)(A)

Because the initial transfers here were made in connection with a swap agreement, Section 546(g) bars their recovery, except for actual fraudulent transfers within two years under Section 548(a)(1)(A). Under Section 546(g), the Trustee may not "avoid a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement," except for actual fraudulent transfers under Section 548(a)(1)(A). 11 U.S.C. § 546(g). As the subsequent transferee, Defendants may raise the Section 546(g) defense even if the initial transferee did not. *546(g) Decision*, 505 B.R. at 143. "[T]o the extent section 546(g) applies to preclude avoidance of an initial transfer underlying these swap transactions, the Trustee may recover a subsequent transfer from the defendants here only insofar as the initial transfer is avoidable under section 548(a)(1)(A)." *Id*. And "[u]nlike Section 546(e), the issue of knowledge is irrelevant to the application of Section 546(g) in this case." *Id*. at 142 n. 6.

Here, the District Court has already ruled that the initial transfer of $30 million to the Rye Funds was protected by the Section 546(g) safe harbor except for claims under Section 548(a)(1)(A). *Id*. at 151.

The Section 546(g) safe harbor also protects the initial transfer of $235.5 million to the Rye Funds. The analysis considers "whether [1] the initial transfer . . . was made 'in connection with' a swap agreement and [2] 'by or to (or for the benefit of) a swap participant or financial participant." *Id*. at 144. Regarding the first element, the District Court has already ruled that the

initial transfers to the Rye Funds were made "in connection with" swap agreements. *Id*. at 148.

Regarding the second element,[26] the pleadings establish that the initial transfers were made for the

benefit of Rye XL, to allow it to obtain the leveraged return it desired—as the District Court has

already held. *See id*. at 150 (finding that "the investment funds withdrew money from their Madoff

Securities accounts in order to benefit themselves by receiving leveraged returns on their assets").

And Rye XL is a financial participant because it entered into the over $700 million Swap

Transaction. See *546(g) Decision*, 505 B.R. at 148.[27]  The initial transfer was also both from a

financial participant (BLMIS) and to one (Prime Fund).[28]  Accordingly, both initial transfers are

protected by Section 546(g), except to the extent that they are also subject to Section 548(a)(1)(A).

> **b.**  Section 546(e) Bars All Claims Other Than Those Under Section
> 548(a)(1)(A)

Section 546(e) also bars recovery of all claims except for actual fraudulent transfers within

two years under Section 548(a)(1)(A).  As the subsequent transferees, Defendants may raise the

Section 546(e) defense even if the initial transferee did not.  *Cohmad*, 2013 WL 1609154, at *7.

---

[26] While the District Court previously ruled that initial transfer to fund the collateral was not protected by Section 546(g) because it was for the benefit of the Funds, not Defendants, *546(g) Decision*, 505 B.R. at 150, it expressly did *not* rule on whether anyone besides Fortis was a financial participant, *id*. at 151 n. 11.  These Defendants had not advanced that argument in their briefing for the District Court, but do so now.

[27] The Bankruptcy Code defines "financial participant" as an entity, who, within 15 months of the bankruptcy filing, "has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate)." 11 U.S.C. § 101(22A)(A).

[28] The Trustee alleges that BLMIS "had billions of dollars under management" pursuant to customer contracts, including over $260 million with Prime Fund.  *See, e.g.*, Tremont Compl. ¶¶ 15(k), 18; PSAC, Ex. D.  Given that those customer contracts are "securities contracts," both BLMIS and Prime Fund exceeded the requirement of $100 million of mark-to-market positions in securities contracts. 11 U.S.C. § 101(22A)(A); *SIPC v. BLMIS ("Cohmad")*, No. 12 MC 115 JSR, 2013 WL 1609154, at *2 (S.D.N.Y. Apr. 15, 2013) ("[T]he account agreements between Madoff Securities and [BLMIS customers] clearly qualify as securities contracts.").

In *Cohmad*, Judge Rakoff reaffirmed that "Section 546(e) precludes the Trustee from bringing any action to recover from any of Madoff's customers [such as the Rye Funds] except in the case of actual fraud." *Id*. at *2. The safe harbor applies "unless the transferee had actual knowledge of Madoff's Ponzi scheme, or more generally, actual knowledge that there were no actual securities transactions being conducted." *Legacy Capital*, 548 B.R. at 28.

As discussed in Section A, *supra*, the Trustee has fallen far short of pleading that Defendants were willfully blind to BLMIS's fraud, let alone that they possessed actual knowledge of it.[29] Nor can the Trustee demonstrate that the initial transferees, the Rye Funds, possessed actual knowledge. The Trustee purports to incorporate his complaint against Tremont, the parent of the Rye Funds, here, and also adds certain allegations against Tremont to the PSAC. But the allegations in those complaints are no different than those that have been rejected by this Court and the District Court on multiple occasions.

