**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Seanna R. Brown
Matthew D. Feil
Chardaie C. Charlemagne
Elizabeth McCurrach

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>  Plaintiff-Applicant,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>  Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>  Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>  Plaintiff,<br><br>  v.<br><br>CITIBANK, N.A., CITIBANK NORTH AMERICA, INC., AND CITIGROUP GLOBAL MARKETS LIMITED,<br><br>  Defendants. | Adv. Pro. No. 10-05345 (SMB) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF TRUSTEE'S**
**MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

ARGUMENT .........................................................................................................3

I.   THE PAC ADEQUATELY ALLEGES DEFENDANTS' WILLFUL
     BLINDNESS.................................................................................................3

    A.   Defendants Subjectively Believed There Was a High Probability of Fraud ..........5

    B.   Defendants Deliberately Avoided Learning the Truth of Their Suspicions ...........9

II.  CGMI'S KNOWLEDGE IS IMPUTABLE TO DEFENDANTS ....................................11

III. THE TRUSTEE ALLEGES TREMONT'S ACTUAL KNOWLEDGE..........................15

    A.   Defendants' Authority is Unhelpful........................................................15

    B.   Tremont Knew of BLMIS's Fraud in Real Time...................................................16

        1.   Tremont Knew of BLMIS's Trade Impossibilities....................................16

        2.   Tremont Knew Others Believed Madoff Was a Fraud ..............................17

        3.   Tremont Shielded Madoff From Due Diligence.......................................17

        4.   Rather than Allow Diligence on BLMIS, Tremont Obfuscated
            and Lied ................................................................................19

    C.   Kingate's Knowledge of Madoff's Fraud is Imputed to Tremont .........................20

IV.  SECTION 550(D) DOES NOT APPLY UNTIL THE TRUSTEE HAS
     RECOVERED $2.1 BILLION RELATING TO TREMONT TRANSFERS ..................21

    A.   Amounts Relating to the Tremont Initial Transfers Remain Outstanding by
        the Express Terms of the Settlement ....................................................21

    B.   Changes in the Law Cannot Be Retroactively Applied to an Unambiguous
        Past Settlement..........................................................................23

V.   THE TRUSTEE HAS SUFFICIENTLY PLEADED AVOIDABLE TRANSFERS........26

CONCLUSION.....................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*,
   96 F. Supp. 3d 182 (S.D.N.Y. 2015).........................................................................4

*In re Adelphia Commc'n Corp.*,
   2006 WL 687153 (Bankr. S.D.N.Y. Mar. 6, 2006) ...............................................30

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*,
   No. 01 Civ. 11448 (JGK), 2005 WL 2385854 (S.D.N.Y. Sept 26, 2005)..............15

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012)....................................................................................3

*Anwar v. Fairfield Greenwich Ltd.*,
   728 F. Supp. 2d 372 (S.D.N.Y. 2010)...................................................................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................3

*Bear, Stearns Secs. Corp. v. Gredd*,
   275 B.R. 190 (S.D.N.Y. 2002)...............................................................................28

*Bernadotte v. New York Hosp. Med. Ctr. of Queens*,
   No. 13-CV-965 (MKB), 2014 WL 808013 (E.D.N.Y. Feb. 28, 2014)....................4

*In re BLMIS*,
   654 F.3d 229 (2d Cir. 2011)...................................................................................29

*Bowers v. Kuse Enters., Inc. (In re Fla. Hotel Props. Ltd. P'ship Plan Tr.
   Agreement)*,
   Nos. 97-2583, 97-2507, 1998 WL 957455 (4th Cir. Sept. 22, 1998)
   (Unpublished Disposition).....................................................................................24

*Buchwald v. Di Lido Beach Resort, Limited (In re McCann, Inc.)*,
   318 B.R. 276 (Bankr. S.D.N.Y. 2004)..............................................................28, 29

*CGMI Inc. v. Abbar*,
   761 F.3d 268 (2d Cir. 2014)...................................................................................13

*Citigroup Global Markets Inc. v. VSG Special Opportunities Master Fund Ltd*,
   No. 08-CV-5520 (BSJ), 2008 WL 4891229 (S.D.N.Y. 2008)................................13

*Collins v. Cayuga Energy, Inc. (In re S. Glens Falls Energy, LLC)*,
   No. 06-60073, 2009 WL 2883141 (Bankr. N.D.N.Y. Jan. 30, 2009)....................26

ii

*In re Consol. Pioneer Mortg. Entities*,
  211 B.R. 704 (S.D. Cal. 1997), *aff'd in part, rev'd in part*, 166 F.3d 342 (9th
  Cir. 1999) .................................................................................................................29

*Cromer Fin. Ltd. v. Berger*,
  No. 00 Civ. 2284, 2002 WL 826847 (S.D.N.Y. May 2, 2002)................................12

*Ctr. v. Hampton Affiliates, Inc.*,
  66 N.Y.2d 782 (1985) ...........................................................................................13

*Dozier v. Deutsche Bank Tr. Co. Ams.*,
  No. 09–Civ–9865 (LMM), 2011 WL 4058100 (S.D.N.Y. Sept. 1, 2011)................4

*Dzikowski v. N. Tr. Bank of Fla., N.A. (In re Prudential of Fla. Leasing, Inc.)*,
  478 F.3d 1291 (11th Cir. 2007) .......................................................................22, 25

*Elendow Fund, LLC v. Rye Select Broad Market XL Fund (In re Tremont Sec.
  Law)*,
  No. 10 Civ. 9061, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013) ....................15, 16

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*,
  690 F. Supp. 256 (S.D.N.Y. 1988)........................................................................14

*Food Holdings Ltd. v. Bank of Am. Corp. (In re Parmalat Sec. Litig.)*,
  684 F. Supp. 2d 453 (S.D.N.Y. 2010)...................................................................13

*Fortis Corp. Ins., S.A. v. M/V CIELO DEL CANADA*,
  320 F. Supp. 2d 95 (S.D.N.Y. 2004)......................................................................12

*Geltzer v. Mooney (In re MacMenamin's Grill, Ltd.)*,
  450 B.R. 414 (Bankr. S.D.N.Y. 2011)...................................................................25

*Gibbons v. First Fid. Bank, N.A. (In re Princeton-New York Inv'rs, Inc.)*,
  255 B.R. 376 (Bankr. D.N.J. 2000) .......................................................................22

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011)............................................................................................3, 5

*Int'l Controls Corp. v. Vesco*,
  556 F.2d 665 (2d Cir. 1977)....................................................................................3

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
  309 F.3d 76 (2d Cir. 2002)....................................................................................22

*Intercontinental Metals Corp. v. Erlanger & Co.*,
  902 F.2d 1565 (4th Cir. 1990) ...............................................................................30

*Ivey v. First-Citizens Bank and Tr. Co. (In re Whitley)*,
No. 10-10426, 2014 WL 6910837 (Bankr. M.D.N.C. Dec. 8, 2014)*, aff'd sub nom. Ivey v. First Citizens Bank & Tr. Co.,* 539 B.R. 77 (M.D.N.C. 2015), *aff'd but criticized sub nom. In re Whitley,* 848 F.3d 205 (4th Cir. 2017)..............................29

*Kermanshah v. Kermanshah*,
580 F. Supp. 2d 247 (S.D.N.Y. 2008)....................................................................4, 10

*Malinowski v. New York State Dep't of Labor (In re Malinowski)*,
156 F.3d 131 (2d Cir. 1998)..................................................................................29

*Minskoff v. Am. Exp. Travel Related Servs. Co.*,
98 F.3d 703 (2d Cir. 1996)...................................................................................12

*N.Y. Univ. v. First Fin. Ins. Co.*,
322 F.3d 750 (2d Cir. 2003).................................................................................13

*In re Napolitano*,
No. 07-73361-478, 2008 WL 5401541 (Bankr. E.D.N.Y. 2008) ...........................24

*Negrete v. Citibank, N.A.*,
237 F. Supp. 3d 112 (S.D.N.Y. 2017).....................................................................4

*New York v. United Parcel Serv., Inc.*,
253 F. Supp. 3d 583 (S.D.N.Y. 2017)................................................................13, 14

*Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*,
51 F. Supp. 2d 457 (S.D.N.Y. 1999)......................................................................15

*Palm Beach Strategic Income, LP v. Salzman*,
No. 10-CV-261 (JS) (AKT), 2011 WL 1655575 (E.D.N.Y. May 2, 2011)...............4

*In re Parmalat Sec. Litig.*,
501 F. Supp. 2d 560 (S.D.N.Y. 2007)....................................................................21

*Picard v. ABN Amro Bank (Ireland) Ltd. (In re Madoff)*,
Adv. Pro. No. 10-05355 (SMB) (Bankr. S.D.N.Y. June 18, 2012)........................26

*Picard v. BNP Paribas, S.A. (In re BLMIS)*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018)................................................................6, 11

*Picard v. Ceretti (In re BLMIS)*,
No. 08-99000 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015)..........15, 20

*Picard v. Greiff (In re Madoff Sec.)*,
476 B.R. 715 (S.D.N.Y. 2012)..............................................................................25

*Picard v. Legacy Capital Ltd. (In re BLMIS),*
    548 B.R. 13(Bankr. S.D.N.Y. 2016) ...........................................................................19

*Picard v. Lustig (In re BLMIS),*
    568 B.R. 481 (Bankr. S.D.N.Y. 2017) ........................................................................27

*Picard v. Madoff (In re BLMIS),*
    458 B.R. 87 (Bankr. S.D.N.Y. 2011) ..........................................................................25

*Picard v. Mendelow (In re BLMIS),*
    560 B.R. 208 (Bankr. S.D.N.Y. 2016) ..........................................................................3

*Picard v. Merkin (In re BLMIS),*
    440 B.R. 243 (Bankr. S.D.N.Y. 2010) ........................................................................15

*Picard v. Merkin (In re BLMIS),*
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ...............................................................9, 10, 28

