**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Regina Griffin
Tracy L. Cole
Elizabeth McCurrach
A. Mackenna White

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                    Plaintiff,<br><br>    v.<br><br>ABN AMRO BANK (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED) and ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.),<br><br>                    Defendants. | Adv. Pro. No. 10-05355 (SMB) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF TRUSTEE'S
MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ........................................................................................................................3

   I.   THE PSAC ADEQUATELY ALLEGES DEFENDANTS' WILLFUL
       BLINDNESS ...............................................................................................................3

       A.   Defendants' Arguments Are Based on the Wrong Standard for "Willful
           Blindness" ...........................................................................................................3

       B.   The PSAC Pleads Specific Facts Demonstrating Defendants Subjectively
           Believed There Was a High Probability of Fraud at BLMIS ...................................5

       C.   The PSAC's Allegations Establish Defendants Took Deliberate Actions to
           Avoid Confirming Madoff's Fraud ...........................................................................8

       D.   The Allegations Setting Forth Defendants' Willful Blindness Are Plausible ..........14

   II.   The PSAC Alleges that Defendants Did Not Provide Value ...........................................15

   III.  THE TRUSTEE'S CLAIMS AGAINST TREMONT ARE NOT LIMITED BY
       THE SAFE HARBORS OF 546(e) AND 546(g).............................................................17

       A.   The Trustee's Claims Against Tremont Are Not Limited by the Safe Harbor of
           546(e) Because the PSAC Alleges Tremont's Actual Knowledge ...........................17

       B.   The Trustee's Claims Against Tremont Are Not Limited by the Safe Harbor of
           546(g) ..................................................................................................................23

   IV.  SECTION 550(D) DOES NOT APPLY UNTIL THE TRUSTEE HAS
       RECOVERED $2.1 BILLION RELATING TO TREMONT TRANSFERS.................24

       A.   Amounts Relating to the Tremont Initial Transfers Remain Outstanding by the
           Express Terms of the Settlement ............................................................................24

       B.   Changes in the Law Cannot Be Retroactively Applied to a Past Settlement ...........25

   V.   DEFENDANTS' ARGUMENT THAT THE BLMIS ESTATE WAS NOT
       DEPLETED HAS NO MERIT......................................................................................28

CONCLUSION....................................................................................................................31

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*,
    No. 01 Civ. 11448 (JGK), 2005 WL 2385854 (S.D.N.Y. Sept 26, 2005)..............................17

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012).......................................................................................................15

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010)..........................................................................................5

*Art Finance Partners, LLC v. Christie's Inc.*,
    58 A.D.3d 469, 870 N.Y.S.2d 331 (1st Dep't 2009) ..................................................................13

*Bowers v. Kuse Enters., Inc. (In re Fla. Hotel Props. Ltd. P'ship Plan Tr. Agreement)*,
    1998 WL 957455 (4th Cir. Sept. 22, 1998) (Unpublished Disposition)..................................27

*Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    2008 WL 4891229 (S.D.N.Y. 2008), *aff'd*, 598 F.3d 30 (2d Cir. 2010) ................................13

*Collins v. Cayuga Energy, Inc. (In re S. Glens Falls Energy, LLC)*,
    No. 06-60073, 2009 WL 2883141 (Bankr. N.D.N.Y. Jan. 30, 2009).....................................28

*Cooperativa Ahorro y Credito Aguada v. Kidder, Peabody & Co.*,
    942 F. Supp. 735 (D. P.R. 1996).............................................................................................10

*Ctr. v. Hampton Affiliates, Inc*,
    66 N.Y.2d 782 (1985) ..............................................................................................................11

*Dzikowski v. N. Tr. Bank of Fla., N.A. (In re Prudential of Fla. Leasing, Inc.)*,
    478 F.3d 1291 (11th Cir. 2007) .................................................................................25, 27, 28

*Fortis Corp. Ins. S.A. v. M/V Cielo Del Canada*,
    320 F. Supp. 2d 95 (S.D.N.Y. 2004).......................................................................................12

*Geltzer v. Mooney (In re MacMenamin's Grill, Ltd.)*,
    450 B.R. 414 (Bankr. S.D.N.Y. 2011).....................................................................................28

*General Builders Supply Co. v. River Hill Coal Venture*,
    796 F.2d 8 (1st Cir. 1986)........................................................................................................10

*Gibbons v. First Fid. Bank, N.A. (In re Princeton-New York Inv'rs, Inc.)*,
    255 B.R. 376 (Bankr. D.N.J. 2000) .........................................................................................25

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
    309 F.3d 76 (2d Cir. 2002).......................................................................................................25

*Intercontinental Metals Corp. v. Erlanger & Co.*,
    902 F.2d 1565 (4th Cir. 1990) .................................................................................................30

TABLE OF AUTHORITIES (CONTINUED)

**Page(s)**

*In re Jeanneret Assocs., Inc.*,
769 F. Supp. 2d (S.D.N.Y. 2011)...........................................................11

*Minskoff v. Am. Exp. Travel Related Servs. Co.*,
98 F.3d 703 (2d Cir. 1996)....................................................................11

*In re Napolitano*,
No. 07-73361-478, 2008 WL 5401541 (Bankr. E.D.N.Y. 2008) ...........27

*Off. Committee of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP*
*Morgan Chase Bank, N.A.*,
394 B.R. 721 (Bankr. S.D.N.Y. 2008)...................................................16

*Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*,
51 F. Supp. 2d 457 (S.D.N.Y. 1999)......................................................12

*In re Optimal U.S. Litig.*,
2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) .........................................11

*In re Parmalat Sec. Litig.*,
501 F. Supp. 2d 560 (S.D.N.Y. 2007).....................................................22

*Picard v. ABN Amro Bank (Ireland) Ltd. (In re Madoff Sec.)*,
505 B.R. 135 (S.D.N.Y. 2013)..........................................................23, 30

*Picard v. BNP Paribas, S.A. (In re BLMIS)*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018)...................................1, 3, 16, 17

*Picard v. Ceretti (In re BLMIS)*,
2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) .........17, 18, 20, 21

*Picard v. Greiff (In re Madoff Sec.)*,
476 B.R. 715 (S.D.N.Y. 2012)...............................................................27

*Picard v. Katz*,
462 B.R. 447 (S.D.N.Y. 2011)........................................................ *passim*

*Picard v. Legacy Capital Ltd. (In re BLMIS)*,
548 B.R. 13 (Bankr. S.D.N.Y. 2016).....................................................20

*Picard v. Lustig (In re BLMIS)*,
568 B.R. 481 (Bankr. S.D.N.Y. 2017)....................................................29

*Picard v. Madoff (In re BLMIS)*,
458 B.R. 87 (Bankr. S.D.N.Y. 2011)......................................................28

*Picard v. Merkin (In re BLMIS)*,
440 B.R. 243 (Bankr. S.D.N.Y. 2010).....................................................12

*Picard v. Merkin (In re BLMIS)*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014)...........................................................4, 9, 17

*Picard v. Merkin (In re BLMIS)*,
563 B.R. 737 (Bankr. S.D.N.Y. 2014)..................................................................9, 19

*Ratzlaf v. U.S.*,
510 U.S. 135 (1994)...........................................................................................18

*Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*,
235 F. 3d 738 (2d Cir. 2000)..............................................................................12

*Residential Funding Corp. (USA) v. SunTrust Mortgage, Inc. (In re Residential
Capital, LLC)*,
536 B.R. 132 (Bankr. S.D.N.Y. 2015)..................................................................27

*Rodriguez v. U.S.*,
54 F.3d 41 (1st Cir. 1995) (Bownes, J., concurring) ............................................22

*Segner v. Ruthven Oil & Gas, LLC (In re Provident Royalties, LLC)*,
581 B.R. 185 (Bankr. N.D. Tex. 2017)............................................................24, 25

*Sharp v. Evanston Ins. (In re C.M. Meiers Co.)*,
2016 WL 9458553 (Bankr. C.D. Cal. Dec. 20, 2016) .......................................25, 26

*SIPC v. BLMIS*,
2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)...............................................3, 18, 24

*SIPC v. BLMIS (In re BLMIS)*,
522 B.R. 41 (Bankr. S.D.N.Y. 2014)...................................................................30

*SIPC v. BLMIS (In re Madoff Sec.)*,
516 B.R. 18 (S.D.N.Y. 2014)...........................................................................3, 27

*U.S. v. Bailey*,
955 F.2d 28 (8th Cir. 1992) ...............................................................................5

*U.S. v. Hansen*,
791 F.3d 863 (8th Cir. 2015) .............................................................................5

*U.S. v. Joly*,
493 F.2d 672 (2d Cir. 1974)...............................................................................4

*U.S. v. Ramos-Atondo*,
732 F.3d 1113 (9th Cir. 2013) ...........................................................................4

*U.S. v. Simon*,
85 F.3d 906 (2d Cir. 1996)................................................................................18

TABLE OF AUTHORITIES (CONTINUED)

Page(s)

*U.S. v. Nektalov*,
461 F.3d 309 (2d Cir. 2006)........................................................................4

*UnitedHealth Grp., Inc. v. Columbia Cas. Co.*,
47 F. Supp. 3d 863 (D. Minn. 2014) .........................................................27

*UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*,
870 F.3d 856 (8th Cir. 2017) ....................................................................27

*Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*,
973 F.2d 1065 (3d Cir. 1992)....................................................................30

