**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>          Plaintiff-Applicant, <br><br>    v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>          Defendant. | Adv. Pro. No. 08-01789 (SMB) <br> SIPA Liquidation <br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br>          Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br>          Plaintiff, <br><br>    v. <br><br> ABN AMRO BANK N.V. (presently known as THE ROYAL BANK OF SCOTLAND, N.V.), <br><br>          Defendant. | Adv. Pro. No. 10-05354 (SMB) |

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S**
**MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

I.    FACTUAL BACKGROUND ..............................................................................3

    A.    Procedural History ...................................................................................3

    B.    The Proposed Second Amended Complaint ............................................6

        1.    The PSAC Plausibly Alleges Defendant Received Subsequent
            Transfers of Customer Property While Willfully Blinding Itself to
            Fraud at BLMIS ...........................................................................6

        2.    The PSAC Plausibly Alleges the Initial Transfers from BLMIS to the
            Tremont Initial Transfer Funds Were Avoided or Avoidable ..................15

II.   ARGUMENT .....................................................................................................19

    A.    Legal Standard Governing Motions to Amend a Pleading .....................19

    B.    The Court Should Grant the Trustee's Motion to Amend in Light of the
        Intervening Change in Law and the Additional Facts Alleged.............................20

    C.    No Futility, Undue Delay, Bad Faith, or Undue Prejudice Exists ........................21

        1.    Amending the Complaint Would Not Be Futile Because the Trustee
            Has Alleged Facts Sufficient to Survive a Motion to Dismiss ................21

        2.    Good Faith or Knowledge of the Avoidability of the Initial Transfer.......22

        3.    Avoidability .................................................................................30

        4.    The Proposed Amendments Relate Back....................................34

    D.    No Undue Delay or Bad Faith Can be Shown Where Defendant Acquiesced
        to the Trustee Waiting to Amend the Complaint Until Legal Standards Were
        Resolved..................................................................................................37

    E.    Defendant Cannot Demonstrate Undue Prejudice .................................38

III.  PERMITTED AMENDMENTS AND REINSTATEMENT OF CLAIM .......................39

IV.   CONCLUSION..................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)...................................................................................19

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
    624 F. Supp. 2d 292 (S.D.N.Y. 2009).............................................................34, 35

*Agerbrink v. Model Serv. LLC*,
    155 F. Supp. 3d 448 (S.D.N.Y. 2016).................................................................38

*Alexander Interactive, Inc. v. Adorama, Inc.*,
    No. 12 Civ. 6608, 2014 WL 113728 (S.D.N.Y. Jan. 13, 2014)..........................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................................22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................. 21-22

*Blagman v. Apple, Inc.*,
    No. 12 Civ. 5453 (ALC) (JCF), 2014 WL 2106489 (S.D.N.Y. May 19, 2014)............... 19-20

*Block v. First Blood Assocs.*,
    988 F.2d 344 (2d Cir. 1993)...............................................................................38

*Commander Oil Corp. v. Barlo Equip. Corp.*,
    215 F.3d 321 (2d Cir. 2000)...............................................................................37

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*,
    282 F.3d 83 (2d Cir. 2002).................................................................................21

*Enron Corp. v. Granite Constr. Co. (In re Enron Corp.)*,
    No. 03-93172 (AJG), 2006 WL 2400369 (Bankr. S.D.N.Y. May 11, 2006) ........................36

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*,
    726 F.3d 62 (2d Cir. 2013).................................................................................21

*Fish v. GreatBanc Tr. Co.*,
    749 F.3d 671 (7th Cir. 2014) .............................................................................23

*Fjord v. AMR Corp. (In re AMR Corp.)*,
    506 B.R. 368 (Bankr. S.D.N.Y. 2014)................................................................19

*Foman v. Davis*,
    371 U.S. 178 (1962) ..............................................................................................19

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    No. 02 Civ. 5068 (JFK), 2008 WL 9359652 (S.D.N.Y. Mar. 17, 2008) ................................21

*Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*,
    665 F. Supp. 2d 239 (S.D.N.Y. 2009) ....................................................................39

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*,
    No. 16-CV-5393 (KMW), 2018 WL 1115517 (S.D.N.Y. Feb. 26, 2018) ...........................38

*Local 802, Associated Musicians of Greater New York v. Parker Meridien Hotel*,
    145 F.3d 85 (2d Cir. 1998) ..................................................................................19

*M.E.S., Inc. v. Safeco Ins. Co. of Am.*,
    No. 10-CV-02798 (PKC)(VMS), 2014 WL 2931398 (E.D.N.Y. June 27,
    2014) ....................................................................................................................38

*Margel v. E.G.L. Gem Lab Ltd.*,
    No. 04 Civ. 1514 (PAC) (HBP), 2010 WL 445192 (S.D.N.Y. Feb. 8, 2010) .......................20

*Mayle v. Felix*,
    545 U.S. 644 (2005) ............................................................................................34

*Metzeler v. Bouchard Transp. Co., Inc. (In re Metzeler)*,
    66 B.R. 977 (Bankr. S.D.N.Y. 1986) ....................................................................36

*Milanese v. Rust-Oleum Corp.*,
    244 F.3d 104 (2d Cir. 2001) ................................................................................19

*Monahan v. N.Y.C. Dep't of Corr.*,
    214 F.3d 275 (2d Cir. 2000) ................................................................................38

*In re Chaus Secs. Litig.*,
    801 F. Supp. 1257 (S.D.N.Y. 1992) ....................................................................35

*In re Dreier LLP*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011) ..................................................................23

*In re Optimal U.S. Litig.*,
    No. 10 CIV 4095 SAS, 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ...............................27

*In re Picard, Trustee for the Liquidation of BLMIS, LLC*,
    917 F.3d 85 (2d Cir. Feb. 25, 2019) ......................................................................5

*Pagano v. Pergament*,
    No. 11-CV-2360 (SJF), 2012 WL 1828854 (E.D.N.Y. May 16, 2012) ...............................34

*Picard v. Ceretti*,
No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ................ *passim*

*Picard v. Katz*,
462 B.R. 447, 455 (S.D.N.Y. 2011) ............................................................................... 29, 30

*Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
548 B.R. 13 (Bankr. S.D.N.Y. 2016) ................................................................................ 6, 21

*Picard v. Magnify (In re Bernard L. Madoff Inv. Sec. LLC )*,
583 B.R. 829 (Bankr. S.D.N.Y. 2018) .................................................................................. 20

*Picard v. Mendelow (In re Bernard L. Madoff Inv. Sec. LLC)*,
560 B.R. 208 (Bankr. S.D.N.Y. 2016) ............................................................. 19, 21, 37, 38

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014) ......................................................................... *passim*

*Picard v. Peter Madoff (In re Bernard L. Madoff Inc. Sec. LLC)*,
468 B.R. 620 (Bankr. S.D.N.Y. 2012) .................................................................................. 35

*Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*,
No. 13 Civ. 1654 (RA), 2015 WL 4097927 (S.D.N.Y. July 6, 2015) .................................... 37

*S.S. Silberblatt, Inc. v. E. Harlem Pilot Block–Bldg. 1 Hous. Dev. Fund Co., Inc.*,
608 F.2d 28 (2d Cir.1979) ...................................................................................................... 19

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard
L. Madoff Inv. Sec. LLC)*,
590 B.R. 200 (Bankr. S.D.N.Y. 2014) (Adv. Pro. No. 08-01789 (SMB)), ECF
No. 7827 ......................................................................................................................... *passim*

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*,
501 B.R. 26 (S.D.N.Y. 2013) .......................................................................................... 20, 30

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
513 B.R. 222 (S.D.N.Y. 2014) ............................................................................................... 4

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
516 B.R. 18 (S.D.N.Y. 2014) ......................................................................................... *passim*

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
No. 12-mc-115 (JSR) (S.D.N.Y. July 10, 2014), ECF No. 552 ............................................... 4

*Soley v. Wasserman*,
No. 08 Civ 9262 (KMW) (FM), 2013 WL 6244146 (S.D.N.Y. Dec. 3, 2013) ..................... 19

*State Teachers Ret. Bd. v. Fluor Corp.*,
654 F.2d 843 (2d Cir. 1981)...........................................................37, 38

*State v. United Parcel Serv., Inc.*,
253 F. Supp. 3d 583 (S.D.N.Y. 2017).........................................................27

*United States v. Fofanah*,
765 F.3d 141 (2d Cir. 2014) (Leval, J., concurring).......................... 27-28

*United States v. Giovannetti*,
919 F.2d 1223 (7th Cir. 1990) .................................................................23

*United States v. Kozeny*,
664 F. Supp. 2d 369 (S.D.N.Y. 2009), *aff'd,* 667 F.3d 122 (2d Cir. 2011) ...........................23

*United States v. Reyes*,
302 F.3d 48 (2d Cir. 2002)........................................................................23

**Statutes**

11 U.S.C. § 548 ....................................................................................................6

11 U.S.C. § 548(c) ..........................................................................................3, 21

11 U.S.C. § 550 ....................................................................................................6

11 U.S.C. § 550(a) .............................................................................................20

11 U.S.C. § 550(a)(2) .........................................................................................20

11 U.S.C. § 550(b) .......................................................................................3, 4, 21

11 U.S.C. § 550(b)(1) .........................................................................................21

28 U.S.C. § 157 ....................................................................................................3

15 U.S.C. §§ 78aaa, *et seq.* ...............................................................................1

**Rules**

Fed. R. Bankr. P. 7015 ....................................................................................1, 19

Fed. R. Civ. P. 12(b)(6)................................................................................21, 22

Fed. R. Civ. P. 15 ....................................................................................1, 22, 37

Fed. R. Civ. P. 15(a) ............................................................................................4

Fed. R. Civ. P. 15(a)(2)......................................................................................19

Fed. R. Civ. P. 26 ..................................................................................................39

Fed. R. Civ. P.  26(d)(1) .........................................................................................4

**Other Authorities**

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1484 (3d ed.) .......................................38

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.) .......................................39

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa, *et seq.*, by and through his undersigned counsel, respectfully submits this Memorandum of Law in Support of Trustee's Motion for Leave to File a Second Amended Complaint (the "Motion") under Federal Rule of Civil Procedure 15, made applicable to this action by Federal Rule of Bankruptcy Procedure 7015. Through this Motion, the Trustee seeks leave to file a proposed second amended complaint (the "PSAC") against ABN AMRO Bank N.V. (presently known as The Royal Bank of Scotland, N.V.) ("Defendant"). The PSAC seeks to recover subsequent transfers of customer property Defendant received from four investment funds of Tremont Group Holdings, Inc. (the "Tremont Group"), and its management arm, Tremont Partners, Inc. ("Tremont Partners," and together with the Tremont Group, "Tremont"). The four investment funds solicited money from clients to invest with BLMIS. Two of the Tremont investment funds—Rye Select Broad Market Portfolio Limited ("Rye Portfolio Limited") and Rye Select Broad Market Fund L.P. ("Rye Broad Market," and together with Rye Portfolio Limited, the "Rye Funds"), invested all or substantially all of their assets with BLMIS's investment advisory business (the "IA Business") and were part of a group of funds known as BLMIS feeder funds.

