

Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  - - - - - - - - - - - - - - - - - - - - - - - - - -x

4  SECURITY INVESTOR PROTECTION

5   CORPORATION,

6       Plaintiff-Applicant,     Case No. 08-01789-smb

7                                 SIPA Liquidation

8  v.                            (Substantively Consolidated)

9  BERNARD L. MADOFF INVESTMENT

10   SECURITIES, LLC,

11       Defendant.

12  - - - - - - - - - - - - - - - - - - - - - - - - - -x

13  IN RE:

14  BERNARD L. MADOFF,

15       Debtor.

16  - - - - - - - - - - - - - - - - - - - - - - - - - -x

17                  U.S. Bankruptcy Court

18                  One Bowling Green

19                  New York, New York 10004-1408

20

21                  June 26, 2019

22                  10:04 AM

23  B E F O R E :

24  HON STUART M. BERNSTEIN

25  U.S. BANKRUPTCY JUDGE

1    HEARING re:  Motion to Vacate Order Granting Trustee's

2    Thirtieth Omnibus Motion to Disallow Claims and Overrule

3    Objections of Claimants Who have No Net Equity, dated April

4    30, 2019

5

6    HEARING re:  Local Bankruptcy Rule 7007-1(b) Conference re:

7    Letter of Chaitman LLP, dated May 31, 2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Beck

Page 3

1    A P P E A R A N C E S :

2    A2AMEDIA

3          Attorneys for the Diana Melton Trust

4          171 Milk Street

5          Boston, MA 02109

6

7    BY:  ANDREW MELTON, ESQ.

8

9    BAKER HOSTETLER LLP

10         Attorneys for Irving H. Picard, Trustee for the

11          Substantively Consolidated SIPA Liquidation of Bernard

12          L. Madoff Investment Securities LLC and the Chapter 7

13          Estate of Bernard L. Madoff

14         45 Rockefeller Plaza

15         New York, NY 10111

16

17   BY:  JASON BLANCHARD, ESQ.

18

19

20

21

22

23

24

25

Page 4

1    BAKER HOSTETLER LLP

2         Attorneys for Irving H. Picard, Trustee for the

3          Substantively Consolidated SIPA Liquidation of Bernard

4          L. Madoff Investment Securities LLC and the Chapter 7

5          Estate of Bernard L. Madoff

6         800 Main Street

7         Suite 1100

8         Houston, TX 77002

9

10   BY:  DEAN D. HUNT, ESQ.

11

12   CHAITMAN LLP

13         Attorneys for the Nelson Defendants

14         465 Park Avenue

15         New York, NY 10022

16

17   BY:  GREGORY M. DEXTER, ESQ.

18

19   WACHTELL, ROSEN, LIPTON & KATZ LLP

20         Attorneys for JPMorgan Chase Bank

21         51 West 52nd Street

22         New York, NY 10019

23

24   BY:  EMIL A. KLEINHAUS, ESQ.

25              BENJAMIN D. KLEIN, ESQ.

Page 5

```
 1                    P R O C E E D I N G S
 2             THE COURT:  Madoff?  We'll do the Melton Trust
 3   first.
 4        (Pause)
 5             MR. MELTON:  Your Honor, should we sit there?
 6             THE COURT:  Yes.
 7        (Pause)
 8             THE COURT:  Before we start, I've reviewed the
 9   declarations that were submitted by the Meltons.  And
10   according to the declarations and the other information,
11   they're the only beneficiaries and only creditors of the
12   trust.  So based on the law I cited in that memorandum
13   endorsement, they can represent the trust as co-trustees
14   although they're not attorneys.
15             All right.  Who's going to speak?
16             MR. MELTON:  I'll start, Your Honor.  So just to
17   be clear --
18             THE COURT:  Who are you?
19             MR. MELTON:  Andrew Melton.
20             THE COURT:  Okay.
21             MR. MELTON:  Yeah.
22             So to be clear, the pro se -- all the documents
23   were adequate as far as you're concerned?
24             THE COURT:  Well, I said you have -- you can
25   represent the trust --
```

1          MR. MELTON:  Got it.

2          THE COURT:  -- you and your brother.

3          THE COURT:  Go ahead002E

4          MR. MELTON:  Great.

5          Well, I'd like to first say it's an honor to meet

6     you and we thank you for this opportunity, Your Honor.

7          We believe that the 30th omnibus, the inter-

8     account issue -- we strongly believe that it was not an

9     inter-account transfer regarding the Diana Melton trust.

10    There were no two trusts that existed at the same time.

11    There was an Ernest Melton Trust and there was a Diana

12    Melton Trust but they never existed at the same time.  So

13    you can't transfer money from one trust to another,

14    especially with the same account number, at the same time.

