

Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4  In the Matter

5  SECURITIES INVESTOR

6  PROTECTION CORPORATION,          Case No. 08-01789-SMB

7          Plaintiff,

8  VS.

9  BERNARD L. MADOFF INVESTMENT

10  SECURITIES, LLC, ET AL.

11          Defendants.

12  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13  IN RE:

14  BERNARD L. MADOFF

15          Debtor.

16  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

17  IRVING H. PICARD, Trustee

18  For the LIQUIDATION OF          Case NO. 10-04390-smb

19  BERNARD L. MADOFF INVESTMENT

20  SECURITIES, LLC.

21          Plaintiff

22  VS.

23  BAM, L.P., ET AL.

24          Defendants.

25  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

1            United States Bankruptcy Court

2                    One Bowling Green

3                New York, New York 10004-1408

4

5                        April 24, 2019

6                        10:02 AM

7

8    B E F O R E:

9    HON. STUART M. BERNSTEIN

10   U.S. BANKRUPTCY JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    HEARING RE:   Case No. 08-01789-smb, Securities Investor

 2    Protection Corporation v. Bernard L. Madoff Investment

 3    Securities; Trustee's Thirtieth Omnibus Motion to Disallow

 4    Claims and Overrule Objections of Claimants Who Have No Net

 5    Equity.

 6

 7    HEARING RE: Case No. 08-01789-smb, Securities Investor

 8    Protection Corporation v. Bernard L. Madoff Investment

 9    Securities;  Twenty-Ninth Application of Trustee and Baker &

10    Hostetler, LLP for Allowance of Interim Compensation for

11    Services Rendered and Reimbursement of Actual and Necessary

12    Expenses Incurred from August 1, 2018 through November 3,

13    2018.

14

15    HEARING RE:  Case No. 08-01789-smb, Securities Investor

16    Protection Corporation v. Bernard L. Madoff Investment

17    Securities; Application of Browne Jackson, LLP, as Special

18    Counsel to the Trustee for Allowance of Interim Compensation

19    for Services Rendered and Reimbursement of Actual and

20    Necessary Expenses Incurred from August 1, 2018 through

21    November 30, 2018.

22

23

24

25
```

Page 4

1    HEARING RE:   Case No. 08-01789-smb, Securities Investor

2    Protection Corporation v. Bernard L. Madoff Investment

3    Securities; Twenty-Eighth Application of Windels, Marx, Lane

4    & Mittendorf, LLP, for Allowance of Interim Compensation for

5    Services Rendered and Reimbursement of Actual and Necessary

6    Expenses Incurred from August 1, 2018 through November 30,

7    2018.

8

9    HEARING RE: Case No. 08-01789-smb, Securities Investor

10   Protection Corporation v. Bernard L. Madoff Investment

11   Securities;  Application of Schiltz & Schiltz as Special

12   Counsel to the Trustee for Allowance of Interim Compensation

13   for Services Rendered and Reimbursement of Actual and

14   Necessary Expenses Incurred from August 1, 2018 through

15   November 30, 2018.

16

17   HEARING RE:   Case No. 08-01789-smb, Securities Investor

18   Protection Corporation v. Bernard L. Madoff Investment

19   Securities; Application of Williams, Barristers & Attorneys

20   as Special Counsel to the Trustee for Allowance of Interim

21   Compensation for Services Rendered and Reimbursement of

22   Actual and Necessary Expenses Incurred from August 1, 2018

23   through November 30, 2018.

24

25

Page 5

1    HEARING RE:   Case No. 08-01789-smb, Securities Investor

2    Protection Corporation v. Bernard L. Madoff Investment

3    Securities; Application of Higgs & Johnson as Special

4    Counsel to the Trustee for Allowance of Interim Compensation

5    for Services Rendered and Reimbursement of Actual and

6    Necessary Expenses Incurred from August 1, 2018 through

7    November 30, 2018.

8

9    HEARING RE: Case No. 08-01789-smb, Securities Investor

10   Protection Corporation v. Bernard L. Madoff Investment

11   Securities;  Application of Soroker, Agmon, Nordman as

12   Special Counsel to the Trustee for Allowance of Interim

13   Compensation for Services Rendered and Reimbursement of

14   Actual and Necessary Expenses Incurred from August 1, 2018

15   through November 30, 2018.

16

17

18   HEARING RE:   Case No. 08-01789-smb, Securities Investor

19   Protection Corporation v. Bernard L. Madoff Investment

20   Securities; Application of Graf & Pitkowitz Rechtsanwalte

21   GMBH as Special Counsel to the Trustee for Allowance of

22   Interim Compensation for Services Rendered and Reimbursement

23   of Actual and Necessary Expenses Incurred from August 1,

24   2018 through November 30, 2018.

25

1    HEARING RE:  Case No. 08-01789-smb, Securities Investor

2    Protection Corporation v. Bernard L. Madoff Investment

3    Securities; Application of Ritter, Schierscher Rechtsanwalte

4    as Special Counsel to the Trustee for Allowance of Interim

5    Compensation for Services Rendered and Reimbursement of

6    Actual and Necessary Expenses Incurred from August 1, 2018

7    through November 30, 2018.

8

9    HEARING RE: Case No. 08-01789-smb, Securities Investor

10   Protection Corporation v. Bernard L. Madoff Investment

11   Securities;  Application of Young, Conaway, Stargatt &

12   Taylor, LLP, as Special Counsel to the Trustee for Allowance

13   of Interim Compensation for Services Rendered and

14   Reimbursement of Actual and Necessary Expenses Incurred from

15   August 1, 2018 through November 30, 2018.

16

17   HEARING RE:  Case No. 08-01789-smb, Securities Investor

18   Protection Corporation v. Bernard L. Madoff Investment

19   Securities; Application of UGGC & Associates as Special

20   Counsel to the Trustee for Allowance of Interim Compensation

21   for Services Rendered and Reimbursement of Actual and

22   Necessary Expenses Incurred from August 1, 2018 through

23   November 30, 2018.

24

25

1    HEARING RE: Case No. 08-01789-smb, Securities Investor

2    Protection Corporation v. Bernard L. Madoff Investment

3    Securities;  Application of Eugene F. Collins as Special

4    Counsel to the Trustee for Allowance of Interim Compensation

5    for Services Rendered and Reimbursement of Actual and

6    Necessary Expenses Incurred from August 1, 2018 through

7    November 30, 2018.

8

9    HEARING RE:  Case No. 08-01789-smb, Securities Investor

10   Protection Corporation v. Bernard L. Madoff Investment

11   Securities; Application of Robbins, Russell, Englert,

12   Orseck, Untereiner & Sauber, LLP as Special Counsel to the

13   Trustee for Allowance of Interim Compensation for Services

14   Rendered and Reimbursement of Actual and Necessary Expenses

15   Incurred from August 1, 2018 through November 30, 2018.

16

17   HEARING RE:  Case No. 08-01789-smb, Securities Investor

18   Protection Corporation v. Bernard L. Madoff Investment

19   Securities; Application of Scaletta Law Firm, PLLC as

20   Special Counsel to the Trustee for Allowance of Interim

21   Compensation for Services Rendered and Reimbursement of

22   Actual and Necessary Expenses Incurred from August 1, 2018

23   through November 30, 2018.

24

25

1    HEARING RE:   Case No. 10-04390-smb, Irving H. Picard,

2    Trustee for the Liquidation of Bernard L. Madoff Investment

3    v. Bam, L.P., et al; Trustee's Motion for Summary Judgment.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Pamela A. Skaw

```
 1   A P P E A R A N C E S :

