# **Attachment A**

**Internal Purposes Only**

**citigroup**

Global Hybrid Trading

**To:**   Internal

**From:**   Global Hybrid Trading Desk

**Date:**   March 10, 2005

**Re:**   Fairfield Sentry Limited - Leverage Facility Arrangement

---

**Executive Summary**

Auriga International Ltd. ("**Auriga**") – A fund of funds based in Switzerland – has currently a USD 281m exposure to Fairfield Sentry Ltd. ("**Sentry**") – a USD 5.1bio Hedge Fund managed by Fairfield Greenwich Group ("**FGG**"). Sentry is a single strategy hedge fund with currently $5.1 billion AUM. Although a Fairfield fund, the investment strategy is advised by Madoff Investment Securities LLC ("**Madoff**") and implemented through a managed account held with Madoff.

The exposure Auriga has to Sentry is leveraged. Of the USD 281m gross exposure, USD 143m is Auriga's capital, with Bank of America ("**BofA**") financing the balance. Due to a change of business strategy, BofA have notifed Auriga that the trade will be called. Having been invested in Sentry for at least seven years, Auriga wish to maintain their investment exposure and are therefore looking for another finance provider. Citigroup has been approached by one of Auriga's brokers to discuss possible novation of the transaction (the hedge specifically).

**Existing leverage arrangements**

The trade is currently structured as an accreting strike call option, the pay-off of which is indexed to the levered exposure to Sentry (minus financing costs and broker fees). The premium of the option represents the un-leveraged investment ($143mio). BofA hold Sentry shares as the option hedge. The option is rebalanced monthly to maintain a constant debt/equity ratio or 'Gap Risk'. In this example, the Gap Risk is 49% with a lower boundary set at 45%.

**Proposed Terms of Replacement Leverage Facility**

a.   **Term:** 7 years

b.   **Initial Premium:** USD[143m]

b.   **Initial Strike Price:** USD[281m]

c.   **Maximum permitted Strike Price:** USD[x]

d.   **Accretion Rate:** Overnight Libor + 150bps p.a.

e.   **Target Leverage Ratio:** x%

f.   **Maximum Leverage Ratio:** 50%

g.   **Trigger Events:** Various standard events to be included in the final documentation, permitting adjustment or termination of the transaction by Citigroup upon the occurrence of certain specified events.

h.   **Structuring Fee:** 1%

1

CGMH00000584
CMHSAA0000584

Internal Purposes Only

**citigroup**

**Global Hybrid Trading**

i.    **Redemption Penalties:**    Year 1  3%
Year 1  2%
Year 3  1%

**Trade Profitability as proposed**

Minimum profitability in the event that Auriga cancelled the trade early would be c.USD 8.0m

The PV of fees for the proposed term trade would be c.USD 14.5m

**Fairfield Greenwich Group** http://www.fggus.com/

FGG is an established hedge fund group, managing both funds of funds, and individual hedge funds

The group was founded in 1983 and currently has USD 9.0bio HF AUM. As well as investing in third party managers & managing its own funds, FGG also selectively identifies external managers for strategic affiliations – where it may for example buy a portion of the management company. For risk monitoring purposes, FGG obtains portfolio transparency from all managers with whom it partners. It is an employee-owned firm with over 60 employees, 14 of whom are shareholders, and has offices in New York, London, and Bermuda, and representative offices in the U.S., Europe, and Latin America. FGG-related funds have over 900 registered shareholders, including private banks, financial advisors, family offices, pension funds, government authorities, and institutional investors. FGG entities are registered with the U.S. SEC as an investment advisor and broker dealer, and with the U.K. Financial Services Authority as an investment advisor.

**Fairfield Sentry**

1.  Fund Inception                December 1, 1990
2.  Total Fund Assets             USD 5.1bio
3.  Annual Standard Deviation     2.62%
4.  Compound Annual Returns       12.27%
5.  Sharpe Ratio                  2.93
6.  Worst Drawdown                -0.55%
7.  Months to Recover             1
8.  Percentage of Up Months       95.88%
9.  Subscriptions & Redemptions   Monthly, 15 days notice
10. Gates                         No
11. Administrator                 Citco Fund Services (Europe) B.V.
12. Custodian/Broker              Madoff
13. Auditors                      PricewaterhouseCoopers

Performance

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1990 | | | | | | | | | | | | 2.8% | 2.83% |
| 1991 | 3.08% | 1.46% | 0.59% | 1.39% | 1.88% | 0.37% | 2.04% | 1.07% | 0.90% | 2.82% | 0.08% | 1.63% | 18.58% |
| 1992 | 0.49% | 2.79% | 1.01% | 2.86% | (0.19)% | 1.29% | - | 0.92% | 0.40% | 1.40% | 1.42% | 1.43% | 14.67% |
| 1993 | - | 1.93% | 1.86% | 0.06% | 1.72% | 0.85% | 0.09% | 1.78% | 0.35% | 1.77% | 0.26% | 0.45% | 11.68% |
| 1994 | 2.18% | (0.36)% | 1.52% | 1.82% | 0.51% | 0.29% | 1.78% | 0.42% | 0.82% | 1.88% | (0.64)% | 0.66% | 11.49% |
| 1995 | 0.92% | 0.76% | 0.84% | 1.69% | 1.72% | 0.50% | 1.08% | (0.16)% | 1.70% | 1.60% | 0.51% | 1.10% | 12.95% |
| 1996 | 1.49% | 0.73% | 1.23% | 0.64% | 1.41% | 0.22% | 1.92% | 0.27% | 1.22% | 1.10% | 1.58% | 0.48% | 12.99% |
| 1997 | 2.45% | 0.73% | 0.86% | 1.17% | 0.63% | 1.34% | 0.75% | 0.36% | 2.39% | 0.55% | 1.56% | 0.42% | 14.00% |
| 1998 | 0.91% | 1.29% | 1.75% | 0.42% | 1.76% | 1.29% | 0.95% | 0.26% | 1.04% | 1.93% | 0.84% | 0.33% | 13.40% |
| 1999 | 2.06% | 0.17% | 2.29% | 0.36% | 1.51% | 1.75% | 0.43% | 0.94% | 0.73% | 1.11% | 1.61% | 0.39% | 14.18% |
| 2000 | 2.20% | 0.20% | 1.84% | 0.34% | 1.37% | 0.80% | 0.65% | 1.32% | 0.26% | 0.92% | 0.68% | 0.43% | 11.55% |
| 2001 | 2.21% | 0.14% | 1.13% | 1.32% | 0.32% | 0.23% | 0.44% | 1.01% | 0.73% | 1.28% | 1.21% | 0.19% | 10.68% |
| 2002 | 0.03% | 0.60% | 0.46% | 1.16% | 2.12% | 0.26% | 3.36% | (0.06)% | 0.13% | 0.73% | 0.16% | 0.06% | 9.33% |
| 2003 | (0.27)% | 0.04% | 1.97% | 0.10% | 0.95% | 1.00% | 1.44% | 0.22% | 0.93% | 1.32% | (0.08)% | 0.32% | 8.21% |
| 2004 | 0.94% | 0.50% | 0.05% | 0.43% | 0.66% | 1.29% | 0.06% | 1.33% | 0.53% | 0.03% | 0.79% | 0.24% | 7.07% |
| 2005 | 0.51% | | | | | | | | | | | | |

2

CONFIDENTIAL

**citigroup***

Global Hybrid Trading

**Investment Manager**

The Fund's investment manager is Fairfield Greenwich (Bermuda) Ltd., a corporation organized under the laws of Bermuda. It is responsible for the management of the Fund's investment activities, the selection of the Fund's investments, monitoring its investments and maintaining the relationship between the Fund and its escrow agent, custodian, administrator, registrar, and transfer agent.

The investment manager of Sentry utilizes an option trading strategy known as a "split strike conversion." In addition, the investment manager has allocated relatively small portions of Sentry's assets to other strategies typically sub-advised by experienced personnel starting new businesses (the "Seedlings"). Allocations to Seedlings may never exceed, in the aggregate, 5% of Sentry's net asset value at the time of the investment. No single allocation to any Seedling can exceed USD $50,000,000 at the time of the investment.

**Split Strike Conversion ("SSC") Investment Approach:**

Un-leveraged purchase of a basket of stocks drawn from the S&P100 Index; hedged with the contemporaneous establishment of a collar using S&P 100 Index Options



**Madoff Investment Securities LLC** http://www.madoff.com/

Founded in 1960, Madoff is an International Broker Dealer. With more than $500m in capital, Madoff ranks among the top 1% of US Securities firms.

A fixed set of criteria and investment parameters are in place and a non-discretionary brokerage account is open with Bernard L. Madoff Securities who has timing implementation authority for the execution of the strategy. Madoff is both the Prime Broker and Custodian of the SSC assets of Sentry

PTO

3

CONFIDENTIAL

**citigroup**

Global Hybrid Trading

## Annex

### Returns Analysis



FFG_SentryAnalysis.
xls

### Sentry Due Diligence Report



Fairfield Sentry B 2004.pdf

### Sentry Offering Memorandum



"Sentry Offering
Memo.pdf"

### Madoff SEC form



"Madoff SEC form
X-17A-5 2003.pdf"

### Sentry Flip Book



"Sentry book.pdf"

### Directors & Auditors Report Dec 31, 2003



"Fairfield Sentry
2003 Audit.pdf"

4

CONFIDENTIAL

CGMH00000587
CMHSAA0000587

# **Returns Analysis**

(Available Upon Request)

# **<u>Sentry Due Diligence Report</u>**

# FAIRFIELD GREENWICH GROUP

# Fairfield Sentry Fund Ltd. (B Shares)

**Client Contact:**

John Wartman
Fairfield Greenwich Group
919 Third Avenue, 11th Floor
New York, NY 10022
Tel:      1.212.319.6060
E-mail: john@fggus.com

Amit Vijayvergiya
12 Church Street
Suite 606
Hamilton, Bermuda HM 11
Tel: 1 (441) 292-5401
Fax: 1 (441) 292-5413
E-mail: main@fggbm.com

**New York** Main Office
919 Third Avenue
11th Floor
New York, NY 10022
Tel: 1 (212) 319-6060
Fax: 1 (212) 319-0450
E-mail: main@fggus.com

**London** Office
32 Dover Street
5th Floor
London W1S 4NE
Tel: 44 207 409 0090
Fax: 44 207 409 3090
E-mail: main@fgguk.com

**Bermuda** Office
12 Church Street
Suite 606
Hamilton, Bermuda HM 11
Tel: 1 (441) 292-5401
Fax: 1 (441) 292-5413
E-mail: main@fggbm.com

**Greenwich** Office
2 Soundview Drive
Greenwich, CT 06830
Tel: 1 (203) 629-8494
Fax: (203) 629-1395
E-mail: main@fggus.com

**Miami** Office
80 S.W. 8th Street
Suite 2018
Miami, FL 33130
Tel: (305) 373-8123
Fax: (305) 373-8113
E-mail: main@fggus.com

**Rio** Office
Ataulfo de Paiva 482
Suite 603
Leblon 22440-030
Rio de Janeiro, RJ Brazil
Tel: 55 21 2511 5783/5909
Fax: 55 21 2249 9505

**Lugano** Office
Via Maderno 6
6900 Lugano
Switzerland
Tel: 41 91 912 1069
Fax: 41 91 912 1066

**Madrid** Representative Office
Invercounsel, S.L.
Salustiano Olozago #4
Bajo Derecha
28001 Madrid, Spain
Tel: (3491) 578-1804
Fax: (3491) 577-3043
Email: ordonez.counsel@terra.es

**Rotterdam** Representative Office
Stockpart B.V.
Veerhaven 16
3016 CJ Rotterdam
The Netherlands
Tel: (3110) 436-3634
Fax: (3110) 436-0095
Email: fgg@planet.nl

CONFIDENTIAL

CGMH00001286
CMHSAA0001286

# TABLE OF CONTENTS

1)       **General Organizational Information**   3

A)   ADDRESS AND CONTACT INFORMATION ................................................................. 3
B)   OWNERSHIP, EMPLOYEES AND COMPENSATION ................................................. 5
C)   REGISTRATIONS, DOCUMENTS AND LEGAL PROCEEDINGS ........................... 10
D)   RECENT ORGANIZATIONAL CHANGES ................................................................ 11
E)   CLIENT PROFILE ......................................................................................................... 13
F)   MARKETING, CLIENT SERVICE AND REPORTING ........................................... 15

2)       **Investment Strategy and Risk Control** 16

A)   INVESTMENT STRATEGY ......................................................................................... 16
B)   RISK CONTROL AND PORTFOLIO CONSTRUCTION ......................................... 19
C)   MARGIN DEBT, COUNTERPARTIES AND SECURITIES LENDING ................. 23
D)   USE OF DERIVATIVES ............................................................................................... 24
E)   USE OF PRIVATE SECURITIES ................................................................................ 24

3)       **Performance, Valuation and Fees**   25

A)   INVESTMENT PERFORMANCE ................................................................................ 25
B)   VALUATION AND PRICING ..................................................................................... 27
C)   FEES ............................................................................................................................... 28

4)       **Trading, Operations, Technology and Compliance**   29

A)   TRADING AND COMMISSIONS ............................................................................... 29
B)   OPERATIONS (BACK OFFICE) ................................................................................. 30
C)   ADMINISTRATION ..................................................................................................... 31
D)   TECHNOLOGY ............................................................................................................. 32
E)   COMPLIANCE .............................................................................................................. 33
F)   PERSONAL TRADING ................................................................................................ 34

5)       **Authentication**       34

**FGC** | **FAIRFIELD GREENWICH GROUP**

2

CGMH00001287
CMHSAA0001287

# 1) General Organizational Information

## A) Address and Contact Information

1. Manager Name:           Fairfield Greenwich (Bermuda) Ltd. - FGBL
                           (Affiliate of the Fairfield Greenwich Group, FGG)

2. Primary Address:        12 Church Street
                           Suite 606
                           Hamilton, Bermuda HM 11

3. Telephone Number:       1-(441) 292-5401

4. Fax Number:             1-(441) 292-5413

5. E-mail:                 main@fggus.com

6. Internet address:       www.fggus.com

7. Primary Marketing/Client Contact:
   John Wartman

8. Telephone Number:
   1 (212) 319-6060

9. Primary Investment Management Contact:
   Amit Vijayvergiya

10. Telephone Number:
    1 (441) 292-5401

11. Name of person filling in questionnaire:
    Amit Vijayvergiya

12. Telephone Number:
    1 (212) 319-6060

13. Fairfield Greenwich Group Total Assets:
    $5.8 Billion (100% of assets are invested in hedge funds)

14. Fairfield Greenwich (Bermuda) Ltd. Assets:
    $4.2 Billion

15. Number of employees at Firm:
    FGG has 55 employees

 **FAIRFIELD GREENWICH GROUP**

3

16.   Firm's branch offices :

Fairfield Greenwich (Bermuda) Ltd.(FGBL) is an affiliate of the Fairfield Greenwich Group (FGG).  FGG maintains its principal office in New York, with a significant presence in London an Bermuda.  FGG also has representation in Greenwich, CT, Florida, Switzerland, Spain, Brazil, and the Netherlands.

17.   Contact information for the Manager, the Administrator, the Custodian, Legal Counsel, and the Auditor.

INVESTMENT MANAGER

Fairfield Greenwich (Bermuda) Ltd.
12 Church Street
Suite 606
Hamilton, Bermuda HM 11
Telephone:  1 (441) 292 - 5401
Facsimile:  1 (441) 292 – 5413

ADMINISTRATOR/CUSTODIAN/REGISTRAR/TRANSFER AGENT

Citco Fund Services (Europe) B.V.
Telestone 8 – Teleport
Naritaweg 165
1043 BWAmsterdam
P.O. Box 7241  1007 JE Amsterdam
The Netherlands
Telephone: (31-20) 572-2100
Facsimile:  (31-20) 572-2610

U.S. COUNSEL

Law Offices of Andrew E. Goldstein
488 Madison Avenue, 16th Floor
New York, New York 10022
USA

BRITISH VIRGIN ISLANDS COUNSEL
Conyers Dill & Pearman
Romasco Place, Wickhams Cay 1
P.O. Box 3140
Road Town, Tortola
British Virgin Islands

AUDITOR

PriceWaterhouseCoopers
Marten Meesweg 25
3068 AV Rotterdam
The Netherlands

CONFIDENTIAL

## B) Ownership, Employees and Compensation

1. Please provide a brief history of the organization.

In 1983 Walter M. Noel, Jr. established a consulting firm to advise offshore clients in connection with their investments in U.S. based alternative assets. Mr. Noel had previously completed stints in the management consulting business with Arthur D. Little & Co. and the international private banking business with Citibank and Chemical Bank. At Chemical, he created the international private banking group in 1977 and helped establish a network of asset management offices throughout the world, until his departure in 1983.

Following the establishment of his consulting business, Mr. Noel developed a number of relationships with investment managers, e.g. Martin Zweig, Tweedy, Brown & Co., Morgans, Waterfalls & Vintiadis, who he determined had the capital preservation, low volatility characteristics appropriate for his client base.

In 1987, Fred Kolber and Jeffrey Tucker, tenants in Mr. Noel's office space, launched the Greenwich Options Fund ("GOF"), a domestic hedge fund. Mr. Kolber had built a successful business during the prior 25 years managing his own money in a variety of hedge and arbitrage strategies. GOF marked Mr. Kolber's entry into the money management business as he sought to extend to passive investors the opportunity to participate in his trading activities, then focused on market-making in equity and equity index options using a market neutral posture in most positions.

Mr. Tucker had previously been engaged in the practice of law for 17 years, and Mr. Kolber was a client of his firm. In 1987 Tucker joined Kolber as a minority partner of the fund management business, providing assistance in the administration and marketing of GOF.

In 1988 Messrs. Noel, Kolber and Tucker created Fairfield Investment Fund, Ltd. ("FIL"), an offshore counterpart of GOF. The precipitous growth of assets in the funds and the changes being experienced in the equity options markets, i.e. declining liquidity and the increasing influence of the professionals, necessitated a reduction of assets in GOF and FIL. Consequently, Noel, Kolber and Tucker sought and received a mandate from their clients to outsource the management of a portion of the funds. Thereafter, Noel and Tucker embarked upon an effort to identify managers meeting their capital preservation, low volatility approach to investing. Contemporaneous with this effort, the three formed Fairfield Greenwich Group (FGG).

In 1989, FGG became acquainted with the split strike conversion strategy. As the strategy employed "tight" stops (put and call strikes fairly close together) it appeared appropriate for FGG clients. In April 1989, FGG started its relationship with Bernard L. Madoff Investment Securities, Inc., and it incorporated the strategy into a multi-strategy fund. And, in December 1990 the Fairfield Sentry Limited Fund was officially launched as a single-strategy fund employing the split-strike conversion strategy.



5

CONFIDENTIAL

In 1997 the firm was merged with Littlestone Associates of New York City. Following the merger, Littlestone's principal, Andres Piedrahita, established a London office for the UK subsidiary, and became the third partner in the Fairfield Greenwich Group, in addition to Walter Noel and Jeffrey Tucker.

Today the firm's personnel are deployed in New York, Greenwich, London, Miami, Madrid, Rio de Janeiro, Lugano, Bermuda, and Holland. The New York office of the firm is responsible for the review and monitoring of the portfolios of the existing managers, for the identification of possible additional managers, and the marketing the firm's investment products. The Fairfield Greenwich Group (FGG) manages more than $5.8 billion for over 700 holders of record representing over 10,000 investors worldwide. FGG offers single as well as multi-strategy funds.

2.      What is the current legal and ownership structure of the managing organization ?

Fairfield Greenwich (Bermuda) Ltd. is a corporation organized under the laws of Bermuda. It is a wholly owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands. The Fairfield Sentry Limited Fund is domiciled in the BVI, having been incorporated as an International Business Company under the International Business Companies Act of the British Virgin Islands since it was launched in 1990.

3.      List all related entities and the role of each one:

The manager and its affiliates currently serve as investment or administrative manager to numerous funds, and have exclusive distribution arrangements with several others. The following entities are wholly owned subsidiaries of Fairfield Greenwich Limited:

- Fairfield Greenwich (UK) Limited is licensed by the Financial Services Authority (FSA)
- Fairfield Greenwich Advisors LLC is seeking registration with the SEC as an investment advisor during 2003
- Heathcliff Capital Corp., an affiliate of FGL, is registered as a broker dealer in US
- FGL is registered with the CFTC (as a Commodity Pool Operator) and the NFA.

4.      List all key employees, and the role of each one:

Investment idea generation/Research :
Walter Noel, Andres Piedrahita, Jeffrey Tucker, Harold Greisman, Richard Landsberger

Trading :

The Manager has established a non-discretionary account for the Fund at Bernard L. Madoff Investment Securities, Inc. (sometimes referred to as "BLM"), a registered broker-dealer in New York, who utilizes a strategy described as "split strike conversion", to which it allocates the predominant portion of the Fund's



6

assets. This strategy has defined risk and profit parameters, which may be ascertained when a particular position is established.

Risk Control:
Harold Greisman, John Wartman, Amit Vijayvergiya

Finance and Operations :
Rob Blum, Dan Lipton, Gordon McKenzie

Legal :
Mark McKeefry

5.    Provide brief biographies (education and prior employment) of key personnel, including all those listed in being in charge of an area.

### Walter Noel

Mr. Noel has over 30 years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management-consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its offshore private banking business. Since founding FGG, an affiliate of the Fund's investment manager, Fairfield Greenwich (Bermuda) Ltd., in 1983, Mr. Noel has been a Director or General Partner for a variety of its funds, directing marketing activity, and originating various of FGG's business opportunities. Mr. Noel graduated from Vanderbilt University in 1952, received a Master of Arts in Economics from Harvard University in 1953, and graduated from Harvard Law School in 1959.

### Andres Piedrahita

Mr. Piedrahita is a director of the Investment Manager, founded Littlestone Associates in 1991, which merged with FGG in 1997. Mr. Piedrahita directs FGGs European and Latin American activities. Mr. Piedrahita has over fifteen years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997). He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987). He received his Bachelor of Arts degree from Boston University's School of Communications.



CONFIDENTIAL

CGMH00001292
CMHSAA0001292

### Jeffrey Tucker

Mr. Tucker has over twenty years of experience in investment related businesses. Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner in the law firm Tucker, Globerman & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. ("Kolber"), a registered broker-dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's private investment funds. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout FGG's development, Mr. Tucker has been responsible for directing its business and operational development and has been a director or general partner for a variety of its investment funds. Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.has been one of the principals of the Fairfield Greenwich Group since 1988.

### Robert Blum

Mr. Blum oversees or assists in all aspects of FGG's activities, and focuses on product creation as well as operational and related matters. Mr. Blum has over fifteen years of directly relevant operational and legal experience in the alternative asset management arena. He previously worked at CIBC Oppenheimer Corp. (1989-1999) where he was a Managing Director, a member of the firm's Management and Operating Committees, and served in various roles during his career, including Deputy General Counsel. At CIBC Oppenheimer, Mr. Blum had extensive business responsibility (including management and operational roles) and legal involvement in the development of a wide range of transactions and businesses in the alternative and conventional asset management areas. Mr. Blum began his career as an associate in the law firm of Fulbright & Jaworski (1984-1989). Mr. Blum received his Bachelor of Arts degree from the University of Pennsylvania and his JD from the University of Chicago Law.

### Harold Greisman

Mr. Greisman is the Chief Investment Officer of FGG, focusing on manager selection and risk oversight. Mr. Greisman has over fifteen years of experience in the investment business. Prior to joining FGG in 1990, Mr. Greisman was an Associate in the Capital Markets Group of Continental Bank (1984-1985) and then worked for DNB Capital Corporation (1985-1990), a proprietary private equity and venture capital operation controlled by Den Norske Bank. Mr. Greisman began his career at Johnson & Higgins, a large industrial insurance brokerage (1978-1982). Mr. Greisman received his Bachelor of Arts degree from

 **FAIRFIELD GREENWICH GROUP**

8

CGMH00001293
CMHSAA0001293

Tufts University and his MBA degree from the Stern School of Business
at New York University.

### Richard Landsberger

Mr. Landsberger has over 20 years of experience in mapital markets.
Prior to joining FGG in 2001, Mr. Landsberger was Managing Director
of Fixed Income Sales at PaineWebber (1993-2000).  Mr. Landsberger
previously was Managing Director and Head of Fixed Income
Government Trading & Sales at Citicorp Securities (1989-1992).  Mr.
Landsberger received his Bachelor of Arts degree from Boston
University and his MBA from Cornell University.

### Mark McKeefry

Mr. McKeefry is General Counsel for the Group.  He joined FGG in
2003 after eight years in private practice in New York and California,
specializing in regulatory and compliance issues for onshore and
offshore funds. He is the author of several articles on hedge fund
compliance issues and investment advisor trading practices. Mr.
McKeefry received his Bachelor of Science from Carnegie Mellon
University in 1984 and his *Juris Doctor* from Fordham University in
1997, where he was a member of the Law Review. He was admitted to
the Bar in California and New York and is based in the New York office.

### John Wartman

Mr. Wartman focuses on quantitative research and risk management. Mr.
Wartman has over 20 years experience in capital markets and risk
management. Prior to joining FGG, he was Director of Risk Management
at InvestorForce. From 1996 to 2000, he was a Principal at American
Management Systems where he worked on enterprise-wide risk
management consulting. From 1984 to 1996, he was a Senior Vice
President at Prudential Securities where his business focused on
derivatives and risk management. From 1980 to1984, Mr. Wartman
worked at money center banks as a currency trader and corporate advisor
to Fortune 100 corporations. Mr. Wartman holds a MIM degree from the
American Graduate School of International Management and an AB
from Brown University.

### Daniel Lipton

Mr. Lipton is a Certified Public Accountant.  Prior to joining FGG in
January 2002, Dan was a senior manager at Ernst and Young, LLP where
he primarily audited, consulted and analyzed numerous hedge fund
clients.  Mr. Lipton received his Bachelor of Arts degree in Economics
from Tufts University and his M.B.A. degrees in Accounting and
Finance from the Stern School of Business at New York University.

### Amit Vijayvergiya



**FAIRFIELD GREENWICH GROUP**

9

CGMH00001294
CMHSAA0001294

Mr. Vijayvergiya is Vice President and the Risk Manager of the
Investment Manager and focuses on manager selection and risk
management for the Fund. He has been employed by the Manager since
2003. Mr. Vijayvergiya has over 9 years of experience in asset
management, risk management and operations research. Prior to joining
the Manager, from 2000 to 2003, Mr. Vijayvergiya managed MAV
Hedge Advisors, a family office investing in traditional and alternative
investment managers. From 1998 to 2000, he was the General Manager
of LOM Asset Management ("LOM AM"), where he oversaw the
management of $160 million in assets. At LOM AM, Mr. Vijayvergiya
structured and managed several multi-manager funds and served on the
firm's management and investment committees. He began his business
career in 1994 with a position in operations research at Canadian
National Railways. Mr. Vijayvergiya received a Masters in Business
Administration from Schulich School of Business at York University, a
Bachelors of Science in Statistics from the University of Manitoba and a
Bachelors of Arts in Economics from the University of Western Ontario.
Mr. Vijayvergiya holds the Chartered Financial Analyst designation and
the Financial Risk Manager certification.

