# **Attachment E**

February 19, 2009

Tremont Partners Inc ("Tremont")

List of Preliminary Concerns/Findings

I.    The staff's examination of Tremont has been hindered by numerous factors which have limited the staff's ability to form conclusions regarding the relationship between Tremont and Bernard L. Madoff ("Madoff"), as noted below:

A.    Robert Schulman, Chairman Emeritus until December 31, 2008 and Chief Executive Officer until July 2, 2008, appears to be an integral person of interest that the staff would like to interview based on his long term relationship with Madoff. Based on discussions with various personnel at Tremont, over the years since the relationship commenced with Madoff in 1994 until his retirement in 2008, Mr. Schulman conducted a high level due diligence review of Madoff and would appear to have the most knowledge of Tremont's relationship with Madoff. The staff has been unable to schedule an interview with Mr. Schulman. The staff attempted to schedule an interview with Mr. Schulman, prior to December 31, 2008, however based on scheduling conflicts, with Mr. Schulman and his outside counsel, Robert A. Giacovas from Lazare Potter and Giacovas, the staff was unable to do so. On numerous occasions during January and February 2009, the staff attempted to schedule an interview with Mr. Schulman through communications with Mr. Schulman's attorney, Mr. Giacovas. On February 14, 2009, Mr. Giacovas informed the staff that Mr. Schulman would be unable to meet in February and that March availability is becoming limited. Due to the long standing relationship between Mr. Schulman and Madoff, it appears that Mr. Schulman could provide information necessary to facilitate the staff's examination regarding Tremont's relationship with Madoff.

### Robert Schulman – Dominant Individual at Tremont

Mr. Schulman may be viewed as a dominant individual for the following reasons:

(1)    Prior to Mr. Schulman's retirement in June 2008, he served as Chief Executive Officer and as Chairman Emeritus for a period of 6 months following his retirement date.

(2)    According to Sal Russo, Director, Senior Analyst, Mr. Schulman conducted the due diligence on Madoff, however, Mr. Schulman did not conduct due diligence on any other managers. Since Mr. Schulman conducted the due diligence, he would be able to control what areas and information is reviewed or not reviewed.

(3)    J. Rudman & Associates ("Rudman Report") (see below for further discussion), dated March 2007, states that the Madoff relationship was driven by Mr. Schulman.

(4)    The staff's review of a letter dated June 9, 2008 to Mr. Schulman from Rupert Allen, President and Chief Executive Officer regarding Mr. Schulman's retirement (the "Schulman retirement letter") states "RS has longstanding relationship with the best-in-class investment managers, Bernard L. Madoff..." It would appear that Tremont relied



United States
Securities and Exchange Commission

**Tracy O'Sullivan**
Staff Accountant
Northeast Regional Office

Rm. # 15215
3 World Financial Center
New York, NY 10281

(212) 336-0195
Fax (212) 336-1327
osullivantr@sec.gov



United States
Securities and Exchange Commission

**Allison N. Erlenwein**
Staff Accountant
Northeast Regional Office

Room #15236
3 World Financial Center
New York, NY 10281-1022

(212) 336-0501
Fax (212) 336-1333
ErlenweinA@sec.gov



**Jennifer Klein**
Branch Chief
Northeast Regional Office

3 World Financial Center
New York, NY 10281

(212) 336-0558
Fax (212) 336-1327
Kleinj@sec.gov



United States
Securities and Exchange Commission

**Catherine Smith**
Senior Counsel
Division of Enforcement

Northeast Regional Office
3 World Financial Center, Room 4300
New York, NY 10281

Tel (212) 336-0170
Fax (212) 336-1317
smithcat@sec.gov



United States
Securities and Exchange Commission

**Beth Abraham**
Securities Compliance Examiner
New York Regional Office

3 World Financial Center
New York, NY 10281

(212) 336-0191
Fax (212) 336-1333
abrahamb@sec.gov



United States
Securities and Exchange Commission

**Kathleen A. Raimondi**
Staff Accountant

3 World Financial Center
New York, NY 10281

(212) 336-0543
Fax (212) 336-1327
raimondik@sec.gov

MADTSS01161397

on this relationship to lessen the concerns raised in the red flags noted by other Tremont personnel.

