UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SECURITIES INVESTOR PROTECTION
CORPORATION,

            Plaintiff,

           v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

           Defendant.
-----------------------------------------------------------X

In re:

BERNARD L. MADOFF,

           Debtor.
-----------------------------------------------------------X

Adv. Proc. No. 08-01789 (SMB)

SIPA LIQUIDATION

(Substantively Consolidated)

# MEMORANDUM DECISION AND ORDER GRANTING MOTION OF DIANA MELTON TRUST FOR RECONSIDERATION OF THE DISALLOWANCE OF ITS CUSTOMER CLAIM AND ADHERING TO THE COURT'S PREVIOUS DECISION AND ORDER

**A P P E A R A N C E S:**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111

    David J. Sheehan, Esq.
    Nicholas J. Cremona, Esq.
    Jorian L. Rose, Esq.
    Amy E. Vanderwal, Esq.
    Jason I. Blanchard, Esq.
        Of Counsel

*Attorneys for Irving H. Picard, Trustee*
 *for the Liquidation of Bernard L. Madoff*
 *Investment Securities LLC*

DIANA MELTON TRUST

     By Alan R. Melton, M.D. and Andrew Melton

*Pro se*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The Diana Melton Trust (the "Diana Trust"), by its sole trustees and beneficiaries, Dr. Alan Melton and Andrew Melton (together, the "Meltons"), has moved (the "*Motion*") to vacate and reconsider the *Order Granting Trustee's Thirtieth Omnibus Motion to Disallow Claims and Overrule Objections of Claimants Who Have No Net Equity*, dated Apr. 30, 2019 ("*Disallowance Order*") (ECF Doc. # 18708) to the extent it disallowed the Diana Trust's customer claim. The *Motion* is opposed by Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA").

For the reasons set forth below, the Court grants the *Motion* to the extent of reconsidering the disallowance of the Diana Trust's customer claim, and upon reconsideration, adheres to the *Disallowance Order*.

**BACKGROUND**

**A.    Madoff's Ponzi Scheme**

Bernard L. Madoff operated the largest Ponzi scheme in history from the investment advisory side of BLMIS satisfying customer withdrawal requests with earlier deposits made by other customers. *See SIPC v. BLMIS* (*In re BLMIS*), 424 B.R. 122, 125-32 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011), *cert. denied*, 567 U.S. 934 (2012); *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), Adv. Proc. No. 10-05286

(SMB), 2019 WL 2593008, at *4-7 (Bankr. S.D.N.Y. June 25, 2019) ("*Legacy*"). On December 11, 2008 (the "Filing Date"), Madoff was arrested for securities fraud and the Securities and Exchange Commission ("SEC") commenced an action against Madoff and BLMIS alleging violations of the Investment Advisors Act of 1940, the Securities Act of 1933 and the Securities Exchange Act of 1934. *Legacy*, 2019 WL 2593008, at *1. The Securities Investor Protection Corporation ("SIPC") also filed an application for a protective decree pursuant to SIPA § 78eee(a)(3) maintaining that BLMIS was unable to meet its obligations to its customers and the customers needed the protections afforded by SIPA. *Id.* The District Court granted SIPC's application, appointed the Trustee and his counsel pursuant to SIPA § 78eee(b)(3), and removed the SIPA proceeding to this Court pursuant to SIPA § 78eee(b)(4). *Id.*

**B.    The Diana Trust BLMIS Account**

The Diana Trust held BLMIS Account No. 1ZA699 (the "Account"). The Account was formerly held in the name of the Ernest Melton Trust (the "Ernest Trust"). (*Declaration of Vineet Sehgal in Support of the Trustee's Reply to the Objection of Dr. Alan Melton to the Thirtieth Omnibus Motion to Disallow Claims and Overrule Objections of Claimants Who Have No Net Equity*, dated April 18, 2019 ("*Sehgal Reply Declaration*") at ¶ 6 (ECF Doc. # 18671).) A total of $320,000.00 in cash was deposited in the Account while it was held in the name of the Ernest Trust. (*See Sehgal Reply Declaration*, Ex. 2.) On September 4, 2007, Ernest Melton, Alan Melton, and Andrew Melton faxed a letter (the "September 2007 Letter")[1] to BLMIS officer Frank DiPascali

---

[1]    A copy of the September 2007 Letter is attached to the *Sehgal Reply Declaration* as Exhibit 4.

asking BLMIS to change the Account's name and tax identification number ("TIN") from the Ernest Trust to the Diana Trust. According to the monthly statement generated by BLMIS, the balance in the Account at the end of September 2007 was $1,046,460.00. (*Sehgal Reply Declaration*, Ex. 7.) In fact, the cash withdrawals from the Account by the Ernest Trust already exceeded the cash deposits by $345,000.00 and the "balance" reflected on the monthly statement consisted entirely of entries made up by Madoff and his staff and were entirely fictitious.

