UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　Plaintiff-Applicant,<br><br>　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES, LLC,<br><br>　　　　　Defendant. | Adv. Pro. No. 08-1789 (SMB)<br><br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re<br><br>BERNARD L. MADOFF<br><br>　　　　　Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br><br>　　　　　Plaintiff,<br><br>　　- against -<br><br>HSBC BANK PLC, *et al.*,<br><br>　　　　　Defendants. | Adv. Pro. No. 09-01364 (SMB) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF ALPHA PRIME FUND LTD. FOR JUDGMENT ON THE PLEADINGS**

---

**DUFFYAMEDEO LLP**
275 Seventh Avenue, 7th Fl
New York, New York 10010
Tel: (212) 729-5832
Todd E. Duffy
Douglas A. Amedeo
*Attorneys for Defendant Alpha Prime Fund Ltd.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................. 2

The Madoff Fraud ..................................................................................... 2

Alpha Prime's BLMIS Losses ................................................................... 2

HSBC ........................................................................................................ 3

The Red Flags ........................................................................................... 4

   1.   Madoff's Secrecy ............................................................................ 5

   2.   Madoff's purported trade volumes were too high to be believed ..................... 5

   3.   There were not enough options to implement Madoff's purported strategy ..... 6

   4.   Many trades appeared to have been executed outside the daily price range ..... 6

   6.   Negative cash balances ................................................................... 8

   7.   Inadequacy of Madoff's Auditors .................................................... 9

   8.   Madoff's returns did not mirror market conditions .......................... 9

   9.   Madoff was able to execute trades at the perfect time, every time ................ 10

   10.   Madoff did not provide real time access to IA business accounts ................. 10

   11.   Madoff's account statements purported to transact with non-existent funds .. 11

   12.   Madoff never identified his options counterparties ......................... 11

   13.   Madoff's options transactions were frequently inconsistent with SSC Strategy. ................................................................................................. 12

   14.   BLMIS's paper trade confirmations were archaic and replete with inconsistencies .......................................................................................... 12

   15.   Madoff walked away from hundreds of millions of dollars by employing a bizarre fee structure ................................................................................... 13

   16.   Many financial professionals publicly questioned Madoff's legitimacy ......... 13

   17.   BLMIS Account Statements and confirmations often reflected settlement anomalies in options transactions ............................................................... 14

   18.   Madoff purported to execute trades that settled on days when the market was closed. ...................................................................................................... 14

PROCEDURAL HISTORY ........................................................................ 15

ARGUMENT ............................................................................................... 16

  I.  Legal Standard ...................................................................................... 16

  II.   BECAUSE THERE ARE NO ASSERTIONS OF ACTUAL KNOWLEDGE IN THE AMENDED COMPLAINT, THE REMAINING CLAIMS MUST BE DISMISSED.... 17

   A.   Without Any Allegations of Alpha Prime's Actual Knowledge of the Ponzi Scheme, the Trustee Cannot Avoid and Recover the Six-Year Transfers. (Counts 5-9) ...... 17

B.      Without Any Allegations of Actual Knowledge, the Trustee Cannot Equitably
Subordinate any Claims of Alpha Prime. (Count 12)........................................................... 18

C.      The Trustee Cannot Equitably Subordinate the Six Year Transfers ............... 27

D.      The Trustee States no Basis to Object to Alpha Prime's................................. 27

Remaining Claim (Count 12) ................................................................................... 27

CONCLUSION............................................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.),* 169 B.R. 832, 837
(Bankr. S.D.N.Y. 1994)...................................................................................... 26

*Austin v. Chisick (In re First Alliance Mortg. Co.)*, 298 B.R. 652, 666 n 2 (C.D. Cal. 2003) ..... 23

*Century Glove, Inc. v. Iselin (In re Century Glove, Inc.)*, 151 B.R. 327, 332 (Bankr. D. Del.
1993)............................................................................................................ 23

*First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir. 1994)........................ 16

*Granite Partners,* 210 B.R. at 517 ........................................................................... 23

*Hirsch v. Pennsylvania Textile Corp. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 611 (Bankr.
S.D.N.Y. 1998)................................................................................................ 23

*In re AlphaStar Ins. Group Ltd.*, 383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008) ........................... 18

*Katz v. Picard*, 462 B.R. 447, 456 (S.D.N.Y. 2011)................................................. 19, 20

*Kittay v. Atl. Bank of New York (In re Global Serv. Group LLC)*, 316 B.R. 451, 462 (Bankr.
S.D.N.Y. 2004)................................................................................................ 20

*Picard v. Merkin (In re Bernard L. Madoff Securities LLC)* , 515 B.R. 117 (Bankr. S.D.N.Y.
2014)..................................................................................................... 17, 19, 22

*Official Comm. Of Unsecured Creditors v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 361
(Bankr. S.D.N.Y. 2010)....................................................................................... 18

*Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir. 2001).................... 16

*Picard v. Legacy Capital Ltd.*, 548 B.R. 13, 32 (Bankr. S.D.N.Y. 2016) ................................ 20

*Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)................................................... 16

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inc. Sec. LLC*, 563 B.R. 737, 754 (Bankr. S.D.N.Y.
2017)............................................................................................................ 21

**Statutes**

11 U.S.C. § 502(d) ........................................................................................ 21, 22, 27

11 U.S.C.§ 502(e) ............................................................................................. 22

11 U.S.C. § 502(h) ........................................................................................ 20, 21

11 U.S.C. § 546(e) ........................................................................................ 17, 27

**Rules**

Fed. R. Civ. P. 12(c) .......................................................................................... 5

Fed. R. Civ. P. 12(h)(2)..................................................................................... 20

**Treatises**

2A Moore & Lucas, Moore's Federal Practice ¶ 12.08 (2d Ed. 1994) ......................................... 16

Alpha Prime Fund Ltd. ("Alpha Prime" or "Alpha Prime Fund") a defendant in the above-captioned adversary proceeding, by and through its undersigned counsel, respectfully submits this memorandum of law in support of Alpha Prime's Motion for a Judgment on the Pleadings (the "Motion") pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (made applicable herein by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")) on those issues (the "Disputed Issues") described as the "Disputed Issues" in the Partial Settlement Agreement dated February 9, 2018 and approved by the Court on March 29, 2018 (ECF No. 498) (the "Partial Settlement Agreement").  In support of its motion, Alpha Prime represents as follows:

## PRELIMINARY STATEMENT

As of this date, the Trustee has held Alpha Prime's money for more than a decade.  Alpha Prime was only a BLMIS customer for a total of five years.  Thus, the Trustee has held Alpha Prime's money twice as long as BLMIS did.  Notwithstanding, the Amended Complaint fails to even allege that Alpha Prime had actual knowledge that BLIMS was not trading securities.

This fact is of key importance because, without even alleging actual knowledge, the Trustee cannot justify avoidance of the transfers that occurred between Alpha Prime and BLMIS during the subject period three to six years prior to December 11, 2008 (the "Filing Date") or the equitable subordination of any claims.  Accordingly, the Court must end what little still remains of this entire adversary proceeding by entering judgment on the pleadings in Alpha Prime's favor.

Similarly, the Trustee admits that Alpha Prime has a remaining net equity claim of $12,533,550.  *See* Partial Settlement Agreement at 1(b) and 1(c)(iii).  The Trustee has asserted no claim against Alpha Prime or its directors alleging that they had actual knowledge that could

warrant subordination of that claim.  Accordingly, after a long ten (10) years, judgment on the

pleadings in favor of Alpha Prime is warranted.

## STATEMENT OF FACTS

### The Madoff Fraud

On the Filing Date, Bernard L. Madoff ("Madoff") was arrested by federal agents for

violations of various criminal securities laws.  Amended Complaint dated October 5, 2010

[ECF170] (the "Amended Complaint" or the "Am. Compl.") at ¶ 28.  Madoff founded BLMIS in

or around 1960.  *Id.* at ¶ 35.  At that time, BLMIS registered with the SEC as a broker-dealer.

*Id.* at ¶ 35.  One portion of BLMIS' business was an investment advisory business unit (the "IA

Business").  *Id.* at ¶ 36.  From the 1990's on, Madoff attributed the success of the IA Business to

his investment strategy known as "split-strike conversion strategy."  *Id.* This strategy allegedly

consisted of investing in a basket of common stocks listed on the Standard & Poor's ("S&P")

100 index and hedging through the use of options.  *Id.*

Customers of the IA Business received monthly statements showing the securities held

in, or traded through, their accounts, as well as any growth and profits in their accounts over

time.  *Id.* at ¶ 40.  As is now known, however, Madoff was perpetrating a massive Ponzi scheme

through BLMIS. *Id.*  BLMIS furthered this scheme by, among other things, informing customers

that it conducted trades on the over-the-counter ("OTC") market after hours and periodically

wiring tens of millions of dollars to a BLMIS affiliate to substantiate that claim.  *Id.* at ¶ 34.

### Alpha Prime's BLMIS Losses

Alpha Prime is a Bermuda investment fund formed in March 2003 (the "Formation

Date").  *Id.* at ¶ 232.  Alpha Prime invested with BLMIS through Account No. 1FR097.  *Id.*  In

connection with its operations, Alpha Prime formed Alpha Prime Asset Management as an investment advisor. *Id.*

In the Amended Complaint, the Trustee alleges that during the six years prior to the December 2008 filing date (the "Filing Date") BLMIS made payments or other transfers from the Alpha Prime Account in the amount of $85.8 million (the "Six Year Transfers"). *Id.* at ¶ 334. All of the Six Year Transfers were a return of principal. *Id.* During the two years prior to the Filing Date, BLMIS made transfers totaling approximately $78.2 million, of which the entire amount constituted a return of principal. *Id.* at ¶ 323. During the 90 days prior to the Filing Date, Alpha Prime received transfers from BLMIS that constituted a return of principal in the amount of $49 million (the "90 Day Transfers"). *Id.* at ¶ 344. Pursuant to the terms of the Partial Settlement Agreement the Two Year Transfers were fully repaid to the Estate. *See* Partial Settlement Agreement at ¶¶ E and 1(a).

## HSBC

On the Formation Date, Alpha Prime entered into two relevant contracts with Bank of Bermuda Ltd. ("BoB")[1]. Amended Complaint at ¶ 32. The first, a custodian agreement (the "Alpha Prime Custodian Agreement"), under which BoB would provide Alpha Prime with a full range of custodial services relating to the safeguarding and segregation of money and securities relating to BLMIS. *Id.* at ¶ 33. The second, an administrative and registrar agreement (the "Alpha Prime Administration Agreement"), was entered into with BoB's nominee, Management International (Bermuda) Ltd. ("Management International") and involved a varied and

---

[1] In or about February 2004, HSBC acquired BoB. HSBC undertook all the contractual duties of BoB, though HSBC did not enter into a formal novation agreement until January 2007 (the "Alpha Prime Custodian Novation Agreement") which expressly novated BoB's duties as custodian to Alpha Prime to HSBC Institutional Trust Services (Bermuda) Ltd ("HITSB"). Upon the same date, a virtually identical novation agreement was executed relating to the Alpha Prime Administration Agreement (the "Alpha Prime Administration Novation Agreement").

miscellaneous range of services that Alpha Prime, which lacked any employees, could not do for itself. *Id.* at ¶ 34.

Simultaneously with the entering into of the Alpha Prime Custodian Agreement, BoB (with Alpha Prime's knowledge) entered into a Sub-Custodian Agreement appointing BoB Lux as sub-custodian to undertake the contractual tasks of BoB. *Id.* at ¶ 35. Simultaneously with the entering into of the Alpha Prime Administration Agreement, BoB (with Alpha Prime's knowledge) entered into a Sub-Administrator and Registrar Agreement appointing BoB Lux as sub-administrator to undertake the contractual tasks of Management International. *Id.* at ¶ 36.

### **The Red Flags**

The Amended Complaint introduces the red flags (collectively, the "Red Flags" and each individually a "Red Flag") by stating, without any foundation or support, that the Defendants "observ[ed] and even internally report[ed] many signs that, at the very least, Madoff was not investing the way he purported to…The red flags were shocking not only for what they demonstrated about Madoff's investment strategy, but also for what they demonstrated about the depth of the Defendants' awareness of the fraud." Amended Complaint ¶ 144. Indeed, the Trustee entitles the section introducing the Red Flags as **"RED FLAGS STRONGLY SUGGESTED THAT BLMIS'S IA BUSINESS WAS A FRAUD".**

There are no allegations concerning how or when the Defendants learned about the Red Flags (or even which Defendants learned about which of the Red Flags). Specifically, for present purposes, the Amended Complaint fails to state that Alpha Prime received the KPMG Reports or that HSBC informed Alpha Prime about these Red Flags or that Alpha Prime knew about these Red Flags. However, assuming that Alpha Prime did know about the Red Flags –

4

which it did not –the knowledge of any, if not all, of these Red Flags fails to show that Alpha

Prime had actual knowledge of the fact that BLMIS was not trading securities.

The Red Flags as described by the Trustee consist of the following:

### 1. Madoff's Secrecy

The Trustee alleges that the Feeder Fund Defendants (which includes Alpha Prime along

with other defendants) acquiesced to BLMIS' demands to keep Madoff's name out of offering

documents.  Amended Complaint ¶ 146.  In addition, the Trustee alleges that the Feeder Fund

Defendants were established in jurisdictions that permitted them to omit mention of both Madoff

and BLMIS in offering materials.  *Id.*  However, hundreds of funds that were not unwittingly

involved with a Ponzi scheme are registered in Bermuda or other well-established offshore

jurisdictions that would permit them to omit Madoff and BLMIS' name in their offering

materials.  This alleged Red Flag fails to show Alpha Prime's actual knowledge that Madoff was

not trading securities, or even to offer a thread of any logical connection between the allegation

that Madoff's name was omitted and the trading of securities.

### 2. Madoff's purported trade volumes were too high to be believed

According to the Trustee, Madoff was unwilling to quantify the BLMIS assets under

management.  Amended Complaint ¶ 149.  However, despite this refusal, the Trustee asserts that

the Feeder Fund Defendants knew that the "IA Business was too big to plausibly execute the

SSC Strategy."  *Id.*  Indeed, the Trustee admits that Madoff did not disclose any information

related to assets under management until July 2006.  *Id.*  Based upon that disclosure, the Trustee

reasons, the "Defendants should have recognized that size would entail trading immense

percentages of some of the most highly-traded stocks in the world."  *Id.*  However, the Trustee

fails to state when or even if Alpha Prime ever learned of the purported value of assets that

BLMIS claimed to have under management.  This, by the Trustee's own admission, was

essential to determining if the trade volumes were too high.  Moreover, the Trustee fails to specifically accuse Alpha Prime of: (i) knowledge of Madoff trading volumes; or (ii) actual knowledge that Madoff was not trading securities.

### 3.  There were not enough options to implement Madoff's purported strategy

Pursuant to the Amended Complaint, "[t]he Defendants were 'on notice' of the impossibility of executing the number of options contracts required by the SSC Strategy." Amended Complaint ¶155.  The Trustee bases this theory on the allegation that "the volume of option contracts which BLMIS reported to the Defendants and the Madoff Feeder Funds exceeded the total volume of contracts…traded on the CBOE."  Amended Complaint ¶ 158. However, the Trustee also acknowledges, that Madoff claimed to "purchase options over-the-counter."  Amended Complaint at ¶ 156.  In the associated chart, the Trustee claims that over the life of Alpha Prime's relationship with BLMIS (March 2003 through December 2008), a total of 153 transactions were over volume according to the CBOE. *Id.*  The Trustee fails to explain how many of these transactions were over-the-counter trades and could therefore not be measured against the CBOE.  Nor does the Trustee ever assert that Alpha Prime knew of these deviations. Rather, if, as the Trustee states, many of the transactions were over the counter transactions, those transactions would not have been measured by the CBOE.  The Amended Complaint makes no allegations as to the total volume of contracts on the OTC market or the magnitude of BLMIS' option trading relative to that market.  Accordingly, this Red Flag cannot help the Trustee in his quest for a double recovery because it does not allege that Alpha Prime had any actual knowledge that BLMIS was not trading securities.

### 4.  Many trades appeared to have been executed outside the daily price range

Here, the Trustee claims that many of the purported trades described in the Defendants' account statements "appeared to have been outside the daily price range."  Amended Complaint

¶ 161.  Without stating the total number of purported trades over the five year life of the

relationship between BLMIS and Alpha Prime, the Trustee claims that only 26 trades were out of

range.  Amended Complaint ¶ 163.  Even more damning is that the Trustee does not allege that

Alpha Prime reviewed the account statements and took some action not to learn about these 26

trades, but that HSBC, as administrator and custodian "ignored that these trade confirmations

often reflected average trade values that were outside the daily price range for such securities."

Amended Complaint ¶ 161.  Thus, there is no allegation that Alpha Prime actually knew about

these 26 anomalous trades, but only that it relied upon its administrator.

 Moreover, Alpha Prime's and Madoff's relationship began on or about March 12, 2003

(the date of Alpha Prime's formation) and ended on December 8, 2008 (the date of Madoff's

arrest).  This span included 1,497 trading days.  Given the vast number of trading days and the

purported activity that Madoff reported to HSBC during that time, the 26 anomalous trades

identified by the Trustee in hindsight would be improbable, if not impossible to pick out in real

time, and, in any event, were a negligible number.  In fact, the existence of 26 anomalous trades

indicates the existence of many thousands of non-anomalous trades providing a real-time basis to

believe Madoff was, in fact, conducting actual trading activity.  Accordingly, this "Red Flag",

even if true, does not support the Trustee's burden of proving actual knowledge.

### 5.  Madoff insisted on acting as his own custodian

While the Trustee claims that HSBC knew that Madoff was acting as his own custodian,

it does not allege that HSBC informed Alpha Prime of this fact.  Moreover, the Amended

Complaint claims that the KPMG report pointed this fact out in "stark terms".  Amended

Complaint at ¶ 168.  However, the KPMG report – relied upon by the Trustee – paints a very

different picture.  The 2006 KPMG Report specifically states that BLMIS "settles the principal

bulk trades through the Depository Trust Company" and goes into great detail about how securities are actually traded and segregated. *See* Declaration of Todd E. Duffy dated July 18, 2019 (the "Duffy Declaration") at Exhibit A. This was confirmed by the 2008 KPMG Report. *See* Duffy Declaration at Exhibit B (collectively with the 2006 KPMG Report, the "KPMG Reports"). The KPMG Reports pointed out that Madoff was acting as his own custodian and also highlighted the fact that KPMG investigated and determined that Madoff was trading securities and implementing a process that involved the DTC, which, according to KPMG performed all of the custodial duties. *See* Duffy Declaration, Exhibit A at 16 and confirmed in Duffy Declaration, Exhibit B at 18. Accordingly, this Red Flag, regardless of Alpha Prime's knowledge of it, cannot be cited as evidence of Alpha Prime's actual knowledge that Madoff was not trading securities.

### 6. Negative cash balances

According to the Amended Complaint, Alpha Prime was a BLMIS customer from June 13, 2003 through the Filing Date. Amended Complaint at ¶232. That means that Alpha Prime was a BLMIS customer for approximately 1,361 workdays during that time. Of those 1,361 workdays, there were 112 days with negative cash balances. Amended Complaint ¶ 175. However, the Trustee fails to state that Alpha Prime knew of any instances where it had a negative cash balance and/or that Alpha Prime believed that because it had a negative cash balance that it believed or even considered that this indicated somehow that BLMIS was not trading securities. Again, the Trustee fails to logically connect an allegation (a temporary negative daily balance in a running account) with actual knowledge of a conclusion (that Madoff must not be trading actual securities). Accordingly, this Red Flag also fails to help the Trustee achieve his recovery goals.

### 7.  Inadequacy of Madoff's Auditors

While the Amended Complaint claims generally that the Defendants knew that Madoff used Friehling & Horowitz to audit BLMIS, it does not specifically state that Alpha Prime knew that the firm was inadequate or even existed.  Amended Complaint ¶ 177.  It only states that the Trustee deemed the firm inadequate in hindsight and that "The Defendants were on notice that BLMIS's auditors did not have the competence, resources, technological capabilities, or expertise to perform the domestic and international auditing functions associated with BLMIS and its billions under management."  *Id*.  However, even assuming this fact was pled with adequate specificity, Alpha Prime's alleged knowledge of an inadequate auditor would not logically lead Alpha Prime to determine that BLMIS was not trading securities.  This Red Flag does not show that Alpha Prime had actual knowledge that BLMIS was not trading securities.

### 8.  Madoff's returns did not mirror market conditions

The Trustee claims that BLMIS's IA Business appeared to be immune from any market instability because it "enjoyed consistent rates of return at all times."  Amended Complaint ¶ 179.  However, according to the Trustee, the concern was not that Alpha Prime (or any of the Defendants) knew that the returns allegedly did not mirror market conditions.  Rather, "[d]espite these logic-defying returns, the Defendants failed to conduct even a cursory review of how Madoff's SSC strategy could achieve these results, ignored clear evidence that Madoff could not possibly be generating the purported returns using the SSC Strategy."  Amended Complaint ¶ 180.  However, because there is no obligation for a customer to investigate its broker and the Trustee asserts that Alpha Prime did not conduct an investigation or know that Madoff's returns did not mirror market conditions, this Red Flag is irrelevant.  Moreover, this is an admission that Alpha Prime, allegedly having not conducted an investigation, had no actual knowledge that BLMIS was not trading securities.

9

### 9.    Madoff was able to execute trades at the perfect time, every time

The Trustee asserts that Madoff had a near perfect ability to buy low and sell high.

Amended Complaint at ¶ 181.  "With remarkable consistency, when Madoff was purchasing

shares, the reported average purchase price was in the lower half of the daily range and when

selling shares, the sale price was in the upper half of the daily range."  *Id.*  While this alone is

concerning to the Trustee, the Trustee further claims that because Madoff was entering the

market at specific intervals during the course of the day, the reported prices were an average and

should have gravitated to the daily midpoint.  Amended Complaint at ¶ 182.  While this section

of the Amended Complaint continues and describes how HSBC "routinely identified – and then

ignored – red flags concerning Madoff's supernatural trading ability" (Amended Complaint at ¶

186) it does not state that HSBC ever conveyed this alleged knowledge to Alpha Prime.  Indeed,

the Trustee states, that despite not knowing how Madoff generated "a track record with almost

no down months…HSBC did nothing to inquire further…"  Amended Complaint at ¶ 187.

Indeed there is no allegation in the case of this Red Flag that even HSBC – much less Alpha

Prime – understood that Madoff's alleged magical timing meant that Madoff was not trading

securities.   Nor, of course, was there any obligation to check prices of trades purportedly

executed by Madoff with the daily trading ranges reported by each of the securities Madoff

purportedly traded.   Absent this analysis—which does not perform itself and which Alpha Prime

was under no obligation to perform—this supposed "Red Flag" was completely invisible.

### 10. Madoff did not provide real time access to IA business accounts

The Trustee cites as a Red Flag that HSBC sought to receive trade confirmations

electronically from BLMIS, but Madoff refused to do so.  Amended Complaint at ¶ 188.  There

is no allegation that Alpha Prime knew that HSBC sought to receive trade confirmations

electronically.  Even if it did – which it did not – there is no allegation that either HSBC or

Alpha Prime understood this to mean that BLMIS was not trading securities.

## 11. Madoff's account statements purported to transact with non-existent funds

The Trustee cites as a Red Flag the fact that Madoff failed to reflect the minor name

alteration of the Fidelity Spartan U.S. Treasury Money Market Fund to Spartan U.S. Treasury

Money Market Fund.  Amended Complaint ¶ 189.  However, the Amended Complaint does not

state that Alpha Prime knew of this and understood it to mean that BLMIS was not trading

securities.  Rather it states simply that "[l]ike the other red flags, this was ignored by the

Defendants."  *Id.*  However, with no obligation for a customer to investigate his broker, this

alleged red flag is meaningless.

## 12. Madoff never identified his options counterparties

According to the Trustee, BLMIS did not identify the counterparties on the thousands of

hedging options transactions he purportedly effected every month.  Amended Complaint ¶ 190.

The Trustee reasons that because Defendants like Alpha Prime bore the risk if these fictional

counterparties defaulted on the options, this condition should have been investigated by the

Defendants, including Alpha Prime.  *Id.*  The Trustee does not state that Alpha Prime had any

knowledge of this.  Rather, he states, "[d]espite the potential exposure, the Feeder Fund

Defendants…failed to perform any reasonable, meaningful, or independent inquiry into the

counterparties' abilities to perform under the contracts."  Amended Complaint ¶ 193.  Here too,

because Alpha Prime had no obligation to investigate its broker this alleged Red Flag does not

support the Trustee's burden to show that Alpha Prime actually knew that BLMIS was not

trading securities.  Moreover, because the Trustee admits that Alpha Prime did not know of this

situation, this "red flag" cannot help the Trustee prove that Alpha Prime had actual knowledge

that BLMIS was not trading securities.

### 13. Madoff's options transactions were frequently inconsistent with SSC Strategy

The Trustee alleges that "The Defendants' account statements frequently showed short-term, one sided, speculative options trades that did not hedge any existing equity investment and that this was inconsistent with Madoff's SSC Strategy." Amended Complaint at ¶ 194-95. There is no allegation that either Alpha Prime or HSBC knew that this happened only that it was reflected in the account statements. Amended Complaint at ¶201. Since, according to the Amended Complaint, Alpha Prime had no knowledge of this and had no obligation to investigate its broker, this Red Flag does not help the Trustee satisfy his burden of showing that Alpha Prime actually knew that Madoff was not purchasing securities.

### 14. BLMIS's paper trade confirmations were archaic and replete with inconsistencies

The Trustee alleges that BLMIS's trade confirmations contained numerous inconsistencies. Amended Complaint ¶ 204. This, the Trustee contends, should have indicated that Madoff was not implementing the SSC Strategy as he purported to. *Id.* The Trustee states that the trade confirmations did not reflect the payment of "Section 31" fees required by NASD and FINRA rules. Amended Complaint ¶ 205. However, the Trustee only believes that this would have raised a red flag with the HSBC Defendants. *Id.* The Trustee states that the trade confirmations occasionally reflected Madoff as both the principal and the agent in a transaction and reflected various coding errors. Amended Complaint at ¶¶ 206-07. However, the Trustee only states that Alpha Prime and HSBC knew this "upon information and belief". Even assuming that they did know about these errors – which they did not – there is no indication that knowledge of these errors without anything more would lead someone to believe that BLMIS was not trading securities. This alleged red flag cannot, therefore, help the Trustee meet his burden of showing Alpha Prime's actual knowledge that BLMIS was not trading securities.

12

### 15. Madoff walked away from hundreds of millions of dollars by employing a bizarre fee structure

The Trustee claims that "…Madoff imposed an unusual fee structure that, when compared to the fees charged by most investment funds, including those charged by the Defendants here, meant that Madoff walked away from hundreds of millions of dollars, if not billions of dollars in fees."  Amended Complaint ¶ 209.  While this may appear suspicious, the Trustee claims that "Madoff's explanation [was] that he was 'perfectly happy to just earn commissions'".  Amended Complaint ¶ 212.  Nonetheless, assuming that Alpha Prime did accept this explanation as the Trustee represents in the Amended Complaint, Alpha Prime had no obligation to investigate further.  Moreover, if Alpha Prime accepted Madoff's explanation relating to his fee structure, and there is no allegation that Madoff made this representation to Alpha Prime directly, both Alpha Prime and HSBC must have believed that BLMIS was trading securities.  In addition, once again the logical connection is missing, for there is no logical connection between Madoff charging lower than market-rate fees and perpetuating a fraud.  Accordingly, this "Red Flag" cannot help the Trustee satisfy his burden to show that Alpha Prime had actual knowledge that BLMIS was not trading securities.

### 16. Many financial professionals publicly questioned Madoff's legitimacy

The Trustee cites various articles stating that the respective authors questioned Madoff's methods.  *See, e.g.,* Amended Complaint ¶ 216.  However, the articles all have one thing in common: not one of those articles mentions the word "fraud" in it.  Moreover, even if any or all of the articles accused Madoff of failing to sell securities – which none of them did – the Trustee does not allege that Alpha Prime read these articles or knew of their existence, or should have known of their existence.

13

### 17. BLMIS Account Statements and confirmations often reflected settlement anomalies in options transactions

Here, the Trustee claims that the alleged options transactions in the respective BLMIS accounts did not close within the next business day.  Amended Complaint at ¶ 221.  According to the Trustee, knowledge of this, which the Trustee implies that Alpha Prime had, but does not explicitly allege, should have (but did not) prompted Alpha Prime to conduct a full investigation and demand more transparency.  Amended Complaint at ¶ 156.  However, because there is no obligation for Alpha Prime to investigate its broker, this alleged "red flag" cannot help the Trustee satisfy his burden.

### 18. Madoff purported to execute trades that settled on days when the market was closed.

According to the Trustee, many account statements reflected the close of a transaction on a non-business day.  Although closing transactions after the market is closed is common in the financial world, it is immaterial because Alpha Prime is not mentioned with respect to this red flag.  Indeed, the Trustee states only that Lagoon, Optimal, Primeo, Square One, Geo Currencies, Kingate Global, Kingate Euro, and Thema International are examples of this "red flag".  Amended Complaint ¶ 226.  The Trustee does not state that Alpha Prime reviewed its statements and found these errors and knew that Madoff did not trade securities as a result.  Rather, the Trustee admits that the Defendants did not do an investigation and the fact that the Defendants did not investigate their broker means (according to the Trustee) that they knew BLMIS was a Ponzi scheme.  *Id.*  However, as has been stated over and over again, it is well-settled that customers have no obligation to investigate their broker.

14

## PROCEDURAL HISTORY

The Trustee commenced this adversary proceeding on July 15, 2009. [ECF No. 1] The original complaint asserted claims against HSBC Bank and Alpha Prime. *Id.* According to the Trustee's certificate of service, the Trustee served Alpha Prime with the original complaint on or about July 21, 2009. [ECF No. 4] Twenty-nine days after service of the complaint, on August 19, 2009, the Trustee requested that the Court enter a default judgment against Alpha Prime. [ECF No. 6]

Alpha Prime was first alerted to the original complaint on August 28, 2009. Peter Fischer, a director of Alpha Prime received notice of the complaint. *See* Declaration of Peter Fischer attached as Exhibit 1 to Alpha Prime's Motion to Vacate Default Judgment dated August 21, 2010 [ECF No. 24]. On August 31, 2009, Alpha Prime moved to vacate the default judgment against it. [ECF No. 24] Alpha Prime and the Trustee entered into a stipulation on September 27, 2009, agreeing to vacate the default judgment and allowing the Trustee to file an amended complaint. [ECF No. 27] On December 5, 2010, the Trustee filed his amended complaint in this adversary proceeding. [ECF No. 170] Alpha Prime answered the Amended Complaint on May 27, 2011. [ECF No. 82]

No substantive activity took place in the case from May 2011 until February 24, 2014, when Alpha Prime filed its motion to compel the Trustee to enter into mediation with Alpha Prime. [ECF No. 280] Ultimately, on April 14, 2014, this Court granted the request of Alpha Prime and compelled the Trustee to enter into mediation. [ECF No. 294]

During the course of the mediation, the Trustee and Alpha Prime entered into their first case management plan on October 22, 2015. [ECF No. 415] Mediation continued throughout this process and finally on or about February 9, 2018, the Trustee and Alpha Prime agreed to a

15

Partial Settlement.  As part of the Partial Settlement Agreement, Alpha Prime and the Trustee

agreed upon an amended case management order.  [ECF No. 499]  The order provided for a

deadline of July 3, 2019 for the completion of fact discovery.  *Id.*  at ¶ 2q.  The parties were also

prohibited from filing a dispositive motion in this adversary proceeding until after July 3, 2019.

*Id.* at ¶ 5.

## ARGUMENT

### I.    Legal Standard

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical

to that of a Rule 12(b)(6) motion for failure to state a claim."  *Patel v. Contemporary Classics of*

*Beverly Hills,* 259 F.3d 123, 126 (2d Cir. 2001); *see also,* Fed. R. Civ. P. 12(h)(2) ("[a] defense

of failure to state a claim upon which relief can be granted … may be made  … by motion for

judgment on the pleadings").  While "the district court must accept all allegations in the

complaint as true and draw all inferences in the non-moving party's favor … conclusions of law

or unwarranted deductions of fact are not admitted."  *Patel*, 259 F.3d at 126; *First Nationwide*

*Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir. 1994) (quoting 2A Moore & Lucas,

Moore's Federal Practice ¶ 12.08 (2d Ed. 1984)).  The Court may also consider "documents that

the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.

*Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).  Where, as here the Amended Complaint

fails to state any set of facts that would entitle the Plaintiffs to relief, the Court should grant

judgment on the pleadings.  *Patel*, 259 F.3d at 126.

II.    **BECAUSE THERE ARE NO ASSERTIONS OF ACTUAL KNOWLEDGE IN THE AMENDED COMPLAINT, THE REMAINING CLAIMS MUST BE DISMISSED**

A.    **Without Any Allegations of Alpha Prime's Actual Knowledge of the Ponzi Scheme, the Trustee Cannot Avoid and Recover the Six-Year Transfers. (Counts 5-9)**

Pursuant to Counts 5-9, the Trustee seeks to avoid the Six-Year Transfers.  However, the Amended Complaint fails to allege that Alpha Prime had actual knowledge that the Debtor was not trading securities.  Accordingly, avoidance of the Six-Year Transfers is barred by section 546(e) of the Bankruptcy Code.  *See, e.g., Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC),* 515 B.R. 117, 138 (Bankr. S.D.N.Y. 2014); *SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),* No. 12 MC 115 (JSR), 2013 WL 1609154 at *4 (S.D.N.Y. Apr. 15, 2013).

The standard for pleading and proving "actual knowledge" is exceedingly high and requires a showing that the transferee had "direct and clear knowledge" of Madoff's Ponzi scheme resulting in "a high level of certainty and [an] absence of any substantial doubt regarding the existence" of the scheme.  *Merkin,* 515 B.R. at 139.  *Merkin* is illustrative of how high the pleading standard is for actual knowledge.  In *Merkin,* the complaint alleged that Merkin openly admitted during various conversations that Madoff "appeared to be running a Ponzi scheme," that BLMIS "could be a Ponzi scheme," and that Madoff's scheme was bigger than Ponzi and that "Charles Ponze [sic] would lose out because it would be called the 'Madoff Scheme.'"  *Id.* at 140.  The Court found that because Merkin's statements solely indicated that Madoff "could be" or "appeared to be" running a Ponzi scheme, the allegations, even if taken as true for the purpose of a motion to dismiss, reflected Merkin's "strong suspicion" of the fraud, but did not satisfy "the absence of doubt associated with actual knowledge."  *Id.* at 140-41.  Accordingly, the Court held that the complaint failed to "plausibly allege that Merkin had actual knowledge of Madoff's Ponzi scheme", and dismissed the counts in the complaint that sought to circumvent the safe

harbor provision of section 546(e) of the Bankruptcy Code.  In the Amended Complaint, the

Trustee fails to allege any facts even remotely close to those in *Merkin*.  Thus, the Trustee,

lacking allegations that demonstrate that Alpha Prime had actual knowledge, avoidance of the

Six Year Transfers is barred by section 546(e) safe harbor rule and Alpha Prime is entitled to

judgment on the pleadings dismissing Counts 5-9 of the Amended Complaint.

### B.   Without Any Allegations of Actual Knowledge, the Trustee Cannot Equitably Subordinate any Claims of Alpha Prime. (Count 12)

#### i.   Without Actual Knowledge of the Ponzi Scheme the Trustee Cannot Equitably Subordinate Alpha Prime's Net Equity Claim

If the Trustee cannot show actual knowledge in order to avoid the Six Year Transfers, he

cannot equitably subordinate any of Alpha Prime's claims.

"Section 510(c) authorizes a bankruptcy court to subordinate claims upon a finding of (i)

fraud, illegality or breach of fiduciary duty, (ii) undercapitalization, or (iii) control or use of the

debtor as an alter ego for the benefit of the claimant." *In re AlphaStar Ins. Group Ltd.*, 383 B.R.

231, 276 (Bankr. S.D.N.Y. 2008) (internal citations omitted) (Bernstein, B.J.).  Thus, a complaint

"must adequately delineate conduct on the part of defendants that 'may be lawful but is

nevertheless contrary to equity and good conscience.'" *Official Comm. Of Unsecured Creditors

v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 361 (Bankr. S.D.N.Y. 2010) (citations

omitted).  Such inequitable conduct may encompass "fraud, breach of a fiduciary duty, unjust

enrichment, or 'enrichment brought about by unconscionable, unjust or unfair conduct or double-

dealing.'" *Id.* (citations omitted). If the claim to be equitably subordinated is that of a party that

is neither an insider of the debtor nor a fiduciary to the debtor, as is the case here, "[a] higher

level of proof is required to equitably subordinate the claim." *Official Comm. Of Unsecured

Creditors v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 363 (Bankr. S.D.N.Y.

2002). Indeed, "[w]hen a non-insider or non-fiduciary is involved, courts have required that a

claimant's conduct be egregious and severely unfair to other creditors before its claim will be

equitably subordinated . . . Few cases find that non- insider, non-fiduciary claimants meet this

standard." *Id*. at 364 (internal citations omitted).

"Equitable subordination is appropriate where the misconduct injured the creditors of the

estate or conferred an unfair advantage on the claimant and equitable subordination is consistent

with bankruptcy law." *Merkin*, 515 B.R. at 158.  While "equitable subordination can apply to an

ordinary creditor, those situations are few and far between." *Id*.  "A creditor may generally

improve his position vis-à-vis the other creditors provided he does not receive a preference or

fraudulent transfer." *Id*.  Thus, the Trustee must "plead and prove that the non-insider engaged in

'gross and egregious' conduct tantamount to fraud, misrepresentation, overreaching or

spoliation." *Id*.  In order to succeed in this endeavor, the Trustee must prove that Alpha Prime

"invested with Madoff Securities with knowledge, or in reckless disregard, of its fraud." *Katz v.

Picard*, 462 B.R. 447, 456 (S.D.N.Y. 2011).

The Complaint falls woefully short of alleging any inequitable conduct on the part of

Alpha Prime.  As Alpha Prime was not a BLMIS insider, the Trustee must adequately plead

"egregious" conduct and the Trustee's allegations are subjected to a more rigorous examination.

*Id*. at 363-64.  Here, the Trustee has made the following factual allegations, many of which not

only fail to establish grounds for equitable subordination, but which demonstrate the Funds'

good faith as a matter of law: (a) the Trustee has alleged and, therefore, admitted that the Funds

hired professionals to monitor transactions and administer the funds; (b) the HSBC

Administrator Defendants were responsible for the day-to-day administration of the funds, which

entailed, among other things, issuing and redeeming fund shares; (c) the HSBC Defendants

should have reviewed trade confirmations regularly; and (d) the HSBC Custodian Defendants

directed and facilitated the transfer of hundreds of millions of dollars to and from BLMIS in NY

for the purported purchase and sale of the securities in New York.  (the "Service Providers

Allegation"), (Am. Comp. at ¶¶ 8, 98, 101, 137, 138, 161, 243, 281, 283, 290-92).  Such

allegations are insufficient to state a claim for equitable subordination. *Id*. at 364 (first

requirement for equitable subordination "is that the claimant itself engaged in the inequitable

conduct") (emphasis added); see *Kittay v. Atl. Bank of New York (In re Global Serv. Group

LLC)*, 316 B.R. 451, 462 (Bankr. S.D.N.Y. 2004) ("an allegation that a lender knew or should

have known that the loan would render the debtor insolvent is insufficient to equitably

subordinate the lender's claim").  Accordingly, the Trustee's claim for equitable subordination

has no substance.

Here, the Trustee has only pled that all of the Defendants failed to see the alleged "red

flags" and should have been on inquiry notice.  (*See, e.g*., Amended Complaint at ¶ 154 "At the

very least, these observations should have caused the Defendants to inquire further about

Madoff's purported trading activity.")  By relying upon the red flags, the Trustee does not even

attempt to allege actual knowledge or reckless disregard.  The Trustee concedes that Alpha

Prime is a sophisticated financial entity (Amended Complaint at ¶ 156).  As stated by this Court

in *Legacy*, it is not plausible for sophisticated financial professionals such as Alpha Prime

"owing fiduciary duties to its own clients and investors [to] knowingly invest their money in a

Ponzi scheme that is doomed to collapse."  *Picard v. Legacy Capital Ltd.*, 548 B.R. 13, 32

(Bankr. S.D.N.Y. 2016) (citing *Katz*, 462 B.R. at 454).  Accordingly, there are no grounds for

subordination.

       **ii.  Alpha Prime is entitled to a 502(h) claim with the same priority as
other customers.**

20

It is undisputed that the Trustee and Alpha Prime have resolved through a court-approved settlement the issues of the Two-Year Transfers that are described in the Amended Complaint. It is also undisputed that in order to obtain that resolution, Alpha Prime paid the Trustee $76,450,000, which represents the full amount of the Two-Year Transfers. The Trustee impliedly agrees that by virtue of the statutory language of section 502(h) of the Bankruptcy Code, Alpha Prime is entitled to a claim for the Two-Year Transfers in the same amount. However, the Trustee has reserved his right to attempt to either recharacterize the claim as something other than a customer claim or equitably subordinate the Springing Claim. Yet, the Trustee cannot meet his burden to justify such an action and accordingly, Alpha Prime is entitled to a judgment on this Disputed Issue.

Section 502(h) of the Bankruptcy Code provides:

> [a] claim arising from the recovery of property under section . . . 550 . . . of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(h). There is no dispute the Trustee recovered the $76,450,000 from Alpha Prime under section 550 of the Bankruptcy Code. Thus, pursuant to the plain reading of the statute, the Springing Claim must be allowed pursuant to 11 U.S.C. § 502(a), (b) or (c). *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inc. Sec. LLC*, 563 B.R. 737, 754 (Bankr. S.D.N.Y. 2017).

### iii.    The Claim Cannot be Disallowed Under 502(d) or (e)

Under the plain reading of Section 502(h) of the Bankruptcy Code, the only basis for disallowance of the Springing Claim can be sections 502(d) or (e). Neither of these sections will further the Trustee's goal of obtaining a double recovery on the alleged fraudulent transfers.

Section 502(d) provides:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under sections 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section . . . 547 [or] 548 . . . of this title, **unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section. . . 542, 543, 550, or 553 of this title.**

11 U.S.C. § 502(d) (emphasis added).

Pursuant to the terms of the Partial Settlement Agreement, all claims rights, remedies, and defenses related to the Two Year Transfers are considered part of the Resolved Issues. See Partial Settlement Agreement at ¶ 1(a). Accordingly, because the Parties agree that the Trustee has previously received the $76,450,000, there is no basis to deny the claim under 11 U.S.C. § 502(d). In addition, because, as described above, the Amended Complaint fails to allege any actual knowledge on the part of Alpha Prime, the Trustee cannot avoid the Six Year Transfers. Similarly, because the Springing Claim is not disallowed, contingent or subject to subrogation, section 502(e) of the Bankruptcy Code will not aid the Trustee in his double recovery efforts. Accordingly, Alpha Prime has a valid Springing Claim.

### iv. The Trustee Cannot Equitably Subordinate the Springing Claim

Pursuant to the terms of the Partial Settlement Agreement, and despite a recovery of 100% of the Two Year Transfers, the Trustee's goal is to equitably subordinate Alpha Prime's Springing Claim that results directly from that payment. However, because equitable subordination is only an alternative remedy available to the Trustee if he did not recover the Two Year Transfers, the Trustee's reach for a double recovery must fail.

This exact issue arose before this Court in *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014). In *Merkin*, the complaint

alleged, *inter alia*, that Merkin openly admitted during various conversations that Madoff

"appeared to be running a Ponzi scheme," that BLMIS "could be a Ponzi scheme," and

that Madoff's scheme was bigger than Ponzi and that "Charles Ponze [sic] would lose out

because it would be called the 'Madoff Scheme.'" *Id.* at 140.  Merkin sought dismissal

of the equitable subordination claim.  In denying that relief, the Court held that the

complaint adequately pled that Ascot "received the transfers in bad faith … [it]

adequately pled inequitable conduct." *Id.* at 158.  "'Thus…the Trustee…can potentially

subordinate [defendants' claims against the [] estate by proving that the defendants

invested with Madoff Securities with knowledge, or in reckless disregard, of its fraud."

*Id.*

The Court also made a reasoned determination that the Trustee could not both

avoid and recover the fraudulent transfers and also equitably subordinate Ascot Partners'

claims:

> It is well-settled that equitable subordination is an alternative to a monetary
> recovery for the creditors' wrongdoing, and the trustee cannot recover damages
> and equitably subordinate a claim based upon the same wrong.  *Hirsch v.
> Pennsylvania Textile Corp. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 611
> (Bankr. S.D.N.Y. 1998); *Granite Partners,* 210 B.R. at 517.  If the Trustee proves
> that the defendants received fraudulent transfers as initial or subsequent
> transferees, their claims will be disallowed under Bankruptcy Code § 502(d).
> *SIPC v. BLMIS,* No. 12-mc-115 (JSR), 2014 WL 2925175, at *5. 8 (S.D.N.Y.
> June 30, 2014).  Disallowance under § 502(d) provides broader relief than
> equitable subordination.  *Granite Partners*, 210 B.R. at 517.

> Furthermore, no defendant will be entitled to any distribution unless it returns the
> fraudulent transfer.  *Id.*  Once it does, it can assert a claim to the extent permitted
> by Bankruptcy Code § 502(h).  It would seem that the Trustee should not be able
> to equitably subordinate the § 502(h) claim because the return of the avoided
> transfer would compensate the estate for the injury caused by the fraudulent
> transfer, and the estate cannot recover damages and equitable subordination for
> the same wrong.  *Austin v. Chisick (In re First Alliance Mortg. Co.)*, 298 B.R.
> 652, 666 n 2 (C.D. Cal. 2003), *aff'd*, 471 F.3d 977 (9th Cir. 2006); *Wachovia*, 453

> B.R. at 517; *Granite Partners*, 210 B.R. at 517; *Century Glove, Inc. v. Iselin (In re Century Glove, Inc.)*, 151 B.R. 327, 332 (Bankr. D. Del. 1993).

*Id*. 160-61. Here, there is no question that the Trustee received repayment to compensate the estate for the Two-Year Payments and are now seeking to recover the Two-Year Transfers again.

Having failed to achieve dismissal of the equitable subordination claim, Merkin then sought summary judgment on the claim. At oral argument on the summary judgment motion, both the Court and the Trustee stated that equitable subordination could not occur if the Trustee was successful on the fraudulent transfer claim. The Court stated repeatedly that equitable subordination was a "red herring" and that if the Trustee won, he would be permitted to avoid the fraudulent transfers, but not equitably subordinate any claim of Ascot Partners:

> THE COURT: They really don't need subordination, because they're going to get disallowance if they win and Ascot doesn't pay them. And if Ascot pays them, they've got their remedies. So equitable subordination's just a red herring in the case. Doesn't mean it's insufficient, but it's just a red herring.

SJ Tr. at 37:11-16. The Court reinforced this message:

> THE COURT: But you don't have a net equity claim if you lose and don't return the transfer.
>
> MS ARCHER: Well, but if we return the transfer then we do have a net equity claim in excess of $226 million.
>
> THE COURT: But then the trustee has gotten his remedy.

*Id.* at 43:15-21. Even the Trustee's counsel admitted that upon the return of the transfer there was no possibility of equitable subordination:

> MS. HOANG: … For equitable subordination, as well –
>
> THE COURT: Well, it's never going to come to that, though.
>
> MS. HOANG: We don't know. It's an alternative remedy. It's not to be –

THE COURT: *Are there any circumstances under which you could get equitable subordination if you [win] on the willful blindness claim and (indiscernible) $280 million?*

MS. HOANG:  No, Your Honor.

THE COURT:  Are there any circumstances under which –

MS. HOANG:  For the 280 million, we're talking about right now?

THE COURT:  Well, if they repay, they're the only transfer wherein they have a claim, right?

MS. HOANG:  Yes, we're talking – yes. Yes.

THE COURT:  Okay.  And there's no circumstances under which you'd have to consider equitable subordination if one of them didn't repay, because then you'd get full disallowance under 502(d).

MS. HOANG:  Yes.

THE COURT:  So, under what circumstances would you get equitable subordination in this case?

MS. HOANG:  If –

THE COURT:  Even if they weren't willfully blind?

MS. HOANG:  Well, 502(d) is just – I'm trying to think of a nice – it's just temporary, until they pay, 502(d).

THE COURT: RIGHT

MS HOANG:  It's – and if they never pay, then the Trustee would move to equitably subordinate.  It's a –

THE COURT:  But if they never pay, their claim is disallowed.

MS. HOANG:  Correct.

THE COURT:  Why would you equitably subordinate a disallowed claim?

MS HOANG:  If we equitably subordinate, then the money goes into the final customer property, because, if we just say, "You know what? You don't get the benefit of that, that's – "

25

THE COURT:   All I'm saying is, if they don't pay, if you win and they don't pay, then there's no equitable subordination.  Their claim is disallowed.  That's fair.

MS. HOANG:  We would be okay with that, too, if the –
THE COURT: *So I'm asking: are there any circumstances under which there would ever be equitable subordination of their claim?*

MS. HOANG:  *We don't know that right now.*

THE COURT:  *I'm asking you.  You brought the claim.*

MS HOANG:  *I don't know that.  I'm hoping they do pay.  I mean if they can't –*
THE COURT:  *But if they pay, how could you equitably subordinate their claim?*

MS. HOANG:  *We wouldn't.  That's – it's an alternative remedy.*

THE COURT:  *Right.*

MS. HOANG:  *If they pay, they're entitled to their claim.*

THE COURT:  And if they don't, their claim is disallowed, right?

MS. HOANG:  Yes.

THE COURT:  Okay.

Transcript of Hearing on Motion to Dismiss in *Picard v. Merkin,* Case No. 09-01182

(SMB) dated June 1, 2016 at pages 72:16-75:5 (emphasis added) [ECF 322, 323].

In *Merkin*, the Court ultimately decided not to dismiss the equitable subordination claim at the summary judgment stage because the Court held that there was a triable issue of fact related to willful blindness.  There is no such issue here because the Two Year Transfers have been returned to the estate and to succeed on any of the remaining claims, the Trustee must have alleged actual knowledge.  Accordingly, as stated by the Trustee's counsel above since Alpha Prime has paid the Two Year Transfers, it is entitled to its claim.

26

### C.    The Trustee Cannot Equitably Subordinate the Balance of Alpha Prime's Claim

Because the Trustee has failed to allege any inequitable conduct on the part of Alpha

Prime or that Alpha Prime had actual knowledge of the BLMIS Ponzi scheme he cannot

subordinate its claim to the remaining principle invested with BLMIS.  See *80 Nassau Assocs. v.*

*Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.),* 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994).

Indeed, this Court has stated "The average general creditor does not owe a fiduciary duty to the

debtor or the creditors of the debtor in the collection of its claim…" *Id.* at 838.  The Second

Circuit agreed:

> The possible parameters of a creditor's efforts to seek collection from a debtor are
> generally those with respect to voidable preferences and fraudulent conveyances
> proscribed by the Bankruptcy Act; apart from these there is generally no objection to
> a creditor using his bargaining position…to improve the status of his existing claims.
> *Id.* (citing *In re W.T. Grant Co.*, 699 F.2d 599, 609-10 (2d Cir. 1983)).

Here, the Trustee has not even alleged inequitable conduct on the part of Alpha Prime.

Accordingly, as demonstrated above, the Trustee cannot subordinate the Six Year Transfers.

### D.    The Trustee States no Basis to Object to Alpha Prime's Remaining Claim (Count 12)

The Trustee also seeks to disallow Alpha Prime's remaining customer claim which

amounts to five percent (5%) of its total net equity claim or $12,533,550.  Count 12 of the

Complaint seeks to disallow the Remaining Net Equity Claim based upon section 502(d) of the

Bankruptcy Code.  (Am. Comp. at ¶ 459).  However, as described above, this section of the

Bankruptcy Code only allows disallowance of a validly filed proof of claim in the event that

Alpha Prime has received an avoidable transfer.  11 U.S.C. § 502(d).  As was further described

by the Trustee's counsel in *Merkin,* "502(d) is just … temporary, until they pay…"  Transcript of

Hearing on Motion to Dismiss in *Picard v. Merkin,* Case No. 09-01182 (SMB) dated June 1,

2016 at pages 72:16-75:5. [ECF 322, 323]  As discussed in more detail above, Alpha Prime has

returned the full value of the Two Year Transfers to the BLMIS estate and as discussed above, the Six Year Transfers are subject to the safe harbor provisions of section 546(e) of the Bankruptcy Code.  The Trustee fails to allege that Alpha Prime had actual knowledge that Madoff was not selling securities.  The Trustee has asserted no other basis to disallow Alpha Prime's Remaining Net Equity Claim.  Accordingly, Alpha Prime's Remaining Net Equity Claim must be allowed.

## **CONCLUSION**

For all of the foregoing reasons, Alpha Prime Fund requests that this Court award Alpha Prime a judgment on the pleadings: (i) allowing Alpha Prime's Springing Claim as a customer claim in the amount of $76,450,000; (2) holding that the Six Year Transfers are not avoidable pursuant to 11 U.S.C. § 546(e); (3) allowing the Remaining Net Equity Claim in the amount of $12,533,550; and (4) awarding such other and further relief that this Court deems just and proper.

Dated: New York, New York
      July 27, 2019

**DuffyAmedeo LLP**

/s/ Todd E. Duffy
Todd E. Duffy
Douglas A. Amedeo
275 Seventh Avenue, 7th Floor
New York, NY 10001
Tel:   (212) 729-5832
Fax:   (212) 208-2437