**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (SMB) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | SIPA LIQUIDATION |
| Defendant. | (Substantively Consolidated) |
| In re: BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and for the Estate of Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-04658 (SMB) |
| v. | |
| CAROL NELSON, | |
| Defendant. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and for the Estate of Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-04377 (SMB) |
| v. | |
| CAROL NELSON, Individually and as Joint Tenant; and STANLEY NELSON, Individually and as Joint Tenant, | |
| Defendants. | |

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION**
***IN LIMINE* NUMBER 2 TO ADMIT THE TRIAL TESTIMONY OF FRANK DIPASCALI**

# <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................. 2

    A.    Criminal Trial Proceedings ............................................................................2

    B.    The Consolidated Nelson Trial ......................................................................3

ARGUMENT .................................................................................................................. 4

    I.    DiPascali's Prior Testimony is Admissible Under Federal Rule of Evidence
804(b)(1) Because the Criminal Defendants Are Predecessors in Interest to the
Nelsons.........................................................................................................4

        A.    Rule 804(b)(1) Requires Only a Substantially Similar Interest ..............................5

        B.    The Criminal Defendants and the Nelsons Share a Substantially Similar
Interest ....................................................................................................6

    II.    DiPascali's Prior Testimony is Admissible Under the Residual Exception ...................14

    III.    DiPascali's Prior Testimony Does Not Lack Foundation, Has Been
Authenticated, and Is Not Unfairly Prejudicial .............................................16

CONCLUSION................................................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Annunziata v. City of New York*,
    No. 06 CIV. 7637 (SAS), 2008 WL 2229903 (S.D.N.Y. May 28, 2008)...............................15

*Antonucci v. Morgan Stanley Dean Witter & Co.*,
    No. 02-cv-5246 (GBD) (CM), 2005 WL 627556 (S.D.N.Y. Jan. 11, 2005) ...........................6

*Constr. Tech., Inc. v. Cybermation, Inc.*,
    No. 91 Civil 7474 (JGK), 1996 WL 376601 (S.D.N.Y. Apr. 30, 1996)...................................5

*Dykes v. Raymark Indus. Inc.*,
    801 F.2d 810 (6th Cir. 1986) ...............................................................................................13

*Fed. Hous. Fin. Agency v. Merrill Lynch & Co., Inc.*,
    No. 11 Civ. 6202 (DLC), 2014 WL 798385 (S.D.N.Y. Feb. 28, 2014) .................................13

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    No. 11cv6201 (DLC), 2015 WL 714747 (S.D.N.Y. Feb. 19, 2015) ........................................5

*Jordonne v. Ole Bar & Grill, Inc.*,
    No. 13 CIV 1573 (VBJ) (CM), 2016 WL 3409088 (S.D.N.Y. Apr. 26, 2016) .......................6

*Lloyd v. Am. Exp. Lines, Inc.*,
    580 F.2d 1179 (1978).............................................................................................................5

*Schering Corp. v. Pfizer, Inc.*,
    189 F.3d 218 (2d Cir. 1999)................................................................................................14

*Silverstein v. Smith Barney, Inc.*,
    No. 96 Civ. 8892 (JSM), 2002 WL 1343748 (S.D.N.Y. June 18, 2002)...............................14

*United States v. DiNapoli*,
    8 F.3d 909 (2d Cir. 1993)................................................................................................5, 14

*United States v. DiPascali*,
    No. 09-cr-764 (RJS) (S.D.N.Y. Aug. 11, 2009), ECF Nos. 11, 12......................................2, 3

*United States v. Panzardi–Lespier*,
    918 F.2d 313 (1st Cir. 1990) ...............................................................................................15

*United States v. Sposito*,
    106 F.3d 1042 (1st Cir. 1997) .............................................................................................15

**Statutes**

15 U.S.C. §§ 78aaa *et seq.* ........................................................................................................1

**Rules**

Fed. R. Evid. 403 ........................................................................................................16

Fed. R. Evid. 803 ..........................................................................................................2

Fed. R. Evid. 803(24)......................................................................................................2

Fed. R. Evid. 804 ..........................................................................................................2

Fed. R. Evid. 804(b)(1) ......................................................................................... *passim*

Fed. R. Evid. 804(b)(1)(A) ..............................................................................................5

Fed. R. Evid. 804(b)(1)(B)...........................................................................................4, 5

Fed. R. Evid. 804(b)(5) ..................................................................................................2

Fed. R. Evid. 807 .....................................................................................................2, 15

Fed. R. Evid. 807(a)..................................................................................................2, 4, 14

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa *et seq.*, and the chapter 7 estate of Bernard L. Madoff,

respectfully submits this supplemental memorandum of law in support of the Trustee's motion *in

limine* number 2 (the "Motion")[1] to admit certain testimony of Frank DiPascali (deceased) in the

criminal trial captioned *United States v. Bonventre, et al.*, No. 10-cr-228 (LTS) (S.D.N.Y.).[2]

At the time the Trustee filed the Motion, the Trustee sought to admit DiPascali's

testimony on several topics.[3]  Given the issues raised at trial, by this supplemental memorandum

of law, the Trustee amends his request to admit only DiPascali's testimony as it relates to

treasury bills, as designated in Exhibit A attached to the declaration of Lan Hoang ("Hoang

Decl.") filed concurrently herewith.  The Trustee also attaches Exhibit B to the Hoang Decl.,

which lists page and line designations to the criminal trial transcripts where DiPascali was cross-

examined (and one instance of redirect examination) on treasury bills.

## PRELIMINARY STATEMENT

At the hearing on the Motion, the Court requested that the Trustee cite to specific lines of

cross-examination to which DiPascali was subjected to aid the Court in evaluating whether his

prior testimony may be admitted in the Nelson trial.  As demonstrated by Exhibits A and B, the

Trustee has complied with the Court's request.  Respectfully, the Trustee submits that the prior

testimony would, nevertheless, be admissible regardless of whether DiPascali was specifically

---

[1] *See* Memorandum of Law in Support of Trustee's Motion in Limine Number 2 to Admit the Trial Testimony of Frank DiPascali, *Picard v. Nelson*, Adv. Pro. No. 10-04377 (Bankr. S.D.N.Y. Apr. 24, 2019), ECF No. 136; Memorandum of Law in Support of Trustee's Motion in Limine Number 2 to Admit the Trial Testimony of Frank DiPascali, *Picard v. Nelson*, Adv. Pro. No. 10-04658 (Bankr. S.D.N.Y. Apr. 24, 2019), ECF No. 139.

[2] Citations to the criminal trial testimony is cited as "Date of Testimony [Witness] Crim. Tr. ___" (*e.g.*, 12/2/13 [DiPascali] Crim. Tr. ___) (TX-___).  Trustee exhibits are cited as TX-___.

[3] *See, e.g.*, 10-04377 Action, ECF No. 137, Hunt Decl., Exh. 5 (page and line designations); TX-005 (same page and line designations).

cross-examined on a particular topic because that is not the standard under Federal Rule of

Evidence 804(b)(1). Rather, all that must be shown is that a "predecessor in interest" to the

Nelsons had the *opportunity* and *motive* to cross-examine the witness.

Here, the five criminal defendants were "predecessors in interest" to the Nelsons because

they elicited testimony on BLMIS's purchase (and failure to purchase) treasury bills for the IA

Business, which is the same issue the Nelsons interjected at trial. Because the criminal

defendants had both the opportunity and motive—and did in fact cross-examine DiPascali on

treasury bills—his former testimony is admissible in the Nelsons' trial under Federal Rule of

Evidence 804(b)(1). DiPascali's testimony on treasury bills can also be admitted under the

"residual" exception of Federal Rule of Evidence 807(a)[4] because it has sufficient guarantees of

trustworthiness and it will aid the Court in its resolution of that issue.

## BACKGROUND

### A.    Criminal Trial Proceedings

In October 2013, the criminal defendants, all former BLMIS employees, were tried for

securities fraud, falsifying records of a broker-dealer, tax fraud, mail fraud, wire fraud, and

related conspiracy charges. DiPascali, the Government's key witness,[5] testified for 16 days of

the criminal trial, including 10 days of cross-examination by counsel for the criminal defendants

---

[4] As of 1997, Rule 807 is the successor provision to Rule 803(24) and Rule 804(b)(5). See Fed. R. Evid. 807 (advisory committee's note to 1997 amendment) ("The contents of Rule 803(24) and Rule 804(b)(5) have been combined and transferred to a new Rule 807. This was done to facilitate additions to Rules 803 and 804. No change in meaning is intended.").

[5] DiPascali pled guilty to conspiracy to commit securities fraud, investment advisory fraud, falsifying books and records of a broker/dealer, falsifying books and records of an investment fund, mail fraud, wire fraud and money laundering; as well as substantive counts of securities fraud, investment adviser fraud, falsifying broker/dealer books and records; falsifying investment adviser books and records; mail fraud; wire fraud; money laundering; perjury; and income tax evasion. His allocution has already been admitted into evidence. *See* TX-002 (Plea Allocution of Frank DiPascali) at 18–20, 44–54, *United States v. DiPascali*, No. 09-cr-764 (RJS) (S.D.N.Y. Aug. 11, 2009), ECF Nos. 11, 12.

(collectively, "defense counsel"). After more than 70 days of trial, all five criminal defendants were convicted in April 2014.

Having worked at BLMIS for more than 30 years, DiPascali had broad knowledge about Madoff's IA Business. Through direct and re-direct examination, the Government elicited testimony from DiPascali about a variety of topics relating to the mechanics of Madoff's fraud, including DiPascali's purchase of treasury bills with IA Business customer money as a cash management tool.[6]

Counsel for the criminal defendants cross-examined and re-cross-examined DiPascali over 10 days of the trial.[7] Defense counsel sought to cast doubt on DiPascali's testimony that the fraud was knowingly perpetrated by the five criminal defendants in concert with DiPascali and Madoff. He was specifically cross-examined on his purchase of treasury bills. With their liberty at stake, the criminal defendants had a strong motive to attack the specifics of DiPascali's testimony as well as his credibility by emphasizing his cooperation with the Government and the benefits he received in exchange for his testimony.

## B.    The Consolidated Nelson Trial

In the consolidated actions against the Nelsons, the Trustee seeks to avoid and recover transfers of fictitious profits made to them by BLMIS. On April 24, 2019, the Trustee filed the Motion to admit DiPascali's testimony. The Nelsons opposed, arguing the testimony was irrelevant and inadmissible hearsay.[8] At the start of the trial on May 8, 2019, the Court heard

---

[6] *See generally* TX-355 at 4508:9 (Direct Examination) through TX 369 at 7115:12 (conclusion of Re-Cross Examination).

[7] *See generally id.*

[8] *See* Memorandum of Law in Opposition to Trustee's Motions *in Limine* Numbers 1 and 2, *Picard v. Nelson*, Adv. Pro. No. 10-04377 (Bankr. S.D.N.Y. May 1, 2019), ECF No. 147; Memorandum of Law in Opposition to Trustee's Motions in Limine Numbers 1 and 2, *Picard v. Nelson*, Adv. Pro. No. 10-04658 (Bankr. S.D.N.Y. May 1, 2019), ECF No. 150.

argument on the Motion but did not rule.[9]  Instead, the Court directed the parties to address in

supplemental briefing whether the criminal defendants cross-examined DiPascali on the same

issues being raised at the present trial.  Trial Tr. of May 8, 2019 at 22:19-23:4; 23:23-24:2; 26:1-

18 ("[L]et me deal with DiPascali this way.  I think you really have to go on a subject-by-subject

response to what they're purporting to put in.").

On June 17, the Trustee's re-sent to the Nelsons the DiPascali testimony he had

designated with his Motion.  On July 1, the Nelsons objected,[10] including a general objection to

admitting DiPascali's testimony[11] and objections to the page and line designation of DiPascali's

testimony identified by the Trustee.  The Trustee submits this post-trial supplemental

memorandum to specifically demonstrate that DiPascali's testimony on the limited issue of

treasuries is admissible under Federal Rules of Evidence 804(b)(1)(B) and 807(a).

## ARGUMENT

I.   **DiPascali's Prior Testimony is Admissible Under Federal Rule of Evidence 804(b)(1) Because the Criminal Defendants Are Predecessors in Interest to the Nelsons**

Federal Rule of Evidence 804(b)(1) provides an exception to the rule against hearsay for

former testimony of an unavailable witness where the former testimony: (1) "was given as a

---

[9] During argument, the Nelsons objected to DiPascali's testimony on the basis that he had not been disclosed as a witness in the Trustee's initial disclosures.  The initial disclosures were served in July 2014, amended in December 2015 and March 2016.  At that time, and until 2017 when the criminal convictions became final, the Trustee had no access to the criminal defendants or the Government's witnesses, including DiPascali.  By 2017, DiPascali had passed away.  The Trustee listed DiPascali on his pre-trial witness list and filed the pre-trial motion, which put the Nelsons on notice that he intended to use DiPascali's testimony at trial.  Conversely, the Trustee notes that the Nelsons did not list either Bernard L. Madoff or Enrica Cotellessa-Pitz in their initial or amended disclosures, yet relied upon their testimony at trial.

[10] Nelsons' Objections to the Trustee's Trial Exhibit List and Designations, *Picard v. Nelson*, Adv. Pro. No. 10-04377 (Bankr. S.D.N.Y. July 1, 2019), ECF No. 160; Nelsons' Objections to the Trustee's Trial Exhibit List and Designations, *Picard v. Nelson*, Adv. Pro. No. 10-04658 (Bankr. S.D.N.Y. July 1, 2019), ECF No. 163.

[11] As part of their general objections, the Nelsons cite to the deposition of Joann Crupi.  This deposition was taken on May 23, 2019 after trial concluded and is therefore outside of the trial record.  To the extent that the Court considers the portions of Crupi deposition testimony cited in the Nelsons' objections, the Trustee respectfully requests permission to designate additional relevant testimony of Ms. Crupi.

witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one;" and (2) it "is now offered against a party who had – or, in a civil case, whose predecessor in interest had – an opportunity and *similar* motive to develop [the testimony] by direct, cross-, or redirect examination."  Fed. R. Evid. 804(b)(1)(A)–(B) (emphasis added). DiPascali is deceased, and thus unavailable.  The only element left for this Court to determine is whether the criminal defendants are predecessors in interest who had an opportunity and similar motive to cross examine DiPascali.

### A.    Rule 804(b)(1) Requires Only a Substantially Similar Interest

To admit hearsay evidence under Rule 804(b)(1), there must be "sufficient community of interest" shared between the predecessor in interest and the party against whom the former testimony is being offered.[12]  *Lloyd v. Am. Exp. Lines, Inc.*, 580 F.2d 1179, 1185 (1978).  Courts take a "realistically generous approach" to defining "predecessor in interest" to include a "previous party having like motive to develop the testimony about the same material facts." *Constr. Tech., Inc. v. Cybermation, Inc.*, No. 91 Civil 7474 (JGK), 1996 WL 376601, at *1 (S.D.N.Y. Apr. 30, 1996) (citation omitted).  Such motive to develop the testimony need only be "of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue."  *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11cv6201 (DLC), 2015 WL 714747, at *2 (S.D.N.Y. Feb. 19, 2015) (quoting *United States v. DiNapoli*, 8 F.3d 909, 914–15 (2d Cir. 1993)).

---

[12] Contrary to the Nelsons' assertion, *see, e.g.,* Opposition to Motion *in Limine* Number 2, *Picard v. Nelson*, Adv. Pro. No. 10-04377 (Bankr. S.D.N.Y. July 1, 2019), ECF No. 147 at 9, they need not have been the party to specifically conduct the cross-examination of DiPascali for his testimony to be admitted under this Rule.  The Rule anticipates that a different party would have conducted the cross-examination.

Courts in this district have recognized that there is no formal requirement for cross-examination. Rather, the opportunity to cross-examine or develop the testimony suffices. *Jordonne v. Ole Bar & Grill, Inc.*, No. 13 CIV 1573 (VBJ) (CM), 2016 WL 3409088, at *7 (S.D.N.Y. Apr. 26, 2016) (citing *Antonucci v. Morgan Stanley Dean Witter & Co.*, No. 02-cv-5246 (GBD) (CM), 2005 WL 627556, at *4 (S.D.N.Y. Jan. 11, 2005) ("Rule 804(b)(1) does not require that the opposing party actually cross-examine the witness; it is instead enough that the opposing party be given a meaningful opportunity to cross examine if it wishes to do so.")). Thus, the Court need only assess whether the motive behind the cross-examination was substantially similar, rather than evaluate whether the prior cross-examination would be identical, on a line-by-line basis, to a defendant's hypothetical cross-examination.

### B.       The Criminal Defendants and the Nelsons Share a Substantially Similar Interest

To avoid a criminal conviction relating to their participation in the Ponzi scheme, the criminal defendants had a substantial motive to challenge DiPascali's testimony. Their liberty was at stake. The criminal defendants had an interest in eliciting testimony about any legitimate activities at BLMIS, including the purported purchase of real securities for IA Business customers. If BLMIS had conducted any real trades, this would have supported the criminal defendants' argument that they believed BLMIS's operations in the IA business were legitimate and undermined DiPascali's credibility.

While testifying about how he and other BLMIS employees fabricated account statements, DiPascali answered questions about treasury bills on direct examination:

> **Q.** As part of this strategy, the IA business would do what was referred to as going into the market and purport to buy securities, is that right?
> **A.** Correct.
> **Q.** Were you really buying securities?
> **A.** No.

**Q.** Was this all just on paper?

**A.** Yes.

**Q.** Then, when you got out of the market, the IA business would purport to buy treasury securities, right?

**A.** That's correct.

**Q.** Did you really buy treasury securities?

**A.** No.

**Q.** Were those all fake?

**A.** Yes.

**Q.** When that activity happened, would there be communications sent to customers?

**A.** Every time.

**Q.** Are you familiar with the term "trade confirmation"?

**A.** Sure.

**Q.** Would trade confirmations be sent to customers?

**A.** Yes.

**Q.** Would that reflect the fake trades that you just described?

**A.** Exactly that.[13]

\*\*\*

**Q.** And how would you go about getting the treasury bill for that month?

**A.** I'd look at where we are on the calendar.  I'd estimate about how long I wanted to be out in maturity; so if it was December of 2013, I would look at a February or March 2014 treasury bill.  I'd go to Bloomberg and ascertain the price and give it to Annette.

**Q.** And when you would go to Bloomberg, would you look at backdated prices?

**A.** Depending on the date that she asked me that she needed the bill for.

**Q.** And was any treasury bill ever purchased?

**A.** Never.[14]

DiPascali explained the nuts and bolts of his process that resulted in treasury transactions

showing up on the IA Business customer statements, and further confirmed that they were all

fake:

**Q.** Now can we go to the second page of this document.  What is this that we are looking at?

**A.** It's a spreadsheet that I created that was going to be the nuts and bolts of this exercise.  It was going to do a lot of the calculation for me and allow the process to progress swiftly instead

---

[13] 12/4/13 [DiPascali] Crim. Tr. 4803:23–4804:21 (TX-356).

[14] 12/5/13 [DiPascali] Crim. Tr. 4930-18–4931:5 (TX-357).

of from month to month to month and client to client to client
calculate all sorts of stuff, and then have to then create another side
to that.  This spreadsheet, which is an Excel-based spreadsheet, is
identifying certain treasury bills across the top column.  The top
row is the CUSIP of treasury bills and options.  The second row
are the symbols of options and then a string of treasury bills.
Going on the far left column are a string of account numbers.
Those are the accounts that Bernie told us he wanted to use to be
the counterparties of the customer option positions.  What this is
doing is it's allowing me to randomly assign, once I know the total
of my customer option positions, a quantity to each of those
counterparties.  Then, once I've randomly defined what each
counterparty's position is, this is calculating what its margin or
collateral requirement would be.  Once I established that, this
spreadsheet allows me to randomly pick a group of treasuries that
were going to represent that collateral, and then the whole total
number would circle back to what I needed.  It's fairly
complicated, but it did all the grind work necessary to accomplish
what Bernie wanted.

**Q.** Were any of the treasury bills that are reflected on this real?

**A.** No.[15]

DiPascali was questioned about whether BLMIS could have purchased the treasury bills

on the IA Business customer statements from inventory held by the Proprietary Trading

Business:

**Q.** How about treasuries?

**A.** What about them?

**Q.** Did they make a market in treasuries?

**A.** No.

**Q.** Could you be buying treasuries out of the inventory upstairs, or
did they have inventory -- strike that question.  Did they have
inventory to be placing into the account of treasuries upstairs that
was equivalent to the amount that was on the statements?

**A.** No.[16]

---

[15] 12/10/13 [DiPascali] Crim. Tr. 5344:24–5346:3 (TX-359).

[16] 1/13/14 [DiPascali] Crim. Tr. 6950:25–6951:9 (TX-368).

DiPascali further testified on direct examination that he was put in charge of purchasing

real treasury bills, with assistance from Jodi Crupi and others.[17]  But the treasury bills that

DiPascali purchased were not for IA Business customers; they were purchased to manage

BLMIS's excess cash and earn interest on the funds.

> **Q.** I'll ask you a question.  Did the market making part of
> Madoff Securities make a market in treasury bills?
> **A.** No.
> **Q.** So could you go to the market making part of the business
> and get a treasury bill to put in an IA account?
> **A.** No.
> **Q.** From time to time did you get real treasury bills?
> **A.** Yes.
> **Q.** And what were those real treasury bills for?
> **A.** To invest the excess cash in the IA checking account.
> **Q.** And when you say to invest the excess cash in the IA checking
> account, for what reason did you get a treasury bill to do that?
> **A.** So as to provide safety and an enhanced yield to what the
> checking account interest rate was.
> **Q.** So it would be fair to say it would be a way of getting interest
> on the checking account?
> **A.** More or less, yes.[18]

DiPascali also testified that the treasury purchases in the eight brokerage accounts (held

at Bank of New York, Bear Stearns, Fidelity, Lehman, and Morgan Stanley) were made at the

direction of Mr. Madoff to earn interest on the cash held in the 703 Account:

> **Q.** Did Mr. Madoff propose a solution for how to deal with this?
> **A.** He either already had an account or two open or was about to
> open a new account or a series of them, I don't recall.  He was
> basically giving that responsibility to me.  He wanted treasury
> notes, treasury bills only.  As the CDs would get unwound or, I
> don't remember, they might have unwound them immediately, I'm
> not sure, but in short order I managed a group of Bernard L.
> Madoff brokerage accounts that were held at other brokerage firms
> for the purpose of purchasing short-term U.S. government
> securities.

---

[17] 12/10/13 [DiPascali] Crim. Tr. 5344:24–5346:3 (TX-359); 12/19/13 [DiPascali] Crim. Tr. 6425:14–6426:18 (TX-365).

[18] 12/5/13 [DiPascali] Crim. Tr. 4931:6-23 (TX-357).

**Q.** These short-term U.S. securities were real, right?

**A.** Yes.

**Q.** This was just a way of getting interest on the real cash that was in the 703 account?

**A.** Yes.

**Q.** What were some of the firms that you now had responsibility for that had these brokerage accounts?

**A.** Bear Stearns, Fidelity, Bank of New York, Morgan Stanley, Lehman Brothers.

**Q.** We talked a little bit about this earlier, when you were buying these short-term securities, what steps would you have to take to buy these real securities on those brokerage accounts?

**A.** I typically picked up the phone and called the broker or the representative of each of those organizations and communicated my needs. Then he typically got or she typically got back to me and told me what I had done. Sometimes those conversations occurred in the form of faxes. Most of the time they were on the telephone.

**Q.** This was different than just looking at historical prices and writing something up for the fake trades, right?

**A.** Yes.[19]

DiPascali differentiated between the treasury bills purchased for cash management

purposes and those fabricated for customers of the IA Business:

**Q.** And when you bought those real treasury bills to earn interest on the Madoff checking account, what did you have to do?

**A.** I had to call my broker.

**Q.** And after you called your broker, was there a process to going out and buying the treasury bill?

**A.** Yeah, I would tell the broker how much dollars I wanted to commit to treasury bills and typically which one I wanted to buy, and he would take down that information and call me back and typically give me a report that I bought X amount of treasury bills at this price.

**Q.** And then that would -- you would actually get a real treasury bill?

**A.** Yeah.

**Q.** Now, for on the IA side, when you had to provide – when you would provide the fake information, what would you do there?

**A.** I'd look at a pricing service of historical prices of treasury bills, ascertain the price on the date that I needed and write a ticket and put it into the AS/400.

---

[19] 12/5/13 [DiPascali] Crim. Tr. 4961:15–4962:22 (TX-357).

> ***
>
> **Q.** Now, what was your understanding of what Ms. Bongiorno
> would do with the treasury information that you gave to her?
> **A.** She would put through a buy ticket that was approximately
> equal to the cash credit balance reflected in the account she was
> working on, and it would produce a confirmation and an entry on
> the customer statement that he was now – owned treasuries.
> **Q.** And as with the other trading that was on those accounts, was
> any of it real?
> **A.** No.[20]

During cross-examination, defense counsel specifically questioned DiPascali on the

purchase of treasury bills with funds in the 703 account as a cash management tool:

> **Q.** Now, you are familiar with the 703 account? We've covered it,
> correct?
> **A.** Yes.
> **Q.** It's true, is it not, that from time to time the company would
> buy treasury instruments with the proceeds in the 703 account?
> **A.** That is correct.
> **Q.** Real, live, honest treasury instruments?
> **A.** Yes.
> **Q.** And that these treasury instruments were – where were they
> held?
> **A.** They were held in an account, at the end, at JP Morgan Chase.
> Prior to that, they were held at many different brokerage firms,
> Bear Sterns, Lehman Brothers.
> **Q.** Merrill Lynch?
> **A.** I don't recall Merrill, but okay.
> **Q.** You don't know for sure? Goldman Sachs?
> **A.** No, sir.
> **Q.** Bank of New York?
> **A.** Yes, sir.
> **Q.** And these real, real treasury instruments were sometimes for
> billions of dollars?
> **A.** They were.[21]

---

[20] 12/5/13 [DiPascali] Crim. Tr. 4931:24–4933:13 (TX-357).

[21] 12/19/13 [DiPascali] Crim. Tr. 6445:17–6446:14 (TX-365).

Defense counsel further questioned DiPascali about his role in purchasing treasury bills

"funded with the 703 proceeds."[22]

> **Q.** We talked also before the break about the T-bills that were kept
> in brokerage accounts at various entities, correct?
> **A.** Yes, sir.
> **Q.** Is it fair to say that generally you were in charge of those
> brokerage accounts at Madoff Securities?
> **A.** Of all the four or five accounts that wounded up being funded
> with the 703 proceeds?
> **Q.** Yes, sir.
> **A.** Yes.
> **Q.** There were times in which the T-bills in these accounts were in
> the billions of dollars?
> **A.** They were.
> **Q.** Would these entities that held these real T-bills send statements
> to Madoff Securities from time to time?
> **A.** They did.
> **Q.** Showing the balance in the brokerage accounts at any particular
> time?
> **A.** That is correct.
> **Q.** Deposits and withdrawals?
> **A.** Yes, sir.
> **Q.** Accrued interest or whatever?
> **A.** A typical brokerage statement.
> **Q.** A typical brokerage statement, except this one reflected reality
> as opposed to some of the ones that were generated on 17?
> **A.** That's correct.[23]

Defense counsel also specifically questioned DiPascali about the statements showing

treasury bills:

> **Q.** You were involved in this transaction or in this revision of these
> account statements in that you supplied information to Ms.
> Bongiorno about T-bills for her to put in these account statements,
> correct?
> **A.** Treasury notes and treasury bills, yes.

---

[22] *Id.* at 6458:9–6461:10.

[23] *Id.* at 6458:9–6459:9.

> **Q.** This statement is one of the statements that shows treasury bills
> in the account, is that right?
> **A.** Among other things, yes.[24]

In addition to cross-examining DiPascali on treasuries, the criminal defendants also vigorously sought to attack his credibility by cross-examining him at great length about his admitted history of lying, his prior inconsistent statements, and bias related to his plea agreement with the Government.  In fact, one of the cornerstones of their defense was their attempt to convince the jury that DiPascali was not credible.  They had a significant opportunity to do so—their cross-examination lasted 10 days.[25]  Each devoted a substantial majority of their closing argument to trying to discredit his testimony.[26]  They were not successful.  All five criminal defendants were convicted in April 2014.

Here, the Nelsons argue that BLMIS purchased treasury bills for their BLMIS accounts.  DiPascali's testimony is a firsthand rebuttal of that allegation.  As the criminal defendants did during their trial, the Nelsons would have also cross-examined DiPascali on any treasury purchases.  The party objecting to admission must show that "the motive and opportunity of the [party] in the first case was not adequate to develop the cross-examination which the instant party would have presented to the witness."  *Fed. Hous. Fin. Agency v. Merrill Lynch & Co., Inc.*, No. 11 Civ. 6202 (DLC), 2014 WL 798385, at *1 (S.D.N.Y. Feb. 28, 2014) (quoting *Dykes v. Raymark Indus. Inc.,* 801 F.2d 810, 817 (6th Cir. 1986)).  Here, that question is more than

---

[24] 12/11/13 [DiPascali] Crim. Tr. 5939:21–5940:3 (TX-362).

[25] *See generally* TX-360 – TX 369.

[26] 3/6/14 [Perez Summation] Crim. Tr. 11038:18-11154:13 (ECF No. 936); 3/10/14 [Crupi Summation] Crim. Tr. 11166:15-11305:18 (ECF No. 938); 3/10/14 [O'Hara Summation] Crim. Tr. 11255:21-11305:18 (ECF No. 938), 3/11/14 [O'Hara Summation] Crim. Tr. 11316:14-11370:10 (ECF No. 940); 3/11/14 [Bongiorno Summation] Crim. Tr. 11372:5-11480:15 (ECF No. 940), 3/12/14 [Bongiorno Summation] Crim. Tr. 11491:20-11531:5 (ECF No. 942); 3/12/14 [Bonventre Summation] Crim. Tr. 11540:4-11626:22 (ECF No. 942).

hypothetical. Given the actual cross-examination that took place on the treasury bills, the Nelsons cannot meet this standard.

The criminal defendants and the Nelsons are on "the same side of the same issue at both proceedings [and also] also have a substantially similar degree of interest in prevailing on that issue." *DiNapoli*, 8 F.3d at 912. The criminal defendants had a similar motive and opportunity to develop the cross-examination on the issue of treasuries and did in fact develop cross-examination on that point. Accordingly, the designated testimony as set forth in Exhibit A to the Hoang Decl. meets the requirements of Federal Rule of Evidence 804(b)(1) and should be admitted into evidence.

## II.    DiPascali's Prior Testimony is Admissible Under the Residual Exception

DiPascali's testimony should also be admitted because it falls under the "residual" exception of the hearsay rule. Fed. R. Evid. 807(a). The testimony: (i) has equivalent circumstantial guarantees of trustworthiness; (ii) is offered as evidence of a material fact; (iii) is more probative on the point for which it is offered than any other evidence the proponent can obtain through reasonable efforts; and (iv) admitting it will best serve the purposes of the Rules of Evidence and the interests of justice. Fed. R. Evid. 807(a); *see Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 231 (2d Cir. 1999); *Silverstein v. Smith Barney, Inc.*, No. 96 Civ. 8892 (JSM), 2002 WL 1343748, at *3 (S.D.N.Y. June 18, 2002).

DiPascali's testimony has circumstantial guarantees of trustworthiness. DiPascali was cross-examined by all five of the criminal defendants' counsel. "Cross-examination serves to test the declarant's sincerity, narrative ability, perception, and memory." *Schering Corp.*, 189 F. 3d at 233 (1999) (citation omitted). DiPascali's testimony was scrutinized and evaluated by a jury when they reached their verdict to convict all five defendants. "[T]he formalities of a trial, including the oath given to witnesses, the presence of a judge, and the transcription of testimony

by a court reporter, provide sufficient guarantees of trustworthiness." *Annunziata v. City of New York*, No. 06 CIV. 7637 (SAS), 2008 WL 2229903, at *11 (S.D.N.Y. May 28, 2008); *see also United States v. Panzardi–Lespier*, 918 F.2d 313, 316 (1st Cir. 1990) ("Courts have consistently provided that former testimony is trustworthy when it is given under oath . . .[and when] the witness testified about matters within his personal knowledge.").

The testimony on treasuries is offered as evidence of a fact that the Nelsons themselves have made material. *United States v. Sposito*, 106 F.3d 1042, 1047 (1st Cir. 1997) (Rule 807 "requires only that the statement be offered as evidence of a material fact. It need not itself be a material fact.").

Di'Pascali's testimony supplements his plea allocution and is a more probative firsthand account than other evidence that could be obtained through reasonable means. DiPascali had direct responsibility for implementing the fraudulent split-strike conversion strategy and generating BLMIS customer statements listing treasury bills. He was also responsible for the purchase of treasury bills for BLMIS's cash management purposes. His testimony could not be more probative.

Finally, the interests of justice will be served by admitting the testimony. The Nelsons made the treasury bills an issue in this trial. While the Trustee has adduced expert testimony and analysis of the BLMIS records confirming that BLMIS did not purchase treasury bills for customer accounts, there is value in having the Court hear from the BLMIS employee with direct knowledge on this issue. While the Trustee intended to seek DiPascali's deposition (and trial testimony) in the BLMIS liquidation, DiPascali could not testify in any other proceedings until such time as the criminal process was completed. He passed away in May 2015, one and a half years before the criminal convictions became final in January 2017. Thus, his criminal trial

15

testimony is the only record of his testimony on these issues and has been available to

Defendants in E-Data Room 1 since 2016.  His testimony on treasuries is admissible under the

residual exception to the hearsay rule.

### III.    DiPascali's Prior Testimony Does Not Lack Foundation, Has Been Authenticated, and Is Not Unfairly Prejudicial

Lastly, the Nelsons challenge the admission of DiPascali's criminal trial testimony in this

action on the basis that it lacks foundation, has not been authenticated, and would be prejudicial

to them.[27]  Each of these contentions is unfounded.

First, the Trustee does not seek to admit any DiPascali testimony where an objection was

sustained for lack of proper foundation.  The testimony that is designated in the attached Exhibit

A is based upon DiPascali's personal knowledge, for which a proper foundation was laid.

Second, the testimony the Trustee asks the Court to admit into evidence has been extracted from

the official trial transcripts.  Authentication is not in question.  Third, the Nelsons cannot show

that any prejudice would outweigh the probative value of the proffered testimony.  The Nelsons

made the treasury bills an issue at trial.  The testimony of the BLMIS employee who had direct,

first-hand knowledge of when BLMIS did and did not purchase treasury bills is plainly

probative.  Rule 403 of the Federal Rules of Evidence does not preclude the admission of this

testimony.

---

[27] *See, e.g.*, Nelsons' Objections, *Picard v. Nelson*, Adv. Pro. No. 10-04377 (Bankr. S.D.N.Y. July 1, 2019), ECF No. 160, Exhibit A at 1.

## **CONCLUSION**

The Trustee respectfully requests that the Court admit DiPascali's prior testimony as designated on Exhibit A to the Hoang Decl. into evidence in the consolidated trial.

Dated: July 30, 2019
     New York, New York

*/s/ David J. Sheehan*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Dean D. Hunt
Email: dhunt@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Lan Hoang
Email: lhoang@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Chapter 7 Estate of Bernard L. Madoff*