**CHAITMAN LLP**
465 Park Avenue
New York, New York 10022
Phone & Fax: (888) 759-1114
Helen Davis Chaitman
Gregory M. Dexter
hchaitman@chaitmanllp.com
gdexter@chaitmanllp.com

**Hearing Date:  September 25, 2019 10:00 AM**
**Objection Date:  September 18, 2019**

*Attorneys for Defendants Carol Nelson and Stanley Nelson*

**UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-1789 (SMB) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC <br><br> Plaintiff, <br><br> v. <br><br> CAROL NELSON, individually and as joint tenant, and STANLEY NELSON, individually and as joint tenant, <br><br> Defendants. | Adv. Pro No. 10-04377 (SMB) |

IRVING H. PICARD, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC

Adv. Pro No. 10-04658 (SMB)

                                    Plaintiff,

v.

CAROL NELSON,

                                    Defendant.

## THE NELSONS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL OVERVIEW ............................................................................................ 2

    I.    The 509 Account and 703 Account were never in the name of the LLC ....................... 2

    II.    The 2017 Fraudulent Coribello Declarations ................................................. 7

LEGAL STANDARD ................................................................................................. 9

ARGUMENT .............................................................................................................. 10

    I.    Picard introduced no evidence to suggest that the LLC ever owned the
        509 Account or the 703 Account ................................................................... 10

        A.    The evidence proved that every alleged payment to the Nelsons
            was made from the 509 Account, which was never owned by the
            LLC ......................................................................................................... 10

        B.    The 2017 Fraudulent Coribello Declarations could only be
            admitted for the purpose of authenticating documents ......................... 11

    II.    Picard does not have standing under any statute to avoid withdrawals
        made from accounts not owned by the LLC ................................................... 15

        A.    Picard does not have standing to avoid withdrawals that were not
            made by the LLC .................................................................................. 15

    III.    Picard does not have Article III standing ..................................................... 17

    IV.    Picard does not have prudential standing ..................................................... 18

CONCLUSION ........................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A.R. Baron & Co.*,
  280 B.R. 794 (Bankr. S.D.N.Y. 2002) .....................................................................................18

*Allen v. Wright*,
  468 U.S. 737 (1984) ...........................................................................................................2, 10, 17

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006) ..........................................................................................................10

*In re Bernard L. Madoff Inv. Sec. LLC*,
  557 B.R. 89 (Bankr. S.D.N.Y. 2016) (*"Avellino"*), *reconsideration denied*,
  2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) (*"Avellino
  Reconsideration Decision"*) ...........................................................................................1, 6, 16

*In re Bernard L. Madoff Inv. Sec. LLC*,
  560 B.R. 208 (Bankr. S.D.N.Y. 2016) (*"Mendelow"*) .......................................................1, 16

*In re Bernard L. Madoff Inv. Sec. LLC*,
  721 F.3d 54, 66 (2d Cir. 2013) (*"HSBC"*) .............................................................1, 9, 17, 18

*Bezier v. I.R.S.*,
  496 U.S. 53 (1990) .............................................................................................................16

*Bogart v. Israel Aero. Indus.*,
  2010 WL 517582 (S.D.N.Y. Feb. 5, 2010) ..........................................................................17

*Caplin v. Marine Midland Grace Trust Co.*,
  406 U.S. 416 (1972) .......................................................................................................16, 18

*Celotex Corp. v. Edwards*,
  514 U.S. 300 (1995) .............................................................................................................9

*Cent. States v. Merck-Medco Managed Care, L.L.C.*,
  433 F.3d 181 (2d Cir. 2005) ..............................................................................................10

*In re Chowaiki & Co. Fine Art Ltd.*,
  593 B.R. 699 (Bankr. S.D.N.Y. 2018) ...............................................................................11

*City of New York v. Venkataram*,
  2011 WL 2899092 (S.D.N.Y. July 13, 2011) .....................................................................11

*Crawford v. Washington*,
  541 U.S. 36 (2004) .............................................................................................................12

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990)................................................................................................10

*House of Clean, Inc. v. St. Paul Fire & Marine Ins. Co.*,
    775 F. Supp. 2d 302 (D. Mass. 2011) ...................................................................15

*In re Int'l Pharmacy & Disc. II, Inc.*,
    443 F.3d 767 (11th Cir. 2005) ...............................................................................11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................................................9

*Margo v. Weiss*,
    213 F.3d 55 (2d Cir. 2000)......................................................................................14

*Martin v. Merrell Dow Pharms. Inc.*,
    851 F.2d 703 (3rd Cir. 1988) .................................................................................14

*Nodoushani v. S. Conn. State Univ.*,
    507 Fed App'x 79 (2d Cir. 2013)............................................................................14

*Palmer v. Hoffman*,
    318 U.S. 109 (1943)................................................................................................15

*Rohrbough v. Wyeth Labs. Inc.*,
    916 F.2d 970 (4th Cir. 1990) .................................................................................14

*In re Schick*,
    246 B.R. 41 (Bankr. S.D.N.Y. 2000)......................................................................17

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991)....................................................................................18

*Tradax Energy, Inc. v. Cedar Petrochemicals, Inc.*,
    317 F. Supp. 2d 373 (S.D.N.Y. 2004).....................................................................12

*United States v. Alessi*,
    599 F.2d 513 (2d Cir. 1979)...............................................................................13, 14

*United States v. Edwards*,
    2012 WL 5522157 (D.D.C. Nov. 15, 2012) .......................................................12, 13

*United States v. Ellis*,
    460 F.3d 920 (7th Cir. 2006) .................................................................................12

*United States v. Johnson*,
    688 F.3d 494 (8th Cir. 2012) .................................................................................12

*United States v. Morgan*,
  505 F.3d 332 (5th Cir. 2007) ...................................................................13

*United States v. Weiland*,
  420 F.3d 1062 (9th Cir. 2005) .................................................................13

*United States v. Yeley-Davis*,
  632 F.3d 673 (10th Cir. 2011) .................................................................12

*Valley Forge Christian College v. Americans United for Separation of Church
  and State, Inc.*,
  454 U.S. 464 (1982)..................................................................................10

*Warth v. Seldin*,
  422 U.S. 490 (1975).........................................................................9, 10, 18

*Wiand v. Lee*,
  753 F.3d 1194 (11th Cir. 2014) ...............................................................15

*Wight v. BankAmerica Corp.*,
  219 F.3d 79 (2d Cir. 2000)........................................................................18

**Statutes**

11 U.S.C. § 541 .................................................................................................17

11 U.S.C. § 547(b) ............................................................................................17

11 U.S.C. § 548(a)(1).........................................................................................16

15 U.S.C. § 78eee(a)(3) .....................................................................................16

15 U.S.C. § 78eee(a)(4)(B) ...............................................................................15

15 U.S.C. § 78eee(b)(3) .....................................................................................15

15 U.S.C. § 78eee(b)(4) .....................................................................................15

15 U.S.C. § 78fff-2(c)(3) ...................................................................................16

15 U.S.C. § 78iii(5)............................................................................................16

**Other Authorities**

Fed. R. Bankr. P. 7012 .........................................................................................1

Fed. R. Civ. P. 12(h)(3).....................................................................................1, 10

Fed. R. Evid. 602 ...............................................................................................13

Fed. R. Evid. 803(6) ..................................................................................................12

Fed. R. Evid. 803(6) ..................................................................................................12

Fed. R. Evid. 803(6)(A)-(C) .................................................................................12, 13

Fed. R. Evid. 902(11) ............................................................................................12, 13

Fticonsulting.com, https://www.fticonsulting.com/insights/case-studies/madoff-
    ponzi-scheme-10-years-later (last accessed August 8, 2019) ....................................4

Lawyers make millions off Madoff mess, Cnn.com,
    https://money.cnn.com/2011/02/16/news/companies/madoff_
    assets_lawyers_payments/index.htm (last accessed August 8, 2019) ........................3

6 Moore's Federal Practice 56.22(1) at 2817 (2d ed. 1965) ..........................................14

U.S. Const. amend. VI ..................................................................................................12

U.S. Const. art. III ............................................................................................... *passim*

U.S. Const. art. III, § 2, cl. 1 ..........................................................................................9

Wright & Miller, Federal Practice and Procedure, § 2738 (1973)..................................14

Defendants Carol Nelson and Stanley Nelson (the "Nelsons"), respectfully submit this memorandum of law in support of their motion to dismiss the Complaints for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(h)(3), made applicable to these bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7012.

## PRELIMINARY STATEMENT

Federal courts are courts of limited jurisdiction and they have no power to entertain a suit unless jurisdiction is conferred by statute and the plaintiff has suffered an actual injury under Article III of the United States Constitution.  Thus, standing is a threshold question in every federal case.  *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 66 (2d Cir. 2013) (*"HSBC"*).  To establish standing, a plaintiff must allege actual personal injury and may not bring claims on behalf of third-parties.  *Id.*  If the plaintiff does not have standing, the court lacks subject-matter jurisdiction and must dismiss the lawsuit at whatever stage of proceedings the defect is found.

Dismissal of these cases for lack of subject-matter jurisdiction is mandated because Irving H. Picard ("Picard"), the Trustee for the Estate of Bernard L. Madoff Investment Securities LLC (the "LLC") does not have standing to avoid any alleged withdrawals made to the Nelsons.  The evidence at trial established that all of the alleged withdrawals to the Nelsons that Picard attempts to avoid were made from a bank account held in the name of Bernard L. Madoff individually ("Madoff").  None of the transfers were made from the LLC.

This Court has already recognized that only the Trustee for Madoff's Estate in Madoff's individual Chapter 7 Bankruptcy case (the "Madoff Trustee") has standing to avoid transfers of Madoff's property.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016) (*"Avellino"*), *reconsideration denied*, 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) (*"Avellino Reconsideration Decision"*); *In re Bernard L. Madoff Inv. Sec. LLC*, 560 B.R. 208

(Bankr. S.D.N.Y. 2016) (*"Mendelow"*).  Those holdings are controlling and compel dismissal of

the Complaints against the Nelsons for lack of subject-matter jurisdiction.

## FACTUAL OVERVIEW

### I.    The 509 Account and 703 Account were never in the name of the LLC

Although it was Picard's burden, he utterly failed at trial to establish that he has standing

to bring these lawsuits.  *See Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984) (the party invoking

the jurisdiction of the federal court bears the burden of demonstrating his standing).  On the

contrary, the evidence at trial was uncontradicted that the Nelsons never received any transfers

from the LLC.  Instead, all of the alleged withdrawals made to the Nelsons were drawn on an

account in the name of "Bernard L. Madoff" (the "509 Account") at JPMorgan Chase ("JPMC").

And all checks from the Nelsons to Madoff were endorsed by "Bernard L. Madoff" and deposited

into an account in the name of "Bernard L. Madoff Investment Securities" ("BLMIS"), the trade

name Madoff used at least as early as 1979 – 22 years  before the LLC was formed (the "703

Account").

The evidence at trial proved that, after the formation of the LLC in 2001, letters were sent

by Madoff and the LLC to the Bank of New York, to the Depository Trust Company, to the

National Securities Clearing Corporation, and to others, informing them that the LLC had been

formed and that Madoff's account should be changed to the name of the LLC.  [Declaration of

Helen Davis Chaitman, August 8, 2019 ("Chaitman Decl."), Ex. B (Tr., May 9, 2019) at 29:15-

31:15]; [*see id.*, Ex. C, Trial Exhibit DX-L (January 1, 2001 letter from Madoff and the LLC to

the Bank of New York)]; [*id.*, Ex. D, Trial Exhibit DX-M (January 1, 2001 letter from Madoff and

the LLC to the National Securities Clearing Corporation)]; [*id.*, Ex. E, Trial Exhibit DX-N

(January 1, 2001 letter from Madoff and the LLC to the Options Clearing Corporation)]; [*id.*, Ex.

F, Trial Exhibit DX-O (January 1, 2001 letter from Madoff and the LLC to the Depository Trust

Company)].  However, no such letter was ever sent to JPMC, where Madoff in his individual name maintained the 509 Account through the date of his bankruptcy filing and where Madoff maintained in his trade name from as early as 1979, BLMIS, the 703 Account to the date of his bankruptcy filing.  Neither Picard nor JPMC ever produced a single document evidencing a change in the ownership of the 509 or 703 Account from Madoff individually to the LLC or from BLMIS to the LLC.

Picard does not dispute that all of the alleged withdrawals made to the Nelsons were made from the 509 Account.  [*See* Chaitman Decl., Ex. B (Tr., May 9, 2019) at 7:22-24, 21:2-4)].  The evidence established that the 509 Account was always held in the name of Bernard L. Madoff – not the LLC – and that there was never a single document to indicate that the 509 Account was ever held in the name of the LLC.  [*See id.*, Ex. B (Tr., May 9, 2019) at 8:14-19, 10:5-12, 12:5-10, 12:12-13, 12:16-26:9)]; [*id.*, Ex. G, Trial Exhibit DX-Y (Electronic Funding Reports)];[1] [*id.*, Ex. H, Trial Exhibit DX-Z)].  Indeed, all of the checks allegedly written to the Nelsons from the 509 Account were printed with the name of "Bernard L. Madoff."  [*Id.*, Ex. I, Trial Exhibits DX-HC to DX-MF].

Picard's own expert witness, Lisa Collura, whose firm had been paid over $100 million[2] to review documents relevant to Picard's claims, reluctantly admitted that, during her extensive

---

[1] *See* MADTSS01293772; MADTSS01293842; MADTSS01326318; MADTSS01326447; MADTSS01326643; MADTSS01326677; MADTSS01326691; MADTSS01326697; MADTSS01326704; MADTSS01338663; MADTSS01338729; MADTSS01338749; MADTSS01338816; MADTSS01338896; MADTSS01338921; MADTSS01344322; MADTSS01344338; MADTSS01344322; MADTSS01344365.

[2] As of February 2011, FTI Consulting ("FTI") had been paid $84 million.  *See* Lawyers make millions off Madoff mess, Cnn.com, https://money.cnn.com/2011/02/16/news/companies/madoff_assets_lawyers_payments/index.htm (last accessed August 8, 2019).  Additionally, over 400 professionals from FTI have reportedly rendered services to Picard in this liquidation.  *See*

review of Madoff's and the LLC's records and third-party records, she had **never** seen any

document to suggest that the LLC owned the 509 Account. Collura testified as follows:

> Q:    And would you agree with me that you've never seen a J.P.
> Morgan Chase monthly statement which read as the owner of the
> account Bernard L. Madoff Investment Securities, LLC?
>
> A:    Not for the 509 account.
>
> Q:    You would agree with me that you have not seen it?
>
> A:    There -- I think there were some other bank accounts that
> were held in the name with LLC.
>
> Q:    Just answer my specific question. You'll have an
> opportunity on redirect to say whatever you'd like. But just answer
> my questions. Did you ever see a statement from the 509 account
> that listed Bernard L. Madoff Investment Securities, LLC as the
> holder of the account?
>
> A:    No.
>
> Q:    Thank you.

[*Id*., Ex. B (Tr., May 9, 2019) at 13:7-21]; [*see also id*. at 18:3-5] (Q: "Okay. The 509 account

was never changed to Bernard L. Madoff Investment Securities, LLC; was it?" A: "That was never

on the statements."). Bruce Dubinsky, Picard's primary expert witness, and whose firm was paid

over $40 million in this liquidation, was also forced to admit that he had never seen any bank

statement for the 509 Account or 703 Account in the name of the LLC. [*Id*., Ex. A (Tr., May 8,

2019) at 171:23-172:8].

Despite the fact that Madoff used the trade name BLMIS from the 1970s on, and that the

LLC was not formed until January 2001, Collura testified that she *assumed* that a withdrawal from

the 703 Account *must have* been from the LLC if it was made from an account that was held in the

---

Madoff Ponzi Scheme: 10 Years later, Fticonsulting.com, https://www.fticonsulting.com/insights
/case-studies/madoff-ponzi-scheme-10-years-later (last accessed August 8, 2019).

name of BLMIS. It is difficult to believe that an expert whose firm had been paid over $100 million for its services did not recognize the legal distinction between an account owned by the LLC and an account owned by Madoff individually titled in the name of BLMIS, Madoff's trade name since the 1970s. [*Id*., Ex. B (Tr., May 9, 2019) at 23:19-26:11]. Even the account statement for the 703 Account for December 2008, the final month of the LLC's operations, lists the account as owned by the trade name, "Bernard L. Madoff Investment Securities," without any reference to the LLC. [*See id*., Ex. J, Trial Exhibit DX-AA]. Incredibly, Collura testified that she did not understand the difference between a trade name and a limited liability company and she never perceived any significance as to whether a document referred to the LLC or just referred to "Bernard L. Madoff Investment Securities." [*Id*., Ex. B (Tr., May 9, 2019) at 24:1-15].

The evidence at trial established that Madoff had been using the trade name of "Bernard L. Madoff Investment Securities" decades before the LLC was formed. [*Id*., Ex. B (Tr., May 9, 2019) at 18:23-19:10]; [*id*., Ex. K, Trial Exhibit DX-U (July 17, 1991 letterhead of Bernard L. Madoff Investment Securities)]. Dubinsky admitted that he was aware of this. [*Id*., Ex. A (Tr., May 8, 2019) at 172:9-12, 173:18-24]. In fact, documents produced by JPMC and Picard prove that the 703 Account was in the name of BLMIS as far back as the 1970s. [*See id*., Ex. A (Tr., May 8, 2019) at 172:9-17]; [*id*., Ex. T (February 9, 1979 credit to the Unflats from Bernard L. Madoff Investment Securities)]; [*id*., Ex. U (February 7, 1979 confirmation slip to the Unflats from Bernard L. Madoff Investment Securities)]; [*see also id*., Ex. L, Trial Exhibit DX-X]. Thus, the evidence was unrefuted that, although Madoff formed the LLC in January 2001 and transferred the legitimate trading business managed by his sons to the LLC, he retained the fraudulent investment advisory business in his own name. And, as this Court has acknowledged, prior to January 1, 2001, "Madoff operated his financial business as a sole proprietorship" under the trade

name BLMIS. *Avellino*, 557 B.R. at 95. [*See also* Chaitman Decl., Ex. B (Tr., May 9, 2019) at 18:23-19:10]. What this Court failed to note in *Avellino*, because the evidence was not put before the Court, is that Madoff's "financial business" consisted of two completely separate businesses – the fraudulent investment advisory business which Madoff retained in his own name and the legitimate trading business, managed by Madoff's sons, which Madoff transferred to the LLC in January 2001.

Picard failed to introduce a single document suggesting that the 703 Account or the 509 Account was ever held in the name of the LLC. [Chaitman Decl., Ex. B (Tr., May 9, 2019) at 14:1-16:23, 26:24-29:11]; [*id.*, Ex. O, Trial Exhibit DX-E (Statements for the 703 Account)]; [*id.*, Ex. N, Trial Exhibits DX-HW to DX-MF]. Indeed, even nearly one year after the LLC was formed, a December 2001 statement for the 703 Account indicates that the 703 Account was held in the name of "Bernard L. Madoff." [*Id.*, Ex. B (Tr., May 9, 2019) at 14:1-23]; [*id.*, Ex. M, Trial Exhibit DX-E at JPMSAB0000001]. Further, none of the checks written by the Nelsons to fund their accounts was ever written to the LLC. [*See id.*, Ex. A (Tr., May 8, 2019) at 173:18-174:6]. All of the checks sent by the Nelsons were sent to Madoff individually and all of them were endorsed by Bernard L. Madoff individually. [*Id.*, Ex. B (Tr., May 9, 2019) at 26:24-29:12]; [*id.*, Ex. P, Trial Exhibits DX-HW, DX-JX]. These checks endorsed by Bernard L. Madoff were stamped "For Deposit Only Bernard L. Madoff." [*See, e.g.*, *id.*, Ex. P, Trial Exhibits DX-HW, DX-JX].

When Madoff wanted certain dealings with counterparties to be done through the LLC rather than through his sole proprietorship, he would write those counterparties and indicate that in writing. [*Id.*, Ex. B (Tr., May 9, 2019) at 29:15-31:15]; [*see id.*, Ex. C, Trial Exhibit DX-L (January 1, 2001 letter from Madoff and the LLC to the Bank of New York)]; [*id.*, Ex. D, Trial Exhibit DX-M (January 1, 2001 letter from Madoff and the LLC to the National Securities Clearing

Corporation)]; [*id.*, Ex. E, Trial Exhibit DX-N (January 1, 2001 letter from Madoff and the LLC

to the Options Clearing Corporation)]; [*id.*, Ex. F, Trial Exhibit DX-O (January 1, 2001 letter from

Madoff and the LLC to the Depository Trust Company)].  Collura and Dubinsky admitted that

they had never seen any such writing to JPMC with respect to the 509 Account or the 703 Account.

[*Id.*, Ex. B (Tr., May 9, 2019) at 31:16-19]; [*id.*, Ex. A (Tr., May 8, 2019) at 170:2-5].  Picard

introduced no such documents in evidence.

## II.    The 2017 Fraudulent Coribello Declarations

Because Picard obviously recognized that he did not have a scintilla of evidence that the

509 Account or 703 Account were ever held in the name of the LLC, he attempted to introduce at

trial five Declarations of Domestic Records by Linda Coribello of JPMC dated December 13, 2017

(the "2017 Fraudulent Declarations").  [*See* Chaitman Decl., Ex. Q, Trial Exhibit TX-28].  The

2017 Fraudulent Declarations constitute the third set of sworn statements provided by Coribello in

her capacity as custodian of records for JPMC, which first produced documents to Picard in 2009-

2010.  [*See id.*, Ex. R, Trial Exhibit TX-31]; [*id.*, Ex. S, Trial Exhibit TX-32].  While Coribello's

earlier affidavits, both dated 2015, simply certify to the authenticity of business records in order

to establish that they are admissible under Federal Rule of Evidence ("FRE") 803(6), [Trial

Exhibits TX-31, TX-32], in December 2017 (after *Avellino* and the *Avellino Reconsideration*

*Decision*), Picard procured additional sworn statements from Coribello in which she stated for the

very first time that "Bernard L. Madoff Investment Securities LLC ('BLMIS') maintained account

numbers 140081703 and 6301428151509 (the 'accounts') at JPMorgan."  [Trial Exhibit TX-28 at

1, 5, 9, 12, 17].

None of Coribello's prior sworn statements as records custodian had made this statement.

[*See* Trial Exhibits TX-31, TX-32]. Moreover, Coribello annexed to the 2017 Fraudulent

Declarations lists of hundreds of Bates numbers of documents.  Yet, remarkably, not a single one

of these documents suggests, in any way, that the 509 Account or the 703 Account was ever held

by the LLC. [*See* Chaitman Decl, Ex. V (all of the documents to which Coribello refers in the

2017 Fraudulent Declarations)]. There is nothing in any of the Coribello sworn statements which

even suggests that Coribello had personal knowledge about the 509 and 703 Accounts. She was

simply attesting that the records produced were JPMC records.

The 2017 Fraudulent Declarations are contrary to binding admissions made by Picard six

months after the execution of the 2017 Fraudulent Declarations. Through his counsel, Picard

admitted that he had no document evidencing that the 509 Account was ever transferred to the

LLC. [*See id.*, Ex. W (email dated June 12, 2018 from Max Shifrin, Esq. to Helen Davis Chaitman,

Esq.)].

At trial, the 2017 Fraudulent Declarations could not possibly have been admitted to

establish that the 509 Account or the 703 Account were ever held in the name of the LLC. Rather,

Picard's counsel stated on the record that he only wanted to put into evidence the 2017 Fraudulent

Declarations "**so that they can be applied to the documents that are <u>actually</u> used at trial**."

[*Id.*, Ex. A (Tr., May 8, 2019) at 30:13-31:1] (emphasis added). This Court asked counsel for the

Nelsons whether counsel consented to the admissibility of the 2017 Fraudulent Declarations. Both

times counsel answered that she had no objection to **third-party <u>records</u>**. Ms. Chaitman never

consented to the admission of hearsay statements contained in the 2017 Fraudulent Declarations

that were outside the scope of what is permissible under a custodian affidavit, unsupported by

personal knowledge, and unsupportable based upon the documents that JPMC produced.

> MR. HUNT: Okay. The next group that I'd like to talk about are the
> authenticity of records, the custodian's records. JP Morgan has
> (indiscernible) well, is an important part of this case. Each party has
> designated JP Morgan records, both BLMIS records and JP Morgan
> account records from the Defendants. Their bank account was held
> at JP Morgan as well. Exhibit 28 – Trustee's Exhibit 28 is the

records custodian affidavit for the JP Morgan-BLMIS records, and Trustee's Exhibit 20 – or 31, excuse me – is the records custodian affidavit for the Nelson's JP Morgan records. We'd like to move those custodian record affidavits into evidence **so that they can be applied to the documents that are actually used at trial.**

THE COURT: Any objection?

MS. CHAITMAN: We have no objection to any third-party documents, just to cut this short, Your Honor. What we do object to, we filed a written objection to Madoff's internal records.

THE COURT: Okay.

[*Id.*, Ex. A (Tr., May 8, 2019) at 30:13-30:7] (emphasis added).

It is noteworthy that Picard concealed the 2017 Fraudulent Declarations from the Nelsons. He did not produce them, after they were procured in December 2017. He did not place them in the E-Data Room where the Nelsons would have had access to them. Instead, he produced them for the first time one week before trial, when he produced thousands of pages of proposed trial exhibits. [Chaitman Decl. ¶ 19]. This Court would never tolerate such gamesmanship and inappropriate conduct from counsel for the Defendants.

## LEGAL STANDARD

Federal courts are courts of limited subject-matter jurisdiction and the Constitution limits the subject-matter jurisdiction of federal courts to actual cases and controversies. *See, e.g.*, *HSBC*, 721 F.3d at 66; *see* U.S. Const. art. III, § 2, cl. 1. A bankruptcy court's jurisdiction is even more circumscribed and is wholly "grounded in and limited by statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). An "essential and unchanging part of the case-or-controversy requirement of Article III" is the "core component of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "If plaintiffs lack Article III standing, a court has no subject-matter jurisdiction to hear their claim."

*Cent. States v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).  Article III

"requires the party who invokes the court's authority 'show that he **personally** has suffered some

actual or threatened injury as a result of the putatively illegal conduct of the defendant.'"  *Valley*

*Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S.

464, 472 (1982) (emphasis added) (citations omitted).

This Court has the power and the duty, *sua sponte,* at any stage of a proceeding to dismiss

a complaint for lack of subject-matter jurisdiction.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court

determines *at any time* that it lacks subject-matter jurisdiction, the court *must* dismiss the action.")

(emphasis added); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("[F]ederal courts are

under an independent obligation to examine their own jurisdiction.").  "The objection that a federal

court lacks subject-matter jurisdiction, may be raised by a party, or by a court on its own initiative,

at any stage in the litigation, even after trial and the entry of judgment."  *Arbaugh v. Y&H Corp.*,

546 U.S. 500, 506 (2006) (internal citation omitted).  A plaintiff bringing suit in federal court bears

the burden of demonstrating standing.  *See Allen*, 468 U.S. at 751.  The debtor in a bankruptcy

case can only establish his standing if the debtor personally suffered some actual injury.  *See*

*Warth*, 422 U.S. at 501 (Article III requires that "plaintiff . . . allege a distinct and palpable injury

to himself").

## **ARGUMENT**

### I.   **Picard introduced no evidence to suggest that the LLC ever owned the 509 Account or the 703 Account**

A.  The evidence proved that every alleged payment to the Nelsons was made from the 509 Account, which was never owned by the LLC

Picard does not dispute that all of the alleged withdrawals to the Nelsons were made from

the 509 Account.  As set forth *supra* at Factual Overview, § II, the evidence at trial conclusively

established that the 509 Account was not held in the name of the LLC.  Likewise, all of the

Nelsons' deposits were made payable to Bernard L. Madoff and were deposited into the 703 Account, and the 703 Account was never held in the name of the LLC. Since the 509 Account and the 703 Account were not held in the name of the LLC, they were not the property of the LLC. *See In re Chowaiki & Co. Fine Art Ltd.*, 593 B.R. 699, 713 (Bankr. S.D.N.Y. 2018) ("New York law presumes that 'once funds are deposited in a bank account, the account holder has title to and control over those funds.'") (citation omitted); *City of New York v. Venkataram*, 2011 WL 2899092, at *5, n.6 (S.D.N.Y. July 13, 2011) ("'Under New York law, the party who possesses property is presumed to be the party who owns it.'") (citation omitted); *see also In re Int'l Pharmacy & Disc. II, Inc.*, 443 F.3d 767, 771 (11th Cir. 2005) ("In most states, the name or title to a bank account creates a presumption of ownership in the titleholder.") (citation omitted).

B. The 2017 Fraudulent Coribello Declarations could only be admitted for the purpose of authenticating documents

Picard's counsel acknowledged, on June 12, 2018, that Picard had no documents evidencing that the 509 Account was ever transferred into the name of the LLC. [*See* Chaitman Decl., Ex. W (email dated June 12, 2018 from Max Shifrin to Helen Davis Chaitman)]. It was only for the first time, at trial, that Picard introduced the 2017 Fraudulent Declarations, which are Picard's **only** evidence to suggest that the 509 Account and the 703 Account were held in the name of the LLC. It appears that Picard procured the 2017 Fraudulent Declarations in a deliberate attempt to avoid the consequences of this Court's holdings in *Avellino* and *Mendelow* that Picard does not have standing to avoid transfers made by Madoff individually.

The 2017 Fraudulent Declarations cannot be used for any purpose other than to authenticate documents. Custodian affidavits are executed by people without personal knowledge of the specific accounts maintained by the bank. Here, for example, Coribello does not suggest that she has any personal knowledge of the 509 or 703 account. Nor does she suggest that she has any

personal knowledge of the documents JPMC produced to Picard.  Custodian affidavits merely

verify the procedures through which the underlying records were made, so that the underlying

records themselves can be admitted for their truth, even though they are hearsay, under the

business-records exception contained in FRE 803(6).  *See* FRE 902(11) (business records can be

admitted under FRE 803(6) if a custodian of records certifies that the records comply with the

requirements of FRE 803(6)(A)-(C)); *Tradax Energy, Inc. v. Cedar Petrochemicals, Inc.*, 317 F.

Supp. 2d 373, 379 (S.D.N.Y. 2004) (observing that custodian affidavits "track[] exactly the

language of Rule 803(6)").  The custodian affidavit itself is not substantive evidence, and it ceases

to be a custodian affidavit when it attempts to do more than simply authenticate documents so that

they can be admitted under FRE 803(6).

Since the permissible scope of a custodian affidavit is necessarily limited to authenticating

underlying documents, custodian affidavits are frequently used to authenticate business records in

criminal trials and not considered testimonial for purposes of the Confrontation Clause of the Sixth

Amendment and *Crawford v. Washington*, 541 U.S. 36 (2004).  *See United States v. Edwards*,

2012 WL 5522157, at *1-3 (D.D.C. Nov. 15, 2012).  Rather than serving as substantive evidence,

custodian affidavits "merely establish the procedures through which the underlying records were

made." *Id*. at *3.  ***"The business records – not the certifications—are used to establish facts***

***against the defendant at trial."***  *Id*. at *3 (emphasis added); *see also United States v. Ellis*, 460

F.3d 920, 927 (7th Cir. 2006) ("The statements do not purport to convey information about Ellis,

but merely establish the existence of the procedures necessary to create a business

record."); *United States v. Johnson*, 688 F.3d 494, 505 (8th Cir. 2012) ("[T]he purpose of

Jacobson's certification was to attest that the copy of the crime lab report was a true copy of the

original – and not to prove the facts of the report's contents . . . ."); *accord United States v. Yeley-*

*Davis,* 632 F.3d 673, 680-81 (10th Cir. 2011); *United States v. Morgan,* 505 F.3d 332, 339 (5th Cir. 2007); *United States v. Weiland,* 420 F.3d 1062, 1077 (9th Cir. 2005); *United States v. Edwards*, 2012 WL 5522157, at *1 (D.D.C. Nov. 15, 2012).

Thus, to the extent the 2017 Fraudulent Declarations attempt to do more than simply recite the elements of FRE 803(6)(A)-(C), they exceed the permissible scope of FRE 902(11) and constitute inadmissible hearsay without any exception. The 2017 Fraudulent Declarations cannot be admitted for substantive evidence. Indeed, when Picard introduced them he admitted as much. *See supra* at Factual Overview, § II.

The soundness of this Rule is proven in this instance where Coribello lacks any personal knowledge concerning the 509 Account and the 703 Account. FRE 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Picard did not have a single piece of evidence even suggesting that either the 509 Account or the 703 Account had ever been in the name of the LLC. And Coribello had no such personal knowledge because she is simply a records custodian; she had no involvement whatsoever in the activities of the 509 Account or the 703 Account.

Thus, the 2017 Fraudulent Declarations are inadmissible because Coribello's statement that the 509 Account and the 703 Accounts were owned by the LLC is: (a) not based upon personal knowledge; (b) is contradicted by Picard's admission; (c) is unsupported by a single document listed in any of the 2017 Fraudulent Declarations; (d) is unsupported by any document produced by Picard after seven years of litigation, despite repeated requests by the Nelsons' counsel for Picard to produce any such evidence; and (e) is contrary to the testimony of Picard's own experts. Thus, here, as the Second Circuit held in reviewing a factual affidavit on summary judgment in *United States v. Alessi*, 599 F.2d 513, 515 (2d Cir. 1979), the inadmissible paragraphs of the 2017

Fraudulent Declarations should be disregarded. *Id.* ("The district court judge was free to disregard the inadmissible paragraphs and consider the rest of the affidavit.") (citing *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578-79 (2d Cir. 1969)); 6 Moore's Federal Practice 56.22(1) at 2817 (2d ed. 1965); Wright & Miller, Federal Practice and Procedure, § 2738 (1973); *Nodoushani v. S. Conn. State Univ.*, 507 Fed App'x 79, 80 (2d Cir. 2013) ("To the extent that an affidavit or declaration contains material that does not comply with [Federal Rule of Civil Procedure] . . . the [c]ourt may strike those portions, or may simply disregard them.").

There is no hearsay exception to admit the hearsay testimony in the 2017 Fraudulent Declarations concerning the 509 Account and 703 Account, and no hearsay exception can apply because the 2017 Fraudulent Declarations are grossly unreliable and, indeed, the evidence clearly suggests that they were procured by Picard in order to deceive this Court as to subject-matter jurisdiction. The 2017 Fraudulent Declarations were completely unnecessary in 2017 because the JPMC documents were produced many years earlier. These Declarations were manipulated by Picard to falsely state that the 509 Account and the 703 Account were in the name of the LLC so as to defeat the impact of this Court's holdings in *Avellino* and *Mendelow*.

"Where a party submits an affidavit to the court that contains information inconsistent with the party's prior deposition testimony or other sworn submission, courts hold that these contradictory affidavits should be disregarded as 'shams' or 'competing affidavits.'" *See Margo v. Weiss*, 213 F.3d 55, 63 (2d Cir. 2000) (holding that it was unreasonable for plaintiff's counsel to file affidavits in which they contradicted earlier testimony); *Rohrbough v. Wyeth Labs. Inc.*, 916 F.2d 970, 976 (4th Cir. 1990) (holding that the district court was justified in disregarding conflicting affidavits); *Martin v. Merrell Dow Pharms. Inc.*, 851 F.2d 703, 705 (3rd Cir. 1988) (disregarding a subsequent affidavit, submitted in the face of defeat, which contradicted earlier

sworn statements).  The circumstances of the 2017 Fraudulent Declarations compel the conclusion

that Picard was attempting to mislead the Court with false and fraudulent evidence.  *See Palmer v.

Hoffman*, 318 U.S. 109, 113-14 (1943) (excluding accident report on the grounds that it was

prepared in anticipation of litigation); *see also House of Clean, Inc. v. St. Paul Fire & Marine Ins.

Co.,* 775 F. Supp. 2d 302, 316 (D. Mass. 2011) ("[W]hen statements are made for the purposes of

litigation, the potential motivation of the [speaker] undermines the statements' trustworthiness.");

*Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014).

The evidence at trial proved conclusively that the 509 Account and the 703 Account were

never held in the name of the LLC.  The 509 Account was always held in Madoff's name; the 703

Account was always in the name of BLMIS, Madoff's trade name from the 1970s on.  There was

never a change to the name of either account indicating that it was owned by the LLC.  Thus, the

alleged withdrawals were not the property of the LLC, Picard lacks standing to sue the Nelsons,

and this Court lacks subject-matter jurisdiction over these cases.

## II.     Picard does not have standing under any statute to avoid withdrawals made from accounts not owned by the LLC

### A.   Picard does not have standing to avoid withdrawals that were not made by the LLC

Jurisdiction and standing in this case stem from the provisions of the Securities Investors

Protection Act ("SIPA").  As alleged in the Complaints, the Securities Investors Protection

Corporation ("SIPC") filed an application in the district court pursuant to 15 U.S.C. §

78eee(a)(4)(B) of SIPA alleging that the LLC was not able to meet its obligations to its customers

and the customers needed protection under SIPA.   In response to the application, the District

Court  appointed Picard as Trustee  for the liquidation  of the LLC pursuant  to 15 U.S.C. §

78eee(b)(3)  of SIPA and removed  the case to the  bankruptcy court pursuant  to 15 U.S.C.  §

78eee(b)(4) of SIPA. Thus, currently before the Court is the liquidation of the LLC, which is the

debtor under the SIPA. *See* 15 U.S.C. § 78iii(5) ("The term 'debtor' means a member of SIPC with respect to whom an application for a protective decree has been filed under section 78eee(a)(3).").

A SIPA trustee may only avoid transfers made by the debtor. *Avellino*, 557 B.R. at 110 ("SIPA authorizes the trustee to avoid and recover transfers of customer property. 'Customer property' includes [property of the debtor]."); *Mendelow*, 560 B.R. at 227("15 U.S.C. § 78fff-2(c)(3) 'creates a legal fiction that confers standing on a SIPA trustee but not the bankruptcy trustee of an individual debtor.'") (citing *Avellino*, 557 B.R. at 108-110); 11 U.S.C. § 548(a)(1) (trustee's avoidance powers are strictly limited to transfers of "an interest of the debtor in property"); 15 U.S.C. § 78fff-2(c)(3). The debtor in this liquidation is the LLC. *See Avellino*, 557 B.R. at 108 ("The 'debtor' in a SIPA liquidation proceeding is 'a member of SIPC with respect to whom an application for a protective decree has been filed . . . .' The SIPA debtor was BLMIS, the limited liability company, and not Madoff's sole proprietorship . . . ."). Therefore, Picard only has standing to avoid withdrawals made from an account owned by the LLC. *See id.* at 110 ("[I]t does not follow that the Trustee can recover the actual withdrawals of cash by customers of the sole proprietorship.").

Here, Picard does not have standing to pursue claims against the Nelsons because only the LLC is the debtor and none of the alleged withdrawals to the Nelsons were made from the LLC. *See Avellino*, 557 B.R. 89 ("Only the Madoff trustee can recover actual transfers by the sole proprietorship."); *Mendelow*, 560 B.R. 208; *see also Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 428-30 (1972) (holding that federal bankruptcy law does not empower a trustee to collect money owed to creditors because a bankruptcy trustee is not empowered "to collect money not owed to the estate"); *Bezier v. I.R.S.*, 496 U.S. 53 (1990) (holding that debtor's payment of

taxes collected from customers were not transfers of "property of the debtor," but were instead transfers of customer property held in trust); *In re Schick*, 246 B.R. 41, 44-45 (Bankr. S.D.N.Y. 2000) (recognizing that "[t]he equitable title or interest is neither 'property of the estate' under section 541 nor 'property of the debtor' under section 547(b)"). Accordingly, Picard does not have standing to avoid any alleged transfers to the Nelsons and the Complaints must be dismissed for lack of subject-matter jurisdiction.

## III.    **Picard does not have Article III standing**

Federal courts have no power to entertain a suit unless the plaintiff has suffered an injury under Article III of the United States Constitution.  *See HSBC*, 721 F.3d at 66 ("Standing depends, first, on whether the plaintiff has identified a 'case or controversy' **between the plaintiff and the defendants** within the meaning of Article III of the Constitution.") (emphasis added).  To establish Article III standing, a plaintiff must allege actual, personal injury.  *Id.*  If the plaintiff cannot do so, the court lacks subject-matter jurisdiction and must dismiss the claim at whatever stage of proceedings the defect is found.  Since the alleged transfers to the Nelsons were made by Madoff and not by the LLC, Picard lacks Article III injury and this Court lacks jurisdiction over the Complaints.

Additionally, there is no causal nexus between the Nelsons' conduct and the claimed injury – also a constitutional standing requirement.  *See Allen*, 468 U.S. at 753 n.19; *see also Bogart v. Israel Aero. Indus.*, 2010 WL 517582, at *3-4 (S.D.N.Y. Feb. 5, 2010) (plaintiff's alleged injury must be fairly traced to the challenged conduct of the defendant, and must not be the result of the independent action of a third party not before the court).  The Nelsons deposits and withdrawals were not made into or from accounts held by the LLC.  Therefore, any causal nexus between the Nelsons' conduct and the claimed injury would be between Madoff individually and the Nelsons, not the LLC and the Nelsons, and Picard thus has no standing to seek to avoid alleged withdrawals

made from Madoff to the Nelsons.  Accordingly, Picard does not have standing to avoid any transfers to the Nelsons and the Complaints must be dismissed for lack of Article III standing.

## IV.    **Picard does not have prudential standing**

In addition to the limitations on standing that Article III requires courts to follow, there are also "several judge-made 'prudential' requirements."  *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000) (citation omitted).  "These are rules of judicial self-restraint and are applied to further preserve the proper – and properly limited – role of the courts in a democratic society."  *Id.* (internal quotation marks omitted) (citations omitted).  "Foremost among the prudential requirements is the rule that a party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"  *Id.* (quoting *Warth*, 422 U.S. at 499); *see also HSBC*, 721 F.3d at 58.  This limitation is "closely related to Art. III concerns."  *Warth*, 422 U.S. at 500.

Since Picard is asserting claims that belong to the Madoff Trustee, Picard does not have prudential standing.  *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) ("[I]f a trustee has no power to assert a claim because it is not one belonging to the bankrupt estate, then he also fails to meet the prudential limitation that the legal rights asserted must be his own."); *In re A.R. Baron & Co.*, 280 B.R. 794, 801 (Bankr. S.D.N.Y. 2002) (same); *see also Caplin*, 406 U.S. at 416 (same).  Accordingly, Picard does not have standing to avoid any transfers to the Nelsons and the Complaints must be dismissed for lack of prudential standing.

## CONCLUSION

None of the alleged withdrawals by the Nelsons were made from an account owned by the LLC.  Therefore, Picard does not have standing to avoid any transfers made to the Nelsons and this Court must dismiss the Complaints for lack of subject-matter jurisdiction.

Dated:    August 8, 2019                              **CHAITMAN LLP**
          New York, New York

                                            By:    */s/ Helen Davis Chaitman*
                                                   Helen Davis Chaitman
                                                   Gregory M. Dexter
                                                   hchaitman@chaitmanllp.com
                                                   gdexter@chaitmanllp.com
                                                   465 Park Avenue
                                                   New York, New York 10022
                                                   Phone & Fax: 888-759-1114

                                                   *Attorneys for Defendants Carol and Stanley*
                                                   *Nelson*