**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY 10020
Telephone:     (212) 610-6300
Facsimile:      (212) 610-6399
Michael S. Feldberg

*Attorneys for Defendant ABN AMRO Bank N.V.*
*(presently known as NatWest Markets N.V.)*

**UNITED STATES BANKRUPTCY COURT**
<u>**SOUTHERN DISTRICT OF NEW YORK**</u>

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05354 (SMB) |
| Plaintiff, | |
| v. | |
| ABN AMRO BANK N.V. (presently known as THE ROYAL BANK OF SCOTLAND, N.V.), | |
| Defendant. | |

**DEFENDANT ABN AMRO BANK N.V.'S (PRESENTLY KNOWN AS THE
ROYAL BANK OF SCOTLAND, N.V.) MEMORANDUM OF LAW IN
OPPOSITION TO THE TRUSTEE'S MOTION FOR LEAVE TO FILE A
<u>SECOND AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................................1

BACKGROUND ......................................................................................................................4

I.    FACTUAL BACKGROUND AND THE TRUSTEE'S ALLEGATIONS ....................................4

    A.    Non-Parties Tremont and the Rye Funds.................................................................4

    B.    ABN/RBS and the Transactions at Issue .................................................................5

    C.    The "Rye Offshore Swap" Transaction ...................................................................5

    D.    The "Rye Onshore Swap" Transaction ....................................................................7

    E.    Due Diligence Related to the Swap Transactions.....................................................8

    F.    The Trustee's Allegations .......................................................................................8

II.   PROCEDURAL HISTORY ................................................................................................9

    A.    Initial Proceedings in the Bankruptcy Court............................................................9

    B.    Good Faith Decisions and First Amended Complaint ............................................10

    C.    Judge Rakoff's Good Faith Decision in 2014 ........................................................11

    D.    Motion for Leave to Amend and Limited Discovery...............................................11

LEGAL STANDARD..............................................................................................................12

ARGUMENT .........................................................................................................................12

I.    SECTION 550(B) BARS THE TRUSTEE'S CLAIMS ........................................................14

    A.    The Trustee Fails to Plead Willful Blindness Because ABN/RBS Did Not
        Subjectively Believe in a High Probability of Madoff's Fraud, Nor Can the
        Trustee Point to Any Acts of Conscious Avoidance............................................15

    1.    The economic realities make the Trustee's theory implausible. .......................15

    2.    The Trustee fails to allege sufficiently the first prong of willful blindness. ....17

        a)    The Trustee's red flag hindsight pleading is insufficient.....................17

            (i)    The allegation that ABN/RBS knew that BLMIS served as both
                custodian and prime broker of investor assets ........................................18

            (ii)   The allegation that ABN/RBS was told it could not access Madoff
                directly and accepted this.........................................................................19

            (iii)  The allegation that RBS received advice from an external hedge fund
                advisor..................................................................................................20

            (iv)   The allegation of improbable returns......................................................21

            (v)    The allegations regarding option counterparties.....................................21

            (vi)   Other red flag allegations.......................................................................23

        b)    If anything, the red flag and due diligence allegations in the PSAC show
            that ABN/RBS thought trades were occurring....................................................24

|   |   | c) | The allegations in the PSAC are weaker than the allegations against BNP which were recently held to be insufficient, and the cases cited by the Trustee are readily distinguishable. ..................................................................... 25 |

|   |   | d) | The allegations regarding the Vista and Fairfield/Mitsubishi transactions do not establish willful blindness and are irrelevant............................................ 27 |

|   |   | e) | The Trustee does not plead that any ABN/RBS employee possessed the requisite knowledge. ............................................................................................. 28 |

|   | 3. | | The PSAC's allegations establish that ABN/RBS did not blind itself to Madoff's fraud. .............................................................................................................................. 29 |

|   |   | a) | The allegations regarding the so-called "BLMIS Fraud Provision" fail because the facts are mischaracterized and the legal precedent cited is inapposite. ........................................................................................................... 30 |

|   |   | b) | According to the Trustee's own allegations, ABN/RBS performed extensive due diligence, only to be stymied by Tremont..................................... 34 |

|   | B. | | This Court Was Correct in Holding that the Trustee Must Allege Suspicion of a Ponzi Scheme or that Madoff Was Not Trading Securities. ............................................. 36 |

| II. | | | §550(B) BARS THE TRUSTEE'S CLAIMS BECAUSE ABN/RBS PROVIDED VALUE FOR THE TRANSFERS AT ISSUE ................................................................................................................. 37 |

| III. | | | THERE HAS BEEN NO INTERVENING CHANGE IN PLEADING STANDARDS ........................................ 39 |

CONCLUSION....................................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................12, 15

*In re Bayou Grp., LLC*,
439 B.R. 284 (S.D.N.Y. 2010).........................................................................36

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).........................................................................................12

*Boyer v. Crown Stock Distrib., Inc.*,
587 F.3d 787 (7th Cir. 2009) ..........................................................................39

*In re Brooke Corp.*,
515 B.R. 632 (Bankr. D. Kan. 2014) ..............................................................39

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*,
480 B.R. 480 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 55 (2d Cir. 2013)...................................2

*Buchwald Capital Advisors, LLC v. Papas*,
584 B.R. 161 (E.D. Mich. 2018).....................................................................39

*Burch v. Pioneer Credit Recovery, Inc.*,
551 F.3d 122 (2d Cir. 2008)............................................................................12

*In re Commercial Loan Corp.*,
396 B.R. 730 (Bankr. N.D. Ill. 2008) .............................................................39

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
No. 16 Civ. 3495, 2017 WL 4049253 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) ...................29

*In re Direct Access Partners, LLC*,
No. 15-11259, 2017 WL 6333926 (Bankr. S.D.N.Y. Dec. 11, 2017) .....................................36

*Elendow Fund, LLC v. Rye Inv. Mgmt.*,
588 F. App'x 27 (2d Cir. 2014) ...................................................................16, 17

*Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund*,
No. 10 Civ. 9061, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013).................................. *passim*

*Gagnon v. Alkermes PLC*,
368 F. Supp. 3d 750 (S.D.N.Y. 2019) ...................................................................28

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ...............................................................................14, 29

*Gowan v. Wachovia Bank, N.A. (In re Dreier, LLP)*,
453 B.R. 499 (Bankr. S.D.N.Y. 2011) ...............................................................12, 37

*Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)*,
916 F.2d 528 (9th Cir. 1990) ...................................................................39

*Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*,
84 F.3d 1330 (10th Cir. 1996) ...................................................................39

*Mangiafico v. Blumenthal*,
471 F.3d 391 (2d Cir. 2006) .....................................................................5

*Meridian Horizon Fund, LP v. KPMG (Cayman)*,
487 F. App'x 636 (2d Cir. 2012) ...............................................................18, 19

*Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*,
747 F. Supp. 2d 406 (S.D.N.Y. 2010) ...................................................................18

*MLSMK Invs. Co. v. JP Morgan Chase & Co.*,
737 F. Supp. 2d 137 (S.D.N.Y. 2010), *aff'd*,  651 F.3d 268 (2d Cir. 2011) ...........................16

*In re N. Merch., Inc.*,
371 F.3d 1056 (9th Cir. 2004) ...................................................................38

*In re Optimal U.S. Litig.*,
No. 10 Civ. 4095, 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ...........................................25

*Picard v. ABN AMRO Bank (Ir.) Ltd.*,
505 B.R. 135 (S.D.N.Y. 2013) *("Safe Harbor Decision")* ...............................................7, 37

*Picard v. Avellino*,
469 B.R. 408 (S.D.N.Y. 2012) ...................................................................10, 21, 39

*Picard v. BNP Paribas*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018) ......................................................... *passim*

*Picard v. Katz*,
462 B.R. 447 (S.D.N.Y. 2011) ................................................................... *passim*

*Picard v. Kingate*,
No. 08 Civ. 99000, 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) .......................27, 38

*Picard v. Legacy Capital ("Legacy I"),*
   548 B.R. 13 (Bankr. S.D.N.Y. 2016)................................................................15, 18, 21, 37

*Picard v. Legacy ("Legacy II"),*
   No. 10 Civ. 05286, 2019 WL 2593008 (Bankr. S.D.N.Y. June 25, 2019) .............................38

*Picard v. Magnify,*
   583 B.R. 829 (Bankr. S.D.N.Y. 2018) ...................................................................................27

*Picard v. Merkin ("Merkin II"),*
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ......................................................................26, 28, 37

*Picard v. Merkin ("Merkin III"),*
   563 B.R. 737 (Bankr. S.D.N.Y. 2017) ..............................................................................17, 26

*Saltz v. First Frontier, LP,*
   782 F. Supp. 2d 61 (S.D.N.Y. 2010), *aff'd*, 485 F. App'x 461 (2d Cir. 2012)............18, 20, 24

*Scheidelman v. Henderson,*
   423 B.R. 598 (Bankr. N.D.N.Y. 2010) ..................................................................................12

*SEC v. Cohmad Sec. Corp.,*
   No. 09 Civ. 5680, 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) ...............................................19

*SIPC v. BLMIS,*
   516 B.R. 18 (S.D.N.Y. 2014) *("Good Faith Decision")*................................................. *passim*

*SIPC v. BLMIS,*
   590 B.R. 200 (Bankr. S.D.N.Y. 2018) *("Good Faith Discovery Decision")*..............11, 39, 40

*Stephenson v. Citco Grp. Ltd.,*
   700 F. Supp. 2d 599 (S.D.N.Y. 2010)........................................................................19, 21, 24

*Tannerite Sports, LLC v. NBCUniversal News Grp.,*
   864 F.3d 236 (2d Cir. 2017).................................................................................................12

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,*
   531 F.3d 190 (2d Cir. 2008).................................................................................................28

*United States v. GAF Corp.,*
   928 F.2d 1253 (2d Cir. 1991)...............................................................................................12

## Statutes

11 U.S.C. § 548(c) ..........................................................................................................10, 38

11 U.S.C. § 548(d) ................................................................................................................37

11 U.S.C. § 550(b) ....................................................................................................... *passim*

**Other Authorities**

5 COLLIER ON BANKRUPTCY ¶ 550.03[1] (16th ed. 2019) ............................................................37

Fed. R. Bankr. P. 2004.................................................................................................12, 15, 38

Fed. R. Civ. P. 12(b)(6)..........................................................................................................12, 19

Fed. R. Civ. P. 15(a) ................................................................................................................11

Fed. R. Civ. P. 26(d)(1)............................................................................................................11

Defendant ABN AMRO Bank N.V. (which was renamed The Royal Bank of Scotland N.V. after the events at issue in this action and was recently renamed again) ("ABN/RBS")[1] respectfully submits this memorandum of law[2] in opposition to the Trustee's Motion For Leave To File A Second Amended Complaint. ECF No. 180 ("Motion" or "Mot.").[3] The Proposed Second Amended Complaint, ECF No. 180-1 ("PSAC") seeks to recover alleged subsequent transfers to ABN/RBS from Rye Select Broad Market XL Portfolio, Ltd. ("XL Portfolio Limited"), Rye Select Broad Market Portfolio Limited ("Rye Portfolio Limited"), Rye Select Broad Market XL Fund L.P. ("XL Broad Market") and Rye Select Broad Market Fund L.P. ("Rye Broad Market") (together, the "Rye Funds") in connection with two swap transactions (the "Rye Swaps").[4]

## PRELIMINARY STATEMENT

As alleged in the PSAC and confirmed by the transaction documents referred to therein, ABN/RBS put at risk approximately $679 million of its own money by entering into swap transactions with the Rye Funds to provide leverage, and committing to pay three times the returns from a referenced Madoff fund. ABN/RBS had no interest in the purported success of

---

[1] The current name of ABN/RBS is NatWest Markets N.V. The entity is distinct from the U.K. bank known as The Royal Bank of Scotland plc ("RBS"). Both ABN/RBS and RBS are currently part of the family of companies owned by The Royal Bank of Scotland Group plc ("RBS Group"). In October 2007, ABN/RBS was acquired by a consortium involving RBS Group. ABN/RBS is also distinct from (and unrelated to) various entities that currently bear the name "ABN AMRO," some of which are defendants in other Madoff avoidance actions.

[2] ABN/RBS reserves the right to make additional arguments in connection with any subsequent motion to dismiss and does not by this brief waive any argument.

[3] Unless otherwise specified, all ECF references refer to this action, Adv. Pro. No. 10-05354.

[4] In a parallel action that is currently stayed pending a petition for a writ of *certiorari*, the Trustee is seeking to recover alleged subsequent transfers to ABN/RBS from a fifth feeder fund, Harley International (Cayman) Limited ("Harley") in connection with another transaction. *See Picard v. ABN AMRO Bank N.V. (Presently Known as The Royal Bank of Scotland N.V.)*, Adv. Pro. No. 11-02760 (Bankr. S.D.N.Y.) ("Harley Action").

Bernard L. Madoff Investment Securities LLC ("BLMIS"). Regardless of BLMIS's

performance, ABN/RBS's sole compensation was a fee on the leverage ranging from .9% to 1%-

over LIBOR.

The principal reason the Trustee's Motion for Leave to File a Second Amended

Complaint should be denied is that it is futile, because the Trustee cannot plausibly allege that

ABN/RBS was willfully blind to the BLMIS fraud. In the words of Judge Sullivan, it would

have been "nonsensical" and "bordering on the absurd" for ABN/RBS to provide over two-thirds

of a billion dollars in leverage in exchange for a relatively modest fee if it believed or willfully

blinded itself to the fact that BLMIS was not trading securities, and thus that the entire sum could

be lost. *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant &

Sons, Inc.)*, 480 B.R. 480, 489 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 55 (2d Cir. 2013).

The Trustee alleged in the First Amended Complaint ("FAC") and continues to allege in

the PSAC that ABN/RBS did this all the while turning a blind eye to the fact that BLMIS was a

massive Ponzi scheme. However, had ABN/RBS suspected there was a high probability that the

reference funds underlying the Rye Swaps were worthless, it would not have entered into the

transactions in the first place, let alone placed its own funds at risk by purchasing, as a hedge,

shares in those same worthless funds. Indeed, the Trustee alleges that by the time the dust from

BLMIS's collapse had cleared, ABN/RBS had lost most of the approximately $679.1 million of

its own money it invested in the reference funds. PSAC ¶ 172. This loss made ABN/RBS an

enormous "net loser" in the Madoff saga.[5]

The Trustee's claim that ABN/RBS risked the loss of hundreds of millions of its own

_____

[5] The Trustee's argument that ABN/RBS subsequently recovered a fraction of its losses in
distributions from the Tremont class action litigation (Mot. at 14) is irrelevant.

2

money in exchange for an agreed rate of interest or fees which, by definition, were a small fraction of ABN/RBS's total exposure, was implausible as alleged in the FAC, and remains implausible as alleged in the PSAC. Remarkably, the Trustee attempts to cast ABN/RBS as a willing participant in a scheme that cost it hundreds of millions. But the new allegations in the PSAC amount to nothing more than the same type of red flag, hindsight pleading that this Court has previously held does not suffice to show willful blindness. If anything, the allegations in the PSAC show that ABN/RBS thought trades *were* occurring—not a high degree of suspicion by ABN/RBS that BLMIS was a Ponzi scheme and not actually trading securities.

Nor does the PSAC allege any actions taken by ABN/RBS to turn a blind eye, the second prong of the willful blindness standard. The Trustee argues that one provision in the Rye agreements (which the Trustee calls the "BLMIS Fraud Provision," though the word fraud does not appear in the provision), is akin to "one-of-a-kind" insurance, and that ABN/RBS used this provision to protect itself from the Madoff Ponzi scheme. But along with the inapt name, the Trustee's allegations entirely mischaracterize the special redemption event provision in the Rye Swaps ("Material Adverse Effect Special Redemption Event" or "MAE SRE"), which merely provided for partial accelerated redemptions in the face of a formal investigation of BLMIS with a material adverse effect. In the event of a Ponzi scheme, with no assets under management, there was nothing to redeem, and in fact, the MAE SRE *did not* protect ABN/RBS from the significant losses it suffered when Madoff was revealed to be a fraud. The so-called "BLMIS Fraud Provision" allegations are a red herring and the legal precedent cited (*Picard v. Katz*) is inapposite.

To the contrary, according to the Trustee's own allegations, ABN/RBS performed extensive due diligence, only to be stymied by Tremont. Despite ABN's best efforts to perform due diligence, it did not detect the Madoff fraud and ultimately suffered tremendous losses along

with Madoff's other victims.  In addition to failing to meet his burden to plead lack of good faith, the Trustee's allegations also establish that ABN/RBS provided value in exchange for the transfers it received in connection with the Rye Swaps, and thus, amendment is futile.

For these reasons, and because the Trustee cannot credibly assert that he would be prejudiced if he were forced to rely on his FAC, the Trustee's Motion is futile and should be denied.

## BACKGROUND

I.    FACTUAL BACKGROUND AND THE TRUSTEE'S ALLEGATIONS[6]

A.    Non-Parties Tremont and the Rye Funds

This Court is familiar with the details of the Madoff fraud and BLMIS's Ponzi scheme that victimized both individual investors and some of the world's largest banks.  As per the Trustee's allegations, BLMIS could not have fooled sophisticated financial institutions on its own.  It had the help of a number of "feeder funds" that placed money in BLMIS.  PSAC ¶¶ 9, 20–22, 85.  One corporation that managed a number of such feeder funds was Tremont.  *Id.* ¶ 19. Tremont was a "multi-billion dollar money management company" that invested at least $4 billion in BLMIS through its funds.  Tremont Compl. ¶¶ 2, 5.  Tremont controlled the Rye Funds at issue in this case.  PSAC ¶¶ 20-21.

Assuming for purposes of this Motion the accuracy of the Trustee's allegations,

---

[6]    The facts set forth below are drawn from the allegations contained in the PSAC, as well as the Trustee's previous allegations in this action—the Complaint ("Compl."), ECF No. 1, the FAC, ECF No. 47, the Proffered Allegations ("Prof. All."), ECF No. 101 and the Harley Action—the Complaint ("Harley Compl."), ECF No. 1 and Proffered Allegations ("Harley Prof. All."), ECF No. 58. These allegations are recited here solely for the purposes of this opposition. ABN/RBS neither admits nor concedes them.  The PSAC incorporates a separate complaint filed by the Trustee against Tremont and feeder funds owned and managed by Tremont to recover alleged fraudulent transfers.  *Picard v. Tremont Group Holdings, Inc.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y.) ("Tremont Action"), ECF No. 1 ("Tremont Compl.").

ABN/RBS was a victim of Tremont, which willfully deceived investors, in addition to being a

victim of BLMIS.[7]  The Trustee pleads that Tremont avoided questions regarding Madoff

through deflection and fabrication, including falsely leading others to believe that it knew the

counterparties of Madoff's trades when it did not and "flip-flop[ping]" or "equivocat[ing]" on

"the question of whether BLMIS traded options OTC or . . . on the CBOE."  PSAC ¶¶ 217, 219-

20, 225-32.  In 2011, Tremont entered into a settlement with the Trustee, paying $1.025 billion.

Id. ¶ 175.

### B.    ABN/RBS and the Transactions at Issue

The Trustee alleges that ABN/RBS entered into two leveraged swap transactions with the

Rye Funds in 2006 and 2007.  Id. ¶¶ 77–84.  In these transactions, ABN/RBS offered three times

synthetic returns in certain BLMIS feeder funds.  Id. ¶¶ 78, 81, 83.  ABN/RBS's sole economic

interest was a 0.9 to 1%-over LIBOR fee for the leverage it provided.

### C.    The "Rye Offshore Swap" Transaction[8]

XL Portfolio Limited, a Cayman Islands-incorporated company, sought to provide its

investors with three times synthetic returns in Rye Portfolio Limited, a BLMIS account holder,

through swap transactions with financial institutions such as ABN/RBS.  Id. ¶ 81.  To that end,

in September 2006, XL Portfolio Limited entered into a total return swap with ABN/RBS.  Id.

XL Portfolio Limited made an initial collateral payment to ABN/RBS of $10 million to be

invested in Rye Portfolio Limited, with the ability to increase the amount to $250 million.  Ex.

---

[7]   ABN/RBS does not concede that the Trustee has alleged sufficient facts to show that Tremont
had knowledge of the BLMIS fraud.

[8]   In support of this opposition, ABN/RBS has filed the Declaration of Michael S. Feldberg dated
August 9, 2019, and the exhibits appended thereto (hereinafter "Ex. __") which include the swap
and other pertinent agreements.  The Court may consider the terms of these agreements, as they
are "integral" to the complaint.  See Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006).

A, § 2.2, Equity Notional Amount.  ABN/RBS guaranteed three times the return of the

investment by providing two times the leverage.  *Id.* at Annex 1, Index Rules.  In exchange,

ABN/RBS received a 1%-over LIBOR fee on the leverage provided (effectively, "interest" on

the leverage), to be paid at redemption.  *Id.* at Annex 1, Leverage Spread.  Over the course of the

swap, XL Portfolio Limited allegedly provided a total of $217 million in collateral transfers, of

which at least $74.6 million was customer property fraudulently transferred from BLMIS.  PSAC

¶¶ 81, 259.

In the PSAC the Trustee misleadingly suggests that ABN/RBS *chose* to reinvest the

collateral and its own funds into Rye Portfolio Limited *(id.* ¶ 82), but that is not the case.  The

two components of the transaction were linked.  As alleged in the FAC (¶¶ 89–90) and

documented in the Rye Offshore Swap, ABN/RBS was required to hedge its position by

reinvesting the collateral plus the leverage (two times the amount of the collateral from

ABN/RBS's own funds) in Rye Portfolio Limited:

> Any [] increase [in the Equity Notional Amount] shall become effective upon . . .
> ABN AMRO [] becom[ing] the legal and beneficial owner of the total number of
> Reference Fund [*i.e.*, Rye Portfolio Limited] Shares . . .

Ex. A, § 2.2, Equity Notional Amount.  XL Portfolio Limited could increase its swap position by

providing more collateral to ABN/RBS, but it would only become effective if and when

ABN/RBS received confirmation that its hedge in Rye Portfolio Limited had correspondingly

been increased.  *Id.*  This provided ABN/RBS with a "perfect hedge"—any returns owed to XL

Portfolio Limited would be completely recouped from ABN/RBS's investment in the reference

fund.  PSAC ¶ 82; FAC ¶ 91.  XL Portfolio Limited could also "deleverage" by requesting to

downsize the swap.  Ex. A, § 2.2, Equity Notional Amount.  By the terms of the swap agreement,

upon such a request ABN/RBS would seek redemption of its hedge in the reference fund.  *Id.*  As

soon as practicable, the collateral portion of the funds would be returned to XL Portfolio

Limited.  *Id.* §2.6, Settlement Terms.  ABN/RBS allegedly received at least $104.5 million in

redemption payments from Rye Portfolio Limited which was customer property fraudulently

transferred from BLMIS.  PSAC ¶¶ 82, 260.

Because under the terms of the Rye Offshore Swap, all gains from its investment in Rye

Portfolio Limited were to be paid to XL Portfolio Limited, ABN/RBS did not stand to gain from

its investment in Rye Portfolio Limited.  The hedge provided ABN/RBS with less protection in

the event of poor performance by the reference fund.  Specifically, if the reference fund

depreciated, XL Portfolio Limited would bear the first loss only up to the amount of the

collateral, or one-third of the investment. Ex. A, § 2.2, Equity Notional Reset.  ABN/RBS would

bear the remaining risk.  Indeed, the Trustee himself implicitly recognizes that ABN/RBS was

"putting its own funds at risk."  *See* PSAC ¶ 168 (alleging that in the unconsummated Mitsubishi

transaction, ABN/RBS "was attempting to earn additional revenue from the Ponzi scheme

without putting its own funds at risk" as it had in the Rye Swaps).

### D.    The "Rye Onshore Swap" Transaction

The structure of the November 1, 2007 swap was nearly identical.  *Id. ¶* 83.  XL Broad

Market, a Delaware-incorporated company, sought to provide its investors with a return linked to

a three times leveraged exposure to the performance of Rye Broad Market, a BLMIS account

holder.  *Id.* ¶¶  83–84.  It was likewise contemplated that ABN/RBS could hedge its risk by

investing in the reference fund, and ABN/RBS did so.  *Id.* ¶ 84; Ex. B, § 2.2, Equity Notional

Amount.[9]  Upon a request to deleverage by XL Broad Market, ABN/RBS was required to seek

---

[9]  *See Picard v. ABN AMRO Bank (Ir.) Ltd.*, 505 B.R. 135, 146 (S.D.N.Y. 2013) ("Safe Harbor
Decision") ("Although. . . the complaints attempt to portray the decision to request a redemption
as a business judgment independent of the defendants' obligations under the swap agreement . . .,
the underlying swap agreements contemplated that the defendants would invest in the reference

corresponding redemptions from Rye Broad Market. *Id.* In exchange, ABN/RBS received a 0.9%-over LIBOR fee on the leverage it provided. *Id.* at Annex 1, Leverage Spread. XL Broad Market allegedly made an initial collateral payment of $7.5 million and subsequent transfers of $88.3 million in collateral to ABN/RBS with the ability to increase to $125 million. PSAC ¶¶ 83, 264. The Trustee alleges that ABN/RBS received $1.4 million in redemptions from Rye Broad Market. *Id.* ¶¶ 84, 265.[10]

### E.    Due Diligence Related to the Swap Transactions

The Trustee concedes that ABN/RBS conducted due diligence on the BLMIS feeder funds and BLMIS. PSAC ¶¶ 13, 87–94, 96, 105–106, 130–31, 137. In his original Complaint and other prior pleadings, the Trustee also acknowledged that ABN/RBS pursued extensive due diligence into BLMIS feeder funds, including extensive requests for information and documentation from Tremont. Compl. ¶¶ 83, 85-86, 88, 92-93; FAC ¶¶ 161, 167, 173, 178, 187; Prof. All. ¶¶ 56-59. According to the Trustee, the due diligence provided ABN/RBS with "a wealth of information" about Madoff and his feeder funds. Compl. ¶ 98. According to the Trustee's own allegations, eventually ABN/RBS got comfortable with the Rye Swaps through additional due diligence, including reliance on the "regulatory oversight of BLMIS." PSAC ¶ 137 (Tremont directed ABN/RBS to search for Madoff on the SEC or NASD website).

### F.    The Trustee's Allegations

Despite these admissions, the Trustee now contends that ABN/RBS failed to conduct additional due diligence (PSAC ¶¶ 5, 116, 137, 139, 141), alleging that ABN/RBS turned a blind

---

funds to perfectly hedge against their obligations under the swap agreements").

[10] In 2008, ABN/RBS entered into another feeder fund transaction to provide a three times leveraged return on investments in Harley ("Harley Option"). *See also* Ex. C. The Trustee seeks to avoid $21.8 million of redemption transfers from Harley in a separate action. Harley Compl. ¶¶ 55, 63.

eye to five primary "fraud risks" while negotiating the Rye Swaps (*id.* ¶ 7):

- Inability to assess option counterparty creditworthiness (*id.* ¶¶ 7, 95–97);

- The fact that BLMIS served as both custodian and prime broker of investor assets (*id.* ¶¶ 7, 88, 93-94, 97-98);

- In the summer of 2007, a hedge fund advisor relayed to RBS (prior to its acquisition of ABN) that its "general advice to clients has been to redeem Madoff due to lack of transparency" (*id.* ¶¶ 7, 161-67);

- Inability to conduct independent due diligence on Madoff and BLMIS (*i.e.*, lack of transparency) and agreement to a gag provision (*id.* ¶¶ 7, 94, 132-36, 139-40, 169); and

- Returns that did not correlate to the movements of the S&P 100 Index, which ABN/RBS was "well-positioned" to observe as an "industry leader" (*id.* ¶¶ 7, 14, 102-111).

These alleged red flags, along with a number of others scattered through the PSAC (such as Madoff's unusual fee structure and use of a small accounting firm) are boilerplate "hindsight" pleadings, and virtually all have been rejected as a basis for alleging willful blindness of Madoff's fraud, as discussed *infra,* § I(A)(2)(a)(i)-(vi).

## II.    PROCEDURAL HISTORY

### A.    Initial Proceedings in the Bankruptcy Court

On December 8, 2010, after over a year of Rule 2004 discovery, the Trustee commenced the current action, seeking to recover subsequent transfers from the Rye Funds to ABN/RBS. Compl.  The initial complaint included allegations aimed at the good faith requirement of Section 550(b), including allegations attempting to plead lack of good faith under both the "inquiry notice" and "willful blindness" standards.  Compl. ¶¶ 100, 130 (alleging that ABN/RBS was "on inquiry notice of possible fraud at BLMIS" and that ABN/RBS was "motivat[ed] to turn a blind eye to the numerous indicia of illegitimate trading activity and fraud.").  Both ABN/RBS and Rye were named as defendants.  Also in December 2010, the Trustee filed the Tremont Action.  Tremont Compl. ¶¶ 35–39 (naming Rye Funds as defendants).

### B.    Good Faith Decisions and First Amended Complaint

In September 2011 and February 2012, in two related proceedings arising from the

Madoff Securities fraud in the context of a SIPA trusteeship, the District Court (i) held that the

lack of good faith standard requires the transferee to have actual knowledge or be "willfully

blind" to the fraud, *Picard v. Katz*, 462 B.R. 447, 455–56 (S.D.N.Y. 2011); and (ii) noted that a

determination would need to be made as to whether the "allegations in each of the Trustee's

complaints plausibly suggest 'willful blindness.'" *Picard v. Avellino*, 469 B.R. 408, 412

(S.D.N.Y. 2012).

In 2012,[11] the District Court withdrew the reference with respect to this case and

numerous others, to determine "whether SIPA and other securities laws alter the standard the

Trustee must meet in order to show that a defendant did not receive transfers in 'good faith'

under either 11 U.S.C. § 548(c) or 11 U.S.C. § 550(b)." *SIPC v. BLMIS*, 516 B.R. 18, 20

(S.D.N.Y. 2014) ("Good Faith Decision") (citation omitted).  On August 8, 2012, knowing that

the issue of the good faith standard was before the District Court—and following the two

decisions in which the District Court articulated the relevant standard and referenced the

Trustee's pleading burden—the Trustee amended his complaint in this action in an attempt to re-

plead good faith.  *Compare*, *e.g.,* Compl. ¶ 18 *with* FAC ¶ 33 (changing title of section from

"ABN Was On Inquiry Notice . . ." to "ABN/RBS Had Knowledge Of Indicia Of Fraud At

BLMIS. . ."); *see* Oct. 12, 2012 Hearing Tr. at 40:2–3, *SIPC v. BLMIS*, No. 12-mc-0115

(S.D.N.Y. Oct. 22, 2012), ECF. No. 401 (the "Good Faith Hearing Tr.") (Trustee's counsel

stated:  "[With respect to] good faith, the trustee certainly has alleged facts.").

---

[11]  Order at 3–4, *SIPC v. BLMIS*, No. 12-mc-0115 (JSR) (S.D.N.Y.), ECF. No. 197.

C.      **Judge Rakoff's Good Faith Decision in 2014**

After consolidated briefing on the Good Faith Issue, the District Court issued an opinion,

reiterating that consistent with its prior decisions, the Trustee bears the burden of pleading

"particularized allegations that the defendants here either knew of Madoff Securities' fraud or

willfully blinded themselves to it." *Good Faith Decision*, 516 B.R. at 24.  The District Court

stressed that placing the burden on the Trustee to allege actual knowledge of fraud or "willful

blindness" was not unreasonable due to the extensive discovery the Trustee was entitled to under

Rule 2004 prior to filing a complaint, and remanded for further proceedings.  *Id.* at 21-22, 24 n.5.

D.      **Motion for Leave to Amend and Limited Discovery**

In August 2014, the Trustee filed an Omnibus Motion for Leave to Replead Pursuant to

Federal Rule of Civil Procedure 15(a) and Court Order Authorizing Limited Discovery Pursuant

to Federal Rule of Civil Procedure 26(d)(1) (the "Omnibus Motion").  In July 2017 (following

other developments in the case), this Court ordered proceedings "solely on the Good Faith

Limited Discovery Issue" of the Omnibus Motion.  On June 5, 2018, this Court denied the

Trustee's Omnibus Motion for additional discovery.  *SIPC v. BLMIS*, 590 B.R. 200, 208-10

(Bankr. S.D.N.Y. 2018) ("Good Faith Discovery Decision") (noting that "the Rule 2004

subpoenas issued to Defendants years before the law changed sought the same discovery he now

seeks relating to the Defendants' . . . knowledge of illegality . . ").

The Trustee filed a new Motion for Leave to File A Second Amended Complaint on June

10, 2019, attaching the PSAC.  ECF No. 180.  Because the PSAC fails to meet the standard for

pleading willful blindness and otherwise advances no new facts or cognizable legal theory, the

Trustee's Motion should be denied.

11

## LEGAL STANDARD

Leave to amend a complaint should generally be denied where amendment is futile.

*Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008). Proposed amendments

are denied as futile where they "fail to cure prior deficiencies or to state a claim under Rule

12(b)(6)." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 252 (2d Cir. 2017).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Conclusory

assertions or a "formulaic recitation of the elements of a cause of action," will not suffice.

*Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. Pleaded facts that are "consistent with a

defendant's liability, [but] stop[] short of . . . plausibility" are insufficient. *Id*. at 680.

Furthermore, "[a] complaint can be dismissed for failure to state a claim pursuant to . . . an

affirmative defense if the defense appears on the face of the complaint." *Gowan v. Wachovia

Bank, N.A. (In re Dreier, LLP)*, 453 B.R. 499, 515 (Bankr. S.D.N.Y. 2011).

Allegations contradicted by documents incorporated into the pleadings by reference need

not be accepted as true. *Scheidelman v. Henderson*, 423 B.R. 598, 614 (Bankr. N.D.N.Y. 2010).

Finally, the PSAC must be evaluated in conjunction with the Trustee's allegations in the

Proffered Allegations, FAC and Complaint which remain binding party admissions. *See United

States v. GAF Corp.*, 928 F.2d 1253, 1259-60 (2d Cir. 1991) (a pleading, though amended or

withdrawn, nevertheless remains an admission by a party).

## ARGUMENT

Section 550(b) bars the Trustee from recovering because, as alleged in the PSAC, it is

clear that ABN/RBS was a victim of the Madoff fraud, acted in good faith and provided value.

Based on the undisputed structure of the swap agreements alone—*i.e.*, the fact that ABN/RBS

had everything to lose (hundreds of millions of dollars of leverage provided) in exchange for a

relatively insignificant fee (1% *per annum* over LIBOR)—no other conclusion is plausible.

Despite the lack of any plausible economic reason for ABN/RBS to risk hundreds of

millions of dollars of its own capital and the acknowledged fact that ABN/RBS performed

extensive due diligence, the PSAC nevertheless claims that ABN/RBS knew or was willfully

blind to Madoff's fraud.  The PSAC alleges that when ABN/RBS received the collateral and

redemptions under the Rye Swaps, it was armed with public and non-public information that

"should have" raised suspicion about Madoff's wrongdoing, without ever alleging that

ABN/RBS had a high degree of suspicion that BLMIS was not actually trading securities or was

a Ponzi scheme.  These cookie-cutter "red flags" are the same or similar to those that have been

raised and rejected in numerous other Madoff-related actions, including in the recent *BNP* case,

where the defendant was far closer and had greater access to Madoff, and so they cannot be used

to prop up the Trustee's allegations.

The Complaint, FAC, Proffered Allegations and PSAC and documents incorporated

therein plead facts showing that, to the contrary, ABN/RBS believed securities were in fact being

traded, reinforcing the conclusion that the elements of willful blindness cannot be met.  Nor does

the PSAC allege with particularity any actions taken by ABN/RBS employees to ignore learning

more or turn a blind eye, aside from the misleading allegations about the so-called "BLMIS

Fraud Provision."  The Trustee has alleged neither of the required elements of "lack of good

faith."  Given that on its face the PSAC does not plausibly allege that ABN/RBS received the

subsequent transfers pursuant to the Rye Swaps other than for value, allowing amendment here

would be futile.

Finally, the Trustee argues that he should be given leave to amend now because his

revisions reflect an intervening change in the law in 2014.  However, this is belied by the District

Court's statement that the standard has not changed since 2012, and by the fact that in his prior

FAC pleadings the Trustee attempted to meet the current (subjective) legal standard.  Rather than

trying to meet a new standard, the PSAC takes the same facts alleged in the FAC and simply

pads them with argumentative narratives, some of which are blatantly incorrect.  This is not a

reason to grant leave to amend.

I.    SECTION 550(B) BARS THE TRUSTEE'S CLAIMS

The Trustee cannot recover the subsequent transfers to ABN/RBS because ABN/RBS

received those transfers in good faith and provided value. Under the Bankruptcy Code, the

Trustee cannot recover from subsequent transferees "that take[] for value . . ., in good faith, and

without knowledge of the voidability of the transfer avoided."  11 U.S.C. § 550(b)(1).

The Trustee has the burden of pleading a subjective lack of good faith.  *Good Faith*

*Decision*, 516 B.R. at 24 n.4 (stating: "just as SIPA affects the meaning of 'good faith' when a

SIPA proceeding is involved, so too it affects the burden of pleading good faith or its absence.  It

would totally undercut SIPA's twin goals of maintaining marketplace stability and encouraging

investor confidence if a trustee could seek to recover the investors' investments while alleging no

more than that they withdrew proceeds from their facially innocent securities accounts"); *see*

*also Picard v. BNP Paribas, S.A.*, 594 B.R. 167, 196 (Bankr. S.D.N.Y. 2018).  "To satisfy his

burden of pleading a lack of good faith, the Trustee must allege that [ABN/RBS] willfully

blinded itself to facts suggesting a high probability of fraud at BLMIS."  *Id*. at 197 (citing

*Good Faith Decision*, 516 B.R. at 22-23).  Willful blindness consists of two elements: "(1) the

defendant must subjectively  believe that there is a high probability that a fact exists and (2) the

defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances,*

*Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).

14

### A. The Trustee Fails to Plead Willful Blindness Because ABN/RBS Did Not Subjectively Believe in a High Probability of Madoff's Fraud, Nor Can the Trustee Point to Any Acts of Conscious Avoidance.

The first prong of the willful blindness analysis focuses on the subjective beliefs of the specific transferee. *Picard v. Legacy Capital ("Legacy I")*, 548 B.R. 13, 29 (Bankr. S.D.N.Y. 2016). It is not enough to allege that the transferee was on inquiry notice or should have known that there was a high probability of fraud. *See Good Faith Decision*, 516 B.R. at 21 (rejecting the Trustee's "inquiry notice approach."). Nor is it enough to plead that ABN/RBS had knowledge of idiosyncrasies that were well-known characteristics of BLMIS, or even concerns about unspecified "fraud." Instead, lack of good faith in the context of these cases refers to the subjective belief of a defendant that "there was a high probability that BLMIS was not actually trading securities and was, in fact, a Ponzi scheme." *BNP*, 594 B.R. at 204.

### 1. The economic realities make the Trustee's theory implausible.

Where a complaint alleges conduct that is "not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior," it fails to state a plausible claim. *Iqbal*, 556 U.S. at 678. In *BNP*, this Court rejected as implausible the theory that BNP would have "made billions of dollars of risky and possibly uncollectible loans to those investing with BLMIS or BLMIS feeder funds in order to make tens of millions of dollars in fees [and interest] and build its profile." 594 B.R. at 202, 204-05. As in *BNP*, it is "implausible to suggest that [ABN/RBS] would . . . engage in the [swap] transactions described in the [PSAC] if they subjectively believed that there was a high probability that BLMIS was not actually trading securities." 594 B.R. at 204; *see also* Ex. D at 4-5 (it would be "absurd" for any Leverage Provider to "hedge its obligations by buying shares in the very funds it suspects are worthless.").

Here, the Trustee alleges that "dire financial" straights and the desire for "quick returns" were what motivated ABN/RBS to enter swap deals even though it was aware of the high

probability of the loss of hundreds of millions of its own investments in exchange for no Madoff

upside and a relatively modest fee. PSAC ¶¶ 15, 80, 85, 115. Unlike suits against feeder funds

and other financial institutions alleging that defendants ignored warning signs of fraud to reap

substantial profits by channeling customer assets into BLMIS (as is alleged in the PSAC against

Tremont), no such allegation has been or could be made against ABN/RBS in connection with

the Rye Swaps at issue, where it stood to earn just approximately 1% *per annum*-over LIBOR on

the leverage provided. That modest return could not possibly justify ABN/RBS risking hundreds

of millions of dollars if it had any inkling of Madoff's fraud, nor is it plausible that ABN/RBS

would have hedged its investment by re-investing directly into the fraud if it knew it risked

losing so much. *See BNP*, 594 B.R. at 182 (rejecting same profitability arguments made by the

Trustee, where BNP was earning higher fees—1.7%-over LIBOR); *MLSMK Invs. Co. v. JP

Morgan Chase & Co.*, 737 F. Supp. 2d 137, 143-44 (S.D.N.Y. 2010), *aff'd*, 651 F.3d 268 (2d Cir.

2011) ("'[T]he fact that [Defendants] stood to gain . . . by earning fees on ... transactions does

not support an inference of fraudulent intent on the part of the banks. . . . [S]uch generalized

motives, which could be imputed to almost any bank, are not sufficiently concrete for purposes

of inferring fraudulent intent.'").

Because ABN/RBS's actions are far more plausibly explained by lawful behavior

consistent with the economic reality of its transactions, the PSAC fails to present a plausible

factual basis to believe that ABN/RBS received the transfers in anything other than good faith

and without knowledge of their voidability. *See Elendow Fund, LLC v. Rye Select Broad Mkt.

XL Fund*, No. 10 Civ. 9061, 2013 WL 5179064, at *6 (S.D.N.Y. Sept. 16, 2013), *aff'd sub nom.

Elendow Fund, LLC v. Rye Inv. Mgmt.*, 588 F. App'x 27 (2d Cir. 2014) ("[T]he more compelling

inference is that [defendant] recognized that an investment with Madoff presented a combination

of risks and benefits and genuinely chose to continue its relationship with Madoff."); *see also*

16

*BNP*, 594 B.R. at 182 (Trustee failed to plead lack of good faith, despite allegation that "[BNP's]

Fund Derivatives Group" had financial incentives to take on the Madoff exposure because it

"would not have been profitable absent the Madoff-related transactions.")

> 2.    The Trustee fails to allege sufficiently the first prong of willful blindness.

As articulated in the *Good Faith Decision* and in *BNP*, ABN/RBS must have "willfully

blinded [itself] to Madoff's Ponzi scheme" for the transfers to be avoided. *Id.* at 197-98 (citing

*Good Faith Decision*, 516 B.R. at 22-23; *Picard v. Merkin ("Merkin III")*, 563 B.R. 737, 752

(Bankr. S.D.N.Y. 2017)).  Here, the Trustee has failed to allege ABN/RBS's subjective belief

that there was a high probability that BLMIS was not actually trading securities, relying instead

on the kind of red flag hindsight pleading that has been rejected by the Second Circuit[12] and this

Court.  Many of the red flag pleadings lack any facts supporting the Trustee's conclusory

allegations that ABN/RBS recognized or was aware of these red flags.  Moreover, as laid out

below, many of the red flags alleged in the PSAC show the opposite—far from suspecting that

BLMIS was not trading securities, the allegations show that ABN/RBS believed trading was

occurring.  Finally, the allegations against ABN/RBS are weaker than allegations against other

defendants which have been held to be insufficient (such as *BNP*), and the cases cited by the

Trustee are readily distinguishable.

> a)    The Trustee's red flag hindsight pleading is insufficient.

In attempting to plead willful blindness, the PSAC relies heavily on the same type of red

flag, hindsight pleading rejected in a myriad of other Madoff-related lawsuits, and it is likewise

futile here.  As noted in the recent *BNP* decision: "[T]he 'red flag' theory of scienter has been

---

[12] *See Elendow*, 588 F. App'x 27, 29-30 (citations omitted) (noting that Second Circuit has
previously rejected "red flags" as sufficient to plead awareness of fraud).

rejected in Madoff-related securities fraud litigation by numerous courts in the Second Circuit.

Instead, the existence of the red flags supports the more compelling inference that Madoff fooled

the Defendants as he did individual investors, financial institutions and the regulators," including

the SEC and FINRA. *BNP*, 594 B.R. at 198–99 (citations omitted); *see also Legacy I*, 548 B.R.

at 33-34 (citations omitted); *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F.

Supp. 2d 406, 413 (S.D.N.Y.2010), *aff'd*, 487 F. App'x 636, 640 (2d Cir. 2012).

While "[h]indsight is infallible," that is not the relevant inquiry. *See Legacy I*, 548 B.R.

at 33. "For twenty years, Madoff operated this fraud without being discovered and with only a

handful of investors withdrawing their funds as a result of their suspicions. An inference of

scienter based on publicly available red flags is simply not as cogent and compelling as the

opposing inference of nonfraudulent intent." *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 72

(S.D.N.Y. 2010), *aff'd*, 485 F. App'x 461 (2d Cir. 2012). The Trustee has not alleged that

ABN/RBS "connect[ed] the dots in real time" (*see id.*) or held a subjective belief of a high

probability that BLMIS was not actually trading securities (*see BNP*, 594 B.R. at 197-98).

> (i)    The allegation that ABN/RBS knew that BLMIS served as
> both custodian and prime broker of investor assets

The Trustee alleges that ABN/RBS knew that BLMIS was acting simultaneously as the

adviser, prime broker and custodian of the assets, that ABN/RBS employees raised concerns

regarding this "lack of independent oversight," and that Tremont failed to address them. Compl.

¶¶ 72, 120-21; FAC ¶¶ 160-69; PSAC ¶¶ 7, 88, 93-94, 97-98. But the fact that Madoff was both

broker and custodian of BLMIS was commonly known at the time, and has been rejected as

insufficient to show willful blindness. *See BNP*, 594 B.R. at 200 (third-party warning regarding

"BLMIS act[ing] as its own custodian" was a "red flag[] that [was] generally known," and thus

insufficient to allege willful blindness).[13]

Moreover, the allegations against ABN/RBS are much less extensive than those in *BNP* which the Court found insufficient to plead willful blindness. 594 B.R. at 178-185, 197-202. In *BNP*, the Trustee alleged that: (i) BNP knew that BLMIS was serving as both the custodian and investment advisor for Oreades, a fund created by BNP and for which BNP served as the administrator; (ii) this non-independent structure was against BNP's own compliance rules; and (iii) BNP hid this fact in violation of Luxembourg law. *Id.* at 178-79. The scant allegations here regarding ABN/RBS's knowledge of Madoff's roles at BLMIS are certainly not sufficient to support any inference that ABN/RBS suspected a high probability of fraud at BLMIS.

(ii)    The allegation that ABN/RBS was told it could not access Madoff directly and accepted this

The PSAC also alleges that during due diligence for separate transactions that never materialized, ABN/RBS raised concerns regarding BLMIS's lack of transparency and its inability to access Madoff or BLMIS. PSAC ¶¶ 7, 94, 132-36, 169. Even if these allegations were relevant to the Rye Swaps at issue here (they are not, *infra*, § I(A)(2)(d)), "Madoff's secrecy" had a "neutral explanation": "that Madoff had a clever marketing strategy by which [h]e cultivated an aura of success and secrecy surrounding BLMIS." *SEC v. Cohmad Sec. Corp.*, No. 09 Civ. 5680, 2010 WL 363844, at *4 (S.D.N.Y. Feb. 2, 2010) ("That Madoff's secrecy warned defendants of fraud amounts to an argument of 'fraud by hindsight,' which the Second Circuit

---

[13] *See also Elendow*, 2013 WL 5179064, at *2 (allegation that defendant understood "that Madoff was 'self clearing,' meaning that there was no third-party to confirm what trades Madoff was making" did not adequately allege recklessness); *Stephenson*, 700 F. Supp. 2d at 624 ("[a]lthough the Court does see this [—*i.e.*, the dual roles held by Madoff—] as something of a red flag, it is far too mild to support an inference of recklessness"); *Meridian Horizon Fund*, 487 F. App'x at 640-41 (rejecting proposition that "lack of an independent third-party custodian, and BLMIS's dual role as both investment manager and administrator" should have put defendants "on notice of the Madoff fraud").

'has rejected as a basis for [] securities fraud'") (citation omitted); *Saltz*, 782 F. Supp. 2d at 69

("secrecy of [Madoff's] strategy" was insufficient red flag that was "written about in industry

publications at the time").

    The Trustee further alleges that ABN/RBS agreed to a so-called gag provision not to

contact Madoff which was "highly unusual" and evidences willful blindness.  PSAC ¶¶ 139-140;

*see also* Ex. E, § 2.  This is undermined by other allegations in the PSAC which state that two

other leverage-provider banks entered into this same provision with Tremont (PSAC ¶ 213) and

that Tremont told ABN/RBS about at least one other bank, Fortis, that did not require this

personal due diligence on Madoff (FAC ¶ 119).  The Trustee further alleges that ABN/RBS

forewent "a 'critical' aspect of its diligence process" when it accepted that it would not be

allowed to access Madoff directly.  PSAC ¶¶ 7, 132-37.  The Court rejected this argument in

*BNP*, holding that alleged deviations from standard due diligence procedures "do not undercut []

affirmative allegations of due diligence."  594 B.R. at 205.

                    (iii)    The allegation that RBS received advice from an external
                             hedge fund advisor

    The Trustee alleges that in the summer of 2007, Albourne Partners Ltd. ("Albourne"), a

hedge fund advisor, relayed to RBS (not ABN/RBS, then an unrelated company known as ABN

AMRO Bank N.V.) that its "general advice to clients has been to redeem Madoff due to *lack of

transparency*."  PSAC ¶¶ 7, 161-167 (emphasis added).  This is no different from the boilerplate

"red flag" discussed above in Section I(A)(2)(a)(ii), which in no way shows a high level of

suspicion by ABN/RBS that Madoff was not trading securities.  Moreover, allegations of third-

party warnings alone "d[o] not imply a subjective belief."  *BNP*, 594 B.R. at 201-202.

    The Trustee also never alleges that the advice given to RBS was shared with any

ABN/RBS employee prior to ABN/RBS entering into the Rye Onshore Swap in November 2007.

Rather, the Trustee points generally to the acquisition of ABN/RBS by a consortium involving

RBS's parent company (RBS Group) and to the integration of teams, which was not effected until March 2008. PSAC ¶ 167.[14]

    (iv)    The allegation of improbable returns

Though the Trustee summarily alleges that ABN/RBS "realized" that BLMIS's returns were inconsistent with BLMIS's claimed strategy (PSAC ¶ 7), a closer look reveals that the PSAC only alleges that ABN/RBS *should have* known this. The PSAC pleads that as an "industry leader . . . with expertise" who received performance information (*id.* ¶ 102), ABN/RBS was "well-positioned to observe questionable . . . fund returns" (*id.* ¶ 14; *see also id.* ¶¶ 102-111). The District Court has explicitly rejected this type of "should have known" pleading. *Good Faith Decision*, 516 B.R. at 21-22 (reaffirming subjective standard and rejecting objective standard of inquiry notice); *Avellino*, 469 B.R. at 412 (citing *Katz*, 462 B.R. at 455).

Even had the Trustee successfully pled that ABN/RBS knew "BLIMS'[s] returns were impossibly consistent" (PSAC ¶ 30), this red flag was rejected by the Court in *BNP* under more extreme circumstances where there was a third-party warning. *See* 594 B.R. at 181, 200-01, n.16 (third-party warning regarding BLMIS's "impossibly consistent" returns was a "red flag[] that [was] generally known," and thus insufficient to allege willful blindness); *see also Stephenson v. Citgo Grp. Ltd.*, 700 F. Supp. 2d 599, 624 (S.D.N.Y. 2010) (court refused to hold "that success in securities trading is a red flag.").

    (v)    The allegations regarding option counterparties

The Trustee cursorily alleges that ABN/RBS "raised serious concerns" about options

---

[14] *See BNP* 594 B.R. at 200-01 (conclusory, generalized pleadings alleging "[u]pon information and belief" that concerns have been shared, do not suffice); *Legacy I*, 548 B.R. at 31 n.13 (where the individual did not receive the email, and it was not explicitly alleged that he saw it, "information within that email cannot be imputed to [individual] or Legacy"). These allegations are also irrelevant to the Rye Offshore Swap which indisputably predated the merger.

counterparties with Tremont, including its inability to assess creditworthiness of counterparties in over-the-counter ("OTC") options trades.  PSAC ¶¶ 7, 95-97.  A closer look at the PSAC reveals no particularized allegations of "serious concerns;" rather the Trustee alleges that on two occasions, ABN/RBS asked for "*further clarification*" on the issue and wanted "*to know a little more*."  *Id.* ¶¶ 96-97 (emphasis added).  Asking for "clarification" does not come close to showing a suspicion of a high likelihood of fraud.

To the contrary, the Trustee's allegations that ABN/RBS was asking about the "OTC parties with which trading is being done" (*id.* ¶ 97) affirmatively undermine any assertion that ABN/RBS suspected a high likelihood that Madoff was not trading securities.  If ABN/RBS did not believe that option trading was occurring, it would not have asked about counterparty credit risk.  Along these same lines, the allegation that ABN/RBS emailed Tremont for assistance in "identifying the options described in a trade activity report" (*id.* ¶ 130) only supports the fact that ABN/RBS believed option trades were occurring.  *See Elendow*, 2013 WL 5179064 at *5 ("if [defendant] had known, or even strongly suspected, that Madoff was perpetrating a fraud, it would have been peculiar . . . to continue sending Madoff due-diligence questionnaires.").  It is likewise surprising that the Trustee alleges that "[ABN] knew that Madoff was not implementing the SSC Strategy" (PSAC ¶ 111; *see also id.* ¶ 131) when ABN/RBS negotiated accelerated liquidity should BLMIS stop trading pursuant to the SSC Strategy (*id.* ¶ 120; Prof. All. ¶¶ 31-32, 46-47).[15]

The Trustee alleges that in response to one of ABN/RBS's requests for assistance in identifying options in a trade activity report, Tremont referred ABN/RBS to CUSIP codes.

---

[15]  Ex. F, Special Redemption Events for Class D Shares § (d); Ex. G, Special Redemption Events § (d); *see also* Exs. A & B, Index Disruption Events § (e)1.

PSAC ¶ 130.  From this, the Trustee argues that ABN/RBS "willfully blinded itself to this

indicator that BLMIS was not executing the trades it claimed to be executing" because CUSIP

codes do not apply to OTC option trades.  *Id*.  In addition to lacking any particularized pleadings

that ABN/RBS had knowledge of this discrepancy,[16] according to the Trustee's allegations both

Madoff and Tremont gave investors inconsistent information on whether Madoff was trading on

the CBOE and/or OTC[17] and Tremont was doing its best to "cover[] up the truth [regarding

purported options counterparties] with fabrications."  PSAC ¶¶ 221-33.  It is equally if not more

plausible that ABN/RBS thought Madoff was trading both "listed [on-exchange] and OTC

contracts," as set out in one of its emails.  *Id.* ¶ 97.  The Trustee has not come close to alleging

that ABN/RBS was highly suspicious that option trades were not occurring.[18]  *See BNP*, 594 B.R.

at 184-85, 198-99, 201 n.17 (allegations that "there were not enough options in the entire market

to implement the SSC Strategy," that "BLMIS was secretive about identities of counterparties to

its purported [OTC] options trades" and that BNP told HSBC it "was unable to reconcile

[BLMIS] trading statements" insufficient to allege willful blindness).

(vi)    Other red flag allegations

The remaining red flag allegations have all been explicitly rejected by this Court.  For

example, the Trustee's allegation that ABN/RBS "would have expected that BLMIS . . . would

---

[16]  There are no particularized pleadings supporting actual knowledge or suspicion by ABN/RBS.
*Cf.* Compl. ¶¶ 100-08; FAC ¶¶ 172-76, 193-99 (similar allegations, except stating that ABN/RBS
"knew or should have known").

[17]  PSAC ¶¶ 219-220 ("Tremont would flip-flop on the question of whether BLMIS traded
options OTC or . . . on the CBOE . . . may be either listed or OTC"); FAC ¶ 190 ("Once some
customers questioned Madoff whether or not the volume of this options trading under the SSC
Strategy was available on the CBOE, Madoff claimed he was trading options in the OTC
marketplace").

[18]  Even had the Trustee alleged that ABN/RBS was highly suspicious about *options* trades (it
has not), this would not equate to a suspicion of no trading in the underlying basket of stocks.

have been audited by an equally sophisticated auditing firm," not Friehling & Horowitz (PSAC ¶¶ 99-101), has been rejected. *See Saltz*, 782 F. Supp. 2d at 69, 71 (allegation that "[BMIS] was audited by an unknown two man operation" rejected, along with other red flags, because plaintiff pled "no evidence Defendants were aware of most red flags, and those of which Defendants were aware, were not so serious as to infer intent to defraud") (citations omitted); s*ee also Stephenson*, 700 F. Supp. 2d at 624. In addition, the Trustee's "would have expected" language fits squarely within the type of inquiry notice previously rejected by this Court in connection with the good faith standard. *Good Faith Decision*, 516 B.R. at 21-22.

Similarly, allegations regarding BLMIS's unusual fee structure (PSAC ¶¶ 67, 112-113) have been rejected by this Court in *BNP* as public knowledge and hence insufficient to allege willful blindness. 594 B.R. at 178, 180-81, 200 ("BLMIS fail[ure] to charge customary investment management fees" was "generally known" red flag insufficient to allege lack of good faith);[19] *see also Saltz*, 782 F. Supp. 2d at 69, 71 (to the extent defendants were aware of "red flags" such as "Madoff's unusual fee structure," they were "not so serious as to infer intent to defraud.") (citations omitted).

> b)    If anything, the red flag and due diligence allegations in the PSAC show that ABN/RBS thought trades were occurring.

As noted in Section I(A)(2)(a)(v), certain of the red flags alleged in the PSAC *disprove* the Trustee's theory and, in fact, show the opposite—*i.e.*, that ABN/RBS believed trading was actually occurring. Likewise, far from a subjective belief of a high probability that BLMIS was not trading securities, allegations regarding the due diligence performed by ABN/RBS and

---

[19]  This was the case even though BNP directly benefitted from delegation to Madoff who did not charge fees, as this allowed BNP subsidiaries to charge these fees without disclosing to investors that it was not performing corresponding services. *Id.* at 178. There is no comparable allegation here. *Cf.* PSAC ¶ 114.

documentation received from Tremont reinforce that ABN/RBS thought trades were occurring—namely, ABN/RBS: (i) received "performance reports" and "performance summaries" stating the "assets under management for each fund" (PSAC ¶¶ 91, 105-06; *see also id.* ¶ 192); and (ii) "trade activity reports and monthly statements" which purported to show actual options trading (*id.* ¶ 130). There are no allegations that show that ABN/RBS believed anything to the contrary. *See BNP*, 594 B.R. at 199 (pointing out that question by BNP employee "clearly shows that [he] did not question whether BLMIS was actually trading securities—he was satisfied that it was.")[20].

> c)    The allegations in the PSAC are weaker than the allegations against BNP which were recently held to be insufficient, and the cases cited by the Trustee are readily distinguishable.

The allegations regarding ABN/RBS's knowledge are significantly weaker than the allegations against BNP which this Court recently held to be insufficient to allege lack of good faith. Though BNP and ABN/RBS were both leverage providers to BLMIS feeder funds and their investors, BNP had far more direct involvement with and greater access to Madoff and also had greater clarity as to BLMIS's regulatory status:

- The Trustee alleged that BNP entered into at least eleven separate transactions or investments with the feeder funds, BLMIS, and/or directly with Madoff over a 20-year period and that BNP had the opportunity to conduct due diligence of Madoff at his offices twice, whereas there are no comparable allegation here. *Compare, id.* at 177, 181 *with* PSAC ¶¶ 3, 7, 80-84, 134-36; Harley Prof. All. ¶ 9 (no alleged 20-year relationship, no opportunity to conduct direct due diligence on Madoff).

- BNP allegedly knew that "BLMIS was not registered as an investment advisor with the SEC in violation of U.S. securities laws" (*BNP*, 594 B.R. at 179 n.4), whereas ABN/RBS "rel[ied] on regulatory oversight of BLMIS" including the SEC and NASD (PSAC ¶ 137).

The cases where the Court has found that the Trustee sufficiently alleged willful

---

[20] *Cf. In re Optimal U.S. Litig.*, No. 10 Civ. 4095, 2011 WL 4908745, at *8 (S.D.N.Y. Oct. 14, 2011) (allegations of internal report flagging "inability to verify actual trading activity" went to "heart of Madoff's Ponzi scheme" and "existence of the assets supposedly held by Madoff").

blindness are clearly distinct because all involved explicit knowledge or suspicion of the Madoff

Ponzi scheme.  In *Picard v. Merkin* ("*Merkin II*"), the Trustee alleged that the defendant was

aware of "some probability" that BLMIS was a Ponzi scheme based on, among other things,

specific statements that Merkin made to Madoff and others.  515 B.R. 117, 140-41 (Bankr.

S.D.N.Y. 2014) (evidence that Merkin "openly admitted that Madoff appeared to be operating a

Ponzi scheme," that Madoff's scheme was bigger than Ponzi, and that "'Charles Ponze [sic]

would lose out because it would be called the 'Madoff Scheme,'" and advised Research

Company A of the dangers of investing significant amounts for the long term with BLMIS"); *see*

*also Merkin III*, 563 B.R. at 749 & n.34 (Bankr. S.D.N.Y. 2017) (same).

Similarly, as discussed in Section I(A)(3), in *Katz* the Court found that the Trustee had

sufficiently pled willful blindness where hand-written notes to the "one-of-a-kind" insurance

policy at issue specified that the coverage would include a "(Ponzie) [sic]" scheme and

"[i]nsolvency for whatever reason."  *Picard v. Katz*, No. 10-05287, Doc. No. 34 (Bankr.

S.D.N.Y. Mar. 18, 2011) ("*Katz* Am. Compl." or Ex. H), ¶ 947; *see also* 462 B.R. at 455 (citing

*Katz* Am. Compl.).  These explicit references by defendants to the possibility of a Ponzi scheme

demonstrated a level of suspicion regarding Madoff's business that is not present in the

allegations against ABN/RBS.

*Merkin II* and *Katz* are further distinguishable because the defendants in those cases were

much closer to Madoff and had economic incentives directly linked to the profitability of

Madoff's funds.  For example, in *Merkin II*: (i) Madoff and Merkin had a "close business and

personal relationship[,]" including Madoff attending bar and bat mitzvahs of Merkin's children,

(515 B.R. at 128) and (ii) the Merkin defendants "earned substantial management and incentive

fees keyed to . . . the fictitious profits generated by BLMIS . . . and [t]hese substantial fees can

explain why they would turn a blind eye to a fraud" (*id.* at 143).  And in *Katz*, the defendants: (i)

26

had a quarter-century "deep personal relationship" with Madoff, including sharing personal and

social occasions (*Katz* Am. Compl. ¶¶ 732-41); and (ii) opened and administered 483 BLMIS

accounts for themselves, family, friends, and business associates and utilized BLMIS for "short-

term cash management," making them "collectively one of the largest beneficiaries of Madoff's

fraud, reaping hundreds of millions in fictitious profits over their quarter-century relationship

with Madoff" (*id.* ¶¶ 2, 4, 782).   Unlike the *Merkin II* and *Katz* defendants, ABN/RBS had far

less access to information and exposure to suspicious conduct and was an indirect investor that

never even met with Madoff.   Most importantly, ABN/RBS had *no* economic incentive to invest

or remain invested in Madoff had it suspected that there was a high probability that Madoff was

not executing trades and indeed was a net loser when the Madoff fraud imploded.[21]

> d)    The allegations regarding the Vista and Fairfield/Mitsubishi
> transactions do not establish willful blindness and are irrelevant.

The Trustee's reliance on allegations relating to Vista and Fairfield, two unrelated non-

swap investments that never materialized, only highlights the dearth of evidence relating to the

transactions at issue here—the Rye Swaps.   The Trustee alleges that during due diligence into a

potential transaction with Vista, an entirely separate fund, ABN/RBS was told that it would be

unable to meet with Madoff in person.   *See* PSAC ¶¶ 132-36; FAC ¶¶ 118-21, Compl. ¶¶ 78-81.

Even if the Vista due diligence was in some way related to the Rye Swaps (it is not), as set out in

---

[21]   *See also, cf. Picard v. Magnify, Inc.*, 583 B.R. 829 (Bankr. S.D.N.Y. 2018) (over a twenty-
five year period, defendants netted nearly $150 million, founder of the fund was a long-time
customer and social acquaintance of Madoff, and individual who later ran the fund had closed-
door meetings with Madoff two to three times a year to agree on the rate of return, showing that
defendants had actual knowledge that financial information was being manipulated to achieve
predetermined results); *Picard v. Kingate*, No. 08 Civ. 99000, 2015 WL 4734749, at *3-4
(Bankr. S.D.N.Y. Aug. 11, 2015) (fund creators were "part of Madoff's inner circle," met with
Madoff at least twice a year including on off-limits 17th floor, and had close to 300 telephone
calls with BLMIS in the 2004 to 2008 period).

Section I(A)(2)(a)(ii), "Madoff's secrecy" is a boilerplate red flag.

The PSAC points to events that postdated the Rye Swaps—namely, due diligence performed in 2008 on an entirely distinct fund manager, Fairfield Sentry, involving a proposed investment by a third-party client, Mitsubishi Securities, facilitated by ABN. PSAC ¶¶ 167-69. The PSAC alleges that ABN/RBS was aware of Mitsubishi's concern that it could not secure a meeting with Madoff and that this constituted a "significant indicator of fraud." *Id.* ¶ 169. This fails for the same reason as the Vista allegations and also because any alleged knowledge postdates the relevant Rye Swaps.[22]

> e)      The Trustee does not plead that any ABN/RBS employee possessed the requisite knowledge.

The Trustee has not pled that any individual ABN/RBS employee possessed the requisite knowledge.[23] Instead, throughout the PSAC the Trustee summarily alleges that the corporate entity "ABN" or "Defendant" had knowledge. *See, e.g.*, PSAC ¶ 168 ("*Defendant* also was warned about Madoff's lack of transparency"); *id.* ¶ 97 ("*Defendant* acknowledged that it entered into the 2006 Leverage Transaction despite Tremont failing to address the important concerns it raised . . . "); *id.* ¶ 129 ("*Defendant* continued to see and appreciate indicia of fraud") (emphasis

---

[22] The PSAC alleges that ABN/RBS made redemptions starting in July 2008 due to "discomfort with Madoff" but ignores the fact that redemptions were made pursuant to the requests of the leverage funds to downsize the swaps. *Compare* PSAC ¶ 170, *with* FAC ¶¶ 79-81, 94-96. Nor does this square with ABN/RBS's entering the Harley Option in February 2008 or the allegation that in September 2008 ABN/RBS stated that it "love[s] the Madoff trade." PSAC ¶ 168.

[23] "To prove liability against a corporation, . . . a plaintiff must prove that an agent of the corporation"—*i.e.*, an individual officer or employee, "committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (internal citation omitted). At the pleading stage, the typical way "to raise such an inference for a corporate defendant" is to plead that an individual employee had the requisite scienter. *Id. See Merkin II*, 515 B.R. at 143 (noting that "scienter is a 'mental state embracing intent to deceive, manipulate, or defraud'" and applying scienter standard from securities fraud context to lack of good faith analysis).

added to each example).  This, however, is legally insufficient for purposes of pleading the

requisite scienter.  *See Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 775–76 (S.D.N.Y. 2019)

(granting dismissal where plaintiff failed to identify "any individual whose scienter may be

imputed to [the corporation]").

     In the instances where individuals are named in the PSAC, the allegations relate to

communications that occurred months (and sometimes years) apart and entirely lack any

particularized facts that a specific employee or employees at ABN/RBS suspected—much less

subjectively believed in a high probability—that BLMIS was a Ponzi scheme when entering into

the Rye Swaps at issue here.  *See In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16 Civ.

3495, 2017 WL 4049253, at *8 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala v. Deutsche

Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) (conclusory statements that individuals

"were aware" or "would have" or "should have" had knowledge is insufficient to allege

scienter).  To the contrary, many of these allegations demonstrate that specific ABN/RBS

employees were appropriately conducting due diligence and asking questions.  *See, e.g.*, PSAC ¶

88 (asking for clarification as to how the "'single strategy fund'" would function); *id.* ¶ 96

(arranging a call to discuss "further clarification on the [BLMIS] OTC options").

     3.    <u>The PSAC's allegations establish that ABN/RBS did not blind itself to
Madoff's fraud.</u>

     Even if the Trustee had alleged that ABN/RBS subjectively believed that there was a high

probability that Madoff was running a Ponzi scheme (it does not), the Trustee must still plead

that ABN/RBS took "deliberate actions to avoid learning of that fact." *Global-Tech*, 563 U.S. at

769.  The Trustee points to only one action taken by ABN/RBS in support of its conscious

avoidance argument—negotiating a special share class and the MAE SRE (*i.e.*, the alleged

"BLMIS Fraud Provision").  Mot. at 27-30.  As set out below, the MAE SRE and share class

were not an attempt by ABN/RBS to avoid learning information; rather, it constituted a good

faith commercial negotiation of a provision to expedite the unwinding of ABN/RBS's hedge upon the occurrence of a material negative event.

Far from turning a blind eye, as in *BNP*, "the [] correspondence and other allegations show that" ABN/RBS exercised its best efforts to "engage[] in ongoing due diligence and received repeated confirmations that the transactions were real" from the Rye Funds in which it was investing. 594 B.R. at 205. Per the Trustee's allegations, Tremont did everything in its power to provide a false sense of comfort to parties performing due diligence on BLMIS. PSAC ¶¶ 96, 98, 137, 139. ABN/RBS engaged its best efforts, conducted extensive due diligence including into the regulatory requirements to which BLMIS was subject (and took comfort in them), and should not be penalized for the deceptive acts of both BLMIS and Tremont that served as a roadblock to ABN/RBS discovering the truth. *BNP*, 594 B.R. at 205 (pleadings failed to allege that BNP turned a blind eye where BNP "engaged in ongoing due diligence").

a)    The allegations regarding the so-called "BLMIS Fraud Provision" fail because the facts are mischaracterized and the legal precedent cited is inapposite.

The Trustee's allegations regarding the so-called "BLMIS Fraud Provision," which appear in a 34-paragraph addition to the PSAC (¶¶ 6-8, 115–25, 141–60), are a last-ditch attempt to salvage a complaint that otherwise fails sufficiently to allege willful blindness. The Trustee argues that the MAE SRE provision was "a way [for ABN/RBS] to enter into the Leverage Transactions, earn millions of dollars in fees and at the same time protect its investment in the Rye Funds from the fraud it suspected at BLMIS." *See* Mot. at 28–29. This argument fails because: (i) the MAE SRE provided no such protection; (ii) the numerous pages of allegations and briefing regarding the so-called "BLMIS Fraud Provision" are replete with misstatements of fact that are at odds with both the Trustee's own prior allegations and the underlying documents; and (iii) the allegations here bear no resemblance to those in *Katz*.

30

In all three swap and/or option agreements that ABN/RBS entered into with BLMIS

feeder funds (Rye Offshore Swap, Rye Onshore Swap, Harley Option), there was a provision

allowing ABN/RBS to terminate the swap/option in the event of any material "action, suit,

proceeding, inquiry or investigation" against the funds, BLMIS or Madoff.[24]  This would leave

ABN/RBS exposed, however, until it could unwind the corresponding hedge in the underlying

reference fund.  According to the Trustee's allegations, in 2006, ABN/RBS proposed a "standard

enhanced liquidity provision[]," providing that upon the occurrence of an "action, suit,

proceeding, inquiry or investigation" against BLMIS, ABN/RBS be allowed to request a

redemption of its limited partnership interest in the Rye Offshore reference fund with 5 days'

notice instead of 36.  PSAC ¶¶ 119-20.  Per the PSAC, ABN/RBS believed this provision to be

uncontroversial (Compl. ¶ 61), but it was rejected by Tremont.  PSAC ¶ 122-23; *cf.* Mot. at 10

(arguing counter to the pleadings that MAE SRE "was a highly irregular provision").

The Trustee alleges that in 2007, while negotiating provision of a greater amount of

leverage under the Rye Onshore Swap, ABN/RBS once again proposed accelerated liquidity.

PSAC ¶ 144.  Eventually the parties agreed upon the following MAE SRE provision:

> If the Manager [BLMIS] becomes the subject of a formal investigation by a U.S. court,
> governmental or regulatory body or agency related to a specific breach of a U.S.
> securities law or regulation and the effect of such a breach would, as reasonably
> determined by the Calculation Agent [ABN], have a material adverse effect on the
> Manager and its ability to conduct its investment management business, the Limited
> Partner may reduce its investment by 33%.

Ex. G, Special Redemption Events § (g).  The hedge for the 2006 swap was allegedly amended

to include a similar provision.  *See* PSAC ¶¶ 159-60.

The Trustee alleges that the MAE SRE provision evidences willful blindness in that it

---

[24] *See* Exs. A & B, Index Disruption Events (c); Ex. C, Reference Fund Events (iii).

was negotiated to protect ABN/RBS in the event that Madoff engaged in fraud or a Ponzi scheme by granting ABN/RBS "a right-to-redeem priority" "ahead of ***all other investors*** . . ." that "would enable [ABN/RBS] to redeem its ***entire investment*** with the Rye funds." *See id.* ¶¶ 5, 6, 116, 119 121, 141, 144, 151, 158 (emphasis added). This description is simply wrong. Rather than guaranteeing redemption of ABN/RBS's "entire investment," were the MAE SRE to be triggered, ABN/RBS would be entitled to liquidate *one third* of "ABN's *pro rata share* of all assets held by the Fund" upon 5 days' notice, instead of 30. *Id.* ¶ 119 (emphasis added); Ex. I, § 7.03(a), Optional Withdrawals from Capital Accounts; Ex. G, Enhanced Liquidity (upon the occurrence of an SRE, redemption is "equal to the Net Asset Value of the limited partnership interests on the corresponding Withdrawal Date."). If Madoff turned out to be a Ponzi scheme (as it did) rendering the limited partnership interests worthless, ABN/RBS would be left without recourse for recovery—exactly what occurred here.

There was also no "priority over *all other investors*." PSAC ¶ 121. According to the Trustee's own allegations, Fortis, another leverage provider, received the same early redemption right as ABN/RBS through a most favored nation clause.[25] If there were other investors, ABN/RBS would still only be entitled to its *pro rata* share of the assets of the fund at the time of withdrawal/redemption; other limited partners would retain their pro rata share.

The Trustee points to ABN/RBS's renewed negotiations for the MAE SRE in 2007 as evidence of ABN/RBS's growing suspicions of the Madoff fraud. PSAC ¶¶ 141-48. The Trustee further alleges that as of 2007, ABN/RBS made the MAE SRE a "requirement" for "Madoff risk" and "would not enter into another leverage deal with a BLMIS feeder fund

---

[25] ABN Ir. Action, the Proposed Second Amended Complaint ("ABN Ir. PSAC"), ECF No. 166-1, ¶¶ 192, 211-214; Memo. of Law in Opp. To the Trustee's Mot. for Leave to File Second Am. Compl., ECF No. 169 at 9–10, 31 & n.37 (citing to ABN Ir. PSAC ¶¶ 211-13).

without it."  Mot. at 2; PSAC ¶¶ 156-57.  This theory is belied by the fact that per the Trustee's

own allegations, ABN/RBS's subscription in Harley in 2008 (pursuant to the Harley Option) did

not include an MAE SRE.  Harley Prof. All. ¶ 18 (ABN/RBS only "successfully negotiated

[MAE SRE] for its investment in two Tremont-managed BLMIS Feeder Funds," but not Harley).

While the Trustee invented the name "BLMIS Fraud Provision" in this last pleading

iteration (*see* PSAC ¶120),[26] the MAE SRE is in line with the other types of Special Redemption

Events that would materially affect the functioning of the portfolio, such as a change in the

investment strategy or the Manager of the fund.  Ex. G, Special Redemption Events §§ (b), (d).

It grants ABN/RBS greater expedience in exiting a portion of its investment in the event that

"[any investigation] would have a *material adverse effect*" on the ability of the manager "to

conduct its investment management business."  *Id.*, Special Redemption Events § (g).

The Trustee's attempt to analogize this case to inapposite precedent—*i.e.*, *Katz*—fails.  In

*Katz,* the Court found that the Trustee had plausibly alleged that defendants willfully blinded

themselves to Madoff's fraud because "they felt they could realize substantial short-term profits

while protecting themselves against the long-term risk."  462 B.R. at 454.  The Court pointed to

allegations that the defendants created their own hedge fund in 2002 and moved half of their

liquid assets out of BLMIS and into that hedge fund by 2008 (equivalent to hundreds of millions

of dollars) and seriously considered purchasing specialized "one-of-a-kind" insurance with

respect to their investments in BLMIS, "at least partly to limit their exposure in Madoff

---

[26]  There is no mention of the word "fraud" in the SRE itself, and it was more properly
characterized in the Trustee's prior pleadings.  *See* Harley Prof. All. ¶18 (referring to "special
redemption rights"); Compl. ¶86 (referring to the fact that ABN/RBS also required a "special
redemption event"); PSAC ¶122 (email from ABN/RBS regarding SRE references "risk"
generally).  This label appears to be based on an internal Tremont email that sheds no light on
ABN/RBS's scienter.  *Id.* ¶ 146 (citing internal Tremont email).

Securities." *Katz* Am. Compl., ¶¶ 702–710, 941–948; *Katz*, 462 B.R. at 455 (citing *Katz* Am. Compl.).  In hand-written notes, the defendants specified that the insurance coverage would include a "Ponzie [sic] scheme" or "insolvency for whatever reason."  *Katz* Am. Compl. ¶ 947.

Unlike *Katz*, ABN/RBS invested in a BLMIS feeder fund to hedge its exposure—the opposite of removing money from Madoff to limit exposure.  Whereas the *Katz* defendants explicitly contemplated that the "one-of-a-kind" insurance provision would provide them with full reimbursement/recovery if Madoff turned out to be a Ponzi scheme or otherwise insolvent, the MAE SRE simply allowed ABN/RBS to partially redeem its pro rata share of the assets in the referenced fund earlier than otherwise, and provided no protection in a situation where there were no assets to redeem, as occurred here.

In sum, the Trustee mischaracterizes the nature of the MAE SRE negotiated by ABN/RBS and misleadingly analogizes it to the "one-of-a-kind" insurance in *Katz*.  The MAE SRE provision was not designed to and did not protect ABN/RBS from Madoff's Ponzi scheme.[27]  The Trustee's 34 new paragraphs of allegations regarding the MAE SRE do not establish willful blindness.

> b)      According to the Trustee's own allegations, ABN/RBS performed extensive due diligence, only to be stymied by Tremont.

ABN/RBS was not a direct investor in BLMIS and had no direct access to its internal practices.  The Rye entities with which ABN/RBS entered into the swap agreements and hedges were separate entities managed by an entirely distinct entity, Tremont.  PSAC ¶¶ 20-21.  As the

---

[27] Even if ABN/RBS had entered into the MAE SRE to "protect itself," that cannot be equated with willful blindness to the fact that Madoff was a Ponzi scheme.  *See BNP*, 594 B.R. at 182, 202 n.19 (Trustee's allegations that BNP entered into an option agreement with HSBC to partially hedge its BLMIS exposure for up to $90 million "to protect itself in the event of BLMIS's failure" were insufficient to allege willful blindness, because hedging is not unusual).

Trustee concedes, ABN/RBS conducted due diligence on both Tremont and BLMIS.  PSAC ¶ 13.

While the Trustee argues that ABN/RBS's due diligence on BLMIS was "minimal" (*id.*

¶¶ 5, 13) and that ABN/RBS "ceased its due diligence and never received answers to its critical

concerns" (Mot. at 30), this stands in stark contrast to other allegations, including in the original

Complaint and other prior pleadings, in which the Trustee acknowledges that ABN/RBS engaged

in extensive due diligence into BLMIS, including extensive requests for information and

documentation from Tremont.  *Compare* FAC ¶ 33 *with* PSAC ¶ 13 (adding "minimal" to nearly

identical allegation regarding due diligence); *see also* Compl. ¶¶ 83, 85-86, 88, 92-93; FAC ¶¶

161, 167, 173, 178, 187; PSAC ¶¶ 97, 148, 156, 161-164.  According to the Trustee, the due

diligence provided ABN/RBS with "a wealth of information" about Madoff and BLMIS.

Compl. ¶ 98.  The Trustee further recognized that following such due diligence, ABN/RBS got

comfortable with the decision to enter into the Rye Swaps "by relying on regulatory oversight of

BLMIS."  PSAC ¶ 137.

If anything, the Trustee has alleged that Tremont misled its investors using evasive

tactics.  *Id.* ("Even though the SEC *did* investigate BLMIS in late 2005 and into 2006, Tremont

refused to make any representations [in response to ABN/RBS's query] regarding 'the scope or

frequency of inspections by U.S. regulatory agencies.'"); *see also id.* ¶¶ 62, 217-33 ("*Tremont*

*Avoided Questions.* . . [and] sought to hide the issues and evidence from investors through

deflection and fabrication," such as by "flip flop[ping]" or "equivocat[ing]" on "the question of

whether BLMIS traded options OTC or . . . on the CBOE" and telling investors that Tremont

knew who the option counterparties were even though they did not); *id.* ¶ 207 ("after Madoff's

arrest, the SEC investigated Tremont").  Thus *despite* ABN/RBS's best efforts to perform due

diligence on Tremont and BLMIS, it was thwarted by Tremont.

**B.**    **This Court Was Correct in Holding that the Trustee Must Allege Suspicion of a Ponzi Scheme or that Madoff Was Not Trading Securities.**

In *BNP*, this Court held that to plead lack of good faith, the Trustee must allege a defendant's suspicion of a high probability that BLMIS was a *Ponzi scheme*, or *was not trading securities*. 594 B.R. at 198, 204. The Trustee has asserted that the Court was wrong—a suspicion as to any type of fraud by Madoff or BLMIS will do.[28]

The standard articulated by this Court in *BNP* follows the weight of authority in this Circuit regarding avoidance of transfers in the bankruptcy context. "The 'fraud' that is relevant in considering the 'good faith' defense is the alleged fraud upon which the [] fraudulent transfer claim is based—namely, a fraud aimed at . . . 'delay[ing], hinder[ing], or defraud[ing] creditors of the debtor'"—which occurs when a debtor is insolvent or unable to repay creditors. *In re Direct Access Partners, LLC*, No. 15-11259, 2017 WL 6333926, at *2 (Bankr. S.D.N.Y. Dec. 11, 2017) (citation omitted). It is insufficient for the Trustee to allege that a transferee suspected that "[BLMIS's] activities in general might be fraudulent." *See In re Bayou Grp., LLC*, 439 B.R. 284, 311, 314–15 (S.D.N.Y. 2010) (collecting cases); *see also Direct Access*, 2017 WL 6333926, at *2 (knowledge of debtor's FCPA and Travel Act violations was not equivalent to knowledge of a fraud on the creditors for purposes of "good faith" inquiry).[29]

For the same reasons, the Trustee has failed to plead "knowledge of voidability." *See BNP*, 594 B.R. at 198 (citing *Legacy I*, 548 B.R. at 38-39) ("lack of good faith" can be

---

[28] *Picard v. ABN ABRO Bank (Ir.), Ltd.*, Adv. Pro. No. 10-05355 (Bankr. S.D.N.Y.) ("ABN Ir. Action"), ECF No. 179 ("Reply Mem.") at 3-5.

[29] Even were this Court to agree with the Trustee's argument that any type of fraud would suffice, the PSAC does not allege that ABN/RBS was suspicious of a high probability of any type of fraud, *supra* § I(A)(2)(a)(i)-(v) (alleged red flags do not show suspicion of high probability of fraud).

considered synonymous with "knowledge of voidability").[30]

## II.    §550(B) BARS THE TRUSTEE'S CLAIMS BECAUSE ABN/RBS PROVIDED VALUE FOR THE TRANSFERS AT ISSUE

The "value" inquiry "looks to what the transferee gave up rather than what the transferor received." *BNP*, 594 B.R. at 206 (citations omitted). "Mere[] consideration sufficient to support a simple contract" suffices. *Id.*; *see also* 5 Collier on Bankruptcy ¶ 550.03[1] (16th ed. 2019).

There can be no dispute that ABN/RBS provided value for the transfers at issue. In the Rye Swaps, ABN/RBS obligated itself to provide three times the returns of the underlying collateral investment—giving the leverage funds the synthetic investments they desired—in exchange for a set fee. PSAC ¶ 78. Each of the collateral and redemption transfers occurred pursuant to the swap agreements (Exs. A & B, §2.2, Equity Notional Amount), at the requests of the leverage funds to either upsize or downsize the swap, an ability they exercised repeatedly (*see, e.g.*, PSAC ¶ 126; FAC ¶¶ 79-81, 94-96). *See also Safe Harbor Decision*, 505 B.R. at 147-48 (holding that both redemption and collateral transfers "were related to, and therefore made in connection with, the underlying swap agreements"). Based on the Trustee's allegations and the swap agreements referenced therein, all of the transfers which the Trustee seeks to claw back from ABN/RBS were for value. *BNP*, 594 B.R. at 202 (indicating that subsequent transfers "related to leverage transactions in which [BNP] . . . provided structured products," would be considered "for value.").[31] *Accord* 11 U.S.C. § 548(d)(2)(D) ("a swap participant or financial

---

[30]  *See also Legacy I*, 548 B.R. at 38-39 (holding Trustee had failed to plead knowledge of voidability where neither of the defendants "knew that BLMIS was *not actually trading securities*.") (emphasis added).

[31]  Unlike *BNP*, here the PSAC alleges that every one of the Trustee's clawback claims relates to collateral or redemption transfers made pursuant to the Rye Swaps. *Compare id.* at 206–07 ("determination cannot be made from the four corners of the [pleadings]" because the complaint did not delineate between transfers relating to leverage transactions and other transfers related to

participant that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer.").

Even viewed in isolation, both the redemption and collateral transfers were clearly made "for value." The collateral was provided to secure "leverage" from ABN/RBS (*see* FAC ¶¶ 71, 85, noting similarities to "a traditional loan") that was to be invested in the reference fund, and that leverage constitutes "consideration" or "value." 11 U.S.C. § 550(b)(1) (providing that "value" includes "satisfaction or *securing* of a present or antecedent debt") (emphasis added); *see also In re N. Merch., Inc.*, 371 F.3d 1056, 1059 (9th Cir. 2004) (debtor who provided security interest in exchange for a loan had received value under 11 U.S.C. § 548(c)).

With respect to the redemptions, this Court has repeatedly held that a return of principal is "for value."[32] The Trustee cannot dispute that ABN/RBS's investment hedges vastly outweigh the value of ABN/RBS's alleged redemptions. *See* PSAC ¶ 172 (alleging that ABN/RBS invested approximately $679.1 million of its own money into the reference funds as hedges against its exposure under the Rye Swaps, and redeemed just $105.8 million).[33] Thus, the

---

a BLMIS account that BNP held on its own behalf), *and Merkin II*, 515 B.R. at 152 (rejecting "net loser" argument where it "[was] not supported by the pleadings"), *with* PSAC ¶¶ 256–66 (collateral and redemption transfers all relate to Rye Swaps). *See also In re Dreier, LLP*, 453 B.R. at 515 (complaint can be dismissed for failure to state a claim pursuant to affirmative defense if it appears on the face of the complaint).

[32] *See Merkin III*, 563 B.R. at 749 ("[h]ere, Ascot Partners gave 'value' because the Transfers constituted the return of principal."); *Katz*, 462 B.R. at 453 ("It is clear that the principal invested by any of Madoff s customers 'gave value to the debtor,' and therefore may not be recovered by the Trustee absent bad faith."); *Picard v. Kingate*, No. 09 Civ. 01161, 2019 WL 1055958, at *2 (Bankr. S.D.N.Y. Mar. 5, 2019) ("Kingate Funds gave 'value' because they were net losers; they withdrew their own deposits."). *Cf. Picard v. Legacy ("Legacy II")*, No. 10 Civ. 05286, 2019 WL 2593008, at *12 (Bankr. S.D.N.Y. June 25, 2019) ("a transferee in a Ponzi scheme does not give value beyond his deposit of principal") (citing cases).

[33] Not included in the above calculus is one-third of each redemption, which was collateral that was returned to the leverage funds pursuant to the swap agreements, making ABN/RBS's losses

complaint acknowledges a $573.2 million net loss on the part of ABN/RBS (PSAC ¶ 172) and

any redemptions were "for value" because they constituted a return of ABN/RBS's principal.

Moreover, a redemption of shares or membership interests have been held to be "for value," and

as such, ABN/RBS's redemption of partnership interests in the reference funds was for value.[34]

**III.    THERE HAS BEEN NO INTERVENING CHANGE IN PLEADING STANDARDS**

The Trustee argues that the District Court's 2014 *Good Faith Decision* constituted "[a]n

intervening change in pleading standards" that justifies leave to amend.  Mot. at 20-21.  He

claims that the *Good Faith Decision* (i) "substantially altered" the good faith standard; and (ii)

shifted the burden, so he should be given a chance to fix allegations that he made in reliance on

an old standard.  *Id.*  The Trustee's Motion misconstrues the procedural history of this case and

his prior litigation approach and his "assertion of prejudice due to the change in law is not

entirely credible."  *See Good Faith Discovery Decision*, 590 B.R. at 209 n.12.

The District Court has already stated that the good faith standard remained unaltered

following two seminal good faith cases in 2011 and early 2012 that predate the operative FAC:

> In a fashion that the Court has learned is typical of the Trustee's litigation strategy, the
> Trustee here seeks to litigate once again the issue of whether "good faith" should be
> judged by a subjective standard of willful blindness or by an objective standard of inquiry

---

even greater.  *See* Exs. A & B, §2.2, Equity Notional Amount.

[34]    *See Buchwald Capital Advisors, LLC v. Papas*, 584 B.R. 161, 178–79 (E.D. Mich. 2018)
(wire transfers to LLC members in exchange for redemption of membership interests were "for
value"); *In re Commercial Loan Corp.*, 396 B.R. 730, 744 (Bankr. N.D. Ill. 2008) (giving up
stock in exchange for payment established a prima facie case of "value"); *In re Brooke Corp.*,
515 B.R. 632, 642 (Bankr. D. Kan. 2014) (surrendering stock for redemption, even if the
company is insolvent, is an exchange for value); *Jobin v. McKay (In re M & L Bus. Mach. Co.,
Inc.)*, 84 F.3d 1330, 1341 (10th Cir. 1996) (investor in Ponzi scheme gave equivalent value for
his redemption payments because he had a claim against the debtor for restitution, and the
redemption of shares reduced the amount of his restitution claim).  *Cf. Boyer v. Crown Stock
Distrib., Inc.*, 587 F.3d 787, 796 (7th Cir. 2009) *and Hayes v. Palm Seedlings Partners-A (In re
Agric. Research & Tech. Grp., Inc.)*, 916 F.2d 528, 540 (9th Cir. 1990) (distributions of profits
on account of equity interests are not for value).

notice.  But nothing in the intervening time has changed the analysis and conclusion that
the Court reached in *Katz* and reiterated in *Avellino*.

*Good Faith Decision*, 516 B.R. at 21 (citing *Katz*, 462 B.R. 447; *Avellino*, 469 B.R. at 412).

Moreover, "[r]egardless of changes [(if any)] to the standard and burden of pleading, the
defendant's good faith has been an issue in every case from the start." *Good Faith Discovery
Decision*, 590 B.R. at 209.  The Trustee has always acknowledged ABN/RBS's good faith and
willful blindness to be a central issue, including in his original Complaint and Rule 2004
discovery requests.  *See* Compl. ¶ 130 (alleging that ABN/RBS was "motivat[ed] to turn a blind
eye to the numerous indicia of . . . fraud").  After the District Court delineated "willful
blindness" as the appropriate measure of a transferee's good faith in the context of a SIPA
trusteeship in 2011 and 2012, the Trustee amended his pleadings in the FAC in an attempt to
meet the subjective pleading standard against ABN/RBS—a fact that has been recognized by this
Court.  *Good Faith Discovery Decision*, 590 B.R. at 209.[35]

In this case, there is no reason to grant the Trustee a second crack at pleading "willful
blindness," an endeavor he already (unsuccessfully) attempted in the operative FAC.[36]

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Trustee's Motion in its entirety.

---

[35]  *Compare, e.g.*, Compl. ¶ 18, *with* FAC ¶ 33 (title of section changes from "ABN Was on
Inquiry Notice . . ." to "ABN[] Had Knowledge of Indicia of Fraud at BLMIS . . ."); FAC ¶¶ 8,
134 (alleging that "rather than conduct further due diligence in response to indicia of fraud of
which they were aware, Defendants ignored the warning signs of fraud and chose to look the
other way" and other allegations that "ABN/RBS chose to ignore [ ] red flags").

[36]  The Trustee also seeks to reinstate a $74.6 million clawback claim for transfers from XL
Portfolio Limited to ABN/RBS that was voluntarily dismissed without prejudice following this
Court's comity decision pursuant to a Tolling Agreement. The Tolling Agreement provides that
in the event of a Second Circuit reversal regarding comity, the Trustee may reinstate the claim
through an amended complaint no later than 90 days after a decision by the Supreme Court either
denying a writ of certiorari or ruling on the merits.  The defendants' petition for a writ of
certiorari is due on August 30, 2019, and so this claim is not ripe for reinstatement.

Dated: New York, New York
      August 9, 2019               Respectfully submitted,

                                            ALLEN & OVERY LLP

                                            By: /s/ Michael S. Feldberg
                                            Michael S. Feldberg
                                            1221 Avenue of the Americas
                                            New York, New York 10020
                                            Telephone:    (212) 610-6300
                                              Facsimile:    (212) 610-6399
                                            michael.feldberg@allenovery.com

                                            *Attorneys for Defendant ABN AMRO Bank N.V.*
                                            *(presently known as NatWest Markets N.V.)*