# EXHIBIT A

**Cash-settled Index Swap Transaction**

Rye Select Broad Market XL Portfolio, Ltd.
c/o Walkers SPV Limited
Walker House
P.O. Box 908 GT
Mary Street
George Town, Grand Cayman
Cayman Islands
Tel: (914) 925-1140
Fax: (914) 925-9337

Date: 1 September 2006
Reference: AARSBM1

To whom it may concern,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between you **Rye Select Broad Market XL Portfolio, Ltd.** (the "Counterparty"), and us, ABN AMRO Bank N.V. ("ABN AMRO"), on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2000 ISDA Definitions (the "Swap Definitions") and in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions", and together with the Swap Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. are incorporated by reference into this Confirmation. In the event of any inconsistency between the Swap Definitions and the Equity Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

1. This Confirmation evidences a complete and binding agreement between you and us to the terms of the Transaction to which this Confirmation relates. This Confirmation incorporate by reference the ISDA Master Agreement (Multicurrency-Cross-Border) (the 1992 version) (the "ISDA Master") which forms an integral part of this Confirmation This Confirmation (together with all written communications between us which are intended to form part of the Transaction which may not refer to or incorporate the terms of any master agreement or standard terms) shall constitute a Confirmation for purposes of the ISDA Master as if you and we had executed an agreement in the form of an ISDA Master but without any Schedule except for the election of English law as the governing law and US Dollars as the Termination Currency on the Trade Date of the first such transaction between us.

   In the event of any inconsistency between either set of Definitions, the ISDA Master and this Confirmation, this Confirmation will govern. The ISDA Master, the Definitions and this Confirmation shall be referred to as the Agreement.

2. **The terms of the particular Transaction to which this Confirmation relates are as follows:**

2.1 **General Terms:**

| | |
|---|---|
| Trade Date: | 1 September 2006 |
| Effective Date: | 5 September 2006 |
| Termination Date: | The third anniversary of the Effective Date subject to adjustment in accordance with the Modified Following Business Day Convention |
| Index: | The Dynamic Leveraged Reference Fund Index, as described in Annex 1 attached hereto |

| | |
|---|---|
| Index Unit: | one unit of the Index |
| Reference Fund: | **Rye Select Broad Market Portfolio Limited** |
| Reference Fund Shares: | Class D Shares in the Reference Fund |
| Reference Fund Documentation: | means, with respect to the Reference Fund, the constitutive and governing documents, subscription agreements and other agreements of the Reference Fund specifying the terms and conditions relating to the Reference Fund and the shares thereof, in each case, as amended from time to time. |
| Exchange(s): | Not Applicable |
| Related Exchange(s): | Not Applicable |
| Clearance System(s): | Not Applicable |

### 2.2 Equity Amounts

| | |
|---|---|
| Equity Amount Payer: | ABN AMRO |
| Equity Amount Receiver: | the Counterparty |
| Type of Return: | Total Return Swap, save as provided for in the Index Rules |
| Equity Amount: | means, subject to the proviso below, an amount in the Settlement Currency as determined by the Calculation Agent and equal to: |

$$ENA \times \left( \frac{P_f - P_i}{P_i} \right), \text{ where}$$

"ENA" means Equity Notional Amount,

"$P_f$" means Final Price, and

"$P_i$" means Initial Price.

PROVIDED ALWAYS THAT, if the Equity Amount is:

(a) positive, the Equity Amount Payer shall pay the Equity Amount to the Equity Amount Receiver; or

(i) negative, the Equity Amount Receiver shall pay the absolute value of the Equity Amount to the Equity Amount Payer.

| | |
|---|---|
| Equity Notional Amount: | USD 10,000,000, as modified in accordance with the provisions set forth below; provided that notwithstanding anything to the contrary in this Confirmation, the Equity Notional Amount shall be no greater than the Upper Limit. |
| | (A) Upon 5 Business Days prior notice, Counterparty may increase the Equity Notional Amount by delivering a net amount in the Settlement Currency equal to the amount of the increase, such amount to represent an Independent Amount, in accordance with the provisions of paragraph 2.3 below. Any such increase shall become effective upon ABN AMRO receiving evidence satisfactory to it from the administrator of the Reference Fund that ABN AMRO has become the legal and beneficial owner of the total number of Reference Fund Shares it was able to acquire on |

the Subscription Date (as defined in the Reference Fund Documentation) that immediately followed the day ABN AMRO received the net amount referred to above, by investing that net amount in Reference Fund Shares.

(B) Upon 5 Business Days prior notice, Counterparty may request to decrease the Equity Notional Amount, such decrease to be effective on the date ABN AMRO actually receives proceeds on the redemption of the relevant number of Reference Fund Shares previously held by it.

"**Upper Limit**" means USD 250,000,000.

Initial Price: The Initial Price shall be determined by the Calculation Agent as follows:

(A) On the Effective Date: the Initial Price shall be equal to the value of one Index Unit i.e. USD 1,000.

(B) Adjustment of the Initial Price for increases of the Equity Notional Amount:

1. The Calculation Agent shall first determine the new Equity Notional Amount ("New ENA") by adding the Equity Notional Amount before any increase made to it in accordance with "Equity Notional Amount" (A) above (the "Previous ENA") and the amount of the increase (the "Increase");

2. The Calculation Agent shall then determine the number of Index Units (as defined in Annex 1 hereto) (such total number of Units, the "Total Number of Units") resulting from the above increase, as follows:

$$\frac{ENA_p}{VIU_p} + \frac{I_t}{VIU_t}$$

where "$ENA_p$" means the Equity Notional Amount (i) immediately after it was last adjusted (whether as a result of an increase or a decrease) (such date, the "Determination Date") or (ii) the initial Equity Notional Amount;

"$VIU_p$" means the value of one Index Unit (as defined in Annex 1 hereto); on the Determination Date. "$VIU_p$" shall be USD 1,000 on the Effective Date;

"$I_t$" means the amount of the increase on the effective day of such increase pursuant to "Equity Notional Amount" (A) above;

"$VIU_t$" means the value of one Index Unit (as defined in Annex 1 hereto) on the date referred to in the definition of "$I_t$" above;

3. Upon determining the Total Number of Units, the Calculation Agent shall divide the New ENA by the Total Number of Units and the result of this calculation shall be the new Initial Price (which may be subsequently adjusted in accordance with the methodology set out herein).

| | |
|---|---|
| Final Price: | means, for the purposes of determining the Equity Amount in respect of the Termination Date, or of determining the Equity Amount in relation to a decrease in the Equity Notional Amount during the life of the Transaction pursuant to paragraph (B) of the Equity Notional Amount provisions above, the value of an Index Unit as determined by the Calculation Agent on the basis of the actual proceeds received by ABN AMRO on the redemption of the relevant number of Reference Fund Shares previously held by it as its hedge for the terminating portion of the Transaction. |
| Equity Notional Reset: | Applicable provided always that notwithstanding anything to the contrary contained in the Equity Definitions, except on the Termination Date, the Equity Amount (or the absolute value thereof) will not be payable and will only increase/decrease the Equity Notional Amount in accordance with Clause 2.3.2 below. |
| Valuation Time: | Not Applicable |
| Valuation Date(s): | Valuation Date in respect of the Reference Fund as defined in the Reference Fund Documentation |
| Futures Price Valuation: | Not Applicable |
| Exchange-traded Contract: | Not Applicable |

**2.3  Floating Amounts – Independent Amount**

2.3.1 The parties hereto hereby irrevocably agree that none of them will be liable or obliged to pay to the other party any Floating Amount, interest or other remuneration in respect of the Equity Notional Amount.

2.3.2 The Independent Amount shall at all times be equal to the Equity Notional Amount and the Independent Amount shall vary exactly according to the variation of the Equity Notional Amount (and vice versa) whenever any such variation of the Equity Notional Amount results from the application of Equity Notional Reset or any other variation of the Equity Notional Amount. The amount of the Independent Amount (or portion thereof) ABN AMRO is obliged to repay, return or refund hereunder shall be reduced by the absolute value of the Equity Amount, or the amount of the reduction of, the Equity Notional Amount, due by the Counterparty to ABN AMRO. The amount of the Independent Amount (or portion thereof) the Counterparty is obliged to pay to ABN AMRO hereunder shall be reduced by the Equity Amount. The Independent Amount, whatever its variations are, will not bear any interest of whatsoever nature.

**2.4  Decrease of the Equity Notional Amount**

(A) Early Termination Fees

Subject to paragraph (B) below, If Counterparty decreases the Equity Notional Amount in accordance with the provisions contained in the paragraphs above, the Counterparty shall pay to ABN AMRO a net amount calculated and determined by the calculation agent as follows:

$$\frac{R \times F \times ACT}{360},$$

where "$R$" the absolute value of the reduction of the Equity Notional Amount (such reduction occurring pursuant to "Equity Notional Amount" (B);
"F" means, if the reduction occurs during (i) the First Period, 0.01 and (ii) the Second Period, 0.005;
"First Period" means a period beginning on and including the Trade Date and ending on and including 1 September 2007;
"Second Period" means a period beginning on and including the first calendar day that immediately follows the end of the First Period and ending on and including 1 March 2008;

"ACT" means the actual number of days from and including the day (such day, the "Reduction Day") on which the reduction occurs until and including the end of the (i) First Period, if the Reduction Day occurs during the First Period, or (ii) the Second Period, if it occurs during the Second Period.

For the avoidance of doubt, an early termination of this Transaction pursuant to Clause 7 below (and where ABN AMRO's credit rating has dropped) will not entitle ABN AMRO to the above early termination fees.

ABN AMRO will not be entitled to the above mentioned fees if (i) the reduction in the Equity Notional Amount results from one or more investors in the Counterparty requesting redemption of its/their shares or units in the Counterparty; (ii) that or those investors do not, with the Counterparty, whether directly or indirectly, reinvest the proceeds of any such redemption in a similar or equivalent transaction as this Transaction; (iii) the Counterparty provides ABN AMRO with satisfactory evidence that the above conditions are satisfied or (iv) the Counterparty terminates this Transaction due to the inability of the Reference Fund to engage an independent third party service provider that has agreed to provide the independent third party service provider reporting requirements specified in the Supplement to the Prospectus of the Reference Fund.

(B) Minimum Notional Amount

If Counterparty decreases the Equity Notional Amount in accordance with "Equity Notional Amount" (B), to an amount (the "Minimum Notional Amount") which is equal to or less than USD20,000,000, then ABN AMRO may, in addition to the fees due under the terms of the preceding paragraph, terminate this Transaction in whole, but not in part only, by notification in writing to Counterparty in accordance with the Notice provisions contained in Annex 2 hereto.

**2.5 Termination Provisions**

Notwithstanding anything to the contrary contained in the ISDA Master, or the Definitions, following termination of this Transaction for any reason whatsoever including, but not limited to, (i) termination on the Termination Date, (ii) an Index Disruption Event, or (iii) an Event of Default, or Illegality or Additional Termination Event (as such terms are defined in the ISDA Master), Notwithstanding anything to the contrary contained in the the ISDA Master or the Definitions, the Parties will determine the Termination Amount by reference to the Index Value, determined by reference to the liquidation proceeds that are actually received by ABN AMRO in respect of its hedge to this Transaction, assuming that ABN AMRO sells, disposes of, transfers or otherwise unwinds such hedge as soon as practicable and possible after the day on which the Index Disruption Event occurs and (b) until such time as it is practicable and possible to sell, dispose of, transfer or otherwise unwind such hedge the Reference Fund Shares will be valued at zero.

During the course of the liquidation process, until such time as liquidation proceeds equal to the value of the Leverage Component immediately prior to the relevant Index Disruption Event, including the value of applicable interest cost which shall continue to accrue on the balance of any unrecovered value of the Leverage Component, any unliquidated Reference Fund Shares will continue to be held by ABN AMRO and valued at zero; provided that as soon as liquidation proceeds equal to the value of Leverage Units has been received by ABN AMRO, any additional liquidation proceeds will be paid by ABN AMRO to Counterparty and any remaining unliquidated Reference Fund Shares will be assigned by ABN AMRO to Counterparty.

**2.6 Settlement Terms:**

| | |
|---|---|
| Settlement Currency: | USD |
| Cash Settlement: | Applicable |
| Cash Settlement Payment Date: | as soon as practicable following the receipt by ABN AMRO of the proceeds of the redemption of the Reference Fund Shares previously held by it as its hedge for the Transaction. |

**2.7 Index Adjustment Events:**

None of the Adjustments provided for in the Equity definitions shall apply. The Calculation Agent shall apply exclusively the adjustments set out in Annex 1 hereto.

**2.8 Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Insolvency Filing: | Not Applicable |
| Hedging Disruption: | Not Applicable |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |

**3. Calculation Agent – Index Agent**

ABN AMRO shall be the Calculation Agent and the Index Agent. Whenever a Calculation Agent or the Index Agent is required hereunder to act or to exercise judgment in any way, it will do so in good faith and in a commercially reasonable manner.

**4. Account Details:**

Account for payments to ABN AMRO:  ABN NYC (SWIFT: ABNAUS33)
A/c number: 6740-5450-1541
ABN AMRO Bank N.V., London Branch (SWIFT: ABNAGB2P)

Account for payments to the Counterparty:  Bank of New York, One Wall Street, New York NY 10286
ABA#: 021-000-018
A/c name: Rye Select Broad Market XL Portfolio Limited
A/c number: 890-0630-531

**5. Offices:**

(a) The Office of ABN AMRO for this Transaction is: London
(b) The Office of the Counterparty for this Transaction is: Cayman

**6.** The "**Cross Default**" provisions of Section 5(a)(vi) will apply to ABN AMRO and to the Counterparty and "Specified Indebtedness" shall have the following meaning, Section 14 of the ISDA Master is amended accordingly:

"**Specified Indebtedness**" shall mean any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) (a) in respect of borrowed money (which, for the avoidance of doubt, shall include, without limitation, bonds, notes, commercial paper or similar instruments issued or guaranteed by the relevant party), and (b) any amount due and payable in respect of any Specified Transaction (except that, for this purpose only, the words "and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party)" shall be amended and replaced by "and any other entity" where they appear in the definition of Specified Transaction), any repo transaction, any reverse repo transaction and any stock loan transaction.

Section 5(a)(vi) is amended by the insertion of the following words after the words "due and payable" on line 8:

"or, in the case of Specified Indebtedness in respect of any Specified Transaction, any repo transaction, any reverse repo transaction and any stock loan transaction, which has resulted in such Specified Indebtedness becoming due and payable as a result of the early termination of the relevant Specified Transaction, repo transaction, reverse repo transaction or stock lending transaction, as the case may be".

The "**Threshold Amount**" means with respect to ABN AMRO, an amount equal to three percent (**3%**) of its total equity share capital (as specified from time to time in its most recent annual report of ABN AMRO containing consolidated financial statements, prepared in accordance with accounting principals that are generally accepted for institutions of its type in the jurisdiction of its organisation and certified by independent public accountants), or its equivalent in any other currency. With respect to the Counterparty, the "**Threshold Amount**" an amount equal to three percent (**3%**) of its NAV, or its equivalent in any other currency.

"Specified Transaction" shall mean, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement or Specified Entity of such Party) and the other party to this Agreement (or any Specified Entity of such other party) which this Equity Option Transaction or any other similar transaction, or (b) any other transaction identified as a Specified Transaction in this Agreement or relevant confirmation.

7. The "**Credit Event Upon Merger**" provisions of Section 5(b)(iv) will apply to ABN AMRO only provided however, that "Credit Event upon Merger" shall not have its meaning as defined in Section 5(b)(iv), but it shall mean that:

   (i) the Counterparty, its Specified Entity or ABN AMRO ("X") consolidates or amalgamates with, or acquires the majority of the shares in, or merges into, or transfers all or substantially all its assets to, another entity ("Y") or Y consolidates or amalgamates with, or acquires the majority of the shares in, or merges into, or transfers all or substantially all its assets to X; and

   (ii) such action does not constitute an event described in Section 5(a)(viii); and

   (iii)(a) in the event X relating to ABN AMRO, immediately prior to such action, was rated by Standard and Poor's Ratings Group, a division of The McGraw-Hill Companies ("S&P") and/or Moody's Investors Service, Inc. ("Moody's") and/or FitchIBCA, Inc. ("Fitch") or any successor organization and (i) S&P and/or Moody's and/or Fitch rates the long term, unsecured, unsubordinated debt obligations of the resulting, surviving or transferee entity immediately after such action at least three modifiers (a modifier being 1 or 2 for Moody's; plus, neutral or minus for S&P and Fitch) lower than that of the long term, unsecured, unsubordinated debt obligations of X immediately prior to such action or such rating is below investment grade, being BBB- for S&P and Fitch and Baa3 for Moody's, or (ii) the resulting, surviving or transferee entity ceases to be rated by S&P and/or Moody's and/or Fitch immediately after such action;

8. **Payments on Early Termination.** For the purpose of Section 6(e) of the ISDA Master the provisions of paragraph 2.5 above will apply.

9. "**Termination Currency**" means the freely-convertible currency selected by the Non-defaulting Party or the party that is not the Affected Party, or in the circumstances where there are two Affected Parties, as agreed between ABN AMRO and the Counterparty, and failing such agreement the Termination Currency shall be US Dollars.

10. **(a) Payer Representations.** For the purpose of Section 3(e) of the ISDA Master, ABN AMRO will make the following representation and the Counterparty will make the following representation:

    It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of the ISDA Master) to be made by it to the other party under the ISDA Master. In making this representation, it may rely on (i) the accuracy of any representations made by the other party

pursuant to Section 3(f) of the ISDA Master, (ii) the satisfaction of the ISDA Master contained in Section 4(a)(i) or 4(a)(iii) of the ISDA Master and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of the ISDA Master and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of the ISDA Master, *provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

**(b) Payee Representations.** For the purpose of Section 3(f) of the ISDA Master, ABN AMRO and the Counterparty make the representations specified below: None.

11. **Governing Law.** This Confirmation will be governed by and construed in accordance with English law.

12. **Netting of Payments.** Subparagraph (ii) of Section 2(c) of the ISDA Master will not apply to any group of Transactions.

13. **No Agency.** Section 3 of the ISDA Master shall be amended by the insertion of the following additional provisions:

    "(g)  **No Agency.** Each party represents to the other that it is entering into the Agreement, each Transaction and any other documentation relating to the ISDA Master or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

14. **Set-off.** Section 6 of the ISDA Master shall be amended by the insertion of the following additional provision:

    "(f)  **Set-off.** Any amount (the "Early Termination Amount") payable to one party (the "Payee") by the other party (the "Payer") under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party will, at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by its set-off against any amount(s) (the "Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to, or in favour of, the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off). X will give notice to the other party of any set-off effected under this Section 6(f).

    For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency. The term "rate of exchange" includes, without limitation, any premiums, and costs of exchange payable in connection with the purchase of or conversion into the relevant currency.

    If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

    Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

15. **Pari Passu.** All payment and delivery obligations of each party under the Agreement will rank at least *pari passu* in all respects with all of that party's other unsecured and unsubordinated obligations (except for those which are mandatorily preferred by the operation of law).

(i) **Non-Reliance**. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanation related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii) **Status of Parties.** The other party is not acting as a fiduciary or an adviser to it in respect of that Transaction.

(iv) **Risk Management**. The Counterparty represents that it is entering the Transactions governed by the ISDA Master purely for the purposes of hedging its exposure or in connection with a line of business, and not for the purpose of speculation.

17. **Additional Termination Event**

An Index Disruption Event shall constitute an Additional Termination Event.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

| **ABN AMRO Bank N.V., London Branch** | **Rye Select Broad Market XL Portfolio, Ltd.** |
|---|---|
| By: | By: |
| ............................................. | ............................................. |
| Name: | Name: Darren Johnston |
| Title: | Title: Director |
| By: | By: |
| ............................................. | ............................................. |
| Name: | Name: |
| Title: | Title: |

(i) **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanation related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii) **Status of Parties.** The other party is not acting as a fiduciary or an adviser to it in respect of that Transaction.

(iv) **Risk Management.** The Counterparty represents that it is entering the Transactions governed by the ISDA Master purely for the purposes of hedging its exposure or in connection with a line of business, and not for the purpose of speculation.

17. **Additional Termination Event**

An Index Disruption Event shall constitute an Additional Termination Event.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

| ABN AMRO Bank N.V., London Branch | Rye Select Broad Market XL Portfolio, Ltd. |
|---|---|
| By: | By: *[signature]* |
| Name: | Name: Darren Johnston |
| Title: | Title: Director |
| By: | By: |
| Name: | Name: |
| Title: | Title: |

# ANNEX 1

## INDEX RULES

### 1. General Description

The Dynamic Leveraged Reference Fund Index (the "Index") notionally replicates a dynamic investment strategy that allocates an investment between two types of investments in Performance Units and Leverage Units (each as defined below). The number of units in each investment depends on several factors, including but not limited to, the level of and path taken of the Index, the Rebalancing Provisions and the Maximum Borrowing Amount. The Index is adjusted between the Performance Units and the Leverage Units according to the Rebalancing Provisions (as described below).

**Value of Index Units:** On any Trading Day, the value of each Index Unit is given by the following equation:

$$I_{(t)} = PC_{(t)} - LC_{(t)}$$

Where:
**PC(t):** is the Value of the Performance Units; and
**LC(t):** is the Value of Leverage Units.

On the Effective Date, the value of each Index Unit shall be equal to USD 1,000.

**Performance Units:** The Performance Unit is a notional investment in the Reference Fund (the "Fund"). On the Effective Date the value of each Performance Unit shall be USD 3,000. Notwithstanding the election made under paragraph 2.2 Type of Return, any and all distribution of whatsoever ever nature in respect of, or in connection with, Reference Fund Shares, shall be re-invested in the Reference Fund through the Index.

**Value of the Performance Units:** On any Trading Day, the value of the Performance Units shall be determined by the Index Agent based on its liquidation value (converted into the Settlement Currency where appropriate at the prevailing exchange rate as determined by the Index Agent), using any information it has available to it, including but not limited to each latest respective net component value per share of the funds comprising the Reference Fund.

**Leverage Units:** The Leverage Unit is a notional borrowing per Index Unit determined on the basis of actual cash movements, with interest compounded daily based on Overnight USD-Libor.

On the Effective Date the value of each Leverage Unit shall be USD 2,000, resulting in a value of Performance Unit of USD 3,000.

**Value of Leverage Unit:** On any Trading Day, the Value of a Leverage Unit is given by the following equation:

$$LC_{(t)} = RLC_{(t-1)} \times \left\{ 1 + \left( \frac{IR_{(t-1)} \times DC_{(t)}}{360} \right) \right\}$$

where:

$LC_{(t)}$ means the value of the Leverage Unit at time t;

|  |  |
|---|---|
|  | $RLC_{(t-1)}$ means the value of the Leverage Unit on the Trading Day or Business Day (where applicable) immediately preceding time t, after the Re-Balancing Event (if any); |
|  | $IR_{(t-1)}$ means the Overnight USD-Libor (on the Trading Day or the Business Day immediately preceding time t) plus Leverage Spread; and |
|  | $DC_{(t)}$ means the actual number of calendar days elapsed from and including the Trading Day or Business Day (where applicable) immediately preceding time t until but excluding time t. |
| **Leverage Spread** | 1.00 % per annum |
| **Re-Balancing Provisions:** | In the event that on any Trading Day the Rebalancing Factor, as defined below, falls outside the range of 2.5 to 3.5, the Index Agent shall re-balance the Index (each a "Re-Balancing Event") such that, after deducting any transaction costs to ABN AMRO resulting from such Re-Balancing, the Value of the Performance Unit and the Value of the Leverage Unit are as close as possible to the following: |

$$RPC_{(t)} = 3 \times I_{(t)} \text{; and}$$

$$RLC_{(t)} = 2 \times I_{(t)}$$

where:

$RPC_{(t)}$ means the value of the value of Performance Unit after re-balancing at the close of trading at time t;
$RLC_{(t)}$ means the value of the Leverage Unit after re-balancing at the close of trading at time t; and
$I_{(t)}$ means the Index Level before re-balancing at the close of trading at time t, as adjusted for any haircut.

Where a Re-Balancing Event results from the Rebalancing Factor being less than 2.5, the Index Agent will, subject to the Maximum Leverage Amount, re-balance the Index by increasing the number of Leverage Units and making a notional cash deposit earning interest at USD-Libor until such time as the required additional Permitted Investments have been added to the Reference Portfolio.

Where a Re-Balancing Event results from the Rebalancing Factor exceeding 3.5, the Index Agent will re-balance the Index by decreasing the number of Leverage Units and liquidating the investments pro rata across all funds comprising the Reference Portfolio, subject to maintenance of the Investment Guidelines of the Reference Portfolio.

For the avoidance of doubt, any re-balancing will not affect the Index Level, except for the deduction of any transaction costs incurred by ABN AMRO in relation to a Re-Balancing Event.

| **Maximum Leverage Amount:** | USD 500,000,000 |
|---|---|
| **Trading Day:** | A day on which dealing may take place in London, New York and Cayman Islands. |
| **Rebalancing Factor:** | The value of the Performance Unit (reduced by (i) any applicable Haircut Penalty, and (ii) the mark to market value of any options held by the Reference Fund, and adjusted for the value of outstanding submitted subscriptions and redemptions submitted by ABN AMRO) divided by the Index Level. |

**2. Specific Definitions**

**2.1  Index Adjustment Provisions**

Valuation Disruption: If the Calculation Agent determines that the Reference Fund and/or the Reference Fund Investment Manager, administrator, any sub-administrator, custodian bank, bank or other service provider to the Reference Fund has imposed fees, taxes or other charges or dealing or settlement rules which, in the determination of the Calculation Agent increases the effective costs associated with investing in, redeeming, or holding units in the Reference Fund, the Calculation Agent will make an adjustment to the Index to reflect such costs.

Subsequent Adjustments to NAV: If the Calculation Agent becomes aware on any Business Day that the basis on which the NAV of the Reference Fund has been or will be amended at any time, the Calculation Agent may, but shall not be obliged to, make such corresponding adjustments to their basis of calculating the Index as it shall deem appropriate.

For purposes of this Agreement, "NAV" shall mean total assets minus its total liabilities (inclusive of subscriptions and redemptions), determined in accordance with generally accepted accounting principles.

**2.2  Index Disruption Events**

If the Calculation Agent determines that:

(a) an order has been made or an effective resolution passed for the winding up or dissolution or termination of the Reference Fund or any other event occurs which, in the reasonable opinion of the Calculation Agent, has a material adverse effect on the future solvency and liquidity of the Reference Fund, including, but not limited to, any substantive litigation proceedings brought by or on behalf of the investors in the Reference Fund; or

(b) the Reference Fund ceases to exist; or

(c) any action, suit, proceeding, inquiry or investigation has been taken or brought, or is pending, by any court, governmental or regulatory body or agency against the Counterparty, the Reference Fund, any Authorised Representative of the Reference Fund or any member of the Reference Fund's Investment Manager's group which the Calculation Agent reasonably considers to be material; or

(d) the Counterparty or the Reference Fund ceases to be managed by Tremont Group Holdings, Inc.; or

(e) unless the Calculation Agent has consented in writing (such consent not to be unreasonably withheld), there is a change in the methodology of calculating the NAV of the Reference Fund, or the Reference Fund does not comply with, or materially modifies a provision in, any Reference Fund Documentation relating to the Reference Fund, which relates to:

1. the investment objectives of the Reference Fund; or
2. its articles of association or memorandum; or
3. the voting rights of Shareholders in the Reference Fund; or
4. the currency in which the Reference Fund Shares are denominated; or
5. the frequency and notice provisions for subscriptions and redemptions of the Reference Fund offered to ABN AMRO is changed; or
6. the issuance or redemption of Shares of the Reference Fund is suspended.

For the purposes of (e) 1. above, the "split strike conversion" strategy referred to in the Investment Objective of the prospectus of the Reference Fund consists of: (i) the purchase of a group or basket of equity securities that are highly correlated to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately

equals the market value of the basket of equity securities or maintains investments in USD cash, USD money market funds or US Treasury Securities; or

(f) a Special Redemption Event, as defined in the Reference Fund Documentation, has occurred; or

(g) ABN AMRO has been notified by the Reference Fund or the Investment Manager of the creation and details of any "side pockets" in the Reference Fund and/or that another investor in the Reference Fund has been offered rights in respect of redemptions or liquidity of shares in the Reference Fund, and in each case ABN AMRO has determined that such rights would have an adverse effect on ABN AMRO; or

(h) the Reference Fund has breached the terms of the Borrowing Limit; or

(i) any change in law (or in its application, interpretation or implementation) has occurred after the Trade Date requiring, in the reasonable determination of Calculation Agent, the imposition, deduction or withholding of tax (the "Taxes") which (i) increases the effective dealing or holding costs of units in the Reference Fund; or (ii) has or would have for effect for ABN AMRO to receive, in connection with or in respect of distributions, dividends or redemption proceeds relating to the Shares, less than it would have received in the absence of any such Taxes;or

(j) any change in taxation adversely affecting the treatment of payments made or received by ABN AMRO in respect of its hedge for the Transaction; or

(k) an Index Adjustment Event that has a material adverse effect on ABN AMRO is occurring and the Calculation Agent reasonably determines that there is no immediate prospect of such Index Disruption Event ceasing to occur; or

(l) in respect of the Reference Fund, on any day on which investors in the Reference Fund would ordinarily be entitled to subscribe for or redeem Reference Fund Shares an event has occurred which, in the reasonable determination of Calculation Agent, restricts (in whole or in part) subscriptions, redemptions or other dealings of any nature in Reference Fund Shares at the NAV corresponding to such day; or

(m) the Reference Fund ceases to employ, either directly or indirectly, an internationally recognized independent third party to provide administrative services including but not limited to trade ticket processing, position reconciliation with the broker, position and fund valuation, preparation of a monthly Net Asset Value, preparation of monthly financial statements and preparation and maintenance of all accounting books and records required by US GAAP; or

(n) in the reasonable opinion of the Calculation Agent any of the parties to the Side Letter is in breach of the terms of the Side Letter, or the Reference Fund for any reason fails to provide the liquidity requested by ABN AMRO in accordance with the terms of the side letter; or

(o) in the reasonable opinion of the Calculation Agent, any of the administrator, registrar or custodian of the Reference Fund (i) is of a lesser standing than on the date of entering into this transaction such that their ability to perform their respective obligations in connection with the Reference Fund is materially adversely affected, or their legal and/or financial independence from the relevant investment manager is compromised; or (ii) is removed or resigns without proper replacement reasonably acceptable to ABN AMRO; or

(p) the manager employing the split strike conversion strategy with whom the Reference Fund invests the majority of its assets, ceases to be the Account Manager (as defined in the Side Letter); or

(q) any of the following events occur following the Trade Date in respect of the Account Manager: (1) a change of control or of its management; or (2) the Reference Fund ceases to invest the majority of its assets in a brokerage account at a registered broker dealer or in an investment that offers the Reference Fund similar liquidity provisions.

(each an "**Index Disruption Event**"), then the Calculation Agent may cease the determination and publication of the Index Level and terminate the Transaction in which case the Termination provisions will apply.

The "Side Letter" shall mean that certain side letter, dated as of the date hereof, by and between, inter alia, the Reference Fund and ABN AMRO.

## 2.3 Investment Guidelines

**Reference Portfolio**
**For Performance Units**   Reference Fund

(a) Investment Guidelines for the Reference Fund:

| | |
|---|---|
| **Reference Fund Eligible Investments** | USD cash<br>US Treasury Securities<br>USD money market funds<br>Split-Strike Conversion Strategy Eligible Investments<br>Units/shares of other hedge funds subject to: maximum 5% of Reference Fund AUM per manager, and maximum of 10% of Reference Fund AUM overall ("Other Funds Limit").<br><br>Any holding of an investment which is not an Eligible Investment will be subject to the Non-Eligible Investment Penalty. |
| **Borrowing Limit** | 20% for liquidity purposes only, and provided that the value of any assets pledged as security for a loan entered into by the Reference Fund does not exceed 120% of the loan value. |

(b) Investment Guidelines for the split-strike conversion strategy component of the Reference Fund:

| | |
|---|---|
| **Split-Strike Conversion Strategy Eligible Investments** | USD cash<br>Listed equity securities in S&P 100<br>Long S&P 100 index Put options, either listed or OTC with identical contract terms to equivalent listed options ("Conforming")<br>Short S&P 100 index Call options, either listed or Conforming.<br>Maximum option maturity: 1 year.<br><br>Any holding of an investment which is not an Eligible Investment will be subject to the Non-Eligible Investment Penalty.<br><br>The number of Put options must be greater than or equal to the number of Call options. The number of Call options times the underlying Index level times the Contract Size must be less than 120% of the value of the equity basket. The number of Put options times the underlying Index level times the Contract Size must be more than 80% and less than 120% of the value of the equity basket. The average strike of the Put options must be less than the average strike of the Call options. The average strike of the put options must be greater than the 80% of the spot price of S&P100 Index at all times. |
| **Issuer Concentration** | The single largest position of the Reference Fund shall not be more than 15% of the fund's NAV. The 5 largest positions of the fund shall not be more 40% of the fund's NAV. |

| | |
|---|---|
| **Sector Concentration** | No more than 35% of the Reference Fund AUM will be invested in any single sector. The Investment Manager may operate outside of the limit provided that (i) the sector concentration is within 10% of the S&P 100 sector concentrations or (ii) there is the written consent by ABN AMRO. |
| **Volatility** | The annualised volatility of the Reference Fund may not exceed 7%, calculated on rolling 3 month basis (weekly observations). |
| **Drawdown** | Any drawdown of the Reference Fund shall not exceed 5% over a rolling 4 week period. |
| **Delta Concentration** | The absolute value of the aggregated delta exposure of the Reference Portfolio may not exceed 100%. |
| **Breaches** | Breaches of the Investment Guidelines will lead to a proportionate decrease in the amount of leverage comprised in the Index implemented by means of the deduction of an amount equal to the Haircut Penalty from the value of the Performance Units, such Penalty to be applied after the elapse of a one week 'cure' period, provided that the relevant breach has not been remedied by the Investment Manager of the Reference Fund. |

(c) Penalties for breaches of the investment guidelines (each, a "Penalty")

| | |
|---|---|
| **Other Funds Penalty** | This shall be the value of any excess over the Other Funds Limit |
| **Non-Eligible Investment Penalty** | In respect of investments which are not Eligible Investments i) other than options, other derivatives or any financial instrument which gives rise to a contingent liability, this shall be the value of the investments, and ii) options or other derivatives, this shall be the amount required to reduce the multiplier to 1. |
| **Issuer Concentration Penalty** | This shall be the sum of (i) for each position which allocation exceeds 15%, this shall be the excess of such allocation over 15%, and (ii) the excess, if any, of the allocation to the 5 largest positions of the fund over 40%. |
| **Sector Concentration Penalty** | This shall be the sum of the excess, if any, of the allocation to each sector of the S&P100 index over 35%, provided that if Party A gives a written consent to it, should a sector represent more than 25% of the S&P 100, the excess for that sector shall be measured against the weight of that sector within the S&P 100 index plus 10%. |
| **Volatility Cap Penalty** | 5% for each 1% by which the volatility exceeds the Volatility limit. |
| **Delta Penalty** | The excess, if any, of the delta over the Delta Concentration limit of 50%. |
| **Drawdown Penalty** | 5% for each 1% of drawdown over the Drawdown limit of 5%. |
| **SP Hedge Penalty** | The sum of (i) the percentage by which the product of (a) the number of puts minus the number of calls and (b) the contract size and (c) the underlying SP 100 index level is less than zero (if any) and (ii) the percentage by which the product of the number of puts and the contract size and the underlying SP 100 index level exceeds 120%, or is less than 80%, as the case may be (or none), (iii) the percentage by which |

|  |  |
|---|---|
|  | the average strike of the Put options is greater than the average strike of the Call options, (iv) the percentage by which the average strike of the put options is less than 80% of the spot price of S&P100 Index. |
| **Haircut Penalty** | This means the sum of: <br> (a)    The Other Funds Penalty <br> (b)    the Non-Eligible Investment Penalty <br> (c)    the Issuer Concentration Penalty; <br> (d)    the Sector Concentration Penalty; <br> (e)    the Volatility Cap Penalty; <br> (f)    the Delta Penalty; <br> (g)    the Drawdown Penalty; <br> (h)    the SP Hedge Penalty; |

**ANNEX A2**

**NOTICES**

Any communication or notice to be made or given in relation to this Confirmation will be duly made or given if in writing and delivered, made or transmitted by registered mail, facsimile or e-mail to the following address (or such other address as specified in a written notice from the relevant party to the other parties at least fifteen days prior to the date of the relevant communication, notice or demand), and confirmed as received by telephone:

**if to ABN AMRO**, at:

ABN AMRO Bank N.V., London Branch
250 Bishopsgate
London EC2M 4AA
Attention:         George Turner
Telephone No: +44 (0) 20 7678 1401
Facsimile No: +44 (0) 20 7678 7186
E-mail: george.turner@uk.abnamro.com

With a copy to:
Attention:         Mike Hodgson
Telephone No: +44 (0) 20 7678 7927
E-mail:   mike.hodgson@uk.abnamro.com


**If to the Counterparty**, at:

Rye Select Broad Market XL Portfolio Limited
c/o Tremont Group Holdings, Inc.
555 Theodore Fremd Avenue, Suite C-300
Corporate Center at Rye
Rye, New York 10580
Telephone: (914) 925-1140
Telecopier: (914) 925-9337
Attention: Darren Johnston
Telephone: (914) 925-1888