# EXHIBIT B

**Cash-settled Index Swap Transaction**

**Rye Select Broad Market XL Fund, LP.**

c/o Tremont Partners, Inc.
555 Theodore Fremd Avenue
Rye, New York 10580

Telephone: (914) 925-1140
Telecopier: (914) 925-4090

**Date: 1 November 2007**
**Reference: [   ]**

___

To whom it may concern,

The purpose of this letter agreement (this "**Confirmation**") is to confirm the terms and conditions of the Transaction entered into between you, Rye Select Broad Market XL Fund, LP. (the "**Counterparty**"), and us, ABN AMRO Bank N.V., London branch ("**ABN AMRO**"), on the Trade Date specified below (the "**Transaction**"). This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

1.      This Confirmation evidences a complete and binding agreement between you and us to the terms of the Transaction to which this Confirmation relates. This Confirmation incorporates by reference, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross-Border) (the 1992 version) (the "**ISDA Master**") as if you and we had executed such agreements in such form along with and subject to the provisions set forth below, on the Trade Date specified below (such provisions, along with the ISDA Master the "**Agreement**"), with this Transaction being the only transaction to be entered into under the Agreement. This Confirmation shall constitute a Confirmation for purposes of the ISDA Master.

        The definitions and provisions contained in the 2000 ISDA Definitions (the "**Swap Definitions**") and in the 2002 ISDA Equity Derivatives Definitions (the "**Equity Definitions**", and together with the Swap Definitions, the "**Definitions**"), in each case as published by the International Swaps and Derivatives Association, Inc. are incorporated by reference into this Confirmation. In the event of any inconsistency between the Swap Definitions and the Equity Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern. In the event of any inconsistency between the Definitions, the ISDA Master and this Confirmation, this Confirmation will govern.

2.      **The terms of the particular Transaction to which this Confirmation relates are as follows:**

2.1     **General Terms:**

        Trade Date:                     1 November 2007

| | |
|---|---|
| Effective Date: | 1 November 2007 |
| Termination Date: | 31 October 2010, subject to adjustment in accordance with the Modified Following Business Day Convention |
| Index: | The Dynamic Leveraged Reference Fund Index, as described in Annex 1 attached hereto, which is an index linked to the Reference Fund |
| Index Unit: | One unit of the Index, initially worth USD $1,000 on the Effective Date |
| Reference Fund: | Rye Select Broad Market Fund, LP. |
| Reference Fund Interest: | A Limited Partnership Interest in the Reference Fund. |
| Reference Fund Documentation: | The private placement memorandum, limited partnership agreement, certificate of limited partnership and subscription-agreements of the Reference Fund specifying the terms and conditions relating to the Reference Fund Interests, in each case, as amended from time to time. |
| Exchange(s): | Not Applicable |
| Related Exchange(s): | Not Applicable |
| Clearance System(s): | Not Applicable |
| Counterparty Exchange Amounts: | The sum of the Initial Amount and the Increase Amount(s). The Initial Amount and the Increase Amount(s) will not bear any interest of whatsoever nature |
| Initial Amount | A USD cash amount equal to the Equity Notional Amount as of the Effective Date. On the Effective Date, Counterparty shall transfer to ABN AMRO the Initial Amount. |
| Increase Amount: | An amount determined and paid to ABN AMRO pursuant to paragraph (a) of the "Equity Notional Amount" provision below. |
| Decrease Amount: | An amount determined pursuant to paragraph (b) of the "Equity Notional Amount" provision below and paid to Counterparty on the relevant Cash Settlement Payment Date. |
| Final Exchange Amount: | The amount of the Counterparty Exchange Amounts which have not been previously returned to the Counterparty as a Decrease Amount(s) and which shall be (a) increased by the Equity Amount (if the Equity Amount is a positive number) or (b) reduced by the absolute value of the Equity Amount if the Equity Amount is a negative number, but the Final Exchange Amount shall not be reduced below zero. The Final Exchange Amount shall be paid by ABN AMRO |

to the Counterparty on the final Cash Settlement Payment Date.

Business Day:                    London and New York.

## 2.2    Equity Amounts

Equity Amount Payer:             ABN AMRO

Equity Amount Receiver:          Counterparty

Type of Return:                  Price Return, subject to the definition of "Performance Unit" as set forth in the Index Rules in Annex I.

Equity Amount:                   means, subject to the proviso below, an amount in the Settlement Currency as determined by the Calculation Agent and equal to:

$$ENA \times \left( \frac{P_f - P_i}{P_i} \right)$$

where:

"*ENA*" means Equity Notional Amount,

"$P_f$" means Final Price, and

"$P_i$" means Initial Price.

provided that, if the Equity Amount is:

(a) positive, the Equity Amount Payer shall pay the Equity Amount to the Equity Amount Receiver; or

(b) negative, the Equity Amount Receiver shall pay the absolute value of the Equity Amount to the Equity Amount Payer.

For the avoidance of doubt, the maximum amount that is payable by the Counterparty in respect of the Equity Amount hereunder shall be limited to the amount of the Counterparty Exchange Amounts outstanding as at the relevant Valuation Date and no such amount shall be payable by Counterparty, it being agreed that alternative (b) above shall be fully satisfied by Counterparty Exchange Amounts previously paid by Counterparty.

Notwithstanding anything contained in this Confirmation or any schedule, addendum or other document issued or delivered in connection with this Transaction, this Confirmation and this Transaction shall (except to the extent of damages caused to ABN AMRO by the fraud, bad faith or gross negligence of any of the following applicable person(s), as the case may be) be non-recourse to Counterparty's affiliates, partners (general or

limited), officers, members or related parties or any partners (general or limited), officers or members of each of the foregoing.  For the avoidance of doubt, nothing in this paragraph shall be construed to expand any obligation or liability that Counterparty or any of its affiliates, partners (general or limited), officers, members or related parties or any partners (general or limited), officers or members of any of the foregoing would otherwise have to ABN AMRO.

**Equity Notional Amount:**  USD 7,500,000; provided that notwithstanding anything to the contrary in this Confirmation, the Equity Notional Amount shall not, at any time during the term of this Transaction, be  greater than the Upper Limit, and provided, further that:

(a) Upon 5 Business Days prior notice, Counterparty may increase the Equity Notional Amount by delivering an amount in the Settlement Currency equal to the amount of the increase (the "**Increase Amount**"),  which such amount shall be added to the Counterparty Exchange Amount and such aggregate amount (the Counterparty Exchange Amount plus all other Counterparty Exchange Amounts) shall be the new Counterparty Exchange Amount, provided that after giving effect to the increase in the Equity Notional Amount, an Event of Default or Termination Event shall not have occurred and be continuing or will not occur in respect of the Counterparty.

In the event Counterparty seeks to increase the Equity Notional Amount, Counterparty must deliver the Increase Amount to ABN AMRO at least one Business Day prior to the day on which ABN AMRO is required or permitted to make a subscription in accordance with the notice specified above.

Counterparty acknowledges that ABN AMRO may hedge itself in respect of this Transaction by entering into certain hedging transactions, including but not limited to subscribing for Reference Fund Interests.  Where ABN decides to hedge itself by so subscribing for Reference Fund Interests, ABN AMRO shall (or shall cause a relevant ABN    AMRO    affiliate    to)    (collectively,    the "Subscription/Withdrawal Covenants"):

(i) submit properly completed subscription forms to acquire Reference Fund Interests on the date(s) when the Equity Notional Amount and Increase Amounts, as applicable, are delivered to ABN AMRO (or as soon thereafter as subscriptions are first permitted under the Reference Fund Documentation); and

(ii) submit properly completed redemption/withdrawal forms to redeem/withdraw the applicable value of Reference Fund Interests on the date(s) when (a) there is a decrease in the Equity Notional Amount as requested by the Counterparty, (b) the Transaction is terminated in part

or in full, or the Termination Date has occurred or (c) a Re-balancing Event occurs (in each case as soon thereafter as redemptions are first permitted under the Reference Fund Documentation).

If such hedge is not made in part or in full in the Reference Fund Interests, all determinations and calculations shall be made on the basis that the Subscription/Withdrawal Covenants would have been complied with (i) if ABN AMRO had hedged itself in the manner set forth above or (ii) by a hypothetical investor in the Reference Fund with the characteristics of a US investor for the purposes of the relevant withholding tax rules of the United States, as applicable.

If the Increase Amount has been received by ABN AMRO within the period specified above and ABN AMRO fails to submit a valid properly completed subscription request on the first day thereafter on which the Reference Fund (or its agent) would ordinarily accept subscriptions, the Equity Amount payable to the Counterparty shall include the amount that would otherwise be payable if such subscription had been validly made and the Equity Notional Amount shall reflect the Increase Amount. For the avoidance of doubt, ABN AMRO shall not be liable for such adjusted Equity Amount if the Reference Fund (or its agent) rejects an otherwise valid subscription request, in which case such Increase Amount shall be immediately repaid by ABN AMRO to Counterparty.

Any such increase in the Equity Notional Amount shall become effective only upon the earlier of the date that either (i) ABN AMRO receives evidence reasonably satisfactory to it from the sub-administrator of the Reference Fund that an additional amount equal to the Increase Amount has been added to the Reference Fund Interest that ABN AMRO or its affiliate already owns as of such date or (ii) a hypothetical qualified investor investing in the Reference Fund would receive having submitted on the first day, after receipt by ABN AMRO of the Increase Amount, on which the Reference Fund (or its agent) would ordinarily accept subscriptions with respect to an amount equivalent to the Increase Amount, confirmation from the sub-administrator of the Reference Fund that such additional Increase Amount had been notionally added to a Reference Fund Interest.

(b) Subject to the terms of Paragraph 2.4 below, upon 5 Business Days prior notice, Counterparty may request to decrease the Equity Notional Amount by a specified amount. Such decrease shall be effective, as applicable, on the earlier of the date ABN AMRO or its affiliate actually receives (if it is hedged by it or its affiliate holding the applicable Reference Fund Interests) or would have received (if it had been hedged by holding the applicable Reference Fund Interests), proceeds ("Actual Proceeds" if

there was a hedge, otherwise, "Notional Proceeds") on the redemption/withdrawal or hypothetical redemption/withdrawal of the relevant amount of the Reference Fund Interests that represents the amount of such requested decrease, or such lesser amount, if the Reference Fund is unable or unwilling to redeem/withdraw the relevant amount of the Reference Fund Interests requested (any decrease in the Equity Notional Amount under this paragraph, the "Decrease Amount"). Notwithstanding the foregoing, if such Actual Proceeds or Notional Proceeds are received or would have been received in installments or in part, such decrease shall be effective in the case of each installment or in part upon the earlier of the receipt or hypothetical receipt of such installment or parts of Actual Proceeds or Notional Proceeds (the "Installment Concept").

| Upper Limit | USD 125,000,000. |
| Initial Price: | The Initial Price shall be determined by the Calculation Agent as follows: |

(a) On the Effective Date: the Initial Price shall be equal to the value of one Index Unit, i.e. USD 1,000.

(b) The Initial Price shall be adjusted from time to time for increases of the Equity Notional Amount as follows:

1. The Calculation Agent shall first determine the new Equity Notional Amount ("New ENA") by adding the value of the Equity Notional Amount immediately before any increase and the Increase Amount;

2. The Calculation Agent shall then determine the new number of Index Units (such total number of Units, the "New Number of Units") resulting from the above increase, as follows:

$$\frac{ENA_p}{VIU_p} + \frac{I_t}{VIU_t}$$

where:

"$ENA_p$" means either (i) the initial Equity Notional Amount if there has been no increase in the Equity Notional Amount or (ii) the value of the Equity Notional Amount immediately prior to the relevant increase, or as the case may be;

"$VIU_p$" means either (i) USD 1,000 on the Effective Date or (ii) the value of one Index Unit immediately prior to the increase being calculated, as the case may be;

"$I_t$" means the Increase Amount on the effective day of such increase; and

$VIU_i$ means the value of one Index Unit on the effective day of such increase;

3. Upon determining the New Number of Units, the Calculation Agent shall divide the New ENA by the New Number of Units and the result of this calculation shall be the new Initial Price (which may be subsequently adjusted in accordance with the methodology set out herein).

| | |
|---|---|
| Final Price: | Subject to Paragraph 2.5 of this Confirmation, the Final Price shall be the value of an Index Unit as determined by the Calculation Agent on the basis of (i) the actual proceeds received by ABN AMRO (or a relevant affiliate) on the redemption/withdrawal or sale of the relevant Reference Fund Interests (as adjusted pursuant to the Equity Notional Amount provisions specified above) held by it as its hedge for the terminating portion of the Transaction, and/or, as applicable, (ii) the notional proceeds ABN AMRO (or a relevant affiliate) would have received on the notional redemption/withdrawal of the relevant Reference Fund Interests (as adjusted pursuant to the Equity Notional Amount provisions specified above) if held by it as its hedge for the terminating portion of the Transaction assuming properly completed redemption/withdrawal forms (as applicable) were submitted and completed as soon as possible. |
| Equity Notional Reset: | Not Applicable provided that the Equity Notional Amount may increase or decrease as set forth herein. |
| Valuation Time: | Not Applicable. |
| Valuation Date(s): | Withdrawal date in respect of the Reference Fund as defined in the Reference Fund Documentation. |
| Futures Price Valuation: | Not Applicable. |
| Exchange-traded Contract: | Not Applicable. |

## 2.3    Floating Amounts

The parties hereto hereby irrevocably agree that none of them will be liable or obliged to pay to the other party any Floating Amount, interest or other remuneration in respect of the Equity Notional Amount.

## 2.4    Decrease of the Equity Notional Amount

Notwithstanding any other termination provision contained in this Confirmation or the Agreement (provided all ABN AMRO's and counterparty's rights in case of Termination Event or Event of Default attributable to the other shall be reserved in all circumstances), the Counterparty may elect to terminate this Transaction in whole or in part by giving up to 5 Business Days prior notice specifying the amount of the Equity Notional Amount to be terminated under the transaction. The Equity Notional Amount reduction shall be in accordance with paragraph (b) of the Equity Notional Amount provision specified above.

The decrease in the Leverage Unit Value corresponding to the Equity Notional Amount reduction shall be determined by the Index Agent in accordance with the Index Rules set out in Annex 1.

(a) Early Termination Fees

Subject to the paragraphs below in this Section 2.4, If Counterparty decreases the Equity Notional Amount in accordance with the provisions contained in the immediately preceding paragraph above, the Counterparty shall pay to ABN AMRO a net amount calculated and determined by the Calculation Agent as follows:

$$\frac{R \times F \times ACT}{360},$$

where:

"R" is the absolute value of the amount of the reduction in the Equity Notional Amount;

"F" means, if the reduction occurs during (i) the First Period, 0.01 and (ii) the Second Period, 0.005;

"First Period" means a period beginning on and including the Trade Date and ending on and including 1 November 2008;

"Second Period" means a period beginning on and including the first calendar day that immediately follows the end of the First Period and ending on and including 1 May 2009; and

"ACT" means the actual number of days from and including the day (such day, the "Reduction Day") on which the reduction occurs until and including the end of the (i) First Period, if the Reduction Day occurs during the First Period, or (ii) the Second Period, if the Reduction Day occurs during the Second Period.

For the avoidance of doubt, an early termination of this Transaction pursuant to Paragraph 7 below will not entitle ABN AMRO to the early termination amounts or fees specified in this Paragraph 2.4.

ABN AMRO will not be entitled to the above mentioned amounts or fees specified in this Paragraph 2.4 if (i) the Counterparty terminates this Transaction due to the inability of the Reference Fund to engage an independent third party service provider/administrator to fulfill the reporting requirements specified in the Side Letter (as hereafter defined) or (ii) the reduction in the Equity Notional Amount results from one or more investors in the Counterparty requesting withdrawal of Limited Partnership Interests in the Counterparty, provided that if the purpose of such investors' withdrawal of Limited Partnership Interests is to invest, directly or indirectly, in a similar or equivalent investment vehicle as the Counterparty, managed by Tremont Partners, Inc. or one of its affiliates (as evidenced by such investor's direct or indirect investment in such similar or equivalent investment vehicles), then ABN AMRO will be entitled to such fees, or (iii) ABN AMRO enters into any direct communications howsoever arising with the Account Manager in respect of this Transaction, or (iv) the Account Manager ceases for any reason to accept instructions from the Reference Fund to enter into new investments or the Account Manager returns any investments to the Reference Fund and the Counterparty has reasonable grounds for believing that such cessation or return of investments will remain in effect for a material period, or (v) there is a breach in respect of this Confirmation or the Agreement wholly attributable to ABN AMRO or an Event of Default or a Termination Event has occurred with respect to ABN AMRO, or (vi) ABN AMRO is no longer an Eligible Counterparty as defined in the Confidential Private Placement Memorandum of the Counterparty, effective as at the

date of this Confirmation (or any future Confidential Private Placement Memorandum of the Counterparty which contains a definition of Eligible Counterparty meeting the same criteria as the Confidential Private Placement Memorandum of the Counterparty in place as at the date of this Confirmation) (an "Eligible Counterparty"). This term shall not give effect to any rating decrease permitted by such definition. For the avoidance of doubt, the Eligible Counterparty definition referred to in the previous sentence should be satisfied at all times during the life of the Transaction. In the event that the Counterparty reasonably believes that ABN AMRO is not entitled to such fees due to this paragraph, the Counterparty shall provide ABN AMRO with reasonably satisfactory evidence that the above conditions are satisfied, provided that no such evidence shall be required in the case of (iii) and in the case of (ii), the following will be considered sufficient evidence: (a) reasonably satisfactory evidence from the sub-administrator confirming such withdrawal with due consideration for confidentiality concerns; and (b) a certificate from Tremont Partners, Inc. confirming that the purpose of such investors' withdrawal of Limited Partnership Interests is not to invest, directly or indirectly, in a similar or equivalent investment vehicle as the Counterparty, managed by Tremont Partners, Inc. or one of its affiliates.

(b) Minimum Notional Amount

If Counterparty decreases the Equity Notional Amount to an amount which is equal to or less than USD 7,500,000 (the "Minimum Notional Amount"), then ABN AMRO may, within 30 days from the occurrence thereof, terminate this Transaction in whole, but not in part only, by notification in writing to Counterparty in accordance with the Notice provisions contained in Annex 2 hereto. Such termination shall be deemed to be an Additional Termination Event for purposes of Section 6 of the Agreement.

## 2.5    Termination Provisions

Notwithstanding anything to the contrary contained in this Confirmation, the Agreement, the Definitions or any other document relating to this Transaction, following termination of this Transaction for any reason whatsoever including, but not limited to, termination on the originally scheduled Termination Date, an Index Disruption Event (as defined in Annex 1), Event of Default, Illegality or Additional Termination Event (as such terms are defined in the ISDA Master), then the amount payable to Counterparty by ABN AMRO shall be the Termination Amount (the "Termination Amount"), and (a) the Termination Amount will be the Index Value, determined by reference to, without duplication, (i) the redemption/withdrawal or sale proceeds that are actually received by ABN AMRO (or the affiliate of ABN AMRO holding the relevant Reference Fund Interest) and/or, as applicable, (ii) redemption/withdrawal proceeds that would have been received if ABN AMRO (or its affiliate) had submitted proper, valid subscription and redemption/withdrawal requests (as specified in Equity Notional Amount above) in respect of its hedge to this Transaction with all Counterparty Exchange Amounts and Leverage Units and assuming compliance with the Subscription/Withdrawal Covenants and/or, as applicable, (iii) notional full redemption/withdrawal proceeds that would have been received if ABN AMRO (or its affiliate) had hedged itself in respect of this transaction by notionally acquiring Reference Fund Interests with relevant Counterparty Exchange Amounts and relevant Leverage Units in full compliance with the Subscription/Withdrawal Covenants (hypothetical or notional proceeds under (ii) and (iii), the "Hypothetical Proceeds"), assuming that ABN AMRO (or such affiliate) redeems and withdraws and unwinds such hedge or notional hedge as soon as practicable and possible following the event leading to such termination in accordance with the Reference Fund Documentation.

During the course of the redemption/withdrawal process, until such time as the sum of the redemption/withdrawal or sale proceeds and/or the sum of the Hypothetical Proceeds (as applicable), (as described in (i) through (iii) above) are equal to the product of (a) the Leverage Unit Value and (b) the number of Index Units (each as determined immediately

prior to the relevant termination event), any unredeemed Reference Fund Interests (not withdrawn) will continue to be held by ABN AMRO (or the affiliate of ABN AMRO holding the relevant Reference Fund Interests) and valued at zero;    provided that for the avoidance of doubt there will be no double counting such amount and; provided further that as soon as the sum of redemption/withdrawal proceeds and/or the sum of the Hypothetical Proceeds (as applicable),  equal to the product of (a) and (b) as described above have been received or notionally received by ABN AMRO (or such affiliate) from the Reference Fund, any additional redemption/withdrawal or sale proceeds and/or Hypothetical Proceeds will be paid by ABN AMRO to Counterparty and any remaining unliquidated Reference Fund Interests and proceeds and rights in respect thereof will be assigned by ABN AMRO (or such affiliate) to Counterparty.  For the avoidance of doubt, until sufficient redemption/withdrawal or sale proceeds and/or Hypothetical Proceeds have been received or notionally received equal to the product of (a) and (b), the interest component included in the calculation of Leverage Unit Value will continue to apply.

This Section 2.5 shall take into account redemption/withdrawal proceeds received and Notional Proceeds that would have been received if ABN AMRO hedged by having its affiliate invest in the Reference Units in accordance with Performance Unit on Annex 1.

**2.6   Settlement Terms:**

| | |
|---|---|
| Settlement Currency: | USD |
| Cash Settlement: | Applicable |
| Cash Settlement Payment Date: | as soon as practicable following the earlier of the receipt by ABN AMRO or its affiliate of the actual proceeds of the redemption/withdrawal of any of the Reference Fund Interests previously held by it as its hedge for the Transaction or the hypothetical receipt by ABN AMRO or its affiliate of Hypothetical Proceeds, but in no event more than 3 days after the earlier of such receipt or hypothetical receipt, taking into account the Installment Concept. |

**2.7   Index Adjustment Events:**

None of the Adjustments provided for in Articles 11 or 12 of the Equity Definitions shall apply. Instead, the Calculation Agent shall apply exclusively the Index Adjustment Provisions set out in Annex 1 hereto.

**2.8   Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Insolvency Filing: | Not Applicable |
| Hedging Disruption: | Not Applicable |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |

3.    **Calculation Agent – Index Agent**

ABN AMRO shall be the Calculation Agent and the Index Agent. Whenever a Calculation Agent, ABN AMRO or the Index Agent is required hereunder to act or to exercise judgment in any way, it will do so in good faith and in a commercially reasonable manner.

4.    **Account Details:**

Account for payments to ABN AMRO:    ABN NYC (SWIFT: ABNAUS33)
A/c number: 6740-5450-1541
ABN AMRO Bank N.V., London Branch (SWIFT: ABNAGB2P)

Account for payments to the Counterparty:    Bank of New York, One Wall Street, New York NY 10286
ABA#: 021-000-018
A/c name: Rye Select Broad Market Fund, L.P
A/c number: 890-0631-473

5.    **Offices:**

(a) The Office of ABN AMRO for this Transaction is: London.   As if there was a Schedule to the ISDA Master, the Counterparty and ABN AMRO hereby specify that Section 10(a) of the ISDA Master applies to ABN AMRO.

(b) The Office of the Counterparty for this Transaction is: Rye, New York

6.    The "Cross Default" provisions of Section 5(a)(vi) of the ISDA Master will apply to ABN AMRO and to the Counterparty and "Specified Indebtedness" shall have the following meaning. Section 14 of the ISDA Master is amended as follows:

"**Specified Indebtedness**" shall mean any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) (a) in respect of borrowed money (which, for the avoidance of doubt, shall include, without limitation, bonds, notes, commercial paper or similar instruments issued or guaranteed by the relevant party), and (b) any amount due and payable in respect of any Specified Transaction (except that, for this purpose only, the words "and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party)" shall be amended and replaced by "and any other entity" where they appear in the definition of Specified Transaction), any repo transaction, any reverse repo transaction and any stock loan transaction.

Section 5(a)(vi) of the ISDA Master is amended by the insertion of the following words after the words "due and payable" on line 8:

"or, in the case of Specified Indebtedness in respect of any Specified Transaction, any repo transaction, any reverse repo transaction and any stock loan transaction, which has resulted in such Specified Indebtedness becoming due and payable as a result of the early termination of the relevant Specified Transaction, repo transaction, reverse repo transaction or stock lending transaction, as the case may be".

Where the Counterparty has entered into transactions with third parties on substantially similar terms to this Transaction, the determination of Specified Indebtedness shall

disregard, and not count as due and payable, or being declared or capable of being declared as due and payable, sums already paid to such third parties.

The "Threshold Amount" means with respect to ABN AMRO, an amount equal to the greater of USD 10,000,000 or three percent (3%) of its total equity share capital (as specified from time to time in its most recent annual report of ABN AMRO containing consolidated financial statements, prepared in accordance with accounting principals that are generally accepted for institutions of its type in the jurisdiction of its organisation and certified by independent public accountants), or its equivalent in any other currency. With respect to the Counterparty, the "Threshold Amount" an amount equal to three percent (3%) of its NAV, or its equivalent in any other currency.

Section 5(a)(vi) of the ISDA Master is hereby amended by adding the following sentence: "Notwithstanding the foregoing, no Event of Default shall be deemed to have occurred under Section 5(a)(vi) if such party confirms to the reasonable satisfaction of the other party within one Business Day after written notice to it of such occurrence that it has the funds to make any applicable payment or, in the case of a non-payment breach or default, it is caused by a correctable administrative or operational error."

"Specified Transaction" shall mean, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement) and the other party to this Agreement (or any Specified Entity of such other party) which is a total return swap transaction or any other substantially similar transaction between such parties, or (b) any other transaction identified as a Specified Transaction in the Agreement or relevant confirmation.

7.      The "Credit Event Upon Merger" provisions of Section 5(b)(iv) of the ISDA Master will apply to ABN AMRO only provided however, that "Credit Event upon Merger" shall not have its meaning as defined in Section 5(b)(iv) of the ISDA Master but it shall mean that:

(i)     ABN AMRO (referred to herein as "X" for purposes of this paragraph 7(i)) consolidates or amalgamates with, or acquires the majority of the shares in, or merges into, or transfers all or substantially all its assets to, another entity ("Y") or Y consolidates or amalgamates with, or acquires the majority of the shares in, or merges into, or transfers all or substantially all its assets to X; and

(ii)    such action does not constitute an event described in Section 5(a)(viii) of the ISDA Master; and

(iii)   In the event ABN AMRO, its successor, or the relevant acquiree, immediately after such action, ceases to be or is not an Eligible Counterparty.

8.      **Payments on Early Termination.** For the purpose of Section 6(e) of the ISDA Master the provisions of paragraph 2.5 above will apply in lieu of Section 6(e).

9.      "Termination Currency" means US Dollars.

10.     (a) **Payer Representations.** For the purpose of Section 3(e) of the ISDA Master, ABN AMRO will make the following representation and the Counterparty will make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of the ISDA Master) to be made by it to the other party under

the ISDA Master. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of the ISDA Master, (ii) the satisfaction of the ISDA Master contained in Section 4(a)(i) or 4(a)(iii) of the ISDA Master and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of the ISDA Master and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of the ISDA Master, *provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of the ISDA Master by reason of material prejudice to its legal or commercial position.

**(b) Payee Representations.** For the purpose of Section 3(f) of the ISDA Master, ABN AMRO and the Counterparty make the representations specified below: None.

11.    **Governing Law.** This Confirmation and the Agreement will be governed by and construed in accordance with New York law.

12.    **Waiver of Jury Trial.** Each Party irrevocably waives any and all right to trial by jury in any legal proceeding instituted in connection with this Agreement or any Transaction to the fullest extent permitted by law. As to any matter for which a jury trial cannot be waived, each party agrees not to assert any such matter as a cross claim or counterclaim in, nor move to consolidate the same with, any legal proceeding in which a jury trial is waived.

13.    **Netting of Payments.** Subparagraph (ii) of Section 2(c) of the ISDA Master will not apply to any group of Transactions.

14.    **No Agency.** Section 3 of the ISDA Master shall be amended by the insertion of the following additional provisions:

"(g)    **No Agency.** Each party represents to the other that it is entering into the Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

15.    **Set-off.** Section 6 of the ISDA Master shall be amended by the insertion of the following additional provision:

"(f)    **Set-off.** Any amount (the "**Early Termination Amount**") payable to one party (the "**Payee**") by the other party (the "**Payer**") under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party will, at the option of the party ("**X**") other than the Defaulting Party or the Affected Party without prior written notice to the Defaulting Party or Affected Party, be reduced by its set-off against any amount(s) (the "**Other Agreement Amount**") payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to, or in favour of, the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off). X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the

rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency. The term "rate of exchange" includes, without limitation, any premiums, and costs of exchange payable in connection with the purchase of or conversion into the relevant currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained. Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

16.    **Pari Passu.** All payment and delivery obligations of each party under the Agreement will rank at least *pari passu* in all respects with all of that party's other unsecured and unsubordinated obligations (except for those which are mandatorily preferred by the operation of law).

17.    **Relationship Between Parties.** Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i)    **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanation related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii)    **Status of Parties.** The other party is not acting as a fiduciary or an adviser to it in respect of that Transaction.

(iv)    **Risk Management.** The Counterparty represents that it is entering the Transactions governed by the ISDA Master purely for the purposes of hedging its exposure or in connection with a line of business, and not for the purpose of speculation.

(v)    **No Agency.** Each party represents to the other that it is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction and any other documentation relating to this Agreement or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(vi)     **Eligible Contract Participant.** It is an "eligible contract participant" under, and as defined in, Section 1a of the Commodity Exchange Act (7 USC 1a), as amended from time to time.

18.    **Counterparty Representations.**

(i)     Section 3(a)(iii) of this Agreement is hereby amended by inserting the words "or investment policies or restrictions" immediately following the word "documents."

(ii)    Section 3(a) of this Agreement is hereby amended by the deletion of "and" at the end of subclause (iv), the substitution of a semi-colon for the period at the end of sub-clause (v) and the addition of the following at the end thereof-

"(vii)   **Compliance with Investment Policies; Investment Advisers Act.**   In the case of Counterparty, (aa) the execution, delivery and performance by Counterparty of this Agreement and the Transactions hereunder do not violate or conflict with the investment policies and objectives of Counterparty set forth in the offering materials and organizational documents of Counterparty from time to time in effect, and (bb) the Counterparty's general partner ("GP") is either registered as an investment adviser under the Investment Advisers Act of 1940, as amended ("Advisers Act") or is not required so to register, and if subject to the Advisers Act, is in compliance with the Advisers Act in all material respects."

(iii)   **Continuous Representation.** In addition to the Representations made under Section 3 of the Agreement, as amended herein, Counterparty makes the following representation and warranty, which shall be deemed to be made continuously at all times that one or more Transactions are outstanding between ABN AMRO and Counterparty:

The assets of Party B are not comprised of "plan assets" for the purposes of 29 C.F.R. § 2510.3-101. Party B is not an "employee benefit plan" (as defined under the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) or a "benefit plan investor" (as defined under 29 C.F.R. §2510.3-101(f)(2) promulgated under ERISA and Section 4975 of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code")) (a "Benefit Plan Investor") and less than twenty-five (25) percent of the value of each class of equity interests in Party B (excluding from the computation interests of any individual or entity with discretionary authority or control over the assets of Party B) is held by employee benefits plans or Benefit Plan Investors. Party B is not entering into the Transaction with funds that constitute, directly or indirectly, the assets of an employee benefit plan subject to Title I of ERISA or a plan subject to Section 4975 of the Internal Revenue Code of 1986. The representations and covenants contained in this paragraph are correct, complete and deemed repeated as of each date from (and including) the date of this Confirmation to (and including) the Final Exchange Date.

19.    **ABN AMRO Representation**

ABN AMRO hereby represents and warrants to Counterparty that ABN AMRO's long term, unsecured, unsubordinated debt obligations are rated AA- by Standard and Poor's Ratings Group, a division of The McGraw-Hill Companies, and Aa2 by Moody's Investors Service, Inc.

20.  **Additional Termination Event**

Any Index Disruption Event shall constitute an Additional Termination Event, this Confirmation shall apply.

21.  **Change of Control**

In the event that ABN AMRO Holding N.V. or ABN AMRO merges with, amalgamates with, is consolidated within, or is acquired by another entity, or enters into a transaction having a similar effect and, as a result of such merger, consolidation, amalgamation, acquisition, or similar transaction, there is a change in corporate control, ABN AMRO expressly agrees that this Transaction will not be terminated by ABN AMRO at any time prior to the one-year anniversary of the date of such merger, consolidation, amalgamation, acquisition, or similar transaction, provided that the foregoing shall not apply in the event of an Event of Default, a Termination Event or an Additional Termination Event with regard to Counterparty, or subject to the operation of any provision herein resulting in the reduction of the Equity Notional Amount to zero.  This Section 21 shall not be construed to create or expand any termination right of ABN AMRO.

22.  **Agreement to Deliver Documents**

For the purpose of Section 4(a)(i) and Section 4(a)(ii) of the ISDA Master Agreement, each party agrees to deliver the following documents, as applicable:

(a)      Tax forms, documents or certificates to be delivered are: Tax forms, documents or certificates to be delivered are:- Both parties shall promptly deliver to the other party (or as directed) any form or document accurately completed and in a manner reasonably satisfactory to the other party that may be required or reasonably requested in order to allow the other party to make a payment under a Transaction without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate, promptly upon reasonable demand by the other party.

**(b)**     Other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificates | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Counterparty | Certified evidence of the authority, incumbency and specimen signature of each person executing any document on Counterparty's behalf (including incumbency certificate, resolutions, etc.) | At or prior to the execution of this Confirmation. | Yes |
| Counterparty | Executed copies of all Constitutive Documents (and any amendments thereto), including the Partnership Agreement in respect of the Reference Fund and Private Placement Memorandum. | At or prior to the execution of this Confirmation. | Yes |
| Counterparty | Partnership Formation and /or Registration Certificate (if applicable) | At or prior to the execution of this Confirmation. | Yes |
| Counterparty | Resolution of the Board of the General Partner of the Reference Fund (or investment manager if so delegated) approving entry into of transaction | At or prior to the execution of this Confirmation. | Yes |
| Counterparty | Legal Opinion of in-house or independent counsel, to include capacity and enforceability | At or prior to the execution of this Confirmation | Yes |
| Counterparty | Recent Annual Certified Accounts / Interim statements | At or prior to the execution of this Confirmation. | Yes |
| Counterparty | IRS Form W8-BEN (or any applicable successor form) in a manner reasonably satisfactory to ABN AMRO | At or prior to the execution of this Confirmation | Yes |

| ABN AMRO | IRS Form W8-BEN (or any applicable successor form) in a manner reasonably satisfactory to Counterparty | At or prior to the execution of this Confirmation | Yes |

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

**ABN AMRO Bank N.V., London Branch**
By:

........................................

Name:    ~~Authorised Signatory~~

Title:

By:

........................................

Name:    Sue White
         Authorised Signature

Title:

**Rye Select Broad Market XL Fund, LP**
By: Tremont Partners, Inc. its General Partner

........................................

Name:

Title:

By:

........................................

Name:

Title:

## ANNEX 1

## INDEX RULES

### 1. General Description

The Dynamic Leveraged Reference Fund Index (the "**Index**") notionally replicates a dynamic investment strategy that allocates an investment between two types of investments in Performance Units and Leverage Units (each as defined below). The number of units in each investment depends on several factors, including but not limited to, the level of and path taken of the Index, the Rebalancing Provisions and the Maximum Borrowing Amount. The Index is adjusted between the Performance Units and the Leverage Units according to the Rebalancing Provisions (as described below).

**Index Unit Value:**  On any Trading Day, the USD value of each Index Unit shall be determined by the following equation:

$$I_{(t)} = PC_{(t)} - LC_{(t)}$$

where:

$I_{(t)}$ is the Index Unit Value at time (t) ;

$PC(t)$ is the Performance Unit Value at time (t);

$LC(t)$ is the Leverage Unit Value at time (t); and

(t) as used in this Confirmation shall mean the time when a relevant calculation is made; that the parties expect the calculation of the Index Unit Value is to be made at least monthly and possibly as frequently as daily.
On the Effective Date, the Index Unit Value shall be equal to USD 1,000 per unit.

Index Value shall mean the aggregate value of all of the Index Unit Values.

**Performance Unit:**  The Performance Unit is a notional investment in the Reference Fund Interests, subscribed for by a hypothetical investor which is deemed to have the characteristics of a U.S. Investor for the purpose of the relevant withholding tax rules of the United States. Notwithstanding the election made under Paragraph 2.2 ("**Type of Return**") above, any and all distribution of, or in connection with, Reference Fund Interests shall be re-invested in the Reference Fund through the Index.

**Performance
Unit Value:**  On any Trading Day, the USD value of each Performance Unit shall be the value of one Performance Unit as determined by the Index Agent. For the purposes of calculating the Rebalancing Factor only, and for the avoidance of doubt, not for calculating the Termination Amounts, the value of each Performance Unit shall be the difference between (a) the value of one Performance Unit and (b) the Haircut Penalty per Performance Unit, if any, as each are determined by the Index Agent. In calculating the value as specified in sub-paragraph (a) only, the Index Agent shall use the net asset value provided by the Reference Fund Administrator, or, if such

information is not available or is incomplete, any information it has available to it (which shall be obtained from a reputable source), including but not limited to the latest net asset value of the Reference Fund.

On the Effective Date, the Performance Unit Value shall be USD 3,000 per unit.

**Leverage Unit:** The Leverage Unit is a notional borrowing per Index Unit determined as of the date that ABN AMRO transfers subscription amounts (or provides Counterparty with credit for such notional subscription in the Reference Fund Interests) if it did hedge, if added to the Reference Fund Interests with respect to any Reference Fund Interests, with interest compounded daily based on the Overnight USD-Libor rate, as determined by the Index Agent.

**Leverage Unit Value:** On any Trading Day, the USD value of a Leverage Unit may be determined by the following equation:

$$LC_{(t)} = RLC_{(t-1)} \times \left\{ 1 + \left( \frac{IR_{(t-1)} \times DC_{(t)}}{360} \right) \right\}$$

where:

$LC_{(t)}$ means the value of the Leverage Unit at time (t);

$RLC_{(t-1)}$ means the value of the Leverage Unit on the Trading Day or Business Day (where applicable) immediately preceding time t after a Re-Balancing Event (if any);

$IR_{(t-1)}$ means the applicable Overnight USD-Libor rate (as determined by the Index Agent as of the Trading Day or the Business Day immediately preceding time t after a Re-Balancing Event (if any)) plus Leverage Spread; and

$DC_{(t)}$ means the actual number of calendar days elapsed from and including the Trading Day or Business Day (where applicable) immediately preceding time t after a Re-Balancing Event (if any) until but excluding time (t).

On the Effective Date the Leverage Unit Value shall be USD 2,000 per unit.

**Leverage Spread** 90 basis points per annum

**Re-Balancing Event:** On the 6th Trading Day prior to the end of each calendar month, the Index Agent shall determine whether the Index should be re-balanced and, if so determined, shall rebalance the Index as of the first business day of the immediately succeeding month such that, after deducting any transaction costs paid by ABN AMRO (which have been reasonably incurred) resulting from such Re-Balancing,

the Performance Unit Value and the Leverage Unit Value are as close as possible to the following ratios:

$$RPC_{(t)} = 3 \times I_{(t)}; \text{ and}$$

$$RLC_{(t)} = 2 \times I_{(t)}$$

where:

**RPC$_{(t)}$** means the Performance Unit Value on the standard market close of the Trading Day or Business Day (where applicable) after re-balancing at time (t);

**RLC$_{(t)}$** means the Leverage Unit Value on the Trading Day or Business Day (where applicable) immediately preceding time (t) after a Re-Balancing Event (if any); and

**I$_{(t)}$** means the Index Unit Value on the standard market close of the Trading Day or Business Day (where applicable) before re-balancing at time (t);

Where a Re-Balancing Event results from the Rebalancing Factor being less than 3, the Index Agent will re-balance the Index by increasing the number of Leverage Units and making a notional cash deposit earning interest at USD-Libor until such time as the required additional Permitted Investments have been added to the Reference Fund, subject to the Investment Guidelines and subject to the Maximum Leverage Amount.

Where a Re-Balancing Event results from the Rebalancing Factor exceeding 3, the Index Agent will re-balance the Index by decreasing the number of Leverage Units and liquidating a portion of the investment in the Reference Fund, subject to the Investment Guidelines.

For the avoidance of doubt, any re-balancing will not affect the Index Unit Value, except for the deduction of any transaction costs reasonably incurred by ABN AMRO in relation to a Re-Balancing Event.

Further for the avoidance of doubt, the Index Agent will re-balance the Index on any relevant day after any relevant adjustments required to be made to the Equity Notional Amount have been made.

Reporting Requirements of ABN AMRO: ABN AMRO shall provide the Counterparty with the following:

(a) within 4 Business Days of the receipt of relevant information from the sub-administrator of the Reference Fund, a valuation report including information necessary to confirm the Calculation Agent's valuation of this Transaction in the form set out in Annex 3 attached hereto; and

(b) upon reasonable request from the Counterparty, ABN AMRO shall use reasonable efforts to provide additional information to the Counterparty relating to the valuation of the Transaction.

**Maximum Leverage Amount:**

USD 250,000,000, provided that if at any time the Upper Limit (as specified in the Confirmation between the parties) is reduced, the Maximum Leverage Amount shall be reduced to an amount equal to the product of 2 multiplied by the amended Upper Limit.

**Trading Day:**

A day on which dealing may take place in London and New York.

**Rebalancing Factor:**

The Performance Unit Value (calculated as the difference between the value of one Performance Unit (as determined above) and the Haircut Penalty per Performance Unit) adjusted as set forth in clause (a) and (b) of this definition and then divided by the Index Unit Value:

(a) reduced by (i) the mark-to-market value of any options held by the Reference Fund and (ii) the value ascribed to any side-pockets (as defined below") in the official NAV of the Reference Fund, as notified to the Index Agent, where "side-pocket" means a separate division of interests of the Reference Fund, to which the General Partner of the Reference Fund may determine to allocate or attribute particular investments or assets, which it may segregate from other assets or investments of the Reference Fund; and

(b) adjusted (as set forth in the next sentence) for the value of outstanding submitted and accepted subscriptions or redemptions/withdrawals submitted by ABN AMRO or its affiliate as of the date on which the Rebalancing Factor is to be calculated divided by number of Index Units. For purposes of this calculation, such value, in the case of outstanding subscriptions shall be added to the Performance Unit Value and, in the case of outstanding redemptions/withdrawals, shall be subtracted from the Performance Unit Value.

## 2.  Specific Definitions

### 2.1    Index Adjustment Provisions

Valuation Disruption: If the Index Agent determines that the Reference Fund and/or Tremont Partners, Inc. (the "GP"), the administrator, any sub-administrator, custodian bank, bank or other service provider to the Reference Fund has imposed fees, taxes or other charges or dealing or settlement rules which, in the determination of the Index Agent increases the effective costs associated with a U.S. investor investing in, redeeming, or holding units in the Reference Fund, the Index Agent will make an adjustment to the Index to reflect such costs.

Subsequent Adjustments to NAV: If the Index Agent becomes aware on any Business Day that the basis on which the NAV of the Reference Fund has been or will be amended at any time, the Index Agent may, but shall not be obliged to, make such corresponding adjustments to their basis of calculating the Index as it shall deem appropriate.

For purposes of this Annex 1, "NAV" shall mean total assets minus its total liabilities (inclusive of subscriptions and redemptions), determined in accordance with generally accepted accounting principles.

**2.2**   **Index Disruption Events**

If the Index Agent determines that:

(a)   an order has been made or an effective resolution passed for the winding up or dissolution or termination of the Reference Fund or any other event occurs which, in the reasonable opinion of the Index Agent, has a material adverse effect on the future solvency and liquidity of the Reference Fund, including, but not limited to, any substantive litigation proceedings brought by or on behalf of the investors in the Reference Fund; or

(b)   the Reference Fund ceases to exist; or

(c)   any action, suit, proceeding, inquiry or investigation (each, an "action") has been taken or brought, or is pending, by any court, governmental or regulatory body or agency against the Account Manager (as defined in the Side Letter), Counterparty, the Reference Fund, any representative, agent, affiliate or owner of the Reference Fund which such action the Index Agent reasonably considers has a material adverse effect on the Reference Fund Interests; or

(d)   the Counterparty or the Reference Fund ceases to be managed by Tremont Group Holdings, Inc., or an Affiliate of Tremont Group Holdings, Inc.; or

(e)   unless the Index Agent has consented in writing (such consent not to be unreasonably withheld), there is a material change in the methodology of calculating the NAV of the Reference Fund, or the Reference Fund does not comply in a material respect with, or materially modifies a provision in, (i) the Limited Partnership Agreement or any other documents that relate to the constitution and management of the Reference Fund (excluding side letters with investors in the Reference Fund); and/or (ii) any Reference Fund Documentation relating to the Reference Fund, which relates to:

1. the "Split Strike Conversion Strategy" (as defined below) investment objectives of the Reference Fund; or
2  the voting rights of Limited Partners in respect of the Reference Fund; or
3. the currency in which the Reference Fund Interests are denominated; or
4. the frequency and notice provisions for subscriptions and redemptions of the Reference Fund offered to ABN AMRO (or the affiliate of ABN AMRO holding Reference Fund Interests) is changed; or
5. the issuance or redemption of Reference Fund Interests is suspended,

and the Index Agent determines that such non-compliance or modification is material.

(f)   a "Special Redemption Event", as defined in the Side Letter, has occurred; or

(g)   the Reference Fund or the GP fails to notify ABN AMRO of the creation and details of any "side pockets" (as defined in the Side Letter) in the Reference Fund; or

(h)   the Reference Fund or the GP fails to notify ABN AMRO of the creation of a side letter or other arrangements with respect to which another investor in the

Reference Fund has been offered rights in respect of redemptions or liquidity of shares in the Reference Fund preferential to rights held by ABN AMRO, and in each case ABN AMRO has reasonably determined that such rights would have a material adverse effect on ABN AMRO (or the affiliate of ABN AMRO holding the Reference Fund Interest in the Reference Fund);  or

(i)     the Reference Fund has breached the terms of the Borrowing Limit; or

(j)     any change in U.S. law (or in its application, interpretation or implementation) has occurred after the Trade Date requiring, in the reasonable determination of Calculation Agent, the imposition, deduction or withholding of tax (the "Subject Taxes") which, in respect to a U.S. investor in the Reference Fund, (1) increases in any material respect the effective dealing or holding costs of Interests in the Reference Fund, or (2) has or would have for effect for ABN AMRO or the affiliate of ABN AMRO holding the Reference Fund Interests to receive, in connection with or in respect of distributions, dividends or redemption proceeds relating to the Reference Fund Interests, less in any material respect than it would have received in the absence of any such Subject Taxes; provided that ABN AMRO has used good faith efforts to avoid the foregoing; or.

(k)     any change in taxation adversely affecting in any material respect the treatment of payments made or received by ABN AMRO or the affiliate of ABN AMRO holding the Reference Fund Interests in the Reference Fund in respect of its hedge for the Transaction; provided that ABN AMRO has used good faith efforts to avoid the foregoing; or

(l)     an Index Adjustment Event that has a material adverse effect on ABN AMRO (or the affiliate of ABN AMRO holding the Reference Fund Interests) is occurring and the Index Agent reasonably determines that there is no immediate prospect of such Index Adjustment Event ceasing to occur; or

(m)     in respect of the Reference Fund, on any day on which investors in the Reference Fund would ordinarily be entitled to redeem Reference Fund Interests an event has occurred which, in the reasonable determination of the Index Agent, materially suspends redemptions in Reference Fund Interests at the NAV corresponding to such day; or

(n)     the Reference Fund ceases to employ, either directly or indirectly, an internationally recognized independent third party to provide administrative services including but not limited to trade ticket processing, position reconciliation with the broker, position and fund valuation, preparation of a monthly Net Asset Value, preparation of monthly financial statements and, preparation and maintenance of all material accounting books and records required by US GAAP; or

(o)     in the reasonable opinion of the Index Agent, the Reference Fund is in material breach of the terms of the Side Letter which is not cured within 5 Business Days after the Index Agent notifies the Counterparty in writing of the breach, or the Reference Fund for any reason fails to provide the liquidity requested by the U.S. affiliate of ABN AMRO holding the Reference Fund Interests in accordance with the terms of the Side Letter; or

(p)     in the reasonable opinion of the Index Agent, any of the administrator, registrar or custodian of the Reference Fund (i) is of a lesser standing than on the date of entering into this transaction such that their ability to perform their respective obligations in connection with the Reference Fund is materially adversely

affected, the Index Agent has notified Tremont Partners, Inc. of this occurrence and Tremont Partners, Inc. has failed to change the relevant entity or provide valid assurances to the Index Agent that the relevant entity is able to perform its respective obligations, and/or (ii) the legal and/or financial independence of such entity from the relevant investment manager is materially compromised, and/or (iii) such entity is removed or resigns without proper replacement reasonably acceptable to ABN AMRO; or

(q)    the manager employing the split strike conversion strategy with whom the Reference Fund invests the majority of its assets, ceases to be the Account Manager; or

(r)    any of the following events occur following the Trade Date in respect of the Account Manager: (1) a material change of control or of its management; or (2) the Reference Fund ceases to invest the majority of its assets in a brokerage account at a registered broker dealer or in an investment that offers the Reference Fund similar liquidity provisions; or

(s)    Tremont Group Holdings Inc. and/or the Reference Fund fail to allow annual onsite inspections of all relevant documentation including but not limited to SEC Advisor's Form ADV Part 2, the annual audited financial statements and the annual Independent Auditors Report on Internal Control prepared by the auditors pursuant to SEC Rule 17a-5.

(each an "**Index Disruption Event**"), then the Index Agent may cease the determination and publication of the Index Unit Value and terminate the Transaction in which case such Index Disruption Event will be an Additional Termination Event, and the termination provisions in the Confirmation shall apply.

The "**Side Letter**" shall mean that certain side letter, dated as of the date hereof, by and between, inter alia, the Reference Fund and ABN AMRO.

**2.3    Investment Guidelines**

(a) Investment Guidelines for the Reference Fund:

| | |
|---|---|
| **Reference Fund**<br>**Eligible Investments** | USD cash<br>US Treasury Securities<br>USD money market funds<br>Split-Strike Conversion Strategy Eligible Investments<br>Units/shares of other hedge funds subject to:<br>        maximum 5% of Reference Fund assets under management ("AUM") per manager, and maximum of 10% of Reference Fund AUM overall ("**Other Funds Limit**").<br><br>Any holding of an investment which is not an Eligible Investment will be subject to the Non-Eligible Investment Penalty. |
| **Borrowing Limit** | 20% for liquidity purposes only, and provided that the value of any assets pledged as security for a loan entered into by the Reference Fund does not exceed 120% of the loan value. Amounts owed to Service Providers in the ordinary course of business shall not count for these purposes. |

(b) Investment Guidelines for the Split-Strike Conversion Strategy component of the Reference Fund:

**Split-Strike Conversion Strategy Eligible Investments**

USD cash

Listed equity securities in S&P 100

Long S&P 100 index Put options, either listed or OTC with identical contract terms to equivalent listed options Short S&P 100 index Call options, either listed or OTC with identical contract terms to equivalent listed options.

Maximum option maturity: 1 year.

Any holding of an investment which is not a Split-Strike Conversion Strategy Eligible Investment (a "Non-Eligible Investment"), and which is not an option, other derivative or any financial instrument which gives rise to a contingent liability, will be subject to the Non-Eligible Investment Penalty.

Where a Non-Eligible Investment is an option, other derivative or a financial instrument which gives rise to a contingent liability, the Index Agent shall decrease to zero the number of Leverage Units and make a corresponding decrease to the number of Performance Units and liquidate the relevant portion of the investment in the Reference Fund, subject to the Investment Guidelines, such liquidation to take place after the elapse of a one-week 'cure' period, which such period shall commence upon the giving of Notice by the Index Agent to the Investment Manager provided that the relevant breach has not been remedied by the Investment Manager of the Reference Fund.

**Split-Strike Conversion Strategy**

The "Split Strike Conversion Strategy" referred to in the "Investment Objective" section of the prospectus of the Reference Fund consists of: (i) the purchase of a group or basket of equity securities that are highly correlated to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities or maintains investments in USD cash, USD money market funds or US Treasury Securities. In order for the Split Strike Conversion Strategy to be acceptable hereunder, the following terms must be met: (a) the number of put options must be greater than or equal to the number of call options; (b) the product of (i) the number of call options and (ii) the underlying Index Unit Value and (iii) the contract size must be less than 120% of the value of the basket of equity securities; (c) the product of (i) the number of put options and (ii) the underlying Index Unit Value and (iii) the contract size must be more than 80% and less than 120% of the value of the basket of equity securities; (d) the average strike of the put options must be less than the average strike of the call options; and (e) the average

strike of the put options must be greater than the 80% of the spot price of S&P100 Index at all times.

**Issuer Concentration**    The single largest long equity position of the Reference Fund shall not be more than 15% of the Reference Fund's NAV. The 5 largest long equity positions of the fund shall not be more 40% of the fund's NAV.

**Sector Concentration**    No more than 35% of the Reference Fund AUM may be invested in any single sector (as such sectors are defined by S&P). The Investment Manager may operate outside of this limit provided that (a) the sector concentration is within 10% of the S&P 100 sector concentrations or (b) there is the written consent by ABN AMRO.

**Volatility Limit**    The annualized volatility of the Reference Fund may not exceed 7%, calculated on a rolling 3-month basis (based on weekly observations).

**Drawdown Limit**    Any reduction of the Reference Fund's NAV shall not exceed 5% over a rolling 4-week period.

**Delta Concentration**    The absolute value of the aggregated delta exposure of the Reference Fund may not exceed 100%.

(c) Penalties for breaches of the investment guidelines:

Breaches of the Investment Guidelines will lead to a proportionate decrease in the amount of leverage comprised in the Index implemented by means of the deduction of an amount equal to the Haircut Penalty from the Performance Unit Value, such Haircut Penalty to be applied after the elapse of a one-week 'cure' period, which such period shall commence upon the giving of Notice by the Index Agent to the Investment Manager provided that the relevant breach has not been remedied by the Investment Manager of the Reference Fund.

**Other Funds Penalty**    The Other Funds Penalty shall be the value of the Reference Fund AUM allocated to a single manager and/or any other funds in excess of the Other Funds Limit.

**Non-Eligible**
**Investment Penalty**    In respect of investments which are Non-Eligible Investments and which are not options, other derivatives or any financial instrument which gives rise to a contingent liability, the Non-Eligible Investment Penalty shall be the value of such non-Eligible Investments.

**Issuer Concentration**
**Penalty**    The Issuer Concentration Penalty shall be the sum of (i) the value of each long equity position in the Reference Fund that exceeds 15% of Reference Fund AUM and (ii) the value of the 5 largest equity positions of Reference Fund AUM that exceeds 40% of the Reference Fund AUM.

**Sector Concentration**

**Penalty**

The Sector Concentration Penalty shall be the value, determined by applying the percent calculated in the following sentence to the Reference Fund AUM. Such percentage is calculated as actual sector allocation in the Reference Fund (measured as a percentage) less the greater of (a) 35% and (b) the actual sector weighting in the S&P 100 (as measured by the S&P 100, calculated as of the same day as the actual sector allocation measurement and referring to the same sector) + 10%.

**Volatility Cap Penalty**

The value of 5% of the Reference Fund AUM for each 1% by which the Reference Fund volatility exceeds the Volatility Limit.

**Delta Penalty**

The value by which the actual delta of the Reference Fund exceeds the Delta Concentration Limit.

**Drawdown Penalty**

The value of 5% of the Reference Fund AUM for each 1% by which the actual drawdown of the Reference Fund exceeds the Drawdown Limit of 5%.

**S&P Hedge Penalty**

The value, determined by applying the percent calculated in the following sentence to the Reference Fund AUM. Such percentage is calculated as the sum of (i) the percentage by which the product of (a) the number of puts owned by the Reference Fund minus the number of calls owned by the Reference Fund and (b) the contract size of such puts and calls and (c) the underlying S&P 100 index level is less than zero (if any) and (ii) the percentage by which the product of the number of puts owned by the Reference Fund and the contract size of such puts and the underlying S&P 100 index level exceeds 120%, or is less than 80%, as the case may be (or none), (iii) the percentage by which the average strike of the put options owned by the Reference Fund is greater than the average strike of the call options owned by the Reference Fund, (iv) the percentage by which the average strike of the put options owned by the Reference Fund is less than 80% of the spot price of S&P 100 Index.

**Haircut Penalty**

This means the sum of:
(a) The Other Funds Penalty
(b) the Non-Eligible Investment Penalty
(c) the Issuer Concentration Penalty;
(d) the Sector Concentration Penalty;
(e) the Volatility Cap Penalty;
(f) the Delta Penalty;
(g) the Drawdown Penalty; and
(h) the S&P Hedge Penalty.

**ANNEX A2**

**NOTICES**

Any communication or notice to be made or given in relation to this Confirmation will be duly made or given if in writing and delivered, made or transmitted by registered mail, overnight courier, facsimile or e-mail to the following address (or such other address as specified in a written notice from the relevant party to the other parties at least fifteen days prior to the date of the relevant communication, notice or demand), and confirmed as received by telephone:

**If to ABN AMRO**, at:

ABN AMRO Bank N.V., London Branch
250 Bishopsgate
London EC2M 4AA
Attention:        George Turner
Telephone No: +44 (0) 20 7678 1401
Facsimile No: +44 (0) 20 7678 7186
E-mail: george.turner@uk.abnamro.com

With a copy to:
Attention:        Mike Hodgson
Telephone No: +44 (0) 20 7678 7927
E-mail: mike.hodgson@uk.abnamro.com

**If to the Counterparty**, at:

Rye Select Broad Market XL Fund, LP
c/o Tremont Group Holdings, Inc.
555 Theodore Fremd Avenue, Suite C-300
Corporate Center at Rye
Rye, New York 10580
Telephone: (914) 925-1140
Telecopier: (914) 925-9337
Attention: Darren Johnston
Telephone: (914) 925-1888

**ANNEX A3**

**VALUATION REPORT**

Valuation Report
Date
Swap Notional +/-            -
Perf Comp +/-               -
Lev Comp +/-                -
Cumulative Funding          -
Funding + Acc Int           -
Cumulative Interest         -
Monthly Interest            -
U/L Perf Unit               -
Perf Units                  -
Lev Units                   -
Index                       -
Perf Comp                   -
Equity Notional             -

Valuation Report
Index Value as of End of September 2007                       -
Number of Indexes (Quantity)                                 -
End of August Swap Value (USD)                               -
Last Updated Funding Notional (USD)                          -
Equity Amount (Fund Value less Funding Notional)             -
Cumulative Compunded Interest Accrued within Index           -

Sum of Equity Amount Plus Accrued Floating Amount            -