# EXHIBIT C

 **ABN·AMRO**

ABN AMRO Bank N.V
London Branch
250 Bishopsgate
London EC2M 4AA
Telephone   +44 (0) 20 7678 8000
Facsimile   +44 (0) 20 7857 9000
Telex       887366 ABNALN G
Foreign Exchange   8951191 ABNAFX G
S.W.I.F.T    ABNAGB2L.

SANTA CLARA II FUND
c/o Fortis Prime Fund Solutions (Cayman) Limited
Grand Pavilion Commercial Centre
802 West Bay Road
PO Box 2003
Grand Cayman KY1-1104
Cayman Islands
British West Indies

14 February 2008

Dear Sirs

**Call Option Transaction - Confirmation**

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2000 ISDA Definitions (the "Swap Definitions") and in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions", and together with the Swap Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the Equity Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

This Confirmation evidences a complete binding agreement between you and us as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation will supplement, form a part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation except as expressly modified below. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation), shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule except for the elections and modifications made to the ISDA Form in this Confirmation (the ISDA Form, as so amended, the "Agreement") on the Trade Date of the first such Transaction between us. In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

Conditions Precedent:

The parties agree that the Buyer's payment of the Premium shall be satisfied by (a) the payment from the Buyer to the Seller of USD 55,000,000 and (b) the delivery from the Buyer to the Seller of (the "Premium Shares") a number of Shares which, for the avoidance of doubt, shall be a number of Shares with a value

1

equal to USD 23,000,000), which payment and delivery together shall satisfy the Buyer's obligation to pay the Premium.

Accordingly, the performance by the Seller of its obligations hereunder shall be subject to:

(i) The parties executing and delivering a Deed of Transfer in the agreed form in respect of the Premium Shares and executing and delivering all other relevant documentation necessary to effect a transfer of the Premium Shares from the Buyer to the Seller;

(ii) The Buyer procuring the amendment of the register of shareholders of the Reference Fund to record the Premium Shares to be registered against the name of the Seller; and

(iii) The Buyer and the Reference Fund executing and delivering a letter relating to liquidity in respect of Shares in the Reference Fund, in the agreed form.

## 1. GENERAL TERMS:

| | |
|---|---|
| Trade Date: | 14 February 2008 |
| Option Style: | European |
| Option Type: | Call |
| Seller: | ABN AMRO Bank N.V., London Branch |
| Buyer: | Santa Clara II Fund, a Cayman Islands exempted company |
| Shares: | The number of Class C Redeemable Preferred Shares of the Reference Fund that would be received by the Seller validly subscribing for such Shares in an amount equivalent to USD 288,600,000 on the Trade Date and no refusals or restrictions in respect of such subscription having been made by the Reference Fund or its agents, subject to the Buyer Adjustments provisions below. |
| Reference Fund: | Harley International (Cayman) Limited, a Cayman Islands exempted company |
| Investment Manager: | Euro-Dutch Management Limited, a Cayman Islands exempted company |
| Sub-Advisor | Aspen International Investment Limited, a Bermuda company |
| Number of Options: | One. |
| Option Entitlement: | The number of Shares validly subscribed for by the Seller on the Trade Date, per Option, as adjusted pursuant to the Buyer Adjustment provisions. |

2

Strike Price:

With respect to the Trade Date, the Strike Price shall be USD 210,600,000 (the "Initial Strike Price").

With respect to each Calculation Date thereafter, the Strike Price shall be a sum denominated in USD determined by the Calculation Agent in accordance with the following formula:

$S_t = S_{t-1} + $ Accretion Rate$_t$, where:

$S_t$ means the Strike Price on the relevant Calculation Date t;

$S_{t-1}$ means the Strike Price on the immediately preceding Calculation Date;

Calculation Date means the first Business Day of each month from and including the Trade Date to and including the Expiration Date; and

Accretion Rate$_t$ means the Accretion Rate as at the relevant Calculation Date t.

The Strike Price may be adjusted by the Calculation Agent in accordance with the Buyer Adjustment provisions specified below, in order to adjust for subscriptions, redemptions or transfers in respect of the Shares, or for increases and decreases of the Premium, subject to the Minimum Strike Price provisions below.

Accretion Rate:

The Accretion Rate shall be determined with respect to each Calculation Date$_t$ by the Calculation Agent in accordance with the following formula:

$S_{t-1}$ * (Floating Rate Option + Spread) * Actual/360; where

$S_{t-1}$ means the Strike Price on the immediately preceding Calculation Date;

Floating Rate Option means USD-LIBOR-BBA, determined two Business Days prior to the relevant Calculation Period.

Spread means 1.15% (115 basis points)

Calculation Period with respect to Actual/360 means the number of days between Calculation Date$_t$ and the immediately preceding Calculation Date.

3

Designated Maturity means one month, or as otherwise agreed between the parties.

Premium:

With respect to the Trade Date, USD 78,000,000 (the "Initial Premium") or a transfer of Shares of an equivalent value, or a combination of cash and Shares equal to the Initial Premium.

With respect to any Premium Payment Date thereafter, a sum or a transfer of Shares of an equivalent value as· agreed between the parties ("Additional Premium").

Premium Payment Date:

With respect to the Initial Premium, the Trade Date.

With respect to an Additional Premium, any other date between the Trade Date and the Expiration Date as agreed between the parties

Maximum Strike Price:

USD 250,000,000

Minimum Strike Price:

Maximum Strike Price x 0.65. If the Strike Price is less than the Minimum Strike Price for each Business Day in any consecutive three month period (such deficit, determined as of the last day of such three month period, the "Underutilisation Amount"), the Buyer shall elect at the end of such three month period either (i) to reduce the Maximum Strike Price by the amount of the Underutilisation Amount, or (ii) in respect of each calendar month thereafter in which the Underutilisation Amount continues to exist, to pay to the Seller at the end of the relevant calendar month, the product of the Underutilisation Amount as calculated on the first Business Day of such month x 0.0105 x actual number of days/360, provided however that where the Underutilisation Amount results directly from the application of a Haircut Penalty no such election will be required.

Calculation Agent:

ABN AMRO. All calculations and determinations under this Transaction shall be made by the Calculation Agent in good faith and in a commercially reasonable manner and shall be binding on the parties absent manifest error; provided, however, that if either (i) the Buyer disagrees with any calculation or determination of the Calculation Agent or (ii) an Event of Default occurs or exists with respect to Seller, then Seller and Buyer each will appoint an independent Reference Market-maker, and such two Reference Market-makers jointly will appoint a third Reference Market-maker. Such three Reference Market-makers jointly will make such calculation or determination (acting as experts and not as arbitrators), whose calculation or determination

4

will be binding and conclusive absent manifest error.

Business Days:                    Cayman Islands, Isle of Man, New York and London

## 2.    BUYER ADJUSTMENTS

Buyer Adjustments:                The Buyer may (subject to the Minimum Strike Adjustment Amount, the Maximum Strike Ratio and the Minimum Put Option Protection provisions specified below) at any time take one or more of the following actions: (i) increase the Strike Price, (ii) decrease the Strike Price (in each case subject to the Maximum Strike Ratio), (iii) increase the number of Shares or (iv) decrease the number of Shares.

Buyer Adjustments may be effected by the transfer of cash or by the transfer of Shares (such transfer to be by way of sale and purchase at market value between the parties as determined by the Calculation Agent in accordance with sub-paragraphs (i) and (ii) below), if applicable, representing the value of the Buyer Adjustments to be made. The amount of cash to be paid or the value of the Shares to be transferred shall be determined based upon, as applicable either:

(i) the amount of the subscription amounts (the "Subscription Amounts") that would be paid by the Seller to the Reference Fund, as of the relevant Subscription Date, subscribing for such amount of Shares. As used herein, "Subscription Date" means, with respect to the Shares, the date as of which the Reference Fund would determine the net asset value of such Shares for purposes of calculating the Subscription Amounts to be paid by the Seller, having submitted a valid subscription notice; or

(ii) the amount of the redemption proceeds (the "Redemption Proceeds") that would be paid by the Reference Fund to the Seller who, as of the relevant Redemption Valuation Date, redeems such amount of Shares. As used herein, "Redemption Valuation Date" means, with respect to the Shares, the date as of which the Reference Fund would determine the net asset value of such Shares for purposes of calculating the redemption proceeds to be paid to the Seller that had submitted a valid notice for redemption in connection with the event requiring such redemption.

The Buyer shall give the Seller 2 (two) Business Days notice of a proposed subscription, redemption

5

or transfer in relation to the Shares. Following receipt of such notice, the Seller shall use commercially reasonable efforts to effect such subscription, redemption or transfer in accordance with such notice.

Promptly following such subscription, redemption or transfer, the Seller shall notify the Buyer of the execution of such orders and the Number of Shares pursuant to this Transaction shall be adjusted accordingly. For the avoidance of doubt, the Seller shall not be required to make adjustments in respect of a notice where, having validly submitted a subscription, redemption or transfer notice, the Reference Fund or its representatives, or any other relevant party, do not allocate, redeem or transfer such Shares in accordance with the notice submitted by the Seller.

All Buyer Adjustments shall be effective on the date the Calculation Agent determines either (i) that the corresponding subscription, redemption or transfer by the Seller in the Reference Fund has become effective (and, in the case of any redemption, the Redemption Proceeds have been delivered to the Seller and, with respect to any adjustments to the number of Shares, when the Calculation Agent determines that any such adjustment is effective), or (ii) that any actual increase or decrease in the Strike Price as agreed between the parties has become effective.

| | |
|---|---|
| Minimum Strike Adjustment Amount: | For adjustments initiated by the Buyer at the end of a calendar month: USD 100,000, which may be waived by the Seller in its sole and absolute discretion |
| | For adjustments initiated by the Buyer at any other time: USD 2,000,000. |
| Minimum Put Option Protection: | On any Business Day that the Calculation Agent determines that the notional value of the Put Options (as defined in Annex 1 hereto) is less than 85% of the market value of the Stock Portfolio (as determined by the Calculation Agent), the Buyer shall not be permitted to make any further increase to the Strike Price until such time as the notional value of the Put Options exceeds 85% of the market value of the Stock Portfolio (as determined by the Calculation Agent). |
| Strike Ratio: | The quotient of the Reference Fund Value divided by the Option Equity |

6

Maximum Strike Ratio:

Strike Ratio of 4

Reference Fund Value:

As of any Calculation Date up to but excluding the Expiration Date, the value of the Shares in USD, as determined by the Calculation Agent.  For the purposes of calculating the Strike Ratio, the Reference Fund Value shall be the value of the Shares in USD less the Haircut Penalty.  For purposes of this paragraph and in connection with a Calculation Date, the value of the Shares will be determined as of the date as of which the Reference Fund determines the value of such Shares and such value will be equal to the most recently available value of such number of Shares as reported by its fund administrator.

Option Equity:

As of any Calculation Date, the excess of the Reference Fund Value minus the Strike Price.

## 3.    PROCEDURES FOR EXERCISE

Commencement Date:

14 February 2008

Expiration Date:

14 February 2011, subject to Seller Optional Early Termination, Buyer Option Early Termination, and the Option Extension Provisions

Expiration Time:

Midday London time on a London Business Day, on the Expiration Date

Automatic Exercise:

Applicable

Optional Extension Provisions:

No later than 90 days prior to the Expiration Date, the Buyer may request that the Expiration Date of the Transaction be extended, which shall be duly extended if agreed by the Seller.

## 4.    SETTLEMENT TERMS:

Settlement Method Election:

Applicable

Electing Party:

Buyer

Settlement Method Election Date:

15 Business Days prior to the Expiration Date, or, in the event of a Seller Optional Early Termination, 3 Business Days prior to the Expiration Date

Default Settlement Method:

Cash Settlement

Physical Settlement Currency:

United States Dollars

Settlement Price:

In respect of the Expiration Date, an amount per Share equal to the Redemption Proceeds that are received by the Seller validly submitting a notice for redemption for such Shares in connection with

7

|  | a redemption of all Shares that are subject to valuation as of the Expiration Date and no refusals or restrictions in respect of such redemption having been made by the Reference Fund or its agents. |
|---|---|
| Physical Settlement Date: | The date following the Expiration Date on which Seller may validly transfer Shares to the Buyer, subject to any restriction on transfer beyond the control of Seller. |
| Cash Settlement Currency: | United States Dollars |
| Cash Settlement Payment Date: | Three Business Days after each date on which the Seller receives the Redemption Proceeds from a redemption or other disposition of the Shares. |

5.    **ADDITIONAL DISRUPTION EVENTS:**

| Change in Law: | Applicable; provided that subject to the Buyer's prior written consent, the Seller shall use reasonable efforts to transfer its affected Hedge Positions, if any, to an affiliated entity not affected by such Change in Law |
|---|---|
| Insolvency Filing (of the Reference Fund): | Applicable |
| Hedging Disruption: | Applicable |
| Hedging Party: | Seller |

6.    **SELLER OPTIONAL EARLY TERMINATION:**

A "**Termination Trigger**" means any of the following:

(i) the Strike Price exceeds the Maximum Strike Price and such breach is not cured within 45 days after notice is given by the Seller to the Buyer provided that if the Buyer has not taken action (or entered into a course of action) reasonably acceptable to the Seller within five Business Days of such notice to cure such breach, the Seller may elect to terminate this Transaction with effect from the end of such fifth day by delivering a notice to the Buyer designating an early Expiration Date (the "Early Expiration Date"); or

(ii) the net asset value of the Buyer as of any Business Day is less than 50 % of the net asset value of the Buyer as of the Trade Date; or

(iii) A Reference Fund Event has occurred and is continuing. If such Reference Fund Event is (i) capable of being cured and (ii) the definition in respect of such relevant Reference Fund Event does not otherwise contain a cure period, then a Termination Trigger shall be deemed to have occurred if such breach has not been cured (or caused to be cured) within 5 Business Days by the Buyer after notification by the Seller, PROVIDED THAT there shall be no cure period with respect to a Special Redemption Event.

Upon the occurrence of a Termination Trigger, the Seller, may elect to terminate this Transaction and shall notify the Buyer of such election by delivering a notice designating an Early Expiration Date.

8

7.      **BUYER OPTIONAL EARLY TERMINATION:**

Upon 45 days prior written notice, Buyer may designate an Early Expiration Date and elect in such notice for either Physical Settlement or Cash Settlement. Such Early Expiration Date shall be the first month-end date following such 45 day notice period upon which the Seller may (i) effect a redemption of the Shares in the case of Cash Settlement or (ii) effect a transfer of the Shares in the case of Physical Settlement.

8.      **ADJUSTMENT AND TERMINATION FEES**

Following either (i) a reduction in the Maximum Strike Price in accordance with the Minimum Strike Price terms as specified above, or (ii) early termination of this Transaction in part or in full, whether as a result of a Reference Fund Event, a Special Redemption Event, an Event of Default attributable to the Buyer, a Termination Event attributable to the Buyer, a Buyer Optional Early Termination or a Seller Optional Early Termination, in each case which results in a Strike Price of less than the Minimum Strike Price, the Buyer shall pay an early termination fee to the Seller in respect of the amount by which the Minimum Strike Price exceeds the Strike Price, after such reduction or termination (such amount being the "Termination Excess Amount"), calculated by the Calculation Agent in accordance with the following formula:

(i)    up to but not including the first anniversary of the Trade Date: the product of the Termination Excess Amount x 0.004 x the number of days remaining from the date of reduction or termination to the originally scheduled Expiration Date/360; or

(ii)   from the first anniversary of the Trade Date up to but not including the second anniversary of the Trade Date: the product of the Termination Excess Amount x 0.004 x number of days remaining from the date of reduction or termination to the originally scheduled Expiration Date/360; or

(iii)  from the second anniversary of the Trade Date up to but not including the third anniversary of the Trade Date: the product of the Termination Excess Amount x 0.003 x number of days remaining from the date of reduction or termination to the originally scheduled Expiration Date/360

in any case less the aggregate of any Termination Excess Amounts previously paid.

9.      **REFERENCE FUND EVENTS**

Each of the following events, at the option of Seller, shall be a Reference Fund Event:

(i)    The Reference Fund shall have breached any of the Portfolio Guidelines specified in Annex I hereto and Buyer has not cured (or caused to be cured) such breach within 5 Business Days after notification by the Seller; or

(ii)   There has occurred a cancellation, suspension or revocation of the registration or approval of Buyer, the Reference Fund, the Investment Manager or the Sub-Advisor or Bernard L. Madoff Investment Securities LLC (the 'Account Manager') by any competent governmental or regulatory entity with authority over Buyer, the Reference Fund, the Investment Manager, the Sub-Advisor or Bernard L. Madoff Investment Securities LLC, as the case may be, the Calculation Agent reasonably considers to be material; or

(iii)  There has occurred a claim, demand, charge, complaint or commencement of any proceeding, with respect to Buyer, Reference Fund, the Investment Manager, Sub-Advisor, or Bernard L. Madoff Investment Securities LLC or any of their respective affiliates or employees by any governmentalauthority, court, or regulatory body or

9

agency (not limited to any fine or adverse regulatory action directed against any such persons) which alleges any impropriety, illegality, negligence, contractual or fiduciary breach or other wrongdoing related to the performance of services by such person and which the Calculation Agent reasonably considers to be material, subject to a cure period of 3 Business Days during which period Buyer may present evidence to the Calculation Agent concerning the materiality of the occurence; or

(iv)    The Reference Fund or Bernard L. Madoff Investment Securities LLC shall have violated in any material respect any civil or criminal law or regulation applicable to it and, in the reasonable judgment of the Seller, such violation has a material adverse effect on the conduct of business of the relevant party; or

(v)    an order has been made or an effective resolution passed for the winding up or dissolution or termination of the Reference Fund or any other event occurs which, in the reasonable opinion of the Seller, has a material adverse effect on the future solvency and liquidity of the Reference Fund, including, but not limited to, any substantive litigation proceedings brought by or on behalf of the investors in the Reference Fund; or

(vi)    the Reference Fund ceases to exist; or

(vii)    the Buyer or the Reference Fund ceases to be managed by either of the Investment Manager or the Sub-Advisor or any of their Affiliates; or

(viii)    unless the Seller has consented in writing (such consent not to be unreasonably withheld), there is a material change in the methodology of calculating the NAV of the Reference Fund, or the Reference Fund does not comply with, or materially modifies a provision in, any Reference Fund Documentation relating to the Reference Fund.

(ix)    a Special Redemption Event, as defined below, has occurred; or

(x)    the Seller has been notified by the Reference Fund or the Investment Manager of the creation and details of any "side pockets" in the Reference Fund and/or that another investor in the Reference Fund has been offered rights in respect of redemptions or liquidity of shares in the Reference Fund that have not previously been offered to the Seller, and in each case the Seller has determined that such rights would have an adverse effect on the Seller (or the affiliate of the Seller holding the Shares in the Reference Fund); or

(xi)    a Reference Fund Adjustment Event (as defined below) that has a material adverse effect on the Seller (or the affiliate of the Seller holding the Shares in the Reference Fund) is occurring and the Seller reasonably determines that there is no immediate prospect of such Reference Fund Adjustment Event ceasing to occur; or

(xii)    in respect of the Reference Fund, on any day on which investors in the Reference Fund would ordinarily be entitled to subscribe for or redeem Reference Fund Shares an event has occurred which, in the reasonable determination of the Seller, restricts (in whole or in part) redemptions in Shares in the Reference Fund at the NAV corresponding to such day; or

10

(xiii) the Reference Fund ceases to employ, either directly or indirectly, an internationally recognized independent third party to provide administrative services including but not limited to trade ticket processing, position reconciliation with the broker, position and fund valuation, preparation of a monthly Net Asset Value, preparation of monthly financial statements and preparation and maintenance of all accounting books and records required by US GAAP; or

(xiv) in the reasonable opinion of the Seller, any of the administrator, registrar or custodian of the Reference Fund (i) is of a lesser standing than on the date of entering into this transaction such that their ability to perform their respective obligations in connection with the Reference Fund is materially adversely affected, or their legal and/or financial independence from the relevant investment manager is compromised; or (ii) is removed or resigns without proper replacement reasonably acceptable to the Seller and in each case the Seller has given notice to the Buyer to cure such breach and the Buyer has not taken action (or entered into a course of action) reasonably acceptable to the Seller within forty five days of such notice to cure such breach; or

(xv) the Sub-Advisor and/or the Reference Fund fail to allow annual onsite inspections of all relevant documentation including but not limited to the discretionary brokerage agreement between the Reference Fund and the Account Manager, and the following documents relating to the Account Manager only: the SEC Advisor's Form ADV Part 2, the annual audited financial statements and the annual Independent Auditors Report on Internal Control prepared by the auditors pursuant to SEC Rule 17a-5.

10.    **SPECIAL REDEMPTION EVENTS**

(i)    The Investment Manager ceases to invest the majority of its assets with the Account Manager; or

(ii)    There is a material change in the management or control of the Account Manager and ABN, after making due investigation into such changes in management or control (including but not limited to conducting onsite inspections at the premises of the Account Manager and reviewing relevant books and records as required) determines in its sole discretion (acting in good faith in a commercially reasonable manner) that the management or control conditions have changed to such an extent that had such conditions existed at the Trade Date, ABN would not have entered into this Transaction, PROVIDED THAT if ABN is not permitted to make relevant onsite inspections and review at the premises of the Account Manager, a Special Redemption Event shall be deemed to have occurred as of the date of permission not being granted; or

(iii)    There is a material change in the methodology of calculating the value of the assets of the Reference Fund which adversely affects the risk profile of the Transaction for the Seller; or

11

(iv)    The Account Manager no longer employs the "split strike conversion" investment strategy (see below); or

(v)    There is a decrease in the net asset value (excluding redemptions or distributions) of the Shares of greater than 10% over a weekly period as determined by the Calculation Agent. in its reasonable discretion based on the net assets reported by the Reference Fund; or

(vi)    The failure to provide, for a period of ten Business Days from the date any such item is due (provided that the Seller has served notice of such failure on the Buyer within 3 Business Days of the date such item was due), any of the Reporting items specified in Annex II, after notice to the relevant party.

## 11.    REFERENCE FUND ADJUSTMENT EVENTS

(i)    Valuation Disruption: If the Calculation Agent determines that the Reference Fund and/or the Investment Manager, the administrator, any sub-administrator, custodian bank, bank or other service provider to the Reference Fund has imposed fees, taxes or other charges or dealing or settlement rules which, in the determination of the Calculation Agent increases the effective costs associated with investing in, redeeming, or holding Shares in the Reference Fund, the Calculation Agent will make appropriate adjustments to the Reference Fund Value to reflect such costs; or

(ii)    Subsequent Adjustments to NAV: If the Calculation Agent becomes aware on any Business Day that the basis on which the NAV of the Reference Fund has been or will be amended at any time, the Calculation Agent may, but shall not be obliged to, make such corresponding adjustments to their basis of calculating the Reference Fund Value as it shall deem appropriate; or

(iii)    Tax – Withholding: any change in law (or in its application, interpretation or implementation) has occurred after the Trade Date requiring, in the reasonable determination of Calculation Agent, the imposition, deduction or withholding of tax (the "**Subject Taxes**") which (i) increases the effective dealing or holding costs of units in the Reference Fund; or (ii) has or would have the effect for the Seller (or the affiliate of the Seller holding the Shares in the Reference Fund) to receive, in connection with or in respect of distributions, dividends or redemption proceeds relating to the Shares, less than it would have received in the absence of any such Subject Taxes; or

(iv)    Tax – Hedge: any change in taxation adversely affecting the treatment of payments made or received by the Seller (or the affiliate of the Seller holding the Shares in the Reference Fund) in respect of its hedge for the Transaction.

12.    **CONFIDENTIALITY**

Each party hereto agrees to keep confidential and private the existence, parties and terms and other material of whatever nature relating to this Transaction provided from one party to the other in respect of this Transaction or provided to Seller pursuant to Annex II (the "Confidential Information").

Each party shall (i) hold the Confidential Information in strict confidence and will not disclose, copy, reproduce or distribute any of it or otherwise make it available to any person other than an Authorised Recipient (as defined below) (on condition that they will not disclose, copy, reproduce, distribute or otherwise make it available to any other person who is not an Authorised Recipient) or otherwise without the other party's prior written approval and (ii) ensure that each Authorised Recipient to whom Confidential Information is disclosed is made .aware of (in advance of disclosure) the terms of this paragraph.

The undertakings given above shall not apply to Confidential Information which (a) at the time of supply is in the public domain, (b) subsequently comes into the public domain or otherwise becomes known to the other party, except through breach of the undertakings set out in this letter agreement or through breach of any other duty of confidentiality relating to that Confidential Information, (c) consists of proprietary information or financial models belonging to the other party used in connection with this Transaction, or (d) is required to be disclosed by law, regulation or any governmental or competent regulatory authority (including without limitation, any securities exchange), as long as the relevant party consults with the other party before such disclosure on the proposed form, timing, nature and purpose of the disclosure.

Each party acknowledges that the other party may be irreparably harmed by any breach of the terms of this paragraph and that damages alone may not necessarily be an adequate remedy. Accordingly, the other party shall be entitled to the remedies of injunction, specific performance and other equitable relief, or any combination of these remedies, for any threatened or actual breach of its terms, and no proof of special damages will be necessary to enforce this paragraph.

**"Authorised Recipients"** means, to the extent that they need access to Confidential Information for the purposes of this Transaction, the relevant party's officers, employees, auditors and other professional advisers, affiliates, joint venture counterparties, subsidiaries, agents and representatives.

13.    **ADDITIONAL TERMS**

| | |
|---|---|
| Non-Reliance: | Applicable |
| Agreements and Acknowledgements regarding Hedging Activities: | Applicable |
| Additional Acknowledgements: | Applicable |

**Account Details**

| | |
|---|---|
| Account for payments to ABN Amro: | ABN Amro Bank New York - ABNAUS33<br>ABA No : 026009580<br>A/c : 674054501541<br>in fav of : ABN Amro Bank London -<br>ABNAGB2P |

13

Account for payments to Buyer:    .    The Northern Trust Banking Corporation
40 Broad Street, 10th floor, New York, NY
10004, USA
SWIFT: CNORUS33
ABA: 026-001-122
Account Name: Fortis Prime Fund Solutions
(IOM)-Client Account
Account Number 105635-20010
Narrative: Santa Clara II re:

**Offices**

ABN Amro Office for this Transaction:    London
Buyer Office for this Transaction:    Grand Cayman

14.    The **"Cross Default"** provisions of Section 5(a)(vi) will apply to ABN AMRO and will apply to
the Buyer and "Specified Indebtedness" shall have the following meaning, Section 14 of the ISDA
Master is amended accordingly:

**"Specified Indebtedness"** shall mean any obligation (whether present or future, contingent or
otherwise, as principal or surety or otherwise) (a) in respect of borrowed money (which, for the
avoidance of doubt, shall include, without limitation, bonds, notes, commercial paper or similar
instruments issued or guaranteed by the relevant party), and (b) any amount due and payable in
respect of any Specified Transaction (except that, for this purpose only, the words "and the other
party to this Agreement (or any Credit Support Provider of such other party or any applicable
Specified Entity of such other party)" shall be amended and replaced by "and any other entity"
where they appear in the definition of Specified Transaction), any repo transaction, any reverse
repo transaction and any stock loan transaction.

Section 5(a)(vi) is amended by the insertion of the following words after the words "due and
payable" on line 8:

"or, in the case of Specified Indebtedness in respect of any Specified Transaction, any repo
transaction, any reverse repo transaction and any stock loan transaction, which has resulted in a
liquidation of, an acceleration of obligations under, or an early termination of, all transactions
outstanding under the documentation applicable to that Specified Indebtedness becoming due and
payable as a result of the early termination of the relevant Specified Transaction, repo transaction,
reverse repo transaction or stock lending transaction, as the case may be".

The **"Threshold Amount"** means with respect to ABN AMRO an amount equal to three percent
(3%) of its total equity share capital (as specified from time to time in its most recent annual
report of ABN AMRO containing consolidated financial statements, prepared in accordance with
accounting principals that are generally accepted for institutions of its type in the jurisdiction of its
organisation and certified by independent public accountants), or its equivalent in any other
currency, and with respect to the Buyer, an amount equal to USD 5 million, or its equivalent in
any other currency.

"**Specified Transaction**" shall mean, (a) any transaction (including an agreement with respect
thereto) now existing or hereafter entered into between one party to this Agreement or Specified
Entity of such Party) and the other party to this Agreement (or any Specified Entity of such other

14

party) which is an Equity Option Transaction or any other similar transaction, or (b) any other transaction identified as a Specified Transaction in this Agreement or relevant confirmation.

For the purpose of Section 5(a)(vi)(1):

(a) Any reference to Specified Indebtedness becoming, or becoming capable of being declared, due and payable shall in the case of Specified Indebtedness which is a Specified Transaction, be deemed to be a reference to such Specified Transaction being terminated, liquidated or accelerated by reason of an event of default in respect of such party to a Transaction; and

(b) In determining the amount to be included in "Threshold Amount" with respect to Specified Indebtedness which is a Specified Transaction, the termination or settlement value of such Transaction shall be used.

15. The "**Credit Event Upon Merger**" provisions of Section 5(b)(iv) will apply to ABN AMRO and the Buyer.

16. **Payments on Early Termination.** For the purpose of Section 6(e): (i) Market Quotation will apply; and (ii) the Second Method will apply.

Notwithstanding any provision to the contrary in this Confirmation or the Agreement, upon the designation of an Early Termination Date under this Transaction (except pursuant to a Bankruptcy (Section 5(a)(vii) of the ISDA Form) with respect to either party (i) no amounts will be payable pursuant to the terms of Section 6(e) of the Agreement (or any other term, definition or section of the Agreement referencing Section 6(e)) except for any Unpaid Amounts, (ii) the Expiration Date of this Confirmation shall be accelerated to such Early Termination Date and this Confirmation shall settle pursuant to the Settlement Terms and (iii) Buyer shall pay to Seller any amounts due pursuant to Section 8 of the Confirmation (Adjustment and Termination Fees). If such amounts are subsequently unpaid, then such non-payment shall be an Event of Default pursuant to Section 5(a)(i) of the ISDA Form and this Agreement shall terminate as if an Event of Default had occurred.

17. "**Termination Currency**" means US Dollars.

18. (a) **Payer Representations.** For the purpose of Section 3(e) of the ISDA Master, ABN AMRO will make the following representation and the Buyer will make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of the ISDA Master) to be made by it to the other party under the ISDA Master. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of the ISDA Master, (ii) the satisfaction of the ISDA Master contained in Section 4(a)(i) or 4(a)(iii) of the ISDA Master and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of the ISDA Master and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of the ISDA Master, *provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b) **Payee Representations.** For the purpose of Section 3(f) of the ISDA Master, ABN AMRO and the Buyer make the representations specified below: None

19. **Governing Law.** This Confirmation will be governed by and construed in accordance with English law.

15

20.    **Netting of Payments.** Subparagraph (ii) of Section 2(c) of the ISDA Master will not apply to any group of Transactions.

21.    **No Agency.** Section 3 of the ISDA Master shall be amended by the insertion of the following additional provisions:

"(g)    **No Agency.** Each party represents to the other that it is entering into the Agreement, each Transaction and any other documentation relating to the ISDA Master or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(h)    **Eligible Contract Participant.** Each party represents that it is an "eligible contract participant" as such term is defined in Section 1a(12) of the Commodity Exchange Act, as amended.".

22.    **Set-off.** Section 6 of the ISDA Master shall be amended by the insertion of the following additional provision:

"(f)    **Set-off.** Any amount (the "Early Termination Amount") payable to one party (the "Payee") by the other party (the "Payer") under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party will, at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by its set-off against any amount(s) (the "Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to, or in favour of, the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off). X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency. The term "rate of exchange" includes, without limitation, any premiums, and costs of exchange payable in connection with the purchase of or conversion into the relevant currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).".

23.    **Pari Passu.** All payment and delivery obligations of each party under the Agreement will rank at least *pari passu* in all respects with all of that party's other unsecured and unsubordinated obligations (except for those which are mandatorily preferred by the operation of law).

24.    **Documents to be Delivered.** Seller shall deliver to the Buyer (i) upon execution of this Agreement, (ii) promptly upon reasonable demand by Buyer and (iii) promptly upon learning that any such form previously provided by the Seller has become obsolete or incorrect, an executed United States Internal Revenue Service Form W-8BEN (or successor thereto). Such forms shall be provided for the purposes of Section 4(a)(i) of the ISDA Form.

16

**25.**    **Relationship Between Parties.** Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i)    **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanation related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii)    **Status of Parties.** The other party is not acting as a fiduciary or an adviser to it in respect of that Transaction.

The time of dealing will be confirmed by ABN Amro upon written request. ABN Amro is regulated by the Financial Services Authority. ABN Amro is acting for its own account in respect of this Transaction.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation and returning it to us.

If you have any questions regarding this Confirmation please email equity.documentation@uk.abnamro.com or call us on +44 (0)20 7678 2735 / 5379 / 0508 / 7809. Your failure to respond to this document shall not affect the validity or enforceability of the Transaction as against you.

We are very pleased to have concluded this Transaction with you.

For and on behalf of:

**ABN AMRO BANK N.V., LONDON BRANCH**

By: _____    By: _____
Name:    Name:
Title:    Authorised Signatory    Title:    Authorised Signatory

**SANTA CLARA II FUND**

By: _____    By: _____
Name:    Name:
Title:    Title:

17

Buyer, acting through its duly authorized signatory, hereby agrees to accept and confirm the terms of the foregoing as of the Trade Date.

18

ANNEX I

## PORTFOLIO GUIDELINES

**Managed Account:** The Reference Fund will invest substantially all of its assets in a managed account managed by Bernard L.Madoff Investment Securities LLC (the "Managed Account") at all times during the term of this Transaction. The Investment Manager will use a Split-Strike Conversion Strategy.

**Eligible Securities** The Reference Fund may only invest in (1) Common stocks of Issuers comprised in the S&P 100 Index (the "Stock Portfolio"), (2) option contracts on the S&P 100 Index, and/or (3) Money Market / US Treasury Bills. The Stock Portfolio must include a minimum of 25 or more common stocks of Issuers comprised in the Standard & Poor's 100 Stock Index (Bloomberg Reference: OEX, the "S&P 100") at the time of purchase of the Stock Portfolio. Non-Eligible Investments consist of any investments which are not Eligible Securities.

**Volatility Constraint:** The annualized standard deviation of the most recent 6 months return of the Reference Fund in aggregate, as calculated by the Calculation Agent based on observations taken on the last Business Day in each week, must be less than 7%

**Split Strike Conversion Strategy:** On the same Business Day as the purchase of the Stock Portfolio, the Reference Fund will purchase put options on the S&P 100 (the "Put Options"). The notional value of the Put Options shall not be more than 120% of the market value of the Stock Portfolio at all times. The time to expiration of the Put Options shall not exceed 60 days at the time of purchase. The strike price of the Put Options shall be at least 94% of the level of the S&P 100 at the time of purchase. The average strike price of the Put Options must be greater than 80% of the spot level of the S&P 100 at all times.

Upon or after establishing the Stock Portfolio and the Put Options, the Reference Fund may sell call options on the S&P 100 (the "Call Options"). The notional value of the Call Options shall not exceed the market value of the Stock Portfolio (in equivalent OEX shares) at the time of purchase. There is no restriction on the strike price of the Call Options to be sold, provided that the average strike of the Call Options is always greater than the average strike of the Put Options. For the purposes of calculating the notional value of options the calculation for both Put Options and Call Options shall be: option strike price x no. of contracts x multiplier

**Issuer concentration** The single largest long equity position of the Reference Fund shall not be more than 15% of the Reference Fund's NAV. The 5 largest long equity positions of the Reference Fund shall not be more 40% of the Reference Fund's NAV.

**Sector concentration** No more than 35% of the Reference Fund's assets under management may be invested in any single sector (as such sectors are defined by Standard & Poor's). The Investment Manager may operate outside of this limit provided that (a) the sector concentration is within 10% of the S&P 100 sector concentrations or (b) the Seller has provided written consent.

**Drawdown limit** Any reduction of the Reference Fund's NAV shall not exceed 5% over a rolling 4-week period (the "Drawdown Limit"). Any excess will give rise to a haircut penalty (for the purposes of resetting the Strike Ratio) of 20% of the Reference Fund value for each 1% of drawdown in excess of the Drawdown Limit (the "Haircut Penalty"). For the avoidance of doubt any reduction of the Reference

19

Fund's NAV which results from capital transactions, such as redemptions or withdrawals, will be excluded from this calculation.

**Borrowing Limit**      20% of the Reference Fund assets under management, for liquidity purposes only, and provided that the value of any assets pledged as security for a loan entered into by the Reference Fund does not exceed 120% of the loan value.

**Liquidity**      The Reference Fund shall effect redemptions/transfers at any time immediately upon written notice from ABN or upon the occurrence of a Reference Fund Event which has not been cured (or caused to be cured) as specified herein or a Special Redemption Event.

**ANNEX II**

## REPORTING AND DOCUMENTS TO BE DELIVERED

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Buyer | Weekly estimated returns of the Reference Fund | Within 4 Business Days after the end of each week |
| Buyer | Monthly estimated NAV report of the Reference Fund | Within 5 Business Days after each month-end |
| Reference Fund Administrator | Monthly final NAV report and full balance sheet of the Reference Fund | Within 15 Business Days after each month-end |
| Reference Fund Administrator | Madoff daily journals of trade activity including, but not limited to, currency, dealing date, amount traded, execution price, number of shares traded | As soon they become available and in any event within one Business Day of the receipt of such information |
| Reference Fund Administrator | Madoff monthly brokerage statements | As soon they become available and in any event within one Business Day of the receipt of such information |
| Reference Fund Administrator | For each share class of the Reference Fund, the Net Asset Value per share, number of shares and the Net Assets attributed to the particular share class; | Within 15 Business Days after the end of each calendar month |
| Reference Fund Administrator | The aggregate subscription and redemption activity for the Reference Fund | Within 15 Business Days after the end of each calendar month |
| Reference Fund Administrator | The annual audited financial statements for the Reference Fund | As soon they become available and in any event within 180 days after the Reference Fund's fiscal year-end |

1

| | | |
|---|---|---|
| Buyer | Various risk management reports as agreed between the parties from time to time | Within 10 Business Days of the end of each calendar month. |

2