# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | 12-mc-00115 (JSR) |
| v. | ECF Case |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | Electronically Filed |
| Defendant. | |
| In re: Madoff Securities | |

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS ON BEHALF OF LEVERAGE PROVIDERS**

## TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................................1

Factual Background ..............................................................................................................2

Argument ..............................................................................................................................3

I. The Willful Blindness Standard Applies to the Leverage Providers, Who Had No Duty to Investigate BLMIS ......................................................................................3

II. As a Matter of Law The Leverage Providers Were Not Willfully Blind ...............4

III. The Leverage Providers Received the Alleged Subsequent Transfers for Value ...7

Conclusion .............................................................................................................................8

## TABLE OF AUTHORITIES

**Page**

### Cases

*Armstrong v. Collins*,
　No. 01 Civ. 2437, 2010 WL 1141158, at *22 (S.D.N.Y. Mar. 24, 2010) .......................... 8

*Ashcroft v. Iqbal*,
　556 U.S. 662, 678 (2009) ................................................................................................ 4, 5, 6

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*,
　396 B.R. 810, 856 (Bankr. S.D.N.Y. 2008) ..................................................................... 7

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544, 567 (2007) ................................................................................................. 5

*Bonded Fin. Servs. v. European Am. Bank*,
　838 F.2d 890, 898 (7th Cir. 1988) ................................................................................... 8

*Defer LP v. Raymond James Fin., Inc.*,
　654 F. Supp. 2d 204, 218 (S.D.N.Y. 2009) ..................................................................... 7

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
　551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ..................................................................... 5

*Global-Tech Appliances, Inc. v. SEB S.A.*,
　131 S. Ct. 2060, 2070 (2011) .......................................................................................... 4

*In re Churchill Mortgage Inv. Corp.*,
　256 B.R. 664, 682 (Bankr. S.D.N.Y. 2000) ..................................................................... 8

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
　703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) ..................................................................... 6

*In re WRT Energy Sec. Litig.*,
　No. 96 CIV. 3610 (JFK), 1999 WL 178749, at *11 (S.D.N.Y. Mar. 31, 1999) ............... 7

*Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*,
　747 F.Supp.2d 406, 413 (S.D.N.Y.2010) ........................................................................ 6

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*,
　737 F. Supp 2d. 137, 143 (S.D.N.Y. 2010) ..................................................................... 5

*Picard v. Katz*,
　462 B.R. 447, 455 (S.D.N.Y. 2011) ................................................................................ 4

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
    694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010) .......................................................................... 7

*Rosendale v. Mahoney*,
    No. 05 Civ. 01966 (CLB) (LMS), 2008 WL 2061266, at *8 (S.D.N.Y. Mar. 27,
    2008), *report and recommendation adopted by*, 2008 WL 2061267 (S.D.N.Y. May
    12, 2008); *rev'd on other grounds by*, 369 Fed. Appx. 313 (2nd Cir. 2010) ...................... 7

*Saltz v. First Frontier, L.P.*,
    782 F. Supp. 2d. 61, 72 (S.D.N.Y. 2010), *aff'd*, 2012 WL 2096399 (2d. Cir. June 12,
    2012) ..................................................................................................................................... 5

*SEC v. Cohmad Sec. Corp.*,
    No. 09 Civ 5680, 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2, 2010) .................................. 6

*United States v. Marino*,
    654 F.3d 310, 322 (2d Cir. 2011) ........................................................................................ 5

### Statutes

11 U.S.C. § 548(d)(2)(A)(D) ............................................................................................... 8

11 U.S.C. § 550(b) ..................................................................................................... 2, 7, 8

11 U.S.C. § 550(b)(1) ........................................................................................................ 8

U.C.C. § 9-608(a)(4) (2001) .............................................................................................. 2

### Other Authorities

5 *Collier on Bankruptcy* ¶ 550.03[1] at 550-20, 550-22 (16th ed. rev. 2010) ........................... 7, 8

This supplemental brief is submitted on behalf of the Subsequent Transferee Defendants[1] listed on Exhibit A (the "Leverage Providers"), in support of their motion to dismiss.

## Introduction

The Leverage Providers are financial institutions, financial intermediaries and their affiliates, who allegedly (i) entered into total return swaps or structured notes that gave counterparties or customers exposure to investment funds that directly or indirectly invested in BLMIS (collectively, the "Derivative Transactions"), and which the Leverage Providers hedged through purchasing shares in BLMIS-related investment funds, and/or (ii) extended credit to investment funds through conventional loans, accepting as collateral the funds' investment advisory accounts held at BLMIS (the "Credit Extensions," and together with the Derivative Transactions, the "Leverage Transactions"). Most, if not all, are net losers, many having lost hundreds of millions of dollars.

The alleged structure of the Leverage Transactions negates any inference of lack of good faith on the part of the Leverage Providers. This is because if a Leverage Provider had any reasonable suspicion that the reference funds underlying a Derivative Transaction, or the collateral supporting a Credit Extension, were worthless, it would not have entered into the transaction in the first place. Moreover, it certainly would not have placed its own funds at risk by purchasing as a hedge shares in those same worthless funds, or accepted a counterparty's BLMIS account as collateral for a loan, in exchange for only an agreed rate of interest or fees— which, by definition, were a mere fraction of the Leverage Provider's total exposure.

---

[1] Capitalized terms not defined herein have the meanings given to them in the Consolidated Brief on Behalf of Subsequent Transferee Defendants Responding to the Good Faith Standard Issues Raised by Order of the Court Dated June 23, 2012, filed July 20, 2012, in Case No. 12-MC-00155 (JSR), Dkt. No. 242 (the "Subsequent Transferee Good Faith Brief"), attached hereto as Exhibit B.

1

For these reasons, and because the Trustee's allegations also establish that the Leverage Providers provided value, the complaints against the Leverage Providers must be dismissed pursuant to section 550(b) of the Bankruptcy Code. *See* 11 U.S.C. § 550(b) (2012) (barring recovery against a subsequent transferee that "takes for value" and "in good faith").

## Factual Background

The Leverage Providers allegedly provided leverage to counterparties based on performance of funds invested in BLMIS, or provided leverage directly to such funds, in exchange for an interest rate or fees. The Leverage Transactions fit three alleged models:

(i) **total return swaps ("TRSs")**, under which the Leverage Provider agreed to pay leveraged returns based on the equivalent of any positive performance of a notional amount of shares in BLMIS investment funds (the "reference funds"), in exchange for an agreed rate of interest on the amount of leverage it provided (the "leverage amount");[2]

(ii) **structured notes**, under which the Leverage Providers issued notes that afforded counterparties leveraged returns on a total notional amount of shares of reference funds in exchange for an agreed rate of interest or fees;[3] and

(iii) **credit extensions**, under which the Leverage Providers made margin loans; thus, the investor, not the Leverage Provider, reaped any appreciation of collateral above the amount loaned.[4] *See* U.C.C. § 9-608(a)(4) (2001).

---

[2] *See, e.g.*, Complaint ¶¶ 18, 20, 70-72, *Picard v. Natixis*, No. Adv. Pro. No. 10-5353 (BRL) (Bankr. S.D.N.Y. Dec. 8, 2010), Dkt. No. 1 ("Natixis Compl."), attached hereto as Exhibit C; Complaint ¶ 102, *Picard v. Citibank, N.A.*, Adv. Pro. No. 10-5345 (BRL) (Bankr. S.D.N.Y. Dec. 8, 2010), Dkt. No. 1 ("Citibank Compl."), attached hereto as Exhibit D; Amended Complaint ¶¶ 256-271, *Picard v. HSBC Bank PLC*, No. Adv. Pro. No. 09-1364 (BRL) (Bankr. S.D.N.Y. Dec. 5, 2010), Dkt. No. 170 ("HSBC Am. Compl."), attached hereto as Exhibit E; Amended Complaint ¶¶ 61-64, *Picard v. ABN AMRO Bank (Ireland) Ltd.*, Adv. Pro. No. 10-5355 (Bankr. S.D.N.Y. July 3, 2012), Dkt. No. 42 ("AA Irish Bank Am. Compl."), attached hereto as Exhibit F; Amended Complaint ¶¶ 70-72 *Picard v. ABN AMRO Bank N.V. (presently known as the Royal Bank of Scotland, N.V.)*, Adv. Pro. No. 10- 5354 (Bankr. S.D.N.Y. Aug. 8, 2012), Dkt. No. 47 ("RBS Am. Compl."), attached hereto as Exhibit G.

[3] *See, e.g.*, Complaint ¶¶ 86-91, *Picard v. Banco Bilbao Vizcaya Argentiaria, S.A.*, Adv. Pro. No. 10-5351 (BRL) (Bankr. S.D.N.Y. Dec. 8, 2010), Dkt. No. 1 ("BBVA Compl."), attached hereto as Exhibit H; Natixis Compl. ¶ 129; HSBC Am. Compl. ¶¶ 278-80; Amended Complaint ¶¶ 6-17, *Picard v. Nomura International plc*, Adv. Pro. No. 10-5348 (BRL) (Bankr. S.D.N.Y. June 6, 2012), Dkt. No. 42 ("Nomura Am. Compl."), attached hereto as Exhibit I; Complaint ¶ 11, *Picard v. Merrill Lynch International & Co., C.V.*, Adv. Pro. No. 10-5346 (BRL) (Bankr. S.D.N.Y. Dec. 8, 2010), Dkt. No. 1 ("MLI Compl."), attached hereto as Exhibit J.

2

Thus, the Leverage Providers are not alleged to have retained returns generated by BLMIS' "split-strike conversion" strategy. Moreover, the Leverage Providers allegedly either purchased shares in the reference funds to hedge their obligations under Derivative Transactions, or accepted the counterparties' accounts at BLMIS as collateral for credit extensions.[5] When Madoff's fraud was discovered, the Leverage Providers lost the entire amount of any outstanding hedges—and in any event would not have netted positive returns from the investment funds. Key factual allegations include:

- <u>Two to five times leverage provided by Leverage Providers</u>. *See, e.g.*, AA Irish Bank Compl. ¶ 61; BBVA Compl. ¶ 90; Citibank Compl. ¶ 102; HSBC Am. Compl. ¶ 257; Natixis Compl. ¶ 129; RBS Am. Compl. ¶ 84; Nomura Compl. ¶¶ 14-17, 103.

- <u>The Leverage Providers placed their own capital at risk by purchasing hedges</u>. *See, e.g.*, AA Irish Bank Am. Compl. ¶ 67; BBVA Compl. ¶ 92; Citibank Compl. ¶ 102; HSBC Am. Compl. ¶ 256; Natixis Compl. ¶ 73; RBS Am. Compl. ¶ 91; Nomura Am. Compl. ¶¶ 2, 13, 16-17, 107; MLI Compl. ¶ 18.

- <u>The Leverage Providers received normal rates of interest, e.g., LIBOR or EURIBOR, plus a nominal margin</u>. *See, e.g.*, BBVA Compl. ¶ 97; Citibank Compl. ¶ 114; HSBC Am.Compl. ¶ 256; Natixis Compl. ¶ 85; Nomura Am. Compl. ¶¶ 12, 104.

- <u>The Leverage Providers did not stand to profit from positive performance of reference funds</u>. *See, e.g.*, AA Irish Bank Ltd. Compl. ¶ 64; BBVA Compl. ¶ 17; Citibank Compl. ¶ 102; HSBC Am. Compl. ¶ 257; Natixis Compl. ¶ 129; RBS Am. Compl. ¶ 70-72; Nomura Am. Compl. ¶ 103.

- <u>The Leverage Providers were at risk of losing the entire value of their shares in reference funds</u>. *See e.g.*, BBVA Compl . ¶ 90; Natixis Compl. ¶ 131.[6]

**Argument**

**I.   The Willful Blindness Standard Applies to the Leverage Providers, Who Had No Duty to Investigate BLMIS**

The Leverage Providers incorporate herein by reference the arguments in (i) the Subsequent Transferee Good Faith Brief that the willful blindness standard applies to subsequent

---

[4] *See, e.g.*, Citibank Compl. ¶¶ 65-67.

[5] *See, e.g.*, RBS Am. Compl. ¶¶ 75, 91; AA Irish Bank Am. Compl. ¶¶ 65-67; Citibank Compl. ¶ 102, 105; Natixis Compl. ¶ 127; BBVA Compl. ¶¶ 2, 20; Nomura Am. Compl. ¶¶ 2, 13, 16-17, 107; MLI Compl. ¶¶ 2, 18.

3

transferees, such as the Leverage Providers, *see* Subsequent Transferee Good Faith Brief, at 8-18; and (ii) the Supplemental Brief on Behalf of Hedge Fund Investors, filed simultaneously with this brief in Case No. 12-MC-115 ("Hedge Fund Investors Good Faith Brief"), that investors in BLMIS investment funds—such as Leverage Providers that hedged by purchasing shares of reference funds—had no duty to investigate BLMIS.

## II. As a Matter of Law The Leverage Providers Were Not Willfully Blind

To establish "willful blindness," the Trustee must show a high probability that the Leverage Providers believed that they were receiving the proceeds of a Ponzi scheme,[7] and took deliberate action to avoid learning the truth. *See* Subsequent Transferee Good Faith Brief, 31-38; *Picard v. Katz*, 462 B.R. 447, 455 (S.D.N.Y. 2011); *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011). Because the Trustee's allegations fail to suggest even a plausible inference, let alone a high probability, of willful blindness, his claims against the Leverage Providers fail. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face") (citation and internal quotation marks omitted).

*First*, the Trustee's allegations that the Leverage Providers hedged their exposure by purchasing reference fund shares conclusively disprove any suggestion that the Leverage Providers were willfully blind to Madoff's fraud. Not only is it implausible that a Leverage Provider would actually enter into a Derivative Transaction where it believed the reference funds relied on the operation of a Ponzi scheme, but it is all the more implausible—indeed, absurd—

---

[7] Thus if the Trustee does not allege that a Leverage Provider was even aware that the funds it received came from BLMIS, the Trustee has *per se* failed to allege willful blindness. *See, e.g.*, AA Irish Bank Am. Compl. ¶ 70 (admitting collateral may have come from subscriptions from other customers and making no allegation that the defendant was aware the collateral came from BLMIS); Natixis Compl. ¶ 102 (alleging the receipt of collateral but making no allegation that defendant was aware that the collateral came from BLMIS).

4

that it would hedge its obligations by buying shares in the very funds it suspects are worthless.[8] A more plausible scenario would be for the Leverage Provider to hedge by investing in assets it knew to be safe, *see, e.g.*, AA Irish Bank Compl. ¶ 65 (Leverage Provider "could have invested the collateral in other hedge funds, bonds, or even its own operations"). Alternatively, a Leverage Provider could choose not to hedge at all, and therefore potentially benefit when the Ponzi scheme collapsed. That, however, is the opposite of what the Leverage Providers are alleged to have done. But the "obvious alternative explanation" to the Trustee's theory is that the Leverage Providers are victims of the fraud. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007); *see United States v. Marino*, 654 F.3d 310, 322 (2d Cir. 2011) ("[N]o reasonable investor would invest in a known Ponzi scheme"); *see also* Subsequent Transferee Brief at 29.

*Second*, the only alleged "motive" the Trustee can muster to explain why the Leverage Providers hedged by knowingly risking hundreds of millions of dollars in a Ponzi scheme—the pursuit of fees—is insufficient as a matter of law. *See MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d. 137, 143 (S.D.N.Y. 2010) (fees do not support inference that defendant was active partner in Ponzi scheme); *see also Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) (pursuit of fees insufficient to establish scienter); *Saltz v. First Frontier, L.P.*, 782 F. Supp. 2d. 61, 72 (S.D.N.Y. 2010), *aff'd*, 2012 WL 2096399 (2d. Cir. June 12, 2012).[9] Moreover, here the alleged fees were, by definition, a tiny percentage—LIBOR

---

[8] Similarly, it is patently implausible that a Leverage Provider would seek to mitigate the risk of a Ponzi scheme—to which it was allegedly willfully blind—by demanding both collateral and an indemnity from its counterparty, as one Leverage Provider is alleged to have done. *See* Citibank Compl. ¶¶ 64-65. No rational Leverage Provider suspecting a Ponzi scheme would accept collateral tied to that scheme or derive comfort from an indemnity given by a party whose ability to indemnify would be undermined by the Ponzi scheme. *See Iqbal*, 566 U.S. at 678.

[9] The Trustee's allegations that "Madoff's purported resistance to leverage" was well-known further contradict willful blindness. *See*, *e.g.*, BBVA Compl. ¶ 5. In a traditional Ponzi scheme, the perpetrator would want leverage to get as much money as possible, as quickly as possible.

5

plus a market-based margin or fees—of the leverage amount funded, and thus of the hedge purchased and at risk. It is beyond implausible that the Leveraged Providers would knowingly purchase shares in a Ponzi scheme to receive a fraction of their purchase price in fees. *See Iqbal*, 556 U.S. at 678.

*Third*, the Trustee's allegations that some Leverage Providers did not receive certain information they requested from investment funds about BLMIS, without more, as a matter of law do not amount to willful blindness. *See Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 413 (S.D.N.Y. 2010) (allegation that auditors failed to verify BLMIS trades from independent sources inadequate to show intent to defraud); *see also* Subsequent Transferee Good Faith Brief at 21-31. On the contrary, the Trustee refutes any inference of willful blindness by admitting that the Leverage Providers—despite having no duty to investigate BLMIS, *see* Hedge Fund Investors' Good Faith Brief at 4-5—took *deliberate action to learn* about BLMIS.[10] *See* Subsequent Transferee Good Faith Brief at 30-31. The only plausible inference from the Trustee's allegations is that the Leverage Providers—like so many other financial institutions and regulators—were deceived by Madoff's elaborate fraud. *See In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) ("[T]he more compelling inference as to why Madoff's fraud went undetected for two decades was his

---

Furthermore, leverage in any transaction can cause increased shareholder activity, which in turn would place a higher administrative burden on a fund and therefore may not be viewed favorably. For example, if the net asset value of a reference fund goes down by even 1%, because the leverage provider has to equalize the leverage ratios, it will divest shares, whereas an investor without leverage will likely hold its position through such small fluctuations in value.
[10] *See, e.g.*, RBS Am. Compl. ¶¶ 117-124, 127-128; Natixis Compl. ¶¶ 152-58, 160, 162; HSBC Am. Compl. ¶¶ 168, 187-88; Citibank Compl. ¶¶ 108; MLI Compl. ¶¶ 60-61; *see also* BBVA Compl. ¶ 100-01 (referring to due diligence performed by defendants); AA Irish Bank Am. Compl. ¶ 103 (same).

6

proficiency in covering up his scheme and eluding the SEC and other financial professionals."); *SEC v. Cohmad Sec. Corp.*, No. 09 Civ 5680, 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2, 2010).

*Fourth*, "red flags" allegedly revealed to parties *other* than the Leverage Providers cannot establish willful blindness on the part of the Leverage Providers themselves. As a matter of law, the alleged knowledge of the Leverage Providers' counterparties cannot be imputed to them.[11] *See Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810, 856 (Bankr. S.D.N.Y. 2008). The same is true of the unsubstantiated musings about BLMIS of an unrelated third party allegedly communicated to a Leverage Provider's employees who had no alleged connection at all to the transactions at issue.[12] *See In re WRT Energy Sec. Litig.*, No. 96 CIV. 3610 (JFK), 1999 WL 178749, at *11 (S.D.N.Y. Mar. 31, 1999). Likewise, the Trustee cannot aggregate the knowledge of two or more corporate entities on the basis that they share the same parent and nothing more.[13] *See Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218 (S.D.N.Y. 2009); *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010).[14]

### III. The Leverage Providers Received the Alleged Subsequent Transfers for Value

A subsequent transferee takes "for value" under Section 550(b) when the transfers at issue satisfy an antecedent debt. *See* 11 U.S.C. § 550(b). The subsequent transferor need only receive slight value; consideration sufficient to support a simple contract suffices. *See* 5 *Collier*

---

[11] *See* BBVA Compl. ¶¶ 100-02; RBS Am. Compl. ¶ 170; Natixis Compl. ¶ 150.

[12] *See, e.g.*, Citibank Compl. ¶¶ 126-36; Natixis Compl., ¶¶ 67-68 (referring to "Natexis", an entity that at the time was not a Natixis entity engaged in relevant transactions and failing to allege any connection to any then current or future employee of Natixis).

[13] *See* AA Irish Bank Am. Compl. ¶¶ 88-91, 96-103 (alleging awareness of red flags on the part of an "AA Network," rather than AA Irish Bank specifically); Natixis Compl. ¶ 179.

[14] Nor can the Trustee rely on his remaining "red flag" allegations against the Leverage Providers, which fall squarely within the categories of allegations that have already been rejected by various courts as a basis for liability in connection with Madoff's fraud. *See* Subsequent Transferee Good Faith Brief at 21-31.

7

*on Bankruptcy* ¶ 550.03[1] at 550-20 (16th ed. rev. 2010); *Rosendale v. Mahoney*, No. 05 Civ. 01966 (CLB) (LMS), 2008 WL 2061266, at *8 (S.D.N.Y. Mar. 27, 2008) (the "proverbial peppercorn" is sufficient consideration), *report and recommendation adopted by*, 2008 WL 2061267 (S.D.N.Y. May 12, 2008); *rev'd on other grounds by*, 369 Fed. Appx. 313 (2nd Cir. 2010). Accordingly, the value prong is satisfied through satisfaction of antecedent debt because the alleged subsequent transfers were (i) in some instances repayments of loans previously extended to initial transferees and/or (ii) redemption payments from investment funds in satisfaction of those funds' obligations pursuant to subscription agreements, the validity of which are not challenged. 11 U.S.C. § 550(b)(1); *see also Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 898 (7th Cir. 1988).

Moreover, all Leverage Providers gave value in providing desired leverage to the counterparties, the value of which is undoubtedly greater than a "peppercorn." *See* 5 Collier on Bankruptcy ¶ 550.03[1] at 550-22 ("securing" a debt is for value) *see also* 11 U.S.C. § 548(d)(2)(A)(D) (transfers under a swap agreement to a swap participant are "for value").

Finally, the value prong of Section 550(b) is also satisfied with regard to the Leverage Providers that are net losers, most of which lost hundreds of millions of dollars by purchasing shares in the Reference Funds. *See In re Churchill Mortgage Inv. Corp.*, 256 B.R. 664, 682 (Bankr. S.D.N.Y. 2000); *Armstrong v. Collins*, No. 01 Civ. 2437, 2010 WL 1141158, at *22 (S.D.N.Y. Mar. 24, 2010).

## Conclusion

For the reasons stated in the Good Faith Subsequent Transferee Brief and the reasons stated above, the Leverage Providers respectfully request that this Court enter an order dismissing the complaints against the Leverage Providers.

8

Dated: August 10, 2012                  **LATHAM & WATKINS LLP**
        New York, New York

                                     By:    /s/ Christopher R. Harris
                                                    Christopher R. Harris

                                                    885 Third Avenue
                                                   New York, New York 10022
                                                  Tel: (212) 906-1200
                                                  E-mail: christopher.harris@lw.com

                                                  *Attorneys for ABN AMRO Bank (Ireland)*
                                                  *Ltd. (f/k/a Fortis Prime Fund Solutions Bank*
                                                  *(Ireland) Ltd.) (n/k/a ABN AMRO Retained*
                                                  *Custodial Services (Ireland) Limited) and*
                                                  *ABN AMRO Custodial Services (Ireland)*
                                                  *Ltd. (f/k/a Fortis Prime Fund Solutions*
                                                  *Custodial Services (Ireland) Ltd.)*

LO\2093197.7