USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/16/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:

BERNARD L. MADOFF INVESTMENT SECURITIES,
LLC,

Debtor.

---

18 Civ. 7449 (PAE)

OPINION & ORDER

---

AARON BLECKER, et al.,

Appellants,

-v-

IRVING H. PICARD,

Defendant.

---

PAUL A. ENGELMAYER, District Judge:

This appeal arises from the liquidation of Bernard L. Madoff Investment Securities LLC
("BLMIS") under the Securities Investor Protection, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"). It is
the latest in a series of challenges to the mechanics by which the Trustee proposes to allocate
funds in the BLMIS customer property estate among BLMIS's customers.

Specifically, Aaron Blecker and other former customers of BLMIS ("Appellants" or
"Participating Claimants") appeal a bankruptcy court decision affirming the calculation
performed by Irving H. Picard, the court-appointed Trustee administering BLMIS's Estate, of the
value of their respective claims against the Estate. The Trustee applies the "Net Investment
Method" to determine the value of each customer's share in the distributions from the Estate—
*i.e.*, a customer's "net equity." In 2011, the United States Court of Appeals for the Second
Circuit ratified that as the method used to calculate a BLMIS customer's net equity and rejected

1

the alternative "Last Statement Method," under which a customer's net equity would have been determined based on the value listed on that customer's last account statement issued by BLMIS. *See In re BLMIS*, 654 F.3d 229, 238 (2d Cir. 2011) ("*Net Equity Decision*"), *cert. denied*, 133 S. Ct. 24 & 25 (2012). In rejecting the Last Statement Method, the Circuit explained that relying on BLMIS's account statements was problematic because they were fictitious. The statements "were after-the-fact constructs that were based on stock movements that had already taken place, were rigged to reflect a steady and upward trajectory in good times and bad, and were arbitrarily and unequally distributed among customers." *Id.* at 238. The Net Investment Method avoided these problems by focusing on "the only accurate entries" on the customer's statements—cash deposits into and withdrawals from the customer's account. *Id.* at 232. Under the Net Investment Method, the Trustee determines net equity by calculating the total amount of principal that was invested in a customer's account (cash in) minus the total amount of money withdrawn from that account (cash out). Accordingly, a BLMIS customer who, during the life of her account, withdraws at least as much money as she had invested, would have zero net equity, even if the BLMIS statements for the account reported a positive balance reflecting apparent profits that BLMIS claimed to have earned for the account.

This appeal raises a corollary question: whether "profit withdrawals," which are designated in BLMIS's books and records by the notation "PW" and which refer to distributions that BLMIS sent by check to the customer, are properly treated as debits under the Net Investment Method. The appeal also raises the related evidentiary questions whether BLMIS's records reflecting PW transactions are admissible as business records and, if so, the weight that they should be given.

Before the Court is a determination by the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, on these questions. On January 19, 2019, Judge Bernstein held an evidentiary hearing on these questions, using the account of a BLMIS customer, Aaron Blecker, as a vehicle to examine the proper treatment of PW transactions.[1] In a July 27, 2018 decision ("*PW Bankr. Decision*")[2] and a follow-on August 3, 2018 order ("PW Order"),[3] Judge Bernstein approved the Trustee's decision to treat the PW notations in BLMIS's books as reflecting actual distributions to a customer's account and as falling within the meaning of debits under the Net Investment Method. Judge Bernstein therefore denied the claims and objections of Blecker and other customers. This appeal followed.

For the reasons that follow, the Court affirms the Bankruptcy Court's decision and order.

## I.  Background[4]

### A.  Factual Background to the Bankruptcy Court's Decision

The infamous multibillion-dollar Madoff Ponzi scheme has been chronicled in numerous decisions in this Circuit. *See, e.g., In re BLMIS*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011) ("*Net Equity Decision*"); *SIPC v. BLMIS (In re Madoff Secs.)*, 476 B.R. 715 (S.D.N.Y. 2012), *supplemented* (May 15, 2012), *aff'd sub nom. Picard v. Ida Fishman Revocable Tr. (In re BLMIS)*, 773 F.3d 411, 415–17 (2d Cir. 2014) ("*546(e) Decision*"), *cert.*

---

[1] Dkt. 15-1 (Joint Notice Correcting Record on Appeal) at 1. After the hearing, on January 31, 2018, the parties filed a joint stipulation setting out their views on the admissibility of certain exhibits in connection with the Bankruptcy Court's ruling. *In re BLMIS*, Adv. Pro. No. 08-01789, Dkt. 17207. The Court understands that Blecker recently died at the age of 107. For clarity's sake, the Court refers to the arguments made on his behalf as made by him.

[2] *See SIPC v. BLMIS (In re BLMIS)*, 592 B.R. 513 (Bankr. S.D.N.Y. 2018).

[3] *In re BLMIS*, Adv. Pro. No. 08-01789, Dkt. 17878.

[4] The Court draws the summary of the facts from the *PW Bankr. Decision* and other aspects of the record.

3

*denied*, 135 S. Ct. 2858 & 2859 (2015); *SIPC v. BLMIS (In re BLMIS)*, 499 B.R. 416 (S.D.N.Y.

2013) ("*Antecedent Debt Decision*"), *certification for interlocutory appeal denied*, 987 F. Supp.

2d 309 (S.D.N.Y. 2013); *SIPC v. BLMIS (In re BLMIS)*, 596 B.R. 451 (S.D.N.Y. 2019)

("*Fraudulent Transfer Decision*").

      The Court assumes familiarity with the facts chronicled and outcomes reached in those

decisions and sets out here only the facts most germane to this appeal.

### 1.      The Madoff Ponzi Scheme

      This Court has summarized the Madoff Ponzi Scheme:

> BLMIS was an investment firm that collected investors' funds and purported to
> invest them in securities according to a "split-strike conversion strategy" that was
> ostensibly designed to produce consistently high rates of return on investments,
> although in fact the "rates of return Madoff assigned to different customers'
> accounts varied significantly and arbitrarily." *Net Equity Decision*, 654 F.3d at
> 231–32 (internal quotation marks omitted). Madoff never actually invested
> investors' money. Instead, BLMIS "generated fictitious paper account statements
> and trading records" to conceal his fraud. *Id.* at 231. Thus, Madoff produced no
> actual profits for his clients, instead operating a classic Ponzi scheme in which he
> used new principal infused by "new and existing customers to fund withdrawals of
> principal and supposed profit made by other customers." *Id.* at 232.
>
> In 2008, Madoff's scheme collapsed, when the money coming in from new
> investments no longer could support the redemptions sought by his customers. *Id.*
> In the end, the "final customer statements issued by BLMIS falsely recorded nearly
> $64.8 billion of net investments and related fictitious gains." *Id.*

*See Fraudulent Transfer Decision*, 596 B.R. at 456–57 (internal footnotes omitted).

### 2.      The SIPA Trustee and the Statutory Framework

      This Court has also summarized the role of Picard, the SIPA Trustee, and the duties

delegated to him by the Securities Investor Protection Act of 1970 ("SIPA"):

> After Madoff's arrest for securities fraud, a court in this District granted an
> application by the Securities Investor Protection Corporation ("SIPC"), issuing a
> protective order under . . . [SIPA], 15 U.S.C. § 78aaa *et seq.*, and appointing Irving

H. Picard as Trustee for BLMIS's liquidation. *Net Equity Decision*, 654 F.3d at 233.[5]

"In a SIPA liquidation, a fund of 'customer property,' separate from the general estate of the failed broker-dealer, is established for priority distribution exclusively among customers. The customer property fund consists of cash and securities received or held by the broker-dealer on behalf of customers, except securities registered in the name of individual customers." *Net Equity Decision*, 654 F.3d at 233 (citing 15 U.S.C. § 78lll(4)).

Under SIPA, customers of the failed broker-dealer are to "share ratably in such customer property on the basis and to the extent of their respective net equities." 15 U.S.C. § 78fff–2(c)(1)(B). "Net equity" under SIPA is defined as:

> the dollar amount of the account or accounts of a customer, to be determined by—(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date—(i) all securities positions of such customer . . . ; minus (B) any indebtedness of such customer to the debtor on the filing date . . . .

*Id.* § 78lll(11). SIPA provides that the Trustee shall pay its obligations to customers, including those based on their net equity, "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee." *Id.* § 78fff–2(b).

Frequently in SIPA liquidations—and as is all but certain to be the case with respect to BLMIS—"the assets in the customer property fund are insufficient to satisfy every customer's 'net equity' claim." *Net Equity Decision*, 654 F.3d at 233.[6] "In such a case, SIPC advances money to the SIPA trustee to satisfy promptly each customer's valid 'net equity' claim," *Net Equity Decision*, 654 F.3d at 233, up to a maximum of $500,000 per customer for claims for securities, and up to $250,000 per customer for claims for cash, 15 U.S.C. §§ 78fff–3(a), (d).

---

[5] SIPC is "a nonprofit corporation consisting of registered broker-dealers and members of national securities exchanges that supports a fund used to advance money to a SIPA trustee," and BLMIS, "[b]y virtue of its registration with the SEC as a broker-dealer, . . . is a member of SIPC." *Net Equity Decision*, 654 F.3d at 232–33 & n.3.

[6] According to his latest Interim Report, the Trustee has "recovered or reached agreements to recover" approximately $10.9 billion out of a total of approximately $20 billion in lost customer principal. Customer claimants have filed claims seeking to recover $17.5 billion of that lost principal. *See* Trustee's Fourteenth Interim Report for the Period April 1, 2015 Through September 30, 2015, at 1 & n.3, Adv. Proc. No. 08–01789, Dkt. 11912. At the time Madoff's scheme collapsed, BLMIS's fictitious account statements for its customers recorded a total of $64.8 billion in purported customer holdings. *See Net Equity Decision*, 654 F.3d at 232.

> In addition to the specific duties assigned to a SIPA trustee specified by the Act, SIPA trustees also have "the general powers of a bankruptcy trustee." *Net Equity Decision*, 654 F.3d at 231 (citing 15 U.S.C. § 78fff–1). SIPA trustees are empowered under the Bankruptcy Code to avoid fraudulent transfers to reclaim additional funds for the customers if, absent the transfer, the funds would have been customer property. *See 546(e) Decision*, 773 F.3d at 414 (citing 15 U.S.C. §78 fff–2(c)(3)); *see also* 11 U.S.C. § 548(a)(1); *Net Equity Decision*, 654 F.3d at 242 & n.10. Significantly, however, avoidance actions may only be taken to recover funds transferred within two years of the date of the filing of the petition (the "reach-back period"). 11 U.S.C. § 548(a)(1); *see also 546(e) Decision*, 773 F.3d at 415–16.

*Fraudulent Transfer Decision*, 596 B.R. at 457–58.

### 3.      Profit Withdrawals[7]

As noted above, the Second Circuit, in 2011, affirmed the Bankruptcy Court's decision upholding the Trustee's use of the Net Investment Method to calculate BLMIS customers' net equity. *Net Equity Decision*, 654 F.3d at 231. As the Circuit explained, the Net Investment Method calculated net equity by

> crediting the amount of cash deposited by the customer into his or her BLMIS account, less any amounts withdrawn from it. The use of the Net Investment Method limits the class of customers who have allowable claims against the customer property fund to those customers who deposited more cash into their investment accounts than they withdrew, because only those customers have positive 'net equity' under that method.

*Id.* at 233 (citation omitted).

---

[7] Given the number of claimants raising the issue of the proper treatment of profit withdrawals, the Bankruptcy Court established a distinct omnibus proceeding to focus on that issue, using customer Blecker's account as exemplary. In discovery, the parties took depositions of, among others, Blecker, and, from within BLMIS, Madoff and several BLMIS employees. The testimony of two BLMIS employees—Annette Bongiorno and Joann Sala—was especially important to the Court's decision. Both were long-term BLMIS employees who testified as to the creation and maintenance of BLMIS books and records. The Bankruptcy Court's admirably clear account of BLMIS's designation and distribution of PW transactions, which this Court adopts in full, draws heavily on Bongiorno and Sala's testimony.

6

The *Net Equity Decision*, however, did not address the specific issue whether PWs designated on BLMIS's account statements should, like cash withdrawals, be treated as debits to a customer's account. BLMIS account statements identified various transaction types and descriptions, including labeling profit withdrawals as "PWs." As the Bankruptcy Court explained, PW transactions were structured and used to "create fictitious transactions and pay fictitious profits." *PW Bankr. Decision*, 592 B.R. at 522. BLMIS would fabricate deals in which customers would be set up in a particular "deal" stock. *Id.* BLMIS would record the ostensible purchase of that stock on the customer's statement. *Id.* The purchase amount of that stock would appear as a debit on the customer's statement. *Id.* At the end of the deal period, the customer's statement would reflect a stock sale with the sale price appearing as a credit on the customer's statement. *Id.* The difference between the reported purchase and sale prices for the deal stock would result, where the sale price exceeded the purchase price, in a profit for the associated BLMIS account. *Id.*

BLMIS treated such profits in one of two ways. Upon opening an account with Madoff, customers would enter into an oral agreement with Madoff about whether (1) to send the customer the profits at the conclusion of each deal or (2) to reinvest those profits. *Id.* This agreement was memorialized on each customer's Name/Address File Maintenance form with either an "S," which meant "send," or an "R," which meant "reinvest." *Id.*

For accounts set up such that the customer would be sent profits, BLMIS would automatically send a check in the amount of the ostensible profit to the customer at the close of each deal. *Id.* BLMIS recorded profit withdrawals with the notation "PW [security name]." *Id.* These checks were not sent to the corporation identified in the PW transaction notation but instead were sent directly to customers. *Id.* As explained further below, for the period of

December 1998 to December 2008, experts hired by the Trustee were able to reconcile 99.6% of

the PW transactions to BLMIS bank records and to the bank records of those who received the

transfers. *Id.* at 523.

Blecker and the Participating Claimants have objected to the Trustee's treatment of PW

transactions. They contend that they never received any cash distributions from these

transactions. Notably, however, Blecker admitted that he received monthly BLMIS account

statements that reflected PW transactions. *Id.* at 531. And the terms of the Customer Agreement

that he entered into with BLMIS required that he object in writing to disputed information

appearing on an account statement within 10 days of receiving that statement. *Id.* Blecker has

not provided evidence of having made any such complaint to BLMIS regarding any of the PW

transactions at issue. *Id.* at 532.

### 4.    Reconciling BLMIS's Customer Accounts and Bank Records

The Trustee retained Lisa Collura, a forensic accountant with the firm FTI Consulting,

"to reconcile cash transactions reflected on the statements of the BLMIS customer accounts with

available BLMIS bank records and other sources and trace the flow of those founds." *Id.* at 519.

Collura presented her findings in a 705-page expert report dated July 14, 2015. *Id.* For

transactions occurring between December 1998 and December 2008, Collura was able to

reconcile 99% of all cash transactions during that period, including 99.6% of the 5,527 PW

transactions that occurred over that span. *Id.* at 523. For transactions between April 1981 and

November 1998, she was only able to corroborate approximately 54% of the PW transactions as

cash payments to the customer, largely due to the availability of bank records. *Id.*

8

### 5.    Blecker's Claims

Between at least 1978 and December 11, 2008, Blecker had four BLMIS accounts: the 022 Account, the 023 Account, the 156 Account, and the 157 Account. *Id.* at 529.  Relying on the Last Statement Method, he filed claims for the 022, 156, and 157 Accounts, in the amounts, respectively, of $753,107.40, $2,625,435.95, and $1,480,131.54. *Id.*  The Trustee, applying the Net Investment Method, denied these claims on the ground that withdrawals from exceeded deposits into the accounts. *Id.*

Importantly, the parties did not dispute that Blecker deposited an aggregate amount of $577,350.33 into the 022 and 023 Accounts.  Blecker contends that he never withdrew any funds from his accounts and that therefore his net equity claim for these accounts is $577,350.33. *Id.* at 530.

The Trustee based his denial of Blecker's claims on the analysis of Matthew Greenblatt, a forensic accountant who oversaw the reconstruction of BLMIS's books and records and the calculation of the principal balance for each BLMIS account. *Id.* at 520.  Greenblatt summarized his team's findings in a set of summary exhibits that the Bankruptcy Court received in evidence. As the Bankruptcy Court explained:  "Mr. Greenblatt reconciled the transactions listed in the customer statements with other internal BLMIS records, including cash receipt records or 'check-in books,' cash disbursement records or 'check-out books' (together with the check-in books, the 'Spiral Notebooks'), Portfolio Management Reports ('PMRs'), Portfolio Management Transaction Reports ('PMTs'), and customer correspondence." *Id.*  Greenblatt was able to review PMRs from the early 1980s through November 2008, with some gaps, and the PMTs and Spiral Notebooks from the mid-1980s to the mid-1990s, with some gaps. *Id.*

After reviewing these documents, Greenblatt determined that the principal balance for each Blecker account was as follows:

As to the 022 Account, Greenblatt found that Blecker made two initial deposits totaling $100,000 into the account in September 1986 and a later deposit of $100,000 in December 1992. *Id.* at 530. Accordingly, the amount of "cash in" totaled $200,000 for this account. Between November 1986 and April 1997, Greenblatt found, 75 PW transactions were made, leaving a negative balance of $59,634 by late April 1997. *Id.* In addition, the BLMIS account statement reflects an inter-account transfer to the 156 Account in the amount of $206,529. *Id.* Thus, even ignoring the PW transactions, Blecker's net equity in the 022 Account was zero. Blecker does not argue otherwise. *Id.*

As to the 023 Account, for which Blecker did not submit a claim, Greenblatt determined that a total of $377,350 over the course of several transactions had been deposited into the account. *Id.* Between April 16, 1981 and June 18, 1982, Blecker received nine checks totaling $13,295. *Id.* The Bankruptcy Court emphasized that these were not PW transactions. *Id.* As for those transactions, the account statements contained 105 PW transactions between August 1982 and April 1997, totaling $843,877 in withdrawals and leaving a negative balance of $466,527 as of late April 1997. *Id.* In addition, the BLMIS account statement reflects an April 24, 1997 inter-account transfer to the 157 Account in the amount of $389,847. *Id.* The account statement also lists another PW Transaction in the amount of $4,381 on April 29, 1997. *Id.* Accordingly, the Trustee, reviewing Greenblatt's report, found that the balance in the 023 Account was zero. *Id.*

As to the 157 Account, Greenblatt found that the account had been funded with a single inter-account transfer of $389,847 from the 023 Account. *Id.* at 531. By that time, however,

under the Inter-Account Method, the 023 Account had already been substantially overdrawn—it

did not have any net equity in it—and, therefore, the amount of principal transferred was zero.

*Id.* In June and September 1997, BLMIS records reflect that the approximately $1.46 million in

equity was transferred from the 157 Account to the 156 Account. *Id.* Here, too, even ignoring

the PW transactions, the net equity in the 157 Account was zero. *Id.*

Finally, as to the 156 Account, Greenblatt found that the account had been funded with a

single inter-account transfer of $206,529 from the 022 Account. *Id.* But, at the time of this

initial transfer, as explained above, the 022 Account had zero net equity. The BLMIS account

statements also indicate that $1.46 million was purportedly transferred into this account from the

157 Account. *Id.* Under the Inter-Account Method, however, the value of that transfer is zero.

As with the 157 Account, the statements for the 156 Account do not reflect any additional

deposits; therefore, the net equity in the 156 Account was also zero.

**B.     The Bankruptcy Court's Decision and Subsequent Appeals**

Based on its review of the evidence as to PW transactions, the Bankruptcy Court held that

"a PW notation appearing in a monthly statement supports the finding, in the absence of credible

evidence offered by a claimant in the claimant's case, that the customer received a cash

distribution in the amount indicated." *PW Bankr. Decision*, 592 B.R. at 517. As to Blecker's

claims specifically, the Bankruptcy Court found that Blecker "waived any objection to the

treatment of PW Transactions in [his] [a]ccounts as cash withdrawals," and failed to prove the

amount of his claims differed from the Trustee's determination. *Id.*

The Court first found that multiple BLMIS records supported the Trustee's decision to

treat PW transactions as debits to a customer's account. BLMIS maintained spiral notebooks to

keep track of incoming and outgoing checks to customers, including those related to PW

11

transactions. *Id.* at 523. The Bankruptcy Court credited the testimony of BLMIS employees

who testified that an entry in the check-out spiral notebook corresponded to a check sent to a

customer. *Id.* BLMIS's computer systems also generated debit memoranda ("debit memos")

that "included the words 'PW Check + [security name]' (which matched the entry on the

customer statement), the accountholder's name and address, account number, and the amount,

date, and security of the PW Transaction." *Id.* The debit memos also contained, as an

attachment, "either a copy of the check for BLMIS's files or the check corresponding to that

transaction for the customer." *Id.* The Bankruptcy Court found that third-party records also

supported the Trustee's decision to treat PW transactions as "outflows, or reductions to an

account's net equity in the Principal Balance Calculations." *Id.* Accordingly, the Bankruptcy

Court found that the assembled evidence "support[ed] the inference that all of the PW

Transactions reflect cash withdrawals." *Id.* The Bankruptcy Court then evaluated Appellants'

evidentiary objections to admission of various BLMIS books and records.

First, the Participating Claimants argued that the BLMIS records on which the Trustee

relied in finding distributions of profits to customers were not authentic. *Id.* at 524. Rejecting

that argument, the Bankruptcy Court found that the Trustee properly confirmed the accuracy of

these records by cross-checking them against records provided by other customers, whose

records matched more than 99% of the PW transactions that occurred between December 1998

and December 2008, and by providing testimony of former BLMIS employees to corroborate the

procedures by which these records had been created. *Id.* at 526.

Second, Blecker argued that many of the BLMIS records that the Trustee offered into

evidence related to other customer accounts for the 1998–2008 period and were, therefore,

irrelevant to his claim. The Bankruptcy Court overruled this objection on the grounds that the

other records supplied important context indicating the accuracy of the PW notations in the

accounts at issue.  The Bankruptcy Court noted that the Second Circuit has found that BLMIS's

records of *cash* deposits and withdrawals are accurate, and that the fact that PW transactions

reported in other accounts had been shown to represent bona fide cash withdrawals made it more

likely that the same notation represented bona fide cash withdrawals in the accounts of Blecker

and the other Participating Claimants.  *Id.* at 527.  The Court further reasoned that the

demonstrated high degree of reliability of the cash transaction notations covering December

1998 through December 2008 made it probable that the records for the earlier 1981–1997 period

(*i.e.*, the period covering the PW transactions appearing on Blecker's account statements) were

also accurate.  *Id.*

   Third, the Participating Claimants argued that the BLMIS records, including customer

statements, are inadmissible hearsay.  The Bankruptcy Court rejected that argument, too.  It

found—for many of the same reasons it found the records to be authentic—that the BLMIS

records were excepted from the rule excluding hearsay by Federal Rule of Evidence 803(6), the

business-records exception.  *Id.* at 528–29.

   The Bankruptcy Court found that, under the Net Investment Method, in light of the PW

transactions noted on the 022 and the 023 Accounts, the balances for these accounts were both

negative.  *Id.* at 530.  The Bankruptcy Court next found that Blecker had waived his right to

contest whether the PW transactions reduced the balances in his accounts because he had ratified

those transactions.  Blecker, the Court noted, was a successful accountant who understood the

difference between a debit and a credit, making significant his failure to object to the PW

transactions on his account statements, which were clearly marked there as debits.  *Id.* at 531–32.

13

Lastly, the Bankruptcy Court held that Blecker had failed to meet his burden to show that he was a customer with a claim against the BLMIS Estate. *Id.* at 532. The Bankruptcy Court explained that Blecker needed to show both that he invested money with BLMIS and that his account had positive net equity. *Id.* In assessing whether Blecker had positive net equity, the Bankruptcy Court credited the evidence offered by the Trustee indicating that Blecker had received PWs that reduced his net equity to zero. This included the exhibits summarizing the cash and PW transactions on the customer account statements, the Collura Report, the BLMIS books and records, and the testimony of the BLMIS employees. In addition, the Bankruptcy Court held that Blecker failed to adduce credible evidence to support a finding that the PW transactions did not, in fact, reflect actual cash withdrawals to him from in his account. The Bankruptcy Court did not credit Blecker's testimony that he had never received a PW Check. *Id.* at 533. The Court explained:

> [I]f Mr. Blecker never withdrew any money as he claims, the 023 Account earned only $12,496.40 in profits over its sixteen-year life. Using April 1984 as the intermediate date to keep the math simple, the 023 Account earned a profit of $1,041.37 for each of the twelve years, or approximately three tenths of one percent per annum.

*Id.* at 538. The Court reasoned that a sophisticated accountant such as Blecker would not view such meager returns as a "good investment" and a "wonderful investment" earning high returns, unless "he received the high returns in the form of the PW checks." *Id.*

### C.     Procedural History of this Appeal

On August 16, 2018, Appellants filed an appeal with the Court. Dkt. 1. On September 11, 2018, the record of appeal became available. Dkt. 5. On November 2, 2018, Appellants filed their memorandum of law. Dkt. 18. On December 14, 2018, intervenor Securities Investor

14

Protection Corporation filed an opposition. Dkt. 19. On December 14, 2018, the Trustee filed

his opposition. Dkt. 20. On January 17, 2019, Appellants filed their reply. Dkt. 24.

## II.    Applicable Legal Standards

District courts are vested with appellate jurisdiction over bankruptcy court rulings

pursuant to 28 U.S.C. § 158(a) ("[D]istrict courts of the United States shall have jurisdiction to

hear appeals . . . from final judgments, orders, and decrees; . . . [and,] with leave of the court,

from other interlocutory orders and decrees . . . of bankruptcy judges."). This Court "may

affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with

instructions for further proceedings." *W. Milford Shopping Plaza v. The Great Atl. & Pac. Tea*

*Co. (In re Great Atl. & Pac. Tea Co.)*, No. 14 Civ. 4170 (NSR), 2015 WL 6395967, at *2

(S.D.N.Y. Oct. 21, 2015) (quoting *Sumpter v. DPH Holdings Corp. (In re DPH Holdings Corp.)*,

468 B.R. 603, 611 (S.D.N.Y. 2012)).[8]

A bankruptcy court's legal conclusions, including its interpretations of SIPA, are

reviewed *de novo. Net Equity Decision*, 654 F.3d at 234; *see also Solow v. Kalikow (In re*

*Kalikow)*, 602 F.3d 82, 91 (2d Cir. 2010).

A bankruptcy court's findings of fact are reviewed for clear error. *In re Bayshore Wire*

*Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000). With respect to a bankruptcy court's factual

findings, clear error exists only where a reviewing court is "left with the definite and firm

conviction that a mistake has been committed." *In re Manville Forest Prods. Corp.*, 896 F.2d

1384, 1388 (2d Cir. 1990) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395

---

[8] The quoted language was found in the former Federal Rule of Bankruptcy Procedure 8013, but
was omitted from the amended Federal Bankruptcy Rules of Procedure, effective December 1,
2014. Nevertheless, "logic still compels the same conclusion with respect to the appellate
powers of the District Court." *In re Great Atl. & Pac. Tea Co.*, 2015 WL 6395967, at *2 n.1.

(1948)).  For a mixed question of law and fact, the standard of review—*de novo* or clear error—

"depends . . . on whether answering it entails primarily legal or factual work." *U.S. Bank Nat'l*

*Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018).

Particularly relevant here, a bankruptcy court's evidentiary rulings are reviewed for abuse

of discretion. *Manley v. AmBase Corp.*, 337 F.3d 237, 247 (2d Cir. 2003).  "[A] bankruptcy

court abuses its discretion if it rests its conclusion on clearly erroneous factual findings or an

incorrect legal standard." *In re Avaya Inc.*, No. 18 Civ. 6312 (JPO), 2019 WL 1986615, at *4

(S.D.N.Y. May 6, 2019) (internal quotation marks and citations omitted).  In addition, the

Second Circuit has explained, "[a]n evidentiary ruling that is an abuse of discretion is, however,

only reversible if it also affects a party's substantial rights." *Schering Corp. v. Pfizer Inc.*, 189

F.3d 218, 224 (2d Cir. 1999) (citing Fed. R. Evid. 103(a)).  "Unless justice requires otherwise, no

error in admitting or excluding evidence . . . is ground for . . . disturbing a judgment or order."

Fed. R. Civ. P. 61.  In the context of a bench trial, the "admission of evidence is rarely ground

for reversal, for the trial judge is presumed to be able to exclude improper inferences from his or

her own decisional analysis." *Bic Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 39 (2d Cir.

2001).

**III.     Discussion**

Appellants—including Blecker, whose circumstances provided effectively the test case as

to how PWs reflected in BLMIS's books are to be treated by the Trustee—object to the

Bankruptcy Court's decision on four grounds.  First, Appellants argue that the Bankruptcy Court,

in applying SIPA, improperly relaxed the requirements of the Federal Rules of Evidence when

making evidentiary rulings relating to PWs.  Appellants therefore argue that this Court should

review the Bankruptcy Court's evidentiary rulings *de novo*.  Second, Appellants challenge

16

various evidentiary rulings, specifically, the decisions to receive BLMIS's books and records and

the summary exhibits prepared by Trustee expert witness Greenblatt.  Third, Appellants

challenge the Bankruptcy Court's findings that (1) Blecker in fact received from BLMIS checks

corresponding to the PWs reflected in BLMIS's books and records, so as to justify the Trustee in

treating these PWs as debits for purposes of measuring Blecker's net equity, and (2) Blecker

ratified the PW transactions listed on his BLMIS monthly account statements.  Fourth,

Appellants contend that the doctrine of *in pari delicto* bars the Trustee from enforcing BLMIS's

customer agreements so as to find ratification.  The Court addresses these contentions in turn.

### A.     Applicability of the Federal Rules of Evidence

Appellants argue that the Bankruptcy Court held that customers, such as Blecker and the

Participating Claimants, were not entitled to the protections of the Federal Rules of Evidence.

As Appellants depict the proceedings below, the Bankruptcy Court's decision turned on its

conclusion that SIPA authorized the Trustee to determine and pay claims even if based on books

and records that the Federal Rules of Evidence would not treat as admissible.  Specifically,

Appellants argue, the Bankruptcy Court credited the Trustee's evidence, primarily BLMIS's

books and records reflecting PWs, without rigorously examining whether that evidence was

admissible under the Federal Rules of Evidence.  Appellants argue that, insofar as these books

and records were not reliable, the Trustee should not have treated the PWs reflected on those

records as signifying actual withdrawals.  Instead, Appellants argue, the Bankruptcy Court

should have taken the occasion to reverse course and apply the Last Statement Method rejected

by the *Net Equity Decision* and its substantial progeny.

This argument is easily put down.  Appellants are correct that the Federal Rules of

Evidence apply in SIPA proceedings.  *See* Fed. R. Evid. 110(a), (b) ("These rules apply to

17

proceedings before: United States bankruptcy and magistrate judges[,]" and "in: civil cases and proceedings, including bankruptcy[.]"). But they are wrong to claim that the Bankruptcy Court failed to do so here. On the contrary, the record reflects that the Bankruptcy Court rigorously applied the Federal Rules of Evidence in assessing whether to admit BLMIS's books and records. And at no point did the Bankruptcy Court purport to apply a standard other than that supplied by those rules. The Court discusses the Bankruptcy Court's evidentiary ruling in detail below. For present purposes, however, three brief examples illustrate the Bankruptcy Court's careful adherence to the Federal Rules of Evidence. First, applying Rule 901(a), the Bankruptcy Court found that the BLMIS books and records were authentic. *PW Decision*, 592 B.R. at 524–25. In so finding, the Court set out the governing legal standards. It determined that the Trustee had submitted sufficient evidence to meet the "light" burden, under that Rule, to demonstrate that the records were authentic, *id.* at 525, and that such a finding was in accord with the case law, *id.* at 526. Second, applying Rule 401 as required, the Bankruptcy Court likewise found the BLMIS records relevant. *Id.* at 527. Third, and finally, applying Rule 803(6), the Bankruptcy Court found the BLMIS records were admissible under the business records exception to the hearsay rule. *Id.* at 528. The Bankruptcy Court's sequential application of these rules was a textbook illustration of a court engaging in the step-by-step inquiry into the admissibility of a purported business record that the Federal Rules of Evidence command.

Based on its application of the Federal Rules of Evidence, not some alternative standard under SIPA, as Appellants imagine, the Bankruptcy Court thus held BLMIS's books and records admissible. Because Appellants' claim that the Bankruptcy Court applied the wrong rules is incorrect, there is no basis for the Court, as Appellants urge, to review the Bankruptcy Court's evidentiary decisions *de novo*, instead of for abuse of discretion. The Court accordingly finds

that the Bankruptcy Court applied the proper rules—the Federal Rules of Evidence—when ruling

on the Participating Claimants and Blecker's challenge to the Trustee's denial of their claims.

The Court therefore reviews these evidentiary rulings for abuse of discretion.

### B.    Evidentiary Objections

Appellants next challenge the Bankruptcy Court's evidentiary rulings that (1) BLMIS's

books and records and (2) the summary exhibits prepared by the Trustee's expert witnesses were

admissible in evidence.  Under the governing abuse of discretion standard, Appellants must show

that these rulings rested "on clearly erroneous factual findings or an incorrect legal standard." *In

re Avaya Inc.*, 2019 WL 1986615 at *4.  Appellants must also show that this ruling affected their

substantive rights. *See Schering Corp.*, 189 F.3d at 224.  The Court finds—with respect both to

BLMIS's books and records and to the summary exhibits—that Appellants have demonstrated

neither an abuse of discretion nor an error that affects their substantial rights.

### 1.    Admissibility of BLMIS's Books and Records

Appellants make two sets of arguments why the Bankruptcy Court erred in admitting the

BLMIS books and records under Federal Rule of Evidence 803(6), which provides a "business

records" exception to the exclusion of what would otherwise be inadmissible hearsay.  First, they

argue, the Bankruptcy Court misapplied each required element of Rule 803(6).  They contend

that the Bankruptcy Court erred in finding that the records were made by "someone with

knowledge," *see* Fed. R. Evid. 803(6)(A); that the records were kept "in the course of a regularly

conducted activity of business," *see* Fed. R. Evid. 803(6)(B); and that the Participating Claimants

failed to demonstrate that the "the source of information or the method or circumstances of

preparation indicate a lack of trustworthiness," *see* Fed. R. Evid. Rule 803(6)(E).  Second,

Appellants argue, the Bankruptcy Court erred in applying Rule 803(6), and not Rule 803(7). Each argument fails.

> **a.**     *Prepared by Someone with Knowledge*

Appellants first contend that "[n]o former [BLMIS] employee could identify the PW notations on customer statements." In addition, they note that Bongiorno, one of the longest-serving BLMIS employees, was unable to state with certainty who had made the "S" and "R" notations in BLMIS's customer records, which indicated whether an account was a send account or a reinvest account.

In fact, Bongiorno testified extensively to the process by which PW transactions were recorded on customer accounts. *See* Dkt. 20-5 at TA081–TA154 ("Bongiorno Tr."). Specifically, she testified that Madoff would have a conversation with the account holder and inform either her or Jodi Crupi, who managed Madoff's larger accounts, whether to mark the account as "S" or "R." *Id.* at TA116–TA117. Relevant here, she testified that Blecker's 022 and 023 Accounts were both designated as send accounts. *Id.*

Bongiorno's demonstrably deep knowledge of the processes regularly used by BLMIS—based on years of experience working with Madoff and entering such records onto customer accounts—is sufficient to satisfy Rule 803(6)(A). As the Second Circuit has held, "there is no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such a person." *Saks Int'l, Inc. v. M/V Exp. Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987). Rather, as the Circuit has explained: "If knowledge were required as to *each particular entry* in a record, document 'custodians' could rarely satisfy the requirements of Rule 803(6)." *United States v. Reyes*, 157 F.3d 949, 952 (2d Cir. 1998) (emphasis in original). Here, by dint of her role,

responsibilities, and longstanding tenure, Bongiorno had ample basis to testify that BLMIS

regularly obtained such information from customers and recorded that information on customer

statements.  The Bankruptcy Court was well within its discretion to credit that testimony.

Accordingly, notwithstanding Bongiorno's lack of specific knowledge as to which particular

employee made the various PW notations on Blecker's account records, her testimony easily

satisfies the knowledge requirement of 803(6)(A).

> b. *Prepared in the Course of a Regularly Conducted Activity*

Appellants next argue that the BLMIS books and records were not prepared in the

ordinary course of business because BLMIS frequently changed its accounting practices and the

frequency with which it distributed checks.  Appellants point to testimony by Bongiorno that

when BLMIS switched from an arbitrage system to an options system in 1998, withdrawal

checks were sent to customers less frequently.  Appellants contend that this change means that

BLMIS failed to maintain regular practices, so as to make the business-records exception

unavailable.  Appellants further argue that BLMIS employees often failed to follow internal

guidelines for recording PW transactions and that the Trustee's experts treated as PW

transactions certain transactions that did not meet those internal guidelines.

These arguments do not supply a basis to find an abuse of discretion by the Bankruptcy

Court in finding that the BLMIS books and records were maintained in the ordinary course of

business.  Bongiorno, and other BLMIS employees, testified that these books and records were

prepared in the ordinary course of business.  The Bankruptcy Court, which evaluated this

testimony firsthand, was within its discretion to credit it.  That the process by which Madoff

determined whether to designate a PW account as Send or Reinvest, or how often to send

withdrawal checks to customers, changed over time does not mean that during each time period

BLMIS's treatment of these transactions was not a regularly conducted activity. And, salient here, these changes in practices did not implicate the accuracy of the central practice at issue: entering either "S" or "R" on the particular customer's account statement and sending checks to "S"-denominated customers in the amounts corresponding to "PW" notations on BLMIS's records. Nor does the record reflect that BLMIS ever ceased sending checks for accounts designated as "S" or "send" accounts, even if the frequency of those distributions changed over time. The Trustee therefore presented sufficient evidence to support the Bankruptcy Court's finding that, as a regularly conducted business practice within the meaning of Rule 803(6), BLMIS recorded customers' PW transactions, designated accounts as send accounts and reinvest accounts, and distributed profit withdrawal checks to customers.

c.     <i>Trustworthiness</i>

Appellants next argue that BLMIS's books and records relevant to profit withdrawals are not trustworthy because BLMIS's internal records were "permeated with fraud." Relatedly, Appellants argue that, even if BLMIS mailed checks that corresponded to the amounts of the PW transactions on Blecker's account, the Trustee has not demonstrated that those checks were made payable to Blecker, as opposed to, for example, a Madoff employee.

Given BLMIS's documented and extensive fraud on its customers, insofar as its entire business model was premised on the bogus premise that it was making bona fide securities transactions for its customers, rigorous review by the Bankruptcy Court of the trustworthiness of BLMIS's books and records as to PWs was in order. Such review similarly had been in order at the time the Net Investment Method, which turned on the accuracy of BLMIS's records of its customers' deposits and withdrawals, was adopted. *See Net Equity Decision*, 654 F.3d at 232 ("The only accurate entries reflected the customers' cash deposits and withdrawals.").

22

But Appellants fail to show any abuse of discretion by the Bankruptcy Court in finding
that BLMIS's books and records were sufficiently trustworthy to be admitted under Rule 803(6)
for the limited purpose of determining whether the species of withdrawals denominated as PWs
were reliable and so recorded.  There were ample bases for the Bankruptcy Court to find this
aspect of BLMIS's records—as opposed to its records of purported securities transactions—
reliable.  For one, BLMIS employees so testified, and the Bankruptcy Court credited them on
this point.  And, importantly, forensic accountant Collura, retained by the Trustee, prepared an
extensive report in which she summarized her efforts to reconcile the BLMIS internal records to,
*inter alia*, bank records chronicling payments from BLMIS's bank account to those of
customers.  These neutral and reliable records supplied important corroboration for BLMIS's
records reflecting profit withdrawal payments paid by BLMIS to customers.

On the basis of the assembled evidence, the Bankruptcy Court convincingly found that
the books and records as to such withdrawals for the entire period from 1981 to 2008 were
trustworthy.  In so finding, the Bankruptcy Court was commendably sensitive to distinctions
among time periods.  Although fewer records were available as to the earlier (pre-1998) period,
the Bankruptcy Court noted that "the older records were generally created in the same manner,
[and] are the same type and form as the documents shown to the BLMIS witnesses during their
depositions and the Ten-Year Period documents that are unquestionably trustworthy."  *PW
Bankr. Decision*, 592 B.R. at 526.

Appellants surmise that while PW checks may have been issued in the amounts noted in
BLMIS's records—thus accounting for debits in these amounts in BLMIS's bank records—such
checks may have been sent to persons other than the customer designated in BLMIS's records
(e.g., Blecker or another Appellant).  But this surmise ignores the fact that Collura was able to

23

reconcile 99.6% of the PW transactions between December 1998 to December 2008, including

based on deposit records for the BLMIS customer recipient.  Even if some of the remaining 0.4%

of the PW transactions involved checks drawn not to the customer but to an undeserving

recipient such as a BLMIS employee, these by definition would have been rare occurrences.

Notably, Appellants have not come forward with any affirmative evidence of the distribution to

someone else of checks purportedly sent to Blecker (or another Appellant).

Under these circumstances, the Bankruptcy Court did not abuse its discretion in finding

the BLMIS books and records trustworthy as to their recording of the profit withdrawals in

question to customers under Rule 803(6).  Any residual arguments as to the accuracy of these

records were instead properly treated by the Bankruptcy Court as going to the weight and

persuasiveness of such records, not their admissibility.

#### d.      Failure to Apply Rule 803(7)

Appellants' final challenge to the Bankruptcy Court's decision to admit the BLMIS

books and records is that the Bankruptcy Court should have treated Federal Rule of Evidence

803(7), relating to the absence of a record of regularly conducted activity, as applicable to these

records.  Specifically, Appellants argue that there is evidentiary significance to the fact that

BLMIS did not retain cancelled check records for (among other transactions) Blecker's PW

transactions.  Appellants argue that the absence of such cancelled checks relating to the 022 or

023 Accounts supports the inference that the PW transactions in these accounts never occurred.

Relatedly, Appellants argue that the lack of a letter in BLMIS's records from Blecker requesting

to receive PW checks is evidence that he never received such payments.

Appellants, however, failed to make this argument before the Bankruptcy Court.

Accordingly, the Court cannot find that the Bankruptcy Court abused its discretion in failing to

apply a hearsay exception that neither party invoked.  Further, by failing to make this argument

before the Bankruptcy Court, Appellants have forfeited it.  *See Allianz Ins. Co. v. Lerner*, 416

F.3d 109, 114 (2d Cir. 2005) ("[I]t is a well-established general rule that an appellate court will

not consider an issue raised for the first time on appeal.").[9]

In any event, even if this argument were properly preserved, the Bankruptcy Court found

that other evidence substantiated that the profit withdrawal transactions occurred—specifically,

third-party evidence in the form of bank records of either the BLMIS or customer bank account

or both.  This evidence, synthesized by the Trustee's forensic accountant Collura, successfully

reconciled—*i.e.*, found substantiation for—99.6% of the PW transactions between December

1998 and December 2008, the period for which bank records were readily available.  The 705-

page Collura Report, which summarizes these findings and the affirmative evidence of the

various withdrawals, provided a more than sufficient basis for the Bankruptcy Court to determine

that the transactions had occurred.  This would have amply justified either not applying the Rule

803(7) hearsay exemption, or applying it but finding scant, if any, evidentiary weight to the fact

that BLMIS did not possess the cancelled checks sent to Blecker or a letter from Blecker asking

that PW checks be sent to him.

Accordingly, the Court rejects this claim of error, too.  It was not an abuse of discretion

for the Bankruptcy Court either to admit BLMIS's books and records under Rule 803(6) or to

---

[9] Independently, presumably because Appellants did not pursue this point below, the record on
appeal is less than pellucid as to the evidentiary significance, if any, of the absence of cancelled
checks among BLMIS's surviving business records reflecting profit withdrawals checks drawn
to Blecker.  The Court can imagine circumstances in which the absence of such records could be
consequential as to whether the corresponding check withdrawal occurred.  The record before the
Court does not permit the Court to make this assessment.

decline, *sua sponte*, to find under Rule 803(7) the absence of cancelled checks or an

authorization letter determinative as to the existence of the PW transactions at issue.

### 2.    Admissibility of Summary Exhibits

Appellants also contend that the Bankruptcy Court abused its discretion in receiving the

summary exhibits prepared by the Trustee's expert, Greenblatt, relating to the PW transactions

that appeared on BLMIS's customer records.  Appellants object to these exhibits being

considered for the truth of the matter asserted.

Under Federal Rule of Evidence 1006, a party "may use a summary, chart, or calculation

to prove the content of voluminous writings, recordings, or photographs that cannot be

conveniently examined in court.  The proponent must make the originals or duplicates available

for examination or copying, or both, by other parties at a reasonable time and place." Fed. R.

Evid. 1006.

Here, to comply with this rule, the Trustee produced to the Participating Claimants, in

discovery, the underlying books and records summarized in Greenblatt's exhibits.  The summary

exhibits, in turn, reflect, by cited Bates-stamp numbers, the pages from which the information at

issue was drawn.  Greenblatt testified that his team prepared the summary exhibits by reviewing

the produced documents and summarizing transactions reported on customer statements for the

Participating Claimants' accounts, including Blecker's.  On this basis, the Bankruptcy Court

found that the Trustee's summary exhibits were properly admitted under Rule 1006. *PW Bankr.*

*Decision*, 592 B.R. at 526 ("Mr. Greenblatt testified and the *Collura Report* confirmed that their

employer, FTI Consulting, was tasked with reconstructing BLMIS's books and records, and

hence, bore the responsibility for assembling, analyzing and reconciling them.").

The Court agrees that the summary exhibits, reflecting cash transactions, were properly received. Appellants' sole challenge to this ruling is, essentially, to reprise an argument made above—and rejected—in connection with the receipt of BLMIS's books and records. They argue that insofar as a sizable portion of the cash transactions reflected in BLMIS's business records for the period between 1981 and 1997 (including relating to Blecker) cannot be authenticated via third-party records, the BLMIS records are not a proper basis for the summary exhibits prepared by Greenblatt. For the same reasons given in connection with the underlying books and records, that challenge fails. The Court has sustained the Bankruptcy Court's ruling receiving BLMIS's books and records as to PW transactions. The Bankruptcy Court reasonably found them reliable, particularly, insofar as these records have been corroborated to the considerable extent that third-party records exist. In so ruling, the Bankruptcy Court tracked the approach taken in the foundational *Net Equity Decision* itself, which found that the cash transactions noted on the BLMIS records were reliable, including records dating back to the time period when Blecker opened his BLMIS accounts. *Net Equity Decision*, 654 F. 3d at 238–39 (noting that "payments based on withdrawals and deposits . . . can be confirmed by the debtor's books and records"). Far from abusing discretion, the Bankruptcy Court's decision to admit the summary exhibits was clearly a proper application of Rule 1006.

### C.    Factual Objections

Appellants next challenge as error two factual determinations by the Bankruptcy Court: that Blecker received PWs and that he ratified the PW transactions reported on the account statements he received. The Court reviews these factual findings for clear error. For the following reasons, the Court finds this challenge baseless and affirms the Bankruptcy Court's findings.

1.      **Blecker Received PWs**

As a threshold matter, as the Bankruptcy Court explained, the burden was on Blecker, as

a customer of BLMIS, to prove that he had positive net equity.[10]  *See PW Bankr. Decision*, 592

at 532.  This meant showing not merely that he had initially deposited cash with BLMIS for

investment purposes, but also that he had positive equity in his accounts at the time of BLMIS's

insolvency, calculated under the Net Investment Method.

Blecker's sole means of doing so was to offer the testimony of himself and his son that

Blecker had not received any PW checks.  Blecker did not offer any documentary proof or

corroboration of this claim, including bank records or tax returns, or any record that he had ever

challenged any of the PW notations on his BLMIS account statements.  Courts in this District,

assessing claims under SIPA, commonly reject such uncorroborated, self-serving testimony.

*See, e.g.*, *In re MF Global Inc.*, 491 B.R. 355, 361–62 (Bankr. S.D.N.Y. 2013) (claimants not

entitled to SIPA customer status where debtor's books and records did not list claimants as

security account holders and claimants failed to offer evidence, other than their own testimony,

showing that they held valid securities accounts); *SIPC v. Bernard L. Madoff Inv. Sec., LLC (In*

*re Bernard L. Madoff)*, 496 B.R. 713, 721 (Bankr. S.D.N.Y. 2013), *aff'd sub nom. Surabian v.*

*Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 13 Civ. 4332 (ALC), 2014 WL 1302660

---

[10] The burden was also on Blecker to establish his status as a customer under SIPA.  *See, e.g.*, *In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 557 (Bankr. S.D.N.Y. 2002) ("[I]t is well-established in the Second Circuit that a customer bears the burden of proving that he or she is a 'customer' under SIPA" and "must establish his entitlement to that status."); *SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273, 277 (Bankr. S.D.N.Y. 1999) ("Just as all creditors in a bankruptcy case who claim priority status have the burden of showing that they are entitled to the asserted priority under the Bankruptcy Code, the Claimants bear the burden of proving that they are the type of priority creditors known as 'customers' and that the equity in their accounts is 'customer property' under SIPA.").

(S.D.N.Y. Mar. 31, 2014) (denying claim where claimants' "conclusory allegations of investment with BLMIS have never been supported by *any* corroborating evidence, let alone any evidence that either proves or creates an issue of fact as to the Surabians' alleged investment."). The Court therefore affirms, as a sound exercise of discretion, the Bankruptcy Court's finding that Blecker failed to meet his burden to show positive net equity.

Regardless, even assuming *arguendo* that Blecker's only duty had been to demonstrate that he initially deposited cash with BLMIS for purposes of investing and that the Trustee had to demonstrate that the net equity in his account was zero, the Bankruptcy Court reasonably found that the Trustee so demonstrated. The Bankruptcy Court's findings that Blecker had received PWs and that these reduced his net equity to zero were not clearly erroneous. On the contrary, there was a convincing evidentiary basis for these findings. The BLMIS books and records, the Collura Report, the exhibits summarizing the cash withdrawals and PWs across BLMIS accounts, and the testimony of BLMIS employees, considered together, strongly indicated that Blecker had in fact received PWs. This proof dwarfed the uncorroborated denials of Blecker and his son. The Court accordingly denies this aspect of Blecker's appeal.

## 2.   Blecker Ratified PW Transactions

Contrary to Blecker's claim on appeal, the Bankruptcy Court also properly held that Blecker ratified the PW transactions noted on his account statements and which the Trustee debited against his net equity.

Blecker signed a customer agreement with BLMIS which provided that all transactions appearing on his customer account statement would be binding upon him unless he filed a timely objection within 10 days of receiving the statement. *PW Bankr. Decision*, 592 B.R. at 532. As the Bankruptcy Court found, Blecker was fairly held to that obligation. He was an experienced

certified public accountant and sophisticated enough to understand the transactions noted on his

customer statements. Blecker further admitted receiving and reviewing the account statements

and noticing that PW transactions were listed on his account statement and that corresponding

debits had been made to his account balances. *Id.* Blecker did not claim ever to have disputed

the accuracy of these reported transactions. *Id.*

Taken together, these facts and circumstances amply support the Bankruptcy Court's

finding that Blecker, by his conduct, ratified the PW transactions, which drew his net equity

down to zero. *See, e.g.*, *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 770 (2d Cir. 2010)

(failure to object to securities trade in BLMIS account confirmed that customer willingly

transferred funds to debtor); *Pitheckoff v. SIPC (In re Great E. Sec. Inc.)*, No. 10 Civ. 8647

(CM), 2011 WL 1345152, at *6 (S.D.N.Y. Apr. 5, 2011) (affirming bankruptcy court's finding

that customer ratified purchase of various stocks by failing to repudiate them); *In re Klein, Maus*

*& Shire, Inc.*, 301 B.R. 408, 420 (Bankr. S.D.N.Y. 2003) (trustee properly denied claims of

investors "because they had not complained on a timely basis, to the correct party, or in

accordance with the procedures that the clearing broker had notified them that they needed to

follow in order to object to an error in an account").

Appellants argue, for the first time on appeal, that the 1992 BLMIS customer agreement

that introduced the 10-day clause cannot be relied upon to support a finding of ratification with

respect to PW transactions going back to 1981. The Trustee objects that this argument has been

waived insofar as Appellants did not so argue before the Bankruptcy Court. Regardless, as

courts in this District have frequently held, even in the absence of such 10-day clauses,

customers' conduct in acquiescing to observed withdrawals on their statement can be held to

ratify those transactions, provided that enough time passed during which no objection was made.

*See, e.g.*, *Richardson Greenshields Sec., Inc. v. Lau,* 819 F. Supp. 1246, 1259 (S.D.N.Y. 1993) (noting that customer's failure to object "over a long period of time is evidence of acquiescence in the unauthorized activity"); *Altschul v. Paine, Webber, Jackson & Curtis, Inc.*, 518 F. Supp. 591, 594 (S.D.N.Y.1981) ("By failing to object to the course of trading in the accounts for approximately two years despite ample opportunity to do so, the [customers] must be held to have ratified the transactions conducted on their behalf."); *cf. SIPC v. Glob. Arena Capital Corp.*, No. 16 Civ. 620 (RWS), 2016 WL 590470, at *4 (S.D.N.Y. Feb. 11, 2016) (finding verbal complaints to broker sufficient to show that accountholders did not ratify transactions). Such is the case here, in which Blecker never once objected to a PW transaction reflected on his account statement.

In a final argument against ratification, Appellants argue that the doctrine of *in pari delicto* bars the Trustee, as a representative of the BLMIS Estate, from enforcing against Blecker the 10-day ratification provision of the Customer Agreement, to the extent that that provision is a basis of the Trustee's ratification argument. That is because, Appellants argue, BLMIS materially breached the contract, which, under New York law, made it incapable of enforcing that contract against a non-breaching party such as Blecker.

Appellants are wrong. The common law doctrine of *in pari delicto* is an affirmative defense used to shield a defendant tortfeasor from liability in an action brought by a plaintiff who bore "at least substantially equal responsibility for his injury." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 307 (1985). Appellants have not cited any case that has used the doctrine affirmatively to sustain a claim for monetary recovery against a bankruptcy or SIPA trustee. And, the Supreme Court has emphasized, in the context of the federal securities laws, "common-law doctrines are sometimes of 'questionable pertinence'" because the securities laws

31

"'were intended to rectify perceived deficiencies in the available common-law protections by

establishing higher standards of conduct in the securities industry.'" *Id.* at 310 (quoting *Herman*

*& MacLean v. Huddleston*, 459 U.S. 375, 388–89 (1983)). In any event, even if the

Trustee and Appellants were *in pari delicto* and the doctrine applied, such a finding would do no

more than defeat the Trustee's agreement-based argument that Blecker ratified the PW

transactions. It would not disturb the Bankruptcy Court's other findings, notably that Blecker

received the PW transactions that left him with negative net equity and therefore no claim

against the BLMIS estate.[11]

The Court therefore affirms the Bankruptcy Court's factual finding that Blecker ratified

the PW transactions that appeared on his account statements.

And, because Blecker's PW transactions exceeded the value of the cash Blecker

deposited into his accounts, the Bankruptcy Court did not err in finding that the net equity of

Blecker's accounts was zero.

## CONCLUSION

For the foregoing reasons, the Court affirms the ruling of the Bankruptcy Court. The

Court respectfully directs the Clerk of Court to close this case.

---

[11] Appellants also argue that under Section 29(b) of the Securities Exchange Act, 15 U.S.C.
§ 78cc(b), "the innocent party may choose whether to void a contract procured by fraud or to
maintain an action for money damages against the wrongdoing counterparty." This argument,
too, fails. As another court in this District has explained, under Section 29(b), "only unlawful
contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts."
*Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.DN.Y. 1981), *aff'd*, 672 F.2d 901 (2d Cir. 1981).
As the Trustee rightly notes, the customer agreement at issue here is a lawful one,
notwithstanding BLMIS's fraudulent conduct.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 16, 2019
       New York, New York