**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 09-01364 (SMB) |
| Plaintiff, | |
| v. | |
| HSBC BANK PLC, et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO ALPHA PRIME FUND LTD.'S
MOTION FOR JUDGMENT ON THE PLEADINGS AND
IN SUPPORT OF THE TRUSTEE'S CROSS-MOTION FOR SEVERANCE AND
FOR LEAVE TO AMEND THE COMPLAINT**

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities
LLC and the Chapter 7 Estate of Bernard L.
Madoff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .........................................................................................................4

ARGUMENT .............................................................................................................10

    I.      ALPHA PRIME'S MOTION FOR JUDGMENT ON THE PLEADINGS
         MUST BE DENIED ..................................................................................10

    II.     SEVERANCE IS WARRANTED ...........................................................11

        A.    The Claims Arise Out of Separate Transactions and Occurrences
             and Do Not Share Common Questions of Law or Facts............................12

        B.    The Trustee's Claims Will Require Different Proofs ...............................14

        C.    Severing the Claims Would Facilitate Judicial Economy and Avoid
             Undue Prejudice......................................................................................15

    III.    THE TRUSTEE'S MOTION FOR LEAVE TO AMEND SHOULD BE
         GRANTED ...............................................................................................16

        A.    Defendants Will Not Be Prejudiced by the Proposed Amendments..........18

        B.    The Trustee Has Acted in Good Faith and Without Delay.......................19

        C.    Amending the Complaint Would Not Be Futile .......................................20

            1.    The SAC Plausibly Alleges Claims to Avoid and Recover the
                 Six-Year Transfers .....................................................................22

                 (1)    Alpha Prime's Directors and Service Providers Had
                      Coveted Access to Madoff.................................................24

                 (2)    The Directors Knew Madoff's Trading Was
                      Impossible Before and During Alpha Prime's
                      Investment With BLMIS.....................................................24

                 (3)    The Directors Deflected Inquiry to Protect the Profits
                      They Earned From Madoff Investment.............................27

             2.    The SAC Plausibly Alleges Facts to Disallow Alpha Prime's
                 Claim Pursuant To Section 502(d)................................................29

             3.    Alpha Prime is Not Entitled to a 502(h) Claim Against the
                 Customer Property Estate .............................................................30

**TABLE OF CONTENTS**
**(continued)**

                                                                                              **Page**

4.    The SAC Plausibly Alleges that Alpha Prime's Claim Can Be
      Subordinated ....................................................................................34

      (1)    The SAC Meets the Equitable Subordination Standard.....35

      (2)    The Extent to Which Alpha Prime's Claim May Be
             Subordinated Depends on the Harm it Caused the
             Estate And Is a Factual Inquiry That Need Not Be
             Decided at the Pleading Stage............................................37

CONCLUSION....................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*,
169 B.R. 832 (Bankr. S.D.N.Y. 1994) ............................................................. *passim*

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012) .................................................................. 17

*In re Adler Coleman Clearing Corp.*,
195 B.R. 266 (Bankr. S.D.N.Y. 1996) .............................................. 31, 32

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
626 F.3d 699 (2d Cir. 2010) .................................................................. 18

*Agnesini v. Doctor's Assocs., Inc.*,
275 F.R.D. 456 (S.D.N.Y. 2011) ......................................................... 12

*Alessi v. Monroe Cty.*,
No. 07-CV-6163T (MAT), 2008 WL 398509 (W.D.N.Y. Feb. 12, 2008) ............................ 15

*Allison v. Clos-ette Too, L.L.C.*,
No. 14 Civ. 1618(LAK)(JCF), 2015 WL 136102 (S.D.N.Y. Jan. 9, 2015) ............................ 18

*Town of New Windsor v. Tesa Tuck, Inc.*,
919 F. Supp. 662 (S.D.N.Y. 1996) ......................................................... 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................. 21

*Austin v. Chisick (In re First Alliance Mortg. Co.)*,
298 B.R. 652 (C.D. Cal. 2003) ......................................................... 40

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................. 21

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
563 F.2d 692 (5th Cir. 1977) ......................................................... 35

*In re Bernard L. Madoff Inv. Sec. LLC*,
654 F.3d 229 (2d Cir. 2011) .......................................................... 31, 32

*In re Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 09-01161 (SMB), 2015 WL
4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) .......................................... *passim*

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
866 F. Supp. 2d 257 (S.D.N.Y. 2012) .................................................. 17

## TABLE OF AUTHORITIES
### (continued)

*Cestone v. Gen. Cigar Holdings, Inc.*,
    No. 00 Civ. 3686 (RCC), 2002 WL 424654 (S.D.N.Y. Mar. 18, 2002)......................11, 12, 15

*Commander Oil Corp. v. Barlo Equip. Corp.*,
    215 F.3d 321 (2d Cir. 2000)...............................................................................................19

*Costello v. Home Depot U.S.A., Inc.*,
    888 F. Supp. 2d 258 (D.Conn. 2012).................................................................................15

*Deskovic v. City of Peekskill*,
    673 F. Supp. 2d 154 (S.D.N.Y. 2009)................................................................................15

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*,
    282 F.3d 83 (2d Cir. 2002).................................................................................................21

*In re Dreier LLP*,
    453 B.R. 499 (Bankr. S.D.N.Y. 2011)...............................................................................29

*Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd.*,
    806 F. Supp. 2d 712 (S.D.N.Y. 2011)...........................................................................11, 12

*Exch. Nat'l Bank of Chicago v. Wyatt*,
    517 F.2d 453 (2d Cir. 1975)...............................................................................................30

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 428 (S.D.N.Y. 2013)................................................................................17

*Fed. Treasury Enter. Sojuzploimportdo v. SPI Spirits Ltd.*,
    726 F.3d 62 (2d Cir. 2013).................................................................................................21

*Fjord v. AMR Corp. (In re AMR Corp.)*,
    506 B.R. 368 (Bankr. S.D.N.Y. 2014)...............................................................................17

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    131 S. Ct. 2060 (2011).......................................................................................................36

*In re Globe Metallurgical, Inc.*
    312 B.R. 34 (Bankr. S.D.N.Y. 2004).................................................................................33

*Hamilton v. City of New York*,
    No. 06-cv-15405 (DC), 2011 WL 1842990 (S.D.N.Y. May 10, 2011)................................17

*Henneberry v. Sumitomo Corp. of Am.*,
    415 F. Supp. 2d 423 (S.D.N.Y. 2006)................................................................................17

*Hill v. Spencer S&L Ass'n (In re Bevill, Bresler & Schulman, Inc.)*,
    83 B.R. 880 (D.N.J. 1988).................................................................................................32

# TABLE OF AUTHORITIES
## (continued)

*Hirsch v. Pa. Textile Corp. (In re Centennial Textiles, Inc.)*,
227 B.R. 606 (Bankr. S.D.N.Y. 1998) ...................................................................39

*Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*,
665 F. Supp. 2d 239 (S.D.N.Y. 2009) .............................................................18, 21

*Jefferson Ins. Co. v. Rouhana (In re Winstar Commc'ns)*,
No. 01 CV 3014(GBD), 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ............20, 21

*Kalie v. Bank of Am. Corp.*,
297 F.R.D. 552 (S.D.N.Y. 2013) ............................................................................12

*Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*,
413 B.R. 115 (Bankr. S.D.N.Y. 2008) ...................................................................35

*Kaster v. Modifications Sys., Inc.*,
731 F.2d 1014 (2d Cir. 1984)..................................................................................17

*Kriegman v. 1127477 Alberta Ltd. (In re LLS Am., LLC)*,
No. 2:12-CV-324-RMP, 2015 WL 328918 (E.D. Wash. Jan. 23, 2015)................38

*Le Café Crème v. Le Roux (In re Le Café Crème)*,
244 B.R. 221 (Bankr. S.D.N.Y. 2000).....................................................................39

*LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*,
511 B.R. 253 (Bankr. S.D.N.Y. 2014)......................................................................40

*In re Lloyd Sec., Inc.*,
75 F.3d 853 (3d Cir. 1996).......................................................................................30

*M.E.S., Inc. v. Safeco Ins. Co. of Am.*,
No. 10-CV-02709 (PKC)(VMS), 2014 WL 2931398 (E.D.N.Y. June 27,
2014) .......................................................................................................................18

*Margel v. E.G.L. Gem Lab Ltd.*,
No. 04 Civ. 1514 (PAC)(HBP), 2010 WL 445921 (S.D.N.Y. Feb. 8, 2010) .........21

*McBeth v. Gabrielli Truck Sales, Ltd.*,
731 F. Supp. 2d 316 (E.D.N.Y. 2010) ....................................................................17

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
214 F.R.D. 152 (S.D.N.Y. 2003) ............................................................................11

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
277 B.R. 520 (S.D.N.Y. 2002)................................................................................36

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Monaghan v. SZS 33 Assocs.*,
  827 F. Supp. 233 (S.D.N.Y. 1993) ...............................................................................15

*Monzack v. ADB Investors (In re EMB Assocs., Inc.)*,
  92 B.R. 9 (Bankr. D.R.I. 1988).....................................................................................39

*Morris v. Northrup Grumman Corp.*,
  37 F. Supp. 2d 556 (E.D.N.Y. 1999) .............................................................................16

*N. Jersey Media Grp. Inc. v. Fox News Network, LLC*,
  312 F.R.D. 111 (S.D.N.Y. 2015) ............................................................................14, 15

*Next Phase Distrib., Inc. v. Does 1-27*,
  284 F.R.D. 165 (S.D.N.Y. 2012) ...................................................................................12

*In re OTC Net, Inc.*,
  34 B.R. 658 (Bankr. D. Colo. 1983) ..............................................................................30

*In re Owens Corning*,
  419 F.3d 195 (3d Cir. 2005)...........................................................................................37

*Picard v. Avellino*,
  557 B.R. 89 (Bankr. S.D.N.Y. 2016) .............................................................................22

*Picard v. Defender Ltd.*,
  Adv. Pro. No. 10-05229 (SMB) (Bankr. S.D.N.Y. Apr. 16, 2015) ...........................34

*Picard v. Estate of Steven Mendelow*,
  560 B.R. 208 (Bankr. S.D.N.Y. 2016)................................................................... *passim*

*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011).................................................................................35, 36

*Picard v. Legacy Capital Ltd. (In re BLMIS)*,
  548 B.R. 13 (Bankr. S.D.N.Y. 2016) ...............................................................5, 22, 36

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
  563 B.R. 737 (Bankr. S.D.N.Y. 2017)...........................................................................29

*Picard v. Merkin (In re BLMIS)*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014) .................................................................. *passim*

*Picard v. Shapiro*,
  542 B.R. 100 (Bankr. S.D.N.Y. 2015)............................................................................22

*In re Picard, Tr. for the Liquidation of Bernard L. Madoff Inv. Sec. LLC*,
  No. 17-2992 (L), 2019 WL 903978 (2d Cir. Feb. 25, 2019) .........................................7

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Redington v. Borghi (In re Weis Sec., Inc.)*,
    411 F. Supp. 194 (S.D.N.Y. 1975), *aff'd* 538 F.2d 317 (2d Cir. 1976) ...................................30

*Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*,
    No. 13 Civ. 1654 (RA), 2015 WL 4097927 (S.D.N.Y. July 6, 2015) .....................................20

*Ricciuti v. N.Y.C. Transit Auth.*,
    941 F.2d 119 (2d Cir. 1991)..........................................................................................................21

*Rosenman Family, LLC v. Picard*,
    395 Fed. App'x 766 (2d Cir. 2010)...............................................................................................31

*Sec. Inv'r Prot. Corp. v. Lehman Bros. Inc.*,
    433 B.R. 127 (Bankr. S.D.N.Y. 2010)..........................................................................................31

*Sec. Inv'r Prot. Corp. v. BLMIS (In re Madoff Sec.)*, No. 12 Misc. 115 (JSR),
    2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)..............................................................................22

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    513 B.R. 222 (S.D.N.Y. 2014)...............................................................................................6, 22

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    516 B.R. 18 (S.D.N.Y. 2014)................................................................................................5, 36

*Sec. Inv'r Prot. Corp. v. Bernard. L. Madoff Inv. Sec. LLC*,
    No. 08-01789 (BRL), 2009 WL 458769 (Bankr. S.D.N.Y. Feb. 24, 2009) ............................33

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016).........................6

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Sec. Inv'r Prot. Corp.)*,
    568 B.R. 481 (Bankr. S.D.N.Y. 2017)........................................................................................34

*SEC v. Pignatiello*,
    97 Civ. 9303 (SWK), 1998 WL 293988 (S.D.N.Y. June 5, 1998) .........................................12

*Silverman v. A-Z Rx, LLC (In re Allou Distribs., Inc.)*,
    No. 04-8369-ESS, 2012 WL 6012149 (Bankr. E.D.N.Y. Dec 3, 2012).................................21

*Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*,
    446 B.R. 32 (Bankr. E.D.N.Y. 2011)...........................................................................................21

*State Teachers Ret. Bd. v. Fluor Corp.*,
    654 F.2d 843 (2d Cir. 1981)..........................................................................................................20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*T.S.I. 27, Inc. v. Berman Enters., Inc.*,
    115 F.R.D. 252 (S.D.N.Y. 1987) ........................................................................ 11

*In re Toy King Distribs.*,
    256 B.R. 1, 127-155, 195-207 (Bankr. M.D. Fla. 2000) .................................... 38

*Tuosto v. Philip Morris USA Inc.*,
    672 F. Supp. 2d 350 (S.D.N.Y. 2009) ............................................................... 17

*United States v. Monfort*,
    603 Fed. Appx. 40 (2d Cir. 2015) ..................................................................... 11

*United States v. Marsten Apts., Inc.*,
    175 F.R.D. 257 (E.D. Mich. 1997) .................................................................... 18

**Statutes**

11 U.S.C. § 501 ................................................................................................... 30

11 U.S.C. § 502 ......................................................................................... *passim*

11 U.S.C. § 510 ............................................................................................... 5, 35

11 U.S.C. § 546 ......................................................................................... *passim*

11 U.S.C. § 548 ......................................................................................... *passim*

11 U.S.C. § 549 ................................................................................................... 39

11 U.S.C. § 550 ................................................................................................. 5, 7

15 U.S.C. § 78aaa ................................................................................................. 1

15 U.S.C. § 78fff ....................................................................................... *passim*

15 U.S.C. § 78*lll* .............................................................................................. 31

17 C.F.R. 240.10b-5 ............................................................................................ 12

28 U.S.C. § 157 ..................................................................................................... 5

**Rules**

Fed. R. Bankr. P. 3002 ........................................................................................ 30

Fed. R. Bankr. P. 5005 ........................................................................................ 30

Fed. R. Bankr. P. 7015 .......................................................................................... 1

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Fed. R. Bankr. P. 7021 ................................................................................................1

Fed. R. Civ. P. 12(b)(6)...........................................................................................21

Fed. R. Civ. P. 13(a) ...............................................................................................12

Fed. R. Civ. P. 15........................................................................................1, 16, 17

Fed. R. Civ. P. 21..........................................................................................1, 11

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa-*lll*, and the consolidated chapter 7 estate

of Bernard L. Madoff, by and through his undersigned counsel, respectfully submits this

Memorandum of Law in Opposition to the Motion for Judgment on the Pleadings ("Motion")

filed by Alpha Prime Fund Ltd. ("Alpha Prime") and in support of the Trustee's cross-motion to

sever his claims against Alpha Prime from his claims against the remaining defendants under

Fed. R. Civ. P. 21, as incorporated by Fed. R. Bankr. P. 7021, and for leave to file a second

amended complaint against Alpha Prime (the "SAC"), substantially in the form attached as

Exhibit A to the Declaration of Oren J. Warshavsky, dated Aug. 27, 2019 (the "Warshavsky

Declaration"), under Fed. R. Civ. P. 15, as incorporated by Fed. R. Bankr. P. 7015.

## PRELIMINARY STATEMENT

Alpha Prime moves for judgment on the pleadings asserting the Trustee's Amended

Complaint filed in December 2010 (the "2010 Complaint") fails to meet a pleading standard not

in existence in 2010.  But the Motion ignores that fact.  It also ignores that the 2010 Complaint's

purported deficiencies are cured by the very documents Alpha Prime produced to the Trustee

since 2010 demonstrating Alpha Prime's knowledge of Madoff's fraud.  Over the last few years,

the Trustee and Alpha Prime repeatedly discussed the Trustee's desire to sever his claims against

Alpha Prime from claims against the remaining defendants and to seek leave to file an amended

complaint.  The parties instead agreed that time and resources were better allocated to

conducting discovery and moving the litigation forward, and in 2018, the parties entered into a

partial settlement agreement (the "Settlement Agreement"), which substantially narrowed the

claims at issue.  Pursuant to the Settlement Agreement, the parties agreed to litigate three

disputed issues: (1) whether Alpha Prime had actual knowledge of Madoff's fraud; (2) whether it

is entitled to a claim under Bankruptcy Code section 502(h); and (3) whether its customer claim and 502(h) claim, if any, are subject to subordination. Despite this agreement, and in the midst of discovery, Alpha Prime now moves for judgment on the pleadings. The Trustee's cross-motion to sever and for leave to file an amended complaint should come as no surprise to Alpha Prime.

*Severance*: The Trustee seeks to sever his claims against Alpha Prime from his claims against the HSBC Defendants (defined below). The 2010 Complaint named sixty-one interconnected parties, including several BLMIS feeder funds, their service providers, and other entities that received subsequent transfers. As a result of settlements and dismissals, only three defendants remain: Alpha Prime, which is the only remaining initial transferee defendant, and two HSBC entities, which are subsequent transferees that received transfers from other, unrelated BLMIS feeder funds. Alpha Prime and the HSBC Defendants stand in different procedural postures. Alpha Prime and the Trustee have been engaged in discovery, set to conclude on April 1, 2020. The HSBC Defendants, on the other hand, have not yet responded to the Trustee's complaint, and discovery with those defendants has not yet commenced, and certain subsequent transferees are awaiting the Supreme Court's disposition of the appeal of the extraterritoriality decision. Keeping these defendants and claims as part of the same action is no longer efficient.

*Amendment*: The Trustee also seeks leave to amend his 2010 Complaint. The 2010 Complaint was drafted in light of the then-existing "inquiry notice" standard for avoiding fraudulent transfers. Since 2010, not only has the good faith standard changed to "willful blindness," but the pleading burden was shifted to the Trustee. Furthermore, the District Court created a heightened standard of "actual knowledge" to avoid transfers other than those under section 548(a)(1)(A). The decisional authorities on the new standard and pleading burden altered

2

established fraudulent transfer jurisprudence.  Courts regularly grant leave to amend for such

intervening changes in the law, and this Court has already done so in *Mendelow*[1] and *Kingate.*[2]

The Trustee's proposed Second Amended Complaint meets the actual knowledge

pleading burden.  It sets forth facts showing that Alpha Prime's directors and service providers

knew that the trading BLMIS reported on Alpha Prime's account statements was "false" and they

noted it in their due diligence reports.  The directors and service providers knew Madoff's

reported trades were impossible before they created Alpha Prime, when they were operating its

predecessor fund, Primeo Fund ("Primeo"), and prepared similar due diligence reports

identifying Madoff's impossible trading practices.  Nonetheless, Alpha Prime's directors sought

to capitalize on Madoff's money-making machine.  They put up a barricade around Madoff,

fabricating explanations to prevent others from learning the truth about Madoff's fraudulent trade

practices.  Alpha Prime concedes that these types of facts prove actual knowledge and therefore

its Motion should be denied.

Alpha Prime also moves on other grounds, which are, likewise, unavailing.  It claims the

Trustee cannot subordinate the unadjudicated portion of Alpha Prime's net equity claim (the

"Remaining Customer Claim"), or any section 502(h) claim (together with the Remaining

Customer Claim, the "Disputed Claims"), and that it is therefore now entitled to a 502(h) claim

as a result of returning the Two-Year Transfers.[3]  Alpha Prime misunderstands the law.  First,

although Alpha Prime repaid the Two-Year Transfers, the Six-Year Transfers are outstanding,

which means that the Disputed Claims are disallowed under section 502(d).  Second, even if the

---

[1] *Picard v. Estate of Steven Mendelow*, 560 B.R. 208 (Bankr. S.D.N.Y. 2016) ("*Mendelow*")

[2] *Picard v. Ceretti (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749
(Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*").

[3] Capitalized terms not defined herein shall have the meaning ascribed in the SAC.

Six-Year Transfers are dismissed, the Trustee may still subordinate the Disputed Claims. Alpha

Prime does not appear to realize that regardless of whether the Six-Year Transfer claims survive,

the Trustee's case will continue: even if this Court determines Alpha Prime is entitled to a 502(h)

claim for any amount returned to the estate, under SIPA's distribution scheme, that amount

would not be added to Alpha Prime's net equity claim and would only be a claim against the

general estate.

The Trustee requests that Alpha Prime's Motion be denied and the Trustee's cross-

motion to sever the claims against Alpha Prime and for leave to file an amended complaint be

granted.

## **BACKGROUND**

*The Pleading Standards Governing the Avoidance Claims Have Changed Since the
Trustee Filed the 2010 Complaint*

In July 2009, the Trustee commenced an avoidance action against Alpha Prime and its

two HSBC service providers for transfers received in the two-year and six-year periods. In

December 2010, the Trustee filed the 2010 Complaint to add fifty-eight defendants, who, as the

Trustee's investigation had by then revealed, were interconnected parties. This included various

other BLMIS feeder funds, their service providers, directors, and beneficial owners, and the

HSBC entities that acted for, and directed customers to, these BLMIS feeder funds. When the

Trustee filed the 2010 Complaint, the standard for avoiding a fraudulent transfer was "inquiry

notice"—whether the defendant knew or should have known of information triggering a duty to

investigate, and whether diligent inquiry would have uncovered fraudulent activity. And it was a

defendant's burden to show good faith under section 548(c).

Since then, the collective action of hundreds of defendants in this and other cases resulted

in changes to the pleading standards for avoidance claims. In 2011 and 2012, defendants sought

the withdrawal of the Bankruptcy Court reference under 28 U.S.C. § 157 to allow the District

Court to consider, among other issues, whether the Trustee has the burden of pleading a

defendant's lack of good faith under sections 548(c) and 550(b) of the Bankruptcy Code, and

whether the section 546(e) "safe harbor" applies in SIPA proceedings.  Alpha Prime participated

in the consolidated briefing on the pleading standard for a defendant's lack of good faith as the

lead moving defendant on both the main brief, *see* BLMIS Customers' Consolidated Brief, *In re*

*Madoff Sec.*, No. 12 Misc. 115 (JSR) (S.D.N.Y. July 20, 2012), ECF No. 243,[4] and a

supplemental brief on behalf of "Net Loser Investment Funds" in support of their motion to

dismiss the Trustee's claims under 11 U.S.C. §§ 548(a)(1)(A) and 510(c).  *Id.*, ECF No. 295.

The District Court's rulings changed how the Trustee must plead avoidance claims.  In

April 2014, the District Court held that the Trustee has the burden of pleading a transferee's lack

of good faith on avoidance claims under section 548.  *Sec. Inv'r Prot. Corp. v. Bernard L.*

*Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 516 B.R. 18, 22-24 (S.D.N.Y. 2014) (the "Good Faith

Decision").  Under that decision and this Court's decisions in *Kingate*, *Merkin*,[5] and *Legacy*,[6] in

order to state a claim under 11 U.S.C. § 548, the Trustee must now plead that initial transferees

willfully blinded themselves to circumstances indicating a high probability of fraud at BLMIS.

The consolidated proceedings also yielded changes to the standard for applying the

section 546(e) safe harbor.  With the District Court's ruling and subsequent rulings by this Court,

the Trustee must now allege the transferee's actual knowledge of BLMIS's fraud; where the

---

[4] The HSBC defendants also sought withdrawal and joined omnibus briefing on these same issues.  *See In re Madoff Sec.*, No. 12 Misc. 115, ECF Nos. 242, 256, 257.

[5] *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("*Merkin I*").

[6] *Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13 (Bankr. S.D.N.Y. 2016) ("*Legacy*").

Trustee does so, the safe harbor does not apply, and the Trustee can avoid and recover

preferential and fraudulent transfers to the full extent permitted by state and federal law.[7]

> *As Part of the Extraterritoriality Proceedings, the Trustee Proffered a Second Amended*
> *Complaint that Included Allegations Developed Through Discovery with Alpha Prime*

This action is also one of the many in which foreign subsequent transferees challenged

the Trustee's ability to recover transfers of customer property from them, based upon the

presumption against the extraterritorial application of federal statutes.  In July 2014, the District

Court ruled that SIPA does not apply extraterritorially and found that recovery of certain

transfers would violate principals of international comity.  *Sec. Inv'r Prot. Corp. v. Bernard L.*

*Madoff Inv. Sec. LLC*, 513 B.R. 222, 231-32 (S.D.N.Y. 2014).

In light of the new pleading standards with respect to good faith and extraterritoriality,

the Trustee filed an omnibus motion seeking leave to amend.  (ECF Nos. 314-16.)[8]  As part of

the omnibus motion, the Trustee submitted a proffered Second Amended Complaint (the

"Proffered Complaint") in this case containing allegations to address the Courts' rulings on both

pleading standards.  (ECF No. 399.)  The Proffered Complaint included allegations about Alpha

Prime's knowledge of BLMIS's fraud.

This Court denied the Trustee's motion with respect to certain of the Trustee's

subsequent transfer claims.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-

01789 (SMB), 2016 WL 6900689, at *16, 26, 29-30 (Bankr. S.D.N.Y. Nov. 22, 2016) (the

"Bankruptcy Court ET Decision").  The Trustee appealed the Bankruptcy Court ET Decision

directly to the Second Circuit, which reversed, holding that the presumption against

---

[7] *Kingate*, 2015 WL 4734749, at *12-15 (citing *Sec. Inv'r Prot. Corp. v. BLMIS*, No. 12 Misc. 115 (JSR), 2013 WL 1609154, at *6 (S.D.N.Y. Apr. 15, 2013)).

[8] All ECF numbers referenced herein are applicable to Adversary Proceeding No. 09-01364, unless otherwise indicated.

exterritoriality and international comity do not limit the reach of section 550(a)(2) of the

Bankruptcy Code. *In re Picard, Tr. for the Liquidation of Bernard L. Madoff Inv. Sec. LLC*, No.

17-2992 (L), (2d Cir. Feb. 25, 2019) (ECF No. 1311). The Second Circuit granted the

defendants' motion to stay the issuance of the mandate pending the filing of a petition for a writ

of certiorari on April 23, 2019, which will continue until disposition of the petition. *Id.*, (ECF

No. 1503). The Trustee must await such disposition to determine which of the HSBC

subsequent transferee defendants[9] will be subject to his subsequent transfer claims.

This Court did not, however, consider the Proffered Complaint's allegations relevant to

knowledge and good faith. *See* ECF No. 351 (the "ET Order"), ¶ 14 ("Further proceedings on

the Trustee's Motion insofar as it seeks . . . leave to amend the complaints listed in Exhibits A

and B to add allegations relevant to the good faith issue . . . shall be scheduled by the Court

following the decision on the Extraterritoriality Motion.").

   *Continuing Mediation and Discovery Yielded Further Information Probative of Alpha
   Prime's Knowledge of BLMIS's Fraud*

Between 2014 and 2017, the Trustee and Alpha Prime engaged in mediation before two

mediators, separated by an interlude in which the parties pursued discovery. The parties

exchanged mediation statements in 2014 and 2016. Each of the Trustee's mediation statements

contained allegations concerning Alpha Prime's knowledge of BLMIS's fraud. During the

interlude in mediation, Alpha Prime and the Trustee entered into a Case Management Plan and

---

[9] The following defendants are parties to the stay of issuance of the mandate, which are: BA Worldwide Fund Management Limited, HSBC Bank plc, HSBC Holdings Plc, HSBC Securities Services (Luxembourg) S.A., HSBC Institutional Trust Services (Ireland) Limited, HSBC Securities Services (Ireland) Limited, HSBC Institutional Trust Services (Bermuda) Limited, HSBC Bank USA, N.A., HSBC Securities Services (Bermuda) Limited, HSBC Bank (Cayman) Limited, HSBC Private Banking Holdings (Suisse) S.A., HSBC Private Bank (Suisse) S.A., HSBC Fund Services (Luxembourg) S.A., and HSBC Bank Bermuda Limited.

discovery commenced.[10]  (ECF No. 415.)  On February 25, 2016, Alpha Prime produced 3,575

documents.[11]  In May 2016, in response to the Trustee's inquiry about the completeness of that

document production, Alpha Prime asserted that it "ha[d] not only produced all documents in its

custody and control that are responsive to the Trustee's Requests, but it has turned over every

single document in its files.  It has withheld nothing."  (*See* Warshavsky Declaration, Ex. B.)

In late 2016, the parties engaged a new mediator, and exchanged new mediation

statements that contained factual allegations based in part upon the discovery that took place

during the interlude in mediation.  The mediation resulted in the Settlement Agreement, by

which Alpha Prime paid the Trustee $76,450,000 and the Trustee allowed a portion of Alpha

Prime's customer claim in an amount equal to 95% of Alpha Prime's net equity.  The parties left

open three disputed issues that would proceed to litigation: (1) whether Alpha Prime is entitled to

a claim under section 502(h) of the Bankruptcy Code in respect of its $76,450,000 payment to

the Trustee, and the treatment such section 502(h) claim may receive; (2) the Trustee's Six-Year

Transfer claims, and in the event of Alpha Prime's payment in respect of the avoidance of those

claims, the treatment a resulting section 502(h) claim would receive; and (3) the Trustee's claims

concerning the treatment of the Remaining Customer Claim.

Following mediation, a First Amended Case Management Plan (the "Amended CMP")

was entered on April 9, 2018, as was a stipulation appointing the Honorable Frank Maas (Ret.)

as discovery arbitrator.  The Amended CMP provides that the parties may not file dispositive

motions before July 3, 2019, which was also the date fact discovery was slated to close, subject

---

[10] Discovery has yet to commence against any of the other defendants in this action, and only Alpha Prime and APAM are parties to the Case Management Plan.

[11] Alpha Prime has made three additional small productions of 5 documents on June 28, 2016, 62 documents on July 25, 2016, and 9 documents on June 4, 2018.

to modification.  (ECF No. 499.)  After the Amended CMP was entered, as a belt-and-suspenders measure, the Trustee served document requests upon Alpha Prime's management company, APAM, and several Alpha Prime directors (all within the definition of "Alpha Prime" in the Trustee's prior document requests to Alpha Prime, and all represented by Alpha Prime's counsel).  Despite Alpha Prime's prior assertions that it had "withheld nothing" and "turned over every single document in its files," in May and September 2018, APAM and the Alpha Prime directors collectively produced tens of thousands of Alpha Prime documents not in Alpha Prime's original production.  Alpha Prime then asserted that "all of [its] current outstanding obligations ha[d] been met," but it has from time to time since then produced additional documents responsive to the Trustee's requests.  Collectively, these productions demonstrate Alpha Prime's knowledge of BLMIS's fraud.

The belated document productions, along with several significant, protracted discovery disputes before Judge Maas, and the Trustee's efforts to obtain still not-yet-produced Alpha Prime documents in the possession of Alpha Prime's agents, have resulted in the extension of the close of fact discovery to April 1, 2020.  Nonetheless, on the day that extension was granted, Alpha Prime sought leave to move for summary judgment.  (ECF No. 541.)  The Court denied Alpha Prime's request, so Alpha Prime moved for judgment on the pleadings.

*The Remaining Defendants*

Since the Trustee filed the 2010 Complaint, the Trustee's claims against most of the defendants have been resolved, either by settlement, voluntary dismissal, or dismissal under the extraterritoriality decision.  Currently, only the Trustee's claims to recover initial transfers from Alpha Prime and subsequent transfers from two HSBC entities—HSBC Bank plc and HSBC Bank USA, N.A. (together, the "HSBC Defendants")—remain. The HSBC Defendants remain in

this case only for their receipt of subsequent transfers unrelated to Alpha Prime which involve

the HSBC Structured Products Group.  The HSBC Defendants also are subject to the stay of the

mandate for transfers unrelated to this action.[12]

Over the past several years, the Trustee has repeatedly informed the remaining

defendants of his intention to sever the claims and amend the complaint if necessary but has

always stated his preference to move forward with the litigation rather than engage in

unnecessary motion practice.  Before making this motion, the Trustee sought Alpha Prime's and

the HSBC Defendants' consent to sever the claims.  The HSBC Defendants consented; Alpha

Prime refused.  Alpha Prime also declined to consent to amendment.

## ARGUMENT

### I.    ALPHA PRIME'S MOTION FOR JUDGMENT ON THE PLEADINGS MUST BE DENIED

Alpha Prime is aware of the fact that the pleading standard has changed since 2010,

having participated in the consolidated briefing that succeeded in changing that standard.  (*See*

*supra* at pp. 4-5.)  Alpha Prime knows the Trustee submitted the Proffered Complaint as part of

the consolidated briefing on the extraterritoriality issue.  (*See supra* at p. 6.)  Furthermore, Alpha

Prime knows it and its directors produced tens of thousands of documents to the Trustee in the

past year, many of which support the Trustee's claims under the heightened standard.  (*See supra*

at p. 9.)  The Trustee opposes Alpha Prime's request for judgment in its favor and seeks leave to

sever his claims against Alpha Prime from the remaining defendants and amend the 2010

Complaint as to Alpha Prime.  As this Court has noted in other proceedings brought by the

---

[12] The HSBC Defendants are part of the Extraterritoriality Appeal for subsequent transfers received out of Fairfield Sentry Limited, Fairfield Sigma Limited, and Harley International (Cayman) Ltd.  The United States Supreme Court has yet to decide whether it will grant certification on the Second Circuit's decision.  Should certification be denied, or the decision of the Second Circuit be upheld, the Trustee's claims relating to these additional dismissed subsequent transfer claims will be revived in this case.

Trustee, "the initial complaint was filed before the pleading standards were set.  That's why [the Trustee has] . . . included additional allegations in the proposed amended complaint and that's what I'm going to look at."  Tr. of Hr'g at 50:2-7, *Picard v. Citibank, N.A.*, Adv. Pro. No. 10-05345 (SMB) (Bankr. S.D.N.Y. July 18, 2019) (ECF No. 169).

## II.    SEVERANCE IS WARRANTED

Under Fed. R. Civ. P. 21, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party.  The court may also sever any claim against a party."  Fed. R. Civ. P. 21.  Courts have broad discretion in ruling on a motion to sever.  *See United States v. Monfort*, 603 Fed. App'x 40, 44 (2d Cir. 2015) (citation omitted).  Courts may order severance "when doing so would serve the ends of justice and further the prompt and efficient disposition of the litigation."  *Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd.*, 806 F. Supp. 2d 712, 720 (S.D.N.Y. 2011) (quoting *T.S.I. 27, Inc. v. Berman Enters., Inc.*, 115 F.R.D. 252, 254 (S.D.N.Y. 1987)).

In deciding whether to sever a claim under Fed. R. Civ. P. 21, courts consider five factors:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*Id.* at 720 (citing *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 214 F.R.D. 152, 154-55 (S.D.N.Y. 2003)).  Courts within this Circuit have stated that "[s]everance requires the presence of only one of these conditions."  *Cestone v. Gen. Cigar Holdings, Inc.*, No. 00 Civ. 3686 (RCC), 2002 WL 424654, at *2 (S.D.N.Y. Mar. 18, 2002) (citation omitted).  Here, all five factors militate in favor of severance.

11

A. **The Claims Arise Out of Separate Transactions and Occurrences and Do Not Share Common Questions of Law or Facts**

What constitutes the same transaction or occurrence "is approached on a case by case basis." *Erausquin*, 806 F. Supp. 2d at 720 (citation omitted). Courts in the Second Circuit have "repeatedly interpreted the phrase 'same transaction' to encompass all logically related claims." *Agnesini v. Doctor's Assocs., Inc.*, 275 F.R.D. 456, 459 (S.D.N.Y. 2011) (internal citations and quotations omitted). When interpreting this factor, courts draw guidance from Fed. R. Civ. P. 13(a), concerning compulsory counterclaims, and consider "whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Kalie v. Bank of Am. Corp.*, 297 F.R.D. 552, 558 (S.D.N.Y. 2013) (internal marks and citation omitted).

Courts will sever related or similar claims when they do not raise the same factual and legal questions. *See, e.g.*, *Next Phase Distrib., Inc. v. Does 1-27*, 284 F.R.D. 165, 169-70 (S.D.N.Y. 2012) (granting severance where it was likely that defendants would have different defenses); *SEC v. Pignatiello*, No. 97 Civ. 9303 (SWK), 1998 WL 293988, at *3 (S.D.N.Y. June 5, 1998) (severance was appropriate even though "both schemes involve alleged violations of Section 10(b) and Rule 10b-5" because the "factual circumstances giving rise to each claim [were] unrelated"). Claims need not be completely unique from one another to be severed; "some common question of law or fact" among claims does not by itself mandate that the claims be litigated together. *See Erausquin*, 806 F. Supp. 2d at 722.

The Trustee's claims against Alpha Prime, on the one hand, and the HSBC Defendants, on the other hand, do not depend upon the same facts and law. The Trustee is seeking to avoid and recover initial transfers of $6,720,000 from BLMIS to Alpha Prime. (SAC ¶ 185.) The Trustee also seeks to disallow or equitably subordinate Alpha Prime's Disputed Claims. (*Id.* ¶

12

189.)  In contrast, the Trustee's claims against the HSBC Defendants seek to recover over $100

million in subsequent transfers they received in connection with structured financial products

from Rye Select Broad Market Fund, L.P. ("Rye Broad Market"), Rye Select Broad Market

Portfolio Limited, and Greenwich Sentry (the "Structured Product Funds").  The Structured

Product Funds are unrelated to Alpha Prime.

        Among the defendants added in the 2010 Complaint were eight feeder funds that, like

Alpha Prime, employed HSBC entities as service providers.  (2010 Compl., ECF 170.)  The 2010

Complaint also included HSBC entities that received subsequent transfers, such as the HSBC

Defendants.  In 2011, Alpha Prime filed cross-claims against several HSBC entities, which it

subsequently amended.[13]  After settlements and dismissals, Alpha Prime is the only remaining

feeder fund defendant.  The cross-claims it asserted against its HSBC service providers have

been dismissed.  (Order, ECF No. 441.)  The HSBC entities that remain, HSBC Bank plc and

HSBC Bank USA, are unrelated to Alpha Prime.

        The essential facts of the claims against Alpha Prime no longer have a logical connection

to the remaining claims against the HSBC Defendants, nor do the questions of law or fact

overlap.  Rather, they involve different conduct by different defendants, different agreements

governing the respective defendants' duties and responsibilities, different transfers involving

different BLMIS accounts, and are subject to different defenses.  A separate analysis of Alpha

Prime's and the HSBC Defendants' knowledge of or willful blindness to Madoff's fraud is

required.  Based on this alone, the Court should grant severance in this action.

---

[13] Alpha Prime and Senator Fund asserted cross-claims against defendants HSBC Bank plc, HSBC Bank Bermuda
Limited, Bank of Bermuda Limited, HSBC Holdings plc, HSBC Institutional Trust Services (Bermuda) Limited,
HSBC Securities Services (Bermuda) Limited, HSBC Securities Services (Luxembourg) S.A., and Bank of Bermuda
(Luxembourg) S.A.  Ans. and Cross-Claim, ECF No.82; Amend Ans. and Cross-Claim, ECF No. 347.

### B.    The Trustee's Claims Will Require Different Proofs

Resolving the Trustee's claims against Alpha Prime and the HSBC Defendants will require testimony, documentary evidence, and expert analysis specific to the initial transfers to Alpha Prime and the subsequent transfers to the HSBC Defendants.  The evidence to support the claims against Alpha Prime will likely include Alpha Prime's BLMIS customer statements, bank statements, its correspondence with its service providers, and evidence of its agents' knowledge of Madoff's fraud, including testimony from Alpha Prime's directors, officers, and third parties with knowledge of Alpha Prime's state of mind.  In contrast, the evidence supporting the claims against the HSBC Defendants will include the Structured Products Funds' BLMIS account and bank statements as well as documents and witness testimony concerning the HSBC Defendants' knowledge of or willful blindness to Madoff's fraud.

The Trustee's case against the HSBC Defendants will relate to Alpha Prime only to the extent that Alpha Prime's HSBC service providers and their employees, including Nigel Fielding, an Alpha Prime director, may testify and/or have documents concerning each party's knowledge of Madoff's fraud.  Although the Trustee may rely on the same experts with respect to proof of the Ponzi scheme and tracing the transfers, these witnesses would address different facts, i.e., the initial transfers to Alpha Prime and subsequent transfers to the HSBC Defendants. This is no different from any of the approximately 1,000 other avoidance actions brought by the Trustee in this liquidation.  In any event, this limited potential overlap in testimony does not warrant denial of severance.  *See, e.g.*, *N. Jersey Media Grp. Inc. v. Fox News Network, LLC*, 312 F.R.D. 111, 117 (S.D.N.Y. 2015) (granting severance even though "there is indisputably some overlap between witnesses and the subjects they will testify to . . . it is not substantial"); *Alessi v. Monroe Cty.*, No. 07-CV-6163T (MAT), 2008 WL 398509, at *2 (W.D.N.Y. Feb. 12,

2008) (although "many of the same witnesses are likely to be called in each case, that factor

alone does not outweigh the several reasons for granting the defendants' motion to sever").

### C.   Severing the Claims Would Facilitate Judicial Economy and Avoid Undue Prejudice

Severing the Trustee's claims would facilitate judicial economy by enabling the trier of

fact to focus on the issues specific to Alpha Prime and the HSBC Defendants without the

distractions of unrelated legal theories and facts.  Only where separate trials would "require

substantial overlap of witnesses or documentary proof" do considerations of judicial economy

weigh against severance.  *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 264-65 (D.

Conn. 2012) (citing *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 171 (S.D.N.Y. 2009)).

The usual judicial efficiencies gained from a combined trial are lost where substantial amounts of

evidence and testimony proffered against one defendant would be irrelevant and inadmissible

against the other defendants.  *See Cestone*, 2002 WL 424654, at *3 ("Two shorter trials will be

more efficient and less expensive than one long, combined trial in which the Court must

constantly caution the jury to not consider evidence that is irrelevant or inadmissible against a

particular Defendant.").

Likewise, courts in this District will avoid undue prejudice by having separate trials in

cases involving multiple defendants and multiple claims to "prevent the factfinder from being

exposed to evidence admitted for the purpose of addressing one claim that would contaminate his

mind regarding a different claim."  *Monaghan v. SZS 33 Assocs.*, 827 F. Supp. 233, 245

(S.D.N.Y. 1993).  There is significant danger of contaminating the factfinder's mind when

claims against multiple defendants are factually unrelated.  *See Morris v. Northrup Grumman

Corp.*, 37 F. Supp. 2d 556, 581 (E.D.N.Y. 1999).

The Trustee's claims against Alpha Prime are different from his claims against the HSBC Defendants. The Alpha Prime claims relate to recovery of initial transfers as well as disallowance and equitable subordination of the Disputed Claims. The HSBC Defendants claims involve only subsequent transfers from the Structured Products Funds. To present all of these facts in a single trial will only delay and confuse matters. The defendants will be forced to sit through testimony irrelevant to claims against them and involve legal issues relating to one but not the others. For example, testimony concerning Rye Broad Market will be relevant only to the claims against the HSBC Defendants, not Alpha Prime.

Additionally, the Trustee's case against Alpha Prime is proceeding on a different track from the case against the HSBC Defendants. The case against Alpha Prime is substantially more advanced, with discovery underway and set to close on April 1, 2020. Discovery with the HSBC Defendants has not yet begun, as those claims are the subject of a still-pending appeal.[14] If the claims against the HSBC Defendants are not severed from this action, any trial against Alpha Prime must be delayed until after discovery with the HSBC Defendants is complete. To avoid prejudice and facilitate judicial economy, the Trustee respectfully requests that this Court sever the Trustee's claims against Alpha Prime from his claims against the HSBC Defendants.

## III.    THE TRUSTEE'S MOTION FOR LEAVE TO AMEND SHOULD BE GRANTED

Under Fed. R. Civ. P. 15(a)(2), made applicable to this proceeding by Fed. R. Bankr. P. 7015, a party may amend its pleading with leave of court, which shall be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). Fed. R. Civ. P. 15 should be liberally construed. *See BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 272 (S.D.N.Y. 2012) ("the rule is 'interpreted liberally, [and] an amendment is normally

---

[14] *See supra* n.10 and accompanying text.

permitted'"") (internal quotation marks and citation omitted). "Generally, amendments are

favored because they 'tend to facilitate a proper decision on the merits.'" *Mendelow*, 560 B.R. at

221 (quoting *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp 428, 472

(S.D.N.Y. 2013)).

In the Second Circuit, a party may amend its pleadings in the absence of (1) bad faith; (2)

prejudice to the opposing party; (3) undue delay in bringing the motion; and (4) futility of the

amendment. *Fjord v. AMR Corp. (In re AMR Corp.)*, 506 B.R. 368, 382 (Bankr. S.D.N.Y.

2014). As long as the moving party demonstrates colorable grounds for relief, justice requires

the court to permit amendment. *Kaster v. Modifications Sys., Inc.*, 731 F.2d 1014, 1018 (2d Cir.

1984); *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 436-37 (S.D.N.Y. 2006).

Courts in this Circuit regularly grant leave to amend when there are intervening changes

in the law. *See, e.g., Mendelow*, 560 B.R. at 221-22; *Absolute Activist Value Master Fund Ltd. v.

Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012); *Hamilton v. City of New York*, No. 06-cv-15405 (DC),

2011 WL 1842990, at *3 (S.D.N.Y. May 10, 2011); *McBeth v. Gabrielli Truck Sales, Ltd.*, 731

F. Supp. 2d 316, 320-21 (E.D.N.Y. 2010); *Tuosto v. Philip Morris USA Inc.*, 672 F. Supp. 2d

350, 366 (S.D.N.Y. 2009).

Decisions rendered since the commencement of this case concerning the Trustee's

standing to assert common law claims for damages, the standard for pleading good faith, the

section 546(e) safe harbor, and the extraterritorial application of SIPA have narrowed the

Trustee's avenues for recovery and changed the applicable standards. Of the sixty-one

defendants named in the 2010 Complaint, only three remain. By this motion, the Trustee seeks

to amend his pleading to meet standards established in those decisions, eliminate nonviable

claims, and remove allegations that do not apply to Alpha Prime.

### A.    Defendants Will Not Be Prejudiced by the Proposed Amendments

Prejudice turns on whether an amendment "would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725-26 (2d Cir. 2010) (internal quotation marks and citation omitted).  "If no prejudice is found, then leave normally will be granted."  6 Wright & Miller, Fed. Prac. & Pro. § 1484 (3d ed. 2004, 2017 Supp.).

The party opposing amendment has the burden of proving that leave to amend would result in "actual prejudice, not the possibility of prejudice." *Mendelow*, 560 B.R. at 224 (citing *United States v. Marsten Apts., Inc.*, 175 F.R.D. 257, 264 (E.D. Mich. 1997))*; see also Allison v. Clos-ette Too, L.L.C.*, No. 14 Civ. 1618 (LAK)(JCF), 2015 WL 136102, at *2 (S.D.N.Y. Jan. 9, 2015).  Whether a party had prior notice of the content amended and whether the amended complaint considers the same transactions as the original pleading are central to analyzing prejudice.  *See M.E.S., Inc. v. Safeco Ins. Co. of Am.*, No. 10-CV-02709 (PKC)(VMS), 2014 WL 2931398, at *3 (E.D.N.Y. June 27, 2014) (granting leave to amend and rejecting the defendant's claim of "surprise" where the proposed amended pleading "mostly elaborate[d]" on the earlier pleading); *see also Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 262 (S.D.N.Y. 2009); 6 Wright & Miller, Fed. Prac. & Pro. § 1487 (3d ed.) (noting that courts allow amendments when the "opponent could not claim surprise, but effectively should have recognized that the new matter included in the amendment would be at issue").

Granting leave to amend would not prejudice Alpha Prime, much less cause the undue prejudice required to deny amendment.  The SAC neither adds claims or parties, nor changes tack in a way that could conceivably prejudice Alpha Prime.  The Trustee has always sought to

avoid and recover the fraudulent transfers from Alpha Prime; it is only the altered pleading and proof standards that necessitate the Trustee's amendment.

The SAC contains no surprises for Alpha Prime.  The Trustee's Proffered Complaint contained allegations to support the heightened pleading burden.  The parties entered into the Settlement Agreement in which the parties agreed to continue to litigate the Trustee's claims that required proof of Alpha Prime's knowledge of or willful blindness to, Madoff's fraud, and Alpha Prime's defenses to the same.  Moreover, granting leave to amend would not impact discovery or create any delay.  For the past year the parties have engaged in discovery and the evidence sought by the Trustee to date clearly reflects the parties' understanding of the Trustee's need to show actual knowledge or willful blindness to succeed on his claims.  Alpha Prime cannot show that it would be unduly prejudiced by the Trustee adding further allegations to support the claims and issues that have been central to this proceeding for years.  Indeed, Alpha Prime has expected the 2010 Complaint to be amended for some time; otherwise, it makes little sense for Alpha Prime to have litigated and participated in discovery on these issues for the past year.

### B.    The Trustee Has Acted in Good Faith and Without Delay

It is well-settled in the Second Circuit that the mere passage of time, in the absence of bad faith, does not warrant a denial of leave to amend.  *Town of New Windsor v. Tesa Tuck, Inc.*, 919 F. Supp. 662, 675-76 (S.D.N.Y. 1996).  This factor largely turns on whether the party acted in good faith during the delay, rather than the length of delay.  *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 333 (2d Cir. 2000) (upholding leave to amend after a seven-year delay); *see also State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.").  And "[d]elay is rarely fatal to a Rule 15 motion if it

can be explained." *Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*, No. 13 Civ. 1654 (RA) (HBP),

2015 WL 4097927, at *7 (S.D.N.Y. July 6, 2015).

The Trustee has acted in good faith and has not delayed in seeking leave to amend.

Between December 2010 and now, the Trustee has actively litigated case-wide issues of law

pertaining to this proceeding, including the good faith standard and extraterritoriality. These

issues bear directly on the Trustee's allegations of fact, the parties named as defendants, and the

evidence required to prove the Trustee's claims. The extraterritoriality issue remains

outstanding. In the interim, the Trustee mediated with Alpha Prime and reached a partial

settlement that further narrowed the Trustee's claims. Following the mediation, and as part of

the settlement, the parties agreed to move forward with discovery and entered into a Case

Management Plan that focused the parties on obtaining evidence rather than motion practice.

The Trustee was proceeding accordingly. *See Mendelow*, 560 B.R. 208 at 223 (this Court noting

that "[t]he Trustee should not be penalized and the defendants should not be rewarded for a delay

in which everyone acquiesced"). Now that Alpha Prime has initiated motion practice, the

Trustee appropriately seeks to amend his pleading.

### C.    Amending the Complaint Would Not Be Futile

To succeed on his claims, the Trustee must show that Alpha Prime had actual knowledge

of Madoff's fraudulent trading activity, or alternatively, was willfully blind to Madoff's fraud.

The SAC sufficiently pleads that Alpha Prime had such knowledge, and as such, is not futile.

*See Jefferson Ins. Co. v. Rouhana (In re Winstar Commc'ns)*, No. 01 CV 3014 (GBD), 2006 WL

473885, at *2 (S.D.N.Y. Feb. 27, 2006) (on a motion for leave to amend, "[t]he Court need not

determine the merits of the claims, but must simply determine that the proposed claims are

colorable and not frivolous"). The party opposing amendment has the burden of proving that

leave to amend would be futile. *Margel v. E.G.L. Gem Lab Ltd.*, No. 04 Civ. 1514 (PAC)(HBP),

2010 WL 445921, at *3 (S.D.N.Y. Feb. 8, 2010) (citations omitted); *Ho Myung Moolsan Co.*

*Ltd.*, 665 F. Supp. 2d at 250 (citations omitted).

The futility inquiry turns on whether the amended complaint could withstand a motion to

dismiss under Fed. R. Civ. P. 12(b)(6). *Dougherty v. Town of N. Hempstead Bd. of Zoning*

*Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119,

123 (2d Cir. 1991)). To survive a motion to dismiss, a complaint must plead "enough facts to

state a claim to relief that is plausible on its face." *Fed. Treasury Enter. Sojuzploimportdo v. SPI*

*Spirits Ltd.*, 726 F.3d 62, 71 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)). A claim is facially plausible where "the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Mendelow*, 560 B.R. at 225 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). It is

particularly important for the Court to draw reasonable inferences in favor of the plaintiff with

respect to facts pleaded about a defendant's knowledge or state of mind, as such elements are

rarely proven by direct evidence:

> To be sure, a defendant's admission of actual knowledge of the
> underlying fraud is likely to be rare. But such direct evidence of
> actual knowledge is not necessary to establish this element of the
> claim. Rather, actual knowledge may be inferred from
> circumstantial evidence, provided that the central inquiry remains
> whether the evidence permits a reasonable finder of fact to infer that
> the defendant actually knew of the underlying fraud.

*Silverman v. A-Z Rx, LLC (In re Allou Distribs., Inc.)*, No. 04-8369-ESS, 2012 WL 6012149, at

*16 (Bankr. E.D.N.Y. Dec 3, 2012) (quoting *Silverman v. United Talmudical Acad. Torah*

*Vyirah, Inc. (In re Allou Distribs., Inc.),* 446 B.R. 32, 51-52 (Bankr. E.D.N.Y. 2011)).

1.      The SAC Plausibly Alleges Claims to Avoid and Recover the Six-Year
        Transfers

SAC Counts One through Four seek to avoid and recover the Six-Year Transfers BLMIS

made to Alpha Prime.  (SAC ¶¶ 188-211.)  As discussed above, under the current standard, the

Trustee may only pursue these transfers if he can plead that Alpha Prime had "actual knowledge

that there were no actual securities transactions being conducted."  *Sec. Inv'r Prot. Corp. v.*

*BLMIS (In re Madoff Sec.)*, No. 12 Misc. 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr.

15, 2013).  The District Court held that the section 546(e) safe harbor would not apply in that

instance because a transferee with actual knowledge did not believe he was signing a securities

contract but was "simply obtaining moneys while he could."  *Id.*  To find actual knowledge, the

Court may look at the totality of the allegations.  *Kingate*, 2015 WL 4734749, at *13.

Actual knowledge requires that the transferee have a "level of certainty" and not just a

"strong suspicion" that Madoff was operating a fraud.  *Merkin I*, 515 B.R. at 139-40.  This

certainty can come from knowing "that BLMIS was not actually trading the securities it reported

it had traded in the monthly statements" for the transferee's BLMIS accounts.  *Picard v. Shapiro*,

542 B.R. 100, 113 (Bankr. S.D.N.Y. 2015).  Allegations showing that the transferee actually saw

red flags in BLMIS's trading activity by reviewing BLMIS account statements and trade

confirmations and comparing them to publicly available sources supports the level of certainty

needed to show actual knowledge.  *See id.* at 116; *Picard v. Avellino*, 557 B.R. 89, 115-16

(Bankr. S.D.N.Y. 2016).  When the Trustee alleges that the defendant "connected the dots in real

time," the high pleading burden is satisfied.  *Legacy*, 548 B.R. at 33.

While determining whether the Trustee has pleaded actual knowledge is case specific,

this Court has found that burden satisfied in a complaint against BLMIS feeder funds structurally

similar to Alpha Prime—Kingate Global Fund Ltd. and Kingate Euro Fund Ltd. (the "Kingate

22

Funds"). *Kingate,* 2015 WL 4734749, at *14. This Court's finding in *Kingate* relied on the

Trustee's allegations that the Kingate Funds' control persons and service providers performed

regular due diligence that closely monitored the performance of the funds and "their review

disclosed impossible trades." *Id.* In reviewing the Kingate Funds' monthly BLMIS statements,

the Kingate Funds' service providers prepared spreadsheets that showed trades reported out of

the daily price range, dividend activity contrary to industry practice, and "Madoff's statistically

uncanny ability to buy equity securities at prices in the lower range of the daily prices and sell

them at prices in the higher range of the daily prices." *Id.* This Court also found that the

Trustee's allegations showing that the Kingate Funds: (i) "took steps to deflect inquiries directed

at Madoff implying that they feared what may be discovered;" (ii) addressed investor concerns

with unverified responses intended to "soothe shareholder anxieties;" and (iii) resisted third party

review of BLMIS, satisfied the actual knowledge pleading burden. *Id.* This Court concluded

that the "totality of the allegations" in the Trustee's complaint against the Kingate Funds

"paint[ed] a picture of sophisticated financial professionals who knew that Madoff was reporting

fictitious transactions, and took steps to prevent inquiry." *Id.* at 15.

The same is true here. The SAC allegations satisfy the pleading burden for actual

knowledge. Alpha Prime's directors and service providers reviewed and analyzed Alpha Prime's

monthly BLMIS statements, created reports identifying impossible trading, sought to soothe

internal and shareholder concerns with unverified and obviously false explanations, and

attempted to prevent third party inquiries into BLMIS.

Alpha Prime argues that the 2010 Complaint fails to allege that Alpha Prime had actual

knowledge because it doesn't state that Alpha Prime "observ[ed] and even internally report[ed]

many signs that, at the very least, Madoff was not investing the way he purported to." (Mot. at

4.)  The SAC amply addresses these points and articulates with particularity that Alpha Prime

saw and understood red flags showing Madoff was not trading securities.

(1)    Alpha Prime's Directors and Service Providers Had Coveted
       Access to Madoff

Alpha Prime was created by a group of sophisticated financial industry individuals who

had been profiting from investing other people's money with BLMIS for over a decade when

they formed Alpha Prime.  (SAC ¶¶ 46, 65.)  This relationship grew out of Sonja Kohn's close

connection with Madoff, which began in the late 1980s.  (*Id.* ¶ 39.)  Madoff relied on Kohn to

recruit investors into his Ponzi scheme.  (*Id.*)  She delivered, introducing at least 30 funds to

BLMIS which collectively invested over $9 billion.  (*Id.* ¶ 40.)  Kohn's access to Madoff was

well-known, and Bank Austria recruited her for that reason.  (*Id.* ¶ 43.)  Shortly after she was

hired, Kohn introduced Bank Austria's head of securities, Stefan Zapotocky, to Madoff, and

together Kohn and Zapotocky established Primeo, their first BLMIS feeder fund.  (*Id.* ¶¶ 43-45.)

Alpha Prime was created as a "clone" of Primeo, with many of the same service providers and

directors, including Kohn, Zapotocky, Peter Fischer, and Ursula Radel-Leszczynski (the

"Directors").  (*Id.* ¶ 46.)  The Directors controlled Primeo and Alpha Prime through the various

service providers they operated, including BA Worldwide and Bank Medici.  (*Id.* ¶¶ 50-55, 67-

69.)  The Directors remained in close contact with Madoff, regularly traveling to meet with him

in New York.  (*Id.* ¶ 66.)  The Directors' relationship with Madoff was viewed as a "cult" in

which the Directors "consider[ed Madoff's] 'interests' before those of the investors."  (*Id.* ¶182.)

(2)    The Directors Knew Madoff's Trading Was Impossible Before and
       During Alpha Prime's Investment With BLMIS

The Directors operated Primeo for nearly ten years before forming Alpha Prime.  (*Id.* ¶

75.)  During that time, Primeo's service providers, including BA Worldwide, Eurovaleur, and

HSSL, performed due diligence on Primeo's purported BLMIS's trading activity.  (*Id.* ¶ 79.)

24

They compared the information on Primeo's BLMIS customer statements and trade

confirmations with publicly available information.  (*Id.*)  Contrary to Alpha Prime's claim

regarding the 2010 Complaint—which was prepared based on an inquiry notice standard—the

SAC is replete with allegations "concerning how or when [Alpha Prime] learned about the Red

Flags."  (Mot. at 4.)  BA Worldwide's and HSSL's reports and analyses, which the Directors

reviewed and understood, (*id.* ¶¶ 81, 84, 85, 88, 93, 102) showed the following trading

impossibilities on Primeo's monthly statements:

- In a two-year period, 64% of the total number of options contracts purportedly traded for Primeo exceeded the total number of comparable options traded on the CBOE.  In one instance, the call options purportedly traded for Primeo on a particular day exceeded the number of those call options executed on the CBOE for that day by 19,700%.  (*Id.* ¶ 83.) When an investor reported to the Directors that the CBOE volume could not support BLMIS's trading, the Directors decided to "think of a coordinated answer" that the options were traded "OTC" even though they knew this was not true.  (*Id.* ¶¶ 81, 82, 84.)

- The prices BLMIS reported for securities traded for Primeo were outside the daily range. When this occurred, BA Worldwide's report marked the BLMIS price "False" and noted whether the false price benefitted Primeo's account by marking it positive or negative. (*Id.* ¶¶ 85-88.)

- Multiple dividend payments made by Fidelity Spartan Fund in a calendar month (even though the fund reported only one payment) and on dates that did not correspond with published dividend payment dates.  (*Id.* ¶ 91).  BLMIS continued to report these dividends and attribute them to Fidelity Spartan Fund until 2008 even though that fund had changed its name in 2005 and was no longer reporting dividend payments under the name listed on the BLMIS statements.  (*Id.* ¶¶ 89, 90.)  Primeo's Dividends Detail Reports indicated that 96.1% of the dividend payments did not correspond with the published payment dates.

- Unbalanced hedges that deviated from the SSC strategy.  Because a certain number of options are needed to hedge the equity positions in the basket, when an equity in a basket is sold without a corresponding adjustment to the options, this creates significant exposure to losses because the value of the equity basket and the options positions no longer match.  (*Id.* ¶ 100.)  BA Worldwide's reports reflected at least 100 such instances over the course of its relationship with BLMIS.  (*Id.* ¶ 101.)

- BA Worldwide's reports monitored the performance of other BLMIS feeder funds and saw that between 2001 and 2008 there would not be enough options on the entire listed market to implement the SSC strategy at any point in time.  (*Id.* ¶¶ 102-104.)

Knowing that Madoff was reporting fictitious transactions, the Directors nonetheless established Alpha Prime to invest with BLMIS. (*Id.* ¶ 107.) Alpha Prime's BLMIS customer statements continued to reflect the impossible trading and provided additional sources of evidence of Madoff's fraud. BA Worldwide, HSSL, and Eurovaleur performed the same due diligence for Alpha Prime that they did for Primeo. They also created the same due diligence reports for Alpha Prime to review and analyze the trading on Alpha Prime's BLMIS customer statements. These reports, which the Directors reviewed and understood (*Id.* ¶ 108), showed impossible trading by BLMIS, including:

- Out-of-range securities prices in the "plausibility control reports" previously prepared for Primeo and marked "False" when the security's price was out of the daily range. (*Id.* ¶¶ 85-88, 109.) BA Worldwide's reports for Alpha Prime showed 395 equities trades outside of the daily range. (*Id.* ¶ 110.) These allegations, along with those noted above in SAC ¶¶ 85-88, directly address Alpha Prime's contention that "there is no allegation that Alpha Prime actually knew about [the] anomalous trades" and wholly contradicts Alpha Prime's assertion that it "would be improbable, if not impossible to pick out [these pricing anomalies] in real time…." (Mot. at 7.)

- Options trades exceeding the total volume for options with the same trade date, strike price and expiration date as traded on the CBOE on 162 separate occasions. (SAC ¶ 111.) These allegations, along with those noted above in SAC ¶¶ 81, 82, 84, directly address Alpha Prime's contention that the Trustee does not "ever assert that Alpha Prime knew of these deviations" with respect to the number of options being traded. (Mot. at 6.)

- Trade confirmations that contradicted the customer statements in that they purported to show the purchase of call options and the sale of put options. (SAC ¶ 117.) If true, this would require trading on margin, for which Alpha Prime's account was not set up. (*Id.* ¶ 118.) These allegations directly address Alpha Prime's contention that the Trustee does not indicate that Alpha Prime knew of errors on the trade confirmations. (Mot. at 12.)

- Multiple dividend payments made by Fidelity Spartan Fund in a calendar month (even though the fund only reported one payment) and on dates that did not correspond with published dividend payments. Alpha Prime's Dividends Detail Reports indicated 128 of 133 dividend payments on the wrong date. (SAC ¶¶ 119, 120.) These allegations, along with those noted above in SAC ¶¶ 89-91, directly address Alpha Prime's contention that the Trustee "does not state that Alpha Prime knew [the reported payments were made by a fund that no longer

existed] and understood it to mean that BLMIS was not trading securities." (Mot. at 11.)

- Equities that were being purchased at the low and sold at the high at statistically impossible rates. (SAC ¶¶ 125-126.) These allegations directly address Alpha Prime's contention that the Trustee does not allege that Alpha Prime "routinely identified" Madoff's "near perfect ability to buy low and sell high." (Mot. at 10.)

- Speculative options trading that deviated from the SSC strategy in 94 transactions. (SAC ¶¶ 129-133.) These allegations, along with those noted above in SAC ¶¶ 100-101, directly address Alpha Prime's contention that the Trustee does not allege that Alpha Prime knew of speculative options trades that were inconsistent with Madoff's SSC strategy. (Mot. at 12.)

- Madoff always exiting the market at quarter- and year-end despite his touting "market timing" as a cornerstone of the SSC strategy. (SAC ¶¶ 131-132.)

In addition to Primeo and Alpha Prime, BA Worldwide created these reports for other BLMIS feeder funds in which the Directors were involved. By doing so, over the course of its relationship with BLMIS, BA Worldwide and the Directors saw over 1,000 instances in which BLMIS reported securities prices that fell outside of the daily price range (*id.* ¶ 88), 514 separate options transactions that exceeded the CBOE volume (*id.* ¶ 111), 402 dividend payments (or 96.2% of those reported to Alpha Prime) that did not correspond with payment dates reported by Fidelity (*id.* ¶ 121), and equity buys at the daily low 83% of the time and equity sales at the daily high 78.1% of the time (*id.* ¶ 125).

(3)    The Directors Deflected Inquiry to Protect the Profits They Earned From Madoff Investment

The Directors reviewed due diligence reports on Madoff feeder funds for years, including for Alpha Prime, and knew they had to keep others from confirming what they already knew— Madoff was not trading the securities reflected on BLMIS's customer statements. (*Id.* ¶¶ 76-137.) When colleagues and third parties came to the Directors with concerns and suspicions, the Directors had scripted responses. (*Id.* ¶¶ 142, 165-166, 169.) When concerns were raised about

BLMIS's remarkably consistent and profitable returns, the Directors told others Madoff was

front running. (*Id.* ¶¶ 143-144.) When concerns were raised that Madoff was front running and

thus engaged in illegal activity, the Directors responded that he had not been caught by the U.S.

authorities. (*Id.* ¶¶ 141, 142, 146, 147.) When concerns were raised about whether BLMIS was

segregating assets, the Directors resisted independent verification. (*Id.* ¶¶ 150-154, 162-163.)

When Alpha Prime's board suspected that BLMIS was not executing trades for Alpha Prime, the

Directors erased the evidence of their suspicions. (*Id.* ¶ 166.) As long as the Directors could

keep others from digging deeper, they would continue to profit from their connection to Madoff.

Over the course of their fifteen-year relationship with Primeo and Alpha Prime, the

actions the Directors took to prevent further inquiry included:

- Dismissing the concerns of colleagues who, based on meetings with Madoff, reported that Madoff's consistent profits were the result of front running or other illegal activity with the response that BLMIS was regulated by the SEC. (SAC ¶¶ 141-42, 144-148.)

- Resisting any meaningful due diligence on BLMIS and attempting to run interference between Madoff and the service providers seeking to perform real due diligence. (*Id.* ¶¶ 150-157, 173-179.)

- Preventing custody from being legitimately confirmed knowing that BLMIS was acting as custodian of the assets. (*Id.* ¶¶ 158, 173-175.) These allegations directly address Alpha Prime's contention that the Trustee "does not allege that HSBC informed Alpha Prime" that "Madoff was acting as his own custodian." (Mot. at 7.)

- Dissuading board members from ending Primeo's investment with BLMIS after a service provider raised several concerns about BLMIS, by stating that BLMIS was registered with the SEC (despite knowing that BLMIS was not registered as an investment advisor) and was audited (despite knowing that Madoff's billion-dollar brokerage was audited by a three-person firm). (*Id.* ¶¶ 159-165.)

- Deleting from Primeo's board meeting minutes the board's "concern[s] of what proof securities were really there and if transaction slips provided by Madoff were valid and had actually been executed." (*Id.* ¶ 166.)

- Allowing service provider entities controlled by or affiliated with them to act as straw men to avoid their involvement with Madoff to be detected by foreign financial authorities. (*Id.* ¶¶ 180-182.)

This non-exhaustive list of Alpha Prime's Directors and service providers observing fraudulent trading activity on Alpha Prime's BLMIS statements and the Directors' efforts to prevent third party inquiry of BLMIS, along with the Trustee's additional allegations, establish Alpha Prime's Directors' and service providers' knowledge of BLMIS's fraud. As founders, directors, control persons, and agents of Alpha Prime, this knowledge is imputed to Alpha Prime.

2.    The SAC Plausibly Alleges Facts to Disallow Alpha Prime's Claim Pursuant to Section 502(d)

Alpha Prime misconstrues section 502(d) when it ignores the fact that as long as the Six-Year Transfers are outstanding, section 502(d) applies to disallow the Disputed Claims. 11 U.S.C. § 502(d); *see also* SIPA § 78fff-2(a)(2); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 563 B.R. 737, 753-54 (Bankr. S.D.N.Y. 2017) ("*Merkin II*"). This Court made that point to Alpha Prime's counsel in denying, on the same basis, Alpha Prime leave to move for summary judgment. *See* Hr'g Tr. at 6:8-8:8, *Picard v. HSBC Bank plc*, Adv. No. 09-01364 (SMB) (July 16, 2019). If the Trustee obtains a judgment of avoidance and recovery for the Six-Year Transfers, and that judgment is not fully satisfied, the Disputed Claims are permanently disallowed. *See Merkin II*, 563 B.R. at 753-54; *see also In re Dreier LLP*, 453 B.R. 499, 517 (Bankr. S.D.N.Y. 2011) (holding that section 502(d) provides "broader relief than the Trustee's equitable subordination claim" because defendant "will not be entitled to any distribution unless it returns the fraudulent transfer"); *Merkin I*, 515 B.R. at 160-61; *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 841 (Bankr. S.D.N.Y. 1994). Only if Alpha Prime satisfies the Trustee's judgment, or is successful in dismissing the Six-Year Claims, would questions arise as to the allowance or subordination of Alpha Prime's Disputed Claims.

3.      Alpha Prime is Not Entitled to a 502(h) Claim Against the Customer
        Property Estate

Alpha Prime appears to believe that a 502(h) claim is treated the same way as a net equity

claim.  SIPA dictates otherwise.

A SIPA proceeding is similar to a bankruptcy liquidation with certain important

differences, most of which concern the special protection SIPA affords to customers of the failed

brokerage.  SIPA § 78fff(a); *see also Exch. Nat'l Bank of Chicago v. Wyatt*, 517 F.2d 453, 457-

459 (2d Cir. 1975); *In re Lloyd Sec., Inc.*, 75 F.3d 853, 857 (3d Cir. 1996).  Under SIPA, a

"liquidation proceeding shall be conducted in accordance with, and as though it were being

conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7" of the Bankruptcy

Code, but only "to the extent consistent" with SIPA.  SIPA § 78fff(b).

For example, SIPA differs fundamentally from the Bankruptcy Code and the Bankruptcy

Rules on how, when, and with whom claims against the bankrupt estate must be filed.  *Compare*

11 U.S.C. § 501(a) and Fed. R. Bankr. P. 3002 and 5005 *with* SIPA § 78fff-2(a)(2) and (3).

SIPA prohibits allowing claims filed "after the expiration of the six-month period beginning on

the date of the publication notice" except in three delineated, narrow circumstances,[15] and even

then, the request for an extension must be made before the six-month limitations period has

lapsed.  SIPA § 78fff-2(a)(3).  SIPA cases demand expeditious administration of the estate, a

date upon which all rights and liabilities are fixed, and finality to the demands upon the SIPC

funds.  *Redington v. Borghi (In re Weis Sec., Inc.)*, 411 F. Supp. 194, 195 (S.D.N.Y. 1975), *aff'd*

538 F.2d 317 (2d Cir. 1976); *In re OTC Net, Inc.*, 34 B.R. 658, 660 (Bankr. D. Colo. 1983)

(citing Hearings on H.R. 8331 Before the Subcomm. on Consumer Protection and Finance of the

---

[15] SIPA only grants an exception to the six-month bar if the claimant is (i) the United States; (ii) a State or political subdivision thereof; or (iii) an infant or incompetent person without a guardian.

Comm. on Interstate and Foreign Commerce, 95th Cong., 1st Sess. at 178 (1977); H.R. Rep. No.

746, 95th Cong., 1st Sess. 28 (1977)).

A 502(h) claim cannot be treated the same way as it would be under the Bankruptcy

Code.  To the extent one is permitted, any 502(h) claim Alpha Prime asserts cannot be recovered

on par with its allowed net equity claim.  "In a SIPA liquidation, a fund of 'customer property,'

separate from the general estate of the failed broker-dealer, is established for priority distribution

exclusively among customers."  *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d

Cir. 2011) (the "*Net Equity Decision*"); *see also Rosenman Family, LLC v. Picard*, 395 Fed.

App'x 766, 768 (2d Cir. 2010).  Customers share in customer property *pro rata* to the extent of

their net equities.  *Net Equity Decision*, 654 F.3d at 233; SIPA §78fff-2(c)(1)(B).  Net equity is

calculated by determining "what would have been owed by the debtor" to a customer "if the

debtor had liquidated . . . on the filing date . . . all securities positions of a customer."  SIPA §

78*lll*(11).

The filing date freezes a customer's net equity.  *See Sec. Inv'r Prot. Corp. v. Lehman

Bros. Inc.*, 433 B.R. 127, 135 (Bankr. S.D.N.Y. 2010) (finding that SIPA requires that a "net

equity" claim be valued as of the filing date); s*ee also In re Adler Coleman Clearing Corp.*, 195

B.R. 266, 273 (Bankr. S.D.N.Y. 1996) ("[A] claimant's SIPA customer claim is fixed as of the

commencement of the SIPA proceeding.").  As one court observed:

> A purpose of SIPA is to freeze the broker-dealer's affairs as of the
> filing date in order to accomplish an orderly liquidation.   In
> fulfillment of this objective, numerous provisions of SIPA require
> that assets and liabilities be fixed as of the filing date.  In calculating
> the net equity claim of a customer, SIPA requires that the trustee
> conduct a hypothetical liquidation of the securities in the customer's
> account as of the filing date.  In determining what securities are
> owed a customer, an examination of the books and records of the
> debtor as of the filing date is required.  When distributing securities

> to customers in satisfaction of net equity claims, all securities shall
> be valued as of the close of business on the filing date.

*Hill v. Spencer S&L Ass'n (In re Bevill, Bresler & Schulman, Inc.)*, 83 B.R. 880, 892 (D.N.J.

1988) (internal quotations and citations omitted).  In the BLMIS liquidation, a customer's net

equity is defined by the Net Investment Method—cash in minus cash out, as of the filing date.

*Net Equity Decision*, 654 F.3d at 233.

Under SIPA's distribution scheme, only customers with net equity claims share in the

fund of customer property.  SIPA § 78fff-2(c)(1).  All other claims are satisfied from the debtor's

general estate.[16]  *Id.*  Because SIPA draws a bright line between net equity claims and all other

claims, and because a customer's net equity is fixed as of the filing date, under SIPA's statutory

scheme, a 502(h) claim, if permitted, may only be paid from the general estate.  The customer

property estate cannot be used to satisfy any other claims until all customers' net equity claims,

and the other categories of obligations to which customer property may be allocated pursuant to

SIPA § 78fff-2(c)(1), have been fully satisfied.  *See In re Adler Coleman*, 195 B.R. at 270.

---

[16] SIPA § 78fff-2(c)(1) provides that: "The trustee shall allocate customer property of the debtor as follows:

(A) first, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-3(c)(1) of this title, to the extent such advances recovered securities which were apportioned to customer property pursuant to section 78fff(d) of this title;

(B) second, to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities;

(C) third, to SIPC as subrogee for the claims of customers;

(D) fourth, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-3(c)(2) of this title.

Any customer property remaining after allocation in accordance with this paragraph shall become part of the general estate of the debtor. To the extent customer property and SIPC advances pursuant to section 78fff-3(a) of this title are not sufficient to pay or otherwise satisfy in full the net equity claims of customers, such customers shall be entitled, to the extent only of their respective unsatisfied net equities, to participate in the general estate as unsecured creditors. For purposes of allocating customer property under this paragraph, securities to be delivered in payment of net equity claims for securities of the same class and series of an issuer shall be valued as of the close of business on the filing date.

This Court has recognized that claims under section 502(h) are not net equity claims and may not be entitled to share in customer property. In *Sec. Inv'r Prot. Corp. v. Bernard. L. Madoff Inv. Sec. LLC*, No. 08-01789 (BRL), 2009 WL 458769, at *1 (Bankr. S.D.N.Y. Feb. 24, 2009), certain BLMIS customers asked this Court to modify the Claims Procedures Order to provide that section 502(h) claims could be filed after the July 2, 2009 bar date. Judge Lifland refused, finding that "this Court does not have the discretion to extend the statutory bar date for filing SIPA claims under these circumstances." *Id.* He further refused to issue an advisory opinion on the fate of a section 502(h) claim that had not accrued, noting: "Although section 78fff(b) of SIPA specifies that the provisions of the Bankruptcy Code shall apply in SIPA liquidation proceedings, to the extent that they are consistent with SIPA, it is unclear whether section 502(h) of the Code would apply." *Id.* at *2 n.2. Finally, Judge Lifland invited the movants to file protective proofs of claim to shield themselves from waiving a right to a section 502(h) claim. *Id.* at *2. Although movants were reluctant to file a proof of claim so as not to submit to the Court's jurisdiction, Judge Lifland emphasized that "[b]ar dates apply to creditors who have reason to believe they have a claim, even if the claim has not yet accrued. *Id.* (citing *In re Globe Metallurgical, Inc*. 312 B.R. 34, 42 (Bankr. S.D.N.Y. 2004)). Thus, this Court warned, if movants wanted an opportunity to assert a section 502(h) claim, they "ha[d] until July 2, 2009" to decide. *Id.*

In approving the Trustee's settlement with the Madoff feeder fund Defender Limited in 2015, this Court questioned whether a 502(h) claim exists at all for the return of fraudulent transfers and whether the claim should be against the customer property estate:

> The only question with a settlement like this is whether the settling parties paying the full amount that's owed gets a 502(h) claim because it's a fraudulent transfer claim. Whether it's a claim against I guess the customer estate or against the general estate, but those

are certain difficult questions and the settlement falls well within the
lowest point within the range of reasonableness so it's approved.

See Hr'g Tr. at 11:16-23, *Picard v. Defender Ltd.*, Adv. Pro. No. 10-05229 (SMB) (Bankr.

S.D.N.Y. Apr. 16, 2015).  Likewise, in 2017, this Court, in granting the Trustee summary

judgment and dismissing certain affirmative defenses, acknowledged that claims under section

502(h) are "unsecured claims."  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re*

*Sec. Inv'r Prot. Corp.)*, 568 B.R. 481, 488 n.6 (Bankr. S.D.N.Y. 2017).  Such unsecured claims

must be paid from the debtor's general estate.

Alpha Prime filed a net equity claim on February 2, 2009.  Alpha Prime's net equity,

fixed as of the filing date is, is $250,671,000.  The Trustee allowed 95% of Alpha Prime's claim

pursuant to settlement.  Should the Trustee be unable to equitably subordinate Alpha Prime's

Remaining Customer Claim, it will be paid out of the customer property fund.  However, Alpha

Prime's section 502(h) claim, if any, can never be part of Alpha Prime's net equity claim, and

thus under SIPA's priority scheme, it may only be paid out of the general estate.

4.      The SAC Plausibly Alleges that Alpha Prime's Claim Can Be
        Subordinated

As stated above, at this juncture, Alpha Prime's Disputed Claims are disallowed under

section 502(d) because Alpha Prime owes the estate approximately $6.7 million in Six-Year

Transfers.  Subordination only becomes viable if Alpha Prime returns the Six-Year Transfers to

the Trustee or the Trustee's claims to recover those transfers are dismissed.  Alpha Prime's

position is that if it succeeds in dismissing the Six-Year Transfers because the section 546(e) safe

harbor is deemed to apply, the Trustee will be unable to equitably subordinate Alpha Prime's

claim.  Alpha Prime is wrong.  Even if the Six-Year Transfer claims are dismissed, the Trustee

would still be able to subordinate the Disputed Claims because the estate would still be harmed

by the loss of the $6.7 million in Six-Year Transfers.  *Merkin I*, 515 B.R. at 161 ("[T]he

34

equitable subordination claim is worth pursuing only if the Trustee fails to succeed on his

fraudulent transfer claims because of defenses such as the § 546(e) safe harbor or the statute of

limitations under § 546(a)(1), but can nonetheless prove inequitable conduct that injured the

creditors or conferred an unfair advantage.").

(1)    The SAC Meets the Equitable Subordination Standard

Equitable subordination is codified in section 510(c) of the Bankruptcy Code, which

provides in relevant part:

> (c) . . . [A]fter notice and a hearing, the court may –
> (1) under principles of equitable subordination, subordinate for
> purposes of distribution all or part of an allowed claim to all or part
> of another allowed claim . . . .

11 U.S.C. § 510(c).  Claims will be subordinated under section 510(c) when (i) a claimant

engaged in inequitable conduct, (ii) which injured creditors of the estate or conferred an unfair

advantage on the claimant, and (iii) equitable subordination is consistent with bankruptcy law.

*Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977); *see also*

*80 Nassau Assocs.*, 169 B.R. at 836-37.  The requisite conduct required to warrant equitable

subordination of a claim has been described as lawful conduct that shocks "good conscience."

*80 Nassau Assocs.*, 169 B.R. at 837.  To subordinate a non-insider claim, the proponent has the

burden of proving that the claimant "engaged in egregious, improper or wrongful conduct that

damages creditors."  *Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115, 133

(Bankr. S.D.N.Y. 2008).

Alpha Prime contends that the Trustee must plead actual knowledge for equitable

subordination, (Mot. at 18), even though this Court and the District Court have already ruled that

a showing of willful blindness satisfies the standard.  *Merkin I*, 515 B.R. at 158 (citing *Picard v.*

*Katz*, 462 B.R. 447, 454-456 (S.D.N.Y. 2011)) ("Because the Amended Complaint adequately

alleges that the defendants did not receive fraudulent transfers in good faith, it also adequately

alleges that they engaged in inequitable conduct."); *see also Mishkin v. Siclari (In re Adler,*

*Coleman Clearing Corp.)*, 277 B.R. 520, 554, 567 (S.D.N.Y. 2002) (subordinating claim of

defendant who knowingly closed his eyes to a fraud).[17]

The SAC meets the actual knowledge standard to recover the Six-Year Transfers, and

thus presents far more than the "modest [factual] basis" required to plead willful blindness.

*Good Faith Decision*, at *2-6.  Even if the Court finds that the SAC does not demonstrate Alpha

Prime's actual knowledge of the fraud, it would nonetheless suffice to allege Alpha Prime's

willful blindness, specifically that (1) Alpha Prime subjectively believed there was a high

probability that BLMIS was engaged in fraud and (2) took deliberate actions to avoid learning of

that fact.  *Legacy*, 548 B.R. at 29; *Merkin I*, 515 B.R. at 139 (quoting *Global-Tech Appliances,*

*Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011)).  "[W]illful blindness connotes strong suspicion

but *some* level of doubt or uncertainty of the existence of a fact and the deliberate failure to

acquire actual knowledge of its existence."  *Legacy*, 548 B.R. at 29 (emphasis in original) (citing

*Merkin I*, 515 B.R. at 139-140); *see also Kingate*, 2015 WL 4734749 at *13.  On the first prong,

the SAC alleges that Alpha Prime knew of quantitatively impossible fictitious trading activity,

and that the HSSL and BA Worldwide due diligence reports did not show actual securities

trading.  (SAC ¶¶ 76-137.)  As to the second prong, if this Court determines that Alpha Prime did

not know that BLMIS was not trading securities as purported on Alpha Prime's statements, then

---

[17] Alpha Prime does not dispute that the Trustee has met the other prongs of the equitable subordination standard.
Regardless, this Court has already ruled that defendants similarly situated to Alpha Prime injured the creditor body
because every dollar they received was unavailable for distributions to good faith customers with allowed claims.
*Kingate*, 2015 WL 4734749, at *17 ("Although the Funds are net losers, the money they withdrew would have been
available to innocent net losers who did not knowingly invest in a Ponzi scheme."); *Merkin*, 515 B.R. at 160 (same).

Alpha Prime purposefully avoided asking BLMIS further questions that would confirm its suspicions and kept others from doing so as well. (*Id.* ¶¶ 138-183.)

The SAC thus clearly sets forth facts concerning Alpha Prime's actual knowledge, or alternatively, willful blindness, and its inequitable conduct that harmed the estate as a whole, and will therefore withstand a motion to dismiss. Accordingly, the Trustee's proposed amendments should not be denied as futile.

> (2)    The Extent to Which Alpha Prime's Claim May Be Subordinated Depends on the Harm it Caused the Estate and Is a Factual Inquiry That Need Not Be Decided at the Pleading Stage

The extent to which the Trustee may subordinate Alpha Prime's Disputed Claims is an issue that cannot be decided now. So long as the Six-Year Transfers are outstanding, Alpha Prime's Disputed Claims are disallowed. Even if Alpha Prime succeeds in dismissing the Trustee's claims to recover the Six-Year Transfers, the Trustee will proceed with his action to subordinate the Disputed Claims. In this scenario, the Trustee would have until trial to prove the amount of harm that Alpha Prime caused the estate. The issue of the quantum of the subordination is therefore not ripe. Nonetheless, because Alpha Prime argues that, as a matter of law, the Trustee may not both recover all of its transfers *and* subordinate its claims, as that would result in a double recovery, (Mot. at 22, 24), the Trustee addresses this issue here.

Avoidance and recovery and equitable subordination provide distinct relief under the Bankruptcy Code and are both available remedies to the Trustee against a creditor that has filed a claim against the estate in appropriate circumstances. "Equitable subordination places bad-acting creditors behind other creditors when distributions are made . . . [while] [t]urnover and fraudulent transfer bring back to the transferor debtor assets improperly transferred to another . . . ." *In re Owens Corning*, 419 F.3d 195, 206 (3d Cir. 2005); *see also 80 Nassau Assocs.*, 169 B.R. at 837 (citing Andrew DeNatale & Prudence B. Abram, *The Doctrine of Equitable Subordination*

*as Applied to Nonmanagement Creditors*, 40 Bus. Law. 417, 419 (1985) ("DeNatale & Abram")
(Equitable subordination "requires the court to consider whether 'notwithstanding the apparent
legal validity of a particular claim, the conduct of the claimant in relation to other creditors is or
was such that it would be unjust or unfair to permit the claimant to share pro rata with the other
claimants of equal status.'")).  Although "the scope of the [equitable subordination] remedy is . .
. limited by the extent of the injury," *80 Nassau Assocs.*, 169 B.R. at 837, when "inequitable
conduct includes discrete as well as pervasive injury to creditors, the making of restitution with
respect to the discrete injury is no bar to the application of the doctrine of equitable
subordination to the offending creditor's claim in order to rectify the pervasive injury to
creditors."  DeNatale & Abram, at 427.

Several courts have found that satisfaction of fraudulent transfer liability alone may be
insufficient to remedy the harm to the estate.  In *Kriegman v. 1127477 Alberta Ltd. (In re LLS
Am., LLC)*, No. 12-CV-324-RMP, 2015 WL 328918 (E.D. Wash. Jan. 23, 2015), a defendant
who solicited investors into the Ponzi scheme had to return all of the fees the defendant earned as
fraudulent transfers, and any claim he would subsequently file would be subordinated.  *Id*. at
*12.  The Court found that defendant recruiting investors into the scheme without investigating
the signs that the debtor's business was fraudulent was inequitable conduct that contributed to
the continued operation of the debtor's scheme.  *Id.*; *see also Official Comm. of Unsecured
Creditors of Toy King Distribs. (In re Toy King Distribs.)*, 256 B.R. 1, 127-155, 195-207 (Bankr.
M.D. Fla. 2000) (the court permitted equitable subordination of creditors' claims, including
502(h) claims, in addition to the recovery of the preferences and fraudulent transfers these
creditors received, concluding that two of the creditors' harm was "pervasive" and thus "the
entirety of the [502(h)] claim that [creditor] might file in this case should be subordinated to the

claims of other unsecured creditors" while one creditor's harm that was determined not be

pervasive was analyzed and set off against his fraudulent transfer liability); *Le Café Crème v. Le*

*Roux (In re Le Café Crème)*, 244 B.R. 221, 244 (Bankr. S.D.N.Y. 2000) (holding that both

recovery of fraudulent transfers and the equitable subordination of the bad faith creditors' claims

was appropriate); *Monzack v. ADB Investors (In re EMB Assocs., Inc.)*, 92 B.R. 9, 19 n.11

(Bankr. D.R.I. 1988) (citation omitted) ("To date it is undecided whether the applicability of the

preference remedy pre-empts the use of equitable subordination.  However, where, as here, the

misconduct by the claimant involves much more than just a preferential transfer, subordination is

appropriate and necessary to offset the full extent of the harm.").

There may be instances in which the harm to the estate is fully remedied by the return of

the fraudulent transfer.  In *Hirsch v. Pa. Textile Corp. (In re Centennial Textiles, Inc.)*, 227 B.R.

606, 608 (Bankr. S.D.N.Y. 1998), the debtors and defendant textile corporation entered into a

fraudulent scheme to pay down defendant's prepetition debt by inflating its postpetition invoices.

This Court held that the trustee was entitled to recover the debtor's postpetition transfers on

account of defendant's prepetition debts in violation of 11 U.S.C. § 549.  *Id.* at 612.  This Court

also found that if a defendant returns the postpetition transfers, the estate is made whole and

equitable subordination becomes moot.  *Id.* at 610.  In *Centennial Textiles*, once the unauthorized

postpetition transfers to a vendor was returned, the injury to the estate would be contained and

remedied.  This is unlike Alpha Prime, which inflicted continuous harm upon the estate.

Alpha Prime contributed to the expansion of the Ponzi scheme which surpasses the harm

created by the fraudulent transfers it received.  Alpha Prime harmed the estate not only by

withdrawing $83 million in fraudulent transfers but also by directing nearly $400 million into the

Ponzi scheme with knowledge that Madoff's scheme was fraudulent, which contributed to the

expansion of the Ponzi scheme.  Alpha Prime was also part of a network of funds—with Primeo,

Senator, Herald, and Herald Lux—through which Alpha Prime's directors and agents directed

more than a billion dollars into the Ponzi scheme.  While not easily quantifiable, this massive

infusion of new investment capital into the Ponzi scheme inflicted far greater harm than the

withdrawal of $83 million.  *Cf. LightSquared LP v. SP Special Opportunities LLC (In re*

*LightSquared Inc.)*, 511 B.R. 253, 361 (Bankr. S.D.N.Y. 2014) ("Determining the amount of

harm that has occurred to these estates as a result of SPSO's conduct, while difficult, will not be

impossible and the SPSO Claim will be subordinated accordingly.").  The significant discovery

disputes between the Trustee and Alpha Prime stemming from Alpha Prime's apparent failure to

retain discoverable documents after litigation was anticipated should also be noted.  While this

issue has not yet been resolved, the question of the spoliation of evidence is in play as discovery

progresses.  Spoliation is a frequent basis for subordinating a creditor's claim.  *See 80 Nassau*

*Assocs.*, 169 B.R. at 838-39; *Austin v. Chisick (In re First Alliance Mortg. Co.)*, 298 B.R. 652,

667 (C.D. Cal. 2003); *see also LightSquared*, 511 B.R. at 346-61 (subordinating creditor's claim

based on postpetition conduct).

The amount of harm Alpha Prime caused the estate has not yet been determined.  It is an

issue that requires additional fact and expert discovery.  The Trustee requests that this Court

allow the Trustee until the end of discovery to prove the amount of harm Alpha Prime caused the

estate, and thus the amount by which its claim may be subordinated to the claims of good faith

investors.

## CONCLUSION

For the reasons stated above, the Trustee respectfully requests that the Court deny Alpha

Prime's Motion and grant the Trustee's cross-motion to sever and for leave to file the SAC in the

form attached as Exhibit A to the Warshavsky Declaration.

Dated: New York, New York
        August 27, 2019

Respectfully submitted,

BAKER & HOSTETLER LLP

By:     *s/Oren J. Warshavsky*
        David J. Sheehan
        dsheehan@bakerlaw.com
        Oren J. Warshavsky
        owarshavsky@bakerlaw.com
        45 Rockefeller Plaza, 14th Floor
        New York, NY  10111
        Telephone:   212.589.4200
        Facsimile:    212.589.4201

*Attorneys for Irving H. Picard,*
*Trustee for the Substantively Consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the Estate of*
*Bernard L. Madoff*