**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>     Plaintiff-Applicant,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>     Defendant. | Adv. Pro. No. 08-01789 (SMB)<br>SIPA Liquidation<br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>     Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>     Plaintiff,<br><br>  v.<br><br>ABN AMRO BANK N.V. (presently known as THE ROYAL BANK OF SCOTLAND, N.V.),<br><br>     Defendant. | Adv. Pro. No. 10-05354 (SMB) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF TRUSTEE'S**
**MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ...................................................................................................................3

I.  The PSAC Adequately Alleges Defendant's Willful Blindness...........................................3

    A.  The Trustee's Theory – That Defendant Willfully Blinded Itself to a Fraud it Suspected at BLMIS – is Plausible .........................................................................4

    B.  The PSAC Pleads Specific Facts Demonstrating Defendant Subjectively Believed There Was a High Probability of Fraud at BLMIS...................................6

        1.  Defendant's Arguments That the PSAC Does Not Sufficiently Allege Willful Blindness are Based on the Wrong Pleading Standard ..................7

        2.  Defendant's Attempts to Minimize the BLMIS Fraud Provision are Contradicted by the Well-Pleaded Allegations of the PSAC....................10

        3.  The Trustee's Allegations of Willful Blindness are Further Supported by Defendant's Knowledge of Several Indicators of Fraud at BLMIS .....13

    C.  Defendant Deliberately Avoided Learning the Truth of Its Suspicions ................17

    D.  This Case is Indistinguishable from *Picard v. Katz*................................................20

II.  The PSAC Sufficiently Alleges Defendant's Knowledge of the Voidability of the Initial Transfers from BLMIS to the Tremont Initial Transfer Funds ..............................21

III.  Defendant's Alleged Value Defense is Not Apparent on the Face of the PSAC .............23

IV.  There Was an Intervening Change in the Applicable Pleading Standard..........................26

V.  The Trustee's $74.6 Million Claim for Subsequent Transfers from XL Portfolio Limited to Defendant Should Be Reinstated ....................................................................27

CONCLUSION..............................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)..................................................................................27

*Anderson News, LLC v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)..................................................................................1

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010).......................................................... 10, 14-15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................3

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp. LLC)*,
    362 B.R. 624 (Bankr. S.D.N.Y. 2007)...................................................................26

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................................3, 4, 5, 11

*Bonded Fin. Servs., Inc. v. European Am. Bank*,
    838 F.2d 890 (7th Cir. 1988) .............................................................................22

*Buchwald Capital Advisors, LLC v. Papas*,
    584 B.R. 161 (E.D. Mich. 2018)......................................................................24, 25

*Cassirer v. Sterling Nat'l Bank & Trust Co. of N.Y. (In re Schick)*,
    223 B.R. 661 (Bankr. S.D.N.Y. 1998)..................................................................26

*Cooperativa Ahorro y Credito Aguada v. Kidder, Peabody & Co.*,
    942 F. Supp. 735 (D. P.R. 1996).........................................................................18

*Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund*,
    2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013)..............................................5, 6, 15

*Elendow, Stephenson v. Citco Grp. Ltd.*,
    700 F. Supp. 2d 599 (S.D.N.Y. 2010)..................................................................14

*Fish v. GreatBanc Tr. Co.*,
    749 F.3d 671 (7th Cir. 2014) ..............................................................................4

*Gagnon v. Alkermes PLC*,
    368 F.Supp.3d 750 (S.D.N.Y. 2019).....................................................................15

*Gen. Builders Supply Co. v. River Hill Coal Venture*,
    796 F.2d 8 (1st Cir. 1986) ................................................................................................18

*Glob. Network Commc'ns, Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006) ...........................................................................................11

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011) ...........................................................................................................3

*Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*,
    453 B.R. 499 (Bankr. S.D.N.Y. 2011) ..........................................................................26

*Harrell v. Beall*,
    84 U.S. 590 (1873) ..........................................................................................................27

*Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)*,
    916 F.2d 528 (9th Cir. 1990) ...............................................................................24, 26, 27

*Int'l Controls Corp. v. Vesco*,
    556 F.2d 665 (2d Cir. 1977) ...........................................................................................18

*In re Altmeyer*,
    268 B.R. 349 (Bankr. W.D.N.Y. 2001) .........................................................................22

*In re Bayou Grp., LLC*,
    439 B.R. 284 (S.D.N.Y. 2010) ......................................................................................10

*In re CNB Int'l, Inc.*,
    393 B.R. 306 (Bankr. W.D.N.Y. 2008) .....................................................................21, 22

*In re Consol. Capital Equities Corp.*,
    175 B.R. 629 (Bankr. N.D. Tex. 1994) ..........................................................................22

*In re Crown Unlimited Mach., Inc. (Bower v. Crown Stock Distrib., Inc.)*,
    2006 WL 6401548 (Bankr. N.D. Ind. Oct. 13, 2006) ...................................................24

*In re Deutsche Bank Aktiengesellschaft Secs. Litig.*,
    2017 WL 4049253 (S.D.N.Y. June 28, 2017) ...............................................................15

*In re Direct Access Partners, LLC*,
    2017 WL 6333926 (Bankr. S.D.N.Y. Dec. 11, 2017) ....................................................10

*In re Enron Corp.*,
    2005 WL 3832059 (Bankr. S.D.N.Y. Nov. 28, 2005) ....................................................23

*In re Greektown Holdings, LLC*,
    765 F. App'x 132 (6th Cir. 2019) ..................................................................................25

*In re J.P. Jeanneret Assoc., Inc.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011)...............................................................3, 4

*In re SemCrude, L.P*,
    2013 WL 2490179 (Bankr. D. Del. June 10, 2013)...............................................24

*In re Southmark Corp.*,
    217 B.R. 499 (Bankr. N.D. Tex. 1997)...............................................................21

*Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,
    740 F.3d 81 (2d Cir. 2014).............................................................................26

*Mathews v. Kidder, Peabody & Co., Inc.*,
    260 F.3d 239 (3d Cir. 2001)...........................................................................18

*Meoli v. The Huntington Nat'l Bank*,
    848 F.3d 716 (6th Cir. 2017) .........................................................................23

*Meridian Horizon Fund, LP v. KPMG (Cayman)*,
    487 F. App'x 636 (2d Cir. 2012) .....................................................................14

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
    138 S. Ct. 883 (2018)...................................................................................25

*MLSMK Invs. Co. v. JP Morgan Chase & Co*,
    737 F. Supp. 2d 137 (S.D.N.Y. 2010)..................................................................5

*Neitzke v. Williams*,
    490 U.S. 319 (1989).......................................................................................5

*Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*,
    51 F. Supp. 2d 457 (S.D.N.Y. 1999)..................................................................16

*Palm Beach Strategic Income, LP v. Salzman*,
    2011 WL 1655575 (E.D.N.Y. May 2, 2011) .........................................................18

*Picard v. ABN AMRO Bank (Ir.) Ltd.*,
    No. 10-05355 (Bankr. S.D.N.Y. Feb. 22, 2019) ............................................. 11-12

*Picard v. ABN AMRO Bank N.V.*,
    No. 11-02760 (Bankr. S.D.N.Y. June 27, 2015)....................................................12

*Picard v. BNP Paribas*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018)........................................................ *passim*

*Picard v. Citibank, N.A.*,
    No. 10-05345 (Bankr. S.D.N.Y. Jul. 18, 2019) ....................................................16

*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011)....................................................................... *passim*

*Picard v. Katz*,
  No. 10-05287 (Bankr. S.D.N.Y. Mar. 18, 2011) ....................................................21

*Picard v. Katz*,
  No. 11 Civ. 3605 (S.D.N.Y. Mar. 5, 2012)............................................................20

*Picard v. Kingate*,
  2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ...........................................17

*Picard v. Legacy Capital*,
  548 B.R. 13 (Bankr. S.D.N.Y. 2016) ...............................................................14, 22

*Picard v. Mendelow (In re Bernard L. Madoff Inv. Sec. LLC)*,
  560 B.R. 208 (Bankr. S.D.N.Y. 2016)................................................................4, 5

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014)........................................................8, 17, 18

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
  563 B.R. 737 (Bankr. S.D.N.Y. 2014)..................................................................18

*Saltz v. First Frontier, LP*,
  782 F. Supp. 2d 61, 69 (S.D.N.Y. 2010)..............................................................17

*Schmidt v. HSC, Inc.*,
  358 P.3d 727 (Haw. Ct. App. 2015) .....................................................................24

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  516 B.R. 18 (S.D.N.Y. 2014)................................................................................26

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)......................................................7, 8

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  454 B.R. 285 (Bankr. S.D.N.Y. 2014)..................................................................25

*SEC v. Cohmad Sec. Corp.*,
  2010 WL 363844 (S.D.N.Y. Feb. 2, 2010)...........................................................16

*Shauer v. Alterton*,
  151 U.S. 607 (1894)..............................................................................................27

*Streit v. Bushnell*,
  424 F. Supp. 2d 633 (S.D.N.Y. 2006).............................................................18, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)....................................................................................5, 6

*United States v. Bailey*,
   955 F.2d 28 (8th Cir. 1992) ......................................................................9

*United States v. Bonventre*,
   No. 10-cr-00228 (S.D.N.Y. Mar. 17, 2014) ..............................................9

*United States v. Chu*,
   183 F. App'x 94 (2d Cir. 2006) ...............................................................9

*United States v. Joly*,
   493 F.2d 672 (2d Cir. 1974).....................................................................9

*United States v. Nektalov*,
   461 F.3d 309 (2d Cir. 2006)..................................................................8, 9

*United States v. Ramos-Atondo*,
   732 F.3d 1113 (9th Cir. 2013) .................................................................9

*United States v. Rocky Mountain Holdings, Inc*,
   782 F. Supp. 2d 106 (E.D. Pa. 2011) .....................................................24

*United States v. Space Hunters, Inc.*,
   429 F.3d 416 (2d Cir. 2005).............................................................23, 24

*Wacker v. JP Morgan Chase & Co.*,
   678 Fed. App'x 27 (2d Cir. 2017)..........................................................11

**Statutes**

11 U.S.C. § 546(e) ................................................................. *passim*

11 U.S.C. § 548(a)(1)(A) ....................................................................8, 26

11 U.S.C. § 548(c) ..............................................................................7, 8

11 U.S.C. § 550(b) ................................................................. *passim*

**Rules**

Fed. R. Civ. Pro. 12(b)(6) ....................................................................5, 18

## PRELIMINARY STATEMENT

The PSAC[1] alleges that Defendant identified and appreciated several facts indicating a high probability of fraud at BLMIS, consciously avoided confirming that BLMIS was a fraud, and obtained fraud protection to preserve its investment in the Rye Funds should that fraud be revealed. Defendant's opposition does not disprove the plausibility of the Trustee's claims but rather sets forth its own version of events, in many instances inappropriately supported by documents and proposed pleadings that are outside of the four corners of the PSAC. In *Anderson News, LLC v. Am. Media, Inc.*, the Second Circuit held that, at the pleading stage, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court." 680 F.3d 162, 185 (2d Cir. 2012). Yet, that is precisely the choice Defendant is asking the Court to make.

Defendant's alternative theory is the now routine rebuttal that a financial institution would never engage in risky behavior. This salvific view of financial institutions ignores the fact that banks and their employees often put their short-term financial interests ahead of their long-term financial interests. While it is ludicrous to suggest that a financial institution would never prioritize short term gain, such an analysis is irrelevant at this procedural juncture where there should be no balancing of competing narratives of plausibility. The Court need only determine that the facts alleged in the PSAC are colorable.

Nevertheless, the plausibility in the Trustee's theory of the case rests in Defendant's fraud protection – the highly-irregular BLMIS Fraud Provision that Defendant believed would enable it to redeem its entire investment in the Rye Funds if BLMIS were investigated and

---

[1] All terms not defined herein have the definitions stated in the Trustee's moving Memorandum of Law and the Proposed Second Amended Complaint.

1

revealed to be a fraud. Defendant does not, and cannot, refute that it required the BLMIS Fraud

Provision before continuing its leverage transactions with Tremont. Instead, ignoring all

contemporaneous statements and conduct by Defendant's employees, Defendant spends much of

its opposition suggesting that the BLMIS Fraud Provision was unremarkable because it did not

ultimately protect Defendant from fraud. Yet, the facts alleged in the PSAC show that as

Defendant's suspicions of BLMIS's fraud grew, so did the necessity of the BLMIS Fraud

Provision. By the time of the 2007 Leverage Transaction, the BLMIS Fraud Provision was

demanded not only for that transaction but also as an amendment to the 2006 Leverage

Transaction. Revealingly, Defendant did not consummate the BLMIS-related deal it was

negotiating with Fairfield after Fairfield refused to include a BLMIS Fraud Provision.

Defendant's contemporaneous communications and actions concerning the BLMIS Fraud

Provision only further support the Trustee's colorable allegations of its importance and

significance to Defendant.

Relying on its claim that no one knowingly transacts with a business running a Ponzi

scheme and alternate interpretation of the BLMIS Fraud Provision, Defendant never fully

addresses the other allegations of the PSAC. Instead, Defendant suggests that problematic facts

showing Defendant's serious suspicion about BLMIS's fraud is "red flag, hindsight pleading"

that should be summarily discounted. But the PSAC alleges in detail that Defendant learned of

and expressed concern about BLMIS's lack of independent oversight, its purported OTC options

trades, and other specific facts suggesting it was engaged in fraud and responded by deliberately

turning away after seemingly protecting itself. These are not generic red flags. Moreover, in

generalizing all of its suspicions of fraud, Defendant paints a contradictory picture of itself as a

sophisticated financial institution with an "extensive" diligence practice on the one hand but, on

the other hand, an entity consistently "thwarted" by Tremont and incapable of properly analyzing any of the financial information it received. Both cannot be true.

Finally, Defendant seeks to shelter its fraudulent transfers by setting forth the wrong standard for willful blindness, i.e., suspicions that Madoff was operating a Ponzi scheme. This standard comes from an incorrect interpretation of the District Court's decision concerning the "actual knowledge" exception to the safe harbor provision of § 546(e) of the Bankruptcy Code (the "Code"). While the PSAC sufficiently alleges that Defendant maintained a strong suspicion that Madoff was not trading securities, the PSAC also sufficiently alleges facts to meet the proper standard – that Defendant subjectively believed there was a high probability of ***some fraud*** at BLMIS.

The PSAC more than plausibly alleges that Defendant willfully blinded itself to fraud at BLMIS. Accordingly, the Court should adhere to the precedent that permits plaintiffs to litigate their claims on the merits and grant the Trustee's motion for leave to amend.

## ARGUMENT

## I.    THE PSAC ADEQUATELY ALLEGES DEFENDANT'S WILLFUL BLINDNESS

To allege willful blindness, the Trustee must plead that Defendant: (1) subjectively believed that there was a high probability that a fact exists and (2) took deliberate actions to avoid learning of that fact. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). The Trustee merely must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In determining facial plausibility, the Court must "liberally construe all claims, accept all factual allegations in

3

the complaint as true, and draw all reasonable inferences" in the Trustee's favor.  *In re J.P.*

*Jeanneret Assoc., Inc.*, 769 F. Supp. 2d 340, 353 (S.D.N.Y. 2011).

Defendant contends that the PSAC's allegations are implausible and fail to plead

Defendant's willful blindness (notably, Defendant does not challenge the voidability of the initial

transfers to the Tremont Initial Transfer Funds).  Defendant's contentions are without merit.  At

most, Defendant's arguments concerning its motivations for executing the Leverage Transactions

and willful blindness – what Defendant knew, when it knew it, and what it did with the

information it learned – raise issues of fact that are not properly considered at the pleading stage.

*See Fish v. GreatBanc Tr. Co.*, 749 F.3d 671 (7th Cir. 2014) (line between willful blindness and

"reason to know" can rarely be drawn as a matter of law).

A.       **The Trustee's Theory – That Defendant Willfully Blinded Itself to a Fraud it Suspected at BLMIS – is Plausible**

Citing *Picard v. BNP Paribas*, 594 B.R. 167 (Bankr. S.D.N.Y. 2018), Defendant argues

that allegations that it would put its own funds at risk in the Leverage Transactions while

subjectively believing that there was a high probability that BLMIS was not trading securities, in

exchange for modest fees, are implausible.  Def. Br. at 15.[2]  Defendant claims that it is more

plausible that it was engaging in some unspecified lawful behavior consistent with the economic

realities of the Leverage Transactions.  *Id*. at 16.

However, plausibility is not a "probability requirement at the pleading stage; it simply

calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the

conduct pled.  *Twombly*, 550 U.S. at 556; *see also Picard v. Mendelow (In re Bernard L. Madoff*

---

[2] Defendant also relies on a Supplemental Memorandum of Law in Support of Motion to Dismiss on Behalf of Leverage Providers, which it attached to its counsel's declaration in support of its opposition as Exhibit D.  Feldberg Decl. Ex. D.  Of course, the Court should not consider counsel's prior legal memorandum in determining the sufficiency of the PSAC.

*Inv. Sec. LLC)*, 560 B.R. 208, 225 (Bankr. S.D.N.Y. 2016) (plausibility merely requires showing

"a sheer possibility that a defendant has acted unlawfully."). The *Twombly* Court noted that "a

well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts

alleged is improbable, and that a recovery is very remote and unlikely." 550 U.S. at 556; *see*

*also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . .

dismissals based on a judge's disbelief of a complaint's factual allegations"). Where, as here, the

PSAC sets forth plausible allegations that are "cogent and at least as compelling" as any

opposing inference of non-fraudulent intent suggested by Defendant, the complaint should not be

dismissed. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

 The PSAC plausibly alleges that Defendant discovered facts causing it to strongly suspect

that BLMIS was engaged in a fraud, including that it was not trading securities. Because of

these well-founded fraud suspicions, Defendant demanded and obtained its own share class in

the Rye Funds and the BLMIS Fraud Provision. Defendant's concerns of fraud at BLMIS could

not be clearer – it explained to Tremont that its risk department was not comfortable entering

into the Leverage Transactions without this fraud protection and, in fact, rejected another BLMIS

investment where it was not provided fraud protection. PSAC at ¶¶ 122, 157.

 The BLMIS Fraud Provision distinguishes the PSAC's allegations from those set forth in

*BNP* and the two other cases cited by Defendant, *MLSMK Invs. Co. v. JP Morgan Chase & Co.*

and *Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund*. Defendant's reliance on *MLSMK* is

further misplaced as the portion cited by Defendant concerns whether the complaint adequately

alleged a motive to commit fraud, which is a specific element of intent necessary to state a fraud-

based civil RICO claim, and did not address whether the plaintiff sufficiently alleged conscious

misbehavior or recklessness. 737 F. Supp. 2d 137, 142–44 (S.D.N.Y. 2010). *Elendow* did not

address Defendant's "economic realities" argument at all.  No. 10 Civ. 9061, 2013 WL 5179064,

at *6 (S.D.N.Y. Sept. 16, 2013).

Instead, the PSAC's allegations squarely accord with *Picard v. Katz*, 462 B.R. 447, 454-

55 (S.D.N.Y. 2011), *abrogated on other grounds, SIPC v. BLMIS (In re Bernard L. Madoff Inv.*

*Sec. LLC)*, 513 B.R. 437 (S.D.N.Y. 2014).  In *Katz*, the District Court accepted as plausible the

Trustee's theory that defendants willfully blinded themselves to the fact that they had invested in

a fraudulent enterprise because they "seriously considered purchasing fraud insurance with

respect to their investments . . . ."  *Id*. at 455.  The ***same motivation*** accepted as plausible by the

District Court in *Katz* – that defendants "felt they could realize substantial short-term profits

while protecting themselves against the long-term risk" – is advanced in the PSAC.  *Id*. at 454.

**B.     The PSAC Pleads Specific Facts Demonstrating Defendant Subjectively
         Believed There Was a High Probability of Fraud at BLMIS**

Defendant parses the PSAC and claims that each indicator of fraud alleged, individually,

fails to show that it subjectively believed there was a high probability of fraud at BLMIS.

However, the Court must consider whether the facts alleged, collectively, allow for the inference

that Defendant did not receive the transfers in good faith.  *Tellabs*, 551 U.S. at 322–23.

Together, the PSAC's allegations sufficiently plead the first prong of willful blindness.  For

example:

- Defendant's employees acknowledged that BLMIS's lack of independent oversight – that it was acting simultaneously as the investment adviser, custodian, and prime broker – was a "big problem" in obtaining approval for the 2006 Leverage Transaction (PSAC at ¶¶ 98–101);

- As early as July 2006, Defendant's employees developed and expressed serious concerns about BLMIS's purported OTC options trades (*Id*. at ¶¶ 95–97);

- Defendant's employees were aware of and expressed serious concerns about BLMIS's lack of transparency, which were reinforced by the advice of Albourne Partners Ltd. ("Albourne"), a well-respected due diligence firm, to redeem all

investment with BLMIS "due to lack of transparency" (*Id*. at ¶¶ 132–40, 163–67); and

- Defendant realized that BLMIS's consistently positive purported returns were impossible and did not correlate to the movements of the S&P 100 Index, as Defendant understood they should if BLMIS had been implementing its purported trading strategy (*Id*. at ¶¶ 102–111).

Defendant memorialized its strong suspicion that BLMIS was engaged in fraud by demanding its own share class in the Rye Funds that included the BLMIS Fraud Provision, which was designed specifically "to cover fraud" at BLMIS. *Id*. at ¶¶ 117–122, 146, 149, 157–60.

1. *Defendant's Arguments That the PSAC Does Not Sufficiently Allege Willful Blindness are Based on the Wrong Pleading Standard*

Defendant argues that, under *BNP*, the Trustee must allege a defendant's suspicion of a high probability that BLMIS was a Ponzi scheme, or was not trading securities. Def. Br. at 15, 36. However, the *BNP* decision is based on the District Court's analysis of the Trustee's pleading burden to avoid application of the § 546(e) safe harbor in *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115(JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013). This pleading burden has no relevance to the Trustee's pleading of bad faith under §§ 548(c) and 550(b).

For the § 546(e) safe harbor to apply, the customer must believe that there was actual trading. *Katz*, 462 B.R. at 452. If § 546(e) is not to apply, the Trustee must prove that the customer actually knew there was no trading. *Sec. Inv'r Prot. Corp.*, 2013 WL 1609154, at *10. That is because investors who did not believe they were signing real securities contracts could have no reasonable expectation that the payments they received were protected by the safe harbor. Indeed, the District Court stated specifically that it was not determining the meaning of the "good faith" statutory language in §§ 548(c) and 550(b) because, as the term does not appear in § 546(e), neither good faith nor the lack of it is relevant. *Id*. at *4 n. 1. The District Court

noted that willful blindness is a "lower standard" and would not suffice to avoid application of §
546(e). *Id*. at *4 n. 2.

Thus, under the District Court decision on which *BNP* relies, it would be anomalous if
the "lower standard" of willful blindness applicable to §§ 548(c) and 550(b) ***also*** included as a
pleading requirement a defendant's subjective belief that BLMIS was not trading securities.  If
the Trustee cannot allege actual knowledge of a Ponzi scheme to avoid the § 546(e) safe harbor,
the analysis turns to whether the Trustee can state claims under §§ 548(a)(1)(A) and 550(b),
which, of course, cannot include knowledge of no actual trading under the standard of willful
blindness because it has already been proven that the customer had no actual knowledge of
actual trading.  This was the precise posture in *Katz*, where the District Court determined that the
Trustee did not meet the heightened pleading standard to avoid the § 546(e) safe harbor, but
allowed his claims for two-year fraudulent transfers to proceed because he sufficiently alleged
that the "defendants willfully blinded themselves to the fact that Madoff Securities was involved
in ***some kind of fraud***  . . . ."  462 B.R. at 454 (emphasis added).

That the Trustee need only allege subjective belief of a high probability of some fraud for
willful blindness also is consistent with the weight of authority in this Circuit, including
conscious avoidance criminal cases where a defendant's liberty is at stake.  This Court has stated
that willful blindness is equivalent to the criminal law doctrine of "conscious avoidance."
*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)* ("*Merkin II*"), 515 B.R. 117, 139 n. 15
(Bankr. S.D.N.Y. 2014).  In these cases, courts have upheld the convictions of defendants under
the conscious avoidance standard who were mistaken about the precise nature of their criminal
conduct.  In *United States v. Nektalov*, the Second Circuit held that "the culpability of the
willfully blind defendant lies in his averting his eyes to what he thinks he sees, not in the

objective accuracy of his vision."  461 F.3d 309, 315 (2d Cir. 2006).  The *Nektalov* court used

the example of a "sting operation" (where no actual criminal conspiracy exists) to illustrate why

the willful blindness doctrine still applies to a defendant whose suspicions about misconduct may

be mistaken.  All that is required for willful blindness is a defendant be aware of facts

"suggestive of illegal behavior" and deliberately fail to confirm those facts.  *Id*. at 316.

Similarly, in *United States v. Joly*, the Second Circuit upheld a conscious avoidance

conviction in a drug courier case based on the defendant's belief only that he "was doing

something wrong," not that he was transporting drugs.  493 F.2d 672, 674 (2d Cir. 1974).[3]

Defendants who participated in Ponzi schemes, albeit claiming "to lack knowledge of the true

nature" of the schemes, have been convicted based on willful blindness where they were

"alerted" to "the high probability that [their] actions were criminal" in nature.  *See, e.g., United*

*States v. Chu*, 183 F. App'x 94, 98 (2d Cir. 2006) (affirming defendant's conviction and willful

blindness jury instruction where he "claimed to lack knowledge of the true nature" of the

fraudulent scheme in which he participated).  Notably, the jury instructions issued in the BLMIS

employee criminal trial regarding conscious avoidance did not require a finding that the

defendants suspected a high probability of a Ponzi scheme.  *See* Court Exhibit #9 (Jury

Instructions) at 110–11, *United States v. Bonventre*, No. 10-cr-00228 (S.D.N.Y. Mar. 17, 2014),

ECF No. 773.  Likewise, in a civil securities case involving the BLMIS Ponzi scheme, a district

court held scienter was adequately pled on allegations that fund manager defendants "turn[ed] a

blind eye to obvious signs of fraud" without a showing that they suspected Madoff was running a

---

[3] *See also United States v. Ramos-Atondo*, 732 F.3d 1113, 1119 (9th Cir. 2013) (affirming drug conviction on willful blindness instruction where defendants who smuggled marijuana thought they could be smuggling illegal aliens); *United States v. Bailey*, 955 F.2d 28, 29 (8th Cir. 1992) (affirming conscious avoidance conviction for possession and intent to distribute cocaine on evidence indicating that defendant thought the package in question looked suspicious and, in all likelihood, illegal).

Ponzi scheme, *per se*. *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 410 (S.D.N.Y. 2010).

The other cases Defendant cites in its opposition do not require a different result. In *In re Direct Access Partners, LLC*, the court did not opine on the correct standard for willful blindness. No. 15-11259, 2017 WL 6333926, at *1–2 (Bankr. S.D.N.Y. Dec. 11, 2017). The court decided that the defendant's prior guilty plea did not collaterally estop him from asserting "good faith" and "value" defenses to the fraudulent transfer claims against him because his conviction did not resolve all of the issues relevant to those defenses. *Id*. In *In re Bayou Grp., LLC*, the District Court found that the Bankruptcy Court committed legal error in applying a "some infirmity" standard as sufficient to trigger inquiry notice because "[t]hat phrase could include a poor business model, incompetent management, inadequate accounting controls, lack of research capabilities, poor marketing, insufficient capital, and a host of other deficiencies." 439 B.R. 284, 311, 314–15 (S.D.N.Y. 2010). The "some infirmity" standard is not relevant here; nor is the inquiry notice standard relevant at this time.

2.    *Defendant's Attempts to Minimize the BLMIS Fraud Provision are Contradicted by the Well-Pleaded Allegations of the PSAC*

Recognizing that the BLMIS Fraud Provision itself indicates that Defendant subjectively believed there was a high probability of fraud at BLMIS, Defendant trivializes its importance and attempts to rebrand it as a standard provision of a commercial contract. Defendant's alternate interpretation of the BLMIS Fraud Provision is contradicted by the well-pleaded allegations of the PSAC.

First, Defendant argues that the BLMIS Fraud Provision did not provide it with the ability to redeem all of its investment in the Rye Funds. Def. Br. at 32. Defendant's contention completely disregards that its employees believed at the time that the BLMIS Fraud Provision

10

would enable Defendant to exit its entire position in the Rye Funds if the fraud it suspected at

BLMIS was discovered.  The PSAC alleges that Defendant was comforted by Tremont's

reasoning that the fraud protection Defendant negotiated would allow it to redeem half of its

investment on five days' notice, and before other investors, and the remaining balance "via the

normal redemption process *well in advance of a guilty verdict*."  PSAC at ¶ 149 (emphasis

added).  In any event, the Court must accept the allegations of the PSAC as true, and it is

inappropriate for the Court to engage in fact finding at the pleading stage to resolve Defendant's

current, competing interpretation of its fraud protection.  *See Twombly*, 550 U.S. at 555; *Wacker

v. JP Morgan Chase & Co.*, 678 Fed. App'x 27, 30 (2d Cir. 2017).

Second, Defendant argues that it did not have priority over all other investors, as the

PSAC alleges.  Def. Br. at 32.  Defendant again contradicts a well-pleaded factual allegation of

the PSAC, which the Court must accept as true at this stage.  Moreover, Defendant supports this

argument by inappropriately citing to the Trustee's proposed second amended complaint *in a

separate action* against ABN AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions

Bank (Ireland) Limited) (the "Fortis PSAC") that alleges that Fortis received the same early

redemption rights as Defendant through a most favored nation clause.[4]  The allegations of the

Fortis PSAC are well outside the four corners of the PSAC and should not be considered.  *See

Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (finding

that district court committed reversible error by considering matters outside plaintiff's complaint

from an unrelated proceeding on a motion to dismiss).

---

[4] Proposed Second Am. Compl., *Picard v. ABN AMRO Bank (Ir.) Ltd.*, No. 10-05355 (Bankr. S.D.N.Y. Feb. 22, 2019), ECF No. 166-1.

11

In any event, the Fortis PSAC actually alleges that Defendant maintained enhanced liquidity rights "ahead of all other investors – notably in the specific instance that BLMIS became the subject of an investigation, which would clearly cover the events that transpired around Madoff's Ponzi scheme." Fortis PSAC at ¶ 212. The exceptional liquidity provided by Defendant's special share class and the BLMIS Fraud Protection triggered a most favored nation's clause that Fortis negotiated in connection with its deal involving one of the Rye Funds. *Id*. at ¶ 211. As a result, in January 2008, *after* Defendant secured the BLMIS Fraud Protection, Fortis obtained the same provision. *Id*. at ¶ 213. The Fortis PSAC does not in any way contradict the PSAC's allegations that, at the time it obtained the BLMIS Fraud Provision, Defendant believed that it had priority over all other investors in the Rye Funds.

Third, Defendant claims that the PSAC's allegations that it refused to execute other BLMIS-related deals without fraud protection are contradicted by the Trustee's proffered allegations in another adversary proceeding that Defendant subscribed in Harley International (Cayman) Limited ("Harley") without fraud protection.[5] Def. Br. at 32–33. Even if the Court considers these proffered allegations, which it should not, the Trustee did not allege that Defendant subscribed in Harley without fraud protection. Rather, the Trustee alleged that Defendant obtained the BLMIS Fraud Provision in connection with the Leverage Transactions, without any reference to whether Defendant obtained the same protection from Harley. Harley Prof. All. at ¶ 18. Notably, according to the Harley Option, which is attached to Defendant's counsel's Declaration as Exhibit C and the Trustee just now obtains, Defendant could terminate that transaction in the event of any material government "action, suit, proceeding, inquiry or investigation" against BLMIS or Madoff. Def. Br. at 31 n. 24 (citing Feldberg Decl. Ex. C,

---

[5] Prof. All., *Picard v. ABN AMRO Bank N.V.*, No. 11-02760 (Bankr. S.D.N.Y. June 27, 2015), ECF No. 58.

Reference Fund Events (iii)). Not only does this support the PSAC's allegations that Defendant

required fraud protection for all of its BLMIS-related deals, but it also reinforces that the Trustee

should be permitted to proceed to discovery and litigate his claims on the merits.

Finally, Defendant further attempts to recharacterize the BLMIS Fraud Provision by

claiming that it was in line with the other types of enhanced liquidity provisions associated with

Defendant's special share class in the Rye Funds, such as a change in the manager of the funds

or investment strategy.[6]  Def. Br. at 33.  However, Defendant did not believe this at the time

because it continued to demand the BLMIS Fraud Provision to cover the fraud it suspected at

BLMIS despite these other special redemption provisions.  PSAC at ¶ 146.

> 3.    *The Trustee's Allegations of Willful Blindness are Further Supported by Defendant's Knowledge of Several Indicators of Fraud at BLMIS*

The PSAC's allegations concerning the BLMIS Fraud Provision alone satisfy the first

prong of willful blindness.  They become irrefutable when considered with the specific factual

allegations of Defendant's knowledge and suspicions of fraud at BLMIS that led to Defendant's

demand for its fraud protection.  Deriding these well-pleaded allegations of the PSAC as

"cookie-cutter" red flags, Defendant tries to minimize the holistic story set forth in the PSAC, as

well as some of the most damning allegations against it.  The red flags alleged in the PSAC are

not generic, but rather contemporaneously known by and concerning to Defendant.

First, Defendant argues that BLMIS's lack of independent oversight was "commonly

known" and rejected by this Court in *BNP* as insufficient to show willful blindness.  Def. Br. at

18.  However, Defendant ignores the PSAC's allegations that it expressed that BLMIS's lack of

---

[6] Incredibly, Defendant contends that it is surprising that the Trustee alleges that Defendant knew BLMIS was not implementing the SSC Strategy when Defendant negotiated accelerated liquidity should BLMIS stop trading pursuant to the SSC Strategy.  Def. Br. at 22.  Defendant demanded exceptional liquidity to protect itself from the fraud it suspected at BLMIS, including the fraud of Madoff not executing the trades he claimed to be executing.

independent oversight was a "big problem."  PSAC at ¶¶ 97–98.  It is this real time appreciation

of and concern about a strong indicator of fraud at BLMIS that distinguishes the PSAC's factual

allegations from those at issue in *BNP* and in the other cases cited by Defendant, *Elendow*,

*Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599 (S.D.N.Y. 2010), and *Meridian Horizon*

*Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636 (2d Cir. 2012).

Second, Defendant downplays the PSAC's allegations regarding the contemporaneous

concerns it expressed about BLMIS's purported OTC options trades.  Def. Br. at 21–23.  From at

least July 2006, Defendant raised concerns regarding BLMIS's purported OTC options trades

and, on July 18, 2006, demanded an immediate call with Tremont to discuss "option

counterparty issues."  PSAC at ¶ 96.  But Tremont could not provide Defendant with any

information that would allow it to verify whether any trades even existed, much less information

on the supposed counterparties.  *Id*. at ¶¶ 96–97.  Shortly after entering into the 2006 Leverage

Transaction, Defendant still could not verify BLMIS's purported OTC options trades and

emailed Tremont for help to identify them in a BLMIS trade activity report Defendant had

received.  Tremont told Defendant to refer to the CUSIP codes from a BLMIS account statement,

which was baffling because CUSIP codes are not used for OTC options transactions.  *Id*. at

¶ 130.  This confirmed for Defendant that BLMIS could not be executing options trades OTC at

all.  *See Picard v. Legacy Capital* ("*Legacy*"), 548 B.R. 13, 35 (Bankr. S.D.N.Y. 2016) ("[T]he

Amended Complaint . . . alleges the first prong of willful blindness Legacy strongly suspected

that, at a minimum, BLMIS' option trades were not real . . . .").

Defendant's argument that it is equally if not more plausible that it thought BLMIS was

trading both listed and OTC options (Def. Br. at 23) is just another example of Defendant asking

the Court to inappropriately weigh evidence and resolve fact issues at the pleading stage.  *See*

*Anwar*, 728 F. Supp. 2d at 403 (courts are tasked with "assess[ing] the legal feasibility of the complaint, not [with] assay[ing] the weight of the evidence which might be offered in support thereof.") (citation omitted). Defendant's argument that because it asked questions about BLMIS's purported options counterparties, it means it thought BLMIS was trading securities also is unavailing. Def. Br. at 22. Unlike in *Elendow*, Defendant did not "continue discussing ways of gaining greater transparency into Madoff's operations." 2013 WL 5179064, at *5. It simply stopped asking after Tremont could not resolve its concerns.

Third, Defendant argues that the PSAC's allegations regarding its concerns about BLMIS's lack of transparency did not involve the Leverage Transactions and, in any event, Madoff's secrecy was a boilerplate red flag that also had a neutral explanation. Def. Br. at 19–20. While Defendant's concerns about its inability to conduct diligence on Madoff were in connection with a separate potential Madoff-related deal, they were expressed by the same employee, David Schwartz, who led Defendant's negotiations with Tremont, shortly before Defendant renewed its demand for the BLMIS Fraud Provision in connection with the 2007 Leverage Transaction. Schwartz's state of mind is relevant to the Trustee's allegations that Defendant willfully blinded itself to fraud at BLMIS.[7]

Nor were Defendant's concerns about Madoff's lack of transparency a boilerplate red flag. Schwartz stated that an independent review of Madoff was "a critical issue for us." PSAC at ¶ 133. When Schwartz was denied a due diligence meeting with Madoff, he responded,

---

[7] Contrary to Defendant's assertions (Def. Br. at 35), the PSAC includes numerous allegations that Defendant's employees possessed the necessary knowledge and engaged in the requisite conduct to find that Defendant was willfully blind. *E.g.*, PSAC at ¶¶ 86-88, 96-98, 106, 127-128, 132-133, 142-146, 148-155. Defendant's cases are easily distinguishable. *See Gagnon v. Alkermes PLC*, 368 F.Supp.3d 750, 775 (S.D.N.Y. 2019) (plaintiff had not identified any individual whose scienter may be imputed to the defendant corporation); *In re Deutsche Bank Aktiengesellschaft Secs. Litig.*, No. 16 Civ. 3495 (AT) (BCM), 2017 WL 4049253, at *8 (S.D.N.Y. June 28, 2017) (confidential source allegations must show that the individual defendants actually possessed the requisite knowledge).

"Richard – how do we invest in this fund if we do not have a direct relationship and the ability to perform due diligence on Madoff?" *Id*. at ¶ 135. Schwartz contemporaneously recognized the serious issue with entering into BLMIS-related transactions without the ability to conduct direct diligence on the firm or Madoff. Yet, Defendant continued with the Leverage Transactions anyway, even agreeing to a highly unusual Gag Provision that would actually prevent it from contacting BLMIS or Madoff regarding the Leverage Transactions and after being advised by Albourne to not invest in Madoff-related products because of his "lack of transparency." *Id.* at ¶¶ 139, 161–67. Defendant's claim that the Gag Provision was not highly unusual because two other Madoff leverage providers agreed to it (Def. Br. at 20) at most shows that the Gag Provision was usual for Madoff deals. Defendant's argument that the PSAC does not adequately impute the knowledge of the Albourne warning to Defendant's employees involved in the Leverage Transactions ignores the PSAC's allegations that they did know (PSAC at ¶¶ 161–67) and, at most, raises a fact issue that should not be addressed at the pleading stage. *See* Transcript of Oral Argument at 37–38, *Picard v. Citibank, N.A.*, No. 10-05345 (Bankr. S.D.N.Y. Jul. 18, 2019), ECF No. 169; *see also*, *e.g.*, *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 51 F. Supp. 2d 457, 471 (S.D.N.Y. 1999) ("New York courts have recognized that the question of the existence and scope of an agency relationship is a factual issue that a court cannot properly adjudicate on a motion to dismiss.").

Moreover, Defendant's theory that Madoff's secrecy had a neutral explanation is not relevant to the Court's determination of the sufficiency of the PSAC. Defendant's cases on this point are inapposite. In *SEC v. Cohmad Sec. Corp.*, the District Court reasoned that the SEC's complaint itself offered what defendants may reasonably perceive was a neutral explanation for Madoff's secrecy. No. 09 Civ. 5680, 2010 WL 363844, at *4 (S.D.N.Y. Feb. 2, 2010). The

PSAC offers no such explanation.  *Saltz v. First Frontier, LP*, is wholly inapplicable because it deals with the secrecy of Madoff's purported trading strategy, not his unwillingness to be subjected to due diligence and Defendant's contemporaneous recognition of the problems that caused.  782 F. Supp. 2d 61, 69 (S.D.N.Y. 2010).

Finally, Defendant argues that the PSAC's allegations concerning BLMIS's improbable returns amounts to a "should have known" allegation.  Def. Br. at 21.  However, "[t]he totality of the allegations" in the PSAC "paint a picture of sophisticated financial professionals who knew that Madoff was reporting fictitious transactions," including that Defendant reviewed performance reports for one of the Rye Funds that showed Madoff's impossibly consistent, positive returns did not correlate to the performance of the S&P 100 Index (which, of course, is a fraud in and of itself, since Madoff was saying one thing and doing another).  PSAC at ¶¶ 102–111; *see Picard v. Kingate*, No. 08 Civ. 99000, 2015 WL 4734749, at *15 (Bankr. S.D.N.Y. Aug. 11, 2015).  These allegations, along with those that adequately plead Defendant's contemporaneous consideration and disregard of other indicators of fraud, including its concerns with BLMIS's purported options trades, demonstrate that Defendant knew that Madoff was not purchasing and selling the securities he purported to be in connection with the SSC Strategy.  This Court has previously found that such allegations satisfy the first prong of willful blindness.  *See Merkin II*, 515 B.R. at 141 (finding willful blindness where defendant "saw and appreciated" quantitative facts).

### C.    Defendant Deliberately Avoided Learning the Truth of Its Suspicions

The PSAC further alleges Defendant took deliberate actions to avoid confirming the fraud it suspected at BLMIS.  PSAC at ¶¶ 126–169.  Defendant argues that it engaged in extensive due diligence.  Def. Br. at 30.

17

Defendant did ask questions, but after receiving no answers or answers that did not make sense from Tremont and a flat-out denial of its request to meet with Madoff, Defendant not only abandoned asking further questions, it went so far as to agree to never contact Madoff to receive any answers.  PSAC at ¶ 139.  Due diligence is not "extensive" where Defendant saw and appreciated facts indicating fraud in real time, asked initial questions, and failed to get answers or ask the key follow up questions in the face of blatant anomalies.  *See Mathews v. Kidder, Peabody & Co., Inc*., 260 F.3d 239, 255 (3d Cir. 2001) (despite obvious storm warnings, investors' acceptance of vague assurances of financial turnaround with no follow-up "evidences a lack of due diligence"); *see also Merkin II*, 515 B.R. at 141; *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 563 B.R. 737, 749 (Bankr. S.D.N.Y. 2014).[8]  Defendant's abandoned diligence amounts to turning away from the likelihood of fraud at BLMIS.

Rather than rebut these specific, factual allegations, Defendant argues that the PSAC's allegations stand in contrast to the Trustee's allegations in his prior pleadings against Defendant. Def. Br. at 35.  However, filing an amended complaint renders the original complaint a nullity, *see Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977), and, typically, even "a prior inconsistent pleading should not trump the Court's obligation under Rule 12(b)(6) to accept a complaint's allegations as true."  *Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-261 (JS) (AKT), 2011 WL 1655575, at *6 (E.D.N.Y. May 2, 2011); *see also Streit v. Bushnell*, 424 F. Supp. 2d 633, 643 n. 4 (S.D.N.Y. 2006) ("[i]t would be a harsh rule of law indeed if a litigant were to change a statement in an amended pleading to repair a weakness cited by an adversary or

---

[8] *See also, e.g., Gen. Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d 8, 13 (1st Cir. 1986) (finding investors did not exercise due diligence where they relied on assurances of promoter and broker); *Cooperativa Ahorro y Credito Aguada v. Kidder, Peabody & Co*., 942 F. Supp. 735, 739 (D. P.R. 1996) ("blind faith in the assurances of an investment advisor does not constitute due diligence . . .").

by the Court, only to have the case dismissed because the conforming change in some way may

conflict with an allegation in the earlier pleadings.").

Here, the PSAC does not contradict the allegations of the Trustee's original Complaint or

the First Amended Complaint (the "FAC"). The PSAC includes additional allegations that paint

the full picture: despite Defendant's surface-level diligence, it failed to follow up in the face of

non-responsive and/or inconsistent, problematic, and troubling responses. For example, the

PSAC's addition of the term "minimal" to Defendant's diligence clarifies, not contradicts, the

allegations of the Complaint and FAC. Nor does the PSAC contradict the Complaint's allegation

that Defendant received a "wealth of information." The PSAC includes allegations concerning

information Defendant received and adds that the information prompted Defendant to ask

questions that ultimately went unanswered. *E.g.*, PSAC at ¶¶ 88–101.

Defendant then attempts to avoid liability by claiming that its diligence efforts were

"thwarted" by Tremont. Def. Br. at 35. Defendant's admission only leads to the reasonable

inference that it was aware that Tremont was intentionally not providing the information it

requested – an additional, significant indicator of fraud at BLMIS. Moreover, blaming Tremont

is inconsistent with Defendant's allegation that it used its resources as a sophisticated institution

to conduct "extensive" due diligence before entering into the Leverage Transactions. There are

several instances where Tremont blatantly told Defendant that it was not going to be providing it

with answers to certain questions, at the outset of negotiations, and throughout, leading up to

both deals. Rather than walk away from the deals, or press Tremont for the information, Defendant moved forward with the Leverage Transactions, turning its eyes away from the fraud.[9]

Finally, Defendant claims that the PSAC alleges that Defendant became comfortable with the Leverage Transactions "by relying on the regulatory oversight of BLMIS." Def. Br. at 35. The PSAC makes no such allegations. The PSAC alleges that Defendant sought to justify its decision to abandon direct diligence on BLMIS by asking Tremont for the frequency of BLMIS's regulatory inspections. PSAC at ¶ 137. Defendant could not have gained comfort in Tremont's response, as Tremont did not answer Defendant's question. *Id*. at ¶¶ 137-38. The PSAC alleges that, instead, Defendant found its comfort in the BLMIS Fraud Provision. *Id*. at ¶¶ 141–57.

### D.    This Case is Indistinguishable from *Picard v. Katz*

Defendant tries, unsuccessfully, to distinguish this case from *Katz*. Here, as in *Katz*, the allegations concern a sophisticated investor who conducted diligence, learned of the high likelihood of fraud, and responded by negotiating for the ability to turn away through what it believed were adequate protections from fraud. Am. Compl. at ¶¶ 918–922, 943–948, *Picard v. Katz*, No. 10-05287 (Bankr. S.D.N.Y. Mar. 18, 2011), ECF No. 34. Indeed, the requisite prongs of willful blindness are more pronounced in this case. Unlike the defendants in *Katz* who decided against the suggested fraud insurance, Defendant actively demanded and received the BLMIS Fraud Provision as a necessary predicate for the Leverage Transactions. PSAC at ¶¶ 144–54, 158–60. Moreover, Defendant conveniently omits the procedural posture of *Katz*. Not

---

[9] After accusing the Trustee of improperly describing the terms of the 2006 Leverage Transaction, which he did not, Defendant misleadingly omits the relevant language of the 2007 Leverage Transaction, which specifically allowed Defendant to choose its hedge: "Counterparty acknowledges that ABN AMRO may hedge itself in respect of this Transaction by entering into certain hedging transactions, including but not limited to subscribing for Reference Fund Interests." Def. Br. at 6–7; Feldberg Decl. Ex. B § 2.2, Equity Notional Amount. That Defendant did not exercise this choice does not nullify the language.

20

only did the District Court find these allegations sufficient to survive a motion to dismiss, the

allegations survived summary judgment and the case was set for trial before it settled.  *See*

Order, *Picard v. Katz*, No. 11 Civ. 3605 (S.D.N.Y. Mar. 5, 2012), ECF No. 142.

## II.   THE PSAC SUFFICIENTLY ALLEGES DEFENDANT'S KNOWLEDGE OF THE VOIDABILITY OF THE INITIAL TRANSFERS FROM BLMIS TO THE TREMONT INITIAL TRANSFER FUNDS

Defendant summarily contends that the PSAC fails to plead "without knowledge of

voidability" under § 550(b) of the Code because it does not satisfy the lack of good faith

pleading standard set forth by this Court in *BNP*.  Def. Br. at 36.  However, the "without

knowledge of voidability" element of § 550(b) is separate and distinct from "good faith" and

only requires Defendant's willful blindness to possible fraud at BLMIS generally, not to a Ponzi

scheme or lack of securities trading in particular.[10]

Courts regularly analyze "good faith" and "without knowledge of voidability" under §

550(b) as distinct elements.  *See, e.g., In re CNB Int'l, Inc.*, 393 B.R. 306, 330 (Bankr. W.D.N.Y.

2008), *aff'd on other grounds*, 440 B.R. 31 (W.D.N.Y. 2010) ("Aside from any issue of good

faith, a defense under 11 U.S.C. 550(b) will arise only if the transferee takes 'without knowledge

of voidability of the transfer avoided'"); *In re Southmark Corp.*, 217 B.R. 499, 507 (Bankr. N.D.

Tex. 1997), *aff'd in part, rev'd in part sub nom.*, *Southmark Corp. v. Schulte, Roth & Zabel,*

*LLP*, 242 B.R. 330 (N.D. Tex. 1999), *aff'd in part sub nom.*, *In re Southmark Corp.*, 239 F.3d

365 (5th Cir. 2000) ("A creditor can act in good faith even with knowledge that a transfer may be

avoidable in the event of an insolvency proceeding.").  In *BNP*, this Court acknowledged the

separateness of these elements in stating that "the Trustee must plead . . . *either* (2) the

---

[10] As discussed in section I.B.1. above, the Trustee asserts that this is the proper standard to plead lack of good faith as well.  Moreover, by making these arguments, the Trustee does not concede that the District Court's decisions regarding the pleading burden and standards for pleading good faith that go beyond inquiry notice are correct.

subsequent transferee lacked good faith **or** (3) received the subsequent transfer with knowledge

that the initial transfer was avoidable." 594 B.R. at 196 (emphasis added).

The separate analysis of these two elements is consistent with the basic principles of

statutory interpretation and is appropriate even if the facts relevant to the two concepts overlap.

*See Legacy*, 548 B.R. at 38–39 (noting the facts often overlap but that it is a "cardinal principle

of statutory construction that a statute ought, upon the whole, to be construed that, if it can be

prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal

quotes and citation omitted); *In re Consol. Capital Equities Corp.*, 175 B.R. 629, 637–38 (Bankr.

N.D. Tex. 1994) ("This court must endeavor to give meaning to each provision of § 550(b)

without rendering a provision superfluous or insignificant. Good faith must therefore be

considered as a separate concept from 'without knowledge of the avoidability of the transfer.'").

Here, Defendant received the subsequent transfers with "knowledge of voidability"

because it knew of facts suggesting that Madoff was operating a fraud, and that the related initial

transfers from BLMIS to the Tremont Initial Transfer Funds might therefore be voidable. First,

it is well-established that "knowledge" in this context does not mean actual knowledge. *See,*

*e.g., Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 898 (7th Cir. 1988) ("No one

supposes that 'knowledge of voidability' means complete understanding of the facts and receipt

of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do."); *In re*

*CNB Int'l, Inc.*, 393 B.R. at 330. Rather, as this Court has explained, a transferee need only

"possess[] knowledge of ***facts that suggest*** a transfer may be fraudulent." *Legacy*, 548 B.R. at

38 (emphasis added, internal quotation omitted); *see also In re Altmeyer*, 268 B.R. 349, 357

(Bankr. W.D.N.Y. 2001) (holding "knowledge of a ***potential basis*** for the avoidance" sufficient

to bar a § 550(b) defense) (emphasis added).

Second, "voidability" includes any circumstance which could result in recoverability of a transfer, including because the transfer was not legitimate. *See, e.g., Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716, 733 (6th Cir. 2017) (knowledge that "the transfer was illegitimate" was "by extension" knowledge "that [the transfer] was voidable"). A defendant, as in this case, that believes the transfers it is receiving may be from a business operating as a fraud, and subject to criminal prosecution, is undoubtedly in possession of facts suggesting such transfers may not be legitimate, thus providing a potential basis for avoidance. *See, e.g., In re Enron Corp.*, No. 05-01074, 2005 WL 3832059, at *22 (Bankr. S.D.N.Y. Nov. 28, 2005) ("If a transferee were aware of the potential for an investigation [into wrongful conduct], the possibility of the voidability of the transfer would hardly be hypothetical or speculative."). In this regard, "voidability" does not depend on the precise nature of the fraud in question, such as whether it was a Ponzi scheme or involved a lack of securities trading in particular.

The PSAC's allegations clearly are sufficient to show that Defendant possessed knowledge of facts providing the potential basis for a determination that the initial transfers from BLMIS to the Tremont Initial Transfer Funds were illegitimate, and thus voidable. By accepting the customer funds with willful blindness to fraud at BLMIS, Defendant acted with knowledge of voidability, whether or not this Court determines that it did not take the customer funds in good faith. The Court should grant the Trustee's motion for leave to amend on this basis alone.

## III.   DEFENDANT'S ALLEGED VALUE DEFENSE IS NOT APPARENT ON THE FACE OF THE PSAC

Defendant bears the burden of pleading and proving the affirmative defense that it provided value for the transfers it received. *BNP*, 594 B.R. at 206. Because no value defense is apparent on the face of the PSAC, its argument fails. *United States v. Space Hunters, Inc.*, 429 F.3d 416, 426 (2d Cir. 2005) (a complaint may be dismissed based on an affirmative defense

only if it appears on the face of the complaint, and "it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim that would entitle him to relief.").

As an equity holder, Defendant's redemptions from the Rye Funds constituted equity

distributions not for value. *See, e.g., In re Crown Unlimited Mach., Inc. (Bower v. Crown Stock

Distrib., Inc.)*, No. 04-1085, 2006 WL 6401548, at *15 (Bankr. N.D. Ind. Oct. 13, 2006), *aff'd*,

2009 WL 418275 (N.D. Ind. Feb. 17, 2009), *aff'd in part & rev'd in part on other grounds*, 587

F.3d. 787 (7th Cir. 2009); *Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech.

Grp., Inc.)*, 916 F.2d 528, 540 (9th Cir. 1990) (distributions to limited partners on account of

equity interests were not for value). The rationale is straightforward: the distributions were

"made, not in return for some exchange of property or services, or the payment of an antecedent

debt, but solely on account of their status as shareholders of the company." *Crown*, 2006 WL

6401548, at *15.

Defendant cites to *Buchwald Capital Advisors, LLC v. Papas*, 584 B.R. 161 (E.D. Mich.

2018), for its claim that "a redemption of shares or membership interests have been held to be

'for value,' and as such, Defendants' redemption of partnership interests in the reference funds

was for value." Def. Br. at 39. Notwithstanding numerous holdings to the contrary,[11] *Buchwald*

is inapplicable because it concerns whether dividend payments made in connection with

redemption of stock which was part of a complex financial transaction constituted "settlement

payments" under § 546(e) of the Code. The District Court ruled that the dividend transfers were

---

[11] *See also In re SemCrude, L.P,* No. 08-11525 (BLS), 2013 WL 2490179, at *5 (Bankr. D. Del. June 10, 2013)
("Case law teaches that equity distributions on account of partnership interests do not confer 'value' upon the
transferor"); *Schmidt v. HSC, Inc.,* 358 P.3d 727, 737 (Haw. Ct. App. 2015) ("the return of a capital contribution to
or for the benefit of an investor is not the same as the repayment of indebtedness to a creditor") (emphasis omitted);
*United States v. Rocky Mountain Holdings, Inc* , 782 F. Supp. 2d 106, 122 (E.D. Pa. 2011) (limited partnership
distributions do not qualify as antecedent debt constituting an exchange for value: "It is widely held that true
creditors hold claims regardless of the performance of the partnership business, whereas payment of partnership
distributions are subject to [] profits or losses.") (internal quotations and citations omitted).

protected settlement payments because they were made "in exchange for value" when properly

viewed as a component part of the broader transaction.  By contrast, this Court has held that

"[e]ach subsequent transfer must be judged separately to determine whether the Defendant gave

value, and that determination cannot be made from the four corners of the PAC or the other

pleadings that the Court has previously considered."  *BNP*, 594 B.R. at 206–07.  Moreover, for

this reason, to the extent Defendant seeks to draw a distinction between "redemption" and

"collateral" subsequent transfers for purposes of a value analysis, any such evaluation cannot

properly be done at the pleading stage.

Even if *Buchwald* was relevant to this case, it is no longer good law.  The decision was

vacated by *In re Greektown Holdings, LLC*, 765 F. App'x 132, 133 (6th Cir. 2019), based on the

Supreme Court's decision in *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883

(2018).  In *Merit*, the Supreme Court held that in determining the applicability of § 546(e), the

focus should be on the particular transfer at issue, not the whole transaction.  *Id.* at 897.

Defendant's claim that it gave value because it is a "net loser" (Def. Br. at 38-39) fails as

well.  There is no rationale or precedent for applying net equity at the subsequent transfer level,

and, to the contrary, prior BLMIS decisions have cautioned against the Bankruptcy Court and the

Trustee involving themselves in such analyses.  *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff

Inv. Sec. LLC*, 454 B.R. 285, 306-7 (Bankr. S.D.N.Y. 2011) ("All of the Feeder Funds are

separate legal entities comprised of a network of rights and obligations to individuals, many of

whom are not before this Court and have interests unknown to the Trustee. . . .  [I]t is only

appropriate the Feeder Funds, and not the Trustee, determine the specific amounts they owe to

their own investors.").  In any event, any determination of Defendant's net winner or net loser

status at the subsequent transfer level would involve a host of factual issues, none of which could

be determined at the pleading stage.

## IV.    THERE WAS AN INTERVENING CHANGE IN THE APPLICABLE PLEADING STANDARD

Defendant argues that the Court should deny the Trustee's motion because the willful

blindness standard was in place when the Trustee filed the FAC.  However, in April 2014, after

the Trustee filed the FAC, the District Court issued its Good Faith Decision, changing the burden

and pleading standards relevant to the Trustee's action against Defendant.  *Sec. Inv'r Prot. Corp.*

*v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 516 B.R. 18 (S.D.N.Y. 2014).  It was

well established that a lack of good faith was not an element of a trustee's claim under §§

548(a)(1)(A) or 550(b) of the Code, including in SIPA cases, and this Court and others had

refused to consider a defendant's good faith defense on a motion to dismiss.  *E.g.*, *Gowan v.*

*Wachovia Bank, N.A. (In re Dreier LLP)*, 453 B.R. 499, 518 n.6 (Bankr. S.D.N.Y. 2011); *Bayou*

*Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp. LLC)*, 362 B.R. 624, 638–

39 (Bankr. S.D.N.Y. 2007); *Cassirer v. Sterling Nat'l Bank & Trust Co. of N.Y. (In re Schick)*,

223 B.R. 661, 664 (Bankr. S.D.N.Y. 1998).  It also was black letter law that the "good faith"

defense was governed by an inquiry notice standard, not willful blindness.  *See, e.g.*, *Marshall v.*

*Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81, 91 n.11 (2d Cir. 2014) (presence of

good faith depends upon "whether the transferee had information that put it on inquiry notice

that the transferor was insolvent or that the transfer might be made with a fraudulent purpose")

(citation omitted); *Hayes*, 916 F.2d at 535–36 (9th Cir. 1990) (courts are to look at what a

transferee objectively "knew or should have known" in questions of good faith, rather than

examining what the transferee actually knew from a subjective standpoint) (citing *Shauer v.*

*Alterton*, 151 U.S. 607 (1894), and *Harrell v. Beall*, 84 U.S. 590 (1873)).

Clearly, the applicable pleading standards have changed, and the Trustee should be

permitted the opportunity to amend his complaint in light of the new pleading standards. *See,*

*e.g., Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012) (granting

leave to amend where an intervening Supreme Court decision clarified the pleading standards for

alleging a domestic securities transaction).

## V.    THE TRUSTEE'S $74.6 MILLION CLAIM FOR SUBSEQUENT TRANSFERS FROM XL PORTFOLIO LIMITED TO DEFENDANT SHOULD BE REINSTATED

Lastly, Defendant incorrectly argues that the Trustee may not seek to reinstate his $74.6

million claim for subsequent transfers it received from XL Portfolio Limited (the "ABN-XL

Portfolio Limited Claim"). Def. Br. at 40 n. 36. The Trustee voluntarily dismissed this claim

without prejudice following the Court's ET Decision with the potential for reinstatement

pursuant to the terms of a Tolling Agreement. The plain language of the Tolling Agreement

stated by Defendant in its footnote permits the Trustee to seek to reinstate the ABN-XL Portfolio

Limited Claim in the event of a Second Circuit reversal of the ET Decision, as long as he does so

no later than 90 days after the Supreme Court either denies certiorari or renders a decision on the

merits. The Second Circuit reversed the ET Decision in February 2019 and the Supreme Court

has not yet decided Defendant's petition for certiorari. As such, the Trustee appropriately seeks

reinstatement of the ABN-XL Portfolio Limited Claim under the Tolling Agreement.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant his

motion for leave to file the PSAC, and any and all other relief the Court deems just and proper.

27

Dated: September 9, 2019
       New York, New York

By:  */s/ Patrick T. Campbell*
      _____

      **Baker & Hostetler LLP**
      45 Rockefeller Plaza
      New York, New York 10111
      Telephone: (212) 589-4200
      Facsimile: (212) 589-4201
      David J. Sheehan
      Email:  dsheehan@bakerlaw.com
      Patrick T. Campbell
      Email:  pcampbell@bakerlaw.com
      Camille C. Bent
      Email:  cbent@bakerlaw.com
      Elizabeth McCurrach
      Email: emccurrach@bakerlaw.com
      Matthew Cowherd
      Email: mcowherd@bakerlaw.com

      *Attorneys for Irving H. Picard, Trustee*
      *for the Substantively Consolidated SIPA*
      *Liquidation of Bernard L. Madoff*
      *Investment Securities LLC and the*
      *estate of Bernard L. Madoff*