Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Adv. Case No. 10-04377-smb

4   Adv. Case No. 10-04658-smb

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

7   MADOFF INVESTMENT SECURITIES LLC,

8                   Plaintiff,

9           v.

10   NELSON et al.,

11                   Defendants.

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14                   United States Bankruptcy Court

15                   One Bowling Green

16                   New York, NY  10004

17

18                   May 8, 2019

19                   10:22 AM

20

21   B E F O R E :

22   HON STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  NAROTAM RAI

Page 2

1    HEARING re 10-04377-smb TRIAL

2

3    HEARING re 10-04377-smb Motion In Limine Number 1 to Admit

4    the Plea Allocutions of Bernard L. Madoff and BLMIS

5    Employees (also applies to Adv. Proc. No. 10-04658)

6

7    HEARING re 10-04377-smb Motion In Limine Number 2 to Admit

8    the Trial Testimony of Frack DiPascali (also applies to Adv.

9    Proc. No. 10-04658)

10

11   HEARING re 10-04377-smb Motion In Limine Number 3 to Exclude

12   Testimony and Exhibits Related to Defendants Asserted Tax

13   Obligations to Governmental Taxing Authorities (also applies

14   to Adv. Proc. No. 10-04658)

15

16   HEARING re 10-04658 TRIAL

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   BAKER HOSTETLER LLP

4         Attorneys for the Trustee

5         45 Rockefeller Plaza

6         New York, NY 10111

7

8   BY:  SEANNA R. BROWN

9         NICHOLAS J. CREMONA

10        DEAN HUNT

11        LAN HOANG

12        AMY E. VANDERWAL

13        MAXIMILLIAN S. SHIFRIN

14

15  BAKER HOSTETLER LLP

16        Attorneys for the Trustee

17        811 Main Street, Suite 1100

18        Houston, TX 77002

19

20  BY:  MARIE L. CARLISLE

21

22

23

24

25

Page 4

1    CHAITMAN LLP

2          465 Park Avenue

3          New York, NY 10022

4

5    BY:  HELEN DAVIS CHAITMAN

6          JENNIFER ALLIM

7

8    ALSO PRESENT TELEPHONICALLY:

9

10   SEAN DALY

11   DAVID J. SHEEHAN

12   ROBERT A. RICH

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  Please be seated.

3              THE COURT:  Picard versus Nelson.  Is the

4     Plaintiff ready?

5              MR. CREMONA:  We are, Your Honor.  Good morning.

6              THE COURT:  Is the Defendant ready?

7              MR. HUNT:  Yes.

8              THE COURT:  All right.  Why don't we deal with the

9     motions in limine first, which -- and objections, which I've

10    reviewed?

11             MR. CREMONA:  Thank you, Your Honor.  Nicholas

12    Cremona of Baker & Hostetler appearing on behalf of Irving

13    Picard as the Trustee.

14             As Your Honor indicated, we have several pretrial

15    motions that we'd like to deal with, the first of which I

16    think is one that's rather straightforward from our

17    perspective, but I understand, as Your Honor often says,

18    your perspective in this case often depends upon where you

19    sit.

20             So the motion in limine number 3 is a motion to

21    exclude the testimony of Robert Oppenheim.  He is an

22    accountant that has been designated by the defendants, and

23    based on the declaration that was submitted in opposition to

24    our motion, it appears that he would testify that the

25    defendants paid roughly $5.3 million in taxes based on

Page 6

1   purported gains from their Madoff investments from the years

2   1985 through 2002.  We object and move to have him excluded

3   because of several reasons.

4           We don't believe the testimony is relevant.  We

5   don't think it's probative to any material or fact at issue.

6   And thirdly, I think when you look at the declaration on its

7   face, it's inaccurate for a couple of reasons, and we can

8   get into that.

9           But first and foremost, I don't think it's

10  relevant to admit his testimony because it will not prove or

11  dispute -- prove a material fact at issue.  And secondly, as

12  we said in our papers and as Your Honor will recall, the

13  issue at the end of the day as to whether the -- what the

14  legal effect of the payment of those taxes has been decided

15  by this court at least two times.

16          As Your Honor noted in your Cohen decision, the

17  payment of taxes is not a defense.  And moreover, to allow

18  the offset for payment of taxes would only come at the

19  expense of other net loser victims and limit the amount

20  recoverable by the trustee for their benefit, which is his

21  charge.  And for those reasons, you noted that it's not a

22  defense.  You reiterated that in your (indiscernible)

23  decision stating that the payment of taxes is not a defense.

24          When you look beyond that, Your Honor, if you look

25  at the declaration itself, it says --

Page 7

1              THE COURT:  Where is the declaration?

2              MR. CREMONA:  It's in -- it's in Exhibit 2, the

3    Defendant's opposition to our motion, and it actually

4    provides in it that -- if you look at Exhibit A to Mr.

5    Oppenheim's declaration, provides that the 5.3 million

6    purportedly paid in gains includes gains on these accounts

7    from the years 1985 through 1991.  These accounts were not

8    opened --

9              THE COURT:  To 2002.

10             MR. CREMONA:  Right, but I'm focused on the 1985

11   period through 1991.  These accounts --

12             THE COURT:  Okay.

13             MR. CREMONA:  These accounts didn't exist, and

14   that aggregates to 2.9 million purportedly in gains that the

15   taxes were paid on.  Obviously, that's (indiscernible)

16   inaccurate and I would submit unreliable, and that presents

17   an independent basis to excluded it.

18             If you look then, Your Honor, to TX-24, which is

19   the Defendant's -- one of Plaintiff's Exhibit TX-24, and

20   that's --

21             THE COURT:  Can you put it up on the screen?  You

22   know, we have a lot of loose leaf here, and I'd appreciate

23   both sides, if you can display the exhibits on a screen.

24             MR. CREMONA:  We can do that, Your Honor.  And

25   just for the record, that is Carol and Stanley Nelson's

Page 8

1    amended objections and responses to Trustee's first set of

2    requests for admissions.

3           And I would direct Your Honor to Paragraph 13,

4    which starts on Page 5 of 9.  And that paragraph references

5    Mr. Oppenheim, and it says that he prepared the tax return

6    for the Defendants from the period 1992 onward.  That was a

7    prior admission by the Defendants which Mr. Oppenheim's

8    subsequent declaration actually contradicts, as you can see

9    if you look at the numbers.  It purports to indicate that

10   $3.5 million in net taxes were paid, and the declaration

11   indicates 5.3.  It also is -- there's a further discrepancy

12   that the defendants here received a tax refund from the IRS

13   in Connecticut in the amount of 1.5 million in their

14   admission and Mr. Oppenheim at --

15           THE COURT:  You know what?  You don't want to call

16   him as a witness, and now you're impeaching him.

17           MR. CREMONA:  I'm just -- I'm just merely

18   providing independent basis that -- to demonstrate that his

19   testimony is unreliable.  I think for the reasons we've

20   stated, legally I think -- based on application of Rules 401

21   and 403 and the prior determinations by Your Honor -- his

22   testimony should be excluded because it will have no

23   material effect on the outcome of the issues before the

24   Court.

25           THE COURT:  What's the relevance of the taxes?

Page 9

1              MS. CHAITMAN:  The relevance of the taxes is, Your

2     Honor, we believe that the Defendant should not be liable

3     for made-up gains to the extent that the reporting of those

4     gains caused them to be liable to the state and local and

5     federal taxing authorities for 50 percent, essentially, in

6     taxes.

7              And I know that Your Honor, in other cases which

8     are not consolidated with this case, you've ruled against

9     the Defendants on this issue, but it hasn't gone up on

10    appeal.  And this is an issue that we are asserting, and

11    we're entitled to a ruling on it.  I anticipate that your

12    ruling will be the same, but it's not a consolidated case,

13    and we have a right to that ruling.

14             THE COURT:  I understand that.  You've made your

15    record.  I'm going to exclude the testimony for the reasons

16    I've stated in the prior decisions referred to by Mr.

17    Cremona.

18             The amount of taxes which these defendants and

19    other investors paid is irrelevant to the determination of

20    what was deposited and what was withdrawn within -- capped

21    by the two-year withdrawal.  So I'll grant that motion to

22    exclude the accountant's testimony.  You've made your

23    record.

24             MS. CHAITMAN:  Thank you.

25             THE COURT:  Okay.

Page 10

1              MR. CREMONA:  Thank you, Your Honor.

2              I'm going to move on to the second motion that's

3    the motion by the Trustee to quash the subpoena of Mr.

4    Picard as Trustee.

5              Your Honor may recall this issue because you

6    issued a decision on a nearly identical motion back in June

7    of 2017 in the profit withdrawal proceeding, and that's

8    referred to at ECF-16180.  I would submit that the issues

9    there were nearly identical to the issues now before you.

10   There, the Claimant sought to subpoena the Trustee and have

11   him testify at that trial on issues as to his determination

12   and the -- and his knowledge of the books and records of the

13   Debtor.

14             Your Honor noted in that decision -- you granted

15   the Trustee's motion and held that allowing the Claimant to

16   pursue that line of inquiry as to the Trustee's subjective

17   knowledge and conclusions would propel the Court and the

18   parties into a time-consuming immaterial area that will

19   prolong the trial without any corresponding benefit.

20             I would say here it's even clearer, Your Honor.

21   We have the Trustee who any personal knowledge that he would

22   -- well, he has no personal knowledge of the books and

23   records prior to his appointment.  Any personal knowledge

24   that he would have obtained would've been in consultation

25   with his counsel and through his experts.

Page 11

```
 1              As you noted in that opinion, those experts were

 2    retained nearly contemporaneously with -- to his appointment

 3    and anything that he would've learned from them would've --

 4    would be most certainly work product and privilege, being

 5    discussions with others.  And that work went on for two

 6    years prior to the commencement of these voidance actions.

 7    So he certainly lacks personal knowledge.  And I think more

 8    importantly, Your Honor --

 9              THE COURT:  But all trustees lack personal

10    knowledge of records that were maintained before he or she

11    was appointed, right?

12              MR. CREMONA:  Understood, but my -- I think the

13    more important point though is that his testimony would

14    merely be duplicative of the testimony of his expert.  The

15    lines of inquiry that have been set forth in Ms. Chaitman's

16    opposition are the Trustee's factual basis for calculating

17    clawback exposure, his factual basis for determining whether

18    they received the withdrawal, and whether any real

19    securities were purchased.

20              The Trustee's three experts that were property

21    disclosed under Rule 26 are going to testify to those very

22    same issues.  His testimony would be merely cumulative of

23    those.  And the very fact that Your Honor should consider

24    and has considered is whether this -- whether this is

25    designed to harass the Trustee.
```

Page 12

1          The decision that I referred to at ECF-16180 went

2    on at length to describe some of the attacks on the trustee.

3    And unfortunately, some of those attacks are maintained in

4    these papers in opposition to this motion which talked about

5    the Trustee's compensation and that he had -- and there are

6    false statements in there, candidly, Your Honor, which are

7    unfortunate.  And I hope today we can put a rest to a lot of

8    that through this trial.

9          But for those reasons, Your Honor, I would

10   respectfully request that the motion be granted because Mr.

11   Picard's testimony is not based on firsthand knowledge,

12   would be duplicative, and the design here is purely to

13   harass the Plaintiff.

14          THE COURT:  Okay.

15          MS. CHAITMAN:  Your Honor, the design is not to

16   harass.  The design is to bring out the truth about what

17   really happened here.

18          THE COURT:  But what does he have to -- what does

19   the Trustee have to say in this case?

20          MS. CHAITMAN:  He has to explain the basis on

21   which he's asserted from inception of his appointment that

22   Madoff never purchased securities with investment advisory

23   customers' money when Mr. Madoff contradicted that, and we

24   will prove that --

25          THE COURT:  I understand your case, but the

Page 13

1    Trustee didn't do any of this work.  He hired FTI to do it.

2             MS. CHAITMAN:  You know what, Judge?  I --

3             THE COURT:  All that he knows -- there's a

4    representation that he has no personal knowledge.  And I

5    know you cited the International Management case in your

6    papers, but there the trustee was the certified forensic

7    accountant who actually did the work that FTI did in this

8    case, and he called himself as the only witness in the case.

9             Mr. Picard's testimony is just going to be, you

10   know -- he won't be able to testify -- or I wouldn't let him

11   testify -- about what FTI or his lawyers told him on work

12   product and attorney-client privilege, and it'll just unduly

13   delay the trial, so I will sustain that motion to quash that

14   subpoena.

15            MR. CREMONA:  Thank you, Your Honor.  We're going

16   to -- I'm going to cede the podium to my colleague, Lan

17   Hoang, who's going to handle the remaining motions in

18   limine.

19            MS. HOANG:  Good morning, Your Honor.  Lan Hoang

20   on behalf of the Trustee.

21            THE COURT:  Okay.  Please keep your voice up.

22            MS. HOANG:  Yes.  In continuing with dealing with

23   witnesses to be presented at trial, I'd like to take the --

24   argue the motion to strike Ms. -- the Defendant's witnesses:

25   Mr. Madoff by deposition, Ms. Pitt by in person or by

Page 14

1    deposition, and the new disclosure, Ms. Agatha Cole as a

2    witness.

3              As to Mr. Madoff and Ms. Pitt, I think it -- the

4    issue here is not the relevance, which is the argument that

5    Defendants made in their papers.  They're relevant.  They

6    worked at BLMIS.  They perpetrated fraud.  That's not the

7    issue here.

8              The issue here is that Your Honor has ruled on.

9    We've had years of discovery, years of discovery dispute,

10   and Your Honor has already ruled that any deposition,

11   particularly the Madoff deposition that was taken after the

12   close of discovery in this case, would not -- are not --

13   that they are not permitted to participate in Madoff's

14   deposition, and that deposition would not apply in that

15   case.

16             THE COURT:  I understand that, but, you know, they

17   weren't permitted to participate in the Bonaventure trial

18   either, and I don't see the difference between your argument

19   for using DiPascali's testimony and the argument to use

20   Madoff's and -- I'm sorry, I forget the other witnesses'

21   names -- deposition testimony.  Isn't it really the same

22   issue?

23             MS. HOANG:  It's actually not, Your Honor.  Your

24   Honor has already ruled in this case as to Mr. Madoff and

25   Ms. Pitt.  As to the -- as to DiPascali, there's other

1    grounds for the inadmissibility of his testimony, and that

2    is the judicial notice, the trustworthiness under 807.

3    There are other grounds to admit that.

4            Here we have court rulings by Your Honor that

5    state explicitly:  these witnesses will not be -- these

6    individuals will not be witnesses at this trial.  The

7    Trustee --

8            THE COURT:  I don't recall stating that.  If you

9    say I did, I did, but I recall also raising the issue that

10   even as to non-participants, how do you keep the information

11   out?

12           MS. HOANG:  Your Honor, that was actually our

13   argument at -- on the motions to open discovery to take

14   adianta -- to take the depositions of additional BLMIS

15   witnesses, and Your Honor said no.  If discovery is closed

16   --

17           THE COURT:  Right.

18           MS. HOANG:  -- those depositions would not --

19           THE COURT:  They can't --

20           MS. HOANG:  That's Ms. Pitt.

21           THE COURT:  I understand that.  They can't

22   participate, but there's a difference between not

23   participating and not being able to use trial transcript or

24   deposition transcript in accordance with the rules of

25   evidence.

1          MS. HOANG:  Your Honor, it's -- we've proceeded

2     based on your orders that the testimony and those witnesses

3     would not -- are you -- I guess is the argument that you're

4     going to take judicial notice of those depositions?

5          THE COURT:  I mean, the judicial -- I don't know

6     what that means.

7          MS. HOANG:  Okay.

8          THE COURT:  Were the depictions taken?  Yeah.  I

9     suppose I could take judicial notice of that --

10         MS. HOANG:  Yes.

11         THE COURT:  -- but the question is the

12     truthfulness.

13         MS. CHAITMAN:  Yeah.

14         THE COURT:  Of all the depositions that are being

15     offered, really, and all the witnesses.

16         And yes, Ms. Chaitman?

17         MS. CHAITMAN:  There's a vital distinction that

18     I'd like to make, which is that the Trustee participated in

19     Madoff's deposition.

20         THE COURT:  They're not arguing that they didn't

21     have a motive to cross-examine, if that's what you're

22     getting to.

23         MS. CHAITMAN:  They had the ability to cross-

24     examine.

25         THE COURT:  Well, they also had the motive because

1    it's the same issues.

2              MS. CHAITMAN:  Right, but they're seeking to put

3    into evidence criminal trial testimony --

4              THE COURT:  We haven't gotten to that yet, but --

5              MS. CHAITMAN:  Okay.  Okay.

6              THE COURT:  But I just --

7              MS. HOANG:  Your Honor, if I may.

8              THE COURT:  Look.  Look.  I'm going to overrule

9    any objection to the use of depositions, assuming that they

10   otherwise comply with, you know, the catchall provision that

11   you had the motive to cross-examine the witness.  When you

12   get to DiPascali, because I have more of a problem with that

13   one, so I'll overrule the objection to the use of Madoff

14   depiction and any deposition unless you can convince that

15   you didn't have a motive to cross-examine on the particular

16   issue on which the deposition is being offered.

17             MS. HOANG:  Okay, Your Honor.  What I would offer

18   is that we will have counter designations to the --

19             THE COURT:  Okay.  Fair enough.

20             MS. HOANG:  -- Ms. Chaitman's designations.  And--

21             THE COURT:  We can deal with that in post-trial

22   briefing.

23             MS. HOANG:  Yeah.

24             THE COURT:  That's not a problem.  That's not an

25   issue.

Page 18

1          MS. HOANG:  As to Ms. Cole, Ms. Cole is an

2     attorney at Ms. Chaitman's firm.  She was disclosed on May

3     1st, 2019 as -- in turning in her firm and somebody who

4     previously worked at Dow Jones.  And now she is being

5     proffered, I'm not really sure for what, whether she's being

6     proffered as a fact witness, whether she's being proffered

7     as an expert witness.

8          In Ms. -- in the argument that -- in response for

9     our motion to strike, Ms. Chaitman says that Ms. Cole will

10    simply testify concerning her analysis of the documents

11    produced by the Trustee, which prove that Madoff purchased

12    securities with investor and advisory customers' money and

13    that those securities were listed on the Nelson statement.

14          That's -- Your Honor, that is expert opinion,

15    expert analysis.  She is going to offer an opinion -- she is

16    going to offer her analysis of those documents produced by

17    Trustee.  That's Ms. Chaitman's words.

18          THE COURT:  All right.  Let me --

19          MS. HOANG:  So here's what --

20          THE COURT:  Just a moment.  Let me -- go ahead.

21    Why don't you finish?

22          MS. HOANG:  Okay.  So we've had years of

23    discovery.  Fact discovery ended in 2016.  She wasn't

24    disclosed.  In -- she hasn't been disclosed in the year

25    since.  We're in 2019 now.  May 1st, seven days before

1    trial, she's disclosed.  So the fact that she's now

2    disclosed should preclude her from being a witness here,

3    whether as a fact witness or an expert witness.  And even

4    more so as an expert witness because she hasn't provided an

5    expert report.  She hasn't set forth her opinions, what she

6    relied on, her background, anything other than she works

7    with Ms. Chaitman and she worked at Dow Jones.

8              THE COURT:  Okay.

9              MS. HOANG:  And we have an opportunity to do that.

10   And then, if I may, Your Honor, just the last argument that

11   they raised, that Ms. Cole would be a rebuttal witness.

12   There really --

13             THE COURT:  I'm not convinced of that one.

14             MS. HOANG:  Yes.  Okay.

15             THE COURT:  It sounds like her direct case, but go

16   ahead.

17             MS. HOANG:  Okay.  I would just -- I'm in

18   agreement with you because if she's --

19             THE COURT:  Well, you may or may not be.  Let me

20   hear from Ms. Chaitman.

21             MS. CHAITMAN:  Ms. Cole was simply going to walk

22   the Court through the documents.

23             THE COURT:  Does she have a chart?  Did she

24   prepare a chart of this?

25             MS. CHAITMAN:  It's not a chart, Judge.  It's just

Page 20

```
 1    a collection of documents.  And if we -- if we just admit

 2    the documents into evidence, in a post-trial brief I can tie

 3    everything together.

 4            THE COURT:  Well, that's what I thought she was

 5    going to do.  She can't opine.

 6            MS. CHAITMAN:  No, she's not.  She was --

 7            THE COURT:  Let me -- let me just finish.

 8            MS. CHAITMAN:  Yeah.

 9            THE COURT:  She can't opine that a particular

10    purchase of treasury notes or treasury bills by BLMIS from

11    Lehman or somebody like that are the same notes that appear

12    in a customer statement.  I suppose if all of the documents

13    are admitted, you know, as -- it's basically a legal

14    argument that on May 1, let's say, you know, BLMIS purchased

15    10,000 treasury bills.  On May 2, the same treasury bills

16    appear in a Nelson statement.  I don't really need a witness

17    for that as long as the documents are admissible.  You can

18    just prepare a chart and point me to the documents in post-

19    trial briefing.

20            MS. CHAITMAN:  That's fine because they're all

21    documents that were produced --

22            THE COURT:  Yeah.

23            MS. CHAITMAN:  -- by the Trustee.

24            THE COURT:  And if she's just going to sit and go

25    through documents, you can do that in post-trial briefing.
```

Page 21

1        MS. CHAITMAN:  That's fine.  That saves us a lot

2    of time, Judge --

3        THE COURT:  All right.

4        MS. CHAITMAN:  Because there are a lot of

5    transactions.

6        THE COURT:  So with that proviso, I guess your

7    motion is granted to exclude her.

8        MS. HOANG:  Thank you.

9        Next, Your Honor, I will move to the motion to

10   admit the allocutions of Mr. Madoff.

11       THE COURT:  I don't have to argument on that.  I'm

12   going to admit the allocutions.  I've dealt with this in

13   (indiscernible).  I'll expand on it if necessary, in post-

14   trial decision to the extent that the issue is relevant.

15   But allocutions satisfy the rules for admissibility.  They

16   have been admitted in numerous criminal proceedings -- or

17   numerous proceedings -- both in the Southern District and

18   elsewhere, and I will receive the allocutions.

19       MS. HOANG:  Thank you, Your Honor.  And now the

20   last motion we have is to admit the criminal trial

21   testimony, only certain portions, of Frank DiPascali who is

22   -- who died in 2015.

23       Mr. DiPascali was identified by the Trustee in his

24   complaint as having knowledge --

25       THE COURT:  You said you weren't going to call him

Page 22

1    though.

2            MS. HOANG:  Yes.  We did -- we did not because at

3    the time we couldn't.  If Your Honor -- at the time, Mr.

4    DiPascali was under indictment.  He was -- he had pleaded

5    guilty and was participating in -- as a government witness

6    in the criminal trial.  Those convictions of those criminal

7    trial defendants did not become final until 2017, so we

8    could not call him even if he -- even though he was

9    available within 100 miles here.  We could not depose him.

10   Mr. DiPascali, unfortunately, died in 2015, so neither of

11   the parties here could've deposed him.

12           THE COURT:  You'll get your chance.

13           MS. HOANG:  I don't think there's an issue that

14   Mr. DiPascali's testimony is relevant.  It is.  He's telling

15   you what he did to perpetuate the fraud.  He --

16           THE COURT:  One of the arguments -- I don't

17   understand it to be a relevance argument.

18           MS. HOANG:  Okay.

19           THE COURT:  -- as much as the defense attorneys in

20   the Bonaventure trial didn't have the same motive to cross-

21   examine DiPascali, at least on some of the issues, which I

22   guess you want to use as testimony.  But for example, there

23   was really no -- there doesn't appear to be motive to cross-

24   examine him on whether or not the treasury purchases were

25   real or actually allocated.  There were various people were

Page 23

1    charged with securities fraud or conspiracy to commit

2    securities fraud.  And there was no reason to make that

3    distinction between treasure bills and equity securities as

4    there may be in this case.  So --

5             MS. HOANG:  Correct, Your Honor.  With regards to

6    the equities, Mr. DiPascali's testimony goes directly to

7    that.  There were no purchase of equities.  There was no

8    purchase of securities here.  And he tells you what he did.

9    He faked everything.  Everything was fake, and he goes

10   through how they did it.

11            On cross-examination on the eight days -- nine

12   days, excuse me -- of cross-examination, he was questioned

13   on the illegitimacy of the IA business, about -- testified

14   when did you learn that there were no trades?  He testified

15   to if you learned that there were no trades, what was the --

16   that would result in the calculation of over 30 years prior

17   to the demise of Madoff Securities, correct?  Correct.  He

18   was cross-examined at length on how they perpetuated the

19   fraud.  And including the securities, including the

20   treasury, and he talked about the backdating of the trades.

21   He talked about the rates of return.  He was all cross-

22   examined on these issues.

23            THE COURT:  Well, I guess what I'm -- I guess what

24   I'm saying is there may be some things he testified about

25   that would be -- that would come in, but there may be other

Page 24

1   things that don't come in, and I really ache to know what it

2   -- you know, what it is.

3        MS. HOANG:  Absolutely, Your Honor.

4        THE COURT:  I'm not prepared to admit as a blanket

5   matter everything he said for the reasons I've stated.

6        MS. HOANG:  Absolutely, Your Honor.  And that's

7   why at Exhibit 5 to Mr. Sheehan's declaration and the

8   Trustee's (indiscernible) papers, we set forth by page and

9   line a specific testimony that the Trustee would like to

10  move in.  It's not the entire transcript.  It's those

11  portions of the transcript that go specifically to proving

12  that BLMIS was a Ponzi scheme, which the Defendants still

13  contest here.

14       THE COURT:  All right.

15       MS. CHAITMAN:  Your Honor, at the criminal trial -

16  - which I did not attend -- nobody was convicted of

17  participating in a Ponzi scheme.

18       THE COURT:  No, but they were convicted of lying

19  about the purchase of securities for the accounts, and they

20  were convicted, among other things, about issuing

21  confirmation orders that falsely depicted purchases.

22       I understand that a "Ponzi scheme" is not a crime,

23  but the factual underpinnings of the security fraud claims

24  or the conspiracy, I guess, to commit security fraud were

25  the same facts that the Trustee is relying on to prove that

1    there's a Ponzi scheme.  In other words --

2              MS. CHAITMAN:  Some are the same facts.  They --

3    some are not.  And clearly, the defense counsel had no

4    interest in cross-examining to elicit what I would try to

5    elicit if I were cross-examining those witnesses.

6              The other thing is, Judge, this is a complete

7    surprise to us because, as we've pointed out in our papers,

8    in the Trustee's initial disclosures, they not only didn't

9    list any of these witnesses, they expressly stated they do

10   not intend to rely on any former BLMIS employees.  And they

11   never corrected that.  They didn't do it during the period

12   of discovery.  They didn't do it until they served their --

13             THE COURT:  Did you identify Madoff and this other

14   witness --

15             MS. CHAITMAN:  Yes.

16             THE COURT:  -- that you want to use now in your

17   initial disclosures?

18             MS. CHAITMAN:  We named a couple of Madoff

19   employees, and we said --

20             THE COURT:  But you didn't name Madoff.

21             MS. CHAITMAN:  And we -- I'm sorry?

22             THE COURT:  Did you name Madoff?

23             MS. CHAITMAN:  I -- you know what?  I can't

24   remember.  I'd have to look.

25             MS. HOANG:  No, Your Honor.

1          THE COURT:  So, look.  Let me -- let me deal with

2     DiPascali this way.  I think you really have to go on a

3     subject-by-subject response to what they're purporting to

4     put in.

5          I probably agree with you that the distinction

6     between treasury trades and equity trades is not something

7     that the defense counsel had a motive to cross-examine him

8     on.  On the other hand, this notion that there was a

9     conspiracy to induce investors to invest and not actually

10    invest and to continue the scheme by issuing false

11    confirmation statements and false trade confirmations and

12    false monthly statements I think is something that there was

13    a substantial motive to cross-examine him on.  They may not

14    have been able to do it because the evidence was

15    overwhelming, but there was certainly a motive in the

16    criminal trial to cross-examine him on because that's what

17    they were being charged with, and that was the factual

18    underpinning of the charges.

19          MS. CHAITMAN:  Yeah.  You know, Judge, if I tried

20    to put in the transcript of a deposition that I took out of

21    the presence of the Trustee's counsel, you wouldn't admit

22    it.

23          THE COURT:  It would depend on what you were

24    doing.  It would depend on this issue of motive and whether

25    somebody had a motive to cross-examine on the same issues,

1    but that's a hypothetical situation.

2            MS. CHAITMAN:  Well, I think -- I think what I

3    would suggest then is that we deal with this in post-trial

4    briefing.

5            THE COURT:  I agree with you.

6            MS. CHAITMAN:  Okay.

7            THE COURT:  I agree with you.  There's no --

8            MS. CHAITMAN:  Because I'm not --

9            THE COURT:  I mean, I can read the -- I can read

10   it and you can read it at some other time.  I'd like to

11   being the trial.

12           MS. CHAITMAN:  Okay.

13           THE COURT:  Are there any other motions that I

14   have to deal with?

15           MS. HOANG:  No, Your Honor.

16           MS. CHAITMAN:  Well, they're also seeking to admit

17   the testimony of (indiscernible) Pitts at the criminal

18   trial, and --

19           MS. HOANG:  No.  We're not.

20           THE COURT:  I -- that's not my understanding.

21           MS. CHAITMAN:  No?

22           MS. HOANG:  No.

23           MS. CHAITMAN:  So the only --

24           MS. HOANG:  No, you wrote that in your papers.

25           MS. CHAITMAN:  Okay.  That's my misunderstanding.

Page 28

1              MS. HOANG:  Okay.

2              MS. CHAITMAN:  Okay.

3              THE COURT:  Okay.  Thank you.

4              MS. HOANG:  Thank you, Your Honor.

5              THE COURT:  Are there any other motions in limine

6    or pretrial objections that I have to deal with?

7              All right.  Mr. Hunt, why don't you call your

8    first witness?

9              MR. HUNT:  Your Honor, just a couple of

10   housekeeping matters.

11             THE COURT:  Okay.

12             MR. HUNT:  We'll eventually get to this.

13             THE COURT:  You're going to tell me what you

14   intend to prove?

15             MR. HUNT:  No, sir.  I think you know what we

16   intend to prove.

17             Here today in the courtroom I have Ms. Collura,

18   Mr. Greenblatt, and Mr. Dubinsky as testifying experts.  I

19   would like, if I could, to have Defendants identify which

20   witnesses they have in the courtroom, please.

21             THE COURT:  What witnesses do you have in the

22   courtroom?

23             MS. CHAITMAN:  We don't have any witnesses in the

24   courtroom.

25             THE COURT:  Okay.

Page 29

1          MR. HUNT:  Okay.  Thank you, Your Honor.

2          And then just to clarify where we are on exhibits,

3     you've ruled on Exhibits 1, 2, 3, and 4, the allocutions, to

4     move those into evidence.  I think you've already ruled on

5     that.

6          THE COURT:  What are the disputed exhibits so we

7     don't have to go through every one?

8          MR. HUNT:  So that's what I was getting ready to

9     talk about.

10         THE COURT:  All right.

11         MR. HUNT:  So there are a number of exhibits in

12    Volume 1 of our binder that I think, you know, we can clean

13    up pretty quickly.  And the good news about that is once

14    we've cleaned it up, that binder will pretty much go away.

15         The only thing in that binder that I don't intend

16    to discuss here in the housekeeping session bar trial is the

17    last exhibit in the binder, which is Mr. Dubinsky's CV.  For

18    some reason it got cut and put in the edit.

19         But just to go through the exhibits in that

20    binder, as I mentioned, Exhibits 1, 2, 3, and 4 are the

21    allocutions.  You've already ruled on those.  Exhibit 5 is

22    the page and line designations of Mr. DiPascali, which we've

23    reserved to discuss in post-trial phase of this proceeding.

24         Exhibits 9 through 26 are the Trustee's

25    interrogatories and the Defendant's responses to those

Page 30

1      interrogatories, and the Defendant's responses to the

2      Trustee's request for admission.

3              We've included our interrogatories in that group

4      because the definitions are -- you have to look at the

5      definitions in order to match them up.

6              But we would like to move Trustee's Exhibits 9

7      through 26, which are the written discovery in this case,

8      into evidence.

9              THE COURT:  Any objection?

10             MS. CHAITMAN:  No.

11             THE COURT:  Okay.  So those are received.

12      (Trustee's Exhibit 9 through 26 Received into Evidence)

13             MR. HUNT:  Okay.  The next group that I'd like to

14     talk about are the authenticity of records, the custodian's

15     records.  JP Morgan has (indiscernible) well, is an

16     important part of this case.  Each party has designated JP

17     Morgan records, both BLMIS records and JP Morgan account

18     records from the Defendants.  Their bank account was held at

19     JP Morgan as well.

20             Exhibit 28 -- Trustee's Exhibit 28 is the records

21     custodian affidavit for the JP Morgan-BLMIS records, and

22     Trustee's Exhibit 20 -- or 31, excuse me -- is the records

23     custodian affidavit for the Nelson's JP Morgan records.

24     We'd like to move those custodian record affidavits into

25     evidence so that they can be applied to the documents that

1    are actually used at trial.

2              THE COURT:  Any objection?

3              MS. CHAITMAN:  We have no objection to any third-

4    party documents, just to cut this short, Your Honor.  What

5    we do object to, we filed a written objection to Madoff's

6    internal records.

7              THE COURT:  Okay.  I would need testimony on that

8    as I needed testimony at the PW trial to establish the

9    trustworthiness and authenticity and deal with any hearsay

10   objections and things.  I know we've dealt with a lot of

11   those issues before.

12             MR. HUNT:  So just to be clear, Your Honor,

13   Trustee's Exhibits 28 and 31, are those custodian

14   affidavits.

15             THE COURT:  Maybe the easier way to do this --

16             MR. HUNT:  Okay.

17             THE COURT:  What exhibits do you object to?  I

18   know there are a lot of exhibits here, and I understand your

19   objection to the business records, which will require

20   testimony, but, you know, what's objectionable here?

21             MS. CHAITMAN:  It's the -- we have the business

22   records, which are not verifiable from a third party.

23             THE COURT:  I thought you had also objected to

24   some of the information in the expert reports.

25             MS. CHAITMAN:  Yeah.

1              THE COURT:  I thought this would be easier.  Maybe

2     not, but --

3              MS. CHAITMAN:  Yeah, but I think that it probably

4     will be easier if we do that as they testify because I don't

5     --

6              THE COURT:  Okay.

7              MS. CHAITMAN:  -- know that they will use

8     everything.

9              THE COURT:  So with respect to the --

10             MS. CHAITMAN:  We objected to the use of the -- to

11    admission of the expert reports, per se.

12             THE COURT:  Well, the expert reports are hearsay,

13    but the experts will testify, presumably.

14             MS. CHAITMAN:  Exactly.  To the extent they

15    testify --

16             THE COURT:  Right.

17             MS. CHAITMAN:  -- and use documents, I would like

18    to be able to object if I find --

19             THE COURT:  Okay.

20             MS. CHAITMAN:  Okay.

21             MR. HUNT:  So --

22             THE COURT:  Maybe that cuts it short.

23             MR. HUNT:  I think it does.  So there are some

24    other records custodian affidavits I just wanted to move

25    into evidence so that there's no question down the road.

Page 33

1   The would be, again, Exhibit 28 and 31 with respect to JP

2   Morgan.  The Oppenheim records have been designated by both

3   parties.  There's a records custodian affidavit --

4            THE COURT:  That's the account's records?

5            MR. HUNT:  Yes, sir.  That's Exhibit 29.  Fiserv

6   and PIMCO is the custodian of Mrs. Nelson's IRA, and there's

7   a records custodian for that, which is Trustee's Exhibit 30.

8   Both parties have designated records from that source, and

9   we would like to move that certification of domestic records

10  into evidence as well.

11           THE COURT:  So we have 28, 29, 30, and 31.  Any

12  objection?

13           MS. CHAITMAN:  No, is it -- again, I have no

14  objection to third-party records.

15           THE COURT:  All right.

16           MR. HUNT:  Okay.  One other minor housekeeping

17  matter, Your Honor.

18           THE COURT:  They are received.

19      (Trustee's Exhibit 28 through 31 Received into

20  Evidence)

21           MR. HUNT:  Thank you.  Then we're done with Volume

22  1 of your exhibit list.

23           Sorry.  Number 32 is the other designation that we

24  got from JP Morgan for the Nelson's bank record.  I

25  apologize, Your Honor.

Page 34

1           THE COURT:  All right.  Any objection to 32?

2           MS. CHAITMAN:  No.  Again, Judge, no.

3           THE COURT:  Okay.

4       (Trustee's Exhibit 32 Received into Evidence)

5           MR. HUNT:  And then finally, so the record is

6    clear, Trustee's Exhibit 6 through 8, certified copies of

7    corporate records of the Debtor from the SEC, which is

8    Exhibits 6 and 7, and from the New York Secretary of State,

9    articles of incorporation, which are Exhibit 8, they're

10   properly authenticated, and they are admissible under

11   Federal Rule 9024.  We move those into evidence as well.

12          THE COURT:  Any objection?

13          MS. CHAITMAN:  No.

14          THE COURT:  Received.

15      (Trustee's Exhibit 6 through 8 Received into Evidence)

16          MR. HUNT:  Thank you, Your Honor.

17          So that takes care of everything but the last

18   exhibit in Volume 1, which is Mr. Dubinsky's CV, and we'll

19   be getting rid of that one in just a minute.

20          That's all I have for pretrial matters, Your

21   Honor.

22          THE COURT:  All right.  I would suggest though, at

23   the end, you just make sure that we've gone through all the

24   exhibits and know what's in and what's out, okay?  But for

25   the time being, as I understand it, the only things that are

Page 35

1    out right now or not received right now are BLMIS business

2    records, the expert reports -- and the expert reports

3    themselves.

4              MS. CHAITMAN:  Correct.  Correct.

5              THE COURT:  Okay.

6              MS. CHAITMAN:  And it's -- I think, just to short-

7    circuit this, I mean, to the extent that on cross-

8    examination I use third-party records, I assume they would

9    be admissible as well.

10             THE COURT:  Why don't we let that just -- okay.

11   Let the events take their course.

12             MR. HUNT:  That's a good point maybe, Your Honor.

13   We would propose -- I think you did this in the profit

14   withdrawal case as well, that we withhold moving records

15   into evidence until the witness's testimony is complete.  We

16   can do it that way or in a posttrial submission, if you'd

17   like us to do it that way.

18             THE COURT:  Well, the BLMIS records may be able to

19   be -- may -- we may be able to do that all at one, depending

20   on the testimony.

21             MR. HUNT:  That's what I was thinking, either at

22   the end of the testimony, or at the end of the trial we can

23   put together a brief on that if you'd like us to.

24             THE COURT:  All right.

25             Do our want to be heard, Ms. Chaitman, before we

```
 1    being in?

 2              MS. CHAITMAN:  No, thank you.

 3              THE COURT:  All right.  You can call your first

 4    witness.

 5              MR. HUNT:  Your Honor, we would call Bruce

 6    Dubinsky to the stand, please.

 7              MR. DUBINSKY:  Good morning, Your Honor.

 8              THE COURT:  Good morning.  Will you rise your

 9    right hand, please?

10              Do you solemnly swear that the testimony you're

11    about to give will be the truth?

12              MR. DUBINSKY:  Yes.

13              THE COURT:  Okay.  Please take a seat.

14              MR. HUNT:  Your Honor, for ease of administration

15    of his testimony, I have a copy of his expert report and --

16              THE COURT:  Are these exhibits?

17              MR. HUNT:  -- two allocutions.

18              THE COURT:  Thank you.

19              MR. HUNT:  These are Exhibits (indiscernible).

20              MS. CHAITMAN:  I'm sorry?

21              MR. HUNT:  These are Exhibits (indiscernible).

22              THE COURT:  I don't -- I don't need the

23    allocutions.

24              MR. HUNT:  I was just (indiscernible).

25              MS. CHAITMAN:  Oh, okay.
```

```
 1              MR. HUNT:  (Indiscernible).  That way you don't

 2    have to look at a whole big one.

 3              MR. DUBINSKY:  Okay.  Great.

 4              THE COURT:  And you can pull the microphone close

 5    to you so you don't have to lean over.

 6              Go ahead.

 7              DIRECT EXAMINATION OF BRUCE DUBINSKY

 8    BY MR. HUNT

 9    Q    Mr. Dubinsky, could you please state your name for the

10    Court?

11    A    Bruce Gordon Dubinsky.

12    Q    Please describe your involvement in this matter.

13    A    I'm a forensic accountant.  I was hired by the Trustee

14    in June of 2011 to investigate allegations of fraud and

15    whether BLMIS was insolvent and whether there was a Ponzi

16    that was perpetrated.

17    Q    Where are you currently employed?

18    A    I'm employed at an international consulting firm called

19    Duff & Phelps.  It's a financial consulting firm

20    headquartered here in New York City, and I'm in the -- I'm a

21    managing director at Duff & Phelps, and I'm in the disputes

22    and investigations business division of Duff & Phelps.

23    Q    What are your duties there?

24    A    My duties are to -- I'm hired by clients such as the

25    Trustee to investigate cases of financial wrongdoing.
```

1    That's about half of my practice, and the other half, Your

2    Honor, is on commercial cases where there's commercial

3    damages.  I either do business evaluations to assess the

4    damages or an economic calculation of damages.  So that's

5    kind of both sides of my practice.

6    Q    Mr. Dubinsky, is Duff & Phelps being paid by the

7    Trustee for your time in this case?

8    A    They are.  Yes.

9    Q    Has your compensation at Duff & Phelps changed based on

10   your appearing?

11   A    No, not at all.  It is not contingent.  As an expert

12   witness, Duff & Phelps is paid by the hour for all the

13   employees that work on the case, and it's not dependent on

14   the outcome.

15   Q    Let's talk about your qualifications an experienced

16   expert.  If you could turn to Trustee's Exhibit 33, TX-33,

17   which is a copy of your CV.  And that's actually the last

18   one in Binder 1.

19   A    Okay.  Okay.

20         MR. HUNT:  Your Honor?

21         THE COURT:  Yes.

22         MR. DUBINSKY:  Okay.

23   Q    Okay.  Yeah.  Then we'll get rid of that great big

24   book.  Is that a copy of your CV?

25   A    This is a copy of my CV, and it also has a list of

1    rules -- the Rule 26 disclosure of testimony at trial or

2    disposition dating back to the first case that I've ever

3    testified as an expert in.

4    Q    So how many times have you testified as a forensic

5    expert regarding fraud investigations or similar matters?

6    A    Today will be the 60th trial, so I've been at 59 trials

7    before this, and I've been deposed dozens and dozens and

8    dozens of times as an expert.

9    Q    Have you testified in court on any matters other than

10   this one related to the collapse of BLMIS?

11   A    I have.  I testified, Your Honor, in the U.S. District

12   Court for the Southern District in the criminal trial,

13   what's known as the Madoff 5 criminal trial.  I was hired by

14   the U.S. Attorney's office and testified for a little over

15   three days on the stand going through and educating the jury

16   on the basic operations of BLMIS, the fraud that was

17   perpetrated at BLMIS.  I talked about the Ponzi, how that

18   was perpetrated.  I talked about a lot of issues relating to

19   how money was moved around, and then I was cross-examined in

20   that case by defense counsel, I think by all five of them.

21   Q    Other than your testimony -- I think you said it was

22   Judge Swain's court?

23   A    That was, yes.

24   Q    Other than your testimony related to the collapse of

25   BLMIS in that court, have you been qualified as an expert in

Page 40

1    any other case related to Ponzi matters?

2    A    I have, Your Honor.  In the U.S. Bankruptcy Court for

3    the District of Maryland in Greenbelt, I was qualified as an

4    expert in the first pay bankruptcy case, and it was a Ponzi

5    scheme.  It was a payroll servicing company that started out

6    in a legitimate matter, was taking money from clients, and

7    then was supposed to pay that money over to the IRS for

8    withholding for taxes.  And that spiraled into a Ponzi

9    scheme very quickly.  They just couldn't sustain the

10   operations, and then were taking -- as they were getting new

11   clients, they were taking money for tax deposits from those

12   new clients and paying the old bills at the IRS, and it just

13   eventually spiraled out of control.  I testified before -- I

14   forget the judge's name who was the chief judge at that

15   time.  Judge Mannes was the chief judge.

16   Q    Has there ever been a situation where you were

17   qualified as an expert but your testimony was excluded in

18   trial?

19   A    There was one recently, Your Honor, and the -- and the

20   only one.  The U.S. District Court in Southern Illinois, it

21   was a case involving political bribery.  There were

22   allegations that a Supreme Court judge at the state level in

23   Illinois was being bribed by State Farm Insurance company.

24   It was a big class action suit, and my testimony was about

25   the money laundering aspect.  They had brought -- the other

1    side had brought an expert that was going to say that State

2    Farm had laundered money through political action campaign

3    committees and dark pools of money.  I was a rebuttal

4    witness.  The judge summarily rejected my testimony.  He

5    believed my testimony was based -- the underpinnings were

6    based on one American institute of certified public

7    accountant's practice aid, which it clearly was not.  There

8    was a 100-and-some-odd-page report.  And he also excluded a

9    lawyer from, I believe it was (indiscernible).  And a former

10   appellate court judge in the state of Illinois was going to

11   testify on the election rules and how it works in Illinois,

12   and all three of us in the same motion were summarily

13   excluded.  That's the only time.

14   Q    Luckily, we're here in New York today.  Where did you

15   go to college?

16   A    I went to the University of Maryland in College Park.

17   I graduated in 1983 with a bachelor's degree in accounting.

18   Q    Do you have any advanced degrees?

19   A    I do.  Subsequent to that, Your Honor, I went to

20   Georgetown University and graduated in 1986 with a master's

21   degree in taxation.  It was the corollary program to the LLM

22   program.  Being that I'm not a lawyer, I wasn't allowed to

23   take classes in that, but I was practicing as a tax

24   accountant during that time.  And so it was a similar

25   program, and I was able to obtain the master's in taxation

Page 42

1    and graduated with high honors in 1986.  That was the end of

2    the formal education.

3    Q    So where are you -- where were you employed before you

4    started working at Duff & Phelps?

5    A    Well, to run through it briefly, Your Honor, I started

6    at one of the internal accounting firms.  When I started, it

7    was called Alexander Grant and Company.  It's now called

8    Grant Thornton.  I was in the audit department.  Spent two

9    years as an auditor going through books and records of

10   financial companies, banks.  I did sports teams.  I had the

11   -- when they were the Washington Bullets at that time in the

12   capitol.

13           Then I moved to the tax department, did tax

14   compliance and tax audits.  To fast forward a little bit

15   from there, I had a real estate development company in

16   between, building in D.C.  And then I went back to public

17   accounting -- this would've been 1990 -- and ran the tax

18   department for a regional tax firm handling IRS audit

19   matters and appellate matters for tax cases.

20           And from there, I started my own firm.  Had a firm

21   with a partner for 16 years in Bethesda, Maryland just

22   outside of Washington D.C.  And then in 2008, Duff & Phelps

23   wanted to expand and purchase my practice in the Washington

24   region, and I became the Washington D.C. office of Duff &

25   Phelps and have been there -- I just crossed the 11-year

1    mark at Duff I Phelps.

2    Q    Do you have any professional licenses or special

3    training?

4    A    I do, Your Honor.  The first one is I'm a certified

5    public accountant.  I was licensed in 1985 and have been

6    dually licensed as a certified public accounting in the

7    state of Maryland ever since.

8         Up on the screen, I -- I'll roll through these

9    fairly quickly for Your Honor.  Certified fraud examiner,

10   that's a professional designation through education and

11   proctored testing that I obtained in 1998 for the discipline

12   of conducting fraud examining, how to conduct interviews and

13   interrogations, how to take custody of documents, everything

14   that Your Honor would anticipate when one goes through and

15   does a fraud examination.  I obtained a certified valuation

16   analyst in 1998.  That's a credentialed body called the

17   National Association of Certified Valuators and Analysts.

18   And that, Your Honor, is again through education and a

19   proctored examination to value non-publicly traded

20   companies, so a division of a company or a whole company,

21   something where there's not a ready market price, and that's

22   the finance and theory behind that.

23        I have a master analyst in financial forensics.

24   So if Your Honor thinks about fraud examination as a

25   subcomponent of financial forensics, fraud is one piece.

1    Financial forensics is the larger body of knowledge dealing

2    with if I'm testifying before a court, what are my roles,

3    what do I need to do to reach an opinion?  So it may not

4    just be on fraud.  It may be on areas of computing economic

5    damages.  So that was obtained in 2008.

6            The certified in financial forensics is from the

7    American Institute of CPAs, very similar to the last one I

8    described, Your Honor.  I was a commercial arbitrator for

9    two years on the American arbitrator panel for commercial

10   arbitrators.  I was one of 25 selected in the county as a

11   non-lawyer.  A that time, the AAA thought that litigants

12   would want a businessperson on a panel.  Turned out they --

13   I found they really didn't.  So for two years, I did that

14   and stopped paying the fee and let that lapse, but I went

15   through all the training and took the test and became a

16   commercial arbitrator.

17           Next to the last one, Your Honor, the registered

18   investment advisory -- advisor representative, that says

19   former.  I was licensed for just about 10 years, and I

20   advised clients on buying and selling stocks, investment

21   advice.  I was licensed through the state of Maryland.  I

22   had my Series 65 examination and was registered with the

23   SEC.  I was with two different firms in the region.  Our

24   clients were basically high-net-worth individuals, many who

25   were already my clients as a CPA.  Then once I got licensed,

1    I could provide advice to them and collect a fee -- we

2    called it a wrap fee -- on assets under management.  And so

3    I went through the training on that and did that.

4            And the last one, Your Honor, is a certified anti-

5    money-laundering specialist.  I obtained that in 2017.

6    That, again, through a proctored examination and education

7    dealing specifically with money laundering, being able to

8    trace money, understanding how the banking system works both

9    nationally, here in the States, and internationally, and the

10   movement of money when people launder money or attempt to

11   launder money.  So I think I've covered them off.

12   Q    So in addition to these professional certifications,

13   have you ever served in any capacity as a member of a

14   professional organization?

15   A    I have.  So, Your Honor, I spoke a few minutes ago

16   about the Association of Certified Fraud Examiners when I

17   was the certified fraud examiner.  That association is the

18   largest anti-fraud examination examining body in the world

19   with about 75,000 current members.

20           I was -- this says chairman emeritus, which I am

21   now.  I was the chairman of the board for a one-year period

22   for that organization internationally, and I was on the

23   board for a year prior to that.  And everything you would

24   expect, dealing with disciplinary actions of members,

25   credentialing issues, education.  The whole gamut, as a

Page 46

1   chairman I was handling.

2   Q    So what do certify fraud examiners and certified

3   forensic financial analysts do?

4   A    We come in, and in a situation like this, try to

5   explain our work.  We conduct our work according to

6   standards, professional standards that I'm governed by.  And

7   if it's a fraud examination, there's usually a predicate of

8   fraud, that I'm hired under that predicate, and then I

9   attempt to either prove or disprove that predicate.  Was

10  there fraud or was there not fraud?  Obviously, the

11  determination of fraud is up to a trier of fact like Your

12  Honor.  It's a legal determination.

13        But I will lay out all of the steps and documents

14  and go through all of that, so whether it's Your Honor or a

15  jury, as it was in the Madoff 5 criminal trial, they can

16  make an educated determination based on my work and my

17  opinions and conclusions.

18  Q    So did you rely on your expertise as a CPA, CFA, CFFA,

19  CAMS, CVA, and master analyst to investigation BLMIS?

20  A    I did, Your Honor.  All of those have components that

21  overlap, and they're all important professional designations

22  that allow me, when I'm conducting work in this case or

23  other cases, to follow the professional standards and make

24  sure that my work is done appropriately, that my opinions

25  are stated to a reasonable degree of accounting certainty,

Page 47

1    and that others can rely on them.

2    Q    So does your expertise extend to computer forensics?

3    A    It does.  Your Honor, in the late '90s and through

4    about 2004, I was a co-owner of a computer forensics company

5    called U.S. Data Forensics, LLC.  This is when computer

6    forensics was just kind of becoming vogue.  My partner was a

7    former federal law enforcement officer out of the

8    government, one of the first to be doing computer forensics

9    work, so I was trained by him.  And I went through and

10   learned the various software.  It was fairly rudimentary at

11   that point but had been able to conduct computer forensics

12   examinations and still -- I'm involved -- I sold that

13   company off to my partner but continue to take training and

14   education courses on computers, on cybercrimes, on computer

15   offensives.

16   Q    What is computer forensics?

17   A    Computer forensics, Your Honor, is -- if you think of

18   every day you go to get your car, you turn the key, and

19   hopefully the car starts, and you can drive to court.  You

20   don't get under the hood every day, and look at the engine,

21   and see what's making the car run.  Computer forensics is

22   kind of looking under the hood in a computer down to what

23   they call binary level, zeros and ones.  And there's

24   information in there.  I can tell when documents have been

25   deleted where if you just did a random search using a

1    browser or file explorer, you can't tell that.  So there's

2    special tools that when the computer -- software

3    manufacturers built the software, you could still look

4    underneath it as a developer or as an examiner and

5    forensically see certain things.  That's the best way to

6    explain it.

7    Q    You mentioned earlier that you have been an investment

8    advisor.

9    A    That is correct.

10    Q    Did you rely on your prior experience as an investment

11    advisor in the investigation of BLMIS?

12    A    I did.  Your Honor, when I was licensed and I had to

13    take the Series 65 examination, that went through many of

14    the items I was looking at from basics of what's a stock,

15    what is an option, what's a put, what's a pull, issues of

16    volatility.  All of those concepts are embodied in the

17    Series 65 examination.

18              I then -- when I passed it, I actually -- I had a

19    practice.  I sold it twice.  I built it up, sold it to one

20    firm, built it up again, sold another practice, so I was

21    actually advising clients, and that experience was helpful

22    in going through this investigation, understanding how

23    things work -- or how they should've worked because it's not

24    so much always what's on the page that's important.  It's

25    what's not on the page sometimes that becomes very important

Page 49

1   when you're doing an investigation.

2   Q    Have you authored any articles in your profession?

3   A    I have.  I've offered -- authored many articles, peer

4   review journal articles.  I authored an article -- I believe

5   there's a list in the CV, Your Honor.

6   Q    There is.  It's, I think, a pretty long.  And I was

7   going to ask you if they were included in that list.

8   A    Yes.  And just of note, Your Honor, there's a series of

9   -- a three-part series on Monte Carlo simulation analysis

10  that is used -- I just testified in a case two weeks ago

11  about Monte Carlo simulation in projecting stock prices.  So

12  those were peer review journals.  There's a list of

13  articles.

14           And I was also the coeditor, Your Honor, of a

15  national newsletter that went out to every -- all the CPA

16  community in the United States if they subscribe.  Back in

17  the '90s, it was a publishing company called Harcourt, Brace

18  & Company, and I was the coeditor, and I wrote half the

19  articles every month.  A little bit of an arduous task

20  writing that many articles while you're practicing, but they

21  focused on tax -- mainly on tax and business issues in that

22  publication.

23  Q    Any professional awards?

24  A    I have received professional awards.  I was awarded the

25  Certified Fraud Examiner of the Year.  I think it was in

Page 50

1    2005 -- I'd have to look here somewhere in the CV -- for the

2    work that I've done on cases like the Lehman Brothers case.

3    I worked on the Lehman Brothers bankruptcy for the special

4    examiner, Tony Valukas, that was appointed here in the

5    Southern District.  So I worked on the Lehman Brothers case

6    as a forensic accountant.  I've worked on cases where -- the

7    Washington Teachers Union case.  That was union fraud, and

8    all six of those individuals went to federal prison.  So a

9    combination of the work that I've done, I was awarded that

10   award.  I think that is listed --

11   Q    The document will say what it says.  I think you're

12   fine.

13   A    Yeah.  It's somewhere in the CV.

14   Q    So was some of that work you did as a forensic

15   accountant for the U.S. government?

16   A    It is.  I'm hired frequently by the U.S. Department of

17   Justice as an expert.  The most notable case other than the

18   Madoff 5 case was the Wyly Brothers bankruptcy case.  When

19   the Wyly Brothers had a case here in New York, the SEC went

20   after them for fraud.  They then subsequently filed

21   bankruptcy in the bankruptcy court in the Northern District

22   of Dallas.  I testified before the Chief Judge Barbara

23   Houser in that trial.

24           And my testimony basically centered around the

25   offshore nature -- the fraudulent offshore nature and sham

1    nature of all the entities involved and that these

2    individuals put their money offshore to basically evade

3    taxes.  And the judge agreed with me in her opinion and --

4    but that's just one of the case -- I do a lot of work for

5    the Department of Justice.

6    Q    So you gave us an overview of your assignment a few

7    minutes ago.  If you could turn to Exhibit 34, which is

8    actually a small bound notebook I gave you, that's your

9    report.

10   A    Okay.  Let me close this big one up for a minute.

11   Q    I think you're done with that.  Could you just tell us

12   if that's the copy -- a copy of the report you prepared in

13   this case?

14   A    It is.  This is a copy of my expert report, Your Honor,

15   in this case that I authored on August 20th, 2013.

16   Q    Mr. Dubinsky, the counsel and the Court both have

17   copies of that report.  You should feel free to refer to it

18   if you need to during your testimony.  But if you do, would

19   you just point out the line, page, something that can

20   identify it so that the record's clear and so that Judge

21   Bernstein can follow along?  We'll try to do our best on

22   that.

23   A    I will.

24   Q    Okay.  So what was your assignment then?

25   A    My assignment was to conduct a proper investigation of

```
 1   BLMIS and determine whether -- three things:  whether there

 2   was -- whether I found evidence of fraud, whether I found

 3   evidence of a Ponzi being perpetrated, and whether at a

 4   certain point in time BLMIS was insolvent using tests that

 5   the bankruptcy court would -- typically looks at.

 6   Q    So just briefly, because we'll get into it in more

 7   detail, could you just briefly tell us the methodologies you

 8   used to do that?

 9   A    The methodologies in general were the investigative

10   methodologies that I'm governed by under the professional

11   standards.  That is, I have to have due professional

12   competence -- professional competence to undertake an

13   investigation.  If it's outside of my area of expertise, I

14   can't do it.

15        I have to have due professional care, so when I'm

16   planning the investigation, I need to properly plan it.  I

17   need to have proper supervision.  This being an

18   investigation of this size, I couldn't do every single

19   thing, so I had people underneath me conducting analysis

20   that then I reviewed.  I had to properly plan and supervise

21   that.

22        Things like chain of custody of documents when I

23   went to, for insane, the Madoff warehouse over in Queens and

24   climbing on ladders and digging through boxes, I had to make

25   sure when I took document out and flagged them that I was
```

Page 53

1    interested in, I had to make sure those were tagged properly

2    so there was a trail back.

3          I had to map out the work and make sure that the

4    work was what we call QC'd or quality control tested.  So if

5    an analysis was done, I would have other people then that

6    didn't do the analysis go back and test it to make sure that

7    it was accurate.  All of these things are under the

8    professional standards, and that's general methodology

9    that's used.  They're specific as we get into it.

10   Q    Sure.

11   A    And we go through specific testing that I did, Your

12   Honor.  I'll explain exactly what I did in more detail.  But

13   as a general overview, that's the basic methodology, and

14   then properly documenting what I did to render the

15   conclusions that I've rendered.

16   Q    So we're going to talk about the books and records in

17   great detail, obviously, as we get further into your

18   findings.  But could you just briefly describe for the Court

19   categories of BLMIS books and records that you considered

20   and generally describe where they came from and how they

21   were relevant?

22   A    Sure.  So I think the best thing, Your Honor -- if Your

23   Honor looks at Page 10 of my expert report, and I guess

24   there are some blue numbers on the bottom.  I'll refer to

25   the blue numbers.  I was told to --

Page 54

1    Q      Okay.

2    A      -- those are -- I don't know if they're TX numbers.

3    Q      No, that's just the Exhibit number.

4    A      Well, there's page numbers in blue on the bottom.

5    Q      Okay.

6    A      There's a Paragraph 13, and it runs through the bullet

7    points of the items.  And I'll run through these quickly for

8    Your Honor.

9             I looked at customer statements, trade

10   confirmations, trade blotters.  I looked at bank statements

11   where available.  I looked at trading records from what's

12   called the prop-trading business.  I'll explain the

13   different sides of the business of BLMIS in a -- in a few

14   minutes.

15            I looked at employment records.  There were issues

16   of whether people were getting paid too much, whether they

17   were profitable, whether there were ghost employees.

18   There's a section of my report about people never showing up

19   to work and getting paid.

20            I looked at the AS400 system, the computer system.

21   That was the computer system used on both sides of the

22   business, two different systems but the similar system.

23   There were backup tapes.  I think there were about 17,000

24   pieces of electronic media, backup tapes, computers,

25   cellphones, you name it in the context of electronic format

1   that I did computer forensics on.  I restored backup takes.

2   I even went as far as securing in an identical model to the

3   AS400 computer, stripping that down clean, and then

4   restoring the exact same operating system that was being

5   used at BLMIS.  Restored that and then took backup tapes and

6   restored it so I had a working version of what the IA

7   business -- and I'll explain that side of the business in a

8   minute.

9          I restored backup tapes.  I even went as far as

10  securing an identical model to the AS400 computer, stripping

11  that down clean, and then restoring the exact same operating

12  system that was being used at BLMIS.  Restored that and then

13  took backup tapes and restored it.

14         So, I had a working version of what the IA

15  business -- and I'll explain that side of that business in a

16  minute -- was using to perpetrate the fraud.  That's the

17  general -- there were vendor files, some emails, accounting

18  records, some deposition transcripts, other sworn testimony.

19  But that's the general flavor of the documents and

20  information.  Like I said, I think I spent almost a week out

21  at the Madoff warehouse just climbing through box after box

22  -- there were just thousands of boxes of documents out there

23  dating back many, many years.  A lot of documents.

24  Q    So, are those the types of documents that forensic

25  accountants and forensic examiners, computer forensics

Page 56

1    experts rely on in your investigations?

2    A    They are, absolutely.

3    Q    What about third party records?  Did you have access to

4    some third party records?

5    A    I did.  There were third party records, what I'll all

6    third party records.  Bank statements.  Those are produced

7    by a third party.  There were records produced by the DTC

8    and the OCC.  There were agreements that I found in the --

9    in parts of BLMIS about agreements between banks.  So, there

10   were third party documents that I found.

11   Q    Were there any restrictions put on you as far as what

12   documents you could review?

13   A    Not -- none whatsoever.  In fact, if I thought I needed

14   a document, I would ask the Trustee.  If they didn't have

15   it, they'd try to go get it for me.  I had to work through

16   the Trustee.  I couldn't just go out on my own and try to

17   get documents because I had to follow the legal process.

18   But absolutely no restrictions.  I had access to a full

19   database of documents.  Unfettered access to search through.

20   So, nothing was withheld, nothing precluded from my eyes

21   from that standpoint.

22   Q    I guess it goes without saying, but did you use those

23   records in your investigation?

24   A    I didn't.  So, Your Honor, while I considered many,

25   many records, what I tried to do in the report is -- there

1    are quite a few footnotes in the report.  So, where a

2    document directly supported a finding, I tried to footnote

3    it to make it easier for the reader.  There is an appendix

4    to the report of documents considered under Federal Rule 26.

5    I'm required to provide a list of documents considered.  So,

6    when I was searching through documents, things that I've

7    looked at, sometimes they weren't relevant.  Those are still

8    in that list.  But I would point to the body of the report

9    and the footnotes as being kind of the prime meat, if you

10   will, of those things.

11   Q    Just for the record, I believe that's Appendix B in

12   your report.  And Schedule 1 to Appendix B?

13   A    That is correct.

14   Q    Okay.  Are your conclusions based on an analysis of the

15   BLMIS books and records?

16   A    Of the BLMIS books and records, yes, plus third party

17   records, plus -- Your Honor, if I needed things from an

18   article or learned treatise, I footnoted that.  So, a

19   combination of all of that, plus my education, training and

20   experience altogether allowed me to form the basis of my

21   opinions.

22   Q    Were the records and documents that you looked at

23   sufficient to allow you to reach your conclusions?

24   A    They were.  If I'm ever in a situation where I don't

25   have enough documents, I'll tell the lawyers that and simply

Page 58

1    can't render the opinion.  Or I'll put a qualification on

2    it.  There were no qualifications put on this report.

3    Q    So, just briefly, did you reach any conclusions during

4    your investigation?

5    A    I did.

6    Q    What did you conclude?

7          THE COURT:  Don't you want to qualify him first?

8          MR. HUNT:  I was just going to -- I can skip that

9    and we can qualify and go to that.  That's fine.

10         THE COURT:  Before he tells me his opinion, don't

11   you think you should qualify him?

12   Q    So, just to make sure we have that methodology clear,

13   though.  So, was your investigation of fraud -- were the

14   methodologies you used for the investigation of fraud

15   generally accepted in your profession?

16   A    Yes, they were.

17   Q    They comply with the applicable standards?

18   A    They do.

19   Q    Did you perform your work in accordance with the

20   applicable professional standards for computer forensics,

21   forensic accountants, fraud examiners, and valuation

22   analysts?

23   A    I did.

24   Q    Are your conclusions made with a reasonable degree of

25   certainty in those fields?

Page 59

1    A    They are, yes.

2    Q    Are your conclusion based on those methodologies and

3    professional standards?

4    A    They are.

5    Q    Can the results of your analysis be replicated by

6    someone with the same level of education, training, and

7    expertise as you do?

8    A    I believe they could, yes.

9    Q    Are your conclusions contained in your report?

10   A    They are, Your Honor.

11   Q    Does your report set fort the facts and data on which

12   you relied on to reach those conclusions?

13   A    It does.

14   Q    Does it include specific examples that directly support

15   your conclusions?

16   A    It does, yes.

17          MR. HUNT:  Your Honor, we would proffer Mr.

18   Dubinsky to testify as an expert witness in this case.  He's

19   a Certified Public Accountant, a Certified Fraud Examiner, a

20   Certified Forensic Financial Analyst, a Certified Valuation

21   Expert, a Certified Anti-Money Laundering Specialist, a

22   master analyst in financial forensics.  We request that the

23   Court recognize him as being qualified to testify in the

24   areas of forensic accounting, fraud examinations, computer

25   forensics, solvency and business valuations, and investment

Page 60

1    theory and practices.

2              THE COURT:  Any objection?

3              MS. CHAITMAN:  No objection.

4              THE COURT:  All right, he's qualified.  Thank you.

5              MR. HUNT:  Thank you, Your Honor.

6              MR. DUBINSKY:  Thank you, Your Honor.

7              MR. HUNT:  Before we get started -- do you want to

8    put some water...?

9              MR. DUBINSKY:  I have it right here, thanks.

10             MR. HUNT:  Okay, good.  I know I've been needing

11   some.

12   Q    The Defendants in their opposition to the Trustee's

13   motion have acknowledged that fraudulent intent is not

14   disputed here.  Rather, it's the nature of the fraud that is

15   issue -- is at issue.  Did you examine the nature of the

16   fraud?

17   A    I did examine the nature of the fraud, yes.

18   Q    Well, let's get some background on BLMIS.

19   A    Okay.

20   Q    Just briefly, for historical context, did you review

21   the books and records to determine when Mr. Madoff began his

22   investment adviser business?

23   A    I did.

24   Q    What did you find?

25   A    It started right around 1960-'61.  Early '60s.

Page 61

```
 1   Q    Moving ahead to the '70s, what type of investment

 2   trading strategy was Mr. Madoff employed in at that time?

 3   A    It was purportedly a convertible arbitrage trading

 4   strategy.  And I should clarify, that would be for the

 5   investment advisory side of the business.  Mr. Madoff had

 6   another side of the business and there were different

 7   strategies or different trading that was occurring there.

 8   But for the investment advisory side, it would've been a

 9   convertible arbitrate strategy.

10   Q    Thank you for that clarification.  Were you able to

11   reach any conclusions about that strategy?

12   A    I was.

13   Q    What did you find?

14   A    That that trading never occurred dating back into the

15   '70s.  That based on my analysis and my conclusions that

16   since the trading never occurred, it was a fraud.

17   Q    So, the accounts at issue here were opened in December

18   of '92 and I think August of '96, is that right?  What

19   trading strategy was the investment advisory side of BLMIS

20   purportedly executing on behalf of clients during that

21   period?

22   A    It was called, Your Honor, split strike conversion

23   trading strategy.

24   Q    Would that -- did that apply to these account as well?

25   A    Yes, it did.
```

Page 62

1    Q    Were you able to determine when BLMIS changed from the

2    convertible arbitrate strategy to the split strike strategy?

3    A    Right around the early '90s.  This was the time period

4    after the SEC had been in to investigate the accounting firm

5    of Avellino and Bienes, who had been putting money into

6    BLMIS through taking money from their clients and posing

7    them as investor notes.  And when that seemed to all

8    unravel, now, Mr. Madoff was faced with about 4,500 clients

9    -- instead of having one accounting firm to deal with and

10   one set of clients in that, now he had thousands of clients

11   to deal with because they had been potentially or

12   purportedly making a decent return and they wanted to come

13   back for more.  And the convertible arbitrage at that point,

14   it was very difficult and time consuming to try to -- to try

15   to perpetrate the fraud.  It took a lot of work, as you'll

16   see when I go through.  And so, the split strike conversion

17   strategy was born or was utilized.

18            This was not a strategy created by Mr. Madoff.

19   The split strike conversion strategy is a legitimate trading

20   strategy that people use on Wall Street.  So, this was

21   nothing genius that Mr. Madoff put in to play, but this was

22   something he put in to play to allow it to be scalable so

23   you could deal with thousands of people in that regard.

24   Q    Okay.  So, during the time we're talking about here,

25   you mentioned there were two legs of the BLMIS business.

Page 63

1   How was it structured?

2   A     So, BLMIS, Your Honor, was structured -- kind of two

3   sides of the business.  One I'll refer to as the investment

4   advisory side.  Sometimes I might slip and call it House 17

5   because it was located on the 17th floor of the Lipstick

6   Building here in Manhattan.  The other side was the

7   proprietary trading and market-making business.  And I'll

8   just refer to that throughout the trial as the prop trading

9   side of the business.  But proprietary trading is basically

10  when a broker-dealer uses its own money to trade for its own

11  account to make profits for itself.  So, somebody like

12  Goldman will have a prop trading desk and they'll try to

13  make money with their own money.

14            The market-making side is acting as a market maker

15  in certain stocks and creating flow into the market, and

16  acting as a broker-dealer to take orders for buys and sells.

17  So, that was going on in the prop trading side of the

18  business.  And sometimes I might slip and refer to that as

19  House 5.  That's how that was known in a lot of the records.

20  So, basically, the investment advisory side and the prop

21  trading side -- two sides of BLMIS.

22  Q     So, was the prop trading side of the business designed

23  to buy and sell securities?

24  A     Absolutely.

25  Q     All right.  What about the investment advisory side of

1   the business?  What was it?  What was it designed to do?

2   A    Well, it was designed to purportedly trade stocks to

3   buy equities, to buy options.  Under the split strike

4   conversion strategy, it would be using puts and calls.  And

5   I'll explain that in more detail.  And it was also

6   purportedly to -- when Mr. Madoff thought the timing was

7   right, to unwind these trades and put the money supposedly

8   in treasuries.  That's what it was purported to do.  The

9   problem is it never did that.

10  Q    So, I was going to ask you that.  So, the proprietary

11  trading side of the business bought and sold securities?

12  A    Absolutely.

13  Q    The investment advisory side?

14  A    Never.

15  Q    Okay.  To operate a securities tradings business like

16  BLMIS, do you need money?

17  A    You do need money, yes.

18  Q    Do you need computers?

19  A    You need a vast computer system.  If you're going to be

20  a broker-dealer like BLMIS and do prop trading, you need

21  sophisticated computer systems.

22  Q    Let's talk about computers first.

23  A    Okay.

24  Q    You mentioned the AS400.

25  A    Yes.

Page 65

1   Q    What is a trading platform?

2   A    Your Honor, a trading platform, if you think about --

3   it's really a collection of different computer systems that

4   will facilitate the trading process.  So, from the time, in

5   the old days, when you'd pick up a phone and call a broker

6   and say I want to buy 100 shares of Exxon, that broker then

7   would initiate that purchase.  They'd put it into a system,

8   that system may be the order entry system.  That would go to

9   another system inside the brokerage firm, maybe it was

10  Merrill Lynch, and connect with another system.  Did Merrill

11  Lynch have a seller on the other side, if they were acting

12  as an agent?  If they did, that system would match it.

13       Then when your money came in, another system would

14  say Your Honor sent the money to pay for the stock or it was

15  taken out of your account.  When the sale went through,

16  money has to clear back out of that brokerage firm to

17  another brokerage firm on the other side.  There's pricing

18  that goes back and forth that needs to talk to the market.

19       The collection of all of those systems, be it

20  separate servers or computer programs, various programs

21  within a server constitute a trading platform.  And you

22  can't trade without it unless you are -- you know, pick up

23  on the phone and call your broker, but BLMIS was a broker-

24  dealer.  They were licensed as a broker-dealer, and they

25  were supposedly making a market and were, in fact, on the

1    prop trading side of the business, making a market in

2    certain stocks.

3              So, all of those connections to the market --

4    Bloomberg pricing -- those things are necessary to be able

5    to execute a trade and make it happen.

6    Q    So, I was going to ask you but I think you already

7    answered this -- does a business like BLMIS need a trading

8    platform?

9    A    Absolutely.  You know, when I conducted the

10   investigation, Your Honor, one of the things I did was went

11   back and looked at the website for BLMIS.  I went back to

12   something called waybackmachine.org and it chronicles

13   historical websites.  A lot of people don't know that

14   they're maintained out there forever.  And those websites

15   talked about how sophisticated BLMIS was, the trading

16   platform, the computers, algorithms, all of the things that

17   were used to sell the public on a broker-dealer side that he

18   could execute trades and, in fact, he did.

19             And I found things inside BLMIS documents, maps of

20   the systems where the internal IT people had mapped out how

21   the systems connected to each other.  I found a lot of that

22   information at BLMIS in the documents.

23   Q    So, you testified earlier about the AS400 systems.  Did

24   you evaluate the investment advisory business side computer

25   system?

1  A    I did.  Let me just clarify.  The AS400 system is in

2  itself a computer.  It was an IBM computer, and used

3  differently -- and I'll explain that in a minute -- on both

4  sides.  But in the prop trading side, it collected data from

5  all of these different servers and connections that the prop

6  trading business had.  It collected that data, and then was

7  used to print customer statements, was used to compute rates

8  of return.  So, the AS400 I wouldn't say was the brains of

9  the business; it was a collector of information on the prop

10 trading side from all these various systems to accumulate

11 and then facilitate further reporting, if you will.

12          In the investment advisory side, there too was

13 another AS400 computer, but the big difference over there

14 when I investigated, Your Honor, is it lacked all of the

15 other trading components that were found on the prop trading

16 side.  So, basically, all you had in the IA business was

17 this machine that was supposed to be the collector of

18 information, as it was in the prop trading side -- in the

19 investment advisory side, it was a standalone machine

20 connected to some terminals that people could enter data

21 into.

22          And I've kind of said this throughout the

23 investigation, it was like a giant typewriter.  It was like

24 a giant electronic typewriter that you could enter purported

25 trades in.  They didn't go to the market, they didn't

1    execute anything because there were no connections to it.

2    And then it could print out statements.  So, some of the

3    same programs that were present over in the prop trading

4    side originally on the AS400 were taken, used in the IA

5    business to facilitate doing some of the same tasks, but it

6    lacked any capability to actually trade.

7    Q    So, the proprietary trading side of the business had a

8    trading platform?

9    A    It had a trading platform and it actually traded.

10   That's what it did.

11   Q    Was it set up to buy and sell stocks?

12   A    Absolutely.

13   Q    How about options?

14   A    Absolutely.

15   Q    How about treasuries?

16   A    Absolutely.

17   Q    How about the computer at the investment advisory

18   business, the AS400, was that a trading platform?

19   A    Absolutely not, Your Honor.

20   Q    Was it set up to buy and sell stocks?

21   A    It was not.

22   Q    Was it set up to buy and sell options?

23   A    It was not.

24   Q    How about treasuries?

25   A    It was not.

1   Q    All right, so let's talk about those two computers.  I

2   want to kind of put them side by side.

3   A    Okay.

4   Q    See what they look like.  If you could take a look at

5   Exhibit 44 in your binder -- do you have that?  You will in

6   a minute.  Here it comes.

7   A    Oh, another big binder.

8   Q    You thought you were getting out of it, but no.

9   A    I won't have to go to the gym later, lifting these.

10  Exhibit 44, you said?

11  Q    Yes, sir.

12  A    Okay.

13  Q    Let me know when you've found that.

14  A    I found that, yes.

15  Q    Okay.  Did you prepare Exhibit 44?

16  A    I did.  This is contained, Your Honor, in my expert

17  report on Page 28 and 29, and 30, and actually 31.  So, it

18  carries over to four pages.  Yes, I prepared this.

19  Q    What sources of information did you use to prepare it?

20  A    A combination of sources of information.  There were

21  internal documents that I found at BLMIS, what I'll call

22  infrastructure -- IT infrastructure diagrams diagraming out

23  the systems.  There were manuals that I found at BLMIS

24  describing the different systems.  The physical examination

25  of computer software, when I went through the actual code

1   and looked at the code, it would identify certain trading

2   systems.  So, it was a combination of putting together a lot

3   of different information to come up with this.

4   Q    Does Exhibit 44 accurately represent your analysis of

5   the computers systems in the two legs of BLMIS?

6   A    It does.

7   Q    If you could refer to Exhibit 44 and tell us what the

8   columns and lines represent across the page, and then I want

9   to ask you about a few of the rows on that exhibit.

10  A    Okay.  So, the left column, Your Honor, where it says

11  Name, that's the name of the trading either platform, system

12  or software that I was able to identify.  The description is

13  a brief description of what the functionality of that

14  software was or should have been.  The third column says

15  Proprietary Trading Business, and that has a column with

16  either a checkmark or a blank, depending on whether I found

17  evidence of that item being used in the prop trading

18  business or not.  And the fourth column says IA Business,

19  and, similarly, there would be a checkmark or a blank to

20  denote whether, in fact, there was evidence that that

21  existed and was in use.

22  Q    I see a lot more checkmarks on Proprietary Trading

23  Business.  What does that mean?

24  A    That means that those systems were present in the prop

25  trading business.  If you flip through the four pages,

Page 71

1    almost every single box is checked, as one would expect to

2    find in a business that was actually trading stocks, and

3    options, and other types of investments.

4    Q    So, I want to take a look at some of those checkmarks

5    in Exhibit 44 and I want to ask you to explain what they are

6    and whether they're relevant to your opinion.

7    A    Okay.

8    Q    And let's start at Page 1, and look at the row labeled

9    ACES.  Is there a checkmark in the proprietary trading

10   column of Exhibit 44?

11   A    There is.

12   Q    Is there one on the IA business side?

13   A    There is not.

14   Q    Can you tell us what the ACES system was and how it's

15   relevant to your opinion?

16   A    It's a system that routed orders between order entry

17   firms and market makers that were doing business with BLMIS.

18   So, if you were another market maker on the other side of a

19   trade, for every trade there's something called a

20   counterparty.  There has to be somebody on the other side of

21   that trade.  And when a buy or sell is initiated, an order

22   is initiated, that has to be tracked.

23          And so there are systems so people can communicate

24   instead of in the old days, really picking up the phone and

25   calling each other and doing it all by paper, to automate

Page 72

1    that process.  And so that's what this did, the ACES system

2    did.  And that was present at the prop trading business.

3    And it was not present in the IA business.

4    Q    Was it part of the trading platform prop business?

5    A    It was part of the trading platform in the proprietary

6    trading business, that's correct.

7    Q    But not the IA business?

8    A    No.  I didn't find any evidence of it being at the IA

9    business.

10   Q    Let's take a look at Page 3 of Exhibit 44.  I'm going

11   to move ahead a little bit.  And I'd like to ask you to talk

12   to us about the row labeled MISS.

13   A    Okay.  So, the MISS system was an order management

14   system and it's used for proprietary trading activities and

15   market making.  It basically can handle over 400,000 trades.

16   It can go up to 1.4 million trades a day at that time.  And

17   there are different -- what made up this system, there were

18   different individual software applications that made up

19   MISS.

20           But, basically, again, if you're trading on high

21   volume all throughout the day, five days a week, every week

22   of the year, you need an order management system that keeps

23   track of it all.  There's just no way if you have a group of

24   traders trading that many things that you can do it by

25   paper.

Page 73

1              And so that system was present and working in the

2     prop trading business.  There was software from it, there

3     were documents from it, there was architecture documents,

4     how that was hooked up, and that was in the prop trading

5     business.

6              On the IA side of the business, Your Honor, it

7     didn't exist.  There's no need -- if you're not trading any

8     stocks and you're not doing anything, you don't need all

9     these systems.  Systems have servers, servers take up room,

10    people can have access to it, they can see what you're

11    doing.  So, in the midst of perpetrating a fraud, things you

12    don't need you don't put in the room.  You leave it out.

13    And that's why these things were not present over in the IA

14    business.

15    Q    Staying on Page 3, just scroll down a little bit, I'd

16    like to talk to you about NASDAQ QIX.  The NASDAQ QIX,

17    whatever that is.  Can you tell us what that was?  What a

18    day.

19    A    So, from the NASDAQ market, it's the -- it was a system

20    that gave you access to real time market data, and it's a

21    trading system.  So, you could actually place trades through

22    that.  And, interestingly enough, Mr. Madoff was involved in

23    NASDAQ.  You see it on the prop trading side of the business

24    because there were stocks being executed, and buys and

25    sells, and prop trading, and market-making activities.

Page 74

1           Again, there's no checkmark under the IA business

2      because there's no need for it.  You don't need real time

3      market quotes and trading when you're not doing trading.

4      Q     I missed one on Page 2.  If you could just flip back to

5      Page 2 of Exhibit 44?  What was the Fix Engine?

6      A     Oh.  The Fix Engine, it's kind of like an instant

7      message communication system for trade-related messages

8      between market participants.  So, there's information on --

9      going back and forth on trading, on what the pricing is.

10     It's an important component if you're actively in the

11     market, and you may have -- before you place an order, you

12     may have a large order of a million shares of Exxon, which

13     would be a larger order.  You don't want to just put that

14     onto the market.  It can tilt the market pretty quickly.

15           So, you may, through Fix, talk to another market

16     participant.  Did they have a buyer for a piece -- you know,

17     maybe 250,000 shares?  So, it's used between the market

18     participants to help form the market and efficiently create

19     the process for trading.  Again, you'll see that for the

20     prop trading business.  It makes sense.  They're trading

21     stocks and other instruments.  You don't see it for the IA

22     business.  Again, you don't need it because nothing as going

23     on.

24     Q     Now, let's go back to Page 3.  Sorry about that detour.

25     And if you can take a look at the Order Audit Trail System

Page 75

1   row of Exhibit 44.

2   A   Right.

3   Q   Tell Judge Bernstein what that's about.

4   A   So, Your Honor, a very important system -- even by its

5   name, the Order Audit Trail System denotes that anything

6   with the word audit in it is usually important.  In the

7   trading world there are things called broken trades.  A

8   trade goes through, is placed and it's never filled.

9   There's some kind of break in the trade that needs to be

10  reconciled every night.  There needs to be an audit trail of

11  trades for regulators to come in, be it federal regulators

12  or state regulators.

13          So, this provided -- it tracked the orders,

14  including the origination, transmission, and cancellation or

15  execution.  Basically, the history of what's going on with

16  an order.  That was functioning in the prop trading

17  business.  It was not present in the IA business.  Again,

18  nothing was being done in the IA business with real stocks,

19  or bonds, or trading, so you don't need an audit trail when

20  you're making everything up.

21  Q   What about on Page 4, Stratus Boss?  Can you tell us

22  about that and why it was one place and not the other?

23  A   So, the Stratus system is a frontend processing system

24  which maximizes the trading speed.  We've heard a lot

25  certainly coming out of the financial crisis of high-

1    frequency traders and people front-running the market by

2    being, you know, at the door quickly.  So, the concept is

3    being able to execute trades very quickly.  You know, if

4    things are happening very quickly, you can maybe get a

5    better price on that trade versus the next trade that you

6    place.

7            So, an important system.  And you can see this

8    interface through -- one of the systems here was the MISS

9    system.  It says, "To process trades place through the M2

10   and MISS system." So, when -- it's like I described earlier,

11   Your Honor.  If you called up your broker, they'll put in

12   the order.  That order goes to another system that then

13   takes that order and starts to process it in the big wire

14   houses like a Merrill or a Charles Schwab.  The same thing

15   was being done on the prop trading side of the business.

16   There are different systems to facilitate all of this.

17   Again, present in the prop trading side of the business; not

18   present in the IA business.

19   Q    How about network connectivity?  Did the investment

20   advisory business AS400 have the necessary connections to

21   the outside world to process the trades BLMIC said it was

22   processing?

23   A    No, not at all.  As you can see, on the prop trading

24   business there were about 80 connections to automated

25   clearing systems that allow the process to occur.  So, as

Page 77

```
 1    you can imagine, there are phone lines and digital lines

 2    connecting to different services.  Order execution services

 3    on the other side when you have counterparties.  That was

 4    all present on the prop trading side.

 5              On the IA side of the business it was very

 6    limited.  And there's a footnote that I put there.  It had a

 7    basic internet connection and what was called an FTP site,

 8    Your Honor, File Transfer Protocol site where basically if

 9    somebody had given you a password, you could log in, go to

10    that site, and download a document, like a statement or a

11    potential trade confirm, or you could upload to that maybe a

12    copy of a document.  It was not the type of site that would

13    allow trades by any stretch of the imagination, and there

14    were no other multiple connections to the internet.  Having

15    one connection to the internet, it would never be able to

16    facilitate -- even if you had the systems, which weren't

17    there, the pipe wouldn't be big enough to get out to the

18    internet to facilitate this kind of trading that was being

19    purportedly done.

20    Q    Well, we've talked about what wasn't there.  So, let's

21    talk about what was there.

22    A    Okay.

23    Q    Take a look at the line on Exhibit 44 or the row on

24    Exhibit 44 called Custom Software.  And if you can explain

25    to the Court what you found.
```

Page 78

1   A    So, I think a few minutes ago, Your Honor, I said, when

2   I was talking about the two AS400s, one in the prop trading

3   business and one in the IA business, I said much of the

4   software that I saw when I examined it in the IA business

5   was originally derived from the prop trading business.

6           But when you're not trading stocks you don't need

7   what we call the bloat in the software, extra lines in the

8   software that do things that you would expect.  So, the

9   custom software was enabled -- enabled the programmers,

10  which went to prison, were convicted in the criminal trial

11  in the Madoff case -- but allowed those programmers to make

12  changes to the programs to facilitate whatever they were

13  trying to do.  Whether it was just entering information

14  directly in using it as a typewriter and bypassing trying to

15  go out and talk to the market because there was no market

16  connection.  Those lines of code were altered.  There was

17  software that was enabled to correct or backdate trades.

18  I'll talk about that.  There's probably another -- there's

19  another line I'll talk about that, called Statement Pro.

20          But when I talk about custom software, this was

21  taking the AS400 computer programs and there was an RPG

22  software -- report generator software that IBM put out that

23  enabled you to go in and write code and change things.  And

24  so when I examined that code -- remember, I said earlier

25  it's not sometimes what you see on the page that's

1    important, it's what you don't see?  So, when you see code

2    that doesn't have code that talks to the market that's

3    supposed to be trading code, you say what's going on here?

4    If it was trading code and it was supposed to allow you to

5    place an order, it should have enough language in there to

6    go do that.  When that's not in there, it can't happen.

7    Q    Well, you mentioned Statement Pro.  I think that's also

8    listed on Exhibit 44.  Why don't you tell us what that is?

9    A    So, Statement Pro was custom software built in the RPG

10   programming language that I just described, Your Honor, that

11   basically allowed people at BLMIS to go in and revise and

12   print customer statements from previous months.  In a real

13   trading environment, if there was a broken trade or if there

14   was a mistake on a trade, the brokerage firm doesn't go back

15   and go...  So, let's say I get my April statement from

16   Charles Schwab and I notice a mistake.  They don't go back

17   and just erase that mistake and reissue the statement.

18   They'll reissue a corrected statement and show what they've

19   corrected, and they'll do that contemporaneously.

20          This software allowed the ability to go back into

21   prior months, six-eight months -- there was no time limit,

22   you could go back years on it -- pull up a statement, type

23   into the AS400 what you wanted to change, delete what was on

24   that statement, and then reprint the statement as if that

25   was the original statement.  It never said Corrected on it,

Page 80

1   it never indicated that there was a correction.  It was just

2   the ability to go make things disappear and reappear.  Kind

3   of the magic behind the curtain, so to speak.

4   Q    I think you've answered this question but based on your

5   review of the computer systems ab BLMIS, were you able to

6   determine if any trades were being processed through the

7   investment advisory business computers?

8   A    I was able to make that determination and the answer is

9   they were not.  There was no evidence, Your Honor, of any

10  trades being executed through the IA business computer

11  systems whatsoever.

12  Q    So, in your professional opinion, can a securities

13  trading business like BLMIS investment advisory business

14  operate without a connected trading platform?

15  A    No, it can't.

16  Q    So, we've talked about computers.  Now let's talk about

17  money.  Before you can buy or sell stocks, options,

18  treasuries, do you need a source of funds?

19  A    You do.

20  Q    I want to discuss the source of funds at the BLMIS

21  investment advisory business, okay?

22  A    Okay.

23  Q    Does your report include a demonstrative aid to help us

24  explain those sources of funds?  I think it's Trial Exhibit

25  37.  And I think we have that on the board, too, don't we?

Page 81

1              THE COURT:  Is that in the report?

2              MR. HUNT:  It's in the report as well, Your Honor.

3       I think it's Page 121, Figure 39.

4              THE COURT:  Okay, thank you.

5              MR. HUNT:  It kind of looks like a house.  I don't

6       know if we can get that up there.

7       Q    Can you identify Exhibit 37 for the record?

8       A    Exhibit 37 is my Figure 39 from Page 121 of my expert

9       report.  And it is a graphic that I prepared.  Basically, in

10      conducting the investigation, I wanted to see where the

11      money was coming from, kind of like follow the money, and to

12      really hone in on how the money went into the IA business

13      and how it came out.  And just to give a closure to any sort

14      of thought that somehow the AI business was doing business

15      through somebody else.

16      Q    So, we'll probably be referring back to Exhibit 37 from

17      time to time.  Did you review the books and records related

18      to each of the bank accounts held by BLMIS?

19      A    I did.

20      Q    Did you determine what bank account the BLMIS

21      investment advisory business deposited customer

22      (indiscernible)?

23      A     It's what I've referred to as the J.P.  Morgan Chase

24      703 account.  The 703 were the last three digits of the

25      account number.  That was the main account where customer

Page 82

1    money was deposited in for the IA business.

2    Q    What's a sweep account?

3    A    A sweep account, Your Honor, is if you have a business

4    checking account and you're maintaining a bunch of money in

5    that checking account, banks typically don't pay very much

6    interest on checking accounts.  Historically, very low.  And

7    so to maximize your cash efficiency, you can arrange -- if

8    the bank is large enough; usually this is with the larger

9    banks -- a situation where every night above a certain

10   amount, they may leave you with $10,000 in the bank account.

11   They will sweep out the rest of the money and put it into

12   very short-term overnight investments.

13        It could be a bankers acceptance type note, it

14   could be just a short-term treasury bill in and out.  But,

15   basically, it is a way to maximize idle money sitting in an

16   account.  Instead of just letting it sit in a checking

17   account, it's able to earn a little bit more that way.  And

18   it goes out the night, it comes back the next morning.  So,

19   that's why they call it an overnight sweep, if you're using

20   a sweep account as an overnight sweep.

21   Q    Were there any overnight sweeps associated with the 703

22   account?

23   A    There were, yes.

24   Q    If you could, Mr. Dubinsky, turn to Exhibit 38 in your

25   binder, which is also Figure 37 on Page 117 in your report.

1    Do you have that, sir?

2    A    I do have that, yes.

3    Q    If you could describe what Exhibit 38 depicts?

4    A    So, Your Honor, I wanted to see, in order to determine

5    whether there was actual trading going on in the investment

6    advisory business, I wanted to see what cash accretions were

7    going into the 703 account.  Where was the cash coming from?

8    And this shows that 97 percent of all the cash going into

9    the 703 account came from customers.  Customers -- either

10   new customers putting money in or existing customers putting

11   additional money in.

12           There's a small slice for 3 percent, what I've

13   called Other Additions, and that is money that came back in

14   vis-à-vis money that was earned on the overnight sweeps over

15   the period when this was computed.  So, basically, what I --

16   what this shows me is if there were trading going on in the

17   investment advisory business, and as purportedly was shown

18   on customer statements, those trades were consistently

19   earning money -- they were never losing, they were always

20   making money -- you would see another huge slice of this

21   pie, probably 80 percent of it being from trading profits.

22   Because money has to come back in to the account at some

23   point if you're going to turn it back into cash, as clients

24   want to get out, from the trading profits when they sold

25   their investments.

1           There was never any addition to the 703 account

2    that I saw when I examined the bank accounts to show that

3    money was coming from trading profits.  Again, if somebody

4    wanted to close their account or take money out -- as many

5    people took out millions and millions of dollars over the

6    years -- it had to come out of the 703 account.  That was

7    the investment advisory account.  There was another account

8    that money from 703 went to to wire the money out or write

9    the checks, but that was just a disbursement account.  This

10   was the main account.

11          And that's a very important finding because

12   without additional money coming in from trading gains, that

13   belies the notion that there were, in fact, trading gains.

14   There weren't.

15   Q    We'll talk about those in a little bit more detail.

16   So, what sources of information did you use to prepare this

17   Exhibit 38?

18   A    These were bank statements from -- that were obtained

19   from J.P.  Morgan Chase.  And in addition to the bank

20   statements, there were -- there was information on customer

21   money in the computer file and that was utilized as well to

22   look at -- to match up the cash additions coming to the

23   account to try to bundle where that money was coming from.

24   In other words, to make sure that if a deposit came in, say,

25   $3 million, it wasn't traceable back to the profits from

1    some alleged stock trade.  It was all traced back to client

2    money, customer money.

3    Q    Okay, so let me see if I understand this.  You're

4    saying that 97 percent of the money going into the

5    investment side, investment advisory side of BLMIS was

6    coming directly from customers.  Is that what you're saying?

7    A    That's correct.

8    Q    Okay.  There's 3 percent that comes from investment

9    activity, overnight sweeps, and stuff like that, right?

10   A    Correct.

11   Q    Where did the money come from to make those

12   investments, those short-term investments?

13   A    Customer money.  It was taken out of the 703 account

14   and then invested overnight and then put back in the 703.

15   So, it originated from customer money just as a way to earn

16   a little bit more interest than the money sitting in the 703

17   checking account.

18   Q    So, what was the source of all of the money deposited

19   into the 703 account?

20   A    Both the 97 percent and the 3 percent were from

21   customer money.  Because if you -- the 3 percent is the

22   derivative, if you will, of the earnings of those overnight

23   sweeps, it would come from customer money.

24   Q    Okay.  So, looking at Exhibit 37, I guess we've

25   identified where the money came from that went into the blue

1    house there.  What is a cash dividend?

2    A    A cash dividend is a type of earning, Your Honor, on a

3    stock, an equity.  Some companies, some of the old blue

4    chips like GE and Coca-Cola paid a cash dividend.  So,

5    basically, as companies earn profits and they accumulate

6    money in their own treasury, that increases the value of the

7    company.  They can either pay that money out in a dividend,

8    they can invest it, or they can hold it.

9         A lot of companies have a history of paying cash

10   dividends.  And a cash dividend is a return to the investor

11   which helps boost the rate of return.  So, if I spent

12   $10,000 on Apple or Exxon stock, and Exxon pays a quarterly

13   dividend, the money I'm getting back is figured into my rate

14   of return.

15        And so it's actually cash.  They would write a

16   check.  If you were holding it through a brokerage firm, the

17   brokerage firm collects that money and then credits your

18   account with that.  The very next day when it's credited to

19   your account, you can go withdraw that cash and go spend it,

20   do with it what you want.

21   Q    Did the BLMIS investment advisory business report the

22   receipt of cash dividends to its customers on their customer

23   statements?

24   A    It did.

25   Q    If you could, sir, turn to Exhibit 39 in your binder,

Page 87

1    which I think is also Table 8 on Page 82 of your report, and

2    identify that for the Court, please.

3    A    So, this is Table 8 from Paragraph 196 on Page 81 and

4    82 of my report.

5    Q    Can I just ask you a couple questions about it?  Did

6    you prepare that?

7    A    I did, yes.

8    Q    Is it an accurate representation of your analysis?

9    A    It is.

10   Q    What period did you analyze here?

11   A    1998 through 2008.

12   Q    So, what do the two columns mean in Exhibit 39?

13   A    So, the two columns -- the left column says Year.  That

14   denotes the year.  The right column is Dividends.  And what

15   I did is I went and looked at all of the IA business

16   customers for that particular year.  So, for the first year

17   of 1998, I said let me look for that entire year, let me go

18   through all of the statements.  Every time it says Cash

19   Dividend, let me add it up.  Let me see what it adds up to.

20   It added up, in 1998, to $137,316,449.

21        Your Honor, I did that for every single year

22   subsequent, all the way through 2008.  You can see, for

23   instance, on the year 2006, it's over $839 million of

24   purported cash dividends.  So, these would have been, as

25   reported on the customer statements, from the equities that

Page 88

1   were supposedly bought, a cash dividend that was paid.  And

2   I aggregated them from all of the different investment

3   advisor clients and aggregated all of the different stocks.

4          So, if it was a dividend from Merck and a dividend

5   from GE, I didn't care, I just added them all up.  Because

6   what I wanted to do is I wanted to go look for the money,

7   back to follow the money.  I went to look in the bank

8   statements for BLMIS to see if, in fact, in 2006, for

9   instance, in the 703 account was there $839 million

10  deposited into that bank account that represented the

11  receipt of cash dividends from the payers or the transfer

12  agents.  In the marketplace you have transfer agents that

13  will facilitate, instead of the company sending out checks

14  to all the broker-dealers or the brokers, the transfer agent

15  will act in that capacity to send those dividends out.

16         So, I did that for every year.  In total, Your

17  Honor can see the total is over $4.3 billion -- $4.3 billion

18  of supposed cash dividends from 1998 to 2008.  There was no

19  record whatsoever of any of that cash ever being received by

20  the IA business.  Which, again, if there were legitimate

21  trades, if the stock had actually been purchased, these

22  dividends were declared -- I checked them in the public

23  market to find out yes, in fact, they were declared.  For

24  real holders of stock, you would've seen the money coming

25  in.  That's a tremendous amount of money.  That money did

Page 89

1    not exist.  Never came in.

2    Q    Let's make sure we're crystal clear about this.  Was

3    there any evidence in the BLMIS books and records on the

4    investment advisory side that showed any of the reported

5    more than $4 billion in cash dividends was received by the

6    investment advisory customers over that ten-year period

7    beginning in 1998 until Mr. Madoff was arrested?

8    A    None.  No evidence.

9    Q    Would those dividends have shown up in the BLMIS

10   investment advisory bank records as being paid to BLMIS for

11   distribution to investment advisory customers?

12   A    Absolutely.

13   Q    Which account?

14   A    It should've gone into the 703 account because that is

15   the account that was maintained for the IA business.  It was

16   basically the only account other than the disbursement

17   account.  And if a customer wanted their money, they had to

18   go to BLMIS, ask for a redemption or a cash out.  The money

19   would've come from the 703 account to the 509 account --

20   that was the control disbursement account -- and ultimately

21   to the investor.

22   Q    Is that why you put a red X on the dividend arrow going

23   into the IA business?

24   A    Oh, so we're back to -- what was that exhibit?

25   Q    Which is Exhibit 37, which I think is also on the chart

Page 90

1    up there.

2    A    Yeah, so --

3           THE COURT:  Which page?  I'm sorry, which page is

4    that in the report?  Oh, I have it.  Page 121.

5           MR. HUNT:  Okay.  Sorry.

6    A    So, yes.  Under -- there's a box underneath the blue

7    box that says IA Business, or there's a line with an arrow

8    that says Dividends.  And I have an X there.  That was one

9    of the things that I eliminated by doing this analysis.

10   That the dividends were never received.

11          I also should say I looked for documentation from

12   the transfer agents saying, well, here's a transmittal, it's

13   going to be wired to the account.  Here's, you know, $20

14   million for a particular dividend payment.  I looked for why

15   are remittances...?  I mean, I scoured the documents to see

16   -- maybe the money came in somewhere and somehow evaporated

17   somewhere else.  I don't know.  But I looked for all of the

18   information that would be surrounding the transmittal, and

19   there was none of it.

20   Q    In fact, in your review of the BLMIS books and records,

21   did you identify any other income-producing activities for

22   the investment advisory business, other than the short-term

23   sweeps and the BLMIS interest-bearing accounts that were

24   funded by 703 customer deposits, what you just discussed?

25   A    No.  There were several brokerage accounts, that money

Page 91

1    was taken from the 703 account and put into, that purchased

2    some treasuries.  But other than -- and those weren't

3    purchased in connection with any split strike conversion

4    strategy.  But, no, other than that, there was absolutely no

5    evidence of any trading whatsoever going on in the IA

6    business.

7    Q    How about any third party financing the investment

8    advisory arm was receiving?  Did you find any of that?

9    A    Other than about $145 million worth of loans, I think

10   it was either 2005 or '06, Your Honor, there was somewhat of

11   a liquidity crush.  You know, again, when you're running a

12   Ponzi scheme like this, the big fear is kind of the run on

13   the bank.  If everybody shows up to cash out, you don't have

14   the money to pay everybody and that's when these things

15   collapse.

16          And so there was a liquidity crunch in the mid-

17   2000s, and there was as loan -- two loans obtained from a

18   bank that were very short term.  I think within six months,

19   the loans were paid off.  I think it was about $145 million.

20   It's in the report.  Other than that -- and that would be --

21   that was not enough to sustain -- that was a short-term kind

22   of bridge loan.

23          But back to your original question, that was the

24   only third party financing I saw.  There was no other

25   legitimate business within the IA business, and no sort of

Page 92

1   use of the money in a legitimate way to create any sort of

2   other profits for the IA business.

3   Q    Where would all that money have shown up?

4   A    In the 703 account.  That was the account that was used

5   for the IA business.

6   Q    Is that why you have the big red Xes on all of those

7   possible incoming sources of funds?

8   A    It is.  I was trying again to see where the money was

9   coming in, how it was being earned, was there -- you know,

10  maybe Mr. Madoff said he was going to trade stocks but he,

11  you know, just invested in gold bars somewhere.  And while

12  that would've have been right, maybe there was an investment

13  somewhere else, and then he was selling those gold bars and

14  producing some income.  So, that's the other income

15  producing box in the upper right.

16          There was no evidence other than money coming in

17  from customers and money going out to customers.  A little

18  bit of the sweep, the overnight sweeps to kind of create

19  more money for the Ponzi to enable it to go a little bit

20  longer, in other words.  And that's why I have Xes on all of

21  those.

22  Q    So, based on your review of the books and records of

23  BLMIS, did you reach a conclusion about the source of funds

24  for the 703 account?

25  A    I did.

1   Q    I probably asked and answered that one but I'll ask it

2   again.

3   A    It came from the IA business customers.

4   Q    Was J.P.  Morgan Chase formerly known as Chase

5   Manhattan Bank?  Do you remember that?

6   A    It was.

7   Q    Did Mr. Madoff testify in his allocution about how he

8   used that bank account?

9   A    I recall he did, yes.

10   Q    If you could turn to the Trustee's Exhibit 1 in your

11   binder.  It's the small binder, I think.  You're going to be

12   happy about that.

13          THE COURT:  Do you have that allocution?

14          MR. HUNT:  Yes, sir, it's --

15          THE COURT:  You had had it separate from --

16          MR. HUNT:  Oh, yeah, we do.  We have it in a small

17   bound copy.

18          THE COURT:  Well, give it to me, rather than...

19   (indiscernible)

20          MR. HUNT:  Do you have...?

21          MR. DUBINSKY:  I have a small binder that says

22   Regarding Madoff Allocution.

23          THE COURT:  Right.  I have a copy of it from...

24          MR. HUNT:  Sorry, I apologize.  I thought I'd

25   provided it.

Page 94

1              THE COURT:  I think I turned it away because I

2      said I didn't need it.

3              MR. HUNT:  It's Trustee's Exhibit 1.

4              THE COURT:  I have it.

5              MR. HUNT:  Okay, thank you.

6      Q    If you could please read Mr. Madoff's allocution

7      starting at the end of Line 15 on Page 24.  On Page 24.

8      A    So, Page 24 starting at the end --

9      Q    At the end of Line 15 through the end of the first

10     sentence on Line 22.

11     A    Okay.  "Up until I was arrested on December 11, 2008, I

12     never invested these funds in the securities as I had

13     promised.  Instead, those funds were deposited in a bank

14     account at Chase Manhattan Bank.  When clients wished to

15     receive the profits they believed they had earned with me or

16     to redeem their principal, I used money in the Chase

17     Manhattan Bank account that belonged to them or other

18     clients to pay the requested funds."

19     Q    Did your investigation confirm if Mr. Madoff's

20     allocution accurately reflected how the Chase accounts were

21     used to pay redemptions?

22     A    It did.  And it does accurately reflect what my

23     investigation concluded, that that's how it was used.

24     Q    Just going back to the dividends we talked about to

25     clean up the point.  Were there any records showing that any

1    of these $4 billion of cash dividends were deposited into

2    any other bank account?

3    A    No.  I scoured every other bank account record and

4    every other document.  I wanted to make sure that I was

5    certain.

6    Q    So, to wrap up this issue, please summarize your

7    conclusions concerning the source of funds flowing out of

8    the investment advisory business to customers.  Where was

9    that money coming from?

10   A    Customer money.  Just other customers' money.

11   Q    Did your conclusion that the BLMIS investment advisory

12   business did not have a connected trading platform have

13   anything to do with your conclusion that the investment

14   advisory business was being operated as a Ponzi scheme?

15   A    Absolutely.

16   Q    Why?

17   A    Because without the ability to actually connect to the

18   market and trade and no evidence of those trades ever

19   occurring, coupled with what I just testified about, that

20   the only money I saw was customer money in and customer

21   money out, no accretion to that 703 account from any sort of

22   trading profit dividends -- that's the classic example of a

23   Ponzi.  There's nothing going on.  You're taking money from

24   people, you're promising that you're going to do something

25   with it, and then you pay them back as if you're fulfilling

1     your promise.

2     Q    So, in addition to the not-connected trading platform,

3     did your conclusion that the customer deposits were used to

4     pay customer redemptions have any bearing on your conclusion

5     that the investment advisory business was being operated as

6     a Ponzi scheme?

7     A    It did.  As I just said, the lack of other funds from

8     trading profits, from dividends, from real results of actual

9     trading -- the lack of that played into the conclusion that

10    this was simply a Ponzi.  Just taking money in and paying it

11    back.

12    Q    Okay.  So, we talked about the trading platform.

13    A    Yes.

14    Q    We talked about the money.

15    A    Correct.

16    Q    Now I want to talk about the investment strategy that

17    BLMIS was marketing to its customers, okay?

18    A    Okay.

19    Q    What was that?

20    A    During the time period for this case?

21    Q    Yes.

22    A    It was called a split strike conversion strategy, Your

23    Honor, and it's a strategy, as I said during my

24    qualification phase, that is a real trading strategy.  And

25    the way it was purportedly set up by BLMIS was to buy some

1    of the stocks in the S&P 100 Index.  So, the Standard &

2    Poor's 100 Index has the largest 100 stocks in that.  And in

3    order to get the equivalent of the index without just buying

4    the index itself, you can pick a basket of stocks that are

5    representative of the 100.  So, maybe you pick 10, 20.

6                And so you buy that.  And then it uses options

7    around that purchase.  And what it uses is a call option and

8    a put option.  So, these are options.  A call option in this

9    case was being sold, and a call option -- if you bought

10   Exxon at 100, the call option might be for expiration in six

11   months at 120.  So, if Exxon goes up to past 120, the holder

12   of that call option can call you up, BLMIS, and say, okay,

13   make good on that option.  I'm going to want that stock.  Or

14   they can cash settle the option.  And let's say Exxon went

15   up to 140.  You as the holder of Exxon have given up the

16   upside past 120.

17               So, you've sold the call option.  Somebody can

18   take it from you at 120 and above.  They can't exercise it

19   below.  And in exchange for giving them the right to do

20   that, you earn a premium.  So, that premium falls into part

21   of the profit of the strategy.  When you sell something at a

22   profit, part of the profit.

23               The downside is buying a put option.  So, it's

24   like Your Honor buying an insurance policy.  If Exxon,

25   instead of going up starts to crater and fall, you may have

Page 98

1    a six-month put option for Exxon at 80.  So, if 80 -- so, if

2    Exxon all of a sudden has a one-day bad announcement and

3    goes from 100 to 50, you're limited once it gets to 80

4    because you have the ability to put that stock -- it's your

5    option to force somebody else to buy it from you at 80, and

6    now you've protected yourself on the downside.

7           In order to buy that insurance, just like if you

8    buy fire insurance or car insurance, you have to pay a

9    premium, and that premium that you pay offsets the premium

10   you receive when you sold the call.  So, that nets that

11   profit down.  And it creates what's called a collar around

12   the stock.  So, basically, it limits the upside, gives you

13   some upside but limits it, and protects you on the downside.

14          In addition -- so, that's the typical split strike

15   conversion strategy.  What BLMIS added a little twist to it

16   was clients were told or it was marketed that when Mr.

17   Madoff or somebody at BLMIS could kind of foresee the market

18   and knew when to get out of the market, and they would

19   unwind this trade and put the money into treasuries.

20   Because treasuries, as we all know, are safer investments

21   with less risk than market.  Markets have volatility.

22   Stocks go up and down.  Yesterday, I think it was, the

23   market was down, I don't know, 490 points based on the trade

24   threat of tariffs.  So, there's volatility.  Treasuries have

25   much less volatility.

Page 99

```
 1              So, this is what it was marketed as, and so that
 2    whole strategy I've kind of called the BLMIS Split Strike
 3    Conversion, which included the sale of a call, the purchase
 4    long of a stock, buying actual stock, buying the put, and
 5    then when the market timing, so to speak, BLMIS would roll
 6    out of that and purportedly put the money in treasuries.
 7    One of --
 8    Q    Let me ask you this.  Was that strategy reflected on
 9    the customer statements included in the BLMIS books and
10    records during the period of 1992 until the time Mr. Madoff
11    was arrested?
12    A    It was, yes.
13    Q    Did you investigate that strategy?
14    A    I did.
15    Q    Did BLMIS's investment advisory leg employ that
16    strategy?
17    A    Purportedly but not -- not real, no.  It was -- it was
18    basically a series of fake trades that were put into the
19    AS400, used as a giant typewriter, produced customer
20    statements, produced one side of a confirmation, and then --
21    that's all it did.  It didn't execute anything.  No trades.
22    Q    Did Mr. Madoff testify about the split strike strategy
23    in his allocution?
24    A    He did.
25    Q    And if you could turn back to Exhibit 1 again?  Let me
```

Page 100

1    know when you have that.

2    A    Okay.

3    Q    And I'd like you to read the end of Line 20 on Page 25

4    through Line 18 on Page 26.

5    A    Okay.  "Through the split-strike conversion strategy, I

6    promised to clients and prospective clients that client

7    funds would be invested in  common stocks within the

8    Standard & Poor's 100 Index, a collection of the 100 largest

9    publicly traded companies in terms of their market

10   capitalization.  I promised that I would select a basket of

11   stocks that would closely mimic the price movements of the

12   Standard and Poor's 100 Index.  I promised that I would

13   opportunistically time those purchases and would be out of

14   the market intermittently, investing client funds during

15   these periods in United States Government-issued securities

16   such as United States Treasury bills.  In addition, I

17   promised that as part of the split-strike conversion

18   strategy, I would hedge the investments I made in the basket

19   of common stocks by using client funds to buy and sell

20   option contracts related to those stocks, thereby limiting

21   potential client losses caused by unpredictable changes in

22   stock prices.  In fact, I never made those investments I

23   promised clients, who believed they were invested with me in

24   the split-strike conversion strategy."

25   Q    Did your investigation confirm if Mr. Madoff's

Page 101

1    allocution accurately reflected how the split-strike

2    strategy was being implemented in his Investment Advisory

3    business?

4    A    It did.  It was not being implemented.  It was --

5    nothing was happening.  It was -- he's allocating here that

6    it never happened, and it was a fraud.

7    Q    Thank you for that clarification.  If you could also

8    turn to Trustee's Exhibit 2, which is Mr. DiPascali's

9    allocution?  And when you have that, let me know.

10   A    I have that.

11   Q    Do you recall if Mr. DiPascali's allocution factored

12   into your opinion in any way?

13   A    The only way it factored into my opinion is it

14   confirmed my findings.  I didn't rely on either Mr. Madoff's

15   allocution, Mr. DiPascali's allocution, or anybody else's

16   allocution or depositions in reliance for my opinion.  I

17   used it, once I did my work and analysis, to see if it

18   confirmed it or if it was being -- if it said something

19   else.  But that's how I used them.

20   Q    Okay.  So, if you could turn to Page 46 of Exhibit 2,

21   Mr. DiPascali's allocution, and read the allocution

22   beginning on Line 21 and ending on Line 25?

23   A    "From our office in Manhattan, at Bernie Madoff's

24   direction, and together with others, I represented to

25   hundreds, if not thousands, of clients that security trades

Page 102

1    were being placed in their accounts when in fact no trades

2    were taking

3    place at all."

4    Q    From your review of the BLMIS books and records, were

5    you able to determine if Mr. DiPascali's allocution about

6    securities trades was accurate?

7    A    Yes.  The results of my analysis and my investigation

8    confirmed what he said in that regard in the allocution was

9    accurate.

10   Q    Okay.  Let's break this down a little bit.  I want to

11   talk to you first about that first element of the split-

12   strike strategy that you mentioned, which was the purchase

13   and sale of stocks.

14   A    Okay.

15   Q    And as a starting point, I want to discuss DTC records.

16   A    Okay.

17   Q    What is a DTC?

18   A    The DTCC, the Depository Trust Corporation -- sometimes

19   goes by DTC -- is the organization in the United States that

20   clears all equity trades.  So, they clear and settle the

21   trades.  They act as custodian for stock.

22          So, in the old days here on Wall Street, before

23   that time if you owned stock you would have a safe and you'd

24   have the actual stock certificates, paper certificates.  And

25   there were runners.  And if you sold the stock, you had to

1    have a runner run the stock to somebody else, and that

2    broker took it and took possession on your behalf as a

3    client.

4          All of that antiquated system changed, and it

5    became computerized, and those stocks are held at a central

6    depository by book entry.  And that's what the DTC does.  It

7    acts as -- it clears all of the equities, records them, and

8    makes sure that in fact if they're custodianing those

9    securities, that they actually exist.

10          Kind of like if you have a bank account at Bank of

11   America.  You get a statement from them every month.

12   They're your custodian of your money, you see it on the

13   statement, and that's what they represent to you.

14   Q    So, you may have already answered this, but how do DTC

15   records relate to legitimate trading?

16   A    Well, every legitimate trade gets recorded at the DTC,

17   and ultimately there are custodian records at the DTC

18   saying, Charles Schwab, you own on this date 10 million

19   shares of Exxon stock.  And if anybody wanted to check that,

20   there is a procedure.  You can do a confirmation with the

21   DTC.

22          But basically, that is the official record of

23   where that stock sits.  So, stock's not flying around in

24   people's hands anymore and sitting in safes, and that sort

25   of stuff.

Page 104

```
 1    Q    Were you able to obtain DTC records evidencing the

 2    purchase and sale of stock at BLMIS?

 3    A    I was.

 4    Q    If you could turn to Exhibit 45 in your binder.  I will

 5    ask you if you prepared it and what information you used to

 6    prepare it.

 7              THE COURT:  Is that in the report?

 8              MR. HUNT:  Yes, Sir.  It is Figure 16 in his

 9    report.  And I apologize I don't have a page number for you.

10              MR. DUBINSKY:  It is on Page 68, Your Honor.

11    A    So, this was --

12              THE COURT:  So, did you prepare that?

13              MR. DUBINSKY:  I did prepare that.  The underlying

14    analysis and the chart, yes.

15    Q    What information did you use?

16    A    So, I used DTC documentation from October 2002 through

17    October 2008.  And what I attempted to do here, and what I

18    was able to do, is I wanted to look at the equity trades,

19    both in the trading side of the business and the purported

20    trades in the IE business, to see where their custodian

21    evidencing all of these stock trades.  Okay?

22    Q    What do the X and Y axis represent on this exhibit --

23    A    So, along the left is the dollar value of total equity.

24    It's the amount -- I'm sorry, not dollar value -- the amount

25    of actual shares held.  And then along the bottom axis is
```

Page 105

1    the date.  So, why don't we focus on the middle where it

2    says October 31, 2005?

3           So, what I did here, Your Honor, was the left bar

4    that's been highlighted on the screen in dark blue, I went

5    and found records at the Prop Trading business, trading

6    records showing that 53,770 shares of stock in total, on

7    October 31, 2005, were supposedly held by the Prop Trading

8    business.

9           I then obtained records from the Debtors for that

10   same date, October 31, 2005, and found evidence to the exact

11   share number, that 353,770 shares.  DTC had records that

12   showed stock for BLMIS was custodied at DTC.

13          It's important, Your Honor, to understand that at

14   DTC, BLMIS had one account.  It was called the 646 account,

15   and that was their participant number when they agreed to

16   participate with DTC.  Recall, as a broker dealer, when

17   you're clearing equities, you have to have a DTC account.

18   And so, the Prop Trading business did have an account, 646.

19          So, with that one account, I obtained the records.

20   We also -- I asked the Trustee when these records were

21   subpoenaed from DTC to ask the DTC for any other potential

22   Madoff accounts, and the DTC responded this was the account.

23   This was the only records they had.  There was only one

24   account, the 646.

25          So, in the middle -- back to the middle, Your

Page 106

1    Honor -- I now have accounted for all of the Prop Trading

2    shares, but I needed to account for the middle column, the

3    lighter blue, which was the IA business, that represented on

4    December 31 across all of the customer accounts, there was

5    over one billion -- so, it was 1,175,593,585 shares taken

6    from the trading records and the customer statements.

7             And I said, okay, where are the custodian records

8    evidencing over a billion shares?  I've got the custodian

9    records to tie out the 353,000 on the Prop Trading side, and

10   there were no records from DTC in that account, the 646

11   account.  That's the only account DTC had for BLMIS

12   evidencing any of that stock.

13            So, to state simply, that stock -- and that

14   confirmed my suspicions in the investigation that those

15   stocks were never traded -- if they were traded, there would

16   be equity results from DTC records showing that those

17   equities were sitting at DTC.

18   Q   Did you find the same performance across the board

19   during the entire period from 2002 to 2008?

20   A   I did.  You can see there's a couple of years the Prop

21   Trading had a few less shares than DTC, like a hundred less

22   shares or 20 less shares.

23            By and large, I was able to reconcile almost every

24   share on the Prop Trading share, and in every single year on

25   this analysis from 2002 through 2008, there wasn't a single

Page 107

1    document, a single real document, from DTC evidencing any of

2    these blue bars.  I mean, billions of dollars -- billions of

3    shares, which represented billions and billions and billions

4    of dollar value of purported trades.

5    Q    So, what's that squiggly line in the middle of this

6    exhibit?

7    A    Hmm.  That's a good question.  The squiggly line, Your

8    Honor, is if I scaled this chart to actual scale, it would -

9    - those blue bars would be off the chart.  So, I'm basically

10   just denoting to the reader that I've broken up the scaling.

11   And so, graphically, it's not a proportion, but I put the

12   nominal numbers, the real numbers, on so the reader can

13   understand that.  And that's what that squiggly gray line

14   means.

15   Q    So, based on your review of the DTC records, what did

16   you conclude about the equity shares that BLMIS was saying

17   it held?

18   A    Didn't hold them.  Never traded them; didn't hold them.

19   Q    Okay.  Is this exhibit --

20   A    And let me just clarify, in the IA business.

21   Q    Was the --

22   A    In the Prop Trading business, I was able to tie down

23   and confirm, Your Honor, that those actually did trade and

24   were sitting at the DTC on those dates.

25   Q    Is this Exhibit 45 an accurate summary of your review

Page 108

1    of all of the DTC records that you were able to obtain for

2    BLMIS?

3    A    It is, yes.

4    Q    Business performance consistent with legitimate

5    Investment Advisory business activity?

6    A    No, not at all.  When I had my investment advisory

7    business and a client asked me to buy stocks, we bought the

8    stocks, placed a trade, got a confirmation, the stock was

9    purchased.  We produced statements for them.  That's what

10   investment advisors do.

11          And there's documentation that if the SEC -- the

12   SEC can do a surprise audit.  When I had the investment

13   advisory when I worked with the firm, the SEC can show up on

14   your doorstep and knock on the door and want to see records.

15          And so, a real investment advisory business buys

16   stocks, sells them when the client says to sell them, and

17   has records to support that and prove it.

18   Q    Let's wrap up this DTC discussion.  I want to ask you

19   what metadata is?

20   A    So, metadata -- the easiest way to describe it in

21   computer terms is if Your Honor is writing an opinion and

22   using Microsoft Word, you can see the words on the page, and

23   if you underline it you can see the underline, and if you

24   bold it you can see that.

25          There's still code embedded in the document

Page 109

1    underneath the document that Your Honor can't see, such as

2    how many keystrokes were in the document, the time the

3    document -- you started working on it -- time that you last

4    saved it.  A variety of those types of characteristics are

5    maintained in a computer file.

6            Now, you can't go find that, and you can't, or I

7    can't, without the use of forensic software.  Forensic

8    software kind of goes underneath the layer that you and I

9    can see normally and looks at what's embedded in the file.

10   Q    So, did you find some documents internally of the

11   Investment Advisory business that talked about the DTC?

12   A    I did.

13   Q    Okay.  If you could take a look at Exhibits 47 and 48

14   in your binder?  And I want to put those on the screen

15   together.  I think those are Figures 17 and 18 on Pages 72

16   and 73 of the report.  I just want to talk about those --

17   A    That is correct.

18   Q    Is this an example of the metadata review that you

19   conducted of those internal records you found?

20   A    It is.  So, Figure 17, Your Honor, this is just one

21   example -- I found multiple documents, dozens of these -- on

22   its face appears to be a what's called a security position

23   inquiry from the Depository Trust Company.

24           In other words, if you have your account -- and

25   remember, Your Honor, I talked about the 646.  You can see

Page 110

1    it's in a couple places, but right underneath the double

2    line, you'll see it says participant -- P-A-R-T -- that's

3    Participant 0646, Madoff LLC.

4             This would allow the participant with a DTC

5    terminal, which the Prop Trading business had, the IA

6    business did not, to go in and at any time -- let's say a

7    regulator came in or you wanted to look up what your

8    position in a certain stock was, how much did you actually

9    own, you go into the DTC terminal, you sign in and you do an

10   inquiry.

11            This inquiry was looking up the CUSIP for AT&T,

12   Incorporated.  What's important about this -- and it shows

13   $8.5 million as a participant position.  Okay.  If Your

14   Honor looks at what's been highlighted up in the upper right

15   corner, it says, date 11/30/2006, time 1600 -- this is in

16   military time -- 1600 hours, 13 minutes and 35 seconds, so

17   4:13 -- no -- yeah --

18   Q    6:13

19   A    6 --

20   Q    (indiscernible)

21   A    Yes, right.  If we look at Figure 18, this is the mega

22   data that I pulled out of this document.  So, this was a

23   Microsoft Word document, and I said I found a bunch of

24   these.  It shows you that the date this document was created

25   was on December 19th, 2006 at 11:16 AM.

Page 111

1          So, this is two and a half weeks after Figure 17

2     was purportedly printed.  So, Figure 17, if you go in and do

3     the look-up and it documents the date, and you were to

4     either do a screen capture or a print-out, that's what you

5     would see of Figure 17.  But underneath it, it shows that

6     this document wasn't even created until after the fact.

7          So, somebody went in -- and it says here, the

8     author was Eric Lipkin.  I can't tell you without

9     interviewing him whether he actually did it or somebody had

10    access to his computer.  But the software was registered to

11    Eric Lipkin.  Microsoft Word, date created 12/19/2006, after

12    the fact.  So, somebody was going in -- and it says, last

13    saved by Eric Lipkin, says the word count, page count.

14         But this document, the metadata proves that this

15    document was created after the fact.  There would be no

16    reason, if you had a legitimate DTC terminal and could sit

17    down and type in and see what positions you owned, that you

18    would ever need to make and backdate a screenshot like this.

19    Q    So, just so our record's clear, I think the Figure 17

20    you've been referring to is Trustee's Exhibit 47, and Figure

21    --

22    A    Correct.

23    Q    -- 18 that you've referred to is Trustee's Exhibit 48?

24    A    That is correct.

25    Q    Did you find other examples of fake DTC records

1    internally at BLMIS?

2    A    I did.

3    Q    Based on your review of the Investment Advisory

4    computer, and the available DTC external records, and the

5    internal documents that you found, did you reach a

6    conclusion about the stock trading of the Investment

7    Advisory business?

8    A    I did.  Your Honor, I found, in addition to these

9    documents, software on the AS/400 in the Investment Advisory

10   side of the business, that recreated official-looking DTC

11   reports.

12           Again, there would be no reason, if you were doing

13   legitimate trading and had owned the stocks, to go into your

14   own computer system and write code that used form-printing

15   software to print out a report that mimicked what the DTC

16   puts out, because you would have the real DTC report.

17           So, when you -- again, looking at the fake DTC

18   ones that we just talked about, the computer software -- and

19   I was able to get it to run and produce what it was

20   producing -- the fake DTC reports, led me to conclude that,

21   again, no trading occurred.

22           You start to pile this on and say, well, no money

23   ever went into the 703, DTC doesn't have records of it.  Now

24   there's fake DTC reports being created.  You layer all this

25   on and it's easier and easier as we go to conclude there's

Page 113

```
 1    no trading.  If there was trading, you would be doing this.

 2    Q    Okay.  Let's add another layer, then.  I want to stick

 3    with stocks.

 4              THE COURT:  Is this a good time --

 5              MR. DEAN:  Yes, it is, Your Honor.

 6              THE COURT:  -- to take a lunch break?

 7              MR. DEAN:  (indiscernible)

 8              THE COURT:  All right.  Why don't we take a lunch

 9    break and we'll reconvene at a quarter to 2:00?

10              WOMAN:  That's all right.

11              THE COURT:  We'll lock the courtroom so you can

12    leave your stuff here.

13              MR. DEAN:  Thank you very much, Your Honor.  We

14    appreciate it.

15         (Recess)

16              THE COURT:  Please be seated.  Let's continue.

17                DIRECT EXAMINATION OF BRUCE DUBINSKY

18    BY MR. HUNT:

19    Q    So, Mr. Dubinsky, when we broke for lunch, we were

20    talking about the stock trading.  Do you recall that?

21    A    I do.

22    Q    So, I want to keep talking about that a little bit and

23    ask you if you could turn to Exhibit 49 in your binder,

24    which I think is Exhibit 11 to your report.

25    A    Okay, I have that.
```

Page 114

1           THE COURT:  Is that in the report?

2           MR. HUNT:  It's in the report, Exhibit 11, in the

3    report.  I think it's actually in the appendices, Your

4    Honor, which is why you probably don't see, that's that big

5    letter.

6           THE COURT:  That's correct.

7           MR. HUNT:  But we've got it on the screen here, if

8    that's okay.

9    Q    Did you prepare Exhibit 49.

10   A    I did.

11   Q    Is that an accurate representation of your analyses?

12   A    It is.

13   Q    If you could, just start by describing each of the

14   columns in Exhibit 49, and tell us what those mean.

15   A    Okay. So, this is an analysis of the time period for

16   the split strike conversion stock between January 2000 and

17   November 2008.  The left column is the trade date, the

18   actual -- or the date that the purported trade occurred.

19   The second column is the ticker.  In other words, the ticker

20   symbol for the stock, so you can see the third one down,

21   AIG, GE, etc.  The third column that says IA Business

22   Purported Volume is the sum for that particular day, so, on

23   the first line, March 9, 2000, for all of the stock for WMT

24   Ticker.  I went and added up across all of the customer

25   statements and the trading records, in the supposed trading

Page 115

1    records.  And that's what that column represents, that the

2    purported, that's why I say purported volume.  The fourth

3    column says IA Business Purported Value.  That's the number

4    of shares times the actual price on that day.  The fifth

5    column says actual market volume.  That's the actual market

6    volume that was reported to Bloomberg.  And I went to

7    Bloomberg.  This was one of the third-party sources of

8    information, Your Honor, that I testified earlier that I

9    obtained to complete the analysis.  So, I went to Bloomberg

10   and obtained actual market data for this trading period.

11   And the last column is what I've called magnitude exceeded.

12   So, this was an analysis where I wanted to look at, day by

13   day, for a particular -- for stocks, to see if the volume

14   that BLMIS indicated it traded for all of its IA business

15   actually exceeded the entire market.  In other words, the

16   entire market of equities that were traded.  And so, it's

17   easy to look, for instance, if we go down about seven lines

18   to July 14, 2000, Your Honor ... and we'll highlight this on

19   the screen.  It's the one ...

20   Q    AIG?

21   A    It's AIG, it's not on the screen.  We'll continue on

22   while he's looking for that on the screen.  But on the face

23   of the exhibit AIG purported volume in IA business 2,822,680

24   shares. If you jump two columns to the right and look at the

25   total market volume that traded that day for all of AIG

Page 116

1    shares in the market, 1,692,800 shares.  So, what BLMIS was

2    purportedly showing is, somehow magically, it was able to

3    trade more than the entire market traded for that day.  In

4    other words, the magnitude exceeded, it traded to the volume

5    of 166, almost 167 percent of the market, which is well in

6    excess of the entire market.  You can look down, halfway

7    down, on September 13, for GE.  GE, in the IA business,

8    purported volume, 17,709,440 shares.  The actual market

9    volume, as reported by Bloomberg in the market, was

10   7,604,800 shares.  So, again, the purported volume exceeded

11   the purported volume in the IA business, exceeded the entire

12   market by over two times.  And so, this whole exhibit goes

13   through many, many, many days throughout the entire period

14   where these trades exceeded the market.  What's important to

15   point out, during this analysis too, there were many that I

16   did not put on this, that while they didn't exceed the

17   entire market, they were 90 percent of the whole market, 95

18   percent of the whole market.  So, this is just, what you're

19   seeing here, is everything that exceeded the market that

20   couldn't be.  You can't exceed the entire market, but there

21   are quite a few that aren't even on here, where it was

22   approaching 95, 90 percent of the entire market, which too,

23   while that's not an impossibility, it's highly unlikely,

24   let's put it that way.

25   Q    So, this 24-page Exhibit 49, does it include both

Page 117

1   instances where the BLMIS investment advisory business

2   exceeded purchases that were reported as well as sales?

3   A    It does.  It starts to flip to the sales on page 12 of

4   24.  And you'll see, when they shift around in the, to

5   brackets, those are the sales, the IA business purported

6   volume.  So, those are the sales that I then just compared

7   to the total market.  So, it was both on the purported buy

8   and the purported sale of these equities.

9   Q    Is that something you would see in a legitimate trading

10   situation?

11   A    No.  You can't trade more than the whole market.  It's,

12   you know, the analogy, if you go to the local Ford dealer

13   and they have 100 cars on the lot, you can't buy 120 cars.

14   They don't have them.

15   Q    Does the Bloomberg data you relied on in Column Five of

16   Exhibit 49 include over-the-counter trades?

17   A    It does.  So, OTC, or over-the-counter trades,

18   Bloomberg collects that data for market participants.  It's

19   reported from equities and all of that's funneled into the

20   Bloomberg data.

21   Q    Is it possible that the trades we discussed were made

22   over the counter somewhere else?

23   A    No.  I looked at that.  I looked at the Frankfurt and

24   London -- this is in footnote 156 on page 58 of my report.

25   I also performed the analysis on the Frankfurt and London

Page 118

1    Stock Exchanges, added up that; first looked at those, did

2    he same analysis, then I said, okay, let's just add them all

3    together and see what it is.  And even if you do that, he's

4    still, these purported trades exceed all of that.

5    Q    So, if the investment advisory business, BLMIS, had

6    been conducting over-the-counter tradings, would the AS400

7    have been connected to some sort of outside trading platform

8    for that?

9    A    Absolutely.

10   Q    So, I want to talk a little bit about how the split

11   strike strategy was supposed to be achieving its results.

12   A    Okay.

13   Q    Are you familiar with the term 'volume weighted average

14   price' in the financial industry?

15   A    I am.  It's known as VWAP in the industry, but yes.

16   Q    What is that?

17   A    It's a formula that basically, if you are time slicing

18   purchases, in other words, if you're buying stock over the

19   period of a day at different intervals, you want to look at

20   what the average price is for each last sale and then

21   average those for the entire day.  And it gives you a gauge

22   on how well you're doing compared to the open market.  It

23   would be a wonderful world if we could always buy low and

24   sell high, but we know that's not the reality, that doesn't

25   work.  If I could do that, I wouldn't be in this court

1    testifying, but it's not the reality.

2    Q    Let's look at that equation you're talking about.  I

3    think it's Exhibit 41 for the trial, and it's also shown on

4    page 60 of your report.  Can you just walk us through all of

5    these fancy symbols on this VWAP equation?

6    A    Sure.  On the top, you're just summing all of the

7    trades for that particular day at the price of each trade

8    times the quantity of each trade, divided by the sum of all

9    the trades and the quantity.  So, basically, it's giving you

10   a volume-weighted average price of everything that you

11   bought during the day.  And it's important because if a

12   client came to me or any trader and said, "Buy me 100,000

13   shares of Exxon," you could put that in as one order, and

14   maybe you put it in at ten o'clock, and at one o'clock some

15   piece of news comes out about Exxon that lowers the value,

16   you just ended up buying at a high price that day, you cost

17   your client money.  So, by time slicing, which is what the

18   trading business was doing, and putting in that trade in

19   time intervals over the course of the day, and then

20   measuring your VWAP, you can see how well you're doing

21   compared to the market.  And at the end of the day, you

22   should be pretty close to the VWAP that the volume weighted

23   average price of all the trades in the market, as a measure

24   of how well you executed your trades.

25   Q    Is the VWAP the benchmark that financial analysts use

1      to evaluate the timing of sales?

2      A    It is.  When you're doing programmatic trading and

3      looking at trying to maximize or minimize your risk of

4      pricing swings during the day, VWAP is a benchmark that's

5      widely used in the industry.

6      Q    Did you conduct a VWAP analysis on the information that

7      you found in the BLMIS books and records?

8      A    I did.

9      Q    Did you analyze the VWAP for trades documented on the

10     BLMIS Investment Advisory side?

11     A    Both on the Investment Advisory side and the prop

12     trading business.  And that was using information that I

13     found at BLMIS.  I also purchased from Bloomberg data,

14     third-party market data, that records VWAP for the entire

15     market for that day.  So, that's the, kind of the benchmark

16     that you compare that to, to see how good is your trader

17     doing against the rest of the market.

18     Q    So, why did you do this?  Why did you do it?

19     A    I wanted to, again, in the quest to be able to see if

20     there was any trading, I wanted to go look at the trades

21     because I noticed when I was going through the statements,

22     it always seemed that the trades were always making money.

23     And again, that's not the reality of the market.  I mean,

24     just nobody can always make money on trading.  And so, when

25     I've looked at that, I said, this is another indication to

Page 121

1    me that something's not right, kind of, you know, a red flag

2    in my mind, so to speak.  And then by looking and doing an

3    analysis, that's what drove me to do this analysis.

4    Q    Did you prepare a demonstrative to kind of summarize

5    what you found?

6    A    I did.  I think there were several, yes.

7    Q    I think that's the Trustee's Demonstrative Exhibit One.

8    I'm not sure if that's in one of those binders up there, but

9    it's on the screen.  Do you have that there?

10   A    I do have that.

11   Q    If you could, just tell us, first of all, if that's the

12   demonstrative you prepared?

13   A    Yes, this is.

14   Q    Okay.  Can you identify what is going on in the small

15   pie in the upper right hand corner?

16   A    So, in the blue label, where it say "Typical market

17   maker prop trader," upper right corner, in the marketplace,

18   if you're executing this type of strategy where you're

19   trying to time slice your trades, the typical market maker

20   prop trader will buy, on average, 50 percent of the time

21   below the average, 50 percent above.  But it converges at

22   about 50-50.  Again, sometimes you can buy at a good price,

23   sometimes you're buying above what other paid and it's not

24   such a good deal.

25   Q    Is that sort of theoretical, what you would see

1   theoretically if you're doing trading?

2   A    Well that's not only theoretical, that's what actually

3   happens in the market.  If you, when you pull the data from

4   Bloomberg, for instance, it will come out at about 50-50.

5   Q    So, if you look at the high in the lower right hand

6   corner, talking about the proprietary trading business, what

7   did you find?

8   A    So, this one looks at the buys.  So, this was from

9   January 2000 through November 2008.  And the prop trading

10  business was at about 51-49, almost 50-50, where you would

11  expect to see prop traders doing the sort of buying to end

12  up, so looking at the actual data from the prop trading

13  business and running the formula that we just talked about.

14  This is what, for that time period, it ended up being.

15  Q    And was the proprietary trading business actually

16  buying stock during that period?

17  A    Yes.  The proprietary trading business was buying stock

18  for the proprietary trading desk and for the market-making

19  clients of that side of the business.  This has nothing--

20  what we're talking about now has nothing to with the IA

21  customers or IA business, at this point.

22  Q    If you look at the large pie on the left, talking about

23  the IA business buys, what does that show?

24  A    So, this shows that in the IA business, what was

25  recorded as the buys, was that the IA business was buying

Page 123

1    below the average price 83 percent of the time.  In other

2    words, in the industry, they're hitting home runs,

3    supposedly, 83 percent of the time.  You can see it's way

4    off kilter with what you would expect to see and if people

5    could really buy below the average price of 83 percent of

6    the time, again, it would be a wonderful world, but that's

7    not the reality.

8    Q    So, how does that investment advisory business VWAP for

9    reported stock purchases compared to proprietary trading

10   business?

11   A    It's off the chart.  It signals that these trades never

12   occurred.  To me that's what it signals.

13   Q    Let's talk about stock sales.

14   A    Okay.

15   Q    I think that's Trustee's Demonstrative Exhibit Two,

16   which should be popping up on the screen right now.  If you

17   could take a look, again, at the pie on the right, top, what

18   do you find?

19   A    So, that's the one under the blue line that says

20   "Typical Market Maker Prop Trader," using the Bloomberg

21   data, that's about 50-50, measuring, and using the actual

22   Bloomberg data in the Madoff proprietary to test that.  It

23   came out that the proprietary trading business was selling

24   above average about 48 percent of the time.  Right about,

25   you know, 50 percent, 50 to 48.  You go to the left, under

1    the red banner, the IA business, was selling above the

2    average price 72 percent of the time.  Again, how convenient

3    if you can always, you know, for the vast majority of the

4    time, buy low and sell high; in the real world that doesn't

5    work.  That's how it's almost, you're guaranteed to make

6    money if you could do this, but the real world doesn't work

7    that way.  So, again, this was an indication to me something

8    was off.  And coupled with the other analysis that I did,

9    proved to me that this trading just didn't occur.

10   Q    So, the proprietary trading business and the investment

11   advisory business, were both operated by the same person,

12   weren't they?

13   A    Yeah, Bernard L. Madoff.

14   Q    Did you reach any conclusion about the discrepancy in

15   the performance between the proprietary trading business and

16   the investment advisory business?

17   A    I did.  Think of it this way:  If there was some sort

18   of magical algorithm that Madoff had to be able to buy low

19   and sell high all the time, that would have been employed in

20   the prop trading desk.  I mean prop trading is his own money

21   for his own firm.  He would have employed that.  The fact

22   that you don't see that, and you see the reality that they

23   were at 52-48 and close to 50 percent on the buys, tells you

24   there is no magical wand that can be waived.  Average

25   traders doing this hit the average.  That's what they're

1    expected to do.  That's how they're measured.  And it shows

2    that the IA business just couldn't have executed these at

3    that rate.

4    Q    Does your conclusion have any bearing on your

5    conclusion that the BLMIS investment advisory business was

6    being operated as a Ponzi scheme?

7    A    It does, because again, going back to the chart across

8    the way there with the IA business in the middle, without

9    any sort of legitimate trading going on for the IA

10   customers, the strategy that was being promised, and no

11   other source of business, this plays in that the trades

12   didn't occur.  Again, that's the classic of a Ponzi.  All

13   you're doing is taking customer money and using that money

14   to pay back customers.  Nothing else is happening with it.

15   Q    So, based on your review of the books and records of

16   BLMIS, was BLMIS buying and selling stocks for its

17   investment advisory customers?

18   A    Not for the IA business customers.  I've seen no

19   evidence of that.

20   Q    So, if we can talk about the second part of the split

21   strategy options --

22   A    Okay.

23   Q    Could you again briefly describe -- and briefly this

24   time -- how the options work with that strategy?

25   A    They're just a paired set of options.  They were,

Page 126

```
 1   because the strategy was supposed to be buying a basket of

 2   stocks around the S&P 100, BLMIS was purportedly using

 3   what's called OEX options, or S&P Index options, on the 100

 4   index.  And there was a sale of a call and a purchase of a

 5   put that created the collar around the stock.  And that was

 6   part of the overall strategy that was being touted, that it

 7   would prevent downside, you know, downside risk protection,

 8   but at the same time limiting the upside so you're probably

 9   not going to hit a home run, but you'll be getting singles

10   and doubles all the time.

11   Q    So, where are options trades recorded?

12   A    Well option trades are reported through the OCC, the

13   Option Clearing Corporation.  First of all, they should be

14   recorded in your own broker dealer accounts in the books and

15   records, if they're actually going on.  But to clear those

16   options, the OCC was established, and that's kind of the

17   clearing house of the options.  These options that were

18   purportedly being used were OEX options, and those are our

19   proprietary options of the Chicago Board of Option Exchange.

20   And so they are exchange-traded options and licensed by the

21   CBOE, that's the only way they can be traded.  But there

22   would be a record of those both from the CBOE and the OCC,

23   the Option Clearing Corporation, just like we talked about

24   with the DTC earlier this morning.

25   Q    Were you able to obtain OCC clearing records for BLMIS?
```

Page 127

1    A    I was.

2    Q    Did you perform an exercise like your DTC exercise for

3    these OCC records?

4    A    I did.

5    Q    And I think you talked about that on page 76 of the

6    report.  What period did you analyze?

7    A    This was October 31, 2002 through 2008.  And similar,

8    Your Honor, to the chart we had earlier, where I went

9    through and said let's look at the proprietary trading for

10   the equities, I said let's look at the proprietary trading

11   for options to see if any of the similar options were traded

12   that appeared on customer statements.  So, I had those on

13   the prop trading side.  I had the ones that were purportedly

14   traded for the IA business, and then I had the OCC records.

15   And none of those, in paragraph 188 I conclude the options

16   purportedly traded on behalf of the IA customers were not

17   shown on any OCC records and were not cleared through the

18   OCC.  So, I was able to match up the options on the prop

19   trading to the OCC records, which one would expect to see.

20   There were options that were traded in the prop trading and

21   market making side of the business.  But on the IA side,

22   those records were not matched because those trades never

23   happened.

24   Q    So, based on your review of the BLMIS books and

25   records, did you reach a conclusion as to whether or not

Page 128

```
 1    BLMIS was trading options for its investment advisory

 2    clients?

 3    A    I reached the conclusion that no options were ever

 4    traded on behalf of the IA business customers.

 5    Q    So, let's talk about the third element of the split

 6    strike strategy, which I think you said was treasuries.

 7    A    Correct.

 8    Q    I think you did an analysis of that and it's on page 70

 9    of the report.  Based on your review of the books and

10    records, did you determine how treasuries factored into this

11    split strike strategy the BLMIS was marketing to is

12    customers?

13    A    I did.  They were supposed to be used, Your Honor, when

14    either Mr. Madoff or somebody at BMLIS determined it was

15    time to, quote, get out of the market, and the purported

16    equity and option trades were unwound and then money was

17    used to purchase treasuries, in other words, to go into kind

18    of a parking situation during that time period.  That's how

19    it was supposed to work.

20    Q    If you could turn to Exhibit One, which is Mr. Madoff's

21    allocution, and starting in the middle of line 7, on page

22    26, through line 11, and read that into the record please.

23    A    What was the line number to start on?

24    Q    It's line 7 through 11 on page 26.

25    A    "I promised that I would opportunistically time those
```

Page 129

1    purchases and would be out of the market intermittently

2    investing client funds during these periods in United States

3    government-issued securities such as United States Treasury

4    bills."

5    Q    And then read line 16 through 18 on that same page.

6    A    "In fact, I never made those investments I promised

7    clients who believed they were invested with me in the split

8    strike conversion strategy."

9    Q    Based on your review of the BLMIS Investment Advisory

10   books and records, were you able to determine if Mr.

11   Madoff's allocation concerning treasuries was accurate?

12   A    It confirmed my analysis in finding that no treasuries

13   were bought or traded for any of the investment advisory

14   clients.

15   Q    Does the DTC also get involved in documenting the

16   purchase of treasuries?

17   A    It does.  It acts as the clearing house for treasuries,

18   just like it does for equities.

19   Q    Were you able to obtain DTC treasury records for BLMIS?

20   A    I was.  For the period of 2002 through 2007, I was able

21   to obtain those records, and then I performed an analysis,

22   identified the -- first I went and identified the unique

23   treasury bills held by the prop trading business on December

24   31 of every year.  I compared those holdings to the holdings

25   at DTC, and I also compared those holdings to the IA

Page 130

1    business.  And what I found, similar to the equities, is

2    that the prop trading that the -- and the treasury bills

3    weren't a big part of the prop trading, but the treasury

4    bills that were held by the prop trading matched to the DTC

5    records, and that was based on the treasury CUSIP, and in

6    contrast none of the CUSIPs held at the DTC matched those

7    that were supposed to have been bought for the IA customers.

8    So, again, it was a process of elimination.  Once I matched

9    everything to the prop trading, to the DTC -- were there any

10   other DTC records left?  No.  Now I'm left with this tranche

11   of purported treasuries for the IA business that have no

12   support, no evidence of ever being purchased.

13   Q    If you could turn to Exhibit 50 in your binder, which

14   is Table Five on page 71 of your report, and identify that

15   for the record?

16   A    This is Table Five from my report on page 71 of my

17   report.  And this was a part of this analysis.  And what I

18   did for each year end, so, starting with 2002, you can see -

19   - that's the first column; the second column says

20   Proprietary Trading Business; third column, IA Business, and

21   the fourth column says Proprietary Trading Business

22   Positions as a Percent of IA Business Positions.  So, in

23   looking at year end, I went to the IA business, added up

24   from all of the records and customer statements, the total

25   dollar amount of treasuries.  And you'll see in that first

Page 131

1   row for 2002, it's $30,975,765 worth of treasuries.  So,

2   just under $31 billion worth of treasuries.  The prop

3   trading, when I added those all up for that same time

4   period, there was $84 million.  So, as a percentage, if one

5   were to somehow try to attribute the treasuries in the prop

6   trading as somehow being attributable to IA business

7   customers, that's .27, two-sevenths of one percent.  And so,

8   in essence, you'd be left with over $30 billion of

9   treasuries that couldn't be allocated to anybody because

10  they didn't exist, if somebody even took that approach.  And

11  I went through the same analysis for every year here and you

12  can see, like in 2007, 80 million of treasuries in the prop

13  trading, the IA business at that point was now just shy of

14  $57 billion of treasuries, so .14 percent.  So, again, it

15  just shows that the treasuries didn't match, they're not the

16  same.  They're not part -- the prop trading treasuries are

17  not part of the trading cycle, if you will, in the IA

18  business, part of the split strike conversion strategy.  And

19  even if you argued somehow that you could attribute these,

20  you're woefully short on the IA business because there's not

21  enough in the prop trading to cover everybody.  So, it just

22  doesn't make sense.

23  Q    So, looking at the DTC records that you were able to

24  recover, how far short were we in 2007?

25  A    Almost $57 billion.  If you take the $56,990,000 minus

Page 132

1   $80 million, that's $56,910,000.  I mean $56 billion of

2   missing treasuries.  It's ...

3   Q    How many were missing in 2006?

4   A    Over 48,300,000, or 270 million.

5   Q    For the period 2002 through 2007, is it your testimony

6   that there are quite a few missing?

7   A    That would be an understatement, quite a few --

8   billions and billions and billions of dollars were missing.

9   Q    So, taken in conjunction with the other evidence you

10  identified with relating to treasuries, did you reach a

11  conclusion regarding the purchase and sale of treasuries, by

12  the BLMIS Investment Advisory business?

13  A    There was no evidence of treasuries being purchased for

14  the IA business customers, plain and simple.

15  Q    So, switching back to Mr. DiPascali, do you recall him

16  testifying about the nature of the split strike hedging

17  strategy?

18  A    I do.

19  Q    If you could turn to Exhibit Two in your binder, Mr.

20  DiPascali's allocutions, and read the allocution starting on

21  page 45, line 23 through 46, line 17.

22  A    "He attracted a lot of these clients by telling them

23  that the firm would apply a hedged investment strategy to

24  their money.  The clients were told that the strategy

25  involved purchasing what we call basket or blue chip common

1    stocks.  Hedging those investments by buying and selling

2    option contracts, getting in and out of the market at

3    opportune times, and investing in government securities at

4    other times.  By 2008, Bernie Madoff had thousands of

5    clients who believed their funds were being invested this

6    way.  For years, I was a main point of contact for many of

7    those clients when they had questions about their account.

8    From at least the early 1990s, through December of 2008,

9    there was one simple fact that Bernie Madoff knew that I

10   knew, and that other people knew, but that we never told the

11   clients, nor did we tell the regulators like the SEC: no

12   purchases of sales of securities were actually taking place

13   in their accounts.  It was all fake.  It was all fictitious.

14   It was wrong and I knew it was wrong at the time, sir."

15   Q    Did the investigation of the BLMIS books and records

16   that you conducted confirm Mr. DiPascali's allocution,

17   accurately summarize the true nature of the split strike

18   strategy?

19   A    It did.  It confirmed my findings.

20   Q    So, moving from the split strike strategy, I want to

21   talk a little bit about a rate of return, specifically the

22   rate of return, the BLMIS, was reporting to its investment

23   advisory customers.

24   A    Okay.

25   Q    And if you can stick with Mr. DiPascali's allocution

Page 134

1    for a minute, Exhibit Two, and turn again to page 47, and

2    read the allocution beginning on line 16 and ending on line

3    22.

4    A    "On a regular basis, I used hindsight to file

5    historical prices on stocks, then I used those prices to

6    post purchase of sales to customer accounts as if they had

7    been executed in real time.  On a regular basis, I added

8    fictitious trade data to account statements of certain

9    clients to reflect the specific rate of earn return that

10   Bernie Madoff had directed for that client."

11   Q    In your review of the books and records of BLMIS, were

12   you able to analyze the rate of return Mr. DiPascali was

13   talking about?

14   A    I did.  In analyzing the rate of return, and he's also

15   talking about a process called shtupping that was going on

16   for certain clients, adding a little bit extra rate of

17   return for those clients.  That's in my report as well.

18   Q    If you could turn to Exhibit 40, which is Figure 15 on

19   page 64 of your report.

20   A    I'm sorry, Exhibit 40?

21   Q    Forty, yes, sir.  Do you have that binder there?

22   A    I do.  And it was on page ...?

23   Q    It's also on page 64 of your report.

24   A    Okay.

25   Q    Is this an exhibit you prepared?

Page 135

1    A    It is.

2    Q    Is it an accurate graphical representation of your

3    analysis?

4    A    It is.

5    Q    Could you identify the sources for this information?

6    A    The source of the information was information from the

7    S&P, from the actual market, through December 11, 2008, from

8    December 1996.  There was also information taken from the

9    Dow Jones Industrial Average on the market.  This

10   information was obtained from Bloomberg.  And those two,

11   what I did here was plotted out the rate of return for those

12   actual indexes for those period of time, so, what did the

13   markets actually do.  And that's in the, both the blue line,

14   Your Honor, and the green line.  And then I plotted the red

15   line, is the IA business average annual rate of return

16   through December 11, 2008.  That's the red line that kind of

17   goes straight across.  And what I wanted to see was, again,

18   in looking at, to answer the question, were there any real

19   trades, were these trades that were being reported on the

20   customer statements, were they real?  I wanted to look at

21   the performance.  And what you can see, recall the split

22   strike conversion strategy, was based on a basket of stocks

23   in the S&P 100, and using S&P index options.  So, that

24   strategy could have come close to mirroring the returns on

25   the S&P, albeit not exactly because you got options, you've

Page 136

1    got a collar situation that tamps that down a little bit.

2    But it should look pretty similar.  And what we see is it's

3    anything but similar.  The red line for the average annual

4    IA business rate of return goes from about, looks like 12

5    percent in the end of '96, close to 20 percent in '99, then

6    it dips down to 10 percent in '04, and in '08 it's about 10

7    percent when the music stopped, when Mr. Madoff went and

8    confessed.  In contrast, Your Honor, you'll see the blue and

9    green line going up and down.  So, for instance, in 2001,

10   when the markets really took a dive, you could see both the

11   S&P 100 was at negative ... the S&P was negative, looks like

12   23, 24 percent.  The Dow was probably negative 18 percent.

13   Yet the Madoff purported returns were about 11 or 12

14   percent.  And you could see in times when the S&P goes up,

15   that's, you know, going up and down that's called volatility

16   in the market, that happens, as we saw yesterday.  But this

17   kind of straight line, red line of average returns, really

18   told more the story that these trades couldn't have

19   occurred.  You can't have that kind of -- when this strategy

20   was built around the S&P 100 index, and a basket of those

21   stocks, it should have behaved similarly, and it didn't.

22   Q    Could the collar have accounted for this abnormally

23   high level of consistently positive returns?

24   A    So, the collar, as it was done, would have taken off

25   the very top peaks and bottom peaks of the returns on the

Page 137

```
 1    S&P and the Dow, but still would have had volatility.  And

 2    that didn't happen.  So, no, it wouldn't have allowed it to

 3    look like this.

 4    Q    Does the finding you've summarized in Exhibit 40 relate

 5    to your opinion that the rates of return BLMIS was reporting

 6    to its investment advisory customers was an element of a

 7    Ponzi scheme?

 8    A    Yes.  Again, you know, the goal of a Ponzi scheme is to

 9    keep it going and get more money and you keep it going and

10    you have to tell clients you're doing something for them.

11    If you tell them you're just taking their money and not

12    doing anything with it, obviously, the suspicious arises.

13    So, this is part of keeping it going.

14    Q    So, let's wrap up our discussion on trading and rates

15    of return.  And I'd like to do that by having you turn again

16    to Exhibit One, Mr. Madoff's allocution, and read page 27,

17    line 9, ending on line 16.

18    A    "To further cover up the fact that I had not executed

19    trades on behalf of my investment advisory clients, I

20    knowingly caused false trading confirmations and client

21    account statements that reflected the bogus transactions and

22    positions to be created and sent to clients purportedly

23    involved in the split strike conversion strategy, as well as

24    other individual clients I defrauded who believed they had

25    invested in securities through me."
```

Page 138

1    Q    And then, if you could, just turn to Exhibit Two, Mr.

2    DiPascali's allocution, and read what he allocated on page

3    51, line 18 through 21.

4    A:   "Judge, thousands of clients, institutions,

5    individuals, funds, charities, were all mislead about the

6    status of their accounts, what was being done with their

7    money and what their accounts were worth."

8    Q    Based on your review of the books and records of BLMIS,

9    are Mr. Madoff's and Mr. DiPascali's allocutions consistent

10   with your finding on the trading and rates of return?

11   A    They are.

12   Q    So, we're here in bankruptcy court.  Solvency is a

13   topic that comes up once in a while.  Did you take a look at

14   that?

15   A    I did.  I was asked to prepare a solvency analysis of

16   BLMIS.

17   Q    Did you reach a conclusion regarding the solvency of

18   BLMIS?

19   A    I did.

20   Q    What test did you use to do that?

21   A    I applied the balance sheet test, Your Honor.  I also

22   looked at the capital adequacy test and the ability to pay

23   test, ultimately relying on the balance sheet test to

24   determine the insolvency, the deep insolvency, of BLMIS, in

25   December 2002 all the way through December 2008.

1    Q     So, what is the balance sheet test?

2    A     Well, the balance sheet test, you want to look, if a

3    company is solvent, its assets, it has to have positive

4    equity.  So, it's assets would exceed its liabilities and

5    you'd be left with equity.  In other words, it has the

6    ability to stay in business and continue.  And that's one

7    test.  You can have a company that has negative equity but

8    it gets from somebody and can continue for a little bit, but

9    basically, if it's in a negative position, the ability to

10   continue becomes a going concern issue.  And so, you look at

11   the balance sheet, add up all the assets, add up all the

12   liabilities and subtract those, and look at what position

13   its in.  And that's what I did.  I, again, because BLMIS is

14   one entity, there were two sides, two legs if you will:  the

15   investment advisory side and the prop trading side.  I

16   looked at the assets of both and the liabilities of both,

17   and then ran my computations and analysis from that.

18   Q     If you could turn to Exhibit 35 in your binder and tell

19   us what that is?  And this is Exhibit 27 to his report, Your

20   Honor.

21   A     So, Exhibit 35 is a series of recast balance sheets for

22   BLMIS from December 11, 2002 and then each subsequent

23   December 11 through 2008.  And what I did is, in the -- it's

24   a basic balance sheet I set forth.  And I wanted to look at

25   what the total assets and total liabilities.  So, for the IA

Page 140

```
 1   business, I knew there was some cash left when -- this is at

 2   2002, so I knew what the cash balance was in 2002.  There

 3   were some inter-company receivables.  And basically, this

 4   relates, Your Honor, to money that was funneled from the IA

 5   business over the years, to the prop trading business to

 6   technically prop up the prop trading business.  I hate to

 7   sound redundant there but basically, there was a scheme that

 8   money was taken from the IA business, funneled into the prop

 9   trading business.  It was made to look like it was

10   additional profits for the prop trading business, through

11   commission revenue and other revenue, added to their

12   financials.  And so, to account for that, on the balance

13   sheet I put it on as a receivable to the IA business,

14   because it really was the IA business money, put it on as a

15   payable from the prop trading.  But because it's one entity,

16   it gets eliminated.  It's, you know, right hand, left hand,

17   right pocket, left pocket.  I then looked at the net trading

18   positions for the prop trading.  It had some cash.  This is

19   in the second column.  It had some net trading positions,

20   some fixed assets.  These numbers are all in millions.  And

21   when you add it all up, all the way across for BLMIS,

22   because again, two legs but one company, there was 1.8

23   billion in assets at December 11, 2002 and 11.9 billion in

24   liabilities.  The biggest chunk of those liabilities were

25   the liabilities owed back to the IA business customers.
```

Page 141

1    Because looking at the situation with no trading going on,

2    but money was taken in on a cash-in, cash-out basis, the

3    business technically would owe those customers back their

4    money, on a net basis.  So, that's the number I used was he

5    net calculation for customer liabilities.  And if you --

6    this doesn't show it on this one, it's shown on my report.

7    Let me find it in my report, because I think that's helpful

8    to look at.  If Your Honor turns to page 1, first 161,

9    you'll see what we're looking at in Exhibit 35 replicated on

10   page 161 in my report.  Right below that, all I do is a

11   simple math and take the total assets, subtract liabilities

12   from above and come up with the, what I call the insolvent

13   number of $10 billion.  So, as of December 11, 2002, BLMIS

14   was insolvent to the tune of $10 billion.

15   Q    I think that may be Exhibit 36 in your binder, if you

16   take a look at that and tell me if you're looking at the

17   same thing?

18   A    Well, we were looking at a piece of Exhibit 36, yes.

19   Q    Getting back to Exhibit 35, what records did you use?

20   Are they accurately reflected at the bottom of the exhibit

21   there?

22   A    They are.  So, there were reports from ... information

23   from focus reports for the prop trading business, there was

24   calculations for the customer liabilities, that's referenced

25   there.  And then you'll see a footnote that I put, the

1    receivables and payables based on analysis of cash infusions

2    from the IA business to the prop trading business.  And that

3    was the same for each of the subsequent years.  It was the

4    same balance sheet test analysis, Your Honor, using similar

5    data for the next year.

6    Q    Look at Exhibit 36 and tell me what that is.

7    A    So, Exhibit 36 is set forth on my table 13 in my report

8    on page 162.  And all this is, is the summary, if you will,

9    of each of the years where I take the total assets, subtract

10   the total liabilities and come up with the determination of

11   whether it was solvent or insolent.  In this case, every

12   single year is insolvent.  And you can see, Your Honor, the

13   insolvency deepens to its deepest point in 2007 at about

14   $21.5 billion.  And in 2008, on December 11, when Mr. Madoff

15   went into the, turned himself in to the authorities, it was

16   over $19 billion insolvent.  So, in every year here, I use

17   the term deeply insolvent, grossly insolvent, but insolvent.

18   Q    So, insolvent from the 2002 to 2008 at least?

19   A    At least.

20   Q    So, just to summarize, Mr. Dubinsky, did your

21   investigation allow you to reach a conclusion regarding the

22   Trustees contention in this case that BLMIS's investment

23   advisory business was committing long-term fraud on its

24   customers?

25   A    Yes.

1    Q    What did you conclude?

2    A    That, in fact, the fraud had been going on for, for

3    decades.  It was -- there's certainly evidence for a court

4    to find that there was a fraud that was committed and that

5    without any trading going on, there was no substantive

6    activities other than operating a Ponzi.

7    Q    If you could turn to Exhibit One, Mr. Madoff's

8    allocution, in our binder, and read the allocution starting

9    on page 24 through the end of the sentence on line 15?

10   A    What was the line to start on?

11   Q    Line 9 through 15.

12   A    Okay.  "The essence of my scheme was that I represented

13   to clients and perspective clients who wished to open

14   investment advisory, in individual trading accounts with me,

15   that I would invest their money in shares of common stock,

16   options and other securities of large well-known

17   corporations, and upon request would return to them their

18   profits and principal.  Those representations were false for

19   any years."

20   Q    Based on your review of the BLMIS books and records,

21   was Mr. Madoff's allocution concerning the nature of the

22   fraud consistent with your findings?

23   A    It was, yes.

24   Q    Did your investigation allow you to reach a conclusion

25   regarding the Trustee's contention in this case that the

Page 144

1    fraud being perpetrated by BLMIS and its investment advisory

2    business was a Ponzi scheme?

3    A    Yes.

4    Q    What did you conclude?

5    A    That, in fact, it was a Ponzi scheme.  It operated as a

6    Ponzi scheme, has all the classic hallmarks of operating as

7    Ponzi scheme, as we've gone through during my direct.  And I

8    concluded it was a Ponzi.

9    Q    If you could turn to page 23 of Exhibit One, Mr.

10   Madoff's allocution, and read lines 14 through the end of

11   the sentence on line 18.

12   A    "Your Honor, for many years up until my arrest on

13   December 11, 2008, I operated a Ponzi scheme through the

14   investment advisory side of my business, Bernard L. Madoff

15   Securities LLC, which was located here in Manhattan, New

16   York at 885 Third Avenue.

17   Q    Based on your review of the BLMIS books and records, is

18   Mr. Madoff's allocution concerning the Ponzi scheme

19   consistent with your findings?

20   A    It is, yes.

21   Q    Based on your review of the books and records of BLMIS,

22   for the periods we just discussed, did you see any evidence

23   of legitimate trading in any of the three split-strike

24   elements of the investment advisory customer accounts?

25   A    No, I did not.

1    Q    Any stock trades?

2    A    None.

3    Q    Any options trades?

4    A    None.

5    Q    Any treasuries trades?

6    A    None.

7    Q    Any profits being generated by the investment advisory

8    business?

9    A    Not for the IA business customer, none.

10   Q    Based on your review of the books and records, what was

11   the source of funds that the BLMIS investment advisory

12   business used to pay customer redemptions?

13   A    Customer money.

14   Q    Is that the only source of funding for the IA business?

15   A    Yes.

16   Q    How much money did the BLMIS investment advisory

17   customer statements say that BLMIS owed is customers in

18   December of 2008?

19   A    The statements indicated about $65 billion.

20   Q    Sixty-five billion dollars?

21   A    Sixty-five billion with B.

22   Q    How much money did BLMIS have in the bank?

23   A    Not anywhere near that amount.  I think it was, in

24   2008, just under $1 billion.

25   Q    What would have happened if all of the investment

1    advisory customers had sought to redeem their statement

2    balances?

3    A    There was no money to pay people back.  No one would

4    have gotten their money back.

5    Q    The system would have collapsed?

6    A    System would have collapsed.  It's a classic, Your

7    Honor, run on the bank.

8    Q    Is that what happened.

9    A    Exactly what happened.

10   Q    Are your conclusions regarding the BLMIS computer

11   systems based on recognized computer forensic methodologies?

12   A    They are.

13   Q    Are your conclusions regarding the solvency of BLMIS

14   based on recognized methodologies used by forensic

15   accountants and valuation professionals?

16   A    They are.

17   Q    Are your conclusions concerning the trading and funding

18   practices of BLMIS based on recognized methodologies used by

19   forensic accountants, fraud examiners and valuation

20   professionals?

21   A    They are.

22   Q    Are your conclusions made with a reasonable degree of

23   certainty in those fields?

24   A    They were, yes, they are.

25   Q    Can the results of your analysis be replicated by

Page 147

1    someone with the same level of education, training and

2    experience as you have?

3    A    I believe they would be able to, yes.

4    Q    Thank you for your time, Mr. Dubinsky.  I have no

5    further questions.

6    A    Thank you.

7              THE COURT:  Cross Examination?

8              CROSS EXAMINATION OF BRUCE DUBINSKY

9    BY MS. CHAITMAN:

10   Q    Mr. Dubinsky, how much has your firm been paid to date

11   by Mr. Picard?

12   A    I believe, it's roughly about $39 million, maybe close

13   to $40 million.

14   Q    Okay.  And of that amount, how much has been paid to

15   you personally?

16   A    I don't know.  I get a salary, so I'm not on any sort

17   of contingency if that's what you're asking.

18   Q    Has your salary increased since you've been retained by

19   Mr. Picard?

20   A    My salary has increased, yes, since that time, yes.

21   Q    What was your salary at the time you were retained by

22   Mr. Picard?

23   A    I would defer to, Your Honor, to not answer that.

24   That's personal information.

25              THE COURT:  Well, it's relevant to bias.  You can

1    answer it.

2    A    My salary was, at that time, $500,000 a year.

3    Q    And what was it last year?

4    A    Last year it was $650,000.

5    Q    And when did it go up from 500 to 650?

6    A    It's gone up over the time period.

7              THE COURT:  You have to speak up and into the

8    microphone Ms. Chaitman, because we're not picking you up.

9              MS. CHAITMAN:  Oh, I'm sorry.

10             THE COURT:  Can you stand at the podium?

11             MS. CHAITMAN:  At the podium?  Sure.

12             THE COURT:  Thank you.

13   Q    And in addition to your salary, do you get other

14   benefits?

15   A    I do, yes.

16   Q    What are those?

17   A    There's life insurance, there's disability insurance,

18   there are stock options for being a partner in the firm;

19   those types of benefits.

20   Q    And have your stock options increased in the time

21   you've been an expert in this case?

22   A    Generally, not only mine but the whole firm's has, yes.

23   Q    Okay.  And what is the, what was the value of your

24   stock options when you were first retained by Mr. Picard?

25             MR. HUNT:  Your Honor, that is getting a little

Page 149

```
 1    personal, I think.

 2            THE COURT:  Well, I think you've made your point

 3    that he gets paid by the firm that does the work.

 4            MS. CHAITMAN:  Right, but if he's getting, you

 5    know, a million dollars in stock options I think that's

 6    relevant.

 7            THE COURT:  Do you know the value of your stock

 8    options?

 9            MR. DUBINSKY:  I don't, sitting here today.  They

10    fluctuate and the firm's been through different acquisitions

11    of private equity firms over the years, so, I don't.

12    Q    You own stock in the firm at this point, right?

13    A    I'm sorry, I couldn't hear you.

14            THE COURT:  Could you keep your voice up, Ms.

15    Chaitman?

16    Q    You own stock in your firm, right?

17    A    Yes, that's correct.

18    Q    And how many shares of stock do you own at the present

19    time?

20    A    I believe it's 1,300 shares.

21    Q    And how many shares did you own at the time that Mr.

22    Picard retained you?

23    A    I don't recall.

24    Q    Has it increased significantly?

25    A    No, I think it's actually decreased.  I was given stock
```

Page 150

1    when Duff & Phelps purchased my business, and so I

2    liquidated some of the stock along the way.

3    Q     What?  I'm sorry?

4    A     I had liquidated some of that stock along the way.

5    Q     But if you hadn't liquidated it, it would have gone up

6    significantly?

7    A     That's correct.

8    Q     Now, in the course of your work you became familiar

9    with the Lazard report that was prepared by the Trustee in

10   his efforts to sell the, what you refer to as the

11   proprietary trading business.

12   A     That is correct, yes.

13   Q     And did you review that report?

14   A     I did.

15   Q     And did you find any factual inaccuracies in that

16   report?

17   A     No.

18   Q     Now, you referred to the market making and proprietary

19   trading business as one business.  You call it the prop

20   trading, right?

21   A     For ease of discussion, that's what I did, yes.

22   Q     Okay.  The proprietary trading, in fact, was investing

23   on Mr. Madoff's account.  Isn't that true?

24   A     On the account of he firm, not Mr. Madoff personally,

25   but the account of the firm, as any prop trading desk would,

Page 151

1    yes.

2    Q    Okay.  And how many traders were involved in

3    proprietary trading?

4    A    It varied over the years that I looked at.  I think --

5    I'd have go to go back.  I think at one point there were

6    maybe six or eight on the prop trading desk.

7    Q    Six or eight?

8    A    Six or eight.

9    Q    And how many traders were there in the market making?

10   A    I think at one point maybe 20, 22.  I'd have to go back

11   and refresh my memory.

12   Q    Okay.  And all together, Madoff employed how people, as

13   of, say, 2007?  Do you remember?

14   A    I don't recall.

15   Q    Approximately?

16   A    I don't recall.  It wasn't in the hundreds, but I don't

17   recall.

18   Q    It was about 180, wasn't it?

19   A    That sounds about right.

20   Q    And of the 180, how many were involved in the IA

21   business?

22   A    There were approximately, I think eight to ten people.

23   Q    Eight to ten people.

24   A    Correct.

25   Q    So, of the 180, 170 were involved in the, what you call

Page 152

1    the prop trading, right?

2    A    I would agree with you, yes.

3    Q    Either traders or support personnel.

4    A    Correct.

5    Q    And is it your testimony that there was anything

6    illegal about the prop trading business?

7    A    Well, I'm not here to give a legal opinion on what was

8    illegal or not but certainly the funneling of money from the

9    IA business into the prop trading business, and then

10   falsifying reports to regulators based on that, it certainly

11   would be wrong and probably would rise to somebody

12   determining it was illegal.

13   Q    Now, you testified that the only use of the investment

14   advisory customer's money, according to your analysis, was

15   that it was used to pay customers who were asking for

16   withdrawals.

17   A    Correct.

18   Q    And then I think your testimony was that that was all

19   it was used for.  It was either used to invest in overnight

20   funds at JP Morgan Chase, right?

21   A    Correct.

22   Q    Or it was used to fund withdrawals, right?

23   A    No.  I think my testimony also said it was used to fund

24   purchases of certain treasuries in brokerage accounts in the

25   IA business, side of the business.  I think I talked about

Page 153

1    all three of those.

2    Q    Well, when you say in brokerage accounts, what

3    brokerage accounts are you referring to?

4    A    There were about six or eight other brokerage accounts

5    that were located during this time period, the 2000 to 2008

6    time period, where there were certain treasuries that were

7    being purchased.  Money was being taken out of the 703

8    account, Your Honor, over to those brokerage accounts.

9    These are at other wire houses.  And treasuries were

10   purchased in those accounts and then liquidated at various

11   times.

12   Q    Now, I typed word verbatim what you said this morning

13   on direct examination, and you said that you, quote,

14   "Scoured every bank record and didn't find any other use of

15   customer funds other than payments to customers and bank

16   sweeps at night at JPMC."  That was your testimony this

17   morning.

18   A    If that's what you typed down.  I think I also

19   testified this morning that three was money for other

20   treasuries and brokerage accounts.

21   Q    Well, I think the record will show that that isn't what

22   you testified.  But in any event, you're now telling us that

23   you're aware that there were approximately eight accounts at

24   which Madoff was using investment advisory customers' money

25   to purchase T bills.  Isn't that true?

Page 154

1    A     That is correct, yes.

2    Q     Okay.  And those accounts included Lehman Brothers.

3    A     Correct.

4    Q     Bear Sterns.

5    A     That's correct.

6    Q     JP Morgan Chase.

7    A     Correct.

8    Q     Morgan Stanley.

9    A     There was a Morgan Stanley account, yes.

10   Q     Right.  Now, a lot of those precise T bills were listed

11   on the Nelson statements.  You know that, don't you?

12   A     I don't know that.  I've never done that analysis to

13   see if those were listed on the Nelson statements.  The

14   analysis that I have done looked in total across client

15   statements.

16   Q     Okay.  You know, there are three accounts at issue

17   here, right, for the Nelsons?

18   A     Yes, that's my understanding.

19   Q     Okay.  Roy, can you pull up, please, Exhibit DX-EG.

20   And can you go to page two, please?  Did you look at

21   documents like this?  Did you review, for example, the

22   Lehman account statements?

23   A     I've seen these documents, yes.

24   Q     Okay.  And you recall that these were investments of

25   securities that were made with investment advisory

Page 155

1   customers' money, right?

2   A    There was money taken out of the 703 account,

3   transferred to these accounts, these various accounts, and

4   then these securities were purchased, yes.

5   Q    Okay.  So, this shows that this is dated ... just one

6   second ... you know what, I've confused myself on this.

7            THE COURT:  It's July 2002 according to the

8   exhibit.

9            MS. CHAITMAN:  Right.  Right.  Hold on one second.

10   I just have to find that document.  Hold on one second.  I'm

11   sorry.  You know what, I'm going to start with a different

12   one -- I'm sorry -- because I can't find the other documents

13   with respect to that.  Would you please, Roy, pull up

14   Exhibit DX-BJ; is that the one I just asked you for?  Okay.

15   How about -- oh, you know what, here's the problem.  Can you

16   go to Bates No. 2000 -- 20042-43 in that document?

17            MR. HUNT:  Sorry.  I was just going to say, while

18   she's looking for that record where she indicated a minute

19   ago that she is reading verbatim from the transcript about

20   (indiscernible).  I just wanted to point out that was -- her

21   reading was not correct.

22            THE COURT:  Well, the record will speak for

23   itself.

24            MR. HUNT:  I agree.

25            MS. CHAITMAN:  Okay.

Page 156

```
 1              THE COURT:  This is BGO-51 you put on the screen

 2    there in the upper left-hand corner?

 3              MS. CHAITMAN:  DX-BG, and then DXBG is a

 4    collection of documents.  This is Bates numbered JPMSAA-

 5    0020042-43.

 6              THE COURT:  This is what was an exhibit, though.

 7              MS. CHAITMAN:  Yes.

 8              THE COURT:  What exhibit is this?

 9              MS. CHAITMAN:  It's Exhibit DX-BG, which is a

10    collection of these documents.

11              THE COURT:  Okay, but that's your marking for the

12    DX-BG?

13              MS. CHAITMAN:  Yes, DX-BG.

14    Q    Okay.  So can you see on this that on June 12th,

15    there's a trade date at the very top which says, UST Bills.

16    Do you see that?

17    A    There are mult- -- oh, right there?  Yes, I see that.

18    Q    Yeah.  Do you see there's a purchase of $50 million?

19    There are a bunch of them; do you see that?

20    A    I do.

21    Q    It's six $50 million purchases of T-bills?

22    A    I see that.

23    Q    Okay.  And that's a T-bill maturing on September 11th,

24    2008; do you see that?

25    A    That's correct.
```

Page 157

1    Q    Okay.

2         MS. CHAITMAN:  And now if you'd be good enough,

3    Roy, to pull up Exhibit DG -- DX-GX, G as in George --

4    excuse me -- DX-GZ, and then the Bates no. ends in 98099.

5    Okay, that's it.

6    Q    This is the --

7         MS. CHAITMAN:  Oh, excuse me.  I'm sorry, Judge.

8    I'm driving everybody crazy.  I have to go back, Roy, he'll

9    kill me.  In the same exhibit, I need Bates No. 2003-A.

10   Q    Okay.  So this shows that on May 12th, do you see where

11   it says May 12th for the trade date?

12   A    I see one category, yes.

13   Q    Okay.  And then underneath that there -- one, two,

14   three, four, five -- six entries of $50 million purchases of

15   the T-bill maturing September 18th, 2008?

16   A    I see that, yes.

17   Q    Okay.  And now can you go back to that account

18   statement, which was -- it's in DX-GZ and it ends 598099.

19   Okay.  And do you see that this shows on May 27th -- so the

20   purchase was on May 12th, this is on May 27th.  Do you see

21   that there's a credit to the Nelson's account no. 265-3-0?

22   A    Yes.

23   Q    And it's for $894,645?

24   A    Yes.

25   Q    Okay.  So this is Madoff's purchase using 703 account

Page 158

1    money of a T -- of a huge position of T-bills, and this is

2    credited to the Nelson's account.  Do you see that?

3    A    I disagree with you.  I see what you're saying, but I

4    disagree with what you're saying.

5    Q    Okay.  In the course of the years of your involvement

6    in this case, did any Madoff employee explain to you why the

7    exact T-bill, which Madoff indisputably purchased with

8    investment advisor customer's money, showed up on --

9              MR. HUNT:  Your Honor, I object to her

10   mischaracterization of that.

11             THE COURT:  Why don't you just ask the question.

12   Q    Shows up on the Nelson's statement.

13             THE COURT:  Rephrase the question because there

14   was an objection.

15             MS. CHAITMAN:  Okay.

16             THE COURT:  Without the introduction.

17   Q    In the years of your investigation in this case, did

18   any Madoff former employee ever explain to you how it

19   happened that that specific T-bill was listed as an asset on

20   the Nelson's statement 265-3-0 as of May 31, 2008?

21   A    So first of all, I've never spoken to any Madoff

22   employee.

23   Q    Okay, then that's the -- that's -- you've answered my

24   question.

25   A    Okay.

Page 159

1          MS. CHAITMAN:  Judge, I  have a huge volume of

2     these.  I can go through them with the witness.  It's going

3     to be the same question.  We're going to get smoother about

4     presenting them, but do you --

5          THE COURT:  I don't know the best way to do it.

6     Did you ever compare BLMIS's purchases of T-bills from one

7     of these brokerage firms with the entries on customer

8     statements to see if it purported to show that the T-bill

9     was allocated to that customer?

10          MR. DUBINSKY:  In the report that I issued that we

11     have in front of us, I did not.  There was a subsequent

12     report that was issued in January 2019 where I did that

13     analysis and concluded that they did not match up.  I've

14     gone through all of the brokerage accounts in that report.

15          THE COURT:  Is that because you -- well, okay.

16          MS. CHAITMAN:  Well, I would object to that, Your

17     Honor.  Even though you elicited the answer, we don't have

18     the benefit in this case of an expert report that was done a

19     few months ago.

20          THE COURT:  That's true.

21          MS. CHAITMAN:  So, and I haven't had an

22     opportunity to analyze it.  I'm prepared to go through

23     about, I think it's about 50 or more transactions where I

24     can match up a statement --

25          MR. HUNT:  Your Honor, counsel's testifying.

Page 160

1          THE COURT:  Well, I guess maybe the simple -- he's

2    not going to testify to any allocation.  And I think we

3    discussed this at the beginning and maybe the simplest way,

4    so there is no dispute regarding business records, is you

5    show a J.P. Morgan brokerage purchase of T-bills and a

6    corresponding entry in a Nelson account statement and you

7    argue, I guess, that that was an actual allocation of that,

8    a portion of that purchase there.

9          MS. CHAITMAN:  Okay.

10         THE COURT:  And you can do it with a chart.

11         MS. CHAITMAN:  Okay.

12         THE COURT:  And just, if you do it with a chart,

13   just identify the exhibits so they can be checked.

14         MS. CHAITMAN:  Okay.  All right, I'll do it that

15   way.

16         THE COURT:  All right.  Unless you think that

17   there's some benefit to taking this witness through your 50

18   examples.

19         MS. CHAITMAN:  I think he's given us his knowledge

20   on this subject.

21         THE COURT:  Your case to try.

22         MS. CHAITMAN:  We'll be submitting all that

23   information with our post-trial brief, Your Honor.

24   Q    Now, you've testified this afternoon that 703 account

25   money was used to fund the, what you call the prop trading

Page 161

1    activities; isn't that true?

2    A    Correct, yes.

3    Q    And it was hundreds and hundreds of millions of dollars

4    just since 2000 that was transferred from the 703 accounts

5    to the Bank of New York account, which was used exclusively

6    for the market making and proprietary trading activities;

7    isn't that true?

8    A    Well, it went into that bank account.  I've never

9    traced to what it was used for.  It was used, presumably

10   there were salaries being paid.  Mr. Madoff's yacht was

11   being paid out of there.  There were a lot of things --

12   office rent, houses -- a lot of things the money was used

13   for.

14   Q    And all of the securities that the traders were

15   purchasing.

16   A    It could have been.  Once it's comingled, there's no

17   way to determine what it's used for at that point.

18   Q    Right.

19   A    All I know, it was taken from the 703 account

20   improperly, put over to the prop trading business.

21   Q    Right.  And how much money in total just from -- in the

22   period from 2000 through 2008, how much money in total was

23   transferred from the 703 account, which was exclusively

24   investment advisory customers money, to the Bank of New York

25   account, which was exclusively prop trading?

Page 162

1   A    I'd have to check the numbers, about $700 or $800

2   million.

3   Q    Right.  Now, the -- what you call the prop trading

4   business, the market making business was a huge, huge

5   business, wasn't it?

6   A    At one point, it was, yes.

7   Q    Okay.  And at one point, you know that Madoff conducted

8   trades equal to approximately 10 percent of the daily volume

9   on the New York Stock Exchange.

10  A    I've seen anecdotal evidence to that, but I don't know

11  for a fact.

12  Q    Okay.  You never did an analysis, say, for example, in

13  2000 or any time between 2000 and 2008, you never did an

14  analysis of the prop trading, the volume of prop trading as

15  compared to other firms?

16  A    No, I didn't.

17  Q    Okay.  But did you ever investigate who the customers

18  of the market making unit were?

19  A    I didn't investigate.  There were documents with

20  customer names, institutional clients, other banks, other

21  customers.  But beyond that, I didn't do an in-depth

22  investigation into that side of the business for that

23  purpose.

24  Q    But it's fair to say, is it not, that the market making

25  unit did business with all of the major financial firms in

1    the United States?

2    A    I don't know about all of them.  It did business with

3    quite a few major financial firms at that time period.

4              MS. CHAITMAN:  Now if your computer person would

5    be good enough to pull up Exhibit 37 that you used this

6    morning.

7              MR. HUNT:  We're not connected.

8              MS. CHAITMAN:  We're not connected.

9              MR. HUNT:  I guess disconnected us.

10             MS. CHAITMAN:  Do you have the Trustee's exhibits,

11   Your Honor?  No.  Can I have your copy of Exhibit 37?

12             THE COURT:  Some of the exhibits are in the report

13   where the charts are in the report.

14             MS. CHAITMAN:  Yeah, let me just find that.  So

15   Exhibit 37, do you know what page it's on?

16             MR. HUNT:  It's Figure 39 in his report.

17             THE COURT:  What page is that?

18             MS. CHAITMAN:  Oh, okay.  Let me do it the old-

19   fashioned way.

20   Q    Can you see this?

21   A    Yes, I can see that.

22             THE COURT:  What page is that in the report?

23             MR. HUNT:  It's on Figure --

24             MR. DUBINSKY:  Page 121, Your Honor.

25             THE COURT:  Thank you.

1   Q    Okay.  So this is what you were testifying about what

2   the use of investment advisor customers money was, right?

3   A    Correct.

4   Q    Okay.  And where on this chart did you indicate that

5   $700 or $800 million was transferred to the BNY account for

6   the purchase of -- for the general use of the prop trading,

7   as you call it?

8   A    That's not on there.  This chart was showing that the

9   source of incoming funds, as an output, I was looking at

10  what -- where the customer money came from.  So I tried to

11  isolate the incoming inbound money into the IA business to

12  eliminate potential other sources of financing, other

13  sources of business, so it wasn't focused on how the IA

14  business spent their money.

15          MS. CHAITMAN:  Now, do you have a chart for 39,

16  Exhibit 39?  Where is that in here, can you tell me?  Is

17  this it?

18          MR. HUNT:  No.

19          MS. CHAITMAN:  Oh, can you show me?

20          MR. HUNT:  What are you looking for?

21          MS. CHAITMAN:  Figure 39.

22          THE COURT:  You know, it's on Page 82.

23          MS. CHAITMAN:  Okay, thank you.

24  Q    Now in your experience with respect to Ponzi schemes,

25  putting aside the Madoff case, what was the longest existing

Page 165

1    Ponzi scheme that you were paid to understand?

2    A    It would either be a case called DBSI -- was hired by

3    the Department of Justice, it was a real estate Ponzi out of

4    Idaho -- or the First Pay case.  The First Pay case, I

5    think, went for 10 years and the DBSI may have been 10 or 12

6    years, but in that range.

7    Q    Okay.  In your experience, have you ever been involved

8    in analyzing a Ponzi scheme that went on from -- for maybe

9    50 years?

10   A    No, I have not.

11   Q    Okay.

12   A    This is pretty unique in that regard.

13   Q    Okay.  In fact, the whole concept of a Ponzi scheme is

14   that it can't last -- it can't survive for a long time

15   because it doesn't have the economic viability; isn't that

16   true?

17   A    Well, at some point, there's going to be a choke point

18   where it goes out of business or a run on the bank, but they

19   can go for a while.

20   Q    Now, you testified that you saw no evidence of any

21   income earned on investment advisory customers money.  But

22   now you've acknowledged that you were aware that money was

23   taken from the 703 accounts and invested in T-bills, right?

24   A    Well, let me correct that, the two things.  I've always

25   been aware that money left the 703 to be invested.  I think

Page 166

1    what I testified to is no money was made in the investment

2    advisory customer accounts on the purported trades that were

3    promised to them.

4    Q    So you're not -- you weren't -- you didn't seek to

5    convince Judge Bernstein that money hadn't been made on the

6    investment advisory customers money to the extent that it

7    was invested in T-bills.

8    A    I'm not sure I understand your question.

9    Q    Isn't it a fact, Mr. Dubinsky, that the T-bill

10   investments that Mr. Madoff made with investment advisory

11   customers money earned interest?

12   A    Are you talking about the overnight sweeps?

13   Q    No, I'm not.  I'm talking about the eight or nine firms

14   that you've acknowledged that Madoff purchased T-bills

15   through with investment advisory customers money.

16   A    So --

17   Q    And those T-bills paid interest, right?

18   A    Those T-bills paid interest.  I don't know when you

19   said whether they made money, I don't know.  I didn't

20   analyze that because, depending on when you buy them at par

21   or below par and the interest that you collect with accrued

22   interest.  And then when you sell them, you may make money,

23   you may not.  I did acknowledge, and I said during my

24   direct, money was used from the 703 for the overnight sweep.

25   I said that earned interest.  That was a way to kind of keep

Page 167

1    enough money in the Ponzi to add more to the pot.  And I

2    acknowledged that money was taken from the 703 to be used

3    where Mr. Madoff purchased or somebody in BLMIS purchased

4    additional treasuries.

5    Q    Okay.  And those treasuries paid interest, right, and

6    they also could have appreciated in value depending on what

7    happened with interest rates during the period that Mr.

8    Madoff held them.

9    A    Or conversely, gone down in value, yes.

10   Q    Right.  And to the extent that those treasuries were

11   allocated to the Nelsons and they appreciated in value, that

12   was --

13            MR. HUNT:  Objection, Your Honor.  He's already

14   testified he didn't do that exercise.  She just said she's

15   going to --

16            THE COURT:  Well, she just -- overruled, she can

17   ask him the question.  Go ahead.

18            MR. HUNT:  She said she's going to do that by

19   paper.

20            THE COURT:  Overruled.

21   Q    To the extent that the Nelson's accounts were credited

22   with T-bills that we can prove that Mr. Madoff owned at the

23   time they were credited --

24            THE COURT:  Ms. Chaitman, just ask him a question.

25   Don't load it with all that.

Page 168

1              MS. CHAITMAN:  Okay.

2              THE COURT:  Okay.

3     Q    Isn't it a fact that if a customer was credited with a

4     T-bill which appreciated during the period of the customer's

5     ownership, that the customer is entitled to that

6     appreciation?

7     A    I disagree with you.

8     Q    Now, is it your testimony that the market making part

9     of Madoff's business was a Ponzi scheme?

10    A    No, I did not issue that opinion.

11    Q    Okay.  And is it your testimony that the proprietary

12    trading part of the business was a Ponzi scheme?

13    A    No, I did not issue that opinion.

14    Q    Okay.  So out of the whole operation of 180 or so

15    employees, it's 8 to 10 employees who, in your opinion, were

16    involved in a Ponzi scheme; is that right?

17    A    That's correct.

18    Q    Okay.  Now, are you aware that the Nelsons never sent a

19    check payable to Bernard L. Madoff Investment Securities,

20    LLC?

21    A    I don't know one way or the other.

22    Q    Okay.  And are you aware that every check that the

23    Nelsons received was from an account in the name of Bernard

24    L. Madoff, that they never received a check from the LLC?

25             MR. HUNT:  Objection, Your Honor.  That

Page 169

1    mischaracterizes the document.

2              THE COURT:  Well, yeah, I think there's an

3    assumption in there, which is an issue in another one of

4    these cases.  If you want to ask him, is he aware that they

5    received a check that had Bernard Madoff's name on it, you

6    can ask him that.  Whose account it was, though, is a

7    different issue.  Was the 703 account, if you know, an

8    account in the name held by Bernard Madoff individually or

9    in the name of BLMIS?

10             MR. DUBINSKY:  BLMIS, Your Honor.

11   Q    It was in the name of Bernard L. Madoff Investment

12   Securities, but it was never -- was it every in the name of

13   the LLC?

14   A    Are you talking about the actual check or the account

15   itself?

16   Q    Let's take them one at a time.

17   A    Okay.

18   Q    Do you agree that the checks from the 703 account was -

19   - well, excuse me, they weren't checks.

20             MR. HUNT:  Your Honor, there were no checks coming

21   from the 703 account.

22             MS. CHAITMAN:  I do.  I'm correcting that.

23   Q    The BLMIS account statements did not list the LLC.

24   A    You mean the word LLC, the three letters?

25   Q    Yes, yes.

Page 170

1    A    I'd have to look at one.  I don't recall.

2    Q    Okay.  And are you aware that no one from Madoff's

3    offices ever notified J.P. Morgan Chase to change the name

4    of the 703 account when the LLC was formed in 2001?

5    A    I don't know one way or the other.

6    Q    Okay.

7              MS. CHAITMAN:  Can you, Roy, pull up DXD and DXE?

8    You know what?  Just go to DXE, that's going to be too hard

9    to look at.

10   Q    Okay.  This is a statement dated December 1, 2000, and

11   you can see this was before Madoff formed BLMIS LLC, right?

12   A    That's correct.  It was turned into an LLC I believe in

13   January 2001.

14   Q    Okay.

15             MS. CHAITMAN:  Can you scroll through and get to a

16   page which has a January 2001 or a February 2001 statement,

17   please?  Okay, well, you know what?  Go back to that.

18   Q    This is December 2004; do you see this?

19   A    I see this.

20   Q    And can you read to the Judge what the name of the

21   account is?

22   A    It now says Bernard L. Madoff Investment Securities.

23   Q    It doesn't say LLC, does it?

24   A    No, it does not have the word LLC on there or the

25   letters LLC.  It's changed because the one you showed me

Page 171

1   earlier just said Bernard L. Madoff.  Now this one says

2   Bernard L. Madoff Investment Securities.

3   Q    Okay.

4          MS. CHAITMAN:  Can you go to the next year?

5   Q    Okay.  This is December 2005.  It doesn't say LLC on

6   the account, does it?

7   A    I agree with you it does not.

8   Q    Okay.

9          MS. CHAITMAN:  Can you go to 2006?

10  Q    Doesn't say LLC on December 2006, does it?

11  A    It does not.

12  Q    Okay.

13         MS. CHAITMAN:  Can you go to 2007?

14  Q    It doesn't say LLC on 2007, does it, December 2007?

15  A    I would agree with you, yes, does not.

16  Q    Okay.

17         MS. CHAITMAN:  Can you go to any statements we

18  have in 2008?

19  Q    Okay.  This is December -- November 29th to December

20  31, 2008.  Do you see it says Bernard L. Madoff Investment

21  Securities?

22  A    I see that.

23  Q    Okay.  So in the entire period applicable to the case

24  against the Nelsons, J.P. Morgan Chase never issued a

25  statement in the name of the LLC; isn't that true?

Page 172

1    A    Well, you showed me a statement that first started as

2    Bernard L. Madoff when it was a sole proprietor.  Then we

3    both agreed that it became an LLC in January of 2001.

4    There's then a name change on the J.P. Morgan Chase

5    statements that then says Bernard L. Madoff Investment

6    Securities; that certainly wouldn't be an individual.  But I

7    agree with you it does not say the letters LLC on any of

8    these.

9    Q    You're aware, are you not, that Mr. Madoff used the

10   trade name Bernard L. Madoff Investment Securities prior to

11   his formation of the LLC?

12   A    Yes.  I saw it on many documents, yes.

13   Q    Okay.  And, in fact, we just pulled up something, DX-X,

14   which is dated December 19th, 1996.  And do you see that

15   even as far back as December 1996, he was using Bernard L.

16   Madoff Investment Securities?

17   A    I see that, yes.

18   Q    So that was really just a trade name that he used,

19   right?

20          MR. HUNT:  Objection, Your Honor.  This witness is

21   not qualified to talk about trade names, corporate

22   structure.

23   Q    You know the difference between a trade name and an

24   LLC, don't you?

25          THE COURT:  Well, there's an objection.  Do you

Page 173

1   know how Madoff used Bernard L. Madoff Securities before it

2   became an LLC?

3           MR. DUBINSKY:  It was on documents before it

4   became an LLC.  I don't know beyond what intent he used it

5   for, anything beyond that.  It was on documents.

6   Q   Okay.  Can you -- well, in fact, this is the top of a

7   check.  See, it says CW check?

8   A   Yes.

9           THE COURT:  Doesn't it say what it says?  It's in

10  evidence, I take it.

11          MS. CHAITMAN:  Yeah.

12          THE COURT:  You can argue that --

13          MS. CHAITMAN:  Okay.  And if you can just scroll--

14          THE COURT:  But that's the name that was used.

15          MS. CHAITMAN:  I'm sorry, Judge.  If you can just

16  scroll through the other pages of this document, Roy.  Thank

17  you.

18  Q   In the course of your work, Mr. Dubinsky, you came

19  across a lot of documents like this, which had the trade

20  name, but not the LLC name.  And it was on the checks, the

21  top part of the checks, wasn't it?

22  A   What was, the trade name?

23  Q   The trade name.

24  A   As you're depicting it, yes, it was.

25  Q   Okay.  And are you able to tell the Judge whether

Page 174

1    you've ever seen a check made out to the Nelsons which was

2    from the LLC, which actually said Bernard L. Madoff

3    Investment Securities, LLC?

4    A    I didn't.  I didn't drill down into the specific Nelson

5    account.  My work was overall across all of the accounts,

6    Your Honor, so I didn't specifically look at those checks.

7    Q    We've put up DX-HW, and this is a deposit.  This is

8    dated March 2002 after the LLC was formed; but, in fact, the

9    Nelsons sent the money to Bernard Madoff Securities.  Do you

10   see that; it was a $300,000 check?

11   A    That's what the check is made out to, yes, for 300,000,

12   yes.

13   Q    Okay.

14          MR. HUNT:  Your Honor, just Mr. Dubinsky has

15   testified he hasn't looked at any of the individual

16   accounts.

17          THE COURT:  Yeah, I'll sustain.  I think that

18   these questions may be better directed to Miss Collura or

19   Mr. Greenblatt.  He didn't drill down into the individual

20   accounts.

21          MS. CHAITMAN:  Okay.

22          THE COURT:  And they say what they say, you know?

23   Your clients made them out however they made them out.

24   Q    Now, you know, don't you, that Frank DiPascali had a

25   Bloomberg terminal on his desk?

Page 175

1    A    Yes.

2    Q    And he used it, right?

3    A    To look up prices, yes, that's my understanding.

4    Q    Well, he used it to trade, didn't he?

5    A    It's not my understanding, no.  It was used to look up

6    prices, to back date trades, purported trades, to obtain

7    historical information, post-facto information.

8    Q    Okay.  And who was it, to your understanding, that

9    handled the purchases of T-bills at the seven or eight

10   accounts that you've acknowledged purchased T-bills from

11   Madoff?

12   A    I don't know for a fact.  I recall that Mr. DiPascali

13   testified he would call the brokers and place a trade

14   through the brokers, I think to those brokerage accounts.  I

15   don't know if he did it all the time or if others were

16   involved, but I recall in the criminal case, he testified to

17   that.

18   Q    Okay.  Now, you opined in your report that the

19   convertible bond arbitrage trading was not accurately

20   reflected by the statements; isn't that true?

21   A    I testified it didn't happen.  But I don't think they

22   were in -- in the time period we're talking about in this

23   case for your client, I don't believe there was any

24   convertible arbitrage; it was all splits strike conversion.

25   Q    Right, right.  But you, in fact, analyzed the

Page 176

1    convertible bond trading by going to the New York Stock

2    Exchange records --

3    A    Correct.

4    Q    -- didn't you?  And you concluded that one of the

5    reasons you felt that the statements were fraudulent was

6    that the volume of trades, according to the New York Stock

7    Exchange, was less than the volume of the same -- of trades

8    in those securities, right?

9    A    Correct.

10   Q    And then  you changed that opinion in your later report

11   because Mr. Madoff pointed out that the trading wasn't done

12   through the New York Stock Exchange; isn't that true?

13   A    No, I didn't change the opinion.

14          THE COURT:  Are you asking you questions about

15   what his later report says?

16          MS. CHAITMAN:  I'm asking --

17          THE COURT:  Because you've objected to what --

18          MS. CHAITMAN:  Right, but I'm asking him, he made

19   several errors in his report, and I want to bring that

20   evidence out.

21          THE COURT:  Which shouldn't he be entitled to

22   testify about that report then?  I don't have the report

23   before me.

24          MS. CHAITMAN:  We don't need to go to the report.

25   We can do it a different way.

1          MR. HUNT:  Your Honor, I would concur that she's

2     asking about the report that has been issued that's not part

3     of this case.

4          THE COURT:  We can deal with it on redirect.

5     Q    Isn't it a fact that you now know that most convertible

6     bond trading was done on -- was done in New York by the

7     counter market?

8     A    I knew at the time as well when I issued this report;

9     there's a footnote in the report that explains that.  And

10    there was additional analysis done post-facto because either

11    you or somebody had raised the criticism of that.

12    Q    Right.  Now, did you look to see what accounts Madoff

13    had safekeeping arrangements with, what banks he had

14    safekeeping arrangements with?

15         THE COURT:  What do you mean by that?

16    Q    Well, you testified that in trying to analyze Madoff's

17    stock and T-bill position, you went only to the DTC records.

18    A    Correct.

19    Q    But isn't a fact that Mr. Madoff also kept securities

20    with financial institutions from which he bought them?

21    A    As in the eight brokerage accounts, yes.

22    Q    Yes.  And you didn't -- you didn't calculate the

23    securities that he had in those brokerage accounts; isn't

24    that true?

25    A    The securities in those brokerage accounts were for the

1    prop trading business.  And those were accounted for in the

2    DTC because those records, even if somebody -- the DTC

3    records the trade of the equity.  And so they would have

4    been there as I went through on the prop trading, whether he

5    held them, in custody of them, or they were with somebody

6    else, they would have been recorded.  On the IA business,

7    those records didn't exist.  We've talked about the eight

8    brokerage accounts, but as I said, even if you add up all

9    the treasuries in those eight brokerage accounts, they're

10   woefully short of what Mr. Madoff or BLMIS was showing on a

11   customer statements for a particular day for all of the

12   treasuries.

13   Q    Right.  But you're aware, are you not, that in this

14   case -- and, in fact, in other cases -- the Trustee has

15   refused to produce the documents he made available to you;

16   that is, we have not been permitted to see account

17   statements of non-clients.

18          MR. HUNT:  Objection.

19   Q    You're testifying to something.

20          MR. HUNT:  She's testifying about discovery.

21          THE COURT:  Sustained.  Just as the question.

22   Q    Now, are you familiar with the term Madoff exemption?

23   A    Yes.

24   Q    What does it mean?

25   A    It was an exemption with the SEC for what's called

1    naked short shelling.

2    Q    Okay.  And you know that a market making, under that

3    exemption, had the right to sell unlimited shorts.

4    A    And then had to close them out within 13 days, that's

5    correct.

6    Q    Okay.

7              MS. CHAITMAN:  I have no further questions, Your

8    Honor.

9              THE COURT:  Redirect?

10             MR. HUNT:  No redirect, Your Honor.

11             THE COURT:  You can step down.  Thank you very

12   much.

13             MR. DUBINSKY:  Thank you, Your Honor.

14             THE COURT:  Call your next witness, please.

15             MR. HUNT:  And would it be possible to get a 10-

16   minute break?

17             THE COURT:  Okay.  We can only go until about 5:00

18   today.

19             MR. HUNT:  We can put on Miss Collura next.

20             THE COURT:  Just to talk about the schedule.  I

21   can continue tomorrow afternoon and then all of Friday.

22             MR. HUNT:  Okay.

23             THE COURT:  All right?  10 minutes.

24             MS. CHAITMAN:  And tomorrow afternoon starting at

25   2:00?

Page 180

1            THE COURT:  2:00, and then we can go as long as we

2       want.

3          (Recess)

4            CLERK:  Please be seated.

5            THE COURT:  Could you raise your right hand,

6       please?  Do you solemnly swear that the testimony you're

7       about to give will be the truth?

8            MS. COLLURA:  I do.

9            THE COURT:  Okay.  Please state your name.  I

10      don't know if it was stated.

11           MS. COLLURA:  Lisa Collura.

12           THE COURT:  Thank you.

13        [WITNESS LILSA COLLURA SWORN IN]

14           MR. HUNT:  Your Honor, I have a binder of exhibits

15      that are demonstrative exhibits for counsel.

16           THE COURT:  Thank you.  Do you have an extra one

17      for my clerk?  If not, he'll tough it out.

18           MR. HUNT:  Okay.  I guess just to clarify, and it

19      seems like we're making good time here, you want to just

20      move all exhibits in?

21           THE COURT:  I think that probably makes sense.

22           MS. CHAITMAN:  And just to, if I may, just on that

23      issue, Your Honor.  We have a lot of exhibits, some of which

24      we started with where we have a hundred of the same document

25      but a different time period.

Page 181

1          THE COURT:  Is there a dispute regarding the

2     authenticity or the admissibility of the documents?  I don't

3     know what they are.

4          MR. HUNT:  I don't have a dispute on the

5     authenticity of the Debtors' books and records, Your Honor.

6          THE COURT:  Are there any DTC records or anything

7     like that?

8          MR. HUNT:  As far as I know, we've got he Debtors'

9     books and records, the third-party bank records, which we

10    got from their accountant.

11         THE COURT:  I just want to make sure that after

12    the evidence is closed, we don't have a problem with

13    authentication or something like that, for which we would

14    need a witness.

15         MS. CHAITMAN:  All right.  I mean, what I have,

16    for example, are like the checks that were sent out by

17    Madoff.

18         THE COURT:  If they're checks on the Madoff

19    account, I don't know if there's any disputes at issue.

20         MS. CHAITMAN:  Right, right, okay.

21         MR. HUNT:  But there are, you know, there are a

22    lot of books and records that we've reviewed that Mr.

23    Dubinsky testified about.

24         THE COURT:  Why don't we complete the evidence.

25    It doesn't sound like there's going to be a dispute.  If you

Page 182

1    think there's going to be an issue regarding authentication

2    or hearsay -- the business records, for example -- you'll

3    have to do it through the witnesses.

4            MR. HUNT:  I would also ask if we could go ahead

5    and qualify Ms. Collura as an expert on forensic accounting?

6            THE COURT:  Any objection to her qualifications as

7    a forensic accountant?

8            MS. CHAITMAN:  No.

9            THE COURT:  She's qualified.  Go ahead.

10           MR. HUNT:  Thank you, Your Honor.

11               DIRECT EXAMINATION OF LISA COLLURA

12   BY MR. HUNT:

13   Q    Good afternoon.

14   A    Hello.

15   Q    Let me ask you what your job was for the BLMIS

16   engagement; what did you do?

17   A    So my job was specifically to focus on looking at the

18   cash transactions that appeared on the customer statements

19   of the BLMIS IA business customers and reconcile those cash

20   transactions to available records.  In addition to

21   reconciliation, part of my responsivity was to trace

22   transactions from BLMIS to other bank accounts, bank

23   accounts held by the defendants or other account holders.

24   Q    If you could turn to Exhibit 3 in your demonstrative

25   binder.  I'll ask you if you can use that to help explain

Page 183

1    those concepts for us a bit.

2    A    This isn't -- the one in here, 3?

3    Q    Yes.

4    A    This one, this one is 4, while 3 is here.  Okay.  Then

5    4 is missing, okay.

6    Q    We've got the tab situation taken care of for a moment,

7    please.

8    A    Great.

9    Q    If you could look at Exhibit 3 and specifically turning

10   to the reconciliation portion of your work, could you

11   explain to us what you mean when you say reconciliation?

12   A    For reconciliation, it's when I match customer cash

13   transactions that were reflected on customer statements to

14   other evidence, and that other evidence included BLMIS bank

15   records, correspondence in BLMIS customer files, or

16   documents that were either produced to or received by the

17   Trustee.

18   Q    Did you reconcile to third-party records for each of

19   the customer accounts in the investment advisor business?

20   A    For all of the customer, BLMIS customer accounts, I

21   reconciled to third-party bank records that were available

22   to me.

23   Q    And did you do that for the Nelson accounts?

24   A    I did.

25   Q    You also say you traced the flow of funds.  Looking at

Page 184

1    Exhibit 3, can you help us walk through that concept?

2    A    So by traced, I mean when I'm following the flow of

3    funds from BLMIS to another bank account.  And so, for

4    purposes of this matter, I traced the cash withdrawals

5    during the two-year period.

6    Q    And you performed that for the Nelson accounts?

7    A    I did.

8    Q    What categories of BLMIS books and records did you

9    review to conduct the reconciliation and tracing analysis of

10   the BLMIS investment advisory accounts?

11   A    BLMIS bank records that were secured by the Trustee,

12   both in the Trustee's -- I'm sorry -- BLMIS' records, as

13   well as received by J.P. Morgan.  I also reviewed

14   correspondence that was included in BLMIS customer files,

15   the files that were maintained at BLMIS for each -- or many

16   of the BLMIS customers of the IA business.  And then lastly,

17   any documents that were produced to the Trustee in this

18   matter or were received by the Trustee related to the Nelson

19   accounts.

20   Q    Did you rely on any specific data that was documents on

21   the BLMIS investment advisory customer statements?

22   A    The cash transactions on those statements.

23   Q    Did FTI compile the information for you to complete

24   that analysis?

25   A    FTI did, yes.

1    Q    How did you all do that?

2    A    So the cash transactions reflected on the customer

3    statements were noted by specific transaction types, and

4    they often had the word check or check wire, and those were

5    all accumulated in a chronological listing of cash

6    transactions for all BLMIS customers.

7    Q    How many transactions are we talking about for these

8    customer statements that you reconciled?

9    A    For the ones that I reconciled, there were over 227,000

10   cash transactions, either -- including both cash deposits

11   and cash withdrawals reflected on the customer statements

12   for the period that I performed my reconciliation analysis.

13   Q    Is that the type of record relied on in the ordinary

14   course by forensic accountants like yourself?

15   A    Bank records?

16   Q    Yes.

17   A    Yes, it is.

18   Q    What about the customer statements?

19   A    Yes.

20   Q    Based on your review of the BLMIS books and records,

21   did you find the investment advisory customer statements to

22   be reliable?

23   A    The cash transactions on those customer statements,

24   yes, were reliable.

25   Q    Do you have all of the customer statements for the

Page 186

1    three Nelson accounts?

2    A    Yes, I do.

3    Q    And you reviewed all of those.

4    A    I did.

5    Q    Let's turn now to another source of data that you

6    identified, third-party bank records with BLMIS.  Are third-

7    party bank records the type of information relied on by

8    forensic accountants while reconciling and tracing funds?

9    A    Yes, they are.

10   Q    Please explain what bank records you analyzed.

11   A    The bank records that I analyzed were related to the

12   bank accounts that were used by the IA business for cash

13   deposits and withdrawals to and from customers.  There were

14   three primary bank accounts that were used in the 10-year

15   period for which I had available bank records; two of those

16   accounts were at J.P. Morgan, and one of those accounts was

17   at Bankers Trust.

18   Q    Was one of the accounts the 703 account?

19   A    Yes, it was.

20   Q    What records did you review for the 703 account?

21   A    For the 703 account, I had available to me monthly bank

22   statements.  I had deposited checks that were deposited into

23   that account, along with many of the related deposit slips,

24   as well as any checks that were written off of the 703

25   account.  And the 703 account also had wire transfers, and

Page 187

1    there was a detailed file received by the Trustee that

2    included all of the information about the wire transfers for

3    a period of time, not the full 10-year period, but a period

4    of that time within the 10-year period.

5    Q    I was going to ask you what period you looked at.

6    A    We had available to us records from December 1998 to

7    December 2008; and, therefore, that's why I refer to it as

8    the 10-year period.

9    Q    Okay.  How about the BLMIS 509 account; did you review

10   bank records for that?

11   A    I did.

12   Q    What records did you look at for the 509 account?

13   A    For the 509 account, there were also monthly bank

14   statements for that account.  The primary record that I

15   reviewed for that account was the cancelled checks that were

16   written from the 509 account.

17   Q    What period did you analyze?

18   A    Again, December 1998 to December 2008.

19   Q    What BLMIS bank records did you review for the Bankers

20   Trust account?

21   A    For the Bankers Trust account, there were monthly bank

22   statements, some checks, although there weren't a lot of

23   checks written from that account.  But I think for Bankers

24   Trust, it was primarily the monthly bank statements.

25   Q    Was the Bankers Trust account involved in any of the

Page 188

1    transfers we're talking about here today?

2    A    No, it was not.

3    Q    If you could turn to Exhibit 4 in your binder, which --

4    A    It's here, it's here.

5    Q    Okay.  And describe for us, first of all, if you

6    prepared that exhibit.

7    A    I did.

8    Q    What records did you use to prepare it?

9    A    The bank statements and other bank records that I just

10   described.

11   Q    Okay.  Using Exhibit 4, demonstrative Exhibit 4 as a

12   guide, I want you to discuss how you -- what you concluded

13   about the flow of BLMIS customer funds.

14   A    So the cash deposits from BLMIS customers were

15   deposited into the 703 account, which is the first account

16   listed there in the middle in the blue boxes.  From the 703

17   account, there were wire transfers, as well as check --

18   excuse me, as well as checks that were sent to BLMIS

19   customers for -- to pay cash withdrawals.

20           The 703 account also funded a hundred percent the

21   509 account, which is another account at J.P. Morgan, which

22   is the middle one there in the blue boxes.  It, the 703

23   account also a hundred percent funded the Bankers Trust

24   account.  And the -- from both the 509 account and the

25   Bankers Trust account, there were checks that were sent to

Page 189

1    pay customers for their withdrawals that they took on their

2    customer accounts.

3    Q    Were there any wires or checks written to the Nelson

4    parties from the 703 account?

5    A    None from the 703 account, no.

6    Q    Okay.  Why is that?

7    A    The withdrawals taken by the Nelsons on their accounts

8    were in the form of checks that were sent from the 509

9    account, which again was a hundred percent funded by the 703

10   account.

11   Q    Where'd the money come for the 703 account again,

12   where'd it come from?

13   A    The customer deposits came into the 703 account.

14   Q    Anywhere else?

15   A    I'm sorry?

16   Q    Did it come from anywhere else into the 703 account?

17   A    Customer deposits?

18   Q    Yeah.

19   A    No, they only went into the 703 account.

20   Q    Okay.

21        THE COURT:  I think he was asking whether the 703

22   account received deposits from any source other than

23   customer funds.  Was that your question?

24        MR. HUNT:  Yes.

25        MS. COLLURA:  Oh, I'm sorry.

Page 190

1   A    Yes.  So the majority of the funds into the 703 account

2   for that 10-year time period was direct -- from BLMIS

3   customers, directly from customers, about 97 percent.  There

4   was 3 percent that weren't directly from customers, but it

5   was related to transactions with brokerage accounts that

6   were in the name of either BLMIS or Bernard L. Madoff; there

7   were transfers back and forth with those accounts.  And the

8   3 percent is also comprised of interest that was earned on

9   the short-term investments that were made -- the overnight

10  sweeps, the CDs, commercial paper, and other short-term

11  investments that were made directly from the 703 account.

12  Q    What is a bank statement?

13  A    A bank statement is typically monthly.  It's a monthly

14  statement that identifies the transactions in a particular

15  bank account on a daily basis.

16  Q    Did you review the bank statements for the 703 and 509

17  account?

18  A    I did.

19  Q    Do the bank statements for the 703 account and the 509

20  account show the interaction between the two accounts you

21  just described?

22  A    Yes, they do.

23  Q    If you could turn to demonstrative 5, please, and

24  identify the document on the left.

25  A    The document on the left is a monthly statement for the

Page 191

1   703 account for the month of November 2008.

2   Q    What's the source of that record?

3   A    That record was from J.P. Morgan.

4   Q    Now identify the record on the right, please.

5             MS. CHAITMAN:  Could you bring those closer so we

6   can see them, so I can see them?

7             THE COURT:  Don't you have at least the -- Miss

8   Chaitman, do you have at least the binder because they're

9   easier to see in the binder.  Is this exhibit in the binder?

10            MR. HUNT:  Yes.

11            THE COURT:  Which number is it?

12            MR. HUNT:  It's Exhibit 5 demonstrative.  No, he's

13  got the wrong one up there.

14            MS. CHAITMAN:  I have it in this.

15            MR. HUNT:  It's demonstrative Exhibit 5.

16            THE COURT:  That's not 5 that's just put up on the

17  -- you had it before.

18            MS. CHAITMAN:  I don't have the one that's on the

19  screen.

20            THE COURT:  That's fine.  You have the wrong

21  exhibit on the screen, or at least it's not Exhibit 5.

22  That's Exhibit 5, all right, that's the correct one.  Do you

23  have what you need?

24            MS. CHAITMAN:  Now I do, thank you.

25            THE COURT:  Okay.

Page 192

1   Q    If you could identify the document on the right,

2   please.

3   A    The document on the right is the monthly statement for

4   the 509 account for November 2008.

5   Q    Do these records relate to your analysis of the flow of

6   funds in the investment advisor business we just discussed?

7   A    Yes.

8   Q    Explain how, please.

9   A    So this -- these two statements show an example of, on

10  one day, particularly November 25th, 2008, where there was a

11  funding transfer from the 703 account to the 509 account.

12  On the left-hand side, you see the transaction dated

13  November 25th with the description, funding xfer or transfer

14  to lots of numbers and then it ends in 509, so that's the

15  509 account for $8,944,621.13.

16          On the right-hand side in the 509 account

17  statement, you see the corresponding receipt of that

18  transfer from the 703 account on the same date in the same

19  amount.

20  Q    Are you familiar with the term holder as it relates to

21  bank accounts?

22  A    I am.

23  Q    How is the term holder defined in the banking world?

24  A    The holder of the -- in a bank account is typically the

25  name that appears on the monthly statements.

Page 193

1    Q     If you could turn to Exhibit 6 in your binder and

2    identify the two documents on the left, please.

3    A     The documents on the left are two different bank

4    account monthly bank statements for the 703 account for the

5    month of August 2002 and then the month of September 2002.

6    Q     What's the source of these records?

7    A     These are from J.P. Morgan.

8    Q     How do you know these are account statements for the

9    703 account?

10   A     The 703 account number is the last three digits of the

11   account number that appears on the statement.

12   Q     Do the statements identify the holder of the account?

13   A     Yes.  The name on the account for the August 2002

14   statement is Bernard L. Madoff.

15   Q     For both, for both accounts?

16   A     For both accounts.  The statements on the right-hand

17   side are the same months, August 2002 and September 2002,

18   just for the 509 account.

19   Q     The documents below those are what?

20   A     Those are the statements for both the 703 account and

21   the 509 account for September 2002 for, again, the 703

22   account and the 509 account.

23   Q     Do these statements identify the holder?

24   A     Yes.  In September of 2002, the holder of the account

25   became Bernard L. Madoff Investment Securities for both the

Page 194

1    703 account and the 509 account.

2    Q    Did you include that opinion in your report?

3    A    Yes.

4    Q    Where did it come up, where is it in your report?

5    A    It was in Exhibit 3 to my report.

6    Q    From the period September 2002 to the time that Mr.

7    Madoff was arrested, it was what entity was the holder of

8    the 703 account?

9    A    Bernard L. Madoff Investment Securities.

10   Q    For the period September 2002 through December 2008

11   when Mr. Madoff was arrested, what was the holder of the 509

12   account?

13   A    Bernard L. Madoff Investment Securities.

14   Q    With the name change in the corporate entity between

15   August and September 2002, did you see any differences in

16   the handling of the transactions reflected in the 703 or 509

17   accounts?

18   A    No.  The transactions in both of those accounts were

19   consistent, meaning they were cash in from customers and

20   withdrawals to customers, for the whole time period that I

21   had statements available to me, which was from back from

22   December 1998.

23   Q    Okay.  Let's go back and talk about reconciliation.

24   You said you did a global reconciliation.  And just refresh

25   my recollection what you did to do that.

1   A      So the global reconciliation was when I took the cash

2   transactions that were reflected on the customer statements

3   for all customer accounts and reconciled those cash

4   transactions to the available BLMIS bank records, again,

5   that were available to me from December 1998 to December

6   2008.

7   Q      Why did you perform this, quote/unquote, global

8   reconciliation of the customer statements and bank records

9   for the BLMIS 703 and 509 accounts?

10  A      This was done to help determine whether or not the cash

11  transactions on the customer statements were accurately

12  reflected as cash transactions -- cash deposits or cash

13  withdrawals.

14  Q      How many transactions did you review?

15  A      On the customer statements, there was over 225,000 cash

16  transactions.  And on the bank records, I reviewed over

17  150,000 transactions on those bank records.

18  Q      How did you keep track of those transactions?

19  A      So we kept track of them, we assigned a unique

20  identifier to each of the cash transactions on the customer

21  statements.  We assigned a different unique identifying

22  number to all the transactions in the bank records.  And we

23  would match those when we reconciled one transaction on the

24  customer statements to one transaction on the bank records;

25  and, therefore, that avoided matching the same transaction

Page 196

1     twice.

2     Q    Is that a methodology that forensic accounts typically

3     use in this reconciliation process?

4     A    Yes, I would say so.

5     Q    If you could turn to Exhibit 7 in your binder and

6     identify that for the Court.

7     A    Exhibit 7 is a summary of these -- of what I just

8     described was my overall reconciliation results of the

9     227,795, to be exact, cash transactions that were reflected

10    on the BLMIS customer statements from December 1998 to

11    December 2008.

12    Q    Records you relied on in that exhibit are the ones we

13    just talked about.

14    A    Yes, correct.

15    Q    Okay.  Is that an accurate summary of your analysis?

16    A    Yes, and this shows the results of my reconciliation.

17    And those results are that I reconciled 99.01 percent of

18    those cash transactions to the available BLMIS records.

19    Q    What does Exhibit 7 tell us about the reconciliation of

20    the investment advisory business customer statements in the

21    703 and 509 accounts?

22    A    That the cash transactions that appeared on the

23    customer statements were accurately reflected.

24    Q    Is that your opinion with respect to all of those cash

25    transactions?

Page 197

1    A    Yes.

2    Q    Now we discussed the global reconciliation.  Did you

3    also reconcile the cash deposits and withdrawals recorded in

4    the BLMIS investment advisory customer statements for the

5    Carol and Stanley Nelson account in the two accounts that

6    were held by or for the benefit of Mrs. Nelson?

7    A    Yes, I did.

8    Q    Let's look at the Carol and Stanley joint account,

9    which is account no. 1ZA284, and I want to talk to you about

10   your reconciliation of that account.  If you could turn to

11   Exhibit 8 in your binder and identify that for the Court.

12   A    Exhibit 8 is an example of a reconciliation of a cash

13   deposit that appeared on the customer statement for 1ZA284

14   and how I reconciled that cash deposit to BLMIS bank

15   records.

16   Q    Okay.  Let's start with the document on the left.  Can

17   you identify that document and its source, please?

18   A    The document on the left is a customer ledger for the

19   BLMIS' customer account 1ZA284, and this was for the month

20   of -- this was a page from the month of January 2008 for

21   1ZA284, which is an account held by Carol Nelson and Stanley

22   Nelson.  This example shows a check, a cash addition

23   transaction in the form of a check on January 17th, 2008 for

24   $500,000.

25   Q    What's the document in the middle?

Page 198

1    A    The document in the middle is the copy of the deposited

2    check and deposit slip that was found in BLMIS bank records.

3    I think these were from J.P. Morgan, related to the deposit

4    into the 703 account.

5    Q    Who sent that check?

6    A    The check was sent from Dr. Stanley Nelson and Carol

7    Nelson.  The check was dated January 15th, 2008.  The check

8    was made out to Bernard Madoff Securities for $500,000, and

9    in the memo is reference to an account number 1ZA284.

10   Q    And the document on the bottom, the deposit slip?

11   A    So the deposit slip shows that this $500,000 check from

12   the Nelsons was included in a larger deposit that was made

13   into the 703 account on January 17th, 2008.  The total

14   deposit on that day into the 703 account was $2,583,500.

15   Q    What about the document on the right?

16   A    So the document on the right is the 703 account

17   statement for January 2008.  And this document reflects that

18   the deposit that I just mentioned, the total deposit on

19   January 17th, 2008 for $2,583,500, which includes the

20   $500,000 from the Nelsons.

21   Q    So I assume you used these records in your

22   reconciliation, didn't you?

23   A    I did.

24   Q    How did you do that?

25   A    So this reconciliation using these records helped to

Page 199

1    determine that this particular cash deposit was accurately

2    reflected on the Nelson's customer statement.

3    Q    Did you perform a similar reconciliation of the 1ZA284

4    customer statements to available records for each deposit

5    into the 1ZA284 Carol and Stanley Nelson account?

6    A    I did.

7    Q    Are those results summarized in your report?

8    A    Yes, they are.

9    Q    Let's talk about withdrawals from the 1ZA284.  And if

10   you could turn to Exhibit 9 in your binder and identify that

11   for the Court, please.

12   A    Exhibit 9 is an example of how I reconciled a cash

13   withdrawal on the customer statement for 1ZA284.

14   Q    What is the document on the left?

15   A    The document on the left is the customer ledger for

16   1ZA284 for the month of November 2008 for the Carol and

17   Stanley Nelson account.

18   Q    What does it show?

19   A    This shows a cash withdrawal transaction, dated

20   November 24th, 2008 for $100,000.

21   Q    What's the document in the middle?

22   A    The document in the middle is a copy of the cancelled

23   check from the 509 account, and this came from J.P. Morgan.

24   And this check was dated the same date that we just saw on

25   the customer statement, November 24th, 2008 for the same

Page 200

1    amount, which was $100,000.  The payee of the check was

2    Carol Nelson and Stanley Nelson.  There is a reference on

3    the check in the memo field for the account number, which is

4    1ZA284, and this was a check written from the 509 account.

5    Q    What is the document on the right?

6    A    The document on the right is a copy of correspondence

7    that was found in the BLMIS customer file for 1ZA284.  This

8    is a letter from the Nelsons, from Stanley Nelson and Carol

9    Nelson, dated November 21st, 2008, requesting the withdrawal

10   of $100,000 from their account 1ZA284.

11   Q    How did you use these records in your reconciliation of

12   the withdrawal from the account?

13   A    So these records reconciled to the cash withdrawal that

14   appeared on the customer statement and supported my

15   determination that the cash transactions on the customer

16   statements were accurately reflected.

17   Q    Did you perform a similar reconciliation of the 1ZA284

18   customer statements to available records for each of the

19   withdrawals in the 1ZA284 Carol and Stanley Nelson account?

20   A    Yes, I did.

21   Q    Did you reach any conclusions about the customer

22   statements?

23   A    I was able to reconcile a hundred percent of all the

24   cash transactions on the customer statements for 1ZA284 to

25   available bank records, to correspondence in customer files

1    for that account, or other documents received by the

2    Trustee.

3    Q    Are those results in your report?

4    A    Yes, they are.

5    Q    Where?

6    A    In my Exhibits 7 and 10 reflect -- Exhibit 7 reflects

7    the reconciliation to those three sources of information --

8    the BLMIS bank records, the documents in the customer file,

9    and as well as any documents that were received by the

10   Trustee.  Exhibit 10 also includes the specific Bates

11   numbers for the bank records that I reconciled to.

12   Q    If you could look at Exhibit 59 in your big binders

13   over there, I'd like to ask you a couple of questions about

14   that.

15   A    59?

16   Q    Yes, ma'am.  Can you identify Exhibit 59?

17   A    Exhibit 59 is a summary exhibit that summarizes those

18   two exhibits that were attached to my report that I just

19   mentioned, Exhibit 7 and Exhibit 10.  This summary exhibit

20   was just, I created to make it easier to put it all in one

21   place, instead of having to look at two separate exhibits

22   that were attached to my report.

23   Q    If you could look across the top of Exhibit 59 and tell

24   us what each of the columns represents.

25   A    The first column is what we refer to as CMID, which is

Page 202

1    just the unique identifier that I mentioned before that we

2    assigned to each one of the cash transactions that appeared

3    on the customer statements.  The next column is the

4    transaction date; next is the amount of the transaction,

5    transaction type, and then the transaction description.  All

6    of those columns, the information in those columns came from

7    the information on the customer statements.

8    Q    Okay.

9    A    The next three columns that are under the banner of

10   called reconciliation results identify the results of my

11   reconciliation to the three sources of information; BLMIS

12   bank records, BLMIS customer files, documents received by

13   the Trustee.  There's either a yes in those columns or an

14   n/a: yes refers to when I was able to reconcile; n/a is

15   where I didn't have an available record to complete my

16   reconciliation.

17         The last set of columns is references to specific

18   Bates numbers.  And so, for every instance that there's a

19   yes in one of the middle columns, there will be a

20   corresponding Bates number in one of the last three columns.

21   Q    What does Exhibit 59 tell us about the accuracy of the

22   customer statements for this account?

23   A    Exhibit 9 supports that I reconciliation a hundred

24   percent of the cash transactions on the customer account for

25   1ZA284 to one of those -- one or more of those three sources

Page 203

1      of information.

2      Q    Is Trustee's Exhibit 59 a fair and accurate summary of

3      the relevant information you used regarding the cash

4      deposits and withdrawals from the BLMIS customer statements

5      for 1ZA284 account and the records you used to reconcile

6      those cash transactions to the customer statements?

7      A    Yes, it is.

8      Q    Again, just to be clear, based on the analysis you just

9      described, did you reach any conclusions concerning the

10     accuracy of the customer statements for the 1ZA284 account?

11     A    That the cash transactions on the customer statements

12     were accurately reported.

13     Q    Okay.  Let's turn now to the next account that's

14     involved with this trial, the 1ZA283 account held by Carol

15     Nelson individually.  Mrs. Nelson has confirmed that a $1

16     million deposit was the only deposit into that account.  Did

17     you reconcile that deposit for the 1ZA283 to a customer

18     statement?

19     A    That deposit would have appeared on the customer

20     statement for 1ZA283.

21     Q    Is Mrs. Nelson's admission that the $1 million deposit

22     was the only deposit into 1ZA283 accurate?

23     A    Could I look at my summary exhibit for 1ZA283?

24     Q    Yes, that's fine.  It's --

25                THE COURT:  Exhibit 58.

Page 204

1           MR. HUNT:  -- Exhibit 58.  Thank you, Your Honor.

2     A    Yes, that is the only cash addition into that account.

3     Q    Let's talk about the cash withdrawals.  Please turn to

4     Exhibit 10 in your binder.

5     A    Okay.

6     Q    Starting with the record on the left, can you tell us

7     what that is, please?

8     A    The record on the left is the BLMIS customer ledger for

9     1ZA283 for the month of November 2008.

10    Q    What about the document in the middle?

11    A    The document in the middle is a copy of a check from

12    the 509 account related to a cash withdrawal that appeared

13    on the customer ledger for November 2008.

14    Q    And finally, identify for the record the document on

15    the far right.

16    A    That is a page -- or a document from the BLMIS customer

17    file related to 1ZA283.

18    Q    Is this a document that came from what we commonly

19    refer to as the account maintenance file?

20    A    Yes.

21    Q    If you could please, tell us how you reconciled the

22    withdrawal for this particular transaction.

23    A    So the cash withdrawal transaction that appeared on the

24    customer statement for November 2008 for 1ZA283 was a

25    $25,000 withdrawal dated November 18th.

Page 205

1    Q    And this, the 1ZA283 is in the name of Carol Nelson.

2    A    From the customer statement?

3    Q    On the customer statement, yes.

4    A    The middle document, which is again the 509 check, is

5    the check that I reconciled to this cash withdrawal

6    transaction is also dated November 18th, 2008 for $25,000,

7    made out to Carol Nelson.  There is reference in the memo

8    line to 1ZA283, and this was a check written from the 509

9    account.

10   Q    Does the information on the back of the check have any

11   meaning for this particular one?

12   A    Not for my reconciliation purposes.  I will -- that

13   will become very relevant for my tracing analysis.

14   Q    Okay.  How about the document on the right?

15   A    The document on the right is a letter that was found in

16   the BLMIS customer file for 1ZA283, and this was a letter

17   from Carol Nelson dated November 17th, 2008 requesting to

18   withdrawn $25,000 from her account 1ZA283.

19   Q    Okay.  Based on your review of these records, did you

20   reach a conclusion about the withdrawal that's shown on

21   Exhibit 152 -- sorry, Exhibit 10?

22   A    Based on my reconciliation results and this specific

23   document shown on Exhibit 10, I was able to reconcile the

24   $25,000 cash withdrawal in November of 2008; and, therefore,

25   I conclude that that withdrawal was accurately reflected on

Page 206

1    the customer statements for this account.

2    Q    Did you perform a similar reconciliation of 1ZA283

3    customer statements to available records for each withdrawn

4    from the Carol Nelson account?

5    A    Yes.

6    Q    Did you reach any conclusions about the customer

7    statements as they pertain to that account?

8    A    I was able to reconcile 100 percent of the cash

9    transactions on the customer statements for 1ZA283, and

10   therefore conclude that the cash transactions were

11   accurately reflected.

12   Q    Are those results reflected your, in your report for

13   this account?

14   A    Yes, they are.

15   Q    Did you prepare a summary exhibit of that

16   reconciliation?

17   A    Yes, I did.

18   Q    If you can turn back to the big binder.  It's Trustee's

19   Exhibit 58, as we just mentioned.  Did you prepare that

20   exhibit?

21   A    I did.

22   Q    What's the source of information for that exhibit?

23   A    So this, the source is the BLMIS customer statements

24   for 1ZA283, BLMIS bank records, BLMIS customer files for

25   this account, 1ZA283, and any documents that were received

Page 207

1   by the trustee related to these transactions.

2   Q    One more time, if you could just go across the columns

3   real quick, tell us what they are and how you used them?

4   A    The very first column is an ID number, CMID, which is a

5   unique identifier assigned to every one of the cash

6   transactions on the customer statements.

7         The next four columns are information that were --

8   that was obtained from the customer statements:  the

9   transaction date, the amount, the transaction type, and the

10  description.  he middle set of columns under the

11  reconciliation results identify either a yes or an N/A to

12  indicate if I reconciled to each of, any of those three

13  sources of information, BLMIS bank records, customer files,

14  or documents received by the trustee.

15        For every time there's a yes in that column, there

16  will be a corresponding Bates number in one of the last

17  three columns, to identify the specific document that I

18  reconciled to.

19  Q    Does Trustee's Exhibit 58 tell us anything about the

20  1ZA283 account customer statements?

21  A    That I reconciled 100 percent of the cash transactions

22  on the customer statements, and therefore the cash

23  transactions on those customer statements for 1ZA283 were

24  accurately reflected on the customer statements.

25  Q    Is Exhibit 58 a fair and accurate summary of the

Page 208

1    relevant information that you reviewed and used regarding

2    the cash deposits and withdrawals from the 1ZA283 account?

3    A    Yes, it is.

4    Q    Finally, turning to your reconciliation of cash

5    deposits and withdrawals for the Carol Nelson IRA account,

6    1ZR265, did you reconcile the deposits into the 1ZR265 IRA

7    account?

8    A    Yes, I did.

9    Q    Did your methodology compare -- how did your

10   methodology compare to the methodologies you used for the

11   283 and the 284 accounts?

12   A    The same methodology.

13   Q    Did you perform similar reconciliation for the customer

14   statements for each withdrawal from the 1ZR265 Carol Nelson

15   IRA account?

16   A    Yes, I did.

17   Q    If you could turn to the trustee's demonstrative

18   Exhibit 11 in your binder.  Starting with the record on the

19   left, could you identify the document and its source?

20   A    That's a BLMIS customer ledger from, related to 1ZA265

21   from BLMIS records for the month of January 2006.

22   Q    What about the document in the middle?

23   A    That's a copy of the check for, written from the 509

24   account related to a cash withdrawal that was reflected on

25   the customer statement for 1ZR265.

Page 209

1    Q    Now could you tell us what the documents on the far

2    right are?

3    A    The documents on the far right are documents that were

4    reproduced to the trustee by Fiserv, which is the custodian

5    of an IRA held by Carol Nelson.  And these records were

6    related to the cash withdrawal from 1ZR265 in January of

7    2006.

8    Q    How did you use these records in reconciling the

9    account 1ZR265 customer statements?

10   A    So there is cash withdrawal reflected on the 1ZR265

11   account statement for January 2006.  On, dated January 5th,

12   there's a cash withdrawal transaction for $200,000.  The

13   name on the account, 1ZR265 is Retirement Accounts, Inc.,

14   customer IRA for the benefit of Carol Nelson.  And there's

15   an account number there in parentheses, which is (47003),

16   which is highlighted here because that will become relevant

17   as we look at various documents related to this IRA account.

18         This, I reconciled this cash withdrawal

19   transaction to first the copy of the 509 check that was

20   written to Retirement Accounts, Inc. for the benefit of

21   Carol Nelson.  It has that same account number, the 47003.

22   The check is dated 1/5, or January 5th, 2006.  It's made out

23   for $200,000.  There's a reference in the memo line to

24   1ZR265, and this is a check written from the 509 account.

25   Q    Same name, date, amount, and account?

Page 210

1    A     Correct.

2    Q     Okay.  What are the documents on the right?

3    A     The documents on the right are documents produced to

4    the trustee by Fiserv, which again is the custodian for the

5    individual retirement account held for the benefit of Carol

6    Nelson.  The first document there is a letter requesting the

7    $200,000 withdrawal, or it's referred to as a partial

8    liquidation from the IRA account held for the benefit of

9    Carol Nelson.  You'll see there, on the top of that document

10   on the right-hand side, there's the same reference to that

11   account number, 47003, which indicates that we're talking

12   about the same account.

13            The set of documents to the far right are month,

14   quarterly account statements that were issued by Fiserv to

15   the account holder that would reflect the, any cash

16   transactions or other transactions that occurred in the IRA

17   account during the month, or I'm sorry, during the quarter.

18   These were quarterly statements.  The relevant information

19   on these statements were, are blown up at the bottom there,

20   which is the cash in from BLMIS, and then, which is the

21   first line on January 6th, 2006, you'll see an increase in

22   the cash column of $200,000, that's the cash withdrawal

23   coming from BLMIS.

24            Three days later, on January 9th, 2006, there is a

25   transaction called, with the description same-day

Page 211

1    distribution for Tax Year 2006, and that's also for

2    $200,000, reflecting the distribution to Carol Nelson.

3    Q    Do you need some water?

4    A    Yes, thank you.

5    Q    So based on your review of these records, did you reach

6    a conclusion about the withdrawal from the 1ZA, ZR265

7    account that's shown on the customer statement here on

8    Demonstrative Exhibit 11?

9    A    Yes, I conclude that that cash withdrawal transaction

10   is accurately reflected on the customer statement.

11   Q    Did you perform a similar reconciliation of the 1ZR265

12   customer statements to available bank records for each of

13   the withdrawals of the 1ZR265 Carol Nelson IRA?

14   A    Yes, I did.

15   Q    Did you reach any conclusions about the customer

16   statements for the 1ZR265 account?

17   A    Based on my reconciliation rate of 100 percent of those

18   cash transactions, I conclude that they were accurately

19   reported on the customer statements.

20   Q    Are those results in your report?

21   A    Yes, they are.

22   Q    Did you prepare a summary of that analysis?

23   A    Yes, I did.

24   Q    If you can turn to Exhibit 60 in your binder, I'll ask

25   you if you prepared that.

1    A    Yes, I did.

2    Q    What's the source of information for Trustee's Exhibit

3    60?

4    A    The source includes the customer statements for 1ZR265,

5    the available BLMIS bank records, the BLMIS customer files

6    that were in BLMIS's records, as well as the documents that

7    were produced to the trustee by Fiserv.

8    Q    Did you use the same information from Exhibits 7 and 10

9    in your report to prepare this summary exhibit?

10   A    Yes, I did.

11   Q    Do the columns have the same meaning and source

12   documents that you discussed in your explanation for the

13   summary exhibits for the 283 and 284 accounts?

14   A    Yes, the same columns appear here on this summary

15   exhibit.

16   Q    Does Trustee's Exhibit 60 tell us anything about the

17   1ZR265 customer statements?

18   A    The cash transactions on those customer statements were

19   reconciled to one of those sources of information that

20   appears on my summary exhibit, and therefore the cash

21   transactions are accurately reflected on the customer

22   statements.

23   Q    Is Trustee's Exhibit 60 a fair and accurate summary of

24   relevant information regarding the cash deposits and

25   withdrawals from the BLMIS customer statements for 1ZR265,

Page 213

1    and the records that you used to reconcile the cash

2    transactions shown on the customer statements?

3    A    Yes, it is.

4    Q    Just to be clear, based on your analysis, did you reach

5    conclusion regarding the accuracy of the customer statements

6    for this account?

7    A    Yes, that the cash transactions that appeared on the

8    customer statements were accurately reported.

9    Q    So just to wrap up the reconciliation portion of the

10   program this afternoon, have you prepared a summary of your

11   findings for these three accounts?

12   A    Yes, I have.

13   Q    If you could turn to Trustee's Demonstrative Exhibit 12

14   in your binder?  Did you prepare that exhibit?

15   A    I did.

16   Q    What is it showing?

17   A    This is a summary of my reconciliation results for the

18   three accounts that were held by the Nelsons, and that this

19   reflects that I reconciled 100 percent of the cash

20   transactions that appeared on the customer statement for

21   those three accounts to the available records that I

22   reviewed.

23   Q    Okay, so you reconciled 96 transactions for the 1ZA283,

24   hundred percent?

25   A    Yes.

Page 214

1    Q    48 transactions for the 1ZA283, a hundred percent.

2    A    Correct.

3    Q    12 transactions for the 1ZR265, a hundred percent?

4    A    Correct.

5    Q    Are you confident in the results of your reconciliation

6    analyses, as summarized on Trustee's Exhibits 58, 59, 60,

7    and this Demonstrative 12?

8    A    Yes.

9    Q    To a reasonable degree of accounting certainty?

10   A    Yes.

11   Q    Okay.  Let's talk about tracing.  Can you just tell us

12   again what you mean by tracing?  Because those two things

13   confuse me sometimes.

14   A    Tracing is when I follow the flow of funds from BLMIS

15   to a bank account held by the defendants, or the account

16   holder.  For this case I've reviewed and traced the cash

17   withdrawals during the two-year period prior to the

18   bankruptcy.

19   Q    Why did you do that?  Why did you trace those funds?

20   A    To confirm that the -- who was in receipt of the funds

21   from BLMIS.

22   Q    What period did you trace the flow of funds for, from

23   each of the three Nelson accounts?

24   A    The two-year period.

25   Q    Before we get into the details, if you could turn to

Page 215

1   Trustee's Demonstrative Exhibit 13 in your binder?  And I'll

2   ask you if you prepared that.

3   A    Yes, I did.

4   Q    Just looking at the summary of your work, what did you

5   conclude about the 1ZA284 account with respect to the

6   tracing analysis?

7   A    For 1ZA284, for all of the cash withdrawals in the two-

8   year period, those withdrawals were sent from BLMIS to an

9   account held by Stanley Nelson and Carol Nelson.  The total

10  cash withdrawals during the two-year period was $2,610,000.

11  Q    What did you learn about the 1ZA283 account?

12  A    For the 1ZA283 account, there was a total of $255,000

13  in withdrawals in the two-year period.  A hundred percent of

14  that was received into two different bank accounts, one that

15  was held by Stanley and Carol, and one that was only held by

16  Carol Nelson.

17  Q    Okay, and what were the amounts of those two splits?

18  A    The 120,000 went into the account held by both Stanley

19  and Carol, and 135,000 went into an account held just by

20  Carol.

21  Q    Turning now to the 1ZR265 account, what did you learn

22  about that?

23  A    My tracing for the 1ZA265 showed that in the two-year

24  period, there was cash withdrawals from that account of

25  $200,000 and -- $200,077.  That money first went to NTC, or

Page 216

1    Fiserv, and then was further distributed to Carol Nelson,

2    and a small portion of that amount was kept by NTC for fees

3    that were charged.

4    Q    I think you said 1ZA265, it's ZR265.

5    A    Okay, I apologized.  Yes, 1ZR265.

6    Q    So let's go back to the 1ZA284 account, and look at the

7    details.  And if you could turn to Trustee's Demonstrative

8    Exhibit 14 in your binder and review -- and identify that

9    for the Court, please?

10   A    This is an example of how I traced a cash withdrawal

11   from 1ZA284 in November 2008 using a cancelled check from

12   the 509 account?

13   Q    Can you walk us through that analysis?

14   A    So there is a -- there was a cash withdrawal, which I

15   think we saw in earlier demonstratives, for $100,000, dated

16   November 24th, 2008, from 1ZA284, held in the name of Carol

17   Nelson and Stanley Nelson.

18          The top portion there is the front of the canceled

19   check, which reflects all that same information.  What was

20   relevant, most relevant to me for my tracing was the

21   information that appeared on the back of the cancelled

22   check, which is shown on the bottom portion of this

23   demonstrative.  The back of the cancelled check was endorsed

24   for deposit only to account ending in 1884, in the name of

25   Dr. Stanley Nelson and Carol Nelson.  The other blue

1    highlight there shows that it went to an account held at JP

2    Morgan Chase.

3    Q    Based on your review of a canceled check, did you reach

4    a conclusion about the November 24, 2008 withdrawal from the

5    1ZA284 account?

6    A    Yes, I conclude that this cash withdrawal went from

7    BLMIS to a bank account at JP Morgan, held by Dr. Stanley

8    Nelson and Carol Nelson, with Account Number ending in 1884.

9    Q    I think you indicated that there was another

10   methodology you used beyond just the review of the cancelled

11   checks for your tracing.  If you could to Exhibit 15 in your

12   binder, and identify that for the record?

13   A    So I don't, I don't know if I would characterize it as

14   another methodology, but this was definitely something else

15   that I looked at when available, and these were the records

16   that were produced, related to the defendant's bank

17   accounts.  So these were records by JP Morgan related to the

18   account that we just talked about, which was ending in 1884,

19   held by Stanley Nelson and Carol Nelson.

20   Q    Okay, and what did you find?

21   A    So, these records further support the receipt of the

22   $100,000 cash withdrawal from BLMIS in November of 2008, as

23   reflected there with the transaction, the deposit

24   transaction dated November 24th, 2008 for $100,000 into this

25   joint bank account at JP Morgan.

1    Q    Based on your review of the defendant's bank records,

2    did you reach a conclusion about the November 24, 2008

3    withdrawal from the 1ZA284 account that you also used to

4    trace the BLMIS cancelled check?

5    A    Yes, that this -- their records further support the

6    receipt of the $100,000 from BLMIS.

7    Q    Did you perform similar tracing analyses for each of

8    the withdrawals from the 1ZA284 Carol and Stanley Nelson

9    account?

10   A    In the two-year period, yes.

11   Q    Are the results of that tracing included in your

12   report?

13   A    Yes, they are.

14   Q    Where?

15   A    In my report, it would be in Exhibit 9 and 10.

16   Q    Okay, if -- have you prepared a summary of that work?

17   A    Yes.

18   Q    Okay.  Take a look at Exhibit -- Trustee's Exhibit 56

19   in the big binder there in front of you.  Does Exhibit 56

20   tell us that about the 1ZA284 account?

21   A    Yes, this exhibit supports the tracing of all of the

22   withdrawals in the two-year period from 1ZA284 to the joint

23   account held by Stanley Nelson and Carol Nelson, with the

24   number ending 1884.  Now, the account was held at JP Morgan.

25   Q    Could you walk us through what each of the columns are

Page 219

1    in this exhibit?

2    A    So the first set of columns is similar to what we saw

3    in the reconciliation summary exhibits.  That was the CMID

4    that's assigned to each of the cash transactions,

5    transaction date amount, transaction type and transaction

6    description.  What's populated in those columns comes from

7    the customer statement, from 1ZA284.

8            The next set of columns is information relevant to

9    the BLMIS bank account that I reconciled those transactions,

10   too, and also with the Bates reference of the check that I

11   would have used or did use for my tracing analysis.  The

12   next set of columns under the banner Tracing Results per

13   BLMIS records, that -- those columns reflect the banking

14   institution, the bank account number, and the potential bank

15   account holder that's based just by looking at the canceled

16   checks from BLMIS records, the 509 cancelled checks.

17           And then finally the last set of columns are the

18   tracing rules, based on my review of the defendant's bank

19   records, when available.  You can see that they were not

20   available up until January 2008.  And then from then on, I

21   have information populated in those columns that reflect

22   information that was included in those records for the

23   defendant's bank accounts.

24   Q    Were you able to trace each of the withdrawals from the

25   1ZA284 account shown on the customer statements during the

1    two-year period between and including December 11th, 2006

2    and December 11, 2008?

3    A    Yes, I was.

4    Q    Is that analysis reflected on Exhibit 56?

5    A    Yes, it is.

6    Q    (indiscernible) looking at.  Is that a fair and

7    accurate summary regarding the relevant information

8    regarding the withdrawals from the BLMIS statement for the

9    1ZA284 account, and the records that you used to trace that

10   information?

11   A    Yes, it is.

12   Q    Just to be clear, based on your analysis, were you able

13   to trace all of the withdrawals from this account during the

14   two-year period?

15   A    Yes, I was.

16   Q    And lets' turn now to the 1ZA283 account, the Carol

17   Nelson individual account, and if you can turn to Trustee's

18   Demonstrative Exhibit 16 in your binder, I'd like to ask you

19   about your tracing analysis for that.  Can you identify the

20   records we're looking at in Trustee's Demonstrative Exhibit

21   16, and tell us how you used them?

22   A    So this demonstrative is a copy of a cancelled check

23   from BLMIS records related to a withdrawal from Carol

24   Nelson's account 1ZA283.  The withdrawal was dated November

25   18th, 2008 for $25,000.  The first -- the front page, which

Page 221

1    is at the top there, is the check -- the front of the check

2    from the 509 account.

3             Again, what's most relevant to my tracing analysis

4    on these cancelled checks is the back of the canceled check.

5    And this case, the endorsement was for deposit only to

6    Account Number ending in 6140 in the name of Carol Nelson.

7    And just like we did before, was there some supporting work

8    you did with respect to this transfer as well?

9    A    Yes, there was available records from the defendant's

10   bank records related to this transaction.

11   Q    If you could turn to Trustee's Demonstrative Exhibit 18

12   in your binder, I want to ask you about those records.

13   Starting with the record on the left, moving to the right.

14   A    The record on the left is a copy of the monthly bank

15   statement for the account ending in 6140 in the name of

16   Carol Nelson, and this statement reflects a deposit on

17   November 20th, 2008 for $25,000.  On the right is the

18   corresponding deposit slip that reflects the same $25,000.

19   The deposit slip is also dated November 20th, 2008, into

20   account ending in 6140, in the name of Carol Nelson.

21   Q    Based on you review of these records, did you reach a

22   conclusion about the November 18, 2008 withdrawal in the

23   1ZA283 account?

24   A    Yes, these documents further confirm the receipt of

25   money into Carol Nelson's bank account for $25,000 from

1   BLMIS?

2   Q    If you could turn now to Trustee's Demonstrative

3   Exhibit 17, when you looked at the tracing via check, are

4   you showing us another example here, just to double-check?

5   A    This is another example.  This is another example of

6   tracing a withdrawal from 1ZA283 using a cancelled check

7   from the 509 account.  This example is dated in May of 2007,

8   and that was before the time period that I had available

9   records to me from the defendant's bank records.  But even

10  without those records, I was able to use the information

11  from the 509 account, cancelled check, and specifically the

12  information on the back of the cancelled check to tell me

13  where the money went when it left BLMIS.

14          And in this case, it was a $40,000 withdrawal.

15  The check is made out to Carol Nelson for $40,000.  The back

16  of the canceled check is endorsed for deposit only to

17  account ending in 1884, in the name, of Dr. Stanley Nelson

18  and Carol Nelson, and the stamp reflects that it went to a

19  bank account held at JP Morgan --

20  Q    Is that reflecting of the branch, and the distributions

21  that we see on the demonstrative that you showed us earlier?

22  A    Yes, it's included in the $120,000 that's traced to

23  account ending in 1884.

24  Q    Did you sue the cancelled checks to trace the other

25  withdrawals from this account?

Page 223

1    A    Yes, I did.

2    Q    Are the results of your analyses reflected in your

3    report for the 1ZA283 and 265 accounts?  I think it's a

4    combined exhibit.

5    A    Yes, it is.

6    Q    If you could turn to Trustee's Exhibit 55 in your

7    binder?  Did you prepare Exhibit 55?

8    A    Yes, I did.

9    Q    What did you do to prepare it?

10   A    This exhibit is similar to the one we just saw for

11   1ZA284.  This one reflects the two-year withdrawals -- the

12   withdrawals in the two-year period from 1ZA283.  It includes

13   the information from the customer statement related to those

14   withdrawals, and it contains the results of my tracing

15   analysis.

16   Q    Are each of the columns the same as they were in the

17   prior example?

18   A    Yes, they are.

19   Q    What does Trustee's Exhibit 55 tell us about the 1ZA283

20   account?

21   A    This exhibit supports that I traced 100 percent of the

22   cash withdrawals from 1ZA283 in the two-year period to two

23   different bank accounts, one held by both Stanley Nelson and

24   Carol Nelson, and one held just by Carol Nelson.

25   Q    Is Trustee's Exhibit 55 a fair and accurate summary of

Page 224

1    relevant information regarding the withdrawals from the

2    BLMIS Account 1ZA283, and the records you used to trace

3    those withdrawals during that two-year period?

4    A    Yes, it is.

5    Q    Just to be clear, what did you find that two-year

6    period?

7    A    In the two-year period, there was a total of $255,000

8    in withdrawals from 1ZA283.  I traced 100 percent of those

9    withdrawals to two different bank accounts.  $120,000 went

10   to a bank account held by Stanley and Carol Nelson, and

11   135,000 went to a bank account held by Carol Nelson.

12   Q    Okay.  Let's turn finally to the IRA account, Mrs.

13   Nelson's IRA account, 1ZR265.  And I want to start with a

14   little background information about that account.  If you

15   could turn to Trustee's Demonstrative Exhibit 19, and

16   identify that for the Court.

17   A    Exhibit 19 is the application for the self-directed

18   IRA, or individual retirement account held by Carol Nelson

19   at Retirement Accounts, Inc., also referred to as NTC, or

20   Fiserv, these are all different names of the entity that

21   held -- that was the custodian for the IRA held for the

22   benefit of Carol Nelson.  This IRA application refers to the

23   account number that we saw a few demonstratives ago for

24   7003, which is an identifying account number related to this

25   IRA account, and this application was signed by Carol

Page 225

1    Nelson.

2    Q    Please tell the Court what you used, and why you used

3    it, with respect to this document.

4    A    This document wasn't related to any specific cash

5    transaction in the BLMIS account, but this, this application

6    informed me of the account that was held at Retirement

7    Accounts, Inc., as custodian for the IRA held for the

8    benefit of Carol Nelson, and that was related to the BLMIS

9    account?

10   Q    If you could turn to Trustee's Demonstrative Exhibit 20

11   in your binder, and identify that for the Court, please?

12   A    These are additional documents that relate to the

13   individual retirement account held for the benefit of Carol

14   Nelson.  The documents on the left-hand side is an IRA

15   distribution request.  You'll see at the top there it says

16   Fiserv, which again is another name that we've seen on a

17   number of these documents related to this same account.  The

18   account number, again, references 47003.  This is a request

19   from -- for $200,000, signed by Carol Nelson, on December

20   28th, 2005.

21        The document on the right is a letter -- a

22   handwritten letter from Carol Nelson, received by Retirement

23   Accounts, Inc., which again is the same entity as Fiserv and

24   NTC.  And the, I will just read this, because it indicates

25   how the distributions were requested from Carol Nelson.  So

Page 226

1    it was, again, this was a self-directed IRA.  Carol Nelson

2    writes, I wish to withdraw $200,000 from Account Number

3    47003.  Please distribute the funds on January 3rd, but not

4    before.  Please have Bernard Madoff overnight funds to you,

5    and overnight them to me at my home address.

6    Q    Based on your review of the books and records, BLMIS,

7    were you able to determine if Mrs. Nelson in fact self-

8    directed these withdrawals?

9    A    Yes, she did.

10   Q    How many withdrawals were there from the 1ZR265

11   account?  And I think you'll probably need to look at

12   Exhibit 162, I think.  Or, no --

13   A    And it's actually Exhibit 60.

14   Q    Okay, thank you.

15   A    Which is the summary exhibit for my reconciliation

16   results, because that has all of the cash transactions. So

17   there were -- I'm sorry, your question was how many cash

18   withdrawals?

19   Q    How many cash withdrawals were there?

20   A    Eight cash withdrawals.

21   Q    How many were there within the two-year period?

22   A    Three.

23   Q    Were there BLMIS 509 account checks for each of those

24   withdrawals?

25   A    Yes.

Page 227

1  Q    Were the amounts consistent with the IRA distribution

2  request?

3  A    Yes, they were.

4  Q    Were you able to track the flow of funds for each of

5  the checks?

6  A    Yes, I was.

7  Q    Where did they go?

8  A    So the checks were deposited into an account held by

9  NTC or Fiserv, and that's reflected on the quarterly account

10  statement.  The 509 checks reflect that those -- the money

11  went into an account held at JP Morgan.  But it's further

12  supported by the quarterly account statements from Fiserv

13  related to her IRA that shows the inflow of money from

14  Bernard L. Madoff, or BLMIS.

15  Q    So finally, with respect to the withdrawals from the

16  1ZR265 account, were you able to determine if the withdrawn

17  funds fever left Mrs. Nelson's custodial account?

18  A    Yes, they did.  Within a few days, they were

19  distributed to Mrs. Nelson, in the form of a distribution.

20  Q    Okay, if you could turn to Trustee's Demonstrative 21,

21  please, and identify that for the record.

22  A    So Demonstrative 21 is an example of my tracing

23  analysis related to the cash withdrawal in January 2007 from

24  1ZR265.

25  Q    What's the document on the left?

Page 228

1   A     That is the check from BLMIS, and it is for $100,000.

2   It's from, related to a cash withdrawal on 1ZR265.

3   Q     Okay.  How about the documents in the middle?

4   A     These are the quarterly account statements that I

5   talked about before, where these reflect the activity in the

6   IRA account held for Mrs. Nelson during this, during the

7   quarter.  This one in particular was the first quarter of

8   2007, which included transactions in January of 2007.

9            The, there's a section in these quarterly account

10  statements that are, is called account transactions, and it

11  reflects cash inflows or outflows in and out of the IRA.

12  And what was relevant here was the transactions dated in

13  January of 2007.  On January 9th, 2007, there was an inflow

14  of cash of $100,000 with the description Bernard L. Madoff

15  Brokerage Account, and this indicates the withdrawal from

16  BLMIS on -- in January 2009 from 1ZR265.

17           And then you'll see six days later, on January

18  15th, there's a transaction with the description same-day

19  distribution for Tax Year 2007.  It's for the same amount,

20  less $10 of a -- for a check fee, and that was the

21  distribution to Carol Nelson.

22  Q     Okay, what about the document on the right, how does

23  that play into your flow of funds?

24  A     So the document on the right is an IRS form, a tax form

25  of 1099, and this identifies distributions made on IRA

Page 229

 1   accounts, made from IRA accounts.  And this was relevant to

 2   me because it confirmed the distribution to Carol Nelson.

 3   The 1099 shows that the payer is Fiserv, and that the

 4   recipient is Carol Nelson.

 5          The same account number that we keep seeing over

 6   and over on these documents, the 47003, is reflected on this

 7   IRA 1099 form, and it shows a gross distribution of $99,990,

 8   which is the same amount that we saw on the quarterly amount

 9   statement, as the distribution for tax year 2007.

10   Q    Did you perform a similar analysis for both of the two-

11   year withdrawals for the 1ZR265 account?

12   A    Yes, I did.

13   Q    What was the timeframe that you saw from the funds

14   going from BLMIS to the IRA, and ultimately to Mrs. Nelson?

15   A    Very short time period.  Within, within a week.

16   Q    Were there any other withdrawals from the IRA to Mrs.

17   Nelson, other than those from BLMIS?

18   A    There was one other small withdrawal that was for fees,

19   paid to NTC.

20   Q    Is that reflected on the demonstrative that we've been

21   looking at here?

22   A    Yes.

23   Q    What was the total amount of fees we're talking about.

24   A    The total amount of fees in the two-year period was

25   $87.

1    Q    If you could tell me if we've now traced all of the

2    funds within the two-year period for the 1ZR265 account?

3    A    Yes, I have.

4    Q    Did you rely on your forensic accounting skills during

5    your reconstruction of the BLMIS books and records to reach

6    conclusions concerning your global reconciliation, your

7    reconciliation of your three accounts at issue, and the

8    tracing of the flow of funds from those accounts during the

9    two-year period?

10   A    Yes, I did.

11   Q    Can the results of your reconstruction of the records

12   and reconciliation, and tracing analysis of these accounts

13   be reconstructed or replicated by someone with your same

14   expertise and training?

15   A    Yes, I believe that they can.

16   Q    Are your methodologies generally accepted in your

17   profession?

18   A    Yes.

19   Q    And are your conclusions based on those methodologies?

20   A    Yes, they are.

21   Q    Thank you for your time.  I have no further questions

22   right now.

23         THE COURT:  All right, we'll pick up at 2:00

24   tomorrow.  All right, thank you.

25         MS. CHAITMAN:  Judge, can we leave things in the

Page 231

1      courtroom or not?

2              THE COURT:  It's not a good idea.  I have a

3      calendar tomorrow, so you should move them down to your

4      respective rooms, okay?

5              MS. CHAITMAN:  Okay.

6              THE COURT:  You can come back earlier tomorrow,

7      and move them back up, but they should be moved out of here

8      tonight, and locked up, I would think.

9              MS. CHAITMAN:  Okay, so what time should we come

10     to bring everything in.  Because you have court in the

11     morning, so --

12             THE COURT:  Yeah, but I mean, you can come at

13     1:00.  How long do you think --

14             MS. CHAITMAN:  1:00?

15             THE COURT:  Yeah.

16             MS. CHAITMAN:  Okay, thank you.

17             THE COURT:  I assume it's not going to take more

18     than an hour to bring everything back up.

19             MS. CHAITMAN:  No.

20             THE COURT:  Okay.

21         (Whereupon these proceedings were concluded at 4:56 PM)

22

23

24

25

Page 232

1                          **I N D E X**

2

3                            RULINGS

4                                              Page        Line

5

6    Motion to Exclude the Robert Oppenheim's

7    Testimony Granted                          9           21

8

9    Motion by the Trustee to quash the subpoena

10   of Mr. Picard as Trustee Sustained        13          13

11

12   Mr. Madoff Allocations Admitted           21          12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 233

1                      C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5   Sonya                    Digitally signed by Sonya Ledanski
                             Hyde
6   Ledanski Hyde            DN: cn=Sonya Ledanski Hyde, o, ou,
                             email=digital@veritext.com, c=US
7                            Date: 2019.05.10 16:06:33 -04'00'

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  May 10, 2019

[& - 1za283]                                                                    Page 1

| **&** |
| --- |

**&** 5:12 37:19,21
37:22 38:6,9,12
42:4,22,24 49:18
97:1 100:8 150:1

| **0** |
| --- |

**0020042-43** 156:5
**04** 136:6
**0646** 110:3
**08** 136:6

| **1** |
| --- |

**1** 2:3 20:14 29:3
29:12,20 33:22
34:18 38:18 57:12
71:8 93:10 94:3
99:25 141:8
145:24 170:10
203:15,21
**1,175,593,585**
106:5
**1,300** 149:20
**1,692,800** 116:1
**1.4** 72:16
**1.5** 8:13
**1.8** 140:22
**1/5** 209:22
**10** 44:19 53:23
97:5 103:18 136:6
136:6 141:13,14
162:8 165:5,5
168:15 179:15,23
186:14 187:3,4,8
190:2 201:6,10,19
204:4 205:21,23
212:8 218:15
228:20 233:25
**10,000** 20:15
82:10 86:12
**10-04377** 1:3 2:1
2:3,7,11
**10-04658** 1:4 2:5
2:9,14,16

**100** 22:9 41:8 65:6
97:1,2,2,5,10 98:3
100:8,8,12 117:13
126:2,3 135:23
136:11,20 206:8
207:21 211:17
213:19 223:21
224:8
**100,000** 119:12
199:20 200:1,10
216:15 217:22,24
218:6 228:1,14
**10004** 1:16
**10022** 4:3
**10111** 3:6
**1099** 228:25 229:3
229:7
**10:22** 1:19
**11** 42:25 94:11
113:24 114:2
128:22,24 135:7
135:16 136:13
139:22,23 140:23
141:13 142:14
144:13 208:18
211:8 220:2
**11.9** 140:23
**11/30/2006** 110:15
**1100** 3:17
**11501** 233:23
**117** 82:25
**11:16** 110:25
**11th** 156:23 220:1
**12** 117:3 136:4,13
165:5 213:13
214:3,7 232:12
**12/19/2006** 111:11
**120** 97:11,11,16
97:18 117:13
**120,000** 215:18
222:22 224:9
**121** 81:3,8 90:4
163:24

**12th** 156:14
157:10,11,20
**13** 8:3 54:6 110:16
116:7 142:7 179:4
215:1 232:10,10
**135,000** 215:19
224:11
**137,316,449** 87:20
**14** 115:18 131:14
144:10 216:8
**140** 97:15
**145** 91:9,19
**15** 94:7,9 134:18
143:9,11 217:11
**150,000** 195:17
**152** 205:21
**156** 117:24
**15th** 198:7 228:18
**16** 42:21 104:8
129:5 134:2
137:17 220:18,21
**1600** 110:15,16
**161** 141:8,10
**16180** 10:8 12:1
**162** 142:8 226:12
**166** 116:5
**167** 116:5
**17** 63:4 109:15,20
111:1,2,5,19
132:21 222:3
**17,000** 54:23
**17,709,440** 116:8
**170** 151:25
**17th** 63:5 197:23
198:13,19 205:17
**18** 100:4 109:15
110:21 111:23
129:5 136:12
138:3 144:11
221:11,22
**180** 151:18,20,25
168:14

**188** 127:15
**1884** 216:24 217:8
217:18 218:24
222:17,23
**18th** 157:15
204:25 205:6
220:25
**19** 142:16 224:15
224:17
**196** 87:3
**1960** 60:25
**1983** 41:17
**1985** 6:2 7:7,10
43:5
**1986** 41:20 42:1
**1990** 42:17
**1990s** 133:8
**1991** 7:7,11
**1992** 8:6 99:10
**1996** 135:8 172:14
172:15
**1998** 43:11,16
87:11,17,20 88:18
89:7 187:6,18
194:22 195:5
196:10
**19th** 110:25
172:14
**1:00** 231:13,14
**1st** 18:3,25
**1za** 211:6
**1za265** 208:20
215:23 216:4
**1za283** 203:14,17
203:20,22,23
204:9,17,24 205:1
205:8,16,18 206:2
206:9,24,25
207:20,23 208:2
213:23 214:1
215:11,12 220:16
220:24 221:23
222:6 223:3,12,19

223:22 224:2,8

**1za284** 197:9,13
197:19,21 198:9
199:3,5,9,13,16
200:4,7,10,17,19
200:24 202:25
203:5,10 215:5,7
216:6,11,16 217:5
218:3,8,20,22
219:7,25 220:9
223:11

**1zr265** 208:6,6,14
208:25 209:6,9,10
209:13,24 211:11
211:13,16 212:4
212:17,25 214:3
215:21 216:5
224:13 226:10
227:16,24 228:2
228:16 229:11
230:2

**2**

**2** 2:7 7:2 20:15
29:3,20 74:4,5
101:8,20

**2,583,500** 198:14
198:19

**2,610,000** 215:10

**2,822,680** 115:23

**2.9** 7:14

**20** 30:22 90:13
97:5 100:3 106:22
136:5 151:10
225:10

**200,000** 209:12,23
210:7,22 211:2
215:25 225:19
226:2

**200,077** 215:25

**2000** 114:16,23
115:18 122:9
153:5 155:16
161:4,22 162:13

162:13 170:10

**2000s** 91:17

**2001** 136:9 170:4
170:13,16,16
172:3

**2002** 6:2 7:9
104:16 106:19,25
127:7 129:20
130:18 131:1
132:5 138:25
139:22 140:2,2,23
141:13 142:18
155:7 174:8 193:5
193:5,13,17,17,21
193:24 194:6,10
194:15

**2003** 157:9

**2004** 47:4 170:18

**20042-43** 155:16

**2005** 50:1 91:10
105:2,7,10 171:5
225:20

**2006** 87:23 88:8
110:25 132:3
171:9,10 208:21
209:7,11,22
210:21,24 211:1
220:1

**2007** 129:20
131:12,24 132:5
142:13 151:13
171:13,14,14
222:7 227:23
228:8,8,13,13,19
229:9

**2008** 42:22 44:5
87:11,22 88:18
94:11 104:17
106:19,25 114:17
122:9 127:7 133:4
133:8 135:7,16
138:25 139:23
142:14,18 144:13

145:18,24 153:5
156:24 157:15
158:20 161:22
162:13 171:18,20
187:7,18 191:1
192:4,10 194:10
195:6 196:11
197:20,23 198:7
198:13,17,19
199:16,20,25
200:9 204:9,13,24
205:6,17,24
216:11,16 217:4
217:22,24 218:2
219:20 220:2,25
221:17,19,22

**2009** 228:16

**2011** 37:14

**2013** 51:15

**2015** 21:22 22:10

**2016** 18:23

**2017** 10:7 22:7
45:5

**2019** 1:18 18:3,25
159:12 233:25

**20th** 51:15 221:17
221:19

**21** 101:22 138:3
227:20,22 232:7
232:12

**21.5** 142:14

**21st** 200:9

**22** 94:10 134:3
151:10

**225,000** 195:15

**227,000** 185:9

**227,795** 196:9

**23** 132:21 136:12
144:9

**24** 7:18,19 94:7,7
94:8 116:25 117:4
136:12 143:9
217:4 218:2

**24th** 199:20,25
216:16 217:24

**25** 44:10 100:3
101:22

**25,000** 204:25
205:6,18,24
220:25 221:17,18
221:25

**250,000** 74:17

**255,000** 215:12
224:7

**25th** 192:10,13

**26** 11:21 29:24
30:7,12 39:1 57:4
100:4 128:22,24

**265** 223:3

**265-3-0** 157:21
158:20

**27** 131:7 137:16
139:19

**270** 132:4

**27th** 157:19,20

**28** 30:20,20 31:13
33:1,11,19 69:17

**283** 208:11 212:13

**284** 208:11 212:13

**28th** 225:20

**29** 33:5,11 69:17

**29th** 171:19

**3**

**3** 2:11 5:20 29:3
29:20 72:10 73:15
74:24 83:12 84:25
85:8,20,21 182:24
183:2,4,9 184:1
190:4,8 194:5

**3.5** 8:10

**30** 23:16 33:7,11
69:17 131:8

**30,975,765** 131:1

**300** 233:22

**300,000** 174:10,11

| | | | |
|---|---|---|---|
| **31**   30:22 31:13 | 77:23,24 79:8 | 192:11,14,15,16 | **650**   148:5 |
| 33:1,11,19 69:17 | **45**   3:5 104:4 | 193:18,21,22 | **650,000**   148:4 |
| 105:2,7,10 106:4 | 107:25 132:21 | 194:1,11,16 195:9 | **68**   104:10 |
| 127:7 129:24 | **46**   101:20 132:21 | 196:21 199:23 | **6th**   210:21 |
| 131:2 158:20 | **465**   4:2 | 200:4 204:12 | |
| 171:20 | **47**   109:13 111:20 | 205:4,8 208:23 | **7** |
| **32**   33:23 34:1,4 | 134:1 | 209:19,24 216:12 | **7**   34:8 128:21,24 |
| **33**   38:16,16 | **47003**   209:15,21 | 219:16 221:2 | 196:5,7,19 201:6 |
| **330**   233:21 | 210:11 225:18 | 222:7,11 226:23 | 201:6,19 212:8 |
| **34**   51:7 | 226:3 229:6 | 227:10 | **7,604,800**   116:10 |
| **35**   110:16 139:18 | **48**   109:13 111:23 | **51**   138:3 156:1 | **70**   128:8 |
| 139:21 141:9,19 | 123:24,25 214:1 | **51-49**   122:10 | **700**   162:1 164:5 |
| **353,000**   106:9 | **48,300,000**   132:4 | **52-48**   124:23 | **7003**   224:24 |
| **353,770**   105:11 | **49**   113:23 114:9 | **53,770**   105:6 | **703**   81:24,24 |
| **36**   141:15,18 | 114:14 116:25 | **55**   223:6,7,19,25 | 82:21 83:7,9 84:1 |
| 142:6,7 | 117:16 | **56**   132:1 218:18 | 84:6,8 85:13,14 |
| **37**   80:25 81:7,8,16 | **490**   98:23 | 218:19 220:4 | 85:16,19 88:9 |
| 82:25 85:24 89:25 | **4:13**   110:17 | **56,910,000**   132:1 | 89:14,19 90:24 |
| 163:5,11,15 | **4:56**   231:21 | **56,990,000**   131:25 | 91:1 92:4,24 |
| **38**   82:24 83:3 | | **57**   131:14,25 | 95:21 112:23 |
| 84:17 | **5** | **58**   117:24 203:25 | 153:7 155:2 |
| **39**   81:3,8 86:25 | **5**   8:4 24:7 29:21 | 204:1 206:19 | 157:25 160:24 |
| 87:12 147:12 | 39:13 46:15 50:18 | 207:19,25 214:6 | 161:4,19,23 |
| 163:16 164:15,16 | 63:19 190:23 | **59**   39:6 201:12,15 | 165:23,25 166:24 |
| 164:21 | 191:12,15,16,21 | 201:16,17,23 | 167:2 169:7,18,21 |
| **3rd**   226:3 | 191:22 | 202:21 203:2 | 170:4 186:18,20 |
| | **5.3**   5:25 7:5 | 214:6 | 186:21,24,25 |
| **4** | **5.3.**   8:11 | **598099**   157:18 | 188:15,16,20,22 |
| **4**   29:3,20 75:21 | **50**   9:5 98:3 121:20 | **5th**   209:11,22 | 189:4,5,9,11,13 |
| 89:5 95:1 183:4,5 | 121:21 123:25,25 | | 189:16,19,21 |
| 188:3,11,11 | 124:23 130:13 | **6** | 190:1,11,16,19 |
| **4,500**   62:8 | 156:18,21 157:14 | **6**   34:6,8,15 110:19 | 191:1 192:11,18 |
| **4.3**   88:17,17 | 159:23 160:17 | 193:1 | 193:4,9,10,20,21 |
| **40**   134:18,20 | 165:9 | **60**   119:4 211:24 | 194:1,8,16 195:9 |
| 137:4 147:13 | **50-50**   121:22 | 212:3,16,23 214:6 | 196:21 198:4,13 |
| **40,000**   222:14,15 | 122:4,10 123:21 | 226:13 | 198:14,16 |
| **400**   112:9 | **500**   148:5 | **60th**   39:6 | **71**   130:14,16 |
| **400,000**   72:15 | **500,000**   148:2 | **6140**   221:6,15,20 | **72**   109:15 124:2 |
| **401**   8:20 | 197:24 198:8,11 | **64**   134:19,23 | **73**   109:16 |
| **403**   8:21 | 198:20 | **646**   105:14,18,24 | **75,000**   45:19 |
| **41**   119:3 | **509**   89:19 187:9 | 106:10 109:25 | **76**   127:5 |
| **44**   69:5,10,15 70:4 | 187:12,13,16 | **65**   44:22 48:13,17 | **77002**   3:18 |
| 70:7 71:5,10 | 188:21,24 189:8 | 145:19 | |
| 72:10 74:5 75:1 | 190:16,19 192:4 | | |

**8**

**8**  1:18 34:6,9,15
  87:1,3 168:15
  197:11,12
**8,944,621.13.**
  192:15
**8.5**  110:13
**80**  76:24 83:21
  98:1,1,3,5 131:12
  132:1
**800**  162:1 164:5
**807**  15:2
**81**  87:3
**811**  3:17
**82**  87:1,4 164:22
**83**  123:1,3,5
**839**  87:23 88:9
**84**  131:4
**87**  229:25
**885**  144:16
**894,645**  157:23

**9**

**9**  8:4 29:24 30:6
  30:12 114:23
  137:17 143:11
  199:10,12 202:23
  218:15 232:7
**90**  116:17,22
**9024**  34:11
**90s**  47:3 49:17
**95**  116:17,22
**96**  136:5 213:23
**97**  83:8 85:4,20
  190:3
**98099**  157:4
**99**  136:5
**99,990**  229:7
**99.01**  196:17
**9th**  210:24 228:13

**a**

**aaa**  44:11

**ab**  80:5
**ability**  16:23
  79:20 80:2 95:17
  98:4 138:22 139:6
  139:9
**able**  13:10 15:23
  26:14 32:18 35:18
  35:19 41:25 45:7
  47:11 61:10 62:1
  66:4 70:12 76:3
  77:15 80:5,8
  82:17 102:5 104:1
  104:18 106:23
  107:22 108:1
  112:19 116:2
  120:19 124:18
  126:25 127:18
  129:10,19,20
  131:23 134:12
  147:3 173:25
  200:23 202:14
  205:23 206:8
  219:24 220:12
  222:10 226:7
  227:4,16
**abnormally**
  136:22
**absolutely**  24:3,6
  56:2,18 63:24
  64:12 66:9 68:12
  68:14,16,19 89:12
  91:4 95:15 118:9
**acceptance**  82:13
**accepted**  58:15
  230:16
**access**  56:3,18,19
  73:10,20 111:10
**account**  30:17,18
  61:24 63:11 65:15
  81:20,24,25,25
  82:2,3,4,5,10,16
  82:17,20,22 83:7
  83:9,22 84:1,4,6,7

84:7,9,10,23
85:13,17,19 86:18
86:19 88:9,10
89:13,14,15,16,17
89:19,19,20 90:13
91:1 92:4,4,24
93:8 94:14,17
95:2,3,21 103:10
105:14,14,17,18
105:19,22,24
106:2,10,11,11
109:24 133:7
134:8 137:21
140:12 150:23,24
150:25 153:8
154:9,22 155:2
157:17,21,25
158:2 160:6,24
161:5,8,19,23,25
164:5 168:23
169:6,7,8,14,18
169:21,23 170:4
170:21 171:6
174:5 178:16
181:19 182:23
184:3 186:18,20
186:21,23,25,25
187:9,12,13,14,15
187:16,20,21,23
187:25 188:15,15
188:17,20,21,21
188:23,24,24,25
189:4,5,9,10,11
189:13,16,19,22
190:1,11,15,17,19
190:20 191:1
192:4,11,11,15,16
192:18,24 193:4,4
193:8,9,10,11,12
193:13,18,20,21
193:22,22,24
194:1,1,8,12
197:5,8,9,10,19

197:21 198:4,9,13
198:14,16 199:5
199:17,23 200:3,4
200:10,12,19
201:1 202:22,24
203:5,10,13,14,16
204:2,12,19 205:9
205:18 206:1,4,7
206:13,25 207:20
208:2,5,7,15,24
209:9,11,13,15,17
209:21,24,25
210:5,8,11,12,14
210:15,17 211:7
211:16 213:6
214:15,15 215:5,9
215:11,12,18,19
215:21,24 216:6
216:12,24 217:1,5
217:7,8,18,25
218:3,9,20,23,24
219:9,14,15,25
220:9,13,16,17,24
221:2,6,15,20,23
221:25 222:7,11
222:17,19,23,25
223:20 224:2,10
224:11,12,13,14
224:18,23,24,25
225:5,6,9,13,17
225:18 226:2,11
226:23 227:8,9,11
227:12,16,17
228:4,6,9,10,15
229:5,11 230:2
**account's**  33:4
**accountant**  5:22
  13:7 37:13 41:24
  43:5 50:6,15
  59:19 181:10
  182:7
**accountant's**  9:22
  41:7

**accountants**
55:25 58:21
146:15,19 185:14
186:8
**accounted** 106:1
136:22 178:1
**accounting** 41:17
42:6,17 43:6
46:25 55:17 59:24
62:4,9 182:5
214:9 230:4
**accounts** 7:6,7,11
7:13 24:19 61:17
81:18 82:6 84:2
90:23,25 94:20
102:1 105:22
106:4 126:14
133:13 134:6
138:6,7 143:14
144:24 152:24
153:2,3,4,8,10,20
153:23 154:2,16
155:3,3 159:14
161:4 165:23
166:2 167:21
174:5,16,20
175:10,14 177:12
177:21,23,25
178:8,9 182:22,23
183:19,20,23
184:6,10,19 186:1
186:12,14,16,16
186:18 189:2,7
190:5,7,20 192:21
193:15,16 194:17
194:18 195:3,9
196:2,21 197:5
208:11 209:13,20
212:13 213:11,18
213:21 214:23
215:14 217:17
219:23 223:3,23
224:9,19 225:7,23

229:1,1 230:7,8
230:12
**accretion** 95:21
**accretions** 83:6
**accrued** 166:21
**accumulate** 67:10
86:5
**accumulated**
185:5
**accuracy** 202:21
203:10 213:5
**accurate** 53:7
87:8 102:6,9
107:25 114:11
129:11 135:2
196:15 203:2,22
207:25 212:23
220:7 223:25
233:4
**accurately** 70:4
94:20,22 101:1
133:17 141:20
175:19 195:11
196:23 199:1
200:16 203:12
205:25 206:11
207:24 211:10,18
212:21 213:8
**aces** 71:9,14 72:1
**ache** 24:1
**achieving** 118:11
**acknowledge**
166:23
**acknowledged**
60:13 165:22
166:14 167:2
175:10
**acquisitions**
149:10
**act** 88:15 102:21
**acting** 63:14,16
65:11

**action** 40:24 41:2
**actions** 11:6 45:24
**actively** 74:10
**activities** 72:14
73:25 90:21 143:6
161:1,6
**activity** 85:9
108:5 228:5
**acts** 103:7 129:17
**actual** 69:25 83:5
96:8 99:4 102:24
104:25 107:8
114:18 115:4,5,5
115:10 116:8
122:12 123:21
135:7,12 160:7
169:14
**add** 87:19 113:2
118:2 139:11,11
140:21 167:1
178:8
**added** 87:20 88:5
98:15 114:24
118:1 130:23
131:3 134:7
140:11
**adding** 134:16
**addition** 45:12
84:1,19 96:2
98:14 100:16
112:8 148:13
182:20 197:22
204:2
**additional** 15:14
83:11 84:12
140:10 167:4
177:10 225:12
**additions** 83:13
84:22
**address** 226:5
**adds** 87:19
**adequacy** 138:22

**adianta** 15:14
**administration**
36:14
**admissibility**
21:15 181:2
**admissible** 20:17
34:10 35:9
**admission** 8:7,14
30:2 32:11 203:21
**admissions** 8:2
**admit** 2:3,7 6:10
15:3 20:1 21:10
21:12,20 24:4
26:21 27:16
**admitted** 20:13
21:16 232:12
**adv** 1:3,4 2:5,8,14
**advanced** 41:18
**advice** 44:21 45:1
**advised** 44:20
**adviser** 60:22
**advising** 48:21
**advisor** 44:18
48:8,11 88:3
158:8 164:2
183:19 192:6
**advisors** 108:10
**advisory** 12:22
18:12 44:18 61:5
61:8,19 63:4,20
63:25 64:13 66:24
67:12,19 68:17
76:20 80:7,13,21
81:21 83:6,17
84:7 85:5 86:21
89:4,6,10,11
90:22 91:8 95:8
95:11,14 96:5
99:15 101:2 108:5
108:6,13,15
109:11 112:3,7,9
117:1 118:5
120:10,11 123:8

124:11,16 125:5
125:17 128:1
129:9,13 132:12
133:23 137:6,19
139:15 142:23
143:14 144:1,14
144:24 145:7,11
145:16 146:1
152:14 153:24
154:25 161:24
165:21 166:2,6,10
166:15 184:10,21
185:21 196:20
197:4
**affidavit** 30:21,23
33:3
**affidavits** 30:24
31:14 32:24
**afternoon** 160:24
179:21,24 182:13
213:10
**agatha** 14:1
**agent** 65:12 88:14
**agents** 88:12,12
90:12
**aggregated** 88:2,3
**aggregates** 7:14
**ago** 45:15 49:10
51:7 78:1 155:19
159:19 224:23
**agree** 26:5 27:5,7
152:2 155:24
169:18 171:7,15
172:7
**agreed** 51:3
105:15 172:3
**agreement** 19:18
**agreements** 56:8
56:9
**ahead** 18:20 19:16
37:6 61:1 72:11
167:17 182:4,9

**ai** 81:14
**aid** 41:7 80:23
**aig** 114:21 115:20
115:21,23,25
**al** 1:10
**albeit** 135:25
**alexander** 42:7
**algorithm** 124:18
**algorithms** 66:16
**allegations** 37:14
40:22
**alleged** 85:1
**allim** 4:6
**allocated** 22:25
131:9 138:2 159:9
167:11
**allocating** 101:5
**allocation** 129:11
160:2,7
**allocations** 29:21
232:12
**allocution** 93:7,13
93:22 94:6,20
99:23 101:1,9,11
101:15,15,16,21
101:21 102:5,8
128:21 132:20
133:16,25 134:2
137:16 138:2
143:8,8,21 144:10
144:18
**allocutions** 2:4
21:10,12,15,18
29:3 36:17,23
132:20 138:9
**allow** 6:17 46:22
57:23 62:22 76:25
77:13 79:4 110:4
142:21 143:24
**allowed** 41:22
57:20 78:11 79:11
79:20 137:2

**allowing** 10:15
**altered** 78:16
**altogether** 57:20
**amended** 8:1
**america** 103:11
**american** 41:6
44:7,9
**amount** 6:19 8:13
9:18 82:10 88:25
104:24,24 130:25
145:23 147:14
192:19 200:1
202:4 207:9
209:25 216:2
219:5 228:19
229:8,8,23,24
**amounts** 215:17
227:1
**amy** 3:12
**analogy** 117:12
**analyses** 114:11
214:6 218:7 223:2
**analysis** 18:10,15
18:16 49:9 52:19
53:5,6 57:14 59:5
61:15 70:4 87:8
90:9 101:17 102:7
104:14 106:25
114:15 115:9,12
116:15 117:25
118:2 120:6 121:3
121:3 124:8 128:8
129:12,21 130:17
131:11 135:3
138:15 139:17
142:1,4 146:25
152:14 154:12,14
159:13 162:12,14
177:10 184:9,24
185:12 192:5
196:15 203:8
205:13 211:22
213:4 215:6

216:13 219:11
220:4,12,19 221:3
223:15 227:23
229:10 230:12
**analyst** 43:16,23
46:19 59:20,22
**analysts** 43:17
46:3 58:22 119:25
**analyze** 87:10
120:9 127:6
134:12 159:22
166:20 177:16
187:17
**analyzed** 175:25
186:10,11
**analyzing** 134:14
165:8
**anecdotal** 162:10
**announcement**
98:2
**annual** 135:15
136:3
**answer** 80:8
135:18 147:23
148:1 159:17
**answered** 66:7
80:4 93:1 103:14
158:23
**anti** 45:4,18 59:21
**anticipate** 9:11
43:14
**antiquated** 103:4
**anybody** 101:15
103:19 131:9
**anymore** 103:24
**apologize** 33:25
93:24 104:9
**apologized** 216:5
**appeal** 9:10
**appear** 20:11,16
22:23 212:14
**appeared** 127:12
182:18 196:22

197:13 200:14
202:2 203:19
204:12,23 213:7
213:20 216:21
**appearing**  5:12
38:10
**appears**  5:24
109:22 192:25
193:11 212:20
**appellate**  41:10
42:19
**appendices**  114:3
**appendix**  57:3,11
57:12
**apple**  86:12
**applicable**  58:17
58:20 171:23
**application**  8:20
224:17,22,25
225:5
**applications**
72:18
**applied**  30:25
138:21
**applies**  2:5,8,13
**apply**  14:14 61:24
132:23
**appointed**  11:11
50:4
**appointment**
10:23 11:2 12:21
**appreciate**  7:22
113:14
**appreciated**  167:6
167:11 168:4
**appreciation**
168:6
**approach**  131:10
**approaching**
116:22
**appropriately**
46:24

**approximately**
151:15,22 153:23
162:8
**april**  79:15
**arbitrage**  61:3
62:13 175:19,24
**arbitrate**  61:9
62:2
**arbitrator**  44:8,9
44:16
**arbitrators**  44:10
**architecture**  73:3
**arduous**  49:19
**area**  10:18 52:13
**areas**  44:4 59:24
**argue**  13:24 160:7
173:12
**argued**  131:19
**arguing**  16:20
**argument**  14:4,18
14:19 15:13 16:3
18:8 19:10 20:14
21:11 22:17
**arguments**  22:16
**arises**  137:12
**arm**  91:8
**arrange**  82:7
**arrangements**
177:13,14
**arrest**  144:12
**arrested**  89:7
94:11 99:11 194:7
194:11
**arrow**  89:22 90:7
**article**  49:4 57:18
**articles**  34:9 49:2
49:3,4,13,19,20
**as400**  54:20 55:3
55:10 64:24 66:23
67:1,8,13 68:4,18
76:20 78:21 79:23
99:19 118:6

**as400s**  78:2
**aside**  164:25
**asked**  93:1 105:20
108:7 138:15
155:14
**asking**  147:17
152:15 176:14,16
176:18 177:2
189:21
**aspect**  40:25
**asserted**  2:12
12:21
**asserting**  9:10
**assess**  38:3
**asset**  158:19
**assets**  45:2 139:3
139:4,11,16,25
140:20,23 141:11
142:9
**assigned**  195:19
195:21 202:2
207:5 219:4
**assignment**  51:6
51:24,25
**associated**  82:21
**association**  43:17
45:16,17
**assume**  35:8
198:21 231:17
**assuming**  17:9
**assumption**  169:3
**at&t**  110:11
**attached**  201:18
201:22
**attacks**  12:2,3
**attempt**  45:10
46:9
**attempted**  104:17
**attend**  24:16
**attorney**  13:12
18:2
**attorney's**  39:14

**attorneys**  3:4,16
22:19
**attracted**  132:22
**attributable**
131:6
**attribute**  131:5,19
**audit**  42:8,18
74:25 75:5,6,10
75:19 108:12
**auditor**  42:9
**audits**  42:14
**august**  51:15
61:18 193:5,13,17
194:15
**authenticated**
34:10
**authentication**
181:13 182:1
**authenticity**
30:14 31:9 181:2
181:5
**author**  111:8
**authored**  49:2,3,4
51:15
**authorities**  2:13
9:5 142:15
**automate**  71:25
**automated**  76:24
**available**  22:9
54:11 112:4
178:15 182:20
183:21 186:15,21
187:6 194:21
195:4,5 196:18
199:4 200:18,25
202:15 206:3
211:12 212:5
213:21 217:15
219:19,20 221:9
222:8
**avellino**  62:5
**avenue**  4:2 144:16

**average** 118:13,20
118:21 119:10,23
121:20,21 123:1,5
123:24 124:2,24
124:25 135:9,15
136:3,17
**avoided** 195:25
**award** 50:10
**awarded** 49:24
50:9
**awards** 49:23,24
**aware** 153:23
165:22,25 168:18
168:22 169:4
170:2 172:9
178:13
**axis** 104:22,25

**b**

**b** 1:21 57:11,12
145:21
**bachelor's** 41:17
**back** 10:6 39:2
42:16 49:16 53:2
53:6 55:23 61:14
62:13 65:16,18
66:11,11 74:4,9
74:24 79:14,16,20
79:22 81:16 82:18
83:13,22,23 84:25
85:1,14 86:13
88:7 89:24 91:23
94:24 95:25 96:11
99:25 105:25
125:7,14 132:15
140:25 141:3,19
146:3,4 151:5,10
157:8,17 170:17
172:15 175:6
190:7 194:21,23
205:10 206:18
216:6,21,23 221:4
222:12,15 231:6,7
231:18

**backdate** 78:17
111:18
**backdating** 23:20
**background** 19:6
60:18 224:14
**backup** 54:23,24
55:1,5,9,13
**bad** 98:2
**baker** 3:3,15 5:12
**balance** 138:21,23
139:1,2,11,21,24
140:2,12 142:4
**balances** 146:2
**bank** 30:18 33:24
54:10 56:6 81:18
81:20 82:8,10
84:2,18,19 88:7
88:10 89:10 91:13
91:18 93:5,8
94:13,14,17 95:2
95:3 103:10,10
145:22 146:7
153:14,15 161:5,8
161:24 165:18
181:9 182:22,22
183:14,21 184:3
184:11 185:15
186:6,7,10,11,12
186:14,15,21
187:10,13,19,21
187:24 188:9,9
190:12,13,15,16
190:19 192:21,24
193:3,4 195:4,8
195:16,17,22,24
197:14 198:2
200:25 201:8,11
202:12 206:24
207:13 211:12
212:5 214:15
215:14 217:7,16
217:25 218:1
219:9,14,14,18,23

221:10,14,25
222:9,19 223:23
224:9,10,11
**bankers** 82:13
186:17 187:19,21
187:23,25 188:23
188:25
**banking** 45:8
192:23 219:13
**bankruptcy** 1:1
1:14,23 40:2,4
50:3,18,21,21
52:5 138:12
214:18
**banks** 42:10 56:9
82:5,9 162:20
177:13
**banner** 124:1
202:9 219:12
**bar** 29:16 105:3
**barbara** 50:22
**bars** 92:11,13
107:2,9
**based** 5:23,25
8:20 12:11 16:2
38:9 41:5,6 46:16
57:14 59:2 61:15
80:4 92:22 98:23
107:15 112:3
125:15 127:24
128:9 129:9 130:5
135:22 138:8
142:1 143:20
144:17,21 145:10
146:11,14,18
152:10 185:20
203:8 205:19,22
211:5,17 213:4
217:3 218:1
219:15,18 220:12
221:21 226:6
230:19

**basic** 39:16 53:13
77:7 139:24
**basically** 20:13
44:24 50:24 51:2
63:9,20 67:16
72:15,20 75:15
77:8 79:11 81:9
82:15 83:15 86:5
89:16 98:12 99:18
103:22 107:9
118:17 119:9
139:9 140:3,7
**basics** 48:14
**basis** 7:17 8:18
11:16,17 12:20
57:20 134:4,7
141:2,4 190:15
**basket** 97:4
100:10,18 126:1
132:25 135:22
136:20
**bates** 155:16
156:4 157:4,9
201:10 202:18,20
207:16 219:10
**bear** 154:4
**bearing** 90:23
96:4 125:4
**becoming** 47:6
**began** 60:21
**beginning** 89:7
101:22 134:2
160:3
**behalf** 5:12 13:20
61:20 103:2
127:16 128:4
137:19
**behaved** 136:21
**belies** 84:13
**believe** 6:4 9:2
41:9 49:4 57:11
59:8 147:3,12
149:20 170:12

175:23 230:15
**believed** 41:5
94:15 100:23
129:7 133:5
137:24
**belonged** 94:17
**benchmark**
119:25 120:4,15
**benefit** 6:20 10:19
159:18 160:17
197:6 209:14,20
210:5,8 224:22
225:8,13
**benefits** 148:14,19
**bernard** 1:6 2:4
124:13 144:14
168:19,23 169:5,8
169:11 170:22
171:1,2,20 172:2
172:5,10,15 173:1
174:2,9 190:6
193:14,25 194:9
194:13 198:8
226:4 227:14
228:14
**bernie** 101:23
133:4,9 134:10
**bernstein** 1:22
51:21 75:3 166:5
**best** 48:5 51:21
53:22 159:5
**bethesda** 42:21
**better** 76:5 174:18
**beyond** 6:24
162:21 173:4,5
217:10
**bg** 156:3,9,12,13
**bgo** 156:1
**bias** 147:25
**bienes** 62:5
**big** 37:2 38:23
40:24 51:10 67:13
69:7 76:13 77:17

91:12 92:6 114:4
130:3 201:12
206:18 218:19
**biggest** 140:24
**bill** 82:14 156:23
157:15 158:7,19
159:8 166:9 168:4
177:17
**billion** 88:17,17
89:5 95:1 106:5,8
131:2,8,14,25
132:1 140:23,23
141:13,14 142:14
142:16 145:19,20
145:21,24
**billions** 107:2,2,3
107:3,3 132:8,8,8
**bills** 20:10,15,15
23:3 40:12 100:16
129:4,23 130:2,4
153:25 154:10
156:15,21 158:1
159:6 160:5
165:23 166:7,14
166:17,18 167:22
175:9,10
**binary** 47:23
**binder** 29:12,14
29:15,17,20 38:18
69:5,7 82:25
86:25 93:11,11,21
104:4 109:14
113:23 130:13
132:19 134:21
139:18 141:15
143:8 180:14
182:25 188:3
191:8,9,9 193:1
196:5 197:11
199:10 204:4
206:18 208:18
211:24 213:14
215:1 216:8

217:12 218:19
220:18 221:12
223:7 225:11
**binders** 121:8
201:12
**bit** 42:14 49:19
72:11 73:15 82:17
84:15 85:16 92:18
92:19 102:10
113:22 118:10
133:21 134:16
136:1 139:8 183:1
**bj** 155:14
**blank** 70:16,19
**blanket** 24:4
**blmic** 76:21
**blmis** 2:4 14:6
15:14 20:10,14
24:12 25:10 30:17
30:21 35:1,18
37:15 39:10,16,17
39:25 46:19 48:11
52:1,4 53:19
54:13 55:5,12
56:9 57:15,16
60:18 61:19 62:1
62:6,25 63:2,21
64:16,20 65:23
66:7,11,15,19,22
69:21,23 70:5
71:17 79:11 80:5
80:13,20 81:18,20
85:5 86:21 88:8
89:3,9,10,18
90:20,23 92:23
95:11 96:17,25
97:12 98:15,17
99:2,5,9 102:4
104:2 105:12,14
106:11 107:16
108:2 112:1
115:14 116:1
117:1 118:5 120:7

120:10,13 125:5
125:16,16 126:2
126:25 127:24
128:1,11 129:9,19
132:12 133:15,22
134:11 137:5
138:8,16,18,24
139:13,22 140:21
141:13 143:20
144:1,17,21
145:11,16,17,22
146:10,13,18
167:3 169:9,10,23
170:11 178:10
182:15,19,22
183:14,15,20
184:3,8,10,11,12
184:14,15,16,21
185:6,20 186:6
187:9,19 188:13
188:14,18 190:2,6
195:4,9 196:10,18
197:4,14,19 198:2
200:7 201:8
202:11,12 203:4
204:8,16 205:16
206:23,24,24
207:13 208:20,21
210:20,23 212:5,5
212:25 214:14,21
215:8 217:7,22
218:4,6 219:9,13
219:16 220:8,23
222:1,13 224:2
225:5,8 226:6,23
227:14 228:1,16
229:14,17 230:5
**blmis's** 142:22
159:6 212:6
**blmis's** 99:15
**bloat** 78:7
**bloomberg** 66:4
115:6,7,9 116:9

117:15,18,20
120:13 122:4
123:20,22 135:10
174:25
**blotters** 54:10
**blown** 210:19
**blue** 53:24,25
54:4 85:25 86:3
90:6 105:4 106:3
107:2,9 121:16
123:19 132:25
135:13 136:8
188:16,22 216:25
**bmlis** 128:14
**bny** 164:5
**board** 45:21,23
80:25 106:18
126:19
**body** 43:16 44:1
45:18 57:8
**bogus** 137:21
**bold** 108:24
**bonaventure**
14:17 22:20
**bond** 175:19
176:1 177:6
**bonds** 75:19
**book** 38:24 103:6
**books** 10:12,22
42:9 53:16,19
57:15,16 60:21
81:17 89:3 90:20
92:22 99:9 102:4
120:7 125:15
126:14 127:24
128:9 129:10
133:15 134:11
138:8 143:20
144:17,21 145:10
181:5,9,22 184:8
185:20 226:6
230:5

**boost** 86:11
**born** 62:17
**boss** 75:21
**bottom** 53:24 54:4
104:25 136:25
141:20 198:10
210:19 216:22
**bought** 64:11 88:1
97:9 108:7 119:11
129:13 130:7
177:20
**bound** 51:8 93:17
**bowling** 1:15
**box** 55:21,21 71:1
90:6,7 92:15
**boxes** 52:24 55:22
188:16,22
**brace** 49:17
**brackets** 117:5
**brains** 67:8
**branch** 222:20
**break** 75:9 102:11
113:6,9 179:16
**bribed** 40:23
**bribery** 40:21
**bridge** 91:22
**brief** 20:2 35:23
70:13 160:23
**briefing** 17:22
20:19,25 27:4
**briefly** 42:5 52:6
52:7 53:18 58:3
60:20 125:23,23
**bring** 12:16
176:19 191:5
231:10,18
**broke** 113:19
**broken** 75:7 79:13
107:10
**broker** 63:10,16
64:20 65:5,6,23
65:23,24 66:17
76:11 88:14 103:2

105:16 126:14
**brokerage** 65:9
65:16,17 79:14
86:16,17 90:25
152:24 153:2,3,4
153:8,20 159:7,14
160:5 175:14
177:21,23,25
178:8,9 190:5
228:15
**brokers** 88:14
175:13,14
**brothers** 50:2,3,5
50:18,19 154:2
**brought** 40:25
41:1
**brown** 3:8
**browser** 48:1
**bruce** 36:5 37:7
37:11 113:17
147:8
**building** 42:16
63:6
**built** 48:3,19,20
79:9 136:20
**bullet** 54:6
**bullets** 42:11
**bunch** 82:4
110:23 156:19
**bundle** 84:23
**business** 23:13
31:19,21 35:1
37:22 38:3 49:21
54:12,13,22 55:7
55:7,15,15 59:25
60:22 61:5,6
62:25 63:3,7,9,18
63:22 64:1,11,15
66:1,7,24 67:6,9
67:16 68:5,7,18
70:15,18,18,23,25
71:2,12,17 72:2,3
72:4,6,7,9 73:2,5

73:6,14,23 74:1
74:20,22 75:17,17
75:18 76:15,17,18
76:20,24 77:5
78:3,3,4,5 80:7,10
80:13,13,21 81:12
81:14,14,21 82:1
82:3 83:6,17
86:21 87:15 88:20
89:15,23 90:7,22
91:6,25,25 92:2,5
93:3 95:8,12,14
96:5 101:3 104:19
104:20 105:5,8,18
106:3 107:20,22
108:4,5,7,15
109:11 110:5,6
112:7,10 114:21
115:3,14,23 116:7
116:11 117:1,5
118:5 119:18
120:12 122:6,10
122:13,15,17,19
122:21,23,24,25
123:8,10,23 124:1
124:10,11,15,16
125:2,5,8,11,18
127:14,21 128:4
129:23 130:1,11
130:20,20,21,22
130:23 131:6,13
131:18,20 132:12
132:14 135:15
136:4 139:6 140:1
140:5,5,6,8,9,10
140:13,14,25
141:3,23 142:2,2
142:23 144:2,14
145:8,9,12,14
150:1,11,19,19
151:21 152:6,9,9
152:25,25 160:4
161:20 162:4,4,5

162:22,25 163:2
164:11,13,14
165:18 168:9,12
178:1,6 182:2,19
183:19 184:16
186:12 192:6
196:20
**businessperson**
44:12
**buy** 63:23 64:3,3
65:6 68:11,20,22
71:21 80:17 96:25
97:6 98:5,7,8
100:19 108:7
117:7,13 118:23
119:12 121:20,22
123:5 124:4,18
166:20
**buyer** 74:16
**buying** 44:20 97:3
97:23,24 99:4,4
118:18 119:16
121:23 122:11,16
122:17,25 125:16
126:1 133:1
**buys** 63:16 73:24
108:15 122:8,23
122:25 124:23
**bypassing** 78:14

**c**

**c** 3:1 5:1 233:1,1
**calculate** 177:22
**calculating** 11:16
**calculation** 23:16
38:4 141:5
**calculations**
141:24
**calendar** 231:3
**call** 8:15 21:25
22:8 28:7 36:3,5
47:23 53:4 63:4
65:5,23 69:21
78:7 82:19 97:7,8

97:9,10,12,12,17
98:10 99:3 126:4
132:25 141:12
150:19 151:25
160:25 162:3
164:7 175:13
179:14
**called** 13:8 37:18
42:7,7 43:16 45:2
47:5 49:17 54:12
61:22 66:12 71:19
75:7 76:11 77:7
77:24 78:19 83:13
96:22 98:11 99:2
105:14 109:22
115:11 126:3
134:15 136:15
165:2 178:25
202:10 210:25
228:10
**calling** 71:25
**calls** 64:4
**campaign** 41:2
**cams** 46:19
**canceled** 216:18
217:3 219:15
221:4 222:16
**cancellation**
75:14
**cancelled** 187:15
199:22 216:11,21
216:23 217:10
218:4 219:16
220:22 221:4
222:6,11,12,24
**candidly** 12:6
**can't** 58:1 65:22
79:6 80:15 97:18
**capability** 68:6
**capacity** 45:13
88:15
**capital** 138:22

**capitalization**
100:10
**capitol** 42:12
**capped** 9:20
**capture** 111:4
**car** 47:18,19,21
98:8
**care** 34:17 52:15
88:5 183:6
**carlisle** 3:20
**carlo** 49:9,11
**carol** 7:25 197:5,8
197:21 198:6
199:5,16 200:2,8
200:19 203:14
205:1,7,17 206:4
208:5,14 209:5,14
209:21 210:5,9
211:2,13 215:9,15
215:16,19,20
216:1,16,25 217:8
217:19 218:8,23
220:16,23 221:6
221:16,20,25
222:15,18 223:24
223:24 224:10,11
224:18,22,25
225:8,13,19,22,25
226:1 228:21
229:2,4
**carries** 69:18
**cars** 117:13,13
**case** 1:3,4 5:18 9:8
9:12 12:19,25
13:5,8,8 14:12,15
14:24 19:15 23:4
30:7,16 35:14
38:7,13 39:2,20
40:1,4,21 46:22
49:10 50:2,5,7,17
50:18,18,19 51:4
51:13,15 59:18
78:11 96:20 97:9

142:11,22 143:25
148:21 158:6,17
159:18 160:21
164:25 165:2,4,4
171:23 175:16,23
177:3 178:14
214:16 221:5
222:14
**cases** 9:7 37:25
38:2 42:19 46:23
50:2,6 169:4
178:14
**cash** 82:7 83:6,7,8
83:23 84:22 86:1
86:2,4,9,10,15,19
86:22 87:18,24
88:1,11,18,19
89:5,18 91:13
95:1 97:14 140:1
140:2,18 141:2,2
142:1 182:18,19
183:12 184:4,22
185:2,5,10,10,11
185:23 186:12
188:14,19 194:19
195:1,3,10,12,13
195:12,15,20
196:9,18,22,24
197:3,12,14,22
199:1,12,19
200:13,15,24
202:2,24 203:3,6
203:11 204:2,3,12
204:23 205:5,24
206:8,10 207:5,21
207:22 208:2,4,24
209:6,10,12,18
210:15,20,22,22
211:9,18 212:18
212:20,24 213:1,7
213:19 214:16
215:7,10,24
216:10,14 217:6

217:22 219:4
223:22 225:4
226:16,17,19,20
227:23 228:2,11
228:14
catchall  17:10
categories  53:19
  184:8
category  157:12
caused  9:4 100:21
  137:20
cboe  126:21,22
cds  190:10
cede  13:16
cellphones  54:25
centered  50:24
central  103:5
certain  21:21 48:5
  52:4 63:15 66:2
  70:1 82:9 95:5
  110:8 134:8,16
  152:24 153:6
certainly  11:4,7
  26:15 75:25 143:3
  152:8,10 172:6
certainty  46:25
  58:25 146:23
  214:9
certificates
  102:24,24
certification  33:9
certifications
  45:12
certified  13:6 34:6
  41:6 43:4,6,9,15
  43:17 44:6 45:4
  45:16,17 46:2
  49:25 59:19,19,20
  59:20,21 233:3
certify  46:2
cfa  46:18
cffa  46:18

chain  52:22
chairman  45:20
  45:21 46:1
chaitman  4:1,5
  9:1,24 12:15,20
  13:2 16:13,16,17
  16:23 17:2,5 18:9
  19:7,20,21,25
  20:6,8,20,23 21:1
  21:4 24:15 25:2
  25:15,18,21,23
  26:19 27:2,6,8,12
  27:16,21,23,25
  28:2,23 30:10
  31:3,21,25 32:3,7
  32:10,14,17,20
  33:13 34:2,13
  35:4,6,25 36:2,20
  36:25 60:3 147:9
  148:8,9,11 149:4
  149:15 155:9,25
  156:3,7,9,13
  157:2,7 158:15
  159:1,16,21 160:9
  160:11,14,19,22
  163:4,8,10,14,18
  164:15,19,21,23
  167:24 168:1
  169:22 170:7,15
  171:4,9,13,17
  173:11,13,15
  174:21 176:16,18
  176:24 179:7,24
  180:22 181:15,20
  182:8 191:5,8,14
  191:18,24 230:25
  231:5,9,14,16,19
chaitman's  11:15
  17:20 18:2,17
chance  22:12
change  78:23
  79:23 170:3 172:4
  176:13 194:14

changed  38:9 62:1
  103:4 170:25
  176:10
changes  78:12
  100:21
characteristics
  109:4
characterize
  217:13
charge  6:21
charged  23:1
  26:17 216:3
charges  26:18
charities  138:5
charles  76:14
  79:16 103:18
chart  19:23,24,25
  20:18 89:25
  104:14 107:8,9
  123:11 125:7
  127:8 160:10,12
  164:4,8,15
charts  163:13
chase  81:23 84:19
  93:4,4 94:14,16
  94:20 152:20
  154:6 170:3
  171:24 172:4
  217:2
check  86:16
  103:19 162:1
  168:19,22,24
  169:5,14 173:7,7
  174:1,10,11 185:4
  185:4 188:17
  197:22,23 198:2,5
  198:6,7,7,11
  199:23,24 200:1,3
  200:4 204:11
  205:4,5,8,10
  208:23 209:19,22
  209:24 216:11,19
  216:22,23 217:3

218:4 219:10
220:22 221:1,1,4
222:3,4,6,11,12
222:15,16 228:1
228:20
checked  71:1
  88:22 160:13
checking  82:4,5,6
  82:16 85:17
checkmark  70:16
  70:19 71:9 74:1
checkmarks
  70:22 71:4
checks  84:9 88:13
  169:18,19,20
  173:20,21 174:6
  181:16,18 186:22
  186:24 187:15,22
  187:23 188:18,25
  189:3,8 217:11
  219:16,16 221:4
  222:24 226:23
  227:5,8,10
chicago  126:19
chief  40:14,15
  50:22
chip  132:25
chips  86:4
choke  165:17
chronicles  66:12
chronological
  185:5
chunk  140:24
circuit  35:7
cited  13:5
city  37:20
claimant  10:10,15
claims  24:23
clarification
  61:10 101:7
clarify  29:2 61:4
  67:1 107:20
  180:18

class   40:24
classes   41:23
classic   95:22
   125:12 144:6
   146:6
clawback   11:17
clean   29:12 55:3
   55:11 94:25
cleaned   29:14
clear   31:12 34:6
   51:20 58:12 65:16
   89:2 102:20
   111:19 126:15
   203:8 213:4
   220:12 224:5
cleared   127:17
clearer   10:20
clearing   76:25
   105:17 126:13,17
   126:23,25 129:17
clearly   25:3 41:7
clears   102:20
   103:7
clerk   5:2 180:4,17
client   13:12 85:1
   100:6,14,19,21
   103:3 108:7,16
   119:12,17 129:2
   134:10 137:20
   154:14 175:23
clients   37:24 40:6
   40:11,12 44:20,24
   44:25 48:21 61:20
   62:6,8,10,10
   83:23 88:3 94:14
   94:18 98:16 100:6
   100:6,23 101:25
   122:19 128:2
   129:7,14 132:22
   132:24 133:5,7,11
   134:9,16,17
   137:10,19,22,24
   138:4 143:13,13

162:20 174:23
   178:17
climbing   52:24
   55:21
close   14:12 37:4
   51:10 84:4 119:22
   124:23 135:24
   136:5 147:12
   179:4
closed   15:15
   181:12
closely   100:11
closer   191:5
closure   81:13
cmid   201:25
   207:4 219:3
coca   86:4
code   69:25 70:1
   78:16,23,24 79:1
   79:2,3,4 108:25
   112:14
coeditor   49:14,18
cohen   6:16
cola   86:4
cole   14:1 18:1,1,9
   19:11,21
collapse   39:10,24
   91:15
collapsed   146:5,6
collar   98:11 126:5
   136:1,22,24
colleague   13:16
collect   45:1
   166:21
collected   67:4,6
collection   20:1
   65:3,19 100:8
   156:4,10
collector   67:9,17
collects   86:17
   117:18
college   41:15,16

collura   28:17
   174:18 179:19
   180:8,11,11,13
   182:5,11 189:25
column   70:10,14
   70:15,18 71:10
   87:13,14 106:2
   114:17,19,21
   115:1,3,5,11
   117:15 130:19,19
   130:20,21 140:19
   201:25 202:3
   207:4,15 210:22
columns   70:8
   87:12,13 114:14
   115:24 201:24
   202:6,6,9,13,17
   202:19,20 207:2,7
   207:10,17 212:11
   212:14 218:25
   219:2,6,8,12,13
   219:17,21 223:16
combination   50:9
   57:19 69:20 70:2
combined   223:4
come   6:18 23:25
   24:1 46:4 62:12
   70:3 75:11 83:22
   84:6 85:11,23
   89:19 122:4
   135:24 141:12
   142:10 189:11,12
   189:16 194:4
   231:6,9,12
comes   69:6 82:18
   85:8 119:15
   138:13 219:6
coming   75:25
   81:11 83:7 84:3
   84:12,22,23 85:6
   88:24 92:9,16
   95:9 169:20
   210:23

comingled   161:16
commencement
   11:6
commercial   38:2
   38:2 44:8,9,16
   190:10
commission
   140:11
commit   23:1
   24:24
committed   143:4
committees   41:3
committing
   142:23
common   100:7,19
   132:25 143:15
commonly   204:18
communicate
   71:23
communication
   74:7
community   49:16
companies   42:10
   43:20 86:3,5,9
   100:9
company   40:5,23
   42:7,15 43:20,20
   47:4,13 49:17,18
   86:7 88:13 109:23
   139:3,7 140:3,22
compare   120:16
   159:6 208:9,10
compared   117:6
   118:22 119:21
   123:9 129:24,25
   162:15
compensation
   12:5 38:9
competence   52:12
   52:12
compile   184:23
complaint   21:24

**complete** 25:6 35:15 115:9 181:24 184:23 202:15
**compliance** 42:14
**comply** 17:10 58:17
**component** 74:10
**components** 46:20 67:15
**comprised** 190:8
**computations** 139:17
**compute** 67:7
**computed** 83:15
**computer** 47:2,4,5 47:8,11,14,16,17 47:21,22 48:2 54:20,21 55:1,3 55:10,25 58:20 59:24 64:19,21 65:3,20 66:24 67:2,2,13 68:17 69:25 78:21 80:5 80:10 84:21 108:21 109:5 111:10 112:4,14 112:18 146:10,11 163:4
**computerized** 103:5
**computers** 47:14 54:24 64:18,22 66:16 69:1 70:5 80:7,16
**computing** 44:4
**concept** 76:2 165:13 184:1
**concepts** 48:16 183:1
**concern** 139:10
**concerning** 18:10 95:7 129:11

143:21 144:18 146:17 203:9 230:6
**conclude** 58:6 107:16 112:20,25 127:15 143:1 144:4 205:25 206:10 211:9,18 215:5 217:6
**concluded** 94:23 144:8 159:13 176:4 188:12 231:21
**conclusion** 59:2 92:23 95:11,13 96:3,4,9 112:6 124:14 125:4,5 127:25 128:3 132:11 138:17 142:21 143:24 205:20 211:6 213:5 217:4 218:2 221:22
**conclusions** 10:17 46:17 53:15 57:14 57:23 58:3,24 59:9,12,15 61:11 61:15 95:7 146:10 146:13,17,22 200:21 203:9 206:6 211:15 230:6,19
**concur** 177:1
**conduct** 43:12 46:5 47:11 51:25 120:6 184:9
**conducted** 66:9 109:19 133:16 162:7
**conducting** 43:12 46:22 52:19 81:10 118:6

**confessed** 136:8
**confident** 214:5
**confirm** 77:11 94:19 100:25 107:23 133:16 214:20 221:24
**confirmation** 24:21 26:11 99:20 103:20 108:8
**confirmations** 26:11 54:10 137:20
**confirmed** 101:14 101:18 102:8 106:14 129:12 133:19 203:15 229:2
**confuse** 214:13
**confused** 155:6
**conjunction** 132:9
**connect** 65:10 95:17
**connected** 66:21 67:20 80:14 95:12 96:2 118:7 163:7 163:8
**connecticut** 8:13
**connecting** 77:2
**connection** 77:7 77:15 78:16 91:3
**connections** 66:3 67:5 68:1 76:20 76:24 77:14
**connectivity** 76:19
**consider** 11:23
**considered** 11:24 53:19 56:24 57:4 57:5
**consistent** 108:4 138:9 143:22 144:19 194:19 227:1

**consistently** 83:18 136:23
**consolidated** 9:8 9:12
**conspiracy** 23:1 24:24 26:9
**constitute** 65:21
**consultation** 10:24
**consulting** 37:18 37:19
**consuming** 10:18 62:14
**contact** 133:6
**contained** 59:9 69:16
**contains** 223:14
**contemporaneo...** 11:2 79:19
**contention** 142:22 143:25
**contest** 24:13
**context** 54:25 60:20
**contingency** 147:17
**contingent** 38:11
**continue** 26:10 47:13 113:16 115:21 139:6,8,10 179:21
**continuing** 13:22
**contracts** 100:20 133:2
**contradicted** 12:23
**contradicts** 8:8
**contrast** 130:6 136:8
**control** 40:13 53:4 89:20
**convenient** 124:2

**converges** 121:21
**conversely** 167:9
**conversion** 61:22
62:16,19 64:4
91:3 96:22 98:15
99:3 100:5,17,24
114:16 129:8
131:18 135:22
137:23 175:24
**convertible** 61:3,9
62:2,13 175:19,24
176:1 177:5
**convicted** 24:16
24:18,20 78:10
**convictions** 22:6
**convince** 17:14
166:5
**convinced** 19:13
**copies** 34:6 51:17
**copy** 36:15 38:17
38:24,25 51:12,12
51:14 77:12 93:17
93:23 163:11
198:1 199:22
200:6 204:11
208:23 209:19
220:22 221:14
**corner** 110:15
121:15,17 122:6
156:2
**corollary** 41:21
**corporate** 34:7
172:21 194:14
**corporation**
102:18 126:13,23
**corporations**
143:17
**correct** 23:5,17,17
35:4,4 48:9 57:13
72:6 78:17 85:7
85:10 96:15
109:17 111:22,24
114:6 128:7

149:17 150:7,12
151:24 152:4,17
152:21 154:1,3,5
154:7 155:21
156:25 161:2
164:3 165:24
168:17 170:12
176:3,9 177:18
179:5 191:22
196:14 210:1
214:2,4
**corrected** 25:11
79:18,19,25
**correcting** 169:22
**correction** 80:1
**correspondence**
183:15 184:14
200:6,25
**corresponding**
10:19 160:6
192:17 202:20
207:16 221:18
**cost** 119:16
**could've** 22:11
**couldn't** 56:16
149:13
**counsel** 10:25
25:3 26:7,21
39:20 51:16
180:15
**counsel's** 159:25
**count** 111:13,13
**counter** 17:18
117:16,17,22
118:6 177:7
**counterparties**
77:3
**counterparty**
71:20
**country** 233:21
**county** 44:10
**couple** 6:7 25:18
28:9 87:5 106:20

110:1 201:13
**coupled** 95:19
124:8
**course** 35:11
119:19 150:8
158:5 173:18
185:14
**courses** 47:14
**court** 1:1,14 5:3,6
5:8 6:15 7:1,9,12
7:21 8:15,24,25
9:14,25 10:17
11:9 12:14,18,25
13:3,21 14:16
15:4,8,17,19,21
16:5,8,11,14,20
16:25 17:4,6,8,19
17:21,24 18:18,20
19:8,13,15,19,22
19:23 20:4,7,9,22
20:24 21:3,6,11
21:25 22:12,16,19
23:23 24:4,14,18
25:13,16,20,22
26:1,23 27:5,7,9
27:13,20 28:3,5
28:11,13,21,25
29:6,10 30:9,11
31:2,7,15,17,23
32:1,6,9,12,16,19
32:22 33:4,11,15
33:18 34:1,3,12
34:14,22 35:5,10
35:18,24 36:3,8
36:13,16,18,22
37:4,10 38:21
39:9,12,22,25
40:2,20,22 41:10
44:2 47:19 50:21
51:16 52:5 53:18
58:7,10 59:23
60:2,4 77:25 81:1
81:4 87:2 90:3

93:13,15,18,23
94:1,4 104:7,12
113:4,6,8,11,16
114:1,6 118:25
138:12 143:3
147:7,25 148:7,10
148:12 149:2,7,14
155:7,22 156:1,6
156:8,11 158:11
158:13,16 159:5
159:15,20 160:1
160:10,12,16,21
163:12,17,22,25
164:22 167:16,20
167:24 168:2
169:2 172:25
173:9,12,14
174:17,22 176:14
176:17,21 177:4
177:15 178:21
179:9,11,14,17,20
179:23 180:1,5,9
180:12,16,21
181:1,6,11,18,24
182:6,9 189:21
191:7,11,16,20,25
196:6 197:11
199:11 203:25
216:9 224:16
225:2,11 230:23
231:2,6,10,12,15
231:17,20
**courtroom** 28:17
28:20,22,24
113:11 231:1
**cover** 131:21
137:18
**covered** 45:11
**cpa** 44:25 46:18
49:15
**cpas** 44:7
**crater** 97:25

crazy 157:8
create 74:18 92:1
92:18
created 62:18
110:24 111:6,11
111:15 112:24
126:5 137:22
201:20
creates 98:11
creating 63:15
credentialed
43:16
credentialing
45:25
credit 157:21
credited 86:18
158:2 167:21,23
168:3
credits 86:17
cremona 3:9 5:5
5:11,12 7:2,10,13
7:24 8:17 9:17
10:1 11:12 13:15
crime 24:22
criminal 17:3
21:16,20 22:6,6
24:15 26:16 27:17
39:12,13 46:15
78:10 175:16
crisis 75:25
criticism 177:11
cross 16:21,23
17:11,15 22:20,23
23:11,12,18,21
25:4,5 26:7,13,16
26:25 35:7 39:19
147:7,8
crossed 42:25
crunch 91:16
crush 91:11
crystal 89:2
cumulative 11:22

current 45:19
currently 37:17
curtain 80:3
cusip 110:11
130:5
cusips 130:6
custodial 227:17
custodian 30:21
30:23,24 31:13
32:24 33:3,6,7
102:21 103:12,17
104:20 106:7,8
209:4 210:4
224:21 225:7
custodian's 30:14
custodianing
103:8
custodied 105:12
custody 43:13
52:22 178:5
custom 77:24 78:9
78:20 79:9
customer 20:12
54:9 67:7 79:12
81:21,25 83:18
84:20 85:2,13,15
85:21,23 86:22
87:25 89:17 90:24
95:10,20,20 96:3
96:4 99:9,19
106:4,6 114:24
125:13 127:12
130:24 134:6
135:20 141:5,24
144:24 145:9,12
145:13,17 153:15
159:7,9 162:20
164:10 166:2
168:3,5 178:11
182:18 183:12,13
183:15,19,20,20
184:14,21 185:2,8
185:11,18,21,23

185:25 188:13
189:2,13,17,23
195:2,3,8,11,15
195:20,24 196:10
196:20,23 197:4
197:13,18,19
199:2,4,13,15,25
200:7,14,15,18,21
200:24,25 201:8
202:3,7,12,22,24
203:4,6,10,11,17
203:19 204:8,13
204:16,24 205:2,3
205:16 206:1,3,6
206:9,23,24 207:6
207:8,13,20,22,23
207:24 208:13,20
208:25 209:9,14
211:7,10,12,15,19
212:4,5,17,18,21
212:25 213:2,5,8
213:20 219:7,25
223:13
customer's 152:14
158:8 168:4
customers 12:23
18:12 83:9,9,10
83:10 85:6 86:22
87:16 89:6,11
92:17,17 93:3
95:8 96:17 122:21
125:10,14,17,18
127:16 128:4,12
130:7 131:7
132:14 133:23
137:6 140:25
141:3 142:24
145:17 146:1
152:15 153:15,24
155:1 161:24
162:17,21 164:2
165:21 166:6,11
166:15 182:19

184:16 185:6
186:13 188:14,19
189:1 190:3,3,4
194:19,20
customers' 95:10
cut 29:18 31:4
cuts 32:22
cv 29:17 34:18
38:17,24,25 49:5
50:1,13
cva 46:19
cw 173:7
cybercrimes
47:14
cycle 131:17

d

d 5:1 232:1
d.c. 42:16,22,24
daily 162:8
190:15
dallas 50:22
daly 4:10
damages 38:3,4,4
44:5
dark 41:3 105:4
data 47:5 59:11
67:4,6,20 73:20
110:22 115:10
117:15,18,20
120:13,14 122:3
122:12 123:21,22
134:8 142:5
184:20 186:5
database 56:19
date 103:18 105:1
105:10 110:15,24
111:3,11 114:17
114:18 147:10
156:15 157:11
175:6 192:18
199:24 202:4
207:9 209:25
219:5 233:25

**dated** 155:5
170:10 172:14
174:8 192:12
198:7 199:19,24
200:9 204:25
205:6,17 209:11
209:22 216:15
217:24 220:24
221:19 222:7
228:12
**dates** 107:24
**dating** 39:2 55:23
61:14
**david** 4:11
**davis** 4:5
**day** 6:13 47:18,20
72:16,21 73:18
86:18 98:2 114:22
115:4,12,13,25
116:3 118:19,21
119:7,11,16,19,21
120:4,15 178:11
192:10 198:14
210:25 228:18
**days** 18:25 23:11
23:12 39:15 65:5
71:24 72:21
102:22 116:13
179:4 210:24
227:18 228:17
**dbsi** 165:2,5
**deal** 5:8,15 17:21
26:1 27:3,14 28:6
31:9 62:9,11,23
121:24 177:4
**dealer** 63:10,16
64:20 65:24,24
66:17 105:16
117:12 126:14
**dealers** 88:14
**dealing** 13:22
44:1 45:7,24

**dealt** 21:12 31:10
**dean** 3:10 113:5,7
113:13
**debtor** 10:13 34:7
**debtors** 105:9
181:5,8
**decades** 143:3
**december** 61:17
94:11 106:4
110:25 129:23
133:8 135:7,8,16
138:25,25 139:22
139:23 140:23
141:13 142:14
144:13 145:18
170:10,18 171:5
171:10,14,19,19
172:14,15 187:6,7
187:18,18 194:10
194:22 195:5,5
196:10,11 220:1,2
225:19
**decent** 62:12
**decided** 6:14
**decision** 6:16,23
10:6,14 12:1
21:14
**decisions** 9:16
**declaration** 5:23
6:6,25 7:1,5 8:8
8:10 24:7
**declared** 88:22,23
**decreased** 149:25
**deep** 138:24
**deepens** 142:13
**deepest** 142:13
**deeply** 142:17
**defendant** 5:6 9:2
**defendant's** 7:3
7:19 13:24 29:25
30:1 217:16 218:1
219:18,23 221:9
222:9

**defendants** 1:11
2:12 5:22,25 8:6,7
8:12 9:9,18 14:5
22:7 24:12 28:19
30:18 60:12
182:23 214:15
**defense** 6:17,22
6:23 22:19 25:3
26:7 39:20
**defer** 147:23
**defined** 192:23
**definitely** 217:14
**definitions** 30:4,5
**defrauded** 137:24
**degree** 41:17,21
46:25 58:24
146:22 214:9
**degrees** 41:18
**delay** 13:13
**delete** 79:23
**deleted** 47:25
**demise** 23:17
**demonstrate** 8:18
**demonstrative**
80:23 121:4,7,12
123:15 180:15
182:24 188:11
190:23 191:12,15
208:17 211:8
213:13 214:7
215:1 216:7,23
220:18,20,22
221:11 222:2,21
224:15 225:10
227:20,22 229:20
**demonstratives**
216:15 224:23
**denote** 70:20
**denotes** 75:5
87:14
**denoting** 107:10
**department** 42:8
42:13,18 50:16

51:5 165:3
**depend** 26:23,24
**dependent** 38:13
**depending** 35:19
70:16 166:20
167:6
**depends** 5:18
**depicted** 24:21
**depicting** 173:24
**depiction** 17:14
**depictions** 16:8
**depicts** 83:3
**depose** 22:9
**deposed** 22:11
39:7
**deposit** 84:24
174:7 186:23
197:13,14 198:2,3
198:10,11,12,14
198:18,18 199:1,4
203:16,16,17,19
203:21,22 216:24
217:23 221:5,16
221:18,19 222:16
**deposited** 9:20
81:21 82:1 85:18
88:10 94:13 95:1
186:22,22 188:15
198:1 227:8
**deposition** 13:25
14:1,10,11,14,14
14:21 15:24 16:19
17:14,16 26:20
55:18
**depositions** 15:14
15:18 16:4,14
17:9 101:16
**depository** 102:18
103:6 109:23
**deposits** 40:11
90:24 96:3 185:10
186:13 188:14
189:13,17,22

195:12 197:3 203:4 208:2,5,6 212:24
**depth** 162:21
**derivative** 85:22
**derived** 78:5
**describe** 12:2 37:12 53:18,20 83:3 108:20 125:23 188:5
**described** 44:8 76:10 79:10 188:10 190:21 196:8 203:9
**describing** 69:24 114:13
**description** 70:12 70:13 192:13 202:5 207:10 210:25 219:6 228:14,18
**design** 12:12,15 12:16
**designated** 5:22 30:16 33:2,8
**designation** 33:23 43:10
**designations** 17:18,20 29:22 46:21
**designed** 11:25 63:22 64:1,2
**desk** 63:12 122:18 124:20 150:25 151:6 174:25
**detail** 52:7 53:12 53:17 64:5 84:15
**detailed** 187:1
**details** 214:25 216:7
**determination** 9:19 10:11 46:11 46:12,16 80:8

142:10 200:15
**determinations** 8:21
**determine** 52:1 60:21 62:1 80:6 81:20 83:4 102:5 128:10 129:10 138:24 161:17 195:10 199:1 226:7 227:16
**determined** 128:14
**determining** 11:17 152:12
**detour** 74:24
**developer** 48:4
**development** 42:15
**dg** 157:3
**diagraming** 69:22
**diagrams** 69:22
**didn't** 56:14,24 67:25,25 72:8 73:7 88:5 94:2 99:21
**died** 21:22 22:10
**difference** 14:18 15:22 67:13 172:23
**differences** 194:15
**different** 44:23 54:13,22 61:6,7 65:3 67:5 69:24 70:3 72:17,18 76:16 77:2 88:2,3 118:19 149:10 155:11 169:7 176:25 180:25 193:3 195:21 215:14 223:23 224:9,20

**differently** 67:3
**difficult** 62:14
**digging** 52:24
**digital** 77:1
**digits** 81:24 193:10
**dipascali** 2:8 14:25 17:12 21:21 21:23 22:4,10,21 26:2 29:22 132:15 134:12 174:24 175:12
**dipascali's** 14:19 22:14 23:6 101:8 101:11,15,21 102:5 132:20 133:16,25 138:2,9
**dips** 136:6
**direct** 8:3 19:15 37:7 113:17 144:7 153:13 166:24 182:11 190:2
**directed** 134:10 174:18 224:17 226:1,8
**direction** 101:24
**directly** 23:6 57:2 59:14 78:14 85:6 190:3,4,11
**director** 37:21
**disability** 148:17
**disagree** 158:3,4 168:7
**disappear** 80:2
**disbursement** 84:9 89:16,20
**disciplinary** 45:24
**discipline** 43:11
**disclosed** 11:21 18:2,24,24 19:1,2
**disclosure** 14:1 39:1

**disclosures** 25:8 25:17
**disconnected** 163:9
**discovery** 14:9,9 14:12 15:13,15 18:23,23 25:12 30:7 178:20
**discrepancy** 8:11 124:14
**discuss** 29:16,23 80:20 102:15 188:12
**discussed** 90:24 117:21 144:22 160:3 192:6 197:2 212:12
**discussion** 108:18 137:14 150:21
**discussions** 11:5
**display** 7:23
**disposition** 39:2
**disprove** 46:9
**dispute** 6:11 14:9 160:4 181:1,4,25
**disputed** 29:6 60:14
**disputes** 37:21 181:19
**distinction** 16:17 23:3 26:5
**distribute** 226:3
**distributed** 216:1 227:19
**distribution** 89:11 211:1,2 225:15 227:1,19 228:19 228:21 229:2,7,9
**distributions** 222:20 225:25 228:25
**district** 1:2 21:17 39:11,12 40:3,20

50:5,21
**dive** 136:10
**divided** 119:8
**dividend** 86:1,2,4
86:7,10,13 87:19
88:1,4,4 89:22
90:14
**dividends** 86:10
86:22 87:14,24
88:11,15,18,22
89:5,9 90:8,10
94:24 95:1,22
96:8
**division** 37:22
43:20
**document** 50:11
52:25 56:14 57:2
77:10,12 95:4
107:1,1 108:25
109:1,2,3 110:22
110:23,24 111:6
111:14,15 155:10
155:16 169:1
173:16 180:24
190:24,25 192:1,3
197:16,17,18,25
198:1,10,15,16,17
199:14,15,21,22
200:5,6 204:10,11
204:14,16,18
205:4,14,15,23
207:17 208:19,22
210:6,9 225:3,4
225:21 227:25
228:22,24
**documentation**
90:11 104:16
108:11
**documented**
120:9
**documenting**
53:14 129:15

**documents** 18:10
18:16 19:22 20:1
20:2,12,17,18,21
20:25 30:25 31:4
32:17 43:13 46:13
47:24 52:22 55:19
55:22,23,24 56:10
56:12,17,19 57:4
57:5,6,22,25
66:19,22 69:21
73:3,3 90:15
109:10,21 111:3
112:5,9 154:21,23
155:12 156:4,10
162:19 172:12
173:3,5,19 178:15
181:2 183:16
184:17,20 193:2,3
193:19 201:1,8,9
202:12 206:25
207:14 209:1,3,3
209:17 210:2,3,3
210:13 212:6,12
221:24 225:12,14
225:17 228:3
229:6
**doesn't** 79:2,14
**doing** 26:24 47:8
49:1 68:5 71:17
71:25 73:8,11
74:3 81:14 90:9
112:12 113:1
118:22 119:18,20
120:2,17 121:2
122:1,11 124:25
125:13 137:10,12
**dollar** 104:23,24
107:4 130:25
**dollars** 84:5 107:2
132:8 145:20
149:5 161:3
**domestic** 33:9

**don't** 57:24 58:7
58:10 66:13 73:8
73:12,12 74:2,13
74:21,22 75:19
78:6 79:1,8,16
80:25 81:5 82:5
90:17 91:13 98:23
**door** 76:2 108:14
**doorstep** 108:14
**double** 110:1
222:4
**doubles** 126:10
**dow** 18:4 19:7
135:9 136:12
137:1
**download** 77:10
**downside** 97:23
98:6,13 126:7,7
**dozens** 39:7,7,8
109:21
**dr** 198:6 216:25
217:7 222:17
**drill** 174:4,19
**drive** 47:19
**driving** 157:8
**drove** 121:3
**dtc** 56:7 102:15
102:17,19 103:6
103:14,16,17,21
104:1,16 105:11
105:12,14,16,17
105:21,21,22
106:10,11,16,17
106:21 107:1,15
107:24 108:1,18
109:11 110:4,9
111:16,25 112:4
112:10,15,16,17
112:20,23,24
126:24 127:2
129:15,19,25
130:4,6,9,10
131:23 177:17

178:2,2 181:6
**dtcc** 102:18
**dually** 43:6
**dubinsky** 28:18
36:6,7,12 37:3,7,9
37:11 38:6,22
51:16 59:18 60:6
60:9 82:24 93:21
104:10,13 113:17
113:19 142:20
147:4,8,10 149:9
159:10 163:24
166:9 169:10
173:3,18 174:14
179:13 181:23
**dubinsky's** 29:17
34:18
**due** 52:11,15
**duff** 37:19,21,22
38:6,9,12 42:4,22
42:24 43:1 150:1
**duplicative** 11:14
12:12
**duties** 37:23,24
**dx** 154:19 155:14
156:3,9,12,13
157:3,4,18 172:13
174:7
**dxbg** 156:3
**dxd** 170:7
**dxe** 170:7,8

e

**e** 1:21,21 3:1,1,12
5:1,1 232:1 233:1
**earlier** 48:7 66:23
76:10 78:24 115:8
126:24 127:8
171:1 216:15
222:21 231:6
**early** 60:25 62:3
133:8
**earn** 82:17 85:15
86:5 97:20 134:4

earned 83:14 92:9
94:15 165:21
166:11,25 190:8
earning 83:19
86:2
earnings 85:22
ease 36:14 150:21
easier 31:15 32:1
32:4 57:3 112:25
112:25 191:9
201:20
easiest 108:20
easy 115:17
ecf 10:8 12:1
economic 38:4
44:4 165:15
ecro 1:25
edit 29:18
educated 46:16
educating 39:15
education 42:2
43:10,18 45:6,25
47:14 57:19 59:6
147:1
effect 6:14 8:23
efficiency 82:7
efficiently 74:18
efforts 150:10
eight 23:11 79:21
151:6,7,8,22,23
153:4,23 166:13
175:9 177:21
178:7,9 226:20
either 14:18 35:21
38:3 46:9 70:11
70:16 83:9 86:7
91:10 101:14
111:4 128:14
152:3,19 165:2
177:10 183:16
185:10 190:6
202:13 207:11

election 41:11
electronic 54:24
54:25 67:24
element 102:11
128:5 137:6
elements 144:24
elicit 25:4,5
elicited 159:17
eliminate 164:12
eliminated 90:9
140:16
elimination 130:8
else's 101:15
emails 55:17
embedded 108:25
109:9
embodied 48:16
emeritus 45:20
employ 99:15
employed 37:17
37:18 42:3 61:2
124:19,21 151:12
employee 158:6
158:18,22
employees 2:5
25:10,19 38:13
54:17 168:15,15
employment
54:15
enable 92:19
enabled 78:9,9,17
78:23
ended 18:23
119:16 122:14
endorsed 216:23
222:16
endorsement
221:5
ends 157:4,18
192:14
enforcement 47:7
engagement
182:16

engine 47:20 74:5
74:6
enter 67:20,24
entering 78:13
entire 24:10 87:17
106:19 115:15,16
116:3,6,11,13,17
116:20,22 118:21
120:14 171:23
entities 51:1
entitled 9:11
168:5 176:21
entity 139:14
140:15 194:7,14
224:20 225:23
entries 157:14
159:7
entry 65:8 71:16
103:6 160:6
environment
79:13
equal 162:8
equation 119:2,5
equities 23:6,7
64:3 87:25 103:7
105:17 106:17
115:16 117:8,19
127:10 129:18
130:1
equity 23:3 26:6
86:3 102:20
104:18,23 106:16
107:16 128:16
139:4,5,7 149:11
178:3
equivalent 97:3
erase 79:17
eric 111:8,11,13
errors 176:19
essence 131:8
143:12
essentially 9:5

establish 31:8
established
126:16
estate 42:15 165:3
et 1:10
evade 51:2
evaluate 66:24
120:1
evaluations 38:3
evaporated 90:16
event 153:22
events 35:11
eventually 28:12
40:13
everybody 91:13
91:14 131:21
157:8
evidence 15:25
17:3 20:2 26:14
29:4 30:8,12,25
32:25 33:10,20
34:4,11,15 35:15
52:2,3 70:17,20
72:8 80:9 89:3,8
91:5 92:16 95:18
105:10 125:19
130:12 132:9,13
143:3 144:22
162:10 165:20
173:10 176:20
181:12,24 183:14
183:14
evidencing 104:1
104:21 106:8,12
107:1
exact 55:4,11
105:10 158:7
196:9
exactly 32:14
53:12 135:25
146:9
examination
23:11,12 35:8

37:7 43:15,19,24
44:22 45:6,18
46:7 48:13,17
69:24 113:17
147:7,8 153:13
182:11
**examinations**
47:12 59:24
**examine**  16:21,24
17:11,15 22:21,24
26:7,13,16,25
60:15,17
**examined**  23:18
23:22 39:19 78:4
78:24 84:2
**examiner**  43:9
45:17 48:4 49:25
50:4 59:19
**examiners**  45:16
46:2 55:25 58:21
146:19
**examining**  25:4,5
43:12 45:18
**example**  22:22
95:22 109:18,21
154:21 162:12
181:16 182:2
192:9 197:12,22
199:12 216:10
222:4,5,5,7
223:17 227:22
**examples**  59:14
111:25 160:18
**exceed**  116:16,20
118:4 139:4
**exceeded**  115:11
115:15 116:4,10
116:11,14,19
117:2
**excess**  116:6
**exchange**  97:19
126:19,20 162:9
176:2,7,12

**exchanges**  118:1
**exclude**  2:11 5:21
9:15,22 21:7
232:6
**excluded**  6:2 7:17
8:22 40:17 41:8
41:13
**exclusively**  161:5
161:23,25
**excuse**  23:12
30:22 157:4,7
169:19 188:18
**execute**  66:5,18
68:1 76:3 99:21
**executed**  73:24
80:10 119:24
125:2 134:7
137:18
**executing**  61:20
121:18
**execution**  75:15
77:2
**exemption**  178:22
178:25 179:3
**exercise**  97:18
127:2,2 167:14
**exhibit**  7:2,4,19
24:7 29:17,21
30:12,20,20,22
33:1,5,7,19,22
34:4,6,9,15,18
38:16 51:7 54:3
69:5,10,15 70:4,7
70:9 71:5,10
72:10 74:5 75:1
77:23,24 79:8
80:24 81:7,8,16
82:24 83:3 84:17
85:24 86:25 87:12
89:24,25 93:10
94:3 99:25 101:8
101:20 104:4,22
107:6,19,25

111:20,23 113:23
113:24 114:2,9,14
115:23 116:12,25
117:16 119:3
121:7 123:15
128:20 130:13
132:19 134:1,18
134:20,25 137:4
137:16 138:1
139:18,19,21
141:9,15,18,19,20
142:6,7 143:7
144:9 154:19
155:8,14 156:6,8
156:9 157:3,9
163:5,11,15
164:16 182:24
183:9 184:1 188:3
188:6,11,11 191:9
191:12,15,21,21
191:22 193:1
194:5 196:5,7,12
196:19 197:11,12
199:10,12 201:6
201:10,12,16,17
201:17,19,19,19
201:23 202:21,23
203:2,23,25 204:1
204:4 205:21,21
205:23 206:15,19
206:20,22 207:19
207:25 208:18
211:8,24 212:2,9
212:15,16,20,23
213:13,14 215:1
216:8 217:11
218:15,18,18,19
218:21 219:1
220:4,18,20
221:11 222:3
223:4,6,7,10,19
223:21,25 224:15
224:17 225:10

226:12,13,15
**exhibits**  2:12 7:23
29:2,3,6,11,19,20
29:24 30:6 31:13
31:17,18 34:8,24
36:16,19,21
109:13 160:13
163:10,12 180:14
180:15,20,23
201:6,18,21 212:8
212:13 214:6
219:3
**exist**  7:13 73:7
89:1 103:9 131:10
178:7
**existed**  70:21
**existing**  83:10
164:25
**expand**  21:13
42:23
**expect**  45:24 71:1
78:8 122:11 123:4
127:19
**expected**  125:1
**expense**  6:19
**experience**  48:10
48:21 57:20 147:2
164:24 165:7
**experienced**
38:15
**expert**  11:14 18:7
18:14,15 19:3,4,5
31:24 32:11,12
35:2,2 36:15
38:11,16 39:3,5,8
39:25 40:4,17
41:1 50:17 51:14
53:23 59:18,21
69:16 81:8 148:21
159:18 182:5
**expertise**  46:18
47:2 52:13 59:7
230:14

[experts - firm]                                                                        Page 22

**experts**  10:25
  11:1,20 28:18
  32:13 56:1
**expiration**  97:10
**explain**  12:20
  46:5 48:6 53:12
  54:12 55:7,15
  64:5 67:3 71:5
  77:24 80:24 158:6
  158:18 182:25
  183:11 186:10
  192:8
**explains**  177:9
**explanation**
  212:12
**explicitly**  15:5
**explorer**  48:1
**exposure**  11:17
**expressly**  25:9
**extend**  47:2
**extent**  9:3 21:14
  32:14 35:7 166:6
  167:10,21
**external**  112:4
**extra**  78:7 134:16
  180:16
**exxon**  65:6 74:12
  86:12,12 97:10,11
  97:14,15,24 98:1
  98:2 103:19
  119:13,15
**eyes**  56:20

**f**

**f**  1:21 233:1
**face**  6:7 109:22
  115:22
**faced**  62:8
**facilitate**  65:4
  67:11 68:5 76:16
  77:16,18 78:12
  88:13
**fact**  6:5,11 11:23
  18:6,23 19:1,3

46:11 56:13 65:25
  66:18 70:20 84:13
  88:8,23 90:20
  100:22 102:1
  103:8 111:6,12,15
  124:21 129:6
  133:9 137:18
  143:2 144:5
  150:22 162:11
  165:13 166:9
  168:3 172:13
  173:6 174:8
  175:12,25 177:5
  177:19 178:14
  226:7
**facto**  175:7
  177:10
**factored**  101:11
  101:13 128:10
**facts**  24:25 25:2
  59:11
**factual**  11:16,17
  24:23 26:17
  150:15
**fair**  17:19 162:24
  203:2 207:25
  212:23 220:6
  223:25
**fairly**  43:9 47:10
**fake**  23:9 99:18
  111:25 112:17,20
  112:24 133:13
**faked**  23:9
**fall**  97:25
**falls**  97:20
**false**  12:6 26:10
  26:11,12 137:20
  143:18
**falsely**  24:21
**falsifying**  152:10
**familiar**  118:13
  150:8 178:22
  192:20

**fancy**  119:5
**far**  55:2,9 56:11
  131:24 172:15
  181:8 204:15
  209:1,3 210:13
**farm**  40:23 41:2
**fashioned**  163:19
**fast**  42:14
**fear**  91:12
**february**  170:16
**federal**  9:5 34:11
  47:7 50:8 57:4
  75:11
**fee**  44:14 45:1,2
  228:20
**feel**  51:17
**fees**  216:2 229:18
  229:23,24
**felt**  176:5
**fever**  227:17
**fictitious**  133:13
  134:8
**field**  200:3
**fields**  58:25
  146:23
**fifth**  115:4
**figure**  81:3,8
  82:25 104:8
  109:20 110:21
  111:1,2,5,19,20
  134:18 163:16,23
  164:21
**figured**  86:13
**figures**  109:15
**file**  48:1 77:8
  84:21 109:5,9
  134:4 187:1 200:7
  201:8 204:17,19
  205:16
**filed**  31:5 50:20
**files**  55:17 183:15
  184:14,15 200:25
  202:12 206:24

207:13 212:5
**filled**  75:8
**final**  22:7
**finally**  34:5
  204:14 208:4
  219:17 224:12
  227:15
**finance**  43:22
**financial**  37:19,25
  42:10 43:23,25
  44:1,6 46:3 59:20
  59:22 75:25
  118:14 119:25
  162:25 163:3
  177:20
**financials**  140:12
**financing**  91:7,24
  164:12
**find**  32:18 60:24
  61:13 71:2 72:8
  88:23 91:8 106:18
  109:6,10 111:25
  122:7 123:18
  141:7 143:4
  150:15 153:14
  155:10,12 163:14
  185:21 217:20
  224:5
**finding**  57:2 84:11
  129:12 137:4
  138:10
**findings**  53:18
  101:14 133:19
  143:22 144:19
  213:11
**fine**  20:20 21:1
  50:12 58:9 191:20
  203:24
**finish**  18:21 20:7
**fire**  98:8
**firm**  18:2,3 37:18
  37:19 42:18,20,20
  48:20 62:4,9 65:9

65:16,17 79:14
86:16,17 108:13
124:21 132:23
147:10 148:18
149:3,12,16
150:24,25
**firm's** 148:22
149:10
**firms** 42:6 44:23
71:17 149:11
159:7 162:15,25
163:3 166:13
**first** 5:9,15 6:9 8:1
28:8 36:3 39:2
40:4 43:4 47:8
58:7 64:22 87:16
94:9 102:11,11
114:23 118:1
121:11 126:13
129:22 130:19,25
141:8 148:24
158:21 165:4,4
172:1 188:5,15
201:25 207:4
209:19 210:6,21
215:25 219:2
220:25 228:7
**firsthand** 12:11
**fiserv** 33:5 209:4
210:4,14 212:7
216:1 224:20
225:16,23 227:9
227:12 229:3
**five** 39:20 72:21
117:15 130:14,16
145:20,21 157:14
**fix** 74:5,6,15
**fixed** 140:20
**flag** 121:1
**flagged** 52:25
**flavor** 55:19
**flip** 70:25 74:4
117:3

**floor** 63:5
**flow** 63:15 183:25
184:2 188:13
192:5 214:14,22
227:4 228:23
230:8
**flowing** 95:7
**fluctuate** 149:10
**flying** 103:23
**focus** 105:1
141:23 182:17
**focused** 7:10
49:21 164:13
**follow** 46:23
51:21 56:17 81:11
88:7 214:14
**following** 184:2
**footnote** 57:2 77:6
117:24 141:25
177:9
**footnoted** 57:18
**footnotes** 57:1,9
**force** 98:5
**ford** 117:12
**foregoing** 233:3
**foremost** 6:9
**forensic** 13:6
37:13 39:4 46:3
50:6,14 55:24,25
58:21 59:20,24
109:7,7 146:11,14
146:19 182:5,7
185:14 186:8
196:2 230:4
**forensically** 48:5
**forensics** 43:23,25
44:1,6 47:2,4,5,6
47:8,11,16,17,21
55:1,25 58:20
59:22,25
**foresee** 98:17
**forever** 66:14

**forget** 14:20 40:14
**form** 57:20 74:18
112:14 189:8
197:23 227:19
228:24,24 229:7
**formal** 42:2
**format** 54:25
**formation** 172:11
**formed** 170:4,11
174:8
**former** 25:10 41:9
44:19 47:7 158:18
**formerly** 93:4
**formula** 118:17
122:13
**fort** 59:11
**forth** 11:15 19:5
24:8 65:18 74:9
139:24 142:7
190:7
**forty** 134:21
**forward** 42:14
**found** 44:13 52:2
52:2 56:8,10
66:19,21 67:15
69:13,14,21,23
70:16 77:25 105:5
105:10 109:19,21
110:23 112:5,8
120:7,13 121:5
130:1 198:2 200:7
205:15
**four** 69:18 70:25
157:14 207:7
**fourth** 70:18
115:2 130:21
**frack** 2:8
**frank** 21:21
174:24
**frankfurt** 117:23
117:25
**fraud** 14:6 22:15
23:1,2,19 24:23

24:24 37:14 39:5
39:16 43:9,12,15
43:24,25 44:4
45:16,17,18 46:2
46:7,8,10,10,11
49:25 50:7,20
52:2 55:16 58:13
58:14,21 59:19,24
60:14,16,17 61:16
62:15 73:11 101:6
142:23 143:2,4,22
144:1 146:19
**fraudulent** 50:25
60:13 176:5
**free** 51:17
**frequency** 76:1
**frequently** 50:16
**friday** 179:21
**front** 76:1 159:11
216:18 218:19
220:25 221:1
**frontend** 75:23
**fti** 13:1,7,11
184:23,25
**ftp** 77:7
**fulfilling** 95:25
**full** 56:18 187:3
**functionality**
70:13
**functioning** 75:16
**fund** 152:22,23
160:25
**funded** 90:24
188:20,23 189:9
**funding** 145:14
146:17 192:11,13
**funds** 80:18,20,24
92:7,23 94:12,13
94:18 95:7 96:7
100:7,14,19 129:2
133:5 138:5
145:11 152:20
153:15 164:9

183:25 184:3
186:8 188:13
189:23 190:1
192:6 214:14,19
214:20,22 226:3,4
227:4,17 228:23
229:13 230:2,8
**funneled** 117:19
140:4,8
**funneling** 152:8
**further** 8:11
53:17 67:11
137:18 147:5
179:7 216:1
217:21 218:5
221:24 227:11
230:21

**g**

**g** 5:1 157:3
**gains** 6:1 7:6,6,14
9:3,4 84:12,13
**gamut** 45:25
**gauge** 118:21
**ge** 86:4 88:5
114:21 116:7,7
**general** 52:9 53:8
53:13 55:17,19
164:6
**generally** 53:20
58:15 148:22
230:16
**generated** 145:7
**generator** 78:22
**genius** 62:21
**george** 157:3
**georgetown** 41:20
**getting** 16:22 29:8
34:19 40:10 54:16
54:19 69:8 86:13
126:9 133:2
141:19 148:25
149:4

**ghost** 54:17
**giant** 67:23,24
99:19
**give** 36:11 81:13
93:18 152:7 180:7
**given** 77:9 97:15
149:25 160:19
**gives** 98:12
118:21
**giving** 97:19
119:9
**global** 194:24
195:1,7 197:2
230:6
**go** 18:20 19:15
20:24 24:11 26:2
29:7,14,19 37:6
41:15 46:14 47:18
53:6,11 56:15,16
58:9 62:16 65:8
67:25 69:9 72:16
74:24 77:9 78:15
78:23 79:6,11,14
79:15,16,20,22
80:2 86:19,19
87:17 88:6 89:18
92:19 98:22 109:6
110:6,9 111:2
112:13,25 115:17
117:12 120:20
123:25 128:17
148:5 151:5,5,10
154:20 155:16
157:8,17 159:2,22
165:19 167:17
170:8,17 171:4,9
171:13,17 176:24
179:17 180:1
182:4,9 194:23
207:2 216:6 227:7
**goal** 137:8
**goes** 23:6,9 43:14
56:22 65:18 75:8

76:12 82:18 97:11
98:3 102:19 109:8
116:12 135:17
136:4,14 165:18
**going** 9:15 10:2
11:21 13:9,15,16
13:17 16:4 17:8
18:15,16 19:21
20:5,24 21:12,25
28:13 39:15 41:1
41:10 42:9 48:22
49:7 53:16 58:8
63:17 64:10,19
66:6 72:10 74:9
74:22 75:15 79:3
83:5,7,8,16,23
85:4 89:22 90:13
91:5 92:10,17
93:11 94:24 95:23
95:24 97:13,25
111:12 120:21
121:14 125:7,9
126:9,15 134:15
136:9,15 137:9,9
137:13 139:10
141:1 143:2,5
155:11,17 159:2,3
160:2 165:17
167:15,18 170:8
176:1 181:25
182:1 187:5
229:14 231:17
**gold** 92:11,13
**goldman** 63:12
**good** 5:5 13:19
29:13 35:12 36:7
36:8 60:10 97:13
107:7 113:4
120:16 121:22,24
157:2 163:5
180:19 182:13
231:2

**gordon** 37:11
**gotten** 17:4 146:4
**governed** 46:6
52:10
**government** 22:5
47:8 50:15 100:15
129:3 133:3
**governmental**
2:13
**graduated** 41:17
41:20 42:1
**grant** 9:21 42:7,8
**granted** 10:14
12:10 21:7 232:7
**graphic** 81:9
**graphical** 135:2
**graphically**
107:11
**gray** 107:13
**great** 37:3 38:23
53:17 183:8
**green** 1:15 135:14
136:9
**greenbelt** 40:3
**greenblatt** 28:18
174:19
**gross** 229:7
**grossly** 142:17
**grounds** 15:1,3
**group** 30:3,13
72:23
**guaranteed** 124:5
**guess** 16:3 21:6
22:22 23:23,23
24:24 53:23 56:22
85:24 160:1,7
163:9 180:18
**guide** 188:12
**guilty** 22:5
**gx** 157:3
**gym** 69:9
**gz** 157:4,18

| h | | | |
|---|---|---|---|

**h**  1:6
**half**  38:1,1 49:18
  111:1
**halfway**  116:6
**hallmarks**  144:6
**hand**  26:8 36:9
  121:15 122:5
  140:16,16 156:2
  180:5 192:12,16
  193:16 210:10
  225:14
**handle**  13:17
  72:15
**handled**  175:9
**handling**  42:18
  46:1 194:16
**hands**  103:24
**handwritten**
  225:22
**happen**  66:5 79:6
  137:2 175:21
**happened**  12:17
  101:6 127:23
  145:25 146:8,9
  158:19 167:7
**happening**  76:4
  101:5 125:14
**happens**  122:3
  136:16
**happy**  93:12
**harass**  11:25
  12:13,16
**harcourt**  49:17
**hard**  170:8
**hate**  140:6
**he'll**  157:8 180:17
**headquartered**
  37:20
**hear**  19:20 149:13
**heard**  35:25 75:24
**hearing**  2:1,3,7,11
  2:16

**hearsay**  31:9
  32:12 182:2
**hedge**  100:18
**hedged**  132:23
**hedging**  132:16
  133:1
**held**  10:15 30:18
  81:18 103:5
  104:25 105:7
  107:17 129:23
  130:4,6 167:8
  169:8 178:5
  182:23 197:6,21
  203:14 209:5
  210:5,8 213:18
  214:15 215:9,15
  215:15,18,19
  216:16 217:1,7,19
  218:23,24 222:19
  223:23,24 224:10
  224:11,18,21,21
  225:6,7,13 227:8
  227:11 228:6
**helen**  4:5
**hello**  182:14
**help**  74:18 80:23
  182:25 184:1
  195:10
**helped**  198:25
**helpful**  48:21
  141:7
**helps**  86:11
**here's**  90:12,13
**he's**  59:18 60:4
**high**  42:1 44:24
  72:20 75:25
  118:24 119:16
  122:5 124:4,19
  136:23
**highlight**  115:18
  217:1
**highlighted**  105:4
  110:14 209:16

**highly**  116:23
**hindsight**  134:4
**hired**  13:1 37:13
  37:24 39:13 46:8
  50:16 165:2
**historical**  60:20
  66:13 134:5 175:7
**historically**  82:6
**history**  75:15 86:9
**hit**  124:25 126:9
**hitting**  123:2
**hmm**  107:7
**hoang**  3:11 13:17
  13:19,19,22 14:23
  15:12,18,20 16:1
  16:7,10 17:7,17
  17:20,23 18:1,19
  18:22 19:9,14,17
  21:8,19 22:2,13
  22:18 23:5 24:3,6
  25:25 27:15,19,22
  27:24 28:1,4
**hold**  86:8 107:18
  107:18 155:9,10
**holder**  97:11,15
  192:20,23,24
  193:12,23,24
  194:7,11 210:15
  214:16 219:15
**holders**  88:24
  182:23
**holding**  86:16
**holdings**  129:24
  129:24,25
**home**  123:2 126:9
  226:5
**hon**  1:22
**hone**  81:12
**honor**  5:5,11,14
  5:17 6:12,16,24
  7:18,24 8:3,21 9:2
  9:7 10:1,5,14,20
  11:8,23 12:6,9,15

13:15,19 14:8,10
  14:23,24 15:4,12
  15:15 16:1 17:7
  17:17 18:14 19:10
  21:9,19 22:3 23:5
  24:3,6,15 25:25
  27:15 28:4,9 29:1
  31:4,12 33:17,25
  34:16,21 35:12
  36:5,7,14 38:2,20
  39:11 40:2,19
  41:19 42:5 43:4,9
  43:14,18,24 44:8
  44:17 45:4,15
  46:12,14,20 47:3
  47:17 48:12 49:5
  49:8,14 51:14
  53:12,22,23 54:8
  56:24 57:17 59:10
  59:17 60:5,6
  61:22 63:2 65:2
  65:14 66:10 67:14
  68:19 69:16 70:10
  73:6 75:4 76:11
  77:8 78:1 79:10
  80:9 81:2 82:3
  83:4 86:2 87:21
  88:17 91:10 96:23
  97:24 104:10
  105:3,13 106:1
  107:8,23 108:21
  109:1,20,25
  110:14 112:8
  113:5,13 114:4
  115:8,18 127:8
  128:13 135:14
  136:8 138:21
  139:20 140:4
  141:8 142:4,12
  144:12 146:7
  147:23 148:25
  153:8 158:9
  159:17,25 160:23

163:11,24 167:13
168:25 169:10,20
172:20 174:6,14
177:1 179:8,10,13
180:14,23 181:5
182:10 204:1
**honors** 42:1
**hood** 47:20,22
**hooked** 73:4
**hope** 12:7
**hopefully** 47:19
**hostetler** 3:3,15
5:12
**hour** 38:12 231:18
**hours** 110:16
**house** 63:4,19
81:5 86:1 126:17
129:17
**housekeeping**
28:10 29:16 33:16
**houser** 50:23
**houses** 76:14
153:9 161:12
**houston** 3:18
**huge** 83:20 158:1
159:1 162:4,4
**hundred** 106:21
180:24 188:20,23
189:9 200:23
202:23 213:24
214:1,3 215:13
**hundreds** 101:25
151:16 161:3,3
**hunt** 3:10 5:7 28:7
28:9,12,15 29:1,8
29:11 30:13 31:12
31:16 32:21,23
33:5,16,21 34:5
34:16 35:12,21
36:5,14,17,19,21
36:24 37:1,8
38:20 58:8 59:17
60:5,7,10 81:2,5

90:5 93:14,16,20
93:24 94:3,5
104:8 113:18
114:2,7 148:25
155:17,24 158:9
159:25 163:7,9,16
163:23 164:18,20
167:13,18 168:25
169:20 172:20
174:14 177:1
178:18,20 179:10
179:15,19,22
180:14,18 181:4,8
181:21 182:4,10
182:12 189:24
191:10,12,15
204:1
**hw** 174:7
**hyde** 2:25 233:3,8
**hypothetical** 27:1

## i

**ia** 23:13 55:6,14
67:16 68:4 70:18
71:12 72:3,7,8
73:6,13 74:1,21
75:17,18 76:18
77:5 78:3,4 80:10
81:12 82:1 87:15
88:20 89:15,23
90:7 91:5,25 92:2
92:5 93:3 106:3
107:20 110:5
114:21 115:3,14
115:23 116:7,11
117:5 122:20,21
122:23,24,25
124:1 125:2,8,9
125:18 127:14,16
127:21 128:4
129:25 130:7,11
130:20,22,23
131:6,13,17,20
132:14 135:15

136:4 139:25
140:4,8,13,14,25
142:2 145:9,14
151:20 152:9,25
164:11,13 178:6
182:19 184:16
186:12
**ibm** 67:2 78:22
**idaho** 165:4
**idea** 231:2
**identical** 10:6,9
55:2,10
**identified** 21:23
85:25 129:22,22
132:10 186:6
**identifier** 195:20
202:1 207:5
**identifies** 190:14
228:25
**identify** 25:13
28:19 51:20 70:1
70:12 81:7 87:2
90:21 121:14
130:14 135:5
160:13 190:24
191:4 192:1 193:2
193:12,23 196:6
197:11,17 199:10
201:16 202:10
204:14 207:11,17
208:19 216:8
217:12 220:19
224:16 225:11
227:21
**identifying**
195:21 224:24
**idle** 82:15
**illegal** 152:6,8,12
**illegitimacy** 23:13
**illinois** 40:20,23
41:10,11
**imagination** 77:13

**imagine** 77:1
**immaterial** 10:18
**impeaching** 8:16
**implemented**
101:2,4
**important** 11:13
30:16 46:21 48:24
48:25 74:10 75:4
75:6 76:7 79:1
84:11 105:13
110:12 116:14
119:11
**importantly** 11:8
**impossibility**
116:23
**improperly**
161:20
**inaccuracies**
150:15
**inaccurate** 6:7
7:16
**inadmissibility**
15:1
**inbound** 164:11
**inception** 12:21
**include** 59:14
80:23 116:25
117:16 194:2
**included** 30:3
49:7 99:3,9 154:2
183:14 184:14
187:2 198:12
218:11 219:22
222:22 228:8
**includes** 7:6
198:19 201:10
212:4 223:12
**including** 23:19
23:19 75:14
185:10 220:1
**income** 90:21
92:14,14 165:21

**incoming**  92:7
  164:9,11
**incorporated**
  110:12
**incorporation**
  34:9
**increase**  210:21
**increased**  147:18
  147:20 148:20
  149:24
**increases**  86:6
**independent**  7:17
  8:18
**index**  97:1,2,3,4
  100:8,12 126:3,4
  135:23 136:20
**indexes**  135:12
**indicate**  8:9 164:4
  207:12
**indicated**  5:14
  80:1 115:14
  145:19 155:18
  217:9
**indicates**  8:11
  210:11 225:24
  228:15
**indication**  120:25
  124:7
**indictment**  22:4
**indiscernible**  6:22
  7:15 21:13 24:8
  27:17 30:15 36:19
  36:21,24 37:1
  41:9 81:22 93:19
  110:20 113:7
  155:20 220:6
**indisputably**
  158:7
**individual**  72:18
  137:24 143:14
  172:6 174:15,19
  210:5 220:17
  224:18 225:13

**individually**
  169:8 203:15
**individuals**  15:6
  44:24 50:8 51:2
  138:5
**induce**  26:9
**industrial**  135:9
**industry**  118:14
  118:15 120:5
  123:2
**inflow**  227:13
  228:13
**inflows**  228:11
**information**  15:10
  31:24 47:24 55:20
  66:22 67:9,18
  69:19,20 70:3
  74:8 78:13 84:16
  84:20 90:18 104:5
  104:15 115:8
  120:6,12 135:5,6
  135:6,8,10 141:22
  147:24 160:23
  175:7,7 184:23
  186:7 187:2 201:7
  202:6,7,11 203:1
  203:3 205:10
  206:22 207:7,13
  208:1 210:18
  212:2,8,19,24
  216:19,21 219:8
  219:21,22 220:7
  220:10 222:10,12
  223:13 224:1,14
**informed**  225:6
**infrastructure**
  69:22,22
**infusions**  142:1
**initial**  25:8,17
**initiate**  65:7
**initiated**  71:21,22
**inquiry**  10:16
  11:15 109:23

  110:10,11
**insane**  52:23
**inside**  65:9 66:19
**insolent**  142:11
**insolvency**  138:24
  138:24 142:13
**insolvent**  37:15
  52:4 141:12,14
  142:12,16,17,17
  142:17,18
**instance**  87:23
  88:9 115:17 122:4
  136:9 202:18
**instances**  117:1
**instant**  74:6
**institute**  41:6 44:7
**institution**  219:14
**institutional**
  162:20
**institutions**  138:4
  177:20
**instruments**  74:21
**insurance**  40:23
  97:24 98:7,8,8
  148:17,17
**intend**  25:10
  28:14,16 29:15
**intent**  60:13 173:4
**inter**  140:3
**interaction**
  190:20
**interest**  25:4 82:6
  85:16 90:23
  166:11,17,18,21
  166:22,25 167:5,7
  190:8
**interested**  53:1
**interestingly**
  73:22
**interface**  76:8
**intermittently**
  100:14 129:1

**internal**  31:6 42:6
  66:20 69:21
  109:19 112:5
**internally**  109:10
  112:1
**international**  13:5
  37:18
**internationally**
  45:9,22
**internet**  77:7,14
  77:15,18
**interrogations**
  43:13
**interrogatories**
  29:25 30:1,3
**intervals**  118:19
  119:19
**interviewing**
  111:9
**interviews**  43:12
**introduction**
  158:16
**invest**  26:9,10
  86:8 143:15
  152:19
**invested**  85:14
  92:11 94:12 100:7
  100:23 129:7
  133:5 137:25
  165:23,25 166:7
**investigate**  37:14
  37:25 62:4 99:13
  162:17,19
**investigated**
  67:14
**investigation**
  46:19 48:11,22
  49:1 51:25 52:13
  52:16,18 56:23
  58:4,13,14 66:10
  67:23 81:10 94:19
  94:23 100:25
  102:7 106:14

133:15 142:21
143:24 158:17
162:22
**investigations**
37:22 39:5 56:1
**investigative** 52:9
**investing** 100:14
129:2 133:3
150:22
**investment** 1:7
12:22 44:18,20
48:7,10 59:25
60:22 61:1,5,8,19
63:3,20,25 64:13
66:24 67:12,19
68:17 76:19 80:7
80:13,21 81:21
83:5,17 84:7 85:5
85:5,8 86:21 88:2
89:4,6,10,11
90:22 91:7 92:12
95:8,11,13 96:5
96:16 99:15 101:2
108:5,6,10,12,15
109:11 112:3,6,9
117:1 118:5
120:10,11 123:8
124:10,16 125:5
125:17 128:1
129:9,13 132:12
132:23 133:22
137:6,19 139:15
142:22 143:14
144:1,14,24 145:7
145:11,16,25
152:13 153:24
154:25 158:8
161:24 164:2
165:21 166:1,6,10
166:15 168:19
169:11 170:22
171:2,20 172:5,10
172:16 174:3

183:19 184:10,21
185:21 192:6
193:25 194:9,13
196:20 197:4
**investments** 6:1
71:3 82:12 83:25
85:12,18 98:20
100:18,22 129:6
133:1 154:24
166:10 190:9,11
**investor** 18:12
62:7 86:10 89:21
**investors** 9:19
26:9
**involved** 47:12
51:1 73:22 129:15
132:25 137:23
151:2,20,25 165:7
168:16 175:16
187:25 203:14
**involvement**
37:12 158:5
**involving** 40:21
**ira** 33:6 208:5,6
208:15 209:5,14
209:17 210:8,16
211:13 224:12,13
224:18,21,22,25
225:7,14 226:1
227:1,13 228:6,11
228:25 229:1,7,14
229:16
**irrelevant** 9:19
**irs** 8:12 40:7,12
42:18 228:24
**irving** 1:6 5:12
**isolate** 164:11
**issue** 6:5,11,13 9:9
9:10 10:5 14:4,7,8
14:22 15:9 17:16
17:25 21:14 22:13
26:24 60:15,15
61:17 95:6 139:10

154:16 168:10,13
169:3,7 180:23
181:19 182:1
230:7
**issued** 10:6
100:15 129:3
159:10,12 171:24
177:2,8 210:14
**issues** 8:23 10:8,9
10:11 11:22 17:1
22:21 23:22 26:25
31:11 39:18 45:25
48:15 49:21 54:15
**issuing** 24:20
26:10
**it'll** 13:12
**item** 70:17
**items** 48:14 54:7
**it's** 60:14 65:3
71:14,16 72:14
73:19,20 74:6,10
74:17 75:8 76:10
78:25 79:1 80:24
81:2,3,23 82:17
86:15,18 87:23
90:12 91:20 93:11
93:14 94:3 96:23
97:23 98:4
**i'd** 72:11 73:15
93:24
**i'll** 55:15 56:5
57:25 58:1 63:3,7
64:5 67:3 69:21
78:18,19 93:1
**i'm** 57:5,24 72:10
86:13 90:3 97:13
**i've** 57:6 60:10
67:22 81:23 83:12
99:2

| j |

**j** 3:9 4:11
**j.p.** 81:23 84:19
93:4 160:5 170:3

171:24 172:4
184:13 186:16
188:21 191:3
193:7 198:3
199:23
**january** 114:16
122:9 159:12
170:13,16 172:3
197:20,23 198:7
198:13,17,19
208:21 209:6,11
209:11,22 210:21
210:24 219:20
226:3 227:23
228:8,13,13,16,17
**jennifer** 4:6
**job** 182:15,17
**joint** 197:8 217:25
218:22
**jones** 18:4 19:7
135:9
**journal** 49:4
**journals** 49:12
**jp** 30:15,16,17,19
30:21,23 33:1,24
152:20 154:6
217:1,7,17,25
218:24 222:19
227:11
**jpmc** 153:16
**jpmsaa** 156:4
**judge** 1:23 13:2
19:25 21:2 25:6
26:19 34:2 39:22
40:14,15,15,22
41:4,10 50:22
51:3,20 75:3
138:4 157:7 159:1
166:5 170:20
173:15,25 230:25
**judge's** 40:14
**judicial** 15:2 16:4
16:5,9

**july** 115:18 155:7
**jump** 115:24
**june** 10:6 37:14
  156:14
**jury** 39:15 46:15
**justice** 50:17 51:5
  165:3

**k**

**keep** 13:21 15:10
  113:22 137:9,9
  149:14 166:25
  195:18 229:5
**keeping** 137:13
**keeps** 72:22
**kept** 177:19
  195:19 216:2
**key** 47:18
**keystrokes** 109:2
**kill** 157:9
**kilter** 123:4
**kind** 38:5 47:6,22
  57:9 63:2 67:22
  69:2 74:6 75:9
  77:18 80:2 81:5
  81:11 91:12,21
  92:18 98:17 99:2
  103:10 109:8
  120:15 121:1,4
  126:16 128:17
  135:16 136:17,19
  166:25
**knew** 98:18 133:9
  133:10,10,14
  140:1,2 177:8
**knock** 108:14
**know** 7:22 8:15
  9:7 13:2,5,10
  14:16 16:5 17:10
  20:13,14 24:1,2
  25:23 26:19 28:15
  29:12 31:10,18,20
  32:7 34:24 54:2
  60:10 65:22 66:9

66:13 69:13 74:16
76:2,3 81:6 90:13
90:17 91:11 92:9
92:11 98:20,23
100:1 101:9
117:12 118:24
121:1 123:25
124:3 126:7
136:15 137:8
140:16 147:16
149:5,7 154:11,12
154:16 155:6,11
155:15 159:5
161:19 162:7,10
163:2,15 164:22
166:18,19 168:21
169:7 170:5,8,17
172:23 173:1,4
174:22,24 175:12
175:15 177:5
179:2 180:10
181:3,8,19,21
193:8 217:13
**knowingly** 137:20
**knowledge** 10:12
  10:17,21,22,23
  11:7,10 12:11
  13:4 21:24 44:1
  160:19
**known** 39:13
  63:19 93:4 118:15
  143:16
**knows** 13:3

**l**

**l** 1:6 2:4 3:20
  124:13 144:14
  168:19,24 169:11
  170:22 171:1,2,20
  172:2,5,10,15
  173:1 174:2 190:6
  193:14,25 194:9
  194:13 227:14
  228:14

**label** 121:16
**labeled** 71:8 72:12
**lack** 11:9 96:7,9
**lacked** 67:14 68:6
**lacks** 11:7
**ladders** 52:24
**lan** 3:11 13:16,19
**language** 79:5,10
**lapse** 44:14
**large** 74:12 82:8
  106:23 122:22
  143:16
**larger** 44:1 74:13
  82:8 198:12
**largest** 45:18 97:2
  100:8
**lastly** 184:16
**late** 47:3
**launder** 45:10,11
**laundered** 41:2
**laundering** 40:25
  45:5,7 59:21
**law** 47:7
**lawyer** 41:9,22
  44:11
**lawyers** 13:11
  57:25
**lay** 46:13
**layer** 109:8
  112:24 113:2
**lazard** 150:9
**leaf** 7:22
**lean** 37:5
**learn** 23:14
  215:11,21
**learned** 11:3
  23:15 47:10 57:18
**leave** 73:12 82:10
  113:12 230:25
**led** 112:20
**ledanski** 2:25
  233:3,8

**label** 121:16
**ledger** 197:18
  199:15 204:8,13
  208:20
**left** 70:10 87:13
  104:23 105:3
  114:17 122:22
  123:25 130:10,10
  131:8 139:5 140:1
  140:16,17 156:2
  165:25 190:24,25
  192:12 193:2,3
  197:16,18 199:14
  199:15 204:6,8
  208:19 221:13,14
  222:13 225:14
  227:17,25
**leg** 99:15
**legal** 6:14 20:13
  46:12 56:17 152:7
  233:20
**legally** 8:20
**legitimate** 40:6
  62:19 88:20 91:25
  92:1 103:15,16
  108:4 111:16
  112:13 117:9
  125:9 144:23
**legs** 62:25 70:5
  139:14 140:22
**lehman** 20:11
  50:2,3,5 154:2,22
**length** 12:2 23:18
**letter** 114:5 200:8
  205:15,16 210:6
  225:21,22
**letters** 169:24
  170:25 172:7
**letting** 82:16
**let's** 60:18 64:22
  69:1 71:8 72:10
  74:24 77:20 79:15
  80:16 89:2 97:14

**level** 40:22 47:23
  59:6 136:23 147:1
**liabilities** 139:4
  139:12,16,25
  140:24,24,25
  141:5,11,24
  142:10
**liable** 9:2,4
**licensed** 43:5,6
  44:19,21,25 48:12
  65:24 126:20
**licenses** 43:2
**life** 148:17
**lifting** 69:9
**lighter** 106:3
**lilsa** 180:13
**limine** 2:3,7,11
  5:9,20 13:18 28:5
**limit** 6:19 79:21
**limited** 77:6 98:3
**limiting** 100:20
  126:8
**limits** 98:12,13
**line** 10:16 24:9
  29:22 51:19 77:23
  78:19 90:7 94:7,9
  94:10 100:3,4
  101:22,22 107:5,7
  107:13 110:2
  114:23 123:19
  128:21,22,23,24
  129:5 132:21,21
  134:2,2 135:13,14
  135:15,16 136:3,9
  136:17,17 137:17
  137:17 138:3
  143:9,10,11
  144:11 205:8
  209:23 210:21
  232:4
**lines** 11:15 70:8
  77:1,1 78:7,16
  115:17 144:10

**lipkin** 111:8,11,13
**lipstick** 63:5
**liquidated** 150:2,4
  150:5 153:10
**liquidation** 1:6
  210:8
**liquidity** 91:11,16
**lisa** 180:11 182:11
**list** 25:9 33:22
  38:25 49:5,7,12
  57:5,8 169:23
**listed** 18:13 50:10
  79:8 154:10,13
  158:19 188:16
**listing** 185:5
**litigants** 44:11
**little** 39:14 42:14
  49:19 72:11 73:15
  82:17 84:15 85:16
  92:17,19 98:15
  102:10 113:22
  118:10 133:21
  134:16 136:1
  139:8 148:25
  224:14
**llc** 1:7 47:5 110:3
  144:15 168:20,24
  169:13,23,24
  170:4,11,12,23,24
  170:25 171:5,10
  171:14,25 172:3,7
  172:11,24 173:2,4
  173:20 174:2,3,8
**llm** 41:21
**llp** 3:3,15 4:1
**load** 167:25
**loan** 91:17,22
**loans** 91:9,17,19
**local** 9:4 117:12
**located** 63:5
  144:15 153:5
**lock** 113:11

**locked** 231:8
**log** 77:9
**london** 117:24,25
**long** 20:17 49:6
  99:4 142:23
  165:14 180:1
  231:13
**longer** 92:20
**longest** 164:25
**look** 6:6,24,24 7:4
  7:18 8:9 17:8,8
  25:24 26:1 30:4
  37:2 47:20 48:3
  50:1 69:4,4 71:4,8
  72:10 74:25 77:23
  84:22 87:17 88:6
  88:7 104:18
  109:13 110:7,21
  111:3 115:12,17
  115:24 116:6
  118:19 119:2
  120:20 122:5,22
  123:17 127:9,10
  135:20 136:2
  137:3 138:13
  139:2,10,12,24
  140:9 141:8,16
  142:6 154:20
  170:1,9 174:6
  175:3,5 177:12
  183:9 187:12
  197:8 201:12,21
  201:23 203:23
  209:17 216:6
  218:18 226:11
**looked** 54:9,10,11
  54:15,20 57:7,22
  66:11 70:1 87:15
  90:11,14,17
  117:23,23 118:1
  120:25 138:22
  139:16 140:17
  151:4 154:14

**174:15** 187:5
  217:15 222:3
**looking** 47:22
  48:14 85:24
  110:11 112:10,17
  115:22 120:3
  121:2 122:12
  130:23 131:23
  135:18 141:1,9,16
  141:18 155:18
  164:9,20 182:17
  183:25 215:4
  219:15 220:6,20
  229:21
**looks** 52:5 53:23
  81:5 109:9 110:14
  122:8 136:4,11
**loose** 7:22
**loser** 6:19
**losing** 83:19
**losses** 100:21
**lot** 7:22 12:7 21:1
  21:4 31:10,18
  39:18 51:4 55:23
  62:15 63:19 66:13
  66:21 70:2,22
  75:24 86:9 117:13
  132:22 154:10
  161:11,12 173:19
  180:23 181:22
  187:22
**lots** 192:14
**low** 82:6 118:23
  124:4,18
**lower** 122:5
**lowers** 119:15
**luckily** 41:14
**lunch** 113:6,8,19
**lying** 24:18
**lynch** 65:10,11

## m

**m** 1:22
**m2** 76:9
**ma'am** 201:16
**machine** 67:17,19
**madoff** 1:7 2:4 6:1
12:22,23 13:25
14:3,11,24 17:13
18:11 21:10 23:17
25:13,18,20,22
39:13 46:15 50:18
52:23 55:21 60:21
61:2,5 62:8,18,21
64:6 73:22 78:11
89:7 92:10 93:7
93:22 98:17 99:10
99:22 105:22
110:3 123:22
124:13,18 128:14
133:4,9 134:10
136:7,13 142:14
144:14 150:24
151:12 153:24
158:6,7,18,21
162:7 164:25
166:10,14 167:3,8
167:22 168:19,24
169:8,11 170:11
170:22 171:1,2,20
172:2,5,9,10,16
173:1,1 174:2,9
175:11 176:11
177:12,19 178:10
178:22 181:17,18
190:6 193:14,25
194:7,9,11,13
198:8 226:4
227:14 228:14
232:12
**madoff's** 14:13,20
16:19 31:5 100:25
101:14,23 128:20
129:11 137:16

138:9 143:7,21
144:10,18 150:23
157:25 161:10
168:9 169:5 170:2
177:16
**madoff's** 94:6,19
**magic** 80:3
**magical** 124:18,24
**magically** 116:2
**magnitude** 115:11
116:4
**main** 3:17 81:25
84:10 133:6
**maintained** 11:10
12:3 66:14 89:15
109:5 184:15
**maintaining** 82:4
**maintenance**
204:19
**major** 162:25
163:3
**majority** 124:3
190:1
**maker** 63:14
71:18 121:17,19
123:20
**makers** 71:17
**making** 47:21
62:12 63:7,14
65:25 66:1 72:15
73:25 75:20 83:20
120:22 122:18
127:21 150:18
151:9 161:6 162:4
162:18,24 168:8
179:2 180:19
**management** 13:5
45:2 72:13,22
**managing** 37:21
**manhattan** 63:6
93:5 94:14,17
101:23 144:15

**mannes** 40:15
**manuals** 69:23
**manufacturers**
48:3
**map** 53:3
**mapped** 66:20
**maps** 66:19
**march** 114:23
174:8
**marie** 3:20
**mark** 43:1
**market** 43:21
63:7,14,14,15
65:18,25 66:1,3
67:25 71:17,18
72:15 73:19,20,25
74:3,8,11,14,14
74:15,17,18 76:1
78:15,15 79:2
88:23 95:18 98:17
98:18,21,23 99:5
100:9,14 115:5,5
115:10,15,16,25
116:1,3,5,6,8,9,12
116:14,17,17,18
116:19,20,22
117:7,11,18
118:22 119:21,23
120:14,15,17,23
121:16,19 122:3
122:18 123:20
127:21 128:15
129:1 133:2 135:7
135:9 136:16
150:18 151:9
161:6 162:4,18,24
168:8 177:7 179:2
**marketed** 98:16
99:1
**marketing** 96:17
128:11
**marketplace**
88:12 121:17

**markets** 98:21
135:13 136:10
**marking** 156:11
**maryland** 40:3
41:16 42:21 43:7
44:21
**master** 43:23
46:19 59:22
**master's** 41:20,25
**match** 30:5 65:12
84:22 127:18
131:15 159:13,24
183:12 195:23
**matched** 127:22
130:4,6,8
**matching** 195:25
**material** 6:5,11
8:23
**math** 141:11
**matter** 24:5 33:17
37:12 40:6 184:4
184:18
**matters** 28:10
34:20 39:5,9 40:1
42:19,19
**maturing** 156:23
157:15
**maximillian** 3:13
**maximize** 82:7,15
120:3
**maximizes** 75:24
**mean** 16:5 27:9
35:7 70:23 87:12
90:15 107:2
114:14 120:23
124:20 132:1
169:24 177:15
178:24 181:15
183:11 184:2
214:12 231:12
**meaning** 194:19
205:11 212:11

**means** 16:6 70:24
  107:14
**measure** 119:23
**measured** 125:1
**measuring** 119:20
  123:21
**meat** 57:9
**media** 54:24
**mega** 110:21
**member** 45:13
**members** 45:19
  45:24
**memo** 198:9
  200:3 205:7
  209:23
**memory** 151:11
**mentioned** 29:20
  48:7 62:25 64:24
  79:7 102:12
  198:18 201:19
  202:1 206:19
**merck** 88:4
**merely** 8:17 11:14
  11:22
**merrill** 65:10,10
  76:14
**message** 74:7
**messages** 74:7
**metadata** 108:19
  108:20 109:18
  111:14
**methodologies**
  52:7,9,10 58:14
  59:2 146:11,14,18
  208:10 230:16,19
**methodology** 53:8
  53:13 58:12 196:2
  208:9,10,12
  217:10,14
**microphone** 37:4
  148:8
**microsoft** 108:22
  110:23 111:11

**mid** 91:16
**middle** 105:1,25
  105:25 106:2
  107:5 125:8
  128:21 188:16,22
  197:25 198:1
  199:21,22 202:19
  204:10,11 205:4
  207:10 208:22
  228:3
**midst** 73:11
**miles** 22:9
**military** 110:16
**million** 5:25 7:5
  7:14 8:10,13
  72:16 74:12 84:25
  87:23 88:9 90:14
  91:9,19 103:18
  110:13 131:4,12
  132:1,4 147:12,13
  149:5 156:18,21
  157:14 162:2
  164:5 203:16,21
**millions** 84:5,5
  140:20 161:3
**mimic** 100:11
**mimicked** 112:15
**mind** 121:2
**mine** 148:22
**mineola** 233:23
**minimize** 120:3
**minor** 33:16
**minus** 131:25
**minute** 34:19
  51:10 55:8,16
  67:3 69:6 134:1
  155:18 179:16
**minutes** 45:15
  51:7 54:14 78:1
  110:16 179:23
**mirroring** 135:24
**mischaracteriza...**
  158:10

**mischaracterizes**
  169:1
**mislead** 138:5
**missed** 74:4
**missing** 132:2,3,6
  132:8 183:5
**mistake** 79:14,16
  79:17
**misunderstanding**
  27:25
**model** 55:2,10
**moment** 18:20
  183:6
**money** 12:23
  18:12 39:19 40:6
  40:7,11,25 41:2,3
  45:5,7,8,10,10,11
  51:2 59:21 62:5,6
  63:10,13,13 64:7
  64:16,17 65:13,14
  65:16 80:17 81:11
  81:11,12 82:1,4
  82:11,15 83:10,11
  83:13,14,19,20,22
  84:3,4,8,8,12,21
  84:23 85:2,2,4,11
  85:13,15,16,18,21
  85:23,25 86:6,7
  86:13,17 88:6,7
  88:24,25,25 89:17
  89:18 90:16,25
  91:14 92:1,3,8,16
  92:17,19 94:16
  95:9,10,10,20,20
  95:21,23 96:10,14
  98:19 99:6 103:12
  112:22 119:17
  120:22,24 124:6
  124:20 125:13,13
  128:16 132:24
  137:9,11 138:7
  140:4,8,14 141:2
  141:4 143:15

  145:13,16,22
  146:3,4 152:8,14
  153:7,19,24 155:1
  155:2 158:1,8
  160:25 161:12,21
  161:22,24 164:2
  164:10,11,14
  165:21,22,25
  166:1,5,6,11,15
  166:19,22,24
  167:1,2 174:9
  189:11 215:25
  221:25 222:13
  227:10,13
**monte** 49:9,11
**month** 49:19 98:1
  103:11 191:1
  193:5,5 197:19,20
  199:16 204:9
  208:21 210:13,17
**monthly** 26:12
  186:21 187:13,21
  187:24 190:13,13
  190:25 192:3,25
  193:4 221:14
**months** 79:12,21
  79:21 91:18 97:11
  159:19 193:17
**morgan** 30:15,17
  30:17,19,21,23
  33:2,24 81:23
  84:19 93:4 152:20
  154:6,8,9 160:5
  170:3 171:24
  172:4 184:13
  186:16 188:21
  191:3 193:7 198:3
  199:23 217:2,7,17
  217:25 218:24
  222:19 227:11
**morning** 5:5
  13:19 36:7,8
  82:18 126:24

153:12,17,19
163:6 231:11
**motion** 2:3,7,11
5:20,20,24 7:3
9:21 10:2,3,6,15
12:4,10 13:13,24
18:9 21:7,9,20
41:12 60:13 232:6
232:9
**motions** 5:9,15
13:17 15:13 27:13
28:5
**motive** 16:21,25
17:11,15 22:20,23
26:7,13,15,24,25
**move** 6:2 10:2
21:9 24:10 29:4
30:6,24 32:24
33:9 34:11 72:11
180:20 231:3,7
**moved** 39:19
42:13 231:7
**movement** 45:10
**movements**
100:11
**moving** 35:14
61:1 133:20
221:13
**mult** 156:17
**multiple** 77:14
109:21
**music** 136:7

**n**

**n** 3:1 5:1 202:14
202:14 207:11
232:1 233:1
**naked** 179:1
**name** 25:20,22
37:9 40:14 54:25
70:11,11 75:5
168:23 169:5,8,9
169:11,12 170:3
170:20 171:25

172:4,10,18,23
173:14,20,20,22
173:23 180:9
190:6 192:25
193:13 194:14
205:1 209:13,25
216:16,24 221:6
221:15,20 222:17
225:16
**named** 25:18
**names** 14:21
162:20 172:21
224:20
**narotam** 1:25
**nasdaq** 73:16,16
73:19,23
**national** 43:17
49:15
**nationally** 45:9
**nature** 50:25,25
51:1 60:14,15,17
132:16 133:17
143:21
**near** 145:23
**nearly** 10:6,9 11:2
**necessary** 21:13
66:4 76:20
**need** 20:16 31:7
36:22 44:3 51:18
52:16,17 64:16,17
64:18,19,20 66:7
72:22 73:7,8,12
74:2,2,22 75:19
78:6 80:18 94:2
111:18 157:9
176:24 181:14
191:23 211:3
226:11
**needed** 31:8 56:13
57:17 106:2
**needing** 60:10
**needs** 65:18 75:9
75:10

**negative** 136:11
136:11,12 139:7,9
**neither** 22:10
**nelson** 1:10 5:3
18:13 20:16
154:11,13 160:6
174:4 183:23
184:6,18 186:1
189:3 197:5,6,21
197:22 198:6,7
199:5,17 200:2,2
200:8,9,19 203:15
203:15 205:1,7,17
206:4 208:5,14
209:5,14,21 210:6
210:9 211:2,13
214:23 215:9,9,16
216:1,17,17,25,25
217:8,8,8,19,19
218:8,23,23
220:17 221:6,16
221:20 222:15,17
222:18 223:23,24
223:24 224:10,11
224:18,22 225:1,8
225:14,19,22,25
226:1,7 227:19
228:6,21 229:2,4
229:14,17
**nelson's** 7:25
30:23 33:6,24
157:21 158:2,12
158:20 167:21
199:2 203:21
220:24 221:25
224:13 227:17
**nelsons** 154:17
167:11 168:18,23
171:24 174:1,9
189:7 198:12,20
200:8 213:18
**net** 6:19 8:10
44:24 140:17,19

141:4,5
**nets** 98:10
**network** 76:19
**never** 12:22 25:11
54:18 61:14,16
64:9,14 75:8
77:15 79:25 80:1
83:19 84:1 89:1
90:10 94:12
100:22 101:6
106:15 107:18
123:11 127:22
129:6 133:10
154:12 158:21
161:8 162:12,13
168:18,24 169:12
171:24
**new** 1:2,16 3:6 4:3
14:1 34:8 37:20
40:10,12 41:14
50:19 83:10
144:15 161:5,24
162:9 176:1,6,12
177:6
**news** 29:13
119:15
**newsletter** 49:15
**nicholas** 3:9 5:11
**night** 75:10 82:9
82:18 153:16
**nine** 23:11 166:13
**nominal** 107:12
**non** 15:10 43:19
44:11 178:17
**normally** 109:9
**northern** 50:21
**notable** 50:17
**note** 49:8 82:13
**notebook** 51:8
**noted** 6:16,21
10:14 11:1 185:3
**notes** 20:10,11
62:7

**notice** 15:2 16:4,9
79:16
**noticed** 120:21
**notified** 170:3
**notion** 26:8 84:13
**november** 114:17
122:9 171:19
191:1 192:4,10,13
199:16,20,25
200:9 204:9,13,24
204:25 205:6,17
205:24 216:11,16
217:4,22,24 218:2
220:24 221:17,19
221:22
**ntc** 215:25 216:2
224:19 225:24
227:9 229:19
**number** 2:3,7,11
5:20 29:11 33:23
54:3 81:25 104:9
105:11,15 115:3
128:23 141:4,13
191:11 193:10,11
195:22 198:9
200:3 202:20
207:4,16 209:15
209:21 210:11
217:8 218:24
219:14 221:6
224:23,24 225:17
225:18 226:2
229:5
**numbered** 156:4
**numbers** 8:9
53:24,25 54:2,4
107:12,12 140:20
162:1 192:14
201:11 202:18
**numerous** 21:16
21:17
**ny** 1:16 3:6 4:3
233:23

**o**

**o** 1:21 5:1 233:1
**o'clock** 119:14,14
**object** 6:2 31:5,17
32:18 158:9
159:16
**objected** 31:23
32:10 176:17
**objection** 17:9,13
30:9 31:2,3,5,19
33:12,14 34:1,12
60:2,3 158:14
167:13 168:25
172:20,25 178:18
182:6
**objectionable**
31:20
**objections** 5:9 8:1
28:6 31:10
**obligations** 2:13
**obtain** 41:25
104:1 108:1
126:25 129:19,21
175:6
**obtained** 10:24
43:11,15 44:5
45:5 84:18 91:17
105:9,19 115:9,10
135:10 207:8
**obviously** 7:15
46:10 53:17
137:12
**occ** 56:8 126:12
126:16,22,25
127:3,14,17,18,19
**occur** 76:25 124:9
125:12
**occurred** 61:14,16
112:21 114:18
123:12 136:19
210:16
**occurring** 61:7
95:19

**october** 104:16,17
105:2,7,10 127:7
**odd** 41:8
**oex** 126:3,18
**offensives** 47:15
**offer** 17:17 18:15
18:16
**offered** 16:15
17:16 49:3
**office** 39:14 42:24
101:23 161:12
**officer** 47:7
**offices** 170:3
**official** 103:22
112:10
**offset** 6:18
**offsets** 98:9
**offshore** 50:25,25
51:2
**oh** 36:25 69:7
74:6 89:24 90:4
93:16 148:9
155:15 156:17
157:7 163:18
164:19 189:25
**okay** 7:12 9:25
12:14 13:21 16:7
17:5,5,17,19
18:22 19:8,14,17
22:18 27:6,12,25
28:1,2,3,11,25
29:1 30:11,13
31:7,16 32:6,19
32:20 33:16 34:3
34:24 35:5,10
36:13,25 37:3
38:19,19,22,23
51:10,24 54:1,5
57:14 60:10,19
62:24 64:15,23
69:3,12,15 70:10
71:7 72:13 77:22
80:21,22 81:4

85:3,8,24 90:5
94:5,11 96:12,17
96:18 97:12 100:2
100:5 101:20
102:10,14,16
104:21 106:7
107:19 109:13
110:13 113:2,25
114:8,15 118:2,12
121:14 123:14
125:22 133:24
134:24 143:12
147:14 148:23
150:22 151:2,12
154:2,16,19,24
155:5,14,25
156:11,14,23
157:1,5,10,13,17
157:19,25 158:5
158:15,23,25
159:15 160:9,11
160:14 162:7,12
162:17 163:18
164:1,4,23 165:7
165:11,13 167:5
168:1,2,11,14,18
168:22 169:17
170:2,6,10,14,17
171:3,5,8,12,16
171:19,23 172:13
173:6,13,25
174:13,21 175:8
175:18 179:2,6,17
179:22 180:9,18
181:20 183:4,5
187:9 188:5,11
189:6,20 191:25
194:23 196:15
197:16 202:8
203:13 204:5
205:14,19 210:2
213:23 214:11
215:17 216:5

217:20 218:16,18
224:12 226:14
227:20 228:3,22
231:4,5,9,16,20
**old** 40:12 65:5
71:24 86:3 102:22
163:18 233:21
**once** 29:13 44:25
98:3 101:17 130:8
138:13 161:16
**ones** 47:23 112:18
127:13 185:9
196:12
**onward** 8:6
**open** 15:13 118:22
143:13
**opened** 7:8 61:17
**operate** 64:15
80:14
**operated** 95:14
96:5 124:11 125:6
144:5,13
**operating** 55:4,11
143:6 144:6
**operation** 168:14
**operations** 39:16
40:10
**opine** 20:5,9
**opined** 175:18
**opinion** 11:1
18:14,15 44:3
51:3 58:1,10 71:6
71:15 80:12
101:12,13,16
108:21 137:5
152:7 168:10,13
168:15 176:10,13
194:2 196:24
**opinions** 19:5
46:17,24 57:21
**oppenheim** 5:21
8:5,14 33:2

**oppenheim's** 7:5
8:7
**oppenheim's**
232:6
**opportune** 133:3
**opportunistically**
100:13 128:25
**opportunity** 19:9
159:22
**opposition** 5:23
7:3 11:16 12:4
60:12
**option** 48:15 97:7
97:8,8,9,10,12,13
97:14,17,23 98:1
98:5 100:20
126:12,13,19,23
128:16 133:2
**options** 64:3
68:13,22 71:3
80:17 97:6,8
125:21,24,25
126:3,3,11,16,17
126:17,18,19,20
127:11,11,15,18
127:20 128:1,3
135:23,25 143:16
145:3 148:18,20
148:24 149:5,8
**order** 30:5 65:8
71:16,21 72:13,22
74:11,12,13,25
75:5,16 76:12,12
76:13 77:2 79:5
83:4 97:3 98:7
119:13
**orders** 16:2 24:21
63:16 71:16 75:13
**ordinary** 185:13
**organization**
45:14,22 102:19
**original** 79:25
91:23

**originally** 68:4
78:5
**originated** 85:15
**origination** 75:14
**otc** 117:17
**outcome** 8:23
38:14
**outflows** 228:11
**output** 164:9
**outside** 42:22
52:13 76:21 118:7
**overall** 126:6
174:5 196:8
**overlap** 46:21
**overnight** 82:12
82:19,20,21 83:14
85:9,14,22 92:18
152:19 166:12,24
190:9 226:4,5
**overrule** 17:8,13
**overruled** 167:16
167:20
**overview** 51:6
53:13
**overwhelming**
26:15
**owe** 141:3
**owed** 140:25
145:17
**owned** 102:23
111:17 112:13
167:22
**owner** 47:4
**ownership** 168:5

**p**

**p** 3:1,1 5:1 110:2
**page** 8:4 24:8
29:22 41:8 48:24
48:25 51:19 53:23
54:4 69:17 70:8
71:8 72:10 73:15
74:4,5,24 75:21
78:25 81:3,8

82:25 87:1,3 90:3
90:3,4 94:7,7,8
100:3,4 101:20
104:9,10 108:22
111:13 116:25
117:3,24 119:4
127:5 128:8,21,24
129:5 130:14,16
132:21 134:1,19
134:22,23 137:16
138:2 141:8,10
142:8 143:9 144:9
154:20 163:15,17
163:22,24 164:22
170:16 197:20
204:16 220:25
232:4
**pages** 69:18 70:25
109:15 173:16
**paid** 5:25 7:6,15
8:10 9:19 38:6,12
54:16,19 86:4
88:1 89:10 91:19
121:23 147:10,14
149:3 161:10,11
165:1 166:17,18
167:5 229:19
**paired** 125:25
**panel** 44:9,12
**paper** 71:25 72:25
102:24 167:19
190:10
**papers** 6:12 12:4
13:6 14:5 24:8
25:7 27:24
**par** 166:20,21
**paragraph** 8:3,4
54:6 87:3 127:15
**parentheses**
209:15
**park** 4:2 41:16
**parking** 128:18

**part** 30:16 49:9
72:4,5 97:20,22
100:17 125:20
126:6 130:3,17
131:16,17,18
137:13 168:8,12
173:21 177:2
182:21
**partial** 210:7
**participant** 74:16
105:15 110:2,3,4
110:13
**participants**
15:10 74:8,18
117:18
**participate** 14:13
14:17 15:22
105:16
**participated**
16:18
**participating**
15:23 22:5 24:17
**particular** 17:15
20:9 87:16 90:14
114:22 115:13
119:7 178:11
190:14 199:1
204:22 205:11
228:7
**particularly**
14:11 192:10
**parties** 10:18
22:11 33:3,8
189:4
**partner** 42:21
47:6,13 148:18
**parts** 56:9
**party** 30:16 31:4
31:22 33:14 35:8
56:3,4,5,6,7,10
57:16 91:7,24
115:7 120:14
181:9 183:18,21

186:6,7
**passed** 48:18
**password** 77:9
**pay** 40:4,7 65:14
82:5 86:7 91:14
94:18,21 95:25
96:4 98:8,9
125:14 138:22
145:12 146:3
152:15 165:4,4
188:19 189:1
**payable** 140:15
168:19
**payables** 142:1
**payee** 200:1
**payer** 229:3
**payers** 88:11
**paying** 40:12
44:14 86:9 96:10
**payment** 6:14,17
6:18,23 90:14
**payments** 153:15
**payroll** 40:5
**pays** 86:12
**peaks** 136:25,25
**peer** 49:3,12
**people** 22:25
45:10 52:19 53:5
54:16,18 62:20,23
66:13,20 67:20
71:23 73:10 76:1
79:11 84:5 95:24
123:4 133:10
146:3 151:12,22
151:23
**people's** 103:24
**percent** 9:5 83:8
83:12,21 85:4,8
85:20,20,21 116:5
116:17,18,22
121:20,21 123:1,3
123:5,24,25 124:2
124:23 130:22

131:7,14 136:5,5
136:6,7,12,12,14
162:8 188:20,23
189:9 190:3,4,8
196:17 200:23
202:24 206:8
207:21 211:17
213:19,24 214:1,3
215:13 223:21
224:8
**percentage** 131:4
**perform** 58:19
127:2 195:7 199:3
200:17 206:2
208:13 211:11
218:7 229:10
**performance**
106:18 108:4
124:15 135:21
**performed** 117:25
129:21 184:6
185:12
**period** 7:11 8:6
25:11 45:21 61:21
62:3 83:15 87:10
89:6 96:20 99:10
106:19 114:15
115:10 116:13
118:19 122:14,16
127:6 128:18
129:20 131:4
132:5 135:12
148:6 153:5,6
161:22 163:3
167:7 168:4
171:23 175:22
180:25 184:5
185:12 186:15
187:3,3,3,4,5,8,17
190:2 194:6,10,20
214:17,22,24
215:8,10,13,24
218:10,22 220:1

220:14 222:8
223:12,22 224:3,6
224:7 226:21
229:15,24 230:2,9
**periods** 100:15
129:2 144:22
**permitted** 14:13
14:17 178:16
**perpetrate** 55:16
62:15
**perpetrated** 14:6
37:16 39:17,18
52:3 144:1
**perpetrating**
73:11
**perpetuate** 22:15
**perpetuated**
23:18
**person** 13:25
124:11 163:4
**personal** 10:21,22
10:23 11:7,9 13:4
147:24 149:1
**personally** 147:15
150:24
**personnel** 152:3
**perspective** 5:17
5:18 143:13
**pertain** 206:7
**phase** 29:23 96:24
**phelps** 37:19,21
37:22 38:6,9,12
42:4,22,25 43:1
150:1
**phone** 65:5,23
71:24 77:1
**physical** 69:24
**picard** 1:6 5:3,13
10:4 147:11,19,22
148:24 149:22
232:10
**picard's** 12:11
13:9

**pick**  65:5,22 97:4
  97:5 230:23
**picking**  71:24
  148:8
**pie**  83:21 121:15
  122:22 123:17
**piece**  43:25 74:16
  119:15 141:18
**pieces**  54:24
**pile**  112:22
**pimco**  33:6
**pipe**  77:17
**pitt**  13:25 14:3,25
  15:20
**pitts**  27:17
**place**  73:21 74:11
  75:22 76:6,9 79:5
  102:3 133:12
  175:13 201:21
**placed**  75:8 102:1
  108:8
**places**  110:1
**plain**  132:14
**plaintiff**  1:8 5:4
  12:13
**plaintiff's**  7:19
**plan**  52:16,20
**planning**  52:16
**platform**  65:1,2
  65:21 66:8,16
  68:8,9,18 70:11
  72:4,5 80:14
  95:12 96:2,12
  118:7
**play**  62:21,22
  228:23
**played**  96:9
**plays**  125:11
**plaza**  3:5
**plea**  2:4
**pleaded**  22:4
**please**  5:2 13:21
  28:20 36:6,9,13

37:9,12 87:2 94:6
  95:6 113:16
  128:22 154:19,20
  155:13 170:17
  179:14 180:4,6,9
  183:7 186:10
  190:23 191:4
  192:2,8 193:2
  197:17 199:11
  204:3,7,21 216:9
  225:2,11 226:3,4
  227:21
**plotted**  135:11,14
**plus**  57:16,17,19
**pm**  231:21
**pocket**  140:17,17
**podium**  13:16
  148:10,11
**point**  11:13 20:18
  35:12 47:11 51:19
  52:4 57:8 62:13
  83:23 94:25
  102:15 116:15
  122:21 131:13
  133:6 142:13
  149:2,12 151:5,10
  155:20 161:17
  162:6,7 165:17,17
**pointed**  25:7
  176:11
**points**  54:7 98:23
**policy**  97:24
**political**  40:21
  41:2
**ponzi**  24:12,17,22
  25:1 37:15 39:17
  40:1,4,8 52:3
  91:12 92:19 95:14
  95:23 96:6,10
  125:6,12 137:7,8
  143:6 144:2,5,6,7
  144:8,13,18
  164:24 165:1,3,8

165:13 167:1
  168:9,12,16
**pools**  41:3
**poor's**  100:8,12
**poor's**  97:2
**popping**  123:16
**populated**  219:6
  219:21
**portion**  160:8
  183:10 213:9
  216:2,18,22
**portions**  21:21
  24:11
**posing**  62:6
**position**  109:22
  110:8,13 139:9,12
  158:1 177:17
**positions**  111:17
  130:22,22 137:22
  140:18,19
**positive**  136:23
  139:3
**possession**  103:2
**possible**  92:7
  117:21 179:15
**post**  17:21 20:2,18
  20:25 21:13 27:3
  29:23 134:6
  160:23 175:7
  177:10
**posttrial**  35:16
**pot**  167:1
**potential**  77:11
  100:21 105:21
  164:12 219:14
**potentially**  62:11
**practice**  38:1,5
  41:7 42:23 48:19
  48:20
**practices**  60:1
  146:18
**practicing**  41:23
  49:20

**precise**  154:10
**preclude**  19:2
**precluded**  56:20
**predicate**  46:7,8,9
**premium**  97:20
  97:20 98:9,9,9
**prepare**  19:24
  20:18 69:15,19
  84:16 87:6 104:6
  104:12,13 114:9
  121:4 138:15
  188:8 206:15,19
  211:22 212:9
  213:14 223:7,9
**prepared**  8:5 24:4
  51:12 69:18 81:7
  104:5 121:12
  134:25 150:9
  159:22 188:6
  211:25 213:10
  215:2 218:16
**presence**  26:21
**present**  4:8 68:3
  70:24 72:2,3 73:1
  73:13 75:17 76:17
  76:18 77:4 149:18
**presented**  13:23
**presenting**  159:4
**presents**  7:16
**presumably**  32:13
  161:9
**pretrial**  5:14 28:6
  34:20
**pretty**  29:13,14
  49:6 74:14 119:22
  136:2 165:12
**prevent**  126:7
**previous**  79:12
**previously**  18:4
**price**  43:21 76:5
  100:11 115:4
  118:14,20 119:7
  119:10,16,23

121:22 123:1,5
124:2
**prices** 49:11
100:22 134:5,5
175:3,6
**pricing** 65:17 66:4
74:9 120:4
**primarily** 187:24
**primary** 186:14
187:14
**prime** 57:9
**principal** 94:16
143:18
**print** 67:7 68:2
79:12 111:4
112:15
**printed** 111:2
**printing** 112:14
**prior** 8:7,21 9:16
10:23 11:6 23:16
45:23 48:10 79:21
172:10 214:17
223:17
**prison** 50:8 78:10
**private** 149:11
**privilege** 11:4
13:12
**pro** 78:19 79:7,9
**probably** 26:5
32:3 78:18 81:16
83:21 93:1 114:4
126:8 136:12
152:11 180:21
226:11
**probative** 6:5
**problem** 17:12,24
64:9 155:15
181:12
**proc** 2:5,9,14
**procedure** 103:20
**proceeded** 16:1
**proceeding** 10:7
29:23

**proceedings**
21:16,17 231:21
233:4
**process** 56:17
65:4 72:1 74:19
76:9,13,21,25
130:8 134:15
196:3
**processed** 80:6
**processing** 75:23
76:22
**proctored** 43:11
43:19 45:6
**produce** 112:19
178:15
**produced** 18:11
18:16 20:21 56:6
56:7 99:19,20
108:9 183:16
184:17 210:3
212:7 217:16
**producing** 90:21
92:14,15 112:20
**product** 11:4
13:12
**profession** 49:2
58:15 230:17
**professional** 43:2
43:10 45:12,14
46:6,21,23 49:23
49:24 52:10,11,12
52:15 53:8 58:20
59:3 80:12
**professionals**
146:15,20
**proffer** 59:17
**proffered** 18:5,6,6
**profit** 10:7 35:13
95:22 97:21,22,22
98:11
**profitable** 54:17
**profits** 63:11
83:21,24 84:3,25

86:5 92:2 94:15
96:8 140:10
143:18 145:7
**program** 41:21,22
41:25 213:10
**programmatic**
120:2
**programmers**
78:9,11
**programming**
79:10
**programs** 65:20
65:20 68:3 78:12
78:21
**projecting** 49:11
**prolong** 10:19
**promise** 96:1
**promised** 94:13
100:6,10,12,17,23
125:10 128:25
129:6 166:3
**promising** 95:24
**prop** 54:12 63:8
63:12,17,20,22
64:20 66:1 67:4,5
67:9,15,18 68:3
70:17,24 72:2,4
73:2,4,23,25
74:20 75:16 76:15
76:17,23 77:4
78:2,5 105:5,7,18
106:1,9,20,24
107:22 110:5
120:11 121:17,20
122:9,11,12
123:20 124:20,20
127:13,18,20
129:23 130:2,3,4
130:9 131:2,5,12
131:16,21 139:15
140:5,6,6,8,10,15
140:18 141:23
142:2 150:19,25

151:6 152:1,6,9
160:25 161:20,25
162:3,14,14 164:6
178:1,4
**propel** 10:17
**proper** 51:25
52:17
**properly** 34:10
52:16,20 53:1,14
**property** 11:20
**proportion**
107:11
**propose** 35:13
**proprietary** 63:7
63:9 64:10 68:7
70:15,22 71:9
72:5,14 122:6,15
122:17,18 123:9
123:22,23 124:10
124:15 126:19
127:9,10 130:20
130:21 150:11,18
150:22 151:3
161:6 168:11
**proprietor** 172:2
**prospective** 100:6
**protected** 98:6
**protection** 126:7
**protects** 98:13
**protocol** 77:8
**prove** 6:10,11
12:24 18:11 24:25
28:14,16 46:9
108:17 167:22
**proved** 124:9
**proves** 111:14
**provide** 45:1 57:5
**provided** 19:4
75:13 93:25
**provides** 7:4,5
**providing** 8:18
**proving** 24:11

provision 17:10
proviso 21:6
public 41:6 42:16
  43:5,6 59:19
  66:17 88:22
publication 49:22
publicly 43:19
  100:9
publishing 49:17
pull 37:4 48:15
  79:22 122:3
  154:19 155:13
  157:3 163:5 170:7
pulled 110:22
  172:13
purchase 20:10
  23:7,8 24:19
  42:23 65:7 97:7
  99:3 102:12 104:2
  126:4 128:17
  129:16 132:11
  134:6 153:25
  156:18 157:20,25
  160:5,8 164:6
purchased 11:19
  12:22 18:11 20:14
  88:21 91:1,3
  108:9 120:13
  130:12 132:13
  150:1 153:7,10
  155:4 158:7
  166:14 167:3,3
  175:10
purchases 22:24
  24:21 100:13
  117:2 118:18
  123:9 129:1
  133:12 152:24
  156:21 157:14
  159:6 175:9
purchasing
  132:25 161:15

purely 12:12
purported 6:1
  64:8 67:24 87:24
  104:19 107:4
  114:18,22 115:2,2
  115:3,23 116:8,10
  116:11 117:5,7,8
  118:4 128:15
  130:11 136:13
  159:8 166:2 175:6
purportedly 7:6
  7:14 61:3,20
  62:12 64:2,6
  77:19 83:17 96:25
  99:6,17 111:2
  116:2 126:2,18
  127:13,16 137:22
purporting 26:3
purports 8:9
purpose 162:23
purposes 184:4
  205:12
pursue 10:16
put 7:21 12:7 17:2
  26:4,20 29:18
  35:23 48:15 51:2
  56:11 58:1,2 60:8
  62:21,22 64:7
  65:7 69:2 73:12
  74:13 76:11 77:6
  78:22 82:11 85:14
  89:22 91:1 97:8
  97:23 98:1,4,19
  99:4,6,18 107:11
  109:14 116:16,24
  119:13,14 126:5
  140:13,14 141:25
  156:1 161:20
  174:7 179:19
  191:16 201:20
puts 64:4 112:16
putting 62:5 70:2
  83:10,10 119:18

164:25
pw 31:8

**q**

qc'd 53:4
qix 73:16,16
qualification 58:1
  96:24
qualifications
  38:15 58:2 182:6
qualified 39:25
  40:3,17 59:23
  60:4 172:21 182:9
qualify 58:7,9,11
  182:5
quality 53:4
quantity 119:8,9
quarter 113:9
  210:17 228:7,7
quarterly 86:12
  210:14,18 227:9
  227:12 228:4,9
  229:8
quash 10:3 13:13
  232:9
queens 52:23
quest 120:19
question 16:11
  32:25 80:4 91:23
  107:7 135:18
  158:11,13,24
  159:3 166:8
  167:17,24 178:21
  189:23 226:17
questioned 23:12
questions 87:5
  133:7 147:5
  174:18 176:14
  179:7 201:13
  230:21
quick 207:3
quickly 29:13
  40:9 43:9 54:7
  74:14 76:2,3,4

quite 57:1 116:21
  132:6,7 163:3
quote 128:15
  153:13 195:7
quotes 74:3

**r**

r 1:21 3:1,8 5:1
  110:2 233:1
rai 1:25
raise 180:5
raised 19:11
  177:11
raising 15:9
ran 42:17 139:17
random 47:25
range 165:6
rate 86:11,13
  125:3 133:21,22
  134:9,12,14,16
  135:11,15 136:4
  211:17
rates 23:21 67:7
  137:5,14 138:10
  167:7
reach 44:3 57:23
  58:3 59:12 61:11
  92:23 112:5
  124:14 127:25
  132:10 138:17
  142:21 143:24
  200:21 203:9
  205:20 206:6
  211:5,15 213:4
  217:3 218:2
  221:21 230:5
reached 128:3
read 27:9,9,10
  94:6 100:3 101:21
  128:22 129:5
  132:20 134:2
  137:16 138:2
  143:8 144:10
  170:20 225:24

reader 57:3
107:10,12
reading 155:19,21
ready 5:4,6 29:8
43:21
real 11:18 22:25
42:15 73:20 74:2
75:18 79:12 88:24
96:8,24 99:17
107:1,12 108:15
112:16 124:4,6
134:7 135:18,20
165:3 207:3
reality 118:24
119:1 120:23
123:7 124:22
really 12:17 14:21
16:15 18:5 19:12
20:16 22:23 24:1
26:2 44:13 65:3
71:24 81:12 123:5
136:10,17 140:14
172:18
reappear 80:2
reason 23:2 29:18
111:16 112:12
reasonable 46:25
58:24 146:22
214:9
reasons 6:3,7,21
8:19 9:15 12:9
24:5 176:5
rebuttal 19:11
41:3
recall 6:12 10:5
15:8,9 93:9
101:11 105:16
113:20 132:15
135:21 149:23
151:14,16,17
154:24 170:1
175:12,16

recast 139:21
receipt 86:22
88:11 192:17
214:20 217:21
218:6 221:24
receivable 140:13
receivables 140:3
142:1
receive 21:18
94:15 98:10
received 8:12
11:18 30:11,12
33:18,19 34:4,14
34:15 35:1 49:24
88:19 89:5 90:10
168:23,24 169:5
183:16 184:13,18
187:1 189:22
201:1,9 202:12
206:25 207:14
215:14 225:22
receiving 91:8
recess 113:15
180:3
recipient 229:4
recognize 59:23
recognized
146:11,14,18
recollection
194:25
reconcile 106:23
182:19 183:18
197:3 200:23
202:14 203:5,17
205:23 206:8
208:6 213:1
reconciled 75:10
183:21 185:8,9
195:3,23 196:17
197:14 199:12
200:13 201:11
204:21 205:5
207:12,18,21

209:18 212:19
213:19,23 219:9
reconciliation
182:21 183:10,11
183:12 184:9
185:12 194:23,24
195:1,8 196:3,8
196:16,19 197:2
197:10,12 198:22
198:25 199:3
200:11,17 201:7
202:10,11,16,23
205:12,22 206:2
206:16 207:11
208:4,13 211:11
211:17 213:9,17
214:5 219:3
226:15 230:6,7,12
reconciling 186:8
209:8
reconstructed
230:13
reconstruction
230:5,11
reconvene 113:9
record 7:25 9:15
9:23 30:24 33:24
34:5 57:11 81:7
88:19 95:3 103:22
126:22 128:22
130:15 153:14,21
155:18,22 185:13
187:14 191:2,3,4
202:15 204:6,8,14
208:18 217:12
221:13,14 227:21
233:4
record's 51:20
111:19
recorded 103:16
122:25 126:11,14
178:6 197:3

records 10:12,23
11:10 30:14,15,17
30:17,18,20,21,22
30:23 31:6,19,22
32:24 33:2,3,4,7,8
33:9,14 34:7 35:2
35:8,14,18 42:9
53:16,19 54:11,15
55:18 56:3,4,5,6,7
56:23,25 57:15,16
57:17,22 60:21
63:19 81:17 89:3
89:10 90:20 92:22
94:25 99:10 102:4
102:15 103:7,15
103:17 104:1
105:5,6,9,11,19
105:20,23 106:6,7
106:9,10,16
107:15 108:1,14
108:17 109:19
111:25 112:4,23
114:25 115:1
120:7,14 125:15
126:15,25 127:3
127:14,17,19,22
127:25 128:10
129:10,19,21
130:5,10,24
131:23 133:15
134:11 138:8
141:19 143:20
144:17,21 145:10
160:4 176:2
177:17 178:2,3,7
181:5,6,9,9,22
182:2,20 183:15
183:18,21 184:8
184:11,12 185:15
185:20 186:6,7,10
186:11,15,20
187:6,10,12,19
188:8,9 192:5

193:6 195:4,8,16
195:17,22,24
196:12,18 197:15
198:2,21,25 199:4
200:11,13,18,25
201:8,11 202:12
203:5 205:19
206:3,24 207:13
208:21 209:5,8
211:5,12 212:5,6
213:1,21 217:15
217:17,21 218:1,5
219:13,16,19,22
220:9,20,23 221:9
221:10,12,21
222:9,9,10 224:2
226:6 230:5,11
**recover** 131:24
**recoverable** 6:20
**recreated** 112:10
**red** 89:22 92:6
121:1 124:1
135:14,16 136:3
136:17
**redeem** 94:16
146:1
**redemption** 89:18
**redemptions**
94:21 96:4 145:12
**redirect** 177:4
179:9,10
**redundant** 140:7
**refer** 51:17 53:24
63:3,8,18 70:7
150:10 187:7
201:25 204:19
**reference** 198:9
200:2 205:7
209:23 210:10
219:10
**referenced** 141:24
**references** 8:4
202:17 225:18

**referred** 9:16 10:8
12:1 81:23 111:23
150:18 210:7
224:19
**referring** 81:16
111:20 153:3
**refers** 202:14
224:22
**reflect** 94:22
134:9 201:6
210:15 219:13,21
227:10 228:5
**reflected** 94:20
99:8 101:1 137:21
141:20 175:20
183:13 185:2,11
194:16 195:2,12
196:9,23 199:2
200:16 205:25
206:11,12 207:24
208:24 209:10
211:10 212:21
217:23 220:4
223:2 227:9 229:6
229:20
**reflecting** 211:2
222:20
**reflects** 198:17
201:6 213:19
216:19 221:16,18
222:18 223:11
228:11
**refresh** 151:11
194:24
**refund** 8:12
**refused** 178:15
**regard** 62:23
102:8 165:12
**regarding** 39:5
93:22 132:11
138:17 142:21
143:25 146:10,13
160:4 181:1 182:1

203:3 208:1
212:24 213:5
220:7,8 224:1
**regards** 23:5
**region** 42:24
44:23
**regional** 42:18
**registered** 44:17
44:22 111:10
**regular** 134:4,7
**regulator** 110:7
**regulators** 75:11
75:11,12 133:11
152:10
**reissue** 79:17,18
**reiterated** 6:22
**rejected** 41:4
**relate** 103:15
137:4 192:5
225:12
**related** 2:12 39:10
39:24 40:1 74:7
81:17 100:20
184:18 186:11,23
190:5 198:3
204:12,17 207:1
208:20,24 209:6
209:17 217:16,17
220:23 221:10
223:13 224:24
225:4,8,17 227:13
227:23 228:2
**relates** 140:4
192:20
**relating** 39:18
132:10
**relevance** 8:25 9:1
14:4 22:17
**relevant** 6:4,10
14:5 21:14 22:14
53:21 57:7 71:6
71:15 147:25
149:6 203:3

205:13 208:1
209:16 210:18
212:24 216:20,20
219:8 220:7 221:3
224:1 228:12
229:1
**reliable** 185:22,24
**reliance** 101:16
**relied** 19:6 59:12
117:15 185:13
186:7 196:12
**rely** 25:10 46:18
47:1 48:10 56:1
101:14 184:20
230:4
**relying** 24:25
138:23
**remaining** 13:17
**remember** 25:24
78:24 93:5 109:25
151:13
**remittances** 90:15
**render** 53:14 58:1
**rendered** 53:15
**rent** 161:12
**rephrase** 158:13
**replicated** 59:5
141:9 146:25
230:13
**report** 19:5 36:15
41:8 51:9,12,14
51:17 53:23 54:18
56:25 57:1,4,8,12
58:2 59:9,11
69:17 78:22 80:23
81:1,2,9 82:25
86:21 87:1,4 90:4
91:20 104:7,9
109:16 112:15,16
113:24 114:1,2,3
117:24 119:4
127:6 128:9
130:14,16,17

134:17,19,23
139:19 141:6,7,10
142:7 150:9,13,16
159:10,12,14,18
163:12,13,16,22
175:18 176:10,15
176:19,22,22,24
177:2,8,9 194:2,4
194:5 199:7 201:3
201:18,22 206:12
211:20 212:9
218:12,15 223:3
**reported** 87:25
89:4 115:6 116:9
117:2,19 123:9
126:12 135:19
203:12 211:19
213:8
**reporting** 9:3
67:11 133:22
137:5
**reports** 31:24
32:11,12 35:2,2
112:11,20,24
141:22,23 152:10
**represent** 70:4,8
103:13 104:22
**representation**
13:4 87:8 114:11
135:2
**representations**
143:18
**representative**
44:18 97:5
**represented** 88:10
101:24 106:3
107:3 143:12
**represents** 115:1
201:24
**reprint** 79:24
**reproduced** 209:4
**request** 12:10
30:2 59:22 143:17

225:15,18 227:2
**requested** 94:18
225:25
**requesting** 200:9
205:17 210:6
**requests** 8:2
**require** 31:19
**required** 57:5
**reserved** 29:23
**respect** 32:9 33:1
155:13 164:24
196:24 215:5
221:8 225:3
227:15
**respectfully** 12:10
**respective** 231:4
**responded** 105:22
**response** 18:8
26:3
**responses** 8:1
29:25 30:1
**responsivity**
182:21
**rest** 12:7 82:11
120:17
**restored** 55:1,5,6
55:9,12,13
**restoring** 55:4,11
**restrictions** 56:11
56:18
**result** 23:16
**results** 59:5 96:8
102:7 106:16
118:11 146:25
196:8,16,17 199:7
201:3 202:10,10
205:22 206:12
207:11 211:20
213:17 214:5
218:11 219:12
223:2,14 226:16
230:11

**retained** 11:2
147:18,21 148:24
149:22
**retirement** 209:13
209:20 210:5
224:18,19 225:6
225:13,22
**return** 8:5 23:21
62:12 67:8 86:10
86:11,14 133:21
133:22 134:9,12
134:14,17 135:11
135:15 136:4
137:5,15 138:10
143:17
**returns** 135:24
136:13,17,23,25
**revenue** 140:11
140:11
**review** 49:4,12
56:12 60:20 80:5
81:17 90:20 92:22
102:4 107:15,25
109:18 112:3
125:15 127:24
128:9 129:9
134:11 138:8
143:20 144:17,21
145:10 150:13
154:21 184:9
185:20 186:20
187:9,19 190:16
195:14 205:19
211:5 216:8 217:3
217:10 218:1
219:18 221:21
226:6
**reviewed** 5:10
52:20 181:22
184:13 186:3
187:15 195:16
208:1 213:22
214:16

**revise** 79:11
**rich** 4:12
**rid** 34:19 38:23
**right** 5:8 7:10
9:13 11:11 15:17
17:2 18:18 21:3
24:14 28:7 29:10
32:16 33:15 34:1
34:22 35:1,1,24
36:3,9 60:4,9,25
61:18 62:3 63:25
64:7 69:1 75:2
85:9 87:14 92:12
92:15 93:23 97:19
110:1,14,21 113:8
113:10 115:24
121:1,15,17 122:5
123:16,17,24
140:16,17 141:10
149:4,12,16
150:20 151:19
152:1,20,22
154:10,17 155:1,9
155:9 156:17
160:14,16 161:18
161:21 162:3
164:2 165:23
166:17 167:5,10
168:16 170:11
172:19 175:2,5
175:25 176:8,18
177:12 178:13
179:3,23 180:5
181:15,20,20
191:4,22 192:1,3
192:16 193:16
198:15,16 200:5,6
204:15 205:14,15
209:2,3 210:2,3
210:10,13 221:13
221:17 225:21
228:22,24 230:22
230:23,24

**rise** 36:8 152:11
**risk** 98:21 120:3
 126:7
**road** 32:25 233:21
**robert** 4:12 5:21
 232:6
**rockefeller** 3:5
**roles** 44:2
**roll** 43:8 99:5
**room** 73:9,12
**rooms** 231:4
**roughly** 5:25
 147:12
**routed** 71:16
**row** 71:8 72:12
 75:1 77:23 131:1
**rows** 70:9
**roy** 154:19 155:13
 157:3,8 170:7
 173:16
**rpg** 78:21 79:9
**rudimentary**
 47:10
**rule** 11:21 34:11
 39:1 57:4
**ruled** 9:8 14:8,10
 14:24 29:3,4,21
**rules** 8:20 15:24
 21:15 39:1 41:11
 219:18
**ruling** 9:11,12,13
**rulings** 15:4 232:3
**run** 42:5 47:21
 54:7 91:12 103:1
 112:19 126:9
 146:7 165:18
**runner** 103:1
**runners** 102:25
**running** 76:1
 91:11 122:13
**runs** 54:6 123:2

**s**

**s** 3:1,13 5:1
**s&p** 97:1 126:2,3
 135:7,23,23,25
 136:11,11,14,20
 137:1
**safe** 102:23
**safekeeping**
 177:13,14
**safer** 98:20
**safes** 103:24
**salaries** 161:10
**salary** 147:16,18
 147:20,21 148:2
 148:13
**sale** 65:15 99:3
 102:13 104:2
 117:8 118:20
 126:4 132:11
**sales** 117:2,3,5,6
 120:1 123:13
 133:12 134:6
**satisfy** 21:15
**saved** 109:4
 111:13
**saves** 21:1
**saw** 78:4 84:2
 91:24 95:20
 136:16 165:20
 172:12 199:24
 216:15 219:2
 223:10 224:23
 229:8,13
**saying** 23:24
 56:22 85:4,6
 90:12 103:18
 107:16 158:3,4
**says** 5:17 6:25 8:5
 18:9 44:18 45:20
 50:11 70:10,14,18
 76:9 87:13,18
 90:7,8 93:21
 105:2 108:16

 110:2,15 111:7,12
 111:13 114:21
 115:3,5 123:19
 130:19,21 156:15
 157:11 170:22
 171:1,20 172:5
 173:7,9 176:15
 225:15
**scalable** 62:22
**scale** 107:8
**scaled** 107:8
**scaling** 107:10
**schedule** 57:12
 179:20
**scheme** 24:12,17
 24:22 25:1 26:10
 40:5,9 91:12
 95:14 96:6 125:6
 137:7,8 140:7
 143:12 144:2,5,6
 144:7,13,18 165:1
 165:8,13 168:9,12
 168:16
**schemes** 164:24
**schwab** 76:14
 79:16 103:18
**scoured** 90:15
 95:3 153:14
**screen** 7:21,23
 43:8 105:4 109:14
 111:4 114:7
 115:19,21,22
 121:9 123:16
 156:1 191:19,21
**screenshot** 111:18
**scroll** 73:15
 170:15 173:13,16
**se** 32:11
**sean** 4:10
**seanna** 3:8
**search** 47:25
 56:19

**searching** 57:6
**seat** 36:13
**seated** 5:2 113:16
 180:4
**sec** 34:7 44:23
 50:19 62:4 108:11
 108:12,13 133:11
 178:25
**second** 10:2
 114:19 125:20
 130:19 140:19
 155:6,9,10
**secondly** 6:11
**seconds** 110:16
**secretary** 34:8
**section** 54:18
 228:9
**secured** 184:11
**securing** 55:2,10
**securities** 1:7
 11:19 12:22 18:12
 18:13 23:1,2,3,8
 23:17,19 24:19
 63:23 64:11,15
 80:12 94:12
 100:15 102:6
 103:9 129:3 133:3
 133:12 137:25
 143:16 144:15
 154:25 155:4
 161:14 168:19
 169:12 170:22
 171:2,21 172:6,10
 172:16 173:1
 174:3,9 176:8
 177:19,23,25
 193:25 194:9,13
 198:8
**security** 24:23,24
 101:25 109:22
**see** 8:8 14:18
 47:21 48:5 62:16
 69:4 70:22 73:10

73:23 74:19,21
76:7,23 78:25
79:1,1 81:10 83:4
83:6,20 85:3
87:19,22 88:8,17
90:15 92:8 101:17
103:12 104:20
106:20 108:14,22
108:23,24 109:1,9
109:25 110:2
111:5,17 114:4,20
115:13 117:4,9
118:3 119:20
120:16,19 121:25
122:11 123:3,4
124:22,22 127:11
127:19 130:18,25
131:12 135:17,21
136:2,8,10,14
141:9,25 142:12
144:22 154:13
156:14,16,17,18
156:19,22,24
157:10,12,16,19
157:20 158:2,3
159:8 163:20,21
170:11,18,19
171:20,22 172:14
172:17 173:7
174:10 177:12
178:16 191:6,6,9
192:12,17 194:15
210:9,21 219:19
222:21 225:15
228:17

**seeing** 116:19
229:5

**seek** 166:4

**seeking** 17:2
27:16

**seen** 88:24 125:18
154:23 162:10
174:1 225:16

**select** 100:10

**selected** 44:10

**self** 224:17 226:1
226:7

**sell** 63:23 66:17
68:11,20,22 71:21
80:17 97:21
100:19 108:16
118:24 124:4,19
150:10 166:22
179:3

**seller** 65:11

**selling** 44:20
92:13 123:23
124:1 125:16
133:1

**sells** 63:16 73:25
108:16

**send** 88:15

**sending** 88:13

**sense** 74:20
131:22 180:21

**sent** 65:14 137:22
168:18 174:9
181:16 188:18,25
189:8 198:5,6
215:8

**sentence** 94:10
143:9 144:11

**separate** 65:20
93:15 201:21

**september** 116:7
156:23 157:15
193:5,17,21,24
194:6,10,15

**series** 44:22 48:13
48:17 49:8,9
99:18 139:21

**served** 25:12
45:13

**server** 65:21

**servers** 65:20 67:5
73:9,9

**services** 77:2,2

**servicing** 40:5

**session** 29:16

**set** 8:1 11:15 19:5
24:8 59:11 62:10
68:11,20,22 96:25
125:25 139:24
142:7 202:17
207:10 210:13
219:2,8,12,17

**settle** 97:14
102:20

**seven** 18:25
115:17 175:9

**sevenths** 131:7

**sham** 50:25

**share** 105:11
106:24,24

**shares** 65:6 74:12
74:17 103:19
104:25 105:6,11
106:2,5,8,21,22
106:22 107:3,16
115:4,24 116:1,1
116:8,10 119:13
143:15 149:18,20
149:21

**sheehan** 4:11

**sheehan's** 24:7

**sheet** 138:21,23
139:1,2,11,24
140:13 142:4

**sheets** 139:21

**shelling** 179:1

**shifrin** 3:13

**shift** 117:4

**short** 31:4 32:22
35:6 82:12,14
85:12 90:22 91:18
91:21 131:20,24
178:10 179:1
190:9,10 229:15

**shorts** 179:3

**should've** 48:23

**should've** 89:14

**show** 79:18 84:2
108:13 122:23
141:6 153:21
159:8 160:5
164:19 190:20
192:9 199:18

**showed** 89:4
105:12 158:8
170:25 172:1
215:23 222:21

**showing** 54:18
94:25 105:6
106:16 116:2
164:8 178:10
213:16 222:4

**shown** 83:17 89:9
92:3 119:3 127:17
141:6 205:20,23
211:7 213:2
216:22 219:25

**shows** 83:8,16
91:13 110:12,24
111:5 122:24
125:1 131:15
155:5 157:10,19
158:12 196:16
197:22 198:11
199:19 217:1
227:13 229:3,7

**shtupping** 134:15

**shy** 131:13

**side** 41:1 55:7,15
61:5,6,8,19 63:4,6
63:9,14,17,20,21
63:22,25 64:11,13
65:11,17 66:1,17
66:24 67:4,10,12
67:16,18,19 68:4
68:7 69:2,2 71:12
71:18,20 73:6,23

76:15,17 77:3,4,5
85:5,5 89:4 99:20
104:19 106:9
112:10 120:10,11
122:19 127:13,21
127:21 139:15,15
144:14 152:25
162:22 192:12,16
193:17 210:10
225:14
**sides** 7:23 38:5
54:13,21 63:3,21
67:4 139:14
**sign** 110:9
**signals** 123:11,12
**signed** 224:25
225:19
**significantly**
149:24 150:6
**similar** 39:5 41:24
44:7 54:22 127:7
127:11 130:1
136:2,3 142:4
199:3 200:17
206:2 208:13
211:11 218:7
219:2 223:10
229:10
**similarly** 70:19
136:21
**simple** 132:14
133:9 141:11
160:1
**simplest** 160:3
**simply** 18:10
19:21 57:25 96:10
106:13
**simulation** 49:9
49:11
**single** 52:18 71:1
87:21 106:24,25
107:1 142:12

**singles** 126:9
**sir** 28:15 33:5
69:11 83:1 86:25
93:14 104:8
133:14 134:21
**sit** 5:19 20:24
82:16 111:16
**site** 77:7,8,10,12
**sits** 103:23
**sitting** 82:15
85:16 103:24
106:17 107:24
149:9
**situation** 27:1
40:16 46:4 57:24
82:9 117:10
128:18 136:1
141:1 183:6
**six** 50:8 79:21
91:18 97:10 98:1
151:6,7,8 153:4
156:21 157:14
228:17
**sixty** 145:20,21
**size** 52:18
**skills** 230:4
**skip** 58:8
**slice** 83:12,20
121:19
**slicing** 118:17
119:17
**slip** 63:4,18 198:2
198:10,11 221:18
221:19
**slips** 186:23
**small** 51:8 83:12
93:11,16,21
121:14 216:2
229:18
**smb** 1:3,4 2:1,3,7
2:11
**smoother** 159:3

**software** 47:10
48:2,3 69:25
70:12,14 72:18
73:2 77:24 78:4,7
78:8,9,17,20,22
78:22 79:9,20
109:7,8 111:10
112:9,15,18
**sold** 47:12 48:19
48:19,20 64:11
83:24 97:9,17
98:10 102:25
**sole** 172:2
**solemnly** 36:10
180:6
**solutions** 233:20
**solvency** 59:25
138:12,15,17
146:13
**solvent** 139:3
142:11
**somebody** 18:3
20:11 26:25 63:11
71:20 77:9 81:15
84:3 97:17 98:5
98:17 103:1 111:7
111:9,12 128:14
131:10 139:8
152:11 167:3
177:11 178:2,5
**something's** 121:1
**somewhat** 91:10
**sonya** 2:25 233:3
233:8
**sophisticated**
64:21 66:15
**sorry** 14:20 25:21
33:23 36:20 74:24
90:3,5 93:24
104:24 134:20
148:9 149:13
150:3 155:11,12
155:17 157:7

173:15 184:12
189:15,25 205:21
210:17 226:17
**sort** 81:13 91:25
92:1 95:21 103:24
118:7 121:25
122:11 124:17
125:9 147:16
**sought** 10:10
146:1
**sound** 140:7
181:25
**sounds** 19:15
151:19
**source** 33:8 80:18
80:20 85:18 92:23
95:7 125:11 135:6
145:11,14 164:9
186:5 189:22
191:2 193:6
197:17 206:22,23
208:19 212:2,4,11
**sources** 69:19,20
80:24 84:16 92:7
115:7 135:5
164:12,13 201:7
202:11,25 207:13
212:19
**southern** 1:2
21:17 39:12 40:20
50:5
**speak** 80:3 99:5
121:2 148:7
155:22
**special** 43:2 48:2
50:3
**specialist** 45:5
59:21
**specific** 24:9 53:9
53:11 59:14 134:9
158:19 174:4
184:20 185:3
201:10 202:17

205:22 207:17
225:4
**specifically** 24:11
45:7 133:21 174:6
182:17 183:9
222:11
**speed** 75:24
**spend** 86:19
**spent** 42:8 55:20
86:11 164:14
**spiraled** 40:8,13
**split** 61:22 62:2
62:16,19 64:3
91:3 96:22 98:14
99:2,22 100:5,17
100:24 101:1
102:11 114:16
118:10 125:20
128:5,11 129:7
131:18 132:16
133:17,20 135:21
137:23 144:23
**splits** 175:24
215:17
**spoke** 45:15
**spoken** 158:21
**sports** 42:10
**squiggly** 107:5,7
107:13
**stamp** 222:18
**stand** 36:6 39:15
148:10
**standalone** 67:19
**standard** 97:1
100:8,12
**standards** 46:6,6
46:23 52:11 53:8
58:17,20 59:3
**standpoint** 56:21
**stanley** 7:25 154:8
154:9 197:5,8,21
198:6 199:5,17
200:2,8,19 215:9

215:15,18 216:17
216:25 217:7,19
218:8,23 222:17
223:23 224:10
**start** 71:8 112:22
114:13 128:23
143:10 155:11
197:16 224:13
**started** 40:5 42:4
42:5,6,20 60:7,25
109:3 172:1
180:24
**starting** 94:7,8
102:15 128:21
130:18 132:20
143:8 179:24
204:6 208:18
221:13
**starts** 8:4 47:19
76:13 97:25 117:3
**state** 9:4 15:5 34:8
37:9 40:22,23
41:1,10 43:7
44:21 75:12
106:13 180:9
**stated** 8:20 9:16
24:5 25:9 46:25
180:10
**statement** 18:13
20:12,16 77:10
78:19 79:7,9,15
79:17,18,22,24,24
79:25 103:11,13
146:1 157:18
158:12,20 159:24
160:6 170:10,16
171:25 172:1
190:12,13,14,25
192:3,17 193:11
193:14 197:13
198:17 199:2,13
199:25 200:14
203:18,20 204:24

205:2,3 208:25
209:11 211:7,10
213:20 219:7
220:8 221:15,16
223:13 227:10
229:9
**statements** 12:6
26:11,12 54:9,10
56:6 67:7 68:2
79:12 83:18 84:18
84:20 86:23 87:18
87:25 88:8 99:9
99:20 106:6 108:9
114:25 120:21
127:12 130:24
134:8 135:20
137:21 145:17,19
154:11,13,15,22
159:8 169:23
171:17 172:5
175:20 176:5
178:11,17 182:18
183:13 184:21,22
185:3,8,11,18,21
185:23,25 186:22
187:14,22,24
188:9 190:16,19
192:9,25 193:4,8
193:12,16,20,23
194:21 195:2,8,11
195:15,21,24
196:10,20,23
197:4 199:4
200:16,18,22,24
202:3,7,22 203:4
203:6,10,11 206:1
206:3,7,9,23
207:6,8,20,22,23
207:24 208:14
209:9 210:14,18
210:19 211:12,16
211:19 212:4,17
212:18,22,25

213:2,5,8 219:25
227:12 228:4,10
**states** 1:1,14 45:9
49:16 100:15,16
102:19 129:2,3
163:1
**stating** 6:23 15:8
**status** 138:6
**stay** 139:6
**staying** 73:15
**step** 179:11
**steps** 46:13
**sterns** 154:4
**stick** 113:2 133:25
**stock** 48:14 49:11
65:14 85:1 86:3
86:12 88:21,24
97:13 98:4,12
99:4,4 100:22
102:21,23,24,25
103:1,19,23 104:2
104:21 105:6,12
106:12,13 108:8
110:8 112:6
113:20 114:16,20
114:23 118:1,18
122:16,17 123:9
123:13 126:5
143:15 145:1
148:18,20,24
149:5,7,12,16,18
149:25 150:2,4
162:9 176:1,6,12
177:17
**stock's** 103:23
**stocks** 44:20
63:15 64:2 66:2
68:11,20 71:2
73:8,24 74:21
75:18 78:6 80:17
88:3 92:10 97:1,2
97:4 98:22 100:7
100:11,19,20

102:13 103:5
106:15 108:7,8,16
112:13 113:3
115:13 125:16
126:2 133:1 134:5
135:22 136:21
**stopped** 44:14
136:7
**story** 136:18
**straight** 135:17
136:17
**straightforward**
5:16
**strategies** 61:7
**strategy** 61:2,4,9
61:11,19,23 62:2
62:2,17,18,19,20
64:4 91:4 96:16
96:22,23,24 97:21
98:15 99:2,8,13
99:16,22 100:5,18
100:24 101:2
102:12 118:11
121:18 125:10,21
125:24 126:1,6
128:6,11 129:8
131:18 132:17,23
132:24 133:18,20
135:22,24 136:19
137:23
**stratus** 75:21,23
**street** 3:17 62:20
102:22
**stretch** 77:13
**strike** 13:24 18:9
61:22 62:2,16,19
64:3 91:3 96:22
98:14 99:2,22
100:5,17,24 101:1
102:12 114:16
118:11 128:6,11
129:8 131:18
132:16 133:17,20

135:22 137:23
144:23 175:24
**stripping** 55:3,10
**structure** 172:22
**structured** 63:1,2
**stuart** 1:22
**stuff** 85:9 103:25
113:12
**subcomponent**
43:25
**subject** 26:3,3
160:20
**subjective** 10:16
**submission** 35:16
**submit** 7:16 10:8
**submitted** 5:23
**submitting** 160:22
**subpoena** 10:3,10
13:14 232:9
**subpoenaed**
105:21
**subscribe** 49:16
**subsequent** 8:8
41:19 87:22
139:22 142:3
159:11
**subsequently**
50:20
**substantial** 26:13
**substantive** 143:5
**subtract** 139:12
141:11 142:9
**sudden** 98:2
**sue** 222:24
**sufficient** 57:23
**suggest** 27:3
34:22
**suit** 40:24
**suite** 3:17 233:22
**sum** 114:22 119:8
**summarily** 41:4
41:12

**summarize** 95:6
121:4 133:17
142:20
**summarized**
137:4 199:7 214:6
**summarizes**
201:17
**summary** 107:25
142:8 196:7,15
201:17,19 203:2
203:23 206:15
207:25 211:22
212:9,13,14,20,23
213:10,17 215:4
218:16 219:3
220:7 223:25
226:15
**summing** 119:6
**supervise** 52:20
**supervision** 52:17
**support** 59:14
108:17 130:12
152:3 217:21
218:5
**supported** 57:2
200:14 227:12
**supporting** 221:7
**supports** 202:23
218:21 223:21
**suppose** 16:9
20:12
**supposed** 40:7
67:17 79:3,4
88:18 114:25
118:11 126:1
128:13,19 130:7
**supposedly** 64:7
65:25 88:1 105:7
123:3
**supreme** 40:22
**sure** 18:5 34:23
46:24 52:25 53:1
53:3,6,10,22

58:12 84:24 89:2
95:4 103:8 119:6
121:8 148:11
166:8 181:11
**surprise** 25:7
108:12
**surrounding**
90:18
**survive** 165:14
**suspicions** 106:14
**suspicious** 137:12
**sustain** 13:13 40:9
91:21 174:17
**sustained** 178:21
232:10
**swain's** 39:22
**swear** 36:10 180:6
**sweep** 82:2,3,11
82:19,20,20 92:18
166:24
**sweeps** 82:21
83:14 85:9,23
90:23 92:18
153:16 166:12
190:10
**swings** 120:4
**switching** 132:15
**sworn** 55:18
180:13
**symbol** 114:20
**symbols** 119:5
**system** 45:8 54:20
54:20,21,22 55:4
55:12 64:19 65:7
65:8,8,9,10,12,13
66:25 67:1 70:11
71:14,16 72:1,13
72:14,17,22 73:1
73:19,21 74:7,25
75:4,5,23,23 76:7
76:9,10,12 103:4
112:14 146:5,6

**systems** 54:22
64:21 65:3,19
66:20,21,23 67:10
69:23,24 70:2,5
70:24 71:23 73:9
73:9 76:8,16,25
77:16 80:5,11
146:11

**t**

**t** 110:2 153:25
154:10 156:21,23
157:15 158:1,1,7
158:19 159:6,8
160:5 165:23
166:7,9,14,17,18
167:22 168:4
175:9,10 177:17
233:1,1
**tab** 183:6
**table** 87:1,3
130:14,16 142:7
**tagged** 53:1
**take** 13:23 15:13
15:14 16:4,9
35:11 36:13 41:23
43:13 47:13 48:13
63:16 69:4 71:4
72:10 73:9 74:25
77:23 84:4 97:18
109:13 113:6,8
123:17 131:25
138:13 141:11,16
142:9 169:16
173:10 218:18
231:17
**taken** 14:11 16:8
65:15 68:4 85:13
91:1 106:5 132:9
135:8 136:24
140:8 141:2 153:7
155:2 161:19
165:23 167:2
183:6 189:7

**takes** 34:17 55:1
76:13
**talk** 29:9 30:14
38:15 53:16 64:22
65:18 69:1 72:11
73:16 74:15 77:21
78:15,18,19,20
80:16 84:15 96:16
102:11 109:16
118:10 123:13
125:20 128:5
133:21 172:21
179:20 194:23
197:9 199:9 204:3
214:11
**talked** 12:4 23:20
23:21 39:17,18
66:15 77:20 80:16
94:24 96:12,14
109:11,25 112:18
122:13 126:23
127:5 152:25
178:7 196:13
217:18 228:5
**talking** 62:24 78:2
113:20,22 119:2
122:6,20,22
134:13,15 166:12
166:13 169:14
175:22 185:7
188:1 210:11
229:23
**talks** 79:2
**tamps** 136:1
**tapes** 54:23,24
55:5,9,13
**tariffs** 98:24
**task** 49:19
**tasks** 68:5
**tax** 2:12 8:5,12
40:11 41:23 42:13
42:13,14,17,18,19
49:21,21 211:1

228:19,24 229:9
**taxation** 41:21,25
**taxes** 5:25 6:14,17
6:18,23 7:15 8:10
8:25 9:1,6,18 40:8
51:3
**taxing** 2:13 9:5
**teachers** 50:7
**teams** 42:10
**technically** 140:6
141:3
**telephonically** 4:8
**tell** 28:13 47:24
48:1 51:11 52:7
57:25 70:7 71:14
73:17 75:3,21
79:8 111:8 114:14
121:11 133:11
137:10,11 139:18
141:16 142:6
164:16 173:25
196:19 201:23
202:21 204:6,21
207:3,19 209:1
212:16 214:11
218:20 220:21
222:12 223:19
225:2 230:1
**telling** 22:14
132:22 153:22
**tells** 23:8 58:10
124:23
**ten** 89:6 119:14
151:22,23
**term** 82:12,14
85:12 90:22 91:18
91:21 118:13
142:17,23 178:22
190:9,10 192:20
192:23
**terminal** 110:5,9
111:16 174:25

**terminals** 67:20
**terms** 100:9
108:21
**test** 44:15 53:6
123:22 138:20,21
138:22,23,23
139:1,2,7 142:4
**tested** 53:4
**testified** 23:13,14
23:24 39:3,4,9,11
39:14 40:13 49:10
50:22 66:23 95:19
115:8 152:13
153:19,22 160:24
165:20 166:1
167:14 174:15
175:13,16,21
177:16 181:23
**testify** 5:24 10:11
11:21 13:10,11
18:10 32:4,13,15
41:11 59:18,23
93:7 99:22 160:2
176:22
**testifying** 28:18
44:2 119:1 132:16
159:25 164:1
178:19,20
**testimony** 2:8,12
5:21 6:4,10 8:19
8:22 9:15,22
11:13,14,22 12:11
13:9 14:19,21
15:1 16:2 17:3
21:21 22:14,22
23:6 24:9 27:17
31:7,8,20 35:15
35:20,22 36:10,15
39:1,21,24 40:17
40:24 41:4,5
50:24 51:18 55:18
132:5 152:5,18,23
153:16 168:8,11

180:6 232:7

**testing** 43:11
53:11

**tests** 52:4

**thank** 5:11 9:24
10:1 13:15 21:8
21:19 28:3,4 29:1
33:21 34:16 36:2
36:18 60:4,5,6
61:10 81:4 94:5
101:7 113:13
147:4,6 148:12
163:25 164:23
173:16 179:11,13
180:12,16 182:10
191:24 204:1
211:4 226:14
230:21,24 231:16

**thanks** 60:9

**that's** 55:16,19
57:11 58:9 63:19
64:8 68:10 70:11
72:1,6 73:13 75:3
78:25 79:2,6,7
82:19 84:11 85:7
88:25 91:14 92:14
92:20 94:23 95:22
98:14 99:21

**theoretical** 121:25
122:2

**theoretically**
122:1

**theory** 43:22 60:1

**there's** 65:17
71:19 72:23 73:7
74:1,2,8 75:9 77:6
78:18,18 83:12
85:8 90:6,7 95:23
98:24

**they'd** 56:15 65:7

**they'll** 63:12
76:11 79:18,19

**they're** 66:14 71:6
74:20

**they've** 79:18

**thing** 25:6 29:15
52:19 53:22 76:14
141:17

**things** 23:24 24:1
24:20 31:10 34:25
48:5,23 52:1,22
53:7 57:6,10,17
66:4,10,16,19
72:24 73:11,13
75:7 76:4 78:8,23
80:2 90:9 91:14
161:11,12 165:24
214:12 230:25

**think** 5:16 6:5,6,9
8:19,20 11:7,12
14:3 22:13 26:2
26:12 27:2,2
28:15 29:4,12
32:3,23 35:6,13
39:20,21 45:11
47:17 49:6,25
50:10,11 51:11
53:22 54:23 55:20
58:11 61:18 65:2
66:6 78:1 79:7
80:4,24,25 81:3
87:1 89:25 91:9
91:18,19 93:11
94:1 98:22 109:15
111:19 113:24
114:3 119:3 121:6
121:7 123:15
124:17 127:5
128:6,8 141:7,15
145:23 149:1,2,5
149:25 151:4,5,10
151:22 152:18,23
152:25 153:18,21
159:23 160:2,16
160:19 165:5,25

169:2 174:17
175:14,21 180:21
182:1 187:23
189:21 198:3
216:4,15 217:9
223:3 226:11,12
231:8,13

**thinking** 35:21

**thinks** 43:24

**third** 31:3,22
33:14 35:8 56:3,4
56:5,6,7,10 57:16
70:14 91:7,24
114:20,21 115:7
120:14 128:5
130:20 144:16
181:9 183:18,21
186:6,6

**thirdly** 6:6

**thornton** 42:8

**thought** 20:4
31:23 32:1 44:11
56:13 64:6 69:8
81:14 93:24

**thousands** 55:22
62:10,23 101:25
133:4 138:4

**threat** 98:24

**three** 11:20 39:15
41:12 49:9 52:1
81:24 144:23
153:1,19 154:16
157:14 169:24
186:1,14 193:10
201:7 202:9,11,20
202:25 207:12,17
210:24 213:11,18
213:21 214:23
226:22 230:7

**ticker** 114:19,19
114:24

**tie** 20:2 106:9
107:22

**tilt** 74:14

**time** 10:18 21:2
22:3,3 27:10
34:25 38:7 40:15
41:13,24 42:11
44:11 52:4 61:2
62:3,14,24 65:4
72:16 73:20 74:2
79:21 81:17,17
87:18 96:20 99:10
100:13 102:23
109:2,3 110:6,15
110:16 113:4
114:15 118:17
119:17,19 121:19
121:20 122:14
123:1,3,6,24
124:2,4,19 125:24
126:8,10 128:15
128:18,25 131:3
133:14 134:7
135:12 147:4,20
147:21 148:2,6,20
149:19,21 153:5,6
162:13 163:3
165:14 167:23
169:16 175:15,22
177:8 180:19,25
187:3,4 190:2
194:6,20 207:2,15
222:8 229:15
230:21 231:9

**timeframe** 229:13

**times** 6:15 39:4,8
115:4 116:12
119:8 133:3,4
136:14 153:11

**timing** 64:6 99:5
120:1

**today** 12:7 28:17
39:6 41:14 149:9
179:18 188:1

**told** 13:11 53:25
98:16 132:24
133:10 136:18
**tomorrow** 179:21
179:24 230:24
231:3,6
**tonight** 231:8
**tony** 50:4
**tools** 48:2
**top** 119:6 123:17
136:25 156:15
173:6,21 201:23
210:9 216:18
221:1 225:15
**topic** 138:13
**total** 88:16,17
104:23 105:6
115:25 117:7
130:24 139:25,25
141:11 142:9,10
154:14 161:21,22
198:13,18 215:9
215:12 224:7
229:23,24
**tough** 180:17
**touted** 126:6
**trace** 45:8 182:21
214:19,22 218:4
219:24 220:9,13
222:24 224:2
**traceable** 84:25
**traced** 85:1 161:9
183:25 184:2,4
214:16 216:10
222:22 223:21
224:8 230:1
**tracing** 184:9
186:8 205:13
214:11,12,14
215:6,23 216:20
217:11 218:7,11
218:21 219:11,12
219:18 220:19

221:3 222:3,6
223:14 227:22
230:8,12
**track** 72:23
195:18,19 227:4
**tracked** 71:22
75:13
**trade** 26:11 54:9
54:10 63:10 64:2
65:22 66:5 68:6
71:19,19,21 74:7
75:8,9 76:5,5
77:11 79:13,14
85:1 92:10 95:18
98:19,23 103:16
107:23 108:8
114:17,18 116:3
117:11 119:7,8,18
134:8 156:15
157:11 172:10,18
172:21,23 173:19
173:22,23 175:4
175:13 178:3
**traded** 43:19 68:9
100:9 106:15,15
107:18 115:14,16
115:25 116:3,4
126:20,21 127:11
127:14,16,20
128:4 129:13
**trader** 119:12
120:16 121:17,20
123:20
**traders** 72:24
76:1 122:11
124:25 151:2,9
152:3 161:14
**trades** 23:14,15
23:20 26:6,6 64:7
66:18 67:25 72:15
72:16 73:21 75:7
75:11 76:3,9,21
77:13 78:17 80:6

80:10 83:18 88:21
95:18 99:18,21
101:25 102:1,6,20
102:21 104:18,20
104:21 107:4
116:14 117:16,17
117:21 118:4
119:7,9,23,24
120:9,20,22
121:19 123:11
125:11 126:11,12
127:22 128:16
135:19,19 136:18
137:19 145:1,3,5
162:8 166:2 175:6
175:6 176:6,7
**trading** 54:11,12
61:2,3,7,14,16,19
61:23 62:19 63:7
63:8,9,12,17,21
63:22 64:11,20
65:1,2,4,21 66:1,7
66:15 67:4,6,10
67:15,15,18 68:3
68:7,8,9,18 70:1
70:11,15,17,22,25
71:2,9 72:2,4,5,6
72:14,20,24 73:2
73:4,7,21,23,25
74:3,3,9,19,20,20
75:7,16,19,24
76:15,17,23 77:4
77:18 78:2,5,6
79:3,4,13 80:13
80:14 83:5,16,21
83:24 84:3,12,13
91:5 95:12,22
96:2,8,9,12,24
103:15 104:19
105:5,5,7,18
106:1,6,9,21,24
107:22 110:5
112:6,13,21 113:1

113:1,20 114:25
114:25 115:10
117:9 118:7
119:18 120:2,12
120:20,24 122:1,6
122:9,12,15,17,18
123:9,23 124:9,10
124:15,20,20
125:9 127:9,10,13
127:19,20 128:1
129:23 130:2,3,4
130:9,20,21 131:3
131:6,13,16,17,21
137:14,20 138:10
139:15 140:5,6,9
140:10,15,17,18
140:19 141:1,23
142:2 143:5,14
144:23 146:17
150:11,19,20,22
150:25 151:3,6
152:1,6,9 160:25
161:6,20,25 162:3
162:14,14 164:6
168:12 175:19
176:1,11 177:6
178:1,4
**tradings** 64:15
118:6
**trail** 53:2 74:25
75:5,10,19
**trained** 47:9
**training** 43:3
44:15 45:3 47:13
57:19 59:6 147:1
230:14
**tranche** 130:10
**transaction** 185:3
192:12 195:23,24
195:25 197:23
199:19 202:4,4,5
202:5 204:22,23
205:6 207:9,9

209:12,19 210:25
211:9 217:23,24
219:5,5,5 221:10
225:5 228:18
**transactions** 21:5
137:21 159:23
182:18,20,22
183:13 184:22
185:2,6,7,10,23
190:5,14 194:16
194:18 195:2,4,11
195:12,14,16,17
195:18,20,22
196:9,18,22,25
200:15,24 202:2
202:24 203:6,11
206:9,10 207:1,6
207:21,23 210:16
210:16 211:18
212:18,21 213:2,7
213:20,23 214:1,3
219:4,9 226:16
228:8,10,12
**transcribed** 2:25
**transcript** 15:23
15:24 24:10,11
26:20 155:19
233:4
**transcripts** 55:18
**transfer** 77:8
88:11,12,14 90:12
192:11,13,18
221:8
**transferred** 155:3
161:4,23 164:5
**transfers** 186:25
187:2 188:1,17
190:7
**transmission**
75:14
**transmittal** 90:12
90:18

**treasure** 23:3
**treasuries** 64:8
68:15,24 80:18
91:2 98:19,20,24
99:6 128:6,10,17
129:11,12,16,17
130:11,25 131:1,2
131:5,9,12,14,15
131:16 132:2,10
132:11,13 145:5
152:24 153:6,9,20
167:4,5,10 178:9
178:12
**treasury** 20:10,10
20:15,15 22:24
23:20 26:6 82:14
86:6 100:16 129:3
129:19,23 130:2,3
130:5
**treatise** 57:18
**tremendous** 88:25
**trial** 2:1,8,16
10:11,19 12:8
13:13,23 14:17
15:6,23 17:3,21
19:1 20:2,19,25
21:14,20 22:6,7
22:20 24:15 26:16
27:3,11,18 29:16
29:23 31:1,8
35:22 39:1,6,12
39:13 40:18 46:15
50:23 63:8 78:10
80:24 119:3
160:23 203:14
**trials** 39:6
**tried** 26:19 56:25
57:2 164:10
**trier** 46:11
**true** 133:17
150:23 153:25
159:20 161:1,7
165:16 171:25

175:20 176:12
177:24 233:4
**trust** 102:18
109:23 186:17
187:20,21,24,25
188:23,25
**trustee** 1:6 3:4,16
5:13 6:20 10:3,4
10:10,21 11:25
12:2,19 13:1,6,20
15:7 16:18 18:11
18:17 20:23 21:23
24:9,25 37:13,25
38:7 56:14,16
105:20 150:9
178:14 183:17
184:11,17,18
187:1 201:2,10
202:13 207:1,14
209:4 210:4 212:7
232:9,10
**trustee's** 8:1
10:15,16 11:16,20
12:5 24:8 25:8
26:21 29:24 30:2
30:6,12,20,22
31:13 33:7,19
34:4,6,15 38:16
101:8 111:20,23
121:7 123:15
143:25 163:10
184:12 203:2
206:18 207:19
208:17 212:2,16
212:23 213:13
214:6 215:1 216:7
218:18 220:17,20
221:11 222:2
223:6,19,25
224:15 225:10
227:20
**trustees** 11:9
142:22

**trustee's** 60:12
93:10 94:3
**trustworthiness**
15:2 31:9
**truth** 12:16 36:11
180:7
**truthfulness**
16:12
**try** 25:4 46:4
51:21 56:15,16
62:14,14 63:12
84:23 131:5
160:21
**trying** 78:13,14
92:8 120:3 121:19
177:16
**tune** 141:14
**turn** 38:16 47:18
51:7 82:24 83:23
86:25 93:10 99:25
101:8,20 104:4
113:23 128:20
130:13 132:19
134:1,18 137:15
138:1 139:18
143:7 144:9
182:24 186:5
188:3 190:23
193:1 196:5
197:10 199:10
203:13 204:3
206:18 208:17
211:24 213:13
214:25 216:7
220:16,17 221:11
222:2 223:6
224:12,15 225:10
227:20
**turned** 44:12 94:1
142:15 170:12
**turning** 18:3
183:9 208:4
215:21

turns 141:8
twice 48:19 196:1
twist 98:15
two 6:15 9:21
  11:5 36:17 42:8
  44:9,13,23 49:10
  54:22 62:25 63:2
  63:21 69:1 70:5
  78:2 87:12,13
  91:17 111:1
  115:24 116:12
  123:15 131:7
  132:19 134:1
  135:10 138:1
  139:14,14 140:22
  154:20 157:13
  165:24 184:5
  186:15 190:20
  192:9 193:2,3
  197:5 201:18,21
  214:12,17,24
  215:7,10,13,14,17
  215:23 218:10,22
  220:1,14 223:11
  223:12,22,22
  224:3,5,7,9
  226:21 229:10,24
  230:2,9
tx 3:18 7:18,19
  38:16 54:2
type 61:1 77:12
  79:22 82:13 86:2
  111:17 121:18
  185:13 186:7
  202:5 207:9 219:5
typed 153:12,18
types 55:24 71:3
  109:4 148:19
  185:3
typewriter 67:23
  67:24 78:14 99:19
typical 98:14
  121:16,19 123:20

typically 52:5
  82:5 190:13
  192:24 196:2

**u**

u.s. 1:23 39:11,14
  40:2,20 47:5
  50:15,16
ultimately 89:20
  103:17 138:23
  229:14
underline 108:23
  108:23
underlying
  104:13
underneath 48:4
  52:19 90:6 109:1
  109:8 110:1 111:5
  157:13
underpinning
  26:18
underpinnings
  24:23 41:5
understand 5:17
  9:14 12:25 14:16
  15:21 22:17 24:22
  31:18 34:25 85:3
  105:13 107:13
  165:1 166:8
understanding
  27:20 45:8 48:22
  154:18 175:3,5,8
understatement
  132:7
understood 11:12
undertake 52:12
unduly 13:12
unfettered 56:19
unfortunate 12:7
unfortunately
  12:3 22:10
union 50:7,7
unique 129:22
  165:12 195:19,21

202:1 207:5
unit 162:18,25
united 1:1,14
  49:16 100:15,16
  102:19 129:2,3
  163:1
university 41:16
  41:20
unlimited 179:3
unpredictable
  100:21
unquote 195:7
unravel 62:8
unreliable 7:16
  8:19
unwind 64:7
  98:19
unwound 128:16
upload 77:11
upper 92:15
  110:14 121:15,17
  156:2
upside 97:16
  98:12,13 126:8
use 14:19 15:23
  17:9,13 22:22
  25:16 32:7,10,17
  35:8 56:22 62:20
  69:19 70:21 84:16
  92:1 104:15 109:7
  119:25 138:20
  141:19 142:16
  152:13 153:14
  164:2,6 182:25
  188:8 196:3
  200:11 209:8
  212:8 219:11
  222:10
uses 63:10 97:6,7
ust 156:15
usually 46:7 75:6
  82:8

utilized 62:17
  84:21

**v**

v 1:9
valuation 43:15
  58:21 59:20
  146:15,19
valuations 59:25
valuators 43:17
value 43:19 86:6
  104:23,24 107:4
  115:3 119:15
  148:23 149:7
  167:6,9,11
valukas 50:4
vanderwal 3:12
varied 151:4
variety 109:4
various 22:25
  47:10 65:20 67:10
  153:10 155:3
  209:17
vast 64:19 124:3
vendor 55:17
verbatim 153:12
  155:19
verifiable 31:22
veritext 233:20
version 55:6,14
versus 5:3 76:5
viability 165:15
victims 6:19
vis 83:14,14
vital 16:17
vogue 47:6
voice 13:21
  149:14
voidance 11:6
volatility 48:16
  98:21,24,25
  136:15 137:1
volume 29:12
  33:21 34:18 72:21

[volume - witness]                                                    Page 53

114:22 115:2,5,6
115:13,23,25
116:4,8,9,10,11
117:6 118:13
119:10,22 159:1
162:8,14 176:6,7
vwap   118:15
119:5,20,22,25
120:4,6,9,14
123:8

**w**

waived   124:24
walk   19:21 119:4
184:1 216:13
218:25
wall   62:20 102:22
wand   124:24
want   8:15 22:22
25:16 35:25 44:12
58:7 60:7 65:6
69:2 70:8 71:4,5
74:13 80:20 83:24
86:20 96:16 97:13
102:10,15 108:14
108:18 109:14,16
113:2,22 118:10
118:19 133:20
139:2 169:4
176:19 180:2,19
181:11 188:12
197:9 221:12
224:13
wanted   32:24
42:23 62:12 79:23
81:10 83:4,6 84:4
88:6,6 89:17 95:4
103:19 104:18
110:7 115:12
120:19,20 135:17
135:20 139:24
155:20
warehouse   52:23
55:21

washington   42:11
42:22,23,24 50:7
wasn't   77:20
84:25
water   60:8 211:3
way   26:2 31:15
35:16,17 37:1
48:5 72:23 82:15
82:17 85:15 87:22
92:1 96:25 101:12
101:13 108:20
116:24 123:3
124:7,17 125:8
126:21 133:6
138:25 140:21
150:2,4 159:5
160:3,15 161:17
163:19 166:25
168:21 170:5
176:25
waybackmachin...
66:12
we've   8:19 14:9
16:1 18:22 25:7
29:14,22 30:3
31:10 34:23 114:7
144:7 174:7 178:7
181:8,22 183:6
225:16 229:20
230:1
website   66:11
websites   66:13,14
week   55:20 72:21
72:21 229:15
weeks   49:10 111:1
weighted   118:13
119:10,22
went   11:5 12:1
41:16,19 42:16
44:14 45:3 47:9
48:13 49:15 50:8
50:19 52:23 55:2
55:9 65:15 66:10

66:11 69:25 78:10
81:12 84:8 85:25
87:15 88:7 97:14
105:4 111:7
112:23 114:24
115:6,9 127:8
129:22 130:23
131:11 136:7
142:15 161:8
165:5,8 177:17
178:4 189:19
215:18,19,25
217:1,6 222:13,18
224:9,11 227:11
weren't   57:1
77:16 84:14 91:2
we'll   81:16 84:15
we're   62:24 89:2
89:24
we've   75:24 77:20
80:16 85:24
whatsoever   56:13
80:11 88:19 91:5
what's   75:15 79:3
82:2 98:11
where'd   189:11
189:12
widely   120:5
wire   76:13 84:8
153:9 185:4
186:25 187:2
188:17
wired   90:13
wires   189:3
wish   226:2
wished   94:14
143:13
withdraw   86:19
226:2
withdrawal   9:21
10:7 11:18 35:14
199:13,19 200:9
200:12,13 204:12

204:22,23,25
205:5,20,24,25
208:14,24 209:6
209:10,12,18
210:7,22 211:6,9
216:10,14 217:4,6
217:22 218:3
220:23,24 221:22
222:6,14 227:23
228:2,15 229:18
withdrawals
152:16,22 184:4
185:11 186:13
188:19 189:1,7
194:20 195:13
197:3 199:9
200:19 203:4
204:3 208:2,5
211:13 212:25
214:17 215:7,8,10
215:13,24 218:8
218:22 219:24
220:8,13 222:25
223:11,12,14,22
224:1,3,8,9 226:8
226:10,18,19,20
226:24 227:15
229:11,16
withdrawn   9:20
205:18 206:3
227:16
withheld   56:20
withhold   35:14
withholding   40:8
witness   8:16 13:8
14:2 17:11 18:6,7
19:2,3,3,4,11
20:16 22:5 25:14
28:8 36:4 38:12
41:4 59:18 159:2
160:17 172:20
179:14 180:13
181:14

witness's  35:15
witnesses  13:23
  13:24 14:20 15:5
  15:6,15 16:2,15
  25:5,9 28:20,21
  28:23 182:3
wmt  114:23
woefully  131:20
  178:10
woman  113:10
wonderful  118:23
  123:6
won't  69:9
word  75:6 108:22
  110:23 111:11,13
  153:12 169:24
  170:24 185:4
words  18:17 25:1
  84:24 92:20
  108:22 109:24
  114:19 115:15
  116:4 118:18
  123:2 128:17
  139:5
work  11:4,5 13:1
  13:7,11 38:13
  46:5,5,16,22,24
  47:9 48:23 50:2,9
  50:14 51:4 53:3,4
  54:19 56:15 58:19
  62:15 101:17
  118:25 124:5,6
  125:24 128:19
  149:3 150:8
  173:18 174:5
  183:10 215:4
  218:16 221:7
worked  14:6 18:4
  19:7 48:23 50:3,5
  50:6 108:13
working  42:4 55:6
  55:14 73:1 109:3

works  19:6 41:11
  45:8
world  45:18 75:7
  76:21 118:23
  123:6 124:4,6
  192:23
worth  44:24 91:9
  131:1,2 138:7
would've  10:24
  11:3,3 42:17
wouldn't  67:8
  77:17
would've  61:8
  88:24 89:19 92:12
wrap  45:2 95:6
  108:18 137:14
  213:9
write  78:23 84:8
  86:15 112:14
writes  226:2
writing  49:20
  108:21
written  30:7 31:5
  186:24 187:16,23
  189:3 200:4 205:8
  208:23 209:20,24
wrong  133:14,14
  152:11 191:13,20
wrongdoing
  37:25
wrote  27:24 49:18
wyly  50:18,19

x

x  1:5,12 89:22
  90:8 104:22
  172:13 232:1
xes  92:6,20
xfer  192:13

y

y  104:22
yacht  161:10
yeah  16:8,13
  17:23 20:8,22

26:19 31:25 32:3
  38:23 50:13 90:2
  93:16 110:17
  124:13 156:18
  163:14 169:2
  173:11 174:17
  189:18 231:12,15
year  9:21 18:24
  42:25 45:21,23
  49:25 72:22 87:13
  87:14,16,16,17,21
  87:23 88:16 89:6
  106:24 129:24
  130:18,23 131:11
  142:5,12,16 148:2
  148:3,4 171:4
  184:5 186:14
  187:3,4,8 190:2
  211:1 214:17,24
  215:8,10,13,23
  218:10,22 220:1
  220:14 223:11,12
  223:22 224:3,5,7
  226:21 228:19
  229:9,11,24 230:2
  230:9
years  6:1 7:7 11:6
  14:9,9 18:22
  23:16 42:9,21
  44:9,13,19 55:23
  79:22 84:6 106:20
  133:6 140:5 142:3
  142:9 143:19
  144:12 149:11
  151:4 158:5,17
  165:5,6,9
yesterday  98:22
  136:16
york  1:2,16 3:6
  4:3 34:8 37:20
  41:14 50:19
  144:16 161:5,24
  162:9 176:1,6,12

177:6
you'd  65:5
you'll  62:15 74:19
you're  64:19
  72:20 73:7,8,10
  74:3,10 75:20
  78:6 82:4,19
  83:23 85:3,6
  91:11 93:11 95:23
  95:24,24,25 98:3
you've  69:13 80:4
  97:17 98:6

z

zeros  47:23
zr265  211:6 216:4

'

'06  91:10
'60s  60:25
'61  60:25
'70s  61:1,15
'90s  62:3
'92  61:18
'96  61:18

à

à  83:14