**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 09-01364 (SMB) |
| Plaintiff, | |
| v. | |
| HSBC BANK PLC, et al., | |
| Defendants. | |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE TRUSTEE'S CROSS-MOTION FOR SEVERANCE AND FOR LEAVE TO AMEND THE COMPLAINT

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the Chapter 7 Estate of Bernard L.*
*Madoff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ..............................................................................................................2

I.  THE PROPOSED AMENDMENT IS NOT FUTILE .............................................2

    A.  THE SAC PLEADS ALPHA PRIME'S ACTUAL KNOWLEDGE ..........3

        1.  The SAC Meets the Requisite Pleading Standard for Avoiding
            Initial Transfers...............................................................................3

        2.  The SAC Goes Well Beyond Pleading Generic Red Flags ............4

        3.  The Trustee Plausibly Alleges That Alpha Prime's Agents
            Were Motivated By Tens of Millions of Dollars in Fees................7

        4.  The SAC Plausibly Alleges That Alpha Prime Knew of Red
            Flags ................................................................................................9

            a.  Alpha Prime's Analysis of Options Trades ........................9

            b.  Alpha Prime's Analysis of Pricing ...................................11

        5.  The Directors' Deflection of Concern and Inquiry.......................12

    B.  THE TRUSTEE PLEADS SUFFICIENT FACTS TO
        SUBORDINATE ALPHA PRIME'S DISPUTED CLAIMS...................13

    C.  ANY 502(h) CLAIM ALPHA PRIME ASSERTS CANNOT BE
        SATISFIED WITH CUSTOMER PROPERTY ......................................14

II.  ALPHA PRIME WILL NOT BE PREJUDICED BY THE FILING OF
     THE SAC ................................................................................................16

III.  SEVERANCE IS WARRANTED ......................................................................19

CONCLUSION...........................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)....................................................................................8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................2

*Baker v. Latham Sparrowbush Assoc.*,
  72 F.3d 246 (2d Cir. 1995)..................................................................................13

*Bear, Stearns Sec. Corp v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
  371 B.R. 1 (S.D.N.Y. 2007)..................................................................................4

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................3

*Berman v. Parco*,
  986 F. Supp. 195 (S.D.N.Y. 1997) ......................................................................18

*In re Blinder, Robinson & Co., Inc.*,
  124 F.3d 1238 (10th Cir. 1997) ...........................................................................15

*Cheung v. Bristol-Myers Squibb Co.*,
  282 F. Supp. 3d 638 (S.D.N.Y. 2017), *aff'd sub nom.*, *Gibbons v. Bristol-
  Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019)............................................14, 15

*Chrysler Motors Corp. v. Schneiderman*,
  940 F.2d 911 (3d Cir. 1991)................................................................................15

*Clarke v. Cosmo (In re Agape Litig.)*,
  773 F. Supp. 2d 298 (E.D.N.Y. 2011) ..................................................................5

*Cresci v. Mohawk Valley Cmty. Coll.*,
  693 F. App'x 21 (2d Cir. 2017) ...........................................................................17

*In re Crude Oil Commodity Litig.*,
  No. 06 Civ. 6677 (NRB), 2007 U.S. Dist. LEXIS 66208 (S.D.N.Y. Sept. 7,
  2007) ..................................................................................................................17

*Cruz v. Coach Stores, Inc.*,
  202 F.3d 560 (2d Cir. 2000).................................................................................17

*Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*,
  804 F.2d 787 (2d Cir. 1986).................................................................................17

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Garcia v. Chrysler Grp. LLC*,
    127 F. Supp. 3d 212 (S.D.N.Y. 2015)....................................................................4

*Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*,
    665 F. Supp. 2d 239 (S.D.N.Y. 2009)...................................................................17

*IMG Fragrance Brands, LLC v. Houbigant, Inc.*,
    759 F. Supp. 2d 363 (S.D.N.Y. 2010).....................................................................4

*In re J.P. Jeanneret Assocs., Inc.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011).....................................................................3

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*,
    No. 16-CV-5393 (KMW), 2018 U.S. Dist. LEXIS (S.D.N.Y. Feb. 26, 2018).......16

*Leber v. Citigroup, Inc.*,
    No. 07 Civ. 9329 (SHS), 2011 U.S. Dist. LEXIS 12944 (S.D.N.Y. Nov. 8,
    2011) ....................................................................................................................18

*LSSi Data Corp. v. Time Warner Cable, Inc.*,
    No. 11 Civ. 7780 (PAE), 2012 U.S. Dist. LEXIS 37914 (S.D.N.Y. Mar. 20,
    2012) ....................................................................................................................18

*MacDraw, Inc. v. CIT Grp. Equip. Fin.*,
    157 F.3d 956 (2d Cir. 1998)..................................................................................18

*Miller v. Metro. Life Ins. Co.*,
    No. 17 Civ. 7284 (AT) (SN), 2018 U.S. Dist. LEXIS 195046 (S.D.N.Y. Nov.
    15, 2018) .........................................................................................................17, 18

*MLSMK Invs. Co. v. JP Morgan Chase & Co.*,
    737 F. Supp. 2d 137 (S.D.N.Y. 2010).....................................................................5

*My First Shades v. Baby Blanket Suncare*,
    914 F. Supp. 2d 339 (E.D.N.Y. 2012) ....................................................................4

*N. Jersey Media Grp. Inc. v. Fox News Network, LLC*,
    312 F.R.D. 111 (S.D.N.Y. 2015) ..........................................................................20

*In re OTC Net, Inc.*,
    34 B.R. 658 (Bankr. D. Colo. 1983) ......................................................................15

*Picard v. Avellino*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016)...........................................................7, 8, 13

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Picard v. Ceretti (In re Bernard L. Madoff Inv. Sec. LLC)*,
  Adv. Pro. No. 09-01161, 2015 Bankr. LEXIS 2674, at *46 (Bankr. S.D.N.Y.
  Aug. 11, 2015) ............................................................................................................4, 6, 8

*Picard v. Citibank, N.A.*,
  Adv. Pro. No. 10-05345 (SMB) (Bankr. S.D.N.Y. July 18, 2019) (ECF No.
  169) ...........................................................................................................................7

*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011)...................................................................................13

*Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
  548 B.R. 13 (Bankr. S.D.N.Y. 2016) ........................................................................7

*Picard v. Mendelow (In re Bernard L. Madoff Inv. Sec. LLC)*,
  560 B.R. 208 (Bankr. S.D.N.Y. 2016) ......................................................................3

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014) ..........................................................3, 13, 14

*Picard v. Square One Fund Ltd.*,
  Adv. Pro. No. 10-04330 (SMB) (Bankr. S.D.N.Y. May 29, 2019) ..........................7

*Redington v. Borghi (In re Weis Sec., Inc.)*,
  411. F. Supp. 194, 195 (S.D.N.Y. 1975), *aff'd*, 538 F.2d 317 (2d Cir. 1976 .........15

*Rosner v. Bank of China*,
  No. 06 CV 13562, (JG), 2008 U.S. Dist. LEXIS 105984, at *14-21 (S.D.N.Y.
  Dec. 18, 2008)...........................................................................................................5

*Ruotolo v. City of New York*,
  No. 03 Civ. 5045 (SHS), 2006 U.S. Dist. LEXIS 57346 (S.D.N.Y. Aug. 15,
  2006) .........................................................................................................................18

*Ryan v. Hunton & Williams*,
  No. 99-cv-5938 (JG), 2000 U.S. Dist. Lexis 13750 (E.D.N.Y. Sept. 20, 2000).......6

*Savage & Assocs., P.C. v. Mandl (In re Telligent, Inc.)*,
  346 B.R. 73 (Bankr. S.D.N.Y. 2006) ........................................................................18

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC v. BNP Paribas S.A.*,
  594 B.R. 167 (Bankr. S.D.N.Y. 2018) ...............................................................7, 18

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  516 B.R. 18 (S.D.N.Y. 2014).....................................................................................4

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   No. 12 MC 115 (JSR), 2013 U.S. Dist. LEXIS 56042 (S.D.N.Y. Apr. 15,
   2013) ....................................................................................................................8

*Starter Corp. v. Converse, Inc.*,
   No. 95 Civ. 3678 (CSH), 1996 U.S. Dist. LEXIS 17502 (S.D.N.Y. Nov. 25,
   1996) ..................................................................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................................3

*Wight v. BankAmerica Corp.*,
   219 F.3d 79 (2d Cir. 2000).....................................................................................4

*Zutty v. Rye Select Broad Mkt. Prime Fund. L.P.*,
   No. 113209/09, 2011 N.Y. Misc. LEXIS 5596 (Sup. Ct. N.Y. Cnty. Apr. 15,
   2011) ....................................................................................................................6

**Statutes**

11 U.S.C. § 502(h) .....................................................................................................16

15 U.S.C. § 78fff-2(b) ...............................................................................................16

15 U.S.C. § 78fff-2(c)(1) .....................................................................................14, 15

15 U.S.C. § 78fff-2(c)(1)(B).......................................................................................14

15 U.S.C. § 78fff-2(c)(1)(D).......................................................................................14

15 U.S.C. § 78fff-2(c)(3) ...........................................................................................14

15 U.S.C. § 78fff(a) ...................................................................................................16

**Rules**

Fed. R. Civ. P. 9(b) .....................................................................................................3

Fed. R. Civ. P. 15(b) .................................................................................................17

## PRELIMINARY STATEMENT

Alpha Prime's directors and service providers saw that Madoff's trades were impossible and then, to protect the fraud from exposure and continue churning the Madoff machine, deflected outside inquiries concerning Madoff. As the Trustee details in his Opening Brief[1] and below, these facts are pleaded with particularity in the SAC.[2] Alpha Prime ignores those facts.

Alpha Prime has repeatedly tried to resist engaging in discovery and confronting the merits of the case. That is unsurprising, as discovery continues to yield evidence unfavorable to Alpha Prime. In part because of Alpha Prime's obstructionist approach to discovery, the Trustee sought an extension of time to complete discovery, which was granted on July 1 by Magistrate Judge Maas, the discovery arbitrator in this case. The day after Magistrate Judge Maas granted the extension, Alpha Prime sought to end the case by moving for summary judgment. This Court rejected that request, and Alpha Prime decided to bring a motion challenging, for the first time, the Trustee's 2010 Complaint.

Tacitly recognizing that the SAC demonstrates Alpha Prime's bad faith, Alpha Prime focuses on "prejudice." There is none: (i) the causes of action in the 2010 Complaint and the SAC are the same; (ii) the parties have been litigating (and mediating) these issues for years; (iii) the parties' 2018 Partial Settlement Agreement explicitly states that they would litigate these issues; and (iv) it was only when Alpha Prime was trying to curb discovery in 2019 that it first sought to challenge the Trustee's 2010 Complaint. Alpha Prime voluntarily chose to make its motion in the midst of discovery, requiring the Trustee to allege the additional facts he has

---

[1] The Trustee's Opposition to Alpha Prime Fund Ltd.'s Motion for Judgment on the Pleadings and In Support of the Trustee's Cross-Motion for Severance and For Leave to Amend the Complaint, ECF No. 548.

[2] Capitalized terms have the same meanings ascribed to them in the Opening Brief.

obtained through ongoing discovery to meet a heightened pleading standard.  That Alpha Prime

will now be forced to answer the SAC is hardly prejudicial.

Alpha Prime's severance objection is baseless.  Alpha Prime's sole contention is that it

would be forced to take discovery from HSBC as a third party.  Right now, many (if not all) of

the HSBC entities from whom Alpha Prime would seek discovery are third parties, having been

dismissed as part of the extraterritoriality decision.  Furthermore, seventeen months have passed

since the amended case management plan was entered and Alpha Prime has made no effort to

seek discovery from HSBC.

Alpha Prime saw Madoff's ongoing fraud and knowingly profited from it.  The Trustee

seeks to prosecute the same bankruptcy claims against Alpha Prime that he raised in the 2010

Complaint, of which Alpha Prime has always been aware.  Alpha Prime's motion for judgment

on the pleadings should be denied and the Trustee's motion for leave to amend should be

granted.

## **ARGUMENT**

## I.    **THE PROPOSED AMENDMENT IS NOT FUTILE**

Alpha Prime contends that the Trustee's cross-motion for leave to amend should be

denied as futile because the SAC could not withstand a motion to dismiss.  (Opp'n[3] at 4.)  To

survive a motion to dismiss, the Trustee must merely "state a claim to relief that is plausible on

its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks

omitted).  In determining facial plausibility, "the Court must liberally construe all claims, accept

all factual allegations in the complaint as true, and draw all reasonable inferences" in the

---

[3] Reply Memorandum of Law in Further Support of Motion of Alpha Prime Fund Ltd. for Judgment on the Pleadings and In Opposition to the Trustee's Motion for Leave to Amend and for Severance, ECF No. 552.

Trustee's favor. *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 353 (S.D.N.Y. 2011).

Plausibility is not "a probability requirement at the pleading stage; it simply calls for enough

facts to raise a reasonable expectation that discovery will reveal evidence" of the conduct

pleaded. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also Picard v. Mendelow (In

re Bernard L. Madoff Inv. Sec. LLC)*, 560 B.R. 208, 225 (Bankr. S.D.N.Y. 2016). Where, as

here, the pleading sets forth plausible allegations that are "cogent and at least as compelling as

any opposing inference," the complaint should not be dismissed. *See Tellabs, Inc. v. Makor

Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

### A.        THE SAC PLEADS ALPHA PRIME'S ACTUAL KNOWLEDGE

The SAC pleads the Directors' long relationship with Madoff and the many BLMIS

feeder funds with which they were associated (SAC ¶¶ 38-46, 48, 49, 54, 56, 71-74); the regular

due diligence performed by Alpha Prime's service providers and reviewed by the Directors

comparing BLMIS account statements and trade confirmations to market data and revealing

impossible trading activity at BLMIS (*id.* ¶¶ 75-137); and the lengths to which the Directors

went to prevent others from learning this information. (*Id.* ¶¶ 138-83). Rather than addressing

these points, Alpha Prime simply states that the SAC relies on conclusory allegations and general

red flags. (Opp'n at 7.) There is nothing generic or conclusory about the SAC's allegations,

which recite that Alpha Prime and its Directors knew: that the securities trades reported on Alpha

Prime's BLMIS account statements were false.

### 1.        The SAC Meets the Requisite Pleading Standard for Avoiding Initial Transfers

The SAC meets the Federal Rule of Civil Procedure 9(b) pleading standard for avoiding

initial transfers. *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 149

(Bankr. S.D.N.Y. 2014). Rule 9(b)'s purpose is to "provide a defendant fair notice of plaintiff's

claim, to enable preparation of a defense." *Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212,

233 (S.D.N.Y. 2015) (internal citations and quotation marks omitted).  As Alpha Prime

acknowledges (Opp'n at 6), Rule 9(b) allows knowledge to be alleged generally.  *See My First*

*Shades v. Baby Blanket Suncare*, 914 F. Supp. 2d 339, 352 (E.D.N.Y. 2012).  This is because "a

plaintiff realistically cannot be expected to plead a defendant's actual state of mind."  *Wight v.*

*BankAmerica Corp.*, 219 F.3d 79, 91-92 (2d Cir. 2000) (internal citation omitted).

Actual knowledge is pleaded when particular facts plausibly show that the defendant

knew of the fraud.  *See IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 759 F. Supp. 2d 363,

385-86 (S.D.N.Y. 2010).  A defendant need not acknowledge the fraud; an inference that the

defendant knew of the fraud is sufficient.  *Id.* at 386.  The Court's evaluation must determine

whether the SAC, as a whole, plausibly alleges that Alpha Prime had actual knowledge that

securities trades on the BLMIS account statements were false.  *See Picard v. Ceretti (In re*

*Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 09-01161, 2015 Bankr. LEXIS 2674, at *46

(Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*") ("The totality of the allegations in the FAC paint a

picture of sophisticated financial professionals who knew that Madoff was reporting fictitious

transactions, and took steps to prevent any inquiry.").  The SAC, taken as a whole, paints a vivid

picture of Alpha Prime's knowledge.

## 2.    The SAC Goes Well Beyond Pleading Generic Red Flags

Contrary to Alpha Prime's assertion, the SAC is significantly more than just an inquiry

notice pleading.  (Opp'n at 7.)  Inquiry notice, the applicable standard in 2010, requires a

plaintiff to assert allegations demonstrating that what a defendant knew or should have known

triggered a duty to investigate further.  *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec.*

*LLC (In re Madoff Sec.)*, 516 B.R. 18, 21 (S.D.N.Y. 2014); *see also Bear, Stearns Sec. Corp. v.*

*Gredd (In re Manhattan Inv. Fund Ltd.)*, 371 B.R. 1, 22 (S.D.N.Y. 2007).  This is in stark

contrast to the SAC, which alleges that Alpha Prime *did* see indicia of fraud.  Beginning in 2001,

Alpha Prime's service provider, BA Worldwide, created reports that compared the securities

prices Madoff reported against Bloomberg and marked the trades "False" in red when the price

was out of range.  (SAC ¶¶ 85-87, 109-10.)  The SAC reproduces a page of a January 2005

report that identifies 16 trades as "False."  (SAC ¶ 87.)  That report is just one example, because,

as the Trustee alleges, there were over one thousand of these out-of-range trades noted in these

reports over time.  (SAC ¶ 88.)  The SAC also alleges that one of the Directors—and BA

Worldwide President—Ms. Radel-Leszczynski analyzed these reports for Primeo, Thema

International, and Alpha Prime.  (SAC ¶¶ 85, 108.)  Such allegations are hardly "formulaic

recitation[s] of the elements" of the Trustee's avoidance claims (Opp'n at 5) and clearly go

beyond "inquiry notice-type allegations."  (Opp'n at 7.)  These allegations, taken as true, show

Alpha Prime's actual knowledge that BLMIS was not trading securities as purported.  Indeed, it

shows Alpha Prime considered these trades "false."

　　　　To support its inquiry notice theory, Alpha Prime relies upon cases in which courts have

found that pleading generic red flags is not by itself enough to show actual knowledge.  Instead

these cases demonstrate the difference between specific allegations of subjective knowledge, like

those in the SAC, and pleadings lacking such specificity.  *See Clarke v. Cosmo* (*In re Agape*

*Litig.*), 773 F. Supp. 2d 298, 311 (E.D.N.Y. 2011) (plaintiffs failed to identify any information

aside from account activity that would have provided the defendant with actual knowledge);

*MLSMK Invs. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 144-45 (S.D.N.Y. 2010)

(speculative allegations without factual support about what defendant should have known);

*Rosner v. Bank of China*, No. 06 CV 13562 (JG), 2008 U.S. Dist. LEXIS 105984, at *14-21

(S.D.N.Y. Dec. 18, 2008) (allegations that the defendant should have had actual knowledge

because the transactions were atypical and because it knew of similar schemes constituted

constructive knowledge but not actual knowledge); *Ryan v. Hunton & Williams*, No. 99-cv-5938

(JG), 2000 U.S. Dist. Lexis 13750, at *26 (E.D.N.Y. Sept. 20, 2000) (complaint included only

allegations regarding suspicion of the fraud); *Zutty v. Rye Select Broad Mkt. Prime Fund. L.P.*,

No. 113209/09, 2011 N.Y. Misc. LEXIS 5596, at *20-21 (Sup. Ct. N.Y. Cnty. Apr. 15, 2011)

(the complaint failed to specify any "red flags" and stated only that the defendants "knowingly

disregarded [unidentified] red flags").

Alpha Prime improperly reads these cases to show that a defendant's knowledge of red

flags can never establish actual knowledge. Alpha Prime's position is erroneous. A defendant's

regular monitoring of trading can—and in this case did—disclose impossible trades and

demonstrate actual knowledge of fraud. *See, e.g.*, *Kingate*, 2015 Bankr. LEXIS 2674, at *42.

Rather than consider the SAC's allegations, Alpha Prime states that "[t]he Red Flags cited in the

[SAC] were known to every BLMIS investor as well as state and federal regulators . . . ."

(Opp'n at 8.) The extensive analysis of BLMIS's trading activity undertaken by Alpha Prime

and its agents demonstrates that Alpha Prime not only had far more information than the vast

majority of BLMIS investors (and even the regulators) but also had specific, real-time

knowledge of red flags. The SEC did not prepare plausibility control reports that marked a trade

"False" when the comparison of the price of a security reported on a BLMIS account statement

to the market price showed the trade was out of range—Alpha Prime and its agents did. (SAC ¶¶

85-88, 109-10.) The National Association of Securities Dealers did not prepare Dividend Detail

Reports that showed multiple payments on dates that did not correspond with published dividend

payments—Alpha Prime and its agents did. (*Id.* ¶¶ 89-93, 119-21.) Most BLMIS investors did

not prepare monthly spreadsheets identifying "naked" hedges that show purported trading

inconsistent with the SSC strategy—Alpha Prime and its agents did. (*Id.* ¶¶ 99-101, 127-30.)

*Cf. Picard v. Legacy Capital Ltd.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 548 B.R. 13, 33-35

(Bankr. S.D.N.Y. 2016) (finding that the Trustee did not show that the defendants "connect[ed]

the dots in real time," which would have "require[d] a regular comparison of information in

BLMIS generated trade confirmations and monthly account reports with market information");

*Picard v. Avellino*, 557 B.R. 89, 115 (Bankr. S.D.N.Y. 2016) (finding actual knowledge was

pleaded based on factors other than red flags, explaining that "the Amended Complaint does not

allege that [the defendants] made that comparison [of information reported on the BLMIS

account statements to market data] and discovered the anomalies as a result").

### 3.    The Trustee Plausibly Alleges That Alpha Prime's Agents Were Motivated By Tens of Millions of Dollars in Fees

Alpha Prime summarily dismisses the notion that its Directors and service providers

(collectively, "Alpha Prime's Agents") were motivated to direct other people's money to BLMIS

to enrich themselves through fees. (Opp'n at 6-7; SAC ¶ 138.) In so doing, Alpha Prime

misunderstands the Court's prior reasoning with respect to sophisticated financial professionals

risking investment in a Ponzi scheme. As this Court recently explained, when the person with

the knowledge is not an investor, but instead is "just getting a lot of fees by collecting money

from people or entities that are investing[, t]hey're less concerned with whether or not it's a

Ponzi scheme as [long] as the fees keep rolling in." Tr. of Hr'g at 53:20-24, *Picard v. Citibank,*

*N.A.*, Adv. Pro. No. 10-05345 (SMB) (Bankr. S.D.N.Y. July 18, 2019), ECF No. 169; *see also*

Tr. of Hr'g at 14:05-15:13, *Picard v. Square One Fund Ltd.*, Adv. Pro. No. 10-04330 (SMB)

(Bankr. S.D.N.Y. May 29, 2019) (distinguishing the circumstances in *Legacy* and *Picard v. BNP*

*Paribas S.A.* and explaining that while it may not make sense for a sophisticated financial

professional to invest their own money in a Ponzi scheme—putting "hundreds of millions" of

dollars at risk "to earn millions in fees"—fund managers that simply collect fees without

investing risk nothing). Alpha Prime's Agents reaped the rewards, with none of the risk.

This Court has already found actual knowledge to be properly pleaded where allegations

show sophisticated financial professionals willing to invest their client's money with BLMIS to

receive significant fees in return. *See Kingate*, 2015 Bankr. LEXIS 2674, at *8-31 (allegations

that sophisticated financial professionals who received hundreds of millions of dollars in fees

knew BLMIS was reporting fictitious transactions and invested their clients' money

nonetheless); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115 (JSR),

2013 U.S. Dist. LEXIS 56042, at *34-40 (S.D.N.Y. Apr. 15, 2013) (allegations that financial

professionals at Cohmad Securities Corporation invested clients' money with BLMIS and earned

substantial commissions as a result, despite having actual knowledge of Madoff's Ponzi

scheme); *Avellino*, 557 B.R. at 115 (allegations that certified public accountants with actual

knowledge of Madoff's Ponzi scheme directed clients to invest with BLMIS in return for

commission payments).

The SAC includes allegations that Alpha Prime's Agents received fees and

contemporaneously attempted to deflect inquiry about BLMIS. (*See, e.g.*, SAC ¶¶ 40, 55, 76, 77,

84, 154, 161-62, 165-67, 173-75, 178-80.) The SAC also alleges that sophisticated third parties

believed the Directors were "considering [Madoff's] interests before those of the investors," and

were part of the Madoff "cult." (SAC ¶ 183.) While Alpha Prime may have a different

interpretation of the impact of the profits earned by Alpha Prime's Agents, at the pleading stage,

"[t]he choice between two plausible inferences that may be drawn from factual allegations is not

a choice to be made by the court." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185

(2d Cir. 2012).

### 4.    The Trustee Plausibly Alleges That Alpha Prime Knew of Red Flags

The Trustee alleges that numerous reports prepared by Alpha Prime's service providers compared Alpha Prime's account statements to market information and identified impossible trading in real time and that the Directors reviewed those reports.  Alpha Prime produced those reports in discovery.  In fact, Alpha Prime goes so far as to state that the "Trustee does not plead any facts that show that Alpha Prime or its directors were actually aware of the alleged Red Flags."  (Opp'n at 8.)  The Trustee undeniably pleads that Alpha Prime's Agents prepared and reviewed these reports for several BLMIS feeder funds, including Alpha Prime and Primeo, which gave Alpha Prime's Agents knowledge of BLMIS's purported trading activity over an extended period of time.  (*See, e.g.*, SAC ¶¶ 79, 81, 82, 85, 86, 88, 90, 93, 94, 99, 100, 102, 108-11, 118-19, 124, 127.)  For example, the SAC contains allegations that the Directors knew that Madoff purportedly traded options on the CBOE and that the CBOE could not support the volume that Madoff claimed to be trading for Alpha Prime's account alone.  (SAC ¶¶ 80-84, 111-12.)  The SAC further alleges that BA Worldwide's reports highlighted at least 94 speculative options trades that deviated from the SSC strategy.  (SAC ¶¶ 129-33.)

### a.  Alpha Prime's Analysis of Options Trades

Alpha Prime contends that an analysis of the purported trades on Primeo's customer statements conducted by HSSL's Saverio Fiorino—which explicitly stated that "Madoff never dealt in OTC options"—did not cover a period between 2001 and 2002, as the Trustee alleges. (Opp'n at 9-10.)  The document, however, speaks for itself.  Under the heading "Bernard Madoff activity," Mr. Fiorino's analysis states that he and Catherine Huet, the fund accountant assigned to Primeo at HSSL, "looked at activity between July & August 2001, September & October 2001, January & February 2002."  (Duffy Decl., ECF No. 553, Ex. B.)  Thus, Mr. Fiorino's

communication to Ms. Radel-Leszczynski puts her on notice that Madoff did not trade options over the counter during the period in question.

Alpha Prime's contrivances only result in confirming the inferences the Trustee draws from the evidence—that Alpha Prime was on notice of indicia of fraud. Alpha Prime states, "It is clear the term 'dealing in OTC options' refers to dealing with OTC options only outside the hedging context." (Opp'n at 10.) But Madoff's SSC strategy purported to use options only to hedge equities positions. Given that Mr. Fiorino's email confirms that Madoff's securities positions are "fully hedge[d]" (Duffy Decl. Ex. B), it is unclear how Alpha Prime could have arrived at this conclusion.

Alpha Prime further contends that an email from Mr. Fischer to Ms. Radel-Leszczynski discussing "com[ing] up with a coordinated response" to an analyst who found that the CBOE volume could not support Madoff's purported options trading (Duffy Decl. Ex. C) (i) does not indicate that the Directors were aware that BLMIS could not have traded options over the counter and (ii) is not indicative of the Directors deflecting further inquiry because "neither had any reason to believe anyone else would ever see their communication." (Opp'n at 11.) Alpha Prime's arguments are meritless. The Directors knew that the options Madoff traded for their account were traded on the CBOE. That was first made clear to them in May 2002 by Mr. Fiorino's email. *See supra* at p.9. More important, Alpha Prime knows this argument is false because BA Worldwide's Holdings Reports—which Alpha Prime produced in discovery in this case but now ignores—indicate that BLMIS purportedly traded options on the CBOE. (SAC ¶¶ 81, 83.) Ms. Radel-Leszczynski, as an Alpha Prime director and BA Worldwide president, reviewed BA Worldwide's reports. (SAC ¶¶ 81-84.) Thus, for the entirety of Alpha Prime's existence, Ms. Radel-Leszczynski knew that BA Worldwide's analyses tied BLMIS's options

trading to the CBOE. As a result, when an analyst communicated to the Directors that there are

not enough options on the CBOE to trade for Alpha Prime's account alone, the Directors'

response that (i) this is something they had previously discussed, and (ii) they should "come up

with a coordinated response" that these options are traded over the counter, can only be

interpreted one way: the Directors knew the options trades were impossible before the analyst

raised it and chose to lie to thwart any further scrutiny of Madoff's purported trading.

### b.  Alpha Prime's Analysis of Pricing

Responding to the SAC's allegations concerning BA Worldwide's January 2005 report

for Primeo reproduced, in part, in the SAC, Alpha Prime asserts without any substantiation that

January 25, 2005 was "a typical trading day for Alpha Prime's account," and extrapolates that

BLMIS reported over 30,000 trades to Alpha Prime during the life of its BLMIS account.[4]

(Opp'n at 11.) While Alpha Prime's speculation and ensuing conclusion are, at best, issues of

fact that have no bearing on the Trustee's motion, it is nevertheless indisputable that Alpha

Prime's Agents reviewed its BLMIS customer statements and created numerous reports

analyzing the purported trading indicated on those statements. Alpha Prime knows exactly how

many securities transactions BLMIS purportedly executed on its behalf. Still it makes this

baseless assertion to obscure the fact that it knew there were more than 1,000 securities

transactions that could not have occurred as reported. (SAC ¶ 88.) No matter how many trades

BLMIS purported to execute on Alpha Prime's account, one out-of-range trade is too many, let

alone over 1,000. This is particularly so where, as here, over 1,000 out-of-range trades were

identified in reports reviewed by the Directors, highlighted in red, and called "False." (*See, e.g.*,

---

[4] Alpha Prime states, "According to the report included in paragraph 87, on January 25, 2005, BLMIS reportedly executed 25 securities transactions." (Opp'n at 11.) It is unclear where this number comes from. The full report indicates many more than 25 transactions on that date, and the specific page of the report reproduced in the SAC indicates 18 transactions on that date. (SAC ¶ 87.)

SAC ¶¶ 87, 88.)[5]  Alpha Prime's argument that the false trades went unnoticed by Alpha Prime, in light of its reports labeling the trades as false, is specious.

Alpha Prime then argues that the false trades must be "more difficult to identify than the Trustee is representing," because the 2010 Complaint (¶ 163) identified 26 out-of-range equities trades and the SAC identifies more than 1,000 out-of-range securities trades.  Whether the transactions were difficult to identify or not is of no moment—BA Worldwide did it more than 1,000 times.  (SAC ¶¶ 87-88.)  Alpha Prime's various arguments to the contrary, the facts were plain: Alpha Prime's Agents identified Madoff's trading impossibilities in real time.

### 5.    The Directors' Deflection of Concern and Inquiry

Of the nearly fifty allegations concerning the Directors' deflection of concern and inquiry into Madoff, Alpha Prime cherry-picks four allegations—three that focus on the Directors' reaction to concerns raised about frontrunning (Opp'n at 12-13) and one of the Trustee's many allegations regarding Nigel Fielding's due diligence.  (Opp'n at 13-14.)  But the Trustee's allegations about deflections of inquiry go much further than Mr. Fielding's prevention of meaningful due diligence into Madoff; they include avoiding verification of Madoff's assets (*id.* ¶¶ 150-53, 162-63), extinguishing worries raised by Primeo's board of directors (*id.* ¶¶ 161, 165, 167), deleting board minutes that showed concerns that Madoff's trades were false (*id.* ¶¶ 164, 166), lying to Ernst & Young about the custody of assets (*id.* ¶ 171), and alerting Madoff to due diligence visits, including insisting that all questions be provided to Madoff in advance (*id.* ¶ 175).  The only plausible inference to be drawn from all of these allegations is that the Directors knew about Madoff's fraud and prevented the truth from being revealed.  Alpha Prime tries to

---

[5] Alpha Prime also asserts, "the report does not indicate that the securities transactions were effected during stock exchange hours.  In the case of extended hours trading . . . securities prices can fall outside of the daily range." (Br. at 11.) There is no evidence that BLMIS ever traded or even purported to trade after hours, nor is there any evidence that Alpha Prime believed that BLMIS engaged in after-hours trading.

hide behind the fact that Mr. Fielding was an HSBC employee. (Opp'n at 13.) As Alpha Prime

knows, of course, Mr. Fielding was an Alpha Prime director (SAC ¶ 46), and there is no question

that his knowledge can be imputed to Alpha Prime. *See, e.g.*, *Baker v. Latham Sparrowbush

Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) ("The knowledge of a director, officer, sole shareholder

or controlling person of a corporation is imputable to that corporation.") (internal quotation

marks and citation omitted); *Avellino*, 557 B.R. at 118 ("A non-individual principal can only

acquire knowledge through its agent.").

With respect to frontrunning, the Trustee's position is not that Alpha Prime believed it,

but rather that this was a story with which it thought its investors could live. In fact, the Trustee

alleges that the Directors used this as a way of explaining Madoff's returns to investors. (SAC

¶¶ 143-44.) Alpha Prime ignores most of the SAC's particularized allegations and relies on its

competing, albeit less plausible, version of the facts. Providing alternative reasons for Alpha

Prime's actions is precisely why its motion for judgment on the pleadings must be denied and the

Trustee's cross-motion for leave to amend should be granted.

## B.      THE TRUSTEE PLEADS SUFFICIENT FACTS TO SUBORDINATE ALPHA PRIME'S DISPUTED CLAIMS

Alpha Prime contends that the Trustee is "wrong" in applying a willful blindness

standard to his equitable subordination claim (Opp'n at 16-17) even though the District Court in

*Katz* and this Court in *Merkin* explicitly stated that it is the applicable standard. *Merkin*, 515

B.R. at 158 (citing *Picard v. Katz*, 462 B.R. 447, 454-56 (S.D.N.Y. 2011)). Alpha Prime goes on

to state that red flags cannot satisfy a willful blindness standard and that the Trustee has failed to

meet his burden, citing no case law and not one paragraph of the SAC. (Opp'n at 17.) Finally,

Alpha Prime opposes subordination on the basis that it would be inequitable to deny Alpha

Prime access to the customer fund by erroneously citing the portion of this Court's opinion in

*Merkin* that dismisses the Trustee's equitable *disallowance* claim. (Opp'n at 17-18 (citing

*Merkin*, 515 B.R. at 154.)) Contrary to Alpha Prime's assertions, this Court in *Merkin* explained

that equitable subordination of a customer claim on the basis of a willful blindness standard is

appropriate. *Id.* at 158.

### C.    ANY 502(h) CLAIM ALPHA PRIME ASSERTS CANNOT BE SATISFIED WITH CUSTOMER PROPERTY

Alpha Prime's assertion that any claim to which it may be entitled for paying the Two-

Year Transfers must be satisfied from the fund of customer property is not supported by SIPA.

SIPA could not be plainer with respect to the distribution of customer property: customers only

"share ratably in such customer property on the basis and to the extent of their respective net

equities." SIPA § 78fff-2(c)(1)(B). If any customer property remains after such allocation, it

becomes part of the general estate. *Id.* § 78fff-2(c)(1)(D). Alpha Prime does not dispute—nor

can it—that its net equity claim is fixed at $250,671,000. Yet Alpha Prime demands that the $76

million representing the Two-Year Transfers it returned to the Trustee also be treated as a net

equity claim. SIPA does not permit such a result.

Finding no support for its position in the statute, Alpha Prime instead argues that SIPA

section 78fff-2(c)(3) is silent on the type of claim a customer who returns customer property may

assert. (Opp'n at 15.) But section 78fff-2(c)(3) is the provision that permits a Trustee to bring

an avoidance action to recover customer property; other sections of SIPA address customer

claims and the distribution of customer property. SIPA section 78fff-2(c)(1), for example,

allocates customer property first to repayment of SIPC advances, second to allowed customer net

equity claims, and last to other SIPC reimbursements. It provides unambiguously that

customers' net equity claims and other claims in the statutory distribution scheme must be fully

satisfied before any other claims can participate. *See generally Cheung v. Bristol-Myers Squibb*

*Co.*, 282 F. Supp. 3d 638, 642–43 (S.D.N.Y. 2017), *aff'd sub nom.*, *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019) ("It is well and long established that courts apply the plain meaning of unambiguous statutory language. . . . If the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words.") (internal citations omitted). Section 502(h) claims fall outside the net equity calculation and thus are not entitled to participate in the fund of customer property until all of the statutory priorities in SIPA section 78fff-2(c)(1) are satisfied.

Alpha Prime insists that the Trustee's reading of SIPA leads to an absurd result and one that contravenes SIPA's purpose. (Opp'n at 16.) Alpha Prime is wrong. Like many other statutes, SIPA creates certain priorities. Some may feel that those are unfair, but that does not render the statute's result absurd. SIPA's policies and provisions reflect the need for finality in the administration of claims. *See Chrysler Motors Corp. v. Schneiderman*, 940 F.2d 911, 914 (3d Cir. 1991); *Redington v. Borghi (In re Weis Sec., Inc.)*, 411. F. Supp. 194, 195 (S.D.N.Y. 1975), *aff'd*, 538 F.2d 317 (2d Cir. 1976); *In re OTC Net, Inc.*, 34 B.R. 658, 660 (Bankr. D. Colo. 1983). SIPA's bar date is a perfect example: it is "mandatory and absolute," and leaves no room for exceptions even in the most extreme of circumstances. *In re Blinder, Robinson & Co., Inc.*, 124 F.3d 1238, 1243 (10th Cir. 1997) (overturning decision that had allowed a claim to be filed late because claimant was in a car accident rendering her incompetent); *see also In re Weis Sec.*, 411 F. Supp. at 195 (overturning decision that had allowed a claim to be filed late because the claimant lacked actual notice of the liquidation; publication of the notice in the newspaper was "sufficient in light of [SIPA's] policy in favor of expeditious completion of liquidation proceedings").

The same is true in the distribution context.  A customer's net equity claim is determined

as of the filing date, which comports with SIPA's mandate that the Trustee, "as promptly as

possible . . . satisfy net equity claims of customers," SIPA § 78fff(a), and "promptly discharge

. . . all obligations of the debtor to a customer . . . insofar as such obligations are ascertainable

from the books and records of the debtor." *Id.* § 78fff-2(b).  A section 502(h) claim cannot be

part of that calculus because it cannot be ascertained as of the filing date or from the debtor's

books and records, and often remains unknown for years.  SIPA draws a bright line between net

equity claims and all other claims; Alpha Prime's $250 million customer claim falls on one side

of that line, and its $76 million section 502(h) claim falls on the other.  This result—dictated by

the plain meaning of the statute—is neither "unfair" or "absurd."  Alpha Prime negotiated a

partial settlement in which it is participating in distributions from the customer property estate,

but is litigating its 502(h) claim.  Alpha Prime insinuates that it is getting nothing in return for its

$76 million payment, which is not the case—Alpha Prime is receiving the benefit of distributions

on an allowed $238 million customer claim.

## II.    ALPHA PRIME WILL NOT BE PREJUDICED BY THE FILING OF THE SAC

Although Alpha Prime concedes that the pleading standard has changed since the Trustee

filed his 2010 Complaint, it contends that the Trustee should not be permitted to amend.  It

dresses up its opposition to the Trustee's motion with bald assertions of "unexplained delay" and

"undue prejudice," but those claims have no basis in fact.  (Opp'n at 4, 21.)

Alpha Prime falls far short of clearing the high bars of showing bad-faith delay or "undue

prejudice."  *See Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, No. 16-CV-

5393 (KMW), 2018 U.S. Dist. LEXIS 31677, at *16 (S.D.N.Y. Feb. 26, 2018).  The

considerations central to "prejudice" are whether a party had prior notice of the content to be

amended and whether the amended complaint considers the same transaction as the claims in the

16

original pleading. *See Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*, 665 F.

Supp. 2d 239, 262 (S.D.N.Y. 2009). Under Fed. R. Civ. P. 15(b), courts routinely consider

claims not alleged in the pleadings so long as the opposing party has been put on notice. *See*

*Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 568-70 (2d Cir. 2000); *Esquire Radio & Elecs., Inc. v.*

*Montgomery Ward & Co.*, 804 F.2d 787, 795 (2d Cir. 1986).

Alpha Prime argues that it will be prejudiced by the Trustee's amendment of the

complaint because the Trustee's claim for equitable subordination is new and will require

extensive discovery. There are no new claims in the SAC. Like the SAC, the 2010 Complaint

included causes of action against Alpha Prime for the avoidance and recovery of fraudulent

transfers and the equitable subordination of its claim to distributions from the estate. (2010

Compl. ¶¶ 62-98; SAC ¶¶ 188-218.)

That the SAC contains additional facts supporting the Trustee's original claims does not

transform the Trustee's existing claims into "new" claims. Alpha Prime responded to the

equitable subordination claim both in its 2011 answer and its amended answer in 2014.

Furthermore, the Trustee's proposed amendment should be no surprise to Alpha Prime. By

signing the Partial Settlement Agreement in 2018, Alpha Prime unequivocally agreed to litigate,

among other things, issues related to its actual knowledge of Madoff's fraud and the equitable

subordination of its claims.

Alpha Prime's claims of delay and undue prejudice are unsupported. Unlike the cases on

which Alpha Prime relies, this is not a case where: (i) the Court has evaluated the pleadings and

granted a motion to dismiss, *see In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB),

2007 U.S. Dist. LEXIS 66208, at *1, 10-15 (S.D.N.Y. Sept. 7, 2007); *Cresci v. Mohawk Valley*

*Cmty. Coll.*, 693 F. App'x 21, 24-25 (2d Cir. 2017); *Miller v. Metro. Life Ins. Co.*, No. 17 Civ.

17

7284 (AT) (SN), 2018 U.S. Dist. LEXIS 195046, at *11-12 (S.D.N.Y. Nov. 15, 2018); (ii) the

plaintiff is seeking to add new claims, new parties, or new information after the close of fact

discovery based on information that had emerged years before, *see Savage & Assocs., P.C. v.*

*Mandl (In re Telligent, Inc.)*, 346 B.R. 73, 76-78 (Bankr. S.D.N.Y. 2006); *MacDraw, Inc. v. CIT*

*Grp. Equip. Fin.*, 157 F.3d 956, 962 (2d Cir. 1998); *Leber v. Citigroup, Inc.*, No. 07 Civ. 9329

(SHS), 2011 U.S. Dist. LEXIS 12944, at *19 (S.D.N.Y. Nov. 8, 2011); *LSSi Data Corp. v. Time*

*Warner Cable, Inc.*, No. 11 Civ. 7780 (PAE), 2012 U.S. Dist. LEXIS 37914, at *6-12 (S.D.N.Y.

Mar. 20, 2012); *Berman v. Parco*, 986 F. Supp. 195, 217-18 (S.D.N.Y. 1997); *Ruotolo v. City of*

*New York*, No. 03 Civ. 5045 (SHS), 2006 U.S. Dist. LEXIS 57346, at *5-9 (S.D.N.Y. Aug. 15,

2006); or (iii) the plaintiff failed to explain its delay in seeking to add a new claim.  *See Starter*

*Corp. v. Converse, Inc.*, No. 95 Civ. 3678 (CSH), 1996 U.S. Dist. LEXIS 17502, at *7-11

(S.D.N.Y. Nov. 25, 1996).

Alpha Prime raises several arguments in support of its assertion that the Trustee should

have amended the 2010 Complaint years ago; all of them involve gross mischaracterizations of

the facts.[6]  Only when this Court rejected Alpha Prime's request for permission to file a motion

for summary judgment did Alpha Prime seek to challenge the sufficiency of the Trustee's

pleading with the instant motion.  As soon as it did so, the Trustee cross-moved for leave to

amend his complaint.

---

[6] First, Alpha Prime claims that the Trustee "ha[s] been instructed . . . that he needed to amend his complaint."
(Opp'n at 19.)  The Trustee's counsel's remarks at the October 2012 hearing on the good faith standard were a
reservation of the right to amend, not an expression of the Trustee's intention to do so.  (Duffy Decl. Ex. E.)
Second, Alpha Prime's attempt to characterize this Court's decision in *Sec. Inv. Prot. Corp. v. Bernard L. Madoff*
*Inv. Sec. LLC v. BNP Paribas S.A.*, 594 B.R. 167, 194 (Bankr. S.D.N.Y. 2018), as having found the proffered
amended complaint in this case "a nullity" is, likewise, an egregious mischaracterization. (Opp'n at 19-20.)  There,
the pleading at issue was an amended complaint in the Trustee's *BNP Paribas* action, which the Court considered "a
nullity" because of a procedural mishap; it has nothing whatsoever to do with the proffered second amended
complaint in this action.  *See BNP Paribas*, 594 B.R. at 194.

Aside from rhetoric, Alpha Prime does not advance any argument that the Trustee has acted in bad faith by unduly delaying its amendment, or that Alpha Prime would be prejudiced by amendment.  Alpha Prime's claims of another ten years of discovery (Opp'n at 23) are untethered to reality and are designed to be inflammatory.  Granting the Trustee's motion to amend will not change the scope of discovery.

Knowing these arguments are a stretch, Alpha Prime turns to the expectations of its shareholders and contends that permitting amendment would be prejudicial because it could further delay its distributions to them.[7]  Alpha Prime seems to argue that the Trustee should not be entitled to discovery if discovery would endanger its shareholders' returns.  Surely, Alpha Prime's shareholders understood that discovery would ensue from the Partial Settlement Agreement when Alpha Prime agreed to *litigate* the disputed issues.  This is particularly true when certain of the disputed issues implicate the amounts available to Alpha Prime for distribution.

## III.    SEVERANCE IS WARRANTED

Alpha Prime's nominal effort to oppose severance should be disregarded.  Alpha Prime's only objection is that the Trustee's severance of his claims against Alpha Prime from those against the HSBC Defendants would put Alpha Prime in a position of seeking discovery from the HSBC Defendants as third-party witnesses.  The issue is illusory given that the Trustee and Alpha Prime entered into a case management plan in April 2018, and Alpha Prime has not once alluded to seeking discovery from the HSBC Defendants, nor has it served any such discovery.  Even so, Alpha Prime's HSBC service providers are presently dismissed based on

---

[7] To support this assertion, Alpha Prime points to a case brought by Access Advantage Master, Ltd.  (Opp'n at 23.) The Access Advantage case is merely a dispute between Alpha Prime and a shareholder apparently aggrieved by Alpha Prime's conduct since the Partial Settlement Agreement and is irrelevant to the question of whether the Trustee's proposed amendment would prejudice Alpha Prime.

extraterritoriality. Alpha Prime will thus likely have to pursue third-party discovery of those witnesses anyway, or else wait months until the Supreme Court provides clarity on whether they will return to the proceeding as parties.

Although Alpha Prime puts forth no other argument to oppose severance, its preliminary statement mentions the possibility that Nigel Fielding would be a witness both for Alpha Prime and the HSBC Defendants. Mr. Fielding was a director of Alpha Prime and a former employee of HSSL, Alpha Prime's sub-custodian and sub-administrator. (SAC ¶ 46; Proffered Second Am. Compl. ¶ 120, ECF No. 399; 2010 Compl. ¶ 101, ECF No. 170-1). Mr. Fielding's relevance to this action is nothing new. Given his role as an Alpha Prime director, in May 2019, the Trustee filed a Motion for the Issuance of Letter of Request to take Mr. Fielding's deposition, which was granted by the Court. (Motion, ECF No. 527; Order, ECF No. 544.) Whether the Trustee will also require Mr. Fielding's testimony in connection with his action against the HSBC Defendants remains to be seen. Regardless, any limited potential overlap in testimony does not require this Court to deny severance. *N. Jersey Media Grp. Inc. v. Fox News Network, LLC*, 312 F.R.D. 111, 117 (S.D.N.Y. 2015).

## CONCLUSION

For the foregoing reasons and those stated in his Opening Brief, the Trustee respectfully requests that the Court deny Alpha Prime's Motion for Judgment on the Pleadings and grant the Trustee's cross-motion to sever and for leave to file the SAC.

Dated: New York, New York
September 13, 2019

Respectfully submitted,

BAKER & HOSTETLER LLP

By:     *s/Oren J. Warshavsky*
        David J. Sheehan
        dsheehan@bakerlaw.com
        Oren J. Warshavsky
        owarshavsky@bakerlaw.com
        Tatiana Markel
        tmarkel@bakerlaw.com
        Michelle R. Usitalo
        musitalo@bakerlaw.com
        45 Rockefeller Plaza, 14th Floor
        New York, NY  10111
        Telephone:   212.589.4200
        Facsimile:    212.589.4201

*Attorneys for Irving H. Picard,*
*Trustee for the Substantively Consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the Chapter*
*7 Estate of Bernard L. Madoff*