**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and for the Estate of Bernard L. Madoff, | Adv. Pro. No. 10-04658 (SMB) |
| Plaintiff, | |
| v. | |
| CAROL NELSON, | |
| Defendant. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and for the Estate of Bernard L. Madoff, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 10-04377 (SMB) |
| CAROL NELSON, Individually and as Joint Tenant; and STANLEY NELSON, Individually and as Joint Tenant, | |
| Defendants. | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS .....................................................................................2

    A.    Corporate Form of BLMIS ......................................................................2

    B.    BLMIS Commercial Bank Accounts .......................................................4

        1.    The 703 and 509 Accounts ........................................................4

        2.    BLMIS changed the holder of the 703 and 509 Accounts after it converted to an LLC ...............................................................5

        3.    The 703 and 509 Accounts were always used for customer deposits and withdrawals .................................................................6

        4.    The 703 and 509 Accounts were always commercial accounts..................6

        5.    JPMorgan's judicial admission and custodian affidavits affirm that the 703 and 509 Accounts were held in the name of the LLC after 2001.................................................................................7

        6.    BLMIS's course of dealing following its conversion to an LLC show that the 703 and 509 Accounts were held by the LLC ......................8

    C.    Defendants' Customer Relationship with BLMIS....................................9

    D.    The Trustee ........................................................................................11

ARGUMENT .....................................................................................................12

I.    The Trustee Has Standing to Recover the Transfers .........................................12

    A.    The JPMorgan Accounts are held in the name of the LLC....................13

    B.    The Trustee can recover transfers of customer property by the SIPA broker-dealer ......................................................................................17

II.    The Coribello Declarations are Not Fraudulent................................................19

III.    The Trustee has Article III, Statutory, and Prudential Standing........................21

CONCLUSION.................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Coon v. Bell*,
No. 1:16-CV-291 (MAD/DJS), 2019 WL 3975547 (N.D.N.Y. Aug. 22, 2019) ....................20

*In re Hypnotic Taxi LLC*,
No. 15-43300 (CEC), 2017 WL 1207471 (Bankr. E.D.N.Y. Mar. 31, 2017) .........................4

*New York v. Solvent Chem. Co.*,
No. 83-CV-1401C, 2006 WL 2640647 (W.D.N.Y. Sept. 14, 2006) ......................................20

*Picard v. Avellino*,
557 B.R. 89 (Bankr. S.D.N.Y. 2016), *reconsideration denied*, 2016 WL
6088136..............................................................................................................................12, 16

*Picard v. BAM L.P.*,
Adv. Pro. No. 10-04390 (SMB), 2019 WL 4316495 (Bankr. S.D.N.Y. Sept.
11, 2019) ............................................................................................................................13, 18

*Picard v. Ida Fishman Revocable Trust*,
773 F.3d 411 (2d Cir. 2014)...............................................................................................9, 18

*In re Picard*,
917 F.3d 85 (2d Cir. 2019)......................................................................................................17

*Rosenman Family, LLC v. Picard*,
395 F. App'x 766 (2d Cir. 2010) .............................................................................................17

*SIPC v. BLMIS*,
Adv. Pro. No. 08-01789, 2018 WL 1442312 (Bankr. S.D.N.Y. Mar. 22, 2018),
*report and recommendation adopted,* 596 B.R. 451 (S.D.N.Y. 2019)..............................11, 21

*SIPC v. BLMIS*,
401 B.R. 629 (Bankr. S.D.N.Y. 2009)....................................................................................17

*SIPC v. BLMIS (In re Bernard L. Madoff)*,
531 B.R. 439 (Bankr. S.D.N.Y. 2015)........................................................................12, 16, 21

*SIPC v. BLMIS (In re BLMIS)*,
522 B.R. 41 (Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL
183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017).............................13

*Tiffany (NJ) Inc. v. eBay, Inc.*,
576 F. Supp. 2d 457 (S.D.N.Y. 2007)......................................................................................20

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016)..................................................................................17

**Statutes**

11 U.S.C. § 546(e) ..................................................................................................18

15 U.S.C. § 78eee(b)(4) ..........................................................................................11

15 U.S.C. § 78fff-2(c)(3) ................................................................................ *passim*

15 U.S.C. § 78*lll*(2)..................................................................................................17

15 U.S.C. § 78*lll*(4)..................................................................................................17

N.Y. U.C.C. § 3–104(1)...........................................................................................16

**Other Authorities**

Registration of Successors to Broker-Dealers and Investment Advisers, Exchange
    Act Release No. 31661, 1992 WL 394548 (Dec. 28, 1992) ..............................13, 15

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071−74
    (2002).................................................................................................................7

Steven M. Biskupic, *Fine Tuning the Bank Fraud Statute: A Prosecutor's
    Perspective*, 82 Marq. L. Rev. 381, 396 (1999).........................................................4

## PRELIMINARY STATEMENT

The parties completed trial on May 9, 2019.  At trial, Defendants raised an affirmative defense regarding the Trustee's standing to recover transfers to them.  During post-trial briefing, where the standing issue was already being briefed, Defendants filed the instant motion. Whether the Court resolves the issue of the Trustee's standing here or there, the evidence submitted at trial (and all the facts outside the trial record) show that the transfers to Defendants were made by Bernard L. Madoff Investment Securities LLC—the SIPA debtor in this proceeding.

At trial, Defendants offered no witnesses or testimony to support their contention that the transfers were made by Bernard Madoff instead of the SIPA debtor.  Instead, they questioned the Trustee's experts generally about two aspects of the BLMIS banking records: (1) the checks made payable to Defendants and drawn upon the JPMorgan 509 Account that had "Bernard L. Madoff" on the top left corner; and (2) the bank statements after September 2002 where the accountholder was changed from "Bernard L. Madoff" to "Bernard L. Madoff Investment Securities" without explicitly listing the abbreviation "LLC" at the end of the accountholder name.  But neither of those aspects—whether standing alone or when viewed with all the evidence presented—refute the Trustee's proof that the bank accounts were held by the SIPA debtor at the time of the transfers.  All the evidence shows the JPMorgan 509 and 703 accounts were commercial bank accounts held by the SIPA debtor at the time the transfers were made to Defendants and that those transfers were comprised of customer property that had been entrusted to the broker-dealer for the purchase of securities.

To escape this reality, Defendants offer a far-fetched theory about what assets and liabilities the broker-dealer did and did not transfer during its corporate changeover to an LLC in

2001 and concoct a make-believe story about the Trustee colluding with JPMorgan to mislead and defraud the Court.  Neither of these fanciful diversions are true.

The Trustee has standing to recover the transfers to Defendants.

## STATEMENT OF FACTS

### A.    Corporate Form of BLMIS

From 1960 until 2001, Bernard L. Madoff operated a sole proprietorship, consisting of three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business.  *See* 5/8/19 [Dubinsky] 63:2-21.  The sole proprietorship was continuously registered with the Securities and Exchange Commission as a broker-dealer under File No. 008-08132, pursuant to the provisions of the Securities Exchange Act of 1934.  *See* TX-006 (SEC Form BD Attestation); TX-007 (SEC Form BD); Answer at ¶ 21, 10-04658 Action, ECF No. 31; Answer at ¶ 21, 10-04377 Action, ECF No. 30.

On January 1, 2001, the sole proprietorship changed its legal status to a single member limited liability company—Bernard L. Madoff Investment Securities LLC (the "LLC").  *See* TX-008 (Articles of Incorporation).  On January 12, 2001, the LLC filed an amended SEC Form BD to reflect the change in corporate form, affirming that:

> EFFECTIVE JANUARY 1, 2001, PREDECESSOR WILL
> TRANSFER TO SUCCESSOR **ALL** OF PREDECESSOR'S
> ASSETS AND LIABILITIES, RELATED TO PREDECESSOR'S
> BUSINESS.  THE TRANSFER WILL NOT RESULT IN ANY
> CHANGE IN OWNERSHIP OR CONTROL.

TX-007 (SEC Form BD) (emphasis added).  The LLC succeeded to the sole proprietorship's SEC File No. 008-08132 and IRS Employer Identification No. 13-1997126.  *See* TX-007 (SEC Form BD).  As reported in the SEC Form BD, the LLC did not have any arrangement with any other person under which accounts, funds, or securities of the business or its customers were held or maintained.  *See id.* at ¶ 8(B)-(C).  After these steps were taken—forming the LLC and

2

transferring the assets, liabilities, and ability to conduct securities trading from the sole

proprietorship to the LLC—the sole proprietorship no longer had authority to operate as a

broker-dealer.  *See id.*

From 2001 until its collapse on December 11, 2008, BLMIS operated all three of its

business units under the LLC.  *See* 5/8/19 [Dubinsky] Tr. 139:13-17.  At trial, the evidence

showed that the Proprietary Trading Business and the IA Business[1] were units of one legal entity,

both operated by Madoff.  *See* 5/8/19 [Dubinsky] Tr. 124:10-13; 139:13-17 ("BLMIS is one

entity, there were two sides, two legs if you will, the investment advisory side and the prop

trading side."); *see also* TX-001 (Madoff Plea Allocution) at 23:14-18; 25:6-9; 27:3-8; 28:5-13;

29:23–30:6 (referring throughout his allocution to a single "firm," and the investment advisory

and proprietary trading businesses as different "sides" of the firm).

During the time it operated as a sole proprietorship and later as an LLC, the primary

assets of the IA Business were customer funds maintained at JPMorgan.  *See* 5/8/19 [Dubinsky]

83:3–85:23; 5/9/19 [Collura] Tr. 188:11–189:10, 189:21–190:11; TX-037 (Sources of Funds into

IA Business); TX-038 (Cash Additions to 703 Account).  Similarly, the primary liabilities of the

IA Business were the amounts owed to customers.  *See* 5/8/19 [Dubinsky] Tr. 139:13-17, 142:6-

17; TX-035 (Annual Solvency Calculations by Year Charts); TX-036 (Annual Solvency

Calculation Chart).  As indicated in the Form BD, all assets and liabilities were transferred from

the sole proprietorship to the LLC in 2001.  *See* TX-007 (SEC Form BD).

---

[1] Capitalized terms not defined in this brief shall have the meanings ascribed in the Trustee's Post-Trial Proposed
Findings of Fact and Conclusions of Law.  *See Picard v. Nelson,* Adv. Pro. No. 10-04377 (SMB) (Bankr. S.D.N.Y.
July 30, 2019), ECF No. 162 (the "10-04377 Action"); *Picard v. Nelson,* Adv. Pro. No. 10-04658 (SMB) (Bankr.
S.D.N.Y. July 30, 2019), ECF No. 165 (the "10-04658 Action"). Defendants filed Proposed Findings of Fact and
Conclusions of Law on September 5, 2019 (the "Defendants' FOF").  *See* 10-04377 Action, ECF No. 176; 10-04658
Action, ECF No. 179.

B. **BLMIS Commercial Bank Accounts**

1. *The 703 and 509 Accounts*

During at least the ten-year period before its collapse on December 11, 2008, BLMIS's

primary bank accounts for the IA Business included JP Morgan Chase Bank, N.A. ("JPMorgan")

account #xxxxx1703 (the "703 Account") and JPMorgan account #xxxxxxxxx1509 (the "509

Account") (collectively, the "JPMorgan Accounts"). *See* 5/8/19 [Dubinsky] Tr. 89:13-21, 92:3-

5; TX-028 (Custodians of Record Affidavit).

When customers of the IA Business entrusted their money with BLMIS, it was deposited

(and commingled) in the 703 Account. *See id.* There was no other significant source of funding

for the 703 Account other than deposits of customer funds. *See* 5/8/19 [Dubinsky] Tr. 82:2–

84:14, 85:8-23; 5/9/19 [Collura] Tr. 190:1-11; TX-038 (Cash Additions to 703 Account).

The 703 Account was linked to the 509 Account, which was a controlled disbursement

account used to send BLMIS customers money from their accounts by check. *See* 5/8/19

[Dubinsky] Tr. 89:9-21. A controlled disbursement account is a commercial banking product

available to businesses that is paired with another checking account and set up to "maximize the

cash flow of a business." Steven M. Biskupic, *Fine Tuning the Bank Fraud Statute: A

Prosecutor's Perspective*, 82 Marq. L. Rev. 381, 396 (1999). Essentially, it is a check writing

account that maintains a zero balance until a check is presented for clearing. At that time, the

related account transfers the money to the check writing account. *Id.; see also In re Hypnotic

Taxi LLC*, No. 15-43300 (CEC), 2017 WL 1207471, at *2 (Bankr. E.D.N.Y. Mar. 31, 2017)

(discussing use by businesses of controlled disbursement account, or a "'zero balance account,'

linked to a funding account from which the funds to honor checks and debits against the

controlled disbursement account would be transferred.").

That is exactly how it worked here: the 509 Account was entirely funded by the 703 Account. 5/8/19 [Collura] Tr. 188:11–189:2 (referencing TX-DEM04, describing flow of activity in the 703 and 509 Accounts). At trial, Ms. Collura used the November 2008 bank statements to demonstrate the controlled disbursement function. The 703 Account bank statement reflected that on November 25, 2008, there was a funding transfer to the 509 Account in the amount of $8,944,621.13 from the 703 Account. TX-149 (703 Account Statement). The 509 Account bank statement also reflected a funding transfer from the 703 Account on that same day, in that same dollar amount, to cover the amount of checks being drawn on the 509 Account that day. *See* TX-150 (509 Account Statement); 5/8/19 [Collura] Tr. 190:23–192:19 (referencing TX-DEM05, which features TX-149 and TX-150).

> 2. *BLMIS changed the holder of the 703 and 509 Accounts after it converted to an LLC*

Bank statements for the JPMorgan Accounts are available from December 1998 through December 2008. These statements reflect that BLMIS changed the holder of its accounts from "Bernard L. Madoff" to "Bernard L. Madoff Investment Securities" following the conversion of the sole proprietorship to an LLC. *Compare* TX-061 (703 Account Statement - August 2002) and TX-062 (509 Account Statement - August 2002) *with* TX-063 (703 Statement - September 2002), TX-064 (509 Statement - September 2002), TX-149 (703 Statement - November 2008), and TX-150 (509 Statement - November 2008); *see also* 5/8/19 [Collura] Tr. 193:1-18 (referencing TX-DEM06, which features TX-061 and TX-062); 5/8/19 [Collura] Tr. 192:20–194:22.

After this change, BLMIS continued to use checks for the 509 Account that listed "Bernard L. Madoff" on the top corner of the check. *See, e.g.*, DX-IE; DX-IF (checks issued to Defendants after September 2002). However, the evidence at trial confirmed that the bank

statements for the 703 Account and 509 Account—not the checks or endorsement stamp—

identified the holder of these accounts.  5/9/19 [Collura] Tr. 27:14-24.  At least after September

2002, the accountholder of these commercial accounts was the LLC.

> 3.    *The 703 and 509 Accounts were always used for customer deposits and
> withdrawals*

The evidence at trial showed that the JPMorgan Accounts were always used for customer

deposits and withdrawals, both when the accounts were held by the sole proprietorship and after

the sole proprietorship was converted to the LLC.  Ms. Collura testified that there were no

changes to the account numbers, and/or handling of the transactions that occurred for either the

703 Account or 509 Account after the change from the sole proprietorship to the LLC.  *See*

5/8/19 [Collura] Tr. 193:14–194:22 ("[t]he transactions in both of those accounts were

consistent, meaning they were cash in from customers and withdrawals to customers for the

whole time period that . . . statements [were] available."); *see also* 5/9/19 [Collura] Tr. 44:6-12;

TX-061, TX-062, TX-063, TX-064, TX-149, TX-150 (703 Account and 509 Account

Statements).

> 4.    *The 703 and 509 Accounts were always commercial accounts*

The 703 and 509 Accounts were commercial business accounts, whether held by the sole

proprietorship or the LLC.  For the entire time for which bank records are available, the face of

the bank statements show that 703 and 509 Accounts were designated as "Commercial

Checking" accounts.  The statements were addressed to the attention of either Anthony ("Tony")

Tiletnick, a BLMIS employee, or Daniel Bonventre, BLMIS's operations manager, at the

BLMIS business address at 885 Third Avenue, New York, New York.  None of the statements

were addressed to Madoff personally.  *See, e.g.,* TX-061 (August 2002 703 Statement); TX-062

(August 2002 509 Statement); TX-063 (September 2002 703 Statement); TX-064 (September

2002 509 Statement); TX-149 (November 2008 703 Statement); TX-150 (September 2008 509

Statement).  Checks to customers from the 509 Account were signed by BLMIS employees.  *See,*

*e.g.,* TX-067, TX-080, TX-081 (checks endorsed by Walter Tiletnick); DX-KN (check endorsed

by Daniel Bonventre); DX-KO (check endorsed by Enrica Cotellessa-Pitz); DX-HC, DX-KM,

DX-KP (checks endorsed by Anthony Tiletnick).

At trial, in response to the Court's question on whether the account was held by Bernard

Madoff individually, Mr. Dubinsky testified:

> **The Court:** Was the 703 account, if you know, an account in the
> name held by Bernard Madoff individually or in the name of
> BLMIS?
>
> **Mr. Dubinsky:**  BLMIS, Your Honor.

5/8/19 [Dubinsky] Tr. 169:2-10.  On cross-examination, Mr. Dubinsky noted the change on the

bank statements to "Bernard L. Madoff Investment Securities" and concluded "that certainly

wouldn't be an individual."  5/8/19 [Dubinsky] Tr. 171:23–172:8.

Because the 703 Account and 509 Account consisted almost entirely of funds deposited

by BLMIS's IA Business customers, *see* 5/8/19 [Dubinsky] 83:3–85:23; 5/9/19 [Collura] Tr.

188:11–189:10, 189:21–190:11; TX-037 (Sources of Funds into IA Business); TX-038 (Cash

Additions to 703 Account), none of the funds in the Accounts ever belonged to Madoff

personally.  *See* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071−74

(2002) ("customer property" is a term of art in the securities industry, which is used regularly to

refer to property held by a broker-dealer but belongs to customers).

> 5.    *JPMorgan's judicial admission and custodian affidavits affirm that the
> 703 and 509 Accounts were held in the name of the LLC after 2001*

In October 2013, with billions of dollars at stake, JPMorgan admitted in litigation

brought by the Trustee in this liquidation that the 703 Account was held by the LLC.  *See*

Answer to Amended Complaint at ¶ 200, *Picard v. JPMorgan Chase & Co.,* Adv. Pro. No. 10-04932 (BRL) (Bankr. S.D.N.Y. October 11, 2013), ECF No. 27 (stating that "[b]ecause BLMIS initially operated as a sole proprietorship, the account was opened in Madoff's name.  In 2002, after BLMIS became a limited liability company, the account was placed in the name of BLMIS.").[2]  Moreover, consistent with its prior admission, JPMorgan averred in sworn affidavits—that the Court admitted into evidence at trial—that the 703 Account and 509 Account were held in the name of the LLC.  *See* TX-028 (JPMorgan Custodian Affidavit).

6.    *BLMIS's course of dealing following its conversion to an LLC show that the 703 and 509 Accounts were held by the LLC*

The accuracy of JPMorgan's admission that the 703 and 509 Accounts were held by the LLC is borne out by the evidence presented at trial.  Consistent with the conversion from a sole proprietorship to an LLC, BLMIS sent letters to banks and organizations advising them of the change in corporate form.  *See* 5/9/19 [Collura] Tr. 30:14–31:15; *see also* DX-L (Letter to Bank of New York), DX-M (Letter to the National Securities Clearing Corporation); DX-N (Letter to Options Clearing Corporation); DX-O (Letter to the Depository Trust Company).  While similar correspondence to JPMorgan was not found in the BLMIS books and records, the fact that the accountholder name of the 703 and 509 Accounts changed in September 2002 is consistent with this practice and makes it likely that a similar communication took place between BLMIS and the bank.  *See* TX-063 (September 2002 703 Account Statement); TX-064 (September 2002 509 Account Statement); TX-149 (November 2008 703 Account Statement); TX-150 (November 2008 509 Account Statement).

---

[2] Defendants stated that the Amended Answer was filed in response to an "unavailable Amended Complaint." Defendants' Findings of Fact and Conclusions of Law at 48.  The Amended Complaint is filed at *Picard v. JPMorgan Chase & Co.,* No. 11 Civ. 00913 (CM) (MHD) (S.D.N.Y. June 24, 2011), ECF No. 50.

### C.    Defendants' Customer Relationship with BLMIS

Defendants claim that they dealt with the sole proprietorship for the entirety of their customer relationship with Madoff and BLMIS.  But the documents say otherwise.

Defendants began investing with BLMIS in 1992, when it was operated as a sole proprietorship.  In 2004, consistent with the BLMIS change in structure, Defendants signed revised account opening documents listing the LLC as the broker.  *See* TX-377 (1ZA283 Customer File) at 19-28; TX-378 (1ZA284 Customer File) at 41-53; TX-379 (1ZR265 Customer File) at 11-20.  The account opening documents provide the basis for which a customer can make deposits or request withdrawals.  *See Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411, 418-19 (2d Cir. 2014) (recognizing that the "transfers at issue originated with, and could not have been possible but for, the relationship created by the Account Documents.").

Both the old and the new executed customer agreements indicate, under the heading addressing "Successors," that "[t]his agreement shall enure to the benefit of the Broker's present organization and any successor organization, irrespective of any change or changes at any time in the personnel thereof, for any cause whatsoever."  TX-338 (1ZA283 Account Opening Documents) at 6-9; TX-339 (1ZR265 Account Opening Documents) at 3-5; TX-340 (1ZA284 Account Opening Documents) at 6-9; TX-377 (1ZA283 Customer File) at 24-26 and 68-71; TX-378 (1ZA284 Customer File) at 48-50 and 119-122; TX-379 (1ZR265 Customer File) at 16-18 and 32-34.

Beginning in January 2001, the month in which the sole proprietorship was converted to an LLC, Defendants received monthly customer statements for their IA Business accounts with the name of "Bernard L. Madoff Investment Securities LLC" in the top left corner of each page. *See, e.g.*, TX-083, TX-090, TX-091, TX-099, TX-100, TX-112, TX-113, TX-121, TX-122, TX-151 (monthly customer statements).

9

Over the course of their relationship, Defendants deposited money with the broker, which was put into the 703 Account. All but two of the deposits made by Defendants were entrusted to the IA Business when it operated as a sole proprietorship. The last two deposits were: (1) a $300,000 check dated March 15, 2002 made out to "Bernard Madoff Securities," and (2) a $500,000 check dated January 15, 2008 also made out to "Bernard Madoff Securities." Neither of these checks were made out to Madoff individually, as claimed by Defendants. Motion at 6; *see also* DX-HW (3/15/2002 Nelsons' Check); DX-JX, TX-264, TX-265, TX-266 (1/15/2008 Nelsons' Check).

Each of the transfers made to Defendants were made from the controlled disbursement 509 Account. *See* 5/8/19 [Collura] Tr. 203:13-16, 215:4–216:3; TX-055 (1ZA283 Tracing Summary); TX-056 (1ZA284 Tracing Summary); TX-057 (1ZR265 Tracing Summary); TX-058 (1ZA283 Reconciliation Summary); TX-059 (1ZA284 Reconciliation Summary); TX-060 (1ZR265 Reconciliation Summary). None of the checks issued to Defendants were signed by Madoff personally. Instead, the checks were signed by various employees of BLMIS, consistent with the JPMorgan Accounts being commercial accounts used for the business. *See, e.g.*, TX-067, TX-080, TX-081 (checks signed by Walter Tiletnick); DX-KN (check endorsed by Daniel Bonventre); DX-KO (check signed by Enrica Cotellessa-Pitz); DX-HC, DX-KM, DX-KP (checks endorsed by Anthony Tiletnick). The transfers sought by the Trustee in this avoidance action were made between 2006 and 2008—at least five years after the sole proprietorship was converted to an LLC.

Debit memos for the transfers sought by the Trustee within BLMIS's books and records show that the LLC was the accountholder of the 509 Account, as indicated in the top left corner of the debit memo. *See, e.g.*, TX-088, TX-097, TX-106, TX-110, TX-119, TX-127, TX-136,

10

TX-146, TX-157, TX-164, TX-177, TX-191, TX-200, TX-208, TX-216, TX-225, TX-234, TX-242, TX-250, TX-260, TX-269, TX-276, TX-284, TX-292, TX-302, TX-318, TX-327 (BLMIS Debit Memos).

These documents are consistent with Defendants' Answers, in which they admitted that they were (1) IA Business customers with accounts held at "Madoff Securities," which they defined as "Bernard L. Madoff Investment Securities LLC," (2) made deposits to, and withdrawals from, those customer accounts, and (3) received those withdrawals into at least one of two bank accounts Defendants held at JPMorgan. *See, e.g.,* Answer at ¶¶ 3, 9, 21, 24, 29, 30, 36-39; 10-04658 Action, ECF No. 31; Answer at ¶¶ 2, 9, 21, 24, 29, 30, 36, 38, 39, 10-04377 Action, ECF No. 30; TX-010 (Stanley Nelson's First Interrogatories Responses, 10-04377 Action) at ¶¶ 5, 7; TX-012 (Carol Nelson's First Interrogatories Responses, 10-04377 Action) at ¶¶ 5, 7; TX-019 (Carol Nelson's First Interrogatories Responses, 10-04658 Action) at ¶¶ 5, 7.

### D.    <u>The Trustee</u>

Following BLMIS's collapse, SIPC filed an application seeking protection of BLMIS's customers under SIPA. The District Court entered a protective decree that appointed the Trustee and removed the liquidation to this Court under SIPA § 78eee(b)(4), which section conferred on this Court "all of the jurisdiction, powers, and duties" granted by SIPA. The Trustee's duties are to collect and distribute customer property to BLMIS's customers.

As this Court previously recognized, the Trustee brings avoidance actions, like this one against Defendants, as a:

> representative of an insolvent customer property estate to avoid and recover transfers for the benefit of the customer property estate which was injured by the fraudulent transfers of customer property, and the Trustee's action will redress that injury by replenishing the funds in the customer property estate available to satisfy the customers' net equity claims in the SIPA proceeding.

11

*SIPC v. BLMIS,* Adv. Pro. No. 08-01789 (SMB), 2018 WL 1442312, at *4 (Bankr. S.D.N.Y.

Mar. 22, 2018), *report and recommendation adopted,* 596 B.R. 451 (S.D.N.Y. 2019) ("*South*

*Ferry R&R*") (citing *SIPC v. BLMIS (In re Bernard L. Madoff)*, 531 B.R. 439, 449 (Bankr.

S.D.N.Y. 2015) ("*Omnibus Good Faith Decision*"). ‼

  In *Picard v. Avellino*, this Court found that the protective order entered at the beginning

of the case covered only "Bernard L. Madoff Investment Securities LLC" but did not cover

Madoff.  557 B.R. 89, 108 (Bankr. S.D.N.Y. 2016), *reconsideration denied*, 2016 WL 6088136

(Bankr. S.D.N.Y. Oct. 18, 2016).  Put another way, as interpreted by this Court, the debtor in the

SIPA liquidation is the LLC and not Madoff individually.  *Id.*  Thus, under this decision, the

Trustee can only recover transfers of customer property made by the LLC after it was formed in

2001.  *Id.* at 109.

  Misguidedly seizing upon *Avellino*, Defendants now argue that the Trustee lacks standing

to recover the avoidable transfers made between 2006-2008 because "none of the alleged

withdrawals to the Nelsons were made from the LLC."  Motion at 15-16.  Defendants are wrong.

## ARGUMENT

## I. The Trustee Has Standing to Recover the Transfers

  Under SIPA, the Trustee can recover customer property transferred by the debtor.  SIPA

§ 78fff-2(c)(3).  Defendants cannot dispute that they received transfers of customer property.

SIPA, and all case law interpreting that statute, makes clear that a SIPA trustee can recover

transfers of customer property.  This case is no different.

  The Trustee demonstrated through evidence adduced at trial that the transfers were made

by the LLC.  Attempting to refute the Trustee's proof, Defendants allege, without support, that

the LLC did not make the transfers to them.  Defendants point out: (1) the bank statements after

September 2002 changed the accountholder from "Bernard L. Madoff" to "Bernard L. Madoff

Investment Securities" without explicitly listing the abbreviation "LLC" at the end of the

accountholder; and (2) the checks drawn on the 509 Account had "Bernard L. Madoff" on the

top left corner.  From there, Defendants speculate that Madoff only transferred the Proprietary

Trading Business to the LLC, keeping the IA Business in his own name, and that the Trustee

colluded with counsel for JPMorgan, Wachtell, Lipton, Rosen & Katz LLP, to procure what they

term the "Fraudulent Coribello Declarations" to "mislead the Court with false and fraudulent

evidence."  Defendants' FOF at ¶ 131.  None of this conjecture is borne out by the evidence put

before the Court during the Nelson trial—or anything outside of the trial record.

### A.    The JPMorgan Accounts are held in the name of the LLC

The evidence shows that the 509 Account was always a business account.  There is no

evidence that it was ever a personal account.  Thus, the only question is whether it was the sole

proprietorship or the LLC that made the transfers from the 509 Account to Defendants.

At the time of the transfers here—2006 through 2008—the sole proprietorship had long

since been converted into an LLC, transferring all its assets and liabilities to the LLC.  *See*

*Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB), 2019 WL 4316495, at *2 (Bankr. S.D.N.Y.

Sept. 11, 2019) (recognizing that conversion from sole proprietorship to an LLC resulted in

transfer to BLMIS of all Madoff's assets and liabilities) (citing *SIPC v. BLMIS (In re BLMIS)*,

522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014) (same), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL 183492

(S.D.N.Y. Jan. 14, 2016) (same), *aff'd*, 697 F. App'x 708 (2d Cir. 2017)).  The primary assets of

BLMIS were its banking and securities accounts, all of which were transferred when it became

an LLC.  *See id.*; *see also* Registration of Successors to Broker-Dealers and Investment Advisers,

Exchange Act Release No. 31661, 1992 WL 394548 (Dec. 28, 1992) (explaining that entity that

relies upon the successor rules must acquire substantially all assets of predecessor, and may not

exclude any significant asset or liability from transfer).

13

Consistent with that conversion, the name of the accountholder on the JPMorgan bank
statements was changed from "Bernard L. Madoff" to "Bernard L. Madoff Investment
Securities."  Because the bank accounts were transferred with all other assets and liabilities from
the sole proprietorship to the LLC in 2001, the *only* business that the bank statements *could be*
referring to during that time period is the LLC.  This fact was confirmed by JPMorgan both in
declarations and admissions in litigation.

Defendants' rejoinder is that "Madoff had been using the trade name of 'Bernard L.
Madoff Investment Securities' decades before the LLC was formed."  Motion at 5.  Defendants
are essentially arguing that Madoff—after converting his sole proprietorship to an LLC—
changed the name on the JPMorgan Accounts from the name of his sole proprietorship (Bernard
L. Madoff) to a "trade name" for his now nonexistent sole proprietorship (Bernard L. Madoff
Investment Securities) that he had already been using for decades.  They further argue that
Madoff somehow converted the JPMorgan Accounts into Madoff's personal accounts.  Under
this circular argument, Defendants claim with no evidence that the sole proprietorship continued
to operate the IA Business after the LLC was formed, while the LLC operated only the
Proprietary Trading Business.

As an initial matter, this pretense does nothing to explain why Madoff changed the name
on any JPMorgan Account if he merely continued to operate as a sole proprietor.  Second, there
is no evidence that Madoff ever operated two separate, legally distinct businesses.  Instead, all
evidence shows that Madoff had a single firm—prior to 2001, a sole proprietorship, and after
2001, an LLC—that operated both the IA Business and the Proprietary Trading units, two
distinct business units within a single firm.  *See* 5/8/19 [Dubinsky] Tr. 139:13-15 ("BLMIS is
one entity, there were two sides, two legs if you will:  the investment advisory side and the prop

trading side."); *see also* TX-001 (Madoff Plea Allocution) at 23:14-18; 25:6-10; 27:3-8; 28:5-13; 29:23–30:6 (referring throughout his allocution to a single "firm," and the investment advisory and proprietary trading as different "sides" of the firm); TX-007 (SEC Form BD) (reflecting the corporate change to the LLC).  The Form BD is clear that *all* assets and liabilities of the sole proprietorship transferred to the LLC.  *See also* Registration of Successors to Broker-Dealers and Investment Advisers, Exchange Act Release No. 31661, 1992 WL 394548 (Dec. 28, 1992) (explaining that successor rules do not apply to situations where predecessor intends to continue its business and that successor rules require transfer of all assets and liabilities).  Defendants' assertion that there was somehow a split of the businesses between the sole proprietorship and the LLC, or that the sole proprietorship continued to conduct any business after 2001 is baseless.

In fact, the evidence shows the opposite.  JPMorgan changed the holder of the bank accounts from one legal entity—the sole proprietorship—to another legal entity—the LLC.  These acts are consistent with the conversion of the sole proprietorship into an LLC, the amended SEC Form BD, the LLC's course of dealing following its succession to the assets of the sole proprietorship, JPMorgan's admissions, and the BLMIS account opening documents (original and 2004 amended versions), monthly customer statements, and debit memoranda.

That the checks continued to display the name "Bernard L. Madoff" until the business collapsed is of no moment.  The trial record shows that the bank statements for the 703 and 509 Accounts—not the checks or endorsement on the back—identified the holder of the relevant accounts.  *See* 5/9/19 [Collura] Tr. 27:14-24.  The account holder of the 509 Account after September 2002 is indisputably "Bernard L. Madoff Investment Securities"—a time after which the sole proprietorship had been converted into an LLC.

Defendants' "check name" argument is also unsupported by the law of negotiable instruments. To be considered a negotiable instrument under the Uniform Commercial Code ("U.C.C."), a written check must be: (a) signed by the maker; (b) an "unconditional promise" to pay a sum certain in money; (c) payable for a fixed amount; (d) payable on demand or at a definite time; and (e) payable to bearer. N.Y. U.C.C. § 3–104(1). The checks were signed by BLMIS employees—not Madoff personally. Anything written on the top of a check is neither relevant nor dispositive under the U.C.C. and is likewise irrelevant to the issue of whether the Trustee can recover the transfers to Defendants. Defendants' argument constructs a requirement that the law does not contain.

While Defendants seek shelter in *Avellino*, that decision provides no cover because the Trustee is not seeking to avoid or recover any transfers made prior to 2001. 557 B.R. at 110; *see also Omnibus Good Faith Decision*, 531 B.R. at 485 (finding that when BLMIS changed to the LLC, "the forms Madoff submitted to SIPC at the time stated that BLMIS was a successor to all of the assets and liabilities of the predecessor business and the transfer would not result in any change in ownership or control. Thus, nothing changed."). Here, the Trustee only seeks to avoid and recover transfers made between 2006 and 2008, after the LLC was formed, and from a commercial checking account that was held by the LLC. Sometimes the simplest answer is the correct one: after BLMIS converted to an LLC in 2001, it changed the holder on its bank accounts to "Bernard L. Madoff Investment Securities" to reflect this change in corporate form and the transfer of its assets and liabilities. Because the evidence shows that the JPMorgan Accounts were held in the name of the LLC, the Trustee can recover the transfers under the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

16

**B.**    **The Trustee can recover transfers of customer property by the SIPA broker-dealer**

There is no dispute that Defendants gave money to the broker-dealer for the purpose of purchasing securities, in accordance with their account agreements and as reflected on their customer statements.  *See* TX-338 (1ZA283 Account Opening Documents); TX-339 (1ZR265 Account Opening Documents); TX-340 (1ZA284 Account Opening Documents); TX-377 (1ZA283 Customer File) at 19-28; TX-378 (1ZA284 Customer File) at 41-53; TX-379 (1ZR265 Customer File) at 11-20; TX-273 (Jan. 2008 Customer Statement for 1ZA284 Account).  This makes the funds "customer property" under SIPA.  SIPA §§ 78*lll*(2), (4); *see also Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768-69 (2d Cir. 2010) (funds sent to BLMIS were debtor property covered by SIPA); *SIPC v. BLMIS*, 401 B.R. 629, 636 (Bankr. S.D.N.Y. 2009) (holding funds in JPMorgan Account were customer property).  Because it is customer property, it is neither property of Madoff nor the broker.  *See* SIPA § 78fff-2(c)(3).

Defendants' customer statements show that the broker made transfers to Defendants, including the 2006-2008 transfers which the Trustee seeks to recover.  *See, e.g.*, TX-083, TX-090, TX-091, TX-099, TX-100, TX-112, TX-113, TX-121, TX-122, TX-151 (monthly customer statements).  As denoted on the top of these customer statements, the broker at the time of these transfers was identified as the LLC.  *Id.*

The evidence at trial showed customer money deposited with the broker was commingled and that this pool of commingled funds was used to pay customer redemptions, including those to Defendants.  *See* 5/8/19 [Dubinsky] Tr. 83:3-11; 5/8/19 [Collura] Tr. 188:11–189:2 (referencing TX-DEM04, describing flow of activity in the 703 and 509 Accounts), 189:11–190-11; TX-001 (Madoff Plea Allocution) at 24:9-22; TX-037 (Sources of Funds into IA Business); TX-038 (Cash Additions to 703 Account); *see also In re Picard*, 917 F.3d 85, 92 (2d Cir. 2019)

17

(noting that Madoff commingled funds into JPMorgan checking account and sent customers

redemptions from commingled account); *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset*

*Mgmt.*, 843 F.3d 561, 564 (2d Cir. 2016) ("BLMIS deposited customer investments into a single

commingled checking account and . . . [w]hen customers sought to withdraw money from their

accounts, including withdrawals of the fictitious profits that BLMIS had attributed to them,

BLMIS sent them cash from the commingled checking account"); *Picard v. BAM L.P.*, 2019 WL

4316495, at *6 (customer funds were put into commingled bank account used to pay

redemptions).

  Any transfers from this commingled pool of funds aggregated by the broker were

transfers of customer property recoverable by the Trustee. *See* SIPA § 78fff-2(c)(3). The name

on any one bank account is not dispositive where the Trustee can show that the transfers to

Defendants were comprised of customer property that was entrusted to the broker for the purpose

of purchasing securities. *See Picard v. BAM L.P.*, 2019 WL 4316495, at *8 ("I do not mean to

suggest that the deposit of customer funds into a Chase account in the name of Madoff or Madoff

Securities changes the nature of customer funds or prevents the Trustee from avoiding and

recovering the Two-Year Transfers.").

  Finally, it is worth noting that if Defendants' argument is correct that the transfers they

received were not made by the broker-dealer, section 546(e) of the Bankruptcy Code would not

be available to them. Defendants invoked the protections of section 546(e) on the bases that they

had "securities contracts" with a stockbroker and that the transfers they received from the broker

were "settlement payments." *Fishman*, 773 F.3d at 417 (noting that customer withdrawals from

BLMIS accounts were related to securities contracts, *i.e.*, account opening agreements, and that

each withdrawal from a customer account was a transfer that constituted a settlement payment

18

from the broker).  Having obtained a decision favorable to them premised on the notion that they

received transfers *from the broker*, they should not be permitted to disavow that position now.

## II.    <u>The Coribello Declarations are Not Fraudulent</u>

The issue of the Coribello Declarations can be easily put to rest because the declarations

were already admitted into evidence at trial and Defendants' claim of fraud on the part of either

the Trustee or JPMorgan is not true.

When Coribello Declarations were being admitted into evidence, Defendants did not

challenge the sworn affidavits, and twice expressly acknowledged that they had no objection to

admissibility.  *See* 5/8/19 [Pre-Trial Motion] Tr. 30:20–33:20.  Although Defendants would like

a "redo," this Court already stated that the "declarations were no secret," and that Defendants'

theory "that the account belonged to Madoff personally rather than to [the] LLC have [sic] been

in the case for quite a while." Hr'g Tr. at 20:20–21:1, *Sec. Inv'r Prot. Corp. v. Bernard L.

Madoff Inv. Sec., LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 26, 2019)

("JPMorgan Hr'g").[3] Defendants could have "subpoena[ed] JPMorgan to testify as to the

ownership of the account" for this trial but did not.  *Id.*  And, contrary to Defendants' suggestion

(Defendants' FOF at ¶ 125), the Trustee was under no obligation to call a witness from

JPMorgan to testify as Defendants never challenged the affidavits until the trial record was

closed.

In an attempt to escape the fact that they failed to object to the admissibility of the

affidavits at trial, Defendants now argue that the JPMorgan affidavits, and specifically TX-028

"cannot be admitted for substantive evidence" relying primarily on criminal cases involving the

Sixth Amendment's Confrontation Clause.  Motion at 13.  However, Defendants raised this

---

[3] A true and correct copy of the hearing transcript is attached as Exhibit A to the Hunt Decl.

argument well after the trial was over and were admonished by this Court that they should have

"objected to the declaration[s] to that extent" at the time of the trial, not nearly two months later.

JPMorgan Hr'g Tr. at 24:2-7, 32:4-5.  Once evidence is admitted, it is admitted.  Particularly as

this is a bench trial, the Court can consider the evidence as it sees fit.  *See, e.g.*, *Coon v. Bell*, No.

1:16-CV-291 (MAD/DJS), 2019 WL 3975547, at *3 (N.D.N.Y. Aug. 22, 2019) (noting the court

"has broad discretion in determining what evidence to admit"); *Tiffany (NJ) Inc. v. eBay, Inc.*,

576 F. Supp. 2d 457, 457 n.1 (S.D.N.Y. 2007) ("In the context of a bench trial where there is not

a concern for juror confusion or potential prejudice, the court has considerable discretion in

admitting the proffered testimony at the trial and then deciding after the evidence is presented

whether it deserves to be credited") (citing *New York v. Solvent Chem. Co.*, No. 83-CV-1401C,

2006 WL 2640647, at *2 (W.D.N.Y. Sept. 14, 2006) ("At trial in the case at bar, the Court will

be the trier of fact, and consequently will not have to function as a gate-keeper for the jury.

Using the discretion given to it, the Court will parse and evaluate the evidence as it comes in.").

Defendants label the affidavits the "2017 Fraudulent Declarations," claiming the Trustee

somehow colluded with JPMorgan and its counsel to commit a fraud on this Court.  Motion at 7.

But the affidavits are consistent with JPMorgan's prior admissions.  Defendants try to confuse

the issue by suggesting that the declarations that dealt with Defendants' bank account records are

earlier versions of declarations dealing with BLMIS's bank account records.  *Compare* TX-028

(Certification of Domestic Records by JP Morgan Chase Dated 12/13/2017 [Five Declarations])

to TX-031 (Certification of Domestic Records by JP Morgan Chase (for Defendant's account

documents) dated 02/13/2015) and TX-032 (Certification of Domestic Records by JP Morgan

Chase (for Defendant's account documents) dated 03/03/2015).  They are not.  The declarations

are for different accounts.  The allegations of fraud are false.  And the affidavits are accurate.

20

### III.     The Trustee has Article III, Statutory, and Prudential Standing

Defendants argue that the Trustee lacks Article III, statutory, and prudential standing.  As

to Article III standing, because the Trustee is seeking to recover transfers of customer property

made by the LLC, the Trustee has standing.  As this Court previously explained:

> A fiduciary that sues as a representative of an insolvent estate to avoid and
> recover transfers for the benefit of that estate satisfies the requirement for
> Article III standing. . . . Here, the estate of customer property suffered the
> injury in fact by virtue of BLMIS fraudulent transfers of that property, the
> Trustee's lawsuits will redress that injury, and . . . the estate is insolvent.
> Any recovery from the defendants will be deemed customer property and
> replenish the funds available to satisfy the customers' net equity claims.
> Accordingly, the Trustee has established Article III standing.

*Omnibus Good Faith Decision*, 531 B.R. at 449.

The same is true for statutory and prudential standing.  As this Court previously found,

the BLMIS estate has been insolvent since December 11, 2002 and all points thereafter, and

customer property is not sufficient to pay the claims listed in SIPA § 78fff-2(c)(3) in full.

Therefore, the Trustee has statutory and prudential standing under SIPA § 78fff-2(c)(3).  *See*

*South Ferry R&R*, 2018 WL 1442312, at *4; *Omnibus Good Faith Decision*, 531 B.R. at 449.

## **CONCLUSION**

For the reasons set forth above, the Trustee respectfully requests that the Motion be

denied and the Court rule that the Trustee has standing to recover transfers from the JPMorgan

Accounts after January 1, 2001.

Dated:   September 18, 2019
        New York, New York

Respectfully submitted,

*/s/ Dean D. Hunt*
David J. Sheehan
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Dean D. Hunt
Email: dhunt@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Lan Hoang
Email:  lhoang@bakerlaw.com
Seanna Brown
Email:  sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*