**CHAITMAN LLP**
465 Park Avenue
New York, New York 10022
Phone & Fax: (888) 759-1114
Helen Davis Chaitman
Gregory M. Dexter
hchaitman@chaitmanllp.com
gdexter@chaitmanllp.com

**Hearing Date:  September 25, 2019 10:00 AM**
**Objection Date:  September 18, 2019**

*Attorneys for Defendants Carol Nelson and Stanley Nelson*

**UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>     Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>     Defendant. | Adv. Pro. No. 08-1789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br><br>     Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC<br><br>     Plaintiff,<br><br>v.<br><br>CAROL NELSON, individually and as joint tenant, and STANLEY NELSON, individually and as joint tenant,<br><br>     Defendants. | Adv. Pro No. 10-04377 (SMB) |

{00042617 2 }

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC | Adv. Pro No. 10-04658 (SMB) |
| Plaintiff, | |
| v. | |
| CAROL NELSON, | |
| Defendant. | |

## <u>THE NELSONS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION</u>

{00042617 2 }

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................iii

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL OVERVIEW ......................................................................................................... 3

    I.    The 509 and 703 Accounts were never owned by the LLC............................................ 3

    II.   One alleged admission by JPMC, buried in one sentence of a 622-paragraph unsworn pleading in an entirely unrelated case in which the Nelsons were not parties cannot confer subject-matter jurisdiction on this Court................................................................................................................... 4

    III.  The 2017 Fraudulent Declarations were offered into evidence for the limited purpose of authenticating documents that were "actually used at trial" .......................................................................................................................... 5

    IV.  Picard admits that he does not have a single letter from Madoff to JPMC requesting to transfer the 509 and 703 Accounts to the LLC .............................. 6

    V.   BLMIS customer statements and debit memoranda – falsified by Madoff – are not relevant to demonstrating ownership of a bank account.................... 7

    VI.  Picard admits that the Nelsons never wrote a check to the LLC and BLMIS employees who signed checks were employees long before the LLC ever came into existence .......................................................................... 8

    VII.  SEC filings demonstrate that the Investment Advisory business was not transferred to the LLC.......................................................................................... 9

LEGAL STANDARD............................................................................................................ 10

ARGUMENT ......................................................................................................................... 11

    I.    Picard failed to meet his burden to establish subject-matter jurisdiction ..................... 11

    II.   Picard does not dispute that custodian affidavits are not substantive evidence .................................................................................................................. 14

    III.  Picard does not rebut the sham affidavit rule ............................................................. 16

    IV.  Picard's evidence does not demonstrate that this Court has subject-matter jurisdiction and parties cannot confer subject-matter jurisdiction on this Court.................................................................................................................. 17

V.      Section 546(e) is irrelevant to Picard's standing ........................................................ 18

VI.     Picard does not have standing........................................................................................ 19

CONCLUSION................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Wright*,
  468 U.S. 737 (1984)................................................................................................11

*In re Bernard L. Madoff Inv. Secs., LLC*,
  424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229 (2d Cir. 2011) ...........................2, 9

*In re Bernard L. Madoff Inv. Secs. LLC*,
  557 B.R. 89 (Bankr. S.D.N.Y. 2016) (*"Avellino"*), *reconsideration denied*,
  2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) (*"Avellino
  Reconsideration Decision"*)..................................................................................19

*In re Bernard L. Madoff Inv. Secs. LLC*,
  560 B.R. 208 (Bankr. S.D.N.Y. 2016) (*"Mendelow"*) ..........................................19

*In re Bernard L. Madoff Inv. Secs. LLC*,
  773 F.3d 411, 423 (2d Cir. 2014) (*"Fishman"*)..............................................18, 19

*In re Cahillane*,
  408 B.R. 175 (Bankr. N.D. Ind. 2009)....................................................................12

*Celotex Corp. v. Edwards*,
  514 U.S. 300 (1995)................................................................................................10

*Cent. States v. Merck-Medco Managed Care, L.L.C.*,
  433 F.3d 181 (2d Cir. 2005)....................................................................................10

*In re Chowaiki & Co. Fine Art Ltd.*,
  593 B.R. 699 (Bankr. S.D.N.Y. 2018)....................................................................11

*City of New York v. Venkataram*,
  2011 WL 2899092 (S.D.N.Y. July 13, 2011) ........................................................11

*In re Estate of Butta*,
  746 N.Y.S.2d 586 (Sur. 2002) ............................................................................1, 12

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990)................................................................................................11

*House of Clean, Inc. v. St. Paul Fire & Marine Ins. Co.*,
  775 F. Supp. 2d 302 (D. Mass. 2011) ....................................................................17

*House v. Malcolm Thomas Indus., Inc.*,
  611 So. 2d 1085 (Ala. Civ. App. 1992) ..................................................................13

*In re Int'l Pharm. & Disc. II, Inc.*,
    443 F.3d 767 (11th Cir. 2005) ........................................................11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................10

*Margo v. Weiss*,
    213 F.3d 55 (2d Cir. 2000)...........................................................16

*Martin v. Merrell Dow Pharms. Inc.*,
    851 F.2d 703 (3rd Cir. 1988) ........................................................17

*Palmer v. Hoffman*,
    318 U.S. 109 (1943)..................................................................17

*Picard v. BAM L.P.*,
    2019 WL 4316495 (Bankr. S.D.N.Y. Sept. 11, 2019)...............................14, 18, 19

*Rohrbough v. Wyeth Labs. Inc.*,
    916 F.2d 970 (4th Cir. 1990) ........................................................17

*In re Simkins*,
    2013 WL 6010496 (Bankr. D. Wyo. Nov. 13, 2013) ...............................13

*In re Singh*,
    585 B.R. 330 (Bankr. E.D.N.Y. 2018)...............................................11

*Tevdorachvili v. Chase Manhattan Bank*,
    103 F. Supp. 2d 632 (E.D.N.Y. 2000) ..............................................12

*Estate of Timoshevich*,
    521 N.Y.S.2d 311 (3d Dept. 1987) ...............................................1, 12

*Tradax Energy, Inc. v. Cedar Petrochems., Inc.*,
    317 F. Supp. 2d 373 (S.D.N.Y. 2004)................................................15

*United States v. Edwards*,
    2012 WL 5522157 (D.D.C. Nov. 15, 2012) ........................................15

*United States v. Robinson*,
    544 F.2d 110 (2d Cir. 1976)........................................................2, 7, 12

*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State,
    Inc.*,
    454 U.S. 464 (1982)..................................................................11

*Warth v. Seldin*,
    422 U.S. 490 (1975)..................................................................10, 11

*Wiand v. Lee*,
    753 F.3d 1194 (11th Cir. 2014) ...............................................................................17

**Statutes**

11 U.S.C. § 546(e) .........................................................................................................18, 19

11 U.S.C. § 548(a)(1)(A) ......................................................................................................19

**Other Authorities**

12 C.F.R. 330.5(a)(1) .............................................................................................................12

Fed. R. Bankr. P. 7012 ..........................................................................................................1

Fed. R. Civ. P. 12(h)(3) .....................................................................................................1, 11

Fed. R. Evid. 803(6) .............................................................................................................15

Fed. R. Evid. 803(7) .............................................................................................................2, 7

Fed. R. Evid. 902(11) ...........................................................................................................15

Successors to Broker-Dealers and Investment Advisers, Exchange Act Release
    No. 31661, 1992 WL 394548 (Dec. 28, 1992) ................................................................17

U.S. Const. art. III, § 2, cl. 1 ..............................................................................................10, 11

The Nelsons[1] respectfully submit this reply memorandum of law in further support of their

motion to dismiss for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil

Procedure 12(h)(3), made applicable by Federal Rule of Bankruptcy Procedure 7012.

## PRELIMINARY STATEMENT

In his Opposition papers, Picard admits or does not dispute any of the following:

- There is not a single document evidencing, or even suggesting, that Madoff ever instructed JPMC to transfer ownership of the 509 and 703 Accounts to the LLC.

- The Nelsons never wrote a check to the LLC.

- None of the account statements for the 509 or 703 Account ever named the LLC as an account owner.

- All of the checks written to the Nelsons were in the name of "Bernard L. Madoff."

- Madoff used the trade name Bernard L. Madoff Investment Securities since as early as the 1970s.

- Custodian affidavits cannot be admitted as substantive evidence.

- The 2017 Fraudulent Declarations were offered by Picard only to authenticate documents that "are actually used at trial."

- There is no explanation for the 2017 Fraudulent Declarations' contradicting Picard's previous admissions.

The ownership of a bank account is demonstrated by the name on a signature card that a

customer completes upon the opening of the account. *See Estate of Timoshevich*, 521 N.Y.S.2d

311, 313 (3d Dept. 1987). The "signature card itself is the best evidence" of ownership of a bank

account. *In re Estate of Butta*, 746 N.Y.S.2d 586, 590 (Sur. 2002). Here, Picard, who has the

burden to establish subject-matter jurisdiction, does not have the "best evidence." He has no

signature card in the LLC's name. He has no correspondence from Madoff to JPMC requesting to

---

[1] All defined terms take those definitions ascribed to them in the Nelsons' opening memorandum. [*See* Memorandum of Law, *Picard v. Nelsons*, Adv. Pro. No. 10-4658, ECF No. 170]; [Memorandum of Law, *Picard v. Nelson*, Adv. Pro. No. 10-4377, ECF No. 167].

transfer the 509 and 703 Accounts to the LLC. Therefore, the Court must conclude that it has no

subject-matter jurisdiction. *See United States v. Robinson*, 544 F.2d 110, 114 (2d Cir. 1976) ("The

absence of a record of an event which would ordinarily be recorded gives rise to a legitimate

negative inference that the event did not occur."); FRE 803(7), advisory committee notes (the

"[f]ailure of a record to mention a matter which would ordinarily be mentioned is satisfactory

evidence of its nonexistence.").

Because he cannot dispute the core evidence against him, Picard instead makes various

tangential arguments and misrepresents what is written in barely relevant documents. For

example, Picard repeatedly relies on an amended SEC Form BD (the "Form BD") as the basis on

which to claim that the 509 and 703 Accounts belonged to the LLC. Picard wrongly claims that

the Form BD references the transfer of the Investment Advisory business, and its assets, to the

LLC in 2001. [*See* Picard's opposition memorandum of law ("Picard's Mem."), ECF No. 180 at

15].[2] But there is no reference whatsoever to the Investment Advisory business in the Form BD

and, indeed, Madoff did not register as an investment advisor at all until 2006. *See, e.g. In re*

*Bernard L. Madoff Inv. Secs., LLC*, 424 B.R. 122, 127 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229

(2d Cir. 2011). It is therefore impossible that a Form BD filed in 2001, five years earlier, could be

used to transfer a registration that did not yet exist.

Picard also refers to certain customer forms – signed in November 2004, not January 2001

when the LLC was created – that allegedly "list[ ] the LLC as the broker." [Picard's Mem. at 9].

In fact, they do not. Far from "listing the LLC as the broker," the effective, executed Trading

Authorization actually authorizes only "Bernard L. Madoff" – not the LLC – to act as the Nelsons'

---

[2]  Unless otherwise indicated, all ECF citations in this reply memorandum are to *Picard v. Nelsons*,
Adv. Pro. No. 10-04377 (Bankr. S.D.N.Y., filed 2010).

agent for buying and selling securities and options. *See infra*, Factual Overview, § V. Similarly, Picard repeatedly refers to the LLC's Articles of Incorporation as somehow effectuating a transfer of all or substantially all of Madoff's assets and liabilities to the LLC. [Picard's Mem. at 2] (citing TX-008). However, those Articles of Incorporation do not purport to do anything of the sort. *See* TX-008. They merely incorporate the LLC. *See id*.

Picard has the burden of establishing his standing and the subject-matter jurisdiction of this Court. Picard has not done so and this Court must dismiss the Complaints.

## FACTUAL OVERVIEW

The Nelsons incorporate the facts set forth in their opening papers, [ECF Nos. 166 to 168-34], and address the following facts in reply to Picard's opposition [ECF Nos. 180-181-1].

### I.    The 509 and 703 Accounts were never owned by the LLC

The 509 and 703 Accounts were never in the name of the LLC. The account statements never once referred to the LLC. [Chaitman Decl.,[3] Ex. B (Tr., May 9, 2019) at 14:1-16:23, 26:24-29:11]; [*id*., Ex. O, Trial Exhibit DX-E (Statements for the 703 Account)]; [*id*., Ex. N, Trial Exhibits DX-HW to DX-MF]. Indeed, even nearly one year after the LLC was formed, a December 2001 statement for the 703 Account indicates that the 703 Account was held in the name of "Bernard L. Madoff." [*Id*., Ex. B (Tr., May 9, 2019) at 14:1-23]; [*id*., Ex. M, Trial Exhibit DX-E at JPMSAB0000001]. Further, none of the checks written by the Nelsons to fund their accounts was ever written to the LLC. [*See id*., Ex. A (Tr., May 8, 2019) at 173:18-174:6].

While Picard claims that the names on each account statement said "Bernard L. Madoff Investment Securities," at some point after 2001, [*see* Picard's Mem. at 5], he also admits that the designation "LLC" never appeared on the statements. Not a single statement or other document

---

[3]  ECF No. 168.

associated with either account ever said "Bernard L. Madoff Investment Securities LLC." [*See*
Nelsons' Mem. at 2-6]. And it is indisputable that Madoff used the BLMIS trade name from the
1970s on.

Picard points to a section of the trial transcript, [Chaitman Decl. Ex. B., (Tr., May 9, 2019)
at 27:14-24], in which he claims that Lisa Collura testified that the "bank statements – not the
checks or the endorsement stamp – identified the holder of these accounts," but Collura did not
actually say this. Collura said only that she chose to look at endorsements on checks to trace
checks that were "written from BLMIS," not that bank statements identified the holder of accounts.
[*Id.* (Tr. May 9, 2019) at 27:14-24].

None of the bank statements refer to the LLC. And, as Picard does not, and cannot, dispute,
Madoff used the BLMIS trade name for his sole proprietorship interchangeably with the name
"Bernard L. Madoff" since the 1970s, long before the LLC was ever formed. [Nelsons' Mem. at
5]. Therefore, a reference to BLMIS on an account statement is not a reference to the LLC.

## II.    One alleged admission by JPMC, buried in one sentence of a 622-paragraph unsworn pleading in an entirely unrelated case in which the Nelsons were not parties cannot confer subject-matter jurisdiction on this Court

Picard's reliance on purported "admissions" by JPMC in its Answer in a completely
unrelated case in which the Nelsons were not parties is misplaced. [*See* Picard's Mem. at 8]. It
is, at best, a boilerplate response that states that JPMC denies knowledge or information sufficient
to form a belief about anything other than the 703 Account being in "BLMIS's name." *See* Answer
to Amended Complaint, ¶ 200, *Picard v. JPMorgan Chase & Co.* Adv. Pro. No.10-04932 (Bankr.
S.D.N.Y. October 11, 2013) (ECF No. 27). The question whether the 703 Account was in the
name of the LLC or in the name of the sole proprietorship was not at issue in that litigation and,
since JPMC carefully noted that it did not have any information about whether the 703 Account
was "placed in the name of BLMIS" by the sole proprietorship, this cannot be read as an admission.

Picard's failure to call any witness from JPMC to testify at trial is conclusive. Clearly if there were evidence that the LLC owned the 509 and 703 Accounts, he would have introduced it. Picard did not even introduce into evidence the JPMC Answer. And, as pointed out in the Nelsons' moving papers, JPMC has never produced a single document indicating that the ownership of either the 509 or the 703 Account was ever changed. Nor has Picard even begun to explain why, if the 703 Account were owned by the LLC, JPMC continuously accepted endorsements stamped "For Deposit Only Bernard L. Madoff," even as late as 2008.

Picard makes an offhand reference to "admissions" of the Nelsons that they were Investment Advisory business customers with accounts held at "Madoff Securities," defined as "Bernard L. Madoff Investment Securities LLC." [*See* Picard's Mem. at 11]. These "admissions" are, at best, simply "admissions" that the Nelsons received certain transfers. The Nelsons could not possibly have personal knowledge of who owned the 509 and 703 Accounts. In the same Answers in which their purported "admissions" were made, the Nelsons asserted affirmative defenses that Picard lacks standing to bring his claims. *See* Answer, *Picard v. Nelsons*, Adv. Pro. No. 10-4377, (ECF No. 30), Fourth Affirmative Defense; *Picard v. Nelson*, Adv. Pro. No. 10-4658, (ECF No. 31), Fourth Affirmative Defense.

### III.    The 2017 Fraudulent Declarations were offered into evidence for the limited purpose of authenticating documents that were "actually used at trial"

The 2017 Fraudulent Declarations were outside the scope of what is permissible under a custodian affidavit, unsupported by personal knowledge, and unsupported by the documents that JPMC produced. Although Picard now attempts to argue that they could be admitted in their entirety because the Nelsons' counsel did not object to their admission at trial, [Picard's Mem. at 18-20], this argument does not address the fact that Picard only offered the 2017 Fraudulent Declarations for the purpose of authenticating documents. The record is clear:

MR. HUNT: Okay. The next group that I'd like to talk about are the authenticity of records, the custodian's records. JP Morgan has (indiscernible) well, is an important part of this case. Each party has designated JP Morgan records, both BLMIS records and JP Morgan account records from the Defendants. Their bank account was held at JP Morgan as well. Exhibit 28 – Trustee's Exhibit 28 is the records custodian affidavit for the JP Morgan-BLMIS records, and Trustee's Exhibit 20 – or 31, excuse me – is the records custodian affidavit for the Nelson's JP Morgan records. We'd like to move those custodian record affidavits into evidence ***so that they can be applied to the documents that are <u>actually used at trial.</u>***

THE COURT: Any objection?

MS. CHAITMAN: We have no objection to any third-party documents, just to cut this short, Your Honor. What we do object to, we filed a written objection to Madoff's internal records.

THE COURT: Okay.

[Chatman Decl., Ex. A (Tr., May 8, 2019) at 30:13-30:7] (emphasis added). Picard cannot now attempt to offer the 2017 Fraudulent Declarations for some other purpose.

## IV. Picard admits that he does not have a single letter from Madoff to JPMC requesting to transfer the 509 and 703 Accounts to the LLC

Picard admits that he does not have a single document to indicate that JPMC was ever asked to transfer ownership of the 509 and 703 Accounts to the LLC. [Picard's Mem. at 8-9]. Picard conceded this through his counsel's June 12, 2018 email with respect to the 509 Account. [*See* Nelsons' Mem. at 8, 11]; [Chaitman Decl., Ex. W]. Picard now seeks to convince this Court that the existence of such a document is nonetheless "likely" – even though his counsel and his own experts admitted during the Nelson trial that they have never seen such a document in their extensive review of Madoff's books and records, and JPMC has never produced such a document. [*See* Chaitman Decl., Ex. B (May 9, 2019) at 13:7-20]; [*see also id*. at 18:3-5] (Q: Okay. The 509 account was never changed to Bernard L. Madoff Investment Securities, LLC; was it? A. That

was never on the statements.); [*id*., Ex. A (May 8, 2019) at 171:23-172:8] (Dubinsky had never

seen a bank statement for either the 509 Account or the 703 Account in the LLC's name).

Picard relies on a "course of dealing following its conversion to an LLC." [Picard's Mem.

at 12]. This so-called "course of dealing" apparently consists of a number of letters from the LLC

to various banks and entities – virtually everyone but JPMC – advising them that the LLC had

been formed and that ownership of Madoff's accounts should be transferred to the LLC. This

Court cannot infer that such a letter was ever sent to JPMC based on the existence of letters *to*

*entities other than JPMC*. The law does not allow it. Instead, the non-production of any such

letter to JPMC makes it clear that there was *never* any such letter to JPMC. *See Robinson*, 544

F.2d at 114 ("The absence of a record of an event which would ordinarily be recorded gives rise

to a legitimate negative inference that the event did not occur."); FRE 803(7), advisory committee

notes (the "[f]ailure of a record to mention a matter which would ordinarily be mentioned is

satisfactory evidence of its nonexistence."). Madoff knew what was required to transfer an account

to the LLC and he clearly did not intend to transfer the 509 and 703 Accounts to the LLC.

## V.    BLMIS customer statements and debit memoranda – falsified by Madoff – are not relevant to demonstrating ownership of a bank account

Picard's reliance on the term "LLC" appearing on monthly customer statements and debit

memoranda, [Picard's Mem. at 9, 10, 15, 17], is unfounded. These internally generated documents

do not indicate that the 509 and 703 Accounts themselves ever became the property of the LLC

and do not affect their ownership at all. Unless the Accounts were transferred by JPMC at

Madoff's request, which they were not, they remained Madoff's bank accounts.

Picard argues that the customer account agreements – signed in November 2004, not

January 2001 when the LLC was created – "list[ ] the LLC as the broker." [Picard's Mem. at 9].

In fact, they do not. Far from "listing the LLC as the broker," the effective, executed Trading

Authorization actually ***authorizes only "Bernard L. Madoff (whose signature appears below)"*** to act as the Nelsons' agent for buying and selling securities and options, ***not the LLC at all.*** [*See* TX-377 (1ZA283 Customer File) at 19-28; TX-378 (1ZA284 Customer File) at 41-53; TX-379 (1ZR265 Customer File) at 11-20]. The customer agreement itself does not define the term "Broker" other than as "You." [*See* TX-377 (1ZA283 Customer File) at 19-28; TX-378 (1ZA284 Customer File) at 41-53; TX-379 (1ZR265 Customer File) at 11-20]. Moreover, the original customer agreement states that it may not be "waived, altered, modified or amended" without a writing signed by the (original) broker. [*See* TX-377 (1ZA283 Customer File) at 68; TX-378 (1ZA284 Customer File) at 119; TX-379 (1ZR265 Customer File) at 32]. The "new" customer agreement is not signed by any broker at all. [*See* TX-377 (1ZA283 Customer File) at 26; TX-378 (1ZA284 Customer File) at 50; TX-379 (1ZR265 Customer File) at 18].

Moreover, the Nelsons' requests for withdrawals after 2001 were not made to the LLC, but to "Bernard Madoff Securities," "Bernard Madoff Investments," or "Bernard L. Madoff." [*See* TX-377 at 4-18 (Requests to "Bernard Madoff Securities" or "Bernard Madoff Investments"); TX-378 (1ZA284 Customer File) at 4-40 (Requests to "Bernard Madoff Securities" or "Bernard Madoff Investments"); TX-379 (1ZR265 Customer File) at 5-9 (Requests all to "Bernard L. Madoff" by FISERV, and referencing the "Bernard L. Madoff Brkg Acct. Value)].

**VI.** **Picard admits that the Nelsons never wrote a check to the LLC and BLMIS employees who signed checks were employees long before the LLC ever came into existence**

Picard admits that the Nelsons never wrote a check to the LLC. [Picard's Mem. at 10]. As set forth in the Nelsons' opening papers, none of the checks written by the Nelsons to fund their accounts was ever written to the LLC. [*See* Chaitman Decl., Ex. A (Tr., May 8, 2019) at 173:18-174:6]. All of the checks sent by the Nelsons were sent to Madoff and were endorsed by Madoff. [Chaitman Decl., Ex. B (Tr. May 9, 2019) at 26:24-29:12]; [Chaitman Decl., Ex. P, Trial Exhibits

DX-HW, DX-JX].  These checks were stamped "For Deposit Only Bernard L. Madoff," and JPMC accepted the checks with that endorsement.  [*See, e.g.*, Chaitman Decl., Ex. P, Trial Exhibits DX-HW, DX-JX].   The Nelsons wrote two checks after 2001, made out to "Bernard Madoff Securities."   Despite Picard's attempt to claim that these were not "made out to Madoff individually," [Picard's Mem. at 10], they were not made out to the LLC.

Picard contends that the withdrawal checks were all "signed by various employees of BLMIS," [Picard's Mem. at 10], listing Walter and Anthony Tiletnick, Daniel Bonventre and Enrica Cotellessa-Pitz.  These individuals had all been employed by the sole proprietorship for many years and Picard has not proven, or even suggested, that they were employed only by the LLC.  Picard has come forward with no evidence whatsoever to suggest that, in signing these checks, these individuals were acting for the LLC.  Moreover, the issue here is not who employed various personnel; the issue is who owned the 509 and 703 Accounts.

## VII.    SEC filings demonstrate that the Investment Advisory business was not transferred to the LLC

Picard repeatedly attempts to rely on the Form BD as a basis on which to claim that the 509 and 703 Accounts belonged to the LLC, claiming that it clearly references the transfer of the Investment Advisory business, and its assets, to the LLC in 2001 when the LLC was formed.  [*See, e.g.* Picard's Mem. at 15].  Picard is wrong.

First, Madoff did not register as an investment advisor at all until 2006. *See, e.g. In re Bernard L. Madoff Inv. Secs., LLC*, 424 B.R. at 127.  It is therefore impossible that a form that simply transfers Madoff's registrations as of 2001, five years earlier, could possibly be used to transfer a registration that did not yet exist.  Second, even if this Court elects to disregard the registration, the Form BD shows that Madoff's Investment Advisory business was not a part of the LLC because the form clearly describes the only businesses that the LLC engages in (or intends to

engage in) as market making and proprietary trading – *i.e.*, the legitimate business – and states that the LLC does not engage in investment advisory services. *See* TX-007.

At pages 8 and 9 of the Form BD, the LLC was asked to check all of the "types of business [it] engaged in" (unless that business accounted for less than 1% of annual revenue). *See* TX-007. The LLC checked item "C," which referenced its market-making activities, item "V," which referenced only its proprietary trading activities, and item "Z", which referenced "Other" activities (page 10 describes this as referencing only Madoff's membership on the Cincinnati Stock Exchange where he was a designated market maker). The LLC did **not** check item "S," which referenced "Investment advisory services." Thus, the Form BD proves  that Madoff did not transfer the Investment Advisory business to the LLC.

Picard repeatedly refers to the LLC's Articles of Incorporation as somehow effectuating a transfer of all or substantially all of Madoff's assets and liabilities to the LLC. [Picard's Mem. at 2]. But those Articles of Incorporation do not purport to do anything of the sort. *See* TX-008.

## LEGAL STANDARD

The Constitution limits the subject-matter jurisdiction of federal courts to actual cases and controversies. *See* U.S. Const. art. III, § 2, cl. 1. A bankruptcy court's jurisdiction is even more circumscribed and is wholly "grounded in and limited by statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). An "essential and unchanging part of the case-or-controversy requirement of Article III" is the "core component of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "If plaintiffs lack Article III standing, a court has no subject-matter jurisdiction to hear their claim." *Cent. States v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005). Article III "requires the party who invokes the court's authority 'show that he ***personally*** has suffered some

actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.,* 454 U.S. 464, 472 (1982) (emphasis added) (citations omitted).

This Court has the power and the duty to dismiss a complaint for lack of subject-matter jurisdiction at any stage of the case. *See* Fed. R. Civ. P. 12(h)(3); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("[F]ederal courts are under an independent obligation to examine their own jurisdiction."). A plaintiff filing suit in federal court bears the burden of demonstrating standing. *See Allen v. Wright*, 468 U.S. 737, 751 (1984). The debtor in a bankruptcy case can only establish his standing if the debtor personally suffered some actual injury. *See Warth*, 422 U.S. at 501 (Article III requires that "plaintiff . . . allege a distinct and palpable injury to himself").

## ARGUMENT

### I. Picard failed to meet his burden to establish subject-matter jurisdiction

Although Picard repeatedly tries to reverse the parties' relative burdens of proof, a plaintiff bringing suit in federal court bears the burden of establishing standing. *See, e.g.*, *Allen*, 468 U.S. at 751. Picard did not meet his burden.

The 509 and 703 Accounts were never held in the name of the LLC and, therefore, they were not owned by the LLC. *See In re Chowaiki & Co. Fine Art Ltd.*, 593 B.R. 699, 713 (Bankr. S.D.N.Y. 2018) ("New York law presumes that 'once funds are deposited in a bank account, the account holder has title to and control over those funds.'") (citation omitted); *City of New York v. Venkataram*, 2011 WL 2899092, at *5, n.6 (S.D.N.Y. July 13, 2011) ("'Under New York law, the party who possesses property is presumed to be the party who owns it.'") (citation omitted); *In re Singh*, 585 B.R. 330, 338 (Bankr. E.D.N.Y. 2018) (debtor could not rebut presumption that funds in his bank account were his property); *see also In re Int'l Pharm. & Disc. II, Inc.*, 443 F.3d 767,

771 (11th Cir. 2005) ("In most states, the name or title to a bank account creates a presumption of ownership in the titleholder.") (citation omitted).

The relationship between a bank and its customer is contractual. *Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 640 (E.D.N.Y. 2000). Madoff had the 509 and 703 Accounts long before 2001 when he formed the LLC. Ownership of a bank account is demonstrated by the name on a signature card that a customer completes upon the opening of the account. *See Estate of Timoshevich*, 521 N.Y.S.2d at 313. The "signature card itself is the best evidence" of ownership of a bank account. *In re Estate of Butta*, 746 N.Y.S.2d at 590; *see also In re Cahillane*, 408 B.R. 175, 199-200 (Bankr. N.D. Ind. 2009) (courts look to the initial agreement between a bank and a depositor to determine the ownership of an account); 12 C.F.R. 330.5(a)(1) ("The FDIC shall presume deposited funds are actually owned in the manner indicated on the deposit account records."). Picard produced no signature card or any other contract between the LLC and JPMC that would identify the owner of the Accounts. Had the Accounts actually been transferred to the LLC, the best evidence would have been a letter to JPMC requesting that transfer. But Picard has no such letter and this Court must conclude that such an instruction from Madoff to JPMC does not exist. *See Robinson*, 544 F.2d at 114 ("The absence of a record of an event which would ordinarily be recorded gives rise to a legitimate negative inference that the event did not occur.").

Picard makes the tangential argument that it is not relevant that the checks paid to the Nelsons bore the name "Bernard L. Madoff" rather than the LLC. [Picard's Mem. at 15-16] ("Anything written on the top of a check is neither relevant nor dispositive under the N.Y.U.C.C. and is likewise irrelevant to the issue of whether Picard can recover the transfers to Defendants"). This is plainly wrong. It is common sense that the name on a check is relevant to ownership of

the account, and courts have so held. *See In re Simkins*, 2013 WL 6010496, at *2 (Bankr. D. Wyo. Nov. 13, 2013) (to determine the ownership of funds in a joint account, courts consider "whose name is printed on face of checks"); *House v. Malcolm Thomas Indus., Inc.*, 611 So. 2d 1085, 1086 (Ala. Civ. App. 1992) (holding that the presumption that the funds in joint account belonged to debtor-husband was rebutted because only his wife's name was printed on checks).

Picard makes the irrelevant argument that the checks to the Nelsons constitute negotiable instruments under the New York Uniform Commercial Code without regard to the name on the check. [Picard's Mem. at 16]. The Nelsons are not disputing whether the checks they received from Madoff were negotiable instruments.

In desperation, Picard argues that the 509 and 703 Accounts were "commercial," which demonstrates, according to Picard, that they were owned by the LLC. This is a complete *non sequitur*. To accept this argument, the Court would have to conclude that sole proprietorships cannot operate commercial enterprises or own "commercial" accounts. Such a conclusion would be absurd. It is completely irrelevant whether the 509 and 703 Accounts were "commercial."

Picard contends that the Nelsons argue that "Madoff somehow converted the JPMorgan Accounts into Madoff's personal accounts." [Picard's Mem. at 14]. This is a straw man. The Nelsons have never contended that the 703 and 509 Accounts were ever held by Madoff as "personal accounts." There is no dispute that the sole proprietorship was commercial. What the Nelsons do contend, however, is that the 703 and 509 Accounts were always the property of the sole proprietorship. They were not transferred to the LLC as a matter of fact, since there is no letter to JPMC, and they were not transferred to the LLC as a matter of law.

Incapable of satisfying his burden of proof, Picard's entire opposition is premised on improperly foisting the burden of proof on the Nelsons. [*See id*. at 1] ("At trial, Defendants

offered no witnesses or testimony to support their contention that the transfers were made by Bernard Madoff instead of the SIPA debtor."); [*id*. at 13] ("Defendants speculate that Madoff only transferred the Proprietary Trading Business to the LLC, keeping the IA Business in his own name . . . ."); [*id*. at 14] ("Defendants claim with no evidence that the sole proprietorship continued to operate the IA Business after the LLC was formed, while the LLC operated only the Proprietary Trading Business."). In fact, the Nelsons put in overwhelming proof that the ownership of the 509 and 703 Accounts was never changed to the LLC. However, it is not the Nelsons' burden, as Picard argues, to come up with a "theory about what assets and liabilities the broker-dealer did and did not transfer during its corporate changeover to an LLC in 2001." [Picard's Mem. at 1-2]. Nor is it the Nelsons burden to explain why certain bank statements at one time stated "Bernard L. Madoff" but then subsequently stated "Bernard L. Madoff Investment Securities." [Picard's Mem. at 14]. The burden in this case was on Picard, and he did not meet his burden to establish that the 509 and 703 Accounts were owned by the LLC.

Picard cites *Picard v. BAM L.P.*, 2019 WL 4316495 (Bankr. S.D.N.Y. Sept. 11, 2019), as authority to hold that Madoff transferred all of his assets and liabilities to the LLC. [Picard's Mem. at 13]. But *BAM L.P.* held that the "ownership of the funds used to pay the Two-Year Transfers is a disputed issue of fact." *Id*. at *8. Picard offered no evidence in this case beyond what he offered in *BAM L.P.*, and, therefore this Court cannot now conclude that Picard has met his burden of proving ownership of the Accounts. Further, this Court in *BAM L.P.* did not make a factual finding that Madoff transferred all of his assets and liabilities to the LLC, certainly not on the record here, and neither did the case that it cites.

## II.    Picard does not dispute that custodian affidavits are not substantive evidence

Picard's relies heavily on the 2017 Fraudulent Declarations, but they cannot be considered substantive evidence. Custodian affidavits merely verify the procedures through which the

underlying records were made, so that the underlying records themselves can be admitted for their truth. *See* FRE 902(11) (business records can be admitted under FRE 803(6) if a custodian of records certifies that the records comply with the requirements of FRE 803(6)(A)-(C)); *Tradax Energy, Inc. v. Cedar Petrochems., Inc.*, 317 F. Supp. 2d 373, 379 (S.D.N.Y. 2004) (observing that custodian affidavits "track[] exactly the language of Rule 803(6)"). The custodian affidavit itself is not substantive evidence, and it ceases to be a custodian affidavit anymore when it attempts to do more than simply authenticate documents. *See United States v. Edwards*, 2012 WL 5522157, at *3 (D.D.C. Nov. 15, 2012) (custodian affidavits "merely establish the procedures through which the underlying records were made"); *id.* (***"The business records – not the certifications – are used to establish facts against the defendant at trial."***) (emphasis added). [*See also* Nelsons' Mem. at 11-15]. Thus, to the extent the 2017 Fraudulent Declarations attempt to do more than simply recite the elements of FRE 803(6)(A)-(C), they exceed the permissible scope of FRE 902(11) and constitute inadmissible hearsay without any exception.

Picard ***does not*** even dispute this. [Picard's Mem. at 18-20]. Thus, the 2017 Fraudulent Declarations cannot be admitted as substantive evidence. Indeed, when Picard introduced them he admitted as much. *See supra*, Factual Overview, § III.

While conceding the main point – that custodian affidavits cannot be admitted as substantive evidence – Picard instead merely argues: (1) the Declarations are "not fraudulent;" (2) they were already admitted into evidence; and (3) this Court can consider them "as it sees fit" because this was a bench trial. [Picard's Mem. at 19-20]. These arguments are all beside the point, and they are meritless.

First, it was not necessary for the Nelsons to prove, at trial, that the Declarations were a product of fraud; the Declarations cannot be used as substantive evidence as a matter of law

regardless of the circumstances in which they were generated.  The circumstances in which they were generated, however, further underscores why they are improper.  Additionally, Picard never produced the Fraudulent Coribello Declarations in 2017 when they were procured, or in 2018; Picard only produced them in 2019 – one week before trial, foreclosing the Nelsons' opportunity to call Coribello as a witness.  Second, they were admitted only for the limited purpose of authenticating documents that were "actually used at trial."  [Chaitman Decl., Ex. A (Tr., May 8, 2019) at 30:13-30:7].  Picard cannot now ask that they be admitted for the additional, improper purpose of establishing disputed facts that were not within Coribello's personal knowledge.  Finally, patently incredible hearsay contained in a custodian affidavit procured in an obvious attempt to deceive the Court cannot possibly establish subject-matter jurisdiction – especially when the affidavit exceeds the scope of what a custodian affidavit is permitted to do.

## III.    Picard does not rebut the sham affidavit rule

Picard's counsel acknowledged, on June 12, 2018, that Picard had no documents evidencing that the 509 Account was ever transferred into the name of the LLC.  [*See* Chaitman Decl., Ex. W (email dated June 12, 2018 from Max Shifrin to Helen Davis Chaitman)].  The earlier Coribello Declarations stated nothing about the 509 and 703 Accounts, or the LLC's alleged ownership of any accounts at JPMC.   Picard gives no serious explanation for these discrepancies, simply giving the unsatisfactory explanation that the "declarations are for different accounts." [Picard's Mem. at 20].  Even if this were true, Picard's explanation is not helpful and does not rebut the presumption of the sham affidavit rule.

The integrity of this Court compels the rejection of the 2017 Fraudulent Coribello Declarations.   "Where a party submits an affidavit to the court that contains information inconsistent with . . . other sworn submission, courts hold that these contradictory affidavits should be disregarded as 'shams' or 'competing affidavits.'"  *See Margo v. Weiss*, 213 F.3d 55, 63 (2d

Cir. 2000) (holding that it was unreasonable for plaintiff's counsel to file affidavits in which they contradicted earlier testimony); *Rohrbough v. Wyeth Labs. Inc*., 916 F.2d 970, 976 (4th Cir. 1990) (holding that the district court was justified in disregarding conflicting affidavits); *Martin v. Merrell Dow Pharms. Inc*., 851 F.2d 703, 705 (3rd Cir. 1988) (disregarding a subsequent affidavit, submitted in the face of defeat, which contradicted earlier sworn statements). The circumstances of the 2017 Fraudulent Declarations compel the conclusion that Picard was attempting to mislead the Court with false and fraudulent evidence. *See Palmer v. Hoffman*, 318 U.S. 109, 113-14 (1943) (excluding accident report on the grounds that it was prepared in anticipation of litigation); *see also House of Clean, Inc. v. St. Paul Fire & Marine Ins. Co.,* 775 F. Supp. 2d 302, 316 (D. Mass. 2011) ("[W]hen statements are made for the purposes of litigation, the potential motivation of the [speaker] undermines the statements' trustworthiness."); *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014). Picard does not rebut the presumption of the sham affidavit rule simply by arguing that the "declarations are for different accounts." [Picard's Mem. at 20]. Thus, the improper references to the 509 and 703 Accounts in the Coribello Declaration should be stricken.

## IV.  Picard's evidence does not demonstrate that this Court has subject-matter jurisdiction and parties cannot confer subject-matter jurisdiction on this Court

As set forth *supra*, barely any of the evidence relied on by Picard is probative and certainly it is insufficient to confer jurisdiction on this Court. The Form BD did nothing to effectuate a transfer in corporate assets. *See supra*, Factual Overview § VII. Picard's reliance on the SEC's Registration of Successors to Broker-Dealers and Investment Advisers, Exchange Act Release No. 31661, 1992 WL 394548 (Dec. 28, 1992) is equally misplaced. While the successor rules do indeed suggest that they would be violated if the predecessor does not transfer all or substantially all assets and liabilities, they simply cannot be read to apply to effectuate a transfer of a registration that does not exist. Further, the Form BD itself is not the mechanism for transferring the

predecessor's assets and liabilities (but rather is a form that refers to transfers that may or may not have been effectuated through other documents). Madoff may not have complied with the successor rules – the Form BD does not prove compliance – which would hardly be surprising.

With respect to alleged admissions in the Nelsons' Answer and JPMC's Answer in a completely unrelated case, this Court has recently held that such admissions do not confer subject-matter jurisdiction on the Court. *BAM L.P.*, 2019 WL 4316495, at *8. Further, as set forth *supra* at Factual Overview, § II, they are not really admissions at all.

Picard relies extensively, and incorrectly, on the use of LLC stationery for customer statements to argue that this demonstrates that the LLC owned the Accounts. LLC stationery does not prove anything. JPMC did not provide the stationery and the customer statements provide no indication whatsoever as to who the broker is or who owns the Accounts; they merely list the LLC on the top of the page because the customer statements are on LLC stationery.

Other Madoff documents cited by Picard actually ***disprove*** Picard's argument. The effective, executed Trading Authorization authorizes only "Bernard L. Madoff (whose signature appears below)" to act as the Nelsons' agent for buying and selling securities and options, not the LLC at all. [*See* TX-377 (1ZA283 Customer File) at 19-28; TX-378 (1ZA284 Customer File) at 41-53; TX-379 (1ZR265 Customer File) at 11-20].

**V.    Section 546(e) is irrelevant to Picard's standing**

Picard argues that the Nelsons' Motion should be denied because they previously relied on Section 546(e) of the Bankruptcy Code to limit their clawback exposure to transfers made within the two years prior to this liquidation. [Picard's Mem. at 18-19] (citing *In re Bernard L. Madoff Inv. Secs. LLC*, 773 F.3d 411, 423 (2d Cir. 2014) *("Fishman")*). This argument makes no sense. "Section 546(e) is a very broadly-worded safe-harbor provision that was enacted to 'minimiz[e] the displacement caused in the commodities and securities markets in the event of a major

bankruptcy affecting those industries.'" *Fishman*, 773 F.3d at 416 (citation omitted). It limits a trustee's power to avoid transfers from a broker or financial institution in connection with a securities contract to only those transfers made two years before the filing date of the liquidation. *See* 11 U.S.C. §§ 546(e), 548(a)(1)(A). No one disputes that the Nelsons received transfers from a broker or financial institution in connection with a securities contract.

Moreover, the Nelsons would not have had to invoke Section 546(e) if they had not been sued by a trustee without standing to bring the avoidance action in the first place. Neither the Nelsons nor Picard can confer subject-matter jurisdiction on this Court based on legal positions they have taken in other cases.

**VI.**   **Picard does not have standing**

Picard argues that the he has standing because he "is seeking to recover transfers of customer property made by the LLC." [Picard's Mem. at 21]. However, as set forth *supra*, the transfers were not made by the LLC. Therefore, Picard does not have standing. *See In re Bernard L. Madoff Inv. Secs. LLC*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016) (*"Avellino"*), *reconsideration denied*, 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) (*"Avellino Reconsideration Decision"*); *In re Bernard L. Madoff Inv. Secs. LLC*, 560 B.R. 208 (Bankr. S.D.N.Y. 2016) (*"Mendelow"*); [*see also* Nelsons' Mem. at 15-20] (explaining why Picard can only clawback transfers of LLC property).

Likewise, this Court recently held that "customer deposits are deemed to have been BLMIS's [the LLC's] property for the purposes of this Avoidance Action unless . . . the customer deposits were Madoff's property at the time of the transfers." *BAM L.P.*, 2009 WL 4316495, at *7. Here, the transfers were made from Madoff's property, not the LLC's. Therefore, Picard does not have standing.

## **CONCLUSION**

Picard does not have standing to avoid any transfers made to the Nelsons and this Court

must dismiss the Complaints for lack of subject-matter jurisdiction.


Dated:    September 20, 2019          **CHAITMAN LLP**
          New York, New York

                                     By:   */s/Helen Davis Chaitman*
                                           Helen Davis Chaitman
                                           Gregory M. Dexter
                                           hchaitman@chaitmanllp.com
                                           gdexter@chaitmanllp.com
                                           465 Park Avenue
                                           New York, New York 10022
                                           Phone & Fax: 888-759-1114

                                           *Attorneys for Defendants Carol and Stanley
                                           Nelson*