**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:

BERNARD L. MADOFF,

       Debtor.

IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,

       Plaintiff,

v.

HSBC BANK PLC, *et al.,*

       Defendants.

Adv. Pro. No. 09-1364 (SMB)

**SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ..........................................................................................1

II.     JURISDICTION AND VENUE .................................................................................2

III.    BACKGROUND, THE TRUSTEE, AND STANDING .........................................3

IV.     THE PONZI SCHEME.................................................................................................6

V.      ALPHA PRIME IS CREATED AS A CLONE OF THE PRIMEO FUND.......................9

        A.      Sonja Kohn Worked with Zapotocky and Bank Austria to Create Primeo ..........11

        B.      Alpha Prime Is Managed and Serviced by Primeo's Directors and Agents ..........13

        C.      The Directors Continue to Find Paths to Madoff.................................................15

VI.     THE DIRECTORS KNEW THAT ALPHA PRIME'S PROFITS WERE
        NOT THE RESULT OF MADOFF'S TRADING SECURITIES ...................................16

        A.      The Directors Were Confronted with Evidence of Fraud at BLMIS While
                Operating Primeo ..........................................................................................16

        B.      The Directors See Additional Evidence of Fraud at BLMIS While Operating
                Alpha Prime ..................................................................................................24

                1.      The Directors Knew the Trades Reflected on Alpha Prime's Account
                        Statements Were Impossible..................................................................25

                2.      The Directors Knew the Trades Reflected on Alpha Prime's Account
                        Statements Did Not Reflect Madoff's Purported SSC Strategy ...............28

VII.    THE DIRECTORS DEFLECT QUESTIONS AND CONCERNS TO
        PREVENT REVEALING THE TRUTH ABOUT MADOFF .........................................31

VIII.   THE TRANSFERS TO ALPHA PRIME ARE AVOIDABLE AND
        RECOVERABLE BY THE TRUSTEE.............................................................................42

IX.     ALPHA PRIME'S REMAINING CUSTOMER CLAIM IS SUBJECT TO
        DISALLOWANCE AND/OR EQUITABLE SUBORDINATION ................................42

COUNT ONE - FRAUDULENT TRANSFER § NEW YORK DEBTOR AND
        CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279 AND 11 U.S.C. §§
        105(a), 502(d), 544, 550(a), AND 551 ..............................................................43

COUNT TWO - FRAUDULENT TRANSFER – NEW YORK DEBTOR AND
        CREDITOR LAW §§ 273 AND 278 AND/OR 279 AND 11 U.S.C. §§
        105(a), 502(d), 544, 550(a), AND 551 ..............................................................44

## TABLE OF CONTENTS

**Page**

COUNT THREE - FRAUDULENT TRANSFER – NEW YORK DEBTOR AND
CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a),
502(d), 544, 550(a), AND 551 ...................................................................................45

COUNT FOUR - FRAUDULENT TRANSFER – NEW YORK DEBTOR AND
CREDITOR LAW §§ 275, 278, AND/OR, 279 AND 11 U.S.C. §§ 105(a),
502(d), 544, 550(a), AND 551 ...................................................................................46

COUNT FIVE - EQUITABLE SUBORDINATION OF THE DISPUTED
CLAIMS ...................................................................................................................47

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. § 78aaa–*lll* ("SIPA"), and the substantively consolidated chapter 7

estate of Bernard L. Madoff (with BLMIS, "Debtors"), by the Trustee's undersigned counsel, for

his Second Amended Complaint ("Complaint") states:

## I.    NATURE OF THE ACTION

1.      The directors of BLMIS feeder fund Alpha Prime Fund Ltd. ("Alpha Prime")

enabled the continuation of the BLMIS Ponzi scheme, directing approximately $400 million to

BLMIS for Alpha Prime alone.  They directed hundreds of millions more through other BLMIS

feeder funds with which they were associated.

2.      These directors, along with Alpha Prime's service providers—most of which the

directors controlled—are sophisticated securities industry professionals and knew BLMIS was

engaged in fraud.

3.      By the early 2000s, and well before the existence of Alpha Prime, these directors

and service providers were aware of numerous impossibilities associated with BLMIS's

operations and purported trading.  They opened Alpha Prime in 2003 anyway.

4.      Alpha Prime's directors and service providers conducted due diligence and

prepared reports detailing BLMIS's fraud, including that BLMIS was trading in securities

outside of their daily price range, purchasing and selling thousands more options for Alpha

Prime's account alone than were available on the entire exchange, and otherwise not executing

the split-strike conversion strategy as BLMIS reported.  When colleagues or investors asked

questions, Alpha Prime's directors deliberately lied to conceal the fraud.  They coordinated

misleading answers as necessary when pressed about the impossibilities of BLMIS's operations.

1

5.      Sometimes these directors worked feverishly to quell the concerns of fellow non-director board members despite knowing the underlying truth about BLMIS's operations.  One director went so far as to alter the minutes of a board meeting at which BLMIS's impossible trading practices were questioned.  Alpha Prime's directors took these actions to keep the Madoff machine running and the profits coming in the door.

6.      Given this history, it is through this action that the Trustee seeks to avoid fraudulent transfers of customer property Alpha Prime received from BLMIS, to disallow or equitably subordinate Alpha Prime's claims against the estate, and any other relief the Court deems just, proper, and equitable.  Alpha Prime received approximately $83,170,000 in avoidable transfers from BLMIS and filed a customer claim in the amount of $250,671,000.

7.      Under the terms of a partial settlement reached between the parties on February 9, 2018 (the "Partial Settlement Agreement"), Alpha Prime returned to the Trustee $76,450,000 in transfers it withdrew from BLMIS within two years of the filing date (the "Two-Year Transfers"), and the Trustee allowed 95% of Alpha Prime's customer claim.  The parties agreed to litigate three issues: (i) whether the Trustee is entitled to disallow or equitably subordinate the remaining five percent of Alpha Prime's customer claim (the "Remaining Customer Claim"); (ii) whether Alpha Prime is entitled to a Bankruptcy Code section 502(h) claim regarding its $76,450,000 payment into the estate, and if so whether such a claim should be subordinated to the claims of good faith customers and/or other creditors (together with the Remaining Customer Claim, the "Disputed Claims"); and (iii) whether the Trustee is entitled to recover transfers beyond the Two-Year Transfers.

## II.    JURISDICTION AND VENUE

8.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Sec. & Exch. Comm'n v. Bernard L. Madoff Inv. Sec. LLC*, No. 08 CV

10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has

jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA §

78eee(b)(2)(A) and (b)(4).

9.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O).

The Trustee consents to the entry of final orders or judgment by this Court.

10.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

11.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3),

11 U.S.C. §§ 105(a), 502(a), (b) and (d), 510(c), 544(b), 548(a), 550(a) and 551, the New York

Fraudulent Conveyance Act (New York Debt. & Cred. Law ("NYDCL") §§ 270–281

(McKinney 2001)), the New York Civil Practice Law and Rules (McKinney 2003) ("N.Y.

C.P.L.R."), and other applicable law.

12.     On February 2, 2009, Alpha Prime filed a claim with the Trustee with respect to

BLMIS account number 1FR097.  By filing this customer claim Alpha Prime submitted to the

jurisdiction of this Court.

13.     Alpha Prime also agreed to submit to the jurisdiction of this Court under the

Partial Settlement Agreement.

## III.    BACKGROUND, THE TRUSTEE, AND STANDING

14.     On December 11, 2008 (the "Filing Date"), Madoff was arrested for federal

securities laws violations, including securities fraud, investment adviser fraud, and mail and wire

fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the

District Court Proceeding.

15.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

16.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

  (a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

  (b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

  (c)     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

17.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

18.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

19.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

20.     At a plea hearing on August 11, 2009, in *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count

criminal information charging him with participating in and conspiring to perpetuate the Ponzi

scheme. DiPascali admitted that no purchases or sales of securities took place in connection with

BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least

the 1980s.

21.     At a plea hearing on November 21, 2011, in the case captioned *United States v.*

*Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded

guilty to a six-count criminal information charging him with securities fraud, falsifying the

records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false,

backdated trades in BLMIS customer accounts beginning in the early 1970s.

22.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George

Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their

participation in the Ponzi scheme perpetuated in BLMIS's investment advisory business ("IA

Business").

23.     As the trustee appointed under SIPA, the Trustee is charged with assessing

claims, recovering and distributing customer property to BLMIS's customers holding allowed

customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its

creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and

recover transfers made by the Debtors to customers and others to the detriment of defrauded,

innocent customers whose money was consumed by the Ponzi scheme. Absent this and other

recovery actions, the Trustee will be unable to satisfy the claims described in SIPA § 78fff-

2(c)(1)(A)-(D).

24.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy

trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant

to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy

Code apply to this proceeding to the extent they are consistent with SIPA.

25.    The Trustee has standing to bring the avoidance and recovery claims under SIPA

§ 78fff-1(a) and applicable provisions of the Bankruptcy Code, including sections 323(b), 544,

and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers

under Bankruptcy Code sections 544, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-

2(c)(3).

26.    The Trustee has standing to object to customer and creditor claims under SIPA

§§ 78fff-1(a) and 78fff(b), and Bankruptcy Code section 502(a), because the Trustee has the

power and authority to discharge obligations to a customer to the extent they are established to

the satisfaction of the Trustee under SIPA §§ 78*lll*(2) and 78fff-2(b).  By his objection, the

Trustee seeks disallowance of any customer and general creditor claims that are unenforceable

against the Debtors or their property under (i) SIPA § 78fff-2(b), because such claims have not

been established to his satisfaction; (ii) SIPA § 78*lll*(2), because such claims are not entitled to a

distribution *pari passu* with other customers;  and (iii) 11 U.S.C. § 502(b)(1), because such

claims are otherwise unenforceable under applicable law.

## IV.    THE PONZI SCHEME

27.    Madoff founded BLMIS in or about 1960 as a sole proprietorship.  On January 1,

2001, Madoff continued BLMIS as a sole member limited liability company organized under

New York law.  BLMIS's ownership and control structure never changed.  BLMIS has been

continually registered with the SEC, under SEC registration number 8-08132 since January 1960

and remained a SIPC member since SIPA's enactment in December 1970 onward.  BLMIS's

principal place of business was 885 Third Avenue, New York, New York.  Madoff, as founder,

sole owner, chairman, and chief executive officer, operated BLMIS with several family members and other employees, including DiPascali, Kugel, Bonventre, Bongiorno, and Crupi.

28.     Beginning in the 1990s, Madoff outwardly ascribed the consistent investment success of BLMIS's IA Business to the "split-strike conversion" ("SSC") investment strategy. Madoff claimed his strategy would produce steady returns without the volatility in the stock market or other high-return investment strategies.  Madoff generally indicated that investors' funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100"), which is a collection of the 100 largest publicly traded companies, as determined by Standard & Poor's Index Committee.  The basket of stocks was designed to correlate to the S&P 100.  The second part of the SSC strategy involved purporting to sell call options and buy put options on the S&P 100; this is commonly referred to as a "collar."  Madoff purported to sell option contracts in order to purchase other option contracts to control the downside risk of price changes in the basket of stocks correlated to the performance of the S&P 100.

29.     All options on the S&P 100 clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

30.     BLMIS commingled all funds received from IA Business investors in a single BLMIS account maintained at JPMorgan Chase Bank, N.A.

31.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation ("DTC"), the clearing house for such transactions, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

32.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements.

33.     Madoff operated the IA Business as a Ponzi scheme.  The money received from IA Business customers was used primarily to make distributions to, or payments for, other customers.  The falsified trades reflected in monthly account statements made it appear that the IA Business accounts included substantial gains on customers' principal investments.  The Ponzi scheme collapsed in December 2008 when the requests for redemptions overwhelmed the flow of new investments with BLMIS's IA Business.

34.     Since at least 1983, BLMIS financial reports filed with the SEC fraudulently omitted the existence of the billions of dollars of customer funds held by BLMIS.

35.     BLMIS did not register as an investment adviser with the SEC until August 2006.  At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment Adviser Registration) representing that BLMIS had 23 customer accounts and $11.7 billion of assets under management.  Thereafter, BLMIS filed a Form ADV annually with the SEC, the latest of which was filed in January 2008.  BLMIS's January 2008 Form ADV represented that BLMIS maintained 23 customer accounts with $17.1 billion in assets under management.  In fact, at that time BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion.

36.     Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz"), a three-person accounting firm in Rockland County, New York, audited BLMIS.  Of the three employees, one was an administrative assistant and one was a semi-retired accountant living in Florida.  On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.

37.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.    ALPHA PRIME IS CREATED AS A CLONE OF THE PRIMEO FUND

38.    In the early 1990s, as his sources of money threatened to run dry, Madoff turned his attention to European investors as a new source of funds.  Madoff relied on his contacts with European connections, chief among them Sonja Kohn, to help create a new stream of investments.

39.    Kohn, an Austrian investment professional, developed a relationship with Madoff in the late 1980s.  Throughout the life of the Ponzi scheme, Kohn was one of Madoff's largest referral sources, directing over nine billion dollars into the scheme.

40.    Madoff paid Kohn for introducing the following accounts:

| PONZI SCHEME INFLOW ATTRIBUTABLE TO KOHN | | | |
|---|---|---|---|
| **BLMIS ACCOUNT** | **ACCOUNT NUMBER** | **OPENING DATE** | **TOTAL INVESTMENT** |
| Howard Gottlieb | 1G0067 | April 18, 1989 | $3,000,000 |
| Mayfair Corporation | 1FN026 | March 23, 1992 | $1,000,054 |
| Lagoon Investment Ltd. | 1FN021 | May 1, 1992 | $134,624,947 |
| RIP Investment LP | 1CM222 | May 12, 1993 | $3,000,000 |
| Primeo Fund | 1FN060 | December 30, 1993 | $1,210,000 |
| Investments Alanis SA | 1FN064 | August 26, 1994 | $5,399,950 |
| Lagoon Investment Ltd. | 1FN066 | December 29, 1994 | $2,100,000 |
| Paolo Dini | 1FN072 | January 23, 1995 | $1,005,545 |
| GeoCurrencies Ltd. S.A. | 1FN079 | June 8, 1995 | $5,054,863 |
| Bank Austria AG | 1FN082 | August 15, 1995 | $1,500,000 |
| Zin Investments Ltd. | 1FN085 | December 7, 1995 | $3,249,985 |
| Optimal Multiadvisors Ltd. | 1FN091 | February 29, 1996 | $90,049,985 |
| Primeo Fund (Class B) | 1FN092 | March 1, 1996 | $370,483,000 |
| Harley International Fund Ltd. | 1FN094 | April 24, 1996 | $2,351,341,277 |
| Thema International Fund | 1FN095 | July 1, 1996 | $1,043,697,424 |
| Lagoon Investment Ltd. | 1FN096 | July 26, 1996 | $500,000 |
| Plaza Investments Int'l | 1FR002 | November 25, 1996 | $534,069,268 |
| Leisure Enterprises Inc. | 1FR007 | January 24, 1997 | $3,500,000 |

| Optimal Multiadvisors Ltd. | 1FR008 | January 28, 1997 | $1,667,445,900 |
| FC Investment Holdings Ltd. | 1FR011 | March 7, 1997 | $2,674,988 |
| Lagoon Investment Ltd. | 1FR015 | April 29, 1997 | $49,862,000 |
| Lagoon Investment Ltd. | 1FR016 | April 29, 1997 | $422,908,000 |
| Iron Reserves Ltd. | 1FR022 | June 2, 1997 | $3,999,980 |
| Triangle Diversified Investments | 1FR042 | June 22, 1998 | $1,000,000 |
| Lexus Worldwide Ltd. | 1FR064 | November 1, 1999 | - |
| Alpha Prime Fund | 1FR097 | June 13, 2003 | $399,941,000 |
| Herald Fund SPC | 1FR109 | April 1, 2004 | $1,533,741,975 |
| Mayfair Corporation | 1M0206 | August 11, 2004 | - |
| Senator Fund | 1FR128 | September 6, 2006 | $247,499,980 |
| Herald (Lux) | 1FR135 | March 17, 2008 | $255,600,000 |
| | | | |
| **TOTAL INTO PONZI SCHEME** | | | **$9,139,460,121** |

41.     In exchange, Madoff paid Kohn and her related entities millions of dollars annually.  This relationship allowed Kohn personal access to Madoff.  Kohn touted that access in European financial circles, which led to her success in recruiting investors, a cycle that propagated Madoff's Ponzi scheme for decades.

42.     In addition to recruiting investors, between 1992 and 2008 Kohn brought various colleagues to New York to meet Madoff to create multiple BLMIS feeder funds.

43.     In 1993, Kohn was hired as an advisor and consultant for Unicredit Bank Austria AG ("Bank Austria").  Stefan Zapotocky, the head of Bank Austria's securities department, recruited Kohn, which led to Bank Austria's access to Madoff.

44.     Kohn introduced Zapotocky and other Bank Austria executives to Madoff, granting Zapotocky his first personal meeting with Madoff in the early 1990s.  Following this introduction, Kohn and Zapotocky established Primeo Fund ("Primeo"), one of the many BLMIS feeder funds with which the two were ultimately associated.

45.     Primeo was hugely successful for its founders.  An outgrowth of this success was the creation of a network of additional feeder funds whose sole purpose was also to direct investments into BLMIS.  Alpha Prime was one such fund.

10

46.     Created in March 2003, Alpha Prime was designed to mimic Primeo in every respect; it was described as a "clone" of Primeo.  Alpha Prime and Primeo shared not only a common broker and investment strategy, but were founded, serviced, and managed by the same individuals: Kohn, Zapotocky, Ursula Radel-Leszczynski, Nigel Fielding, and Peter Fischer (collectively, the "Directors").

47.     In their roles with Primeo (and other Madoff feeder funds), the Directors saw evidence of fraud at BLMIS.  When they opened Alpha Prime's account, they already had knowledge that Madoff was engaged in a fraud.

### A.    Sonja Kohn Worked with Zapotocky and Bank Austria to Create Primeo

48.     In October 1993 and April 1994, Kohn and Zapotocky met with Madoff at BLMIS.  In January 1994, Zapotocky signed Primeo's BLMIS account opening documents.

49.     Kohn and Zapotocky were the architects of Primeo's organizational structure and appointed service providers to form the enterprise that operated Primeo and later created funds.

50.     They also formed BA Worldwide Fund Management Limited ("BA Worldwide"), a Bank Austria affiliated company, to serve as Primeo's investment adviser.

51.     In 1995, Zapotocky hired Radel-Leszczynski to work at BA Worldwide.  Radel-Leszczynski became BA Worldwide's president and served in that capacity from 2000 to 2007.  Radel-Leszczynski oversaw Primeo's day-to-day operations to such an extent that one of Primeo's directors considered her Primeo's "general manager."

52.     Bank Austria held 100% of Primeo's voting rights and the exclusive right to appoint Primeo's directors.  This allowed Zapotocky to appoint himself to Primeo's board of directors and stock it with high-level managers from Bank Austria, including his colleagues, Fischer and Radel-Leszczynski.  Zapotocky, Fischer, Radel-Leszczynski, and Kohn later became directors of Alpha Prime.

11

53.     At the same time Primeo was founded, Bank Austria sold Kohn a majority stake in a company called Anton-Schwarz GmbH.  Kohn renamed the company Medici Finanz Beratung.  In 2003, Medici Finanz Beratung obtained a banking license and was renamed Bank Medici AG ("Bank Medici").

54.     Through Bank Medici, Kohn and her colleagues supported several BLMIS feeder funds, including Thema International Fund plc ("Thema International") which invested over $1 billion with BLMIS, Herald Fund SPC ("Herald") which invested over $1.5 billion with BLMIS, and Herald (Lux) SICAV ("Herald (Lux)") which invested over $250 million with BLMIS.

55.     Bank Medici and Eurovaleur Inc. ("Eurovaleur"), another entity Kohn owned and controlled, were appointed as Primeo's sub-advisers and earned substantial fees as a result of that appointment.  Many of the investment adviser duties were delegated, at least on paper, to Eurovaleur, for which it earned 20% of BA Worldwide's fees.  Director Nigel Fielding confirmed that, in practice, Eurovaleur performed no investment advisory activities.

56.     By the time Kohn started working at Bank Austria, she had developed a relationship with The Bank of Bermuda Limited (predecessor to HSBC Bank Bermuda) ("HBOB") and other HSBC entities.  When Primeo was created, HBOB was already acting as custodian to a Madoff feeder fund, Hermes International Fund Limited ("Hermes"), which invested over $609 million with BLMIS, and HSBC Securities Services (Luxembourg) S.A. ("HSSL") was designated as Hermes' sub-custodian.

57.     Zapotocky and Kohn appointed HSSL as Primeo's custodian and HSBC Bank (Cayman) Ltd. as its administrator.  HSBC Bank (Cayman) Ltd. delegated certain administrator duties to HSSL.

58.    Fielding was an employee of HSSL who worked with, and at times led, the

Alternative Funds Services division ("AFS").  In this role, he was responsible for the day-to-day

fund administration and custody services that HSSL provided to funds invested with BLMIS,

including Primeo, Hermes, Alpha Prime, Herald, and Herald (Lux).

59.    The following chart depicts Primeo's structure:



**B.    Alpha Prime Is Managed and Serviced by Primeo's Directors and Agents**

60.    Equipped with the knowledge about BLMIS from its experience with Primeo and

other Madoff feeder funds, and in light of their success, Bank Austria, BA Worldwide, Kohn,

Zapotocky, and Radel-Leszczynski, with the help of HSSL, HBOB, and Fielding, created Alpha

Prime.

61.    Alpha Prime was incorporated in Bermuda and maintained a registered address at

Bank of Bermuda Building, 6 Front Street, Hamilton HM11, Bermuda.

62.    In March 2003, Alpha Prime appointed HBOB its administrator and custodian.

By a January 2, 2007 novation, Alpha Prime appointed HSBC Securities Services (Bermuda)

Ltd. ("HSSB") its administrator and HSBC Institutional Trust Services (Bermuda) Limited

("HITSB") its custodian. When appointed for Alpha Prime, HSSB and HITSB were already

acting in these capacities for Madoff feeder fund Thema Fund Limited, which invested over

$130 million with BLMIS. HBOB, HSSB, and HITSB delegated their duties to HSSL which, as

a result, was appointed Alpha Prime's sub-administrator and sub-custodian.

63.    The Directors created Alpha Prime Asset Management ("APAM") to be Alpha

Prime's investment manager, although most of APAM's duties were delegated to BA

Worldwide.

64.    In June 2003, Radel-Leszczynski opened Alpha Prime's BLMIS customer

account 1FR097 and began soliciting investments.

65.    As with Primeo, the Directors were named to Alpha Prime's board and brought

with them over two decades of experience with BLMIS's operation.

66.    The Directors maintained their close relationship with Madoff. Zapotocky,

Radel-Leszczynski, and Fielding traveled to New York to meet with Madoff in person. Radel-

Leszczynski, for example, visited Madoff in New York at least twice a year between 1998 and

2008 on behalf of Alpha Prime, Primeo, BA Worldwide, and other BLMIS feeder funds with

which she was associated.

67.    The Directors actively directed and controlled Primeo's and Alpha Prime's daily

activities, including the funds' dealings with Madoff and BLMIS.

68.    The Directors and Alpha Prime's service providers worked together as divisions

of a single organization, just as they did with Primeo. Kohn, Zapotocky, and Radel-Leszczynski

recruited and interfaced with potential BLMIS investors; Fielding managed the diligence on

BLMIS and acted as the gatekeeper between the HSBC service providers and the funds' directors

14

and managers; and BA Worldwide monitored and analyzed Alpha Prime's investment portfolio and performed various other administrative services.

69.    Radel-Leszczynski remained an integral part of Alpha Prime's operations and management even after she left Alpha Prime's board in 2007.

70.    The following chart depicts Alpha Prime's structure:



### C.    The Directors Continue to Find Paths to Madoff

71.    Bank Medici, Kohn, Radel-Leszczynski, and Fischer continued to create BLMIS feeder funds after Alpha Prime was established.

72.    In 2004, Kohn formed Herald "as a progression of the Primeo Fund" and created Herald Asset Management to serve as Herald's investment manager.  Kohn appointed Bank Medici as Herald's primary distributor, and as with Alpha Prime and Primeo, staffed Herald's board of directors with senior executives of Bank Austria and Bank Medici.

73.    In July 2006, Radel-Leszczynski opened an account with BLMIS for Senator Fund SPC ("Senator").  Senator's directors included Fischer and Adam Zielinski—an art professor who was Radel-Leszczynski's longtime friend and mentor.  Fischer and Zielinski were also Alpha Prime directors.

74.    On February 18, 2008, Kohn, through Bank Medici, launched Herald (Lux) and appointed Bank Medici as Herald (Lux)'s investment manager.

## VI.    THE DIRECTORS KNEW THAT ALPHA PRIME'S PROFITS WERE NOT THE RESULT OF MADOFF TRADING SECURITIES

75.    For over a decade, beginning in the 1990s, the Directors operated Primeo and saw their profits grow by millions, both for the fund itself and for the service providers and individuals who ran it.  During this same period, the Directors were confronted with evidence that the returns from Primeo's investment with BLMIS were not the result of Madoff's purported strategy and Primeo's account statements reflected impossible trading activity.  Armed with this knowledge, the Directors created Alpha Prime and continued to see that same evidence of fraud while earning more and more profits.  Careful to avoid disrupting the profit-making machines they had built, the Directors vigorously protected BLMIS from outside inquiry and deterred colleagues and third parties from confirming suspicions of Madoff's fraudulent trading activity.

### A.    <u>The Directors Were Confronted with Evidence of Fraud at BLMIS While Operating Primeo</u>

76.    The Directors designed Primeo's structure to allow them to control all facets of the fund and ensure it was a profit-earning enterprise.  They appointed their affiliated entities as Primeo's service providers.  This gave the Directors autonomy in operating the fund as they deemed fit.  It also ensured that Primeo's profits would ultimately benefit them individually.

77.     While earning large fees, Primeo and its service providers delegated their

investment oversight duties to BLMIS, which acted as the fund's investment adviser, custodian,

and broker-dealer responsible for initiating and executing securities trades.

78.     Contrary to standard practice in the investment advisory industry, BLMIS did not

charge the IA Business customers fees for investment advisory services, investment

management, or custody of the assets.  Instead of charging fees for these services, BLMIS

purported to accept commissions for the trades.

79.     BA Worldwide executives, HSSL, and Eurovaleur confirmed that they performed

due diligence on Madoff's purported trading activity on behalf of Primeo.  This due diligence

included tracking the purported securities trades shown on BLMIS customer statements and trade

confirmations alongside publicly available market data.  That purported trading activity

consistently showed impossible trades.

Impossible Options Trades

80.     As part of the SSC strategy, Madoff purported to hedge equities positions with

S&P 100 Index options.  The options trade confirmations for the BLMIS accounts BA

Worldwide analyzed included a CUSIP number and "OEX" ticker for the S&P 100 Index options

indicating the options were traded on the Chicago Board Options Exchange ("CBOE") as

opposed to over-the-counter contracts that do not have a CUSIP or a ticker.

81.     Radel-Leszczynksi confirmed that BA Worldwide analyzed the securities

transactions BLMIS purportedly entered into on behalf of the funds.  BA Worldwide

documented this analysis in "Holdings Reports."  The Holdings Reports confirm BA

Worldwide's understanding that BLMIS purportedly traded the "OEX" options on the CBOE,

which comports with the fact that "OEX" options are proprietary to the CBOE.

82.    An HSSL analysis of Madoff's trading activity sent to Radel-Leszczynski further confirmed that Madoff purported to trade OEX options on the CBOE.  Saverio Fiorino, an HSSL employee, analyzed the trades reported on Primeo's customer statements and trade confirmations in 2001 and 2002.  He noted that during this period Madoff "never dealt in OTC options or other derivatives."

83.    BA Worldwide's Holdings Reports showed that in 2001 and 2002, BLMIS reported having executed thousands of options contracts for Primeo.  More than 64% of BLMIS's purported options trades during that period exceeded the total number of comparable options traded on the CBOE.  For example, on October 18, 2001, BLMIS reported executing 2,758 "October 525" call options for Primeo.  The CBOE reported 14 such call options executed market-wide for the entire day—thus, for Primeo alone, BLMIS claimed to have executed 19,700% more options contracts than were executed on the market that day.

84.    When confronted with evidence that BLMIS's purported options trading was impossible, however, the Directors deflected any further inquiry by insisting that BLMIS traded options over-the-counter.  For example, an investor commissioned an analytics firm to examine BLMIS's purported trading activity as shown on Position Appraisal Reports HSSL prepared for the fund which analyzed the securities purportedly held based on BLMIS customer statements and trading confirmations.  The analysis found that the CBOE volume as reported by Bloomberg could not support the trading indicated on the fund's Position Appraisal Report.  The analysis was sent to Peter Fischer, who emailed Radel-Leszczynski, stating, "interesting, a topic that we discussed yesterday.  How should we answer that?"  Fischer and Radel-Leszczynski decided they "should think of a coordinated reply"—the options were traded "OTC."  Of course, Fischer and

Radel-Leszczynski knew that the OEX options could only have been traded on the CBOE, as the

BA Worldwide reports and HSSL analysis indicated.

Impossible Securities Pricing

85.     In response to a directive from Bank Austria's audit division in 2001, BA

Worldwide initiated a "plausibility control" procedure for every transaction BLMIS purportedly

entered into on behalf of Primeo, Thema International, and later Alpha Prime.  The "plausibility

control" involved "extensive analytical work; [BA Worldwide] reviewed, for example, whether

the transactions were in line with the market."  This included checking the securities prices

Madoff reported against the prices Bloomberg reported.  Radel-Leszczynski analyzed the

"plausibility control" reports BA Worldwide prepared.

86.     BA Worldwide created an Access database that imported pricing directly from

Bloomberg to compare it to the trade prices listed on the BLMIS account statements.  BA

Worldwide's reports organized the trading data into 13 columns, four of which specifically

identified the existence of out-of-range trades as: "True/False"; "Negative/Positive"; "Absolute

Variance"; and "Variance in Percent."

87.     If BLMIS's reported price was not in the range of the Bloomberg prices, these

four columns would indicate as much.  The entry in the out-of-range security's "True/False"

column would read "False" and would appear in red.  If the result of the out-of-range trade was

disadvantageous to Primeo (e.g., BLMIS purportedly sold an equity below the daily low), the

entry in the "Negative/Positive" column would read "Negativ" and would appear in red; if the

out-of-range trade benefitted Primeo (e.g., BLMIS purportedly bought an equity below the daily

low), the entry would read "Positiv."  The two "Variance" columns tracked the difference

between Bloomberg's daily high and low and the price on the BLMIS statement.  If BLMIS's

reported price fell within Bloomberg's daily range, the two "Variance" columns would remain

19

blank and the entry in the out-of-range security's "True/False" column would read "True."

These anomalies were specifically identified by BA Worldwide employees for Radel-Leszczynski. A page from BA Worldwide's January 2005 report for Primeo is reproduced below.

| Datum | Equity | Price | Bought | Sold | High | Low | Amount | W/F | N/P | absolute variance | variance in percent | Ticker |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25-Jan | Pfizer | 24.420 | 17,015 | | 24.72 | 24.3 | 415,506.30 | TRUE | POSITIV | | | PFE |
| | Pharmacia | | | | | | 0.00 | TRUE | POSITIV | | | PHA |
| 25-Jan | Procter & Gamble | 55.300 | 5,740 | | 55.92 | 55.2 | 317,422.00 | TRUE | POSITIV | | | PG |
| 25-Jan | SBC Communications | 24.410 | 7,585 | | 24.65 | 24.32 | 185,149.85 | TRUE | POSITIV | | | SBC |
| 25-Jan | Schlumberger | 66.280 | 1,230 | | 67.51 | 65.85 | 81,524.40 | TRUE | POSITIV | | | SLB |
| 25-Jan | Texas Instruments | 21.070 | 3,895 | | 21.29 | 21 | 82,067.65 | TRUE | POSITIV | | | TXN |
| 25-Jan | Time Warner | 18.300 | 10,455 | | 18.52 | 18.17 | 191,326.50 | TRUE | POSITIV | | | TWX |
| 25-Jan | Tyco International | 35.100 | 4,510 | | 35.42 | 35 | 158,301.00 | TRUE | POSITIV | | | TYC |
| 25-Jan | US Bancorp | 30.070 | 4,305 | | 30.27 | 30 | 129,451.35 | TRUE | POSITIV | | | USB |
| 25-Jan | United Technologies Corp | 99.380 | 1,230 | | 100.95 | 99.02 | 122,237.40 | TRUE | POSITIV | | | UTX |
| 25-Jan | Verizon Communications | 36.910 | 6,150 | | 37.1 | 35.85 | 226,996.50 | TRUE | POSITIV | | | VZ |
| 25-Jan | Viacom Inc | 37.710 | 3,895 | | 38.44 | 38.02 | 146,880.45 | FALSE | POSITIV | -0.730 | -1.90% | VIA |
| 25-Jan | Wal-Mart Stores Inc | 53.180 | 9,635 | | 53.45 | 53.11 | 512,389.30 | TRUE | POSITIV | | | WMT |
| 25-Jan | Wells Fargo & Co | 60.280 | 3,895 | | 60.48 | 59.95 | 234,790.60 | TRUE | POSITIV | | | WFC |
| | US Treasury Bill | | | | | | 0.00 | TRUE | POSITIV | | | |
| | US Treasury Bill | | | | | | 0.00 | TRUE | POSITIV | | | |
| | US Treasury Bill | | | | | | 0.00 | TRUE | POSITIV | | | |
| 25-Jan | Fidelity Spartan | 1.000 | 45,249 | | 1.000 | 1.000 | 45,249.00 | TRUE | POSITIV | | | FDLXX |
| 25-Jan | S&P 100 Index February 555 Put | 4.900 | 205 | | 5.500 | 3.900 | 100,655.00 | TRUE | POSITIV | | | OEX 02 P555 |
| 24-Jan | S&P 100 Index February 565 Call | 4.700 | | 277 | 5.700 | 4.300 | 129,913.00 | TRUE | POSITIV | | | OEX 02 C565 |
| | S&P 100 Index | | | | | | 0.00 | TRUE | POSITIV | | | |
| 25-Jan | US Treasury Bill 5/12/2005 | 99.290 | | 3,625,000 | 99.296 | 99.233 | 3,539,262.50 | FALSE | NEGATIV | -0.006 | -0.01% | TB 5/12/05 |
| 25-Jan | US Treasury Bill 5/19/2005 | 99.243 | | 3,625,000 | 99.253 | 99.240 | 3,597,558.75 | TRUE | POSITIV | | | TB 5/19/05 |
| 26-Jan | US Treasury Bill 05/26/2005 | 99.203 | | 3,625,000 | 99.210 | 99.207 | 3,596,108.75 | FALSE | NEGATIV | -0.007 | -0.01% | TB 5/26/05 |
| 26-Jan | US Treasury Bill 06/02/2005 | 99.136 | | 3,625,000 | 99.143 | 99.136 | 3,593,680.00 | TRUE | POSITIV | | | TB 6/2/05 |
| 26-Jan | US Treasury Bill 06/09/2005 | 99.073 | | 3,625,000 | 99.084 | 99.077 | 3,591,396.25 | FALSE | NEGATIV | -0.011 | -0.01% | TB 6/9/05 |
| 25-Jan | S&P 100 Index February 565 Call | 5.000 | | 205 | 5.700 | 4.500 | 102,295.00 | TRUE | POSITIV | | | OEX 02 C565 |
| 27-Jan | US Treasury Bill 04/28/2005 | 99.403 | | 3,625,000 | 99.401 | 99.333 | 3,603,358.75 | FALSE | POSITIV | 0.002 | 0.00% | TB 4/28/05 |
| 27-Jan | US Treasury Bill 05/05/2005 | 99.349 | | 3,625,000 | 99.349 | 99.333 | 3,601,401.25 | TRUE | POSITIV | | | TB 5/5/05 |
| 27-Jan | US Treasury Bill 06/16/2005 | 99.032 | | 3,625,000 | 99.032 | 99.020 | 3,589,910.00 | TRUE | POSITIV | | | TB 6/16/05 |
| 27-Jan | US Treasury Bill 06/23/2005 | 98.971 | | 3,625,000 | 98.967 | 98.955 | 3,587,698.75 | FALSE | POSITIV | 0.004 | 0.00% | TB 6/23/05 |
| 27-Jan | US Treasury Bill 04/14/2005 | 99.510 | | 3,650,000 | 99.508 | 99.502 | 3,632,115.00 | FALSE | POSITIV | 0.002 | 0.00% | TB 4/14/05 |
| 28-Jan | US Treasury Bill 04/21/2005 | 99.461 | | 3,625,000 | 99.451 | 99.442 | 3,605,461.25 | FALSE | POSITIV | 0.010 | 0.01% | TB 4/21/05 |
| 28-Jan | US Treasury Bill 06/30/2005 | 98.925 | | 7,900,000 | 98.921 | 98.912 | 7,815,075.00 | FALSE | POSITIV | 0.004 | 0.00% | TB 6/30/05 |
| 31-Jan | Fidelity Spartan | 1.000 | 847 | | 1.000 | 1.000 | 847.00 | TRUE | POSITIV | | | FDLXX |

88.    Over the course of its relationship with BLMIS, BA Worldwide and Alpha Prime's Directors saw over 1,000 instances in which the securities prices reported on BLMIS account statements fell outside of their actual daily price range. For example, BA Worldwide's January 2005 report indicates that there were 16 separate purported securities trades on Primeo's BLMIS customer statement that were outside of the daily range as reported by Bloomberg.

Impossible Dividend Payments

89.    During the periods that BLMIS's IA Business was purportedly out of the market,

BLMIS claimed to invest in the Fidelity Spartan U.S. Treasury Money Market Fund (the

"Fidelity Spartan Fund").  BLMIS purported to do so notwithstanding the fact that the Fidelity

Spartan Fund changed its name in August 2005.  Nevertheless, from the end of 2005 until

Madoff's arrest in 2008, the Madoff feeder funds' account statements continued to show

transactions with a fund that no longer existed.

90.    BA Worldwide's monthly reports tracked BLMIS's purported investments in the

Fidelity Spartan Fund and compared the prices to those reported by Bloomberg.  After Fidelity

Spartan Fund changed its name, BA Worldwide's reports continued to show transactions with a

fund that no longer existed.

91.    The Fidelity Spartan Fund issued dividend payments only once a month, either at

month's beginning or end.  But "Dividends Detail Reports" created by HSSL—based on the

funds' customer statements—often reported multiple dividend payments by Fidelity Spartan

Fund in a calendar month and on dates that did not correspond with published dividend

payments.  In February 2007, for example, the Dividends Detail Report for Primeo indicated

eight dividend payments purportedly made by the Fidelity Spartan Fund on February 1, 6, 13, 16,

20, 22, 23, and 28.  Only one of these purported payments corresponded with the single payment

date publicly reported by Fidelity: February 1, 2007.

92.    Over the duration of Primeo's investment with BLMIS, Primeo's customer

statements and the Dividends Detail Reports reflected that 96.1% of the purported Fidelity

Spartan Fund dividend payment dates did not correspond with the published payment dates.

93.    Kohn and Radel-Leszczynski reviewed the Dividends Detail Reports for Alpha

Prime, Primeo, and Herald.

21

<u>Purported Trades Did Not Comport with the SSC Strategy</u>

94.    The Directors began monitoring Madoff's SSC strategy when Primeo was

established in 1994.  The SSC strategy involved the purchase and sale of S&P 100 put and call

options to "collar" the underlying securities holdings.  The put options hedged the downside risk

of price changes in the underlying basket of stocks.  The sale of call options, which limited

potential gains, largely offset the purchase of the puts.

95.    Because Madoff claimed to carefully time purchases and sales of the basket of

common stocks to maximize value, customer funds were intermittently out of the market.

During those times, Madoff claimed that the funds were invested in U.S. Treasury bills or mutual

funds invested in Treasury bills.

96.    The SSC strategy could not have eliminated market volatility.  At best, the

strategy would have smoothed out peaks and valleys in the returns generated by the basket of

S&P 100 stocks but would have correlated with the S&P 100's performance when BLMIS was

in the market.

97.    Over time, it should have been impossible for BLMIS investors to obtain gains on

their investment when the S&P 100 was significantly down.  This is because downswings were

hedged only by put options.  BLMIS could not have turned losses into gains by exercising put

options—that could only have created a floor for losses.

98.    Similarly, it was virtually impossible for the SSC strategy to outperform the S&P

100 during a major upswing, as the call options BLMIS sold would have been exercised during a

significant market upswing, putting a ceiling on gains.

99.    Deviating from an investment strategy is a red flag.  BA Worldwide monitored

the trading in Primeo's BLMIS account to ensure compliance with the SSC strategy and

reviewed Madoff's options trading to ensure proper hedging in the portfolio. In doing so, BA Worldwide recognized trading anomalies, which they then raised with Radel-Leszczynski.

100.    Radel-Leszczynski reviewed BA Worldwide's monthly reports analyzing whether Primeo's investment portfolio contained any unhedged, or "naked" positions. The number of options needed to hedge the equity positions for the execution of the SSC strategy depended on the value of the equity positions (i.e., if more equities are purchased, more options are needed to hedge the position). Thus, when equities were sold, the option positions needed to be reduced to maintain an effective hedge. "Naked" hedges occur when, for example, an equity in a basket is sold before the rest of the basket, without a corresponding adjustment to the options collar. An unbalanced hedge creates potentially significant exposure to losses because the value of the basket and the corresponding options positions no longer match, reducing the potential gain or leaving the customer exposed to potential losses.

101.    Over the course of its relationship with BLMIS, BA Worldwide and the Directors saw at least 100 instances of unbalanced hedges reported on BLMIS account statements. For example, BA Worldwide's November 2006 report for Primeo indicated that a position in Verizon Communications Inc. was liquidated on November 16, 2006, but, as shown in BA Worldwide's December 2006 report, the basket was not sold until the end of December 2006. BA Worldwide's November 2006 report also indicated that there was no corresponding change made to the options collar when the Verizon position was liquidated. Each such hedge was a deviation from the SSC strategy and left Primeo exposed to market risk.

Lack of Scalability

102.    Radel-Leszczynski confirmed that, in addition to Primeo and Thema International, BA Worldwide monitored performance data for other Madoff feeder funds,

including Fairfield, Kingate, and Herald.  In May 2003, BA Worldwide was aware that BLMIS

had between $6 and $7 billion of assets under management.

103.    To execute the SSC strategy with at least $6 billion under management, BLMIS

would have needed at least $6 billion of notional value in call options.

104.    Between 2001 and 2008, there were not enough options on the entire listed market

to implement the SSC strategy at any point in time.

105.    After examining a Position Appraisal Report, an analytics firm informed the

Directors of liquidity issues with BLMIS's purported equities trading, noting that it would take 3

days to liquidate a $6 billion basket of stocks.

106.    Despite being aware of the issues associated with implementing the SSC strategy

with an asset base of billions of dollars, the Directors formed Alpha Prime.

**B.    The Directors Saw Additional Evidence of Fraud at BLMIS While Operating Alpha Prime**

107.    Knowing that Madoff was not trading securities as he purported to be doing on

the BLMIS account statements, the Directors nevertheless sought to expand their relationship

with Madoff by creating Alpha Prime.  After Alpha Prime was created, the evidence of Madoff's

fraud continued to mount.

108.    BA Worldwide executives, HSSL, and Eurovaleur confirmed that they performed

due diligence on Madoff's purported trading activity on behalf of Alpha Prime, including

tracking the purported securities trades shown on Alpha Prime's BLMIS customer statements

and trade confirmations.  The Directors reviewed these due diligence reports prepared on behalf

of Alpha Prime.  That trading activity consistently showed impossible trades.

24

### 1.    The Directors Knew the Trades Reflected on Alpha Prime's Account Statements Were Impossible

<u>Impossible Securities Pricing</u>

109.    As with Primeo, BA Worldwide extensively analyzed BLMIS's purported trading activity on behalf of Alpha Prime, including tracking out-of-range securities prices.  For example, BA Worldwide's December 2006 report for Alpha Prime shows that on December 22, 2006 BLMIS purportedly sold on Alpha Prime's behalf thousands of shares of Merck & Co. at $44.61 per share.  BA Worldwide's December 2006 report further indicated that Merck's daily high on December 22, 2006 was $43.42 and the low was $42.78.  The Directors therefore knew that, as BA Worldwide's report highlighted, BLMIS purported to trade thousands of shares that were $1.19 outside of that equity's daily range.

110.    BA Worldwide's reports for Alpha Prime showed 395 securities trades that were outside of the daily range.

<u>Impossible Options Trades</u>

111.    As with Primeo, BA Worldwide's reports for Alpha Prime reflected purported options trades that exceeded the total volume for options with the same trade date, strike price, and expiration date as traded over the CBOE on 162 separate occasions.  For all of the BLMIS accounts that BA Worldwide analyzed, it reported 514 separate options transactions that exceeded the CBOE volume.

112.    For example, the BLMIS account records of Alpha Prime reflect the sale of thousands of OEX put option contracts with a November 22, 2008 expiration date and a strike price of 475 on November 14, 2008.  Public records show only three such contracts actually traded on the CBOE on that date.

113.    In 2005, Kohn approached Capital Bank, an Austrian investment bank, to structure a guaranteed product based on Herald.  Capital Bank initially refused because of Kohn's and other Bank Medici personnel's inability to answer questions about Herald's BLMIS account statements, including concerns regarding Herald's options transactions.  At Kohn's request, Capital Bank agreed to meet with HSSL, Herald's administrator and custodian.

114.    Capital Bank's diligence team met with HSSL in Luxembourg, expressed concerns about trade volumes, and specifically asked how BLMIS could trade in seemingly impossible volumes.  In an attempt to address Capital Bank's concerns, HSSL's administrative team proffered the explanation that Madoff operated his own options exchange over which he traded the options for his IA accounts against his other clients on that exchange.  Capital Bank found the explanation incredible and chose not to invest in Herald.

115.    While the trading volume BLMIS reported was impossible on its face, the very documents that purported to confirm the execution of BLMIS's options trades raised red flags.

116.    In BLMIS's strategy, the sale of call options necessarily preceded the purchase of put options because the proceeds of the sales purportedly funded the purchase of put options. BLMIS's customer statements reflected the proper sequence of these transactions.

117.    But BLMIS's option trade confirmations contradicted the customer statements. The trade confirmations showed the purchase of call options, and the sale of put options— precisely the opposite of what the customer statements reported.

118.    The due diligence performed by BA Worldwide and reviewed by the Directors showed that the trades purportedly made by BLMIS on behalf of Alpha Prime could not have been traded as Madoff claimed.

Impossible Dividend Payments

119.    As they did for Primeo, HSSL's "Dividends Detail Reports" often reported multiple dividend payments by Fidelity Spartan Fund in a calendar month and on dates that did not correspond with published dividend payments. Even after Fidelity Spartan Fund changed its name, BA Worldwide's reports continued to show transactions with a fund that no longer existed. In February 2007, for example, the Dividends Detail Report for Alpha Prime indicated seven dividend payments purportedly made by the Fidelity Spartan Fund, which did not correspond with the single payment date publicly reported by Fidelity.

120.    Alpha Prime's Dividends Detail Reports indicated a total of 133 Fidelity Spartan Fund dividend payments throughout the life of Alpha Prime's BLMIS investment; 128 of them were purportedly made on the wrong date.

121.    Of the 418 purported Fidelity Spartan Fund dividend payments reported on the Dividends Detail Reports Alpha Prime's directors and BA Worldwide analyzed on behalf of Thema International, Alpha Prime, and Primeo, 402 (or 96.2%) did not correspond with the dividend payment dates reported by Fidelity.

Impossible Timing

122.    The consistently favorable execution BLMIS claimed to achieve—in which it purported nearly always to trade at an optimal price point—was statistically impossible. If BLMIS had been purchasing or selling stocks multiple times throughout a trading day, BLMIS's reported prices would have reflected the day's average price.

123.    The average price at which a given security is traded throughout a trading day is measured by a metric called volume weighted average price, or "VWAP." Consistently buying below the VWAP and selling above the VWAP year after year is statistically impossible. But BLMIS's customer statements showed that it did just that.

27

124.    BA Worldwide's Holdings Reports tracked the daily high and low prices of the

equities listed on the BLMIS statements and trade confirmations as well as the price at which

BLMIS purportedly traded those equities.  The Holdings Reports indicated that Madoff was

consistently buying low and selling high.

125.    As illustrated in the table below, BLMIS reported to Alpha Prime and BA

Worldwide that it was purchasing equities below the VWAP and selling equities above the

VWAP at statistically impossible rates:

| | Total Below VWAP | Total Buys | Percentage Below VWAP | Total Above VWAP | Total Sells | Percentage Above VWAP |
|---|---|---|---|---|---|---|
| Alpha Prime/APAM | 2,726 | 3,236 | 84.2% | 2,175 | 2,825 | 77.0% |
| BA Worldwide | 10,686 | 12,813 | 83% | 9,195 | 11,770 | 78.1% |

126.    Achieving these statistics while trading even a single equity is impossible, but

Madoff claimed to trade in baskets containing between 35 and 40 equities.  To achieve the

results reported on Alpha Prime's account statements, Madoff would have had to enter and exit

the market at the optimal time of the day, not just for one equity, but for 35 to 40 equities

simultaneously.

**2.    The Directors Knew the Trades Reflected on Alpha Prime's Account Statements Did Not Reflect Madoff's Purported SSC Strategy**

127.    BA Worldwide's due diligence reports noted other deviations from the SSC

strategy.  At times, Madoff purported to engage in short-term, speculative options trades that

resulted in substantial gains for BLMIS customers.

128.    Options were purportedly used in the SSC strategy solely as a "collar" to limit the

potential losses and potential gains of the equity positions; they were not used to speculate on

market movements.

28

129.    BA Worldwide's analysis of Madoff's purported options trading saw 94 speculative options transactions which generated a net gain of $54,870,233.

130.    For example, BA Worldwide's January 2006 report indicated that on January 5, 6, 9, and 10, 2006, BLMIS purported to enter into a basket of equities for Alpha Prime and set a corresponding options collar on each of those days.  The report further indicated that the collar was rolled over on January 20, 2006.  On January 27, 2006, however, the report showed that BLMIS purported to buy 2,400 OEX call option contracts, representing 240,000 shares, with a strike price of 585 and a February expiration date, at a price of $1.95 per share.  The report noted that these same options were purportedly sold "one working day later," on January 30, 2006, for a price of $3.60 per share, generating a net gain of $391,200.  The Directors knew the SSC strategy did not encompass short-term options transactions that were not tied to equity positions in the basket and knew that any such transaction would leave the funds open to market fluctuation.

131.    The Directors also knew that Madoff's consistent exiting of the market and investing in Treasury bills at quarter-end and year-end did not comply with the SSC strategy.  Various SEC reporting requirements are triggered when securities are invested in the market at either quarter-end or year-end.  To evade those reporting requirements, Madoff purported to liquidate all investments at those times and invest the proceeds in Treasury bills or mutual funds invested in Treasury bills.

132.    Consistent with those purported periodic market exits, BLMIS account statements and BA Worldwide reports showed full investment in Treasury bills at quarter-end and year-end.  Madoff was out of the market at the end of each quarter for 25 straight quarters beginning in the third quarter of 2002 and proceeding through the collapse of his scheme.  Madoff's practice of

29

exiting the market according to the calendar, rather than market or economic indicators, was a red flag and inconsistent with his strategy. The Directors knew that Madoff touted "market-timing" as a cornerstone of the SSC strategy, and that Madoff's practice of exiting the market at quarter-end and year-end contravened that strategy because it locked Madoff into prevailing market conditions, regardless of whether they were favorable. The SSC strategy, based on long positions hedged by options contracts, themselves subject to expiration, could not be implemented effectively under these circumstances.

133.    In addition to BA Worldwide, Bank Medici also received BLMIS customer statements and valuation reports for Alpha Prime, Thema International, and Herald and performed due diligence on BLMIS on behalf of those funds. In October 2008, Bank Medici, prepared and provided JPMorgan Securities with reports showcasing the performance of another of Kohn's Madoff feeder funds, Herald, in which JPMorgan Securities was invested. The reports charted times when Madoff was in and out of the market, and purported to show Herald's performance compared to the S&P 100's performance during months when the S&P 100 suffered significant downturns. The data reflected that Herald generally was invested in the market during times of market gains and was out of the market during downturns, outperforming the S&P 100 at every point in time.

134.    JPMorgan Securities had serious concerns about Madoff's operations. On October 27, 2008, JPMorgan Securities formalized its concerns in a letter that was sent to Kohn and Bank Medici. They sought confirmation that the options were "over-the-counter derivative transactions," "identification of the Counterparty to each Put option and Call option held by the [Herald] Fund," and that the portfolio guidelines had been complied with since the Effective Date of the Herald Fund. If such information was not provided by Herald by 5:00 p.m. the

following day, JPMorgan Securities may "exercise [its] discretion" to redeem its investment in Herald.

135.    Herald responded the next day that they were "unable to address and cannot accept any of the points raised" in JP Morgan's letter, except for a previously provided one-sentence, cursory explanation by Kohn on Madoff's holding of U.S. Treasury bills to mitigate counterparty risk.

136.    On October 29, 2008 JPMorgan Securities redeemed its investment in Herald. According to JPMorgan Securities, its inability to access the counterparty identities for Madoff's OTC options and the fact that the custodian did not actually hold Herald's assets caused JPMorgan Securities to seek to terminate its Madoff exposure.

137.    On the same day, JPMorgan Securities filed a Suspicious Activity Report concerning BLMIS with the government agency in the United Kingdom charged with investigating fraud, bribery, and corruption.

## VII.    THE DIRECTORS DEFLECT QUESTIONS AND CONCERNS TO PREVENT REVEALING THE TRUTH ABOUT MADOFF

138.    As a result of their role as service providers to Primeo, Alpha Prime, Thema International, and Herald, BA Worldwide, Bank Medici, and APAM received tens of millions of dollars in fees.  The Directors knew that the exposure of Madoff's fraud would put an end to these profits and likely result in the demise of these entities.  To prevent that, the Directors purposefully suppressed inquiry and deflected concerns about Madoff and the trading activity purportedly made on behalf of Primeo and Alpha Prime.

139.    In 1995, in an attempt to increase Bank Austria's involvement with Madoff, Zapotocky arranged for a high-ranking Bank Austria executive ("BA Executive No. 1") to visit Madoff in New York.  During the meeting, Madoff did not explain how the SSC strategy

produced the consistent returns his customers saw but instead described how he used data from his market making clients to observe the direction of the market. According to Madoff, it was capitalizing on this data that allowed him to achieve his returns for IA Business customers. After meeting with Madoff, BA Executive No. 1 urged Kohn and Zapotocky, who were Primeo directors at the time, to refrain from investing with BLMIS because it was a strategy that could not be explained and could be based on Madoff trading ahead of his clients' investments—an illegal strategy.

140.    Zapotocky and Kohn were furious with BA Executive No. 1 and refused to speak to BA Executive No. 1 for years afterwards.

141.    In 1996, Zapotocky sent another Bank Austria employee ("BA Executive No. 2"), this time a young executive, to meet with Madoff in New York, again in the hope that it would result in the bank expanding its relationship with Madoff. During the visit, Madoff provided a slightly different explanation for his investment success from the one he had given BA Executive No. 1 the previous year. This time, Madoff explained that he enticed large institutional investors to use his market making business by not charging those investors a fee. With those institutional investors in the fold, Madoff could favor trades he purportedly made for the IA Business customers over those of his market making clients by sequencing trade execution. Upon his return, BA Executive No. 2 told Kohn and his supervisors at Bank Austria that Madoff's explanation of his strategy amounted to illegal front-running. Kohn responded only that BLMIS was regulated by the SEC.

142.    Kohn continued to deflect the concerns about front-running over the next decade. According to a Bank Medici consultant, there were two standard responses to inquiries about Madoff's investment strategy. First, they would describe the SSC strategy. If that failed to

satisfy an investor's concerns, they would resort to telling investors that Madoff's secret was his willingness to capitalize on inside information.

143.    It was not just Kohn who used this explanation. An internal BA Worldwide memorandum drafted by Radel-Leszczynski in 1999, updated in 2000 and 2001, and disseminated to the Directors, summarized DiPascali's explanation of Madoff's strategy:

> maybe we can predict only the next 10 or 15 minutes but we watch the market continuously and if we get an order to buy a large stake of an equity which is quoted currently at 40$ with a limit up to 44$, there can't be anything wrong with buying [sic] same stock for our portfolio at 41$ or 42$.

144.    Kohn, Zapotocky, and Radel-Leszczynski adopted DiPascali's explanation, which was akin to front-running and securities fraud, as a means of justifying the impossible returns reflected on Primeo's customer statements.

145.    In 2002, concerns about Madoff's fraudulent activity continued to swirl within Bank Austria. A Bank Austria executive ("BA Executive No. 3") attempted to reverse engineer Madoff's SSC strategy to see whether he could replicate Madoff's results. BA Executive No. 3 confirmed that the results were not replicable. The test results yielded returns of only one to two percent annually, whereas Madoff purported to yield returns of eighteen percent annually.

146.    Convinced that Madoff's reported returns were impossible and fraudulent, BA Executive No. 3 approached Kohn with the test results. Kohn did not react with surprise, but instead sought to reassure the executive, insisting that even if Madoff's results were obtained through illegal activity, that conduct went undetected by authorities in the United States. Kohn also told BA Executive No. 3 that Madoff managed her funds as a "special favor to her" and "no one else had such special access."

147.    BA Executive No. 3 communicated his concerns about Madoff to a colleague who worked for Kohn at Bank Medici ("Bank Medici Executive No. 1"). Bank Medici Executive No.

1 confronted Kohn with his own concerns about illegal conduct at BLMIS.  Kohn's response was

similar to her response to BA Executive No. 3: Madoff's illegal activities had not been detected

by U.S. regulators.

148.    While Kohn and Zapotocky sought to quell the concerns within Bank Austria,

Fielding sought to reassure his HSBC AFS colleagues who noted indicia of fraud they observed

while fulfilling HSSL's duties as administrator and custodian to Primeo, Alpha Prime, and other

Madoff feeder funds.

149.    In 2002, Fielding signed a sub-custody agreement between BLMIS and HSSL

which transferred control of Primeo's assets to Madoff.

150.    In July 2002 Fielding agreed to go to New York as part of a due diligence

investigation into BLMIS's operations.  The diligence visit was intended to verify the existence

of the assets held by BLMIS and that these assets were properly segregated.  Fielding simply

asked Madoff to complete a standard questionnaire without performing any independent

investigation or verification of the answers Madoff provided.

151.    Fielding's failure to independently verify whether assets were segregated or

whether trades were executed was not lost on other HSBC employees.  Tom Young, a colleague

of Fielding's at HSBC, wrote in September 2002 to ask Fielding to independently verify that

Madoff properly segregated fund assets.

152.    In September and October 2002, members of the AFS group further discussed the

need for independent confirmation that BLMIS was holding fund assets in segregated accounts.

153.    Fielding initially resisted additional diligence, suggesting instead that HSBC rely

on "whatever verification process the fund [e.g., Primeo] auditors had undertaken."  The AFS

board disagreed, noting that HSBC's inability to independently confirm the segregation of assets

34

at BLMIS was a "red flag" "too big to ignore," and insisted an independent auditor go to BLMIS.

154.    Following this instruction, Fielding separately liaised with another HSSL employee, and director of Thema International, David Smith.  Smith and Fielding agreed that Fielding needed to tread carefully in his response to the AFS board because the board was focused on risk whereas Fielding needed to "preserve the relationship with Bank Austria." Fielding responded that if an independent auditor was sent to BLMIS, HSBC must "afford Madoff the opportunity to circle back to me if he is concerned as I believe I am one of the few people he has met."

155.    On May 19, 2003, Fielding and his colleague Germain Birgen, gave a presentation to Bank Austria about Madoff's operations (the "2003 Presentation").  Radel-Leszczynski attended the presentation.

156.    The 2003 Presentation disclosed, among other things, that BLMIS was [HSSL]'s sub-custodian, and that all "assets are held with BLM[IS]."  The 2003 Presentation also provided that Alpha Prime's Managers were "expected to perform initial and regular due diligence in relation to the Trading Account."  HSBC, in turn, would perform due diligence on the sub-custody relationship.

157.    On June 11, 2003, three weeks after the 2003 Presentation, and just as Radel-Leszczynski was signing Alpha Prime's BLMIS account opening documents, Bank Austria concluded an internal audit of its relationship with BLMIS and issued a report (the "BA Audit Report").

158.    The BA Audit Report highlighted several areas of concern.  First, it identified that there was no written agreement between Madoff and BA Worldwide.  Indeed, despite BA

Worldwide's "intensive talks" with BLMIS, Madoff refused to enter into an agreement. Second, because the assets were held by BLMIS, HSSL disclaimed any liability for their safekeeping. Third, because BLMIS held the assets, there was no way to verify their existence. BA Worldwide's ability to review the securities transactions was "completely dependent" on BLMIS. Fourth, because of HSSL's disclaimer of liability, Bank Austria and BA Worldwide determined that they were liable for all fund assets held with BLMIS.

159.    On June 23, 2003, Primeo held a board meeting attended by the Directors and the various Bank Austria executives that composed Primeo's board.

160.    Fielding and Radel-Leszczynski made a presentation to the board. Radel-Leszczynski informed them of the issues the BA Audit Report raised. The board was so alarmed by these concerns that the immediate response was "to terminate the relationship with Madoff."

161.    Fielding jumped in to mitigate the board's alarm, stating that Madoff's monthly statements, his registration with the SEC, and his "clean audit opinions" should provide sufficient comfort. As indicated above, at this time Madoff was not a registered investment adviser. Fielding knew that Madoff's auditor was a three-person accounting firm not approved by HSSL—but he did not raise this.

162.    On March 3, 2004, HSSL sent Fielding to BLMIS for another due diligence visit. Instead of doing anything of substance, Fielding helped cloak Madoff by providing him with the same questionnaire and asked Madoff to update the responses. To assuage others' concerns at HSSL, and without any verification, Fielding characterized the results of his due diligence visit as "perfectly satisfactory."

36

163.    Not surprisingly, a year later, an HSBC risk officer criticized Fielding's due diligence on BLMIS as woefully deficient because Fielding again failed to confirm if BLMIS actually held customer assets in segregated accounts.

164.    At Primeo's May 14, 2004 board meeting, the concerns raised by the BA Audit Report and discussed at the 2003 board meeting had escalated.  The board was now questioning whether Madoff was actually selling the securities and whether the trading slips reflected real securities transactions.  According to the *draft* meeting minutes, "[t]he lack of an investment contract and objective confirmations raised concern of what proof securities were really there and if transaction slips provided by Madoff were valid and had actually been executed."

165.    Fielding and Radel-Leszczynski participated in the board meeting and, again, assuaged concerns.

166.    But Fielding did more than simply mollify the Primeo board; he changed the record.  The final meeting minutes of the May 14, 2004 board meeting were the product of Fielding's substantial revisions.  Among other changes to the characterizations of the discussions regarding Madoff's trading practices, Fielding deleted the language "concern of what proof securities were really there and if transaction slips provided by Madoff were valid and had actually been executed" from the final minutes.

167.    According to fellow Primeo director James O'Neill, Fielding consistently downplayed any concerns the board had with respect to Madoff.  "Mr Fielding responded by advising the Board that HSSL receive[d] confirmation from Madoff every time a trade was made including the total positions.  Mr Fielding added that Bank Austria should be confident of the fact that Madoff was regulated by the [SEC], and that all investment restrictions were being met."

37

168.    In 2005, Ernst & Young ("E&Y") raised several serious questions concerning

Madoff.  These concerns were passed along to Fielding by Saverio Fiorino, then head of AFS for

HSSL.  On February 24, 2005, Fiorino wrote to Fielding: "(1) what is [Madoff's] real strategy,

how on earth can he always produce 12% pa [per annum] (2) where are the assets and are there

really assets or is it all fictitious"?

169.    On March 17, 2005, Fiorino again wrote to Fielding in response to the issues

E&Y raised about Madoff: How does Madoff's strategy result in profits "even when markets are

bad?"  Is Madoff segregating the assets?  Do the assets really exist? Are Madoff's auditors

Friehling & Horowitz independent and reliable?  E&Y apparently had asked Friehling &

Horowitz questions that they could not answer.  E&Y was also concerned that Friehling &

Horowitz was personally related to Madoff.

170.    In particular, E&Y was concerned with its inability to confirm custody of

Primeo's assets.  E&Y questioned whether it could continue to rely upon the audit work

Friehling & Horowitz performed and suggested that E&Y be allowed to perform the work itself,

which would require Madoff's consent and cooperation.

171.    Without the ability to audit BLMIS, or otherwise confirm the custody of Primeo's

assets, E&Y threatened to resign.  In an effort to forestall E&Y's resignation, or its attempt to

audit BLMIS, Fielding agreed to have HSBC issue custody confirmations on behalf of all the

Madoff feeder funds HSBC serviced, including Alpha Prime.  Fielding did so knowing that

BLMIS custodied the assets and that HSBC truly could not confirm custody.

172.    On March 21, 2005, various HSBC employees—including Fielding, Fiorino, and

HSBC's head of network management, Brian Pettitt—met to discuss the Madoff relationship,

specifically as it related to the funds for which Madoff acted as custodian, including Primeo,

Thema International, and Alpha Prime.  Some of the concerns raised during the meeting

included: BLMIS's role as manager, custodian and counterparty broker; BLMIS's ability to

consistently outperform the market; BLMIS's tendency to deviate from the SSC strategy by

leaving its positions unhedged; and its practice of sending its trade tickets by mail.

173.    HSBC's risk department threatened to withhold credit from funds investing with

BLMIS unless Pettitt did his own diligence on Madoff.  When Paul Smith informed Kohn of

HSBC's position, she responded that she would rather HSBC restrict her funds' credit lines than

agree to further due diligence.

174.    In emails to members of the AFS Global Management Committee, Fielding

suggested pushing the risk department to allow someone from AFS to perform the diligence

review rather than Pettitt and declared that AFS needed to put the "correct spin" on the diligence

review.  In response to Fielding's email, Paul Smith, a member of the AFS Global Management

Committee, agreed and stated, "We must make sure [Pettitt] comes up with the correct answer."

175.    When a final decision was made that Pettitt would visit Madoff, Fielding

contacted Madoff to warn him of the visit.  Fielding insisted that the questionnaire that Pettitt

intended to use be provided to Madoff in advance so that they would not take Madoff by

surprise.  Fielding also insisted that Pettitt be "careful not to ask about how [Madoff] figures his

trading strategy."  Fielding warned that if Pettitt "cross[es] these rubicons this is when [Madoff]

may get upset and in worst case contact the clients and bitch he does not need their business as

he is closed for new business.  Remember he is firstly hired by the client to run their managed

accounts and the sub-custody is a by product he has no great interest in as a business."  Fielding

recognized that he must shelter Madoff to protect the profits emanating from the feeder fund

machine he helped create.

176.    Following Pettitt's visit to BLMIS, Christine Coe, the head of Global Risk for

HSBC Securities Services, prepared a discussion paper that was circulated to, among others,

Fielding and John Gubert, head of HSBC Securities Services.  The discussion paper stated that

the visit with Madoff gave HSBC no additional comfort, and many of the operational problems

that had been identified in the past remained unresolved.  For example, there was no "real time

process" to confirm the transactions.  Options trades were "processed through [BLMIS's] sister

company.  Thus the whole process and evidence of all trades and holdings are entirely within the

control of the Madoff family."  It was impossible "to confirm the integrity of the whole activity"

because the "end to end process flow" was not audited.  Madoff's auditors remained unreliable

because they were "not one of the major independent accountancy groups."

177.    In response to the discussion paper, Gubert wrote to Coe and Fielding and

acknowledged that because of those concerns, he was prepared to terminate the Madoff

relationship:

> We do not have full control of assets or real time sight of transaction flows[;] the
> transactions are all internal to the family firms and there is no proof of best execution or
> even actual execution[;] the audit is undertaken by a firm that is not on our recognised list
> of auditors . . . I cannot countenance this process—and I appreciate it is a major money
> earner—unless we can adopt the common process in banking in the USA . . . Under that
> process we—or our delegate—could arrive unannounced at the client office to assess that
> all security was in place as advised . . . If this cannot be done, then we should exit the
> relationship.

178.    Fielding responded with damage control: "If I were Madoff, I think I would have

some difficulty understanding why after Brian [Pettitt] did a review that HSBC want[s] to send

in another team to probe further and I would probably call my clients . . . However, I suppose

this is a better risk than having [Gubert] insist we exit all accounts where Madoff is

subcustodian."

179.    The Directors consistently sought to cement the relationship with Madoff and ensure that he and BLMIS received a clean bill of health every time they were subject to a due diligence review.

180.    They were also willing to mislead regulators to shield Madoff and allow their funds and entities to continue earning fees despite knowing it was a sham.

181.    For example, Bank Medici was appointed as investment manager to Thema International, a fund established under the European Union regulations governing retail investment funds commonly referred to as "UCITS." Bank Medici was appointed even though that function had already been delegated to BLMIS. Because UCITS directives require that a fund have separate, independent, and publicly disclosed entities perform the roles of custodian and investment manager, BLMIS's role as investment adviser, investment manager, and custodian, paired with Madoff's insistence on secrecy about those roles, prevented UCITS compliance. Kohn agreed that Bank Medici would publicly accept that role although she admitted that Bank Medici was only a nominal investment manager and did "not pick the stocks" and Thema International's directors knew Bank Medici "[would] not do anything in practice."

182.    BA Worldwide accepted the designation of investment adviser to Thema International from 2000 to 2006, which allowed Thema International to hide BLMIS's role as investment adviser, particularly because BLMIS was not registered with the SEC as an investment adviser at that time.

183.    The Directors efforts to ward off inquiry was apparent to investors as well. In October 2008, JPMorgan raised concerns about Madoff's operations, the execution of his strategy, and the counterparties for the options trades. When a JPMorgan analyst asked Bank Medici to confront Madoff with these questions, Bank Medici was "genuinely reluctant."

41

JPMorgan's analyst was struck by Bank Medici's and Kohn's "lack of curiosity" and willingness to take Madoff's "representations at face value without enquiring further and get any details that might provide comfort." From his interactions with Kohn, the analyst believed that Kohn was "considering [Madoff's] 'interests' before those of the investors," and seemed to be part of the Madoff "cult."

## VIII. THE TRANSFERS TO ALPHA PRIME ARE AVOIDABLE AND RECOVERABLE BY THE TRUSTEE

184.    During the six years preceding the Filing Date, BLMIS made transfers to Alpha Prime totaling at least $83,170,000. Of that amount, pursuant to the Partial Settlement Agreement, Alpha Prime returned $76,450,000 in Two-Year Transfers. The Trustee seeks to avoid and recover $6,720,000 (the "Six-Year Transfers") under section 544 of the Bankruptcy Code and applicable provisions of the NYDCL, particularly §§ 273-277, and of SIPA, particularly § 78fff-2(c)(3).

185.    Alpha Prime received the Six-Year Transfers with actual knowledge of Madoff's fraud.

186.    The Six-Year Transfers were, and continue to be, customer property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 548, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

## IX. ALPHA PRIME'S REMAINING CUSTOMER CLAIM IS SUBJECT TO DISALLOWANCE AND/OR EQUITABLE SUBORDINATION

187.    On or about February 2, 2009, Alpha Prime filed a customer claim with the Trustee that the Trustee has designated as Claim No. 001503 (the "Customer Claim"). The Customer Claim asserted that Alpha Prime is entitled to the allowance of a customer claim in an amount reflected on its BLMIS account statement for the period ending November 30, 2008. Alpha Prime subsequently agreed that its Customer Claim is limited to its net equity,

42

$250,671,000.  As part of the Partial Settlement Agreement, the Trustee allowed Alpha Prime's

Customer Claim in an amount equal to 95% of Alpha Prime's net equity, or $238,137,450.  The

Trustee seeks to have the Remaining Customer Claim disallowed and/or equitably subordinated.

## COUNT ONE
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
#### §§ 276, 276-a, 278, AND/OR, 279 AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551

188.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

189.    At all times relevant to the Six-Year Transfers, there has been one or more

creditors who has held and still holds matured or unmatured unsecured claims against BLMIS

that are allowable under section 502 of the Bankruptcy Code or not allowable only under

section 502(e) of the Bankruptcy Code.

190.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined

under NYDCL § 270.

191.    Each of the Six-Year Transfers was made by BLMIS with the actual intent to

hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six-Year Transfers to or for

the benefit of Alpha Prime in furtherance of a fraudulent investment scheme.

192.    Each of the Six-Year Transfers was received by Alpha Prime with actual intent to

hinder, delay, or defraud creditors or future creditors of BLMIS at the time of each of the Six-

Year Transfers.

193.    As a result of the foregoing, and pursuant to NYDCL §§ 276, 276-a, 278, and/or

279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the

Trustee is entitled to a judgment against Alpha Prime: (a) avoiding and preserving the Six-Year

Transfers, (b) directing that the Six-Year Transfers be set aside, (c) recovering the Six-Year

43

Transfers, or the value thereof, from Alpha Prime for the benefit of the BLMIS estate, (d)

directing Alpha Prime, to the extent allowable by law, to disgorge any and all profits relating to

or arising from the Six-Year Transfers, (e) awarding attorneys' fees and costs from Alpha Prime,

and (f) awarding any other relief the Court deems just and appropriate.

## COUNT TWO
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 273, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551

194.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

195.    At all times relevant to the Six-Year Transfers, there has been one or more

creditors who has held and still holds matured or unmatured unsecured claims against BLMIS

that are allowable under section 502 of the Bankruptcy Code or not allowable only under

section 502(e) of the Bankruptcy Code.

196.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined

under NYDCL § 270.

197.    BLMIS did not receive fair consideration for the Six-Year Transfers.

198.    BLMIS was insolvent at the time it made each of the Six-Year Transfers or, in the

alternative, BLMIS became insolvent as a result of each of the Six-Year Transfers.

199.    As a result of the foregoing, and pursuant to NYDCL §§ 273, 278, and/or 279,

sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the

Trustee is entitled to a judgment against Alpha Prime: (a) avoiding and preserving the Six-Year

Transfers, (b) directing that the Six-Year Transfers be set aside, (c) recovering the Six-Year

Transfers, or the value thereof, from Alpha Prime for the benefit of the BLMIS estate,

(d) directing Alpha Prime, to the extent allowable by law, to disgorge any and all profits relating

44

to or arising from the Six-Year Transfers, (e) awarding attorneys' fees and costs from Alpha

Prime, and (f) awarding any other relief the Court deems just and appropriate.

## COUNT THREE
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§274, 278, AND/OR, 279 AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551

200.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

201.    At all times relevant to the Six-Year Transfers, there has been one or more

creditors who has held and still holds matured or unmatured unsecured claims against BLMIS

that are allowable under section 502 of the Bankruptcy Code or not allowable only under

section 502(e) of the Bankruptcy Code.

202.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined

under NYDCL § 270.

203.    BLMIS did not receive fair consideration for the Six-Year Transfers.

204.    At the time of each of the Six-Year Transfers, BLMIS was engaged in a business

or a transaction, or was about to engage in a business or a transaction, for which any property

remaining with BLMIS was an unreasonably small amount of capital.

205.    As a result of the foregoing, and pursuant to NYDCL §§ 274, 278, and/or 279,

sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the

Trustee is entitled to a judgment against Alpha Prime: (a) avoiding and preserving the Six-Year

Transfers, (b) directing that the Six-Year Transfers be set aside, (c) recovering the Six-Year

Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of BLMIS,

(d) directing Alpha Prime, to the extent allowable by law, to disgorge any and all profits relating

45

to or arising from the Six-Year Transfers, (e) awarding attorneys' fees and costs from Alpha

Prime, and (f) awarding any other relief the Court deems just and appropriate.

### COUNT FOUR
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 275, 278, AND/OR, 279 AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551

206.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

207.     At all times relevant to the Six-Year Transfers, there has been one or more

creditors who has held and still holds matured or unmatured unsecured claims against BLMIS

that are allowable under section 502 of the Bankruptcy Code or not allowable only under 502(e)

of the Bankruptcy Code.

208.     Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined

under NYDCL § 270.

209.     BLMIS did not receive fair consideration for the Six-Year Transfers.

210.     At the time BLMIS made each of the Six-Year Transfers, BLMIS had incurred,

was intending to incur, or believed that it would incur debts beyond its ability to pay as the debts

matured.

211.     As a result of the foregoing, and pursuant to NYDCL §§ 275, 278, and/or 279,

sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the

Trustee is entitled to a judgment against Alpha Prime: (a) avoiding and preserving the Six-Year

Transfers, (b) directing that the Six-Year Transfers be set aside, (c) recovering the Six-Year

Transfers, or the value thereof, from Alpha Prime for the benefit of the BLMIS estate,

(d) directing Alpha Prime, to the extent allowable by law, to disgorge any and all profits relating

to or arising from the Six-Year Transfers, (e) awarding attorneys' fees and costs from Alpha

Prime, and (f) awarding any other relief the Court deems just and appropriate.

**COUNT FIVE**
**EQUITABLE SUBORDINATION OF THE DISPUTED CLAIMS**

212.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

213.    Alpha Prime engaged in inequitable conduct, including the conduct described in

this Complaint.

214.    Based on Alpha Prime's inequitable conduct, BLMIS's customers have been

misled as to the true financial condition of BLMIS and have been induced to invest without

knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and

creditors are less likely to recover the full amounts due to them.

215.    Alpha Prime's conduct enabled Madoff to prolong the Ponzi scheme that resulted

in injury to all customers and creditors of the BLMIS estate and conferred an unfair advantage on

Alpha Prime.

216.    Prior to the Filing Date, Alpha Prime benefited by the withdrawal of

approximately $83,170,000 from BLMIS.  But for these withdrawals, there would have been

additional customer property available on the Filing Date for distribution.

217.    The Court should exercise the full extent of its equitable powers to ensure that

claims, payments, or benefits, of whatever kind or nature, which Alpha Prime asserted or sought,

directly or indirectly against the estate, and only to the extent such claims are allowed, are

subordinated for distribution purposes pursuant to sections 510(c) and 105(a) of the Bankruptcy

Code to the allowed claims of all other customers and creditors of BLMIS.

47

218.    Equitable subordination of the Disputed Claims, as requested herein, is consistent with the provisions and purposes of the Bankruptcy Code.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Alpha Prime as follows:

(i)    On the First Claim for Relief, pursuant to NYDCL §§ 276, 276-a, 278, and/or sections 105(a), 502(d), sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of BLMIS;

(ii)    On the Second Claim for Relief, pursuant to NYDCL §§ 273, 278, and/or 279, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of BLMIS;

(iii)    On the Third Claim for Relief, pursuant to NYDCL §§ 274, 278, and/or 279, sections 105(a), 502(d), 544(b), 550(a), 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3):  (a) avoiding and preserving the Six-Year Transfers, (b) directing the Six-Year Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the state of BLMIS;

(iv)    On the Fourth Claim for Relief, pursuant to NYDCL §§ 275, 278, and/or 279, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the Six-Year Transfers, (b) directing that the Six-Year

Transfers be set aside, and (c) recovering the Six-Year Transfers, or the value thereof, from Alpha Prime for the benefit of the estate of BLMIS;

(v)      On the Fifth Claim for Relief, subordinating the Disputed Claims for purposes of distribution to all allowed claims of BLMIS's customers and creditors due to Alpha Prime's inequitable conduct pursuant to sections 510(c) and 105(a) of the Bankruptcy Code, such that no claim of Alpha Prime is paid ahead of the allowed claim of any customer or creditor of BLMIS;

(vi)      On all Claims for Relief, directing Alpha Prime to disgorge to the Trustee all profits, including any and all compensation and/or remuneration received by Alpha Prime related to, arising from, or concerning the Six-Year Transfers from BLMIS to Alpha Prime;

(vii)      On all Claims for Relief, pursuant to federal common law and N.Y. C.P.L.R. §§ 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Six-Year Transfers were received;

(viii)      On all Claims for Relief, establishment of a constructive trust over all the Six-Year Transfers and their proceeds, product, and offspring in favor of the Trustee for the benefit of the estate of BLMIS;

(ix)      On all Claims for Relief, assignment of Alpha Prime's income tax refunds from the United States, state, and local governments paid on fictitious profits during the course of the scheme;

(x)      On all Claims for Relief, awarding the Trustee attorneys' fees, all applicable interest, costs, and disbursements of this action; and

    (xi)    Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.

Date:  September 24, 2019          **BAKER & HOSTETLER LLP**
      New York, New York

    By: /s/ *Oren J. Warshavsky*
      45 Rockefeller Plaza
      New York, New York 10111
      Telephone: (212) 589-4200
      Facsimile: (212) 589-4201
      David J. Sheehan
      Email: dsheehan@bakerlaw.com
      Oren J. Warshavsky
      Email: owarshavsky@bakerlaw.com

      *Attorneys for Irving H. Picard, Trustee for the*
      *substantively consolidated SIPA Liquidation*
      *of Bernard L. Madoff Investment Securities*
      *LLC and the estate of Bernard L. Madoff*