# EXHIBIT A

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-01789-smb

4   - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   BERNARD L. MADOFF INVESTMENT SECURITIES, LLC,

7           Debtor.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - x

9   Adv. Case No. 10-05355-smb

10  - - - - - - - - - - - - - - - - - - - - - - - - - - x

11  IRVING H. PICARD, Trustee for the

12  Liquidation of Bernard L. Madoff Investment

13  Securities LLC,

14  Adv. Pro. No. 10-05355 (SMB)

15          Plaintiff,

16      v.

17

18  ABN AMRO BANK (IRELAND) LTD.(f/k/a FORTIS PRIME FUND

19  SOLUTIONS BANK (IRELAND) LIMITED) and

20  ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (f/k/a FORTIS

21  PRIME FUND SOLUTIONS CUSTODIAL

22  SERVICES (IRELAND) LTD.),

23          Defendants.

24  - - - - - - - - - - - - - - - - - - - - - - - - - - x

25

Page 2

1   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

2   Adv. Case No. 10-04658-smb

3   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4   IRVING H. PICARD, Trustee for the Substantively

5   Consolidated SIPA Liquidation of Bernard L. Madoff

6   Investment Securities LLC and Bernard L. Madoff,

7              Plaintiff,

8        v.

9   CAROL NELSON,

10              Defendant,

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  Adv. Case No. 10-04377

13  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14  IRVING PICARD, Trustee for the Liquidation

15  of Bernard L. Madoff Investment Securities

16  LLC,

17

18              Plaintiff,

19        v.

20  CAROL NELSON, individually and as joint

21  tenant and STANLEY NELSON, individually

22  and as joint tenant,

23

24              Defendants.

25  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Page 3

1    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

2    Adv. Case No. 10-03800-smb

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    PICARD,

5

6            Plaintiff,

7    v.

8    Fairfield Greenwich Group (In re Fairfield Sentry Ltd.),

9

10            Defendants.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                U.S. Bankruptcy Court

14                One Bowling Green

15                New York, NY  10004

16

17                September 25, 2019

18                10:19 AM

19

20

21   B E F O R E :

22   HON STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: JONATHAN

Page 4

1   Hearing re: Adv. Case No. 10-05355-smb - PICARD v. ABN AMRO

2   BANK (IRELAND)

3   Trustee's Motion for Leave to Amend

4

5   Adv. Case No. 10-04377-smb - PICARD v. CAROL NELSON et al

6   Motion to Dismiss for Lack of Subject Matter Jurisdiction

7

8   Adv. Case No. 10-04658-smb - PICARD v. NELSON

9   Motion to Dismiss for Lack of Subject Matter Jurisdiction

10

11   Adv. Case No. 10-03800-smb - PICARD v. Fairfield Greenwich

12   Group

13   Conference (also applies to Adv. Pro. Nos. 09-01239 & 12-

14   01701)

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 5

```
 1   A P P E A R A N C E S :

 2

 3   BAKERHOSTETLER

 4        Attorneys for the Trustee for Fairfield

 5        45 Rockefeller Plaza

 6        New York, NY  10111

 7

 8   BY:  OREN J. WARSHAVSKY

 9        SEANNA R. BROWN

10

11   SIMPSON THACHER & BARLETT LLP

12        425 Lexington Avenue

13        New York, NY 10017

14

15   BY:  PETER E. KAZANOFF

16

17   BROWN RUDNICK

18

19   BY:  CHELSEA E. MULLARNEY

20

21   WOLLMUTH MAHER & DEUTSCH LLP

22        Attorney for Fairfield

23        500 Fifth Avenue

24        New York, NY 10110

25
```

Page 6

```
 1   BY:  FLETCHER W. STRONG

 2        WILLIAM A. MAHER

 3

 4   MORRISON & FOERSTER

 5        250 West 55th Street

 6        New York, NY 10019

 7

 8   BY:  CARL. H. LOEWENSON, JR.

 9

10   LATHAM & WATKINS LLP

11        Attorney for ABN Defendant

12        53rd at Third

13        885 Third Avenue

14        New York, NY 10022

15

16   BY:  KEVIN L. MALLEN

17        CHRISTOPHER HARRIS

18

19   SECURITIES INVESTOR PROTECTION CORPORATION

20        1667 K. Street, N.W., Suite 1000

21        Washington, D.C. 20006

22

23   BY:  NATHANAEL S. KELLEY

24

25
```

Page 7

1    BAKERHOSTETLER

2         Attorneys for the Trustee Picard v. Fortis

3         811 Main Street, Suite 1100

4         Houston, TX 77002

5

6    BY:  REGINA L. GRIFFIN

7         ELIZABETH B. MCCALLUM

8

9    APPEARING TELEPHONICALLY:

10   NICHOLAS CREMONA

11   RICHARD LEVY, JR.

12   PATRICK MOHAN

13   DAVID J. SHEEHAN

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  Please be seated.

3              THE COURT:  Good morning.

4              MR. WARSHAVSKY:  Good morning.

5              CLERK:  Fairfield.  Fairfield.

6              THE COURT:  Good morning.  I scheduled the

7    conference because I got your request to extend the

8    schedule, and I had two points.  First is I wouldn't give an

9    open-ended extension.  Do you have a date set to start the

10   mediation?

11             MR. WARSHAVSKY:  Owen Warshavsky for the Trustee,

12   Your Honor.  We do.  As you can see by the bench behind us,

13   there are several parties here.

14             THE COURT:  Mh hmm.

15             MR. WARSHAVSKY:  And so we're scheduling it.  We

16   have an initial meeting just myself and Mr. Kazanoff, the

17   counsel for most defendants or the corporate -- I'll let him

18   explain who he's representing, but for the majority of the

19   defendants.  We -- and we'll be meeting with Mr. Davis in --

20   I think it's October 17th.  We're trying to schedule a

21   follow-up meeting for the different parties.  We've been

22   working through a few issues to try and narrow the scope of

23   the mediation.

24             THE COURT:  Mh hmm.

25             MR. WARSHAVSKY:  In particular, Your Honor, I

Page 9

1    think we're focused on the -- there's differences in

2    accounting.  We've been working through those issues over

3    the summer to try and narrow it down to --

4              THE COURT:  So how long do you think this'll take.

5              MR. WARSHAVSKY:  I'll ask Mr. Kazanoff to respond.

6              MR. KAZANOFF:  You mean in terms of be ready to

7    have a full-blown mediation or to complete it?

8              THE COURT:  Well, to complete the mediation.  As I

9    said, I'm loathe to give an open-ended extension.  I'll give

10   you the time you need, but -- and maybe you have to come

11   back, but I don't want to give you an open-ended extension.

12             MR. KAZANOFF:  No, no.  We understand, Your Honor.

13   I -- you know, our hope -- at least my -- at least my hope

14   is that, you know, now we're going to involve -- we've

15   invited the Sentry liquidator --

16             THE COURT:  Okay.

17             MR. KAZANOFF:  -- into the mediation.  Mr.

18   Molten's here, if you have any questions about that.  You

19   know, the scope of the mediation is broad, so to -- but let

20   me -- let me answer your question.  When can we be done?

21   Listen, I think it's a -- I think we -- I hope we have a

22   very serious mediation session that hopefully yields

23   concrete results by the end of the year.  But I would be --

24   I think it would be unreasonable to suggest it's going to

25   resolve everything, but I'm hoping that it can significantly

Page 10

1    narrow the issues.

2            THE COURT:  Okay.

3            MR. KAZANOFF:  Which is what we're trying to --

4            THE COURT:  Does anyone else want to be heard?

5    What I'll do is I'll give you the extension to the end of

6    the year.  I'll schedule another conference so you don't

7    have to submit another order at some point in November, and

8    you can give me an update on the status, whether it's

9    actually progressing or the case has to be tried.  Okay.

10           MR. KAZANOFF:  And, Your Honor, so just to be

11   clear, we can hold off on putting in our reply brief to the

12   opposition?

13           THE COURT:  Well, yeah.  It's basically --

14   everything stops.  Why don't we say November 26th?  That's

15   after Thanksgiving.  Okay.  So I'll adjourn this conference

16   to November 26th.

17           MR. KAZANOFF:  Thank you, Your Honor.

18           THE COURT:  And you can submit an order.  You

19   don't have to do a stipulation, so you don't have to bother

20   to get signatures, which provides for this.

21           Okay.  Thanks.

22           MR. KAZANOFF:  Thank you, Your Honor.

23           MR. WARSHAVSKY:  Thank you, Your Honor.

24           THE COURT:  Picard versus Nelson.

25           MS. CHAITMAN:  Good morning, Your Honor.

Page 11

1           THE COURT:  Good morning.

2           MS. CHAITMAN:  Helen Davis --

3           THE COURT:  Please keep your voice up.

4           MS. CHAITMAN:  Sure.  Helen Davis Chaitman,

5     Chaitman LLP, on behalf of the Nelsons.

6           Your Honor, we've moved to dismiss the complaints

7     on the grounds that there's no Article 3 jurisdiction

8     because based on the Court's decisions in Avellino, Irving

9     Picard does not have standing to recover funds that were

10    transferred by Madoff individually.

11          THE COURT:  But aren't you assuming the answer to

12    the merits of whether they've proved their claim?  In other

13    words, they would have to prove -- or the trustee would have

14    to prove that the LLC made a transfer?  And that's -- that

15    goes to the merits of its claim.  I mean, what's -- in other

16    words, what's the difference between what I would have to

17    decide factually to resolve your motion and what I would

18    have to decide factually to resolve whether or not they're

19    entitled to a judgment?

20          MS. CHAITMAN:  Well, there are a number of other

21    issues that are raised by the trial in the evidence.  The

22    jurisdictional issue I think has to be determined logically

23    before you reach --

24          THE COURT:  No, I understand that, but if I

25    conclude based on the evidence that the LLC didn't make the

Page 12

1    transfers, you lose.  If I decide that the LLC did make the

2    transfers, then even under your theory, they have standing,

3    right?

4            MS. CHAITMAN:  Well, there are certain documents

5    that were not put into evidence at the trial that are part

6    of the record here.  And I think that, for example, just to

7    take one example, the Caraballo 2017 declarations, which we

8    contend were procured with a fraudulent intent by the

9    Trustee, we've now put into -- before the Court the report

10   of Mr. Greenblatt from 2012.  Mr. Greenblatt is one of the

11   trustee's experts.  In 2012, he issued a report in which he

12   opined upon the documents that were produced by Caraballo in

13   2017.  And we've annexed all the Bates numbers so the Court

14   can see that the Bates numbers from Mr. Greenblatt's report

15   from 2012 included the documents that purportedly were

16   produced by JPMorgan Chase in 2017.

17           THE COURT:  I didn't think that they were produced

18   by JPMorgan in 2017.  I just that that's when her

19   certification was up.

20           MS. CHAITMAN:  Right, but the Trustee has never

21   produced the certifications for the original production.

22           THE COURT:  But this is for the trial.  He wanted

23   to get those documents into evidence, so he needed a

24   custodian to identify them.  They could've been produced 10

25   years ago, but the trial was in May.

1          MS. CHAITMAN:  I'm not aware of anything in the

2     record which suggests that the Caraballo 2017 declaration

3     was needed to put things in evidence.  Number one because

4     there had to have been a custodian of records affidavit at

5     the time of the original production.

6          THE COURT:  But why?

7          MS. CHAITMAN:  I'm sorry?

8          THE COURT:  Why?  You need the custodial affidavit

9     for trial.  You don't need it before that.

10          MS. CHAITMAN:  Judge, if that were their intent,

11     they would've provided me with a copy of it.  They didn't

12     provide me with a copy of it until a week before the trial.

13     It's -- in my -- based on my review of everything --

14          THE COURT:  I understand your argument that they

15     produced a lot of documents (indiscernible), but -- and they

16     should be excluded for that reason, but I don't understand

17     the argument that documents were produced in 2012, and her

18     declaration should -- or her custodial affidavit, which was

19     designed -- you get documents into evidence should speak as

20     of 2012.

21          MS. CHAITMAN:  You know what, Judge?  I'm not --

22     the documents were probably produced in 2009.  I assume that

23     the Trustee used the period after his appointment to get all

24     the JPMorgan Chase documents, which of course were

25     essential.  I assume those were produced in 2009.  We never

1    saw the custodial affidavit that would've been -- the

2    would've accompanied that production.  We saw later

3    custodial affidavits that didn't contain the representation

4    that that --

5              THE COURT:  Well, I saw one for 2015, I think,

6    that didn't even refer to BLMIS, so --

7              MS. CHAITMAN:  Exactly.  Exactly.  But if -- even

8    -- the productions that were made available to the callback

9    defendants were in the e-data room, those were -- those

10   predated significantly even the 2015 Caraballo declaration.

11   So I think it's --

12             THE COURT:  But isn't the question who owns the

13   account?

14             MS. CHAITMAN:  The question is who owns the

15   account.

16             THE COURT:  Right.

17             MS. CHAITMAN:  There is not a shred of evidence

18   that the LLC owns the account.

19             THE COURT:  Let me ask you a question.  Is this --

20   I was looking through some of the exhibits, and this was one

21   of the trial exhibits which you offered, and it's the

22   deferred prosecution agreement between the U.S. attorney and

23   JPMorgan.  Paragraph 7 says Bernard L. Madoff ran the

24   largest Ponzi scheme in history through Bernard L. Madoff

25   Investment Securities LLC and its predecessor and affiliates

Page 15

1    collectively Madoff Securities.  And then it says Madoff

2    Securities had a continuing banking relationship with

3    JPMorgan and that the 703 account was part of -- part of

4    that relationship.

5              Why would the government say that LLC had an

6    account if it didn't?

7              MS. CHAITMAN:  You know, Judge, I was not a party

8    to that proceeding, obviously.

9              THE COURT:  But you -- but you offered this

10   document into evidence.

11             MS. CHAITMAN:  But not for that purpose.

12             THE COURT:  But I can read.  That's what it says.

13             MS. CHAITMAN:  Judge, I understand that.  But the

14   fact of the matter is you can't transfer a bank account

15   without having a document which requests a transfer of the

16   bank account.  These -- if you just look at it logically,

17   Judge, Madoff testified that by the time he formed the LLC,

18   he recognized he was going to go under.  And obviously what

19   he did was he tried -- he formed the LLC.

20             THE COURT:  He testified to that?

21             MS. CHAITMAN:  Yes, he did in his --

22             THE COURT:  He formed the LLC in 2001.

23             MS. CHAITMAN:  He testified that at that time he

24   formed the LLC.  I asked him in his deposition, since he'd

25   been in business for -- since the 1960s -- what happened in

1    2001 that he formed an LLC.

2              THE COURT:  Mh hmm.

3              MS. CHAITMAN:  And his answer was he realized he

4    was never going to get out of the situation he was in, and

5    he formed the LLC for protection.  What did he do then?  He

6    notified everyone that did business with his sons through

7    the LLC that he had formed the LLC.  He didn't notify

8    JPMorgan Chase.  He didn't notify any of the investment

9    advisory customers.  He was clearly doing that in order to

10   protect his sons and insulate his sons away from the

11   investment advisory business where he had been perpetrating

12   a fraud.

13             So the fact -- he knew -- he certainly knew --

14   when you look at the letters that he wrote to --

15             THE COURT:  How would his sons be implicated if he

16   was running a sole proprietorship any more than they would

17   be -- or less than they would be implicated if he was

18   running it as an LLC?

19             MS. CHAITMAN:  He was not running the sole -- what

20   he -- the investment advisory business was never -- based on

21   any evidence was never run by the LLC.  It was -- the boys

22   were running a legitimate trading business.  He was running

23   the LLC.

24             THE COURT:  Dubinsky testified, and I found his

25   testimony credible, that it was only one business.  And, in

1    fact, I think the government information that accompanied

2    deferred prosecution agreement, but maybe the statement of

3    facts in the deferred prosecution agreement said that there

4    was one business, and it had a proprietary trading, market

5    making, and investment advisory business.

6              MS. CHAITMAN:  You know what, Judge?  I --

7              THE COURT:  But that brings me back to my original

8    question.  I don't -- I -- this motion just seems to be the

9    same argument that they failed to prove that there was a

10   transfer.

11             MS. CHAITMAN:  It's much -- it's much more

12   important than that, Judge.  This goes to the -- whether the

13   Trustee actually has constitutional standing to be suing in

14   any of the callbacks.

15             THE COURT:  Well, why wouldn't he have

16   constitutional standing if he's alleging non-speculative

17   concrete injury?

18             MS. CHAITMAN:  He doesn't have that injury.  You

19   held that in Avellino.

20             THE COURT:  No, no, no.  That -- but Avellino

21   dealt with pre-2001 issues.  There's no question that post-

22   2001 there was an LLC, and your argument is that the bank

23   account from which the transfers were made were personal.

24   They weren't LLC transfers.  His argument is they were LLC

25   transfers.  Why doesn't he have standing to make that

Page 18

1    argent?

2             MS. CHAITMAN:  Well, he -- I think, look.  He --

3    it's his burden to prove that the Court has jurisdiction.  I

4    believe the Court does not have jurisdiction.  I think it's

5    -- we -- you know, we've been litigating these cases since

6    2010 based on what I believe was a deliberate

7    misrepresentation of the most material fact, whether there

8    is jurisdiction here.  I think that this impacts so many

9    people, and this deception has gone on for such a long time.

10   I feel that it's important that this go up to the Second

11   Circuit as quickly as possible.

12             THE COURT:  Okay.  Thank you.

13             MR. HUNT:  Your Honor, Dean Hunt for the Trustee.

14   It's clear that the Court understands exactly what the issue

15   is.  We believe that the post findings of fact and

16   conclusions of law raise those exact same issues.

17             I would point out, though, that I think it's

18   really not only a matter of who owns the accounts, which

19   clearly is the LLC based on the evidence, but also whether

20   or not the Debtor here held dominion and control over those

21   accounts, which the evidence clearly says is the case.

22             And based upon that and the evidence that was

23   presented at trial, the fact that they have admitted -- that

24   they now admit that they never contested that they received

25   transfers from a broker-dealer in connection with a

1   securities contract that they don't appear to contest that

2   this is customer property, that they sought and received

3   protection of the property provided by SIPA, and at the time

4   of the two-year transfers, they were clearly our customers.

5           THE COURT:  But under SIPA, they can only recover

6   a transfer by the debtor.  It's treated as -- treated as

7   personal property of the debtor --

8           MR. HUNT:  Agreed.

9           THE COURT:  -- to circumvent, you know, state law

10  rules about who owns the property.  But if the transfer were

11  made by Madoff individually, for example, that's not a

12  transform by the debtor, and Madoff is not a SIPA debtor.

13          MR. HUNT:  Agreed.  Agreed.  But that's not the

14  case here, as indicated by the evidence.  So I had a big

15  long argument ready to go.  It's pretty clear you understand

16  what the issue is.

17          THE COURT:  Well, I just -- look, I'll decide this

18  as part of the merits of the case.  I agree with you that

19  they have the burden of proof, whether it's standing or

20  whether the transfer was made by the debtor, and I'll just

21  decide it in connection with that.  I don't see the issues

22  as being separate.

23          MR. HUNT:  Thank you, Your Honor.

24          THE COURT:  All right.  Thank you.

25          Oh, this is (indiscernible) documents.  We'll go

Page 20

1    through it later.

2             Picard versus ABN AMRO.  Go ahead.

3             MS. GRIFFIN:  Would Your Honor mind if I stayed at

4    the desk?

5             THE COURT:  As long as you speak into the

6    microphone --

7             MS. GRIFFIN:  Okay.

8             THE COURT:  -- that's okay.

9             MS. GRIFFIN:  Good morning, Your Honor.  Regina

10   Griffin, counsel for the Trustee.

11            Your Honor, we're here today on the Trustee's

12   motion for leave to amend, which the Trustee submits is not

13   futile because he has successfully pled allegations that

14   meet the willful blindness standard.  And the Defendant's

15   entire argument is premised on the wrong legal standard.

16   And basically what --

17            THE COURT:  What's the wrong legal standard?

18            MS. GRIFFIN:  So they cite to the BNP Paribas

19   decision, Your Honor, which -- in which this Court stated

20   that lack of good faith refers to knowledge of Madoff's

21   Ponzi scheme, i.e. knowledge that BLMIS was not actually

22   trading securities.  But the case that is cited there is

23   actually the 546(e) decision, if you look at Your Honor's

24   citation.  And in that case with the 546(e) exception, it

25   makes sense that the defendants have to actually know that

Page 21

1    there's no trading and that it could be a Ponzi scheme.

2              THE COURT:  So what's the test?

3              MS. GRIFFIN:  The test is what the Court

4    articulated in Katz, Your Honor, and exactly what the Court

5    there said is both sides agree that if the defendant had

6    actual knowledge of Madoff's scheme it would constitute a

7    lack of good faith.  But even the Trustee does not appear to

8    undertake the dubious task of plausibility pleading the

9    Defendants knowingly invested in the Ponzi scheme.

10             THE COURT:  But he -- the Court's just saying what

11   the plaintiff -- what the parties agree.  That's not --

12             MS. GRIFFIN:  Yes, but he --

13             THE COURT:  That's not a legal determination.

14             MS. GRIFFIN:  But what he goes on to say, Your

15   Honor, is but both sides agree, however, that if the

16   Defendants willfully blinded themselves to the fact that

17   Madoff Securities was involved in some kind of a fraud, this

18   too might -- depending on the facts -- constitute a lack of

19   good faith.

20             THE COURT:  Okay.  So what's the fraud if not

21   knowledge but willful blindness of the Ponzi scheme?  What's

22   the fraud that they had -- that they suspected?

23             MS. GRIFFIN:  So, Your Honor, the entire willful

24   blindness standard that is developed under criminal law in

25   which Judge Rakoff bases --

Page 22

1           THE COURT:  I'm just asking you a question.

2           MS. GRIFFIN:  Sure.

3           THE COURT:  You said Judge Rakoff said that they

4    have to have some suspicion.

5           MS. GRIFFIN:  Of a fraudulent --

6           THE COURT:  Of a fraud.

7           MS. GRIFFIN:  Of a fraudulent enterprise.

8           THE COURT:  But what's the fraud in this case that

9    you say they have a suspicion of?

10          MS. GRIFFIN:  Well, Your Honor, we're saying that

11   the Defendants are citing to the wrong legal standard, but

12   we're saying here --

13          THE COURT:  I'm just asking --

14          MS. GRIFFIN:  Sure.

15          THE COURT:  -- what's the difference if the only

16   fraud is the fraud relating to the Ponzi scheme?  I've had

17   this in other cases when --

18          MS. GRIFFIN:  I understand, and I'm not trying to

19   be difficult.  I'm trying to answer your question.  What we

20   allege here is that the Fortis defendants, the employees at

21   the time specifically suspected that Madoff might not be

22   trading and didn't have custody of his assets.  That's

23   exactly what we alleged, that -- in our allegations.  We're

24   saying we don't need to, but we do that.  And in the Optimal

25   case, Your Honor --

Page 23

1          THE COURT:  But if Madoff didn't have custody of

2     the assets, who did?

3          MS. GRIFFIN:  That's the point.  They didn't know

4     what he had custody of.  He was getting --

5          THE COURT:  But that's not -- but that's not a

6     fraud.  The fraud is that he was telling people that he had

7     these assets when in fact he didn't have them because he was

8     using the money to pay redemptions or for his personal

9     benefit.

10          The point is -- and we can move on from this -- I

11     hear what you're saying, but the -- some kind of fraud that

12     we're talking about is that he's not trading securities.

13          MS. GRIFFIN:  Three is some concern that he is not

14     doing what he's saying he's doing, Your Honor.  And they

15     deliberately act -- the mens rea --

16          THE COURT:  But other than not trading securities,

17     what is the fraud?  In other words, you've had other cases

18     where they talk about cherry picking, or they talk about

19     front running.

20          MS. GRIFFIN:  Right.

21          THE COURT:  That's not even in this case.

22          MS. GRIFFIN:  Right.

23          THE COURT:  So what's the fraud?

24          MS. GRIFFIN:  I guess, Your Honor, my question to

25     you is why do you believe that at the time, they had to

Page 24

1    specifically suspect exactly what he was doing rather than

2    what the Second Circuit said in Nektalov is it doesn't

3    matter if they're -- if they are subjectively correct about

4    what they suspect.  But the culpable act of deliberate

5    ignorance is what we're talking about here.  If they suspect

6    some sort of a fraud, and that's what Judge Rakoff said.

7               THE COURT:  But what -- you know, look, let's get

8    off this, but I keep asking you the same question.  Why does

9    some sort of fraud that you think they suspected or you

10   plead they suspected other than Madoff wasn't really trading

11   securities?

12              MS. GRIFFIN:  And, Your Honor, that's -- you're

13   absolutely right, but that is exactly what we plead.

14              THE COURT:  Okay.

15              MS. GRIFFIN:  Okay.  And Your Honor --

16              THE COURT:  Glad we resolved that.

17              MS. GRIFFIN:  Well, Your Honor, we absolutely

18   plead that the Fortis defendant suspected that he wasn't

19   trading based on the fact that, at the time, the Defendant's

20   employees were very concerned that they couldn't get two

21   independent streams to verify that the trades were actually

22   taking place.

23              THE COURT:  So why'd they invest $500 million?

24   I'll give out the benefit of the collateral.  Why'd they

25   invest $500 million and why didn't they pull the money out

Page 25

1    if they suspected that it was a Ponzi scheme?

2             MS. GRIFFIN:  Well, Your Honor, like Judge Rakoff

3    in Katz said is perhaps they thought they could get the

4    short-term profits -- the benefit of the short-term profits

5    while they thought they could minimize the risk.

6             And let me point out that in Katz, Your Honor, the

7    two things that the judge pointed to were, one, that they

8    considered Ponzi insurance, which they never got.  And two,

9    they considered -- they created a hedge fund to minimize

10   their exposure to Madoff.  Neither one of those would have

11   worked, but the point here is that where they thought they

12   could minimize the risk but still keep procuring the short-

13   term gains, that is enough that they --

14            THE COURT:  How'd they minimize the risk?

15            MS. GRIFFIN:  I'm sorry.  I don't --

16            THE COURT:  How'd they minimize the risk, by

17   investing in the private fund or the Broad Market fund?

18            MS. GRIFFIN:  They mimed the risk by -- well, that

19   was the hedge to --

20            THE COURT:  So that increased their risk, right?

21            MS. GRIFFIN:  It certainly did, Your Honor, but

22   they also had those built-in protections that none of the

23   other Tremont investors got.  That's what we need to focus

24   on here.  They got protections that put them ahead of all

25   the other individual investors.  These aren't one of the

Page 26

1    (indiscernible) things that every Tremont individual

2    investor got.  They got collateral, so the first third of

3    their money is not exposed.  And I --

4              THE COURT:  The last part of the -- is part of the

5    swap, the collateral.

6              MS. GRIFFIN:  Yeah, and --

7              THE COURT:  That's the -- that's the deal.

8              MS. GRIFFIN:  And so that's one part of their

9    state of mind that goes into how are we minimizing the risk?

10   They also --

11             THE COURT:  But that's the deal.  They're

12   investing $230 million, and they're going to pay three times

13   the performance of -- I guess it was the Broad Market fund

14   which was the (indiscernible).

15             MS. GRIFFIN:  Your Honor, at the time that they

16   entered into the swap, they had already been willfully blind

17   since 2003.  They had already exhibited that willful

18   blindness by being so concerned that they could be liable

19   for Madoff's acts as custodian -- they had so little faith

20   that he actually had custody of those assets they up and

21   moved.  So what you have to look at is --

22             THE COURT:  Of course they moved.  The -- what was

23   it, Bermuda?

24             MS. GRIFFIN:  Bahamas.

25             THE COURT:  Bermuda had imposed -- well, the

1    Bahamas had --

2              MS. GRIFFIN:  Yeah.

3              THE COURT:  -- now imposed more rigorous

4    regulations, so they moved to another jurisdiction that had

5    less rigorous requirements.

6              MS. GRIFFIN:  Your Honor, they did it in

7    deliberate reaction to Madoff.  They were that concerned.

8    If you look at the emails that they're -- that we cite to in

9    our amended complaint, they are not doing this just as a

10   deliberate, hey, we want to get out generally --

11             THE COURT:  Can I consider the allegations in your

12   earlier complaints?

13             MS. GRIFFIN:  Yes, Your Honor.  I mean --

14             THE COURT:  No, I'm just asking.

15             MS. GRIFFIN:  So, I mean on his --

16             THE COURT:  Is it -- as a matter of a 12(b)(6)

17   motion, can I look at the allegations in your earlier

18   complaints?  Because one of the arguments they say is, you

19   know, your earlier complaints did allege a lot of due

20   diligence by them.

21             MS. GRIFFIN:  I am so glad you asked that, Your

22   Honor.

23             THE COURT:  Okay.

24             MS. GRIFFIN:  Because here, it's very clear --

25   Defendants made it very clear that there was no amount of

Page 28

1    due diligence that could ever satisfy them.

2            If you'll give me one second.

3            In September 2003, Brenda Buckley insisted that

4    without two separate streams of information that can be

5    provided that will allow independent reconciliation of the

6    trades, Fortis should not provide financing to its customer,

7    should change legal jurisdictions away from the Bahamas.

8            THE COURT:  But isn't it more due -- updated due

9    diligence in 2006 or 2007?

10           MS. GRIFFIN:  In July 2004, Fortis again confirms

11   that independent verification that Buckley wanted was not

12   possible.  And here's the quote.  Madoff's double role

13   implies there is no guarantee that the trades and positions

14   provided by Madoff to Fortis's administrator are objective,

15   and it is not possible to obtain independent confirmations

16   on trades and positions." Cadogan later said -- they

17   describe Madoff as a black box investment dilemma, a

18   phenomenon long-term record but meaningful access to

19   meaningful information was unviable.

20           Again in 2008, Cadogan and FMM decided to redeem

21   because of the unwillingness of the Madoff organization to

22   provide sufficient transparency.

23           THE COURT:  Wasn't there some sort of due

24   diligence prior to the swap transaction?

25           MS. GRIFFIN:  Yes, Your Honor, but they could

1    never get -- according to these people in the complaint,

2    they could never get the independent verification which was

3    the very thing that triggered their concern.

4              THE COURT:  But -- okay, but how can you say

5    they're willfully blind if they're suspicious?

6              MS. GRIFFIN:  Right.

7              THE COURT:  Which you're saying.  And then they do

8    this due diligence.

9              MS. GRIFFIN:  But, Your Honor, if you are

10   concerned that he doesn't have custody of assets, if you ask

11   him who your board of directors are and what's their title

12   and what's their training, that is never going to resolve

13   what the key issue is.  There is check-the-box due

14   diligence, and there is what these people reported up their

15   line to their credit committees, to their central board that

16   concern them the most.  And they could -- they said it was

17   impossible to ever get sufficient due diligence that would

18   satisfy them.

19             THE COURT:  Okay, but they didn't turn a blind

20   eye.  They found out what they could.  They couldn't get

21   satisfactory answers, and then they were willing to invest

22   the money, but they --

23             MS. GRIFFIN:  That is --

24             THE COURT:  But they didn't turn a blind eye.

25             MS. GRIFFIN:  Not getting confirmation of that

1    which you say is essential, which Buckley said is essential

2    since 2003, is the act of turning a blind eye.  Continue --

3    Judge Rakoff held this in Katz.  Continuing to reap short-

4    term benefits while just looking away to -- and thinking

5    that you can minimize the risk by shifting jurisdictions and

6    not being liable or by -- you have these things in your --

7    in your swap transaction that you think might project you.

8            And by the way, Your Honor, they don't -- it's

9    about what these people thought at the time, and we cite in

10   our papers the fact that these institutions, after the 2008

11   financial crisis, there were -- there were articles written

12   and congressional testimony given that individuals at these

13   institutions have personal financial incentives that -- to

14   take on risky transactions that are contrary to the long-

15   term benefits of their institution.  So --

16           THE COURT:  I agree with you that maybe with

17   investment managers who don't have a lot of skin in the game

18   and get enormous fees, if that's the case, but this is a

19   lender, essentially, who -- let me finish -- who's loaning

20   $470 million.  What you're saying, they knew or should have

21   known -- well, I shouldn't say should have known -- but they

22   willfully blinded themselves to a Ponzi scheme, and, you

23   know, they -- even Judge Rakoff said nobody would -- nobody

24   would plausibly allege that they knowingly invested in a

25   Ponzi scheme.

Page 31

1          MS. GRIFFIN:  Right, and that's not what we have

2     to plead.  But, Your Honor, the -- Judge Kimba Wood

3     explained it best in the Fischbach Securities case that we

4     had cited in our brief.  She wrote there, facts suggesting

5     reckless disregard of the truth in a 10(b)(5) case often

6     suggest willful blindness.  In most cases of reckless

7     disregard of the truth, defendants have had a motive for

8     deliberately remaining ignorant of the fact in question,

9     rendering their characterization as willfully blind more

10    plausible.  The defendant is motivated not to open his eyes

11    to the underlying facts since this would place him in a

12    position of terminating his profitable financial situation

13    and exposing his associate or continuing to participate in

14    the fraudulent activities but now without his cherished

15    modicum of deniability.

16          Your Honor, with all due respect, I think you're

17    conflating motive and opportunity, which requires this huge

18    personal benefit as the scienter element when we are

19    pleading an alternative that is reckless disregard.  That is

20    where you consciously turn away from something because you

21    have a profitable association.  It's not $100 billion.  I

22    get -- I grant you this is not a feeder fund where they're

23    reaping all that, but it explains -- she says -- Judge Kimba

24    Wood says it explains why these non-neophytes in the

25    financial institution marketplace would turn a blind eye.

Page 32

1    That's why it doesn't have to be a bullet-proof protection

2    to a Ponzi scheme.  It's just they thought they can continue

3    to do this while not getting the confirmation they said they

4    needed.

5            THE COURT:  I had a different question which I was

6    going to ask both of you.  Having read Judge Rakoff's 520 --

7    was it 546(g) decision.

8            MS. GRIFFIN:  Sure.

9            THE COURT:  Most of the discussion concerns

10   willful blindness under 550(b), but there's some confusion,

11   at least in my mind, whether there are two safe harbors or,

12   at least with respect to the collateral -- there's only one

13   safe harbor, five --you know, 546(g).  It doesn't apply, and

14   I guess they could be liable for, under state law, for

15   constructive fraudulent transfer.

16           Or even if 546(g) doesn't apply, is it possible

17   that 546(e) applies to the same transfer.

18           MS. GRIFFIN:  Your Honor, I think -- the first

19   thing I'll say is that I -- respectfully, I don't think you

20   have to answer that question here for our purposes.

21           THE COURT:  Well, I'm curious.

22           MS. GRIFFIN:  I know.  I think in a nutshell that

23   in the 546(g) case, the judge there was focused on an

24   argument where the focus was on the defendants.  And if you

25   look at the language of the decision, it was about did the

Page 33

1    subsequent transferee, was it made by or -- was the transfer

2    made by or to the benefit of the subsequent transferee.  And

3    under those circumstances, he said that with respect to the

4    participants of a swap transaction, which is what Defendants

5    were, the mindset is irrelevant because that swap

6    transaction actually occurred.

7              THE COURT:  But he was talking about the initial

8    transfer.

9              MS. GRIFFIN:  He was talking about the -- right.

10    but if you look at the language of the --

11             THE COURT:  So if the initial transfer from BLMIS

12    to, I guess, the Broad Market fund --

13             MS. GRIFFIN:  Mh hmm.

14             THE COURT:  -- is not safe harbored, the trustee

15    could recover that initial transfer or avoid that initial

16    transfer on a variety of theories.  As I understand the

17    defendant's argument, that even if that transfer is not

18    safe-harbored under 546(g), it's safe-harbored under 546(e),

19    which just struck me as odd that you would have two safe

20    harbors.

21             MS. GRIFFIN:  I think it's because Judge Rakoff

22    held that the mindset of the participants -- whether the

23    swap actually took place is irrelevant.  I think that's what

24    the -- you asked the difference.

25             THE COURT:  I'm asking a different question.

1            MS. GRIFFIN:  Yeah.  Okay.

2            THE COURT:  Let's all agree that 546(g) does not

3     safe harbor the $235 million swap because that's what Judge

4     Rakoff held.

5            MS. GRIFFIN:  Could you repeat that, Your Honor?

6            THE COURT:  Yeah.  I'll read from his decision.

7            MS. GRIFFIN:  Yes.

8            THE COURT:  He's talking at the end.  In sum, the

9     Court finds that both the initial transfer of the redemption

10    and collateral payments were made in connection with swap

11    transactions.  Only the initial transfers of the redemption

12    payments and not the collateral payments were made, quote

13    "for the benefit of the defendants here," closed quote.  So

14    he seems to be saying that the transfer from BLMIS to, I

15    guess it's itinually to the Prime Fund.  I forget who the

16    initial transferee is, but let's just say Prime Fund.

17            MS. GRIFFIN:  Right.

18            THE COURT:  The initial transfer from Tremont --

19    to Tremont for the purpose of investing in a swap is not

20    safe-harbored under 520 --546(g).  That's what he seems --

21    that's how I read this.

22            MS. GRIFFIN:  The way we read it, Your Honor, is

23    that the redemption payments to Tremont were safe harbored.

24    The collateral was not under the second --

25            THE COURT:  But you have to avoid the initial

Page 35

1    transfer in order to recover the subsequent transfers.

2              MS. GRIFFIN:  Correct.

3              THE COURT:  And if you can avoid the initial

4    transfer relating to the $235 million delivery of

5    collateral, the collateral transfer, on theories of state

6    law, preference, whatever it might be, it seems it's easier

7    for you at least to avoid that initial transfer as opposed

8    to the initial transfer which led to the redemption, which

9    presumably is safe-harbored under both 524(g) -- or is safe-

10   harbored under 524(g).

11             MS. GRIFFIN:  I agree with you there, Your Honor,

12   because there was no -- there was no distinction made that

13   between the initial transfers that Tremont made on a daily

14   basis that were then directly tied, as Judge Rakoff pointed

15   out, to the redemptions that were made --

16             THE COURT:  Let me ask the question different.

17             MS. GRIFFIN:  Okay.  Yeah.  Okay.

18             THE COURT:  If I conclude that the collateral

19   transfer is not safe-harbored under 524 -- I keep saying 524

20   --

21             MS. GRIFFIN:  546.

22             THE COURT:  -- 546(g), do I then have to consider

23   whether that same transfer is safe-harbored under 546(e)?

24             MS. GRIFFIN:  Your Honor, we believe the logic of

25   the 546(e) is the direct reason why the Defendant's argument

1    on this -- on the collateral provision doesn't apply.  But

2    --

3              THE COURT:  We're not getting anywhere.

4              MS. GRIFFIN:  Okay.

5              THE COURT:  All right.  Why don't you -- why don't

6    you wrap it up?

7              MS. GRIFFIN:  Okay, Your Honor.  I guess for the

8    reasons that we've put forth in our papers, we believe that

9    the Trustee has pled willful blindness allegations

10   consistent with the standards set down in Katz and with the

11   other caselaw in the circuit on willful blindness.

12             THE COURT:  Thank you.

13             Good morning.

14             MR. HARRIS:  Thank you, Your Honor.  Chris Harris

15   of Latham & Watkins for Defendants ABN AMRO.  If it's all

16   right with your court, I'm going to address the 550(b) good

17   faith defense, and my collage, Kevin Mallen will address any

18   questions you have on the no diminution of the estate and

19   also the issue we were just describing, which is 546(g) and

20   (e), and whether that means there's a double recovery that's

21   (indiscernible).

22             THE COURT:  Well, not a double recovery, but if I

23   conclude that 546(g) doesn't apply, can 546(e) still apply

24   with the same initial transfer?  That's my question.

25             MR. HARRIS:  Understood.  I'll just give a

1    preview.  There is a difference that Judge Rakoff found in

2    his 546(g) decision.

3              THE COURT:  Yeah.

4              MR. HARRIS:  Which is that under 546(e), the state

5    of mind of the recipient of the initial transfer is

6    relevant, and under 546(g), it's not.

7              THE COURT:  I understand the difference.  I'm just

8    asking whether both apply or only one applies.

9              MR. HARRIS:  They both apply, Your Honor.

10             THE COURT:  Okay.

11             MR. HARRIS:  I'll let my colleague explain why,

12   but it's basically because we made an argument today, we did

13   not make before your -- before Judge Rakoff, and he noted we

14   didn't make it.  And we preserve the ability to make it now,

15   and they don't deny it.

16             THE COURT:  Okay.

17             MR. HARRIS:  Which is that Tremont itself

18   satisfies the definition of a financial participant, and it

19   was for the benefit of Tremont.

20             Let me tell you what I would like to address with

21   Your Honor.  I was not planning on going into the standard

22   because I know that's before Your Honor on a number of

23   cases.  I am happy to if you would like.

24             The one thing I did want to point out is this

25   issue that they are raising.  Do you have to have knowledge

Page 38

1    of the Ponzi scheme fraud or some other fraud?  Does it

2    matter here?

3            THE COURT:  Well, the argument -- one of the

4    arguments Ms. Griffin has made is that you did whatever you

5    did.  You suspected -- you were concerned about some of the

6    way that Madoff did business.  You did what you did, but you

7    could never really satisfy yourself.  It was impossible to

8    satisfy yourself because of Madoff's secretiveness and

9    whatever else that he really had custody of the assets with

10   him.  And then you take the -- you receive the transfers,

11   the subsequent transfers anyway.

12           And I guess the argument is if you can never

13   really satisfy yourself, and you take the transfers, you've

14   turned a blind eye.

15           MR. HARRIS:  Your Honor, that is just factually

16   untrue according to what they allege, which is that these

17   people who were involved in 2003 and '4 were then involved

18   in the relevant time period, 2007.  We did diligence in the

19   interim.  That diligence resulted in a diligence memo,

20   January 2017.  And it is extremely clear --

21           THE COURT:  2017?  2007.

22           MR. HARRIS:  I'm sorry, 2007.  Thank you, Your

23   Honor.  And it is very clear what we concluded, which is

24   that not only is his exposure what you would expect, not

25   only is his reputation excellent, but let me -- let me quote

Page 39

1    to you the conclusion.  This is --

2              THE COURT:  This is (indiscernible).

3              MR. HARRIS:  This is in the Gibson -- Giblin

4    declaration Exhibit C.

5              THE COURT:  Okay.

6              MR. HARRIS:  This is the conclusion on Page -- on

7    Page 5.  Quote, "our review of the trades executed on behalf

8    of Harley through 2006 indicates that the trading mandate

9    has been implemented effectively and consistently."  That is

10   the exact opposite of a belief that BLMIS hasn't been

11   implementing its trading mandate but instead is a Ponzi

12   scheme where no trades occur.  It is impossible to both

13   think that he's effectively implementing his mandate and

14   that he is not doing any trades.  So you know what the end

15   result here is after we do our diligence.  We believed he

16   was implementing his trading mandate.  That's the end

17   result.

18             You -- there are other documents from that sign --

19   same time period that also show that we believe BLMIS was

20   executing trades.  They cite the internal resonance from

21   September 2007.  That's the Giblin declaration Exhibit D,

22   and that says that we could reconstruct the portfolio two

23   days after trade tickets are received.  They also cite the

24   November 2006 credit application.  That's Giblin declaration

25   Exhibit E, and it said that Madoff provides copies of

Page 40

1    individual trade tickets from each and every trade on the

2    brokerage account on a daily basis.  It is very clear, to

3    cut to the end of the chase, that we believed Madoff was

4    executing his trading strategy.  That's what we said.  And

5    based on that, the relevant time period we then did the swap

6    agreement.

7            A couple other points I'd like to make on good

8    faith because they aren't in our briefing because they came

9    up in the reply.  What you just heard in response to Your

10   Honor's question, why would we risk -- why would we invest

11   $500 million?  What you heard in response was fees.  What

12   they don't tell you is what were those fees?  Well, you can

13   look at the documents.  The swap agreement, which is Giblin

14   Exhibit B, Page 6, tells you the fees, and they are

15   miniscule.  It is 0.9 percent over LIBOR -- 0.9 percent over

16   LIBOR.  That is half the fees in the BNP case.  The spread

17   is half of the 1.7 percent over LIBOR in the BMP case Your

18   Honor already found was not a credible economic incentive.

19           So in other words, the Trustee's theory is that we

20   intentionally invested -- we'll use Your Honor's number --

21   $500 million in a Ponzi scheme knowing it would have to fail

22   eventually on the chance of earning $2 or $3 million a year.

23   It is simply incredible.

24           Their only other response is, well, we were in bad

25   economic straits, and so we had an enhanced motive to make

Page 41

1    risky transactions.  Well, it's one thing to do a gamble on

2    buying a lottery ticket where it's risky but there's a big

3    upside.  That's not what they allege here.  The situation

4    here is there is -- we're investing in a Ponzi scheme where

5    we know it's going to fall apart, and we have no chance of a

6    big upside.  All we're going to get is a 0.9 percent fee if

7    we happen to get -- keep getting those fees before it

8    crashes.  That is not just implausible but inconceivable

9    that any rational economic actor would do that.

10           Couple other points I'd like to make on good

11   faith, Your Honor.  If you look back at the 2003 and 2004

12   documents that they cite, none of them mention a risk of

13   fraud, any fraud.  And that's why -- sorry to say, Your

14   Honor, this dispute we -- you were having about does it have

15   to be some risk of fraud or Ponzi scheme in particular

16   doesn't matter in our situation because there is no document

17   cited throughout or any quote of a person --

18           THE COURT:  Well --

19           MR. HARRIS:  -- where anyone suspects that

20   (indiscernible) was engaging in fraud.

21           THE COURT:  Well, there are -- there are documents

22   where they're questioning whether he was actually trading in

23   securities.

24           MR. HARRIS:  Your Honor, I don't believe there

25   are.

Page 42

1              THE COURT:  That was my recollection.

2              MR. HARRIS:  Counsel said that, but there's no

3     document that suggests he wasn't trading in securities.

4     And, in fact, if you look at the 2003 documents, they

5     suggest the opposite.  If you look at Giblin Exhibit F, it

6     says that Harley, quote, "receives trade tickets, and the

7     portfolio is also independently priced with the exception of

8     the over-the-counter options," and it also says there is

9     subsequently a further reconciliation as the trade tickets

10    come in.  Sounds like they think they're trading.

11             If you look at Giblin Exhibit G, it talks about

12    Harley's investment strategy.  And it says Harley has

13    changed from investing 100 percent in treasury bills to

14    investing in 50 S&P stocks hedged by synthetic

15    (indiscernible) and that has, quote, "changed the risk

16    profile."

17             Clearly, the person writing this thinks that this

18    trading is happening, and that's why the risk profile has

19    changed.

20             And the other thing that's striking about these

21    documents is that they also -- the same people writing them

22    recommended that Fortis consider pitching to become the

23    custodian.  Who pitches to become a custodian of a Ponzi

24    scheme or a fraudster or anything like that?  No one.  It's

25    not economically rational.  That's why there is no document

1    that says we think he's not actually doing trades.  It just

2    doesn't exist.

3           A couple other points I'd like to make on good

4    faith -- good faith.  They mention a few third parties.

5    They mention MeesPierson, Cadogan, Fortis Multi-Management.

6    I don't have those documents because they're third parties,

7    and the Trustee declined to give them to me for this hearing

8    when I asked.  But based on what they -- how they described

9    them in the complaint, we know that all of these entities

10   just had access to the same red flags that have been found

11   numerous times did not satisfy willful blindness.

12          So if you look at the complaint, the way they

13   structure it is Paragraph 159 talks about the Cadogan

14   concerns, A, B, C, D, all these different red flags.  And

15   then Paragraph 160 says, quote, "Cadogan's list looks

16   substantially the same as the Mees memo.  Fortis employees'

17   concerns articulated in connection with Harley, and Fortis

18   Multi-Management's observations and questions."  So we know

19   whatever those documents are, it's all the same thing you

20   can find in 159.  And nothing in that list is a belief that

21   there's a Ponzi scheme.  Nothing in that list says he's not

22   actually trading.  So these are just the same red flags that

23   already covered in BNP, for example.

24          The other thing I'd say about all this, these

25   third parties, is what they allege is that these concerns

Page 44

1    filtered up to FMM, which is on the other side of the

2    business from the defendants here.

3              THE COURT:  Can I decide what -- what you're

4    really talking about is imputation.  Can I decide that on

5    motion to dismiss?

6              MR. HARRIS:  There certainly are cases that we

7    cite where it is decided on a motion to dismiss.  But I --

8    even before you get to imputation, there's another point I

9    wanted to make, which is if you look at what FMM -- so these

10   all bubble up to FMM.  Great.  I don't know what those

11   documents say, but I do know how FMM took them.  And that's

12   because if you look at Paragraph 156, it tells us.  It says

13   that FMM stopped investing in Rye because of, quote,

14   "concerns with counterparty risk," and they explain that

15   means concerns that (indiscernible) counterparties like

16   Goldman would go bankrupt, "cost of leverage, liquidity."

17   You can also look at Paraph 141 where they again explain

18   what counterparty risk means.  It means that BLMIS was so

19   big it was exposed to risk if its counterparties like Lehman

20   failed.

21              So that's what FMM was concerned about and why it

22   stopped doing business.  It was concerned about counterparty

23   risk, cost of leverage, liquidity.  So whatever percolated

24   up to FMM, it's not a concern that BLMIS was a Ponzi scheme

25   or there wasn't engaging in trades.  It was other reasons.

1          On imputation, to answer your question, yes.

2    There certainly are lots of cases that we cite and where you

3    -- Courts have decided there's no agency as a matter of law

4    on a motion to dismiss based on the allegations.  Here, the

5    only thing that they allege that ties us is they allege --

6    well, first they say that we are part of the same global

7    risk management evaluation.  And therefore, the inference is

8    that they must share their concerns with us.  That is just

9    like in BNP where Your Honor held that complaint does not

10   allege facts supporting the inference that the knowledge

11   garnered on one side was shared with the other.

12          And, in fact, the actual facts here show that it

13   wasn't because if you look at our documents, the credit memo

14   from November, the January -- November 2006, the January

15   diligence, none of them mention FMM.  None of them mention

16   any concerns from them.  And, in fact, the credit memo --

17   that's Giblin Exhibit E -- talks about Tremont being a new

18   relationship.  That's on Page 2 of it.

19          So it's not only that there's no facts alleged,

20   but what they do allege suggests that there was no sharing

21   of concerns.

22          THE COURT:  Can I consider all of these documents

23   in connection with the motion to dismiss?  I assume I can

24   consider the swap because that's the underlying -- that's

25   one of the underlying claims, the principle claims.  But,

Page 46

1    for instance, you've attached as Exhibit a Fortis's annual

2    review for 2005.  I don't recall them relying on that.

3            MR. HARRIS:  Your Honor, all the documents we

4    attached were cited in their complaint.

5            THE COURT:  In the original complaint?

6            MR. HARRIS:  Some were in the original.  Some were

7    in the amended.

8            THE COURT:  All right.  I'll --

9            MR. HARRIS:  And they, you know, agreed that we

10   can -- they're fair game.  So, yes.  They are -- they all

11   can be considered.

12           Just a couple other points I wanted to make on

13   good faith, Your Honor.  The -- really the last point I

14   wanted to make on it is the standard here, whether it's

15   knowledge of the Ponzi scheme or knowledge of some other

16   fraud, it's not a suspicion.  It is high probability.

17           THE COURT:  High probability.  I use suspicion as

18   a shorthand.

19           MR. HARRIS:  Well, the Global-Tech case tells us

20   what that means.  It means, quote, "you can almost be said

21   to have actually known the critical facts." Almost actually

22   known.  And then the Supreme Court tells us that's more than

23   recklessness, which is a substantial and unjustified risk.

24   And they -- it then tells us certainly more than negligence,

25   which is just that you should've known.  Okay.

1          What is it -- taking everything they -- all the

2     inferences they drew -- draw as true, what do they allege?

3     They allege negligence.  They say that -- this is on Page 2

4     of their reply brief.  They say the same thing on Page 5.

5     Fortis acquires subjective belief Madoff might not be

6     trading and could be misappropriating customers' assets.

7     That is negligence.  And counsel just said the same thing

8     today.  She said they believe that -- we had a belief that

9     they might not be trading and didn't have custody of the

10    assets.  Nowhere is there even an assertion that we had a

11    high probability that we could almost be said to have

12    actually known that there was -- whether it's the Ponzi

13    scheme fraud or some other fraud.

14          Second point I'd like to turn to is the diligence,

15    turning a blind eye.  So, as Your Honor noted, and they

16    don't dispute, we did extensive diligence both in 2003 and

17    2004.  And then we did more in 2006 and 2007.  2006, we met

18    with Madoff, or with BLMIS, asked our questions, got

19    answers.  We also got trade tickets and reconciled and

20    confirmed, and then we did further diligence on Tremont

21    itself, and we did diligence on its controls and its ability

22    to manage the Madoff relationship.  We did all of that

23    diligence in -- up -- leading up to the 2007 decision.  So

24    it's simply not true to suggest we turned a blind eye.  We

25    did the exact opposite of that.

Page 48

```
 1              In terms of the two things that they do point to,

 2     to suggest are turning a blind eye, which is the transfer of

 3     administration of Harley from Bahamas to Cayman and then the

 4     deal protection devices, they are confusing or conflating

 5     avoiding risk with avoiding knowledge.  Neither of those two

 6     things have anything to do with avoiding knowledge.  So if

 7     you look at the transfer back in 2003, they say it was

 8     trigged by these new Bahamas statutes.  But as we explained,

 9     and they don't deny, those statutes had nothing to do with

10     obtaining knowledge.  There was no duty to investigate or

11     verify the trades were being executed in the new statute.

12     It didn't impose any duty to verify the conduct.  And, in

13     fact, it decreased the deputy in some instances.

14              We pointed that out, and they don't -- they don't

15     deny that.  What they say is, well, that doesn't matter.  It

16     doesn't matter what the statute actually says.  What matters

17     is what do the people think?  Okay.  Well, then look at the

18     documents that they cite.  The Giblin declaration Exhibit F,

19     that is the documents where they say talks about what our

20     concerns were, and those concerns were about liability.

21     Nothing about them says anything about a duty to investigate

22     BLMIS.

23              So the transfer didn't result in and wasn't

24     triggered by any desire to avoid learning.  It was a desire

25     to minima our economic risk, which is not surprising.
```

1          The other thing they point to is the deal

2     mechanism in the swap transaction.  Again, none of those are

3     about avoiding knowledge.  They are about avoiding our

4     economic risk.  They are not unusual.  As Your Honor has

5     pointed out, they are normal indemnification techniques.

6          The other thing we got was a most-favored nation

7     clause, which again is not usual.  That happened to then

8     drag along specific fraud-related items that a different

9     party, RBS, had negotiated, but we didn't request them.

10    And, in fact, we did the original swap transaction without

11    having them.  So those are not evidence at all that we are

12    turning a blind eye or even were aware there was fraud.

13         The other thing I would like to turn to now, just

14    quickly, is value because we argue that we provided value.

15    That's the other prong.  There were two sets of transfers

16    here.  One was related to collateral, and they don't deny

17    that we provided value in exchange for collateral.  And it's

18    not surprising because we gave -- we gave exactly what

19    Tremont wanted, which was we gave them this enormous

20    leverage return.  They do challenge that we provide value on

21    the second thing, which is the $30 million redemption, which

22    Judge Rakoff already found was triggered by Tremont reducing

23    the size of the swap.

24         Well, we did provide -- and we provided value in

25    two ways.  We gave up a stock, and that has two different

Page 50

1    forms of value.  One is the stock itself has value.  Now,

2    they say, well, it's a bankrupt entity.  Therefore, it has

3    no value.  That's just not true.  Companies in bankruptcy,

4    their stock has value because it has option value.  You

5    never know what's going to happen.  and that's why there's

6    several cases, and Your Honor cited them in BNP, explaining

7    specific to the 550(b) context by giving up stock in a

8    bankrupt company, you can add value.

9           The second kind of value is by giving up the

10   stock, we gave up the litigation claims against Tremont and

11   Rye that are associated with that.  And that's a second form

12   of value.  It's similar to this --

13           THE COURT:  I understand (indiscernible) anything

14   like that.

15           MR. HARRIS:  Well, Your Honor, I'll -- let me

16   explain what happened on those because actually --

17           THE COURT:  It's not in the complaint.

18           MR. HARRIS:  Well, it is.  Both of these are

19   conceded in the complaint.  Let me -- let me show you where.

20           THE COURT:  I know the complaint refers to them as

21   redemption, as a redemption.

22           MR. HARRIS:  That's right.  They concede they're

23   redemptions, but they also concede the two value points I

24   just made.  So let me -- let me tell you where.  The first

25   is that they admit that the Broad Market shares ended up

Page 51

1   having value.  Where did they admit that?  Well, they admit

2   that in the Tremont settlement, the Trustee gave Broad a

3   $1.6 billion claim plus its share of a $800 million

4   (indiscernible) claim.

5           So we know -- no surprise -- that Broad in fact

6   has a lot of -- is going to have a lot of assets, and those

7   shares will have value that will flow from Broad.  That's

8   the first prong.  Just like many bankrupt entities, there

9   may still be value for the shareholders, and they admit

10  that.  One place you can look at that is Reply Brief Page

11  29.  They concede that this settlement occurred, and they

12  granted billions of dollars of claims to Broad, the entity

13  whose shares we gave up.

14          The second thing they also concede is these

15  litigation claims.  So --

16          THE COURT:  Where's that in the reply brief?

17          MR. HARRIS:  That's in Paragraph 217.  Because

18  what happened, which they concede is that there was a

19  settlement between the Rye shareholders and Tremont of

20  litigation claims, and these resulted in hundreds of

21  millions of dollars being paid by Tremont, and they

22  calculate our share of that would've been several hundred

23  million dollars.

24          So there's two different forms of value, and

25  they're both conceded in the complaint.  Broad itself will

1    have money to distribute, and we got money from Tremont, and

2    so we gave up the portion of it that was associated with the

3    $30 million claims.

4              The last point I'd make on --

5              THE COURT:  I don't understand that.  You got

6    dollar for dollar for your $30 million of investment.

7    You're not getting dollar for dollar for the money you left

8    in the fund.

9              MR. HARRIS:  Well, what they're sign is our shares

10   were worthless, right.  550(b) doesn't ask whether you gave

11   reasonably (indiscernible) value.  It says did you give any

12   value, value (indiscernible).

13             THE COURT:  Right.

14             MR. HARRIS:  They're sign the shares we gave up

15   were worth zero.  And I'm saying no.  If I'd kept them, I

16   would've gotten money from Broad.

17             THE COURT:  Right.

18             MR. HARRIS:  And I would've gotten money from

19   Tremont.  And there's evidence in the complaint that

20   supports both of those.

21             If Your Honor has any other questions -- if not,

22   I'll let my colleague speak about the other defense.

23             THE COURT:  Sure.

24             MR. MALLEN:  Good morning, Your Honor.

25             THE COURT:  Good morning.

1          MR. MALLEN:  Kevin Mallen with Latham & Watkins

2     for the ABN AMRO defendants, and I'd like to speak a little

3     bit first about the 546(g) defense and then a little bit on

4     depletion of the estate defense.

5          THE COURT:  Okay.

6          MR. MALLEN:  So on 546(g), we just would like to

7     make the point that we do still advance our argument that

8     the 235.5 million collateral is covered by Section 546(g).

9     And --

10          THE COURT:  I thought Judge Rakoff said it wasn't.

11          MR. MALLEN:  Well, Judge Rakoff said it wasn't

12     because we had advanced in our prior briefing only that

13     Fortis -- that it was the swap transaction or -- excuse me,

14     that the initial transfer was for the benefit of Fortis, but

15     we hadn't advanced the arguments that we now advance in our

16     current papers, which is that there are two other entities

17     that can satisfy the (indiscernible) entity requirement of

18     Section 546(g), one of them being Rye XL.  And the initial

19     transfer of the benefit of Rye XL because it allowed Rye XL

20     to obtain the leverage investment (indiscernible), and

21     that's something that Judge Rakoff recognized in the 546(g)

22     decision.  And then Rye XL is also a financial participant

23     because by entering into the over $700 million swap

24     transaction, it satisfied Section 546 -- or, excuse me, the

25     requirement for a financial participant to have a gross

Page 54

1    (indiscernible) market position of at least $100 million

2    within 15 months of petition date.

3              We also put forward that (indiscernible) would

4    also be a financial participant for the purposes of 546(g)

5    with the initial transfer and (indiscernible) Tremont

6    complaint, which was --

7              THE COURT:  But didn't Judge Rakoff say that it

8    was for the benefit of Tremont, and Tremont was not a -- or

9    implicitly was not a financial participant?

10             MR. MALLEN:  But we didn't --

11             THE COURT:  Why --

12             MR. MALLEN:  I don't belle we advanced that

13   argument in our papers at the time.

14             THE COURT:  Why not?

15             MR. MALLEN:  I don't believe it was addressed in

16   the (indiscernible).

17             THE COURT:  Was the argument limited to the

18   applicability of 524 -- 546(g)?

19             MR. MALLEN:  Excuse me, Your Honor?

20             THE COURT:  Was the argument or the issue before

21   Judge Rakoff -- because he withdrew the refence on a lot of

22   the issues --

23             MR. MALLEN:  Sure.

24             THE COURT:  -- if you look at the order, including

25   546(e), obviously.  Was the argument limited to the

Page 55

1      applicability of 546(g) before Judge Rakoff that triggered

2      this decision?

3              MR. MALLEN:  My understanding is that it was, Your

4      Honor.

5              THE COURT:  All right.  Is that -- is that the

6      Trustee's understand?

7              MS. GRIFFIN:  I don't -- I don't know in which way

8      you think it's limited.  I think the issue of 546(g) -- I

9      mean, you advanced an argument pursuant to --

10             THE COURT:  Did they -- well, the question -- did

11     they make an argument in that case that even if 546(g)

12     didn't apply, 546(e) did or something like that?

13             MS. GRIFFIN:  I don't --

14             THE COURT:  Okay.

15             MR. MALLEN:  We certainly advanced argument in

16     this case that 546(e) applies if 546(g) does not.

17             THE COURT:  Well, I don't know what the answer is,

18     but there seems to be some sort of agreement that both

19     apply.  So, I guess it doesn't matter.

20             MR. MALLEN:  Right.  And so, Your Honor, I would

21     point out that in the Trustee's reply brief, he does not

22     speak that the transfers in this case are covered by 546(g).

23     It doesn't -- the reply doesn't address at all whether or

24     not the 245.5 million collateral --

25             THE COURT:  But you got all your transfers within

1    two years.  What difference does it make?  It still comes

2    down to willful blindness.  I know there's an argument that

3    maybe they didn't plead that Tremont had actual knowledge,

4    but -- which they would have to plead if one of the safe

5    harbors applied.

6              MR. MALLEN:  Well, Your Honor, I understand Judge

7    Rakoff's decision in the 546(g) (indiscernible) that's not

8    the case that the actual knowledge exception to the safe

9    harbor only applies to Section 546(e), but not Section

10   546(g).

11             THE COURT:  I know that, but -- that's why I kept

12   asking the question.  I guess I haven't -- maybe I didn't

13   get an answer whether both applied.

14             MR. MALLEN:  Well --

15             THE COURT:  And if 546(g) doesn't protect the

16   transfer relating to the collateral transfer, 546(e) does.

17   Then they both apply.

18             MR. MALLEN:  Your Honor, we would say that they

19   both apply.  And I think from -- in our view -- perhaps

20   Section 546(g), if all the other requirements are meant, is

21   easier because we don't have to argue whether Tremont knew

22   that -- with respect to Madoff's fraud.

23             THE COURT:  Okay.

24             MR. MALLEN:  And so if we (indiscernible) that

25   understanding, there's not really any dispute that these

1    transfers are covered by Section 546(g) between the parties,

2    and if that's the case, then with respect to all the

3    transfers here, the claimants would be limited to actual

4    file and transfer within two years (indiscernible).

5             THE COURT:  Okay, but all the transfers were made

6    within two years.

7             MR. MALLEN:  Right.

8             THE COURT:  The initial transfers.  That's my

9    understanding.

10            MR. MALLEN:  Your Honor, I'm not sure it's clear

11   on the (indiscernible).

12            THE COURT:  Oh, I thought -- I thought I saw that

13   --

14            MR. MALLEN:  The subsequent transfers certainly

15   were all made within two years.

16            THE COURT:  Yeah.  Okay.  Fair enough.

17            MR. MALLEN:  I confess I'm not as familiar with

18   the initial transfers on the long sheet (indiscernible).

19            And so on this -- if I may, I'd like to move to

20   the depletion of the estate argument.

21            THE COURT:  Sure.

22            MR. MALLEN:  So independently, the Trustee can't

23   recover these transfers because they were circular transfers

24   that do not deplete the estate.  And importantly --

25            THE COURT:  What do you mean circular transfers?

Page 58

1           MR. MALLEN:  So the transfer started at Madoff

2    Securities.

3           THE COURT:  Right.

4           MR. MALLEN:  And it went around the horn to

5    Tremont, withdrew some money from Prime Fund with a goal of

6    shooting it to Rye XL so it could make its leveraging

7    investment in my client.  Then my client tripled it, went

8    back to Broad Market, and it went back to Madoff Securities.

9           THE COURT:  Where's the allegation that it was

10   reinvested in Madoff Securities, and who got -- and who got

11   the credit for that investment?  The Trustee has already

12   paid a settlement based on that investment.

13          MR. MALLEN:  So, Your Honor, in terms of that it

14   was invested in Madoff -- sorry.  You're asking what that

15   Broad -- (indiscernible).

16          THE COURT:  Well, your assumption is -- putting

17   aside the legal effect -- that the money, I guess, that

18   Fortis invested with -- I'll just say Tremont, which then

19   reinvested --

20          MR. MALLEN:  Into --

21          THE COURT:  Okay.  And where's the allegation of

22   that complaint?

23          MR. MALLEN:  Well, Your Honor, in --

24          THE COURT:  How do we know it wasn't used to pay

25   other redemptions?

Page 59

1            MR. MALLEN:  So specifically, in the original

2    complaint at Paragraph 119 -- you may remember this chart,

3    which many defendants in these cases have referenced -- the

4    Trustee created this chart which showed that in May 2008,

5    Prime Fund withdrew 475 million to impart -- provide the

6    defendants 125 million to upsize the swap transaction.

7            THE COURT:  But okay.  Let's assume you're right.

8            MR. MALLEN:  Sure.

9            THE COURT:  But then when the Trustee settles with

10   Prime Fund -- with Tremont, it's based on Tremont's net

11   equity claim, and Tremont is getting credit for its net

12   equity claim based on any investment that Tremont made in

13   BLMIS.  And then Trustee is paying out on that, so how is

14   that not a depletion of the estate?  If you had never

15   returned the money, the Trustee wouldn't be paying out that

16   money to Tremont.

17           MR. MALLEN:  Well, Your Honor, I think we're --

18   there -- we have -- there are two responses to this.  One is

19   looking at that this is a single integrated transaction and

20   looking at the cases like Adelphia.  They state that if

21   you're looking at this integrated transaction at the times

22   of -- time of the -- this circular transfer, those transfers

23   aren't filing conveyances if at that time the money -- or

24   they say it was not depleted at that time because the money

25   went around the horn and went back to the Debtor.

Page 60

1              And then the second point to be made is just that

2    we point out that Broad Market had a 1.6 billion customer

3    claim, was a big-time net loser.  They paid 1 billion back

4    into the estate but only received an 800 million claim, so

5    we think there's an inconsistent there were certain

6    subsequent transferees may have provided additional value

7    back to the estate, and so there may not have been

8    depletion.

9              THE COURT:  Okay.

10             MR. MALLEN:  No further questions.

11             THE COURT:  No. Ms. Griffin, what is your response

12   to this depletion argument?

13             MS. GRIFFIN:  I guess I'm confused, Your Honor.

14   It's -- the cases that talk about the round tripping, it's

15   usually where the debtor takes the money out and gives it to

16   somebody else who then passes it back in.  And what we're

17   talking about here is a situation where Tremont has on a

18   rolling basis has Fortis redeeming.  It has other people

19   coming in.  It replaces Citibank.  You know, it's -- this

20   defendant is not -- is not round-tripping anything with the

21   debtor.  It's taking its money out, and it's keeping it.

22   And the other defendants are doing the same.  So the fact

23   that other people come in, that's what the Ponzi is.

24             THE COURT:  Well, maybe the answer is that the

25   money that they invested is not the money that was taken

Page 61

1    out.

2          MS. GRIFFIN:  Correct.  That's what the Ponzi

3    scheme is, Your Honor.

4          You know, I guess -- very quickly.  I'm not going

5    to feed the dead horse on everything we've talked about

6    before, Your Honor, but all of the things that Mr. Harris

7    pointed to about they did due diligence, they reviewed the

8    trade tickets, reconstructed trade tickets, all of these did

9    not give the independent trade information that Buckley

10   wanted in 2003.  She wanted two independent streams to

11   verify.

12         All shoestrings about the excellent track record

13   of Madoff, Cadogan -- again, FMM's partner -- said at the

14   time, yeah, they had a great track record, but you couldn't

15   get any meaningful information.  So none of that diligence

16   works.

17         The fact that the Defendants didn't use the risk

18   of fraud language in their documents, if you look at the

19   Optimal decision, Your Honor, questions going to the

20   existence of the -- of the assets, whether or not there is

21   trades -- and, by the way, Buckley actually is the person.

22   Not all the documents that we cited to were actually

23   included by Defendants when we submitted them, and we

24   certainly -- I don't make it a practice to attach a ton of

25   things, but if you look at --

1              THE COURT:  I'll consider what you want me to

2      consider --

3              MS. GRIFFIN:  Sure.

4              THE COURT:  -- as long as it's --

5              MS. GRIFFIN:  Sure, Your Honor.

6              THE COURT:  -- you know, can be considered.  But I

7      can't go looking through --

8              MS. GRIFFIN:  No, no.  I --

9              THE COURT:  -- records hoping to find some gold

10     for you.

11             MS. GRIFFIN:  Okay.  If you look at Paragraph 1 --

12     oh -- 114.

13             THE COURT:  Of the complaint?

14             MS. GRIFFIN:  Yes.

15             THE COURT:  Let me just get there.

16             MS. GRIFFIN:  There's an email string in September

17     1, 2003.  And Your Honor thought that there were some

18     documents that say that they thought there was the

19     possibility of no securities trading.  This is the exact

20     paragraph I was talking about.

21             THE COURT:  Mh hmm.

22             MS. GRIFFIN:  I am still extremely uncomfortable

23     with giving financing to so-and-so and now possibly redacted

24     given their investment in Harley and the broker-dealer with

25     Madoff.  Before that option can be considered, we'll need

Page 63

1     some assurance in how the front and back office are

2     separated.  And if two separate streams of trade information

3     can be provided, that will allow independent reconciliation

4     of trades in Harley.  Without this, I do not support

5     financing.

6                 THE COURT:  Well, yeah, but that's a risk

7     analysis.  It's not -- it's not saying we don't think he's

8     trading securities.  It's just saying you can't confirm what

9     he's doing.

10                MS. GRIFFIN:  Your Honor --

11                THE COURT:  And I understand they might not want

12    to invest on that -- or participate on that basis.

13                MS. GRIFFIN:  They --

14                THE COURT:  But that's a far cry from saying I

15    think there's a high probability that he's not trading

16    securities or engaged in any other fraud.

17                MS. GRIFFIN:  On this basis, they suggested that

18    they should -- that they should get their client to try to

19    get another custodian appointed, that they -- that they

20    should cease providing administrator services.  One -- Roger

21    Hanson said if we cannot get the jurisdiction changed, we

22    have no choice but to resign.  We have no choice to resign

23    as the administrator.  Fortis Multi-Management is reported

24    as being nervous, apprehensive.  These words are words that

25    don't say, hey, we're worried that the pricing might be

1    wrong.  These are serious actions and reactions to a real

2    concern that they articulate -- Sue Novo.  If you go through

3    our complaint again, they are asking questions.  Does he

4    have custody of the assets?  Do we have information that can

5    verify trading is happening?  And the Optimal case says that

6    goes to the heart of the existence of the Ponzi scheme here.

7    That is Judge Scheindlin, and I think she's citing to the

8    (indiscernible) case as well.

9            So, Your Honor, with regard to one other question

10   with respect to whether the Bahamas law eliminated a duty,

11   Your Honor, I'm going to start with this is all a misdirect.

12   They litigate by hindsight here trying to create issues of

13   fact as opposed to looking at what the people at the time

14   thought was going on.

15           If you look at our allegations, it's the act, not

16   the regulations Defendants attach in there at declaration.

17   I can point you to the Bahamas's act if you want to.  We can

18   get into a whole legal debate about what the scope of the

19   act was and what it was.  But in the act, which we pulled up

20   again.  Because I thought it was irrelevant, I didn't deal

21   with it on reply.  But the act made it clear that in 2003,

22   the administrator -- it's not attached, Your Honor.  The

23   regs are attached to --

24           THE COURT:  Mh hmm.

25           MS. GRIFFIN:  -- that declaration.  I'll be happy

1    to submit the two sets of acts subsequently.

2            Again, Your Honor, this is a misdirect, and it's

3    not really relevant, but I want you to understand the act in

4    the 2003 made the administrator have to verify that the

5    licensing requirements continued to be met.  And those

6    licensing requirements now require that the fund verify its

7    custodians and its investment manager were fit improper.

8    And it was that -- that act is what prompted Sue Novo to say

9    -- this is her words.  We don't have to have a lawyer

10   debate.  What we think in 2019 doesn't matter.  She says in

11   Paragraph 105, all in all, if these funds still fall under

12   Bahamas Securities Commission for the present, then

13   irrespective of anything else, we need to be very careful in

14   that the responsibilities of the administrator are

15   (indiscernible) with someone of an overall responsibility

16   for the fund, responsibility to investors -- and I'll skip

17   to the end -- and I believe in the latest legislation

18   responsibility for the custodian.  Be very careful I believe

19   the legislation makes us responsible for Madoff.

20           That is evidence of how high probability of --

21   that they're not engaging in trades, Your Honor, that they

22   don't have custody --

23           THE COURT:  Why doesn't it mean they just can't

24   confirm the information?

25           MS. GRIFFIN:  That's not an option under the act.

Page 66

1        THE COURT:  Well, I don't know.  I --

2        MS. GRIFFIN:  They -- that's what she thinks.

3        THE COURT:  I don't know what the act says.  I

4   don't have any affidavits from experts on what the act says,

5   but you're telling me that it doesn't matter what the act

6   says, that I have to look at the concerns --

7        MS. GRIFFIN:  That it's --

8        THE COURT:  -- of the people.  And, you know, when

9   I read this, I get it.  They couldn't confirm that he was

10  the custodian.  They couldn't confirm some other things, but

11  that doesn't mean that they think he's not trading -- that

12  there's a high probability that he's not trading securities.

13  And even as counsel pointed out in your reply memo -- I'll

14  just get the language -- you're saying Fortis had a

15  subjective belief that Madoff might not be engaged in trades

16  and could be misappropriating customer assets.  That doesn't

17  sound like a high probability.

18        MS. GRIFFIN:  Your Honor, it gets repetitive when

19  you write a brief, but when you look at Paragraph 11 --

20        THE COURT:  That's what I'm reading.

21        MS. GRIFFIN:  No, I know.  But if you look at

22  Paragraph 11 of our complaint, this highly affirmative

23  action by Fortis not only demonstrates the high degree of

24  probably of fraud at BLMIS that they saw and that

25  demonstrates their willful blindness.  We have highly -- I

1    can go through and highlight the number of times we say that

2    there is a high probability of fraud and that he's not

3    trading or not custodian.

4              It -- the fact that I was loose on language in a

5    reply is definitely not what you should look at.  You should

6    look at the well-pleaded facts of our complaint.

7              THE COURT:  All right.

8              MS. GRIFFIN:  And I think, Your Honor, with that,

9    unless you have any further questions --

10             THE COURT:  No.  I'll reserve decision.  Thank you

11   very much.

12             MS. GRIFFIN:  Thank you.

13             (Whereupon these proceedings were concluded at

14   11:16 AM)

15

16

17

18

19

20

21

22

23

24

25

Page 68

1                     C E R T I F I C A T I O N

2

3     I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya
      Ledanski Hyde

      Digitally signed by Sonya Ledanski
      Hyde
      DN: cn=Sonya Ledanski Hyde, o, ou,
      email=digital@veritext.com, c=US
      Date: 2019.09.27 16:04:59 -04'00'

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:   September 27, 2019

[& - addressed]

| & |
| --- |

**&**   4:13 5:11,21
6:4,10 36:15 53:1

| 0 |
| --- |

**0.9**   40:15,15 41:6
**01701**   4:14
**08-01789**   1:3
**09-01239**   4:13

| 1 |
| --- |

**1**   60:3 62:11,17
**1.6**   51:3 60:2
**1.7**   40:17
**10**   12:24 31:5
**10-03800**   3:2 4:11
**10-04377**   2:12 4:5
**10-04658**   2:2 4:8
**10-05355**   1:9,14
4:1
**100**   31:21 42:13
54:1
**1000**   6:20
**10004**   3:15
**10017**   5:13
**10019**   6:6
**10022**   6:14
**10110**   5:24
**10111**   5:6
**105**   65:11
**10:19**   3:18
**11**   66:19,22
**1100**   7:3
**114**   62:12
**11501**   68:23
**119**   59:2
**11:16**   67:14
**12**   4:13 27:16
**125**   59:6
**141**   44:17
**15**   54:2
**156**   44:12
**159**   43:13,20

**160**   43:15
**1667**   6:20
**17th**   8:20
**1960s**   15:25

| 2 |
| --- |

**2**   40:22 45:18 47:3
**20006**   6:21
**2001**   15:22 16:1
17:21,22
**2003**   26:17 28:3
30:2 38:17 41:11
42:4 47:16 48:7
61:10 62:17 64:21
65:4
**2004**   28:10 41:11
47:17
**2005**   46:2
**2006**   28:9 39:8,24
45:14 47:17,17
**2007**   28:9 38:18
38:21,22 39:21
47:17,23
**2008**   28:20 30:10
59:4
**2009**   13:22,25
**2010**   18:6
**2012**   12:10,11,15
13:17,20
**2015**   14:5,10
**2017**   12:7,13,16
12:18 13:2 38:20
38:21
**2019**   3:17 65:10
68:25
**217**   51:17
**230**   26:12
**235**   34:3 35:4
**235.5**   53:8
**245.5**   55:24
**25**   3:17
**250**   6:5
**26th**   10:14,16

**27**   68:25
**29**   51:11

| 3 |
| --- |

**3**   11:7 40:22
**30**   49:21 52:3,6
**300**   68:22
**330**   68:21

| 4 |
| --- |

**4**   38:17
**425**   5:12
**45**   5:5
**470**   30:20
**475**   59:5

| 5 |
| --- |

**5**   31:5 39:7 47:4
**50**   42:14
**500**   5:23 24:23,25
40:11,21
**520**   32:6 34:20
**524**   35:9,10,19,19
54:18
**53rd**   6:12
**546**   20:23,24 32:7
32:13,16,17,23
33:18,18 34:2,20
35:21,22,23,25
36:19,23,23 37:2
37:4,6 53:3,6,8,18
53:21,24 54:4,18
54:25 55:1,8,11
55:12,16,16,22
56:7,9,10,15,16
56:20 57:1
**550**   32:10 36:16
50:7 52:10
**55th**   6:5

| 6 |
| --- |

**6**   27:16 40:14

| 7 |
| --- |

**7**   14:23

**700**   53:23
**703**   15:3
**77002**   7:4

| 8 |
| --- |

**800**   51:3 60:4
**811**   7:3
**885**   6:13

| a |
| --- |

**ability**   37:14
47:21
**abn**   1:18,20 4:1
6:11 20:2 36:15
53:2
**absolutely**   24:13
24:17
**access**   28:18
43:10
**accompanied**   14:2
17:1
**account**   14:13,15
14:18 15:3,6,14
15:16 17:23 40:2
**accounting**   9:2
**accounts**   18:18,21
**accurate**   68:4
**acquires**   47:5
**act**   23:15 24:4
30:2 64:15,17,19
64:19,21 65:3,8
65:25 66:3,4,5
**action**   66:23
**actions**   64:1
**activities**   31:14
**actor**   41:9
**acts**   26:19 65:1
**actual**   21:6 45:12
56:3,8 57:3
**add**   50:8
**additional**   60:6
**address**   36:16,17
37:20 55:23
**addressed**   54:15

adelphia 59:20
adjourn 10:15
administration
48:3
administrator
28:14 63:20,23
64:22 65:4,14
admit 18:24 50:25
51:1,1,9
admitted 18:23
adv 1:9,14 2:2,12
3:2 4:1,5,8,11,13
advance 53:7,15
advanced 53:12
53:15 54:12 55:9
55:15
advisory 16:9,11
16:20 17:5
affidavit 13:4,8
13:18 14:1
affidavits 14:3
66:4
affiliates 14:25
affirmative 66:22
agency 45:3
ago 12:25
agree 19:18 21:5
21:11,15 30:16
34:2 35:11
agreed 19:8,13,13
46:9
agreement 14:22
17:2,3 40:6,13
55:18
ahead 20:2 25:24
al 4:5
allegation 58:9,21
allegations 20:13
22:23 27:11,17
36:9 45:4 64:15
allege 22:20 27:19
30:24 38:16 41:3
43:25 45:5,5,10

45:20 47:2,3
alleged 22:23
45:19
alleging 17:16
allow 28:5 63:3
allowed 53:19
alternative 31:19
amend 4:3 20:12
amended 27:9
46:7
amount 27:25
amro 1:18,20 4:1
20:2 36:15 53:2
analysis 63:7
annexed 12:13
annual 46:1
answer 9:20 11:11
16:3 22:19 32:20
45:1 55:17 56:13
60:24
answers 29:21
47:19
anyway 38:11
apart 41:5
appear 19:1 21:7
appearing 7:9
applicability
54:18 55:1
application 39:24
applied 56:5,13
applies 4:13 32:17
37:8 55:16 56:9
apply 32:13,16
36:1,23,23 37:8,9
55:12,19 56:17,19
appointed 63:19
appointment
13:23
apprehensive
63:24
argent 18:1
argue 49:14 56:21

argument 13:14
13:17 17:9,22,24
19:15 20:15 32:24
33:17 35:25 37:12
38:3,12 53:7
54:13,17,20,25
55:9,11,15 56:2
57:20 60:12
arguments 27:18
38:4 53:15
article 11:7
articles 30:11
articulate 64:2
articulated 21:4
43:17
aside 58:17
asked 15:24 27:21
33:24 43:8 47:18
asking 22:1,13
24:8 27:14 33:25
37:8 56:12 58:14
64:3
assertion 47:10
assets 22:22 23:2
23:7 26:20 29:10
38:9 47:6,10 51:6
61:20 64:4 66:16
associate 31:13
associated 50:11
52:2
association 31:21
assume 13:22,25
45:23 59:7
assuming 11:11
assumption 58:16
assurance 63:1
attach 61:24
64:16
attached 46:1,4
64:22,23
attorney 5:22
6:11 14:22

attorneys 5:4 7:2
available 14:8
avellino 11:8
17:19,20
avenue 5:12,23
6:13
avoid 33:15 34:25
35:3,7 48:24
avoiding 48:5,5,6
49:3,3
aware 13:1 49:12

**b**

b 3:21 7:7 27:16
31:5 32:10 36:16
40:14 43:14 50:7
52:10
back 9:11 17:7
41:11 48:7 58:8,8
59:25 60:3,7,16
63:1
bad 40:24
bahamas 26:24
27:1 28:7 48:3,8
64:10 65:12
bahamas's 64:17
bakerhostetler
5:3 7:1
bank 1:18,19 4:2
15:14,16 17:22
banking 15:2
bankrupt 44:16
50:2,8 51:8
bankruptcy 1:1
3:13,23 50:3
barlett 5:11
based 11:8,25
13:13 16:20 18:6
18:19,22 24:19
40:5 43:8 45:4
58:12 59:10,12
bases 21:25
basically 10:13
20:16 37:12

**basis** 35:14 40:2
  60:18 63:12,17
**bates** 12:13,14
**behalf** 11:5 39:7
**belief** 39:10 43:20
  47:5,8 66:15
**believe** 18:4,6,15
  23:25 35:24 36:8
  39:19 41:24 47:8
  54:15 65:17,18
**believed** 39:15
  40:3
**belle** 54:12
**bench** 8:12
**benefit** 23:9 24:24
  25:4 31:18 33:2
  34:13 37:19 53:14
  53:19 54:8
**benefits** 30:4,15
**bermuda** 26:23
  26:25
**bernard** 1:6,12
  2:5,6,15 14:23,24
**bernstein** 3:22
**best** 31:3
**big** 19:14 41:2,6
  44:19 60:3
**billion** 31:21 51:3
  60:2,3
**billions** 51:12
**bills** 42:13
**bit** 53:3,3
**black** 28:17
**blind** 26:16 29:5
  29:19,24 30:2
  31:9,25 38:14
  47:15,24 48:2
  49:12
**blinded** 21:16
  30:22
**blindness** 20:14
  21:21,24 26:18
  31:6 32:10 36:9

36:11 43:11 56:2
  66:25
**blmis** 14:6 20:21
  33:11 34:14 39:10
  39:19 44:18,24
  47:18 48:22 59:13
  66:24
**blown** 9:7
**bmp** 40:17
**bnp** 20:18 40:16
  43:23 45:9 50:6
**board** 29:11,15
**bother** 10:19
**bowling** 3:14
**box** 28:17 29:13
**boys** 16:21
**brenda** 28:3
**brief** 10:11 31:4
  47:4 51:10,16
  55:21 66:19
**briefing** 40:8
  53:12
**brings** 17:7
**broad** 9:19 25:17
  26:13 33:12 50:25
  51:2,5,7,12,25
  52:16 58:8,15
  60:2
**broker** 18:25
  62:24
**brokerage** 40:2
**brown** 5:9,17
**bubble** 44:10
**buckley** 28:3,11
  30:1 61:9,21
**built** 25:22
**bullet** 32:1
**burden** 18:3
  19:19
**business** 15:25
  16:6,11,20,22,25
  17:4,5 38:6 44:2
  44:22

**buying** 41:2

**c**

**c** 5:1 8:1 39:4
  43:14 68:1,1
**cadogan** 28:16,20
  43:5,13 61:13
**cadogan's** 43:15
**calculate** 51:22
**callback** 14:8
**callbacks** 17:14
**caraballo** 12:7,12
  13:2 14:10
**careful** 65:13,18
**carl** 6:8
**carol** 2:9,20 4:5
**case** 1:3,9 2:2,12
  3:2 4:1,5,8,11
  10:9 18:21 19:14
  19:18 20:22,24
  22:8,25 23:21
  30:18 31:3,5
  32:23 40:16,17
  46:19 55:11,16,22
  56:8 57:2 64:5,8
**caselaw** 36:11
**cases** 18:5 22:17
  23:17 31:6 37:23
  44:6 45:2 50:6
  59:3,20 60:14
**cayman** 48:3
**cease** 63:20
**central** 29:15
**certain** 12:4 60:5
**certainly** 16:13
  25:21 44:6 45:2
  46:24 55:15 57:14
  61:24
**certification**
  12:19
**certifications**
  12:21
**certified** 68:3

**chaitman** 10:25
  11:2,4,4,5,20 12:4
  12:20 13:1,7,10
  13:21 14:7,14,17
  15:7,11,13,21,23
  16:3,19 17:6,11
  17:18 18:2
**challenge** 49:20
**chance** 40:22 41:5
**change** 28:7
**changed** 42:13,15
  42:19 63:21
**characterization**
  31:9
**chart** 59:2,4
**chase** 12:16 13:24
  16:8 40:3
**check** 29:13
**chelsea** 5:19
**cherished** 31:14
**cherry** 23:18
**choice** 63:22,22
**chris** 36:14
**christopher** 6:17
**circuit** 18:11 24:2
  36:11
**circular** 57:23,25
  59:22
**circumstances**
  33:3
**circumvent** 19:9
**citation** 20:24
**cite** 20:18 27:8
  30:9 39:20,23
  41:12 44:7 45:2
  48:18
**cited** 20:22 31:4
  41:17 46:4 50:6
  61:22
**citibank** 60:19
**citing** 22:11 64:7
**claim** 11:12,15
  51:3,4 59:11,12

60:3,4
**claimants** 57:3
**claims** 45:25,25
50:10 51:12,15,20
52:3
**clause** 49:7
**clear** 10:11 18:14
19:15 27:24,25
38:20,23 40:2
57:10 64:21
**clearly** 16:9 18:19
18:21 19:4 42:17
**clerk** 8:2,5
**client** 58:7,7
63:18
**closed** 34:13
**collage** 36:17
**collateral** 24:24
26:2,5 32:12
34:10,12,24 35:5
35:5,18 36:1
49:16,17 53:8
55:24 56:16
**colleague** 37:11
52:22
**collectively** 15:1
**come** 9:10 42:10
60:23
**comes** 56:1
**coming** 60:19
**commission** 65:12
**committees** 29:15
**companies** 50:3
**company** 50:8
**complaint** 27:9
29:1 43:9,12 45:9
46:4,5 50:17,19
50:20 51:25 52:19
54:6 58:22 59:2
62:13 64:3 66:22
67:6
**complaints** 11:6
27:12,18,19

**complete** 9:7,8
**concede** 50:22,23
51:11,14,18
**conceded** 50:19
51:25
**concern** 23:13
29:3,16 44:24
64:2
**concerned** 24:20
26:18 27:7 29:10
38:5 44:21,22
**concerns** 32:9
43:14,17,25 44:14
44:15 45:8,16,21
48:20,20 66:6
**conclude** 11:25
35:18 36:23
**concluded** 38:23
67:13
**conclusion** 39:1,6
**conclusions** 18:16
**concrete** 9:23
17:17
**conduct** 48:12
**conference** 4:13
8:7 10:6,15
**confess** 57:17
**confirm** 63:8
65:24 66:9,10
**confirmation**
29:25 32:3
**confirmations**
28:15
**confirmed** 47:20
**confirms** 28:10
**conflating** 31:17
48:4
**confused** 60:13
**confusing** 48:4
**confusion** 32:10
**congressional**
30:12

**connection** 18:25
19:21 34:10 43:17
45:23
**consciously** 31:20
**consider** 27:11
35:22 42:22 45:22
45:24 62:1,2
**considered** 25:8,9
46:11 62:6,25
**consistent** 36:10
**consistently** 39:9
**consolidated** 2:5
**constitute** 21:6,18
**constitutional**
17:13,16
**constructive**
32:15
**contain** 14:3
**contend** 12:8
**contest** 19:1
**contested** 18:24
**context** 50:7
**continue** 30:2
32:2
**continued** 65:5
**continuing** 15:2
30:3 31:13
**contract** 19:1
**contrary** 30:14
**control** 18:20
**controls** 47:21
**conveyances**
59:23
**copies** 39:25
**copy** 13:11,12
**corporate** 8:17
**corporation** 6:19
**correct** 24:3 35:2
61:2
**cost** 44:16,23
**could've** 12:24
**counsel** 8:17
20:10 42:2 47:7

66:13
**counter** 42:8
**counterparties**
44:15,19
**counterparty**
44:14,18,22
**country** 68:21
**couple** 40:7 41:10
43:3 46:12
**course** 13:24
26:22
**court** 1:1 3:13 8:3
8:6,14,24 9:4,8,16
10:2,4,13,18,24
11:1,3,11,24 12:9
12:13,17,22 13:6
13:8,14 14:5,12
14:16,19 15:9,12
15:20,22 16:2,15
16:24 17:7,15,20
18:3,4,12,14 19:5
19:9,17,24 20:5,8
20:17,19 21:2,3,4
21:10,13,20 22:1
22:3,6,8,13,15
23:1,5,16,21,23
24:7,14,16,23
25:14,16,20 26:4
26:7,11,22,25
27:3,11,14,16,23
28:8,23 29:4,7,19
29:24 30:16 32:5
32:9,21 33:7,11
33:14,25 34:2,6,8
34:9,18,25 35:3
35:16,18,22 36:3
36:5,12,16,22
37:3,7,10,16 38:3
38:21 39:2,5
41:18,21 42:1
44:3 45:22 46:5,8
46:17,22 50:13,17
50:20 51:16 52:5

52:13,17,23,25
53:5,10 54:7,11
54:14,17,20,24
55:5,10,14,17,25
56:11,15,23 57:5
57:8,12,16,21,25
58:3,9,16,21,24
59:7,9 60:9,11,24
62:1,4,6,9,13,15
62:21 63:6,11,14
64:24 65:23 66:1
66:3,8,20 67:7,10
**court's** 11:8 21:10
**courts** 45:3
**covered** 43:23
53:8 55:22 57:1
**crashes** 41:8
**create** 64:12
**created** 25:9 59:4
**credible** 16:25
40:18
**credit** 29:15 39:24
45:13,16 58:11
59:11
**cremona** 7:10
**criminal** 21:24
**crisis** 30:11
**critical** 46:21
**cry** 63:14
**culpable** 24:4
**curious** 32:21
**current** 53:16
**custodial** 1:20,21
13:8,18 14:1,3
**custodian** 12:24
13:4 26:19 42:23
42:23 63:19 65:18
66:10 67:3
**custodians** 65:7
**custody** 22:22
23:1,4 26:20
29:10 38:9 47:9
64:4 65:22

**customer** 19:2
28:6 60:2 66:16
**customers** 16:9
19:4 47:6
**cut** 40:3

**d**

**d** 8:1 39:21 43:14
**d.c.** 6:21
**daily** 35:13 40:2
**data** 14:9
**date** 8:9 54:2
68:25
**david** 7:13
**davis** 8:19 11:2,4
**days** 39:23
**dead** 61:5
**deal** 26:7,11 48:4
49:1 64:20
**dealer** 18:25
62:24
**dealt** 17:21
**dean** 18:13
**debate** 64:18
65:10
**debtor** 1:7 18:20
19:6,7,12,12,20
59:25 60:15,21
**deception** 18:9
**decide** 11:17,18
12:1 19:17,21
44:3,4
**decided** 28:20
44:7 45:3
**decision** 20:19,23
32:7,25 34:6 37:2
47:23 53:22 55:2
56:7 61:19 67:10
**decisions** 11:8
**declaration** 13:2
13:18 14:10 39:4
39:21,24 48:18
64:16,25

**declarations** 12:7
**declined** 43:7
**decreased** 48:13
**defendant** 2:10
6:11 21:5 24:18
31:10 60:20
**defendant's** 20:14
24:19 33:17 35:25
**defendants** 1:23
2:24 3:10 8:17,19
14:9 20:25 21:9
21:16 22:11,20
27:25 31:7 32:24
33:4 34:13 36:15
44:2 53:2 59:3,6
60:22 61:17,23
64:16
**defense** 36:17
52:22 53:3,4
**deferred** 14:22
17:2,3
**definitely** 67:5
**definition** 37:18
**degree** 66:23
**deliberate** 18:6
24:4 27:7,10
**deliberately** 23:15
31:8
**delivery** 35:4
**demonstrates**
66:23,25
**deniability** 31:15
**deny** 37:15 48:9
48:15 49:16
**depending** 21:18
**deplete** 57:24
**depleted** 59:24
**depletion** 53:4
57:20 59:14 60:8
60:12
**deposition** 15:24
**deputy** 48:13

**describe** 28:17
**described** 43:8
**describing** 36:19
**designed** 13:19
**desire** 48:24,24
**desk** 20:4
**determination**
21:13
**determined** 11:22
**deutsch** 5:21
**developed** 21:24
**devices** 48:4
**difference** 11:16
22:15 33:24 37:1
37:7 56:1
**differences** 9:1
**different** 8:21
32:5 33:25 35:16
43:14 49:8,25
51:24
**difficult** 22:19
**dilemma** 28:17
**diligence** 27:20
28:1,9,24 29:8,14
29:17 38:18,19,19
39:15 45:15 47:14
47:16,20,21,23
61:7,15
**diminution** 36:18
**direct** 35:25
**directly** 35:14
**directors** 29:11
**discussion** 32:9
**dismiss** 4:6,9 11:6
44:5,7 45:4,23
**dispute** 41:14
47:16 56:25
**disregard** 31:5,7
31:19
**distinction** 35:12
**distribute** 52:1
**district** 1:2

**document**  15:10
  15:15 41:16 42:3
  42:25
**documents**  12:4
  12:12,15,23 13:15
  13:17,19,22,24
  19:25 39:18 40:13
  41:12,21 42:4,21
  43:6,19 44:11
  45:13,22 46:3
  48:18,19 61:18,22
  62:18
**doing**  16:9 23:14
  23:14 24:1 27:9
  39:14 43:1 44:22
  60:22 63:9
**dollar**  52:6,6,7,7
**dollars**  51:12,21
  51:23
**dominion**  18:20
**double**  28:12
  36:20,22
**drag**  49:8
**draw**  47:2
**drew**  47:2
**dubinsky**  16:24
**dubious**  21:8
**due**  27:19 28:1,8,8
  28:23 29:8,13,17
  31:16 61:7
**duty**  48:10,12,21
  64:10

**e**

**e**  3:21,21 5:1,1,15
  5:19 8:1,1 14:9
  20:23,24 32:17
  33:18 35:23,25
  36:20,23 37:4
  39:25 45:17 54:25
  55:12,16 56:9,16
  68:1
**earlier**  27:12,17
  27:19

**earning**  40:22
**easier**  35:6 56:21
**economic**  40:18
  40:25 41:9 48:25
  49:4
**economically**
  42:25
**ecro**  3:25
**effect**  58:17
**effectively**  39:9,13
**element**  31:18
**eliminated**  64:10
**elizabeth**  7:7
**email**  62:16
**emails**  27:8
**employees**  22:20
  24:20 43:16
**ended**  8:9 9:9,11
  50:25
**engaged**  63:16
  66:15
**engaging**  41:20
  44:25 65:21
**enhanced**  40:25
**enormous**  30:18
  49:19
**entered**  26:16
**entering**  53:23
**enterprise**  22:7
**entire**  20:15 21:23
**entities**  43:9 51:8
  53:16
**entitled**  11:19
**entity**  50:2 51:12
  53:17
**equity**  59:11,12
**essential**  13:25
  30:1,1
**essentially**  30:19
**estate**  36:18 53:4
  57:20,24 59:14
  60:4,7

**et**  4:5
**evaluation**  45:7
**eventually**  40:22
**evidence**  11:21,25
  12:5,23 13:3,19
  14:17 15:10 16:21
  18:19,21,22 19:14
  49:11 52:19 65:20
**exact**  18:16 39:10
  47:25 62:19
**exactly**  14:7,7
  18:14 21:4 22:23
  24:1,13 49:18
**example**  12:6,7
  19:11 43:23
**excellent**  38:25
  61:12
**exception**  20:24
  42:7 56:8
**exchange**  49:17
**excluded**  13:16
**excuse**  53:13,24
  54:19
**executed**  39:7
  48:11
**executing**  39:20
  40:4
**exhibit**  39:4,21,25
  40:14 42:5,11
  45:17 46:1 48:18
**exhibited**  26:17
**exhibits**  14:20,21
**exist**  43:2
**existence**  61:20
  64:6
**expect**  38:24
**experts**  12:11
  66:4
**explain**  8:18
  37:11 44:14,17
  50:16
**explained**  31:3
  48:8

**explaining**  50:6
**explains**  31:23,24
**exposed**  26:3
  44:19
**exposing**  31:13
**exposure**  25:10
  38:24
**extend**  8:7
**extension**  8:9 9:9
  9:11 10:5
**extensive**  47:16
**extremely**  38:20
  62:22
**eye**  29:20,24 30:2
  31:25 38:14 47:15
  47:24 48:2 49:12
**eyes**  31:10

**f**

**f**  1:18,20 3:21
  42:5 48:18 68:1
**fact**  15:14 16:13
  17:1 18:7,15,23
  21:16 23:7 24:19
  30:10 31:8 42:4
  45:12,16 48:13
  49:10 51:5 60:22
  61:17 64:13 67:4
**facts**  17:3 21:18
  31:4,11 45:10,12
  45:19 46:21 67:6
**factually**  11:17,18
  38:15
**fail**  40:21
**failed**  17:9 44:20
**fair**  46:10 57:16
**fairfield**  3:8,8
  4:11 5:4,22 8:5,5
**faith**  20:20 21:7
  21:19 26:19 36:17
  40:8 41:11 43:4,4
  46:13
**fall**  41:5 65:11

familiar 57:17
far 63:14
favored 49:6
fee 41:6
feed 61:5
feeder 31:22
feel 18:10
fees 30:18 40:11
  40:12,14,16 41:7
fifth 5:23
file 57:4
filing 59:23
filtered 44:1
financial 30:11,13
  31:12,25 37:18
  53:22,25 54:4,9
financing 28:6
  62:23 63:5
find 43:20 62:9
findings 18:15
finds 34:9
finish 30:19
first 8:8 26:2
  32:18 45:6 50:24
  51:8 53:3
fischbach 31:3
fit 65:7
five 32:13
flags 43:10,14,22
fletcher 6:1
flow 51:7
fmm 28:20 44:1,9
  44:10,11,13,21,24
  45:15
fmm's 61:13
focus 25:23 32:24
focused 9:1 32:23
foerster 6:4
follow 8:21
foregoing 68:3
forget 34:15
form 50:11

formed 15:17,19
  15:22,24 16:1,5,7
forms 50:1 51:24
forth 36:8
fortis 1:18,20 7:2
  22:20 24:18 28:6
  28:10 42:22 43:5
  43:16,17 47:5
  53:13,14 58:18
  60:18 63:23 66:14
  66:23
fortis's 28:14 46:1
forward 54:3
found 16:24 29:20
  37:1 40:18 43:10
  49:22
fraud 16:12 21:17
  21:20,22 22:6,8
  22:16,16 23:6,6
  23:11,17,23 24:6
  24:9 38:1,1 41:13
  41:13,15,20 46:16
  47:13,13 49:8,12
  56:22 61:18 63:16
  66:24 67:2
fraudster 42:24
fraudulent 12:8
  22:5,7 31:14
  32:15
front 23:19 63:1
full 9:7
fund 1:18,21 25:9
  25:17,17 26:13
  31:22 33:12 34:15
  34:16 52:8 58:5
  59:5,10 65:6,16
funds 11:9 65:11
further 42:9
  47:20 60:10 67:9
futile 20:13

g

g 8:1 32:7,13,16
  32:23 33:18 34:2
  34:20 35:9,10,22
  36:19,23 37:2,6
  42:11 53:3,6,8,18
  53:21 54:4,18
  55:1,8,11,16,22
  56:7,10,15,20
  57:1
gains 25:13
gamble 41:1
game 30:17 46:10
garnered 45:11
generally 27:10
getting 23:4 29:25
  32:3 36:3 41:7
  52:7 59:11
giblin 39:3,21,24
  40:13 42:5,11
  45:17 48:18
gibson 39:3
give 8:8 9:9,9,11
  10:5,8 24:24 28:2
  36:25 43:7 52:11
  61:9
given 30:12 62:24
gives 60:15
giving 50:7,9
  62:23
glad 24:16 27:21
global 45:6 46:19
go 15:18 18:10
  19:15,25 20:2
  44:16 62:7 64:2
  67:1
goal 58:5
goes 11:15 17:12
  21:14 26:9 64:6
going 9:14,24
  15:18 16:4 26:12
  29:12 32:6 36:16
  37:21 41:5,6 50:5

51:6 61:4,19
  64:11,14
gold 62:9
goldman 44:16
good 8:3,4,6 10:25
  11:1 20:9,20 21:7
  21:19 36:13,16
  40:7 41:10 43:3,4
  46:13 52:24,25
gotten 52:16,18
government 15:5
  17:1
grant 31:22
granted 51:12
great 44:10 61:14
green 3:14
greenblatt 12:10
  12:10
greenblatt's 12:14
greenwich 3:8
  4:11
griffin 7:6 20:3,7
  20:9,10,18 21:3
  21:12,14,23 22:2
  22:5,7,10,14,18
  23:3,13,20,22,24
  24:12,15,17 25:2
  25:15,18,21 26:6
  26:8,15,24 27:2,6
  27:13,15,21,24
  28:10,25 29:6,9
  29:23,25 31:1
  32:8,18,22 33:9
  33:13,21 34:1,5,7
  34:17,22 35:2,11
  35:17,21,24 36:4
  36:7 38:4 55:7,13
  60:11,13 61:2
  62:3,5,8,11,14,16
  62:22 63:10,13,17
  64:25 65:25 66:2
  66:7,18,21 67:8
  67:12

**gross** 53:25
**grounds** 11:7
**group** 3:8 4:12
**guarantee** 28:13
**guess** 23:24 26:13
  32:14 33:12 34:15
  36:7 38:12 55:19
  56:12 58:17 60:13
  61:4

**h**

**h** 1:11 2:4 6:8
**half** 40:16,17
**hanson** 63:21
**happen** 41:7 50:5
**happened** 15:25
  49:7 50:16 51:18
**happening** 42:18
  64:5
**happy** 37:23
  64:25
**harbor** 32:13 34:3
  56:9
**harbored** 33:14
  33:18,18 34:20,23
  35:9,10,19,23
**harbors** 32:11
  33:20 56:5
**harley** 39:8 42:6
  42:12 43:17 48:3
  62:24 63:4
**harley's** 42:12
**harris** 6:17 36:14
  36:14,25 37:4,9
  37:11,17 38:15,22
  39:3,6 41:19,24
  42:2 44:6 46:3,6,9
  46:19 50:15,18,22
  51:17 52:9,14,18
  61:6
**hear** 23:11
**heard** 10:4 40:9
  40:11

**hearing** 4:1 43:7
**heart** 64:6
**hedge** 25:9,19
**hedged** 42:14
**held** 17:19 18:20
  30:3 33:22 34:4
  45:9
**helen** 11:2,4
**hey** 27:10 63:25
**high** 46:16,17
  47:11 63:15 65:20
  66:12,17,23 67:2
**highlight** 67:1
**highly** 66:22,25
**hindsight** 64:12
**history** 14:24
**hmm** 8:14,24 16:2
  33:13 62:21 64:24
**hold** 10:11
**hon** 3:22
**honor** 8:12,25
  9:12 10:10,17,22
  10:23,25 11:6
  18:13 19:23 20:3
  20:9,11,19 21:4
  21:15,23 22:10,25
  23:14,24 24:12,15
  24:17 25:2,6,21
  26:15 27:6,13,22
  28:25 29:9 30:8
  31:2,16 32:18
  34:5,22 35:11,24
  36:7,14 37:9,21
  37:22 38:15,23
  40:18 41:11,14,24
  45:9 46:3,13
  47:15 49:4 50:6
  50:15 52:21,24
  54:19 55:4,20
  56:6,18 57:10
  58:13,23 59:17
  60:13 61:3,6,19
  62:5,17 63:10

**hear** 23:11
**heard** 10:4 40:9
  40:11
64:9,11,22 65:2
  65:21 66:18 67:8
**honor's** 20:23
  40:10,20
**hope** 9:13,13,21
**hopefully** 9:22
**hoping** 9:25 62:9
**horn** 58:4 59:25
**horse** 61:5
**houston** 7:4
**how'd** 25:14,16
**huge** 31:17
**hundred** 51:22
**hundreds** 51:20
**hunt** 18:13,13
  19:8,13,23
**hyde** 4:25 68:3,8

**i**

**i.e.** 20:21
**identify** 12:24
**ignorance** 24:5
**ignorant** 31:8
**impacts** 18:8
**impart** 59:5
**implausible** 41:8
**implemented** 39:9
**implementing**
  39:11,13,16
**implicated** 16:15
  16:17
**implicitly** 54:9
**implies** 28:13
**important** 17:12
  18:10
**importantly**
  57:24
**impose** 48:12
**imposed** 26:25
  27:3
**impossible** 29:17
  38:7 39:12
**improper** 65:7

**imputation** 44:4,8
  45:1
**incentive** 40:18
**incentives** 30:13
**included** 12:15
  61:23
**including** 54:24
**inconceivable**
  41:8
**inconsistent** 60:5
**increased** 25:20
**incredible** 40:23
**indemnification**
  49:5
**independent**
  24:21 28:5,11,15
  29:2 61:9,10 63:3
**independently**
  42:7 57:22
**indicated** 19:14
**indicates** 39:8
**indiscernible**
  13:15 19:25 26:1
  26:14 36:21 39:2
  41:20 42:15 44:15
  50:13 51:4 52:11
  52:12 53:17,20
  54:1,3,5,16 56:7
  56:24 57:4,11,18
  58:15 64:8 65:15
**individual** 25:25
  26:1 40:1
**individually** 2:20
  2:21 11:10 19:11
**individuals** 30:12
**inference** 45:7,10
**inferences** 47:2
**information** 17:1
  28:4,19 61:9,15
  63:2 64:4 65:24
**initial** 8:16 33:7
  33:11,15,15 34:9
  34:11,16,18,25

35:3,7,8,13 36:24
37:5 53:14,18
54:5 57:8,18
**injury**  17:17,18
**insisted**  28:3
**instance**  46:1
**instances**  48:13
**institution**  30:15
31:25
**institutions**  30:10
30:13
**insulate**  16:10
**insurance**  25:8
**integrated**  59:19
59:21
**intent**  12:8 13:10
**intentionally**
40:20
**interim**  38:19
**internal**  39:20
**invest**  24:23,25
29:21 40:10 63:12
**invested**  21:9
30:24 40:20 58:14
58:18 60:25
**investigate**  48:10
48:21
**investing**  25:17
26:12 34:19 41:4
42:13,14 44:13
**investment**  1:6,12
2:6,15 14:25 16:8
16:11,20 17:5
28:17 30:17 42:12
52:6 53:20 58:7
58:11,12 59:12
62:24 65:7
**investor**  6:19 26:2
**investors**  25:23,25
65:16
**invited**  9:15
**involve**  9:14

**involved**  21:17
38:17,17
**ireland**  1:18,19,20
1:22 4:2
**irrelevant**  33:5,23
64:20
**irrespective**  65:13
**irving**  1:11 2:4,14
11:8
**issue**  11:22 18:14
19:16 29:13 36:19
37:25 54:20 55:8
**issued**  12:11
**issues**  8:22 9:2
10:1 11:21 17:21
18:16 19:21 54:22
64:12
**items**  49:8
**itinually**  34:15

**j**

**j**  5:8 7:13
**january**  38:20
45:14,14
**joint**  2:20,22
**jonathan**  3:25
**jpmorgan**  12:16
12:18 13:24 14:23
15:3 16:8
**jr**  6:8 7:11
**judge**  3:23 13:10
13:21 15:7,13,17
17:6,12 21:25
22:3 24:6 25:2,7
30:3,23 31:2,23
32:6,23 33:21
34:3 35:14 37:1
37:13 49:22 53:10
53:11,21 54:7,21
55:1 56:6 64:7
**judgment**  11:19
**july**  28:10
**jurisdiction**  4:6,9
11:7 18:3,4,8 27:4

63:21
**jurisdictional**
11:22
**jurisdictions**  28:7
30:5

**k**

**k**  1:18,20 6:20
**katz**  21:4 25:3,6
30:3 36:10
**kazanoff**  5:15
8:16 9:5,6,12,17
10:3,10,17,22
**keep**  11:3 24:8
25:12 35:19 41:7
**keeping**  60:21
**kelley**  6:23
**kept**  52:15 56:11
**kevin**  6:16 36:17
53:1
**key**  29:13
**kimba**  31:2,23
**kind**  21:17 23:11
50:9
**knew**  16:13,13
30:20 56:21
**know**  9:13,14,19
13:21 15:7 17:6
18:5 19:9 20:25
23:3 24:7 27:19
30:23 32:13,22
37:22 39:14 41:5
43:9,18 44:10,11
46:9 50:5,20 51:5
55:7,17 56:2,11
58:24 60:19 61:4
62:6 66:1,3,8,21
**knowing**  40:21
**knowingly**  21:9
30:24
**knowledge**  20:20
20:21 21:6,21
37:25 45:10 46:15
46:15 48:5,6,10

49:3 56:3,8
**known**  30:21,21
46:21,22,25 47:12

**l**

**l**  1:6,12 2:5,6,15
6:16 7:6 14:23,24
**lack**  4:6,9 20:20
21:7,18
**language**  32:25
33:10 61:18 66:14
67:4
**largest**  14:24
**latest**  65:17
**latham**  6:10 36:15
53:1
**law**  18:16 19:9
21:24 32:14 35:6
45:3 64:10
**lawyer**  65:9
**leading**  47:23
**learning**  48:24
**leave**  4:3 20:12
**led**  35:8
**ledanski**  4:25 68:3
68:8
**left**  52:7
**legal**  20:15,17
21:13 22:11 28:7
58:17 64:18 68:20
**legislation**  65:17
65:19
**legitimate**  16:22
**lehman**  44:19
**lender**  30:19
**letters**  16:14
**leverage**  44:16,23
49:20 53:20
**leveraging**  58:6
**levy**  7:11
**lexington**  5:12
**liability**  48:20
**liable**  26:18 30:6
32:14

**libor** 40:15,16,17
**licensing** 65:5,6
**limited** 1:19 54:17
  54:25 55:8 57:3
**line** 29:15
**liquidation** 1:12
  2:5,14
**liquidator** 9:15
**liquidity** 44:16,23
**list** 43:15,20,21
**listen** 9:21
**litigate** 64:12
**litigating** 18:5
**litigation** 50:10
  51:15,20
**little** 26:19 53:2,3
**llc** 1:6,13 2:6,16
  11:14,25 12:1
  14:18,25 15:5,17
  15:19,22,24 16:1
  16:5,7,7,18,21,23
  17:22,24,24 18:19
**llp** 5:11,21 6:10
  11:5
**loaning** 30:19
**loathe** 9:9
**loewenson** 6:8
**logic** 35:24
**logically** 11:22
  15:16
**long** 9:4 18:9
  19:15 20:5 28:18
  30:14 57:18 62:4
**look** 15:16 16:14
  18:2 19:17 20:23
  24:7 26:21 27:8
  27:17 32:25 33:10
  40:13 41:11 42:4
  42:5,11 43:12
  44:9,12,17 45:13
  48:7,17 51:10
  54:24 61:18,25
  62:11 64:15 66:6

66:19,21 67:5,6
**looking** 14:20
  30:4 59:19,20,21
  62:7 64:13
**looks** 43:15
**loose** 67:4
**lose** 12:1
**loser** 60:3
**lot** 13:15 27:19
  30:17 51:6,6
  54:21
**lots** 45:2
**lottery** 41:2

## m

**m** 3:22
**madoff** 1:6,12 2:5
  2:6,15 11:10
  14:23,24 15:1,1
  15:17 19:11,12
  21:17 22:21 23:1
  24:10 25:10 27:7
  28:14,17,21 38:6
  39:25 40:3 47:5
  47:18,22 58:1,8
  58:10,14 61:13
  62:25 65:19 66:15
**madoff's** 20:20
  21:6 26:19 28:12
  38:8 56:22
**maher** 5:21 6:2
**main** 7:3
**majority** 8:18
**making** 17:5
**mallen** 6:16 36:17
  52:24 53:1,1,6,11
  54:10,12,15,19,23
  55:3,15,20 56:6
  56:14,18,24 57:7
  57:10,14,17,22
  58:1,4,13,20,23
  59:1,8,17 60:10
**manage** 47:22

**management** 43:5
  45:7 63:23
**management's**
  43:18
**manager** 65:7
**managers** 30:17
**mandate** 39:8,11
  39:13,16
**market** 17:4
  25:17 26:13 33:12
  50:25 54:1 58:8
  60:2
**marketplace**
  31:25
**material** 18:7
**matter** 1:5 4:6,9
  15:14 18:18 24:3
  27:16 38:2 41:16
  45:3 48:15,16
  55:19 65:10 66:5
**matters** 48:16
**mccallum** 7:7
**mean** 9:6 11:15
  27:13,15 55:9
  57:25 65:23 66:11
**meaningful** 28:18
  28:19 61:15
**means** 36:20
  44:15,18,18 46:20
  46:20
**meant** 56:20
**mechanism** 49:2
**mediation** 8:10,23
  9:7,8,17,19,22
**mees** 43:16
**meespierson** 43:5
**meet** 20:14
**meeting** 8:16,19
  8:21
**memo** 38:19
  43:16 45:13,16
  66:13

**mens** 23:15
**mention** 41:12
  43:4,5 45:15,15
**merits** 11:12,15
  19:18
**met** 47:17 65:5
**mh** 8:14,24 16:2
  33:13 62:21 64:24
**microphone** 20:6
**million** 24:23,25
  26:12 30:20 34:3
  35:4 40:11,21,22
  49:21 51:3,23
  52:3,6 53:8,23
  54:1 55:24 59:5,6
  60:4
**millions** 51:21
**mimed** 25:18
**mind** 20:3 26:9
  32:11 37:5
**mindset** 33:5,22
**mineola** 68:23
**minima** 48:25
**minimize** 25:5,9
  25:12,14,16 30:5
**minimizing** 26:9
**miniscule** 40:15
**misappropriating**
  47:6 66:16
**misdirect** 64:11
  65:2
**misrepresentation**
  18:7
**modicum** 31:15
**mohan** 7:12
**molten's** 9:18
**money** 23:8 24:25
  26:3 29:22 52:1,1
  52:7,16,18 58:5
  58:17 59:15,16,23
  59:24 60:15,21,25
  60:25

**months** 54:2
**morning** 8:3,4,6
  10:25 11:1 20:9
  36:13 52:24,25
**morrison** 6:4
**motion** 4:3,6,9
  11:17 17:8 20:12
  27:17 44:5,7 45:4
  45:23
**motivated** 31:10
**motive** 31:7,17
  40:25
**move** 23:10 57:19
**moved** 11:6 26:21
  26:22 27:4
**mullarney** 5:19
**multi** 43:5,18
  63:23

**n**

**n** 5:1 8:1 68:1
**n.w.** 6:20
**narrow** 8:22 9:3
  10:1
**nathanael** 6:23
**nation** 49:6
**need** 9:10 13:8,9
  22:24 25:23 62:25
  65:13
**needed** 12:23 13:3
  32:4
**negligence** 46:24
  47:3,7
**negotiated** 49:9
**neither** 25:10 48:5
**nektalov** 24:2
**nelson** 2:9,20,21
  4:5,8 10:24
**nelsons** 11:5
**neophytes** 31:24
**nervous** 63:24
**net** 59:10,11 60:3
**never** 12:20 13:25
  16:4,20,21 18:24

25:8 29:1,2,12
  38:7,12 50:5
  59:14
**new** 1:2 3:15 5:6
  5:13,24 6:6,14
  45:17 48:8,11
**nicholas** 7:10
**non** 17:16 31:24
**normal** 49:5
**nos** 4:13
**noted** 37:13 47:15
**notified** 16:6
**notify** 16:7,8
**november** 10:7,14
  10:16 39:24 45:14
  45:14
**novo** 64:2 65:8
**number** 11:20
  13:3 37:22 40:20
  67:1
**numbers** 12:13,14
**numerous** 43:11
**nutshell** 32:22
**ny** 3:15 5:6,13,24
  6:6,14 68:23

**o**

**o** 3:21 8:1 68:1
**objective** 28:14
**observations**
  43:18
**obtain** 28:15
  53:20
**obtaining** 48:10
**obviously** 15:8,18
  54:25
**occur** 39:12
**occurred** 33:6
  51:11
**october** 8:20
**odd** 33:19
**offered** 14:21 15:9
**office** 63:1

**oh** 19:25 57:12
  62:12
**okay** 9:16 10:2,9
  10:15,21 18:12
  20:7,8 21:20
  24:14,15 27:23
  29:4,19 34:1
  35:17,17 36:4,7
  37:10,16 39:5
  46:25 48:17 53:5
  55:14 56:23 57:5
  57:16 58:21 59:7
  60:9 62:11
**old** 68:21
**open** 8:9 9:9,11
  31:10
**opined** 12:12
**opportunity**
  31:17
**opposed** 35:7
  64:13
**opposite** 39:10
  42:5 47:25
**opposition** 10:12
**optimal** 22:24
  61:19 64:5
**option** 50:4 62:25
  65:25
**options** 42:8
**order** 10:7,18
  16:9 35:1 54:24
**oren** 5:8
**organization**
  28:21
**original** 12:21
  13:5 17:7 46:5,6
  49:10 59:1
**overall** 65:15
**owen** 8:11
**owns** 14:12,14,18
  18:18 19:10

**p**

**p** 5:1,1 8:1
**page** 39:6,7 40:14
  45:18 47:3,4
  51:10
**paid** 51:21 58:12
  60:3
**papers** 30:10 36:8
  53:16 54:13
**paragraph** 14:23
  43:13,15 44:12
  51:17 59:2 62:11
  62:20 65:11 66:19
  66:22
**paraph** 44:17
**paribas** 20:18
**part** 12:5 15:3,3
  19:18 26:4,4,8
  45:6
**participant** 37:18
  53:22,25 54:4,9
**participants** 33:4
  33:22
**participate** 31:13
  63:12
**particular** 8:25
  41:15
**parties** 8:13,21
  21:11 43:4,6,25
  57:1
**partner** 61:13
**party** 15:7 49:9
**passes** 60:16
**patrick** 7:12
**pay** 23:8 26:12
  58:24
**paying** 59:13,15
**payments** 34:10
  34:12,12,23
**people** 18:9 23:6
  29:1,14 30:9
  38:17 42:21 48:17
  60:18,23 64:13

66:8
**percent** 40:15,15
40:17 41:6 42:13
**percolated** 44:23
**performance**
26:13
**period** 13:23
38:18 39:19 40:5
**perpetrating**
16:11
**person** 41:17
42:17 61:21
**personal** 17:23
19:7 23:8 30:13
31:18
**peter** 5:15
**petition** 54:2
**phenomenon**
28:18
**picard** 1:11 2:4,14
3:4 4:1,5,8,11 7:2
10:24 11:9 20:2
**picking** 23:18
**pitches** 42:23
**pitching** 42:22
**place** 24:22 31:11
33:23 51:10
**plaintiff** 1:15 2:7
2:18 3:6 21:11
**planning** 37:21
**plausibility** 21:8
**plausible** 31:10
**plausibly** 30:24
**plaza** 5:5
**plead** 24:10,13,18
31:2 56:3,4
**pleaded** 67:6
**pleading** 21:8
31:19
**please** 8:2 11:3
**pled** 20:13 36:9
**plus** 51:3

**point** 10:7 18:17
23:3,10 25:6,11
37:24 44:8 46:13
47:14 48:1 49:1
52:4 53:7 55:21
60:1,2 64:17
**pointed** 25:7
35:14 48:14 49:5
61:7 66:13
**points** 8:8 40:7
41:10 43:3 46:12
50:23
**ponzi** 14:24 20:21
21:1,9,21 22:16
25:1,8 30:22,25
32:2 38:1 39:11
40:21 41:4,15
42:23 43:21 44:24
46:15 47:12 60:23
61:2 64:6
**portfolio** 39:22
42:7
**portion** 52:2
**position** 31:12
54:1
**positions** 28:13,16
**possibility** 62:19
**possible** 18:11
28:12,15 32:16
**possibly** 62:23
**post** 17:21 18:15
**practice** 61:24
**pre** 17:21
**predated** 14:10
**predecessor** 14:25
**preference** 35:6
**premised** 20:15
**present** 65:12
**presented** 18:23
**preserve** 37:14
**presumably** 35:9
**pretty** 19:15

**preview** 37:1
**priced** 42:7
**pricing** 63:25
**prime** 1:18,21
34:15,16 58:5
59:5,10
**principle** 45:25
**prior** 28:24 53:12
**private** 25:17
**pro** 1:14 4:13
**probability** 46:16
46:17 47:11 63:15
65:20 66:12,17
67:2
**probably** 13:22
66:24
**proceeding** 15:8
**proceedings**
67:13 68:4
**procured** 12:8
**procuring** 25:12
**produced** 12:12
12:16,17,21,24
13:15,17,22,25
**production** 12:21
13:5 14:2
**productions** 14:8
**profile** 42:16,18
**profitable** 31:12
31:21
**profits** 25:4,4
**progressing** 10:9
**project** 30:7
**prompted** 65:8
**prong** 49:15 51:8
**proof** 19:19 32:1
**property** 19:2,3,7
19:10
**proprietary** 17:4
**proprietorship**
16:16
**prosecution** 14:22
17:2,3

**protect** 16:10
56:15
**protection** 6:19
16:5 19:3 32:1
48:4
**protections** 25:22
25:24
**prove** 11:13,14
17:9 18:3
**proved** 11:12
**provide** 13:12
28:6,22 49:20,24
59:5
**provided** 13:11
19:3 28:5,14
49:14,17,24 60:6
63:3
**provides** 10:20
39:25
**providing** 63:20
**provision** 36:1
**pull** 24:25
**pulled** 64:19
**purportedly**
12:15
**purpose** 15:11
34:19
**purposes** 32:20
54:4
**pursuant** 55:9
**put** 12:5,9 13:3
25:24 36:8 54:3
**putting** 10:11
58:16

| q |
| --- |

**question** 9:20
14:12,14,19 17:8
17:21 22:1,19
23:24 24:8 31:8
32:5,20 33:25
35:16 36:24 40:10
45:1 55:10 56:12
64:9

**questioning**  41:22
**questions**  9:18
   36:18 43:18 47:18
   52:21 60:10 61:19
   64:3 67:9
**quickly**  18:11
   49:14 61:4
**quote**  28:12 34:12
   34:13 38:25 39:7
   41:17 42:6,15
   43:15 44:13 46:20

**r**

**r**  3:21 5:1,9 8:1
   68:1
**raise**  18:16
**raised**  11:21
**raising**  37:25
**rakoff**  21:25 22:3
   24:6 25:2 30:3,23
   33:21 34:4 35:14
   37:1,13 49:22
   53:10,11,21 54:7
   54:21 55:1
**rakoff's**  32:6 56:7
**ran**  14:23
**rational**  41:9
   42:25
**rbs**  49:9
**rea**  23:15
**reach**  11:23
**reaction**  27:7
**reactions**  64:1
**read**  15:12 32:6
   34:6,21,22 66:9
**reading**  66:20
**ready**  9:6 19:15
**real**  64:1
**realized**  16:3
**really**  18:18 24:10
   38:7,9,13 44:4
   46:13 56:25 65:3
**reap**  30:3

**reaping**  31:23
**reason**  13:16
   35:25
**reasonably**  52:11
**reasons**  36:8
   44:25
**recall**  46:2
**receive**  38:10
**received**  18:24
   19:2 39:23 60:4
**receives**  42:6
**recipient**  37:5
**reckless**  31:5,6,19
**recklessness**
   46:23
**recognized**  15:18
   53:21
**recollection**  42:1
**recommended**
   42:22
**reconciled**  47:19
**reconciliation**
   28:5 42:9 63:3
**reconstruct**  39:22
**reconstructed**
   61:8
**record**  12:6 13:2
   28:18 61:12,14
   68:4
**records**  13:4 62:9
**recover**  11:9 19:5
   33:15 35:1 57:23
**recovery**  36:20,22
**red**  43:10,14,22
**redacted**  62:23
**redeem**  28:20
**redeeming**  60:18
**redemption**  34:9
   34:11,23 35:8
   49:21 50:21,21
**redemptions**  23:8
   35:15 50:23 58:25

**reducing**  49:22
**refence**  54:21
**refer**  14:6
**referenced**  59:3
**refers**  20:20 50:20
**regard**  64:9
**regina**  7:6 20:9
**regs**  64:23
**regulations**  27:4
   64:16
**reinvested**  58:10
   58:19
**related**  49:8,16
**relating**  22:16
   35:4 56:16
**relationship**  15:2
   15:4 45:18 47:22
**relevant**  37:6
   38:18 40:5 65:3
**relying**  46:2
**remaining**  31:8
**remember**  59:2
**rendering**  31:9
**repeat**  34:5
**repetitive**  66:18
**replaces**  60:19
**reply**  10:11 40:9
   47:4 51:10,16
   55:21,23 64:21
   66:13 67:5
**report**  12:9,11,14
**reported**  29:14
   63:23
**representation**
   14:3
**representing**  8:18
**reputation**  38:25
**request**  8:7 49:9
**requests**  15:15
**require**  65:6
**requirement**
   53:17,25

**requirements**
   27:5 56:20 65:5,6
**requires**  31:17
**reserve**  67:10
**resign**  63:22,22
**resolve**  9:25 11:17
   11:18 29:12
**resolved**  24:16
**resonance**  39:20
**respect**  31:16
   32:12 33:3 56:22
   57:2 64:10
**respectfully**  32:19
**respond**  9:5
**response**  40:9,11
   40:24 60:11
**responses**  59:18
**responsibilities**
   65:14
**responsibility**
   65:15,16,18
**responsible**  65:19
**result**  39:15,17
   48:23
**resulted**  38:19
   51:20
**results**  9:23
**return**  49:20
**returned**  59:15
**review**  13:13 39:7
   46:2
**reviewed**  61:7
**richard**  7:11
**right**  12:3,20
   14:16 19:24 23:20
   23:22 24:13 25:20
   29:6 31:1 33:9
   34:17 36:5,16
   46:8 50:22 52:10
   52:13,17 55:5,20
   57:7 58:3 59:7
   67:7

rigorous  27:3,5
risk  25:5,12,14,16
  25:18,20 26:9
  30:5 40:10 41:12
  41:15 42:15,18
  44:14,18,19,23
  45:7 46:23 48:5
  48:25 49:4 61:17
  63:6
risky  30:14 41:1,2
road  68:21
rockefeller  5:5
roger  63:20
role  28:12
rolling  60:18
room  14:9
round  60:14,20
rudnick  5:17
rules  19:10
run  16:21
running  16:16,18
  16:19,22,22 23:19
rye  44:13 50:11
  51:19 53:18,19,19
  53:22 58:6

s

s  5:1 6:23 8:1
s&p  42:14
safe  32:11,13
  33:14,18,18,19
  34:3,20,23 35:9,9
  35:19,23 56:4,8
satisfactory  29:21
satisfied  53:24
satisfies  37:18
satisfy  28:1 29:18
  38:7,8,13 43:11
  53:17
saw  14:1,2,5
  57:12 66:24
saying  21:10
  22:10,12,24 23:11
  23:14 29:7 30:20

34:14 35:19 52:15
  63:7,8,14 66:14
says  14:23 15:1,12
  18:21 31:23,24
  39:22 42:6,8,12
  43:1,15,21 44:12
  48:16,21 52:11
  64:5 65:10 66:3,4
  66:6
schedule  8:8,20
  10:6
scheduled  8:6
scheduling  8:15
scheindlin  64:7
scheme  14:24
  20:21 21:1,6,9,21
  22:16 25:1 30:22
  30:25 32:2 38:1
  39:12 40:21 41:4
  41:15 42:24 43:21
  44:24 46:15 47:13
  61:3 64:6
scienter  31:18
scope  8:22 9:19
  64:18
seanna  5:9
seated  8:2
second  18:10 24:2
  28:2 34:24 47:14
  49:21 50:9,11
  51:14 60:1
secretiveness  38:8
section  53:8,18,24
  56:9,9,20 57:1
securities  1:6,13
  2:6,15 6:19 14:25
  15:1,2 19:1 20:22
  21:17 23:12,16
  24:11 31:3 41:23
  42:3 58:2,8,10
  62:19 63:8,16
  65:12 66:12

see  8:12 12:14
  19:21
sense  20:25
sentry  3:8 9:15
separate  19:22
  28:4 63:2
separated  63:2
september  3:17
  28:3 39:21 62:16
  68:25
serious  9:22 64:1
services  1:20,22
  63:20
session  9:22
set  8:9 36:10
sets  49:15 65:1
settlement  51:2
  51:11,19 58:12
settles  59:9
share  45:8 51:3
  51:22
shared  45:11
shareholders  51:9
  51:19
shares  50:25 51:7
  51:13 52:9,14
sharing  45:20
sheehan  7:13
sheet  57:18
shifting  30:5
shoestrings  61:12
shooting  58:6
short  25:4,4,12
  30:3
shorthand  46:18
should've  46:25
show  39:19 45:12
  50:19
showed  59:4
shred  14:17
side  44:1 45:11
sides  21:5,15

sign  39:18 52:9,14
signatures  10:20
significantly  9:25
  14:10
similar  50:12
simply  40:23
  47:24
simpson  5:11
single  59:19
sipa  2:5 19:3,5,12
situation  16:4
  31:12 41:3,16
  60:17
size  49:23
skin  30:17
skip  65:16
smb  1:3,9,14 2:2
  3:2 4:1,5,8,11
sole  16:16,19
solutions  1:19,21
  68:20
somebody  60:16
sons  16:6,10,10,15
sonya  4:25 68:3,8
sorry  13:7 25:15
  38:22 41:13 58:14
sort  24:6,9 28:23
  55:18
sought  19:2
sound  66:17
sounds  42:10
southern  1:2
speak  13:19 20:5
  52:22 53:2 55:22
specific  49:8 50:7
specifically  22:21
  24:1 59:1
speculative  17:16
spread  40:16
standard  20:14,15
  20:17 21:24 22:11
  37:21 46:14

standards 36:10
standing 11:9
  12:2 17:13,16,25
  19:19
stanley 2:21
start 8:9 64:11
started 58:1
state 19:9 26:9
  32:14 35:5 37:4
  59:20
stated 20:19
statement 17:2
states 1:1
status 10:8
statute 48:11,16
statutes 48:8,9
stayed 20:3
stipulation 10:19
stock 49:25 50:1,4
  50:7,10
stocks 42:14
stopped 44:13,22
stops 10:14
straits 40:25
strategy 40:4
  42:12
streams 24:21
  28:4 61:10 63:2
street 6:5,20 7:3
striking 42:20
string 62:16
strong 6:1
struck 33:19
structure 43:13
stuart 3:22
subject 4:6,9
subjective 47:5
  66:15
subjectively 24:3
submit 10:7,18
  65:1
submits 20:12

submitted 61:23
subsequent 33:1,2
  35:1 38:11 57:14
  60:6
subsequently 42:9
  65:1
substantial 46:23
substantially
  43:16
substantively 2:4
successfully 20:13
sue 64:2 65:8
sufficient 28:22
  29:17
suggest 9:24 31:6
  42:5 47:24 48:2
suggested 63:17
suggesting 31:4
suggests 13:2 42:3
  45:20
suing 17:13
suite 6:20 7:3
  68:22
sum 34:8
summer 9:3
support 63:4
supporting 45:10
supports 52:20
supreme 46:22
sure 11:4 22:2,14
  32:8 52:23 54:23
  57:10,21 59:8
  62:3,5
surprise 51:5
surprising 48:25
  49:18
suspect 24:1,4,5
suspected 21:22
  22:21 24:9,10,18
  25:1 38:5
suspects 41:19
suspicion 22:4,9
  46:16,17

suspicious 29:5
swap 26:5,16
  28:24 30:7 33:4,5
  33:23 34:3,10,19
  40:5,13 45:24
  49:2,10,23 53:13
  53:23 59:6
synthetic 42:14

**t**

t 68:1,1
take 9:4 12:7
  30:14 38:10,13
taken 60:25
takes 60:15
talk 23:18,18
  60:14
talked 61:5
talking 23:12 24:5
  33:7,9 34:8 44:4
  60:17 62:20
talks 42:11 43:13
  45:17 48:19
task 21:8
tech 46:19
techniques 49:5
telephonically 7:9
tell 37:20 40:12
  50:24
telling 23:6 66:5
tells 40:14 44:12
  46:19,22,24
tenant 2:21,22
term 25:4,4,13
  28:18 30:4,15
terminating 31:12
terms 9:6 48:1
  58:13
test 21:2,3
testified 15:17,20
  15:23 16:24
testimony 16:25
  30:12

thacher 5:11
thank 10:17,22,23
  18:12 19:23,24
  36:12,14 38:22
  67:10,12
thanks 10:21
thanksgiving
  10:15
theories 33:16
  35:5
theory 12:2 40:19
thing 29:3 32:19
  37:24 41:1 42:20
  43:19,24 45:5
  47:4,7 49:1,6,13
  49:21 51:14
things 13:3 25:7
  26:1 30:6 48:1,6
  61:6,25 66:10
think 8:20 9:1,4
  9:21,21,24 11:22
  12:6,17 14:5,11
  17:1 18:2,4,8,17
  24:9 30:7 31:16
  32:18,19,22 33:21
  33:23 39:13 42:10
  43:1 48:17 55:8,8
  56:19 59:17 60:5
  63:7,15 64:7
  65:10 66:11 67:8
thinking 30:4
thinks 42:17 66:2
third 6:12,13 26:2
  43:4,6,25
this'll 9:4
thought 25:3,5,11
  30:9 32:2 53:10
  57:12,12 62:17,18
  64:14,20
three 23:13 26:12
ticket 41:2
tickets 39:23 40:1
  42:6,9 47:19 61:8

61:8
tied 35:14
ties 45:5
time 9:10 13:5
  15:17,23 18:9
  19:3 22:21 23:25
  24:19 26:15 30:9
  38:18 39:19 40:5
  54:13 59:22,23,24
  60:3 61:14 64:13
times 26:12 43:11
  59:21 67:1
title 29:11
today 20:11 37:12
  47:8
ton 61:24
track 61:12,14
trade 39:23 40:1,1
  42:6,9 47:19 61:8
  61:8,9 63:2
trades 24:21 28:6
  28:13,16 39:7,12
  39:14,20 43:1
  44:25 48:11 61:21
  63:4 65:21 66:15
trading 16:22
  17:4 20:22 21:1
  22:22 23:12,16
  24:10,19 39:8,11
  39:16 40:4 41:22
  42:3,10,18 43:22
  47:6,9 62:19 63:8
  63:15 64:5 66:11
  66:12 67:3
training 29:12
transaction 28:24
  30:7 33:4,6 49:2
  49:10 53:13,24
  59:6,19,21
transactions
  30:14 34:11 41:1
transcribed 4:25

transcript 68:4
transfer 11:14
  15:14,15 17:10
  19:6,10,20 32:15
  32:17 33:1,8,11
  33:15,16,17 34:9
  34:14,18 35:1,4,5
  35:7,8,19,23
  36:24 37:5 48:2,7
  48:23 53:14,19
  54:5 56:16,16
  57:4 58:1 59:22
transferee 33:1,2
  34:16
transferees 60:6
transferred 11:10
transfers 12:1,2
  17:23,24,25 18:25
  19:4 34:11 35:1
  35:13 38:10,11,13
  49:15 55:22,25
  57:1,3,5,8,14,18
  57:23,23,25 59:22
transform 19:12
transparency
  28:22
treasury 42:13
treated 19:6,6
tremont 25:23
  26:1 34:18,19,23
  35:13 37:17,19
  45:17 47:20 49:19
  49:22 50:10 51:2
  51:19,21 52:1,19
  54:5,8,8 56:3,21
  58:5,18 59:10,11
  59:12,16 60:17
tremont's 59:10
trial 11:21 12:5
  12:22,25 13:9,12
  14:21 18:23
tried 10:9 15:19

trigged 48:8
triggered 29:3
  48:24 49:22 55:1
tripled 58:7
tripping 60:14,20
true 47:2,24 50:3
  68:4
trustee 1:11 2:4
  2:14 5:4 7:2 8:11
  11:13 12:9,20
  13:23 17:13 18:13
  20:10,12 21:7
  33:14 36:9 43:7
  51:2 57:22 58:11
  59:4,9,13,15
trustee's 4:3
  12:11 20:11 40:19
  55:6,21
truth 31:5,7
try 8:22 9:3 63:18
trying 8:20 10:3
  22:18,19 64:12
turn 29:19,24
  31:20,25 47:14
  49:13
turned 38:14
  47:24
turning 30:2
  47:15 48:2 49:12
two 8:8 19:4
  24:20 25:7,8 28:4
  32:11 33:19 39:22
  48:1,5 49:15,25
  49:25 50:23 51:24
  53:16 56:1 57:4,6
  57:15 59:18 61:10
  63:2 65:1
tx 7:4

**u**

u.s. 3:13,23 14:22
uncomfortable
  62:22

underlying 31:11
  45:24,25
understand 9:12
  11:24 13:14,16
  15:13 19:15 22:18
  33:16 37:7 50:13
  52:5 55:6 56:6
  63:11 65:3
understanding
  55:3 56:25 57:9
understands
  18:14
understood 36:25
undertake 21:8
united 1:1
unjustified 46:23
unreasonable
  9:24
untrue 38:16
unusual 49:4
unviable 28:19
unwillingness
  28:21
update 10:8
updated 28:8
upside 41:3,6
upsize 59:6
use 40:20 46:17
  61:17
usual 49:7
usually 60:15

**v**

v 1:16 2:8,19 3:7
  4:1,5,8,11 7:2
value 49:14,14,17
  49:20,24 50:1,1,3
  50:4,4,8,9,12,23
  51:1,7,9,24 52:11
  52:12,12 60:6
variety 33:16
verification 28:11
  29:2

**verify**  24:21 48:11
48:12 61:11 64:5
65:4,6
**veritext**  68:20
**versus**  10:24 20:2
**view**  56:19
**voice**  11:3

**w**

**w**  6:1
**want**  9:11 10:4
27:10 37:24 62:1
63:11 64:17 65:3
**wanted**  12:22
28:11 44:9 46:12
46:14 49:19 61:10
61:10
**warshavsky**  5:8
8:4,11,11,15,25
9:5 10:23
**washington**  6:21
**watkins**  6:10
36:15 53:1
**way**  30:8 34:22
38:6 43:12 55:7
61:21
**ways**  49:25
**we've**  8:21 9:2,14
11:6 12:9,13 18:5
36:8 61:5
**week**  13:12
**went**  58:4,7,8
59:25,25
**west**  6:5
**why'd**  24:23,24
**willful**  20:14
21:21,23 26:17
31:6 32:10 36:9
36:11 43:11 56:2
66:25
**willfully**  21:16
26:16 29:5 30:22
31:9

**william**  6:2
**willing**  29:21
**withdrew**  54:21
58:5 59:5
**wollmuth**  5:21
**wood**  31:2,24
**words**  11:13,16
23:17 40:19 63:24
63:24 65:9
**worked**  25:11
**working**  8:22 9:2
**works**  61:16
**worried**  63:25
**worth**  52:15
**worthless**  52:10
**would've**  13:11
14:1,2 51:22
52:16,18
**wrap**  36:6
**write**  66:19
**writing**  42:17,21
**written**  30:11
**wrong**  20:15,17
22:11 64:1
**wrote**  16:14 31:4

**x**

**x**  1:4,8,10,24 2:1,3
2:11,13,25 3:1,3
3:11
**xl**  53:18,19,19,22
58:6

**y**

**yeah**  10:13 26:6
27:2 34:1,6 35:17
37:3 57:16 61:14
63:6
**year**  9:23 10:6
19:4 40:22
**years**  12:25 56:1
57:4,6,15
**yields**  9:22
**york**  1:2 3:15 5:6
5:13,24 6:6,14

**z**

**zero**  52:15