# Exhibit 2

10-05286-smb   Doc 134   Filed 03/14/16   Entered 03/14/16 12:12:38   Main Document   Pg 2 of 42

08-01789-cgm   Doc 19164-2   Filed 11/22/19   Entered 11/22/19 13:48:03   Exhibit 2
3/14/2016 Memorandum Decision Regarding Motions to Dismiss the Trust   Pg 2 of 43

5UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

In re:                                              :
                                                    :
BERNARD L. MADOFF INVESTMENT        :       Case No. 08-99000 (SMB)
SECURITIES LLC,                                 :       Adv. Proc. No. 08-01789 (SMB)
                                                    :       SIPA LIQUIDATION
                              Debtor.          :

------------------------------------------------------------X

IRVING H. PICARD, Trustee for the Liquidation    :
of Bernard L. Madoff Investment Securities LLC, :
                                                    :
                              Plaintiff,         :
                                                    :       Adv. P. No. 10-05286 (SMB)
LEGACY CAPITAL LTD. and             :
KHRONOS LLC                                  :
                                                    :
                              Defendants.     :

------------------------------------------------------------X

## MEMORANDUM DECISION REGARDING MOTIONS
## TO DISMISS THE TRUSTEE'S AMENDED COMPLAINT

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
*Attorneys for Plaintiff, Irving H. Picard,*
  *Trustee for the Liquidation of*
  *Bernard L. Madoff Investment Securities LLC*
45 Rockefeller Plaza
New York, NY 10111

        David J. Sheehan, Esq.
        Oren J. Warshavsky, Esq.
        Jason S. Oliver, Esq.
              Of Counsel

STEVENS & LEE, P.C.
*Attorneys for Legacy Capital Ltd.*
485 Madison Avenue
New York, NY 10022

        Nicholas F. Kajon, Esq.
              Of Counsel

BINDER & SCHWARTZ LLP
*Attorneys for Khronos LLP*
28 West 44th Street-Suite 700
New York, NY 10036-4039

>   Eric B. Fisher, Esq.
>   Lindsay S. Bush, Esq.
>       Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Defendants Legacy Capital Ltd. ("Legacy") and Khronos LLC ("Khronos," and together

with Legacy, the "Defendants") have each moved to dismiss the Amended Complaint, dated July

2, 2015 (ECF Doc. # 112) filed by Irving H. Picard (the "Trustee"), the trustee of the liquidation

of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa, *et seq*. The Amended Complaint seeks to

avoid and recover approximately $213 million in initial transfers made to Legacy and

approximately $6.6 million in subsequent transfers made to Khronos. For the reasons that

follow, Legacy's motion to dismiss is granted except as to the portion of Count I seeking to

avoid and recover fictitious profits transferred to Legacy within two-years of the BLMIS filing

date, and Khronos' motion to dismiss is granted in its entirety.

## BACKGROUND

### A.    The Ponzi Scheme[1]

The background information is taken from the well-pleaded factual allegations of the

Amended Complaint and other information that the Court may consider on a motion to dismiss

for failure to state a claim. The allegations are sometimes at odds with the documents they

---

[1]    Some of the headings are derived from the Amended Complaint. They are descriptive only, and do not
necessarily imply the Court's views of the allegations.

10-09789-smb   Doc 134-2   Filed 03/14/16   Entered 03/14/16 22:42:58   Main Document
Pg 4 of 42

08-01789-cgm   Doc 19164-2   Filed 11/22/19   Entered 11/22/19 13:48:03   Exhibit 2
3/14/2016 Memorandum Decision Regarding Motions to Dismiss the Trust   Pg 4 of 43

purport to describe, and the content of the documents is examined in more detail later in this opinion.

Beginning in the 1990s, Madoff outwardly ascribed the consistent investment success of BLMIS' investment advisory business to the "split-strike conversion" ("SSC") investment strategy.  (¶ 20.)[2]  Madoff generally indicated that BLMIS would invest its investors' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100"), which was designed to correlate with the movement of the S&P 100.  (¶ 20.)  As a hedge, BLMIS would supposedly sell call options and buy put options on the S&P 100; this was commonly referred to as a "collar."  (¶ 20.)  Madoff claimed that he would carefully time purchases and sales to maximize value, and consequently, customer funds would intermittently be out of the market. During those times, Madoff claimed that the funds were invested in U.S. Treasury securities or mutual funds invested in treasury bills.  (¶ 22.)

None of this actually happened.  BLMIS never purchased or sold securities, and instead, used the money invested by customers to make distributions to other BLMIS customers.  (¶ 24.) On December 11, 2008 (the "Filing Date"), Madoff was arrested for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  (¶ 7.)  The Securities and Exchange Commission ("SEC") contemporaneously commenced an action in the United States District Court for the Southern District of New York, and that action was consolidated with an application by the Securities Investor Protection Corporation ("SIPC") alleging that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.  (¶¶ 7-8.)  District

---

[2]        The parenthetical notation "(¶ _ )" refers to paragraphs in the Amended Complaint.

3

Judge Stanton granted SIPC's application to appoint the Trustee and his counsel and remove the case to this Court.  (¶ 9.)

At a plea hearing on March 12, 2009, Madoff pleaded guilty to an eleven count criminal information, and admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (¶ 12.)

## B.    Defendants

Legacy is a British Virgin Islands corporation that functioned as a single purpose vehicle to invest in BLMIS.  (¶¶ 32-33.)  Jimmy Mayer controlled Legacy's BLMIS account, and his son, Rafael Mayer ("Rafael"), was an officer of Legacy.  (¶ 33.)

Khronos is a New York limited liability company co-founded by Rafael and David Mayer, both of whom serve as managing directors.  (¶¶ 30-31.)  Khronos provided accounting services to Legacy, and also acted as service providers to other funds that ultimately invested in Legacy, including Montpellier Resources Ltd. ("Montpellier").  (¶ 35.)

## C.    The Renaissance Report

Renaissance Technologies, LLC ("Renaissance") is a New York hedge fund management company, and Meritage Fund Ltd. ("Meritage") is an investment fund under its umbrella that invested in BLMIS through a swap agreement with HCH Capital Ltd. ("HCH"), one of Legacy's predecessors.  (¶¶ 1, 38-39.)  Meritage's investment activities were overseen by a committee (the "Meritage Committee"), which included Paul Broder, Peter Brown, Henry Laufer, Nathaniel Simons and James Simons.  (¶ 40.)  Rafael was also a member of the Meritage Committee.  (¶ 41.)

Renaissance became curious about BLMIS' consistent, positive returns.  In 2003, it
attempted to replicate BLMIS' SSC strategy utilizing BLMIS account statements provided by
Legacy and publically available information.  (¶¶ 45-46.)  The results were presented in a
document entitled "Madoff – Proposal," dated Oct. 6, 2003 (the "Renaissance Report"), which
was shared with the Meritage Committee, including Rafael.[3]  According to the Amended
Complaint, the Renaissance Report found that (i) the market could not support the options
volume Madoff purported to trade; (ii) a very high percentage of BLMIS' purported equity trades
were bought below the daily closing price and sold above the daily trading price; (iii)
Renaissance's simulation of Madoff's strategy put him in the market on days the account
statements showed he was out of the market; and (iv) Madoff's ability to trade billions of dollars
without leaving a footprint was a mystery.  (¶ 47.)

The Renaissance Report's findings sparked an email exchange among the members of the
Meritage Committee in which they expressed their disquiet regarding Meritage's BLMIS
investment.  (¶ 48.)  Nathaniel Simons initiated the email chain on November 13, 2003, stating
among other things:

> It's high season on money managers, and Madoff's head would
> look pretty good above Elliot Spitzer's mantle.  I propose that
> unless we can figure out a way to get comfortable with the
> regulatory tail risk in a hurry, we get out.  The risk-reward on this
> bet is not in our favor.

(¶ 50.)  Meritage Committee member Paul Broder wrote in a November 14, 2003 email, "[l]ike
background radiation my concern about Madoff has never really gone away . . . . I am in favour
of redemption."  (¶ 49.)  Meritage Committee member James Simons wrote the same day,

---

[3]      A copy of the Renaissance Report is annexed as Exhibit C to the

"[u]nless one of you can give a compelling reason to stay I will ask Nat[haniel Simons] to withdraw the funds next week."  (¶ 51.)

Meanwhile, Legacy retained Khronos to value Legacy's portfolio on a daily basis based on "end of day pricing" and "volume statistics."[4]  Khronos was also tasked with performing this historical valuation of trades dating back to January 1992, the time of the Mayers' original investment with BLMIS.[5]  (¶ 52.)

**D.    The Defendants Knew of Market Impossibilities and Indicia of Fraud**

*1.    Defendants Knew That BLMIS' Purported Options Trading Was Impossible*

The BLMIS account statements and trade confirmations showed that it traded S&P 100 call and put option contracts on the Chicago Board Options Exchange ("CBOE"), and also included a unique identifier CUSIP number that is assigned to the options traded on the CBOE and designated OEX options.  (¶ 57.)  Based on "prevailing wisdom," Renaissance assumed that BLMIS had $6 billion under management.  Using that assumption, the Renaissance Report noted that Madoff "would need approximately 133000 put or call contracts for the collar [and that d]aily volume figures for the exchange traded OEX options do not support anything like this trade size."  (¶ 58.)

In a December 11, 2003 email, Rafael identified BLMIS' options volume as an "open issue" that needed Madoff's explanation.  (¶ 59.)  Although the confirmations sent to Legacy

---

[4]    *See* "Accounting Services Agreement," a copy of which is annexed as Exhibit A to the *Fisher Declaration*.

[5]    The Amended Complaint alleges, "upon information and belief," that only Rafael and David Mayer had access to Legacy's account information, and their (Khronos') employees' access was restricted.  (¶ 52.)  The Trustee did not allege the source of his information and belief, and moreover, the Amended Complaint alleges that Legacy provided its monthly statements to Renaissance to conduct its investigation.  (¶ 46.)

6

indicated that trades were being made on CBOE, Rafael could only explain the volumes by

hypothesizing that BLMIS was trading options on the over-the-counter ("OTC") market.  (¶ 59.)

However, the Renaissance Report released two months earlier explained that trading OEX

options on the OTC market would be impossible because "the OTC market in OEX options is

not developed."  (¶ 61.)

Knowing that the OTC market could not support Madoff's volume, Meritage Committee

member Paul Broder helped Rafael draft a script of questions Khronos should ask Madoff in a

future meeting to clarify Madoff's options trading practices:

> First ask [Madoff how he would hedge out the other side of the
> trade.]  To which we strongly expect an answer that he does this
> OTC.  Then ask (in innocent amazement!):  So you can do this
> kind of volume on OEX OTC options?!?! … Gee, what kind of
> banks are big enough to [trade with you] (more animated
> amazement!!!)

(¶ 59.)  As to Madoff's timing of trades, Broder instructed Rafael to ask:

> We have noticed that the strike on the OTC options trade we do
> with you always seems to be close to the closing price of the
> underlying – is this for convenience purposes (try to look as
> though this is a really serious question).

> Does this mean that you execute your OTC trades (assuming this
> was his claim earlier) towards the end of the day (I really want to
> hear that the OTC counterparty does $15bln trades almost at the
> close.)

(¶ 60.)

In a November 21, 2003 email, which was not sent to Rafael, Broder estimated that

BLMIS had between $5 and $15 billion in assets under management, but even if Madoff traded

all of the options available on the exchange on any given day, he could only hedge a $750

million investment in equities.  (¶ 62.)  Broder also noted that Renaissance interviewed several

10-05287-smb  Doc 134-2  Filed 03/14/16  Entered 03/14/16 12:12:58  Exhibit 2
3/14/2016 Memorandum Decision Regarding Motions to Dismiss the Trust    Pg 9 of 43

08-01789-cgm   Doc 12164-2   Filed 11/22/19   Entered 11/22/19 13:48:03   Main Document
Pg 8 of 42

OTC options market makers and they confirmed that no significant S&P 100 options volume were traded over the counter.  (¶ 63.)  In addition, Broder questioned how a counterparty would enter into consistently unfavorable transactions, especially at the volumes Madoff purported to trade.  (¶ 64.)  Finally, none of the options trade confirmations sent to the Defendants identified counterparties to the options trades.  (¶ 65.)

Legacy's account statements and trade confirmations reflected that over 26% of the time, the options volume BLMIS reported for these accounts exceeded the total number of OEX options traded on the CBOE for contracts with the same purchase date, strike price, and expiration date.  (¶¶ 66-69.)

2.     *Defendants Knew That the Timing of Madoff's Trades Was Impossible*

The Amended Complaint alleges, upon information and belief, that Madoff represented that he was time-slicing (*i.e.*, entering the market for a particular stock at different times throughout a trading day) and that the prices reported on the account statements reflected the average price over the course of the day.  (¶ 72.)  The average price at which a security is traded through a trading day is measured by a metric called volume weighted average price, or "VWAP."  (¶ 73.)

The Renaissance Report examined BLMIS' purported equities trades and found that a high percentage of the purported equity purchases were bought below or at the daily closing price and sold above the daily closing price.  Meritage Committee member Henry Laufer, who supervised Renaissance's review of BLMIS, stated that Madoff's trade timing "was statistically almost impossible … if you were trading in an ordinary way."  (¶ 74.)  Rafael also noted that

Khronos had flagged "the timing of [Madoff's] trades" as an issue that Madoff had to explain. (¶ 75.)

Laufer later told the SEC that in 2003, during the time the Renaissance Report was prepared, "if you looked at [BLMIS'] monthly statements and looked at the executions of the stock side … the prices were just too good from any mode of execution that we were aware of that was legitimate." (¶¶ 76, 78.) Laufer also told the SEC that he "had no idea" how Madoff timed the liquidation of his positions during quarters when having no position was a good strategy. (¶ 77.)

Legacy's account statements and trade confirmations indicated that over the life of its BLMIS account 81.79% of 5,776 equity buys were below the VWAP and 76.27% of 5,315 equity sales were above the VWAP. (¶ 79.) The Defendants knew these trades were statistically impossible because Khronos had developed technology to track "pricing and volume statistics" including "VWAP", and used this technology to analyze the trades reported on BLMIS account statements dating back to 1992. (¶ 80.)

### 3.    *Defendants Were Aware of Madoff's Unusual Fee Structure*

BLMIS' fee structure differed from industry standards. (¶ 81.) Instead of charging the typical 1% to 2% management fee and a 10% to 20% performance fee, BLMIS only charged a trading commission of $.04 per share and $1 per option contract. (¶ 82.) However, the BLMIS trade confirmations sent to Khronos did not report BLMIS' commissions. In December 2003, Rafael asked: "1) How [Madoff] make[s] money from [Legacy] since he does not charge commissions? 2) Why bother with this? Why doesn't he go to conventional financing and keep more upside for him?" (¶ 84.) Meritage Committee member Nathaniel Simons also asked:

10-04357-smb    Doc 134-2    Filed 03/14/16    Entered 03/14/16 22:12:38    Main Document
                                    Pg 11 of 42

1:08-cv-01789-cgm    Doc 18164-2    Filed 11/22/19    Entered 11/22/19 13:48:03    Exhibit 2
3/14/2016 Memorandum Decision Regarding Motions to Dismiss the Trust    Pg 11 of 43

"[W]hy does [Madoff] let us make so much money? Why doesn't he capture that for himself?"
(¶ 85.)[6]

> 4.    *Defendants Knew That BLMIS' Enormous Trading Volume Never Impacted the Market*

Based on the amount the Defendants believed BLMIS managed (between $5-15 billion),
they understood that BLMIS purported to move billions of dollars into and out of the market
over the course of a few days multiple times every year.  (¶¶ 88-89.)  In December 2003, Rafael
expressed concerns about BLMIS' purported trading volume, and determined that they needed to
address with Madoff the "timing differences based on account size." (¶ 91.)  Broder urged
Rafael to "[a]sk—given the size of these trades how do you stop the market from noticing
them—doesn't the spike in volumes alert people to your trades?"

> 5.    *Defendants Knew That BLMIS' Rates of Return Were Impossible*

Based on Madoff's purported use of the SSC strategy, Legacy's returns should have
correlated to the S&P 100.  (¶ 94.)  Khronos screened investments "on a quantitative basis to
evaluate its overall fit with the portfolio on a risk, return and market correlation basis."  (¶ 95.)
The quantitative data Khronos analyzed indicated that from October 2000 to November 2008,
Legacy's annual returns with BLMIS averaged 11.32% with only four months of negative
returns during the ninety-eight month period, while the S&P 100 experienced forty-six months of
negative returns.  (¶ 96.)  Legacy's BLMIS account achieved positive returns even during market
downturns such as the "dot com" bubble bursting in 2000, the 2000-2002 bear market, and the

---

[6]    Simons was similarly curious about BLMIS' fee structure when compared to the "$100 million per year in
fees" made by a BLMIS feeder fund Fairfield Sentry "for doing absolutely nothing."  (¶ 87.)

recession of 2008. (¶ 97.) BLMIS evaded certain SEC reporting requirements by liquidating all investments at the end of each quarter and year-end. (¶ 99.)

### 6. *Defendants Knew BLMIS' Operations Lacked Transparency and Controls*

Madoff held positions at BLMIS that would normally be occupied by three separate entities: he was the investment advisor, custodian, and the broker-dealer. (¶ 102.) Renaissance estimated that BLMIS managed between $5 and $15 billion, but BLMIS' regulatory filings revealed that it lacked the number of employees needed to manage that amount. BLMIS reported that it had between one and five employees to perform its investment advisory functions including research. (¶ 103.) These concerns were highlighted in a November 13, 2003 email from Nathaniel Simons to Rafael:

> The point is that we don't know why [Madoff] does what he does we have no idea if there are conflicts in his business that could come to some regulator's attention. Throw in that his brother-in-law is his auditor and his son is also high up in the organization and you have the risk of some nasty allegations, the freezing of accounts, etc.

(¶ 105.)

### 7. *Defendants Were Aware That BLMIS Did Not Have a Capable Auditor*

Although it had billions under management, BLMIS was audited by Friehling & Horowitz, an accounting firm with only two accountants, one of whom was semi-retired and living in Florida, and located in a strip mall in Rockland County, New York. (¶ 106.) Nathaniel Simons' November 13, 2003 email, which Rafael received, reflected concerns over BLMIS' lack of a sufficiently independent auditor. The email restated the widespread rumor that Friehling & Horowitz was run by Madoff's brother-in-law. Although the rumor was wrong, the concern

10-04289-smb    Doc 134-2    Filed 03/14/16    Entered 03/14/16 22:12:38    Main Document
Pg 13 of 42

08-01789-cgm    Doc 19164-2    Filed 11/22/19    Entered 11/22/19 13:48:03    Exhibit 2
3/14/2016 Memorandum Decision Regarding Motions to Dismiss the Trust    Pg 13 of 43

highlighted Renaissance's misgivings about the auditor's lack of qualifications and independence.  (¶ 110.)

8.    *Defendants Knew That BLMIS Reported Trades Outside of the Daily Range*

Defendants received and reviewed BLMIS trade confirmations and account statements. Khronos valued securities daily according to prices reported by the relevant exchange, and also "proactively monitored [BLMIS'] investment performance, [which] consist[ed] of an ongoing reapplication of all its qualitative and quantitative analysis."  (¶ 111.)  Legacy's BLMIS trade confirmations reported 138 equity trades that reflected prices outside the range reported in the market.  (¶¶ 112-15.)

9.    *Defendants Knew That BLMIS Account Statements Showed Impossible Dividends*

During periods that BLMIS investments were supposedly out of the market, BLMIS purported to invest in U.S. treasuries and the Fidelity Spartan U.S. Treasury Money Market Fund even though BLMIS account statements failed to account for the Fidelity fund's name change in August 2005.  (¶ 116.)

During the period of Legacy's investment with BLMIS, the Fidelity fund issued dividends only once a month, while Legacy's BLMIS account statements reported up to seven dividend payments per month.  (¶ 117.)  Over 97% of the dividend payments (155 of 159) reported on Legacy's account statements were impossible, reporting dividends on dates that did not match the dividend dates of the Fidelity fund.  Khronos tracked the activity in Legacy's account which reflected these improper dividends.  (¶ 118.)

10.    *Defendants Knew That BLMIS Purported to Engage in Speculative Options Trading That Deviated From the SSC Strategy*

The Defendants understood that the SSC strategy's options "collar" was designed to protect against volatility; the options "collar" would limit the loss if the S&P 100 fell and limit the gain if the S&P 100 rose. (¶ 119.) Legacy's BLMIS account statements showed, however, that on at least ten separate occasions, purported options transactions were used solely to generate profit and not to hedge an equity transaction. In total, these non-hedging options transactions created $8,094,580 in profits in trading, at odds with the SSC strategy, and exposed the Legacy BLMIS account to risk. (¶ 120.)

11. *Options Confirmations Reflected Trades Inconsistent with SSC Strategy*

In executing the SSC strategy, the sale of call options necessarily preceded the purchase of put options because the proceeds of the sales purportedly funded the purchases. The BLMIS customer statements reflected this sequence of transactions. (¶ 123.) But the BLMIS option trade confirmations showed the purchase of call options followed by the sale of put options— precisely the opposite of what the customer statements reported. (¶ 124.) Khronos received copies of Legacy's trade tickets from BLMIS and was responsible for valuing and verifying Legacy's portfolio based on information contained in those trade tickets. (¶ 126.)

12. *Defendants Were Aware That Options Collars Purportedly Executed by BLMIS Were Not Properly Balanced With Changes to the Composition of the Equities Basket*

The SSC strategy required the options "collar" to be adjusted to reflect changes in the basket of equities if some of the underlying securities were sold before liquidation of the entire basket. The Legacy BLMIS account statements showed changes to the basket of equities purportedly purchased for the Legacy account but failed to show corresponding changes to the options hedging the original trade. (¶ 127.) BLMIS' failure to rebalance the hedges was a

10-05287-smb   Doc 134-2   Filed 03/14/16   Entered 03/14/16 12:42:48   Main Document
Pg 14 of 42

10-05287-smb   Doc 13164-2   Filed 11/22/19   Entered 11/22/19 13:48:03   Exhibit 2
3/14/2016 Memorandum Decision Regarding Motions to Dismiss the Trust   Pg 15 of 43

deviation from the SSC strategy that would have exposed the Legacy BLMIS account to risk.  (¶ 128.)  Legacy's account statements showed that on twenty-three separate occasions, BLMIS did not change the corresponding hedge when an equity was purportedly sold before the rest of the basket.  (¶ 129.)

13.   *Defendants Knew That BLMIS Account Statements Showed Illegal, Unauthorized Margin Trades*

On several occasions, Legacy's BLMIS account had negative cash balances resulting from either the purchase of equities that exceeded the value of U.S. treasuries sold to fund the purchase, the purchase of put options prior to selling the call options they were meant to fund, or cash being withdrawn prior to the sale of equities to fund the withdrawal.  When a customer purchases assets prior to the availability of funds in the customer's account, the customer is buying on "margin."  (¶ 130.)  There were at least sixty-eight occasions on which cash was withdrawn from the Legacy BLMIS account, resulting in a negative cash balance.  Upon information and belief, Legacy did not have a margin account with BLMIS and could not have traded on margin.  (¶ 131.)  Moreover, and upon information and belief, Madoff never charged Legacy any margin interest for this extension of credit or other margin fees.  (¶ 132.)

14.   *Defendants Were Aware They Were Not Getting Real-Time Electronic Access to Accounts and Trade Confirmations*

BLMIS' marketing materials highlighted its technological capabilities, including its ability to "customize client reports and deliver them electronically in whatever format best meets the needs of customers."  (¶ 135.)  BLMIS did not, however, provide its customers with real-time electronic access to accounts.  Instead, it only provided printed account statements and paper trading confirmations sent via U.S. mail, three or four days after the trades occurred.  (¶ 136.)

14

E.      **Despite Knowledge of Fraud, Defendants Borrowed Money to Remain Invested With BLMIS When Renaissance Redeemed**

When Renaissance decided to redeem its BLMIS investment in early 2004, Rafael was the only Meritage Committee member to vote against redemption.  (¶ 138.)  After redeeming half of its investment, Rafael could not persuade the Meritage Committee to delay redeeming the remainder so that he could find a lender to buy out Meritage to avoid redeeming directly from BLMIS.  Within several months, Rafael obtained a $100 million line of credit from BNP Paribas – Dublin Branch secured by Legacy's BLMIS account.  (¶¶ 139-40.)  BLMIS transferred $87 million of customer property to BNP Paribas between September 2007 and June 2008 in partial repayment of Legacy's loan.  (¶ 141.)

F.      **The Transfers**

1.      *Transfers to Legacy*

During the life of the Legacy account, BLMIS transferred at least $213,180,068 to or for Legacy's benefit (the "Initial Transfers").  (Amended Complaint, Ex. A.)  Theses transfers consisted of $86,505,850 in fictitious profits and $126,674,218 of principal.  (¶ 142.)  Of the Initial Transfers, BLMIS transferred $212,800,000 within six years of the Filing Date (the "Six-Year Transfers") and $174,000,000 within two years of the Filing Date (the "Two-Year Transfers").  (¶¶ 143-44.)  The Two-Year Transfers included all $86,505,850 in fictitious profits. (*See* Amended Complaint, Ex. A, at 14-17.)

2.      *The Subsequent Transfers*

From at least 2004, Khronos served as investment manager for Montpellier, a fund that placed investments with Legacy, and received a monthly fee equal to 1.2% of Montpellier's net asset value.  (¶ 148.)  From 2004 to 2005, Khronos also received a performance fee of 5% of

10-09289-smb    Doc 134-2    Filed 03/14/16    Entered 03/14/16 22:42:38    Main Document
                                                    Pg 16 of 42

10-01789-cgm    Doc 18164-2    Filed 11/22/19    Entered 11/22/19 13:48:03    Exhibit 2
3/14/2016 Memorandum Decision Regarding Motions to Dismiss the Trust    Pg 17 of 43

Montpellier's new investment profits, and between 2006 and 2008, Khronos received a

performance fee equal to 10% of Montpellier's new investment profits.  (¶ 149.)

Legacy paid Khronos an annual fee of at least $42,000, paid monthly, for performing

accounting services on behalf of Legacy.  Khronos also charged a one-time set up fee and a one-

time fee to create historical data loads.  By the end of 2004, Khronos had received fees from

Legacy totaling $154,690.  Upon information and belief, Legacy paid a total of $319,190 to

Khronos for providing accounting services.  (¶ 150.)  According to the Amended Complaint, the

subsequent transfers from Legacy and Montpellier to Khronos totaled $6,601,079 (the

"Subsequent Transfers").  (¶ 151.)

## G.    This Adversary Proceeding

The Trustee commenced this adversary proceeding on December 6, 2010, and filed the

Amended Complaint on July 2, 2015, asserting eight claims for relief summarized in the

following table:

| Count | ¶¶ | Defendant | Description of Claim |
|-------|-----|-----------|----------------------|
| 1 | 156-61 | Legacy | Avoid and recover the Two-Year Transfers as actual fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A), 550(a), 551, and 105(a). |
| 2 | 162-70 | Legacy | Avoid and recover the Two-Year Transfers as constructive fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(B), 550(a), 551, and 105(a). |
| 3 | 171-75 | Legacy | Avoid and recover the Six-Year Transfers as actual fraudulent transfers under New York Debtor & Creditor Law ("NYDCL") §§ 276, 276-A, 278 and/or 279, and 11 U.S.C. §§ 544(b), 550(a), 551, and 105(a). |
| 4 | 176-81 | Legacy | Avoid and recover the Six-Year Transfers as constructive fraudulent transfers under NYDCL §§ 273 and 278 and/or 279, and 11 U.S.C. §§ 544(b), 550(a), 551, and 105(a). |

| 5 | 182-87 | Legacy | Avoid and recover the Six-Year Transfers as constructive fraudulent transfers under NYDCL §§ 274, 278 and/or 279, and 11 U.S.C. §§ 544(b), 550(a), 551, and 105(a). |
| 6 | 188-93 | Legacy | Avoid and recover the Six-Year Transfers as constructive fraudulent transfers under NYDCL §§ 275, 278 and/or 279, and 11 U.S.C. §§ 544(b), 550(a), 551, and 105(a). |
| 7 | 194-200 | Legacy | Avoid and recover the Initial Transfers as undiscovered fraudulent transfers under N.Y. C.P.L.R. §§ 203(g) and 213 (8), NYDCL §§ 276, 276-a, 278 and/or 279, and 11 U.S.C. §§ 544, 550(a), 551, and 105(a). |
| 8 | 201-205 | Khronos | Recover the Subsequent Transfers under 11 U.S.C. §§ 550(a) and 105(a). |

Legacy moved to dismiss Counts II through VII arguing that the claims were barred by the safe harbor of Bankruptcy Code § 546(e).[7]  (*Legacy Memo* at 12-16.)  Legacy also asserted that the branch of Count I seeking the return of its principal deposits should be dismissed because the deposits provided value for the transfers pursuant to section 548(c) of the Bankruptcy Code.  (*Id.* at 16-22.)  Khronos separately moved to dismiss Count VIII of the Amended Complaint asserting that the Amended Complaint failed plead that the Initial Transfers were avoidable, or that the subsequently transferred funds originated with BLMIS.[8]  (*Khronos Memo* at 13-16.)

The Trustee opposed the motions arguing that the Defendants were not entitled to the safe harbor of Bankruptcy Code § 546(e) because the Amended Complaint adequately pled that the

---

[7]    *See Legacy's Memorandum of Law In Support of its Motion to Dismiss the Amended Complaint under Bankruptcy Rule 7012(b) and Federal Rule of Civil Procedure 12(b)(6)*, dated July 30, 2015 ("*Legacy Memo*") (ECF Doc. # 118), supported by *Declaration of Nicholas F. Kajon*, dated July 30, 2015 ("*Kajon Declaration*") (ECF Doc. # 117).

[8]    *See Khronos's Memorandum of Law In Support of its Motion to Dismiss the Amended Complaint under Bankruptcy Rule 7012(b) and Federal Rule of Civil Procedure 12(b)(6)*, dated July 30, 2015 ("*Khronos Memo*") (ECF Doc. # 120-12), supported by *Fisher Declaration*.

17

Defendants had actual knowledge of the BLMIS fraud.[9]  (*Trustee Memo* at 21-25.)  In addition,

Legacy and Khronos could not rely on the good faith defenses in Bankruptcy Code §§ 548(c) and

550(b)(1), respectively, because the Amended Complaint adequately pled that they willfully

blinded themselves to Madoff's Ponzi scheme.  (*Id*. at 25-33.)  Lastly, the Trustee asserted that

he had sufficiently pled his Subsequent Transfer claim against Khronos.  (*Id*. at 33-38.)

The Defendants filed replies on September 18, 2015,[10] and the Court heard oral argument

on October 28, 2015.

## DISCUSSION

### A.    Standards Governing the Motions

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citations omitted); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 570.  Courts do not decide

plausibility in a vacuum.  Determining whether a claim is plausible is "a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*,

556 U.S. at 679.  "The plausibility standard is not akin to a 'probability requirement,' but it asks

for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678;

*Twombly*, 550 U.S. at 556.  "Where a complaint pleads facts that are 'merely consistent with' a

---

[9]      *See Memorandum of Law In Opposition to Defendants' Motions to Dismiss the Amended Complaint*, dated
Aug. 27, 2015 ("*Trustee Memo*") (ECF Doc. # 122).

[10]     *See* ECF Doc. Nos. 126 & 127.

defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

*Iqbal* outlined a two-step approach in deciding a motion to dismiss. First, the court should begin by "identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. "Threadbare recitals of the elements of a cause of action supported by conclusory statements" are not factual. *See id.* at 678. Second, the court should assume the veracity of all "well-pleaded factual allegations," determine whether, together, they plausibly give rise to an entitlement of relief. *Id.* at 679.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint is deemed to include any written instrument attached to it as an exhibit, documents incorporated in it by reference, and other documents "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citations omitted); *accord Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992). A document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous information and relied on in framing the complaint. *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153). However, "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to

incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67

(2d Cir. 2004); *accord Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008).

Here, the Amended Complaint relied on and quoted extensively from the Renaissance

Report and several emails identified above which are considered and discussed below.  Those

documents were integral in framing the Amended Complaint and will be considered in

connection with the motions to dismiss.  In addition, the Trustee referred to and quoted from the

testimony that Meritage Committee members Henry Laufer and Paul Broder gave to the SEC to

bolster his core contention that they knew in 2003 that that Madoff's trades were impossible.

(*See* ¶¶ 76-78.)  The Court will, therefore, consider the transcripts of their SEC testimony.

The Defendants' opposition also attached and relied on the SEC testimony of Nathaniel

Simons and the 477 page report issued by the SEC Office of Investigations[11] in which the emails

cited in the Amended Complaint and the testimony of members of the Meritage Committee

figured prominently.  The Amended Complaint did not, however, rely on the SEC Report or

Simons' testimony.  The Trustee's opposition did not argue that the Court could not consider the

SEC Report, and on a motion to dismiss for failure to state a claim, a court may take judicial

notice of documents, like the SEC Report, that are available on a government website.  *Wells

Fargo Bank, N.A. v. Wrights Mill Holdings, LLC,* No. 14 Civ. 9783 (PAE), 2015 WL 5122590,

at *6-7 (S.D.N.Y. Aug. 31, 2015) ("When considering a Rule 12(b)(6) or Rule 12(c) motion, the

Court may take judicial notice of certain matters of public record without converting the motion

---

[11]    *See* SEC REP. NO. OIG-50, INVESTIGATION OF THE FAILURE OF THE SEC TO UNCOVER BERNARD MADOFF'S
PONZI SCHEME – PUBLIC VERSION, dated Aug. 31, 2009 ("SEC Report").  The report was attached to the
Defendants' motion papers.  (*See Kajon Declaration*, Ex. F; *Fisher Declaration*, Ex. G.)  The SEC Report is also
available on the SEC website at www.sec.gov/news/studies/2009/oig-509.pdf (last visited March 11, 2016).

into one for summary judgment [including] documents publicly filed with the SEC [and] documents filed with governmental entities and available on their official websites"); *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 435 n. 27 (S.D.N.Y. 2014). Here, the SEC concluded that Renaissance did not believe that BLMIS was engaged in fraudulent trading. (*See* SEC Report at 153.) Nor did the Trustee contend that it was improper to consider Nathaniel Simons' SEC testimony because the Trustee did not rely on it in drafting the Amended Complaint. Instead, the Trustee responded that the statements attributed to Laufer, Broder and Simons did not contradict the evidence of their willful blindness, were self-serving, contradicted their contemporaneous statements and were inadmissible hearsay.

The Court is nonetheless disinclined to draw adverse inferences against the Trustee based on the SEC's conclusions or Simons' testimony. While both are plainly relevant, the Trustee did not rely on either. Moreover, they are cumulative of the emails and Laufer's and Broder's SEC testimony. The Court loath to stray so far beyond the four corners of the Amended Complaint particularly given the Court's disposition of the motions.

**B.    Counts I through VII (Avoidance Claims)**

**1.    Introduction**

Counts I and II seek to avoid the Two-Year Transfers pursuant to section 548 of the Bankruptcy Code, Counts III through VI seek to avoid the Six-Year Transfers under New York law, and Count VII seeks to avoid all Initial Transfers under New York law regardless of when they occurred. The Trustee's ability to avoid and recover transfers has been limited by several decisions issued by the Second Circuit Court of Appeals and the United States District Court for the Southern District of New York. In light of the safe harbor granted under 11 U.S.C. § 546(e), the Trustee may only avoid and recover intentional fraudulent transfers under § 548(a)(1)(A)

21

made within two years of the Filing Date, *Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*),

773 F.3d 411, 423 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015); *Picard v. Katz*, 462 B.R.

447, 452 (S.D.N.Y. 2011) ("*Katz*"), unless the transferee had actual knowledge of Madoff's

Ponzi scheme, or more generally, "actual knowledge that there were no actual securities

transactions being conducted." *SIPC v. BLMIS* (*In re BLMIS*), No. 12 MC 115 (JSR), 2013 WL

1609154, at *4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"). The safe harbor was intended, among

other things, to promote the reasonable expectations of legitimate investors. If an investor knew

that BLMIS was not actually trading securities, he had no reasonable expectation that he was

signing a contract with BLMIS for the purpose of trading securities for his account. *Id*. In that

event, the Trustee can avoid and recover preferences and actual and constructive fraudulent

transfers to the full extent permitted under state and federal law. *See id*. at *6.

Although the safe harbor does not bar the Trustee's intentional fraudulent transfer claims

under 11 U.S.C. § 548(a)(1)(A), the transferee's knowledge is still relevant under 11 U.S.C. §

548(c). Section 548(c) provides a defense to a fraudulent transfer claim brought under

Bankruptcy Code § 548(a) to the extent the transferee "takes for value and in good faith." 11

U.S.C. § 548(c). Where, as here, the Trustee seeks to recover the transfer of principal in addition

to fictitious profits, he must plead the transferee's lack of subjective good faith which, in this

SIPA case, means the transferee turned a blind eye to facts that suggested a high probability of

fraud. *SIPC v. BLMIS* (*In re BLMIS*), 516 B.R. 18, 21 (S.D.N.Y. 2014) ("*Good Faith

Decision*"); *Katz*, 462 B.R. at 454, 455-56; *Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117, 138-

39 (Bankr. S.D.N.Y. 2014) ("*Merkin*"); *Picard v. Ceretti* (*In re BLMIS*), Adv. P. No. 09-01161

(SMB), 2015 WL 4734749, at *12 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*"), *leave to appeal

denied*, 15 Civ 7086 (JPO) (S.D.N.Y. Dec. 4, 2015). Lack of objective good faith is not enough

"because the securities laws do not ordinarily impose any duty on investors to investigate their brokers, [and] those laws foreclose any interpretation of 'good faith' that creates liability for a negligent failure to so inquire." *Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012); *accord Katz*, 462 B.R. at 455.

In summary, in order to meet his pleading burden under Counts II through VII, the Trustee must plead that Legacy had actual knowledge that BLMIS was not engaged in the trading of securities. If the Amended Complaint does not plead actual knowledge, the Trustee can still recover intentional fraudulent transfers pursuant to Bankruptcy Code § 548(a)(1)(A) under Count I if he pleads and proves that Legacy willfully blinded itself to the fact that BLMIS was not engaged in the actual trading of securities. If the Trustee does not plead actual knowledge or willful blindness, his recovery under 11 U.S.C. § 548(a)(1)(A) is limited to the fictitious profits transferred by BLMIS to Legacy.

## 2.    Knowledge

This Court outlined what it means to have actual knowledge of, or to be willfully blind to, a fact in *Merkin* and *Kingate*. "Knowledge" is "[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact." BLACK'S LAW DICTIONARY 1003 (10th ed. 2014) ("BLACK"); *accord Merkin*, 515 B.R. at 139; *Kingate*, 2015 WL 4734749, at *13. "Actual knowledge" is "direct and clear knowledge, as distinguished from constructive knowledge." BLACK at 1004. "Thus, 'actual knowledge' implies a high level of certainty and absence of any substantial doubt regarding the existence of a fact." *Merkin*, 515 B.R. at 139.

In contrast, "willful blindness" involves two elements: "(1) the defendant must

subjectively believe that there is a high probability that a fact exists and (2) the defendant must

take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*,

131 S. Ct. 2060, 2070 (2011).  If a person who is not under an independent duty to investigate

"nonetheless, intentionally chooses to blind himself to the 'red flags' that suggest a high

probability of fraud, his 'willful blindness' to the truth is tantamount to a lack of good faith."

*Katz*, 462 B.R. at 455; *accord Merkin*, 515 B.R. at 139.  "Thus, willful blindness connotes strong

suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate

failure to acquire knowledge of its existence."  *Merkin*, 515 B.R. at 140 (emphasis in original).

As explained below, the sufficiency of the Amended Complaint comes down to the

question of whether the information acquired by Khronos as a result of its due diligence provided

Legacy with actual knowledge that BLMIS was not engaged in trading securities.  The

knowledge imputed to Legacy through Rafael, particularly the Renaissance Report and the

emails cited by the Trustee, raised strong suspicions about BLMIS' trading but no more.  As a

result of those suspicions, Legacy hired Khronos to review the entire history of its BLMIS

trades, past and future, and hence, did not turn a blind eye.  Thus, the only basis for Legacy's

actual knowledge would be what it learned through Khronos.

### a.    The Renaissance Report and the Emails

The Amended Complaint places great weight on the Renaissance Report.  According to

the Trustee, the Renaissance Report found that BLMIS' option trades were impossible, a high

percentage of its equity trades fell outside the daily price range, Madoff's SSC strategy could not

be simulated without putting BLMIS in the market on days the account statements showed it was

out of the market and Madoff supposedly traded billions of dollars but inexplicably left no

footprint.  (¶ 47.)  While it aroused suspicions regarding how Madoff did what he said he did, the Renaissance Report did not conclude that Madoff's operation was a Ponzi scheme or that BLMIS was not actually making the trades it was reporting.  Instead, it speculated that Madoff was most likely gambling that his initial long portfolio would rise in price, and stated that "the challenge is to see if we can find a rising market predictor based around Madoff's trading dates." (Renaissance Report at 4.)  The authors of the report wrote a simulator to "better understand the Madoff strategy," (*id.* at 22), and made a proposal focused on the belief that "we have a simulator that seems to capture the essence of the scheme."  (*Id.* at 45.)  The Renaissance Report concluded: "We think this scheme is worth an experiment where we actually put on a small portfolio to further investigation and research."  (*Id.*)  In short, the Renaissance Report failed to conclude that BLMIS was not actually engaged in trading securities, and pondered how Renaissance could replicate his strategy.

The issuance of the Renaissance Report was followed by emails between the Meritage Committee members, some of which were sent to Rafael, that raised concerns about BLMIS' purported trading activities as well as the structure of BLMIS.  The Amended Complaint includes quotes from these emails but omits other portions required to understand what the members of the Meritage Committee actually knew and believed at the time.

The first email was sent by Meritage Committee member Nathaniel Simons, dated November 13, 2003, and Rafael was one of the recipients.  (*See Fisher Declaration*, Ex. F at RE00000008.)  According to Simons, an ex-Madoff trader had said that Madoff "cherry picked"[12] trades, and Simons speculated that Madoff took the good trades from the hedge fund

---

[12]      "Cherry picking" describes a practice whereby a trader executes trades without immediately assigning them to a particular account and later allocates the purchased securities to the account of a favored party if the securities

10-04289-smb    Doc 134-2    Filed 03/14/16    Entered 03/14/16 22:42:38    Main Document
                                                      Pg 26 of 42

10-04289-smb    Doc 13164-2    Filed 11/22/19    Entered 11/22/19 13:48:03    Exhibit 2
3/14/2016 Memorandum Decision Regarding Motions to Dismiss the Trust    Pg 27 of 43

(presumably, Meritage).  David Zierk of Renaissance heard a similar story from a consultant who had interviewed another ex-trader and speculated that Madoff would have a serious problem within a year.  Simons' email also expressed concern about Madoff's fee structure; it allowed the managers of the feeder funds to capture the fees without doing any work other than investing in BLMIS.  Simons stated that Meritage did not know how Madoff did what he claimed he did (the email described Madoff as "pretty tight-lipped"), and had no idea if there were conflicts in his business that could come to a regulator's attention.  In addition, Simons stated (incorrectly) that Madoff's brother-in-law was his accountant and his son held a high-level position in the organization, and the situation presented "the risk of some nasty allegations, the freezing of accounts, etc. etc."

Simons concluded that "[p]erhaps the best reason to get out is that we really don't expect to make an outsized return on this investment."  Furthermore, Eliot Spitzer (then-New York Attorney General) would prize Madoff's head on his mantle, and unless Meritage could get comfortable with the "regulatory tail risk" in a hurry, Meritage should get out of its BLMIS investment because the "risk-reward on this bet is not in our favor."

The next day, Paul Broder, another Meritage Committee member, sent an email that compared his concerns about Madoff to "background radiation" that would not go away.  (*Id.* at RE00000003.)  Rafael also received this email.  Broder's stated concern was that if Madoff was cherry picking, and the funds that invested with BLMIS and the fund managers were taking the

---

appreciate in value.  *See, e.g., United States v. Motz*, 652 F. Supp. 2d 284, 289 (E.D.N.Y. 2009); *S.E.C. v. Slocum, Gordon, & Co.*, 334 F. Supp. 2d 144, 147 (D. R.I. 2004).

hit.  He concluded that he would not be surprised to see a link exposed to the current

SEC/Spitzer investigation, and he favored redemption.

Jim Simons, another Meritage Committee member, also favored redemption in his

November 14, 2003 email that Rafael received.  (*Id.* at RE00000001.)  Simons stated that the

BLMIS investment fell into the "who needs it" category, and absent a compelling reason to stay,

he would ask Simons to withdraw the funds next week.[13]

Finally, the Amended Complaint relied on a December 11, 2003 email from Broder to

Rafael, (¶¶ 59-60), which was not attached to any of the motion papers but was supplied at the

hearing.  This email actually consisted of two emails: one from Rafael containing "open issues

for research we would like to address with Madoff" and a response from Broder with

"suggestions for interaction with Madoff" interwoven into Rafael's original email.  Rafael's

email outlined areas of inquiry, including (1) the amount of assets under management, (2)

options trading (whether options are traded OTC; trade volumes; identity of counterparties), (3)

stock trading (volume; timing of stock trades); (4) monitoring by regulators/auditors, and (5)

Madoff's unusual fee structure.

Like the Renaissance Report, Rafael's email struck a tone of wanting to understand

Madoff's investment strategy.  Broder's comments showed that he was more suspicious of

Madoff's activities.  For example, once Madoff confirmed he was trading options OTC (as

Broder suspected), Broder instructed Rafael to "ask (in innocent amazement!): So you can do

---

[13]    The Amended Complaint also discussed and quoted from a November 21, 2003 Broder email, (*see* ¶¶ 62-
64), which is attached to the *Fisher Declaration* as Exhibit D at RE00000240.  The email discussed irregularities
with respect to BLMIS' investment (*e.g.* impossible options trading volume), but Rafael was not a recipient of this
email, and the Amended Complaint does not allege that he saw it.  Therefore, the information within that email
cannot be imputed to Rafael or Legacy.

this kind of volume on OEX OTC Options?!?!"  Also, with respect to options counterparties, Broder instructed Rafael to ask, "Gee, what kind of banks are big enough to do that (more animated amazement!!!)".

The Renaissance Report and the emails relied on by the Trustee confirm that the Meritage Committee members, including Rafael, were highly suspicious of Madoff's option trades and his uncanny ability to time his equity trades to minimize the purchase price and maximize the sale price.  They were also troubled by Madoff's unusual fee structure, rumors of cherry picking, the fact that his massive trades did not impact the market, the employment of his son and the mistaken belief that BLMIS employed his brother-in-law as BLMIS' accountant.

But the allegations of the Amended Complaint do not plead a plausible claim that they actually knew that Madoff was not trading securities.  In fact, the Meritage Committee members' anxiety about cherry picking showed the opposite; cherry picking involved actual, albeit fraudulent, trading.  Furthermore, their fear that regulators or Eliot Spitzer would come after Madoff was connected not to rumors of a Ponzi scheme but to cherry picking and the employment of his family members.  Moreover, they were anxious that their accounts would be frozen, not that the securities in the accounts were a mirage.  As Broder testified before the SEC, "if you're asking did we come to the conclusion that there was a fraud going on, I would say we didn't."  (*Fisher Declaration*, Ex. E, at RE00000095.)  Instead, Broder concluded that they did not understand what Madoff was doing; the volume numbers that he was reporting were not supported by evidence they could discover, and this, without more meant they should get out. (*Id.*, Ex. E, at RE00000096.)

Finally, and despite James Simons' advice to "withdraw the funds next week," Renaissance initially redeemed only half of its investment in BLMIS.  It held on to the other half for several months until Legacy could buy out the other half of Meritage's position.  (¶¶ 139-40.)  It is common knowledge (undoubtedly more common among sophisticated financial professionals) that a Ponzi scheme will inevitably collapse.  *See Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC* (*In re Bayou Grp., LLC*)*, 439 B.R. 284, 306 n. 19 (S.D.N.Y.2010) (explaining the Ponzi scheme presumption).  While greed may cloud judgment, it is not plausible that the average financial professional owing fiduciary duties to its own clients and investors would knowingly invest their money in a Ponzi scheme that is doomed to collapse.  *See Katz*, 462 B.R. at 454 ("[E]ven the Trustee does not appear to undertake the dubious task of plausibly pleading that the defendants knowingly invested in a Ponzi scheme."); *cf. Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 480 B.R. 480, 489 (S.D.N.Y. 2012) (concluding that it was implausible, "bordering on the absurd," that banks would continue to lend to the debtor despite their awareness that the debtor and its affiliates were insolvent and merely shuffling around money to meet their short term obligations), *aff'd* 541 F. App'x. 55 (2d Cir. 2013).  If the Meritage Committee actually believed that BLMIS was a Ponzi scheme, it is implausible that they would have divested only half of Meritage's BLMIS investment and held on to the other half for several months.

### b.   The Accounting Services Agreement

The execution of the Accounting Services Agreement, effective January 1, 2004, can only be explained by the continuing uncertainty and suspicions surrounding Madoff.  Khronos had already flagged the timing of Madoff's trades as an area of concern, (¶ 75), and Rafael had highlighted numerous questions about Madoff's operations in his December 11, 2003 email.  In

addition, Legacy was intent on buying the other half of Meritage's BLMIS investment.

According to the Accounting Services Agreement, Khronos' tasks included valuing the portfolio

daily based on end of day pricing and store price/volume statistics from IDC,[14] producing daily

and monthly position, profit/loss and transaction reports, reconciling Legacy's account to the

monthly brokerage statements provided and recording any non-trade related activity and

producing a monthly trial balance, balance sheet, income statement and statement of changes in

net asset value for Legacy. (*Accounting Services Agreement* at 6-7.) The scope of these services

covered Legacy's account beginning with its inception – January 1, 1992 – and continuing into

the future.[15]

The retention of Khronos to conduct due diligence implies that Legacy did not know that

Madoff was a fraud. *Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund* (*In re Tremont Sec.

Law, State Law and Ins. Litig.*), No. 10 Civ. 9061 (TPG), 2013 WL 5179064 (S.D.N.Y. Sept. 16,

2013), *aff'd* 588 F. App'x 27 (2d Cir. 2014), illustrates why. There, the plaintiff charged that the

defendant Tremont had committed securities fraud when it recommended that the plaintiff invest

in one of its Madoff feeder funds. The complaint alleged that Tremont was aware of numerous

red flags, had engaged in fruitless efforts to shed light on Madoff's opaque operations, and the

awareness of the red flags plausibly implied fraudulent intent. The District Court concluded that

the inference was implausible; if Tremont believed that Madoff was a fraud, it would not have

bothered to conduct due diligence:

---

[14]    The parties have not identified IDC.

[15]    The Amended Complaint also alleges that Khronos' was responsible for evaluating the adequacy of
BLMIS' accounting and back-office processes, internal controls, adherence to and compliance with tax and legal
guidelines, and potential for conflicts of interest. (¶ 104.) These services were not mentioned in the Accounting
Services Agreement, and it is difficult to understand how Khronos could perform such an evaluation of "tight-
lipped" Madoff.

> [I]f Tremont had known, or even strongly suspected, that Madoff was perpetrating
> a fraud, it would have been peculiar for Tremont to continue discussing ways of
> gaining greater transparency into Madoff's operations and to continue sending
> Madoff due-diligence questionnaires.

*Id.* at *5. Similarly, it would have been "peculiar" for Legacy to commission Khronos to

conduct the type of due diligence alleged in the Amended Complaint if it already knew based on

the Renaissance Report and subsequent emails that BLMIS was a fraud.

According to the Trustee, the investigation performed by Khronos confirmed the

aforementioned red flags, revealed new ones and caused Rafael to become aware of market

impossibilities and indicia of fraud.  (¶¶ 55-137.)  The red flags included impossible option

trades, impossible timing of equity trades, impossible rates of return, unusual fee structure, the

lack of market impact given the large trade volume, lack of transparency and controls, lack of a

capable auditor, trades outside of the daily range, impossible dividends, trades inconsistent with

the SSC strategy, failure to balance option collars, unauthorized margin trades, and lack of

electronic access to account information.

The "red flag" theory of *scienter* has been rejected in the Madoff-related federal

securities law litigation because it amounts to pleading fraud by hindsight.  *E.g.*, *DeLollis v.

Friedberg, Smith & Co.,* 600 F. App'x 792, 796 (2d Cir. 2015) ("Numerous actions brought

against auditors and investment advisors by victims of Madoff's fraud have been dismissed

despite the presence of 'red flags,' which in hindsight arguably should have called attention to

Madoff's illegal conduct."); *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x.

636, 640 (2d Cir. 2012) (describing the red flags as "an archetypical example of impermissible

'allegations of fraud by hindsight.'") (quoting *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir. 2000)

(quotation marks omitted)).  Hindsight is infallible, but connecting the dots in real time may

31

require clairvoyance.  In many cases, it requires a regular comparison of information in BLMIS

generated trade confirmations and monthly account reports with market information.  Even if the

comparison is made, many red flags are no more than pale pink especially when they crop up

infrequently over a long period.  This case provides a good example.  The Legacy account

statements covered seventeen years (1992-2008) and reflected 11,091 equity trades.  (*See* ¶ 79.)

The red flags identified in the Amended Complaint included a grand total of 138 equity trades

outside the daily price range, (¶ 115), ten occasions when the option trades generated a profit at

odds with the SSC strategy, (¶ 120), twenty-three occasions when BLMIS failed to rebalance the

options after changing the composition of the underlying basket of equities, (¶ 129), and sixty-

eight purchases on margin.  (¶ 131.)  When the red flags are viewed in real time, "[t]he more

compelling inference as to why Madoff's fraud went undetected for two decades was his

proficiency in covering up his scheme and deceiving the SEC and other financial professionals."

*Meridian*, 487 F. App'x. at 640 (quoting lower court's decision); *accord Ellendow Fund, LLC v.*

*Rye Inv. Mgmt.*, 588 F. App'x 27, 28-29 (2d Cir. 2014) (collecting cases); *see also R.W. Grand*

*Lodge of Free & Accepted Masons of Pennsylvania v. Meridian Capital Partners, Inc.*, No. 15-

1064-CV, 2015 WL 8731547, at *2 (2d Cir. Dec. 15, 2015) ("Grand Lodge essentially makes a

'red flag' argument—that Appellees were aware or had the duty to become aware of red flags in

the Rye Funds' operations and that Appellees were reckless in ignoring the red flags. This court,

along with many district courts in this circuit, has rejected similar claims based upon a failure of

due diligence to uncover Madoff's infamous Ponzi scheme.").

    While plaintiffs in federal securities litigation must satisfy a standard of proof requiring

allegations that give rise to a "strong inference" of fraud that is "more than merely plausible or

reasonable—it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent," *Tellabs,* 551 U.S. at 314, the standard in this SIPA case is no less rigorous. The plaintiff must plead non-conclusory allegations that support the inference that the defendants actually knew that Madoff was not trading securities. Alleging actual knowledge based on the existence of red flags amounts to pleading that the defendant, here Khronos and Legacy, knew *or should have known* that BLMIS was not engaged in the actual trading of securities. This is the objective standard of knowledge rejected by the District Court. Although the Trustee, the SEC and everyone else can look back today and connect the dots with the benefit of hindsight, the inference that Khronos did so before Madoff's fraud was publically exposed is not as plausible as the inference that, like mostly everyone else, Khronos missed it. *MLSMK Invs. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 145 (S.D.N.Y. 2010) ("[W]hile it might have been possible for Defendants to determine that Madoff was committing fraud from the 'red flags' that Plaintiff points out, Plaintiff alleges no facts to demonstrate that Defendants actually did make such a discovery."), *aff'd*, 431 F. App'x 17 (2d Cir. 2011); *cf. Clark v. Cosmo* (*In re Agape Litig.*), 773 F. Supp. 2d 298, 310 (E.D.N.Y. 2011) ("[W]hile a visual representation of the account activity and actual dollar amounts in hindsight may suggest that the fraud was obvious, . . . the Court can only infer that this information raises an inference of BOA's constructive knowledge of the fraud.").

This inference is bolstered by the actions that Legacy took. Legacy hired Khronos to conduct due diligence of its account going back to 1992 following the revelations in the Renaissance Report and the questions raised about Madoff in the ensuing emails. Thus, Legacy did not turn away or willfully blind itself to its suspicions. The notion that Khronos discovered through its diligence that Madoff was a fraud is implausible. If Khronos' work actually confirmed that Madoff was engaged in securities fraud, or worse, that he was running a Ponzi

scheme, why would Legacy remain invested in BLMIS and increase its investment by buying
Meritage's position?  Did Legacy need confirmation that Madoff was running a Ponzi scheme
before it decided to invest another $100 million?  As noted earlier, it is implausible that a fund
such as Legacy would entrust its own investors' money with someone it knew was not trading
securities.  The only plausible explanation is that like everyone else that Madoff fooled, Khronos
did not uncover in real time what the Trustee and everyone else discovered with the aid of
hindsight.

The Trustee's attempt to analogize this case to the Court's *Kingate* decision is
unpersuasive.  There, the Trustee's complaint included allegations beyond knowledge of red
flags.  Ceretti and Grosso, the principals of the Kingate funds, actively deflected inquiries
directed at Madoff, intimidated, attacked and threatened analysts who raised questions about
Madoff and threatened their employers with the loss of business, fabricated stories about Madoff
to placate the funds' investors, and tellingly, expressed a fear that an audit by
PricewaterhouseCoopers "might actually 'start to ask all sort [sic] of questions next time they
visit Madoff.'"  *Kingate*, 2015 WL 4734749, at *14.  In addition, an employee had sent an email
to Grosso the day after Madoff's arrest in which he reminded Grosso that he had previously sent
him an email with "all the details" supporting his belief that BLMIS was a "scam."  *Id.*  The
Court held that the "totality of the allegations [against Kingate] paint a picture of sophisticated
financial professionals who knew that Madoff was reporting fictitious transactions, and took
steps to prevent any inquiry."  *Id.* at *15.  These allegations gave rise to a strong inference of
actual knowledge in *Kingate*, but are missing from the Amended Complaint.[16]

---

[16]    After the briefing in this matter, the Court decided *Picard v. Shapiro* (*In re BLMIS*), 542 B.R. 100 (Bankr.
S.D.N.Y. 2015).  There, the Court concluded that the complaint alleged a plausible claim that the principal individual

In conclusion, the Amended Complaint does not allege a plausible claim that Legacy had actual knowledge that BLMIS was not engaged in trading securities. Further, while it alleges the first prong of willful blindness – Legacy strongly suspected that, at a minimum, BLMIS' option trades were not real – it does not allege the second prong, that Legacy turned a blind eye to its suspicions. Instead, it alleges that Legacy hired Khronos to conduct due diligence regarding Madoff's trades for Legacy's account. Accordingly, Counts II through VII are dismissed, and the motion to dismiss Count I is granted except to the extent it seeks to avoid and recover the transfer of fictitious profits to Legacy.

## C.    Count VIII (Subsequent Transfer Claim)

Section 550(a)(2) of the Bankruptcy Code allows the Trustee to recover an avoidable transfer from "any immediate or mediate transferee of" an initial transferee. To plead a subsequent transfer claim, the Trustee must plead that the initial transfer is avoidable, and the defendant is a subsequent transferee of that initial transfer. Rule 9(b) of the Federal Rules of Civil Procedure governs the portion of a claim to avoid an initial intentional fraudulent transfer, *Sharp Int'l Corp. v. State Street Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005); *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 251 (2d Cir. 1987); *Nisselson v. Drew Indus., Inc.* (*In re White Metal Rolling & Stamping Corp.*), 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998), but Rule 8(a) governs the portion of a claim to recover the subsequent

---

defendant (Stanley Shapiro) had actual knowledge that BLMIS was not engaged in trading securities. The Court's conclusion was based primarily on Stanley Shapiro's access to Madoff and the 17th floor which housed the investment advisory business and his collaboration with BLMIS employees "to fabricate large numbers of back-dated trades to increase the value of the Core Accounts, and thereafter, to manufacture back-dated losses to eliminate the adverse tax consequences resulting from the fictitious value." *Id.* at 113 (record citations omitted). While the Amended Complaint implies that Rafael may have had the ability to meet with Madoff, it does not draw any conclusions from the nature of that access or the information obtained at any meeting with Madoff, and does not allege that Rafael collaborated with BLMIS personnel to manipulate and back-date trading records.

10-05288-smb    Doc 134-16    Filed 03/14/16    Entered 03/14/16 22:12:58    Exhibit 2
3/14/2016 Memorandum Decision Regarding Motions to Dismiss the Trust    Pg 37 of 43

10-01789-cgm    Doc 13164-2    Filed 11/22/19    Entered 11/22/19 13:48:03    Main Document
Pg 36 of 42

transfer.  *Picard v. Madoff* (*In re BLMIS*), 458 B.R. 87, 119 (Bankr. S.D.N.Y. 2011); *Picard v.*

*Merkin* (*In re BLMIS*), 440 B.R. 243, 269 (Bankr. S.D.N.Y. 2010); *SIPC v. Stratton Oakmont,*

*Inc.*, 234 B.R. 293, 317-18 (Bankr. S.D.N.Y. 1999).

To satisfy his burden to recover the subsequent transfer, the complaint must allege facts

that support the inference "that the funds at issue originated with the debtor," *Silverman v.*

*K.E.R.U. Realty Corp.* (*In re Allou Distribs., Inc.*), 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007);

*accord Picard v. Estate of Chais* (*In re BLMIS*), 445 B.R. 206, 235 (Bankr. S.D.N.Y. 2011), and

contain the "necessary vital statistics—the who, when, and how much" of the purported transfers

to establish an entity as a subsequent transferee of the funds.  *Allou Distribs.*, 379 B.R. at 32;

*accord Gowan v. Amaranth LLC* (*In re Dreier LLP*), 452 B.R. 451, 464 (Bankr. S.D.N.Y. 2011).

The plaintiff's burden at the pleading stage "'is not so onerous as to require "dollar-for-dollar

accounting" of "the exact funds" at issue.'"  *Picard v. Charles Ellerin Revocable Trust* (*In re*

*BLMIS*), Adv. P. Nos. 10-04398 & 10-05219 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y.

Mar. 14, 2012) (quoting *Allou Distribs.*, 379 B.R. at 30 (citing *IBT Int'l, Inc. v. Northern* (*In re*

*Int'l Admin. Servs., Inc.*), 408 F.3d 689, 708 (11th Cir. 2005))).

A trustee may not, however, recover the avoided transfer from a subsequent transferee

that "takes *for value*, including satisfaction or securing of a present or antecedent debt, *in good*

*faith*, and *without knowledge of the voidability* of the transfer avoided." 11 U.S.C. § 550(b)(1)

(emphasis added).  Bankruptcy Code § 550(b)(1), like section 548(c), is an affirmative defense

that the subsequent transferee must ordinarily plead and prove.  *Official Comm. of Unsecured*

*Creditors v. JP Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 394 B.R. 721, 740

n. 20 (Bankr. S.D.N.Y. 2008); *Cassirer v. Sterling Nat'l Bank & Trust Co. of N.Y.* (*In re Schick*),

223 B.R. 661, 664–65 (Bankr.S.D.N.Y.1998).  In addition, the majority approach applies an

objective, reasonable person standard to determine the defendant's good faith.  *Gowan v. Patriot Grp.* (*In re Dreier LLP*), 452 B.R. 391, 447 (Bankr. S.D.N.Y. 2011) (collecting cases); *see Banner v. Kassow*, 104 F.3d 352, No. 96-5040, 1996 WL 680760, at *3 (2d Cir. Nov. 22, 1996) (summary order) ("[A] transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency.") (quoting *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1355 (8th Cir. 1995)).

The District Court has concluded, however, that a subjective test governs the good faith defense under Bankruptcy Code § 550(b)(1), and has placed the burden of pleading the lack of good faith on the Trustee.  *Good Faith Decision,* 516 B.R. at 24 & n. 4 (a subsequent transferee can prevail on a motion to dismiss by showing that the complaint fails to plausibly allege that it did not act in good faith).  Given the District Court's uniform treatment of the defenses under Bankruptcy Code §§ 548(c) and 550(b)(1), I conclude that the Trustee must also plead that the subsequent transferee lacked "knowledge of the voidability of the transfer avoided."

## 1.    The Montpellier Transfers

The Mayers, "through various Khronos companies they operated" acted as a service provider to Montpellier, a fund that "ultimately" invested in Legacy.  (¶ 35.)  From at least 2004, Khronos served as investment manager for Montpellier, and received a monthly fee equal to 1.2% of Montpellier' net asset value, which it shared with HCH.  (¶ 148.)  In addition, from 2004 to 2008, Khronos received a performance fee ranging from between 5% to 10% of Montpellier's new net investment profits.  (¶ 149.)

Although the Amended Complaint provides information pertaining to what Montpellier paid Khronos, it fails to allege any facts supporting the inference that those funds originated with

BLMIS.  In particular, it does not allege that Legacy transferred BLMIS funds to Montpellier,

and in fact, Trustee's counsel conceded at oral argument that the Amended Complaint did not

plead this linkage.  (*Transcript of Oct. 28, 2015 Hearing* at 54:19-57:3.)  Accordingly, any

Subsequent Transfer claims based on the payments Montpellier made to Khronos are legally

insufficient.

### 2. The Legacy Transfers

Legacy paid Khronos for its accounting services at the rate of $42,000 per year, paid

monthly, and made one-time payments for historical pricing services.  (¶ 150; *Accounting*

*Services Agreement* at 5.)  These payments totaled $154,690 as of the end of 2004, and Legacy

paid Khronos a total of $319,190 for providing accounting services.  (¶ 150.)  Unlike

Montpellier, the Amended Complaint describes Legacy as "a single purpose vehicle" investing

"solely with BLMIS."  (¶ 33.)  This implies that Legacy had no other source of cash, and

whatever Legacy paid Khronos originated with BLMIS.  *See Gowan v. Amaranth Advisors*

*L.L.C.* (*In re Dreier LLP*), Adv. P. No. 10-03493 (SMB), 2014 WL 47774, at *15 (Bankr.

S.D.N.Y. Jan. 3, 2014).

The allegations are also sufficient to infer that Legacy paid Khronos during the Two-Year

Period, and specifically, after September 2007, with the avoidable transfers of fictitious profits it

withdrew from BLMIS.  Legacy paid $3,500 per month in arrears.  (*See Accounting Services*

*Agreement* at 5.)  At a minimum, the Amended Complaint implies that Legacy paid that amount

during October 2007 through November 2008, and possibly, in December 2008, for the

November services.  However, the Subsequent Transfer allegations involving the payments that

Legacy made to Khronos are nevertheless deficient.

### a.      Value

Even where the burden of pleading rests on the defendant, the Court may dismiss the claim pursuant to Rule 12(b)(6) where the defense is apparent on the face of the complaint. *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003); *accord Picard v. ABN AMRO Bank (Ireland) Ltd.* (*In re BLMIS*), 505 B.R. 135, 141 (S.D.N.Y. 2013).  The Amended Complaint, in this regard, pleads that Khronos gave value for the Subsequent Transfers.  The "value" that a subsequent transferee must provide under section 550(b)(1) is "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value."  5 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 550.03[1] at 550-25 (16th ed. 2015) ("COLLIER ON BANKRUPTCY"); *accord Enron Corp. v. Ave. Special Situations Fund II, LP* (*In re Enron Corp.*), 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005); KATHY BAZOIAN PHELPS & HON. STEVEN RHODES, THE PONZI BOOK § 4.03[2] at 4.42 (2012).  The Amended Complaint alleges that Legacy transferred the Subsequent Transfers to Khronos in payment for accounting and historical pricing services, and therefore, pleads that Khronos gave "value" for the subsequent transfers.

### b.      Good Faith

In addition, the Amended Complaint fails to satisfy the Trustee's burden to plead that Khronos did not act in good faith.  The District Court equated lack of good faith under Bankruptcy Code § 548(c) with willful blindness, *Good Faith Decision*, 516 B.R. at 21, and stated that the same standard applies to non-investors as well as investors under sections 548(c) and 550(b).  *Id.* at 22-23.  The Court has already concluded that the Amended Complaint fails to allege that Legacy, through Rafael, had actual knowledge of or willfully blinded itself to

Madoff's fraudulent scheme.  Although the Subsequent Transfer claim focuses on the good faith

of Khronos, the Trustee suggests no meaningful distinction between what Legacy knew and what

Khronos knew, and pleads that Khronos' knowledge should be imputed to Legacy.  (¶ 53.)  Nor

is there any suggestion that Khronos willfully blinded itself to anything during its work for

Legacy.  It developed technology to track volume and pricing statistics, (¶ 80), and actively

tracked Legacy's trades.  (¶¶ 111, 118, 126.)  In fact, the Amended Complaint rests on the theory

that Khronos conducted extensive diligence, and through its diligence, acquired actual

knowledge that BLMIS was a Ponzi scheme.

### c.    Knowledge

For similar reasons, the Amended Complaint fails to allege that Khronos knew that it was

being paid by Legacy with the proceeds of an avoidable transfer.  This requirement originated

with the § 4-609(b)(1) of the Bankruptcy Commission's 1973 proposed bill.  H. DOC. NO. 93-

137, 93D CONG., 1st Sess., pt. II (1973); 5 COLLIER ON BANKRUPTCY ¶ 550.03[3], at 550-28.  It is

not defined or explained in the Bankruptcy Code, and has been interpreted to mean that "'[i]f a

transferee possesses knowledge of facts that suggest a transfer may be fraudulent,' he has

sufficient knowledge to preclude his incantation of § 550(b)'s defense."  *Banner*, 1996 WL

680760, at *3 (quoting *In re Sherman*, 67 F.3d at 1357).  Section 550(b)(1) does not impose a

duty to investigate or monitor the chain of transfers that preceded the subsequent transfer, but

"some facts strongly suggest the presence of others; a recipient that closes its eyes to the

remaining facts may not deny knowledge."  *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838

F.2d 890, 898 (7th Cir. 1988) (Easterbrook, J.).  This essentially defines willful blindness which,

the District Court has held, is synonymous with lack of good faith.

It is not surprising, therefore, that the facts relevant to this element under 11 U.S.C. §

550(b)(1) often overlap with the good faith requirement, and some Courts and commentators

have suggested that the two requirements are really only one.  *See Genova v. Gottlieb* (*In re

Orange Cnty. Sanitation Corp.*), 221 B.R. 323, 328 (Bankr. S.D.N.Y. 1997) ("There is no

meaningful distinction between the two remaining requirements of § 550(b)….") (citation

omitted); 5 COLLIER ON BANKRUPTCY ¶ 550.03[3] at 550-28 ("The language appears to be

derived from section 4-609(b)(1) of the [The Commission on the Bankruptcy Laws of the United

States]'s bill, and was included as surplusage to illustrate a transferee that could not be in good

faith."); *but see CCEC Asset Mgmt. Corp. v. Chem. Bank* (*In re Consol. Capital Equities Corp.*),

175 B.R. 629, 637-38 (Bankr. N.D. Tex. 1994) ("This court must endeavor to give meaning to

each provision of § 550(b) without rendering a provision superfluous or insignificant.  Good

faith must therefore be considered as a separate concept from 'without knowledge of the

avoidability of the transfer.'").   Furthermore, although "[i]t is 'a cardinal principle of statutory

construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented,

no clause, sentence, or word shall be superfluous, void, or insignificant,'" *TRW Inc. v. Andrews*,

534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation

marks omitted)), neither the Trustee nor Khronos have offered a distinction between lack of good

faith and knowledge of the avoidability of the initial transfer under Bankruptcy Code §

550(b)(1).

In short, the Amended Complaint does not plead that Khronos willfully blinded itself to

any red flags; it conducted extensive due diligence on behalf of Legacy.  Nor did it possess

actual knowledge that it was receiving the proceeds of a fraudulent transfer because neither

Legacy nor Khronos knew that BLMIS was not actually trading securities.  Accordingly, Count
VIII is dismissed.

The Court has considered the remaining arguments by the parties that are not specifically
discussed, and concludes that they lack merit or are rendered moot by this opinion.  Settle order
on notice.

Dated: New York, New York
      March 14, 2016

                           /s/ *Stuart M. Bernstein*
                           STUART M. BERNSTEIN
               United States Bankruptcy Judge