# Exhibit B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

In re:                                                    :
                                                          :    Adv. Pro. No. 08-01789 (SMB)
SECURITIES INVESTOR PROTECTION            :
CORPORATION,                                         :    SIPA Liquidation
                                                          :    (Substantively Consolidated)
                        Plaintiff-Applicant,    :
                                                          :
            – against –                             :
                                                          :
BERNARD L. MADOFF INVESTMENT       :
SECURITIES LLC,                                    :
                                                          :
                        Defendant.                  :

-------------------------------------------------------X

In re:                                                    :
                                                          :
BERNARD L. MADOFF,                               :
                                                          :
                        Debtor.                       :

-------------------------------------------------------X

IRVING PICARD, Trustee for the Liquidation     :
of Bernard L. Madoff Investment Securities       :
LLC,                                                      :
                                                          :
                        Plaintiff,                     :
                                                          :
            – against –                             :    Adv. Pro. No. 10-05286 (SMB)
                                                          :
LEGACY CAPITAL LTD.,                          :
                                                          :
                        Defendant.                  :

-------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER GRANTING
## RELIEF UNDER FEDERAL CIVIL RULE 56(g)

A P P E A R A N C E S :

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111

        David J. Sheehan, Esq.
        Oren J. Warshavsky, Esq.
        Jason S. Oliver, Esq.

Of Counsel

*Attorneys for Plaintiff*

SECURITIES INVESTOR PROTECTION
  CORPORATION
1667 K St., NW, Suite 1000
Washington, D.C. 20006

>   Josephine Wang, Esq.
>     General Counsel
>   Kevin H. Bell, Esq.
>     Senior Associate General Counsel
>     For Dispute Resolution
>   Nathanael S. Kelley, Esq.
>     Associate General Counsel
>     Of Counsel

*Attorneys for Securities Investor Protection
  Corporation*

STEVENS & LEE, P.C.
485 Madison Avenue, 20th Floor
New York, New York 10022

>   Nicholas F. Kajon, Esq.

*Attorneys for Defendant*

**STUART M. BERNSTEIN**
**United States Bankruptcy Court:**

Plaintiff Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard

L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), commenced this adversary

proceeding, *inter alia*, to avoid and recover intentional fraudulent transfers from the

BLMIS account held by Legacy Capital Ltd. ("Legacy") pursuant to 11 U.S.C. §§

548(a)(1)(A) and 550(a)(1).  The Trustee now moves for summary judgment.  For the

reasons that follow, the Trustee's motion is denied but certain facts are deemed either

immaterial or undisputed for the purposes of this adversary proceeding.

# BACKGROUND

## A.  Madoff's Arrest and the BLMIS SIPA Liquidation

On December 11, 2008 (the "Filing Date"), Bernard L. Madoff was arrested for

securities fraud, *see United States v. Madoff*, 586 F. Supp. 2d 240, 244 (S.D.N.Y. 2009),

and the Securities and Exchange Commission ("SEC") commenced an action against

Madoff and BLMIS alleging various violations of the Investment Advisers Act of 1940,

the Securities Act of 1933, and the Securities Exchange Act of 1934.  (*See Complaint*,

dated Dec. 11, 2008 (ECF Dist. Ct. No. 1:08-cv-10791-LLS Doc. # 1).)  Four days later,

the Securities Investor Protection Corporation ("SIPC") filed an application for a

protective decree pursuant to SIPA § 78eee(a)(3) maintaining that BLMIS was unable to

meet its obligations to its customers and the customers needed the protections afforded

by SIPA.  (*See Application of the Securities Investor Protection Corporation*, dated Dec.

15, 2008 (ECF Dist. Ct. No. 1:08-cv-10791-LLS Doc. # 5).)  The District Court granted

SIPC's application, appointed the Trustee and his counsel pursuant to SIPA §

78eee(b)(3), and removed the SIPA proceeding to this Court pursuant to SIPA §

78eee(b)(4).  (*See Order*, dated Dec. 15, 2008 (ECF Main Case[1] Doc. # 1).)

On March 12, 2009, Madoff pleaded guilty to an eleven-count criminal

information including charges of securities fraud, investment adviser fraud, mail fraud,

wire fraud, money laundering, making false statements, perjury, making false filings

with the SEC, and theft from an employee benefit plan.  (*See Transcript of March 12,*

---

[1]      "ECF Main Case Doc. # _" refers to documents filed on the electronic docket of the BLMIS SIPA
proceeding, *In re BLMIS*, No. 08-01789 (SMB).  "ECF Doc. # _" refers to documents filed on the
electronic docket of this adversary proceeding, *Picard v. Legacy Capital Ltd.*, Adv. Pro. No. 10-05286
(SMB).  References to District Court dockets will include the abbreviation "Dist. Ct.," the case number,
and the document number.

*2009 Hr'g in United States v. Madoff*, No. 09 CR 213 (DC) ("Madoff Allocution")[2] at

7:23-8:12.) On June 29, 2009, Madoff was sentenced to a prison term of 150 years.

(*See Judgment*, dated June 29, 2009 (ECF Dist. Ct. No. 1:09-cr-00213-DC-1 Doc. #

100).)

## B. This Adversary Proceeding

The Trustee commenced this adversary proceeding on December 6, 2010 and

filed an *Amended Complaint* on July 2, 2015 ("*Amended Complaint*") (ECF Doc. # 112)

asserting actual and constructive fraudulent transfer claims under the Bankruptcy Code

and New York law to avoid and recover over $213 million from Legacy as initial

transferee and $6.6 million from Khronos LLC as subsequent transferee. (*See Amended

Complaint*, ¶ 2.) Legacy and Khronos each moved to dismiss the *Amended Complaint*

for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

(*See* ECF Doc. ## 115, 120.) As set forth in *Picard v. Legacy Capital Ltd.* (*In re BLMIS*),

548 B.R. 13 (Bankr. S.D.N.Y. 2016) ("*Dismissal Decision*"), the Court dismissed the

claims against Khronos and dismissed the claims against Legacy except for the actual

fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(A) to avoid and recover transfers

from Legacy's BLMIS account within two years of the Filing Date. (*See Order Granting

Legacy Capital Ltd.'s and Khronos LLC's Motions to Dismiss the Amended Complaint

under Bankruptcy Rule 7012(b) and Federal Rule of Civil Procedure 12(b)(6)*, dated

---

[2]       A copy of the Madoff Allocution is attached as Exhibit 1 to the *Declaration of Oren J. Warshavsky
in Support of Plaintiff's Motion for Summary Judgment*, dated Dec. 21, 2018 ("*Warshavsky
Declaration*") (ECF Doc. # 193).

Apr. 12, 2016 (ECF Doc. # 137).)  Legacy answered the *Amended Complaint* on May 16,

2016 ("*Answer*") (ECF Doc. # 139).

    The Trustee now moves for summary judgment on the remaining claim, (*see*

*Trustee's Memorandum of Law in Support of Motion for Summary Judgment*, dated

Dec. 21, 2018 ("*Trustee Brief*") (ECF Doc. # 191)), and Legacy opposes the motion.  (*See*

*Memorandum of Law in Opposition to Trustee's Motion for Summary Judgment*,

dated Mar. 1, 2019 ("*Legacy Brief*") (ECF Doc. # 199).)

## DISCUSSION

    Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary

proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure,

governs motions for summary judgment.  The moving party bears the initial burden of

showing that no genuine factual issue exists and that the undisputed facts establish its

right to judgment as a matter of law.  *Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1060-61

(2d Cir. 1995); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In making that

determination, a court must view the evidence "in the light most favorable to the

opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157 (1970)).  If the movant carries his initial burden, the

nonmoving party "must do more than simply show that there is some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

475 U.S. 574, 586-87 (1986).  "Where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

*Id.* at 587 (citation and internal quotation marks omitted); *accord Scott v. Harris*, 550

U.S. 372, 380 (2007).  The court's function at the summary judgment stage is not to

resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Where the Court does not grant all the relief sought by the movant, it may nonetheless enter an order stating any material fact, including any item of damages or other relief, not in genuine dispute and treat that fact as established in the case. FED. R. CIV. P. 56(g); *see* 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.123 (3d ed. 2018).

## A.    The Trustee's *Prima Facie* Case

Under section 548(a)(1)(A) of the Bankruptcy Code, a bankruptcy trustee "may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . made such transfer . . . with actual intent to hinder, delay, or defraud any [creditor]."[3] Thus, the elements of an intentional fraudulent transfer claim under section 548(a)(1)(A) are: (i) a transfer of an interest of the debtor in property;[4] (ii) made within two years of the petition date;[5] (iii) with "actual intent to hinder, delay, or defraud" a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, No. 05 Civ. 9050 (LMM), 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd*, 748 F.3d 110 (2d Cir.

---

[3]    To the extent consistent with SIPA, a liquidation of a broker or dealer is "conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7" of the Bankruptcy Code. SIPA § 78fff(b).

[4]    Money held by a broker on behalf of its customers is not the broker's property under state law. SIPA § 78fff-2(c)(3) circumvents this problem by treating customer property as though it were the debtor's property in an ordinary bankruptcy. *See Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014) (SIPA creates a "legal fiction that confers standing on a SIPA trustee by treating customer property as though it were 'property of the debtor'"). Thus, customer deposits are deemed to be BLMIS's property for the purposes of this adversary proceeding.

[5]    In this SIPA proceeding, the relevant "petition date" is the Filing Date of December 11, 2008, the date the SIPA proceeding is deemed to have been commenced. *See* SIPA § 78*lll*(7)(B).

2014); *McHale v. Boulder Capital LLC* (*In re 1031 Tax Grp., LLC*), 439 B.R. 47, 68

(Bankr. S.D.N.Y. 2010), *supplemented by* 439 B.R. 78 (Bankr. S.D.N.Y. 2010).

**1.    The Transfers**

Legacy has admitted that BLMIS transferred $174 million from its BLMIS

account within two years of the Filing Date (the "Two-Tear Transfers").  (*Legacy Capital

Ltd.'s Response to Trustee's Statement of Material Facts Pursuant to Local Bankruptcy

Rule 7056-1*, dated Mar. 1, 2019 ("*Legacy 7056-1 Statement*"), ¶ 35 (ECF Doc. # 199-

47); *see Amended Complaint*, ¶ 37 and *Answer*, ¶ 37; *see also Stipulation and Order as

to Undisputed Transfers*, dated Jan. 12, 2017 ("*Transfers Stipulation*"), ¶ 4 ("Exhibit A

to this stipulation accurately sets forth the cash deposits and cash withdrawals from the

. . . BLMIS accounts.") (ECF Doc. # 155).)[6]  Legacy argues that the aggregate of $87

million was actually transferred from its BLMIS account to BNP Paribas – Dublin

Branch, a registered branch of BNP Paribas S.A. (together, "BNP Paribas") as repayment

for a $100 million line of credit.  (*Amended Complaint*, ¶¶ 139, 140; *Answer*, ¶¶ 139,

140, 142.)  It suggests that the Court should ignore these transfers in computing its

liability.  (*Legacy Brief* at 16-17.)

The argument lacks merit.  The payment to BNP Paribas does not affect the

amount of the transfers.  At most, it makes BNP Paribas rather than Legacy the initial

transferee of transfers that are otherwise fraudulent.  Liability is not, however, limited to

recovery from the initial transferee.  A trustee may also recover an avoided fraudulent

---

[6]    Legacy now contends that the Trustee has not established the source of the transfers.  (*Legacy Brief* at 13.)  Its new argument ignores its earlier admissions that the transfers were made by BLMIS.  It matters not which BLMIS bank account was the source of the transfers.

transfer from the entity for whose benefit the transfer was made, 11 U.S.C. § 550(a)(1), and any subsequent transferee.  11 U.S.C. § 550(a)(2).  Since the transfers made to BNP Paribas satisfied Legacy's obligations to BNP Paribas, Legacy was the entity for whose benefit those transfers were made within the meaning of 11 U.S.C. § 550(a)(1).  *See Ames Merch. Corp. v. Nikko Am., Inc.* (*In re Ames Dep't Stores, Inc.*), No. 01-42217 (REG), 2011 WL 1239804, at *5 (Bankr. S.D.N.Y. Mar. 28, 2011) ("The 'paradigm' transfer beneficiary is a party . . . whose debts are extinguished or reduced by the transfer: that is someone who receives the benefit but not the money.") (footnote, alteration and internal quotation marks omitted).

### 2.    Intent

To prove intent to deceive, the Trustee relies on the "Ponzi scheme presumption" under which the intent to hinder, delay, or defraud creditors is presumed if the transferor operated a Ponzi scheme and the transfers are made in furtherance of the Ponzi scheme.  *See Moran v. Goldfarb*, No. 09 Civ. 7667 (RJS), 2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012) ("an actual intent to defraud is presumed because the transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay, or defraud creditors") (citation, internal quotation marks and alteration omitted); *Bear, Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 11 (S.D.N.Y. 2007) ("if a transfer serves to further a Ponzi scheme, then the presumption applies and 'actual intent' under § 548(a)(1)(A) is present"); *Geltzer v. Barish* (*In re Starr*), 502 B.R. 760, 770 (Bankr. S.D.N.Y. 2013) ("In order to apply the Ponzi scheme presumption, the transfers must be made in furtherance of the fraud."); *see Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC* (*In re*

*Bayou Grp., LLC*), 439 B.R. 284, 294, 307-08 (S.D.N.Y. 2010). "A 'Ponzi scheme'

typically describes a pyramid scheme where earlier investors are paid from the

investments of more recent investors, rather than from any underlying business

concern, until the scheme ceases to attract new investors and the pyramid collapses."

*Eberhard v. Marcu*, 530 F.3d 122, 132 n. 7 (2d Cir. 2008); *accord Hirsch v. Arthur*

*Andersen & Co.*, 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995) (quoting *McHale v. Huff* (*In re*

*Huff*), 109 B.R. 506, 512 (Bankr. S.D. Fla. 1989)). The presumption is based on a

recognition that a Ponzi scheme operator knows that the scheme will eventually collapse

when the pool of investors runs dry and the remaining investors will lose their money.

*Bayou*, 439 B.R. at 306 n. 19 ("Knowledge to a substantial certainty constitutes intent in

the eyes of the law, and awareness that some investors will not be paid is sufficient to

establish actual intent to defraud.") (citation and internal quotation marks omitted).

Some courts have used the following four-factor test to determine the existence of

a Ponzi scheme:

> 1) deposits were made by investors; 2) the Debtor conducted little or no
> legitimate business operations as represented to investors; 3) the
> purported business operation of the Debtor produced little or no profits or
> earnings; and 4) the source of payments to investors was from cash
> infused by new investors.

*Armstrong v. Collins*, No. 01 Civ. 2437 (PAC), 2010 WL 1141158, at *22 (S.D.N.Y. Mar.

24, 2010), *reconsideration denied*, No. 01 Civ. 2437 (PAC), 2011 WL 308260 (S.D.N.Y.

Jan. 31, 2011); *accord Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1312 (M.D. Fla.

2009); *Forman v. Salzano* (*In re Norvergence, Inc.*), 405 B.R. 709, 730 (Bankr. D. N.J.

2009); *Rieser v. Hayslip* (*In re Canyon Sys. Corp.*), 343 B.R. 615, 630 (Bankr. S.D.

Ohio 2006). Ultimately, however, the Ponzi scheme label applies "to any sort of

inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud." *Manhattan Inv. Fund*, 397 B.R. at 12; *accord Gowan v. Amaranth Advisors L.L.C.* (*In re Dreier LLP*), Adv. Proc. Nos. 10-03493, 10-05447 (SMB), 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 3, 2014); *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P.* (*In re Bayou Grp., LLC*), 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007).

The Trustee relies primarily on the plea allocutions of Madoff and another former BLMIS employee, Frank DiPascali,[7] to prove that BLMIS was operated as a Ponzi scheme.[8]  Madoff admitted that "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of [BLMIS]," (Madoff Allocution at 23:14-17), and described how he misrepresented to investment advisory ("IA") clients that he would invest their funds using the so-called split-strike-conversion ("SSC") strategy:

> Through the [SSC strategy] I promised to clients and prospective clients that client funds would be invested in a basket of common stocks within the Standard & Poors 100 index, a collection of the 100 largest publicly-traded companies in terms of their market capitalization.  I promised that I would select a basket of stocks that would closely mimic the price

---

[7]    *See Transcript of Aug. 11, 2009 Hr'g in United States v. DiPascali*, No. 09 CR 764 (RJS) ("DiPascali Allocution"), a copy of which is attached to the *Warshavsky Declaration* as Exhibit 3.

[8]    The Trustee also relies on the plea allocutions of David Kugel, Irwin Lipkin, Eric Lipkin and Enrica Cotellessa-Pitz, long time BLMIS employees.  The Court may rely on a plea allocution as evidence to support a fact.  *Am. Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.*, No. 94Civ.2727 (WK)(AJP), 1997 WL 906427, at *4 n. 7 (S.D.N.Y. Sept. 12, 1997) ("plea allocutions are admissible pursuant to Fed. R. Evid. 803(22)") (citing authorities); *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.* (*In re Bayou Grp., LLC*), 396 B.R. 810, 834-35 (Bankr. S.D.N.Y. 2008) ("Guilty pleas and plea allocutions in criminal cases are admissible evidence in subsequent civil proceedings.  *See* Fed. R. Evid. 803(22) and 807.") (citing authorities), *aff'd in part and rev'd in part on other grounds*, 439 B.R. 284 (S.D.N.Y. 2010); *accord Johnson v. Neilson* (*In re Slatkin*), 525 F.3d 805, 812 (9th Cir. 2008) ("the plea agreement is admissible under Federal Rule of Evidence 807").

movements of the Standard & Poors index.  I promised that I would
opportunistically time those purchases and would be out of the market
intermittently, investing client funds during these periods in United States
Government-issued securities, such as United States Treasury bills.  In
addition, I promised that as part of the [SSC strategy], I would hedge the
investments I made in the basket of common stocks by using client funds
to buy and sell option contracts related to those stocks, thereby limiting
potential client losses caused by unpredictable changes in stock prices.  In
fact, I never made those investments I promised to clients, who believed
they were invested with me in the [SSC strategy].

(Madoff Allocution at 25:25-26:18.)

As Madoff never invested in securities on behalf of his IA clients (which included

Legacy), the securities positions listed on the BLMIS account statements were fictitious,

and redemptions were paid from a commingled bank account containing the deposits of

all IA customers:

The essence of my scheme was that I represented to clients and
prospective clients who wished to open investment advisory and individual
trading accounts with me that I would invest their money in shares of
common stock, options, and other securities of large well-known
corporations, and upon request, would return to them their profits and
principal.  Those representations were false for many years.  Up until I was
arrested on December 11, 2008, I never invested these funds in the
securities, as I had promised.  Instead, those funds were deposited in a
bank account at Chase Manhattan Bank.  When clients wished to receive
the profits they believed they had earned with me or to redeem their
principal, I used the money in the Chase Manhattan bank account that
belonged to them or other clients to pay the requested funds.

(*Id.* at 24:9-22.)  DiPascali similarly admitted that BLMIS made no actual trades for its

IA customers:

THE DEFENDANT:  From at least the early 1990s through December of
2008, there was one simple fact that Bernie Madoff knew, that I knew, and
that other people knew but that we never told the clients nor did we tell
the regulators like the SEC.  No purchases of [sic] sales of securities were
actually taking place in their accounts.  It was all fake.  It was all fictitious.
It was wrong and I knew it was wrong at the time, sir.

THE COURT:  When did you realize that?

11

THE DEFENDANT: In the late '80s or early '90s.

. . .

From our office in Manhattan at Bernie Madoff's direction, and together
with others, I represented to hundreds, if not thousands, of clients that
security trades were being placed in their accounts when in fact no trades
were taking place at all.

(DiPascali Allocution at 46:9-25.) To cover up the fraud, Madoff and BLMIS generated

trade confirmations and account statements containing "bogus transactions and

positions." (Madoff Allocution at 27:9-13; *see also* DiPascali Allocution at 47:16-22 ("On

a regular basis I used hindsight to file historical prices on stocks then I used those prices

to post purchase of [sic] sales to customer accounts as if they had been executed in

realtime. On a regular basis I added fictitious trade data to account statements of

certain clients to reflect the specific rate of . . . return that Bernie Madoff had directed

for that client.").)

The allocutions establish *prima facie* that Madoff ran BLMIS as a Ponzi scheme.

Madoff admitted to operating a Ponzi scheme, (Madoff Allocution at 23:15-16), failing to

invest customer funds as promised, (*id*. at 24:9-17), paying redemption requests with

customer deposits, (*id*. at 24:18-22) and issuing bogus customer statements and trade

confirmations to conceal the fraud. (*Id*. at 27:9-19.) DiPascali also admitted that

BLMIS performed no securities trades as promised to customers, (DiPascali Allocution

at 46:9-25) and posted fictitious "gains" in customer accounts and statements. (*Id*. at

47:16-22.)

Legacy nonetheless challenges this conclusion. During the course of its

operations, BLMIS also purchased U.S. Treasury Bills ("T-Bills") from third-party

brokers such as Morgan Stanley and Lehman Brothers with customer deposits not

needed to pay redemptions, (*Transcript of Deposition of Bernard L. Madoff*, dated Dec.

20, 2016 ("Madoff 12/20/16 Dep. Tr.")[9] at 161:11-25), in order to earn more interest

than its Chase bank accounts paid. (*Transcript of United States v. Bonventre*, No. 10 Cr

228 (LTS), dated Dec. 5, 2013 ("Criminal Trial 12/5/13 Tr.")[10] at 4931:16-23.) Legacy

argues that BLMIS was not a Ponzi scheme because it engaged in these legitimate

transactions. (*Legacy Brief* at 8-10.)

The purchase of T-Bills did not transform BLMIS into a legitimate enterprise or

prohibit the Trustee's reliance on the Ponzi scheme presumption. Ponzi scheme

operators often engage in some legitimate transactions but if the legitimate transactions

further the scheme or are funded by the scheme they are part of the scheme. For

example, in *Wing v. Layton*, 957 F. Supp. 2d 1307 (D. Utah 2013), VesCor ostensibly

operated as a real estate development enterprise promising substantial returns to its

investors. The business was never profitable and VesCor actively concealed its losses by

paying earlier investors with money raised from later investors. *Id.* at 1309-10. VesCor

was eventually placed into receivership and the receiver sued a former officer of VesCor

("Layton") seeking the return of funds he received from VesCor as intentional fraudulent

transfers under state law. *Id.* at 1313.

---

[9]     A copy of Madoff 12/20/16 Dep. Tr. is attached as Exhibit 2 to the *Warshavsky Declaration*.

[10]     A copy of the Criminal Trial 12/5/13 Tr. is attached as Exhibit 2 to the *Reply Declaration of Oren J. Warshavsky in Support of the Trustee's Motion for Summary Judgment*, dated Mar. 22, 2019 ("*Warshavsky Reply Declaration*") (ECF Doc. # 202).

The receiver invoked the Ponzi scheme presumption because "VesCor as a whole operated as a Ponzi scheme." *Id.* at 1314.  Layton countered that even if VesCor was a Ponzi scheme, the Ponzi scheme presumption did not apply to the relevant transfers because the two real estate projects with which he was most involved (KOJO and Siena Office Park) were profitable and independent of any Ponzi scheme which may have existed. *Id.* at 1314.  The District Court rejected Layton's effort to disaggregate the legitimate transactions from the Ponzi scheme:

> [T]he fact that the KOJO and Siena Office Park projects might have been profitable—which the Receiver strongly disputes—misses the point.  The Receiver appears to not dispute that development activity occurred with the VesCor enterprise.  Even so, seemingly legitimate business activity does not insulate companies from a finding that they were operated as part of a Ponzi scheme.  As the Receiver points out, ponzi schemes sometimes use legitimate operations to attract investors, but this does not insulate those operations from the taint of the Ponzi scheme.  *See, e.g.*, *Jobin v. McKay*, 84 F.3d 1330, 1332 (10th Cir.1996) (Ponzi scheme existed where its perpetrator used the company's legitimate operations as a computer sales and leasing company as a front); *Sender v. Simon*, 84 F.3d 1299, 1302 (10th Cir.1996) (Ponzi scheme existed in partnership hedge fund where "trading resulted in net profits in a few years," though "in most years the Hedged Investments operation realized net trading losses").

*Id.* at 1315 (record citations omitted).  Regardless of their profitability, the KOJO and Sienna Office Park projects were part of the larger VesCor scheme and the money that funded those projects came from VesCor's commingled funds.  *Id.*

*Gredd v. Bear, Stearns Sec. Corp.* (*In re Manhattan Inv. Fund Ltd.*), 310 B.R. 500, 510-11 (Bankr. S.D.N.Y. 2002), *leave to appeal denied*, 288 B.R. 52 (S.D.N.Y. 2002), is to the same effect.  There, Berger ran a Fund that engaged in the business of short-selling securities.  Bear Stearns served as the prime broker and financed all the Fund's short sales with loans of securities to cover the short sales.  *Id.* at 502-03.  As losses mounted, Berger hid the losses, distributed false account statements to investors

14

and service providers and paid off earlier investors with funds acquired from later investors, a classic Ponzi scheme much like BLMIS.  *Id.* at 503.

Gredd, the Fund's chapter 11 trustee, sued Bear Stearns under 11 U.S.C. § 548(a)(1)(A) to avoid and recover the margin payments as intentional fraudulent transfers and relied on the Ponzi scheme presumption to establish the Fund's actual intent to defraud.  Bear Stearns moved to dismiss, countering that even if the Fund was operated as a Ponzi scheme, the presumption was inapplicable to the transfers at issue because the practice of short selling stocks was a legitimate business separate from the Ponzi scheme.  *Id.* at 506.

Judge Lifland made quick work of Bear Stearns' argument:

> Bear Stearns' argument that actual fraudulent intent cannot be presumed in this case because the margin payments at issue were made in connection with a legitimate business outside of the Ponzi scheme—namely, the short selling of securities—is ludicrous.

*Id.* at 510-11.  Noting that Berger had pled guilty to criminal charges of securities fraud while working for the Fund, Judge Lifland concluded:

> [I]t is impossible for this Court to understand how Bear Stearns attempts to characterize Berger's continued short selling activities as a legitimate business enterprise.  Moreover, "a guilty plea or criminal conviction of the perpetrator of the Ponzi scheme provides evidence of actual fraudulent intent."  *In re C.F. Foods,* 280 B.R. at 111 (*citing Floyd v. Dunson, (In re Ramirez),* 209 B.R. 424, 433 (Bankr.S.D.Tex.1997)).  Accordingly, I find that by citing to Berger's guilty plea and conviction, coupled with the fact that the margin payments were made in connection with a massive Ponzi scheme, the Trustee has sufficiently alleged facts pursuant to Bankruptcy Rules 7009(b) and 7012(b) to withstand Bear Stearns' Motion to Dismiss.

*Id.* at 511.

Madoff operated the largest, longest running Ponzi scheme in history.  He had to pay redemptions and profits to or for the benefit of customers like Legacy to further the scheme.  If BLMIS did not pay redemptions or profits on request, its aura of success would evaporate, new investments would dry up and the scheme would collapse. The use of the funds he stole from BLMIS's customers to purchase T-Bills was an integral part of the scheme; it enabled BLMIS to earn more interest to pay more redemptions for a longer time and keep the scheme running.  In fact, Madoff allocuted that he told his investors, albeit falsely, that the timed purchase of T-Bills was a component of the SSC strategy.  (Madoff Allocution at 26:7-11.)

Accordingly, the Trustee has established that there is no genuine disputed issue of fact that BLMIS was a Ponzi scheme and that it transferred its interest in $174 million to or for the benefit of Legacy in furtherance of the Ponzi scheme within two years of the Filing Date.  Furthermore, although the start date of the Ponzi scheme is disputed for the reasons discussed in the next section, Legacy does not dispute that the Ponzi scheme was ongoing during the period of the Two-Year Transfers or that the Two-Year Transfers were made in connection with the Ponzi scheme in large part from the property of other customers.  The Trustee is, therefore, entitled to rely on the Ponzi scheme presumption, and has established as a matter of law that the Two-Year Transfers were made with the actual intent to defraud.

## B.   Legacy's Value Defenses

Section 548(c) of the Bankruptcy Code provides a defense to a fraudulent transfer claim to the extent the transferee took "for value and in good faith."  The Trustee has the burden of proving lack of good faith, *SIPC v. BLMIS* (*In re BLMIS*), 516 B.R. 18, 23-24

(S.D.N.Y. 2014), and Legacy has the burden of proving value. *Bayou*, 439 B.R. at 308 (burden of proving "value" under 11 U.S.C. § 548(c) is on the transferee); *cf. Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 206 (Bankr. S.D.N.Y. 2018) (subsequent transferee must demonstrate that it gave value to prevail on defense under Bankruptcy Code § 550(b)(1)); *Dismissal Decision*, 548 B.R. at 37 (same). The Court previously ruled that the Trustee failed to adequately allege Legacy's bad faith, *see Dismissal Decision*, 548 B.R. at 28-35, and the remaining issue under section 548(c) is whether Legacy received some or all of the Two-Year Transfers for value.

The parties agreed in the *Transfers Stipulation* that $126,674,219.00 in principal was deposited into Legacy's BLMIS account and $212,800,000 was withdrawn, leaving a negative balance of $86,125,781.00. The Trustee's expert computed the fictitious profits in the slightly higher amount of $86,505,850.00. (*See Expert Report of Matthew B. Greenblatt, CPA/CFF, CFE, Senior Managing Director FTI Consulting, Inc., Principal Balance Calculation as Applied to Legacy Capital Ltd.*, dated Feb. 20, 2017, ¶ 45.)[11] The difference appears to relate to additional reductions based on withholding taxes. (*See id*, Ex. 4D.) I leave to trial the determination of the correct amount.

Legacy makes three arguments in support of its contention that the amount of fictitious profits should be lower or even zero: (1) the Ponzi scheme started later than

---

[11] A copy of Mr. Greenblatt's report is attached to the *Warshavsky Declaration* as Exhibit 9.

the Trustee argues; (2) Legacy earned profits from legitimate T-Bill trades in its account

that the Trustee ignores; and (3) the Two-Year Transfers satisfied antecedent debts.[12]

### 1. Ponzi Scheme Start Date

To determine a customer's net equity in its BLMIS account, the Second Circuit

has endorsed the Trustee's Net Investment methodology of subtracting cash

withdrawals from cash deposits and ignoring the fictitious securities and trading profits

that appeared on the customers' monthly statements. *In re BLMIS*, 654 F.3d 229, 234-

40 (2d Cir. 2011), *cert. denied*, 567 U.S. 934 (2012). "Value" under section 548(c) is

computed in the same way. *Picard v. Greiff* (*In re BLMIS*), 476 B.R. 715, 725 (S.D.N.Y.

2012) ("transfers from [BLMIS] to defendants that exceeded the return of defendants'

principal, *i.e.*, that constituted profits, were not 'for value'"), *aff'd on other grounds by*

773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015).

In some cases, a BLMIS account received a deposit through an inter-account

transfer from another BLMIS account.  In determining the amount of the deposit to be

credited to the transferee account, the Trustee followed the same methodology.  First, he

computed the actual balance in the transferor account under the Net Investment

method.  Second, he gave the transferee account a credit up to the amount of the actual

balance and ignored the amount of any purported transfer to the extent it exceeded the

---

[12]     Arguably, the first two points, the Ponzi scheme start date and the profits from T-Bill trades, are
foreclosed by the *Transfers Stipulation*.  If correct, the cash deposits were greater than the stipulated
amounts.  Legacy raised these contentions in its opposition papers.  The Trustee did not argue in his reply
or at oral argument that these arguments were foreclosed by the *Transfers Stipulation*.

actual balance.  *See Sagor v. Picard* (*In re BLMIS*), 697 F. App'x 708, 710-11 (2d Cir. 2017).

   In October 2000, Montpellier International LDC ("Montpellier") transferred the balance in its BLMIS account to Legacy's BLMIS account.[13]  Utilizing the inter-account methodology, the Trustee credited the Legacy account in the amount of $13,706,225. (*See Transfers Stipulation*, Ex. A, at 7.)  In computing the balance at the time of the transfer, the Trustee assumed that the Ponzi scheme was in full force throughout the life of the Montpellier account.  Hence, he ignored trading profits appearing on Montpellier's monthly statements.  If, however, the Ponzi scheme began after the Montpellier account was opened, pre-scheme trading profits would have been real instead of fictitious.  In that case, the balance in the Montpellier BLMIS account at the time of the transfer to Legacy would have been greater, the amount of the transfer to Legacy would have been greater and the amount of Legacy's liability for fictitious profits would be smaller.

   The Montpellier BLMIS account was opened on March 16, 1992, (*id.*), which may have been before the Ponzi scheme began.  The evidence submitted on this issue is confusing.  Madoff stated in his allocution that "[t]o the best of my recollection, my fraud began in the early 1990s."  (Madoff Allocution at 25:12-13.)  At his December 2016 deposition, Madoff for the most part stuck with 1992 as the year that the Ponzi scheme began, (Madoff 12/20/16 Dep. Tr. at 19:14-17; 26:20-23), but added that 1992 was a

---

[13]   Legacy also received inter-account transfers from two other accounts held by Olympus Assets LDC and HCH Management Company Limited, but those accounts were opened in 1997 and 1999, respectively, (*see Transfers Stipulation,* Ex. A, at 8-9), well after the latest date suggested as the onset of the Ponzi scheme.

"ballpark number" and the Ponzi scheme began "during the Gulf War situation."[14] (*Id.* at 20:1-4.)  During his April 2017 deposition, Madoff declared that although his Ponzi scheme "began in 92," BLMIS performed "some transactions" for its IA customers "through 1993." (*Transcript of Deposition of Bernard L. Madoff*, dated April 26, 2017 ("Madoff 4/26/17 Dep. Tr.")[15] at 91:7-12; *accord id.* at 12:1-4.)  Moreover, while Madoff never said that trades occurred in 1994, he answered in the affirmative to a question that referenced 1994 as a timeframe for when BLMIS was still performing some trades. (*See id.* at 92:9-12 ("Q. . . .  [Y]ou testified earlier today that you were doing the split strike trades until late 1993 or early 1994?[16]  A.  Right."); *see also id.* at 17:20-18:2.) Other former BLMIS employees, however, fixed the onset of the Ponzi scheme to a much earlier date.  DiPascali stated that he realized that BLMIS was not trading securities in the "late '80s or early '90s," (DiPascali Allocution at 46:9-17), and David Kugel allocuted that, "beginning in the early 70s," he helped create "fake, backdated trades based on historical stock prices" that were "executed only on paper." (*Transcript of Nov. 21, 2011 Hr'g in United States v. Kugel*, No. 10 Cr. 228 (LTS) ("Kugel Allocution") at 32:4-14.)[17]

---

[14]     Although not part of the record for purposes of this summary judgment motion, the Gulf War began and ended in the early part of 1991. *See War in the Gulf: The White House; Transcript of President's Address on the Gulf War*, N.Y. TIMES, Feb. 28, 1991, *available at* https://www.nytimes.com/1991/02/28/world/war-gulf-white-house-transcript-president-s-address-gulf-war.html?searchResultPosition=11.

[15]     A copy of Madoff 4/26/17 Dep. Tr. is attached as Exhibit B to the *Declaration of Nicholas F. Kajon in Opposition to the Trustee's Motion for Summary Judgment*, dated Mar. 1, 2019 ("*Kajon Declaration*") (ECF Doc. # 199-1).

[16]     Counsel did not object to this question at the deposition.

[17]     A copy of the Kugel Allocution is attached to the *Warshavsky Declaration* as Exhibit 4.

Viewing the evidence in the light most favorable to Legacy, it is possible that the
Ponzi scheme did not begin until sometime in 1994 and any prior trades and profits
derived from those trades in the Montpellier account were real.  The Court cannot
determine as a matter of law the date when the Ponzi scheme began and hence, the
actual balance transferred from Montpellier to Legacy is a genuine issue of disputed
fact.

### 2.  T-Bills Allocated to Customers

Although BLMIS' purchase of T-Bills does not affect the conclusion that BLMIS
was operated as a Ponzi scheme for the purposes of the Ponzi scheme presumption, a
related but separate question is whether the profits made by a BLMIS customer such as
Legacy from actual T-Bill purchases allocated to its BLMIS account during the Ponzi
scheme were real rather than fictitious and, therefore, increased the account balance
and decreased the amount of fictitious profits.  Legacy matched five such transactions to
its own BLMIS account,[18] but a discussion of just one illustrates its point.  On May 9,
2002, BLMIS purchased approximately $100 million worth of T-Bills, due July 25,
2002, from Morgan Stanley.  (*Mayer Declaration*, Ex. 2.)  According to BLMIS's
records, a corresponding trade confirmation sent to Legacy showed that BLMIS sold
Legacy approximately $12.4 million worth of the same T-Bills on May 20, 2002, (*id.*, Ex.
3), and the transaction also appeared on Legacy's May 2002 BLMIS account statement.

---

[18]     The actual matching was performed by Rafael Mayer, the managing member of Khronos LLC,
which provided accounting and financial services to Legacy.  (*Declaration of Rafael Mayer in Opposition
to the Trustee's Motion for Summary Judgment*, dated Feb. 28, 2019 ("*Mayer Declaration*"), at ¶ 1 (ECF
Doc. # 199-11).)  The records he matched are admissible, and the Court can perform the same task.  As
Mayer lacked personal knowledge of the five sets of trades he discussed in his declaration, I discount his
declaration, including his speculation that there are more than five sets of matching trades, in its entirety.

(*Id.*, Ex. 4.)  BLMIS's records then indicated that Legacy sold the same T-Bills back to

BLMIS on July 19, 2002, (*id.*, Exs. 5, 6), and BLMIS sold the original $100 million of T-

Bills back to Morgan Stanley on July 25, 2002.  (*Id.*, Ex. 7.)  According to Legacy's

monthly customer statements, it earned approximately $35,000.00 in profit from that

buy-sell transaction.  Legacy argues as a factual matter that BLMIS allocated actual T-

Bill purchases to its account, and as a legal matter, the profits from the T-Bill

transactions reduced its potential liability for fictitious profits.

The parties dispute whether the T-Bills that appeared in the trade confirmations

and monthly statements were real or, alternatively, were fictitious like the equity

securities in the same statements and unrelated to the actual T-Bills purchases by

BLMIS from third-party brokers.  The proof offered by the parties was mixed.  During

his allocution, Madoff described the SSC strategy, which included the timed purchases

of T-Bills, and said that none of the transactions took place in the customers' accounts.

At his deposition, however, he answered a series of questions indicating that he

purchased the T-Bills for the customers and those purchases were reflected on the

BLMIS customer statements:

> Q.    So you basically took the money that went into the 703 account?
>
> A.    Correct.
>
> Q.    Which was the investment advisory customers' money?
>
> A.    Correct.
>
> Q.    And you purchased Treasury bills with that?
>
> A.    Correct.
>
> Q.    And in the early '90s the Treasury bills were bearing an interest rate
> of about six percent; isn't that true?

> A.      No. . . . [T]hey were short-term T bills, so they were probably . . .
> closer to three to four percent.

> Q.      Okay.  And that three to four percent was money that was earned by
> the customers . . . whose money you were using?

> A.      Correct.

> Q.      And, in fact, the statements reflected the ownership of those
> Treasury securities?

> A.      Correct.  And they . . . also . . . reflected the ownership of the
> securities that I wasn't buying.

(Madoff 4/26/17 Dep. Tr. at 19:3-20:1; *accord id*. at 44:16-22.)  However, in the same

deposition, Madoff stated that the T-Bills were purchased to benefit his brokerage firm:

> Q.      And [the T-Bills] would have been held for the benefit of the
> investment advisory customers?

> A.      It would have been . . . held at the firm for the benefit of the firm.
> We didn't segregate . . . these securities.

(*Id.* at 40:2-6.)

In contrast, DiPascali testified during the criminal trial against multiple, former

BLMIS employees, *United States v. Bonventre*, No. 10 Cr. 228 (LTS), that although T-

Bills were purchased using customer property to earn additional interest, those

purchases were not reflected on the IA customer statements, and the T-Bills trades on

the IA customer statements were entirely fake:

> Q.      From time to time did you get real treasury bills?

> A.      Yes.

> Q.      And what were those real treasury bills for?

> A.      To invest the excess cash in the IA checking account.

> Q.      And when you say to invest the excess cash in the IA checking
> account, for what reason did you get a treasury bill to do that?

A.    So as to provide safety and an enhanced yield to what the checking account interest rate was.

Q.    So it would be fair to say it would be a way of getting interest on the checking account?

A.    More or less, yes.

. . .

Q.    Now, for . . . the IA side . . . when you would provide the fake information, what would you do there?

A.    I'd look at a pricing service of historical prices of treasury bills, ascertain the price on the date that I needed and write a ticket and put it into the AS/400.

. . .

Q.    Now, what was your understanding of what Ms. Bongiorno would do with the treasury information that you gave to her?

A.    She would put through a buy ticket that was approximately equal to the cash credit balance reflected in the account she was working on, and it would produce a confirmation and an entry on the customer statement that . . . now - - owned treasuries.

Q.    And as with the other trading that was on those accounts, was any of it real?

A.    No.

(Criminal Trial 12/5/13 Tr. at 4931:12-4933:13; *accord Transcript of United States v. Bonventre*, No. 10 Cr 228 (LTS), dated Dec. 4, 2013 at 4804:6-12.)[19]

Much of the Trustee's reply dealt with the five sets of T-Bill trades that Mayer had identified and pointed to inconsistencies in the evidence. These discrepancies and the relationship, if any, between BLMIS's purchase of T-Bills from brokers and the apparent

---

[19]    A copy of the December 4 trial transcript is attached as Exhibit 1 to the *Warshavsky Reply Declaration*. Legacy did not object to the use of DiPascali's trial testimony.

resale of a portion of those purchases to customers like Legacy raise factual issues that

the Court cannot resolve on this motion.

This does not necessarily mean that the disputed factual issue regarding the

allocation of actual T-Bill purchases to Legacy's account is material. The Court in *Wing*

*v. Layton* referred to the oft-cited opinion of Circuit Judge Posner in *Scholes v.*

*Lehmann*, 56 F.3d 750 (7th Cir.), *cert. denied*, 516 U.S. 1028 (1995). There, the Ponzi-

scheme fraudster ("Douglas") promised investors returns from commodities trading.

*Id.* at 752. Although Douglas engaged in some commodities trades, most of the money

raised from investors was used to pay the returns promised to earlier investors. *Id.*

Douglas's scheme lasted two years, he was arrested for fraud, and a receiver was

appointed. *Id.* The receiver commenced fraudulent conveyance actions under state law

against Phillips, a net winner investor in Douglas's Ponzi scheme. *Id.* at 753, 755.

Like the defendant in *Wing v. Layton*, Phillips argued that he was entitled to

keep the profits derived from legitimate trades. Rejecting Phillips's argument, Judge

Posner opined that profits earned with other people's money are not legitimate:

> It is no answer that some or for that matter all of Phillips's profit may have
> come from "legitimate" trades made by the corporations. They are not
> legitimate. The money used for the trades came from investors gulled by
> fraudulent representations. Phillips was one of those investors, and it may
> seem "only fair" that he should be entitled to the profits on trades made
> with his money. That would be true as between him and Douglas or
> Douglas's corporations. It is not true as between him and either the
> creditors of or the other investors in the corporations. He should not be
> permitted to benefit from a fraud at their expense merely because he was
> not himself to blame for the fraud.

*Id.* at 757; *accord Slatkin*, 525 F.3d at 815 ("Although the Johnsons argue that there is a

question of fact as to whether the purported profits they received were from 'legitimate'

investments made by Slatkin, in truth none of the trades made by Slatkin were 'legitimate' because the money used for the trades came from investors gulled by Slatkin's fraudulent representations.").

This case illustrates Judge Posner's point. Legacy was a substantial net winner. Its withdrawals exceeded its deposits by over $86 million. Even if Legacy received the benefits of Montpellier's early trades and the T-Bill profits realized from purchases made with its own principal deposits, it still received tens of millions of dollars of fictitious profits resulting from imaginary equity trades paid with other customers' funds. Once Legacy exhausted the net equity in its account, BLMIS necessarily used other investors' property to make the profitable T-Bill trades for which Legacy demands credit. I question the logic of this argument, but the parties did not address it and I do not decide it.

### 3.    Antecedent Debt

Finally, Legacy argues that it provided "value" within the meaning of section 548(c) because the transfers from BLMIS satisfied antecedent debts. *See* 11 U.S.C. § 548(d)(2)(A) ("value" includes the satisfaction of an antecedent debt of the debtor). As a victim of the fraud, Legacy had numerous statutory and common law claims against BLMIS and Madoff. Legacy maintains that the withdrawals from its BLMIS account satisfied BLMIS's liability to Legacy arising from BLMIS's fraud, breach of fiduciary duty and breach of contract claims under state law, and because Legacy was entitled to the securities that appeared on its customer statements under the New York Uniform Commercial Code. (*Legacy Brief* at 20-24; *see also Sur-Reply of Legacy Capital Ltd. in Response to Reply Memorandum of the Securities Investor Protection Corporation in*

26

*Support of the Trustee's Motion for Summary Judgment*, dated Apr. 4, 2019 ("*Legacy Sur-Reply*") (ECF Doc. # 212).)

These arguments have been rejected on multiple occasions by the District Court and this Court in other fraudulent transfer actions brought by the Trustee. *See Picard v. Lowrey* (*In re BLMIS*), 596 B.R. 451, 464 (S.D.N.Y. 2019) ("*Lowrey II*") (Engelmayer, J), *appeal docketed*, No. 19-429(L) (2d Cir. Feb. 20, 2019); *SIPC v. BLMIS* (*In re BLMIS*), 499 B.R. 416, 422-26 (S.D.N.Y. 2013) ("*Antecedent Debt Decision*") (Rakoff, J), *certification for interlocutory appeal denied*, 987 F. Supp. 2d 309 (S.D.N.Y. 2013); *Picard v. Greiff*, 476 B.R. at 724-26; *Picard v. Goldenberg* (*In re BLMIS*), No. 10-04946(SMB), 2018 WL 3078149, at *4-5 (Bankr. S.D.N.Y. June 19, 2018) (report and recommendation); *Picard v. Cohen* (*In re BLMIS*), 2016 WL 1695296, at *6-13 (Bankr. S.D.N.Y. Apr. 25, 2016) (report and recommendation), *adopted by* No. 16 Civ. 5513 (LTS), slip op. (S.D.N.Y. Feb. 24, 2016); *SIPC v. BLMIS* (*In re BLMIS*), 531 B.R. 439, 461-63 (Bankr. S.D.N.Y. 2015) ("*Omnibus Good Faith Decision*").

These decisions have established that a transferee in a Ponzi scheme does not give value beyond his deposit of principal. *See, e.g.*, *Lowrey II*, 596 B.R. at 464 ("where defendants seek rescission and have received full repayment on the principal investment, they have no freestanding interest claim") (quoting *Antecedent Debt Decision*, 499 B.R. at 422); *Antecedent Debt Decision*, 499 B.R. at 421 n. 4; *Greiff*, 476 B.R. at 725 (ruling that transfers in excess of principal were not "for value" and noting that "every circuit court to address this issue has concluded that an investor's profits from a Ponzi scheme, whether paper profits or actual transfers, are not 'for value'"); *Omnibus Good Faith Decision*, 531 B.R. at 462-63 (citing authorities); *see also*

*Silverman v. Cullin* (*In re Agape World, Inc.*), 633 F. App'x 16, 17 (2d Cir.) (noting that the "prevailing view" among district and bankruptcy courts in the Second Circuit is to treat the payment of interest in Ponzi schemes as fraudulent transfers because "fair consideration" is not present in the context of such schemes) (summary order), *cert. denied*, 137 S. Ct. 160 (2016). In addition, a broker cannot use customer property to satisfy his personal liability. Hence, a transferee of the broker cannot defend against a SIPA trustee's claim for the return of customer property by arguing that the earlier transfer of customer property satisfied the transferee's statutory and common law claims against the broker. *See, e.g.*, *Lowrey II*, 596 B.R. at 464 (quoting *Antecedent Debt Decision*, 499 B.R. at 424) (alteration omitted); *accord Cohen*, 2016 WL 1695296, at *11.[20]

Legacy argues, (*see Legacy Brief* at 21-22; *Legacy Sur-Reply* at 2-4), that the above precedent was overruled by the Second Circuit's decision in *Picard v. Ida Fishman Revocable Tr.* (*In re BLMIS*), 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015), but this argument has also been rejected on numerous occasions by this Court and the District Court. *See Lowrey II*, 596 B.R. at 466-67 ("the Second Circuit did not, in *Ida Fishman* or elsewhere, upset 'the general rule in Ponzi scheme cases limiting value to principal deposits'") (quoting *Lowrey I*, 2018 WL 1442312, at *13); *Cohen*, 2016 WL 1695296, at *12-13; *Omnibus Good Faith Decision*, 531 B.R. at 469-70.

---

[20]     Non-bankruptcy law similarly prohibits a broker from using customer property held by the broker to discharge the broker's personal debts. *See Picard v. Lowrey* (*In re BLMIS*), No. 10-04387 (SMB), 2018 WL 1442312, at *10-11 (Bankr. S.D.N.Y. Mar. 22, 2018) (report and recommendation) ("*Lowrey I*"), *adopted by* 596 B.R. 451 (S.D.N.Y. 2019), *appeal docketed*, No. 19-429(L) (2d Cir. Feb. 20, 2019).

Last, Legacy argues, (*see Legacy Brief* at 18-20), that the Trustee's method for calculating its fraudulent transfer exposure violates the two-year-reach-back period set forth in 11 U.S.C. § 548(a)(1), citing to the Supreme Court decision in *Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017). Like the other arguments, this specific argument has also failed. *See Lowrey II*, 596 B.R. at 470-72; *Lowrey I*, 2018 WL 1442312, at *14; *accord Antecedent Debt Decision*, 499 B.R. at 427-28.

These rulings constitute law of the case, *see In re Motors Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018) (law of the case doctrine applies across adversary proceedings within the same bankruptcy case), *appeal docketed*, No. 18-1939 (2d Cir. June 28, 2018); *accord Moise v. Ocwen Loan Servicing LLC* (*In re Moise*), 575 B.R. 191, 205 (Bankr. E.D.N.Y. 2017), and the Court declines Legacy's invitation to revisit these prior decisions. But even if they did not establish the law of the case, the Court would follow the earlier precedent for the reasons they explained.

## CONCLUSION

The Trustee has shown that there is no genuine material issue of fact regarding his *prima facie* case and those facts are deemed established for the purposes of this adversary proceeding. The Trustee's motion for summary judgment is otherwise denied. The Court has considered the parties' other arguments and concludes that they lack merit or are mooted by the disposition of the motion. The Trustee is directed to

settle an order on notice that sets forth the established facts.  The parties are also

directed to schedule a conference with chambers to fix a trial date.


Dated:   New York, New York
         June 25, 2019


                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge