**Baker&Hostetler** LLP

45 Rockefeller Plaza
New York, NY 10111

T 212.589.4200
F 212.589.4201
www.bakerlaw.com

Nicholas J. Cremona
direct dial: 212.589.4682
ncremona@bakerlaw.com

January 10, 2020

VIA ECF

Honorable Vernon S. Broderick
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
New York, New York 10007-1312

Re:   *Picard v. BAM L.P. et al.*, Adv. Pro. No. 10-04390 (SMB) (the "Adversary Proceeding");
Motion to Withdraw the Reference ("Motion To Withdraw"), No. 18-cv-09916 (VSB);
Motion for Leave to Appeal, 19-cv-00812 (VSB)

Dear Judge Broderick:

We are counsel to Irving H. Picard, trustee (the "Trustee") for the substantively consolidated liquidation proceedings of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L. Madoff under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq*.

We write to notify the Court that the above-referenced Adversary Proceeding is now trial ready, pending this Court's disposition of the Motion to Withdraw, based upon the bankruptcy court's determination of the Trustee's summary judgment motion.  *Picard v. Bam L.P., et al. (In re Bernard L. Madoff Inv. Sec., LLC)*, 608 B.R. 165 (Bankr. S.D.N.Y. 2019) (the "Summary Judgment Decision").  At a pre-trial conference directed by the Summary Judgment Decision, the Honorable Stuart M. Bernstein suggested that the Trustee write to your Honor to inquire about the status of the above-captioned matters so that the Adversary Proceeding may proceed to trial expeditiously in the appropriate forum as this Court determines.  A copy of the relevant portion of the transcript of the pre-trial conference is annexed hereto as Exhibit 1.  In that regard, the Trustee is available for a status conference and/or to provide any additional information to aid the Court in resolving the above-captioned matters as your Honor deems appropriate under the circumstances.

We also write in response to Defendants' letter filed earlier today. *See* 18-cv-09916-VSB, ECF No. 26; 19-cv-00812 (VSB), ECF No. 8.  Defendants selectively cite the Summary Judgment

Honorable Vernon S. Broderick
January 10, 2020
Page 2

Decision, mischaracterize the bankruptcy court's findings and ignore prior and subsequent precedent that is directly applicable.  In particular, Defendants' assertion that the "the Claims Litigation did not impact the outcome of the Avoidance Action" is expressly contradicted in the Summary Judgment Decision.  *See* Summary Judgment Decision, p. 9 ("the Court concluded in the Jurisdiction Decision that it possessed equitable jurisdiction over the Avoidance Action at the time it was commenced based on the pending dispute over the allowance of the Customer Claims, and the subsequent withdrawal of the Customer Claims did not affect that jurisdiction.") (citing *Picard v. Mann* (*In re BLMIS*), 597 B.R. 466, 486 (Bankr. S.D.N.Y. 2019), *request for leave to appeal docketed*, No. 1:19-cv-00812-VSB (S.D.N.Y. Jan. 28, 2019) (the "Jurisdiction Decision")).  A copy of the Jurisdiction Decision is annexed hereto as Exhibit 2.  The language cited in Defendants' letter relates to the bankruptcy court's determination of whether an admission in the claims litigation precluded certain defenses in the avoidance action based on *res judicata* principles.

The bankruptcy court had already determined the legal effect of the Defendants' filed claim in the Jurisdiction Decision. The court specifically held that by filing a claim the Defendants waived the right to a jury trial and submitted to the bankruptcy court's jurisdiction.  *See* Jurisdictional Decision, p. 17 (distinguishing *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1327 (2d Cir. 1993) and specifically rejecting arguments cited in Defendants' letter).  In addition, Defendants fail to acknowledge that the bankruptcy court subsequently reiterated its holding in the Jurisdiction Decision most recently in a November 2019 opinion resolving a nearly identical adversary proceeding against similarly situated defendants.  *See Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. Nos. 10-04658 & 10-04377, 2019 WL 6245772 (Bankr. S.D.N.Y. Nov. 21, 2019) (the "Nelson Decision").  A copy of the Nelson Decision is annexed hereto as Exhibit 3.  In the Nelson Decision, the bankruptcy court held, *inter alia*, that:

> [T]he Defendants filed net equity claims against the BLMIS estate, the Trustee determined to disallow the claims, the Defendants objected to the Trustee's determination and the Trustee commenced these adversary proceedings while the Defendants' objections were pending.  Accordingly, the Defendants have submitted to the Court's equitable jurisdiction to hear and determine the Trustee's avoidance and recovery claims and <u>have no right to a jury trial</u>. *Picard v. Mann* (*In re BLMIS*), 597 B.R. 466, 476 (Bankr. S.D.N.Y. 2019), *request for leave to appeal docketed*, No. 1:19-cv-00812-VSB (S.D.N.Y. Jan. 28, 2019).

*See* Nelson Decision, 2019 WL 6245772 at *9 (emphasis added).

Honorable Vernon S. Broderick
January 10, 2020
Page 3

The Trustee remains available if your Honor has any questions or requires any additional information.

Respectfully submitted,

/s/ Nicholas J. Cremona

Nicholas J. Cremona

cc:    Hon. Stuart M. Bernstein (Via ECF and Email)
       Arthur H. Ruegger, Esq. (Email)
       David J. Sheehan, Esq. (Email)
       Kevin H. Bell, Esq. (Email)
       Nathanael S. Kelley, Esq. (Email)

# Exhibit 1

```
                                                              Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    - - - - - - - - - - - - - - - x

 4    IRVING H. PICARD, TRUSTEE

 5    For the LIQUIDATION OF B,

 6             v.                    CASE NO. 10-04390-smb

 7    BAM L.P., et al,

 8    - - - - - - - - - - - - - - - x

 9    IRVING H. PICARD, ESQ., TRUSTEE

10    For the SUBSTANTIV,

11             v.                    CASE NO. 10-05354-smb

12    ABN AMRO BANK N.V.,

13    - - - - - - - - - - - - - - - - - - - - - - - - - - x

14                   U.S. Bankruptcy Court

15                   Courtroom 723 (SMB)

16                   One Bowling Green

17                   New York, New York  10004-1408

18

19                   October 30, 2019

20                   10:01 AM

21    B E F O R E :

22    HON STUART M. BERNSTEIN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  KAREN
```

Case 1:19-cv-00812-VSB    Document 9-1    Filed 01/10/20    Page 3 of 8

Page 2

1    Hearing re:  Final Pre-Trial Conference.

2

3    Hearing re:  Trustee's Motion for Leave to File Second

4    Amended Complaint.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Nicole Yawn and Sheila Orms

Page 3

```
 1   A P P E A R A N C E S :

 2   BAKERHOSTETLER

 3         Attorneys for the U.S. Trustee

 4         45 Rockefeller Plaza

 5         New York, NY  10111-0100

 6

 7   BY:  NICHOLAS J. CREMONA, ESQ.

 8         PATRICK T. CAMPBELL, ESQ.

 9         ELIZABETH G. MCCURRACH, ESQ.

10

11   ALLEN & OVERY LLP

12         Attorney for ABN RBS

13         1221 Avenue of the Americas

14         New York, NY  10020

15

16   BY:  MICHAEL S. FELDBERG, ESQ.

17

18   DENTONS U.S. LLP

19         Attorney for Defendants

20         1221 Avenue of the Americas

21         New York, NY  10020-1089

22

23   BY:  ARTHUR H. RUEGGER, ESQ.

24

25
```

Page 4

```
1              P R O C E E D I N G S

2          THE COURT:  Please be seated.

3          Picard vs. BAM?

4          MR. CREMONA:  Excuse me.  Good morning, Your

5    Honor.

6          THE COURT:  Good morning.

7          MR. CREMONA:  Nicholas Cremona, appearing on

8    behalf of the trustee.  We're here this morning, Your Honor,

9    on a final pre-trial conference in this matter, pursuant to

10   the directive in your September 11th opinion, granting

11   certain relief, pursuant to Rule 56(g), wherein Your Honor

12   established certain material facts going forward, but also

13   identified one remaining issue to be tried.  While the

14   trustee has consulted his experts and is prepared to move

15   forward, I do -- the trustee does agree with the procedural

16   posture as represented in the letter that my colleague,

17   Mr. Ruegger, filed in to court on October 25th.

18          Specifically, as Your Honor will recall, there is

19   a motion to withdraw the reference pending before Judge

20   Broderick, and that has been pending since last October, and

21   that motion precluded trial of this matter in December of

22   last year.  So it is the parties' recommendation, provided

23   that it's acceptable to the Court, that that issue and the

24   trial of that issue be deferred until Judge Broderick

25   resolves the motion to withdraw the reference.
```

Page 5

1              THE COURT:  Well, I agree.  Have you heard

2     anything from his chambers?

3              MR. CREMONA:  Unfortunately, we have not.  As

4     Mr. Ruegger pointed out in his letter and is accurate from

5     reviewing the docket, both of those matters have been fully

6     briefed since January and February of this year,

7     respectively.

8              THE COURT:  I mean, I don't know what you can do.

9     Have you thought about writing him a letter requesting a

10    conference or -- this case seems -- it's ready to be tried,

11    and it's a question of where it's going to be tried, I

12    guess.

13             MR. CREMONA:  We agree, Your Honor, and I'm happy

14    to do that, and as I said, we've consulted our experts and

15    we're prepared to move forward, but I understand that's a

16    gate-keeping item that Your Honor has identified.

17             THE COURT:  Right.  Well, all I can say is that

18    you can try and move this along, if you want to try -- if

19    you're anxious to try the case, and I assume you are.

20             MR. CREMONA:  We are, and we will do that.

21             THE COURT:  Okay, okay, all right.  I'm just going

22    to adjourn the conference CNDA (ph), and you can advise me

23    when, as, and if the motion to withdraw the reference is

24    resolved.

25             MR. CREMONA:  We will do so.  Thank you, Your

1    Honor.

2              THE COURT:  Okay.

3              MR. CREMONA:  If I may, there is one --

4              THE COURT:  Mr. Ruegger wants to speak.

5              MR. CREMONA:  Oh.

6              THE COURT:  Let's --

7              MR. CREMONA:  No, no, I --

8              MR. RUEGGER:  Your Honor, Mr. Cremona and I

9    consulted beforehand, and I believe he's going to address

10   the issue that I wanted to raise.

11             THE COURT:  Okay.

12             MR. CREMONA:  There is one housekeeping item that

13   I'd like to bring before the Court.  As Your Honor may

14   recall, we have a status conference scheduled for November

15   14th on 4 adversary proceedings and --

16             THE COURT:  Including this one?

17             MR. CREMONA:  What's that?

18             THE COURT:  Including this one?

19             MR. CREMONA:  Not this one.  It's actually the

20   Hyne (ph) matter, which is 10-4861; Brife (ph), which is 10-

21   4357; Alvin Gindell (ph), 10-4925; and Rose Gindell, 10-

22   4401.  As you may recall, those matters were referred to

23   mediation and had stalled.  I'm happy to report, if Your

24   Honor is inclined, to have that conference now and get that

25   update, that we've successfully mediated three of those

Case 1:19-cv-00812-VSB    Document 21-1    Filed 01/20/20    Page 8 of 8

Page 7

1    cases since we appeared before Your Honor last, and we will

2    endeavor to mediate the final case before the end of

3    November.  So I think that obviates the need for the

4    conference on 11/14, and Mr. Ruegger had a conflict.  So

5    that's why we wanted to address it.

6               THE COURT:  How many of those client -- how many

7    of those four cases are you involved in, Mr. Ruegger?

8               MR. RUEGGER:  All four, Your Honor.

9               THE COURT:  All right.  Why don't you adjourn them

10   to some time in December or January even?

11              MR. CREMONA:  I was going to suggest that we have

12   -- we put them on the December 12th omnibus hearing, to the

13   extent it's really only the one that remains.  The other

14   three we've settled, in principle.

15              THE COURT:  Put them all on that date, and if

16   they're still -- if they're scheduled but they're still not

17   dismissed, you can tell me at that time.

18              MR. CREMONA:  Will do.  Thank you, Your Honor.

19              THE COURT:  Okay, thank you.

20              Picard vs. ABN AMRO?

21         (Pause)

22              MR. CAMPBELL:  Good morning, Your Honor.  Patrick

23   Campbell, on behalf of the trustee on the trustee's motion

24   for leave to amend the complaint.

25              THE COURT:  Okay.  Why don't I hear from

# Exhibit 2

597 B.R. 466
United States Bankruptcy Court, S.D. New York.

In re: SECURITIES INVESTOR PROTECTION
CORPORATION, Plaintiff-Applicant,
v.
BERNARD L. MADOFF INVESTMENT
SECURITIES LLC, Defendant.
In re: Bernard L. Madoff, Debtor.
Irving Picard, Trustee for the Liquidation of Bernard
L. Madoff Investment Securities LLC, Plaintiff,
v.
BAM L.P., Michael Mann and
Meryl Mann, Defendants.

Adv. Pro. No. 08-01789 (SMB)(Substantively
Consolidated), Adv. Pro. No. 10-04390 (SMB)
|
Signed January 18, 2019

**Synopsis**

**Background:** After customers filed proofs of claim, trustee for liquidation of bankrupt investment company under the Securities Investor Protection Act (SIPA), whose principal had perpetrated Ponzi scheme, denied claims and brought adversary proceeding to avoid and recover fraudulent transfers from customers, who then withdrew their claims, moved in the District Court to withdraw the reference, and moved in the Bankruptcy Court to stay a previously scheduled trial of the adversary proceeding.

The Bankruptcy Court, Stuart M. Bernstein, J., held that under the time-of-filing rule, the court acquired equitable jurisdiction over SIPA trustee's fraudulent transfer action when it was commenced, and customers' subsequent withdrawal of their proofs of claim on the eve of trial did not destroy jurisdiction.

Motion denied.

**Procedural Posture(s):** Motion for Stay.

**Attorneys and Law Firms**

**\*470** BAKER & HOSTETLER LLP, 45 Rockefeller Plaza, New York, New York 10111, David J. Sheehan, Esq., Dean

D. Hunt, Esq., Lan Hoang, Esq., Nicholas J. Cremona, Esq., Seanna R. Brown, Esq., Of Counsel, Attorneys for Plaintiff

SECURITIES INVESTOR PROTECTION CORPORATION, 1667 K St., NW, Suite 1000, Washington, D.C. 20006, Josephine Wang, Esq., General Counsel, Kevin H. Bell, Esq., Senior Associate General Counsel, For Dispute Resolution, Nathanael S. Kelley, Esq., Associate General Counsel, Of Counsel, Attorneys for Securities Investor Protection Corporation

DENTONS US LLP, 1221 Avenue of the Americas, New York, New York 10016, Carole Neville, Esq., Of Counsel, Attorneys for Defendants

SIPA Liquidation

**MEMORANDUM DECISION AND
ORDER UPHOLDING COURT'S
EQUITABLE JURISDICTION**

STUART M. BERNSTEIN, United States Bankruptcy Judge:

The Defendants filed proofs of claim and the Trustee responded with a fraudulent transfer action. The Defendants subsequently withdrew their claims with prejudice, moved in the District Court to withdraw the reference and moved in this Court to stay a previously scheduled trial of this adversary proceeding. The latter motion raises the question of whether a bankruptcy court loses its equitable jurisdiction over a fraudulent transfer action because the defendant-creditor withdraws his proof of claim after the adversary proceeding was filed but before the bankruptcy court has tried the matter. The Court concludes that it acquired equitable jurisdiction over the Trustee's fraudulent transfer action when it was commenced under the time-of-filing rule, and the Defendants' withdrawal of their claims did not destroy it. Accordingly, the Defendants' motion to stay the trial on that basis is denied. [1]

**BACKGROUND** [2]

This adversary proceeding arises out of the Ponzi scheme perpetrated by Bernard Madoff through Bernard L. Madoff Investment Securities LLC ("BLMIS"). The background to Madoff's scheme has been recounted in numerous reported opinions, *see, e.g.,* 🔖 *Picard v. Ida Fishman Revocable Trust*

*In re BLMIS* ), 773 F.3d 411, 415 (2d Cir. 2014), cert. denied U.S. ——, 135 S.Ct. 2859, 192 L.Ed.2d 910 (2015); **\*471** *Picard v. JPMorgan Chase & Co.* ( *In re BLMIS* ), 721 F.3d 54, 58-59 (2d Cir. 2013), cert. denied, 573 U.S. 945, 134 S.Ct. 2895, 189 L.Ed.2d 832 (2014); *SIPC v. BLMIS* ( *In re BLMIS* ), 424 B.R. 122, 125-32 (Bankr. S.D.N.Y. 2010), aff'd, 654 F.3d 229 (2d Cir. 2011) (" *Net Equity Decision* "), cert. denied, U.S. 567934, 133 S.Ct. 24, 25, 183 L.Ed.2d 675 (2012), and the Court limits the discussion to the facts necessary to explain this decision.

On December 15, 2008, the Securities Investor Protection Corporation ("SIPC") commenced a liquidation against BLMIS under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"). [3] The District Court appointed Irving H. Picard, Esq. as trustee ("Trustee"), *see* SIPA § 78eee(b)(3), and removed the liquidation to this Court, SIPA § 78eee(b)(4), where it is to be conducted, to the extent consistent with SIPA, in accordance with chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11. *See* SIPA § 78fff(b).

**A. Claims Allowance Process**
SIPA § 78fff-2 sets out the general parameters of the claims procedure in a SIPA liquidation. Following his or her appointment, the SIPA trustee must publish notice of the proceedings and mail notice to each customer. SIPA imposes two time limits for filing a statement of claim keyed to the notice of publication – an initial time limit of sixty days or less and an outer time limit of six-months. A customer who files the claim during the initial period has greater rights regarding the satisfaction of his net equity claim than the customer who files after the initial period but before the six-month deadline, *see Mishkin v. Peat, Marwick, Mitchell & Co.* (*In re Gov't Sec. Corp.),* 107 B.R. 1012, 1018-1019 (S.D. Fla. 1989), but the distinction is irrelevant in this case. After receipt of the written statement of claim, the SIPA trustee is required to promptly discharge the obligations or net equity claims owed to the customer "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee." SIPA § 78fff-2(b). SIPA does not set out a claims objection or claims resolution procedure.

Accordingly, the Court established a thorough procedure for resolving claims, *see Picard*, 440 B.R. 579, 585 (S.D.N.Y. 2010), in the *Order on Application for an Entry of an Order Approving Form and Manner of Publication*

and Mailing of Notices, Specifying Procedures for Filing, Determination, and Adjudication of Claims; and Providing Other Relief, dated Dec. 23, 2008 ("*Claims Procedure Order* ") (ECF Main Case Doc. # 12). The *Claims Procedure Order* tracked the time limits under SIPA. (*See Claims Procedure Order* at 7.) In the event the Trustee determined that the customer's statement of claim was not supported by BLMIS' books and records, the following procedures governed the resolution of the dispute: (i) the Trustee notified the customer in writing of his determination to disallow the claim, in whole or in part, and his reasons, (*id.* at 6); (ii) if the customer disagreed with the Trustee's determination, he had thirty days to file a written statement of his opposition along with supporting documentation, failing which "the Trustee's determination shall be deemed approved by the Court and binding on the **\*472** claimant," (*id.* at 7); and (iii) upon receipt of the customer's opposition, the Trustee would obtain a hearing date from the Court and notify the customer. (*Id.*)

**B. The Defendants' Claims and the Trustee's Determinations**
Per the *Claims Procedure Order*, Michael Mann and Meryl Mann served the Trustee with a statement of claim, dated June 16, 2009, for BLMIS Account No. 1CM363 (the "Mann Claim"), in the amount $ 7,192,467.45. [4] The Mann Claim was based on the handwritten, corrected balance shown on the Manns' last customer statement, dated November 30, 2008. BAM L.P. ("BAM") served the Trustee with the BAM Claim, dated June 16, 2009, regarding Account No. 1CM579, in the amount of $ 714,333.85. The BAM Claim was also based on the handwritten, corrected balance shown on BAM's last customer statement, dated November 30, 2008.

The Trustee denied the Defendants' Claims. (*See* Determinations.) He explained that no securities were ever purchased for their BLMIS accounts, and the Defendants withdrew more than they deposited into their accounts over the lives of the accounts. [5] The Manns withdrew $ 5.8 million more than they deposited, and BAM withdrew $ 1,135,993.39 more than it deposited. Each Determination included a chart showing all deposits into and withdrawals from the account.

The Defendants filed the same Objections to the Determinations. [6] For the most part, the Objections raised purely legal issues. They primarily argued that the Last Statement Method, under which net equity was determined by the balance shown in the November 30, 2008 monthly customer statement, rather than the Trustee's Net Investment

Method, which offset withdrawals against deposits, should control. They further argued that the Trustee's net equity calculation was barred by the statute of limitations on avoidance actions and should include interest or a similar adjustment to reflect the passage of time. In paragraph 10 of the Objections, the Defendants also asserted that the Determinations violated the *Claims Procedure Order* because they failed to state the reason for the disallowance of the claims and the relevant facts and legal theories on which the Determination was based (citing relevant bankruptcy law), (Mann Objection ¶ 10(a), (c) ), failed to rebut the *prima facie* validity of the claims (citing Bankruptcy Code § 502(a) and FED. R. BANKR. P. 3001(f) ) (Mann Objection ¶ 10(b) ), and as a factual matter, "includes an exhibit which purportedly calculates the money deposited less subsequent withdrawals, but is completely unsubstantiated and incorrect." (Mann Objection ¶ 10(d) ) (collectively, the "Paragraph 10 Objections"). Finally, the Defendants reserved "the right to revise, supplement, or amend" their Objections. (Mann Objection ¶ 24.)

**\*473  C. This Adversary Proceeding**
The Trustee filed his original complaint commencing this adversary proceeding on November 30, 2010 (the "*Complaint* ") (ECF Doc. # 1) and filed an amended complaint (the "*Amended Complaint* ") in the District Court while a motion to withdraw the reference was pending. (*See Amended Complaint*, dated Jan. 25, 2012 (ECF Dist. Ct. No. 11 Civ. 07667 Doc. # 9).) As noted in the Determinations, the Defendants were "net winners" because they withdrew more than they deposited. The Trustee sought, *inter alia*, to avoid and recover the excess transfers to the Defendants, *i.e.*, the negative net equity, made during the six years and two years (the "Two-Year Transfers") prior to the Filing Date under bankruptcy and state fraudulent transfer law. [7]

Both the *Complaint* and the *Amended Complaint* included, as Exhibit B, the Trustee's calculation of all deposits into and withdrawals from the Defendants' BLMIS accounts. The calculations in Exhibit B were identical to the calculations evidencing the Defendants' negative net equity included in the Determinations. Exhibit B showed that the Manns and BAM had received $ 2.25 million and $ 563,000, respectively, within two years of the Filing Date. Neither pleading included a count to disallow the Defendants' Claims under 11 U.S.C. § 502(d) or for any other reason. Instead, they stated that "[t]he Trustee intends to resolve the Mann Customer Claim, BAM Customer Claim, and Claims Objections to the Trustee's

determination of such claims through a separate hearing as contemplated by the Claims Procedures Order." (*Complaint* ¶ 52; *accord Amended Complaint* ¶ 55.)

**D. Disposition of the Defendants' Claims**
Prior to the filing of the adversary proceeding, the Bankruptcy Court had rejected the Last Statement Method, upheld the use of the Net Investment Method to calculate net equity, and overruled certain objections, including the Defendants' Objections, "insofar as those objections are based upon using the Final Customer Statements rather than the Net Investment Method to determine Net Equity." (*Order (1) Upholding Trustee's Determination Denying Customer Claims for Amounts Listed on Last Customer Statement; (2) Affirming Trustee's Determination of Net Equity; and (3) Expunging Those Objections with Respect to the Determinations Relating to Net Equity*, dated Mar. 8, 2010 (ECF Main Case Doc. # 2020).) [8] The Court's order was appealed directly to the Second Circuit which affirmed in 2011, *see Net Equity Decision*, and the Supreme Court denied petitions for a writ of *certiorari* in 2012. *See* **\*474** *Velvel v. Picard*, 567 U.S. 934, 133 S.Ct. 25, 183 L.Ed.2d 675 (2012). The Supreme Court's action ended any further challenge to the use of the Net Investment Method. The *Net Equity Decision* also implicitly rejected the contention that the Net Investment Method violated any statute of limitations because the Net Investment Method required the Trustee to compute withdrawals and deposits over the entire life of the account.

After this adversary proceeding was commenced, the Bankruptcy Court overruled the objection based on the Trustee's failure to make any adjustments to account for time-based damages such as interest. *SIPC v. BLMIS (In re BLMIS* ), 496 B.R. 744, 761 (Bankr. S.D.N.Y. 2013). The Court's order was appealed directly to the Second Circuit which affirmed. *SIPC v. 2427 Parent Corp. (In re BLMIS* ), 779 F.3d 74 (2015). The Supreme Court denied a petition for a writ of *certiorari* later that year. *See Pirella, ——— U.S. ———, 136 S.Ct. 218, 193 L.Ed.2d 130 (2015).*

With the latter denial, only the Paragraph 10 Objections, including the Defendants' factual objections to the computation of the deposits and withdrawals listed in the Determinations, remained unresolved. These were the same computations listed in Exhibit B to the *Complaint* and the *Amended Complaint.* To compute net equity, the Trustee is required to subtract withdrawals from deposits over the life of each BLMIS account. *See Net Equity Decision*, 654 F.3d at

238-39 ("[T]he Net Investment Method allows the Trustee to make payments based on withdrawals and deposits, which can be confirmed by the debtor's books and records, and results in a distribution of customer property that is proper under SIPA.").

To compute the amount of fictitious profits, the Trustee must engage in the same exercise. *SIPC v. BLMIS* (*In re BLMIS* ), 499 B.R. 416, 430 (S.D.N.Y. 2013) ("[T]he Court finds that a straight netting method—subtracting total withdrawals from total deposits of principal—is the appropriate way to calculate not only net equity but also a defendant's fraudulent-transfer liability."), *cert. for interlocutory appeal denied*, 987 F.Supp.2d 309 (S.D.N.Y. 2013); *Picard v. Greiff* (*In re BLMIS* ), 476 B.R. 715, 729 (S.D.N.Y. 2012) (Under the first step in computing potential clawback liability, "amounts transferred by Madoff Securities to a given defendant at any time are netted against the amounts invested by that defendant in Madoff Securities at any time."), *aff'd sub nom. on other grounds*, *Picard v. Ida Fishman Revocable Trust (In re BLMIS* ), 773 F.3d 411 (2d Cir. 2014), *cert. denied* U.S. ——, 135 S.Ct. 2859, 192 L.Ed.2d 910 (2015); *see* Transcript of 9/26/18 Hr'g at 17:19-22 (concession by Defendants' counsel) (ECF Main Case Doc. # 18045); Transcript of 11/28/18 Hr'g ("Tr. 11/28/18") at 13:3-7 (same) (ECF Doc. # 130). However, because the Trustee can only recover fictitious profits transferred within two years of the Filing Date, *see* 11 U.S.C. § 548(a)(1), the aggregate amount of the Two-Year Transfers caps the Defendants' clawback liability. *Picard v. Greiff*, 476 B.R. at 729 (After netting deposits and withdrawals, "if the amount transferred to the defendant exceeds the amount invested, the Trustee may recover these net profits from that defendant to the extent that such monies were transferred to that defendant in the two years prior to Madoff Securities' filing for bankruptcy. Any net profits in excess of the amount transferred during the two-year period are protected from recovery by the Bankruptcy Code's statute of limitations. *See* 11 U.S.C. § 548(a)(1)."). In other words, a good faith defendant's clawback liability is the lesser **\*475** of the fictitious profits received over the life of his BLMIS account (*i.e.*, all of the negative net equity) and the aggregate amount of transfers from the account received within two years of the Filing Date. [9]

## E. The Withdrawal of the Defendants' Claims

The Court conducted a pre-trial conference on September 26, 2018 and scheduled a trial for December 3, 2018. (*Order Setting Trial*, dated Sept. 28, 2018 (ECF Doc. # 108).) In response, the Defendants moved one month later to withdraw the reference, and on or about November 20, 2018, moved to stay the December 3 trial. The Court scheduled a hearing for November 28, 2018. By then, the parties had submitted a proposed joint pre-trial order in which they stipulated to the deposits and withdrawals and the Two-Year Transfers in the amounts of $ 2.25 million from the Mann account and $ 563,000 from the BAM account. Putting aside the objection relating to the legal sufficiency of the Determinations (and the Defendants' reservation of their rights, if any, to amend or supplement their Objections), it seemed that the Defendants' Objections had been resolved through judicial determinations or by stipulation.

The effect of the pendency of the Defendants' Claims on this Court's ability to try the adversary proceeding was much debated. Since their Objections now appeared to have been resolved and there was no point to forcing the Defendants to litigate their claims when they no longer asserted a right to payment, the Court offered the Defendants the opportunity at the November 28 hearing to make an oral motion to withdraw the Defendants' Claims with prejudice. The Defendants accepted the invitation, (Tr. 11/28/18 at 16:6-14), and the Court granted the motion. (*Order Withdrawing Claims and Objections with Prejudice and Finally Determining Net Equity*, dated Dec. 20, 2018 (ECF Doc. # 138).) However, the order made clear that it did not determine "this Court's jurisdiction over the adversary proceeding or any other issues in that case." In addition, the Trustee announced his intention to move for summary judgment (which he has done), and the Court stated that it would deal with the question of its equitable jurisdiction, which the parties had already briefed, [10] either before or in the context of the summary judgment motion. (Transcript of 12/19/18 Hr'g at 51:3-7 (ECF Doc. # 147).) This memorandum reflects the Court's disposition of that issue.

## DISCUSSION

### A. The Basis of the Court's Equitable Jurisdiction

Bankruptcy Code § 502(d) mandates the disallowance of any claim filed by **\*476** a creditor that received a fraudulent transfer unless and until the creditor restores the transferred property or its value to the estate. [11] Section 502(d) establishes the link between this adversary proceeding

Securities Investor Protection Corporation v. Bernard L. Madoff..., 597 B.R. 466 (2019) Page 6 of 14

to avoid and recover fraudulent transfers and the claims allowance process triggered by the Defendants' Claims. An objection under section 502(d) "is, like other objections, part and parcel of the allowance process and is subject to adjudication by a bankruptcy court." *Katchen v. Landy,* 382 U.S. 323, 330, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) (discussing section 502(d)'s predecessor, section 57g of the former Bankruptcy Act, 11 U.S.C. § 93(g) (repealed) ). Thus, even if a defendant would be entitled to a jury trial on the avoidance claim had he not filed a claim against the bankruptcy estate, *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 36, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the filing of a claim brings the creditor within the bankruptcy court's equitable jurisdiction where the avoidance action will be determined by the bankruptcy court without a jury. *Langenkamp v. Culp,* 498 U.S. 42, 45, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990); *Katchen v. Landy,* 382 U.S. at 336-37, 86 S.Ct. 467.

Not every claim filing triggers the bankruptcy court's equitable jurisdiction and defeats the defendant-creditor's right to a jury trial. *Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.),* 529 F.3d 432, 466 (2d Cir. 2008) ("[F]iling a proof of claim is a necessary but not sufficient condition to forfeiting a creditor's right to a jury trial."), *cert. denied,* 555 U.S. 1183, 129 S.Ct. 1998, 173 L.Ed.2d 1086 (2009); *Germain v. Conn. Nat'l Bank,* 988 F.2d 1323, 1327 (2d Cir. 1993) ("We agree that the filing of a proof of claim is a *necessary* condition – the claims – allowance process can hardly begin before a claim is made – however, it is not a *sufficient* condition.") (emphasis in original). "Rather, a creditor loses its jury trial right only with respect to claims whose resolution affects the allowance or disallowance of the creditor's proof of claim or is otherwise so integral to restructuring the debtor-creditor relationship." *CBI Holding,* 529 F.3d at 466; *accord Stern v. Marshall,* 564 U.S. 462, 496-99, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).

Principles of collateral estoppel and *res judicata* dictate whether a proceeding affects the claims allowance process or the restructuring of the debtor-creditor relationship. *Katchen v. Landy,* 382 U.S. at 334, 86 S.Ct. 467. If the bankruptcy court must determine the same issues or claims in connection with the adversary proceeding and the allowance of the proof of claim, a determination of the issue or claim in one proceeding will preclude the relitigation of the same issue or claim in the other proceeding. Avoidance claims always implicate the claims allowance process because the trustee must avoid the transfer to recover against the defendant-creditor and disallow the defendant-creditor's claim under Bankruptcy Code § 502(d).

**\*477** The filing of a statement of claim under SIPA is the "functional equivalent" of filing a claim in a bankruptcy case. *SIPC v. BLMIS (In re BLMIS ),* 513 B.R. 437, 443 (S.D.N.Y. 2014). In the absence of a conflict between SIPA and Bankruptcy Code § 502(d), "section 502(d) applies to customer claims brought under SIPA section 78fff-2," *id.,* and the filing of the statement of claim subjects the customer to the bankruptcy court's equitable jurisdiction to the same extent as in an ordinary bankruptcy case. [12] *Picard v. Saren-Lawrence (In re BLMIS ),* No. 17 Civ. 5157 (GBD), 2018 WL 2383141, at *3-5 (S.D.N.Y. May 15, 2018), *reconsideration denied,* 2018 WL 4659476 (S.D.N.Y. Sept. 11, 2018); *Zaremba v. Pheasant (In re Cont'l Capital Sec.),* No. 3:06 CV 02394 (JGC), 2007 WL 5964307, at *2 (N.D. Ohio Sept. 19, 2007); *Rubin v. Kellner (In re Blinder Robinson & Co., Inc.),* 135 B.R. 892, 895-97 (D. Colo. 1991). Although the Defendants contest this conclusion for reasons discussed later, the determination in favor of the Trustee on his fraudulent transfer claims would mandate the disallowance of the Defendants' Claims.

## B. The Effect of Disallowance or Withdrawal of the Claim

The principal question is whether the Defendants' withdrawal of their claims on the eve of trial strips the Court of its equitable jurisdiction. The majority of cases that have considered the issue have concluded that it does. *E.g., Seven Ctys. Servs., Inc. v. NextGen Healthcare Info. Sys., Inc.,* Civil Action No. 3:14CV330-S (CRS), 2014 WL 3941789, at *2 (W.D. Ky. Aug. 12, 2014) (a creditor cannot "un-ring the bell" by withdrawing its claim "after 'recognizing the [unforeseen] alleged implications of the filing ...' ") (internal citation omitted); *Wagner v. Appelman (In re Vaughan Co.),* No. 12-CV-0197 WJ/SMV, 2014 WL 12789686, at *6 (D.N.M. July 22, 2014) ("[E]ven if a proof of claim is withdrawn, the right to a jury trial is not thereby restored. Once a proof of claim is filed, the right to a jury trial is extinguished as to any issue that bears on the claims-allowance process.") (citing *Langenkamp,* 498 U.S. at 44–45, 111 S.Ct. 330); *Siegel v. Cal. Self-Insurers' Sec. Fund (In re Circuit City Stores, Inc.),* No. 08-35653-KRH, 2016

WL 1714515, at *7 (Bankr. E.D. Va. Apr. 26, 2016) ("The fact that the Fund later withdrew its proofs of claim is of no moment. The general rule is that 'by filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power.' It follows that a creditor cannot seemingly un-pull the trigger of this Court's equitable power by withdrawing its proof of claim.")

(quoting *Langenkamp*, 498 U.S. at 44, 111 S.Ct. 330); *Kriegman v. Phillips* (*In re LLS AMERICA, LLC* ), No. 09-06194-PCW11, 2013 WL 12122309, at *2 n.2 (Bankr. E.D. Wash. May 2, 2013) ("[W]ithdrawal [of a proof of claim] has no effect upon jurisdiction."); *MCI WorldCom Commc'ns, Inc. v. Commc'ns Network Int'l* (*In re WorldCom, Inc.*), 378 B.R. 745, 754 (Bankr. S.D.N.Y. 2007) ("[I]t is immaterial whether the proof of claim has been disallowed prior to the Court's determination of the jury trial demand.... [T]he filing of the proof of claim invokes the claims-allowance process and the creditor thereby subjects itself to the equitable jurisdiction of the Court thereby waiving its right to a jury trial as to any issue that bears directly on **\*478** the claims-allowance process."); *Enron Corp. v. Citigroup, Inc.* (*In re Enron Corp.*), 349 B.R. 108, 114 n.2 (Bankr. S.D.N.Y. 2006) ("The disposition of a claim, alone, does not nullify the consequences of a creditor's invocation of jurisdiction premised upon such claim."); *EXDS, Inc. v. RK Elec., Inc.* (*In re EXDS, Inc.*), 301 B.R. 436, 440 (Bankr. D. Del. 2003) ("[Claimant] lost its right to a jury trial because it elected to participate in the equity court proceeding. Given the unequivocal language of *Langenkamp* and *Katers* as to the effect of filing a proof of claim, I do not believe that a creditor can, for strategic reasons, reverse the result it triggered by filing a proof of claim by later withdrawing the claim."); *Acad., Inc. v. James, Hoyer, Newcomer and Smiljanich, P.A.* (*In re Acad., Inc.*), 289 B.R. 230, 234 (Bankr. M.D. Fla. 2003) ("The defendants voluntarily came to this court to assert their claims against the plaintiff. In so doing, they consented to the jurisdiction of the court for the purpose of their claims against the plaintiff and the plaintiff's claims against them. The fact that they no longer wish to assert claims against the plaintiff should not impact in any way the court's jurisdiction over them for the purpose of the plaintiff's claims against them."); *see also Moore v. Mobley* (*In re Sea Island Cotton Trading, Inc.*), No. 00-06033A (JSD), 2000 WL 33952877, *3 (Bankr. S.D. Ga. July 25, 2000) ("A consequence of filing a proof of claim is waiving the right to a jury trial. Defendants' assignment of the claims does not reverse their submission to this court's jurisdiction.").

The Defendants cite several decisions for the contrary proposition, (*Defendants Memo* ¶ 27), but all save one are distinguishable or incorrectly decided. Both *Germain v. Conn. Nat'l Bank* and *Picard v. Katz*, 825 F.Supp.2d 484 (S.D.N.Y. 2011) ("*Katz* ") dealt with the defendant-creditor's opposition to the trustee's request for a jury trial. In *Germain*, the defendant had filed a proof of claim and the trustee thereafter sued the defendant alleging it had used its power as the debtor's primary lender to exercise control over the debtor to its detriment. 988 F.2d at 1325-26. The Second Circuit noted the limitation on the jury trial waiver; under *Katchen*, *Granfinanciera*, and *Langenkamp*, "for a waiver to occur, the dispute must be part of the claims-allowance process or affect the hierarchical reordering of creditors' claims. Even there the right to a jury trial is lost not so much because it is waived, but because the legal dispute has been transformed into an equitable issue." *Germain*, 988 F.2d at 1329-30. However, the Court would "not presume that the same creditor or debtor has knowingly and willingly surrendered its constitutional right to a jury trial for the resolution of disputes that are only *incidentally related* to the bankruptcy process." *Id.* at 1330 (emphasis added). Unlike the claims asserted in the litigation against the creditor in *Germain*, the fraudulent transfer claims in this case are directly related to the claims allowance process through Bankruptcy Code § 502(d).

*Katz* involved a similar issue except that the Trustee had brought a fraudulent transfer action against the defendants. The District Court concluded that the fraudulent transfer claims were legal in nature, and the Trustee had a right to a jury trial. *Katz*, 825 F.Supp.2d at 485-86. Noting that a waiver occurs when the dispute is part of the claims allowance process or affects the reordering of creditor claims, the District Court ruled that it had withdrawn the reference "substantially severing adjudication of the Trustee's fraudulent transfer actions from both 'the claims-allowance process' and 'the hierarchical reordering of creditors' claims.' " *Id.* at 486-87. As a result, Congress' regulatory scheme for **\*479** the adjudication of claims embodied in SIPA "simply cannot take priority over the Trustee's Seventh Amendment right to a jury trial." *Id.* at 487. Here, the District Court has not withdrawn the reference or "severed" the connection with the claims allowance process. [13]

In *Riederer v. Kutak Rock, LLP* (*In re Brooke Corp.*), Adv. No. 10-06246 (DLS), 2011 WL 4971503 (Bankr. D.

Kan. Sept. 14, 2011) (report and recommendation), adopted, No. 11-2517-JAR, 2011 WL 4972076 (D. Kan. Oct. 19, 2011), the trustee sued the defendants for allowing the debtor to pay unlawful redemptions and dividends and for breach of fiduciary duty. Addressing a motion to withdraw the reference, the Bankruptcy Court concluded that the filing of proofs of claim did not waive the defendants' jury trial rights because the issues in the adversary proceeding did not directly involve the claims allowance process, and importantly, "[t]he Trustee has made no argument that resolution of the Adversary Case will directly implicate the claims resolution process." *Id.* at *4. In contrast, the Trustee's fraudulent transfer claims implicated the claims allowance process because avoidance of the Two-Year Transfers would have mandated the disallowance of the Defendants' Claims under Bankruptcy Code § 502(d).

In  Mirant Corp. v. S. Co., 337 B.R. 107 (N.D. Tex. 2006), the debtor and the creditors committee sued the defendants asserting, *inter alia*, common law and fraudulent transfer claims. The defendants moved to withdraw the reference and transfer the case based on their jury demand. The District Court concluded that the defendants were entitled to a jury trial on the fraudulent transfer claims because the right to a jury trial is presumed, "[t]here is no suggestion in the record that Southern has knowingly, voluntarily, and intelligently waived its right to trial by jury," and the fraudulent transfer claims did not implicate the claims allowance process because only preference claims implicated the claims allowance process.  Id. at 121 (citing *Langenkamp* and *Katchen* ).

**\*480** The decision was subsequently criticized in another decision by the same court (but a different judge) in  U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc., No. 3:10-CV-1842-G (AJF), 2012 WL 987539 (N.D. Tex. Mar. 21, 2012), aff'd,  761 F.3d 409 (5th Cir. 2014), cert. denied, —— U.S. ——, 135 S.Ct. 1430, 191 L.Ed.2d 366 (2015). There, the District Court concluded that *Mirant*'s waiver analysis was incorrect; the filing of the proof of claim transformed the legal dispute into an equitable dispute regardless of what the creditor intended. Moreover, there is no basis to distinguish between preference actions and fraudulent transfer actions. *Id. at *4*; W Condrey, P.C. v. Endeavour Highrise, L.P. (In re Endeavour Highrise L.P.), 425 B.R. 402, 408 n. 3 (Bankr. S.D. Tex. 2010) ("This Court can see no way to harmonize its own interpretation of *Katchen, Granfinanciera*, and *Langenkamp* with the District Court's interpretation, in *Mirant,* of these three cases.").

The one case cited by the Defendants that does support their position is  Messer v. Magee (*In re FKF 3, LLC* ), Case No. 13-CV-3601 (KMK), 2016 WL 4540842 (S.D.N.Y. Aug. 30, 2016). There, the principals of the debtor operated a fraudulent scheme inducing investors to lend money to the debtor based on the misrepresentation that the debtor would make secured loans at higher interest rates. In fact, the principals converted the funds for their own benefit. *Id.* at *2. Following the commencement of an involuntary case and the entry of an order for relief, one of the principals (Magee) filed two claims: a claim for $ 609,448.46 based on a loan evidenced by a promissory note and a claim in the sum of $ 30 million based on breaches of fiduciary duty and mismanagement. *Id.* at *1. The $ 30 million claim was eventually expunged, but before that had happened, the trustee commenced an adversary proceeding against Magee and many others on a variety of common law and fraudulent transfer theories and sought disallowance of their claims under 11 U.S.C. § 502(d). *Id.* at *2-3.

Addressing a motion to withdraw the reference, the District Court concluded that the Bankruptcy Court lacked adjudicative authority over the breach of fiduciary duty claims. Even if Magee's filing of the breach of fiduciary duty claim might have authorized the Bankruptcy Court to decide the Trustee's common law breach of fiduciary duty claims as part of the claims allowance process, that claim had been expunged, the expungement did not resolve the trustee's counterclaims, and there was no longer any possibility that resolving Magee's claim would resolve the trustee's state law counterclaims. *Id.* **\*14** "In other words, timing matters." *Id.* The District Court also rejected reliance on contrary authority decided before *Stern v. Marshall. Id.* at *8 n. 3 ("*Stern* suggests that the relevance of filing a proof of claim to the Article III analysis is limited by its practical implications for the claims resolution process. In particular, the justification for the 'necessarily resolved' rule is practical: where a Trustee's counterclaims are resolved by the bankruptcy court in the process of adjudicating a creditor's proof of claim, the creditor has 'no basis' for demanding a second adjudication of those claims in an Article III court.")

(*citing*  Stern, 564 U.S. at 496, 131 S.Ct. 2594).

In reaching its conclusion regarding "timing," the District Court cited a decision **\*481** of this Court (also cited by the Defendants) which reached the same conclusion. *See* SIPC v. BLMIS, 531 B.R. 439, 455 (Bankr. S.D.N.Y. 2015)

("The Court's authority to enter a final judgment depends, therefore, on whether a particular defendant filed a claim that is still subject to allowance or disallowance through the claims allowance process [but] no § 502(d) disallowance claim would lie against a defendant who filed a claim that has been finally disallowed."); *cf. Picard v. Estate of Igoin (In re BLMIS )*, 525 B.R. 871, 887–88 (Bankr. S.D.N.Y. 2015) (Trustee could not base personal jurisdiction on the filing of a SIPA claim that had been finally disallowed because the adversary proceeding did not implicate the claims allowance process). In light of the fuller briefing on this issue submitted by the parties, the Court is persuaded to revisit its reasoning regarding the timing issue and reach a different conclusion for the reasons discussed immediately below. *See SIPC v. BLMIS (In re BLMIS )*, 513 B.R. at 442 (revisiting and reversing the earlier determination in *Picard v. Katz*, 462 B.R. 447, 456 (S.D.N.Y. 2011) that Bankruptcy Code § 502(d) does not apply in SIPA).

### C. Jurisdiction and the Time-of-Filing Rule

While the Court agrees that timing matters, it is the time of filing rather than the time of trial that determines the existence of the bankruptcy court's equitable jurisdiction. "It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought,' " *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004) (quoting *Mollan v. Torrance*, 9 Wheat. 537, 539, 6 L.Ed. 154 (1824) ), and "[e]vents occurring subsequent to the institution of suit ... do not oust jurisdiction." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289-90, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *accord Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 62 (2d Cir. 1999); *Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Tr. Co.*, 93 F.3d 1064, 1071 (2d Cir. 1996). The time-of-filing rule is most frequently invoked in connection with diversity jurisdiction. *E.g., Grupo Dataflux*, 541 U.S. at 570-71, 124 S.Ct. 1920 ("This time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any basic course on federal civil procedure. It measures all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing.") (footnote omitted); *Freeport–McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991) (per curiam) (stating "the well-established rule

that diversity of citizenship is assessed at the time the action is filed [and] if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events"); *see generally* CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 3608 (3d. ed. Oct. 2018 Update) ("It has long been hornbook law, applied by courts at all levels of the federal judiciary throughout the nation, that whether federal diversity of citizenship jurisdiction exists is determined by examining the citizenship of the parties at the time the action is commenced by filing the complaint with the court...."). However, the time-of-filing rule is not limited to diversity jurisdiction and applies generally in determining the existence of federal jurisdiction. *CIT, Inc. v. 170 Willow St. Assocs.*, No. 93 Civ. 1201 CSH, 1997 WL 528163, at *7 (S.D.N.Y. Aug. 26, 1997) ("[W]hile this rule may trace its origins to the diversity context, courts have applied it in resolving other jurisdictional disputes.") (collecting **\*482** cases); *see, e.g., Dole Food Co. v. Patrickson*, 538 U.S. 468, 478, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) (plain text of 28 U.S.C. § 1441(d), which authorizes removal of state court action brought against a foreign state as defined in section 1603(a), "requires that instrumentality status be determined at the time suit is filed."); *Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) (in determining whether Court of Federal Claims jurisdiction is barred over a claim "for or in respect to which" the plaintiff "has [a suit or process] pending" in any other court, 28 U.S.C. § 1500, the "general rule" that "subject-matter jurisdiction turns on the facts upon filing") applies); *FDIC v. Four Star Holding Co.*, 178 F.3d 97, 100 (2d Cir. 1999) (FDIC's transfer of subject property to a private third party did not divest district court of subject matter jurisdiction under statute granting federal courts jurisdiction over suits to which FDIC is a party) (quoting *Freeport–McMoRan*, 498 U.S. at 428, 111 S.Ct. 858) ).

Importantly, the time-of-filing rule also governs the bankruptcy court's subject matter jurisdiction. In determining whether the outcome in a proceeding will have a "conceivable effect" on the estate for the purpose of "related to" jurisdiction under 28 U.S.C. § 1334(b), "[c]onceivability is determined at the time the lawsuit is filed." *Nuveen Mun. Tr. v. WithumSmith Brown, P.C.*, 692 F.3d 283, 294 (3d Cir. 2012) (citing *Grupo Dataflux* and *Dole Food*); *accord In re WorldCom, Inc. Sec. Litig.*, 294 B.R. 553, 556 (S.D.N.Y.

2003) (The "conceivable effect" test "does not require federal district courts constantly to revisit jurisdictional findings to determine whether the effect of the litigation on the bankruptcy estate remains 'conceivable.' Instead, federal jurisdiction arising under Section 1334 is determined, like federal jurisdiction generally, on the basis [of] the facts at the time of removal."), *aff'd*, 368 F.3d 86 (2d Cir. 2004), *cert. denied*, 543 1080, 125 S.Ct. 962, 160 L.Ed.2d 824 (2005) (*case* *see* *Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, 496 B.R. 706, 710 (S.D.N.Y. 2013) (quoting *WorldCom* ). Consequently, the dismissal of the bankruptcy case does not automatically strip the bankruptcy court of jurisdiction over pending litigation. *Jamaica Shipping Co. Ltd. v. Orient Shipping Rotterdam, B.V.* (*In re Millenium Seacarriers, Inc.*), 458 F.3d 92, 96 (2d Cir. 2006); *Porges v. Gruntal & Co., Inc.* ( *In re Porges* ), 44 F.3d 159, 162 (2d Cir. 1995); *Certain Underwriters at Lloyd's, London v. ABB Lummus Glob., Inc.*, 337 B.R. 22, 25 (S.D.N.Y. 2005).

This case concerns the Court's equitable rather than its subject matter jurisdiction, [15] but the same time-of-filing rule should apply. *In re EXDS* is directly on point. There, the creditor (RK) filed a proof of claim, and the debtor subsequently commenced an adversary proceeding against RK to avoid and recover a preference. RK answered the complaint and demanded a jury trial. RK then moved for leave to withdraw its proof of claim under Federal Bankruptcy Rule 3006 [16] in order **\*483** to reinstate its right to a jury trial, and the debtor moved to strike the jury demand. *EXDS*, 301 B.R. at 437.

The bankruptcy court concluded that while RK sought to withdraw the proof of claim to reinstate its right to a jury trial, the withdrawal would not divest the bankruptcy court of its equitable jurisdiction. *Id.* at 438. In reaching its conclusion, the bankruptcy court focused on *Langenkamp*'s reliance on the sequence of events. [17] If the creditor's claim is "met" by a preference action, the claim and the "ensuing" avoidance action "become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's *equity jurisdiction*." *EXDS*, 301 B.R. at 439 (emphasis in original) (quoting *Langenkamp*, 498 U.S. at 44-45, 111 S.Ct. 330 (in turn citing *Granfinanciera*, 492 U.S. at 57–58, 109 S.Ct. 2782) ).

At the time of filing of the adversary proceeding, RK was subject to the Bankruptcy Court's jurisdiction, there was no

right to a jury trial, and RK could not reverse the result it triggered by later withdrawing its claim. *Id.* at 440. The Bankruptcy Court found support for its conclusion in the time-of-filing rule:

> In the matter before me, as in the *Langenkamp* case, the proof of claim was filed before the avoidance action was commenced. That fact pattern suggests a result similar to that involving federal jurisdiction based on diversity. Federal diversity jurisdiction depends on the citizenship of the parties at the time the suit is filed.... In the matter before me, when the avoidance action complaint was filed, RK had already subjected itself to the jurisdiction of this bankruptcy court.

*Id.* at 440-41 (citations omitted).

There are several reasons supporting the conclusion that the time-of-filing rule governs the determination of a bankruptcy court's equitable jurisdiction. First, a concern animating the time-of-filing rule — improper manipulation of federal jurisdiction, **\*484** *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1503 (3d Cir. 1996); *In re 170 Willow Street Assocs.* , 1997 WL 528163, at \*7 — is equally applicable to a situation like the present one involving the Court's equitable jurisdiction. If equitable jurisdiction depended on the status of the defendant-creditor's claim, the defendant-creditor could manipulate the bankruptcy jurisdiction at any time simply by withdrawing the claim. Taking this argument to its logical conclusion, the defendant could seek to withdraw the claim at any time prior to final judgment if the defendant did not like the way the proceedings were unfolding. Here, the Defendants' Claims were pending for nearly ten years, but they sought to withdraw them with prejudice at the Court's invitation only a few days before the trial was scheduled to begin. Until then, the Paragraph 10 Objections continued to raise a live dispute and the Defendants' reservation of rights, if any, to amend or supplement their Objections remained a possibility.

It is no answer that Fed. R. Bankr. P. 3006 permits the bankruptcy court to condition the withdrawal of the claim,

and consequently, could theoretically condition withdrawal on the retention of equitable jurisdiction over the companion adversary proceeding. *See, e.g.,* *Kaiser Grp. Int'l, Inc.*, 272 B.R. 852, 856 (Bankr. D. Del. 2002) (conditioning withdrawal of claim on retention of jurisdiction). First, if the bankruptcy court's equitable jurisdiction under the Supreme Court precedent discussed above depends on the *continuing* effect that the adversary proceeding will have on the claims allowance process, and the adversary proceeding will no longer have a practical effect on the claims allowance process because the defendant-creditor essentially consents to disallowance of his claim by seeking to withdraw it, there is no basis to exercise equitable jurisdiction. Second, in deciding whether to grant a motion to withdraw the claim, a trial court must consider whether the non-moving party will suffer legal prejudice. *Moses v. CashCall, Inc.*, 781 F.3d 63, 89 (4th Cir. 2015) ("In general, withdrawal should be granted unless the party opposing the motion can demonstrate that it would be legally prejudiced by the withdrawal.") (quoting *Sempra Energy Trading Corp. v. Covanta Union, Inc.* ( *In re Ogden N.Y. Servs., Inc.*), 312 B.R. 729, 732 (S.D.N.Y. 2004) ). The non-moving party does not suffer legal prejudice by being required to try the case before a jury rather than in the bankruptcy court. *Ogden N.Y. Servs.,* 312 B.R. at 733; *In re 20/20 Sport,* 200 B.R. at 980 ("[L]egal prejudice is not visited upon [defendants] because they might have to try their case to a jury rather than to the court.") (quoting *Hoffmann v. Alside, Inc.,* 596 F.2d 822, 823 (8th Cir. 1979) ). In the absence of any other claim of legal prejudice, the bankruptcy court would arguably abuse its discretion by refusing to grant the withdrawal motion, especially where, as here, the withdrawal is with prejudice.

Second, the application of the time-of-filing rule is consistent with the pre-merger rule that a court's equitable jurisdiction was determined at the time of filing. *Am. Life Ins. Co. v. Stewart,* 300 U.S. 203, 215, 57 S.Ct. 377, 81 L.Ed. 605 (1937) ("[T]he settled rule is that equitable jurisdiction existing at the filing of a bill is not destroyed because an adequate legal remedy may have become available thereafter.").

Third, the application of the time-of-filing rule is consistent with the Supreme Court's analysis in *Stern v. Marshall.* There, the respondent ("Pierce") filed a proof of claim based on defamation in the petitioner's ("Vickie") bankruptcy case, and Vickie filed a counterclaim alleging tortious interference with a gift she expected **\*485** from her late husband, Pierce's

father. 564 U.S. at 470, 131 S.Ct. 2594. The bankruptcy court entered a $ 425 million judgment against Pierce on Vickie's counterclaim. *Id.* at 470-71, 131 S.Ct. 2594.

The question before the Supreme Court was whether the bankruptcy court had the authority to enter the judgment. Vickie argued, among other things, that the bankruptcy court had the authority to enter a final judgment on her state law counterclaim under *Katchen* and *Langenkamp* because Pierce had filed a proof of claim. *Id.* at 495, 131 S.Ct. 2594. Notably, the bankruptcy court had expunged Pierce's proof of claim almost a year before it entered the judgment. *Id.* at 497, 131 S.Ct. 2594.

The Supreme Court did not, however, reject Vickie's argument on the basis that the disallowance of Pierce's claim severed her counterclaim from the claims allowance process. Instead, it examined the relationship between Pierce's expunged claim and Vickie's counterclaim. The Court concluded that "there was never any reason to believe that the process of adjudicating Pierce's proof of claim would necessarily resolve Vickie's counterclaim," *id.* at 497, 131 S.Ct. 2594; *accord* *id.* at 498, 131 S.Ct. 2594, and "[f]rom the outset, it was clear that" even if the bankruptcy court ruled in Vickie's favor on her tortious interference claim, it could not enter judgment in her favor without first resolving certain issues of Texas law. *Id.* at 498, 131 S.Ct. 2594. In the end, Vickie failed to show that her tortious interference counterclaim stemmed from the bankruptcy itself or that its relationship to Pierce's defamation claim was such that the determination of her counterclaim would have affected the claims allowance process or the restructuring of the debtor-creditor relationship. Accordingly, the bankruptcy court lacked the Constitutional authority to enter the judgment. *Id.* at 499, 131 S.Ct. 2594.

In contrast to *Stern v. Marshall,* "from the outset it was clear" that a ruling in the Trustee's favor avoiding as fraudulent the transfers to the Defendants would result in the disallowance of the Defendants' Claims under 11 U.S.C. § 502(d). The Court invited the Defendants to withdraw their claims with prejudice because there was no reason to "somehow force[ ] them to continue with litigation to establish their rights to payment ... when they no longer assert any rights to payment." *In re Acad., Inc.,* 289 B.R. at 234. However, the withdrawal of their claims did not negate the submission to the Court's

jurisdiction by virtue of their filing the statements of claim which were met with the Trustee's adversary proceeding.

Finally, I find meritless the Defendants' contention that this adversary proceeding did not implicate the claims allowance process because the *Complaint* and the *Amended Complaint* did not request disallowance and alleged that the Objections would be resolved in a separate proceeding in accordance with the *Claims Procedure Order*. (*See Defendants Memo* ¶¶ 17-19.) "In *Langenkamp,* the Supreme Court held that if a creditor who has filed such a claim *is met* with an adversary proceeding, *the resolution of which affects* the equitable restructuring of debtor-creditor or creditor-creditor relations, then the creditor loses its right to a jury trial even with regard to traditional legal claims." *CBI Holding*, 529 F.3d at 466 (emphasis added). Here, the Defendants' Claims were "met" with the Trustee's fraudulent transfer claims. Although the *Complaint* did not include a disallowance claim, the avoidance of the Two-Year Transfers would mandate the disallowance of the Defendants' Claims **\*486** under Bankruptcy Code § 502(d). While a fraudulent transfer claim and section 502(d) disallowance objection are often joined in the same adversary proceeding, there is no requirement that they must be joined in one adversary proceeding. Instead, the equitable jurisdiction inquiry asks whether the resolution of the Trustee's claims would "affect" the claims

allowance process, and here, it did at the time the Trustee filed his adversary proceeding. Moreover, the separation of the adversary proceeding from the claim objection was purely procedural and was based on the *Claims Procedure Order* which contemplated a separate proceeding to resolve the Trustee's objections to customer claims. The Trustee adhered to that procedure in this instance, but the adversary proceeding still affected the claims allowance process for the reasons stated.

Accordingly, the Court concludes that it acquired equitable jurisdiction over the Trustee's fraudulent transfer claims because the Trustee commenced this adversary proceeding after the Defendants filed their claims (and after they objected to the Trustee's Determinations), the avoidance of the transfers to the Defendants would result in the disallowance of their claims, and the withdrawal of the Defendants' Claims did not strip the Court of its equitable jurisdiction that attached at the time-of-filing. The Court has considered the Defendants' remaining arguments and concludes that they lack merit.

So ordered.

**All Citations**

597 B.R. 466

Footnotes

1    Notwithstanding this conclusion, the trial is not imminent. The Trustee has moved for summary judgment, and even if that motion is denied, the Court will await the District Court's disposition of the motion to withdraw the reference.

2    The citation "ECF Doc. #" refers to the electronic docket in this adversary proceeding. Where the Court refers to the electronic docket in the main case (08-01789) or another proceeding, the citation so indicates.

3    The SEC had commenced an action against BLMIS on December 11, 2008, and thereafter consented to the combination of its own action with the SIPA proceeding. December 11, 2008 is deemed the "Filing Date" of the SIPA proceeding for purposes of computing the reach back of the fraudulent transfer claims at issue. *See* SIPA § 78*lll*(7).

4    The Defendants' claims (the Mann Claim, the "BAM Claim," and together, the "Defendants' Claims"), the Trustee's determinations relating to those claims (the "Mann Determination," the "BAM Determination," and together, the "Determinations") and the Defendants' objections to the Trustee's Determinations (the "Mann Objection," the "BAM Objection," and together, the "Objections"), all discussed in the succeeding text, are annexed as Exhibit 3 to the *Declaration of Nicholas J. Cremona in Support of Memorandum of Law in Opposition to Motion for a Stay of Trial Pursuant to Rule 5011(c) Pending Ruling by District Court on Defendants' Motion to Withdraw the Reference*, dated Nov. 27, 2018 ("*Cremona Declaration* ") (ECF Doc. # 128).

5    The Mann account was opened in 1996 and the BAM account was opened in 1999.

6    Accordingly, the Court cites only to the Mann Objection.

7    The Trustee had also asserted a claim against NTC & Co. LLP which was dismissed by stipulation and order. (*Stipulation and Order for Voluntary Dismissal Without Prejudice*, dated Apr. 20, 2011 (ECF Doc. # 12).) In addition, by stipulation and order dated August 19, 2015, the Trustee dismissed counts seeking to avoid obligations (with prejudice), subsequent transfer claims against two other defendants (without prejudice) and all fraudulent transfer claims (with prejudice) except

for claims to avoid the Two-Year Transfers under 🔖 Bankruptcy Code § 548(a)(1)(A). (*Stipulation and Order*, dated Aug. 19, 2015 (ECF Doc. # 46).)

8    The order is annexed as Exhibit 4 to the *Cremona Declaration,* and refers to the claims identified in Exhibit A to the Trustee's earlier motion. (*See* ECF Main Case Doc. # 530.) The latter included the Mann Claim but not the BAM Claim because the Trustee's motion and Exhibit A were filed before BAM filed the BAM Objection. Nevertheless, the parties agree that the order also covers the BAM Claim.

9    A "good faith" defendant is one who did not know or willfully blinded himself to the fact that BLMIS was engaged in a Ponzi scheme and the transactions listed on his monthly customer statements were entirely fictitious. The Defendants are "good faith" defendants.

10   *See* 🔖 *Trustee's Memorandum of Law on the Legal Effect of the Ruling Withdrawing Claims and Objections with Prejudice and in Support of Motion to Strike the Mann Defendants' Jury Demand*, dated Dec. 5, 2018 (ECF Doc. # 131); *Memorandum of Law of the Securities Investor Protection Corporation on the Legal Effect of the Order Withdrawing Claims and Objections with Prejudice and in Support of Motion to Strike the Mann Defendants' Jury Demand*, dated Dec. 5, 2018 (ECF Doc. # 132); *Defendants' Response to Trustee and the Securities Investor Protection Corporation's Memoranda on the Legal Effect of the Order Withdrawing Claims and Objections with Prejudice and in Support of the Motion to Strike the Defendants' Jury Demand*, dated Dec. 12, 2018 ("*Defendants Memo* ") (ECF Doc. # 137).

11   Section 502(d) states:

Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under 🔖 section 522(f), 522(h), 544, 545, 🔖 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under 🔖 section 522(i), 542, 543, 550, or 553 of this title.

For purposes of section 502(d), there is no distinction between preferences under 🔖 Bankruptcy Code § 547 and fraudulent transfers under Bankruptcy Code §§ 544 and 🔖 548. In either case, the claims are disallowed if the transfer is avoided.

12   The Defendants' argument that a customer claim under SIPA is not the "functional equivalent" of a proof of claim in a bankruptcy case, (*Defendants Memo* ¶¶ 35-36), ignores the contrary case law.

13   I do not suggest that the withdrawal of the reference or the other grounds for the *Katz* Court's conclusions should make a difference. In 🔖 *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, No. 3:10-CV-1842-G (AJF), 2012 WL 987539 (N.D. Tex. Mar. 21, 2012), *aff'd,* 🔖 761 F.3d 409 (5th Cir. 2014), *cert. denied*, ––– U.S. ––––, 135 S.Ct. 1430, 191 L.Ed.2d 366 (2015), the Court questioned the soundness of *Katz*'s reasoning on three bases. First, *Katz* failed to recognize *Germain*'s statement that a preference action would implicate the claims allowance process. Second, Katz failed "to recognize that Section 502(d) seems to make preference and fraudulent conveyance actions necessarily integral to this process." Third, *Katz* cited no authority to support the proposition that the withdrawal of the reference "substantially severed" the adjudication of the fraudulent transfer action from the claims allowance process, and motions to withdraw the reference have found that *Langenkamp* applies. *Id.* at *5; *accord* *In re Vaughn Co.*, 2014 WL 12789686, at *3 ("The [*Katz* ] court cites no authority for the proposition that withdrawal of the reference under 🚩 28 U.S.C. § 157(b) severs proceedings from the claims-allowance process. Nor does the [*Katz* ] court explain why *Langenkamp* does not apply. Therefore, this Court declines to follow [*Katz* ].") (footnote omitted); *Kapila v. Bank of Am., N.A.* (*In re Pearlman* ), 493 B.R. 878 (Bankr. M.D. Fla. 2013) (disagreeing with *Katz*'s reasoning because "[t]he district courts serve as the original courts of equity for all bankruptcy related proceedings. Trying a fraudulent conveyance claim in the district court, which has all the equitable powers assigned to a bankruptcy court, no more disrupts the equitable distribution process or severs legal claims from equity than if the district court chose to resolve the bankruptcy matter in its entirety, which it is entitled to do.") (footnote omitted). In other words, even if the District Court withdraws the reference, the disposition of the fraudulent transfer action will still affect the claims allowance process through Bankruptcy Code § 502(d).

14   The District Court reached the opposite conclusion with respect to the Trustee's fraudulent transfer and turnover claims because Magee's remaining claim based on the promissory note remained unresolved and section 502(d) mandated its disallowance if the trustee prevailed on those counterclaims. 🔖 *FKF 3, LLC*, 2016 WL 4540842, at *11.

15  The Court has subject matter jurisdiction over this adversary proceeding under SIPA § 78eee(b)(4), 28 U.S.C. §§ 1334(b), 157(a) & (b) and Order No. M 10-450 (S.D.N.Y. July 10, 1984), as amended by Amended Standing Order of Reference No. M 10-468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012).

16  Rule 3006 provides in pertinent part:

> A creditor may withdraw a claim as of right by filing a notice of withdrawal, except as provided in this rule. If after a creditor has filed a proof of claim an objection is filed thereto or a complaint is filed against that creditor in an adversary proceeding, ... the creditor may not withdraw the claim except on order of the court.... The order of the court shall contain such terms and conditions as the court deems proper....

17  The Bankruptcy Court noted that in *Travellers Int'l v. Robinson*, 982 F.2d 96 (3d Cir. 1992), the Court upheld the bankruptcy court's equitable jurisdiction even though the adversary proceeding was commenced before the proof of claim was filed. *EXDS*, 301 B.R. at 439. Some courts have expressly concluded that the sequence is irrelevant, and the adversary proceeding is part of the claims allowance process and subject to the bankruptcy court's equitable jurisdiction whether it is filed before or after the creditor-defendant files the proof of claim triggering the claims allowance process.

*SNA Nut Co.* v. *Häagen-Dazs Co.*, 302 F.3d 725, 730 (7th Cir. 2002) (quoting *In re Peachtree Lane Assocs., Ltd.*, 150 F.3d 788, 798 (7th Cir. 1998) ); *WorldCom*, 378 B.R. at 754. Other cases have concluded, consistent with the time-of-filing rule, that "the successful withdrawal of a creditor's claim prior to the initiation of an adversarial proceeding by the trustee renders the withdrawn claim a legal nullity for purposes of submission to the equitable jurisdiction of the bankruptcy court." *Smith v. Dowden*, 47 F.3d 940, 944 (8th Cir. 1995); *accord* *In re 20/20 Sport, Inc.*, 200 B.R. 972, 979 (Bankr. S.D.N.Y. 1996); *cf. Lehman Bros. Special Fin. Inc v. Bank of Am. Nat'l Ass'n* (*In re Lehman Bros. Holdings Inc.*), 544 B.R. 16, 34-36 (Bankr. S.D.N.Y. 2015) (claim withdrawn before adversary proceeding commenced cannot serve as basis for personal jurisdiction); *Cruisephone, Inc. v. Cruise Ships Catering & Servs.* (*In re Cruisephone, Inc.*), 278 B.R. 325, 331 (Bankr. E.D.N.Y. 2002) (same).

The Court need not address this issue because the Defendants filed their claims before the Trustee commenced the adversary proceeding. That said, one could argue that a creditor that files a claim *after* he has already been sued in an adversary proceeding waives any objection and impliedly consents to the exercise by the bankruptcy court of equitable jurisdiction to decide any issues in the adversary proceeding that affect the allowance of his claim.

---

End of Document     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   13

# Exhibit 3

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

2019 WL 6245772
United States Bankruptcy Court, S.D. New York.

SECURITIES INVESTOR PROTECTION
CORPORATION, Plaintiff-Applicant,
v.
BERNARD L. MADOFF INVESTMENT
SECURITIES LLC, Defendant.
In re: Bernard L. Madoff, Debtor.
Irving H. Picard, Trustee for the Substantively
Consolidated SIPA Liquidation of Bernard
L. Madoff Investment Securities LLC and for
the Estate of Bernard L. Madoff, Plaintiff,
v.
Carol Nelson, Defendant.
Irving H. Picard, Trustee for the Substantively
Consolidated SIPA Liquidation of Bernard
L. Madoff Investment Securities LLC and for
the Estate of Bernard L. Madoff, Plaintiff,
v.
Carol Nelson, Individually and as Joint
Tenant; and Stanley Nelson, Individually
and as Joint Tenant, Defendants.

Adv. Pro. No. 08-01789 (SMB) (Substantively
Consolidated), Adv. Pro. No. 10-04658
(SMB), Adv. Pro. No. 10-04377 (SMB)
|
Signed November 21, 2019

**Attorneys and Law Firms**

BAKER & HOSTETLER LLP, 45 Rockefeller Plaza, New
York, New York 10111, David J. Sheehan, Esq., Dean D.
Hunt, Esq., Nicholas J. Cremona, Esq., Lan Hoang, Esq.,
Seanna R. Brown, Esq., Of Counsel, Attorneys for Irving H.
Picard, Trustee for SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC

CHAITMAN LLP, 465 Park Avenue, New York, New York
10022, Helen Davis Chaitman, Esq., Gregory M. Dexter,
Esq., Of Counsel, Attorneys for Defendants Carol Nelson and
Stanley Nelson

SIPA LIQUIDATION

**POST-TRIAL FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

STUART M. BERNSTEIN, United States Bankruptcy Judge:

**\*1** Plaintiff, Irving H. Picard, as trustee (the "Trustee") for
the liquidation of Bernard L. Madoff Investment Securities
LLC ("BLMIS") under the Securities Investor Protection
Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA") brought these
adversary proceedings to recover intentional fraudulent
transfers (the "Two-Year Transfers," defined below) made by
BLMIS to Carol Nelson and Stanley Nelson (collectively, the
"Defendants") in the aggregate amount of $3,065,077.00 The
Court consolidated the cases for trial and conducted a two-day
trial on May 8 and 9, 2019. The Trustee called three witnesses
and the Defendants called no witnesses. [1]

Pursuant to the *Order Setting Trial*, dated Jan. 17, 2019 (ECF
Doc. # 126), [2] the parties were required to exchange witness
lists and pre-marked exhibits on or before May 1, 2019. In
order to expedite the trial, the Court and the parties adopted
a procedure that left the question of the admissibility of all
designated exhibits for post-trial briefing. (*See Stipulation
and Order Setting Post Trial Briefing Schedule*, dated May
15, 2019 (ECF Doc. 157).) The parties thereafter submitted
post-trial proposed findings of fact and conclusions of law [3]
and the Defendants' submission included objections to the
admission of many of the exhibits designated by the Trustee. [4]
These objections are dealt with below.

The principal factual issue the Court must decide is whether
the Two-Year Transfers were made by BLMIS or Madoff
personally. The Court finds that BLMIS made the Two-Year
Transfers. For the reasons that follow, the Court avoids the
Two-Year Transfers and awards a final judgment in favor
of the Trustee and against Carol Nelson in the sum of
$455,077.00 and against Carol Nelson and Stanley Nelson in
the sum of $2,610,000.00.

**FINDINGS OF FACT**

**A. BLMIS's Business**
Beginning in 1960 and until January 1, 2001, Bernard L.
Madoff ran his broker-dealer business as a sole proprietorship
(hereinafter referred to as "Madoff Securities"). Madoff
Securities frequently used the trade name "Bernard L. Madoff

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

Investment Securities" in the course of its business. Effective January 1, 2001, Madoff registered BLMIS as a New York single member limited liability company. (TX-008.) On January 12, 2001, BLMIS amended its SEC Form BD to reflect its change from a sole proprietorship to a single member limited liability company with Madoff as the sole member.[5] BLMIS affirmed that it was transferring all of Madoff Securities' assets and liabilities relating to the business of Madoff Securities to BLMIS. (TX-007, at 11.) In 2006, BLMIS registered as an investment advisor. (TX-001 (Madoff Plea Allocution) at 28:10-19; TX-002 (DiPascali Plea Allocution) at 49:16-21.)

**\*2** BLMIS was a single enterprise that operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business. (Tr. (5/8) at 63:2-21.) The proprietary trading business traded for its own account to make money for BLMIS. (Tr. (5/8) at 62:24–63:21, 64:10-12, 68:7-16, 122:15-19, 151:2-8.) The market-making business made markets in certain stocks, bonds, warrants and rights. (Tr. (5/8) at 62:24–63:21, 122:15-19, 151:9-10.) The proprietary trading and market-making businesses were referred to within BLMIS as "House 5" and were collectively referred to in the trial testimony as the "Proprietary Trading Business." (Tr. (5/8) at 62:24–63:21, 150:18-21.) By all accounts, the Proprietary Trading Business was legitimate.

The investment advisory business ("IA Business") supposedly bought equity securities and options on behalf of its customers' accounts. (Tr. (5/8) at 62:24–63:21, 63:25–64:14.) Madoff represented to IA Business customers that he would invest their funds in shares of common stock and options, and "promised [investors that he] would opportunistically time those purchases [to] be out of the market intermittently, investing client funds during th[o]se periods in United States Government-issued securities, such as United States Treasury bills" as part of the purported "split-strike conversion" strategy. (TX-001 (Madoff Plea Allocution) at 26:7-11.) In addition, Madoff promised to "hedge the investments [he] made in the basket of common stocks by using client funds to buy and sell option contracts related to those stocks, thereby limiting potential client losses caused by unpredictable changes in stock prices." (*Id.* at 26:12-16.)

During at least the ten-year period before its collapse on December 11, 2008, BLMIS primarily used three bank accounts for the IA Business: JP Morgan Chase Bank,

N.A. ("Chase") account #xxxxx1703 (the "703 Account"); Chase account #xxxxxxxxx1509 (the "509 Account," and together with the 703 Account, the "Chase Accounts"); and Bankers Trust account #xx-xx0-599 (the "599 Account"). (Tr. (5/8) at 89:13-21, 92:3-5, 186:11-17; TX-028; TX-029; TX-030; TX-031; TX-032.) The Chase Accounts were linked accounts. The 509 Account was a controlled disbursement account that was entirely funded by the 703 Account. (Tr. (5/8) at 188:11–189:2.) IA Business customers' cash deposits were deposited and commingled in the 703 Account. (Tr. (5/8) at 83:3-11; 188:11–189:2; *see* TX-037; TX-038.) IA Business customer withdrawals were made through the 509 Account which was entirely funded by the 703 Account during the period for which bank records were available. (Tr. (5/8) at 188:11–189:10; TX-149; TX-150; *see* TX-037.)

Ninety-seven percent of all cash deposited into the 703 Account came directly from IA Business customers; "either new customers putting money in or existing customers putting additional money in." (Tr. (5/8) at 83:3–85:23, 189:21–190:11; *see* TX-037; TX-038.) The other three percent of inflows into the 703 Account came from overnight sweeps and short-term investments. Because the overnight sweeps and short-term investments were made directly from the 703 Account, the source of the money for those investments was also customer funds. (Tr. (5/8) at 82:2–84:14, 85:8-23, 190:1-11; *see* TX-038.) "[T]he overnight sweeps [were used] to kind of create more money for the Ponzi [scheme] to enable it to go a little bit longer, in other words." (Tr. (5/8) at 92:6-21.)

Importantly, there were no inflows into the 703 Account from sales of securities for customer accounts, (Tr. (5/8) at 84:1-14, 190:1-11; *see* TX-038), or outflows from the 703 Account to purchase securities for customer accounts. (Tr. (5/8) at 83:3–84:14, 190:1-11.) Apart from two short-term loans BLMIS received from Chase totaling $145 million in November 2005 and January 2006—both of which were repaid by June 2006—the IA Business did not obtain loans from third parties or from the Proprietary Trading Business sufficient to pay the IA Business customer withdrawals. (Tr. (5/8) at 80:20–93:3; *see* TX-037; TX-038.)

**\*3** Furthermore, the IA Business did not receive payments of any cash dividends despite what the customer statements reported. Between 1998 and 2008, BLMIS reported on the customer statements that it had paid *or credited* its customers $4.3 billion in cash dividends. (Tr. (5/8) at 86:21-24, 88:16-18; TX-039.) Of the more than 8,300 IA Business

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

dividend transactions identified on the customer account statements from 1998 to 2008, not one purported dividend payment matched to a cash addition to the 703 Account. (Tr. (5/8) at 85:24–90:19; TX-039.) Hence, the only source of cash available for the IA Business to pay purported investment profits as well as redemption requests from its customers was from cash IA Business customers deposited in the 703 Account. (Tr. (5/8) at 80:20–93:3; *see* TX-037.)

Not surprisingly, these transactions rendered BLMIS insolvent. By no later than December 2002, its assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion. (Tr. 5/8 at 138:17–141:14; TX-035; TX-036.) By 2007, BLMIS's insolvency had deepened to $21.5 billion. (Tr. (5/8) at 142:6-17.) Defendants did not present testimony or evidence to rebut Dubinsky's conclusion that the funds in the 703 Account consisted of customer money, that the IA Business had no other source of funds, or that customer redemptions were paid with funds from the 703 Account through the 509 Account.

**B. The Ponzi Scheme**

On December 11, 2008 (the "Filing Date"), [6] Bernard L. Madoff was arrested for violating numerous federal statutes and the SEC commenced proceedings against him and BLMIS in the United States District Court for the Southern District of New York. On December 15, 2008, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). The District Court granted SIPC's application, appointed the Trustee as the trustee for the liquidation of BLMIS, appointed Baker & Hostetler LLP as counsel to the Trustee, and removed the case to this Court. The evidence demonstrates that Madoff operated Madoff Securities and BLMIS as a Ponzi scheme at least since the early 1990s before the Defendants opened their initial BLMIS accounts in December 1992 and certainly by the time they received the Two-Year Transfers.

**1. The Allocutions**

Madoff pled guilty in the criminal case brought against him. At his plea allocution on March 12, 2009, Madoff admitted to operating a Ponzi scheme through the IA Business beginning in at least the early 1990s. (TX-001 (Madoff Plea Allocution) at 23:14-18, 25:12-13):

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options, and other securities of large well-known corporations, and upon request, would return to them their profits and principal. Those representations were false for many years. Up until I was arrested on December 11, 2008, I never invested [customer] funds in the securities, as I had promised. Instead, those funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds ... I never made those investments I promised clients, who believed they were invested with me in the split strike conversion strategy.

**\*4** (*Id.* at 24:9-22, 26:16-18.) The purported profits were reflected on false account statements that Madoff sent to his investors. (*Id.* at 27:9-22; Tr. (5/8) at 94:6-23, 100:3-101:6.)

Frank DiPascali, Madoff's loyal assistant and thirty-year veteran of Madoff Securities and BLMIS, also pled guilty. At his plea allocution on August 11, 2009, he explained that investors were told Madoff was purchasing a basket of stocks, "[h]edging those investments by buying and selling option contracts, getting in and out of the market at opportune times and investing in government securities at other times." (TX-002 (DiPascali Plea Allocution) at 46:2-4.) In fact:

> THE DEFENDANT: From at least the early 1990's through December of 2008, there was one simple fact that Bernie Madoff knew, that I knew, and that other people knew but that we never told the clients nor did we tell the regulators

like the SEC. No purchases [or] sales of securities were actually taking place in their accounts. It was all fake. It was fictitious....

THE COURT: When did you realize that?

THE DEFENDANT: In the late '80s or early '90s.

...

THE DEFENDANT: From our office in Manhattan at Bernie Madoff's direction, and together with others, I represented to hundreds, if not thousands, of clients that security trades were being placed in their accounts when in fact no trades were taking place at all.

(*Id.* at 46:9-25; *accord* Tr. (5/8) at 101:20–102:9.) DiPascali also admitted to using historical stock prices to falsify the trading activity reflected on the customer statements and using phony trades for certain customers to obtain the targeted rate of return that Madoff had directed for them. As DiPascali explained:

> On a regular basis, I used hindsight to file historical prices on stocks then I used those prices to post purchase [or] sales to customer accounts as if they had been executed in real-time. On a regular basis I added fictitious trade data to account statements of certain clients to reflect the specific rate of return that Bernie Madoff had directed for that client.

(TX-002 (DiPascali Plea Allocution) at 47:16-22.)

The Trustee moved in *limine* for a determination that the allocutions were admissible, (*Trustee's Memorandum of Law in Support of Motion in Limine Number 1 to Admit the Plea Allocutions of Bernard L. Madoff and BLMIS Employees*, dated Apr. 24, 2019 (ECF Doc. # 135)), and the Defendants opposed the motion. (*Defendants' Memorandum of Law in Opposition to Trustee's Motions in Limine Number 1 (to Admit the Plea Allocutions of Bernard L. Madoff and BLMIS Employees) and Number 2 (to Admit the Former Testimony of Frank DiPascali)*, dated May 1, 2019 ("*Defendants' in Limine Opposition*") (ECF Doc. # 147).) [7] The Court granted the Trustee's motion from the bench at the beginning of the trial,

(Tr. (5/8) at 21:11-18), but the Defendants have renewed their opposition in their post-trial submission. (*See Defendants' Findings & Conclusions* at ¶¶ 66-72.)

To the extent their opposition is deemed a timely request for reconsideration, the Court adheres to its earlier decision. Criminal plea allocutions are admissible under the exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a judgment of a previous conviction and FED. R. EVID. 807's residual exception to hearsay. *Picard v. Legacy Capital Ltd. (In re BLMIS)*, 603 B.R. 682, 689 n. 8 (Bankr. S.D.N.Y. 2019) ("*Legacy*") (citing authorities). The Defendants cite this Court's decision in *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Adv. Proc. No. 10–03493 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014) as contrary authority but the case is distinguishable. There, the Court limited the admissibility of Marc Dreier's *judgment of conviction* under FED. R. EVID. 803(22) to the facts "essential to the judgment." *Id.* at *11. The Court ruled, however, that Dreier's allocution was admissible to prove the elements of the chapter 11 trustee's claim that Dreier LLP was a Ponzi scheme although Dreier never allocuted that he used the proceeds from later investors to pay earlier investors. *Id.* In contrast, as set out above, Madoff and DiPascali allocuted to the facts that established that BLMIS was a Ponzi scheme. [8] Accordingly, the allocutions are admissible. [9]

### 2. The Trustee's Expert Evidence

#### a. The Experts

**\*5** The Trustee called three experts to establish his *prima facie* case and rebut the Defendants' cases to the extent necessary. Dubinsky is a forensic accountant with more than thirty years of experience in financial fraud investigations and cases. Defendants did not object to his qualifications and he was qualified by the Court as an expert in the areas of forensic accounting, fraud examinations, computer forensics, solvency and business valuations, and investment theory and practices. Lisa M. Collura is a forensic accountant with more than twenty years of experience in financial fraud investigations and cases. Defendants did not object to Collura's qualifications and she was qualified by the Court as an expert in the area of forensic accounting. Finally, Matthew B. Greenblatt is a forensic accountant with more than twenty years of experience in financial fraud investigations and cases. Defendants did not object to his qualifications and he

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

was qualified by the Court as an expert in the area of forensic accounting.

### b. Dubinsky's Testimony

Dubinsky conducted several analyses from which he concluded that BLMIS did not conduct any trading on behalf of its IA Business customers. His analyses disclosed (a) the impossible reported volume of equity trades; (b) the low volatility in its reported daily trading performance compared to the actual market behavior and the performance achieved by BLMIS in the Proprietary Trading Business unit as measured by the volume weighted average prices for its sales and purchases; (c) the consistently positive rates of return that did not "mirror" the volatility of the markets; (d) a lack of any Depository Trust Corporation ("DTC") records to confirm the reported IA Business equity or treasury trades; and (e) a lack of Options Clearing Corporation ("OCC") records to confirm the reported IA Business options trades. (Tr. (5/8) at 102:15–112:21, 113:22–118:4, 118:10–125:19, 133:20–138:11; TX-040; TX-049; *see* TX-041; TX-045.) [10]

#### (i) Volume of Equity Trades

Dubinsky analyzed equity trades that the IA Business reportedly made in the split-strike conversion ("SSC") strategy between January 2000 and November 2008. He compared the daily volumes for certain stocks reported as purchased or sold by the IA Business on the aggregated customer statements with the actual market volumes sold as reported by Bloomberg. He summarized the results of his analysis in TX-049, a 24-page, exhibit. (Tr. (5/8) at 113:22–118:4.) Dubinsky found many instances where the volume that BLMIS claimed to have purchased or sold on behalf of all IA Business customers exceeded the volume of equities traded for the entire market. Sometimes, the trades exceeded "90 percent of the whole market, 95 percent of the whole market." (Tr. (5/8) at 113:22–118:4; TX-049.) For example, on July 14, 2000, the aggregated IA Business customer statements reported purchases of 2,822,680 shares of AIG (as reflected in the column on TX-049 titled "IA Business Purported Volume"), but the total market volume that traded that day for all of AIG shares in the market was only 1,692,800 (as reflected in the column titled "Actual Market Volume"). (Tr. (5/8) at 114:13–116:24; TX-049.) Similarly, the IA Business reported trading 17,709,440 shares of GE on September 13, 2000, but the total market volume that traded

all day for GE shares in the market was only 7,604,800. (Tr. (5/8) at 116:6-12.)

#### (ii) Volume Weighted Average Price Analysis

**\*6**  The absence of actual trading was also reflected in the prices at which the IA Business purportedly bought and sold shares using the SSC strategy. Dubinsky conducted a Volume Weighted Average Price ("VWAP") analysis of the daily purchases and sales reported by the IA Business and the Proprietary Trading Business. VWAP is a trading benchmark that gives the average price a security has traded throughout the day, based on both volume and price. (Tr. (5/8) at 118:10–125:19.) The VWAP is a widely used industry benchmark that allows a firm to see how well its traders are doing compared to the rest of the market. (Tr. (5/8) at 120:4-17.) Typically, a trader "will buy, on average, 50 percent of the time below the average, 50 percent above. But it converges at about 50-50." (Tr. (5/8) at 121:14-24.) This matched the VWAP realized by the traders in the Proprietary Trading Business. (Tr. (5/8) at 122:5-14.)

Based on Dubinsky's analysis, the traders in the IA Business appeared to be remarkably prescient. He determined that the IA Business purportedly executed 83% of the daily buy transactions by share volume *below* the VWAP, (Tr. (5/8) at 122:22–123:7), and 72% of the daily sell transactions by share volume *above* the VWAP. (Tr. (5/8) at 123:15–124:9.) In other words, BLMIS had the uncanny ability to buy low and sell high at a remarkable rate compared to the rest of the market. One would think that if the IA Business could do this, it would show the Proprietary Trading Business how to achieve the same results.

#### (iii) Annual Rates of Return

To further test whether the IA Business engaged in trading, Dubinsky analyzed the volatility of the IA Business's reported average annual rate of return for the SSC strategy as compared with the volatility of the annual rate of return reported by Bloomberg for the two major market indices, the S & P 100 Index and the Dow Jones Industrial Average (the "Dow Jones") from December 31, 1996 through December 11, 2008. Because the IA Business's SSC strategy was supposedly engineered around the S & P 100, with "a basket of stocks in the S & P 100 and using S & P index options," the IA

Securities Investor Protection Corporation v. Bernard L. Madoff..., 2019 WL 6245772...

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

Business's returns should have performed similarly to the S & P 100 Index. (Tr. (5/8) at 134:18–137:3; TX-040.)

Dubinsky's analysis showed, however, that the volatility in the IA Business rates of return did not mirror the volatility of the rates of return of the major indices. The IA Business rates of return stayed within a small range, generally between 10-12% for most years and reached 20% for the year of 1999. The returns for the major market indices ranged from a high of 31% to a low of -37% (the S & P 100 swung between a high of 31% and a low of -37%, and the Dow Jones from a high of 25% to a low of -34%). The IA Business never had a negative year or month (even throughout 2008). (Tr. (5/8) at 134:18–136:21; TX-040.)

### (iv) Securities Listed on the IA Business Customer Statements Did Not Reconcile with DTC Records

Dubinsky compared the trades purportedly executed for the customer accounts in the IA Business with the records maintained by the DTC, an organization in the United States that clears and settles equity transactions in the U.S. market. When equity trades are recorded at the DTC it creates the official record of where that stock is held. The ownership of the stock can be confirmed with the DTC. (Tr. (5/8) at 102:17–103:21.) BLMIS had a single account with the DTC, the "646 account." (Tr. (5/8) at 104:1-106:17.) All equity trades made by BLMIS should have been reflected in the DTC records pertaining to its account.

Dubinsky's analysis confirmed that the equity securities that were cleared through BLMIS's DTC account were traded by the Proprietary Trading Business but no IA Business trades were cleared through BLMIS's DTC account. (Tr. (5/8) at 104:1–108:17; see TX-045.) While the Proprietary Trading Business shares reflected in the DTC records matched the BLMIS records evidencing those trades, (Tr. (5/8) at 107:15-24; see TX-045), the DTC records did not reflect the IA Business trades. (Tr. (5/8) at 104:1–107:4; see TX-045.) Based on his analysis, Dubinsky concluded that the IA Business did not execute the equity trades reflected on the customer statements. (Tr. (5/8) at 107:15-20.)

*7  Without actual DTC records to confirm the IA Business equity trades, BLMIS created fake DTC records. Dubinsky discovered dozens of fake DTC screen inquiries to document purported trading activity of the IA Business. (Tr. (5/8) at 108:18–112:21; see TX-047; TX-048.) BLMIS installed

software on the IA Business computer system that created "official-looking DTC reports." Dubinsky explained that "there would be no reason, if you were doing legitimate trading and had owned the stocks, to go into your own computer system and write code that used form-printing software to print out a report that mimicked what the DTC puts out, because you would have the real DTC report." (Tr. (5/8) at 108:18–111:18, 112:3–113:1; see TX-047; TX-048.)

### (v) Reported Options Trades Could Not Be Reconciled to OCC Records

In addition, the options purportedly executed for the customer accounts in the IA Business could not be reconciled with the records of the OCC, an organization that clears and settles options transactions in the U.S. market. (Tr. (5/8) at 126:11-24.) BLMIS had a single account with the OCC, and the IA Business purportedly traded S & P Index options ("OEX"), which are "proprietary options" traded exclusively on the Chicago Board of Options Exchange ("CBOE"). Dubinsky testified "that's the only way they can be traded, [b]ut there would be a record of those both from the CBOE and the OCC." (Tr. (5/8) at 126:11-24.) Dubinsky reviewed the OCC records for the BLMIS account from October 31, 2002 through October 31, 2008. He was able to reconcile and confirm the options that were traded by the Proprietary Trading Business but could not account for the options purportedly traded for the customers in the IA Business. He found that "on the IA [Business] side, those records were not matched because those trades never happened," (Tr. (5/8) at 126:25–127:23), and concluded that BLMIS did not conduct any options trading on behalf of its IA Business customers. (Tr. (5/8) at 127:24–128:4.)

### (vi) IA Business Did Not Purchase Treasuries for IA Business Customer Accounts

Besides purchasing equity securities and options, BLMIS claimed it would intermittently invest IA Business customer funds in U.S. treasury bills ("T-Bills") as part of the SSC strategy. (Tr. (5/8) at 96:16–99:21.) While BLMIS purchased T-Bills with customer funds, these purchases did not match the allocation of T-Bill transactions that appeared on customer statements. Dubinsky testified that for the period of 2002 through 2007, he reviewed the BLMIS books and records to identify the unique T-Bills held by the Proprietary Trading Business on December 31 of each of those years. He then

Securities Investor Protection Corporation v. Bernard L. Madoff..., --- B.R. ---- (2019)

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

compared those holdings to (i) the T-Bill positions held at BLMIS's account at the DTC, which serves as the custodian or "the clearing house for treasuries," and (ii) the T-Bills purportedly held by the IA Business for its customers. Dubinsky prepared a summary exhibit, (TX-050,) of his review. (Tr. (5/8) at 129:15–132:14.) He determined that the T-Bill CUSIPs (*i.e.*, unique security identifiers) held at the DTC under BLMIS's account matched the T-Bills reported as having been purchased and held by the Proprietary Trading Business. In contrast, none of the T-Bills CUSIPs held at the DTC under BLMIS's account matched those purportedly purchased for and held on behalf of IA Business customers. (Tr. (5/8) at 129:15–130:12.)

Importantly, Dubinsky also compared the *volume* of T-Bills held by the Proprietary Trading Business and reflected in the DTC records to the volume reported on the IA Business customer statements as of year-end for 2002-2007. He found that the T-Bills reported as held by customers was exponentially greater than the T-Bills BLMIS actually purchased and held:

| Year-End | Proprietary Trading Business T-Bill Positions | T-Bills Allocated to IA Business Customers | Proprietary Trading Business Positions as a Percent of IA Business Positions |
|---|---|---|---|
| 2002 | $84,000,000 | $30,975,765,000 | 0.27% |
| 2003 | $70,000,000 | $33,643,020,000 | 0.21% |
| 2004 | $70,000,000 | $37,935,258,000 | 0.18% |
| 2005 | $75,000,000 | $40,913,910,000 | 0.18% |
| 2006 | $70,000,000 | $48,342,420,000 | 0.14% |
| 2007 | $80,000,000 | $56,990,055,000 | 0.14% |

(TX-050.)

As Dubinsky explained, "if you add up all the treasuries in those eight [BLMIS] brokerage accounts, they're woefully short of what Mr. Madoff or BLMIS was showing on [IA Business] customer statements for a particular day for all of the treasuries." (Tr. (5/8) at 177:19–178:12.) [11] In short, although the Proprietary Trading Business purchased T-Bills, the volume of T-Bills that appeared on the customer statements dwarfed the aggregate volume of T-Bills actually purchased and held by BLMIS. Accordingly, the T-Bill positions that appeared on the customer statements in general, and the Defendants' in particular, were fictitious. This conclusion was borne out by certain testimony provided by DiPascali, discussed below.

## C. The Defendants' Accounts

The Defendants opened three separate accounts with Madoff Securities. (TX-338-340.) Defendant Carol Nelson opened Account 1ZA283 in December 1992. She made one deposit into Account 1ZA283, totaling $1,000,000. (Tr. (5/8) at 203:13-204:2; TX-058; TX-344.) During the next sixteen years, she made forty-eight cash withdrawals, totaling $2,700,000, (Tr. (5/8) at 215:11-20; TX-055; TX-058; TX-344,) and during the two years preceding the commencement of the SIPA liquidation on December 11, 2008 ("Two-Year Period"), she withdrew $255,000.00. (TX-058.)

Defendant Carol Nelson also opened an individual retirement account ("IRA") designated Account 1ZR265, in August 1996. (TX-339.) NTC [12] made four deposits on behalf of Defendant Carol Nelson totaling $458,387.92, (TX-060; TX-349), and made eight cash withdrawals totaling $860,135.42, (Tr. (5/8) at 215:21–216:3; TX-060; TX-349), including $200,077 within the Two-Year Period. (TX-060.)

Finally, Defendants Carol Nelson and Stanley Nelson opened Account 1ZA284 in the name of Carol Nelson and Stanley Nelson J/T WROS in December 1992. (Tr. (5/8) at 197:8-203:12; TX-024 at ¶ 1; TX-056; TX-059; TX-077; TX-340.) They made ten deposits totaling $5,550,000, (TX-059; TX-353,) and eighty-six cash withdrawals totaling $11,955,000, (Tr. (5/8) at 215:4-10; TX-056; TX-059; TX-353), including $2,610,000 during the Two-Year Period. (TX-059; TX-353.)

The withdrawals made during the Two-Year Period are the Two-Year Transfers that the Trustee is seeking to avoid and recover.

## D. These Adversary Proceedings

The Trustee initially commenced these two adversary proceedings against the Defendants to avoid and recover fraudulent transfers made within six years of the Filing Date. Following *Picard v. Ida Fishman Revocable Tr.* (*In re BLMIS*), 773 F.3d 411 (2d Cir. 2014) ("*Ida Fishman*"), *cert. denied* U.S. ———, 135 S. Ct. 2859, 192 L.Ed.2d 910 (2015), the Trustee's claims against Defendants were limited to the avoidance and recovery of the Two-Year Transfers, totaling $3,065,077.00

## CONCLUSIONS OF LAW

08-01789-cgm   Doc 19250-2   Filed 01/10/20   Entered 01/10/20 18:26:52   Main Document
Pg 34 of 52
Securities Investor Protection Corporation v. Bernard L. Madoff..., 110 Fed. R. Evid....

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

## A. Subject Matter Jurisdiction

**\*9** This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the District Court's Standing Order of Reference, dated July 10, 1984, and the Amended Standing Order of Reference, dated Jan. 31, 2012. In addition, the District Court removed the SIPA liquidation to this Court pursuant to SIPA § 78eee(b) (4), (*see Order*, dated Dec. 15, 2008, at ¶ IX (ECF Case No. 08-01789 Doc. # 1)), and this Court has jurisdiction under the latter provision. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H). Finally, the Defendants filed net equity claims against the BLMIS estate, the Trustee determined to disallow the claims, the Defendants objected to the Trustee's determination and the Trustee commenced these adversary proceedings while the Defendants' objections were pending. Accordingly, the Defendants have submitted to the Court's equitable jurisdiction to hear and determine the Trustee's avoidance and recovery claims and have no right to a jury trial. *Picard v. Mann* (*In re BLMIS*), 597 B.R. 466, 476 (Bankr. S.D.N.Y. 2019), *request for leave to appeal docketed*, No. 1:19-cv-00812-VSB (S.D.N.Y. Jan. 28, 2019).

The Trustee has demonstrated Article III standing. He brings the avoidance actions as a representative of an insolvent customer property estate to avoid and recover transfers for the benefit of the customer property estate which was injured by the fraudulent transfers of customer property, and the Trustee's action will redress that injury by replenishing the funds in the customer property estate available to satisfy the customers' net equity claims in the SIPA proceeding. *SIPC v. BLMIS* (*In re BLMIS*), 531 B.R. 439, 449 (Bankr. S.D.N.Y. 2015) ("*Omnibus Good Faith Decision*"). The Trustee has also demonstrated that he has statutory and prudential standing under 15 U.S.C. § 78fff-2(c)(3). The BLMIS estate has been insolvent since no later than December 2002, and customer property is "not sufficient" to pay in full the claims referenced in 15 U.S.C. § 78fff-2(c)(3). [13]

The Defendants nevertheless contend that the Court lacks subject matter jurisdiction because the Trustee lacks standing. [14] They point out that from December 1998 to August 2002, checks drawn on the 509 Account listed "Bernard L. Madoff" as the drawer of the check. (*See, e.g.*, DX-HC; DX-HK; DX-HN; DX-HR; DX-HV.) From September 2002 through December 2008, the bank statements for the Chase Account listed the account holder as "Bernard L. Madoff Investment Securities." (*See, e.g.*, TX-063; TX-064; TX-149; TX-150.) After September 2002, BLMIS continued to use checks for the 509 Account that listed "Bernard L. Madoff" as the drawer of the check. (*See, e.g.*, DX-IE; DX-IF; DX-IL; DX-IW; DX-JA.) From all this, Defendants conclude that Madoff rather than BLMIS made the transfers.

**\*10** The Defendants conflate subject matter jurisdiction with the merits of the Trustee's claims. The Trustee certainly has standing to argue that BLMIS made the Two-Year Transfers. [15] If he cannot prove this, he will lose on the merits. In any event, the Defendants' jurisdictional argument lacks merit because the evidence demonstrated that BLMIS owned the Chase Accounts, the source of the Two-Year Transfers. [16]

BLMIS operated as a sole proprietorship — Madoff Securities — prior to 2001. In January 2001, Madoff Securities was converted to a single member LLC (BLMIS), and BLMIS succeeded to the business of Madoff Securities. (TX-007, at 5 (Question No. 5).) In response to the direction in the SEC Form BD to "[b]riefly describe details of the *succession* including any assets or liabilities not assumed by the *successor* [BLMIS]," (emphasis in original) (TX-007, at 10), Madoff replied:

> EFFECTIVE JANUARY 1, 2001, PREDECESSOR WILL TRANSFER TO SUCCESSOR ALL OF PREDECESSOR'S ASSETS AND LIABILITIES, RELATED TO PREDECESSOR'S BUSINESS.

(TX-007, at 11.) He further certified that no "accounts, funds, or securities of customers of the *applicant* are held or maintained by such other *person*, firm, or organization." (TX-007, at 6) (Question No. 8(c) (emphasis in original).)

Thus, while the customers' funds held by BLMIS remained their property under non-bankruptcy law, *see Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014), all of the bank accounts in which the customer funds were held were transferred to BLMIS, and Madoff informed the SEC that he did not retain them regardless of what he told Chase. In addition, all of the Madoff Securities customers, including the Defendants, became BLMIS customers. Each Customer Agreement signed by the Defendants acknowledged that it

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

inured to the benefit of the "Broker's present organization and any successor organization, irrespective of any change or changes at any time in the personnel thereof, for any cause whatsoever." (TX-338, 340, at Customer Agreement, ¶ 15; TX-339, at Customer Agreement, ¶ 9.) In short, after 2000, Madoff Securities had no business-related assets and no customers with which to carry on the business of a broker-dealer.

Consistent with its conversion from a sole proprietorship to the LLC, BLMIS sent letters to banks and organizations advising them of the change in legal status in or around January 2001. (DX-L; DX-M; DX-N; DX-O.) There is no evidence, however, that Madoff sent a similar letter to Chase, and as noted, the checks continued to bear the name "Bernard L. Madoff." Starting in September 2002, the Chase Accounts statements used the name "Bernard L. Madoff Investment Securities," a trade name used by Madoff Securities, without the "LLC." From this, the Defendants contend that "although Madoff formed the LLC in January 2001 and transferred the legitimate trading business managed by his sons to the LLC, he retained the fraudulent investment advisory business in his own name." (*Motion to Dismiss* at 5.)

 **\*11** There are several reasons why I reject this conclusion. First, and as noted, Madoff certified through SEC Form BD that all of Madoff Securities' assets and liabilities were being transferred to BLMIS, and that no "accounts, funds, or securities of customers of the *applicant* are held or maintained by such other *person*, firm, or organization." This is consistent with the change from a sole proprietorship to a limited liability company. In addition, Dubinsky testified that BLMIS operated through three divisions, proprietary trading, market making and IA. The IA Business did not operate separately as a sole proprietorship after January 1, 2001.

Second, for the time period for which bank records were available (December 1998 through December 2008), the evidence showed that the Chase Accounts were used solely for customer deposits and withdrawals—the business of the IA Business. (Tr. (5/8) at 194:6-22; *see also* Tr. (5/9) at 44:4-11.) The face of the bank statements for the Chase Accounts disclosed that they were "Commercial Checking" accounts, they were addressed to the attention of either Anthony Tiletnick, a BLMIS employee, or Daniel Bonventre, BLMIS's operations manager, at the BLMIS business address at 885 Third Avenue, New York, New York and none of the statements were addressed to Madoff personally. (*See, e.g.*, TX-061; TX-062; TX-063; TX-064; TX-149; TX-150.)

Third, the Defendants admitted in their answers that they received the transfers from "Madoff Securities," which they defined as "Bernard L. Madoff Investment Securities LLC." (Answer at p. 2, ¶¶ 3, 21, 24, 29, 30, 36-39 (ECF Adv. Pro. No. 10-04658 Doc. # 31); Answer at p. 2, ¶¶ 2, 21, 24, 29, 30, 36, 38, 39 (ECF Doc. # 30).) These are binding judicial admissions. [17] *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer ... are judicial admissions that bind the defendant throughout [the] litigation.").

Fourth, although the checks bore the name Bernard L. Madoff, the debit memos issued with the checks indicated that the disbursements were made by BLMIS. (*See* TX-088; TX-097; TX-106; TX-110; TX-119; TX-127; TX-136; TX-146; TX-157; TX-164; TX-177; TX-191; TX-200; TX-208; TX-216; TX-225; TX-234; TX-242; TX-250; TX-260; TX-269; TX-276; TX-284; TX-292; TX-302; TX-318; TX-327.)

Madoff was not particularly attentive to the names he used in operating his Ponzi scheme but his representations made to the SEC confirm that Madoff Securities ceased to operate on January 1, 2001. At that moment, all of its business and business property w transferred to BLMIS. No other person or entity retained any of that property and the Chase Accounts were maintained by BLMIS to hold customer deposits in accordance with the requirements of the Customer Protection Rule, 17 C.F.R. § 240.15c3-3. [18] That Madoff had his name printed on the BLMIS checks proves nothing and the debit memos issued with the checks show that BLMIS made the disbursements. I therefore overrule the Defendants' jurisdictional objection and deny their motion to dismiss.

## B. Evidentiary Objections

 **\*12** The Defendants have objected to many of the Trustee's proffered exhibits. [19] The Court has already explained the procedure adopted at the trial to address offers of evidence and objections post-trial. Hence, whether a party actually offered an exhibit at the time of the trial does not control. The Court has already overruled the objection to the admission of the allocutions, *supra*, and addresses the Defendants' remaining objections immediately below.

### 1. BLMIS Books and Records

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

The Trustee seeks to admit into evidence numerous exhibits derived from BLMIS's books and records including customer statements,[20] customer correspondence and files,[21] and debit memos.[22] Defendants object to the admissibility of these BLMIS books and records on the grounds of hearsay (FED. R. EVID. 801, 802), failure to authenticate (FED. R. EVID. 901), and lack of foundation. However, Defendants do not object to the admission of BLMIS checks which reflect the same transactions as the debit memos and the cash withdrawals on the customer statements. In addition, the Defendants do not object to the admission of any documents, including copies of BLMIS records, produced by their accountant, Richard Oppenheim, but the parties have not identified those documents.[23] The Trustee also seeks to admit Defendants' customer claims for their BLMIS Accounts and related documents, including the Trustee's Notices of Determination of Claim.[24] To the extent these exhibits are based on information contained in the BLMIS books and records, Defendants object on the grounds of hearsay (FED. R. EVID. 801, 802). Finally, Defendants object to the admission of the Trustee's Principal Balance Calculations (TX-076, TX-077, TX-078) to the extent they are based on information contained in the BLMIS books and records on the grounds of hearsay (FED. R. EVID. 801, 802), failure to authenticate (FED. R. EVID. 901), and lack of foundation.[25]

### a. Authentication

*13 The proponent of evidence may satisfy the authentication requirement by producing evidence "sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). The authentication burden is a "light one." Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC), 781 F.3d 1262, 1267 (11th Cir. 2015). The Court is not required to hear the testimony of the document's author to demonstrate its authenticity. U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co., 112 F. Supp. 3d 122, 144 (S.D.N.Y. 2015), reconsideration denied, Nos. 12 Civ. 6811, 13 Civ. 1580 (CM), 2015 WL 4610894 (S.D.N.Y. July 30, 2015). Authentication can be established based upon testimony from a competent witness as to the knowledge of the document's authenticity or the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Arista Records LLC v. Lime Grp. LLC, 784 F. Supp. 2d 398, 419 (S.D.N.Y. 2011) (quoting FED. R. EVID. 901(b)(4)); see also Parker v. Reda, 327 F.3d 211, 215 (2d

Cir. 2003). A trial court has broad discretion in determining whether an exhibit has been properly authenticated. United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir.), cert. denied, 534 U.S. 897, 122 S.Ct. 219, 151 L.Ed.2d 156 (2001). Ultimately, the question of authenticity is intertwined with the concept of trustworthiness, and many courts consider trustworthiness of a document in analyzing its authenticity. 5 JACK B. WEINSTEIN ET AL., WEINSTEIN'S FEDERAL EVIDENCE § 901.02[2] (2d ed. 2019) ("WEINSTEIN").

The testimony of the Trustee's experts established the authenticity of BLMIS's books and records and their trustworthiness as they relate to the cash deposits and withdrawals. Greenblatt testified that FTI Consulting, his employer, was engaged by the Trustee in December 2008 and Greenblatt has been personally involved since then. He and a team of FTI professionals were specifically tasked with the "reconstruction of the [BLMIS] books and records that were secured by the Trustee when he took control in December of 2008." (Tr. (5/9) at 47:21-49:2.) Greenblatt compiled the chronological listings of cash and principal transactions primarily based on the BLMIS customer statements. He further stated that he relied on the customer statements because: (i) the customer statements represent the complete BLMIS records for the longest time period, spanning from April 1981 to November 30, 2008; (ii) customer statements contain the most comprehensive details for each transaction for every account, including the transaction dates, amounts, descriptions and transaction codes; and (iii) customers could confirm the deposits into and withdrawals from their accounts because they received customer statements monthly. (Tr. (5/9) at 52:15–53:19.) Greenblatt also testified that the customer statements were maintained in BLMIS's books and records in two different forms over the years. For the period from December 1995 through November 2008, they were all available in electronic form on BLMIS computer systems, and for the periods prior to December of 1995, they were available on microfilm. (Tr. (5/9) at 54:15-21.)

Collura testified that she confirmed the accuracy and reliability of the cash transactions on the customer statements by reconciling those transactions reported on the BLMIS customer statements to available third-party bank records. These bank records included hundreds of thousands of pages of BLMIS bank statements, wire transfer data, cancelled checks and deposit slips. (Tr. (5/8) at 194:23–197:1; Tr. (5/9) at 44:15–45:19.) She confirmed that the deposit and withdrawal transactions identified on the BLMIS customer statements corresponded to transactions on the

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

available third-party bank records in the same amount, on or around the same date, and to or for the benefit of the same customer. Approximately 225,000 cash deposit and withdrawal transactions were reflected on the BLMIS customer statements during the ten years spanning 1998 through 2008 when bank records were available. Collura reconciled 99% of these 225,000 transactions between 1998 and 2008 to the available BLMIS bank records. (Tr. (5/8) at 194:23–197:1; Tr. (5/9) at 44:15–45:19.)

 *14 Collura also reconciled the pre-1998 cash transactions using BLMIS's customer files. (*See* TX-058, 059, 060.) The Defendants do not dispute the withdrawals after June 18, 2017. They contend, however, because of the absence of confirming third party evidence, the Trustee failed to prove six withdrawals aggregating $1,045,000.00 from Account 1ZA284 and six withdrawals aggregating $630,000.00 from Account 1ZA283 before that date. (*Defendants' Findings & Conclusions* at ¶ 51.) However, I credit Collura's reconciliation and Greenblatt's Principal Balance Calculations which support the earlier withdrawals. Furthermore, if the Trustee failed to prove the earlier withdrawals because of the absence of third-party records, he also failed to prove the earlier deposits for the same reason. According to the Trustee's evidence, Carol Nelson deposited $1 million in Account 1ZA283 before June 18, 1997, (TX-344, at 4), and if I ignore that deposit, the amount of fictitious profits she withdrew from that account increases by an additional $370,000.00. Similarly, the Defendants deposited $3,850,000.00 into Account 1ZA284 before June 18, 1997. If I ignore those deposits, the amount of fictitious profits they withdrew from that account increases by an additional $2,805,000.00.

Finally, Dubinsky testified that he spent almost a week at the "warehouse over in Queens" where Madoff stored "thousands of boxes of documents ... dating back many, many years," and had to follow a specific protocol and properly tag any documents he was interested in to ensure there was a "trail back." He looked at customer statements, trade confirmations, trade blotters, bank statements, trading records from the proprietary trading business, the AS-400 back-up tapes and included a complete listing of those records in his expert report. (Tr. (5/8) at 52:6–55:23.) He also cross-checked the BLMIS books and records against third-party records. (Tr. (5/8) at 56:3-10, 57:14-21.)

The Trustee's expert witnesses' testimony established that the BLMIS books and records are what they purported to be and

thus, were authentic. Moreover, although Madoff fabricated the trades reported in the customer statements, the records pertaining to cash deposits and withdrawals were reliable and confirmed through comparison with third-party bank records. Based on the foregoing, the requirements of authentication and foundation as to BLMIS books and records have been met. *See IKB Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00 Civ. 4763 (RMB) (JCF), 2006 WL 2136249, at *5 (S.D.N.Y. Aug. 1, 2006)* ("If in the court's judgment it seems reasonably probable that the evidence is what it purports to be, the command of Rule 901(a) is satisfied ....") (quoting *United States v. Dhinsa*, 243 F.3d at 658).

### b. Relevance

According to the Defendants, the Trustee refused to produce the records relating to other customers during discovery on the ground that they were irrelevant, and should not be allowed to use that evidence now. In support, the Defendants point to the Trustee's response to Interrogatory Request No. 2 in a different adversary proceeding, *Picard v. Wilenitz* (*In re BLMIS*), Adv. Pro. No. 10-04995 (Bankr. S.D.N.Y.). (*Defendants' Findings & Conclusions* at ¶ 198.)

The Defendants misrepresent the record. Defendants' Interrogatory Request No. 2 in that adversary proceeding asked the Trustee to list all of the factual errors he had found in BLMIS's books and records:

> With respect to Madoff's and BLMIS' books and records, list every single factual error you found in those books and records including, without limitation, inconsistencies between the deposits and withdrawals shown on the customer statements and the cancelled checks and copies of cancelled checks in the Trustee's possession.

(ECF Adv. Pro. No. 10-04995 Doc. # 70-1.) The Trustee responded, in pertinent part, that the records relating to other customers were irrelevant but they were nonetheless available in the Trustee's electronic data room ("E-Data Room") and the defendants were free to inspect them:

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

The Trustee further objects that it seeks Information Outside the Scope of Relevance because it calls for documents that relate to customers other than the Wilenitz Defendants, and such documents are not relevant to the claims or defenses or proportional to the needs of the Wilenitz case. Notwithstanding that information about other BLMIS customers is not relevant to the Wilenitz case, the Trustee responds that customer statements and canceled checks are in E-Data Room 1. The Trustee states pursuant to Federal Rule 33(d)(1) that Defendants may determine the response to this request by comparing the customer statements with the checks and that the burden of ascertaining the information is substantially the same for either party.

**\*15** (ECF Adv. Pro. No. 10-04995 Doc. # 70-2.)

The records relating to other customers, including all of the records upon which Dubinsky relied, have always been available for inspection in the E-Data Room, *Picard v. Wilenitz* (*In re BLMIS*), 605 B.R. 617, 619-20 (Bankr. S.D.N.Y. 2019), and Defendants' assertions that the Trustee "refused to produce other Madoff customer statements when the demand was served on him to do so," (*Defendants' Findings & Conclusions* at ¶ 198), or "provide 'direct access' to a database that contained copies of BLMIS documents or electronic documents," (*id.* ¶ 199), are false. [26] The Defendants' counsel has simply been unwilling to inspect the documents and counter the Trustee's experts with her own expert's analysis.

### c. Hearsay

Under the business records exception, the hearsay rule does not exclude

A record of an act, event, condition, opinion or diagnosis if:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6). "The business records exception has been construed generously in favor of admissibility, due to the general trustworthiness of regularly kept records and the need for this type of evidence in many cases." *Arista Records*, 784 F. Supp. 2d at 421; *accord Ilco, Inc. v. Dep't of Energy*, 99 F.3d 387, 391 (Fed. Cir. 1996); *Healthwork, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121, 129 (S.D.N.Y. 2007) ("Rule 803(6) favors the admission of evidence rather than its exclusion if it has any probative value at all."), *aff'd*, 294 F. App'x 680 (2d Cir. 2008). The principal precondition to the admission of a document under the business records exception is that the records "have sufficient indicia of trustworthiness to be considered reliable ... [and] [t]he determination of whether, in all the circumstances, the records are sufficiently reliable to warrant their admission in evidence is left to the sound discretion of the trial court." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632-33 (2d Cir. 1994) (internal quotation marks and citation omitted); *accord Elsevier B.V. v. UnitedHealth Grp., Inc.*, 784 F. Supp. 2d 286, 292 (S.D.N.Y. 2011). "The custodian need not have personal knowledge of the actual creation of the document to lay a proper foundation." *United States v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014) (citation and internal quotation marks omitted), *cert. denied*, 575 U.S. 925, 135 S. Ct. 1579, 191 L.Ed.2d 660 (2015); *accord Int'l Mgmt.*, 781 F.3d at 1268 ("As long as the trustee presented enough circumstantial evidence to establish the trustworthiness of the underlying documents, he did not need to present testimony from the person who actually prepared them; his own testimony would suffice."); *Saks Int'l, Inc. v. M/V "Export Champion"*, 817 F.2d 1011, 1013 (2d Cir. 1987) ("[T]here is no requirement

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such a person."); *see generally* 5 WEINSTEIN § 803.08[4]. The Defendants have not objected to certain BLMIS books and records (*i.e.*, their own BLMIS customer statements or BLMIS checks produced by third parties) and have themselves sought to admit certain of these documents into evidence, even when not produced by third parties. (*See, e.g.*, DX-BJ; DX-BK; DX-CS; DX-CT (BLMIS customer statements as produced by BLMIS).)

*16 The Defendants object to the admission of the BLMIS books and records under FED. R. EVID. 803(6) and 807(a) as "unreliable hearsay" because they are permeated with fraud and are not trustworthy. (*Defendants' Findings & Conclusions* at ¶¶ 85-92.) The testimony of Greenblatt and Collura show otherwise; the records of deposits and withdrawals are extremely trustworthy and prove the Defendants' deposits and withdrawals over the lives of their accounts, and particularly, during the Two-Year Period. While the Defendants challenge the Trustee's contention that BLMIS rather than Madoff made the transfers, they do not dispute the transfers themselves. The transfers were confirmed by Collura through a reconciliation with BLMIS bank records and are evidenced by checks whose admissibility the Defendants do not challenge.[27] Moreover, the debit memos to which the Defendants do object match each undisputed transfer and hence, are trustworthy and reliable. As discussed below, the Trustee need only prove the Two-Year Transfers as part of his affirmative case.

Dubinsky did not vouch for the reliability of the BLMIS records to the extent they purported to show equity, T-Bill and option transactions. Instead, he showed their falsity to demonstrate that BLMIS was a Ponzi scheme. He did this primarily by comparing the BLMIS records to outside, reliable information. His comparisons showed that in many instances the volume of equity trades reported on the IA Business customer statements actually exceeded the total volume traded for the entire market, his VWAP analysis showed BLMIS's uncanny ability to buy low and sell high, his comparison with market data demonstrated BLMIS's unusually consistent and positive rates of return, he verified that the securities and T-Bills listed on the IA Business customer statements did not match the DTC records and established that the reported options trades could not be reconciled with OCC records. In short, he used BLMIS's records to prove that the reporting of equity, T-Bill and option trades was, in the Defendants' words, permeated with fraud. On the other hand, the testimony of Collura and Greenblatt

proved that the BLMIS records reliably reported all of the cash transactions.

Accordingly, the Defendants' objections to the admission of the BLMIS records offered by the Trustee is overruled.

**2. Expert Reports**

Each expert rendered one or more expert reports, (*see* TX-034 ("Dubinsky Report"), TX-053 and TX-054 ("Collura Reports"), and TX-071-73 ("Greenblatt Reports," and collectively with the Dubinsky and Collura Reports, the "Expert Reports").)[28] The Trustee seeks to admit the Expert Reports into evidence. The Defendants asserted two objections.[29] First, the Expert Reports are inadmissible hearsay. Second, they were based on BLMIS's books and records which are inadmissible and unreliable. The Court has already overruled the second objection and turns to the hearsay objection.

"As a rule, expert reports are hearsay." *In re Quigley Co., Inc.*, 437 B.R. 102, 151 (Bankr. S.D.N.Y. 2010) (listing authorities); *accorde Thaló Universal Mach. Co. of Pottstown, Inc.*, 670 F. Supp. 2d 705, 724 (N.D. Ill. 2009) ("expert reports under Rule 26 are not independently admissible.... It may be noted that the Conference Committee comments to the proposed amendments to Rule 26 state that expert reports themselves are not admissible.") (listing authorities); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 329 (N.D. Ill. 2008) (citing cases). Nonetheless, the Trustee argues that the Expert Reports should be admitted because they would be "helpful to the Court." (*Trustee's Findings & Conclusions* at ¶¶ 292-93.) Were this the sole basis for admission, few expert reports that passed through the gate, *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), would be excluded.

*17 Furthermore, two of the three cases cited by the Trustee in support of this argument are distinguishable. *Weisfelner v. Blavatnick (In re Lyondell Chem. Co.)*, 558 B.R. 661 (Bankr. S.D.N.Y. 2016) involved a defendants' motion *in limine* in fraudulent transfer litigation to preclude certain portions of plaintiff's expert reports pertaining to a prepetition leveraged buyout. In general, the defendants argued that the plaintiff's expert reports contained improper "factual narratives" and speculated as to the parties' state of mind. *Id.* at 665. After setting out the general rule for the admissibility of expert testimony under FED. R. EVID. 702, the Bankruptcy Court stated that the "fundamental" requirement of expert testimony

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

is to "assist the trier of fact ...." *Id.* at 666. However, the motion in *Lyondell* sought to exclude the prospective testimony of experts whose reports included material not meeting the strictures of FED. R. EVID. 702 and *Lyondell* did not address whether the expert reports themselves were admissible. The Trustee also cites an excerpt from *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir.), *cert. denied* U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), (*Trustee's Findings & Conclusions* at ¶ 292), in which the Second Circuit ruled that the practice and customs of securities transactions are rightly the province of securities testimony. *See* 550 F.2d at 508-09. *Diners' Club* did not address the admissibility of an expert report.

*Nat'l Ass'n for the Advancement of Colored People v. A.A. Arms Inc.*, No. 99-CV-3999(JBW), 2003 WL 2003750 ("*NAACP*") (E.D.N.Y. Apr. 4, 2003) does provide some support for the Trustee's position. There, the parties moved *in limine* to exclude certain expert reports. They contended that the experts were scheduled to testify at trial, and the reports would be redundant. *NAACP*, 2003 WL 2003750, at *1. Judge Weinstein questioned the position apparently taken by the movants that the reports were inadmissible hearsay in light of Rules 702 and 703 of the Federal Rules of Evidence. In addition, he distinguished the cases cited by the movants on the grounds that they were decided before the 2000 amendments to these rules and the courts excluded the reports because the experts were scheduled to testify. *Id.* Judge Weinstein ultimately concluded that he could not rule out an expert reports he had not yet seen, observing that the "[r]ulings will have to be made on a report by report basis as requested by the parties." *Id.* at *1; *but see Marr v. City & Cty. of San Francisco*, No. C 07-03685 SBA, 2010 WL 3476681, at *10 (N.D. Cal. Sept. 2, 2010) (disagreeing with *NAACP*).

The Court faced a similar issue in *Quigley* closer to the one raised by the Defendants. There, the debtor filed a post-trial motion to exclude portions of the liquidation analysis included in the report filed by the expert (Shaked) retained by an ad hoc committee objecting to confirmation of the debtor's plan. The debtor argued that Shaked had not testified about his liquidation analysis and the debtor did not, therefore, have an opportunity to cross-examine Shaked on this point. *Quigley*, 437 B.R. at 151. The Court agreed and distinguished *NAACP*. The motion was made post-trial, not *in limine*, and although the liquidation analysis might have proved helpful to the Court had Shaked testified about his liquidation analysis,

it was unfair to credit the liquidation analysis under the circumstances. *Id.*

Unlike in *Quigley*, the Defendants have not identified any opinion or subject contained in the Expert Reports on which the experts did not testify and were not subject to cross-examination. Nevertheless, the Court sees no reason to depart from the general rule and admit the Expert Reports.

However, the Expert Reports included certain charts, tables and attachments (the "Summary Charts") that were separately marked, many were relied on by the experts during their trial testimony and the summaries represented compilations of information culled from BLMIS and third-party books and records that were available in the E-Data Room even if the Defendants chose not to review the data. The Dubinsky Report included charts and tables that Dubinsky used to amplify his testimony regarding his analysis of complex and voluminous information. These included TX-035, TX-036, TX-039, TX-040, TX-049 and TX-050. [30] Collura explained her tracing and reconciliation utilizing TX-055, TX-056, TX-058, TX-059 and TX-060. Finally, Greenblatt was questioned about his Principal Balance Calculations for each account and referred to TX-076, TX-077 and TX-078 which embodied those calculations.

**\*18** These exhibits are admissible under FED. R. EVID. 1006. Rule 1006 allows "[t]he content of voluminous writings ... that cannot be conveniently examined in court" to be presented in the form of "a summary, chart or calculation" provided that the original or duplicates of the underlying evidence are available for inspection and copying and are admissible in evidence, but the documents underlying the summary do not have to be introduced into evidence. *Accord PW I*, 592 B.R. at 534 (citing 6 WEINSTEIN § 1006.06[1], [3] ). In addition, the summary exhibit must "be based on foundation testimony connecting it with the underlying evidence summarized." *Fagiola v. Nat'l Gypsum & Co.*, 906 F.2d 53, 57 (2d Cir. 1990). As noted, the exhibits relied on in the expert's testimony represented compilations or graphic depictions of voluminous data, the backup documentation to everything Dubinsky did was available in the E-Data Room and the objections to the admission of BLMIS's books and records have been overruled. In addition, the reconciliation, tracing and Principal Balance Calculations prepared or performed by Collura and Greenblatt and summarized in the corresponding exhibits were derived from the cash transactions listed in the Defendants' customer statements,

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

checks and the third-party bank records, none of which are the subject of an evidentiary objection.

Accordingly, the Summary Charts offered for admission are received except for TX-046 and TX-057. The Court could not locate any discussion of these exhibits in the transcript and the Defendants' objection to their admission is sustained based on lack of foundation.

#### 3. DiPascali's Testimony

The Trustee had moved *in limine* to admit certain testimony that Frank DiPascali, since deceased, gave at the multi-day criminal trial held in *United States v. Bonventre*, 10-cr-228 (S.D.N.Y.) (LTS). Although the motion sought to admit a greater portion of DiPascali's testimony contained in TX-355 through TX-370 and excerpted in TX-005, the Trustee has narrowed his request and now seeks only to admit testimony pertaining to BLMIS's purchase (or failure to purchase) T-Bills for the IA Business customers. (*See Supplemental Memorandum of Law in Support of Trustee's Motion in Limine Number 2 to Admit the Trial Testimony of Frank DiPascali*, dated July 30, 2019, at 4-13 ("*Trustee's DiPascali Memo*") (ECF Doc. # 163); *Declaration of Lan Hoang in Support of Trustee's Supplemental Memorandum of Law on Motion in Limine Number 2 to Admit the Trial Testimony of Frank DiPascali*, dated July 30, 2019 ("*Hoang Declaration*"), Ex. A (ECF Doc. # 164).) On direct, DiPascali testified that the IA Business used funds in the 703 Account to purchase T-Bills as a cash-management tool but the T-Bills were not purchased for IA Business customers, and DiPascali and other BLMIS employees created fictitious T-Bill positions in the customer statements. On cross-examination, DiPascali confirmed that funds in the 703 Account were used to purchase T-Bills but he was apparently not cross-examined about the fake T-Bill entries in the customer statements. (*See Trustees' DiPascali Memo* at 11-13.) The Defendants argue in opposition to the proffer that the testimony is hearsay and inadmissible under FED. R. EVID. 804(b)(1) or 807. The Court reserved decision on the motion *in limine* and now concludes that although the testimony is not admissible under Rule 804(b)(1), it is admissible under Rule 807. Accordingly, the Defendants' objection is overruled.

#### a. FED. R. EVID. 804(b)(1)

Former testimony of an unavailable witness, such as DiPascali who died before the trial in these adversary proceedings, is admissible as a hearsay exception if the testimony:

(A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

(B) is now offered against a party who had – or, in a civil case, whose predecessor in interest had – an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

FED. R. EVID. 804(b)(1). DiPascali's testimony given in the *Bonventre* criminal trial satisfies subparagraph (A) but not (B) because the criminal defendants were not "predecessors in interest" with a "similar motive" to cross-examine DiPascali regarding the fake T-Bill transactions that appeared in the IA Business customer statements. Although subparagraph (B) includes two separate elements, the "interest" and "motive" requirements overlap. Courts take a "realistically generous approach" and find a "predecessor in interest" where the "previous party [had] like motive to develop the testimony about the same material facts ...." *Constr. Tech v. Cybermation, Inc.*, No. 91 Civil 7474, 1996 WL 376601, at *1 (S.D.N.Y. Apr. 30, 1996) (quoting *Clay v. Johns-Manville Sales Corp.*, 722 F.2d 1289, 1295 (6th Cir. 1983)); *accord Fed. Hous. Fin. Agency v. Merrill Lynch & Co., Inc.*, No. 11 Civ. 6202(DLC), 2014 WL 798385, at *1 (S.D.N.Y. Feb. 28, 2014); *Zola v. Cedar Park Concrete Corp.*, No. 85 CIV. 1887, 1997 WL 306909, at *12 (S.D.N.Y. Mar. 21, 1997), *aff'd in part and vacated in part on other grounds*, 202 F.3d 82 (2d Cir. 2000); *see also* 5 WEINSTEIN § 804.04. As the Second Circuit has explained:

> **\*19** The proper approach ... in assessing similarity of motive under Rule 804(b)(1) must consider whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue. The nature of the two proceedings—both what is at stake and the applicable burden of proof—and, to a lesser extent, the cross-examination at the

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

prior proceeding—both what was undertaken and what was available but forgone—will be relevant though not conclusive on the ultimate issue of similarity of motive.

*United States v. DiNapoli*, 8 F.3d 909, 914-15 (2d Cir. 1993); *accord id.* at 912 ("If a fact is critical to a cause of action at the second proceeding but the same fact was only peripherally related to a different cause of action at the first proceeding, no one would claim that the questioner had a similar motive at both proceedings to show that the fact had been established (or disproved).").[31]

According to the Trustee, the *Bonventre* defendants had a similar interest and motive:

> To avoid a criminal conviction relating to their participation in the Ponzi scheme, the criminal defendants had a substantial motive to challenge DiPascali's testimony. Their liberty was at stake. The criminal defendants had an interest in eliciting testimony about any legitimate activities at BLMIS, including the purported purchase of real securities for IA Business customers. If BLMIS had conducted any real trades, this would have supported the criminal defendants' argument that they believed BLMIS's operations in the IA business were legitimate and undermined DiPascali's credibility.

(*Trustee' DiPascali Memo* at 6.)

I disagree. The *Bonventre* defendants lacked an "interest of substantially similar intensity to prove ... the same side of a substantially similar issue," to wit, that BLMIS traded actual T-Bills on behalf of its IA Business customers and recorded those transactions in their customer statements. The *Bonventre* defendants were on trial for securities fraud, falsifying records of a broker-dealer, tax fraud, mail fraud, wire fraud, and related conspiracy charges. (*Trustee's*

*DiPascali Memo* at 2.) They had no motive to show that the T-Bill transactions listed in the customer statements were real even if the equity and options trades were phony; the latter were a sufficient predicate to prove the criminal charges. The lack of any cross-examination on this point implies as much. The Defendants, on the other hand, have a strong motive to draw that distinction. Even if the equity and option trades were fake, real T-Bill trades may reduce their liability for fictitious profits.

### b. FED. R. EVID. 807

**\*20** Under the residual hearsay exception, FED. R. EVID. 807 (formerly Rule 804(b)(5)), a hearsay statement is not excluded by the general rule against hearsay if:

(1) the statement has equivalent circumstantial guarantees of trustworthiness;

(2) it is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4) admitting it will serve the purposes of these rules and the interests of justice.

FED. R. EVID. 807(a). In addition, the party offering the hearsay evidence must, prior to trial, give the "adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it." FED. R. EVID. 807(b).

"To be admissible pursuant to the residual exception, the evidence must fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice." *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991). DiPascali's direct testimony established that the T-Bill trades appearing on the customer statements were fabricated and bore no relationship to BLMIS's use of funds in the 703 Account to purchase T-Bills as a cash management tool. In other words, the actual T-Bill purchases were never allocated to the IA Business customers. His testimony is obviously relevant to the material issue raised by the Defendants and is the most probative on that issue. Furthermore, the adequacy of notice is not in question.

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

Instead, the Defendants primarily challenge the trustworthiness of DiPascali's testimony. (*Defendants' DiPascali Memo* at 10-12.) When considering the trustworthiness of former testimony under the residual exception, courts look to a number of factors including (1) the character of the witness for truthfulness and honesty; (2) whether the testimony was given voluntarily, under oath, subject to cross-examination, and a penalty for perjury; (3) the witness's relationship with both the defendant and the government; (4) the witness's motivation to testify; (5) whether the witness ever recanted the testimony; (6) the existence of corroborating evidence; and (7) the reasons for the witness's unavailability. *United States v. Singleton*, 125 F.3d 1097, 1106 (7th Cir. 1997) (citation omitted), *cert. denied*, 522 U.S. 1098, 118 S.Ct. 898, 139 L.Ed.2d 833 (1998); *accord* 5 WEINSTEIN § 807.03[2][b]; *see Rivers United States*, 777 F.3d 1306, 1315 (11th Cir.), *cert. denied*, ––– U.S. ––––, 136 S. Ct. 267, 193 L.Ed.2d 212 (2015). On the one hand, "[t]he residual exception should be invoked sparingly," *Robinson v. Shapiro*, 646 F.2d 734, 742 (2d Cir. 1981), but on the other hand, "the rules on hearsay should be read to exclude unreliable hearsay but to admit reliable hearsay.... [S]uch 'reliable hearsay' has, of course, the effect of promoting the truth-seeking function of a criminal trial and, therefore, ought to be presented to the finders of facts." *United States v. Carneglia*, 256 F.R.D. 384, 392 (E.D.N.Y. 2009) (Weinstein, J.) (quoting *United States v. Gotti* (*In re Drake*), 786 F. Supp. 229, 234–35 (E.D.N.Y. 1992)); *accord Davis v. City of New York*, 959 F. Supp. 2d 427, 434 (S.D.N.Y. 2013).

**\*21** The factors pertaining to trustworthiness point in different directions, and I conclude that DiPascali's prior testimony identified in the *Hoang Declaration*, Exs. A & B, is trustworthy and will be received in evidence. Admittedly, DiPascali was a self-confessed liar during the time that the Ponzi scheme was operating. Furthermore, when he testified in *Bonventre*, he had already pled guilty but I understand that he had not yet been sentenced. He had an interest in continuing to cooperate with the Government in the hope of a favorable sentencing recommendation. Conversely, he gave his testimony (for sixteen days) under oath in open Court and was subject to cross-examination in connection with anything he said even if he was not actually cross-examined on the allocation issue. The Court has already concluded that he had no motive to lie when he allocuted, the Defendants have not identified any inconsistencies between his allocution and his trial testimony, he never recanted his testimony and his unavailability was due to his death rather than to any

attempt to absent himself to avoid testifying at the Defendants' trial in these adversary proceedings. [32] Moreover, Dubinsky's unimpeached testimony corroborated DiPascali's testimony relating to the T-Bills. Dubinsky compared the volume of T-Bills allocated to the customers on their monthly statements to the volume of T-Bills actually purchased and held by BLMIS, as confirmed by the records maintained by the DTC, on six specific dates. The customer allocations were exponentially greater than the actual purchases, confirming their fictitious nature. Finally, DiPascali's testimony is consistent with the purposes of the Federal Rules of Evidence of "ascertaining the truth and securing a just determination." FED. R. EVID. 102. Accordingly, the Court concludes in the exercise of its discretion to admit the testimony under the residual exception.

### c. FED. R. EVID. 403

Finally, the Defendants contend that DiPascali's testimony should be excluded under FED. R. EVID. 403. The latter provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Evidence is generally unfairly prejudicial when its effect is to manipulate the sensibilities of a jury or trigger intense human reactions. *See* 2 WEINSTEIN § 403.04[1][c]. The Defendants contend that DiPascali's testimony should be excluded because its probative value is substantially outweighed by the danger of unfair prejudice. (*Defendants' DiPascali Memo* at 12.) "The prejudice that Rule 403 is concerned with involves some adverse effect ... beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (internal quotation marks and citation omitted). Evidence is not unfairly prejudicial because it hurts a party's case by proving or disproving a material fact. *See Perma v. Ethan Allen, Inc.*, 115 F.3d 143, 151 (2d Cir. 1997) (prejudice contemplated by FED. R. EVID. 403 involves some adverse

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

effect beyond tending to prove fact or issue that justifies admission of evidence).

DiPascali's testimony is probative of the fact that the T-Bill positions reflected in the customer statements were wholly fictitious and were unrelated to the actual T-Bill purchases made by BLMIS. The Defendants fail to identify the precise unfair prejudice they would face and I conclude there is none. The Court conducted a bench trial and is confident it can consider DiPascali's testimony and accord it the appropriate weight.

#### 4. Coribello Declarations

The Trustee seeks the admission of a series of declarations of Linda Coribello (TX-028), the custodian of the records for Chase. The declarations state, in paragraph 4, that "Bernard L. Madoff Investment Securities LLC ('BLMIS') maintained [the 703 Account and 509 Account] at JPMorgan." The Defendants do not object to the declarations on hearsay grounds to the extent that they authenticate Chase's records but do object to the extent that they attempt to prove that the Chase Accounts were held in the name of BLMIS rather than Madoff or Madoff Securities.[33] (*Defendants' Findings & Conclusions* at ¶¶ 63, 74, 131.) The Trustee responds that they were received at trial without objection and the Defendants' belated objection comes too late. (*Trustee's Findings & Conclusions* at ¶¶ 235-40.)

**\*22** I initially expressed the same view when the parties argued post-trial and in connection with the motion to dismiss. However, having now had the opportunity to review the entire record, I conclude that the statements in the Coribello declarations, to the extent they assert that BLMIS held the Chase Accounts in its own name, are hearsay and will be excluded. During the trial, the Court received the Coribello declarations after the following colloquy:

> MR. HUNT: JP Morgan ... is an important part of this case. Each party has designated JP Morgan records, both BLMIS records and JP Morgan account records from the Defendants. Their bank account was held at JP Morgan as well.
>
> Trustee's Exhibit 28 is the records custodian affidavit for JP Morgan-BLMIS records, and Trustee's Exhibit ... 31 ... is the records custodian affidavit for the Nelson's [sic] JP Morgan records. We'd like to move those custodian record affidavits into evidence so that they can be applied to the documents that are actually used at trial.

> THE COURT: Any objection?
>
> MS. CHAITMAN: We have no objection to any third-party documents, just to cut this short, Your Honor.
>
> ...
>
> THE COURT: So we have 28, 29, 30, and 31. Any objection?
>
> MS. CHAITMAN: No ....
>
> ...
>
> THE COURT: Any objection to 32?
>
> MS. CHAITMAN: No ....

(Tr. (5/8) at 30:15-34:2.)

As the colloquy indicates, the Trustee offered the Coribello declarations as custodial affidavits to authenticate Chase's records and satisfy the business records exception to the hearsay rule under FED. R. EVID. 803(6). Defendants' counsel responded that she had no objection to any third-party records. The Trustee cannot, however, use the Coribello declarations to prove a material fact because "[i]t is the records, *not* the certification, that are introduced as substantive evidence." *United States v. Edwards*, Cr. No. 11-129-1 (CKK), 2012 WL 5522157, at \*2 (D.D.C. Nov. 15, 2012) (emphasis in original). The Trustee concedes as much, arguing that the Defendants waived the objection without challenging the Defendants' underlying evidentiary objection. Although the Defendants' counsel should have articulated her limited "non-objection" to the receipt of the Coribello declarations more precisely, her non-objection, viewed in terms of the Trustee's offer, leads me to conclude that she was not objecting to the Coribello declarations for the limited purposes noted. Accordingly, the Coribello declarations that comprise TX-028 are received for the limited purpose of authenticating Chase's records and establishing their admissibility under FED. R. EVID. 803(6). Other Coribello declarations (TX-031, TX-032), which do not refer to the name on the Chase Accounts, are also received for the same limited purposes.

#### 5. Summary Charts and Demonstrative Exhibits

The Defendants object to several Summary Charts (TX-035–040; TX-044-050; TX-055-060) and demonstrative exhibits (TX-375; TX-380-99) on the ground that neither the

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

documents nor the underlying exhibits were provided to them before the first day of trial as required by a Court order, (*Defendants' Findings & Conclusions* at ¶¶ 79-81), and are based on inadmissible and unreliable evidence. (*Id.* at ¶¶ 82-84.) The Court has already addressed the Summary Charts in connection with the discussion relating to the Expert Reports. That discussion noted that the Trustee was not seeking to admit several of the Summary Charts, (TX-037, TX-038, TX-041, TX-044, TX-045, TX-047, TX-048) and had failed to lay a foundation for two other charts, TX-046 and TX-057. The remaining Summary Charts were admissible under FED. R. EVID. 1006.

**\*23** The Trustee has marked the Demonstrative Exhibits for identification only and does not offer them into evidence. (*See Declaration of Helen Davis Chaitman in Opposition to the Trustee's Evidentiary Rulings in His Proposed Findings of Fact and Conclusions of Law*, dated Sept. 5, 2019, Ex. E (ECF Doc. # 175).) Accordingly, the Court need not rule on their admissibility.

## C. The Trustee's *Prima Facie* Case

Under section 548(a)(1)(A) of the Bankruptcy Code, a bankruptcy trustee "may avoid any transfer ... of an interest of the debtor in property ... that was made ... on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily ... made such transfer ... with actual intent to hinder, delay or defraud any [creditor]."[34] Thus, the elements of an intentional fraudulent transfer claim under section 548(a)(1)(A) are: (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to hinder, delay, or defraud" a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, No. 05 Civ. 9050 (LMM), 2011 WL 1419617, at \*2 (S.D.N.Y. Apr. 7, 2011), *aff'd* 748 F.3d 110 (2d Cir. 2014); *McHale v. Boulder Capital LLC (In re 1031 Tax Grp., LLC)*, 439 B.R. 47, 68 (Bankr. S.D.N.Y. 2010), *supplemented by* 439 B.R. 78 (Bankr. S.D.N.Y. 2010). The Two-Year Transfers were obviously made within two years of the Filing Date, leaving only BLMIS's ownership of the property that was transferred and its actual intent in dispute.

### 1. Transfer of BLMIS's Property

Money held by a broker on behalf of its customers is not the broker's property under state law. SIPA § 78fff-2(c)(3) circumvents this problem by treating customer property as though it were the SIPA debtor's property in an ordinary bankruptcy. *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d at 213 (SIPA creates a "legal fiction that confers standing on a SIPA trustee by treating customer property as though it were 'property of the debtor' ").

The evidence, summarized in Greenblatt's Principal Balance Calculations, proved the following Two-Year Transfers made to the Defendants:

| Defendant | Account | Amount ($) |
|---|---|---|
| Carol Nelson | 1ZA283 | 255,000.00 |
| Carol Nelson | 1ZR265 | 200,077.00 |
| Stanley & Carol Nelson | 1ZA284 | 2,610,000.00 |

All of the transfers were made from the 509 Account held by BLMIS and consisted entirely of fictitious profits. Under SIPA, the customer deposits are deemed to have been BLMIS's property for the purposes of these adversary proceedings. In this regard, for the reasons stated in overruling the Defendants' jurisdictional objection, the Court concludes that the Two-Year Transfers were made from property of BLMIS.

### 2. Intent

#### a. The Ponzi Scheme Presumption

The Trustee primarily relies on the Ponzi scheme presumption to establish intent under 11 U.S.C. § 548(a)(1)(A). The intent to hinder, delay or defraud creditors is presumed if the Trustee can prove that (1) the transferor operated a Ponzi scheme; and (2) the transfers made to the transferee by the debtor were "in furtherance" of the Ponzi scheme. *See Legacy*, 603 B.R. at 688; *see also Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp. LLC)*, 439 B.R. 284, 304-05 (S.D.N.Y. 2010) ("*Bayou*"). Because Ponzi schemes use investor deposits rather than profits to pay returns, they are insolvent and become more insolvent with each transaction. *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014). The Ponzi scheme cannot work forever because the pool of investors must eventually run dry. The Ponzi scheme operator knows that the scheme will collapse and that those still invested in the enterprise will lose their money. *In re Dreier LLP*, 2014 WL 47774, at \*10 (citation omitted).

**\*24** The Court concludes that the Trustee demonstrated that BLMIS conducted the IA Business as a Ponzi scheme at least no later than the early 1990s and is entitled to rely on the Ponzi scheme presumption to prove that BLMIS made

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

the Two-Year Transfers with the intent to hinder, delay and defraud its other creditors. The Madoff and DiPascali Pleas Allocutions established the hallmarks of a Ponzi scheme. The IA Business side of BLMIS did not operate any business. It induced customers to deposit funds based on the false promise that their money would be invested pursuant to the SSC strategy. BLMIS did not make the promised investments — it never intended to — and used new deposits to pay redemptions. It perpetuated the scheme by sending customers fraudulent statements listing fictitious investments in equity securities and T-Bills. Dubinsky's testimony provided further support for this conclusion by showing through the use of reliable market data relating to volume and prices of trades that BLMIS did not make the trades reported on the customer statements and used customer funds to pay redemptions. And although there is no evidence that Madoff promised large returns in so many words to his investors, BLMIS's actions spoke louder than any words. Despite the ups and downs of the market as reflected in the historical performance of the S & P 100 Index, the IA Business rates of return generally averaged between 10-12% and were as high as 20% in 1999. Customers saw the apparent growth of their BLMIS accounts in their monthly statements.

Each redemption drove BLMIS further into insolvency. By no later than December 2002, its assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion. (Tr. 5/8 at 138:17–141:14; TX-035; TX-036.) By 2007, BLMIS's insolvency had deepened to $21.5 billion. (Tr. (5/8) at 142:6-17.) The IA Business also had the added burden of supporting the Proprietary Trading Business. The evidence showed that the IA Business provided funds to the Proprietary Trading Business, not the other way around. (*See, e.g.*, Tr. (5/8) at 139:18-141:14, 160:24–162:2.) [35]

Quoting Madoff's deposition testimony, the Defendants imply that BLMIS was not insolvent because it always had enough money to cover redemptions, at least until the last week in December 2008. (*Defendants' Findings & Conclusions* at ¶ 62.) In addition, Dubinsky never identified a single redemption request that could not be covered. (*Id.*) This is a remarkable argument apparently based on a skewed idea of equitable insolvency. [36] There is no evidence that BLMIS had any assets of its own with which to pay fictitious profits. It paid fictitious profits with money Madoff stole from other customers. Under state law, those funds belonged to the customers, not BLMIS. BLMIS maintained its positive cash flow by duping investors at a faster rate than it had to pay fictitious profits to people like the Defendants. By the time

the new investments ran out, BLMIS was $20 billion short. This situation did not suddenly arise during the last week in December 2008.

The Defendants also argue that BLMIS was not a Ponzi scheme because the IA Business actually purchased T-Bills with customer funds. [37] However, Ponzi scheme operators often engage in some legitimate transactions. If the legitimate transactions further the scheme or are funded by the scheme they are part of the scheme and do not insulate the legitimate transactions from the taint of the scheme. *Legacy*, 603 B.R. at 691-93 (collecting and discussing cases). DiPascali testified that BLMIS purchased T-Bills from time to time with excess cash to earn more interest than Chase was paying on the Chase Accounts. (*Hoang Declaration*, Ex. A, at 4 of 10 (excerpting DiPascali's trial testimony in *U.S. v. Bonventre*).) The use of customer funds was an integral part of the Ponzi scheme allowing BLMIS to keep the scheme going by earning more cash to pay more redemptions for a longer period of time. *Legacy*, 603 B.R. at 693.

**\*25** Finally, while the Defendants' contest the onset date of the Ponzi scheme, (*Defendants' Findings & Conclusions* at ¶ 182), they essentially concede that they made every withdrawal from their accounts during the Ponzi scheme. They acknowledge that the Ponzi scheme began no later than 1993. (*Defendants' Findings & Conclusions* at ¶ 182.) The first withdrawals from the two accounts opened in 1992 (Accounts 1ZA283 and 1ZA284) occurred on April 5, 1994. (TX-344, at 4; TX-353, at 4.) More important, there is no dispute that by December 11, 2006, the beginning of the Two-Year Period, the IA Business was operated as a Ponzi scheme and the Two-Year Transfers were made in connection with that scheme. The transfers consisted entirely of other customers' funds used to pay fictitious profits fraudulently reported on the Defendants' customer statements. Accordingly, the Trustee has established that the Two-Year Transfers were made with actual intent to defraud under the Ponzi scheme presumption.

### b. Badges of Fraud

The Trustee further contends that he proved actual intent to defraud even without the Ponzi scheme presumption based on the evidence of "badges of fraud." Badges of fraud include (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry. *See Salomon v. Kaiser (In re Kaiser),* 722 F.2d 1574, 1582-83 (2d Cir. 1983). The "concealment of facts and false pretenses by the transferor" is also a badge of fraud. *Id.* at 1582 (quoting 4 COLLIER ON BANKRUPTCY ¶ 548.02[5] at 548–34 to 38 (L. King 15th ed. 1983)). The existence of several badges can "constitute conclusive evidence of an actual intent to defraud...." *Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.),* No. 11-md-2296 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017) (citation omitted).

Here, the Two-Year Transfers bear at least three "badges of fraud" that imply actual intent to defraud: (i) "[c]oncealment of facts and false pretenses by the transferor," (ii) BLMIS's insolvency at the time of the Two-Year Transfers and (iii) the lack of consideration for the fictitious transfers. In fact, the Defendants allege that they were defrauded by Madoff in connection with the inducement to invest. (*Defendants' in Limine Opposition* at 7 ("Fraudulent intent is not disputed here; rather it is the nature of the fraud that is at issue.").) In addition, they argue that the Court should sustain their objections to the admission of the BLMIS records and disbelieve the allocutions and DiPascali testimony because BLMIS was rife with fraud.

Accordingly, the existence of the badges of fraud supply a separate basis to conclude that the Two-Year Transfers were made with the actual intent to defraud. Hence, the Trustee satisfied his initial burden of going forward under 11 U.S.C. § 548(a)(1)(A) by showing that BLMIS made the Two-Year Transfers with actual intent to defraud.

### D. Defendants' Affirmative Defenses

Section 548(c) of the Bankruptcy Code provides a defense to a fraudulent transfer claim to the extent the transferee took "for value and in good faith." The Trustee concedes the Defendants' good faith but they must prove that they gave value. *Bayou,* 439 B.R. at 308 (burden of proving "value" under 11 U.S.C. § 548(c) is on the transferee); *cf. Picard v. BNP Paribas S.A. (In re BLMIS),* 594 B.R. 167, 206 (Bankr. S.D.N.Y. 2018) (subsequent transferee must demonstrate that it gave value to prevail on defense under Bankruptcy Code § 550(b)(1)). The Defendants did not call any witnesses at trial

or provide evidence that contradicted the Principal Balance Calculations which supported the Court's finding that the Two-Year Transfers consisted entirely of fictitious profits.

*\*26* Instead, the Defendants make several legal arguments which have been rejected a number of times, *e.g., SIPC v. BLMIS (BLMIS),* 499 B.R. 416, 422-26 (S.D.N.Y. 2013) (the "*Antecedent Debt Decision*"), *certification for interlocutory appeal denied,* 987 F. Supp. 2d 309 (S.D.N.Y. 2013); *Picard v. Greiff (In re BLMIS),* 476 B.R. 715, 724-26 (S.D.N.Y. 2012), *aff'd on other grounds by* 773 F.3d 411 (2d Cir. 2014), *cert. denied,* --- U.S. ----, 135 S. Ct. 2859, 192 L.Ed.2d 910 (2015); *Legacy,* 603 B.R. at 698-700; *Picard v. Goldenberg,* No. 10-04946 (SMB), 2018 WL 3078149, at *4-5 (Bankr. S.D.N.Y. June 19, 2018) (report and recommendation); *Picard v. Cohen (In re BLMIS),* 2016 WL 1695296, at *6-13 (Bankr. S.D.N.Y. Apr. 25, 2016) (report and recommendation), *adopted by* No. 16 Civ. 5513 (LTS), slip op. (S.D.N.Y. Feb. 24, 2016); *Omnibus Good Faith Decision,* 531 B.R. at 461-63, most recently in *SIPC v. BLMIS (In re BLMIS),* 596 B.R. 451, 463-65 (S.D.N.Y. 2019) ("*Lowrey II*"), *appeal docketed,* No. 19-429(L) (2d Cir. Feb. 20, 2019). These decisions have established that "a transferee in a Ponzi scheme does not give value beyond his deposit of principal." *Legacy,* 603 B.R. at 699; *see also Fox v. Lowrey,* 596 B.R. at 464; *Picard v. Lowrey (In re BLMIS),* No. 10-04387 (SMB), 2018 WL 1442312, at *6-8 (Bankr. S.D.N.Y. Mar. 22, 2018) (report and recommendation) ("*Lowrey I*"), *adopted by* 596 B.R. 451 (S.D.N.Y. 2019), *appeal docketed,* No. 19-429(L) (2d Cir. Feb. 20, 2019). In fact, "virtually every court to address the question has held that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers." *Bayou,* 439 B.R. at 337 (citations and internal quotation marks omitted); *accord Omnibus Good Faith Decision,* 531 B.R. at 462; *see also Silverman (In re Agape World, Inc.),* 633 F. App'x 16, 17 (2d Cir.) (noting that the "prevailing view" among district and bankruptcy courts in the Second Circuit is to treat the payment of interest in Ponzi schemes as fraudulent transfers because "fair consideration" is not present in the context of such schemes) (summary order), *cert. denied,* --- U.S. ----, 137 S. Ct. 160, 196 L.Ed.2d 122 (2016).

In *Lowrey II,* the District Court also rejected the arguments made by the Defendants that *Ida Fishman* undercut or rejected the *Antecedent Debt Decision* and its progeny, 596 B.R. at 466-67, the *Antecedent Debt Decision* was not controlling because it arose in connection with a motion to dismiss, *id.*

08-01789-cgm Doc 19250-2 Filed 01/10/20 Entered 01/10/20 18:26:52 Main Document
Pg 48 of 52

Securities Investor Protection Corporation v. Bernard L. Madoff Investment..., --- B.R. ---- (2019) Page 23 of 27

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

at 468, the *Antecedent Debt Decision* only applies to equity investors, *id.* at 468-69, and the Supreme Court's decision in *Cal. Pub. Emps' Ret. Sys. v. ANZ Sec., Inc.*, ––– U.S. ––––, 137 S. Ct. 2042, 198 L.Ed.2d 584 (2017) mandates the conclusion that the two-year reach-back under 11 U.S.C. § 548(a)(1) is a statute of repose that prevents the Trustee from looking back more than two years to consider earlier withdrawals in computing fictitious profits. *Id.* at 471-72.

In addition, the Court has previously rejected the Defendants' argument that they are entitled to a credit for taxes paid on account of fictitious profits. *Cohen*, 2016 WL 1695296, at *15 (citing *Donell v. Kowell*, 533 F.3d 762, 779 (9th Cir.) (explaining that offsetting tax payments would create a slippery slope for other expenses paid, that "one could argue that every purchase made with the gains from the scheme would not have been made 'but for' receipt of that money. If each net winner could shield his gains in their entirety in this manner ... the multitude of victims who lost their entire investment would receive no recovery."), *cert. denied*, 555 U.S. 1047, 129 S.Ct. 640, 172 L.Ed.2d 612 (2008)); *Picard v. Estate (Succession) of Doris Igoin (In re BLMIS)*, 525 B.R. 871, 893 (Bankr. S.D.N.Y. 2015) ("The withdrawal of the money to pay taxes the [d]efendants never should have had to pay is not a defense to the fraudulent transfer claims."); *accord Jobin v. Ritz*, 647 F.3d 585, 602 (5th Cir. 2011) (affirming that taxes could not reduce fraudulent transfers received); *Sender v. Buchanan (In re Hedged-Invs. Assocs., Inc.)*, 84 F.3d 1286, 1290 (10th Cir. 1996) (declining to allow investor to recover tax and interest payments paid out of Ponzi scheme investment, stating that "this case, however, is not ordinary; it arises out of a Ponzi scheme" and "[a]ny recovery would not come from the debtors' own assets because they had no assets they could legitimately call their own. Rather, any award of damages would be paid out of money rightfully belonging to other victims of the Ponzi scheme.") (citation omitted); *Wing v. Dockstader*, No. 2:08 Civ. 776 (DVB), 2010 WL 5020959, at *7 (D. Utah 2010) (rejecting defendants' request to offset income taxes paid on fraudulent transfers, holding that "allowing offsets would create problems of equity because any amount offset, which would differ based on the financial situation of each defendant, would come at the expense of other investors."), *aff'd*, 482 F. App'x 361 (10th Cir. 2012); *S.E.C. v. Aragon Capital Mgmt., LLC*, 672 F. Supp. 2d 421, 438-39 (S.D.N.Y. 2009) (declining to grant defendants any credit for taxes they may have paid for profits in scheme), *aff'd in part sub nom. S.E.C. v. Rosenthal*, 426 F. App'x 1 (2d Cir. 2011) (summary order).

**\*27** The prior decisions within this SIPA proceeding constitute law of the case and Defendants offer no reason or evidence to allow this Court to revisit them here. *Legacy*, 603 B.R. at 700 (citing *In re Tribune Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018) (law of the case doctrine applies across adversary proceedings within the same bankruptcy case), *aff'd*, 943 F.3d 125 (2d Cir. 2019)); *see Par. v. Terrastar Corp. (In re Terrestar Corp.)*, No. 16 Civ. 1421 (ER), 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017) (applying the law of the case doctrine because "[a]dversary proceedings filed in the same bankruptcy case do not constitute different cases"), *appeal dismissed*, No. 17-1117 (2d Cir. June 29, 2017); *Bourdeau Bros., Inc. v. Montagne (In re Montagne)*, No. 08-1024 (CAB), 2010 WL 271347, at *6 (Bankr. D. Vt. Jan. 22, 2010) ("Since different adversary proceedings in the same main case do not constitute different 'cases,' it would follow that the law of the case doctrine as articulated in one adversary proceeding would apply in another adversary proceeding filed in the same case."). Even if these rulings were not law of the case and the Court again addressed these defenses, the Court would reach the same conclusions it and the District Court have previously reached rejecting them.

Based on the foregoing, the Trustee has met his burden of proof under 11 U.S.C. § 548(a)(1)(A) and the Two-Year Transfers are avoided.

**E. Recovery of the Avoided Transfers**

Section 550 of the Bankruptcy Code provides for the recovery of avoided transfers:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from--

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith,

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550. Similarly, SIPA § 78fff-2(c)(3) allows a trustee to "recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11." SIPA § 78fff-2(c) (3). The Trustee has avoided the Two-Year Transfers and is entitled to recover a judgment for their value. Defendant Carol Nelson contends, however, that the IRA custodian rather than she is the initial transferee of the transfers to her IRA account (Account 1ZA265) and the Trustee has not demonstrated that she is a person for whose benefit the transfer was made or a subsequent transferee within the meaning of 11 U.S.C. § 550(a). (See Defendants' Findings and Conclusions at ¶¶ 230-36.)

This argument lacks merit. In the first place, an IRA is not a separate legal entity from its owner. See Weber v. Eberhard (In re Vaughn Co., Realtors), Adv. Pro. No. 11-1226, 2014 WL 271632, at *3 (Bankr. D.N.M. Jan. 23, 2014) (collecting cases). Carol Nelson owned her IRA account. In the second place, the IRA custodian is a mere conduit. The initial transferee is the one who first acquires dominion and control over the transferred asset, see Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 130 F.3d 52, 57 (2d Cir. 1997), cert. dismissed, 524 U.S. 912, 118 S.Ct. 2295, 141 L.Ed.2d 154 (1998), and in the words of Judge Easterbrook, can invest the funds in lottery tickets or uranium stock. Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 894 (7th Cir. 1988). Carol Nelson's IRA custodian was not free to invest her money in lottery tickets or uranium stock.

*28 Accordingly, the Trustee is entitled to judgments avoiding the Two-Year Transfers and recovering $455,077.00 from Defendant Carol Nelson and $2,610,000.00, jointly and severally from Defendants Stanley Nelson and Carol Nelson. The Court has considered the Defendants remaining arguments and concludes that they lack merit. The Trustee is directed to settle a separate judgment in each adversary proceeding together with a statement of judgment setting forth his calculation of interest and costs.

**All Citations**

--- B.R. ----, 2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

Footnotes

1 In this decision, Tr. (5/8) and Tr. (5/9) refer respectively, to the transcripts covering May 8 and 9. TX refers to the Trustee's trial exhibits and DX refers to the Defendants' exhibits.

2 "ECF" refers to the docket in Adversary Proceeding No. 10-04377. The same documents were filed in Adversary Proceeding No. 10-04658. Documents filed on other dockets will include the case number.

3 Plaintiff Irving H. Picard's Post-Trial Proposed Findings of Fact and Conclusions of Law, dated July 30, 2019 ("Trustee's Findings & Conclusions") (ECF Doc. # 162); Defendants' Proposed Findings of Fact and Conclusions of Law, dated Sept. 5, 2019 ("Defendants' Findings & Conclusions") (ECF Doc. # 176).

4 The Defendants also submitted objections in a separate pleading, (see Defendants' Objections to the Trustee's Trial Exhibit List and Designations, dated July 1, 2019 (ECF Doc. # 160)), but the same objections appear in the Defendants' Findings & Conclusions.

5 Madoff Securities and BLMIS were continuously registered with the Securities and Exchange Commission (the "SEC") as a broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). (TX-006; TX-007.)

6 The "filing date" for SIPA purposes is deemed to be the date the SEC action was commenced against BLMIS. See 15 U.S.C. § 78lll(7)(B); Stafford v. Giddens ( In re New Times Sec. Servs., Inc.), 463 F.3d 125, 126 (2d Cir 2006) (the SIPA "filing date" was the date that the SEC filed a complaint against the debtor).

7 As the title indicates, the Defendants' opposition also addressed a separate in limine motion to admit the testimony of DiPascali given at another trial. That motion is addressed in the succeeding text.

8 The Defendants contend that no BLMIS employee was charged with operating a Ponzi scheme, and operating a Ponzi scheme was not an element of the charges brought. (Defendants' Findings & Conclusions at ¶¶ 67-71.) The Court is not aware of the specific crime of operating a Ponzi scheme but the Trustee is not relying on the judgments of conviction;

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 23

he is relying on the allocutions to prove the facts necessary to show that Madoff Securities and BLMIS committed the various crimes to which they pled guilty (securities fraud, *etc.*) through the operation of a Ponzi scheme.

The Defendants also contend that the allocutions should not be trusted because they come from the "perpetrators of the fraud." (*Defendants' Findings & Conclusions* at ¶ 66, *accord id.* at ¶ 72.) I credit the allocutions because neither Madoff nor DiPascali had a motive to lie when they admitted to the crimes for which they faced potentially long prison sentences. In fact, Madoff received a sentence of 150 years. In addition, while the Defendants shrug off the Madoff, *et al.* as "perpetrators of the fraud," they frequently rely on Madoff's deposition to support their proposed findings of fact. (*See Defendants' Findings & Conclusions* at ¶¶ 55, 62, 68, 164, 177, 178, 182, 189.) Thus, the Defendants credit testimony by this principal "perpetrator of the fraud" when it suits them. In any event, this argument goes to the weight of the evidence, not its admissibility, and as stated, I credit the Madoff and DiPascali allocutions.

9     The Trustee also relies on the allocutions by David Kugel (TX-003) and Irwin Lipkin (TX-004). The former allocuted that he helped create fake trading records as far back as the early 1970s. (TX-003, at 32:4-14.) Although these allocutions are admissible for the same reasons as the Madoff and DiPascali allocutions, Madoff and DiPascali had the superior view of BLMIS's overall operations and their statements regarding the onset of the Ponzi scheme are entitled to greater weight. In any event, for reasons discussed in the succeeding text, the Defendants have conceded that all of the transfers they received over the lives of their BLMIS Accounts occurred during the Ponzi scheme.

10    Dubinsky also testified extensively regarding his comparison of the features of the computer systems used by the IA Business and the Proprietary Trading Business (which actually traded securities) and concluded that the IA Business's computer system was incapable of supporting a securities trading business and was only good for creating fictitious records. (Tr. (5/8) at 64:18-80:15.) The testimony was not helpful because it did not fix a relevant time frame. Before computers, brokerage firms traded securities without the type of interconnected computer system that the Proprietary Trading Business had but the IA Business lacked. In fact, the software used by the IA Business computer system was originally derived from the Proprietary Trading Business. (Tr. (5/8) at 78:3-5.) Thus, BLMIS could have been trading securities in the past despite the deficiencies in the BLMIS computer system identified by Dubinsky.

11    Dubinsky also emphasized that the T-Bill transactions did not necessarily generate profits because the T-Bills could have gone down in value during the time period they were held, (Tr. (5/8) at 167:5-9), depending on whether "you buy them at par or below par and the interest you collect with accrued interest. And then when you sell them, you may make money, you may not." (Tr. (5/8) at 166:19-23.)

12    The NTC acted as the custodian for the IRA. (Tr. (5/8) at 224:17-22.)

13    Section 78fff-2(c)(3) of SIPA states:

> Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11. Such recovered property shall be treated as customer property. For purposes of such recovery, the property so transferred shall be deemed to have been the property of the debtor and, if such transfer was made to a customer or for his benefit, such customer shall be deemed to have been a creditor, the laws of any State to the contrary notwithstanding.

14    In addition to raising this motion in their post-trial proposed findings and conclusions, the Defendants filed a motion to dismiss for lack of subject matter jurisdiction after trial. (*See The Nelsons' Memorandum of Law in Support of Motion to Dismiss for Lack of Subject-Matter Jurisdiction*, dated Aug. 8, 2019 ("*Motion to Dismiss*") (ECF Doc. # 167); *see also The Nelsons' Reply Memorandum of Law in Further Support of Motion to Dismiss for Lack of Subject-Matter Jurisdiction*, dated Sept. 20, 2019 (ECF Doc. # 184).) The Trustee and SIPC opposed the motion. (*See Trustee's Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction*, dated Sept. 18, 2019 (ECF Doc. # 180); *Securities Investor Protection Corporation's Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction* dated Sept. 18, 2019 (ECF Doc. # 182).) The Court heard oral argument on September 25, 2019 and reserved decision.

15    He would also have standing to argue that he was entitled to avoid and recover the Two-Year Transfers from the Defendants as subsequent transferees of Madoff (the initial transferee), although he has not made this argument.

16    In making this finding, I do not rely on the affidavit submitted by the custodian of the Chase records attesting to the fact that BLMIS held the Chase Accounts. (*See* TX-028.)

17    The Trustee also hinted that the Defendants were judicially estopped from contending that Madoff rather than BLMIS made the transfers based on their successful arguments before the District Court and the Second Circuit in *Ida Fishman* that BLMIS was a broker-dealer, the transfers were settlement payments made on account of securities contracts and

accordingly, the safe harbor under 11 U.S.C. § 546(e) barred all but the intentional fraudulent transfer claims under 11 U.S.C. § 548(a)(1)(A). The Court asked for and received supplemental briefing from the parties on this point. The Court is not convinced that judicial estoppel precludes the Defendants' argument. The litigation culminating in *Ida Fishman* occurred in the context of motions to dismiss and were based on the Trustee's allegations, deemed to be true, that BLMIS made the transfers. The Defendants did not necessarily subscribe to that position but only that the complaints failed to state claims because BLMIS was a broker-dealer subject to the safe harbor.

18 Among other things, the Customer Protection Rule requires that "[e]very broker or dealer must maintain with a bank ... at all times when deposits are required or hereinafter specified a "Special Reserve Bank Account for the Exclusive Benefit of Customers" (hereinafter referred to as the Customer Reserve Bank Account) ... separate from ... any other bank account of the broker or dealer...." 17 C.F.R. § 240.15c3-3(e)(1).

19 The Defendants state that the Trustee has objected to several of their exhibits, (*Defendants' Findings & Conclusions* at ¶¶ 97-110), but these objections are not mentioned in the *Trustee's Findings & Conclusions* and the Court has not located them on the docket.

20 TX-066, TX-083, TX-084, TX-090, TX-091, TX-092, TX-093, TX-099, TX-100, TX-101, TX-102, TX-112, TX-113, TX-114, TX-115, TX-121, TX-122, TX-123, TX-124, TX-132, TX-133, TX-141, TX-142, TX-151, TX-152, TX-153, TX-159, TX-160, TX-167, TX-168, TX-169, TX-170, TX-180, TX-181, TX-182, TX-183, TX-192, TX-193, TX-203, TX-204, TX-205, TX-206, TX-211, TX-212, TX-213, TX-214, TX-219, TX-220, TX-221, TX-222, TX-228, TX-229, TX-230, TX-231, TX-237, TX-238, TX-239, TX-240, TX-245, TX-246, TX-247, TX-248, TX-254, TX-255, TX-256, TX-257, TX-262, TX-263, TX-273, TX-282, TX-289, TX-290, TX-298, TX-299, TX-306, TX-307, TX-314, TX-315, TX-323, TX-324, TX-335, TX-336, TX-337.

21 TX-079, TX-085, TX-094, TX-103, TX-107, TX-116, TX-125, TX-134, TX-143, TX-154, TX-163, TX-175, TX-188, TX-194, TX-198, TX-207, TX-215, TX-223, TX-232, TX-241, TX-249, TX-258, TX-274, TX-283, TX-291, TX-300, TX-308, TX-316, TX-325, TX-330, TX-338, TX-339, TX-340, TX-377, TX-378, TX-379.

22 TX-088, TX-097, TX-106, TX-110, TX-119, TX-127, TX-136, TX-146, TX-157, TX-164, TX-177, TX-191, TX-200, TX-208, TX-216, TX-225, TX-234, TX-242, TX-250, TX-260, TX-276, TX-284, TX-292, TX-302, TX-318, TX-327.

23 Some of the exhibits offered by the Trustee include Bates Nos. with the prefix "Oppenheim." These may be documents produced by Oppenheim but the record is silent.

24 TX-342, TX-343, TX-344, TX-345, TX-346, TX-347, TX-348, TX-349, TX-350, TX-351, TX-352, TX-353, TX-354.

25 The Court previously overruled the same objections made by the same counsel for other BLMIS investors in connection with the "profit withdrawal" litigation but that determination was based on a different record. *See In re BLMIS*, 592 B.R. 513, 524-29 (Bankr. S.D.N.Y. 2018) ("*PW I*"), *aff'd*, 605 B.R. 570 (S.D.N.Y. 2019) ("*PW II*")

26 The Defendants also served interrogatories in these adversary proceedings. (*See Trustee Irving H. Picard's Responses and Objections to Defendants' First Set of Interrogatories*, verified Oct. 5, 2015 (ECF Doc. # 44-1).) The Defendants did not pose the same interrogatory as the *Wilenitz* defendant and hence, did not elicit the same objection.

27 Each transfer is documented by two checks, one as drawn and one as cashed. (*See* TX: 80, 81, 86, 87, 95, 96, 104, 105, 108, 109, 117, 118, 126, 128, 135, 137, 144, 145, 156, 158, 165, 166, 178, 179, 189, 190, 195, 196, 199, 201, 209, 210, 217, 218, 224, 226, 233, 235, 243, 244, 251, 252, 259, 261, 275, 277, 285, 286, 293, 294, 301, 303, 309, 310, 317, 319, 326, 328, 331, 332.)

28 The Trustee separately marked additional exhibits which display charts or figures extracted from the Expert Reports. (*E.g.*, TX-037, TX-038, TX-040.)

29 The Trustee contends that the Defendants did not object to the admission of the Collura Reports. (*See Trustee's Findings & Conclusions* at ¶ 223 (listing TX-053 and TX-054 as having been admitted without objection).) This is incorrect. (*See Defendants' Findings & Conclusions* at ¶ 75) (asserting objection to the admission of TX-053 and TX-054).

30 Dubinsky referred to other exhibits (TX-037, TX-038, TX-041, TX-044, TX-045, TX-047, TX-048) that the Trustee has offered for identification but does not seek to admit into evidence.

31 The Defendants cite *United States v. Salerno*, 505 U.S. 317, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992) for the proposition that the proponent of the former testimony must satisfy both the "predecessor in interest" and "similar motive" requirements. (*Defendants' Supplemental Memorandum of Law in Opposition to Trustee's Motion in Limine Number 2, to Admit the Former Testimony of Frank DiPascali*, dated Sept. 5, 2019, at 3-4 ("*Defendants' DiPascali Memo*") (ECF Doc. # 174).) The "predecessor in interest" requirement was not at issue in that case and the Supreme Court was referring to the dual requirements of unavailability and "similar motive." *See United States v. Salerno*, 505 U.S. at 321, 112 S.Ct. 2503 (parties agreed that the witnesses were "unavailable" but disagreed "about whether the 'similar motive' requirement in the final clause of Rule 804(b)(1) should have prevented admission of the testimony in this case.").

Securities Investor Protection Corporation v. Bernard L. Madoff Inv..., --- B.R. ---- (2019)

2019 WL 6245772, 68 Bankr.Ct.Dec. 15, 110 Fed. R. Evid. Serv. 1442

32    Following her conviction in *Bonventre*, JoAnn Crupi moved for a new trial on several counts, arguing that DiPascali's trial testimony was incredible because he was a convicted perjurer and had lied during his testimony just as he had lied to the SEC, the investors and everyone else. *United States v. Bonventre*, No. 10CR228-LTS, 2014 WL 3673550, at *20 (S.D.N.Y. July 24, 2014), *aff'd*, 646 F. App'x 73 (2d Cir. 2016), *cert. denied*, ⸺ U.S. ⸺, 137 S. Ct. 676, 196 L.Ed.2d 560 (2017). Denying the motion, the District Court stated:

> While DiPascali admitted that he lied in the past, the Court does not find that his testimony over the course of nearly a month at this trial was so patently incredible as to rise to the level of exceptional circumstances warranting setting aside the verdict and granting a new trial.

*Id.* While hardly a ringing endorsement, it does imply that the District Court did not believe that he had lied.

33    The Defendants refer to the Coribello declarations as the "2017 Fraudulent Coribello Declarations" and charge that the Trustee's preparation and submission of the declarations was dishonest and in bad faith. (*Defendants' Findings & Conclusions* at ¶ 128 ("[T]he Trustee relies upon the 2017 Fraudulent Coribello Declarations which establish, indisputably, the dishonesty and bad faith of the Trustee and his counsel.").)

34    To the extent consistent with SIPA, a liquidation of a broker or dealer is "conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7" of the Bankruptcy Code. SIPA § 78fff(b).

35    The Defendants also contend that BLMIS was not a Ponzi scheme because most of its employees worked for the Proprietary Trading Business. This is irrelevant. The IA Business was the big tail wagging the little Proprietary Trading Business dog.

36    Under the Bankruptcy Code, "insolvency" means balance sheet insolvency. *See* 11 U.S.C. § 101(32)(A) (defining the insolvency of a corporation as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation," excluding intentionally fraudulently transferred property and exempt property).

37    On a related point, DiPascali's trial testimony in *Bonventre* and Dubinsky's analysis demonstrated that the T-Bill transactions that appeared in the customer statements were fictitious and bore no relationship to the actual T-Bills purchased by BLMIS and documented in the DTC records.

---

End of Document                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.