**CHAITMAN LLP**
465 Park Avenue
New York, New York 10022
Phone & Fax: (888) 759-1114
Helen Davis Chaitman
hchaitman@chaitmanllp.com

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>          Plaintiff-Applicant,<br><br>      v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>          Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>          Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC<br><br>          Plaintiff,<br><br>v.<br><br>DEFENDANTS LISTED ON ECF No. 14283,<br><br>          Defendants. | Adv. Pro. Nos. listed on ECF No. 14283. |

**DECLARATION OF HELEN DAVIS CHAITMAN IN
OPPOSITION TO THE TRUSTEE'S MOTION FOR FEES AND EXPENSES
PURSUANT TO FED. R. CIV. P. 37(a)(5)(B)**

HELEN DAVIS CHAITMAN hereby declares, under penalty of perjury pursuant to 28

U.S.C. § 1746, as follows:

1.      I am a member of the bars of New York and New Jersey, and of this Court.  I am a member of Chaitman LLP, counsel for Defendants listed on ECF No. 14283 ("Defendants").

2.      I submit this Declaration in opposition to the Trustee's Motion for Fees and Expenses Pursuant to Fed. R. Civ. P. 37(a)(5)(B) (the "Motion").

3.      As demonstrated by the record established at the trial of the Nelsons' cases conducted on May 8 and 9, 2019, the Trustee's representations that Madoff never purchased securities with investment advisory customers' money has been demonstrably false from inception.  *Picard v. Carol & Stanley Nelson*, Adv. Pro. No. 10-04377, ECF Nos. 174, 176-2. Indeed, after repeatedly testifying falsely on direct examination that Madoff never purchased securities with investment advisory customers' money, the Trustee's expert, Bruce Dubinsky, admitted on cross-examination that Madoff did buy securities with investment advisory customers' money.  *Id.,* ECF No. 174 at. 10-14.  And the documentary evidence at trial demonstrated, for example, in many instances, the T-bills listed on the Nelsons' statements were owned by Madoff at the time, as proven by the third party statements of trading firms through which Madoff purchased T-bills with investment advisory customers' money.  For example, as of May 31, 2008, the total account value of all three of the Nelsons' accounts was $10,343.972.50.  As of that same date, the total value of T-bills in the Nelsons' accounts that the third party trading records (the "Trading Records") prove that Madoff owned was $10,262,587.50 which represented 99.2% of the total account value.  *Id.* ECF No. 274 at 21-22

4.      The evidence adduced at the Nelsons' trial demonstrates the importance of the Trading Records that we have sought production of since 2016 and the Trustee has continually sought to evade production of these records.  For example, the Trustee never gave Defendants

access to the BLMIS Database, even though this Database contains, we have been told, 30 million

pages of Madoff's business records.

5.        While the Trustee's submission is replete with claims that Defendants "ignored and

circumvented" the "Protocol" (Trustee's Br. at 1), Defendants did not do so.  On the contrary, the

Trustee has sought for years to conceal the truth about Madoff's trading.  As detailed herein, the

Trustee's counsel played endless games with us in an effort to conceal the Trading Records and,

even    the most recent production, from the Queens Warehouse, yielded  substantial Trading

Records that had never previously been produced.  There is no doubt that, even at this time, the

Trustee has failed to produce large numbers of Trading Records despite the relevance of these

records and despite the unprecedented compensation that has been paid to him and his law firm.

## FACTUAL BACKGROUND

### The Trustee's Document Repositories

6.        The Trustee has the following document depositories of records of which we are

aware:  (1) the E-Data Room, into which the Trustee has placed only those documents that he relies

upon to support his claims; (2) the BLMIS Database, which contains approximately 30 million

hard copy documents and electronically stored information to which Defendants have never been

given access; (3) hard copy documents stored in a warehouse in Queens (the "Queens

Warehouse"); (4) the  documents the Trustee obtained pursuant to Rule 2004 subpoenas (the "Rule

2004 Database") containing documents dating back only to approximately the year 2000, obtained

by the Trustee from third party firms with which Madoff/BLMIS did business; and (5) several

thousand reels of microfilm and other media, some of which have apparently not been digitized

and some of which have.

**The E-Data Room**

7.      The Trustee set up the E-Data Room to hold only the documents on which the Trustee relies to support his contentions.  The Defendants have access to it but they cannot download any documents from it.  Instead, they have to make a specific request to the Trustee if they want to download specific documents.  See *In re BLMIS,* Adv. Pro. No. 08-0189 ECF No. 16348-5 E-Data Room 1 User Guide for Outside Litigation Counsel.

**The BLMIS Database**

8.      The Trustee has what he calls the "BLMIS Database" consisting of approximately 30 million documents, to which he has refused to give Defendants access.  *Picard v. Zraick,* Adv. Pro. No. 10-05257 (SMB), ECF No. 68, Trustee's Mem. at 8, Filed March 22, 2017 ("[T]he Trustee created a searchable electronic database containing approximately 30 million hard-copy documents and electronically stored information, to which litigants do <u>not</u> have access.").  (Internal citation omitted) (Emphasis in original). According to the Trustee, the BLMIS Database is "an internal Relativity database that contains the processed data, processed BLMIS data in the Trustee's possession. . . That includes virtually every single hard copy and electronic document recovered from the operative floors of the Lipstick Building." **Ex. A** [Nov. 19, 2018 Tr. at 8:8-17]. There is no legitimate reason for the Trustee to have concealed this database from the Defendants. As set forth below, at one point, the Trustee had agreed to give counsel for the clawback defendants access to the BLMIS Database, but then he withdrew that offer without explanation.

**The Queens Warehouse**

9.      The Queens Warehouse contains many thousands of boxes that include both processed and unprocessed hard copy documents.  The Trustee has never disclosed what documents, if any, from the Queens Warehouse are also in the BLMIS Database or in the E-Data

Room.  Defendants possess a 300 page index of the boxes in the Queens Warehouse.  At the December 2016 conference, Judge Maas had acknowledged that his looking at the warehouse inventory was "almost as useless as [Defendants] looking at the inventory" **Ex. J.** [December 13, 2016 Tr. at 165:24-25] because it was almost certainly "extraordinarily lengthy and probably not terribly informative."  *Id.* at 166:2-3.  As can be seen from the extract from the Warehouse Index containing the first 20 pages, attached as **Ex. B** (the full index is too bulky to submit, but is available on request) while in some instances, the descriptions do suggest that they may contain Trading Records, most of the  descriptions give no real indication of the contents of the boxes.

**The Rule 2004 Database**

10.     The Trustee's Rule 2004 Database presumably contains all the documents the Trustee has received from third-parties pursuant to Rule 2004 subpoenae.  While on January 9, 2017, Judge Maas ordered that the Trustee produce documents received from a third-party custodian within ten days after their receipt, **Ex. C** [January 9, 2017 Order], Defendants have never been given access to the Rule 2004 Database and have no idea whether all of the documents on that database have been produced to them.

**The Media**

11.     Finally, there is also a large number of microfilms and other media, some of which has been restored but the vast majority of which have not.

**Defendants' Efforts to Obtain the Trading Records**

12.     There is no question that the Trading Records are relevant. The Trustee has, from inception of his appointment, represented to numerous courts that Madoff never purchased securities for his investment advisory customers and his clawback actions are premised on this contention. *See Picard v. Carol and Stanley Nelson,* Adv. Pro. No. 10-04377, Doc. No. 156-1.

Declaration of Helen Davis Chaitman in Support of Defendants' Opposition to the Trustee's

Motion to Quash Subpoena to the Trustee and to Strike Bernard L. Madoff, Enrica Cotellessa-Pitz,

and Agatha M. Cole from Defendants' Proposed Witness List. As Judge Maas recognized in his

March 15, 2017 Order, the Trading Records go to "significant" legal issues in these cases. *See* **Ex.**

**D** [March 15, 2017 Order at 2]. Defendants first attempted to obtain the Trading Records in the

discovery demands they served on the Trustee on March 8, 2016. **Ex. E** [Discovery Demands

dated March 8, 2016]. The parties held an unsuccessful meet and confer, and then the Trustee

wrote to the Court on April 4, 2016, requesting a pre-motion conference and claiming that he was

entitled to a protective order because, in relevant part:

> the requests seek information and documents which are cumulative
> to what is in the Trustee's E-Data Room 1, such as information
> relating to whether BLIMS was a Ponzi scheme. E-Data Room 1
> contains approximately five million documents relating to the
> operations of and fraud at BLMIS. The purpose of E-Data Room 1
> is to provide defendants with direct access to certain BLMIS records
> to relieve the burden on the Trustee of having to search for generic
> information about BLMIS in every matter. It also prevents
> defendants from shifting the burden of investigating their own case
> theories to the Trustee.

*Picard v. Wilenitz,* Adv. Pro. No. 10-04995 ("*Wilenitz*"), ECF No. 63.

13.    This firm responded to the Trustee's letter on May 2, 2016, seeking permission to

file a motion to compel the same discovery for which the Trustee sought a protective order. The

Trustee responded to this firm's letter, again contending he was entitled to a protective order for

these and other documents and information, and claiming, in relevant part, that he had "already

produced virtually all possible relevant discovery to the Defendant that is not objectionable."

14.    At the Rule 7007 conference that the Court held on the two competing motions, the

Trustee once again claimed that he had placed all Trading Records in the E-Data Room. He praised

his own E-Data Room, maintaining that:

{00043545 3 }                                    6

[w]hat the Trustee has done in discovery in this case is quite remarkable, and I believe unprecedented, and we're very proud of it. Without even receiving a discovery request, we provide every single defendant with what we refer to as their core account documents, which are their customer statements, the cash activity of their accounts, their correspondence files with all of their correspondence to and from BLMIS over the life of their account; the account opening and closing documents; and in addition to that all of the applicable financial statements from BLMIS's financial institutions showing the bank transfer records from those independent third parties with respect to the cash activity in each and every single account. Where we don't have a complete set of customer statements, we produce portfolio management reports, which contain exactly the same information of the cash activity over the life of the account. Where we don't have those, we produce spiral notebooks where various employees over time at BLMIS kept meticulous notes of that cash transaction activity. And we provide that to every defendant. Wilenitz is no exception. We produced, I believe, approximately, 19,000 records that we've indexed to make it easy for the defendant to navigate exactly what's in that –

THE COURT: 19,000 records for Wilenitz?

MR. JACOBS: For the Wilenitz accounts, correct, over the life of their accounts. And that includes all of the items that I just discussed.

**Ex**. **F** [May 17, 2016 Tr. at 7:2 – 8:4]

15.    The Trustee represented that Defendants could, essentially, access any data they wished to through the E-Data Room:

MR. JACOBS: Every single document -- what we've endeavored to do, Your Honor, is that what we refer to as Electronic Data Room 1 contains all of the underlying documents considered by Mr. Dubinsky and we're also building upon that in including documents that our other experts who we may offer to prove transactions and who do other functions, all of those documents as well. So, that's approximately 4 million records. Not pages, but records.

And it's an enormous amount of data that I believe is unprecedented, at least in my career, and for that reason we've structured the E-Data room in a very organized fashion with issue trees. So if you're a participant who's accessing the E-Data room, you'll see something that you might be familiar with already in terms of like, an Outlook email folder tree that has topics, broken

down documents, financials, third party records; and then each of those trees can be broken down further to drill down to J.P. Morgan statements. You know, Chicago Options Trading information, Depository Trust Clearing Corporation documents; all of those types of things. It's also searchable.

So, absolutely the Defendant has the ability to conduct whatever investigation they believe is relevant to the claims of their defenses, the same that our expert did,  and they have access to all the same information that our expert did. And we did that to be transparent and to provide any data that any litigant believes that they should have access to.

*Id.* at 11:11 – 12:14

16.    Further, the Trustee claimed categorically that all trading records had been put into the E-Data Room:

> MR. JACOBS:  There is a subfolder in Data Room 1 that is called DTC that has all of those records.
>
> MS. CHAITMAN:  I'm not asking for -- I have the DTC records.
>
> THE COURT:  She wants other non-DTC records.
>
> MR. JACOBS:  **To the extent we have them in addition to publicly available information that we obtain, it's all in the E-Data room clearly labeled.**

*Id*. at 61:7 – 17 (emphasis added).

17.    As the Court recognized, however, all of the Trading Records were clearly not in the E-Data Room at all.  During the conference, the Court discussed with the parties exactly what Defendants were seeking and why. And this Court ordered the Trustee to produce *all* of the Trading Records, expecting that he would supplement his disclosure by placing the documents in the E-Data Room.  (THE COURT: "Well, if the Trustee has additional documents, he's got to supplement the disclosure or the production, which he does by adding them to the E-Data room . . . .") *Id.* at 69:19-21.

18.    After the Trustee complained once again that "what we're saying is that we shouldn't have to do more than we've already done because we have [already] invested enormous

amounts of resources and time in finding a way to make all of those [*sic*] information available to all litigants in order for them to conduct their own investigations and have access to the same information that we do." *Id.* at 70:18-22, the Court then gave Defendants permission to make their motion to compel.

19.    On May 31, 2017, there was the following colloquy before this Court:

> MS. CHAITMAN:  Okay. So when I was before you on May 17th, 2016 on my motion to compel the trustee to produce documents to us and other issues, Your Honor said to the trustee and I quote -- well, you said in court, **"If the trustee has additional documents, he's got to supplement the disclosure or the production, which he does by adding them to the E-Data room." The trustee completely ignored what you said.**
>
> \*       \*       \*
>
> MR. JACOBS: Understood. I would like to correct the record. There was never a motion to compel the trustee to produce any documents pending in this Court, that's a fiction.
>
> THE COURT: **But I thought I directed you to produce the documents.**

**Ex G** [May 31, 2017 Tr. at 12:2-9; 17:4-9] (emphasis added). As the Court reminded the Trustee on June 29, 2017, there are "two orders directing you to turn over the documents." **Ex. H** [June 29, 2017 Tr. at 74:14-15]. Judge Maas held, in his January 2, 2019 Order (the very Order for which the Trustee is seeking fees), that this Court directed that, "if the Trustee found additional responsive documents, he would have to add them to E-Data Room 1." **Ex. I** [January 2, 2019 Order at 3].

**Defendants' First Motion**

20.    When the Trustee added nothing to the E-Data Room, Defendants filed their motion to compel, on August 29, 2016.  *See Wilenitz*, ECF No. 68.  The parties agreed to have Magistrate Judge Maas decide it.  On January 4, 2017, in response to that motion, Judge Maas issued a formal

Order ordering the prompt production of all Trading Records. **Ex. L** [Magistrate Judge Maas

Discovery Arbitration Order, January 4, 2017, *In re: Bernard L. Madoff*, Adv. Pro. No. 08-01789

(SMB), ECF No. 14807 at 3] (ordering "any additional relevant records of securities trading that

have not been made available [ . . .] through Data Room 1, they must promptly be produced.")

This Order is indisputably an order to produce Trading Records. Even if the Trustee chooses to

characterize this Court's earlier order as not an order at all, there is no question that Judge Maas

ordered the Trustee to produce the Trading Records. Judge Maas also ordered the Trustee to

"indicate how long it will take to make a good faith determination as to whether there are any

BLMIS trading records for the years prior to 1992." *Id.*

**The Trustee Produced Additional Trading Records**

21.     At the hearing on the motion, on December 13, 2016, the Trustee stated that he was

looking for older trading records and would "produce it if we can identify it." **Ex. J** [December

13, 2016 Tr. at 150:2]. As Judge Maas noted, "as a practical matter . . . it doesn't sound like under

any conceivable scenario it could occur before next Tuesday." *Id.* at 150:4-8. The Trustee further

promised that "we will endeavor to see if, on some floppy disk somewhere in a box in a warehouse,

there might be early stock trading records from periods predating what we currently have." *Id.* at

153:25-154:3.

22.     When Judge Maas asked if the Trustee had yet found pre-1992 trading records, the

Trustee again represented that "[w]e are looking. . .And we're trying very hard to get it." *Id.* at

160:21-24. The Trustee also represented that "it takes time" to determine whether the material

was there. *Id.* at 162:15.

23.     Nonetheless, the Trustee reported within two days of the hearing that he had

managed to locate some additional DTCC and NSCC records, together with an additional 18,306

records he had found in the BLMIS Database. He also represented that he had retained a vendor

to process 167 reels of microfilm that the Trustee believed may contain DTCC and NSCC records

from before 1992. **Ex. K** [letter from Baker & Hostetler to Judge Maas dated December 15, 2016]**.**

24.    Following the hearing, therefore, Judge Maas issued a formal Order requiring the

Trustee to produce the Trading Records.    **Ex. L** [January 4, 2017 Order at 3 (ordering "any

additional relevant records of securities trading that have not been made available [ . . .] through

Data Room 1, they must promptly be produced.")]    Judge Maas also ordered the Trustee to

"indicate how long it will take to make a good faith determination as to whether there are any

BLMIS trading records for the years prior to 1992." *Id*.

25.    On January 5, 2017, the Trustee represented that he would add certain trading

records to the E-Data Room and would simultaneously produce them to Defendants. In a telephone

conference the Trustee's counsel stated that he was "using the search terms I disclosed in my letter

in December to identify any records or reports that reflect securities trades having been conducted

historically for BLMIS at any point in time."  He confirmed that "if it's a BLMIS trading record

of securities having been produced, we will produce it." **Ex. M** [January 5, 2017 Tr. at 30:14-16]**.**

26.    On February 3, 2017, the Trustee made a supplemental production.  But while the

production contained some additional Trading Records, Defendants believed that these documents

did not come close to reflecting all of the Trading Records prior to 1992 that the Trustee possessed.

**Defendants' Next Motion**

27.    Accordingly, during a February 9, 2017 telephone conference with Judge Maas,

Defendants raised their intention to file a motion. Judge Maas ordered the parties to prepare

submissions, and on February 21, 2017, Defendants made that motion by letter.  In that letter,

Defendants pointed out that Judge Maas had premised his January 5, 2017 Order on the

understanding that, since "the underlying records have been made available" and "the burden of undertaking the requested investigation would be extensive" any additional relevant records "that have not been made available . . .must promptly be produced." **Ex. N** [letter to Judge Maas dated February 21, 2017].

28.       On March 15, 2017 Judge Maas denied Defendants' motion without prejudice. **Ex. D** [March 15, 2017 Order]. Judge Maas noted in the Order that the Trustee may have "cabined" his responses to Defendants' requests by agreeing to continue to "search for additional records, including records reflecting Treasury purchases, and will supplement [his] production to the extent any such records are readily accessible and can be identified." *Id.*at 5. It was unclear to Judge Maas whether there was a substantive objection by the Trustee or "merely an indication that every box and microfilm reel has not been exhaustively searched." *Id.* at 6. He reasoned that "[t]he continuing existence of this ambiguity is no doubt attributable . . . to counsels' failure to have any face-to-face discussion regarding the Defendants' claim that the Trustee's response to their requests for trading records is inadequate." *Id*. at 6.

29.       Around the time of Judge Maas' ruling, the Trustee produced to Defendants two Indices—an index of all of the media the Trustee possessed and an index of the boxes in the Queens Warehouse. Judge Maas ordered Defendants to meet and confer and Defendants to identify, with reference to the two Indices, additional documents that they wished to have produced. Following the meet and confer, the parties were to send a joint letter to Judge Maas if there were additional issues, at which time the motion that the Order denied could be renewed. *Id.* at 6-7. Of course, while they were now (or soon would be) in possession of the Warehouse Index and the Media Index, those indices did not, to Defendants' knowledge, represent an index of the Trustee's BLMIS Database, which Defendants believed that the Trustee was continuing to search.

30.     The Trustee continued to produce documents regarding Trading Records through April 16, 2017.

**The "Microfilm" Issue**

31.     While the Trustee contends that the issue of microfilm is an example of Defendants' non-compliance with the "Protocol," he neglects to mention that it was he who first raised it with the Court, not Defendants at all.  Specifically, the Trustee misrepresented in his Memorandum of Law in opposition to Defendants' notice to depose Madoff on Day 2 deposition topics, without mentioning Judge Maas's Order on the Motion to Compel, that he had made all Trading Records available in the E-Data Room and that his more recent productions "yielded from a broad search for related records" which "do not relate to the IA business." *In re BLMIS,* Adv. Pro. No. 08-0189 ECF No. 16135 at 11.

**The Parties Appeared to Have an Agreement**

32.     Since the Trustee had concededly only run the 147 terms he came up with across his BLMIS Database (and had never disclosed those terms to Defendants), Defendants and other counsel requested that the Trustee run a list of additional terms. The Trustee responded on June 25, 2017 that the his for those terms was "quite voluminous" and noted that a portion of the records were already in the E-Data Room which he once again invited the Defendants to search. **Ex. O**, [email from Kristen Keranen of Baker & Hostetler, dated June 25, 2017]. Though the Trustee claimed in Court that he had produced those documents, as he was forced to admit, he actually had not. **Ex. P** [email from Kristin Keranen of Baker & Hostetler, dated July 27, 2017, to Andrew Kratenstein of McDermott Will & Emery (stating that "Mr. Sheehan misspoke yesterday).] After some back and forth, and after Madoff's continued deposition (first held on November 8 and 9, 2017) was continued once again to allow more Trading Records to be produced, the parties met

and conferred on November 14, 2017.  At that meeting, Defendants believed that they then reached

an agreement that would resolve the issue of Trading Records once and for all.

**The Meet and Confer**

33.     The bulk of the documents the Trustee obtained are on the BLMIS Database and

the Trustee has never produced an index to the BLMIS Database.

34.     At the November 14, 2017 meeting with David Sheehan and Max Shifrin, the

Trustee's counsel represented to me that they were going to promptly produce all of the Trading

Records that had already been ordered and that they would conduct a search of the BLMIS

Database.  However, they claimed they did not know how to search the BLMIS Database.  I

suggested that they simply search by the specific account numbers that Madoff had at each third

party firm from which he purchased securities.  Mr. Shifrin thought that was a brilliant idea and

promptly agreed to conduct those search in the BLMIS Database.

35.     I raised at the meeting the issue of scheduling the next date for Madoff's deposition

because I was concerned about his health and his continuing ability to testify.  The Trustee's

counsel requested that I agree to defer Madoff's deposition until the Trustee ran the searches to

produce the Trading Records.  I agreed, on the understanding that the Trading Records would be

produced forthwith.

36.     The next day, on November 15, 2017, the Trustee's counsel sent me an email in

which he represented that he had "identified a list" of Madoff's trading account numbers and third

party firms and that we therefore "don't have to go digging up those numbers yourself."  **Ex. Q**,

[Email from Maximilian Shifrin dated November 15, 2017].

37.     Shortly thereafter, on November 19, 2017, in the hope that we could finally obtain the discovery Defendants had sought for so long, I sent the following email, in relevant part, to David Sheehan, counsel for the Trustee:

> Dave:  I very much appreciated your statements at our meeting last week that the Trustee is willing to cooperate with me in producing the documents I have requested, *i.e.,* **all of the third party trading records received by Madoff from other financial firms and custodial banks, regardless of time period and regardless of whether the trades were deemed "House 5" or House 17"** because, as I explained, Madoff operated as one entity and I view the distinction between House 5 and House 17 as artificial.

**Ex. R** [email to Maximilian Shifrin dated November 19, 2017] (emphasis added)**.**

38.     In that email, I set forth exactly what Mr. Sheehan had agreed to do. Mr. Sheehan never contradicted me.  Nevertheless, when I approached Judge Bernstein for sanctions against the Trustee, the Trustee's counsel contended that they had never agreed to what I stated in my November 19, 2017 email.  Accordingly, on November 21, 2017, Defendants served an additional document demand so that the Trustee would be required, under the Federal Rules of Civil Procedure, to produce the documents I requested no later than December 21, 2017.  **Ex. S.**

39.     Thereafter, I heard nothing from the Trustee's counsel. On January 2, 2018, I sent the following email to counsel:

> It is now a month and a half since you promised me that you would **search the BLMIS data base for third party trading records** and, to date, I have not received a single document as a result of that search.  Can you please explain to me what steps you have taken to fulfill your representation to me and when I can expect to receive the documents you have located?  Thanks.

**Ex. T** [email to Maximilian Shifrin, dated January 2, 2018] [emphasis added].

40.     On January 2, 2018, I received the following email in response:

> As we stated in our December 21, 2017 responses and objections to your discovery requests, our search and review of additional records is ongoing, and we anticipate making a supplemental production of

> any additional records that we identify within four weeks. In addition, as we also stated in our responses and discussed at our meet and confer, we are using known BLMIS bank account numbers to run searches in our Third Party Documents, and are reviewing that population to ensure that we identify and produce the specific types of records that you seek.
>
> As soon as these steps are completed, we will produce any additional responsive records that we identify.

**Ex. U** [email from Maximilian Shifrin, dated January 2, 2018**].**

41.      Even though he responded on the same day, and even though I had specifically used the words "BLMIS Database" in the email to which he was responding, the Trustee did not correct me or tell me, even then, that this was not where he was searching or what he thought our agreement had been.  Indeed, this is not something he even bothered to raise until *after* we met with this Court regarding possible sanctions.  If the Trustee really thought that we had it wrong, he should have raised the issue on November 19, 2017, when I sent my confirming email to Mr. Sheehan.  While the Trustee's counsel now claims that *his* email referred to "known BLMIS bank account numbers" in "our Third Party Documents," this is patently dishonest.  The record could not be clearer that I had been seeking production, since 2016, of all Trading Records in the Trustee's possession or control.  Obviously, neither I nor Judge Maas would have accepted the Trustee's limiting his search to documents he had previously provided to us from the documents he subpoenaed from third party institutions that do not go back further than the year 2000.

42.      What I had understood the Trustee to be doing—and what we had discussed at the November meet and confer—was to search Madoff's account numbers with the various institutions—most of them investment banks—from which he purchased securities, across the BLMIS Database, which Defendants believed was the only place such records could still exist. Nonetheless, I received no documents from the Trustee whatsoever.  Instead, on March 16, 2018,

the Trustee's counsel proposed holding his production "in abeyance" pending a motion.

Specifically, counsel stated that:

> In connection with your request for documents pertaining to what you consider to be "trading records," the Trustee has identified documents from the third-party database responsive to the agreed-upon search terms based upon BLMIS bank account numbers.
>
> As you are aware, the Trustee has filed a Motion for an Order Establishing an Omnibus Proceeding for the Purpose of Determining the Existence, Duration, and Scope of the Ponzi Scheme at BLMIS (the "Omnibus Proceeding"). The proposed Omnibus Proceeding and its impact on consolidated discovery will be discussed with Judge Bernstein during the April 25, 2018 omnibus hearing date. While the Trustee is prepared to begin production of those documents now, we suggest holding the production in abeyance in light of the proposed Omnibus Proceeding. This way we can ensure the involvement of all interested parties and avoid further discovery into the nature of the Ponzi scheme on a piecemeal basis. Other defendants with ongoing cases have agreed to hold discovery related to the Ponzi scheme in abeyance pending this motion.
>
> If you prefer to receive the documents prior to Judge Bernstein's ruling on the Trustee's motion, however, we are prepared to process and send you the bulk of the responsive documents, but will need to provide notice to the producing parties, pursuant to the procedures in the June 6, 2011 Litigation Protective Order, with respect to certain documents that have been designated confidential.

**Ex. V** [email from Maximilian Shifrin, dated March 16, 2018]

    43.    On the same day, I declined the Trustee's proposal to hold his production in

abeyance and asked that I receive it forthwith. Specifically, I stated:

> When we met in your office in early January, you gave me every impression that you would promptly produce the documents that I had been requesting because we agreed to defer the continued deposition of Mr. Madoff until you produced these documents. It is now four months later. I would like the documents immediately. I see no reason why you should have delayed as long as you have. Please also give me all of the account opening forms and updates for the 509 account. As you know, this was something I requested in

January and it is a very small number of documents.  Again, the
delay in production is inexplicable.

**Ex. W** [email to Maximilian Shifrin, dated March 16, 2018]

44.   On March 23, 2018, the Trustee's counsel finally made his first production of what

I hoped and expected to be the Trading Records we had been seeking since March 8, 2016.  This

production, however, was grossly insufficient.  Though it technically comprised 2,356 documents

and a total of 16,848 pages, the production contained documents that were completely

unresponsive to the requests.  The documents largely appeared to be "bank account" records rather

than Trading Records because, apparently, the Trustee searched bank account numbers instead of

the trading account numbers.  Thus, Defendants received thousands of pages of irrelevant

documents, including checks to and from customers; customer account statements; internal emails;

internal Madoff documents, etc.  And there were no new Trading Records produced for most of

the companies with which Madoff and BLMIS maintained accounts and no Trading Records

whatsoever that predated 2007.  It is impossible for me to believe that the Trustee's counsel made

an honest mistake here.  I had never asked for bank records; I had always asked for Trading

Records.

45.   I have practiced law since 1976 and, based on my experience, the Trustee's

behavior clearly indicated to me that he was deliberately concealing Trading Records and playing

unethical games in delaying and obfuscating the issues.  Accordingly, on April 11, 2018, I wrote

to the Court requesting to file a motion seeking sanctions for the Trustee's conduct. *Wilenitz,* ECF

No. 100. Shortly after the hearing on the request, the Trustee claims that he proposed that he now

run the exact same search terms across the BLMIS Database itself, and that he did perform it, once

we finally agreed that he would do so in May 2018.  Though the Trustee contends he subsequently

made such a search with Defendants' agreement, and produced its results in May 2018, he agreed

to provide access to the BLMIS Database itself very shortly thereafter, on June 5, 2018 **Ex. X,**

[July 25, 2018 Tr., at 26:13-15] (MR. BELL: "In the context of that discussion, the BLMIS

database came up and Mr. Sheehan did represent that the Trustee is certainly open to producing

that database.") and Defendants believed that this would finally solve the issue . Yet, after finally

making this offer, the Trustee rescinded it. The Trustee has never explained why he is concealing

the documents on the BLMIS database since these documents are all Madoff's records.

46.     On September 4, 2018, therefore, Defendants sent their portion of a proposed joint

letter to Judge Maas to the Trustee which, as the Trustee acknowledged, was in fact prepared

"pursuant to the March 15, 2017 Order".  **Ex. Y** [letter from Baker & Hostetler dated September

17, 2018].  The Trustee requested an additional meet and confer on September 5, 2018, claiming

that he was "evaluating a motion to seek additional limited discovery from defendants" and there

was "potential overlap" between the requests.  **Ex. Z** [email from Baker & Hostetler dated

September 5, 2018] I declined, both because all such meet and confers had "still not resulted in

the Trustee's compliance with two court orders" and because the Trustee's proposal to seek

discovery had already been denied by Judge Bernstein and was "time-barred." **Ex. AA** [email to

Baker & Hostetler dated September 5, 2018]

47.     The Trustee then returned his portion of the joint letter to us on September 10, 2018.

However, after or at about the same time as the Trustee responded, he was in the process of

communicating with Defendants regarding the general impenetrability of what he claimed to have

been producing, including what he claimed was in the E-Data Room and what was not.  In one of

those threads, dating back to June 2018, Defendants had asked for the Trustee's assistance in

locating certain NSCC excel documents that reflected Madoff's trades in 14 specific equity

securities for an eight day period in March 2005, documents that certainly should have been

produced to Defendants. On July 10, 2018, the Trustee's counsel confirmed that these NSCC records had never been produced. Mr. Shifrin claimed that he'd never represented that he had produced all documents that the SEC had produced to him, that he had only ever produced one specific production that the SEC made in July 2012 containing DTCC documents (rather than NSCC documents), and that even though he had searched for them, he did not think he had them because he did not know what the SEC had, or had not, included in its overall productions to the Trustee. **Ex. AB, [**email from Maximilian Shifrin to Agatha Cole dated July 10, 2018**].**

48.     On July 17, 2018, the Trustee agreed to produce all of the documents the SEC had produced, though it's not completely clear when that production was made. Indeed, when Mr. Shifrin finally provided a list of third party bates prefixes, it became apparent that many of those productions had not been made available either.

49.     When, on September 12, 2018, the Trustee's counsel said, not only that the third party productions were not relevant, but also claimed in that communication that the Trustee had produced all responsive documents to his search of third party records, **Ex. AC [**email from Maximilian Shifrin to Agatha Cole, dated September 12, 2018**],** Defendants did not file the joint letter but instead sent an additional letter to the Trustee on September 14, 2018, in the hope that they could finally resolve the issue of Trading Records without involving Judge Maas or the Court. In that letter, we further explained why the Trustee's searches did not provide us with the Trading Records and why this also demonstrated that we needed access to the BLMIS Database. **Ex. AD** [letter to Baker & Hostetler dated September 14, 2018].

50.     In response, the Trustee rejected this approach and asked that we present the joint letter to Judge Maas, effectively cutting off the possibility of any additional meet and confer. **See Ex. Y** [letter from Baker & Hostetler dated September 17, 2018]. As the Trustee stated "[i]t is

clear to us we *will need Judge Maas's assistance* if we are to come to any resolution, *and we therefore encourage you to submit the joint letter at your earliest convenience."  Id.* (emphasis added).

51.    Accordingly Defendants revised the joint letter, incorporated the Trustee's updated response, and filed it as requested on September 20, 2018.

**The Joint Letter**

52.    On September 20, 2018, following a failed meet-and-confer process that occurred over the course of a year, Defendants made an application, pursuant to Fed. R. Civ. P. 37(b), to sanction the Trustee's counsel for failure to comply with two court orders, and requested an Order requiring him to share access to the BLMIS Database, since Defendants believed that this would resolve the issue of Trading Records altogether. **Ex. AE** [joint letter to Judge Maas, dated September 20, 2018].  As Defendants explained at length, "[t]he Trustee has been repeatedly ordered to produce all trading records," and this was the basis for their application.  *Id.*

53.    In his portion of the letter, however, the Trustee represented Defendants' request for access to the BLMIS Database as seeking "the wholesale production of 30 million documents—a collection comprising every hard-copy and electronic document recovered from the operative floors of BLMIS headquarters at the Lipstick Building."  *Id.* at II.  In fact, there is no legitimate reason for the Trustee to have denied Defendants access to the BLMIS Database. Providing such access would have been the easiest way to comply with Defendants' discovery demands and the orders of this Court and Judge Maas.

54.    On November 19, 2018, Judge Maas conducted a hearing regarding the joint letter. At that hearing, the Trustee acknowledged that the documents that were "unprocessed and not in the BLMIS database" had not generally been searched. **Ex. A** [Nov. 19, 2018 Tr. at 46:21-24].

Defendants took this to mean that the Queens Warehouse had never been searched and, accordingly, updated their application to seek access to the Queens Warehouse in addition to the BLMIS Database. **Ex. AF [**letter to Judge Maas dated November 20, 2018].

55.    Moreover, although the Trustee claims that the Warehouse Index contains "descriptors in each line that tell you what's in the box" **Ex.  A** [Nov. 19, 2018 Tr. at 47:9-12, it only does that for a few boxes.  In fact, it does not provide much guidance to the contents of the boxes at all.  **Ex. B** [extract from Warehouse Index—full index available on request].

**Judge Maas's Decision and the Appeal**

56.    On January 2, 2019, Judge Maas denied the motion.  In his Order, consistent with Defendants' belief that they had filed a motion for sanctions, Judge Maas summarized the dispute, stating that: "[i]n brief, the Defendants contend that the Trustee has intentionally and contumaciously failed to produce records . . . The Trustee denied that he has failed to comply with any court orders." **Ex. I [**January 2, 2019 Order at 2.]  We sought leave from this Court to appeal that Order, *Wilenitz,* ECF. Nos. 126, 126-1-10.  On February 15, 2019, this Court granted Defendants leave to appeal that Order.  *Wilenitz*, ECF No. 130. Defendants' appeal was filed on March 18, 2019.  *Wilenitz,* ECF Nos. 138, 138-1-4.

## Even After the Appeal, Defendants Have Found More Documents In The Queens Warehouse

57.    While the appeal was pending, the Trustee finally granted Defendants access to the Queens Warehouse so that Defendants could conduct their own search for Trading Records.  In May 2019, in less than a day, Defendants easily located more boxes in the Queens Warehouse that contained Trading Records.  The Warehouse Index was of little, if any, use in locating them. Defendants simply went to various places in the warehouse, opened the boxes there and looked inside.  While some of the boxes indeed contained irrelevant material, some of them held Trading Records.  Defendants asked the Trustee to produce the contents of 138 boxes.  The Trustee provided only 11 of them, claiming that most had already been searched, and that one of the boxes contained media that was too expensive to restore. (Trustee's Br. at 3).

58.    Notably, the Trustee claims in his Motion that he had already scanned the documents in 125 of the boxes and placed them into the BLMIS Database—a database which Defendants, of course, have never been able to access, and claims that "most" of those documents have been added to the E-Data Room. (Trustee's Br. at 3).  But the Trustee never specified which documents had been scanned and put into the E-Data Room; and, of course, we never had access to the BLMIS Database.

59.    In any event, on the day of their visit, Defendants discovered additional boxes and asked that the contents of these boxes, as well as the original 11, be produced to them.  Defendants have discovered that, within that sampling, there are, in fact, Trading Records that have never been produced before and that are not in the E-Data Room.  **Ex. AG.** [Index of documents from Queens Warehouse production that are not in the E-Data Room].  Since Defendants have never received access to the BLMIS Database, they cannot know what would have been uncovered there.

60.     In sum, the Trustee has done everything possible to prevent the Defendants from proving that Madoff did use investment advisory customers' money to purchase securities and that those securities were shown on the Defendants' statements.

Dated:  New York, New York
        January 13, 2020

*/s/ Helen Davis Chaitman*
Helen Davis Chaitman