# EXHIBIT K

# BakerHostetler

Baker&Hostetler LLP

45 Rockefeller Plaza
New York, NY 10111

T 212.589.4200
F 212.589.4201
www.bakerlaw.com

Edward J. Jacobs
direct dial: 212.589.4674
ejacobs@bakerlaw.com

December 15, 2016

**VIA ELECTRONIC MAIL**

Honorable Frank Maas
c/o JAMS, Inc.
620 Eighth Avenue, 34th Floor
New York, New York 10018

*Re:*   In re BLMIS (08-01789) – Motion to Compel filed by Chaitman LLP in *Picard v. Wilenitz*, Adv. Pro. No. 10-04995

Dear Judge Maas:

We are counsel to the Trustee in the above-referenced adversary proceeding and submit this letter (i) to provide an update on, and further context to, the identification of pre-2002 trading records per your Honor's direction at the December 13, 2016 arbitration; and (ii) in response to defense counsel's December 14, 2016 e-mail attaching the allocution of Frank DiPascali.

**Pre-2002 Trading Records**

At the arbitration, your Honor requested that the Trustee provide an update on his ongoing efforts to identify any records reflecting real trading activities at BLMIS prior to 2002. As your Honor is aware, the Trustee has already made available in E-Data Room 1 records obtained from the Depository Trust and Clearing Corporation ("DTCC") reflecting BLMIS trading activities through its "House 5" operations between 2002 and 2008.[1]  In addition, we have also separately produced to Ms. Chaitman raw data files that were available from BLMIS's single DTCC account through its DTCC terminal in House 5 at the time of BLMIS's collapse. Records show that BLMIS maintained this single DTCC account from at least the 1970s.

We write to inform your Honor that we have searched for and found additional documents that may be relevant.  We will be producing to Defendants an additional 95 records

---

[1] Inside BLMIS, the market making and proprietary trading businesses were collectively referred to as "House 5," while the investment advisory business was referred to as "House 17."

Atlanta   Chicago   Cincinnati   Cleveland   Columbus   Costa Mesa   Denver
Houston   Los Angeles   New York   Orlando   Philadelphia   Seattle   Washington, DC

December 15, 2016
Page 2

related to the DTCC and/or the National Securities Clearing Corporation ("NSCC"), an affiliate of the DTCC, that we believe may reflect trading activity at BLMIS for dates prior to 2002. These documents will be produced to defense counsel by the end of this week. We will further include in that production an additional 18,306 documents that hit on the search terms "Depository Trust," or "National Securities," which we ran across the more than 30 million available BLMIS records. Two of the 95 NSCC trading records (Bates Nos. MF00715276 and MF0071586) and 2,264 of the 18,306 additional documents are already in E-Data Room 1 (the NSCC records are in the DTC sub-folder), and the Trustee will promptly upload the balance so that all authorized litigants can access and review them. The Trustee's efforts to identify additional records related to trading activities at BLMIS prior to 2002 are ongoing, and to the extent such documents are identified, they will be promptly produced to the defendants and uploaded to E-Data Room 1.

In addition, since the June 15, 2016 deposition of Mr. Madoff, where he made self-serving statements that the BLMIS fraud did not begin until 1992, the Trustee sought to identify additional media most likely to contain BLMIS trading records from these earlier time periods. Prior to the Court's authorization of a second deposition of Madoff focusing on the start date of the fraud, the Trustee objected to the burdens associated with further efforts to identify and restore such documents pursuant to the proportionality considerations of Federal Rule of Civil Procedure 26. Notwithstanding those objections, the Trustee has engaged a vendor to process an additional 167 reels of microfilm that may contain additional BLMIS trading records from 2002 and earlier. Our vendor is processing these reels on a rolling basis, and we will promptly produce to defense counsel and add to E-Data Room 1 any additional BLMIS trading records from 2002 and earlier and/or other documents otherwise responsive to the above search terms as we receive them. To date, 24 of these 167 reels have been processed, resulting in an additional 56,000 documents, but the Trustee has not identified any additional responsive documents utilizing the search terms described above. We anticipate that the processing of the remaining reels will be completed within three to six weeks.

As your Honor is aware, a second deposition of Bernard L. Madoff is scheduled to take place on December 20, 2016. In order to maximize efficiencies and avoid additional depositions, the Trustee is amenable to postponing the deposition until any additional BLMIS trading records from 2002 and earlier that are located on the unprocessed microfilm reels are processed, produced to defense counsel, and added to E-Data Room 1. We believe that this will serve the interests of all parties involved and will minimize the administrative burdens of scheduling multiple depositions with the Department of Corrections. However, if defense counsel prefers to proceed with the Madoff deposition as scheduled, the Trustee will not object.

Finally, in response to your Honor's inquiry into whether the Trustee possesses an inventory of BLMIS records, the Trustee will produce: (1) a searchable index of hard-copy BLMIS documents ("Hard-Copy Index"); and (2) an index of electronic media obtained from BLMIS ("Media Index"). The Hard-Copy Index is a summary of the hard-copy documents contained in the more than 13,000 boxes of documents that the Trustee inherited from the Lipstick Building and BLMIS' off-site storage locations.

08-01789-smb Doc 18635-3 Filed 04/01/19 Entered 04/01/19 17:51:52 Main Document
Pg 4 of 5

December 15, 2016
Page 3

Each of the 13,000 boxes of documents reflected in the index were bar coded, and more than 4 million documents were scanned and loaded into the Trustee's review platform. The Hard-Copy Index reflects which boxes were scanned, and if a box was not scanned, it was nevertheless preserved at a warehouse in Queens, New York where BLMIS rented space for several years before its collapse. Given the extraordinary volume and associated expense, it is not possible to scan each and every piece of paper obtained from BLMIS.

These same documents have also been used by the various government agencies that investigated BLMIS. Efforts were made to ensure that, if the government required originals of certain documents, scans of those documents were first made for the Trustee. At several points over the past several years, including as recently as July 2015, the Federal Bureau of Investigation has returned original documents to the Trustee, and the Trustee has updated the Hard-Copy Index when necessary. Though the FBI and the U.S. Attorneys' Office continue to retain certain hard-copy original documents, the Hard-Copy Index is believed to reflect those documents as well.

The Media Index reflects all electronic evidence collected from the Lipstick Building and BLMIS's off-site storage locations. The Trustee identified and restored the active data contained on servers, desktops, laptops, phones, and other media and loaded that data into the Trustee's review database. However, as with the hard-copy documents, it is neither possible nor necessary to restore *all* data from the electronic media, given the associated expenses and the redundancies in the data that has already been processed.

**Defense Counsel's E-Mail Regarding Mr. DiPascali's Plea Allocution**

At the arbitration, your Honor requested a copy of Mr. DiPascali's plea allocution. On December 14, 2016, Ms. Chaitman sent your Honor an email attaching a transcript of Frank DiPascali's allocution in purported support for her argument that the Ponzi scheme did not begin until 1992. However, Ms. Chaitman's characterization of Mr. DiPascali's testimony is inaccurate. The testimony is clear that Mr. DiPascali was not offering the start date of the fraud as a factual matter, but instead was recalling when he personally became aware that it was occurring. Needless to say, Mr. DiPascali's awareness of the fraud at a particular time does not mean that the fraud did not occur earlier.

Indeed, this is evident from the face of Ms. Chaitman's email and the portions of the allocution she emphasizes. For example, on page 44, Mr. DiPascali testified that he "helped" to carry out the fraud from the early 1990s through December of 2008, which is hardly the equivalent of asserting that the fraud itself began in the 1990s. Likewise, on page 46, Mr. DiPascali stated that he "knew" that the trading was fake beginning in the 1990s, but again, does not address when the fraud started. Lastly, in specifically identifying "the late 80s or early 90s," Mr. DiPascali responded to a question from the Court concerning when Mr. DiPascali "realize[d]" that the purported trades were fraudulent, not when BLMIS first became fraudulent. Even the fact that Mr. DiPascali states that he possibly became aware of the fraud in the late

3

December 15, 2016
Page 4

1980s is inconsistent with any assertion that the fraud did not begin until 1992. In sum, a proper reading of Mr. DiPascali's allocution reveals that he did not testify as to the start date of the fraud, but only as to when he became aware of the fraud.

Other plea allocutions by BLMIS employees provide much clearer evidence that the fraud began long before Mr. DiPascali became aware of it. For example, David Kugel, in his plea allocution, testified that he backdated trades at BLMIS beginning in the early 1970s. Specifically, Mr. Kugel testified:

> As to Counts One, Three, Four and Five, I provided historical trade information to other BLMIS employees, which was used to create false, profitable trades in the Investment Advisory clients' accounts at BLMIS. Specifically, <u>beginning the early '70s, until the collapse of BLMIS in December 2008, I helped create fake, backdated trades</u>.
>
> I provided historical trade information—sorry—first to Annette Bongiorno, and later to Joanne Crupi, and others which enabled them to create fake trades that, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred. I helped Bongiorno, Crupi and others create these fake, backdated trades based on historical stock prices and were executed only on paper.

(Kugel Plea Allocation, Nov. 21, 2011, 32:1-14.) (emphasis added) Mr. Kugel's plea allocution provides unambiguous evidence that the fraud began, at the latest, in the early 1970s.

We are available to discuss these issues with you further at your convenience.

Respectfully submitted,

/s/ Edward J. Jacobs

Edward J. Jacobs
Partner


cc: Helen Davis Chaitman, Esq. (Chaitman LLP) (via Electronic Mail)

4