UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

| | | |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : | |
| | : | Adv. Pro. No. 08-01789 (SMB) |
| | : | |
| Plaintiff-Applicant, | : | SIPA Liquidation |
| | : | |
| – against – | : | (Substantively Consolidated) |
| | : | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : | |
| | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------X

| | |
|---|---|
| In re: | : |
| | : |
| BERNARD L. MADOFF, | : |
| | : |
| Debtor. | : |

-------------------------------------------------------X

| | | |
|---|---|---|
| IRVING PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| – against – | : | Adv. Pro. No. 10-05355 (SMB) |
| | : | |
| ABN AMRO BANK (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED) and ABN AMRO CUSTODIAL SERVICES (IRELAND), LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------X

**MEMORANDUM DECISION DENYING MOTION FOR
LEAVE TO FILE SECOND AMENDED COMPLAINT**

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP

45 Rockefeller Plaza
New York, New York 10111

>David J. Sheehan, Esq.
>Regina Griffin, Esq.
>Tracy L. Cole, Esq.
>Elizabeth McCurrach, Esq.
>A. Mackenna White, Esq.
>Of Counsel

*Attorneys for Plaintiff*

LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022

>Christopher R. Harris, Esq.
>Thomas J. Giblin, Esq.
>Kevin Mallen, Esq.

*Attorneys for Defendants*

**STUART M. BERNSTEIN**
**United States Bankruptcy Court:**

Plaintiff Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard

L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), has moved ("Motion")[1] for leave to

file his *Proposed Second Amended Complaint* ("*PSAC*")[2] seeking to recover two

subsequent transfers totaling $265.5 million from ABN AMRO Bank (Ireland) Ltd.

(f/k/a Fortis Prime Fund Solutions Bank (Ireland) Limited) ("Fortis Bank") and ABN

AMRO Custodial Services (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Custodial

---

[1]     *See Memorandum of Law in Support of Trustee's Motion for Leave to File Second Amended Complaint*, dated Feb. 22, 2019 ("*Trustee Memo*") (ECF Doc. # 165); *see also Reply Memorandum of Law in Further Support of Trustee's Motion for Leave to File Second Amended Complaint*, dated May 23, 2019 ("*Trustee Reply*") (ECF Doc. # 179).  "ECF Doc. # _" refers to documents filed on the electronic docket of this adversary proceeding.  References to other dockets will include the case number.

[2]     A copy of the *PSAC* is attached as Exhibit A to the *Declaration of Regina Griffin in Support of the Trustee's Motion for Leave to File Second Amended Complaint*, dated Feb. 22, 2019 ("*Griffin Declaration*") (ECF Doc. # 166).  "(¶ _ )" refers to paragraphs in the *PSAC*.

Services (Ireland) Ltd.) ("Fortis Custodial Services," and together with Fortis Bank, the "Defendants").  The Defendants oppose the Motion on the basis that the amendment is futile.[3]  For the reasons set forth herein, the Motion is denied.

## BACKGROUND

Unless otherwise indicated, the background information is taken from the well-pleaded factual allegations of the *PSAC* and other information the Court may consider in determining whether the pleading is legally sufficient.

### A.    Madoff's Ponzi Scheme

At all relevant times, Bernard L. Madoff operated the investment advisory arm of BLMIS as a Ponzi scheme.  (¶ 53.)  He purported to employ a "split-strike conversion" strategy ("SSC Strategy") under which BLMIS would purchase a basket of stocks intended to track the S&P 100 Index and hedge the investment by purchasing put options and selling call options on the S&P 100 Index.  (¶¶ 59, 61-64.)  In reality, BLMIS never purchased any securities on behalf of its investors and sent monthly statements to investors containing falsified trades typically showing fictitious gains.  (¶¶ 59, 60.)  All investor deposits were commingled in a JPMorgan Chase Bank account held by BLMIS, and the funds were used to satisfy withdrawals by other investors, benefit Madoff and his family personally, and prop-up BLMIS's proprietary trading division.  (¶ 59.)

The BLMIS Ponzi scheme collapsed and Madoff was arrested by federal agents for criminal violations of federal securities laws on December 11, 2008 (the "Filing

---

[3]    *See Memorandum of Law in Opposition to the Trustee's Motion for Leave to File Second Amended Complaint*, filed Apr. 29, 2019 ("*Fortis Memo*") (ECF Doc. # 174).

Date").  (¶ 35.)  The Securities and Exchange Commission ("SEC") contemporaneously commenced an action in the United States District Court for the Southern District of New York, and that action was consolidated with an application by the Securities Investor Protection Corporation ("SIPC") asserting that BLMIS's customers needed the protections afforded by SIPA.  (¶¶ 35, 36.)  On December 15, 2008, the District Court granted SIPC's application, appointed the Trustee and his counsel, and removed the SIPA liquidation to this Court.  (¶ 37.)

At a plea hearing on March 12, 2009, Madoff pleaded guilty to an eleven-count criminal information and admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (¶ 40; *accord* ¶ 76.)

## B.    Two Subsequent Transfers at Issue

Fortis Bank and Fortis Custodial Services are Irish companies incorporated in 2003 and 1995, respectively.  (¶¶ 78-79.)  The Defendants along with their affiliates, employees and business groups worked together as one unified entity (collectively, "Fortis") to provide banking services to clients worldwide including financing, hedge fund services, and asset management services.  (¶¶ 3, 80, 85, 91, 224.)

The two transfers at issue arose out of a May 2, 2007 swap transaction ("Swap Transaction") between Fortis Bank and Rye Select Broad Market XL Fund (the "Rye XL Fund").[4]  (¶¶ 2, 166, 193.)   Rye XL Fund was an affiliate of Rye Select Broad Market

---

[4]      *See Amended and Restated Confirmation of Interest Swap Transaction*, dated Jan. 30, 2008 ("*Swap Confirmation*"), a copy of which is annexed as Exhibit B to the *Declaration of Thomas J. Giblin in Support of Defendants' Opposition to Trustee's Motion for Leave to File Second Amended Complaint*, filed Apr. 29, 2019 ("*Giblin Declaration*") (ECF Doc. # 175).

Fund L.P. (the "Broad Market Fund"), a fund managed by Tremont Partners, Inc. ("Tremont"), that invested all of its assets with BLMIS. (¶ 244.) Under the Swap Transaction, Rye XL Fund deposited funds with Fortis Bank as collateral and Fortis Bank agreed to pay Rye XL Fund three times the returns that would have been generated had the collateral amount been invested directly in Broad Market Fund. In return for providing Rye XL Fund with leveraged returns on its hypothetical investment in Broad Market Fund, Fortis Bank earned millions in fees and interest including the spread on the floating interest rate charged to Rye XL Fund based on the collateral deposited with Fortis Bank. (¶ 194.)

Rye XL Fund initially provided $10 million in collateral to Fortis Bank, (¶ 197), but between May 2, 2007 and May 1, 2008, increased the collateral deposited under the Swap Transaction to $235.5 million (the "Collateral Transfer"). (¶ 265.) Fortis hedged its risk by investing three times the collateral amount directly in Broad Market Fund (the "Hedge"). (¶¶ 195, 198.) Therefore, when the Swap Transaction grew to $235.5 million, Fortis's investment in Broad Market Fund under the Hedge correspondingly grew to $706.5 million. (¶ 198.) The Collateral Transfer is the first transfer that the Trustee is seeking to recover.

The second transfer appears to relate to a $30 million July 1, 2008 redemption (the "Partial Hedge Redemption," and together with the Collateral Transfer, the "Subsequent Transfers") by either Fortis Bank or Fortis Custodial Services[5] from Broad

---

[5]    Fortis Custodial Services was the registered subscriber of the account at Broad Market Fund, but Fortis Bank was the actual owner. (¶ 258; *see also* ¶ 260.)

Market Fund.  (¶¶ 257-60; ¶¶ 344-50 (Count Two); *PSAC*, Ex. G (listing the date and amount of the Partial Hedge Redemption).)  Rye XL Fund had the right to decrease the amount of the collateral held by Fortis Bank.  (*Swap Confirmation* at § 10(c).)  Given the structure of the Swap Transaction, if Rye XL Fund reduced the amount of its collateral, Fortis Bank would reduce the Hedge by three times the reduction.  While the *PSAC* is silent, I assume that the Partial Hedge Redemption was triggered by a reduction of $10 million in the Rye XL Fund collateral.  Fortis Bank had no reason to render its perfect hedge, *see Picard v. ABN AMRO Bank (Ireland) Ltd.* (*In re BLMIS*), 505 B.R. 135, 138 (S.D.N.Y. 2013); *Picard v. Citibank, N.A.* (*In re BLMIS*), 608 B.R. 181, 185 (Bankr. S.D.N.Y. 2019) ("*Citibank*"), imperfect by withdrawing its investment in the Broad Market Fund absent a corresponding reduction in the collateral amount.  My assumption is merely for narrative purposes and does not affect the disposition of the Motion.

## C.    This Adversary Proceeding

The Trustee contends that the Subsequent Transfers are traceable to initial transfers from BLMIS, the initial transfers are avoidable and he can recover the Subsequent Transfers from the Defendants under section 550(a)(2) of the Bankruptcy Code.  The initial transfers from BLMIS were made to Prime Fund and Broad Market Fund, (¶¶ 244-48; *PSAC*, Exs. A, C (providing the BLMIS account information for the funds) and Exs. B, D (listing the initial transfers)), and in the case of the Collateral Transfer, the intermediate transferee was Rye XL Fund.  (¶¶ 251-56; *PSAC*, Exs. E and F (listing transfers to Rye XL Fund from Broad Market Fund and Prime Fund, respectively).)

By the Motion, the Trustee seeks leave under Rule 15(a)(2) of the Federal Rules of Civil Procedure to file the *PSAC*. According to the Trustee, (*Trustee Memo* at 1, 10-11), the amendments are necessary to meet the more rigorous pleading requirements relating to allegations of bad faith imposed by the District Court in *SIPC v. BLMIS* (*In re BLMIS*), 516 B.R. 18, 21-24 (S.D.N.Y. 2014) ("*Good Faith Decision*"); *see also SIPC v. BLMIS* (*In re BLMIS*), 590 B.R. 200, 204-05 (Bankr. S.D.N.Y. 2018) (discussing precedent in BLMIS adversary proceedings), and the *PSAC*'s allegations against the Defendants meet the heightened requirements. (*Trustee Memo* at 12-33.)

The Defendants assert that the amendments proposed in the *PSAC* are futile. In the main, they argue that the Trustee has failed to sufficiently plead a lack of good faith on the part of the Defendants and the *PSAC* alleges that they received the Subsequent Transfers for value. Consequently, the Trustee's claims are barred by the defense set forth in section 550(b)(1) of the Bankruptcy Code. (*Fortis Memo* at 14-32.) In addition, the initial transfers to Prime Fund and Broad Market Fund are protected by the safe harbors set forth in sections 546(e) and 546(g) of the Bankruptcy Code, (*id.* at 32-37), the Trustee is barred by 11 U.S.C. § 550(d) from recovering from the Defendants because he already recovered the initial transfers through a settlement with Tremont and its affiliates, (*id.* at 37-39), and the Subsequent Transfers did not deplete the estate because the Defendants deposited greater amounts back into BLMIS (through Broad Market Fund) than it received by way of the Subsequent Transfers. (*Id.* at 39-41.)

The Trustee replied to the Defendants' opposition, (*see Trustee Reply*), and the Court heard oral argument on September 25, 2019.

## DISCUSSION

### A.    Standards Governing the Motion

Rule 15(a) of the Federal Rules of Civil Procedure, made applicable pursuant to Rule 7015 of the Federal Rules of Bankruptcy Procedure, governs motions for leave to amend pleadings.  Generally, leave should be freely granted, but the court may deny the motion in instances of undue delay, bad faith, dilatory motive, undue prejudice to the opposing party or futility.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The Defendants' sole objection is that the *PSAC* is futile.  (*Fortis Memo* at 3.)  "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6)."  *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 556.  It is not sufficient for the complaint to plead facts that "permit the court to infer . . . the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679; he must state "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint states a plausible claim is a "context-specific task that

requires the reviewing court to draw on its judicial experience and common sense."
*Iqbal*, 556 U.S. at 679. The court should assume the veracity of all "well-pleaded factual
allegations," and determine whether, together, they plausibly give rise to an entitlement
of relief. *Id.*

In deciding the motion, "courts must consider the complaint in its entirety, as
well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to
dismiss, in particular, documents incorporated into the complaint by reference, and
matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues &
Rights, Ltd.,* 551 U.S. 308, 322 (2007). The court may also consider documents that the
plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that
the plaintiff knew of when bringing suit. *Chambers v. Time Warner, Inc.,* 282 F.3d 147,
153 (2d Cir. 2002); *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993);
*Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir. 1991), *cert. denied,*
503 U.S. 960 (1992); *McKevitt v. Mueller,* 689 F. Supp. 2d 661, 665 (S.D.N.Y. 2010).
Where the complaint cites or quotes from excerpts of a document, the court may
consider other parts of the same document submitted by the parties on a motion to
dismiss. *131 Main St. Assocs. v. Manko,* 897 F. Supp. 1507, 1532 n. 23 (S.D.N.Y. 1995).
If "the documents contradict the allegations of a plaintiff's complaint, the documents
control and the [c]ourt need not accept as true the allegations in the complaint." *2002
Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assurance Co.,* 96 F. Supp.
3d 182, 199 (S.D.N.Y. 2015) (quoting *Bill Diodato Photography LLC v. Avon Prods.,
Inc.,* No. 12–CV–847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012)) (citing
authorities).

Here, the *PSAC* relies on and/or quotes from the *First July 2003 Email*, the *Second July 2003 Email*, the *July 2004 Meeting Excerpt*, the *Credit Application*, the *Swap Confirmation*, and the *Tremont Settlement*.[6]

## B.   Claims to Recover Subsequent Transfers

Section 550(a)(2) of the Bankruptcy Code allows the Trustee to recover an avoidable transfer from "any immediate or mediate transferee of" the initial transferee. To plead a subsequent transfer claim, the Trustee must plead that the initial transfer is avoidable, and the defendant is a subsequent transferee of that initial transferee, that is, "that the funds at issue originated with the debtor." *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548 B.R. 13, 36 (Bankr. S.D.N.Y. 2016); *accord Silverman v. K.E.R.U. Realty Corp.* (*In re Allou Distribs., Inc.*), 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007). The Court assumes for the purpose of analysis that the initial transfers are avoidable and that the initial transfers were the source of the Subsequent Transfers.

Section 550(b) of the Bankruptcy Code provides a defense to a subsequent transferee who "[took] for value, . . . in good faith, and without knowledge of the voidability" of the initial transfer. Ordinarily, the transferee must raise section 550(b) as an affirmative defense. *Legacy*, 548 B.R. at 36. In addition, an objective, reasonable person test usually applies to determine a transferee's good faith. *See Marshall v. Picard* (*In re BLMIS*), 740 F.3d 81, 90 n. 11 (2d Cir. 2014) ("The presence of 'good faith' depends upon, *inter alia*, 'whether the transferee had information that put it on inquiry

---

[6]    Other than the *Swap Confirmation* which was defined above, these documents are defined and described in the succeeding text.

notice that the transferor was insolvent or that the transfer might be made with a

fraudulent purpose.'") (quoting *Christian Bros. High Sch. Endowment v. Bayou No*

*Leverage Fund, LLC* (*In re Bayou Grp., LLC*), 439 B.R. 284, 310 (S.D.N.Y. 2010)).

However, in the *Good Faith Decision*, the District Court ruled that good faith should be

determined under a subjective standard, 516 B.R. at 21-23, and placed the burden of

pleading a lack of good faith on the Trustee. *Id.* at 23-24.  Before addressing good faith,

I consider the other element of section 550(b), "value."

### 1.    Value

Although the District Court shifted the burden of pleading good faith, the burden

of pleading value for purposes of section 550(b) remains with the subsequent transferee

who is in a better position to identify the value given for the subsequent transfer.

*Citibank*, 608 B.R. at 195; *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 206

(Bankr. S.D.N.Y. 2018) ("*BNP*").  Where the burden of pleading rests on the defendant,

the Court may nevertheless dismiss the claim pursuant to Federal Civil Rule 12(b)(6) if

the defense is apparent on the face of the complaint.  *Official Comm. of Unsecured*

*Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir.

2003).  "Value" within the meaning of section 550(b) is "merely consideration sufficient

to support a simple contract, analogous to the 'value' required under state law to achieve

the status of a bona fide purchaser for value."  5 COLLIER ON BANKRUPTCY ¶ 550.03[1] at

550-25 (Richard Levin & Henry J. Sommer eds., 16th ed. 2019) ("COLLIER ON

BANKRUPTCY"); *Citibank*, 608 B.R. at 195; *Enron Corp. v. Ave. Special Situations Fund*

*II, LP* (*In re Enron Corp.*), 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005).  Once a

subsequent transferee meets the three elements of § 550(b)(1), a later subsequent

transferee that acted in good faith (and regardless of value or knowledge of avoidability) is fully protected.  *See* 11 U.S.C. § 550(b)(2); *Coleman v. Home Sav. Ass'n* (*In re Coleman*), 21 B.R. 832, 836 (Bankr. S.D. Tex. 1982); *accord* 5 COLLIER ON BANKRUPTCY ¶ 550.03[1] and [4].

The *PSAC* pleads that Fortis Bank gave value for the Subsequent Transfers. Under the Swap Transaction, in exchange for the Collateral Transfer and related interest and fees, Fortis Bank was obligated to pay Rye XL Fund leveraged returns based on a hypothetical investment in Broad Market Fund equal to three times the amount of the Collateral Transfer.  (¶¶ 193-94, 196 (chart illustrating the relationship between the Collateral Transfer and the leveraged returns); *see also* ¶ 2.)  In addition, Fortis Bank was required to pay interest to Rye XL Fund on the amount of the collateral transferred. (*Swap Confirmation* at § 4.)  As a result, the Collateral Transfer was made to Fortis Bank as part of the Swap Transaction, and Fortis Bank gave value for the transfer by satisfying its obligations under the Swap Transaction – providing leveraged returns to Rye XL Fund and paying interest on the amount of the collateral.

The Defendants also provided value for the Partial Hedge Redemption because they surrendered a portion of their equity interest in Broad Market Fund in return.  (*See* ¶ 260 (discussing Fortis Bank's "redemption request").)  Surrendering equity interests constitutes value for purposes of section 550(b) because it is consideration sufficient to support a simple contract.  *CLC Creditors' Grantor Tr. v. Howard Sav. Bank* (*In re Commercial Loan Corp.*), 396 B.R. 730, 744 (Bankr. N.D. Ill. 2008); *accord Redmond v. Brooke Holdings, Inc.* (*In re Brooke Corp.*), 515 B.R. 632, 641-42 (Bankr. D. Kan. 2014).

- 12 -

The Trustee responds that equity interests in Broad Market Fund were worthless because the fund was insolvent. (*Trustee Reply* at 16.) The Court disagrees. Initially, it is possible for equity shares of an insolvent entity to have value for purposes of section 550(b). *See Brooke Corp.*, 515 B.R. at 642 ("Nothing in § 550 requires the adoption of a balance-sheet test for the value of stock transferred to the issuer for redemption. [Stock of an insolvent corporation] could have value because of control issues or because solvency is on the horizon.").

Moreover, equity interests in the Broad Market Fund have substantial value. In September 22, 2011, the Court approved a settlement with Tremont and its funds ("*Tremont Settlement*").[7] (¶ 269.) As part of the *Tremont Settlement*, Broad Market Fund received an allowed customer claim against the BLMIS SIPA estate in an amount not less than $1,647,687,625.00, ("SIPA Claim"), and a pro rata portion of an additional $800 million customer claim once the settling defendants satisfied their settlement payment obligations. (*Tremont Settlement* at ¶ 5.) Tremont agreed that distributions received in respect of the SIPA Claim would be "equitably allocated" including among Broad Market Fund's partners and/or investors. (*Tremont Settlement* at ¶¶ 5, 5(c).) The Trustee recently reported that substantial distributions have been made to holders of customer claims. (*See Trustee's Twenty-Second Interim Report for the Period April 1, 2019 Through September 30, 2019*, dated Oct. 31, 2019 at ¶¶ 2, 11 (reporting distributions of $13.489 billion against allowed customer claims of $19.307 billion) (ECF Case No. 08-01789 Doc. # 19097).)[8] Thus, Broad Market Fund has already

---

[7]     A copy of the *Tremont Settlement* is available at ECF Adv. Pro No. 10-05310 Doc. # 17-1.

[8]     The *PSAC* also states that Tremont investors received distributions from a class action filed against Tremont's BLMIS feeder funds, *In re Tremont Sec. Law, State Law and Ins. Litig.*, No. 1:08-cv-

received tens if not hundreds of millions of dollars based on its allowed net equity claim against the BLMIS SIPA estate and may receive more in the future.

Based on the foregoing, the *PSAC* pleads that the Collateral Transfer and the Partial Hedge Redemption were received for "value" within the meaning of section 550(b) of the Bankruptcy Code.

### 2.    Knowledge and Good Faith

As stated, the Trustee must plead that the Defendants lacked good faith when they took the Subsequent Transfers, and he must also plead that Defendants had knowledge of the avoidability of the initial transfer.  *Legacy Capital*, 548 B.R. at 36. The two concepts represent separate elements under section 550(b)(1), but they are related.

### a.    Good Faith

To satisfy his burden of pleading a lack of good faith, the Trustee must allege that each Defendant willfully blinded itself to facts suggesting that BLMIS was not actually trading securities.[9]  *Good Faith Decision*, 516 B.R. at 22-23; *Picard v. Merkin* (*In re*

---

11117-TPG (S.D.N.Y.), which were in turn funded by customer claim distributions from BLMIS.  (¶¶ 34, 217.)

[9]    The Trustee contends that it is sufficient to allege that the Defendants willfully blinded themselves to fraud generally rather than to the fact that BLMIS was not trading securities and was operating a Ponzi scheme.  (*Trustee Reply* at 3-5.)  In his moving brief, however, the Trustee asserted that he had adequately pleaded willful blindness because, "[s]ince at least 2003, Fortis employees were well aware of facts suggesting the high probability that Madoff could be engaging in fraud – in particular, that Madoff might not be engaging in the trades he claimed and/or may have misappropriated customers' assets," (*Trustee Memo* at 14), and "[t]hrough this relationship, Fortis employees became aware of facts that led them to believe there was a high probability that Madoff might not be trading and/or have custody of Harley's assets – in other words, that BLMIS might be engaging in fraud." (*Id.* at 14-15.)  The *PSAC* does not allege another type of fraud at BLMIS that the Defendants believed was highly probable.

- 14 -

*BLMIS*), 563 B.R. 737, 752 (Bankr. S.D.N.Y. 2017).  Willful blindness consists of two

elements: "(1) the defendant must subjectively believe that there is a high probability

that a fact exists and (2) the defendant must take deliberate actions to avoid learning of

that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).  If a

person who is not under an independent duty to investigate "nonetheless, intentionally

chooses to blind himself to the 'red flags' that suggest a high probability of fraud, his

'willful blindness' to the truth is tantamount to a lack of good faith." *Picard v. Katz*, 462

B.R. 447, 455 (S.D.N.Y. 2011), *abrogated on other grounds by SIPC v. BLMIS*, (*In re*

*BLMIS*), 513 B.R. 437 (S.D.N.Y. 2014).

Neither recklessness nor negligence constitutes willful blindness.  "[A] reckless

defendant is one who merely knows of a substantial and unjustified risk of such

wrongdoing, see ALI, Model Penal Code § 2.02(2)(c) (1985), and a negligent defendant

is one who should have known of a similar risk but, in fact, did not, see § 2.02(2)(d)."

*Global-Tech*, 563 U.S. at 770.  Acting in the face of a "known risk" does not establish

willful blindness.  *Id.*  Furthermore, "deliberate indifference" to the risk does not

establish willful blindness.  *See id.*

---

The Trustee's reliance on *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372 (S.D.N.Y. 2010), a securities fraud case involving a BLMIS feeder fund, is misplaced.  He contends that any fraud is sufficient quoting the District Court's statement that the defendants "turn[ed] a blind eye to obvious signs of fraud" without showing that Madoff was running a Ponzi scheme.  (*Trustee Reply* at 5 (quoting *Anwar*, 728 F. Supp. 2d at 410).)  The fraud in that case concerned Madoff's operation of a Ponzi scheme.

Moreover, the fraud that Fortis Bank allegedly suspected and ignored obviously had to relate to the Ponzi scheme.  Otherwise, if Fortis suspected that Madoff was charging some personal expenses to BLMIS but was ignorant of the Ponzi scheme, it would nonetheless be deemed to have received the Subsequent Transfers in bad faith because Madoff was running a fraudulent scheme that Fortis Bank never suspected.

### b.    Knowledge of Avoidability

To plead that a Defendant knew that it was receiving the proceeds of an avoidable transfer, the Trustee must plausibly allege that the Defendant "possess[ed] knowledge of facts that suggest a transfer may be fraudulent." *Banner v. Kassow*, 104 F.3d 352, 1996 WL 680760, at *3 (2d Cir. Nov. 22, 1996) (summary order) (quoting *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1357 (8th Cir. 1995)). Section 550(b)(1) does not impose a duty to investigate or monitor the chain of transfers that preceded the subsequent transfer, but "[s]ome facts strongly suggest the presence of others; a recipient that closes its eyes to the remaining facts may not deny knowledge." *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 898 (7th Cir. 1988) (Easterbrook, J.). This standard "essentially defines willful blindness which, the District Court has held, is synonymous with lack of good faith." *Legacy*, 548 B.R. at 38; *see also id.* at 38-39 (noting that some courts and commentators have suggested that the good faith and knowledge elements of 11 U.S.C. § 550(b)(1) are one and the same). Here, the parties have not identified a distinction between the two elements of § 550(b)(1).

### 3.    Allegations of Willful Blindness

### a.    The First Prong

The first prong of the willful blindness inquiry asks whether the Defendants subjectively believed that there was a high probability that BLMIS was not trading securities at the time of the transfer.[10] Many of the allegations regarding the

---

[10]    Given the disposition of the Motion, the Court assumes that the knowledge of all Fortis affiliates is imputable to the Defendants. The Defendants vehemently dispute this.

Defendants' subjective beliefs are based on items of information received (or not received) by affiliates of the Defendants, in some cases four years before the Swap Transaction and the due diligence that preceded it.  The allegations fall into two categories: what they learned or couldn't confirm and the implications from actions that they took.  The allegations relating to Harley encompass both.

### i.    The Administration of Harley

Fortis Prime Fund Solutions (Bahamas) Limited ("Fortis Bahamas"), an affiliate of the Defendants, served as the administrator for Harley International (Cayman) Ltd. ("Harley"), a BLMIS feeder fund formed in 1996.  While Fortis Bahamas served as the administrator, BLMIS served the triple role of Harley's investment advisor, broker-dealer and custodian.  Harley and Fortis Bahamas were subject to Bahamian investment regulations and the authority of the Securities Commission of the Bahamas ("SCB").  In 2003, the Bahamas passed stricter regulations governing the administration of investment funds requiring the administrator to (i) verify that the fund's service providers, including the custodian, were "fit and proper," and (ii) report to the SCB if it "knows or has reason to believe" that "an investment fund . . . is carrying on business in a manner that is or is likely to be prejudicial to investors or creditors of the investment fund."  (¶¶ 92-100.)

According to the *PSAC*, the stricter regulations raised concerns regarding Fortis Bahamas' role as Harley's administrator presumably because it required Fortis Bahamas to vouch to some extent for BLMIS.  On July 23, 2003, Fortis executive Sue Novo

emailed ("*First July 2003 Email*")[11] colleague Brenda Buckley regarding Fortis's role as administrator for Harley.  The email acknowledged that Buckley had "quite rightly raised the issue of broker dealer accounts and how [Fortis] can work with them within our principles."  Fortis Bahamas needed to consider "'control' of the assets with regard to segregation versus pooled accounts, restrictions on money movements/transfers, [i]nsurance cover for the assets should the broker go bust, in particular if we have a lien/charge over them."  Finally, Fortis Bahamas needed to "be very careful" if Harley remained regulated by the SCB because "the responsibilities of the [a]dministrator are very onerous, with somewhat of an overall responsibility for the Fund, responsibility to the investors, responsibility for the actions of the Directors and I believe in the latest legislation, responsibility for [c]ustodian."  (¶¶ 103-05; *First July 2003 Email* at Bates No. FPFS E 000009364.)

Novo followed-up with another email to Buckley on the same day ("*Second July 2003 Email*").[12]  She reiterated a concern about what would happen to Harley's investment, "in particular if anything happens to the broker.  We should also have confirmation as to how the Harley assets are held with the broker eg segregated/pooled account and my comment below viz insurance is probably also valid as well."  (¶ 106; *Second July 2003 Email* at Bates No. FPFS E 000009363.)

The Novo/Buckley emails were forwarded to others including Fortis Bahamas' officer Rhonda Eldridge.  On July 24, 2003, she sent a letter to BLMIS seeking

---

[11]     A copy of the *First July 2003 Email* is attached as Exhibit F to the *Giblin Declaration*.

[12]     The *Second July 2003 Email* is also included in Exhibit F to the *Giblin Declaration*.

confirmation that BLMIS acted as an agent for Harley and that Harley's funds were segregated from BLMIS's own assets and assets of other customers. Fortis Bahamas also requested a "SAS 70 Report," which at the time was an industry standard audit report prepared by broker-dealers and custodians setting forth the controls in place to, *inter alia*, protect customer securities from fraud. One week later, BLMIS employee Frank DiPascali confirmed in a letter stating that "all security positions held are segregated for the exclusive benefit of [Harley]." In an internal Fortis email chain roughly one month after DiPascali's letter, Eldridge, Buckley and others stated that DiPascali had not provided the assurances and information Fortis required, but the *PSAC* does not provide a factual basis for this conclusion. (¶¶ 107-10.)

The answer to Fortis's concerns regarding the additional responsibilities imposed on it by the new Bahamian regulations was to change jurisdictions. Fortis employee Roger Hanson suggested to Buckley that Fortis should replace Fortis Bahamas with Fortis Prime Fund Solutions (Cayman) Limited ("Fortis Cayman") as administrator of Harley. Hanson noted that this change would require the consent of a Harley investor ("Harley Investor A") who had made a loan to the fund. He suggested that the Defendants' parent company – Fortis Bank N.V. – loan funds to Harley Investor A to repay the pre-existing loan. If Fortis could not effect the loan and the change in jurisdiction, Hanson opined that Fortis Bahamas should resign as Harley's administrator. (¶¶ 111-12.)

Buckley agreed that jurisdiction should be changed away from the Bahamas but was hesitant to have Fortis lend money to Harley Investor A until she had more information about BLMIS's operations:

- 19 -

> I am still extremely uncomfortable with giving financing to [redacted] and now possibly [redacted] given their investment in Harley and the broker dealer relationship with Madoff.  Before this option can be considered further we will need some assurance of how the front and back office are separated in Madoff and if two separate streams of trade information can be provided, that will allow independent reconciliation of trades in Harley.  Without this, I do not support financing by Fortis to [redacted].
>
> . . .
>
> [I]f financing is to be considered seriously then I think he should be asked to put pressure on Madoff to give the assurances we need or else appoint another custodian to Harley.  I would agree therefore that the only option at present is to proceed with the transfer of administrator (and possibly pitch [to replace BLMIS] for the custodian work).

(¶¶ 113-15.)  A senior executive agreed with Buckley stating that "this must be addressed properly."  (¶ 116.)

Replacing the administrator with a non-Bahamian entity would not eliminate the operation of Bahamian law because Harley was still a Bahamian entity.  Therefore, Fortis set out to change Harley's jurisdiction as well.  To facilitate the change, Fortis agreed to reimburse up to $25,000 in expenses incurred by Harley's investors and other parties relating to the change.  (¶¶ 119-120.)  Ultimately, Fortis transferred the role of administrator of Harley from Fortis Bahamas to Fortis Cayman effective October 2003 – before the new Bahamian regulations took effect.  In December 2003, Harley's name was officially changed to reflect that it was now a Cayman entity.  (¶¶ 118, 121.)

Even after relocating to the Cayman Islands, Fortis continued to raise questions about Madoff.  In a July 26, 2004 email, Eldridge forwarded an excerpt ("*July 2004 Meeting Excerpt*")[13] from a meeting of Fortis's Investment Banking Compliance

---

[13]    A copy of the *July 2004 Meeting Excerpt* is attached as Exhibit G to the *Giblin Declaration*.

Committee ("IBCoCo") to another Fortis executive.  The excerpt discussed whether

Fortis should continue to provide administration, custody, financing and other services

to a hedge fund that invested solely in Harley ("Harley Investor B") given its concerns

about Madoff's multiple roles with Harley:

> [I]t appears that Madoff who acts as the Broker Dealers [sic] as well as the
> Custodian for Harley effectively is the investment manager of the Harley
> Fund. . . .  Madoff's double role implies that there is no guarantee that the
> trades and positions provided by Madoff to Fortis as Administrator are
> objective and it is not possible to obtain independent confirmations on
> trades and positions.
>
> Compliance/Legal Fortis Curacao[14] has recommended negatively on the
> requested [sic] due to the Madoff issue, in particularly [sic] given the size
> of the increased limit [of financing] . . . .

(¶ 126; *July 2004 Meeting Excerpt* at Bates No. FPFS E 000009372.)  Ultimately, the

IBCoCo decided against increasing the financing amount for Harley Investor B:

> The IBCoCo deems it however remarkable that . . . Cayman/Curacao and
> London apparently disagree on whether to keep providing administration
> services to [redacted] given the Madoff issue stated above[.]
>
> Given the above the committee is not comfortable with accepting the client
> as presented, especially as a credit proposal is in the pipeline for an
> increase to USD 160 mln.

(¶ 126; *July 2004 Meeting Excerpt* at Bates No. FPFS E 000009372.)[15]  Despite Fortis's

concern about Madoff, Fortis Cayman continued to serve as Harley's administrator until

Madoff's arrest.  (¶ 129.)

---

[14]      "Fortis Curacao" refers to Fortis Fund Services (Curaçao) NV.

[15]      The *PSAC* refers to an additional instance in which the IBCoCo denied a request by a new client
for financing to invest in Harley.  (¶ 128.)

### ii.    The $56 Million Redemption

Beginning in 2001, Fortis's investment management arm (then-operating through MeesPierson-branded entities) invested tens of millions of dollars of its clients' money in BLMIS feeder funds managed by Tremont. (¶ 130.) After meeting with Madoff, MeesPierson personnel noted several red flags in a May 15, 2003 internal memorandum:

- Madoff's secrecy and lack of transparency;
- BLMIS's exceptionally stable returns;
- BLMIS's returns were inconsistent with the returns one would expect from a money manager employing the SSC Strategy;
- BLMIS left investor relations to feeder funds such as Tremont and hardly granted meetings with end investors; and
- BLMIS's trades and assets could not be verified.

(¶ 132.)

After newly-formed "Fortis Multi-Management" assumed control of MeesPierson's investment book in 2006, including its Tremont investment which had grown to over $70 million, Mark Geene of Fortis Multi-Management emailed Tremont stating that Fortis had been internally discussing its Madoff investments "at length . . . especially the opaque structure/process" surrounding BLMIS and wished to meet with both Tremont and BLMIS personnel. (¶¶ 133-34.)[16] Tremont informed Geene that

---

[16]    Tremont had a pre-existing contractual obligation to prepare diligence reports and arrange onsite diligence visits for Fortis Multi-Management. (¶ 134.)

Madoff refused to meet and Fortis Multi-Management had to settle for a meeting with Tremont only.  (¶ 135.)  The meeting was scheduled for May 19, 2006.

Before the meeting, Geene sent questions he wished to address, including (i) why, "[i]f [Madoff] can so quickly and efficiently put his trades on just ahead of market rally," he doesn't "also close out his positions as quickly once the rally has played out and book the gains?"; and (ii) whether Madoff had "collateral arrangements with his option counterparties?"  (¶¶ 137-38.)  According to the Trustee, Geene's latter inquiry went to the difference between options traded over an exchange and those traded over-the-counter ("OTC").  There is no counterparty risk associated with exchanged-traded options because the exchange guarantees the obligations.  Options traded OTC, on the other hand, are open to counterparty risk, and collateral arrangements can mitigate that risk.  (¶¶ 139-41.)

The parties met as scheduled.  Following the meeting, one Tremont executive described the meeting as "challenging" while another recounted:

> The results of that meeting left them [Fortis Multi-Management] nervous (we didn't talk details) and they went back and explained their apprehensions with Eric.  They have $70m with Madoff, and we derive over $1m in fee from this.  My suggestion was two-fold.  First in the short run, lets [sic] get them comfortable with Madoff, via Bob and Cynthia.  Second, lets [sic] facilitate a meeting in the Madoff offices.

(¶¶ 141-42.)

Geene and Tremont scheduled a follow-up conference call in August 2006.  In advance of the call, Geene emailed another list of questions about Madoff, the SSC Strategy, OTC options trading, and custodial arrangements, including:

- "details with respect to collateral: how often exchanged (daily/weekly), how conservative are the haircuts, does Madoff use minimum [thresholds] and why does Tremont not see the exchange of collateral?";

- whether "investment banks quote for puts as well as calls and on both sides (buy/sell)?  How will he hedge the basis risk: for instance when hitting Goldman for puts with 2B he cannot instanteniously [sic] trade 2B in equities the same second: does he average is [sic], is he using his time slicing methodology (still: basis risk (or alpha??) remains.  Does he have to do calls with the same investment bank (later that day based upon the same grid?)?"; and

- Tremont should "elaborate a bit on the 'hiding of trades' between Feeder trades and Madoff Securities trades as he has to trade for the Feeder before his own trading."

(¶¶ 144-50.)  Geene also asked Tremont for a third-party opinion letter that "the Feeder accounts cannot be touched" in the event of a BLMIS bankruptcy as well as a full due diligence questionnaire ("DDQ") for BLMIS.  (¶¶ 151-52.)  Tremont employees acknowledged internally that they could not produce a BLMIS DDQ but eventually produced one that was not as fulsome as ones prepared for other money managers.  (¶ 153.)

By October 2006, Geene and others at Fortis Multi-Management grew dissatisfied with Tremont's inability to answer their Madoff-related questions.  In an internal Tremont email dated October 9, 2006, a Tremont executive acknowledged that Fortis Multi-Management "may now not be investing in" a separate leverage deal involving a Tremont-managed synthetic BLMIS feeder fund.  (¶ 156.)

In November 2006, Fortis acquired a 70% interest in Cadogan Management ("Cadogan") – a management company that would allow Fortis to conduct hedge fund due diligence in-house.  Cadogan was suspicious of Madoff and described him as a "'black box' investment dilemma . . . a phenomenal long-term track record but . . .

- 24 -

meaningful access to meaningful information [was] unavailable." Prior to the

acquisition, Cadogan had advised its investors that it was "highly skeptical" of Madoff

listing the following:

i.   the competitive difficulties of the space;

ii.  the apparent mismatch between Madoff's supposed AUM [assets under management] and the size of the options market which would need to accommodate this capital;

iii. the immense implied net revenues given the estimated AUM and the reported results;

iv.  the extraordinary complexity and opacity of the Madoff investment vehicles;

v.   the lack of any spin-off of senior personnel over the years; and,

vi.  the smoothness of returns relative to other traders in the area.

(¶¶ 157-59.) Cadogan was so concerned with what it called the "intellectual mismatch"

between Madoff's results and those of his competitors that it had a policy against

investing in BLMIS feeder funds. (¶ 161.)

In February 2007, Fortis Multi-Management redeemed the remaining $56

million it had invested in the Broad Market Fund. In December 2008, the month of

Madoff's arrest, Cadogan wrote to investors that it and Fortis Multi-Management had

decided to redeem because of "[t]he unwillingness of the Madoff organization to provide

sufficient transparency to evaluate the investment and other merits of that portfolio's

investment." (¶ 163.)

### iii.   Shifting Explanations Relating to BLMIS Option Trades

In May 2001, Fortis Bahamas asked BLMIS for "[a] list of counter-parties for the

OTC S&P 100 options." BLMIS responded that its OTC option counterparties were

"major financial institutions" but would not disclose their identities because "[t]his information is considered confidential and proprietary." (¶¶ 171-72.)

In October 2006, Tremont sent Fortis the private placement memoranda (the "PPMs") for Broad Market Fund and Rye XL Fund. The PPMs indicated that BLMIS purchased options OTC. Likewise, the DDQ prepared by Tremont for Fortis Multi-Management on November 30, 2006 stated that BLMIS executed "all option trades" OTC. (¶¶ 173-75.) After completing its diligence for the Swap Transaction with Tremont at the end of November 2006, Laurence Headlam of Fortis Prime Fund Solutions USA requested that a credit application (the "*Credit Application*")[17] be drafted for review by Fortis's Central Credit Committee. Despite the PPMs and DDQ stating that BLMIS options were traded OTC, Headlam's application to the credit committee omitted any details about the market in which BLMIS options were traded. (¶¶ 176-77.)

In January 2007, Headlam drafted a second credit application for a different swap unrelated to Tremont which stated that BLMIS option trades "may be effected in the over-the-counter market or on a registered options exchange." (¶ 178.)

### iv.    The Swap Transaction

As further evidence of the Defendants' subjective belief in the high probability that BLMIS was not trading securities, the *PSAC* highlights certain provisions in the *Swap Confirmation* that protected Fortis Bank in the event BLMIS was revealed to be a fraud or became insolvent. First, Fortis Bank had a security interest in the collateral Rye

---

[17]        A copy of the *Credit Application* is attached as Exhibit E to the *Giblin Declaration*.

XL Fund transferred under the Swap Transaction, and such collateral constituted one-third of the amount Fortis Bank deposited with Broad Market Fund under the Hedge. Therefore, Fortis Bank's exposure to BLMIS through Broad Market Fund was less than that of other investors in the fund.  (¶¶ 199-200, 216.)

Second, Fortis Bank negotiated an indemnification provision in the Swap Transaction under which Rye XL Fund agreed to indemnify and reimburse fees and costs "[i]n the event that [Fortis Bank] or any of its Affiliates becomes involved in any capacity in any action, proceeding or investigation brought by or against any person . . . in connection with" the Swap Transaction.  (¶¶ 201-04.)

Third, Fortis negotiated a "claw-back" provision under which Rye XL Fund would reimburse Fortis Bank to the extent Fortis Bank had to return any portion of amounts redeemed from Broad Market Fund:

> In the event that [Fortis Bank] would be required to return all or any portion of any payment received with respect to any investment in [Broad Market Fund] (whether pursuant to the terms of the investment in the Fund, any insolvency law, regulation, court order or otherwise ("Claw-back Obligation"), then notwithstanding anything herein to the contrary, [Rye XL Fund] will, upon demand by [Fortis Bank], pay to [Fortis Bank] an amount in cash equal to such Claw-back Obligation.

(¶¶ 205-10.)

Fourth, Fortis Bank entered into a side letter agreement in May 2007 with Broad Market Fund which contained a "most favored nations" clause requiring Broad Market Fund to offer Fortis Bank the most favorable redemption rights of liquidity or redemption that the fund gave to any other investor.  The clause was triggered in September 2007 when Tremont gave another leverage provider – ABN AMRO Bank

- 27 -

N.V., presently known as the Royal Bank of Scotland ("RBS") – the right to redeem half

of its investment on five-days' notice (thirty-one days faster than the typical Tremont

investor) in the event

> [BLMIS] becomes the subject of a formal investigation by a U.S. court,
> governmental or regulatory body or agency related to a specific breach of a
> U.S. securities law or regulation and the effect of such a breach, as
> reasonably determined by the Calculation Agent, have a material adverse
> effect on [BLMIS] and its ability to conduct its investment management
> business . . . .

(¶¶ 211-14.)

### v.    Implausibility of the Trustee's Theory

The *PSAC* does not actually plead that the Defendants subjectively believed that

Madoff was not trading securities or segregating assets. Instead, it tries to create the

inference. It relies on the existence of red flags, Madoff's lack of transparency and his

opacity, his exceptionally stable returns that were inconsistent with the SSC Strategy,

BLMIS's multiple roles, its personnel, but red flags do not imply an awareness of

Madoff's fraud because "the more compelling inference as to why Madoff's fraud went

undetected for two decades was his proficiency in covering up his scheme and deceiving

the SEC and other financial professionals." *Elendow Fund, LLC v. Rye Inv. Mgmt.*, 588

F. App'x 27, 29 (2d Cir. 2014) (addressing *scienter* under the federal securities laws)

(summary order) (quoting *Meridian Horizon Fund, L.P. v. KPMG (Cayman),* 487 F.

App'x 636, 641 (2d Cir. 2012)). In addition, the *PSAC* alleges that Fortis could not

confirm Harley's trades (although the *PSAC* omits the portion of the *Second July 2003*

*Email* in which the author says Harley independently priced its trades other than the

over-the-counter trades) or confirm that BLMIS was segregating Harley's assets. It also

suggests that Fortis (and Harley) pulled out of the Bahamas because Fortis did not want

the added responsibility of vouching for BLMIS and withdrew $56 million from the Broad Market Fund because of concerns with Madoff and BLMIS.

The *PSAC's* allegations do not plausibly imply that Fortis Bank subjectively believed in the high probability that BLMIS was not trading securities. Under the Swap Transaction, Fortis Bank invested over $470 million of its *own* funds in the Broad Market Fund (three months after it withdrew $56 million from the same fund) over and above the amount of collateral posted by Rye XL Fund. The Broad Market Fund invested all of its assets with BLMIS so that Fortis Bank's investment was really with BLMIS. The Trustee's argument that Fortis Bank surrendered a worthless equity interest in the Broad Market Fund in exchange for the Partial Hedge Redemption essentially concedes that the Broad Market Fund was worthless if BLMIS was a Ponzi scheme. It is simply not plausible for Fortis Bank to have entered into the Swap Transaction and invested $470 million of its own funds with BLMIS while at the same time subjectively believing in the high probability that BLMIS was not actually trading securities, was stealing its investors' assets and violating the federal securities laws.

The Trustee suggests that Fortis Bank was willing to lose $470 million of its own money in a Ponzi scheme and pay Rye XL Fund three times the increase in the fictional net asset value of the Broad Market Fund which was on BLMIS's non-existent investments and fraudulent bookkeeping in order to earn "millions of dollars" in fees and interest. (¶ 194.) The Court rejected similarly implausible allegations in *BNP* and *Citibank*. In *Citibank*, the Trustee sought to recover subsequent transfers from Citibank, N.A. ("Citibank") – an entity that had agreed to loan up to $400 million to Prime Fund ("Prime Fund Deal"), another BLMIS feeder fund run by Tremont, with the

- 29 -

understanding that the loan proceeds would be used to invest with BLMIS.  *Citibank*,

608 B.R. at 188, 191-92.  The Trustee sought recovery of $343 million from Citibank, the

majority of which constituted repayment of the loan, *id.* at 193, 202-03, asserting that

Citibank received the transfers while subjectively believing there was a high probability

that Madoff was a fraudster.  The Court rejected the theory as "absurd":

> The [proposed amended complaint] implies that the [d]efendants entered
> into the Prime Fund Deal to earn interest and fees.  The interest and fees
> aggregated approximately $43 million over the roughly three year life of
> the loan.  The idea that the Defendants would loan $400 million to a
> borrower to invest the proceeds in a criminal, fraudulent enterprise in
> order to earn between $14 million and $15 million in annual fees and
> interest is absurd . . . .

*Id.* at 202 (record citations omitted).

Likewise, in *BNP*, the Trustee sought recovery of $156 million from BNP Paribas

S.A. ("BNP Bank") – an entity that had provided loans to entities for the purpose of

investing in BLMIS and entered into various leverage deals including swaps linked to

BLMIS feeder funds.  *BNP*, 594 B.R. at 182-84.  BNP Bank moved to dismiss asserting,

*inter alia*, that it took the subsequent transfers in good faith, *i.e.*, that it was not willfully

blind to Madoff's Ponzi scheme.  *Id.* at 186.  The Court agreed ruling that the Trustee's

theory was implausible:

> The Defendants' ability to collect on whatever leverage BNP Bank
> extended to direct investors in BLMIS or investors in BLMIS feeder funds
> ultimately depended on the value of the BLMIS investments.  If BLMIS
> was a Ponzi scheme, the securities listed in the BLMIS customer
> statements were non-existent and BNP Bank's collateral was as worthless
> as its borrowers' investments in BLMIS or a BLMIS feeder fund.
> According to the [proposed amended complaint], BNP Bank nonetheless
> engaged in billions of dollars of risky transactions, including loans and
> extensions of credit that ultimately depended on the value of BLMIS
> accounts, to earn "tens of millions of dollars in fees and interest
> payments," and raise BNP Bank's position as a world leader in the fast-
> moving derivatives market.  This theory is as preposterous as the scheme

- 30 -

alleged by the plaintiff in *Fabrikant*, and it is implausible to suggest that
the Defendants would make loans or engage in the transactions described
in the [proposed amended complaint] if they believed that there was a
high probability that BLMIS was not actually trading securities.

*Id.* at 203-04 (record citations and footnote omitted).

These rulings relied heavily on then-District Judge Sullivan's decision in

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A.* (*In re Fabrikant &*
*Sons, Inc.*), 480 B.R. 480 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 55 (2d Cir. 2013). There,

the defendant banks (the "Banks") made prepetition secured loans to two entities that

operated a jewelry business (the "Debtors"). *Id.* at 483-84. The Debtors then allegedly

transferred the loan proceeds to entities unaffiliated with the Debtors but affiliated with

and owned and controlled by the Debtors' owners, the Fortgangs (the "Affiliates"), *id.* at

484, leaving the Debtors with encumbered assets but without the loan proceeds.

In subsequent litigation commenced against the Banks to avoid the Banks' loans

and liens, the unsecured creditors committee sought to collapse the first leg of the

transaction (the Banks' loans to the Debtors) with the second leg (the Debtors' transfer

of the loan proceeds to the Affiliates) under the collapsing principles discussed in *HBE*

*Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995), contending that the Banks knew or

should have known that the loans were part of a fraudulent scheme by which the

Debtors would transfer the loan proceeds to the Affiliates.[18]  According to the plaintiff,

the Banks were aware of the Debtors' poor financial condition, the transfers to the

Affiliates, the Affiliates' lack of any relationship to the Debtors and the poor loan

---

[18]     Following the confirmation of the chapter 11 plan, the GUC Trustee was substituted for the
committee as the plaintiff.

- 31 -

documentation.  *Id.* at 488-89.  They nevertheless made loans to raise their profiles and earn commissions.  After this Court dismissed the complaint for failure to state a claim, the plaintiff appealed.

Judge Sullivan affirmed, stating that the plaintiff's theory "requires an inference that is highly implausible, bordering on the absurd":

> In essence, [the plaintiff] alleges that the Banks took the massive risk of continuing their lending relationships with the [Debtors and Affiliates] on the speculative hope that there may be sufficient liquidity in the 'Fabrikant Empire' . . . as a whole to enable the Banks to obtain repayment through personal guarantees and other pressure.  Such an assertion would be nonsensical if the Banks were in fact aware that Debtors and the Affiliates had to use the same dollars to repay separate obligations.  *Put simply, drawing all inferences in favor of [the plaintiff], it is difficult to see what benefit the Banks could hope to obtain by lending ever-larger amounts of money to failing companies.  The [complaint's] wholly conclusory allegations that the Banks were clouded in judgment due to lavish commissions is equally implausible, since the loss of principal would have far outweighed the commissions earned on the loans[.]*

*Id.* at 489 (record citations and corresponding quotation marks omitted) (emphasis added).

The idea that Fortis Bank would risk over $400 million through the Hedge and pay Rye XL Fund three times the increase in a net asset value based ultimately on BLMIS's non-existent investment to earn millions in fees and interest while subjectively believing in the high probability that BLMIS was a fraud is equally "preposterous" and "absurd."  The Trustee nevertheless argues that Fortis Bank dealt with its strong suspicions by requiring certain protections in the *Swap Confirmation*.  However, the protections were commonplace and provided little or no protection if BLMIS was really a Ponzi scheme.  First, the Trustee points out that Fortis Bank maintained a security interest in the Collateral Transfer representing one-third of the Hedge investment in

- 32 -

Broad Market Fund. (¶ 216.) In other words, Fortis took solace in the fact that it would only lose around $470 million of its own money because the rest of its investment was covered by the collateral.[19] Hedging an investment, in this case only one-third of that investment, does not imply that Fortis Bank suspected it was investing in an illegal enterprise. *See BNP*, 594 B.R. 204 n. 9 ("[I]t is not uncommon to purchase hedges, such as credit default swaps, to guard against the default of one's obligor.").

Second, the Trustee touts two forms of indemnification that Fortis negotiated with Rye XL Fund. (¶¶ 201-10.) Rye XL Fund agreed to reimburse Fortis Bank "[i]n the event that [Fortis Bank] or any of its Affiliates becomes involved in any capacity in any action, proceeding or investigation brought by or against any person . . . in connection with" the Swap Transaction. (¶ 202.) In addition, if Fortis Bank was compelled to return any payment it received in connection with its investment in the Broad Market Fund (defined as the "Claw-back Obligation"), Rye XL Fund "will, upon demand by [Fortis Bank], pay to [Fortis Bank] an amount of cash equal to such Claw-back Obligation." (¶ 207.)

These indemnification provisions do not imply a subjective belief that BLMIS was in all likelihood a Ponzi scheme. In the first place, an indemnification provision is a common feature in business contracts including those that have nothing to do with Ponzi schemes. *See 4Kids Entm't, Inc. v. Upper Deck Co.*, 797 F. Supp. 2d 236, 246 (S.D.N.Y. 2011) (The Term Sheet "contains all the provisions one regularly finds in

---

[19] In fact, this is precisely what happened. Although not mentioned in the *PSAC*, the Defendants lost approximately $450 million when BLMIS collapsed although they have likely recovered some of those losses through distributions from the Trustee to the Broad Market Fund and from the Broad Market Fund to its investors.

business contracts, including . . . indemnifications."). In the second place, if Fortis Bank believed that BLMIS was not trading securities, it would also believe that the indemnifications were worthless. Rye XL Fund was formed in July 2006 "as a Special Purpose Vehicle for the sole and exclusive purpose of gaining exposure by way of Total Return Swaps to the [Broad Market Fund]." (*Credit Application* at 1.) It had few assets beyond its investment in another swap transaction (*see Credit Application* at 7); Prime Fund and the Broad Market Fund, themselves BLMIS feeder funds, (¶ 243), funded the Collateral Transfer, (¶¶ 251-55); and their ability to continue to fund Rye XL Fund depended on their own BLMIS investments. Fortis Bank's willingness to accept Rye XL Fund's promise of indemnity implies the opposite of what the Trustee is trying to suggest. *See Citibank*, 608 B.R. at 205 ("That the Defendants ultimately closed the Prime Fund Deal and subsequently extended it solely on the strength of the Tremont Indemnity implies the opposite of what the Trustee contends: the Defendants did not believe that BLMIS was a fraudulent operation.").

Third, the Trustee points to the "most favored nations" clause requiring Broad Market Fund to give Fortis Bank the most favorable redemption rights it offered to another investor. (¶¶ 211-14.) However, the *PSAC* does not allege that any investor had superior redemption rights when the most favored nations clause was negotiated in May 2007. (¶ 211.) Rather, it was not until September 2007 when another leverage provider – RBS – received a superior redemption right that Tremont granted Fortis Bank a special redemption right. (¶ 212.)

- 34 -

Accordingly, the Court concludes that the *PSAC* fails to plead that the Defendants had a subjective belief in a high probability that BLMIS was not trading securities and was not segregating its investors' assets when they received the subsequent transfers.

### b.   Second Prong

Even if the Trustee adequately pleaded the first prong, he failed to plead the second prong, *i.e.*, that the Defendants turned a blind eye to BLMIS's highly probable fraud. If Fortis subjectively believed that BLMIS was probably a fraud, it would have been peculiar for Fortis to continually inquire about Madoff's operations and conduct due diligence. *Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund* (*In re Tremont Sec. Law, State Law, and Ins. Litig.*), No. 10 Civ. 9061(TPG), 2013 WL 5179064, at *5 (S.D.N.Y. Sept. 16, 2013), *aff'd*, 588 F. App'x 27 (2d Cir. 2014). Yet, the *PSAC* sets forth numerous instances in which Fortis performed due diligence and had ongoing deliberations concerning BLMIS.[20] Fortis communicated directly and met with Madoff and other BLMIS employees in New York from "at least 2001 through 2008" in connection with its role as Harley's administrator. (¶ 95.) When the Novo/Buckley July 2003 email chain was forwarded to Eldridge, Eldridge followed-up with DiPascali to inquire about asset segregation and to request a SAS 70 Report. (¶¶ 107-08.) Fortis's IBCoCo met in 2004 to discuss performing services for, and providing financing to, Harley Investor B. (¶ 126.) Geene met with Tremont in May 2006 sending questions

---

[20] The *PSAC* also omits references to Fortis's due diligence included in the original complaint at a time before the willful blindness standard was imposed by the District Court. For example, Fortis Bank conducted due diligence at BLMIS in June 2006 and came away with "a favorable impression of the firm's execution capabilities and some insight into the source of their alpha generating capability in the context of the market timing strategy." Furthermore, Madoff's level of secrecy surrounding the scale of activity and number of clients was "understandable," and Fortis concluded that there was no immediate risk to collateral values. (Original Complaint, dated Dec. 8, 2010, at ¶ 86 (ECF Doc. # 1-1).) .

about BLMIS in advance.  (¶¶ 133-42.)  Geene had a conference call with Tremont in August 2006 again sending questions beforehand and requesting a third-party opinion letter regarding asset separation as well as a DDQ for BLMIS.  (¶¶ 144-53.)

Most importantly, Fortis performed extensive due diligence in the late summer and fall of 2006 in connection with the Swap Transaction.  (¶¶ 166-68.)  Fortis's diligence efforts culminated in the submission of the *Credit Application* in November 2006 to Fortis's Central Credit Committee to approve the Swap Transaction.  (¶ 176.)  In addition to providing detailed information about the Swap Transaction, the *Credit Application* included extensive information about Tremont, BLMIS and the Tremont funds that Fortis had learned.  Among other things, it noted that Tremont was the general partner and provided investment management services to both Broad Market Fund (referred to as the Master Fund) and Rye XL Fund (referred to as the Feeder Fund), and the Broad Market Fund had an excellent track record.  In addition, Tremont was a registered investment advisor with the SEC, Tremont and the Tremont Group are regarded as "exemplary and top tier," Tremont carried out extensive due diligence on Madoff "in line with the Tremont Investment Process" and "has sufficient risk management capabilities to control the investment into the Madoff account," and reconciled the BLMIS daily trade tickets that BLMIS provided against the BLMIS monthly statements.  (*Credit Application* at 3-5.)

The *Credit Application* also discussed BLMIS and Madoff.  BLMIS utilized the SSC Strategy purchasing forty to fifty large cap stocks hedged with equity index options.  "Madoff has been successfully executing this strategy since the 1960's" and had $20 billion in assets under management.  BLMIS's performance "is regarded as sustainable.

Madoff has a 40 year track record in the chosen strategy, executed 10% to 15% of the trades on the NYSE and NASDAQ and has consistently performed.  The strategy is the dominant strategy of Madoff and forms the cornerstone of their reputation."  Madoff was selective and only accepted investment "when they have capacity," but "Tremont have [sic] an excellent relationship with Madoff which should continue to supply Tremont with the required capacity in the future."  Madoff was a leading market maker in all S&P 500 stocks and over 200 NASDAQ issues, his clients included JP Morgan Chase Investments, Charles Schwab, Harley International Cayman Limited and Tremont and finally, Chinese walls existed between the brokerage and custody sides of the business.[21]  The *Credit Application* concluded that Tremont had "sufficient risk management capabilities to control the investment into the Madoff account," and "fully recommended" the Swap Transaction.  (*Credit Application* at 3-5, 8.)

Far from turning a blind eye to Madoff's fraud, Fortis performed due diligence when working on transactions involving Madoff and BLMIS as borne out in the *Credit Application* and ultimately, put its money where its mouth was by investing $470 million of its own funds through the Hedge.  There is always a risk that a broker will be a fraud or become insolvent, and that included Madoff.  But investing in the face of a known risk or deliberate indifference to that risk is not willful blindness.  *Global-Tech*, 563 U.S. at 770.  Accordingly, the Trustee has failed to plead that the Defendants turned a blind eye to Madoff's fraud.[22]

---

[21]     The application also noted that Fortis had extended credit facilities to two funds invested with BLMIS for amounts up to $600 million.  (*Credit Application* at 8.)

[22]     The *PSAC* also discusses Fortis's attempt to have AIG issue credit default swaps ("CDS") to shift "some" of Fortis's $1 billion BLMIS exposure.  (¶¶ 181-84.)  However, the *PSAC* does not state the amount

- 37 -

## CONCLUSION

For the reasons set forth herein, the Trustee's Motion is denied. The Court has considered the parties' other arguments and concludes that they lack merit or have been rendered moot by the disposition of the Motion. Settle order on notice.

Dated:  New York, New York
         January 23, 2020

                               /s/ *Stuart M. Bernstein*
                               STUART M. BERNSTEIN
                            United States Bankruptcy Judge

---

of the proposed CDSs and whether AIG went through with the CDSs. Moreover, it is not uncommon to purchase hedges, such as credit default swaps, to guard against the default of an obligor. *BNP*, 594 B.R. at 204 n. 19.