# EXHIBIT 1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**Cause No: FSD 30 of 2013 - AJJ**

BETWEEN

**PRIMEO FUND (IN OFFICIAL LIQUIDATION)**

**Plaintiff**

AND

**(1)  BANK OF BERMUDA (CAYMAN) LIMITED**
**(2)  HSBC SECURITIES SERVICES (LUXEMBOURG) SA**

**Defendants**

_____

**WITNESS STATEMENT OF BRIAN PETTITT**
_____

I, Brian Pettitt, of Gore Farm, Gore Road, Stambridge, Essex SS4 2DA, England WILL STATE AS FOLLOWS:

**Introduction**

1.      I am the former Head of the Network Management function for HSBC Securities Services ("**HSS**"). HSS manages HSBC's global custody and fund administration business. I was employed by HSBC Bank Plc ("**HSBC**") and based in London. I retired on 30 June 2009. Pursuant to the terms of a retention letter dated 26 September 2012, HSBC retained me to provide assistance with Madoff-related litigation, including these proceedings, on account of my involvement in relevant matters during my time as an employee.[1] By a further letter dated 5 January 2016 and signed by me on 8 February 2016 it was confirmed, for the

_____

[1] BP0001 {N/2895}

avoidance of any doubt, that any witness testimony I give does not form any part of my retainer.[2]

2.    I make this statement in connection with the proceedings commenced by Primeo Fund (in Official Liquidation) ("**Primeo**") in the Grand Court of the Cayman Islands against the Bank of Bermuda (Cayman) Limited ("**BBCL**") and HSBC Securities Services (Luxembourg) SA ("**HSSL**"). I am authorised to make this statement on behalf of both BBCL and HSSL.

3.    For the purpose of giving this witness statement, I have read Primeo's Re-Re-Amended Statement of Claim dated 17 July 2015 (the "**Re-Re-Amended Claim**"), the Defendants' Amended Defence dated 18 November 2015 (the "**Amended Defence**") and Primeo's Amended Reply dated 11 December 2015 (the "**Amended Reply**"). I am also aware of the Order made by Mr Justice Jones QC on 16 December 2015 concerning the strike out of certain paragraphs of the Re-Re-Amended Claim. I am therefore familiar with the claims currently made by Primeo against the Defendants in these proceedings.  I have also read the witness statements of Christine Coe and Nigel Fielding in these proceedings. Save where I say otherwise, I agree with the contents of those witness statements.

4.    I make this statement from information acquired by me in the course of my involvement with matters relevant to issues in dispute in these proceedings. This outline of evidence is based upon my best recollection of events and my review of documents that have been made available for me to review, and is true to the best of my knowledge and belief. I do not in this outline attempt to address every relevant event or document.

**Introduction**

5.    I understand Primeo alleges in these proceedings that BBCL and HSSL breached their obligations as the administrator and custodian respectively to Primeo.

6.    As against BBCL, my understanding is that Primeo asserts that BBCL did not exercise reasonable care and skill in determining the Net Asset Value, in keeping the accounts and financial books of Primeo, that it did not take reasonable steps to ensure that the

---

[2] BP0002 {N/2960}

information provided by its investment manager, Bernard L Madoff Investment Securities LLC ("**BLMIS**"), as to the existence and value of its assets was accurate, and did not exercise reasonable care and skill in producing administration reports.

7.     As against HSSL, I understand Primeo asserts that HSSL did not exercise reasonable care and skill in keeping safe its securities, that it did not deal with its securities in accordance with the relevant custodian agreement, that there were no objectively reasonable grounds on which HSSL could be satisfied as to the ongoing suitability of BLMIS to provide custodial services and that HSSL failed to require BLMIS to implement the most effective safeguards under New York law to protect Primeo's assets, and did not exercise reasonable care and skill in producing custodian reports.

8.     In the case of both Defendants, I understand that the central allegations now made are that the Defendants failed to obtain independent confirmation of the existence of the assets of Primeo that were under BLMIS' management (for example by obtaining independent confirmation of securities held at the central depositary, the Depository Trust Company ("**DTC**")), that they failed to tell Primeo that they could not obtain such independent confirmation and that they did not warn Primeo about the risks associated with BLMIS' business model (in particular, the fact that BLMIS performed multiple roles and that independent verification from third parties was not possible), which Primeo alleges should have caused the Defendants to inform Primeo they were unable to fulfil their contractual duties.  Finally, I understand Primeo alleges that, if the Defendants had told Primeo that they could not carry out their duties under the relevant agreements because of their concerns, Primeo would have withdrawn all of its assets under management with BLMIS and would have been invested elsewhere.

9.     In my view, Primeo's case against the Defendants is entirely divorced from the facts and seeks retrospectively, without any basis, to place the blame for Primeo's losses arising out of Mr Madoff's Ponzi scheme with the Defendants. I address the relevant factual matters in greater detail in this statement, however my simple response to Primeo's allegations against the Defendants is as follows:

(a)  Primeo opened a managed account with BLMIS to provide a suite of services as its investment manager. These services included investment management, brokerage and

**B / 5 / 3**

custody. It was well known to and accepted by Primeo and its advisers that BLMIS insisted upon providing all of these services to its investment management clients.

(b) As one would expect, assets held in an account with a third party, whether a prime broker, investment manager or otherwise, pursuant to separate arrangements between Primeo and that third party fell outside of the responsibility of the custodian, HSSL. This is a standard provision in custodian agreements and I note is reflected in the Custodian Agreement between Primeo and HSSL dated 19 December 1996 at clauses 6(B) and 6(C). Accordingly, HSSL was not in my view responsible for the safekeeping of securities or cash deposited with or remaining in Primeo's managed account with BLMIS.

(c) HSSL, and later HSBC, extended significant credit to Primeo that was secured in part against Primeo's assets held in the custody of BLMIS for investment management. Accordingly, the bank needed to ensure that it could enforce its security against such assets in the event of a credit default by Primeo. HSSL therefore purported to agree with BLMIS that, upon instructions by HSSL, BLMIS would effect the free transfer of Primeo's assets to HSSL. This purported arrangement was recorded in clause 6 of a Sub-Custody Agreement between HSSL and BLMIS dated 7 August 2002 and a revised Sub-Custody Agreement dated 8 September 2004.

(d) As the assets of Primeo were outside the responsibility of HSSL, HSSL did not have any obligation to conduct due diligence in respect of BLMIS concerning the custody of such assets. However, HSSL sought to ensure that BLMIS was a fit and proper party to hold custody of Primeo's assets so that HSSL could be satisfied that it could enforce its security against Primeo's assets in the custody of BLMIS should the need arise. Accordingly, a number of due diligence exercises were undertaken by and on behalf of HSSL in respect of BLMIS. These included two due diligence visits to BLMIS led by a senior HSSL executive, Mr Nigel Fielding, three due diligence visits led by me (in my capacity as the Head of Network Management for HSS) and two separate fraud and related risk reviews undertaken by KPMG that were commissioned by HSS. The appointment of third party experts independently to conduct due diligence in respect of a sub-custodian, let alone a client-appointed investment manager and custodian, was to my knowledge unprecedented at the time. Among many other things, KPMG tracked trades purported to have been executed by BLMIS, many of which had been randomly selected, from end to end. KPMG did not identify any evidence of fraud or financial

impropriety by BLMIS and were satisfied as to the integrity of BLMIS' operations, including the validity and existence of trades and assets.

(e) On the strength of the comprehensive due diligence that had been undertaken, particularly that by KPMG, HSS continued to extend very significant credit lines to numerous client funds, including Primeo, that had appointed BLMIS as their investment manager. Such credit was secured in part against assets in the custody of BLMIS. HSS simply would not have done this if it was not comfortable with the integrity of BLMIS' operations and activities in the market. Moreover, at the time of Mr Madoff's arrest in December 2008, HSBC held a proprietary investment that was valued at more than US$1 billion in funds that had appointed BLMIS as their investment manager.

(f) The allegation that the Defendants not only breached their obligations to Primeo but that they did so deliberately and then concealed their breach from Primeo is, on the basis of the facts known to me, entirely without merit.

**Background and Roles**

10.    I spent my entire professional career working in the financial services industry. Beginning in 1974, I worked for Standard Chartered Bank in IT operations, before moving to Midland Bank in September 1975 where I was based in their international banking division. My early roles with Midland Bank were within payments operations, management accounting and general finance.

11.    In 1989, I moved into the area of securities services, initially selling Midland Bank's UK sub-custody services to foreign global custodians. In the securities services business, after the investment managers have made their investment decisions and the brokers have executed their trades, the custodian normally handles any subsequent actions involving the securities such as the settlement of the securities transaction, the safekeeping of assets and the collection of income associated with the securities. In a global investment environment, custody services are provided on a multi-jurisdictional basis. Typically, a global custodian is appointed which in turn appoints sub-custodians to provide custody services on its behalf in jurisdictions where it does not have a local presence. These "network" sub-custodians have the necessary infrastructure and contacts, including links into the local depository.

12. For five years between 1989 and 1994, I sold Midland Bank's UK sub-custody services to network managers from international global custodians requiring a UK agent. In this role I regularly received network managers from custodial banks that were undertaking due diligence in respect of Midland Bank in its capacity as a network sub-custodian. Midland Bank was acquired by HSBC in 1992. In 1994, I switched roles from selling to procuring and monitoring sub-custody services when I became Head of Network Management for HSS. "Network Management" describes the process of selecting, engaging and, thereafter, monitoring sub-custodians on behalf of the global custodian. The role also involves market analysis to provide information to both clients and colleagues in operational areas. I was the Head of Network Management for HSS for 15 years until my retirement in 2009, by which time there were seven people in the HSS Network Management team based in London. By 2009, HSS had sub-custodian agents in approximately 90 countries worldwide. Third party agents or sub-custodians were providing these services in a little over half of these countries, with HSS entities providing sub-custody services directly in the remainder. Throughout my career, I gained significant experience reviewing the agents used by HSS as its sub-custodian. Most of these were in the traditional, global sub-custody market but, particularly later in my career, I also oversaw reviews of sub-custodians of the assets of alternative funds. Although I was based in London, I performed sub-custodian reviews in North America, Europe, Asia, Australasia, Sub-Saharan Africa and the Middle East.

13. In early 2004, HSBC acquired the Bank of Bermuda ("**BOB**") group, which provided fund administration, custody, trust, asset management and banking services to clients in numerous jurisdictions. Whereas HSS' clients at the time were large traditional funds, BOB's fund services clients were primarily alternative funds. I was involved in integrating the BOB sub-custody network into the HSS structure. My colleague Christine Coe, who was at this time HSS' Head of Credit based in London, was closely involved in reviewing and integrating the credit facilities being provided to BOB's alternative funds clients by BOB's legacy business.

14. During this review, Ms Coe had identified that BLMIS had been appointed by a number of BOB client funds to manage their investments and that BLMIS had custody of the clients' assets for this purpose notwithstanding that BOB (now HSS) entities had been appointed as custodian. Ms Coe explained to me that BLMIS provided a package of services as part of its investment management service offering, which included investment management, brokerage and custody. I later came to learn that there were a number of sub-custody

agreements in place between BOB entities and BLMIS, however BLMIS was not a network sub-custodian. The sub-custody arrangements between BOB in Ireland and BLMIS had evidently been put in place to comply with UCITS requirements. A UCITS, or undertaking for collective investment in transferable securities, is an investment fund regulated in accordance with specific European Union requirements. I came to learn in March 2005 that there was also a sub-custody agreement between HSSL and BLMIS, which purported to grant HSSL the right to instruct BLMIS concerning the transfer of clients' assets in BLMIS' custody. I refer to the sub-custody agreement in this statement without prejudice to the Defendants' contentions concerning its validity and effect. Ms Coe explained to me that client assets in BLMIS' custody were being used to secure or support credit facilities and that, in the event of a credit default by a client, the bank may need to enforce its security rights against the client's assets, the first step of which would involve instructing BLMIS to make a free transfer of the assets to the bank. My first reaction was that BLMIS was not an HSS network sub-custodian and that it would therefore be necessary to bring the assets within the HSS network by transferring them to one of HSS' network sub-custodian banks in the United States.

15.    Neither Ms Coe nor I were familiar with BLMIS or its chairman Bernard Madoff ("**Mr Madoff**"). Ms Coe was eager to understand better the services Mr Madoff was providing to HSS clients and the structure that was in place. She therefore asked me to conduct a review of BLMIS in my capacity as the Head of Network Management. Ms Coe was principally focussed upon how the bank would enforce its security in the event of a credit default by a client whose borrowing was secured against assets in the custody of BLMIS.

**The 2005 BLMIS Due Diligence Review**

16.    The arrangements between BLMIS and various ex-BOB clients were somewhat different to what I was accustomed. In traditional global custody, sub-custodians were almost always network sub-custodial banks and it was unusual for a client to direct the appointment of a particular sub-custodian. I had encountered this previously at the request of clients including National Bank of Egypt and Société Générale in circumstances where those banks wished to use a sub-custodian from within their group of companies. In the alternative funds market, it was more common for clients to either direct the appointment of a particular sub-custodian or to make separate arrangements for their assets to be held by a third party, typically a broker. In the latter case, the third party was not a sub-custodian at all, since the assets were

being held pursuant to arrangements between the client and the third party, however such third parties were often referred to as "sub-custodians" as shorthand to indicate that they were the party holding the client's assets. This was the case in respect of BLMIS, which retained custody of clients' assets as part of the package of investment management services that it provided. For obvious reasons, it was routine for custodians to exclude responsibility for the safekeeping of assets held by prime brokers and other third parties at a client's direction. This is ordinarily confirmed in the custody agreement and I note that clause 6(B) of the Custodian Agreement between Primeo and HSSL dated 19 December 1996 expressly provides such exclusion.

17.    HSS' approach to reviewing a sub-custodian involved a rigorous due diligence process. First, we gathered background information by liaising with contacts within our own businesses. Secondly, we gathered information by using a questionnaire sent directly to the sub-custodian and finally we conducted a site visit to the sub-custodian. The due diligence questionnaire was typically provided to the sub-custodian in advance of the site visit to ensure the site visit was conducted as efficiently as possible. It was a thorough process by industry standards, conducted professionally and with care. Indeed, HSS had a reputation as conducting one of the most rigorous sub-custodian due diligence processes in the market. I recall an instance of a colleague at another major custodial bank, which was acting as a sub-custodian for HSBC in one of the Latin American markets but was also a competitor of HSS for global custody services, saying that HSS' was the most robust due diligence process he had seen. This was consistent with other feedback I received and my understanding of the perception of HSS within the market. HSS was regarded as conservative and risk-averse by industry standards.

18.    Notwithstanding the non-standard BLMIS service model, the review that I proposed to conduct in respect of BLMIS would apply the usual HSS sub-custody due diligence standards, although the approach would be tailored to reflect the fact that BLMIS was not a bank. So for example, a number of the questions in the due diligence questionnaire that related only to banks would not be applicable.

19.   I was informed by Ms Coe that Nigel Fielding, a senior HSSL executive based in Luxembourg, had led some previous reviews of BLMIS and so I began by liaising with him. In February 2005, I made preparations to visit Mr Fielding and some of his colleagues at HSSL to be briefed concerning BLMIS.[3] Prior to this visit, Mr Fielding helpfully provided me by email on 20 February 2005[4] with some background information on BLMIS. It was clear from the e-mail that clients were keen to maintain their relationship with BLMIS and that Mr Madoff was understood to be sensitive to the possibility of third parties gaining knowledge of his investment strategy.

20.   On 23 February 2005, HSS in Ireland also provided me with some background information on Mr Madoff's relationship with clients of HSS in Ireland, together with an overview of some of the operational issues that they had experienced in dealing with BLMIS.

21.   On 21 March 2005, I met with Mr Fielding and a number of his colleagues at HSSL in Luxembourg to be given a briefing in advance of my planned visit to BLMIS' New York offices. HSSL had prepared an agenda for the briefing, which took up most of the day.[5] I was starting from a position where I knew very little about Mr Madoff or BLMIS.  My objective was to conduct as much background research as possible so that I could understand the structure and the risks it entailed. My call report of the meeting records some of what I learned and the types of issues that arose.[6]

22.   Mr Fielding and his colleagues explained to me that HSSL had a number of fund clients, including Primeo, which used BLMIS' services. I was informed that BLMIS was fulfilling a number of roles for clients as investment manager, broker/ dealer and custodian. It was explained to me that BLMIS was primarily a broker/ dealer, but that Mr Madoff also provided an investment management service to select clients. BLMIS' investment strategy reportedly involved the exercise of timing discretion to buy S&P 100 securities, hedged using put and call options (i.e. a "collar" strategy). BLMIS also reportedly purchased US treasury bills and held funds in a Fidelity account. My colleagues at HSSL told me that BLMIS was closed for new investment management business. They also said that Mr Madoff was highly protective of his trading strategy, and that it was partly for this reason that Mr Madoff insisted upon

---

[3] HSBC_0003530 {N/1150}
[4] HSBC_0064835 {N/1154.1}
[5] HSBC_0003652 {N/1201.1}
[6] HSBC_0065128 {N/1202}

B / 5 / 9

retaining custody of his clients' assets. I was told that the clients were very familiar with Mr Madoff's operating model and had appointed BLMIS directly.

23.    I noted that Mr Madoff was known for his successful track record, exclusivity and liquidity. I was informed that clients were very happy to be able to access his services and were resistant to any change in the arrangements or other action which might upset Mr Madoff. I specifically noted in my report the advice that Mr Madoff consistently outperforms the market and clients would not leave this arrangement voluntarily. I also recorded Mr Fielding's advice that if HSS wished to change the arrangements (for example by transferring custody to a network sub-custodian), HSS would likely lose the business as clients would prefer to find another custodian and administrator than risk upsetting Mr Madoff and losing access to his investment management services. I was aware that Mr Fielding was at this time a director of client funds, including Primeo, which had appointed Mr Madoff as their investment manager, so I took this seriously however it did not alter the approach that I took when undertaking my review of BLMIS.

24.    I was provided at the meeting with a copy of the sub-custody agreement between HSSL and BLMIS, as well as various documents concerning the arrangements that had been put in place directly between Primeo and BLMIS, which I noted in my report included standard documentation for custody. I understood that this was the agreement to which Ms Coe had referred, which purported to provide HSSL with the right to require BLMIS to effect the free transfer of clients' assets to HSSL upon a request being made.

25.    We also discussed at the meeting the exposure that HSS had to BLMIS. As I recorded in my call report, Mr Fielding advised that *"most of the exposure was FX related"* {N/1202/3}. This was a reference to the credit being extended to clients for foreign exchange purposes that was secured against assets in the custody of BLMIS. I also noted that Ms Coe had advised that, as credit was secured against these assets, one of the main purposes of my forthcoming due diligence would be to ensure that HSSL had first call on these assets, and that they had not been pledged or otherwise encumbered. Mr Fielding confirmed that HSSL had a right under the sub-custody agreement with BLMIS to require the free delivery of clients assets held by BLMIS in the event of a credit default.

26.    I understood Mr Fielding to believe that BLMIS had only one account with the DTC, the central securities depository in the US. I wanted to clarify this because one of my tasks was

781756-1

to ensure that there was proper segregation between client assets held by BLMIS and any BLMIS proprietary assets. I also wanted to confirm that there was appropriate segregation of different clients' assets within BLMIS' books and records. In accordance with market practice, I expected to see segregation by client in BLMIS's books and records, but not separate client accounts at the DTC. It had always been standard practice for a DTC participant to have an omnibus client account with client segregation in their books and records. Indeed, in the case of some of HSBC's US agents, such as Citibank and Brown Brothers Harriman, the sub-custodians did not even segregate assets by client in their books and records, but rather by tax description, with segregation by client occurring in the books and records of the global custodian (*i.e.* HSS) only. Therefore, segregation within the books and records of BLMIS was actually better than the level of segregation provided by other US sub-custodians. I later came to learn that BLMIS had two "accounts" with the DTC – one for its proprietary assets, and one omnibus account for client assets.

27.    A further relevant feature of the DTC (and other depositories) is that non-participants are not entitled to access DTC account records. HSS as custodian had no entitlement to access the accounts of a sub-custodian or any other third party DTC participant. HSS had a long history of dealing with US agents who were DTC participants and never in my experience of dealing with such agents did I have access to their DTC accounts, nor would I expect to. Indeed, accessing information concerning a DTC participant's omnibus DTC account would breach confidentiality obligations as such accounts, by definition, contain securities of multiple clients. I note that Primeo alleges in these proceedings that HSSL should have established a DTC sub-account for the holding of Primeo's assets. That would have been alien to the policy and practice of the DTC at the time. In any event, if Primeo wanted to establish a BLMIS sub-account at the DTC for its assets, then Primeo should have sought to do so as its purported assets were being held outside of HSSL's custody pursuant to the arrangements that had been put in place between Primeo and BLMIS.

28.    I went through a standard version of HSBC's due diligence questionnaire with Mr Fielding and tailored it for my visit to BLMIS in New York, which had been arranged for 1 April 2005. Many of the standard questions, relevant to a global sub-custodian appointment (typically a sub-custodian bank), were irrelevant and therefore omitted. The questionnaire had also been amended to remove some unnecessary questions about the general US market and Mr Madoff's market experience to focus attention on the information we needed to collect. Mr Fielding also noted that both Bank Austria and Genevalor Benbassat, who had created the

HSSL client funds that placed their assets with BLMIS for management, conducted their own due diligence in respect of BLMIS.

29.   On 22 March 2005, Mr Fielding sent a fax to Mr Madoff to inform him that I would be conducting the due diligence visit on 1 April 2005 together with my colleague Ms Tanya Nystrom, who at that time was Head of Fund Administration for Alternative Fund Services ("**AFS**") at HSS in New York, and that we had both been briefed.[7]

30.   On 23 March 2005, Mr Fielding emailed me and Ms Nystrom with some further comments in advance of our meeting with Mr Madoff.[8] Once again, clients were reported as being very nervous about HSS taking any steps which might result in them losing access to Mr Madoff's services. Whereas there is always a natural tension between the commercial concerns of the business and the desire to manage risk, as a network manager, my focus was on risk and from a risk perspective I had a clear mandate to conduct a thorough review. I knew from previous experience that parting company with custodian agents could involve significant business ramifications. Due diligence reviews conducted by Network Management had led to the exiting of numerous relationships in the past. If we had been unsatisfied with what we found, and notwithstanding any commercial concerns, my experience was always that HSBC was prepared to exit the relationship and manage the consequences. Usually this arose where there were concerns about an agent's operational capabilities.

31.   On 24 March 2005, I sent an email to Ms Coe to provide her with the contractual documents concerning the arrangements that had been put in place between BLMIS and Primeo.[9] These documents had been provided to me at the meeting I attended with Mr Fielding and his colleagues at HSSL on 21 March 2005 and included a Customer Agreement, a Trading Authorization Limited to Purchases and Sales of Securities, and an Option Agreement.

32.   Also on 24 March 2005, I faxed Mr Madoff a due diligence questionnaire in advance of our meeting.[10] It was standard practice to provide due diligence questionnaires in advance and I let Mr Madoff know in the cover fax that we could either complete the questionnaire at our meeting or he could complete it in advance such that it would be ready for discussion.

---

[7] HSBC_0003673 {N/1204}
[8] HSBC_0065049 {N/1206}; HSBC_0013924 {N/1209}
[9] BP0003 {N/1218}
[10] HSBC_0032231 {N/1214}

**The 1 April 2005 Due Diligence Visit to BLMIS' Offices**

33.    Ms Nystrom and I met with Mr Madoff at BLMIS' New York offices on 1 April 2005 as planned. I remember expecting that it might be difficult to extract the information I needed from Mr Madoff based on what I had been told about him being secretive and protective of his trading strategy. I was therefore pleasantly surprised to find that Mr Madoff was helpful, well prepared, and willing to engage and answer my questions.

34.    In the course of this meeting, the completed questionnaire was handed back to me by Mr Madoff.[11] Response 8 to the questionnaire referred to an *"Auditors (sic) report on internal controls"* dated 31 October 2004 [N/1217/5], and I recall being provided with a short report from Friehling & Horowitz, BLMIS' auditors, around this time.[12] Although I had no reason to question the standing of Friehling & Horowitz I was conscious at the time that the report lacked detail and had not been prepared by a major accountancy firm. Later, this was one of the factors which prompted the decision to send KPMG into BLMIS to conduct an independent review, as described below.  The questionnaire responses also confirmed, as expected, that BLMIS' securities and custody operations were regulated by the Securities and Exchange Commission ("**SEC**") and the National Association of Securities Dealers.

35.    Mr Madoff provided me with background information concerning BLMIS and broadly described his trading strategy, which was consistent with the strategy described by my colleagues at HSSL. The apparent strategy was pre-determined, with Mr Madoff exercising discretion in relation to the timing of its execution. It seemed to have been successful over a long period of time. Mr Madoff appeared to be a person of substance who had built up a company with a formidable reputation. In advance of the meeting, I had spoken to some contacts in the US custody industry, with a view to learning more about BLMIS and Mr Madoff's reputation. I remember speaking to a colleague at another major custodial bank, who was a senior member of that bank's custody team and its representative at the Association of Global Custodians. The Association, which represents the global custody industry, is a group of leading financial institutions providing global custody services. My colleague confirmed to me that BLMIS' principal business was as a broker / dealer and that

---

[11] HSBC_0084025 {N/1217}
[12] HSBC_0084026 {N/1055}

**B / 5 / 13**

both BLMIS and Mr Madoff were well known and highly regarded. I came to learn that Mr Madoff had been actively involved in developing the NASDAQ stock exchange and had served as chairman of its board of directors, as well as being on various industry committees. I also learned that BLMIS was one of the largest market makers in the United States. As a DTC participant, BLMIS would also have to meet the controls that the DTC imposes on their participants. At the time, I took comfort from the strength of Mr Madoff's reputation and standing, and the regulated market in which BLMIS operated.

36.     I said to Mr Madoff that I wanted to move custody of HSS client assets from BLMIS to Brown Brothers Harriman, which was one of HSS' network sub-custodians in the United States. Mr Madoff responded that he would not agree to that as the clients had engaged him to provide a package of services that included custody, which he explained was necessary for him to operate efficiently and without revealing his investment strategy to the market. Investment managers are well known for being protective of their strategies and Mr Madoff was no exception. I recall that he gave an example of Merrill Lynch having made repeated attempts to copy his trading strategy to support the basis for his concerns. Mr Madoff said that the clients were fully aware of and were comfortable with BLMIS retaining custody of their assets for the purpose of operating the managed account. While this was not the structure I would have preferred, the arrangements had been put in place directly between BLMIS and its clients, and the safekeeping of the assets was therefore outside of HSS's responsibility. Mr Madoff's insistence that BLMIS retain custody of his client's assets did however represent a risk to HSS from a credit perspective, as lending was secured against the assets in BLMIS' custody. This was the principal reason why HSS later decided to engage KPMG to conduct their due diligence reviews in respect of BLMIS.

37.     I discussed with Mr Madoff HSS' concern regarding the enforcement of its security in the event of a client credit default secured against assets in the custody of BLMIS. I referred in this regard to HSS' contractual right (for example pursuant to the sub-custody agreement between HSSL and BLMIS) to require BLMIS to effect the free transfer of the client's assets to the bank. I wanted to know how Mr Madoff thought that this would operate in practice. Mr Madoff said that in such an event, he would prefer not to transfer the clients' stock to HSS as this would leave BLMIS with uncovered options but rather to transfer cash to HSS. Mr Madoff also confirmed in response to a question that I put to him that he did not use client assets for margin trading. He said further that he did not want the client assets to be

encumbered in any way so that he would be in a position to deliver on any exercised options if the need arose.

38.    Mr Madoff advised us that BLMIS maintained a complete segregation of client and proprietary assets at the DTC. He advised us in the questionnaire of BLMIS' client account number at the DTC (0646). However, as BLMIS operated an omnibus client account, it would not have been possible for us to access information concerning that account. Nor would HSS be permitted access to BLMIS' back office to review activity on individual client accounts. This was not unusual. Often when conducting due diligence of agents, particularly large financial institutions and competitors, access to their information was tightly controlled and access to their back office was refused. BLMIS was a well-established, SEC-regulated, reputable institution that was operating in a highly regulated environment and I had no reason to doubt the veracity of Mr Madoff's answers. Our inability to access information in BLMIS's back office was also among the reasons that HSS decided to engage KPMG to conduct a risk review in respect of BLMIS on our behalf.

39.    The need for secrecy about trading activity was also the reason given by Mr Madoff for his relying on basic communications systems such as fax, which I believed were the source of some of the operational difficulties that our custody and administration businesses had experienced in their dealings with BLMIS. For example, the information used by HSSL to determine the net asset value ("**NAV**") of its fund clients was typically sent to them by fax or post.  At that time, it would have been unusual for major global sub-custodians not to be SWIFT-enabled. However, SWIFT was not the industry standard in the alternative funds sector, where communication by other means remained quite common. SWIFT was expensive, and while banks used it routinely it was uncommon for a broker or investment manager to be SWIFT-enabled. Furthermore, I recall Mr Madoff telling me that BLMIS received commission on its brokerage service only, and did not charge custody fees. It was therefore not surprising that Mr Madoff did not consider it to be necessary or cost-effective to become SWIFT-enabled.

40.    Mr Madoff noted that BLMIS withheld tax based on the domicile of clients supplied at the time accounts were set up and that BLMIS had all the necessary paperwork in place to support this approach and make all necessary returns to the IRS. He also confirmed that

corporate actions were dealt with by a standing instruction and that he voted in the best interest of the funds.[13] I understood that corporate actions were not notified by BLMIS to HSSL and this was standard where assets were in the custody of a broker. I later understood that dividend payments, for example, were in fact reflected in the fictitious statements received from BLMIS, although they were not pre-notified to HSS by BLMIS.

41.    Overall, I was satisfied with the results of the BLMIS due diligence review.  The BLMIS structure was non-standard, however clients had agreed to the terms upon which BLMIS would manage their investment and had put those arrangements in place directly. As Mr Madoff was unwilling to transfer client assets to an HSS network sub-custodian bank, my primary concern was to ensure that there was a clear means by which HSS could enforce its security against assets held by BLMIS should a client default on their credit facility.

**Follow-up to the 1 April 2005 Visit**

42.    On 4 April 2005, I sent an email summarising the meeting with Mr Madoff to Mr Fielding, with a copy to Ms Nystrom, Ms Coe and Chris Wilcockson (the Head of HSSL).[14] I also let them know that I would be preparing a written report.

43.    On 26 April 2005, I received an email from Mr Jean-Claude Stoffel, a Senior Business Implementation Manager at HSSL, conveying a query which had reportedly been raised by Ernst & Young concerning the segregation of assets at BLMIS.[15] I replied to Mr Stoffel the same day that, whilst I was unable to verify it during my visit to BLMIS, Mr Madoff had confirmed during our meeting and in the questionnaire that client and proprietary assets were segregated at the DTC.[16] I let Mr Stoffel know that I was in the process of writing up my report on the BLMIS due diligence visit, which I would send to him in due course together with the completed due diligence questionnaire. Until this query arose, I was not aware that Ernst & Young were the auditors of some of HSSL's client funds. Ernst & Young's involvement gave me some comfort as they were a reputable audit firm and would need to obtain all of the audit confirmations that were necessary to approve their clients' audited accounts.

---

[13] HSBC_0084025 {N/1217/12-13}; HSBC_0013924 {N/1209}
[14] HSBC_0013959 {N/1234}
[15] HSBC_0065271 {N/1252}
[16] HSBC_0014024 {N/1249/2}

**B / 5 / 16**

44.    On 27 April 2005, I followed my email of 4 April 2005 with a more detailed call report[17] that I sent as part of my overall review to Ms Coe.[18] Whilst my report noted a number of procedural issues that needed to be addressed, the conclusion to the report recorded my view that BLMIS appeared to be operating appropriately and in accordance with market practice.

45.    On 13 May 2005, we discussed the results of my due diligence review and the issues surrounding BLMIS at an HSS sub-custodian review meeting. Mr John Gubert, who was at that time the Global Head of HSS based in London, said that, based upon the information received, and despite Mr Madoff's reputation, he did not regard the then current arrangements as acceptable to HSS. His stated concerns related to the credit risk to the bank associated with the BLMIS model and the fact that BLMIS did not use SWIFT. He asked me to liaise with Ms Coe and revert with a recommendation that would address these issues, failing which HSS would cease the relationship. In practice, credit is typically provided to fund clients by the custodian bank in such a way that it can be secured against the client's assets held by the custodian (or within the custodian's network). I therefore understood Mr Gubert to mean that, if HSS could not obtain sufficient comfort concerning the credit risk arising from the BLMIS structure, it would be necessary for our clients to appoint a new custodian and administrator. The credit risk to HSS associated with an unacceptable structure would far outweigh the revenue generated by HSS' relationship with funds that had appointed BLMIS to manage their investments.

46.    Although I do not recall seeing it at the time, I have since read the discussion paper on BLMIS produced by Ms Coe dated 23 May 2005.[19] She was clearly concerned that we could not conduct comprehensive due diligence concerning BLMIS to confirm everything was as it should be. Her suggestion that we should commission an independent control review was the genesis of the proposal to bring in KPMG. Ms Coe obtained support for her approach from Mr Gubert. An advantage of using KPMG would be that Mr Madoff would likely be more willing to provide them with access to BLMIS' back office since they were an independent third party.

---

[17] HSBC_0084024 {N/1231}
[18] HSBC_0084022 {N/1462}; HSBC_0084023 {N/1054}; HSBC_0084024 {N/1231}; HSBC_0084025 {N/1217}; HSBC_0084026 {N/1055}; HSBC_0084027  {N/56.2}
[19] HSBC_0078374 {N/1285}

47.    On 30 May 2005, Mr Gubert copied me on an email in which he set out the steps that he
       thought were required for HSS to be satisfied as to the integrity of BLMIS, failing which we
       would exit the relevant client relationships.[20] Mr Gubert had responsibility for both revenue
       and risk for all HSS businesses internationally, so this was an important statement of intent
       for HSS as a whole. I had known Mr Gubert for a long time and he had a very strong credit
       and risk background.

**The Engagement of KPMG and Preparation for their Due Diligence Visit**

48.    Ms Coe led the process of engaging KPMG through one of their partners, Karen Briggs, to
       conduct the independent review. Ms Briggs had nominated David Luijerink and David Yim at
       KPMG in London as the best people for this assignment on the basis of their experience and
       expertise. I understood that Mr Luijerink was a fraud expert and Mr Yim was a forensic
       accountant with experience conducting audit and internal control reviews of financial
       market entities.

49.    Whilst it was common for a custodian or sub-custodian to ask an independent auditor to
       review its own operations and to produce an independent review report as a means of
       demonstrating its own compliance with international control standards, such as SAS70, it
       was highly unusual for an independent auditor to be asked to conduct a review of BLMIS in
       the circumstances. We had already been given control reports produced by BLMIS' own
       independent auditors. However it was thought that a comprehensive independent review by
       KPMG, an internationally recognised accounting and audit firm, would provide a reliable
       assessment of BLMIS, including the validity of its market activity and the existence of assets
       in its custody, which was based upon robust testing methodology.

50.    In my experience, engaging a third party such as KPMG to conduct a risk review was a new
       initiative in terms of due diligence in the market. I did not know of any other example of such
       an in-depth review process having been carried out on an agent or sub-custodian, let alone a
       client-appointed investment manager, at the behest of a global custodian. I remember
       discussing the monitoring of sub-custodians and prime brokers in the alternative funds
       sector with my peers at the Association of Global Custodians around the time of the BLMIS

---

[20] HSBC_0065529 {N/1293/2-3}

due diligence. Based upon these discussions, it was clear to me that the due diligence being conducted concerning BLMIS went significantly beyond what anybody else was doing within the alternative funds industry at that time.

51.    Ms Coe was very focused on verifying insofar as possible the authenticity of Mr Madoff's operation by testing what he claimed to have done and the review was designed around that objective. Ms Coe and I were in regular contact with one another and KPMG during this period.  There was a series of discussions with Ms Coe, Mr Luijerink and Mr Yim to put together terms of reference for the review. This process took place over the summer of 2005. The KPMG offices were just across the street from HSBC in Canary Wharf, and there were several meetings where on a round table basis we discussed with KPMG what we wanted them to do. Ms Coe was very clear that she wanted KPMG to conduct whatever testing they considered necessary to verify the integrity of BLMIS' operations and to track trades from end to end.

52.    In early September 2005, Ms Coe finalised the terms of the engagement letter with KPMG[21] and we continued to discuss with KPMG the development of their detailed testing procedures. Ultimately, as forensic accountants and fraud specialists, KPMG put together a testing plan designed around what we wanted to achieve and I relied upon their expertise in that regard. At no stage did I or to my knowledge Ms Coe or anyone else instruct KPMG to limit or restrict their enquiries in any way and I was satisfied that their methodology was appropriate to the circumstances. KPMG's testing involved tracing HSBC client trades (based on data provided by us) through Mr Madoff's operation so that they would have end-to-end verification of Mr Madoff's entire trading process – *i.e* verifying that a trade had occurred, that assets were held appropriately, that there was a proper segregation of client assets from any of BLMIS' proprietary assets, and that there was a further segregation of HSBC client assets within Mr Madoff's own books and records.

53.    I acted as liaison between KPMG and people in the relevant HSS entities in Luxembourg and Dublin in collecting together the necessary background material for KPMG. We had various conversations and email exchanges during the latter half of September 2005.[22] For example, KPMG asked for the client and agent contracts and some information on custodian

---

[21] HSBC_0084005 {K/1}
[22] HSBC_0004712 {N/1396}; HSBC_0033648 {N/1422}; HSBC_0051286 {N/1399}; HSBC_0051296 {N/1432}; HSBC_0033682 {N/1435}; HSBC_0051310 {N/1441}

responsibilities in the two jurisdictions. The contractual position was something we wanted to clarify and simplify. I also sought feedback from HSS in Luxembourg and Dublin on any current issues that had arisen with BLMIS, which were reported as being largely operational in nature and appeared to arise primarily out of Mr Madoff's insistence on fax communication. Mr Yim, Mr Luijerink and I discussed how the DTC operated, BLMIS' omnibus account and how that might affect the ability to test Mr Madoff's transactions. We wanted to find a way to maximise the impact and scope of KPMG's trade testing and, in order to do that, we needed to gain a better understanding of the mechanics of the DTC. I received some information on the DTC from one of our other US agents, Brown Brothers Harriman, and fed that back to KPMG.[23] These exchanges confirmed my understanding that the DTC would not provide information directly to an outsider such as ourselves because of the omnibus nature of DTC accounts, which meant that the trade testing had to focus on data provided to KPMG by BLMIS.

54.    On 3 October 2005, Ms Coe forwarded to me an email that had been sent by a person named David Smith who I did not know but understood to be a former BOB employee and a key representative of a client fund that used Mr Madoff.[24] It reflected the clients' very deferential attitude towards Mr Madoff. I am now aware that David Smith worked for Genevalor, Benbassat & Cie, which had sponsored a number of funds whose investments were managed by Mr Madoff, including Thema International Fund Plc ("**Thema**") in Ireland. I had understood that there were client sensitivities about Mr Madoff and Mr Smith's comments were a prime example. I was displeased that our clients were trying to influence this review, particularly since Mr Madoff had been appointed by them as their investment manager and that they had therefore accepted the terms upon which BLMIS would operate their managed account. Ms Coe had also forwarded the note to KPMG for their information.[25] Their reaction was similar to my own at the time – that Mr Madoff had a great hold over his clients and that the upcoming review was a good opportunity to test the integrity of his operations.[26]

55.    On 6 October 2005, I forwarded another copy of my due diligence review to Ms Coe.[27]

---

[23] HSBC_0004712 {N/1396}
[24] HSBC_0033715 {N/1955}
[25] HSBC_0033716 {N/1956}
[26] HSBC_0033718 {N/1440}
[27] HSBC_0084022 {N/1462}

**B / 5 / 20**

56.     Around this time, I understood from Mr Fielding that there were client sensitivities associated with the proposed KPMG review, and this had an impact on the timing of KPMG's visit to BLMIS because it was decided that Paul Smith, a senior executive from the former BOB funds business, who was now Global Head of AFS for HSS, would speak with Mr Madoff in person prior to the KPMG visit to explain its purpose. I understood that certain clients were sensitive because Mr Madoff had fostered an air of exclusivity around the opportunity to invest with him, and consequently there was a concern that if he was upset by HSBC's conduct he would tell the clients in question that he did not want their business any more.

57.     On 10 October 2005, I emailed Mr Yim of KPMG to let him know that the onsite visit at BLMIS was going to be delayed for a short period.[28] In the meantime we continued with preparations. Mr Yim and Mr Luijerink were well aware of our concerns regarding the BLMIS model and operations, and in particular the operational concerns that had been raised in Ireland and Luxembourg regarding the timeliness and the manner (*e.g.* by fax) of BLMIS' reporting.

58.     Via a series of emails in the middle of October 2005, I organised a conference call between KPMG and some HSS people from Luxembourg and Dublin so that KPMG could speak directly to those with experience of dealing with BLMIS operationally.[29] Although I do not recall participating in the conference calls myself, their purpose was to equip KPMG with knowledge about the local systems that might prove useful for their review of BLMIS.

**The November 2005 KPMG On-Site Review**

59.     KPMG's onsite review began at BLMIS' offices in New York on 7 November 2005. I believe it lasted for 4 days. I happened to be in New York at the time on unrelated business and met up with Mr Yim and Mr Luijerink for dinner on 8 November 2005 after the second day of their testing at BLMIS. It was very clear from KPMG's feedback that no alarm bells had been sounded. I recall Mr Luijerink telling me that Mr Madoff had apparently engaged initially in some "posturing" over some of the issues that KPMG raised, but in the end relented and gave them access to the information they needed. This was a common theme in Mr Madoff's

---

[28] HSBC_0066183 {N/1472}
[29] HSBC_0033804 {N/1470}

behaviour; he would at first resist the intrusion and then provide what had been asked for. Overall, KPMG indicated that they were impressed with what they had seen, and were generally satisfied with the results of their review to date.

60.    KPMG confirmed that they had tracked trades through to the market side (*i.e.* the proprietary broker/ dealer side of BLMIS) and were happy that the random 'spot checks' had shown the audit trail to be as expected. 'Spot checks' was a reference to a random selection of trades purportedly executed for HSS clients over the previous six months. I understood from Mr Yim and Mr Luijerink that they had arrived at BLMIS on the first morning and asked to be shown records in relation to trades from specific dates. BLMIS reportedly was able to produce the relevant records from offsite storage within a short period of time. From recollection I think that this appeared to have been done within a few hours pursuant to an arrangement Mr Madoff had with his storage company, and involved the retrieval of a significant volume of documentation. Mr Yim and Mr Luijerink said that Mr Madoff's process was paper driven so the relevant records were things like client statements, trade blotters, trade confirmations, DTC records, broker / dealer confirmations and so on. Mr Yim said that it was *"inconceivable"* that anyone could fabricate these records in the circumstances and, on the basis of what was being reported to me, I agreed. The possibility that fabrication of records might be taking place, on that kind of scale and within a short period of time, was not something that had been a serious concern, but KPMG had designed a thorough process to check for fraud and it was reassuring that everything appeared to be authentic. Some of the less pressing matters that KPMG had identified involving legal contracts and service issues became part of our work going forward. I asked KPMG to keep an eye out while reviewing BLMIS for any operational or other improvements that might be made to the services provided at the HSS end and to include any recommendations in that regard in their report.

61.    I emailed Ms Coe[30] the following morning to give her a report on how the review was going based upon my discussion with Mr Yim and Mr Luijerink.

62.    KPMG continued their review and Ms Coe informed me following its completion that KPMG had confirmed to her that they were satisfied with what they had seen at BLMIS. KPMG

---

[30] HSBC_0034073 {N/1553}

**B / 5 / 22**

produced a draft report dated 7 December 2005.[31] The report included a number of findings and recommendations, which Ms Coe and I discussed. None of the findings were indicative of fraud or other impropriety and the recommendations made by KPMG primarily concerned operational matters and suggestions to ensure good order. Ms Coe and I met with KPMG following the production of the draft report to discuss their findings and the contents of the report. There remained only a few minor adjustments in order to finalise the report. I do not remember the specifics of the meeting but I remember that, overall, we were content that KPMG had conducted a thorough process and found nothing untoward.

63.   On 13 March 2006, Ms Coe sent me a draft of a letter that it was proposed Paul Smith would send to Mr Madoff as a follow-up to the KPMG review.[32] Ms Coe had asked me to coordinate the implementation of some of the recommendations arising out of KPMG's review. These recommendations related to both Mr Madoff and HSS. By this stage, I had not seen the finalised report and so I asked Ms Coe to forward it to me.

64.   The final KPMG Report was dated 16 February 2006 (the "**First KPMG Report**")[33] although I received it on 21 March 2006.[34] Its content was very reassuring. We had brought KPMG in as experts to design and conduct a forensic examination of the transactions BLMIS claimed to have undertaken, with a specific emphasis on searching for fraud risks, and relied upon their expertise in conducting that investigation. Our main focus had been on confirming the integrity of the trades. KPMG had interviewed Mr Madoff and Mr Frank Di Pascali, a senior BLMIS employee, and documented the processes that BLMIS apparently had in place. They then proceeded to test a series of HSS client trades by calling for and examining BLMIS records, including records apparently produced by third parties such as the DTC. The testing set out at Appendix B of the First KPMG Report appeared to me to be thorough and appropriate. KPMG had reportedly examined records which appeared to confirm external confirmation of the settlement of trades and the holding of assets at the DTC. The report also confirmed that there was a segregated client account at the DTC and that there was a further segregation of assets by client within BLMIS' own books and records. It was highly implausible to imagine that all of these records could have been fabricated. While the report

---

[31] HSBC_0066586 {N/1593}
[32] BP0004 {N/1693}
[33] HSBC_0084088 {K/2}
[34] HSBC_0084087 {N/1719}

did not set out which trades were the subject of pre-notification, there was a very large volume of documentation involved in the six month period at issue.

65. I note that the First KPMG Report refers to KPMG having specifically tested for numerous risks including that *"client cash received is diverted for personal gain"*, which included reviewing *"a sample of reconciliations between 'STFS Participants Statement' as provided by the DTC (to Madoff LLC)"* {K/2/30}. The hypothetical scenarios for which KPMG had reportedly tested included (among many others) scenarios in which trades purportedly made by BLMIS were *"a sham in order to divert client cash"* {K/2/37}, in which BLMIS *"falsely reports buy/sell trades without actually executing in order to earn commissions"* {K/2/38} and in which BLMIS *"falsifies accounting records which are provided to HSBC and clients"* {K/2/39}. This testing reportedly included having *"confirmed holdings on an aggregate basis for a selection of trades with DTC participant Statement"* {K/2/39}. Reassuringly, KPMG's testing had not identified any evidence of fraud or financial impropriety whatsoever.

66. In addition, the First KPMG Report made specific reference to the fact that they had found no evidence of certain less sophisticated types of frauds perpetrated by brokers, such as 'front-running' and 'churning'. In simple terms, 'front running' involves a broker executing orders on its own account in preference to clients' pending orders and 'churning' is excessive trading to generate commissions. As clients of BLMIS were not able to see the trades executed themselves, and because BLMIS was primarily a broker dealer, these were potential concerns.  In the absence of any evidence of this sort of conduct, there was effectively little ground for any suspicion that a larger, more complex fraudulent scheme was being perpetrated, particularly given the nature and volume of the documentary records that had been produced by BLMIS.

67. On the basis of KPMG's thorough review, Mr Gubert and Ms Coe were content to continue extending credit to clients that was secured against assets held at BLMIS. Although the structure and arrangements would continue to be reviewed and monitored, we were satisfied that KPMG's testing had been robust and that no major concerns had been identified.

68. In hindsight, the fraudulent operation within BLMIS, which appears to have involved the collusion of many individuals, was sufficiently sophisticated to prevent its detection by clients, banks, regulators and auditors (including Primeo's own auditor, Ernst & Young), over

many decades. KPMG was expert in work of this nature and had been able to investigate BLMIS in a more comprehensive fashion than we could. Yet they had not reported back any major issues of concern.

69.    KPMG's main recommendations were set out at page 6 of their report with further recommendations contained in Appendix B. The first KPMG recommendation was that a more appropriate trade notification system be used such as an electronic system for the notification of trading activity from Mr Madoff to our operations teams. This was something that Mr Madoff would not countenance when I raised it with him. He was firmly anti-automation. In one of our meetings, he said that he had been shocked at the way in which his staff had abused the privilege of access to email and the internet. Mr Madoff also claimed that his competitive edge was based on his skill in timing the market and that electronic notification would undermine his ability to protect his trading model from those trying to copy it. In hindsight, this delay would have assisted him to maintain his fraudulent scheme but at the time any concerns that one might have had about the veracity of his trading had been addressed by the testing that KPMG had conducted. Many of the KPMG recommendations around testing transactions would have required access to the back office of BLMIS, which is something that Mr Madoff would not allow HSBC to have. It seemed to me at the time that many of these proposed tests could only be done through the further engagement of KPMG. There were other recommendations in relation to legal contracts, service level agreements, operational issues and ongoing monitoring which became part of our internal plans going forward, but overall we were satisfied that KPMG had verified the integrity of the BLMIS operation that Mr Madoff had previously described.

70.    As part of the process of considering and implementing the KPMG report recommendations, I felt that our responsibility within Network Management was to perform the necessary due diligence, including liaising with KPMG, and thereafter support the relevant HSS centres in implementing any changes that were required. HSS in Luxembourg, for example, had all the operational systems and relationships in place to interact with both BLMIS and its clients on a day-to-day basis and it made sense that they would be the principal centre both operationally and contractually. My role was a centralised function dealing specifically with Network Management issues.

**2007**

71.   I attended meetings of the Association of Global Custodians on a quarterly basis, which were typically held in New York or Boston. I tried to co-ordinate my visits to Mr Madoff with meetings of the Association in New York. Whilst I had originally planned to conduct a further site visit to BLMIS in November 2006, the next opportunity was in February 2007.

72.   In January 2007, I began preparations for my next review meeting with Mr Madoff. At the time we typically conducted biennial reviews so this meeting fell into that cycle, albeit that it was not a full due diligence visit. It was an opportunity to prepare the ground with the client-facing parts of the bank (in Luxembourg and Dublin) for some of the contractual and operational changes that followed on from the first KPMG review. I exchanged emails[35] with HSS people in Luxembourg and Dublin indicating that I intended to address with Mr Madoff the legal contracts that were in place with BLMIS and asked that they provide some details of the accounts that were maintained with Mr Madoff, together with a summary of any operational concerns they had at that time. The feedback from Dublin was that there were issues around delay in the delivery of information and the completeness of that information. Luxembourg indicated that some of the documentation received from Mr Madoff was difficult to read.[36]

73.   On 26 January 2007, I sent Mr Madoff a fax setting out the main agenda items I wanted to cover with him at our meeting scheduled for 9 February 2007.[37] I indicated that I wanted to discuss the revision of legal agreements, the adoption of a service level agreement and some of the current operational issues that HSS in Dublin and Luxembourg had identified.

74.   On 1 February 2007, Ronnie Griffin at HSBC Institutional Trust Services (Ireland) Limited ("**HTIE**") in Dublin emailed me to let me know that HTIE now had a number of clients who wished to set up funds that would open managed accounts with BLMIS.[38] I understood that this was new business that had come from funds with many of the same sponsors as the existing client funds that had appointed BLMIS as their investment manager.  Mr Griffin said he wanted to structure any new contractual arrangements with Mr Madoff via HSS in London. My reaction to this was that it was more appropriate for the HSS entities in Dublin and Luxembourg to contract with Mr Madoff directly if necessary, with London helping to

---

[35] HSBC_0037456 {N/2026}; HSBC_0037457 {N/2031}; HSBC_0037463 {N/2033}; HSBC_0037465 {N/2034}; HSBC_0037466 {N/2037}; HSBC_0052458 {N/2038};  HSBC_0052459 {N/2040}
[36] HSBC_0079942 {N/2041}
[37] HSBC_0068213 {N/2044}
[38] HSBC_0068232 {N/1984}

more actively manage BLMIS as appropriate. HSS entities in Luxembourg and Dublin had the client relationships, they were contracting with clients under their own local regulations, all of the operational contacts were in those jurisdictions and they had the systems in place to handle the relevant transactions. In those circumstances, it made more sense for Luxembourg and Dublin to contract directly. In an exchange of emails between 6 and 8 February 2007, Ms Coe agreed with my approach, as did Tony Lewis, who was then Head of Custody within HSS in London (this was an operational client-services role). We did not have time to resolve the question before the visit so I decided to deal with Mr Madoff on the basis that we needed to update the contracts and we could sort out the details subsequently.[39]

75.    On 8 February 2007, I exchanged emails with Ms Coe about the most important matters to concentrate on in my meeting with Mr Madoff the following day.[40] I had reviewed the KPMG recommendations. It seemed to me that certain of the KPMG recommendations were more useful than others. In addition, a number of them would require access to the back office at BLMIS and would therefore necessitate further involvement of an independent auditor, probably KPMG. My view at the time was that it simply was not going to be feasible for HSBC, acting alone, to implement some of the measures that had been recommended because of confidentiality issues that would arise. I asked Ms Coe for her view regarding the most important things to address, which she identified as clear operational routines and communications channels, revised legal agreements between each jurisdiction and BLMIS, the ability to enforce our security over client assets held with BLMIS and agreed operational procedures.

76.    I met with Mr Madoff at BLIMS's offices in New York on 9 February 2007. Mr Madoff agreed to work with us to put in place a service level agreement, to update legal contracts and that he would, reluctantly, acknowledge a pledge over assets. I understood from Mr Madoff the reason for his reluctance to be that he did not want the assets in his custody to be encumbered in any way, as that could constrain his ability to execute his trading strategy; he would rather deliver cash.

77.    On the other hand, there was no resistance from Mr Madoff to the putting in place of a service level agreement.   We felt that this was a useful way to address some of the

---

[39] HSBC_0052474 {N/2063}
[40] HSBC_0068278 {N/2064}

**B / 5 / 27**

operational concerns. In addition, we talked about his internal fraud risk management processes, including fraud escalation and reporting, which KPMG had recommended we raise with him. Mr Madoff told me that he would personally deal with fraud escalation issues. My view at the time was that there was limited utility in what was effectively a whistle blowing policy channelled through Mr Madoff; not because of any concern regarding Mr Madoff but because any whistle blowing policy that is channelled back to the key person within an organisation is of limited use. He also informed us that he had increased his insurance cover and agreed to address some of the operational concerns that had been raised about time delays with mid-month reporting and fax quality. Later that day I reported back to Ms Coe my view that we had made significant progress.[41]

78.    In the period between February and May 2007, HTIE were making preparations for the launch of a new client fund which was going to use BLMIS. It was a good opportunity to reassess the situation with BLMIS and implement some of the changes that we had been considering in respect of the BLMIS relationship. I thought that HSS's contractual relationship should be directly between BLMIS and the HSS operational centre in Dublin, rather than London, but it took some time to align everyone to this view.

79.    In the period from 6 to 8 March 2007, I exchanged emails with Mr Griffin.[42] HTIE was beginning to gear up for their new client fund launch and I had discussed this with Jackie Dunne, who was the Head of Custody at HTIE in Dublin. I provided Mr Griffin with feedback in relation to my recent visit to Mr Madoff. In response, he asked me to confirm that we could verify the segregation of assets at BLMIS and I replied that I thought we could do that based on the KPMG report, subject to Ms Coe's confirmation.

80.    Having spoken to Mr Griffin about HTIE's plans, I decided that now was the time to put in place a new contract and service level agreement which could be used as a template for the relationship going forward.[43] On or around 14 March 2007, I asked Mr Griffin to provide some of the existing contracts so that we could review them and see how best to proceed.[44]

---

[41] HSBC_0037567 {N/2066}
[42] HSBC_0068384 {N/2083}, HSBC_0037774 {N/2085}
[43] HSBC_0037774 {N/2085}
[44] BP0005 {N/2092}

81.     In order to launch the new client fund, HTIE needed to close off their audit point regarding the segregation of client assets held at BLMIS. Ms Dunne tried to contact me on 28 March 2007 for confirmation we could do this.[45] I was on holidays but on 30 March 2007 I communicated via my colleague Mick Underwood my confirmation that based on the First KPMG Report we could confirm that there was sufficient segregation of assets at BLMIS.[46] Ms Coe also confirmed this.[47]

82.     During April 2007, HTIE focused on preparing to put in place a new sub-custody agreement with BLMIS, together with a service level agreement and new operational procedures. On 19 April 2007, I received a draft service level agreement from Dublin for review. I also sought some background documentation from HSSL around this time for the purpose of comparison.

83.     On 25 April 2007, I contacted Mr Madoff to let him know that we were going to send over some draft agreements for review. I emailed Andrew Bastow, the Chief Operating Officer of HSS in Ireland, indicating that I had done so and stated that I would review the drafts that HTIE had provided in the meantime.[48] On 26 April 2007 I sent my comments on a draft service level agreement back to Ms Dunne.[49] I proposed various changes to our standard service level agreement for a global sub-custodian, to remove material which was irrelevant to an alternative fund agent such as BLMIS.  It was a busy time and a lot of effort was being made to get everything ready for the launch of the new fund for the client.

84.     A number of other minor issues came up in correspondence in the next few days and on 2 May 2007 I forwarded a copy of the 2005 BLMIS due diligence questionnaire to Ms Dunne in Dublin for review before the new sub-custody agreement was formally signed off by HTIE.[50] I believed that what we had done so far, when considered alongside KPMG's review, was adequate, although I envisaged further due diligence work as part of our ongoing monitoring program.

85.     After this flurry of activity there was a relatively quiet period regarding BLMIS. Further due diligence was planned in the normal cycle and Ms Coe wanted to do further testing in due

---

[45] HSBC_0038080 {N/2107}
[46] HSBC_0068574 {N/2114}
[47] HSBC_0068574 {N/2114}
[48] BP0006 {N/2185}
[49] BP0007 {N/2184}
[50] HSBC_0038481 {N/2195}

course via KPMG. Both of these were ultimately scheduled for early 2008. By this time, the markets were starting to tighten up and the temperature was rising generally from a risk management perspective.

86.     In August 2007, I was asked by Ms Coe to establish the level of assets that Mr Madoff then held in custody for HSBC clients. I collected this information from HSS people in Ireland and Luxembourg over the next few weeks.[51] Ms Coe had told me that another part of HSBC was seeking to expand its business with Mr Madoff and in that context she was involved in assessing the overall level of business that HSBC had with BLMIS. At this point I was unaware that HSBC had some proprietary exposure to BLMIS.  By this stage Ms Coe was preparing to send KPMG back in for another review of BLMIS and I was planning another due diligence visit in November of that year.

87.     In line with our usual approach and KPMG's recommendations, Ms Coe was keen to monitor BLMIS periodically so that we could be satisfied about the on-going integrity of its operations. On 11 September 2007, I asked Mr Bastow at HSS in Dublin for an update on service levels with BLMIS and sought copies of the agreements that had been finalised between HTIE and BLMIS in May.[52] I intended to use them as a guide for updating the position in Luxembourg. Mr Bastow provided me with a copy of the new sub-custody agreement[53] and also wrote[54] that he had spot checked some BLMIS client files and found them a little light in terms of content. He indicated that he had asked the local risk officer to review the position. I forwarded Mr Bastow's email to Ms Coe for her information.[55]

**2008 BLMIS Due Diligence**

88.     My next due diligence visit to BLMIS was postponed from November 2007 to February 2008. In January 2008, I began preparing for the visit. On 11 January 2008 I exchanged emails with Saverio Fiorino, a senior HSSL employee.[56] The relationship between BLMIS and HSS clients was continuing to expand and I knew that Ms Coe was keeping a close eye on it. I explained that Network Management would continue with due diligence of BLMIS and that KPMG

---

[51] HSBC_0039412 {N/2260}
[52] HSBC_0039525 {N/2268}
[53] BP0008 {N/2204}
[54] HSBC_0007898 {N/2266}
[55] HSBC_0053027 {N/2269}
[56] HSBC_0080911 {N/2343}

would also go back into BLMIS early in the year to conduct another rigorous review. I wanted HSSL to update their contracts in the same way that HTIE had the previous year and was happy to facilitate the process. There were no reports from HSSL of any service issues at this time.

89.    On 29 January 2008, Mr Yim from KPMG contacted me[57] regarding arrangements for a further KPMG site visit to BLMIS. I had less direct involvement with this further review than I did with the first KPMG review. The second review was coordinated by Ms Coe in conjunction with Mr Yim and Mr Luijerink, who were by this time more familiar with BLMIS and the objectives of the review.

90.    On 13 February 2008, I telephoned Mr Madoff to lay the groundwork for the second KPMG visit and reported back to Ms Coe the following day that he had agreed to this second review.[58] I remember that Mr Madoff seemed irritated that we felt it necessary for KPMG to conduct another review, having apparently gained the impression the last time from Paul Smith that the first one was a one-off. Due diligence reviews are time-consuming and a distraction from usual business activities, so I did not expect Mr Madoff to welcome the news of a further review. In any event, he made a fuss about it but then agreed.

91.    On 14 February 2008, I faxed Mr Madoff a copy of an updated due diligence questionnaire in advance of my own visit which was to take place the following week.[59] Some of the answers had been pre-filled on the basis of the previous visit, and because certain answers were basic information bearing in mind BLMIS' standing in the market. However, the due diligence checklist had been re-structured to a degree and took into account some new requirements regarding operational risk that had arisen as a result of Basel II (the second of the Basel Accords, which made a number of recommendations concerning banking laws and regulations). Mr Madoff completed the balance of the questionnaire in advance of my visit and gave it to me at our meeting. I also indicated that Mr Yim would be in contact with him about KPMG's proposed work schedule for their forthcoming visit.

---

[57] HSBC_0040687 {N/2354}
[58] HSBC_0040839 {N/2365}
[59] BP0009 {N/2368}

**B / 5 / 31**

92.    On 14 and 15 February 2008, I sought and received up to date reports from HSS in Ireland and Luxembourg[60] regarding service issues with BLMIS. HSS in Luxembourg reported problems with delays in receiving data from BLMIS for mid-month valuations, which I thought could readily be addressed with BLMIS because we had addressed a similar issue for HSS in Ireland previously. HSS in Ireland reported that custody confirmations for cash movements and account opening requests were not being received as required, which was an issue under the service level agreement. Ireland also said that they were still receiving information post trade date, which did not surprise me given Mr Madoff's history of refusing to automate.  Mr Madoff's practice was to send fax confirmations after the execution of trades, rather than sending confirmations electronically in real time. This was understandable as BLMIS was not the timing of the trades he made was purportedly central to his trading strategy and he did not want that information to be divulged. His view as expressed to me was that it ought to make no difference to HSS, as the NAV calculations would still be correct at each month end.

93.    KPMG were liaising directly with Mr Madoff and on 20 February 2008 Mr Yim emailed an update on their preparations.[61] He asked me to confirm the names of clients within scope for their review and to follow up with Ms Coe regarding the proprietary and wealth management divisions within HSBC that were exposed to BLMIS. I understood that these divisions had some sort of relationship with Mr Madoff but I was not privy to any detail. Mr Yim planned to send Mr Madoff a fax regarding some of the trade samples which KPMG intended to use for their next round of trade testing. On 20 February 2008, Michael Barnes from KPMG emailed asking me to arrange for trade data from February, April, June, August, November and December 2007 to be forwarded to him from Luxembourg and Ireland to assist with their review.[62]

94.    On 21 February 2008 I visited BLMIS, meeting again with Mr Madoff, and on the following day I emailed Ms Coe to provide her with my initial feedback.[63] I felt that the meeting had been productive. Mr Madoff had increased his insurance cover, which was welcome. He had told me that he was keen to identify the clients that KPMG would be testing and that he would sit with them this time because of his heightened confidentiality concerns. His view

---

[60] HSBC_0040840 {N/2366}, HSBC_0083227 {N/2374}, HSBC_0040847 {N/2369}
[61] HSBC_0070013 {N/2378}
[62] HSBC_0070014 {N/2379}
[63] HSBC_0040915 {N/2384}

was that auditors do not remain with audit firms forever and that he wanted to make sure that they were not in a position to copy or disclose his strategy for some future gain. Given his stated desire to protect his strategy and its apparent success, these comments were understandable. Some time later, I produced a short call report[64] of the meeting although I do not believe that this note covered all of the issues that we had discussed. I recorded our clients' increase in business with BLMIS and that KPMG required us to provide information concerning the sample period to enable them in turn to inform Mr Madoff of the period that would be the subject of the review, so he could get old records back from offsite. The sample trade information was for the months of February, April, June, August, November and December 2007, from which KPMG would randomly select trades to test.

95.    On 26 February 2008 I sent a follow-up email[65] to Ms Coe regarding the provision of information from HSBC's wealth management and proprietary trading divisions, although I understand that, in the end, those parts of HSBC did not provide any usable data for testing purposes.

96.    On 27 February 2008, I exchanged emails with Mr Yim.[66] KPMG had made further contact with Mr Madoff and I updated Mr Yim on my recent due diligence meeting. I reported that the meeting had gone well and that Mr Madoff had answered the questions in our latest due diligence questionnaire.

97.    During March and into April 2008, I liaised with HSS in both Luxembourg and Dublin regarding the provision of the sample trading information that KPMG needed for their review, which was scheduled for April. Monthly transaction statements for a number of Luxembourg and Dublin clients covering the months February, April, June, August, November and December 2007 were sent to me over the course of a few weeks and passed on to KPMG. In the meantime, Ms Coe signed off on KPMG's new engagement letter.[67] I also organised conference calls in early April between KPMG and relevant HSS people in Luxembourg and Ireland,[68] and received the most recent sub-custody agreements with BLMIS from both jurisdictions. As part of this process, I participated in a conference call with

---

[64] HSBC_0084146 {N/2417}; HSBC_0084147 {N/2382}
[65] HSBC_0040974 {N/2376}
[66] HSBC_0040986 {N/2385}
[67] HSBC_0084144 {N/2412}; HSBC_0084145 {K/3}
[68] HSBC_0041530 {N/2450}; HSBC_0084195 {N/2459}

KPMG and my HSS colleagues on 10 April 2008,[69] during which Mr Yim gave a summary of the further review that KPMG was about to conduct at BLMIS and sought input on the issues that arose for HSS when dealing with BLMIS.

98.   During April 2008, KPMG conducted their second BLMIS review, including spending approximately a week on site at BLMIS, and again reported back that nothing untoward from a fraud risk perspective had been identified. They had reportedly again tracked trades, this time going even further than they had during their first review by following two bulk trades which included third party client data from end to end. This was particularly significant as I understood that KPMG had been able to track the entire trade process in respect of these two bulk trades from end to end, notwithstanding that doing so revealed information to KPMG concerning BLMIS' third party clients. There remained a number of operational recommendations, but I understood KPMG had not identified any evidence of fraud or any other irregularity.

99.   During May and June 2008, KPMG asked me to follow up on some points within HSBC as they prepared their second review written report. By this time, Bear Stearns had collapsed and there was considerable nervousness evident in global financial markets. It was a very busy and challenging period, and financial markets were deteriorating rapidly.

100.  In early May 2008, I received an email indicating that an HTIE client wanted to speak with me about the due diligence that HSS had conducted concerning BLMIS.[70] This client was the promoter of a BLMIS-invested fund that had been launched back in May 2007, which was around the time that the new sub-custody agreement had been signed between HTIE and BLMIS.  I responded on 9 May 2008[71] that the client might not want to hear my views on the arrangements with BLMIS  and that I wanted to understand the client relationship and what they were trying to achieve. Whilst KPMG by this stage had reviewed BLMIS twice without finding anything untoward from a fraud risk perspective, I would not have been particularly complimentary of BLMIS from a custody operations point of view.  Operationally, BLMIS' performance fell below what I was used to from the leading global sub-custodian banks that HSS typically dealt with (which used SWIFT and specialised in sub-custody), although that

---

[69] HSBC_0053380 {N/2456}
[70] HSBC_0041955 {N/2489}
[71] HSBC_0053436 {N/2490}

**B / 5 / 34**

was unsurprising. I was also cautious about such a conversation because I thought it likely that the client would report back anything I said to Mr Madoff.  In any event, my recollection is that a conversation never ultimately occurred.  I did not encourage this type of client communication as Network Management monitoring was an internal function.

101.    To elaborate briefly, it is a central function of Network Management to identify concerns, monitor them and address or mitigate them as appropriate. It was not part of my role to liaise directly with clients but rather to inform and liaise with relevant parties internally.  Our concerns were principally in relation to matters such as structure and operational issues that posed a potential risk to the bank and I understood were already well known to clients. Upon investigation, there were no specific problems that we identified within BLMIS that gave rise to concern over the integrity of its operations, or otherwise warranted being reported to clients, although there was recognition that the relationship required careful monitoring. To the extent that the operational concerns that had arisen affected or were likely to affect individual clients, those matters would be addressed by the operational centres in Dublin and Luxembourg as they owned the relevant client relationships.

102.    On 10 June 2008, I received an email[72] from Mr Stoffel at HSSL about a query from an investor that had been sent via Bank Medici, a service provider to a number of BLMIS-invested funds. I was asked for assistance in answering some custody-related questions that had been raised. The investor appeared to be seeking reassurance about BLMIS' operation. At the time, the financial environment was dominated by credit and liquidity concerns and therefore I did not think it unusual that an investor was seeking reassurance about their investment. I was somewhat reticent about answering questions that had come through from an investor. That said, I prepared some draft answers and sent them to Ms Coe,[73] who was continuing to oversee the BLMIS relationship, and later sent my reply to Mr Stoffel on 2 July 2008.[74]

103.    On 3 July 2008,[75] I asked Mr Stoffel to hold off on communicating the content of my note because KPMG had identified a potential issue with the way BLMIS operated with a Fidelity fund which they wanted to investigate further. Ultimately, this turned out to be a technical

---

[72] HSBC_0042358 {N/2513}
[73] HSBC_0042358 {N/2513}
[74] HSBC_0042637 {N/2514}
[75] HSBC_0042651 {N/2536}

issue not giving rise to any concern but at the time I wanted to ensure we had been as thorough as possible before communicating with the client.

104.    On 17 July 2008, I attended a meeting and teleconference between Ms Coe, the KPMG team of Mr Yim and Mr Luijerink, Steven Phan, Global Head of Structured Fund Products at HSBC, and others from his team, as well as Scott Epstein, the Head of Fund Services at HSS in North America.[76] Around this time, I became generally aware that HSBC had invested approximately US$1 billion of its own money in funds that were managed by Mr Madoff. Ms Coe asked me to join the meeting, the primary purpose of which she explained was to make the KPMG team available to the Structured Fund Products team, to answer any questions or concerns that they might have and to provide them with an overview of some of the risks associated with BLMIS.

105.    At the meeting, Mr Yim explained that BLMIS held an omnibus Fidelity account for the benefit of clients (this was later confirmed in their written report) and that units from the Fidelity fund were allocated internally to clients within BLMIS' books and records, which mirrored the approach with client assets that BLMIS held at the DTC.  In relation to trade testing, Mr Yim made reference to reviewing trading information including DTC statements and confirmations that had been provided by Mr Madoff within a couple of hours of request. This was in line with the description that KPMG had given during their first review. Although there was a reference on the call to the possibility that Mr Madoff was operating a Ponzi scheme, all possible scenarios were being considered and there was no evidence to suggest that he in fact was doing that. Mr Yim also confirmed that client funds were not held on the BLMIS balance sheet. My impression following this meeting was that the representatives from Structured Fund Products had taken comfort from the testing done by KPMG.

106.    This call with KPMG was typical of discussions that were taking place within HSS at this time concerning the risks facing HSS and many of our clients (which were by no means limited to BLMIS). Ms Coe was an experienced risk manager and it was clear that she wanted people to keep an open mind to all of the potential risks associated with financial institutions with which the bank interacted, directly or indirectly, however remote such risks may be.

---

[76] BP0010 {K/5}

107.    On 18 July 2008, I emailed a colleague at JP Morgan about a discussion concerning Madoff which I felt might be *"to our mutual benefit"*.[77] I knew that JPMorgan was the banker to BLMIS and I had heard that JPMorgan was considering increasing its proprietary exposure to BLMIS, so I was interested to learn whether they had done any due diligence or had any particular concerns. However, ultimately, I do not think that this discussion ever took place prior to Mr Madoff's arrest.

108.    On 22 July 2008, I received an email from Mr Stoffel at HSSL.[78] He had been contacted by a person from the Structured Funds Group within (by coincidence) JP Morgan who had apparently enquired about HSBC's due diligence of BLMIS and was seeking some assurance from HSBC and KPMG about Mr Madoff's operation. I forwarded the request to Ms Coe[79] and copied her comments in my reply back to Mr Stoffel.[80] I referred to Mr Madoff having been a *"hot subject"* over the last week.  What I meant by this was simply that he had come up regularly. There was no new information that had either increased or decreased any concerns that we had.  My view, which was shared by Ms Coe, was that we should not provide any assurances to JP Morgan, and this was where our communication with JP Morgan about Mr Madoff rested as far as I am aware. At Ms Coe's request, I asked Mr Stoffel for an update on the level of HSS Luxembourg clients assets held with BLMIS.[81]

109.    On 12 August 2008, Ms Coe copied me on an email[82] that she sent to senior HSS executives about BLMIS. At my level of involvement, I had not seen any deterioration in the way things had been working with BLMIS although there was at this time an increased level of concern in the custody environment and indeed financial markets generally. The global financial crisis had, by August of 2008, caused significant market turmoil. Liquidity pressures were widespread. As the Chief Risk Officer of HSS, Ms Coe's remit was very broad, so I was not surprised by this email given the condition of the financial markets. Her stated objective was to enhance the controls that we had in place in our relationship with BLMIS and to prepare for Mr Madoff's anticipated resistance to any structural changes. I was copied on a reply

---

[77] HSBC_0042886 {N/2554}
[78] HSBC_0083273 {N/2560}
[79] HSBC_0053592 {N/2547}
[80] HSBC_0083273 {N/2560}
[81] HSBC_0083273 {N/2560}
[82] HSBC_0070765 {N/2570}

**B / 5 / 37**

dated 14 August 2008[83] from Mr Epstein and followed this up with a request[84] for him to find out whether I could contact my HSS peers to discover how they viewed Mr Madoff, although as it transpired I could not identify anyone with relevant knowledge.

110.    On 19 August 2008, I received an email[85] that had been sent from HSSL to Ms Coe indicating the level of assets in client funds held with BLMIS. On 22 August 2008, I received an email[86] from Mr Yim of KPMG containing a list of information that he was seeking in connection with KPMG's latest review. I went through these requests with Mr Madoff in the course of the due diligence visit I conducted at BLMIS in November later that year.

111.    The draft second KPMG Report on Mr Madoff was dated 8 September 2008 (the "**Second KPMG Report**").[87] I remember reviewing it some time after it was produced. The tone and content of the report were similar to the previous one, and it provided further reassurance. The draft report stated that KPMG had again tested for numerous specific fraud and related risk scenarios, including that trades were *"a sham in order to divert client cash"*, that BLMIS *"falsely reports buy/sell trades without actually executing in order to earn commissions"* and that BLMIS *"falsifies accounting records which are provided to HSBC and clients"*. KPMG's testing had again included a review of material that had apparently emanated from third party organisations such as the DTC and Fidelity. Most significantly, the report confirmed that KPMG had not identified any evidence of fraud or other illegal or improper activity. There was nothing in the report that gave rise to alarm, although there were, as one would always expect, again some recommendations for improvements. I reviewed their main recommendations, set out at page 9 and 10 of the report. My impression was that the implementation of these recommendations would not advance matters much in terms of protecting HSS and its clients from fraud and related risks.

112.    The first recommendation concerned fraud escalation, which I took forward to my next meeting with Mr Madoff. Fraud escalation is the process by which somebody within an organisation reports suspected fraud to higher levels of management. In hindsight, it was

---

[83] HSBC_0070782 {N/2573}
[84] HSBC_0070784 {N/2578}
[85] HSBC_0070805 {N/2575}
[86] HSBC_0009252 {N/2582}
[87] PRI_0015584 {K/4}

unlikely to have been at all useful in terms of uncovering the fraud because of Mr Madoff's level of control over his organisation.

113.    Secondly, there was a whistle blowing recommendation. Mr Madoff had told me that his team were very loyal and I did not feel that such a provision would enhance our risk control in any meaningful way. In any event, a whistle blowing procedure that is channelled back through the key person in an organisation, in this case Mr Madoff, would in my view have been of little assistance.

114.    Thirdly, there was a recommendation in relation to 'fund recognition'; specifically, it was recommended that HSS should consider consolidating report information provided by BLMIS. I discussed this with Ms Coe and our conclusion was that a consolidated report would not add value and indeed could make reporting less clear. I was satisfied that any allocation discrepancies would have been identified in Luxembourg and Ireland using existing controls.

115.    The fourth recommendation concerned the documentation of a Disaster Recovery Plan, which I again planned to discuss with Mr Madoff at our next meeting. In retrospect, I do not think that this would have made any difference to our ability to secure any client assets following Mr Madoff's arrest. Nor would it have assisted in terms of detecting fraud.

116.    The fifth recommendation was for on-going periodic review of BLMIS trading, which we had done and planned to continue, although we decided that we should try to do this ourselves, rather than using KPMG, subject to overcoming Mr Madoff's confidentiality concerns. This was largely because the KPMG reviews were very expensive. Although I later secured agreement in principle from Mr Madoff to perform this testing, we did not get a chance to do so prior to the fraud being uncovered.

117.    Recommendation six concerned contract review. There were some minor outstanding issues on this point and I intended to address those with Mr Madoff in due course.

118.    Finally, there was a recommendation to clarify the legal chain between HSBC and BLMIS, which I also adopted as an action point for my next visit to Mr Madoff.

119.    In the middle of September 2008, Lehman Brothers collapsed, which sent financial markets deeper into turmoil. Following this, there was a real sense of crisis for a period, with

heightened concern about the possibility of contagion and the wholesale failure of financial institutions and markets. There was a large degree of uncertainty and people were focused on ring-fencing assets. BLMIS was one concern among many.

120.    A planned due diligence visit to BLMIS was postponed until November 2008. In the meantime, there was a further examination within HSBC of exposure to BLMIS. On 8 October 2008, Michael May, who was Ms Coe's deputy based in Luxembourg, forwarded me and Ms Coe an email[88] that had been sent by Chris Wilcockson, then the CEO of HSSL, to various HSS executives. Mr Wilcockson's email reflected the level of concern in the market at the time and highlighted that, whilst there was no reason to have concerns about Mr Madoff's operations, it was appropriate to remain vigilant and to liaise proactively with clients concerning their relationships with BLMIS. Mr May's email echoed the concerns raised by Mr Wilcockson. This did not surprise me; Mr May was a senior member within the HSS risk team and this was a time of great uncertainty and trepidation.

121.    On 13 October 2008,[89] Mr May emailed me and Ms Coe concerning reported unease within Luxembourg and Ireland about BLMIS on account of the deteriorating market conditions. Mr May liaised with HSS in Luxembourg and Dublin about the level of exposure to BLMIS and the risks that we faced in the context of the changed market conditions.

122.    I was copied on email reports about BLMIS from Mr Bastow in Dublin[90] and Gordon Thomson at HSSL in Luxembourg[91] on 15 and 16 October 2008, respectively. Information provision from BLMIS was reportedly timely and at this stage all tests that they had performed had produced uncontroversial results. However both jurisdictions reported some concerns about BLMIS. Mr Bastow's remark about calling for a significant redemption stands out now but I do not remember giving it any serious consideration at the time, not least because doing so would have been highly impractical. As Mr Bastow said, this would have been a radical approach. I followed up with Mr Bastow,[92] noting his comments about BLMIS' performance.

---

[88] HSBC_0044159 {N/2616}
[89] HSBC_0071120 {N/2626}
[90] HSBC_0071142 {N/2631}
[91] HSBC_0071161 {N/2638}
[92] HSBC_0071145 {N/2632}

123.    Mr May also responded[93] to both Mr Bastow and Mr Thomson, requesting information from them concerning HSS in Ireland and Luxembourg respectively that would help to shape the approach that I would take with Mr Madoff when we met again in November. This prompted a reply from Mr Thomson in which he set out his apparent concerns about BLMIS' operations.  I am not able to comment on the significance of the returns generated by BLMIS for clients as that was not my concern, but I understood Mr Thomson's principal concern to be about the concentration of roles in BLMIS' hands. However, this was precisely why we sent KPMG in there to make sure there was segregation of functions and segregation of assets.   As I have set out above, KPMG came back with some relatively minor recommendations, but as to our main concerns about segregation KPMG had discovered no evidence of fraud or other impropriety.

124.    On 13 November 2008, I faxed[94] Mr Madoff to confirm our scheduled meeting and informed Ms Coe that I had done so.[95] Ms Coe had expected to accompany me to the meeting but due to pressing matters she was not in a position to travel. It was not a regular due diligence meeting as such. I explained that the main purpose of the meeting was to go through the issues raised by the most recent KPMG review and any current HSS operational matters. Some of KPMG's queries were still outstanding in relation to, for example, naming conventions and which funds were covered under the relevant sub-custody agreements. I planned to discuss these with Mr Madoff at our meeting.

125.    In the meantime, I collected feedback from HSS in Luxembourg[96] and Dublin[97] about any current issues that they might have in their interactions with BLMIS. The Luxembourg issues were around the quality and timeliness of fax communication from BLMIS and some problems with mid-month valuations. Ireland had concerns with over-reliance on fax as a communication method, although their problem was in getting information to, rather than from, BLMIS.

---

[93] HSBC_0053719 {N/2630}
[94] HSBC_0071357 {N/2679}
[95] HSBC_0044794 {N/2667}
[96] HSBC_0044795 {N/2664}
[97] HSBC_0044881 {N/2678}

126.    As part of my preparation, I exchanged emails with Mr May on 17 November 2008.[98] Mr May
        had reviewed the Second KPMG Report and summarised his views on the issues arising.[99] His
        summary reflected some of the matters that we had been working to address over time. I
        then spoke with Ms Coe to get her up to date view about what she wanted me to achieve in
        terms of changes. In my response to Mr May, I addressed some of the issues that he had
        raised. I agreed with him that the escalation of fraud concerns within BLMIS via Mr Madoff
        was not ideal. This was part of the 'key man' risk associated with Mr Madoff, of which I
        understood the client funds were well aware. We had some outstanding issues with the
        clarity of documentation, which I planned to tackle. I was aiming to put in place a disaster
        recovery escalation plan, as had been recommended by KPMG. Most importantly, I was
        going to address with Mr Madoff our desire for greater transparency and clarity concerning
        asset segregation. Ms Coe had in mind that in future we would undertake directly with
        BLMIS some of the trade testing that KPMG had previously done on our behalf, doing this on
        an unannounced basis. I expected a certain degree of resistance from Mr Madoff to this and,
        whilst I did not wish to be unduly confrontational with him, I intended to make it very clear
        that HSS would be willing to resign as custodian and administrator to our client funds if we
        did not achieve the level of satisfaction we required. This was partly because of the
        significant costs associated with sending in KPMG, particularly if we would need to continue
        to do so repeatedly to remain satisfied with BLMIS' operations.

127.    One of Ms Coe's objectives was that she wanted to maximise the level of segregation of
        client assets held with BLMIS. The obstacle to complete segregation was the way in which
        the DTC omnibus accounts operated and Ms Coe wanted to see if we could find a way
        around this issue. On 18 November 2008, I emailed Ms Coe,[100] confirming my understanding
        that the level of segregation employed by BLMIS (*i.e.* one 'omnibus' client account at the
        DTC with segregation by client in his own books and records) was consistent with market
        practice.

128.    I recalled from a conversation with the secretary of the Association of Global Custodians in
        2006 or 2007 that the possibility of enhanced segregation had been raised a number of years
        prior by the Association of Global Custodians with the DTC, well before Mr Madoff's fraud

---

[98] HSBC_0044849 {N/2673}
[99] HSBC_0044850 {N/2674}
[100] HSBC_0071384 {N/2677}

781756-1                                        42

**B / 5 / 42**

was uncovered. The DTC had reportedly not entertained the idea on the grounds that it would be prohibitively expensive to implement such a system. In those circumstances, I felt that it would be necessary for KPMG to continue to conduct periodic trade testing because HSBC would be prevented from doing so due to client confidentiality issues associated with the use of the omnibus account. Under the model as I understood it, we could not avoid seeing data in relation to non-clients. However, Ms Coe asked that I try to find a way around the issue. She also wanted me to see if Mr Madoff would agree to unannounced spot checks being conducted.

### 19 November 2008 Meeting with Mr Madoff

129.    I met Mr Madoff at his New York offices on 19 November 2008 and produced a call report following the meeting.[101] I remember Mr Madoff being more agitated during this meeting than he had been at my previous meetings with him, which he put down to the pressures of work. Whether his agitation was related to the house of cards coming down, I do not know. I told him that in view of recent uncertainties in the market, some of our clients had been expressing concern and seeking assurances about segregation and transparency.  Although he asked me to identify the clients, I did not do so as I did not want them to be placed in a difficult position. I explained that his model was of particular concern because he was fulfilling a number of functions under one roof, which concentrated risk. In response, Mr Madoff stressed that he did not know of any KPMG findings which demonstrated any problems, pointing out that KPMG had reconciled trades all the way through to the DTC accounts and reconciled the totals into the segregated books at BLMIS for both HSBC client and non-client funds. He said that much of this testing had been undertaken on a random basis. Mr Madoff said that, so far as he knew, everything had been fine and he wanted to know what else he was supposed to do.

130.    I agreed that KPMG had not uncovered any major problems but that our requirement going forward was for HSBC rather than KPMG to conduct spot checks without advance notice of the trades to be checked and account data that we wished to review.  Spot checks such as this would not be fundamentally different from the checks that KPMG had made previously. I remember being surprised that he agreed in principle to this requirement because until then

---

[101] HSBC_0084165 {N/2680}

we had not been allowed to access his office environment. He still maintained some resistance to the idea that the visits would be unannounced, claiming that the testing was quite disruptive to his business and he would require some advance notice. I said that this would need to be discussed further.

131.   Mr Madoff also agreed to address some other requirements arising out of the KPMG recommendations. He acknowledged that procedures in relation to fraud escalation could be improved and agreed to look at the possibility of implementing a new governance contract. Mr Madoff was also happy to help clarify some of the contractual issues that had been identified and share information in relation to his malpractice insurance, which he claimed never to have had to call upon. On the operational issues, Mr Madoff agreed to make available an alternative fax number and an emergency email address to improve communication flows, which was a new departure for him.

132.   In relation to corporate actions notifications, Mr Madoff explained that all decisions on corporate events were taken by BLMIS and that HSS was advised of subsequent entitlements of stock and cash. I said that there remained a problem because there would not be a corporate event against which to post entitlements. Mr Madoff replied that BLMIS had no facility to broadcast events. Mr Madoff asked to be notified the next time there was a problem with the quality of faxed documents. In relation to mid-month reporting, he claimed that due to the way his system was set up, the information provided mid-month had to be generated in a different format but that it should still allow valuations to be calculated, and I agreed to follow up on this with HSS in Luxembourg.

133.   On 24 November 2008, I sent an email[102] indicating that my meeting with Mr Madoff had been productive and that he had agreed to a number of our requirements. I planned to write to Mr Madoff confirming what we had discussed and the implementation of what we had agreed, although in the end I did not have a chance to do so before he turned himself in to the authorities.

---

[102] HSBC_0044955 {N/2682}

781756-1                                    44

**B / 5 / 44**

134.    I heard the news of Mr Madoff's arrest at about 6.30am on the morning of 12 December 2008 when I received a phone call from Ms Coe. She told me that the BLMIS operation was evidently all a scam, a Ponzi scheme, and that it appeared there were no assets. Ms Coe told me that Mr Madoff had admitted that the operation was fraudulent. I remember being shocked. We agreed to meet at our offices, to appraise the situation and to do everything we could to address client and internal queries and mitigate the damage. I remember thinking that, if the whole thing was a fiction, how could Mr Madoff have possibly got around the regulatory investigations and the checks undertaken by KPMG, among many others? Later that day, I attended a meeting with, amongst others, Ms Coe and Mr Yim of KPMG. Mr Yim expressed his utter disbelief at the news and his astonishment that so much documentation had apparently been falsified. To this day, it is very difficult to understand how Mr Madoff was able to maintain the appearance of real trading given what we and KPMG, among many others, had done.

Brian Pettitt
February 2016