**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantially Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff, | Adv. Pro. No. 10-05311 (SMB) |
| Plaintiff, | |
| v. | |
| UBS AG, *et al.* | |
| Defendants. | |

**[PROPOSED] ORDER GRANTING TRUSTEE'S MOTION FOR ORDER**
**ISSUING LETTER ROGATORY TO AA ALTERNATIVE ADVANTAGE**
**INVESTMENT PLC ON BEHALF OF LANDMARK INVESTMENT FUND IRELAND**

Upon the Motion for Order Issuing Letter Rogatory to AA Alternative Advantage plc ("Alternative Advantage"), on behalf of its sub-fund, Landmark Investment Fund, Ireland ("Landmark"), pursuant to 18 U.S.C. § 1781(b)(2), (the "Motion"), filed by Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated SIPA liquidation of the business of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, seeking entry of an order (the "Order") issuing the Letter Rogatory to Alternative Advantage to be transmitted, via the appropriate channels, to The High Court Justice of Ireland; and counsel for the Trustee and Alternative Advantage/Landmark); and it appearing that (i) due and sufficient notice of the Motion has been given under the circumstances, and no objections have been filed, (ii) the relief sought in the Motion is appropriate based upon the information provided in the Motion and in the record, and (iii) this Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§1334(b) and 157(a); and after due deliberation and sufficient cause appearing therefor; it is hereby

ORDERED, ADJUDGED AND DECREED THAT:

1. the Motion is GRANTED as set forth herein;

2. This Court shall transmit the Letter Rogatory, attached as Exhibit A to this Order, to The High Court Justice of Ireland in the Republic of Ireland so that valid service of process may be effectuated upon Alternative Advantage;

3. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion;

4. The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion; and

5.  This Court shall retain jurisdiction with respect to all matters arising from or

related to the implementation or interpretation of this Order.

Dated:                    , 2020
        New York, New York


_____
HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Oren J. Warshavsky

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and for the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                                Plaintiff,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                                Defendant. | No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated)<br><br><br>**LETTER ROGATORY** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                                Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                                Plaintiff-Applicant,<br><br>        v.<br><br>UBS AG, *et al.*,<br><br>                                Defendants. | Adv. Pro. No. 10-05311 (SMB) |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE TO THE
## APPROPRIATE JUDICIAL AUTHORITY IN THE REPUBLIC OF IRELAND

**SENDER:**

Honorable Stuart M. Bernstein
Judge of United States Bankruptcy Court
for the Southern District of New York
One Bowling Green
New York, New York 10004-1408
United States of America

**CENTRAL AUTHORITY OF
THE REQUESTED STATE:**

The Master of the High Court
Inns Quay
Dublin 7
Ireland

**PERSONS TO WHOM THE
EXECUTED REQUEST IS
TO BE RETURNED:**

Donal Dunne
Eugene F. Collins Solicitors
3 Burlington Road
Dublin 4
Ireland

Presenting his compliments to The High Court Justice of Ireland, this Letter Rogatory is made by the Honorable Stuart M. Bernstein, of the United States Bankruptcy Court for the Southern District of New York, which is located at One Bowling Green, New York, New York 10004-1408, United States of America, to The High Court Justice of Ireland at The Supreme Court of Ireland, Four Courts, Inns Quay, Dublin 7.

A copy of the transcript of the examination and the certification of the Master of the High Court should be returned to the Honorable Stuart M. Bernstein, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408.

In light of the international law and comity that exists between the United States and the Republic of Ireland, the undersigned applicant respectfully submits this Letter Rogatory.

This Court requests assistance from the appropriate judicial authority in the Republic of Ireland to obtain testimony supported, as may be appropriate, by relevant documentation from the witness (the "Witness") identified below who has material and relevant information:

> AA Alternative Investment plc, on behalf of its sub-fund,
> Landmark Investment Fund Ireland
> By: Adrian Waters
> HSBC House
> Harcourt Centre
> Harcourt St.
> Dublin 2, Ireland

## INTRODUCTION

This Letter Rogatory seeks evidence for use in the above-named proceeding pending before this Court, which alleges claims arising under the Securities Investor Protection Act of 1970 ("SIPA"), the United States Bankruptcy Code, and the New York Debtor and Creditor Law. The purpose of this Letter Rogatory is to obtain testimonial and documentary evidence from the Witness, AA (Alternative Advantage) PLC on behalf of its sub-fund Landmark Investment Fund Ireland ("Landmark") for use as evidence in this proceeding in this Court. The Court's summary herein is derived from Plaintiff's allegations in its Complaint dated December 5, 2010. As the Court has not yet heard evidence in this case or considered its merits, this summary of those allegations does not denote this Court's views of the allegations or reflect any findings by the Court.

On December 7, 2010, the Trustee filed his Complaint in the United States Bankruptcy Court for the Southern District of New York in this adversary proceeding captioned *Picard v. UBS AG, et al.*, Adv. Pro. No. 10-05311 (Bankr. S.D.N.Y.) (SMB) (the "Adversary Proceeding"). In the Complaint, a copy of which is attached as Exhibit A, the Trustee asserted claims, *inter alia*, against the defendants to avoid and recover on the theories of fraudulent

3

transfers under 11 U.S.C. §§ 544, 547, 548, 550 or 551, SIPA § 78fff-2(c)(3), and the New York Debtor and Creditor Law §§ 270–281.

A summary of the Trustee's claims and allegations asserted in this Adversary Proceeding relevant to this Letter Rogatory are set forth below.

## THE PARTIES AND THEIR REPRESENTATIVES

The parties to this action and their representatives are as follows:

The Applicant and Plaintiff is Mr. Irving H. Picard, as trustee ("Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), substantively consolidated with the Estate of Bernard L. Madoff.  The Trustee is represented in this action by his counsel Baker & Hostetler LLP, 45 Rockefeller Plaza, New York, New York 10111, United States of America, and may be contacted through his attorneys at owarshavsky@bakerlaw.com and +1 (212) 589-4200.

The remaining defendants in this action are Luxembourg Investment Fund ("LIF") and Luxembourg Investment Fund U.S. Equity Plus ("LIF-USEP"), as represented by their liquidators, Maître Alain Rukavina ("Rukavina") and Paul Laplume ("Laplume"); Maître Alain Rukavina and Paul Laplume, in their capacities as liquidators and representatives of LIF and LIF-USEP; Landmark; and Reliance International Research LLC.

Defendants LIF, LIF-USEP, Rukavina and Laplume are represented in this action by their counsel Porzio, Bromberg & Newman, P.C., 156 West 56th Street, Suite 803 New York, New York 10019-3800, United States of America, and may be contacted via Mr. Brett Moore at bsmoore@pbnlaw.com or +1 (646) 348-6723.

Defendant Reliance International Research is represented by its counsel Seward & Kissel

LLP, One Battery Park Plaza, New York, New York 10004, United States of America, and may

be contacted via Mr. Mark Hyland at hyland@sewkis.com or +1 (212) 574-1541.

The Witness is represented by its counsel Norton Rose Fulbright US LLP, 1301 Avenue

of the Americas, New York, New York 10019, United States of America, and may be contacted

via Mr. Thomas Hall at thomas.hall@nortonrosefulbright.com or +1 (212) 408-5487.

## NATURE AND PURPOSE OF THE PROCEEDING
## AS ALLEGED BY THE TRUSTEE IN THE COMPLAINT[1]

**This Proceeding**

This is an adversary proceeding commenced in this Court, in which the main underlying

SIPA proceeding, No. 08-01789 (SMB), is pending.  By way of background, Bernard L. Madoff

("Madoff"), through BLMIS investment advisory business, allegedly conducted a decades-long

Ponzi scheme of breathtaking scale.  (*See* Compl. at ¶¶ 21-29.)  The Trustee alleges that

Madoff's fraud was sustained by infusions of capital from investors around the globe.  In

particular, the Trustee alleges domestic and foreign investment vehicles, colloquially known as

"feeder funds," injected several billions of dollars into the scheme.

Allegedly among these feeder funds were LIF, LIF-USEP and Landmark.  (*Id*. at ¶¶ 52-

53, 57.)  The Trustee alleges that since their inception, these funds collectively deposited more

than $900 million and over time withdrew nearly $550 million dollars from BLMIS.  (*Id.* ¶¶

188–206.)  The Trustee alleges that these withdrawn funds comprise customer property and

constitute avoidable transfers under the United States Bankruptcy Code.  (*Id.*)  The Trustee seeks

to recover these withdrawn funds for equitable distribution.  (*Id.*)  The Trustee asserts that the

---

[1] The Court's summary is derived from the Plaintiff's allegations in his Complaint filed December 7, 2010
("Compl.") [ECF No.1] and does not necessarily denote the Court's views of such allegations or reflect findings by
the Court.

defendants, at the time they had accounts with BLMIS, either had knowledge of BLMIS's fraud

or they were "willfully blind" to it. (*See, e.g.*, 120, 134, 160.) The Trustee asserts that the

alleged knowledge held of BLMIS's fraud of others should be imputed to these defendants.

Currently, the parties to this Adversary Proceeding are permitted to engage in international fact

discovery pursuant to Court Order, a copy of which is attached as Exhibit B (ECF No. 238).

**The Creation of LIF and LIF-USEP**

The Trustee alleges that LIF and LIF-USEP were established by a group of well-

connected and sophisticated investment professionals with pre-existing ties to Madoff, including:

- *Manuel Echeverría ("Echeverría"), head of Optimal Investment Services, S.A.*
  *("Optimal")*: Echeverría's relationship with Madoff allegedly began in 1996 when
  Optimal and its predecessor began investing exclusively with BLMIS. (*Id.* ¶ 93.)
  The Trustee alleges that Echeverría was a close friend of Madoff and one of the few
  people with whom Madoff would share the intricate details of supposed investment
  strategies. (*Id.* ¶ 123.) As such, the Trustee alleges that Echeverría had knowledge of
  BLMIS's trading and operations. (*Id.* ¶¶ 93, 94, 117.)

- *Guillermo Morenes Mariategui ("Morenes") and Francisco Javier Botín Sanz de*
  *Sautuola O'Shea ("Botín"), co-owners of M&B Capital Advisers Sociedad de*
  *Valores S.A. ("M&B")*: The Trustee alleges that Echeverría had worked closely with
  Morenes and Botín at Santander Bank. (*Id.* ¶ 42.) It is alleged that, in 2000, Morenes
  and Botin left Santander to form M&B which allegedly opened an account for LIF-
  USEP with BLMIS. (*Id.* ¶ 94.) The Trustee alleges that Echeverría's relationship
  with Madoff was the key to establishing that LIF-USEP account, and that Echeverría

acted as the agent for LIF-USEP and M&B in their dealings with Madoff and

BLMIS.  (*Id.*)

- *Tim Brockmann ("Brockmann") and Justin Lowe ("Lowe") of Reliance International Research LLC ("RIR")*:  The Trustee alleges that Echeverría had a close relationship with Brockmann and Lowe, alleged founders of RIR and its group of companies, including Reliance Management (BVI) Limited ("Reliance BVI") and Reliance Management  (Gibraltar) Limited ("Reliance Gibraltar," and together with RIR and Reliance BVI, "Reliance" or the "Reliance Group").  (*See, e.g.*, ¶¶ 49, 118, 119.)  The Trustee alleges Echeverría provided Brockmann assistance in gaining access to BLMIS, and helped the Reliance Group open its own Madoff feeder fund in 2007.  (*Id.*)

- *UBS*:  The Trustee alleges that, prior to assuming roles with LIF/LIF-USEP as Custodian and Main Paying Agent, Administrator and Portfolio Manager, UBS (Luxembourg) S.A. ("UBS SA"), UBS Fund Services (Luxembourg) S.A. ("UBSFSL") and UBS Third Party Management S.A. ("UBSTPM") held various roles with other Madoff feeder funds that directed more than $1.5 billion into BLMIS.  (*Id.* ¶¶ 100–03.)  The Trustee alleges that UBS SA knew that there were concerns about fraud at BLMIS while it serviced those funds.  (*Id.* ¶ 68.)

The Trustee alleges that LIF-USEP was formed on August 18, 2005 as a sub-fund of the already existing Luxembourg Investment Fund, with Reliance Gibraltar as LIF-USEP's Investment Advisor and M&B as its Distributor.  (*Id.* ¶ 93.)  The Trustee alleges that all of LIF-USEP's directors were employees of UBS SA, which was LIF-USEP's Custodian.  The Trustee alleges that Echeverría, acting as M&B's and LIF-USEP's agent, exercised enormous control

over that fund's formation and operations, and BLMIS's records allegedly identified Echeverría as the owner of the LIF-USEP account.  (*Id.* ¶¶ 53, 93, 123.)

The Trustee further alleges that LIF-USEP's rapid growth was a source of concern for UBS due to its increasingly large exposure to Madoff.  This concern, the Trustee asserts, prompted UBS to close LIF-USEP to new subscriptions in March 2007.  (*Id.* ¶ 123.)  The Trustee alleges that UBS's decision to close LIF-USEP was a catalysts for M&B opening a new fund, Landmark, the Witness herein.  (*Id.*)  Madoff's approval allegedly was needed to open the Landmark account and Echeverria allegedly assisted in establishing that account, with M&B serving as Landmark's Investment Manager.  (*Id.* ¶¶ 91, 123–24.)

**Allegations Relevant to the Evidence Sought in This Letter of Request**

Information possessed by the Witness Landmark is relevant to the Trustee's claims in his Complaint, giving rise to the need for this Letter Rogatory, most significantly in connection with the Trustee's claims of imputation of knowledge of the BLMIS trading and operations.  Specifically, the Trustee anticipates that Landmark will provide information in relation to any connections between the shareholders of that fund to entities associated with Echeverría and/or M&B and their connections to LIF and/or LIF-USEP, as alleged in paragraphs 44-46, 93-94 and 104-106 of the Complaint.

## REQUEST FOR JUDICIAL ASSISTANCE

## General Purpose

The evidence to be obtained from the Witness consists of documents and testimony to be used in court proceedings, motion practice, including dispositive motions, and trial of this action, as appropriate, and is necessary for the just and proper disposal of the proceedings before this Court.  While this Court expresses no view as to the merits or the Trustee's claims and

allegations, it believes the evidence sought will likely be relevant to, and either support or

contradict, material facts alleged in the Trustee's Complaint.

## **Request for Testimonial Evidence and Question List for Witness**

### DEFINITIONS

"M&B" means M&B Capital Advisers Sociedad de Valores S.A.

"BLMIS" means Bernard L. Madoff Investment Securities LLC.

"Landmark" means Landmark Investment Fund, Ireland.

"LIF" means Luxembourg Investment Fund.

"LIF-USEP" means Luxembourg Investment Fund-US Equity Plus.

"Echeverría" means Manuel Echeverría.

### SUBJECT MATTER OF EXAMINATION

### Questions

<u>Nature</u>

The questions will seek confirmation of relevant matters relating to the Landmark shareholder register as of December 2008, specifically the identity of those shareholders, their holdings within the fund, their known connections, if any, to entities associated with Echeverría and/or M&B or entities associated with them, and their known connections, if any, to LIF and/or LIF-USEP.

<u>Purpose</u>

This information concerns the imputation of knowledge of BLMIS's purported trading and operations, and the connections between the Landmark shareholders and entities associated with Echeverría and/or M&B, and/or LIF and LIF-USEP.

## **Request for Documents**

It is hereby requested that the witness be compelled to make the following documents

available for inspection and copying by the Trustee's legal representatives:

1. The shareholder register, as of December 2008, of Landmark Investment Fund Ireland.

## PROCEDURES TO BE FOLLOWED

It is requested that:

1.  Both United States and Irish counsel for Plaintiff and Defendants herein be permitted to be present at the examination throughout;

2.  Plaintiff, through counsel of his choosing, be permitted to conduct the examination and re-examination of the witness;

3.  Defendants, through counsel of their choosing, be permitted to conduct the cross examination of the witness;

4.  The examination be given under oath or affirmation before an Examiner appointed by the Irish court;

5.  The examination be conducted pursuant to the U.S. Federal Rules of Civil Procedure, and any and all objections made during the examination, except those relating to Irish law, be adjudged by this Court;

6.  The examination be transcribed by a reputable firm of transcribers;

7.  The transcript of the examination may be signed by the Examiner and the Witness in counterparts, with no requirement that the Witness sign in the presence of the Examiner;

8.  The transcript of the examination be provided to Eugene F. Collins at the address appearing below and to the parties;

9.  The examination to take place at the offices of Eugene F. Collins at Temple Chambers, 3 Burlington Road, Dublin 4, Ireland, D04 RD68; or such other venue as is convenient and agreed between the parties and the Witness;

10. The examination take place at 10:00 a.m. on March 26, 2020, on such other date and time as may be agreed upon among the Examiner, the Witness, and counsel for the parties.

## COSTS

All fees and costs incurred in the execution of this Letter Rogatory shall be borne by

Plaintiff Trustee.

## CONCLUSION

This Court expresses its appreciation for this assistance and states that the courts of the United States are authorized by statute, Section 1782 of Title 28 of the United States Code, to extend similar assistance to the tribunals of the Republic of Ireland and shall be ready and willing to provide reciprocal assistance in a similar case when required.

The Court extends to the judicial authorities of the Republic of Ireland the assurances of the highest consideration.

Dated:                          , 2020
    New York, New York

_____
The Honorable Stuart M. Bernstein
United States Bankruptcy Judge

# EXHIBIT A

**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Oren J. Warshavsky
Keith R. Murphy
Jonathan B. New
Melissa L. Kosack
Sammi Malek

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>       Debtor. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>       Plaintiff,<br><br>       v.<br><br>UBS AG, UBS (LUXEMBOURG) S.A., UBS FUND SERVICES (LUXEMBOURG) S.A., UBS THIRD PARTY MANAGEMENT COMPANY S.A., M&B CAPITAL ADVISERS SOCIEDAD DE VALORES, S.A., M&B CAPITAL ADVISERS HOLDING, S.A., M&B CAPITAL ADVISERS GESTIÓN SGIIC, S.A., JB CAPITAL MARKETS SOCIEDAD DE VALORES, S.A. (F/K/A M&B CAPITAL MARKETS SOCIEDAD DE VALORES, S.A.), FRANCISCO JAVIER BOTIN-SANZ de SAUTUOLA O'SHEA, GUILLERMO MORENES MARIATEGUI, RELIANCE MANAGEMENT (BVI) LIMITED, | Adv. Pro. No. 10- _____ (BRL)<br><br><br><br>__COMPLAINT__<br><br><br>__FILE UNDER SEAL__ |

RELIANCE INTERNATIONAL RESEARCH
LLC, RELIANCE MANAGEMENT
(GIBRALTAR) LIMITED, LUXEMBOURG
INVESTMENT FUND AND LUXEMBOURG
INVESTMENT FUND U.S. EQUITY PLUS, as
represented by their Liquidators MAITRE ALAIN
RUKAVINA and PAUL LAPLUME, MAITRE
ALAIN RUKAVINA and PAUL LAPLUME, in
their capacities as liquidators and representatives of
LUXEMBOURG INVESTMENT FUND AND
LUXEMBOURG INVESTMENT FUND U.S.
EQUITY PLUS, and LANDMARK
INVESTMENT FUND IRELAND,

Defendants.

# TABLE OF CONTENTS

**Page**

JURISDICTION AND VENUE ............................................................................................ 4

BACKGROUND .............................................................................................................. 5

THE PONZI SCHEME ..................................................................................................... 7

TRUSTEE'S POWER AND STANDING ........................................................................... 9

THE DEFENDANTS ...................................................................................................... 11

    A.    THE UBS DEFENDANTS ................................................................... 11

    B.    THE M&B DEFENDANTS ................................................................... 13

    C.    THE RELIANCE GROUP DEFENDANTS ......................................... 14

    D.    LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG
        INVESTMENT FUND U.S. EQUITY PLUS SUB-FUND ................... 16

    E.    LANDMARK INVESTMENT FUND IRELAND ................................. 17

THE DEFENDANTS' ACCESS TO MADOFF AND HIS GLOBAL NETWORK OF
    FEEDER FUNDS ..................................................................................................... 19

THE UBS DEFENDANTS SAW THE INDICIA OF FRAUD SURROUNDING BLMIS ....... 20

FORMATION OF LIF-USEP .......................................................................................... 26

    A.    Knowing the Likelihood of Fraud, the UBS Defendants Knowingly
        Provided a Façade Of Legitimacy for BLMIS .................................... 26

        1.    UBS AG – Sponsor ................................................................ 27

        2.    UBS SA – Sponsor, Custodian, and Portfolio Manager ......... 29

        3.    UBSTPM – Portfolio Manager ............................................... 29

        4.    UBSFSL – Administrator ....................................................... 29

    B.    The M&B Defendants and Reliance Group Defendants' Roles in
        Connection with LIF-USEP .............................................................. 30

THE UBS DEFENDANTS' ROLES IN ENABLING THE FRAUD ...................................... 31

    A.    The UBS Defendants Enabled Madoff By Providing the Appearance of
        Legitimacy and Security For LIF-USEP .............................................. 31

    B.    The UBS Defendants Relinquished Their LIF-USEP Management and
        Custodial Duties ................................................................................. 31

    C.    The UBS Defendants' Operation of LIF-USEP Invited a Fraud ........... 31

    D.    UBS Defendants Were Paid Millions for Their "Work" on LIF-USEP ... 32

THE M&B DEFENDANTS AND THE RELIANCE GROUP DEFENDANTS' LIF-
    USEP-RELATED FEES ........................................................................................... 32

# TABLE OF CONTENTS
(continued)

Page

THE RELIANCE GROUP DEFENDANTS WERE ON NOTICE OF INDICIA OF
FRAUD BUT TURNED A BLIND EYE AND FAILED TO ACT ...............................33

THE RELIANCE GROUP DEFENDANTS MEET WITH MADOFF AND HIGHLIGHT
OTC OPTIONS AS THE KEY PIECE OF THE PUZZLE .............................................34

THE RELIANCE GROUP DEFENDANTS OBTAIN AN ACCOUNT AT BLMIS ................36

THE M&B DEFENDANTS' FORMATION OF THE LANDMARK ACCOUNT AT
BLMIS ..............................................................................................................37

THE RELIANCE GROUP DEFENDANTS' VIEW OF MADOFF: THE SACRED COW ......37

THE RELIANCE GROUP DEFENDANTS MEET WITH MADOFF ON DECEMBER
4, 2008 ............................................................................................................39

DEFENDANTS WERE ON NOTICE OF RED FLAGS CONCERNING MADOFF'S
STRATEGY, PERFORMANCE, AND OPERATIONAL INFRASTRUCTURE..........41

    A.    There Were Not Enough Options for Madoff to Implement the SSC
Strategy....................................................................................................41

    B.    The Defendants Entered into Hundreds of Millions in Options Contracts
with Unknown Counterparties..................................................................48

    C.    The Options Trade Confirmations Contained Other Significant
Abnormalities .........................................................................................50

    D.    Settlement Period Abnormalities................................................................50

    E.    Madoff's Returns Were Suspiciously Consistent for Too Many Years ...............51

    F.    Madoff Demonstrated Purported Trades Inconsistent with the SSC
Strategy....................................................................................................53

    G.    LIF-USEP and Landmark Had a Negative Cash Balance with BLMIS...............54

    H.    Trades Were Executed Outside of the Daily Price Range....................................55

    I.    Madoff's Ability to Buy Low and Sell High.........................................................55

    J.    Madoff Provided Paper Trade Confirmations ......................................................56

    K.    Despite Exorbitant Trading Volumes There Was Never Any Impact on the
Market......................................................................................................57

    L.    BLMIS's Non-Reputable Auditor .......................................................................58

    M.    BLMIS's Unusual Fee Structure .........................................................................59

    N.    No Segregation of Assets ....................................................................................60

    O.    Lack of Independent Verification of Assets .........................................................60

# TABLE OF CONTENTS
(continued)

P.    Madoff's Insistence on Secrecy: Lack of Transparency; Non-Disclosure of
Madoff's Name in Offering Material ................................................................... 61

THE TRANSFERS ............................................................................................................. 62

CUSTOMER CLAIMS ...................................................................................................... 65

COUNT ONE PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C.
§§ 547(b), 550(a), AND 551 ......................................................................... 66

COUNT TWO PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) – 11
U.S.C. §§ 547(b), 550(a), AND 551 ............................................................. 67

COUNT THREE PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) – 11
U.S.C. §§ 547(b), 550(a), AND 551 ............................................................. 68

COUNT FOUR PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) – 11
U.S.C. §§ 547(b), 550(a), AND 551 ............................................................. 69

COUNT FIVE FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C.
§§ 548(a)(1)(A), 550(a), AND 551 ............................................................... 70

COUNT SIX FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§
548(a)(1)(B), 550(a), AND 551 ..................................................................... 71

COUNT SEVEN FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW
YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279,
AND 11 U.S.C. §§ 544, 550(a), AND 551 ................................................... 73

COUNT EIGHT FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW
YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND
11 U.S.C. §§ 544, 550(a), AND 551 ............................................................. 74

COUNT NINE FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK
DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C.
§§ 544, 550(a), AND 551 ............................................................................... 75

COUNT TEN FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK
DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C.
§§ 544, 550(a), AND 551 ............................................................................... 76

COUNT ELEVEN RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK
DEBTOR AND CREDITOR LAW §§ 273-279, AND 11 U.S.C. §§ 544, 548,
550(a), AND 551 ............................................................................................. 77

COUNT TWELVE  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11
U.S.C. §§ 548(a)(1)(A), 550(a), AND 551 ................................................... 78

COUNT THIRTEEN FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11
U.S.C. §§ 548(a)(1)(B), 550(a), AND 551 ................................................... 79

# TABLE OF CONTENTS
(continued)

Page

COUNT FOURTEEN FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW
    YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279,
    AND 11 U.S.C. §§ 544, 550(a), AND 551 ...................................................................80

COUNT FIFTEEN FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW
    YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND
    11 U.S.C. §§ 544, 550(a), AND 551 .................................................................81

COUNT SIXTEEN FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW
    YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11
    U.S.C. §§ 544, 550(a), AND 551 .......................................................................82

COUNT SEVENTEEN FRAUDULENT TRANSFER (INITIAL TRANSFEREE) –
    NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279,
    AND 11 U.S.C. §§ 544, 550(a), AND 551 ...........................................................83

COUNT EIGHTEEN: RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK
    DEBTOR AND CREDITOR LAW §§ 273-279, AND 11 U.S.C. §§ 544, 548,
    550(a), AND 551 ...............................................................................................84

COUNT NINETEEN DISALLOWANCE OF CUSTOMER CLAIMS ....................................85

COUNT TWENTY EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS ...............86

COUNT TWENTY-ONE UNJUST ENRICHMENT ................................................................87

COUNT TWENTY-TWO MONEY HAD AND RECEIVED ...................................................88

COUNT TWENTY-THREE UNJUST ENRICHMENT ..........................................................88

COUNT TWENTY-FOUR MONEY HAD AND RECEIVED..................................................90

COUNT TWENTY-FIVE UNJUST ENRICHMENT ...............................................................90

COUNT TWENTY-SIX MONEY HAD AND RECEIVED......................................................91

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of

Bernard L. Madoff ("Madoff"), individually, under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa, *et seq.* ("SIPA"), by and through his undersigned counsel, as and for his

Complaint, alleges as follows:

## NATURE OF THE PROCEEDING

1.      The Defendants named in this complaint funneled more than $1 billion into the

single largest financial fraud in history predominantly through two "feeder funds."    The

Defendants' willful blindness substantially aided, enabled, and helped sustain the massive Ponzi

scheme masterminded by Madoff, in order to reap an extraordinary financial windfall for

themselves.

2.      Collectively, the Defendants received approximately $555 million in avoidable

transfers from BLMIS's investment advisory business ("IA Business").    The Defendants also

appear to have collected millions of dollars in management, performance, custodial, advisory,

subscription, and administration fees, in an amount to be determined at trial, for helping deposit

money with Madoff.    Every cent the Defendants withdrew from BLMIS, directly or indirectly,

and every cent they purportedly earned in fees, is in fact stolen Customer Property, as defined by

statute,[1] and must be returned to the Trustee for the benefit of the estate.

3.      Defendant UBS AG, an international bank based in Switzerland, is one of the

most highly-sophisticated financial institutions in the world.    UBS AG and its affiliated entities

(collectively, the "UBS Defendants"), including, but not limited to, UBS (Luxembourg) S.A.

("UBS SA"), capitalized on the Ponzi scheme in the face of clear indicia of fraud that cast doubt

---

[1]      SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities … at any time received, acquired, or held
by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such
property transferred by the debtor, including property unlawfully converted."

on the legitimacy of BLMIS.  Even though the UBS Defendants apparently had identified certain
red flags of BLMIS's fraud that reportedly led the UBS Defendants' Private Wealth
Management Group to refuse to recommend BLMIS-related funds to Private Wealth clients, the
UBS Defendants remained undeterred.  Despite their knowledge that BLMIS was likely a fraud,
the UBS Defendants sponsored the formation of Defendant Luxembourg Investment Fund U.S.
Equity Plus sub-fund ("LIF-USEP"), lending its name to that sub-fund to lull the outside world
into believing LIF-USEP was legitimate.  The UBS Defendants created LIF-USEP for the sole
purpose of investing assets with BLMIS.  As used herein, and in other similar actions brought by
the Trustee, a BLMIS Feeder Fund ("BLMIS Feeder Fund") is an investment vehicle, like LIF-
USEP, which invested assets through BLMIS via direct customer accounts with BLMIS's IA
Business.

4.      The UBS Defendants purported to serve various functions for LIF-USEP, such as
custodian, manager, and administrator, but relinquished their custodial and managerial duties to
BLMIS.  The UBS Defendants had a powerful financial incentive to turn a blind eye to the
numerous indicia of illegitimate trading activity and fraud.  As they generated millions in "fees"
for looking the other way, the UBS Defendants consciously and deliberately ignored the lack of
checks and balances on BLMIS.  The UBS Defendants are also the subject of a separate action
brought by the Trustee.

5.      The UBS Defendants did not act alone with respect to the direction of assets from
LIF-USEP into BLMIS.  Defendant M&B Capital Advisers Sociedad de Valores, S.A. ("M&B")
helped found LIF-USEP with the UBS Defendants and received millions of dollars for serving as
the distributor of LIF-USEP.  Further, M&B's BLMIS-related investments and relationships
predated its involvement with LIF-USEP.  Always searching for ways to satiate its ever-

expanding appetite for further access to BLMIS, M&B eventually formed its own BLMIS Feeder

Fund, Defendant Landmark Investment Fund Ireland ("Landmark").  While M&B and its related

entities (collectively, the "M&B Defendants") purportedly acted as Landmark's investment

manager and herded new investors into BLMIS as Landmark's distributor, the M&B Defendants

obtained millions in fees for ignoring red flags of fraud.

6.    Additionally, Defendants Reliance Management (BVI) Limited ("Reliance BVI"),

Reliance International Research, LLC ("RIR"), and Reliance Management (Gibraltar) Limited

("Reliance Gibraltar") (collectively, the "Reliance Group Defendants") worked in tandem to

derive millions of dollars as the so-called "investment advisor" and as another distributor of LIF-

USEP.  The Reliance Group Defendants had been investing assets with BLMIS for several years

prior to the formation of LIF-USEP.  In order to exploit the highly lucrative nature of the

consistent returns delivered by BLMIS, the Reliance Group Defendants were repeatedly willing

to cut corners on due diligence and consciously disregarded warnings that Madoff was engaging

in fraudulent activity.  The Reliance Group Defendants furthered the Ponzi scheme in their quest

for coveted access to Madoff by obtaining another BLMIS Feeder Fund with M&B, Defender

Limited ("Defender"), and a direct avenue to millions more in fees and profits.

7.    The Defendants' financial sophistication, as well as their extensive access to

BLMIS's financial information placed them individually, and collectively, in a position to

recognize indicia of fraud.  Even though the Defendants were on notice of many red flags

strongly indicating that BLMIS was a fraud, they continued to justify the investment of hundreds

of millions with BLMIS.  In the face of indicia of fraud, the Defendants were more than content

to reap millions in management, advisory, and distribution fees, and a share of the profits that

typically would be paid to BLMIS.  This compensation arrangement, together with a lack of

3

transparency and other factors set forth herein, should have caused these Defendants, who were experienced investment professionals, to investigate BLMIS. Yet, it was more profitable for them to simply turn a blind eye, which they deliberately and willingly did.

8.      Through this Complaint, the Trustee seeks the return of Customer Property belonging to the BLMIS estate, in the form of withdrawals, redemptions, fees, partnership distributions, profits, and assets, as well as the disgorgement of all funds, properties, and assets by which the Defendants were unjustly enriched.

## JURISDICTION AND VENUE

9.      The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 502(d), 510, 544, 547, 548(a), 550(a), and 551 of 11 U.S.C. §§ 101 (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 *et. seq.* (McKinney 2001)), New York Civil Practice Law and Rules (McKinney 2001), and other applicable law, for avoidance and recovery of preferential transfers and fraudulent conveyances, unjust enrichment, money had and received, consequential damages, and the Trustee's disallowance, and equitable subordination of the customer claims filed by certain Defendants.

10.     The Trustee seeks, among other things, to avoid such transfers, preserve the Customer Property for the benefit of the estate, and recover *all* transfers, or the value thereof, from the Defendants in whatever form it may now, or in the future, exist.

11.     This is an adversary proceeding brought in the Court in which the main underlying SIPA Proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending. The Securities Investor Protection Corporation ("SIPC") originally brought the SIPA Proceeding in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the

"District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA §§ 78eee(b)(2)(A), (b)(4).

12.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O).

13.    Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND

14.    On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal agents for violations of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the United States Securities and Exchange Commission ("SEC") filed a complaint in the District Court, commencing the District Court Proceeding against Madoff and BLMIS, which is pending before that Court. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.

15.    On December 12, 2008, the Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the "Receiver").

16.    On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA. On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with SIPC's application.

---

[2]    In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm. *See* Section 78*lll*(7)(B) of SIPA.

17.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree") which, in pertinent part:

    a.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    b.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3);

    c.    removed the case to this Bankruptcy Court pursuant to SIPA § 78eee(b)(4); and

    d.    removed the Receiver for BLMIS.

18.    By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

19.    At a plea hearing (the "Madoff Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At his Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50) ("Madoff Plea Allocution"). Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id*. On June 29, 2009, Madoff was sentenced to 150 years in prison, the maximum possible sentence for his crimes. Madoff began serving his sentence at a federal penitentiary in Butner, North Carolina on July 14, 2009.

20.    On August 11, 2009, a former BLMIS employee, Frank DiPascali ("DiPascali"),

pled guilty to participating in and conspiring to perpetuate the Ponzi scheme.  At a Plea Hearing

on August 11, 2009 in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS),

(the "DiPascali Plea Hearing") DiPascali pled guilty to a ten-count criminal information.  Among

other things, DiPascali admitted that the Ponzi scheme had begun at BLMIS since at least the

1980s.  Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764

(RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11) ("DiPascali Plea Allocution").

### THE PONZI SCHEME

21.    BLMIS was founded in 1959 by Madoff as a sole proprietorship, and, for most of

its existence, operated from its principal place of business at 885 Third Avenue, New York, New

York.  In January 2001, BLMIS became a New York limited liability company wholly-owned by

Madoff.  Madoff, as founder, Chairman, Chief Executive Officer, and sole owner, operated

BLMIS together with several of his friends and family members.  BLMIS was registered with the

SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934

(the "1934 Act"), 15 U.S.C. § 78*o*(b).  By virtue of that registration, BLMIS is a member of

SIPC.  BLMIS had three business units: the IA Business, market-making, and proprietary

trading.

22.    Outwardly, Madoff ascribed the consistent success of the IA Business to his so-

called "split-strike conversion strategy" ("SSC Strategy").  Pursuant to that strategy, Madoff

purported to invest BLMIS's IA Business customers' funds in a basket of common stocks within

the S&P 100 Index—a collection of the 100 largest publicly traded companies.  Madoff claimed

that his basket of stocks would mimic the movement of the S&P 100 Index.  He also asserted

that he would carefully time purchases and sales to maximize value, and correspondingly,

BLMIS's IA Business customers' funds would, intermittently, be out of the equity markets.

While out of the market, those funds were purportedly invested in United States Treasury bills or in mutual funds holding Treasury bills.  The second part of the SSC Strategy was the hedge of Madoff's stock purchases with S&P 100 Index options.  Those options functioned as a "collar," limiting both the potential gains and the potential losses of the stock positions.  Madoff purported to use proceeds from the sale of S&P 100 Index call options to finance the cost of purchasing S&P 100 Index put options.  Madoff also told BLMIS's IA Business customers, including the Defendants, that he would enter and exit the market between six and ten times each year.

23.    BLMIS's IA Business customers received fabricated either monthly or quarterly statements showing that securities were held in—or had been traded through—their accounts. However, the securities purchases and sales shown in such account statements virtually never occurred and the profits reported were entirely fictitious.  At his Plea Hearing, Madoff admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts.  In fact, there is no record of BLMIS having cleared a *single* purchase or sale of securities in connection with the SSC Strategy.  Madoff's SSC Strategy was entirely fictitious.

24.    At times prior to his arrest, Madoff assured customers and regulators that he purchased and sold the put and call options over-the-counter ("OTC"), rather than through an exchange.  Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold *any* of the options described in the IA Business's customer account statements.  Further, the Options Clearing Corporation ("OCC"), which clears all option contracts has no record of the BLMIS IA Business having bought or sold any exchange-listed options on behalf of any of BLMIS's IA Business customers.

25.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options.  Rather, BLMIS used

its IA Business customers' deposits to pay redemptions by other customers and to make other transfers, which are, of course, avoidable by the Trustee. Many of these transfers were used to enrich Madoff, his associates, and his family directly.

26.     The falsified monthly account statements reported that the accounts of BLMIS's IA Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme, BLMIS did not have the funds to pay BLMIS's IA Business customers what their account statements reported. BLMIS was only able to survive for as long as it did by using the stolen principal invested by some customers to pay other customers.

27.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors, and to lure other investors into the Ponzi scheme.

28.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

29.     Madoff's scheme continued until December 2008, when the requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

## TRUSTEE'S POWER AND STANDING

30.     As the Trustee appointed under SIPA, the Trustee has the responsibility of recovering and paying out Customer Property to BLMIS's customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the consolidated estate and its creditors.

The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway.  Such assets, however, will not be sufficient to reimburse the customers of BLMIS for the billions of dollars they invested with BLMIS over the years.  Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recovery from BLMIS accountholders who received avoidable transfers to the detriment of other customers whose money was stolen via the Ponzi scheme, and from any entities or individuals to which BLMIS accountholders subsequently transferred those funds.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

31.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff-1(b).  Chapters 1, 3, 5, and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case pursuant to section 78fff(b) of SIPA.

32.    In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA.

33.    The Trustee is a real party in interest and has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

a.    the Defendants received "Customer Property" as defined in SIPA § 78lll(4);

b.    BLMIS incurred losses as a result of the conduct detailed herein;

c.    BLMIS's customers were injured as a result of the conduct detailed herein;

10

d.      SIPC cannot, by statute, advance funds to the Trustee to fully reimburse all customers for all of their losses;

e.      the Trustee will not be able to satisfy fully all claims;

f.      the Trustee, as bailee of customer property, can sue on behalf of the customer-bailors;

g.      as of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted. As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

h.      SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such customers are referred to herein as collectively, "Accountholders"). SIPC has expressly conferred upon the Trustee the power to enforce its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

i.      the Trustee has the power and authority to avoid and recover transfers pursuant to sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

## THE DEFENDANTS

### A.      THE UBS DEFENDANTS

34.      Defendant UBS AG is a public company, incorporated under the laws of Switzerland, with its registered and principal offices at Bahnhofstrasse 45, CH-8001 Zurich, and at Aeschenvorstadt 1, CH-4051 Basel, Switzerland. UBS AG is present in New York, with offices located at 299 Park Avenue, New York, NY 10171 and 101 Park Avenue, New York, NY

10178.  UBS AG sponsored the formation of Luxembourg Investment Fund ("LIF") and served

as its promoter.  UBS AG also sponsored and served as the promoter for sub-fund LIF-USEP.

35.    Defendant UBS (Luxembourg) S.A. ("UBS SA"), a wholly-owned subsidiary of

UBS AG, is a *société anonyme* (public limited company), organized under the laws of the Grand

Duchy of Luxembourg, and has its registered office at 33a, Avenue John F. Kennedy, BP2, L-

1855 Luxembourg.  UBS SA served as promoter and custodian of LIF, which eventually

included LIF-USEP.  In addition, UBS SA served as portfolio manager of LIF from December

2004 through May 2, 2006, including LIF-USEP.

36.    Defendant UBS Fund Services (Luxembourg) S.A. ("UBSFSL"), a wholly-owned

subsidiary of UBS AG, is a *société anonyme* (public limited company), organized under the laws

of the Grand Duchy of Luxembourg, with its registered office at 33a Avenue John F. Kennedy,

L-1855 Luxembourg.  UBSFSL acted as an administrator and accounting agent to LIF and LIF-

USEP.

37.    Defendant UBS Third Party Management Company S.A. ("UBSTPM"), which is,

upon information and belief, a wholly-owned subsidiary of UBS AG, is a *société anonyme*

(public limited company), organized under the laws of the Grand Duchy of Luxembourg, with its

registered office at 33a, Avenue John F. Kennedy, L-1855 Luxembourg.  On May 2, 2006, UBS

SA assigned to UBSTPM its portfolio management function for LIF.  UBSTPM also acted as

LIF-USEP's portfolio manager.

38.    UBS AG, UBS SA, UBSFSL, and UBSTPM are collectively referred to herein as

the "UBS Defendants."

39.    On or about March 2, 2009, UBS SA filed a customer claim, on behalf of LIF-

USEP with the Trustee which the Trustee has designated as Claim No. 004536.

## B.    THE M&B DEFENDANTS

40.    Defendant M&B Capital Advisers Sociedad de Valores, S.A. ("M&B") is a securities broker-dealer organized and existing under the laws of Spain.  M&B has an office located at Plaza Manuel Gomez Moreno, No. 2 Edificio Alfredo Mahou., 28020 Madrid, Spain.

41.    Defendant M&B Capital Advisers Holding, S.A. ("M&B Holding") has served as the holding company for M&B, as well as related companies Defendants M&B Capital Advisers Gestión SGIIC, S.A. and JB Capital Markets Sociedad de Valores, S.A., formerly known as M&B Capital Markets Sociedad de Valores, S.A.  M&B Holding has an office located at Plaza Manuel Gomez Moreno, No. 2 Edificio Alfredo Mahou., 28020 Madrid, Spain.  Upon information and belief, M&B Capital Advisers Gestión SGIIC, S.A. and JB Capital Markets Sociedad de Valores, S.A. also have offices located at Plaza Manuel Gomez Moreno, No. 2 Edificio Alfredo Mahou., 28020 Madrid, Spain.  M&B, M&B Holding, M&B Capital Advisers Gestión SGIIC, S.A., and JB Capital Markets Sociedad de Valores, S.A. are collectively referred to herein as the "M&B Defendants."

42.    M&B and M&B Holding were formed in 2000 by Defendants Francisco Javier Botin-Sanz de Sautuola O'Shea ("Botin") and Guillermo Morenes Mariategui ("Morenes").  Botin is the son of Emilio Botin-Sanz, the executive chairman of Banco Santander Central Hispano ("Santander").  Botin is a citizen of a foreign state.  Morenes is Emilio Botin-Sanz's son-in-law.  Morenes is a citizen of a foreign state.  Morenes and Botin worked at Santander until 2000, when they formed M&B and M&B Holding.  Morenes is the Chairman of M&B Holding.

43.    M&B operated as a broker under the supervision of the Spanish market regulator CNMV until it transformed into a broker-dealer and incorporated as a member of the Madrid Stock Exchange in 2004.  Upon information and belief, M&B provided asset management,

portfolio management, and financial advice services, trade execution, investment advice, IPOs and secondary placements, and private placement services, as well as company presentations reports, company notes, company visit reports, and monthly equities.

44.    Upon information and belief, the M&B Defendants, due to their close relationship with Santander, first became involved with Madoff when they began promoting Optimal Strategic U.S. Equity Limited ("Optimal").  Optimal was a fund run by Santander.  The Trustee has entered into a settlement agreement with Optimal, which has been approved by this Court.

45.    The M&B Defendants were the principal entities behind the formation of the LIF-USEP sub-fund and served as a distributor of LIF-USEP in Spain and Portugal.  In 2007, the M&B Defendants also launched Landmark, solely for the purpose of exposing more of their investor base to the Madoff product.  The M&B Defendants served as investment manager of Landmark.

46.    Upon information and belief, the M&B Defendants were used, at least in part, by Morenes and Botin for the purpose of furthering the BLMIS Ponzi scheme.  Upon information and belief, the M&B Defendants have been dominated and used as the instrument of Morenes and Botin to advance their own personal interests rather than legitimate corporate ends.  Upon information and belief, Morenes and Botin exercised complete domination and control of the M&B Defendants, including in the M&B Defendants' dealings with BLMIS, whose activities they knew or should have known were predicated on fraud.  As a result, Morenes and Botin functioned as alter egos of the M&B Defendants and no corporate veil can be maintained among them.  Accordingly, the M&B Defendants include Morenes and Botin.

C.    **THE RELIANCE GROUP DEFENDANTS**

47.    Defendant Reliance Management (BVI) Limited ("Reliance BVI") is a company incorporated under the laws of the British Virgin Islands on June 17, 1998.  At the time of

Madoff's arrest, Reliance BVI had its registered address at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands. Tim Brockmann ("Brockmann") created Reliance BVI, which served as portfolio manager for various hedge funds. Upon information and belief, Reliance BVI's first exposure to Madoff was not a direct investment. Rather, Reliance BVI invested through Kingate Global Fund Ltd. ("Kingate") and later through Optimal. Upon information and belief, in 2004, Reliance BVI created a wholly-owned subsidiary in Gibraltar, Reliance Gibraltar, to serve the needs of its Luxembourg-based funds, including LIF-USEP. Upon information and belief, Reliance BVI now has its office in Gibraltar.

48.     Defendant Reliance International Research LLC ("RIR") is a private limited liability company organized under the laws of New York on August 29, 2000, with an office located at 147 East 48th Street, New York, NY 10017, USA. Brockmann and childhood friend Justin Lowe ("Lowe") created RIR. Upon information and belief, RIR was the research arm of Reliance BVI and Reliance Gibraltar, and performed various research functions for Reliance BVI and Reliance Gibraltar concerning their new and existing investments, including investments with BLMIS. Lowe is currently the majority owner of RIR.

49.     Defendant Reliance Management (Gibraltar) Limited ("Reliance Gibraltar") is a company incorporated under the laws of Gibraltar on March 17, 2004, with its registered address at Suite 207, Neptune House, Marina Bay, Gibraltar. Brockmann founded Reliance Gibraltar as well. Reliance Gibraltar was the investment advisor to LIF-USEP until LIF-USEP was placed in liquidation. Upon information and belief, at all times relevant hereto, Reliance Gibraltar has been a wholly-owned subsidiary of Reliance BVI.

50.    Reliance BVI, RIR, and Reliance Gibraltar are collectively referred to herein as
the "Reliance Group Defendants."  The Reliance Group Defendants are also the subject of a
separate action brought by the Trustee.

51.    On or about 2007, the Reliance Group Defendants created a BLMIS Feeder Fund
under the name Defender, which is the subject of a separate action brought by the Trustee.  The
M&B Defendants served as the distributor for a class of shares of Defender.

D.    **LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT
FUND U.S. EQUITY PLUS SUB-FUND**

52.    Upon information and belief, Defendant Luxembourg Investment Fund ("LIF")
was incorporated on August 26, 2002 pursuant to the laws of the Grand Duchy of Luxembourg,
with its registered office at 33a Avenue John F. Kennedy, L-1855 Luxembourg.  It was
registered in the Luxembourg Trade and Companies Register under No. B.88859.

53.    LIF was structured as an open-ended umbrella investment company with multiple
sub-funds ("SICAV").   Upon information and belief, on August 18, 2005, Defendant
Luxembourg Investment Fund U.S. Equity Plus ("LIF-USEP"), a sub-fund of LIF, was formed
for the exclusive purpose of investing with BLMIS.  An account in the name of "UBS
(Luxembourg) S.A. for the benefit of Luxembourg Investment Fund U.S. Equity Plus" was
opened with BLMIS, and held account number 1FR123 with BLMIS.  LIF-USEP's account was
still open when Madoff was arrested on December 11, 2008.

54.    LIF, including LIF-USEP, was placed in liquidation by the District Court of
Luxembourg on April 30, 2009 and is represented by its court-appointed liquidators, Alain
Rukavina and Paul Laplume (the "Luxembourg Liquidators").  Mr. Rukavina and Mr. Laplume
are also defendants in their capacities as liquidators and representatives of LIF, including LIF-

USEP.  Mr. Rukavina and Mr. Laplume are residents of Luxembourg.  Accordingly, Defendant

LIF includes Mr. Rukavina and Mr. Laplume.

55.     All of the members of the Board of Directors of LIF are current or former

employees of UBS SA.  Roger Hartmann ("Hartmann") served as Chairman of the Board of

Directors of LIF from August 2004 to January 1, 2008.  Alain Hondequin ("Hondequin") served

as a Director of LIF from August 2004 through LIF's liquidation.  Bernd Stiehl ("Stiehl") served

as a Director of LIF from August 2004 to December 7, 2005.  René Egger ("Egger") served as a

Director of LIF from January 2, 2006 through LIF's liquidation.  Ralf Schroeter ("Schroeter")

became a Director of LIF on January 1, 2008 and served as Chairman of the Board of Directors

of LIF at the time of LIF's liquidation.  Hartmann, Hondequin, Stiehl, Egger, and Schroeter are

not parties to this Complaint and are the subject of a separate action brought by the Trustee.

56.     On or about March 2, 2009, LIF filed a customer claim with the Trustee which the

Trustee has designated as Claim No. 004417.  On or about March 3, 2009, LIF filed another

customer claim with the Trustee which the Trustee has designated as Claim No. 006182.

**E.     LANDMARK INVESTMENT FUND IRELAND**

57.     Upon information and belief, Defendant Landmark Investment Fund Ireland

("Landmark") was established as a sub-fund of AA (Alternative Advantage) plc ("AA") in

Ireland, in or about October 2007.  AA had been incorporated in Ireland since November 3,

2003.  Prior to November 25, 2004, AA's name was M&B Capital plc.  Upon information and

belief, Landmark's office is located at HSBC House, Harcourt Centre, Harcourt Street, Dublin 2,

Ireland.

58.     M&B served as investment manager of AA and its sub-funds, including

Landmark, at all relevant times until April 2008, at which time the investment manager role was

handed over to another M&B-related entity, M&B Capital Advisers Gestión, SGIIC, S.A.

17

59.     At all relevant times, HSBC Institutional Trust Services (Ireland) Limited served as the custodian for AA and its sub-funds, including Landmark.  HSBC Institutional Trust Services (Ireland) Limited is not a party to this Complaint and the Trustee is pursuing claims against it in a separate action.

60.     Landmark was formed for the exclusive purpose of investing with BLMIS.  An account in the name of "HSBC Institutional Trust Svcs (Ireland) Ltd. for the benefit of Landmark Investment Fund Ireland" was opened with BLMIS, and held account number 1FR133 with BLMIS.  Landmark's account was still open when Madoff was arrested on December 11, 2008.

61.     This Court has personal jurisdiction over all of the Defendants captioned herein pursuant to N.Y. CPLR 301 and 302 and Bankruptcy Rule 7001.

62.     All Defendants have maintained minimum contacts with New York in connection with the claims alleged herein.  The UBS Defendants, the M&B Defendants, and the Reliance Group Defendants all have transacted business in New York.  Defendants LIF-USEP and Landmark had accounts with BLMIS in New York, and entered into agreements with BLMIS in New York.

63.     The UBS Defendants, the M&B Defendants, the Reliance Group Defendants, LIF, LIF-USEP, and Landmark delivered agreements or caused agreements to be delivered in New York relating to BLMIS.

64.     Certain of the UBS Defendants, M&B Defendants, and the Reliance Group Defendants communicated regularly with persons in New York regarding LIF-USEP and/or Landmark, and/or BLMIS, and also sent funds to BLMIS in New York for, among other reasons, the direction and/or purchase of securities in New York, and/or received funds from BLMIS in New York, all through the use of New York banks.

65.     Furthermore, the UBS Defendants, the M&B Defendants, and the Reliance Group Defendants have committed tortious acts both within and without New York, causing injury in New York, and the UBS Defendants, the M&B Defendants, and the Reliance Group Defendants expected or should reasonably have expected these tortious acts to have consequences in New York and derive substantial revenue from interstate or international commerce.

66.     LIF filed Customer Claims in the SIPA Proceeding seeking to recover funds it allegedly lost on LIF-USEP's investments with BLMIS, whereby it has submitted to the jurisdiction of this Court.

67.     Thus, this Court has personal jurisdiction over the Defendants based on the Defendants' contacts with the U.S.

### THE DEFENDANTS' ACCESS TO MADOFF AND HIS GLOBAL NETWORK OF FEEDER FUNDS

68.     The UBS Defendants sponsored, managed, administered, or served as custodian for several BLMIS Feeder Funds that the Trustee is investigating or pursuing through separate actions.  Indeed, the UBS Defendants provided crucial infrastructure for several BLMIS Feeder Funds.  For example, UBS SA served as the custodian for Plaza Investments International Limited ("Plaza"), which directed investments of approximately $534 million into BLMIS.  At various times, UBS SA also served as administrator and custodian for Thybo Asset Management Limited, Thybo Global Fund Limited, Thybo Return Fund Limited, and Thybo Stable Fund Limited, which collectively directed investments of approximately $207 million into BLMIS. Further, the UBS Defendants served in multiple roles for Luxalpha SICAV ("Luxalpha") and Groupement Financier Ltd. ("Groupement Financier") including sponsor, manager, administrator, and custodian or prime banker.  Plaza, Thybo Asset Management Limited, Thybo

19

Global Fund Limited, Thybo Return Fund Limited, Thybo Stable Fund Limited, Luxalpha, and

Groupement Financier are the subject of separate actions that have been brought by the Trustee.

69.     The UBS Defendants served as support for these massive BLMIS Feeder Funds

despite having concluded that BLMIS was not a suitable investment for marketing to their own

clients.

70.     Upon its formation, M&B began placing investor funds with Madoff, initially

investing with BLMIS Feeder Funds Optimal and Plaza.

71.     The Reliance Group Defendants commenced funneling funds to Madoff in 1999

by investing with an investment in Kingate and then increased their investment with Madoff by

investing in Optimal.

**THE UBS DEFENDANTS SAW THE INDICIA OF FRAUD SURROUNDING BLMIS**

72.     Upon information and belief, because of concerns about Madoff's purported

strategy and because he would not meet with their due diligence teams, the UBS Defendants

refused to recommend or market BLMIS to their private bank clients.  Remarkably, this did not

prevent the UBS Defendants from supporting and assisting BLMIS in return for millions in fees.

73.     Upon information and belief, neither BLMIS nor any BLMIS Feeder Fund was

ever placed on the list of Global Wealth Management & Business Banking recommendations for

direct investment maintained by the UBS Defendants for their clients.

74.     Following the revelation of the Madoff fraud, UBS AG, the parent entity of the

UBS Defendants, stated publicly that it had no material exposure to BLMIS.

75.     Upon information and belief, the UBS Defendants' lack of exposure to BLMIS

and the decision not to market BLMIS Feeder Funds to their own private bank clients were the

result of due diligence analyses performed by the UBS Defendants on Madoff and BLMIS.

76.    In November 2000, UBS AG acquired Fondvest AG ("Fondvest"), a Zurich-based company specializing in analyzing funds for institutional investors.    Fondvest served as the research unit for the UBS Defendants, providing analysis on third-party funds for the UBS business units.    Upon information and belief, Fondvest analyzed BLMIS-related funds and repeatedly declined to endorse them for distribution to UBS clients because of the lack of transparency regarding their ability to generate such high, stable returns.

77.    Fondvest was discontinued in 2004 and the Investment Solutions unit within UBS Wealth Management became responsible for providing analysis of third-party funds to the UBS Defendants.    Investment Solutions continued to refuse to endorse BLMIS-related funds. According to an April 2009 *Financial Times* article, UBS AG's Wealth Management unit:

> had earlier looked at the Madoff funds platform from a general process and firm perspective, but did not receive the required levels of comfort and gave the funds a "non approved" status for internal records.  This was seen as a clear signal that Madoff funds should not be actively held for portfolio construction uses at UBS.

78.    The UBS Defendants decided against investing in a BLMIS Feeder Fund, despite its attractive returns, as early as 2002, noting that "[t]he fund seems to do very well, but there are voices in the industry warning because generating such consistent returns with such a strategy is more or less impossible."    The BLMIS Feeder Fund's promoters claimed that their "great relationship" with Madoff provided complete transparency, yet they were never able to sufficiently answer the UBS Defendants' questions about the strategy.    As a result, the UBS Defendants decided not to invest in the BLMIS Feeder Fund, saying "[w]e consider ourselves pretty smart and no one in their firm has properly explained their strategy to match the return profile to us, so we avoid stuff like that."

79.    Between September 2007 and December 2008, UBS was approached about investing in several BLMIS-related products.    Internal emails from the UBS Defendants show

that, in response to these requests, UBS AG performed extensive due diligence on BLMIS. During this process several red flags were raised regarding BLMIS and the underlying manager, Madoff, including Madoff's lack of transparency and his refusal to meet with UBS AG's analysts.

80.     For example, representatives of an investment firm called Pioneer Alternative Investment Management, Ltd., Dublin or Pioneer Global Asset Management S.p.A. in Milan ("Pioneer") approached UBS AG.  Pioneer sought to have a BLMIS Feeder Fund called Primeo Select offered and promoted through UBS AG.  Ultimately, UBS AG refused to allow the Primeo Select fund to be offered through UBS AG.  Upon information and belief, this decision appears to have been based on due diligence done by UBS AG in London, as well as a decision from UBS AG's asset management group in Switzerland.  UBS AG believed that it did not have enough information on Madoff, who was the underlying fund manager for Primeo Select, could not get comfortable with Madoff's strategy, and refused to offer any Madoff product because Madoff would not meet with UBS AG's analysts.

81.     To approve investments in BLMIS related products, UBS AG required its analysts to obtain more information on the underlying fund manager, Madoff.  One of the due diligence requirements "was a face to face meeting with the manager and a site visit to the HQ of the firm where money is managed."  This task was assigned to Mary Kleckner ("Kleckner"), a UBS analyst in London.  In September 2008, as part of preparation for such a meeting, Kleckner asked her team for a list of specific questions or topics they would like answered.  The team responded with concerns about the total assets BLMIS was managing and whether there was a point at which these assets would be large enough to deteriorate the strategy's performance.

Additionally, UBS raised questions about the potential misuse of information between BLMIS's

market-making and IA Business arms.

82.     UBS AG's questions were never answered, as Madoff continuously thwarted

Kleckner's efforts to gain transparency, repeatedly refusing Kleckner's requests to meet with

him.  In a September 17, 2008 email, Kleckner was informed:

> Madoff has turned down our request for a meeting.  His simple
> explanation was that if he meets with one client he would be
> obligated, perhaps even from a regulatory standpoint now that he is
> an RIA, to meet with all of them, and he would literally be forced
> to build an infrastructure to support meetings and devote a huge
> amount of time to it.

83.     Kleckner also reached out to others for their opinions on Madoff.  On October 31,

2007, in response to her question, "What are your feelings on Madoff," Kleckner received the

following response:

> I think [M]adoff is one of the most controversial funds out there.
> The historic returns and low vol[ume] make the [M]adoff feeders
> look very attractive for leveraged structured products and FAs love
> it.  In addition, [M]adoff is very involved with the [NASD] and on
> a number of committees there.  We get asked about sp's on these
> funds all the time, but there are a lot of folks who are concerned
> about the fund.  Everything is probably fine, but there are a number
> of things that are odd or different than the norm.  Like no prime
> broker, all trades done through [M]adoff securities through an
> ordinary brokerage account.  It's also unclear which dealers are
> executing the [OTC] collars for him?  They are pretty big, but no
> one seems to know who is trading them. The compensation for him
> is just through commission, no mgmt or incentive fee.  There are a
> couple of other flags as well but [redacted] have both written a lot
> of structured products on Madoff . . . .  I've never met him, but we
> did have a call with one of his risk folks some time ago.  Could be
> ok, but there is more risk due to the lack of transparency on this
> one than in many other funds.  **Some folks think [M]adoff could
> be one of the most successful schemes ever, I think it would be
> hard to do anything on them without more transparency than
> they have historically been willing to provide.**

(Emphasis added.)

84.     Ultimately, UBS AG decided that it did not have enough information on Madoff to invest with him.  UBS AG was unable to assuage its concerns as no further transparency was forthcoming, since Madoff refused to meet with any of UBS's analysts.  UBS ultimately concluded that "Madoff is not a manager that we are willing to structure products on. . . ."

85.     UBS AG also issued a series of notes linked to Momentum AllWeather Strategies II, which in turn was partially invested in a BLMIS Feeder Fund, Kingate (8.24% reported as of December 2008).  Upon information and belief, UBS, as issuer of these notes, would have performed due diligence on Madoff and BLMIS in the normal course of business.

86.     Despite not permitting the investment of a significant amount, if any, of its own money in BLMIS and refusing to recommend any BLMIS Feeder Fund to their clients, the UBS Defendants decided as early as January 2004 to create and structure the BLMIS Feeder Funds Luxalpha and Groupement Financier.  Even more so, the UBS Defendants continued to consciously disregard the glaring indicia of Madoff's fraud to acquire additional revenue streams through the creation of the LIF-USEP as a BLMIS Feeder Fund in 2005.

87.     The UBS Defendants consciously disregarded the numerous red flags raised by various UBS employees and internal opposition regarding whether the UBS Defendants should be involved with a BLMIS structure in any capacity.  As Stiehl, one of the directors of Luxalpha, a managing director of UBS SA, and eventually a director of LIF-USEP, stated in January 2004 in response to an email from UBS AG which explicitly raised concerns about getting involved with BLMIS, "Business is business.  We cannot permit ourselves to lose 300 million."  Upon information and belief, Mr. Stiehl was referring to anticipated fees.

88.     While performing due diligence, UBS SA reached out to other UBS entities for information on BLMIS, and received significant negative feedback.  For example, Mike Welch

("Welch") of UBS O'Connor LLC, a subsidiary of UBS AG, cautioned against becoming involved with Madoff due to the lack of transparency into BLMIS. In a March 5, 2004 email regarding BLMIS, a portion of which was entitled "Thoughts and Rationale for NOT Investing," Welch raised several red flags. First, he noted that since 1990 there were only a handful of negative months, and that the strategy generated incredibly consistent returns each year. Second, he stated that "[i]f Madoff were to run the strategy totally independently from his [broker/dealer business], it would be IMPOSSIBLE to generate the returns that he has produced since 1990." Additionally, Welch noted that Madoff did not charge fees for his hedge fund, which "[m]akes one ask the question of why Madoff would bother to have such a product when the only revenue coming from running outside money is commission dollars." Welch concluded that "[t]he simple fact that an investor has to start considering how the fund and the [broker/dealer] benefit one another is a non-starter in our mind."

89.     Tim Bell ("Bell"), a UBS AG employee who regularly advised on hedge fund investments, echoed Welch's concerns about BLMIS. In an email dated March 5, 2004, Bell characterized the question of whether the UBS Defendants "should [] go there" as depending on the answers to the questions, "can we really get transparency and can we really get comfortable?" In response to UBS SA's inquiries about BLMIS, Bell stated:

> [w]e should have a proper UBS view on what we think of all this rather than a purely personal view on my part, but I think you will find that the general UBS view would steer on the negative side given the great need for transparency . . . . My natural leaning would be negative as well, not because of anything against the strategy or Madoff himself, but because of the size, the lack of transparency, [and] the lack of capcity [*sic*] . . . .

90.     UBS SA itself acknowledged the serious risks involved in working with BLMIS. In response to a request in 2003 by UBS SA for feedback regarding Madoff, a UBS AG (Zurich)

employee stated that one of UBS AG's biggest concerns was that Madoff was acting as both a

broker and a depository at once. In addition, this same employee stated:

> We normally have to give "NO" as the answer in cases like
> Madoff. In doing so, we make reference to the following
> principles: no broker as depository, and the broker may under no
> circumstances also be a depository at the same time! Such a NO is
> easy to comprehend for both business policy reasons and risk
> reasons.

In a December 17, 2003 email forwarding UBS AG's feedback on Madoff, Vivian De Angelis

("De Angelis") of UBS SA concurred with this assessment, stating that "[t]he risk should not be

underestimated," however, she also countered that working with BLMIS "would be

advantageous on the income side."

91.     In spite of the UBS Defendants' own policy against such a structure, BLMIS was

given "'special' handling" and permitted to function as both depository and broker. Apparently

to give themselves comfort, UBS SA and UBS AG attempted to impose certain conditions. For

example, they wanted to require BLMIS to report cash and security movements to UBS SA for

the purpose of daily reconciliations. They also wanted electronic access to their accounts. None

of these requirements was met.

92.     Rather than heeding the glaring red flags and words of warning from their own

colleagues, UBS SA forged on with the corrupt relationship with Madoff through the formation

of BLMIS Feeder Funds, Luxalpha, Groupement Financier, and LIF-USEP.

## FORMATION OF LIF-USEP

**A.     Knowing the Likelihood of Fraud, the UBS Defendants Knowingly Provided a
Façade Of Legitimacy for BLMIS**

93.     Upon information and belief, sometime in December 2004, Manuel Echeverria

("Echeverria"), who was at that time the head of Optimal Investment Services SA, approached

UBS SA on behalf of the M&B Defendants with regard to the creation of a new account at

BLMIS.  Upon information and belief, Echeverria had been a long time friend of Madoff's and hence, had direct connections to BLMIS-related investment opportunities.  Despite their knowledge of indicia of Madoff's fraudulent activity, the UBS Defendants consciously and deliberately disregarded these red flags and sought instead to exploit even more BLMIS opportunities.  Indeed, upon information and belief, M&B, UBS AG, and UBS SA made a collective decision to create a new BLMIS Feeder Fund to be structured as a replica of another, contemporaneously "successful" BLMIS Feeder Fund, Luxalpha, which was within the UBS Defendants' BLMIS-related auspices.  In lieu of creating an entirely new fund, UBS AG and UBS SA created a sub-fund within one of their already existing, approved funds – LIF.  On July 22, 2005, the Board of Directors of LIF approved opening an account with BLMIS in the name of LIF-USEP.  LIF-USEP's sole purpose was to invest with BLMIS.  LIF-USEP was officially formed on August 18, 2005 and investments began in September 2005.

94.    Additionally, sometime in 2004, Echeverria approached the Reliance Group with an offer to become LIF-USEP's investment advisor.  Since LIF-USEP was an open-ended investment company, or a SICAV, its investment advisor had to be a European Union-based company.  Upon information and belief, to accede to Echeverria's request, on March 17, 2004, the Reliance Group founded Reliance Gibraltar.

### 1.    UBS AG – Sponsor

95.    The UBS Defendants held many roles in connection with LIF and LIF-USEP:

96.    UBS AG's role with respect to LIF was integral to developing and promoting the fund as a so-called UCITS fund.  This means that the fund was created under the "Undertakings for Collective Investments in Transferable Securities," a set of directives and laws in the EU, as well as local Luxembourg laws.  A UCITS fund may take the legal form of either a common fund, or a SICAV.  LIF was a UCITS fund and an umbrella SICAV, and as such, was open to

investments from the public at large, rather than limited to investments from sophisticated investors.

97.    UBS AG served as the sponsor and promoter of LIF, and eventually LIF-USEP (titles that UBS AG used interchangeably).    UBS AG was named LIF's sponsor in the draft prospectus sent to the Commission de Surveillance du Secteur Financier ("CSSF"), the Luxembourg regulator, at LIF's inception as part of its approval application in 2002.    The September 2002 LIF sales prospectus states in relevant part, "[t]he Sponsor of the Fund is UBS AG, Zurich and Basel, one of the world's leading financial institutions which offers a full range of commercial, trading, risk management and investment services."    UBS AG's sponsor role was subsequently confirmed on each LIF prospectus including all the prospectuses at, and after, the opening of the LIF-USEP sub-fund.    UBS AG was also identified as the fund's promoter in an Operating Memorandum for LIF, dated December 20, 2005.

98.    Under Luxembourg law, a fund's sponsor/promoter is responsible for the creation of the fund.    The sponsor/promoter of a UCITS fund, such as LIF-USEP, must be a regulated entity with sufficient financial resources.    A UCITS fund, such as LIF-USEP, is authorized in Luxembourg by the CSSF on the basis of the sponsor/promoter's experience and financial soundness.    Specifically, the sponsor/promoter of a UCITS fund is expected to provide compensation for damages sustained by third parties as a result of fault in the management or administration of the fund.

99.    By serving as the fund's sponsor/promoter, UBS AG explicitly gave its imprimatur to LIF-USEP, and led the Luxembourg regulator, as well as investors across Europe, to rely on UBS AG's global reputation, thus believing that one of the world's largest financial institutions was endorsing and standing behind LIF-USEP.    By acting in such a capacity, UBS

AG created the appearance of legitimacy and security for LIF-USEP, which in reality was a mere façade and a means to channel all of LIF-USEP's investments into the custody and control of Madoff; one of the very reasons UBS AG did not recommend that its own clients invest with BLMIS.

### 2.    UBS SA – Sponsor, Custodian, and Portfolio Manager

100.    UBS SA served in multiple roles for LIF, including sponsor, custodian, portfolio manager, and main paying agent.

101.    UBS SA acted as custodian of LIF, pursuant to a Custody Agreement of August 26, 2002.  As LIF's, and eventually LIF-USEP's custodian, UBS SA was by law responsible for safekeeping the fund's assets and supervising the fund.  Despite earning substantial fees for purportedly acting as a custodian, UBS SA knowingly and deliberately surrendered to BLMIS its custodial obligations with respect to LIF-USEP.

### 3.    UBSTPM – Portfolio Manager

102.    In May 2006, UBSTPM replaced UBS SA as portfolio manager of LIF and LIF-USEP.  As manager of LIF-USEP, UBSTPM represented to the CSSF and the public that it had assumed the responsibility for the management and administration of the sub-fund, as well as the monitoring of investment policies and restrictions of the sub-fund.  In reality, all management functions for LIF-USEP had already been relinquished to BLMIS as a result of the asset management agreement executed between UBS SA and BLMIS.

### 4.    UBSFSL – Administrator

103.    UBSFSL acted as administrator for LIF-USEP, meaning that it was responsible for accounting functions, calculation of the sub-fund's net asset value ("NAV"), keeping the register of shareholders, handling subscriptions and redemptions, communication with investors, and preparation of financial statements for the funds.  UBSFSL calculated the NAV of LIF-

USEP with information provided by BLMIS, without any independent verification of the numbers BLMIS provided.

**B.** **The M&B Defendants and Reliance Group Defendants' Roles in Connection with LIF-USEP**

104.    Upon information and belief, during initial discussions in December 2004, UBS SA and M&B had agreed that the LIF-USEP sub-fund would be launched as a private vehicle exclusive to M&B and Reliance Group investors.

105.    Directly following the formation of the LIF-USEP sub-fund, M&B signed a Consultancy and Exclusive Introducing Agreement with UBS SA on September 1, 2005. Pursuant to this agreement, M&B was entitled to receive from UBS SA a trailing fee, which was a part of the portfolio manager fee, "with respect to the net assets held by shareholders procured to the [LIF-USEP]." Upon information and belief, M&B also was entitled to receive from UBS SA the subscription fee provided in the prospectus of the sub-fund and had discretion to determine that amount within the limits of the subscription fee. Upon information and belief, M&B's commercial division handled the marketing and sales of LIF-USEP.

106.    On the same day of the formation of LIF-USEP, Reliance Gibraltar signed a Portfolio Advisory Agreement with LIF, on behalf of LIF-USEP, and UBS SA. Pursuant to this agreement, Reliance Gibraltar's duties, as Portfolio Adviser, included a broad range of advisory services, including without limitation: (i) giving recommendations to the Investment Manager and the fund for the manner in which the cash raised by the fund might be invested; (ii) advising the Portfolio Manager concerning all actions which it appears to the Portfolio Adviser the fund should consider in order to carry into effect the purchase and sale programs; and (iii) assisting the fund in obtaining necessary information to determine the NAV of the fund, etc.

## THE UBS DEFENDANTS' ROLES IN ENABLING THE FRAUD

**A.**    **The UBS Defendants Enabled Madoff By Providing the Appearance of Legitimacy and Security For LIF-USEP**

107.    Partnering with the M&B Defendants and the Reliance Group Defendants, the UBS Defendants knowingly or recklessly facilitated Madoff's fraud by essentially selling LIF-USEP under the banner of the UBS brand and reputation, providing the sub-fund with the appearance of legitimacy.

108.    While outwardly named in multiple and substantial roles for LIF-USEP, the UBS Defendants yielded most of their responsibilities to BLMIS and Madoff.

**B.**    **The UBS Defendants Relinquished Their LIF-USEP Management and Custodial Duties**

109.    On August 18, 2005, UBS SA signed a Sub-Custodian Agreement with BLMIS, entrusting all of LIF-USEP's assets to BLMIS, an unregistered investment adviser/broker-dealer, to be used at Madoff's discretion.  The Sub-Custodian Agreement put in place could not have met the approval of the CSSF because BLMIS did not meet the criteria for officially performing the duties of a custodian of a Luxembourg UCITS fund.

110.    The UBS Defendants knowingly and purposefully appointed BLMIS all of the management and custodial duties they outwardly assumed for LIF-USEP.  Custody of LIF-USEP's assets was at all times yielded to BLMIS.  UBS SA failed to ensure that the assets were kept in a segregated account.  Management of LIF-USEP's assets was also surrendered entirely to BLMIS, with Reliance Gibraltar serving in purported advisory capacities, although LIF-USEP was at all times 100% invested with BLMIS.

**C.**    **The UBS Defendants' Operation of LIF-USEP Invited a Fraud**

111.    The operational procedures for LIF-USEP, put in place by UBS SA and UBSFSL were tailor-made to accommodate Madoff's atypical methods perpetuating his fraud and

allowing it to thrive.  These procedures, set forth in an internal operating memorandum, prepared

by the UBS Defendants included a combination of custody and trading authority in the hands of

BLMIS, complete reliance on unverified pricing and trade confirmations issued by BLMIS, and

the calculation of the sub-fund's NAV on an abnormally delayed basis.

**D.**      **UBS Defendants Were Paid Millions for Their "Work" on LIF-USEP**

112.    The net effect of the operating procedures put in place for LIF-USEP was to allow

UBS SA and UBSFSL, two sophisticated financial institutions that appeared to be directly

involved in the operation of LIF-USEP, to earn fees for serving in roles that actually provided no

real oversight or protection for LIF-USEP's assets, and which provided Madoff with freedom to

manipulate reports as needed to perpetuate his fraud.  Throughout the life of LIF-USEP, the UBS

Defendants collected millions.

**THE M&B DEFENDANTS AND THE RELIANCE GROUP DEFENDANTS'
LIF-USEP-RELATED FEES**

113.    Upon information and belief, M&B entered into a formal Distribution Agreement

to distribute LIF-USEP as of January 1, 2006.  M&B's distribution duties extended to Spain and

Portugal.  Pursuant to the Distribution Agreement, M&B was entitled to receive distribution fees,

which varied per the different classes of shares.

114.    At the outset, Reliance Gibraltar derived fees from its August 18, 2005 Portfolio

Advisory Agreement with LIF-USEP.   Upon information and belief, Reliance Gibraltar also

received fees for its role as a distributor of LIF-USEP.  Upon information and belief, Reliance

Gibraltar split the distribution fees with M&B in its capacity as the other distributor of LIF-

USEP.  According to LIF-USEP's Offering Memorandum, which took effect on January 1, 2007,

"[i]n principle 100% of the Portfolio Management fee will be paid to those two companies

[Reliance Gibraltar and M&B]."   Upon information and belief, the division of the portfolio

32

management fees was determined by invoices prepared by both distributors.  LIF-USEP charged

between .6% and 1.5% for portfolio management fees based on the different classes of shares of

the sub-fund.

115.    Throughout the life of LIF-USEP, the M&B Defendants collected millions.

116.    Throughout the life of LIF-USEP, the Reliance Group Defendants collected

millions.

### THE RELIANCE GROUP DEFENDANTS WERE ON NOTICE OF INDICIA OF FRAUD BUT TURNED A BLIND EYE AND FAILED TO ACT

117.    Upon information and belief, with the Reliance Group Defendants' personal

relationship with Echeverria and their Optimal-related investments, the Reliance Group

Defendants were in possession of a "due diligence report" Optimal had drafted after a visit with

Madoff on February 1, 2006 (the "2006 Optimal Report").  Upon information and belief, the

Reliance Group Defendants were on notice of the following red flags raised in the 2006 Optimal

Report:

**Integrity and Enforceability of contractual arrangements with the Broker Dealer:**

- . . . if you look at the trading authorisation under which our accounts are managed it is not clear who the agreement is with – whether it is Madoff the individual or Madoff the Corporation.  If it is the individual then there is a significant risk to this investment and reliance cannot be place[d] on the balance sheet of the Madoff corporation.

**Traceability and recovery of assets in the event of a failure of the Broker Dealer or a counter party:**

- . . . nothing in the documentation reviewed to-date indicates that properly segregated client accounts have been set up for the receipt of cash and from which the transactions on an execution only basis will be managed.

- In relation to the Options strategy – the OTC counterparty risk is an area where we have to rely on the investment judg[]ment of Madoff because there is the risk that even though you may be left with liquid stocks if the option is a long put – in the event of a default you will be left with a basket of securities with falling values and have lost the premium paid to buy the downside protection.

- In addition we should consider the extent to which we should seek to have either Madoff[']s auditor or indeed the Optimal Funds auditor to carry out certain restricted procedures to confirm that segregated accounts have been properly set up and are in place and are capable of identifying our assets as belonging to us, verify their counterparty assessment procedures for the Options strategy.

**Risk of Fraud and misrepresentation of process:**

- **One of the difficulties with this account is the current inability to verify actual trading activity in the market through counterparty and other market user intelligence.**

- . . . A major issue is that the key controls are all in the hands of family members . . . .

**Reliance on a single person – Keyman risk:**

- . . . the keyman risk here is of particular note because there is considerable reliance being placed on one person in relation to the decision making process and although he is supported by a broader organisation – the Client side activities do not have the formal documentation and external service providers that one would expect with a normal hedge fund and hence some of the safeguards that those structures might provide.

(Emphasis added.)

## THE RELIANCE GROUP DEFENDANTS MEET WITH MADOFF AND HIGHLIGHT OTC OPTIONS AS THE KEY PIECE OF THE PUZZLE

118.    Upon information and belief, the Reliance Group Defendants understood that directly contacting Madoff or anyone else at BLMIS was strictly forbidden.    Instead, the principals of the Reliance Group Defendants, specifically Brockmann and Lowe, funneled all communications through Echeverria.

119.   On February 1, 2007, Echeverria brokered a meeting with Madoff during which

he introduced Madoff to Lowe and Brockmann.  Lowe's February 1, 2007 note to file (the "2007

note to file") documented the following responses from Madoff and the Reliance Group

Defendants' conclusions:

- We discussed the strategy and he [Madoff] confirmed that he was
  not using the major investment banks as counterparts on the option
  side as they were not competitive (they had to hedge back
  themselves …) but used long term clients of the firm such as US
  and European pension funds and life insurances.

- We discussed the sustainability of the strategy with less volume or
  less volatility and lower IR.  He claimed that due to the
  technological developments such as smart trade he could execute
  the entire strategy in small incremental positions without being
  visible in the market and without slip[p]age.  This allowed him to
  increase the size of the advisory accounts.  This was also the
  reason that he was giving the account holders an average
  transaction price for all trades instead of a stamp trade.

- We also briefly touched base on the fact that he had small
  unknown auditors and he basically said that he knew these people
  since the days he started . . . he believes in human relationships and
  their personal achievement instead of the institutionalized names
  (philosophy of his firm).

- Finally, when we discussed the biggest risk to the strategy he said
  that if we should see a major disruption in the markets and that all
  the put option counterparts were to default th[e]n we would be left
  over with a basket of the most prominent US stocks at probably
  depressed valuations.

**Conclusion**

- Need to dig in the next meeting further into the details as not all
  questions on the list answered.

- **As we knew prior to the meeting OTC options are key piece of
  the puzzle and important to gain comfort with the
  counterparts.**

(Emphasis added.)

120. However, upon information and belief, despite their awareness of these red flags, the Reliance Group Defendants did not perform any independent, meaningful, or reasonable due diligence to access the "key" information on counterparties or to investigate any other suspicions, whether discussed or not. After almost nine years of BLMIS-related investments, the Reliance Group Defendants began to belatedly ask basic due diligence questions, especially with respect to BLMIS's purported counterparties, they should have been independently asking prior to investing hundreds of millions with BLMIS and collecting millions in fees. Moreover, despite the Reliance Group Defendants' dependence upon BLMIS for millions in fees, they failed to conduct an adequate investigation and chose instead to remain willfully ignorant.

**THE RELIANCE GROUP DEFENDANTS OBTAIN AN ACCOUNT AT BLMIS**

121. Despite their mounting concerns about Madoff and, upon information and belief, their awareness of red flags, in late 2006 the Reliance Group Defendants decided to open a direct account at BLMIS with the assistance of Echeverria. In connection with these preparations, RIR hired an additional Senior Hedge Fund Analyst (the "Senior Analyst") in March 2007. The Reliance Group Defendants' new BLMIS Feeder Fund opened an account with BLMIS in early May 2007 in the name of Defender. Reliance BVI was Defender's manager. Additionally, the M&B Defendants served as the distributor for a class of shares of Defender.

122. Upon information and belief, RIR received trade confirmations in connection with the LIF-USEP BLMIS account, as well as for the Defender BLMIS account. At the outset of the Senior Analyst's employment with the Reliance Group Defendants, he found the trade confirmations randomly stored away in a drawer, many in unopened envelopes. The Senior Analyst began to review the trade confirmations and set up an Excel program that would, among other things, analyze the data on the trade confirmations so as to compare LIF-USEP's performance to Defender's.

### THE M&B DEFENDANTS' FORMATION OF THE LANDMARK ACCOUNT AT BLMIS

123.    Upon learning that UBS SA had closed off new investments into LIF-USEP in the first quarter of 2007, the M&B Defendants embarked on a path to establish their own account with BLMIS to satisfy their ever-expanding appetite for Madoff-related investments and fees. To achieve this objective, the M&B Defendants consulted with Echeverria to exploit his personal connections with Madoff.  In early 2007, upon information and belief, Echeverria introduced the M&B Defendants to Madoff.

124.    Upon information and belief, after their meeting with Madoff, the M&B Defendants decided to structure their direct account as a sub-fund of AA.  In or about October 2007, the M&B Defendants officially opened their BLMIS Feeder Fund, called Landmark.

125.    At all relevant times, M&B and/or M&B Capital Advisers Gestión SGIIC SA served as the investment manager for Landmark.  Upon information and belief, M&B also was Landmark's distributor, thereby funneling new investors into BLMIS.  Accordingly, Landmark generated millions in fees for these certain M&B Defendants.

### THE RELIANCE GROUP DEFENDANTS' VIEW OF MADOFF: THE SACRED COW

126.    In the face of the ongoing global economic meltdown (the S&P 100 had declined nearly 40% between 2007 and 2008), Madoff's continuing low volatility and near-double-digit returns were suspicious.  The Senior Analyst repeatedly raised numerous concerns to his superiors about the Reliance Group Defendants' Madoff-related investments, but to no avail. Upon information and belief, based upon the Reliance Group Defendants' responses, the Senior Analyst understood that Madoff was a "sacred cow" in that the BLMIS IA Business was a highly lucrative investment opportunity, which the Reliance Group research team was not to question. Indeed, the Reliance Group Defendants' comfort with Madoff was presumably a direct function

of the desired profits Madoff generated. The Reliance Group Defendants turned a blind eye to information clearly signifying that Madoff may have been engaged in fraudulent activity so as to preserve their relationship with Madoff.

127.    Upon information and belief, the Senior Analyst was concerned with counterparty risk relative to Madoff's extensive options trading, particularly after the collapse of Bear Stearns in March 2008 and Lehman Brothers in September 2008. Upon information and belief, the Senior Analyst could not ascertain who would be on the other side of Madoff's trades, as he already knew that Deutsche Bank was not doing business with BLMIS and BLMIS seemed completely unaffected by Bear Stearns and Lehman Brothers' failures. The Senior Analyst recommended to the Reliance Group Defendants' principals to withdraw all of their BLMIS-related investments on multiple occasions in 2007 and 2008, but his advice was repeatedly rejected.

128.    On September 29, 2008, in an instant messenger exchange with Lowe, the Senior Analyst queried:

> Senior Analyst:  Given what is going on, is there any chance to use this as an opportunity to get more clarity (maybe through [M]anuel) on [M]adoff counterparties?  It makes absolutely zero sense that [L]ehman was not one given their prominence in the otc equity derivatives market (and neither is [D]eutsche as we recently heard, also a large player). I don't even want to send this by email, **but my actual opinion is that IF the whole thing is a fraud, in this environment it could/will be exposed**.  I am not trying to give you a heart attack…but my honest opinion is that it is extremely worrisome.

> Lowe: Manuel is coming to NY in Oct and we can visit him then. You are right not to be complacent but I am not sure how else to check.  Perhaps calling competition to cross check.

> Senior Analyst: Nobody seems to know (that I have spoken to).  **I am really uncomfortable with the risk….putting my FOF hat on, my recommendation is to redeem.**

> <u>Senior Analyst</u>: I really fear that all the account holders (ourselves
> included) are so hooked on the low vol returns that we are not
> really thinking objectively: it makes no sense.

(Emphasis added.)

### THE RELIANCE GROUP DEFENDANTS MEET WITH MADOFF
### ON DECEMBER 4, 2008

129.   The Reliance Group Defendants learned in mid-November 2008 that the head of

Banco Santander risk management would be meeting with Madoff on Thanksgiving and had

offered to inquire of Madoff on their behalf.   In response, Lowe recognized "[t]his is a unique

chance so let's put something together."   Among other things, the Senior Analyst suggested the

following unanswered questions regarding articulated problems with the Reliance Group

Defendants' massive investments via BLMIS Feeder Funds:

- Does Madoff have insurance in excess of the SIPA protections for
  account holders (ie surety bonds issued by CAPCO or a similar
  company)?

- Who are the counterparties for the options?   Can BLM give
  specific examples (top 3 or top 5) even if not disclosing all?   How
  many counterparties are there?   What is the maximum exposure to
  any one counterparty?

- Are the options trades between the accounts and the broker/dealer,
  which may then have its own trades with counterparties?   Or, are
  the option trades with the counterparties directly?

130.   On December 4, 2008, merely days before the inevitable collapse of the Ponzi

scheme, Brockmann and Lowe met with Echeverria and Madoff.   Lowe's December 4, 2008

note to file (the "2008 note to file") describing that meeting demonstrated the Reliance Group

Defendants' concerns about Madoff, especially in light of his overall evasiveness and extreme

nervousness with respect to escalating redemptions.

131.   Lowe contrasted the overall tone of this meeting with the meeting in February

2007: "BM appears extremely nervous when compared to previous encounters and very

concerned by redemptions.  **This leads us to think that perhaps something is not right**." 2008 note to file (emphasis added.)  Further, during the meeting, Madoff seemed to suggest to the Reliance Group Defendants and Echeverria he had a new and profitable strategy that he planned to employ in the new year for which he was seeking more investments.  Lowe remarked: "Clearly the sense of urgency to launch a new variation from someone who has run the same system for years is kind of odd."

132.    Though explicitly acknowledging in the 2008 note to file that Madoff's "answers remain still too vague for comfort," the 2008 note to file consisted of late reminders of just a few of the many red flags the Reliance Group Defendants had consciously and deliberately ignored for many years.  The Reliance Group Defendants decided to seek to verify that "Defender stated assets and other [BLMIS] account stated assets = total held at BLMIS DTC account" by finding someone at DTC to confirm.  The 2008 note to file asserted that the incongruity between account stated assets and assets held at a DTC account, which did not exist, "is basically the only way to commit some kind of fraud."  They also considered hiring a private detective as a possible means to "[i]dentify option counterparts that can confirm not only that they trade with Madoff but that they do it in the appropriate size given his AUM.  This will be extremely difficult as they are unlikely to reveal size."

133.    However, these proposed steps and previously ignored insights regarding indicia of BLMIS's fraud were too little, too late as on December 11, 2008, the flood of redemptions finally revealed what the Defendants had suspected, that the IA Business was nothing more than a Ponzi scheme.  The trades were false.  The options contracts were false.  The profits were false.

## DEFENDANTS WERE ON NOTICE OF RED FLAGS CONCERNING MADOFF'S STRATEGY, PERFORMANCE, AND OPERATIONAL INFRASTRUCTURE

134.    Numerous indicia of fraud concerning BLMIS gave Defendants actual and/or constructive knowledge of BLMIS's fraud.  These indicia of fraud, and Defendants' willful and deliberate decision to continue investing with BLMIS despite them, demonstrates a motive and opportunity to commit fraud, and/or conscious misbehavior or recklessness amounting to fraudulent intent.  Given the Defendants' actual or constructive knowledge of these indicia of fraud, the Defendants were neither innocent nor good faith investors.

135.    Defendants knew or should have known that BLMIS's IA Business was predicated on potential fraud, and that LIF-USEP and Landmark's purported account activity was inconsistent with legitimate trading activity.

136.    Defendants were operated by sophisticated experienced investment professionals who, upon information and belief, accepted money from their customers based on purported assets under management and/or fund performance in consideration for the due diligence they were expected to exercise in selecting and monitoring investment managers such as Madoff.

### A.    There Were Not Enough Options for Madoff to Implement the SSC Strategy

137.    An essential element of the SSC Strategy was the purchase and sale of S&P 100 Index ("S&P 100") options to hedge the investment of S&P 100 Index stocks.  Madoff told customers that he purchased these options on the Chicago Board of Exchange ("CBOE").  However, even using conservative estimates of BLMIS's assets under management ("AUM"), there were not enough options on the CBOE to hedge a fund the size of BLMIS's IA Business.  On many occasions (including the majority of 2008), BLMIS would have had to trade more options than were traded on the entire CBOE index to hedge the accounts of either LIF-USEP or Landmark *alone*.  Indeed, the option volumes traded by BLMIS on behalf of LIF-USEP would

have exceeded the total options available on the CBOE approximately 61% of the time. Similarly, the option volumes traded by BLMIS on behalf of Landmark would have exceeded the total options available on the CBOE approximately 54% of the time.

138.    For example, on November 14, 2008, with a settlement date of November 19, 2008, BLMIS purportedly bought a total of 8,824 S&P 100 put options for the LIF-USEP account and 2,404 S&P 100 put options for the Landmark account (with December expiration and a strike price of 420).   The total volume traded on the CBOE for all such contracts that day was 132.  Similarly, BLMIS purportedly sold a total of 8,824 S&P 100 call options for the LIF-USEP account and 2,404 S&P 100 call options for the Landmark account (with December expiration and a strike price of 430).   The total volume traded on the CBOE for all such contracts that day was 255.   In each of these instances, Defendants knew or should have known that the option trading volumes reported by BLMIS were impossible if exchange-traded.

139.    Graphical displays of the options needed to hedge *just* LIF-USEP and Landmark's BLMIS investments are illuminating.   The below charts depict the volume of S&P 100 put options BLMIS purported to trade on behalf of LIF-USEP and Landmark as compared to the entire CBOE volume.

140.    As shown below in charts 1(a) and 1(b), the volume of S&P 100 put options BLMIS purported to trade on behalf of LIF-USEP and Landmark (the red bars) completely dwarfs the volume of S&P 100 put options traded on the entire CBOE (the black bars).

**CHART 1(a)**

LIF-USEP, 1FR123 – Historic Option Activity compared to CBOE 2007-2008 (Puts Only)



Red bars indicate BLMIS Volume
Black bars indicate CBOE Volume

**CHART 1(b)**

Landmark, 1FR133 – Historic Option Activity compared to CBOE 2007-2008 (Puts Only)



Red bars indicate BLMIS Volume
Black bars indicate CBOE Volume

141.    Charts 2(a) and 2(b) below depict the volume of S&P 100 call options BLMIS

purportedly traded on behalf of LIF-USEP and Landmark (the blue bars) as compared to the

*entire* CBOE exchange volume (the black bars).

**CHART 2(a)**

LIF-USEP, 1FR123 – Historic Option Activity compared to CBOE 2007-2008 (Calls Only)



Blue bars indicate BLMIS Volume
Black bars indicate CBOE Volume

**CHART 2(b)**

Landmark, 1FR133 – Historic Option Activity compared to CBOE 2007-2008 (Calls Only)



Blue bars indicate BLMIS Volume
Black bars indicate CBOE Volume

142.    The Defendants did not perform independent, meaningful, or reasonable due diligence or make further inquiry regarding the impossible options volume BLMIS purported to trade.

**B.    The Defendants Entered into Hundreds of Millions in Options Contracts with Unknown Counterparties**

143.    When Madoff purportedly first began trading options pursuant to the purported SSC Strategy, he claimed he traded the options contracts on the CBOE.    When confronted by customers questioning whether the volume of his options trading activity was too large for the CBOE, Madoff shifted his story and claimed he had moved to OTC trades.    These claims should have raised great suspicion, requiring independent, meaningful, or reasonable due diligence by the Defendants.

144.    Trading OTC options would have required BLMIS to enter into private contracts with willing counterparties.    BLMIS purportedly entered into those options contracts as an agent on behalf of BLMIS's IA Business customers, such as LIF-USEP and Landmark.    Had those theoretical counterparties defaulted on those contracts, BLMIS's IA Business customers, including LIF-USEP and Landmark, would have been exposed to substantial losses.    If a counterparty failed to perform, it was LIF-USEP and Landmark, and not BLMIS, who would suffer the loss.

145.    Madoff refused to identify the counterparties, claiming he had to prevent his customers from dealing directly with the counterparties, and that the names of parties were "proprietary."    Upon information and belief, the Defendants never inquired of Madoff as to why *past* counterparties needed to be concealed to protect operations or execution of the SSC Strategy.

146.    The Defendants never reviewed, commented, modified, negotiated, or rejected any form of draft or final counterparty agreement or OTC transaction confirmation.  Indeed, the Defendants never knew the identities of these options counterparties due to Madoff's refusal to identify counterparties that did not exist.

147.    The Defendants, who were sophisticated, financially savvy professionals, recognized that LIF-USEP and Landmark had hundreds of millions of dollars in counterparty exposure, yet they had no idea whether their counterparties were reliable, well capitalized and liquid, or whom they would pursue in the event of a default.  Over time, the Defendants became increasingly concerned about their lack of knowledge and recognized Madoff's secrecy about his counterparties as a potential badge of fraud.

148.    As described above in paragraphs 118-120, during their first meeting with Madoff in February 2007, the Reliance Group Defendants specifically asked Madoff about the identities of his counterparties but received a vague and nonsensical response.  As highlighted in the 2007 note to file with respect to that meeting, the Reliance Group Defendants left the meeting believing that "OTC options are key piece of the puzzle and important to gain comfort with the counterparts."  Yet, the Reliance Group Defendants never obtained this "key" information.  After the collapse of Lehman Brothers, in September 2008, the Reliance Group Defendants desperately sought "more clarity . . . on [M]adoff counterparties."  (*Supra* ¶¶ 127-128.)  Indeed, in an instant messenger conversation with one of the principals of the Reliance Group Defendants, on or about September 29, 2008, the Senior Analyst expressed his concerns about Madoff's undisclosed counterparties and explicitly raised the specter that Madoff might be a fraud.  (*Supra* ¶ 128.)

C.      **The Options Trade Confirmations Contained Other Significant Abnormalities**

149.    Upon information and belief, the options trade confirmations for LIF-USEP and
Landmark contained other significant abnormalities that should have prompted the Defendants to
inquire further about the legitimacy of these transactions.    First, in the OTC market the
counterparty may expressly be identified on the confirmation statement.    However, upon
information and belief, the options trade confirmations received by the Defendants from BLMIS
never identified the counterparty.    Second, upon information and belief, the Defendants' trade
confirmations contained "CUSIP" (Committee on Uniform Security Identification Resources)
numbers, which are securities identification numbers that appear only on trade confirmations
pertaining to CBOE options.    Furthermore, the options that BLMIS purportedly traded expired
on the same date and had the same exercise pricing as the standardized CBOE options, and
therefore appear to be the identical options traded on the CBOE.    Additionally, the options
represented on the trade confirmations are a CBOE licensed product and should not trade in an
OTC environment.    Upon information and belief, the trade confirmations BLMIS sent to the
Defendants for review included information that supported that the options were purportedly
being traded on the CBOE.

D.      **Settlement Period Abnormalities**

150.    The Defendants also ignored that a high percentage of options transactions in their
BLMIS accounts settled in a time range outside of market practices.    It is common industry
practice for the purchase or sale of exchange-traded options to settle on the business day
following execution ("T +1").    However, trade confirmations produced by BLMIS, and upon
information and belief, sent to the Defendants, regularly showed options transactions that settled
more than one day after execution.    The frequency with which this occurred was staggering.
Upon information and belief, 80% of all of the purported options transactions for LIF-USEP, and

93% of all of Landmark's purported options transactions, settled more than one business day after execution and did not comply with standard market practices.

151.    Settlement anomalies in such high percentages were clear red flags that should have prompted sophisticated financial entities, such as the Defendants, to conduct further investigations, request verifications of the trades, and demand more transparency into BLMIS's operations.  Upon information and belief, the Defendants did not make any such independent, meaningful, or reasonable inquiry.

**E.    Madoff's Returns Were Suspiciously Consistent for Too Many Years**

152.    Madoff's SSC Strategy purported to invest in, and therefore correlate with, the S&P 100.  Yet the IA Business, LIF-USEP, and Landmark seemed impervious to market forces, remaining consistent and positive even in bad markets.

153.    Moreover, the Reliance Group Defendants had been aware that BLMIS earned extraordinarily consistent rates of return since at least 1999 based upon their investments in other BLMIS Feeder Funds.  The Reliance Group began investing in Kingate in approximately 1999 and also invested in Optimal starting in 2001.  Upon information and belief, the M&B Defendants were also privy to these funds' annual rate of return information through Optimal's investment with BLMIS and the M&B Defendants' connection to Echeverria.  Upon information and belief, the consistency of the IA Business's returns was one of the key motivating factors behind the decision of the UBS Defendants, the M&B Defendants, and the Reliance Defendants to form LIF-USEP, and the M&B Defendants' subsequent decision to create Landmark.

154.    The following chart depicts the annual rate of return on the IA Business accounts of Kingate, Optimal, LIF-USEP, and Landmark, based on information provided by BLMIS to each fund, as compared to the rate of return on the S&P 100.

**Kingate, Optimal, LIF-USEP, and Landmark v. S&P 100 Rate of Return Comparison**

| Year | Kingate Rate of Return | Optimal Rate of Return | LIF-USEP Rate of Return | Landmark Rate of Return | S&P 100 Rate of Return |
|---|---|---|---|---|---|
| 1997 | 17.2% | 15.7% | | | 27.8% |
| 1998 | 16.6% | 16.7% | | | 31.3% |
| 1999 | 18.2% | 18.3% | | | 31.3% |
| 2000 | 14.6% | 14.4% | | | -13.4% |
| 2001 | 13.7% | 13.6% | | | -14.9% |
| 2002 | 12.2% | 12.2% | | | -23.9% |
| 2003 | 10.8% | 10.8% | | | 23.8% |
| 2004 | 10.0% | 9.9% | | | 4.5% |
| 2005 | 10.5% | 10.4% | 4.3%[3] | | -0.9% |
| 2006 | 13.2% | 13.4% | 12.4% | | 15.9% |
| 2007 | 10.9% | 11.0% | 11.2% | 2.2%[4] | 3.8% |
| 2008[5] | 9.4% | 9.2% | 9.3% | 9.2% | -36.9% |

As illustrated by the chart above, Madoff had maintained consistent—and seemingly impossible—positive returns throughout the course of events that devastated the S&P 100. For example, through the burst of the "dotcom bubble" in 2000, the September 11, 2001 terrorist attacks, and the recession and housing crisis of 2008, the SSC Strategy purported to produce positive returns, outperforming the S&P 100 by 27 to 46 percent in each instance where the S&P suffered double-digit losses. In 2008, when the S&P 100 index was down nearly 40%, LIF-USEP and Landmark showed annual positive returns of 9.3% and 9.2%, respectively.

155. During its life from September 2005 to November 2008 (more than 35 months), LIF-USEP only experienced 1 negative month, while the S&P 100 had 16 months of negative returns. During its life from October 2007 to November 2008 (more than 12 months), Landmark

---

[3]     Since LIF-USEP began investing with BLMIS in September 2005, this data point only represents returns calculated from September 2005 through December 2005.

[4]     Since Landmark began investing with BLMIS in October 2007, this data point only represents returns calculated from October 2007 through December 2007.

[5]     All 2008 data points are calculated through November 2008.

experienced no negative months, while the S&P 100 had 9 months of negative returns.  These

performance results should have raised a red flag to the Defendants that Madoff's SSC Strategy

was not what it purported to be.

156.    The Defendants knowingly turned a blind eye to the fact that the SSC Strategy,

dependent in large part on the performance of stocks in the S&P 100, continued to yield positive

returns without any correlation to the S&P 100.

## F.    Madoff Demonstrated Purported Trades Inconsistent with the SSC Strategy

157.    Upon information and belief, on a number of occasions, account statements

purported to show gains on behalf of LIF-USEP and Landmark resulting from transactions

inconsistent with the SSC Strategy.  Certain of these transactions involved short term option

trading that resulted in substantial gains for LIF-USEP and Landmark.  For example, in 2008,

LIF-USEP and Landmark each participated in two of these trades, which generated gains of

approximately $5.9 million and $1.2 million, respectively.  These transactions represented

approximately 11% of the total return for LIF-USEP in 2008, and approximately 12% of the total

return for Landmark in 2008.  These gains were purportedly achieved through speculation in the

options market, which would contradict the premise of the SSC Strategy.  Between 2005 and

2008, LIF-USEP and Landmark benefitted in excess of $7 million from such trades.

158.    Another example of transactions that were not consistent with the SSC Strategy

were instances when Madoff purported to sell a specific stock or stocks from a basket before the

rest of the basket was liquidated.  Not only was the premature sale of stock inconsistent with the

SSC Strategy, but the liquidation of these positions should have caused Madoff to adjust the

options collar for the basket, which he did not.

159.    Both of these trading activities contradicted Madoff's SSC Strategy and should

have raised a red flag for the Defendants.  The Defendants should have identified and

investigated these trading inconsistencies.  Instead, these departures from the SSC strategy were
ignored.

**G.      LIF-USEP and Landmark Had a Negative Cash Balance with BLMIS**

160.    Upon information and belief, LIF-USEP's cash account with BLMIS had a
negative value on at least 15 separate occasions.  Similarly, upon information and belief,
Landmark's cash account with BLMIS had a negative value on at least 4 separate occasions.  In
these instances, purported transactions occurred in LIF-USEP's and Landmark's accounts even
when the cash necessary to execute those transactions was not available.  Certain of these
negative balance instances resulted from either the purchase of equities that exceeded the value
of Treasurys sold to fund the purchase, the put options being purchased prior to selling the call
options they were meant to fund, which was in contrast to Madoff's purported SSC Strategy, or
the withdrawal of cash prior to the sale of equities to fund the redemption.  For example, in July
2006, over a seven-day period, LIF-USEP had an average negative balance of more than $9
million.  Notably, upon information and belief, the UBS Defendants highlighted this occurrence
as a leverage situation for the LIF-USEP account.  Despite their recognition of this red flag, the
UBS Defendants willfully turned a blind eye and continued funneling additional investments into
BLMIS.

161.    Similarly, in November 2008, over a seven-day period, Landmark had an average
negative balance of more than $10 million.

162.    Madoff never charged LIF-USEP or Landmark interest for this extension of
credit.  Neither LIF-USEP nor Landmark had a margin account with Madoff and could not have
traded on credit.  The Defendants never independently, meaningfully, or reasonably questioned
this atypical practice.

H.    **Trades Were Executed Outside of the Daily Price Range**

163.    Upon information and belief, on at least 3 occasions, BLMIS sent trade

confirmations for LIF-USEP's account showing stock trades that could not have occurred,

because they took place outside of the range of stock prices on the day of the purported trades.

For example, BLMIS's records for LIF-USEP's account reflect that 46,659 shares of Merck

(MRK) were sold for $44.61 with a trade date of December 22, 2006 and settlement date of

December 28, 2006.    The price range for Merck stock actually bought and sold in the

marketplace on December 22, 2006 was between $42.78 and $43.42.

164.    BLMIS was reporting trades at prices that were not possible.    However, the

Defendants ignored this indicia of fraudulent trading activity.

I.    **Madoff's Ability to Buy Low and Sell High**

165.    Upon information and belief, BLMIS's trades almost always appeared to occur at

precisely the right time of day.    An analysis of LIF-USEP's and Landmark's trade data reveals

that for approximately 81% and approximately 72%, respectively, of trades where BLMIS was

purportedly purchasing shares for LIF-USEP and Landmark, the purported purchase price was

below the daily midpoint price, and in the lower half of the daily price range.    A similar analysis

reveals that, when purportedly selling shares for LIF-USEP and Landmark, approximately 70%

and approximately 66%, respectively, of Madoff's trades were above the daily midpoint price

and in the upper half of the daily price range.    It was a huge indicia of fraud for Madoff to

achieve such percentages for such an extended period of time.    The improbability of Madoff

buying low and selling high for all of BLMIS's IA Business customers just once a day was by

itself suspicious.    Even more so, if Madoff were executing the SSC Strategy by engaging in

"time slicing" within a given day, as he claimed, meaning he would have purportedly made

multiple purchases and sales throughout the day, such a practice would have resulted in BLMIS's trades being closer to the daily midpoint price.

166.   Madoff's degree of success was even more improbable given the enormous volumes BLMIS appeared to trade.  Any request to sell such a large volume of stock would have driven the price down, making it impossible for Madoff to so frequently sell above the daily midpoint.

167.   Upon information and belief, the Defendants did not perform independent, meaningful, or reasonable due diligence into how Madoff was able to deliver such consistently improbable market timing success within the days he was trading for the entirety of the IA Business, or over the life of LIF-USEP and Landmark.  To the extent any of the Defendants did perform such due diligence, they deliberately ignored the resulting indicia of fraud and continued investing with BLMIS and collecting millions in fees.

**J.      Madoff Provided Paper Trade Confirmations**

168.   Despite Madoff's reputation as a pioneer of electronic record-keeping in the market-making business, as a standard practice, Madoff did not send electronic trade confirmations to clients of BLMIS's IA Business.  The Defendants knew that Madoff provided only paper print-outs of trade confirmations for the IA Business which he sent via standard mail. Instead of receiving contemporaneous online access to their trade information, BLMIS's IA Business customers, including LIF-USEP and Landmark, had to wait several days for their paper trade confirmations to arrive by mail.

169.   An Operating Memorandum for LIF-USEP dated January 1, 2007, prepared by UBS SA, specifies that LIF-USEP's investment advisor, Reliance Gibraltar, would provide UBS SA "with a backdated monthly investment recommendation."  This backdating procedure was

made necessary and put in place as a result of the delayed, hard copy-only way in which BLMIS
reported its purported trades.

170.    Rather than performing independent, meaningful, or reasonable inquiry into this
red flag, the Defendants blindly accepted it and accommodated their practices to work around it.

## K.    Despite Exorbitant Trading Volumes There Was Never Any Impact on the Market

171.    Madoff told customers such as LIF-USEP and Landmark that the SSC Strategy
involved moving all assets into the market over the span of a few days, and then selling off all of
those securities over the same span of time.  Upon information and belief, prior to registering as
an investment adviser, BLMIS Feeder Funds such as LIF-USEP and Landmark understood
Madoff to have billions under his management.  When he registered as an investment adviser in
2006, Madoff represented in BLMIS's ADV Form filed with the SEC that BLMIS had
approximately $11.7 billion of assets under management at the end of July 2006.  Later filings
stated that BLMIS was managing $13.2 billion at the end of 2006, and $17.1 billion at the end of
2007.  Defendants, therefore, knew or should have known that BLMIS was purporting to move
well over $11 billion into and out of the market over the course of a few days, a few times a year.

172.    Upon information and belief, Defendants did not ever conduct independent,
meaningful, or reasonable due diligence as to how Madoff was able to perform such
extraordinary trading volumes without any impact on the price of the securities he purportedly
bought and sold, without any market footprint, and without anyone "on the Street" having
knowledge or even a whisper of any such trading activity.

173.    When Madoff exited the market, he claimed to have placed BLMIS's IA Business
customers' assets in U.S. Treasury bills or mutual funds holding Treasurys.  The movement of
over $11 billion in and out of the market for Treasury bills should have affected the price of

Treasury bills. This too never happened, and upon information and belief was not independently or reasonably investigated by Defendants.

**L.    BLMIS's Non-Reputable Auditor**

174.    Upon information and belief, the Defendants knew or should have known that BLMIS's auditor was not legitimate and independent, nor reasonably capable of performing the required domestic and international auditing functions for BLMIS. BLMIS, which purportedly had tens of billions of dollars under management, was audited not by one of the major audit firms, but by Friehling & Horowitz CPAs P.C. ("Friehling"), an accounting "firm" of three employees, including one active accountant, one (semi-retired) accountant living in Florida, and a secretary. Friehling's offices were located in a strip mall in suburban Rockland County, New York. Friehling's size and qualifications and the nature of the services they provided were readily accessible to the Defendants. The Defendants had only to call Friehling's office or review the Dun & Bradstreet report on the firm.

175.    Such reasonable investigation is exactly what Aksia, LLC ("Aksia"), an independent hedge fund research and advisory firm, did when it had Friehling's office physically inspected. Aksia discovered a simple office with what appeared to be a few chairs, a reception desk, one office, and a conference table. Furthermore, individuals that occupied office space adjacent to Friehling's told Aksia's investigator that the office did not have regular hours. Having determined that it was hardly a facility from which one would expect the auditor of a multi-billion dollar fund to operate, Aksia advised its clients against investing with BLMIS, Madoff, or any of his feeder funds.

176.    The Defendants were on inquiry notice of this red flag, thereby triggering the need for reasonable due diligence into the legitimacy of BLMIS's relationship with Friehling. On several occasions, the Reliance Group Defendants' Senior Analyst, for example, raised with

his superiors his suspicions that Friehling "looks so sketchy to me: why would they use an unheard of accountant in New City, New York (up near where [. . .] lives)?" Nevertheless, the Reliance Group Defendants failed to perform any independent, meaningful, or reasonable investigation of Friehling.

177.     Upon information and belief, the Defendants did not look into Friehling's registration status with the American Institute of Certified Public Accountants ("AICPA"). Had they done so, the Defendants would have known that he was not qualified to perform audits at all. Investigation would have revealed that Friehling had not been peer reviewed, as required, since 1993 because he had notified AICPA that he no longer performed audits. No experienced investment professional could have reasonably believed that a firm with one accountant, particularly a firm that did not conduct audits, could have competently and independently audited an entity the size of BLMIS.

## M.     BLMIS's Unusual Fee Structure

178.     The Defendants were on inquiry notice that the fee structure between BLMIS and the BLMIS Feeder Funds was highly atypical of the hedge fund industry and was a red flag that fraud was a possibility. BLMIS did not charge investors any traditional management or performance fees, fees that were standard in the hedge fund industry. Madoff was purportedly satisfied with simply charging BLMIS's IA Business customers $1 per option contract and $.04 per equity share traded. The standard investment advisory fee charged by a hedge fund manager ranges from 1% to 2% of assets under management plus a performance fee of 10% to 20% of any profits earned by the investment. Fees normally run higher for investment advisers with a history of success. Compared with industry practice, this fee structure had Madoff leaving hundreds of millions, if not billions, of dollars on the table. Instead, BLMIS allowed investment funds investing through BLMIS to collect those lucrative fees themselves from their own

investors, as well as, the managers and advisers of BLMIS Feeder Funds, such as UBS SA, the

M&B Defendants, and the Reliance Group Defendants.

179.    Other industry professionals realized that BLMIS's highly unusual fee structure

was a serious red flag for fraud.  For example, the London due diligence firm Albourne Partners

("Albourne") recognized that by not charging management or performance fees for its services,

BLMIS forfeited millions of dollars in fees each year.  Identifying this as a red flag of possible

fraud, Albourne urged its clients to avoid BLMIS and BLMIS Feeder Funds.  The Defendants,

however, having already invested millions of dollars of their clients' funds in BLMIS Feeder

Funds, ignored this evidence of the possibility of fraud.

## N.    No Segregation of Assets

180.    Upon information and belief, the Defendants knew or should have known that

accounts at BLMIS were not segregated, and therefore not subject to independent verification.

Adequate segregation allows independent checks and balances throughout the trading cycle, the

movement of cash, and the custody process, and is a fundamental area of inquiry for those

performing independent and reasonable due diligence on investment managers.    Upon

information and belief, the Defendants failed to perform independent, meaningful, or reasonable

due diligence into the practices surrounding the segregation of assets.

## O.    Lack of Independent Verification of Assets

181.    The Defendants knew that BLMIS functioned not only as the *de facto* investment

adviser and/or manager to LIF-USEP and Landmark, but also as the funds' prime broker and

custodian.  This arrangement, unusual within the hedge fund industry, eliminated a key check

and balance in investment management by excluding an independent custodian of securities from

the process.  Without an independent party to verify the existence of assets and execution of

purported securities trades, Madoff could carry out his massive fraud without detection.

182.    This clear conflict of interest was, on its face, a red flag of potential fraud that was identified by numerous industry professionals who performed basic due diligence on BLMIS. The Defendants, however, accepted this arrangement without hesitation and turned a blind eye to the possibility of fraud.

**P.     Madoff's Insistence on Secrecy: Lack of Transparency; Non-Disclosure of Madoff's Name in Offering Material**

183.    Madoff avoided questions about his IA Business operations, was consistently vague in responding to any such questions, and operated with no transparency.  The Defendants were aware of this lack of transparency and that principal employees at BLMIS provided elusive, nonsensical answers to questions about Madoff's trading.

184.    The Defendants further acquiesced to Madoff's insistence that his name not appear in any official marketing or offering document relating to the feeder funds that invested with BLMIS.

185.    The Defendants never questioned Madoff's explanation that he desired anonymity so that his day would not be spent talking to investors.  Instead, the Defendants blindly abided by his rules.  UBS SA, for example, omitted Madoff from all of LIF-USEP's offering documents – such as prospectuses and marketing materials.  UBS SA also strove to remove all Madoff-related references from their audit reports, which Ernst & Young prepared.  Thus, UBS SA chose to risk regulatory and legal sanctions rather than jeopardize its lucrative relationship with BLMIS.

186.    The Reliance Group Defendants similarly omitted Madoff from their marketing materials to existing and potential clients.  For example, a January 2008 draft version of the Reliance Group Defendants' Due Diligence Questionnaire for LIF-USEP did not even mention that the sub-fund's assets had been entrusted to a sub-custodian (BLMIS).  Rather, the document misleadingly stated that UBS SA was the prime broker and custodian of LIF-USEP's assets.

187.    By complying with Madoff's demand for secrecy, the Defendants not only consciously ignored indicia of fraud, but also effectively assisted Madoff in concealing the size and scope of his ever-burgeoning fraud.

## THE TRANSFERS

188.    According to BLMIS's records, Defendants LIF-USEP and Landmark maintained accounts (Nos. 1FR123 and 1FR133, respectively) with BLMIS, set forth on <u>Exhibit A</u> (collectively, the "Accounts").  Upon information and belief, for their respective accounts, LIF-USEP and Landmark each executed, or caused to be executed, a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements"), and delivered such documents to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

189.    The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.  The Accounts were held in New York, New York, and LIF-USEP and Landmark sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York for application to the Accounts and the purported conducting of trading activities.

190.    Prior to the Filing Date, BLMIS transferred at least $502,321,919 million to LIF-USEP in the form of withdrawals from LIF-USEP's BLMIS Account (the "LIF-USEP Initial Transfers"), as set forth in <u>Exhibits A and B</u>.  The LIF-USEP Initial Transfers constituted the return of principal.

191.    Prior to the Filing Date, BLMIS transferred at least $52,415,207 million to Landmark in the form of withdrawals from Landmark's BLMIS Account (the "Landmark Initial

Transfers" and, together with the LIF-USEP Initial Transfers, the "Initial Transfers"), as set forth in <u>Exhibits A and C</u>.  The Landmark Initial Transfers constituted the return of principal.

192.    The accountholder Defendants listed on <u>Exhibit A</u> were initial transferees of the avoidable transfers set forth above.

193.    The Initial Transfers are avoidable and recoverable under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of N.Y. CPLR 203(g) and 213(8) (McKinney 2001) and New York Debtor and Creditor Law ("DCL") sections 273-279 (McKinney 2001).

194.    During the six years prior to the Filing Date, BLMIS made transfers to LIF-USEP in the collective amount of approximately $502,321,919 million, all of which constituted a return of principal (the "LIF-USEP Six Year Initial Transfers").  *See* <u>Exhibit B</u>, column 11.

195.    The LIF-USEP Six Year Initial Transfers are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.

196.    During the two years prior to the Filing Date, BLMIS made transfers to LIF-USEP in the collective amount of approximately $501,663,029 million, all of which constituted a return of principal (the "LIF-USEP Two Year Initial Transfers").  *See* <u>Exhibit B</u>, column 10.

197.    During the two years prior to the Filing Date, BLMIS made transfers to Landmark in the collective amount of approximately $52,415,207 million, all of which constituted the return of principal (the "Landmark Two Year Initial Transfers" and, together with the LIF-USEP Two Year Initial Transfers, the "Two Year Initial Transfers").  *See* <u>Exhibit C</u>, column 10.

198.    The Two Year Initial Transfers are avoidable and recoverable under sections 548(a)(1), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly section 78fff-2(c)(3) and applicable provisions of DCL sections 273-279.

199.    During the 90 days prior to the Filing Date, BLMIS made payments or other transfers to LIF-USEP in the collective amount of $195,404,478 (the "LIF-USEP Preference Period Initial Transfers").  *See* Exhibit B, column 9.

200.    During the 90 days prior to the Filing Date, BLMIS made payments or other transfers to Landmark in the collective amount of $27,582,455 (the "Landmark Preference Period Initial Transfers" and, together with the LIF-USEP Preference Period Initial Transfers, the "Preference Period Initial Transfers").  *See* Exhibit C, column 9.

201.    The Preference Period Initial Transfers are avoidable and recoverable under sections 547, 550(a)(1), and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly section 78fff-2(c)(3).

202.    Upon information and belief, LIF, the UBS Defendants, the M&B Defendants, and the Reliance Group Defendants (the "LIF-USEP Subsequent Transferee Defendants") received subsequent transfers of the LIF-USEP avoidable transfers referenced above (the "LIF-USEP Subsequent Transfers").   Upon information and belief, the M&B Defendants (the "Landmark Subsequent Transferee Defendants") received subsequent transfers of the Landmark avoidable transfers referenced above (the "Landmark Subsequent Transfers" and, together with the LIF-USEP Subsequent Transfers, the "Subsequent Transfers").

203.    The Subsequent Transfers, or the value thereof, are recoverable from the LIF-USEP Subsequent Transferee Defendants and the Landmark Subsequent Transferee Defendants

(together, the "Subsequent Transferee Defendants") pursuant to section 550(a) of the Bankruptcy Code.

204.    All the Defendants knew or should have known that the Initial Transfers made to LIF-USEP and Landmark, as well as the Subsequent Transfers made to the Subsequent Transferee Defendants, were made for a fraudulent purpose.

205.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

206.    The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information regarding the Initial Transfers, Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

## CUSTOMER CLAIMS

207.    On or about March 2, 2009, Defendant LIF filed a customer claim with the Trustee which the Trustee has designated as Claim No. 004417.  On or about March 3, 2009, LIF filed another customer claim with the Trustee which the Trustee has designated as Claim No. 006182.  In addition, on or about March 2, 2009, Defendant UBS SA filed a customer claim, on behalf of LIF-USEP with the Trustee which the Trustee has designated as Claim No. 004536. These three customer claims are referred to herein as the "Customer Claims."

208.    The Trustee has not yet determined the Customer Claims.

209.    On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order"; Docket No. 12).  The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating.  The Trustee intends to resolve the Customer Claims and any related objections to the Trustee's

determination of such claims through a separate hearing as contemplated by the Claims Procedures Order.

**COUNT ONE**
**PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) –**
**11 U.S.C. §§ 547(b), 550(a), AND 551**

***Against LIF-USEP***

210.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

211.    At the time of each of the LIF-USEP Preference Period Initial Transfers, LIF-USEP was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

212.    Each of the LIF-USEP Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

213.    Each of the LIF-USEP Preference Period Initial Transfers was to or for the benefit of LIF-USEP.

214.    Each of the LIF-USEP Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS to LIF-USEP before such transfer was made.

215.    Each of the LIF-USEP Preference Period Initial Transfers was made while BLMIS was insolvent.

216.    Each of the LIF-USEP Preference Period Initial Transfers was made during the 90-day preference period under section 547(b)(4) of the Bankruptcy Code.

217.    Each of the LIF-USEP Preference Period Initial Transfers enabled LIF-USEP to receive more than it would receive if: (i) this case was a case under chapter 7 of the Bankruptcy

Code; (ii) the transfers had not been made; and (iii) such transferee received payment of such

debt to the extent provided by the provisions of the Bankruptcy Code.

218.    Each of the LIF-USEP Preference Period Initial Transfers constitutes a

preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code

and recoverable from LIF-USEP as an initial transferee or the entity for whose benefit such

transfers were made pursuant to section 550(a) of the Bankruptcy Code.

219.    As a result of the foregoing, pursuant to sections 547(b), 550(a), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-

USEP:   (a) avoiding and preserving the LIF-USEP Preference Period Initial Transfers; (b)

directing that the LIF-USEP Preference Period Initial Transfers be set aside; and (c) recovering

the LIF-USEP Preference Period Initial Transfers, or the value thereof, from LIF-USEP for the

benefit of the estate of BLMIS.

<u>**COUNT TWO**</u>
<u>**PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) –**</u>
<u>**11 U.S.C. §§ 547(b), 550(a), AND 551**</u>

***Against the LIF-USEP Subsequent Transferee Defendants***

220.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

221.    Each of the LIF-USEP Preference Period Initial Transfers is avoidable under

section 78fff-2(c)(3) of SIPA and section 547(b) of the Bankruptcy Code.  Furthermore, each of

the LIF-USEP Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS

in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA

§ 78fff-2(c)(3).

222.    Upon information and belief, the LIF-USEP Subsequent Transferee Defendants

were immediate or mediate transferees of some portion of the LIF-USEP Preference Period

Initial Transfers pursuant to section 550(a) of the Bankruptcy Code (the "LIF-USEP Preference Period Subsequent Transfers").

223.    Each of the LIF-USEP Preference Period Subsequent Transfers was made directly or indirectly to or for the benefit of the LIF-USEP Subsequent Transferee Defendants.

224.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the LIF-USEP Preference Period Subsequent Transfers, or the value thereof, from the LIF-USEP Subsequent Transferee Defendants for the benefit of the estate of BLMIS.

## COUNT THREE
## PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) –
## 11 U.S.C. §§ 547(b), 550(a), AND 551

### *Against Landmark*

225.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

226.    At the time of each of the Landmark Preference Period Initial Transfers, Landmark was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

227.    Each of the Landmark Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

228.    Each of the Landmark Preference Period Initial Transfers was to or for the benefit of Landmark.

229.    Each of the Landmark Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS to Landmark before such transfer was made.

230.   Each of the Landmark Preference Period Initial Transfers was made while BLMIS was insolvent.

231.   Each of the Landmark Preference Period Initial Transfers was made during the 90-day preference period under section 547(b)(4) of the Bankruptcy Code.

232.   Each of the Landmark Preference Period Initial Transfers enabled Landmark to receive more than it would receive if:  (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) such transferee received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

233.   Each of the Landmark Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from Landmark as an initial transferee or the entity for whose benefit such transfers were made pursuant to section 550(a) of the Bankruptcy Code.

234.   As a result of the foregoing, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark:  (a) avoiding and preserving the Landmark Preference Period Initial Transfers; (b) directing that the Landmark Preference Period Initial Transfers be set aside; and (c) recovering the Landmark Preference Period Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS.

## COUNT FOUR
## PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a), AND 551

### *Against Landmark Subsequent Transferee Defendants*

235.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

236.    Each of the Landmark Preference Period Initial Transfers is avoidable under section 78fff-2(c)(3) of SIPA and section 547(b) of the Bankruptcy Code.  Furthermore, each of the Landmark Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

237.    Upon information and belief, the Landmark Subsequent Transferee Defendants were immediate or mediate transferees of some portion of the Landmark Preference Period Initial Transfers pursuant to section 550(a) of the Bankruptcy Code (the "Landmark Preference Period Subsequent Transfers").

238.    Each of the Landmark Preference Period Subsequent Transfers was made directly or indirectly to or for the benefit of the Landmark Subsequent Transferee Defendants.

239.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Landmark Preference Period Subsequent Transfers, or the value thereof, from the Landmark Subsequent Transferee Defendants for the benefit of the estate of BLMIS.

### COUNT FIVE
### FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

#### *Against LIF-USEP*

240.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

241.    Each of the LIF-USEP Two Year Initial Transfers was made on or within two years before the Filing Date.

242.    Each of the LIF-USEP Two Year Initial Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

243.    Each of the LIF-USEP Two Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the LIF-USEP Two Year Initial Transfers to or for the benefit of LIF-USEP in furtherance of a fraudulent investment scheme.

244.    Each of the LIF-USEP Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from LIF-USEP pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

245.    As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Two Year Initial Transfers; (b) directing that the LIF-USEP Two Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Two Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS.

**COUNT SIX**
**FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) –**
**11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551**

***Against LIF-USEP***

246.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

247.    Each of the LIF-USEP Two Year Initial Transfers was made on or within two years before the Filing Date.

248.   Each of the LIF-USEP Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

249.   BLMIS received less than a reasonably equivalent value in exchange for each of the LIF-USEP Two Year Initial Transfers.

250.   At the time of each of the LIF-USEP Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of the LIF-USEP Two Year Initial Transfers.

251.   At the time of each of the LIF-USEP Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

252.   At the time of each of the LIF-USEP Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

253.   Each of the LIF-USEP Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from LIF-USEP pursuant to section 550(a) and SIPA § 78fff-(2)(c)(3).

254.   As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Two Year Initial Transfers; (b) directing that the LIF-USEP Two Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Two Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS.

## COUNT SEVEN
## FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR
## AND CREDITOR LAW
## §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against LIF-USEP*

255.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

256.   At all times relevant to the LIF-USEP Six Year Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

257.   Each of the LIF-USEP Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

258.   Each of the LIF-USEP Six Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the LIF-USEP Six Year Initial Transfers to or for the benefit of LIF-USEP in furtherance of a fraudulent investment scheme.

259.   Each of the LIF-USEP Six Year Initial Transfers was received by LIF-USEP with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the LIF-USEP Six Year Initial Transfers, and/or future creditors of BLMIS.

260.   As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set

aside; (c) recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from LIF-USEP.

## COUNT EIGHT
## FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against LIF-USEP*

261.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

262.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

263.    Each of the LIF-USEP Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

264.    BLMIS did not receive fair consideration for the LIF-USEP Six Year Initial Transfers.

265.    BLMIS was insolvent at the time it made each of the LIF-USEP Six Year Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the LIF-USEP Six Year Initial Transfers.

266.    As a result of the foregoing, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; and (c)

recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS.

**COUNT NINE**
**FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR
AND CREDITOR LAW
§§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

***Against LIF-USEP***

267.    The Trustee repeats and realleges the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

268.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

269.    Each of the LIF-USEP Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

270.    BLMIS did not receive fair consideration for the LIF-USEP Six Year Initial Transfers.

271.    At the time BLMIS made each of the LIF-USEP Six Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the LIF-USEP Six Year Initial Transfers was an unreasonably small capital.

272.    As a result of the foregoing, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP:  (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; and (c)

recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the

benefit of the estate of BLMIS.

## COUNT TEN
## FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against LIF-USEP*

273.   The Trustee repeats and realleges the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

274.   At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e)

of the Bankruptcy Code.

275.   Each of the LIF-USEP Six Year Initial Transfers constituted a conveyance by

BLMIS as defined under DCL section 270.

276.   BLMIS did not receive fair consideration for the LIF-USEP Six Year Initial

Transfers.

277.   At the time BLMIS made each of the LIF-USEP Six Year Initial Transfers,

BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its

ability to pay them as the debts matured.

278.   As a result of the foregoing, pursuant to DCL sections 275, 278, and/or 279,

sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee

is entitled to a judgment against LIF-USEP:  (a) avoiding and preserving the LIF-USEP Six Year

Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; and (c)

recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS.

**COUNT ELEVEN**
**RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK DEBTOR**
**AND CREDITOR LAW**
**§§ 273-279, AND 11 U.S.C. §§ 544, 548, 550(a), AND 551**

***Against the LIF-USEP Subsequent Transferee Defendants***

279.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

280.    Each of the LIF-USEP Initial Transfers are avoidable under sections 544 and 548 of the Bankruptcy Code, DCL sections 273-276, and SIPA § 78fff-2(c)(3).

281.    Upon information and belief, the LIF-USEP Subsequent Transferee Defendants received some or all of the LIF-USEP Subsequent Transfers, which are recoverable pursuant to section 550(a) of the Bankruptcy Code.

282.    Each of the LIF-USEP Subsequent Transfers was made directly or indirectly to, or for the benefit of, the LIF-USEP Subsequent Transferee Defendants.

283.    The LIF-USEP Subsequent Transferee Defendants are immediate or mediate transferees of the LIF-USEP Subsequent Transfers.

284.    Each of the LIF-USEP Subsequent Transfers was received by the LIF-USEP Subsequent Transferee Defendants with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the LIF-USEP Subsequent Transfers, and/or future creditors of BLMIS.

285.    As a result of the foregoing, pursuant to DCL sections 273-279, section 544, 548, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the LIF-USEP Subsequent Transferee Defendants recovering the LIF-USEP

Subsequent Transfers, or the value thereof, and attorneys' fees for the benefit of the estate of
BLMIS.

## COUNT TWELVE
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) –
## 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

### *Against Landmark*

286.   The Trustee incorporates by reference the allegations contained in the previous
paragraphs of this Complaint as if fully rewritten herein.

287.   Each of the Landmark Two Year Initial Transfers was made on or within two
years before the Filing Date.

288.   Each of the Landmark Two Year Initial Transfers constituted a transfer of an
interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the
Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

289.   Each of the Landmark Two Year Initial Transfers was made by BLMIS with the
actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.
BLMIS made the Landmark Two Year Initial Transfers to or for the benefit of Landmark in
furtherance of a fraudulent investment scheme.

290.   Each of the Landmark Two Year Initial Transfers constitutes a fraudulent transfer
avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and
recoverable from Landmark pursuant to section 550(a) of the Bankruptcy Code and SIPA §
78fff-(2)(c)(3).

291.   As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of
the Bankruptcy Code, the Trustee is entitled to a judgment against Landmark: (a) avoiding and
preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year

Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS.

### COUNT THIRTEEN
### FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) –
### 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

#### *Against Landmark*

292.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

293.    Each of the Landmark Two Year Initial Transfers was made on or within two years before the Filing Date.

294.    Each of the Landmark Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

295.    BLMIS received less than a reasonably equivalent value in exchange for each of the Landmark Two Year Initial Transfers.

296.    At the time of each of the Landmark Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of the Landmark Two Year Initial Transfers.

297.    At the time of each of the Landmark Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

298.    At the time of each of the Landmark Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

299.     Each of the Landmark Two Year Initial Transfers constitutes a fraudulent transfer
avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and
recoverable from Landmark pursuant to section 550(a) and SIPA § 78fff-(2)(c)(3).

300.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of
the Bankruptcy Code, the Trustee is entitled to a judgment against Landmark: (a) avoiding and
preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year
Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the
value thereof, from Landmark for the benefit of the estate of BLMIS.

## COUNT FOURTEEN
### FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

*Against Landmark*

301.     The Trustee incorporates by reference the allegations contained in the previous
paragraphs of this Complaint as if fully rewritten herein.

302.     At all times relevant to the Landmark Two Year Initial Transfers, there have been
one or more creditors who have held and still hold matured or unmatured unsecured claims
against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not
allowable only under section 502(e) of the Bankruptcy Code.

303.     Each of the Landmark Two Year Initial Transfers constituted a conveyance by
BLMIS as defined under DCL section 270.

304.     Each of the Landmark Two Year Initial Transfers was made by BLMIS with the
actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Landmark
Two Year Initial Transfers to or for the benefit of Landmark in furtherance of a fraudulent
investment scheme.

305.     Each of the Landmark Two Year Initial Transfers was received by Landmark with

actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Landmark

Two Year Initial Transfers, and/or future creditors of BLMIS.

306.     As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278, and/or

279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the

Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark

Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set

aside; (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from

Landmark for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from

Landmark.

### COUNT FIFTEEN
### FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR
### AND CREDITOR LAW
### §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

*Against Landmark*

307.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

308.     At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e)

of the Bankruptcy Code.

309.     Each of the Landmark Two Year Initial Transfers constituted a conveyance by

BLMIS as defined under DCL section 270.

310.     BLMIS did not receive fair consideration for the Landmark Two Year Initial

Transfers.

311.    BLMIS was insolvent at the time it made each of the Landmark Two Year Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Landmark Two Year Initial Transfers.

312.    As a result of the foregoing, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS.

### COUNT SIXTEEN
### FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

*Against Landmark*

313.    The Trustee repeats and realleges the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

314.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

315.    Each of the Landmark Two Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

316.    BLMIS did not receive fair consideration for the Landmark Two Year Initial Transfers.

317.    At the time BLMIS made each of the Landmark Two Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Landmark Two Year Initial Transfers was an unreasonably small capital.

318.    As a result of the foregoing, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark:  (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS.

## COUNT SEVENTEEN
## FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against Landmark*

319.    The Trustee repeats and realleges the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

320.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

321.    Each of the Landmark Two Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

322.    BLMIS did not receive fair consideration for the Landmark Two Year Initial Transfers.

323.   At the time BLMIS made each of the Landmark Two Year Initial Transfers,
BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its
ability to pay them as the debts matured.

324.   As a result of the foregoing, pursuant to DCL sections 275, 278, and/or 279,
sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee
is entitled to a judgment against Landmark:  (a) avoiding and preserving the Landmark Two
Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside;
and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from
Landmark for the benefit of the estate of BLMIS.

**COUNT EIGHTEEN:**
**RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK DEBTOR**
**AND CREDITOR LAW**
**§§ 273-279, AND 11 U.S.C. §§ 544, 548, 550(a), AND 551**

***Against the Landmark Subsequent Transferee Defendants***

325.   The Trustee incorporates by reference the allegations contained in the previous
paragraphs of this Complaint as if fully rewritten herein.

326.   Each of the Landmark Initial Transfers are avoidable under sections 544 and 548
of the Bankruptcy Code, DCL sections 273-276, and SIPA § 78fff-2(c)(3).

327.   Upon information and belief, the Landmark Subsequent Transferee Defendants
received some or all of the Landmark Subsequent Transfers, which are recoverable pursuant to
section 550(a) of the Bankruptcy Code.

328.   Each of the Landmark Subsequent Transfers was made directly or indirectly to, or
for the benefit of, the Landmark Subsequent Transferee Defendants.

329.   The Landmark Subsequent Transferee Defendants are immediate or mediate
transferees of the Landmark Subsequent Transfers.

330.    The Landmark Subsequent Transferee Defendants received the Landmark Subsequent Transfers with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Landmark Subsequent Transfers, and/or future creditors of BLMIS.

331.    As a result of the foregoing, pursuant to DCL sections 273-279, section 544, 548, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Landmark Subsequent Transferee Defendants recovering the Landmark Subsequent Transfers, or the value thereof, and attorneys' fees for the benefit of the estate of BLMIS.

**COUNT NINETEEN**
**DISALLOWANCE OF CUSTOMER CLAIMS**

*Against LIF, LIF-USEP, and UBS SA*

332.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

333.    LIF and UBS SA, on behalf of LIF-USEP, filed Customer Claims Nos. 004417, 006182, and 004536, which have not yet been determined.

334.    LIF-USEP is the recipient, as a direct transferee, of transfers of Customer Property.  The Trustee has commenced this adversary proceeding against LIF-USEP to avoid and recover the LIF-USEP Initial Transfers under sections 544(b), 547, 548, and 550 of the Bankruptcy Code, DCL sections 273-279, and applicable sections of SIPA, including section 78fff-2(c)(3), as set forth above, and LIF-USEP has not returned the LIF-USEP Initial Transfers to the Trustee.

335.    LIF and UBS SA, who filed the Customer Claims, are the recipients of transfers of BLMIS's property which are avoidable and recoverable under sections 544, 547, 548, and/or

550(a) of the Bankruptcy Code, DCL sections 273-279, and SIPA section 78fff-2(c)(3), as set

forth above, and LIF and UBS SA have not returned the transfers to the Trustee.

336.    As a result of the foregoing, pursuant to section 502(d) of the Bankruptcy Code,

LIF and UBS SA's Customer Claims must be disallowed.

337.    The Claims Procedures Order includes a process for determination and allowance

of claims under which the Trustee has been operating.  As a result of the foregoing, the Trustee

intends to resolve LIF and UBS SA's Customer Claims and any related objections through the

mechanisms contemplated by the Claims Procedures Order.

## COUNT TWENTY
## EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS

### *Against LIF, LIF-USEP, and UBS SA*

338.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

339.    LIF, LIF-USEP, and UBS SA engaged in inequitable conduct, including behavior

described in this Complaint, that has resulted in injury to the customers and creditors of the

estate and has conferred an unfair advantage on LIF, LIF-USEP, and UBS SA.

340.    Based on LIF, LIF-USEP, and UBS SA's inequitable conduct as described above,

the customers of BLMIS have been misled as to the true financial condition of the debtor,

customers have been induced to invest without knowledge of the actual facts regarding BLMIS's

financial condition, and/or customers and creditors are less likely to recover the full amounts due

to them because of the conduct of LIF, LIF-USEP, and UBS SA.

341.    The Court should exercise the full extent of its equitable powers to ensure that

claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by LIF

and UBS SA directly or indirectly against the estate – and only to the extent such claims are

allowed – are subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of
the Bankruptcy Code.

342.    Equitable subordination as requested herein is consistent with the provisions and
purposes of the Bankruptcy Code.

### COUNT TWENTY-ONE
### UNJUST ENRICHMENT

*Against the UBS Defendants*

343.    The Trustee incorporates by reference the allegations contained in the previous
paragraphs of this Complaint as if fully rewritten herein.

344.    The UBS Defendants have been unjustly enriched.  The UBS Defendants have
wrongfully and unconscionably benefited from the receipt of money from BLMIS and LIF-
USEP, for which UBS did not in good faith provide fair value.  Rather, the UBS Defendants
received these monies only as a result of perpetuating and participating in a fraudulent scheme
that they were aware of or, at a minimum, should have detected, had they not been willfully
blind.

345.    The UBS Defendants benefited greatly from their exploitation of Madoff's
returns.  The UBS Defendants received millions in fees for purportedly serving LIF-USEP in
various capacities.  The UBS Defendants acted as a mere façade for LIF-USEP, and did so
despite having done their own due diligence on Madoff that resulted in their refusal to
recommend or market the very BLMIS Feeder Fund, LIF-USEP, from which they derived their
substantial fees.

346.    The UBS Defendants chose to ignore compelling indicia of Madoff's fraud.  As a
result, the UBS Defendants have pocketed millions that rightfully belong to BLMIS's customers.

The UBS Defendants have been enriched at the expense of the Trustee and, ultimately, at the expense of BLMIS's customers.

347.    Equity and good conscience require full restitution of the monies received by the UBS Defendants, directly and indirectly, from BLMIS.  This includes not only the money itself that the UBS Defendants received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Trustee.

## COUNT TWENTY-TWO
## MONEY HAD AND RECEIVED

### *Against the UBS Defendants*

348.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

349.    The UBS Defendants are currently in possession, or have control over, money which originated from BLMIS.  This money is Customer Property and belongs to the customer fund under the Trustee's control.  The UBS Defendants have no lawful or equitable right to this money, having obtained it through fraud, deceit, and/or mistake.

350.    In equity and good conscience, the UBS Defendants may not retain possession or control of this money, which rightfully belongs to the customer fund under the Trustee's control. The UBS Defendants are obligated to return all such money to the Trustee.

## COUNT TWENTY-THREE
## UNJUST ENRICHMENT

### *Against the M&B Defendants*

351.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

352.    The M&B Defendants have been unjustly enriched.  The M&B Defendants have wrongfully and unconscionably benefited from the receipt of money from BLMIS and from LIF-

USEP and Landmark, for which they did not in good faith provide fair value.  Rather, the M&B Defendants received these monies only as a result of perpetuating and participating in a fraudulent scheme that they were aware of or, at a minimum, should have detected, had they not been willfully blind.

353.   The M&B Defendants benefited greatly from their exploitation of Madoff's returns.   The M&B Defendants received millions for purportedly serving LIF-USEP and Landmark in various capacities.

354.   The M&B Defendants were constantly faced with indicia of BLMIS's potential fraud.  They knew the consistency of Madoff's returns were, statistically, too good to be true. (*Supra* ¶¶ 152-156.)  They also knew Madoff's purported trading structure was inconsistent with industry practices and produced trading volumes that were virtually impossible.  (*Supra* ¶¶ 137-151.)

355.   The M&B Defendants chose to ignore compelling indicia of Madoff's fraud.  As a result, the M&B Defendants have pocketed millions that rightfully belong to BLMIS's customers.   The M&B Defendants have been enriched at the expense of the Trustee and, ultimately, at the expense of BLMIS's customers.

356.   Equity and good conscience require full restitution of the monies received by the M&B Defendants directly and indirectly, from BLMIS.  This includes not only the money itself that the UBS Defendants received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Trustee.

## COUNT TWENTY-FOUR
## MONEY HAD AND RECEIVED

### *Against the M&B Defendants*

357.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

358.    The M&B Defendants are currently in possession, or have control over, money which originated from BLMIS.  This money is Customer Property and belongs to the customer fund under the Trustee's control.  The M&B Defendants have no lawful or equitable right to this money, having obtained it through fraud, deceit, and/or mistake.

359.    In equity and good conscience, the M&B Defendants may not retain possession or control of this money, which rightfully belongs to the customer fund under the Trustee's control. The M&B Defendants are obligated to return all such money to the Trustee.

## COUNT TWENTY-FIVE
## UNJUST ENRICHMENT

### *Against the Reliance Group Defendants*

360.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

361.    The Reliance Group Defendants have been unjustly enriched.  The Reliance Group Defendants have wrongfully and unconscionably benefited from the receipt of money from BLMIS and LIF-USEP, for which they did not in good faith provide fair value.  Rather, the Reliance Group Defendants received these monies only as a result of perpetuating and participating in a fraudulent scheme that they were aware of or, at a minimum, should have detected, had they not been willfully blind.

362.    The Reliance Group Defendants benefited greatly from their exploitation of Madoff's returns.  The Reliance Group Defendants received millions for purportedly serving LIF-USEP in various capacities.

363.    The Reliance Group Defendants willfully turned a blind eye to many red flags, all the while continuing to market LIF-USEP, soliciting investments for Madoff.  The Reliance Group Defendants were constantly faced with indicia of BLMIS's potential fraud.  They knew the consistency of Madoff's returns were, statistically, too good to be true.  (*Supra* ¶¶ 152-156.) They also knew Madoff's purported trading structure was inconsistent with industry practices and produced trading volumes that were virtually impossible.  (*Supra* ¶¶ 137-151.)

364.    The Reliance Group Defendants chose to ignore compelling indicia of Madoff's fraud.  As a result, the Reliance Group Defendants have pocketed millions of dollars that rightfully belong to BLMIS's customers.  The Reliance Group Defendants have been enriched at the expense of the Trustee and, ultimately, at the expense of BLMIS's customers.

365.    Equity and good conscience require full restitution of the monies received by the Reliance Group Defendants, directly and indirectly, from BLMIS.  This includes not only the money itself that the Reliance Group Defendants received, but also the proceeds of that money. Any profits earned with the money they received must be returned to the Trustee.

## COUNT TWENTY-SIX
## MONEY HAD AND RECEIVED

### *Against the Reliance Group Defendants*

366.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

367.    The Reliance Group Defendants are currently in possession, or have control over, money which originated from BLMIS.  This money is Customer Property and belongs to the

customer fund under the Trustee's control.  The Reliance Group Defendants have no lawful or equitable right to this money, having obtained it through fraud, deceit, and/or mistake.

368.    In equity and good conscience, the Reliance Group Defendants may not retain possession or control of this money, which rightfully belong to the customer fund under the Trustee's control.  The Reliance Group Defendants are obligated to return all such money to the Trustee.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

i.    On the First Claim for Relief, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP:  (a) avoiding and preserving the LIF-USEP Preference Period Initial Transfers; (b) directing that the LIF-USEP Preference Period Initial Transfers be set aside; and (c) recovering the LIF-USEP Preference Period Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS;

ii.    On the Second Claim for Relief, the Trustee is entitled to a judgment pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the LIF-USEP Preference Period Subsequent Transfers, or the value thereof, from the LIF-USEP Subsequent Transferee Defendants for the benefit of the estate of BLMIS;

iii.    On the Third Claim for Relief, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark:  (a) avoiding and preserving the Landmark Preference Period Initial Transfers; (b) directing that the Landmark Preference Period Initial Transfers be set aside; and (c) recovering

the Landmark Preference Period Initial Transfers, or the value thereof, from Landmark for the

benefit of the estate of BLMIS;

iv.    On the Fourth Claim for Relief, the Trustee is entitled to a judgment pursuant to

sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering

the Landmark Preference Period Subsequent Transfers, or the value thereof, from the Landmark

Subsequent Transferee Defendants for the benefit of the estate of BLMIS;

v.    On the Fifth Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551

of the Bankruptcy Code, the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding

and preserving the LIF-USEP Two Year Initial Transfers; (b) directing that the LIF-USEP Two

Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Two Year Initial Transfers,

or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS;

vi.    On the Sixth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551

of the Bankruptcy Code, the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding

and preserving the LIF-USEP Two Year Initial Transfers; (b) directing that the LIF-USEP Two

Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Two Year Initial Transfers,

or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS;

vii.    On the Seventh Claim for Relief, pursuant to DCL sections 276, 276-a, 278,

and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3),

the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-

USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be

set aside; (c) recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-

USEP for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from LIF-USEP;

viii.    On the Eighth Claim for Relief, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS;

ix.    On the Ninth Claim for Relief, pursuant to DCL sections, 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP:  (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS;

x.    On the Tenth Claim for Relief, pursuant to DCL sections 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP:  (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS;

xi.    On the Eleventh Claim for Relief, pursuant to DCL sections 273-279, sections 544, 548, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the LIF-USEP Subsequent Transferee Defendants recovering the LIF-USEP Subsequent Transfers, or the value thereof, and attorneys' fees for the benefit of the estate of BLMIS;

xii.    On the Twelfth Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS;

xiii.    On the Thirteenth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS;

xiv.    On the Fourteenth Claim for Relief, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from Landmark;

xv.    On the Fifteenth Claim for Relief, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS;

xvi.    On the Sixteenth Claim for Relief, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark:  (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS;

xvii.    On the Seventeenth Claim for Relief, pursuant to DCL sections 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark:  (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS;

xviii.    On the Eighteenth Claim for Relief, pursuant to DCL sections 273-279, sections 544, 548, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Landmark Subsequent Transferee Defendants recovering the Landmark Subsequent Transfers, or the value thereof, and attorneys' fees for the benefit of the estate of BLMIS;

xix.    On the Nineteenth Claim for Relief, a judgment that the Customer Claims filed by LIF and UBS SA be disallowed pursuant to section 502(d) of the Bankruptcy Code;

xx.    On the Twentieth Claim for Relief, a judgment that the Customer Claims filed by LIF and UBS SA—only to the extent such claims are allowed—be equitably subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code;

xxi.    On the Twenty-First Claim for Relief, a judgment awarding full restitution of the monies received by the UBS Defendants, directly and indirectly, from BLMIS and any assets derived from that money;

xxii.    On the Twenty-Second Claim for Relief, a judgment against the UBS Defendants for compensatory damages in an amount to be determined at trial;

xxiii.    On the Twenty-Third Claim for Relief, a judgment awarding full restitution of the monies received by the M&B Defendants, directly and indirectly, from BLMIS and any assets derived from that money;

xxiv.    On the Twenty-Fourth Claim for Relief, a judgment against the M&B Defendants for compensatory damages in an amount to be determined at trial;

xxv.    On the Twenty-Fifth Claim for Relief, a judgment awarding full restitution of the monies received by the Reliance Group Defendants, directly and indirectly, from BLMIS and any assets derived from that money;

xxvi.    On the Twenty-Sixth Claim for Relief, a judgment against the Reliance Group Defendants for compensatory damages in an amount to be determined at trial;

xxvii.    On the Twenty-First through Twenty-Sixth Claims for Relief, compensatory and exemplary damages in an amount to be proven at trial;

xxviii.    On all Claims for Relief, pursuant to federal common law and N.Y. CPLR §§ 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Initial Transfers, Subsequent Transfers, and any additional transfers were received;

xxix.    On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS's estate;

xxx.    Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

xxxi.    Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.


Date:  December 7, 2010                          BAKER & HOSTETLER LLP


                                                BY:  /s/ Oren J. Warshavsky
                                                     David J. Sheehan
                                                     Email: dsheehan@bakerlaw.com
                                                     Oren J. Warshavsky
                                                     Email: owarshavsky@bakerlaw.com
                                                     Keith R. Murphy
                                                     Email: kmurphy@bakerlaw.com
                                                     Jonathan B. New
                                                     Email: jnew@bakerlaw.com
                                                     Melissa L. Kosack
                                                     Email: mkosack@bakerlaw.com
*Of Counsel*:                                        Sammi Malek
                                                     Email: smalek@bakerlaw.com
Mark A. Kornfeld
Email: mkornfeld@bakerlaw.com
Deborah H. Renner
Email: drenner@bakerlaw.com                     45 Rockefeller Plaza
Gonzalo S. Zeballos                             New York, New York 10111
Email: gzeballos@bakerlaw.com                   Telephone: (212) 589-4200
Geraldine Ponto                                 Facsimile: (212) 589-4201
Email: gponto@bakerlaw.com
Timothy Scott Pfeifer
Email: tpfeifer@bakerlaw.com                    *Attorneys for Irving H. Picard,*
Marc F. Skapof                                  *Trustee for the SIPA Liquidation of Bernard L.*
Email: mskapof@bakerlaw.com                     *Madoff Investment Securities LLC*
Seanna R. Brown
Email: sbrown@bakerlaw.com
Marianna Shelenkova
Email: mshelenkova@bakerlaw.com

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| UBS (LUXEMBOURG) SA FBO LUXEMBOURG INVESTMENT FUND US EQUITY PLUS | 1FR123 |
| HSBC INSTITUTIONAL TRUST SVCS (IRELAND) LTD FBO LANDMARK INVESTMENT FUND IRELAND | 1FR133 |

BLMIS ACCOUNT NO. 1FR123 - UBS (LUXEMBOURG) SA FBO LUXEMBOURG INVESTMENT FUND US EQUITY PLUS

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 9/8/2005 | CHECK WIRE | 24,780,505 | 24,780,505 | - | - | - | 24,780,505 | - | - | - |
| 10/11/2005 | CHECK WIRE | 2,499,980 | 2,499,980 | - | - | - | 27,280,485 | - | - | - |
| 10/12/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (65) | - | (65) | - | - | 27,280,420 | - | - | (65) |
| 10/13/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 27,280,419 | - | - | (0) |
| 10/14/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 27,280,419 | - | - | (0) |
| 10/19/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 27,280,419 | - | - | (0) |
| 10/21/2005 | CHECK WIRE | 349,980 | 349,980 | - | - | - | 27,630,399 | - | - | - |
| 10/31/2005 | W/H TAX DIV MWD | (293) | - | (293) | - | - | 27,630,106 | - | - | (293) |
| 11/9/2005 | CHECK WIRE | 1,799,980 | 1,799,980 | - | - | - | 29,430,086 | - | - | - |
| 11/15/2005 | W/H TAX DIV ABT | (447) | - | (447) | - | - | 29,429,639 | - | - | (447) |
| 11/15/2005 | W/H TAX DIV PG | (1,631) | - | (1,631) | - | - | 29,428,008 | - | - | (1,631) |
| 11/17/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (23) | - | (23) | - | - | 29,427,985 | - | - | (23) |
| 11/21/2005 | W/H TAX DIV TXN | (84) | - | (84) | - | - | 29,427,901 | - | - | (84) |
| 11/21/2005 | W/H TAX DIV GS | (187) | - | (187) | - | - | 29,427,714 | - | - | (187) |
| 11/23/2005 | W/H TAX DIV MER | (299) | - | (299) | - | - | 29,427,415 | - | - | (299) |
| 11/23/2005 | W/H TAX DIV C | (3,813) | - | (3,813) | - | - | 29,423,603 | - | - | (3,813) |
| 11/30/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 29,423,600 | - | - | (2) |
| 12/1/2005 | W/H TAX DIV WFC | (1,476) | - | (1,476) | - | - | 29,422,124 | - | - | (1,476) |
| 12/1/2005 | W/H TAX DIV INTC | (817) | - | (817) | - | - | 29,421,308 | - | - | (817) |
| 12/2/2005 | W/H TAX DIV BA | (336) | - | (336) | - | - | 29,420,971 | - | - | (336) |
| 12/6/2005 | W/H TAX DIV PFE | (2,373) | - | (2,373) | - | - | 29,418,598 | - | - | (2,373) |
| 12/7/2005 | CHECK WIRE | 3,299,980 | 3,299,980 | - | - | - | 32,718,578 | - | - | - |
| 12/8/2005 | W/H TAX DIV MSFT | (1,238) | - | (1,238) | - | - | 32,717,340 | - | - | (1,238) |
| 12/9/2005 | W/H TAX DIV XOM | (3,086) | - | (3,086) | - | - | 32,714,254 | - | - | (3,086) |
| 12/12/2005 | W/H TAX DIV IBM | (538) | - | (538) | - | - | 32,713,716 | - | - | (538) |
| 12/12/2005 | W/H TAX DIV UTX | (381) | - | (381) | - | - | 32,713,335 | - | - | (381) |
| 12/12/2005 | W/H TAX DIV CVX | (1,729) | - | (1,729) | - | - | 32,711,606 | - | - | (1,729) |
| 12/12/2005 | W/H TAX DIV MMM | (565) | - | (565) | - | - | 32,711,041 | - | - | (565) |
| 12/13/2005 | W/H TAX DIV JNJ | (1,671) | - | (1,671) | - | - | 32,709,369 | - | - | (1,671) |
| 12/15/2005 | W/H TAX DIV TWX | (393) | - | (393) | - | - | 32,708,976 | - | - | (393) |
| 12/15/2005 | W/H TAX DIV HD | (359) | - | (359) | - | - | 32,708,618 | - | - | (359) |
| 12/15/2005 | W/H TAX DIV KO | (966) | - | (966) | - | - | 32,707,652 | - | - | (966) |
| 12/16/2005 | W/H TAX DIV AIG | (650) | - | (650) | - | - | 32,707,002 | - | - | (650) |
| 12/16/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (22) | - | (22) | - | - | 32,706,980 | - | - | (22) |
| 12/20/2005 | CHECK WIRE | 4,799,980 | 4,799,980 | - | - | - | 37,506,960 | - | - | - |
| 12/22/2005 | CHECK WIRE | 2,099,980 | 2,099,980 | - | - | - | 39,606,940 | - | - | - |
| 12/22/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 39,606,927 | - | - | (13) |
| 12/23/2005 | W/H TAX DIV BAC | (3,362) | - | (3,362) | - | - | 39,603,565 | - | - | (3,362) |
| 12/30/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 39,603,564 | - | - | (2) |
| 12/30/2005 | W/H TAX DIV S | (123) | - | (123) | - | - | 39,603,440 | - | - | (123) |
| 1/3/2006 | W/H TAX DIV WMT | (414) | - | (414) | - | - | 39,603,026 | - | - | (414) |
| 1/3/2006 | W/H TAX DIV MRK | (1,419) | - | (1,419) | - | - | 39,601,607 | - | - | (1,419) |
| 1/3/2006 | W/H TAX DIV PEP | (738) | - | (738) | - | - | 39,600,869 | - | - | (738) |
| 1/3/2006 | W/H TAX DIV VIA.B | (188) | - | (188) | - | - | 39,600,681 | - | - | (188) |
| 1/4/2006 | W/H TAX DIV HPQ | (386) | - | (386) | - | - | 39,600,294 | - | - | (386) |
| 1/5/2006 | CHECK WIRE | 4,699,980 | 4,699,980 | - | - | - | 44,300,274 | - | - | - |
| 1/6/2006 | W/H TAX DIV DIS | (928) | - | (928) | - | - | 44,299,346 | - | - | (928) |
| 1/6/2006 | W/H TAX DIV SLB | (220) | - | (220) | - | - | 44,299,127 | - | - | (220) |
| 1/13/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (15) | - | (15) | - | - | 44,299,111 | - | - | (15) |
| 1/31/2006 | CHECK WIRE | 5,399,980 | 5,399,980 | - | - | - | 49,699,091 | - | - | - |
| 1/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 49,699,081 | - | - | (11) |
| 1/31/2006 | W/H TAX DIV MS | (764) | - | (764) | - | - | 49,698,317 | - | - | (764) |
| 2/1/2006 | W/H TAX DIV VZ | (620) | - | (620) | - | - | 49,697,697 | - | - | (620) |
| 2/1/2006 | W/H TAX DIV T | (712) | - | (712) | - | - | 49,696,985 | - | - | (712) |
| 2/13/2006 | SCHLUMBERGER LTD  CXL W/H TAX SLB | 220 | - | 220 | - | - | 49,697,204 | - | - | - |
| 2/13/2006 | W/H TAX DIV TXN | (125) | - | (125) | - | - | 49,697,079 | - | - | (125) |
| 2/15/2006 | W/H TAX DIV ABT | (1,102) | - | (1,102) | - | - | 49,695,977 | - | - | (1,102) |
| 2/15/2006 | W/H TAX DIV PG | (2,443) | - | (2,443) | - | - | 49,693,534 | - | - | (2,443) |
| 2/23/2006 | W/H TAX DIV GS | (295) | - | (295) | - | - | 49,693,239 | - | - | (295) |
| 2/24/2006 | W/H TAX DIV C | (6,408) | - | (6,408) | - | - | 49,686,832 | - | - | (6,408) |
| 2/28/2006 | W/H TAX DIV MER | (590) | - | (590) | - | - | 49,686,242 | - | - | (590) |
| 2/28/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (19) | - | (19) | - | - | 49,686,223 | - | - | (19) |
| 3/1/2006 | CHECK WIRE | 78,499,980 | 78,499,980 | - | - | - | 128,186,203 | - | - | - |
| 3/1/2006 | W/H TAX DIV WFC | (2,207) | - | (2,207) | - | - | 128,183,996 | - | - | (2,207) |
| 3/1/2006 | W/H TAX DIV INTC | (1,554) | - | (1,554) | - | - | 128,182,442 | - | - | (1,554) |

MADC1127_00000002

BLMIS ACCOUNT NO. 1FR123 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV US EQUITY PLUS

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 3/3/2006 | W/H TAX DIV BA | (637) | - | (637) | - | - | 128,181,805 | - | - | (637) |
| 3/7/2006 | W/H TAX DIV UPS | (1,075) | - | (1,075) | - | - | 128,180,730 | - | - | (1,075) |
| 3/7/2006 | W/H TAX DIV PFE | (4,579) | - | (4,579) | - | - | 128,176,151 | - | - | (4,579) |
| 3/9/2006 | W/H TAX DIV MSFT | (2,139) | - | (2,139) | - | - | 128,174,012 | - | - | (2,139) |
| 3/10/2006 | W/H TAX DIV UTX | (571) | - | (571) | - | - | 128,173,441 | - | - | (571) |
| 3/10/2006 | W/H TAX DIV XOM | (5,120) | - | (5,120) | - | - | 128,168,321 | - | - | (5,120) |
| 3/10/2006 | W/H TAX DIV TGT | (236) | - | (236) | - | - | 128,168,086 | - | - | (236) |
| 3/10/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 128,168,078 | - | - | (8) |
| 3/10/2006 | W/H TAX DIV CVX | (2,618) | - | (2,618) | - | - | 128,165,460 | - | - | (2,618) |
| 3/10/2006 | W/H TAX DIV IBM | (810) | - | (810) | - | - | 128,164,650 | - | - | (810) |
| 3/13/2006 | W/H TAX DIV MMM | (868) | - | (868) | - | - | 128,163,782 | - | - | (868) |
| 3/14/2006 | W/H TAX DIV JNJ | (2,568) | - | (2,568) | - | - | 128,161,214 | - | - | (2,568) |
| 3/15/2006 | W/H TAX DIV TWX | (603) | - | (603) | - | - | 128,160,611 | - | - | (603) |
| 3/16/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 128,160,607 | - | - | (4) |
| 3/17/2006 | W/H TAX DIV AIG | (997) | - | (997) | - | - | 128,159,611 | - | - | (997) |
| 3/23/2006 | W/H TAX DIV HD | (814) | - | (814) | - | - | 128,158,797 | - | - | (814) |
| 3/24/2006 | W/H TAX DIV BAC | (6,013) | - | (6,013) | - | - | 128,152,784 | - | - | (6,013) |
| 3/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (17) | - | (17) | - | - | 128,152,767 | - | - | (17) |
| 3/31/2006 | CHECK WIRE | 6,499,980 | 6,499,980 | - | - | - | 134,652,747 | - | - | - |
| 3/31/2006 | W/H TAX DIV S | (570) | - | (570) | - | - | 134,652,177 | - | - | (570) |
| 3/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 134,652,177 | - | - | (1) |
| 3/31/2006 | W/H TAX DIV PEP | (3,324) | - | (3,324) | - | - | 134,648,852 | - | - | (3,324) |
| 4/3/2006 | W/H TAX DIV MRK | (6,395) | - | (6,395) | - | - | 134,642,458 | - | - | (6,395) |
| 4/3/2006 | W/H TAX DIV KO | (4,916) | - | (4,916) | - | - | 134,637,541 | - | - | (4,916) |
| 4/3/2006 | W/H TAX DIV WMT | (3,241) | - | (3,241) | - | - | 134,634,301 | - | - | (3,241) |
| 4/5/2006 | CHECK WIRE | 26,499,980 | 26,499,980 | - | - | - | 161,134,281 | - | - | - |
| 4/5/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 161,134,280 | - | - | (1) |
| 4/5/2006 | W/H TAX DIV HPQ | (1,776) | - | (1,776) | - | - | 161,132,504 | - | - | (1,776) |
| 4/7/2006 | W/H TAX DIV SLB | (3) | - | (3) | - | - | 161,132,500 | - | - | (3) |
| 4/7/2006 | W/H TAX DIV SLB | (364) | - | (364) | - | - | 161,132,136 | - | - | - |
| 4/10/2006 | W/H TAX DIV MO | (12,924) | - | (12,924) | - | - | 161,119,213 | - | - | (12,924) |
| 4/21/2006 | CHECK WIRE | 8,999,980 | 8,999,980 | - | - | - | 170,119,193 | - | - | - |
| 4/21/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 170,119,183 | - | - | (10) |
| 4/25/2006 | W/H TAX DIV GE | (6,829) | - | (6,829) | - | - | 170,112,353 | - | - | (6,829) |
| 4/28/2006 | CNL W/H TAX DIV SLB | 364 | - | 364 | - | - | 170,112,717 | - | - | - |
| 4/28/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 170,112,707 | - | - | (11) |
| 4/28/2006 | W/H TAX DIV MDT | (897) | - | (897) | - | - | 170,111,810 | - | - | (897) |
| 4/28/2006 | W/H TAX DIV MS | (2,275) | - | (2,275) | - | - | 170,109,534 | - | - | (2,275) |
| 5/1/2006 | W/H TAX DIV JPM | (6,806) | - | (6,806) | - | - | 170,102,728 | - | - | (6,806) |
| 5/1/2006 | W/H TAX DIV VZ | (9,289) | - | (9,289) | - | - | 170,093,438 | - | - | (9,289) |
| 5/1/2006 | W/H TAX DIV T | (10,041) | - | (10,041) | - | - | 170,083,397 | - | - | (10,041) |
| 5/3/2006 | CHECK WIRE | 14,499,980 | 14,499,980 | - | - | - | 184,583,377 | - | - | - |
| 5/5/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 184,583,368 | - | - | (9) |
| 5/10/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 184,583,363 | - | - | (5) |
| 5/10/2006 | W/H TAX DIV AXP | (1,180) | - | (1,180) | - | - | 184,582,183 | - | - | (1,180) |
| 5/15/2006 | W/H TAX DIV ABT | (3,522) | - | (3,522) | - | - | 184,578,661 | - | - | (3,522) |
| 5/15/2006 | W/H TAX DIV PG | (8,055) | - | (8,055) | - | - | 184,570,606 | - | - | (8,055) |
| 5/22/2006 | W/H TAX DIV CAT | (1,345) | - | (1,345) | - | - | 184,569,261 | - | - | (1,345) |
| 5/22/2006 | W/H TAX DIV TXN | (379) | - | (379) | - | - | 184,568,882 | - | - | (379) |
| 5/24/2006 | W/H TAX DIV MER | (2,228) | - | (2,228) | - | - | 184,566,654 | - | - | (2,228) |
| 5/25/2006 | W/H TAX DIV GS | (1,229) | - | (1,229) | - | - | 184,565,425 | - | - | (1,229) |
| 5/26/2006 | CHECK WIRE | 6,999,980 | 6,999,980 | - | - | - | 191,565,405 | - | - | - |
| 5/26/2006 | W/H TAX DIV C | (19,271) | - | (19,271) | - | - | 191,546,134 | - | - | (19,271) |
| 5/31/2006 | W/H TAX DIV UPS | (4,063) | - | (4,063) | - | - | 191,542,071 | - | - | (4,063) |
| 5/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (27) | - | (27) | - | - | 191,542,045 | - | - | (27) |
| 6/1/2006 | W/H TAX DIV INTC | (5,792) | - | (5,792) | - | - | 191,536,253 | - | - | (5,792) |
| 6/1/2006 | W/H TAX DIV WFC | (8,803) | - | (8,803) | - | - | 191,527,450 | - | - | (8,803) |
| 6/2/2006 | CHECK WIRE | 7,289,980 | 7,289,980 | - | - | - | 198,817,430 | - | - | - |
| 6/2/2006 | W/H TAX DIV BA | (2,406) | - | (2,406) | - | - | 198,815,024 | - | - | (2,406) |
| 6/5/2006 | W/H TAX DIV WMT | (4,179) | - | (4,179) | - | - | 198,810,845 | - | - | (4,179) |
| 6/6/2006 | CHECK WIRE | 3,999,980 | 3,999,980 | - | - | - | 202,810,825 | - | - | - |
| 6/6/2006 | W/H TAX DIV BMY | (4,326) | - | (4,326) | - | - | 202,806,499 | - | - | (4,326) |
| 6/6/2006 | W/H TAX DIV PFE | (17,535) | - | (17,535) | - | - | 202,788,964 | - | - | (17,535) |
| 6/8/2006 | W/H TAX DIV MSFT | (7,939) | - | (7,939) | - | - | 202,781,026 | - | - | (7,939) |
| 6/9/2006 | W/H TAX DIV XOM | (19,449) | - | (19,449) | - | - | 202,761,577 | - | - | (19,449) |

MADC1127_00000003

BLMIS ACCOUNT NO. 1FR123 - UBS (LUXEMBOURG) SA ON BEHALF OF INVESTMENT FUND US EQUITY PLUS

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 6/12/2006 | W/H TAX DIV IBM | (4,683) | - | (4,683) | - | - | 202,756,894 | - | - | (4,683) |
| 6/12/2006 | W/H TAX DIV MMM | (3,279) | - | (3,279) | - | - | 202,753,615 | - | - | (3,279) |
| 6/12/2006 | W/H TAX DIV UTX | (2,597) | - | (2,597) | - | - | 202,751,018 | - | - | (2,597) |
| 6/13/2006 | W/H TAX DIV JNJ | (11,026) | - | (11,026) | - | - | 202,739,992 | - | - | (11,026) |
| 6/15/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (29) | - | (29) | - | - | 202,739,963 | - | - | (29) |
| 6/15/2006 | W/H TAX DIV TWX | (2,237) | - | (2,237) | - | - | 202,737,726 | - | - | (2,237) |
| 6/20/2006 | CHECK WIRE | 11,999,980 | 11,999,980 | - | - | - | 214,737,706 | - | - | - |
| 6/22/2006 | W/H TAX DIV HD | (3,208) | - | (3,208) | - | - | 214,734,498 | - | - | (3,208) |
| 6/23/2006 | W/H TAX DIV BAC | (23,166) | - | (23,166) | - | - | 214,711,332 | - | - | (23,166) |
| 6/30/2006 | CHECK WIRE | 11,999,980 | 11,999,980 | - | - | - | 226,711,312 | - | - | - |
| 6/30/2006 | W/H TAX DIV S | (735) | - | (735) | - | - | 226,710,577 | - | - | (735) |
| 6/30/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (94) | - | (94) | - | - | 226,710,483 | - | - | (94) |
| 6/30/2006 | W/H TAX DIV PEP | (4,868) | - | (4,868) | - | - | 226,705,615 | - | - | (4,868) |
| 7/3/2006 | CHECK WIRE | 5,999,980 | 5,999,980 | - | - | - | 232,705,595 | - | - | - |
| 7/3/2006 | W/H TAX DIV CVX | (11,583) | - | (11,583) | - | - | 232,694,012 | - | - | (11,583) |
| 7/3/2006 | W/H TAX DIV KO | (4,383) | - | (4,383) | - | - | 232,689,629 | - | - | (4,383) |
| 7/3/2006 | W/H TAX DIV AIG | (3,876) | - | (3,876) | - | - | 232,685,753 | - | - | (3,876) |
| 7/3/2006 | W/H TAX DIV MRK | (8,126) | - | (8,126) | - | - | 232,677,627 | - | - | (8,126) |
| 7/5/2006 | W/H TAX DIV HPQ | (2,266) | - | (2,266) | - | - | 232,675,361 | - | - | (2,266) |
| 7/7/2006 | W/H TAX DIV SLB | (1,536) | - | (1,536) | - | - | 232,673,825 | - | - | (1,536) |
| 7/10/2006 | W/H TAX DIV MO | (11,312) | - | (11,312) | - | - | 232,662,513 | - | - | (11,312) |
| 7/12/2006 | CHECK WIRE | 2,999,980 | 2,999,980 | - | - | - | 235,662,493 | - | - | - |
| 7/14/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (39) | - | (39) | - | - | 235,662,454 | - | - | (39) |
| 7/31/2006 | CHECK WIRE | 20,999,980 | 20,999,980 | - | - | - | 256,662,434 | - | - | - |
| 7/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (26) | - | (26) | - | - | 256,662,408 | - | - | (26) |
| 7/31/2006 | W/H TAX DIV MS | (1,623) | - | (1,623) | - | - | 256,660,784 | - | - | (1,623) |
| 8/3/2006 | CHECK WIRE | 25,999,980 | 25,999,980 | - | - | - | 282,660,764 | - | - | - |
| 8/7/2006 | CXL W/H TAX DIV SLB | 1,536 | - | 1,536 | - | - | 282,662,300 | - | - | - |
| 8/15/2006 | W/H TAX DIV ABT | (2,513) | - | (2,513) | - | - | 282,659,787 | - | - | (2,513) |
| 8/15/2006 | W/H TAX DIV PG | (10,261) | - | (10,261) | - | - | 282,649,526 | - | - | (10,261) |
| 8/17/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 282,649,516 | - | - | (10) |
| 8/21/2006 | W/H TAX DIV TXN | (468) | - | (468) | - | - | 282,649,048 | - | - | (468) |
| 8/21/2006 | W/H TAX DIV CAT | (1,052) | - | (1,052) | - | - | 282,647,996 | - | - | (1,052) |
| 8/23/2006 | W/H TAX DIV MER | (2,237) | - | (2,237) | - | - | 282,645,759 | - | - | (2,237) |
| 8/24/2006 | W/H TAX DIV GS | (1,566) | - | (1,566) | - | - | 282,644,194 | - | - | (1,566) |
| 8/25/2006 | W/H TAX DIV C | (24,355) | - | (24,355) | - | - | 282,619,839 | - | - | (24,355) |
| 8/30/2006 | CHECK WIRE | 7,499,980 | 7,499,980 | - | - | - | 290,119,819 | - | - | - |
| 9/1/2006 | W/H TAX DIV WFC | (9,519) | - | (9,519) | - | - | 290,110,300 | - | - | (9,519) |
| 9/1/2006 | W/H TAX DIV BA | (2,415) | - | (2,415) | - | - | 290,107,885 | - | - | (2,415) |
| 9/1/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (21) | - | (21) | - | - | 290,107,864 | - | - | (21) |
| 9/1/2006 | W/H TAX DIV INTC | (5,854) | - | (5,854) | - | - | 290,102,009 | - | - | (5,854) |
| 9/5/2006 | CHECK WIRE | 8,999,980 | 8,999,980 | - | - | - | 299,101,989 | - | - | - |
| 9/5/2006 | W/H TAX DIV WMT | (4,196) | - | (4,196) | - | - | 299,097,794 | - | - | (4,196) |
| 9/5/2006 | W/H TAX DIV PFE | (17,632) | - | (17,632) | - | - | 299,080,162 | - | - | (17,632) |
| 9/6/2006 | CHECK WIRE | 2,999,980 | 2,999,980 | - | - | - | 302,080,142 | - | - | - |
| 9/6/2006 | W/H TAX DIV UPS | (4,079) | - | (4,079) | - | - | 302,076,063 | - | - | (4,079) |
| 9/11/2006 | W/H TAX DIV UTX | (2,608) | - | (2,608) | - | - | 302,073,455 | - | - | (2,608) |
| 9/11/2006 | W/H TAX DIV CVX | (11,630) | - | (11,630) | - | - | 302,061,825 | - | - | (11,630) |
| 9/11/2006 | W/H TAX DIV XOM | (19,306) | - | (19,306) | - | - | 302,042,519 | - | - | (19,306) |
| 9/11/2006 | W/H TAX DIV IBM | (4,562) | - | (4,562) | - | - | 302,037,957 | - | - | (4,562) |
| 9/12/2006 | W/H TAX DIV JNJ | (11,071) | - | (11,071) | - | - | 302,026,886 | - | - | (11,071) |
| 9/12/2006 | W/H TAX DIV MMM | (3,292) | - | (3,292) | - | - | 302,023,594 | - | - | (3,292) |
| 9/14/2006 | W/H TAX DIV MSFT | (7,935) | - | (7,935) | - | - | 302,015,658 | - | - | (7,935) |
| 9/15/2006 | W/H TAX DIV AIG | (4,281) | - | (4,281) | - | - | 302,011,378 | - | - | (4,281) |
| 9/15/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (18) | - | (18) | - | - | 302,011,360 | - | - | (18) |
| 9/15/2006 | W/H TAX DIV TWX | (2,389) | - | (2,389) | - | - | 302,008,971 | - | - | (2,389) |
| 9/21/2006 | CHECK WIRE | 8,999,980 | 8,999,980 | - | - | - | 311,008,951 | - | - | - |
| 9/21/2006 | W/H TAX DIV HD | (3,086) | - | (3,086) | - | - | 311,005,864 | - | - | (3,086) |
| 9/22/2006 | CHECK WIRE | 2,999,980 | 2,999,980 | - | - | - | 314,005,844 | - | - | - |
| 9/22/2006 | W/H TAX DIV BAC | (25,550) | - | (25,550) | - | - | 313,980,294 | - | - | (25,550) |
| 9/27/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 313,980,281 | - | - | (13) |
| 9/29/2006 | W/H TAX DIV PEP | (4,949) | - | (4,949) | - | - | 313,975,332 | - | - | (4,949) |
| 9/29/2006 | W/H TAX DIV S | (751) | - | (751) | - | - | 313,974,582 | - | - | (751) |
| 10/2/2006 | CHECK WIRE | 36,999,980 | 36,999,980 | - | - | - | 350,974,562 | - | - | - |
| 10/2/2006 | W/H TAX DIV KO | (6,379) | - | (6,379) | - | - | 350,968,183 | - | - | (6,379) |

MADC1127_00000004

Exhibit B

BLMIS ACCOUNT NO. 1FR123 - UBS (LUXEMBOURG) SA/ACCESS INTERNATIONAL INVESTMENT FUND US EQUITY PLUS

| Column 1<br>Date | Column 2<br>Transaction<br>Description | Column 3<br>Transaction Amount<br>Reported in<br>Customer Statement | Column 4<br>Cash<br>Deposits | Column 5<br>Cash<br>Withdrawals | Column 6<br>Transfers of<br>Principal In | Column 7<br>Transfers of<br>Principal Out | Column 8<br>Balance of<br>Principal | Column 9<br>90-Day<br>Preferential<br>Transfers | Column 10<br>2-Year<br>Cash<br>Withdrawals | Column 11<br>6-Year<br>Cash<br>Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/2/2006 | W/H TAX DIV MRK | (8,159) | - | (8,159) | - | - | 350,960,025 | - | - | (8,159) |
| 10/4/2006 | CHECK WIRE | 10,499,980 | 10,499,980 | - | - | - | 361,460,005 | - | - | - |
| 10/4/2006 | W/H TAX DIV HPQ | (2,219) | - | (2,219) | - | - | 361,457,786 | - | - | (2,219) |
| 10/10/2006 | W/H TAX DIV MO | (18,034) | - | (18,034) | - | - | 361,439,752 | - | - | (18,034) |
| 10/17/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (34) | - | (34) | - | - | 361,439,718 | - | - | (34) |
| 10/19/2006 | CHECK WIRE | 2,999,980 | 2,999,980 | - | - | - | 364,439,698 | - | - | - |
| 10/25/2006 | W/H TAX DIV GE | (26,069) | - | (26,069) | - | - | 364,413,630 | - | - | (26,069) |
| 10/26/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 364,413,623 | - | - | (6) |
| 10/27/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 364,413,622 | - | - | (1) |
| 10/30/2006 | CHECK WIRE | 3,999,980 | 3,999,980 | - | - | - | 368,413,602 | - | - | - |
| 10/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 368,413,597 | - | - | (5) |
| 10/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 368,413,597 | - | - | (0) |
| 11/2/2006 | CHECK WIRE | 35,999,980 | 35,999,980 | - | - | - | 404,413,577 | - | - | - |
| 11/7/2006 | CHECK WIRE | 6,999,980 | 6,999,980 | - | - | - | 411,413,557 | - | - | - |
| 11/16/2006 | CHECK WIRE | 9,799,980 | 9,799,980 | - | - | - | 421,213,537 | - | - | - |
| 11/17/2006 | CHECK WIRE | 24,999,980 | 24,999,980 | - | - | - | 446,213,517 | - | - | - |
| 11/20/2006 | W/H TAX DIV TXN | (1,227) | - | (1,227) | - | - | 446,212,290 | - | - | (1,227) |
| 11/20/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 446,212,279 | - | - | (11) |
| 11/22/2006 | W/H TAX DIV C | (46,847) | - | (46,847) | - | - | 446,165,432 | - | - | (46,847) |
| 11/22/2006 | W/H TAX DIV MER | (4,510) | - | (4,510) | - | - | 446,160,922 | - | - | (4,510) |
| 11/27/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 446,160,918 | - | - | (4) |
| 11/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 446,160,915 | - | - | (3) |
| 12/8/2006 | CHECK WIRE | 3,499,980 | 3,499,980 | - | - | - | 449,660,895 | - | - | - |
| 12/18/2006 | CHECK WIRE | 6,999,980 | 6,999,980 | - | - | - | 456,160,875 | - | - | - |
| 12/20/2006 | CHECK WIRE | 1,499,980 | 1,499,980 | - | - | - | 457,660,855 | - | - | - |
| 12/21/2006 | CHECK WIRE | 1,099,980 | 1,099,980 | - | - | - | 458,760,835 | - | - | - |
| 12/22/2006 | CHECK WIRE | 4,999,980 | 4,999,980 | - | - | - | 463,760,815 | - | - | - |
| 1/2/2007 | W/H TAX DIV WMT | (9,878) | - | (9,878) | - | - | 463,750,937 | - | (9,878) | (9,878) |
| 1/2/2007 | W/H TAX DIV PEP | (11,925) | - | (11,925) | - | - | 463,739,012 | - | (11,925) | (11,925) |
| 1/2/2007 | W/H TAX DIV MRK | (19,512) | - | (19,512) | - | - | 463,719,500 | - | (19,512) | (19,512) |
| 1/3/2007 | W/H TAX DIV MSFT | (16,832) | - | (16,832) | - | - | 463,702,668 | - | (16,832) | (16,832) |
| 1/3/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 463,702,667 | - | (1) | (1) |
| 1/3/2007 | W/H TAX DIV WB | (25,743) | - | (25,743) | - | - | 463,676,924 | - | (25,743) | (25,743) |
| 1/3/2007 | W/H TAX DIV MCD | (23,451) | - | (23,451) | - | - | 463,653,473 | - | (23,451) | (23,451) |
| 1/3/2007 | W/H TAX DIV TGT | (1,948) | - | (1,948) | - | - | 463,651,525 | - | (1,948) | (1,948) |
| 1/3/2007 | W/H TAX DIV TWX | (5,344) | - | (5,344) | - | - | 463,646,181 | - | (5,344) | (5,344) |
| 1/3/2007 | W/H TAX DIV HPQ | (5,220) | - | (5,220) | - | - | 463,640,961 | - | (5,220) | (5,220) |
| 1/3/2007 | W/H TAX DIV S | (1,767) | - | (1,767) | - | - | 463,639,194 | - | (1,767) | (1,767) |
| 1/3/2007 | W/H TAX DIV MMM | (6,638) | - | (6,638) | - | - | 463,632,556 | - | (6,638) | (6,638) |
| 1/3/2007 | W/H TAX DIV BA | (4,871) | - | (4,871) | - | - | 463,627,685 | - | (4,871) | (4,871) |
| 1/3/2007 | W/H TAX DIV PFE | (34,358) | - | (34,358) | - | - | 463,593,327 | - | (34,358) | (34,358) |
| 1/3/2007 | W/H TAX DIV WFC | (18,339) | - | (18,339) | - | - | 463,574,988 | - | (18,339) | (18,339) |
| 1/3/2007 | W/H TAX DIV UTX | (5,258) | - | (5,258) | - | - | 463,569,729 | - | (5,258) | (5,258) |
| 1/3/2007 | W/H TAX DIV HD | (10,931) | - | (10,931) | - | - | 463,558,798 | - | (10,931) | (10,931) |
| 1/3/2007 | W/H TAX DIV EXC | (5,051) | - | (5,051) | - | - | 463,553,747 | - | (5,051) | (5,051) |
| 1/3/2007 | W/H TAX DIV AIG | (10,202) | - | (10,202) | - | - | 463,543,545 | - | (10,202) | (10,202) |
| 1/3/2007 | W/H TAX DIV CVX | (22,513) | - | (22,513) | - | - | 463,521,032 | - | (22,513) | (22,513) |
| 1/3/2007 | W/H TAX DIV XOM | (37,122) | - | (37,122) | - | - | 463,483,910 | - | (37,122) | (37,122) |
| 1/3/2007 | W/H TAX DIV BAC | (60,369) | - | (60,369) | - | - | 463,423,541 | - | (60,369) | (60,369) |
| 1/3/2007 | W/H TAX DIV INTC | (11,240) | - | (11,240) | - | - | 463,412,301 | - | (11,240) | (11,240) |
| 1/3/2007 | W/H TAX DIV JNJ | (21,647) | - | (21,647) | - | - | 463,390,654 | - | (21,647) | (21,647) |
| 1/3/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (70) | - | (70) | - | - | 463,390,584 | - | (70) | (70) |
| 1/3/2007 | W/H TAX DIV KO | (15,061) | - | (15,061) | - | - | 463,375,524 | - | (15,061) | (15,061) |
| 1/3/2007 | W/H TAX DIV IBM | (8,826) | - | (8,826) | - | - | 463,366,698 | - | (8,826) | (8,826) |
| 1/4/2007 | CHECK WIRE | 7,399,980 | 7,399,980 | - | - | - | 470,766,678 | - | - | - |
| 1/4/2007 | W/H TAX DIV UPS | (8,226) | - | (8,226) | - | - | 470,758,452 | - | (8,226) | (8,226) |
| 1/10/2007 | W/H TAX DIV MO | (11,682) | - | (11,682) | - | - | 470,746,770 | - | (11,682) | (11,682) |
| 1/12/2007 | W/H TAX DIV DIS | (15,435) | - | (15,435) | - | - | 470,731,335 | - | (15,435) | (15,435) |
| 1/25/2007 | W/H TAX DIV GE | (39,898) | - | (39,898) | - | - | 470,691,437 | - | (39,898) | (39,898) |
| 1/29/2007 | CHECK WIRE | 20,999,980 | 20,999,980 | - | - | - | 491,691,417 | - | - | - |
| 1/29/2007 | CHECK WIRE | 12,999,980 | 12,999,980 | - | - | - | 504,691,397 | - | - | - |
| 1/29/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (31) | - | (31) | - | - | 504,691,366 | - | (31) | (31) |
| 1/31/2007 | CHECK WIRE | 13,999,980 | 13,999,980 | - | - | - | 518,691,346 | - | - | - |
| 1/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 518,691,344 | - | (2) | (2) |
| 2/6/2007 | CHECK WIRE | 19,999,980 | 19,999,980 | - | - | - | 538,691,324 | - | - | - |

MADC1127_00000005

BLMIS ACCOUNT NO. 1FR123 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV US EQUITY PLUS INVESTMENT FUND US EQUITY PLUS

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 2/6/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 538,691,320 | - | - | (4) |
| 2/8/2007 | CHECK WIRE | 14,999,980 | 14,999,980 | - | - | - | 553,691,300 | - | - | - |
| 2/12/2007 | CHECK WIRE | 4,999,980 | 4,999,980 | - | - | - | 558,691,280 | - | - | - |
| 2/13/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (18) | - | (18) | - | - | 558,691,262 | - | - | (18) |
| 2/15/2007 | CHECK WIRE | 102,999,980 | 102,999,980 | - | - | - | 661,691,242 | - | - | - |
| 2/16/2007 | CHECK WIRE | 15,999,980 | 15,999,980 | - | - | - | 677,691,222 | - | - | - |
| 2/16/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 677,691,213 | - | - | (9) |
| 2/20/2007 | CHECK WIRE | 4,999,980 | 4,999,980 | - | - | - | 682,691,193 | - | - | - |
| 2/20/2007 | CHECK WIRE | 8,999,980 | 8,999,980 | - | - | - | 691,691,173 | - | - | - |
| 2/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 691,691,170 | - | - | (3) |
| 2/22/2007 | CHECK WIRE | 4,999,980 | 4,999,980 | - | - | - | 696,691,150 | - | - | - |
| 2/22/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 696,691,145 | - | - | (5) |
| 2/23/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 696,691,145 | - | - | (0) |
| 2/27/2007 | W/H TAX DIV CMCSA | (4) | - | (4) | - | - | 696,691,140 | - | - | (4) |
| 2/28/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 696,691,130 | - | - | (10) |
| 3/1/2007 | W/H TAX DIV COP | (10,706) | - | (10,706) | - | - | 696,680,424 | - | (10,706) | (10,706) |
| 3/6/2007 | W/H TAX DIV UPS | (7,096) | - | (7,096) | - | - | 696,673,328 | - | (7,096) | (7,096) |
| 3/9/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (16) | - | (16) | - | - | 696,673,312 | - | (16) | (16) |
| 3/12/2007 | W/H TAX DIV T GT | (1,659) | - | (1,659) | - | - | 696,671,653 | - | (1,659) | (1,659) |
| 3/12/2007 | W/H TAX DIV MMM | (10,291) | - | (10,291) | - | - | 696,661,362 | - | (10,291) | (10,291) |
| 3/12/2007 | W/H TAX DIV CVX | (10,011) | - | (10,011) | - | - | 696,651,351 | - | (10,011) | (10,011) |
| 3/12/2007 | W/H TAX DIV UTX | (2,440) | - | (2,440) | - | - | 696,648,912 | - | (2,440) | (2,440) |
| 3/13/2007 | W/H TAX DIV JNJ | (31,154) | - | (31,154) | - | - | 696,617,758 | - | (31,154) | (31,154) |
| 3/15/2007 | W/H TAX DIV TWX | (6,191) | - | (6,191) | - | - | 696,611,567 | - | (6,191) | (6,191) |
| 3/15/2007 | W/H TAX DIV WB | (30,015) | - | (30,015) | - | - | 696,581,552 | - | (30,015) | (30,015) |
| 3/16/2007 | W/H TAX DIV AIG | (11,939) | - | (11,939) | - | - | 696,569,613 | - | (11,939) | (11,939) |
| 3/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (25) | - | (25) | - | - | 696,569,588 | - | (25) | (25) |
| 3/22/2007 | W/H TAX DIV HD | (13,266) | - | (13,266) | - | - | 696,556,323 | - | (13,266) | (13,266) |
| 3/23/2007 | W/H TAX DIV BAC | (70,535) | - | (70,535) | - | - | 696,485,788 | - | (70,535) | (70,535) |
| 3/28/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (17) | - | (17) | - | - | 696,485,770 | - | (17) | (17) |
| 3/30/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 696,485,767 | - | (4) | (4) |
| 3/30/2007 | W/H TAX DIV S | (2,503) | - | (2,503) | - | - | 696,483,264 | - | (2,503) | (2,503) |
| 3/30/2007 | W/H TAX DIV PEP | (17,098) | - | (17,098) | - | - | 696,466,166 | - | (17,098) | (17,098) |
| 4/2/2007 | W/H TAX DIV MRK | (29,301) | - | (29,301) | - | - | 696,436,866 | - | (29,301) | (29,301) |
| 4/2/2007 | W/H TAX DIV WMT | (18,925) | - | (18,925) | - | - | 696,417,941 | - | (18,925) | (18,925) |
| 4/2/2007 | W/H TAX DIV KO | (24,563) | - | (24,563) | - | - | 696,393,378 | - | (24,563) | (24,563) |
| 4/4/2007 | W/H TAX DIV HPQ | (7,778) | - | (7,778) | - | - | 696,385,600 | - | (7,778) | (7,778) |
| 4/10/2007 | W/H TAX DIV MO | (63,429) | - | (63,429) | - | - | 696,322,170 | - | (63,429) | (63,429) |
| 4/19/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (37) | - | (37) | - | - | 696,322,133 | - | (37) | (37) |
| 4/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 696,322,133 | - | (0) | (0) |
| 4/25/2007 | W/H TAX DIV GE | (81,791) | - | (81,791) | - | - | 696,240,342 | - | (81,791) | (81,791) |
| 5/4/2007 | W/H TAX DIV CVS | (2,262) | - | (2,262) | - | - | 696,238,081 | - | (2,262) | (2,262) |
| 5/15/2007 | W/H TAX DIV PG | (40,077) | - | (40,077) | - | - | 696,198,004 | - | (40,077) | (40,077) |
| 5/21/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (14) | - | (14) | - | - | 696,197,990 | - | (14) | (14) |
| 5/23/2007 | W/H TAX DIV MER | (10,609) | - | (10,609) | - | - | 696,187,381 | - | (10,609) | (10,609) |
| 5/24/2007 | W/H TAX DIV GS | (3,104) | - | (3,104) | - | - | 696,184,277 | - | (3,104) | (3,104) |
| 5/25/2007 | W/H TAX DIV C | (94,568) | - | (94,568) | - | - | 696,089,709 | - | (94,568) | (94,568) |
| 5/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 696,089,705 | - | (4) | (4) |
| 6/1/2007 | W/H TAX DIV INTC | (23,490) | - | (23,490) | - | - | 696,066,214 | - | (23,490) | (23,490) |
| 6/1/2007 | W/H TAX DIV BA | (9,793) | - | (9,793) | - | - | 696,056,422 | - | (9,793) | (9,793) |
| 6/1/2007 | W/H TAX DIV WFC | (33,947) | - | (33,947) | - | - | 696,022,474 | - | (33,947) | (33,947) |
| 6/1/2007 | W/H TAX DIV COP | (24,383) | - | (24,383) | - | - | 695,998,092 | - | (24,383) | (24,383) |
| 6/4/2007 | W/H TAX DIV WMT | (19,264) | - | (19,264) | - | - | 695,978,828 | - | (19,264) | (19,264) |
| 6/5/2007 | W/H TAX DIV PFE | (74,226) | - | (74,226) | - | - | 695,904,602 | - | (74,226) | (74,226) |
| 6/5/2007 | W/H TAX DIV UPS | (15,559) | - | (15,559) | - | - | 695,889,042 | - | (15,559) | (15,559) |
| 6/6/2007 | W/H TAX DIV TYC | (7,176) | - | (7,176) | - | - | 695,881,866 | - | (7,176) | (7,176) |
| 6/11/2007 | W/H TAX DIV IBM | (21,554) | - | (21,554) | - | - | 695,860,312 | - | (21,554) | (21,554) |
| 6/11/2007 | W/H TAX DIV UTX | (9,817) | - | (9,817) | - | - | 695,850,495 | - | (9,817) | (9,817) |
| 6/11/2007 | W/H TAX DIV XOM | (71,500) | - | (71,500) | - | - | 695,778,995 | - | (71,500) | (71,500) |
| 6/11/2007 | W/H TAX DIV CVX | (44,926) | - | (44,926) | - | - | 695,734,069 | - | (44,926) | (44,926) |
| 6/12/2007 | W/H TAX DIV MMM | (12,932) | - | (12,932) | - | - | 695,721,137 | - | (12,932) | (12,932) |
| 6/12/2007 | W/H TAX DIV JNJ | (42,897) | - | (42,897) | - | - | 695,678,240 | - | (42,897) | (42,897) |
| 6/14/2007 | W/H TAX DIV MSFT | (31,205) | - | (31,205) | - | - | 695,647,035 | - | (31,205) | (31,205) |
| 6/15/2007 | W/H TAX DIV TWX | (7,651) | - | (7,651) | - | - | 695,639,383 | - | (7,651) | (7,651) |
| 6/15/2007 | W/H TAX DIV WB | (37,719) | - | (37,719) | - | - | 695,601,664 | - | (37,719) | (37,719) |

MADC1127_00000006

BLMIS ACCOUNT NO. 1FR123 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV/INVESTMENT FUND US EQUITY PLUS

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 6/15/2007 | W/H TAX DIV AIG | (15,559) | - | (15,559) | - | - | 695,586,105 | - | (15,559) | (15,559) |
| 6/15/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 695,586,103 | - | (1) | (1) |
| 6/21/2007 | W/H TAX DIV HD | (16,671) | - | (16,671) | - | - | 695,569,432 | - | (16,671) | (16,671) |
| 6/22/2007 | W/H TAX DIV BAC | (90,526) | - | (90,526) | - | - | 695,478,906 | - | (90,526) | (90,526) |
| 6/29/2007 | W/H TAX DIV PEP | (22,301) | - | (22,301) | - | - | 695,456,605 | - | (22,301) | (22,301) |
| 6/29/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 695,456,598 | - | (6) | (6) |
| 6/29/2007 | W/H TAX DIV S | (2,610) | - | (2,610) | - | - | 695,453,988 | - | (2,610) | (2,610) |
| 7/2/2007 | W/H TAX DIV KO | (24,448) | - | (24,448) | - | - | 695,429,541 | - | (24,448) | (24,448) |
| 7/2/2007 | W/H TAX DIV MRK | (29,435) | - | (29,435) | - | - | 695,400,106 | - | (29,435) | (29,435) |
| 7/3/2007 | CHECK WIRE | 79,500,000 | 79,500,000 | - | - | - | 774,900,106 | - | - | - |
| 7/3/2007 | CANCEL C&S | (79,500,000) | (79,500,000) | - | - | - | 695,400,106 | - | - | - |
| 7/5/2007 | W/H TAX DIV HPQ | (7,813) | - | (7,813) | - | - | 695,392,293 | - | (7,813) | (7,813) |
| 7/10/2007 | W/H TAX DIV MO | (51,838) | - | (51,838) | - | - | 695,340,454 | - | (51,838) | (51,838) |
| 7/17/2007 | CXL W/H TAX DIV TYC | 7,176 | - | 7,176 | - | - | 695,347,621 | - | 7,176 | 7,176 |
| 7/17/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 695,347,621 | - | (10) | (10) |
| 8/2/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (16) | - | (16) | - | - | 695,347,604 | - | (16) | (16) |
| 8/2/2007 | CHECK WIRE | (11,300,000) | - | (11,300,000) | - | - | 684,047,604 | - | (11,300,000) | (11,300,000) |
| 8/6/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 684,047,601 | - | (3) | (3) |
| 8/21/2007 | CHECK WIRE | (17,000,000) | - | (17,000,000) | - | - | 667,047,601 | - | (17,000,000) | (17,000,000) |
| 8/24/2007 | W/H TAX DIV C | (38,551) | - | (38,551) | - | - | 667,009,050 | - | (38,551) | (38,551) |
| 9/4/2007 | W/H TAX DIV WMT | (7,705) | - | (7,705) | - | - | 667,001,345 | - | (7,705) | (7,705) |
| 9/4/2007 | W/H TAX DIV INTC | (9,547) | - | (9,547) | - | - | 666,991,799 | - | (9,547) | (9,547) |
| 9/4/2007 | W/H TAX DIV WFC | (15,033) | - | (15,033) | - | - | 666,976,766 | - | (15,033) | (15,033) |
| 9/5/2007 | CHECK WIRE | (10,000,000) | - | (10,000,000) | - | - | 656,976,766 | - | (10,000,000) | (10,000,000) |
| 9/5/2007 | W/H TAX DIV PFE | (29,688) | - | (29,688) | - | - | 656,947,078 | - | (29,688) | (29,688) |
| 9/5/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (57) | - | (57) | - | - | 656,947,021 | - | (57) | (57) |
| 9/7/2007 | W/H TAX DIV BA | (3,772) | - | (3,772) | - | - | 656,943,249 | - | (3,772) | (3,772) |
| 9/10/2007 | W/H TAX DIV UTX | (4,741) | - | (4,741) | - | - | 656,938,508 | - | (4,741) | (4,741) |
| 9/10/2007 | W/H TAX DIV CVX | (17,969) | - | (17,969) | - | - | 656,920,539 | - | (17,969) | (17,969) |
| 9/10/2007 | W/H TAX DIV XOM | (28,758) | - | (28,758) | - | - | 656,891,780 | - | (28,758) | (28,758) |
| 9/10/2007 | W/H TAX DIV IBM | (8,082) | - | (8,082) | - | - | 656,883,698 | - | (8,082) | (8,082) |
| 9/13/2007 | W/H TAX DIV MSFT | (12,258) | - | (12,258) | - | - | 656,871,441 | - | (12,258) | (12,258) |
| 9/14/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 656,871,435 | - | (6) | (6) |
| 9/18/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 656,871,433 | - | (2) | (2) |
| 9/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 656,871,430 | - | (3) | (3) |
| 9/20/2007 | CHECK WIRE | (66,000,000) | - | (66,000,000) | - | - | 590,871,430 | - | (66,000,000) | (66,000,000) |
| 9/26/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 590,871,423 | - | (7) | (7) |
| 10/1/2007 | W/H TAX DIV KO | (8,831) | - | (8,831) | - | - | 590,862,592 | - | (8,831) | (8,831) |
| 10/10/2007 | W/H TAX DIV MO | (20,409) | - | (20,409) | - | - | 590,842,183 | - | (20,409) | (20,409) |
| 10/16/2007 | CHECK WIRE | (13,000,000) | - | (13,000,000) | - | - | 577,842,183 | - | (13,000,000) | (13,000,000) |
| 10/16/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (60) | - | (60) | - | - | 577,842,123 | - | (60) | (60) |
| 10/25/2007 | W/H TAX DIV GE | (53,896) | - | (53,896) | - | - | 577,788,228 | - | (53,896) | (53,896) |
| 10/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 577,788,226 | - | (2) | (2) |
| 11/6/2007 | CHECK WIRE | (37,000,000) | - | (37,000,000) | - | - | 540,788,226 | - | (37,000,000) | (37,000,000) |
| 11/6/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 540,788,216 | - | (10) | (10) |
| 11/7/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 540,788,215 | - | (1) | (1) |
| 11/13/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 540,788,205 | - | (10) | (10) |
| 11/15/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 540,788,201 | - | (4) | (4) |
| 11/21/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 540,788,200 | - | (1) | (1) |
| 11/21/2007 | W/H TAX DIV MER | (2,578) | - | (2,578) | - | - | 540,785,623 | - | (2,578) | (2,578) |
| 11/21/2007 | W/H TAX DIV C | (21,874) | - | (21,874) | - | - | 540,763,749 | - | (21,874) | (21,874) |
| 11/30/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 540,763,744 | - | (4) | (4) |
| 12/3/2007 | W/H TAX DIV COP | (5,435) | - | (5,435) | - | - | 540,758,309 | - | (5,435) | (5,435) |
| 12/3/2007 | W/H TAX DIV MCD | (20,153) | - | (20,153) | - | - | 540,738,156 | - | (20,153) | (20,153) |
| 12/4/2007 | CHECK WIRE | (16,000,000) | - | (16,000,000) | - | - | 524,738,156 | - | (16,000,000) | (16,000,000) |
| 12/5/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 524,738,151 | - | (5) | (5) |
| 12/10/2007 | W/H TAX DIV CVX | (13,787) | - | (13,787) | - | - | 524,724,364 | - | (13,787) | (13,787) |
| 12/10/2007 | W/H TAX DIV EXC | (3,183) | - | (3,183) | - | - | 524,721,181 | - | (3,183) | (3,183) |
| 12/10/2007 | W/H TAX DIV UTX | (3,638) | - | (3,638) | - | - | 524,717,543 | - | (3,638) | (3,638) |
| 12/11/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 524,717,542 | - | (1) | (1) |
| 12/11/2007 | W/H TAX DIV JNJ | (26,075) | - | (26,075) | - | - | 524,691,467 | - | (26,075) | (26,075) |
| 12/12/2007 | W/H TAX DIV MMM | (7,783) | - | (7,783) | - | - | 524,683,684 | - | (7,783) | (7,783) |
| 12/13/2007 | W/H TAX DIV MSFT | (10,004) | - | (10,004) | - | - | 524,673,680 | - | (10,004) | (10,004) |
| 12/18/2007 | CHECK WIRE | (3,000,000) | - | (3,000,000) | - | - | 521,673,680 | - | (3,000,000) | (3,000,000) |
| 12/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 521,673,670 | - | (10) | (10) |

MADC1127_00000007

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 12/24/2007 | CHECK WIRE | (15,000,000) | - | (15,000,000) | - | - | 506,673,670 | - | (15,000,000) | (15,000,000) |
| 12/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (19) | - | (19) | - | - | 506,673,651 | - | (19) | (19) |
| 1/2/2008 | W/H TAX DIV WMT | (3,756) | - | (3,756) | - | - | 506,669,894 | - | (3,756) | (3,756) |
| 1/2/2008 | W/H TAX DIV HPQ | (1,471) | - | (1,471) | - | - | 506,668,423 | - | (1,471) | (1,471) |
| 1/3/2008 | W/H TAX DIV UPS | (4,775) | - | (4,775) | - | - | 506,663,649 | - | (4,775) | (4,775) |
| 1/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 506,663,648 | - | (1) | (1) |
| 1/3/2008 | CHECK WIRE | (9,000,000) | - | (9,000,000) | - | - | 497,663,648 | - | (9,000,000) | (9,000,000) |
| 1/16/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 497,663,640 | - | (8) | (8) |
| 1/16/2008 | CHECK WIRE | (1,000,000) | - | (1,000,000) | - | - | 496,663,640 | - | (1,000,000) | (1,000,000) |
| 1/18/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 496,663,639 | - | (1) | (1) |
| 1/18/2008 | CHECK WIRE | (1,500,000) | - | (1,500,000) | - | - | 495,163,639 | - | (1,500,000) | (1,500,000) |
| 1/28/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 495,163,638 | - | (1) | (1) |
| 2/1/2008 | CHECK WIRE | (2,500,000) | - | (2,500,000) | - | - | 492,663,638 | - | (2,500,000) | (2,500,000) |
| 2/1/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 492,663,637 | - | (1) | (1) |
| 2/20/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 492,663,628 | - | (9) | (9) |
| 2/22/2008 | W/H TAX DIV C | (21,135) | - | (21,135) | - | - | 492,642,493 | - | (21,135) | (21,135) |
| 2/28/2008 | W/H TAX DIV GS | (1,712) | - | (1,712) | - | - | 492,640,780 | - | (1,712) | (1,712) |
| 3/3/2008 | W/H TAX DIV INTC | (9,825) | - | (9,825) | - | - | 492,630,956 | - | (9,825) | (9,825) |
| 3/3/2008 | W/H TAX DIV COP | (9,773) | - | (9,773) | - | - | 492,621,183 | - | (9,773) | (9,773) |
| 3/3/2008 | W/H TAX DIV WFC | (14,029) | - | (14,029) | - | - | 492,607,154 | - | (14,029) | (14,029) |
| 3/4/2008 | W/H TAX DIV UPS | (6,054) | - | (6,054) | - | - | 492,601,100 | - | (6,054) | (6,054) |
| 3/4/2008 | W/H TAX DIV PFE | (28,180) | - | (28,180) | - | - | 492,572,920 | - | (28,180) | (28,180) |
| 3/5/2008 | W/H TAX DIV MER | (3,853) | - | (3,853) | - | - | 492,569,067 | - | (3,853) | (3,853) |
| 3/7/2008 | W/H TAX DIV BA | (3,914) | - | (3,914) | - | - | 492,565,153 | - | (3,914) | (3,914) |
| 3/10/2008 | W/H TAX DIV EXC | (4,281) | - | (4,281) | - | - | 492,560,872 | - | (4,281) | (4,281) |
| 3/10/2008 | W/H TAX DIV CVX | (16,316) | - | (16,316) | - | - | 492,544,556 | - | (16,316) | (16,316) |
| 3/10/2008 | W/H TAX DIV XOM | (25,685) | - | (25,685) | - | - | 492,518,871 | - | (25,685) | (25,685) |
| 3/10/2008 | W/H TAX DIV IBM | (7,339) | - | (7,339) | - | - | 492,511,532 | - | (7,339) | (7,339) |
| 3/10/2008 | W/H TAX DIV UTX | (4,305) | - | (4,305) | - | - | 492,507,227 | - | (4,305) | (4,305) |
| 3/11/2008 | W/H TAX DIV JNJ | (15,735) | - | (15,735) | - | - | 492,491,492 | - | (15,735) | (15,735) |
| 3/12/2008 | W/H TAX DIV MMM | (4,892) | - | (4,892) | - | - | 492,486,599 | - | (4,892) | (4,892) |
| 3/13/2008 | W/H TAX DIV MSFT | (11,705) | - | (11,705) | - | - | 492,474,894 | - | (11,705) | (11,705) |
| 3/17/2008 | W/H TAX DIV TWX | (2,981) | - | (2,981) | - | - | 492,471,913 | - | (2,981) | (2,981) |
| 3/17/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 492,471,905 | - | (8) | (8) |
| 3/17/2008 | W/H TAX DIV MCD | (5,963) | - | (5,963) | - | - | 492,465,942 | - | (5,963) | (5,963) |
| 3/17/2008 | W/H TAX DIV WB | (17,221) | - | (17,221) | - | - | 492,448,721 | - | (17,221) | (17,221) |
| 3/19/2008 | CHECK WIRE | (1,000,000) | - | (1,000,000) | - | - | 491,448,721 | - | (1,000,000) | (1,000,000) |
| 3/19/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 491,448,721 | - | (0) | (0) |
| 3/24/2008 | W/H TAX DIV AIG | (6,849) | - | (6,849) | - | - | 491,441,871 | - | (6,849) | (6,849) |
| 3/27/2008 | W/H TAX DIV HD | (4,954) | - | (4,954) | - | - | 491,436,918 | - | (4,954) | (4,954) |
| 3/28/2008 | CHECK WIRE | 20,999,980 | 20,999,980 | - | - | - | 512,436,898 | - | | |
| 3/28/2008 | W/H TAX DIV BAC | (37,574) | - | (37,574) | - | - | 512,399,324 | - | (37,574) | (37,574) |
| 3/31/2008 | W/H TAX DIV PEP | (7,797) | - | (7,797) | - | - | 512,391,527 | - | (7,797) | (7,797) |
| 4/1/2008 | W/H TAX DIV MRK | (11,155) | - | (11,155) | - | - | 512,380,372 | - | (11,155) | (11,155) |
| 4/1/2008 | W/H TAX DIV KO | (10,225) | - | (10,225) | - | - | 512,370,147 | - | (10,225) | (10,225) |
| 4/2/2008 | W/H TAX DIV HPQ | (2,740) | - | (2,740) | - | - | 512,367,407 | - | (2,740) | (2,740) |
| 4/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 512,367,403 | - | (4) | (4) |
| 4/4/2008 | W/H TAX DIV KFT | (5,614) | - | (5,614) | - | - | 512,361,789 | - | (5,614) | (5,614) |
| 4/7/2008 | W/H TAX DIV WMT | (7,262) | - | (7,262) | - | - | 512,354,527 | - | (7,262) | (7,262) |
| 4/23/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 512,354,520 | - | (7) | (7) |
| 4/25/2008 | W/H TAX DIV MDT | (1,668) | - | (1,668) | - | - | 512,352,852 | - | (1,668) | (1,668) |
| 4/25/2008 | W/H TAX DIV GE | (41,329) | - | (41,329) | - | - | 512,311,524 | - | (41,329) | (41,329) |
| 4/30/2008 | W/H TAX DIV JPM | (15,214) | - | (15,214) | - | - | 512,296,310 | - | (15,214) | (15,214) |
| 4/30/2008 | W/H TAX DIV MS | (3,303) | - | (3,303) | - | - | 512,293,007 | - | (3,303) | (3,303) |
| 5/1/2008 | W/H TAX DIV VZ | (14,824) | - | (14,824) | - | - | 512,278,183 | - | (14,824) | (14,824) |
| 5/1/2008 | W/H TAX DIV T | (28,915) | - | (28,915) | - | - | 512,249,268 | - | (28,915) | (28,915) |
| 5/2/2008 | W/H TAX DIV BK | (3,203) | - | (3,203) | - | - | 512,246,065 | - | (3,203) | (3,203) |
| 5/2/2008 | W/H TAX DIV CVS | (1,068) | - | (1,068) | - | - | 512,244,998 | - | (1,068) | (1,068) |
| 5/9/2008 | W/H TAX DIV AXP | (2,402) | - | (2,402) | - | - | 512,242,596 | - | (2,402) | (2,402) |
| 5/14/2008 | CHECK WIRE | (5,000,000) | - | (5,000,000) | - | - | 507,242,596 | - | (5,000,000) | (5,000,000) |
| 5/14/2008 | CHECK WIRE | (4,000,000) | - | (4,000,000) | - | - | 503,242,596 | - | (4,000,000) | (4,000,000) |
| 5/15/2008 | W/H TAX DIV PG | (15,125) | - | (15,125) | - | - | 503,227,471 | - | (15,125) | (15,125) |
| 5/15/2008 | W/H TAX DIV ABT | (6,806) | - | (6,806) | - | - | 503,220,665 | - | (6,806) | (6,806) |
| 5/20/2008 | CHECK WIRE | (6,000,000) | - | (6,000,000) | - | - | 497,220,665 | - | (6,000,000) | (6,000,000) |
| 5/20/2008 | W/H TAX DIV CAT | (2,802) | - | (2,802) | - | - | 497,217,863 | - | (2,802) | (2,802) |

MADC1127_00000008

BLMIS ACCOUNT NO. 1FR123 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV GROUP EQUITY INVESTMENT FUND US EQUITY PLUS

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 5/23/2008 | W/H TAX DIV C | (19,217) | - | (19,217) | - | - | 497,198,645 | - | (19,217) | (19,217) |
| 5/28/2008 | CHECK WIRE | (2,000,000) | - | (2,000,000) | - | - | 495,198,645 | - | (2,000,000) | (2,000,000) |
| 5/28/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (30) | - | (30) | - | - | 495,198,616 | - | (30) | (30) |
| 5/29/2008 | W/H TAX DIV GS | (1,557) | - | (1,557) | - | - | 495,197,059 | - | (1,557) | (1,557) |
| 6/2/2008 | W/H TAX DIV INTC | (9,809) | - | (9,809) | - | - | 495,187,250 | - | (9,809) | (9,809) |
| 6/2/2008 | W/H TAX DIV WFC | (22,412) | - | (22,412) | - | - | 495,164,839 | - | (22,412) | (22,412) |
| 6/2/2008 | CHECK WIRE | (3,000,000) | - | (3,000,000) | - | - | 492,164,839 | - | (3,000,000) | (3,000,000) |
| 6/2/2008 | W/H TAX DIV COP | (5,539) | - | (5,539) | - | - | 492,159,299 | - | (5,539) | (5,539) |
| 6/2/2008 | W/H TAX DIV WMT | (12,591) | - | (12,591) | - | - | 492,146,708 | - | (12,591) | (12,591) |
| 6/3/2008 | W/H TAX DIV UPS | (10,094) | - | (10,094) | - | - | 492,136,614 | - | (10,094) | (10,094) |
| 6/3/2008 | W/H TAX DIV PFE | (48,286) | - | (48,286) | - | - | 492,088,328 | - | (48,286) | (48,286) |
| 6/6/2008 | W/H TAX DIV BA | (6,525) | - | (6,525) | - | - | 492,081,803 | - | (6,525) | (6,525) |
| 6/10/2008 | W/H TAX DIV CVX | (30,485) | - | (30,485) | - | - | 492,051,319 | - | (30,485) | (30,485) |
| 6/10/2008 | W/H TAX DIV EXC | (7,137) | - | (7,137) | - | - | 492,044,182 | - | (7,137) | (7,137) |
| 6/10/2008 | W/H TAX DIV XOM | (47,752) | - | (47,752) | - | - | 491,996,430 | - | (47,752) | (47,752) |
| 6/10/2008 | W/H TAX DIV UTX | (7,178) | - | (7,178) | - | - | 491,989,252 | - | (7,178) | (7,178) |
| 6/10/2008 | W/H TAX DIV JNJ | (9,886) | - | (9,886) | - | - | 491,979,366 | - | (9,886) | (9,886) |
| 6/10/2008 | W/H TAX DIV IBM | (15,293) | - | (15,293) | - | - | 491,964,072 | - | (15,293) | (15,293) |
| 6/12/2008 | W/H TAX DIV MMM | (8,156) | - | (8,156) | - | - | 491,955,916 | - | (8,156) | (8,156) |
| 6/12/2008 | W/H TAX DIV MSFT | (19,514) | - | (19,514) | - | - | 491,936,402 | - | (19,514) | (19,514) |
| 6/19/2008 | CHECK WIRE | 39,999,980 | 39,999,980 | - | - | - | 531,936,382 | - | - | - |
| 7/3/2008 | CHECK WIRE | (15,000,000) | - | (15,000,000) | - | - | 516,936,382 | - | (15,000,000) | (15,000,000) |
| 7/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 516,936,371 | - | (11) | (11) |
| 7/18/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 516,936,367 | - | (4) | (4) |
| 7/18/2008 | CHECK WIRE | (50,000,000) | - | (50,000,000) | - | - | 466,936,367 | - | (50,000,000) | (50,000,000) |
| 7/21/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 466,936,366 | - | (1) | (1) |
| 7/23/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 466,936,366 | - | (0) | (0) |
| 8/1/2008 | W/H TAX DIV CVS | (1,560) | - | (1,560) | - | - | 466,934,806 | - | (1,560) | (1,560) |
| 8/8/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 466,934,804 | - | (2) | (2) |
| 8/13/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 466,934,803 | - | (1) | (1) |
| 8/20/2008 | W/H TAX DIV CAT | (4,155) | - | (4,155) | - | - | 466,930,648 | - | (4,155) | (4,155) |
| 8/22/2008 | W/H TAX DIV C | (26,683) | - | (26,683) | - | - | 466,903,965 | - | (26,683) | (26,683) |
| 8/28/2008 | W/H TAX DIV GS | (1,979) | - | (1,979) | - | - | 466,901,986 | - | (1,979) | (1,979) |
| 8/29/2008 | CHECK WIRE | (15,000,000) | - | (15,000,000) | - | - | 451,901,986 | - | (15,000,000) | (15,000,000) |
| 8/29/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 451,901,984 | - | (3) | (3) |
| 10/2/2008 | W/H TAX DIV WMT | (11,760) | - | (11,760) | - | - | 451,890,224 | (11,760) | (11,760) | (11,760) |
| 10/2/2008 | W/H TAX DIV XOM | (45,723) | - | (45,723) | - | - | 451,844,501 | (45,723) | (45,723) | (45,723) |
| 10/2/2008 | W/H TAX DIV INTC | (12,267) | - | (12,267) | - | - | 451,832,233 | (12,267) | (12,267) | (12,267) |
| 10/2/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 451,832,229 | (4) | (4) | (4) |
| 10/2/2008 | W/H TAX DIV MSFT | (19,110) | - | (19,110) | - | - | 451,813,120 | (19,110) | (19,110) | (19,110) |
| 10/2/2008 | W/H TAX DIV MMM | (7,922) | - | (7,922) | - | - | 451,805,197 | (7,922) | (7,922) | (7,922) |
| 10/2/2008 | W/H TAX DIV UTX | (6,972) | - | (6,972) | - | - | 451,798,225 | (6,972) | (6,972) | (6,972) |
| 10/2/2008 | W/H TAX DIV IBM | (10,600) | - | (10,600) | - | - | 451,787,626 | (10,600) | (10,600) | (10,600) |
| 10/2/2008 | W/H TAX DIV COP | (11,292) | - | (11,292) | - | - | 451,776,333 | (11,292) | (11,292) | (11,292) |
| 10/2/2008 | W/H TAX DIV AIG | (12,761) | - | (12,761) | - | - | 451,763,572 | (12,761) | (12,761) | (12,761) |
| 10/2/2008 | W/H TAX DIV EXC | (6,932) | - | (6,932) | - | - | 451,756,640 | (6,932) | (6,932) | (6,932) |
| 10/2/2008 | W/H TAX DIV BA | (4,523) | - | (4,523) | - | - | 451,752,118 | (4,523) | (4,523) | (4,523) |
| 10/2/2008 | W/H TAX DIV BAC | (61,570) | - | (61,570) | - | - | 451,690,548 | (61,570) | (61,570) | (61,570) |
| 10/2/2008 | W/H TAX DIV HD | (2,425) | - | (2,425) | - | - | 451,688,122 | (2,425) | (2,425) | (2,425) |
| 10/2/2008 | W/H TAX DIV JNJ | (27,982) | - | (27,982) | - | - | 451,660,140 | (27,982) | (27,982) | (27,982) |
| 10/2/2008 | W/H TAX DIV WFC | (14,896) | - | (14,896) | - | - | 451,645,244 | (14,896) | (14,896) | (14,896) |
| 10/2/2008 | W/H TAX DIV MCD | (9,125) | - | (9,125) | - | - | 451,636,118 | (9,125) | (9,125) | (9,125) |
| 10/2/2008 | W/H TAX DIV BUD | (4,183) | - | (4,183) | - | - | 451,631,935 | (4,183) | (4,183) | (4,183) |
| 10/2/2008 | W/H TAX DIV UPS | (9,804) | - | (9,804) | - | - | 451,622,131 | (9,804) | (9,804) | (9,804) |
| 10/2/2008 | W/H TAX DIV QCOM | (1,634) | - | (1,634) | - | - | 451,620,497 | (1,634) | (1,634) | (1,634) |
| 10/2/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 451,620,488 | (9) | (9) | (9) |
| 10/2/2008 | W/H TAX DIV PEP | (14,310) | - | (14,310) | - | - | 451,606,178 | (14,310) | (14,310) | (14,310) |
| 10/2/2008 | W/H TAX DIV PFE | (33,467) | - | (33,467) | - | - | 451,572,711 | (33,467) | (33,467) | (33,467) |
| 10/2/2008 | W/H TAX DIV CVX | (29,241) | - | (29,241) | - | - | 451,543,470 | (29,241) | (29,241) | (29,241) |
| 10/2/2008 | W/H TAX DIV TWX | (4,899) | - | (4,899) | - | - | 451,538,571 | (4,899) | (4,899) | (4,899) |
| 10/20/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 451,538,569 | (2) | (2) | (2) |
| 10/20/2008 | CHECK WIRE | (70,000,000) | - | (70,000,000) | - | - | 381,538,569 | (70,000,000) | (70,000,000) | (70,000,000) |
| 11/4/2008 | W/H TAX DIV HPQ | (4,233) | - | (4,233) | - | - | 381,534,336 | (4,233) | (4,233) | (4,233) |
| 11/4/2008 | W/H TAX DIV MRK | (17,310) | - | (17,310) | - | - | 381,517,026 | (17,310) | (17,310) | (17,310) |
| 11/4/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 381,517,026 | (1) | (1) | (1) |

MADC1127_00000009

Exhibit B

BLMIS ACCOUNT NO. 1FR123 - UBS (LUXEMBOURG) SA NO. 2 FOR GROUNDFUL INVESTMENT FUND US EQUITY PLUS

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 11/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 381,517,024 | (1) | (1) | (1) |
| 11/4/2008 | W/H TAX DIV MO | (3,329) | - | (3,329) | - | - | 381,513,695 | (3,329) | (3,329) | (3,329) |
| 11/4/2008 | W/H TAX DIV BAX | (3,015) | - | (3,015) | - | - | 381,510,680 | (3,015) | (3,015) | (3,015) |
| 11/4/2008 | W/H TAX DIV KO | (5,299) | - | (5,299) | - | - | 381,505,381 | (5,299) | (5,299) | (5,299) |
| 11/4/2008 | CHECK WIRE | (125,000,000) | - | (125,000,000) | - | - | 256,505,381 | (125,000,000) | (125,000,000) | (125,000,000) |
| 11/4/2008 | W/H TAX DIV PM | (7,872) | - | (7,872) | - | - | 256,497,510 | (7,872) | (7,872) | (7,872) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 256,497,509 | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 256,497,509 | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 256,497,507 | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 256,497,507 | (2) | (2) | (2) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 256,497,506 | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 256,497,506 | (1) | (1) | (1) |
| | Total: | $ 758,819,425 | $ (502,321,919) | $ - | $ - | $ 256,497,506 | $ (195,404,478) | $ (501,663,029) | $ (502,321,919) | |

MADC1127_00000010

**BLMIS ACCOUNT NO. 1FR133 - HSBC INSTITUTIONAL TRUST SVCS (IRELAND) LTD FBO LANDMARK INVESTMENT FUND IRELAND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/31/2007 | CHECK WIRE | 37,400,000 | 37,400,000 | - | - | - | 37,400,000 | - | - | - |
| 11/7/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 37,400,000 | - | (0) | (0) |
| 11/13/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 37,399,999 | - | (0) | (0) |
| 11/14/2007 | CHECK WIRE | 16,000,000 | 16,000,000 | - | - | - | 53,399,999 | - | - | - |
| 11/15/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 53,399,999 | - | (0) | (0) |
| 11/21/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 53,399,996 | - | (3) | (3) |
| 11/29/2007 | CHECK WIRE | 14,900,000 | 14,900,000 | - | - | - | 68,299,996 | - | - | - |
| 11/30/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 68,299,991 | - | (5) | (5) |
| 12/3/2007 | W/H TAX DIV MCD | (1,188) | - | (1,188) | - | - | 68,298,803 | - | (1,188) | (1,188) |
| 12/10/2007 | W/H TAX DIV CVX | (812) | - | (812) | - | - | 68,297,991 | - | (812) | (812) |
| 12/10/2007 | W/H TAX DIV UTX | (214) | - | (214) | - | - | 68,297,777 | - | (214) | (214) |
| 12/10/2007 | W/H TAX DIV EXC | (188) | - | (188) | - | - | 68,297,589 | - | (188) | (188) |
| 12/11/2007 | W/H TAX DIV JNJ | (2,046) | - | (2,046) | - | - | 68,295,544 | - | (2,046) | (2,046) |
| 12/11/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 68,295,534 | - | (10) | (10) |
| 12/12/2007 | W/H TAX DIV MMM | (611) | - | (611) | - | - | 68,294,923 | - | (611) | (611) |
| 12/13/2007 | W/H TAX DIV MSFT | (590) | - | (590) | - | - | 68,294,334 | - | (590) | (590) |
| 12/14/2007 | CHECK WIRE | 8,500,000 | 8,500,000 | - | - | - | 76,794,334 | - | - | - |
| 12/20/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 76,794,330 | - | (4) | (4) |
| 12/28/2007 | CHECK WIRE | 13,000,000 | 13,000,000 | - | - | - | 89,794,330 | - | - | - |
| 12/31/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 89,794,325 | - | (5) | (5) |
| 1/2/2008 | W/H TAX DIV HPQ | (161) | - | (161) | - | - | 89,794,164 | - | (161) | (161) |
| 1/2/2008 | W/H TAX DIV WMT | (412) | - | (412) | - | - | 89,793,752 | - | (412) | (412) |
| 1/3/2008 | W/H TAX DIV UPS | (281) | - | (281) | - | - | 89,793,470 | - | (281) | (281) |
| 1/14/2008 | CHECK WIRE | 1,700,000 | 1,700,000 | - | - | - | 91,493,470 | - | - | - |
| 1/28/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 91,493,460 | - | (11) | (11) |
| 1/31/2008 | CHECK WIRE | 15,900,000 | 15,900,000 | - | - | - | 107,393,460 | - | - | - |
| 2/14/2008 | CHECK WIRE | 1,650,000 | 1,650,000 | - | - | - | 109,043,460 | - | - | - |
| 2/20/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 109,043,451 | - | (9) | (9) |
| 2/22/2008 | W/H TAX DIV C | (3,256) | - | (3,256) | - | - | 109,040,195 | - | (3,256) | (3,256) |
| 2/28/2008 | CHECK WIRE | 7,500,000 | 7,500,000 | - | - | - | 116,540,195 | - | - | - |
| 2/28/2008 | W/H TAX DIV GS | (264) | - | (264) | - | - | 116,539,932 | - | (264) | (264) |
| 3/3/2008 | W/H TAX DIV COP | (1,505) | - | (1,505) | - | - | 116,538,426 | - | (1,505) | (1,505) |
| 3/3/2008 | W/H TAX DIV WFC | (2,161) | - | (2,161) | - | - | 116,536,265 | - | (2,161) | (2,161) |
| 3/3/2008 | W/H TAX DIV INTC | (1,513) | - | (1,513) | - | - | 116,534,752 | - | (1,513) | (1,513) |
| 3/4/2008 | W/H TAX DIV UPS | (933) | - | (933) | - | - | 116,533,820 | - | (933) | (933) |
| 3/4/2008 | W/H TAX DIV PFE | (4,341) | - | (4,341) | - | - | 116,529,479 | - | (4,341) | (4,341) |
| 3/5/2008 | W/H TAX DIV MER | (593) | - | (593) | - | - | 116,528,885 | - | (593) | (593) |
| 3/7/2008 | W/H TAX DIV BA | (603) | - | (603) | - | - | 116,528,282 | - | (603) | (603) |
| 3/10/2008 | W/H TAX DIV CVX | (2,513) | - | (2,513) | - | - | 116,525,769 | - | (2,513) | (2,513) |
| 3/10/2008 | W/H TAX DIV EXC | (659) | - | (659) | - | - | 116,525,110 | - | (659) | (659) |
| 3/10/2008 | W/H TAX DIV XOM | (3,956) | - | (3,956) | - | - | 116,521,153 | - | (3,956) | (3,956) |
| 3/10/2008 | W/H TAX DIV IBM | (1,130) | - | (1,130) | - | - | 116,520,023 | - | (1,130) | (1,130) |
| 3/10/2008 | W/H TAX DIV UTX | (663) | - | (663) | - | - | 116,519,360 | - | (663) | (663) |
| 3/11/2008 | W/H TAX DIV JNJ | (2,424) | - | (2,424) | - | - | 116,516,936 | - | (2,424) | (2,424) |
| 3/12/2008 | W/H TAX DIV MMM | (754) | - | (754) | - | - | 116,516,182 | - | (754) | (754) |
| 3/13/2008 | W/H TAX DIV MSFT | (1,803) | - | (1,803) | - | - | 116,514,379 | - | (1,803) | (1,803) |
| 3/17/2008 | CHECK WIRE | (6,000,000) | - | (6,000,000) | - | - | 110,514,379 | - | (6,000,000) | (6,000,000) |
| 3/17/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (28) | - | (28) | - | - | 110,514,352 | - | (28) | (28) |
| 3/17/2008 | W/H TAX DIV TWX | (459) | - | (459) | - | - | 110,513,893 | - | (459) | (459) |
| 3/17/2008 | W/H TAX DIV WB | (2,653) | - | (2,653) | - | - | 110,511,240 | - | (2,653) | (2,653) |
| 3/17/2008 | W/H TAX DIV MCD | (918) | - | (918) | - | - | 110,510,321 | - | (918) | (918) |
| 3/19/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 110,510,321 | - | (1) | (1) |
| 3/24/2008 | W/H TAX DIV AIG | (1,055) | - | (1,055) | - | - | 110,509,266 | - | (1,055) | (1,055) |
| 3/27/2008 | W/H TAX DIV HD | (763) | - | (763) | - | - | 110,508,503 | - | (763) | (763) |
| 3/28/2008 | W/H TAX DIV BAC | (5,788) | - | (5,788) | - | - | 110,502,715 | - | (5,788) | (5,788) |
| 3/31/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 110,502,713 | - | (2) | (2) |
| 3/31/2008 | CHECK WIRE | (8,000,000) | - | (8,000,000) | - | - | 102,502,713 | - | (8,000,000) | (8,000,000) |
| 3/31/2008 | W/H TAX DIV PEP | (1,201) | - | (1,201) | - | - | 102,501,512 | - | (1,201) | (1,201) |
| 4/1/2008 | W/H TAX DIV KO | (1,575) | - | (1,575) | - | - | 102,499,937 | - | (1,575) | (1,575) |
| 4/1/2008 | W/H TAX DIV MRK | (1,718) | - | (1,718) | - | - | 102,498,218 | - | (1,718) | (1,718) |
| 4/2/2008 | W/H TAX DIV HPQ | (422) | - | (422) | - | - | 102,497,796 | - | (422) | (422) |
| 4/4/2008 | W/H TAX DIV KFT | (865) | - | (865) | - | - | 102,496,932 | - | (865) | (865) |
| 4/4/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 102,496,930 | - | (2) | (2) |
| 4/7/2008 | W/H TAX DIV WMT | (1,119) | - | (1,119) | - | - | 102,495,811 | - | (1,119) | (1,119) |
| 4/14/2008 | CHECK WIRE | 8,000,000 | 8,000,000 | - | - | - | 110,495,811 | - | - | - |

MADC1127_00000011

BLMIS ACCOUNT NO. 1FR133 - HSBC INSTITUTIONAL TRUST SERVICES (IRELAND) LTD/LANDMARK INVESTMENT FUND IRELAND

| | | Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 4/23/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 110,495,803 | - | (8) | (8) |
| 4/25/2008 | W/H TAX DIV GE | (6,366) | - | (6,366) | - | - | 110,489,437 | - | (6,366) | (6,366) |
| 4/25/2008 | W/H TAX DIV MDT | (279) | - | (279) | - | - | 110,489,158 | - | (279) | (279) |
| 4/30/2008 | W/H TAX DIV JPM | (2,549) | - | (2,549) | - | - | 110,486,609 | - | (2,549) | (2,549) |
| 4/30/2008 | W/H TAX DIV MS | (553) | - | (553) | - | - | 110,486,056 | - | (553) | (553) |
| 5/1/2008 | W/H TAX DIV VZ | (2,483) | - | (2,483) | - | - | 110,483,572 | - | (2,483) | (2,483) |
| 5/1/2008 | W/H TAX DIV T | (4,844) | - | (4,844) | - | - | 110,478,728 | - | (4,844) | (4,844) |
| 5/2/2008 | W/H TAX DIV CVS | (179) | - | (179) | - | - | 110,478,550 | - | (179) | (179) |
| 5/2/2008 | W/H TAX DIV BK | (537) | - | (537) | - | - | 110,478,013 | - | (537) | (537) |
| 5/9/2008 | W/H TAX DIV AXP | (402) | - | (402) | - | - | 110,477,611 | - | (402) | (402) |
| 5/15/2008 | W/H TAX DIV PG | (2,534) | - | (2,534) | - | - | 110,475,077 | - | (2,534) | (2,534) |
| 5/15/2008 | CHECK WIRE | (4,000,000) | - | (4,000,000) | - | - | 106,475,077 | - | (4,000,000) | (4,000,000) |
| 5/15/2008 | W/H TAX DIV ABT | (1,140) | - | (1,140) | - | - | 106,473,937 | - | (1,140) | (1,140) |
| 5/20/2008 | W/H TAX DIV CAT | (469) | - | (469) | - | - | 106,473,467 | - | (469) | (469) |
| 5/23/2008 | W/H TAX DIV C | (3,219) | - | (3,219) | - | - | 106,470,248 | - | (3,219) | (3,219) |
| 5/28/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (40) | - | (40) | - | - | 106,470,209 | - | (40) | (40) |
| 5/29/2008 | W/H TAX DIV GS | (261) | - | (261) | - | - | 106,469,948 | - | (261) | (261) |
| 5/30/2008 | CHECK WIRE | 17,500,000 | 17,500,000 | - | - | - | 123,969,948 | - | - | - |
| 6/2/2008 | W/H TAX DIV COP | (977) | - | (977) | - | - | 123,968,970 | - | (977) | (977) |
| 6/2/2008 | W/H TAX DIV INTC | (1,643) | - | (1,643) | - | - | 123,967,327 | - | (1,643) | (1,643) |
| 6/2/2008 | W/H TAX DIV WFC | (3,957) | - | (3,957) | - | - | 123,963,371 | - | (3,957) | (3,957) |
| 6/2/2008 | W/H TAX DIV WMT | (2,221) | - | (2,221) | - | - | 123,961,150 | - | (2,221) | (2,221) |
| 6/3/2008 | W/H TAX DIV PFE | (8,518) | - | (8,518) | - | - | 123,952,632 | - | (8,518) | (8,518) |
| 6/3/2008 | W/H TAX DIV UPS | (1,781) | - | (1,781) | - | - | 123,950,851 | - | (1,781) | (1,781) |
| 6/6/2008 | W/H TAX DIV BA | (1,151) | - | (1,151) | - | - | 123,949,700 | - | (1,151) | (1,151) |
| 6/10/2008 | W/H TAX DIV XOM | (8,420) | - | (8,420) | - | - | 123,941,281 | - | (8,420) | (8,420) |
| 6/10/2008 | W/H TAX DIV IBM | (2,698) | - | (2,698) | - | - | 123,938,583 | - | (2,698) | (2,698) |
| 6/10/2008 | W/H TAX DIV CVX | (5,378) | - | (5,378) | - | - | 123,933,206 | - | (5,378) | (5,378) |
| 6/10/2008 | W/H TAX DIV UTX | (1,266) | - | (1,266) | - | - | 123,931,939 | - | (1,266) | (1,266) |
| 6/10/2008 | W/H TAX DIV EXC | (1,259) | - | (1,259) | - | - | 123,930,680 | - | (1,259) | (1,259) |
| 6/10/2008 | W/H TAX DIV JNJ | (1,744) | - | (1,744) | - | - | 123,928,936 | - | (1,744) | (1,744) |
| 6/12/2008 | W/H TAX DIV MSFT | (3,442) | - | (3,442) | - | - | 123,925,494 | - | (3,442) | (3,442) |
| 6/12/2008 | W/H TAX DIV MMM | (1,439) | - | (1,439) | - | - | 123,924,055 | - | (1,439) | (1,439) |
| 6/13/2008 | CHECK WIRE | 1,500,000 | 1,500,000 | - | - | - | 125,424,055 | - | - | - |
| 7/16/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (23) | - | (23) | - | - | 125,424,033 | - | (23) | (23) |
| 7/16/2008 | CHECK WIRE | (3,000,000) | - | (3,000,000) | - | - | 122,424,033 | - | (3,000,000) | (3,000,000) |
| 7/21/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 122,424,032 | - | (1) | (1) |
| 7/23/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 122,424,031 | - | (0) | (0) |
| 8/1/2008 | W/H TAX DIV CVS | (308) | - | (308) | - | - | 122,423,724 | - | (308) | (308) |
| 8/4/2008 | W/H TAX DIV UPS | (2) | - | (2) | - | - | 122,423,722 | - | (2) | (2) |
| 8/13/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 122,423,721 | - | (0) | (0) |
| 8/20/2008 | W/H TAX DIV CAT | (819) | - | (819) | - | - | 122,422,902 | - | (819) | (819) |
| 8/21/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 122,422,900 | - | (2) | (2) |
| 8/21/2008 | CHECK WIRE | (3,700,000) | - | (3,700,000) | - | - | 118,722,900 | - | (3,700,000) | (3,700,000) |
| 8/22/2008 | W/H TAX DIV C | (5,262) | - | (5,262) | - | - | 118,717,638 | - | (5,262) | (5,262) |
| 8/28/2008 | W/H TAX DIV GS | (390) | - | (390) | - | - | 118,717,248 | - | (390) | (390) |
| 9/12/2008 | CHECK WIRE | (2,000,000) | - | (2,000,000) | - | - | 116,717,248 | (2,000,000) | (2,000,000) | (2,000,000) |
| 10/2/2008 | W/H TAX DIV INTC | (2,419) | - | (2,419) | - | - | 116,714,829 | (2,419) | (2,419) | (2,419) |
| 10/2/2008 | W/H TAX DIV WMT | (2,417) | - | (2,417) | - | - | 116,712,412 | (2,417) | (2,417) | (2,417) |
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 116,712,411 | (1) | (1) | (1) |
| 10/2/2008 | W/H TAX DIV CVX | (6,003) | - | (6,003) | - | - | 116,706,409 | (6,003) | (6,003) | (6,003) |
| 10/2/2008 | W/H TAX DIV UPS | (2,015) | - | (2,015) | - | - | 116,704,393 | (2,015) | (2,015) | (2,015) |
| 10/2/2008 | W/H TAX DIV EXC | (1,425) | - | (1,425) | - | - | 116,702,969 | (1,425) | (1,425) | (1,425) |
| 10/2/2008 | W/H TAX DIV UTX | (1,433) | - | (1,433) | - | - | 116,701,536 | (1,433) | (1,433) | (1,433) |
| 10/2/2008 | W/H TAX DIV QCOM | (370) | - | (370) | - | - | 116,701,166 | (370) | (370) | (370) |
| 10/2/2008 | W/H TAX DIV JNJ | (5,746) | - | (5,746) | - | - | 116,695,420 | (5,746) | (5,746) | (5,746) |
| 10/2/2008 | W/H TAX DIV MCD | (1,880) | - | (1,880) | - | - | 116,693,540 | (1,880) | (1,880) | (1,880) |
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 116,693,533 | (7) | (7) | (7) |
| 10/2/2008 | W/H TAX DIV HD | (549) | - | (549) | - | - | 116,692,984 | (549) | (549) | (549) |
| 10/2/2008 | W/H TAX DIV MMM | (1,628) | - | (1,628) | - | - | 116,691,356 | (1,628) | (1,628) | (1,628) |
| 10/2/2008 | W/H TAX DIV PFE | (6,600) | - | (6,600) | - | - | 116,684,756 | (6,600) | (6,600) | (6,600) |
| 10/2/2008 | W/H TAX DIV IBM | (2,090) | - | (2,090) | - | - | 116,682,666 | (2,090) | (2,090) | (2,090) |
| 10/2/2008 | W/H TAX DIV AIG | (2,626) | - | (2,626) | - | - | 116,680,040 | (2,626) | (2,626) | (2,626) |
| 10/2/2008 | W/H TAX DIV BAC | (892) | - | (892) | - | - | 116,679,148 | (892) | (892) | (892) |
| 10/2/2008 | W/H TAX DIV MSFT | (3,927) | - | (3,927) | - | - | 116,675,222 | (3,927) | (3,927) | (3,927) |

MADC1127_00000012

Exhibit C

BLMIS ACCOUNT NO. 1FR133 - HSBC INSTITUTIONAL TRUST SERVICES (IRELAND) LTD/LANDMARK INVESTMENT FUND IRELAND

| Column 1<br><br>Date | Column 2<br><br>Transaction<br>Description | Column 3<br>Transaction Amount<br>Reported in<br>Customer Statement | Column 4<br><br>Cash<br>Deposits | Column 5<br><br>Cash<br>Withdrawals | Column 6<br><br>Transfers of<br>Principal In | Column 7<br><br>Transfers of<br>Principal Out | Column 8<br><br>Balance of<br>Principal | Column 9<br>90-Day<br>Preferential<br>Transfers | Column 10<br>2-Year<br>Cash<br>Withdrawals | Column 11<br>6-Year<br>Cash<br>Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 116,675,221 | (1) | (1) | (1) |
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 116,675,210 | (11) | (11) | (11) |
| 10/2/2008 | W/H TAX DIV XOM | (9,393) | - | (9,393) | - | - | 116,665,817 | (9,393) | (9,393) | (9,393) |
| 10/2/2008 | W/H TAX DIV TWX | (1,008) | - | (1,008) | - | - | 116,664,808 | (1,008) | (1,008) | (1,008) |
| 10/2/2008 | W/H TAX DIV COP | (2,227) | - | (2,227) | - | - | 116,662,582 | (2,227) | (2,227) | (2,227) |
| 10/2/2008 | W/H TAX DIV BAC | (12,670) | - | (12,670) | - | - | 116,649,911 | (12,670) | (12,670) | (12,670) |
| 10/2/2008 | W/H TAX DIV BUD | (825) | - | (825) | - | - | 116,649,086 | (825) | (825) | (825) |
| 10/2/2008 | W/H TAX DIV WFC | (2,938) | - | (2,938) | - | - | 116,646,149 | (2,938) | (2,938) | (2,938) |
| 10/2/2008 | W/H TAX DIV PEP | (2,941) | - | (2,941) | - | - | 116,643,207 | (2,941) | (2,941) | (2,941) |
| 10/6/2008 | CHECK WIRE | (1,000,000) | - | (1,000,000) | - | - | 115,643,207 | (1,000,000) | (1,000,000) | (1,000,000) |
| 10/16/2008 | CHECK WIRE | (14,000,000) | - | (14,000,000) | - | - | 101,643,207 | (14,000,000) | (14,000,000) | (14,000,000) |
| 11/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 101,643,207 | (0) | (0) | (0) |
| 11/4/2008 | W/H TAX DIV HPQ | (869) | - | (869) | - | - | 101,642,338 | (869) | (869) | (869) |
| 11/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 101,642,338 | (0) | (0) | (0) |
| 11/4/2008 | W/H TAX DIV PM | (1,618) | - | (1,618) | - | - | 101,640,720 | (1,618) | (1,618) | (1,618) |
| 11/4/2008 | W/H TAX DIV MO | (656) | - | (656) | - | - | 101,640,063 | (656) | (656) | (656) |
| 11/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 101,640,063 | (0) | (0) | (0) |
| 11/4/2008 | W/H TAX DIV KO | (1,089) | - | (1,089) | - | - | 101,638,974 | (1,089) | (1,089) | (1,089) |
| 11/4/2008 | W/H TAX DIV MRK | (3,558) | - | (3,558) | - | - | 101,635,416 | (3,558) | (3,558) | (3,558) |
| 11/4/2008 | W/H TAX DIV BAX | (620) | - | (620) | - | - | 101,634,796 | (620) | (620) | (620) |
| 11/21/2008 | CHECK WIRE | (10,500,000) | - | (10,500,000) | - | - | 91,134,796 | (10,500,000) | (10,500,000) | (10,500,000) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 91,134,796 | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 91,134,794 | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 91,134,793 | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 91,134,793 | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 91,134,793 | (0) | (0) | (0) |
| | **Total:** | **$ 143,550,000** | **$ -** | **$ (52,415,207)** | **$ -** | **$ -** | **$ 91,134,793** | **$ (27,582,455)** | **$ (52,415,207)** | **$ (52,415,207)** |

MADC1127_00000013

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>UBS AG, UBS (LUXEMBOURG) S.A., UBS FUND SERVICES (LUXEMBOURG) S.A., UBS THIRD PARTY MANAGEMENT COMPANY S.A., M&B CAPITAL ADVISERS SOCIEDAD DE VALORES, S.A., RELIANCE INTERNATIONAL RESEARCH LLC, RELIANCE MANAGEMENT (GIBRALTAR) LIMITED, LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, as represented by their Liquidators MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, in their capacities of liquidators and representatives of LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, and LANDMARK INVESTMENT FUND IRELAND,<br><br>Defendants. | Adv. Pro. No. 10-05311 (SMB) |

## STIPULATION AND ORDER AUTHORIZING
## INTERNATIONAL DISCOVERY

WHEREAS, on April 4, 2016, the Trustee and the defendants in this action (the "LIF

Action") and *Picard v. UBS AG, et al.*, Adv. Pro. No. 10-4285 (SMB) (the "Luxalpha Action"

and with the LIF Action, the "Actions"), which the Parties have agreed should be coordinated for

scheduling purposes, participated in a conference under Rule 26(f) of the Federal Rules of Civil

Procedure in the Actions to discuss, among other things, a schedule for discovery therein;

WHEREAS, at the Rule 26(f) conference and in additional efforts to meet and confer, the

Parties disputed the appropriate timing of the commencement of discovery under the Federal

Rules or otherwise;

WHEREAS, the Trustee asserted that the Federal Rules permit the immediate

commencement of discovery in the Actions and that the further delay of discovery would result

in the loss of evidence relevant to the events underlying the Trustee's claims in the Actions and

would unduly prejudice his ability to prosecute those claims and, in connection with the Rule

26(f) conference, served requests for the production of documents under Rule 34 (the "Rule 34

Requests");

WHEREAS, the Defendants objected to the commencement of discovery under the

Federal Rules or otherwise, asserting that certain pending motions, including the

Extraterritoriality Motion, the Trustee's motion for leave to amend his complaints, and the

defendants' motions to dismiss for lack of personal jurisdiction and *forum non conveniens*, and

anticipated motions to dismiss on other grounds (the "Anticipated Motions") will affect the

identity of the parties and the scope of discovery in the Actions, making the commencement of

discovery premature at this time and proposed that, in an effort to make progress while the

parties awaited the Court's decision on the Extraterritoriality Motion, (a) the parties move

forward with briefing on the Anticipated Motions, or (b) in the alternative, the parties be

permitted to pursue document discovery overseas by letters of request pursuant to the Hague

Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague

Convention");

WHEREAS, unable to resolve their dispute concerning the appropriate time for the

commencement of discovery, counsel for the Trustee and certain Parties appeared before the

Honorable Stuart M. Bernstein, U.S.B.J. on April 27, 2016 for a status conference; and

WHEREAS, having considered the Parties' positions at the April 27 status conference,

Judge Bernstein permitted the Parties to commence document discovery through the Hague

Convention.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and between

the undersigned counsel that:

1.     As of the date of the entry of this Order, the Parties are authorized to conduct

document discovery in connection with the Actions under the Hague Convention or through any

other internationally recognized means of obtaining cross-border discovery, including but not

limited to, letters rogatory (collectively, "International Discovery").

2.     All discovery other than International Discovery shall be stayed until further order

of this Court authorizes such other discovery or the Parties agree, by further stipulation, that such

other discovery shall be permitted to proceed.

3.     Any Party that avails itself under this Order of International Discovery procedures

will not be deemed to have waived, prejudiced, or otherwise altered its right to conduct

discovery under the Federal Rules.

4.     No Party served with Rule 34 Requests will be required to respond to those requests until the Court authorizes the commencement of discovery under the Federal Rules or until the Trustee and the Party served with Rule 34 Requests otherwise agree.

5.     Nothing in this Stipulation shall constitute a waiver of (a) any objections that any Party may have to any particular discovery that may be propounded, or (b) any jurisdictional or other defense that any Party may have.

6.     This Stipulation may be signed by respective counsel for the Parties in any number of counterparts, each of which when so signed shall be an original, but all of which shall together constitute one and the same instrument.  A signed facsimile, photostatic or electronic copy of this Stipulation shall be deemed an original.

Dated:  May 17, 2016

BAKER & HOSTETLER LLP

By: */s/ Oren J. Warshavsky*
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
Oren J. Warshavsky
Email:  owarshavsky@bakerlaw.com
Geoffrey A. North
Email: gnorth@bakerlaw.com

*Attorneys for Plaintiff Irving H. Picard,*
*Trustee for the substantively consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the*
*Estate of Bernard L. Madoff*

PORZIO BROMBERG & NEWMAN P.C.

By: */s/ Brett S. Moore*
156 West 56th St., Suite 803
New York, New York 10019
Telephone: (212) 265-6888
Facsimile: (212) 957-3983
Brett S. Moore
Email: bsmoore@pbnlaw.com

*Attorneys for Defendants Luxembourg*
*Investment Fund and Luxembourg Investment*
*Fund U.S. Equity Plus, as represented by their*
*Liquidators Maître Alain Rukavina and Paul*
*Laplume, in their capacities of*
*liquidators and representatives of*
*Luxembourg Investment Fund and*
*Luxembourg Investment Fund U.S. Equity*
*Plus*

4

GIBSON, DUNN & CRUTCHER LLP          SEWARD & KISSEL LLP


By: */s/ Marshall R. King*                      By: */s/ Mark J. Hyland*
200 Park Avenue                                 One Battery Park
New York, New York 10166-0193                   New York, New York 10004
Telephone:  (212) 351-4000                      Telephone:  (212) 574-1541
Marshall R. King                                Mark J. Hyland
Email:  mking@gibsondunn.com                    Email:  hyland@sewkis.com
Gabriel Herrmann                                Michael B. Weitman
Email: gherrmann@gibsondunn.com                 Email: weitman@sewkis.com

*Attorneys for Defendants UBS AG, UBS*          *Attorneys for Defendant Reliance International*
*(Luxembourg) S.A., UBS Fund Services*          *Research LLC*
*(Luxembourg) S.A., UBS Third Party*
*Management Company S.A.*

CHADBOURNE & PARKE LLP


By: */s/ Thomas J. Hall*
30 Rockefeller Plaza
New York, New York 10112
Telephone:  (212) 408-5487
Facsimile:  (646) 710-5487
Thomas J. Hall
Email:  thall@chadbourne.com
Stacey Trimmer
Email: strimmer@chadbourne.com

*Attorneys for Defendant Landmark*
*Investment Fund Ireland*


**SO ORDERED:**


                                                /s/ STUART M. BERNSTEIN
Dated: May 18th, 2016                           HONORABLE STUART M. BERNSTEIN
New York, New York                              UNITED STATES BANKRUPTCY JUDGE