**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04285 (SMB) |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT** |
| UBS AG, UBS (LUXEMBOURG) SA, UBS FUND SERVICES (LUXEMBOURG) SA, UBS THIRD PARTY MANAGEMENT COMPANY SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS MANAGEMENT LUXEMBOURG SA (f/k/a ACCESS INTERNATIONAL ADVISORS (LUXEMBOURG) SA) as represented by its Liquidator MAÎTRE FERNAND ENTRINGER, ACCESS PARTNERS SA as represented by its | |

Liquidator MAÎTRE FERNAND ENTRINGER, PATRICK LITTAYE, CLAUDINE MAGON DE LA VILLEHUCHET (a/k/a CLAUDINE DE LA VILLEHUCHET) in her capacity as Executrix under the Will of THIERRY MAGON DE LA VILLEHUCHET (a/k/a RENE THIERRY DE LA VILLEHUCHET), CLAUDINE MAGON DE LA VILLEHUCHET (a/k/a CLAUDINE DE LA VILLEHUCHET) individually as the sole beneficiary under the Will of THIERRY MAGON DE LA VILLEHUCHET (a/k/a RENE THIERRY DE LA VILLEHUCHET), PIERRE DELANDMETER, THEODORE DUMBAULD, LUXALPHA SICAV as represented by its Liquidators MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA AND PAUL LAPLUME, in their capacities as liquidators and representatives of LUXALPHA SICAV, and GROUPEMENT FINANCIER LTD.,

Defendants.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................3

    I.     Procedural History ..........................................................................3

          A.     The Pleading Standards Governing the Avoidance Claims Have
                 Changed Since the Trustee Filed the 2010 Complaint and 2011
                 Amended Complaint ..............................................................3

          B.     As Part of the Extraterritoriality Proceedings, the Trustee Proffered a
                 Second Amended Complaint ....................................................5

          C.     Mediation, Settlement Discussions, and Motion Practice ...........................7

    II.    The Proposed Second Amended Complaint .........................................9

ARGUMENT ................................................................................................9

    I.     Standard Governing Motion for Leave to Amend a Pleading ...............................9

    II.    Defendants Will Not Be Prejudiced by the Proposed Amendments.....................10

    III.    Amending the Complaint Would Not Be Futile ...................................11

          A.     The PSAC Sufficiently Alleges That Defendants Subjectively
                 Believed There Was a High Probability of Fraud at BLMIS.....................14

                1.     Access Formed Luxalpha Notwithstanding the Warning
                      Provided by the Closing of Oreades .............................14

                  2.     UBS's Unwillingness to Invest in BLMIS....................15

                  3.     Red Flags ........................................................16

                        a.     Madoff's Numerous Roles.................................17

                        b.     Luxalpha's Internal and External Investigations
                            Revealed Significant Evidence of Fraud............................18

                        c.     Lack of Identified Counterparties ......................18

                        d.     Impossibly Consistent Returns ..........................19

                        e.     Madoff's Unorthodox Policies and Practices ...................20

i

B.     The Feeder Fund Defendants Deliberately Avoided Confirming
        BLMIS's Fraud ........................................................................................20

IV.    There Is No Evidence That the Trustee Has Acted With Undue Delay or Bad
        Faith ........................................................................................................23

CONCLUSION ....................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
　677 F.3d 60 (2d Cir. 2012).....................................................................................................10

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
　626 F.3d 699 (2d Cir. 2010)...................................................................................................10

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)...............................................................................................................12

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007)...............................................................................................................12

*Block v. First Blood Assocs.*,
　988 F.2d 344 (2d Cir 1993)....................................................................................................23

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
　866 F. Supp. 2d 257 (S.D.N.Y. 2012)......................................................................................9

*Commander Oil Corp. v. Barlo Equip. Corp.*,
　215 F.3d 321 (2d Cir. 2000).............................................................................................23, 24

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*,
　282 F.3d 83 (2d Cir. 2002).....................................................................................................12

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
　986 F. Supp. 2d 428 (S.D.N.Y. 2013)......................................................................................9

*Fed. Treasury Enter. Sojuzploimportdo v. SPI Spirits Ltd.*,
　726 F.3d 62 (2d Cir. 2013).....................................................................................................12

*Fish v. GreatBanc Tr. Co.*,
　749 F.3d 671 (7th Cir. 2014) .................................................................................................13

*Fjord v. AMR Corp. (In re AMR Corp.)*,
　506 B.R. 368 (Bankr. S.D.N.Y. 2014)....................................................................................10

*Hamilton v. City of New York*,
　No. 06-cv-15405 (DC), 2011 WL 1842990 (S.D.N.Y. May 10, 2011)...................................10

*Henneberry v. Sumitomo Corp. of Am.*,
　415 F. Supp. 2d 423 (S.D.N.Y. 2006)....................................................................................10

*Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*,
665 F. Supp. 2d 239 (S.D.N.Y. 2009) .......................................................................11, 12

*Jefferson Ins. Co. v. Rouhana (In re Winstar Commc'ns)*,
No. 01 CV 3014 (GBD), 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ...................................12

*Kaster v. Modifications Sys., Inc.*,
731 F.2d 1014 (2d Cir. 1984).............................................................................................10

*M.E.S., Inc. v. Safeco Ins. Co. of Am.*,
No. 10-CV-02709 (PKC)(VMS), 2014 WL 2931398 (E.D.N.Y. June 27, 2014) ..................11

*Margel v. E.G.L. Gem Lab Ltd.*,
No. 04 Civ. 1514 (PAC)(HBP), 2010 WL 445921 (S.D.N.Y. Feb. 8, 2010) ...................12, 24

*McBeth v. Gabrielli Truck Sales, Ltd.*,
731 F. Supp. 2d 316 (E.D.N.Y. 2010) .................................................................................10

*Ohio Cas. Ins. Co. v. Transcon. Ins. Co.*,
No. 05 6432 (BSJ) (RLE), 2016 WL 1540540 (S.D.N.Y. May 31, 2006) ..............................9

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018) .................................................................................13

*Picard v. Ceretti (In re BLMIS)*,
Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug.
11, 2015) ...........................................................................................................................5, 9

*Picard v. Katz*,
462 B.R. 447 (S.D.N.Y. 2011).............................................................................................13

*Picard v. Legacy Capital Ltd. (In re BLMIS)*,
548 B.R. 13 (Bankr. S.D.N.Y. 2016) .............................................................................5, 9, 13

*Picard v. Magnify, Inc. (In re BLMIS)*,
583 B.R. 829 (Bankr. S.D.N.Y. 2018) .................................................................................13

*Picard v. Mendelow (In re BLMIS)*,
560 B.R. 208 (Bankr. S.D.N.Y. 2016) ......................................................................... *passim*

*Picard v. Merkin (In re BLMIS)*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014) ......................................................................... *passim*

*In re Picard, Tr. for the Liquidation of Bernard L. Madoff Inv. Sec. LLC*,
917 F.3d 85 (2d Cir. 2019).....................................................................................................6

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*,
46 F.3d 230 (2d Cir.1995)....................................................................................................23

iv

*Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*,
   No. 13 Civ. 1654 (RA), 2015 WL 4097927 (S.D.N.Y. July 6, 2015) ...................................24

*Ricciuti v. N.Y.C. Transit Auth.*,
   941 F.2d 119 (2d Cir. 1991)...........................................................................................12

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Madoff)*,
   Adv. Pro. No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov.
   22, 2016) .....................................................................................................................4, 6

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Madoff Sec.)*,
   513 B.R. 222 (S.D.N.Y. 2014)........................................................................................5, 6

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Madoff Sec.)*,
   516 B.R. 18 (S.D.N.Y. 2014)........................................................................................5, 8, 9

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec.*,
   No. 12 Misc. 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)..................................5

*Silverman v. A-Z Rx., LLC (In re Allou Distribs., Inc.)*,
   Adv. No. 04-8369-ESS, 2012 WL 6012149 (Bankr. E.D.N.Y. Dec. 3, 2012) ......................12

*Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*,
   446 B.R. 32 (Bankr. E.D.N.Y. 2011)...............................................................................12

*State v. United Parcel Serv., Inc.*,
   253 F. Supp. 3d 583 (S.D.N.Y. 2017)..............................................................................20

*Tuosto v. Philip Morris USA Inc.*,
   672 F. Supp. 2d 350 (S.D.N.Y. 2009)..............................................................................10

*United States v. Fofanah*,
   765 F.3d 141 (2d Cir. 2014) ......................................................................................20, 21

**Statutes**

11 U.S.C. § 546(e) .....................................................................................................4, 5, 10

11 U.S.C. § 548...........................................................................................................4, 5, 9

11 U.S.C. § 550.......................................................................................................4, 6, 9, 13

15 U.S.C. §§ 78aaa–*lll* ......................................................................................................1

28 U.S.C. § 157.................................................................................................................4

**Rules**

Fed. R. Bankr. P. 7015 ........................................................................................................1, 9

Fed. R. Civ. P. 12(b)(6)......................................................................................................12, 13

Fed. R. Civ. P. 15 ...................................................................................................1, 9, 13, 24

**Other Authorities**

6 Wright & Miller, Fed. Prac. & Pro. § 1484 (3d ed. 2004, 2017 Supp.).....................................11

6 Wright & Miller, Fed. Prac. & Pro. § 1487 (3d ed. 2004, 2017 Supp.).....................................11

Plaintiff Irving H. Picard (the "Trustee"), as Trustee for the substantively consolidated

liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under

the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa–*lll*, and the consolidated

chapter 7 estate of Bernard L. Madoff respectfully submits this Memorandum of Law in Support

of the Trustee's Motion for Leave to File a Second Amended Complaint under Rule 15 of the

Federal Rules of Civil Procedure and Rule 7015 of the Federal Rules of Bankruptcy Procedure.

With this motion, the Trustee submits a proposed second amended complaint (the "PSAC"),

against Luxalpha SICAV ("Luxalpha") as represented by its Liquidators, Maître Alain Rukavina

and Paul Laplume, in their capacities as liquidators and representatives of Luxalpha, Groupement

Financier Ltd., Access International Advisors LLC ("AIA"), Claudine Magon de la Villehuchet

(a/k/a Claudine de la Villehuchet) in her capacity as executrix under the will of Thierry Magon

de la Villehuchet (a/k/a Rene Thierry de la Villehuchet), Claudine Magon de la Villehuchet

(a/k/a Claudine de la Villehuchet) individually as the sole beneficiary under the will of Thierry

Magon de la Villehuchet (a/k/a Rene Thierry de la Villehuchet), and Theodore Dumbauld

(collectively "Defendants," together with the Trustee, the "Parties"). The PSAC seeks to recover

fraudulent transfers made to BLMIS feeder funds Luxalpha and Groupement Financier

(collectively, the "Feeder Fund Defendants") and the subordination or disallowance of

Luxalpha's customer claims.

## INTRODUCTION

This motion seeks leave to amend to bring the filed amended complaint in line with both

the current legal standards and the existing facts. But it is so much more than that. By obtaining

leave to amend his complaint, the Trustee will be able to continue the pursuit of funds

wrongfully obtained by entities and individuals who willfully blinded themselves to Madoff's

fraud.

1

The founders and principals of the Feeder Fund Defendants, Patrick Littaye and Thierry Magon de la Villehuchet, were uniquely situated both personally and professionally. Madoff was Littaye's long-time friend and business partner. Littaye and Villehuchet garnered extensive BLMIS exposure as they closed one Madoff feeder fund, Oreades SICAV ("Oreades"), and flipped its investors into Luxalpha, another fund they created when they learned that BNP Paribas would close Oreades because of serious questions about BLMIS's legitimacy. In abandoning Oreades, BNP Paribas expressed concern over the fact that BLMIS's role as asset manager was not properly disclosed to investors. BNP Paribas also was aware of issues concerning the proper custody and segregation of Oreades's assets. BNP Paribas also highlighted BLMIS's lack of transparency given that trading confirmations were supplied only by fax or mail many days after the purported trade. There was no way to verify that purported trading activity. BNP Paribas's knowledge of these practices forced it to close Oreades.

Undeterred, and even before Oreades formally closed, Access, as defined herein[1], facilitated their clients' smooth transition into Luxalpha. At this point, Access brought UBS, as defined herein[2], on board, even though other UBS entities had previously rejected BLMIS investments, deeming them unsafe for their clients. With the formation of Luxalpha, Access's and UBS's behavior became even more egregious. They ignored and otherwise stifled investor inquiries, and omitted mention of BLMIS and Madoff from prospectuses and regulatory filings. The Feeder Fund Defendants and their agents misled regulators and disregarded Access's and UBS's own internal practices and procedures that were designed to prevent an investment into an entity with as many red flags as BLMIS presented. Further, Access made exceptions to its due diligence policies specially for BLMIS because Madoff was a "special manager."

---

[1] *See infra* note 4.
[2] *Id.*

Most importantly, Access, as an agent of the Feeder Fund Defendants, retained a third-party consultant to look for signs of fraud at BLMIS.  In approximately four days, the consultant discovered the impossibility of BLMIS's purported options trades, questioned the viability of the strategy as a whole, and identified various opportunities for BLMIS to commit fraud.  His opinion was unequivocal: BLMIS failed to meet even basic due diligence standards. He recommended a complete exit of all BLMIS-related investments.  Access ignored him and suppressed his findings.

The Trustee easily satisfies the standard governing a motion for leave to amend.  As explained in more detail below, the law has changed since the Trustee filed his action and his first amended complaint.  Moreover, there is no futility, undue prejudice or delay, or bad faith.  Neither is this request untimely, given the numerous appellate proceedings, intervening settlement discussions, and mediation sessions in which the parties have participated in good faith.  The Trustee deserves the opportunity to continue this action through the filing of his PSAC to advance his work on behalf of the victims of Madoff's horrible crime.

## BACKGROUND

I.    **Procedural History**

A.    **The Pleading Standards Governing the Avoidance Claims Have Changed Since the Trustee Filed the 2010 Complaint and 2011 Amended Complaint**

The Trustee filed his complaint on November 23, 2010[3] seeking the recovery of the more than $1.1 billion of transfers of customer property to Luxalpha, Groupement Financier, and their

---

[3] *Picard v. UBS AG, et. al*, No. 10-04285 (SMB) (Bankr. S.D.N.Y.), ECF No. 1.  References to docket entries from *Picard v. UBS AG et. al*, No. 10-04285 (SMB) (Bankr. S.D.N.Y.) shall be identified as "UBS Docket."

service providers.[4]  In August 2011, after the Bankruptcy Court reference had been withdrawn[5]

to allow the District Court to consider the Trustee's standing to assert common law claims for

damages, the Trustee filed an amended complaint.[6]  When the Trustee filed these complaints, the

applicable standard for avoiding a fraudulent transfer was "inquiry notice," i.e.,—whether the

defendant knew or should have known of information triggering a duty to investigate, and

whether diligent inquiry would have uncovered fraudulent activity.  The burden was on the

defendant to refute a showing of inquiry notice by proving good faith under section 548(c) of the

Bankruptcy Code.

Since then, the collective action of hundreds of defendants in Madoff-related cases has

resulted in changes to the pleading standards for avoidance claims.  In 2011 and 2012, hundreds

of other defendants in the Trustee's adversary proceedings moved to withdraw the reference

under 28 U.S.C. § 157 to allow the District Court to consider, among other issues, whether the

Trustee had the burden of pleading a defendant's lack of good faith under sections 548(c) and

550 of the Bankruptcy Code, and whether the section 546(e) "safe harbor" applied in SIPA

proceedings.

---

[4] The service providers include UBS AG, UBS (Luxembourg) S.A. ("UBS SA"), UBS Fund Services (Luxembourg) S.A. ("UBSFSL"), UBS Third Party Management Company S.A. ("UBSTPM") (together with UBS AG, UBS SA, and UBSFSL, "UBS"), Access International Advisors Europe Limited ("AIA Europe"), Access Partners (Suisse) SA ("AP (Suisse)"), Access International Advisors Ltd. ("AIA Ltd."), Access International Advisors LLC ("AIA LLC"), Access Management Luxembourg S.A. ("AML") (f/k/a Access International Advisors (Luxembourg) S.A. ("AIA (Lux)")), as represented by its Liquidator Maître Fernand Entringer, Access Partners S.A. (Luxembourg) ("AP (Lux)"), as represented by its Liquidator Maître Fernand Entringer (together with AIA Ltd., AIA LLC, AIA (Lux), and AML, "Access"), Patrick Littaye, Pierre Delandmeter, and certain Luxalpha Directors.
Should the Supreme Court deny *certiorari* of the Second Circuit's ruling on the extraterritorial application of SIPA, the Trustee reserves his right to amend his Complaint to reinstate his claims against Defendants and other defendants dismissed pursuant to *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Madoff)*, Adv. Pro. No. 08-01789 (SMB), 2016 WL 6900689, at *36 (Bankr. S.D.N.Y. Nov. 22, 2016) (the "*Bankruptcy Court ET Decision*").
[5] UBS Docket, ECF Nos. 70-74.  Access, Delandmeter, Groupement Financier, Littaye, Villehuchet, Dumbauld, and Luxalpha all joined UBS's motion.  *See Picard v. UBS AG, et. al*, Case No. 1:11-cv-4212 (CM), ECF Nos. 6, 8 and 9 (hereinafter, "UBS District Court Docket").
[6] UBS District Court Docket, ECF No. 23.

4

The District Court's rulings changed how the Trustee must plead avoidance claims in this and other cases. In April 2014, the District Court held that the Trustee has the burden of pleading a transferee's lack of good faith on avoidance claims under section 548 of the Bankruptcy Code. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Madoff Sec.)*, 516 B.R. 18, 22-24 (S.D.N.Y. 2014) (the "*Good Faith Decision*"). Under that decision and this Court's decisions in *Kingate*,[7] *Merkin*,[8] and *Legacy*,[9] to state a claim under section 548, the Trustee must now plead that initial transferees willfully blinded themselves to circumstances indicating a high probability of fraud at BLMIS.

The consolidated proceedings also yielded changes to the standard for applying the section 546(e) safe harbor. With the District Court's ruling and subsequent rulings by this Court, the Trustee must now allege the transferee's actual knowledge of BLMIS's fraud: where the Trustee does so, the safe harbor does not apply, and the Trustee can avoid and recover preferential and fraudulent transfers to the full extent permitted by state and federal law.[10]

## B.     As Part of the Extraterritoriality Proceedings, the Trustee Proffered a Second Amended Complaint

This action is also one of the many in which foreign subsequent transferees challenged the Trustee's ability to recover transfers of customer property based on the presumption against the extraterritorial application of federal statutes. In July 2014, the District Court ruled that SIPA does not apply extraterritorially and found that recovery of certain transfers would violate principles of international comity.[11] As a result, the Trustee was required to plead certain facts to

---

[7] *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*").

[8] *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("*Merkin II*").

[9] *Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13 (Bankr. S.D.N.Y. 2016) ("*Legacy*").

[10] *Kingate*, 2015 WL 4734749, at *12–15 (citing *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec.*, No. 12 Misc. 115 (JSR), 2013 WL 1609154, at *6 (S.D.N.Y. Apr. 15, 2013)).

[11] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Madoff Sec.)*, 513 B.R. 222, 231–32 (S.D.N.Y. 2014) (the "*District Court ET Decision*").

establish that the subsequent transfers he seeks to recover are "domestic" transfers. *District*

*Court ET Decision*, 513 B.R. at 222, 232 n. 4. Alternatively, the District Court held that the

recovery of subsequent transfers received from an entity in foreign liquidation proceedings

would violate principles of international comity. *Id.* at 231–32.

 In light of the new pleading standards with respect to good faith and extraterritoriality,

the Trustee filed an omnibus motion seeking, among other things, leave to amend.[12] As part of

the omnibus motion, the Trustee submitted a proffered Second Amended Complaint (the

"Proffered Complaint") in this case containing allegations to address the Courts' rulings on both

pleading standards.[13] Each of the foreign subsequent transferees that had been named as

defendants,[14] except Delandmeter, joined in filing a consolidated memorandum of law in support

of the Extraterritoriality Motion to Dismiss.[15]

 The Bankruptcy Court denied the omnibus motion with respect to certain of the Trustee's

subsequent transfer claims between foreign parties.[16] The Trustee appealed the Bankruptcy

Court's ET Decision directly to the Second Circuit, which reversed, holding that the presumption

against exterritoriality and international comity do not limit the reach of section 550(a)(2) of the

Bankruptcy Code.[17] The Second Circuit granted the defendants' motion to stay the issuance of

the mandate pending the filing of a petition for a writ of certiorari which was filed on August 29,

2019.[18] On December 9, 2019, the Supreme Court invited the Solicitor General to file a brief

---

[12] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, No. 08-01789 (SMB), ECF Nos. 7827 and 7828 (the "Main Case Docket").
[13] UBS Docket, ECF No. 210
[14] Parties dismissed from this case as a result of the *Bankruptcy Court ET Decision* included: UBS AG, UBS SA, UBSFSL, UBSTPM, AIA Ltd., AML, AIA (Lux), AP (Lux), Littaye, and Delandmeter.
[15] UBS Docket, ECF Nos. 193, 194.
[16] *See Bankruptcy Court ET Decision*, 2016 WL 6900689, at *36.
[17] *In re Picard, Tr. for the Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85 (2d Cir. 2019).
[18] *HSBC Holdings PLC v. Irving H. Picard*, 17-2992(L) (U.S.).

expressing the views of the United States on the extraterritorial application of SIPA.[19]   The

Trustee must await the disposition of the extraterritoriality proceedings to determine which of the

foreign subsequent transferees will be subject to his subsequent transfer claims.

This Court did not, however, consider the Proffered Complaint's allegations in the

context of knowledge and good faith.[20]

### C.    Mediation, Settlement Discussions, and Motion Practice

Between 2010 and now, the Parties have engaged in settlement negotiations, mediation,

and motion practice, which have narrowed the scope of this case.  In 2011, all of the defendants

moved to dismiss for lack of personal jurisdiction.  Luxalpha also moved to dismiss for *forum*

*non conveniens*.

Those motions were fully briefed, and the parties appeared before Judge Lifland to argue

the motions.  Rather than hear argument on the motions, Judge Lifland converted the hearing to a

Rule 16 conference, and directed the parties to negotiate to narrow the scope of the claims in the

case.

Thereafter, the Parties negotiated the dismissal of eight defendants.[21]   The negotiations in

this case took place in parallel with similar negotiations in *Picard v. UBS AG, et. al.*, Adv. Pro.

No. 10-5311 (SMB) (Bankr. S.D.N.Y.), an action by the Trustee against Luxembourg Investment

Fund and Landmark Investment Fund Ireland, Madoff feeder funds with origins similar to, and

service providers that overlapped with, Luxalpha's and Groupement Financier's.  The parties'

negotiations significantly narrowed the scope of both actions.

---

[19] *Id.*

[20] UBS Docket, ECF No. 192 ¶ 14 ("Further proceedings on the Trustee's Motion insofar as it seeks . . . leave to amend the complaints listed in Exhibits A and B to add allegations relevant to the good faith issue . . . shall be scheduled by the Court following the decision on the Extraterritoriality Motion.").

[21] UBS Docket, ECF No. 154 (dismissing without prejudice Roger Hartmann, Ralf Schroeter, Rene Egger, Alain Hondequin, and Hermann Kranz). Trustee subsequently voluntarily dismissed his claims against foreign subsequent transferees AIA Europe, AP (Suisse), and Bernd (a/k/a, Bernard) Stiehl. UBS Docket, ECF Nos. 159, 164.

As Luxalpha was an initial transferee that had filed a customer claim with the Trustee, it was not possible for the Trustee to narrow the case against Luxalpha through the negotiations, which centered on the pending jurisdictional arguments. The Trustee and Luxalpha did, however, use the negotiations directed by Judge Lifland to further settlement discussions that began in 2010. Those settlement discussions, which extended over the next several years, involved multiple meetings between the Trustee and Luxalpha.

The settlement discussions took on an additional dimension when the Trustee and Luxalpha agreed to enter into formal mediation,[22] and exchanged mediation statements in mid-2018. The Trustee's mediation statement included a detailed recitation of the facts supporting the Trustee's claims, including allegations regarding Defendants' knowledge of BLMIS's fraud keyed to the current pleading standards. The Trustee and Luxalpha further agreed during the mediation to suspend motion practice in connection with this adversary proceeding without prejudice to any party making appropriate motions at a later date.[23] In December 2019, after multiple discussions, the mediator terminated the mediation without the parties having reached a settlement.

Accordingly, the Trustee now moves for leave to amend his pleading to comport with the new standard articulated in the *Good Faith Decision* for the claims that remain against the Defendants.[24]

---

[22] UBS Docket, ECF No. 243.

[23] *Id.*

[24] Certain claims against foreign subsequent transferees were dismissed pursuant to the *Bankruptcy Court ET Decision*. In the PSAC, the Trustee has removed these claims. Should the Supreme Court deny *certiorari*, affirming the Second Circuits reversal of the *Bankruptcy Court ET Decision*, however, the Trustee reserves his right to amend his Complaint to reinstate his claims against Defendants and the dismissed foreign subsequent transferees.

## II.    The Proposed Second Amended Complaint

The Trustee now seeks leave to file a second amended complaint in this matter to set

forth additional relevant facts sufficient to meet the Trustee's pleading burden.[25]  As required by

the *Good Faith Decision* and this Court's opinions in *Kingate*, *Merkin*, and *Legacy*, to state a

claim under 11 U.S.C. §§ 548 and 550, the Trustee now must plead particularized allegations

that initial transferees had actual knowledge of BLMIS's fraud or willfully blinded themselves to

circumstances indicating a high probability of fraud at BLMIS.[26]  For the reasons set forth

below, the Trustee should be permitted to file the Second Amended Complaint.

## ARGUMENT

## I.    Standard Governing Motion for Leave to Amend a Pleading

Under Federal Rule of Civil Procedure 15(a)(2), made applicable here by Federal Rule of

Bankruptcy Procedure 7015, a party may amend its pleading with leave of court, which shall be

"freely give[n] when justice so requires."  Rule 15 should be liberally construed.  *See BNP*

*Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 272 (S.D.N.Y. 2012) ("the rule

is 'interpreted liberally, [and] an amendment is normally permitted'") (alteration in original)

(quoting *Ohio Cas. Ins. Co. v. Transcon. Ins. Co.*, No. 05 6432 (BSJ) (RLE), 2016 WL 1540540,

at *1 (S.D.N.Y. May 31, 2006)).  "Generally, amendments are favored because they 'tend to

facilitate a proper decision on the merits.'"  *Picard v. Mendelow (In re BLMIS)*, 560 B.R. 208,

221 (Bankr. S.D.N.Y. 2016) (quoting *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F.

Supp. 2d 428, 472 (S.D.N.Y. 2013)).

---

[25] The Trustee's PSAC also removes the claims dismissed by the *Bankruptcy Court ET Decision* and makes conforming changes to background allegations.

[26] By seeking to file an amended pleading, the Trustee does not concede that the District Court's decisions regarding the pleading burden and standards for Defendants' good faith are correct.  The Trustee has filed for certification to the Second Circuit to appeal those decisions. *See Picard v. Legacy Capital Ltd (In re Bernard L. Madoff Inv.)*, No. 19-4283 (2d Cir.), ECF No. 1; *Picard v. Citibank, N.A., et al.*, No. 19-4282 (2d Cir.), ECF No. 1.

In the Second Circuit, a party may amend its pleadings in the absence of: (1) bad faith; (2) prejudice to the opposing party; (3) undue delay in bringing the motion; and (4) futility of the amendment. *Fjord v. AMR Corp. (In re AMR Corp.)*, 506 B.R. 368, 382 (Bankr. S.D.N.Y. 2014). As long as the moving party demonstrates colorable grounds for relief, justice requires the court to permit amendment. *Kaster v. Modifications Sys., Inc.*, 731 F.2d 1014, 1018 (2d Cir. 1984), *abrogated on other grounds by Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229 (2d Cir. 2015); *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 436–37 (S.D.N.Y. 2006).

Courts in this Circuit regularly grant leave to amend when there are intervening changes in the law. *Mendelow*, 560 B.R. at 221; *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012); *Hamilton v. City of New York*, No. 06-cv-15405 (DC), 2011 WL 1842990, at *3 (S.D.N.Y. May 10, 2011); *McBeth v. Gabrielli Truck Sales, Ltd.*, 731 F. Supp. 2d 316, 320–21 (E.D.N.Y. 2010); *Tuosto v. Philip Morris USA Inc.*, 672 F. Supp. 2d 350, 366 (S.D.N.Y. 2009).

Decisions rendered since the commencement of this case concerning the Trustee's standing to assert common law claims for damages, the standard for pleading good faith, the section 546(e) safe harbor, and the extraterritorial application of SIPA have narrowed the Trustee's avenues for recovery and changed the applicable standards. By this motion, the Trustee seeks to amend his pleading to meet the standards established in those decisions.

## II.    Defendants Will Not Be Prejudiced by the Proposed Amendments

Prejudice turns on whether an amendment "would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725–26 (2d Cir. 2010) (internal quotation marks and citation omitted). "If no

10

prejudice is found, then leave normally will be granted." 6 Wright & Miller at § 1484 (3d ed. 2004, 2017 Supp.).

The party opposing amendment has the burden of proving that leave to amend would result in "actual prejudice, not the possibility of prejudice." *Mendelow*, 560 B.R. at 224. Whether a party had prior notice of the amended content and whether the amended complaint considers the same transactions as the original pleading are central to analyzing prejudice. *See M.E.S., Inc. v. Safeco Ins. Co. of Am.*, No. 10-CV-02709 (PKC)(VMS), 2014 WL 2931398, at *3 (E.D.N.Y. June 27, 2014) (granting leave to amend and rejecting the defendant's claim of "surprise" where the proposed amended pleading "mostly elaborate[d]" on the earlier pleading); *see also Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 262 (S.D.N.Y. 2009); 6 Wright & Miller, Fed. Prac. & Pro. § 1487 (noting that courts allow amendments when the "opponent could not claim surprise, but effectively should have recognized that the new matter included in the amendment would be at issue").

Granting leave to amend would not prejudice Defendants, much less cause the undue prejudice required to deny amendment. The PSAC does not add claims or parties, nor does it change the Trustee's approach in a way that would prejudice the Defendants. Further, Defendants are aware of the amended content the Trustee pleads in the PSAC due to prior negotiations, settlement discussions, and mediation. The Trustee has always sought to avoid and recover fraudulent transfers from the Defendants; it is only the altered pleading and proof standards that necessitate the Trustee's amendment.

## III.    Amending the Complaint Would Not Be Futile

To succeed on his claims, the Trustee must show that the Defendants had actual knowledge of Madoff's fraudulent trading activity, or alternatively, were willfully blind to Madoff's fraud. The PSAC sufficiently pleads that the Defendants were willfully blind to

Madoff's fraud and as such, it is not futile.  *See Jefferson Ins. Co. v. Rouhana (In re Winstar Commc'ns)*, No. 01 CV 3014 (GBD), 2006 WL 473885, at *2 (S.D.N.Y. Feb. 27, 2006) (on a motion for leave to amend, "[t]he Court need not determine the merits of the claims, but must simply determine that the proposed claims are colorable and not frivolous").  The party opposing amendment has the burden of proving that leave to amend would be futile.  *Margel v. E.G.L. Gem Lab Ltd.*, No. 04 Civ. 1514 (PAC)(HBP), 2010 WL 445921, at *3 (S.D.N.Y. Feb. 8, 2010) (citations omitted); *Ho Myung Moolsan Co.*, 665 F. Supp. 2d at 250 (citations omitted).

The futility inquiry turns on whether the amended complaint could withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).  To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Fed. Treasury Enter. Sojuzploimportdo v. SPI Spirits Ltd.*, 726 F.3d 62, 71 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Mendelow*, 560 B.R. at 225 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  It is particularly important for the Court to draw reasonable inferences in favor of the plaintiff with respect to facts pleaded about a defendant's knowledge or state of mind, as such elements are rarely proven by direct evidence. *See, e.g.*, *Silverman v. A-Z Rx., LLC (In re Allou Distribs., Inc.)*, Adv. No. 04-8369-ESS, 2012 WL 6012149, at *16 (Bankr. E.D.N.Y. Dec. 3, 2012) (quoting *Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*, 446 B.R. 32, 51–52 (Bankr. E.D.N.Y. 2011)).

12

In order to demonstrate that his amendment is not futile under Rule 15, and that he states a plausible claim, pursuant to Rule 12(b)(6), to recover initial transfers in this case, the Trustee must plausibly allege that Defendants lacked good faith by either having: (i) actual knowledge, or (ii) willfully blinding themselves to circumstances indicating a high probability of fraud at BLMIS. *Picard v. Magnify, Inc. (In re BLMIS)*, 583 B.R. 829, 841 (Bankr. S.D.N.Y. 2018) (collecting cases); *Picard v. Katz*, 462 B.R. 447, 455 (S.D.N.Y. 2011). According to this Court, knowledge and good faith are two distinct, but overlapping, elements under section 550(b) of the Bankruptcy Code. *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 198 (Bankr. S.D.N.Y. 2018) ("*BNP*"); *Legacy*, 548 B.R. at 38–39. To plead knowledge, the Trustee must allege that Defendants "possessed knowledge of facts that suggest a transfer may be fraudulent." *BNP*, 594 B.R. at 198 (internal citations omitted). Alternatively, to plead a lack of good faith, the Trustee must "allege that each Defendant willfully blinded itself to facts suggesting a high probability of fraud at BLMIS." *Id.* at 197. Willful blindness requires the Trustee to plead that: (1) the defendants subjectively believed there was a high probability that a fact existed, and (2) the defendants took deliberate actions to avoid learning of that fact. *Id.* Willful blindness "connotes [a] strong suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate failure to acquire knowledge of its existence." *Merkin II*, 515 B.R. at 140.

It is important to note that willful blindness can rarely be determined as a matter of law. *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 685 (7th Cir. 2014) ("Consistent with these observations, we have said that finding the line between 'willful blindness' and 'reason to know' may be like finding the horizon over Lake Michigan in a snowstorm . . . In other words, only rarely could that line be drawn as a matter of law.") (citations omitted). Thus, the court should

13

not prematurely determine whether the Defendants were in fact willfully blind and should grant

leave to amend.

A.    **The PSAC Sufficiently Alleges That Defendants Subjectively Believed There Was a High Probability of Fraud at BLMIS**

Leave to amend should be granted here because the PSAC sets forth facts that would

permit this Court to draw the reasonable inference that Defendants received transfers from

BLMIS, willfully blinding themselves to the high probability of fraud.  *First*, Access formed

Luxalpha in the face of numerous concerns BNP Paribas raised about BLMIS when it was

Oreades's prime bank, administrator, and custodian.  (PSAC ¶¶ 81–83.)  *Second*, the Feeder

Fund Defendants and their agents knew of, but chose to ignore, the myriad reasons that prompted

other UBS entities to refuse to invest in BLMIS.  Finally, the Feeder Fund Defendants and their

agents were aware of and acknowledged numerous red flags, including: (i) Madoff's acting in

multiple roles for the Feeder Fund Defendants; (ii) impossible trading, based on a review of

BLMIS account statements; (iii) Theodore Dumbauld's and Chris Cutler's analyses of BLMIS's

option trades and trading strategy; (iv) the lack of identified counterparties; and (v) Madoff's

unorthodox policies and practices.  (PSAC ¶¶ 78, 147–202.)

1.    *Access Formed Luxalpha Notwithstanding the Warning Provided by the Closing of Oreades*

Before Luxalpha and Groupement Financier were formed, Littaye, Access, and BNP

Paribas operated Oreades, a feeder fund that BNP Paribas shut down in March 2004 because of

its awareness of the fraud risks involved with BLMIS investment.  In July 2003, BNP Paribas

began to express its concerns about BLMIS, identifying, in particular, the lack of transparency

regarding BLMIS's role as asset manager, BLMIS's role as custodian although it was not a bank,

and the proper segregation of Oreades's assets.  (PSAC ¶ ¶ 74–76.)  Additionally, BNP Paribas

raised concerns about the unusual amount of time between BLMIS's purported execution of

trades and the delivery of the confirmation of those trades to Oreades, inhibiting Oreades's

ability to verify trades.  (*Id.* ¶ 75.)  BLMIS was the only investment for which Access did not

have immediate or next-day trading transparency.  (*Id.* ¶ 76.)  BNP Paribas recognized that these

practices violated BNP Paribas's internal rules, Luxembourg law, and, likely, U.S. law.  (*Id.* ¶¶

78–79.)  As a result of these concerns, BNP Paribas forced Oreades to shut down.  (*Id.* ¶ 81.)

Unwilling to give up their lucrative relationship with Madoff—Oreades's BLMIS

investment generated significant fees—Villehuchet, Littaye, and Access established Luxalpha to

carry over Oreades's BLMIS investment to a new vehicle and continue to capture the fees that

Oreades generated.  (*Id.* ¶ 83.)  Before Oreades ceased operations in 2004, Access orchestrated a

plan to simultaneously close Oreades and open Luxalpha.  In UBS, Access found new partners to

replace BNP Paribas, whereupon they transferred Oreades's assets to fund Luxalpha, and within

a week of Oreades closing, opened a BLMIS Account.  (*Id.* ¶¶ 83–84.)  In February 2003,

Access, likewise, created Groupement Financier and in April 2003 opened a BLMIS account.

(*Id.* ¶ 94.)

### 2.  *UBS's Unwillingness to Invest in BLMIS*

In agreeing to serve as Luxalpha's manager and custodian, UBS SA disregarded the

findings of other UBS entities that had previously considered and rejected BLMIS as an

investment vehicle.  (*Id.* ¶¶ 99–105.)  As early as 2002, UBS analyzed BLMIS and developed

serious doubts.  (*Id.* ¶ 101.)  When UBS SA solicited input from a UBS division that had

previously analyzed BLMIS, that division reported that "it would be IMPOSSIBLE to generate

the returns that [Madoff] has produced since 1990."  (*Id.* ¶ 104.)  Additionally, they questioned

Madoff's practice of not charging fees, an oddity that, by itself, was reason enough for UBS to

stay away from BLMIS investment.  (*Id.*)

UBS SA was aware of these concerns and told Littaye not to pursue an Access client

seeking to create a Luxalpha-based leveraged product.  (*Id.* ¶ 107.)  UBS SA warned Littaye that

if the UBS analysts in Zurich were to find out that Madoff was behind Luxalpha, "we would be

killed."  (*Id.*)  Nonetheless, UBS continued as Luxalpha's and Groupement Financier's "official"

prime bank and custodian, responsibilities that they had contractually delegated to BLMIS.

Ultimately, UBS SA—acting on behalf of Luxalpha and Groupement Financier—dismissed

these and other concerns such as Madoff's roles as broker, custodian, and investment adviser,

concluding that despite the risk, they could not miss out on the opportunity to make millions. (*Id.*

¶¶ 91–92.)  When deciding whether to invest in BLMIS, Bernd Stiehl, a Luxalpha director and

UBS SA managing director, disregarded the concerns and stated that "[b]usiness is business.  We

cannot permit ourselves to lose 300 million.  Accept client."  (*Id.* ¶ 91.)

       3.   *Red Flags*

The Feeder Fund Defendants' and their agents' conduct in the face of significant

evidence of fraud at BLMIS amounted to willful blindness.  "'[W]illful blindness' may be

inferred from the presence of a pattern of 'red flags' putting defendant on notice of the illegal

source of the funds." *Merkin II*, 515 B.R. at 139–140 (citation omitted).  Here, Defendants were

similarly aware of and acknowledged numerous red flags and the PSAC alleges many of the

same "red flags" as the Trustee's Third Amended Complaint in *Merkin II*, which this Court

found were sufficient to defeat a motion to dismiss.  *Id.* at 144.  In *Merkin II*, the Court noted that

Merkin saw and appreciated many red flags:

He was aware, among other things, that the volume of options transactions that Madoff reported were impossible and exceeded the total volume of option trades in the market, he knew that BLMIS's returns were too good to be true and lacked any correlation to the performance of the S & P 500, he knew that BLMIS cleared its own trades and did not use a third party custodian, he had been warned that Madoff's use of a strip mall accounting firm was a "red flag," and BLMIS used an unusual fee structure.

*Id.* at 141. These facts were sufficient for the Court to find that the Trustee sufficiently pleaded that Merkin was aware of a high probability of fraud at BLMIS and those same facts are present here with regard to both Luxalpha and Groupement Financier. *Id.* at 144.

a.    *Madoff's Numerous Roles*

The fact that Madoff was Luxalpha's broker, custodian, and investment adviser was, standing alone, cause for concern. According to a UBS AG (Zurich) employee, UBS "normally [has] to give 'NO' as the answer in cases like Madoff" because of the industry standard that no entity should occupy the position of a broker and custodian at the same time." "Such a NO," the UBS AG employee commented, "is easy to comprehend for both business policy and risk reasons." (PSAC ¶ 90.) This warning did not account for Madoff's third role of investment adviser. By allowing Madoff to serve in these three roles, Luxalpha violated Luxembourg law prohibiting custodians of UCITS funds from delegating custodial functions and from appointing a single entity as both custodian and investment manager. Luxalpha circumvented this law by lying to the Commission de Surveillance du Secteur Financier (the "CSSF"), identifying one UBS entity as Luxalpha's custodian and another UBS entity and Access as its portfolio manager. The very purpose of the UCITS regulations was to protect against fraud, yet Luxalpha and its agents deliberately disregarded the regulations.

17

     b.    *Luxalpha's Internal and External Investigations Revealed Significant Evidence of Fraud*

The Trustee alleges that, during the course of their BLMIS investment, Defendants developed further concerns based on the review of Luxalpha's and Groupement Financier's respective account statements. Defendants could see that trades were purportedly being made at impossible times and prices. (PSAC ¶¶ 160–64, 167, 169.) The account statements included clear market impossibilities that illustrated the fact that Madoff could not be executing all the securities transactions reported therein. (*Id.* ¶¶ 147, 162, 167.) These concerns led Dumbauld, an Access partner and Chief Investment Officer of AIA LLC, to conduct his own analysis and determine that the option trades reported by BLMIS could not be taking place. (*Id.* ¶ 148.) To test Dumbauld's findings, Access hired external consultant Chris Cutler. (*Id.* ¶ 149.) Within four days, Cutler easily confirmed Dumbauld's findings concerning the reported option trades. (*Id.* ¶¶ 150–51.)

Cutler also identified: (i) serious problems with the feasibility of Madoff's strategy—that the Split Strike Conversion ("SSC") strategy could not work, the claimed rates of return were impossible, and the assets under management were too voluminous for Madoff to be able to implement the strategy without moving the market against himself; (ii) the lack of any independent verification of trades or assets; and (iii) the opportunity for fraud caused by the delayed, paper confirmation—the only way in which BLMIS reported trades to the Feeder Fund Defendants and their service providers. (*Id.* ¶ 156.)

     c.    *Lack of Identified Counterparties*

Cutler was also unable to identify any of Madoff's purported counterparties. (*Id.* ¶ 178.) This concern was not new to the Feeder Fund Defendants and their agents: at least one Access client demanded disclosure of BLMIS's counterparties, and when that demand remained

18

unsatisfied the client contacted Madoff directly.  (*Id.* ¶¶ 181–82.)  Madoff then contacted Littaye,

stating that he would not identify counterparties unless there was a default, and that there was no

risk because the options were part of "portfolio assurance programs."  (*Id.* ¶ 182.)  Even though

the Feeder Fund Defendants would have been exposed to substantial losses had a counterparty

defaulted or failed to perform, the funds never reviewed any counterparty agreement or OTC

transaction confirmation.  (*Id.* ¶¶ 180, 184.)  Luxalpha further concealed the counterparty risk by

falsely reporting to its auditors that UBS AG had approved the option counterparties.  (*Id.* ¶ 186.)

Moreover, the Feeder Fund Defendants knew through UBS that the SEC was eager to identify

Madoff's counterparties and had requested such information from UBS in a draft document

request to UBS's U.S. offices.  (*Id.* ¶ 185.)  In 2006, the SEC's Enforcement Staff sought to

confirm whether any of UBS's European affiliates had served as one of Madoff's OTC option

counterparties.  (*Id.*)  The Feeder Fund Defendants knew through their relationship with UBS

that no UBS entity had ever acted as a counterparty to an option trade with BLMIS's Investment

Advisory Business.

               *d.*     *Impossibly Consistent Returns*

      Defendants understood that it was impossible to legitimately achieve the consistent

returns Madoff claimed to achieve through the SSC strategy; the SSC strategy could not yield the

returns reflected in the customer statements.  Access had previously suspected that Madoff was

engaging in illegal frontrunning or illicitly using his market making operation to generate such

consistent returns.  (*Id.* ¶ 168.)  As early as 1999, while running Oreades, Access had concerns

that Madoff was front-running. (*Id.* ¶¶ 166–68.)  An internal review of Oreades's returns

acknowledged the irregularity of having "no negative months and very stable positive

performance." (*Id.* ¶ 166.)  Luxalpha and Groupement Financier, likewise, generated similarly

implausible returns, unblemished by negative months—hallmarks of fraud. (*Id.* ¶¶ 164–65.)

> e.    *Madoff's Unorthodox Policies and Practices*

Access and UBS established practices and procedures for handling Luxalpha's and

Groupement Financier's accounts that violated Access's and UBS's own internal policies as well

as industry standards.  For example, Madoff insisted that his name never appear on any official

Feeder Fund document—he was not to be listed for any of his numerous roles.  (*Id.* ¶¶ 197–99.)

Access and UBS complied with this request even though it meant violating applicable laws. (*Id.*)

Littaye even assured Madoff that "by no means" would Madoff's name appear in Luxalpha's

prospectus.  (*Id.* ¶ 200.)

Access knew that BLMIS used Friehling & Horowitz, a small, nearly unknown auditing

firm, for the reports it filed with the SEC and provided to investors.  (*Id.* ¶ 203.)  After

conducting preliminary research, Access expressed concern about Friehling & Horowitz's ability

to provide large-scale and international auditing services to BLMIS, but inquired no further and

took no further action. (*Id.* ¶¶ 204–06.)

## B.    The Feeder Fund Defendants Deliberately Avoided Confirming BLMIS's Fraud

The Trustee sufficiently alleges facts to establish the second prong of willful blindness—

that the Feeder Fund Defendants consciously avoided learning of BLMIS's fraud.  "[A] willfully

blind defendant is one who takes deliberate actions to avoid confirming a high probability of

wrongdoing and who can almost be said to have actually known the critical facts."  *State v.

United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 667 (S.D.N.Y. 2017) (citations omitted).

Importantly, "the standard does not require proof of an identifiable 'affirmative act'" and merely

refers to a "requisite state of mind."  *Id.*; *see also United States v. Fofanah*, 765 F.3d 141, 150

(2d Cir. 2014) (Leval, J., concurring) ("A finding that a defendant's ignorance of incriminating

facts was a conscious choice on the defendant's part in no way requires a finding that the

defendant took affirmative steps to avoid gaining the knowledge.").

Where, as here, the Trustee alleges that Defendants appreciated facts indicating a high

probability of fraud yet consciously decided to suppress this information and shield BLMIS from

scrutiny, the Trustee has sufficiently alleged deliberate avoidance. *See Fofanah*, 765 F.3d at 150

(Leval, J., concurring) (Conscious avoidance "means only, as we have repeatedly stated in

reciting the standard, that there must be evidence from which a jury could find that the defendant

was aware of a high probability of the critical incriminating facts and consciously decided to act

without confirming them.").

The Trustee alleges that despite Defendants' awareness of signs of fraud at BLMIS,

Luxalpha's and Groupement Financier's directors, managers, and agents deliberately avoided

confronting such facts, going so far as to conceal, suppress, and ignore concerns or inquiries.

Access protected Madoff—Littaye's personal friend—through deflection and deceit, never

seeking answers to the questions that lay before them. Access ignored its own internal due

diligence policies with respect to BLMIS, allowing investment in BLMIS while eschewing its

requirements that fund managers submit to Access's standard battery of tests, including its

extensive due diligence questionnaire, handwriting analysis, and monthly site visits from the

Access diligence team.

Access concealed Madoff's involvement in Luxalpha and Groupement Financier without

ever questioning why Madoff demanded his name not appear on any prospectuses or regulatory

filings. (PSAC ¶¶ 197–99.) Luxalpha simply complied with the request—to the point of

creating a UCITS fund that falsely purported to comply with regulations intended to prevent the

very kind of fraudulent structure that Access and BLMIS created.  (*Id.* ¶¶ 127, 134–35.)

Likewise, UBS protected Madoff by intentionally misleading U.S. and Luxembourg regulators

with regard to BLMIS's roles, responsibilities, and options trading partners.  (*Id.* ¶¶ 132–33.)  In

an internal meeting, Littaye acknowledged that Access took "a small risk for Luxalpha" by

helping BLMIS evade the SEC.  (PSAC ¶ 63.)  And despite internal discussions regarding the

falsity of these representations, Access prepared marketing materials that included a chart

detailing anti-fraud regulations that Groupement Financier satisfied.  (PSAC ¶¶ 143–46.)

Access suppressed additional inquiry into matters that did not reflect favorably on

Madoff.  Access expressed concern over how Madoff could legitimately achieve consistent

returns, but Littaye simply dismissed the concerns out of hand, and pointed to the three models

BLMIS purported to use in making decisions on when to enter and exit the market.  (*Id.* ¶ 169.)

Access accepted these models, even though they made no sense and Access's research staff was

provided no details about them.  (*Id.*)  When an investor reached out to Madoff directly after

Access's failure to provide adequate answers, Villehuchet told the investor not to send any more

inquires to Madoff directly.  (*Id.* ¶ 183.)  When Cutler determined that the trades BLMIS

purported to execute under the SSC strategy were impossible, he was not asked to produce a

formal report or put his findings in writing, as he had previously done.  Instead he gave an oral

report to Littaye, Villehuchet, Dumbauld, and Chantal Lanchon, a long-time trusted adviser to

Littaye and Villehuchet.  (*Id.* ¶¶ 188–89.)  Cutler concluded that Access should exit BLMIS, a

recommendation that displeased Littaye.  Rather than accept Cutler's conclusion, Littaye

questioned Cutler's "business judgment."  (*Id.* ¶ 190.)  Littaye, who by this time had assumed

sole responsibility for due diligence of Access's BLMIS investment, prioritized Access's

relationship with Madoff over Cutler's warnings, no doubt because Access's BLMIS business

was outperforming other parts of its business. (*Id.* ¶¶ 123–24, 190.) Cutler reached out to

Dumbauld in an attempt to follow up with Littaye, and was told that "[Littaye] is highly sensitive

and defensive of the situation." (*Id.* ¶ 191.) Cutler was not afforded his requested follow-up call

with Littaye and his findings were not shared outside of the meeting. (*Id.* ¶¶ 192–93.) Cutler

said that it was "understood" that his conclusion would not be shared beyond the meeting. (*Id.* ¶

193.) Although he had taken on sole responsibility for the ongoing due diligence of BLMIS at

Access, Littaye yet again turned away from the evidence showing that BLMIS was a fraud,

choosing to protect his close—and Access's lucrative—relationship with Madoff over the facts

before him.

Littaye never questioned Madoff, even when Madoff's responses were nonsensical.

When confronted with Madoff's refusal to provide the names of counterparties, Littaye took

Madoff at his word, even though Littaye's notes reflect that he had never before heard of a

"portfolio assurance program" and had no idea what such a program was. (*Id.* ¶ 182.) Littaye's

complacency on behalf of Access, is representative of the Feeder Fund Defendants' willful

blindness.

The Trustee, in the PSAC, sufficiently pleads the Feeder Fund Defendants' and their

agents' willful blindness, illustrating Luxalpha's and Groupement Financier's awareness of the

impossibility of BLMIS's purported trading activity and performance, demonstrable suspicion of

fraud, and the deliberate actions of Feeder Fund Defendants' agents, officers, and directors to

suppress ample evidence of fraud and protect Madoff from scrutiny.

## IV.    There Is No Evidence That the Trustee Has Acted With Undue Delay or Bad Faith

The mere passage of time, in the absence of bad faith, does not warrant a denial of leave

to amend. *See, e.g.*, *Commander Oil Corp. v. Barlo Equip. Corp*., 215 F.3d 321, 333 (2d Cir.

2000); *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d Cir.1995); *Block v. First

23

*Blood Assocs.*, 988 F.2d 344, 350–51 (2d Cir 1993); *Margel*, 2010 WL 445192, at *10–11. This factor largely turns on whether the party acted in good faith during the delay, rather than the length of the delay. *Commander Oil Corp.*, 215 F.3d at 333. "Delay is rarely fatal to a Rule 15 motion if it can be explained." *Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*, No. 13 Civ. 1654 (RA) (HBP), 2015 WL 4097927, at *7 (S.D.N.Y. July 6, 2015).

The Trustee has acted in good faith and has not delayed in seeking leave to amend. Between December 2010 and now, the Trustee has actively litigated case-wide issues of law pertaining to this proceeding, including the good faith standard and the extraterritorial application of SIPA. These issues bear directly on the Trustee's allegations of fact, the parties named as defendants, and the evidence required to prove the Trustee's claims. Further, the parties have engaged in good-faith settlement negotiations, a stay of motion practice, and mediation—the most recent of which spanned over a year and a half—which have contributed to the passage of time. The timing of this request merely reflects this complex procedural history of this proceeding and the Parties' intentions. This Court found in *Mendelow* that the dramatic change in the legal landscape, spanning several years, "explains the delay in moving for leave to amend." *Mendelow*, 560 B.R. at 223. "The Trustee should not be penalized and the defendants should not be rewarded for a delay in which everyone acquiesced." *Id.*

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that this Court grant his motion for leave to file his Second Amended Complaint.

Dated: March 2, 2020
     New York, New York

By:    */s/ Oren J. Warshavsky*

     **Baker & Hostetler LLP**
     45 Rockefeller Plaza
     New York, New York 10111
     Telephone: 212.589.4200
     Facsimile: 212.589.4201
     David J. Sheehan
     Email: dsheehan@bakerlaw.com
     Oren J. Warshavsky
     Email: owarshavsky@bakerlaw.com

     *Attorneys for Irving H. Picard, Trustee*
     *for the Substantively Consolidated SIPA*
     *Liquidation of Bernard L. Madoff*
     *Investment Securities LLC and the*
     *Chapter 7 Estate of Bernard L. Madoff*

25