# **EXHIBIT 9**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br>  v.<br><br>Edward A. Zraick, Jr., individually and as joint tenant; Nancy Zraick, individually and as joint tenant; Patricia Zraick DeLuca, individually and as joint tenant; Karen M. Rich, individually and as joint tenant; Estate of Lorraine Zraick; Edward A. Zraick, Jr., as personal representative of the Estate of Lorraine Zraick; and Patricia Zraick DeLuca, as personal representative of the Estate of Lorraine Zraick,<br><br>    Defendants. | Adv. Pro. No. 10-05257 (SMB) |

**EXPERT REBUTTAL REPORT**
**OF**
**BILL FEINGOLD**

**February 13, 2017**

## I. Introduction

1. I have been retained by the law firm Hunton & Williams LLP to provide my expert opinion regarding certain matters involving convertible securities pertaining to Bernard L. Madoff Investment Securities (BLMIS) and certain of its clients. These matters are addressed in the Expert Report of Mr. Bruce Dubinsky, paragraphs 82-118. This report is confined to addressing those paragraphs of Mr. Dubinsky's report as well as the exhibits and tables referenced therein.

## II. Expert Background and Qualifications

2. I am co-founder and managing principal of Hillside Advisors LLC, a research and consulting firm founded in 2014. Hillside's work focuses on the convertible-securities market. We also are involved in related asset classes including high-yield bonds, small-capitalization stocks and options. Since July 2014 Hillside has regularly published *Hybrid Vigor*, the only analytical newsletter dedicated to the convertible market. To date we have published over 135 editions. *Hybrid Vigor* includes regular statistical features employing two proprietary risk and rating measures, HOCS™ (Hillside Overall Convertible Score) and HARP (Hillside Adjusted Risk Points) we have developed.

3. In addition to our publishing and research efforts, Hillside has been retained for major consulting assignments. We were hired as outside experts in a dispute between a hedge fund and its prime broker (i.e., lending bank) regarding the valuation of convertible securities during the financial crisis of 2008-2009. The dispute involved accounts with multiple billions of dollars of securities. We have also been hired to test the accuracy of methodologies being used by a major self-regulatory agency.

4. I earned a Bachelor of Arts degree in economics from Yale University, where I was elected to Phi Beta Kappa in my junior year and graduated *summa cum laude*. I was awarded the Arthur Twining Hadley Prize at Yale as the top graduating senior in social sciences. I also received a Master of Business Administration degree in finance, with distinction, from The Wharton School of the University of Pennsylvania.

5. In my career I have worked with stocks, bonds, and options, but my primary focus has been convertible securities. I began trading convertibles in late 1993 when I was employed by PaineWebber Incorporated after working for PaineWebber for more than two years in equity derivatives (primarily options) research and trading. Since then, in addition to being a market-making convertible trader, I have been a publishing analyst (with Lehman Brothers) and a hedge-fund portfolio manager and partner. I was also employed by Goldman Sachs as a convertible trader responsible for managing positions valued at over half a billion dollars.

6. I am also the author of two books dealing in large part with convertible securities. The most recent was published by Financial Times Press in 2012. I am regularly asked to

comment on convertible-market developments in the major financial media including Bloomberg, CNBC, *The Wall Street Journal* and Fox Business.

7. My other qualifications are listed on my CV, which is included in this report as Attachment 1.

8. Hillside Advisors LLC is being compensated at the rate of $575 per hour for my work in this matter. This compensation is in no way contingent upon any finding or result in this matter. This report has been prepared in connection with the above-captioned litigation and is to be used only for the specific purposes of this litigation. This report is not to be used for any other purpose without the express written consent of Hillside Advisors LLC. I am the person solely responsible for the opinions contained in this report.

9. A list of the materials considered in forming my opinions and conclusions rendered in this report is included in this report as Attachment 2.

10. I have not testified as an expert at trial or by deposition during the previous four years.

11. A list of publications authored in the previous ten years is included in this report as Attachment 3.

### III. Analysis

12. The section of Mr. Dubinsky's report discussing convertible strategies relies heavily on the implicit assumption that accurate and complete market data were publicly available during the period in question (the 1970s through the early 1990s). In fact, they were not. Mr. Dubinsky even acknowledges this in footnote 105, where he cites the distinction between bonds traded on the New York Stock Exchange (NYSE) and those traded in the over-the-counter (OTC) market.

13. Most trading in bonds, unlike stocks, takes place in the OTC market. On an exchange like the NYSE, trading is centralized and prices are determined through continuous auctions in which the highest bidder and lowest seller transact and investors trade directly with each other. On the website investinginbonds.com, which is maintained by SIFMA (Securities Industry and Financial Markets Association), investors are told "The OTC market is much larger than the exchange markets, and the vast majority of bond transactions, even those involving exchange-listed issues, take place in this market."

14. In an OTC market, investors do not trade directly with each other, but with many individual dealers who continuously make markets (buy and sell). As such, OTC markets are much less centralized and data are less readily available.

15. Bonds, unlike stocks, trade OTC for a number of reasons. There are far more bonds than stocks—a company typically only has one class of common stock, but it might have dozens of bonds. Investors generally buy bonds for capital preservation and income, not for appreciation, unlike most stocks. Thus bonds are not as well designed for active trading as stocks. Auction markets such as the NYSE rely on steady order flows. OTC

2

markets are better characterized as "trade by appointment". The foregoing explain why trading volumes on the NYSE cannot be used to measure activity in the corporate (including convertible) bond market. Beginning in 2002 bond dealers have been required to report many trades through the TRACE (Trade Reporting and Compliance Engine) system, and while even TRACE data have certain limitations that help protect the information possessed by bond dealers, they make analysis of bond trading much more feasible than previously. However, TRACE did not come into being until 10 years after the convertible activity discussed in Mr. Dubinsky's report ceased.

16. NYSE bond volume in 1985, during which the Macmillan (paragraph 91) case study Mr. Dubinsky presents took place, averaged $35.9 million per day. This was a significant increase from the five previous years, none of which saw daily average volume of even $30 million.

17. Because TRACE data were not available before 1982 it is impossible to quantify precisely how much greater OTC volumes were in 1985. But in 2002, the first year of TRACE data, the corporate bond market had average daily volume of $17.8 billion (with a "b") according to SIFMA.

18. Also from SIFMA: the corporate debt outstanding at year-end 1985 totaled $777 billion. By year-end 2002 the balance had grown to $4.039 trillion. If we assume that daily volumes in 1985 were approximately the same percentage of the amount outstanding as in 2002, we can estimate that volumes in 1985 were on the order of $3.4 billion. This suggests that the $35.9 million exchange-traded volume represented approximately 1% of total bond trading.

19. Thus, when Mr. Dubinsky cites data from the NYSE to support his arguments about bond volume, he is treating approximately 1% of the activity as indicative of the entire market.

20. Also in his footnote 105, Mr. Dubinsky cites the Standard & Poor (S&P)'s Bond Guide as a presumably reliable source of monthly high and low prices for bond trading both on the NYSE and in the OTC market. But given the diffusion of the OTC market and the lack of a system like TRACE during the period in question, this is plainly nonsense. There would have been no formal manner for S&P to collect these data. The best S&P might have done would have been to gather quotes from individual dealers. Trading data were highly valuable proprietary information and dealers would have clung to it—I know this, having been a convertible market maker in the 1990's. My colleagues, competitors and I would sometimes provide general quotes for pricing services. We would never tell them about actual trades. Mr. Dubinsky's assertion in footnote 105, that Macmillan convertibles could not have traded at 138 on January 9, 1985, because that price is lower than the low for January 1985 as reported in the S&P Bond Guide, cannot stand.

21. A more probable account of the difference between the price of the Macmillan convertible in the customer ledgers and the price range in the S&P Bond Guide would show that the underlying stock traded at a lower price on January 9, 1985 than it did on the dates S&P used for its observations.

3

22. The hedging trades accompanying the convertible bond purchase at 138 indicate sales of common shares at an average price of $44.86 the day following the bond purchase. The customer apparently purchased the bond and then waited a day, choosing to take market risk to be able to lock in a better price for the hedge. The strategy worked, as the customer was able to sell shares for presumably more than the previous day's market price, locking in a gain of nearly $85,000.

23. Mr. Dubinsky's assertions, that convertible trades must have been fictitious because they do not conform to NYSE data, have no basis in fact. Specifically, his assertion that Macmillan convertibles could not have traded on January 9, 1985, because the bonds did not appear in a table typically representing about 1% of the actual trades that took place on a given day, is nonsensical.

24. As for Mr. Dubinsky's contention in paragraph 96, comparing ledger trades to the daily high and low prices shown in the New York Stock Exchange bond tables in major financial publications: the data in the tables only reflect, in all likelihood, a tiny fraction of the actual trading volume, and thus should not be deemed representative of the high and low trades that may have taken place.

25. Further, the largest determinant of convertible-bond prices is usually the stock price. This is certainly the case for highly equity-sensitive convertibles (where the underlying shares are trading above the conversion price, meaning ultimate conversion is likely). This type of convertible lends itself best to the type of arbitrage strategy pursued by the investment advisor in question. Such convertibles typically trade at relatively small premiums to the value of the shares they control and thus move nearly in lockstep with the shares.

26. Because of this, and because convertibles are usually issued by smaller companies with more volatile stock prices, it's highly likely that any given day's OTC convertible trades would frequently take place outside of the price range indicated by the (very small) group of trades done on the NYSE. Mr. Dubinsky cites in paragraphs 96 and 97 that 76% of the trades in customer ledgers fell outside the high and low prices in the NYSE-based tables and uses this as evidence that the customer trades must have been fictitious. In fact, given that the NYSE-based tables represent such a tiny percentage of the overall volume, it would have been much more suspicious had most of the customer trades fallen within the ranges Mr. Dubinsky used.

27. In paragraph 99, Mr. Dubinsky inaccurately describes the process by which convertible securities become common shares. He writes that "Many convertible securities have the option for the company to call the security at a predetermined date or at the company's discretion. That is, the company has the right to convert the convertible securities into common shares. In instances where the bond or preferred equity is called, the shares are converted on the record date at a determined amount." In fact, except for a specific sub-category known as "mandatory" convertible securities, the securities are convertible at the investor's discretion, not the issuing company's. When a company calls a security, the investor is then given a period, typically between 20 and 120 days, in which to decide

4

whether to convert the security into common shares or to accept the cash call price stipulated in the company's call notice.

28. Contrary to Mr. Dubinsky's assertion, convertible securities can and regularly do trade in the open market after they have been called. The window described in the preceding paragraph affords investors an opportunity to sell their securities in the open market to other investors and dealers who then make the decision whether to convert. Because of the paperwork and waiting periods that occur in the conversion process, many investors prefer to sell their securities during the call period described in the preceding paragraph.

29. It is thus plausible that the customer could have acquired the Macmillan convertible securities and the accompanying hedging position in the underlying stock on January 9, and January 10, 1985 and then put the securities in for conversion at a subsequent date (apparently, January 17, when a journal entry was made for the cash to be received upon conversion in lieu of a fractional share, presumably based on the market price that day), with the entry made to close out the position in March once the bonds had been delivered and the shares received. Indeed, the New York Times of January 14, 1985 reported a call announcement by the company in January requiring conversion before February 15, 1985 (thereby relieving the company of its obligation to pay the coupon due on that date), with the company subsequently delivering the shares.

30. Footnote 102 of Mr. Dubinsky's report contends that a significant percentage of the short positions reported by Madoff customers exceeded the amount of short interest in those stocks as reported at month-end by the stock exchange. I found this very dubious. Going through the list, I noticed that Pfizer, one of the world's largest drug companies, had short interest, according to Mr. Dubinsky's table, of 826,162 shares at the end of March 1992. Pfizer's closing price that month was $69.50 per share according to Yahoo Finance. Average daily trading volume in Pfizer was 10.74 million shares. If Mr. Dubinsky's data are correct, the short interest in Pfizer then constituted less than 8% of an average day's volume.

31. As I prepare this report, Pfizer's most recently reported short interest, as of mid-January 2017, was 37.9 million shares, according to the site shortsqueeze.com. According to Yahoo Finance, average daily volume is about 27.7 million shares. If Mr. Dubinsky's data are correct, which appears unlikely, Pfizer's short interest has gone from less than 8% of average daily volume to nearly 140%.

32. Another example: Wal-Mart, the giant discounter. Per Mr. Dubinsky's report, in August 1984, Wal-Mart had short interest of only 753,925 shares. Average daily volume that month was 8.11 million shares. The short interest was only about 9% of a day's trading.

33. Currently, Wal-Mart's short interest is 27.94 million shares, while average daily volume is just under 9 million shares. So short interest has, if Mr. Dubinsky's data are correct, gone from 9% to over 300% of average daily volume. This also seems highly unlikely.

5

34. Accordingly, I question both the accuracy of Mr. Dubinsky's short-interest data and his charges that the Madoff accounts had short positions inconsistent with market conditions.

35. Mr. Dubinsky asserts (paragraphs 101-104) that Madoff customers were not credited with dividend and interest payments they should have received. While he only gives a single example with only partial supporting data, it is entirely possible that income ended up being a very small part of the Madoff convertible arbitrage strategy when holding periods were very short.

36. Dividends are typically paid either quarterly or semi-annually. If an investor were to acquire a convertible preferred stock and then sell or convert within a period of a month or two—something very common with a trading-oriented strategy—it is likely that the investor would not collect any dividends.

37. With bonds, interest payments are often built into the bond price. When an investor purchases a bond, that investor typically pays the quoted price plus an amount reflecting the interest that has accrued since the most recent coupon payment.

38. For example, in Mr. Dubinsky's Table 2 covering the Macmillan convertible bond, line A shows 706,000 principal amount at a price of 138. By itself, this would equate to a dollar payment of $706,000*1.38 or $974,280. But the table shows a cash outflow of $1,000,191. The difference of $25,911 primarily reflects the accrued and unpaid interest from the previous coupon date of August 15, 1984. The trade would have settled on January 14, 1985, or essentially five months from the previous payment (the actual day count using the convention of 30-day months would have been 149). Multiplying the coupon of 8.75% by the $706,000 principal amount by 149/360 gives $25,568. The small unaccounted amount ($343) presumably covered other fees.

39. As above, an active trader would likely have held many convertible-arbitrage positions for substantially less than the period until the next (usually) semi-annual coupon was paid. Most likely, bonds were either converted or sold into the open market. Again, an investor who sells a corporate bond receives accrued interest from the buyer instead of collecting on the coupon date from the issuer, and the interest is built into the total cash inflow.

40. Mr. Dubinsky asserts that because one of the Madoff accounts held convertible preferred shares of Textron on June 15, 1982, which was a record date (meaning that holders as of that date were entitled to a dividend, in this case, of $0.52 per preferred share), the account should reflect receipt of the associated dividend but did not. However, Table 4 of Mr. Dubinsky's own report appears to contradict his assertion.

41. Per Table 4, the Madoff customer acquired the Textron convertible preferred shares and established an associated hedge in the underlying common shares on April 29 and 30th, 1982. The notation on May 7th for a cash amount of $18.90, addressed in paragraph 113 of Mr. Dubinsky's report, suggests that the preferred shares were put in for conversion on that date, not June 30th as asserted by Mr. Dubinsky.

6

42. While the receipt of the common shares via conversion and the elimination of the preferred shares are both indicated on the final day of the quarter, which may have been a practice of BLMIS (it is consistent with the treatment of the Macmillan securities discussed above), the conversion instructions were made over a month before the June 15 record date cited. Mr. Dubinsky appears to be confusing BLMIS' recordkeeping conventions with the actual conversion date. Consequently, it appears reasonable that the account did not receive the associated dividend.

43. Mr. Dubinsky's report asserts that in trades involving Aetna securities the trade confirmation reports (Figures 8-10) show the customer doing the opposite of the trades indicated by the statement in Figure 7. In fact, the trade confirmations appear to reflect not the customer's trades but the trades of BLMIS itself, acting as counterparty to the customer and not simply as agent. In other words, the confirmations shown by Mr. Dubinsky are the trades from BLMIS' point of view in its role as dealer, as described earlier in this report's explanation of the OTC market. The customer, accordingly, would have had the opposite trades of the ones shown in these confirms, which is consistent with the statement in Figure 7.

44. Mr. Dubinsky's report further asserts that BLMIS incorrectly reports the conversion of a customer's position in Cooper Industries, not giving effect to a stock split and thus crediting the customer with only half the appropriate number of shares. In the absence of further information, it is possible that this was simply an oversight in the update of BLMIS' internal database and not an example of fraudulent activity.

Respectfully submitted,

Bill Feingold

7

**Attachment 1**

**Curriculum Vitae**

# Bill Feingold

Co-Founder and Managing Principal at Hillside Advisors LLC

400 Columbus Ave Suite 240E

Valhalla, NY 10595

(646) 712-9289

bill@hillsideadvisors.com

---

## Summary

I have been a trader, portfolio manager, analyst, and author. I also enjoy teaching and have done so in a variety of settings, including seminars at my alma mater, Yale. My career has been focused on convertible securities for over 20 years. I have written two books dealing with convertibles--the most recent, *Beating the Indexes*, was published in May 2012 by Financial Times Press. I am recognized as an authority in the convertible market and am regularly quoted and interviewed in leading financial media such as Bloomberg, CNBC, Forbes.com, Fox Business and Minyanville.

---

## Experience

**Co-Founder and Managing Principal, Hillside Advisors LLC (Valhalla, NY)**
2014-

**Portfolio Manager, Wellesley Investment Advisors, Inc. (Wellesley, MA/New York, NY)**
2012-2013

**Managing Director, Convertible Securities Trading, BTIG LLC (New York, NY)**
2010-2012

**Columnist, Minyanville Media, Inc. (New York, NY)**
2008- 2010

**Vice President, Proprietary Convertible Trading, Goldman Sachs (New York, NY)**
2007-2008

**Consultant/Correspondent/Blogger, Schaeffer's Investment Research (Cincinnati, OH)**
2006-2007

**Partner and Portfolio Manager, FrontPoint Partners (Greenwich, CT)**
2003-2005

**Portfolio Manager, Clinton Group (New York, NY)**
2000-2003

# Experience (cont.)

**Visiting Lecturer, Yale University (New Haven, CT)**
1999-2000

   Taught (with Sky Lucas) residential-college seminar "Market Psychology and the Truth About Derivatives." Course was designed to educate liberal-arts undergraduates about derivatives and other Wall Street topics. My goal was to teach future policy makers how to think for themselves about finance so that they would not necessarily believe what they read in the newspapers.

**Head of U.S. Convertibles Research, Lehman Brothers (New York, NY)**
1998-1999

**Convertibles Trader, Credit Suisse First Boston (New York, NY)**
1997-1998

**Convertibles and Equity Derivatives Trader, PaineWebber Incorporated (New York, NY)**
1991-1997

**Analyst, Corporate Finance, Dillon, Read & Co. Inc. (New York, NY)**
1985-1987

# Education

**University of Pennsylvania - The Wharton School**
MBA in finance, 1991
Activities and Societies: Graduated with distinction. Finance teaching assistant, writer for Wharton Follies & newspaper. Founder, Wharton Thoroughbred Club.

**Yale University**
BA in economics, 1985
Activities and Societies: Phi Beta Kappa, *summa cum laude*. Hadley Prize: top social sciences graduate. Yale Precision Marching Band, U.S. Grant Foundation.

Publications

**Beating the Indexes**
Financial Times Press April 24, 2012

> You can beat the market by avoiding risk-averse, career-protecting investment managers and index-based strategies that are perfectly satisfied with mediocrity. Fact is, as indexing and quasi-indexing have become more prevalent, the dangers of these strategies have become more pronounced: a bias toward overvalued, overgrown, large-cap stocks likely to hit long periods of underperformance. But there's good news: If you're willing to invest a bit more of your own time, you have a much better chance of beating the pros than they want you to think. In Beating the Indexes, leading trader and Minyanville columnist Bill Feingold shows you how to systematically exploit the biases and mediocrity of index investors, and continuously make winning investments. Writing for individual investors as well as professional advisors and money managers, Feingold introduces a more profitable set of investing strategies based on convertible bonds and related alternative investments. In this surprisingly readable (even fun to read) book, each chapter exposes one index investing myth – and presents a powerful strategy for beating investors who still buy into it. If you're tired of minimal returns that disappear with the slightest market volatility, this is the book you've been searching for.

**The Undoing of Cowardice**
BookSurge August 19, 2009

> The Undoing of Cowardice by Bill Feingold, a former convertible bond trader at Goldman Sachs, is a provocative call to arms for individual investors. Humorous and helpful, Feingold reassures people that they can wrestle control of their investing decisions from professional money managers—and use common sense to manage their own financial decisions. To ease the process, he demystifies complex topics that Wall Street would rather obfuscate in order to keep its fees flowing. Feingold uses his two decades of financial experience to make this a guide that is both accessible and fun. Whether you're a seasoned investor or a novice, you can't afford not to take advantage of the tips, tricks, and expert advice Feingold offers. He also includes an invaluable compendium of his online investing columns which dispel even more myths about investing.

## Attachment 2

## List of Materials Considered

In addition to the materials cited in my report, the following materials were considered by me in issuing my opinions and conclusions. Documents identified below are to be considered inclusive of any and all exhibits to the particular document.

1. Expert Report of Bruce G. Dubinsky MST, CPA, CFE, CVA, CFF, MAFF, dated August 20, 2013.
2. *The New York Times*, January 14, 1985.
3. Bloomberg
4. Yahoo Finance
5. Nyse.com (website of the New York Stock Exchange)
6. Shortsqueeze.com, using short-interest data provided by NYSE and NASDAQ
7. Eyeonhousing.com, using data from the Securities Industry and Financial Markets Association (SIFMA)
8. Pipat Luengnaruemitchai and Li Lian Ong, *International Monetary Fund Working Paper*: *An Anatomy of Corporate Bond Markets: Growing Pains and Knowledge Gains*, July 2005.
9. Allcountries.org, using data provided by NYSE
10. Bruce Mizrach, *FINRA Office of the Chief Economist Research Note: Analysis of Corporate Bond Liquidity*, 2015. (Mr. Mizrach is professor of economics at Rutgers).
11. *BlackRock Viewpoint: Corporate Bond Market Structure: The Time for Reform Is Now*, September 2014.
12. Investinginbonds.com, managed by SIFMA (Securities Industry and Financial Markets Association)
13. David Hollingsworth and Emily Liner, *The Bond Market: How it Works, or How it Doesn't,* published on thirdway.org, February 27, 2015.
14. Chizoba Morah, *Why Are Most Bonds Traded on the Secondary Market "Over the Counter"?,* published on Investopedia.com.

## Attachment 3

## Publications

*Authored*

**Beating the Indexes**
Financial Times Press April 24, 2012

**The Undoing of Cowardice**
BookSurge August 19, 2009

*Contributed*

**Hybrid Vigor** (Regular newsletter of Hillside Advisors LLC)
Over 135 editions published on various subjects since July 2014.

I also have been a contributor to two financial websites: **Minyanville.com** and **Forbes.com**