**PORZIO BROMBERG & NEWMAN P.C.**
Brett S. Moore (BM-0014)
156 West 56th Street
Suite 803
New York, New York 10019-3800
(212) 265-6888 (telephone)
(212) 957-3983 (fax)

*Attorneys for Defendants Luxalpha Sicav as represented by its Liquidators Maitre Alain Rukavina and Paul Laplume, Maitre Alain Rukavina and Paul Laplume, in their capacities as liquidators and representatives of Luxalpha Sicav*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff, | SIPA LIQUIDATION |
| -v- | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES, LLC. | |
| Defendant. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04285 (SMB) |
| Plaintiff, | |
| -v- | |
| UBS AG, et al. | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT AND IN SUPPORT OF CROSS MOTION FOR CLAIM DETERMINATION AND ALLOWANCE**

4429215

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................ 1

I.    FACTUAL BACKGROUND AND THE TRUSTEE'S ALLEGATIONS ....................... 3

      A.    Luxalpha ............................................................................................ 3

      B.    UBS and Access ................................................................................. 3

      C.    The Filed Customer Claims And Objection To Jurisdiction ..................... 4

      D.    BNP Paribas and Oreades .................................................................. 7

      E.    Claims Set Forth In The PSAC Against Luxalpha ................................ 8

II.   APPLICABLE LEGAL STANDARDS ................................................................. 8

      A.    For Leave To Amend .......................................................................... 8

      B.    To State A Claim In These Proceedings Against Luxalpha .................... 10

            1.    Actual Knowledge ................................................................ 12

            2.    Willful Blindness .................................................................. 12

III.  ARGUMENT ............................................................................................... 13

      A.    BNP Paribas's Closing Of Oreades .................................................... 13

      B.    Allegations of Access Deflection ....................................................... 15

      C.    "UBS" Entities Refusal To Offer BLMIS To Private Clients While Agreeing
            To Serve As Luxalpha's Service Agents ............................................. 16

            1.    The "Impossible" Communications Are Taken Out Of Context ..... 16

            2.    In the AC The Trustee Admitted And Detailed UBS's Extensive Efforts
                  To Conduct Due Diligence On Madoff And BLMIS ...................... 22

            3.    UBS's Agreement To Accept BLMIS Structure For Luxalpha ....... 24

      D.    Alleged Red Flags ............................................................................ 29

            1.    Access/Cutler's Investigation ................................................. 31

2.      Other Alleged Red Flags....................................................................34

E.      Counts Five and Six---The Disallowance Claims ....................................................38

F.      Luxalpha's Cross-Motion For Claim Determination And Allowance Should
        Be Granted ....................................................................................................39

        1.      The Court Has Authority To Determine And Allow Luxalpha's Claims
                Under 11 U.S.C. §§ 502(b) And 105(a)........................................................41

        2.      The Trustee Is Not Entitled To Pursue Equitable Subordination If The
                Six-Year (Or, As the Case May Be, The Two-Year) Transfers Are Paid
                To The Estate....................................................................................................42

        3.      There Is No Basis To Equitably Subordinate A 502(h) Claim....................46

        4.      Madoff Victim Fund ....................................................................................48

CONCLUSION............................................................................................................................50

ii

## TABLE OF AUTHORITIES

Page(s)

### CASES

*131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507 (S.D.N.Y. 1995)............................................ 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 6, 9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ........................................... 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................... 9

*Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692 (5th Cir. 1977) ....................... 42, 45

*Century Glove, Inc. v. Iselin (In re Century Glove, Inc.),* 151 B.R. 327 (Bankr. D.
    Del. 1993) ............................................................................................................................. 45

*Concord Assocs., L.P. v Entm't Props. Tr.,* No. 12-cv-1667, 2014 WL 1396524
    (S.D.N.Y. April 9, 2014)....................................................................................................... 16

*First Trust & Deposit Company v. Receiver of Salt Springs National Bank (In re
    Onodaga Litholite Co.)*, 218 F.2d 671 (2d Cir. 1955) .................................................... 48

*Forman v. Davis*, 371 U.S. 178 (1962) ........................................................................................... 8

*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011) ......................................... 12, 29

*Good Faith Decision*, 516 B.R. at 21 ...................................................................................... 34, 37

*Hirsch v. Pennsylvania Textile Corp.* (*In re Centennial Textiles, Inc*.), 227 B.R.
    606 (Bankr. S.D.N.Y. 1998) ............................................................................... 44, 45, 47

*HSBC Holding PLC v. Irving H. Picard*, 17-2992(L) (U.S.).......................................................... 39

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
    Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015) ......................................................... 9

*In re 80 Nassau Assocs.*, 169 B.R. 832 (Bankr. S.D.N.Y. 1994) .................................................... 43

*In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 991 F. Supp. 2d 479
    (S.D.N.Y. 2014)..................................................................................................................... 16

*In re Bernard L. Madoff Investment Securities LLC (Picard v. Legacy Capital
    Ltd and Khronos LLC) ("Legacy")*, 548 B.R. 13 (Bankr. S.D.N.Y.
    2016)(SMB) ...................................................................... 24, 25, 26, 27, 30, 34, 35

*In re Best Prods. Co.*, 168 B.R. 35 (Bankr. S.D.N.Y. 1994) ........................................................... 48

4429215

*In re BLMIS*, 654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24 (2012) .........................1, 11

*In re Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 480 B.R. 480 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 55 (2d Cir. 2013)......................................................................................................................8, 15

*In re Centennial Textiles, Inc.*, 227 B.R. 606 (Bankr. S.D.N.Y. 1998).....................................44, 47

*In re East End Dev.*, 2017 Bankr. LEXIS 949 (Bankr. E.D.N.Y. 2017)..........................................42

*In re First Alliance Mortg. Co.*, 298 B.R. at 666..............................................................................47

*In re Granite Partners, L.P.*, 210 B.R. 508 (Bankr. S.D.N.Y. 1997)................................. 42, 43, 44

*In re Kansas City Journal–Post Co.*, 144 F.2d 791 (8th Cir. 1944)................................................45

*In re Monahan Food Corp. of Flushing*, 340 B.R. 1 (Bankr. E.D.N.Y. 2006)...............................43

*McGowan v. Wachovia Bank, N.A.* (*In re Dreier LLP*), 453 B.R. 499 (Bankr. S.D.N.Y. 2011) (SMB) ............................................................................................43, 44

*Messer v. Magee (In re FKF 3, LLC)*, 2106 U.S. Dist. LEXIS 117258 (S.D.N.Y. 2016)..........................................................................................................................41

*Negrete v. Citibank, N.A.*, 237 F. Supp. 3d 112, 129 (S.D.N.Y. 2017), *aff'd*, No. 17-2783-CV, 2019 WL 80773 (2d Cir. Jan. 3, 2019) .............................................10

*Net Equity Decision.* 654 F.3d at 240 ...............................................................................................41

*Pereira v. Prompt Mort. Providers of N. Am., LLC (In re Heavey)*, 608 B.R. 341 (Bankr. E.D.N.Y. 2019) ....................................................................................42

*Picard v. ABN AMRO Bank N.V.*, Adv. Pro. No. 10-05354(SMB) (Bankr. S.D.N.Y.), ECF No. 200 at p. 24 (*"ABN AMRO"*) ..........................................29, 36

*Picard v. Avellino*, 469 B.R. 408 (S.D.N.Y. 2012) .........................................................................12

*Picard v. Avellino (In re BLMIS)*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016), *reconsideration denied,* Adv. Pro. No. 10-05421 (SMB), 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) ...............................................................................37

*Picard v. BNP Paribas S.A., et al.*, 594 B.R. 167 (Bankr. S.D.N.Y. 2018) (SMB) .............. *passim*

*Picard v. Ceretti(In re BLMIS)*, Adv. P. No. 09-01161 (SMB ), 2015 WL 473479, at *12 (Bankr. S.D.N.Y. Aug. 11, 2015) (*"Kingate"*), *leave to appeal denied*, 15 Civ 7086 (JPO) (S.D.N.Y. Dec. 4, 2015). ............................................... 11, 12, 37

*Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*), 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015) ...............................................................10

iv

*Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011)........................................................10, 11, 12, 24, 37

*Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117 (Bankr. S.D.N.Y. 2014) . 11, 12, 37, 38, 43, 45, 46

*Picard v. UBS AG, et al.*, Adv. Pro. No. 10-04285 (SMB) Case No. 1:11-cv-4212
    (CM), ECF No. 23 .........................................................................................................1, 3

*Schneidelman v. Henderson (In re Henderson)*, 423 B.R. 598 (Bankr. N.D.N.Y.
    2010)........................................................................................................................9

*SEC v. Cohmad Sec. Corp.*, No. 09 Civ. 5680 (LLS), 2010 WL 363844 (S.D.N.Y.
    Feb. 2, 2010) .....................................................................................................36, 37

*SIPC v. BLMIS* (*In re BLMIS*), 516 B.R. 18 (S.D.N.Y. 2014) ......................................11

*SIPC v. BLMIS* (*In re BLMIS*), No. 12 MC 115 (JSR), 2013 WL 1609154
    (S.D.N.Y. Apr. 15, 2013)..................................................................................11

*Stevelman v. Alias Research, Inc.*, 174 F.3d 79 (2d Cir. 1999) ......................................36

*Taylor v. Standard Gas Co*., 306 U.S. 307 (1938) .........................................................45

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)................................10

*United States v. GAF Corp.*, 928 F.2d 1253 (2d Cir. 1991) .............................. 10, 22, 23

## STATUTES

11 U.S.C. § 101(5)(a) ............................................................................................41

11 U.S.C. § 105(a) ................................................................................... 8, 38, 41

11 U.S.C. § 502(a) ..........................................................................................38, 41

11 U.S.C. § 502(b) ................................................................................................41

11 U.S.C. § 502(b)(1) ...........................................................................................38

11 U.S.C. § 502(d) .....................................................................8, 38, 41, 44, 46

11 U.S.C. § 502(h) .......................................................40, 41, 46, 47, 48, 50

11 U.S.C. § 510.....................................................................................................42

11 U.S.C. § 510(c) ................................................................................................42

11 U.S.C. § 542......................................................................................................41

v

11 U.S.C. § 543 ................................................................................................................41

11 U.S.C. § 544 ................................................................................................................10

11 U.S.C. § 545 ................................................................................................................10

11 U.S.C. § 546(a)(1) .......................................................................................................46

11 U.S.C. § 546(e) ...........................................................................10, 11, 37, 46

11 U.S.C. § 547 ................................................................................................................10

11 U.S.C. §  548(a) .....................................................................................................11, 37

11 U.S.C. § 548(a)(1)(A) .............................................................8, 10, 11, 37, 38

11 U.S.C. § 548(a)(1)(B) .................................................................8, 10, 38

11 U.S.C. §  548(b) ..........................................................................................................10

11 U.S.C. § 548(c) .....................................................................................................11, 37

11 U.S.C. § 549(a) ...........................................................................................................44

11 U.S.C. § 550 ...........................................................................41, 44, 46, 47

11 U.S.C. § 550(a) .......................................................................................................8, 38

11 U.S.C. § 550(d) ...........................................................................................................39

11 U.S.C. § 551 ...........................................................................................................8, 38

11 U.S.C. § 552 ................................................................................................................46

11 U.S.C. § 553 .........................................................................................................41, 46

15 U.S.C. §§ 78aaa, *et seq.* ............................................................................................1

Collier on Bankruptcy, § 502.09[1] .................................................................................47

## RULES

Fed. R. Civ. P. 8(a)(3) .....................................................................................................45

Fed.R. Civ. P. 15(a) ..........................................................................................................8

Fed. R. Civ. P. 7015...........................................................................................................8

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY 1003 (10th ed. 2014) .................................................................. 12

4429215

Defendants Luxalpha Sicav ("Luxalpha" or "LAF") as represented by its Liquidators Maitre Alain Rukavina and Mr. Paul Laplume, and Maitre Alain Rukavina and Mr. Paul Laplume, in their capacities as liquidators and representatives of Luxalpha Sicav (collectively, the "Liquidators" and together with LAF, the "Defendants"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in opposition (the "Opposition") to the motion (ECF No. 247)[1] filed by Irving H. Picard as Trustee (the "Trustee") for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") for leave to file a second amended complaint (the "PSAC") (ECF No. 248, Ex. A)  (the "Motion") and in support of Luxalpha's cross-motion for claim determination and allowance (the "Cross-Motion").

## PRELIMINARY STATEMENT

Luxalpha is a substantial net loser, with a net equity claim in excess of $760 million.  On behalf of Luxalpha and its investors and creditors, the Liquidators have spent years meeting with the Trustee's counsel, exchanging information and making substantial efforts to try and resolve this litigation to no avail.  Now, as we soon approach what will be the ten year anniversary of when the Trustee first commenced the instant adversary proceeding, the Trustee is seeking leave to file yet another amended complaint.  If the Motion is granted, this will undoubtedly lead to years more of delay on top of the nearly twelve years that have already passed since this SIPA[2] case commenced.  And during all this time, despite having a substantial net equity claim, Luxalpha has yet to receive a single distribution despite its great efforts to resolve the matter. That can't possibly be in line with what a SIPA Trustee's goal should be—the expedited return of customer property.  *See In re BLMIS*, 654 F.3d 229, 240 (2d Cir. 2011), *cert. denied*, 133 S. Ct.

---

[1] All references to docket entries herein, unless otherwise indicated, are to *Picard v. UBS AG, et al.*, Adv. Pro. No. 10-04285 (SMB).

[2] Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA").

1

24 (2012) (the "Net Equity Decision") (stating "SIPA is intended to expedite the return of *customer property*") (emphasis in original).

As explained below, the Liquidators assert that the Motion should be denied as futile given that the Trustee fails to allege sufficient facts to meet either the "actual knowledge" or "willful blindness" standards governing this case.  This is particularly true in light of the fact that the Trustee has been searching the globe for facts to support his claims *for nearly twelve years and with an unlimited budget*, and yet, the Trustee largely basis his case on selective quotes, many from entities who were not even Luxalpha service agents.  When read in context, those communications actually tell a much different story than what the Trustee implies.  In short, the Trustee's implausible theories utterly fail to meet his heavy burden here.

However, to the extent that the Court finds that the Trustee has stated requisite facts to approve the Motion, the Liquidators respectfully request that the Court consider and approve the Cross-Motion which requests that Luxalpha's claims be finally determined and allowed.  In light of the reserve that the Trustee is currently maintaining on behalf of Luxalpha's net substantial equity claim, under the terms set forth in the Cross-Motion, even after paying the Trustee in full for any fraudulent transfer claims found to survive the Opposition, there will still be sufficient funds to: (i) provide a substantial net recovery for Luxalpha's estate; (ii) provide certainty to the Madoff Victim Fund in terms of what Luxalpha will receive from the BLMIS estate so that the Madoff Victim Fund can proceed with additional distributions to eligible Luxalpha victims; and (iii) avoid additional substantial cost and delay for Luxalpha, the Trustee and all defendants whose claims are based on their association with Luxalpha.  In short, this case will be over for all claims related to Luxalpha, and after twelve long years, the substantial reserve being held by the

2

4429215

Trustee will be freed up for all BLMIS victims with allowed claims, including those who invested through Luxalpha.

## I.    FACTUAL BACKGROUND AND THE TRUSTEE'S ALLEGATIONS

The facts set forth below are drawn from the allegations contained in the PSAC, as well as the Trustee's previous allegations in the Original Complaint[3] (the "OC"), and the Amended Complaint[4] (the "AC"), and are recited here solely for the purposes of this opposition. Luxalpha neither admits nor concedes these allegations.

### A.    Luxalpha

Luxalpha is a Luxembourg-based, open-ended "UCITS" investment fund that maintained a registered office at 33A, Avenue J.F. Kennedy, L-1855 Luxembourg. PSAC ¶ 40. Luxalpha was subject to the regulatory authority of the Luxembourg Commission de Surveillance du Secteur Financier (the "CSSF"). *Id.* ¶ 41. Luxalpha was placed into liquidation by the District Court of Luxembourg on April 2, 2009 and is represented by its court-appointed liquidators, Maitre Alain Rukavina and Mr. Paul Laplume. *Id.* The Liquidators are named as defendants solely in their capacity as court-appointed liquidators and representatives of Luxalpha and its investors and creditors as set forth in the judgment of the District Court of Luxembourg dated April 2, 2009. *Id.* ¶ 42.

### B.    UBS and Access

Given that Luxalpha never had any employees or office space, the Trustee attempts to impute knowledge from certain "UBS" entities that served as Luxalpha's official sponsor,

---

[3] ECF No. 1.

[4] *Picard v. UBS AG, et al.*, Case No. 1:11-cv-4212 (CM), ECF No. 23. A copy of the AC is attached to the Declaration of Brett S. Moore (the "Moore Decl.") submitted in support of this Opposition and Cross-Motion as **Exhibit "A"**.

4429215

custodian, administrator, and manager, and certain "Access" entities that served as Luxalpha's advisor and in managerial roles to Luxalpha. *Id.* ¶¶ 228-236. More specifically, the Trustee makes allegations against Luxalpha based on its relationships with UBS AG ("UBS AG"); UBS (Luxembourg) S.A. ("UBS SA"); UBS Fund Services (Luxembourg) S.A. ("UBSFSL"); and UBS Third Party Management Company S.A. ("UBSTPM" which, along with UBS AG, UBS SA and UBSFSL the Trustee collectively refers to as "UBS"). *Id.* ¶¶ 64-68. Similarly, the Trustee seeks to impute knowledge to Luxalpha based on its relationships with Access International Advisors, Inc. ("AIA Inc."); Access International Advisors LLC ("AIA LLC"); Access International Advisors Ltd. ("AIA Ltd."); Access Management Luxembourg S.A. ("AML") (f/k/a Access International Advisors (Luxembourg) S.A. ("AIA (Lux)"); and Access Partners S.A. (Luxembourg) ("AP (Lux)") (all of which are collectively referred to by the Trustee as "Access"). *Id.* ¶¶ 3, 58-63. In addition to UBS and Access, the Trustee attempts to impute to Luxalpha the knowledge from Patrick Littaye ("Littaye") and Thierry Magon de la Villehuchet ("Villehuchet") founders of Access, *Id.* ¶¶ 2-3, as well as Luxalpha's board members who consisted of UBS and Access employees, including Littaye. *Id.* ¶ 93.

In March 2004, UBS SA opened BLMIS Account 1FR108 which was held in the name of "UBS (Luxembourg) S.A. for the benefit of Luxalpha" and executed various BLMIS account opening documents. *Id.* ¶¶ 84, 86. "All money invested in BLMIS through the Luxalpha fund was invested through BLMIS Account No. 1FR108, which was held in the name of UBS SA." AC ¶ 136.

## C.    The Filed Customer Claims And Objection To Jurisdiction

As alleged in the PSAC, UBS employees Ralf Schroeter and Alan Hondequin, who were also Luxalpha Directors, filed customer claims on behalf of Luxalpha with the Trustee in this

SIPA proceeding.  PSAC ¶ 250.  Those claims were designated Claim Nos. 004419 and 005725

by the Trustee and each claim was in the amount of $1,537,099,731.  *Id.*  Additionally, UBS SA

filed a third customer claim on behalf of Luxalpha designated by the Trustee as Claim No.

005025, also in the amount of $1,537,099,731.  *Id.*  All three claims are collectively referred to

as the "Customer Claims" by the Trustee.  *Id.*

As alleged by the Trustee, the Customer Claims, all of which relate to Account 1FR108,

were filed by UBS employees and Luxalpha directors on behalf of Luxalpha.  *Id.*  The Trustee

correctly alleges that Luxalpha (by and through its Liquidators) has pending litigation in

Luxembourg against UBS (as well as Access, amongst others).  *Id.* ¶ 254.  The Trustee is

absolutely incorrect, however, when he asserts that "Luxalpha has also disavowed the Customer

Claims by asserting that UBS SA, and not Luxalpha, filed the Customer Claims and that UBS

SA did so only for purposes of protecting its own interests, not in Luxalpha's interest, and

limiting UBS's potential liability to Luxalpha in Luxembourg."  *Id.* ¶ 253.  Rather, in its motion

to dismiss the Trustee's AC based on grounds of personal jurisdiction and *forum non conveniens*

filed on April 27, 2012, Luxalpha merely challenged the argument that the filing of the Customer

Claims was an affirmative action by Luxalpha itself to submit to the Court's jurisdiction and

stated as follows:

> although a customer claim was filed on behalf of [Luxalpha] by UBS SA
> employees who also served as [Luxalpha] directors, this was not an affirmative
> submission to the Court's jurisdiction by [Luxalpha].  Rather, it was a defensive
> measure to attempt to limit UBS SA's liability to [Luxalpha]'s investors for
> having invested [Luxalpha]'s assets with BLMIS in violation of Luxembourg
> law.

*See* Luxalpha's Memorandum of Law (ECF No. 102) at p.1, with a copy of the relevant pages

attached to the Moore Decl. as **Exhibit "B"**; April 28, 2016 Transcript at 37:4-39:-22 attached to

the Moore Decl. as **Exhibit "C"**.  As such, Luxalpha did not "disavow" the Customer Claims.

5

Rather, for purposes of a jurisdictional analysis, Luxalpha simply argued (consistent with its pending claims against UBS and Access in Luxembourg) that because UBS violated Luxembourg law, and hence its duties to Luxalpha and its investors, when it opened an account with BLMIS and improperly deposited Luxalpha funds with BLMIS (*see* PSAC ¶¶ 109-117), the filing of the Customer Claims by UBS was not an affirmative submission to the Court's Jurisdiction by Luxalpha itself.

As admitted by the Trustee, Luxalpha (by and through the Liquidators) has litigation pending in Luxembourg against UBS entities based on their liability to Luxalpha and its investors and creditors given their roles with Luxalpha as they relate to BLMIS. PSAC ¶ 254. The Trustee also acknowledges that UBS AG and UBS SA face liability for damages to third parties under Luxembourg law for the mismanagement of Luxalpha's assets. PSAC ¶¶ 113, 114, 254; AC ¶¶ 130, 134, 147. As such, it would be inconsistent for the Liquidators to concede that UBS SA was acting properly on behalf of Luxalpha when it filed the Customer Claims for purposes of Luxalpha's affirmative submission to the Court's jurisdiction.

Although Luxalpha cannot concede the jurisdictional issue under these circumstances, the Liquidators recognize that the Court must accept all "well-pleaded factual allegations" as true for purposes of the instant Motion, and the Trustee has pleaded that UBS, Access and the Luxalpha Directors were all agents of Luxalpha. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), PSAC ¶¶ 2-9, 48-68, 93. Given this legal standard, the Liquidators do not challenge herein that those parties were acting as Luxalpha's agents for purposes of the Motion. Furthermore, the Liquidators are fully aware that the Court will likely find that, under U.S. law, the Court has jurisdiction over Luxalpha by virtue of the fact that Luxalpha's agent, UBS SA, filed the Customer Claims on behalf of Luxalpha that must be resolved before this Court. However, Luxalpha reserves all

6

rights in the future to challenge the scope, authority and knowledge imputable to Luxalpha by its service agents, including UBS and Access, as well as any Luxalpha directors.

### D.    BNP Paribas and Oreades

The Trustee asserts that Access established Luxalpha to continue its relationship with Madoff when BNP Paribas decided to shut down a BLMIS feeder fund called Oreades in March 2004, and that Luxalpha was opened as Oreades's successor.  PSAC ¶¶ 73, 83.  In the PSAC, the Trustee alleges that BNP Paribas shut down Oreades because BNP Paribas: (i) had "discomfort with Oreades's relationship with BLMIS" (*Id.* ¶ 73); (ii) was concerned with its potential liability associated with Oreades's management given that BLMIS's roles as Oreades's asset manager, custodian and investment advisor had not been disclosed to the CSSF which was a violation of BNP Paribas's internal security rules and Luxembourg law (*Id.* ¶ 74, 78); (iii) could not verify trades due to BLMIS's delayed reports of trading activity (*Id.* ¶ 75); and (iv) requested to disclose Madoff's name to the CSSF and for real-time access to BLMIS trade confirmations, and Madoff refused (*Id.* ¶ 79-80).  The Trustee alleges that an unnamed Access employee "recounted the story behind BNP Paribas's liquidation of Oreades, stating that BNP Paribas did not want to be liable to Oreades's investors and believed it had to exit or 'destroy' Oreades." *Id.* ¶ 82.

Because BNP Paribas had decided to close Oreades, according to the Trustee, Access convinced certain UBS entities to partner with Access before Oreades ceased operations in 2004. *Id.* ¶ 83.  And in March 2004, a week after Oreades was closed, UBS SA opened BLMIS Account 1FR108 which was held in the name of "UBS (Luxembourg) S.A. for the benefit of Luxalpha" and executed various BLMIS account opening documents. *Id.* ¶¶ 84, 86.

Although the Trustee argues that the circumstances surrounding the closing of Oreades support his claims against Luxalpha, as explained below, these precise allegations have already

7

been considered and rejected by the Court in the Trustee's failed attempt to pursue subsequent

fraudulent transfer claims against BNP Paribas in *Picard v. BNP Paribas S.A., et al.,* 594 B.R.

167, 204 (Bankr. S.D.N.Y. 2018) (SMB) ("*BNP Paribas*") (where the Court found the Trustee's

allegations "as preposterous as the scheme alleged by the plaintiff in *Fabrikant*"), *citing In re*

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons,*

*Inc.),* 480 B.R. 480 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 55 (2d Cir. 2013) ("*Fabrikant*").  These

same tired (and previously rejected) arguments are as equally preposterous here.

### E.      Claims Set Forth In The PSAC Against Luxalpha

In the PSAC, the Trustee has asserted the following claims against Luxalpha: (i) Count

One—Equitable Subordination Of Customer Claims; (ii) Count Two—Fraudulent Transfers

(Initial Transferee) 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a) and 551; (iii) Count

Three—Fraudulent Transfers (Initial Transferee) 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B),

550(a), and 551; (iv) Count Five—Objection And Disallowance Of Claims; and (v) Count Six—

Equitable Disallowance Of Claims.  PSAC ¶¶ 257-279, 286-299.

## II.    APPLICABLE LEGAL STANDARDS

### A.      For Leave To Amend

Rule 15(a) of the Federal Rules of Civil Procedure, made applicable pursuant to Rule

7015 of the Federal Rules of Bankruptcy Procedure, governs motions for leave to amend

pleadings.  Although leave is generally freely granted, a court may deny a motion for leave in

instances of undue delay, bad faith, dilatory motive, undue prejudice to the opposing party or

futility.  *Forman v. Davis*, 371 U.S. 178, 182  (1962).  As explained below, Luxalpha and its

Liquidators primarily challenge the Motion on the basis of futility, as well as undue prejudice

given that Luxalpha victims are being denied distributions from the Madoff Victim Fund.  "[T]he

8

standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015). "To survive a motion to dismiss, a complaint must contain factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly,* 550 U.S. at 556. A party must state "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555), and it is insufficient to simply plead facts that "permit the court to infer … the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

*Iqbal* outlined a two-step approach in deciding a motion to dismiss. First, courts should begin by "identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. "Threadbare recitals of the elements of a cause of action supported by conclusory statements" are not factual. *See id.* at 678. Second, courts should assume the veracity of all "well-pleaded factual allegations," and determine whether, together, they plausibly give rise to an entitlement of relief. *Id.* at 679.

In deciding a motion to dismiss, courts may consider documents incorporated into the complaint by reference and matters of which a court may take judicial notice; however, allegations contradicted by documents that are incorporated by reference into the complaint need not be accepted as true. *Schneidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 614

9

(Bankr. N.D.N.Y. 2010); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Further, a court may consider other parts of a document that a complaint quotes to or provides

excerpts from in considering a motion to dismiss. *131 Main St. Assocs. v. Manko*, 897 F. Supp.

1507, 1532 n. 23 (S.D.N.Y. 1995).   Additionally, the PSAC must be evaluated in conjunction

with the Trustee's prior allegations set forth in the OC and AC, which are binding party

admissions. *United States v. GAF Corp.*, 928 F.2d 1253, 1259-60 (2d Cir. 1991) (a pleading,

even if amended or withdrawn, remains an admission by a party). *See also Negrete v. Citibank,*

*N.A.*, 237 F. Supp. 3d 112, 129 (S.D.N.Y. 2017) ("A party [] cannot advance one version of the

facts in its pleadings, conclude that its interests would be better served by a different version, and

amend its pleadings to incorporate that version.") (alteration in original), *aff'd*, No. 17-2783-CV,

2019 WL 80773 (2d Cir. Jan. 3, 2019).

### B.    To State A Claim In These Proceedings Against Luxalpha

The Trustee's ability to avoid and recover transfers has been limited by several decisions

issued by the Second Circuit Court of Appeals and the United States District Court for the

Southern District of New York.   Under the safe harbor set forth in 11 U.S.C. § 546(e),[5] the

Trustee may only avoid and recover intentional fraudulent transfers under § 548(a)(1)(A) made

within two years of the Filing Date, *Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*), 773

F.3d 411, 423 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015); *Picard v. Katz*, 462 B.R. 447,

452 (S.D.N.Y. 2011) ("*Katz*"), unless the transferee had ***actual knowledge*** of Madoff's Ponzi

scheme, or more generally, "actual knowledge that there were no actual securities transactions

---

[5] Bankruptcy Code § 546(e) states in relevant part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a
> transfer that is a . . . settlement payment, . . . or that is a transfer made by or to (or for the benefit of) a . . .
> stockbroker . . . in connection with a securities contract . . . except under section 548(a)(1)(A) of this title.

10

being conducted." *SIPC v. BLMIS* (*In re BLMIS*), No. 12 MC 115 (JSR), 2013 WL 1609154, at

*4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*") (emphasis added). There, the District Court noted that

the safe harbor was intended, among other things, to promote the reasonable expectations of

legitimate investors. *Id.* And if an investor knew that BLMIS was not actually trading

securities, the court reasoned that the investor had no reasonable expectation that he was signing

a contract with BLMIS for the purpose of trading securities for his account. *Id.* In that event, the

Trustee is permitted to seek to avoid and recover preferences and actual and constructive

fraudulent transfers to the full extent permitted under state and federal law. *See id.* at *6.

Additionally, although the 546(e) safe harbor does not bar the Trustee's intentional

fraudulent transfer claims under 11 U.S.C. § 548(a)(1)(A), a transferee's knowledge is still

relevant under 11 U.S.C. § 548(c). Section 548(c) provides a defense to a fraudulent transfer

claim brought under Bankruptcy Code § 548(a) to the extent a transferee "takes for value[6] and in

good faith." 11 U.S.C. § 548(c). Where the Trustee seeks to recover the transfer of principal as

in the case *sub judice*, he must plead, with particularized allegations, Luxalpha's lack of

subjective good faith which, in this SIPA case, means the Trustee must plausibly allege that

Luxalpha turned a blind eye to facts that suggested a high probability of fraud. *SIPC v. BLMIS*

(*In re BLMIS*), 516 B.R. 18, 21 (S.D.N.Y. 2014) ("*Good Faith Decision*"); *Katz*, 462 B.R. at 454,

455-56; *Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117, 138-39 (Bankr. S.D.N.Y. 2014)

("*Merkin*"); *Picard v. Ceretti* (*In re BLMIS*), Adv. P. No. 09-01161(SMB), 2015 WL 4734749, at

*12 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*"), *leave to appeal denied*, 15 Civ 7086 (JPO)

(S.D.N.Y. Dec. 4, 2015). Lack of objective good faith is not enough "because the securities laws

---

[6] For purposes of analyzing the "good faith defense" set forth in section 548(c) of the Bankruptcy Code, transferees
give value to the extent of cash deposited with BLMIS. *See e.g., Merkin*, 515 B.R. at 138-39. As such, because
Luxalpha is a substantial net loser and the Trustee is seeking the return of principal, value is not at issue herein.

11

do not ordinarily impose any duty on investors to investigate their brokers, [and] those laws foreclose any interpretation of 'good faith' that creates liability for a negligent failure to so inquire." *Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012); *accord Katz*, 462 B.R. at 455.

### 1.    Actual Knowledge

This Court outlined what it means to have actual knowledge of, or to be willfully blind to, a fact in *Merkin* and *Kingate*.  "Knowledge" is "[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact." BLACK'S LAW DICTIONARY 1003 (10th ed. 2014) ("BLACK"); *accord Merkin*, 515 B.R. at 139; *Kingate*, 2015 WL 4734749, at *13. "Actual knowledge" is "direct and clear knowledge, as distinguished from constructive knowledge." BLACK at 1004. "Thus, 'actual knowledge' implies a high level of certainty and absence of any substantial doubt regarding the existence of a fact." *Merkin*, 515 B.R. at 139.

### 2.    Willful Blindness

"Willful blindness" involves two elements: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011) ("*Global-Tech*").  If a person who is not under an independent duty to investigate "nonetheless, intentionally chooses to blind himself to the 'red flags' that suggest a high probability of fraud, his 'willful blindness' to the truth is tantamount to a lack of good faith." *Katz*, 462 B.R. at 455; *accord Merkin*, 515 B.R. at 139. "Thus, willful blindness connotes strong suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate failure to acquire knowledge of its existence." *Merkin*, 515 B.R. at 140 (emphasis in original).

As explained below, the Trustee neither meets the actual knowledge, nor the willful blindness standards set forth above, and as such, the Motion should be denied.

## III.    ARGUMENT

The crux of the Trustee's allegations in support of his claims against Luxalpha center around: (i) Access opening Luxalpha "in the face of numerous concerns BNP Paribas raised about BLMIS when it was Oreades's prime bank, administrator and custodian" (Tr. Brf.[7] p. 14, PSAC ¶¶ 81-83); (ii) the alleged knowledge of "the myriad reasons that prompted other UBS entities to refuse to invest in BLMIS" (Tr. Brf. p. 14); and (iii) the alleged knowledge of red flags by Luxalpha's service providers and directors (*Id.*, PSAC ¶¶ 78, 147-202).  As explained below, none of these allegations are sufficient to meet the Trustee's burden to plausibly allege claims against Luxalpha under the "actual knowledge" or the "willful blindness" standards.  And in fact, many of the allegations have already been considered and expressly rejected by the Court when evaluating similar claims the Trustee has brought against other defendants.

### A.    BNP Paribas's Closing Of Oreades

As noted above, the Trustee asserts that Access formed Luxalpha "in the face of numerous concerns BNP Paribas raised about BLMIS when it was Oreades's prime bank, administrator and custodian" (Tr. Brf. p. 14, PSAC ¶¶ 81-83).  More specifically, the Trustee alleges that in July 2003, BNP expressed concerns about: (i) "the lack of transparency regarding BLMIS's role as asset manager,"; (ii) "BLMIS's role as custodian although it was not a bank,"; (iii) "the proper segregation of Oreades's assets"; and (iv) "the unusual amount of time between BLMIS's purported execution of trades and the delivery of the confirmation of those trades to

---

[7] References to the Trustee's Memorandum of Law in support of the Motion (ECF No. 247) shall be referred to herein as "Tr. Brf. p. __."

Oreades, inhibiting Oreades's ability to verify trades". Tr. Brf. pp. 14-15, PSAC ¶¶ 74-76. The

Trustee further asserts that "BNP Paribas recognized that these practices violated BNP Paribas's

internal rules, Luxembourg law, and likely, U.S. law." Tr. Brf., p. 15, PSAC ¶¶ 78-79. These

concerns, according to the Trustee, led to BNP Paribas to shut Oreades down. Tr. Brf., p. 15,

PSAC ¶ 81.

In its *BNP Paribas* decision, the Court soundly rejected the Trustee's arguments that the

closing of Oreades supported a finding of actual knowledge or willful blindness:

> The Trustee alleges that the way certain Defendants serviced and ultimately
> closed Oreades supports an inference that they knew that there was a high
> probability of fraud at BLMIS. Some of the Defendants' practices with respect
> to Oreades were undoubtedly questionable. They include representing that BNP
> Securities Services was Oreades' custodian and receiving fees while delegating
> those duties to BLMIS, (¶¶ 97-100), allowing BLMIS to act as Oreades'
> custodian and investment advisor in violation of BNP Bank's 'strict separation'
> rule, (¶ 106), and Luxembourg law, and failing to disclose that BLMIS served
> as Oreades' investment advisor. (¶¶ 108-111). Although these allegations raise
> questions about the propriety of certain of Defendants' actions in servicing
> Oreades, and imply that they were willing to overlook legal and regulatory
> violations to make more money, they do not support the inference that those
> Defendants believed that there was a high probability that BLMIS was not
> actually trading securities on behalf of Oreades and its investors.

*BNP Paribas,* 594 B.R. at 199. In rejecting the Trustee's argument that the closing of Oreades

supports an inference that BNP Paribas subjectively believed that BLMIS was not trading

securities, the Court expressly found:

> [t]he more plausible inference is that the Defendants shut down the Oreades
> fund because of the risks associated with using the unregistered BLMIS as a
> sub-custodian and investment advisor in violation of Luxembourg law, (¶¶ 116,
> 118, 122, 123), questions regarding the location of the U.S. Treasury securities
> held by BLMIS, (¶ 117), and Madoff's refusal to allow BNP Bank to confirm
> the trades in real time or disclose his role to the CSSF because BLMIS was not
> registered as an investment advisor in the United States and wanted to avoid
> regulatory scrutiny. (¶¶ 119, 121).

14

*Id.* at 200.  The Court went on to highlight the numerous financial transactions that BNP Paribas

engaged in which involved BLMIS **after** shutting down Oreades, wherein BNP Paribas "made

billions of dollars of risky and possibly uncollectible loans to those investing with BLMIS or

BLMIS feeder funds."   *Id.* at 202.    The Trustee argued that BNP engaged in such risky

transactions to earn fees, to establish their reputation as a leverage provider in a highly

competitive market, to grow its brand and to cross-sell services to institutional clients.  *Id.*  The

Court rejected the Trustee's theory as preposterous:

> According to the PAC, BNP Bank nonetheless engaged in billions of dollars of
> risky transactions, including loans and extensions of credit that ultimately
> depended on the value of BLMIS accounts, to earn 'tens of millions in fees and
> interest payments,' (¶ 64), and raise BNP Bank's position as a world leader in
> the fast-moving derivatives market.   This theory is as preposterous as the
> scheme alleged by the plaintiff in *Fabrikant*, and it is implausible to suggest that
> the Defendants would make loans or engage in the transactions described in the
> PAC if they subjectively believed that there was a high probability that BLMIS
> was not actually trading securities.

*Id.* at 203-04 *citing Fabrikant* 480 B.R. 480.  The Trustee's efforts to use BNP Paribas's decision

to close Oreades to support his theories against Luxalpha should similarly be rejected.

### B.    Allegations of Access Deflection

The Trustee argues generally at various points that Access suppressed "inquiry into

matters that did not reflect favorably on Madoff" and cites to Littaye referencing three models

(short, middle and long-term) that BLMIS used to make decisions on entering/exiting the market.

Tr. Brt. P. 22 citing PSAC ¶¶ 169, 183.  However, in the AC, the Trustee admitted that when

Littaye met with Madoff, he "raised questions that Access or its clients had with respect to the

BLMIS-related funds.    He would then relay Madoff's answers to Access's New York

employees."  AC ¶  89.  Although the Trustee questions the legitimacy of the "three models" as

well as the "portfolio assurance programs" (PSAC ¶  182) that Madoff explained to Littaye as the

reason he would not identify counterparties to options trades, the Trustee's hindsight analysis of

15

these explanations misses the mark.  The "three models" explanation came from questions raised by Access employees (AC ¶ 240) and were Madoff's way of explaining his market entry and exit decisions.  AC ¶ 241.  Further, the communication that the Trustee partially quotes from in PSAC ¶ 182 is attached to the Moore Decl. as **Exhibit "D"**.  Therein, Littaye asks various Access employees "what on earth is a portfolio or performance assurance?"  *Id.*  The fact that Littaye asked these questions to both Madoff and then his own Access co-workers, reported the answers Madoff provided him to Access employees and Access clients, and didn't figure out that Madoff was lying to him does not support the theory that Littaye knew Madoff was not trading securities, or had a highly probable belief Madoff was running a Ponzi scheme.  Further, by asking questions both to Madoff and his Access associates, he did not turn a blind eye.

        **C.     "UBS" Entities Refusal To Offer BLMIS To Private Clients While Agreeing To Serve As Luxalpha's Service Agents**

            **1.     The "Impossible" Communications Are Taken Out Of Context**

As an initial matter, in certain instances, the Trustee refers to "UBS" without specifically identifying which particular entity the allegation relates to, and thus, it is not always clear whether the Trustee is discussing a UBS entity that served as a service provider to Luxalpha or not.  Such group pleading is improper and all such allegations should be disregarded.  A plaintiff cannot rely upon group pleading, whereby allegations of knowledge are made against affiliated entities, without parsing specifically what each of the individual defendants themselves knew.  *See Concord Assocs., L.P. v Entm't Props. Tr.,* No. 12-cv-1667, 2014 WL 1396524, at *24 (S.D.N.Y. April 9, 2014) ("Group pleading, by which allegations are made against families of affiliated entities[,] is simply insufficient to withstand review on  a motion to dismiss."); *In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 991 F. Supp. 2d 479, 501 (S.D.N.Y. 2014) (same).

16

4429215

The Trustee asserts that "[a]s early as 2002, UBS analyzed BLMIS and developed serious doubts." Tr. Brf., p. 15, PSAC ¶ 101. The actual allegation set forth in PSAC ¶ 101 states that "UBS O'Connor, a UBS AG subsidiary, noted that '[t]he fund seems to do very well, but there are voices in the industry warning because generating such consistent returns with such a strategy is more or less impossible.'" The allegation in PSAC ¶ 101 quotes from a "Manager Analysis" prepared by UBS Asset Management dated January 26, 2002, a copy of which is attached to the Moore Decl. as **Exhibit "E"**, most of which is redacted. The language quoted by the Trustee that is contained in Exhibit E reads as follows:

> One particularly strange investment is the Broad Market Fund, run by Madoff. The fund seems to do very well, but there are voices in the industry warning because generating such consistent returns with such a strategy is more or less impossible. However, [redacted in exhibit] argues that they know more than anyone else about Madoff because they have got a great relationship with Madoff.
>
> **O'Connor:**
>
> [**Redacted in exhibit**]
>
> We understand there is a particular concentration in Broad Market, which is run by Madoff. They have done very well, and I will send you an article about them (sent to fax 5590). We have missed that one, perhaps a big mistake on our part, but if you read the article, you'll know why. We consider ourselves pretty smart and no one in their firm has properly explained their strategy to match the return profile to us, so we avoid stuff like that.

Exhibit E, PSAC ¶¶ 101-02.

First, neither "UBS Asset Management" nor "O'Connor" were Luxalpha service providers and there is no allegation that Exhibit E was even provided to a Luxalpha service agent. Second, there is nothing in Exhibit E, or PSAC ¶¶ 101-02 when read in context to support the argument that these "UBS" related entities did not believe that Madoff was not actually trading securities. Rather, there is an acknowledgement that O'Connor was unable to match the return profile with the Madoff's investment strategy, and nobody at the Broad Market Fund had been able to "sufficiently answer UBS's questions about the strategy." PSAC ¶ 101. Being unable to reverse

17

engineer or get comfortable with an investment strategy despite asking questions (i.e., performing due diligence) does not come close to meeting the required actual knowledge or willful blindness standards required herein. Indeed, there is a statement that UBS O'Connor (alleged to be the author in PSAC ¶¶ 101, 102) "missed that one, perhaps a big mistake on our part" which is inconsistent with the idea that there was an actual belief that Broad Market was investing in a Ponzi scheme as opposed to a lost investment opportunity.

The Trustee next argues that UBS SA (a Luxalpha service provider) solicited input from "a UBS division that had previously analyzed BLMIS" and reported to UBS SA that "it would be IMPOSSIBLE to generate the returns that [Madoff] has produced since 1990" and questioned Madoff's practice of not charging fees. Tr. Brf. p. 15, PSAC ¶ 104. It's clear from the PSAC that the Trustee is again referring to "UBS O'Connor" when he speaks to the prior due diligence conducted by a "UBS division." PSAC ¶ 104. The email exchange referenced in PSAC ¶ 104 is attached to the Moore Decl. as **Exhibit "F"** and involves communications between Dieter Kiefer and Mike Welch, with copies to Danny Schweizer (on a March 5, 2004 email) and Viviane De-Angelis (on a March 8, 2004 email). In the March 5, 2004 email, Mike Welch emailed Deiter Kiefer and stated as follows:

> I understand you are interested in more information on Madoff. I enclose a short write-up that we did a couple of years ago to help understand why we have not invested with this firm. You should understand that we never got enough transparency to truly see how they were generating returns, but our issue is that it could not have been how it was marketed. Therefore, we did not pursue it further.
>
> \*\*\*
>
> The current manager seeks to obtain capital appreciation by utilizing a non-traditional options trading strategy which they describe as a 'split strike synthetic conversion' strategy. The portfolio consists of 30 to 35 large-cap S&P 100 stocks that are hedged with OEX index options (S&P100). A proprietary computer system continually optimizes this small basket of stocks to replicate and enhance the performance of the S&P 100 at low cost.

18

The establishment of a typical position entails (1) buying the single stocks, (2) selling the front month slightly out-of-the money calls (representing the same number of shares that were just bought), and (3) buying the same expiry slightly out-of-the money put options (funded by the premium call sales and monthly dividend flows). If the manager has a bullish view for the month, the strike prices of the collar are spread wider around the OEX index price. With a bearish market view, the manager would narrow the option strikes on the collar. Their whole strategy can be legged into and does not generally go up together.

The driver of returns in the strategy is stock prices going higher. Madoff has run the strategy since 1990 with only a handful of negative months, generating 11% to 14% per annum EVERY year. Demand for the return stream has driven his asset base well over $10B and people often speculate how Madoff actually makes money so consistently. As a point of background, Madoff happens to run one of the largest market making broker/dealer (B/D) in the world.

Thoughts and Rationale for NOT Investing

I argue that the strategy that Madoff implements is not a stand-alone hedge fund product. If Madoff were to run the strategy totally independently from his B/D, it would be IMPOSSIBLE to generate the returns that he has produced since 1990. The reason is quite simple – the skew in doing 1 month option collars where you sell out-of-the money (OTM) calls and buy the OTM puts is always working against you. For instance, if you want to buy OTM puts, sell OTM calls in the 1 month 1.5% OTM strikes, you would net pay away at least 2-3 vol points which is roughly 10BPs. If the strategy were implemented in a systematic way (as it is portrayed), market makers on the trading floor would dramatically worsen the spread paid away. This implies that every month, Madoff if starting his strategy below a level playing field.

Compounding issues for Madoff is that the OEX option pit has become reasonably illiquid since the index was cut in half a few years ago. Now it is considered to be illiquid by the major liquidity providers in the options markets. They are all playing the SPX now. There may be net dividend benefits given the stock market basket selection, but far from enough to pay for the skew differential. Clearly it is not the strategy that is profitable – if the fund were to operate in a vacuum away from the B/D it would be a money losing proposition.

Another thing to consider about Madoff's product is that he does not charge fees for his hedge fund. The only people charging fees are those who distribute it [redacted in exhibit] – clearly a boon for the distributors. Makes one ask the question of why Madoff would bother to have such a product when the only revenue coming from running outside money is commission dollars. I would argue that Madoff uses the product as a tool to improve his overall market-making business and enable him to provide the market liquidity without taking as much risk. He knows that he always has a bid for certain names in the fund which enables him to concentrate on the offer side – decreases the risk of making two-way prices. In any event, this is pure supposition. The simple fact

19

> that an investor has to start considering how the fund and the B/D benefit one
> another is a non-starter in our mind.

Exhibit "F" (emphasis added).

Despite the Trustee selectively quoting from Exhibit "F" in an effort to imply that UBS entities had actual knowledge or were willfully blind to Madoff's fraud, a full reading of the exhibit demonstrates the opposite. Exhibit "F" makes clear that O'Connor: (i) presumed Madoff was purchasing a basket of "30 to 35 large-cap S&P 100 stocks"; (ii) hedged with S&P 100 index options; and (iii) used a proprietary computer system to optimize and "enhance the performance of the S&P 100 at low cost". What O'Connor apparently couldn't figure out was how Madoff was using his broker/dealer office to be able to obtain such consistent returns, but speculated that Madoff used the volume of stocks held in his market making business to help manage buys/sells for his investment advisory business.[8]  *Id.*  Additionally, as conceded by the Trustee, BLMIS did engage in proprietary trading on its own behalf (AC ¶ 50)—so the fact that O'Connor was not able to figure out how these businesses operated together due to Madoff's lack of transparency is unsurprising. The Trustee leaves all of this critical information out in a transparent effort to drum up support for the argument that O'Connor knew Madoff was engaged in a Ponzi scheme, but the actual documents and statements do not support his theory whatsoever. Accordingly, all of the Trustee's cites to the above referenced truncated quotations should be disregarded. *See e.g.,* PSAC ¶¶ 101-102, 104-105, 162 and 195.

---

[8] In fact, according to the Trustee's own expert, Bruce Dubinsky, the two businesses were intermingled because Madoff used funds from the BLMIS Investment Advisory business ("BLMIS IA") to fund operations at the B/D Proprietary Trading Business. *See* Expert Report of Bruce G. Dubinsky MST, CPA, CFE, CVA, CFF, MAFF, dated Aug. 20, 2013 ("Dubinsky Report") which was publicly filed on November 25, 2015. (Adv. Pro. No. 08-01789 (SMB) ECF Doc. # 12137-1.) There, Dubinsky opined, inter alia, that the BLMIS IA business had always operated as a Ponzi scheme. In connection with his opinion, Dubinsky noted that the "Proprietary Trading Business," a supposedly legitimate part of BLMIS' business sometimes referred to as "House 5," engaged in trading operations "funded from money taken from IA Business customer money." (Dubinsky Report ¶ 29.)

4429215

Turning again to Exhibit "F", the March 8, 2004 email responds to the March 5, 2004 email as follows: "thanks Mike.  It is not our intention to go into the fund.  We have key clients who have positions with Madoff and where we could eventually run into a settlement risk. Regards Dieter."   Settlement risk implies the trading of securities, not a Ponzi scheme. Furthermore, the exchange is but one example the Trustee concedes were efforts by UBS SA to perform due diligence and evaluate Madoff/BLMIS.

The Trustee also makes inconsistent assertions by claiming in PSAC ¶ 107 that in response to Access contacting UBS SA about potentially creating a "Luxalpha-based leveraged product" Littaye was told that "if the UBS analysts in Zurich were to find out that Madoff was behind Luxalpha, 'we would be killed.'"  Tr. Brf. p. 16.  However, the Trustee also concedes that UBS AG (which is based in Zurich per PSAC ¶ 64) in fact knew and approved of Luxalpha's setup with BLMIS, "UBS AG made an exception to its prohibition on the delegation of custodial management authority to a single entity after UBS SA persuaded it to do so."  PSAC ¶ 126. The Trustee fails to explain this discrepancy, fails to identify which "analysts" he is referring to and fails to explain why the fund would be "killed."  Regardless of what some unnamed analyst may have thought, it is undeniable that UBS AG was aware of Madoff/BLMIS involvement as UBS AG served as Luxalpha's co-sponsor and co-promotor, and interfaced with the CSSF.  PSAC ¶ 114 ("UBS AG created the appearance, both with the CSSF and with potential investors, that the fund was backed by a highly capitalized, stable bank.").  Further, as explained in detail below, UBS AG required very specific parameters based on enumerated assumptions for UBS SA to enter into a service relationship with BLMIS.

**2.     In the AC The Trustee Admitted And Detailed UBS's Extensive Efforts To Conduct Due Diligence On Madoff And BLMIS**

The Trustee previously acknowledged the "extensive due diligence" performed by UBS entities on Madoff/BLMIS in the AC, even though he chose to exclude such allegations from the PSAC. The reason he chose to exclude such allegations, of course, is because they completely undermine the Trustee's argument that Luxalpha, by and through the actions and knowledge of its UBS related service agents, turned a "blind eye" to a known Ponzi scheme. As noted, *supra*, however, such allegations remain binding party admissions. *United States v. GAF Corp.*, 928 F.2d 1253, 1259-60 (2d Cir. 1991) (a pleading, even if amended or withdrawn, remains an admission by a party).

For example, in the AC, the Trustee stated: "[u]pon information and belief, the UBS Defendants' lack of exposure to BLMIS and the decision to not market BLMIS-feeder funds to their own private bank clients were the result of due diligence analysis performed by the UBS Defendants on Madoff and BLMIS." AC ¶ 106. BLMIS related funds were not endorsed for sale to UBS clients "because of the lack of transparency regarding their ability to generate such high, stable returns." AC ¶ 107. The Trustee admitted the many instances in which UBS "performed extensive due diligence on BLMIS" including as late as between September 2007 and December 2008, but "could not get comfortable with Madoff's strategy, and refused to offer any Madoff product because Madoff would not meet with UBS AG's analysts." AC ¶¶ 112-13.

The Trustee also admits that "[t]o approve investments in BLMIS-related products, UBS AG required its analysts to obtain more information on the underlying fund manager, Madoff. One of the due diligence requirements was a 'face to face meeting with the manager and a site visit to the HQ of the firm where money is managed.'" AC ¶ 114. This task was assigned to Mary Kleckner ("Kleckner"), a UBS AG analyst in London. *Id.* Kleckner asked her team for a

22

list of questions or topics to question Madoff about, and her "team responded with concerns about the total assets BLMIS was managing and whether there was a point at which these assets would be large enough to deteriorate the strategy's performance. Additionally the team raised questions about the potential misuse of information between BLMIS's market-making and investment advisory arms." *Id.*

Kleckner reached out to others to get opinions on Madoff and in October 2007 received an email response from an unidentified sender stating that although Madoff "is one of the most controversial funds out there…[e]verything is probably fine, but there are a number of things that are odd or different than the norm." *Id.* at 116. Kleckner continued in her efforts to gain answers to the questions her team had raised and to meet with Madoff but "Madoff continuously thwarted Kleckner's efforts to gain transparency, repeatedly refusing Kleckner's requests to meet with him." *Id.* at 115. And in a September 17, 2008 email (mere months before Madoff's fraud was discovered), Kleckner was informed:

> Madoff has turned down our request for a meeting. His simple explanation was that if he meets with one client he would be obligated, perhaps even from a regulatory standpoint now that he is an RIA, to meet with all of them, and he would literally be forced to build an infrastructure to support meetings and devote a huge amount of time to it.

*Id.* The Trustee goes on to state:

> After performing extensive due diligence, UBS AG decided that it did not have enough information on Madoff to be able to get comfortable with his strategy. UBS AG was unable to assuage its concerns as no further transparency was forthcoming, since Madoff refused to meet with any of UBS AG's analysts. UBS AG ultimately concluded that 'Madoff is not a manager that we are willing to structure products on…'

*Id.* at 117. Thus, far from turning a blind eye, the above shows that UBS AG engaged in "extensive" due diligence efforts that were thwarted by Madoff as late as September 2008. It is illogical and implausible to conclude, as the Trustee apparently does, that such actions were

23

taken with actual knowledge of the Ponzi scheme. And, the extensive due diligence and efforts to try to obtain answers and a meeting with Madoff also entirely undermines the argument that Luxalpha, through its UBS service providers, turned a blind eye.

> **3.      UBS's Agreement To Accept BLMIS Structure For Luxalpha**

Recognizing that the above extensive due diligence admissions undercut his theories against Luxalpha, they are not repeated in the PSAC. Rather, in the PSAC, the Trustee selectively quotes statements to argue more generally that UBS SA dismissed the concerns of other UBS entities who refused to offer BLMIS funds to their private wealth clients, "and other concerns such as Madoff's roles as broker, custodian, and investment adviser, concluding that despite the risk, they could not miss out on the opportunity to make millions." Tr. Brf. p. 16; PSAC ¶¶ 91-92. The Liquidators agree that UBS SA, as well as Access and every other servicing agent who did business with Madoff, agreed to accept the BLMIS structure despite its obvious and well-known potential risks in order to earn fees, and it was willing to do so even in violation of Luxembourg law. But, the desire to earn fees in order to do business with BLMIS in the face of known potential risks falls far short of the Trustee's burden to demonstrate knowledge of a Ponzi scheme. As this Court has previously found, the financial and reputational damage alone makes it implausible that a sophisticated financial firm like UBS would knowingly do business with Madoff if they actually believed he was engaged in a Ponzi scheme. *In re Bernard L. Madoff Investment Securities LLC (Picard v. Legacy Capital Ltd and Khronos LLC) ("Legacy")*, 548 B.R. 13, 32 (Bankr. S.D.N.Y. 2016)(SMB) ("While greed may cloud judgment, it is not plausible that the average financial professional owing fiduciary duties to its own clients and investors would knowingly invest their money in a Ponzi scheme that is doomed to collapse.") *citing Katz*, 462 B.R. at 454.

24

To try to support his implausible theory, the Trustee selectively quotes from an email dated March 31, 2003 from Forentin Soliva to Klaus Kieft in PSAC ¶¶ 90, 92, a full copy of which is attached to the Moore Decl. as **Exhibit "G"**.  However, as set forth therein, Mr. Soliva describes in detail the assumptions and possible set-up that would be required by UBS AG in order for UBS SA to enter into a service relationship with BLMIS.  *Id.*  The portion of that email that is quoted by the Trustee in PSAC ¶ 90 states (*italicized/bolded* portion is omitted by the Trustee):

> *Pursuant to our depository policy*, we normally have to give "NO" as the answer in cases like Madoff.  In doing so, we make reference to the following principles: no broker as depository, and the broker may under no circumstances also be a depository at the same time!  Such a NO is easy to comprehend for both business policy reasons and risk reasons.
>
> *On the basis of the documents at hand regarding the Madoff case, we make the following assumptions and can give you a set-up recommendation.  Should the mentioned assumptions be incorrect, please notify us so that we can correct our recommendation.*

Exhibit "G".  That email then goes on to state a whole series of assumptions, possible set-up structure and conditions that UBS AG would require to be met, including:

> *Assumptions:*
>
> *-Madoff as broker dealer is being monitored and audited by both the SEC (Securities Exchange Commission) and the NASD (National Association of Securities Dealers)*
>
> ***
>
> *-Madoff acts as a broker and depository for these client positions, which consist exclusively of US securities*
>
> ***
>
> *-UBS Zurich will neither have to build a depository relationship for these special positions with this client nor with UBS Lux*
>
> ***
>
> *-Madoff has some kind of trading authority for the client's entire depository holdings*
>
> ***

*Possible Set-Up:*

*\*\*\**

***2.) UBS Lux keeps a segregated depository with Madoff which explicitly contains only the Securities of this one client. Madoff reports to UBS Lux for the purpose of daily reconciliation similar to the reconciliation usage at UBS Luxembourg.***

*Id.* Far from supporting an argument of actual knowledge or willful blindness, Exhibit "G" demonstrates the conditions under which UBS AG would permit UBS SA to enter into a serving relationship with BLMIS to account for the unusual structure Madoff demanded. There are repeated references to securities, as well as the reconciliation of positions—none of which make any sense if there was actual knowledge that Madoff was engaged in a Ponzi scheme.

With respect to the actual operational setup for Luxalpha, in PSAC ¶ 222, the Trustee asserts that "AML provided UBS SA with backdated monthly investment recommendations for Luxalpha." The earlier iteration of this allegation contained more detail, and is set forth in ¶ 221 of the OC, where the Trustee states that this procedure was set forth in an Operating Memorandum for Luxalpha dated October 10, 2008 (the "Oct 2008 OPTMEM").[9] The reason for this procedure, as admitted by the Trustee, was that "[t]his backdating procedure was made necessary and put in place as a result of delayed, hard copy only way in which BLMIS reported its purported results." The Oct 2008 OPTMEM sets forth in great detail how Luxalpha's various service providers would work together in connection with managing the fund, monitoring the investments, reconciling positions, and control of investment restrictions amongst other operational issues—all of which go against the theory that Luxalpha's service agents had either knowledge of or a highly probable belief Madoff was operating a Ponzi scheme. *See e.g.,* Exhibit H at pp. 13-18.

---

[9] A copy of what is believed to be the Oct 2008 OPTMEM is attached to the Moore Decl. as **Exhibit "H"** and the correct date of the Oct 2008 OPTMEM is October 16, 2008. The language cited by the Trustee is set forth on p. 16.

4429215

Exhibit "G" also sheds light on the Trustee's assertions set forth in PSAC ¶ 92, where he attempts to emphasize (but does not properly explain) known "risks" that "UBS" was aware of at the time it was considering doing business with Madoff, and noted the potential income to be generated.  However, when one actually looks to Exhibit "G" the ***actual*** risks that UBS SA identified were in connection with UBS SA's role as promoter, being on the administrative board, and in a depository bank function.  *Id.*  "The risk should not be underestimated.  It would be advantageous on the income side because I have already told the client that I would not accept the offer for 0.20% p.a. but would charge a minimum of 0.50% p.a. (in the event that we accepted it)."  *Id*.  As noted, the acknowledgement of these risks was appropriate as the Liquidators have brought suit against UBS SA for its liability as promotor, sponsor, etc. for Luxalpha.  It's not plausible that, having recognized these substantial risks, UBS SA would have gone forward if it knew Madoff was operating a Ponzi scheme.

In a related email to the one set forth in Exhibit "G" there is an exchange cited to by the Trustee wherein "Bernd Stiehl, a Luxalpha director and UBS SA managing director" answers an email from Viviane De-Angelis asking if they should accept the client by stating "Business is business.  We cannot permit ourselves to lose 300 million.  Accept client." PSAC ¶ 91.  A full copy of that email exchange is attached to the Moore Decl. as **Exhibit "I"**.  Importantly, the "Assumptions," "Possible Set-Up" and "Conditions" set forth in Exhibit G, are also part of the email chain set forth in Exhibit "I" and it's clear that these were mandatory conditions because "the acceptance of Madoff as a custodian will only be tolerated by Zurich if all conditions described below are met."  These exchanges demonstrate a business evaluation of potential upside (fees) in the face of a structure that would leave UBS AG and UBS SA with "risks" (i.e., potential liability) to Luxalpha investors, and do not support the Trustee's contrary arguments.

27

Indeed, the financial risks to the UBS entities was and remains substantial, and in many ways are similar to the financial risks that has led the Court to find the Trustee's rationale unpersuasive in cases like BNP Paribas.  *See BNP Paribas*, 594 B.R. at 202.  Although the Trustee eliminated any reference to UBS related investments in the PSAC, he included them in the AC.  *See* AC ¶ 118 ("UBS AG also issued a series of notes linked to Momentum AllWeather Strategies II, which in turn was invested in a Madoff feeder fund, Kingate Global Fund, Ltd (8.24% reported as of December 2008).  Upon information and belief, UBS, as issuer of these notes, would have performed due diligence on Madoff and BLMIS in the normal course of business.").  Additionally, the UBS entities, specifically, UBS AG and UBS SA, put themselves at substantial financial risk because, as admitted by the Trustee, they are liable to third-parties (i.e., Luxalpha's investors and creditors) for mismanagement of the fund's assets, and in fact remain subject to pending claims in Luxembourg based on such liability.  PSAC ¶¶ 113, 114, 254; AC ¶ 130 ("The promoter of a UCITS, including Luxalpha, is required to have a significant capital base because it is expected to provide compensation for damages sustained by third parties as a result of fault in the management or administration of the fund."); ¶ 133 ("UBS SA assumed responsibility for providing compensation for damages sustained by third parties as a result of fault in the management or administration of the fund"); ¶ 134 ("UBS SA was also the custodian and distributor of Luxalpha.  As custodian, UBS SA was by law responsible for both the safekeeping of that fund's assets and the supervision of the fund.  Despite earning substantial fees for serving as the fund's custodian, UBS SA delegated its custodial functions to BLMIS in violation of relevant law."); ¶ 147 ("In an email dated March 11, 2004, Serge Karp of UBS SA, outlined UBS SA's concerns of a 'worst case scenario' whereby BLMIS would fail, leaving UBS SA on the hook for investor claims.").  While Madoff's structure presented risks, as this Court

28

has recently stated, a party who proceeds in the face of a "known risk" or exhibits "deliberate indifference" to such a risk may be negligent, but is not willfully blind. *Picard v. ABN AMRO Bank N.V.*, Adv. Pro. No. 10-05354(SMB) (Bankr. S.D.N.Y.), ECF No. 200[10] at p. 24 ("*ABN AMRO*") *citing Global-Tech*, 563 U.S. at 770. It is simply implausible that UBS entities would subject themselves to such financial risks if they knew or even highly suspected that Madoff was operating a Ponzi scheme.

### D.    Alleged Red Flags

The Trustee cites to "Madoff's Numerous Roles" as broker, custodian and investment advisor as cause for concern (Tr. Brf. at p. 17), and PSAC ¶ 90 wherein a UBS AG employee commented on the structure as normally requiring a "No" to such structures for business policy and risk reasons. However, as explained above, the actual communication that the Trustee selectively quotes in PSAC ¶ 90 sets forth the "Assumptions," "Possible Set-Up" and "Conditions" that would be necessary in order to proceed with the Madoff relationship. The fact that UBS agreed to accept this unusual structure (just like everyone else who did business with Madoff was forced to) does not support a finding of actual knowledge or willful blindness of Madoff's fraud. As for UBS's representations to the CSSF concerning its roles with Luxalpha, the Trustee himself admits that UBS could not have disclosed BLMIS's roles to the CSSF, because Luxalpha's setup would have violated Luxembourg laws and regulations governing UCITS funds like Luxalpha. *See e.g.*, PSAC ¶ 125 ("Luxembourg's UCITS regulations prohibit UCITS fund custodians from sub-delegating custodial functions. The regulations further prohibit UCITS funds from appointing one entity as both custodian and investment manager."); AC ¶¶ 154, 160. As admitted by the Trustee in the AC, UBS was willing to set up Luxalpha in a way to

---

[10] A copy of the *ABN AMRO* opinion dated March 31, 2020 is attached to the Moore Decl. as **Exhibit "J"**.

meet the requirements of Luxembourg authorities "in return for millions of dollars in fees" but it's implausible to assume that UBS would take on potential liability to all investors (AC ¶¶ 130, 134, 147) in exchange of earning millions in fees.  AC ¶ 181.

The Trustee asserts that "[d]efendants could see that trades were purportedly being made at impossible times and prices."  *Id.* citing PSAC ¶¶ 160-64, 167, 169.  The Trustee also alleges that account statements "included clear market impossibilities".  *Id.* citing PSAC ¶¶ 147, 162, 167.  As in other cases, the majority of the cited paragraphs in the PSAC concerning alleged red flags contain nothing more than bare assertions void of actual facts to support the allegation that anyone at UBS, Access or anyone else for that matter, reviewed and observed these supposed red flags in real time.  *See e.g.,* PSAC ¶¶ 147, 152-55, 158-65, 167, 171-73, 176-77, 179-80, 185, 195-96, 207-211, 213-29, 223-27.  As this Court has repeatedly ruled, that is simply insufficient. *See e.g., Legacy* where the Court stated:

> The 'red flag' theory of *scienter* has been rejected in the Madoff-related federal securities law litigation because it amounts to pleading fraud by hindsight. Hindsight is infallible, but connecting the dots in real time may require clairvoyance.  In many cases, it requires regular comparison of information in BLMIS generated trade confirmations and monthly account reports with market information.  Even if a comparison is made, many red flags are no more than pale pink especially when they crop up infrequently over a long period . . . When the red flags are viewed in real time, '[t]he more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals.'

*Legacy*, 548 B.R. at 33-34 (internal citations omitted) (emphasis in original); *B.N.P. Paribas,* 594 B.R. at 198-99.  As such, the Court should disregard all of the Trustee's red flag allegations that fail to rely on any actual facts as they do not meet his burden here.

1.    **Access/Cutler's Investigation**

Turning to the actual facts alleged by the Trustee, he asserts that in 2006, Defendant Theodore Dumbauld, an Access partner and Chief Investment Officer of AIA LLC, "conducted his own analysis and concluded that the option trades reported by BLMIS could not be taking place." Tr. Brf. p 18 citing PSAC ¶ 148. However, in the PSAC, the Trustee left out some important facts that undermine and contradict the Trustee's assertion of actual knowledge or willful blindness for Access.

In the AC, the Trustee asserted that in the Spring of 2006, certain individuals at Access began raising questions about the volume of trade options being reported by Madoff. AC ¶ 210. In response to those questions, "Villehuchet asked Theodore Dumbauld, a Partner at AIA LLC and its Chief Investment Officer, to look at the options currently being traded by BLMIS." *Id.* ¶ 211. Dumbauld then compared Madoff's trade confirmations "to the information reflected in the Options Clearing Corporation ("OCC") database. Dumbauld confirmed that the trades being reported by BLMIS did not show up anywhere in the OCC database." *Id.* In the AC, the Trustee goes on to allege that Dumbauld "then made inquiries to people who knew in the industry" and "came to the conclusion that the options trades could not be occurring as reported by BLMIS." *Id.* ¶ 212-13. After reporting his findings to Villehuchet, "Villehuchet steadfastly refused to accept that conclusion and demanded Dumbauld get a second opinion." *Id.* ¶ 213.

Far from turning a blind eye to this, after Dumbauld reported his findings to Villehuchet, Access hired "Chris Cutler, a third-party consultant hired to examine signs of fraud." PSAC ¶¶ 147-48. The Trustee asserts that "Cutler reviewed generally available information on BLMIS's business, its auditor, audit reports, available trade tickets, and descriptions of the SSC strategy. Access, however, forbade him from speaking to Madoff or anyone at BLMIS" and "confirmed

Dumbauld's concerns about reported trade options."  PSAC ¶¶ 150-51.  The Trustee alleges that in addition to option trades, Cutler identified: "(i) serious problems with the feasibility of Madoff's strategy; (ii) the lack of any independent verification of trades or assets; and (iii) the opportunity for fraud caused by the delayed, paper-confirmation-only way in which trades were reported to Access."  PSAC ¶ 156.

The Trustee also asserts that Cuter was unable to identify Madoff's purported counterparties (PSAC ¶ 178), and in performance his evaluation of BLMIS, Cutler noted "EITHER extremely sloppy errors OR serious omissions in tickets.  That's the best case…"  PSAC ¶ 157.  The actual communication set forth in PSAC ¶ 157 (which is also referenced in PSAC ¶¶ 178, 187) is attached to the Moore Decl. as **Exhibit "K"**.  As evidenced in Exhibit "K", which is an email from Cutler to Dumbauld dated April 20, 2006, it is clear that Cutler was providing his "observations thus far" and listed a series of his initial findings and questions, and plans on follow-up to investigate further.  Thus, the Trustee is incorrect when he asserts that Cutler made the statements contained in Exhibit "K" [u]pon completing his review".  PSAC ¶ 187.  As for the "delayed" trade confirmation received by Access that were cited by Cutler (PSAC ¶¶ 156, 220-22), the Trustee previously acknowledged that Access was "willing to look past BLMIS's delayed, paper trade confirmations reporting because Madoff purportedly justified his atypical reporting method by contending that it was the only way to protect his trading strategy."  AC ¶ 239.

The Trustee asserts that in April or early May 2006, Cutler conveyed his conclusions in an oral report to "Littaye, Villehuchet, Dumbauld and Chantal Lanchon, a long-time, trusted adviser to Littaye and Villehuchet who worked for Access from time to time" and offered his conclusion that Access should exit BLMIS.  PSAC ¶ 189.  In the PSAC, the Trustee then asserts

32

4429215

"[a]s Cutler was conveying his conclusion, he was interrupted by Littaye, who said that he questioned Cutler's 'business judgment' given that Access's BLMIS business was 'going well,' while other parts of its business were not going well." PSAC ¶ 190. It is telling that in an earlier iteration of PSAC ¶ 190, the Trustee had also asserted that "Chantal Lanchon then declared her view that Cutler's conclusions could not be correct because she claimed BLMIS was audited on a regular basis by the SEC and FINRA, and that there could not possibly be a problem." AC ¶ 221. "Littaye thus considered the subject closed, and Cutler did not conduct any further investigation of BLMIS." AC ¶ 222. According to Dumbauld, concerns over Madoff's roles were "answered by the fact that Madoff was an SEC registered broker-dealer and therefore the SEC was in there doing their monitoring and that was perceived to be sufficient." AC ¶ 252.

The Trustee's implausible theory is that Access went through all these steps despite already knowing Madoff was a fraud. But, none of these allegations support a finding that Access, Dumbauld, Littaye, Cutler or anyone else had actual knowledge that Madoff was not actually trading securities and was engaged in a Ponzi scheme. What these allegations do support, however, is that Access discovered inconsistencies with the reported options trades that required a deeper investigation. And, as admitted by the Trustee, that's exactly what happened. As noted above, (i) questions were raised, (ii) Dumbauld was asked to investigate, (iii) he couldn't determine the answers, (iv) an outside consultant was hired, (v) a meeting was held to discuss Cutler's findings that included an outside "long-time trusted adviser" and (vi) Cutler's concerns were rejected as not credible because there was a belief that "Madoff was audited on a regular basis by the SEC and FINRA, and that there could not possibly be a problem." AC ¶ 221. The plausible conclusion from this is that Access and Chantal Lanchon were fooled by Madoff's stature and reputation in the industry, believed he was being carefully monitored by the SEC and

33

4429215

FINRA, and it was simply unbelievable to them that Madoff could be engaged in a fraud. And the fact that an outside consultant, Cutler, was hired to perform an evaluation cuts against any legitimate argument that Luxalpha, through its Access agents, "turned a blind eye to facts that suggested a high probability of fraud." *See, Good Faith Decision*, 516 B.R. at 21. The Court rejected a similar argument in *Legacy*, noting "it would have been 'peculiar' for Legacy to commission Khronos to conduct the type of due diligence alleged in the Amended Complaint if it already knew … BLMIS was a fraud." 548 B.R. at 33.

### 2.    Other Alleged Red Flags

The Trustee also cites to "impossibly consistent returns" as a red flag, and asserts that Access suspected that Madoff "was engaging in illegal frontrunning or illicitly using his market making operations to generate such consistent returns" as early as 1999 while running Oreades. Tr. Brf. p. 19 citing PSAC ¶¶ 166-68. However, PSAC ¶ 166 fails to contain sufficient facts and, without identifying who, how or provide other details, it merely contains the observance by someone at Access about the irregularity of BLMIS having "no negative months and very stable positive performance." PSAC ¶ 166. However, Madoff's consistent and positive returns were known by all who invested with BLMIS and was indeed a major reason people were interested in investing with Madoff. This Court has found similar red flag allegations insufficient to meet the Trustee's burden here. *See, e.g., BNP Paribas*, 594 B.R. at 198-99 (finding "[t]he Trustee's 'red flag' allegations do not support an inference that the Defendants subjectively believed there was a high probability that BLMIS was not actually trading securities."). PSAC ¶ 167 contains no reference to anyone possessing knowledge, it merely asserts that "BLMIS account statements and trade confirmations show that almost always, the trades beat the market—an impossibility" and that "Access and UBS possessed clear evidence" that Madoff's purported trades were

34

impossible. This is insufficient and is a "should have known" argument that fails to meet the Trustee's burden. *See, e.g., Legacy*, 548 B.R. at 32 (collecting cases). It is also undermined by the fact that the Trustee admitted that UBS relied exclusively on the confirmations provided by BLMIS. *See* AC ¶¶ 3, 139 (admitting that UBSFL, as Luxalpha's administrator, was responsible for accounting functions, and "calculated the NAV of [Luxalpha] **with information provided by BLMIS, without any independent verification of the numbers BLMIS provided**.")(emphasis added). The same is true for Access as set forth by the Trustee in PSAC ¶ 194 (describing the disclosure Access made to describe monthly portfolio movements "to make clear that AIA is dependent on the information provided to us by BMI and that we do not validate the accuracy of that information."). PSAC ¶ 168 similarly fails to support the Trustee's theory, and states "Access inquired whether Madoff was illicitly using his market-making operation for insight as to when the market would move." This shows that Access: (i) believed that Madoff *was* engaged in trading activities; and (ii) refutes the Trustee's allegation that Access knew that Madoff was engaged in a Ponzi scheme.

The Trustee also points to the fact that "Madoff insisted that his name never appear on any official Feeder Fund document—he was not listed for any of his numerous roles" even though it meant violating applicable laws. Tr. Brf. p. 20 citing PSAC ¶¶ 197-99. However, Madoff's demand for secrecy was not in any way unique relative to Luxalpha. And as recognized by the Trustee, Madoff was not even eligible under Luxembourg law to be a custodian. *See e.g.,* AC ¶ 154 ("The [Luxalpha] Sub-Custodian Agreement put in place could not have met the approval of the CSSF because Madoff and/or BLMIS did not meet the criteria for officially performing the duties of a custodian of a Luxembourg UCITS fund."); ¶ 160 ("Concentration of power in the hands of Madoff and/or BLMIS violated the Luxembourg law

35

implementing the UCITS directives that governed Luxalpha.").  Furthermore, this Court recently stated, "Madoff's penchant for secrecy was legendary and in any event, does not support a conclusion that Madoff's secrecy made the Defendant aware that he was a fraud." *ABN AMRO*, Adv. Pro. No. 10-05354, ECF No. 200 at p. 32 (citing *SEC v. Cohmad Sec. Corp.*, No. 09 Civ. 5680 (LLS), 2010 WL 363844, at *4 (S.D.N.Y. Feb. 2, 2010) ("That Madoff's secrecy warned defendants of fraud amounts to an argument of 'fraud by hindsight,' which the Second Circuit 'has rejected as a basis for a securities fraud complaint.'") (quoting *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

Finally, the Trustee points to the accounting firm that was used by BLMIS, Friehling & Horowitz, for the reports it filed with the SEC and provided to investors, and questioned its ability to provide large-scale and international auditing services to BLMIS. Tr. Brf. p. 20 citing PSAC ¶¶ 203-06.  Again, Madoff's use of Friehling & Horowitz was well known and is not unique to Luxalpha.  Further, the Trustee admits that Littaye's belief was that if the firm is good enough for the SEC, it should be considered good enough for Access.  AC ¶ 235.  In paragraph 206, the Trustee references the fact that Friehling & Horowitz never appeared in the American Institute of Certified Public Accountants ("AICPA") peer review program.  PSAC ¶ 206.  However, the Trustee does not allege that either UBS or Access actually reviewed the AICPA or, even if they did, what the implication of not being listed in the AICPA meant as a practical matter.  As such, this also fails to support the Trustee's red flag theory of knowledge against Luxalpha.  *ABN AMRO,* Adv. Pro. No. 10-05354, ECF No. 200 at p. 26 (where the Court held a defendant's knowledge of red flags such as "BLMIS's unsophisticated auditor, impossibly consistent returns, refusal to charge management and performance fees, and ability to perform the SSC Strategy despite having assets under management in an amount that rendered the

36

strategy unfeasible . . . were common knowledge and do not support the inference that the Defendant subjectively believed there was a high probability that BLMIS was not trading securities.") citing *Picard v. Avellino (In re BLMIS)*, 557 B.R. 89, 115 (Bankr. S.D.N.Y. 2016) ("Many of the red flags were generally known to investors and the SEC, and in many cases, the red flags would become visible, if at all, only after comparing the BLMIS-generated account statements with market information."), *reconsideration denied*, Adv. Pro. No. 10-05421 (SMB), 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016).

Based on all of the foregoing, the PSAC does not contain plausible allegations that Luxalpha (neither Luxalpha itself, nor, through its agents) had ***actual knowledge*** of Madoff's Ponzi scheme, or, more generally, actual knowledge that no actual securities transactions were being conducted.  Because the Trustee has failed to meet the pleading standards required under *Katz* and *Cohmad*, only claims to avoid and recover intentional fraudulent transfers under § 548(a)(1)(A) made within two years of the Filing Date will survive the application of the safe harbor set forth in 11 U.S.C. § 546(e).  Furthermore, because the Trustee has also failed to plausibly allege that Luxalpha turned a blind eye to facts that suggested a high probability of fraud, section 548(c) provides a defense to the Trustee's claims under § 548(a) as any transfers made to Luxalpha were for value and in good faith.  *See* 11 U.S.C. § 548(c); *Good Faith Decision*, 516 B.R. at 21; *Merkin,* 515 B.R. at 138-39; *Kingate,* 2015 WL 4734749, at *12. Furthermore, if the Trustee has failed to allege actual knowledge or willful blindness, his claim for equitable subordination based on these same allegations must likewise fail.  *See Merkin*, 515 B.R. at 158 (*citing Katz*, 462 B.R. at 454-56) (permitting the Trustee to pursue equitable subordination claims because he met his burden on properly alleging willful blindness).

37

4429215

As such, the Trustee's Motion should be denied with respect to his asserted equitable subordination and fraudulent transfer claims: against Luxalpha: (i) Count One—Equitable Subordination of Customer Claims; (ii) Count Two—Fraudulent Transfers (Initial Transferee) 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a) and 551; and (iii) Count Three—Fraudulent Transfers (Initial Transferee) 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B), 550(a), and 551. And as explained below, the remaining claims asserted against Luxalpha similarly fail.

### E.    Counts Five and Six---The Disallowance Claims

In Counts Five and Six, the Trustee seeks disallowance of Luxalpha's claims, asserting arguments that this Court has already repeatedly rejected. More specifically, in Count Five, the Trustee alleges that Luxalpha "was not an innocent investor" and "was willfully blind to numerous and serious indications of fraudulent activity at BLMIS" such that Luxalpha "does not have a claim enforceable against the BLMIS estate under SIPA or other applicable law" citing to sections 502(a) and 502(b)(1) of the Bankruptcy Code, and section 78fff-2 of SIPA. PSAC ¶¶ 287-90. Count Six alleges that Luxalpha engaged in inequitable conduct and requests that the Court exercise "its equitable powers to ensure that claims, payments or benefits, of whatever kind or nature, which are asserted or sought by Luxalpha against the estate, are disallowed." PSAC ¶¶ 293-97. In rejecting these precise claims in *Kingate*, the Court stated as follows:

> The Court addressed the same claims at length in *Merkin* and rejected them. It concluded that SIPA did not permit the equitable disallowance of a customer claim to the principal the customer had invested; it only disqualified the customer from participating in the insurance fund administered by SIPC. *Merkin*, 515 B.R. at 153-56. It also concluded that there was no basis to disallow a claim under general principles of equity. *Id.* at 156-57.

*Kingate*, 2015 WL 4734749, at * 16. Based on the Court's reasoning in *Merkin* as reinforced in *Kingate*, Counts Five--Objection And Disallowance Of Claims and Six--Equitable Disallowance Of Claims have no basis in law and should be dismissed.

38

4429215

### F.   Luxalpha's Cross-Motion For Claim Determination And Allowance Should Be Granted

To the extent that the Court finds that the Trustee has adequately alleged facts to plausibly assert fraudulent transfer claims against Luxalpha and is inclined to grant the Trustee's Motion, Luxalpha respectfully requests that the Court grant Luxalpha's Cross-Motion which would effectively result in ending this entire proceeding for both Luxalpha and all defendants whose claims are based on their relationships with Luxalpha.   This includes any potential subsequent transfer claims that could be returned to the Court based on the pending petition for a writ of certiorari before the United States Supreme Court in *HSBC Holding PLC v. Irving H. Picard*, 17-2992(L) (U.S.).  Such claims would be moot under 11 U.S.C. § 550(d).

As noted above, Luxalpha is a substantial net loser.  As set forth in Exhibit B to the Trustee's PSAC, over the life of Account No. 1FR108 (the "Account"), $1,514,049,766 of Luxalpha's funds were deposited into the Account, while withdrawals totaled $751,566,000, leaving a net equity claim of $762,483,766 (the "Net Equity Claim").   The six-year initial transfers from the Account total $751,566,000 (the "Six-Year Transfers"), while the two-year initial transfers from the Account total $735,366,000 (the "Two-Year Transfers").  If the Court finds that the Trustee has plausibly alleged fraudulent transfer claims against Luxalpha, be it the Six-Year Transfers or the Two-Year Transfers, Luxalpha will consent to the payment of such amounts to the Trustee's estate to end this 10+ year litigation on the terms set forth herein.

According to the Trustee's website (madofftrustee.com), inclusive of the recent Eleventh pro rata interim distribution, as of March 20, 2020, the Trustee has made distributions to allowed customer claims in the amount of 68.608% (the "Current Distribution Percentage").  As noted, Luxalpha's Net Equity Claim is $762,483,766, which means that, upon allowance, Luxalpha would be entitled to receive a distribution in the amount of $523,124,862.17 (the "Allowable Net

39

Equity Distribution").    Upon payment of either the Six-Year Transfers or the Two-Year

Transfers, Luxalpha would also be entitled to an additional claim under 11 U.S.C. § 502(h).

Thus, in the Six-Year Transfer scenario, Luxalpha would be entitled to a total allowed customer

claim in the amount of $1,514,049,766 consisting of its Net Equity Claim ($762,483,766) plus its

section 502(h) claim ($751,566,000) (the "Allowable Six-Year Customer Claim").    Applying the

Current Distribution Percentage to the Allowable Six-Year Customer Claim would result in a

distribution payable to Luxalpha in the amount of $1,038,759,263.    In that scenario, the Trustee

would keep the Six-Year Transfers ($751,566,000) and Luxalpha would be entitled to receive the

net remaining amount of $287,193,263.

Similarly, in the Two-Year Transfer scenario, Luxalpha would be entitled to a total

allowed customer claim in the amount of $1,497,849,766 consisting of its Net Equity Claim

($762,483,766) plus its two-year section 502(h) claim ($735,366,000) (the "Allowable Two-Year

Customer Claim").    Applying the Current Distribution Percentage to the Allowable Two-Year

Customer Claim would result in a distribution payable to Luxalpha in the amount of

$1,027,644,767.    In that scenario, the Trustee would keep the Two-Year Transfers

($735,366,000) and Luxalpha would be entitled to receive the net remaining amount of

$292,278,767.

As explained above, if the Court determines and allows the Net Equity Claim, even if the

Court finds that the Trustee has set forth plausible avoidance claims, there will be sufficient

resources to not only pay the Trustee's estate in full, but, there will be hundreds of millions of

dollars that will flow over to the Luxalpha's estate for the benefit of its investors at long last.

Additionally, the substantial reserve being held by the Trustee on account of Luxalpha's Net

Equity Claim will be released for the benefit of every party with allowed claims.  And for the

reasons set forth below, none of the arguments raised by the Trustee in the PSAC should serve as a bar to the Court's determination and allowance of the Luxalpha's claims.

### 1.    The Court Has Authority To Determine And Allow Luxalpha's Claims Under 11 U.S.C. §§ 502(b) And 105(a)

Bankruptcy Code section 502(a) provides that filed claims are deemed allowed unless a party in interest objections.  11 U.S.C. § 502(a).  And section 502(b) states in relevant part that "if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in the lawful currency of the United States as of the date of the filing of the petition".  11 U.S.C. § 502(b).  Determining the extent and validity of claims is a long-standing function of Bankruptcy Courts.  The Bankruptcy Court is the proper venue to "finally adjudicate such claims that do not exist independent of a bankruptcy case." *Messer v. Magee (In re FKF 3, LLC)*, 2106 U.S. Dist. LEXIS 117258 at *47 (S.D.N.Y. 2016).   Although section 502(d) disallows "any claim of any entity from which property is recoverable under section 542, 543, 550 or 553," as set forth above, Luxalpha agrees and consents that the Court condition claim allowance on a payment being made to the Trustee of either the Six-Year Transfers or the Two-Year Transfers, which eliminates 11 U.S.C. § 502(d) as a basis to deny the Cross-Motion. Coupled with section 105(a) of the Bankruptcy Code, there is no doubt that the Court has the authority to grant the Cross-Motion by permitting payment of the alleged fraudulent transfers to the Trustee by netting any amount due to Luxalpha on account of its Net Equity Claim and any claim it would be entitled to under section 502(h) of the Bankruptcy Code.  11 U.S.C. § 101(5)(a) ("Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title").  Furthermore, granting the Cross-Motion comports with SIPA's purpose of expediting the return of customer property as emphasized by the Second Circuit in the *Net Equity Decision*. 654 F.3d at 240.

41

2.     **The Trustee Is Not Entitled To Pursue Equitable Subordination If The Six-Year (Or, As the Case May Be, The Two-Year) Transfers Are Paid To The Estate**

Equitable subordination is a remedy unique to bankruptcy. *See In re Granite Partners, L.P.*, 210 B.R. 508, 518 (Bankr. S.D.N.Y. 1997) ("*Granite Partners*").  Section 510(c) of the Bankruptcy Code provides as follows:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510.

Courts within the Second Circuit generally follow the standard established by the Fifth Circuit that three elements must be proven in order to equitably subordinate a claim: "(a) the claimant engaged in some type of inequitable conduct; (b) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and (c) equitable subordination of the claim is consistent with bankruptcy law." *Granite Partners,* 210 B.R. at 514 (citing *Benjamin v. Diamond* (*In re Mobile Steel Co.), 563 F.2d 692 (5th Cir. 1977).  Equitable subordination is a "remedial, rather than penal [remedy], and courts may subordinate an entire claim or portion of a claim . . . [h]owever, equitable subordination is an extraordinary remedy and all of the conditions must be satisfied." *Pereira v. Prompt Mort. Providers of N. Am., LLC (In re Heavey)*, 608 B.R. 341, 354 (Bankr. E.D.N.Y. 2019) (citing *In re East End Dev.*, 2017 Bankr. LEXIS 949 at *9 (Bankr. E.D.N.Y. 2017)) (internal quotation marks omitted).

With respect to the first prong, the degree of misconduct necessary to warrant equitable subordination of an ordinary non-insider, non-fiduciary creditor's claim has been described as

"gross and egregious . . . tantamount to fraud, misrepresentation, overreaching or spoilation" or "involving moral turpitude." *Merkin*, 515 B.R. at 158 (citing *Granite Partners, L.P.,* 210 B.R. at 515). "Traditionally, equitable subordination has been limited to cases involving (1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, or (3) control or use of the debtor as an alter ego for the benefit of the claimant." *Granite Partners*, 210 B.R. at 514; *see also In re Monahan Food Corp. of Flushing*, 340 B.R. 1, 44 (Bankr. E.D.N.Y. 2006). However, "unless the creditor has dominated or controlled the debtor to gain an unfair advantage, his claim will be subordinated, based upon inequitable conduct, only if the claimant has committed some breach of an existing, legally recognized duty arising under contract, tort or other area of law." *In re 80 Nassau Assocs.*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994). The Court has stated that "equitable subordination is appropriate where the misconduct injured the creditors of the estate or conferred an unfair advantage on the claimant, and equitable subordination is consistent with bankruptcy law." *Merkin*, 515 B.R. at 158.

This Court's decision in *In re Dreier* is also informative, where a trustee sought to bring both avoidance action claims along with a count for equitable subordination. *See McGowan v. Wachovia Bank, N.A.* (*In re Dreier LLP*), 453 B.R. 499, 507 (Bankr. S.D.N.Y. 2011) (SMB). The Court ultimately dismissed the trustee's complaint with prejudice as to all claims but two, allowing the trustee to attempt to replead only its fraudulent transfer claim and a claim for equitable subordination based on an escrow transfer theory that was not fully articulated in the original complaint. *Id*. at 517-18.

With respect to the claim for equitable subordination, the Court noted that the same conduct that supported the fraudulent transfer claim the Court dismissed was used to support the trustee's equitable subordination claim, and that without more, the trustee failed to allege "gross

43

and egregious" conduct necessary to support its equitable subordination claim against the non-insider. *Id*. at 516-17. Furthermore, the Court went on to state: "[e]ven when a complaint alleges gross and egregious conduct, ***equitable subordination is only an alternative to a monetary recovery for the creditor's wrongdoing, and the trustee cannot recover damages and equitably subordinate a claim based on the same wrong***." *Id*. at 517 (emphasis added) (citing *Hirsch v. Pennsylvania Textile Corp*. (*In re Centennial Textiles, Inc*.), 227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998); *Granite Partners,* 210 B.R. at 517). In explaining that equitable subordination is not available when fraudulent transfers are returned to an estate, the Court stated:

> Equitable subordination merely reorders the priority of the claim, but the claim may still be allowed. If the Trustee pleads and ultimately proves that [the creditor] received a fraudulent transfer, [the creditor's] claim will be disallowed under Bankruptcy Code § 502(d). Thus, the § 502(d) claim provides broader relief than the Trustee's equitable subordination claim. Furthermore, [the creditor] will not be entitled to any distribution unless it returns the fraudulent transfer. In that event, the estate will have been made whole, and will not be entitled to the additional remedy of equitable subordination.

*Id*. Another case that dealt with equitable subordination as an additional or alternative remedy is *In re Centennial Textiles, Inc*., 227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998). In *In re Centennial Textiles, Inc*., after trial, the Court ruled that unauthorized post-petition transfers may be avoided and recovered by the trustee under sections 549(a) and 550 of the Bankruptcy Code and that the trustee's claim for equitable subordination was thus rendered moot. *Id*. at 610-11. The Court stated that "[e]quitable subordination . . . merely postpones payment but does not disallow the claim. It is an alternative remedy to monetary recovery from the wrongdoing claimant. Consequently, a trustee cannot recover damages and equitably subordinate a claim based upon the same wrong." *Id.* at 611 (citations omitted). Again, the rationale underlying the determination that equitable subordination is an unnecessarily duplicative remedy is that the estate is made whole by either the disallowance of the defendant's claim, or payment to the

estate.  As the Court described, "[the defendant] cannot receive any distribution until it pays the judgment . . . on account of preferential transfers. If it pays the judgment, the estates will be made whole.   In that event, the trustee will not be entitled to the remedy of equitable subordination." *Id.* (citations omitted).

Likewise, in *Century Glove, Inc. v. Iselin (In re Century Glove, Inc.),* 151 B.R. 327, 332 (Bankr. D. Del. 1993) the court held that the plaintiff "cannot ultimately prevail upon both types of claims" but "can plead alternate and inconsistent forms of relief." *Id.* at 332 (citing Fed. R. Civ. P. 8(a)(3)).   The court went on to state that "[a] debtor may not obtain both equitable subordination and an award of money damages which would compensate it for the damages resulting from the same conduct." *Id*. at 332 (Bankr. D. Del. 1993) (citing *In re Kansas City Journal–Post Co*., 144 F.2d 791, 801 (8th Cir. 1944)). "On the contrary, equitable subordination is a remedy available only when damages cannot be reasonably ascertained." *Id*. (citing *Taylor v. Standard Gas Co*., 306 U.S. 307, 323 (1938)).   Further, the court held that in the event the plaintiff's equitable subordination claim is successful, the defendant's claims should only be subordinated to the extent necessary to offset the harm suffered on account of the inequitable conduct. *Id*. at 336 (citing *Mobile Steel*, 563 F.2d at 701).

Finally, in *Merkin*, the Trustee brought an action against certain direct and indirect feeder funds for fraudulent transfers, equitable subordination, equitable disallowance, and subsequent transferee liability.   515 B.R. at 117.   In connection with a motion to dismiss, the Court determined that the Trustee failed to plead that the defendants had actual knowledge of Madoff's Ponzi scheme, but, had set forth facts supporting willful blindness.   515 B.R. at 140-47.   In addressing the Trustee's ability to pursue both a return of alleged fraudulent transfers and

45

equitable subordination simultaneously, the Court explained that the Trustee was not entitled to

both recover damages and equitably subordinate a claim based upon the same wrong:

> It is well-settled that equitable subordination is an alternative to a
> monetary recovery for the creditor's wrongdoing, and the trustee cannot
> recover damages and equitably subordinate a claim based on the same
> wrong.  If the Trustee proves that the defendants received fraudulent
> transfers as initial or subsequent transferees, their claims will be
> disallowed under Bankruptcy Code § 502(d).  Disallowance under §
> 502(d) provides broader relief than equitable subordination.
>
> Furthermore, no defendant will be entitled to any distribution unless it
> returns the fraudulent transfer.  Once it does, it can assert a claim to the
> extent permitted by Bankruptcy Code § 502(h).  It would seem that the
> Trustee should not be able to equitably subordinate the § 502(h) claim
> because the return of the avoided transfer would compensate the estate for
> the injury caused by the fraudulent transfer, and the estate cannot recover
> damages and equitable subordination for the same wrong.
>
> In this sense, the equitable subordination claim is worth pursuing only if
> the Trustee fails to succeed on his fraudulent transfer claims because of
> defenses such as the § 546(e) safe harbor or the statute of limitations under
> § 546(a)(1), but can nonetheless prove inequitable conduct that injured the
> creditors or conferred an unfair advantage. For present purposes, however,
> a court should not dismiss an equitable subordination claim for legal
> insufficiency merely because the plaintiff has also asserted a claim for
> damages based upon the same conduct.

*Merkin*, 515 B.R. at 160-61.  Accordingly, if the Court allows Luxalpha's claims as set forth

above and the Trustee is paid for any outstanding surviving fraudulent transfers, the Trustee's

estate will have been made whole and there is no basis to permit the Trustee to pursue the

alternative remedy of equitable subordination.

### 3.     There Is No Basis To Equitably Subordinate A 502(h) Claim

Bankruptcy Code section 502(h) states, "[a] claim arising from the recovery of property

under section 522, 550, or 553 of this title shall be determined, and shall be allowed under

subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section,

the same as if such claim had arisen before the date of the filing of the petition."  11 U.S.C. §

502(h).   Section 550 is the provision of the Bankruptcy Code that sets forth the remedies

available to the plaintiff in an avoidance case, including a fraudulent conveyance action.

Accordingly, if an alleged fraudulent transfer is returned to the estate by the creditor, the creditor

is entitled to a claim for the amount returned.   Thus, in the claim allowance scenario discussed

above, if the Trustee has asserted viable avoidance claims against Luxalpha, Luxalpha will be

entitled to a claim under section 502(h) in the amount of either the Six-Year Transfers or the

Two-Year Transfers "as if such claim had arisen before the date of the filing of the petition."  11

U.S.C. § 502(h).

"In short, section 502(h) is intended to put a creditor in the same position as it would

have been if a recovered transfer had not occurred, permitting the creditor to assert a claim for

amounts owed just as it would if a preferential or other avoidable transfer had not been made."

Collier on Bankruptcy, §502.09[1].  Thus, a claim under 502(h) has the same prepetition status

that it would have had if no transfer had ever occurred.  In this case, that means that Luxalpha's

502(h) claim must be given the same priority as its existing Net Equity Claim.  Because section

502(h) recognizes a claim for the value defendants would have held had the transfers never

happened, and therefore effectively aims to restore the parties to their pre-transfer positions, the

preceding equitable subordination analysis is equally applicable to the question of whether the

Trustee can equitably subordinate a 502(h) claim.  In other words, the Trustee is precluded from

obtaining the return of fraudulent transfers while also equitably subordinating a defendant's

502(h) claim based on the same wrongdoing.  *See In re Dreier LLP*, 453 B.R. at 517; *In re

Centennial Textiles, Inc.*, 227 B.R. at 611; *In re First Alliance Mortg. Co.*, 298 B.R. at 666.

The Second Circuit long ago held that after recovery of an avoided or fraudulent transfer,

the surrendering party will have a claim that is shared *equally* with other creditors, thus

envisioning the statutory support that would later come in the form of section 502(h) of the

Bankruptcy Code.  Specifically, in *In re Onodaga Litholite Co*., a defendant bank that conducted

a foreclosure sale was found to have received a fraudulent transfer represented by the proceeds

of said sale.  *First Trust & Deposit Company v. Receiver of Salt Springs National Bank (In re*

*Onodaga Litholite Co.)*, 218 F.2d 671, 673 (2d Cir. 1955).  After return of the proceeds, a

creditor moved to subordinate the defendant bank's resulting claim, which was originally granted

by the referee, affirmed by the District Court, but ultimately reversed by the Second Circuit:

> [T]he Bankruptcy Court was without power in the circumstances of this
> case, to order the subordination of the appellant's claim . . . [i]f a creditor
> having a valid common claim free of equitable infirmities, in an effort to
> obtain satisfaction of his claim or security therefor, accepts a conveyance
> of assets of his debtor – later the bankrupt – with actual intent thereby to
> defraud the debtor's other creditors, nevertheless, **if after adjudication he**
> **surrenders the assets thus acquired to the court, he may share on a**
> **parity with other creditors.**

*Id.* (emphasis added).  *See also In re Best Prods. Co.*, 168 B.R. 35, 38 (Bankr. S.D.N.Y. 1994)

([T]his much is unassailable: to the extent that [defendants] gave consideration to the debtor . . .

[they] would have a claim which would be allowable so long as they satisfied the judgment

arising out of the fraudulent transfer action.").  Accordingly, there is no basis to either

subordinate a 502(h) claim, nor treat a 502(h) claim in this proceeding as being entitled to a

different priority than allowed net equity customer claims.

### 4.    Madoff Victim Fund

With respect to undue prejudice present if the Motion is granted and the Cross-Motion

denied, it's important that the Court is aware of the current predicament Luxalpha victims are

facing regarding the Madoff Victim Fund (the "MVF") being administered by Special Master

Richard C. Breeden on behalf of the U.S. Department of Justice.  In short, not only are Luxalpha

victims being denied the opportunity to receive a distribution by the Trustee, because Luxalpha's

48

Customer Claim remains undetermined, Luxalpha victims are also being excluded from distributions from the MVF. Further, they may lose their right to any distribution from the MVF at some point.

In response to Luxalpha investors contacting the Liquidators about the MVF, counsel for the Liquidators wrote to the MVF to try and obtain information as to why Luxalpha related victims were being excluded from distributions by the MVF. *See* correspondence from Brett S. Moore to MVF dated September 20, 2018 attached to the Moore Decl. as **Exhibit "L"**. In response, the MVF explained its position that although Luxalpha victims with allowed claims had been included in the initial distribution from MVF, "any additional distributions will be withheld until the Luxalpha victims can provide information as to their likely bankruptcy recoveries." *See* correspondence from MVF dated October 23, 2018 attached to the Moore Decl. as **Exhibit "M"**. The letter goes on to state as follows:

> For the sake of all the parties, we hope that this litigation can be concluded before too long. For now, MVF has maintained a reserve sufficient to pay the Luxalpha investors a second distribution should that be appropriate after Luxalpha resolves its litigation with the trustee. MVF will follow a similar procedure in MVF's upcoming third distribution.
>
> However, when MVF approaches final distribution of its remaining funds, we cannot guarantee that these reserves will be maintained. It is quite possible that claims with uncertain collateral recovery amounts will have to be disallowed to enable MVF to wind up its existence without further cost or uncertainty for other victims. We are not at that point now, but at some point the need to finalize MVF's *pro rata* payout percentage and wind up its affairs could conceivably force MVF and DOJ to disallow remaining claims that are contingent in amount and pay out the MVF balance to those whose claims can be qualified. We hope to avoid any such outcome for the Luxalpha victims. We sincerely hope that this litigation can be resolved before MVF is forced to redirect funds currently reserved for the Luxalpha investor claims.

Exhibit "M".

This unfortunate potential result is avoided by the Cross-Motion, as it will: (i) provide payment in full on any fraudulent transfer claims that survive the Opposition; (ii) provide a

substantial net recovery for Luxalpha's estate; (iii) provide certainty to the MVF in terms of what Luxalpha will receive from the BLMIS estate so that MVF can proceed with additional distributions to eligible Luxalpha victims; (iv) avoid substantial cost and delay for Luxalpha, the Trustee and all defendants whose claims are based on their association with Luxalpha; and (v) free up the substantial reserve being held by the Trustee for the benefit of all BLMIS victims with allowed claims.

## CONCLUSION

WHEREFORE, LAF respectfully requests that the Court: (i) deny the Trustee's Motion; or alternatively, (ii) allow Luxalpha's Cross-Motion, determine the extent and validity of Luxalpha's Net Equity and 502(h) claims.

Dated: April 3, 2020                Respectfully submitted,

**PORZIO BROMBERG & NEWMAN P.C.**

/s/     Brett S. Moore
Brett S. Moore (BM-0014)
156 West 56th Street
Suite 803
New York, New York 10019-3800
(212) 265-6888 (telephone)
(212) 957-3983 (fax)
bsmoore@pbnlaw.com

*Attorneys for Defendants Luxalpha Sicav as represented by its Liquidators Maitre Alain Rukavina and Paul Laplume, Maitre Alain Rukavina and Paul Laplume, in their capacities as liquidators and representatives of Luxalpha Sicav*

4429215