# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

SECURITIES INVESTOR PROTECTION            :
CORPORATION,                               :          Adv. Pro. No. 08-01789 (SMB)
                                           :
            Plaintiff-Applicant,           :          SIPA Liquidation
                                           :
        – against –                        :          (Substantively Consolidated)
                                           :
BERNARD L. MADOFF INVESTMENT               :
SECURITIES LLC,                            :
                                           :
            Defendant.                     :

------------------------------------------------------------X

In re:                                     :
                                           :
BERNARD L. MADOFF,                         :
                                           :
            Debtor.                        :

------------------------------------------------------------X

IRVING PICARD, Trustee for the Liquidation :
of Bernard L. Madoff Investment Securities :
LLC,                                       :
                                           :
            Plaintiff,                     :
                                           :
        – against –                        :          Adv. Pro. No. 10-05354 (SMB)
                                           :
ABN AMRO BANK N.A.                         :
                                           :
            Defendant.                     :

------------------------------------------------------------X

**MEMORANDUM DECISION DENYING
TRUSTEE'S MOTION FOR LEAVE TO
FILE A SECOND AMENDED COMPLAINT**

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111

     David J. Sheehan, Esq.
     Patrick T. Campbell, Esq.
     Camille C. Bent, Esq.
     Elizabeth McCurrach, Esq.

Matthew Cowherd, Esq.
Of Counsel

*Attorneys for Plaintiff*

REICHMAN JORGENSEN LLP
750 Third Avenue, Suite 2400
New York, New York 10017

Michael S. Feldberg, Esq.
Of Counsel

*Attorneys for Defendant*

## STUART M. BERNSTEIN
## United States Bankruptcy Judge:

Plaintiff Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard

L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), has moved ("Motion")[1] for leave to

file his *Proposed Second Amended Complaint* ("*PSAC*")[2] seeking to recover subsequent

transfers totaling $276,313,906.oo from ABN AMRO Bank N.V. ("Defendant").[3]  The

Defendant opposes the Motion on the basis that the amendment is futile.[4]  For the

reasons that follow, the Motion is denied.

---

[1]    *See Memorandum of Law in Support of Trustee's Motion for Leave to File a Second Amended Complaint*, dated June 10, 2019 ("*Trustee Memo*") (ECF Doc. # 179); *see also Reply Memorandum of Law in Further Support of Trustee's Motion for Leave to File a Second Amended Complaint*, dated Sept. 9, 2019 ("*Trustee Reply*") (ECF Doc. # 189).  "ECF Doc. # _" refers to documents filed on the electronic docket of this adversary proceeding.  References to other dockets will include the case number.

[2]    A copy of the *PSAC* is attached as Exhibit A to the *Declaration of Patrick T. Campbell in Support of the Trustee's Motion for Leave to File a Second Amended Complaint*, dated June 10, 2019 ("*Campbell Declaration*") (ECF Doc. # 180).  "(¶ _ )" refers to paragraphs in the *PSAC*.

[3]    The Defendant changed its name to The Royal Bank of Scotland N.V. on February 6, 2010, (¶ 16), and then to NatWest Markets N.V. on May 30, 2018.  (*PSAC* at 1 n.1.)

[4]    *See Defendant ABN AMRO Bank N.V.'s (Presently Known as The Royal Bank of Scotland, N.V.) Memorandum of Law in Opposition to the Trustee's Motion for Leave to File a Second Amended Complaint*, dated Aug. 9, 2019 ("*Opposition*") (ECF Doc. # 182).

## BACKGROUND

Unless otherwise indicated, the background information is taken from the well-pleaded factual allegations of the *PSAC* and other information the Court may consider in determining whether the pleading is legally sufficient.

### A.    Madoff's Ponzi Scheme

At all relevant times, Bernard L. Madoff operated the investment advisory ("IA") arm of BLMIS as a Ponzi scheme.  (¶ 52.)  From 1992 on, Madoff told IA customers that he employed the "split-strike conversion" strategy ("SSC Strategy"), under which BLMIS purported to purchase a basket of stocks intended to track the S&P 100 Index, and hedged the investment by purchasing put options and selling call options on the S&P 100 Index.  (¶¶ 58, 60-62.)  In reality, BLMIS never purchased any securities on behalf of its investors and sent monthly statements to investors containing falsified trades typically showing fictitious gains.  (¶¶ 58, 59.)  BLMIS commingled all investor deposits in a JPMorgan Chase Bank account held by BLMIS and used the funds to satisfy withdrawals by other investors, benefit Madoff and his family personally and prop up BLMIS's proprietary trading business.  (¶ 58.)

The BLMIS Ponzi scheme collapsed when redemption requests overwhelmed the rate of new investments.  (¶ 74.)  On December 11, 2008 ("Filing Date"), Madoff was arrested for criminal violations of federal securities laws, and the Securities and Exchange Commission ("SEC") contemporaneously commenced an action in the United States District Court for the Southern District of New York.  (¶¶ 23, 34.)  The SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC") alleging that BLMIS could not meet its obligations to

securities customers and the customers needed the protections afforded by SIPA.  (¶ 35.)  On December 15, 2008, the District Court granted SIPC's application, appointed the Trustee and his counsel, and removed the SIPA liquidation to this Court.  (¶ 36.)

At a plea hearing on March 12, 2009, Madoff pleaded guilty to an eleven-count criminal information and admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (¶¶ 39, 75.)

## B.    The Defendant and the Tremont Funds

The Defendant is a Dutch commercial bank and, at all relevant times, was an industry leader in derivatives.  (¶¶ 10, 14.)  The Defendant worked closely with, and acted through, its wholly-owned subsidiary ABN AMRO Inc. ("ABN Inc.") including in connection with the Swap Transactions (defined below).  (¶¶ 12-13, 17.)  In October 2007, the Defendant's parent company was sold to a subsidiary of The Royal Bank of Scotland Group plc ("RBS").  (¶ 16.)

Non-party Tremont Group Holdings, Inc. and its management arm Tremont Partners, Inc. (together, "Tremont") managed and controlled numerous investment funds including BLMIS feeder funds Rye Select Broad Market Portfolio Limited ("Rye Portfolio Limited"), Rye Select Broad Market Fund L.P. ("Rye Broad Market"), Rye Select Broad Market Insurance Portfolio LDC ("Rye Insurance LDC"), and Rye Select Broad Market Prime Fund, L.P. ("Rye Prime Fund," and collectively, the "Initial Transferees").  (¶¶ 2, 19-20.)  Tremont also managed and controlled indirect BLMIS feeder funds Rye Select Broad Market XL Portfolio, Ltd. ("XL Portfolio Limited") and

- 4 -

Rye Select Broad Market XL Fund L.P. ("XL Broad Market," and together, the "XL Funds"). (¶¶ 2, 21.)

## C.    The Swap Transactions and the Subsequent Transfers at Issue

The subsequent transfers at issue emanated from two swap transactions between the Defendant and the XL Funds (the "Swap Transactions"). Each Swap Transaction followed the same basic structure: the XL Fund posted cash collateral with the Defendant, and the Defendant agreed to pay the XL Fund three times the returns that would have been generated if the cash collateral amount was directly invested in a specified reference fund. (¶¶ 21, 78.) Thus, the Swap Transaction provided leverage to the XL Fund so that it could receive three times the returns on its investment in the reference fund. In return, the Defendant earned millions of dollars in fees. (¶¶ 78, 81, 83.)

The Defendant hedged its risk by investing three times the amount of the collateral in the same reference fund (the "Hedge") so it would earn the same amount in returns from the reference fund that it owed to the XL Fund under the Swap Transaction. This meant that one-third of the Defendant's investment under the Hedge consisted of the XL Fund's cash collateral, and the remaining two-thirds consisted of the Defendant's own funds. (¶ 79.)

### 1.  2006 Swap Transaction

#### a.  Due Diligence

In September 2006, the Defendant entered into the first of two Swap Transactions (the "2006 Swap Transaction") with XL Portfolio Limited keyed to Rye

- 5 -

Portfolio Limited as the reference fund.[5]  In the leadup to the 2006 Swap Transaction,
David Schwartz of ABN, Inc. requested and received information from Tremont relating
to Madoff, BLMIS, and BLMIS feeder funds.  On April 24, 2006, Schwartz emailed
Tremont's Darren Johnston, Patrick Kelley and others at Tremont expressing interest in
providing leverage to its BLMIS feeder funds if Tremont would clarify that is was the
"administrator of the one fund in question . . . [and] explain how that would work in
terms of reporting and independence."  (¶ 88.)  After signing a non-disclosure
agreement with Tremont, the Defendant gained access to non-public information
including BLMIS's trading strategy and customer operations.  (¶ 89.)

The Defendant sought additional BLMIS information the following month, and
Tremont provided (i) historical returns for BLMIS feeder fund Kingate Global Fund
Limited ("Kingate Fund"), which Tremont indicated was a "proxy" for Rye Portfolio
Limited, (ii) Investment Summary Reports for Rye Portfolio Limited for years 2002
through 2006, (iii) Rye Portfolio Limited's prospectus, (iv) Performance Reports for
four Tremont BLMIS feeder funds showing historical performance, and (v) account
opening documents for Rye Portfolio Limited's BLMIS account.  (¶¶ 90-91.)

In July 2006, Schwartz requested a conference call with Tremont to discuss,
among other things, "further clarification on the [BLMIS] OTC options."[6]  During the

---

[5]    *See* Confirmation Letter for Cash-settled Index Swap Transaction, dated Sept. 1, 2006 ("2006
Swap Confirmation"), a copy of which is annexed as Exhibit A to the *Declaration of Michael S. Feldberg
in Support of ABN AMRO Bank N.V.'s (Presently Known as The Royal Bank of Scotland, N.V.)
Memorandum of Law in Opposition to the Trustee's Motion for Leave to File a Second Amended
Complaint*, dated Aug. 9, 2019 ("*Feldberg Declaration*") (ECF Doc. # 183).

[6]    "OTC" options refer to options traded over the counter rather than through an exchange.

call, Schwartz discussed the Defendant's issues including the creditworthiness of BLMIS's option counterparties as well as BLMIS's "lack of independence." Subsequently, Kelly admitted in an internal Tremont email that "[w]e have nothing to offer on the option issue." Tremont did not have "much to offer" on the lack of independence issue either. (¶¶ 96, 98.)

The Defendant also wanted the ability to withdraw its Hedge investment on five-days' notice rather than the thirty-six-days' notice required for other Rye Portfolio Limited investors. When Tremont responded that early redemptions would require Board approval, the Defendant suggested that Tremont create a new share class with "accelerated liquidity" provisions for the Defendant. (¶¶ 117-19.) The Defendant's "bottom line" was the ability to exercise accelerated redemption rights upon the occurrence of certain "special redemption events" including "if any action, suit, proceeding, inquiry or investigation has been taken or brought, or is pending, by any court, governmental or regulatory body or agency against the Account Manager [BLMIS]" (the "Fraud Provision"). (¶ 120.)

Tremont agreed to create a new share class for the Defendant – Class D – and agreed to most of the proposed special redemption events triggering the enhanced liquidity rights[7] except the Fraud Provision. (¶¶ 121-22.) The Defendant eventually acquiesced in the exclusion of the Fraud Provision after Tremont threatened to walk

---

[7]    The swap confirmation for the 2006 Swap Transaction also provided that the Defendant could cancel the swap upon the occurrence of a special redemption event. (¶ 125.)

away from the deal, (¶ 123), and the parties executed the 2006 Swap Transaction in
September 2006.[8]

### b. The 2006 Swap

Under the 2006 Swap Transaction, XL Portfolio Limited transferred $217 million
in cash collateral to the Defendant between September 1, 2006 and July 2, 2007. (*See
PSAC*, Ex. P.) Of that amount, $74,616,573 ("Portfolio Limited Collateral Transfers")
consisted of BLMIS customer property initially transferred to either Rye Portfolio
Limited or Rye Insurance LDC and subsequently transferred to XL Portfolio Limited.
(¶¶ 81, 257-59; *PSAC*, Exs. I and M (transfers from BLMIS to Rye Portfolio Limited and
Rye Insurance LDC), K and N (transfers from Rye Portfolio Limited and Rye Insurance
LDC to XL Portfolio Limited), and P (transfers from XL Portfolio Limited to
Defendant).)

As a Hedge for the 2006 Swap Transaction, the Defendant invested three times
the cash collateral amount – $651 million – in Rye Portfolio Limited of which $434
million represented the Defendant's own money unprotected by the collateral
transferred by the XL Fund. The Hedge assured the Defendant that it would earn
enough on its direct investment in the referenced fund to cover the amount it would
have to pay the XL Fund if the value of the reference fund increased. For this reason, it
was a "perfect hedge." *See Picard v. ABN AMRO Bank (Ireland) Ltd.* (*In re BLMIS*),
505 B.R. 135, 138 (S.D.N.Y. 2013).

---

[8]    The *PSAC* makes reference to a "side letter" issued by Rye Portfolio Limited confirming
Defendant's superior redemptions rights, (¶ 125), but doesn't state whether any additional rights were
granted by the letter.

The Hedge was not without risk.  If the value of the Defendant's investment declined, the Defendant could lose more than any fees it earned on the transaction and possibly, its entire investment.  The Defendant ultimately redeemed at least $104,464,000 between September 4, 2007 and December 1, 2008 from Rye Portfolio Limited ("Portfolio Limited Hedge Redemptions"), which Rye Portfolio Limited satisfied by withdrawing funds from its BLMIS customer account.  (¶¶ 82, 260; *PSAC*, Exs. I (transfers from BLMIS to Rye Portfolio Limited) and J (transfers from Rye Portfolio Limited to Defendant).)

The following month, an employee of the Defendant noted to a Tremont employee that he was having trouble identifying the options described in the trade activity report provided by Tremont.  Tremont responded that the Defendant should refer to the CUSIP codes on the BLMIS account statements.  (¶ 130.)  The Trustee speculates that the Defendant found Tremont's response problematic because CUSIP codes are only available for options traded on the Chicago Board Options Exchange and the Defendant understood BLMIS to trade options OTC.  (¶¶ 95, 130.)

### 2.  2007 Swap Transaction

#### a.  Due Diligence

In early 2007, Johnston and Schwartz discussed the possibility of the Defendant entering into a new swap transaction with XL Broad Market as the counterparty and Rye Broad Market as the reference fund.  Schwartz and his team were receptive to the idea and requested preliminary information about those Tremont funds.  In response, Tremont provided the Defendant with the offering memorandum, trading authorization, certificate of incorporation, and certificates of limited partnership for XL Broad Market

and Rye Broad Market.  (¶ 127.)  Schwartz thanked Johnston for the documents and

said, "I believe we look good on our side and should have the internal compliance

approval for the on-shore [sic] transaction soon.  Then the hard stuff starts."  (¶ 128.)

On March 14, 2007, senior executives of the Defendant and Tremont met to

discuss the new swap transaction.  As with the 2006 Swap Transaction, the Defendant

demanded a special share class for its Hedge investment in Rye Broad Market that

permitted redemption on five-days' notice.  The Defendant also renewed its request that

the 2007 Swap Transaction include the Fraud Provision as a special redemption event

and that the 2006 Swap Transaction be amended to include the Fraud Provision as well.

(¶¶ 142-44.)  Schwartz told Tremont that the inclusion of the Fraud Provision as a

special redemption event "reflects the importance of the key issue of the transaction (the

degree of trust which [the Defendant] has to have in Madoff)."  (¶ 145.)

On March 27, 2007, Tremont countered with language which would allow the

Defendant to recover half of its investment in the reference fund.  (¶ 147.)  Schwartz

responded with an email to Johnston and Kelly:

> During our conversation earlier this week, you indicated that there might
> be a two-tiered approach where this approach is only one-tiered.  Can you
> pls tell us what happened to this point.  Perhaps the second tier could
> relate to the concept that the manager is found guilty of the breach [of
> securities laws] or otherwise.
>
> Also, any chance (at the risk of sounding greedy) of getting 50% rather
> than 33% redemption?

(¶ 148.)  Kelly responded to both inquiries:

> We discussed that in detail here and found it next to impossible for the
> account manager [BLMIS] to found [sic] guilty prior to being charged with
> a breach [of securities laws].  It would be our expectation that [the
> Defendant] would have ample opportunity to unwind via the normal
> redemption process well in advance of a guilty verdict.

- 10 -

. . .

33% is meant to represent 50% of [the Defendant's] exposure since one third of your investment is hypothetically the equity [collateral] provided by the XL feeder.

(¶¶ 149-50.)[9]  With Kelly's explanation, the Defendant accepted Tremont's counterproposal, (¶ 151), and the modified Fraud Provision was added to the 2006 Swap Transaction and the forthcoming 2007 Swap Transaction.[10]  (¶¶ 158-59.)

On April 5, 2007, Schwartz asked Tremont for information regarding the frequency with which BLMIS was inspected by regulators such as "the SEC or the NASD."  Tremont suggested that Schwartz "do a search for Madoff" on the regulators' websites.  (¶ 137.)  On July 30, 2007, Kelly informed Johnston and Tremont's CEO Robert Schulman that the Defendant had agreed to add to the 2006 Swap Transaction and the new 2007 Swap Transaction a provision ("Gag Provision") prohibiting the Defendant from "contact[ing] Madoff with regard to this transactions [sic].  Waiver of any early termination fees in the event they do."  (¶ 139.)

### b.    The 2007 Swap

In November 2007, the Defendant entered into the second Swap Transaction (the "2007 Swap Transaction") with XL Broad Market using Rye Broad Market as the reference fund.[11]  Under the 2007 Swap Transaction, XL Broad Market transferred

---

[9]      As it had with the 2006 Swap Transaction, the Defendant also negotiated the right to terminate the 2007 Swap Transaction in the event of a fraud investigation of BLMIS.  (¶ 152.)

[10]     A copy of the Letter Agreement, dated Nov. 1, 2007 ("Letter Agreement"), which lists *inter alia* the Fraud Provision as a "Special Redemption Event" is attached as Exhibit G to the *Feldberg Declaration*.

[11]     *See* Confirmation Letter for Cash-settled Index Swap Transaction, dated Nov. 1, 2007 ("2007 Swap Confirmation"), a copy of which is annexed as Exhibit B to the *Feldberg Declaration*.

$95,833,333 in cash collateral to the Defendant ("Broad Market Collateral Transfers").
These funds consisted of BLMIS customer property initially transferred either to Rye
Prime Fund or Rye Broad Market and subsequently transferred to XL Broad Market.
(¶¶ 83, 262-64; *PSAC* Exs. B and F (transfers from BLMIS to Rye Broad Market and Rye
Prime Fund), D and G (transfers from Rye Broad Market and Rye Prime Fund to XL
Broad Market), and O (transfers from XL Broad Market to Defendant).)

    As a Hedge for the 2007 Swap Transaction, the Defendant entered into another
"perfect hedge."  It invested three times the cash collateral amount – over $287 million
of which over $191 million represented the Defendant's own funds – in Rye Broad
Market.  The Hedge faced the same risks described earlier.  The Defendant ultimately
redeemed $1.4 million from Rye Broad Market on November 3, 2008 ("Broad Market
Hedge Redemption"), which Rye Broad Market satisfied by withdrawing funds from its
BLMIS account.  (¶¶ 84, 265; *PSAC* Exs. B (transfers from BLMIS to Rye Broad Market)
and C (transfer from Rye Broad Market to Defendant).)

    Although the *PSAC* is silent, I assume that the Broad Market and the Portfolio
Limited Hedge Redemptions were triggered by a proportional one-third reduction in the
respective XL Fund's cash collateral.  Under the Swap Transactions, the XL Funds had
the right to reduce their cash collateral deposits with the Defendant.  (*See* 2006 Swap
Confirmation § 2.2 (permitting the XL Fund to decrease collateral on five-days' notice
effective upon the Defendant's corresponding redemption from the reference fund);
2007 Swap Confirmation § 2.2 (similar).)   The Defendant had no reason to render its
perfect hedge, *see Picard v. Citibank, N.A.* (*In re BLMIS*), 608 B.R. 181, 185 (Bankr.
S.D.N.Y. 2019) ("*Citibank*"), imperfect by withdrawing its investment in the reference

funds absent a corresponding reduction in the collateral amount.  My assumption is merely for narrative purposes and does not affect the disposition of the Motion.

The parties executed the 2007 Swap Transaction on November 1, 2007.  (¶ 160.) Six months later, Turner asked Johnston if he knew whether BLMIS had a blanket bond to cover against employee dishonesty.  Johnston replied that BLMIS carried enough coverage to comply with applicable regulations.  (¶ 153.)

Tremont observed in September 2008 that the Defendant "love[s] the Madoff trade."  The Defendant sought other ways to profit from Madoff and entered in arrangements with Tremont and Fairfield to earn fees for introducing new investors to their BLMIS feeder funds.  (¶ 168.)  Schwartz attempted to steer Mitsubishi Securities ("Mitsubishi") to a Fairfield fund, but Mitsubishi was concerned with Madoff's lack of transparency and direct access.  The Trustee alleges on information and belief that Mitsubishi did not invest in the Fairfield fund.  (¶ 169.)

## D.    Other Potential Deals

The Defendant explored a similar deal to provide leverage to BLMIS feeder funds managed by Fairfield Greenwich Group ("Fairfield").  (¶ 6.)  In connection with a potential deal with Fairfield, the Defendant indicated that it wanted more information about Madoff's operation.  In an October 6, 2006 email, an employee of the Defendant told Fairfield:

> The big problem with approval of [the 2006 Swap Transaction] was that Madoff was also responsible for making position overviews public.
>
> There were questions about the independence of that.  Thus, in this case we need to know how the relationship between Fairfield Sentry and

Bernard Madoff exactly works and whether the positions might need to be verified independently.

We would also like to know a little more about the purchased put options. This has to do primarily with the relationship between the listed and OTC contracts, as well as the creditworthiness of the OTC parties with which trading is being done. Of course, it's obvious that those options significantly limit the downside risk, but we would like to know to what extent we can count on that protection. This will be important especially in the discussion of higher multipliers.

(¶ 97.) The Defendant and Fairfield renewed negotiations in the summer of 2007, and Schwartz sought the ability to redeem on five-days' notice as well as the inclusion of the Fraud Provision as a special redemption event. Fairfield accepted the Defendant's terms except for the Fraud Provision, and the Defendant refused to consummate the deal on that basis. (¶¶ 156-57.)

In early 2007, Schwartz and Richard Glantz discussed investments in "Lakeview" and "Vista" – two BLMIS feeder funds managed by Glantz. In connection with its due diligence, Schwartz told Glantz that it was "critical" for the Defendant to perform diligence on Madoff. Glantz replied, "Bernie simply said no. He does not do this . . . . that is not possible now or in the future." (¶¶ 132-35.)[12]

The *PSAC* also outlines interactions that the fund derivatives groups of a U.K.-based RBS affiliate ("RBS UK") and a U.S.-based RBS affiliate ("RBS US") had relating to Madoff and BLMIS in the months before the October 2007 acquisition of Defendant's parent by RBS. In July 2007, representatives of RBS US visited Tremont to discuss a potential leverage deal. (¶ 162.) The following month, RBS UK retained a hedge fund advisory firm to provide diligence on certain BLMIS feeder funds. The advisory firm

---

[12]    Schwartz was also told that it was not possible to speak to Madoff's subordinates. (¶ 136.)

advised against investing in "Madoff due to lack of transparency." (¶¶ 161, 163.)
Thereafter, RBS US ceased its leverage deal discussions with Tremont, (¶ 164), but the
*PSAC* does not allege that RBS UK relayed the advisory firm's advice to RBS US.
Tremont later observed that RBS was "not comfortable with Madoff" when it was
approached about the leverage deal, and now that RBS had acquired the Defendant, it
"is really not comfortable." (¶ 165.) Nonetheless, the Defendant remained a leverage
provider to the XL Funds until Madoff's arrest. (¶ 167.)

## E.    Red Flags

The *PSAC* lists certain BLMIS red flags that the Defendant purportedly knew of
based on materials and documents that were available to it. According to the Trustee,
the Defendant knew that Friehling & Horowitz –  BLMIS's auditor – was not qualified to
audit an entity the size of BLMIS (¶¶ 99-100), BLMIS's returns were impossibly
consistent and not correlated to the S&P 100 Index as would be expected from the SSC
Strategy (¶¶ 102-11), BLMIS fees were limited to commissions for stock trades ($0.04
per share) and option trades ($1.00 per option contract) instead of the lucrative
management and performance fees typically charged in the investment industry (¶¶ 112-
13), and it was implausible that BLMIS could execute the SSC Strategy with the large
amount it had under management given the high transactional costs associated with
moving in and out of the market and the limited options volume on the OTC options
market. (¶ 131.)

## F.    This Adversary Proceeding

In this adversary proceeding, the Trustee seeks to recover from the Defendant as
subsequent transferee pursuant to section 550(a)(2) of the Bankruptcy Code the

- 15 -

Portfolio Limited Hedge Redemptions (¶¶ 268-72 (Count I)), the Portfolio Limited

Collateral Transfers (¶¶ 273-77 (Count II)), the Broad Market Hedge Redemption (¶¶

278-82 (Count III)), and the Broad Market Collateral Transfers. (¶¶ 283-87 (Count

IV).) The Court will refer to the four categories of transfers collectively as the

"Subsequent Transfers." The Trustee asserts that the Subsequent Transfers are

traceable to initial transfers from BLMIS made to the Initial Transferees as described

*supra* in section C.

By the Motion, the Trustee seeks leave under Federal Civil Rule 15(a)(2) to file

the *PSAC*. He asserts that the amendments are necessary to meet the more rigorous

pleadings requirements relating to allegations of bad faith imposed by the District Court

in *SIPC v. BLMIS* (*In re BLMIS*), 516 B.R. 18, 21-24 (S.D.N.Y. 2014) ("*Good Faith

Decision*"); *see also SIPC v. BLMIS* (*In re BLMIS*), 590 B.R. 200, 204-05 (Bankr.

S.D.N.Y. 2018) (discussing precedent in BLMIS adversary proceedings), and the

allegations in the *PSAC* satisfy those requirements. (*Trustee Memo* at 6-15, 20-30.) The

Defendant objects arguing that the *PSAC* is futile. According to the Defendant, the

Trustee's claims are subject to the defense set forth in section 550(b)(1) of the

Bankruptcy Code because he has failed to plead a lack of good faith on the part of the

Defendant, (*Opposition* at 15-37), and the *PSAC* alleges that the Defendant received the

Subsequent Transfers for value. (*Id.* at 37-39.) Moreover, the Defendant disputes that

there has been an intervening change in the law. (*Id.* at 39-40.)

## DISCUSSION

### A.    Standards Governing the Motion

Rule 15(a) of the Federal Rules of Civil Procedure, made applicable pursuant to Rule 7015 of the Federal Rules of Bankruptcy Procedure, governs motions for leave to amend pleadings.  Generally, leave should be freely granted, but the court may deny the motion in instances of undue delay, bad faith, dilatory motive, undue prejudice to the opposing party or futility.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6)."  *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 556.  It is not sufficient for the complaint to plead facts that "permit the court to infer . . . the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679; he must state "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

- 17 -

*Iqbal*, 556 U.S. at 679.  The court should assume the veracity of all "well-pleaded factual allegations," and determine whether, together, they plausibly give rise to an entitlement of relief.  *Id.*

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).  The court may also consider documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit.  *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir. 1991), *cert. denied,* 503 U.S. 960 (1992); *McKevitt v. Mueller,* 689 F. Supp. 2d 661, 665 (S.D.N.Y. 2010). Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss.  *131 Main St. Assocs. v. Manko,* 897 F. Supp. 1507, 1532 n. 23 (S.D.N.Y. 1995).

## B.    Claims to Recover Subsequent Transfers

Section 550(a)(2) of the Bankruptcy Code allows the Trustee to recover an avoidable transfer from "any immediate or mediate transferee of" the initial transferee. To plead a subsequent transfer claim, the Trustee must plead that the initial transfer is avoidable, and the defendant is a subsequent transferee of that initial transferee, that is, "that the funds at issue originated with the debtor."  *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548 B.R. 13, 36 (Bankr. S.D.N.Y. 2016) ("*Legacy*"); *accord Silverman v.*

- 18 -

*K.E.R.U. Realty Corp.* (*In re Allou Distribs., Inc.*), 379 B.R. 5, 30 (Bankr. E.D.N.Y.

2007).  The Court assumes for the purpose of analysis that the initial transfers are

avoidable and that the initial transfers were the source of the Subsequent Transfers.

Section 550(b) of the Bankruptcy Code provides a defense to a subsequent

transferee who "[took] for value, . . . in good faith, and without knowledge of the

voidability" of the initial transfer.  Ordinarily, the transferee must raise section 550(b)

as an affirmative defense.  *Legacy*, 548 B.R. at 36.  In addition, an objective, reasonable

person test usually applies to determine a transferee's good faith.  *See Marshall v.*

*Picard* (*In re BLMIS*), 740 F.3d 81, 90 n. 11 (2d Cir. 2014) ("The presence of 'good faith'

depends upon, *inter alia*, 'whether the transferee had information that put it on inquiry

notice that the transferor was insolvent or that the transfer might be made with a

fraudulent purpose.'") (quoting *Christian Bros. High Sch. Endowment v. Bayou No*

*Leverage Fund, LLC* (*In re Bayou Grp., LLC*), 439 B.R. 284, 310 (S.D.N.Y. 2010)).

However, in the *Good Faith Decision*, the District Court ruled that good faith should be

determined under a subjective standard, 516 B.R. at 21-23, and placed the burden of

pleading a lack of good faith on the Trustee.  *Id.* at 23-24.  Before addressing good faith,

I consider the other element of section 550(b), "value."

### 1.    Value

Although the District Court shifted the burden of pleading good faith, the burden

of pleading value for purposes of section 550(b) remains with the subsequent transferee

who is in a better position to identify the value given for the subsequent transfer.

*Citibank*, 608 B.R. at 195; *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 206

(Bankr. S.D.N.Y. 2018) ("*BNP*").  Where the burden of pleading rests on the defendant,

the Court may nevertheless dismiss the claim pursuant to Federal Civil Rule 12(b)(6) if the defense is apparent on the face of the complaint. *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003). "Value" within the meaning of section 550(b) is "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value." 5 COLLIER ON BANKRUPTCY ¶ 550.03[1] at 550-25 (Richard Levin & Henry J. Sommer eds., 16th ed. 2019) ("COLLIER ON BANKRUPTCY"); *accord Citibank*, 608 B.R. at 195; *Enron Corp. v. Ave. Special Situations Fund II, LP* (*In re Enron Corp.*), 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005). Once a subsequent transferee meets the three elements of § 550(b)(1), a later subsequent transferee that acted in good faith (and regardless of value or knowledge of avoidability) is fully protected. *See* 11 U.S.C. § 550(b)(2); *Coleman v. Home Sav. Ass'n* (*In re Coleman*), 21 B.R. 832, 836 (Bankr. S.D. Tex. 1982); *accord* 5 COLLIER ON BANKRUPTCY ¶ 550.03[1] and [4].

The *PSAC* pleads that the Defendant received the Portfolio Limited Collateral Transfers and the Broad Market Collateral Transfers (together, the "Collateral Transfers") for value. Under the Swap Transactions, in exchange for the Collateral Transfers and fees, the Defendant agreed to pay the XL Funds leveraged returns based on a hypothetical investment in the respective reference funds equal to three times the amount of the Collateral Transfers. (¶¶ 21, 78, 81, 83.) Thus, the Collateral Transfers were received for value. *See Picard v. ABN AMRO Bank (Ir.) Ltd.* (*In re BLMIS*), Adv. Pro. No. 10-05355 (SMB), 2020 WL 401822, at *5 (Bankr. S.D.N.Y. Jan. 23, 2020)

("*Fortis*") ("Fortis Bank gave value for the transfer by satisfying its obligations under the Swap Transaction").

The Portfolio Limited Hedge Redemptions and the Broad Market Hedge Redemption (together, the "Hedge Redemptions") were also received by the Defendant for value. Surrendering equity interests constitutes value for purposes of section 550(b) because it is consideration sufficient to support a simple contract. *Fortis*, 2020 WL 401822, at *5; *accord Redmond v. Brooke Holdings, Inc.* (*In re Brooke Corp.*), 515 B.R. 632, 641-42 (Bankr. D. Kan. 2014); *CLC Creditors' Grantor Tr. v. Howard Sav. Bank* (*In re Commercial Loan Corp.*), 396 B.R. 730, 744 (Bankr. N.D. Ill. 2008). The *PSAC* outlines the extensive negotiations between the Defendant and Tremont leading to the creation of special share classes in Rye Portfolio Limited and Rye Broad Market in connection with the Defendant's Hedge investments. (¶¶ 5, 116-25, 141, 143-51.) The Defendant redeemed its shares in those classes through the Hedge Redemptions. (¶¶ 82, 84.)

Furthermore, the *PSAC* expressly pleads that the shares in the Tremont reference funds had value. Shareholders of the Tremont funds, including the Defendant, received substantial distributions from a class action bought by Tremont investors in *In re Tremont Sec. Law., State Law and Ins. Litig.*, No. 1:08-cv-11117-TPG (S.D.N.Y.). (¶¶ 31, 172 (alleging that Defendant received over $165 million from the class action).) In addition, as a result of a 2011 settlement of the Trustee's claims against Tremont, the Initial Transferees and others, (¶ 175) (the "Tremont Settlement"),[13] Rye Broad Market

---

[13]    A copy of the Tremont Settlement is available at ECF Adv. Pro No. 10-05310 Doc. # 17-1.

and Rye Portfolio Limited received allowed SIPA claims against the BLMIS customer
property estate in the respective amounts of $1,647,687,625.00 and $498,490,000.00,
and those claims were increased by an aggregate $800,000,000.00 after Tremont
satisfied its settlement payment obligations.  (Tremont Settlement at ¶ 5.)  Tremont
agreed that distributions received on account of the SIPA claims would be "fairly and
equitably allocated" including among the funds' "respective partners and/or investors."
(Tremont Settlement at ¶ 5(c).)  The Trustee recently reported that substantial
distributions have been made to holders of customer claims.  (*See Trustee's Twenty-
Second Interim Report for the Period April 1, 2019 Through September 30, 2019*, dated
Oct. 31, 2019 at ¶¶ 2, 11 (reporting distributions of $13.489 billion against allowed
customer claims of $19.307 billion) (ECF Case No. 08-01789 Doc. # 19097).)  Thus, Rye
Portfolio Limited and Rye Broad Market have received hundreds of millions of dollars
based on their allowed net equity claims against the BLMIS SIPA estate and may receive
more in the future.  *Fortis*, 2020 WL 401822, at *5.

The Trustee cites (*see Trustee Reply* at 24) two cases for the proposition that
redemptions paid to equity holders are not for value under 11 U.S.C. § 550(b)(1) but his
authorities are distinguishable.  In *Hayes v. Palm Seedlings Partners-A* (*In re Agric.
Research & Tech. Grp., Inc.*), 916 F.2d 528 (9th Cir. 1990), the Court ruled that profit
distributions paid by a general partner (the initial transferee) to limited partners were
not received for value.  *Id.* at 540.  In *Boyer v. Crown Stock Distrib., Inc.* (*In re Crown
Unlimited Mach., Inc.*), Adv. Pro. No. 04-1085 (REG), 2006 WL 6401548 (Bankr. N.D.
Ind. Oct. 13, 2006), *aff'd*, No. 1:06-CV-409RM, 2009 WL 418275 (N.D. Ind. Feb. 17,
2009), *aff'd in part & rev'd in part on other grounds*, 587 F.3d 787 (7th Cir. 2009), the

- 22 -

Court held that the subsequent distributions to shareholders of proceeds received by a corporation in exchange for sale of assets were not received for value. *Id.* at *15. Neither case dealt with redemptions involving the surrender of equity in exchange for a payment. Instead, the Trustee's two cases dealt with distributions in the nature of dividends to equity, and the equity interest holder was not required to surrender its capital or give anything of value in exchange for the subsequent transfer. In contrast, the Defendant surrendered its shares in the Tremont reference funds in exchange for the Hedge Redemptions.

### 2.    Knowledge and Good Faith

As stated, the Trustee must plead that the Defendant lacked good faith when it took the Subsequent Transfers, and he must also plead that the Defendant had knowledge of the avoidability of the initial transfer. *Legacy*, 548 B.R. at 36. The two concepts represent separate elements under section 550(b)(1), but they are related.

#### a.    Good Faith

To satisfy his burden of pleading a lack of good faith, the Trustee must allege that the Defendant willfully blinded itself to facts suggesting that BLMIS was not actually trading securities. *Good Faith Decision*, 516 B.R. at 22-23; *Picard v. Merkin* (*In re BLMIS*), 563 B.R. 737, 752 (Bankr. S.D.N.Y. 2017). Willful blindness consists of two elements: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). If a person who is not under an independent duty to investigate "nonetheless, intentionally chooses to blind himself to the 'red flags' that suggest a high probability of fraud, his

- 23 -

'willful blindness' to the truth is tantamount to a lack of good faith." *Picard v. Katz*, 462
B.R. 447, 455 (S.D.N.Y. 2011), *abrogated on other grounds by SIPC v. BLMIS*, (*In re
BLMIS*), 513 B.R. 437 (S.D.N.Y. 2014).  In contrast, "a reckless defendant is one who
merely knows of a substantial and unjustified risk of such wrongdoing." *Global-Tech*,
563 U.S. at 770.  As a result, a defendant who acts despite a "known risk" or exhibits
"deliberate indifference" to that risk is not willfully blind.  *Id.*

### b.    Knowledge of Avoidability

To plead that the Defendant knew that it was receiving the proceeds of an
avoidable transfer, the Trustee must plausibly allege that the Defendant "possess[ed]
knowledge of facts that suggest a transfer may be fraudulent." *Banner v. Kassow*, 104
F.3d 352, 1996 WL 680760, at *3 (2d Cir. Nov. 22, 1996) (summary order) (quoting
*Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1357 (8th Cir. 1995)).
Section 550(b)(1) does not impose a duty to investigate or monitor the chain of transfers
that preceded the subsequent transfer, but "[s]ome facts strongly suggest the presence
of others; a recipient that closes its eyes to the remaining facts may not deny
knowledge." *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 898 (7th
Cir. 1988) (Easterbrook, J.).  This standard "essentially defines willful blindness which,
the District Court has held, is synonymous with lack of good faith." *Legacy*, 548 B.R. at
38; *see also id.* at 38-39 (noting that some courts and commentators have suggested
that the good faith and knowledge elements of 11 U.S.C. § 550(b)(1) are one and the
same).  Here, the parties have not identified a distinction between the two elements of §
550(b)(1).

### 3.    Allegations of Willful Blindness

### a.    The First Prong

The first prong of the willful blindness inquiry asks whether the Defendant

subjectively believed that there was a high probability that BLMIS was not trading

securities at the time of the transfer.[14]  To plead the first prong, the Trustee relies on (i)

the Defendant's asking questions while performing diligence for the Swap Transactions

and not always receiving satisfactory answers, (ii) interactions with third parties about

Madoff and BLMIS, and (iii) the existence of red flags regarding BLMIS.

Initially, this Court has rejected prior attempts by the Trustee to plead a

defendant's subjective knowledge through the existence of BLMIS red flags.  *BNP*, 594

B.R. at 198-99; *Legacy*, 548 B.R. at 33-34.  Likewise, the "red flag" theory of *scienter*

---

[14]    The Trustee contends, among other things, that he need only allege that the Defendant had a
subjective belief in the high probability that Madoff was engaged in *any* type of fraud.  (*Trustee Reply* at
8.)  However, the subjective belief component of willful blindness applies to defendants "who can almost
be said to have actually known the *critical facts*." *Global-Tech*, 563 U.S. at 769 (emphasis added); *accord
id.* at 766 (observing that under many criminal statutes, a defendant is willfully blind where he
deliberately shielded himself "from clear evidence of critical facts that are strongly suggested by the
circumstances").  Similarly, in the criminal context, a "conscious avoidance" jury instruction may only be
given if "(1) the defendant asserts a lack of some specific aspect of knowledge *required for conviction* and
(2) . . . the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that
the defendant was aware of a high probability of *the fact in dispute* and consciously avoiding confirming
that fact." *United States v. Goffer*, 721 F.3d 113, 126-27 (2d Cir. 2013) (quoting *United States v. Svoboda*,
347 F.3d 471, 280 (2d Cir. 2003)) (emphasis added; alteration omitted); *cert. denied*, 574 U.S. 831 (2014);
*accord United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011); *United States v. Nektalov*, 461 F.3d
309, 314 (2d Cir. 2006).

       Here, the "critical facts" were that Madoff was not trading securities for his IA customers and
operated BLMIS as a Ponzi scheme.  If the Defendant suspected that Madoff was padding expenses, it
would suspect a fraud, but that fraud would have nothing to do with the "critical fact" that Madoff was not
trading securities or the circumstances that rendered the transfer fraudulent.  In addition, although the
Trustee's briefs assert that the Defendant was aware to a high probability of "fraud" without specifying the
nature of the fraud, (*Trustee Memo* at 2, 6, 23; *Trustee Reply* at 1, 3, 6), the *PSAC* alleges (albeit
insufficiently) that the Defendant was aware of a high probability that BLMIS was not trading securities.
(*See, e.g.*, ¶ 130 (Defendant "willfully blinded itself" to the impossibility of BLMIS option trades), ¶¶ 102-
11 (Defendant was aware that BLMIS's returns were not correlated to the S&P 100 Index as would be
expected from the SSC Strategy), ¶ 131 (Defendant was aware that it was impossible to perform the SSC
Strategy given the size of BLMIS's assets under management).)  When asked at oral argument to identify a
separate "fraud" that the *PSAC* alleged, the Trustee's counsel was unable to do so.  (Transcript of Oct. 30,
2019 Hr'g at 37:9-43:13 (ECF Doc. # 196).)

has been rejected on numerous occasions by the Second Circuit in Madoff-related

securities litigation because it amounts to pleading fraud by hindsight, and "the more

compelling inference as to why Madoff's fraud went undetected for two decades was his

proficiency in covering up his scheme and deceiving the SEC and other financial

professionals." *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 641

(2d Cir. 2012) (quotation omitted); *accord R.W. Grand Lodge of Free & Accepted

Masons of Pa. v. Meridian Capital Partners, Inc.*, 634 F. App'x 4, 8 (2d Cir. 2015);

*DeLollis v. Friedberg, Smith & Co., P.C.*, 600 F. App'x 792, 796 (2d Cir. 2015) (noting

that "[n]umerous actions brought against auditors and investment advisors by victims

of Madoff's fraud have been dismissed despite the presence of 'red flags,' which in

hindsight arguably should have called attention to Madoff's illegal conduct"); *Elendow

Fund, LLC v. Rye Inv. Mgmt.*, 588 F. App'x 27, 28-29 (2d Cir. 2014) ("Elendow fails to

plead sufficient red flags to show that the inference that Tremont must have been aware

of the fraud is at least as compelling as any opposing inference of nonfraudulent

intent.") (quotation omitted).  As set forth above, the *PSAC* alleges that the Defendant

was aware of several red flags, including BLMIS's unsophisticated auditor, impossibly

consistent returns, refusal to charge management and performance fees, and ability to

perform the SSC Strategy despite having assets under management in an amount that

rendered the strategy unfeasible.  These "red flag" allegations were common knowledge

and do not support the inference that the Defendant subjectively believed there was a

high probability that BLMIS was not trading securities.  *Picard v. Avellino* (*In re

BLMIS*), 557 B.R. 89 (Bankr. S.D.N.Y. 2016) ("Many of the red flags were generally

known to investors and the SEC, and in many cases, the red flags would become visible,

if at all, only after comparing the BLMIS-generated account statements with market

information."), *reconsideration denied*, Adv. Pro. No. 10-05421 (SMB), 2016 WL
6088136 (Bankr. S.D.N.Y. Oct. 18, 2016).

Nonetheless, the *PSAC* points to instances where the Defendant or third parties
expressed or alluded to concerns about Madoff.  In July 2006, Tremont could not
answer Schwartz's questions relating to BLMIS OTC options and lack of independence,
although the Defendant's concerns focused on the creditworthiness of the option
counterparties and not whether the option trades were real.  (¶¶ 96, 98.)  A month after
entering into the 2006 Swap Transaction, Tremont told the Defendant to look to the
CUSIP codes on BLMIS customer statements in response to an inquiry about options –
a response that the Trustee speculates troubled the Defendant because it thought
BLMIS traded options OTC.  (¶¶ 95, 130.)  At the same time, the Defendant told
Fairfield it had concerns about BLMIS's lack of independence and "wanted to know
more" about BLMIS's option trades.  (¶ 97.)  The Defendant told Glantz that it was
"critical" to get access to Madoff, and the Trustee implies that the Defendant decided
against investing in Vista and Lakeview because Madoff refused access.  (¶¶ 132-35.)  An
advisory firm warned RBS UK[15] about Madoff's lack of transparency.  (¶¶ 161, 163.)
Last, Mitsubishi told the Defendant that it would not invest in a Fairfield fund because
of Madoff's lack of transparency.  (¶ 169.)

The Trustee posits that these suspicions and concerns taken together plausibly
plead that the Defendant was aware that there was a high probability that BLMIS was

---

[15]    The Court assumes, for purposes of the Motion only, that the knowledge acquired by RBS UK was
shared with the Defendant after RBS's acquisition of the Defendant's parent.  The Defendant disputes
this.  (*Opposition* at 20-21.)

not trading securities. (*See Trustee Memo* at 27 ("[T]he Trustee alleges here that Defendant raised all of the critical questions about the risk that Madoff was running a Ponzi scheme, yet failed to further investigate those risks or decline to enter into the [Swap Transactions]. Defendant's concerns went to the heart of Madoff's Ponzi scheme because they concerned the existence of assets supposedly held by Madoff, Madoff's self-custody and Madoff's secrecy.") (internal quotation marks and citation omitted).)

The Trustee's allegations that the Defendant subjectively believed in a high probability that Madoff was not trading securities is implausible. Initially, there is no allegation, direct or inferential, that the Defendant believed BLMIS was not trading securities. Rather, the Trustee argues that the Defendant must have believed that BLMIS was a Ponzi scheme because the "Defendant developed concerns with, among other things: (i) BLMIS's complete lack of independent oversight; (ii) BLMIS's purported OTC options trades; and (iii) the total lack of transparency of BLMIS." (*Trustee Memo* at 23-24.) Yet despite these "concerns," the Defendant entrusted $679,109,384.00 of its own capital (which dwarfed the amount of any fees it earned) with BLMIS feeder funds it strongly suspected had invested with an entity that was not actually trading securities and agreed to pay the XL Funds three times the increase in the value of the referenced funds based on the fictitious values Madoff ascribed to the securities he was not actually buying.[16] The Court having rejected this preposterous theory in the past reaches the same conclusion here. *See Fortis*, 2020 WL 401822, at *14; *Citibank*, 608 B.R. at 202-03; *BNP*, 594 B.R. at 203-04; *cf. Buchwald Capital*

---

[16]   Specifically, the *PSAC* provides that the Defendant invested $991,942,717.00 of which $312,833,333.00 represented the XL Funds' cash collateral. (¶ 172.)

Advisors LLC v. JP Morgan Chase Bank, N.A. (*In re Fabrikant & Sons, Inc.*), 480 B.R.

480, 489 (S.D.N.Y. 2012) (ruling that it was implausible that a bank would knowingly

lend ever-larger amounts to fraudulent companies), *aff'd*, 541 F. App'x 55 (2d Cir. 2013).

Moreover, the Trustee makes much of the fact that the Defendant insisted on

fraud protections in the Swap Transactions and backed off of other transactions that did

not include them.  It also obtained the benefit of other special redemption events,

including if (i) Rye Broad Market ceased to invest the majority of its assets with BLMIS,

(ii) there was a change in the management of BLMIS, (iii) there was a material change in

the methodology of calculating Rye Broad Market's asset value, (iv) BLMIS stopped

using the SSC Strategy or (v) the value of Defendant's equity interests in Rye Broad

Market decreased by over 10% in any given week.  (*See* Letter Agreement at 5-6.)  Yet

despite its subjective belief in the high probability that BLMIS was not trading securities

(or was engaged in fraudulent conduct) it never exercised its rights under these

provisions to cash in its substantial investments.

Accordingly, the Court concludes that the *PSAC* fails to plead that the Defendant

subjectively believed in a high probability that BLMIS was not actually trading

securities.

### b.    The Second Prong

The *PSAC* also fails to plead that the Defendant took deliberate actions to

avoiding learning about BLMIS's fraud.  The Trustee argues that the Defendant ceased

conducting due diligence once it became highly suspicious of BLMIS, and instead, relied

on the inclusion of the Fraud Provision to the Swap Transactions. (*Trustee Memo* at 28-29.) This argument fails for several reasons.

First, the *PSAC* pleads that the Defendant performed substantial diligence, and was constantly seeking more information about Madoff, BLMIS and BLMIS feeder funds. In connection with the 2006 Swap Transaction, the Defendant "requested and received information about Tremont's BLMIS feeder funds, Madoff, and BLMIS from Tremont," (¶ 88), and subsequently signed a non-disclosure agreement to get non-public diligence materials. (¶ 89.) In May 2006, the Defendant requested additional materials, and Tremont provided (i) historical returns for the Kingate Fund, (ii) the Investment Summary Reports, prospectus, and BLMIS account documents for Rye Portfolio Limited, and (iii) performance reports for four Tremont BLMIS feeder funds. (¶¶ 90-91.) In July 2006, Schwartz requested a conference call with Tremont seeking information on BLMIS OTC options and BLMIS's independence. (¶ 96.) In October 2006, the Defendant sought BLMIS diligence from Fairfield in connection with a potential transaction. (¶ 97.) In early 2007, the Defendant sought to perform diligence on Madoff directly while exploring investments in BLMIS feeder funds managed by Glantz. (¶¶ 132-35.) The Defendant received diligence materials regarding Rye Broad Market and XL Broad Market in anticipation of the 2007 Swap Transaction. (¶ 127.) Last, the Defendant asked Tremont about inspection of BLMIS by regulators and whether BLMIS was covered by a blanket bond. (¶¶ 137, 153.) The Defendant's ongoing due diligence supports the opposite inference, *viz*, the Defendant did not turn a blind eye to Madoff's fraud. *See Elendow Fund, LLC v. Rye Select Broad Mkt. Fund*, No. 10 Civ. 11117 (TPG), 2013 WL 5179064, at *5 (S.D.N.Y. Sept. 16, 2013) ("if Tremont had

known, or even strongly suspected, that Madoff was perpetrating a fraud, it would have
been peculiar for Tremont to continue discussing ways of gaining greater transparency
into Madoff's operations"), *aff'd*, 588 F. App'x 27 (2d Cir. 2014).

Second, the Trustee relies heavily on the Defendant's insistence on the fraud
protections and existence of the other special redemption events in the Swap
Transactions contending that they served as substitutes for due diligence.  The *PSAC*
alleges that the reference funds met the Defendant's redemption requests by
withdrawing money from their BLMIS accounts.  (¶¶ 82, 84.)  Special redemption rights
would not mean much if there are no underlying securities to pay the redemption price
and Madoff was stealing other customers' funds to pay the redemptions.  The fact that
the Defendant was insisting on fraud protections or special redemption rights implies its
belief that the reference funds' investments with BLMIS had value.  Further, while the
Fraud Provision provided some protection against the *risk* of *future* fraud, and under
the best of circumstances, would have permitted the Defendant to redeem
$339,554,692.00 of its Hedge investments on five-days' notice, the Defendant would
have had to wait thirty-six days for the remaining $339,554,692.00 and compete with
the other Tremont investors for distributable assets.[17]  And as noted, the Defendant
never exercised these rights implying that it did not believe that its investments in the
reference funds were threatened.  Lastly, it is not uncommon for sophisticated parties to

---

[17]    The Trustee argues (*Trustee Reply* at 11) that the Defendant was "comforted" by Tremont's
response that it could redeem the other half "via the normal redemption process well in advance of a
guilty verdict."  (¶¶ 149, 151.)  The *PSAC* alleges that the reference funds paid the redemptions by
withdrawing the money from their BLMIS accounts.  If the Defendant was "comforted" because it could
get its money out through the regular redemption process at any time before a guilty verdict, it must have
subjectively believed that the feeder funds' investments in BLMIS would not be impaired until a guilty
verdict, *i.e.,* that the assets underlying their investments in BLMIS feeder funds existed and had value.

a business contract to seek various forms of protection – in this case, accelerated
liquidity rights. *See, e.g.*, *Fortis*, 2020 WL 401822, at *15 ("an indemnification
provision is a common feature in business contracts"); *BNP*, 594 B.R. at 204 n. 19 ("it is
not uncommon to purchases hedges, such as credit default swaps to guard against the
default of one's obligor").

Third, the Trustee points to on the inclusion of the Gag Provision in connection
with the 2007 Swap Transaction which precluded the Defendant from contacting
Madoff directly. (*Trustee Memo* at 27; *Trustee Reply* at 16.) The Defendant already
knew from its experience with Glantz that Madoff would not allow direct access,
Madoff's penchant for secrecy was legendary and in any event, does not support a
conclusion that Madoff's secrecy made the Defendant aware that he was a fraud. *Cf.*
*SEC v. Cohmad Sec. Corp.*, No. 09 Civ. 5680 (LLS), 2010 WL 363844, at *3 (S.D.N.Y.
Feb. 2, 2010) ("That Madoff's secrecy warned defendants of fraud amounts to an
argument of 'fraud by hindsight,' which the Second Circuit 'has rejected as a basis for a
securities fraud complaint.'") (quoting *Stevelman v. Alias Research, Inc.,* 174 F.3d 79,
85 (2d Cir. 1999)). The Defendant did the next best thing to assess the risk of its
investments. It relied predominately on Tremont for Madoff-related diligence, and this
practice apparently continued after the Defendant agreed to the Gag Provision. (*See* ¶
153.)

Accordingly, even if the Trustee pleaded the first prong of willful blindness, the
*PSAC* nevertheless fails to plead the second prong.

## CONCLUSION

For the reasons set forth herein, the Trustee's Motion is denied.  The Court has

considered the parties' other arguments and concludes that they lack merit or have been

rendered moot by the disposition of the Motion.   Settle order on notice.


Dated:  New York, New York
        March 31, 2020


                                    /s/ *Stuart M. Bernstein*
                                   STUART M. BERNSTEIN
                               United States Bankruptcy Judge