**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04285 (SMB) |
| Plaintiff, | |
| v. | **REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT AND OPPOSITION TO CROSS MOTION FOR CLAIM DETERMINATION AND ALLOWANCE** |
| UBS AG, UBS (LUXEMBOURG) SA, UBS FUND SERVICES (LUXEMBOURG) SA, UBS THIRD PARTY MANAGEMENT COMPANY SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS MANAGEMENT LUXEMBOURG SA (f/k/a ACCESS INTERNATIONAL ADVISORS (LUXEMBOURG) SA) as represented by its Liquidator MAÎTRE FERNAND ENTRINGER, ACCESS PARTNERS SA as represented by its | |

Liquidator MAÎTRE FERNAND ENTRINGER,
PATRICK LITTAYE, CLAUDINE MAGON DE
LA VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) in her capacity as Executrix
under the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), CLAUDINE MAGON DE LA
VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) individually as the sole
beneficiary under the Will of THIERRY MAGON
DE LA VILLEHUCHET (a/k/a RENE THIERRY
DE LA VILLEHUCHET), PIERRE
DELANDMETER, THEODORE DUMBAULD,
LUXALPHA SICAV as represented by its
Liquidators MAÎTRE ALAIN RUKAVINA and
PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA
AND PAUL LAPLUME, in their capacities as
liquidators and representatives of LUXALPHA
SICAV, and GROUPEMENT FINANCIER LTD.,

Defendants.

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................5

    I.      The Trustee Has Plausibly Alleged Willful Blindness .............................................5

    II.    The Allegations in the PSAC Show That Luxalpha Was Willfully Blind...............8

          A.     Littaye Ensured Control Over His BLMIS Feeder Funds ...........................8

          B.     BNP Alerted Access to Madoff's Fraud Risk .............................................9

          C.     UBS's Knowledge and Actions Lead to the Conclusion that
               Luxalpha Was Willfully Blind.................................................................10

               i.      The PSAC Alleges That UBS Was Repeatedly Confronted
                        With Evidence Indicative of Madoff's Fraud and Lied to
                        Regulators and Investors to Protect Madoff and Its Own
                        Fees ..............................................................................................10

               ii.     The UBS Documents Luxalpha Attaches to Its Opposition
                        Support the Trustee's Allegations....................................................15

               iii.    The Allegations in the Trustee's Prior Complaints Against
                        UBS and Luxalpha Support the Allegations in the PSAC.............17

               iv.    The UBS Entities' Knowledge is Imputed to Luxalpha ...............18

          D.     Access Circumvented Its Own Robust Due Diligence Procedures
                As Well As Laws and Regulations For BLMIS Investments ....................20

          E.     The Disregard and Suppression of Christopher Cutler's Analysis
                Perfectly Demonstrates Luxalpha's Willful Blindness and Satisfies
                the Trustee's Pleading Burden ...............................................................23

               i.      The Trustee's Cutler Allegations Are Sufficient ...........................23

                ii.     Luxalpha's Response to the Cutler Allegations Fails....................26

          F.     Luxalpha Provided False and Implausible Explanations (Or
                Outright Lies) to Shield Madoff and his Strategy from Further
                 Inquiry....................................................................................................29

III.    OPPOSITION TO LUXALPHA'S CROSS MOTION ..........................................31

A.    502(d) Precludes the Allowance of Luxalpha's Claims ...........................32

B.    Luxalpha's Cross Motion Should Be Denied Because It Improperly
       Seeks an Advisory Opinion .......................................................................33

C.    Luxalpha Cannot Move to Allow the Very Claims It Has
       Disavowed..................................................................................................35

D.    The Trustee Has Pleaded a Claim for Equitable Subordination ...............37

       i.    The Trustee Need Not Choose Between Recovery of
             Fraudulent Transfers and Equitable Subordination ......................38

       ii.   Whether the Trustee Can Pursue Both Equitable
             Subordination and Fraudulent Transfer Claims Need Not
             Be Decided Now ...........................................................................40

       iii.  Luxalpha Is Not Entitled To a 502(h) Claim Against the
             Customer Property Estate ..............................................................44

E.    The PSAC Will Not Prejudice Luxalpha With Respect to Its
       Investors' Madoff Victim Fund Claims....................................................48

CONCLUSION.....................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*,
 169 B.R. 832 (Bankr. S.D.N.Y. 1994) .......................................................37, 40, 41

*ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*,
 210 B.R. 508 (Bankr. S.D.N.Y. 1997) ...............................................................39

*In re Adler Coleman Clearing Corp.*,
 195 B.R. 266 (Bankr. S.D.N.Y. 1996) .............................................................47, 48

*Anderson News, L.L.C. v. Am. Media Inc.*,
 680 F.3d 162 (2d Cir. 2012) ..............................................................................5, 7

*In re Arbco Capital Mgmt., LLP*,
 498 B.R. 32 (Bankr. S.D.N.Y. 2013) .................................................................14

*Ashcroft v. Iqbal*,
 556 U.S. 662 (1949) .........................................................................................5

*In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*,
 991 F. Supp. 2d 479 (S.D.N.Y. 2014) ...............................................................18

*Barnard v. Gateway Bank (In re Ideal Mortg. Bankers, Ltd.)*,
 Adv. Pro. No. 12-08453 (DTE), 2013 WL 6813737 (Bankr. E.D.N.Y. Dec. 23,
 2013) ............................................................................................................38

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
 563 F.2d 692 (5th Cir. 1977) ..........................................................................37, 41

*In re Bernard L. Madoff Inv. Sec. LLC*,
 654 F.3d 229 (2d Cir. 2011) ............................................................................45, 46

*In re BISYS Sec. Litig.*,
 397 F. Supp. 2d 430 (S.D.N.Y. 2005) ...............................................................18

*Century Glove, Inc. v. Iselin (In re Century Glove, Inc.)*,
 151 B.R. 327 (Bankr. D. Del. 1993) .................................................................39, 41

*Concord Assoc., L.P. v. Entm't Props. Tr.*,
 No. 12 Civ 1667 (ER), 2014 WL 1396524 (S.D.N.Y. April 9, 2014) ...................18

*In re Cubic Energy, Inc.*,
 587 B.R. 849 (Bankr. D. Del. 2018) .................................................................34

*Exch. Nat'l Bank of Chicago v. Wyatt*,
    517 F.2d 453 (2d Cir. 1975)..................................................................44

*Flast v. Cohen*,
    392 U.S. 83 (1968)............................................................................33

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011).................................................................... *passim*

*GNK Enters. Inc. v. Conagra, Inc. (In re GNK Enters., Inc.)*,
    197 B.R. 444 (Bankr. S.D.N.Y. 1996)..................................................43

*Gouveia v. The RDI Group, Inc. (In re Globe Bldg. Materials, Inc.)*,
    325 B.R. 253 (Bankr. N.D. Ind. 2005)..................................................33

*Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*,
    453 B.R. 499 (Bankr. S.D.N.Y. 2011)..................................................40

*Graham v. S.E.C.*,
    222 F.3d 994 (D.C. Cir. 2000).............................................................29

*Halperin v. Moreno (In re Green Field Energy Servs.)*,
    594 B.R. 239 (Bankr. D. Del. 2018)......................................................33

*Hausler v. JP Morgan Chase Bank, N.A.*,
    127 F. Supp. 3d 17 (S.D.N.Y. 2015)....................................................35

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995).................................................................14

*Hill v. Spencer Sav. & Loan Ass'n (In re Bevill, Bresler & Schulman, Inc.)*,
    83 B.R. 880 (D.N.J. 1988).................................................................46

*Hirsch v. Pa. Textile Corp.* (*In re Centennial Textiles, Inc.*),
    227 B.R. 606 (Bankr. S.D.N.Y. 1998).............................................40, 42

*Ingersoll–Rand Co. v. Textron, Inc.*,
    No. 96 Civ. 2582 (MBM), 1996 WL 680266 (S.D.N.Y. Nov. 25, 1996).............34

*Int'l Controls Corp. v. Vesco*,
    556 F.2d 665 (2d Cir. 1977).................................................................17

*Knopf v. Esposito*,
    Nos. 17-4151, 18-668(L), 18-2193, 2020 WL 890731 (2d Cir. Feb. 25, 2020)........7

*Kriegman v. 1127477 Alberta Ltd. (In re LLS Am., LLC)*,
    No. 12-CV-324-RMP, 2015 WL 328918 (E.D. Wash. Jan. 23, 2015)..................41

*Le Café Creme v. Le Roux (In re Le Café Creme, Ltd.)*,
    244 B.R. 221 (Bankr. S.D.N.Y. 2000) ...................................................................41

*Lichtyger v. Franchard Corp.*,
    18 N.Y.2d 528 (1966) .............................................................................................39

*LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*,
    511 B.R. 253 (Bankr. S.D.N.Y. 2014) ...................................................................43

*In re Lloyd Sec., Inc.*,
    75 F.3d 853 (3d Cir. 1996) .....................................................................................44

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020) .......................................................................................7

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
    277 B.R. 520 (Bankr. S.D.N.Y. 2002) ...................................................................37

*Monzack v. ADB Inv'rs (In re EMB Assocs., Inc.)*,
    92 B.R. 9 (Bankr. D.R.I. 1988) ..............................................................................41

*Official Comm. of Unsecured Creditors of Toy King Distribs. v. Liberty Savs.
    Bank (In re Toy King Distribs. Inc.)*,
    256 B.R. 1, 127–55, 195–207 (Bankr. M.D. Fla. 2000) .........................................41

*In re OTC Net, Inc.*,
    34 B.R. 658 (Bankr. D. Colo. 1983) .......................................................................45

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005) ...................................................................................40

*Palm Beach Strategic Income, LP v. Salzman*,
    No. 10-CV-261(JS) (AKT), 2011 WL 1655575 (E.D.N.Y. May 2, 2011) ..............17

*Picard v. Alpha Prime Fund, Ltd., et al.*,
    Adv. Pro. No. 09-01364 (SMB) (Bankr. S.D.N.Y. Sept. 19, 2019) ..................20, 34

*Picard v. BNP Paribas*,
    594 B.R. 167 (2018) ...............................................................................................11

*Picard v. Ceretti (In re BLMIS)*,
    Adv. Pro. No. 08-01789 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug.
    11, 2015) .............................................................................................22, 23, 26, 30

*Picard v. Citibank, N.A.*,
    Adv. Pro. No. 10-05345 (SMB) (Bankr. S.D.N.Y. July 18, 2019) .........................19

*Picard v. Defender Ltd.*,
 Adv. Pro. No. 10-05229 (SMB) (Bankr. S.D.N.Y. Apr. 16, 2015) ...................................47, 48

*Picard v. Katz*,
 462 B.R. 447 (S.D.N.Y. 2011) ..............................................................................................37

*Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
 548 B.R. 13 (Bankr. S.D.N.Y. 2016) .....................................................................................24

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec.)*,
 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ............................................................................ *passim*

*Picard v Nelson*,
 Adv. Pro. No. 10-04377 (Bankr. S.D.N.Y. Dec. 9, 2019) ......................................................33

*Picard v. Square One Fund Ltd.*,
 Adv. Pro. No. 10-04330 (SMB) (Bankr. S.D.N.Y. May 29, 2019) .............................5, 24, 25

*Picard v. Zraick*,
 Adv. Pro. No. 10-05257 (SMB) (Bankr. S.D.N.Y. Feb. 26, 2020) ..........................................32

*In re Red Dot Scenic, Inc.*,
 313 B.R. 181 (Bankr. S.D.N.Y. 2004) ....................................................................................45

*Redington v. Borghi (In re Weis Sec., Inc.)*,
 411 F. Supp. 194 (S.D.N.Y. 1975), *aff'd* 538 F.2d 317 (2d Cir. 1976) ..................................45

*Rosenman Family, LLC v. Picard*,
 395 F. App'x 766 (2d Cir. 2010) ...........................................................................................46

*S.E.C. v. KPMG LLP*,
 No. 03 Civ. 671 (DLC), 2003 WL 21976733 (S.D.N.Y. Aug. 20, 2003)..............................29

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
 516 B.R. 18 (S.D.N.Y. 2014)................................................................................................44

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Sec. Inv'r Prot. Corp.)*,
 568 B.R. 481 (Bankr. S.D.N.Y. 2017) ...................................................................................48

*Sec. Inv'r Prot. Corp. v. Bernard. L. Madoff Inv. Sec. LLC*,
 No. 08-01789 (BRL), 2009 WL 458769 (Bankr. S.D.N.Y. Feb. 24, 2009) .....................36, 47

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
 Adv. Proc. No. 08-01789 (SMB), 2018 Bankr. LEXIS 828 (Bankr. S.D.N.Y.
 March 22, 2018)....................................................................................................................32

*Sec. Inv'r Prot. Corp. v. Lehman Bros. Inc.*,
    433 B.R. 127 (Bankr. S.D.N.Y. 2010) .................................................................45

*Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*,
    234 B.R. 293 (Bankr. S.D.N.Y. 1999) ..........................................................38, 39

*Streit v. Bushnell*,
    424 F. Supp. 2d 633 (S.D.N.Y. 2006) ................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..............................................................................................7

*In re Worldcom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................................................14

**Statutes**

11 U.S.C. § 501 ..........................................................................................................45

11 U.S.C. § 502 ..................................................................................................... *passim*

15 U.S.C § 78fff ...........................................................................................44, 46, 47

15 U.S.C. § 78*lll* ........................................................................................................45

**Rules**

Fed. R. Bankr. P. 3002 ..............................................................................................45

Fed. R. Bankr. P. 5005 ..............................................................................................45

Fed. R. Civ. P. 8 .........................................................................................................38

Fed. R. Civ. P. 9 ...................................................................................................18, 19

**Other Authorities**

Andrew DeNatale & Prudence B. Abram, *The Doctrine of Equitable
    Subordination as Applied to Nonmanagement Creditors*, 40 The Bus. Law.
    417 (1985) ......................................................................................................41, 42

C. Wright, Federal Courts 34 (1963) ........................................................................34

5 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1283 (3d ed.) ......................39

H.R. Rep. No. 746, 28 (1977) ....................................................................................46

Hearings on H.R. 8331 Before the Subcomm. on Consumer Prot. and Fin. of the
    Comm. on Interstate and Foreign Commerce, 95th Cong. 178 (1977) ....................................46

1 Moore's Federal Practice § 2.03 (3d ed.)...................................................................................40

U.S. Sec. and Exch. Comm'n Regulation of Investment Advisers (2018)....................................21

Plaintiff Irving H. Picard (the "Trustee"), as Trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, and the consolidated chapter 7 estate of Bernard L. Madoff ("Madoff") respectfully submits this Reply Memorandum of Law in Further Support of the Trustee's Motion for Leave to File a Second Amended Complaint and in Opposition to the Cross-Motion for Determination and Allowance of Claim brought by Defendant Luxalpha SICAV ("Luxalpha") as represented by its Liquidators, Maître Alain Rukavina and Paul Laplume, in their capacities as liquidators and representatives of Luxalpha (the "Liquidators").

## INTRODUCTION

Patrick Littaye and Thierry Villehuchet, together the driving force behind Luxalpha, had a long and fruitful relationship with Madoff and BLMIS.  Their company, Access, created numerous funds for investment with Madoff.  One of those funds, Oreades, was administered by BNP Paribas ("BNP").  BNP told Littaye and Access that Oreades's failure to disclose Madoff's identity was "unconscionable" and violated Luxembourg law.  The Luxembourg law at issue, which implemented the EU's Undertakings for Collective Investments in Transferable Securities ("UCITS") provisions, requires structural checks and balances to prevent fraud.  Prominent among those anti-fraud measures is the requirement that an independent custodian safeguard and segregate fund assets, thus allowing confirmation that the assets exist and the trades the broker claims to have made have, in fact, been made.  BNP told Access that under Luxembourg law, it was required to disclose Madoff's involvement to the Commission de Surveillance du Secteur Financier ("CSSF"), Luxembourg's financial regulator.  Access blocked this disclosure because, as Littaye and Villehuchet explained, Madoff sought to evade regulatory scrutiny.  As such, Access chose to shut Oreades rather than comply with the law.

1

Knowing that Oreades's structure could not be used for a UCITS fund, Littaye and Villehuchet, in setting up Luxalpha, nonetheless duplicated the structure they knew was illegal from the outset.  Access found UBS—which, after initially refusing to do so, agreed to ignore its own internal policies and Luxembourg law—to act as a "front" and "window dressing" to mislead the CSSF.  Littaye and Access even used its own New York affiliate (Access International Advisors LLC ("AIA LLC")) to serve as "investment adviser" to help Madoff avoid the SEC's scrutiny, thus helping to mislead a second regulator.  Luxalpha admits that UBS and Access acted as straw men at all times.

Access frequently fielded clients' questions concerning Madoff's options strategy.  In 2006, Access's Chief Investment Officer, Theodore Dumbauld, analyzed Luxalpha's BLMIS account statements and determined that Madoff was reporting impossible options.  Access hired an outside consultant, Christopher Cutler, who confirmed these and more impossibilities and recommended an immediate exit.  Littaye disregarded the analysis and ended Cutler's inquiry.  Later in 2006, a Luxalpha investor contacted Madoff directly to ask for the identity of options counterparties.  Madoff called Littaye to shut the investor's inquiry down, providing Littaye with a nonsensical response concerning the counterparties that Littaye himself did not understand.  Littaye passed Madoff's explanation along to the investor.  Later that day, recognizing that Littaye's problematic response could lead to further questions, Villehuchet contacted the same investor and directed him never to contact Madoff again.  All the while, Littaye and Villehuchet worked to ensure Madoff was not subject to Access's anti-fraud due diligence, which it publicly touted and conducted on all of its other existing and potential investments.

It is much easier to set up a fund that complies with the law than to set up a fund that secretly breaks the law.  Yet Luxalpha chose a different tack.  With the knowledge that, at the

very least, Madoff's structure of evading both anti-fraud measures and regulatory oversight presented a fraud risk, Access took the extraordinary steps of shutting Oreades, replacing BNP with a willing partner in UBS, opening Luxalpha with Oreades's money and clients, and with UBS, lying to the CSSF. Access went so far as to list its New York entity as investment adviser to further conceal Madoff's involvement, while also exempting BLMIS from Access's anti-fraud protocols. As Luxalpha concedes in its pleadings in its lawsuit in Luxembourg, Access and UBS were effectively paid for shielding Madoff's identity and involvement with Luxalpha. By the time Dumbauld and Cutler approached the Access principals with evidence that Madoff's options trades were impossible, Access was clearly aware that Madoff presented a serious fraud risk. Certainly, after Dumbauld and Cutler presented their analysis—and their analysis was right—Access was aware of a high probability that Madoff was perpetrating his fraudulent scheme. And rather than do anything about it, they barred further inquiry, just as they did a few months later when a Luxalpha customer called Madoff about option risks—they shut down further inquiry rather than follow up. Access was aware for years of the high probability of Madoff's wrongdoing, and cut off further investigation because it did not want to know—and because it did not want anyone else to know—the intricacies of Madoff's fraud.

Faced with these and other incontrovertible facts, Luxalpha argues it was nonetheless acting in good faith—and overtly pushes the Court to use the wrong standard for the avoidance and subordination claims and recasts facts to portray itself as a victim. For example, Luxalpha argues that UBS was not willfully blind to Madoff's fraud despite the fact that UBS knew (i) Luxalpha's structure violated both internal polices and Luxembourg law and insulated Luxalpha and Madoff from scrutiny, and (ii) then lied to the CSSF to protect the Madoff investment. Though the Trustee demonstrates why Luxalpha's arguments are incorrect, the Trustee's case

3

here is based not solely on UBS's state of mind, but on the driving forces behind Luxalpha—

Access, Littaye, and Villehuchet—and the information they received from and acts of their

agents, such as UBS and BNP.  And, among other things, Luxalpha's decision to hire a bank

willing to collaborate in lying to the CSSF in order to help Luxalpha and Madoff evade anti-

fraud provisions—while it was on notice that such provisions were intended to prevent frauds

like Ponzi schemes—does not inure to Luxalpha's benefit, as Luxalpha disingenuously suggests.

Luxalpha also argues that Cutler's findings and unequivocal recommendation to exit

Madoff can be explained away by the glib response of an Access "advisor" that Madoff was

regulated by the SEC.  Yet the Proposed Second Amended Complaint ("PSAC") shows that

Access knew that Madoff was not registered as an investment adviser, and that Access used its

own New York affiliate (AIA LLC) to help Madoff evade scrutiny, told BNP that Madoff sought

to evade regulatory scrutiny, and hired a bank (UBS) willing to lie to the CSSF to avoid

regulatory scrutiny.  But even if a plausible inference could be drawn from Luxalpha's version of

the facts, Luxalpha's demand that the Court choose between plausible theories is simply another

instance where Luxalpha invites legal error, as any plausible explanation put forth by the Trustee

requires the Court to draw an inference in his favor.  There is no balancing of competing

narratives at the pleading stage.  The Trustee's motion to amend should be granted.

Finally, on its cross-motion to allow its customer claims, Luxalpha seeks an advisory

opinion.  Luxalpha takes issue with the Trustee's failure to provide a distribution, arguing that

such a denial is at odds with SIPA.  Luxalpha is wrong.  Luxalpha cannot dictate the terms of the

allowance of its claims—the very claims that Luxalpha, for years, denied it even filed—when

Luxalpha has not repaid the fraudulent transfers plus prejudgment interest.  Luxalpha cannot

force the payment of a Bankruptcy Code section 502(h) claim when SIPA does not allow it.  And

4

Luxalpha certainly cannot choose to repay the fraudulent transfers it received from BLMIS

instead of having its claims subordinated simply because doing so would be more beneficial to

Luxalpha.  Although Luxalpha may now realize—more than 11 years after Madoff's fraud was

uncovered and after years of stalling and trying to prevent discovery—that it would be a good

deal to settle with the Trustee on terms favorable to Luxalpha, that does not make it a proper

legal argument.  Luxalpha's cross-motion for the allowance of its claims should be denied.

## ARGUMENT

### I.    The Trustee Has Plausibly Alleged Willful Blindness

The PSAC plausibly alleges that Luxalpha and its agents knew of Madoff's wrongdoing

and took deliberate actions to avoid confirming the critical facts of Madoff's fraud.  *Anderson*

*News*, *L.L.C. v. Am. Media Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (citing *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (1949)) ("A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged.").  Accordingly, the Trustee has satisfied the two-prong test for willful

blindness set out in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) and

applied in other proceedings in this SIPA liquidation to avoid and recover transfers made within

the two years prior to the Filing Date.[1]  (PSAC ¶ 240.)  *See Picard v. Merkin (In re Bernard L.*

*Madoff Inv. Sec. LLC )*, 515 B.R. 117, 139 (Bankr. S.D.N.Y. 2014) ("*Merkin*") ("(1) the

defendant must subjectively believe that there is a *high probability* that a fact exists and (2) the

defendant must take deliberate actions to avoid learning of that fact."); Tr. of Mot. To Dismiss

Hr'g at 39:9-13, *Picard v. Square One Fund Ltd.*, Adv. Pro. No. 10-04330 (SMB) (Bankr.

S.D.N.Y. May 29, 2019), ECF No. 185 ("*Square One*") (same).

---

[1] Luxalpha's repeated assertions throughout its Opposition that the PSAC is futile because it fails to allege actual knowledge is a distraction—"actual knowledge" is not the applicable standard.

As the PSAC clearly pleads, Luxalpha was repeatedly confronted with evidence of fraudulent activity at BLMIS and strong evidence that the trades appearing on its BLMIS account statements were impossible. (*See, e.g.*, PSAC ¶¶ 137, 138, 147–51, 154–68, 170–75, 178–79, 181–82, 207–08, 212–13, 215–16.) This type of knowledge satisfies prong one of the willful blindness standard: knowledge of fraudulent trading activity and evidence suggesting the illegitimacy of Madoff's business, that if pursued to a logical conclusion (rather than deliberately avoided), would have confirmed Madoff's fraud. *See Global-Tech*, 563 U.S. at 769 ("[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts").

Though armed with this information, Luxalpha avoided confirming the conclusion— taking the same approach as the defendant in *Global-Tech*. In *Global-Tech*, the Supreme Court found that the defendant willfully blinded himself by purposefully withholding information from his attorney to induce the attorney to render a clean right-of-use opinion for the defendant's invention. *Id.* at 771. Here, Luxalpha went even a step further: Luxalpha lied both (i) to its auditors that it confirmed options counterparties, to prevent them from concluding that Luxalpha's purported returns from BLMIS did not exist and (ii) to its regulator, the CSSF, to prevent the CSSF from rejecting Luxalpha's fund structure, which was susceptible to fraud. (PSAC ¶¶ 114–17, 125, 127, 186.) Like the defendant in *Global-Tech*, who purposefully copied a foreign model rather than a U.S. model because he understood that the U.S. model could reflect a patent number, and thus would have explicitly confronted him with the fact that the model was patented, Luxalpha bypassed standard procedures to avoid confronting the truth. *Global-Tech*, 563 U.S. at 758. The *Global-Tech* defendant's maneuver preserved a façade of legitimacy that

6

hid the evidence of impropriety.  The same can be said of Luxalpha.  Luxalpha and its agents

maintained a façade of due diligence even though their anti-fraud practices (and standard due

diligence) were never performed on its BLMIS investments.  (PSAC ¶¶ 118–24.)  And, when

Luxalpha turned to an outside analyst whose analysis indicated that no securities were being

traded, Littaye rejected and suppressed his findings and shut down the analyst's further inquiry.

(PSAC ¶¶ 190–94, 149–51, 156–7, 170, 178.)

        Luxalpha's Opposition improperly asks this Court to find Luxalpha's alternate

interpretation of the facts more plausible than the allegations set forth in the PSAC.  (*See*

*generally* Mem. of Law in Opp. to Trustee's Mot. For Leave to File a Second Am. Compl. and in

Supp. of Cross Mot. for Claim Determination and Allowance, Apr. 4, 2020, ECF No. 251

("Opp.").)  Even if the Court were inclined to treat some of Luxalpha's far-fetched explanations

as plausible, that would be insufficient to deem the PSAC futile.  *See Lynch v. City of New York*,

952 F.3d 67, 75 (2d Cir. 2020); *see also Knopf v. Esposito*, Nos. 17-4151, 18-668(L), 18-2193

(Con), 2020 WL 890731, at *2 (2d Cir. Feb. 25, 2020) (citing *Anderson News*, 680 F.3d at 185)

("a complaint that states a plausible version of the events" should not be dismissed "because the

court finds a different version more plausible"); *Anderson News*, 680 F.3d at 190 ("[A]lthough

an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that

the plaintiff's allegation that that conduct was culpable is not also plausible.").  Because the

PSAC sets forth plausible allegations that are "cogent and at least as compelling" as any

opposing inference of non-fraudulent intent Luxalpha suggests, it should not be dismissed.  *See*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Luxalpha will have its

opportunity to prove its defenses on the merits.  But its attempts to do so at the pleading stage are

inappropriate.  The PSAC is not futile and the Trustee's motion to amend should be granted.

II.    **The Allegations in the PSAC Show That Luxalpha Was Willfully Blind**

  A.  **Littaye Ensures Control Over His BLMIS Feeder Funds**

Littaye is a sophisticated businessman whose Access group of companies were expert at establishing investment funds.  (PSAC ¶¶ 3, 48–49, 71.)  Littaye and Access knew how to set up a proper investment and understood the duties Luxalpha assumed as a matter of law to act in the best interests of shareholders.  When it came to Luxalpha and the other BLMIS feeder funds Littaye founded, those rules and duties were disregarded—these entities existed for the sole purpose of channeling funds to BLMIS in exchange for millions of dollars in fees.  Luxalpha admits this: "Luxalpha, in the guise of a coordinated Luxembourg [UCITS], was, in fact, only an instrument intended to collect funds from the public to be entrusted to B[L]MIS and in the process, to allow the various UBS entities to receive very large fees—in the order of $83,758,610.08 . . . ."  (Liquidators Compl.[2] at 21.)

Littaye's decades-old direct and personal access to Madoff—access he limited to himself and, occasionally, his partner Villehuchet—allowed Littaye to maintain control over Access's relationship with Madoff and establish not just one, but four feeder funds, that together invested over $2.2 billion with BLMIS over 13 years.  (*See, e.g.*, PSAC ¶¶ 70, 71, 123, 239.)  As detailed in the PSAC and addressed below, Littaye also guarded his and Access's relationship with Madoff, leading him to disseminate Madoff's far-fetched explanations of BLMIS's performance—explanations that Littaye himself did not believe—to Luxalpha's investors.  (*Id.* ¶¶ 123–24, 182–83.)  His desire for continued profit compelled him to suppress further inquiry.

---

[2] On December 18, 2009, the Liquidtaors filed an action in the District Court of Luxembourg against, among others, several of the original defendants to this action, for damage caused to Luxalpha as a result of the fraud perpetrated by Madoff and facilitated by each of the named defendants (the "Liquidators Compl.").  A copy of the certified translation of the Liquidators Complaint is attached as Exhibit 1 to the accompanying Reply Declaration of Oren J. Warshavsky dated May 4, 2020 ("Warshavsky Decl.").

(*Id.* ¶¶ 8, 169, 183, 204.)  Littaye recognized that the wrongdoing Luxalpha and its agents

identified that related to Luxalpha and his other BLMIS feeder funds implied a high probability

of Madoff's fraud.  When others came too close to confirming that truth, he halted their efforts,

protecting his profits.

### B.  BNP Alerted Access to Madoff's Fraud Risk

During the nearly ten years in which Oreades operated, Littaye's relationship with

Madoff and his exposure to the indicia of fraud reported in BLMIS trading activity continued.

(*Id.* ¶¶ 73–82.)  Oreades was forced to close in 2004, when BNP, its sponsor and service

provider, developed serious concerns about its involvement with a Madoff investment vehicle.

BNP communicated its concerns to Access.  (*Id.* ¶¶ 73–75, 78.)  Access responded by creating

Luxalpha, and it was then ready to be used as a new receptacle for Oreades's investors' money

just days after Oreades's closing.  (*Id.* ¶¶ 81, 83–84, 87–88.)  Access and its principals brought to

Luxalpha their knowledge of the concerns that prompted BNP to leave Oreades, but deliberately

imported to Luxalpha the very structure BNP identified as being illegal and undermining

protections against fraud.

Luxalpha now contends that the Court's decision in *Picard v. BNP Paribas*, which

addressed BNP's—not Access's—knowledge of or willful blindness to Madoff's fraud, controls.

(Opp. at 7-8.)  This is a misapprehension of both the Trustee's claims here and the *BNP Paribas*

decision, and is an argument that should be rejected.  The Trustee's allegations against Luxalpha

are not based on a claim of BNP's willful blindness to Madoff's fraud.  Rather, the PSAC alleges

BNP's "discomfort" with the risk it bore as Oreades's sponsor and service provider.  (PSAC ¶¶

73–74, 127.)  That discomfort resulted from (i) BLMIS's simultaneously acting as the fund's

custodian, investment adviser, and broker dealer, a violation of both Luxembourg law and BNP's

own security rules (*id*. ¶¶ 74, 78); (ii) Oreades hiding BLMIS's role from the CSSF, and

Madoff's refusal to disclose his name despite BNP's request to do so (*id.* ¶¶ 74, 78, 79); (iii)

BNP being unable to determine whether Oreades's assets existed at BLMIS (*id.* ¶ 74); and (iv)

BLMIS transmitting trading reports by fax and mail, delivered seven or eight days after the

reported trades, a deviation from BNP's standard practices, which required that trading records

be transmitted the day of the trade (*id.* ¶¶ 75–77).  BNP communicated these issues to Access

and gave Access the opportunity to rectify the problem.  (*Id.* ¶¶ 78–80.)

The concerns BNP shared with Access were serious enough for BNP to shutter

Oreades.  Access's reaction, by contrast, was to immediately seek out a sponsor for an

investment vehicle to receive Oreades assets.  (*Id.* ¶¶ 83–84.)  Access understood that once it

found a new sponsor, it would have to continue violating Luxembourg law and subverting its

own requirements regarding trade transparency.  To capture as much of the earnings endangered

by Oreades's closing, Access wasted no time.  Within a week, Access had another fund—

Luxalpha—in place, into which Access directed nearly all of Oreades's investors' money.  (*Id.*

¶¶ 84, 87–88.)  It is Access's actions in response to the warnings it received from BNP and the

steps it took despite those warnings that are meaningful here and are the first in a series that

demonstrate Luxalpha's willful blindness.

### C.  UBS's Knowledge and Actions Lead to the Conclusion that Luxalpha Was Willfully Blind

#### i.  The PSAC Alleges That UBS Was Repeatedly Confronted With Evidence Indicative of Madoff's Fraud and Lied to Regulators and Investors to Protect Madoff and Its Own Fees

When Access and Littaye enlisted UBS to replace BNP, UBS brought with it its own

knowledge of Madoff's fraudulent practices.  Through its policies and procedures, UBS was

well-equipped to uniformly assess its exposure to fraudulent activity and avoid taking

unacceptable risk.  (PSAC ¶¶ 88–92.)

By the time Access and Littaye brought UBS on board with Luxalpha, UBS had, through UBS O'Connor, performed a due diligence analysis of the Broad Market Fund, another BLMIS feeder fund.  (*Id.* ¶¶ 101–02.)  UBS O'Connor found Madoff's strategy to be "more or less impossible" and could not prove otherwise, through either its efforts or Broad Market's explanations.  (*Id.* ¶ 101.)  Stymied, UBS O'Connor declined to invest in Broad Market Fund and chose not to endorse BLMIS as a suitable investment for its clients.  (*Id.* ¶¶ 101–02.)  In 2004 UBS confirmed its belief that Madoff's returns were "IMPOSSIBLE" and could not be produced by the split strike conversion strategy.  (*Id.* ¶ 104.)  This information was shared across divisions at UBS.  This knowledge that Madoff was not trading securities as purported, evidence in UBS's possession from the beginning of its involvement with Luxalpha, reflected a high probability of Madoff's fraud.

Despite its refusal to invest its own or its clients' money with BLMIS, UBS earned millions of dollars as a service provider to BLMIS feeder funds.[3]  While UBS normally declined to act as a service provider to structures susceptible to fraud—such as when the broker also acted as custodian—it was unable to subvert its desire to avail itself of the lucrative fees a Madoff investment promised.  When this opportunity presented itself with respect to Luxalpha, UBS acknowledged that it normally gives a "NO" in such situations, but UBS (Luxembourg) SA ("UBS SA") managing director (and Luxalpha director) Bernd Stiehl gave voice to the powerful urge to capitalize, despite the danger of fraud: "We cannot permit ourselves to lose 300 million. Accept client."  (*Id.* ¶¶ 90–91.)

---

[3] This is in contrast to BNP, which Luxalpha compares to UBS.  Luxalpha contends that "the financial risks to the UBS entities was and remains substantial, and in many ways are similar to the financial risks that has led the Court to find the Trustee's rationale unpersuasive in cases like BNP Paribas." (Opp. at 28) (citing *BNP Paribas*, 594 B.R. at 202).)  Luxalpha is wrong.  As the PSAC pleads, UBS did not risk its own or its clients' money; it simply collected millions of dollars in fees. (PSAC ¶ 103.)

While circumventing its own risk safeguards, UBS took deliberate steps to conceal the

delegation of its role as custodian to BLMIS. UBS gave "special handling" to Luxalpha,

granting exceptions to UBS policies so that it could nominally remain "custodian" of Luxalpha's

assets, even after impermissibly subdelegating both that role and managerial roles to BLMIS.

(*Id.* ¶¶ 111–12.) As the Trustee alleges, UBS's legal department knew the delegation to BLMIS

was improper, and that failing to disclose the delegation in Luxalpha's prospectus was illegal.

(*Id.* ¶ 136.) UBS lied with purpose, representing to the CSSF and potential investors that it

actively managed Luxalpha's assets and monitored those assets under supervision of the

Luxalpha board. (*Id.* ¶ 132.) UBS lied because it knew that by allowing this structure—a

structure Madoff insisted upon—it was circumventing Luxembourg anti-fraud laws that forbade

this structure. (*Id.* ¶ 125.) The implications of these actions—as the Supreme Court recognized

in *Global-Tech*—are to be ascribed to Access, Luxalpha, and UBS: "[w]hen a person actively

induces another to take some action, the inducer obviously knows the action that he or she

wishes to bring about." *Global-Tech*, 563 U.S. at 760. UBS wished for Madoff's fraudulent

activity to go undetected and took steps to ensure that Luxalpha would be approved by the CSSF.

Luxalpha admits that UBS overtly lied to the Luxembourg regulatory authority on this point

(Opp. at 21, 24, 29), acknowledging that it knew that BLMIS did not "meet the conditions for

officially performing the duties of custodian of a Luxembourg SICAV." (Liquidators Compl. at

12.) Luxalpha further admits that if UBS had controlled the tasks delegated to BLMIS, rather

than purposefully avoiding the checks and balances that the CSSF required, "it is inconceivable

that it would not have made it possible to detect the misappropriation of assets of which the

subcustodian was guilty or the absence of actual asset management." (Liquidators Compl. at

73.) Thus, Luxalpha was aware that if UBS had performed its duties, as required by

Luxembourg law, and truthfully submitted to the checks the CSSF required under UCITS, it was "inconceivable" that Madoff's fraud would not be detected. Neither UBS nor Luxalpha can reconcile these alleged facts with a showing of good faith.

The PSAC alleges that UBS maintained these lies even as UBS's limited due diligence continued to uncover the impossibilities of Madoff's trading. It noted out-of-range trades on Luxalpha's account statements. (PSAC ¶ 138.) And, as a service provider to Luxembourg Investment Fund ("LIF"), another BLMIS feeder fund, UBS identified weeks-long negative cash balances in the fund's BLMIS accounts—inexplicable because LIF had no margin account with BLMIS. (*Id.* ¶ 212.) These blatant signs of fraud did not deter UBS. It marched on, willfully blinding itself (and thus Luxalpha), as the Trustee has alleged, to the high probability of Madoff's fraudulent activity.

Luxalpha's decision to lie to the CSSF and at least some shareholders is not a matter of negligence or omission—Luxalpha and its service providers made the conscious decision to refrain from conducting diligence and oversight they were legally obligated to undertake,[4] steps that Luxalpha concedes would have revealed the fraud. And this is precisely why, the Trustee

---

[4] Article 86 of Luxembourg's Law of 20 December 2002 Relating to Undertakings for Collective Investment and Amending the Law of 23 February 1979 Concerning the Value Added Tax (included at Warshavsky Decl., Ex. 2) provides, "In the conduct of its business activities, a management company authorised under this Chapter shall, at all times, in furtherance of rules of conduct:

    (a) act honestly and fairly in conducting its business activities in the best interests of its clients and the integrity of the market;

    (b) act with due skill, care and diligence, in the best interests of its clients and the integrity of the market;

    (c) have and efficiently employ the resources and procedures that are necessary for the proper performance of its business activities,

    (d) try to avoid conflicts of interests and, when they cannot be avoided, ensure that its clients are fairly treated, and

    (e) comply with all regulatory requirements applicable to the conduct of its business activities so as to promote the best interests of its clients and the integrity of the market.

alleges, those steps were not taken.  The decision to abdicate all monitoring responsibility to

BLMIS and to lie to both investors and regulators about this delegation flips this duty on its

head.[5]  Luxalpha argues that in shutting down Cutler, lying to the CSSF, and misleading the SEC

to earn millions of dollars, Luxalpha and its agents were making acceptable calculated business

decisions and thus could not be willfully blind.  But taking a calculated risk of fraud for financial

gain does not save a defendant from a finding of willful blindness—rather, it shows the

defendant's motivation for ignoring the risk.  Like the defendant in *Global-Tech* who made a

calculated business decision to copy a foreign product, or misdirect his counsel in obtaining an

opinion, Luxalpha and its agents made the decision, despite evidence of Madoff's wrongdoing,

to lie to the CSSF and shut down further inquiries into Madoff.

Courts in this District have previously held that in willful blindness cases, parties are

precluded from asserting a defense to willful blindness where they owe a fiduciary duty to their

beneficiaries.  *See In re Arbco Capital Mgmt., LLP*, 498 B.R. 32, 44 (Bankr. S.D.N.Y. 2013)

(holding that allegations of willful blindness, in the context of a fiduciary, were "sufficient to

survive the Motion to Dismiss and may be sufficient, if proven, to constitute actual

knowledge."); *see also In re Worldcom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 331 (S.D.N.Y.

2005) (holding that the lead plaintiff's testimony that Anderson's failure to act when a "red flag"

existed was "evidence to show that Andersen had acted in willful blindness to WorldCom's

financial condition and in abrogation of its duty as an auditor"); *HBE Leasing Corp. v. Frank*, 48

F.3d 623, 637 (2d Cir. 1995) (finding that, as a former director with fiduciary duties, failure to

inquire constitutes "conscious turning away from the subject").  In *Merkin*, the court found that

---

[5] Luxalpha, Littaye, Access, and UBS were consumed by self-interest from the very beginning, when they
established an illegal fund for the sole purpose of collecting fees, and funneling money to Madoff
(another fact Luxalpha admits).  *See supra* at Part II.D. and Liquidators Compl. at 21.  To date, their
gamble has paid off.  Their decision to further Madoff's fraud made them millions.

the Trustee sufficiently alleged willful blindness where the defendant funds owed a fiduciary

duty to perform due diligence on the third-party money managers to whom they delegated fund

assets.  515 B.R. at 131.  The Court should so find here as well.

ii.    **The UBS Documents Luxalpha Attaches to Its Opposition Support the Trustee's Allegations**

The UBS exhibits attached to Luxalpha's Opposition support the plausible inference that

Luxalpha was willfully blind.  At best, Luxalpha's Opposition proposes an alternative inference

from the documents, which as discussed, would be inappropriate to accept at the pleading stage.

The Trustee does, however, agree that the Court may consider these documents, as a review of

the exhibits will confirm the Trustee's pleading is faithful to the documents.

Luxalpha attempts to use Exhibit F—a March 2004 email chain between Dieter Kiefer,

Mike Welch, and Viviane De Angelis of UBS—to alter the pleading standard.  Luxalpha's

efforts are meritless.  The Trustee is not relying on the March 2004 email chain to allege that

UBS O'Connor knew Madoff was a Ponzi scheme, as actual knowledge of a Ponzi scheme is not

the applicable pleading standard here.  Nor does the Trustee concede that this document shows

that UBS performed meaningful due diligence.  It does not.  The salient point of the email chain,

as the Trustee alleges, is that, within three days of opening Luxalpha, UBS was discussing

Madoff's strategy as "impossible" and a "non-starter" for its clients.  (PSAC ¶¶ 104–05.)  This is

precisely what Exhibit F reflects.

Luxalpha's position on this document is conflicted.  On the one hand, Luxalpha would

like to ignore the fact that the email chain originated with Dieter Kiefer, of UBS AG, and that

Viviane De Angelis, a UBS Managing Director, was a party thereto, and characterize it as a

"UBS O'Connor document."  On the other hand, Luxalpha trumpets the document as evidence of

Luxalpha's due diligence efforts.  (Opp. at 21.)  Such a selective reading of this document, which would prefer Luxalpha's desired reading over any other, is inappropriate.

Luxalpha uses Exhibits G and I to mischaracterize the Trustee's arguments.  These documents actually undermine Luxalpha's position that it was not willfully blind.  These two email chains have the same starting point: "assumptions" about BLMIS, a "possible set up" to structure a BLMIS investment, and "conditions" to accept a BLMIS investment.  Both chains state that "Madoff as a custodian will only be tolerated by [UBS] Zurich if all the conditions described below are met."  Luxalpha argues these email chains demonstrate that UBS evaluated the investment with BLMIS and therefore undercut allegations of UBS's willful blindness.  (Opp. at 26–27.)  The reality is to the contrary.  The "assumptions" were impossible to confirm, the investment was not "set up" as the email indicated and the "conditions" were never met.  Rather than support Luxalpha's position, the email chains confirm that UBS identified the steps it needed to take to be comfortable enough with BLMIS to make a calculated business decision, and then proceeded without obtaining those assurances because its own money was not at risk.  Indeed, the timing of Luxalpha's formation in relation to the email chains suggests UBS did not even take the conditions set forth in the email chains into consideration.

The flaws in Luxalpha's position are exacerbated by its argument that these conditions were "mandatory."  (Opp. at 27.)  Failing to heed mandatory conditions for accepting the BLMIS investment in the face of known problems constitutes willful blindness and undermines any argument of good faith.  Luxalpha admits that UBS took on the BLMIS investment despite not meeting mandatory conditions and knowing it violated Luxembourg law.  (Opp. at 24 ("The Liquidators agree that UBS SA, as well as Access . . .  agreed to accept the BLMIS structure despite its obvious and well-known potential risks in order to earn fees, and it was willing to do

16

so even in violation of Luxembourg law.").)  Luxalpha's flawed claim of good faith is exposed if

its best-case scenario is that it knowingly violated Luxembourg anti-fraud laws—intended to

protect against frauds like Madoff's Ponzi scheme—to profit from its Madoff investment.

### iii.   The Allegations in the Trustee's Prior Complaints Against UBS and Luxalpha Support the Allegations in the PSAC

Unable to squarely address the allegations in the PSAC, Luxalpha vainly engages in the

comparison of the PSAC to the Trustee's prior complaints.  Luxalpha claims that the Trustee

"chose to exclude" previous allegations of UBS's "extensive due diligence" conducted because

they undermine the Trustee's allegations of willful blindness.  (Opp. at 22.)  Luxalpha's

argument is flawed on both the law and the facts.

Filing an amended complaint renders the original complaint a nullity, *see Int'l Controls*

*Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977), and, typically, even "a prior inconsistent

pleading should not trump the Court's obligation under Rule 12(b)(6) to accept a complaint's

allegations as true."  *Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-261(JS) (AKT),

2011 WL 1655575, at *6 (E.D.N.Y. May 2, 2011); *see also Streit v. Bushnell*, 424 F. Supp. 2d

633, 639 n.4 (S.D.N.Y. 2006) ("It would be a harsh rule of law indeed if a litigant were to

change a statement in an amended pleading to repair a weakness cited by an adversary or by the

Court, only to have the case dismissed because the conforming change in some way may conflict

with an allegation in the earlier pleadings.").  Nonetheless, the PSAC is not inconsistent with the

Amended Complaint ("AC"); rather, it simplifies the Trustee's allegations relating to the UBS

entities, which are no longer defendants.

UBS's due diligence and its decision to heed the results for itself and its own clients but

ignore them in its role as Luxalpha's service provider, are clearly alleged in the PSAC.

Paragraph 99 of the PSAC states that "[b]efore UBS created Luxalpha or began servicing

17

Groupement Financier, UBS Wealth Management, a UBS AG business division, considered and

rejected BLMIS as a vehicle for direct investment and derivative financial products."  Paragraph

100 goes on to state, "In November 2000, UBS AG acquired Fondvest AG . . .  Upon

information and belief, Fondvest analyzed BLMIS-related funds and repeatedly declined to

endorse them for distribution to UBS clients. . . ."  Paragraphs 101 through 108 similarly repeat

allegations of UBS's due diligence pursuant to which UBS declined to recommend BLMIS

investment to their clients.  The Trustee's allegations have consistently demonstrated Luxalpha's

willful blindness and it is not for Luxalpha to cherry-pick the allegations that it believes to be

beneficial to its position.

### iv.   The UBS Entities' Knowledge is Imputed to Luxalpha

The "group pleading doctrine," which Luxalpha contends the Trustee violates in the

PSAC, does not apply here.  None of the UBS entities is a defendant in this proceeding and,

accordingly, the Trustee is not required to plead their knowledge with particularity under Fed. R.

Civ. P. 9(b).  The group pleading doctrine applies to averments of fraud.  It requires that

fraudulent statements "be linked directly to the party accused of fraudulent intent" if the plaintiff

has alleged facts showing the defendant was a "corporate insider or affiliate with direct

involvement in the daily affairs of the company."  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430,

438–41 (S.D.N.Y. 2005).  The cases cited by Luxalpha confirm that point.  *See Concord Assoc.,*

*L.P. v. Entm't Props. Tr.*, No. 12 Civ 1667 (ER), 2014 WL 1396524, at *35 (S.D.N.Y. April 9,

2014) (group pleading against defendants is impermissible for conspiracy claims); *In re Bank of*

*N.Y. Mellon Corp. Forex Transactions Litig.*, 991 F. Supp. 2d 479, 501 (S.D.N.Y. 2014)

(plaintiffs are obligated to plead specific claims against specific defendants for fraud claims).

None of the Trustee's claims includes averments of fraud.  The Trustee's allegations concern

UBS's knowledge, which can be alleged generally without running afoul of Rule 9(b)'s

18

requirements.  While requiring particularity for pleading circumstances of fraud or mistake, Rule

9(b) states that "[m]alice , intent, knowledge, and other conditions of a person's mind may be

alleged generally."  Fed. R. Civ. P. 9(b).

The Trustee's claims involving UBS adequately allege that UBS's knowledge can be

imputed to Luxalpha.  Luxalpha ignores that the Trustee's definition of "UBS" in paragraph 68

of the PSAC includes only those UBS entities that were Luxalpha service providers.  And "under

well-established principles of agency law, the acts of agents, and the knowledge they acquire

while acting within the scope of their authority are presumptively imputed to their principals."

*Merkin*, 515 B.R. at 146 (internal quotation and citation omitted).  The PSAC sufficiently alleges

that the UBS entities included in the definition of "UBS" were service providers to Luxalpha,

and thus Luxalpha's agents.  (PSAC ¶¶ 84–86, 93.)  The knowledge the PSAC attributes to

"UBS" is therefore imputed to Luxalpha.

Even where an allegation in the PSAC addresses a UBS entity that was not a Luxalpha

service provider (*see, e.g.*, PSAC ¶¶ 101–02, 104–06), the Trustee also alleges that those entities

acted in concert with the service providers.  For example, the PSAC alleges that UBS as a whole:

> presented itself to the public as a unified global entity operating as 'a coherent and
> effective whole.'  UBS shared a centralized structure for core enterprise functions
> including finance, risk, legal, compliance, and shared services, including, among
> other things, human resources, information technology, communication and
> branding, and corporate development. . . UBS AG subsidiaries market themselves
> as part of a 'worldwide financial network,' providing 'an international network of
> experts and can propose truly global investment solutions' that benefits from 'the
> experience, know-how and substantial resources provided by the UBS Group as a
> whole.'

(PSAC ¶ 69.)  Such pleading is sufficient for imputation, which should not be decided on a

motion to dismiss.  Tr. of Hr'g on Mot. for Leave to Am. 72:2–3, *Picard v. Citibank, N.A.*, Adv.

Pro. No. 10-05345 (SMB) (Bankr. S.D.N.Y. July 18, 2019), ECF No. 169 ("I'm not going to

decide an imputation issue or anything like that on a motion to dismiss."); Tr. of Hr'g on Mot.

19

for Leave to Am. and to Sever 18:14-16, *Picard v. Alpha Prime Fund, Ltd., et al.*, Adv. Pro. No.

09-01364 (SMB) (Bankr. S.D.N.Y. Sept. 19, 2019), ECF No. 569 ("*Alpha Prime*") ("I

understand the rules of imputation, but that's not something I can resolve on a Motion to

Dismiss."). Furthermore, when information originated with a non-service provider—as in the

case of UBS O'Connor—the relevant communications were forwarded to UBS personnel

servicing Luxalpha. For example, Exhibit F to Luxalpha's Opposition, which supports the

Trustee's allegations in PSAC ¶¶ 104–05, 162, 195, includes emails among Mike Welch of UBS

O'Connor and Dieter Kiefer of UBS AG and Viviane De Angelis of UBS SA who both serviced

Luxalpha. Accordingly, any information obtained by other UBS entities and UBS personnel

such as Kiefer and De Angelis, who acted on behalf of Luxalpha, can be imputed to Luxalpha.

### D. Access Circumvented Its Own Robust Due Diligence Procedures As Well As Laws and Regulations For BLMIS Investments

Luxalpha and its agents knew that industry-standard checks and balances that would have

protected against fraudulent trading were, in the case of Luxalpha, circumvented at Madoff's

direction. The PSAC alleges that this course of conduct began early on in Littaye's and Access's

Madoff relationship. For example:

- Littaye knew that by occupying multiple roles, including custodian, Madoff blocked the ability to confirm whether assets were held in a segregated account at BLMIS. (PSAC ¶ 74.)

- Littaye knew that BNP's standard practices and procedures for verifying trades could not be followed because of the unusual lag time between trade dates and the receipt of trading records from BLMIS. (*Id.* ¶ 75.) In fact, Access began the practice of backdating trading recommendations to Luxalpha as a result of the delayed trading records. (*Id.* ¶ 222.)

- Access knew that, to avoid regulatory scrutiny, Madoff had purposely not registered his investment advisory business with the SEC. (*Id.* ¶ 79.)

This knowledge is evidence that suggests the high probability of an illegitimate scheme.

Without the confirmation of a segregated account, a fund could not ensure that its assets were not

commingled, and subject to theft through fraud.  Without the ability to verify trades, a fund could

not ensure that trading activity reflected on its account statements mirrored the market and

complied with the strategy.  And, without an investment adviser's registration with the SEC, a

fund could not ensure that the watchdog functions of the regulator were being performed.  *See*

U.S. Sec. and Exch. Comm'n Regulation of Investment Advisers (2018).  These are fundamental

measures whose absence were telltale signs of fraud.  Luxalpha has admitted that "in an

environment in which instant communications by electronic means have become the rule, the

simple fact that a counterparty takes the time to send paper and does not allow the client

immediate and online access to its deposits and current accounts" was a red flag, particularly

when the "counterparty [was] one of the pioneers in implementing automated and electronic

trading in the United States, as was the case of B[L]MIS or at least its boss, the receipt of

confirmations in paper form constitutes an anachronism that should have set off alarm bells . . .

."  (Liquidators Compl. at 99.)  Thus, when Luxalpha was founded, Littaye and Access were

already aware of  evidence suggesting Madoff's fraud.

Access furthered Madoff's ability to avoid regulatory scrutiny, despite knowing that

doing so subverted anti-fraud laws.  When an Access executive suggested that a New York SEC-

registered entity act as manager to Groupement Financier, another Access-run BLMIS feeder

fund, Littaye, knowing Madoff sought to elude all regulatory scrutiny, rejected the idea as "too

risky."  (PSAC ¶ 146.)  Access also knew that the CSSF's regulations, intended to protect

investors from fraud, posed a risk to Luxalpha.  To subvert regulations, Access intentionally

deceived the CSSF to allow Luxalpha's BLMIS investments despite knowledge of Madoff's

wrongdoing.  Access acknowledged that there was "a wink and a nod" to Littaye and asked him

to "sanitize" Luxalpha by concealing UBS's sub-delegation of custodial duties to Madoff so that

Luxalpha would appear legally compliant even though it was not.  (*Id.* ¶ 115.)  Luxalpha has

admitted that Access intended only to create the appearance that Luxalpha was compliant with

Luxembourg law and to maintain a façade that it was the custodian, knowing that the true

internal structure violated the law.  (Liquidators Compl. at 12, 17.)  To keep investors at bay,

Access also withheld the sub-delegation from its prosepctus.  (PSAC ¶¶ 125, 130–31.)

Access understood the importance of compliance with anti-fraud measures, having

established its own rigorous due diligence practices to detect and avoid the risk of fraud.  (*Id.* ¶

118–22.)  It applied these practices to all investments it managed—except for BLMIS

investments.  (*Id.*)  It subjected fund managers to extensive background checks, handwriting

analysis, and monthly meetings between the Access team and the manager.  (*Id.* ¶¶ 119–21.)

Access's standard diligence procedures also examined the manager's fee structure and noted that

Madoff's unusual fee structure was a "non-starter."  (*Id.* ¶ 195.)  Luxalpha admits that Madoff's

forgoing management and performance fees meant that those fees:

> went directly into the "sellers" pockets . . . All they had to do was to create a fund
> that opened the door for Madoff, collect funds from their client investors and
> forward them to Madoff.  The sellers also received substantial fees without having
> to manage the funds themselves.  To obtain access to Madoff's services, sellers
> simply had to open an account with him, transfer the assets to be managed and
> authorize him to manage them.

(Liquidators Compl. at 6.)

But for Madoff, it made an exception.  Littaye ensured that Access did not fully perform

its standard due diligence on BLMIS.  (PSAC ¶¶ 119–24.)  In fact, Littaye made sure that he was

the only person at Access to meet and contact Madoff, a role he did not take on for any other

fund manager working with Access.  (*Id.* ¶¶ 123–24.)  This Court has previously found that

suppression of standard due diligence is indicative of actual knowledge.  *See Picard v. Ceretti

(In re BLMIS)*, Adv. Pro. No. 08-01789 (SMB), 2015 WL 4734749, at *13 (Bankr. S.D.N.Y.

22

Aug. 11, 2015) ("*Kingate*") (finding the fact that BLMIS had not been subjected to FIM's

rigorous due diligence standards as signaling actual knowledge).  Likewise, here, such

suppression, is at a minimum, indicative of Luxalpha's willful blindness.

### E.  The Disregard and Suppression of Christopher Cutler's Analysis Perfectly Demonstrates Luxalpha's Willful Blindness and Satisfies the Trustee's Pleading Burden

Although the Trustee has sufficiently alleged a pervasive course of willful blindness by

Luxalpha spanning several years, that willful blindness manifested itself perhaps most

egregiously with Access's disregard and subsequent suppression of outside consultant

Christopher Cutler's analysis of BLMIS.  Recognizing the significant weakness the Cutler

allegations present for its Opposition, Luxalpha buries deep in its argument a failed and legally

improper attempt to explain away the Trustee's well-pleaded facts concerning Cutler and his

work on behalf of Access.  Luxalpha does not and cannot squarely address those facts in their

entirety, resorting instead to cherry-picking and spin.  When properly viewed in their entirety and

in the light most favorable to the Trustee, the Cutler allegations include every component of

willful blindness that the Trustee is required to allege.

### i.    The Trustee's Cutler Allegations Are Sufficient

The Trustee has alleged that Luxalpha (through Access) was aware of Cutler's concerns

and findings of impossibilities at BLMIS, shut down his further inquiry, suppressed his

conclusions, and attempted to limit its liability to investors while it buried its head in the sand.

The Trustee has done so by alleging that:

- Throughout 2006, Access was pressured by one or more clients to provide an answer for the apparently impossible volume of options traded by BLMIS. (PSAC ¶¶ 175, 181.)

- By 2006, Access itself had developed concerns that the volume of options BLMIS purported to have traded was impossible.  (*Id.* ¶ 148.)

23

- Access analyzed the options trades reported by BLMIS and concluded that they could not be taking place. (*Id.* ¶ 148.)

- With the equivalent of just four days' work, Cutler determined that there were serious problems with BLMIS. (*Id.* ¶ 150.)

- Cutler easily confirmed that the reported volume of options trades was impossible. (*Id.* ¶ 151.)

- Cutler identified additional issues with BLMIS's purported trading, including serious problems with the feasibility of Madoff's strategy, the lack of any independent verification of trades or assets, and the opportunity for fraud created by the delayed, paper-confirmation-only reporting of trades. (*Id.* ¶ 156.)

- Cutler conveyed to Access his belief that BLMIS's strategy did not make sense, and that he had identified, at best, extremely sloppy errors or serious omissions in trade tickets. (*Id.* ¶ 157.)

- Cutler conveyed to Access his conclusion that the size of BLMIS's purported trades was so large that there was no apparent way the trades could actually have been implemented without moving the market against BLMIS. (*Id.* ¶ 170.)

- Cutler conveyed to Access that he could not identify BLMIS's options trading partners or understand how BLMIS could be entering into such options contracts. (*Id.* ¶ 178.)

- Cutler conveyed to Access his conclusion that if BLMIS were a new investment product, not only would it fail to meet due diligence standards, but that Access would "likely shove it out the door." (*Id.* ¶ 187.)

- Cutler recommended to Access that it exit all of its investments with BLMIS. (*Id.* ¶ 188.)

- Cutler's conclusions were conveyed to Access's inner circle in late April or early May 2006. (*Id.* ¶ 189.)

These facts, when properly viewed in the light most favorable to the Trustee and with all plausible inferences drawn in the Trustee's favor, more than sufficiently allege Access's (and thus Luxalpha's) subjective belief of the high probability of Madoff's fraud. *See Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*, 548 B.R. 13, at *29 (Bankr. S.D.N.Y. 2016); *Square One*, at 39. Cutler's warnings did not hint at concerns with Madoff's trading; they explicitly revealed that: (i) the trading activity Madoff reported could not be taking

24

place in the marketplace; (ii) the volume of securities Madoff claimed to be buying were not
available on the market; (iii) the market should reflect Madoff's trading activity but never did;
and (iv) no counterparties that traded options with Madoff could be found.  (PSAC ¶ 178.)
Cutler identified these facts to Access, indicating that the purported trading could not exist.

   Further, with regard to the deliberate actions Access took to avoid learning of or
confirming Madoff's fraud, the Trustee has alleged:

- Access forbade Cutler from contacting or questioning Madoff or anyone at
  BLMIS directly.  (*Id.* ¶ 150.)

- Access did not ask Cutler to produce a formal report or to put his findings
  concerning BLMIS in writing, a deviation from its past practices with regard to
  other investments.  (*Id.* ¶ 188.)

- Littaye dismissed Cutler's conclusions because Access's BLMIS business was
  "going well" while the other parts of Access's business were not going well.  (*Id.*
  ¶ 190.)

- Littaye was "highly sensitive and defensive of the situation."  (*Id.* ¶ 191.)

- Cutler testified that it was "understood" that his conclusion would not be shared
  beyond Access's inner circle.  (*Id.* ¶ 193.)

- Cutler's findings were not shared with anyone at Access beyond its inner circle
  and were withheld from its research and marketing staff.  (*Id.*)

- Cutler was never given any further feedback from Access on the options volume
  issue or the opportunity for a follow-up conversation with anyone at Access.  (*Id.*
  ¶ 192.)

- Following its receipt of Cutler's conclusions, Access decided it needed to add a
  disclaimer to its monthly report to investors stating "that AIA is dependent on
  the information provided to us by BMI and that we do not validate the accuracy
  of that information."  (*Id.* ¶ 194.)

These facts sufficiently allege deliberate actions by Luxalpha's agent to avoid confirming

Madoff's fraud.  *See Global-Tech,* 563 U.S. at 769; *Merkin*, 515 B.R. at 139; *Square One*, at 39.

In fact, many of the allegations here are analogous to those pleaded by the Trustee in *Kingate* where this Court found the Trustee satisfied the higher pleading burden of actual knowledge. *Kingate,* 2015 WL 47344749, at *13. For example, in *Kingate*, the Trustee pleaded that Ceretti and Grosso instructed employees to raise their concerns internally and not directly with Madoff. *See id.* at *4. Here, Littaye forbade Cutler from contacting Madoff directly, despite instructing him to perform due diligence on BLMIS, and ensured his conclusions were not shared outside of Littaye's inner circle. (PSAC ¶¶ 150, 183, 189.) In *Kingate*, the Trustee alleged that FIM's due diligence procedures required FIM to reject investments with the same types of red flags identified for BLMIS. *Kingate*, 2015 WL 4734749, at *4. Here, Cutler noted that Luxalpha would fail Access's due diligence procedures and would "likely shove it out the door." (PSAC ¶ 187.) In *Kingate*, the Trustee alleged that written due diligence reports were prepared for all of FIM managed funds except Kingate. *Kingate*, 2015 WL 4734749, at *4. Likewise, here Littaye ensured that Cutler's report was given orally, rather than in writing as had been Cutler's instructions in the past for his analysis of other Access investments. (PSAC ¶ 188.) And like the allegation that Littaye was defensive when Cutler presented his conclusions (*id.* ¶ 191), the Trustee alleged in *Kingate* that Ceretti and Grosso responded to warnings about BLMIS with *ad hominem* attacks. *See Kingate*, 2015 WL4734749, at *14. While here the Trustee need not meet the high burden of actual knowledge he pleaded in *Kingate*, these similarities show that the PSAC plausibly pleads that Luxalpha's knowledge and reactions satisfy the willful blindness standard.

## ii.    Luxalpha's Response to the Cutler Allegations Fails

Stripped of its rhetoric, Luxalpha's rejoinder to the Cutler allegations boils down to three points: Cutler's findings were only preliminary (an assertion that is demonstrably false); Access was willing to indulge Madoff's purported explanations for trading and strategy abnormalities (a

fact that is, at best, equivocal); and the Trustee's AC allegations, including that an advisor to Access purportedly believed BLMIS was sufficiently monitored by the SEC (a risible suggestion given Luxalpha's disregard for securities regulators), undermine the Trustee's allegations of willful blindness in the PSAC.

### a.    Cutler's Findings Were Not Preliminary

Contrary to Luxalpha's suggestion (Opp. at 32), Cutler's findings were not preliminary. There was no difference between Cutler's initial observations and the ultimate conclusions of probable fraud that he delivered to Access.  (PSAC ¶¶ 150–51, 189–93).  Indeed, it was Cutler's conclusion that Access should "exit BLMIS."  (*Id.* ¶ 189.)  The Trustee pleads that Cutler found and conveyed to Access that BLMIS's purported options volumes were impossible and that there were serious risks that Madoff was not trading securities as he purported.  Luxalpha's alternative interpretation cannot be properly entertained.

### b.    Access Knew Madoff's Explanations Were Faulty

While ignoring almost every Cutler-identified issue, Luxalpha focuses on Cutler's concern about BLMIS's delayed paper-only reporting and attempts to manufacture a "gotcha" moment by suggesting that in the AC the Trustee "acknowledged" that Access was willing to accept Madoff's explanation that such a paper-only practice protected his trading strategy.  (Opp. at 32.)  There is no fair reading of the AC that would lead to the conclusion that the Trustee was suggesting that Access was sincerely fooled by Madoff's purported desire to protect his trading strategy.  As noted above, Luxalpha could not have been fooled by this "anachronism" given the accepted methods of delivering account information at that time.  *See supra* Part II.D.  Further, given Littaye's close personal relationship with Madoff (PSAC ¶¶ 2, 70) and Access's dependence on BLMIS for its business (*Id.* ¶¶ 3, 70–72, 190), Access's willing indulgence of Madoff's dubious rationale is at least equally supportive of a finding of willful blindness (and

27

more so when properly viewed in the light most favorable to the Trustee). This is particularly

true given the Trustee's additional allegations regarding Access's willingness to regurgitate

Madoff's nonsensical explanations of trading models and nonexistent "portfolio assurance plans"

in its effort to deflect client scrutiny. (*Id.* ¶¶ 169, 182–83.) Access's willingness to accept or

disseminate unsubstantiated explanations for BLMIS's aberrant practices does nothing to dispel

a finding of Luxalpha's willful blindness.

c.     **The Allegations of the Amended Complaint Are Consonant with the Cutler Allegations**

Luxalpha's recitation of other facts from the AC that it asserts the Trustee purposely "left

out" of the PSAC, is similarly unavailing. (Opp. at 31.) The record is clear that both UBS and

Access undertook due diligence, and that this due diligence unearthed evidence suggesting a high

probability of Madoff's fraud. Both the AC and the PSAC allege facts that demonstrate this

reality. In fact, both complaints clearly allege that Cutler and Dumbauld warned Littaye and

Access that, *inter alia*, Madoff could not be trading the options he claimed to be trading, that he

could not be using the trading strategy he purported to be using, and that they could not verify

the existence of counterparties. (PSAC ¶¶ 148–51, 157, 170, 178; AC ¶¶ 210–17.) In essence,

they could not verify that the options trades were real. Cutler recommended exiting the

investment based on his diligence, but that warning was ignored. (PSAC ¶¶ 187–92; AC ¶¶ 218–

24.) With both internal and external allegations of fraud at his fingertips, Littaye not only

decided to keep Luxalpha invested with BLMIS, but more importantly, halted all further inquiry

into Dumbauld's and Cutler's identification of strong indicia of fraud. (PSAC ¶¶ 190–94; AC ¶¶

221–27.) Littaye declined to follow Dumbauld's and Cutler's inquiry to its obvious, logical

conclusion. This is willful blindness. And it is clearly articulated in both the AC and the

PSAC.

28

Luxalpha finds it "telling" that the PSAC does not include an allegation from the AC that Chantal Lanchon, an outside advisor of Access who was present when Cutler conveyed his conclusions to Access, declared her view that Cutler's conclusions could not be correct because BLMIS was regularly audited by the SEC and FINRA.  (Opp. at 33.)  Given that Luxalpha's agents were knowingly (and successfully) deceiving securities regulators, both in the U.S. and in Luxembourg, it is not plausible to believe that Luxalpha itself was truly satisfied, in the face of Cutler's damning analysis, that BLMIS was sufficiently monitored by regulators.  More important, as stated above, Luxalpha already told others that Madoff avoided regulatory scrutiny—and, in fact, set itself up as the investment adviser in support of that effort.  Moreover, the SEC's and FINRA's review of a financial institution does not "clear" that institution of wrongdoing, nor does it absolve service providers from performing their obligatory due diligence.  *See e.g.*, *Graham v. S.E.C.*, 222 F.3d 994, 1008 (D.C. Cir. 2000) (an entity subject to a series of SEC investigations cannot "be said to have been cleared along the way"); *S.E.C. v. KPMG LLP*, No. 03 Civ. 671(DLC), 2003 WL 21976733, at *3 (S.D.N.Y. Aug. 20, 2003) (KPMG could not have reasonably relied upon the SEC's lack of confirmation that it suspected fraud to "relieve them of their obligation to perform an audit that conformed with the law").

Luxalpha's Opposition fails to address the Trustee's well-pleaded facts concerning Cutler's analysis in any way that could justify denying the Trustee's motion for leave to amend.

### F.    Luxalpha Provided False and Implausible Explanations (Or Outright Lies) to Shield Madoff and his Strategy from Further Inquiry

Armed with evidence of wrongdoing that indicated a high probability of Madoff's fraud, and adeptly circumventing regulations and internal due diligence, Luxalpha took additional steps to prevent others from confirming what it already suspected.  Luxalpha's actions to suppress inquiry satisfy the second prong of the willful blindness standard.  It is these types of actions that

convinced the Court in *Global-Tech* to find that the defendant was willfully blind. Luxalpha's

argument that the Trustee's allegations of suppression are "hindsight analysis" or show that

Littaye "didn't figure out that Madoff was lying to him" cannot rewrite history. (Opp. at 15–16.)

The plausible, and likely, inference to be made from the allegations that Luxalpha lied and

provided faulty explanations to prevent others from taking a closer look at BLMIS's trading

activity is to give itself, like the defendant in *Global-Tech* "plausible deniability," of the fact that

Madoff was not engaged in trading securities as he reported. As the Court noted in *Kingate*,

taking "steps to deflect inquiries directed at Madoff impl[ies] that they feared what might be

discovered." *Kingate*, 2015 WL 4734749, at *14.

The PSAC's detailed allegations describe how Littaye used nonsensical explanations to

pacify internal and client questions. In response to Access analysts questioning Madoff's

"market timing edge," Littaye claimed that Madoff had three models on the market to help him

make decisions. (PSAC ¶ 169.) Not only did Littaye not provide any details to support this

"theory" but the approach he described was at odds with the strategy itself. (*Id.*) Internal

inquiries also questioned Friehling & Horowitz as BLMIS's auditor, an inquiry Littaye quickly

quashed. (*Id.* ¶ 204.)

Luxalpha fended off inquiry from its own auditors as well, in one instance with the

outright lie that UBS approved the counterparties. (*Id.* ¶ 186.) Luxalpha knew that UBS did not

approve the counterparties, nor could it, as Madoff refused to identify his counterparties. (*Id.* ¶

184.) Luxalpha lied to its auditor because it knew the truth would raise alarm. Luxalpha's

inability to identify BLMIS's counterparties consistently raised suspicions over the course of its

entire investment. One client brought its inquiry directly to Madoff. (*Id.* ¶ 186.) Rather than

give the answer, because he could not, Madoff called Littaye and told him to tell the client that

30

the risk of defaulting counterparties was obviated by "portfolio assurance programs." (*Id.* ¶ 182.) Littaye had never heard of a "portfolio assurance program" but passed the bogus explanation on to his client. (*Id.* ¶¶ 182–83.) Understanding that Littaye's response was not credible, Villehuchet then told the client not to contact Madoff again. (*Id.*)

In response, Luxalpha points to Exhibit D, claiming it calls for an inference that Luxalpha was acting in good faith because Littaye was asking questions of both Madoff and his colleagues. (Opp. at 16.) This is not demonstrative of either due diligence or a lack of willful blindness. In fact, Exhibit D shows that while Littaye asked the question, he did not understand the answer, and did not attempt to obtain an answer from Madoff that he did understand. Instead, Littaye passed along the answer to the client, who found Littaye's message to be incredible. (PSAC ¶ 183.) Rather than investigate further, Littaye's partner shut down the entire line of questioning and ordered the client to have no future contact with Madoff. (*Id.*) This interaction with the inquiring customer followed the 2006 incident with Cutler only by a few months.

These are not examples of indifference or risk measures, as Luxalpha argues: they are deliberate and calculated steps intended to prevent confirming the true nature of Madoff's trading strategy.

## III.   OPPOSITION TO LUXALPHA'S CROSS MOTION

Included with its Opposition is Luxalpha's cross-motion for the allowance of its claims. Luxalpha does not attempt to hide the reason for its unusual motion—based on Luxalpha's calculations, it does better by paying the Trustee for its fraudulent transfer liability and having its claims allowed in return. (Opp. at 39.) This "deal" is so beneficial for Luxalpha that it is willing to repay its full fraudulent transfer liability (though not prejudgment interest, to which the Trustee is entitled, and which would be quite significant here) if the Trustee simply meets his pleading burden. Luxalpha's proposal, however, is fatally flawed for several reasons. First,

31

despite its assertion to the contrary, Bankruptcy Code section 502(d) precludes the allowance of

Luxalpha's claims. Second, this is purely a "what if" scenario—a blatant solicitation of an

advisory opinion. Third, Luxalpha has disavowed the customer claims it now seeks to have

determined and allowed. Fourth, Luxalpha is not entitled to a claim under section 502(h) of the

Bankruptcy Code. And fifth, there are live claims for both fraudulent transfer avoidance and

equitable subordination, which precludes the allowance of Luxalpha's claims. Luxalpha's cross-

motion should therefore be denied.

### A. 502(d) Precludes the Allowance of Luxalpha's Claims

Luxalpha admits that section 502(d) disallows its customer claims so long as the

fraudulent transfers it received remain outstanding, but suggests that its agreement "that the

Court condition claim allowance on a payment being made to the Trustee of either the Six-Year

Transfers or the Two-Year Transfers . . . eliminates 11 U.S.C. § 502(d) as a basis to deny the

Cross-Motion." (Opp. at 41.) This is the first of Luxalpha's many miscalculations in its cross-

motion. While Luxalpha is eager to return the fraudulent transfers in exchange for the allowance

of its claims, Luxalpha conveniently ignores that the Trustee is seeking prejudgment interest

(PSAC ¶ 71); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Proc. No. 08-

01789 (SMB), 2018 Bankr. LEXIS 828, at *43, (Bankr. S.D.N.Y. Mar. 22, 2018) (Though

"prejudgment interest is discretionary," "absent a sound reason to deny it, it should be

awarded.") (citing cases); Tr. of Status Conference 8:10-11, *Picard v. Zraick*, Adv. Pro. No. 10-

05257 (SMB) (Bankr. S.D.N.Y. Feb. 26, 2020), ECF No. 116 (THE COURT: . . . "I believe the

Trustee is entitled to [prejudgment] interest").

Section 502(d) requires a transferee to pay pre- and post-judgment interest on a

fraudulent transfer judgment before the transferee's claim may be allowed. *See In re Red Dot*

*Scenic, Inc.*, 313 B.R. 181, 185 (Bankr. S.D.N.Y. 2004) ("It is clear that Carroll's failure to pay

the Trustee the amount of the judgment in the adversary proceeding, plus post-judgment interest,

requires the disallowance of his claim under section 502(d) of the Bankruptcy Code"); *Halperin*

*v. Moreno (In re Green Field Energy Servs.)*, 594 B.R. 239, 308 (Bankr. D. Del. 2018) (ordering

creditor to pay a judgment of $645,552.91 "plus applicable prejudgment interest" and finding

that the creditor's claims are disallowed until he pays that judgment "pursuant to 11 U.S.C. §

502(d) of the Bankruptcy Code."); *Gouveia v. The RDI Group, Inc. (In re Globe Bldg. Materials,*

*Inc.)*, 325 B.R. 253, 264 (Bankr. N.D. Ind. 2005) ("The Trustee's complaint finally requests that

RDI's claim be disallowed in its entirety.  The Court has determined that RDI is liable to the

Trustee for the amount of $360,643.63 plus pre-judgment interest.  Pursuant to 11 U.S.C. §

502(d), unless and until RDI pays this amount to the Trustee, including post-judgment interest

thereon to the date of payment, RDI's claim cannot be allowed.").  At 9% annual interest over

the ten years since the Trustee filed his complaint, Luxalpha's liability to the Trustee is now

nearly doubled.  *See, e.g.,* Judgment, *Picard v. Nelson*, Adv. Pro. No. 10-04377 (Bankr.

S.D.N.Y. Dec. 9, 2019), ECF No. 203 (ordering "pre-judgment interest on the Avoidable

Transfers at the rate of 9% per annum . . .  from Nov. 30, 2010 [date of complaint] through Dec.

5, 2019 [date of judgment]").  Obviously, Luxalpha has not offered to pay prejudgment interest.

For this reason alone, Luxalpha's motion must fail.

### B.  Luxalpha's Cross Motion Should Be Denied Because It Improperly Seeks an Advisory Opinion

Luxalpha's motion also improperly seeks an advisory opinion.  The "oldest and most

consistent thread in the federal law of justiciability is that the federal courts will not give

advisory opinions." *Flast v. Cohen*, 392 U.S. 83, 96 (1968) (quoting C. Wright, Federal Courts

34 (1963)).  A request seeks an advisory opinion when the movant asks for a legal ruling based

on a hypothetical, conjectural, or conditional question, or on a factual situation that may never

develop.  *Ingersoll–Rand Co. v. Textron, Inc.*, No. 96 Civ. 2582 (MBM), 1996 WL 680266, at *3

(S.D.N.Y. Nov. 25, 1996).  Even if litigation on the issue is imminent, it is "not a sufficient

reason to provide an advisory opinion" because "the parties' legal rights cannot be decided until

the underlying factfinding has been done."  *In re Cubic Energy, Inc.*, 587 B.R. 849, 856–57

(Bankr. D. Del. 2018) (internal citations and quotation omitted).

Luxalpha's entire cross-motion is based on a "what if" scenario.  Luxalpha asserts that

"[i]f the Court finds that the Trustee has plausibly alleged fraudulent transfer claims against

Luxalpha . . . Luxalpha will consent to the payment [of the amount of the fraudulent transfers] . .

. on the terms set forth" in the cross-motion.  (Opp. at 39.)  These terms include the allowance of

the claims under Bankruptcy Code section 502(h), and the evaporation of the Trustee's equitable

subordination claim.  (*Id.*)  Luxalpha effectively asks the Court to authorize a resolution that it

could not obtain through settlement.

The Trustee and Luxalpha agreed to proceed with litigation and submit briefing to this

Court to determine the adequacy of the Trustee's allegations and, if sufficient, to proceed to a

determination on the merits.  The parties are not engaged in extrajudicial dispute resolution

where parties can choose to bargain outside of the confines of the statute.  Luxalpha is asking

this Court to skip the underlying fact finding the Federal Rules of Civil Procedure and the

Bankruptcy Code require and instead accept Luxalpha's proposed settlement terms which

Luxalpha freely admits, significantly benefit Luxalpha.  But this is not an appropriate form of

relief.  Furthermore, this Court has previously declined to rule on the application of 502(h) in a

similar circumstance, noting that such a ruling would be "premature" if the Court first

determined that the Trustee had adequately pleaded bad faith in his complaint.  *Alpha Prime*, at

34

43:23.  Luxalpha wants to jump the line, but certain prerequisites must be met before the allowance of Luxalpha's claim becomes a justiciable issue.

Moreover, Luxalpha's cross-motion raises several questions.  For example, is Luxalpha's payment of the fraudulent transfers an acknowledgment that it was willfully blind?  If so, does that admission equate to an admission that it engaged in inequitable conduct that should allow the Trustee to equitably subordinate Luxalpha's claims, in addition to, or instead of, collecting on the fraudulent transfer?  It is questions like these that make plain that Luxalpha seeks an advisory opinion here because it is not possible, or proper, for the relief Luxalpha seeks by its cross-motion to be granted by this Court.

### C.  Luxalpha Cannot Move to Allow the Very Claims It Has Disavowed

Luxalpha's cross-motion to allow its customer claims is also improper because Luxalpha has disavowed its customer claims.  Luxalpha's briefing on its motion to dismiss for lack of personal jurisdiction contained admissions that UBS, acting as Luxalpha's agent, filed the customer claims without Luxalpha's consent or authorization.  (*See* Mem. of Law in Supp. of Mot. by Luxalpha to Dismiss the Am. Compl., Apr. 27, 2012, ECF No. 102).  UBS's only reason for doing so, Luxalpha maintained, was as a "defensive measure" to limit UBS's liability to Luxalpha in the Luxembourg action.  *Id.*  Luxalpha's representations to this Court that the customer claims were unauthorized are judicial admissions.  *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 36–38 (S.D.N.Y. 2015) (holding that judicial admissions are formal concessions by a party that have the effect of withdrawing a fact from issue and dispensing wholly the need for proof of that fact, and finding that admissions in pleadings, statements in briefs, and statements in court conferences may be binding as judicial admissions).

Luxalpha now tries to argue that its admissions should be considered only for jurisdictional purposes and that, for purposes of obtaining the relief sought in its Cross-Motion,

35

Luxalpha should be granted all the rights and benefits that go along with an authorized claim. Luxalpha cannot have it both ways. When it sought to escape liability for the fraudulent transfers by distancing itself from its customer claims, Luxalpha chose its path. This was a strategic calculation, one many foreign defendants seeking to avoid this Court's jurisdiction made when they chose not to file a claim. *See, e.g.*, *Sec. Inv'r Prot. Corp. v. Bernard. L. Madoff Inv. Sec. LLC*, No. 08-01789 (BRL), 2009 WL 458769, at *1–2 (Bankr. S.D.N.Y. Feb. 24, 2009) (discussing customers' "strategic" decision not to file a claim and having to live with the consequences of that decision). Now that the Trustee's recovery efforts have proven successful at building a significant customer property estate and the value of a potential customer claim has skyrocketed, Luxalpha wants to change tack. But it is too late.

By admitting that the customer claims were filed without authorization, Luxalpha has foregone its ability to now claim the benefits that would come with them. At the very least, whether the customer claims were properly filed is a question of fact. Following a meet and confer between the parties intended to narrow the issues in Luxalpha's motion to dismiss for lack of personal jurisdictional, Luxalpha insisted that the parties make clear to the Court that several questions of fact with respect to the customer claims remained in dispute: "(i) whether the fund defendants, or their custodian maintained accounts with BLMIS; (ii) whether the fund defendants, or their custodian filed claims with BLMIS; (iii) whether the fund defendants, or their custodian transferred monies into and out of the accounts." (*See* Correspondence between Brett Moore and Geoffrey A. North, Feb. 25 and Feb. 26, 2013, Warshavsky Decl., Ex. 3; Letter to Hon. Burton R. Lifland, U.S.B.J., Mar. 7, 2013, Warshavsky Decl., Ex. 4). In a 2016 conference before this Court, counsel for Luxalpha again stated that whether Luxalpha's service providers were acting within the scope of their agency in filing the customer claims remains a

question of fact in this case.  (Tr. of Status Conference 37:15–22, Apr. 27, 2016, ECF No. 227.)

Even if Luxalpha is not held accountable for its admissions to this Court, Luxalpha's attempt

here to seek an opinion on whether the customer claims should be allowed is premature.

### D.  The Trustee Has Pleaded a Claim for Equitable Subordination[6]

The legal standard for equitable subordination is well known.  Claims will be

subordinated under Bankruptcy Code section 510(c) when (i) a claimant engaged in inequitable

conduct, (ii) which injured creditors of the estate or conferred an unfair advantage on the

claimant, and (iii) equitable subordination is consistent with bankruptcy law.  *Benjamin v.*

*Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699–700 (5th Cir. 1977); *see also 80 Nassau*

*Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*), 169 B.R. 832, 836–37 (Bankr.

S.D.N.Y. 1994).  Both this Court and the District Court have ruled that a showing of willful

blindness satisfies the standard for equitable subordination.  *See Merkin*, 515 B.R. at 158 (citing

*Picard v. Katz*, 462 B.R. 447, 454–56 (S.D.N.Y. 2011)) ("Because the Amended Complaint

adequately alleges that the defendants did not receive fraudulent transfers in good faith, it also

adequately alleges that they engaged in inequitable conduct."); *see also Mishkin v. Siclari (In re*

*Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 554, 567 (Bankr. S.D.N.Y. 2002) (subordinating

claim of defendant who knowingly closed his eyes to a fraud).  Thus, upon a showing of

Luxalpha's willful blindness to Madoff's fraud, the Trustee may avoid the fraudulent transfers

Luxalpha received and/or equitably subordinate Luxalpha's claims.

Luxalpha makes the novel argument that it—not the Court or the Trustee, the plaintiff in

this case—gets to choose which of the two claims proceed against it.  (Opp. at 39–40, 46.)

Under Luxalpha's proposal, Luxalpha has the right to determine whether the Trustee may

---

[6] This section assumes, for the sake of argument, that Luxalpha filed the customer claims, a fact which, as noted above, is in dispute.

proceed with subordination or recovery of fraudulent transfers based on which of the two claims

is better for Luxalpha, which at this stage of the litigation (as opposed to when the litigation

commenced) is the recovery of the fraudulent transfers. Then, once Luxalpha were to repay the

fraudulent transfers, its claims would be allowed and the Trustee's equitable subordination claim

would disappear, a scenario Luxalpha admits would confer a significant benefit upon Luxalpha.

(Opp. at 39–40.) Luxalpha's proposal is fraught with false assumptions, its ability to dictate the

path of this lawsuit, chief among them. It is the Trustee, not Luxalpha, that may choose which

claims proceed, based on the *Trustee's* evaluation of what is most beneficial *to the BLMIS estate*

and its customers with allowed claims, not what is most beneficial to Luxalpha's shareholders.

### i. The Trustee Need Not Choose Between Recovery of Fraudulent Transfers and Equitable Subordination

Even if Luxalpha were correct (which the Trustee denies, *infra*) that equitable

subordination and recovery of fraudulent transfers are alternative claims, at this stage, the

Trustee may still proceed on both claims. "A party may state as many separate claims for relief

or defenses as he or she wishes regardless of their consistency with each other and of whether

they are based on legal or equitable grounds." *See Sec. Inv'r Prot. Corp. v. Stratton Oakmont,

Inc.*, 234 B.R. 293, 332 (Bankr. S.D.N.Y. 1999) (citing Fed. R. Civ. P. 8(e)(2)); *see also* Fed. R.

Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or

hypothetically, either in a single count or defense or in separate ones. If a party makes

alternative statements, the pleading is sufficient if any one of them is sufficient."); Fed. R. Civ.

P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of

consistency."). The Federal Rules give a plaintiff "wide latitude" in framing its right to recover.

*Barnard v. Gateway Bank* (*In re Ideal Mortg. Bankers, Ltd*.), Adv. Pro. No. 12-08453 (DTE),

2013 WL 6813737, at *8 (Bankr. E.D.N.Y. Dec. 23, 2013). The Trustee cannot "be forced to

select a single theory on which to seek recovery against the defendant." 5 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1283 (3d ed.).

None of the cases Luxalpha cites stands for the proposition that the Trustee must choose recovery of fraudulent transfers over equitable subordination. (Opp. at 42–46.) In fact, most of them state the opposite. In *Merkin*, this Court made clear that "a court should not dismiss an equitable subordination claim for legal insufficiency merely because the plaintiff has also asserted a claim for damages based upon the same conduct." 515 B.R. at 161; *see also ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*, 210 B.R. 508, 517 (Bankr. S.D.N.Y. 1997) (same); *Century Glove, Inc. v. Iselin (In re Century Glove, Inc.)*, 151 B.R. 327, 332 (Bankr. D. Del. 1993); *Stratton Oakmont*, 234 B.R. at 333 ("[W]hen plaintiffs seek both money damages and equitable relief . . . the courts will not entertain a motion to dismiss solely that portion of the complaint which asks for the equitable remedy . . . [a] motion to dismiss the complaint . . . will be denied if the complaint states a case for relief either at law or in equity.") (quoting *Lichtyger v. Franchard Corp.*, 18 N.Y.2d 528, 583 (1966)). A plaintiff need not choose between a fraudulent transfer claim and one for equitable subordination "until the status of the litigation requires an election," which may be "after trial." *Stratton Oakmont*, 234 B.R. at 333 *(citing* 1 Moore's Federal Practice § 2.03 (3d ed.)).

The Trustee has satisfied his pleading burden concerning his claims to avoid and recover the fraudulent transfers and for the equitable subordination of Luxalpha's claims by pleading Luxalpha's willful blindness to Madoff's fraud. The Trustee therefore is entitled to proceed with this action. Luxalpha cannot force the Trustee to select the theory on which he seeks relief, and certainly cannot force the Trustee to select the cause of action that yields the greatest advantage to Luxalpha and deals the biggest blow to the BLMIS estate and its good faith customers.

ii.    **Whether the Trustee Can Pursue Both Equitable Subordination and
Fraudulent Transfer Claims Need Not Be Decided Now**

Recovery of fraudulent transfers and equitable subordination provide distinct relief under

the Bankruptcy Code, and both, in appropriate circumstances, are remedies available to the

Trustee against a creditor that has filed a claim against the estate.  "Equitable subordination

places bad-acting creditors behind other creditors when distributions are made.  Turnover and

fraudulent transfer bring back to the transferor debtor assets improperly transferred to another . . .

."  *In re Owens Corning*, 419 F.3d 195, 206 (3d Cir. 2005); *see also In re 80 Nassau Assocs.*, 169

B.R. at 837 (citing Andrew DeNatale & Prudence B. Abram, *The Doctrine of Equitable*

*Subordination as Applied to Nonmanagement Creditors*, 40 The Bus. Law. 417, 419 (1985)

("DeNatale & Abram")) (Equitable subordination "requires the court to consider whether

'notwithstanding the apparent legal validity of a particular claim, the conduct of the claimant in

relation to other creditors is or was such that it would be unjust or unfair to permit the claimant

to share pro rata with the other claimants of equal status.'").

The cases Luxalpha cites for the proposition that a creditor's claim may not be equitably

subordinated if the creditor repays the fraudulent transfers it received from the debtor rest on the

proposition that the return of the fraudulent transfer remedies all the harm the creditor caused.

*See Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*, 453 B.R. 499, 517 (Bankr. S.D.N.Y.

2011) ("[Upon repayment of fraudulent transfer], the estate will have been made whole, and will

not be entitled to the additional remedy of equitable subordination."); *Hirsch v. Pa. Textile Corp.*

*(In re Centennial Textiles, Inc.)*, 227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998) ("Penn-Tex cannot

receive any distribution until it pays the judgment in this case as well as other judgments that the

trustee has recovered against it on account of preferential transfers.  If it pays the judgments, the

estates will be made whole. In that event, the trustee will not be entitled to the remedy of

equitable subordination."); *Cf. In re Century Glove, Inc.*, 151 B.R. at 333 (claims should be

subordinated only to the extent necessary to offset the harm suffered on account of the

inequitable conduct) (citing *In re Mobile Steel*, 563 F.2d at 700).

The Trustee does not dispute that "[t]he scope of the [equitable subordination] remedy is

. . . limited by the extent of the injury." *In re 80 Nassau Assocs.*, 169 B.R. at 840. However,

when "inequitable conduct includes discrete as well as pervasive injury to creditors, the making

of restitution with respect to the discrete injury is no bar to the application of the doctrine of

equitable subordination to the offending creditor's claim in order to rectify the pervasive injury

to creditors." DeNatale & Abram, at 427. In *Kriegman v. 1127477 Alberta Ltd. (In re LLS Am.,*

*LLC)*, No. 12-CV-324-RMP, 2015 WL 328918 (E.D. Wash. Jan. 23, 2015), a defendant who

solicited investors into the Ponzi scheme had to return all of the fees the defendant earned as

fraudulent transfers, *and* any claim he would subsequently file would be subordinated. *Id*. at

*12. The Court found that recruiting investors into the scheme without investigating the signs

that the debtor's business was fraudulent equated to inequitable conduct that contributed to the

continued operation of the debtor's scheme. *Id.*; *see also Official Comm. of Unsecured Creditors*

*of Toy King Distribs. v. Liberty Savs. Bank (In re Toy King Distribs. Inc.)*, 256 B.R. 1, 127–55,

195–207 (Bankr. M.D. Fla. 2000) (concluding that of the three creditors, two caused harm that

was "pervasive" and "the entirety of the [502(h)] claim that [the creditor] might file in this case

should be subordinated to the claims of other unsecured creditors" while one creditor's harm was

determined to be discrete and was set off against his fraudulent transfer liability); *Le Café Creme*

*v. Le Roux (In re Le Café Creme, Ltd.)*, 244 B.R. 221, 244 (Bankr. S.D.N.Y. 2000) (holding that

both recovery of fraudulent transfers and the equitable subordination of the bad faith creditors'

claims was appropriate); *Monzack v. ADB Inv'rs (In re EMB Assocs., Inc.)*, 92 B.R. 9, 19 n.11

41

(Bankr. D.R.I. 1988) ("To date, it is undecided whether the applicability of the preference remedy pre-empts the use of equitable subordination. However, where, as here, the misconduct by the claimant involves much more than just a preferential transfer, subordination on totally independent ground is appropriate and necessary to offset the full extent of the harm.") (citation omitted).

There are instances in which the harm to the estate is fully remedied by the return of the fraudulent transfer, but they are distinguishable from this case. For example, Luxalpha relies on *Centennial Textiles*, 227 B.R. at 608, which involved a fraudulent scheme to pay down defendant's prepetition debt by inflating its postpetition invoices. The Court held that the trustee was entitled to recover the debtor's postpetition transfers made on account of defendant's prepetition debts, but that the return of the transfers rendered the estate whole, mooting the equitable subordination claim. *Id.* at 610, 612. *Centennial Textiles* is a textbook example of a discrete harm—once the vendor returned the transfers, the estate's injury was contained and remedied. This is not the case here.

The harm Luxalpha inflicted on the BLMIS estate exceeded the discrete harm caused by Luxalpha's receipt of fraudulent transfers. For example, when BNP pulled out of Oreades in 2004, forcing its closure, Oreades was a significant net winner. (PSAC ¶ 4.) As the PSAC alleges, Access turned a blind eye to the fraud risks that BNP communicated to Access as part of the decision to close Oreades. Instead of heeding, let alone investigating, BNP's warning, Access informed the Oreades investors that Oreades was being renamed Luxalpha and immediately reinvested $330 million of Oreades investors' funds into Luxalpha. (*Id.* ¶¶ 87–88.) That investment, which Luxalpha would have the Trustee treat as "cash in" for purposes of its claim, in fact consisted of $135 million in fictitious profits. (*Id.* ¶¶ 4, 87–88.) The return of the

42

fraudulent transfers Luxalpha received will not remedy the harm of the $135 million fictitious

profits for which Luxalpha seeks credit.  BLMIS customers with allowed claims have been

harmed by that $135 million for which, other than equitable subordination of Luxalpha's claims,

there is no remedy.  *Cf. Merkin*, 515 B.R. at 161 (finding that equitable subordination is

appropriate when, for example, fraudulent transfers may not be recovered based on statutes of

limitation); *GNK Enters. Inc. v. Conagra, Inc. (In re GNK Enters., Inc.)*, 197 B.R. 444, 449

(Bankr. S.D.N.Y. 1996) ("There is no specific statute of limitations applicable to equitable

subordination claims.").

Furthermore, Luxalpha enabled and perpetuated the Ponzi scheme, a pervasive harm

which surpasses the otherwise discrete harm created by the fraudulent transfers it received.

Luxalpha harmed the estate by directing $1.5 *billion* into the Ponzi scheme while closing its eyes

to Madoff's fraud, and this significantly contributed to the Ponzi scheme's expansion.  It also led

to investments by other feeder funds, such as Groupement Financier and LIF.  While not easily

quantifiable, this massive infusion of investment capital into the Ponzi scheme inflicted far

greater harm than the fund's withdrawal of half that amount.  *Cf. LightSquared LP v. SP Special

Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 361 (Bankr. S.D.N.Y. 2014)

("Determining the amount of harm that has occurred to these estates as a result of [the creditor's]

conduct, while difficult, will not be impossible and the [creditor's] Claim will be subordinated

accordingly.").

The Trustee's equitable subordination claim rests upon a determination of the amount of

harm Luxalpha caused the estate and its creditors.  That amount has not yet been determined, nor

can it be at the pleading stage.  It is an issue that requires additional fact, and perhaps expert,

discovery.  The Court should allow the Trustee the benefit of discovery to prove the amount of

43

harm Luxalpha caused the BLMIS estate and thus the amount by which its claims may be subordinated to the claims of good faith investors.

### iii.    Luxalpha Is Not Entitled To a 502(h) Claim Against the Customer Property Estate

In Luxalpha's proposed scenario, which effectively asks the Court to bless a settlement on Luxalpha's terms, Luxalpha would agree to credit the fraudulent transfers and immediately be entitled to a claim under section 502(h).  Luxalpha would then have the amount of the repaid transfers added to its net equity claim, resulting in a $1.5 billion payout to Luxalpha that could otherwise be distributed to good faith customers.  From the distribution on that $1.5 billion, Luxalpha will then "repay" the Trustee the amount of the fraudulent transfer.  SIPA dictates a different result.  Under SIPA, a 502(h) claim cannot be transformed into a net equity claim.

A SIPA proceeding is similar to a bankruptcy liquidation with certain important differences, most of which concern the special protection SIPA affords to customers of the failed brokerage.  SIPA § 78fff(a); *see also Exch. Nat'l Bank of Chicago v. Wyatt*, 517 F.2d 453, 457–59 (2d Cir. 1975); *In re Lloyd Sec., Inc.*, 75 F.3d 853, 857 (3d Cir. 1996).  Under SIPA, a "liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7" of the Bankruptcy Code, but only "to the extent consistent" with SIPA.  SIPA § 78fff(b).  While most of the time SIPA and the Bankruptcy Code are consistent, there are times when they are not.

For example, SIPA differs fundamentally from the Bankruptcy Code and the Bankruptcy Rules on how, when, and with whom claims against the bankrupt estate must be filed.[7]  *Compare*

---

[7] The District Court has also found that the concept of good faith is different in SIPA proceedings than it is in bankruptcy proceedings.  *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R. 18, 21 (S.D.N.Y. 2014).

11 U.S.C. § 501(a) and Fed. R. Bankr. P. 3002 and 5005 *with* SIPA § 78fff-2(a)(2) and (3).

SIPA prohibits allowing claims filed "after the expiration of the six-month period beginning on

the date of publication of notice" except in three delineated, narrow circumstances,[8] and even

then, the request for an extension must be made before the six-month limitations period has

lapsed.  SIPA § 78fff-2(a)(3).  SIPA cases require a date upon which all rights and liabilities are

fixed and finality to the demands upon the SIPC funds.  *Redington v. Borghi (In re Weis Sec.,*

*Inc.)*, 411 F. Supp. 194, 195 (S.D.N.Y. 1975), *aff'd* 538 F.2d 317 (2d Cir. 1976); *In re OTC Net,*

*Inc.*, 34 B.R. 658, 660 (Bankr. D. Colo. 1983) (citing Hearings on H.R. 8331 Before the

Subcomm. on Consumer Prot. and Fin. of the Comm. on Interstate and Foreign Commerce, 95th

Cong. 178 (1977); H.R. Rep. No. 746, 28 (1977)).

    A 502(h) claim cannot be treated the same way it would be under the Bankruptcy Code.

To the extent a section 502(h) claim is permitted, any such claim Luxalpha asserts cannot be

recovered on par with its net equity claim.  "In a SIPA liquidation, a fund of 'customer property,'

separate from the general estate of the failed broker-dealer, is established for priority distribution

exclusively among customers."  *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d

Cir. 2011) (the "*Net Equity Decision*"); *see also Rosenman Family, LLC v. Picard*, 395 F. App'x

766, 768 (2d Cir. 2010).  Customers share in customer property *pro rata* to the extent of their net

equities.  *Net Equity Decision*, 654 F.3d at 233; SIPA §78fff-2(c)(1)(B).  Net equity is calculated

by determining what "would have been owed by the debtor" to a customer "if the debtor had

liquidated . . . on the filing date . . . all securities positions of such customer."  SIPA § 78*lll*(11).

    The filing date freezes a customer's net equity.  *See Sec. Inv'r Prot. Corp. v. Lehman*

*Bros. Inc.*, 433 B.R. 127, 135 (Bankr. S.D.N.Y. 2010) (finding that SIPA requires that a "net

---

[8] SIPA only grants an exception to the six-month bar if the claimant is (i) the United States; (ii) a State or
political subdivision thereof; or (iii) an infant or incompetent person without a guardian.

equity" claim be valued as of the filing date); *In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 273 (Bankr. S.D.N.Y. 1996) ("[A] claimant's SIPA customer claim is fixed as of the commencement of the SIPA proceeding."). As one court observed:

> A purpose of SIPA is to freeze the broker-dealer's affairs as of the filing date in order to accomplish an orderly liquidation. In fulfillment of this objective, numerous provisions of SIPA require that assets and liabilities be fixed as of the filing date. In calculating the net equity claim of a customer, SIPA requires that the trustee conduct a hypothetical liquidation of the securities in the customer's account as of the filing date. In determining what securities are owed a customer, an examination of the books and records of the debtor as of the filing date is required. When distributing securities to customers in satisfaction of net equity claims, all securities shall be valued as of the close of business on the filing date.

*Hill v. Spencer Sav. & Loan Ass'n (In re Bevill, Bresler & Schulman, Inc.)*, 83 B.R. 880, 892 (D.N.J. 1988) (internal quotations and citations omitted)). In the BLMIS liquidation, a customer's net equity is defined by the Net Investment Method—cash in minus cash out, as of the filing date. *Net Equity Decision*, 654 F.3d at 233. Luxalpha defined its "Net Equity Claim" using the same method. (Opp. at 39.)

Under SIPA's distribution scheme, only customers with net equity claims share in the fund of customer property. SIPA § 78fff-2(c)(1). All other claims are satisfied from the debtor's general estate.[9] *Id.* Because SIPA draws a bright line between net equity claims and all other

---

[9] SIPA § 78fff-2(c)(1) provides that: "The trustee shall allocate customer property of the debtor as follows:
(A) first, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-3(c)(1) of this title, to the extent such advances recovered securities which were apportioned to customer property pursuant to section 78fff(d) of this title;
(B) second, to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities;
(C) third, to SIPC as subrogee for the claims of customers;
(D) fourth, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-3(c)(2) of this title. Any customer property remaining after allocation in accordance with this paragraph shall become part of the general estate of the debtor. To the extent customer property and SIPC advances pursuant to section 78fff-3(a) of this title are not sufficient to pay or otherwise satisfy in full the net equity claims of customers, such customers shall be entitled, to the extent only of their respective unsatisfied net equities, to participate in the general estate as unsecured creditors. For purposes of allocating customer property

claims, and because a customer's net equity is fixed as of the filing date, under SIPA's statutory

scheme, a 502(h) claim, if permitted, may be paid only from the general estate. The customer

property estate cannot be used to satisfy any other claims until all customers' net equity claims,

and the other categories of obligations to which customer property may be allocated pursuant to

SIPA § 78fff-2(c)(1), have been fully satisfied. *See In re Adler Coleman Clearing*, 195 B.R. at

270. Because a 502(h) claim may only be paid from the general estate, Luxalpha's discussion of

whether the Trustee may equitably subordinate a 502(h) claim (Opp. at 46-48) is beside the

point.

This Court has recognized that claims under section 502(h) are not net equity claims and

may not be entitled to share in customer property. In *Sec. Inv'r Prot. Corp. v. Bernard. L.

Madoff Inv. Sec. LLC*, 2009 WL 458769, at *1, BLMIS customers asked this Court to modify the

Claims Procedures Order to provide that section 502(h) claims could be filed after the July 2,

2009 bar date. Judge Lifland refused, finding that "this Court does not have the discretion to

extend the statutory bar date for filing SIPA claims under these circumstances." *Id.* He further

refused to issue an advisory opinion on the fate of a section 502(h) claim that had not accrued,

noting: "Although section 78fff(b) of SIPA specifies that the provisions of the Bankruptcy Code

shall apply in SIPA liquidation proceedings, to the extent that they are consistent with SIPA, it is

unclear whether section 502(h) of the Code would apply." *Id.* at *2 n.2.

In approving the Trustee's settlement with Defender Limited in 2015, this Court

questioned whether a 502(h) claim exists at all for the return of fraudulent transfers and whether

the claim should be against the customer property estate:

> The only question with a settlement like this is whether the settling
> parties paying the full amount that's owed gets a 502(h) claim

under this paragraph, securities to be delivered in payment of net equity claims for securities of the same
class and series of an issuer shall be valued as of the close of business on the filing date.

> because it's a fraudulent transfer claim. Whether it's a claim against
> I guess the customer estate or against the general estate, but those
> are certain difficult questions and the settlement falls well within the
> lowest point within the range of reasonableness so it's approved.

*See* Hr'g Tr. at 11:16–23, *Picard v. Defender Ltd.*, Adv. Pro. No. 10-05229 (SMB) (Bankr.

S.D.N.Y. Apr. 16, 2015). Likewise, in 2017, this Court, in granting the Trustee summary

judgment and dismissing certain affirmative defenses, acknowledged that claims under section

502(h) are "unsecured claims." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re*

*Sec. Inv'r Prot. Corp.)*, 568 B.R. 481, 488 n.6 (Bankr. S.D.N.Y. 2017). Such unsecured claims

must be paid from the debtor's general estate.

As Luxalpha admits, its net equity, fixed as of the filing date, is $762,483,766. (Opp. at

39.) Depending on the ultimate success of the Trustee's equitable subordination claim, that

amount could be paid out of the customer property fund. However, to the extent Luxalpha

repays the fraudulent transfers it received from BLMIS and seeks a 502(h) claim, under SIPA's

priority scheme, it may only be paid out of the general estate.

### E. The PSAC Will Not Prejudice Luxalpha With Respect to Its Investors' Madoff Victim Fund Claims

Through their opposition and cross-motion, the Luxalpha Liquidators seek to force upon

the Trustee and various parties not before the Court a "global resolution" of the customer claims,

the Trustee's avoidance claims against Luxalpha, and the claims various unidentified Luxalpha

interest-holders filed with the Madoff Victim Fund ("MVF"). For obvious reasons, the Court

should reject those arguments.

The Liquidators do not represent Luxalpha interest-holders. Yet, claiming pressure from

such anonymous interest-holders, the Liquidators argue they are giving voice to the interests of

these unidentified victims. No party in this case has standing to raise this issue. If Luxalpha's

customer claims are not immediately allowed, the Liquidators argue, the anonymous interest-

holders will be "excluded from distributions from the MVF" and "may lose their right to any distribution from the MVF at some point," and this will unduly prejudice the Liquidators. (Opp. at 48–49.)  Although the Trustee is not a party to dealings between the Liquidators and the MVF, the correspondence between the Liquidators and the Special Master of the MVF, attached to the Opposition, demonstrates that neither Luxalpha nor its interest-holders will suffer any prejudice by the filing of the PSAC.  While the Special Master and the Trustee do not directly coordinate their efforts, the Special Master clearly recognized that, if Luxalpha prevails here, significant distributions of customer property will be paid to Luxalpha.  Having already made significant distributions to Luxalpha investors, a fact Luxalpha obfuscates, the Special Master sought to prevent Luxalpha interest-holders from obtaining recoveries of greater than 100% of their claimed injury.  The Special Master advised the Liquidators that he would "withh[o]ld MVF distributions until the Luxalpha victims can provide information as to their likely bankruptcy recoveries" and made appropriate reserves for future distributions.  The Trustee, likewise, has made similar provisions with respect to Luxalpha's customer claims.

To ensure that customer property is equitably distributed to innocent victims—SIPA's charge to the Trustee—the Trustee must assess Luxalpha's good faith or lack thereof as set forth above.  In 2016 Luxalpha, together with the other defendants, opposed the commencement of federal rules discovery, agreeing only to international discovery.  The Trustee obtained the issuance of letters of request by this Court.  When the letters were put before the Lexembourg authorities, objections were raised by Luxalpha, UBS and Access.  Though Luxalpha subsequently withdrew its objections, it has not supported the Trustee's letters of request, and they remain held up in the Luxembourg Court proceedings.  As of this filing, the Trustee has not received a single page in response to his international discovery requests.  Without such

discovery, the Trustee's ability to assess Luxalpha's good faith—and whether the customer claims should be allowed—is hindered. The Court should not heed the Liquidators' gripes about the pace of litigation—there will be no prejudice to the Liquidators if the Trustee's motion for leave to amend is granted. And to the extent the Liquidators seek the resolution of the Luxalpha interest-holders' MVF claims through the opposition and cross-motion, those efforts must not be countenanced, as neither the interest-holders nor the Special Master are before the Court.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that this Court grant his motion for leave to file a Second Amended Complaint and deny Luxalpha's Cross-Motion.

Dated: May 4, 2020
  New York, New York

By:   */s/ Oren J. Warshavsky*

    **Baker & Hostetler LLP**
    45 Rockefeller Plaza
    New York, New York 10111
    Telephone: 212.589.4200
    Facsimile: 212.589.4201
    David J. Sheehan
    Email: dsheehan@bakerlaw.com
    Oren J. Warshavsky
    Email: owarshavsky@bakerlaw.com

    *Attorneys for Irving H. Picard, Trustee*
    *for the Substantively Consolidated SIPA*
    *Liquidation of Bernard L. Madoff*
    *Investment Securities LLC and the*
    *chapter 7 estate of Bernard L. Madoff*