First, the allegations against Tremont amount to nothing more than the generic "red flag" allegations that—as discussed above—were well-known and have been consistently rejected as enough to suggest knowledge.[30] The Trustee merely rehashes the same allegations that have

---

[29] The Defendants are not bound by the Trustee's self-serving "agreement" with the Trustee that the initial transfers were "deemed avoided." PSAC ¶ 269; Tremont Settl. Agmt., ¶ 16. *See e.g., McDowell v. Morgan Stanley & Co.*, 645 F. Supp. 2d 690, 696 (N.D. Ill. 2009) (ruling that "representations . . . made in furtherance of a settlement agreement" are not "admissions or binding on this Court" and that while "[t]here may be disclaimers of fault or liability within the settlement agreement, as often is the case[,]" those "representations . . . hold no precedential value."); *see also Walker v. Bozeman*, 243 F. Supp. 2d 1298, 1307 (N.D. Fla. 2003) ("A defendant with no authority to act on behalf of a co-defendant cannot bind the co-defendant to a settlement.").

[30] *Legacy Capital*, 548 B.R. at 33 (finding that "red flag" allegations amounted to "pleading . . . by hindsight"); *Elendow Fund*, 2013 WL 5179064, at *5 ("Nowhere does the complaint specifically and plausibly allege that Tremont actually knew that Madoff's operation was a fraud."); *see also Picard v. Avellino (In re BLMIS)*, 557 B.R. 89, 115 (Bankr. S.D.N.Y. 2016) (noting the "red flag" theory of *scienter* had been rejected in Madoff-related federal securities litigation because it "it was based on hindsight and required clairvoyance."); *BNP Paribas*, 594

already been rejected,[31] and makes no effort to distinguish his allegations from those cases.  The
only difference here is that in the PSAC, the Trustee adds an allegation suggesting Tremont was
aware of certain differences between the prices from BLMIS and the prices reported by
Bloomberg.  *See* PSAC ¶ 289.  However, this is merely a different flavor of the allegations this
court found insufficient in *Legacy Capital*, and the Trustee still has not been able to show that
Tremont conducted "a regular comparison of information [generated by BLMIS] and market
information."  548 B.R. at 33.  The "red flag" allegations are not enough.

    *Second*, the Trustee alleges that Tremont "received warnings of BLMIS's fraudulent
operations" from third parties.  These allegations have also been rejected by courts at every turn,
as mere "pleading by innuendo." PSAC ¶¶ 273-91; *BNP Paribas*, 594 B.R. at 201; Tremont
Compl. ¶¶ 236-50.  Indeed, the Tremont Complaint itself undermines the Trustee's argument,
citing internal emails suggesting that Tremont employees genuinely believed these concerns to be
"misconceptions."   Tremont Compl. ¶ 194; *see Elendow Fund*, 2013 WL 5179064, at *5
(allegations Tremont viewed concerns as "misconceptions" do not show Tremont actually knew
of Madoff's fraud but instead "strongly support the opposite inference").

    *Third*, the Trustee alleges that Tremont shielded Madoff from third parties and limited who
could correspond with Madoff and the types of information those individuals were allowed to
solicit.  *See* Tremont Compl. ¶¶ 89, 90, 191, 216; PSAC ¶¶ 294, 307, 309.  However, these
allegations are fundamentally at odds with allegations that the Trustee has advanced in other cases,

_____

B.R. at 198-99 ("[T]he 'red flag' theory of *scienter* has been rejected in Madoff-related securities
fraud litigation by numerous courts in the Second Circuit.").

[31] These include the consistency of Madoff's returns, the impossibility of Madoff's trading
volumes and transaction pricing, his unknown auditor and other related concerns implicating
Madoff's lack of transparency and the risks associated with the structure of BLMIS. *See* Tremont
Compl. ¶¶ 158-222.

in which he pleaded that Tremont actively helped to facilitate due diligence, including scheduling meetings at BLMIS with Madoff.  *See Picard v. Citibank N.A., et al*, Adv. Pro. No. 10-5345 (Bankr. S.D.N.Y.), ECF. No. 150, Ex. A ¶¶ 219, 221-22, 243-44, 249.  Such allegations undermine the inference that Tremont actually knew BLMIS was not trading securities.  *Elendow*, 2013 WL 5179064 at *5 ("[I]f Tremont had known, or even strongly suspected, that Madoff was perpetrating a fraud, it would have been peculiar for Tremont to continue discussing ways of gaining greater transparency into Madoff's operations and to continue sending Madoff due-diligence questionnaires."); *Legacy Capital*, 548 B.R. at 33 (stating it would be "peculiar" for Tremont to commission due diligence if it knew BLMIS was a fraud).  This Court has also already rejected the Trustee's attempts to analogize Tremont to the allegations in his *Kingate* action.  *See id.* at 35.  Indeed, no allegation in the Tremont Complaint comes close to the allegations that Kingate declined to conduct any due diligence on Madoff and "intimidated, attacked and threatened analysts who raised questions about Madoff."  *Id.*; *see Picard v. Ceretti (In re Madoff)* (*Kingate*), No. 08-99000 (SMB), 2015 WL 4734749, at *14 (Bankr. S.D.N.Y. Aug. 11, 2015).[32]

### 2.  Section 550(d) Bars The Trustee From Recovering The Remaining Transfers

Although Sections 546(e) and 546(g) do not bar recovery of actual fraudulent transfers within two years under Section 548(a)(1)(A), any such transfers have already been recovered in

---

[32]  The Trustee draws an attenuated connection between the Rye Funds and a different offshore Tremont entity, Tremont (Bermuda) Limited, which allegedly co-managed Kingate Global.  PSAC ¶¶ 333-37.  He then conclusorily asserts that Kingate's knowledge may be imputed to Tremont.  ¶ 337; *see also* Mot. at 34 n. 41.  The Trustee points to no law to support the idea that the knowledge of one entity can be imputed to an otherwise unaffiliated entity simply by virtue of being parties to a "co-management agreement."  *Id.*  And even if it could, the Trustee has pled no facts that the knowledge of Tremont (Bermuda)—itself only held by imputation—should be imputed further to the Rye Funds.  This bald, unsupported, and nonsensical legal conclusion is due no weight.  *See, e.g.*, *Twombly*, 550 U.S. at 555.

the settlement with Tremont. Under Section 550(d), therefore, the Trustee is thus barred from recovering the subsequent transfers as well. 11 U.S.C. § 550(d) (Trustee "entitled to only a single satisfaction under subsection (a) of this section"). This Court has already recognized that Section 550(d) may properly be applied to settlements with feeder funds who were initial transferees from BLMIS. *See, e.g.*, *BNP Paribas*, 594 B.R. at 186; *see also Kapila v. SunTrust Mortg., Inc. (In re Pearlman)*, 515 B.R. 887, 896 (Bankr. M.D. Fla. 2014) (noting that Section 550(d) prevents recovery of the same funds from the initial and subsequent transferees).

As in *BNP Paribas*, the Trustee has settled with the feeder fund, Tremont, that received the initial transfers here, and recovered all transfers within two years. Pursuant to the settlement, Tremont paid the Trustee $1.025 billion, exceeding the $959.6 million worth of initial transfers made to the Rye Funds and other Tremont entities within the two year lookback. *Picard v. Tremont Group Holdings, Inc., et al.*, Adv. Pro. No. 10-5310 (Bankr. S.D.N.Y.), ECF No. 17 Ex. A (hereinafter "Tremont Settlement Agmt."), ¶¶ 2-3, ¶ L. And there can be little doubt that the settlement recovered all of the transfers made in the two years prior to BLMIS's collapse. While the Trustee conspicuously omitted a provision—which he included in other settlements—confirming that the settlement was being allocated toward the entirety of the two-year transfers, this is not definitive.[33] This Court is permitted to, and should, find that the settlement agreement covers 100% of the two-year transfers, because recovering and avoiding any earlier transfers

---

[33] *See, e.g.*, Press Release, Irving H. Picard, Madoff Trustee Reaches Recovery Agreement of $140 Million with Feeder Fund Plaza Investments International & Notz, Stucki Management (Bermuda) Limited (June 19, 2015), https://www.madofftrustee.com/document/news/000595-sipa-trustee-and-sipc-press-release-on-plaza-settlement.pdf ("This payment by Plaza represents . . . 100 percent of the preference and transfers from BLMIS to the Plaza defendants that occurred within two years of the BLMIS liquidation filing.").

would require a showing of Tremont's knowledge, which as noted above would be very difficult.[34]

*See, e.g.*, *Legacy Capital*, 548 B.R. at 33-35; *Elendow Fund*, 2013 WL 5179064, at *5.  For these

reasons, the Trustee's claims under Section 548(a)(1)(A) are barred as already satisfied.

### C.    The Trustee Cannot Avoid the Alleged Transfers Because The Transfers Did Not Deplete The BLMIS Estate

Alternatively, the Trustee cannot recover the alleged subsequent transfers to Defendants

for the independent reason that they did not deplete the estate, and are therefore not avoidable.  *See*

*In re Whitley*, No. 10-10426, 2014 WL 6910837, at *1 (Bankr. M.D.N.C. Dec. 8, 2014); *Devon*

*Mobile Commc'ns Liquidating Tr. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,

No. 02-41729 (REG), 2006 WL 687153, at *14 (Bankr. S.D.N.Y Mar. 6, 2006) ("[T]he relevant

inquiry is whether the transfer had a net effect on the assets or liabilities of [the debtor].") (internal

quotation marks and citation omitted).  The Bankruptcy Code's avoidance provisions do not exist

to enrich the estate (or the Trustee's counsel) but to "protect a debtor's estate from depletion to the

prejudice of the unsecured creditor."  *In re Harris*, 464 F.3d 263, 273 (2d Cir. 2006) (citing *In re*

*French*, 440 F.3d 145, 150 (4th Cir. 2006)).

As the District Court recognized, the initial and subsequent transfers involved in the Swap

Transaction were "an integrated series of transactions."  *546(g) Decision*, 505 B.R. at 147.  These

transfers should therefore be evaluated as a circular transfer which did not deplete the estate.  *See*

*Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*, 500 B.R. 371, 379 (Bankr.

S.D.N.Y. 2013) (analyzing transactions as single integrated transaction "compatible with

fraudulent conveyance principles as both emphasize substance over form"); *see also*

---

[34] *See Dzikowski v. N. Tr. Bank of Fla., N.A. (In re Prudential of Florida Leasing, Inc.)*, 478 F.3d 1291, 1301, 1303 (11th Cir. 2007) (Court should allocate settlement "if future litigation requires" when "collateral litigation implicates the rule of single satisfaction").

*Intercontinental Metals Corp. v. Erlanger & Co., Inc.*, 902 F.2d 1565 (Table), No. 89-2626, 1990 WL 64805, at *1-2 (4th Cir. May 1, 1990) (upholding decision of the bankruptcy court and affirmance by the district court that "circular transfer" from a now-bankrupt company was not avoidable where the transfer had "no net deleterious effect on the bankruptcy estate").  For example, as the Trustee admitted, in March 2008, while Prime Fund withdrew $475 million to, in part, provide Defendants with $125 million, Defendants in turn invested $371 million into Broad Market, which then deposited $575 million into BLMIS.  Orig. Compl. ¶ 119-20.  From the months immediately prior to the Swap Transaction through the petition date, Prime Fund withdrew approximately $630 million from BLMIS.  PSAC Ex. D.[35]  But from the May 2, 2007 execution of the Swap Agreement to the petition date, Broad Market deposited a staggering $1.1 *billion* back into BLMIS.  *Id*. Ex. B.[36]  Accordingly, the alleged transfers did not deplete the BLMIS estate.

This is underscored by looking specifically at transfers to and from the Defendants.  While Defendants indirectly received $235.5 million from BLMIS via Prime Fund and Rye XL, and $30 million from BLMIS via Broad Market, they simultaneously reinvested that $235.5 million, along with an additional $450 million, into Broad Market, which invested that money back into BLMIS.  PSAC ¶¶ 260, 265.  In other words, BLMIS *gained* at least $420 million ($685.5 million less the $235 million in collateral and the $30 million redemption) from the Defendants in this "integrated series of transactions."  This situation is very different from the typical "net loser" scenario, where

---

[35] According to the account statement attached to the PSAC at Exhibit D, Prime made $630 million in withdrawals from June 2006 through the petition date ($30 million in June 2006, $35 million in August 2006, $50 million in September 2006, $20 million in November 2006, $20 million in December 2006, and $475 million in March 2008).

[36] According to the account statement attached to the PSAC at Exhibit B, Broad Market's BLMIS account had $517,687,625 in principal as of May 2, 2007, and $1,647,687,625 as of the petition date, resulting in a net *gain* of $1,130,000,000.

the transfer comes months or years later; here the transfer was part of and to facilitate an increased

investment in BLMIS.  Accordingly, the Trustee is barred from recovering these transfers.

## **CONCLUSION**

For all of the above reasons, Defendants respectfully request that the Court deny the

Trustee's Motion and deny leave to amend as futile.

Dated:  April 23, 2019
       New York, New York

                          Respectfully submitted,

                          LATHAM & WATKINS LLP

By:  /s/ Christopher R. Harris

                          Christopher R. Harris
                          Thomas J. Giblin
                          885 Third Avenue
                          New York, New York 10022
                          Telephone: (212) 906-1200
                          Facsimile: (212) 751-4864
                          Email: christopher.harris@lw.com
                          Email: thomas.giblin@lw.com

                          *Attorneys for ABN AMRO Bank (Ireland)*
                          *Ltd. (f/k/a Fortis Prime Fund Solutions Bank*
                          *(Ireland) Ltd.) (n/k/a ABN AMRO Retained*
                          *Custodial Services (Ireland) Limited) and*
                          *ABN AMRO Custodial Services (Ireland)*
                          *Ltd. (f/k/a Fortis Prime Fund Solutions*
                          *Custodial Services (Ireland) Ltd.)*