*Picard v. Merkin (In re BLMIS),*
    563 B.R. 737 (Bankr. S.D.N.Y. 2017) ..................................................................7, 9, 17

*Playboy Enters. Int'l, Inc. v. On Line Entm't, Inc.,*
    No. CV 00-6618(DGT), 2004 WL 626807 (E.D.N.Y. Mar. 29, 2004) ...................................25

*Ratzlaf v. United States,*
    510 U.S. 135 (1994) ..............................................................................................16

*Reiss v. Societe Centrale Du Groupe Des Assurances Nationales,*
    235 F.3d 738 (2d Cir. 2000) .....................................................................................11

*Residential Funding Corp. (USA) v. SunTrust Mortgage, Inc. (In re Residential
    Capital, LLC),*
    536 B.R. 132 (Bankr. S.D.N.Y. 2015) ........................................................................25

*Rodriguez v. United States,*
    54 F.3d 41 (1st Cir. 1995) (Bownes, J., concurring) .........................................................20

*Schumacher v. Ray (In re Schumacher),*
    No. CV 08-3027-SVW, 2010 WL 11444287 (C.D. Cal. Jan. 15, 2010) ...........................22, 23

*Segner v. Ruthven Oil & Gas, LLC (In re Provident Royalties, LLC),*
    581 B.R. 185 (Bankr. N.D. Tex. 2017) ........................................................................21

*Sharp v. Evanston Ins. (In re C.M. Meiers Co.),*
    No. 1:12–bk–10229–MT, 2016 WL 9458553 (Bankr. C.D. Cal. Dec. 20,
    2016) ................................................................................................................22

*SIPC v. BLMIS (In re BLMIS)*,
    522 B.R. 41 (Bankr. S.D.N.Y. 2014) ...................................................................28

*SIPC v. BLMIS (In re BLMIS)*,
    No. 08-01789(SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016) ..........................29

*SIPC v. BLMIS (In re Madoff Sec.)*,
    516 B.R. 18 (S.D.N.Y. 2014) ...................................................................5, 25

*SIPC v. BLMIS (In re Madoff Sec.)*,
    No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. April 15, 2013) ...........................15, 16

*Streit v. Bushnell*,
    424 F. Supp. 2d 633 (S.D.N.Y. 2006) ...................................................................4

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................3

*United States v. Nektalov*,
    461 F.3d 309 (2d Cir. 2006) ...................................................................5

*United States v. Reyes*,
    302 F.3d 48 (2d Cir. 2002) ...................................................................5

*United States v. Simon*,
    85 F.3d 906 (2d Cir. 1996) ...................................................................16

*UnitedHealth Grp., Inc. v. Columbia Cas. Co.*,
    47 F. Supp. 3d 863 (D. Minn. 2014), *aff'd sub nom. UnitedHealth Grp. Inc. v.
    Exec. Risk Specialty Ins. Co.*, 870 F.3d 856 (8th Cir. 2017)...................................................................24

*Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*,
    973 F.2d 1065 (3d Cir. 1992) ...................................................................29

*Weinberg v. Vill. of Clayton, New York*,
    No. 5:17-cv-00021(BKS/ATB), 2018 WL 5777292 (N.D.N.Y. Nov. 2, 2018) ..................3, 4

*Westinghouse Credit Corp. v. D'Urso*,
    278 F.3d 138 (2d. Cir. 2002) ...................................................................29

*Wheatland v. Pryor*,
    133 N.Y. 97 (1892) ...................................................................12, 13

## Statutes

11 U.S.C. § 544 ...................................................................24

11 U.S.C. § 546(e) ...................................................................15, 23, 25

11 U.S.C. § 546(g) .............................................................................................................15

11 U.S.C. § 547 ..................................................................................................................24

11 U.S.C. § 548 ..................................................................................................................24

11 U.S.C. § 548(a)(1)(A) ....................................................................................................28

11 U.S.C. § 548(c) ..............................................................................................................27

11 U.S.C. § 550 .............................................................................................................21, 24

11 U.S.C. § 550(d) .....................................................................................................21, 22, 25

11 U.S.C. § 741(7) ..............................................................................................................15

**Rules**

Fed. R. Bankr. P. 2004 ........................................................................................................12

Fed. R. Bankr. P. 9019 ........................................................................................................23

Fed. R. Civ. P. 12(b)(6) .........................................................................................................4

## PRELIMINARY STATEMENT

Defendants' efforts to convince this Court to accept their version of events—rather than the well-pleaded allegations in the Trustee's complaint—revolve around two central premises. The first is that the indemnification was meaningless because it did not actually protect them in the event of BLMIS's fraud. And the second is that it is implausible for Defendants to enter into a transaction to earn fees having identified a risk of fraud. Neither is borne out by the PAC.[1]

Defendants do not, and cannot, refute that they required indemnification from fraud as part of any deal involving Madoff. So they downplay its significance. They argue the indemnification did not actually protect them because it was offered by a party (Tremont Partners) whose ability to pay out on it would have been eradicated by BLMIS's collapse. But the facts show that at the time they entered into the indemnification, Defendants believed that Tremont Partners was invested with hundreds of asset managers and in at least a dozen different strategies. Defendants also made clear they required Tremont Partners remain a wholly owned subsidiary of Oppenheimer Funds and reserved the right to terminate the deal if that changed. Far from being meaningless, Defendants negotiated a powerful remedy that protected them from the risk—BLMIS's fraud—that they saw and turned away from.

Defendants join in the oft-repeated chorus that no one would knowingly transact with a business engaged in a fraudulent scheme, particularly just for fees. While the argument has some facial appeal, one need look no further than last week's newspaper to see financial institutions either engaging directly in fraud, or transacting with another party it knows to be engaging in fraud, in order to earn fees. But here, the Court need not decide whether it is illogical for a party to enter into a transaction knowing that it is exposed to the specific risk of

---

[1] All terms not defined here have the definitions stated in the Trustee's opening brief and the PAC.

fraud to earn fees because Defendants were not exposed to that risk.  Defendants were

indemnified, allowing them to enter into the transaction and earn their fees—$43 million dollars

in three years—without fear of losing.

Having staked their claim on the idea that no one knowingly transacts with a business

running a Ponzi scheme, Defendants do not squarely address the Trustee's allegations of willful

blindness.  They first belittle them as generic red flags compiled in hindsight and then claim their

due diligence was a deliberate step to confirm that BLMIS operated much like any other

managed fund overseen by the SEC.  Neither of these diversionary tactics overcomes the detailed

chronology of events showing that Defendants developed a subjective belief Madoff was likely

engaged in fraud and *then* marshalled their considerable institutional resources to profit from

BLMIS's fraud, leaving others to bear the costs.  The $343 million Defendants received in

subsequent transfers was comprised of other people's money—money Madoff misappropriated

(as Defendants suspected) from other customers.

Alternatively, Defendants argue this Court should allocate settlement proceeds in a

manner that wholly expunges their subsequent transfer liability.  But Defendants have it

backwards—the Court must first determine the liability of Defendants and other similarly-

situated parties, and then it can conduct a post-settlement allocation (if necessary) in a

comprehensive manner that is fair and equitable to all affected parties.  To allow the Defendants

to rewrite a settlement agreement entered into over seven years ago on a motion on the pleadings

is contrary to the law that requires the court, when conducting an allocation, to consider the law

and facts as they were at the time the settlement was consummated.  In any event, the Court need

not engage in such an allocation here because the Trustee adequately alleges Tremont's actual

knowledge of Madoff's fraud, in light of Tremont's ten-year involvement with Kingate, the

warnings it received from third parties, and its efforts to shield Madoff from scrutiny.

## ARGUMENT

## I.    THE PAC ADEQUATELY ALLEGES DEFENDANTS' WILLFUL BLINDNESS

To allege willful blindness, the Trustee must plead: "(1) [Defendants] subjectively believe that there is a high probability that a fact exists and (2) [Defendants] take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). Defendants contend the Trustee's allegations are implausible and contradicted by the Trustee's original complaint, and that the Trustee fails to adequately allege both prongs of willful blindness. Defendants' assertions are without merit.

First, a claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Picard v. Mendelow (In re BLMIS)*, 560 B.R. 208, 225 (Bankr. S.D.N.Y. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plausibility is not a "probability requirement," merely requiring "a sheer possibility that a defendant has acted unlawfully." *Id.* Defendants ask this Court to engage in a comparative evaluation and incorrectly contend that their suggested inferences are more compelling than the Trustee's. However, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). Were this Court to engage in such an analysis, a reasonable person would deem the Trustee's inferences to be "cogent and at least as compelling" as any opposing inference of non-fraudulent intent suggested by Defendants. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Second, filing an amended complaint renders the original complaint a nullity. *See Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977); *Weinberg v. Vill. of Clayton, New*

3

*York*, No. 5:17-cv-00021 (BKS/ATB), 2018 WL 5777292, at *6 (N.D.N.Y. Nov. 2, 2018). "[I]n

a typical case, a prior inconsistent pleading should not trump the Court's obligation under Rule

12(b)(6) to accept a complaint's allegations as true." *Palm Beach Strategic Income, LP v.*

*Salzman*, No. 10-CV-261 (JS) (AKT), 2011 WL 1655575, at *6 (E.D.N.Y. May 2, 2011).

Nonetheless, some courts have held that they "need not accept as true allegations that conflict

with a plaintiff's prior allegations." *Dozier v. Deutsche Bank Tr. Co. Ams.,* No. 09–Civ–9865

(LMM), 2011 WL 4058100, at *2 (S.D.N.Y. Sept. 1, 2011). Other courts have held otherwise,

noting "[i]t would be a harsh rule of law indeed if a litigant were to change a statement in an

amended pleading to repair a weakness cited by an adversary or by the Court, only to have the

case dismissed because the conforming change in some way may conflict with an allegation in

the earlier pleadings." *Streit v. Bushnell*, 424 F. Supp. 2d 633, 640 n.4 (S.D.N.Y. 2006); *see also*

*Bernadotte v. New York Hosp. Med. Ctr. of Queens*, No. 13-CV-965 (MKB), 2014 WL 808013,

at *5 (E.D.N.Y. Feb. 28, 2014) (collecting cases).

Despite the different approaches taken by courts within this Circuit, Defendants' reliance

on the rationale in cases like *Salzman* and *Negrete v. Citibank, N.A.*, 237 F. Supp. 3d 112, 129

(S.D.N.Y. 2017), is inapplicable here. Unlike those cases, the PAC is not inconsistent with, nor

does it contradict, the original complaint. *See Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247,

266 (S.D.N.Y. 2008) ("The changes between the complaint and amended complaint are, when

taken as a whole, not 'blatant' or 'directly contradict[ory],' and can be described as clarifying but,

at most, as inconsistent."); *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*,

96 F. Supp. 3d 182, 206-07 (S.D.N.Y. 2015).

Finally, Defendants argue the Trustee fails to allege both prongs of willful blindness.

Defendants conflate the willful blindness and actual knowledge standards, arguing that the "fact"

in the first prong of *Global-Tech* requires the Trustee to allege Defendants subjectively believed

Madoff was operating a Ponzi scheme *specifically*, rather than fraud generally.  But this

argument is contrary to well-established case law governing willful blindness in this Circuit.

> The culpability of the wilfully [sic] blind defendant lies in his averting his eyes to
> what he thinks he sees, not in the objective accuracy of his vision. . . . Thus,
> conscious avoidance encompasses a defendant's "deliberately refusing to confirm
> the existence of one or more facts that he believes to be true," regardless of whether
> those facts actually are true.

*United States v. Nektalov*, 461 F.3d 309, 315 (2d Cir. 2006) (quoting *United States v. Reyes*, 302

F.3d 48, 54 (2d Cir. 2002)).

Thus, the Trustee need only allege Defendants "intentionally [chose] to blind

[themselves] to the 'red flags' that suggest a high probability of fraud" at BLMIS.  *SIPC v.*

*BLMIS (In re Madoff Sec.)*, 516 B.R. 18, 21 (S.D.N.Y. 2014) (first alteration in original) (citation

omitted).  Either way, because the Trustee alleges Defendants contemporaneously expressed

their belief in a high probability BLMIS was misappropriating customers' assets instead of

investing them, the Trustee's allegations demonstrate Defendants' willful blindness.

### A.    Defendants Subjectively Believed There Was a High Probability of Fraud

The Trustee adequately alleges Defendants learned of facts causing them to believe there

was a high probability BLMIS was not making trades as purported and misappropriating its

customers' assets (*i.e.*, running a Ponzi scheme).  Because of these well-founded suspicions of

fraud, Defendants obtained an indemnity to protect themselves should those suspicions prove

true.  Defendants now downplay the importance of their unique indemnity and self-proclaimed

"primary mitigant of fraud," arguing that it was a "standard" provision meant to protect a

"remote" and "theoretical" risk, and that it did not actually protect them from fraud.

These arguments are contradicted by Defendants' contemporaneous statements and

conduct, which demonstrate their belief the indemnity was necessary and sufficient.  When

Defendants entered the Prime Fund Credit Deal, they believed the probability of fraud at BLMIS was too high to rely on Prime Fund's assets as collateral, as those assets were custodied by BLMIS. *Cf. Picard v. BNP Paribas, S.A. (In re BLMIS)*, 594 B.R. 167, 202-03 (Bankr. S.D.N.Y. 2018) (noting it was implausible defendant would rely on Madoff-pledged securities as collateral for a loan if it believed BLMIS was not trading securities). Instead, they required the indemnity to protect against fraud at BLMIS. *See* PAC at ¶¶ 177, 180-83; *see also* Decl. of Carmine D. Boccuzzi Jr., March 12, 2019 ("Boccuzzi Decl."), Ex. C ("May 2005 Memo") at 5, 9.

Defendants argue the Trustee's allegations are implausible, their concerns of fraud were sufficiently mitigated by Madoff's reputation and the indemnity against fraud, and that the May 2005 Memo reflects their belief in Madoff's "trustworthiness," not his fraudulence. Def. Br. at 21. Defendants also claim the indemnity obtained from Tremont Partners was fully dependent on BLMIS, and thus, "essentially worthless," and "had no value." *Id.* at 7, 21-23. Defendants' attempts to recharacterize their actions are specious at best.

Defendants took multiple precautions to ensure Tremont Partners could repay the credit facility, including requiring Tremont Partners' audited financials. *See* PAC at ¶ 238-39; 242; *see also* Boccuzzi Decl., Ex. A ("Credit Facility") at 35-36. In fact, "any material adverse change in [Tremont Partners'] financial position or impairment of [its] ability to perform its obligations would be an event of default, under which [Defendants could] terminate the Facility and demand repayment." May 2005 Memo at 6. Defendants also insisted that Tremont Partners remain a wholly owned subsidiary of Oppenheimer Funds—a requirement they incorporated into the agreement and reiterated to Tremont: "[Defendants] approved this deal with the knowledge that Tremont is part of the Oppenheimer family. We would want the right to reconsider that if Tremont were no longer an affiliate of OFI." PAC at ¶¶ 184-85.

6

Contrary to Defendants' claims they believed Tremont Partners was wholly invested in BLMIS (thereby making the indemnification worthless in the event of BLMIS's collapse), their contemporaneous memoranda show they believed "Tremont's strategy [wa]s to be diversified by asset class, manager and geography with allocations of client money to some 400 different managers across as many as 12 different strategies."[2]  May 2005 Memo at 9.

Defendants repeatedly renewed the Prime Fund Credit Deal until Tremont Partners removed the indemnity.  Defendants concede they were unwilling to renew the Credit Facility on "worse terms," but the only material difference was the lack of fraud indemnification.  Def. Br. 22-23.  Understanding the parties had reached an impasse because Defendants "need[ed] indemnification against manager fraud," Tremont informed CGMI it intended to repay the loan five days before the expiration date and executed the termination agreement.  PAC at ¶¶ 258-59.

Defendants were unwilling to enter the Prime Fund Credit Deal without an indemnity because they suspected Madoff was committing fraud, knowing he could not achieve his purported returns with the SSC strategy.  Defendants knew BLMIS's returns should have correlated to the returns of the S&P 100 Index.  *See* May 2005 Memo at 2 (explaining the SSC strategy involved the purchase of 30-40 S&P 100 equities "expected to most closely mirror the performance of the [S&P 100 Index]").  But Defendants' agent, CGMI, performed an analysis showing that BLMIS outperformed the S&P 100 Index (Def. Br. at 30), "achieve[d] consistent results, whether the S&P [100] trend[ed] up or down," and the "performance of [BLMIS was] to a large degree independent of the gyrations of the S&P [100]."  *Picard v. Merkin (In re BLMIS)*, 563 B.R. 737, 746 (Bankr. S.D.N.Y. 2017) ("*Merkin III*") (first, third, and fifth alterations in

---

[2] In fact, Defendants point specifically to Tremont's financial strength to mitigate the fraud risk at BLMIS, stating: "The discretionary nature of the Brokerage Account presents potential fraud risk [sic] from the Investment Advisor [BLMIS].  That potential risk is mitigated by the financial strength of Tremont."  May 2005 Memo at 9.

original) (holding a similar study raised strong suspicions BLMIS was a fraud); *see also* PAC at ¶¶ 138, 142-54. This analysis confirmed "that BLMIS could not achieve the investment returns it purported to earn using the SSC strategy."[3] PAC at ¶ 154. CGMI managing director, Leon Gross, replicated these results in a separate investigation and "mathematical analysis" (PAC at ¶ 163) and also concluded BLMIS was either lying about its purported returns or the strategy it used to achieve them. *See id.* at ¶¶ 155, 159-166. In either event, Defendants subjectively believed there was a high probability of fraud.

Defendants contemporaneously expressed and internally memorialized their concerns that BLMIS's self-custody and lack of internal controls created a high risk of misappropriation. *See id.* at ¶¶ 118, 120, 126-35, 180-83. Defendants also understood it was highly improbable, if not impossible, for BLMIS to regularly trade billions of dollars of S&P 100 Index options and unsuccessfully sought evidence BLMIS was not fabricating its purported options trades. *See id.* at ¶¶ 114-17, 127, 165-68.

Defendants make much of a single use of the word "remote" in the May 2005 Memo to qualify their suspicions of fraud. But by April 2006, Defendants described the probability of fraud at BLMIS as a "fundamental roadblock[]" and the absence of proof of BLMIS's purported trades was a "critical issue." *Id.* at ¶¶ 219, 226. By that time, it was clear from their requests to Tremont and FGG that Defendants suspected BLMIS was not making its purported trades. *See, e.g.*, *id.* at ¶¶ 187-216. Defendants sought proof of the trades, including the names of one or two counterparties, to inspect copies of the purported trade confirmations, and any independent verification the assets existed. This information would not provide enough detail to conduct an

---

[3] Contrary to Defendants' argument that the Trustee previously alleged they never performed any quantitative analyses, the Trustee originally alleged that *Mathur* claimed Defendants never conducted any such analysis. Orig. Compl. ¶ 112. Mathur's claim is contradicted by the existence of the Quantitative Analysis and Gross's analysis.

analytical review or ongoing due diligence but was specifically targeted at substantiating the existence of the purported trades.  By their own admission, Defendants never received the answers they sought.  *See id*. at ¶¶ 209-16.  Based on these facts, Defendants suspected Madoff was misappropriating assets and not trading—*i.e.*, that he was conducting a Ponzi scheme.

### B.    Defendants Deliberately Avoided Learning the Truth of Their Suspicions

Defendants mistakenly argue the Trustee cannot show they turned a blind eye because they conducted some due diligence.  *See* Def. Br. at 24, 31.  This argument ignores the chronology alleged in the PAC.  "The willful blindness inquiry asks whether an individual took deliberate action to avoid confirming a fact *after* learning that there was a high probability that such fact was true."  *Merkin III*, at 749.  That is precisely what Defendants did.  After learning of the high probability of fraud at BLMIS, by April 20, 2006, Defendants ceased their efforts to verify BLMIS was making its purported trades.  *See id*. at ¶¶ 225-26.

Notwithstanding their claim of "continuous due diligence being performed throughout the lifetime of the transactions" (Def. Br. at 22), Defendants do not cite any attempt to address their concerns of fraud after April 20, 2006.  Nor can they rely on their "standard due diligence process" and "internal CMAC approval process" (*id.*) that occurred before that date, where those processes demonstrate that they saw, appreciated, and contemporaneously articulated their suspicions of fraud.  *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 141 (Bankr. S.D.N.Y. 2014) ("*Merkin I*"); *see also Merkin III*, at 749.  Defendants' statements reflect their specific suspicions that BLMIS was misappropriating customer assets instead of investing them.  PAC ¶¶ 118, 126-31, 169-71, 180-81, 195-205, 209-19, 226-28.  They never resolved these suspicions, but stopped trying, despite opportunities to air those concerns directly to Madoff.  *See id.* at ¶¶ 241-52.

They abandoned the first such opportunity (the April 2006 meeting), describing their suspicions as "fundamental roadblocks" to a deal that did not protect them from Madoff's fraud,

while simultaneously affirming they were "extremely happy" with the Prime Fund Credit Deal because they were indemnified. *See* PAC at ¶¶ 228-29. Like Merkin, Defendants had made their peace with Madoff and no longer sought to question him.[4] *See Merkin I*, at 131.

After abandoning this meeting, Defendants focused their "due diligence" solely on Tremont Partners' audited financials to verify the sufficiency of their fraud indemnification. *Id.* at ¶¶ 237-40. When Tremont was unable to produce its audited financials, Defendants became "increasingly uncomfortable" and "very unsettled." *Id.* at ¶ 240. This led to Defendants' renewed interest in meeting with Madoff to "resolve internal wonder." *Id.* at ¶¶ 242-43. After receiving Tremont Partners' audited financials, Defendants shifted the purpose of their Madoff meeting and were no longer concerned with proof of the purported options trades, the stated purpose of the abandoned April 2006 meeting. *See id.* at ¶¶ 219, 244-48. The meeting agenda of topics Defendants sought to discuss with Madoff in November 2006 did not mention BLMIS's purported options transactions, the identity of the purported counterparties, or verification of BLMIS's purported trading activity. *Id.* at ¶ 249. Moreover, Defendants sent individuals with a direct economic interest in renewing and increasing the Prime Fund Credit Deal, rather than those who had expressed concerns about BLMIS. *See id.* at ¶¶ 167-68, 200-01, 222-23.

These allegations are consistent with the Trustee's original complaint, which alleges Defendants continued to have concerns about fraud and sought to meet with Madoff. The PAC contains salient details concerning the personnel sent to this meeting and the agenda of issues they sought to address, both of which further clarify Defendants' intent to consciously avoid confirming Madoff's fraud. *See Kermanshah*, 580 F. Supp. 2d at 266.

---

[4] That Defendants abandoned this meeting is not inconsistent with the Trustee's original complaint, which alleges Tremont cancelled the meeting. Defendants did not have direct access to Madoff, and thus relied on Tremont to arrange a meeting with Madoff. Because they no longer sought to meet with him, Tremont cancelled the meeting.

Defendants do not cite to anything they learned between April 20, 2006, and the

termination of the agreement in March 2008, that turned them from non-believers into believers.

*Cf. BNP*, 594 B.R. at 200 (noting defendants did not learn information "that turned them from

believers to non-believers."). Nor can they. It is clear they made no attempt to address their

suspicions of fraud at BLMIS after that date because they were indemnified. Defendants refused

to renew the deal without the indemnification, confirming that from its outset until its

termination: "Citi need[ed] indemnification from manager fraud." PAC at ¶ 258.

## II.    CGMI'S KNOWLEDGE IS IMPUTABLE TO DEFENDANTS

The PAC sufficiently alleges CGMI and its personnel acted with actual authority for

Defendants with respect to the Prime Fund Credit Deal.[5] The PAC extensively details how

Defendants conducted their BLMIS-related business through CGMI employees,[6] who conducted

nearly all aspects of the Prime Fund Credit Deal including key business roles, negotiations, due

diligence, and execution of the Credit Facility and its associated agreements. *See id.* at ¶¶ 39, 57,

60-63, 66, 175-186, 228-232, 236. CGMI personnel also evaluated and executed agreements

associated with the Fairfield Sentry Leverage Deal and evaluated and rejected the Proposed

Tremont Deal. *Id.* at ¶¶ 64-66. Defendants do not dispute they conducted their BLMIS-related

business through these individuals, nor claim these individuals were not CGMI employees.

---

[5] The allegations in the PAC also support an agency relationship between CGMI and Defendants based on apparent authority that requires "some conduct by the principal, communicated to a third party, which reasonably gives the appearance that the agent has authority to conduct a particular transaction . . . ." *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738, 748 (2d Cir. 2000). Here, Tremont referred to "Citi" when referencing its negotiations with CGMI and made no distinction between the entities. *See* PAC ¶¶ 219, 239, 257-58. Notably, Defendants do the same thing in their opposition. Def. Br. at 5, 8, 10, 12, 26, 28, 32, 37, n.3, n.26, n. 28.

[6] Specifically: Marc Adelman (*id.* ¶¶ 60, 62, 179, 185, 236-37, 240, 242-43), Richard Burns (*id.* ¶¶ 54, 117, 200-01, 218, 222-24), Bruce Clark (*id.* ¶¶ 60, 250-51), Paul Donlin (*id.* ¶¶ 60-61), Joseph Elmlinger (*id.* ¶¶ 54, 117, 200-01, 218, 222-24), Thomas Fontana (*id.* ¶¶ 60, 250-51), Leon Gross (*id.* ¶¶ 6, 54, 117, 155-67, 169-74, 198), Ramesh Gupta (*id.* ¶¶ 117, 120, 167-68, 198, 208, 211-13, 218, 222-25), Samir Mathur (*id.* ¶¶ 107, 120, 123-28, 133, 140, 190, 196, 199-201, 208-16, 218, 224, 234), Elena Matrullo (*id.* ¶ 222), Vishal Mishra (*id.* ¶¶ 202-03, 208-11, 225, 234), Matthew Nicholls (*id.* ¶¶ 60, 62, 179, 187, 190, 225-26, 229, 232, 236, 240, 243, 245, 248-52), and Rajiv Sennar (*id.* ¶¶ 107, 190-91, 193-196).

Instead, they demur these "allegations appear to be plucked from thin air . . . ." Def. Br. p. 4-5

n.3. These well-founded allegations are based on public records and Rule 2004 discovery.[7]

Actual authority exists when an agent has power "to do an act or to conduct a transaction

on account of the principal which, . . . he is privileged to do because of the principal's

manifestations to him." *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d

Cir. 1996). "The 'consent for actual authority may be either express or implied from "the

parties'" words and conduct . . . .'" *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372,

435 (S.D.N.Y. 2010) (quoting *Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2284, 2002 WL 826847,

at *4 (S.D.N.Y. May 2, 2002)). CGMI was part of Citigroup's one cohesive unit strategy,

supporting the Trustee's contention of agency. *See* PAC at ¶¶ 47-49, 52-57.

Defendants' clear intent to grant authority is evidenced by the terms of the Credit Facility

itself, which anticipated that Citibank may use multiple agents to effectuate the deal.[8] *See Fortis*

*Corp. Ins., S.A. v. M/V CIELO DEL CANADA*, 320 F. Supp. 2d 95, 98 (S.D.N.Y. 2004) (noting

that "[a] principal can have multiple agents"). The Credit Facility explicitly authorizes the

"Agent" to execute its duties through agents of its own. Credit Facility, at 48. Defendants

ignore these explicit terms of the Credit Facility and the fact that:

> There are undoubtedly cases where an agent is authorized by his principal to
> employ sub-agents, . . . and in such cases it is frequently true that both the agent
> and the sub-agents are the representatives of the principal, and the knowledge which
> either of them acquired in the business may be imputed to the principal.

---

[7] These include publicly available "BrokerCheck" reports from the Financial Industry Regulatory Authority, showing employment by CGMI. *See* Decl. of Seanna R. Brown, dated May 7, 2019 ("Brown Decl.") Ex. A.

[8] Defendants incredibly argue that CGMI was not Citibank, N.A.'s agent because "Citicorp, not CGMI, signed the Credit Facility transaction documents as agent . . . ." Def. Br. at 27 n.23. This nonsensical argument ignores the fact that Adelman, a CGMI employee, also signed the Credit Facility on behalf of Citibank and CAFCO, themselves parties to the Credit Facility with different roles other than "Agent." Although Citicorp was identified as "Agent" (a defined term) under the agreement, this does not preclude an agency relationship between CGMI and Citicorp, Citibank, and CAFCO, when CGMI's Adelman signed for all three parties. *See* Credit Facility at signature page.

*Wheatland v. Pryor*, 133 N.Y. 97, 103 (1892).

Notably, CGMI has taken contradictory positions regarding their role as agent for Defendants and other Citigroup entities in the past.[9]  Here, Defendants cannot insulate themselves from CGMI's actions, where they conducted nearly all their BLMIS-related business through CGMI and its employees.  CGMI implicitly demonstrated its consent to act as Defendants' agent by performing these duties.

Defendants argue that even if an agency relationship existed, only the knowledge of individuals who worked on the Prime Fund Credit Deal can be imputed to Defendants.  Def. Br. at 27.  Under New York law, however, "a principal is chargeable with the acts and knowledge of an agent as long as the agent in some respect served the principal . . . ."  *Food Holdings Ltd. v. Bank of Am. Corp. (In re Parmalat Sec. Litig.)*, 684 F. Supp. 2d 453, 472 (S.D.N.Y. 2010).  The knowledge imputed to Defendants comes from facts the agents acquired in the course of their employment, without regard to the specific transaction that supplied such knowledge.

The Trustee need not allege that the agent communicated all information to the principal. "[K]nowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it."  *Ctr. v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985); *see also N.Y. Univ. v. First Fin. Ins. Co.*, 322 F.3d 750, 753 n.2 (2d Cir. 2003); *New York v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 669 (S.D.N.Y. 2017) ("the presumption of corporate knowledge is conclusive, even if the corporate employee never communicated the information to her

---

[9] In *Citigroup Global Markets Inc. v. VSG Special Opportunities Master Fund Ltd.*, CGMI argued that where "Citibank [was] the counterparty designated in [relevant] documents" for a transaction, "individuals who negotiated the terms of that transaction with [defendant] were 'clearly acting on behalf of Citibank—not CGMI,'" even though they were "formally employed by CGMI."  No. 08-CV-5520 (BSJ), 2008 WL 4891229, at **4-5 (S.D.N.Y. 2008). In *CGMI Inc. v. Abbar,* the court noted the fluidity between Citigroup entities because CGMI "acted primarily for [CGML]."  761 F.3d 268, 271 (2d Cir. 2014).

superiors.").

The PAC establishes a pattern of communication among CGMI employees whose collective knowledge is imputable to Defendants.[10]  *See First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988) ("a corporation may be charged with the collective knowledge of its employees"); *see also United Parcel Serv.*, 253 F. Supp. 3d at 670 ("Corporations often compartmentalize information . . . . But such compartmentalization does not shield a company from knowledge maintained by employees in such a structure . . . . A corporation is considered to have acquired the *collective knowledge* of its employees and is held responsible for their failure to act accordingly.") (emphasis added).

The Trustee has alleged various connections and communications between and amongst all the CGMI employees who worked on Defendants' behalf on the Fairfield Sentry Leverage Deal, the Prime Fund Credit Deal, and the Proposed Tremont Deal.[11]  The CGMI employees who worked on Defendants' behalf were their agents and acquired collective knowledge through their various connections and communications that is imputable to Defendants.

Finally, imputation is a *fact*-intensive inquiry that cannot be determined upon a motion challenging the *legal* sufficiency of pleadings.  The allegations in the PAC sufficiently plead an

---

[10] Defendants incorrectly claim that Mathur's testimony shows he did not actually communicate with Nicholls or anyone involved in the Prime Fund Credit Deal. (Def. Br. At 28.)  To the contrary, Mathur testified that he and his group "cooperated" with Nicholls and Nicholls's group who asked them "to take a look at the Tremont trade." Boccuzzi Decl., Ex. E, 163:25-165:25.

[11] Nicholls, a CGMI employee, worked in the Alternative Investment business segment of Citigroup to conduct Defendants' BLMIS-related transactions.  *See* PAC ¶¶ 47-55, 60.  Nicholls led the negotiations for the Prime Fund Credit Deal with CGMI employee, Adelman.  *See id.* at ¶¶ 60, 179.  Nicholls also worked with Mathur, Gupta, and Sennar on the Proposed Tremont Deal, who themselves worked on the Fairfield Sentry Leverage Deal.  *See id.* at ¶¶ 107, 120, 123-128, 167-168, 190, 196, 208, 211, 218, 222, 225.  *See id.* at ¶¶ 107, 123-128, 190.  Leon Gross reported directly to Joseph Elmlinger, also involved in Citibank's BLMIS-related transactions. *Id.* at ¶ 54. Like Nicholls, Elmlinger also worked with Mathur, Gupta, and Sennar on the Proposed Tremont Deal and had concerns about Madoff.  *Id.* at ¶¶ 54, 218, 222.  The same "fundamental roadblocks" that prompted Defendants' refusal to proceed with the Proposed Tremont Deal existed between 2005 and April 20, 2006 with the Prime Fund Credit Deal and the Fairfield Sentry Leverage Deal.  *Id.* at ¶¶ 107-108, 120, 128-131, 225-26.

14

agency relationship between CGMI and Defendants.  *See Picard v. Merkin (In re BLMIS)*, 440

B.R. 243, 260 (Bankr. S.D.N.Y. 2010) (At the pleading stage, the question is not whether the

Trustee has proved the existence of an agency relationship, merely whether he should have the

chance to do so.); *see also Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 51 F. Supp.

2d 457, 471 (S.D.N.Y. 1999) ("an agency relationship is a factual issue that a court cannot

properly adjudicate on a motion to dismiss").

## III.    **THE TRUSTEE ALLEGES TREMONT'S ACTUAL KNOWLEDGE**

Defendants' "double recovery" argument fails because the PAC amply pleads Tremont

had actual knowledge BLMIS was not trading securities.[12]  *See Picard v. Ceretti, (In re BLMIS)*,

No. 08-99000 (SMB), 2015 WL 4734749, at *12 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*").

### A.    **Defendants' Authority is Unhelpful**

Defendants' arguments regarding Tremont's actual knowledge are not supported by their

cited cases.  Def. Br. at 35.  For example, *Elendow Fund, LLC v. Rye Select Broad Market XL

Fund (In re Tremont Sec. Law)*, does not hold that the Trustee's pleadings in the Tremont

litigation were insufficient.[13]  No. 10 Civ. 9061, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013).

---

[12] Defendants seem to suggest that by virtue of the credit facility, § 546(e) should apply directly to the subsequent
transfers they received from BLMIS through Prime Fund.  *See* Def. Br. at 34 n.30.  But § 546(e) does not apply to
shield subsequent transfers.  *See SIPC v. BLMIS (In re Madoff Sec.)*, No. 12 MC 115 (JSR), 2013 WL 1609154, at
*9 (S.D.N.Y. April 15, 2013) ("both initial transferees and subsequent transferees are entitled to raise a defense
based on the application of Section 546(e) to the *initial transfer* from [BLMIS]") (emphasis added); *accord Picard
v. ABN Amro Bank (Ireland) Ltd. (In re Madoff Sec.)*, 505 B.R. 135, 143 (Bankr. S.D.N.Y. 2013) ("[T]he Court also
rejects the defendants' assertion that section 546(g)'s safe harbor should be extended to apply to subsequent
transfers sought to be recovered by the Trustee under section 550.").  Nor do Defendants cite to any authority for
their position that the credit agreement qualifies as a "securities contract."  *See* Bankruptcy Code § 741(7).

[13] The Trustee filed the Tremont complaint when his pleading standard was inquiry notice.  *See* Complaint, *Picard v.
Tremont Grp. Holdings, Inc. (In re BLMIS)*, Adv. Pro. No. 10-05310, ECF No. 1 (Bankr. S.D.N.Y. Dec. 7, 2010)
("Tremont Compl.").  Because the pleading standard changed, the Trustee supplemented his original complaint with
the PAC's additional allegations to more clearly present Tremont's actual knowledge and ensure such allegations
were not overshadowed by "objective red flag" allegations contained in the original complaint.  *See AIG Global Sec.
Lending Corp. v. Banc of Am. Sec., LLC*, No. 01 Civ. 11448 (JGK), 2005 WL 2385854, *12 (S.D.N.Y. Sept 26,
2005) (Court's prior concerns regarding "fraud by hindsight" were "resolved by the plaintiffs' new allegations.").

The plaintiff in *Elendow* brought a private securities action against Tremont pleading scienter based on red flags. *Id.* at *1. *Elendow* was litigated by different parties, based on different underlying statutes, causes of action, and elements to plead and prove. Moreover, *Elendow* and decisions like it based on a "red flags theory" of scienter are inapplicable here, where the Trustee alleges particular facts that Tremont knew of BLMIS's fraud. *See United States v. Simon*, 85 F.3d 906, 910 (2d Cir. 1996) (holding factfinder may "find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of *defendant's* conduct.") (quoting *Ratzlaf v. United States*, 510 U.S. 135, 149 n.19 (1994)).

As the third-largest BLMIS feeder fund and co-manager of Kingate Global (part of the second-largest), Tremont was not just a management company that saw and understood red flags of Madoff's fraud; it actively participated in the fraud. *See SIPC v. BLMIS (In re Madoff Sec.)*, No. 12 MC 115(JSR), 2013 WL 1609154, at *4 (S.D.N.Y. April 15, 2013) (those who knew of and took advantage of Madoff's fraud "effectively participated in it"). Tremont did whatever was necessary to keep money flowing into BLMIS—protecting Madoff, fabricating stories as necessary to deflect further inquiry about Madoff and ignoring the red flags of fraud that Tremont saw, heard, and knew for years.

### B.     Tremont Knew of BLMIS's Fraud in Real Time

#### 1.     *Tremont Knew of BLMIS's Trade Impossibilities*

Despite Defendants' claims the Trustee is pleading by hindsight, Tremont knew through its own regular review and analysis of BLMIS customer statements and trade tickets that Madoff was reporting impossible trades. *See Kingate*, at *14 (finding actual knowledge where Kingate regularly monitored funds' performance showing impossible trades). Tremont knew the positions and prices BLMIS reported differed from Bloomberg owing to their monthly analysis and review of the purported trade prices. PAC at ¶¶ 281-82. Tremont also estimated BLMIS's

assets under management to calculate if there was sufficient volume to execute the trades.  *Id*. at ¶¶ 283-84.  Having done this, Tremont knew many purported trades exceeded the trading volume, demonstrating they were impossible.  *Id*.

### 2.    *Tremont Knew Others Believed Madoff Was a Fraud*

Far from "pleading by innuendo," the Trustee alleges Tremont received numerous direct and identifiable warnings about Madoff (PAC ¶¶ at 267-78) supporting the inference Tremont knew of BLMIS's fraud.  *See Merkin III*, at 749.  Investors repeatedly questioned Tremont about the legitimacy of BLMIS's operations, with some even asking if it was a Ponzi scheme.  *See* PAC at ¶¶ 268, 270, 272, 276.  Others expressed concerns to Tremont about Madoff's purported trading practices, including lack of management fees; absence of a third-party custodian; stable returns; the identity of counterparties to BLMIS's purported options transactions; and Madoff's impossible trading volumes.  *Id*. at ¶¶ 268, 273.  These are not indirect hints or "innuendos" of fraud: they are affirmative statements on the illegitimacy of Madoff's operation.  Tremont responded to these warnings that Madoff was not trading securities by ignoring them or fabricating stories to protect him.[14]  *Id*. at ¶ 278.

### 3.    *Tremont Shielded Madoff From Due Diligence*

Defendants downplay Tremont's lack of transparency into BLMIS as industry standard. Tremont deliberately shielded Madoff from both internal and external due diligence.  *Id*. at ¶¶ 300-04.  To preemptively quash attempts to conduct due diligence, Tremont told its employees, including high-ranking executives, that they "cannot" conduct due diligence on BLMIS, nor ask questions about BLMIS's AUM, how it generated returns, or its auditors.  *Id*. at ¶¶ 287, 291.

---

[14] Tremont's practice of deflecting and fabricating information with clients also shows why the word "misconceptions"—as used by one unnamed Tremont individual when discussing a BLMIS warning—has no significance.  Def. Br. at 36.

17

Employees were warned that even contacting BLMIS—for anything—was strictly prohibited. *Id.* at ¶ 302. It was also "[f]irm policy" to deny customers contact with BLMIS. *Id.* at ¶ 300.

Tremont also made BLMIS the sole exception to its requirement of third-party oversight and went to great lengths to deflect inquiries directed at Madoff. *Id.* at ¶ 296. For example, Tremont executives refused to respond in writing to investor questions about asset verification because it believed this would "lead closer to BLMIS which [Tremont] strictly wants to avoid." *Id.* at ¶¶ 297-98. One high-ranking Tremont officer requested that instead of allowing diligence, his colleague try to simply "convince" an investor that Madoff's assets existed. *Id.* at ¶ 298. This Court previously found that shielding Madoff from third parties supports a finding of actual knowledge. *See Kingate*, at *14. As Tremont *already knew* Madoff was a fraud, it exempted BLMIS from any due diligence analysis. PAC at ¶ 287. Defendants argue Tremont did not shield Madoff from investors because it arranged two meetings for "Citi," (Def. Br. at 37) but Tremont did so only after initially denying their requests, later acquiescing to a general "corporate overview." PAC at ¶¶ 189, 248.

Tremont's contracts with its lenders included provisions for termination and penalties if the lenders ever contacted Madoff. *Id.* at ¶ 301; *see also Kingate*, at *14 (noting Trustee's allegation that Kingate threatened investors with losing their business if they raised questions about BLMIS). Tremont's auditor was barred from contacting Madoff, and its administrator was prevented from receiving BLMIS customer statements and trade tickets directly from BLMIS. PAC at ¶¶ 303-04. Tremont acted as a go-between to help perpetuate Madoff's fiction. *Id.*

Defendants argue Tremont conducted due diligence on BLMIS and relied upon the fact that the NASD was regularly verifying Madoff's trades. Def. Br. at 38-39. Tremont's "diligence" was, in reality, an "outcome-determinative" façade intended to give Tremont cover.

18

Tremont Compl. at ¶¶ 223, 228.  And Tremont's reliance upon the NASD verification was part

of this same artificial exercise.  *Id*. at ¶¶ 231-32.[15]  Tremont understood the numerous

impossibilities as to Madoff's purported securities trading and sought to protect Madoff from

being discovered by routinely deflecting attention away from BLMIS and preventing both third

parties and even its own employees from inquiring into Madoff's activity.  PAC ¶¶ 287, 291; *c.f.*

*Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, at 28-32 (Bankr. S.D.N.Y. 2016).

4.      *Rather than Allow Diligence on BLMIS, Tremont Obfuscated and Lied*

In *Kingate*, this Court found allegations that defendants fabricated stories about Madoff's

purported counterparties sufficient to allege actual knowledge.  *Kingate,* at *14.  Similarly, here,

investor questions were often handled off the record, or, in some cases, required Tremont to

fabricate stories.  *Id.* at ¶¶ 275, 305.  For example, Tremont failed to coordinate on messaging

and flip-flopped on what it told its investors about Madoff's purported OTC options trading.  *Id.*

at ¶ 307.  This included inventing the number, identity, and characteristics of the purported OTC

options counterparties.  *Id.* at ¶¶ 312-13.  Tremont told its investors the counterparties were

"typical banks," naming JP Morgan Chase as a counterparty.  Ironically, JPMorgan Chase

inquired about the identity of the counterparties a month prior.  *Id.* at ¶ 313.

Tremont knew there could not have been any OTC counterparties and thus no OTC

options trading.  Despite bearing all the counterparty default risk, Tremont accepted that no

identifying information existed.  The trade confirmations only showed a CUSIP number—which

identifies an exchange-traded security—but Tremont nevertheless told its investors that BLMIS

---

[15] Defendants' remaining arguments regarding Tremont's supposed due diligence are similarly perplexing.  For example, the Trustee does not allege that Tremont continued "discussing ways of gaining greater transparency into Madoff's operations" nor that Tremont "continue[d] sending Madoff due diligence questionnaires."  *See* Def. Br. at 39.  To the contrary, the Trustee alleges only that Tremont created due diligence questionnaires for investors, which contained statements designed to protect Madoff.  *See, e.g.,* PAC at ¶ 308.

19

traded options OTC.  *Id.* at ¶¶ 306-07.  These responses were lies intended to mollify investors,

and show Tremont knew Madoff was not engaged in securities trading.  *See Kingate*, at **14-15.

### C.    Kingate's Knowledge of Madoff's Fraud is Imputed to Tremont

Defendants incorrectly claim the Trustee fails to impute Kingate's knowledge of

Madoff's fraud to Tremont because the relationship between Tremont Bermuda and Kingate is

"tenuous."[16]  Def. Br. at 38.  This mischaracterizes the relationship.  Tremont founder and co-

CEO Sandra Manzke[17] introduced Kingate founders Carlo Ceretti and Federico Grosso to

Madoff and served as a director and manager of Kingate Global for nearly ten years.  PAC at ¶

324.  Under their co-management agreement, Tremont Bermuda and Kingate Management (the

"Co-Managers") worked jointly to manage the investments of Kingate Global.  *Id.* at ¶ 326.  In

return, the Co-Managers shared fees, with Tremont receiving over $40 million between 1998-

2008, a significant portion of Tremont's revenues.  *Id.* at ¶ 325.  This amount is too substantial

and the relationship too long to claim the Tremont-Kingate relationship was insignificant.

Moreover, the PAC plausibly alleges facts supporting imputation of Kingate's knowledge

to Tremont and its entities.  When a duty exists for co-agents to exchange certain information,

the principal's liability for the agents' acts is "judged in light of what the actor knew or should

have known." *Rodriguez v. United States*, 54 F.3d 41, 48 (1st Cir. 1995) (Bownes, J.,

concurring).  Where multiple agents are engaged in a collective action requiring the sharing of

information, the co-agents are not isolated actors but rather persons or entities that "should be

---

[16] Defendants' argument as to Tremont Bermuda's purported lack of ties to Prime Fund or transactions at issue here is a red herring. Def. Br. at 38.  Tremont Bermuda delegated most of its investment management responsibilities to Tremont Partners, which was Prime Fund's General Partner.  Tremont Compl. at ¶ 47.

[17] Despite Defendants' attempts to minimize Tremont's relationship with Madoff, it is akin to the relationship between Kingate and Madoff.  *See Picard v. Ceretti, (In re BLMIS)*, No. 08-99000 (SMB), 2015 WL 4734749, at *3 (Bankr. S.D.N.Y. Aug. 11, 2015) (noting Trustee's allegations that defendants were part of "Madoff's inner circle" because they met with Madoff "at least twice a year," and engaged in "various telephone conversations"); PAC at ¶¶ 264-66.

assessed as one piece." *Id.* at 49; *see also In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 590

(S.D.N.Y. 2007) ("Knowledge of a joint adventurer is imputed to its co-adventurers.").

Similarly, here, Tremont Bermuda worked jointly with Kingate Management to manage

the investments of their principal, Kingate Global.  PAC at ¶ 326.  As Kingate Global's

managers, the Co-Managers necessarily shared information, acting in concert for its benefit.

Kingate Management's knowledge of Madoff's fraud is, at least, imputed to Tremont Bermuda,

its co-agent, whose knowledge is imputed to its principal, Tremont Group Holdings, Inc.

Tremont Compl. at ¶ 57.  Thus, Kingate Management's knowledge is imputable to Tremont.

## IV.    SECTION 550(D) DOES NOT APPLY UNTIL THE TRUSTEE HAS RECOVERED $2.1 BILLION RELATING TO TREMONT TRANSFERS

### A.    Amounts Relating to the Tremont Initial Transfers Remain Outstanding by the Express Terms of the Settlement

Contrary to Defendants' wishes, the rule of single satisfaction is not implicated here.  As

this Court determined in its order approving the Tremont Settlement, the Trustee has not

recovered the full value of the avoidable initial transfers received by the Tremont Funds.  Order

Approving Settlement, *Picard v. Tremont Grp. Holdings, Inc.*, Adv. Pro. No. 10-05310 (BRL),

ECF No. 38, at 6 (Bankr. S.D.N.Y. Sept. 22, 2011) ("Settlement Order").[18]

The purpose behind § 550(d) "is to prevent the trustee from recovering more than he

should, but the trustee is still entitled to a full satisfaction."  *Segner v. Ruthven Oil & Gas, LLC*

*(In re Provident Royalties, LLC)*, 581 B.R. 185, 190 (Bankr. N.D. Tex. 2017).  Indeed, "[i]f a

partial recovery from the initial transferee always impaired the ability of the trustee to pursue the

remainder of its claim against the subsequent transferee, the purpose of section 550 would be

thwarted."  *Id.* at 193.  Thus, courts have "cautioned against adoption of an application of the

---

[18] The Tremont Settlement can be found at *Picard v. Tremont Grp. Holdings, Inc.*, Adv. Pro. No. 10-05310 (BRL), ECF No. 17-1 (Bankr. S.D.N.Y. Jul. 28, 2011).

single satisfaction rule that would prevent complete satisfaction in many instances." *Id.*;

*Dzikowski v. N. Tr. Bank of Fla., N.A. (In re Prudential of Fla. Leasing, Inc.)*, 478 F.3d 1291,

1301 (11th Cir. 2007) ("550(d) limits the trustee to a 'single satisfaction': no more and no less.").

The Trustee sought to recover $2,152,524,086 in avoidable initial transfers to the

Tremont Funds.  The Trustee received $1.025 billion from the Tremont Settlement.  Here, the

Trustee seeks to recover $343,084,590 in customer property Defendants received as subsequent

transfers from Prime Fund, well-below the remaining $1,127,524,086 left to be recovered.  As

this Court already found, "the Settlement specifically provides that the Trustee may seek

additional recovery from any non-settling defendant or subsequent transferee, and Section 550(d)

does not dictate otherwise."  Settlement Order, at 6; *see also Gibbons v. First Fid. Bank, N.A. (In

re Princeton-New York Inv'rs, Inc.),* 255 B.R. 376, 384 (Bankr. D.N.J. 2000) (noting trustee is

"entitled to recover from any combination of entities, as long as there is no double recovery").

The Tremont Settlement specifically named Defendants as parties from whom the Trustee may

seek recovery, and Defendants were on notice of the settlement and did not object.

Applying § 550(d) here would be contrary to the express terms of the settlement and

render much of it superfluous.  *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d

76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a contract

superfluous.").  It would allow Defendants to collaterally attack a settlement of which they had

notice and failed to object.  *See Sharp v. Evanston Ins. (In re C.M. Meiers Co.)*, Case No. 1:12–

bk–10229–MT, 2016 WL 9458553, at **12-13 (Bankr. C.D. Cal. Dec. 20, 2016) (defendants'

insurance company could not dispute the reasonableness of settlement between defendants and

trustee where it declined the opportunity "to object and participate in the negotiations");

*Schumacher v. Ray (In re Schumacher)*, No. CV 08-3027-SVW, 2010 WL 11444287, at *5 (C.D.

22

Cal. Jan. 15, 2010) (party was estopped from challenging settlement approved under Bankruptcy

Rule 9019 where party "only raised his objection two-and-a-half years later").

> **B.    Changes in the Law Cannot Be Retroactively Applied to an Unambiguous
> Past Settlement**

Pointing to changes in the law that occurred *after* the settlement was entered into,

Defendants claim the Trustee's recovery is limited to the amount of the two-year transfers to the

Tremont Funds.  Because the Trustee received $1.025 billion in the Tremont Settlement, and the

two-year transfers to the Tremont Funds totaled $959,632,359, Defendants claim the Trustee has

already been satisfied.  Defendants are wrong for at least four reasons.

As an initial matter, Defendants' argument fails completely if the Trustee adequately

alleges the Tremont Funds had actual knowledge that BLMIS was not trading securities.[19]  In

that instance, the Trustee's recovery would not be limited to the two-year transfers but would

instead encompass the life-to-date transfers to the Tremont Funds.  There is no argument that the

Trustee has already recovered the full amount of the life-to-date transfers to the Tremont Funds

and thus the single satisfaction rule would be inapplicable by its express terms.

Second, Defendants are wrong that they can use a subsequent change in the law to rewrite

a clear and unambiguous settlement agreement.  The Tremont Settlement's unambiguous terms

state that the settlement payment of $1,025,000 (with no allocation between the 90-day, two-

year, six-year, or life-to-date amounts) was consideration for the release by the Trustee of

$2,152,524,086 in life-to-date avoidable transfers, a release of equitable subordination claims,

and a "spring" of $800 million.  Tremont Settlement, at 12-13.  The Tremont Settlement further

---

[19] It should be noted that most of the funds the Trustee seeks to recover from Defendants ($323,112,442 of the total $343,084,590 sought) comprise transfers made within the two years preceding the Filing Date.  These transfers are not subject to the § 546(e) safe harbor and thus the Trustee need not allege that Prime Fund had actual knowledge BLMIS was not trading securities, only willful blindness, which Defendants do not dispute.

23

states that the Trustee may recover the remainder of avoidable transfers under §§ 544, 547, 548 and 550—over $1.1 billion—from subsequent transferees, specifically carving out Defendants and the March 2008 transfers at issue here. *See id*. at 4-6, 8, 12-13, 25-26, 34, 40.

To now rewrite the settlement agreement to say that the settlement payment can only be attributed to two-year claims would be an improper, retroactive application of law that did not exist and could not have been considered by the parties or the Court at the time the Tremont Settlement was approved. "[I]t is well settled that a subsequent change in law cannot be used to set aside a written agreement. . . . In entering into a settlement agreement, parties need to consider the risks and costs of litigation and part of this risk analysis includes the possibility that laws, including the judicial construction of laws, may change." *In re Napolitano,* No. 07-73361-478, 2008 WL 5401541, at *4 (Bankr. E.D.N.Y. 2008).

For these reasons, courts do not permit parties to engage in a post-hoc rewriting of a settlement when conducting a subsequent allocation. Instead, courts look at the information and law available to the parties at the time of the settlement. *See Bowers v. Kuse Enters., Inc. (In re Fla. Hotel Props. Ltd. P'ship Plan Tr. Agreement)*, Nos. 97-2583, 97-2507, 1998 WL 957455, at *7 (4th Cir. Sept. 22, 1998) (Unpublished Disposition) (conducting post-settlement allocation by considering the factors existing at time of settlement, specifically "[t]he amount of the settlement, its terms, as well as the negotiations between the parties to the settlement"); *UnitedHealth Grp., Inc. v. Columbia Cas. Co.,* 47 F. Supp. 3d 863, 872-73 (D. Minn. 2014), *aff'd sub nom. UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856 (8th Cir. 2017) (Allocating proceeds of prior settlement and declining to "rely on events that occurred or on information that [the parties] learned after the Settlement was reached to show how a reasonable party in [their] position would have allocated at the time that the Settlement was

24

reached."); *accord Residential Funding Corp. (USA) v. SunTrust Mortgage, Inc. (In re Residential Capital, LLC)*, 536 B.R. 132, 146 (Bankr. S.D.N.Y. 2015).

Allocating a settlement based on the law that existed at the time the settlement was entered supports the parties' need for finality and reflects the incentives they weighed and choices they made when entering into the agreement. *See, e.g., In re Prudential*, 478 F.3d at 1302 (when making an allocation under § 550(d), court should evaluate claims based on information and law known at the time of settlement); *Playboy Enters. Int'l, Inc. v. On Line Entm't, Inc.*, No. CV 00-6618(DGT), 2004 WL 626807, at *9 (E.D.N.Y. Mar. 29, 2004) ("[T]here is a strong interest in the finality of judgments, especially when the parties have entered into a settlement agreement.").

Thus, any post-settlement allocation by this Court must be based on the law as it existed at the time of the settlement, including that (i) the defendant, and not the Trustee, had the pleading burden as to good faith,[20] (ii) the standard for good faith was inquiry notice,[21] (iii) this Court had upheld the Trustee's actions for life-to-date transfers pursuant to New York's discovery rule,[22] and (iv) no case had applied § 546(e) to non-existent securities transactions.[23]

Third, the Trustee does not dispute that the Court may one day be required to conduct an allocation of the Tremont Settlement. But that day is not yet here. Courts have noted that allocations are most often conducted after liability has been ascertained. *See In re Prudential*, 478 F.3d at 1301. Thus, until it is determined Defendants are liable to the Trustee, there is no

---

[20] *See SIPC v. BLMIS (In re Madoff Sec.)*, 516 B.R. 18, 22-24 (S.D.N.Y. 2014).

[21] *Id.*, at 23-24 (citing *Picard v. Greiff (In re Madoff Sec.)*, 476 B.R. 715, 723 (S.D.N.Y. 2012)).

[22] *See, e.g., Picard v. Madoff (In re BLMIS)*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011) (denying the Madoff family's motion to dismiss state law fraudulent transfer claims).

[23] *See, e.g.*, *Geltzer v. Mooney (In re MacMenamin's Grill, Ltd.)*, 450 B.R. 414, 421-22 (Bankr. S.D.N.Y. 2011) (interpreting § 546(e) narrowly).

issue of double recovery and this Court is "without authority to render an advisory opinion on a *potential* controversy." *Collins v. Cayuga Energy, Inc. (In re S. Glens Falls Energy, LLC)*, No. 06-60073, 2009 WL 2883141, at *4 (Bankr. N.D.N.Y. Jan. 30, 2009) (emphasis in original). This is all the more true here where the Court has not even determined whether the Tremont Feeder Funds had actual knowledge BLMIS was not trading securities—and whether an allocation would even be necessary at all.

Finally, an allocation by the Court would require consideration of numerous facts and issues not presented on a motion on the pleadings. For example, an allocation would require more than a dollar for dollar credit of the $1.025 billion settlement payment against the $2.1 billion in avoidable transfers. As additional consideration in the Tremont Settlement, the Trustee dismissed two sizeable equitable subordination counts and gave an $800 million "spring" to those claims. *See* Settlement Order, at 2. The allocation also affects other subsequent transferees who may ultimately be liable to the Trustee. Once it is determined who is liable to the Trustee and in what amounts, the Court can conduct an allocation of the Tremont Settlement if needed in a comprehensive manner that is equitable to all. To do so now on a piecemeal basis with only one of the subsequent transferee defendants affected by the Tremont Settlement is unfair to all.

## V.    THE TRUSTEE HAS SUFFICIENTLY PLEADED AVOIDABLE TRANSFERS

The transfers at issue here depleted the fund of customer property and were not part of an integrated transaction. Without relevant authority, Defendants contend the subsequent transfers they received from Prime Fund are not recoverable because an unrelated party, ABN Amro Bank (Ireland) Ltd. ("ABN Amro"), later invested in a different fund, Broad Market Fund, which invested those funds in its own separate BLMIS account. *See* Am. Compl., *Picard v. ABN Amro*

*Bank (Ireland) Ltd. (In re Madoff)*, Adv. Pro. No. 10-05355 (SMB), (Bankr. S.D.N.Y. June 18,

2012), ECF No. 42. Defendants are wrong on the facts and the law.

The Trustee's claims against Defendants arise from their withdrawal from BLMIS

through Prime Fund. Had Prime Fund not received the March 25, 2008 initial transfer at issue

here and subsequently transferred a portion of it to Defendants, those funds would have become

part of the customer property fund available to distribute pro rata to all customers. *See* PAC at ¶

260. To the extent any of Prime Fund's $475 million redemption made its way back to BLMIS

through a later investment by Broad Market Fund, the $301 million subsequently transferred to

Defendants never returned to BLMIS or the BLMIS estate and can be recovered. *Id*. Even if

Broad Market Fund's separate transaction with ABN Amro could somehow partially trace back

to this redemption, this transaction is still a separate transaction governed by the agreements

Broad Market Fund had with ABN Amro and BLMIS, separate from the agreements Prime Fund

had with Defendants and BLMIS. *See Picard v. Lustig (In re BLMIS)*, 568 B.R. 481, 490

(Bankr. S.D.N.Y. 2017). Defendants suggest that because Broad Market Fund later deposited

other funds into its separate BLMIS account, Defendants are entitled to a setoff of their

subsequent transfer liability. These arguments are legally baseless and ignore the harm to the

customer property fund were the Trustee unable to recover customer property from Defendants.

Defendants are not the first to argue that a withdrawal from one BLMIS account and

subsequent deposit into a different BLMIS account should offset fraudulent transfer liability.

This Court already rejected a similar argument, explaining that it was inconsistent with § 548(c)

because it would deprive the funds of their rights. *See id*. at 487 ("[t]he Funds gave the value

through the deposits that the Lustig Defendants are trying to conscript for their own benefit, and

the Funds are entitled to the credit for those deposits under § 548(c)").

Likewise, here, Defendants are asking this Court to give a second round of credits.  As shown on their Exhibit D,[24] Broad Market held BLMIS account number 1T0027.  The net equity in that account formed the basis for the Trustee's settlement of Broad Market's customer claim.  *See* Settlement Order at 2.  To now credit that deposit against Prime Fund's withdrawal from its BLMIS account (1C126930) requires this Court to give a second credit to that deposit (for Defendants' benefit)—a result that would be inequitable to all BLMIS customers, particularly those who have yet to receive their principal back.[25]

Defendants' reliance on *Bear, Stearns Securities Corporation v. Gredd*, 275 B.R. 190 (S.D.N.Y. 2002) is misplaced.  The *Bear, Stearns* court specifically "decline[d] to make 'diminution of the estate' an element of § 548(a)(1)(A)."  *Id*. at 196.  Instead, that court recognized an affirmative defense where, unlike here, "the transferred assets were never available to any creditors by operation of federal law . . . ."[26]  *Id*.  The property was never "an interest of the debtor in property" because the property was never in the debtor's possession and control by virtue of Regulation T.  *Id*. at 198.  Likewise, in *Buchwald v. Di Lido Beach Resort, Limited (In re McCann, Incorporated)*, the Court explained that assets held in trust, unable to be used by the debtor, were thus unavailable to creditors.  318 B.R. 276, 283 (Bankr. S.D.N.Y.

---

[24] *See* Boccuzzi Decl., Ex. D.  The Trustee objects to the Court's consideration of this document as an improper submission of evidence at the pleading stage.  *Picard v. Merkin*, 515 B.R. 117, 142 (Bankr. S.D.N.Y. 2014) (This Court declined to "go outside the permissible record" and consider documents not relied upon in drafting the complaint.)

[25] If Defendants believe they are entitled to a credit, they need to recover those funds directly from the co-parties to their allegedly integrated transaction.  The Trustee is not required to mediate between the parties here.  *Cf. SIPC v. BLMIS (In re BLMIS)*, 522 B.R. 41, 61 (Bankr. S.D.N.Y. 2014) (explaining that individuals whose investment in BLMIS was made indirectly through other accounts could not receive a separate customer claim).

[26] The *Bear, Stearns Securities Corporation v. Gredd*, court held that "the transferee will bear both the ultimate burden of proof as well as the initial burden of production on this issue" and set forth three elements the transferee must prove: "that the transfer did not (1) reduce the res that would have been available to any creditor or creditors, (2) 'hinder, delay, or defraud' any creditor or creditors, nor (3) have any other adverse impact on any creditor or creditors generally."  275 B.R. 190, 196 (S.D.N.Y. 2002).  Defendants plainly cannot satisfy this test, nor do they even try.

2004). Here, Defendants did not argue the transfers at issue were unavailable to any creditors by operation of federal law, or otherwise. Nor can they, because there is no question the transfers are customer property originating from BLMIS, with BLMIS retaining control of the property. *In re BLMIS*, 654 F.3d 229, 232, 238-39 (2d Cir. 2011). Defendants' reliance on cases like *Bear, Stearns* and *McCann*, which involved property that did not belong to the debtor, is misplaced.[27] The transfers here are avoidable—to follow through on Defendants' argument would be inequitable to all parties involved.[28]

Defendants invoke the "integrated transaction" doctrine to explain why the March 25, 2008 transfer to Prime Fund is not avoidable but fail to address the relevant standard. Def. Br. at 18. The doctrine is an equitable solution that allows for recoupment—the offsetting of debts arising out of the same transaction. *See Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1079 (3d Cir. 1992). The Second Circuit has adopted a narrow view of the "same transaction," ruling that even "discrete and independent units" of a singular transaction destroy claims of integration. *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 147 (2d. Cir. 2002) (quoting *Malinowski v. New York State Dep't of Labor (In re Malinowski)*, 156 F.3d 131, 135 (2d Cir. 1998)). Notwithstanding this Circuit's narrow interpretation, Defendants' argument fails because there is no factual basis for asserting these disparate transfers to and from independent,

---

[27] This Court has already found that the property unlawfully transferred is an interest of BLMIS in property. *See SIPC v. BLMIS (In re BLMIS)*, No. 08-01789(SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016).

[28] Defendants selectively quote cases without regard for the subsequent history or facts of the case. For example, the Fourth Circuit narrowed *Ivey v. First-Citizens Bank and Tr. Co. (In re Whitley)*, No. 10-10426, 2014 WL 6910837, at *2 (Bankr. M.D.N.C. Dec. 8, 2014), *aff'd sub nom. Ivey v. First Citizens Bank & Tr. Co.*, 539 B.R. 77 (M.D.N.C. 2015), *aff'd but criticized sub nom. In re Whitley*, 848 F.3d 205, 210 (4th Cir. 2017), holding a debtor's deposits into his own checking account were not "transfers" and thus it need not decide whether they diminished the estate. *In re Consol. Pioneer Mortg. Entities*, also cited by Defendants, was dismissed for the same reason. 211 B.R. 704, 714 (S.D. Cal. 1997), *aff'd in part, rev'd in part*, 166 F.3d 342 (9th Cir. 1999).

29

unrelated parties form a coordinated transaction.[29]

To bolster the defects of Defendants' argument that Defendants' transfers can be offset against ABN Amro's transfers, Defendants misconstrue *Picard v. ABN Amro Bank (Ireland) Ltd. (In re Madoff Sec.)*, 505 B.R. 135, 147 (S.D.N.Y. 2013). Rather than decide the transfers at issue there were "integrated" with the transactions at issue in the Trustee's other proceedings, the District Court merely found the withdrawals and collateral payments governed by their respective swap agreements were *themselves* integrated transactions. *Id.* Defendants collapse two unrelated transactions in an attempt to prevent the Trustee from avoiding and recovering the $475 million transfer from BLMIS to Prime Fund. This argument necessarily fails.

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests the Court grant his request for leave to file an amended complaint, and any and all other relief the Court deems just and proper.

---

[29] Defendants mistakenly rely on *In re Adelphia Commc'n Corp.* ("*Adelphia*"), the reverse of this situation: funds were transferred to the debtor and from the debtor, with the debtor's transfer the source of the fraudulent transfer. No. 02-41729 (REG), 2006 WL 687153, at *15 (Bankr. S.D.N.Y. Mar. 6, 2006). Because the transfers were made to pay service fees, the court found no assets of the debtor were depleted and the transfer was not a fraudulent conveyance. *Id.* Here, Prime Fund deposited funds, withdrew funds, and then Broad Market deposited funds; yet Defendants are somehow seeking credit for the Prime Fund withdrawal in addition to credit already granted the Broad Market deposit. Moreover, *Adelphia* concerned a constructively fraudulent transfer, requiring inquiry into whether the transfer was made with fair consideration. *Id.* at *8. *Adelphia* relies on constructive fraud cases that are similarly inapposite. Defendants' reliance on *Intercontinental Metals Corp. v. Erlanger & Co.*, 902 F.2d 1565 (4th Cir. 1990), concerning transfers made in good faith in satisfaction of antecedent debt, is similarly misguided.

Dated: May 7, 2019
New York, New York

By:  */s/ Seanna R. Brown*

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Seanna R. Brown
Email:  sbrown@bakerlaw.com
Matthew D. Feil
Email:  mfeil@bakerlaw.com
Chardaie C. Charlemagne
Email:  ccharlemagne@bakerlaw.com
Elizabeth McCurrach
Email:  emccurrach@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and the
Estate of Bernard L. Madoff*