*Wacker v. JP Morgan Chase & Co*,
678 Fed. App'x 27 (2d Cir. 2017)...............................................................7

*Westinghouse Credit Corp. v. D'Urso*,
278 F.3d 138 (2d. Cir. 2002).....................................................................30

**Statutes**

Bankruptcy Code §§ 548 and 550...................................................................3

Bankruptcy Code §546(e) ....................................................................... *passim*

**Other Authorities**

Crotty, J. (2009) "Structural causes of the global financial crisis: a critical
assessment of the 'new financial architecture,'" *Cambridge Journal of
Economics*, 33(4) ....................................................................................15

Testimony of Scott G. Alvarez, General Counsel to the Board of Governors of the
Federal Reserve, *Compensation Structure and Systemic Risk: Hearing Before
the Committee on Financial Services*, 111 Cong. 80 (2009) ....................15

Restatement (Third) of Agency § 2.03 ....................................................12, 14

Restatement (Third) of Agency § 4.01 cmt. D...........................................12

## PRELIMINARY STATEMENT

The central premise of Defendants' opposition is that the Trustee fails to adequately plead willful blindness, which they claim requires allegations that they had "knowledge of Madoff's Ponzi scheme, *i.e.*, knowledge that BLMIS was not actually trading securities." Def. Br. at 15. But Defendants' articulation of the standard and the language they quote from the *BNP Paribas* decision incorrectly quote from the District Court's decision with respect to the "*actual knowledge*" exception to the safe harbor of § 546(e).

Moreover, Defendants' reliance on the "actual knowledge" standard is illogical. The District Court's decision with respect to the § 546(e) safe harbor was based on a customer's belief that securities were actually being traded at BLMIS. The District Court held that a party who had actual knowledge that no securities were being traded at BLMIS was not entitled to the safe harbor because they would know the transfers received were not "settlement payments," nor related to "securities contracts" within the meaning of § 546(e).

After determining whether an initial transferee has "actual knowledge" and falls within the exception to the § 546(e) safe harbor, the analysis turns to whether the Trustee has sufficiently pled claims to avoid and recover transfers pursuant to §§ 548(a)(1)(A) and 550, which the District Court held requires the Trustee to sufficiently allege that Defendants lacked good faith and "willfully blinded themselves to the fact that Madoff Securities was involved *in some kind of fraud.*" *See Picard v. Katz*, 462 B.R. 447, 454–55 (S.D.N.Y. 2011).

The District Court has thus set forth two separate standards: one for actual knowledge (which includes knowledge of the Ponzi scheme and no trading) for determining whether the safe harbor of § 546(e) will apply, and one for willful blindness to "a fraud" governing the Trustee's claims under §§ 548(a)(1)(a) and 550. Defendants improperly conflate the two. Even assuming

that Defendants' pleading standard was correct, the PSAC is not futile because the Trustee alleges that, before entering into the Swap Transaction, Fortis acquired a subjective belief Madoff might not be trading and could be misappropriating customers' assets – and that knowledge is imputable to Defendants.  These allegations are more than sufficient at the pleading stage.

Defendants contend that it is implausible that a sophisticated financial institution would ever "willingly throw away money into Ponzi schemes."  But regulators and experts who studied the recent financial crises have found that individuals have powerful personal financial incentives to structure transactions to generate short term gain, even if they carry significant risk for their institution.

This is precisely what the PSAC alleges:  that Fortis willfully blinded itself to evidence of Madoff's fraud in order to enter into the Swap Transaction to generate substantial short-term revenue.  Defendants did so perceiving that most of the risk posed by the potential for fraud at BLMIS was to other investors' assets, because they had special safeguards and rights designed to enable Fortis to redeem, recover and/or setoff its investments ahead of other Tremont individual investors who did not possess these special rights.  Indeed, as alleged, Fortis was apparently in financial distress in 2007, and had an enhanced motive to engage in risky transactions to bolster the appearance of profitability.

For the reasons set forth below, Defendants' other legal arguments also fail because, among other things, the Trustee pleads Tremont's actual knowledge of Madoff's fraud, and it would be premature at this stage to engage in a Section 550(d) analysis where the Trustee has not recovered all avoidable transfers to Tremont and the Court has not fully determined liability.

## ARGUMENT

I. **THE PSAC ADEQUATELY ALLEGES DEFENDANTS' WILLFUL BLINDNESS**

A.    *Defendants' Arguments Are Based on the Wrong Standard for "Willful Blindness"*

Defendants argue the PSAC fails to plead their "willful blindness," claiming this requires allegations of their "knowledge of Madoff's Ponzi scheme, i.e., knowledge that BLMIS was not actually trading securities." Def. Br. at 15. But Defendants' brief and the *BNP Paribas* decision incorrectly rely on the District Court's decision with respect to a separate statutory provision – namely, the "*actual knowledge*" exception to the safe harbor of § 546(e). *Id.; see also Picard v. BNP Paribas, S.A. (In re BLMIS)*, 594 B.R. 167, 193 (Bankr. S.D.N.Y. 2018) (*quoting SIPC v. BLMIS*, 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) (analyzing § 546(e) safe harbor).

Under the District Court's decisions, the Trustee must plead an initial transferee's "actual knowledge" that BLMIS did not trade securities to avoid application of the safe harbor of §546(e) of the Code. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2013 WL 1609154, at *4. The District Court premised this exception to the safe harbor on the grounds that a defendant who knew that Madoff was operating a Ponzi scheme or not actually trading securities would know that the transfers it received from BLMIS were not "settlement payments," nor related to "securities contracts" within the meaning of § 546(e). *Id.* at *3.

After determining whether an initial transferee has "actual knowledge" for purposes of the § 546(e) safe harbor, the analysis turns to whether the Trustee states claims under §§ 548 and 550 of the Bankruptcy Code, which the District Court held requires the Trustee allege defendants' willful blindness, that they "intentionally [chose] to blind [themselves] to the 'red flags' that suggest a high probability of fraud." *SIPC v. BLMIS (In re Madoff Sec.)*, 516 B.R. 18, 21 (S.D.N.Y. 2014); *see also Katz*, 462 B.R. at 455 (holding Trustee adequately pled willful blindness to "some kind of fraud" at BLMIS).

This Court has recognized that the willful blindness standard is equivalent to the concept of "conscious avoidance." *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 139 n. 15 (Bankr. S.D.N.Y. 2014) ("*Merkin II*"). In *Global–Tech Appliances, Inc. v. SEB S.A.*, the Supreme Court stated that conscious avoidance requires "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." 563 U.S. 754, 769 (2011).

Defendants argue that applying the *Global-Tech* test means the PSAC must allege Defendants suspected *specifically* that Madoff was operating a Ponzi scheme in which no securities trades were actually taking place. But that is contrary to *Nektalov*, where the Second Circuit noted that "the culpability of the willfully blind defendant lies in his averting his eyes to what he thinks he sees, *not in the objective accuracy of his vision*:"

> In other words, the applicability of the [willful blindness] doctrine does not turn on the truth of the particular proposition in question, but on what the defendant does to avoid reaching subjective certainty *(mistaken or not) about that proposition. Thus, conscious avoidance encompasses a defendant's "deliberately refusing to confirm the existence of one or more facts that he believes to be true," regardless of whether those facts actually are true.*

*United States v. Nektalov*, 461 F.3d 309, 315-16 (2d Cir. 2006) (emphasis added). The Second Circuit used the example of a "sting operation" (where no actual criminal conspiracy exists) to illustrate why the willful blindness doctrine still applies to a defendant whose suspicions about misconduct are mistaken. All that is required for willful blindness is a defendant be aware of facts "suggestive of illegal behavior" and deliberately fail to confirm those facts. *Id*. at 316.

Defendants thus have been convicted of crimes based on willful blindness even when mistaken about the *precise* nature of the illegal conduct suspected.[1] Defendants who participated

---

[1] *See, e.g., U.S. v. Joly*, 493 F.2d 672, 674 (2d Cir. 1974) (upholding conscious avoidance conviction in drug courier case where defendant admitted that he "thought he was doing something wrong," without direct evidence he knew he was carrying a specific drug); *U.S. v. Ramos-Atondo*, 732 F.3d 1113, 1119 (9th Cir. 2013) (affirming drug

in Ponzi schemes, albeit claiming "to lack knowledge of the true nature" of the scheme, have

been convicted based on willful blindness where defendants were "alerted" to "the high

probability that [their] actions were criminal" in nature.[2]   Likewise, in a securities case involving

the BLMIS Ponzi scheme, a district court held scienter was adequately on allegations that fund

manager defendants "turn[ed] a blind eye to obvious signs of fraud" without a showing that they

suspected Madoff was running a Ponzi scheme, *per se*.  *See Anwar v. Fairfield Greenwich Ltd.*,

728 F. Supp. 2d 372, 410 (S.D.N.Y. 2010).

B.    *The PSAC Pleads Specific Facts Demonstrating Defendants Subjectively Believed
There Was a High Probability of Fraud at BLMIS*

### 1.    Since 2003, Fortis Had a Subjective Belief in the High Probability of Fraud at BLMIS

Defendants do not – because they cannot – seriously deny that Fortis turned away from

"some kind of fraud" at BLMIS.  *See Katz*, 426 B.R. at 455.  Instead, their arguments are

premised on the wrong pleading standard, which they suggest requires written proof that

Defendants specifically thought Madoff was engaged in a Ponzi scheme or not trading.

Even were Defendants' pleading standard correct, the PSAC meets it.  The PSAC alleges

that since 2003, Fortis had a subjective belief that Madoff might not be engaging in trades and

could be misappropriating customers' assets instead of investing them:

---

conviction on willful blindness instruction where defendants who smuggled marijuana thought they could be smuggling illegal aliens); *U.S. v. Bailey*, 955 F.2d 28, 29 (8th Cir. 1992) (affirming conviction for possession and intent to distribute cocaine, where defendant claimed he thought he was transporting counterfeit money, not drugs).

[2] In *U.S. v. Chu*, for example, the court affirmed a defendant's conviction and willful blindness jury instruction where the defendant "claimed to lack knowledge of the true nature" of the fraudulent scheme in which he participated.  183 F. App'x 94, 98 (2d Cir. 2006); *see also U.S. v. Hansen*, 791 F.3d 863, 869 (8th Cir. 2015) (affirming criminal liability tied to Ponzi scheme and willful blindness jury instruction where court found defendant "was presented with facts that put him on notice that criminal activity was particularly likely and that he intentionally failed to investigate those facts").

- In 2003 and 2004, employees from multiple Fortis entities expressed concern they could not independently verify whether BLMIS was actually engaging in the trades it claimed, or did in fact have custody of Harley's assets (PSAC at ¶¶ 103-107, 110-116, 126);

- Fortis employee Novo noted Fortis did not know how BLMIS held custody of Harley's assets, whether they were segregated, or what would happen to them "if anything happens" to BLMIS, and recommended insurance cover for them (*Id.* at ¶¶ 103-104, 106-107);

- Fortis employees escalated their concerns to senior management personnel and credit committee members (*Id.* at ¶¶ 107, 112, 115-116, 126-128);

- Fortis employee Buckley wrote that she was "extremely uncomfortable" that Fortis could not independently verify BLMIS's trades for Harley, and that she wanted "some assurance of how the front and back office are separated in Madoff and if two separate streams of trade information can be provided that will allow independent reconciliation of trades in Harley" (*Id.* at ¶ 114);

- Fortis employees warned that, absent verification of BLMIS's trades, Fortis should not lend money to those who planned to invest it with BLMIS (*Id.* at ¶¶ 114-117; 126);

- Fortis employees recommended that they should insist that BLMIS be replaced as custodian to Harley (*Id.* at ¶ 115);

- Novo warned that Fortis needed to be "very careful," because as administrator, Fortis was responsible under Bahamian law for BLMIS's acts as custodian (*Id.* at ¶105);

- Fortis employees warned that, absent changing legal jurisdiction out of the Bahamas, it would "have no alternative than to resign" as Harley's administrator (*Id.* at ¶¶ 110-112);

- In 2004, other Fortis entities wanted to cease providing administration services to a BLMIS feeder fund because of the inability to independently verify Madoff's "trades" and "positions," nicknamed the "Madoff issue" (*Id.* at ¶ 126);

- Fortis chose to continue servicing Harley after changing legal jurisdictions (*Id.* at ¶¶ 118-121).

The dire warnings Fortis employees issued to management, and the lengths they insisted Fortis go in order to insulate itself from exposure to the potential fraud at BLMIS, demonstrate the high degree to which employees subjectively believed Madoff could be engaging in potential fraud, including not trading or custodying the assets he claimed.

Rather than accepting as true all factual allegations in the PSAC as is required for

purposes of this motion, Defendants ask the Court to accept their interpretation of the documents

cited in the PSAC, including, for example, speculating employees could have been seeking

"trade verification" of Harley's trades "for any number of reasons." Def. Br. at 19-20.[3]

Defendants' proffered interpretations of the documents cited in the PSAC are implausible

because they are contrary to the specific allegations highlighted above, which demonstrate Fortis

employees were concerned they could not verify Madoff's trades or custody of assets.

In any event, it is inappropriate for the Court to engage in fact finding at the pleading

stage in order to resolve Defendants' competing interpretation. *See Wacker v. JP Morgan Chase

& Co*, 678 Fed. App'x 27, 30 (2d Cir. 2017).

### 2.    Fortis Multi-Management Had A Subjective Belief in the High Probability of Fraud at BLMIS

Defendants' arguments with respect to Fortis Multi-Management's subjective belief in

the high probability of fraud at BLMIS fail for the same reasons discussed above. Defendants not

only rely on the wrong legal standard for willful blindness, but try to convince the Court to

engage in inappropriate fact finding at the pleading stage.

Moreover, the inference Defendants want drawn from the documents cited in the PSAC –

that Fortis Multi-Management was *not* suspicious that BLMIS might be engaged in fraud (Def.

Br. at 22-23) – is implausible in light of the allegations of the PSAC, including:

- By May 2006, Fortis Multi-Management executives were "nervous" and had "apprehensions" about their investments with Madoff (PSAC at ¶¶ 134, 142-143);

- Fortis Multi-Management knew that Tremont did not have its standard full diligence report for BLMIS, and could not answer basic logistical questions about Madoff's trades and operations, even material terms of its own trades (*Id*. at ¶¶ 144-154);

---

[3] Defendants also claim that another document cited in the PSAC suggests Fortis employees were only concerned about the propriety of "BLMIS's "valuation" of securities; and that a Fortis employee's inquiries about Fortis' security interest in Harley's assets exhibited her "belief" that Harley did in fact have assets. *Id.*

- Fortis Multi-Management's suspicions were reinforced by warnings of its new business partner, Cadogan, which had a "No-Madoff" policy (*Id.* at ¶¶ 156-163); and

- Fortis Multi-Management and Cadogan jointly decided to terminate the remaining $70 million investment with Tremont's feeder funds (*Id.* at ¶ 163).

### 3. Before Entering Into the Swap and Hedge Transactions, Defendants Were Aware of BLMIS's Shifting Story Regarding Options Trades

The PSAC alleges that Fortis employees working on the Swap Transaction became aware that Madoff's story about where BLMIS traded customers' options was shifting from what it had always been told (OTC) (*Id.* at ¶¶ 168-169), and prepared documents in 2007 that stated that BLMIS was trading options *either* over an exchange or OTC.

Defendants argue Fortis did not have reason to know that BLMIS traded options OTC, claiming the only party that knew was Fortis Multi-Management.  Def. Br. at 25-26.  Defendants are wrong – they knew BLMIS traded OTC since at least 2001.[4]  Once again, the competing inferences Defendants advance in connection with documents cited in the PSAC (*see* Def. Br. at 26) are contrary to the allegations of the PSAC.[5]

### C. The PSAC's Allegations Establish Defendants Took Deliberate Actions to Avoid Confirming Madoff's Fraud

### 1. Fortis' Change of Legal Jurisdictions Establishes that Defendants Intentionally Blinded Themselves to BLMIS's Fraud

Cognizant that Fortis' decision to seek to move legal jurisdictions to reduce its exposure to the potential for fraud at BLMIS and still continue to provide administrator services to Harley

---

[4] The PSAC alleges that Fortis employees providing administrator services to Harley were aware since 2001 that Madoff purported to trade options OTC (PSAC at ¶¶ 106-107, 170-172), and this was confirmed directly to Defendants themselves in 2006 through a PPM they received in connection with the Swap Transaction.  *Id.* at ¶¶ 173-174.

[5] Defendants speculate Fortis employees who reported in 2007 that BLMIS was trading options either OTC *or* on an exchange possibly received "updated information about these options trades" or the drafters of a document were "simply mistaken."  Def. Br. at 26. The PSAC alleges that (i) all previous information Fortis received from all sources was that BLMIS's options trades took place OTC (PSAC at ¶¶ 170-175), and (ii) it is unlikely Fortis employees received "updated information," because Fortis' sole sources of information – Tremont and BLMIS – had different stories about where BLMIS traded options than what Fortis was saying at the time.  *Id.* at ¶¶ 187-188.

exhibits willful blindness, Defendants reframe the issue as a legal dispute over precisely what the

Bahamian regulations required of Fortis with respect to BLMIS.  Def. Br. at 27-29.

But the parties' current interpretation of the regulations is irrelevant,[6] as the only germane

issue is what *Fortis' own employees understood* contemporaneously those Bahamian regulations

required of Fortis at the time.  As the PSAC alleges, Fortis employees themselves believed in

2003 that the Bahamian regulations made Fortis Fund Bahamas as Harley's administrator

responsible for Madoff's acts as custodian,[7] and warned Fortis would have to be "particularly

careful" with how they proceeded since they could not independently verify BLMIS's trades or

custody of Harley's assets.  PSAC at ¶¶ 103-115.  Indeed, Fortis employees were so concerned

about Fortis' exposure under the regulations for potential wrongdoing at BLMIS they insisted

that, absent a change in legal jurisdictions, Fortis "will have no alternative than to resign" as

Harley's administrator.  *Id.* at ¶ 112.

Defendants mistakenly argue the Trustee cannot show they turned a blind eye because

they claim Fortis conducted "extensive due diligence into Tremont and BLMIS."  *See* Def. Br. at

30.  But Defendants cannot rely on what they claim to be "extensive" diligence in light of the

fact that they saw, appreciated, and contemporaneously articulated their suspicions of fraud.  *See*

*Merkin II*, at 141; *see also Picard v. Merkin (In re BLMIS)*, 563 B.R. 737, 749 (Bankr. S.D.N.Y.

2014) ("*Merkin III*").

Moreover, the act of writing a letter to BLMIS about Fortis' concerns, and receiving

vague, unverified assurances back from the party you suspect of fraud (Def. Br. at 29-30) is *not*

---

[6]While the correct interpretation is not relevant, it is worth noting that both the IFR and its predecessor, the MFR, provided that administrators were responsible for ensuring that the fund's service providers properly carried out their duties. *See* Giblin Decl. Exhibit H (IFR at 17(e)) and Exhibit I (MFR at 4(5)).

[7] *See also* Fortis communications attached to the Giblin Aff. as Exhibit F.

due diligence.[8]  The other items Fortis points to as diligence – such as receiving daily trade

tickets, private placement memoranda, and reviewing Harley's history of trades – were all

exercises based on BLMIS-sourced information that numerous Fortis employees indicated was

insufficient independent verification of Madoff's trades and custody of assets to assuage their

concerns.  PSAC at ¶¶ 108-111, 114-118, 126.

> **2.    Defendants Turned a Blind Eye By Continuing to Engage in BLMIS-Related
> Transactions Where They Perceived They Could Minimize Their Exposure**

Despite never obtaining independent verification of BLMIS's trades or custody of

customer assets, Fortis chose to continue providing administrator services to Harley (after first

moving legal jurisdictions) (PSAC at ¶¶ 118-122), and thereafter to engage in other BLMIS

related transactions, including the Swap Transaction, over the continued objections and concerns

expressed by multiple Fortis employees and affiliates.  *Id.* at ¶ 126.  Fortis did so where it

perceived it could minimize risk.

Fortis claims the rights and special protections in the Swap and Hedge transactions (*Id.* at

¶¶ 197-214) were "run of the mill" and commonplace.  If these were "commonplace" provisions,

all of Tremont's individual investors would have them – and they did not.  *Id.* at ¶¶ 200, 210.

Indeed, the early right of redemption provision provided Defendant with a priority right *over*

*other investors* to redeem if Madoff were to be investigated for federal securities law violations.

*Id.* at ¶¶ 212-13.  Notably, the District Court already held allegations precisely such as these

which demonstrate a party took affirmative action to minimize exposure to the risk of fraud at

---

[8] *See, e.g.*, *General Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d 8, 13 (1st Cir. 1986) (finding investors did not exercise due diligence where they relied on assurances of promoter and broker); *Cooperativa Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 942 F. Supp. 735, 739 (D. P.R. 1996) ("blind faith in the assurances of an investment advisor does not constitute due diligence . . .").

BLMIS satisfy the willful blindness standard at the pleading stage.[9]

### 3.    The Knowledge of Fortis Employees Is Imputable to Defendants

(a)    <u>The Knowledge Fortis Employees Acquired Providing Harley
Administrator Services is Imputable to Defendants</u>

Defendants claim the Trustee cannot impute knowledge from years earlier by employees of entities other than Defendants.  (Def. Br. at 17-18).  This argument is nonsensical given that at least two Fortis employees – Buckley and Eldridge – were involved in (i) structuring and getting approval for the Swap Transaction in 2007, and (ii) providing Harley administrator services, and sharing their concerns about BLMIS.  PSAC at ¶¶ 235-237, 103-118, 126.  These Fortis employees brought their personal knowledge about the high probability of fraud at BLMIS directly to the Swap Transaction they worked on for Defendants.[10]

The knowledge acquired by Fortis employees while collectively working to provide administrator services to Harley is also imputable to Defendants under principles of agency.  *Ctr. v. Hampton Affiliates, Inc*, 66 N.Y.2d 782, 784 (1985).[11]  Under New York law, agency exists where the principal and agent agree the agent will act for the principal under either actual[12] or

---

[9] *See Katz*, 462 B.R. at 454–55; *see also In re Jeanneret Assocs., Inc.,* 769 F. Supp. 2d at 340, 368-69 (S.D.N.Y. 2011) (finding scienter adequately pled where defendants expressed doubts about legitimacy of BLMIS, but nevertheless chose to continue profiting from Madoff investments transactions while seeking to limit its exposure through special agreements and gradual divestment).

[10] *See In re Optimal U.S. Litig*., 2011 WL 4908745 at *8 (S.D.N.Y. Oct. 14, 2011) (holding that an employee did not act "with blinders on" with regard to knowledge he acquired at one defendant when he acted for another defendant, because he brought that earlier knowledge with him).

[11]  "The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it." *Id.*

[12] Actual authority exists when an agent has the power "to do an act or to conduct a transaction on account of the principal which…he is privileged to do because of the principal's manifestations to him."  *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996).

apparent authority,[13] or where a party ratifies the actions of another.[14] *See Fortis Corp. Ins. S.A.*

*v. M/V Cielo Del Canada*, 320 F. Supp. 2d 95 (S.D.N.Y. 2004).

The PSAC sets out the numerous ways in which employees across Fortis entities worked

together and interchangeably acted with actual and apparent authority as each other's agents to

effectuate Fortis' business transactions, including with the Tremont feeder funds:

- All of the Fortis affiliates and business units operated as one institution, marketed Fortis as one institution, and had one central management (PSAC at ¶ 224);

- In 2005, Fortis bundled its fund services to form a single unit, Fortis Fund Solutions, operating in thirteen jurisdictions under Defendants' leadership (*Id.* at ¶¶ 224-225);

- Defendant Fortis Fund Bank served as the headquarters of Fortis Fund Solutions and was central to its decision-making process (*Id.* at ¶ 226);

- Fortis employees from multiple Fortis affiliates worked on behalf of Defendant entering into the Swap Transaction (*Id.* at ¶¶ 235-237);

- Even before 2005, Fortis employees worked across affiliate lines to service hedge funds, including providing administrator services to Harley (*Id.* at ¶¶ 230, 233-234);

- Fortis employees shared information and concerns about BLMIS, which made its way up Fortis' central credit committees (*Id.* at ¶¶ 228-230, 237, 103-118, 126);

- Under Fortis' global framework, transactions with BLMIS feeder funds were evaluated by the same committee members—who oftentimes structured and/or approved the transactions (*Id.* at ¶¶ 228-230, 235-237).

At this stage, the Trustee must only plead the existence of an agency relationship between

Defendants and employees from other Fortis affiliates with relevant knowledge,[15] and the PSAC

---

[13] An agent acts with apparent authority when the conduct of the principal, communicated to a third party, reasonably gives the appearance the agent has authority with regard to that transaction. *See Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F. 3d 738 (2d Cir. 2000); Restatement (Third) of Agency § 2.03.

[14] Restatement (Third) of Agency § 4.01 cmt. D (a person may ratify an act by manifesting assent the act affect the person's legal relations).

[15] *See Picard v. Merkin (In re BLMIS)*, 440 B.R. 243, 260 (Bankr. S.D.N.Y. 2010) ("*Merkin I*")(at the pleading stage, the question is not whether the Trustee has proved the existence of an agency relationship, merely whether he should have the chance to do so.); *see also Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 51 F. Supp. 2d

does so by establishing a pattern of central reporting, communication, decision-making and

acceptance of profits and potential risks of the Fortis' affiliates' collective business transactions.

*See Art Finance Partners, LLC v. Christie's Inc.*, 58 A.D.3d 469, 471, 870 N.Y.S.2d 331, 333

(1st Dep't 2009) ("A principal-agent relationship may be established by evidence of the consent

of one person to allow another to act on his or her behalf and subject to his or her control, and

consent by the other so to act").[16]  Defendants ratified the knowledge and acts of those involved

in the Swap Transaction when they accepted the benefits of their work.  PSAC at ¶¶ 235-237.

> (b)    The Knowledge of Fortis Multi-Management Is Imputable to Defendants

For the same reasons set forth above, Fortis Multi-Management's knowledge and

subjective beliefs about BLMIS[17] is imputable to Defendants because the PSAC alleges an

agency relationship between Fortis Multi-Management and Defendants.[18]

As alleged in the PSAC, Fortis Multi-Management was part of the family of global

entities that Fortis marketed to clients as one entity.  PSAC at ¶¶ 224, 228.  Moreover, Fortis

Multi-Management was subject to the same global risk framework and central risk and credit

committees as Defendants, which were staffed by Buckley (and other Fortis Fund Solutions

employees including Eldridge), who had previously expressed concerns about BLMIS and also

participated in the Swap Transaction on behalf of Defendant.  *Id.* at ¶ 228.  And notably, the

---

457, 471 (S.D.N.Y. 1999) ("an agency relationship is a factual issue that a court cannot properly adjudicate on a motion to dismiss").

[16] *See* also *Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund Ltd.*, 2008 WL 4891229, at **4-5 (S.D.N.Y. 2008), *aff'd*, 598 F.3d 30 (2d Cir. 2010) (holding that where a customer contacted one entity, but services for him were carried out by another affiliate, second entity may be found to be agent of first entity).

[17] Defendants' argument that the Trustee must establish a joint-venture between Cadogan and Fortis Multi-Management (Def. Br. at 23) is a red herring.  There is no need for imputation or agency principles to come into play, because the PSAC alleges Cadogan and Fortis Multi-Management directly communicated and shared their concerns about BLMIS with regard to investments in Tremont. PSAC at ¶¶ 16, 162-163.

[18] Defendants' argument that the Trustee is attempting to improperly rely on "group pleading" (Def. Br. at 23) has no application here, as the Trustee has not sued any Fortis affiliate entities, nor is he attempting pierce any corporate veil.  Rather, the PSAC merely alleges the existence of an agency relationship.

PSAC alleges that a Fortis Fund Solutions entity, overseen by Defendants, acted as the agent of Fortis Multi-Management with regard to its investments in Tremont. *Id.* at ¶ 239.

Contrary to Defendants' assertions that Tremont's "impressions" with respect to Fortis Multi-Management and its relationship to Defendants is not enough to create an agency relationship (Def. Br. at 24), the allegations of the PSAC evidence apparent authority between the two entities in that they shared information, decision makers and centralized risk committees.[19]  *See* Restatement (Third) of Agency § 2.03.  Indeed, the PSAC alleges that Tremont sought to exploit the "overlap" in management between Defendants and Fortis-Multi-Management to prevent the latter from terminating its investment in the Tremont feeder funds.[20]

D.    *The Allegations Setting Forth Defendants' Willful Blindness Are Plausible*

Defendants claim it is implausible a sophisticated financial institution would ever "willingly throw away money into Ponzi schemes," and the only plausible inference is that Fortis employees believed BLMIS was a "legitimate investment."  Def. Br. at 16.

The District Court found it entirely plausible a party might willfully blind itself to a fraud at BLMIS if it felt it could realize short-term profits while at the same time seek to protect itself against the long-term risk.  *Katz,* 462 B.R. at 454.[21]  This is precisely what the PSAC alleges:

---

[19] Tremont understood that the Fortis entities, including Fortis Multi-Management, operated as one group, and shared information about global risk factors including BLMIS, as demonstrated by Fortis USA's request for information about Fortis Multi-Management's investments with Tremont to expedite credit committee approval of the Swap Transaction.  PSAC at ¶¶ 240-242.

[20] At the time Defendants were preparing to enter into the Swap Transaction, Tremont employees planned to inform Fortis of the "cost" it would incur should Fortis Multi-Management proceed to terminate its investment with Tremont's feeder funds.  PSAC at ¶ 241.

[21] The District Court in *Katz* stated:

…[I]f the defendants willfully blinded themselves to the fact that Madoff Securities was involved *in some kind of fraud,* this too might, depending on the facts, constitute a lack of good faith . . . . But why would defendants willfully blind themselves to the fact that they had invested in a fraudulent enterprise? The Amended Complaint alleges, in effect, that it was because they felt they could realize substantial short-term profits while protecting themselves against the long-term risk. Although the defendants vehemently deny these accusations, the Amended Complaint . . .pleads sufficient allegations to survive a motion to dismiss …"). *Id.* at 454-55 (citing Katz

that Fortis willfully blinded itself to evidence of a fraud at BLMIS in order to enter into the Swap

Transaction to generate short-term revenue.  Defendants did so perceiving that most of the risk

posed by the potential for fraud at BLMIS was to other investors' assets, as they had special

safeguards and rights designed to enable Fortis to redeem, recover and/or setoff its investments

ahead of all Tremont individual investors who did not possess such special rights.  PSAC at ¶¶

197-219.

Finally, Defendants' argument that sophisticated financial institutions will not choose to

engage in risky transactions is itself implausible.  Regulators and experts alike studying the

causes of the financial crisis in 2007-2008 and subsequent collapse of Lehman Brothers and Bear

Stearns have noted that there are powerful financial incentives for individuals at institutions to

take on transactions which carry significant risk in order to generate short term gain.[22] Due to its

financial distress in 2007, Fortis appears to have had an enhanced motive to engage in risky

transactions to bolster the appearance of profitability.  PSAC at ¶¶ 220-221, 223.

The PSAC adequately alleges plausible claims against Fortis, and "[t]he choice between

two plausible inferences that may be drawn from factual allegations is not a choice to be made

by the court" at the pleading stage.  *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162,

185 (2d Cir. 2012).

II.     **The PSAC Alleges that Defendants Did Not Provide Value**

Defendants concede that whether they provided value for the transfers they received is an

---

complaint allegations that defendants considered purchasing fraud insurance with respect to their BLMIS
investments and created own hedge fund at least partly to limit their exposure in BLMIS).

[22] Testimony of Scott G. Alvarez, General Counsel to the Board of Governors of the Federal Reserve, *Compensation
Structure and Systemic Risk: Hearing Before the Committee on Financial Services*, 111 Cong. 80 (2009)
("[C]ompensation arrangements at many financial institutions provided executives and employees with incentives to
take excessive risks that were not consistent with the long-term health of the organization"); *see also* Crotty, J.
(2009) "Structural causes of the global financial crisis: a critical assessment of the 'new financial architecture,'"
*Cambridge Journal of Economics*, 33(4), at p. 565 (noting same).

affirmative defense that is their burden to plead and prove.  Def. Br. at n. 24; *see Off. Committee of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A.*, 394 B.R. 721, 740 n.20 (Bankr. S.D.N.Y. 2008).  Because no value defense is apparent on the face of the PSAC, their argument fails. *See BNP Paribas*, 594 B.R. at 207.

The PSAC alleges that Defendant Fortis Fund Bank was an investor in Broad Market Fund that was free to redeem its shares of the fund as it wished.  PSAC at ¶ 257.  Specifically, Fortis decided to hedge its risk under the Swap Transaction by investing three times the initial collateral it received from Rye XL Fund in Broad Market Fund, and therefore purchased shares in Broad Market Fund equal to that amount.  PSAC at ¶¶ 195-196.

Accordingly, when Fortis Fund Bank decided in July 2008 to redeem $30 million from Broad Market Fund, the PSAC alleges this transfer represented equity interests, either as shareholders or partners, by the Defendants in Broad Market Fund.  *Id.* at ¶¶ 259-260. Distributions on account of an equity interest in an entity are not transfers for value under section 550(b).  This is particularly true where, as here, the transferor entity is insolvent at the time it makes the transfer.  *Id.* at ¶ 259.

Defendants argue that because they had invested more than $30 million into Broad Market Fund, they are "net losers" who give value up to the "return of principal."  Def. Br. at 32. They rely for this proposition on cases interpreting the net equity of BLMIS customers for purposes of SIPA.  *See id.*, and cases cited therein.  BLMIS customers, of course, were not equity holders of BLMIS, and the concepts of "net winner" and "net loser" are irrelevant to  non-customer subsequent transferees, such as Defendants.  Contrary to Defendants' arguments, the PSAC does not allege any antecedent debt or sale but rather that Defendants received the transfer on account of their ownership status with the Fund.  "[T]he value element …looks to what the

transferee gave up" (*BNP Paribas*, 594 B.R. at 205), and Defendants gave up nothing.

At best, because the Trustee alleges that Defendants were equity owners in the Broad

Market Fund, the determination of whether defendants gave value for the subsequent transfer is a

factual determination that cannot be determined on a motion to dismiss.  *See BNP Paribas*, 594

B.R. at 207; *Merkin II*, at 151–52 (value defense was not supported by the pleadings and goes

outside the record the court may consider on a motion to dismiss).

III.    **THE TRUSTEE'S CLAIMS AGAINST TREMONT ARE NOT LIMITED BY THE
        SAFE HARBORS OF 546(e) AND 546(g)**

A.    *The Trustee's Claims Against Tremont Are Not Limited by the Safe Harbor of 546(e)
       Because the PSAC Alleges Tremont's Actual Knowledge*

Defendants' "double recovery" argument fails because the PSAC amply pleads Tremont

had actual knowledge BLMIS was not trading securities.  *See Picard v. Ceretti, (In re BLMIS)*,

2015 WL 4734749, at *12 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*").

### 1.    Defendants' Authority is Unhelpful

Defendants' arguments regarding Tremont's actual knowledge are not supported by their

cited cases.  Def. Br. at 35.  For example, *Elendow Fund, LLC v. Rye Select Broad Market XL

Fund (In re Tremont Sec. Law)*, does not hold that the Trustee's pleadings in the Tremont

litigation were insufficient.[23]  2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013).  The plaintiff in

*Elendow* brought a private securities action against Tremont pleading scienter based on red flags.

*Id*. at *1.  *Elendow* was litigated by different parties, based on different underlying statutes,

causes of action, and elements to plead and prove.  Moreover, *Elendow* and decisions like it

---

[23] The Trustee filed the Tremont complaint when his pleading standard was inquiry notice.  *See Complaint, Picard v. Tremont Grp. Holdings, Inc. (In re BLMIS)*, Adv. Pro. No. 10-05310, ECF No. 1 (Bankr. S.D.N.Y. Dec. 7, 2010) ("Tremont Compl.").  Because the pleading standard changed, the Trustee supplemented his original complaint with the PSAC's additional allegations to more clearly present Tremont's actual knowledge and ensure such allegations were not overshadowed by "objective red flag" allegations contained in the original complaint.  *See AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, No. 01 Civ. 11448 (JGK), 2005 WL 2385854, *12 (S.D.N.Y. Sept 26, 2005) (Court's prior concerns regarding "fraud by hindsight" were "resolved by the plaintiffs' new allegations.").

based on a "red flags theory" of scienter are inapplicable here, where the Trustee alleges

particular facts that Tremont knew of BLMIS's fraud. *See U.S. v. Simon*, 85 F.3d 906, 910 (2d

Cir. 1996) (holding factfinder may "find the requisite knowledge on defendant's part by drawing

reasonable inferences from the evidence of *defendant's* conduct.") (quoting *Ratzlaf v. U.S.*, 510

U.S. 135, 149 n.19 (1994)).

As the third-largest BLMIS feeder fund and co-manager of Kingate Global (part of the

second-largest), Tremont was not just a management company that saw and understood red flags

of Madoff's fraud; it actively participated in the fraud. *See SIPC v. BLMIS*, No. 2013 WL

1609154, at *4 (those who knew of and took advantage of Madoff's fraud "effectively

participated in it"). Tremont did whatever was necessary to keep money flowing into BLMIS—

protecting Madoff, fabricating stories as necessary to deflect further inquiry about Madoff and

ignoring the red flags of fraud that Tremont saw, heard, and knew for years.

### 2.    Tremont Knew of BLMIS's Fraud in Real Time

#### (a)    Tremont Knew of BLMIS's Trade Impossibilities

Despite Defendants' claims the Trustee is pleading by hindsight, Tremont knew through

its own regular review and analysis of BLMIS customer statements and trade tickets that Madoff

was reporting impossible trades. *See Kingate*, at *14 (finding actual knowledge where Kingate

regularly monitored funds' performance showing impossible trades). Tremont knew the

positions and prices BLMIS reported differed from Bloomberg owing to their monthly analysis

and review of the purported trade prices. PSAC at ¶¶ 288-89. Tremont also estimated BLMIS's

assets under management to calculate if there was sufficient volume to execute the trades. *Id.* at

¶¶ 290-91. Having done this, Tremont knew many purported trades exceeded the trading

volume, demonstrating they were impossible. *Id.*

(b)    Tremont Knew Others Believed Madoff Was a Fraud

Far from "pleading by innuendo," the Trustee alleges Tremont received numerous direct

and identifiable warnings about Madoff (*Id.* at ¶¶ 273-85) supporting the inference Tremont

knew of BLMIS's fraud.  *See Merkin III*, 563 B.R. at 749.  Investors repeatedly questioned

Tremont about the legitimacy of BLMIS's operations, with some even asking if it was a Ponzi

scheme.  *Id.* at ¶¶ 274, 276, 278, 282.  Others expressed concerns to Tremont about Madoff's

purported trading practices, including lack of management fees; absence of a third-party

custodian; stable returns; the identity of counterparties to BLMIS's purported options

transactions; and Madoff's impossible trading volumes.  *Id.* at ¶¶ 274, 279.  These are not

indirect hints or "innuendos" of fraud: they are affirmative statements on the illegitimacy of

Madoff's operation.  Tremont responded to these warnings that Madoff was not trading securities

by ignoring them or fabricating stories to protect him.[24]  *Id.* at ¶ 285.

(c)    Tremont Shielded Madoff From Due Diligence

Defendants downplay Tremont's lack of transparency into BLMIS as industry standard.

Tremont deliberately shielded Madoff from both internal and external due diligence.  *Id.* at ¶¶

307-311.  To preemptively quash attempts to conduct due diligence, Tremont told its employees,

including high-ranking executives, that they "cannot" conduct due diligence on BLMIS, nor ask

questions about BLMIS's AUM, how it generated returns, or its auditors.  *Id.* at ¶¶ 294, 298.

Employees were warned that even contacting BLMIS—for anything—was strictly prohibited.

Id. at ¶ 309.  It was also "[f]irm policy" to deny customers contact with BLMIS.  *Id.* at ¶ 307.

Tremont also made BLMIS the sole exception to its requirement of third-party oversight

---

[24] Tremont's practice of deflecting and fabricating information with clients also shows why the word
"misconceptions"—as used by one unnamed Tremont individual when discussing a BLMIS warning—has no
significance.  Def. Br. at 36.

and went to great lengths to deflect inquiries directed at Madoff.  *Id*. at ¶ 304.  For example,

Tremont executives refused to respond in writing to investor questions about asset verification

because it believed this would "lead closer to BLMIS which [Tremont] strictly wants to avoid."

*Id*. at ¶¶ 304-305.  One high-ranking Tremont officer requested that instead of allowing

diligence, his colleague try to simply "convince" an investor that Madoff's assets existed.  *Id*. at

¶ 305.  This Court previously found that shielding Madoff from third parties supports a finding

of actual knowledge.  *See Kingate*, at *14.  As Tremont *already knew* Madoff was a fraud, it

exempted BLMIS from any due diligence analysis.  PSAC at ¶ 294.  Defendants argue Tremont

did not shield Madoff from investors because it arranged meetings at BLMIS (Def. Br. at 37) but

Tremont did so only after initially denying their requests, later acquiescing to a general

"corporate overview."  *See Picard v. Citibank N.A., et al*. Adv. Pro. No. 10-5345 (Bankr.

S.D.N.Y.), ECF No. 150, Ex. A ¶¶ 189, 248.

Tremont's contracts with its lenders included provisions for termination and penalties if

the lenders ever contacted Madoff.  PSAC at ¶ 308; *see also Kingate*, at *14 (noting Trustee's

allegation that Kingate threatened investors with losing their business if they raised questions

about BLMIS).  Tremont's auditor was barred from contacting Madoff, and its administrator was

prevented from receiving BLMIS customer statements and trade tickets directly from BLMIS.

*Id*. at ¶¶ 310-11.  Tremont acted as a go-between to help perpetuate Madoff's fiction.  *Id*.

Tremont understood the numerous impossibilities as to Madoff's purported securities trading and

sought to protect Madoff from being discovered by routinely deflecting attention away from

BLMIS and preventing both third parties and even its own employees from inquiring into

Madoff's activity.  PSAC at ¶¶ 294, 298; *cf. Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548

B.R. 13, 28-32 (Bankr. S.D.N.Y. 2016).

(d)    <u>Rather than Allow Diligence on BLMIS, Tremont Obfuscated and Lied</u>

In *Kingate*, this Court found allegations that defendants fabricated stories about Madoff's

purported counterparties sufficient to allege actual knowledge. *Kingate*, at \*14.  Similarly, here,

investor questions were often handled off the record, or, in some cases, required Tremont to

fabricate stories.  PSAC at ¶¶ 281, 312.  For example, Tremont failed to coordinate on messaging

and flip-flopped on what it told its investors about Madoff's purported OTC options trading.  *Id*.

at ¶ 314.  This included inventing the number, identity, and characteristics of the purported OTC

options counterparties.  *Id*. at ¶¶ 320-21.  Tremont told its investors the counterparties were

"typical banks," naming JP Morgan Chase as a counterparty.  Ironically, JPMorgan Chase

inquired about the identity of the counterparties a month prior.  *Id*. at ¶ 321.

Tremont knew there could not have been any OTC counterparties and thus no OTC

options trading.  Despite bearing all the counterparty default risk, Tremont accepted that no

identifying information existed.  The trade confirmations only showed a CUSIP number—which

identifies an exchange-traded security—but Tremont nevertheless told its investors that BLMIS

traded options OTC.  *Id*. at ¶¶ 313-15.  These responses were lies intended to mollify investors,

and show Tremont knew Madoff was not engaged in securities trading.  *See Kingate*, at \*\*14-15.

### 3.    Kingate's Knowledge of Madoff's Fraud is Imputed to Tremont

Defendants incorrectly claim the Trustee fails to impute Kingate's knowledge of

Madoff's fraud to Tremont because the relationship between Tremont Bermuda and Kingate is

"attenuated."[25]  Def. Br. at 37.  Tremont founder and co-CEO Sandra Manzke[26] introduced

---

[25] Defendants' argument as to Tremont Bermuda's purported lack of ties to the Tremont BLMIS Feeder Funds or transactions here is a red herring. Def. Br. at 38.  Tremont Bermuda delegated most of its investment management responsibilities to Tremont Partners, which was Prime Fund's General Partner.  Tremont Compl. at ¶ 47.

[26] Despite Defendants' attempts to minimize Tremont's relationship with Madoff, it is akin to the relationship between Kingate and Madoff.  *See Kingate*, at \*3 (noting Trustee's allegations that defendants were part of

Kingate founders Carlo Ceretti and Federico Grosso to Madoff and served as a director and manager of Kingate Global for nearly ten years.  PSAC at ¶ 333.  Under their co-management agreement, Tremont Bermuda and Kingate Management (the "Co-Managers") worked jointly to manage the investments of Kingate Global.  *Id*. at ¶ 335.  In return, the Co-Managers shared fees, with Tremont receiving over $40 million between 1998-2008, a significant portion of Tremont's revenues.  *Id*. at ¶ 334.  This amount is too substantial and the relationship too long to claim the Tremont-Kingate relationship was insignificant.

Moreover, the PSAC plausibly alleges facts supporting imputation of Kingate's knowledge to Tremont and its entities.  When a duty exists for co-agents to exchange certain information, the principal's liability for the agents' acts is "judged in light of what the actor knew or should have known." *Rodriguez v. U.S.*, 54 F.3d 41, 48 (1st Cir. 1995) (Bownes, J., concurring).  Where multiple agents are engaged in a collective action requiring the sharing of information, the co-agents are not isolated actors but rather persons or entities that "should be assessed as one piece."  *Id. at 49; see also In re Parmalat Sec. Litig*., 501 F. Supp. 2d 560, 590 (S.D.N.Y. 2007) ("Knowledge of a joint adventurer is imputed to its co-adventurers.").

Similarly, here, Tremont Bermuda worked jointly with Kingate Management to manage the investments of their principal, Kingate Global.  PSAC at ¶ 335.  As Kingate Global's managers, the Co-Managers necessarily shared information, acting in concert for its benefit. Kingate Management's knowledge of Madoff's fraud is, at least, imputed to Tremont Bermuda, its co-agent, whose knowledge is imputed to its principal, Tremont Group Holdings, Inc. Tremont Compl. at ¶ 57.  Thus, Kingate Management's knowledge is imputable to Tremont.

---

"Madoff's inner circle" because they met with Madoff "at least twice a year," and engaged in "various telephone conversations"); PSAC at ¶¶ 270-72.

B.     *The Trustee's Claims Against Tremont Are Not Limited by the Safe Harbor of 546(g)*

Defendants argue that, even assuming that the PSAC sufficiently pleads that Tremont had

actual knowledge of Madoff's Ponzi scheme, the Trustee's avoidance claims against initial

transferees Prime Fund and Broad Market Fund are limited by the safe harbor of 546(g)

pertaining to swap transactions.  Def. Br. at 33-34.  But Defendants misconstrue the District

Court's decisions pertaining to §§ 546(g) and 546(e), and further misapply those cases here.

In the 546(g) decision in *Picard v. ABN Amro Bank (Ireland) Ltd. (In re Madoff Sec.)*,

505 B.R. 135 (S.D.N.Y. 2013), the District Court was addressing Defendants' argument that the

*subsequent transfers* made to the Fortis Defendants were protected by the safe harbor of § 546(g)

because they were participants in a swap transaction.  The Court there held that there, with

respect to participants in the swap, there was no actual knowledge exception. *Id*. at n.6.[27]

In contrast to that case, the Fortis Defendants are asserting here that the § 546(g) safe

harbor with respect to swap transactions should apply to limit the avoidability of the *initial*

*transfers* to Tremont's Prime Fund and Broad Market Fund.  But neither Prime Fund nor Broad

Market Fund were participants in the swap at issue; thus, the District Court's ruling finding that

"the mindset of the participants" in the swap transaction "is irrelevant" has no bearing here.

On the other hand, the District Court's 546(e) decision makes it plain that, to the extent

Prime Fund and Broad Market Fund had actual knowledge of Madoff's fraudulent scheme, they

did not have reasonable expectations of investors who believed they were signing a securities

---

[27] The District Court noted:

Unlike section 546(e), the issue of knowledge is irrelevant to the application of section 546(g) *in this case*.
Customers' "good faith" in believing that Madoff Securities was engaging in securities transactions on their
behalf was relevant under section 546 because Madoff Securities never actually engaged in such securities
transactions, and the application of section 546(e) therefore turned on the investors' understanding of what they
had contracted for. Here, by contrast, there is no dispute that *the swap transactions* actually occurred, *so the
mindset of the participants in those transactions is irrelevant.*

contract, but rather were "simply obtaining moneys while [they] could." *SIPC v. BLMIS*, 2013

WL 1609154, at *4.  Most importantly, the District Court broadly held that with respect to such

initial transferees with actual knowledge of Madoff's fraud that "neither  law nor equity permits

such a person to profit from a safe harbor intended to promote the legitimate workings of the

securities markets and the reasonable expectations of legitimate investors."  *Id.*

Accordingly, to the extent the Trustee pleads that Tremont had actual knowledge of

Madoff's scheme, under the District Court's decisions, the Trustee's avoidance claims against

the Tremont feeder fund initial transferees are not limited by either §§ 546(e) or 546(g).

## IV.     SECTION 550(D) DOES NOT APPLY UNTIL THE TRUSTEE HAS RECOVERED $2.1 BILLION RELATING TO TREMONT TRANSFERS

### A.    Amounts Relating to the Tremont Initial Transfers Remain Outstanding by the Express Terms of the Settlement

Contrary to Defendants' wishes, the rule of single satisfaction is not implicated here.  As

this Court determined in its order approving the Tremont Settlement, the Trustee has not

recovered the full value of the avoidable initial transfers received by the Tremont Funds.  Order

Approving Settlement, *Picard v. Tremont Grp. Holdings, Inc*., Adv. Pro. No. 10-05310 (BRL),

ECF No. 38, at 6 (Bankr. S.D.N.Y. Sept. 22, 2011) ("Settlement Order").[28]

The purpose behind § 550(d) "is to prevent the trustee from recovering more than he

should, but the trustee is still entitled to a full satisfaction."  *Segner v. Ruthven Oil & Gas, LLC*

*(In re Provident Royalties, LLC)*, 581 B.R. 185, 190 (Bankr. N.D. Tex. 2017).  Indeed, "[i]f a

partial recovery from the initial transferee always impaired the ability of the trustee to pursue the

remainder of its claim against the subsequent transferee, the purpose of section 550 would be

thwarted."  *Id*. at 193.  Courts have "cautioned against adoption of an application of the single

---

[28] The Tremont Settlement can be found at *Picard v. Tremont Grp. Holdings, Inc*., Adv. Pro. No. 10-05310 (BRL), ECF No. 17-1 (Bankr. S.D.N.Y. Jul. 28, 2011).

satisfaction rule that would prevent complete satisfaction in many instances." *Id.; Dzikowski v. N. Tr. Bank of Fla., N.A. (In re Prudential of Fla. Leasing, Inc.)*, 478 F.3d 1291, 1301 (11th Cir. 2007) ("550(d) limits the trustee to a 'single satisfaction': no more and no less.").

The Trustee sought to recover $2,152,524,086 in avoidable initial transfers to the Tremont Funds.  The Trustee received $1.025 billion from the Tremont Settlement.  Here, the Trustee seeks to recover $265,500,000 in customer property Defendants received as subsequent transfers from Broad Market Fund and Rye XL Fund, well-below the remaining $1,127,524,086 left to be recovered.  As this Court found, "the Settlement specifically provides that the Trustee may seek additional recovery from any non-settling defendant or subsequent transferee, and Section 550(d) does not dictate otherwise."  Settlement Order, at 6; s*ee also Gibbons v. First Fid. Bank, N.A. (In re Princeton-New York Inv'rs, Inc.)*, 255 B.R. 376, 384 (Bankr. D.N.J. 2000) (noting trustee is "entitled to recover from any combination of entities, as long as there is no double recovery").  Specifically named in the Tremont Settlement as parties from whom the Trustee may seek recovery, Defendants were on notice of the settlement and did not object.

Applying § 550(d) here would be contrary to the express terms of the settlement and render much of it superfluous.  *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a contract superfluous.").  It would allow Defendants to collaterally attack a settlement of which they had notice and failed to object.  *See Sharp v. Evanston Ins. (In re C.M. Meiers Co.)*, 2016 WL 9458553, at **12-13 (Bankr. C.D. Cal. Dec. 20, 2016) (defendants' insurance company could not dispute the reasonableness of settlement between defendants and trustee where it declined the opportunity "to object and participate in the negotiations").

  B.    *Changes in the Law Cannot Be Retroactively Applied to a Past Settlement*

Pointing to changes in the law that occurred *after* the settlement was entered into,

25

Defendants claim the Trustee's recovery is limited to the amount of the two-year transfers to the Tremont Funds. Because the Trustee received $1.025 billion in the Tremont Settlement, and the two-year transfers to the Tremont Funds totaled $959,632,359, Defendants claim the Trustee has already been satisfied. Defendants are wrong for at least four reasons.

As an initial matter, Defendants' argument fails completely if the Trustee adequately alleges the Tremont Funds had actual knowledge that BLMIS was not trading securities.[29] In that instance, the Trustee's recovery would not be limited to the two-year transfers but would instead encompass the life-to-date transfers to the Tremont Funds. There is no argument that the Trustee has already recovered the full amount of the life-to-date transfers to the Tremont Funds and thus the single satisfaction rule would be inapplicable by its express terms.

Second, Defendants are wrong that they can use a subsequent change in the law to rewrite a clear and unambiguous settlement agreement. The Tremont Settlement's unambiguous terms state that the settlement payment of $1,025,000 (with no allocation between the 90-day, two-year, six-year, or life-to-date amounts) was consideration for the release by the Trustee of $2,152,524,086 in life-to-date avoidable transfers, a release of equitable subordination claims, and a "spring" of $800 million. Tremont Settlement, at 12-13. The Tremont Settlement further states that the Trustee may recover the remainder of avoidable transfers under §§ 544, 547, 548 and 550—over $1.1 billion—from subsequent transferees, specifically carving out Defendants and the transfers at issue here. *See id.* at 4-6, 8, 12-13, 25-26, 34, 40.

To now rewrite the settlement agreement to say that the settlement payment can only be attributed to two-year claims would be an improper, retroactive application of law that did not

---

[29] It should be noted that the entirety of the funds the Trustee seeks to recover from Defendants comprise transfers made within the two years preceding the Filing Date. These transfers are not subject to the § 546(e) safe harbor and thus the Trustee need not allege actual knowledge of the initial transferee, only willful blindness, which Defendants do not dispute.

exist and could not have been considered by the parties or the Court at the time the Tremont

Settlement was approved.  "[I]t is well settled that a subsequent change in law cannot be used to

set aside a written agreement. . . . In entering into a settlement agreement, parties need to

consider the risks and costs of litigation and part of this risk analysis includes the possibility that

laws, including the judicial construction of laws, may change."  *In re Napolitano*, No. 07-73361-

478, 2008 WL 5401541, at *4 (Bankr. E.D.N.Y. 2008).

For these reasons, courts do not permit parties to engage in a post-hoc rewriting of a

settlement when conducting a subsequent allocation, looking to information and law available to

the parties at the time of the settlement.[30]

Allocating a settlement based on the law that existed at the time the settlement was

entered supports the need for finality and reflects the incentives parties weighed and choices they

made when entering into the agreement.  *See, e.g., Dzikowski v. N. Tr. Bank of Fla., N.A. (In re*

*Prudential of Fla. Leasing, Inc.),* 478 F.3d 1291, 1302 (11th Cir. 2007) (when making an

allocation under § 550(d), court should evaluate claims based on information and law known at

the time of settlement).  Any post-settlement allocation by this Court must be based on the law as

it existed at the time of the settlement, including that (i) the defendant, and not the Trustee, had

the pleading burden as to good faith,[31] (ii) the standard for good faith was inquiry notice,[32] (iii)

---

[30] S*ee Bowers v. Kuse Enters., Inc. (In re Fla. Hotel Props. Ltd. P'ship Plan Tr. Agreement)*, Nos. 97-2583, 97-2507, 1998 WL 957455, at *7 (4th Cir. Sept. 22, 1998) (Unpublished Disposition) (conducting post-settlement allocation by considering the factors existing at time of settlement, specifically "[t]he amount of the settlement, its terms, as well as the negotiations between the parties to the settlement"); *UnitedHealth Grp., Inc. v. Columbia Cas. Co*., 47 F. Supp. 3d 863, 872-73 (D. Minn. 2014), aff'd sub nom. *UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co*., 870 F.3d 856 (8th Cir. 2017) (allocating proceeds of prior settlement and declining to "rely on events that occurred or on information that [the parties] learned after the Settlement was reached to show how a reasonable party in [their] position would have allocated at the time that the Settlement was reached."); *accord Residential Funding Corp. (USA) v. SunTrust Mortgage, Inc. (In re Residential Capital, LLC)*, 536 B.R. 132, 146 (Bankr. S.D.N.Y. 2015).

[31] *See SIPC v. BLMIS (In re Madoff Sec.)*, 516 B.R. 18, 22-24 (S.D.N.Y. 2014).

[32] *Id.*, at 23-24 (citing *Picard v. Greiff (In re Madoff Sec.)*, 476 B.R. 715, 723 (S.D.N.Y. 2012)).

27

this Court had upheld the Trustee's actions for life-to-date transfers pursuant to New York's discovery rule,[33] and (iv) no case had applied § 546(e) to non-existent securities transactions.[34]

Third, the Trustee does not dispute that the Court may one day be required to conduct an allocation of the Tremont Settlement. But that day is not yet here. Courts have noted that allocations are most often conducted after liability has been ascertained. *See In re Prudential*, 478 F.3d at 1301. Thus, until it is determined Defendants are liable to the Trustee, there is no issue of double recovery and this Court is "without authority to render an advisory opinion on a potential controversy." *Collins v. Cayuga Energy, Inc. (In re S. Glens Falls Energy, LLC)*, No. 06-60073, 2009 WL 2883141, at *4 (Bankr. N.D.N.Y. Jan. 30, 2009) (emphasis in original). Here—where the Court has not even determined whether the Tremont Feeder Funds had actual knowledge BLMIS was not trading securities—allocation is premature.

Finally, an allocation by the Court would require consideration of numerous facts and issues not presented on a motion on the pleadings.[35] The allocation also affects other subsequent transferees who may ultimately be liable to the Trustee. Once liability is determined, the Court can conduct an allocation of the Tremont Settlement if needed in a comprehensive manner that is equitable to all. To do so now on a piecemeal basis is unfair to all.

## V.    DEFENDANTS' ARGUMENT THAT THE BLMIS ESTATE WAS NOT DEPLETED HAS NO MERIT

The transfers at issue here depleted the fund of customer property and were not part of an

---

[33] *See, e.g., Picard v. Madoff (In re BLMIS)*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011) (denying the Madoff family's motion to dismiss state law fraudulent transfer claims).

[34] *See, e.g., Geltzer v. Mooney (In re MacMenamin's Grill, Ltd.)*, 450 B.R. 414, 421-22 (Bankr. S.D.N.Y. 2011) (interpreting § 546(e) narrowly).

[35] For example, an allocation would require more than a dollar for dollar credit of the $1.025 billion settlement payment against the $2.1 billion in avoidable transfers. As additional consideration in the Tremont Settlement, the Trustee dismissed two sizeable equitable subordination counts and gave an $800 million "spring" to those claims. *See* Settlement Order, at 2.

integrated transaction.  Without relevant authority, Defendants wrongly contend the subsequent transfers they received from Broad Market Fund and XL Fund are not recoverable because wholly unrelated parties later transferred funds to Broad Market Fund.  Def. Br. at 40.

The Trustee's claims against Defendants arise from their transfers from BLMIS through Broad Market Fund and XL Fund via Prime Fund.  To the extent any of Prime Fund's $475 million redemption made its way back to BLMIS through transfers from Broad Market Fund, the monies subsequently transferred to Defendants never returned to BLMIS or the BLMIS estate and can be recovered.  *Id.*  This transaction is still a separate transaction governed by the agreements Broad Market Fund had with Defendant and BLMIS, separate from the agreements Prime Fund had with other parties and BLMIS.  *See Picard v. Lustig (In re BLMIS)*, 568 B.R. 481, 490 (Bankr. S.D.N.Y. 2017).  Defendants suggest that because Broad Market Fund later deposited funds wholly unrelated to Defendants' transactions into its BLMIS account, Defendants are entitled to a setoff of their subsequent transfer liability.  These arguments are legally baseless and ignore the harm to the customer property fund.

Defendants are not the first to argue that a withdrawal from one BLMIS account and subsequent deposit into a different BLMIS account should offset fraudulent transfer liability.  This Court already rejected a similar argument, explaining that it was inconsistent with § 548(c) because it would deprive the funds of their rights.[36]  Likewise, here, Defendants are asking this Court to give a second round of credits.  As shown on Exhibit A to the PSAC, Broad Market Fund held BLMIS account number 1T0027.  The net equity in that account formed the basis for the Trustee's settlement of Broad Market Fund's customer claim.  See Settlement Order at 2.  To

---

[36] *See Lustig*, 568 B.R. at 487 ("[t]he Funds gave the value through the deposits that the Lustig Defendants are trying to conscript for their own benefit, and the Funds are entitled to the credit for those deposits under § 548(c)").

now credit that deposit against Prime Fund's withdrawal from its BLMIS account (1C126930)
requires this Court to give a second credit to that deposit (for Defendants' benefit)—a result that
would be inequitable to all BLMIS customers, particularly those who have yet to receive their
principal back.[37]

Defendants invoke the "integrated transaction" doctrine but fail to address the relevant
standard.  Def. Br. at 18.  The doctrine is an equitable solution that allows for recoupment—the
offsetting of debts from the same transaction.[38]  *See Univ. Med. Ctr. v. Sullivan (In re Univ. Med.
Ctr.)*, 973 F.2d 1065, 1079 (3d Cir. 1992).  The Second Circuit has adopted a narrow view of the
"same transaction," ruling that even "discrete and independent units" of a singular transaction
destroy claims of integration.  *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 147 (2d. Cir.
2002) (internal citation omitted).  Notwithstanding this Circuit's narrow analysis, this argument
necessarily fails as no basis exists for asserting these transfers form a coordinated transaction.[39]

---

[37] If Defendants believe they are entitled to a credit, they need to recover those funds directly from the co-parties to
their allegedly integrated transaction.  *Cf. SIPC v. BLMIS (In re BLMIS)*, 522 B.R. 41, 61 (Bankr. S.D.N.Y. 2014).

[38] To bolster the defects of Defendants' argument, Defendants misconstrue *Picard v. ABN Amro Bank (Ireland) Ltd.
(In re Madoff Sec.)*, 505 B.R. 135, 147 (S.D.N.Y. 2013).

[39] Defendants mistakenly rely on *In re Adelphia Commc'n Corp*. ("*Adelphia*"), the reverse of this situation. No. 02-
41729 (REG), 2006 WL 687153, at *15 (Bankr. S.D.N.Y. Mar. 6, 2006).  Moreover, *Adelphia* relies on constructive
fraud cases that are inapposite. Defendants' reliance on *Intercontinental Metals Corp. v. Erlanger & Co*., 902 F.2d
1565 (4th Cir. 1990), concerning transfers made in good faith in satisfaction of antecedent debt, is also misguided.

**CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court grant the

Trustee's request for an order allowing him to amend the complaint, and any and all other relief

the Court deems just and proper.

Dated: New York, New York
      May 23, 2019

*/s/ Regina Griffin*
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Regina Griffin
Email: rgriffin@bakerlaw.com
Tracy L. Cole
Email: tcole@bakerlaw.com
A. Mackenna White
Email: awhite@bakerlaw.com
Elizabeth G. McCurrach
Email: emccurrach@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*