## PRELIMINARY STATEMENT

Defendant received at least $276,313,906 in subsequent transfers of customer property in connection with two separate leverage deals involving the four Tremont funds referenced above. The first deal, which closed in September 2006, involved a total return swap between Defendant and Rye Select Broad Market XL Portfolio, Ltd. ("XL Portfolio Limited"), and a series of investments by Defendant in Rye Portfolio Limited (the "2006 Leverage Transaction"). The

1

second deal, which closed in November 2007 and involved an almost identical total return swap between Defendant and Rye Select Broad Market XL Fund L.P. ("XL Broad Market," and together with XL Portfolio Limited, the "XL Funds"), and a series of investments by Defendant in Rye Broad Market (the "2007 Leverage Transaction," and together with the 2006 Leverage Transaction, the "Leverage Transactions").

In the process of negotiating and carrying out these Leverage Transactions, and from conferring with other BLMIS feeder funds in its search for other Madoff-related deals, Defendant identified and appreciated several facts that indicated a high probability of fraud at BLMIS. Defendant's need for profits outweighed these significant fraud concerns. Rather than investigate these fraud concerns, Defendant instead obtained fraud protection to insulate its investment in the Rye Funds from loss should the fraud it suspected at BLMIS be revealed. This fraud protection came in the form of a special investment class in the Rye Funds that would allow Defendant priority over all other investors in redeeming its investment if BLMIS were investigated by the government for securities fraud—essentially guaranteeing redemption of its entire investment in the Rye Funds "well in advance of a guilty verdict."

The facts show that, once Defendant obtained this fraud protection, it would not enter into another leverage deal with a BLMIS feeder fund without it. Defendant sought the same fraud protection in a potential leverage deal with the Fairfield Greenwich Group ("Fairfield"), which operated its own BLMIS feeder funds. When Fairfield rejected the demand for fraud protection, Defendant never finalized a deal with Fairfield because it was unwilling to take on additional BLMIS fraud risk without protecting its own funds from loss.

Defendant's fraud protection exemplifies exactly why a financial institution would knowingly invest in a fraud—it gained significant profits while protecting itself from losses in

the event BLMIS's fraud was revealed.  While Defendant's fraud protection did not operate as

planned, Defendant remains liable for the return of BLMIS customer property it received.

# I.    FACTUAL BACKGROUND

## A.    Procedural History

### 1.    Initial Proceedings in the Bankruptcy Court

The Trustee filed a complaint against Defendant, ABN AMRO Incorporated ("ABN

Inc."), XL Broad Market, and XL Portfolio Limited on December 8, 2010.[1]  Following several

stipulations extending Defendant's time to respond, the Trustee filed an amended complaint

against Defendant and XL Broad Market on August 8, 2012.[2]

### 2.    Proceedings in the District Court

Beginning in late 2011, Defendant, and hundreds of other defendants in the Trustee's

adversary proceedings, moved to withdraw the reference under 28 U.S.C. § 157.  As relevant

here, issues withdrawn by the District Court included whether the Trustee had the burden of

pleading lack of "good faith" under sections 548(c) and 550(b) (the "Good Faith Issue") and

whether the Trustee's claims to recover subsequent transfers were barred by the presumption of

extraterritoriality (the "Extraterritoriality Issue").

In April 2014, the District Court issued its Good Faith Issue decision.[3]  Diverging from

longstanding precedent establishing an inquiry notice standard to recover fraudulent transfers,

---

[1] Compl., *Picard v. ABN AMRO Bank N.V.*, Adv. Pro. No. 10-05354 (SMB) (Bankr. S.D.N.Y. Dec. 10, 2010), ECF No. 1 (filed under seal); ECF No. 7 (redacted).  Future references to docket entries of *ABN AMRO Bank* shall be identified as "ABN AMRO Docket."

[2] The amended complaint reflected the settlement of the Trustee's claims against XL Portfolio Limited.  *Id.* at ECF Nos. 37, 47.  On February 27, 2013, the Trustee filed a notice of voluntary dismissal of XL Broad Market, leaving Defendant as the only remaining defendant in this case.  *Id.* at ECF No. 56.

[3] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 516 B.R. 18 (S.D.N.Y. 2014) (the "Good Faith Decision").

the District Court ruled that in a SIPA proceeding, in order for his claims to survive a motion to

dismiss, the Trustee has the burden of pleading that transferees willfully blinded themselves to

circumstances suggesting fraud.[4]

Three months later, the District Court concluded that because section 550(b) does not

apply extraterritorially, the Trustee must plead certain facts to establish that the subsequent

transfers he seeks to recover are "domestic" transfers.[5]  Alternatively, the District Court held that

recovery of subsequent transfers received from an entity in foreign liquidation proceedings

would violate principles of international comity.[6]  Following these decisions, the District Court

returned the cases to this Court.[7]

### 3.    Subsequent Proceedings in the Bankruptcy Court

In light of the altered pleading standards, the Trustee filed the Omnibus Motion for Leave

to Replead Pursuant to Federal Rule of Civil Procedure 15(a) and Court Order Authorizing

Limited Discovery Pursuant to Federal Rule of Civil Procedure 26(d)(1) (the "Omnibus

Motion") in August 2014.[8]

In September 2014, at a status conference on the Omnibus Motion, defense counsel

argued that pending motions to dismiss based on extraterritoriality should be addressed prior to

---

[4] *Id.* at 22–24.

[5] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 513 B.R. 222, 232 n.4 (S.D.N.Y. 2014) (the "District Court ET Decision").

[6] *Id.* at 231-32.

[7] *See* Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12-mc-115 (JSR) (S.D.N.Y. July 10, 2014), ECF No. 552.

[8] Mem. of Law on Omnibus Mot., *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 590 B.R. 200 (Bankr. S.D.N.Y. 2014) (Adv. Pro. No. 08-01789 (SMB)), ECF No. 7827; *see also* Decl. of Regina Griffin, *In re Madoff*, 590 B.R. 200 (Adv. Pro. No. 08-01789 (SMB)), ECF No. 7828.  Future references to the docket of *In re Madoff*, 590 B.R. 200 (Adv. Pro. No. 08-01789 (SMB)), shall be identified as "Main Docket."

the Trustee's request for discovery.[9]  In December 2014, the Court agreed, and stayed

proceedings on the Omnibus Motion until after the extraterritoriality proceedings concluded.[10]

On November 22, 2016, this Court issued its Memorandum Decision Regarding Claims to

Recover Foreign Subsequent Transfers (the "Bankruptcy ET Decision"), granting the Trustee

leave to amend his complaint against Defendant relating to the Extraterritoriality Issue.[11]

In July 2017, this Court ordered proceedings "solely on the Good Faith Limited Discovery

Issue" of the Omnibus Motion.[12]  In June 2018, the Court denied the Trustee's request for limited

discovery concerning good faith and issued a decision (the "Discovery Decision") and order (the

"Discovery Order").[13]  Thus, without any additional discovery, the Trustee now moves for leave

to amend his pleading to comport with the new standard articulated in the Good Faith Decision.

---

[9] Hr'g Tr. of Sept. 17, 2014 at 16:14-17, Main Docket (Nov. 11, 2014), ECF No. 8636 ("it is not fair to the vast majority of the defendants who have *prima facie* good motions to dismiss on extraterritoriality, to subject them to [discovery]").

[10] *See* Order at ¶ 14, Main Docket, ECF No. 8800 ("December 10 Scheduling Order") (staying proceedings on the Trustee's request for discovery and to replead based on good faith until after the Court ruled on the Defendants' motion to dismiss based on extraterritoriality).  The December 10 Scheduling Order was subsequently modified three times.  *See* Main Docket, ECF Nos. 8990, 9350, 9720.  None of the subsequent orders modified the original paragraph 14 of the December 10 Order concerning discovery and repleading as to good faith.  *See also* Hr'g Tr. of Sept. 17, 2014 at 27:17-25, Main Docket (Nov. 11, 2014), ECF No. 8636.

[11] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 08-01789 (SMB), 2016 WL 6900689, at *15–16, *36–37 (Bankr. S.D.N.Y. Nov. 22, 2016).  The Trustee appealed the parts of the Bankruptcy ET Decision that dismissed its subsequent transfer claims as to other defendants directly to the Second Circuit, and on February 25, 2019, the Second Circuit vacated the Bankruptcy ET Decision, and remanded.  *In re Picard, Trustee for the Liquidation of BLMIS, LLC*, 917 F.3d 85 (2d Cir. Feb. 25, 2019), ECF No. 1311-1.  On April 23, 2019, the Second Circuit granted the defendants-appellees' request to stay the issuance of the mandate pending their petition for a writ of certiorari in the Supreme Court of the United States.  *In re Picard,* No. 17-2992 (2d Cir. Apr. 23, 2019).

[12] Order at ¶¶ 1, 4, Main Docket (July 24, 2017), ECF No. 16428.  That order deferred proceedings on the issue of leave to replead concerning the Good Faith Issue in the Omnibus Motion until after the Court's disposition of the Trustee's request for limited discovery.

[13] Discovery Decision, *In re Madoff,* 590 B.R. at 205 n.4 (S.D.N.Y. 2018); Discovery Order, Main Docket (June 19, 2018), ECF No. 17696.

**B.    The Proposed Second Amended Complaint**

Pursuant to the Court's Discovery Decision and Discovery Order, the Trustee seeks leave to file a second amended complaint in this matter to set forth additional relevant facts sufficient to meet the Trustee's pleading burden.  As required by the Good Faith Decision and this Court's opinions in *Kingate*,[14] *Merkin*,[15] and *Legacy*,[16] to state a claim under 11 U.S.C. §§ 548 and 550, the Trustee now must plead particularized allegations that initial transferees had actual knowledge of BLMIS's fraud or willfully blinded themselves to circumstances indicating a high probability of fraud at BLMIS and that subsequent transferees similarly willfully blinded themselves.[17]  For the reasons set forth below, the Trustee should be permitted to file the PSAC.

  *1.    The PSAC Plausibly Alleges Defendant Received Subsequent Transfers of Customer Property While Willfully Blinding Itself to Fraud at BLMIS*

  *a)    Defendant Sought Quick Profits from Transactions Involving BLMIS Feeder Funds to Help Its Dire Financial Situation*

Defendant, formerly known as ABN AMRO Bank N.V. ("ABN"), was a financial institution organized under the laws of the Netherlands.  (Declaration of Patrick T. Campbell in Support of the Trustee's Motion for Leave to File a Second Amended Complaint, dated June 10, 2019 ("Campbell Decl."), Ex. A, PSAC at ¶¶ 10-11.)  During the relevant time period, Defendant worked closely with, and acted through, ABN Inc., a U.S. subsidiary, regarding the work associated with the Leverage Transactions.  (*Id.* at ¶ 13.)  Defendant, ABN Inc. and their key

---

[14] *Picard v. Ceretti (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*").

[15] *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("*Merkin II*").

[16] *Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*, 548 B.R. 13 (Bankr. S.D.N.Y. 2016) ("*Legacy*").

[17] By seeking to file an amended pleading, the Trustee does not concede that the District Court's decisions regarding the pleading burden and standards for Defendant's good faith are correct.  The Trustee intends to appeal those decisions at the appropriate time.

personnel involved with Defendant's BLMIS-related business were sophisticated and
experienced industry investment professionals with particular expertise in the options and
derivative markets. (*Id.* at ¶¶ 12, 14.)

However, by 2006, Defendant was in dire financial straits. (*Id.* at ¶ 15.) It was exploring
ways to generate short term revenue to help its financial condition. Total return swap deals were
an appealing solution, where the bank could earn millions of dollars in fees, enhance its
reputation in the industry and structure the deals to minimize its long-term risk. Between 2006
and December 2008, Defendant targeted BLMIS feeder funds for these total return swap
transactions, sending its structuring brochure to (or otherwise contacting) at least a half dozen
BLMIS feeder fund managers, pitching its structuring capabilities and appetite for access to
Madoff. (*Id.* at ¶ 80.)

As described above, Defendant executed two leverage deals with Tremont BLMIS-
related funds, which worked as follows. In exchange for millions of dollars in fees, Defendant
received subsequent transfers of customer property from the XL Funds in the form of cash
collateral, which Defendant invested in the Rye Funds. (*Id.* at ¶¶ 78-79.) In return, Defendant
promised the XL Funds three times the returns of Defendant's investments of their cash
collateral in the Rye Funds. (*Id.*) To hedge its own exposure, Defendant invested three times the
value of the cash collateral provided by the XL Funds of its own money in the Rye Funds, and
received subsequent transfers of customer property from the Rye Funds in the form of cash
redemption payments. (*Id.* at ¶¶ 78-79, 82, 84.)

     *b)*    *Defendant Began Negotiating the 2006 Leverage Transaction*

In April 2006, Defendant emailed Tremont stating that it was interested in providing
leverage with respect to a Tremont BLMIS "single strategy fund." (PSAC at ¶ 88.) Defendant
signed a non-disclosure agreement with Tremont and, in late May 2006, Tremont provided

Defendant with: (i) historical weekly returns from 1996 to 2006 for Kingate Global Fund

Limited ("Kingate Global"), a BLMIS feeder fund that Tremont designated as a "proxy" for Rye

Portfolio Limited; (ii) Annual Rye Portfolio Limited "Investment Reports" for 2002 to 2006,

which identified the positions to be held by the fund each year; and (iii) the prospectus for Rye

Portfolio Limited.  (*Id.* at ¶¶ 89, 91.)  Subsequently, Tremont provided Defendant with

performance reports from 1994 to 2006 for four of its BLMIS feeder funds and Rye Portfolio

Limited's Customer Agreement and Option Agreement with BLMIS.  (*Id.*)

Although it never executed any BLMIS-related swap transaction with Fairfield,

Defendant communicated with, and received information concerning BLMIS from, Fairfield,

including about its BLMIS feeder fund, Fairfield Sentry Limited ("Sentry").  (*Id*. at ¶ 92.)

Both Tremont and Fairfield informed Defendant, through materials, emails and phone

conversations, that, among other things: (i) the BLMIS feeder funds that it was considering for

its investments and swap transactions were "single strategy funds" under the sole control of

BLMIS; (ii) the strategy that would be employed by the fund manager, BLMIS, relied heavily on

options trading; and (iii) BLMIS simultaneously was the investment adviser, custodian, and

prime broker for the BLMIS feeder funds.  (*Id.* at ¶¶ 93, 95.)

        *c)*      *During Negotiations of the 2006 Leverage Transaction, Defendant Identified Facts and Circumstances Suggesting a High Probability of Fraud at BLMIS*

Defendant, an industry leader in options and derivatives, recognized several indicators of

fraud at BLMIS.  For example, Defendant acknowledged that BLMIS's lack of independent

oversight was a "big problem" in obtaining approval for the 2006 Leverage Transaction.  (PSAC

at ¶ 98.)  During a July 18, 2006 call, Defendant raised this concern with Tremont.  (*Id.*)

Tremont never addressed Defendant's concern. Defendant accepted Tremont's non-response and conducted no other diligence on BLMIS's lack of independent oversight. (*Id.*)

Defendant also knew from the materials it obtained from Tremont and Fairfield that a fundamental part of BLMIS's split strike conversion strategy (the "SSC Strategy") was the purported purchase of put options and the sale of call options to hedge losses on the underlying basket of S&P 100 Index stocks. (*Id.* at ¶ 95.) Defendant also learned that Madoff purported to execute options trades over-the-counter ("OTC"). Defendant raised concerns about BLMIS's purported OTC options trades in July 2006, when it requested an immediate call for "further clarification on the OTC options." (*Id.* at ¶ 96.) Given Madoff's heavy dependence on options trades, a thorough analysis of the creditworthiness of his counterparties was a necessity. (*Id.* at ¶ 95.) Gaining an understanding of the basic terms of the agreements governing the OTC options trades was also standard.[18] (*Id.*)

On July 18, 2006, Defendant discussed "option counterparty issues," including the inability to assess a counterparty's creditworthiness, over the phone with Tremont. (*Id.* at ¶ 96.) Similar to its response to Defendant's concerns about the lack of independent oversight of BLMIS, Tremont had "nothing to offer on the option issue." (*Id.*) Defendant accepted Tremont's response and did no further diligence on this serious issue. As a result, despite its significant concerns about BLMIS's purported OTC options trades, Defendant entered into the 2006 Leverage Transaction without visibility into BLMIS's counterparties or their creditworthiness, without reviewing a single options agreement and without verifying a single options trade. (*Id.* at ¶ 97.)

---

[18] OTC options transactions are private contracts between the two counterparties to the transaction which, like all contracts, have material terms that must be defined in the parties' agreement, including the underlying obligations of the parties to the transactions, events of default and termination events.

Moreover, from the BLMIS feeder fund performance reports it received from Tremont, Defendant recognized that BLMIS-produced returns did not correlate with the S&P 100 Index, which Defendant knew was a key component of the SSC Strategy. (*Id.* at ¶ 102.) Indeed, the reports reflected a pattern of abnormal profitability both in terms of consistency and rate of return. (*Id.* at ¶¶ 102-11.)

> d)    *Defendant Demanded its Own Share Class with Exceptional Liquidity Instead of Conducting Further Diligence on the Facts Suggesting a High Probability of Fraud at BLMIS that it Identified*

Instead of conducting additional diligence on its serious concerns of fraud at BLMIS, or walking away from the 2006 Leverage Transaction, Defendant sought a way to protect its investment in Rye Portfolio Limited should its concerns be substantiated and the fraud at BLMIS be revealed. First, Defendant asked Tremont whether it could redeem its investment in Rye Portfolio Limited on fewer days' notice than provided for in the fund's prospectus. (PSAC at ¶ 117.) Tremont responded that the fund's Board of Directors would need to approve any early redemptions. (*Id.*) Clearly unsatisfied with this lack of guarantee, and still uncomfortable with the transaction due to all of the concerns of fraud it had identified at BLMIS, Defendant offered Tremont a compromise: Defendant asked for a special share class that would allow it to redeem its investment in Rye Portfolio Limited on only five days' notice—quicker than all other investors—if certain "special redemption events" ("SREs") were triggered. (*Id.* at ¶ 118.) Several of these SREs, including the requirement that BLMIS continue employing the SSC Strategy, related specifically to BLMIS. (*Id.* at ¶ 120.) In Defendant's view, the most critical SRE was a highly irregular provision that would permit it to redeem its investment in Rye Portfolio Limited "if any action, suit, proceeding, inquiry or investigation has been taken or brought, or is pending, by any court, governmental or regulatory body or agency against the Account Manager [BLMIS]" (hereinafter referred to as the "BLMIS Fraud Provision"). (*Id.* at ¶

10

120.)  With the BLMIS Fraud Provision, Defendant attempted to build a structure into the 2006

Leverage Transaction that would allow it to be the first investor to pull its funds from Rye

Portfolio Limited at the first sign of a government fraud investigation into BLMIS.

Tremont agreed to provide Defendant with a special share class that would provide it

with redemption rights that were superior to the redemption rights of any other investor in Rye

Portfolio Limited.  (*Id*. at ¶ 121.)  Tremont also agreed to almost all of the SREs that Defendant

requested, except for the BLMIS Fraud Provision.  (*Id*. at ¶ 122.)  Defendant urged Tremont to

reconsider and stated that the BLMIS Fraud Provision was "fundamental to risk" and necessary

for Defendant to get comfortable with Madoff.  (*Id*.)  Tremont did not yield and provided

Defendant with an ultimatum: execute the 2006 Leverage Transaction without the BLMIS Fraud

Provision or Tremont would find an alternate solution for funding.  (*Id*. at ¶ 123.)

Eager to generate the fees and other business opportunities the 2006 Leverage

Transaction would bring, Defendant agreed and the 2006 Leverage Transaction closed without

the BLMIS Fraud Provision on September 1, 2006.  (*Id*. at ¶ 124.)  However, other terms of the

2006 Leverage Transaction still protected Defendant's investment in Rye Portfolio Limited from

the fraud it suspected at BLMIS.  Defendant could still exercise its other priority redemption

rights, and also cancel its agreement with XL Portfolio Limited, should any of the agreed-upon

SREs occur.  (*Id*.)  Further, Defendant knew that the cash collateral provided by XL Portfolio

Limited totaling at least one-third of Defendant's investment with Rye Portfolio Limited would

be first exposed to any fraud revealed at BLMIS.  (*Id*.)  Defendant also had the right to seek

additional payments from XL Portfolio Limited if Defendant suffered losses that were greater

than 33% of its investment.  (*Id*.)

e)    *During Negotiation of the 2007 Leverage Transaction, Defendant
Identified Further Concerns of Fraud at BLMIS and Took
Additional Steps to Avoid Confirming its Subjective Beliefs*

In January 2007, Defendant searched for a way to increase the value of the 2006

Leverage Transaction so that it could earn additional fees.  In late January 2007, Defendant

began discussing with Tremont a new and separate BLMIS-related transaction—a $250 million

swap deal involving two other Tremont funds, XL Broad Market and Rye Broad Market.  (PSAC

at ¶ 127.)  Defendant continued to see, appreciate and turn a blind eye to significant indicators of

fraud at BLMIS during negotiations for this second leverage deal with Tremont.

For example, not only did Defendant maintain unresolved, serious concerns about

BLMIS's purported OTC options trades and counterparties, but as early as October 2006, it

learned that BLMIS could not be executing options trades OTC at all.  On October 9, 2006,

Defendant emailed Tremont that it was having trouble identifying the options trades described in

a BLMIS trade activity report emailed to it.  (*Id*. at ¶ 130.)  Tremont responded that Defendant

should refer to the Committee on Uniform Securities Identification Procedures ("CUSIP") codes

from the September 30, 2006 BLMIS account statement to identify the options trades.  (*Id*.)

However, Defendant knew that CUSIP numbers are only used for exchange-traded options.  (*Id.*)

Moreover, the trade data showed a $1.00 commission per options trade; Defendant knew that

OTC options are paid for in bid/offer spreads, not fee commissions.  (*Id.*)  Despite being told by

Tremont that BLMIS executed options trades OTC, Defendant did not conduct any diligence on,

and failed to question, the contradictory trade data.

Defendant also gained a much stronger appreciation for BLMIS's lack of transparency.

In connection with potential investments in other BLMIS-related funds, Defendant sought to

undertake direct diligence on Madoff and BLMIS.  (*Id*. at ¶ 132.)  The control person for the

12

BLMIS-related funds told Defendant that a meeting with Madoff or tour of BLMIS was "not possible now or in the future." (*Id*. at ¶ 134.)  Despite acknowledging that direct diligence on Madoff and BLMIS was a critical risk issue for the bank, *id*. at ¶ 133, Defendant proceeded with the Leverage Transactions without ever speaking with Madoff or visiting BLMIS.  Defendant even agreed to a highly unusual gag provision in connection with the Leverage Transactions that prohibited it from communicating with Madoff or anyone else at BLMIS.  (*Id*. at ¶¶ 139-40.)

Rather than conduct additional diligence on its concerns or walk away from the deal, Defendant renewed its demand for the BLMIS Fraud Provision, not only as a condition for entering into the 2007 Leverage Transaction, but also as an amendment to the 2006 Leverage Transaction.  In March 2007, high-level executives at Defendant met with Tremont representatives to "discuss the Madoff transaction" and review the language that would "cover fraud" at BLMIS.   (*Id*. at ¶¶ 142, 146.)  This time, Tremont agreed to include a slightly modified BLMIS Fraud Provision, both for the 2007 Leverage Transaction and as an amendment to the 2006 Leverage Transaction, as an SRE that would allow Defendant to redeem its investment in the Rye Funds before any other investor and "well in advance of a guilty verdict" against BLMIS.  (*Id*. at ¶¶ 149, 158-60.)

Defendant required the BLMIS Fraud Provision for other Madoff-related deals as well. Defendant refused to enter into a leverage transaction it was negotiating with Fairfield involving Sentry because Fairfield refused to include the BLMIS Fraud Provision as a reason to allow Defendant to redeem its investment before all other investors in Sentry.  (*Id*. at ¶ 157.)

> f)    *Defendant Received, and Ignored, Additional Warnings Regarding BLMIS*

Defendant was informed of a high probability of fraud at BLMIS by third parties as well. For example, in the summer of 2007, the Fund Derivatives Group of The Royal Bank of Scotland

Group Plc's ("RBS") U.K. operations retained Albourne Partners Ltd. ("Albourne"), a major and well-respected hedge fund advisor, to provide a detailed analysis of a BLMIS portfolio that included Kingate Global and Ascot Fund Limited, another BLMIS Feeder Fund. (PSAC at ¶ 163.) In an August 21, 2007 email, Albourne wrote to RBS:

> Both Ascot and Kingate are Madoff Feeders. Our general advice to clients has been to redeem Madoff due to lack of transparency.

(*Id*. at ¶ 163.) RBS acquired ABN two months later, and before the 2007 Leverage Transaction was executed. Defendant was aware of Albourne's warning, as after RBS acquired ABN, RBS integrated the ABN team that managed Defendant's relationships with BLMIS feeder funds and they began working on potential transactions and marketing products together. (*Id*. at ¶ 167.) However, armed with its BLMIS fraud protection, Defendant ignored Albourne's warning and proceeded with the 2007 Leverage Transaction. (*Id*.)

g)      *Defendant Recouped Most of Its Investment in the Rye Funds*

Ultimately, Defendant did not have enough time to utilize the BLMIS Fraud Provision and redeem its entire investment from the Rye Funds before the funds that were left at BLMIS after Madoff was arrested were frozen. Yet, Defendant still managed to minimize its losses resulting from Madoff's fraud. Defendant invested $991,942,717 in the Rye Funds in connection with the Leverage Transactions. (PSAC at ¶ 172.) However, Defendant received at least $312,833,333 in collateral payments from the XL Funds, which it kept, and redeemed at least $105,864,000 from the Rye Funds before Madoff's arrest. (*Id*.) Additionally, Defendant received $165,525,005.98 in distributions in a subsequent class action litigation against Tremont. (*Id*.) Thus, on information and belief, Defendant to date has recovered at least $584,222,338 of its investments in the Rye Funds. (*Id*.) Notably, this figure does not include the millions of

dollars in fees Defendant earned from the Leverage Transactions or any future additional

recoveries Defendant may obtain due to ongoing recovery efforts.

> 2.    *The PSAC Plausibly Alleges the Initial Transfers from BLMIS to the
> Tremont Initial Transfer Funds Were Avoided or Avoidable*

In addition to pleading sufficient facts regarding Defendant's receipt of subsequent

transfers was in bad faith, the PSAC plausibly alleges that the initial transfers from BLMIS to the

Rye Funds, Rye Select Broad Market Prime Fund, L.P., and Rye Select Broad Market Insurance

Portfolio LDC (the "Tremont Initial Transfer Funds") were avoided or avoidable.  The

subsequent transfers of customer property received by Defendant were initially transferred from

BLMIS to the Tremont Initial Transfer Funds.  (PSAC at ¶¶ 256-65.)

> a)    *The Settlement Agreement Provides that the Initial Transfers to the
> Tremont Initial Transfer Funds Were Avoided*

In 2010, the Trustee sued Tremont for avoidance and recovery of $2.1 billion of initial

transfers from BLMIS that constituted customer property under SIPA (Campbell Decl. Ex. B

("Tremont Complaint")), which is incorporated by reference into the PSAC.[19]  (PSAC at ¶ 174.)

In 2011, the Bankruptcy Court approved a settlement between the Trustee and Tremont, which

provides that the transfers made to the Tremont Initial Transfer Funds were "deemed avoided."

(*Id.* at ¶ 175.)

> b)    *The PSAC Plausibly Alleges That the Initial Transfers are
> Avoidable*

Notwithstanding the provisions of the settlement agreement, the PSAC plausibly alleges

that the initial transfers are avoidable because Tremont had actual knowledge that BLMIS was

not trading securities.  Alternatively, the PSAC plausibly alleges that the initial transfers are

---

[19] Compl., *Picard v. Tremont Group Holdings, Inc. (In re Bernard L. Madoff Inv. Sec. LLC)*, (Adv. Pro. No. 10-05310) (Bankr. S.D.N.Y. Dec. 7, 2010) ECF No. 1.

avoidable because Tremont was willfully blind to the fact suggesting a high probability of fraud at BLMIS.

### (1)     Tremont was Closely Tied to Madoff and BLMIS

Tremont's founder and first CEO, Sandra Manzke, first met Madoff in 1991.  (PSAC at ¶ 176.)  After selecting Madoff as a money manager, Manzke and Tremont's later co-CEO, Robert Schulman, had regular contact with Madoff, including quarterly visits to BLMIS.  (*Id.*)  Schulman had a longstanding, unusually close relationship with Madoff, which Tremont touted in its marketing materials to investors.  (*Id.* at ¶ 177.)  Their relationship was so close that Madoff sought Schulman's advice on individual hiring decisions at BLMIS.  (*Id.*)

### (2)     Tremont Had Evidence Madoff Was Engaged in a Fraud

#### (a)     TREMONT KNEW OF TRADE IMPOSSIBILITIES

Tremont regularly received customer statements, trade tickets, and other information from BLMIS.  (PSAC at ¶ 193.)  Tremont reviewed and analyzed this information, which reflected obvious quantitative trade impossibilities and other indications of BLMIS's fraud, including but not limited to, the following:

- Tremont's monthly analytic summaries showed that it knew the positions and prices BLMIS reported to Tremont differed from prices Bloomberg reported.  (*Id.* at ¶ 194.)

- BLMIS's returns were unrealistically consistent.  (Tremont Compl. at ¶¶ 160-64.)

- Tremont estimated the amount of assets BLMIS purported to manage and calculated whether there was sufficient volume in each instrument for Madoff to be able to execute trades.  (PSAC at ¶ 195.)

- The volume of BLMIS's purported equities trades was improbable.  (Tremont Compl. at ¶¶ 165-69; PSAC at ¶¶ 195-196.)

- The volume of BLMIS's purported options trades was impossible.  (Tremont Compl. at ¶¶ 170-74; PSAC at ¶ 131.)

16

- BLMIS's timing of trades was improbable.  (Tremont Compl. at ¶¶ 179-180.)

- BLMIS reported hundreds of option and equity trades conducted at prices outside of the daily reported range.  (Tremont Compl. at ¶¶ 181-83.)

(b)    TREMONT WAS REPEATEDLY WARNED ABOUT FRAUD AT BLMIS

Tremont received repeated and direct warnings of fraud about Madoff.  For example, in April 2001, one investor wrote to Schulman, "I know you are sick of answering this but man is it hot out here with the Bernie fraud rumors," and questioned Madoff's practice of going to cash at year-end every year and use of such a "small" auditor.  (PSAC at ¶ 179.)  Other investors expressed concerns to Tremont regarding BLMIS's lack of transparency, absence of third-party custodian, and exceptionally stable returns, among other things.  (*Id.* at ¶ 180.)  The warnings of BLMIS's fraud continued until 2008, when Madoff was arrested.  (*Id.* at ¶¶ 181-83.)

(c)    TREMONT KNEW BLMIS LACKED THIRD-PARTY OVERSIGHT

Tremont knew that BLMIS deviated from well-established industry practice by acting as investment adviser, prime broker, and custodian of its clients' assets, while also using a virtually unknown auditor, Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz").  (PSAC at ¶ 205.)  Tremont recognized the risk of BLMIS's lack of independent oversight, and it avoided questions from investors that dealt with asset verification.  (*Id.* at ¶ 101; Tremont Compl. at ¶¶ 209-11.)

(3)    Tremont Exempted BLMIS From Its High Due Diligence Standards, Prevented Third Parties from Conducting Their Own Due Diligence and Fabricated Stories About BLMIS

Tremont was a sophisticated manager with industry-leading due diligence standards. (PSAC at ¶ 198.)  It often implemented those procedures when placing its clients' assets with third-party managers.  (*Id.* at ¶ 197.)  Yet, when it came to BLMIS, Tremont made an exception

17

from its due diligence standards. (*Id*. at ¶ 199.) Tremont executives ensured that even

Tremont's own personnel did not conduct meaningful due diligence on BLMIS or Madoff. (*Id.*)

Tremont also shielded Madoff from third parties, often rejecting any requests to visit or

speak with Madoff. (*Id.* at ¶ 212.) At least one institutional investor redeemed its BLMIS

investments because of Madoff's opacity and refusals to meet. (*Id.* at ¶ 182.) Tremont also

refused to allow its administrator to receive Tremont BLMIS feeder fund confirmations directly

from BLMIS and intervened to limit contact between Madoff and Tremont's auditor, Ernst &

Young. (*Id.* at ¶ 215.) This deliberate shielding of Madoff continued when Tremont replaced

Ernst & Young with KPMG. (*Id.* at ¶ 216.)

        (4)     <u>Tremont Avoided Questions and Fabricated Answers about
BLMIS's Purported Options Trading</u>

Tremont knew that BLMIS did not provide straight answers about its purported options

trades, the central part of the SSC Strategy. When faced with questions about BLMIS's

purported options trading, Tremont flip-flopped on the OTC/listed option trading question,

sometimes telling investors that BLMIS traded OTC options and sometimes telling them BLMIS

traded exchange listed options. (PSAC at ¶¶ 219-20.) Tremont also failed to identify, or conduct

due diligence on, BLMIS's purported options counterparties. (*Id.* at ¶ 221.) At times, Tremont

fabricated information to tell investors about these purported counterparties. (*Id.* at ¶ 225.)

        (5)     <u>Tremont Co-Managed Kingate Global</u>

From the inception of their respective BLMIS investment accounts, Federico Ceretti and

Carlo Grosso worked closely with Manzke to create Kingate Global and its manager, Kingate

Management Limited (collectively, "<u>Kingate</u>"). (PSAC at ¶ 239.) Manzke introduced Ceretti

and Grosso to Madoff in 1993 and was a Kingate Global director and manager from 1995 until

about 2004. (*Id*.) Through its affiliate, Tremont Bermuda, Tremont and Kingate Management

Limited ("KML") shared information pursuant to co-management and consulting agreements beginning as early as 2002. (*Id.* at ¶ 240.) The Tremont-Kingate relationship continued through the revelation of Madoff's fraud. (*Id.*)

## II.   ARGUMENT

### A.   Legal Standard Governing Motions to Amend a Pleading

Federal Rule of Civil Procedure 15(a)(2), made applicable here by Federal Rule of Bankruptcy Procedure 7015, provides that when a party requires leave of court to amend its pleading: "[t]he court should freely give leave when justice so requires." It is well settled in the Second Circuit that Federal Rule of Civil Procedure 15(a)(2) is a "generally lenient" standard that favors adjudication on the merits. *Fjord v. AMR Corp. (In re AMR Corp.)*, 506 B.R. 368, 382 (Bankr. S.D.N.Y. 2014). Accordingly, leave to amend "should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). And while the Second Circuit has repeatedly noted that the trial court has "broad" discretion in ruling on a motion to amend, *Local 802, Associated Musicians of Greater New York v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998), a motion to amend must be granted where "the plaintiff has at least colorable grounds for relief." *Soley v. Wasserman*, No. 08 Civ. 9262 (KMW) (FM), 2013 WL 6244146, at *1 (S.D.N.Y. Dec. 3, 2013) (quoting *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block–Bldg. 1 Hous. Dev. Fund Co., Inc.,* 608 F.2d 28, 42 (2d Cir.1979)).

"An intervening change in pleading standards may justify leave to amend." *Picard v. Mendelow (In re Bernard L. Madoff Inv. Sec. LLC)*, 560 B.R. 208, 221 (Bankr. S.D.N.Y. 2016) (citing *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012)). The burden is on the party opposing leave to amend to demonstrate that there is evidence of either bad faith, undue prejudice, or futility. *See, e.g., Blagman v. Apple, Inc.*, No. 12 Civ. 5453 (ALC)

(JCF), 2014 WL 2106489, at *3 (S.D.N.Y. May 19, 2014) (bad faith); *Alexander Interactive, Inc.*

*v. Adorama, Inc.*, No. 12 Civ. 6608, 2014 WL 113728, at *4 (S.D.N.Y. Jan. 13, 2014) (futility);

*Margel v. E.G.L. Gem Lab Ltd.*, No. 04 Civ. 1514 (PAC) (HBP), 2010 WL 445192, at *3

(S.D.N.Y. Feb. 8, 2010) (undue prejudice).

### B.    The Court Should Grant the Trustee's Motion to Amend in Light of the Intervening Change in Law and the Additional Facts Alleged

The Trustee seeks leave to amend his complaint against Defendant on the well-accepted

grounds of an intervening change in pleading standards.  At the time the amended complaint was

filed, the burden of asserting and proving the affirmative defense of good faith, as to both initial

and subsequent transferees, was on the defendant, and an objective reasonable investor standard

applied.  *See Merkin II*, 515 B.R. at 138.  As such, the amended complaint alleged facts

sufficient to meet that standard.  *See, e.g., Picard v. ABN Amro Bank, N.V. (In re Bernard L.*

*Madoff Inc. Sec. LLC)*, Adv. Pro. No. 10-05354 (SMB) (Bankr. S.D.N.Y. Aug. 8, 2012), ECF

No. 47 ("Am. Compl."), at ¶¶ 54-200.

In 2014, almost two years after the filing of the amended complaint, the District Court

held that the Trustee must plead that the initial transferee knew of or "turned a blind eye to facts

that suggest[] a high probability of fraud."  *Picard v. Magnify (In re Bernard L. Madoff Inv. Sec.*

*LLC)*, 583 B.R. 829, 841 (Bankr. S.D.N.Y. 2018) (collecting cases).[20]  The District Court further

held that the same "willful blindness" legal standard and same pleading burden applies to

recovery of subsequent transfers under section 550(a)(2).  *Good Faith Decision*, 516 B.R. at 22-

23.  Section 550(a) provides that the Trustee may recover subsequent transfers, subject to the

---

[20] In a separate decision, the District Court held that the Trustee need not obtain a fully litigated judgment of avoidance before pursuing a subsequent transfer claim.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 501 B.R. 26, 33-34 (S.D.N.Y. 2013).

defense that the transfers were received "in good faith," "for value," and without knowledge of the avoidability of the transfer avoided.  11 U.S.C. § 550(b)(1).  To meet this requirement, the Trustee must similarly allege that the subsequent transferees willfully blinded themselves to a high probability of fraud at BLMIS.  *See Legacy*, 548 B.R. at 38 ("The District Court equated a lack of good faith under Bankruptcy Code § 548(c) with willful blindness and stated that the same standard applies to non-investors as well as investors under sections 548(c) and 550(b)").

This Court has recognized that there was good cause in granting motions brought on similar grounds to the instant motion.  *See, e.g.*, *Mendelow*, 560 B.R. at 224; *see also* Order Granting Mot. for Leave to File a Fourth Am. Compl., *Kingate*, Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Mar. 17, 2014), ECF No. 99.  Where, as here, the complaint has grown "stale due to the unusually drawn out procedural history" of a case, a trustee should be permitted to add new facts and allegations.  *See Grand River Enters. Six Nations, Ltd. v. Pryor*, No. 02 Civ. 5068 (JFK), 2008 WL 9359652, at *3 (S.D.N.Y. Mar. 17, 2008) (granting motion for leave to amend where rulings and subsequent decisions on appeal delayed proceedings for several years).

### C.    No Futility, Undue Delay, Bad Faith, or Undue Prejudice Exists

#### 1.    *Amending the Complaint Would Not Be Futile Because the Trustee Has Alleged Facts Sufficient to Survive a Motion to Dismiss*

Leave to amend should be granted here because the PSAC sets forth facts that permit this Court to reasonably infer that Defendant is liable for the misconduct alleged.  "An amendment to a pleading will be futile if a proposed claim would not withstand a motion to dismiss pursuant to Rule 12(b)(6)."  *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002).  To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 71 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). A claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Mendelow*, 560 B.R. at 225 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

In order to demonstrate that his amendment is not futile under Federal Rule of Civil Procedure 15 and thus, that he states a plausible claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), to recover subsequent transfers in this case, the Trustee must plausibly allege that the subsequent transferee either (1) "lacked good faith;" or (2) "received the subsequent transfer with knowledge that the initial transfer was avoidable" and that (3) "the initial transfer is avoidable." *Picard v. BNP Paribas S.A. (In re Bernard L. Madoff Inv. Sec LLC)*, Adv. Pro. No. 08-01789 (SMB), 2018 WL 4833984, at *18 (Bankr. S.D.N.Y. Oct. 3, 2018) ("*BNP*"). Leave to amend should be granted here because the PSAC sets forth facts that would permit this Court to reasonably infer that Defendant received subsequent transfers, which were comprised of avoidable initial transfers, with the requisite lack of good faith and knowledge.

## 2.    *Good Faith or Knowledge of the Avoidability of the Initial Transfer*

The Trustee must plead either that: "the subsequent transferee lacked good faith or [] received the subsequent transfer with knowledge that the initial transfer was avoidable." *BNP*, 2018 WL 4833984, at *18. According to this Court, knowledge and good faith are two distinct, but overlapping, elements under section 550(b). *Id* at *19. To plead knowledge, the Trustee must allege that Defendant "possessed knowledge of facts that suggest a transfer may be fraudulent." *Id.* Alternatively, to plead a lack of good faith, the Trustee must "allege that each Defendant willfully blinded itself to facts suggesting a high probability of fraud at BLMIS." *Id.* Willful blindness requires the Trustee to plead that: (1) the defendant subjectively believed there was a high probability that a fact existed and (2) the defendant took deliberate actions to avoid learning of that fact. *Id.*

22

Willful blindness, also known as deliberate ignorance or conscious avoidance, is a well-established and commonly-utilized doctrine in criminal law. *United States v. Reyes*, 302 F.3d 48, 54 (2d Cir. 2002); *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 684 (7th Cir. 2014) ("[W]illful blindness is a concept taken from criminal law and the often-given 'ostrich' instruction."). The ostrich instruction, "is designed for cases in which there is evidence that the defendant, knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings." *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990); *see also United States v. Kozeny*, 664 F. Supp. 2d 369, 388 (S.D.N.Y. 2009), *aff'd*, 667 F.3d 122 (2d Cir. 2011); *In re Dreier LLP*, 452 B.R. 391, 450 (Bankr. S.D.N.Y. 2011). Willful blindness "connotes a strong suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate failure to acquire knowledge of its existence." *Merkin II,* 515 B.R. at 140.

As an initial matter, it is important to note that willful blindness can rarely be determined as a matter of law. *Fish*, 749 F.3d at 685 ("Consistent with these observations, we have said that 'finding the line between "willful blindness" and "reason to know" may be like finding the horizon over Lake Michigan in a snowstorm' . . . . In other words, only rarely could that line be drawn as a matter of law.") (citations omitted). Thus, here, the Court should not prematurely determine whether Defendant was in fact willfully blind and should grant leave to amend.

a)      *The Trustee Sufficiently Pleads that Defendant Subjectively Believed There Was a High Probability of Fraud at BLMIS*

The Trustee sufficiently alleges that Defendant believed there were significant facts and concerns held by Defendant suggesting a high probability of fraud at BLMIS. During the course of negotiating and implementing the Leverage Transactions, Defendant developed concerns with,

23

among other things: (i) BLMIS's complete lack of independent oversight; (ii) BLMIS's

purported OTC options trades; and (iii) the total lack of transparency of BLMIS.

During negotiations of the 2006 Leverage Transaction, Defendant learned from Tremont

and Fairfield that BLMIS simultaneously was the investment adviser, custodian and prime

broker.  (PSAC at ¶ 93.)  Defendant also knew that BLMIS's so-called independent auditor,

Friehling & Horowitz, a three-person accounting firm based out of a strip mall in Rockland

County, New York, could not possibly perform the auditing function required for a firm of

BLMIS's purported size and complexity.  (*Id*. at ¶¶ 99-100.)  This complete lack of independent

oversight of BLMIS was highly irregular and allowed BLMIS to function with no external

controls.

In an email Defendant sent to Fairfield a month after the 2006 Leverage Transaction

closed, Defendant admitted that BLMIS's lack of independent oversight was a "big problem"

concerning approval of the 2006 Leverage Transaction.  (*Id*. at ¶ 98.)  On a July 18, 2006 call,

Defendant raised its concern with BLMIS's "lack of independence" to Tremont.  (*Id*.)

According to an internal Tremont email of the same day, Tremont had nothing to offer to address

Defendant's concern and intended simply to remind Defendant that it knew of "the brokerage

issue" upfront.  (*Id*.)  Despite the significance of these concerns, Defendant accepted Tremont's

non-response and moved forward with the 2006 Leverage Transaction.

As early as July 2006, Defendant developed serious concerns about BLMIS's purported

OTC options trades.  Defendant knew that BLMIS's SSC Strategy was heavily dependent on

options trading and that BLMIS purportedly was executing options trades OTC.  (*Id*. at ¶ 95.)

Defendant and its personnel involved in the Leverage Transactions were experienced in OTC

options trading and well aware of the associated counterparty risk of Madoff's purported OTC

options trades.  (*Id.*)  Defendant knew that OTC options trading required creditworthy

counterparties and the use of daily collateral exchanges.  (*Id.*)  Knowing that parties to OTC

options trades enter into bilateral contracts setting forth the terms and conditions of the trades,

Defendant knew that if the counterparties to any of BLMIS's purported OTC options trades were

unable to perform their obligations, Madoff's SSC Strategy would fail.  (*Id.*)

On July 17, 2006, Defendant demanded an immediate conference call with Defendant to

discuss BLMIS's purported OTC options trades.  (*Id.* at ¶ 96.)  Over the phone with Tremont the

next day, Defendant raised its concerns regarding BLMIS's purported OTC options trading,

including Defendant's inability to assess the creditworthiness of BLMIS's counterparties.  (*Id.*)

Similar to its response to Defendant's concern about the lack of independent oversight of

BLMIS, Tremont "had nothing to offer [Defendant] on the option issue."  (*Id.*)  Defendant

accepted Tremont's response and proceeded without verifying the identity of any of BLMIS's

OTC options trades counterparties, assessing how BLMIS was managing counterparty credit

risk, reviewing a single options contract, or verifying a single options trade.  (*Id.* at ¶ 97.)

Subsequently, despite Tremont's representation to Defendant that BLMIS was executing

options trades OTC, Defendant learned that BLMIS was not executing options trades OTC at all,

a fact that holds added significance because of the lack of independent oversight of BLMIS.

While reviewing Madoff account statements that it received under the reporting requirements of

the 2006 Leverage Transaction, Defendant observed that BLMIS's purported OTC options trades

had CUSIP numbers, indicating that they were not actually taking place.  (*Id.* at ¶¶ 130, 218.)

Defendant did not ask Tremont about, or otherwise conduct any diligence on, this significant

discrepancy that it had identified.

Moreover, through its receipt and review of historical information from Tremont, Fairfield and other BLMIS feeder funds, Defendant knew that, not only were BLMIS's returns too good to be true, but they were not correlated with the performance of the S&P 100 Index. For example, Tremont sent Defendant a performance report for Rye Broad Market that covered the period from 1994 to 2006. (*Id*. at ¶ 106.) From this report, Defendant observed that Rye Broad Market never experienced a down year. (*Id*. at ¶ 107.) Indeed, in the 149-month history covered by the report, Rye Broad Market experienced only seven negative months. (*Id*. at ¶ 108.) The report also showed that Rye Broad Market inexplicably posted positive performance for 26 consecutive months, from April 2004 to May 2006. (*Id*.)

On the other hand, the S&P 100 Index was not so consistently profitable. A striking example of the lack of correlation could be seen during the 2000 to 2002 period, when the S&P Index endured a 43% loss, while Rye Broad Market purportedly produced cumulative positive returns of over 36%. (*Id*. at ¶ 110.) Through its review, Defendant saw and appreciated quantitative facts that Madoff could not be employing the SSC Strategy in the way he purported to be doing. This Court has previously found that such allegations satisfy the first prong of willful blindness. *See Merkin II*, 515 B.R. at 141 (finding willful blindness where defendant "saw and appreciated" quantitative facts).

Finally, Defendant had serious concerns regarding BLMIS's total lack of transparency, another significant indicator of a high probability of fraud at BLMIS. Defendant acknowledged that a critical part of its diligence process was an independent review of Madoff. (PSAC at ¶ 140.) In connection with another potential transaction involving BLMIS, Defendant attempted to conduct this independent review. (*Id*. at ¶¶ 132-35.) Defendant was rebuffed and told that the question of direct access to Madoff or BLMIS was "not open." (*Id*. at ¶ 136.) Far from

demanding access to Madoff and BLMIS to satisfy its own internal diligence standards, or

walking away from the Leverage Transactions, Defendant actually agreed to a highly unusual

gag provision in connection with the Leverage Transactions that prohibited it from

communicating with Madoff or anyone else at BLMIS.  (*Id*. at ¶¶ 139-40.)

Defendant also received direct warnings concerning Madoff's lack of transparency from

third parties.  For example, Defendant's transparency concerns were echoed back to it by due

diligence firm Albourne in August 2007.  Like Defendant, Albourne had identified numerous red

flags at BLMIS "due to lack of transparency" and counseled clients against investing in BLMIS

feeder funds, advice that was heeded by certain affiliates of Defendant, but not Defendant itself.

(*Id*. at ¶ 163.)

As in *In re Optimal U.S. Litig.*, No. 10 CIV 4095 SAS, 2011 WL 4908745, at *7

(S.D.N.Y. Oct. 14, 2011), the Trustee alleges here that Defendant raised "all of the critical

questions about the risk that Madoff was running a Ponzi scheme," yet failed to further

investigate those risks or decline to enter into the Leverage Transactions.  Defendant's concerns

"went to the heart of Madoff's Ponzi scheme because they concerned the existence of assets

supposedly held by Madoff, Madoff's self-custody and Madoff's secrecy."  *Id*. at 6.

<blockquote>b)    *Defendant Consciously Avoided Confirming BLMIS's Fraud*</blockquote>

The Trustee also alleges facts sufficient to establish the second prong of willful

blindness—that Defendant consciously avoided learning of BLMIS's fraud.  "[A] willfully blind

defendant is one who takes deliberate actions to avoid confirming a high probability of

wrongdoing and who can almost be said to have actually known the critical facts."  *State v.*

*United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 667 (S.D.N.Y. 2017) (citations omitted).

Importantly, however, "the standard does not require proof of an identifiable 'affirmative act'"

and merely refers to a requisite state of mind.  *Id.* at 667; *see also United States v. Fofanah*, 765

27

F.3d 141, 150 (2d Cir. 2014) (Leval, J., concurring) ("A finding that a defendant's ignorance of incriminating facts was a conscious choice on the defendant's part in no way requires a finding that the defendant took affirmative steps to avoid gaining the knowledge.").

Accordingly, where, as here, the Trustee alleges that Defendant appreciated facts indicating a high probability of fraud yet consciously decided to enter the Leverage Transactions without confirming its suspicions, the Trustee has sufficiently alleged deliberate avoidance. *See id.* at 149 (conscious avoidance "means only, as we have repeatedly stated in reciting the standard, that there must be evidence from which a jury could find that the defendant was aware of a high probability of the critical incriminating facts and consciously decided to act without confirming them.").

Ceasing diligence in the face of fraud suspicions, such as the conduct engaged in by Defendant, alone is enough to meet this prong of the willful blindness standard. *See Merkin II*, 515 B.R. at 141 (concluding that defendant's refusal to prod Madoff further when Madoff refused to answer questions about the assets he managed constituted deliberate action in the face of various red flags that raise a high probability of fraud). But Defendant went a step further and developed a way to enter into the Leverage Transactions, earn millions of dollars in fees and at the same time protect its investment in the Rye Funds from the fraud it suspected at BLMIS. Defendant's solution was to negotiate the ability to redeem its investment before any other investor in the Rye Funds at the first sign of a government fraud investigation of BLMIS—the BLMIS Fraud Provision.

According to Defendant, the key issue of the Leverage Transactions was "the degree of trust which ABN AMRO has to have in Madoff." (PSAC at ¶ 145.) But, Defendant did not try to satisfy its "trust" requirement by conducting further diligence into the several significant facts

it had uncovered that revealed a high probability that the IA Business was a fraud.  It adopted a different strategy—protecting its investment in Rye Funds should its suspicions be confirmed and the fraud at BLMIS be revealed.  The BLMIS Fraud Provision provided Defendant that comfort.  Defendant was guaranteed that the BLMIS Fraud Provision would allow Defendant to redeem its entire investment in the Rye Funds before all other investors should Madoff or BLMIS come under investigation for securities fraud, and "well in advance of a guilty plea." (*Id*. at ¶ 149.)

This case is analogous to *Picard v. Katz*, where the District Court held on a motion to dismiss that the Trustee sufficiently plead willful blindness by alleging that the defendants considered purchasing "fraud insurance" on their Madoff investment.  462 B.R. 447, 455 (S.D.N.Y. 2011), *abrogated on other grounds by Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In Madoff Sec.)*, 513 B.R. 437 (S.D.N.Y. 2014).  In *Katz*, the Trustee alleged that the defendants voiced certain concerns about Madoff, including the risk of a BLMIS investigation for fraud.  Am. Compl. at 189, *Picard v. Katz*, No. 10-0587 (SMB) (Bankr. S.D.N.Y. Mar. 18, 2011).  Based on these concerns and upon an advisor's recommendation, the defendants met with an insurance brokerage firm to discuss purchasing fraud insurance.  *Id.*  Due to coverage limits, the bulk of defendants' investment was uninsurable, and the defendants never purchased the fraud insurance.  *Id.* at 190.  The District Court found that the Trustee's allegations shed light on why the defendants would "willfully blind themselves to the fact that they had invested in a fraudulent enterprise . . . because they felt that they could realize substantial short-term profits while protecting themselves against the long-term risk."  *Katz*, 462 B.R. at 454-55.

Here, the Trustee's allegations are stronger.  The Trustee alleges that Defendant had the same concerns about fraud as in *Katz*.  But Defendant did not just consider purchasing fraud

29

insurance, it purchased it, in the form of the BLMIS Fraud Provision. In doing so, Defendant,

like the defendants in *Katz attempted to do*, figured out a way to generate short-term profits

while protecting itself against the risk of losing its investment because of BLMIS's fraud.

Defendant's initial diligence revealed critical facts that led it to believe there was a high

probability of fraud at BLMIS; however, Defendant ceased its due diligence and never received

answers to its critical concerns. Unlike this Court's holding in *BNP*, the Trustee's allegations

show that Defendant engaged in some due diligence, suspected fraud, then ceased that due

diligence upon receiving the protections of a special share class and the BLMIS Fraud Provision.

*See BNP*, 2018 WL 4833984, at *26. Defendant was happy to turn a blind eye for as long as it

was protected by the BLMIS Fraud Provision. Significantly, when Fairfield rejected its

inclusion in a proposed deal, Defendant walked away. (PSAC at ¶ 157.)

### 3. Avoidability

The Trustee's PSAC sufficiently alleges the avoidability of the initial transfers to the

Tremont Initial Transfer Funds because (1) the initial transfers have already been deemed

avoided and (2) the PSAC, which incorporates the Tremont Complaint, alleges facts that

establish the avoidability of the initial transfers. *See BNP*, 2018 WL 4833984, at *18 (finding

subsequent transferee sufficiently alleged avoidability by incorporation of separate complaint);

*In re Madoff*, 501 B.R. at 36 (same).

First, the initial transfers have already been "deemed avoided" by the settlement

agreement in the Tremont Complaint, which this Court approved. (PSAC at ¶ 175.)

Second, the Trustee alleges facts in the PSAC, which sufficiently plead that the initial

transfers are avoidable because Tremont had actual knowledge that Madoff was not trading

securities. Alternatively, the PSAC alleges that Tremont willfully blinded itself to facts

suggesting a high probability of fraud.

30

The allegations in the PSAC regarding Tremont mirror those regarding the defendants in the Trustee's Fourth Amended Complaint in *Kingate*, at \*14-15.[21]  In *Kingate,* this Court found that the Trustee sufficiently alleged defendants' actual knowledge based on the defendants' monitoring of the BLMIS Feeder Funds' performance on a regular basis, which disclosed impossible trades.  *Id*. at \*14, 29.  Here, the Trustee similarly alleges that Tremont analyzed BLMIS information reflecting the same obvious quantitative impossibilities demonstrating those trades "could not have taken place."  *Id*. at \*13; (PSAC ¶¶ 193-196).

As in *Kingate*, Tremont's executives also deliberately prevented transparency into BLMIS and access to Madoff by deflecting investors' inquiries, implying that they feared what might be discovered.  *Kingate*, 2015 WL 4734749, at \*4, 14; (PSAC at ¶¶ 212-215).  Among other things, Tremont prohibited leverage providers from contacting Madoff, as evidenced by the gag provision Tremont required Defendant to agree to in connection with the Leverage Transactions.  (PSAC at ¶¶ 139-40.)  Tremont executives even took measures to prevent their own personnel and auditors from conducting Tremont's standard due diligence.  (*Id.* at ¶ 214.)  Like *Kingate*, Tremont also lied to shareholders to address issues for which it knew there were no legitimate explanations, such as who Madoff's option counterparties were and how BLMIS executed its options trades.  (*Id.* at ¶¶ 217-220.)

In *Kingate*, this Court found that similar allegations that Ceretti and Grosso took steps to deflect inquiries to Madoff and fabricated stories to placate shareholders supported a finding that

---

[21] As an initial matter, KML's knowledge should be imputed to Tremont.  Tremont and KML shared information with each other regarding BLMIS in a number of ways, including: (i) in Manzke's role as director and manager of Kingate Global; (ii) through KML and Tremont Bermuda's co-management agreement; and (iii) through KML and Tremont Bermuda's consulting agreement.  In *Kingate*, this court held that the Trustee's Fourth Amended Complaint sufficiently pleaded actual knowledge as to the defendants, including Ceretti and Grosso.  By virtue of the relationships between KML, Kingate Global, and Tremont, Kingate's knowledge that the IA Business was a fraud, and that many of the entries in the statements and trade confirmations depicted trades that could not have occurred, should be imputed to Tremont.

the Trustee sufficiently alleged actual knowledge.  *Kingate*, 2015 WL 4734749, at *14.  As with

*Kingate*, Tremont did all this knowing that BLMIS did not satisfy Tremont's standard due

diligence requirements and having received numerous warnings that Madoff was a fraud.  (PSAC

at ¶¶ 180-199.)

Alternatively, the PSAC sufficiently alleges that Tremont was willfully blind to the truth

of BLMIS's fraud.  The Trustee sufficiently alleges that Tremont subjectively believed there was

a high probability that BLMIS was not trading securities as purported because, like Merkin,

Tremont saw and appreciated various warning signs indicating that BLMIS was a fraud,

including "that the volume of options transactions that Madoff reported were impossible," "that

BLMIS' returns were too good to be true," "Madoff's use of a strip mall accounting firm," and

that "BLMIS used an unusual fee structure and exceeded the total volume of option trades in the

market."  *Merkin II*, 515 B.R. at 141; (PSAC ¶¶ 112-113, 133, 195-196, 205.)  This Court held

that the awareness and appreciation of such facts was sufficient to plead that a defendant

believed there was a high probability that BLMIS was a fraudulent operation."  *Merkin II*, 515

B.R. at 141.

The Trustee similarly alleges in the PSAC that Tremont was aware of and appreciated the

same facts this Court found sufficient to allege the first prong of willful blindness in *Merkin II*.

For example, the Trustee alleges that Tremont was aware of and appreciated the impossibilities

of BLMIS's trade activity due to its review, preparation, or comparison of: (1) reports

concerning the performance of the Tremont Initial Transfer Funds (PSAC at ¶ 91); (2) customer

statements and trade tickets (*Id.* at ¶ 193); and (3) monthly analytic summaries that reported

differences between the prices reported by BLMIS versus those reported by a third-party source

(*Id.* at ¶ 194.)  Tremont also knew, based on its own estimation, that the volume of trades

reported by Madoff were impossible.  (*Id*. at ¶¶ 193-96.)  Tremont appreciated the fact that

Madoff's returns were too good to be true and raised concerns regarding Madoff's use of a strip

mall accounting firm (Tremont Compl. at ¶¶ 215-16) and unusual fee structure (*id*. at ¶¶ 204-09).

As in *Merkin II*, the Trustee alleges that Tremont saw these facts, understood them and purposely

ignored them.  (*Id*. at ¶ 158); (PSAC at ¶¶ 179-233); *see also Merkin II*, 515 B.R. at 144.

Lastly, the Trustee alleges that Tremont deliberately avoided learning the truth about

BLMIS, thereby sufficiently alleging the second prong of willful blindness.  The Trustee alleges

that Tremont had close ties with Madoff and BLMIS.  (PSAC at ¶¶ 176-78.)  Tremont's CEOs,

Manzke and Schulman, regularly communicated with Madoff, including at least during quarterly

visits to BLMIS.  (*Id*. at ¶ 176.)  Schulman and Madoff had a particularly close relationship—so

close that Madoff even sought Schulman's advice on individual hiring decisions at BLMIS.  (*Id.*

at ¶ 177.)  In this respect, and in others, Manzke, Schulman and the Tremont BLMIS feeder

funds are analogous to the defendants in *Kingate*, 2015 WL 4734749 at *14-15, and *Merkin II,*

515 B.R. at 128.  Indeed, Manzke was responsible for introducing Ceretti and Grosso to Madoff

in the early 1990's.  *Kingate*, 2015 WL 4734749, at *3.  Despite its close relationship to Madoff

and BLMIS, Tremont refused to ask any hard questions regarding Madoff's business, focused on

appeasing Madoff, and avoided institutional client due diligence in favor of the "Palm Beach

Crowd," which was less likely to ask questions.  (Tremont Compl. at ¶¶ 5-9.)

In *Merkin II*, the Trustee alleged that when Madoff refused to answer Merkin's questions,

Merkin did not press Madoff, but instead stated that he had "made [his] peace with Bernie."  515

B.R. at 141.  Additionally, Merkin told investors with inquiries "don't ask so many questions.

Sit tight."  *Id.* at 142.  This Court found such statements sufficient to plead that Merkin took

deliberate actions to avoid learning the truth.  Similarly, here, the Trustee alleges in the PSAC

that Tremont deliberately prevented any transparency into Madoff and BLMIS throughout the

Tremont-BLMIS relationship, noting categories of information "ya don't ask."  (PSAC at ¶ 199.)

The totality of the allegations in the PSAC and the Tremont Complaint alternatively

demonstrate that Tremont subjectively believed there was a high probability of fraud at BLMIS

and took deliberate actions to avoid learning the truth and was thus willfully blind.

### 4.     *The Proposed Amendments Relate Back*

The PSAC includes $38,333,333 of subsequent transfers of customer property in addition

to those alleged in the amended complaint that Defendant received pursuant to the Leverage

Transactions.  The additional transfers were made pursuant to the same transactions which the

previously pleaded transfers were made, and thus arise out of the same "common core of

operative facts."[22] *Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 333-34

(S.D.N.Y. 2009) (new transfers relate back because they were margin loan payments arising out

of certain co-borrowing facility transactions, and occurred during same time period as original

transfers); *Pagano v. Pergament*, No. 11-CV-2360 (SJF), 2012 WL 1828854, at *7 (E.D.N.Y.

May 16, 2012) (new transfers relate back because they were payments on the same loan, from

the same sale proceeds, and "arise from the same basic facts and conduct as alleged in the

Trustee's complaint").  Where new transfers are in connection with a specific agreement or

group of transactions alleged in an original complaint, defendants are put "on notice of what

must be defended against in the amended pleadings" and such transfers relate back.  *Adelphia*,

624 F. Supp. 2d at 333-334.

---

[22] *See Mayle v. Felix*, 545 U.S. 644, 646 (2005) ("relation back depends on the existence of a common core of
operative facts uniting the original and newly asserted claims").

Here, the new transfers consist solely of transfers to Defendant pursuant to the Leverage

Transactions as set forth in both the original and amended complaints.  Thus, both the new and

previously pleaded transfers to Defendant arose out of the exact same transactions.

Defendant was on notice that the Trustee was ultimately seeking any and all transfers

made to Defendant pursuant to the Leverage Transactions.  The amended complaint makes clear

that the Trustee may in the future seek to add more like-kind transfers, by stating that the

subsequent transfers being sought were only those "presently known" and that the "Trustee's

investigation is on-going and the Trustee reserves the right to (i) supplement the information on .

. . additional transfers, and (ii) seek recovery of such additional transfers."  *See* Am. Compl. at

¶¶ 213-214; 227-228; 237-238.  This language was sufficient to give Defendant notice that new

transfers would likely be added.  *See, e.g., Picard v. Peter Madoff (In re Bernard L. Madoff Inc.*

*Sec. LLC)*, 468 B.R. 620, 633-34 (Bankr. S.D.N.Y. 2012) (similar allegations in the Trustee's

original complaint gave sufficient notice of the Trustee's intent to seek recovery of additional

transfers).

Beyond the parties' contractual relationships, both the previously pleaded and new

subsequent transfers also arise out of the same "common core of operative facts" because such

transfers were received by Defendant in bad faith and with willful blindness to Madoff's

fraudulent scheme.  *See Adelphia*, 624 F. Supp. 2d at 334 (finding relation back of new

fraudulent transfers, noting that fraudulent transfer actions "often involve a common scheme to

defraud which provides a nexus for relation back" (citation omitted)); *In re Chaus Secs. Litig.*,

801 F. Supp. 1257, 1264 (S.D.N.Y. 1992) (finding accounts receivable manipulations in

amended complaint related back even though the events were distinct from those alleged in the

original complaint, because they were a "natural offshoot" of the same "basic scheme" to

defraud investors as was alleged in the original complaint). As bad faith recipients of customer property, Defendant here was more than just an innocent investor "looking to payments from third parties," but rather a part of the "common scheme to strip assets from BLMIS." *BNP*, 2018 WL 4833984, at *29.

Defendant was at all times in possession of its own, complete set of records setting forth each payment for the duration of the Leverage Transactions. On notice that the Trustee was seeking all known subsequent transfers made to Defendant arising out of the Leverage Transactions, Defendant at all times knew the full amount of possible recoveries the Trustee might seek. *See, e.g.*, *Enron Corp. v. Granite Constr. Co. (In re Enron Corp.)*, No. 03-93172 (AJG), 2006 WL 2400369, at *12 (Bankr. S.D.N.Y. May 11, 2006) (finding relation back of amended complaint enlarging amount of fraudulent transfer because defendant was on notice that the particular transfer was being sought, and knew or should have known from its own records the correct amount).

For all these reasons, these new transfers relate back even if individual fraudulent transfers might under other circumstances be considered "separate and distinct" transactions.[23] Both the existing and new transfers are under the same Leverage Transactions to the same Defendant; sought under the same legal theory (i.e. as fraudulently conveyed SIPA customer property); subject to the same allegations of bad faith in connection with Madoff's scheme; and based on the same relationship established under the Leverage Transactions.

---

[23] *See, e.g., BNP*, 2018 WL 4833984, at *28; *Metzeler v. Bouchard Transp. Co., Inc. (In re Metzeler)*, 66 B.R. 977, 984 (Bankr. S.D.N.Y. 1986).

D.    **No Undue Delay or Bad Faith Can be Shown Where Defendant Acquiesced to the Trustee Waiting to Amend the Complaint Until Legal Standards Were Resolved**

There is no evidence of undue delay, bad faith, or undue prejudice.  Although it has been nearly seven years since the Trustee filed his amended complaint, the mere passage of time, in the absence of bad faith, does not warrant a denial of leave to amend.  *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 333 (2d Cir. 2000) (upholding grant of leave to amend even in face of seven-year delay); *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.").  And "[d]elay is rarely fatal to a Rule 15 motion if it can be explained."  *Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*, No. 13 Civ. 1654 (RA) (HBP), 2015 WL 4097927, at *7 (S.D.N.Y. July 6, 2015).

The Trustee did not unduly delay or act in bad faith in bringing this Motion now.  The timing of this request merely reflects the procedural history of this liquidation and the intentions of the parties.  The parties participated in case-wide issues of good faith and extraterritoriality and, in the meantime, held this matter in abeyance pending the Court's determination of these issues.  Therefore, the Trustee appropriately seeks to amend his pleading now that legal issues have been decided and this Court has determined no additional discovery will be permitted prior to amendment.[24]  *See Mendelow*, 560 B.R. 208 at 223 (discussing change in legal standards applicable to Trustee's proceedings, "The Trustee should not be penalized and the defendants should not be rewarded for a delay in which everyone acquiesced.").

---

[24] This Court recognized that the Trustee's Omnibus Motion could not be determined until after the resolution of the legal standards concerning extraterritoriality.  *In re Madoff*, 590 B.R. at 205 n.4.

### E.    Defendant Cannot Demonstrate Undue Prejudice

While prejudice to the opposing party "has been described as the most important reason for denying a motion to amend, only *undue* prejudice warrants denial of leave to amend." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 454 (S.D.N.Y. 2016) (internal citations omitted).  To ascertain whether undue prejudice exists, courts consider whether the proposed amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction."  *Mendelow*, 560 B.R. at 223 (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)); *see Agerbrink*, 155 F. Supp. 3d at 454 (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000)).

Undue prejudice is a high bar, and the party opposing an amendment has the burden of proving "substantial prejudice would result were the proposed amendment to be granted."  *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, No. 16-CV-5393 (KMW), 2018 WL 1115517, at *2 (S.D.N.Y. Feb. 26, 2018).  Defendant "must show actual prejudice, not the possibility of prejudice." *Mendelow*, 560 B.R. at 224.  "If no prejudice is found, then leave normally will be granted."  Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1484 (3d ed.).

Prejudice is highly unlikely to be found where—as here—the case is in the early stage of the proceedings.  *See, e.g.*, *State Teachers Ret. Bd.*, 654 F.2d at 856 (reversing denial of leave to amend where "no trial date had been set by the court," and "the amendment will not involve a great deal of additional discovery").  Whether a party had prior notice of the content amended and whether the amended complaint considers the same transaction as the claims in the original pleading are central to analyzing prejudice.  *See M.E.S., Inc. v. Safeco Ins. Co. of Am.*, No. 10-CV-02798 (PKC)(VMS), 2014 WL 2931398, at *3 (E.D.N.Y. June 27, 2014) (granting leave to

38

amend where, because proposed amended pleading "mostly elaborate[d]" on earlier pleading, defendant could not claim surprise by new claims); *see also Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 262 (S.D.N.Y. 2009); Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.) (noting that courts allow amendments when "opponent could not claim surprise, but effectively should have recognized that the new matter included in the amendment would be at issue.").

Here, granting leave to amend would cause no prejudice at all, much less the undue prejudice that a party opposing leave to amend has the burden of demonstrating. The Trustee seeks amendment now because, almost two years after filing of the amended complaint, the Good Faith Decision shifted the pleading burden and changed the legal standard. The extraterritoriality decisions reduced certain claims, transfers and, in some cases, parties. Throughout this litigation, Defendant has known of the Trustee's intention to amend his complaint to adhere to the changed standards.

At this juncture, the Trustee seeks to amend the complaint to tailor his allegations to the appropriate legal standard, as Defendant was well aware he would. The Trustee is not adding a single count or party. Nor does the PSAC contain any other surprise change in tactics or theories that could conceivably prejudice Defendant. The amended allegations concern issues that have been central to this suit for years. Moreover, this suit is still at an early stage of litigation: Defendant has not responded to the amended complaint, no pre-trial conference has been held, no pre-trial scheduling order has been entered, and no Rule 26 discovery has been taken.

## III.    PERMITTED AMENDMENTS AND REINSTATEMENT OF CLAIM

The PSAC includes amended allegations permitted by the Bankruptcy ET Decision and reinstates a claim the Trustee voluntarily dismissed without prejudice. First, the PSAC includes certain allegations from the *Trustee's Proffered Allegations Pertaining to the Extraterritoriality*

*Issue as to ABN Amro Bank N.V. (Presently Known as the Royal Bank of Scotland)* (the
"Proffered Allegations") filed on June 26, 2015.[25]  These amendments are permitted by the
Bankruptcy ET Decision.  Second, on August 14, 2018, the parties entered into a Tolling
Agreement providing for the dismissal without prejudice of the Trustee's claim seeking to
recover approximately $74.6 million in subsequent transfers of BLMIS customer property that
Defendant received from XL Portfolio Limited (the "ABN-XL Portfolio Limited Claim"),
subject to the right of the Trustee to reinstate the ABN-XL Portfolio Limited Claim by filing an
amended complaint in accordance with the terms of the Tolling Agreement.  On August 17,
2018, the Parties stipulated to these terms, and the Court so ordered the stipulation.[26]  Pursuant to
the Tolling Agreement, the Second Circuit's decision vacating the Bankruptcy ET Decision
provides the basis for the Trustee to reinstate the ABN-XL Portfolio Limited Claim, and he does
so in his PSAC.

## IV.    **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court grant his
request for an order allowing him to amend his complaint against Defendant, and any and all
other relief the Court deems just and proper.

---

[25] Proffered Allegations, ABN AMRO Docket, ECF No. 101.

[26] So Ordered Stipulation, ABN AMRO Docket, ECF No. 171.

Dated: June 10, 2019          By:    /s/ Patrick T. Campbell
New York, New York                   _____

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Patrick T. Campbell
Email: pcampbell@bakerlaw.com
Camille C. Bent
Email: cbent@bakerlaw.com
Elizabeth McCurrach
Email: emccurrach@bakerlaw.com
Matthew Cowherd
Email: mcowherd@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the*
*estate of Bernard L. Madoff*