15    It's impossible to make a transfer.  We've checked with

16    Fidelity and Vanguard and banks and so forth.  You have to

17    have two separate accounts.  Now there were others that had

18    two separate accounts and we understand the inter-account

19    methodology regarding those.  But with our case, the Diana

20    Melton Trust and Ernest Melton Trust did not exist at the

21    same time.  So that's out the window as far as we're

22    concerned.

23          THE COURT:  Well, I understand.  In your letter to

24    Mr. DiPascali in July 2007 said change the name on the

25    trust --

1          MR. MELTON:  Correct.

2          THE COURT:  -- to Diana Melton.  And isn't that

3    what the trustee did?

4          MR. MELTON:  The trustee did that but in the

5    normal course of events -- we did the same thing with

6    Merrill Lynch with the Ernest Melton Trust and Diana Melton

7    Trust.  The normal course of events -- every bank in the

8    United States, every brokerage house in the United States,

9    in order to effectuate that, basically, what they have to do

10   is they have to get the new trust documents of the Diana

11   Melton Trust in this instance.  Then they have to get a

12   death certificate.  They have to have a TIN number which

13   we've provided the TIN number.  And then with that, they

14   actually have to liquidate the funds from one, which is what

15   Merrill Lynch did -- they have to liquidate the funds from

16   the Ernest Melton Trust and then put in new funds into the

17   Diana Melton Trust.  And that's exactly what -- so we're lay

18   people.  You know, we're not bankers.  We're not brokers.

19   We told them what to do.  We didn't tell them how to do it.

20   You know, it was their responsibility to do what every other

21   financial institution does.  You know, Madoff was a fraud

22   and all his books and records, they were all fraudulent.  So

23   just because we told them to rename it, we didn't have to

24   tell them, well, you have to do this and you have -- you

25   know, we'll liquidate the funds and you have to put the

Page 8

1    funds back into a new trust once the institution realizes

2    and accepts that it's a new trust, based on the death

3    certificate, the new TIN number, et cetera.

4           So we didn't have to do that.  Yeah.  You're

5    absolutely right, Your Honor.  We told DiPascali exactly

6    what to do but he didn't do it the way every other

7    institution in this country does it.

8           THE COURT:  Can I ask you a question?

9           MR. MELTON:  Of course.

10          THE COURT:  If it occurred the way you say it

11   should have occurred, how would that change the economic

12   outcome of the case?

13          MR. MELTON:  Well, again -- and we have letters

14   from banks and so forth --

15          THE COURT:  I'm asking in this situation.  How

16   would it change the outcome?

17          MR. MELTON:  The outcome would have changed

18   because what would have happened, in order to change the

19   name and create a new trust, you have to liquidate the

20   funds.  You have to -- it's as if the funds were taken out

21   before 2008 from someone and then reinvested back in Madoff.

22   So the obligation was on Madoff to actually withdraw the

23   funds, liquidate the funds and create a new account with a

24   new account number -- we never got a new account number --

25   and then put those funds, whatever -- a million dollars,

Page 9

1   $500,000, whatever it is, put those new funds into the new

2   account with the new account number.  That's the way it's

3   done.  Madoff didn't do it.  That's not our problem.

4              THE COURT:  Let me hear from the trustee.

5              MR. BLANCHARD:  Thank you, Your Honor.  Jason

6   Blanchard for the trustee.

7              Just to clarify, there were no inter-account

8   transfers the Melton trust account.  As Your Honor held at

9   the prior hearing, regardless of whether the name changed

10  for the Melton trust or a new account had been opened at the

11  time of the request, no new money entered the account.  So

12  in either event, there's no positive net equity in the

13  account.

14             THE COURT:  Well, they're saying -- Mr. Melton is

15  saying that what should have happened was Madoff should have

16  taken whatever money was supposedly in the account, cashed

17  it out and then put fresh cash account into the Diana Melton

18  account.

19             MR. MELTON:  Correct.

20             THE COURT:  But there was no cash in your father's

21  account.  It was all fictitious.

22             MR. MELTON:  Well, it was today but back then it

23  wasn't.  I mean --

24             THE COURT:  But he could be a defendant in the

25  fraudulent transfer action.

1          MR. MELTON:  But in 2007, people were taking out

2     money all the time.  That was real money.  That was real

3     money.  If we had taken it out in 2007, which this was in

4     2007, this was a year and a half prior to the discovery of

5     the fraud, that was real money.  It wasn't fictitious money.

6          THE COURT:  I will point out had you done that,

7     you'd be a defendant in a lawsuit today.  That's who the

8     trustee is suing, all the people who took more money out

9     than they put in.

10          MR. MELTON:  Right.  Right.  But there was a

11     clawback.  If people took out more money than they put in,

12     there was a clawback.  But that clawback well expired.  So

13     if that money was taken out in 2007, which, effectively, it

14     should have been in 2007, a year and a half -- and it was

15     all done for estate tax planning purposes because, at the

16     time, you could pass on to heirs two million dollars.  So in

17     my mother's account, there was some monies in Merrill Lynch.

18     And so that's why there was the name change.  And it was

19     written by the same lawyer -- unfortunately, he passed away

20     in 2011.  He did the same thing with Merrill Lynch as he did

21     with Madoff.  And Merrill Lynch did it correctly in 2007.

22          THE COURT:  I understand your theory.

23          MR. MELTON:  Yeah.

24          THE COURT:  I didn't quite get it when I was

25     reading the --

1          MR. MELTON:  Understandably.  So --

2          THE COURT:  Anything else?

3          MR. BLANCHARD:  I would just add that all the

4    principle was depleted from the account in 2006.

5          THE COURT:  All right.  Yes, sir.  You are?

6          DR. MELTON:  Again, I'm Dr. Melton.  Thank you

7    very much -- thank you very much for having us here today.

8          I've been through -- as a little preface, I've

9    been through three or four malpractice cases as well as

10   expert witness cases.  And I found some subtleties in some

11   of these situations.

12          The -- Madoff as we all know, did things and

13   cooked the books as well for the SEC, for all the

14   investigations, for everything, starting in '92, maybe even

15   before then.  We have no idea.

16          Was he concerned with one particular account?  No.

17   Did he change the name?  Yes.  Did he change the TIN number?

18   Yes.  Did, in 2007, the Diana Melton trust obey the IRS

19   rules and file taxes in 2007 to the IRS under the Diana

20   Melton Trust with the TIN number correctly?  Yes.

21   Otherwise, we would be, frankly, in front of the IRS in a

22   fraud case.  However, because he didn't assign a new account

23   number -- and we have this all the time in our practice.  If

24   you don't assign a new account number -- I have documents

25   here both with the Diana Melton Trust and also I had asked

Page 12

1    the trustee and his associates to supply me with one other

2    one which I -- all of a sudden came to mind which was our

3    trust, the Melton Family Trust, which was my own.

4            Back in '92, it was the Alan Melton account with

5    my social security number.  In 2002, some accountants came

6    to me and said, boy, are you an idiot.  Why don't you form

7    an LLC so that your kids who are part of it, can get K-1s

8    and it's much easier for them to file.

9            2002, the Melton family LLC was established.

10   Similar to this situation, we got those.  I looked at the

11   top of each statement like every single -- every single one

12   of Madoff's people did.  And, yes, we looked at the bottom

13   line and we said, oh, we're making money.  And we looked at

14   the name.  And, yes, it was changed from the Alan Melton to

15   the Melton Family Trust.  And we looked at the -- over on

16   the right corner, we looked at the social security number.

17   And the social security number was appropriately changed.

18           But it was a habit of Madoff that he couldn't be

19   bothered and it was still the same account number which we

20   discovered when the trustee sent us the forms on the Melton

21   Family Trust.  I never looked at the account number.  Who

22   looks at an account number?  I don't look at my bank account

23   numbers.  I know that one of them is called x; one is called

24   y.  In any case, one of them -- so we have two separate

25   whole sets of documents that were denied by the trustee.

Page 13

1    However, what I don't understand, and this I'll use a --

2    because I've been in it for over 40 years.  And now in total

3    mammography for the past -- since I've been at Columbia and

4    then in a private office since 2004.  If two years ago, a

5    woman comes in for a mammogram and somebody misses a breast

6    cancer, unfortunately, and last year they come back and the

7    second person misses the breast cancer, and this year they

8    come back and someone finds it, both people, both the first

9    and the second people, are liable in the lawsuit in a

10   malpractice suit.

11           Well, Madoff was the miss, the first miss.  From

12   what I can gather from these documents, both documents from

13   both trusts, from all the data that was supplied to us very

14   nicely by the trustee going all the way back end of the year

15   statements from '92 to 2007, the trustee did, as far as I'm

16   concerned -- committed a flaw.  There was a flaw in his

17   calculations of the net equity.

18           THE COURT:  How so?

19           DR. MELTON:  I do not see any place in that entire

20   scenario where any clerk, any paralegal, anybody correlated

21   the account number with the TIN or the social security

22   number.  They just went by straight account numbers.

23           THE COURT:  Well, there was only one account, your

24   brother told me.

25           DR. MELTON:  But it shouldn't have been one

1    account.  The trustee should have picked it up because there

2    were two separate on these forms.

3            THE COURT:  I'm not understanding.  Are you making

4    a different argument than your brother made that the Ernest

5    account, I'll call it --

6            DR. MELTON:  Right.

7            THE COURT:  -- should have been cashed out and

8    fresh cash should have been put in the Diana account?  Are

9    you saying something else?

10           DR. MELTON:  The similar situation that the

11   trustee should have picked up that there were two separate

12   accounts and not one continuous account that they denied.

13           THE COURT:  And if that were the case, how would

14   the economics of this outcome be --

15           DR. MELTON:  The economics were -- was that the

16   whole net equity, what I'm throwing into a little bit of a

17   question on, how the net equity was determined because they

18   never correlated in -- maybe out of the 5500 direct

19   investors, maybe 20 investors had situations where things

20   were transferred over because of LLC because of a death in

21   the family, because of an establish of a new account.

22   Madoff never, never assigned a new account number.

23           THE COURT:  Let me come back to this, though.

24   After the -- or the time of the account change -- the name

25   change and thereafter, were any fresh funds put into the

1    account?

2              DR. MELTON:  On the Melton family one?  On mine?

3              THE COURT:  No, no, no.

4              DR. MELTON:  Yes.

5              THE COURT:  We're talking about the Diana Melton.

6              DR. MELTON:  On the Diana Melton --

7              THE COURT:  Yes.

8              DR. MELTON:  -- I would have to look back and

9    check.

10             THE COURT:  Okay.  'Cause according to the

11   documents that the trustee filed in this case, I think no

12   cash was put into the -- or it would have been the Ernest

13   account at that point.  But no more cash was added after

14   1996.

15             DR. MELTON:  I don't --

16             THE COURT:  So my question is, if no money was put

17   into the Diane Melton Trust, where did the money come from

18   to support the claim?

19             DR. MELTON:  As my brother said, it should have

20   been a fresh new account --

21             THE COURT:  I just didn't understand if you were

22   making a different argument than that --

23             DR. MELTON:  The -- well, it was my --

24             THE COURT:  -- 'cause you --

25             DR. MELTON:  Yes.

Page 16

```
 1              THE COURT:  -- accused the trustee of fraud and

 2    all sorts of things.  But economically, it comes down to the

 3    argument that fresh cash should have been -- the LV account

 4    should have been cashed out or the first account and fresh

 5    cash should have been put in.

 6              DR. MELTON:  Right.

 7              THE COURT:  Okay.  And the trustee's position is

 8    there was no cash to put in.  And that's what it comes down

 9    to --

10              DR. MELTON:  The --

11              THE COURT:  -- because the Ernest account was

12    overdrawn.

13              DR. MELTON:  I understand that.  I agree with that

14    statement.  I will also state that I think they have it.  I

15    don't know whether you were given that information.  But my

16    mother passed away in 2007.  My father lived to the

17    wonderful age of 95.  On his 95th birthday, in the hospital,

18    he committed suicide in the hospital.  Overdose.  He was a

19    physician.  He took extra sleeping pills and on his 95th

20    birthday died.  Halfway through his 94th year, they found

21    him in his independent care cutting netting on his balcony

22    ready to jump.  And we had to institutionalize him.

23              Would a man in that situation -- who my brother

24    and I got calls every night from because this was already

25    2009, do I have enough money to live for the next day.  No.
```

Page 17

1    They -- pardon me -- mentally destroyed this excellent

2    physician.  And there was no way no matter how much money he

3    did have, he could have put any money into it.  He was

4    totally gone.

5              MR. MELTON:  Alan -- if I may, Judge?  My brother

6    was just taking a sideline.

7              THE COURT:  I understand.

8              MR. MELTON:  But to answer your question, Judge --

9    and, you know, it's sad.  I'm sure a lot of people go

10   through a lot of family pains that have happened for various

11   reasons.  But the bottom line right -- you know, to cut to

12   the chase is that there were no new funds put in to the

13   Diana Melton Trust.  But the funds that were in the Ernest

14   Melton Trust should have been withdrawn in 2007 before the

15   discovery, December 11th, 2008.  And those new funds -- that

16   was real money in 2007.  That's what funded the Diana Melton

17   Trust.  That is what funded the Diana Melton Trust which had

18   a new name and a new TIN number.  So it was a million --

19   whatever the number was, that was the new money that was put

20   in.

21             It's the same as if we instructed -- had we

22   instructed DiPascali to withdraw the funds, send us a check

23   and we'll decide what to do with it.  Maybe we'll put it

24   back in Madoff, maybe we'll put it back in JPMorgan.  So

25   it's no different.  It was real money in 2007 and that money

Page 18

```
 1    -- if Madoff and his team had done the correct way, which

 2    everything was not done correctly as we all know, but we

 3    didn't know that in 2007.  And again, we did it for estate

 4    tax planning purposes.  We didn't do it for anything else.

 5    That money should have been withdrawn.  Every financial

 6    institution operates that way.  And that money withdrawn --

 7    they could have put it in a -- whatever -- we don't know, a

 8    holding place, in a treasury or whatever, that new money

 9    funded the Diana Melton Trust which then existed -- it

10    didn't exist until the changeover in name.

11            So the two never existed at the same time.  As Mr.

12    Blanchard said, there was no inter-account transfer.  And

13    the equity was real equity because it should have been

14    withdrawn and new money should have been put in.  I mean,

15    that's what we're saying.

16            THE COURT:  Okay.  Thank you.  I'll reserve

17    decision.

18            MR. MELTON:  Thank you.

19        (Pause)

20            THE COURT:  I'll hear the next matter, the

21    conference regarding the subpoena.

22            Who represents the trustee in this matter?

23            MR. HUNT:  We represent the trustee, Your Honor.

24            THE COURT:  All right.

25            MR. HUNT:  We're not on the docket.
```

 1            THE COURT:  I know but a similar issue has arisen

 2     and why don't we just deal with both of them at the same

 3     time?  The same issue.

 4            MR. HUNT:  Yes.  Yeah --

 5            THE COURT:  All right.  Let me hear from -- Mr.

 6     Dexter, why don't you tell me what this is about?

 7            MR. DEXTER:  Good morning, Your Honor.

 8            We served a subpoena and we also served a document

 9     demand.  The subpoena was on JPMorgan.  The document demand

10     was on the trustee.

11            THE COURT:  How could you serve the document

12     demand on JPMorgan also?

13            MR. DEXTER:  Well, it's a subpoena demanding

14     documents.

15            THE COURT:  It sounds like a document demand.

16            MR. DEXTER:  It is.

17            THE COURT:  Okay.

18            MR. DEXTER:  But they're a non-party.

19            THE COURT:  Okay.  Oh, I see.  You didn't go by

20     Rule 34.  All right.

21            MR. DEXTER:  So what the documents seek are

22     communications relating to the Coribello declarations.  And

23     the Coribello declarations effectively are what would be

24     certifications of a custodian of records to have a document

25     satisfy the hearsay exception.

Page 20

1              THE COURT:  Right.

2              MR. DEXTER:  And ordinarily, when you see a

3    certification for that purpose, it'll maybe have the four

4    elements of the hearsay rule just so that it could be

5    admitted as a business record.

6              THE COURT:  Well, if we're just talking about the

7    Nelson trial, it was admitted at the Nelson trial and that

8    record is closed.

9              MR. DEXTER:  But because of the events of the

10   Nelson trial, because of what was revealed --

11             THE COURT:  What was revealed?

12             MR. DEXTER:  That the Coribello declaration was

13   being admitted to establish that BLMIS LLC held two accounts

14   at JPMorgan Chase when the trustee didn't have any other

15   evidence of that, this Coribello declaration, which is to

16   satisfy the business records exception, was now being

17   admitted for substantive evidence.  So that raises certain

18   questions and as a result, we would like to take discovery

19   to find out information about that declaration.

20             THE COURT:  But why didn't you subpoena -- I mean,

21   the declarations were no secret.  And your theory that the

22   account belonged to Madoff personally rather than to LLC

23   have been in the case for quite a while.

24             And as to the Nelson trial, why didn't you just

25   subpoena JPMorgan to testify as to the ownership of the

Page 21

1    account.

2             MR. DEXTER:  Well, the Coribello declaration was

3    not made available declarations until five days -- or, I

4    think, seven days before trial.

5             THE COURT:  So did you look at it at that

6    point003F

7             MR. DEXTER:  I wasn't at the trial.  But I'm sure

8    -- I know that the attorneys when they received the

9    documents were preparing for trial and must have seen it.

10            THE COURT:  All right.  So --

11            MR. DEXTER:  That was within -- that was right

12   before the trial.  You get two bankers boxes for the

13   documents and then you have one declaration which is used to

14   satisfy the business records exception has this one little

15   line that you would really have to look at very carefully to

16   notice that is being admitted now for substantive evidence

17   which exceeds this --

18            THE COURT:  Let me ask a question.  Who drafted

19   those Coribello declarations?

20            MR. HUNT:  Your Honor, those were drafted between

21   our firm and --

22            THE COURT:  Okay.

23            MR. HUNT:  -- Wachtell.

24            THE COURT:  Okay.

25            MR. HUNT:  But ultimately --

Page 22

1                  THE COURT:  You see --

2                  MR. HUNT:  -- JPMorgan --

3                  THE COURT:  Okay.  Go ahead.

4                  MR. DEXTER:  That's one of the things that we'd

5      like to find out, Your Honor.  And if they can answer that

6      in open court, I don't know why they have to resist the

7      subpoena and can't just produce the documents.  I mean, it's

8      really a very simple --

9                  THE COURT:  Well --

10                 MR. DEXTER:  -- request.

11                 THE COURT:  -- I mean, I guess, if the LLC owned

12     the bank account, that's the end of the matter.  Right?

13     Then the Court -- what you're really alleging is a fraud on

14     the Court.  And what the -- the sense I got from your

15     letters was that the trustee had manufactured a document or

16     at least submitted a document knowing it to be untrue.  Is

17     that what you're arguing?

18                 MR. DEXTER:  Until we have the documents, we don't

19     know.  But we find it highly possible that Coribello may

20     have been mistaken.  Whether it was an intentional mistake

21     or not, it's highly --

22                 THE COURT:  So why don't you just take her

23     deposition if discovery is still open or subpoena her at

24     trial to establish the ownership of the account?  That's

25     what I'm saying.  I understand why you're arguing -- your

1   underlying argument that there's no transfer on BLMIS LLC.

2   But it would seem to me, rather than go around in this

3   roundabout way, if discovery is still open in a case, you

4   can take Coribello's deposition.  If discovery is closed --

5   I mean, you know, the trustee has set forth in his letter

6   the basis of his understanding or his belief that the

7   account was owned by the LLC based on the answer that Chase

8   filed in the litigation.  Primarily.  There were some other

9   things.  So if you're asserting a fraud on the court claim,

10  that's one thing.  If you're telling me, at least in the

11  Nelson trial, that you didn't look at the documents or you

12  didn't focus on the significance of those documents until I

13  said something, frankly, after the record was closed,

14  whatever is the issue or I raised the question of whether

15  this was even an issue in the case based on proof, that

16  seems to be what's generated this, right?  Or you don't

17  know?

18         MR. DEXTER:  No.  I don't -- I didn't catch the

19  last part of your sentence.

20         THE COURT:  This seems to come up because I made a

21  statement after the record was closed during closing

22  argument that the only evidence of ownership was the

23  Coribello declarations.  And it said that the accounts were

24  in the name of the LLC.

25         MR. DEXTER:  That's absolutely correct.

Page 24

1            THE COURT:  Right.

2            MR. DEXTER:  -- because when you have

3    certification from a custodian of records to satisfy the

4    hearsay exception, you don't expect it to exceed the scope

5    and be introduced for substantive evidence which is what --

6            THE COURT:  Well, then you should have objected to

7    the declaration to that extent.

8            MR. DEXTER:  Okay.  But as a result of those

9    events in the other cases, put aside the Nelson cases, that

10   is a reason to pursue discovery in those cases.

11           THE COURT:  Well, if --

12           MR. DEXTER:  And that's what we're trying to do.

13           THE COURT:  If discovery is closed, it's closed.

14   But you can still subpoena JPMorgan at trial or Coribello

15   trial, whoever's going to be a witness, can't you?

16           MR. DEXTER:  She could show up at trials.  I guess

17   we wouldn't have any discovery before that.  Wouldn't it

18   make more sense to have documents produced and that, as you

19   say -- as Your Honor says, we can take her deposition.

20           THE COURT:  What I don't understand is this

21   argument that the account was not an LLC account.  It was a

22   personal account that's been in the case.  Why haven't you

23   prepared for that?

24           MR. DEXTER:  Because Coribello is not identified

25   as the person who had knowledge about this until five days

Page 25

1    or seven days before the trial.  They identified, as a

2    person with knowledge in their disclosures unidentified

3    JPMorgan custodian.  They had never identified Coribello.

4    They didn't know about her until seven days before trial.

5           THE COURT:  It's just a custodian of the records.

6    Is your problem Coribello or is your problem that the

7    declaration said LLC and that is the owner of the accounts?

8           MR. DEXTER:  It's the letter --

9           THE COURT:  All right.

10           MR. DEXTER:  -- that says LLC.  And that's the

11   only evidence.  It's very important.  It goes to one of --

12   our most important affirmative defenses which is a lack of

13   standing.  It's dispositive.  And we just want to take

14   discovery.

15           THE COURT:  All right.  Let me hear from JPMorgan.

16           MR. KLEINHAUS:  Good morning, Your Honor.  For the

17   record, Emil Kleinhaus from Wachtell Lipton Rosen & Katz on

18   behalf of JPMorgan Chase Bank.

19           Just a little bit of context from JPMorgan's

20   standpoint.  JPMorgan has been a witness in the form of

21   producing documents in many dozens, if not hundreds, of

22   Madoff adversary proceedings.  At this point, the typical

23   process is either the trustee or a defendant subpoenas

24   JPMorgan for documents.  We produce documents relating to

25   particular accounts and transfers and the like.

1           In this particular situation, what happened is

2     that in order to avoid the need for inefficient witness

3     testimony and the like, the trustee asked us if a JPMorgan

4     witness could authenticate a whole bunch of records.  So a -

5     - that request was made.  The trustee sent over draft

6     declarations.  We worked on the wording of it.  And based on

7     JPMorgan's records, those declarations were signed.  We were

8     not -- we're just a witness here producing documents.  We

9     were not in any way in the loop on the underlying issues.

10          THE COURT:  He's not really concerned with the

11    certification of the documents.

12          MR. KLEINHAUS:  Understood.

13          THE COURT:  The documents are business records of

14    JPMorgan.

15          MR. KLEINHAUS:  Yeah.

16          THE COURT:  What he's concerned with, as you

17    probably know, is the declarations say that the account

18    owner was BLMIS LLC.  And that's an issue in the case.  So

19    why shouldn't he be able, because it may go to standing -- I

20    don't know if it does.  But why shouldn't he be able to

21    inquire into who owned the account?

22          MR. KLEINHAUS:  Well, Your Honor, we got a

23    subpoena from Ms. Chaitman's firm.  And what the subpoena

24    asked for were, on its face, "documents evidencing or

25    referencing communications between any employees and/or

1   officers and/or attorneys for JPMC and Irving H. Picard

2   and/or any of his attorneys and/or assistants from December

3   11, 2018 to the present relating in any way to the

4   preparation, execution, purpose or use of Linda Coribello

5   declarations dated in December 2017."

6               THE COURT:  Okay.

7               MR. KLEINHAUS:  So our understanding of the

8   subpoena when we got it was the defendant here wanted

9   communications between JPMorgan and the trustee.  And all

10  we've said about this is get them from the trustee.

11              THE COURT:  Well --

12              MR. KLEINHAUS:  They're the plaintiff.

13              THE COURT:  I'm not sure that's a response to the

14  document request.

15              MR. KLEINHAUS:  Well --

16              THE COURT:  He can get them from both sides, can't

17  he?

18              MR. KLEINHAUS:  Understood.  I have some case --

19              THE COURT:  If you're telling me that to the

20  extent he's asking for communications between lawyers for

21  JPMorgan and employees of JPMorgan about the subpoena, I

22  assume that's privileged.

23              MR. KLEINHAUS:  Right.  So there are a couple of

24  categories here.  One is, the interactions, communications

25  with the trustee.  As to those, I have some cases if this is

Page 28

```
 1    going to be briefed but I don't know if we want to bother
 2    Your Honor with inefficient briefing as to duplicative
 3    discovery.  But to the extent that the request is for
 4    communications between JPMorgan and the trustee, all we've
 5    said is why don't you ask the plaintiff in the first
 6    instance.  I don't have any super fundamental objection to
 7    that discovery other than it seems duplicative to get it
 8    from both sides.
 9            THE COURT:  Except I think he's more interested to
10    know what JPMorgan says about the ownership of the account
11    not what the trustee says --
12            MR. KLEINHAUS:  Right.  Well, I mean, to the
13    extent he's asking for internal documents related to the
14    affidavit, I expect most or substantially all of those
15    documents will be privileged.  And I will say there is -- we
16    believe that affidavit is accurate.  There is a record that
17    that account, the 703 account and the 509 account was the
18    Madoff business account going all the way back to the 1980s.
19            THE COURT:  In the 1980s, there wasn't an LLC --
20            MR. KLEINHAUS:  Understood, Your Honor.
21            THE COURT:  And Madoff has his own bankruptcy and
22    --
23            MR. KLEINHAUS:  Understood, Your Honor.  It was a
24    sole proprietorship.  And our understanding, as Your Honor
25    has found in multiple cases, is that in 2001, it was
```

1    transformed from a sole proprietorship and LLC.  And what

2    the bank's records show is that the account has been

3    identified with the TIN, the tax identification number, that

4    the LLC has used since 2001 which was previously used by the

5    sole proprietorship.

6           So the bank's understanding is that this has been

7    the business account.  It has been the LLC account for some

8    time.  So we don't have -- we believe the affidavit is

9    accurate.  But as a witness here, we're not trying to

10   prevent anybody from getting anything.  It's simply a matter

11   of what's being asked for.  And to the extent that they're

12   asking for communications with the trustee, all we've said

13   is, you know, please get them from the trustee.

14           THE COURT:  Mr. Dexter, what is it that you're

15   really looking for here?

16           MR. DEXTER:  We're looking for everything that's

17   been discussed.  We're looking for communications between

18   the trustee and JPMorgan.

19           THE COURT:  Why do you need that?  Isn't the issue

20   who owns the account?

21           MR. DEXTER:  Yes.

22           THE COURT:  So what do the communications with the

23   trustee, which may be work product anyway, have to do with

24   who owns the account?  I mean, what you're really asking for

25   is communications regarding what the trustee said to a

1      witness in preparation for trial testimony.  And that sounds

2      like Hickman v. Taylor material.

3                  MR. DEXTER:  I don't think they've --

4                  THE COURT:  You can --

5                  MR. DEXTER:  -- raised work product.

6                  THE COURT:  Well, they haven't raised anything.

7      This is a conference.  And at the end of the conference, if

8      you insist on what you're asking for, I'll tell you to make

9      a motion and then I'll put in a response.  But, you know, if

10     what you're looking for is information relating to the

11     ownership of the account, that's one thing.  If you're

12     looking for communications, which don't seem to be relevant,

13     that's quite another thing.  So if you're going to insist on

14     asking for what you originally asked for, you'll have to

15     make a motion.

16                 MR. DEXTER:  Okay.

17                 THE COURT:  Okay?

18                 MR. DEXTER:  Are you suggesting that we should

19     modify our request to --

20                 THE COURT:  I am suggesting that you should speak

21     to JPMorgan about requesting documents that relate to who

22     owns the account or the ownership of the account.  That's

23     what I'm suggesting because it's -- I understand the

24     relevance of that.  I'm not reopening discovery in any

25     cases.  This has been an issue in the cases for 10 years

Page 31

1    now.  The trustee has always taken the position in its

2    pleadings that the transfers were by the LLC.  And you and

3    others have taken positions, at least in the last year or

4    two that I've been involved in this, that the transfers were

5    not by the LLC.  They were by a -- from a bank account in

6    the name of Madoff personally or his former d/b/a.  So it's

7    an issue in the case.  And, you know, I'm not reopening

8    discovery or at least I don't have a motion before me to

9    reopen discovery.  If you made that motion, you would have

10   to explain why you didn't ask for this information before.

11          MR. DEXTER:  Well, if we meet and confer with

12   JPMorgan and those talks are unsuccessful then can we have

13   permission to make the motion that we've requested and

14   also --

15          THE COURT:  You can always make the motion.  I was

16   trying to suggest to you that if you make the motion, you're

17   probably not going to get what you want.

18          MR. DEXTER:  Can we also --

19          THE COURT:  I'm not ruling on it but that's where

20   I'm coming from.

21          MR. DEXTER:  Right.  And can we have leave to file

22   a motion to extend discovery?

23          THE COURT:  You can file any motion you want.

24          MR. DEXTER:  Okay.

25          THE COURT:  You don't need leave from me.  But if

Page 32

1    you make that motion, you're going to have to explain to me

2    why you didn't take discovery from JPMorgan or the trustee,

3    for that matter, in the last couple of years when discovery

4    was still open.  As far as I'm concerned, the Nelson trial

5    record is closed.  There's no motion to reopen the record.

6    Incidentally, the trustee included a lot of materials in his

7    response which are not part of the record.  I'm not going to

8    consider those.  You know, I thought you were making a fraud

9    on the court claim and then they're relevant because you

10   have to show by clear and convincing evidence that the

11   trustee made a knowing misrepresentation.  And the trustee

12   has said that the ownership is based -- or his contention

13   regarding the ownership is based on what JPMorgan responded

14   to in its complaint that JPMorgan is not.  So that's all I

15   have to say.

16            MR. DEXTER:  Okay.

17            THE COURT:  And if you're seeking the same

18   information from the trustee to save you another trip back

19   here to have the same conversation, you can make the motion

20   with respect to the trustee also if you can't agree on

21   anything.

22            But it sounds like the account was using the TIN

23   of the LLC.

24            MR. DEXTER:  Okay.

25            THE COURT:  All right.

Page 33

1              MR. DEXTER:  So just to clarify, we have

2    permission to make the motions.

3              THE COURT:  Yes.

4              MR. DEXTER:  But we should meet and confer.

5              THE COURT:  You can always make a motion.

6              MR. DEXTER:  Okay.

7              THE COURT:  Okay?

8              MR. DEXTER:  Thank you, Your Honor.

9              THE COURT:  Thank you.  Anything else?

10             MR. HUNT:  No, Your Honor.  I think you've

11   succinctly stated it.

12             THE COURT:  All right.  We are adjourned.  Thank

13   you very much.

14        (Whereupon, these proceedings were concluded at 10:40

15   a.m.)

16

17

18

19

20

21

22

23

24

25

Page 34

1                       C E R T I F I C A T I O N

2

3      I, Lisa Beck, certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5      Lisa Beck            Digitally signed by Lisa Beck
                            DN: cn=Lisa Beck, o, ou,
6      _____email=digital1@veritext.com, c=US
                            Date: 2019.06.27 15:48:54 -04'00'

7      Lisa Beck

8

9

10

11

12     Date:   June 27, 2019

13

14

15

16

17

18

19     Veritext Legal Solutions

20     330 Old Country Road

21     Suite 300

22     Mineola, NY 11501

23

24

25