 2   BAKER HOSTETLER

 3        Attorneys for

 4        45 Rockefeller Plaza

 5        New York, NY 10111

 6

 7   BY:  JASON BLANCHARD, ESQUIRE

 8        LAN HOANG, ESQUIRE

 9        IRVING H. PICARD, ESQUIRE

10        BRIAN BASH, ESQUIRE

11        DAVID J. SHEEHAN, ESQUIRE

12        NICHOLAS J. CREMONA, ESQUIRE

13

14   WINDELS, MARX, LANE & MITTENDORF, LLP

15        Attorney for

16   `    156 West 56th Street

17        New York, NY 10019

18

19   BY:  KIM M. LONGO, ESQUIRE

20

21

22

23

24

25
```

Page 10

1   SECURITIES INVESTOR PROTECTION CORPORATION

2        Attorney for

3        1667 K Street, N.W., Suite 1000

4        Washington, D.C. 20006

5

6   BY:  KEVIN H. BELL, ESQUIRE

7

8   DENTONS US LLP

9        Attorney for All Defendant Bam adv. 10-04390

10       1221 Avenue of the Americas

11       New York, NY 10020

12

13  BY:  ARTHUR H. RUEGGER, ESQUIRE

14

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2           THE COURT:   Please be seated.   Good morning.

3       (Chorus of good morning)

4           THE COURT:   Madoff.

5       (Pause)

6           MR. CREMONA:   Good morning, Your Honor.

7           Nicholas Cremona of Baker & Hostetler appearing on

8    behalf of the Trustee.

9           As Your Honor will note from the agenda, we have

10   three items that are set go forth; the twenty-ninth interim

11   fee applications, the Trustee's thirtieth omnibus vlaims

12   motion and a motion for summary.

13          We're happy to proceed in any order that Your

14   Honor would see fit.

15          THE COURT:   Why don't we do the fee applications

16   just so if anybody wants to leave, they can leave --

17          MR. CREMONA:   Okay.

18          THE COURT:   -- if they don't have an interest in

19   the other matters.

20          MR. CREMONA:   Thank you, Your Honor.

21       (Pause)

22          MR. SHEEHAN:   Good morning, Your Honor.

23          THE COURT:   Good morning.

24          MR. SHEEHAN:   It's been a while but

25   David Sheehan on behalf of Baker Hostetler appearing for the

Page 12

1    Trustee, BLMIS and for the law firm of Baker Hostetler in

2    connection with the twenty-ninth fee application.

3           As Your Honor is aware, most of the things that

4    are happening in the domestic front, I can report to you

5    that the motion to stay discovery in connection with the ADA

6    cases that were returned to you, other (indiscernible) that

7    I'm sure you know that that was granted so there will be no

8    discovery applications in connection with that.

9           And, in terms of the foreign proceedings, I just

10   want to mention three of those to you that are not so

11   apparent but are apparent from the time references.

12          There have been a number of discovery applications

13   before Your Honor but they then carried over other areas

14   such as Bermuda in connection with HSBC and some discovery

15   that took place there which involved our local counsel quite

16   a bit.

17          Through his law discovery and (indiscernible) in

18   the United Kingdom so any (indiscernible) that were -- it

19   was during the reporting period.  And so they required a

20   great deal of time and there was a good deal of opposition

21   and there was a lot of litigating back and forth.

22          They eventually took place.  Your Honor may be

23   aware of that.

24          But, in any event, that is why there was so much

25   time that took place with respect to the English law firm.

Page 13

1           And then lastly, of course, there is the legacy --

2    I'm sorry, the magnify matter and the -- in the Israeli

3    courts.

4           What's happening there is is that we are

5    attempting to mediate that.  As Your Honor is aware, there's

6    multiple parties there; some direct, mostly subsequent.

7           So, we are in the process of assembling -- and

8    there should be a mediation at the end of May.  At which

9    point, we'll make a decision whether we continue in Israel

10   or whether we just go forward here in the United States.

11          So, that comprehends exactly what's happening in

12   most of those cases.  Lots of activity, as Your Honor knows

13   from looking at those time records.  It occurs in all

14   jurisdictions; France, Luxenberg. Austria.

15          There's always activities taking place there,

16   usually in the form of discovery that is still taking place

17   today as the European Courts slowly get through this

18   process.  Just like it takes a long time here, it takes a

19   long time there to resolve all of this.

20          So, at the end of the day, we're feeling as though

21   with the cases returned to us, that there's probably another

22   couple years of this litigation that will take place and

23   we're looking forward to obviously resolving everything to

24   the satisfaction of the Court.

25          And I would move today that we -- for the approval

Page 14

1    of the Trustee and his counsel's application but also for

2    all the counsel that we retain outside the country and are

3    familiar to you.

4            And as -- and lastly and most exemplary is, of

5    course, Windels, Marx and all the work they've done for us

6    both as conflicts counsel, as co-counsel, too, in a number

7    of cases that we're proceeding on before Your Honor.

8            Thank you very much.

9            THE COURT:  Thank you.

10       (Pause)

11           MR. BELL:  Good morning, Your Honor.

12           Kevin Bell on behalf of the Securities Investor

13   Protection Corporation.

14           It was 3,786 days ago that this case began and, if

15   your Court would like other information on dates and times,

16   I can --

17           THE COURT:  At this point, that's more than

18   enough.

19           MR. BELL:  SIPC has filed its recommendations with

20   regard to all these applications.  SPIC has intensively

21   reviewed each and every application and the invoices

22   thereunder.  Every entry is read and when questions are --

23   arise, I ask those questions and get the answers and the

24   former general counsel, who is not the president and CEO of

25   SIPC, Ms. Wang, has reviewed them.

Page 15

1          She took that office after she signed the

2   recommendations.  So, she is now the new head of SIPC.

3          We -- I would note, as I always do, with regard to

4   the twenty-ninth fee application of Baker Hostetler, at

5   paragraph five, the review by SIPC has caused reductions in

6   the request of -- to the tune of about 14.74 percent which

7   includes the ten percent agreed reduction.

8          And Wendel's, in their paragraph three, that

9   reduction, after the review, including the ten percent off

10   the regular rates is 16.68 percent.

11          In light of the fact that the statute provides

12   where there is still no likelihood of this being a -- other

13   than a no asset case --

14          THE COURT:  That's not what you told me about a

15   year ago.

16          MR. BELL:  -- that we will have a general -- huh?

17          THE COURT:  That's not what you told me about a

18   year ago.

19          MR. BELL:  Well, Your Honor, I expect that by the

20   time the Supreme Court denies cert, maybe this time next

21   year, we will get those 88 cases going involving somewhere

22   between three and four billion dollars.

23          THE COURT:  Uh-huh.

24          MR. BELL:  And Mr. Sheehan is more optimistic than

25   I am on a timeline.  I think it will be longer.

Page 16

1              But I do -- since your order in January allowed

2      the trustee to make the distribution, there is 66.633

3      percent of the stolen customer property back in the hands of

4      the people who had allowable claims and the pursuit to the

5      goal of satisfying everybody continues.

6              I, of course, am always overly optimistic that we

7      will get there.

8              And, in light of certain recent decisions, I think

9      that the path is becoming less rocky and I would ask the

10     Court to approve these -- all these applications.

11             Does the Court have any questions?

12             THE COURT:  No, I don't.  Does anyone else want to

13     be heard in connection with the fee applications?

14             Hearing no response, I'll approve them in light of

15     SIPA's recommendation and the grudging representation by

16     Mr. Bell that the estate may not -- the customer estate may

17     not be solvent.

18             So, you can submit an order.  Thank you.

19             MR. BELL:  Thank you, Your Honor.

20             MR. SHEEHAN:  Thank you, Your Honor.

21             THE COURT:  Why don't we deal with the claims

22     objections now.

23        (Pause)

24             MR. BLANCHARD:  Good morning, Your Honor.

25             Jason Blanchard for the Trustee.

```
 1              THE COURT:  Good morning.  Oh, the -- thank you.

 2              MR. BLANCHARD:  Before the Court is the Trustee's

 3    thirtieth omnibus motion to disallow claims and overrule

 4    objections of claimants who have no net equity.

 5              We received one objection to the motion from

 6    Dr. Melton on behalf of Melton Trust pro se.

 7              The objection essentially contends that the Melton

 8    Trust's -- the Trustee's calculation of the Melton Trust net

 9    equity claim was incorrect because it included deposits and

10    withdrawals from a prior predecessor account.

11              THE COURT:  Oh-huh.

12              MR. BLANCHARD:  We just wants to note, for the

13    Court, that the Melton Trust appears to be represented by

14    counsel.  Counsel of record filed a notice of appearance

15    several years ago and hasn't formally sought this Court's

16    request to withdraw.

17              In addition, courts in this circuit have denied or

18    not permitted pro se parties from representing a trust in

19    federal court.

20              THE COURT:  I understand that.  Let's get to the

21    merits for Melton.

22              MR. BLANCHARD:  Sure.

23              THE COURT:  What happened here?  And what's the

24    Trustee's position on the merits?

25              MR. BLANCHARD:  Sure.  Sure.
```

Page 18

1          The Trustee's position is that the books and

2     records of BLMIS for his claims determination that the claim

3     was determined according to net investment math.  There was

4     only one account at all times.

5          BLMIS's books and records show that in 1992,

6     Ernest Melton formed a -- or asked BLMIS to open a customer

7     account then in the name of The Ernest Melton Trust.  The

8     account was assigned an account number and, then,

9     subsequently, in 2007, Dr. Melton and his family members,

10    asked the -- BLMIS to rename the account then in the name of

11    The Diana Melton Trust.

12         The letter doesn't contained a request to transfer

13    funds, withdraw funds, reinvest them.

14         THE COURT:  Well, the bottom line is no funds were

15    ever transferred.  This is when the debtor has -- BLMIS

16    still had bank records.

17         MR. BLANCHARD:  Correct.

18         THE COURT:  Right?  So, no funds were transferred

19    and the Meltons are saying that you should have opened a new

20    account.  But that new account was never funded except

21    possibly by a inter-account transfer, right?

22         MR. BLANCHARD:  Correct.  That's exactly correct.

23         THE COURT:  So, either he's a net winner or he's

24    got a zero net equity under either circumstance.

25         MR. BLANCHARD:  That's right.

Page 19

1            THE COURT:  Because he never funded the account.

2            MR. BLANCHARD:  That's correct.

3            THE COURT:  All right.  Does anyone else want to

4    be heard in connection with the claims objections?

5            I'm going to grant the Trustee's motion.  You

6    know, I read all of Mr. Melton's and Dr. Melton's emails and

7    letters.  And, no matter how you slice it, whether the Diana

8    Melton account -- trust account was a new account or simply

9    a renamed account, it was never funded with real dollars

10   under either circumstance.

11           So, as I said, either that account is a net loser,

12   if you consider it an account transfer because, in the

13   records the Trustee has produced, there wasn't any equity in

14   the Ernest Melton account when the new account or the

15   renamed account was opened or was renamed and there was

16   never any put in.

17           So, in either event, the net equity is zero.

18           Has the Trustee sued them as net winners?

19           MR. BLANCHARD:  No, we did not.

20           THE COURT:  Okay.  All right.  You can submit an

21   order and send a copy of the order to the Meltons.

22           MR. BLANCHARD:  Thank you, Your Honor.

23           THE COURT:  All right.  I'll hear the motion for

24   summary judgment now.

25        (Pause)

Page 20

1          MR. CREMONA:  Good morning, again, Your Honor.

2          Nicholas Cremona appearing on behalf of the

3    Trustee.

4          We're here this morning on the Trustee's motion

5    for summary judgment against the Mann Defendants.

6          As an initial matter, Your Honor, the Trustee

7    believes that he's entitled to summary judgment because he's

8    established his prima facia case and the Defendants have

9    failed to come forward with any material issue of fact that

10   requires --

11         THE COURT:  Well --

12         MR. CREMONA:  -- determination by this court.

13         THE COURT:  I mean, I guess the of fact that

14   they've come forward with is that the checks had the name

15   Bernard Madoff on it and the suggestion is that the account

16   was not a BLMIS account.  It was a Bernard Madoff account.

17         I've read all the papers.

18         MR. CREMONA:  Uh-huh.

19         THE COURT:  It probably was a BLMIS account.

20         MR. CREMONA:  Uh-huh.

21         THE COURT:  But there's still a factual issue.

22         MR. CREMONA:  I respectfully disagree, Your Honor.

23   I think that we don't even have to get to those documents or

24   the account statements because, prior to that, these

25   Defendants have admitted that they received the transfers

Page 21

1    from BLMIS in paragraph 43 of their answer.  They admitted

2    that they received all amounts set forth in Exhibit B of the

3    complaint, in columns 10 and 11.  That would --

4              THE COURT:  Well, they agree they received the --

5    you have to make a distinction I think between receiving the

6    money and receiving it from BLMIS.

7              MR. CREMONA:  I -- but, yes, Your Honor, in our

8    complaint we allege that they -- that it was -- the

9    transfers of a debtor --

10             THE COURT:  I know.

11             MR. CREMONA:  -- or an interest in the debtor's

12   property were made by BLMIS and they admitted that.

13             THE COURT:  And they're contending that the

14   proposed pre-trial order, which they never signed, is

15   essentially an amended pleading which eviscerates that

16   admission.

17             MR. CREMONA:  Well, I think that's faulty as well

18   as a matter of law and we can get into that.

19             But in that pre-trial order, section two of that

20   order, provides the stipulated facts among the parties and,

21   as Your Honor acknowledged, at the December 2018 hearing, we

22   were going to utilize those stipulated facts as the facts

23   for purposes of this motion.

24             If you drill down on that joint pre-trial order,

25   you'll see in paragraphs seven, eight and nine, and that's

1    annexed to Mr. Sheehan's declaration, they ratified that

2    very admission in paragraph seven.  And they went on to

3    provide greater detail in paragraphs eight and nine as to --

4              THE COURT:  Which Exhibit is that?  Huh?

5              MR. CREMONA:  It is --

6              THE COURT:  I have it.  Okay.  Paragraphs seven,

7    eight and nine?

8              MR. CREMONA:  Yes.

9              THE COURT:  Let me just --

10        (Pause)

11             MR. CREMONA:  In Section 2, which is the

12   stipulated facts.

13        (Pause)

14             MR. CREMONA:  I believe that's the -- it may be --

15   I'm sorry.  Section 3.

16        (Pause)

17             THE COURT:  I read it.

18             MR. CREMONA:  So, Your Honor, I would submit that

19   the initial motion established our prima facia case and

20   there is no need for us to even address the 509 account

21   issue because the Defendants have admitted that they

22   received the transfer of an interest in the debtor's

23   property from BLMIS.

24             THE COURT:  Well, it was never the debtor's

25   property.

1          MR. CREMONA:  The customer property.

2          THE COURT:  Right.

3          MR. CREMONA:  It constitute -- excuse me, it

4     constitutes customer property.

5          THE COURT:  Whether it's in the BLMIS account or

6     Madoff's account, it's never -- it's always the customers'

7     property.

8          MR. CREMONA:  Agreed.  And that also is an

9     important distinction.

10          But the documents who what they show.  Even if

11     Your Honor were to look at them, they accounts -- the checks

12     show that they are on the 509 account.

13          The Trustee has put forward statements attached to

14     our reply declaration by Mr. Sheehan that shows that that

15     account was -- the 509 account that they claim was held by

16     Bernard L. Madoff, individually, were at -- is, in fact,

17     held by BLMIS, the debtor.

18          THE COURT:  But putting aside their admission, and

19     I understand there's conflicting evidence, at the end of the

20     day, you're probably right.

21          Don't I still -- can I grant summary judgment when

22     I have conflicting evidence like that or do I have to have a

23     trial?

24          MR. CREMONA:  I -- my -- I believe Your Honor can

25     absolutely grant summary judgment because the documents

1    speak for themselves.

2            THE COURT:  Well, so does the check --

3        `    MR. CREMONA:  One --

4            THE COURT:  -- with just Bernard Madoff's name on

5    it.

6            MR. CREMONA:  But it -- the -- what's important

7    about the check is that it bears the account number that

8    ends in 509 and it's common --

9            THE COURT:  But how have you shown, as a matter of

10   law, that that was a BLMIS account when they've come forward

11   with evidence that --

12           MR. CREMONA:  We have --

13           THE COURT:  -- suggests, you know, that it was a

14   Bernard Madoff account?

15           MR. CREMONA:  That we've submitted in

16   Mr. Sheehan's reply declaration those account statements

17   from BLMIS that show that it's a 509 -- that it's their

18   account.  And it shows transfers of customer property from

19   that account during the very same time period that those

20   checks were issued.

21           And I think it's important too, Your Honor, to

22   point out that the illegal entity that they claim made those

23   transfers didn't exist at the time of the transfers.

24           THE COURT:  Well, Bernard Madoff was an

25   individual.  He existed.

1          MR. CREMONA:  Right.  But he did not possess the

2     509 account that is --

3          THE COURT:  But that's the dispute.  You see,

4     you're saying that the dispute is not a dispute and that's

5     -- that doesn't really get us anywhere.

6          MR. CREMONA:  Well, I -- well, I guess let me --

7     let me back up and make two points, Your Honor.

8          Number one, the documents speak for themselves.

9     And, Your Honor, can review those documents and make a

10    determination as a matter of law.  I don't think that's a

11    material issue of fact.

12         But there's an important concession here that

13    needs to be reiterated for the record and that is the

14    defendants here -- this is a unique case.

15         They've made important and significant concessions

16    throughout multiple hearings and in their pleadings.

17         They've conceded, by virtue of withdrawing their

18    claims and objections with prejudice to a number of things

19    as a matter of law.

20         One of which is they've conceded that they

21    received the transfer of customer property from BLMIS in the

22    amount set forth in the Trustee's determination letter when

23    they agreed to the negative net equity set forth in that

24    determination.

25         That determination letter specifically provides

Page 26

1    that they received those transfers from BLMIS; that they

2    received fictitious profits; that they received other

3    people's money and that no securities were ever purchased on

4    their behalf.

5              They also agree and concede to the calculations

6    set forth on that addendum to the Trustee's determination

7    letter.

8              And I think we have to also focus on Your Honor's

9    opinion from January of this year which is also in this very

10   case which specified a number of things; not the least of

11   which Your Honor said Exhibit B to the complaint is

12   identical and it provides the exact same information as the

13   schedule to the determination letter.

14             THE COURT:  I don't think we're arguing over that

15   anymore whatever the attachment to the complaint or a

16   schedule to the --

17             MR. CREMONA:  Uh-huh.

18             THE COURT: -- determination letter showed.  Those

19   were the ins and outs.

20             MR. CREMONA:  Correct.

21             THE COURT:  I guess what you're saying is they

22   gave the money to BLMIS but they withdrew the money from

23   Madoff.  That seems to be what they're saying.

24             MR. CREMONA:  And what I'm saying, Your Honor,

25   respectfully is their estopped from arguing otherwise.

Page 27

1          THE COURT:  You may be right.

2          MR. CREMONA:  They can't now -- they can't, on the

3    one hand, concede to net equity and the negative net equity

4    that was calculated in the determination letter and withdraw

5    all of those arguments and their claim, with prejudice,

6    which means they now cannot reassert those very same

7    arguments.

8          Your Honor said, in your opinion, I believe it was

9    at page 19, you articulated the principles of res judicata

10   and Your Honor stated that if, on the one hand, I decide an

11   issue as to a claim, I -- and that's been decided, those

12   very same litigants cannot subsequently relitigate those

13   issues in the adversary proceedings.  And that's exactly

14   what we're doing here.

15         THE COURT: Yeah.  I guess their argument is I

16   didn't decide anything.  They simply withdrew their claim

17   with prejudice which, to me, is a trial on the merits.  But

18   -- or that's what I always understood to be a withdrawal of

19   a claim with prejudice.

20         MR. CREMONA:  Well -- Your Honor, we can go

21   through the factors of res judicata which is entirely

22   consistent with the way you articulated it in your opinion.

23   We have the -- we have here very unique facts.

24         THE COURT:   There's no question that if I tried

25   the objection and concluded that they were net winners,

1    shorthand method, but they couldn't relitigate that here.

2    They're arguing I never decided that.  That's what they're

3    saying.

4                MR. CREMONA:  But Your Honor said otherwise.  Your

5    Honor --

6                THE COURT:   Right.

7                MR. CREMONA:  -- said that the calculation of

8    avoidance liability and the calculation of net equity are

9    precisely the same.

10               THE COURT:   There's -- they're going to say I

11   never calculated the net equity.  But I get it.   Go ahead.

12   I get the res judicata argument.  Go ahead.

13               MR. CREMONA:  Okay.  Well, I think their -- Your

14   Honor, I think that the -- I think we should focus on what

15   the evidence is before the Court and what the --

16               THE COURT:   Right.

17               MR. CREMONA:  -- the way that -- in which the

18   Trustee has satisfied his prima facia case.

19               THE COURT:   Okay.  Go ahead.

20               MR. CREMONA:  Okay?  I think there are three --

21               THE COURT:   Because I'm going to ask them what

22   the issues affect.

23               MR. CREMONA:  Okay.  I would submit that there

24   aren't any and there aren't any for a number of a reasons.

25               I think, as an initial matter, the Trustee has

1    established the actual fraudulent intent of the debtor here.

2    And he has done so by submitting, in support of the motion,

3    the allocutions of Mr. Madoff, Mr. DiPascali (ph) and

4    several other employees.

5              THE COURT:   Yeah.  I read the other allocutions.

6    I'm not sure they really get you there.  But DiPascali and

7    Madoff's probably do.

8              MR. CREMONA:  Right.  Fair enough.  They certain

9    corroborate the fraud.

10              But Mr. -- let's put that aside.

11              Mr. Madoff testified, in name and substance, that

12   he was operating a Ponzi scheme from at least the 90s.  Mr.

13   DiPascali confirmed that.

14              Let's be clear.  The Trustee's position is that

15   the (indiscernible) was a Ponzi scheme from the outset and

16   our experts will prove that at the appropriate time.

17              But, for purposes of this case, that doesn't

18   really matter because these accounts were opened in 1995 and

19   1999.  So, for all times relevant to this proceeding, we

20   believe we've established that we're entitled to the Ponzi

21   presumption and they haven't rebutted that.

22              THE COURT:   Well, they --

23              MR. CREMONA:  They put nothing in evidence.

24              THE COURT:   You know, they argue it's not a

25   classic Ponzi scheme in the sense I get from their papers is

1   you're supposed to trace the money from customers into their

2   withdrawal, I guess.

3           MR. CREMONA: Well, Your Honor, we can gather a lot

4   of things from their papers.  But there's no articulated

5   issue of fact.  There's no link.  There's generalities and

6   conclusory statements.  Both --

7           THE COURT:   Let me ask you this.  What do you

8   have to prove to prove your direct case?

9           You have to prove there was a transfer.  We've

10  been through that already.

11          MR. CREMONA:  Right.

12          THE COURT:   You have to prove that it was made

13  with the intent to defraud and that's where the Ponzi scheme

14  -- they're claiming you didn't prove that it was a Ponzi

15  scheme because you're relying on the Ponzi scheme, at least

16  on this motion.

17          MR. CREMONA:  In part.  We have another argument

18  on that.  We'll get to.

19          THE COURT:   Okay.  And the amounts that were

20  transferred are not in dispute as I take it based on the

21  pre-trial order.

22          MR. CREMONA:  And based on the admissions --

23  previous admissions and their withdrawal of the claim.

24          THE COURT:   Do you have to prove anything else?

25  I'm just getting what's --

Page 31

1              MR. CREMONA:  I believe that we've -- once we've

2     established factual intent and the receipt of the transfers

3     in the amounts, I don't -- I believe that we've satisfied

4     our prima facie case.

5              THE COURT:   Okay.  Okay.

6              MR. CREMONA:  And I think we've done that for the

7     reasons I have said based on the admissions in the record.

8     I think there is a -- then, when we look at the second

9     argument, which we've touched upon, is the res judicata

10    affect of the withdrawal of the claims with prejudice.

11             The -- Your Honor we discussed this at length in

12    September, November and December.

13             THE COURT:   No.  I remember the discussion.

14             MR. CREMONA:  Which --

15             THE COURT:   I didn't decide anything.  I just

16    raised the issue that --

17             MR. CREMONA:   Well --

18             THE COURT:   -- that a withdrawal with prejudice

19    might lead to a res judicata or collateral estoppel effect.

20             MR. CREMONA:  That's true.  And defendants'

21    counsel conceded a number of things in those hearings and in

22    their pleadings in that they conceded that they're not

23    disputing the ins and outs.

24             They've conceded that -- they conceded as well

25    that the calculation of net equity is precisely the same.

1          So, once they stipulated to the negative net

2    equity here, You Honor, the the only thing they can utilize

3    as a defense to avoidance liability is positive net equity

4    and they've stipulated that it doesn't exist here.

5          So, they're collaterally estopped from raising a

6    defense to that now.

7          THE COURT:  Uh-huh.

8          MR. CREMONA:  And I think that -- by virtue of

9    that, they can't raise a material issue of fact.  They've

10   conceded them all.

11         We had this discussion on the record and you said,

12   what's left?  And I said, nothing.  If they are willing to

13   do that and they have now done that.

14         And it's been validated by a final order of this

15   Court.  I think that collaterally estops them from rebutting

16   our prima facia case which we've just went over how we've

17   established it.

18         And I think there's a third way in which

19   additional important concessions were made.

20         And let me just back up, Your Honor, because I

21   think it's worth stating.  They've offered nothing to

22   contradict our prima facia case on the Ponzi.

23         What you've said is they articulate the hallmarks

24   of Ponzi are lacking; that, you know, somehow there's a

25   precise definition for a Ponzi.  But they don't put any

1    evidence forward.

2             And I would submit to Your Honor that's a legal

3    determination that you could make based on the facts before

4    you.  So, you absolutely could --

5             THE COURT:   Right.

6             MR. CREMONA:  -- decide as a matter of law that

7    we've met the elements of a Ponzi scheme based on the

8    evidence we've put forward.

9             So, I do think that can be determined as a matter

10   of law because there's no evidence to the contrary; there's

11   no material issue of fact other than conclusory statements

12   that say things about rates of return or treasuries that may

13   have been purchased.

14            But there's no link between any of those

15   generalities to these particular defendants at all; anywhere

16   in the papers or in what's been submitted.

17            I'd also like to point out that there's a third

18   way in which these defendants have conceded issues.  And

19   that is I would ask Your Honor to take judicial notice of

20   defendants' opposition to the Trustee's motion in limine

21   which is at ECF No. 126.

22            And in that opposition at paragraph 12, the

23   defendants conceded, and I will quote from it; that the

24   fraudulent intent is not dispute here.  Rather it is the

25   nature of the fraud.

Page 34

1          And I would submit that by virtue of that

2    concession, they've conceded that all of the transfers here

3    were made with actual intent to defraud.

4          They now are, once again, estopped from rescinding

5    that admission.  They -- that's been pleaded before Your

6    Honor.

7          In that same document, they -- at paragraph or

8    excuse me, at page four, also reiterate their admission

9    that, as a practical matter, for purposes of this adversary

10   proceeding, Mann and BAM have admitted that the transactions

11   in the complaint are accurate.

12         And I read that to mean accurate in terms of

13   receipt, amount and from the debtor.  That's what our

14   complaint alleges.  That's what they've conceded.

15         They -- again, couple that with their withdrawal

16   of the claim with prejudice, the admissions, the fact that

17   they've -- in that -- and, by operation of law, Your Honor,

18   they're bound by the Trustee's determination as I said.

19         And I know you're very familiar with it.  It's

20   attached to our complaint.

21         It says you are advised no securities were traded

22   on your behalf.  You received fictitious profits.  You were

23   paid with other people's money and you withdrew more than

24   you deposited.  All of which are the hallmarks of a Ponzi

25   scheme.

1           So, I'd say each of those independently, in my

2    view, Your Honor, provide us with a basis for Your Honor --

3    provide Your Honor with a basis for granting us with summary

4    judgment as a matter of law.

5           Taken in the aggregate, I think their -- it's

6    irrebuttable.

7           THE COURT:   Okay.  Thank you,

8           MR. CREMONA:  Thank you, Your Honor.  I would just

9    reserve an opportunity to rebut.

10          THE COURT:  Sure.

11          MR. CREMONA:  Thank you.

12          MR. BELL:  Kevin Bell on behalf the Securities

13   Investor Protection Corporation.

14          SIPC supports wholeheartedly the Trustee's

15   position.

16          THE COURT:   Okay.  Thank you.

17          Mr. Ruegger, I think you had a motion or a request

18   to strike a reply declaration?

19          MR. RUEGGER:  That's correct, Your Honor.

20          Arthur Ruegger from Dentons on behalf of the

21   defendants.

22          We made a letter motion to strike, Judge, related

23   to Mr. Sheehan's March 27th declaration and the exhibits.

24   And the reasons are several fold.

25          First, we believe that trying to put that in --

Page 36

1    information in -- factual information in reply is

2    inappropriate.

3              THE COURT:  Well, wasn't it a response to your

4    contention that the account was held in the name of Madoff?

5              MR. RUEGGER: It addressed that issue, Your Honor.

6    But that was not a secret that -- it was first disclosed in

7    our opposition papers.

8              THE COURT:  Well, nor was it a secret that the

9    BLMIS -- that it's a BLMIS account.  You've admitted it.  My

10   recollection is that is was conceded on the record.  It was

11   conceded in the answers.

12             It, frankly, was a non-issue until you put it in

13   which you could have chosen to put in or not put in.

14             MR. RUEGGER:  Well, Your Honor, I --

15             THE COURT:  Your -- look.  It's over moot.

16             What you're really suggesting is that the Trustee

17   sandbagged you by ignoring an issue that I don't think is

18   really an issue in this case.  But we'll find out.

19             But I'm certainly not going to imply that he acted

20   in bad faith or anything like that.

21             The record is spread out in this case and frankly

22   in other cases if you're getting into his intent, that that

23   was a BLMIS account.  He's got reports of experts.  He's got

24   affidavits from J.P. Morgan Chase.

25             So, to suggest that he was lying in the weeds so

Page 37

1    he could put that evidence in in a reply just doesn't make a

2    lot sense.

3              MR. RUEGGER:  Understood, Your Honor.

4              THE COURT:  So, overruled.  What don't you move

5    on?

6              MR. RUEGGER:  The next two arguments we have on

7    that issue were that we'd never seen the declarations

8    before.  They weren't produced in any kind of discovery.

9              THE COURT:  I'm told they're in data room.

10             MR. RUEGGER:  The account statements might be in

11   there.  But my understanding is --

12             THE COURT:  Let me ask you a question.  Do you

13   really think that that account, the 509 account, was a

14   Madoff account as opposed to a BLMIS account?

15             MR. RUEGGER:  If you mean by BLMIS, LLC --

16             THE COURT:  LC, yeah.

17             MR. RUEGGER:  Yes.  I -- I believe it was, Judge.

18   It was certainly a sole proprietorship account and there's

19   no proof -- and we're not aware of any proof, that it was

20   ever shifted over to LLC.

21             THE COURT:  What about the account statements?

22             MR. RUEGGER:  The account statements said BLMIS.

23   They don't say LLC.

24             THE COURT:  I believe they say LLC on them but I

25   have a very simple way to deal with this but go ahead.  Why

Page 38

1    don't you respond to the motion for summary judgment?

2            MR. RUEGGER:  Very well, Your Honor.

3            We believe there are at least two issues of fact;

4    one is the transfers that we've just discussed.  Those

5    checks are -- are Bernard Madoff.  They're not LLC checks.

6            The second issue is whether there is proof of a

7    Ponzi scheme here.

8            We believe that there is a fraud but we believe,

9    for a variety of reasons, there's not sufficient proof of a

10   Ponzi scheme.

11           THE COURT:  Well, that's what Madoff allocated to

12   and so did DiPascali.

13           MR. RUEGGER:  Well, Your Honor, I'm not sure about

14   Mr. DiPascali but that gets to the threshold problem with

15   the Ponzi scheme and that is there's no controlling

16   precedent on the definition of a Ponzi scheme.

17           THE COURT:  Well, but -- okay.  Fair enough.  But

18   Madoff testified that he -- I mean, initially he defrauded

19   people into investing with him; told them he was going to

20   buy equities or treasury notes or whatever.  Didn't do it

21   and simply paid off one investor with another investor's

22   money and he had no -- and it had no business operation.

23   So, what's left?

24           What do you think is missing?

25           MR. RUEGGER:  Your Honor, even if that is

Page 39

1    accurate, I don't think that's a Ponzi scheme.  That's a

2    fraud.

3              THE COURT:  What's missing?

4              MR. RUEGGER:  Needing the new investor's money to

5    pay off old investors who have a --

6              THE COURT:  How do you think --

7              MR. RUEGGER:  -- maturity date --

8              THE COURT:  How do think he paid off the $18

9    billion?

10             MR. RUEGGER:  Well, we do know that he invested

11   the monies that he received in not only treasuries but other

12   securities.

13             THE COURT:  Well whose money did he invest though?

14             MR. RUEGGER:  Obviously, customer money.  But he

15   made -- he had a return on some of that.

16             THE COURT:  But you think -- do you think you're

17   entitled to that if some other customers' money was invested

18   to buy actual T-bills and generate interest?

19             MR. RUEGGER:  Your Honor, I --

20             THE COURT: Or are you saying that because he

21   bought T-bills every quarter, that made it a legitimate

22   business?

23             MR. RUEGGER:  Your Honor, we believe that he had a

24   fraud going which could have gone on and did -- does not

25   have the hallmarks of a Ponzi scheme.

1          He didn't need the new investors to pay off old

2     investors --

3          THE COURT:  But how was he going to pay off the

4     investors?

5          MR. RUEGGER:  He had -- he had, I think at one

6     point, $11 billion.

7          THE COURT:  But where did that come from?

8          MR. RUEGGER:  Well, it -- but it could -- this

9     fraud could go on for --

10         THE COURT:  I understand that.  But he never had

11    anything more than investor money.

12         MR. RUEGGER:  But every fraud in securities fraud

13    is customers' money.

14         THE COURT:  Not necessarily.  He can go out; he

15    can invest it in uranium stock or something like that and

16    puff up the stock.  But there are different types of frauds.

17         MR. RUEGGER:  Well, the fact that it's customer

18    money, Your Honor, we don't think makes it a Ponzi scheme

19    under any of the statutes or the case law.

20         THE COURT:  All right.  I got --

21         MR. RUEGGER:  It was --

22         THE COURT:  I got that.  I understand your

23    argument and I understand your argument that it wasn't a

24    BLMIS, LLC -- a debtor account.  Let's call it a SPIC debtor

25    account.

Page 41

1              Are there any other factual issues that have to be

2        resolved in this?

3              MR. RUEGGER:  There are a number related to the

4        Ponzi scheme, Your Honor.  But if Your Honor has heard

5        enough on that --

6              THE COURT:  But that's factual -- I understand

7        your argument.  But I'm being told that the transfers were

8        made with fraudulent intent.  That is was conceded in the

9        opposition to a motion in limine.

10             MR. RUEGGER:  We have never questioned that there

11       was fraud here.

12             THE COURT:  But what do I need -- but what do I

13       have to know?  If you've admitted that they were transferred

14       with fraudulent intent; on whose fraud?  Who was defrauded?

15             MR. RUEGGER:  Well, we don't believe that the

16       Trustee is entitled to use the Ponzi scheme presumptions of

17       intent.

18             THE COURT:  But -- okay.  Okay.  But you've

19       admitted that the transfers were made with fraudulent

20       intent, I am told, in an opposition to a motion in limine;

21       is that correct?

22             MR. RUEGGER:  I -- no, Your Honor.  If I

23       understood the Trustee's counsel's quote, he's -- we

24       conceded there was fraud.  We do not concede that the --

25             THE COURT:  I understand that.  But I thought that

Page 42

1   what you told me, Mr. Cremona, was that they conceded that

2   the transfers were made with fraudulent intent.

3           MR. CREMONA:  Yes, Your Honor, and I'm happy to

4   hand up a copy of that.  Unfortunately, I only have one copy

5   with --

6           THE COURT:  Why don't you just read into the

7   record what you are referring to?

8           MR. CREMONA:  Okay.

9           Your Honor, it is defendants' response and

10  objections to Trustee's motions in limine, which is ECF

11  docket number 126 filed 11/26/18.

12          And, at paragraph 12, the Trustee also cites a

13  number of cases where guilty pleas of frauds are admitted to

14  establish fraudulent intent.  Fraudulent intent is not

15  disputed here.  Rather, it is the nature of the fraud that

16  is at issue.

17          THE COURT:  So, do I really need the Ponzi scheme

18  presumption if you've admitted that the transfers were made

19  with fraudulent intent?

20          MR. RUEGGER:  Your Honor, we also believe -- I

21  don't believe that we conceded, although --

22          THE COURT:  All right.  I'll look at it.

23          MR. RUEGGER:  This -- we haven't -- this wasn't in

24  the papers.  So, I'm not sort of ready on that one, Judge.

25          THE COURT:  Okay.

Page 43

1              MR. RUEGGER:  But it's -- the Ponzi scheme is one

2     major fact issue.  And there are other aspects that -- of

3     fraud here that were not consistent with a classic Ponzi

4     scheme.  There was no promise of exorbitant returns.  There

5     was an investment by Mr. Madoff.  His fraud was not short

6     lived or inevitably doomed.  I mean, it went on for 15

7     years.

8              If it hadn't been for the financial crisis, it

9     could still be going on.

10             THE COURT:  So, that makes it a -- so, if it's

11    successful fraud, it can't be a Ponzi scheme?  Is that what

12    you're arguing?

13             MR. RUEGGER:  Well, a Ponzi -- a classic Ponzi

14    scheme is that it is short lived and inevitably doomed

15    quickly because you're basically pleading with new investors

16    so you can take that money and pay off old investors.

17             THE COURT:  Isn't that -- but isn't that exactly

18    what he did?  He just didn't do it for either 16 years or 30

19    years depending on who talk to.

20             MR. RUEGGER:  With respect, Your Honor, that's not

21    exactly what he did.  He -- some of these older investors

22    were there for 15 years like the Man, our clients, they were

23    there  --

24             THE COURT:  Like the Pickauers (ph) who wind up

25    having to repay $7.2 billion.

Page 44

1             MR. RUEGGER:  I think there's a lot difference

2     between the Manns and the Pickauers.

3             THE COURT:  No.  I'm just saying the Pickauers

4     were a longstanding customers, investors but, you know, they

5     got a lot of fictitious profits.  Whose money did they get?

6             MR. RUEGGER:  I -- I'm not familiar with the

7     Pickauers enough to --

8             THE COURT:  Okay.  You see what I'm getting at,

9     Mr. Ruegger, is -- didn't he have to be repaying, I'll call

10    them old investors and new investors, it's not exactly right

11    but wasn't he paying -- repaying one investor with another

12    investor's money since the company had no business and the

13    money was never invested or -- to generate actual profits?

14            MR. RUEGGER:  Your Honor, only in the most loose

15    sense.  This is more of a classic fraud, not a classic Ponzi

16    scheme.  Some of his older investors like the Manns, not

17    only started in the 90s but they made investments that --

18    well, into like 2007, 2006.

19            THE COURT:  Right.

20            MR. RUEGGER:  I mean, this is not I'll get you --

21    double your money in 60 days, the classic Ponzi scheme.

22            There wasn't any kind of maturity date.  He --

23            THE COURT:  You don't think that the monthly

24    customer statements were giving that information?

25            MR. RUEGGER:  They were giving what the balances

Page 45

1   were.  They weren't saying, and you're going to paid on a 60

2   day basis.

3                  THE COURT:  But how many months over those

4   whatever number of years, did the Manns lose money?

5                  MR. RUEGGER:  I'm not aware, Your Honor.  I

6   haven't looked at their account statements.

7                  THE COURT:  Okay.

8                  MR. RUEGGER:  And I understand generally there

9   were not losses in the account statements.

10                  THE COURT:  Sounds like a profitable investment.

11                  MR. RUEGGER:  I can't disagree, Your Honor.

12                  THE COURT:  Okay.  All right.

13                  MR. CREMONA:  Your Honor, if I may just -- make a

14   few clarifications.

15                  THE COURT:  Sure.

16                  MR. CREMONA:  One, just on what my colleague, Mr.

17   Ruegger, said about the certifications of the --

18                  THE COURT:  Oh, I want to ask something else.

19                  MR. CREMONA:  Okay.

20                  THE COURT:  Can I ask you something?  And this is

21   -- goes to the collateral estoppel issue.

22                  I always thought that a withdrawal of a claim with

23   prejudice was the equivalent of trying and losing that

24   claim.  Is that right?

25                  MR. RUEGGER:  We don't believe that's true, Your

1    Honor.

2                THE COURT:  Is there a dispute as to that?

3                MR. RUEGGER:  We --

4                MR. CREMONA:  Your Honor, we've cited case law in

5    our papers that say exactly that.

6                THE COURT:  There -- if there --

7                MR. CREMONA:  And Your Honor has previously

8    articulated that on the record.

9                THE COURT:  Yeah.  But I --

10               MR. CREMONA:  I -- we --

11               THE COURT:  -- wasn't deciding anything then.  I

12   just thought that that was what the law was.

13               MR. CREMONA:  Uh-huh.

14               MR. RUEGGER:  Your Honor, at the time of the

15   withdrawal, the net equity decision had come down from the

16   Second Circuit.  It was a final decision.  The adversaries

17   had been started.

18               There was nothing left to decide in front of --

19               THE COURT:  We've been through this already.  Your

20   clients were still contesting the deposits and withdrawals.

21   I dealt with that in the case.

22               And it wasn't until the pre-trial order that they

23   finally agreed that the Trustee's calculations were correct.

24               But my question is the following:  if you -- if

25   your clients' deposited money with BLMIS and only withdrew

Page 47

1    money from Madoff, individually, how could they not have

2    positive net equity?

3              MR. RUEGGER:  Your Honor --

4              THE COURT:  They never withdrew any money.

5              MR. RUEGGER:  They submitted requests for

6    withdrawals and they received checks.

7              THE COURT:  But I thought the Second Circuit said

8    that you have to offset deposits and withdrawals with BLMIS,

9    not from third parties.

10              MR. RUEGGER:  The Second Circuit may have said

11   that, Your Honor, but our point on the transfers is -- is

12   that the Trustee hasn't proved that that was property of the

13   debtor.

14              THE COURT:  Well, none of it was property of the

15   debtor whether it was in a BLMIS account or a Madoff

16   account.

17              MR. RUEGGER:  Well, it wasn't -- it wasn't

18   customer property or debtor's property.

19              THE COURT:  So, you think it really makes a

20   difference if it's customer property if it's held in the

21   account of -- in Madoff's account or it's held in a BLMIS

22   account?

23              MR. RUEGGER:  Well, I think it's at least a -- the

24   Trustee's burden to prove that it's the funds that came from

25   the customers that were used to pay the Manns.

Page 48

1          THE COURT:  Wouldn't -- assuming that it was a --

2     assuming it was a Madoff account, wouldn't the customers

3     simply be subsequent transferees of Madoff?  Of -- of

4     Madoff, yeah.

5          MR. RUEGGER:  I don't know, Your Honor.

6          THE COURT:  Okay.  Or subsequent transferees of

7     BLMIS, I guess.  The money goes to Madoff from BLMIS because

8     that's where it's deposited, right?

9          Madoff steals the money, under your theory, for

10    his personal account and then he pays the customers.

11         MR. RUEGGER:  But, Your Honor, also it's not

12    strictly customer account -- customer money in some of these

13    accounts.  There were earnings from these treasuries, from

14    the other securities.

15         We don't know what was --

16         THE COURT:  Well, you haven't demonstrated that

17    your accounts had any earnings from treasuries.

18         MR. RUEGGER: And -- correct, Your Honor.  But the

19    Trustee's burden is to show that it's --

20         THE COURT:  Well, the Trustee has Madoff --

21         MR. RUEGGER:  -- the Trustee's property.

22         THE COURT:  -- saying everything was fictitious.

23         MR. RUEGGER:  And we disagree with that, too, Your

24    Honor.

25         THE COURT:  I understand you disagree with it.

Page 49

1    But that is evidence.

2         Okay.

3         MR. RUEGGER:  Your Honor, we also -- a new issue

4    in these papers that had not been briefed or discussed

5    before is the issue of whether the Trustee can avoid

6    obligations that arose prior to the two-year reach back

7    period.

8         THE COURT:  Okay.  Is this the UCC argument and

9    the 548(c) argument?

10        MR. RUEGGER:  No, Your Honor.  It's the issue that

11   was teed up in the Kirschner and the Tribune Company

12   conveyance cases.

13        THE COURT:  But those were legitimate obligations.

14        But, you know, we've been through this already.

15   Even if they were obligations, they were obligations owed by

16   BLMIS.  You can't use customer funds to pay BLMIS's

17   obligations.

18        And I'm not even sure -- I don't even think they

19   were legitimate obligations.  I know it -- because SIPA

20   primes the UCC on these issues according to the official

21   comment.

22        And the arguments that these were legitimate

23   obligations have not done very well in the Second Circuit in

24   several cases.

25        MR. RUEGGER:  We don't agree that the -- Your

Page 50

1    Honor, it's our position that whether they're legitimate or

2    illegitimate isn't the (indiscernible) --

3             THE COURT:  Well, what you're saying is the

4    transfers paid legitimate obligations and unless  you avoid

5    the obligations, the transfers are legitimate.  And all I'm

6    saying is that argument's been rejected.

7             Maybe the Second Circuit will take a different

8    view.  One of the cases is going up to the Second Circuit.

9             MR. RUEGGER:  That's our understanding, Your

10   Honor.

11            THE COURT:  But really this is -- you know, this

12   has been decided something like six or seven times already.

13            MR. RUEGGER:  Your Honor, finally on the -- on res

14   judicata, we don't believe res judicata has any

15   applicability here.  It was not the same case.  It's not the

16   same issues.  It's not the same --

17            THE COURT:  Well, but it's the --

18            MR. RUEGGER:  -- claims.

19            THE COURT:  -- same issues in determining whether

20   or not you received fictitious profits because fictitious

21   profits and net equity, positive net equity, are really the

22   same issue; aren't they?

23            MR. RUEGGER:  Net equity is not the same --

24            THE COURT:  Subject to the statute of limitations.

25            MR. RUEGGER:  But the defenses that are -- we

1      contend are available under 548, Your Honor, were not at

2      issue in the -- in that equity decision or --

3                THE COURT:  I agree with you.

4                MR. RUEGGER:  So, it's --

5                THE COURT:  And maybe those defenses are claims

6      against the general estate.  That's what I'm saying.

7                MR. RUEGGER:  But I believe Judge Rakoff also

8      believed that it was a -- there are different claims and

9      different causes of action where res judicata is not --

10               THE COURT:  Okay.  Yes, sir.

11               MR. CREMONA:  Your Honor, just a few minor points.

12               In terms of my colleague, Mr. Ruegger's statement

13     on the declarations of the custodian, those documents were

14     not -- that -- that's not new evidence at all.  They were

15     part of the pre-trial order.

16               THE COURT:  Was there ever a discovery request in

17     these cases?

18               MR. CREMONA: I -- we did exchange discovery.  But

19     the point, I think, Your Honor, is when we submitted the

20     joint pre-trial order, Exhibit A had those custodian

21     declarations.   They were listed at 228, 229 and 230 and

22     Section 7 of the joint pre-trial order specifically says,

23     the parties agree to the authenticity and admissibility of

24     the Exhibits.

25               So, I think he's foreclosed from raising that.  I

Page 52

1   just wanted to point that out.

2           The account statement point that Mr. Ruegger made,

3   he did not believe that they were -- the 509 accounts were

4   in the name of BLMIS.  They are in the name of Bernard L.

5   Madoff Investment Securities and they were sent to the

6   attention of Dan VonVentry (ph) who's the director of

7   operations.

8           THE COURT:  Well, I guess, there's a difference

9   between the accounts, the customer accounts, and the name on

10  the account at Chase Bank.  Don't you have evidence that the

11  name on the accounts at Chase Bank were also BLMIS?

12          MR. CREMONA:  Correct.  That's what I'm referring

13  to.

14          One additional point on the opposition to the

15  Trustee's motion in limine, again, I would ask Your Honor to

16  take judicial notice.  This is a different paragraph, which

17  is paragraph two.

18          And I'll just read it into the record.  Defendants

19  object to the admission of the criminal pleas of

20  Bernard L. Madoff and employees of BLMIS to prove the

21  existence of a Ponzi scheme.  The criminal pleas weight

22  heavily toward treating this case as a case of securities

23  and investor advisor fraud and fail to establish the

24  elements of a Ponzi scheme except for fraudulent intent.

25          That's another instance where they've conceded

Page 53

1   that.

2          And I -- I guess -- I think it's already been

3   discussed at length, I think -- I can go through Madoff's

4   allocution to demonstrate that all of the hallmarks of a

5   Ponzi --

6          THE COURT:  Uh-huh.

7          MR. CREMONA:  -- were testified to.  Those are the

8   crimes he admitted to.

9          He admitted that no transactions were made; that

10  he took money from customers to pay --

11          THE COURT:  Right.

12          MR. CREMONA:  -- other customers.  So, I think

13  that's -- based on the record before the Court, that's been

14  demonstrated.

15          And unless Your Honor has any other questions, I

16  would rest on the papers.

17          THE COURT:  No.  Notwithstanding the admissions,

18  I'm still a little hung up on what this -- resolving this

19  factual issue about whether the bank accounts were in the

20  name of the SIPA debtors or Madoff individually.

21          What I would propose very simply is that you send

22  a notice to admit today that the bank accounts, the 509

23  account, was held by, in the name of, owned by, whatever you

24  want to use, BLMIS, LLC, notwithstanding whatever name

25  appeared on the check.

1        And if they deny it, 30 days from now, we'll have

2   a trial on that issue.  But, you know, then you can seek to

3   the attorneys' fees and the cost of the trial, you know.

4        I don't think there are any other legal -- factual

5   issues.  Putting aside all the res judicata and stuff like

6   that,  I think that Madoff's allocution attest to all the

7   hallmarks of a Ponzi scheme because he says we got the

8   customer money and frauded customers into giving them the

9   money.  The customer -- monthly customer statements were

10  part of the fraud.

11       There were no business operations and he simply

12  repair customer withdrawal requests with other customer

13  money.  And, to me, that's the hallmark of a Ponzi scheme.

14       And I know you mentioned he didn't promise high

15  interest rates but everybody -- frankly, everybody knew what

16  -- what they were getting by investing in Madoff which is

17  why he was able to attract investors.

18       So, I suggest you do that.

19            MR. CREMONA:  Your Honor --

20            THE COURT:  If they want to stick with it, 30 days

21  from now, we'll just have a trial on that issue, of whose

22  account it is.

23            MR. CREMONA:  Your Honor, we're happy to do that.

24  I would just --

25            THE COURT:  I think it's the simplest way because,

1      as I said, I'm leery -- and I understand the admissions.

2      They're not judicial admissions at this point if I consider

3      the pre-trial orders and the amended answer.  They're still

4      admissions though.

5                MR. CREMONA:  Well, but, Your Honor, we should

6      address that issue then.  I thought you denied Mr. Ruegger's

7      motion to -- or you did deny his motion to strike.

8            `    THE COURT:  I denied his motion to strike.

9                MR. CREMONA:  But we should the Rule 15 issue

10     because I think that's meritless and I'm happy to walk

11     through that.

12           `    They -- they've established -- they've asserted

13     that they amended the joint pre-trial order based on one

14     line in there that says, the pleadings --

15                THE COURT:  Right.

16                MR. CREMONA:  -- are amended to incorporate these

17     contentions.

18                Number one, that's inconsistent with with the

19     prior section three of the order that has the stipulated

20     facts that the parties agreed to.

21                Number two, and perhaps more important than that,

22     Rule 15 doesn't apply here.  That's the Rule that --

23                THE COURT:  I agree with you.  There's no --

24                MR. CREMONA:  That's the Rule by which they're

25     trying to amend.

1           THE COURT:  There's a different Rule.

2           If you accept the pre-trial order, the unsigned

3   pre-trial order, as essentially an amended answer, which is

4   what their argument is --

5           MR. CREMONA:  But that's not a valid argument

6   based -- that's based on Rule 15 which does not apply here.

7   That's -- that Rule says, it's either applies at trial or it

8   applies to an un-pleaded issue.  Your Honor but let me just

9   finish.

10          THE COURT:  I think they're making a different

11  argument.

12          They're not saying that I'm trying an issue that

13  was never pleaded and therefore was implied later.

14          MR. CREMONA:  But that's what the Rule requires.

15          THE COURT:  I understand.  But what I understand

16  them to be saying, and maybe Mr. Ruegger can correct me, is

17  that the pre-trial order and their statements and their

18  contentions in the pre-trial order are essentially an

19  amended answer.

20          And to the extent that amended answer is

21  inconsistent with the answers they gave in what they would

22  now call a superseded answer, that it's no longer a judicial

23  admission; although it's still an evidentiary admission,

24  under the law.

25          MR. CREMONA:  Uh-huh.

 1            THE COURT:  Which seems to be the law in the

 2     Second Circuit, if I consider the joint pre-trial order to

 3     be an amended answer.

 4            Forget about, you know --

 5            MR. CREMONA:  Right.

 6            THE COURT:  -- evidence conforming to -- or the

 7     pleadings conforming to the proof.  It's -- I agree with

 8     you; that's got no place here.

 9            MR. CREMONA:  And the cases that they rely upon

10     though, Your Honor, do not carry the day.  They are again,

11     they focus on whether there was an un-pleaded issue; whether

12     the parties consent.

13            Clearly, there was no consent to this issue and

14     these admissions being retracted based on that one sentence.

15     And it's inconsistent with the reading of the document

16     itself.  It would render it internally inconsistent.

17            And, in fact, it would nullify five years worth of

18     admissions.  And we have to graft on top of that, Your

19     Honor, the withdrawal of the claim with prejudice, which

20     establishes that very issue in the Trustee's favor.

21            So, I am sorry to belabor the point --

22            THE COURT:  Okay.

23            MR. CREMONA:  -- but I --

24            THE COURT:  All right.

25            MR. CREMONA:  -- I --

1          THE COURT:  I'll reserve decision.

2          MR. CREMONA:  Thank you, Your Honor.

3          MR. RUEGGER:  Your Honor, can I be heard on the

4    last issues you raised?

5          THE COURT:  Which was what?

6          MR. RUEGGER:  Whether the pre-trial order

7    essentially supersedes the answer; whether we were moot --

8          THE COURT:  Well, it supersedes the issue.

9    Certainly the issues.  I'm not so sure it's an amended

10   answer for what we're talking about.

11          I don't know if it matters, even it is because

12   it's still an admission and you have a lot of this other

13   stuff in the record.

14          But go ahead.  Briefly.

15          MR. RUEGGER:  I understand, Your Honor.

16          Just to be very quick.

17          Our letter of April 11th, which is docket number

18   171 made three arguments as to why the old answers don't

19   control.

20          First, because of the pre-trial order stipulation,

21   the language in that pre-trial order that was submitted to

22   you, it made the parties' contentions conform to the

23   evidence.  This pre-trial order does never in stipulated

24   facts do we stipulate that --

25          THE COURT:  He's not relying on your stipulation.

Page 59

1    He's just saying you admitted it in your answer.

2             MR. RUEGGER:  Right.  So, argument number one; the

3    pre-trial order has a stipulation that no longer controls.

4             Argument --

5             THE COURT:  But -- no, no, no, no.  That's -- that

6    may not be the case.

7             In other words, you have stipulated facts in the

8    pre-trial order.  And fine, those facts are stipulated and I

9    guess you could say to the extent they're inconsistent with

10   an answer you gave, the stipulated facts control.

11            You now have a contention that the transfers were

12   made from Madoff individually as opposed to from the entity

13   or the company.

14            But you -- how -- that doesn't really necessarily

15   affect your answer.

16            MR. RUEGGER:  It does in two ways, Your Honor.

17            THE COURT:  Except to the extent that the answer

18   is conclusive and it prevents you from raising that issue.

19            MR. RUEGGER:  The parties stipulated that the

20   prior pleadings, including our answer was to be deemed

21   amended to conform to the contents.

22            THE COURT:  Okay.

23            MR. RUEGGER:  I can --

24            THE COURT:  I'll take another look at it if that's

25   what it says.

1           MR. RUEGGER:  If -- even if we didn't have that

2   stipulation, the Rockwell case says if you've got a pre-

3   trial order, that supersedes any answer.

4           And, thirdly, those are on Rule 16, not on Rule

5   15(b).

6           THE COURT:  I guess I never -- but I never saw in

7   the pre-trial order, but everybody seems to be relying on

8   it, is there any dispute that I should treat it as an order

9   of the Court?

10          MR. RUEGGER:  I would -- I would ask that you read

11  it carefully, Judge, in terms of what --

12          THE COURT:  Well, I'll certainly read it.

13          Is it -- but I'm asking -- you're relying on it as

14  if it was signed, right?

15          My only question is whether the Trustee takes the

16  same position.

17          MR. CREMONA:  We have no objection, Your Honor.

18          THE COURT:  Okay.

19          MR. CREMONA:  I think -- but it's also important

20  to point out that Rule 16 in that context applies to a final

21  pre-trial order when we're at trial.

22          This is a very unique case where we were going to

23  trial.  Trial was stayed.  Now, we're at summary judgment.

24          So, I don't think the Rule 16 application and that

25  case law have any application to this situation.

Page 61

1          THE COURT:  But you pointed out stipulation to me

2    in the pre-trial order in support of your motion.

3          MR. CREMONA:  Yes but Your Honor articulated on

4    12/18 that we -- that we should utilize those stipulated

5    facts as agreed upon for our purposes of our Rule 56 motion,

6    which we did.

7          THE COURT:  Okay.  All right.  Thank you.

8          I'll reserve decision.

9          I think the easier way is simply to serve them a

10   notice to admit but it'll take ten minutes to try this case.

11   But you proceed how you want.

12         MR. CREMONA:  Thank you, Your Honor.

13         MR. RUEGGER:  Thank you, Your Honor.

14

15      (Whereupon, these proceedings were concluded at 10:57

16   a.m.)

17                        *  *  *  *  *

18

19

20

21

22

23

24

25

Page 62

1

2                        C E R T I F I C A T I O N

3

4    I, Pamela A. Skaw, certifies that the foregoing transcript

5    is a true and accurate record of the proceedings.

6    Pamela A Skaw          Digitally signed by Pamela A Skaw
                            DN: cn=Pamela A Skaw, o, ou,
                            email=digital1@veritext.com, c=US
7    _____    Date: 2019.04.29 14:16:27 -04'00'

8    Pamela A. Skaw

9

10

11

12   Date:  April 29, 2019

13

14

15

16

17

18   Veritext Legal Solutions

19   330 Old Country Road

20   Suite 300

21   Mineola, NY 11501

22

23

24

25