6.    Are all employees potentially eligible to become owners/partners? What
      determines eligibility for ownership/partnership?

      Yes. The criteria are subjective, but based upon individuals' demonstrated ability
      to enhance enterprise value. Currently, 13 employees are shareholders.

7.    Do any of the owners or employees invest their personal capital in the firm's
      investments?

      In general, 70% of Partners' liquid net worth is invested in the FGG funds.

8.    Do any of the firm's principals have other business involvements? If so, what
      fraction of their professional time is allocated to the firm ?

      No.

## C) Registrations, Documents and Legal Proceedings

 **FGG** **FAIRFIELD GREENWICH GROUP**

10

1. Which regulatory agencies (i.e. SEC, IMRO) has the organization registered with? What is the date of registration for each ?

   - Fairfield Greenwich (UK) Limited is licensed by the Financial Services Authority (FSA) (FGGUK was authorised and regulated from October 1998 under IMRO, Investment Management Regulatory Organisation, which was merged in December 2001 into the Financial Services Authority. (FSA)
   - Heathcliff Capital Corp. is registered as a broker-dealer with the SEC and NASD (April 2001)
   - Fairfield Greenwich Advisors LLC is seeking registration with the SEC during 2003.

2. Does the company have any other registration?

   Yes, FGL is registered with the CFTC as a Commodity Pool Operator.  It is also registered with the National Futures Association.

3. Is any material, criminal, civil or administrative proceeding pending or threatened against the firm, its funds, or any of its principals? If so, please provide a detailed explanation.

   No.

4. Has any material, criminal, civil or administrative proceeding been settled by the firm, its funds, or any of its principals in the past ? If so, please provide a detailed explanation.

   No

5. Please provide the following documentation.

   a) Offering Memorandum
   b) Subscription Document
   c) Audited Financial Statements, Auditors Reports and Management Letter
   d) Form ADV (all parts) if applicable
      - Not yet SEC registered
   e) Organizational Chart – see FGG brochure.
   f) Written policies regarding insider trading – see appendix.
   g) Insurance (Fidelity, D&O, Errors and Omissions).  List amounts and carrier (AIG, XL, Travelers, HCC - $5MN each)

## D) Recent Organizational Changes

1. Have you had any significant changes to your organization over the past year such as a merger, a strategic alliance, or an internal reorganization?

   Fairfield Sentry Limited (the "Fund") is organized as an international business company under the laws of the Territory of the British Virgin Islands ("BVI"). The registered office of the Fund is located in the BVI. There are three signifcant


FAIRFIELD GREENWICH GROUP

11

CONFIDENTIAL

CGMH00001296
CMHSAA0001296

changes over the past year :

a)   Shares of the Fund's Class B Common Stock (the "Shares") are being offered at a
     price equal to the Net Asset Value (as hereinafter defined) as of the opening of
     business on the date of issuance. The Fund initially sold Shares on February 1,
     2003, at an initial offering price of U.S. $1,000 per Share.
     The Fund also issues Class A Shares, which utilize the same investment strategy
     as the Class B Shares, but have a different fee structure. The Fund initially sold
     what are now its Class A Shares on November 30, 1990 at an initial offering
     price of $200 per share.

b)   As of July 1, 2003, Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or the
     "Manager"), a corporation organized under the laws of Bermuda, serves as the
     Fund's investment manager. It is the wholly-owned subsidiary of Fairfield
     Greenwich Limited ("FGL"), an exempted company organized under the laws of
     the Cayman Islands, which previously served as the investment manager of the
     Fund. Jeffrey H. Tucker, Walter M. Noel, Jr. and Andres Piedrahita are the main
     principals of FGL.  Mr. Noel is also a Director of the Fund. FGBL expects to
     make application with the Bermuda Monetary Authority to become licensed as
     an investment provider and has made a claim for no-action relief from
     registration as a commodity pool operator with the U.S. Commodity Futures
     Trading Commission.

c)    The Manager, in its sole and exclusive discretion, may allocate a portion of the
      Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset
      Value at the time of investment) to alternative investment opportunities other
      than the account at Bernard L.Madoff Securities ("the "Non-BLM Investments")
      as part of a new manager seeding initiative. It is anticipated that the Non-BLM
      Investments will be allocated among several managers, with no single allocation
      exceeding $50 million at the time it is made. These arrangements may include
      "lock-up" provisions of varying durations of these assets in such investments,
      subject to early release for breach of risk control or performance guidelines, or
      for cause. The Fund will pay fees with respect to the Non-BLM Investments at a
      rate that will not exceed the Fund's rate of fees  (in certain cases, this may be
      accomplished by the Manager subsidizing, from its own moneys, the fees
      charged on these assets by Non-BLM Investment managers). The Manager and
      its affiliates may separately benefit from these Non-BLM Investment
      arrangements.

2.  List the names and responsibilities of employees who have joined or departed the
    fund over the past twelve months.

    No departures of professional staff this year.  Hired within the last 12 months :

    Mark McKeefrey          General Counsel
    Patrick Blake           Risk Analyst
    Amit Vijayvergiya       Finance/Accounting
    Gordon McKenzie         Finance/Accounting
    Kathleen Barker         Administrative/Client Service


FAIRFIELD GREENWICH GROUP

12

CGMH00001297
CMHSAA0001297

| | |
|---|---|
| Agnes Loteta Dimandja | Administrative |
| Andrew Ludwig | Communications/Reporting |
| Jason Elizaitis | Technology/Infrastructure |
| Lauren Ross | Marketing Support |
| Annie Hudson | Marketing Support |
| Mami Hidaka | Marketing |
| Marko Musciacco | Marketing |
| Stephan Muuls | Marketing |
| Kim Perry | Marketing |
| Ron Thomann | Marketing |

Summarize the gains and losses of employees over the past five years in the table.

| | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| Employees Added | 15 | 15 | 7 | 5 | |
| Employees Lost | 0 | 1 | 0 | 0 | 0 |
| Total Number | 55 | 40 | 26 | 19 | 14 |

3.  Plans for expansion in the near future (next two years):

   As AUM grow and FGG adds managers and rolls out new product offerings, analysts, accounting, performance reporting, and client services personnel may be added.

## E) Client Profile

1.  Do you have domestic qualified plan (ERISA or similar) investors in your offshore funds?

   No.

2.  Do you accept money in your offshore funds from domestic (i.e. onshore) funds of funds that are composed entirely of qualified plan (ERISA or similar) investors?

   No.

3.  Summarize your client base.

   FGG has more than 700 holders of record representing private and commercial banks, insurance companies, government authorities, financial advisors, family offices, and other institutional investors. An estimated 1/3 are institutional investors.

4.  Do you manage separate accounts?

   FGG does manage separate accounts for various non-Sentry funds. To justify the time and effort, account minimum is usually U.S.$50 million.



13

5. Are separate account investors allowed to choose a custodian/prime broker?
If yes, which prime brokers are you most comfortable working with?

Yes.

6. List the amount of firm assets gained/lost over the past 5 years:

| Year | Total Assets |
|------|--------------|
| 2003* | 5.8 Billion |
| 2002 | 5.2 Billion |
| 2001 | 4.3 Billion |
| 2000 | 3.17 Billion |
| 1999 | 2.48 Billion |
| 1998 | 1.65 Billion |
| * A/O 8/31/2003 | |

The Fairfield Greenwich Group in its underlying funds has over 700 holders of record representing banks, family offices, government authorities, and institutional investors. These relationships may represent over 8,000 individual investors.

7. List the number of clients and the amount of assets gained/lost over the past 5 years for the specific product being considered, Fairfield Sentry Fund. Specify the reasons for each loss.

| AUM | | | # of Clients* |
|-----|--|--|---------------|
| 2003 | | | |
| Q3 | $ | 4.2  BN | |
| Q2 | $ | 4.2  BN | |
| Q1 | $ | 4.1  BN | |
| 2002 | | | 603 |
| Q4 | $ | 4.0  BN | |
| Q3 | $ | 3.9  BN | |
| Q2 | $ | 3.7  BN | |


**FGG  FAIRFIELD GREENWICH GROUP**

14

CONFIDENTIAL

| Q1 | $ | 3.6 | BN | |
|----|---|-----|----|--|
| 2001 | | | | 585 |
| Q4 | $ | 3.5 | BN | |
| Q3 | $ | 3.4 | BN | |
| Q2 | $ | 3.4 | BN | |
| Q1 | $ | 3.3 | BN | |

| | AUM | | | |
|----|---|-----|----|--|
| 2000 | | | | 527 |
| Q4 | $ | 3.1 | BN | |
| Q3 | $ | 2.9 | BN | |
| Q2 | $ | 2.7 | BN | |
| Q1 | $ | 2.5 | BN | |
| 1999 | | | | 449 |
| Q4 | $ | 2.4 | BN | |
| Q3 | $ | 2.3 | BN | |
| Q2 | $ | 2.1 | BN | |
| Q1 | $ | 1.9 | BN | |
| 1998 | | | | 359 |
| Q4 | $ | 1.6 | BN | |

\* class A shares, class B shares were initiated in February 2003.

## F)  Marketing, Client Service and Reporting

1. How are the funds marketed?  Are any third party marketers used to market the funds?  How are they reimbursed?

   The Fairfield Greenwich Group has been marketing the offshore fund.  While the fund may engage a placement agent to market the fund, due to the limited capacity of this fund, third party sales have become limited. Each month, redemptions are replaced with new investments. Retrocessions are paid to outside sales agents.

2. List all reports and correspondence that are sent routinely to clients. How often are they sent?

   Weekly NAV Estimates (generated in-house by Fairfield Greenwich Bermuda Ltd.)
   Monthly NAV (provided by CITCO)
   Monthly Value at Risk reports
   Monthly Tear Sheets



**FGG   FAIRFIELD GREENWICH GROUP**

15

Annual Report
Annual Audit

3.  What level of transparency is routinely offered to clients?

    Full risk transparency is provided to meet the clients' needs, with some
    restrictions determined on a case-by-case basis.

4.  Will you offer complete transparency on a monthly basis to a fund of funds to
    facilitate aggregation for the purposes of risk profiling if the fund of funds reveals
    only its aggregate long and short positions to clients with a delay?

    Will be considered on a case-by case basis.

5.  Additional services?

    Additional material is often sent to clients during periods of unusual market
    conditions.

## 2)    Investment Strategy and Risk Control

### A)    *Investment Strategy*

1.  Do you employ a single investment strategy or is your fund a multi-strategy fund?
    Explain your strategy.

    The Fund is a single investment strategy that seeks to obtain capital appreciation of
    its assets principally through the utilization of a non-traditional options trading
    strategy described as a modified "split strike conversion", to which the Fund allocates
    the predominant portion of its assets.  This strategy has defined risk and profit
    parameters, which may be ascertained when a particular position is established. Set
    forth below is a description of the "split strike conversion" strategies ("SSC
    Investments").

    The establishment of a typical position entails (i) the purchase of a group or basket of
    equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the
    sale of out-of-the-money S&P 100 Index call options in an equivalent contract value
    dollar amount to the basket of equity securities, and (iii) the purchase of an
    equivalent number of out-of-the-money S&P 100 Index put options.  An index call
    option is out-of-the-money when its strike price is greater than the current price of
    the index; an index put option is out-of-the-money when the strike price is lower than
    the current price of the index.  The basket typically consists of approximately 35 to
    45 stocks in the S&P 100.

    The logic of this strategy is that once a long stock position has been established,
    selling a call against such long position will increase the standstill rate of return,
    while allowing upward movement to the short call strike price.  The purchase of an
    out-of-the-money put, funded with part or all of the call premium, protects the equity
    position from downside risk.



FAIRFIELD GREENWICH GROUP

16

CONFIDENTIAL

A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 puts and calls. The further away the strike prices are from the price of the S&P 100, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks.

The options transactions executed for the benefit of the Fund may be effected in the over-the-counter market or on a registered options exchange.

The Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value at the time of investment) to alternative investment opportunities other than its modified "split strike conversion" investments (the "Non-SSC Investments"). It is anticipated that the Non-SSC Investments will be allocated to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding $50 million at the time it is made. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines, or for cause. FGBL and the Fund generally share in fees received by portfolio managers of Non-SSC Investments from investors other than the Fund. The Fund will pay fees with respect to the Non-SSC Investments at a rate that will not exceed the Fund's rate of fees (in certain cases, this may be accomplished by FGBL subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers).

2.  Are the market inefficiencies you exploit present continuously or do they appear sporadically? What market environments favor or hinder the availability of investment opportunities?

    This strategy performs best in a market with an upward bias with moderate volatility. The strategy requires modest market volatility for opportunistic implementation in a tactical sense.

    A relatively unfavorable situation would be a stagnant market with no volatility. Also, extreme downside market leaves little opportunity for success for this strategy. However, in such cases, the manager can raise cash levels and wait for more favorable market conditions.

3.  How are investment ideas generated and how are they implemented? What are your primary sources of research? What securities and instruments are used to implement your views?

    The Fund's investment process is not driven by research, but rather market timing. A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 puts and calls. The further away the strike prices are from the price of the S&P 100, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks.

4.  Do you use any external investment sub-advisors? If you do, identify them, describe their contribution to your investment process, and describe how their performance and compliance with your investment guidelines are monitored.



FGG    FAIRFIELD GREENWICH GROUP

17

CONFIDENTIAL

No sub-advisors on the split strike conversion strategy which is 95% of the fund,
however, the fund may seed new managers with 5% of the funds assets not to exceed
$50 million per manager. These managers undergo an extensive due diligence
process and investment parameters are jointly developed with the manager and these
are closely monitored on an ongoing basis by the risk team. As a requirement of the
seeding agreement, these managers must provide full position transparency.

5.  Describe your criteria for a new investment.  Are your investment criteria purely
    objective (i.e. all investments that meet a fixed set of criteria are entered into) or are
    they partially or wholly subjective (i.e. investment criteria are not entirely pre-
    determined and/or each investment is considered on its own merits possibly using its
    own unique set of criteria)

    The manager will remain in cash if an opportunity does not appear. A fixed set of
    criteria and investment parameters are in place and a non-discretionary brokerage
    account is open with Bernard L. Madoff Securities who has timing implementation
    authority for the execution of the strategy.

6.  Are new investments considered in isolation (i.e. purely as a good long holding) or as
    part of a hedged basket (e.g. as one leg of a market neutral pair)?

    If a basket of stocks is purchased, an equivalent number of puts with the same
    notional value as the basket of stocks must be purchases at the same time.  One is
    never considered in isolation of the other.  The sale of the calls to finance the
    purchase of the puts and to enhance the "stand still" rate of return of the overall
    strategy may be delayed depending on the relative bullishness at the time of
    execution. The manager tries to take advantage of each investment opportunity with
    this structure.

7.  What is the expected return of the portfolio? How do you arrive at this number?

    For most FGG funds, the return objective is two to three times the risk free rate. The
    risk free rate is a good indicator of the current risk/reward ratio for any given
    investment period.

8.  How and when are existing positions in the portfolio closed out?

    The positions are usually held until expiration of the options when the total strategy
    is closed. If the manager remains bullish on the market, new option positions may be
    established at new strike prices while keeping the underlying basket of stocks. The
    stocks at all times will be covered with protective puts. If the manager determines no
    opportunity exist for further appreciation of the portfolio, the manager may go
    completely into cash until further opportunities develop.

9.  What level of turnover do you experience?  What is your average holding period?

    The portfolio may turnover as much as once per month due to the fact that usually the
    options have a one-month time horizon.



18

However, in general the strategy is implemented about 6-7 times each year, staying invested in T-Bills the remaining time.

10. What fraction of a day's trading volume do you limit your positions and trades to?

There is no stated limit because trades are only made in very liquid securities being S&P 100 stocks.

11. What is the capacity of your strategy, and what is the primary determinant of this? At what level of assets will the fund be closed to new investors? At what level of assets will the fund be closed to existing investors?

The Fairfield Sentry strategy has been closed for direct investment for two years. Direct investment has only been allowed up to the amount of redemptions from the strategy.

In February 2003, FGG introduced a new class of shares, Fairfield Sentry Class B. In the event that capacity in the Fund now opens up through redemptions by current investors, FGG can accommodate new investments into the Fund through the Class B shares. The Class B shares have a 1% management fee.

However, the fund has continued to be accessible through our multi-strategy products.

12. Do you hold any illiquid securities such as 144a stock?

No.

13. What is the minimum, average and maximum exposure to cash? How is cash managed?

This strategy calls for being 100% in U.S. Treasury bills with less than 9 months to maturity if the strategy is not being implemented.

14. What are your borrowing costs and what do you earn from your short rebate?

Not applicable in this strategy.

The Investment Manager of the Fairfield Sentry Fund has established non-discretionary trading accounts for the Fund at Bernard. L. Madoff Investment Securities, Inc. ("BLM"). These cash accounts do not permit the use of margin or borrowings against assets in the accounts and are ring-fenced from other non-Sentry accounts at BLM (i.e. no co-mingling of assets).

## B) Risk Control and Portfolio Construction

1. How do you view risk and how is it controlled? Do you have a risk manager? Do you use quantitative tools for risk control? If so, how are they used?


**FGG**   FAIRFIELD GREENWICH GROUP

19

CGMH00001304
CMHSAA0001304

Due to the collar used in this modified split strike conversion strategy, the portfolio has defined risk/reward parameters. The portfolio is not subject to extreme market movements due to the nature of the long protective put and the short call position. However, risk is measured and monitored in an exhaustive qualitative as well as quantitative manner by FGG, who uses an outside third party vendor, to calculate VaR analysis and stress tests on the portfolios. The risk team monitors positions and this risk data to determine that the portfolio is within investment guidelines. Investment risk is monitored for all FGG moderate return, low volatility strategies. To that end, FGG oversight determines that all investments are within pre-determined investment guidelines.

This holds true for all non-SSC managers in the fund as well. Extensive due diligence is performed on these managers due to the strategic alliances formed between them and FGG, allowing for full transparency and disclosure of investment, business and operating risk. Additionally, they have operating guidelines that provide a peak to trough drawdown limit of 10%.

Also, should the Fairfield Sentry Fund's aggregate position in all non-SSC managers be in deficit, at the end of any annual period, against their original investment amount, Fairfield Greenwich Limited will temporarily forego receipt of all performance fees that it would otherwise receive on the overall appreciation of the Fairfield Sentry Fund in subsequent fee periods until such time as the Fairfield Sentry Fund's initial investment level in those non-SCC funds is recovered from fees foregone by FGL and/or subsequent aggregate Non-SCC fund investment appreciation. FGL will recapture the previously delayed performance fees to the extent that there is subsequent aggregate Non-SCC fund investment appreciation.

2.  Do you calculate VaR and do you Stress Test the portfolio?

    Yes. Every month, FGG performs Monte Carlo VaR calculations with a 95% confidence interval and a one-month time horizon. In addition, to determine the portfolios sensitivity to extreme market events , FGG applies 4 stress tests to the portfolio.  The report can then be set up to slice the portfolio by a number of dimensions so that the FGG risk group can aggregate and disaggegate the risk to analyze the sources of risk in the portfolio. Risk numbers are also tracked over time to determine a "risk profile" for each manager and compare the risk number to the return.

3.  Do you have risk limits for market risk?

    No we do not have a defined limit, but we do monitor the risk profile of the portfolio over time through many calculations. FGG's main concern is not with a particular risk number as much as a major variation in the profile of the fund. A variation in the risk profile of the fund can be caused by a market event, such as increased volatility or by the manager deviating from their established trading and investment profile.



FGG    FAIRFIELD GREENWICH GROUP

20

CGMH00001305
CMHSAA0001305

4. How do you view diversification and how is your view reflected in your portfolio?

Diversification can be observed in the Fund's investment restrictions:

   i. no more than 10 percent of the Net Asset Value of the Fund will be invested in the equity or debt securities of any one issuer (other than any government or governmental agency);

   ii. the Fund may not hold more than 10 percent of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

   iii. no more than 10 percent of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty, in each case calculated at the time of investment;

   iv. no more than 10 percent of the Net Asset Value of the Fund may be invested in securities whose prices are not quoted;

   v. no more than 10 percent of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

   vi. the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Manager collectively own in excess of 5 percent of such securities;

   vii. the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

   viii. the Fund will adhere to the general principle of diversification in respect of all of its assets;

   ix. the Fund will not invest directly in real property;

   x. the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) except with the consent of the custodian of the Fund's assets; and

   xi. no more that 10 percent of the Net Asset Value of the Fund will be invested in physical commodities.

5. What is the minimum number of long and short positions in the portfolio? How many long and short positions are currently in the portfolio?

This portfolio is made up of long stock, long put options, and short call options. The fund will hold a basket of stocks, between 40 and 50, to replicate the S&P 100 index.



21

CONFIDENTIAL

CGMH00001306

CMHSAA0001306

6.  How are hedges constructed?  Does each long position have a corresponding short position or do you view the portfolio as a long basket offset by a short basket?

The hedging of the portfolio of long only stocks is created with a collar of OEX, S&P 100 index options.  When a basket of stocks is purchased, a protective collar is always purchased, with the notional value of the long put options equivalent to the market value of the underlying basket. The sale of an out of the money call finances the purchase of the protective put and enhances the stand still rate of return.

7.  How many positions (long/short) does the portfolio hold, what is the range of permissible gross exposure (minimum/maximum/historical average) to a single security?

Please refer to investment restrictions listed in question 4.  Gross exposure to a single security will not exceed 10% of the NAV.  Generally, the basket of stocks resembling the S&P 100 is generally composed of around 40-50 stocks.

8.  What is the range of permissible gross exposure to a single industry or sector?

The basket of stocks consists of U.S. equities represented on the S&P100 index. These equities exhibit an overall correlation in excess of 95% to the S&P100 index at the time of trade completion and represent a market capitalization of at least 75% of the total market capitalization, as measured by Standard & Poors, of the S&P100 index components at the time of trade completion.  The portfolio typically exceeds these guidelines and exhibits a correlation to the index of over 99%.

Given these correlation and market capitalization requirements, both industry and sector exposure resemble that of the S&P 100 Index.

9.  Is the portfolio beta neutral in each sector? If not, is there an allowable range of sector betas?

The portfolio does not aim to be beta neutral in each sector.

10. What is the allowable range for the net market exposure (minimum/maximum/historical average) of the portfolio?

Gross exposure of the fund ranges from 0% to 100%, as the fund is either in cash or fully invested. However, the fund is not subject to extreme market movements due to the nature of the option coverage.

11. What level of leverage (minimum/maximum/historical average) do you employ? How do you define leverage? Does it include off balance sheet items?

No leverage is on the modified split strike conversion strategy portion of the fund (95%+).  However, non-SSC managers to which the fund may allocate up to 5% of its capital may use leverage.  The non-SCC investment vehicles in which the fund


**FGC**  FAIRFIELD GREENWICH GROUP

22

invests may borrow funds in connection with their investment strategies. However, all FGG managers must still adhere to the FGG leverage limits that are low relative to competitors.

12. What is the volatility (minimum/maximum/historical average, measured by annualized standard deviation) of the portfolio?

The standard deviation of the fund is under 3% for the over 13 year record of the Fund.

13. Approximately, how long does it take to sell all portfolio securities for redemption request?

The portfolio operates in extremely liquid markets, the S&P 100 stocks. Redemptions require a 15-calander day notice period and can be accommodated in an orderly manner with no disruption expected to the fund or other investors. In addition, because there are over 600 holders of record representing thousands of investors, the likelihood that the entire portfolio would be redeemed is extremely low.

14. Maximum Drawdown?

Fairfield Sentry Class B, adjusted for the 1 and 20 fee structure, strategy's largest drawdown has been 64 basis points since 1990. Recovery took only two months.

15. How often is the portfolio rebalanced?

The portfolio is reviewed daily, particularly, in order to maintain the correlation of the basket of stocks to resemble the S&P 100.

## C)    *Margin Debt, Counterparties and Securities Lending*

1. Who are your lenders for margin, and what relationship if any do they have to the firm, its principals, or any of the firm's funds? Do you have multiple prime brokers?

Bernard L. Madoff Investment Securities acts as the prime broker for at least 95+% of the assets. Goldman/Morgan Stanley/Refco are prime brokers for the remaining assets, since October 1, 2002. Each seeded manager may select their own prime brokers. As of October, 1, 2003, about 2% of the fund has been allocated to seedling managers.

2. Do you use exchange traded instruments or OTC? List a breakdown of which instruments are exchange traded or OTC.

The strategy employs S&P 100 stocks and OTC options.

3. How do you evaluate counterparties and how do you monitor counterparty risks? Do your counterparties have trading limits? How often are counterparties reviewed?



FAIRFIELD GREENWICH GROUP

23

CGMH00001308
CMHSAA0001308

For the OTC options, there is a list of approved counterparties. Only well capitalized investment banks are used as counterparties. There are counterparty trading limits and the bank's creditworthiness is reviewed regularly.

4. Do you engage in securities lending? If so, please provide us with a written set of lending guidelines. What fraction of the portfolio's return can be attributed to securities lending?

No.

## D) *Use of Derivatives*

1. Do you use derivatives to implement your investment decisions?

Fairfield Sentry uses OTC S&P 100 index options as an integral part of its strategy.

2. If you do use derivatives, do you maintain a written derivatives policy statement?

The use of S&P 100 options is an integral part of the strategy and strict but simple guidelines dictate the use of these options. When the basket of stocks is purchased, out of the money S&P index put options must be purchased in equal amounts. Out of the money calls are sold to finance the purchase of the puts and to increase the stand still rate of return of the portfolio.

3. Please list all derivative instruments that are used and explain why are they used instead of physicals. Can you quantify the benefit of using derivatives instead of physicals?

A collaring strategy is used to hedge the portfolio by overlaying the basket of stocks with an S&P 100 index collar. (Sale of out of the money OEX calls, purchase of out of the money OEX puts.)
The put options, funded in part with the proceeds of the sale of the calls and any dividend stream, protect the equity position from downside risk. The dollar value underlying these option positions always approximates the value of the basket of stocks.

4. If futures are used, are they used expressly for hedging or are they used to generate unhedged returns as well? Furthermore, is the aggregate open interest monitored?

No other derivatives are used.

## E) *Use of Private Securities*



24

CGMH00001309
CMHSAA0001309

1. Do you invest in private securities or private placements of public securities? Do you invest in such securities only when no public equivalent exists?

   The SSC portion of the fund invests only in liquid public securities. The non-SSC portion has managers who may invest in a very small amount of private securities.

2. If you invest in private securities, estimate the expected advantage to the portfolio relative to holding a similar public security.

   N/A

3. What is the range of permissible gross exposure (minimum/maximum/historical average) to private securities?

   N/A

4. Where are private securities held?

   N/A

5. How are private securities valued and how is their risk estimated?

   N/A

6. What is the average holding period for private securities and what exit strategies are used to dispose of them?

   N/A

## 3) Performance, Valuation and Fees

### A) *Investment Performance*

1. Please provide the monthly performance history for the product, from inception, net of all fees and expenses.

   Please see current tear sheet.



25

2.  Does the performance history represent actual investment results? Is any portion of it simulated?

    Actual strategy performance is indicated, which provides the track record for Fairfield Sentry Fund, A Shares. The actual performance net of fees and expenses for Fairfield Sentry Fund, B Shares, starts with the inception of the fund in February, 2003.

3.  Was any portion of the performance history generated at a prior employer? If so, can the track record be substantiated?

    No.

4.  Do the performance records reflect the investment decisions of a single individual or a team? If an individual made the decisions, identify that individual. If made by a team, identify the team. If there have been changes to the individual or the team over the course of the track record, attribute the track record appropriately.

    The investment committee mentioned earlier makes investment decisions.

5.  Are your returns AIMR compliant? If the returns are AIMR compliant, are they compliant at Level I or Level II?

    No.

6.  Who computes the performance and the NAVs for the funds? If you manage separate accounts, who computes the performance of the composite?

    FGG employs a common fund administrator, CITCO. CITCO independently computes monthly performance and NAVs for FGG funds as well as separate accounts. However, weekly estimated NAV numbers are calculated by the Finance Group at FGG.

7.  What index is the portfolio benchmarked to, and what are the expected and realized tracking errors relative to the benchmark?

    Fairfield Sentry is an absolute return strategy whose target return is 2 to 3 times the risk free rate.

8.  What caused the three highest monthly returns and the three largest drawdowns?

    The strategy is a market timing strategy. Class B is identical to Class A in every respect except for the 1.00% management fee. The performance record of Class B is the actual Class A returns back to December 1990 adjusted for the 1% management fee. The three highest returns for Class B were 3.29%, 3.01%, and 2.79% and the largest drawdowns were 0.64%, 0.44% and 0.24%. There are only 11 monthly drawdowns in this entire period.

    The return is dependant on catching a market upturn. In the best months, the returns were allowed to run by adjusting the strike price of the written calls. In the down



FGG    FAIRFIELD GREENWICH GROUP

26

months, although the losses were minimal, the market move did not cover the cost of implementing the option coverage or the stock basket never reached a profitable position during the month.

## B.    *Valuation and Pricing*

1.  What is the frequency of valuation for liquid instruments? Is pricing performed using an independent source? If so, please indicate the source. Is pricing corroborated by independent sources (e.g. administrator and prime broker)?

    Liquid instruments, S&P 100 stocks, make up over 95% of the portfolio. The seedling manager trade in liquid securities as well by mandate. The portfolio is priced daily by the prime broker and the manager. Weekly estimate NAVs are calculated by FGG. Pricing is independently verified by the fund administrator, CITCO, who issues an NAV, monthly.

2.  How are individual securities valued (i.e. bid, ask, midpoint, primary exchange closing price, composite closing price)?

    S&P 100 stock prices are readily available and are priced at the exchange closing prices.

3.  How is collateral valued?

    Usually cash.

4.  How is the dealer priced portion of the portfolio substantiated?  Who substantiates it, and how are discrepancies in estimated value resolved?  Is the value recorded at the bid, the ask or the mid-point?

    N/A.

5.  What is the average bid/ask spread for dealer-valued securities in your portfolio?

    N/A

6.  What is the frequency of valuation for illiquid instruments?  Please describe your procedure for valuing them.  Are these valuations adjusted to reflect for the cost of trading the security?

    N/A.  The fund does not invest in illiquid securities.


FAIRFIELD GREENWICH GROUP

27

CONFIDENTIAL

7. How are ratings assigned to unrated securities?  How are these ratings reviews?

N/A

## C.    *Fees*

1. What are the minimum and maximum levels of investment in your funds for an institutional (ERISA) investor?

   Minimum investment in the Fairfield Sentry Fund is $100,000. Currently there are no ERISA investors.

2. Describe all fee arrangements with existing clients in your onshore funds, offshore funds and separate accounts. Include management fees, performance fees (including any hurdle rates and/or high water marks), subscription and redemption fees and any other fees that apply, and the corresponding frequency at which they are paid. Does a minimum level of fees apply?

   Subscribers to Fairfield Sentry Fund, Ltd., B Shares, pay the following fees:

   Management Fee:    1%
   Performance Fee:    20%
   Subscription and Redemption Fees:  No
   High Water Mark:    Yes
   Hurdle Rate:        No

3. When does a client pay management fees and performance fees?

   Management and performance fees are paid on a quarterly basis.

4. Do all clients pay the same level of fees or do some have special negotiated fee arrangements?  If negotiated fee arrangements exist, does the fund obtain any goods or services in return?

   All clients pay the same fees in Class B shares.

5. Describe your withdrawal and lock-up policies.  Are they different for your domestic and offshore funds.

   FGG funds offer monthly redemptions and subscriptions.  There are no lock ups.



28

## 4)    Trading, Operations, Technology and Compliance

### A)    *Trading and Commissions*

1. Who among the Firm's employees can authorize a trade? Who among the firm's employees can actually execute a trade?

   Amit Vijayvergiya, Andres Piedrahita, Jeffrey Tucker, Rob Blum, Dan Lipton

2. How are authorized trades communicated to the trader? What instructions are given, and how are unauthorized trades prevented and/or detected?

   Trades require two signatures. The manager maintains a non-discretionary brokerage account with Bernard L. Madoff Securities that has strict trading parameters outlined. BLM Securities has timing execution discretion. Trade confirms are reconciled immediately.

3. How are the primary back office functions (trading, accounting, settlement and custody) segregated among the back office staff? How do you ensure that back office professionals cannot execute jobs that they are not authorized to perform (e.g. a trader settling a trade)?

   Trading is not considered a "back office function." Settlement, accounting and custody are segregated functions by design.

4. What sources of liquidity are used to execute a trade?

   Since the split strike conversion portfolio is comprised of extremely liquid securities, liquidity is not much of a concern. However, the trading staff always works the orders in a manner as to minimize market impact. Many execution systems are used both electronic and traditional.

5. How are trades communicated to the custodian/prime broker? If you have more than one prime broker, you have a tri-party agreement in place? How and why are trades allocated between prime brokers?

   In the hedge fund community the prime broker is usually the custodian. In this case the manager does not use separate executing brokers and executes all trades at the prime broker.

6. What are your brokerage policies? Do you have a preferred list of brokers? What is your average level of commission?

   Trades are made through Bernard L. Madoff Investment Securities, Inc., a registered broker-dealer in New York. Brokerage commissions are 4 cents per share.

7. Do you ever share in commissions by accepting a rebate?

   No.

 FAIRFIELD GREENWICH GROUP

29

CGMH00001314
CMHSAA0001314

8. Do you use soft dollars? If so, what do you use them for? Are all your soft dollar expenses permissible under Section 28-E's safe harbor ruling?

No.

9. Do you allow clients to direct brokerage?

No.

## B)    *Operations (Back Office)*

1. Are trades confirmed by your firm or by your prime broker? Who receives telephone confirmation of fills? Are written confirms reviewed manually, and if so how?

With regard to this fund, prime broker and executing broker are the same. Trades are confirmed back to the manager. All written confirms are reviewed manually by back office staff.

1. How are fills at a single broker and at a single price allocated between accounts?

Fills will be split electronically amongst accounts.

2. How are partial fills and multiple partial fills at different prices allocated among accounts?

These types of fills are averaged electronically and allocated equally among accounts.

3. What controls are in place to ensure that none of your funds or accounts is treated preferentially?

Equal treatment is ensured through computer driven allocations among accounts.

4. How often are portfolio holdings reconciled? What software, if any, is used to perform reconciliations?

Portfolio holdings are reconciled daily. Proprietary software is used.

5. How often are accrued interest, dividends and short interest rebates reconciled?

Accrued interest, dividends and short interest rebates are reconciled weekly by the manager and monthly by the administrator.

6. Is the daily trade blotter reconciled with the prime broker's daily activity statement? What checks are in place to ensure that trade information is recorded in the accounting system?


**FGG    FAIRFIELD GREENWICH GROUP**

30

CONFIDENTIAL

Yes the daily trade blotter is reconciled with the prime broker's daily report. The prime broker reports daily and reconciles with the administrator as well as the manager.

7.  Are monthly broker statements reconciled with custodial records before monthly performance calculations are performed?  How are unreconciled items dealt with?

Yes, with regard to Fairfield Sentry, the executing broker and the prime broker are the same and reconcile with the manager and the administrator daily.

8.  What records of order placement are maintained and for how long?

Records are maintained indefinitely.

9.  Who authorizes the movement of cash and securities?  Is this done completely independently of the reconciliation function?

Andres Piedrahita or Amit Vijayvergiya have authorization. This function is completely independent of reconciliation. Secondary authority rests with Dan Lipton, rob Blum and Jeffrey Tucker.

10. What mechanisms are in place to facilitate the availability of funds for redemption?

Due largely to the liquidity of the portfolio, the manager is able to raise significant amounts of cash for redemptions.

## C)    *Administration*

1.  Do you administer your funds internally or do you have an administrator?

CITCO is the fund administrator.


2.  If you administer your funds internally

   a)   Are your accounting practices consistent with industry norms
        N/A

   b)   What software platform do you use?
        N/A

3.  If you use an administrator

   a)   Do they independently compute the NAV?  How do they get values for dealer priced and illiquid securities?  Do they work with one or more prime brokers to verify valuations for dealer priced and illiquid securities?

        CITCO is the common fund administrator across all FGG managers. CITCO has a unit that prices all securities independently. The portfolios are in liquid securities, which are generally easier to price.



FGG    FAIRFIELD GREENWICH GROUP

31

CONFIDENTIAL

CGMH00001316
CMHSAA0001316

CITCO rechecks all dealer prices using three pricing sources: Reuters, Bloomberg and IBC. CITCO's prices are the final prices used in calculation of the NAV.

b) What software platform do they use?

Citco uses an internally developed platform developed in conjunction with Paul Tudor Jones.

4. Are accounts maintained on a cash or accrual basis?

Accrual basis.

5. How many days after the end of each month is an NAV or a performance report available?

By the 20th of the following month, the NAV is available. Estimates are also available on a weekly basis.

## D)    Technology

1. Does the investment process require computer technology to allow its implementation or can it be performed manually in large part?

It can be performed manually.

2. How often do you backup your computer systems? Are backup tapes maintained off-site? Do you have a formal disaster recovery plan?

All data is stored at FGG's main locations: NY and London. NY and London have identical data centers, with full network functionality available in either location. The data is replicated between NY and London, with redundant Internet connections in both locations. All operational data is replicated between our New York and London sites every 1/2 hour. Daily backups are taken at both locations. Weekly backup tapes are taken off site, and monthly backup tapes are exchanged between the two locations.
A plan and facilities are in place in case of emergency. Essential US personnel relocate to the Greenwich, Connecticut office, while remaining personnel worldwide work from home. All personnel are trained to connect remotely to either the NY or London site in the event of a loss at the other. All other fund accounting and agent payment systems are housed at CITCO Fund Services, which is subject to its own extensive disaster recovery procedures audited by PricewaterhouseCoopers.

3. Are your computer systems maintained by an in-house IT staff or is this function outsourced?

Daily maintenance and operations are performed by an in-house staff. The staff is responsible for all global satellite offices and coordinating local outsourcers for direct

 **FGG**  FAIRFIELD GREENWICH GROUP

32

CGMH00001317
CMHSAA0001317

support.  Additional support and 24-hour global network monitoring are supplied by
Omega Network Services.

### E)    *Compliance*

1.   Who is responsible for regulatory compliance?

Rob Blum, Mark McKeefry, John Donachie are responsible for legal and compliance
issues regarding the Fairfield Greenwich Group.

2.   What procedures are in place to ensure regulatory compliance?

At the portfolio level, compliance issues are procedural in nature and all regulatory
filings have been made. One of our principal partners, Jeffery Tucker, was an SEC
lawyer for a number of years and Rob Blum was a general counsel at an alternative
investment firm for over 10 years.

3.   How are compliance violations handled?

We have not encountered any violations largely because of the close monitoring by
our compliance group.  However, if we were to encounter a situation, we would
correct the situation immediately.

4.   Have you been the subject of any investigations, public or private, by the SEC,
NASD, CFTC, NFA, any exchange, or any state, federal or foreign authority?

No.

5.   Have you had any correspondence with the SEC, NASD, CFTC, NFA, any exchange,
or any state, federal or foreign authority other than routine registration
correspondence?

No.

6.   Have you ever been audited by the SEC, NASD, CFTC, NFA, any exchange, or any
state, federal or foreign authority?

No.

7.   Has any regulatory action ever been taken against the firm?

No.

8.   Has the firm ever settled any insurance claims?

No.

9.   Have all relevant Blue Sky filings been made?



33

Yes.

### F)    *Personal Trading*

1. Do principals and employees trade for their own accounts? Is this monitored and are records maintained?

   Yes, personal accounts are permitted. However, monthly statements from outside brokerage firms need to be reported monthly to ensure compliance.

2. Are any proprietary (i.e. house) or employee orders placed along with client orders?

   No.

3. Do you have policies that govern personal and proprietary trading?   If so, describe them or attach a copy of a document containing them.

   Yes, see appendix.

## 5)    Authentication

I certify that all the statements made above are true to the best of my knowledge.

Signature of person who filled this form:  Amit Vijayvergiya

Name of person who filled this form:    Amit Vijayvergiya

| Date: | 10/13/02 | (441) 292-5362 |
|-------|----------|----------------|

*Appendix:    Insider Trading; Personal Account Trading section from FGG Employee Manual*

A critical extension of the confidentiality policies discussed above (within the FGG Employee Manual) involves the knowledge and trading use of material inside information regarding a public company, also known as insider trading.   Insider trading is a matter of paramount importance to regulators and the credibility of the capital markets.   Use of inside information can result in criminal and civil penalties to both you and the firm and are grounds for immediate dismissal.  The problem of insider trading is often attributable to intentional or negligent leaks of confidential information to market participants and their agents (lawyers, accountants, etc.).  Material non-public information generally takes two forms: (1) information about events or circumstances relating to a public company's business, assets, revenues or earning power or plans which is known only to corporate management and its confidants, and which can reasonably be



**FAIRFIELD GREENWICH GROUP**

34

CONFIDENTIAL

expected to impact materially the market price of the company's securities ("inside information"), and (2) information about events or circumstances which affect the company or its market but which emanates from sources or events outside of the company, i.e. significant block transactions, tender offers, etc...("market information").

Generally, information with respect to earnings, losses, lawsuits, mergers, tenders, market transactions and substantial financing has been considered material. Additionally, front running (see Section 2.1, above) is a prohibited activity that, in certain instances, may be analogous to insider trading. Any employee or consultant who believes that he/she may have acquired material inside information cannot use such information and should promptly disclose it to appropriate FGG senior management personnel.

In addition to these principles, you should be mindful of other personal trading limitations or conditions that may have been separately communicated to you by the Company including, for FSA-regulated employees, manager pre-approval of personal trades, and for NASD-regulated employees, providing copies of brokerage account statements.

---

**FGG** | **FAIRFIELD GREENWICH GROUP**

35

CONFIDENTIAL

CGMH00001320
CMHSAA0001320

# **<u>Sentry Offering Memorandum</u>**

*Confidential Private Placement Memorandum*

## FAIRFIELD SENTRY LIMITED

*A British Virgin Islands International Business Company*

*Securities Offered: Redeemable, Voting Shares*

*Minimum Investment per Subscriber: U.S. $100,000*

*Purchase Price per Share: Net Asset Value per Share*

**Investment Manager**
*Fairfield Greenwich (Bermuda) Ltd.*

**Administrator**
*Citco Fund Services (Europe) B.V.*

*SHARES OF THE FUND MAY BE OFFERED TO PERSONS WHO ARE NEITHER CITIZENS NOR RESIDENTS OF THE UNITED STATES AND TO A LIMITED NUMBER OF UNITED STATES INVESTORS CONSISTING OF PENSION AND PROFIT SHARING TRUSTS, CHARITIES AND OTHER TAX-EXEMPT ENTITIES.*

*THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. THEY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF ANY JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS.  THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE FUND'S ARTICLES OF ASSOCIATION.  THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY, NOR HAS ANY SUCH AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.*

*The date of this Confidential Private Placement Memorandum is as of October 1, 2004.*

**Fairfield Greenwich (Bermuda) Ltd.**

CGMH00001338
CMHSAA0001338

## COMMODITY POOL OPERATOR NO-ACTION RELIEF

PURSUANT TO NO-ACTION RELIEF ISSUED BY THE COMMODITY FUTURES TRADING COMMISSION, FAIRFIELD GREENWICH (BERMUDA) LTD. ("FGBL") IS NOT REQUIRED TO REGISTER, AND IS NOT REGISTERED WITH THE COMMISSION AS A CPO.  AMONG OTHER THINGS, THE NO-ACTION RELIEF REQUIRES THIS CPO TO FILE A CLAIM OF NO-ACTION RELIEF WITH THE NATIONAL FUTURES ASSOCIATION AND THE COMMISSSION.  IT ALSO REQUIRES THAT AT ALL TIMES EITHER:  (A) THE AGGREGATE INITIAL MARGIN AND PREMIUMS REQUIRED TO ESTABLISH COMMODITY INTEREST POSITIONS DOES NOT EXCEED TWO PERCENT OF THE LIQUIDATION VALUE OF THE POOL'S PORTFOLIO; OR (B) THE AGGREGATE NOTIONAL VALUE OF THIS POOL'S COMMODITY INTEREST POSITIONS DOES NOT EXCEED FIFTY PERCENT OF THE LIQUIDATION VALUE OF THE POOL'S PORTFOLIO. YOU SHOULD ALSO KNOW THAT THIS REGISTRATION NO-ACTION RELIEF IS TEMPORARY.  IN THE EVENT THE COMMISSION ADOPTS A REGISTRATION EXEMPTION RULE THAT DIFFERS FROM THE NO-ACTION RELIEF, FGBL MUST COMPLY WITH THAT RULE TO BE EXEMPT FROM CPO REGISTRATION.  IF FGBL DETERMINES NOT TO COMPLY WITH THIS RULE, IT MUST EITHER REGISTER WITH THE COMMISSION OR CEASE HAVING THE POOL TRADE COMMODITY INTERESTS. A REASONABLE OPPORTUNITY TO TRADE FOR LIQUIDATION ONLY WILL BE PROVIDED.

CONFIDENTIAL

CGMH00001339
CMHSAA0001339

## CERTAIN GENERAL INFORMATION

The Shares offered hereby (the "Shares") will be issued only on the basis of the information in this Confidential Private Placement Memorandum and any attachments hereto (the "Memorandum"). No other information about Fairfield Sentry Limited (the "Fund") has been authorized. Any investment in the Fund on the basis of information that is not contained, or which is inconsistent with, the information herein shall be solely at your risk. The delivery of this Memorandum does not imply that any information herein is correct at any time after the date hereof.

You should inform yourself of the legal requirements and tax consequences within the countries of your residence or domicile for the purchase, holding or sale of the Shares, and any foreign exchange restrictions. Shares that are bought by persons not entitled to hold them in accordance with the provisions herein may be compulsorily redeemed. No Shares may be transferred without the prior written consent of the Directors.

The distribution of this Memorandum may be restricted by law in certain countries. You must inform yourself of and observe any such restrictions. You should review the Country-Specific Notices contained herein for any applicable notices for your countries of residence or domicile. This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which the offer or solicitation is not authorized, or to any person to whom it is unlawful to make the offer or solicitation.

No person is authorized to give any information with respect to the Fund unless authorized by the Directors. This Memorandum supersedes any written or verbal information relating to the Fund.

You should not construe this Memorandum as legal or investment advice. You should consult your own attorneys, accountants and other advisers regarding this investment.

This Memorandum describes certain documents relating to this investment, including various executed and unexecuted documents and certain statutes, rulings and regulations. Such summaries do not purport to be complete and are qualified in their entirety by reference to the full text of those documents, statutes, rulings and regulations.

You and your investment representatives are invited to ask questions of and to obtain additional information from the Administrator (Citco Fund Services (Europe) B.V.) or Investment Manager (Fairfield Greenwich (Bermuda) Ltd.) concerning the Fund, including additional information to verify the completeness or accuracy of the information in this Memorandum.

All references herein to $ are to United States dollars.

iii

CONFIDENTIAL

The Fund is incorporated as an International Business Company under the International Business Companies Act of the British Virgin Islands. The Fund constitutes a "professional fund" as defined in the Mutual Funds Act, 1996 (as amended) of the British Virgin Islands (the "BVI Act") and as such is required to be and is recognized as a "professional fund" under the provisions of the BVI Act. Such recognition does not entail supervision of the investment performance or portfolio of the Fund by the Financial Services Commission of the British Virgin Islands (the "BVI"), which accepts no responsibility for the financial soundness of the Fund or the correctness of any statements or opinions expressed herein. There is no financial obligation or compensation scheme imposed on or by the Financial Services Commission of the BVI in favor of or available to the investors in the Fund.

As an entity regulated under the BVI Act, the Fund will be subject to the supervision of the Financial Services Commission in the BVI, which is authorized by the BVI Act to direct the Fund to furnish information or provide access to any records, books or other documents which it deems necessary to ascertain compliance with the BVI Act or any regulations made under the BVI Act.

The BVI Act provides that the Fund's certificate of recognition may be cancelled if, among other things, the Fund has breached the BVI Act or any regulations or codes of conduct, or conditions of its certificate, has been convicted of an offense, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound up or dissolved.

Because the Fund is a professional fund under the BVI Act, whose shares are listed on the Irish Stock Exchange, the Shares may be held only by persons who are "professional investors" within the meaning of the BVI Act and the Irish Stock Exchange, and on the basis that the initial investment in the Fund by each of its shareholders is not less than $100,000. A professional investor is any person whose ordinary business involves, whether for his own account or for the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund (in this case, investment instruments), or who has signed a declaration that he, whether individually or jointly with his spouse, has a net worth in excess of $1,000,000, or, if an institution, $5,000,000 or its equivalent in any other currency, and that he consents to being treated as a professional investor. In addition, in order to comply with rules of the Irish Stock Exchange, an investor will have to represent that he has knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in the Fund, that he is aware of such risks and can bear the loss of the entire investment.

This is a private offering made only on delivery of this Memorandum to the prospective investor whose name appears on the cover hereof. This Memorandum may not be reproduced or used for any other purpose. Any distribution of this Memorandum in whole or in part, or the divulgence of any of its contents, is unauthorized. By accepting delivery of this Memorandum, you agree to return it to the Fund if you do not invest.

iv

CONFIDENTIAL

CGMH00001341
CMHSAA0001341

# TABLE OF CONTENTS

Page

CERTAIN GENERAL INFORMATION ............................................................................iii

FUND DIRECTORY ......................................................................................................vi

MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS ..................................... 5

INVESTMENT POLICIES ............................................................................................... 8

OFFERING OF THE SHARES ....................................................................................... 10

FEES, COMPENSATION AND EXPENSES...................................................................... 13

ESCROW BANK AND CUSTODIAN .............................................................................. 14

ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT............................................. 15

RISK FACTORS ........................................................................................................... 16

POTENTIAL CONFLICTS OF INTEREST ....................................................................... 20

PRIOR TRADING RESULTS ......................................................................................... 21

DESCRIPTION OF SHARES .......................................................................................... 21

DIVIDEND POLICY ..................................................................................................... 21

TRANSFERS, REDEMPTIONS AND TERMINATION....................................................... 21

ANTI-MONEY LAUNDERING REGULATIONS .............................................................. 23

ANTI-MONEY LAUNDERING POLICIES ...................................................................... 23

TAX CONSIDERATIONS AND EXCHANGE CONTROL ................................................... 25

LEGAL MATTERS....................................................................................................... 28

MISCELLANEOUS ...................................................................................................... 28

COUNTRY-SPECIFIC NOTICES ................................................................................... 31

v

CGMH00001342
CMHSAA0001342

# FUND DIRECTORY

| | |
|---|---|
| THE FUND | Fairfield Sentry Limited<br>c/o Codan Trust Company (B.V.I.) Ltd.<br>P.O. Box 3140<br>Romasco Place, Wickhams Cay<br>Road Town, Tortola<br>British Virgin Islands |
| INVESTMENT MANAGER | Fairfield Greenwich (Bermuda) Ltd.<br>12 Church Street<br>Suite 606<br>Hamilton, Bermuda<br>Telephone: 441-292-5401<br>Facsimile: 441-292-5413 |
| ADMINISTRATOR; REGISTRAR<br>AND TRANSFER AGENT | Citco Fund Services (Europe) B.V.<br>Telestone 8 -Teleport<br>Naritaweg 165<br>1043 BW Amsterdam<br>The Netherlands<br>Telephone: (31-20) 572-2100<br>Facsimile: (31-20) 572-2610 |
| U.S. COUNSEL | Law Offices of Andrew E. Goldstein<br>488 Madison Avenue, 16th Floor<br>New York, New York 10022<br>USA |
| BRITISH VIRGIN ISLANDS COUNSEL | Conyers Dill & Pearman<br>Romasco Place, Wickhams Cay 1<br>P.O. Box 3140<br>Road Town, Tortola<br>British Virgin Islands |
| AUDITORS | PricewaterhouseCoopers<br>Marten Meesweg 25<br>3068 AV Rotterdam<br>The Netherlands |
| PAYMENT BANK | Citco Bank Nederland, N.V. Dublin Branch<br>Custom House Plaza, Block 6<br>International Financial Services Centre<br>P.O. Box 6639<br>Dublin 1<br>Ireland<br>Telephone: 353 (0) 1 636 7100<br>Facsimile: 353 (0) 1 636 7102 |

vi

CONFIDENTIAL

CUSTODIAN

Citco Global Custody N.V.
Telestone 8 – Teleport
Naritaweg 165
1043 BV Amsterdam
The Netherlands
Telephone: (31-20) 572-2200
Facsimile: (31-20) 572-2629

CONFIDENTIAL

CGMH00001344
CMHSAA0001344

## SUMMARY

*The following Summary is intended to highlight certain basic information which is set forth more fully elsewhere in this Confidential Private Placement Memorandum and, accordingly, should be read in conjunction with such detailed information.*

### THE OFFERING

**Issuer**

Fairfield Sentry Limited (the "Fund") is organized as an international business company under the laws of the Territory of the British Virgin Islands ("BVI"). The registered office of the Fund is located in the BVI.

**Securities Offered**

The Fund's redeemable, voting shares (the "Shares") were sold on November 30, 1990 at an initial offering price of U.S. $200 per Share and thereafter have been sold at a price equal to the Net Asset Value (as hereinafter defined) as of the opening of business on the date of issuance.

**Offerees**

Shares may be offered only to experienced and sophisticated investors who are neither citizens nor residents of the United States ("Non-U.S. Persons") and to a limited number of United States investors that are tax-exempt entities ("U.S. Tax Exempt Investors"). See "OFFERING OF THE SHARES".

**Minimum Subscription**

The minimum initial subscription per investor is U.S. $100,000. Following his initial investment, a shareholder may make additional investments in amounts of not less than U.S. $50,000.

**Maximum Capitalization**

The Fund will not accept a subscription tendered at a time when the number of its outstanding Shares is 10,000,000.

**Subscription Procedures**

It is preferable that subscriptions be made by wire transfer. However, subscriptions may be made by mail if necessary. Subscriptions received during any monthly period prior to the third to the last business day of the month will ordinarily be accepted, subject to the sole discretion of the Manager, as of the first business day of the following monthly period, i.e., subscriptions received between December 29 and January 28 will be accepted as of February 1. Subscriptions will become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund.

CONFIDENTIAL

| | |
|---|---|
| **Solicitation of Subscriptions** | There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents or other intermediaries. Such unaffiliated placement agents and intermediaries may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned by Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), as Investment Manager, which they may rebate to their clients. FGBL or an affiliate may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent or FGBL and such amounts will not constitute part of the assets of the Fund. |
| **Business Objective** | The Fund will seek to achieve capital appreciation of its assets through the purchase and sale of securities principally by utilizing an options trading strategy described as "split strike conversion". See "INVESTMENT POLICIES". |
| **Investment Manager** | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or the "Manager"), a corporation organized under the laws of Bermuda, serves as the Fund's investment manager. It is the wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL"), an exempted company organized under the laws of the Cayman Islands, which previously served as the investment manager of the Fund. Jeffrey H. Tucker, Walter M. Noel, Jr. and Andres Piedrahita are the main principals of FGL. Mr. Noel is also a Director of the Fund (see "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS"). FGBL expects to make application with the Bermuda Monetary Authority to become licensed as an investment provider and has made a claim for no-action relief from registration as a commodity pool operator with the U.S. Commodity Futures Trading Commission. |
| **Directors** | Walter M. Noel, Jr., Jan R. Naess and Peter P. Schmid are the Directors of the Fund. Mr. Noel is a Director of the Manager. |
| **Citco** | Citco Fund Services (Europe) B.V., an affiliate of The Citco Group Ltd., acts as payment bank, administrator, registrar and transfer agent for the Fund. The Fund's bank account is maintained at Citco Bank Nederland, N.V. Dublin Branch. |
| **Dividend Policy** | It is anticipated that the Fund will not declare any dividends; rather, income will be reinvested and will be reflected in the Net Asset Value of the Shares. |

CONFIDENTIAL

CGMH00001346
CMHSAA0001346

## SALE AND REDEMPTION OF SHARES

**Redemption at the Option of a Shareholder**

A shareholder of the Fund, on fifteen (15) calendar days' notice, may cause his Shares to be redeemed as of the last business day (being any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, the Republic of Ireland or the United States of America)of any month. There is no minimum period of time that Shares must be held in order for a shareholder to redeem his Shares.

**Compulsory Redemption**

The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time. This right will only be exercised as to Shares where the continued holding of which would result in regulatory, pecuniary, legal, taxation, or material administrative disadvantage for the Fund or the shareholders as a whole.

**Sales**

Subscriptions received during any monthly period prior to the third to the last business day of the month will ordinarily be accepted, subject to the sole discretion of the Manager, as of the first business day of the following monthly period, i.e., subscriptions received between December 29 and January 28 will be accepted as of February 1. Subscriptions will become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund.

**Exchange Listing**

The Fund was admitted to the Official List of the Irish Stock Exchange in Dublin, Ireland on January 12, 1995 and has been issued SEDOL number 0330934. It is unlikely that a public trading market will develop for the Fund's shares and none has developed to date. Shareholder redemption rights are not affected by this listing.

## COMPENSATION AND EXPENSES

**Expenses**

The Fund will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; all expenses in maintaining the Fund's office and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading activities.

3

CGMH00001347
CMHSAA0001347

**Management Fee**

The Manager will receive a monthly management fee in an amount equal to one-twelfth of one percent (0.0833%) (1% per annum) of the Net Asset Value before Performance Fees (as hereinafter defined) of the Shares, as calculated at the opening of the first day of each calendar month, which will include subscriptions for Shares accepted by the Fund as of the first day of the month. This fee is payable monthly in arrears. The Manager will pay a portion of the Management Fee to an affiliate inconsideration of the affiliate providing certain administrative services and back-office support to the Fund.

**Performance Fee**

The Manager will receive, for each calendar quarter, a performance fee (the "Performance Fee") with respect to each Share outstanding during such calendar quarter in an aggregate amount equal to 20% of any New High Net Profits (as defined under "FEES, COMPENSATION AND EXPENSES - Performance Fee") allocable to the Shares, subject to reduction in connection with certain offsets with respect to each Share. Shares which are either purchased or redeemed during a calendar quarter shall be subject to the payment of a Performance Fee only for the portion of the calendar quarter during which such Shares were outstanding. The Performance Fee will only be paid on "new appreciation" in the Fund's Net Asset Value allocable to the Shares.

In certain circumstances, the Performance Fee may be reduced for particular calendar quarters and the amount of the reduction repaid in subsequent calendar quarters (see "FEES, COMPENSATION AND EXPENSES – Performance Fee").

The Manager and the Fund may enter into an agreement pursuant to which the Manager may elect to defer payment of all or a portion of its Management Fees and/or Performance Fees.

4

CGMH00001348
CMHSAA0001348

# THE FUND

<u>Description</u>

The Fund was incorporated in the Territory of the British Virgin Islands ("BVI") as an international business company on October 30, 1990. The registered office of the Fund is located in Road Town, Tortola, British Virgin Islands.

Shareholders will have the right to redeem part or all of their Shares as of the last business day of any month, or purchase additional shares as of the first business day of any month (See "TRANSFERS, REDEMPTIONS AND TERMINATION").

## MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS

<u>The Fund</u>

The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. None of the Fund's Directors own an equity interest in the Fund.

The Directors of the Fund are as follows:

**Walter Noel** has over forty years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its international private banking business. He founded The Fairfield Greenwich Group, an affiliate of the Fund's investment manager, Fairfield Greenwich (Bermuda) Ltd., in 1983. Since founding The Fairfield Greenwich Group, Mr. Noel has been a director or general partner for a variety of its funds.

**Jan R. Naess** received a Bachelor of Arts degree in 1981 and a Masters degree in Economics in 1983 from the University of Oslo. From 1983 to 1987, he was employed in the Economic Research Department of R.S. Platou a.s. in Oslo, a leading shipbrokering firm. In 1987, Mr. Naess joined with R.S. Platou a.s. to form R.S. Platou Asset Management a.s., which was instrumental in the sale and purchase of 15 bulk carriers from 1987 to 1989. In 1989, Mr. Naess liquidated his interest in R.S. Platou Asset Management a.s. and formed PAN Shipping Ltd., a shipowning/operating and project development fund, which merged with Northern Navigation International Limited ("NNI") in 1991. Mr. Naess is a Vice President of NNI, a Liberian corporation, which is in the business of investing in and managing shipping assets.

**Peter P. Schmid** received a Swiss Federal Certificate of Capacity in 1968. Mr. Schmid was employed by Credit Suisse from 1968 to 1986. From 1975 to 1977, he was employed in Credit Suisse's International Portfolio Management Department in Zurich. After a brief posting in Credit Suisse's New York office, Mr. Schmid was in charge of the bank's representative office in Rio de Janeiro from 1977 to 1984. From 1984 to 1986, Mr. Schmid was Vice President in charge of Credit Suisse's Latin American Private

CONFIDENTIAL

CGMH00001349
CMHSAA0001349

Banking Desk in Geneva. Mr. Schmid has been an independent investment adviser since April 1986. He is President of Peter Schmid (Portfolio Management), P. Schmid & Associés, S.A. and Armor S.A. Mr. Schmid is a Director of Inter Asset Management Inc.

## The Investment Manager

The Fund's investment manager is Fairfield Greenwich (Bermuda) Ltd., a corporation organized under the laws of Bermuda ("FGBL" or the "Manager"), which was incorporated on June 13, 2003. It is responsible for the management of the Fund's investment activities, the selection of the Fund's investments, monitoring its investments and maintaining the relationship between the Fund and its escrow agent, custodian, administrator, registrar and transfer agent. The Manager is the wholly-owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands ("FGL"), which previously served as the investment manager of the Fund.

The Fairfield Greenwich Group ("FGG"), of which the Manager is an affiliate, was established in 1983 and has approximately $8 billion employed in alternative asset management funds. Throughout its history, the firm has internally managed alternative asset funds and selectively identified external managers for affiliations where it serves as a marketing and distribution partner, and obtains underlying portfolio information for monitoring and client communication purposes.

The Manager and its affiliates currently serve as investment or administrative manager to approximately twenty funds, and have exclusive distribution arrangements with several others. FGG maintains its principal office in New York, with a significant presence in London and Bermuda. Marketing and client support offices are located elsewhere in the United States, Europe, and Latin America. FGG's London entity is licensed and subject to the supervision of the Financial Services Authority in the UK, and another FGG-affiliated entity is registered as a broker- dealer in the United States.

The Manager has made a claim for no-action relief from registration as a commodity pool operator with the U.S. Commodity Futures Trading Commission with respect to its operation of the Fund.

Pursuant to the Investment Management Agreement between the Fund and the Manager, the Manager is not liable for any error of judgment or for any loss incurred by the Fund, except a loss resulting from willful malfeasance, bad faith or gross negligence in the performance of its duties under such agreement. The Investment Management Agreement further provides that the Manager, its directors, officers, employees, agents and counsel will be indemnified and held harmless by the Fund against any and all claims, liability and expenses for any loss suffered by the Fund arising out of any act or omission of such indemnified party, except to the extent an act or omission constitutes willful misconduct or reckless disregard of the duties of such indemnified party. The Investment Management Agreement may be terminated by either party thereto on ten days' written notice prior to the end of any calendar quarter.

Following is biographical information on the founders, principal officers and certain other key employees of FGG:

**Walter M. Noel, Jr.** His background is summarized above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS - The Fund".

**Andres Piedrahita** founded Littlestone Associates in 1991, which merged with FGG in 1997. Mr. Piedrahita directs FGG's European and Latin American activities. Mr. Piedrahita has over fifteen years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997). He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-

6

CGMH00001350
CMHSAA0001350

1990).  Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987).  He received his Bachelor of Arts degree from Boston University's School of Communications.

**Jeffrey Tucker** has over twenty years of experience in investment related businesses.  Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978.  From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program.  Mr. Tucker entered private practice in 1978 as a partner in the law firm Tucker, Globerman & Feinsand, where he remained until 1987.  He specialized in securities and transactional matters, with a principal focus on limited partnership offerings.  Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. ("Kolber"), a registered broker-dealer.  At Kolber, Mr. Tucker was responsible for the development and administration of the firm's private investment funds.  FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities.  Throughout FGG's development, Mr. Tucker has been responsible for directing its business and operational development and has been a director or general partner for a variety of its investment funds.  Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.

**Robert Blum** oversees or assists in all aspects of FGG's activities, and focuses on product creation as well as operational and related matters.  Mr. Blum has over fifteen years of directly relevant operational and legal experience in the alternative asset management arena.  He previously worked at CIBC Oppenheimer Corp. (1989-1999) where he was a Managing Director, a member of the firm's Management and Operating Committees, and served in various roles during his career, including Deputy General Counsel.  At CIBC Oppenheimer, Mr. Blum had extensive business responsibility (including management and operational roles) and legal involvement in the development of a wide range of transactions and businesses in the alternative and conventional asset management areas.  Mr. Blum began his career as an associate in the law firm of Fulbright & Jaworski (1984-1989).  Mr. Blum received his Bachelor of Arts degree from the University of Pennsylvania and his JD from the University of Chicago Law School.

**Harold Greisman** is the Chief Investment Officer of FGG, focusing on manager selection and risk oversight.  Mr. Greisman has over fifteen years of experience in the investment business.  Prior to joining FGG in 1990, Mr. Greisman was an Associate in the Capital Markets Group of Continental Bank (1984-1985) and then worked for DNB Capital Corporation (1985-1990), a proprietary private equity and venture capital operation controlled by Den Norske Bank.  Mr. Greisman began his career at Johnson & Higgins, a large industrial insurance brokerage (1978-1982).  Mr. Greisman received his Bachelor of Arts degree from Tufts University and his MBA degree from the Stern School of Business at New York University.

FGL and certain of its principals have beneficial interests in the Fund.

The backgrounds of the Directors and key officers of the Manager are set forth below:

**Andres Piedrahita** is a Director and the President of the Manager.  His background is set forth above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS-The Investment Manager".

**Ian Pilgrim** is a Director of the Manager and serves as General Counsel of Citco Fund Services.  Prior to joining Citco in January 2001, Mr. Pilgrim practiced from the beginning of 1997 until the end of 2000 as a Barrister & Attorney with M.L.H. Quin & Co. in Bermuda, specializing in the structuring and establishment of hedge funds and other collective investment vehicles. From 1994 to 1996, Mr. Pilgrim practiced as a solicitor with Allen & Overy in Hong Kong, where he was involved primarily in banking and project finance, and, prior to that, from 1991 to 1994, with Deacons in Hong Kong. Before moving to

7

CONFIDENTIAL

CGMH00001351
CMHSAA0001351

Hong Kong, Mr. Pilgrim practiced as a solicitor with the City of London law firm, Taylor Joynson Garrett. Mr. Pilgrim was admitted to practice as a solicitor in England and Wales in 1989 and in Hong Kong in 1992. He was admitted to the Bar in Bermuda in 1998. He is a member of the Law Societies of England and Wales and Hong Kong and of the Bar of Bermuda.

**Amit Vijayvergiya** is Vice President and the Risk Manager of the Manager and focuses on manager selection and risk management for the Fund. He has been employed by the Manager since 2003. Mr. Vijayvergiya has over 9 years of experience in asset management, risk management and operations research. Prior to joining the Manager, from 2000 to 2003, Mr. Vijayvergiya managed MAV Hedge Advisors, a family office investing in traditional and alternative investment managers. From 1998 to 2000, he was the General Manager of LOM Asset Management ("LOM AM"), where he oversaw the management of $160 million in assets. At LOM AM, Mr. Vijayvergiya structured and managed several multi-manager funds and served on the firm's management and investment committees. He began his business career in 1994 with a position in operations research at Canadian National Railways. Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

## INVESTMENT POLICIES

The Fund seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as "split strike conversion", to which the Fund allocates the predominant portion of its assets. This strategy has defined risk and profit parameters, which may be ascertained when a particular position is established. Set forth below is a description of the "split strike conversion" strategies ("SSC Investments").

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index , (ii) the sale of out-of-the-money S&P 100 Index call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out-of-the-money S&P 100 Index put options. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index. The basket typically consists of approximately 35 to 45 stocks in the S&P 100.

The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price. The purchase of an out-of-the-money put, funded with part or all of the call premium, protects the equity position from downside risk.

A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 puts and calls. The further away the strike prices are from the price of the S&P 100, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks.

The options transactions executed for the benefit of the Fund may be effected in the over-the-counter market or on a registered options exchange.

CONFIDENTIAL

CGMH00001352
CMHSAA0001352

## Other Investments

The Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value at the time of investment) to alternative investment opportunities other than its "split strike conversion" investments (the "Non-SSC Investments"). It is anticipated that the Non-SSC Investments will be allocated to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding $50 million at the time it is made. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines, or for cause. FGBL and the Fund generally share in fees received by portfolio managers of Non-SSC Investments from investors other than the Fund. The Fund will pay fees with respect to the Non-SSC Investments at a rate that will not exceed the Fund's rate of fees (in certain cases, this may be accomplished by FGBL subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers).

In certain circumstances, the Performance Fee may be reduced for particular calendar quarters for certain Non-SSC Investment Losses. See "POTENTIAL CONFLICTS OF INTEREST" and "FEES, COMPENSATION AND EXPENSES –Performance Fee".

In order to ensure that the Fund will not be subject to United States federal income taxation on trading gains from the disposition of certain investments, it is expected that the Fund will not invest in any "United States real property interest" (including, for example, certain interests in any U.S. Corporation that is a "United States real property holding corporation"), as such terms are defined under the U.S. Internal Revenue Code of 1986 (the "Code") and the Treasury Regulations promulgated thereunder. (See "TAX CONSIDERATIONS AND EXCHANGE CONTROL.")

The Fund may invest some of its assets in short-term U.S. government obligations, certificates of deposit, short-term high grade commercial paper and other money market instruments, including repurchase agreements with respect to such obligations, money market mutual funds and short term bond funds. In order to ensure that substantially all of the interest earned by the Fund will not be subject to United States federal withholding taxes, any investment in an obligation of a U.S. person or entity (other than in certificates of deposits in banks) primarily will be in an instrument (i) which is issued and purchased at a discount from its face amount, which is not otherwise interest bearing, and which has a term of no more than 183 days from the date of issuance or (ii) which is in registered form and which is issued after July 18, 1984. (See "TAX CONSIDERATIONS AND EXCHANGE CONTROL.")

## Investment Restrictions

The Fund will observe the investment restrictions set forth in the Fund's Articles of Association which are summarized here:

a) no more than 10 percent of the Net Asset Value of the Fund will be invested in the securities of any one issuer (other than any government or governmental agency);

b) the Fund may not hold more than 10 percent of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

c) no more than 10 percent of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (other than any government or governmental agency), in each case calculated at the time of investment;

CONFIDENTIAL

CGMH00001353
CMHSAA0001353

d)  no more than 10 percent of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

e)  the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Manager collectively own in excess of 5 percent of such securities;

f)  the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

g)  the Fund will adhere to the general principle of diversification in respect of all of its assets;

h)  the Fund will not invest directly in real property;

i)  the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) to any one issuer (other than any government or governmental agency) except with the consent of the custodian of the Fund's assets; and

j)  no more that 10 percent of the Net Asset Value of the Fund will be invested in physical commodities.

The investment restriction set out in (c) above will not apply to transactions with any counterparty which advances full and appropriate collateral to the Fund in respect of such transactions.

## OFFERING OF THE SHARES

The Fund is offering up to 10,000,000 Shares. The initial offering price was U.S. $200 per Share on November 30, 1990. The Shares are currently offered at a price equal to the Net Asset Value per Share (as hereinafter defined) as of the opening of business on the date of issuance.

Shares may be offered only to experienced and sophisticated investors who are neither citizens nor residents of the United States ("Non-U.S. Investors") and to a limited number of United States investors that are tax-exempt entities ("U.S. Tax-Exempt Investors').

The minimum initial purchase by each subscriber is U.S. $100,000. The Fund may reject any subscription, in whole or in part, in its discretion. All subscriptions, once made, are irrevocable to the subscriber.

All proceeds from the sale of Shares will be received by the Fund in trust and will be deposited by the Fund into a segregated account in the Fund's name at the Fund's bank, Citco Bank Nederland N.V. Dublin Branch. There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents and other intermediaries, who may charge a placement fee of up to 5% of the total amount of the subscriptions for Shares sold, and/or share in the fees earned by the Manager, which they may rebate to their clients. FGBL or an affiliate thereof may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent and such amounts will not constitute part of the assets of the Fund.

The Fund will offer its Shares on a continuous basis at a price equal to its Net Asset Value as of the opening of business on the date of issuance of such Shares. Subscriptions received during any calendar

CONFIDENTIAL

CGMH00001354
CMHSAA0001354

month prior to the third to the last business day of the month will be accepted, subject to the sole discretion of the Manager, as of the first business day of the following month. Thus, for example, subscriptions received between January 1 and January 28 shall be accepted as of February 1, assuming the 29th-31st are business days. The Fund reserves the right, in its discretion, to accept any subscription prior to such first day. Subscriptions shall become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund.

The Fund was admitted to the Official List of the Irish Stock Exchange, Dublin, Ireland on January 12, 1995 and has been issued SEDOL number 0330934. It is unlikely that a trading market in the Fund's Shares will develop and none has developed to date. The listing does not affect shareholder redemption rights.

## Net Asset Value Defined

The Net Asset Value of the Shares is the value of the Fund's assets as calculated in accordance with the International Financial Reporting Standards and the Memorandum and Articles of Association of the Fund.

Notwithstanding the foregoing:

>        (i)      in the case of extraordinary circumstances which warrant a different valuation of any securities, such as an inability to liquidate existing positions, such securities will be valued at such prices as the Directors shall determine; and

>        (ii)      the amount of any distribution or dividend made shall be a liability of the Fund from the day when the distribution or dividend is declared until it is paid.

All decisions on the valuation of assets and liabilities and determination of Net Asset Value shall be made by the Fund's Board of Directors.

Net Asset Value per Share is defined as the Net Asset Value divided by the number of Shares then outstanding.

The Net Asset Value of the Fund will be calculated on a monthly basis by the Fund's administrator, Citco Fund Services (Europe) B.V., which will promptly notify the Irish Stock Exchange of the results of each such Net Asset Value calculation.

Pursuant to the Fund's Articles of Association, the Fund may suspend the calculation of its Net Asset Value for the whole or any part of any period:

>   (a)      during which any stock exchange or over-the-counter market on which any significant portion of the investments of the Fund are listed, quoted, traded or dealt in is closed (other than customary weekend and holiday closing) or trading on any such stock exchange or over-the-counter market is restricted; or

>   (b)      when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Fund to dispose of investments or as a result of which any such disposal would be materially prejudicial to the shareholders; or

>   (c)      when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the

11

CGMH00001355
CMHSAA0001355

investments or other assets of the Fund cannot reasonably or fairly be ascertained; or

(d)    during which the Fund is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realization or acquisition of investments or payments due on redemptions of Shares cannot in the opinion of the Directors be effected at normal rates of exchange.

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share of the Fund until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorized under the Fund's Articles of Association shall exist. Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Fund and as shall be in effect at the time. To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive. Whenever the Directors shall declare a suspension of the determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall give notice to all shareholders stating that such declaration has been made. At the end of any period of suspension as aforementioned the Directors shall give notice to all shareholders stating that the period of suspension has ended.

## Who Should Purchase/Subscription Procedure

This offering is limited to non-U.S. persons who have the ability to speculate in high risk securities and for whom such a purchase is suitable in light of such person's financial condition. The Fund will require as a condition to the acceptance of a subscription that the subscriber represent and warrant that he has a net worth in excess of U.S. $1,000,000 and is not a U.S. person.

Prospective subscribers should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange or tax considerations relevant to such purchase.

As part of the Fund's responsibility for the prevention of money laundering, the Fund will require detailed verification of a prospective investor's identity to be included with its subscription application.

An individual will be required to produce a certified copy of a passport or identification card. Corporate applicants will be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or other documents evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity. Trusts and other entities which subscribe to the Fund must demonstrate organizational documents which verify the existence of the entity and which verify the authority of one or more signatories to sign subscriptions on behalf of the entity.

The Fund reserves the right to request such further information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Fund may refuse to accept the application and the subscription moneys relating thereto.

12

CGMH00001356
CMHSAA0001356

In order to subscribe for Shares, subscribers must complete and sign the Subscription Agreement included in the Subscription Documents which accompany this Confidential Private Placement Memorandum, and mail them to Fairfield Sentry Limited, c/o Citco Fund Services (Europe) B.V., Telestone 8-Teleport, Naritaweg 165, 1043BW Amsterdam, The Netherlands; fax number (31-20) 572-2610. Subscription funds should be wire transferred to the Fund's bank at:

*Intermediary Bank – Swift Field 56*
HSBC Bank, New York
BIC: MRMDUS33
Fed Wire: 021001088

*Account with Institution – Swift Field 57*
Account Name: Citco Bank Nederland N.V. Dublin Branch
Account Number: 000306487
BIC: CITCIE2D

*Beneficiary Customer – Swift Field 59*
Beneficiary Account Name: Fairfield Sentry Limited
Beneficiary International Bank Account Number (IBAN):
IE23 CITC 0000 0035 810 501

*Reference - SWIFT Field 70*: Name and Full Address of Subscriber:

## FEES, COMPENSATION AND EXPENSES

### Expenses

The Fund bears all of the continuing offering costs and all other expenses incurred in the operation of the Fund, if any, including the ordinary and necessary expenses directly related to its investment and trading activities, all insurance expenses, all administration fees and all legal and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund.

### Management Fee

The Manager will receive for each calendar month a management fee (the "Management Fee") in an amount equal to one-twelfth of one percent (0.0833%) (1% per annum) of the Net Asset Value of the preceding month before performance fees as calculated at the open of the first day of such month (which would include any subscriptions for Shares accepted by the Fund as of the first day of the month). The Management Fee is payable monthly in arrears. The Manager will pay a portion of the Management Fee to an affiliate inconsideration of the affiliate providing certain administrative services and back-office support to the Fund.

### Performance Fee

The Manager will receive, for each calendar quarter, a performance fee (the "Performance Fee") in an amount equal to 20% of the amount of any New High Net Profits allocable to the Shares. Shares which are purchased or redeemed during a calendar quarter shall have their Net Asset Value decreased by the payment of the Performance Fee only for the portion of the quarter during which such Shares were

13

CGMH00001357
CMHSAA0001357

outstanding.  New High Net Profits are defined as the excess, if any, of, respectively, (A) the Net Asset Value as of the last day of a calendar quarter (before the deduction of the current Performance Fee, if any, paid or payable) over (B) the difference between (i) the sum of (a) the highest Net Asset Value of the Shares as of the last day of any preceding calendar quarter during which such Share was outstanding, or the date of the initial closing of this offering (or if such Share was issued thereafter, as of the date of such issuance, whichever date the Net Asset Value was higher), and (b) the amount of any subscription proceeds for Shares issued as of, or subsequent to, the date thereof, and (ii) the amount of any dividends, distributions and redemptions payable as of, or subsequent to, the date thereof, and losses, if any, associated with redeemed shares.  IN OTHER WORDS, PERFORMANCE FEES WILL ONLY BE PAID ON "NEW APPRECIATION" IN THE NET ASSET VALUE OF THE SHARES.  No Share will be subject to the payment of a Performance Fee until all Shares have recouped their respective loss carryovers, i.e., until the Net Asset Value of such Shares is at least as high as the previous highest Net Asset Value per Share.  The Manager will reduce any Performance Fees otherwise payable to it by offsetting it against an amount equal to the "Shared Cash Flow Amount" as defined in "POTENTIAL CONFLICTS OF INTEREST", below) attributable to Non-SSC Investments.

Notwithstanding the foregoing, in the event that, as at the end of any calendar year, the aggregate amount of original investments in Non-SSC Investment vehicles exceeds the aggregate net asset value of the Fund's interests in Non-SSC Investment vehicles (before deduction of the Fund's share of fees payable by the Non-SSC Investment vehicles) (such excess being the "Non-SSC Investment Loss") the Manager will reduce its Performance Fee payable at subsequent quarter-end by an amount equal to the Non-SSC Investment Loss.  The portion of the Performance Fee that is reduced to cover the Non-SSC Investment Loss will be carried forward.  In the event that the Non-SSC Investment Loss is, in part or in whole, subsequently recouped by Non-SSC Investment vehicles, the Fund will pay the Manager such portion of the Performance Fee that was previously reduced to cover Non-SSC Investment Losses in addition to Performance Fees otherwise payable for any quarter.

Pursuant to its agreement with the Fund, the Manager may elect to defer payment of all or a portion of its Performance Fee.

**Salaries and Other Personnel Expenses**

Mr. Noel will not be compensated for serving as a director of the Fund, but he and representatives of the Manager will be reimbursed by the Fund for any out-of-pocket expenses they may incur in attending meetings of the Board of Directors or of shareholders.  The Directors not affiliated with the Manager, of which there are at the present time two, will each be paid a fee of $25,000 per annum by the Fund together with his out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders.

## BANK AND CUSTODIAN

The Fund's bank account is maintained at Citco Bank Nederland N.V. ("Citco Bank").  Citco Global Custody ("Citco Custody") has agreed to act as custodian of the Fund's assets.  Bernard L. Madoff Investment Securities LLC ("BLM" and, together with other qualified entities with which sub-custodial arrangements may be made, the "Sub-Custodians", and each, singularly, a Sub-Custodian") serves as a sub-custodian for certain assets of the Fund.  In addition, the underlying assets of the Non-SSC Investments managers may be held at Goldman, Sachs & Co., Refco, LLC and other prime brokers and qualified custodians.

Citco Custody has been appointed custodian to the Fund pursuant to a brokerage and custody agreement dated September 20, 1994 between and among the Fund, Citco Bank and Citco Custody (the "Custody

14

CONFIDENTIAL

CGMH00001358
CMHSAA0001358

Agreement"). Citco Custody currently has U.S.$36 billion under custody. Currently BLM has approximately 95% of the Fund's assets under custody. Citco Custody will be responsible for all of the assets of the Fund, other than the assets deposited with the Sub-Custodians. All assets under custody will be held by Citco Custody and/or a Sub-Custodian, as the case may be, in a separate client account and will be separately designated in the books and records of Citco Custody and the Sub-Custodians. Assets deposited as margin need not be segregated and may become available to the creditors of brokers.

Sub-custodians may be appointed by Citco Custody provided that Citco Custody shall exercise reasonable skill, care and diligence in the selection of a suitable sub-custodian and shall be responsible to the Fund for the duration of the sub-custody agreement for satisfying itself as to the ongoing suitability of the sub-custodians to provide custodial services to the Fund. Citco Custody will also maintain an appropriate level of supervision over the sub-custodians and will make appropriate inquiries periodically to confirm that the obligations of the sub-custodians continue to be competently discharged. Any sub-custodian appointed will be paid at normal commercial rates.

Citco Custody shall not be liable in the event of loss of any assets held by a sub-custodian, provided that such sub-custodian exercised reasonable care and acted without gross negligence or willful misconduct.


## ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

Pursuant to an agreement between Citco Fund Services (Europe) B.V. ("Citco") and the Fund, Citco serves as the administrator for the Fund, under the overall direction of the Fund's Board of Directors. As administrator, Citco has the responsibility for furnishing the day-to-day administrative services which the Fund may require, such as: accounting services; maintaining the Fund's books and records; preparation of reports and accounts; calculation of Net Asset Value and fees; communications with shareholders and/or governmental bodies; paying the Fund's expenses; providing suitable facilities and procedures for handling dividends and distributions (if any) and the orderly liquidation and dissolution of the Fund, if required. In consideration of its services, Citco receives a monthly fee based on the Net Asset Value of the Fund as of the last business day of each month at a rate of 6 basis points per annum.

To the extent that Citco relies on information supplied by the Fund, any investee fund of the Fund or any brokers engaged by the Fund, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations. Citco shall not be liable for the accuracy of the underlying data provided to it.

Pursuant to the Administration Agreement, dated February 20, 2003, between the Fund and Citco, the Fund has agreed to indemnify Citco, its subsidiaries, affiliates, directors and other officers, shareholders, servants, employees, agents and permitted delegates under the Administration Agreement, against any and all liabilities, obligations, losses, judgments and expenses of any kind or nature whatsoever (collectively, the "Claims" and, individually, a "Claim")which may be imposed on, incurred by or asserted against any of them arising (other than by reason of negligence, bad faith, fraud or dishonesty on the part of Citco or such other indemnified party) out of the provision of services under the Administration Agreement. Similarly, Citco will indemnify the Fund from and against any Claim which arises directly out of the negligence, bad faith, fraud or dishonesty of its obligations on the part of Citco in connection with its provision of services under the Administration Agreement. The Administration Agreement may be terminated by either party on 90 days' prior written notice; provided, however, that the Administration Agreement may be terminated forthwith by notice in writing by either party if the other party (a) commits a material breach of the Administration Agreement and fails to cure such breach

CONFIDENTIAL

CGMH00001359
CMHSAA0001359

within 30 days after notice from the non-defaulting party; or (b) enters into involuntary liquidation or if a receiver is appointed over any of its assets.

## RISK FACTORS

The purchase of Shares in the Fund involves substantial risks that are incident to the Fund's allocation of assets to SSC and Non-SSC Investments.

      1.    **Trading Risks**.  Substantial risks are involved in the trading of equity securities and options.  Market movements can be volatile and are difficult to predict.  U.S. Government activities, particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affect securities and options prices, as well as the liquidity of such markets.  Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities and options.  A variety of possible actions by various government agencies also can inhibit the profitability of the Fund's business or can result in losses.  Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Fund.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategies utilized on behalf of the Fund.  The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution.  Thus, substantial risk remains that the techniques employed by or on behalf of the Fund cannot always be implemented or effective in reducing losses.  At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities at desired prices or in desired quantities difficult or impossible. In addition, options prices are extremely volatile.  The volume and volatility of trading in these markets depends in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by market-makers and specialists.  The liquidity of the market may also be affected by a halt in trading on a particular futures or securities exchange or exchanges.  Illiquid markets may make it difficult to get an order executed at a desired price.

      2.    **Trading Strategies May Not be Successful**.  There can be no assurance that any trading method employed by or on behalf of the Fund will produce profitable results, and the past performance of the Fund is not necessarily indicative of its future profitability.  In that regard, certain of the managers receiving Non-SSC Investment allocations may not have investment records compiled while managing assets on their own.  Profitable trading is often dependent on anticipating trends or trading patterns.  In addition, markets experiencing random price fluctuations, rather than defined trends or patterns, may generate a series of losing trades.  There have been periods in the past when the markets have been subject to limited and ill-defined price movements, and such periods may recur.  Any factor which may lessen major price trends (such as governmental controls affecting the markets) may reduce the prospect for future trading profitability.  Any factor which would make it difficult to execute trades, such as reduced liquidity or extreme market developments resulting in prices moving the maximum amount allowed in a single day, could also be detrimental to profits or cause losses.

      3.    **Dependence Upon Principals and Key Employees of the Manager**.  The services of the Manager's principals and key employees are essential to the continued operations of the Fund.  If their services were no longer available, their absence would have an adverse impact upon an investment in the Fund. The key employees of the Manager will allocate a small portion of the Fund's assets between and among the Non-SSC Investment managers.  The Fund will be dependent on the

16

CGMH00001360
CMHSAA0001360

continued presence of these key employees in connection with identification of the recipients of these allocations and the monitoring of the Non-SSC Investments.

4. **Conflicts of Interest**. The Manager and the Non-SSC Investment managers receiving allocations of the Fund's assets, and their respective principals and affiliates, are presently affiliated with and may in the future form and manage, or provide other services to, other investment entities (including without limitation investment partnerships, investment companies and mutual funds) with substantially the same or different objectives as those of the Fund. They may also make investments in securities for their own accounts. In addition, the Manager functions as the investment manager for unregistered foreign investment companies in addition to the Fund. Such activities could detract from the time that the Manager and its principals allocate to the affairs of the Fund. The Manager will obtain certain business and financial benefits from the Fund's investments in the Non-SSC Investments which may result in a conflict of interest between the Manager and the Fund in the selection of, and allocation of assets between and among, the Non-SSC Investments. The broker-deal through which the Fund conducts its SSC Investments, in its role as a market-maker may effect transactions in equity securities with the Fund as principal. This may provide such broker-dealer with the ability to use the Fund's assets to enhance its securities market-making function. See "POTENTIAL CONFLICTS OF INTEREST".

5. **Custodian/Clearing Firm Loss or Insolvency**. If a custodian or clearing firm utilized in connection with accounts maintained on behalf of the Fund was to become insolvent, the Fund could have some or all of these positions closed out without its consent. In addition, all of the Fund's positions may not be closed out under these circumstances, yet delays or other difficulties may be experienced in attempting to close out or exercise options positions. Widespread insolvency among clearing firms that clear securities options could also impair the ability of the Options Clearing Corp. (the "OCC") to honor all exercises, in spite of the system of safeguards which the OCC has in place. Such widespread insolvency, or of a particular custodian, could result in substantial losses to the Fund.

6. **Competition**. The securities industry, including market-making activities and transactions effected in connection therewith, are very competitive. Competition from other persons or entities involved in activities similar to those of the Fund can restrict the ability of the Fund to acquire positions at the prices deemed most beneficial to its overall trading strategies. Many such competing persons or entities are better capitalized and have more experience in trading than the Fund. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Fund.

7. **Regulated Industries**. The securities and commodities industries are highly regulated. The Fund will not be directly subject to regulation by the SEC, national securities exchanges, the CFTC or the Federal Reserve Board. However, the SEC and CFTC regularly review the practices and procedures of the securities and commodities industries, and the market place in general, and from time to time revises rules and regulations pertaining thereto. The exchanges engage in similar reviews and at times revise their rules. There can be no assurance whatsoever that any rules and regulations promulgated by the SEC, the CFTC, the Federal Reserve Board, or the various securities exchanges or statutory amendments to the Securities Exchange Act of 1934 or the Commodity Exchange Act will not adversely impact the Fund.

8. **Over-the-Counter Options Transactions.** Options transactions effected on behalf of the Fund may utilize the over-the-counter market for their execution. Trading index options in the over-the-counter market is subject to counter-party risk and is without the protections afforded by transactions effected through the OCC, a registered options exchange.

17

CGMH00001361
CMHSAA0001361

9.    **Option Buyer's Risk of Loss of Entire Investment**.  An option is a wasting asset which becomes worthless when the option expires.  As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration.  This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

10.    **Arbitrage Transactions**.  Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction.  Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination.  Consequently, a substantial favorable price movement may be required before a profit can be realized.

11.    **Combination Transactions**.  At various times, the Fund may engage in spreads or other combination options transactions involving the purchase and sale of related options contracts, in various combinations.  Such transactions are considerably more complex than the purchase or writing of a single option.  The following are among the many risks of combination option transactions: the difficulty that may be involved in attempting to execute simultaneously two or more buy or sell orders at the desired prices; the possibility that a loss could be incurred on both sides of a multiple options transaction; and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding.  Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination.  This can have the effect of requiring a substantial favorable price movement before a profit can be realized.

12.    **Trading Decisions Based on Trend Analysis**.  Certain of the trading decisions of the Fund are based on the use of computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm.  In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends.  Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analyses, or that trades dictated by the analyses may not be executed in time to take advantage of the price disparities.  This latter risk is likely to materialize when numerous market makers use similar analyses, all of which dictate the desirability of executing identical or similar contracts.  In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur.  Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow.  Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

13.    **Assignment of Puts or Calls**.  Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the short put or short call portion of the hedged position.  Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes.  Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses.  The same would be true given an illiquid market such as that of October 1987.

14.    **Prohibition of Exercise Rights**.  The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading

CONFIDENTIAL

CGMH00001362
CMHSAA0001362

in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

15.    **Incentive Compensation**.  The Non-SSC Investment managers will generally be compensated through incentive arrangements.  Under these arrangements, the Non-SSC Investment managers may benefit from appreciation, including unrealized appreciation in the value of the Non-SSC Investment, but may not be similarly penalized for decreases in the value of such investment vehicle. Such fee arrangements may create an incentive for the Non-SSC Investment managers to make purchases that are unduly risky or speculative.  In most cases, however, the Fund anticipates that it will invest in Non-SSC Investments where the manager is required to recoup prior losses before any performance-type fee is payable in respect of current gains.

To the extent that an accrual for an incentive fee is reflected in the net asset value of shares of a Non-SSC Investment vehicle, then if such accrual is reversed by the Non-SSC Investment vehicle as a result of subsequent depreciation, all of the Shares of the Fund will benefit from the reversal of the accrual, including Shares purchased after the Non-SSC Investment vehicle made the accrual.  Further, to the extent that the Performance Fee is reduced by the Non-SSC Investment Loss amount, then if such reduction is repaid in part or in whole by the Fund due to recoupment of losses by Non-SSC Investment vehicles, the Net Asset Value of all Shares of the Fund then outstanding will be reduced, including Shares purchased after the reduction of the Performance Fee.

16.    **Risks of Leverage**.  The Non-SSC Investment vehicles in which the Fund invests may borrow funds in connection with their investment strategies.  A particular Non-SSC Investment vehicle may not be subject to any limitation in the amount of its borrowings, and the amount of borrowings that the Non-SSC Investment vehicle may have outstanding at any time may be large in comparison to its capital.

The use of leverage may provide the Non-SSC Investment vehicle with the opportunity for greater capital appreciation, but at the same time will increase the Non-SSC Investment vehicle's, and indirectly the Fund's, exposure to capital risk and higher current expenses.  Moreover, if the assets of the Non-SSC Investment vehicle are not sufficient to pay the principal of, and interest on, the Non-SSC Investment vehicle's debt when due, the Fund could sustain a total loss of its investment in the Non-SSC Investment vehicle.

17.    **Possibility of Misappropriation of Assets**.  When the Fund invests utilizing the "split strike conversion" strategy or in a Non-SSC Investment vehicle, it will not have custody of the assets so invested.  Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund.

18.    **Sole Proprietor Non-SSC Investment Managers**.  Some of the Non-SSC Investment vehicles to which the Fund may allocate capital may consist of investment operations with only one principal.  In such cases, if that individual's services became unavailable to the Non-SSC Investment vehicle, the Fund might sustain losses.

19.    **Experience of Non-SSC Investment Managers**.  While certain of the Non-SSC Investment Managers have had extensive experience in trading securities generally and within their specific investment strategies, they may have had little experience in investing and trading on behalf of a pooled investment vehicle, in utilizing certain of the investment strategies to be employed on behalf of the Fund or in managing an account as large as that anticipated for the Non-SSC Investments.  In that regard, as the assets of the Non-SSC Investment vehicles increase, it is not known what effect, if any, this will have on the trading strategies utilized on their behalf or their investment results.

CONFIDENTIAL

CGMH00001363
CMHSAA0001363

20.    **Emerging Managers**.  As the Non-SSC Investment vehicles generally will be in an early stage of formation or operation, this can pose a number of operational and other issues.  For example, in its early stages the Non-SSC Investment manager may have little capital available to cover expenses and, accordingly, may have difficulty attracting qualified personnel.  Competing investment managers have a larger number of qualified management and technical personnel and benefit from a larger capital base.

21.    **Lack of Liquidity**.    Certain of the Fund's investments in the Non-SSC Investments will be subject to lock-up provisions any of which will limit the ability of the Fund to withdraw capital from such investment.  While such lock-up period may be subject to early release for breach of risk control or performance guidelines or for cause, there can be no assurance that the Fund will not sustain additional losses while such lock-up period remains in effect.

22.    **Exchange Rate Risk**.  The Fund will maintain its assets in U.S. dollars.  The Net Asset Value per Share is determined in U.S. dollars.  Non-dollar investors are subject to possible reduction in the value of their Shares due to changes in the rate of exchange between the U.S. dollar and their native currency.  In addition, a hedge may be established in anticipation of new subscribers.  In the event such subscriptions are not made, the hedge position will be unwound and the transactions will be borne by the existing shareholders.

## POTENTIAL CONFLICTS OF INTEREST

The Manager, the Non-SSC Investment managers and their respective affiliates, officers and employees may form and manage other investment entities (including without limitation investment partnerships, investment companies, mutual funds and offshore funds) and provide investment services to clients other than the Fund in the future with substantially the same or different objectives as those of the Fund.  They may also make investments in securities for their own accounts.  Such activities could detract from the time they allocate to the affairs of the Fund and negatively impact the Fund's investment opportunities.  Similarly, Messrs. Naess and Schmid, the non-affiliated directors, have other business interests and will not devote their entire time to the Fund's affairs.  See also "RISK FACTORS".

In connection with the investment of Fund assets in Non-SSC Investments, the Manager and its affiliates may obtain financial and business benefits, including but not limited to: (i) additional investment capacity in Non-SSC Investments, which may be made available to other clients of the Manager, (ii) compensation from Emerging Managers in connection with placement of such additional investment capacity, and/or (iii) sharing in the equity or cash flows of the entire investment business (Fund and non-Fund related) of such Emerging Managers.  The Manager will share with the Fund annually, through Performance Fee offset, an amount equal to the greater of (i) 50% of cash flows generated by equity held by the Manager or an affiliate thereof in the businesses of Emerging Managers or (ii) 10% of all revenues accruing to the Manager or an affiliate thereof directly from its association with Non-SSC Investment vehicles (the "Shared Cash Flow Amount").  Despite this sharing, however, the arrangements described in this paragraph may result in a conflict of interest between the Manager and the Fund.

Because the Fund was organized by affiliates of the Manager, the fees paid by the Fund to the Manager were not the result of arms-length negotiation.

The Fund may engage placement agents to market the Fund.  If you are introduced to the Fund by an agent, you should expect it to be paid by the Manager for the introduction out of the fees the Manager receives from the Fund.  You should also expect the agent to have an incentive to recommend that you

CONFIDENTIAL

CGMH00001364
CMHSAA0001364

remain an investor in the Fund, since the agent will likely be paid a portion of the Manager's fees each year that you remain an investor.

The broker-dealer through which the fund conducts its SSC Investment activities, in its role as a market-maker, may effect transactions in equity securities with the Fund as principal. This may provide such broker-dealer with the ability to use the Fund's assets to enhance its equities market-making function.

Because Mr. Noel is a principal of the Manager as well as a Director of the Fund, he may have an incentive to take actions as a Director that favors the Manager over the Fund.

Citco Fund Services (Europe) B.V., Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody N.V. are affiliates.

Each service provider to the Fund shall pay regard to its obligation to act in the best interest of the Fund and the Directors of the Fund will ensure that all such potential conflicts of interest are resolved fairly and in the interest of the shareholders. When allocating investment opportunities, the Manager will ensure that all such investments are allocated in a fair and equitable manner.

## DESCRIPTION OF SHARES

The Fund is authorized to issue up to 10,000,000 shares in one class, with a par value of U.S. $.01. The Fund has an authorized share capital of U.S. $100,000. The Shares will be issued in registered form. Each Share, when issued, will be fully paid and non-assessable.

Holders of Shares are entitled to one vote per Share and will participate on a pro rata basis in the assets of the Fund on liquidation and in dividends and other distributions as declared.

## DIVIDEND POLICY

Since the business objective of the Fund is directed toward achieving capital appreciation, it is anticipated that the Fund will not declare any dividends or make any distributions to its shareholders. Subject to the foregoing and to applicable law, the Fund's Board of Directors will have sole discretion in determining the amount and frequency of dividend distributions, if any. Any distributions made will be in accordance with the policies of the Irish Stock Exchange, which provide that a dividend payment may only be made out of the Fund's accumulated net income plus the net of accumulated realized and unrealized capital gains and accumulated net realized and unrealized capital losses.

## TRANSFERS, REDEMPTIONS AND TERMINATION

### Transfers

NO SALE OR TRANSFER OF SHARES WILL BE PERMITTED WITHOUT THE FUND'S CONSENT; HOWEVER, SHARES MAY BE REDEEMED AS OF THE LAST DAY OF EACH CALENDAR MONTH ON FIFTEEN (15) CALENDAR DAYS' NOTICE TO THE FUND.

Any sale or transfer of a shareholder's entire interest in any Shares or any transfer of Shares by operation of law must be submitted to the Fund for consent and will not be effective until such consent is given by the Fund. Any other dealing with Shares by way of assignment, pledge, mortgage or otherwise is prohibited unless consented to by the Fund and any attempt to do so without first obtaining the consent of the Fund will constitute grounds for compulsory redemption of the Shares concerned. Such consent may only be withheld if the transfer would result in regulatory, pecuniary, legal, taxation or material

21

CONFIDENTIAL

CGMH00001365
CMHSAA0001365

administrative disadvantages for the Fund or its shareholders as a whole. Any application to record a transfer of Shares, including an application to record a transfer by operation of law, if not approved by the Fund within 30 days, also will be treated as an application to redeem the Shares in question as of the next permissible redemption date and will be subject to a processing charge per share of 2% of the Net Asset Value per Share.

THE DISPOSITION OF SHARES TO U.S. PERSONS (INCLUDING U.S.TAX-EXEMPT INVESTORS AS DEFINED UNDER "OFFERING OF THE SHARES") WITHOUT THE PRIOR WRITTEN APPROVAL OF THE FUND IS EXPRESSLY PROHIBITED, AND THE FUND SHALL HAVE THE RIGHT COMPULSORILY AND IMMEDIATELY TO REDEEM ANY SHARES HELD FOR ANY REASON BY U.S. PERSONS.

## Redemptions at the Option of the Shareholders

A shareholder may cause part or all of his Shares to be redeemed as of the last business day (i.e., any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, the Republic of Ireland or the United States of America)of any month, provided that the Fund shall be in receipt of written notice of redemption for at least fifteen (15) calendar days prior to such redemption date. In the Fund's discretion, a shareholder requesting redemption of part of his Shares may be required to redeem all of his Shares unless such shareholder notifies the Fund to cancel the redemption.

## Compulsory Redemption

The Fund reserves the right to make compulsory redemption where the holding of such Shares may result in regulatory, pecuniary, legal, taxation or material administrative disadvantages for the Fund or its shareholders as a whole. Except as set forth above, no processing charge will be imposed with respect to any Shares so compulsorily redeemed.

## Redemptions - General Information

Redemptions will be at the Net Asset Value per Share, subject to any applicable processing charge, as described above. If notice of intent to voluntarily redeem is not received by the Fund within the prescribed period of time, then, in the Fund's discretion, the redemption date may be deferred to the end of the next following permissible redemption period, unless the shareholder notifies the Fund to cancel the redemption and the Directors consent to such cancellation. With respect to a total redemption of Shares, except in the case of extraordinary circumstances, such as an inability to liquidate existing positions, or the default or delay in payments due the Fund from brokers, banks or other persons, payment on redemptions will be made within 30 days after the redemption date. The Fund will not pay interest to the redeeming shareholders on any payment.

Partial redemptions will be paid in full within 30 days after the redemption date.

Shareholders bear the risk of any decline in Net Asset Value from the date notice of intent to redeem is given until the redemption date. In addition, the Fund may temporarily suspend any redemption during any period that the Fund has suspended the calculation of its Net Asset Value (see "OFFERING OF THE SHARES- Net Asset Value Defined"). Requests for redemption can be made by use of the form included in the Subscription Documents which accompany this Memorandum.

CONFIDENTIAL

CGMH00001366
CMHSAA0001366

**Termination**

The shareholders may, by a majority vote, elect to wind up and dissolve the Fund at any time. If the Fund's Board of Directors determines that it would be in the best interests of the Fund to wind up and dissolve the Fund at any time, it will recommend to the shareholders that they vote to do so, and will submit a plan of dissolution for approval by the shareholders.

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Fund's or Administrator's responsibility for the prevention of money laundering, the Manager and its affiliates, subsidiaries or associates may require a detailed verification of a shareholder's identity, any beneficial owner underlying the account and the source of the payment.

The Manager reserves the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's or a shareholder's Shares in the Fund. In the event of delay or failure by the subscriber or shareholder to produce any information required for verification purposes, the Manager may refuse to accept a subscription or may cause the redemption of any such shareholder from the Fund. The Fund, without notice, may suspend the redemption rights of such shareholder if the Fund or the Manager reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Manager or any of the Fund's other service providers.

Each subscriber and shareholder shall be required to make such representations to the Fund as the Fund and the Manager shall require in connection with such anti-money laundering programs, including without limitation, representations to the Fund that such subscriber or shareholder is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Such shareholder shall also represent to the Fund that amounts contributed by it to the Fund were not directly or indirectly the proceeds of criminal conduct or derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws and regulations.

## ANTI-MONEY LAUNDERING POLICIES

To ensure compliance with statutory and other generally accepted principles aimed at the prevention of money-laundering, the Fund and/or the Administrator may require a detailed verification of a prospective investor's identity. Although the Fund and/or the Administrator reserve the right to request a detailed verification of a prospective investor's identity, a detailed verification should not be necessary if:

- the prospective investor makes a subscription payment from an account held in their own name at a Qualified Financial Institution (a "QFI"); or

- the prospective investor is introduced by a QFI and that QFI provides written assurance to the Fund and/or the Administrator that it has established the identity of the prospective investor and holds evidence of that identity.

A QFI is defined as a financial institution which is:

- established in a European Union (EU) member state and subject to the EU Money Laundering Directives; or

CONFIDENTIAL

CGMH00001367
CMHSAA0001367

- established in one of the countries which make up the Financial Action Task Force ("FATF") and/or is subject to regulation which complies with the FATF Recommendations. Such countries are the 15 EU countries as of 1st January 2004, being Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, Sweden and the United Kingdom, together with Australia, Canada, Guernsey, Hong Kong, Iceland, Isle of Man, Japan, Jersey, New Zealand, Norway, Singapore, Switzerland, Turkey and the United States.

Subscription payments will not be accepted unless made from an account held in the name of the prospective investor. In addition, prospective investors who DO NOT make the subscription payment from an account held at a QFI and who are NOT introduced by a QFI will be required to provide the following documentation, as relevant to their status.

**Individual Investors** will be required to provide the following information:

- full name;

- permanent address;

- a certified copy of their passport or national identity card;

- a bank reference letter; and

- verification of address.

**Partnerships** will be required to provide the following information:

- a mandate from the partnership authorizing the subscription and conferring authority on those persons executing the subscription agreement; and

- the identities of at least two partners and of all those authorized to issue instructions.

**Corporate entities** that are quoted on a stock exchange in an EU member country or in one of the QFI prescribed countries or that are known to be the subsidiary of such a quoted company will be required to provide the following information:

- the original or certified copy of the certificate of incorporation or similar document;

- a list of the directors' names, occupations, addresses and dates of birth; and

- properly authorized mandate of directors authorizing the subscription and conferring authority on those persons executing the subscription form.

Where the prospective investor to the transaction is a corporation that is a private company, the following additional information will need to be provided:

- certified  passport copies or national identity card copies of at least two directors; and

24

CONFIDENTIAL

- a list of names and addresses of shareholders holding 10% or more of the issued share capital of the company and in the case of individual shareholders, their occupations and dates of birth.

When a significant shareholder of a private company (25% or more) is a body corporate, information will need to be provided from the company regarding the ultimate beneficial ownership of that particular body corporate. If the ultimate beneficial owner(s) of that particular body corporate is (are) individual(s), such individual(s) will need to provide the information that is required from individual investors and outlined above.

Furthermore, subscriptions will be cross checked against lists held by various international agencies in order to establish that the persons or entities subscribing have not been blacklisted or wanted in connection with a criminal investigation. Such international agencies include the Bahamas Financial Intelligence Unit, the Central Bank of Ireland, the FBI, the Bank of England and the US Treasury Department's Office of Foreign Assets Control (OFAC). Other agencies will be consulted as and when appropriate.

Finally, it should be noted that redemption payments will only be paid to a bank account held in the name of the registered owner of the Shares and that any transferee will have to furnish the same information (and enter into a subscription agreement) which would be required in connection with a direct subscription in order for a transfer application to be considered by the Administrator.

Pending the provision of evidence satisfactory to the Administrator as to the identity of any prospective investor, the evidence of title in respect of Shares may be retained at the absolute discretion of the Administrator. If, within a reasonable period of time following a request for verification of identity, the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event application moneys will be returned without interest to the account from which such moneys were originally debited. Alternatively, if the Fund has issued Shares to an investor prior to all identification documentation being provided, such investor will not be able to redeem any Shares so issued until it has provided all required identification documents.

Financial institutions which have been duly qualified and authorized to exercise their activity in their respective countries as a bank and which are subject to internationally recognized anti money-laundering legislation may subscribe for Shares on behalf of their clients.

## TAX CONSIDERATIONS AND EXCHANGE CONTROL

As of the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Act of the BVI, including with respect to all dividends, interests, rents, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the BVI. Capital gains realized with respect to any shares, debt obligation or other securities of the Fund by persons who are not persons resident in the BVI are also exempt from the provisions of the Income Tax Act of the BVI. No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the BVI with respect to any shares, debt obligations or other securities of the Fund.

There are no exchange control restrictions in the BVI. Accordingly, the Fund will be free to acquire, to hold and to sell any foreign currency and securities without restriction.

25

CONFIDENTIAL

CGMH00001369
CMHSAA0001369

The Fund's gains from its investments in or trading in stocks, options or other investments should not be subject to United States federal income, branch or withholding taxes because the Fund expects that it will not be engaged (or treated as engaged) in a "trade or business" in the United States, or treated as a personal holding company, for United States federal income tax purposes. Any dividend income received by the Fund from U.S. corporations generally will be subject to United States federal withholding taxes. Although substantially all of the interest earned by the Fund from sources within the United States is expected to be of the type which will not be subject to United States federal income, branch or withholding taxes, the Fund may earn interest from time to time that could be subject to United States federal income, branch or withholding taxes (although it is not expected that the amount of such taxes would be material). In addition, with respect to Shares held by non-U.S. persons who are not engaged in a "trade or business" in the United States (as defined under the Code), such persons should not be subject to United States federal income, branch or withholding taxes (i) on dividends paid to them by the Fund and (ii) on the redemption of their Shares by the Fund. The Fund expects that it will not be subject to state and local taxes in the United States on its income or capital. Because of the absence of full guidance under state and local law, however, this result is not entirely clear. The conclusions in this paragraph are based on the Code and existing laws, judicial decisions and administrative regulations, rulings and practice in the United States, all of which are subject to change.

## Non-U.S. Investors

In addition, with respect to Shares held by Non-U.S. Persons who are not engaged in a "trade or business" in the United States (as defined under the Code), such persons should not be subject to United States federal income, branch or withholding taxes (i) on dividends paid to them by the Fund and (ii) on the redemption of their Shares by the Fund.

## U.S. Tax-Exempt Investors

As noted above, Shares may be sold to a limited number of U.S. Tax-Exempt Investors which are pension and profit sharing trusts or other tax exempt organizations. The Fund is a "passive foreign investment company" ("PFIC") as defined in Code Section 1297. Under present law, assuming a U.S. Tax-Exempt Investor does not borrow money or otherwise utilize leverage in connection with its acquisition of Shares, any dividends from the Fund or gain on the sale or redemption of Shares should not constitute "unrelated debt-financed income" as defined in Code Section 512 to the U.S. Tax-Exempt Investor and should not be subject to United States federal income tax under the PFIC provision of the Code.

## ERISA Matters

The Fund will not accept any contributions from investors that are "benefit plan investors" as defined in U.S. Department of Labor Regulation 2510.3-2101, pension plans or similar pension or retirement trusts (all such entities are herein referred to as "Plans") if after such contribution the Shares in the Fund held by the Plan would be 25% or more of the total outstanding shares of any class of shares in the Fund. If the shares in the class held by the Plans were to exceed this 25% limit, then the Fund's assets would be considered "plan assets" under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which could result in adverse consequences to the Manager and the fiduciaries of the Plans.

Prospective subscribers should consult their professional advisors on the possible tax consequences of subscribing for, buying, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence or domicile.

## PRIVACY POLICY

CONFIDENTIAL

CGMH00001370
CMHSAA0001370

Set forth below is a summary of the policies and practices of the Fund and the Manager with respect to the treatment of nonpublic personal information acquired about the Fund's investors. The provisions of this policy apply to current and former investors in the Fund and are subject to change.

1. The Fund and the Manager collect nonpublic personal information about investors from the following sources: (i) information received from subscribers in subscription documents and other forms; and (ii) information about an investor's transactions with the Fund, the Manager and their respective affiliates. This information may be received in any manner, including in-person discussions, telephone conversations, and electronic or other written communications.

2. The Fund and the Manager do not disclose any nonpublic personal information about investors to anyone other than the affiliates of the Fund and the Manager and "Service Providers" without permission, except as required or permitted by law (including, without limitation, as required pursuant to applicable US and anti-money laundering laws). Service Providers include third parties that provide the Partnership with services, such as brokers, transfer agents, custodians, accountants, lawyers, bankers, and other professional service providers.

3. The Fund and the Manager restrict access to nonpublic personal information, about investors to those employees and agents who need to know that information in order to provide services. They maintain physical, electronic and procedural safeguards to guard personal information.

4. The Fund and the Manager will continue to adhere to the policies and practices described herein with respect to information acquired about investors, even if such investor has redeemed its Shares from the Fund.

5. The Fund and the Manager reserve the right to change these policies and practices at any time and will provide investors with a notice describing the revised policies. In addition, this privacy policy will be sent to investors annually.

## PROXY VOTING POLICY

The Fund invests a portion of its assets in equity securities offered by publicly traded entities. From time to time, such entities may ask their investors to vote their interests in the entities with regard to corporate governance and other matters. The Manager, as the investment manager of the Fund has authority to vote such proxies and other securities on behalf of the Fund and may delegate such authority to custodians or sub-custodians of its assets. In addition, the managers of the Non-SSC Investments will vote proxies relating to those investments.

The Fund and the Manager have developed a proxy voting policy which they believe ensures that the Manager votes proxy proposals, amendments, consents or resolutions relating to the Fund's securities (collectively, "proxies") in a manner that best serves the interests of the Fund. They have reviewed the proxy voting policies of the custodians, sub-custodians and Non-SSC Investments managers. The following factors are elements of the proxy voting policies of each of the foregoing:

- the impact on short-term and long-term value;
- the preservation and increase in capital of the Fund;
- the costs and benefits associated with the proposal;
- the effect on the liquidity of the Fund; and
- the customary industry and business practices.

CONFIDENTIAL

CGMH00001371
CMHSAA0001371

With respect to proxies, the Manager will:

- maintain accurate records as to voting proxies;
- with the Fund, periodically review voting procedures employed and actions taken on individual voting situations;
- have procedures in place for reconciling proxies;
- take reasonable steps to ensure that proxies for which it is responsible are received and, where appropriate, voted; and
- comply with all current applicable proxy laws, rules and regulations.

## LEGAL MATTERS

Legal matters in connection with this offering have been passed upon for the Fund in the United States by Andrew E. Goldstein, Esq., 488 Madison Avenue, 16th Floor, New York, New York 10022. Matters with respect to the laws of the British Virgin Islands have been passed upon by Conyers Dill & Pearman, Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands.

## MISCELLANEOUS

**Reports and Financial Statements**

The Fund's fiscal year will end on December 31, except that the Fund's final fiscal year will terminate on the date the Fund commences to wind up and dissolve. The Fund will keep its books on an accrual basis. Audited financial statements of the Fund will be mailed to shareholders at their registered addresses and the Irish Stock Exchange, normally within 120 days after year-end. At the same time, each shareholder shall be furnished with an annual report of the Fund, which will include the Net Asset Value of the Fund and the Net Asset Value per Share at the end of the year, and such other information as the Fund, in its discretion, determines to be necessary or appropriate. Shareholders also will receive an unaudited interim report with respect to the Fund's financial performance within four months from the end of June of each year.

1) **General**

   a) No Share or loan capital of the Fund is under option or agreed, conditionally or unconditionally, to be put under option.

   b) Shares in the Fund are in registered form. Temporary documents of title will not be issued.

   c) Except for their ownership of Shares, none of the Directors or any connected person has any interest in the Shares or loan capital of the Fund, the existence of which is known to, or could with reasonable diligence be ascertained by, the relevant Director.

   d) None of the Directors has a service contract with the Fund and no such contract is proposed, although, Walter M. Noel, Jr. is a principal of the Manager.

   e) No loan or guarantee has been granted or provided by the Fund to or for the benefit of any Director.

CONFIDENTIAL

CGMH00001372
CMHSAA0001372

f) None of the Directors or any member of their respective immediate families has or has had any interest in any transaction or transactions which are or were unusual in their nature or conditions or significant in the business of the Fund and which have been effected by the Fund since its incorporation.

g) As of the date of this Confidential Private Placement Memorandum, the Shares have commenced operations, but no dividends have been declared.

h) The Fund has no loan capital outstanding, no loan capital created but unissued, no loans or any other borrowing or indebtedness or any contingent liabilities, nor has it given any guarantees.

## 2) Litigation and Arbitration

The Fund is not engaged in any legal or arbitration proceedings and no legal or arbitration proceedings are known to the Directors to be threatened by or against the Fund.

## 3) Memorandum and Articles of Association

Pursuant to Paragraph 4 of the Fund's Memorandum of Association, the Fund may engage in any act or activity that is not prohibited under any law for the time being in force in the BVI. As such, the Fund may carry on business as an investment company. The Fund's Memorandum and Articles of Association may be amended by a resolution of Directors or a resolution of shareholders.

The Memorandum and Articles of Association of the Fund provide that no director or officer of the Fund shall be liable for the acts, receipts, neglects or defaults of any other director or officer, or for joining in any receipt or act for conformity, or for any loss or expense happening to the Fund through the insufficiency of deficiency of title to any property acquired by order of the directors for or on behalf of the Fund, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Fund shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, to the extent permitted by law.

The Memorandum and Articles of Association of the Fund further provide that each director or officer of the Fund shall be indemnified by the Fund against, and it shall be the duty of the directors out of the funds of the Fund to pay, all costs, losses, and expenses which any director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Fund, and have priority as between the shareholders over all other claims but only if such director or officer acted honestly and in good faith with a view to the best interests of the Fund and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

## 4) Directors

a) The number of Directors shall not be less than one (1) or more than twenty (20).

b) The remuneration of Directors shall be fixed from time to time by the Board. Currently the Director who is affiliated with the Manager does not receive compensation as a Director. The two Directors not affiliated with the Manager are each paid $25,000 per annum.

29

CGMH00001373
CMHSAA0001373

c)  None of the Directors has a service contract, existing or proposed with the Fund, although Walter M. Noel, Jr. is a principal of the Manager.

d)  There is no retirement age for Directors.

e)  The Directors may vote on any transaction in which they have a material interest if they first disclose the nature of their interest to the Fund.

f)  The Directors may, by resolution of Directors, fix the emoluments of the Directors with respect to services to be rendered in any capacity to the Fund.

g)  The Directors may exercise the powers of the Fund to borrow money and to mortgage or charge its undertakings, property and uncalled capital or any part thereof, to issue debentures, debenture stock and offer securities whenever money is borrowed as security for any debt, liability or obligation of the Fund.

h)  No Director has

- any unspent convictions in relation to indictable offenses;

- been adjudged a bankrupt, entered into a voluntary arrangement with creditors or had a receiver appointed to oversee any asset of such Director;

- been the director of any company which, while he was a director with an executive function or after 12 months after he ceased to be director with an executive function, had a receiver appointed or went into compulsory liquidation, creditors voluntary liquidation, administration or company voluntary arrangements, or made a composition or arrangements with its creditors generally or with any class of its creditors;

- been a partner of any partnership which, while he was partner or within 12 months after he ceased to be a partner, went into compulsory liquidation, administration or partnership voluntary arrangement or had a receiver appointed to oversee any partnership asset;

- had any public criticism by statutory or regulatory authorities (including recognized professional bodies); or

- been disqualified by a court from acting as a director or from acting in the management or affairs of any company.

**5) <u>Borrowing Powers</u>**

The Board may exercise all the powers of the Fund to borrow money, give guarantees and to mortgage, pledge or charge all or part of its undertaking, property and uncalled capital and to issue debentures and other securities, whether outright or as collateral security for any liability or obligation of the Fund.

CONFIDENTIAL

CGMH00001374
CMHSAA0001374

**Documents Available for Inspection**

Copies of the following documents will be available for inspection at the offices of the Fund's registered office in the British Virgin Islands and the offices of the Sponsoring Broker during usual business hours on any weekday (Saturdays, Sundays and holidays excepted):

a) the Memorandum and Articles of Association of the Fund;

b) the material contracts of the Fund;

c) the British Virgin Islands Mutual Funds Act, 1996;

d) when available, the latest financial statements of the Fund;

e) audited accounts as of the close of the last immediately fiscal year;

f) Auditors letter of consent; and

g) a list of all past and present directorships and partnerships held by each Director over the past five years.

## COUNTRY-SPECIFIC NOTICES

Australia.  No offer for subscription or purchase of the Shares offered hereby, nor any invitation to subscribe for or buy such Shares, has been made or issued in Australia, otherwise than by means of an excluded issue, excluded offer or excluded invitation within the meaning of Section 66(2) or 66(3) of the Corporations Law.  Accordingly, the Memorandum has not been lodged with the Australian Securities Commission.  Further, the Shares offered hereby may not be resold in Australia within a period of six (6) months after the date of issue otherwise than by means of an excluded offer or excluded invitation as described above.

Bahamas.  The Shares may not be offered or sold or otherwise disposed of in any manner to persons deemed by the Central Bank of the Bahamas as resident for exchange control purposes, unless such persons deemed as resident obtain the prior approval of the Central Bank of the Bahamas.

Belgium.  The information in this Memorandum may not be disclosed to the public in Belgium, the Shares may not be offered, sold, transferred or delivered in or from Belgium as part of their initial distribution or at any time thereafter, directly or indirectly, other than to persons or entities mentioned in Article 3 of the Royal Decree of January 9, 1991 Relating to the Public Characteristic of Operations Calling for Savings and on the Assimilation of Certain Operations to a Public Offer (Belgian Official Journal of January 12, 1991).  Therefore, the Shares are exclusively designed for credit institutions, stock exchange companies, collective investment funds, companies or institutions, insurance companies, and/or pension funds acting for their own account only.

Brazil.  The Shares have not been, and will not be, registered with the Comissao de Valores Mobiliarios and may not be offered or sold in Brazil except in circumstances which do not constitute a public offering or distribution under Brazilian laws and regulations.

British Columbia and Ontario, Canada.  The Memorandum constitutes an offering of the securities described therein only in those jurisdictions and to those persons where and to whom they may be lawfully offered for sale, and therein only by persons permitted to sell such securities.  The

31

CONFIDENTIAL

CGMH00001375
CMHSAA0001375

Memorandum is not, and under no circumstances is to be construed as, an advertisement or a public offering of the securities described therein in Canada. No securities commission or similar authority in Canada has reviewed or in any way passed upon the Memorandum or the merits of the securities described therein, and any representation to the contrary is an offense. If the Memorandum, together with any amendment thereto, contains an untrue statement of a material fact or omits to state a material fact that is required to be stated or is necessary in order to make any statement therein not misleading in the light of the circumstances in which it was made (a "Misrepresentation") and it was a Misrepresentation on the date of purchase, purchasers in British Columbia and Ontario to whom the Memorandum was sent or delivered and who purchase Shares shall have a right of action against the Fund for rescission (while still the owner of such shares) or alternatively, for damages, exercisable on written notice given not more than 90 days subsequent to the date of purchase, provided that the Fund will not be liable: (a) if the purchaser purchased such Shares with knowledge of the Misrepresentation; (b) for all or any portion of any damages that the Fund proves do not represent the depreciation in value of such Shares as a result of the Misrepresentation; and (c) for amounts in excess of the price at which such Shares were sold to the purchaser. The foregoing summary is subject to the express provisions of either the Securities Act (British Columbia) or the Securities Act (Ontario), whichever the case may be, and reference is made to the complete text of such provisions.

British Virgin Islands. The Shares offered hereby may not be sold to or purchased by persons resident in the British Virgin Islands, but may be sold to British Virgin Islands international business companies.

Cayman Islands. No invitation may be made to the public in the Cayman Islands to subscribe for the Shares unless the Fund is listed on the Cayman Islands stock exchange. Cayman Islands exempted and ordinary non-resident companies and certain other persons engaged in offshore business, however, may be permitted to acquire Shares.

Chile. The Shares have not been, and will not be, registered with the Superintendencia de Valores y Seguros (the Chilean Securities Commission) and may not be offered and sold in Chile except in circumstances which do not constitute a public offering or distribution under Chilean laws and regulations.

Republic of China. No invitation to offer for, or sale of, the Shares shall be made to the public in China or by any means that would be deemed public under the laws of China. The offer of Shares is personal to the investor to whom the Memorandum has been addressed by the Fund. Business entities incorporated under the laws of China (excluding foreign investment business entities) shall apply for approval from the Chinese government authorities before purchasing the Shares. Furthermore, all business entities incorporated under the laws of China and Chinese citizens residing in China shall obtain prior approval from the Chinese Foreign Exchange Authority before purchasing Shares.

Costa Rica. The Shares have not been, and will not be, registered with the Comision Nacional de Valores (the Costa Rican Securities Commission) and may not be offered or sold in Costa Rica except in circumstances which do not constitute a public offering or distribution under Costa Rican laws and regulations.

Ecuador. The Shares have not been, and will not be, registered with the Superintendencia de Companias del Ecuador (the Ecuadorian Securities and Exchange Commission) and may not be offered and sold in Ecuador except in circumstances which do not constitute a public offering or distribution under Ecuadorian laws and regulations. This communication is for informative purposes only; it does not constitute a public offering of any kind.

CONFIDENTIAL

CGMH00001376
CMHSAA0001376

France.  "Cette note d'information n'a pas été soumise au visa de la Commission des Opérations de Bourse.  Par conséquent, ni cette note d'information, ni tout autre document promotionnel se rapportant aux intérêts ne pourront être communiqués au public ou utilisés dans la cadre de toute offre de souscription ou de vente des intérêts en France et les intérêts ne peuvent être émis, offerts ou cédés de toute façon en France.  Les investisseurs doivent agir pour leur propre compte.  Le vente, directe ou indirecte, au public des instruments financiers acquis sera faite conformément aux dispositions les concernant."  This Memorandum has not been submitted to the Commission des Operations de Bourse in France.  Accordingly, neither this Memorandum nor any other offering materials relating to the Shares may be available to the public or used in connection with any other offer for subscription or sale of the Shares in France, and the Shares may not be issued, offered or otherwise sold in France, investors should act for their own account.  The sale, direct or indirect, in the public of the purchased financial instruments will be made in compliance with all requirements in relation thereto.

Germany.  Any person who is in possession of the Memorandum understands that no action has or will be taken which would allow an offering of the Shares to the public in Germany.  Accordingly, the Shares may not be offered, sold or delivered and neither the Memorandum nor any other offering materials relating to the Shares may be distributed or made available to the public in Germany.  Individual sales of the Shares to any person in Germany may only be made according to German securities, tax and other applicable laws and regulations.

Greece.  The Shares may not be offered or sold in any manner that constitutes an offer or sale to the public in the Hellenic Republic within the laws and regulations from time to time applicable to public offers or sales of securities.

Hong Kong.  No action has been taken to permit an offering of the Shares to the public in Hong Kong and, accordingly, no copy of this Memorandum may be issued, circulated or distributed in Hong Kong other than (i) exclusively to persons whose business involves the acquisition, disposal or holding of securities, whether as principal or agent, or (ii) otherwise in circumstances that do not constitute an invitation to the public for the purpose of the Protection of Investors Ordinance (Chapter 335 of the Laws of Hong Kong).

Ireland.  It is not the intention of the Fund to advertise or market the Shares in Ireland, and no such marketing will take place without the prior approval in writing of the Central Bank of Ireland.

Isle of Man.  The Fund is not a recognized collective investment scheme for the purposes of Sections 12 or 13 of the Financial Services Act 1988 (the "FS Act") of the Isle of Man and is accordingly subject to the prohibition on the promotion of collective investment schemes as contained in Section 1(1) of the FS Act.  Accordingly, the Memorandum may only be issued or passed on to any person in the Isle of Man by way of the two limited exceptions to this general prohibition contained in Section 1(2) of the FS Act and the Financial Supervision (Promotion of Unregulated Schemes (Exemption)) FS Regulations 1992 (the "Exemption Regulations").  Under Regulation 3(2) of the Exemption Regulations, any advertisement issued in the Isle of Man in connection with the Fund must contain a statement either (a) that participants in the Fund are not protected by any statutory compensation scheme; or (b) that participants in the Fund are protected by a statutory compensation scheme and particulars sufficient to identify the compensation arrangements.

Israel.  The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution which would be other than a private placement.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.  Israeli residents, other than those considered "exemption

33

CGMH00001377
CMHSAA0001377

holders" under the General Currency Control Permit, 1978, require a special permit from the Israeli Controller of Foreign Currency in order to purchase the Shares.

Italy. This Memorandum may not be distributed to members of the public in Italy. The Italian Commission Nazionale per la Societa e la Borsa has not authorized any offering of the subscription of Shares in the Fund; accordingly, Shares may not be offered or sold in Italy or to residents thereof except as permitted by Italian law. With respect to any potential purchaser or transaction subject to Italian law, this Memorandum is for the sole use of the person who has requested it and whose name appears on the cover page hereof (the "Prospective Buyer") and may not be disclosed, in whole or in part, to any person other than the Prospective Buyer and the Prospective Buyer's authorized agents. This Memorandum may not be copied in whole or in part. The Prospective Buyer, by accepting delivery of the Memorandum, agrees to return it to the Fund if such Prospective Buyer does not undertake to purchase the securities offered hereby.

Japan. Under Article 23-14 Paragraph 1 of the Securities Exchange Law (the "SEL"), the purchase of Shares cannot be made unless the purchaser agrees to the condition that it will not make an assignment of the Shares to any person other than a non-resident of Japan (having the same meanings as defined in Article 6, Paragraph 1(6) of the Foreign Exchange and Foreign Trade Control Laws), except for the case that all the Shares (excluding the Shares assigned to non-residents of Japan) are assigned to one person. Furthermore, disclosure under the SEL has not been made. The Shares will not be registered under the SEL. The offer and sale of the Shares in Japan may be made only in accordance with an exemption available under the SEL and with all other applicable laws and regulations of Japan.

Jersey. The Memorandum relates to a private placement and does not constitute an offer to the public in Jersey to subscribe for the Shares offered hereby. No regulatory approval has been sought for the offer in Jersey. The offer of the Shares is personal to the person to whom the Memorandum is being delivered by or on behalf of the Fund, and a subscription for the Shares will be accepted only from such person. The Memorandum may not be produced or used for any other purpose, nor be furnished to any other person other than those to whom it has been so delivered.

Korea. The Memorandum is not, and under no circumstance is to be construed as, a public offering of securities in Korea. Neither the Fund nor the investment manager is making any representation with respect to the eligibility of any recipients of the Memorandum to acquire the Shares under the laws of Korea, including without limitation the Foreign Exchange Management Act and regulations thereunder. The Shares have not been registered under the Securities and Exchange Act of Korea and none of the Shares may be offered, sold or delivered, or offered or sold to any person for re-offering or resale, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

Liechtenstein. The Shares are offered to a narrowly defined category of investors, in all cases under circumstances designed to preclude a public solicitation. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Luxembourg. The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution that would be other than a private placement. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Netherlands. The Shares may not be solicited, acquired or offered, directly or indirectly, in or from the Netherlands, and this Memorandum may not be circulated in the Netherlands to any individuals

34

CGMH00001378
CMHSAA0001378

or legal entities as part of the initial distribution or anytime thereafter, except to individuals or legal entities who or which trade or invest in subjects of investment ("Beleggingsobjecten") in the conduct of a profession or trade, including banks, brokers, securities institutions, insurance companies, pension funds, investment institutions, other institutional investors and other parties, including treasury departments of commercial enterprises and finance companies which are regularly active in the financial markets in a professional manner (a "Professional Market Party" and/or "Professional Market Parties") investing in subjects of investment as described in Article 1 of the Exemption Regulation of October 9, 1990 issued pursuant to Article 14 of the Investment Institutions Supervision Act (Wet Toezicht Beleggingsinstellingen) of June 27, 1990, as amended from time to time (the "Investment Institutions Act"), and the respective accompanying Memoranda thereto of the Minister of Finance of the Netherlands.  In the event of a solicitation, acquisition or offering made to or by Professional Market Parties and therefore exempt from the general prohibition as provided for in the Investments Institutions Act, no subsequent offering of the Shares in a "secondary offering" by such Professional Market Parties to persons other than such Professional Market Parties may be made.

New Zealand.  The Memorandum has been prepared solely for and the offer made in it is made solely to habitual investors (being persons defined in Section 3(2)(a)(ii) of the New Zealand Securities Act 1978).

Norway.  The Memorandum has not been filed with the Oslo Stock Exchange in accordance with the Norwegian Securities Trading Act, Section 5-1, and may therefore not be distributed to more than fifty potential investors in Norway.

Oman.  The Memorandum and the Shares are not available to any member of the public and are restricted to investors having an existing business relationship with the Fund.  Application for the Shares made by or on behalf of investors not having an existing relationship with the investment manager will not be accepted.  Any investor that considers purchasing the Shares offered by the Memorandum should consult a professional adviser before doing so.

Panama.  The Shares have not and will not be registered with the Comision Nacional de Valores (the National Securities Commission) of the Republic of Panama under Cabinet Decree No. 247 of 1970 ("Panama's Securities Laws") and may not be offered or sold in a primary offering within Panama, except in certain transactions exempt from the registration requirements of Panama's Securities Laws.

Russia.  The Shares are not intended to be sold or offered in (or on the territory of) the Russian Federation or to Russian residents and the Memorandum has not been registered with, and will not be registered with, the Federal Securities Markets Commission of the Russian Federation.

Singapore.  The Memorandum has not been registered with the Registrar of Companies in Singapore and the Shares will be offered in Singapore pursuant to an exemption invoked under Sections 106c and 106d of the Companies Act, Chapter 50 of Singapore ("Singapore Act").  Accordingly, the Shares may not be offered or sold, nor may the Memorandum or any other offering document or material relating to the Shares be circulated or distributed, directly or indirectly, to the public or any member of the public other than (1) to an institutional investor or other body or person specified in Section 106c of the Singapore Act, or (2) to a sophisticated investor specified in Section 106d of the Singapore Act, or (3) otherwise pursuant to, and in accordance with the conditions of, Section 106e(2) of the Singapore Act or any other applicable exemption invoked under Division 5a of Part IV of the Singapore Act.

South Africa.  The Shares are for your acceptance only and may not be offered or become available to persons other than yourself and may not be publicly offered, sold or advertised in South Africa and the Memorandum may only be circulated to selected individuals.

CONFIDENTIAL

CGMH00001379
CMHSAA0001379

<u>Spain</u>.  This Memorandum has not been and will not be registered with la Comision Nacional del Mercado de Valores of Spain and may not be distributed in Spain in connection with the offering and sale of participations without complying with all legal and regulatory requirements in relation thereto.

<u>Switzerland</u>.  This Memorandum has been prepared for private information purposes of interested investors only.  It may not be used for and shall not be deemed a public offering of Shares.  No application has been made under Swiss law to publicly market the Fund in or out of Switzerland.  The Shares are not subject to the Swiss Investment Fund Act and are therefore not subject to supervision by the Federal Banking Commission and, accordingly, may not be advertised publicly.  Therefore, no public offer of the Shares or public distribution of this Memorandum may be made in or out of Switzerland.  This Memorandum is strictly for private use by its holders and may not be passed on to third parties.

<u>United Kingdom</u>.    The Fund is an unrecognized collective investment scheme for the purposes of the Financial Services and Markets Act of 2000 of the United Kingdom (the "Act").  The promotion of the Fund and the distribution of this Prospectus in the United Kingdom is accordingly restricted by law.

The content of this Prospectus has not been approved by an authorized person and such approval is, save where this Prospectus is directed at or issued to the types of person referred to above, required by Section 21 of the Act.  Acquiring Shares may expose an investor to a significant risk of losing all of the amount invested.  The Fund is a limited liability company and any person who acquires Shares will not thereby be exposed to any significant risk of incurring additional liability.  Any person who is in any doubt about investing in the Fund should consult an authorized person specializing in advising on such investments.

<u>Uruguay</u>.  The Shares correspond to a private issue and are not registered with the Central Bank of Uruguay.

CONFIDENTIAL

CGMH00001380
CMHSAA0001380

# **Madoff SEC Form**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

HO-965799

OFFICE OF FILINGS AND
INFORMATION SERVICES

January 30, 2004

1-2

Mr. Gordon McKenzie
Fairfield Greenwich (Bermuda) Ltd.
12 Church Street, Ste. 606
Hamilton, Bermuda, HM 11

RE: Form X-17A-5

Dear Mr. McKenzie:

Enclosed is the information that you requested. Please do not hesitate to contact, a
member of my staff, if we can be of further assistance to you, at (202) 942-8078.

Sincerely,

Valerie A. Lenyear
Chief, Public Reference Branch

VAL/djr



CONFIDENTIAL

CGMH00001321
CMHSAA0001321

03052896

C M SECURITIE ... SION

Washington, D.C. 20549

A†† 12-16-2003

OMB APPROVAL
OMB Number:        3235-0123
Expires:        October 31, 2004
Estimated average burden
hours per response......12.00

# ANNUAL AUDITED REPORT
## FORM X-17A-5
### PART III

SEC MAIL PROCESSING

DEC 1 1 2003

SEC FILE NUMBER
8- 8132

## FACING PAGE

**Information Required of Brokers and Dealers Pursuant to Section 17 of the
Securities Exchange Act of 1934 and Rule 17a-5 Thereunder**

REPORT FOR THE PERIOD BEGINNING ___11/01/02___ AND ENDING ___10/31/03___
                                        MM/DD/YY                                       MM/DD/YY

## A. REGISTRANT IDENTIFICATION

NAME OF BROKER-DEALER:
    BERNARD L. MADOFF INVESTMENT SECURITIES LLC

ADDRESS OF PRINCIPAL PLACE OF BUSINESS: (Do not use P.O. Box No.)

OFFICIAL USE ONLY

885 Third Avenue

FIRM I.D. NO.

(No. and Street)

| New York | New York | 10022 |
|---|---|---|
| (City) | (State) | (Zip Code) |

NAME AND TELEPHONE NUMBER OF PERSON TO CONTACT IN REGARD TO THIS REPORT
    Enrica Cotellessa-Pitz                  212-230-2424 Ext. 2429
                                                                        (Area Code – Telephone Number)

## B. ACCOUNTANT IDENTIFICATION

INDEPENDENT PUBLIC ACCOUNTANT whose opinion is contained in this Report*

    Friehling & Horowitz, CPA's P.C.

(Name – if individual, state last, first, middle name)

| Four High Tor Road | New City | New York | 10956 |
|---|---|---|---|
| (Address) | (City) | (State) | (Zip Code) |

CHECK ONE:

☒ Certified Public Accountant

☐ Public Accountant

☐ Accountant not resident in United States or any of its possessions.

PROCESSED
DEC 23 2003
THOMSON
FINANCIAL

| FOR OFFICIAL USE ONLY |
|---|
|  |

*Claims for exemption from the requirement that the annual report be covered by the opinion of an independent public accountant
must be supported by a statement of facts and circumstances relied on as the basis for the exemption. See Section 240.17a-5(e)(2)*

SEC 1410 (06-02)

**Potential persons who are to respond to the collection of
information contained in this form are not required to respond
unless the form displays a currently valid OMB control number.**

CONFIDENTIAL
CGMH00001322
CMHSAA0001322

## OATH OR AFFIRMATION

I, __Bernard L. Madoff_____, swear (or affirm) that, to the best of
my knowledge and belief the accompanying financial statement and supporting schedules pertaining to the firm of
__Bernard L. Madoff Investment Securities LLC_____, as
of __October 31_____, 20 _03_, are true and correct. I further swear (or affirm) that
neither the company nor any partner, proprietor, principal officer or director has any proprietary interest in any account
classified solely as that of a customer, except as follows:

_____

_____

_____

_____
Signature

__Sole Member_____
Title

_____
Notary Public

H. DAVID BERKOWITZ
NOTARY PUBLIC, State of New York
No. 60-4963036
Qualified in Westchester County
Commission Expires February 26, 20226

This report ** contains (check all applicable boxes):
- ☒ (a) Facing Page.
- ☒ (b) Statement of Financial Condition.
- ☒ (c) Statement of ~~Income (Loss)~~ Operations.
- ☒ (d) Statement of ~~Changes in Financial Condition~~ Cash Flows.
- ☒ (e) Statement of Changes in Stockholders' Equity or Partners' or Sole Proprietors' Capital.
- ☐ (f) Statement of Changes in Liabilities Subordinated to Claims of Creditors.
- ☒ (g) Computation of Net Capital.
- ☒ (h) Computation for Determination of Reserve Requirements Pursuant to Rule 15c3-3.
- * ☐ (i) Information Relating to the Possession or Control Requirements Under Rule 15c3-3.
- ** ☐ (j) A Reconciliation, including appropriate explanation of the Computation of Net Capital Under Rule 15c3-3 and the Computation for Determination of the Reserve Requirements Under Exhibit A of Rule 15c3-3.
- ☐ (k) A Reconciliation between the audited and unaudited Statements of Financial Condition with respect to methods of consolidation.
- ☒ (l) An Oath or Affirmation.
- ☐ (m) A copy of the SIPC Supplemental Report.
- *** ☐ (n) A report describing any material inadequacies found to exist or found to have existed since the date of the previous audit.
- X (o) Independent Auditors' Report on Internal Accounting Control.

**For conditions of confidential treatment of certain portions of this filing, see section 240.17a-5(e)(3).

* See Note 3 Supplementary Information
** See Note 1 Supplementary Information
*** See Note 2 Supplementary Information

CONFIDENTIAL

BERNARD L. MADOFF INVESTMENT SECURITIES LLC

STATEMENT OF FINANCIAL CONDITION

OCTOBER 31, 2003



**FRIEHLING & HOROWITZ**
CERTIFIED PUBLIC ACCOUNTANTS

CONFIDENTIAL

CGMH00001324
CMHSAA0001324

## FRIEHLING & HOROWITZ, CPA'S, P.C.

FOUR HIGH TOR ROAD

NEW CITY, NEW YORK 10956

945-634-1254

FAX: 845-634-2310

Bernard L. Madoff Investment Securities LLC
885 Third Avenue
New York, New York  10022

## INDEPENDENT AUDITORS' REPORT

Gentlemen:

We have audited the accompanying statement of financial condition of Bernard L. Madoff
Investment Securities LLC (the "Company") as of October 31, 2003.  The financial
statement is the responsibility of the Company's management.  Our responsibility is to
express an opinion on the financial statement based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the
United States of America.  Those standards require that we plan and perform the audit to
obtain reasonable assurance about whether the financial statement is free of material
misstatement.  An audit includes examining, on a test basis, evidence supporting the
amounts and disclosures in the financial statement.  An audit also includes assessing the
accounting principles used and significant estimates made by the Company's
management, as well as evaluating the overall financial statement presentation.  We
believe that our audit provides a reasonable basis for our opinion.

In our opinion, the statement of financial condition presents fairly, in all material respects,
the financial position of Bernard L. Madoff Investment Securities LLC at October 31, 2003
in conformity with accounting principles generally accepted in the United States of
America.

New City, New York
December 10, 2003

*Friehling & Horowitz, CPA's P.C.*

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC
## STATEMENT OF FINANCIAL CONDITION
## AS OF OCTOBER 31, 2003

### ASSETS

| | |
|---|---:|
| Cash and cash equivalents | $149,278,000 |
| Cash segregated in compliance with federal and other regulations | 1,476,000 |
| Securities borrowed | 245,055,000 |
| Receivable from brokers, dealers and others | 32,982,000 |
| U.S. government and federal agency obligations owned, at market value | 89,046,000 |
| Other securities owned, at market value | 375,525,000 |
| Furniture, fixtures, equipment and leasehold improvements (net of accumulated depreciation) | 8,720,000 |
| Membership in exchange | 2,293,000 |
| **TOTAL ASSETS** | **$904,375,000** |

SEE ACCOMPANYING NOTES TO FINANCIAL STATEMENT

FRIEHLING & HOROWITZ
CERTIFIED PUBLIC ACCOUNTANTS

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC
### STATEMENT OF FINANCIAL CONDITION
### AS OF OCTOBER 31, 2003

### LIABILITIES AND MEMBER'S EQUITY

| | |
|---|---:|
| Payable to brokers, dealers and others | $ 11,063,000 |
| Securities sold, but not yet purchased, at market value | 407,856,000 |
| Accounts payable, accrued expenses, taxes and other liabilities | 7,456,000 |
| **TOTAL LIABILITIES** | $426,375,000 |
| **MEMBER'S EQUITY** | 478,000,000 |
| **TOTAL LIABILITIES AND MEMBER'S EQUITY** | $904,375,000 |

SEE ACCOMPANYING NOTES TO FINANCIAL STATEMENT

FRIEHLING & HOROWITZ
CERTIFIED PUBLIC ACCOUNTANTS

CONFIDENTIAL

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC
## NOTES TO STATEMENT OF FINANCIAL CONDITION
### OCTOBER 31, 2003

Our audited Statement of Financial Condition filed pursuant to S.E.C. rule 17a-5, dated October 31, 2003, is available for examination and copying at our office and at the Securities and Exchange Commission in New York, New York.

## NOTE 1 -- NATURE OF BUSINESS AND ORGANIZATION

Bernard L. Madoff Investment Securities LLC (the "Company") is a registered broker/dealer with the Securities and Exchange Commission and a member of the National Association of Securities Dealers, Inc. The Company has been executing securities transactions since 1960.

## NOTE 2 -- SIGNIFICANT ACCOUNTING POLICIES

Cash and cash equivalents consist of cash and highly liquid investments not held for resale with maturities, when purchased, of three months or less.

Securities borrowed and securities loaned are recorded at the amount of cash collateral advanced or received in connection with the transactions. Securities borrowed transactions require the Company to provide the counterparty with cash collateral whereas the Company receives cash collateral in securities loaned transactions. The amount of cash collateral required to be deposited is an amount in excess of the market value of the securities borrowed or loaned. It is the Company's policy to monitor the market value of the securities on a daily basis with additional collateral obtained or refunded as necessary.

Assets, liabilities, and income statement accounts denominated in foreign currencies are translated at fiscal year-end rates of exchange. Gains or losses resulting from foreign currency transactions are included in net income.

Proprietary securities transactions in regular-way trades are recorded on the trade date, as if they had settled. Profit and loss arising from all securities transactions entered into for the account and risk of the Company are recorded on a trade date basis. Customers' securities transactions are reported on a settlement date basis with related commission income and expenses reported on a trade date basis. Securities owned or sold but not yet purchased are stated at quoted market values, with resulting unrealized gains and losses included in results of operations.

The process of preparing financial statements in conformity with generally accepted accounting principles requires the use of estimates and assumptions regarding certain types of assets, liabilities, revenues and expenses. Such estimates primarily relate to unsettled transactions and events as of the date of the financial statements. Accordingly, upon settlement, actual results may differ from estimated amounts.

### FRIEHLING & HOROWITZ
CERTIFIED PUBLIC ACCOUNTANTS

CONFIDENTIAL

The Company is engaged in various trading and brokerage activities whose counterparties primarily include broker-dealers, banks and other financial institutions. In the event counterparties do not fulfill their obligations, the Company may be exposed to risk. The risk of default depends on the creditworthiness of the counterparty or issuer of the instrument. It is the Company's policy to review, as necessary, the credit standing of each counterparty.

Furniture and equipment are stated at cost, less accumulated depreciation. Depreciation is provided on the MACRS method over the estimated useful life of the asset, generally five or seven years.

Membership in exchange is recorded at cost.

NOTE 3 -- REGULATORY REQUIREMENTS

The Company is subject to the Securities and Exchange Commission Uniform Net Capital rule 15c3-1. The Company has elected to compute its Net Capital requirement under the Alternative Method. At October 31, 2003, under this method, the Company's Net Capital was $376,327,000. The required Net Capital was $1,000,000 thereby leaving capital in excess of all requirements of $375,327,000.

NOTE 4 -- COMMITMENTS AND CONTINGENT LIABILITIES

The Company leases certain office space under non-cancelable operating leases which expire in 2007. The aggregate lease and rental commitment payable for the entire term of the lease is $12,037,000.

The Company has no pending lawsuits against it.

FRIEHLING & HOROWITZ
CERTIFIED PUBLIC ACCOUNTANTS

CONFIDENTIAL

# **<u>Sentry Flip Book</u>**

CONFIDENTIAL

FairfieldGreenwichGroup

# Fairfield Sentry Limited

**New York Office:**
919 Third Avenue
New York, NY 10022
phone: +1 212.319.6060
fax: +1 212.319.0450
e-mail: main@fggus.com

**London Office:**
Pollen House
10-12 Cork Street
London W1S 3NP
phone: +44 207.534.9244
fax: +44 207.534.9245
e-mail: main@fgguk.com

**Bermuda Office:**
12 Church Street, Suite 606
Hamilton, Bermuda HM 11
phone: +441 292-5401
fax: +441 292-5413
www.fggus.com

CGMH00001330
CMHSAA0001330

CONFIDENTIAL

# Legal/Compliance Disclaimers

This document has been prepared solely to provide you with a profile of Fairfield Greenwich Group (FGG). It may not be used or reproduced for any other purpose.

The information and opinions contained in this document are for background purposes only and do not purport to be full or complete. No reliance may be placed for any purpose on the information or opinions contained in this document or their accuracy or completeness. No representation, warranty or undertaking, express or implied, is given by FGG as to the accuracy or completeness of the information or opinions contained in this document and no liability is accepted by FGG for the accuracy or completeness of any such information or opinions.

No information provided herein shall constitute, or be construed as, an offer to sell or a solicitation of an offer to acquire any security, investment product or service, nor shall any such security, product or service be offered or sold in any jurisdiction where such offer or solicitation is prohibited by law or regulation. Recipients of this document who intend to apply for shares in an FGG Fund are reminded that any such application may be made solely on the basis of the information and opinions contained in that Fund's Offering Memorandum which may be different from the information and opinions contained in this document.

**UK Residents**: Fairfield Greenwich (UK) Limited is regulated in the conduct of investment business by the FSA. The Funds referred to in this document are unregulated collective investment schemes for the purposes of Section 76 of the Financial Services Act 1986 of the United Kingdom (the "Act"). Accordingly, this document may only be issued in the United Kingdom to persons who are authorised to carry on investment business under the Act ("authorised persons"), persons whose ordinary business involves the acquisition and disposal of property of the same kind as the property, or a substantial part of the property, to which the Funds relate and to persons to whom unregulated collective investment schemes are permitted to be promoted in accordance with the Financial Services (Promotion of Unregulated Schemes) Regulations 1991. The Funds are not authorised to carry on investment business in the United Kingdom. Accordingly, all or most of the protections afforded by the United Kingdom regulatory system will not apply to investments in the Funds and compensation will not be available to investors under the Financial Services Compensation Scheme.

CGMH00001331
CMHSAA0001331

CONFIDENTIAL

# Firm Profile

**Established in 1983, Fairfield Greenwich Group ("FGG") is one of the largest and most experienced alternative asset managers, with over $8 billion in client and firm assets under management.**

- Employee-owned firm with over 65 employees, 12 of whom are shareholders

- Offices in New York, London, and Bermuda, and representative offices in the U.S., Europe and Latin America; joint venture in Singapore

- FGG entities are: registered with the U.S. SEC as an investment advisor and broker dealer; authorized and regulated by the U.K. Financial Services Authority.

- Client base includes: private banks, financial advisors, family offices, pension funds, government authorities, and other institutional investors

- FGG invest capital alongside its clients

- *Strategic partnership* with underlying managers allows for full transparency

- Rigorous portfolio oversight and risk monitoring

Fairfield Greenwich Group

3

CGMH00001332
CMHSAA0001332

CONFIDENTIAL

# Investment Philosophy — Capital Preservation

**FGG's investment philosophy requires that managers maintain *capital preservation* as a core tenet and adhere to the following principles:**

- **Full Transparency**
  - To securities level, for FGG portfolio analysis and risk monitoring
- **Liquid Portfolios**
  - Managers hold relatively liquid securities
  - Monthly investor liquidity
- **Low Correlation**
  - To broader markets and other FGG Managers
- **Low Relative Leverage**
  - At manager level and portfolio level
- **Low Volatility**
  - Relative to other funds in the asset class

CGMH00001333
CMHSAA0001333

CONFIDENTIAL

# Fairfield Sentry Limited

- Founded:                 **1990 by Fairfield Greenwich Group**

- Objective:               **Seek investment returns that:**
  - Provide long-term capital appreciation by consistently delivering short-term gains
  - Are uncorrelated to market movements and trends
  - Are disproportionately high relative to market risk exposure

- Investment Strategy:     ***Unlevered purchase*** **of a basket of the largest U.S. stocks drawn from the S&P100 Index;** *hedged* **with the contemporaneous establishment of a collar using S&P 100 Index Options**

- Investment Results:      **Compounded annual returns of over 12% since 1990 with annual volatility in the 3% range.**

- Current Fund Size:       **$5.0 billion at September, 2004**

FairfieldGreenwichGroup

5

CGMH00001334
CMHSAA0001334

CONFIDENTIAL

# Investment Strategy

- **Objective:**
  - Single investment strategy; no deviation from stated strategy
  - Seek and deliver optimal risk-adjusted consistent investment returns
  - Provide returns that are uncorrelated to the market
- **The strategy has *defined risk and profit parameters* which may be ascertained when the position is established**
- **The transactions for a typical position would be:**

| CONTEMPORANEOUS | | |
|---|---|---|
| **PORTFOLIO** | **HEDGE STRATEGY** | **RESULTS** |
| • Purchase of a basket of large-cap U.S. stocks from the S&P 100<br>• **No** leverage used | • Overlay of "collar"<br>  • Sale of *out of money* S&P 100 calls<br>  • Purchase S&P 100 puts *out of the money*<br>• Notional value of the long put options is equivalent to market value of underlying portfolio | • Consistent returns<br>• Low volatility<br>• Uncorrelated to market movements<br>• Limited down months |

CGMH00001335
CMHSAA0001335

CONFIDENTIAL

# Investment Strategy

- A call option is *out of the money* when its strike price is higher than the current price of the S&P100 Index

- A put option is *out of the money* when its strike price is below the price of the S&P100 Index

- The sale of S&P 100 call options against the basket of stocks is designed to increase the standstill rate of return, while allowing upward movement of the stock portfolio to the strike price of the calls

- The put options, funded in part with the proceeds of the sale of the calls and any dividend stream, protect the equity position from downside risk

- The combination of stock basket and options collar forms a payoff profile known as a "bull spread"

CGMH00001336
CMHSAA0001336

CONFIDENTIAL

# Terms and Conditions

| | |
|---|---|
| The Fund: | **Fairfield Sentry Limited** |
| Structure: | **Open-ended B.V.I. Company** |
| Management Fee: | **1%** |
| Performance Fee: | **20%** |
| Currency: | **USD (currency feeder classes in EUR and CHF)** |
| Investment Manager: | **Fairfield Greenwich (Bermuda) Limited** |
| Subscriptions: | **Monthly, notice due by third to last business day** |
| Payment: | **Last business day of month** |
| Redemptions: | **Monthly, on fifteen calendar days' notice** |
| Subscription/Redemption Price: | **N.A.V.** |
| Minimum Redemption: | **$25,000** |
| Minimum Investment: | **$100,000** |
| Minimum Additional Investments: | **$50,000** |
| Subscription Price: | **N.A.V.** |
| Listing/Published: | **Irish Stock Exchange/International Herald Tribune** |
| Administrator/Registrar/ Transfer Agent: | **Citco Fund Services (Europe) B.V.** |
| Bank: | **Citco Bank Nederlands, NV** |
| Auditors: | **PriceWaterhouseCoopers (Rotterdam)** |

FairfieldGreenwichGroup

CGMH00001337
CMHSAA0001337

# <u>Directors & Auditors Report</u>

# <u>Dec. 31, 2003</u>

**Directors' report and financial statements**
**for the year ended December 31, 2003**
**Fairfield Sentry Limited**
**Road Town, Tortola**
**British Virgin Islands**

CONFIDENTIAL

# Contents

| | | |
|---|---|---|
| **1** | **Directors and other information** | **2** |
| 1.1 | Directors and other information | 3 |
| | | |
| **2** | **Directors' report** | **4** |
| 2.1 | Directors' report | 5 |
| | | |
| **3** | **Financial statements** | **6** |
| 3.1 | Balance sheet as at December 31, 2003 | 7 |
| 3.2 | Income statement for the year ended December 31, 2003 | 8 |
| 3.3 | Cash flow statement for the year ended December 31, 2003 | 9 |
| 3.4 | Statement of changes in shareholders' equity for the year ended December 31, 2003 | 11 |
| 3.5 | Notes to the financial statements | 14 |
| | Auditor's report | |

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

CONFIDENTIAL

CGMH00001261
CMHSAA0001261

# 1    Directors and other information

CONFIDENTIAL

## 1.1    Directors and other information

**Board of directors**
Mr Walter M. Noel, Jr.
Mr Jan R. Naess
Mr Peter P. Schmid

**Investment manager**
Fairfield Greenwich (Bermuda) Ltd.
12 Church Street
Suite 606
Hamilton, Bermuda HM 11

**Registered office**
Fairfield Sentry Limited
P.O. Box 662
Road Town
Tortola
British Virgin Islands

**Auditors**
PricewaterhouseCoopers Accountants N.V.
P.O. Box 881
3000 AW  Rotterdam
The Netherlands

**Administrator, registrar and transfer agent**
Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW  Amsterdam
The Netherlands

**Legal advisor**
Andrew E. Goldstein, Esq.
488 Madison Avenue, 16th Floor
New York, New York 10022
United States of America

**Bank**
Citco Bank Nederland N.V., Dublin Branch
Customs House Plaza Block 6
International Financial Services Centre
P.O. Box 6639 Dublin - 1
Ireland

**Custodian**
Citco Global Custody N.V.
6 Customs House Plaza
Harbourmaster Plaza
Dublin - 1
Ireland

CONFIDENTIAL

CGMH00001263
CMHSAA0001263

## 2    Directors' report

CONFIDENTIAL

**2.1**        **Directors' report**

Results for fiscal 2003 were satisfactory. Expenses, including performance fees, were 23.4% of gross income, which is consistent with prior years. Gains from trading activities in equities and US Treasury Bills were approximately 154.6% of net realized and unrealized gains. These gains were offset by losses associated with options transactions; the purchase and sale of put and call options. Options transactions during the year represented a loss of approximately 54.6% of the net realized and unrealized gains earned by the Company.

The strategy performs best in gradually trending markets with an upward bias and with moderate volatility and good liquidity. A market environment in which the large cap US equities display a sustained one to two percent move with no pullback is considered quite favorable. The worst market environment for the strategy is a stagnant to downward trending market with little volatility and no volume. There were no substantial changes to the strategy during the year.

CONFIDENTIAL

CGMH00001265
CMHSAA0001265

## 3    Financial statements

CONFIDENTIAL

## 3.1    Balance sheet as at December 31, 2003

| | Notes | 2003 | 2002 |
|---|---|---|---|
| (in thousands) | | USD | USD |
| **Assets** | | | |
| Cash due from bank and brokers | 3.5.3 | 168,504 | 56,225 |
| Trading securities | 3.5.4 | 4,379,401 | 4,029,313 |
| Redemptions paid in advance | | 2,882 | 0 |
| Other receivables | 3.5.7 | 424 | 0 |
| | | 4,551,211 | 4,085,538 |
| **Liabilities** | | | |
| Subscriptions received in advance | | 103,426 | 32,625 |
| Fees payable and accrued expenses | 3.5.8 | 20,475 | 10,587 |
| | | 123,901 | 43,212 |
| **Total assets less liabilities** | | 4,427,310 | 4,042,326 |
| **Shareholders' equity** | | | |
| Share capital | 3.5.9 | 46 | 46 |
| Share premium | | 2,472,583 | 2,417,627 |
| Retained earnings | | 1,954,681 | 1,624,653 |
| **Total shareholders' equity** | | 4,427,310 | 4,042,326 |
| **Net asset value per Class A share (in USD)** | | 957.84 | 885.17 |
| **Net asset value per Class B share (in USD)** | | 1,076.54 | 0.00 |

The accompanying notes are an integral part of these financial statements.

CONFIDENTIAL

CGMH00001267
CMHSAA0001267

### 3.2      Income statement for the year ended December 31, 2003

| | Notes | 2003 | 2002 |
|---|---|---|---|
| (in thousands) | | USD | USD |
| **Revenue** | | | |
| Interest income | | 339 | 322 |
| Dividend income | | 40,702 | 24,677 |
| Other income | | 50 | 2 |
| Net realised gains on trading securities | | 385,341 | 406,150 |
| Change in net unrealised gains on trading securities | | 4,236 | 1,500 |
| | | 430,668 | 432,651 |
| **Expenses** | | | |
| Management fees | 3.5.11 | 5,221 | 3,844 |
| Performance fees | 3.5.11 | 80,515 | 83,591 |
| Administration fees | 3.5.11 | 2,092 | 1,523 |
| Legal and professional fees | | 57 | 57 |
| Bank charges and commissions | | 264 | 192 |
| Directors' fees | 3.5.11 | 50 | 90 |
| Other operating expenses | | 231 | 114 |
| | | 88,430 | 89,411 |
| **Net result for the year before taxation** | | 342,238 | 343,240 |
| Withholding tax | | (12,210) | (7,403) |
| **Net result for the year** | | 330,028 | 335,837 |
| **Earnings per Class A share (in USD)** | | 72.46 | 75.19 |
| **Earnings per Class B share (in USD)** | | 67.55 | 0.00 |

The accompanying notes are an integral part of these financial statements.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

8

CONFIDENTIAL

### 3.3      Cash flow statement for the year ended December 31, 2003

|  | 2003 | 2002 |
|---|---:|---:|
| (in thousands) | USD | USD |
| **Net result for the year** | 330,028 | 335,837 |
| *Adjustments for:* | | |
| Net realised gains on trading securities | (385,341) | (406,150) |
| Change in net unrealised gains on trading securities | (4,236) | (1,500) |
| Interest income | (339) | (322) |
| Dividend income | (40,702) | (24,677) |
| Accounts receivable | (2,888) | 5,795 |
| Accounts payable | 9,888 | (13,218) |
| Interest received | 339 | 322 |
| Dividend received | 40,285 | 24,677 |
| **Net cash used in operating activities** | (52,966) | (79,236) |
| **Cash flows from investing activities** | | |
| Purchases of trading securities | (59,299,578) | (55,740,161) |
| Sales of trading securities | 59,339,066 | 55,643,338 |
| **Net cash from/(used in) investing activities** | 39,488 | (96,823) |
| **Cash flows from financing activities** | | |
| Pending subscriptions for participating shares | 70,801 | 5,026 |
| Subscriptions | 701,844 | 660,967 |
| Redemptions | (646,888) | (508,983) |
| **Net cash from financing activities** | 125,757 | 157,010 |

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

9

CGMH00001269
CMHSAA0001269

|  | 2003 | 2002 |
|---|---|---|
| (in thousands) | USD | USD |
| **Net increase/(decrease) in cash and cash equivalents** | 112,279 | (19,049) |
| Cash and cash equivalents at beginning of the year | 56,225 | 75,274 |
| **Cash and cash equivalents at end of the year** | 168,504 | 56,225 |

The accompanying notes are an integral part of these financial statements.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

10

CGMH00001270
CMHSAA0001270

### 3.4 Statement of changes in shareholders' equity for the year ended December 31, 2003

*3.4.1 Consolidated*

| (in thousands) | Share capital | Share premium | Retained earnings | Total share-holders' equity |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| Balance as at December 31, 2001 | 44 | 2,265,645 | 1,288,816 | 3,554,505 |
| Subscriptions for the year | 8 | 660,959 | 0 | 660,967 |
| Redemptions for the year | (6) | (508,977) | 0 | (508,983) |
| Net result for the year | 0 | 0 | 335,837 | 335,837 |
| Balance as at December 31, 2002 | 46 | 2,417,627 | 1,624,653 | 4,042,326 |
| Subscriptions for the year | 15 | 701,829 | 0 | 701,844 |
| Redemptions for the year | (15) | (646,873) | 0 | (646,888) |
| Net result for the year | 0 | 0 | 330,028 | 330,028 |
| Balance as at December 31, 2003 | 46 | 2,472,583 | 1,954,681 | 4,427,310 |

The reconciliation of the movement in shares outstanding during the years ended December 31, 2003 and December 31, 2002 is as follows:

| | 2003 | 2002 |
|---|---|---|
| Number of shares outstanding as at beginning of the year | 4,566,729.01 | 4,389,875.49 |
| Shares issued during the year | 1,519,230.04 | 772,893.59 |
| Shares redeemed during the year | (1,496,564.46) | (596,040.07) |
| Number of shares outstanding as at end of the year | 4,589,394.59 | 4,566,729.01 |

The accompanying notes are an integral part of these financial statements.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

11

CONFIDENTIAL

CGMH00001271
CMHSAA0001271

*3.4.2    Class A shares*

| (in thousands) | Share capital | Share premium | Retained earnings | Total share-holders' equity |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| Balance as at December 31, 2001 | 44 | 2,265,645 | 1,288,816 | 3,554,505 |
| Subscriptions for the year | 8 | 660,959 | 0 | 660,967 |
| Redemptions for the year | (6) | (508,977) | 0 | (508,983) |
| Net result for the year | 0 | 0 | 335,837 | 335,837 |
| Balance as at December 31, 2002 | 46 | 2,417,627 | 1,624,653 | 4,042,326 |
| Subscriptions for the year | 12 | 419,742 | 0 | 419,754 |
| Redemptions for the year | (15) | (643,177) | 0 | (643,192) |
| Net result for the year | 0 | 0 | 323,734 | 323,734 |
| Balance as at December 31, 2003 | 43 | 2,194,192 | 1,948,387 | 4,142,622 |

The reconciliation of the movement in Class A shares outstanding during the years ended December 31, 2003 and December 31, 2002 is as follows:

| | 2003 | 2002 |
|---|---|---|
| Number of shares outstanding as at beginning of the year | 4,566,729.01 | 4,389,875.49 |
| Shares issued during the year | 1,245,595.88 | 772,893.59 |
| Shares redeemed during the year | (1,487,376.46) | (596,040.07) |
| Number of shares outstanding as at end of the year | 4,324,948.43 | 4,566,729.01 |

The accompanying notes are an integral part of these financial statements.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

12

CONFIDENTIAL

*3.4.3   Class B shares*

| (in thousands) | Share capital | Share premium | Retained earnings | Total share-holders' equity |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| Balance as at December 31, 2002 | 0 | 0 | 0 | 0 |
| Subscriptions for the year | 3 | 282,087 | 0 | 282,090 |
| Redemptions for the year | 0 | (3,696) | 0 | (3,696) |
| Net result for the year | 0 | 0 | 6,294 | 6,294 |
| Balance as at December 31, 2003 | 3 | 278,391 | 6,294 | 284,688 |

The reconciliation of the movement in Class B shares outstanding during the year ended December 31, 2003 is as follows:

| | 2003 |
|---|---|
| Number of shares outstanding as at beginning of the year | 0.00 |
| Shares issued during the year | 273,634.16 |
| Shares redeemed during the year | (9,188.00) |
| Number of shares outstanding as at end of the year | 264,446.16 |

The accompanying notes are an integral part of these financial statements.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

13

CONFIDENTIAL

CGMH00001273
CMHSAA0001273

## 3.5    Notes to the financial statements

### 3.5.1    General

Fairfield Sentry Limited ('the Company') was incorporated in the British Virgin Islands on
October 30, 1990 under the provisions of The Mutual Funds Law of the British Virgin Islands.
The Company commenced operations on December 1, 1990. The first shares were issued against
cash.

On July 1, 2003, Fairfield Greenwich Limited assigned its investment management agreement
for the Company to Fairfield Greenwich (Bermuda) Ltd., which was incorporated under the laws
of Bermuda on July 1, 2003. Fairfield Greenwich (Bermuda) Ltd. is a wholly owned subsidiary
of Fairfield Greenwich Limited.

The investment manager of the Company utilizes an option trading strategy, known as a "split
strike conversion". In addition, the investment manager has allocated relatively small portions of
the Company's assets to other strategies typically sub-advised by experienced personnel starting
new businesses (the "Seedlings"). Allocations to Seedlings may never exceed, in the aggregate,
5% of the Company's net asset value at the time of the investment. It is anticipated that the other
allocations will be made to new investment vehicles, with no single allocation exceeding USD
50,000,000 at the time of the investment.

On January 15, 2003 the board of directors resolved to issue a separate class of shares of the
Company's common stock: Class B shares.

Pursuant to the provisions of the Articles of Association, changes in the net asset value of the
Company are allocated to each share on a monthly basis.

Each share entitles the holder to one vote and to receive such dividends as declared by the
directors and to participate upon liquidation on a proportional basis.

Dividend policy is determined by the directors and current policy is directed towards capital
appreciation.

The minimum initial subscription per investor for the shares is USD 100,000, unless the
Company deems it advisable to permit subscriptions for a lesser amount.

Following his initial investment, a shareholder may make additional investments in amounts of
not less than USD 50,000.

Subscriptions received during any monthly period three business days before the last business
day of the month will be accepted as of the first day of the following month.

CONFIDENTIAL

CGMH00001274
CMHSAA0001274

Redemption at the option of the shareholder will be accepted at the end of any month taking into account fifteen calendar days written notice. The Company reserves the right to call all or a part of a shareholder's shares for redemption at any time for any reason or for no reason.

The Company's financial statements were authorised for issue on June 29, 2004 by the board of directors.

### 3.5.2   Accounting policies

The principal accounting policies adopted in the preparation of these financial statements are set out below.

#### Basis of preparation

The financial statements are prepared in accordance with International Financial Reporting Standards (IFRS).

The financial statements are prepared under the historical cost convention as modified by the fair valuation of trading securities, financial assets and financial liabilities held for trading and all derivative contracts.

The financial statements are denominated in US dollars (USD), the measurement currency of the Company.

#### Offsetting financial instruments

Financial assets and liabilities are offset and the net amount is reported in the balance sheet when there is a legally enforceable right to set off the recognised amounts and there is an intention to settle on a net basis, or realise the asset and settle the liability simultaneously.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

15

CONFIDENTIAL

CGMH00001275
CMHSAA0001275

*Trading securities*

Trading securities are securities, which were either acquired for generating a profit from short-term fluctuations in price or included in a portfolio in which a pattern of short-term profit taking exists.

All investment securities are initially recognised at cost (which includes transaction costs). Trading securities listed and regularly traded on recognised securities exchanges are stated at the last quoted trade price on the day of valuation. If no sales price was reported on any valuation date, long securities held are valued at the last quoted bid price and short securities held at the last quoted ask price.

Other (unlisted) investments are valued at their fair values as determined by management in consultation with the directors in accordance with recognised accounting and financial principles.

Interest earned whilst holding investment and trading securities is reported as interest income. Dividends are recognised when the Company's right to receive payment is established. Dividends received are included separately in dividend income.

All purchases and sales of investments and trading securities that require delivery within the time frame established by regulation or market convention ('regular way' purchases and sales) are recognised at trade date, which is the date on which the Company commits to purchase or sell the asset. In cases which are not within the time frame established by regulation or market convention, such transactions are recognised on settlement date. Any change in fair value of the asset to be received is recognised between the trade date and settlement date.

*Cash and cash equivalents*

Cash comprises balances due from and due to banks and brokers with original maturities of three months or less. Cash equivalents are short-term, highly liquid trading securities that are readily convertible to known amounts of cash and which are subject to insignificant changes in value.

*Determination of gains or losses on sale of trading securities*

Both realised and unrealised gains and losses on trading securities are taken as income and expenses as incurred. Realised gains and losses on sales of trading securities are calculated on a first-in-first-out basis. The change in the difference between the cost and the fair value of trading securities held is reflected in the income statement as the change in unrealised gains or losses on trading securities.

*Interest and dividend income*

Interest income is recognised on an accruals basis for those securities for which collection is probable. Interest is recognised on a when-received basis for those securities for which collection is doubtful. Dividend income is recognised on the ex-dividend date. Dividend income received by the Company is subject to foreign withholding taxes.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

16

CONFIDENTIAL

CGMH00001276
CMHSAA0001276

*Allocation of income and expenses*

Income is not class specific and is therefore allocated on a pro-rata basis to the different classes of shares. Expenses that are class specific are allocated to their respective share class.

*Expenses*

Expenses are accounted for on an accruals basis. Expenses are charged to the income statement except for expenses incurred on the acquisition of a trading security which is included within the cost of that trading security. Expenses arising on the disposal of trading securities are deducted from the disposal proceeds.

*Taxation*

The Company is not subject to any income, withholding or capital gains taxes in the British Virgin Islands. Generally, the Company intends to conduct its affairs so as not to be liable to taxation in any other jurisdiction; however, it does invest in securities whose dividend income is subject to non-refundable foreign withholding taxes.

*Use of estimates*

Because of the inherent uncertainty of valuation for all fair value investments and interests, the estimate of fair value may differ from the values that would have been used had a ready market existed, and the differences could be material.

*3.5.3    Cash due from bank and brokers*

| (in thousands) | Dec 31, 2003 | Dec 31, 2002 |
| --- | --- | --- |
| | USD | USD |
| Cash at banks | 128,437 | 56,159 |
| Deposit | 40,000 | 0 |
| Cash at brokers | 67 | 66 |
| | 168,504 | 56,225 |

As at December 31, 2003 there is no restricted cash.

*Fairfield Sentry Limited,*                                                                 17
*Road Town, Tortola, British Virgin Islands*

CONFIDENTIAL

*3.5.4    Trading securities*

As at December 31, 2003, the portfolio of trading securities comprised the following positions:

|  | **Market value** | **Unrealised/ realised gains (losses)** |
|---|---|---|
| (in thousands) | USD | USD |
| Shares and other investments (long) | 71,900 | 579,854 |
| US treasury bills | 4,307,501 | 22,520 |
| Call options (long) | 0 | (3,309) |
| Put options (long) | 0 | (252,475) |
| Call options (short) | 0 | 42,986 |
| **Total trading securities** | 4,379,401 | 389,576 |

As at December 31, 2002, the portfolio of trading securities comprised the following positions:

|  | **Market value** | **Unrealised/ realised gains (losses)** |
|---|---|---|
| (in thousands) | USD | USD |
| Shares and other investments (long) | 81,473 | 767,083 |
| US treasury bills | 3,947,840 | 38,302 |
| Call options (long) | 0 | 119,014 |
| Put options (long) | 0 | (200,898) |
| Call options (short) | 0 | (315,851) |
| **Total trading securities** | 4,029,313 | 407,650 |

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

18

CONFIDENTIAL

CGMH00001278
CMHSAA0001278

As at December 31, 2003 the portfolio of trading securities can be specified as follows:

| | Market value | % of net assets of the Company |
|---|---|---|
| (in thousands) | USD | % |
| *Shares and other investments (long)* | | |
| EMF Corporate Bond Arbitrage Class AA1 | 21,812 | 0.5 |
| Fairfield GMO market neutral, Class I1 | 35 | 0.0 |
| Fairfield Greenwich FFTW, Class E | 104 | 0.0 |
| Fairfield Masters Fund Ltd, Class I USD | 213 | 0.0 |
| Fairfield Redstone fund Ltd, Class A1 | 20,007 | 0.4 |
| Fairfield Schlarbaum, Class A1 | 29,620 | 0.7 |
| FIF Advanced Ltd Class A | 109 | 0.0 |
| | 71,900 | 1.6 |
| | | |
| *US treasury bills* | | |
| US 0% treasury bill 04/15/04 | 538,983 | 12.2 |
| US 0% treasury bill 04/29/04 | 150 | 0.0 |
| US 0% treasury bill 05/27/04 | 538,401 | 12.2 |
| US 0% treasury bill 06/03/04 | 538,236 | 12.1 |
| US 0% treasury bill 06/17/04 | 538,015 | 12.1 |
| US 0% treasury bill 06/24/04 | 537,837 | 12.1 |
| US 0% treasury bill 04/22/04 | 150 | 0.0 |
| US 0% treasury bill 05/13/04 | 538,590 | 12.2 |
| US 0% treasury bill 05/20/04 | 538,474 | 12.2 |
| US 0% treasury bill 05/06/04 | 538,665 | 12.2 |
| | 4,307,501 | 97.3 |
| | 4,379,401 | 98.9 |

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

19

CONFIDENTIAL

CGMH00001279
CMHSAA0001279

As at December 31, 2002 the portfolio of trading securities can be specified as follows:

| | Market value | % of net assets of the Company |
|---|---:|---:|
| (in thousands) | USD | % |
| *Shares and other investments (long)* | | |
| EMF Corporate Bond Arbitrage Class AA1 | 20,060 | 0.5 |
| Fairfield Redstone fund Ltd, Class A1 | 31,201 | 0.8 |
| Fairfield Schlarbaum, Class A1 | 30,212 | 0.7 |
| | 81,473 | 2.0 |
| *US treasury bills* | | |
| US 1.185% treasury bill 03/27/03 | 493,329 | 12.2 |
| US 1.185% treasury bill 04/03/03 | 493,192 | 12.2 |
| US 1.185% treasury bill 04/10/03 | 493,065 | 12.2 |
| US 1.630% treasury bill 04/17/03 | 492,965 | 12.2 |
| US 1.665% treasury bill 04/24/03 | 492,851 | 12.2 |
| US 1.515% treasury bill 05/01/03 | 871 | 0.0 |
| US 1.395% treasury bill 05/08/03 | 871 | 0.0 |
| US 1.200% treasury bill 03/20/03 | 493,453 | 12.2 |
| US 1.635% treasury bill 03/13/03 | 493,562 | 12.2 |
| US 0% treasury bill 03/06/03 | 493,681 | 12.2 |
| | 3,947,840 | 97.7 |
| | 4,029,379 | 99.7 |

US treasury bills are stated at the last quoted trade price in Bloomberg as at December 31, 2003. Shares and other funds are valued at net asset values, as calculated by the underlying fund administrators.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

20

CONFIDENTIAL

### 3.5.5    Risks associated with financial instruments

The Company may utilise options, futures and forward contracts to hedge against currency fluctuations, but there can be no assurance that such hedging transaction will be effective. The Company is exposed to market price risk, interest rate risk, credit risk, liquidity risk and currency risk arising from the financial instruments it holds. The risk management policies employed by the Company to manage these risks are discussed below.

#### Market price risk

The Company's interest rate securities, equity securities and trading derivative financial instruments are susceptible to market price risk arising from uncertainties about future prices of the instruments.

#### Credit risk

Credit risk is the risk that an issuer or counterparty will be unable or unwilling to meet a commitment that it has entered into with the Company. Financial assets, which potentially expose the Company to credit risk, consist principally of cash due from brokers and receivables for investments sold. The Company's cash balances are primarily with high credit quality, well-established financial institutions. The extent of the Company's exposure to credit risk in respect of these financial assets approximates their carrying value as recorded in the Company's balance sheet.

#### Liquidity risk

The Company's listed securities are considered to be readily realisable as they are listed on the New York stock exchange. The Company has the option to invest up to 5% of the total net assets in non-listed alternative investments.

#### Currency risk

The Company may invest in assets denominated in currencies other than its reporting currency, the USD. Consequently, the Company is exposed to risks that the exchange rate of the USD relative to other currencies may change in a manner, which has an adverse effect on the reported value of that portion of the Company's assets, which are denominated in currencies other than the USD.

#### Off-balance sheet risks

An off-balance sheet risk exists when the maximum potential loss on a particular trading security is greater than the value of such trading security. Off-balance sheet credit risk exists, among other situations, when the collateral received by the Company or the money manager is insufficient to cover losses, which might result from a counterparty's failure to fulfil its obligation under contracts with the Company or the money manager.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

CONFIDENTIAL

CGMH00001281
CMHSAA0001281

### 3.5.6    Fair values

Investments are carried at fair value in accordance with the accounting policy disclosed in note 3.5.2. The carrying value of other assets and liabilities approximates the fair value due to their short-term nature.

### 3.5.7    Other receivables

| (in thousands) | Dec 31, 2003 USD | Dec 31, 2002 USD |
|---|---|---|
| Dividends receivable on shares | 417 | 0 |
| Prepaid general expenses | 7 | 0 |
| | 424 | 0 |

### 3.5.8    Fees payable and accrued expenses

| (in thousands) | Dec 31, 2003 USD | Dec 31, 2002 USD |
|---|---|---|
| Performance fees | 16,244 | 9,243 |
| Management fees | 1,710 | 1,014 |
| Administration fees | 189 | 137 |
| Legal and professional fees | 51 | 67 |
| Custody fees | 9 | 0 |
| Other accounts payable and accrued expenses | 2,272 | 126 |
| | 20,475 | 10,587 |

CONFIDENTIAL

CGMH00001282
CMHSAA0001282

### 3.5.9   Share capital

The authorised share capital of Fairfield Sentry Limited is USD 100,000 divided into 10,000,000 ordinary shares of USD 0.01 each.

Holders of shares are entitled to one vote per share and participate on a pro rata basis in the net assets of the Company on liquidation and other distributions as declared. As at December 31, 2003 there were 4,324,948.43 Class A (December 31, 2002: 4,566,729.01) and 264,446.16 Class B (December 31, 2002: no shares) shares issued and fully paid.

The Company will not accept a subscription tendered at a time when the number of its outstanding shares is 5,000,000.

The net asset value of the shares is calculated by dividing the value of the assets, less the liabilities and appropriate reserves, by the total number of shares outstanding on the valuation date.

### 3.5.10   Related parties

Mr Noel, a director of the Company, is also principal officer and director of the parent company of the Company's investment manager. In accordance with the investment management agreement, the appointment of Fairfield Greenwich (Bermuda) Ltd. is for an indefinite period of time, which may be terminated on notice ten days prior to the end of any calendar quarter.

As at December 31, 2003 related parties held 111,055.67 shares in the Company (December 31, 2002: 338,349.04).

### 3.5.11   Fees

#### Directors' fees

The directors not affiliated with the investment manager, of which there are at the present time two, will each be paid a fee of USD 25,000 per annum by the Company together with out-of-pocket expenses made in attending meetings of the board of directors or of shareholders.

#### Performance fees

The investment manager of the Company is Fairfield Greenwich (Bermuda) Ltd., a corporation organised under the laws of Bermuda. The investment manager receives a performance fee of 20% of the new appreciation in share value each quarter. The performance fees are calculated quarterly and payable after the end of the quarter.

Pursuant to a Deferred Fee Agreement dated July 1, 2003 with the Company the investment manager and Fairfield Greenwich Limited have the option to defer the payment of, all or a portion of the performance fees and/or management fees. In 2003, the investment manager has deferred payment of the performance fee for an amount of USD 1,797,847. The remaining part of the performance fee as stated in the income statement is paid to the investment manager.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

23

CONFIDENTIAL

CGMH00001283
CMHSAA0001283

*Management fees*

The investment manager receives a monthly management fee in an amount equal to one-twelfth of one percent (0.0833%) of the net asset value before performance fees of Class B shares, as calculated at the opening of the first day of each calendar month, which will include subscriptions for Class B shares accepted by the Company as of the first day of the month. This fee is payable monthly in advance.

*Administration fees*

The administrator of the Company is Citco Fund Services (Europe) B.V. The Company pays to the administrator a monthly fee based on the net asset value of the Company as of the last business day of the month. The administrator will also be reimbursed for all disbursements and reasonable expenses incurred in the performance of its duties as detailed in the administrative services agreement.

*Expense reimbursement*

The Company pays an annual expense reimbursement to Fairfield Greenwich Advisors LLC ("FGA"), an affiliate of the investment manager, of one fortieth of one percent (0.025%) of the net asset value of the Company as of the last day of each calendar quarter is payable to FGA to reimburse for certain of the Company's internal accounting and operational expenses.

*3.5.12  Earnings per share*

The earnings per share are calculated by dividing the net result of USD 330,028,000 attributable to shareholders by the weighted average number of shares outstanding during the year. The weighted average number of Class A shares outstanding for the year ended December 31, 2003 is 4,468,004 and for Class B shares 93,180.36. There is no dilution of the earnings per share.

*3.5.13  Post balance sheet events*

There were no material post balance sheet events, which have a bearing on the understanding of the financial statements. There has been no significant changes in the financial or trading position since the date of the audited information.

CONFIDENTIAL

CGMH00001284
CMHSAA0001284

PRICEWATERHOUSECOOPERS 🩶

PricewaterhouseCoopers
Accountants N.V.
Hofplein 19
3032 AC Rotterdam
P.O. Box 881
3000 AW Rotterdam
The Netherlands
Telephone +31 (10) 400 86 00
Facsimile +31 (10) 400 86 70
www.pwc.com/nl

To the directors and shareholders of
Fairfield Sentry Limited

## Auditors' report

*Introduction*

In accordance with your instructions we have audited the accompanying balance sheet of
Fairfield Sentry Limited as at December 31, 2003 and the related income and cash flow
statements for the year then ended. These financial statements are the responsibility of the
Company's management. Our responsibility is to express an opinion on these financial
statements based on our audit.

*Scope*

We conducted our audit in accordance with International Standards on Auditing. Those
standards require that we plan and perform the audit to obtain reasonable assurance about
whether the financial statements are free of material misstatement. An audit includes
examining, on a test basis, evidence supporting the amounts and disclosures in the financial
statements. An audit also includes assessing the accounting principles used and significant
estimates made by management, as well as evaluating the overall presentation of the
financial statements. We believe that our audit provides a reasonable basis for our opinion.

*Opinion*

In our opinion the financial statements give a true and fair view of the financial position of
the Company as at December 31, 2003 and of the results of its operations and its cash
flows for the year then ended in accordance with International Financial Reporting
Standards.

June 29, 2004

*PricewaterhouseCoopers Accountants NV*

FG-0551u-av-00230794001

PricewaterhouseCoopers is the trade name of amongst others the following companies: PricewaterhouseCoopers Accountants N.V. (registered with the Trade
Register under number 34180285), PricewaterhouseCoopers Belastingadviseurs N.V. (registered with the Trade Register under number 34180284),
PricewaterhouseCoopers Corporate Finance & Recovery N.V. (registered with the Trade Register under number 34180287) and PricewaterhouseCoopers
B.V. (registered with the Trade Register under number 34180289). The services rendered by these companies are governed by General Terms & Conditions,
which include provisions regarding our liability. Purchases by PricewaterhouseCoopers are governed by general purchase conditions ("Algemene
Inkoopvoorwaarden"). Both General Terms & Conditions are filed with the Amsterdam Chamber of Commerce and can also be viewed at www.pwc.com/nl.

CONFIDENTIAL

CGMH00001285
CMHSAA0001285