(5)    A significant amount of capacity is given to Mr. Schulman and his investment vehicle, Foredestine LLC ("Foredestine") (Please see below for a discussion on Foredestine). Specifically, the Schulman retirement letter states, "For a period of thirty-six months following the Retirement Date (the "Investment Period"), RS or Foredestine ... shall be permitted on a collective basis to make principal contributions of up to $250 million, in total (the "TM Maximum Capacity"), in one or more of the Tremont single manager Bernard L. Madoff Investment Securities LLC ("BLM Securities") investment products...then offered by Tremont, as selected by RS or Foredestine." By Schulman having a $250 million capacity, he is taking away capacity from other investors and may be breaching its fiduciary duty by favoring one investor over other investors.

(6)    Schulman's retirement letter states that "Any material interruption in the relationship between Tremont and BLM (Madoff) ...would have an adverse effect on Tremont and that infrastructure. RS and Tremont, therefore recognize the mutual benefits to them arising from RS providing, or causing his solely-owned entity, Foredestine LLC, to provide, certain relationship maintenance assistance to Tremont following his retirement..." Although Mr. Schulman is retiring, he can still be considered a dominant individual since Tremont is relying on Schulman for "relationship maintenance." Furthermore, as stated above, Tremont acknowledges the "adverse effect" on its firm if there were any material interruptions in the relationship between Tremont and Madoff. Therefore, to avoid this adverse effect on its business, it appears that Tremont may have ignored the red flags identified in its due diligence and continued its investment with Madoff.

B.    The staff experienced difficulty in obtaining certain information from Tremont regarding records that were known to exist from independent sources but that Tremont did not provide in response to the staff's requests. Specifically, the examination revealed the following:

The staff was informed by an unidentified tipper, "Mark" about the existence of a consultant's report, i.e., the Rudman Report. The Rudman Report was not originally provided to the staff, although the staff requested Tremont to provide any audit and/or consultant reports issued by any consultants or third parties. The staff verbally asked Stephen Clayton, Chief Compliance Officer, about the existence of this report and Mr. Clayton initially denied any knowledge of the report, however, after speaking with other Tremont employees, he later recalled the report. Tremont subsequently provided the staff with 2 reports by Rudman.

C.    The staff interviewed numerous Tremont employees and received contradictory responses relating to information regarding Madoff, as follows:

(1)    On February 5, 2009, Tremont informed the staff in writing that the Adviser (Tremont) has never had a formal "waiting list" for investors wishing to gain access to a fund with exposure to Madoff. However, the staff was informed by Mr. Russo on February 12,

2009, that persons under the Rye Investment Management product line maintain a waiting list for investors that want to invest in Tremont's funds.

(2) On February 5, 2009, Tremont informed the staff in writing that the Adviser (Tremont) has never had a written capacity agreement with Madoff. Although there were no written capacity agreements with Madoff, it may be possible that there was a verbal understanding about capacity with Madoff. Specifically, the staff reviewed some handwritten notes taken by Jim Mitchell, Senior Vice President, after his meetings with Madoff. The handwritten notes discuss capacity and state the following: "Tremont on good list, others won't get capacity." In addition, the Schulman retirement letter states the following, "In 2008 it is Tremont's understanding from BLM (Madoff) that Tremont will be allowed $600 million of capacity through the TM Products and other clients."

(3) Robert Stone, Global Sales & Marketing, informed the staff on January 28, 2009, that an investor in one of Tremont's funds that invested in Madoff planned to withdraw funds totaling approximately $600 million and that Tremont attempted to raise funds to cover this withdrawal, but that no funds were raised. However, on February 10, 2009, Tremont subsequently provided the staff with a spreadsheet of funds raised in the 4th quarter of 2008 and noted that approximately $49 million was raised.

(4) The staff verbally questioned Mr. Clayton about any subpoenas received by Tremont and/or its employees. Initially, Mr. Clayton informed the staff that he was not aware of any subpoenas. Subsequent to the staff's questioning, Mr. Clayton provided the staff with 2 subpoenas, one from the United States District Court, Southern District of New York and one from the Commonwealth of Massachusetts, which was addressed to Mr. Clayton.

## II. DUE DILIGENCE

Although several red flags were identified in the due diligence conducted on Madoff as noted below, Tremont not only continued its investment with Madoff, but also contributed approximately $3 billion since 2004 to its Madoff investments. Tremont's representations made to investors and potential investors describe a broad, vague due diligence process. In addition the staff notes differences in the due diligence conducted on Madoff versus another manager, i.e., Renaissance Technologies ("Renaissance"). As of the date of this meeting, the staff has requested and received an additional 7 due diligence files on other underlying managers, however, the staff has not reviewed these due diligence files for any differences in the due diligence process. In addition, though a number of concerns were identified with respect to Madoff, it appears that the relationship between Madoff and Robert Schulman and their long standing relationship mitigates the concerns of the due diligence staff. Furthermore, it appears that there was an incentive to continue the Madoff investment due to the fees that Tremont received. Since 1994, Tremont informed the staff that it earned approximately $255 million in management and administrative fees from its investments with Madoff.

3

MADTSS01161399

A.  **Madoff DD vs. DD for other underlying managers**

(1)   As noted previously, Mr. Schulman conducted due diligence on Madoff, however, he did not conduct due diligence on other managers. This appears to be an outlier in Tremont's procedures and should be discussed with Mr. Schulman.

(2)   Tremont's procedures - September 2001 TREMONT RESEARCH AND DUE DILIGENCE PROCESS ("2001 DD Process") states the following:

> "**STAGE 3 – RISK REVIEW** Following the second meeting, the Director of Risk Management will undertake a risk review. This will generally require a meeting with the fund manager and the fund's CFO or equivalent. The risk review will focus on operational and back office risk and will include a background check of the manager and a conversation with the fund's auditors."

> The staff's review of the Madoff due diligence materials provided to the staff did not reveal any evidence of conversations with Madoff's auditors. Patrick Kelly, Senior Vice President, Product Management, informed the staff that auditors will not speak to Tremont because of privacy. The staff's review of emails noted an email dated November 20, 2008 from Jeff Hammill, Investment Management, to Messrs. Kelly and Mitchell and James Purnell, Managing Director, Investments, in which Mr. Hammill states that they should proceed with an onsite meeting at Friehling & Horowitz, Madoff's auditor, to get a better understanding of its business model and hedge fund clients.

> The staff notes that Mr. Kelly's statement contradicts evidence found in the due diligence file for Renaissance. The staff's review of Renaissance's due diligence revealed that Tremont spoke to Renaissance's auditors. In addition, Mr. Kelly stated that the 2001 DD Process was an early draft. Tremont's Compliance Manual contains a brief section on due diligence procedures which does not contain any procedures about speaking to auditors. Therefore, it appears that when the final procedures were put together a section on meeting with auditors was taken out although this procedure would appear to be an important control. It should also be noted that it appears that Tremont's auditors did not verify assets with an independent 3rd party and only verified assets using Madoff account statements that were sent directly to them from Madoff with a signed letter acknowledging the authenticity of such statements.

(3)   Managers that failed operational due diligence - Tremont turned down the Asian Debt Fund as an investment for several reasons, including, lack of operational infrastructure. The fund had 1 operations manager who was responsible for all operational duties however, Tremont continued its investment with Madoff although all operational guidelines with respect to trading and execution are controlled by one individual, Mr. Madoff. Specifically, Mr. Purnell's notes on Fairfield Greenwich Sentry ("Fairfield") states that with respect to trading and execution, that operational guidelines are in "Bernie's hands."

(4)   The staff's review of the Renaissance due diligence file revealed that a more extensive review was done as compared to the due diligence review on Madoff. For example, the

4

due diligence file for Renaissance discusses AUM, compensation, trading fills with Bear Stearns, pricing sources, leverage, and risk management system with respect to leverage. As mentioned previously, the staff received additional due diligence files for other underlying mangers which have not been reviewed as of the date of this meeting.

B. **Madoff Due Diligence Red Flags**

(1)     **2006 Mike Lynch Memo**

Mike Lynch, a former employee, drafted a memo dated November 17, 2006, on Madoff Operations. Since Mr. Lynch was not an employee during the staff's examination, he may be a person of interest to interview. The Lynch memo noted the following concerns:

- Counterparty risk – The counterparty to the options that are traded by Madoff is not listed on the trade ticket that is received by Tremont.
- Counterparty risk – Madoff Securities has not entered into ISDA agreements with any counterparties.
- Third Party Relationships – Friehling & Horowitz CPA's are the independent auditors for Bernard L. Madoff Securities LLC. Friehling and Horowitz are not well known in the hedge fund industry and they are a small local firm in the New York area that does not specialize in investment firms.
- Summary – One of the biggest risks we are taking is allowing Madoff Securities to have discretion over our accounts without any third party oversight. Given that the NASD is regularly verifying that the trades that Madoff is placing on Tremont's behalf are valid gives us assurances that Madoff is not falsifying any activity for our portfolios. There is no true prime broker/custodian as all the trades for the Fund are executed through Madoff's desk and all positions are custodied at Madoff. There is an inherent risk with having the Investment Advisor to the Fund acting as broker dealer, however this is mitigated by several factors. Madoff has a long standing relationship with the Investment Manager (Tremont). In addition, the IA has been registered with the NASD since 1960 and has had no significant regulatory issues. Commission rates have been communicated to be .04 per share for US Equity positions, typical rates for these types of instruments are generally .01-.02 per share. Given that there are not any other fees generated by Madoff this is not a large issue, however Madoff is incentivized to actively trade the account as this is how he generates revenue from the portfolio....In addition a formal background check has been run on Bernard L. Madoff and Bernard L. Madoff Investment Securities by Tremont's outsourced provider, First Advantage...There were no significant negative points to note from the background check.

(2)     **2008 James Purnell Memo**

Mr. Purnell, Managing Director, Investments, may be a good person of interest for an additional interview. Mr. Purnell joined Tremont in the summer of 2008. Mr. Purnell drafted

5

MADTSS01161401

an Operational Due Diligence Review memo on Tremont's investment in Fairfield, a feeder fund into Madoff, which notes the following concerns regarding investing with Madoff:

- The fund's relationship with Madoff, while identical to other Madoff relationships, does not represent the best industry practices.
- Self custody – the Fund maintains accounts at Madoff Securities and Madoff trades those accounts for the benefit of the fund.
- Madoff's auditors – Fairfield also pointed out that while Madoff's auditors, Friehling and Horowitz, is thought to make a material percentage of their annual revenue from Madoff, they have from Fairfield's perspective been very thorough.
- Compliance – Fairfield pointed out that while Peter Madoff, Bernie's brother, is head of Compliance at Madoff Investment Securities LLC, there is no evidence of there ever having been compliance issue there.
- Memo states "Given the structure of the Madoff relationship, this investment requires an exception approval from the Investment Committee." In addition, an email from Mr. Purnell to the Tremont Investment Management Group dated October 10, 2008, states that Fairfield should be re approved at the next investment committee meeting. However, the staff's review of the subsequent investment committee meeting minutes does not document any exception or re-approval of Fairfield. Tremont informed the staff, in writing, that Mr. Purnell's analysis of Madoff was still ongoing at the time of the investment committee meeting and was continuing when Madoff's arrest was publicly disclosed. Based on Tremont's response, the Fairfield investment was not re-approved or given an exception approval and Tremont did not document in its minutes Mr. Purnell's analysis and that it was ongoing.

### III. Foredestine LLC

Robert Schulman started another firm, Foredestine located on Madison Avenue. Foredestine, an unregistered entity, has a website located at www.foredestine.com, which identifies Mr. Schulman and his business background, and he was formerly with Tremont. The website states "Robert I Schulman is capping off 30 successful years in the financial industry with the establishment of Foredestine, LLC, a new investment advisory firm specializing in obtaining unique and difficult to acquire assets in the market." In addition, a Wall Street Journal Article, dated December 27, 2008, stated that people close to Mr. Schulman say he planned to resume advising clients on Madoff investments through a new firm called Foredestine. The staff's review of a spreadsheet attached to Mr. Schulman's retirement letter dated June 9, 2008 disclosed a list of investors that will liquidate their investments with Tremont and reinvest in the same funds through Foredestine Series Fund LLC. Based on the forgoing, it appears that funds are being transferred from funds managed by a registered entity to an unregistered fund. The staff reviewed the private placement memoranda ("PPM") for Foredestine Series Fund LLC dated July 1, 2008 which states that the fund may invest directly in securities or indirectly in one or more underlying managed accounts or vehicles. With respect to fees, the PPM states that management fees may be payable at the relevant series level or at the underlying fund level. The Manager, Foredestine, in its sole discretion may waive all or part of the Management Fee

MADTSS01161402

otherwise due with respect to any member, by rebate or otherwise. Mr. Schulman's retirement letter states that with respect to Foredestine investments in Tremont products for the investment period, i.e., 36 months following the retirement date, Foredestine is entitled to receive an amount equal to the annual fees charged by and otherwise payable to Tremont, less 50 basis points, which will be retained by Tremont.

IV.    **Fund Raising Campaign – Fall 2008**

In the months prior to the unraveling of the Madoff scandal, Tremont was attempting to raise funds to replace an anticipated investor withdrawal of approximately $600 million. A letter, dated November 14, 2008 was sent to current investors in Rye Select Broad Market Prime Fund ("RSBMPF"), Rye Select Broad Market Portfolio Limited ("RSBMPL"), and Rye Select Broad Market Fund ("RSBMF") suggesting that now would be a good time to make an investment. The staff obtained a list of investors that received this letter and noted that certain of these investors made additional contributions subsequent to receiving the aforementioned letter. Specifically 10 investors in the RSBMF made additional investments on December 1, 2008 totaling approximately $34 million. Two of these investors, Spectrum Select LP and Spectrum Select II LP, invested $175,000 and $1,300,000, respectively on December 1, 2008 into RSBMPF. Spectrum Select II LP also invested $1,300,000 into Rye Select Broad Market XL Fund on December 1, 2008.

V.    **Kingate Global Fund Ltd.**

Tremont (Bermuda) Limited, served as co-manager of Kingate Global Fund, Ltd. until approximately March 2006. As co-manager, Tremont was responsible for providing investment advisory, accounting and administrative services required by Kingate Global Fund, Ltd. In addition, FIM Ltd serves as a consultant for Kingate Global Fund, Ltd. The staff was informed that Sandra Manzke, former Director and Founder of Tremont in 1984, who left Tremont in 2005 to start another investment adviser, Maxam Capital Management LLC, had a relationship with the people at FIM Ltd. In March 2006, Tremont (Bermuda) Limited became a consultant to Kingate Management Limited, the Manager of Kingate Global Fund, Ltd. As consultant, Tremont was to provide consulting, and sales and marketing services to Kingate Management Limited for a fee. During the period 1998 through 2008, Tremont received approximately $40.7 million in fees for acting as either a co-manager or consultant.[1] The staff's review of Kingate Global Fund, Ltd.'s PPM and audited financial statements do not contain any disclosure of the consulting fees received by Tremont.

In addition, according to the January 13, 2009 interview with Ms. Manzke, the staff was informed that while at Tremont, Ms. Manzke was informed by Mr. Madoff that if she solicited any investors from Fairfield into her new fund at Tremont, which was charging lower fees, that Madoff would shut her down. In addition, Kingate was informed that it would also be shut down if it solicited any investors from Fairfield. Specifically, the staff was informed by Ms. Manzke

---

[1]    During the examination, the staff requested all fees generated from investments with Madoff. It is unclear to the staff if this $40.7 million is included in the total fees received by Tremont from Madoff.

7

that Walter Noel, from Fairfield, was Madoff's friend and Madoff imposed a rule that if anyone invested in Ms. Manzke's fund who was a Fairfield client/investor that Madoff would shut Ms. Manzke down. The staff was informed that Ms. Manzke had originally specifically targeted investors in Fairfield to invest in her fund at Tremont since she was charging lower fees. The staff has scheduled a meeting with Ms. Manzke on February 24, 2009 to obtain additional information as to how Tremont would be aware of whom Fairfield's investors were.

## VI.    Other people of interest:

(1)    Counsel for Tremont, Maxam, Kingate, Foredestine, and RISCHUL LLC, a private investment limited liability company controlled by Mr. Schulman, is Tannenbaum, Helpern Syracuse & Hirschtritt LLP. Also, Michael Tannenbaum signed a 2004 Kingate Co Manager Agreement as a Director of Kingate Management LTD. The PPM for Kingate states that Mr. Tannenbaum serves as an operating director of the Manager, Kingate Management Limited. Also, James McCormick, General Counsel for Tremont used to work at Tannenbaum. Michael Tannenbaum may be a good person of interest to interview.

(2)    Frank DiPasquali was also a contact at Madoff. He was day to day operations contact. The staff was informed during various interviews with Tremont personnel that he was the next in line after Madoff retired.

8

MADTSS01161404

Schulman - high level DD reviews

Manzke - left to start Maxam, initiated relationship w/ Madoff, left in 2005

Kingate exposure - Tremont (Bermuda) Ltd served as co-manager of Kingate Global Fund

Manzke founded Tremont - Oppenheimer owns Tremont Group Holdings

Tremont Capital Mgmt - FoF - sorry so exposure to Madoff — invested in Fairfield

Rye Investment Management - single manager group
→ 6 or 7 funds exposure to Madoff
→ 7% exposure

invested in Rye Funds, Kingate, Fairfield — small pieces

Tremont receives fees from Kingate for being a consultant - no dealings in Kingate IPS or PPM about fees paid to Tremont

Manzke may have targeted FGG investors to get them to invest in Tremont, lesser fees, Madoff got wind of it and told her to stop

BLM was only manager Schulman did business with as far as DD reviews

MADTSS01161406

pitch books - discuss w/ investment managers but not BLM - BLM didn't want investors reaching out

Erin Reardon  ⎤
Jodi Crupi    ⎬ handled redemptions/additions
Eric Lipkin   ⎦

3.5 billion

Sal Russo - ongoing due diligence - relied on Schulman

Rudman Report - Tremont had outside consultant come in and do a report

When Oppenheimer bought Tremont, consultants may have come in and did a review of Madoff investment and found nothing

investors made redemptions and then requested thru Foredestine ($80M) thru Tremont to Madoff

Sept 2008 - large redemption from investor ($600M) requested lump sum, but Tremont persuaded him to withdraw in pieces

Russo would look over statements and confirms and put it into Advent/metrics

Jim Mitchell met w/ person at F66, concerned that family members involved, self-custody, small auditor

MADTSS01161408

DD done on Fairfield FX [?] fund, invested in Madoff but no DD done directly on Madoff

Pat Kelly supposed to meet BLM on 12/9/08, on 12/8/08 Frank called up and canceled

investors were coming in knowing they were investing with BLM even though not in solicitation materials, just by word of mouth

KPMG did Bye audits - KPMG sent letter to Frank to confirm assets    *confirm*

- received audited F/S of broker/dealer to determine if well-capitalized

Jim McCormick - General Counsel for Tremont