BLMIS complied with the request, changing the name of owner of the Account to the Diana Trust and using the new TIN supplied by the trustees. No additional funds were ever deposited into the Account after it was renamed, and by the Filing Date, the Diana Trust had withdrawn an additional $62,500.00 from the Account. Thus, withdrawals from the Account ultimately exceeded deposits by $407,500. (*Sehgal Reply Declaration*, Ex. 2.)

C.    **The Claim Dispute**

After the commencement of the BLMIS SIPA liquidation, and in accordance with the *Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination, and Adjudication of Claims; and Providing Other Relief*, dated Dec. 23, 2008 (ECF Doc. # 12), the Diana Trust filed a customer claim (the "Customer Claim") in the amount of $1,120,005.21 – the amount reflected on the Account's final BLMIS monthly statement sent prior to Madoff's arrest.[2] On October 19, 2009, the Trustee sent a notice

---

[2]    A copy of the Customer Claim is attached to the *Sehgal Reply Declaration* as Exhibit 1. The last monthly statement, on which it was based, is attached to the Customer Claim.

- 4 -

denying the Customer Claim (the "Trustee Determination")[3] because no securities were ever purchased for the Account and amounts withdrawn from the Account were greater than the amounts deposited leaving the Account with negative net equity. (Trustee Determination at MWPTAP01018738-41.)

Two months later, the Diana Trust, through its counsel, objected to the Trustee Determination (the "Objection to Determination").[4] Counsel argued, *inter alia*, that its net equity should reflect the amount listed on the Account's final customer statement (Objection to Determination at ¶¶ 9, 11), the Diana Trust was entitled to interest on its deposits under state law (*id.* at ¶ 12), at least some of the gains were not fictitious to the extent BLMIS engaged in actual trades for the Account (*id.* at ¶ 14), the Diana Trust should get an offset for the taxes paid based on fictitious gains (*id.* at ¶ 15), and the Trustee's net equity calculation did not give sufficient credit to an inter-account transfer from one or more predecessor accounts. (*Id.* at ¶ 16.)

The legal issues raised by the Diana Trust were resolved through subsequent litigation.[5] First, the Second Circuit upheld the Trustee's methodology for computing a customer's net equity claim. Under that approach, the Trustee ignored the last BLMIS customer statements and all fictitious profits and calculated net equity by netting deposits against withdrawals (the "Net Investment Method"). *In re BLMIS*, 654 F.3d 229, 233-35 (2d Cir. 2011) ("*Net Equity Decision*"), *cert. denied*, 567 U.S. 934 (2012). If

---

[3]   A copy of the Trustee Determination is attached to the *Sehgal Reply Declaration* as Exhibit 2.

[4]   A copy of the Objection to Determination is attached to the *Sehgal Reply Declaration* as Exhibit 3.

[5]   The Diana Trust has not argued or offered proof that BLMIS engaged in actual trades for the Account.

a customer withdrew more from his BLMIS account than he deposited into that account, he was a net winner and did not have a net equity claim.

Second, the Second Circuit ruled that the same methodology applied to inter-account transfers between BLMIS accounts. Under the Inter-Account Method, the transferee account did not receive credit for any amounts supposedly transferred in excess of the transferor account's net equity as computed under the Net Investment Method. *Sagor v. Picard* (*In re BLMIS*), 697 F. App'x 708, 711 (2d Cir. 2017) (summary order). Hence, if the transferor account was a net winner with zero net equity at the time of the transfer, the transferee account did not receive any credit.

Third, the Second Circuit rejected the contention that a net equity claim must account for inflation or interest, *SIPC v. 2427 Parent Corp.* (*In re BLMIS*), 779 F.3d 74, 79-81, 83 (2d Cir.), *cert. denied*, 136 S. Ct. 218 (2015), and this Court rejected the argument that net equity should take into consideration the taxes paid by the customer. *SIPC v. BLMIS* (*In re BLMIS*), 522 B.R. 41, 54 n. 9 (Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017) (summary order); *cf. Donell v. Kowell*, 533 F.3d 762, 779 (9th Cir.) (rejecting an offset for taxes paid by defendant on fictitious gains received from Ponzi scheme in fraudulent transfer action), *cert. denied*, 555 U.S. 1047 (2008); *Picard v. Estate of Igoin* (*In re BLMIS*), 525 B.R. 871, 893 (Bankr. S.D.N.Y. 2015) ("the withdrawal of the money to pay taxes the Defendants never should have had to pay is not a defense to the fraudulent transfer claims").

On March 14, 2019, the Trustee moved to disallow seven customer claims, including the Customer Claim. Relying on the precedent just discussed, he argued in substance that these customers were net winners and their BLMIS accounts had either a negative or zero net equity. (*Trustee's Thirtieth Omnibus Motion to Disallow Claims and Overrule Objections of Claimants Who Have No Net Equity*, dated Mar. 14, 2019 (ECF Doc. # 18552).)

Up to this point, the Diana Trust had been represented by counsel. The Meltons, however, now undertook the representation of the Diana Trust.[6] They submitted numerous emails arguing that the Customer Claim should be allowed but failed to appear on the return date of the Trustee's motion. The Court ruled that the Diana Trust was a net winner, granted the motion and entered the *Disallowance Order*.

### D.    The Motion to Vacate

Within hours of the entry of the *Disallowance Order*, the Meltons emailed the Court asking that the Customer Claim not be disallowed and reiterating the arguments made in their prior emails. In addition, the Meltons claimed that they had not received notice of the hearing. (*See* ECF Doc. # 18709.)[7] By Memorandum Endorsement and

---

[6]    As a rule, a non-lawyer cannot represent a trust, which is a separate legal person. *See* 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."); *Guest v. Hansen*, 603 F.3d 15, 20 (2d Cir. 2010); *Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007). Notwithstanding the general rule, a non-lawyer administrator and sole beneficiary of an estate that has no creditors may represent that estate because he is the only affected party and is entitled to the right of self-representation. *Guest*, 603 F.3d at 21. In advance of the hearing, the Meltons certified that they were the only trustees and beneficiaries of the Diana Trust and the Diana Trust had no creditors. Accordingly, the Court has allowed the Meltons to represent the Diana Trust in this matter.

[7]    The *Affidavit of Mailing*, signed on March 15, 2019 (ECF Doc. # 18584) stated that notice of hearing for the Trustee's motion was served on Kachroo Legal Services, P.C. who served as counsel to the Diana Trust. (*See Notice of Appearance*, dated Dec. 17, 2013 (ECF Doc. # 5609).) Kachroo Legal Services, P.C. withdrew as counsel to the Diana Trust a week before the hearing on the *Motion*. (*Order*

Order, dated April 30, 2019 (ECF Doc. # 18710), the Court ruled that it would treat the Meltons' latest email as a motion to vacate the *Disallowance Order* and scheduled a hearing on the *Motion*.

## DISCUSSION

Section 502(j) of the Bankruptcy Code[8] allows the Court to reconsider the allowance or disallowance of a claim "for cause." If reconsideration is granted, the Court may allow or disallow the claim "according to the equities of the case." 11 U.S.C. § 502(j). Motions made under section 502(j) within fourteen days of the order disallowing the claim are governed by Rule 9023 of the Federal Rules of Bankruptcy Procedure (which incorporates Rule 59 of the Federal Rules of Civil Procedure). *Davidson v. AMR Corp.* (*In re AMR Corp.*), 566 B.R. 657, 665 (S.D.N.Y. 2017); *Rozier v. Rescap Borrower Claims Tr.* (*In re Residential Capital, LLC*), No. 15 Civ. 3248 (KPF), 2016 WL 796860, at *15 (S.D.N.Y. Feb. 22, 2016). "To prevail on a motion under Rule 9023, the movant must show that the court overlooked controlling decisions of factual matters that might materially have influenced its earlier decision, and the motion is granted only when the movant identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest

---

*Granting Motion to Withdraw Gaytri D. Kachroo and Kachroo Legal Services, P.C. as an Attorney or as Attorneys of Record Pursuant to Local Bankruptcy Rule 2090-1(e)*, dated June 19, 2019 (ECF Doc. # 18821).)

[8] Chapters 1, 3, and 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply in SIPA liquidation proceedings to the extent consistent with SIPA, SIPA § 78fff(b), and a claim in a SIPA proceeding is the "functional equivalent" of a proof of claim in a bankruptcy case. *SIPC v. BLMIS* (*In re BLMIS*), 513 B.R. 437, 443 (S.D.N.Y. 2014).

injustice." *AMR*, 560 B.R. at 666 (citations, internal quotation marks, and alteration omitted).

The nub of the Diana Trust's argument is that when the Ernest Trust trustees wrote to BLMIS to change the name on the Account and use a new TIN, BLMIS was legally required to withdraw the approximate $1 million in cash that purported to be the balance in the Ernest Trust Account and redeposit that approximate $1 million in cash in the Diana Trust Account even though they were the same account. The Diana Trust argues that if this had been done, the it would have received a cash deposit of approximately $1 million entitled to full credit under the Net Investment Method. Because the Meltons' theory became clear at the argument on the *Motion*, I will reconsider the disallowance in light of that argument but will dispense with any further argument as it would not assist the Court in deciding the ultimate question of allowance.

Upon reconsideration, I adhere to my prior ruling that the Customer Claim cannot be allowed. First, BLMIS did exactly what the trustees of the Ernest Trust asked BLMIS to do in the September 2007 Letter. It changed the name on the Account and used the new TIN. The Account number remained the same and was listed on the Diana Trust's monthly customer statements. The Diana Trust has not pointed to any legal authority, such as a statute or regulation, to support its underlying contention that BLMIS was required as a matter of law to withdraw cash from and then redeposit cash in the Account. They have alluded to conversations with representatives at Vanguard and Fidelity, (June 26, 2019 Hr'g Tr. at 6:15-17 (ECF Doc. # 18863)), but these statements are hearsay and, in any event, are inadmissible to prove the law.

Second, even if BLMIS had withdrawn the cash from the Ernest Trust and redeposited the same cash into the renamed Account, the Diana Trust and its transferees would be subject to substantial liability and the Customer Claim would still have to be disallowed as a matter of law.  BLMIS operated as a Ponzi scheme, and any fictitious profits withdrawn from the Account within two years of the Filing Date constituted intentional fraudulent transfers.  *Legacy*, 2019 WL 2593008, at *2-7.  As noted, the Ernest Trust was already overdrawn by $345,000.00 in September 2007 and the cash withdrawal of an additional $1,046,460.00 that the Diana Trust argues it should have received would have consisted entirely of fictitious profits.  Under those circumstances, the Diana Trust would be liable to the SIPA estate for more than $1 million and the Customer Claim would be automatically disallowed under 11 U.S.C. § 502(d) unless and until the Diana Trust repaid those sums to the SIPA estate.[9]

The Court sympathizes with the Meltons and the personal tragedies that Madoff's Ponzi scheme has visited upon them and their families.  Nevertheless, the Court must be guided by the legal principles, discussed above, that govern the allowance of the Customer Claim.  Furthermore, the principles of equitable distribution that animate bankruptcy law also support the Court's conclusion.  Only $320,000.00 was ever deposited into the Account while a total of $727,500.00 was withdrawn during its

---

[9]  Section 502(d) states:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

sixteen-year existence. In this sense, it was a profitable investment although not as profitable as the phony BLMIS customer statements indicated. The net losers were not so lucky.

Moreover, the Customer Claim is based on a myth. The $1,120,005.21 balance reflected in the Account's final customer statement is a made-up number consisting entirely of fictitious profits arbitrarily assigned by Madoff and BLMIS. If the Trustee pays the Diana Trust $1,120,005.21, those funds must come from money that will otherwise be used to pay the customer claims of net losers. Though innocent of Madoff's fraud, the Diana Trust has no right as a matter of equity to enjoy the fruits of that fraud at the expense of equally innocent victims who have lost their principal investments. *Cf. Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 568 (2d Cir. 2016) ("The loss of an opportunity to lay hands on funds belonging to others is not a legally cognizable injury. In this case, it is a missed chance for innocent enjoyment of a fraud. A court of equity 'will not lend its power to assist or protect a fraud.'") (quoting *Kitchen v. Rayburn*, 86 U.S. 254, 263 (1873)), *cert. denied*, 137 S. Ct. 2279 (2017).

So ordered.

Dated:  New York, New York
        July 25, 2019

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge