# Exhibit 1


**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK    )
                     )
                     )    ss
COUNTY OF NEW YORK   )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from French into English of the attached pages with Bates Nos.

UBSL 000770–000913.

Ian Kemper, Project Manager
Geotext Translations, Inc.

Sworn to and subscribed before me

this 30th day of June , 20 10 .

ABIGAIL SIMONE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SI6195558
Qualified in New York County
My Commission Expires October 27, 2012

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. **tel** 212.631.7432 **fax** 212.631.7778
San Francisco  220 Montgomery Street, 3rd Floor, San Francisco, CA 94104, U.S.A. **tel** 415.576.9500 **fax** 415.520.0525
London  107-111 Fleet Street, London EC4A 2AB, United Kingdom **tel** +44.(0)20.7936.9002 **fax** +44.(0)20.7990.9909
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong **tel** +852.2159.9143 **fax** +852.3010.0082
translations@geotext.com  |  www.geotext.com

**OFFICES OF CARLOS CALVO**
**COURT BAILIFF** [*HUISSIER DE JUSTICE*]

**l-1512 Luxembourg, 7, rue Pierre Federspiel * Mailing Address: B.P. 2625 L-1026 Luxembourg**

123211/ak/**A27706**

**SUMMONS BEFORE THE DISTRICT COURT**
**OF AND IN LUXEMBOURG**
**RULING IN A COMMERCIAL MATTER**
**PURSUANT TO CIVIL PROCEDURE**

The year two thousand and nine, the *seventeenth of December.*

At the request of

1. **the open-ended mutual fund Luxalpha SICAV** [*société d'investissement à capital variable*]**, in court-ordered liquidation**, formed and having its registered office at L-1855 Luxembourg, 33 A, avenue J.F. Kennedy, registered in the Luxembourg Trade and Companies Register under No. B. 98874, declared to be in court-ordered liquidation by the April 2, 2009 ruling of the Luxembourg District Court, based on article 104 (1) of the amended Law of December 20, 2002 on undertakings for collective investment [*organismes de placement collectifs* = OPCs], represented by its trustees, Alain Rukavina, Esq., Court Attorney, residing at L-1528 Luxembourg, 10A, boulevard de la Foire, and Mr. Paul Laplume, company auditor, residing at L-6131 Junglinster, 42, rue des Cerises,

alternatively, Alain Rukavina, Esq. and Mr. Paul Laplume, prequalified, acting in their capacity as trustees and representatives of the open-ended mutual fund Luxalpha SICAV in court-ordered liquidation, prequalified;

2. Alain Rukavina, Esq. and Mr. Paul Laplume, prequalified, acting in their capacity as trustees and representatives of the investors and creditors of the open-ended mutual fund Luxalpha SICAV, in court-ordered liquidation, prequalified following the provisions of the April 2, 2009 ruling of the Luxembourg District Court;

hereinafter referred to as "the plaintiffs," "Luxalpha" or "the shareholders"

represented by Alain Rukavina, Esq., Court Attorney, residing at L-2016 Luxembourg, 10A Bld. de la Foire, electing domicile in his office, who has been briefed accordingly.

I, the undersigned, Gilles Hoffmann, acting Court Bailiff, replacing <u>Carlos Calvo</u>, Court Bailiff, residing at L-1512 Luxembourg, 7 rue Pierre Federspiel, registered with the District Court of and in Luxembourg, **summoned**:

1.     **UBS (Luxembourg) SA**, established and having its registered office at L-1855 Luxembourg, 33a, Avenue John F. Kennedy, BP 2, a corporation, represented by its current board of directors, registered in the Luxembourg Trade and Companies Register under No. B11.142 (hereinafter referred to as "UBS SA"), domiciled at the office of Marc Elvinger, Esq., 2, place Winston Churchill, L-2014 Luxembourg

2.     **UBS Third Party Management Company SA**, established and having its registered office at L-1855 Luxembourg, 33a, Avenue John F. Kennedy, BP 2, a corporation, represented by its current board of directors, registered in the Luxembourg Trade and Companies Register under No. B45.991 (hereinafter referred to as "UBSTPM"), domiciled at the office of Marc Elvinger, Esq., 2, place Winston Churchill, L-2014 Luxembourg

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                                             UBSL 000770

3.    **UBS Fund Services (Luxembourg) SA,** established and having its registered office at L-1855 Luxembourg, 33a, Avenue John F. Kennedy, a corporation, represented by its current board of directors, registered in the Luxembourg Trade and Companies Register under No. B58.535 (hereinafter referred to as "UBSFS"), domiciled at the office of Marc Elvinger, Esq., 2, place Winston Churchill, L-2014 Luxembourg

4.    **UBS AG,** a Swiss corporation, established and having its registered office in Switzerland at CH-8001, Zurich, Bahnhofstrasse 45 and at CH-4051 Basel, Aeschenvorstadt 1, represented by its current board of directors, registered in the Basel and Zurich Trade and Companies Registers under No. CH-270.3.004.646.4, domiciled at the office of Marc Elvinger, Esq., 2, place Winston Churchill, L-2014 Luxembourg

5.    **Acces** [sic] **Management Luxembourg SA,** established and having its registered office at L-2453 Luxembourg, 12, Rue Eugène Ruppert, registered in the Luxembourg Trade and Companies Register under No. B94564 (hereinafter referred to as "AML"), BP 2, currently in voluntary liquidation, represented by its trustee, Fernand Entringer, Esq., Court Attorney, domiciled at the office of Fernand Entringer, Esq., 34a, rue Philippe II, L-2011 Luxembourg

5. [sic]    Mr. **Roger Hartmann,** formerly Chairman of the Board of Directors of Luxalpha SICAV, private employee, residing at L-2128 Luxembourg, 11, avenue Marie-Adélaïde

6.    Mr. **Ralf Schroeter,** current Chairman of the Board of Directors of Luxalpha SICAV, domiciled at the registered office of UBS (Luxembourg) S.A. at L-2010 Luxembourg, 33a avenue John F. Kennedy, BP 2, domiciled at the office of Gilles Dusemon, Esq. 18-20 rue Edwald Steichen, L-2540 Luxembourg

7.    Mr. **René Egger**, member of the board of directors of Luxalpha SICAV, domiciled at the registered office of UBS (Luxembourg) S.A. at L-2010 Luxembourg, 33a, avenue John F. Kennedy, BP 2, domiciled at the office of Gilles Dusemon, Esq. 18-20 rue Edwald Steichen, L-2540 Luxembourg

8.    Mr. **Alain Hondequin,** member of the board of directors of Luxalpha SICAV, domiciled at the registered office of UBS (Luxembourg ) S.A. at L-2010 Luxembourg, 33a avenue John F. Kennedy, BP 2, domiciled at the office of Gilles Dusemon, Esq. 18-20 rue Edwald Steichen, L-2540 Luxembourg

9.    Mr. **Herman Kranz,** member of the board of directors of Luxalpha SICAV, domiciled at the registered office of UBS (Luxembourg) S.A. at L-2010 Luxembourg, 33a avenue John F. Kennedy, BP 2, domiciled at the office of Gilles Dusemon, Esq. 18-20 rue Edwald Steichen, L-2540 Luxembourg

10.    Mr. **Patrick Littaye**, member of the board of directors of Luxalpha SICAV, domiciled at the registered office of UBS (Luxembourg) SA, L-2010 Luxembourg, 33a, avenue John F. Kennedy, BP 2, or at Chaussée de Saint Job, B-1180 Brussels, domiciled at the office of Fernand Entringer, Esq., 34a, rue Philippe II, L-2011 Luxembourg 777,

11.    Mr. **Pierre Delandmeter,** member of the board of directors of Luxalpha SICAV, domiciled at the registered office of UBS (Luxembourg) S.A. at L-2010 Luxembourg, 33a avenue John F. Kennedy, BP2, at his elected domicile at the office of Fernand Entringer, Esq., 34a, rue Philippe II, L-2011 Luxembourg

CONFIDENTIAL TREATMENT REQUESTED                                                   UBSL 000771

12.     Mr. **Bernard Stiehl**, former member of the board of directors of Luxalpha SICAV, domiciled at the registered office of UBS (Luxembourg) S.A. at L-2010 Luxembourg, 33a, avenue John F. Kennedy, BP 2, with private domicile at 3, allée des Bruyères, F-78630 Orgeval, France,

13.     **Ernst & Young S.A.,** established and having its registered office at 7, parc d'Activité Syrdall, L-5365 Munsbach, BP 780, L-2017, Luxembourg, a corporation, represented by its current board of directors, registered in the Luxembourg Trade and Companies Register under No. B47.771

14.     **The Commission de Surveillance du Secteur Financier, "CSSF"** [Luxembourg's Financial Sector Supervisory Committee], a public establishment, established at L-2991 Luxembourg, 110, route d'Arlon, represented by its current management,

to appear, with their attorney, within the legal time period of 15 days, plus additional time if required for travel, specifically with respect to Sub-part (12), at 9:00 a.m. before the District Court of and in Luxembourg, Commercial Section, in accordance with civil procedure, 2nd Chamber, Room 1.01, new Cité Judiciaire, Plateau de St Esprit;

with the declaration, pursuant to articles 79 and 80 of Luxembourg's New Code of Civil Procedure, that if service is made personally and the parties summoned do not appear, the judgment to be issued will be deemed to have been given in proceedings in which all parties were represented and an application may not be brought to set it aside, for:

## I. THE FACTS:

This section provides a chronological summary of the events that led to the court-ordered liquidation of the open-ended mutual fund Luxalpha SICAV [*société d'investissement à capital variable*], (hereinafter, Luxalpha).

The plaintiffs note that the statement of the facts corresponds to the current state of their knowledge and is based on the documents and information available to them. The plaintiffs are not sure that they have complete information regarding Luxalpha. They emphasize that the statement of facts below is without prejudicial effect and subject, expressly and formally, to possible modification based on facts or evidence that may come to their attention in the course of the proceeding.

Section 1 briefly presents the events that led to Luxalpha's creation on February 5, 2004.

Section 2 presents the creation and establishment of Luxalpha.

Section 3 describes the "official" operation of Luxalpha as a Luxembourg SICAV, marketable throughout the European Economic Area.

Section 4 describes the actual operation of Luxalpha and its relationship with the U.S. company, Bernard L. Madoff Investment Securities (hereinafter, "BMIS").

[stamp:] 2 euros

4

CONFIDENTIAL TREATMENT REQUESTED                                                                                            UBSL 000772

### 1. Events leading to the creation of Luxalpha:

- During the 1980s and 1990s, the name Bernard L. Madoff (hereinafter, "Madoff") circulated in the world of finance as an interesting investment contact.

Although not a major player in the New York market, Madoff's fund management had the reputation of ensuring constant and safe returns for clients.

Originally, Madoff was a small market-maker who, through Bernard Madoff Investment Securities ("BMIS"), provided his clients with buy and sell prices for stocks. Over the years, BMIS grew, becoming a member of the National Association of Securities Dealers ("NASD"). Bernard Madoff, the head of the company, then helped to found the National Association of Securities Dealers Automated Quotations (the "NASDAQ") and even served as its chairman in 1990, 1991 and 1992.

- Parallel to this official brokerage activity, Madoff conducted a much less visible operation through which he provided investment advice and managed financial assets. The latter activity was confidential, even shrouded in secrecy.

From a legal perspective, BMIS was not authorized to solicit public funds as it was not registered to do so. Madoff thus found ways to avoid the controls and sanctions of U.S. supervisory authorities. Specifically, he claimed that he did not manage money directly and that by serving only as an advisor to his clients, his operations were only those of a "broker-dealer."[1] In addition, he stated that his clients were limited to feeders [sic] funds, which allowed him an exemption.

As noted above, his "management advising services" had the reputation of ensuring steady and growing returns for his clients. However, his investment method remained shrouded in secrecy. When questioned on several occasions regarding this issue, Madoff invoked confidentiality.

Madoff was often suspected of "front running"; that is, as a broker, placing his bank and buy orders just prior to his clients', which allowed him to increase his earnings by using this privileged information. Others believed that his excellent contacts in the New York market gave him greater insight into the financial markets.

- BMIS's "good results" served the interests of the financial intermediaries seeking to channel funds that their client investors entrusted to them to Madoff. Hoping they had found the right product to sell to their clients, they were also enthusiastic about the prospect of earning large commissions.

In that regard, it is important to specify that investment management entities generally take large fees and transfer some of them to the intermediary that

---

[1]    The definition of these two terms may be found in Section 3 of the 1934 Securities Exchange Act. A "broker" is defined as "*any person engaged in the business of effecting transactions in securities for the account of others*" and a dealer as "*any person engaged in the business of buying and selling securities for such person's own account through a broker or otherwise.*"

5

provides the funds. Generally, investment funds retrocede 20–25% of their own fees to the intermediary that places their securities.

Bernard Madoff, who presented himself formally as simply an advisor, did not request advisory or management fees on the funds managed, stating that he was satisfied with brokerage fees. The management and performance fees that he did not seek thus went directly into the "sellers'" pockets. (Investors consider fees of 2% and 20% to be normal.) All they had to do was to create a fund that opened the door for Madoff, collect funds from their client investors and forward them to Madoff. The sellers also received substantial fees without having to manage the funds themselves.

To obtain access to Madoff's services, sellers simply had to open an account with him, transfer the assets to be managed and authorize him to manage them.

- Two former French bankers, Thierry de la Villehuchet and his partner, Patrick Littaye, who founded Access International Advisors LLC in the U.S., with headquarters in New York, were among the first to take advantage of this opportunity to create feeder funds for Madoff.

De la Villehuchet and Littaye were charmed by Madoff and decided to entrust their clients' funds to BMIS. Over the course of its operations, Access International Advisors LLC marketed approximately 10 different feeder funds, including the Luxembourg SICAV, Oreades. Oreades used BNP Paribas as its custodian bank. Its primary shareholder was one of the wealthiest people in France. In addition to that individual, Oreades' shareholders included other very wealthy Europeans.

- For various reasons—all independent of Madoff—Oreades was dissolved in 2004. However, based on their commercial success, Access International Advisors LLC's representatives decided to launch a new fund. Seeking a custodian bank to replace BNP Paribas, they were welcomed with open arms by UBS AG.

It should be noted that in 2004, UBS AG was the leading wealth management firm worldwide and enjoyed a first-rate reputation among wealthy clients.

The Access Group and UBS AG agreed to create a new investment vehicle, to be managed by Madoff.

- Acts of fault and negligence began to mount beginning at that time:

Based on Oreades' apparent success and the reputation of Luxembourg SICAVs, the latter form was chosen for the new investment vehicle.

This was how the Luxalpha SICAV came to be created.

By selecting a Luxembourg SICAV as the investment instrument, UBS AG—which, meanwhile, had joined UBS (Luxembourg) SA—chose a product available to the public at large. As a result of their availability to the public at large, Luxembourg SICAVs are a highly regulated product whose creation requires prior approval from the Commission de Surveillance du Secteur Financier ("CSSF").

[stamp:] 2 euros

6

CONFIDENTIAL TREATMENT REQUESTED                                      UBSL 000774

Since January 1, 2003, SICAVs have been subject to Luxembourg's OPC Law of December 20, 2002, which replaced the amended Law of March 30, 1988.

Compliance with the principle of risk spreading and restrictions on investments is at the very core of a SICAV.

A SICAV is subject to many other conditions, including the requirement to provide investors with a prospectus, which must explain its investment policy, how it operates and how it is managed.

## 2. The creation of Luxalpha:

- In 2004, UBS AG and UBS SA thus created, as sponsors, the Luxembourg SICAV called Luxalpha SICAV.

It was created in close collaboration with the Access group, incorporated in New York, London and the Bahamas and, since the early part of the 2000s, without prejudice as to the precise date, in Luxembourg (hereinafter, "Access" or the "Access group").

- Luxalpha was formed on **February 5, 2004** as a SICAV governed by part I of the OPC Law [*loi sur les Organismes de Placement Collectif*] (Exhibit 1, Articles of Incorporation).

Luxalpha sought approval from the CSSF in Luxembourg on January 22, 2004 (Exhibit 2, Approval Application). The CSSF confirmed its inclusion on the list of approved OPCVMs [*Organisme de placement collectif en valeurs mobilières*, UCITS] on March 8, 2004, effective as of **February 11, 2004** (Exhibit 3, approval of March 8, 2004).

It was thus able to benefit from the exemption granted to OPCVMs approved prior to **February 13, 2004** by the transitional provisions (article 134(4)) of the Law of December 20, 2002 (hereinafter, the Law of 2002). Thus, it was exempt from certain important provisions of the new law, specifically regarding management and the opportunity to combine the duties of manager and custodian.

- The approval was based on the reputation of its sponsors,[2] UBS AG and UBS SA. Their co-sponsor status was the result of the express reference to UBS SA as sponsor in the approval request letter and to UBS AG as sponsor in the February 2004 draft prospectus, which was part of the approval application submitted to the CSSF[3] (appendix to Exhibit 2, draft prospectus), and in the successive prospectuses that the CSSF certified (Exhibits 4a–4e, Luxalpha prospectuses certified by the CSSF).

---

[2]	The function of sponsor is not defined by law, but is a creation of the CSSF 's administrative practice. The "sponsor" may be defined as the party that initiates an OPC (*Organisme de Placement Collectif*) and is responsible for creating it. The sponsor determines the focus of the OPC's activities and sets up its structures. It also benefits from the OPC's founding, in general because it takes on, directly or indirectly, a certain number of compensated duties within the structure established.

[3]	Only UBS SA appears as sponsor in the January 22, 2004 approval request letter, but UBS AG is mentioned as a sponsor in the first draft prospectus submitted to the CSSF with the approval application and in the first prospectus certified by the CSSF and intended for the public (dated February 2004) (*cf.* p. 14 of the draft prospectus and the prospectuses: *"The Sponsor of the Fund is UBS AG, one of the world's leading financial institutions which offers a full range of commercial, trading, risk management and investment services. UBS is a publicly traded shareholder-driven company, incorporated under Swiss law. It operates from five major geographical centers: Zurich, London, New York, Singapore and Tokyo and employs 29,000 people globally, located in over 400 offices worldwide."*)

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000775

UBS SA's sponsor status was expressly confirmed to the CSSF by letter of August 20, 2008, when the manager was changed (Exhibit 2b).

- Luxalpha is a SICAV governed by part I of the Law of 2002.

OPCs governed by part I of the Law of 2002 invest their assets in securities and other instruments authorized by Directive 85/611/EEC. They are therefore defined as "*Organismes de Placement Collectif en Valeurs Mobilières*" ("OPCVM" or "UCITS" in English). They benefit from the "European passport"[4] granted by Directive 85/611/EEC and are consequently defined as "coordinated UCITS."

Luxalpha is thus a European SICAV intended for the general public, governed by European Directive 85/611/EEC of December 20, 1985 amended by Directives 2001/107/EC and 2001/108/EC (hereinafter, "Directive 85/611/EEC") and benefiting from the "European Passport."

Starting in late 2004, Luxalpha took advantage of the European Passport by marketing its units in Luxembourg and France. To that end, it transmitted the CSSF's certificate of approval to the *Autorité des Marchés Financiers* [AMF, = French financial regulator] in November 2004 and thus obtained AMF approval in November 2004.

In principle, Luxalpha was a SICAV with multiple sub-funds.[5] In fact, it was still comprised of a single sub-fund, the "American Selection" sub-fund, which invested in listed securities in the United States, in compliance with the principle of risk-spreading. This principle, which follows from the law, requires SICAVs and in particular, those governed by part I—among others—to comply with strict investment restrictions with regard to maximum participation allowed and restrictions on sums not invested in securities.[6] These restrictions are considerably more strict for a SICAV governed by part I of the law than for those governed by part II.

The investment policy of a SICAV or of one of its sub-funds is defined precisely within the legal framework and must be described in the prospectus. Any change in investment policy must be approved by the CSSF and shareholders must be notified of such change with at least 30 days' notice. Shareholders who object to the change must have the opportunity to redeem their shares, without redemption fees, during the notice period.

The same rule applies in the case of a change in the asset management entity.

[stamp:] 2 euros

---

[4]       The "European Passport" authorizes marketing within the European Economic Area, in accordance with article 7 of the Investment Services Directive ("ISD," Directive 93/22/EEC), to which article 5 *quater* 1 of Directive 85/611/EEC refers – units of an approved UCITS in its Member State of origin. The ISD and its accompanying measures establish the single investment services market.

[5]       "Multiple sub-funds" allow a SICAV to divide its assets into several distinct portfolios and place their management under different rules. Investors choose the sub-fund in which they wish to become shareholders. The sub-funds are part of the same corporate structure. The English term for an OPC with multiple sub-funds is "umbrella fund."

[6]       This involves legal investment restrictions found in articles 43 and thereafter of the Law of 2002.

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000776

- In fact, and as explained above, Luxalpha's primary goal was to collect funds from the public to be placed in custody with BMIS and managed by Madoff.

### 3. The visible aspect of the "Luxalpha product":

Having made the inappropriate choice of a Luxembourg SICAV as an investment instrument, the UBS and Access entities involved had to do everything possible to adapt Luxalpha—at least in appearance—in order to satisfy the requirements of such an investment company.

All documents intended for the public—specifically, the February 2004, August 2004, August 2006 and March 2007 prospectuses—presented Luxalpha as a purely UBS product, except that Access entities were designated as investment advisors in certain prospectuses.[7]

According to the descriptions in the prospectuses, Luxalpha strictly complied with legal provisions and all participants named were approved by the CSSF.

UBS AG and UBS SA created Luxalpha and UBS AG's role as sponsor was always emphasized in the prospectus.

Luxalpha was always domiciled with UBS SA.

Luxalpha's board of directors had always been managed by and composed of a majority of UBS (AG and SA) members. The Access group provided the remaining directors.

UBS SA was always Luxalpha's custodian.

UBS SA managed Luxalpha's assets from the time it was created until August 2006, when it was replaced by UBSTPM (UBS Third Party Management Company SA).

UBS SA and UBSFS performed, respectively, the duties of distributor and administrator of Luxalpha (see "General Provisions" of the prospectuses dated February 2004, August 2004, August 2006, March 2007 and November 2007 (Exhibits 4a–4e)).

- Luxalpha's investment policy had been defined in the February 2004 prospectus as follows: "*The purpose of the Fund is to provide investors with the opportunity for investment in all types of transferable securities through professionally managed Subfunds, each with their own specific investment objectives and policies as more fully described in Section I, in order to achieve a high regular income or a maximum capital appreciation, while giving ultimate consideration to capital security and portfolio liquidity.*" (cf Exhibit 4a, February 2004 prospectus, p. 9, subsection 2, "Investment Objectives and Policy").

The investment policy chosen more specifically for the American Selection Sub fund was as follows: "*The aim of the Sub fund is to provide investors with an opportunity to invest mainly in transferable securities listed on* [the] *New York Stock Exchange and to provide a consistent performance. The Sub fund's assets are invested according to the principle of risk diversification in equity securities listed on the New York*

---

[7]    The first Access entity did not participate as an approved management company until November 17, 2008, more than one month before the permanent suspension of the calculation of Luxalpha's net asset value.

CONFIDENTIAL TREATMENT REQUESTED                                                                UBSL 000777

*Exchange and U.S. government securities (U.S. T-bills). The Sub fund may hold liquidities on an ancillary basis (which may include on an ancillary basis units of U.S. money market mutual funds providing daily liquidity). The Sub fund may enter into transactions relating to 'options' on financial instruments for a purpose of efficient portfolio management in compliance with what is provided under "Financial Techniques and Instruments" (in Section 11 General Provisions, 13. Investment Guidelines) and in the interest of an orderly management of its assets. Due to their high volatility, options are exposed to greater risks than direct investments in securities.*" (cf Exhibit 4a, February 2004 prospectus, p. 5 "Investment Objectives and Policy" and p. 9).

These descriptions were never amended subsequently in later prospectuses (cf. identical provision, Exhibit 4b, pp. 5 and 10; Exhibit 4c, pp. 5 and 10; Exhibit 4d, pp. 5 and 10; and Exhibit 4e, pp. 6 and 9).

- The role of independent auditor was entrusted to Ernst & Young S.A., a prestigious auditor that is one of the "Big Four" accounting firms. It was undoubtedly chosen because it was already the auditor for UBS AG, UBS SA and UBS Fund Services.[8]

- Two duties were officially assigned to entities of the Access group: management consultant ("Portfolio Advisor") from August 1, 2004 to November 17, 2008; and, "Client Introducer," from February 2, 2004 to February 13, 2007.

- Mr. Pierre Delandmeter, lawyer and director of Access' Luxembourg entities, was the SICAV's legal advisor.

- Based on the information in the prospectuses dated February 2004 to March 2007, and, respectively, the information that Mr. Delandmeter, Luxalpha's legal advisor, provided the CSSF , Luxalpha's organizational chart was as presented below:



[stamp:] 2 euros

With the internal structure thus established, the duties of the various professional actors turned out to create a community of interests between UBS and Access. The actors thus lost their independence and ability to carry out objective supervision.

From February 5, 2004 to August 1, 2006, UBS SA performed the duties both of custodian and manager of Luxalpha.[9]

---

[8]        Roger Hartmann, a member of UBS management and who was a member of Luxalpha's board of directors, later joined Ernst & Young in Luxembourg.
[9]        The amended Law of March 30, 1988 did not prohibit this combination of duties. The prohibition appears in both the European Directive 85/611/EEC of December 20, 1985 (Article 10) and in Article 85 (1) of the Law of December 20, 2002.

CONFIDENTIAL TREATMENT REQUESTED                                                UBSL 000778

- The duties of custodian and manager were not assigned to two different companies—at least officially—until August 1, 2006.

On August 1, 2006, Luxalpha submitted voluntarily to the entire Law of 2002, ahead of the February 13, 2007 deadline.

A notice to shareholders was published at that time. "*In the context of submitting Luxalpha SICAV to the Law of December 20, 2002 on undertakings for collective investment as amended, the Board of Directors is pleased to inform you that UBS Third Party Management Company SA has been appointed as manager with effect as of August 1, 2006 in accordance with article 27 of the Law. This appointment will not induce additional cost to Luxalpha SICAV nor will change its investment objective and policy.*" (Exhibit 11).

To comply with—that is, to appear to comply with—article 85 (1) of the Law of 2002, which requires separating the duties of custodian from those of manager, UBSTPM thus replaced UBS SA as manager. This change was made official in an agreement dated September 22, 2006, which took effect on August 1, 2006.

The other duties remained assigned to the same entities as previously.

- All the duties described above were described properly in successive prospectuses. However, they did not correspond to reality. Acting in the guise of a Luxembourg SICAV available to the general public, Luxalpha actually operated as a simple investment vehicle channeling savings to BMIS. Some participants did not perform their duties, which were instead simply abandoned to BMIS.

### 4. Luxalpha's actual operation:

Luxalpha's actual operation required a structure quite different from the official one presented to the general public. This structure was set up on February 5, 2004, the day that Luxalpha was created, and was maintained (with several modifications to "the facade") until it entered liquidation.

Analysis reveals three distinct chronological periods:

- the period between Luxalpha's creation and August 1, 2006 (§ a)
- the period between August 1, 2006 and November 17, 2008 (§ b)
- the period between November 17, 2008 and liquidation (§ c)

---

Luxalpha, which was created on February 5, 2004 and whose March 8, 2004 letter of approval confirmed that it was included on the list of authorized UCITs, taking effect on **February 11, 2004**, was thus able to avoid application of Article 27 (and of Article 85 (1) e) by taking advantage of the option available to UCITs approved before **February 13, 2004** as provided by the transitional provisions (Article 134 (4)); that is, to remain subject to the provisions of the amended Law of March 30, 1988 until February 13, 2007, and to thus combine the functions of custodian and manager in a single entity.

11

### a) Starting in February/March 2004:

- In order to carry out its primary mission, Luxalpha could not operate with UBS SA named as either custodian or manager. It was thus critical to establish another structure—operating behind the Luxembourg SICAV façade, with participants duly accredited by the CSSF—consistent with the requirements of fund management provided by BMIS.

Although not noted in the prospectus, on February 5, 2004, UBS SA, in its **capacity as Luxalpha's custodian**, had entered into a sub-custodian agreement with BMIS (Exhibit 5, February 5, 2004 "Sub-Custodian Agreement"). Clearly, BMIS did not meet the conditions for officially performing the duties of custodian of a Luxembourg SICAV and the CSSF was not asked to issue any approval.

On March 18, 2004, in its **capacity as Luxalpha's manager**, UBS SA had also signed a document entitled "Trading Authorization Limited to Purchases and Sales of Securities and Options" (Exhibit 6) in favor of BMIS. Under its terms, management of nearly all the assets was, in fact, delegated to the latter. However, BMIS was not authorized as a manager in the United States. As a result, it could not take advantage of CSSF approval to act as manager of a Luxembourg SICAV, even under the Law of 1988.

In the same context, BMIS had signed a document entitled "Trading Authorization Directive" (Exhibit 7).

UBS SA had signed two other agreements ("Agreements") and probably transmitted them to BMIS. The first was entitled "Option Agreement," dated March 18, 2004, and the second, "Customer Agreement," was undated (Exhibits 35 and 36).

- In addition, UBS SA had entered into a "Portfolio Advisory Agreement" with Access International Advisors (Luxembourg SA) (Exhibit 8) and, on August 11, 2004, entered into another "Portfolio Advisory Agreement" with Access International Advisors LLC, a U.S. company (Exhibit 9).

- Without objection, the board of directors immediately approved—as its first order of business and as soon as it was proposed, on February 5, 2004—a resolution, undoubtedly drafted by the sponsors, in which it approved BMIS's participation, at least in part, in Luxalpha.

[stamp:] 2 euros

12

CONFIDENTIAL TREATMENT REQUESTED

Consequently, the actual organization chart was as follows:



not included in the prospectus

From the moment the SICAV was created, UBS SA had thus delegated, to BMIS, nearly every aspect of serving as Luxalpha's custodian and asset manager.

As a result of the preceding, BMIS served as both sub-custodian and manager.

In other words, not only did UBS SA, UBS AG and Access create a Luxembourg SICAV profiting Madoff but, in addition, they placed that SICAV's assets at the mercy of this mysterious manager. Not only did UBS SA abandon the assets to BMIS, it also deprived itself of the opportunity to exercise any supervision, as will be explained below.

Such concentration of powers in the hands of a single manager—independent of the quality and reliability of this sub-manager—unquestionably constitutes a tragic error in judgment by such high-level, experienced professionals.

No information about the delegations to BMIS appeared in the February 2004 and August 2004 prospectuses (Exhibits 4a and 4b).

13

CONFIDENTIAL TREATMENT REQUESTED

UBSL 000781

**b) As of August 2006:**

- After Luxalpha submitted to the Law of December 20, 2002 (which prohibits assigning the duties of custodian and manager to the same entity), the management duty was transferred to UBSTPM. The new agreement was signed on September 22, 2006, taking retroactive effect on August 1, 2006 (Exhibit 10, September 22, 2006 "Management Company Services Agreement").

Shareholders were notified of this change in a notice to shareholders (Exhibit 11) and the prospectus was amended as a result (Exhibit 4c, August 2006 prospectus).

The new organization chart was as follows:



This organization chart clearly shows that, in fact, the duties of sub-custodian and sub-manager continued to be combined. Despite the official separation of the duties of custodian and manager and the appointment of a new manager, the delegation of the combined duties of manager and sub-custodian to BMIS continued.

As in the past, the Luxalpha prospectuses of August 2006 and March 2007 (Exhibits 4c and 4d) did not reflect this reality as they did not include any information about BMIS' duties.

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                                   UBSL 000782

- The Portfolio Advisory Agreement entered into on August 11, 2004 between UBS SA and Access International Advisors LLC (Exhibit 9) was terminated by a "Termination Agreement" dated August 1, 2006, but information about Access International Advisors LLC continued to appear in the prospectus of August 2006.

- In addition to the new custodian and manager agreements, which were essential to creating the appearance of complying with the Law of December 20, 2002 (Exhibits 12 and 10), another document was signed when management duties were transferred to UBSTPM, undoubtedly to strengthen it in its role as manager "in appearance."

On September 22, 2006, the day that the management agreement between Luxalpha and UBSTPM was signed, UBS SA signed—by taking advantage of its status as sponsor—an "Agreement of Understanding and Indemnification" benefiting UBSTPM. In this agreement, it undertook to indemnify UBSTPM "*...in respect of losses/liabilities which the Management Company may incur directly or indirectly in relation to the management of the Fund as a result of having, at the request of the Promoter, delegated certain of its functions to third parties.*") (Exhibit 13).

This "Agreement of Understanding and Indemnification" makes express mention of a delegation of administrative duties to UBSFS and of "marketing" duties to UBS SA (article 2 of the aforementioned agreement).

However, it does not refer to the delegation of the duties of manager either to BMIS or any other third party, but specifies that it also covers (UBSTPM's) potential liability with regard to failure to comply with the investment policy or the investment restrictions and, in general, the liability of the designated manager (article 5).

Although the "Agreement of Understanding and Indemnification" does not expressly refer to the delegation of the duties of manager to BMIS, the fact that this is the only known delegation of management suggests that this is the delegation addressed in articles 2 and 5 of the guarantee.

In other words, UBS SA thus undertook, in its capacity as co-sponsor, to release and hold UBSTPM harmless for any consequences resulting from the hidden aspect of the structure; that is, the delegation of the duties of manager to BMIS and the combining of that delegation with the duties of custodian.

- On February 13, 2007, UBSTPM signed an "Investment Advisory Agreement" with Access Partners SA. The latter was designated as "Investment Advisor" in the March 2007 prospectus.

- No further changes with respect to the actors occurred until November 2008.

### c) As of November 17, 2008:

- By agreement of November 17, 2008, Access Management Luxembourg SA became the new manager of Luxalpha (Exhibit 14, "Management Company Services Agreement" of November 17, 2008).

This change was addressed in a notice to shareholders and duly included in the November 2008 version of

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000783

the Luxalpha prospectus.

- At the same time, an investment advisory agreement was signed between the new manager and Access Partners SA (Exhibit 16, "Investment Advisory Agreement," dated November 17, 2008), which replaced the one signed on February 13, 2007 between UBSTPM and Access Partners SA.

- That same day, a new central administration agreement was signed between Luxalpha and UBSFS, confirming UBSFS as administrator (Exhibit 17).

These changes were also noted in the prospectus.

The preceding leads to the same observation: the new change of manager did not change the actual situation either (that is, BMIS continued to serve as both custodian and manager).

The organization chart then became as follows:



BMIS's duties were still not noted in the November 2008 Luxalpha prospectus.

This organization chart did not change until Luxalpha entered liquidation.

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000784

UBS SA, UBS AG and Access—with the assistance of Ernst & Young and certain members of the UBS group—committed the fault of setting up an official façade to hide the actual internal structures.

These same professionals did everything possible to maintain this façade for years, until the Madoff scandal broke. That façade suggested that Luxalpha had a benign purpose, complying with the policy of risk-spreading and, further, offering the "seal of approval" conferred by the leading names in fund management, together with an auditor—Ernst & Young—providing the most reliable guarantees a potential investor could hope for.

By maintaining that façade, the professionals involved attracted growing numbers of new investors. These professionals thus truly acted in collusion.

**II. The change in Luxalpha's assets and NAV between the date the fund was created and the date it entered liquidation:**

- Between the date it was created and November 2008, Luxalpha posted very regular annual returns ranging from 7.8% to 10.25% (all classes of shares combined) and the NAV of its shares rose as a result. The volume of Luxalpha investments grew significantly, also as a result of new share subscriptions. Ultimately, on November 17, 2008, the volume of investments reached $1,409,377,821.50.

- Analysis of the structure reveals that UBS placed nearly all the funds that subscribers entrusted to Luxalpha[10] in custody with BMIS, which had sole responsibility for managing them.

- According to the prospectus, "*the Luxalpha sub-fund offers investors an opportunity to invest primarily in securities listed or quoted in the United States and to achieve stable performance guaranteeing steady earnings, while ensuring the safety of capital and portfolio liquidity. The sub-fund's assets are invested based on the principle of risk-spreading among shares quoted on the New York Stock Exchange or the NASDAQ and/or in U.S. Treasury bonds.*"

- Madoff stated that he managed funds according to a technique referred to as "split-strike conversion." This investment strategy, which Madoff claimed to use, involved buying and selling a basket of shares (30 to 40) from the S&P 100 and, simultaneously, buying sale and purchase options in order to cover the risk. This technique was used each time market opportunities appeared favorable. The rest of the time, he stated, the assets were invested in U.S. Treasury bonds.

- On December 10 and 11, Madoff admitted, first, to his sons and, next, to U.S. authorities, that for many years he had not been investing the funds his clients entrusted to him. Rather, he simply used them to pay so-called profits or repay prior investors. This had certainly been the case prior to the time the Luxalpha agreements were signed and

---

[10]    UBS SA retained a small portion for current cash flow and to hedge against the $-to-€exchange risk.

CONFIDENTIAL TREATMENT REQUESTED                                                            UBSL 000785

during the entire period in which he was supposed to be managing Luxalpha assets.

- As Madoff henchman Frank Di Pascali's[11] statement also reveals, that "split-strike conversion" strategy was entirely fictitious. In reality, Di Pascali and his colleagues analyzed the changes in certain shares after the fact and built a fictitious portfolio based on imaginary transactions, making it possible to track the earnings claimed.

Once Madoff and Di Pascali had "assembled" a portfolio of shares that matched the objectives, this portfolio and all transactions related to it were automatically assigned to all accounts that BMIS managed. The program was designed such that when a transaction was entered in the database, it was applied and adapted to all investors' deposits. The program automatically assigned the fictitious transactions, on a pro rated basis, to the various individual accounts. Confirmations and statements of these transactions, and of the individual portfolio reflecting them, were then sent to investors on paper (by fax or mail), rather than electronically.

Because equity investments were subject to specific reporting requirements posing a significant risk of fraud detection, BMIS claimed that it had withdrawn from the equity markets and was investing in T-Bonds[12] at the end of each quarter.

To reduce suspicions raised by continuous profits and to lend the strategy greater credibility, Madoff periodically directed Di Pascali to incorporate baskets of shares intended to lose money.

Again according to Mr. Di Pascali's statements, accounts held by overly-curious investors and intermediaries (those who sought too much information) were closed.

- UBS SA was not among the curious, as Luxalpha's assets remained with BMIS. Throughout Luxalpha's existence, UBS SA received fictitious information, as described above, together with equally fictitious trade tickets that were supposed to prove that BMIS had carried out transactions for Luxalpha's account. UBS SA passed on the information provided to UBSFS without confirming its veracity. In turn, UBSFS calculated the SICAV's net asset value (NAV) on a bimonthly basis, based solely on statements of the custodian. Subscriptions and redemptions were carried out on the basis of these NAVs, as were the calculations of the participants' fees and all other fees and taxes that were determined by the value of Luxalpha assets.

- On December 11, 2008, BMIS was placed in liquidation and the New York court appointed Mr. Irving H. Picard as trustee.

- On December 18, 2008, UBS issued a press release to a stunned public. It stated that "*UBS did not invest its clients' assets in Madoff funds in any market or financial center, including in the United States, the Cayman Islands, Switzerland, Luxembourg, the United Kingdom or Australia … Several press reports state that UBS is the manager of the Luxalpha SICAV. This is not the case. UBS' role is limited to that of agent and custodian. The Luxalpha SICAV is managed by Access Management Luxembourg, which is not part of UBS.*"

[stamp:] 2 euros

---

[11]    Di Pascali was also UBS SA's direct contact with BMIS, as appears from the latter's faxes to BMIS, dated March 31, 2004 and April 2, 2004.

[12]    Treasury Bonds

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000786

- UBS must have quickly realized that the opposite was true. In a February 25, 2009 press release, UBS confirmed that "*the Luxalpha fund was created at the explicit request of wealthy clients who requested a tailor-made fund to enable them to continue investing their assets with Madoff. These clients were represented by sophisticated financial institutions that were fully aware of the nature of the investments. These investors, their advisors and the CSSF were informed that the sole purpose of Luxalpha was to enable the funds to be invested with Madoff.*" (Exhibit 25, UBS press release, February 25, 2009).

- As soon as Luxalpha learned of the Madoff scandal, it sought to recover its assets in the United States.

When that proved impossible, the Luxalpha board of directors decided to implement article 11 of its bylaws and suspend calculation of the NAV and subscriptions, conversions and redemption of shares on a temporary basis (as of December 12, 2008) and, then, on a final basis (as of December 15, 2008). (Exhibit 18, minutes of the December 15, 2008 meeting of the Luxalpha board of directors).

On December 15, 2008 Luxalpha informed shareholders and the CSSF of this decision, respectively, in a notice to shareholders and by letter to the CSSF (Exhibit 19, December 15, 2008 notice to shareholders and Exhibit 20, December 15, 2008 letter to the CSSF).

- On February 3, 2009, pursuant to article 94(2) of the Law of 2002, the CSSF decided to withdraw Luxalpha from the list of OPCs. The CSSF notified Luxalpha of its decision of withdrawal that same day (Exhibit 21).

The CSSF's decision was motivated by the board of directors' own decision to suspend calculation of the NAV based on the fact that BMIS held the U.S. assets of Luxalpha's only sub-fund and that BMIS and Madoff were being prosecuted in the U.S.

The CSSF concluded that because available information suggested that the situation could not be resolved within a reasonable amount of time, Luxalpha was no longer capable of complying with the principles set forth in articles 28(1) and 28(1) b of the Law of December 20, 2002. Those principles require that a SICAV be able to issue its shares at any time and to redeem them upon a shareholder's request.

By letter of February 3, 2009, the CSSF submitted a petition to the State Prosecutor, pursuant to article 104 (1) of the amended Law of December 20, 2002, seeking to place Luxalpha in liquidation.

As Luxalpha did not appeal the February 3, 2009 decision of withdrawal, the CSSF informed the State Prosecutor that the decision had become final.

After receiving this information, the State Prosecutor took action on the CSSF's February 3, 2009 petition and, on March 10, 2009, filed a motion in the 6th Chamber of the District Court of Luxembourg to dissolve and liquidate Luxalpha.

- In its ruling of April 2, 2009, the 6th Chamber of the District Court of Luxembourg responsible for commercial matters granted the State Prosecutor's motion and ordered that Luxalpha be dissolved and liquidated.

19

CONFIDENTIAL TREATMENT REQUESTED

In the same ruling, Christiane Junck, Vice-President of the Luxembourg District Court, was appointed *juge-commissaire* [bankruptcy judge] and Alain Rukavina and Paul Laplume were appointed trustees.

The ruling specified that the trustees represent the company, its investors and its creditors and are vested with the broadest powers to carry out their objective in the Grand Duchy of Luxembourg and abroad (Exhibit 22, ruling of April 2, 2009).

- When the trustees conducted an inventory of Luxalpha's assets, pursuant to the mission assigned to them by the Court, they noted the following:

- on the date it was placed in liquidation, Luxalpha's UBS SA accounts totaled only €39,437,070.95 out of the NAV of $1,409,377,821.50, calculated for November 17, 2008. Luxalpha did not have accounts at any other banking institutions.

- the sum of €1,000,000, which had been subject to ring-fencing that was no longer necessary, had been returned to Luxalpha.

- the sum of €30,072,217.90 had been paid to a third party in enforcement of a summary judgment prior to the liquidation ruling.[13]

- on February 27, 2009, the board of directors of Luxalpha filed a proof of claim under the BMIS liquidation proceeding ordered by the December 11, 2009 ruling of a New York court. This proof of claim was in the amount of $1,537,099,731 and was based on the fact that BMIS owed Luxalpha securities and cash (Exhibit 23, proof of claim).

- Mr. Erwin H. Picard, BMIS' U.S. trustee, had already notified Luxalpha, by registered letter of February 27, 2009, that pursuant to U.S. bankruptcy law, he intended to recover the sum of $535,000,000, representing the total amount of transfers that BMIS made to Luxalpha during the 90 days preceding the date BMIS was placed in liquidation. In that letter, the trustee reserved all other rights (Exhibit 24, Baker & Hostetler letter of February 27, 2009).

- As reflected in the discussions of the board of directors during its February 5, 2009 meeting (in the presence of the CSSF), the BMIS trustee may, under applicable U.S. law, demand repayment of all sums paid to Luxalpha over a period of two to six years prior to the date that Luxalpha was placed in liquidation.

Accordingly, of the Luxalpha assets used as the basis for the last calculation of the NAV performed on November 17, 2008—which UBSFS and the Luxalpha board of directors had valued at $1,409,377,822.50—only $787,850 and €38,862,810.13 (made available to the trustees when they were appointed) remained. The trustees subsequently managed to recover the sums of €100,000, which had been blocked as the result of a ring-fencing that was no longer necessary, and of €30,072,217.90, the fate of which still depended on the outcome of an appeal [*procédure de cassation*] then underway. The rest had been lost.

[stamp:] 2 euros

---

[13]    By order of the Superior Court of Justice [*Cour Supérieure de Justice*] dated July 15, the third party in question was ordered to return the sum of €30,072,217.90 and did so. On October 5, 2009, the Luxalpha trustees were notified that that ruling had been appealed to the Court of Cassation.

20

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000788

Furthermore, as was explained above, the BMIS trustee's demands exceeded the remaining Luxalpha assets.

- When the trustees analyzed the causes of the loss of nearly all of Luxalpha's assets, they understood, as was explained at length in Subsection I.2 above, that UBS SA had, at the time Luxalpha was created, entered into a sub-custodian agreement with BMIS and that that agreement had remained in effect until the time Luxalpha was placed in liquidation. The trustees also learned that UBS SA's delegation of management, undertaken at the time Luxalpha was created, had also remained in effect until the subsequent managers referred to in the prospectus had placed it in liquidation.

When they compared the investment policy carried out by the sole Luxalpha sub-fund with that of other investment funds whose management had been delegated to BMIS, the trustees were also surprised to note that the sponsors and the other professionals involved in Luxalpha had not defined the SICAV's investment policy. Rather, they simply copied Madoff's. This was the same investment policy that Madoff applied—at least according to what he led his clients to believe—to all the portfolios he managed.

Based on the preceding, it is clear that Luxalpha, in the guise of a coordinated Luxembourg OPCVM, was, in fact, only an instrument intended to collect funds from the public to be entrusted to BMIS and in the process, to allow the various UBS entities to receive very large fees—in the order of $83,758,610.08—for all "services" rendered between the date Luxalpha was created and the date it was placed in liquidation.


### III. Legally:

The goal of this writ of summons is to obtain restitution for Luxalpha and its shareholders for the damages that they suffered due to the loss of nearly all of Luxalpha's assets.

Before examining the liability of the various summoned parties, let us recall their roles in Luxalpha.

-**Sponsors:**
  UBS AG
  UBS (Luxembourg) SA
  Access Management Luxembourg SA[14]

-**Asset Custodian:**
  UBS (Luxembourg) SA (agreements dated February 5, 2004 and September 22, 2006)

-**Managers:**
  UBS (Luxembourg) SA (agreement dated February 5, 2004)
  UBS Third Party Management Company SA (agreement dated September 22, 2006)
  Access Management Luxembourg SA (agreement dated November 17, 2008)

-**Sub-custodian and actual manager:**

---

[14]    See subsection 5 below for details

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000789

BMIS (agreements dated February 4 and March 18, 2008 with UBS SA)

**-Administrators:**
UBS Fund Services (Luxembourg) SA (agreements dated February 5, 2004 and September 22, 2006 (with UBSTPM) and November 17, 2008)
UBSTPM (agreement dated September 22, 2006)

-**Board of directors:**

R. Hartmann – UBS employee (February 2004– January 1, 2008)
B. Stiehl – UBS employee (February 2004–December 15, 2005)
A. Hondequin – UBS employee (February 2004–court-ordered liquidation)
H. Kranz – UBS employee (February 2004 – court-ordered liquidation)
P. Delandmeter – Access group (February 2004 – court-ordered liquidation)
R. Egger – UBS employee (December 15, 2005 – court-ordered liquidation)
R. Schroter – UBS employee (January 1, 2008 – court-ordered liquidation)
P. Littaye – Access group (February 1, 2006 – court-ordered liquidation)

**-Auditor:**
Ernst & Young[15] (February 2004 – court-ordered liquidation)

**-Legal advisor:**
Attorney Pierre Delandmeter (February 2004 – court-ordered liquidation)

**-Supervisory authority:**
CSSF

### A. Legal standing:

- In the court-ordered liquidation ruling of April 2, 2009, the Luxembourg District Court, ruling in a commercial matter, stated *"that a company in liquidation loses administrative authority over all of its assets. These are turned over to the trustees, who act on behalf of both the company and the investors and creditors that they represent and they should benefit from the widest possible scope of powers for the purpose of achieving their objective. In this case, because their powers apply in the Grand Duchy of Luxembourg and in other countries, the rule of the unity and universality of the court-ordered liquidation of a company that has a head office in Luxembourg theoretically applies to all real and personal property owned by the company in liquidation, even if this property is located in a foreign country..."*

*"In addition, in application of article 104 (1) 2nd paragraph, last sentence of the Law of 2002, it is appropriate to declare that the rules governing bankruptcy liquidation are applicable, subject to the derogation rules described above, and subject to the modifications that are required by the liquidation method to be implemented in the future, if necessary..."* (Exhibit 22, ruling of April 2, 2009).

**The trustees thus have the legal standing to simultaneously act in Luxalpha's name and in the name of the creditors and investors. In this capacity, they may carry out all actions for which Luxalpha and/or its shareholders is/are responsible, specifically liability actions against the various professional players within Luxalpha which are described more fully hereinafter.**

[stamp:] 2 euros

---

[15]    Ernst & Young are also the auditors for UBS (Luxembourg) SA and UBSFS

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000790

**B. Various players' liability:**

In section B, the roles and responsibilities of the following professional players will be examined:

-custodian (§ 1)
-manager(s) (§ 2)
-administrator (§ 3)
-board of directors (§ 4)
-sponsor (§ 5)
-auditor (§ 6)
-regulatory authority (§ 7)

**1.1 Custody of assets and the custodian(s):**

**a) The custody arrangement:**

On February 5, 2004, Luxalpha signed a "Custodian Agreement," in accordance with article 26 of its bylaws[16] and in accordance with articles 34. (1),[17] 35. (1) and 35. (2)[18] of the Law of 2002. By this agreement, it entrusted the custody of its assets to a banking institution which was approved by the CSSF for this purpose; in this case, UBS SA (Exhibit 26).

In accordance with legal requirements, all of Luxalpha's assets, meaning all funds resulting from shareholders' subscription to shares, were transferred into accounts at UBS SA opened in Luxalpha's name for the purpose of investing these funds in compliance with Luxalpha's investment policy and with legal restrictions on investment.

Sizable amounts of money were thus entrusted to UBS SA. On November 30, 2008, notwithstanding the exact date, Luxalpha's assets as declared by UBS SA to UBSFS for the purpose of calculating the NAV [net asset value] included the following stocks and financial instruments. This information does not contain any admissions prejudicial to either party's interests with respect to the description of shares and is subject to the option to increase the request during the legal action.

| Stock name | BMIS Quantity | BMIS Market price | Assessed value |
|---|---|---|---|
| AT&T INC COM | 1 872 746,00 | 28,56 | 53 485 625,76 |
| ABBOTT LABS COM | 498 404,00 | 52,39 | 26 111 385,56 |
| ALTRIA GROUP INC COM | 654 154,00 | 16,08 | 10 518 796,32 |
| AMGEN INC COM | 342 653,00 | 55,54 | 19 030 947,62 |
| APPLE INC | 280 352,00 | 92,67 | 25 980 219,84 |
| BANK OF AMERICA | 1 610 836,00 | 16,25 | 26 176 085,00 |

---

[16]        Under the terms of article 26 of its bylaws, Luxalpha must sign a "custody agreement" with a banking or savings institution as defined by the Law of April 5, 1993, and which has the powers and responsibilities specified by the Law of December 20, 2002.

[17]        Art. 34 (1) Custody of a SICAV's [open-ended mutual fund = *société d'investissement à capital variable*] assets must be entrusted to an asset custodian.

[18]        Art. 35 (1) The asset custodian must either have its registered office in Luxembourg or have an office there, if its registered office is in another European Union member state. 35. (2) The custodian must be a financial institution as defined by the amended Law of April 5, 1993 relative to the financial sector.

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000791

| | | | |
|---|---|---|---|
| CORPORATION COM | | | |
| BK OF NY MELLON CP COM STK USD0.01 | 365 495,00 | 30,21 | 11 041 603,95 |
| BAXTER INTL INC COM | 197 077,00 | 52,90 | 10 425 373,30 |
| BOEING CO COM | 243 874,00 | 42,63 | 10 396 348,62 |
| BRISTOL MYERS SQUIBB CO COM | 633 160,00 | 20,70 | 13 106 826,00 |
| CVS/CAREMARK CORP COM STK USD0.01 | 458 945,00 | 28,93 | 13 277 278,85 |
| CHEVRON CORP NEW COM | 664 330,00 | 79,01 | 52 488 713,30 |
| CISCO SYS INC COM | 1 882 880,00 | 16,54 | 31 142 835,20 |
| CITIGROUP INC COM | 1 739 302,00 | 8,29 | 14 418 813,58 |
| COCA COLA CO COM | 633 160,00 | 46,87 | 29 677 146,60 |
| COLGATE PALMOLIVE CO | 3 330,00 | 65,07 | 216 683,10 |
| COMCAST CORP NEW CL A | 925 532,00 | 17,34 | 16 048 724,88 |
| CONOCOPHILLIPS COM | 490 095,00 | 52,52 | 25 739 789,40 |
| WALT DISNEY CO. DISNEY COM USD0.01 | 603 855,00 | 22,52 | 13 598 814,60 |
| EXELON CORP | 4 662,00 | 56,21 | 262 061,02 |
| EXXON MOBIL CORP COM | 1 673 803,00 | 80,15 | 134 155 310,45 |
| FIDELITY HEREFORD STREET TRUST-SPARTAN US TREASURY MMKT | 37 019,00 | 1,00 | 37 019,00 |
| GENERAL ELECTRIC CO COM | 3 338 803,00 | 17,17 | 57 327 247,51 |
| GOLDMAN SACHS GROUP INC COM | 132 113,00 | 78,99 | 10 435 605,87 |
| GOOGLE INC CL A | 62 301,00 | 292,96 | 18 251 700,96 |
| HEWLETT PACKARD CO COM | 788 931,00 | 35,28 | 27 833 485,68 |
| HOME DEPOT INC COM | 551 730,00 | 23,11 | 12 750 480,30 |
| INTEL CORP COM | 1 788 270,00 | 13,80 | 24 678 126,00 |
| INTERNATIONAL BUSINESS MACHS COM | 436 103,00 | 81,60 | 35 586 004,80 |
| JP MORGAN CHASE & CO COM | 1 183 708,00 | 31,66 | 37 476 195,28 |
| JOHNSON & JOHNSON COM | 895 048,00 | 58,58 | 52 431 911,84 |
| KRAFT FOODS INC CL A | 489 429,00 | 27,21 | 13 317 363,09 |
| MCDONALDS CORP COM | 364 829,00 | 58,75 | 21 433 703,75 |
| MEDTRONIC INC COM | 365 495,00 | 30,52 | 11 154 907,40 |
| MERCK & CO INC COM | 685 305,00 | 26,72 | 18 311 349,60 |
| MICROSOFT CORP COM | 2 514 192,00 | 20,22 | 50 836 962,24 |
| OCCIDENTAL PETE CORP DEL COM | 272 044,00 | 54,14 | 14 728 462,16 |
| ORACLE CORP COM | 1 268 184,00 | 16,09 | 20 405 080,56 |
| PEPSICO INC COM | 498 404,00 | 56,70 | 28 259 506,80 |
| PFIZER INC COM | 2 161 406,00 | 16,43 | 35 511 900,58 |
| PHILIP MORRIS INTL COM STK NPV 'WI' | 666 155,00 | 42,16 | 28 085 094,80 |
| PROCTER & GAMBLE CO COM | 964 990,00 | 64,35 | 62 097 106,50 |
| QUALCOMM INC COM | 529 554,00 | 33,57 | 17 777 127,78 |
| SCHLUMBERGER COM USD0.01 | 383 978,00 | 50,74 | 19 483 043,72 |
| 3M CO COM | 218 052,00 | 66,93 | 14 594 220,36 |
| TIME WARNER INC COM | 545 974,00 | 9,05 | 4 941 064,70 |

24

CONFIDENTIAL TREATMENT REQUESTED

| | | | |
|---|---|---|---|
| US BANCORP DEL COM NEW | 560 704,00 | 26,98 | 15 127 793,92 |
| UNITED PARCEL SERVICE INC CL B | 311 502,00 | 57,60 | 17 942 515,20 |
| UNITED TECHNOLOGIES CORP COM | 311 502,00 | 48,53 | 15 117 192,06 |
| VERIZON COMMUNICATIONS COM | 905 223,00 | 32,65 | 29 555 530,95 |
| WAL MART STORES INC COM | 716 455,00 | 55,88 | 40 035 505,40 |
| WELLS FARGO & CO NEW COM | 1 062 437,00 | 28,89 | 30 693 804,93 |
| WYETH | 9 324,00 | 36,01 | 335 757,24 |

**Total BMIS portion:** **1,323,852,143.93**

It is appropriate to add the following account assets to this list (value date November 30, 2008):

USD                    3,557,869.13
EUR                    12,628,121.27

Thus, the total value of Luxalpha's assets on November 30, 2008 amounted to USD 1,343,481,823.

### b) The importance of the custodian's role:

The Law of 2002 and the amended Law of March 30, 1988 (hereinafter "the Law of 1988") that was in effect before it, and Directive no. 85/611/EEC took care to require that OPCVMs entrust the care of their assets to a custodian, clearly with the goal of protecting OPCVMs' assets.

The role of custodian is crucial for a SICAV, as its accreditation depends on its custodian's accreditation.[19]

Even a financial institution is not automatically authorized to perform the role of custodian for a Luxembourg OPC. Its selection by the OPC must be approved in advance by the CSSF.

When the CSSF is asked for this type of approval, it examines the integrity and professional experience of the custodian's directors. It also asks the custodian to prove "*that it has the necessary infrastructure, meaning sufficient human and technical capabilities to perform all of the tasks related to its role.*" The custodian must prove that its staffing level is sufficient in terms of number and experience and that its computer systems are adequate and appropriate.

"*When an OPC is accredited, the custodian's capabilities are also accredited for the same sector by the CSSF. An OPC's accreditation is subject to the CSSF's approval of its choice of custodian. This accreditation differs from the accreditation of a financial institution as such. This may seem odd insofar as the general accreditation theoretically covers all banking professions. In reality,*

---

[19]        Claude Kremer & Isabelle Lebbe "*Organismes de placement collectif et véhicules d'investissement apparentés en droit luxembourgeois*" [Collective investment undertakings and related investment vehicles in Luxembourg law], Larcier, 2nd edition 2007, no. 807, pg. 38

CONFIDENTIAL TREATMENT REQUESTED                                                        UBSL 000793

*the role of OPC custodian is so specialized that it requires implementation of an infrastructure and the submission of specific professional and financial guarantees."[20]*

Thus, the custodian is an essential player in the operations of a Luxembourg SICAV.

The selection of a custodian is of the utmost importance, as the security of the SICAV's assets and thus that of the shareholders' investments depend on it.

### c) Luxalpha's custodian, UBS SA, and its sub-custodian, BMIS:

In order to comply with legal requirements, Luxaplpha [sic] signed an initial custody agreement with UBS SA on February 5, 2004, entitled "Custodian Agreement" (Exhibit 26) and later, on September 22, 2006, a second agreement entitled "Custodian Bank and Paying Agency Agreement" (Exhibit 12).

It was on the basis of the first of these two agreements, which was submitted to the CSSF in draft form along with the accreditation application of January 22, 2004, that the CSSF accredited Luxalpha.

Thus, UBS SA performed the role of CSSF-accredited custodian from Luxalpha's formation until its entry into court-ordered liquidation.

The trustees observed that UBS SA signed a sub-custodian agreement with the United States-law corporation Bernard L. Madoff Investment Securities (BMIS) on February 5, 2004, called the "Sub-Custodian Agreement" (Exhibit 5). Subsequent to the signing of this agreement, nearly all of Luxalpha's assets were entrusted by UBS SA to BMIS. This remained true until BMIS was placed into liquidation via an American legal ruling on December 12, 2008. No CSSF accreditation was ever requested or obtained for this sub-custodian.

### 1.2 Custodian's obligations:

A Luxembourg SICAV's asset custodian's obligations are above all the classic obligations of any custodian, meaning the obligation to hold and return the assets received into custody. These obligations will be discussed in §1.2.1 hereinafter.

A SICAV's asset custodian has a certain number of additional obligations that an ordinary custodian does not have. These responsibilities will be discussed in §1.2.2 hereinafter.

### 1.2.1 The obligation to hold and return:

In this Subsection, we will first analyze the applicable contractual provisions (Subsection 1.2.1.1), then the legal nature and scope of the hold and return obligations (Subsection 1.2.1.2), the case of the BMIS sub-custodian agreement as concerns the custodian's obligations (Subsection 1.2.1.3) and finally UBS SA's failure to fulfill its obligations (Subsection 1.2.1.4).

1.2.1.1 The applicable contractual and legal provisions:

This Subsection will first study UBS SA's obligations by virtue of the successive agreements that it signed with Luxalpha (subsection a) and then the provisions of the Luxembourg Civil Code (subsection b)), the provisions of the Laws of 1998 and 2002 (subsection c)) and those of the Law of August 1, 2001 (subsection d)):

[stamp:] 2 euros

---

[20]    Claude Kremer & Isabelle Lebbe, op. cit. Nos. 807 and 808, pg. 385–386

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000794

### a) The contractual provisions:

Luxalpha signed two successive agreements with UBS SA, the "Custodian Agreement" of February 5, 2004 and the "Custodian Bank and Paying Agency Agreement" of September 22, 2006.

### (i) The custody agreement of February 5, 2004:

- This agreement, called the "Custodian Agreement" (Exhibit 26) specifies in its article IV par. 3 ("submission to law," pg. 5 of the agreement) that it is to be subject to Luxembourg law.

- The preamble to the agreement states that Luxalpha has named UBS SA as the custodian responsible for holding all of its financial instruments, its liquid assets and its other authorized assets and that the custodian agrees to act in this capacity in compliance with the contractual provisions.[21]

- Points 1 and 2 of article III ("Holding of the Fund's assets," pg. 2) specifically state the following:
"*All securities, cash and other authorised assets of the Fund held by or to the order of the Custodian, shall be kept by the Custodian in one or several separated account(s) under its custody, subject to the provisions of this Agreement.*
*The Custodian may under its responsibility entrust the Assets or any part of them to* **third parties, i.e. Agents of the Custodian or of an agent, including, but without limitation, banks, central securities depositories and clearing systems such as Euroclear and Clearstream (hereinafter called the "Agents"). The Assets shall be held to the order of the Custodian who shall continue to be responsible to the Fund for the supervision of the Assets so entrusted to third parties.**"

- Article III subsection 3 of the agreement ("Responsibility of the Custodian" – pg. 4) states as follows:

"*Responsibility of the Custodian*

*The Custodian shall execute its duties pursuant to the present Agreement with professional care and shall be liable to the Fund and to its shareholders for any loss suffered by them as a result of wrongful failure to perform its obligations or its wrongful improper performance thereof.*
*The Custodian shall, however, not bear any liability in cases of force majeure.*
**The Custodian's liability shall not be affected by the fact that it has entrusted all or some of the Assets to a third party or third parties.**[22]
*In carrying out its role as Custodian, the Custodian shall act solely in the interest of the shareholders.*"

- Article III subsection 2 paragraph 11 (pg. 3) specifies that the custodian will assume its roles, obligations and responsibilities in accordance with the provisions of the Law of 2002 and that it will execute its obligations according to article 36 of that law.

---

[21]    "(*B) The Fund has appointed the Bank as custodian to be responsible for the safekeeping of all its securities, cash and other authorised assets;*
*(C) The Custodian is ready and willing to act as custodian as aforesaid subject to and in accordance with the provisions hereinafter set forth*";
[22]    Text of provision corresponds to that of article 34 (2) of the Law of 2002 which will be discussed in subsection c) below

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000795

<u>(ii) The custody agreement of June 22, 2006, effective on August 1, 2006:</u>

- The "Custodian Agreement" of February 5, 2004 was replaced on September 22, 2006 by a new agreement which was meant to become effective on August 1, 2006 and was signed by the same parties. (Exhibit 12 "Custodian Bank and Paying Agency Agreement")

- This agreement does not exclude application of Luxembourg law, and more specifically the provisions of the Civil Code.

Article 12 of the agreement of September 22, 2006 ("Applicable law and litigation" pg. 6) expressly specifies its subjection to Luxembourg law, and subsection B of the preamble states that UBS SA will act as custodian in accordance with the provisions of the Law of 2002 and with the associated provisions. "*The Bank is ready and willing to act in such capacities subject to and in accordance with the provisions of the Luxembourg Law of December 20, 2002 relating to undertakings for collective investment (the "Law") and all relating regulations as amended from time to time, the provisions of the Fund's Articles of Incorporation (the "Articles of Incorporation") and the provisions of the present agreement (the "Agreement")."*

- The custodian's option to assign a portion of the custody is specified in article 1.1 (page 2) of the agreement, which states that: (The Bank shall) "*Receive and hold in deposit, either in its own safe deposit **or at other banks, duly authorised financial Institutions or clearing houses, such as Clearstream and Euroclear (together referred to hereinafter as "Correspondents"),** all cash amounts, securities and other assets belonging to the Fund, whether such assets are in bearer or in registered form, in the Bank's or in a nominee's or in any other person's name as required in other countries for securities acquired there."*

- Article 4 of the agreement ("Liability" – pg. 4) states as follows:

"*a) The general rules relating to the Bank's liability toward the Fund's shareholders are essentially described by articles 17 to 21 of the Law,*" (it is appropriate to note that the references are incorrect and that the correct reference would be "articles 34 to 38") "*as well as by all relating regulatory provisions.*[23]
*b) The Bank has, in the performance of its duties, a general obligation of prudence and shall keep the Fund's assets with due diligence ("*en bon père de famille*"). The Bank is liable towards the shareholders for any damage sustained by them as a result of the non-performance or the faulty performance of the Bank's duties hereunder.
c) The Bank shall not be liable for damages due to acts of God.*"[24]

<u>b) The provisions of the Civil Code:</u>

- Under Luxembourg law, the custody agreement is governed by the provisions of articles 1915 and thereafter of the Civil Code.

- It is defined in article 1915 as follows: "*In general, custody is an act by which one receives something from another and is responsible for holding it and fully returning it.*"

Standard or voluntary custody is an *intuitu personae* contract whether on an unpaid or paid basis, by which

[stamp:] 2 euros

---

[23]

[24]    Note that even if the contract does not expressly stipulate as such, article 34 (2) of the Law of 2002 states that "the custodian's liability is not affected by the fact that it entrusts all or part of the assets of which it has custody to a third party."

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000796

an entity, the custodian, receives (this is an actual contract) personal or real property that the depositor entrusts to it, and accepts the responsibility of holding it and fully returning it.[25]

Thus, the Civil Code places <u>two primary obligations</u> upon the custodian:

- The custodian must first **hold** the item that has been entrusted to it for custody and must treat it with the same care as it would its own property. This constitutes the "hold" obligation.

- It must then and above all **return** this item.

- Article 1927 indicates that as concerns custody of the held item, the custodian must exercise the same care as it would with items that belong to it.

- Article 1928 specifies that the provision of article 1927 must be applied more rigorously if the custodian volunteered to receive the deposit or if it required payment for keeping custody of the deposit.[26]

In this case, it is difficult for UBS SA to argue that it volunteered to receive the deposit, especially because it was generously compensated. Between February 4, 2004 and the date upon which Luxalpha was placed into liquidation, it earned 38,474,471.26 in commissions ("custody fees" and "management fees" and "performance fees").

- Article 1930 specifies that the custodian does not have the right to use the item in custody without the custodian's [sic] express or presumed permission. It is true that for fungible deposits of sums of money, the custodian may use the deposited cash; this has led legal doctrine and legal case precedent to state that it is difficult to determine the difference between this and a loan agreement, although such a transaction does not truly constitute custody. However, this opinion remains highly contested at least insofar as the depositor's motivation is to ensure the security of its deposit and not to earn interest. Such was the case in this situation, both from the de facto point of view and from the point of view of the legal obligation to entrust "custody" of a SICAV's assets to an accredited custodian.

In this case, only a very small part of the assets in custody was in the form of cash, with the majority in the form of securities and other financial instruments in line with Luxalpha's investment policy. In addition, contracts between parties expressly exclude "use" of the securities by the custodian, as they specifically prohibit the custodian from voting in issuer meetings.[27]

<u>c. The Laws of 1988 and 2002:</u>

Neither the Law of 2002 nor the prior Law of March 30, 1988 derogate from the provisions of the Civil Code concerning custody, but the Law of 2002 expressly states, in article 35 (1) that "*the depositary must either have its registered office in Luxembourg or be established in Luxembourg if its registered office is in another Member State of the European Union.*"

---

[25]    Cf. *Vocabulaire juridique* [Legal vocabulary] 8th corrected edition, Gérard Cornu – Association Henri Capitant – published by Presses Universitaires de France

[26]    Thus, it has been ruled that in the event that the item in custody is stolen, a custodian that volunteered to receive the deposit cannot be exonerated from liability other than by proving that the theft constitutes a case of *force majeure* and that the theft was possible despite all due precautions having been taken. Lux November 11, 1960, Pasicrisie 18, 292.

[27]    Art. 1.4 of the agreement of August 1, 2006

29

CONFIDENTIAL TREATMENT REQUESTED                                                          UBSL 000797

Under the terms of article 35 (2), "*The depositary must be a credit institution within the meaning of the Law of April 5, 1993 concerning the financial sector, as amended*" and under the terms of article 35 (3), "*the directors of the depositary must be of sufficiently good repute and be sufficiently experienced, also in relation to the UCITS concerned. To that end, the identity of the directors and of every person succeeding them in office must be communicated forthwith to the CSSF.*"

Article 36 specifies that "*The depositary shall be liable in accordance with Luxembourg Law to the shareholders for any loss suffered by them as a result of its wrongful failure to perform its obligations or its wrongful improper performance thereof.*"

These provisions are thus identical to those in the agreements, except as concerns the beneficiaries of liability, to which the agreement of February 5, 2004 adds the SICAV ("The Fund").

> d) <u>The Law of August 1, 2001:</u>

The Law of August 1, 2001 (hereinafter "the Law of 2001") concerning the circulation of securities and other fungible instruments does not derogate from the obligations that subject the custodian to the provisions of the Civil Code.

Under the terms of its article 3, this law applies" ... *to securities and other financial instruments within the broadest possible sense which are deposited or held in an account with a depository and which are or are declared to be fungible, whether they be materialized or dematerialized, in bearer form, to the order of or in registered form, subject to Luxembourg law or a foreign law, and irrespective of the form in which they have been issued under their governing law.*"

Thus, this law indisputably applies to the deposit of securities and financial instruments entrusted into custody by Luxalpha to UBS SA by virtue of the agreements in question above.

The Law of 2001 applies the term "custodians" to, among others, financial institutions that are approved in Luxembourg and expressly states in its article 3 that "*Fungible securities and other financial instruments received on deposit or held in an account shall be booked to an account with the depository opened in the name of the depositor and may be transferred from one account to another with the same depository or with different depositories.*"

By virtue of article 4 of the Law of 2001, the custodian must also keep accounting records not only for these securities received into custody or held in accounts, but must also keep accounting records for them separately from its own assets and off the balance sheet.

Finally and most importantly, article 11 of this law specifies that "***The provisions of the Civil Code relating to the depositories shall apply***, *subject to the exceptions set out herein or resulting from the nature of the securities or other financial instruments held with the depository.*"

Article 12 specifies that "*The depository is entitled to sub-deposit with other depositories in Luxembourg or abroad, by book entry or otherwise, the securities and other financial instruments remitted or transferred to an account held with it. The depository must ensure that such securities and other financial instruments be held separate from its own securities or other financial instruments with such other depositories. Neither the applicability of the law <u>nor the location of the securities and other financial instruments, which shall be deemed to remain with the depository,</u> nor the validity and enforceability of the pledge created pursuant to this law, <u>shall be affected by such sub-deposit.</u>*" (Emphasis ours)

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED

UBSL 000798

From this text, it is apparent that even when they are entrusted to foreign sub-custodians, the "location" of the securities from a legal standpoint continues to be with the custodian, and Luxembourg law remains applicable. This is clearly true both for the Law of 2001 and for the provisions of the Civil Code to which it refers.

### 1.2.1.2 The legal nature of the scope of the hold and return obligations:

a) **The return obligation** specified in article 1915 of the Civil Code translates—as do the hold and return obligations in general—into a results-based obligation. This is upheld both by doctrine and by legal precedent.

b) As concerns **the hold obligation**, opinions vary. The provisions of the Civil Code, the specific contractual provisions and article 36 of the Law of 2002 make it possible to believe, due to the language contained within them, that this relates to a means-based obligation.

In light of the particular importance of the role played by a SICAV's custodian, and the wording of article 1928, UBS SA's hold obligation must at least be assessed with particular rigor.

### 1.2.1.3 The sub-custodian agreement's effect on the custodian's liability:

As indicated above, UBS SA signed a "Sub-Custodian Agreement" (Exhibit 5) with BMIS when it assumed its duties on February 5, 2004. By virtue of this agreement, UBS SA subdelegated custody of nearly all of Luxalpha's assets to BMIS.

UBS SA's keep and hold obligation is in no way affected by the fact that the custodian was able to delegate some or all of its role as custodian.

This is true both for the stipulations of the agreements between the parties (Subsection a) below) and for the provisions of the Civil Code and the other applicable legal texts (Subsections b) and c) below).

### a) The contractual provisions:

- Article III 3 of the aforementioned custody agreement of February 5, 2004 expressly specifies that the custodian's liability is not affected by the fact that it has entrusted all or some of the assets to one or more third parties. ("The Custodian's liability shall not be affected by the fact that it has entrusted all or some of the assets to a third party or third parties.")

- The custody agreement of September 22, 2006 does not expressly include the aforementioned provision. However, no contractual provision excludes the application of the provisions of the Civil Code related to custody, nor those of article 34 (2) of the Law of 2002 that will be discussed in Subsections b) and c) below.

However, the agreement of September 22, 2006 specifies, in contradiction to the case of the agreement of February 5, 2004, the option for the custodian to hold the assets itself or to entrust them into the custody of "correspondents."

It is useful to analyze this option, which is defined as follows in article B.1.1.1:

*"The Bank shall, save in case of explicit contrary instructions given by the Fund...receive and hold in deposit, either in its own safe deposit or **at other banks, duly authorised financial institutions or clearing houses, such as Clearstream and Euroclear** (together referred to hereinafter as "Correspondents"), all cash amounts, securities and other assets*

31

CONFIDENTIAL TREATMENT REQUESTED

UBSL 000799

*belonging to the Fund, whether such assets are in bearer or in registered form, in the Bank's or in a nominee's or in any other person's name as required in other countries for securities acquired there."*

Although, to the trustees' knowledge, the option to sub-delegate the custodianship has not been forbidden by "instructions to the contrary," BMIS does not meet the definition of the professionals to which custodianship may be delegated.

- All of Luxalpha's prospectuses with information for potential investors specify that Luxalpha's custodian was "UBS (Luxembourg) S.A., a fully fledged bank, founded on August 20, 1973 and has its registered office at (...). In addition to international banking, UBS (Luxembourg) S.A. is also active in private banking and offers a wide range of customer services, among them investment advisory and asset management services, time deposits as well as securities and foreign exchange. Since the July 1, 1998 its share capital amounts to CHF 150 Mio." (cf. Chapter 7 of the prospectuses, Exhibits 4a–4e).

It is important to recall, as was explained in subsection I above, that none of Luxalpha's series of prospectuses makes any allusion whatsoever to any future sub-custodianships or to any functions whatsoever being entrusted to BMIS.

b). The Civil Code:

- The Civil Code does not contain any provisions concerning the situation of a custodian entrusting a third party with the item that was entrusted to it by the depositor.

Sub-custodianship is therefore neither expressly permitted nor expressly prohibited.

- The provisions of article 1165, under the terms of which the agreements are effective only between the parties to the agreement and as long as they do not harm third parties in any way, thus must be applied. These provisions prohibit the sub-custodianship agreement from putting Luxalpha and its shareholders in a situation that is less favorable than the situation in which they would have been had UBS SA not signed the sub-custodianship agreement with BMIS.

The fact that BMIS embezzled the assets that UBS SA entrusted to it as a sub-custodian cannot be held against Luxalpha.

It is appropriate to state that BMIS is a third party with respect to the agreements of February 5, 2004 and September 22, 2006 signed between Luxalpha and UBS SA.

- The existence or potential misconduct of BMIS is therefore not likely to exonerate UBS SA from its liability for failing to hold and return the assets that had been entrusted to it in its capacity as custodian.

In effect, "*Other than in cases where it displays characteristics of force majeure, the existence of a third party is not, strictly speaking, cause to exonerate the debtor: the debtor cannot enforce this situation against the wronged creditor. The wronged creditor is entitled to obtain a ruling against the third party for redress of all of its damages. The solutions are identical to those for tort liability; let us briefly recall them. Concerning the victim—the creditor— the fact that the debtor's failure to perform involves the existence of a third party—a situation which must necessarily have led to liability in order to be taken into consideration—not only cannot harm it, but entirely to the contrary, benefits it. In effect, both players are jointly and severally held responsible*

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000800

*with respect to the victim, who can claim complete redress for its damages from one or the other of them at its discretion. In practice, from the more solvent of them."[28]*

Such is the case even if the agreement between parties implicitly or explicitly authorizes such a substitution. In the event that a sub-custodian does not perform its obligations, the primary custodian thus remains responsible with respect to the depositor, jointly and severally with the third party that it substituted for itself.

Legal precedent and legal doctrine are in agreement that in the event that a person or entity that a party to the agreement substituted for itself fails to perform its contractual obligations, the question of whether the party to the agreement would have been liable had it acted in the same manner must be raised.

According to Jacques Flour, Jean-Luc Aubert and Eric Savaux, any time that a debtor calls on other people or entities to perform its obligations, supposing that the contract implicitly or explicitly authorizes this and that we follow a line of intellectual reasoning that is familiar to jurists, we are led to make distinctions between third parties.

*"First, it is appropriate to eliminate third parties that, through unsolicited involvement, prevent performance of the commitments agreed to by a party to the contract...the question then applies only in terms of personal liability.*

*As for the problem of contractual liability due to other people or entities, the custodian must have voluntarily introduced a third party into the performance of its obligation, for example either by entrusting the performance of its obligation to an employee, agent or associate or by calling on an independent collaborator. This practice shows that this situation happens frequently. Despite the similarity between the first situation and the liability of a party to a contract due to the actions of an employee, the question is not answered in article 1384, par. 5 because this would violate the rule of non-cumulation of liability. In the face of this type of situation, one's first reaction might be to feel that because the active principle is that of personal liability, there can be no contractual liability due to the fault of another except in cases where the law so specifies. Outside of these situations, the debtor's liability is not engaged unless it agreed to personally perform the obligations or if it committed an error in selecting the executor. This restrictive analysis has been justly rejected. Based on a pre-eminent concept of personal liability that has been substantially beaten back in recent times, oddly enough it leads to better treatment for a debtor that entrusts others with the responsibility of performing its obligations than of a debtor that personally performs them...*

*If we attempt to specify the conditions under which the debtor's liability can be engaged in similar cases, it seems necessary to make distinctions based on the nature of the obligations agreed to. If it is a question of a results-based obligation, there is no need whatsoever to prove fault by the executor, it is sufficient that the promised result was not achieved. If it is a question of a means-based obligation, it is necessary to prove fault on the part of the executor.*

*Thus, we can appreciate all of the ambiguity in contractual liability due to the fault of others. This liability arises from the legal relationship between the creditor and the debtor; the debtor agreed to its obligations and did not fulfill them. But this liability was incurred subsequent to the involvement of a third party. In assessing the third party's behavior, we can determine if the debtor is liable or not. In effect, we must ask ourselves if it would have engaged its liability by acting in the same manner as its employee or replacement."[29]*

---

[28]      Jacques Flour, Jean-Luc Aubert, Eric Savaux,  *Droit civil, Les Obligations* (Civil Law of Obligations) 10th edition, *The obligation relationship* , 6th edition, SIREY University, pg. 187

[29]      François Terré, Philippe Simler, Yves Lequette, *Droit civil, Les Obligations* (Civil Law of Obligations) 10th edition, Précis Dalloz, pg. 590 and 501

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000801

UBS SA's liability is thus not diminished by the fact that it chose to place Luxalpha's assets into custody with BMIS.

### c) The Law of 2002, the Law of 2001 and Directive 85/611/EEC:

- Article 34 (2) of the Law of 2002 to which Luxalpha's investment prospectus explicitly refers, and article 7.2 of Directive 85/611/EEC state that "*A depositary's liability shall not be affected by the fact that it has entrusted to a third party all or some of the assets in its safe-keeping.*"

This provision fits perfectly with the logic of the "*intuitu personae*" nature of the custody agreement, as well as with the specific importance of the person or entity serving as custodian for a SICAV's assets and with the very strict legal provisions concerning this.

While the law and the directive do not prohibit delegation and they do not define the conditions that a sub-custodian must fulfill, due to the magnitude of an OPCVM custodian's role and the care with which both the directive and the Law of 2002 define the very strict conditions that the custodian must fulfill, this can only be explained by the fact that it entrusts all or part of the assets **which have been entrusted to it for custody** to a third party.

- The Law of 2001 does not derogate from the principle of the primary custodian's ongoing liability under Luxembourg law, as explained above.

On the contrary, and as explained in Subsection 1.2.1.1 b. above, article 12 states that "*The depository is entitled to sub-deposit with other depositories in Luxembourg or abroad, by book entry or otherwise, the securities and other financial instruments, remitted or transferred to an account held with it. The depository must ensure that such securities and other financial instruments be held separate from its own securities and other financial instruments with such other depositories. Neither the applicability of the law nor the location of the securities and other financial instruments, which shall be deemed to remain with the depository, nor the validity and enforceability of the pledge created pursuant to this law, shall be affected by such sub-deposit.*"

This text demonstrates that even when they are entrusted to foreign sub-custodians, the "location" of the entrusted assets—from the legal standpoint—remains with the custodian and that Luxembourg law remains applicable. Obviously, this is true both for the Law of 2001 and for the provisions of the Civil Code to which it refers. Concerning a SICAV's assets, this clearly applies as concerns the applicability of the Law of 2002.

Conclusion: From the preceding, it is clear that UBS SA is not discharged from compliance with its contractual obligations due to its delegation of custody to BMIS. On the contrary, it remains fully liable with respect to Luxalpha and its shareholders.

### 1.2.1.4 UBS SA's failure to fulfill its contractual and legal hold and return obligations:

(i) Principally:

According to the portfolio confirmed by BMIS on 11/30/2008 as detailed above, a value of US $1,343,481,823 (in securities and cash) should have been in custody when Luxalpha was placed into court-ordered liquidation via a ruling on April 2, 2009. Upon the trustees' express request to transfer all of Luxalpha's assets to them, UBS SA did not do so, other than the following amounts:

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000802

| | |
|---|---|
| USD | 737,850.00 |
| EUR | 38,862,810.13 |

On April 22, 2009, UBS SA transferred US $39,437,070.95.

Thus, UBS SA objectively failed to meet its fundamental obligation, that of returning the assets entrusted to it.

This simple fact is, in and of itself, sufficient to justify UBS SA's conviction, insofar as the return obligation translates into a results-based obligation.

 (ii) Secondarily:

UBS SA committed serious faults and/or negligence in performing its obligations:

-UBS SA entrusted nearly all of Luxalpha's assets to its own sub-custodian, BMIS.

-This action, which in and of itself is disputable due to the "*intuitu personae*" nature of the custody agreement, is all the more serious because BMIS was not an eligible sub-custodian under the terms of the agreement of February 5, 2004 and the terms of article B.1.1.1 of the agreement of September 22, 2006.

BMIS does not meet the definition of "other bank," "duly authorized financial institution" or "clearing house such as Euroclear or Clearstream."

It must be stated that BMIS does not meet the contractual definition of an eligible sub-custodian.

-The fact that nearly all of Luxalpha's assets were entrusted to BMIS also constitutes a violation of the spirit of the provisions of the Law of 2002 in the sense that an approved custodian's entrusting of nearly all of a SICAV's assets to a sub-custodian that does not even meet the "minimal" conditions listed in this law, namely those for a financial institution, strips all meaning from article 35 (2) of the Law of 2002.

In no case can this fact place UBS SA in a better position than if it had held the assets itself.

-The fact that Luxalpha's assets were placed into sub-custodianship with BMIS and that BMIS was declared to be in court-ordered liquidation does not, as stated in Subsection 2.1.3 above, remove UBS SA's obligation to return Luxalpha's assets, nor its obligation to respond to its failure to fulfill the hold and return obligations.

Even a delegation that was expressly permitted would not have discharged UBS SA from this obligation in the absence of an express contractual or legal provision.

More importantly, the fact that UBS SA entrusted the assets to BMIS is not, due to the legal and contractual provisions that expressly prohibit this action, sufficient to discharge UBS SA from its legal and contractual obligations to return the assets. The faults and negligence of the entity that UBS SA substituted for itself in the performance of its contractual hold obligations are its responsibility, just as if it had committed these faults and negligence itself.

CONFIDENTIAL TREATMENT REQUESTED                UBSL 000803

- The fault committed by BMIS in holding Luxalpha's assets is clear. Far from holding the assets with the care that one would expect from a paid custodian, or even simply with the care of a *bonus pater familias*, BMIS simply appropriated the assets in custody that had been entrusted to it.

It is difficult to imagine a worse violation of the hold obligation on the part of the custodian, as even the act of using the item in custody is prohibited by article 1930 of the Civil Code. As concerns securities, this prohibition applies even in cases of dematerialized securities being placed into custody. UBS SA would never have been allowed to permit the entity that it substituted for itself in the performance of its obligations to use the securities that were in custody, by virtue of the principle that no one can assign more rights than he has.

- UBS SA's hold obligation should be assessed with particular rigor, due to the fact that UBS SA's delegation of all of Luxalpha's assets to BMIS did not stop it from billing a total amount of US $10,539,560.33 in custodian compensation until the time that Luxalpha was placed into court-ordered liquidation.

- The fault of its "subcontractor," as proven by Madoff's confession and which has a clear causal link with the loss of the assets is therefore fully enforceable against UBS SA. It should be ordered to indemnify the plaintiffs for the losses incurred due to its own non-performance and for the faulty execution of its obligations by the entity that it substituted for itself.

- Conclusion: UBS SA's liability has already been established on the basis of its non-performance of its return obligation, and otherwise on the basis of its non-performance of its hold obligation.

Subsection 1.2.2 hereinbelow will examine to what extent it violated other contractual or legal obligations.

### 1.2.2 Additional obligations of a SICAV asset custodian:

As indicated above, UBS SA, in its capacity as the asset custodian for the coordinated SICAV known as Luxalpha, had associated contractual and legal obligations which exceed the traditional scope of the hold and return obligations that a simple custodian has.

This concerns an obligation to oversee the OPC's assets and to oversee the correctness of its operations. Doctrine universally agrees that this cannot be delegated and must, on the contrary, always be carried out by the custodian.[30]

### 1.2.2.1 Applicable contractual and legal provisions:

This Subsection will first examine UBS SA's obligations by virtue of the successive agreements that it signed with Luxalpha, respective to Luxalpha's prospectuses (subsection a) and by virtue of the provisions of the Law of 2002 and Directive 85/611/ECC (subsection b).

a) Contractual provisions:

In this Subsection, the provisions of the agreements of February 5, 2004 and August 1, 2006 will be referred to, as will the information provided to investors via Luxalpha's successive prospectuses.

[stamp:] 2 euros

---

[30]    CF. Claude Kremer and Isabelle Lebbe op. cit. no. 825

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000804

(i) The custody agreement of February 5, 2004:

According to the stipulations of the "Custodian Agreement" of February 5, 2004, (Exhibit 26), the custodian was required to comply with, among other things, the following obligations, in addition to the hold and return obligations:

"*Upon receipt of Proper Instructions (as defined in below) and insofar as monies are available, the Custodian shall insofar as the assets of the Fund allow it, execute the following transactions:*
*(i) to receive on behalf of the Fund the proceeds of the sales of the securities owned by the Fund;*
*(ii) to pay the counter value of the securities purchased, further to proper instructions of the Fund, by debiting the account of the Fund. The Bank shall, as far as possible and provided there are no proper instructions to the contrary, pay the securities and other assets purchased against delivery and deliver the securities and other assets sold against payment of their counter value;*

*(iv) to collect, pursuant to a permanent authorization from the Fund, the dividends, interest and other cash or stock dividends, resulting from the ownership of securities and other assets deposited in favor of the Fund with itself or with Agents, and to remit to the fund the above mentioned dividends, interest and other distributions of any nature upon receipt. The Bank shall transfer or arrange to transfer to the right body the securities and other assets for which reimbursement, redemption, exchange or other regularization or settlement is required, and will undertake all acts and measures necessary to cash all income and amounts due to the Fund.*" (article 2.4 – pg. 2)

"*ensure that in transactions involving the assets of the Fund, the consideration is remitted to the Custodian within the usual time limits*"; (article 2.11.b – pg. 4),

"*ensure that the income of the Fund is applied in accordance with the articles of incorporation*"; (art. 2.11 c – pg. 4)

Thus, UBS SA should have at least ensured that the purchases and sales, as well as the repurchase, conversion and cancellation of shares on behalf of Luxalpha occurred in accordance with the law and with the fund's Articles of Incorporation, and that for securities transactions related to the fund's assets, that the consideration was remitted to it within the usual time limits and that the fund's profits were applied in accordance with the law and with Luxalpha's Articles of Incorporation.

(ii) The custody agreement of September 22, 2006:

According to the stipulations of the "Custodian Bank and Paying Agency Agreement" of September 22, 2006 (Exhibit 12), UBS SA had the following obligations, in addition to other obligations including hold and return:

(the obligation to) "*perform, through the Fund's accounts, the settlement of securities transactions executed in accordance with the Fund's instructions;*
*The Bank shall, whenever possible and make sure to pay for securities and other assets purchased only against delivery and to deliver only such securities and assets against payment of the due amount. In any case, the Bank shall establish a reconciliation statement and take care of pending matters.*" (article 1.2 b., pg. 2).

"*The Bank furthermore performs all other duties as provided for by the Law. In particular, the Bank shall perform the following duties:*

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000805

*a) ensure that the sale, issue, redemption and cancellation of shares effected on behalf of the Fund or any sub-fund are carried out in accordance with Luxembourg Law and the Articles of Incorporation;*
*b) ensure that in transactions involving the Fund's assets, any consideration is remitted to it within the usual time limits; and*

    c)   *ensure that the income of the Fund is applied in accordance with the Articles of Incorporation."* (article 1.7 – pg. 3)

Thus, under this agreement UBS SA should not have ceded control of funds intended for the purchase of securities without obtaining delivery of those funds, and should not have ceded control of securities until payment was received. It should have at least ensured that the sale, repurchase, conversion and cancellation of shares on behalf of the fund occurred in accordance with the law and with the fund's articles of incorporation, and that for transactions involving the fund's assets, the consideration was remitted to it within the usual time limits and that the fund's income was applied in accordance with the law and with Luxalpha's articles of incorporation.

The two agreements are expressly subject to Luxembourg law in general and specifically to the Law of 2002.

<u>(iii) The successive prospectuses</u>

Luxalpha's successive prospectuses (Exhibits 4a–4e) also specify the custodian's additional obligations and make express reference to article 34 of the Law of 2002 which formalizes the fact that the custodian's liability is not affected by any delegation of custody to a third party.

In article 7, they indicate that: "*Furthermore, the custodian ensures that*
- *the sale, repurchase, conversion and cancellation of shares on behalf of the fund occurs in accordance with the law and with the fund's articles of incorporation,*
- *in transactions involving the fund's assets, the consideration is remitted to it within the usual time limits,*
- *the fund's income is applied in accordance with the law and with the Fund's articles of incorporation."*

<u>b) The Law of 2002 and Directive 85/611/EEC:</u>

- According to the express provisions of the Law of 2002, the custodian is required to oversee the OPC's transactions and notably must ensure that in transactions related to the OPC's assets, the consideration is remitted to it within the usual time limits (article 34b). It must also ensure that the SICAV's income is applied in accordance with its articles of incorporation (article 34c).

- Directive 85/611/EEC also requires, in its article 7.3, that the custodian ensures that in transactions related to the fund's assets, the consideration is remitted to it within the usual time limits (paragraph d) and that the fund's income is applied in accordance with the law or with the fund's regulations (paragraph e).

- The Law of 2002 and Directive 85/611/EEC both prohibit cumulation of the roles of custodian and manager.

<u>1.2.2.2 UBS SA's failure to fulfill its additional contractual and legal obligations:</u>

By sub-delegating the role and responsibility of custodian to BMIS in a manner that

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED

UBSL 000806

also did not allow it to assume its additional obligations in any way, UBS SA breached the law and the agreement between the parties:

- It clearly failed in its additional obligation that consisted of verifying that the transactions carried out by the manager did not lead to a violation of investment restrictions to which the SICAV is subject by virtue of the law of 2002 or of its management regulations, since it is clear that Luxalpha's assets were in fact never invested in any way.

- It did not implement any oversight measures in order to ensure that, concerning transactions related to Luxalpha's assets, the consideration was remitted to it within the usual time limits, or that the resulting income was applied in accordance with the law and with the Fund's articles of incorporation.

Entirely to the contrary, by entrusting custody to BMIS while BMIS was also the sub-manager, it removed any possibility of overseeing whether there had been any consideration for the transactions carried out by BMIS and whether the funds had been invested.

UBS SA cannot ignore this fact, since it, in its capacity as manager (which will be examined hereinafter), delegated management of nearly all of Luxalpha's assets to BMIS.

Even if the fact that it entrusted nearly all of the assets to BMIS in terms of both custody and management was not directly forbidden by law when the delegations occurred in February and March, 2004, because Luxalpha succeeded in obtaining its approval two days before the deadline to avoid immediate application of articles 27 and 85 (1) e) of the Law of 2002, it took a very great risk in doing so, and thus in depriving itself of any oversight of the assets.

In its capacity as a high-level specialist in fund management, it necessarily must have been aware of this risk due to its experience but also because the cumulation of the roles of custodian and manager had been prohibited since 1985 by Directive 85/611/EEC and since January 1, 2003 by the Law of 2002.

The risk was all the larger because the sub-custodian was not eligible as a custodian for the assets of a Luxembourg SICAV under the terms of article 34 of the Law of 1988 and article 35 of the Law of 2002, nor under the terms of the provisions of the agreement of September 22, 2006.

Given Luxalpha's voluntary submission to article 27 of the Law of 2002 and the entry into effect of the new custody agreement on August 1, 2006, the delegation of the role of custodian to BMIS was counter to article B.1.1.1 of the agreement and the cumulation of the roles of custodian and manager was strictly prohibited by article 85 (1) e) of the Law of 2002.

This did not stop UBS SA from continuing to have BMIS as the custodian of Luxalpha's assets, despite the fact that it was clearly aware that the delegation of management to BMIS—initiated by UBS SA—remained in effect, despite the termination of its own management agreement and the signing of a new management agreement between Luxalpha and UBSTPM.

Even if it was not aware of this fact in its capacity as sponsor, it clearly must have realized this, due to the mere fact that it did not receive any instructions whatsoever from UBSTPM related to the purchase or sale of securities during the entire duration of the management agreement.

CONFIDENTIAL TREATMENT REQUESTED
UBSL 000807

Concerning this, let us also recall that it contractually agreed to indemnify UBSTPM for the liability that it might incur due to a possible delegation of management. This would have been utterly meaningless if UBSTPM had been providing management.

In reality, UBS SA was not only fully aware of everything that was happening with Luxalpha, but everything that was happening with Luxalpha was necessarily desired by it.

In addition, by not complying with its additional obligations as stated above, UBS SA caused Luxalpha the damage that it incurred, which consists of the loss of nearly all of its assets.

The causal link between the facts and the damage is established because it is indisputable that if UBS SA had correctly fulfilled its additional obligations, BMIS could not, during a nearly six-year period, have embezzled the funds that UBS SA transferred to it on behalf of Luxalpha instead of investing them in accordance with the investment policy and with legal provisions.

### 1.2.2.3 Aggravating circumstance:

Not only did UBS SA know and tolerate that the cumulation of the roles of custodian and manager was occurring and continued after Luxalpha's voluntary submission to the Law of 2002, but it actively contributed to this ongoing situation, as was explained in item 1.3 above. It also did everything possible to construct a "facade" of compliance with the law.

Let us recall, as proof of UBS SA's knowledge of the fact that the designated manager (UBSTPM) was not going to manage the assets, the signature of the "Agreement of Understanding and Indemnification" of 9/22/2006 (Exhibit 13) for UBSTPM's benefit. By this document, UBS SA agreed to indemnify UBSTPM for the losses/liability that UBSTPM might directly or indirectly incur related to the management of the fund, because upon the sponsor's request, it would have delegated some of its functions to third parties. Even if the "Agreement of Understanding and Indemnification" does not mention any delegations of management functions either to BMIS or to any other third party, it specifies at length that it also covers potential liability due to non-compliance with investment policy or with investment restrictions and, in general, the designated manager's liability (article 5 of the "Agreement of Understanding and Indemnification").

In the absence of other management delegations, this provision can only be explained by UBS SA's knowledge of the ongoing delegation that it had signed in favor of BMIS and by its desire to see this delegation remain in place.

### 1.2.3 The petitioned judgment:

1. Principally:

a) (1) The petitioners, acting within the company's rights, intend to obtain a conviction against UBS SA on the basis of the agreements, and resulting in the return to them of the following securities and financial instruments, notwithstanding the name, quantities and/or value listed hereinafter:

[stamp:] 2 euros

40

CONFIDENTIAL TREATMENT REQUESTED                                UBSL 000808

| Stock name | BMIS Quantity | BMIS market price | Assessed value |
|---|---|---|---|
| AT&T INC COM | 1 872 746,00 | 28,56 | 53 485 625,76 |
| ABBOTT LABS COM | 498 404,00 | 52,39 | 26 111 385,56 |
| ALTRIA GROUP INC COM | 654 154,00 | 16,08 | 10 518 796,32 |
| AMGEN INC COM | 342 653,00 | 55,54 | 19 030 947,62 |
| APPLE INC | 280 352,00 | 92,67 | 25 980 219,84 |
| BANK OF AMERICA CORPORATION COM | 1 610 836,00 | 16,25 | 26 176 085,00 |
| BK OF NY MELLON CP COM STK USD0.01 | 365 495,00 | 30,21 | 11 041 603,95 |
| BAXTER INTL INC COM | 197 077,00 | 52,90 | 10 425 373,30 |
| BOEING CO COM | 243 874,00 | 42,63 | 10 396 348,62 |
| BRISTOL MYERS SQUIBB CO COM | 633 180,00 | 20,70 | 13 106 826,00 |
| CVS/CAREMARK CORP COM STK USD0.01 | 458 945,00 | 28,93 | 13 277 278,85 |
| CHEVRON CORP NEW COM | 664 330,00 | 79,01 | 52 488 713,30 |
| CISCO SYS INC COM | 1 882 880,00 | 16,54 | 31 142 835,20 |
| CITIGROUP INC COM | 1 739 302,00 | 8,29 | 14 418 813,58 |
| COCA COLA CO COM | 633 180,00 | 46,87 | 29 677 146,60 |
| COLGATE PALMOLIVE CO | 3 330,00 | 65,07 | 216 683,10 |
| COMCAST CORP NEW CL A | 925 532,00 | 17,34 | 16 048 724,88 |
| CONOCOPHILLIPS COM | 490 095,00 | 52,52 | 25 739 789,40 |
| WALT DISNEY CO. DISNEY COM USD0.01 | 603 855,00 | 22,52 | 13 598 814,60 |
| EXELON CORP | 4 662,00 | 56,21 | 262 051,02 |
| EXXON MOBIL CORP COM | 1 673 803,00 | 80,15 | 134 155 310,45 |
| FIDELITY HEREFORD STREET TRUST-SPARTAN US TREASURY MMKT | 37 019,00 | 1,00 | 37 019,00 |
| GENERAL ELECTRIC CO COM | 3 338 803,00 | 17,17 | 57 327 247,51 |
| GOLDMAN SACHS GROUP INC COM | 132 113,00 | 78,99 | 10 435 605,87 |
| GOOGLE INC CL A | 62 301,00 | 292,96 | 18 251 700,96 |
| HEWLETT PACKARD CO COM | 788 931,00 | 35,28 | 27 833 485,68 |
| HOME DEPOT INC COM | 551 730,00 | 23,11 | 12 750 480,30 |
| INTEL CORP COM | 1 738 270,00 | 13,80 | 24 678 126,00 |
| INTERNATIONAL BUSINESS MACHS COM | 436 103,00 | 81,60 | 35 586 004,80 |
| JP MORGAN CHASE & CO COM | 1 183 708,00 | 31,66 | 37 476 195,28 |
| JOHNSON & JOHNSON COM | 895 048,00 | 58,58 | 52 431 911,84 |
| KRAFT FOODS INC CL A | 489 429,00 | 27,21 | 13 317 363,09 |
| MCDONALDS CORP COM | 364 829,00 | 58,75 | 21 433 703,75 |
| MEDTRONIC INC COM | 365 495,00 | 30,52 | 11 154 907,40 |
| MERCK & CO INC COM | 685 305,00 | 26,72 | 18 311 349,60 |
| MICROSOFT CORP COM | 2 514 192,00 | 20,22 | 50 836 962,24 |
| OCCIDENTAL PETE CORP DEL COM | 272 044,00 | 54,14 | 14 728 462,16 |
| ORACLE CORP COM | 1 268 184,00 | 16,09 | 20 405 080,56 |

41

CONFIDENTIAL TREATMENT REQUESTED

UBSL 000809

| | | | |
|---|---|---|---|
| PEPSICO INC COM | 498 404,00 | 56,70 | 28 259 506,80 |
| PFIZER INC COM | 2 161 406,00 | 16,43 | 35 511 900,58 |
| PHILIP MORRIS INTL COM STK NPV 'WI' | 666 155,00 | 42,16 | 28 085 094,80 |
| PROCTER & GAMBLE CO COM | 964 990,00 | 64,35 | 62 097 106,50 |
| QUALCOMM INC COM | 529 554,00 | 33,57 | 17 777 127,78 |
| SCHLUMBERGER COM USD0.01 | 383 978,00 | 50,74 | 19 483 043,72 |
| 3M CO COM | 218 052,00 | 66,93 | 14 594 220,36 |
| TIME WARNER INC COM | 545 974,00 | 9,05 | 4 941 064,70 |
| US BANCORP DEL COM NEW | 560 704,00 | 26,98 | 15 127 793,92 |
| UNITED PARCEL SERVICE INC CL B | 311 502,00 | 57,60 | 17 942 515,20 |
| UNITED TECHNOLOGIES CORP COM | 311 502,00 | 48,53 | 15 117 192,06 |
| VERIZON COMMUNICATIONS COM | 905 223,00 | 32,65 | 29 555 530,95 |
| WAL MART STORES INC COM | 718 455,00 | 55,68 | 40 035 505,40 |
| WELLS FARGO & CO NEW COM | 1 062 437,00 | 28,89 | 30 693 804,93 |
| WYETH | 9 324,00 | 36,01 | 335 757,24 |

**Total BMIS portion:** **1,323,852,143.93**

for which the value in US dollars amounts to US $1,323,852,143.93. For purposes of record-keeping and jurisdiction, this is assessed at EUR 881,216,896.71.

(ii) Alternatively, and in the event that their authorization to act in this capacity might be contested, the plaintiffs are lodging this same petition for a conviction, in this instance on a tort or quasi-tort basis, based on articles 1382 and thereafter of the Civil Code, in their capacity as representatives of Luxalpha's creditors and shareholders.

In both cases, there is cause to order UBS SA to return to the plaintiffs the entirety of the securities and financial instruments listed in Subsection (i) above, or to return their cash value. This restitution/payment petition is increased by the income from a *bonus pater familias* management strategy carried out in accordance with the investment policy, from November 30, 2008 until the restitution or payment. Otherwise, the restitution/payment should be increased by the legal interest rate from November 30, 2008 until the payment date, or from the date of this petition for judgment until the payment date.

This judgment should be supported by an order to pay 10 million euros per day of lateness beginning on the notification date of the upcoming judgment.

b) Otherwise, alternatively, there is cause to order UBS SA to pay the plaintiffs the amount of US $1,323,852,143.93, which is assessed at EUR 881,216,896.71 for purposes of record-keeping and jurisdiction. Otherwise any greater amount to be determined by the court or by expert testimony, otherwise increased by the legal interest rate from November 30, 2008 until the payment date, or by any other potentially greater amount resulting from expert testimony or to be determined by the court and representing the cash consideration for the securities that should have been in Luxalpha's portfolio on the date in which it was placed into liquidation, and which the manager cannot reasonably claim could have (and should have) been acquired with the capital contributed by the shareholders and entrusted to it by Luxalpha. This petition is increased by the income from a *bonus pater familias* management strategy carried out in accordance with the investment policy, from November 30, 2008 until the restitution or payment. Otherwise and secondarily, the restitution/payment should be increased by the legal interest rate from November 30, 2008 until the payment date, or from the date of this petition for judgment until the payment date.

[stamp:] 2 euros

42

CONFIDENTIAL TREATMENT REQUESTED

c) Alternatively, there is cause, primarily based on the petition made by the plaintiffs representing Luxalpha's rights on a contractual basis, or based on the petition submitted by the plaintiffs in their capacity as representatives of Luxalpha's creditors and shareholders on a tortuous basis, to order UBS SA to pay the plaintiffs US $762,484,886, representing the cash consideration for the securities placed into accounts at UBS SA, forwarded by UBS SA to its sub-custodian and embezzled by BMIS and/or Bernard L. Madoff. This amount should be decreased by the amounts reclaimed from the sub-custodian and increased by the income from a *bonus pater familias* management strategy carried out in accordance with the investment policy, from February 5, 2004 until the restitution or payment. Otherwise and secondarily, the restitution/payment should be increased by the legal interest rate from November 17, 2008 until the payment date, or from the date of this judgment petition until the execution date.

d) Alternatively, there is cause to convict UBS SA based on the same primary and subsidiary issues and based on the same legal foundations invoked as the principal and alternative bases for non-compliance with its contractual obligations, specifically by entrusting BMIS, a company that did not meet the legal criteria or the criteria in article B.1.1.1 of the agreement of September 22, 2006, both for not complying with its other contractual obligations as discussed in Subsection 1.2.1.2 hereinabove by not ensuring that investment occurred, and that it occurred in compliance with the investment policy and legal restrictions on the amounts transferred to the sub-custodian and/or for not having ensured that the assets were held in custody in its own name or in the SICAV's name, nor that consideration for the securities transactions carried out on Luxalpha's behalf was remitted within the usual time limits.

e) Alternatively, in the event that it is decided that UBS SA is not liable, there would be cause to order UBS SA to return commissions in the amount of US $10,539,560.33, assessed at EUR 7,015,616.28 for record-keeping and jurisdiction purposes. Otherwise any greater amount to be determined by the court or by expert testimony, otherwise increased by the legal interest rate from November 30, 2008 until the payment date. The commissions in question were not subject to any consideration, based on UBS SA's contractual liability, or based on the absence of a subject/and or cause, as the plaintiffs are representing the company's rights, or alternatively based on tort and quasi-tort liability as specified in articles 1382 and thereafter of the Civil Code, as the plaintiffs are representing the creditors and shareholders' rights; this amount should be subject to the legal interest rate from the summons until the payment date.

2. In all cases, there is also cause to order UBS SA to pay 10 million euros or any greater amount to be determined by an accounting report plus the legal interest rate from the date of this petition until the payment date, for damages for expenses incurred, subscription taxes paid and other disbursements based on the same primary and secondary legal bases previously stated.

3. In all cases, UBS SA should be jointly and severally (or *in solidum*) ordered to uphold BMIS's restitution obligation, which was the subject of the debt security statement of February 27, 2009 that Luxalpha filed as a conservatory measure. Luxalpha was forced to do this in the face of its custodian's failure to act.

4. UBS SA's conviction must also be declared to be joint and several (or *in solidum*) with the convictions of the other summoned parties.

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000811

**2.1 The management of assets and the portfolio managers of UBS Luxembourg S.A., UBS Third Party Management S.A. and Access Management Luxembourg S.A.**

Given that the objective of a SICAV such as Luxalpha is to invest its shareholders' contributions in eligible securities and financial instruments according to the investment policy reflected in its articles of incorporation and described in its prospectus, and within the limit of legal and/or statutory investment restrictions, the management of its portfolio is, quite obviously, an essential function.

Pursuant to the Law of 1998, the management of a SICAV was the responsibility of the board of directors. In fact, the management was almost always entrusted to companies specialized in portfolio management. Under the Law of 1988, the CSSF already required that it be informed of the identity of the portfolio managers and admitted management delegations only to financial sector professionals showing proof of sufficient financial resources and subject to prudential supervision in their country of origin.

Since the Law of 2002 went into effect, and in view of the importance of management, collective investment vehicles must meet an entire series of new conditions in accordance with article 27, unless they delegate the management of their portfolio to a portfolio manager (or management company) authorized in accordance with Council Directive 85/611/EEC. The new conditions include, among others, a proper administrative and accounting organization. In this regard, article 27 (2) of the Law of 2002 says, in particular, that "*the CSSF, having regard also to the nature of the SICAV, shall require that the company has sound administrative and accounting procedures, control and safeguard arrangements for electronic data processing and adequate internal control mechanisms including, in particular, rules for personal transactions by its employees or for the holding or management of investments in financial instruments in order to invest its initial capital and ensuring, inter alia, that each transaction involving the company may be reconstructed according to its origin, the parties concerned, its nature, and the time when and the place at which it was effected and that the assets of the SICAV are invested according to the constitutional documents and the legal provisions in force.*"

Management companies are regulated by the Law of 2002, which also imposes strict conditions as to management delegations.

Between the date it was formed and its placement in court-ordered liquidation, Luxalpha entered into three successive agreements with three different portfolio managers, namely:

- the Portfolio Management Agreement of February 5, 2004 with UBS SA (Exhibit 27)
- the Management Company Services Agreement of September 22, 2006 with UBSTPM (Exhibit 10), and
- the Management Company Services Agreement of November 17, 2008 with Access Management Luxembourg SA ("AML") (Exhibit 14).

Section 2.1.1. to 2.1.3. below will examine the applicable contractual and legal obligations for each of these agreements (Subsections 2.1.1.1, 2.1.2.1. and 2.1.3.1.), the legal nature of these obligations (Subsections 2.1.1.2, 2.1.2.2. and 2.1.3.2.), the impact of the delegation to BMIS (Subsections 2.1.1.3, 2.1.2.3, and 2.1.3.3.), and the breaches by the successive portfolio managers of their obligations (Subsections 2.1.1.4, 2.1.2.4. and 2.1.3.4.). These sections will also point out the "aggravating circumstances" for each portfolio manager (Subsections 2.1.2.5, 2.1.2.5 [sic]. and 2.1.3.5.) and will specify the judgments sought against them (Subsections 2.1.1.6, 2.1.2.6. and 2.1.3.6.).

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000812

### 2.1.1. The portfolio management agreement with UBS SA:

As was said above, UBS SA was able to manage the assets of Luxalpha and simultaneously perform the functions of custodian and portfolio manager until Luxalpha's voluntary subjection to article 27 of the Act of 2002 that took place on August 1, 2006.

Although Luxalpha was formed more than two years after the Law of 2002 went into effect, we reiterate again that taking on these functions simultaneously was not formally prohibited. Luxalpha's registration on the list of UCITS was confirmed by the CSSF on March 8, 2004, effective February 11, 2004, or two days before the possibility expired for SICAVs to be exempt from the application of article 27 until February 2007, as provided in article 134 (4) of the Law of 2002.

Luxalpha was thus able to appoint UBS SA, which was not an authorized portfolio manager, as manager of its assets. It also avoided the prohibition from giving a mandate concerning the principal management function to the custodian, in other words, the prohibition from simultaneously handling the functions of custodian and portfolio manager provided in article 85 (1) e of the Law of 2002.

### 2.1.1.1. The applicable contractual and legal provisions:

This portion will examine the provisions of the agreement and the information in the prospectuses (Subsection a)) before dealing with the provisions of the Civil Code and special applicable laws (Subsection b)).

#### a) The contractual provisions and information in the prospectuses:

##### (i) The portfolio management agreement of February 5, 2004:

- The first agreement, in effect between February 5, 2004, or the date of Luxalpha's approval, and August 1, 2006, was the Portfolio Management Agreement of February 5, 2004, signed between Luxalpha and UBS SA (Exhibit 27).

- Article 2 of this agreement ("Applicable Provisions") stipulates that it is governed by the Law of 2002 and by CSSF Circular no. 91/75 of January 1, 1991.[31]

- Its article 3 sub-paragraph 7 provides a **formal prohibition for the portfolio manager to take custody of assets from the fund or to take possession of these assets.[32]**

- With regard to the material performance of the mandate given to the portfolio manager, article 3 subparagraphs 2 and 3 specify that the portfolio manager must **identify by name** the persons responsible for performing the mandate and that **only persons registered with Luxalpha** are authorized to handle transactions for it.[33]

---

[31] *"The Portfolio Manager manages the assets of the Fund in accordance with the following provisions and regulations:*
- *Luxembourg Law dated December 20, 2002 relating to undertakings for collective investment, the IML Circular 91/75 of 21st January, 1991 and all related regulations, as amended from time to time;*
- *Provisions of the Fund's Prospectus, as amended from time to time;*
- *Operational duties of the Portfolio Manager (Appendix II)*
- *Any additional written instructions from the Fund*
    *Appendices* [sic] *II has to be in accordance with the Fund's Prospectus."*

[32] *"Nothing herein shall authorize the Portfolio Manager to take custody or possession of, lend or pledge any of the assets of the Fund. Borrowing for investment purposes is prohibited."*

[33] *"2. The Portfolio Manager shall identify by name the person(s) responsible for carrying out this mandate and inform the Fund in writing of their name(s), functions and deputies. The Fund shall be notified in writing of any and all changes at an early stage but not later than two weeks before the person takes up the appointment and of any change in the person bearing the overall responsibility together with their curriculum vitae...*
    *3. Only persons registered with the Fund are authorised to handle transactions for the Fund."*

45

CONFIDENTIAL TREATMENT REQUESTED                                                    UBSL 000813

To the trustees' knowledge, no written information concerning execution of any involvement whatsoever of BMIS, Bernard Madoff or any other natural person or legal entity forming part of BMIS in managing the assets of Luxalpha was ever sent to Luxalpha. Consequently, neither BMIS nor Madoff or any other natural person or legal entity forming part of BMIS can be considered as having been authorized to handle transactions on behalf of Luxalpha.

- With regard to the contacts with whom the portfolio manager is authorized to handle transactions on behalf of Luxalpha, article 4 sub-paragraph 2 specifies that the portfolio manager has the right to conduct transactions **only with contacts appearing on the official UBS AG list or for whom there is written approval from UBS AG's specialized unit.** According to the trustees' information, BMIS did not appear on the official list and there was also no special written authorization, such that BMIS was not even eligible as a contact.

- The operational duties of the portfolio manager are defined in exhibit II of the agreement.

This exhibit, which clearly refers to normal portfolio management and is consistent with the official version of Luxalpha's structure, sets out in particular that the portfolio manager may **only sell securities *actually* available from the custodian**, that it shall be required to inform the custodian and the SICAV of any settlement problems that it might encounter in relation with the transactions conducted on behalf of the SICAV, be available for the SICAV and for the custodian to answer questions concerning the portfolio management, prepare portfolio manager's reports and inform the custodian and the SICAV of all transactions to be conducted.

- Article 12 sets out the portfolio manager's responsibility and specifies that the latter agrees to meet the obligations entrusted to it with care and to comply with legal and regulatory provisions as well as with the terms and conditions of the agreement.

Article 12 also specifies that the portfolio manager shall be responsible to Luxalpha for all losses, (...) damages (...) and costs the latter incurs caused by a breach of a stipulation of the agreement, unless it proves it is not at fault.[34]

The same article expressly stipulates without limitation with regard to proving absence of fault that the portfolio manager shall be liable for any damage caused by willful violation of the investment restrictions.

- Article 13 ("Involvement of Third Parties") specifies that the portfolio manager may call on

[stamp:] 2 euros

---

[34]     *"The Portfolio Manager undertakes to perform the duties that it has been assigned with due care and to observe the legal and regulatory provisions as well as contractual terms. The Portfolio Manager shall be liable to the Fund for any losses, liabilities, claims, actions, damages, expenses or demands caused by it through any breach of any of the provisions of this Agreement, unless it proves that it is not at fault. (…) Any damage caused by an infringement of these provisions by the Portfolio Manager shall be reimbursed by the Portfolio Manager to the Fund on account of the sub-fund(s) concerned upon receipt of the first request to do so."*

46
CONFIDENTIAL TREATMENT REQUESTED                              UBSL 000814

third parties to meet its obligations, **provided that it has obtained the prior written consent of Luxalpha and that it will be liable for their actions as if they were its own.** For delegations of decision-making powers on the investments, sub-paragraph 2 specifies furthermore that the written authorization shall be required to contain **the approval of the extent of the delegation and the division of duties between the portfolio manager and third parties**.[35]

To the trustees' knowledge, there is no authorization corresponding to this definition.

An annex IV determines the "investment rules with respect to the account open [sic] with Bernard L. Madoff Investment Securities LLC for Luxalpha SICAV American Selection," which conveys specific limitations concerning the type of financial instruments permitted for this account.

The trustees stated that the text of the "investment rules" set out in this annex IV is **identical** to that of the Trading Authorization Directive originating from Madoff as authorized agent, and exactly like the investment technique that Madoff was supposed to be using for the other accounts that he claimed to manage.

Consequently, UBS SA therefore clearly did not participate in its capacity of portfolio manager in defining the investment policy of the sole sub-fund of Luxalpha.

- The agreement of February 5, 2004 was approved by the board of directors by circular resolution dated the same day.

### (ii) The February 2004 and August 2004 prospectuses:

The Luxalpha prospectuses (Exhibits 4a and 4b, p. 15) dated February 2004 and August 2004 both state the following in chapter 9 (PORTFOLIO MANAGER/ADVISOR):

*"The Board of Directors of the Fund **shall be assisted** by UBS (Luxembourg) S.A. for the portfolio management.*
*The Portfolio Management comprises the active management of the Sub fund's assets and the ongoing monitoring and adjusting of investments. The mandate is executed under the supervision and the responsibility of the Fund's Board of Directors.*
*In the performance of its management duties, the Portfolio Manager shall be advised by Access International Advisors, LLC; the costs of such advice are borne by the Portfolio Manager."*

The prospectuses show that the board of directors was supposed to be "assisted" by UBS SA in managing Luxalpha's assets. In fact, it nevertheless delegated the management to UBS SA by the agreement of February 5, 2004. As soon as it took on its duties, UBS SA sub-delegated nearly all of the management to BMIS and did not assume the task mentioned in the prospectus and disclosed to the CSSF with the approval application. The actual management was therefore different from what was mentioned in the prospectuses.

---

[35]        "1. Provided the Portfolio Manager considers it beneficial, it may, given prior written approval from the Fund, enlist the help of specialists and advisers to fulfill its duties. The Portfolio Manager is liable for the actions of any representatives it appoints as if they were its own actions. Any remuneration of any third parties appointed occurs at the Portfolio Manager's own expense.

        2. The Portfolio Manager shall obtain from the Fund in writing the approval of any delegation of investment decision-making powers, their extent and the division of tasks between itself and any third party or parties."

CONFIDENTIAL TREATMENT REQUESTED                                        UBSL 000815

b) The provisions of the Civil Code:

The Civil Code does not contain any special provisions regarding the mandate given to a portfolio manager, such that the general rules of the mandate provided in articles 1984 and thereafter are applicable and, in particular, the following provisions:

- article 1989: *"The agent may do nothing other than what is conveyed in its mandate."*

- article 1991: *"The agent is required to carry out the mandate as long as it remains responsible for it and answers for the damages that could result from its nonperformance."*

- article 1992: *"The agent answers not only for fraud, but also for negligence in its management. Nevertheless, liability relating to negligence is applied less strictly to the agent whose mandate is unpaid than to the agent who receives a salary."*

- article 1994: *"The agent answers for anyone who it has substituted for it in the management: 1. when it has not received the authority to substitute itself with anyone;
2. when this authority has been granted to it without designating a person, and the person whom it has chosen was manifestly incapable or insolvent."*

As specified above, the substitution of BMIS in the duties of UBS SA was not authorized according to the contractual requirements provided, particularly in articles 3 and 13 of the agreement between the parties.

In addition, article 13 of the agreement contains an express exception to the provisions of article 1994 of the Civil Code in the sense that the portfolio manager remains liable for the actions of third parties "as if they were its own," even in the case of Luxalpha's written authorization for their involvement.

c) The Law of 1988, the Law of August 10, 1915:

As explained in the introduction in Subsection 2.1 above, Luxalpha was able to benefit from the option of setting aside the application of article 27 of the Law of 2002, which was possible even though the law in question had been in effect since January 1, 2003.

The management of its assets therefore remained governed by the Law of 1988.

Pursuant to this law, which did not contain any mandatory provisions regarding the designation of a portfolio manager, the board of directors of a SICAV was responsible for its management. Thus, the general provisions applicable to corporations were applicable to the management and to the management delegations:

Pursuant to article 53 of the Law of August 10, 1915 on commercial companies, the board of directors has the authority for all necessary or useful acts associated with accomplishing the corporate purpose.

The board of directors of any corporation may delegate the day-to-day management of the business to one or more administrators, directors, managers or other agents.

It has always been accepted that the board of directors of a SICAV may entrust limited powers as to the management of the company's portfolio to a portfolio manager.

Luxalpha's articles of incorporation do not convey any exclusion in this regard.

[stamp:] 2 euros

48

CONFIDENTIAL TREATMENT REQUESTED

Although a delegation was admissible, the Luxalpha prospectuses indicate only, as was noted in Subsection b) above, that the board of directors would be "assisted" by UBS SA for the management of the assets.

As specified above, even before the Law of 2002 went into effect, the CSSF required that, in the case of a management delegation of the assets of a Luxembourg SICAV, the designated portfolio manager have sufficient financial resources and that it be subject to prudential supervision. BMIS, which was neither authorized nor subject to prudential supervision as a portfolio manager, could not have been authorized or accepted by the CSSF.

- Article 86 (1) of the Law of 1988 requires **that the prospectus contain the necessary information so that investors may make an informed judgment on the investment that is recommended to them, in particular, the information provided in the diagram to be appended to the Law.** Appended diagram 1 provides that information on **advisory firms or external investment advisors** is mandatory insofar as the use of their services is called for in the agreement and compensated by paying out from the assets of the collective investment undertaking.
The following information is mandatory:

2.1    identity or corporate name of the firm or name of the advisor;
2.2    information from the agreement with the management company or the investment company likely to be of interest to the participants, except for its statements exclusive to compensation;
2.3    other significant activities.

- Conclusion: Even though a management delegation was admissible under the Law of 1998 and the Law of 1915, the board of directors could not, even under these laws, delegate the management to just anyone. Although the management delegation to UBS SA, a credit institution duly authorized in Luxembourg and supervised by the CSSF is in this regard above all criticism, the same is not true of a delegation to BMIS. BMIS, the purpose of which was not portfolio management and as such was not subject to the prudential supervision of the SEC in the United States, could not have been approved as an official portfolio manager of a Luxembourg SICAV by the CSSF.

At most, such a delegation could have been made by the official portfolio manager, and under its full and entire liability. There again, in this case, the contractual terms and conditions had to be met.

UBS SA, as a professional asset manager, could not be unaware of the fact that BMIS was not eligible for a management delegation and therefore could not claim any exemption whatsoever from its own liability due to the delegation that it had given to BMIS.

2.1.1.2 The legal nature of the portfolio manager's obligations:

The majority of authors are of the opinion that the agreement by which the board of directors entrusts the management of the portfolio to a portfolio manager qualifies as a service agreement.

The portfolio manager's liability depends on the content of the agreement. In general, it is a best-efforts obligation.

As a salaried agent, the liability for its acts must be assessed with particular scrutiny.

CONFIDENTIAL TREATMENT REQUESTED                                        UBSL 000817

The general principles of contractual liability are therefore applicable. Under contractual provisions, the liability of the portfolio manager is analyzed as an enhanced best-efforts obligation with regard to compliance with the contractual provisions, since article 12 of the agreement stipulates **that the portfolio manager is liable unless it proves that it is not at fault.**

**With regard to losses caused by a willful violation of the investment restrictions,** the exclusion of absence of fault does not apply, and the liability of the portfolio manager must therefore be analyzed, under article 12 as well, as an absolute obligation.

The obligation of UBS SA may be analyzed as a best-efforts obligation only for losses incurred as a result of a prudent choice of investments and their performance, given that, even in this regard, its liability would still be assessed as thoroughly as appropriate for a salaried agent.

### 2.1.1.3. The impact of the management delegation to BMIS:

- As noted above, with its signing of the Trading Authorization Limited to Purchases and Sales of Securities, UBS SA had in fact, as soon as it took on its duties on February 5, 2004, relinquished to BMIS all the decisions required in relation to the investments of Luxalpha, once the investment policy and the "investment rules" were set out.

- Furthermore, and as was just noted in Subsection 2.1.1.1 above, the text of the "investment rules" set out in exhibit IV of the agreement of February 5, 2004 is identical to the Trading Authorization Directive originating from Madoff, and exactly like the investment technique that Madoff was supposed to be using for the other accounts that he claimed to manage.

Consequently, UBS SA therefore clearly did not participate in its capacity of portfolio manager in defining the investment policy actually used by the sole sub-fund of Luxalpha.

- According to the delegation to BMIS, the only activity that remained with UBS SA was that of managing some liquid assets so that they could offset fluctuations in the exchange rate between the US dollar and the euro.

**-** The legal and contractual obligations of UBS SA were never affected by the fact that it had delegated—all or a portion of—its role to BMIS.

This is just as valid with regard to the general rules applicable in contractual matters as it is with regard to the contractual provisions.

We have said that the Law of 1998 did not contain any special provisions regarding such a delegation.

The general rules governing contracts are interpreted by legal scholarship and by prevailing case law in the sense that the introduction of a third party by one party to a contract, which was supposed to perform all or a portion of its contractual obligations, is not likely to release the party from its liability.

This fact, as well as the fact that the portfolio manager remains liable for the actions of such third parties as if it had carried them out itself, is expressly reaffirmed by article 13 of the

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000818

agreement ("…and that that it shall be liable for their actions as if they were its own…").

The same article specifies, by exception to article 1994 of the Civil Code, that such is the case even in the case of Luxalpha's agreement for its involvement.

- We also reiterate that BMIS was not eligible as a delegated third party pursuant to article 3 of the agreement, and that there was no written information from UBS SA with regard to the person of a delegated third party or details concerning its activities and the sharing of these activities with the delegated portfolio manager.

- Lastly, we reiterate that no mention of BMIS was made in the Luxalpha prospectuses, and that the delegation of BMIS had not received the approval of the CSSF.

2.1.1.4. UBS SA's nonperformance of its contractual and legal obligations:

- As specified above, UBS SA placed nearly all of the assets of Luxalpha in custody with BMIS.

As a result, the Trading Authorization limited to the Purchase and Sale of Securities and Options that it signed in favor of BMIS also applied to nearly all of the assets of Luxalpha.

Since "UBS SA – portfolio manager" could not have been unaware of what "UBS SA – custodian" was doing, "UBS SA – portfolio manager" therefore could not have been unaware of the extent of the delegation to BMIS.

It therefore would have had to inform Luxalpha with all the precision required by the agreement and in any case obtain its written approval for the delegation of decision-making power with respect to investments, both with regard to its extent and to the division between its own tasks and those of BMIS.

- In any case, the fact of delegating the management to an entity that was also sub-custodian constitutes a breach of UBS SA's contractual obligations, since simultaneously taking on these two functions was prohibited by article 3 sub-paragraph 7 of its agreement with Luxalpha[36] and since UBS SA could not exempt the person that it substituted for itself in its management from meeting its own contractual obligations.

The act of entrusting the function of sub-portfolio-manager to the same entity as that which was already in charge of custody of the assets would constitute fault even without a contractual prohibition, or at least serious carelessness on the part of UBS SA.

Under no circumstances can such a delegation be likely to release UBS SA from its obligations to Luxalpha or to its shareholders.

- The agreement between the parties gave UBS SA the essential obligation of managing the assets of Luxalpha. Now, during the entire term of the agreement, UBS SA gave **no** instructions to purchase or sell securities or financial instruments, managed nothing as defined in the agreement, and limited itself to serving as a front for BMIS, while the latter could not have received the approval of the CSSF, essential in order to act as the official delegate in the portfolio management.

By not handling the management of the assets, UBS SA definitively deprived itself of

---

[36]        Article 3.7. *"Nothing herein shall authorize the Portfolio Manager to take custody or possession of, lend or pledge any of the assets of the Fund."*

CONFIDENTIAL TREATMENT REQUESTED                                                UBSL 000819

any possibility of discovering that BMIS, instead of managing and keeping the assets of Luxalpha in sub-custody, was misappropriating them as soon as they were delivered to it.

By refraining from any involvement in the management, UBS SA voided the agreement of February 5, 2004 of all its content and all its intent. Furthermore, it turns out that it did not perform the specific management set out in exhibit IV for the account opened with BMIS and that it did not ensure that BMIS, namely the person for whom it substituted itself in this management, was doing it.

In fact, the management had simply been relinquished to BMIS by the Trading Authorization Directive (Exhibit 7).

It is now well attested that this management delegate was also not managing Luxalpha's assets and that nothing was ever invested in accordance with the agreement, in accordance with the investment policy of the sub-fund, or with the legal restrictions or even with the specific investment rules in annex 4 of the agreement of February 5, 2004.

BMIS simply took possession of Luxalpha's assets, the management of which had been delegated to it, and used them as if they belonged to BMIS. The result is that practically all the assets were lost.

UBS SA nevertheless had an absolute obligation to comply with the legal investment restrictions that excluded delivering the funds of a SICAV to a third party for its personal use. UBS SA is therefore fully liable for failing to comply with the restrictions.

UBS SA is also liable for its inaction in relation to the mandate that it had been given, since it at no time managed the assets of Luxalpha. The simple proof of its inaction is enough in this regard to incur its liability and it is liable for the inaction of its delegate as its own.

2.1.1.5 Aggravating circumstances:

The fact that it did not manage anything did not prevent UBS SA from being paid, between February 2004 and its replacement by UBSTPM, the total amount of USD 14,464,522.57 as fees for its management ("management fee"). It also was paid, by reason of its "excellent performance" as manager, a success fee ("Performance Fee") in the amount of USD 13,470,388.36.

The fact that it did not manage anything at all also did not prevent it from hiring an advisor, as of February 5, 2004, Access International Advisors (Luxembourg) SA, and subsequently, as of August 11, 2004, Access International Advisors LLC, a company organized under U.S. law with domicile in New York.

One should definitely wonder about the usefulness of any such advisor for a manager that does not manage anything at all, and everything leads to the belief that the sole purpose of the "mission" assigned to the ACCESS entities was to make it possible to pay the latter fees that in reality were nothing other than the premium to be paid for having access to the services of Madoff and/or BMIS.

It should be noted that the fact that the management of Luxalpha assets was completely delegated to BMIS did not prevent Attorney Pierre Delandmeter, Luxalpha's legal counsel, in a notification letter to the Financial Sector Supervisory Committee dated July 29, 2004, from justifying the appointment of an investment advisor by the fact that "*UBS (Luxembourg) S.A., pursuant to the policy of the subfund, which invests in US SP 100 stocks according to strategies which combine the criteria of counterparty liquidity, rapidity of execution, and risk hedging, employs the*

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED
UBSL 000820

*advice of Access International Advisors LLC for purposes of implementation of these strategy criteria in American markets."*

It was the delegation of management of almost all of the assets to BMIS, the absence of any UBS SA participation in management, and the total absence of any supervision, control, and monitoring by the entity that had replaced it in its role as manager, that enabled BMIS to misappropriate Luxalpha funds instead of investing them

UBS SA's nonperformance of contractual and legal obligations therefore had a direct and evident causal relationship with the loss of almost all of Luxalpha's assets.

2.1.1.6.      The petitioned judgment

1.      Principally

a) (i) The plaintiffs, exercising the company's rights, seek to obtain a judgment on a contractual basis against UBS SA ordering it to pay full indemnification of the damages suffered by Luxalpha due to the loss of all of its assets, the total value of which in USD is USD 1,323,852,143.93, which amount was estimated for court and recording requirements at EUR 881,216,896.71, if not any other higher amount to be decided by the court or by expert opinion,

(ii) As a subsidiary petition, and in the event that their legal standing to act in the aforementioned capacity is contested, the plaintiffs present the same judgment petition, on this occasion based upon tort liability, on the grounds of articles 1382 ff. of the Civil Code, in their capacity as representatives of Luxalpha creditors and shareholders.

In both instances, it is therefore lawful and necessary to render a judgment against UBS SA to pay the plaintiffs the amount of USD 1,323,852,143.93, estimated, reserving all rights, at EUR 881,216,896.71, which represents the cash equivalent of the shares and securities deemed to be in the Luxalpha portfolio as of the date it was placed in liquidation, in regard to which the manager could not reasonably contest that they could have (and should have) been acquired with the capital provided by the shareholders and entrusted to it by Luxalpha, increased by the result of prudent management in compliance with the investment policy, from November 30, 2008 until execution, if not any other higher amount to be decided by the court or by expert opinion, if not, as a more subsidiary petition, increased by interest at the legal rate from November 30, 2008 until payment in full, if not, as an even more subsidiary petition, from the date of the filing of this claim with the court until payment in full.

b) If not, as a subsidiary petition, and on the following principal and subsidiary bases, based upon the same legal standings and legal grounds cited principally and subsidiarily, a judgment against UBS SA to pay the plaintiffs the amount of USD 1,136,780,477, which represents the cash equivalent of the shares and securities deemed to be in the Luxalpha portfolio as of August 1, 2006, the date of UBS SA's replacement by UBSTPM, in regard to which the manager could not reasonably contest that they could have (and should have) been acquired with the capital provided by the shareholders and entrusted to it by Luxalpha, which amount was estimated for court and recording requirements at EUR 756,693,388.14, if not any other higher amount to be decided by the court or by expert opinion, increased by the result of prudent management in compliance with the investment policy, from November 30, 2008 until execution, if not, as a more subsidiary petition, increased by interest at the legal rate from November 30, 2008 until payment in full, if not, as an even more subsidiary petition, from the date of the filing of this claim with the court until payment in full.

c) If not, as a more subsidiary petition, the amount of USD 762,484,886, which amount was estimated for court and recording requirements at EUR 507,545,021.63, if not any other higher amount to be decided by the court or by

53

expert opinion, which represents the capital entrusted to it and transferred to BMIS, minus the amounts repatriated by BMIS, and increased by the result of prudent management in compliance with the investment policy, from the date of remittance of the funds until execution,

d) If not, as an even more subsidiary petition, the amount of USD 762,484,886, estimated for court and recording requirements at EUR 507,545,021.63, if not any other higher amount to be decided by the court or by expert opinion, representing the capital entrusted to it and transferred to BMIS, minus the amounts repatriated by BMIS, and increased by the result of prudent management in compliance with the investment policy from the date of remittance of the funds until August 1, 2006,

e) If not, on a more subsidiary petition, the amount of USD 762,484,886, estimated for court and recording requirements at EUR 507,545,021.63, if not any other higher amount to be decided by the court or by expert opinion, which represents the capital entrusted to it and transferred to BMIS, minus the amounts repatriated by BMIS, and increased by interest at the legal rate from the date of the remittance of the funds until execution,

2. On a more subsidiary petition, in the event that it should be decided that UBS Luxembourg S.A. is not liable for the loss of Luxalpha's assets, it would be lawful and necessary to render a judgment ordering it to refund the fees in a total amount of USD 14,464,522.57 (management fees) + USD 13,470,388.36 (performance fees), which is to say, USD 27,934,910.93, estimated for court and recording requirements at EUR 18,594,761.98, if not any other higher amount to be decided by the court or expert opinion, given that there was no consideration provided for the fees in question, and the foregoing is mainly on the basis of UBS SA's contractual liability, if not, on the basis of the absence or a purpose and/or a reason, with the plaintiffs exercising the rights of Luxalpha, if not, on a subsidiary basis, on the grounds of tort liability as provided by articles 1382 ff of the Civil Code, with the plaintiffs exercising the rights of the creditors and shareholders, and the latter with interest at the legal rate from [the date of the filing] of this claim with the court until payment in full.

3. In all instances, it is also lawful and necessary to render a judgment against the party UBS SA for damages for costs and expenses incurred, subscription tax paid, and other expenditures on the grounds of the same principal and subsidiary legal bases cited hereinabove, in the amount of 10 million Euros, or any other higher amount to be determined by an accounting expert opinion, with interest at the legal rate from [the date of] this claim until payment in full.

4. Also in all instances, the judgment should be rendered against UBS SA jointly and severally, if not, in solidum with BMIS's indemnification obligation which was the subject of the credit declaration that Luxalpha filed on February 27, 2009 to protect its interests [as a creditor].

5. The judgment against UBS SA should also be ruled to be joint and several if not in solidum with the other managers that participated in Luxalpha, as well as the other parties served summonses as defendants in this action.


### 2.1.2. The agreement with UBSTPM


As was amply explained hereinabove, Luxalpha's voluntary subjection to the applicability of article 27 of the Law of 2002, on August 1, 2006, required it to assign management of its assets to an authorized manager.

Furthermore, the designation of the same single entity as custodian and manager was thenceforth prohibited.

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000822

On September 22, 2006, Luxalpha therefore entered into a new management agreement with UBS Third Party Management Company SA (UBSTPM) (Exhibit 10).

Even though it is difficult to see how the management of Luxalpha assets could have been organized between the two dates, this agreement entitled "Management Company Services Agreement" entered into effect retroactively as of August 1, 2006.

### 2.1.2.1. The applicable contractual and legal provisions:

These provisions are indicated in the September 22, 2006 agreement and the prospectuses issued during the period in which the contractual provisions were in effect (Subsection a). The provisions of law are from the Civil Code (Subsection b) and the Law of 2002 (Subsection c).

### a) The contractual provisions:

The contractual provisions are indicated in the September 22, 2006 management agreement and in the Luxalpha prospectuses dated August 2006 and March 2007.

### (i) The September 22, 2006 agreement:

- Article 2 (p. 3) of the September 22, 2006 agreement (Exhibit 10) specifies that UBSTPM's functions as manager shall be performed in accordance with the contractual provisions and in compliance with applicable laws, the bylaws, as well as the investment policy and objectives.[37]

- This agreement was subject to Luxembourg law, like the agreement previously signed with UBS SA.

- According to the contractual definition of "Laws" appearing in the preamble to the agreement, the reference to the "law" is a reference to Luxembourg law and to all other applicable laws and regulations including, without limitation, any applicable notice or guidelines promulgated by the cognizant supervisory authorities.[38]

- Article 3.2 of the agreement specifies that the mutual fund shall submit a copy of its prospectus to the manager.[39] UBSTPM therefore could not have been unaware, as shall be explained hereinafter, that the prospectus made no reference to anything [being] under management or a management delegation to BMIS.

- Under the agreement, UBSTPM also assumed the functions of domiciliation agent (article 4), administrator (article 6), the party responsible for maintaining the share register ("registrar"), and transfer agent (article 7). The functions in question were nevertheless delegated to UBS Fund Services under an agreement entitled "Central Administration Agreement" signed on September 22, 2006 by Luxalpha, UBSTPM and UBSFS (Exhibit 28).

---

[37]    *"ManCo shall act with effect from the date hereof or the specified effective date as management company of the Fund upon the terms hereinafter contained and in accordance with the Laws, the Articles and the investment objective and policies of the sub-funds of the Fund generally for the time being determined by the Directors until its appointment shall be terminated as hereinafter provided and ManCo hereby accepts such appointment and agrees to assume the obligations set forth herein."*
[38]    *"'Laws' means the laws of Luxembourg (including the Law) and any other applicable laws and regulations for the time being in force including without limitation any relevant notices and guidelines of the relevant supervisory authority then in force";*
[39]    *"The Fund will deliver, or cause to be delivered, to ManCo a copy of the offering prospectus published by the Fund as amended or completed from time to time (the "Prospectus")."*

55

- The functions of the manager are described in article 5 of the agreement. They are, in substance, the standard functions of a manager, and in order to perform those functions, UBSTPM was given the power and authority to issue orders and instructions in connection with the acquisition and disposition of Luxalpha investments ("*authority, power in right to…issue orders and instructions with respect to the acquisition and disposition of the investments of the Fund*") (article 5.3.).

- Article 5.4. specifies that the manager must comply with the provisions of the prospectus. Therefore, even if it had been so authorized by a decision of the Luxalpha board of directors, UBSTPM could not have delegated management to a third party that was not mentioned in the prospectus without violating article 5.4 of the agreement.

- Under article 5.5., UBSTPM could act itself or, in part or in total, through its delegates ("its Delegates") in the same manner and with the same force and effect as Luxalpha could. ("*in the same manner and with the same force and effect as the Fund might or could do so.*").

The latter article therefore limited the ability to delegate its functions by obligating the manager to make only those delegations that the mutual fund itself could make.

It is useful to point out in this situation that, by application of the Law of 2002, which at that time was fully applicable, only the delegation of management to an authorized manager was possible. UBSTPM therefore could not, without violating the aforementioned provision of law, allow the management delegation to BMIS to remain in effect, given that Luxalpha itself would not have been able to delegate management to the latter.

- Article 11 of the agreement ("Power of delegation") also makes the delegations of authority that the manager can effect subject to the following limitations:

- Prior authorization of said delegation by the supervisory authority (which is the Financial Sector Supervisory Committee) (11.1)

- Continuous monitoring of the activities of delegates by the manager, and contractual provisions that enable the manager—at any time—to give further instructions to delegates and to terminate their mandate effective immediately, if that is in the interest of the shareholders. (11.2)

- The manager's responsibility and liability is not affected by the fact that it has delegated certain of its functions (11.3)

- The manager shall ensure that the delegates were capable and qualified to assume the functions delegated to same, in view of the nature of the functions to be delegated (11.4)

- The delegation must not affect the effectiveness of the manager's supervision and in particular, it must not prevent the manager from acting, or the mutual fund from being managed, in the best interest of its shareholders. (11.5)

- A management function can only be delegated to delegates that are authorized and registered as portfolio managers and subject to prudential supervision, and whose interests do not have potential conflicts with the interests of the manager, the open-ended mutual fund, or its shareholders. (11.6).[40]

[stamp:] 2 euros

---

[40]    "*11. Power of Delegation*

*11.1 ManCo shall, to the extent permitted by the Law and subject to the prior approval of the relevant supervisory authority, have full power to delegate under its control and full responsibility the whole or any part of its functions or powers hereunder to any person, firm or company (the "Delegate").*

*11.2 ManCo shall monitor on a continued basis the activities of the Delegates. The agreements to be entered into between ManCo and the Delegates must provide that ManCo can give at any time further instructions to such Delegates, and that it can withdraw their mandate with immediate effect if this is the interest of the shareholders."*

*11.3 ManCo's liability towards the Fund under this agreement is not affected by the fact that it has delegated certain of its functions to Delegates;*

*11.4 ManCo shall see to it that, having due regard to the nature of the functions to be delegated, the Delegates are qualified and capable of undertaking the functions in question.*

*11.5 The delegation may not prevent the effectiveness of supervision over ManCo and in particular, it must not prevent ManCo from acting, or the Fund from being managed, in the best interest of its shareholders.*

*11.6 ManCo may delegate its investment management functions only to Delegates which are authorised or registered for the purpose of asset management and are subject to prudential supervision. ManCo shall not delegate any investment management functions to any entity whose interests may conflict with those of ManCo, the Fund or its*

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000824

- Article 14 of the agreement ("Liability of ManCo") defines the manager's liability more fully, and in its first paragraph provides that the manager is required to comply with the bylaws, as well as all the provisions and restrictions set forth in the prospectus and in the laws and regulations under which the mutual fund had been organized ("*14.1 ManCo shall observe and comply with the articles and all provisions and restrictions set out in the Prospectus and the laws and regulations under which the Fund is incorporated.*").

- Article 14.2 specifies that the management company shall be required to perform its obligations with the diligence of a salaried agent ("*14.2 ManCo shall fulfill its obligations hereunder with the diligence of a salaried agent.*").

- Article 18 provides a liability exemption for the management company in the instance of force majeure.

(ii) The prospectuses:

The prospectuses of August 2006 and March 2007 (Exhibits 4c and 4d, p. 7) inform investors that Luxalpha's management company "Management Company" is UBS THIRD PARTY MANAGEMENT COMPANY SA, 291, Route d'Arlon, Luxembourg.

They also indicate the following on page 19, under section 9: "MANAGEMENT COMPANY/INVESTMENT ADVISOR": *"The Fund is managed by the Management Company which has the overall responsibility for the management and administration of the Fund, its Subfunds and, if applicable, its corresponding class of shares. The Management Company is responsible for the monitoring of investment policies and restrictions of the Subfunds or the Fund.*
*In the performance of its duties, the Management Company may be assisted by an Investment Advisor with regard to investment recommendations relating to the asset allocation between the permitted investment instruments."*

No reference was made to BMIS.

b) The provisions of the Civil Code:

The provisions of the Civil Code are the same as those cited in Subsection 2.1.1. b) hereinabove, which is to say, the general provisions governing agencies, powers of attorney, and mandates which appear in articles 1984 ff.

The exception to article 1994 of the Civil Code appears in the new agreement, in the provisions of article 11.4,

---

*shareholders. Any delegation of investment management functions to parties other than Affiliates shall require the prior approval of the relevant Delegate by the Directors.*
    *11.7 ManCo shall be entitled to obtain investment and other advice from such source or sources and on such terms as it thinks fit (including, without prejudice to the generality of the foregoing, full power to appoint one or more investment advisers, approved by the Directors and the relevant supervisory authority, to advise as to the investment and re-investment of the investments."*

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000825

which provide no exception to the general rule that a manager that has delegated certain of its functions remains liable.

Moreover, by reason of the strict contractual limitations on the delegation authority, only a delegation that would comply with the limitations in question—and the legal conditions—could potentially fall within the scope of applicability of article 1994.

c) The Law of 2002:

- We point out first of all that with Luxalpha's subjection to article 27 of the Law of 2002, beginning on August 1, 2006, article 85 (1) e) became fully applicable, and the combining of the functions of custodian and manager was therefore prohibited.

- We also point out that, due to the capital importance of the manager function for an open-ended mutual fund, from that point forward management had to be assigned to an authorized manager. Articles 77 and following of the Law of 2002 in fact very strictly regulate the conditions for access to the manager activity, and make engaging in said activity subject to the requirement for prior authorization issued by the Financial Sector Supervisory Committee. The conditions for the granting of authorization are governed by articles 78 and 79 of the Law of 2002, and the conditions in question cover both the company's financial assets as well as the quality of the company's shareholders and top managers.

- Article 84 (1) of the Law of 2002 expressly provides that *"Given the nature of the OPCVM that it manages and on the basis of the prudential rules that it is required to observe at all times in the activity of management of an OPCVM subject to section 1 of this Law, a management company is required:*
*a) to have an excellent administrative and accounting organization, security and control mechanisms in the information system area, as well as adequate internal audit and control mechanisms including, specifically, rules regarding its salaried employees' personal transactions or the holding or management of investments in financial instruments for the purpose of investing its* [own] *equity capital and guaranteeing, among other things, that each transaction pertaining to the OPCVM may be reconstructed as to its origin, the parties involved, its nature, as well as the time and place where it was executed, and that the assets of mutual funds or investment firms managed by the management company are invested in compliance with the articles of organization or incorporation and the provisions of law currently in force."*

- Article 85 of the Law of 2002 authorizes a management company to delegate to third parties, in order to conduct its activities more efficiently, the performance, on its own behalf, of one or more of its functions. The article in question establishes the following preconditions for any delegation:

*a) the Financial Sector Supervisory Committee must be properly informed of same;*
*b) the mandate must not interfere with the proper performance of the supervision* [obligation] *to which the management company is subject; specifically, it must not prevent the management company from acting, nor the mutual fund from being managed, in the best interests of investors;*
*c) when the delegation pertains to investment management, the mandate may be given only to firms authorized or registered for portfolio management purposes and subject to prudential supervision; the delegation must conform to the investment allocation criteria periodically established by the management company;*
*d) when the mandate pertains to investment management and is given to a firm in a third country, cooperation between the Financial Sector Supervisory Committee and the supervisory authority for the latter country must be assured;*
*e) no mandate pertaining to the principal investment management function shall be given to the custodian, nor to any other firm whose interests may conflict with those of the management company or the shareholders;*
*f) there are measures that enable the persons who manage the management company*

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000826

*to effectively monitor at all times the activities of the firm to which the mandate was given;*
*g) the mandate does not prevent the persons who manage the management company from giving further instructions at any time to the firm to which the functions are delegated, nor to withdraw the mandate effective immediately when such is in the interest of the investors;*
*h) depending upon the nature of the functions to be delegated, the firm to which the functions shall be delegated must be qualified and capable of performing the functions in question; and*
*i) the OPCVM's prospectuses shall specify the functions that the management company was authorized to delegate.*

- Lastly, article 85 (2) of the Law specifies that "in no event shall the fact that the management company delegated its functions to third parties have any impact on the liability of the management company and the custodian, and in no event can the management company delegate its functions to the extent that it becomes a shell company."

- The contractual provisions cited in Subsection a) are therefore to a great extent modeled on the provisions of law. The management delegation to BMIS which was made and maintained, respectively, constitutes a flagrant violation of both the law and the agreement.

### 2.1.2.2    The legal nature of UBSTPM's obligations:

- In this regard, it must be pointed out, first of all, that in the opinion of the majority of [legal doctrine] authors, the agreement by which a board of directors assigns responsibility for portfolio management to a manager is to be classified as a service agreement and that the manager's liability depends upon the content of the agreement.

The agreement provides both that the manager must act with the diligence of a salaried agent, and provides as the sole exclusion that the manager shall not be liable in instances of force majeure.

It must be concluded from the foregoing that the manager's obligation must be analyzed as a result obligation, if not at least as an *obligation de moyens renforcée* [enhanced means obligation: in which there is a presumption of fault on the part of the nonperforming or breaching party, which consequently has the burden of proof in any resulting litigation].

- Even if the definition of enhanced means obligations could be employed for those manager's obligations the performance of which may present risk, they must certainly be analyzed as a result obligation in the instance of the obligations that do not present risk.

Legal doctrine and case law generally accept that the agent who does nothing (which is to say, who does not perform any management act)—as was the case with both UBSTPM and its delegate, BMIS—must be considered to be at fault, even on the basis of the means obligation.

### 2.1.2.3    The impact of the delegation to BMIS:

- The plaintiffs cite their representations and arguments under Subsection 2.1.1.3. hereinabove, with respect to the effects of a delegation of contractual obligations to a third party and with respect to the scope of the delegation.

- Contrary to what was the case with the Law of 1988, the Law of 2002 regulates the manager's functions as well as the delegations made by the manager and the effects of same on its liability.

Article 85 (2) of the law specifies, we shall recall, that "*in no event shall the fact that the management company*

CONFIDENTIAL TREATMENT REQUESTED
UBSL 000827

*delegated its functions to third parties have any impact on the liability of the management company and the custodian.*"

- The agreement made no exception to this principle, given that article 11.4 of the agreement of September 22, 2006 recapitulated this provision of law in its entirety.

It must be found that the management delegation to BMIS did not comply with any of the legal and contractual conditions for any such delegation.

**-** As an accredited professional, UBSTPM had the obligation to scrupulously comply with the applicable law, the agreement, and the provisions of the prospectus.

The retention of BMIS in its prior functions therefore cannot in any case discharge UBSTPM from its full and complete liability as manager.

UBSTPM therefore assumed *vis-à-vis* the plaintiffs the full and complete liability connected to its functions, for its own direct actions, violations, nonperformance, and wrongs and, in parallel fashion, for those of the party to which management was delegated.

    2.1.2.4.    UBSTPM's nonperformance of its contractual and legal obligations:

- The delegation of management to BMIS was unallowable under the provisions of article 5.5 of the management agreement of August 1, 2006 (which are stricter than the provisions of law, in the sense that, according to the terms of article 5.5., only a delegation to a management company authorized in compliance with the Law of 2002 was possible). Now BMIS was not a management company authorized in compliance with the Law of 2002.

- Retaining BMIS in its prior functions also constitutes a manifest violation of article 11, and specifically subsection 11.1, (there was no Financial Sector Supervisory Committee authorization for any such delegation), subsection 11.2, (the delegation to BMIS is not contained in any of the obligatory contractual provisions set forth therein), subsection 11.5 (no effective monitoring and supervision was possible), and subsection 11.6 (BMIS did not have the qualifications required by this article).

- We point out that, as was indicated in Section 1 of this writ of summons, the instructions, the custody agreement, and the management delegation to BMIS, signed in 2004 by UBS SA in favor of BMIS, nevertheless remained in effect without the slightest change or amendment.

This combining, within BMIS, of the functions of sub-custodian and actual manager was nevertheless illegal, because it stripped of any meaning the provision of article 85 (1) subsection e), by respecting only the "façade" and semblance, and not at all the actual substance, of custody and management.

**-** By retaining the management delegation to BMIS, UBS TPM also violated the following provisions of article 85:

-   Subsection a), given that the Financial Sector Supervisory Committee had not been properly informed of the retention of the aforementioned management delegation,
-   Subsection b), given that the delegation manifestly prevented UBSTPM from acting and Luxalpha assets from being managed, because in actual reality no portfolio management was ever performed by the manager indicated in the prospectus.
-   Subsection c), because BMIS was not a firm authorized or registered for portfolio management purposes and subject to prudential supervision, [by the Financial Sector Supervisory Committee]
-   Subsection e), because BMIS was also sub-custodian,

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED         UBSL 000828

- Subsection g), because the delegation did not comply with the conditions mandated therein,
- Subsection i), because the Luxalpha prospectus dated August 2006 and amended on the occasion of UBSTPM's assuming its position did not specify any function that the management company would be authorized to delegate.

- The delegation to BMIS also violated article 85 (2) of the Law, which expressly provided that "and in no event can the management company delegate its functions to the extent that it becomes a shell company."

That was nevertheless what UBSTPM did, because all the functions that it was deemed to have assumed under the terms of the agreement of September 22, 2006 had been delegated, without exception. The form of the management delegation to BMIS was such that UBSTPM could not give management instructions and—a fact that is even graver—such that it had no means of effectively and continuously supervising and monitoring BMIS's management.

It is difficult to see how a professional firm such as UBSTPM could accept any such mandate in which it simply was a straw man. The only explanation which presents itself is that its decision was dictated to it by its parent firm or by the group of which it is a member. That would then explain the signing of the "Agreement of Understanding and Indemnification" signed on September 22, 2006, which was addressed hereinabove (Exhibit 13).

In reality, UBSTPM never had contact with the portfolio assets nor with the sub-manager, BMIS. That explains the inexplicable, to wit, how it is possible that the Luxalpha assets were never invested, even by the admission of Madoff himself.

Given the concealed and hidden nature of BMIS's management, and its absence of management, respectively, UBSTPM therefore failed in its obligation to ensure that Luxalpha assets were invested in compliance with the Luxalpha articles of incorporation.

Lastly, and above all, UBSTPM failed in its primary obligation, which was to ensure that the Luxalpha assets were invested in compliance with the investment policy defined and established in its bylaws and in its prospectus, as well as the investment restrictions provided by law.

In actual fact, it did nothing to prevent Luxalpha's loss of almost all of its assets.

UBSTPM's wrongful stance therefore had a direct causal relationship with the damage suffered by Luxalpha and by its shareholders, given that if UBSTPM had actually taken over management, BMIS would have been required to transfer portfolio management to it and would not have been able to appropriate the funds for itself, or then the truth would have come out earlier, and the additional losses after September 22, 2006 would have been prevented.

### 2.1.2.5.    Aggravating circumstances:

- We point out first of all that UBSTPM obtained from the sponsor UBS SA the signing of an agreement under which the latter obligated itself to indemnify and hold UBSTPM harmless from all liability. ("Agreement of Understanding and Indemnification," signed on September 22, 2006," Exhibit 13).

- The fact that it did not perform its obligations as manager did not prevent UBSTPM from being paid, between August 1, 2006 and its replacement on November 17, 2008, a total amount of USD 27,167,047.71 as management fees, as well as a "performance fee" of USD 15,482,220.05. It therefore was paid in all, in a period of hardly more than two years, a total amount of USD 42,649,267.76.

CONFIDENTIAL TREATMENT REQUESTED                                   UBSL 000829

- The fact that it did not perform its functions as manager likewise did not prevent UBSTPM from hiring Access PARTNERS SA as an investment advisor, under an agreement dated February 13, 2007.

- UBSTPM retained the "Investment Advisory Agreement" signed by UBS SA and Access International Advisory LLC on August 11, 2004, because information on the latter agreement continued to be indicated in the Luxalpha prospectus, and on February 13, 2007, it signed a new "Investment Advisory Agreement" with Access Partners SA.

- UBSTPM, undoubtedly aware of the fact that that it was never actually going to manage on the assets of Luxalpha and therefore that it was in violation of its legal and contractual obligations, even signed, on September 22, 2006, an "Agreement for Constitution of an Advisory Committee" with UBS SA. (Exhibit 38). Said document contains an in appendix the list of the members of the Advisory Committee. Those members were Messrs. Hartmann, Hondequin, Egger, Littaye and Delandmeter, therefore with the exception of Mr. H. Kranz, all the members of the Luxalpha board of directors.

The agreement in question contains, in an unnumbered appendix, the recommendation by the "Advisory Committee" to appoint (initially) as Investment Advisors of the open-ended mutual fund (SICAV), the firm Access International Advisor LLC in New York and (after the authorization of Access Partners SA by the Financial Sector Supervisory Committee), to assign the function of investment advisor to Access Partners SA. The document also contains the recommendation to appoint as "Client Introducer" Access International Advisors Limited in Nassau, Bahamas, and as distributor UBS (Luxembourg) SA. The recommendation was approved by the signature of UBS third Party Management. It appears that this was the only recommendation ever issued by that committee.

It is difficult to see the usefulness for the institution of any such committee, unless it was an additional attempt by UBSTPM to attempt to indirectly limit its liability as manager, and/or increase, with the approval or at the request of the sponsors, the circle of parties who would be paid fees.

### 2.1.2.6.    The petitioned judgment:

1. Principally,

a) (i) The plaintiffs, exercising the rights of the company, seek to obtain a judgment against UBSTPM on a contractual basis, ordering it to provide full indemnification of the damage suffered by Luxalpha by reason of the loss of all of its assets, the total value of which in USD is USD 1,323,852,143.93, which amount was estimated for court and recording requirements at EUR 881,216,896.71, if not any other higher amount to be decided by the court or by expert opinion,

(ii) As a subsidiary petition, and in the event that their legal standing to act in the aforementioned capacity is contested, the plaintiffs make the same judgment petition, on this occasion, based on tort liability on the basis of articles 1382 ff. of the Civil Code, in their capacity as representatives of Luxalpha creditors and shareholders.

In both instances, it is therefore lawful and necessary to render a judgment against UBSTPM to pay the plaintiffs the amount of USD 1,323,852,143.93, estimated for court and recording requirements at EUR 881,216,896.71, which represents the cash equivalent of the shares and securities deemed to be in the Luxalpha portfolio as of the date it was placed in liquidation, in regard to which the manager could not reasonably contest that they could have (and should have) been acquired with the capital provided by the shareholders and entrusted to it by Luxalpha, increased by the result of prudent management in compliance with the investment policy, from November 30, 2008

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                                UBSL 000830

until execution, if not any other higher amount to be decided by the court or by expert opinion, if not, as a more subsidiary petition, increased by interest at the legal rate from November 30, 2008 until payment in full, if not, as an even more subsidiary petition, from the date of the filing of this claim with the court until payment in full.

b) If not, as a subsidiary petition and on the following principal and subsidiary bases, on the basis of the same legal standings and legal grounds cited principally and subsidiarily, a judgment against UBSTPM to pay the plaintiffs the amount of USD 1,285,693,475.09, estimated for court and recording requirements at EUR 855,816,731.07, if not any other higher amount to be decided by the court or by expert opinion, which represents the cash equivalent of the shares and securities deemed to be in the Luxalpha portfolio as of November 17, 2008, the date of its replacement by AML, and in regard to which the manager could not reasonably contest that they could have (and should have) been acquired with the capital provided by the shareholders and entrusted to it by Luxalpha, with the latter amount increased by the result of prudent management in compliance with the investment policy, from November 30, 2008 until execution, if not, as a more subsidiary petition, increased by interest at the legal rate from November 30, 2008 until payment in full, if not, as an even more subsidiary petition, from the date of the filing of this claim with the court until payment in full.

c) If not, as a more subsidiary petition, the amount of USD 762,484,886, which amount was estimated for court and recording requirements at EUR 507,545,021.63, if not any other higher amount to be decided by the court or by expert opinion, which represents the capital entrusted to it and transferred to BMIS, minus the amounts repatriated by BMIS, and increased by the result of prudent management in compliance with the investment policy, from the date of remittance of the funds until execution.

d) If not, on an even more subsidiary basis, the amount of USD 762,484,886, estimated for court and recording requirements at EUR 507,545,021.62, if not any other higher amounts to be decided by the court or by expert opinion, representing the capital transferred to BMIS, minus the amounts repatriated by BMIS , and increased by the result of prudent management in compliance with the investment policy, from the date of remittance of the funds until November 17, 2008.

e) If not, as a more subsidiary petition, the amount of USD 762,484,886, if not any other higher amount to be decided by the court or by expert opinion, estimated for court and recording requirements at EUR 507,545,021.62, which represents the capital entrusted to it and transferred to BMIS, minus the amounts repatriated by BMIS, and increased by interest at the legal rate from the date of the remittance of the funds until execution.

2. As a more subsidiary petition, in the event that it should be decided that UBSTPM is not liable for the loss of Luxalpha's assets, it would be lawful and necessary to render a judgment ordering it to refund the fees in a total amount of USD 27,167,047.71 as management fees, as well as the "performance fee" of USD 15,482,220.05, for a total amount of USD 42,649,267.76, estimated for court and recording requirements at EUR 28,389,314.89,
if not any other higher amount to be decided by the court or expert opinion, given that there was no consideration provided for the fees in question, and the foregoing is mainly on the basis of UBSTPM's contractual liability, if not, on the basis of the absence or a purpose and/or a reason, with the plaintiffs exercising the rights of Luxalpha, on the basis of contractual liability, if not, on a subsidiary basis, on the grounds of tort liability as provided by articles 1382 ff. of the Civil Code, with the plaintiffs exercising the rights of the creditors and shareholders, and the latter with interest at the legal rate from [the date of the filing] of this claim with the court until payment in full.

3. In all instances, the judgment should be rendered against UBSTPM jointly and severally, if not, in solidum with BMIS's indemnification obligation which was the subject of the credit declaration that Luxalpha filed on February 27, 2009 to protect its interests [as a creditor].

CONFIDENTIAL TREATMENT REQUESTED                                        UBSL 000831

4. The judgment against UBSTPM should also be ruled to be joint and several if not in solidum with the other managers that participated in Luxalpha, as well as the other parties served summonses as defendants in this action.

**2.1.3. The agreement with Access Management Luxembourg S.A.**

On November 17, 2008, a new management agreement, entitled "Management Company Services Agreement" (Exhibit 14) was signed by Luxalpha and Access Management Luxembourg S.A. (referred to hereinafter as "AML"), which on September 26, 2008 had been newly authorized for fund portfolio management, under article 77, Chapter 13 of the Law of 2002 (Exhibit 31).

2.1.3.1.      The applicable contractual and legal provisions:

a) The contractual provisions

(i) The agreement of November 17, 2008

This agreement, exactly like the one previously adopted with UBSTPM, according to the definition of "Laws" appearing in its preamble, is subject to Luxembourg law and to all other applicable laws and regulations including, without limitation, any applicable notices and guidelines promulgated by the cognizant supervisory authorities.[41]

The portfolio management functions defined in articles 2, 3, 5, and 11 are copied and pasted from the provisions of the agreement with UBSTPM, such that all the representations and arguments presented on the subject of said provisions in Subsection 2.1.2.1a) hereinabove shall be deemed to be transcribed herein.

However, it should be noted that AML did not assume the other functions previously entrusted to UBSTPM, which were those of domiciliation agent, administrator, share register management delegate, and transfer agent.

(ii) The prospectus:

The November 2008 prospectus (Exhibit 4 e), on page 9, indicates Access Management Luxembourg SA to be manager.

Chapter 9 of the prospectus ("MANAGEMENT COMPANY/INVESTMENT ADVISOR") indicates the following: "*The Fund is managed by the Management Company which has the overall responsibility for the management and administration of the Fund, its Subfunds and, if applicable, its corresponding class of shares. The Management Company is responsible for the monitoring of investment policies and restrictions of the Subfund or of the Fund. In the performance of its duties the Management Company may be assisted by an Investment Advisor with regard to the investment recommendations relating to the assets allocation between the permitted investments.*"

The prospectus, exactly like the previous prospectuses, does not mention BMIS.

b) The provisions of the Civil Code:

The provisions of the Civil Code are the same as those cited in Subsection 2.1.1.1. b) hereinabove.

[stamp:] 2 euros

---

[41]        "*'Laws' means the laws of Luxembourg (including the Law) and any other applicable laws and regulations for the time being in force including without limitation any relevant notices and guidelines of the relevant supervisory authority then in force.*"

CONFIDENTIAL TREATMENT REQUESTED                                                    UBSL 000832

c) The Law of 2002 and EC Directive 85/611:

The provisions of law are identical to those indicated in Subsection 2.1.2.1. c) hereinabove.

2.1.3.2. and 2.1.3.3. The legal nature of AML's obligations and the impact of the delegation to BMIS:

The representations and arguments are the same as those in Subsections 2.1.2.2. and 2.1.2.3. hereinabove.

2.1.3.4.      AML's nonperformance of its contractual and legal obligations:

In exactly the same fashion as UBSTPM, AML did not change anything in the previous structure and left in place the delegations to BMIS. As in the past, the prospectus did not indicate any management delegation.

The representations and arguments regarding UBSTPM's liability in Subsections 2.1.2.2 and 2.1.2.3 consequently apply identically to AML, and are also to be deemed to be transcribed herein.

Exactly like its predecessors, AML never actually performed any management, and served only as a straw man or shell company.

Contrary to its predecessors, however, AML did not have the opportunity to be paid management fees, because the "Madoff" scandal broke out less than one month after its appointment.

AML's wrongful stance had a direct causal relationship to the damage suffered by Luxalpha and by its shareholders, given that if AML had actually taken over management, BMIS would have been required to transfer portfolio management to it and would not have been able to appropriate the funds for itself, or then the truth would have come out earlier, and the additional losses after November 17, 2008 would have been prevented.

By maintaining the former system in place, AML contributed to the damage incurred by Luxalpha.

2.1.3.5.      Aggravating circumstances:

AML, like its predecessors UBS SA and UBSTPM, did everything to maintain the fiction of actual management, because on November 17, 2008 it signed a new "Investment Advisory Agreement" with Access Partners SA (Exhibit 16).

2.1.3.6.      The petitioned judgment:

1. Principally:

a) (i) The plaintiffs, exercising the rights of the company, seek to obtain a judgment against AML on a contractual basis, ordering it to provide full indemnification of the damage suffered by Luxalpha by reason of the loss of all of its assets, the total value of which in USD is USD 1,323,852,143.93, which amount was estimated for the registration and accrual requirements at EUR 881,216,896.71, if not any other higher amount to be decided by the court or by expert opinion,

(ii) As a subsidiary petition, and in the event that their legal standing to act in that capacity is contested, the plaintiffs present the same judgment petition, on this occasion, based upon tort liability on the grounds of articles 1382 ff. of the Civil Code,

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000833

in their capacity as representatives of Luxalpha creditors and shareholders,

In both instances, it is therefore lawful and necessary to render a judgment against AML to pay the plaintiffs the amount of USD 1,323,852,143.93, which amount was estimated for court and recording requirements at EUR 881,216,896.71, which represents the cash equivalent of the shares and securities deemed to be in the Luxalpha portfolio as of the date it was placed in liquidation, in regard to which the manager could not reasonably contest that they could have (and should have) been acquired with the capital provided by the shareholders and entrusted to it by Luxalpha, increased by the result of prudent management in compliance with the investment policy, from November 30, 2008 until execution, if not any other higher amount to be decided by the court or by expert opinion, if not also, as a more subsidiary petition, increased by interest at the legal rate from November 30, 2008 until payment in full, if not, as an even more subsidiary petition, from the date of the filing of this claim with the court until payment in full.

b) If not, as a subsidiary petition, and on the following principal and subsidiary bases, on the basis of the same legal standing and legal grounds cited principally and subsidiarily, a judgment against AML to pay the plaintiffs the amount of USD 1,285,693,475.09, estimated for court and recording requirements at EUR 855,816,731.07, if not any other higher amount to be decided by the court or by expert opinion, which represents the cash equivalent of the shares and securities deemed to be in the Luxalpha portfolio as of November 17, 2008, the date of AML's assumption of its functions, and in regard to which the manager could not reasonably contest that they could have (and should have) been acquired with the capital provided by the shareholders and entrusted to it by Luxalpha, increased by the result of prudent management in compliance with the investment policy, from November 30, 2008 until execution, if not, as a more subsidiary petition, increased by interest at the legal rate from November 17, 2008 until payment in full, if not, as an even more subsidiary petition, from the date of the filing of this claim with the court until payment in full.

c) If not, as a more subsidiary petition, the amount of USD 762,484,886, which amount was estimated for court and recording requirements at EUR 507,545,021.63, if not any other higher amount to be decided by the court or by expert opinion, which represents the capital entrusted to it and transferred to BMIS, minus the amounts repatriated by BMIS, and increased by the result of prudent management in compliance with the investment policy, from the date of remittance of the funds until execution,

d) If not, as an even more subsidiary petition, the amount of USD 762,484,886, estimated for court and recording requirements at EUR 507,545,021.63, if not any other higher amount to be decided by the court or by expert opinion, representing the capital transferred to BMIS, minus the amounts repatriated by BMIS, and increased by the result of prudent management in compliance with the investment policy, from the date of remittance of the funds until November 17, 2008,

e) If not, as a more subsidiary petition, the amount of USD 762,484,886, if not any other higher amount to be decided by the court or by expert opinion, estimated for court and recording requirements at EUR 507,545,021.63, which represents the capital entrusted to it and transferred to BMIS, minus the amounts repatriated by BMIS, and increased by interest at the legal rate from the date of the remittance of the funds until execution,

2. In all instances, the judgment should be rendered against AML jointly and severally, if not, in solidum with BMIS's indemnification obligation which was the subject of the credit declaration that Luxalpha filed on February 27, 2009 to protect its interests [as a creditor].

3. The judgment against AML should also be ruled to be joint and several if not in solidum with the other managers that participated in Luxalpha, as well as the other parties served summonses as plaintiffs in this action.

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                UBSL 000834

**3. The Administrator function of UBS Fund Services (UBSFS)**

The central administration of an open-ended mutual fund covers its administrative and accounting management, and normally entails the following activities:

**-** maintaining the accounting records;
**-** computation of the net asset value (NAV);
**-** execution of issuances and redemptions;
**-** maintaining the fund investor registry;
**-** collaboration in the preparation of documents addressed to investors;
**-** sending investors the documents addressed to them;
**-** retention of documentation essential to the mutual fund.

It is therefore a function that is essential to the operation of a mutual fund, in the interest of both the mutual fund and the shareholders.

Three agreements were signed with UBS Fund Services SA regarding the administration of Luxalpha, a first agreement at the time of its incorporation in 2004, a second in 2006 at the time it was made subject to the Law of 2002, and a third on November 17, 2008, on the occasion of AML's designation as manager for Luxalpha.

UBSFS was therefore Luxalpha's administrator from the time of its incorporation until it was placed in court-ordered liquidation. Between August 1, 2006 and November 17, 2008, the designated administrator was UBSTPM, and UBSFS performed its functions on the basis of a delegation by UBSTPM.

**3.1. The applicable contractual and legal provisions:**

3.1.1 The contractual provisions:

As was stated hereinabove, the function of Luxalpha administrator was the subject of three successive agreements:

**-** The agreement of February 5, 2004 between Luxalpha and UBSFS,
**-** The agreement of September 22, 2006 between Luxalpha, UBSTPM, and UBSFS, and subsequently
**-** The agreement of November 17, 2008 between Luxalpha and UBS FS.[42]

The contractual provisions are therefore found in the aforementioned three provision of laws and the successive Luxalpha prospectuses.

(i) The agreement of February 5, 2004:

The first agreement signed by Luxalpha and UBSFS was the "Central Administration and Domiciliation Agreement" of February 5, 2004 (Exhibit 32).

As its title indicates, the agreement designates UBSFS as central administrator and as domiciliation agent. The representations and arguments set forth hereinafter shall be limited to the former function.

Article 16 makes the agreement subject to Luxembourg law.

Article V (p. 3) of the agreement makes UBSFS responsible for the following functions in particular:

---

[42]        The dates of these three agreements correspond to the date of the signing of the three successive management agreements.

CONFIDENTIAL TREATMENT REQUESTED                                        UBSL 000835

- maintaining the accounting records and books of the open-ended mutual fund (article V 1.)
- computation of the net asset value, specifically on the basis of the values provided by the open-ended mutual fund manager (article V 2.)
- preparation of annual financial statements, reports, and balance sheets in compliance with provisions of law and regulations as well as with the rules promulgated by the Financial Sector Supervisory Committee (article V 4.)
- maintaining contacts with the auditor (article V 6.)
- maintaining the share register, executing issuances and redemptions "if the prospectus so provides." [43]

The prospectuses of February and August 2004 state that UBSFS' administrative services mainly include computation of the net asset value (NAV). [44]

At the time it performed its tasks, and specifically the computation of the net asset value, UBSFS had the attitude of always behaving as a docile implementing agent, and of having computed the NAV—which we now know to have been only theoretical—on the basis of solely the information transmitted by UBS SA, without ever having been concerned with verifying the reality of the investments. That would appear to be at the very least astonishing on the part of a professional firm which knew that Luxalpha benefited from the transitional provisions of the Law of 2002 and that the entity that transmitted the information was both custodian and manager. Now, by reason of that combination of roles, there was no monitoring except for its own and possibly that of the board of directors.

　　　(ii) The agreement of September 22, 2006:

- The "Central Administration Agreement" of September 22, 2006 was signed by Luxalpha, UBSTPM and UBSFS (Exhibit 32).

It entered into effect on August 1, 2006.

The reason for UBSTPM's participation in this agreement is that, as a result of the signing of the "Management Company Services Agreement" of September 22, 2006, which was addressed and covered in Subsection 2.1.2. hereinabove, it was UBSTPM that was in charge of all the administrative functions required by the Law of 2002 and, in particular ("in particular"), those functions set forth in Appendix II of the aforementioned law. [45]

UBSTPM's functions are more fully defined in article 7, and it was responsible for:

[stamp:] 2 euros

---

[43]　　　*"If provided in the fund's prospectus"*

[44]　　　　　*"UBS Fund Services (Luxembourg) S.A. as the Administrative Agent is responsible for the general administrative duties involved in managing the Fund and prescribed by Luxembourg law. These administrative services mainly include calculation of the net asset value per share, accounting as well as reporting. The Administrative Agent is entitled to charge commission in line with the scale of fees customarily applied at the financial centre of Luxembourg and amounts to 0.05% per annum."*

[45]　　　*"Functions included in the mutual fund portfolio management activity – Portfolio Management – Administration:*
　　*a)　　fund legal services and accounting management services;*
　　*b)　　customer information requests;*
　　*c)　　portfolio valuation and determination of share value (including the tax aspects);*
　　*d)　　monitoring of compliance with provisions of regulations;*
　　*e)　　maintaining the shareholder registry;*
　　*f)　　income distribution;*
　　*g)　　share issuance and redemption;*
　　*h)　　conclusion of agreements (including issuing certificates);*
　　*i)　　recording transactions and maintaining transaction records on file. Marketing"*

CONFIDENTIAL TREATMENT REQUESTED　　　　　　　　　　　　　　　　　　UBSL 000836

- data storage and retention, as well as maintaining and retaining the share register
- maintaining share certificates on file
- subscriptions
- redemptions and conversions
- issuing share certificates
- destruction of voided share certificates
- communication of information to shareholders
- opening an account with the custodian bank.

Article 24 makes the agreement subject to Luxembourg law.

- By signing the Central Administration Agreement of September 22, 2006, UBSTPM delegated certain of its functions to UBSFS, with the approval of Luxalpha. This delegation complied with the provisions of the law (article 85 (1) ), particularly in the sense that the Financial Sector Supervisory Committee was so informed, the delegation was revocable at any time, and it was given to an accredited Financial Sector Professional (FSP).

UBSTPM remains responsible for the delegation under the provisions of article 85 (2). Moreover, it is covered, with respect to its liability for—and despite—this delegation by UBS SA's guarantee (Exhibit 13), which was also addressed and covered in Subsection 2.1.2. hereinabove.

- UBSFS was made responsible for the following functions:

- The functions of an administrator properly speaking, such as the communication of information to shareholders, tax statements and publications, and contacts with the Financial Sector Supervisory Committee and the various government agencies (article 1).
- The functions of Accounting Agent, such as keeping accounting records (article 2.1.), **the computation of the NAV—with the authority to require necessary estimated information from the manager(s) and to request that the latter approve the computation of the NAV or the valuation of certain elements involved in the computation** (article 2.2), the preparation of annual financial statements and tax statements (articles 2.3 and 2.4) and maintaining contacts with the auditor (article 2.5.)
- The functions of transfer agent, such as maintaining the share register, redemptions, voiding, transfer, or conversion of shares, maintaining share certificates on file, compliance with money laundering prevention provisions, and compliance with "late trading and market timing" provisions (article 3)
- The functions of domiciliation agent for the open-ended mutual fund (article 4)

- Article 5, paragraph 1 of the agreement states that UBSTPM, in compliance with the law and Financial Sector Supervisory Committee Circular 03/108, had designated the persons responsible for the actual conduct of its activities. UBSFS authorized UBSTPM to designate certain UBSFS employees to assume this responsibility and obligated itself to provide other services to it which are more fully described in Appendix II to the agreement[46] (article 5).

---

[46]    *"In accordance with the requirements of the Law, the Management Company has appointed persons responsible for effectively conducting the business of the Management Company (the 'Managers'). The Managers will perform the duties and functions imposed on them by the Law and CSSF Circular 03/108. The Management Company shall notify the Agent of the identity of the Managers approved by the Supervisory Authority and appointed by the Management Company. Any change in Managers shall be notified to the Agent forthwith.*

*5.2 The Agent authorizes the Management Company to select certain of its employees to act as Managers in accordance with the provisions of Appendix 1 to this Agreement.*

*5.3 The Agent will support the Managers in the performance of their duties by providing the supporting services more fully described in Appendix 2 to this Agreement.*

*5.4 The Agent shall see to it that a sufficient number of staff is at all the time available to the Management Company and its Managers for the purpose of providing the supporting services referred to in section 5.2 above."*

CONFIDENTIAL TREATMENT REQUESTED                              UBSL 000837

The services appearing in Appendix II to the agreement are very numerous, and specifically include:

- "Product Control," which entails—among other things—verification of the NAV before publication and daily and periodic auditing of compliance with the investment policy and investment restrictions.

- The preparation of documentation (prospectuses, bylaws, etc.);

- Relationships with auditors and the Financial Sector Supervisory Committee in relation to product compliance management (Luxalpha).[47] In regard to the relationship with the Financial Sector Supervisory Committee, the administrator is considered to be the "Central Point Of Contact";

- "Compliance and risk control," which specifically entails auditing of the [fund] structure's compliance with the law, regulations, and prudential rules,[48] the identification of particular areas of risk, as well as the establishment and monitoring of preventive/corrective action.[49] The administrator must also ensure compliance with new laws, regulations, or prudential rules.

- Under the subsection "Product Compliance and Risk Control," Appendix 2 states that this administrator function entails assistance in the monitoring of delegated tasks, and specifically:

    *  the establishment of a standardized "screening" system for a delegated tasks and
    * the monitoring and screening of delegated tasks in conformance to customary "industry standards."

The tasks assigned to UBSFS under the agreement of September 22, 2006 therefore went beyond the customary functions, and made UBSFS play the actual role of monitor, auditor and guardian of Luxalpha investments and structures.

Article 6.11 of the agreement states that it is subject to Luxembourg law and that its legal basis is the Law of 2002.

   (iii) The agreement of November 17, 2008:

The "Central Administration Agreement" of November 17, 2008 (Exhibit 17) was, once again, adopted directly by Luxalpha and UBSFS.

Articles 1–4 and 6 of said agreement are pasted in copies of articles 1-4 and 6 of the agreement of September 22, 2006. Solely the references to the manager as fellow party to the agreement were replaced

[stamp:] 2 euros

---

[47]       "Relationship with external auditors or Luxembourg Supervisory Authorities (CSSF) regarding Product Compliance Management"
[48]       UBSFS is also advisor in relation to the compliance of organizations and structures, specifically with respect to managers and sponsors ("Compliance advisor to UBS internal or external clients (portfolio managers, sponsors, etc.)")
[49]       "Ensure the legal regulatory compliance of the corporate structure by identifying potential risk areas linked to legal/regulatory obligations and initiate/monitor the implementation of rectifying/preventing measures"

70

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000838

by references to Luxalpha ("the Fund"). In article 5, the second paragraph was deleted and the reference to Appendix II was replaced by a reference to Appendix I.

The agreement therefore also contains the special provision in article 2.1 which was addressed hereinabove in regard to the agreement of September 22, 2006, and which granted the administrator the authority to require necessary estimated information from the manager(s) and to request that the latter approve the computation of the NAV or the valuation of certain elements involved in the computation.

Appendix I does not contain all of the services contained in the previous Appendix II, but most of the services were retained. Such is the case with "Product Control," specifically the verification of the NAV prior to publication, and auditing of compliance with the investment policy and investment restrictions. Such is also the case with "compliance and risk control" and specifically the auditing of the [fund] structure's compliance with the law and regulations, identification of risk areas, and the functions related to the establishment of preventive and/or corrective actions.

The representations and arguments pertaining to Subsection (ii) hereinabove therefore also apply to this Subsection (iii).

   (vi) The prospectuses

The prospectuses of February and August 2004 accurately indicate UBSFS' functions (Exhibits 4a and 4b).

The prospectuses of August 2006 and March 2007 indicate the UBSTPM's delegation to UBSFS[50] (Exhibits 4c and 4d).

The prospectus of November 17, 2008 correctly indicates UBSFS's functions (Exhibit 4e).

   3.1.2. The Laws of 2002 and April 5, 1993 and EC Directive 85/611:

Article 4 of the Law of 2002 requires that the central administration of a Luxembourg open-ended mutual fund be located in Luxembourg. This requirement also appears in the Directive.

According to the definition in Appendix II to the Law of 2002 and Appendix II to the Directive, administrative activities include legal services and accounting management services, the processing of customer information requests, portfolio valuation and the determination of the NAV of shares, monitoring of compliance with provisions of regulations, maintaining the share portfolio register, income distributions, share issuance and redemption, the conclusion of agreements, recording transactions and maintaining transaction records on file.

In Luxembourg, administrator activities are reserved for management companies authorized in compliance with the Law of 2002 or entities accredited as "Financial Sector Professionals" in compliance with the Law of April 5, 1993 on the financial sector.

---

[50]    *"Following a Central Administration Agreement concluded between the Management Company, the Fund and UBS Fund Services (Luxembourg) SA on August 1, 2006, the Management Company has delegated, under its control and responsibility both the central administration and domiciliation functions to UBS Fund Services (Luxembourg) S.A. (the "Administrative Agent"). The Administrative Agent is responsible for the general administrative duties involved in managing the Fund and prescribed by Luxembourg law. These administrative services mainly include calculation of the net asset value per share, accounting as well as reporting. The Administrative Agent is entitled to charge commission in line with the scale of fees customarily applied at the financial centre of Luxembourg and amounts to 0.05% per annum. It also carries out the other tasks of the Administrative Agent in accordance with the provisions applicable, in Luxembourg. It is responsible in particular for processing share subscriptions, repurchases and conversions, as well as for transferring the relevant monies" (p. 17).*

71

CONFIDENTIAL TREATMENT REQUESTED                                         UBSL 000839

### 3.2. UBSFS' nonperformance of its contractual and legal obligations:

- As was indicated in Subsection (1) hereinabove, UBSFS provided the Luxalpha NAVs every two weeks for more than four years, manifestly without being assured of the reality of the investments made as well as the existence, nature, and value of the open-ended mutual fund's investments. Nevertheless, by virtue of its function, it guaranteed the reality, existence, and preservation of said assets, under its legal obligations set forth in the successive prospectuses.

The computations performed by UBSFS with respect to the NAV therefore relied upon purely fictitious and unverified information.

As a knowledgeable professional, it had the obligation to demand additional proof and confirmations with respect to the sub-custody arrangement established with BMIS, all the more so because of the authority to demand and require information that had been expressly granted to it by article 2.2 of the agreements of August 1, 2006 and November 17, 2006.

The fact that it did not demand or require any additional information or proof regarding the investments is all the more grave because UBSFS was not unaware of the fact that UBS SA had combined the functions of custodian and manager and that it had delegated both functions to BMIS, such that the reciprocal oversight and monitoring between the entities in charge of these functions, which is the principal advantage of not combining the functions, could not take place.

UBSFS likewise could not have been unaware of the fact that UBSTPM performed no management, and that the situation of combining the functions under BMIS did not change after August 1, 2006.

UBSFS knew that the board of directors no longer supervised investments, because the task of monitoring the investment policy and investment restrictions had been delegated to the UBSFS "product control team," by a board of directors decision dated November 28, 2006 (Exhibit 15).

It therefore should have been aware that after the custodian, the manager, and the board of directors had been excluded, it was the only one in charge and that it should have performed its own audit, control, and monitoring tasks with particular vigilance.

- UBSFS was responsible for preparation of the prospectuses. Nevertheless, the prospectuses mentioned neither the existence of a delegation of custody to BMIS, nor the existence of a management delegation.

- According to the information in the possession of the trustees, it would also appear that UBSFS did not submit the information regarding the delegations to the Financial Sector Supervisory Committee.

- After August 1, 2006, UBSFS also failed in its obligation to audit and verify the legality of structures and to identify the risk areas that had been established in Appendix II to the agreement of September 22, 2006 and Appendix I to the agreement of November 17, 2008, respectively.

It was hardly concerned at all with the fact that no information had ever been transmitted to it by the official manager, nor by the fact that all the shares and securities upon which its computations were based were in the custody of BMIS and managed by the latter. These facts nevertheless constituted "risk areas" in the structure, and maintaining them was in violation of mandatory provisions of law, beginning in the month of August 2006.

[stamp:] 2 euros

72

It certainly failed to recommend and perform effective monitoring of the delegated tasks, because manifestly no monitoring of the tasks delegated to BMIS ever took place. If any such control or monitoring had taken place, it is inconceivable that it would not have made it possible to detect the misappropriations of assets of which the sub-custodian was guilty or the absence of actual asset management.

A discovery of these facts at the point in time that the pertinent responsibility was assigned to UBSFS, moreover, would have made it possible to prevent any losses.

UBSFS is therefore jointly liable for the wrongs committed and the damages caused.

### 3.3. Aggravating circumstances:

By accepting the administrator functions and by appearing as such in subsequent prospectuses, UBSFS contributed to creating an appearance of security which induced many investors to invest in Luxalpha and subsequently not to request redemption of their shares, the performance of which appeared to be satisfactory.

Its valuation of Luxalpha shares, published twice a month, provided investors with an additional and definite guarantee as to the assets held by Luxalpha and prevented investors from doubting the fact that UBS SA, in its capacity as custodian, effectively controlled and preserved the assets.

As the consideration for its work as Luxalpha administrator, UBSFS received a fee of 0.05% of assets per annum, for a total amount of USD 2,634,871.06 over the life of Luxlpha [sic].

### 3.4. The petitioned judgment:

For the period from August 1, 2006 to November 17, 2008, UBSTPM was Luxalpha's administrator. The fact that it delegated its duties has no impact on its own liability.

At the end of this subsection 3.4, the plaintiffs will therefore lodge the same petition as that directed against UBSFS, described hereinbelow, against UBSTPM.

1. Principally:

a) (i) The plaintiffs, exercising the rights of the company, seek to obtain a judgment against UBSFS on a contractual basis, ordering it to provide full indemnification of the damage suffered by Luxalpha by reason of the loss of all of its assets, the total value of which in USD is 1,323,852,143.93, which amount was estimated for court and recording requirements at EUR 881,216,896.71, if not any other higher amount to be decided by the court or by expert opinion,

(ii) As a subsidiary petition, and in the event that their legal standing to act in that capacity is contested, the plaintiffs present the same judgment petition, on this occasion, based upon tort liability on the grounds of articles 1382 ff. of the Civil Code, in their capacity as representatives of Luxalpha creditors and shareholders,

In both instances, it is therefore lawful and necessary to render a judgment against UBSFS to pay the plaintiffs the amount of USD 1,323,852,143.93, which was estimated for court and recording requirements at EUR 881,216,896.71, if not any other higher amount to be decided by the court or by expert opinion, which represents the cash equivalent of the shares and securities deemed to be in the Luxalpha portfolio as of the date it was

CONFIDENTIAL TREATMENT REQUESTED

UBSL 000841

placed in liquidation, in regard to which the administrator could not reasonably contest that they could have (and should have) been acquired with the capital provided by the shareholders and entrusted to it by Luxalpha, with said amount increased by the result of prudent management in compliance with the investment policy, from November 30, 2008 until execution, if not any other higher amount to be decided by the court or by expert opinion, if not, as a more subsidiary petition, increased by interest at the legal rate from November 30, 2008 until payment in full, if not, as an even more subsidiary petition, from the date of the filing of this claim with the court until payment in full.

b) If not, as a subsidiary petition and on all the following principal and subsidiary bases, on the basis of the same legal standings and legal grounds cited principally and subsidiarily, a judgment against UBSFS to pay the plaintiffs the amount of USD 762,484,886, which amount was estimated for court and recording requirements at EUR 507,545,021.63, if not any other higher amount to be decided by the court or by expert opinion, which represents the capital transferred to BMIS, minus the amounts repatriated by BMIS, and increased by the result of prudent management in compliance with the investment policy, from the date of remittance of the funds until execution, if not, as a more subsidiary petition, that same amount increased by interest at the legal rate from the date of remittance of the funds until restitution, if not, as an even more subsidiary petition, from the date of the filing of this claim with the court until payment in full.

2. In all instances, the judgment should be rendered against UBSFS jointly and severally, if not, in solidum with BMIS's indemnification obligation which was the subject of the credit declaration that Luxalpha filed on February 27, 2009 to protect its interests [as a creditor].

3. The judgment against UBSFS should also be ruled to be joint and several if not in solidum with the other parties summonsed as defendants in this action.

A judgment identical to the petitioned judgment against UBSFS should be rendered against UBSTPM, which was the designated administrator between September 22, 2006 and November 17, 2009, and which in any case should receive a judgment against itself in the same manner as UBSFS, which UBSTPM succeeded in its tasks, specifically on the grounds of the express provision of article 85 (2) of the Law of 2002.

**4. The board of directors and its members:**

In an open-ended mutual fund organized in the form of a corporation, the functions of the board of directors are those of any board of directors, which means that the board has the power and authority to take all actions necessary or useful to achieving the company purpose, to the extent that such acts and actions are not reserved for the shareholder meeting.

Given the importance of the board of directors for an open-ended mutual fund, the Financial Sector Supervisory Committee requires that, as a general rule, the majority of the board of directors of a Luxembourg open-ended mutual fund be representatives of the sponsor.

The positions as members of the board of directors were held by the defendants named in the action under numbers 5 through 12, who held their positions during the following periods of time.

- R. Hartmann – UBS employee (February 2004–January 1, 2008)
- B. Stiehl – UBS employee (February 2004–December 15, 2005)
  The resignations of these two members of the board of directors were nevertheless not published in the Official Bulletin until February 12, 2009 and recorded with the Business and Companies Registry on February 27, 2009 (Exhibits 34 and 35)
- Hondequin – UBS employee (February 2004 – court-ordered liquidation)

[stamp:] 2 euros

74

CONFIDENTIAL TREATMENT REQUESTED

UBSL 000842

- H. Kranz – UBS employee (February 2004 – court-ordered liquidation)
- P. Delandmeter – ACCESS group (February 2004 – court-ordered liquidation)
- R. Egger – UBS employee (December 15, 2005 – court-ordered liquidation)
- R. Schroter – UBS employee (January 1, 2008 – court-ordered liquidation)
- P. Littaye – Access group (February 1, 2006 – court-ordered liquidation)

  Mr. Pierre Delandmeter – (February 1, 2006 – court-ordered liquidation). Mr. Delandmeter also acted in the capacity of legal counsel for Luxalpha. In the latter capacity he was in charge of, among other things, correspondence with the Financial Sector Supervisory Committee.

Subsection 4.1. hereinafter shall indicate the provisions of law applicable to their positions. Subsection 4.2. shall analyze the violations and nonperformance of which they are accused. Subsection 4.3 shall specify further the nature of the liability of members of the board of directors. Subsection 4.4 shall examine, as "aggravating circumstances," to what extent their actions make them complicit in the establishment and maintenance of an operating system that led to the loss of almost all Luxalpha assets. Subsection 4.5 shall state the judgment that the plaintiffs seek against them.


### 4.1 The applicable provisions of law and the bylaws:

- Luxalpha is an open-ended mutual fund organized in the form of a corporation. On that basis, it is subject to the provisions of the Law of August 10, 1915 on commercial companies, and with respect to its administration and management, it is subject to articles 50 through 60 bis of the aforementioned law.

- According to article 59 of the Law of August 10, 1915, *"the members of the board of directors are liable to the company in accordance with ordinary law, with respect to performance of the duties of the positions to which they were appointed and the wrongs committed in their management performance.*
*They are jointly and severally liable, both vis-à-vis the company and vis-à-vis all third parties, for all damages resulting from violations of the provisions of this law or the company bylaws. They shall be discharged from the aforementioned liability for violations in which they did not take part, only if no fault is attributable to them and if they reported said violations to the next shareholder meeting after they became aware of same."*

- The Law of 2002, exactly like the Law of 1988, requires that the top executives of a mutual fund have sufficient experience and reputability, including in view of the type of mutual fund involved. For such purpose, notification of the identity of the top executives, as well as the identity of every person succeeding them in their positions, must be immediately provided to the Financial Sector Supervisory Committee. [51]

- According to article 14 of the Luxalpha bylaws, the board of directors shall enjoy the broadest powers to orient and manage company affairs and to carry out the acts of disposition and administration that fall within the company purpose, conditional upon compliance with the investment policy, as provided by article 17 of the bylaws (Exhibit 38, coordinated bylaws).

- The company purpose is defined in the following manner by article 4 of the bylaws:

*"The exclusive purpose of the Company is to invest the funds that it possesses in securities of any nature and in other assets authorized by law within the framework of the investment policy and restrictions determined by the board of directors in compliance with Article 17 hereinafter, with the objective of spreading investment risks and causing its shareholders to benefit from the results of management of its assets.*

---

[51]    Article 93 (3) of the Public Law of 2002, Article 71 (3) of the Public Law of 1988.

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000843

*The Company may take all actions and execute all transactions that it shall deem necessary and appropriate to accomplishing and carrying out its purpose, in the broadest sense authorized by the Law of December 20, 2002 on mutual funds, as amended."*

### 4.2 The nonperformance and violation of obligations on the part of members of the board of directors:

- First of all, we specifically note that all the board of directors decisions were adopted unanimously.

- Even though by reason of the fact that they were appointed at the recommendation of the sponsors, one cannot expect total independence on their part, they took their dependence on the sponsors so far that it is possible to term them puppets of UBS and ACCESS—in view of their attitude throughout the course of the events.

 That is what shall be demonstrated hereinafter.

- As was stated in Subsections 1.1. and 1.2. hereinabove, the board of directors signed three successive custody agreements with UBS SA, and on February 5, 2004 it also signed with UBS SA an agreement under which it assigned UBS SA responsibility for asset management.

It was the fact of entrusting asset custody and asset management for Luxalpha assets to UBS SA that made possible the fact that the latter was able to delegate those two functions to BMIS.

This fact, even if it had not been contrary to law at the time that the decision was made, at the least constituted grave imprudence on the part of the members of the board of directors who, as knowledgeable professionals, could not be unaware of the fact that if Luxalpha had obtained its authorization only three days later, the law would have prohibited such a combining of delegations for quite evident reasons of protection of investor interests.

In any case, the fact that they were aware of such a combination of functions should have prompted the board of directors to exercise its investment supervision and monitoring functions with particular vigilance, which it manifestly did not do.

- At the time they formally took office, on February 5, 2004, the board of directors authorized the signing of the two agreements to be signed with UBS SA. It also decided to approve Luxalpha assets being held by the custodian instead of in-house, which is to say, with a "broker dealer" registered in the United States, as well as to open separate accounts ("segregated accounts") with BMIS. (Exhibit 35, Board of Directors Decision of February 5, 2004). [52]

Even though the "Custodian Agreement" had been signed on that same date, no reference was made therein to the opening of accounts with BMIS.

Also on that same date, the board of directors decided to assign to UBS SA management of the aforementioned accounts, and authorized the signing of the "Trading Authorization Limited to Purchases and Sales of Securities" and the "Option Agreement."

Even though the "Portfolio Management Agreement" was signed on that same date, no reference was made therein to the "Trading Authorization" or to the "Option Agreement." Appendix IV[53] to the "Portfolio Management Agreement" contains only the special investment rules for the account to be opened with BMIS, but no reference was made to the other documents, nor to a management delegation. Furthermore, as was stated in Paragraph 1.2., the signing of a management delegation to BMIS was provided under the very terms of the "Portfolio Management Agreement" (specifically by the provisions of article 3, paragraph 7 and article 4, paragraph 2).

[stamp:] 2 euros

---

[52]      In actual fact, the segregated account was opened at BMIS in the name of UBS SA.

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000844

It is difficult to see the reasons that prevented the board of directors from mentioning BMIS's functions in the agreements, unless the reason was that the agreement was supposed to have been submitted to the Financial Sector Supervisory Committee along with the authorization application documentation, or that the board was not informed, or that it was hardly concerned at all with the scope and extent of the delegation to BMIS.

In the same decision of February 5, 2004, the board of directors approved the prospectus. The prospectus nevertheless reflected neither the fact that UBS SA would place Luxalpha assets in the custody of a broker dealer, nor the opening of accounts with BMIS. The prospectus was also silent on any BMIS participation in fund asset management.

All these actions constitute manifest violations of the obligation of members of the board of directors to provide to shareholders complete and honest information on Luxalpha, its assets, and its management.

However, article 110 (1) of the Law of December 20, 2002, which is a mandatory public order provision, provides that *"both the simplified prospectus and the complete prospectus must contain the information that is necessary in order for investors to be able to judge, with full and complete knowledge of the matter, the investment that is offered to them, and particularly the risks inherent in the latter. The complete prospectus shall contain a clear and easily understandable description of the fund's risk profile, independently of the instruments in which it invests."*

By not complying with the aforementioned obligation, the members of the board of directors therefore manifestly violated article 110 (1).

- The board subsequently decided, on August 1, 2006, to make Luxalpha subject to the Law of 2002 which, it shall be recalled, prohibits assigning a management function to the custodian.

The initial custody agreement with UBS SA was therefore superseded by the agreement of September 22, 2006 (Exhibit 10), without any contractual provision that made any allusion to the fact that almost all of the assets in custody were with BMIS. On the contrary, as was underscored in Subsection 1.2. hereinabove, the new agreement itself contained provisions prohibiting any such custody (specifically article B.1.1.1.1.).

The management agreement with UBS SA was in turn terminated and the new management agreement was signed on September 22, 2006 with UBSTPM (Exhibit 10). The agreement did not make the slightest reference to BMIS, not even in the form of a text similar to Appendix IV of the prior agreement.

Furthermore, the agreement—and applicable law—expressly prohibited a delegation of management to BMIS. We point out in this regard that article 11 of the agreement adopted with UBSTPM limited UBSTPM's delegation authority solely to the delegations that Luxalpha could make. Now, beginning with the time of its subjection to the Law of 2002, Luxalpha could delegate management only to a manager authorized in compliance with the law. Even if the agreement had not placed those particularly strict conditions on any delegation of functions on the part of UBSTPM, the sub-delegation to BMIS would have in any case been contrary to the provisions of article 85 of the Law of 2002, which limits the possibility of delegation to firms authorized or registered for portfolio management purposes and subject to prudential supervision, make it subject to prior authorization by the Financial Sector Supervisory Committee, and limits said delegation as to its scope and extent.[54]

---

[53]

[54]        See the representations and arguments in Subsection 2.1.2.1. hereinabove

CONFIDENTIAL TREATMENT REQUESTED                                        UBSL 000845

Nevertheless, the members of the board of directors themselves—with the exception of Mr. Rene Egger, who was appointed only on December 15, 2005—had made possible the delegations to BMIS. Even Mr. Egger, in his position since December 2005, could not have been unaware that custody and management had been delegated to BMIS.

The members of the board of directors did nothing to stop the combining of the sub-custodian and manager delegations to BMIS, which was nevertheless prohibited under the terms of article 85 (1) e of the Law of 2002.[55]

The members of the board of directors therefore manifestly violated article 85 of the Law of 2002.

While avoiding any reference to the delegations in the agreements, which were submitted to the Financial Sector Supervisory Committee, the members of the board of directors also failed to provide information regarding BMIS' roles in the Luxalpha prospectuses (Exhibits 4 c-e). They were concerned solely with creating and maintaining an appearance of compliance with the requirements of the Law of 2002. By acting in that manner, they made themselves "accomplices" of the sponsors and the other participants.

- Far from supervising and monitoring Luxalpha assets with most particular vigilance, they subsequently decided, on November 28, 2006 (Exhibit 15), to delegate their investment policy and restrictions monitoring function to the "product control team" of UBSFS—which, it shall be recalled, was also the Luxalpha administrator—comprised of several participants, which were:

- the board of directors
- the management company
- the custodian and
- the agent responsible for computation of the NAV

The responsibility in question therefore in any case fell to UBSFS by reason of its obligations in relation to the computation of the NAV. The computation of the NAV was, as was explained in Section 3 hereinabove, delegated to UBSFS by the "dummy management company," which was UBSTPM under the agreement of September 22, 2006, to which Luxalpha was also a party.

If one knows that the provisions of the aforementioned agreement (Exhibit 28) permitted UBSFS, for purposes of the computation of the NAV, to rely upon the indications provided by the management company UBSTPM,[56] one can better understand that no one verified or audited anything. In actual fact, the information on the investments continued—as in the past—to be transmitted by UBS SA, because UBSTPM never took any part in management.

The board of directors therefore could not have been unaware of the fact that the delegation of the investment policy and restrictions monitoring and control function to UBSFS would in fact result in the outright elimination of any degree of monitoring and control.

Any monitoring and control of the reality or the nature of the investments by the board of directors was therefore excluded as a result of the aforementioned delegation. Unfortunately, UBSFS likewise performed no monitoring and controls, but simply relied upon the information regarding the (alleged) composition of the portfolio that it received from UBS SA.

[stamp:] 2 euros

---

[55]    Article 85 (1) e) "no agency or delegation pertaining to the principal function of investment management shall be given to the custodian, nor any other firm whose interests may conflict with those of the management company or the shareholders."

[56]    Article 2.2. of the Central Administration Agreement of September 22, 2006

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000846

As was explained in Subsection 2.1.3 of this writ of summons, the situation described hereinabove changed hardly at all with the adoption of the third custody agreement with UBS SA and the management agreement with AML on November 17, 2008.

The members of the board of directors thereby violated the Law of August 15, 1915, and specifically article 50, as well as the Law of 2002, by delegating all of the management of Luxalpha to third parties and not exercising the supervision, monitoring and control that was required.

They violated article 14 of the Luxalpha bylaws by not ensuring that the assets were invested in compliance with the Luxalpha investment policy.

They also violated article 4 of the bylaws by taking actions prohibited by the Law of 2002 or by permitting that such actions take place, specifically the delegation of management to BMIS or the combining of the latter delegation with the custody delegation.

They violated article 110 (1) of the Law of 2002 by publishing prospectuses that did not contain all the information that was required to be given to investors.

Lastly, they violated article 85 of the Law of 2002, by permitting the existence of prohibited delegations.

### 4.3. The nature of the liability of the members of the board of directors:

**- Principally:**

The wrongs, violations, and nonperformance committed by the members of the board of directors are all violations of provisions of law and/or provisions of the bylaws.

The plaintiffs bring their civil liability actions against the members of the board of directors on the grounds of article 59, paragraph 2 (i) principally on the basis of the rights of the Luxalpha company, which according to legal doctrine is a contractual liability, if not, on a subsidiary basis, tort liability, and (ii) on a subsidiary basis, the rights of creditors and investors on the basis of liability for damages to assets [aquilian liability], subsidiarily on the grounds of articles 1382 and 1383 ff. of the Civil Code, and on a more subsidiary basis, for purposes of completeness, on a contractual basis.

Simply the determination of a violation of law or the bylaws is sufficient to establish a civil wrong, without it being necessary to also demonstrate that the perpetrator was imprudent. (see RCJB 1990, page 203, Dalcq note).

"*In the event of a violation of the law or the bylaws, the members of the board of directors are presumed to be at fault; in order to overturn this presumption it shall be necessary for them to specifically establish that no fault can be attributable to them, and said fault may consist of negligence or omissions; to be exonerated of the aforementioned liability it is not sufficient to not have taken part in the violation....*" (Brussels Appeals Court, Division 1, Decision of September 28, 1966, Court Journal, 1967, page 97).

Their liability under article 59, paragraph 2 is incurred not only on the grounds of violations of the Law of 1915, but also on the grounds of the violation of the Law of 2002, and all other provisions of law currently in force, as well as on the grounds of provisions of the bylaws. In fact, "*if the violation of the bylaws is beyond the slightest dispute (as provided by the version of the company bylaws applicable at the time of the acts), the violation of the law raises questions. Does this violation only involve corporate law? Legal doctrine responds in the negative to this question. Violation of the law does not necessarily mean a violation of the L.S.C.*" [The Law on Commercial Companies of

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000847

August 10, 1915] and "*Any wrong whatsoever, in a direct causal relationship with damages suffered by third parties, for example, a violation of article 1382 of the Civil Code and article 1383 of the Civil Code, suffices.*" [57]

Case law therefore has established a presumption of their liability. Said presumption can only be overturned by the proof to be provided by the members of the board of directors that they did not participate in the violation, that they did not commit a wrong and—if they did not participate—that they reported the violations in question to the next shareholder meeting after they became aware of said violation.

A liability action brought on the grounds of article 59, paragraph 2 entails joint and several liability on the part of all the members of the board of directors.

Any possible full discharge of liability does not discharge the members of the board of directors from liability pursuant to an action brought in the name of creditors and investors; pursuant to a civil liability action brought by the receiver or trustee, a discharge protects them only if the acts committed in violation of the law and the bylaws had been specifically indicated in the meeting notice for the shareholder meeting called to make a decision regarding the discharge [in question]. However, such was never the case in the case before us.

**- On a subsidiary basis:**

By application of article 59, paragraph 1 of the Law of August 10, 1915, the members of the board of directors are liable for the wrongs, nonperformance and violations committed in the management of the assets of the open-ended mutual fund. Their in solidum liability is therefore sought, if not, each for his own share, on a contractual basis, in connection with the plaintiffs exercising the company's rights with respect to the damages caused to Luxalpha by the management faults, violations, and wrongs committed.

Furthermore, Luxembourg legal doctrine indicates that in the event that management was partially delegated to a management company, the board of directors remains liable for the supervision and coordination of the delegated tasks. [58]

Such is also indicated by the bylaws and article 9 of the prospectuses, which specifically state that the (portfolio management) delegation shall be performed subject to the supervision and responsibility of the fund's board of directors.

We specifically state that the members of the board of directors every year requested and obtained a discharge vote from a regular shareholder meeting.

Because the discharges in question were obtained on the basis of the presentation to the shareholder meeting of company reports and financial statements, no element of which made it possible to suspect the actual structure of Luxalpha, nor the fact that the assets placed in the custody of BMIS had been systematically misappropriated by Madoff, said discharge cannot exonerate the members of the board of directors from their full and complete liability for the damages caused.

- As a result of the act of authorizing the delegation of custody and management of nearly all of Luxalpha's assets to BMIS, without establishing or ensuring the establishment of structures that would make it possible to verify the existence and nature of the investments made for Luxalpha, the damages suffered by the plaintiffs were absolutely foreseeable.

[stamp:] 2 euros

---

[57]     Jean-Pierre Winandy, Corporate Law Handbook, Legitech, Legal and Tax Publishers, 2008 edition, p. 537
[58]     Claude Kremer & Isabelle Lebbe, op. cit., No. 772, p. 366.

80

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000848

- <u>In all instances:</u> The damages are in a direct causal relationship with the violations by the members of the board of directors of their legal and bylaws obligations, as well as, subsidiarily, with the other wrongs or imprudent acts that they committed during the course of carrying out the duties and functions of their positions, given that said violations, faults, and wrongs contributed to establishing the famous façade and made it possible to maintain that facade over the course of the years.

### 4.4. Aggravating circumstances:

In view of the manner in which the structure of Luxalpha was designed, and in view of the failure of the board of directors to reference BMIS's functions in the agreements that they signed and which covered the custody and management of Luxalpha assets, in view of the fact that they failed to indicate the delegation of the aforementioned functions to BMIS in the Luxalpha prospectus, it can be clearly seen that the board of directors were more concerned with the sponsors' interest in obtaining and maintaining authorization for Luxalpha, and thereby benefiting from a structure that enabled them to receive substantial fees, than the interests of Luxalpha and its shareholders.

The interests of Luxalpha and its shareholders would have consisted of sound and secure management and preservation of assets, in compliance with provisions of law and the bylaws, as well as prudential rules. We have seen that the board of directors had no concern for the latter.

In fact, the members of the Luxalpha board of directors quite simply behaved as puppets of the sponsors. That is specifically shown by the fact that they did not prevent the retention of the delegations of the custody and management functions to BMIS when they became illegal in 2006, and that they delegated all of their own functions, including the investment supervision function, to third parties.

They appear to have been aware of the personal risk inherent to their role in Luxalpha, because they decided, at their very first meeting on February 5, 2004, not only to take out business civil liability insurance for themselves and for Luxalpha, but to have themselves issued individually, as additional coverage, as of February 5, 2004, by ACCESS International Advisors (Luxembourg) SA—referred to in this document as "Sponsor"—a guarantee ("Indemnity") by which the latter obligated itself to indemnify and hold them harmless from any liability that they might incur by reason or in connection with the performance or the nonperformance of their obligations as members of the board of directors, an example of which is Exhibit 39 cited by the plaintiffs (Exhibit 39 "Indemnity Letter" of February 5, 2004).

These guarantees were superseded on November 17, 2008 by new guarantees signed by Access Management Luxembourg SA, again in its capacity as sponsor (Exhibit 39 b "Indemnity Letter" of November 17, 2008).

### 4.5. The petitioned judgment:

### 1. Principally:

The plaintiffs bring their civil liability action against the shareholders on the grounds of article 59, paragraph 2,
(i) <u>principally</u> on the basis of the rights of the Luxalpha company, which according to legal doctrine is a contractual liability, if not, on a subsidiary basis, tort liability, and
(ii) <u>on a subsidiary basis</u>, the rights of creditors and investors on the basis of liability for damages to assets, subsidiarily on the grounds of articles 1382 and 1383 ff. of the Civil Code, and on a more subsidiary basis, for purposes of completeness, on a contractual basis.

81

CONFIDENTIAL TREATMENT REQUESTED

UBSL 000849

**2. As a subsidiary petition:**

The plaintiffs bring in the name of Luxalpha an "actio mandati" on the grounds of article 59, paragraph 1, given that by the wrongs, violations, and nonperformance cited hereinabove, the members of the board of directors gravely violated their obligation to perform the duties of their positions in a prudent and diligent manner.

A judgment should therefore be rendered against the members of the board of directors, on a contractual basis, in solidum, if not, each for his own share of the damages, which must nevertheless be full and complete for each party against whom judgment is imposed, given their role in the genesis of the damages,

**3. in all the instances cited hereinabove,** on the principal and subsidiary bases which are cited therein and on the basis of the same legal standings and legal grounds cited, it is necessary and lawful to render a judgment against the members of the board of directors jointly and severally, if not, in solidum, if not, each for his own share of the damages, which must nevertheless be full and complete for each party against whom judgment is imposed, given their role in the genesis of the damages, to be paid to the plaintiffs.

a. as the principal petition, the amount of USD 1,323,852,143.93, which was estimated for court and recording requirements at EUR 881,216,896.71, if not any other higher amount to be decided by the court or by expert opinion, with the latter amount increased by the result of prudent management in compliance with the investment policy beginning on November 30, 2009 [sic], if not, as a more subsidiary petition, increased by interest at the legal rate from November 30, 2008 until payment in full;

b. as a subsidiary petition, the amount of USD 762,484,886, which amount was estimated for court and recording requirements at EUR 507,545,021.63, if not any other higher amount to be decided by the court or by expert opinion, which represents the capital transferred to BMIS, increased by the result of prudent management in compliance with the investment policy, from the date of remittance of the funds until execution;

c. as a more subsidiary petition, the amount of USD 762,484,886, which amount was estimated for court and recording requirements at EUR 507,545,021.63, if not any other higher amount to be decided by the court or by expert opinion, which represents the capital entrusted to it and transferred to BMIS, increased by interest at the legal rate, from the date of remittance of the funds until execution;

4. In all instances, the judgment should be rendered against the members of the board of directors jointly and severally, if not, in solidum with BMIS's indemnification obligation which was the subject of the credit declaration that Luxalpha filed on February 27, 2009 to protect its interests [as a creditor].

5. The judgment against the members of the board of directors should also be ruled to be joint and several if not in solidum with the other parties served summonses as defendants in this action.

**5. The sponsors:**

The following legal entities have stated as fact their capacities as sponsors of Luxalpha:

- UBS AG, in the Luxalpha prospectuses (Exhibit 4a–4e);

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000850

- UBS SA, in the authorization application submitted to the Financial Sector Supervisory Committee (Exhibit 2) and in a confirmation letter sent to the Financial Sector Supervisory Committee on August 20, 2008 (Exhibit 2b), as well as in the agreement signed on September 22, 2006 with UBSTPM (Exhibit 13).

- Access Management Luxembourg SA, according to the "Indemnification Letters" signed on January 5, 2004 and November 17, 2008, respectively, to the benefit of the members of the Luxalpha board of directors (Exhibits 39 and 39b).

The function of sponsor is a construction of the administrative practice of the Financial Sector Supervisory Committee. Its role is not defined in any provision of law.[59]

The participation of one or even several sponsors is required by the Financial Sector Supervisory Committee so that they can assume the consequences of any possible failure of the open-ended mutual fund *vis-à-vis* its shareholders. On that basis, the Financial Sector Supervisory Committee requires that the sponsor be a first tier banking and financial group.

In order to ascertain the financial soundness of sponsors and their capacity, if circumstances dictate, to indemnify the shareholders of an open-ended mutual fund, the Financial Sector Supervisory Committee requires for such purpose the production of the sponsor's recent financial reports. When the soundness of the financial institution in question does not appear to be sufficient, the Financial Sector Supervisory Committee refuses to authorize the mutual fund.

For its part, legal doctrine specifies that "*the sponsor of a mutual fund must, in addition, have a sufficiently strong financial position to be able to meet, if necessary, the damages compensation claims resulting from any possible violations, irregularities, or deficiencies found in the management and administration of the mutual fund. The purpose of this requirement is to prevent the liability of the top executives of a mutual fund from remaining purely theoretical or illusory.*" [60]

It may occur that a sponsor does not have the financial position required by the Financial Sector Supervisory Committee. In that event, legal doctrine considers that "*the sponsor must have the support of a third party that has means and resources that are deemed to be sufficient. Said third party is deemed to have made available the funds for any possible damages compensation required.*"[61]

Subsection 5.1 hereinafter sets forth the grounds for and the scope and extent of the sponsors' liability. Subsection 5.2 details the sponsors' violations and nonperformance of their obligations. Subsection 5.3 specifies the petitioned judgment against them.

### 5.1 The grounds for and the scope and extent of the sponsors' liability:

The term "sponsor" refers to the party that is behind a mutual fund, that provided the impetus for or prompted the organization of the fund, and that determines the direction and orientation of its activities or that benefits from the implementation of same.

All the foregoing conditions are indisputably met by the three sponsors enumerated hereinabove. It was they that were behind the organization of Luxalpha, it was they who determined the direction and orientation of its functioning and activities so that it would be compatible with its function as a "feeder" for BMIS. Indisputably, they also benefited greatly from its existence, not only because their ability to offer investments with Madoff enabled them to attract more wealthy clients, but above all because of the substantial fees deducted from Luxalpha's

---

[59]       Claude Kremer & Isabelle Lebbe, op. cit., Nos. 374 ff.
[60]       Claude Kremer & Isabelle Lebbe, op. cit., No. 379.
[61]       Claude Kremer & Isabelle Lebbe, op. cit., No. 385.

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000851

assets which they collected or were paid by affiliated companies.

UBS AG, UBS SA and ACCESS MANAGEMENT LUXEMBOURG SA have indisputably determined the conduct of Luxalpha's activities since its creation, specifically through the following actions and interventions:

(i) UBS SA and UBS AG organized Luxalpha and arranged for its launch and marketing;

(ii) UBS SA and UBS AG enabled Luxalpha, due to their reputation and the financial guarantees that they provided, to obtain Financial Sector Supervisory Committee authorization and thereby to be authorized for marketing;[62]

(iii) The sponsors designated their representative and employees to be members of, and to direct the board of directors of the open-ended mutual fund;

(iv) UBS SA, the chairman and a majority of the members of whose board of directors are UBS AG representatives and employees, itself performed the functions of custodian, paying agent, and distributor and, for more than two years, the function of management company;

(v) UBS SA and UBS AG also delegated (or had the board of directors delegate) all of the following functions to their affiliated Luxembourg entities:
- the management company function to UBSTPM, the chairman and a majority of the members of whose board of directors are their representatives and employees and
- the administrator function to UBSFS, which is another entity in the UBS group.

They are consequently liable on the same basis as the de jure directors and in identically the same manner as the latter, but of course without, for all that, exonerating the latter from their liability.

In terms of liability, the scope and extent of the sponsor's obligations has been reaffirmed on numerous occasions, both by Financial Sector Supervisory Committee regulations and administrative practice, and by legal doctrine.

According to the Financial Sector Supervisory Committee, the sponsor's crucial and determining participation and intervention in the launching and management of a mutual fund makes it liable for "all damages caused to third parties as the result of any faults or wrongs in the management or administration of the mutual fund."

The Financial Sector Supervisory Committee in fact affirms that the sponsor's role specifically consists of covering all damages caused by violations, irregularities or deficiencies in the management and administration of a mutual fund.

As was indicated hereinabove, UBS AG made public its commitment to investors as sponsor in the Luxalpha prospectus, and the purpose of the advantageous presentation of the UBS Group's financial position and soundness was to provide total confidence to future investors as to the security of the UBS product in which it was proposed that they invest.

Furthermore, by expressly indicating their capacity as sponsors in the other documents cited hereinabove, the sponsors, UBS AG, UBS SA and Access Management Luxembourg, had clearly manifested their

[stamp:] 2 euros

---

[62]       We point out that the Luxalpha prospectus states: *"The Fund's sponsor, UBS AG, is one of the principal financial institutions in the world, and offers an entire product line of commercial, trading, risk management, and placement services."*

CONFIDENTIAL TREATMENT REQUESTED                                                    UBSL 000852

intention *vis-à-vis* Luxalpha and the investors to fully assume the responsibilities and liabilities inherent in the status of a sponsor under Luxembourg law. The sponsors thereby established themselves as guarantors of the organization and proper operation of the open-ended mutual fund.

Besides their functions as guarantors, UBS SA, UBS AG and Access Management Luxembourg SA, due to their omnipresence in Luxalpha, are to be considered de facto directors. They are consequently liable on the same basis as the de jure directors, but without for all that exonerating the members of the board of directors from their liability.

The plaintiffs suffered losses by reason of the wrongs or negligent acts committed by the various professional actors, [and] the sponsors are responsible for performing and executing their guarantee by indemnifying Luxalpha and the investors.

In their capacity as Luxalpha sponsors, UBS AG, UBS SA, and Access Management Luxembourg are required to indemnify the damages suffered by Luxalpha and the investors by reason of the wrongs and violations committed by the aforementioned actors.

### 5.2. The sponsors' violations and nonperformance of their obligations:

These violations and nonperformance consist, first of all, of establishing a structure that only apparently represented that of an open-ended mutual fund subject to section I of the Law of 2002, but which did not provide the asset preservation, management and supervision guarantees and protections the aforementioned provision of law provides with the evident purpose of investment protection.

They subsequently consisted of incomplete disclosures and information for investors, who could have thought, in complete good faith, that they were investing in a purely UBS product.

The aforementioned nonperformance and violations are the direct cause of the loss of the totality of Luxalpha investments as a result of their misappropriation by Madoff.

The sponsors themselves are therefore fully liable for indemnification of the plaintiffs for all of the damages resulting from the violations, irregularities or deficiencies in the management and administration of Luxalpha.

### 5.3. The petitioned judgment:

The plaintiffs therefore seek to obtain from the sponsors, by reason of the liability that legal and prudential rules impose on the latter, indemnification of the entirety of their damages detailed hereinafter.

### 1. Principally, as guarantors:

The plaintiffs bring this action principally on the basis of Luxalpha's rights, if not, subsidiarily on the basis of the rights of investors and creditors,

(i) principally, on a contractual basis, and

(ii) subsidiarily, on the tort liability basis of articles 1382 ff. of the Civil Code,

### 2. Sudsidiarily, as de facto directors:

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000853

The plaintiffs first of all intend to bring the action for which Luxalpha has a right of action, and more subsidiarily the action for which the creditors and shareholders have rights of action,

(i)        principally on the grounds of article 59, paragraph 2 of the Law of August 10, 1915, and
(ii)       subsidiarily, on the grounds of articles 1382 ff. of the Civil Code and
(iii)      more subsidiarily, for purposes of completeness, on a contractual basis.

In all instances the sponsor seeks a judgment that is joint and several, if not, in solidum, if not each for his own share of the damages, which judgment must nevertheless be full and complete for each party summoned as a defendant in this action as well as UBS AG, and on all the principal and subsidiary bases which have been cited herein, and on the basis of the same legal standing and the same legal grounds that have been cited, to pay the plaintiffs:

a. as the principal petition, the amount of USD 1,323,852,143.93, which was estimated for court and recording requirements at EUR 881,216,896.71, if not any other higher amount to be decided by the court or by expert opinion, with the latter amount increased by the result of prudent and diligent management in compliance with the investment policy beginning on November 30, 2009 [sic], if not, as a more subsidiary petition, increased by interest at the legal rate from November 30, 2008 until payment in full;

b. as a subsidiary petition, the amount of USD 762,484,886, which amount was estimated for court and recording requirements at EUR 507,545,021.63, if not any other higher amount to be decided by the court or by expert opinion, which represents the capital transferred to BMIS, increased by the result of prudent and diligent management in compliance with the investment policy, from the date of remittance of the funds until execution;

c. as a more subsidiary petition, the amount of USD 762,484,886, which amount was estimated for court and recording requirements at EUR 507,545,021.63, if not any other higher amount to be decided by the court or by expert opinion, which represents the capital transferred to BMIS, increased by interest at the legal rate, from the date of remittance of the funds until execution;

3. **In all instances,** the judgment should be rendered against the sponsors jointly and severally, if not, in solidum with BMIS's indemnification obligation which was the subject of the credit declaration that Luxalpha filed on February 27, 2009 to protect its interests [as a creditor], as it was obligatorily forced to do in view of its custodian's inaction.

4. The judgment against the sponsors should also **in all instances** be ruled to be joint and several if not in solidum with the other parties served summonses as defendants in this action.

[stamp:] 2 euros

86

CONFIDENTIAL TREATMENT REQUESTED                                                    UBSL 000854

### 6. The auditor: Ernst & Young S.A.

Ernst & Young S.A. (referred to hereinafter as "EY"), is a corporation organized under Luxembourg law accredited as a corporate auditor in compliance with the Law of June 28, 1984, a member of the [Luxembourg] Institute of Registered Auditors, [IRE = *Institut des réviseurs d'entreprises*] and included on the official register of corporate auditors.[63]

EY is part of a network of auditors and consultants that is rated as one of the top four firms operating worldwide.

EY's reputation constitutes a guarantee of confidence for the investor, and its Internet site describes the service quality that the investor is entitled to expect from EY.[64]

EY was not an insignificant service provider when it signed an engagement letter with Luxalpha. In fact, the auditor plays an essential role in the operation and functioning of a Luxembourg open-ended mutual fund. The auditor's missions are clearly defined by law:

- first of all, it is the auditor of the annual financial statements prepared by the board of directors. In this role, it is the guardian of the accuracy of the financial information disclosed and communicated by the open-ended mutual fund to shareholders and third parties.

- Secondly, it acts pursuant to the prudential audit established by the Financial Sector Supervisory Committee (CSSF) by examining the open-ended mutual fund's operations, organization and established procedures. In this capacity, it participates in prudential supervision and, in the interest of said supervision, it performs a certain number of duties that normally would be the responsibility of the supervisory authority.

As shall be explained hereinafter, for the audit of the annual financial statements, the auditor prepares a report on the annual financial statements which is made available to the public. For the audit of operations and activities, it prepares a report specifically addressed to the board of directors of the open-ended mutual fund, and most especially the Financial Sector Supervisory Committee.

### 6.1. The applicable legal and contractual provisions:

---

[63]     See IRE Internet site http://www.ire.lu under the member directory

[64]     site: http://www.ey.com/GL/en/Services/Assurance/About-Assurance

"*About Ernst & Young's Audit Services*

*A tailored service and a consistent methodology: The quality of our audit starts with our 60,000 assurance professionals who have the breadth of experience that comes from auditing many of the world's leading and fastest growing companies and to whom we provide the best available ongoing personal and professional development. We provide a consistent worldwide audit by assembling the right multi-disciplinary team to address the most complex issues, using a proven global methodology and deploying the latest, high quality auditing tools and perspectives. And because we understand that, to achieve your potential, you need a tailored service as much as a consistent methodology, we work to give you the benefit of our deep industry sector knowledge and experience, our extensive subject matter knowledge and the latest insights on topics which concern you. It's how Ernst & Young makes a difference.*"

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000855

A corporate auditor's work is strictly defined by the work standards mandated, respectively, by Luxembourg laws (see Section (a) hereinafter), the Institute of Registered Auditors (IRE) (see Section (b) hereinafter, and Financial Sector Supervisory Committee Circulars (see Section (c) hereinafter). Moreover, the work of a corporate auditor is performed pursuant to a contract signed with the audited entity (see Section (d) hereinafter).

**(a) Luxembourg Laws:**

**(a) 1. The Law of December 20, 2002 on mutual funds:**

- According to article 110 (5) of the aforementioned law "*the annual report must contain a balance sheet or a statement of assets, a detailed statement of fiscal year income and expenses, a report on activities during the past fiscal year, and the other information provided by Appendix I, Schedule B of this law, as well as any significant information that enables investors to make, with full knowledge of the situation, a judgment regarding the mutual fund's results and the progress of its activities.*"

- The provisions of article 113 provide that:

"*(1) Luxembourg mutual funds must have the accounting data and information contained in their annual reports audited by an accredited auditor.
The auditor's certification and, if applicable, the audit qualifications shall be reproduced in full in every annual report….*

*(3) The auditor is required to rapidly report to the Financial Sector Supervisory Committee any action or decision of which it became aware during the performance of the audit of the accounting data and information contained in the annual report of a mutual fund, or any other mission with a mutual fund that is provided by law, when said action or said decision is of such a nature as to:
- constitute a grave violation of the provisions of this law or provisions of the implementing regulations adopted for this law, or
- harm the status of the mutual fund as a going concern, or
- result in denial of certification of the financial statements or the issuing of qualifications to the financial statements certification.*

*In performing missions contemplated by the foregoing paragraph at a mutual fund, the auditor is also required to rapidly inform the Financial Sector Supervisory Committee of any action or decision pertaining to the mutual fund which meets the criteria enumerated in the foregoing paragraph, of which the auditor became aware in performing the audit of the accounting data and information contained in its annual report, or pursuant to any another mission provided by law at another company related to said mutual fund through a control relationship.*

*(…) if in performing its mission, the auditor acquires knowledge of the fact that the information provided to investors or to the Financial Sector Supervisory Committee in the mutual fund's report or other documents does not truly and fairly describe the financial position and the asset position of the mutual fund, it is required to so inform the Financial Sector Supervisory Committee as soon as possible.*

*The auditor is also required to provide to the Financial Sector Supervisory Committee all the information or certifications that the latter should require regarding the issues of which the auditor has or should have gained knowledge pursuant to the performance of its mission. The same applies if the auditor acquires knowledge that the mutual fund's assets are not or have not been invested in compliance with the rules provided by law or the prospectus.*"

According to this legal definition of its mission, the auditor is therefore required to certify whether the accounting data and information contained in an open-ended mutual fund's annual report provides a true and fair view of the assets, financial situation, and results of the open-ended mutual fund, which enables investors to

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000856

make a decision with full and complete knowledge of the situation. However, the auditor's mission goes further, with the auditor's obligation to alert the Financial Sector Supervisory Committee in the event of the discovery of important facts.

**a.) 2. The Law of June 28, 1984 on the organization of the audit profession:**

According to article 1 of the aforementioned law, a corporate auditor is "a person that has as a customary profession the performance of legal audits of company accounts."

Article 10 created the IRE (Institute of Registered Auditors), whose general meeting may, according to article 22, "*at the recommendation of the Institute Council, issue to auditors recorded in the Institute official register, recommendations regarding the preparation or auditing of financial statements.*"

Despite the term employed, these "recommendations" in fact constitute binding and mandatory professional standards, non-conformance to which may be penalized by the Disciplinary Council as professional wrongdoing or negligence (article 26).

**b) Financial Sector Supervisory Committee Circulars:**

**b) 1. Financial Sector Supervisory Committee Circular 02/81 of December 6, 2002:**

- Financial Sector Supervisory Committee Circular 02/81 covers auditor missions with mutual funds. "*Its purpose is to establish rules as to the scope of the mandate for audits of annual accounting documents and the content of the audit reports to be prepared pursuant to same.*"

The Circular specifies that "*the auditor's mission is not limited to an audit of accounting documents, but also consists of an analysis of the operation and functioning of the mutual fund as well as an analysis of procedures.*"

- Chapter I of the Circular defines the **auditor's mandate** in the following terms:

*1. "The audit of annual financial statements must be performed according to the work recommendations issued by the IRE. In this regard, the IRE provides for the application of international audit standards ("International Standards on Auditing, ISA") published by the IFAC ("International Federation of Accountants"), as adapted or supplemented as necessary by national legislation or practices.*

*2. The audit must encompass all the mutual fund's categories of transactions, whether such transactions are on or off the balance sheet. The mandate granted to the auditor may not exclude from the scope of the audit a category of transactions or a specific transaction. The audit must also cover all of the risks incurred by the mutual fund.*

*3. The audit must cover all organizational aspects as well as an examination of the procedures applicable to the mutual fund. Among other things, it shall involve an analysis of procedures regarding compliance with investment restrictions, NAV computation control, reconciliations, as well as procedures with respect to valuation methods. The audit must in fact make it possible to provide all the information required in the report on the annual financial statements and in the report of the audit of the mutual fund's activities.*

*4.        (………………......)*

89

*5. The audit of annual financial statements described hereinabove is to be documented, first of all, by a report on the annual financial statements and, secondly, by a report of the audit of the mutual fund's activities."*

- Chapter II states that the **report on the annual financial statements** shall contain the auditor's certification, which is issued in conformance to ISA 700 standards, as adopted by the IRE. The report on the annual financial statements must contain "*all significant information that makes it possible for investors to make, with full and complete knowledge of the situation, a judgment regarding the mutual fund's results and the progress of its activities." and it "is required to be submitted to the Financial Sector Supervisory Committee within a period of four months following the end of the period covered by said report.*"

- In Chapter III, the Circular covers the **report of the audit of the mutual fund's activities (long form).** The "*objective of the report is to report the findings regarding the mutual fund's organizational and financial aspects, particularly its relationships with the central administration, the custodian bank, and the other intermediaries (the managers, transfer agents, distributors, etc.), that the auditor has made during the course of its audit. The report on the audit of mutual fund activities must be clear, concise, and critical. It is not intended for the public. It is issued for the exclusive use of the mutual fund board of directors or the mutual fund management company, as well as for use by the Financial Sector Supervisory Committee.*"

The report must cover for each point enumerated in a reporting outline "*the findings that are essential to enabling a precise and well-founded judgment regarding the mutual fund's organization and financial statements*" and "*the auditor must state an opinion pursuant to its customary controls performed in accordance with the recommendations of IRE RRC No. 21,*[65] *regarding compliance with legal and/or regulatory investment restrictions, and the auditor must also achieve assurance that the established systems make possible an accurate computation of the net asset value.*"

*"The auditor must indicate the NAV computation errors and violations of investment restrictions which it may have found during the audit….," the auditor "must state in detail the weakness and areas for improvement that it found during the audit…"*

It is required that the auditor's finding be accompanied by comments by the mutual fund board of directors or the mutual fund management company. In the event that a letter of recommendations is prepared, the latter must be appended to the report on the audit of the mutual fund's activities.

*"The auditor shall audit and examine whether the management company is performing its functions in compliance with legal and contractual provisions….In the event that the auditor should find major problems, it must provide a detailed description of the problems in the report on the audit of the mutual fund's activities."*

*"The report on the audit of the mutual fund's activities must provide an analysis and an assessment of the systems put in place by the mutual fund for the purpose of controlling and managing the various risks that the mutual fund incurs in conducting its activities.*
*In the event that gaps and deficiencies are found, the auditor must provide precise indications and information that enable the Financial Sector Supervisory Committee to assess the situation."*

[stamp:] 2 euros

---

[65]   Accounting Audit Recommendation No. 21: Audits of mutual fund financial statements

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000858

In regard to the time frame for submission of the report, the Circular specifies that "the report on the audit of the mutual fund's activities is to be submitted to the Financial Sector Supervisory Committee within a period of four months following the end of the period covered by said report."

In summary, the Financial Sector Supervisory Committee therefore delegates a portion of controls of mutual funds to auditors on the basis of specifications that define their mission. Said mission includes certification of annual financial statements and issuing a report describing and assessing the mutual fund's operating rules. The auditor's mandate extends to the organization and procedures existing at the custodian bank, the management company and the administrator. It is not necessary for the auditor itself to issue the latter reports if another auditor has prepared same and transmitted a copy to the auditor.

**b). 2. Financial Sector Supervisory Committee Circular 02/77 of November 27, 2002:**

- Financial Sector Supervisory Committee Circular 02/77 covers the minimum guidelines to be followed in the event of errors in the administration or management of mutual funds.

- First of all, it specifies that *"it is the responsibility of the mutual fund sponsor to ensure that any possible errors are properly addressed in compliance with the strictest guidelines that are specified in this Circular."* The errors contemplated are most especially inaccuracies in the computation of the NAV.

- In subsection 1.3, the Circular indicates the guidelines on procedures that are to be followed:
  - information to be provided to the mutual fund sponsor and custodian and to the Financial Sector Supervisory Committee;
  - the determination of the financial impact of computation errors;
  - the indemnification of the damages resulting from computation errors, for the mutual fund and/or its investors;
  - the auditor's participation in the review of the correction process and
  - the notifications and disclosures to be made to the investors that are to be indemnified.

- The Circular requires the mutual fund's central administration to provide notice of the occurrence of the error to the mutual fund's sponsor and custodian, as well as the Financial Sector Supervisory Committee, and to submit to the sponsor and the Financial Sector Supervisory Committee a corrective action plan covering the action recommended or taken to remedy the problems that were the cause of the computation error found.

The Circular expressly provides for the participation of the auditor, which the mutual fund must request to issue an opinion regarding the appropriateness and adequacy of the methods employed to correct the errors.

In summary, the Circular therefore defines the action to be taken in the event of a NAV computation error and emphasizes the mutual fund's sponsor's responsibility with respect to the corrective action implemented.

Financial Sector Supervisory Committee Circulars constitute an indispensable set of reference standards and guidelines for assessing the work of a mutual fund auditor, given that the contract signed by Luxalpha and its auditor expressly reference and cite Financial Sector Supervisory Committee Circulars 02/77 and 02/81.

### (c) IRE Standards:

A mutual fund auditor's work is defined by international standards on audit missions which incorporate the International Standards on Auditing (ISA Standards) as well as by two specific standards, the former pertain to procedures related to Financial Sector Supervisory Committee Circular 2002/77, and the latter pertain to practical rules for mutual fund audits.

CONFIDENTIAL TREATMENT REQUESTED
UBSL 000859

**(c) 1. ISA Standards:**[66]

- ISA audit standards establish a conceptual framework that enables auditors to perform audit missions.

**-** First of all, we cite the international audit standard **ISA 315 "**Understanding the Entity and its Environment and Assessing the Risks of Material Misstatement**."**

This standard requires the auditor to acquire knowledge and understanding of the entity and its environment—including its internal controls—which are sufficient to enable the auditor to identify and assess the risks of material misstatements in financial statements, whether they are the result of fraud or errors. It is on the basis of this assessment that the auditor must design and implement audit procedures.

In order to identify risks, the auditor must take into account the audited entity in the context of its environment, including the existence and nature of the controls pertinent to the audit.

If the auditor identifies significant risks at that point that require a special audit approach, the auditor must define the pertinent audit procedures to address same.

Several points are of particular importance:

**(point 11)**, In the section "*risk assessment procedures: the auditor must perform 'checks of the operations in the financial information processing system (conformance tests)'*" in order to gain an understanding of the audited entity and its environment;

**(point 54)**, In the section "*degree of knowledge and understanding of internal controls: acquiring an understanding of internal controls entails an assessment of the design of a control and a test of its implementation.*"

"*The implementation of a control means that the control exists and that the entity applies it.*"

**(point 55)**, In the section "*degree of knowledge and understanding of internal controls: the risk assessment procedures, in obtaining probative evidence as to the design and application of pertinent controls, may encompass…observation of the performance of specific controls, inspection of documents and reports, as well as monitoring operations via the information system in regard to the processing of financial information.*"

**(point 56),** In the section "*degree of knowledge and understanding of internal controls: acquiring knowledge and understanding of the controls put in place in the entity is not sufficient in order to test the operational effectiveness of said controls, unless there is a certain amount of automation that assures regularity in the performance of controls."*

**(point 70)**, In the section "*control environment: At the time the auditor reviews the elements and components of the control environment, the auditor shall also determine whether such elements and components are actually applied. In general, the auditor obtains the pertinent probative evidence through a combination of interviews and other risk*

[stamp:] 2 euros

---

[66]        ISA Standards may be found at the IRE site – www.ire.lu – under the heading "standards environment."  They govern the auditor's work from mission preparation through the issuance of the auditor's report.

CONFIDENTIAL TREATMENT REQUESTED                                                    UBSL 000860

*assessment procedures, for example, by corroborating the information received through observation or the inspection of documents.*"

The auditor must therefore not be limited to controlling and examining what one wishes to show the auditor, but must perform its own controls in order to make certain of the exhaustiveness and reliability of the data and information provided to the auditor. In the case of Luxalpha, the auditor was therefore required to perform an analysis of the operation of the open-ended mutual fund, to find and determine that almost all of the assets had been entrusted to BMIS, which was also responsible for actual management of said assets, to inquire as to risk inherent in BMIS's preponderant role, examine the internal control procedures put in place to mitigate said risk, assess the appropriateness of said controls, and issue a report on the identified risk and the adequacy of the internal controls applied.

- The international audit standard **ISA 700** concerns **the auditor's report** to investors. The **ISA 700-2** standard details a **standard report** in which the auditor provides an opinion in the following manner: "*in our opinion, the financial statements provide a true and fair view of the financial position of the entity as of the dates, and of the results of its operations and the change in its net assets for the fiscal year ending on said date, in compliance with legal and regulatory requirements regarding the preparation and presentation of financial statements which are currently in effect in Luxembourg.*"

The auditor is not free to choose the conclusion of its report, but must conform to the text established by the standard. The conclusion presented hereinabove constitutes the most reassuring conclusion that an auditor can provide. In the investor's perception, it represents the auditor's approval of the annual financial statements. Below we shall find that EY provided a conclusion of this type for all Luxalpha annual financial statements from 2004 to 2008.

The **ISA 240** standard more specifically covers the **auditor's responsibility with respect to taking into consideration fraud** that the auditor may encounter in the audit of financial statements.

In order to obtain reasonable assurance, the auditor must demonstrate a critical attitude throughout the audit and be aware of the fact that the other procedures that may be appropriate to detect errors are not necessarily appropriate to detect material misstatements in a fraud risk situation.

The following points in the standard appear to be particularly important to this situation:

(**point 24**)- "*The auditor must demonstrate a critical attitude throughout the audit and be aware of the fact that possibility of a significant misstatement resulting from fraud might exist, despite the auditor's past experience with the entity and the auditor's conviction as to the honesty and integrity of the management and the persons comprising its corporate governance.*"

The auditor must therefore not relax its vigilance, even if the audit concerns an entity and actors that would appear to the auditor to be worthy of confidence and trust.

(**point 48**) "*At the time that the auditor acquires knowledge and understanding of the entity and its environment, as well as its internal controls, the auditor must evaluate whether the information received indicates the presence of one or more fraud risk factors.*"

(**point 57**) "*In the auditor's process of identification and assessment of the risk of material misstatements… the auditor must identify and assess the risk of material misstatements resulting from fraud. Because any such risk is, as a general rule, important, the auditor must consequently assess, to the extent that it has not*

CONFIDENTIAL TREATMENT REQUESTED
UBSL 000861

*already been done, the design of the controls established by an entity and intended to prevent same, including the pertinent control activities, and determine whether such controls were put in place."*

(**point 107**) *"The documentation on the acquisition of an understanding of the entity and its environment and the assessment of the risk of material misstatements...must include:*
*a) The important decisions made during the course of discussions among the members of the team assigned to the mission as to the possibility that the entity's financial statements contain material misstatements resulting from fraud; and*
*b) the identified risks as well as the assessed risks of material misstatements resulting from fraud in terms of the financial statements and in terms of the assertions made."*

(**point 109**)- *"The auditor must record in its work papers the fraud notifications made to the management, the persons comprising corporate governance, supervisory authorities, and other third parties."*

(**point 110**)- *"When the auditor has concluded that the presumption of the existence of a risk of material misstatements resulting from fraud related to accounting records of revenues is not applicable to the mission, the auditor must record in its documentation the reasons for that conclusion."*

The auditor therefore is deemed to have precisely documented the performance of its mission with respect to the identification of risks. In the case of Luxalpha, the auditor therefore was supposed to inquire as to the consequences of any possible fraudulent actions by the open-ended mutual fund's actors. Such inquiries, the audit procedures performed in order to provide a response to same, the responses received, and the conclusions drawn from same were supposed to have been recorded in the auditor's work papers. If necessary, the auditor was supposed to have had ad hoc communications with the open-ended mutual fund's board of directors, the Financial Sector Supervisory Committee, and even the shareholders. By reason of the significant role played by BMIS and Madoff in the operation of Luxalpha, the Luxalpha auditor should have devoted an important portion of its fraud risk analysis to them.

The audit standard **ISA 500**, along with supplementary standards 501 through 580, define and describe the **probative evidence** that an auditor is required to assemble in order to make its conclusions.

### c) 2. The Standard on Procedures in Relation to Financial Sector Supervisory Committee Circular 2002/77:

The objective of this IRE standard dated June 27, 2002 is to define the auditor's work in relation to Financial Sector Supervisory Committee Circular 2002/77, which covers NAV computation errors.

### c) 3. The Standard on Practical Rules for Mutual Fund Audits:

- The standard was written in English and was adopted by the IRE on June 28, 2004. Its objective is to define and describe auditor procedures of the report on mutual fund activities in compliance with Financial Sector Supervisory Committee Circular 2002/81 of December 6, 2002 (see subsection 6 b) 1.)

- The auditor's mission shall include *"a critical description of the fund's organization and a review of the way the fund operates, including the fund's procedures and relationships with the central administration, the custodian bank, management company and other intermediaries (such as investment managers and distributors)."*

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                                             UBSL 000862

- As was explained in subsection 6 (b) 1 in regard to mutual funds, the auditor issues two types of reports, the report on the annual financial statements and the report on the audit of the mutual fund's activities (also referred to as "long form reports").

The long form report covers, among other things, the organization of the mutual fund and its service providers. The Circular provides that the mutual fund's auditor shall make use of the reports issued by other auditors regarding the activities of the mutual fund's service providers.

The standard specifies that the long form report is to be issued exclusively to the mutual fund's board of directors or the mutual fund's manager, as well as to the Financial Sector Supervisory Committee.

The terms of the audit mission must be established by the mutual fund and the auditor in a commitment letter.

The long form report describes the mutual fund's organization, and specifically covers the central administration, the custodian bank, the investment advisor, and the other service providers. The standard specifies: "This description should be sufficient to understand the fund's organization."

- The section of the standard on the central administration addresses the existing procedures and controls at the central administration, and must include a conclusion regarding its adequate functioning. This conclusion is normally provided in a negative formula of the type: "*no facts came to our attention that lead us to think that the procedures and controls do not function adequately.*"

The mutual fund auditor may make use of a report on the central administration issued by another auditor, and such was the case with Luxalpha, where the open-ended mutual fund's auditor made use of specific reports regarding UBSFS.

- The section of the standard on the custodian bank (**section D.1.2.**) addresses the existing procedures and controls at the custodian bank, and must include a conclusion regarding its adequate functioning. This conclusion is also provided in the negative. In this case as well, the mutual fund's auditor may make use of the report on the custodian bank issued by another auditor. In the case of Luxalpha, the open-ended mutual fund's auditor made use of specific reports regarding UBS SA.

The mutual fund's auditor must indicate whether a procedures manual exists and is appropriate to the mutual fund's activities and legal structure. The standard describes the minimum requirement for the procedures manual, which must specifically cover the asset preservation and supervision activity performed by the custodian bank (**section D 1.2.2.1.**).

It states: "*Where necessary, the fund auditor should describe the segregation of duties between central administration and custodian responsibilities. The fund auditor must detail any significant weaknesses in the procedures and controls in relation to the correspondent bank network and, if applicable, include such weaknesses in the Management Letter.*"

The mutual fund's auditor must also state an opinion regarding the reconciliation of the assets on the mutual fund's books with the assets on the custodian bank's books.

In the instance of Luxalpha, the auditor was therefore required to provide a precise description of the manner in which the open-ended mutual fund's asset custody functioned, as well as specifically the role played by BMIS and the procedures carried out in order to supervise BMIS. Lastly, the auditor was required to note any possible weaknesses in the monitoring and controls of BMIS's activities.

CONFIDENTIAL TREATMENT REQUESTED                                                                UBSL 000863

- The section on the management company (**section D 1.3.**) concerns all the functions performed by the management company for the mutual fund. The mutual fund's auditor is required to review all the agreements in order to verify whether the functions are correctly covered and addressed in said agreements. The standard specifies that the auditor is not responsible for verifying the legal validity of said agreements. On the other hand, the auditor must describe in detail any major problem of which the auditor is aware.

Pursuant to the above, the Luxalpha auditor was required to describe and assess the management powers granted to BMIS.

- **section D.2** of the standard covers the audit of the fund's operations.

> - **Subsection 2.3** concerns the control of the risk management system. The mutual fund's board of directors shall make available to the auditor a description of the systems and controls in place to monitor and control the risks incurred by the mutual fund. Said description shall specifically indicate whether risk management is partially or totally delegated to third parties: *"The fund auditor will state in his report which person, entity or entities (internally or externally) is responsible for each of the major risks to which the fund is exposed."*
> *"Based on above information and representations received from the board, the fund auditor shall indicate whether, as a minimum, the risk control system implemented by the board covers, or is applicable in respect of (…) counter-party risk (…)."*
> *"The fund auditor shall limit his review to those monitoring controls performed at the level of the board or at the level of the management of the fund. However, he has no responsibility to verify procedures and controls carried out by other parties (e.g. asset managers)."*
>
> - **Subsection 2.5** notes that the long form report must indicate whether window dressing activities were discovered by the auditor. If such is the case, the auditor must make a report on said discoveries and must, if necessary, extend its tests.
>
> - **Subsection 2.7** covers the custody and accounting reconciliation process ("accounting/custody reconciliations"). The mutual fund auditor is required to indicate whether the results of said reconciliations were satisfactory. In the instance of Luxalpha, the auditor therefore was supposed to describe and test the specific procedures established for the purpose of reconciling the mutual fund's accounts with the actual assets in the custody of the custodian.

- According to **section 6**, the mutual fund's auditor must make conclusions regarding its work and summarize all the significant facts discovered during its work. The auditor's conclusion shall be positive or negative as a function of the nature of the work performed.

The work performed by the auditor therefore consists of a description and assessment of the established procedures which enable the mutual fund to operate. If third parties participate in the operation of the mutual fund, the mutual fund's auditor may refer to the work performed by the auditor for said third parties.

In summary, the professional standard therefore required EY to issue (i) a report on Luxalpha's annual financial statements, which report was intended for the general public and (ii) a report on operations addressed solely to the open-ended mutual fund's board of directors and the Financial Sector Supervisory Committee. Whereas the former report must contain a conclusion regarding the annual financial statements' true and fair view of Luxalpha's financial position and results, the latter report must state conclusions regarding the proper functioning of the procedures and controls put in place by the open-ended mutual fund.

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000864

**(d) The contract signed with the audited entity:**

All of the auditor's missions are defined and described in a contract signed with the audited entity. The content of the contract signed by the two parties is determined by the ISA 201 Standard "Terms of Audit Engagements."

Any such contract generally takes the form of an engagement letter and describes the objective of the audit, the responsibility of the board of directors, the audit scope, references to applicable legislation, the limitations inherent to any audit, the management's responsibility to put in place effective internal controls, auditor access to information, etc. The IRE provides standard mission letters for auditors. (www.ire.lu ISA 210)

Luxalpha signed engagement letters with EY for the audits from 2004 to 2008. The details of the letters are recapitulated in Subsection 6.4. hereinafter. Said engagement letters specifically cite and reference provisions of law, Financial Sector Supervisory Committee Circulars, and IRE work standards, which were consequently an integral part of the services contract between the auditor and the open-ended mutual fund. (Exhibits 46a–46e)

**6.2. EY's violations and nonperformance of its legal, contractual, and prudential obligations:**

-        The foregoing section shows that an open-ended mutual fund auditor must perform three missions:

(i) the audit of the annual financial statements, concluding with the preparation of a report on the annual financial statements;

(ii) the audit of the operations, organization, and applicable procedures of the mutual fund, concluding with the preparation of a report on the open-ended mutual fund's activities (referred to as a "long form report"); and

(iii) reporting to the Financial Sector Supervisory Committee.

The auditor's mission may therefore be described as an active audit mission, with an obligation to disclose the facts found and determined. Said disclosure obligation applies to the public in general and investors in particular, via the report on the annual financial statements. Subsequently it concerns the board of directors and the Financial Sector Supervisory Committee, through the long form report, and lastly the Financial Sector Supervisory Committee, through ad hoc reports or notifications.

- EY prepared reports on the annual financial statements for the periods ending December 31, 2004, 2005, 2006 and 2007 (Exhibits 41a–41d). On each occasion these reports presented a conclusion of the existence of a true and fair view. We cite as an example the 2007 report: "*In our opinion the financial statements give a true and fair view of the Financial position of Luxalpha SICAV as at December 31, 2007, and of the result of its operations and changes in its net assets for the year then ended in accordance with the Luxembourg legal and regulatory requirements relating to the preparation and presentation of the financial statements.*"

- EY prepared long form reports for the periods ending December 31, 2004, 2005, 2006 and 2007 (Exhibits 42a–42 d). The 2004–2006 reports were signed, the 2007 report exists in the form of two drafts, but it was not signed. Said reports on each occasion concluded that there were no significant deficiencies in the controls established for the mutual fund's activities. We cite as an example the 2006 report (Exhibit 42c).

CONFIDENTIAL TREATMENT REQUESTED                                                                UBSL 000865

"*Based on our work performed, nothing came to our attention except for the item referred to above,[67] to indicate that the controls surrounding the activity of the Fund suffer significant deficiencies for the year ended December 31, 2006.*"

- The trustees do not have any information that leads one to think that EY informed the Financial Sector Supervisory Committee of irregularities, weaknesses, or significant risks found in the operation of Luxalpha.

- We then point out that the principal criticism made against the actors in the open-ended mutual fund consists of the collective construction and creation of window dressing designed to give investors an illusion of reliability and security and which in fact was used to siphon off funds to Bernard L. Madoff, who utilized them to perpetrate his pyramid scheme fraud.

EY not only tolerated the existence of the aforementioned window dressing, but actively collaborated in maintaining it, even though it knew—or it should have known if it had performed its duties with the professionalism and reliability which one is entitled to expect from an accredited auditor, which is also well-known throughout the world—that the reality of the operation of the open-ended mutual fund was different from the information provided to the public in the bylaws and in the prospectuses. By acting as it did, the auditor contributed to the "siphoning off" of increasingly larger amounts to BMIS, and thereby enabled an increase in losses well beyond what the losses would have been if EY had properly performed its missions since its engagement.

Subsections 6.2.1 through 6.2.6 hereinafter shall analyze in detail EY's principal violations and nonperformance which the trustees were able to determine, given their current state of knowledge.

### 6.2.1.    EY has certified the SICAV's annual financial statements without qualification:

- At December 31, 2004, 2005, 2006 and 2007, the *réviseur d'entreprises* certified the SICAV's annual financial statements without qualification, even though the assets entrusted to BMIS had disappeared in the pyramid scheme implemented by Madoff and the assets assigned to the "securities portfolio managed by BMIS" no longer existed.

- Pursuant to the ISA 500 revision regulation on probatory elements, a *corporate auditor* is required to base its conclusions on probatory elements collected during its examination. In the case in question, it was established that the asset portfolio entrusted to BMIS simply did not exist in reality. In this context, we must recall that the portfolio in question represented virtually all the assets of Luxalpha. Due diligence by the SICAV corporate auditor would, first of all, have consisted of confirming the existence of, and then valuing, these assets.

> - By letters dated July 10 and August 6, 2009 (Exhibits 43a-43b) and by letter dated November 11, 2009 (Exhibit 43c, order to perform), the trustees requested that EY send them, among other items, copies of the confirmations received in their capacity as corporate auditor of the SICAV and originating specifically from banks, transfer agents, attorneys, broker-dealers and others.

To date, no copy of these confirmations has been forthcoming.

[stamp:] 2 euros

---

[67]    The passage makes reference to the management letter dated March 6, 2007, in which the auditor did not state exceptions or major weaknesses (page 28 of the 2006 long form report).

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000866

It may therefore not be legitimately concluded that such confirmations had never been requested by EY, nor received.

Within the context of these standard procedures, the corporate auditor is required to request from third parties the confirmation of certain facts or values: bank balances, the existence and valuation of securities held in portfolio, etc. In the present case, given the extent of the assets entrusted to BMIS, it is unthinkable and in any case unpardonable that EY would not have requested confirmation of the existence and valuation of this item.

- Absent any evidence of these confirmations, and absent a clear and precise response from EY, but admitting for reasoning purposes that EY had taken measures in this matter and that it had obtained a confirmation, the following would necessarily have been forthcoming from BMIS or UBS SA:

- Confirmation issued by BMIS:

One might imagine the existence of confirmations of deposits received from BMIS corresponding to the first assumption, based on portfolio confirmations sent each month by BMIS, an example of which is provided as an attachment[68] (Exhibit 44).

An analysis of this document yields the conclusion that it was sent in hard copy (by fax) **2 days after** its date of preparation. This document bears no signature or other information justifying its being sent in the form of a hard copy. The same finding applies for confirmations of individual transactions that were also forwarded by BMIS in hard copy, without signature and by mail.

From 2004 to 2008, in an environment in which instant communications by electronic means have become the rule, the simple fact that a counterparty takes the time to send paper and does not allow the client immediate and online access to its deposits and current accounts should have attracted the attention of a diligent corporate auditor. If, in addition, this counterparty is one of the pioneers in implementing automated and electronic trading in the United States, as was the case of BMIS or at least its boss,[69] the receipt of confirmations in paper form constitutes an anachronism that should have set off alarm bells among accountants.[70]

A diligent corporate auditor would not have been satisfied with such confirmations. It would have applied alternative procedures to ensure the reality of the portfolio's existence. EY clearly did not do so, because the system was able to function for nearly five years without calling attention to the diversion of assets.

---

[68]     Monthly confirmation of the portfolio held with BMIS (monthly account statement as per November 30, 2008).

[69]     Madoff was one of the founders and a director of NASDAQ (National Association of Securities Dealers Automated Quotations).

[70]     Since the testimony of Frank DI PASCALI, assistant to Bernard Madoff, we know that confirmations in paper form were a key part of the fraud, as their use allowed gaining the time needed to identify market fluctuations and to show, *ex post*, profitable fictitious trades. See SEC complaint against DI PASCALI, Points 53 and thereafter (Exhibit 45).

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000867

- Confirmation originating from UBS SA:

Since EY was the corporate auditor for both UBS SA and for Luxalpha, the fact that the confirmation of assets originated from UBS SA would not have further justified an absence of verification on the part of the corporate auditor.

In each of these cases, EY committed a serious professional error, in the first instance by accepting a false confirmation as auditor of Luxalpha, in the second by accepting such a false confirmation as corporate auditor of UBS SA and then of Luxalpha.

We note that the securities portfolio with BMIS represented virtually all of Luxalpha's investments. By failing to monitor the existence of this portfolio, the auditor did not take the minimum measures needed to be able to certify the annual financial statements. And therefore EY concluded, in its review certification, that "the financial statements give a true and fair view of the financial position of Luxalpha SICAV as at December 31, 2007 and of the result of its operations and changes in its net assets for the year then ended," while assets totaling USD 1,491,363,986.05 out of 1,509,531,323.62 simply no longer existed!

### 6.2.2. EY remained silent on the lack of segregation between the function of manager and the function of the SICAV's assets custodian:

BMIS combined the duties of manager and sub-custodian of the SICAV's assets. It was this combining that allowed Madoff to appropriate the funds of the SICAV to promote the pyramid scheme. A segregation of duties would have allowed either the manager or the sub-custodian to immediately detect differences between the claimed assets and the assets actually existing. We note that these were not minor differences, but that all the investments held by the SICAV through BMIS disappeared.

As explained above, the delegation of these two tasks to BMIS and the absence of segregation between them was at all times contrary to the contractual provisions and good operating practice of an OPC. Since August 1, 2006, this practice has been strictly prohibited by law.

EY did not raise this point, either in its report on the annual financial statements, nor in its long reports, nor in a specific communication to the CSSF.

EY contented itself with repeating the following cryptic comment in its reports on the annual financial statements and in its long reports: "The Board of Directors resolved that the Portfolio Manager may open managed accounts with registered broker dealers. At the date of this report, the portfolio of the Fund is part of such a segregated account."[71]

It is hard to imagine that an individual not familiar with the case might interpret this sentence as being information that all the SICAV's assets had been entrusted to BMIS and that management had also been abandoned to the latter. The above comment proves nevertheless that the corporate auditor was familiar with the effective functioning of the SICAV and therefore knew that the structure explained in the prospectus was not accurate. Therefore, through its inaction, it allowed the board of directors to disseminate a false message for over four years.

[stamp:] 2 euros

---

[71]    See specifically page 5 of the long report of December 31, 2006 or page 14, Note 6 of the annual report dated December 31, 200[sic]. The long report adds "*Appendix IV of the Management Agreement sets out the investment rules for this account.*"

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000868

In conclusion, the professional rules required that the corporate auditor inform the board of directors, the CSSF and the public (i) of the absence of segregation of duties, (ii) of a violation of the legal provisions that that absence entailed, and (iii) of the risks to Luxalpha investments caused by this absence. It is necessary to find that EY did not communicate any intelligible information on the absence of segregation between the duties of custodian and manager.

### 6.2.3. EY failed to assess the SICAV's operating risk:

The purpose of the corporate auditor is to examine the risks incurred by the SICAV and to assess whether internal controls that have been implemented are adequate as to cover this risk.

In this case, EY knew or should have known the role played by BMIS. Even if Madoff had been considered an honorable man at the time, entrusting to him all the SICAV's investments constituted—in the absence of any guarantee—a significant risk for Luxalpha. As shown in Chapter 6.1., the role of the corporate auditor was precisely that of identifying the extent of this risk, of calling the attention of the SICAV management and the CSSF to it, all while demanding the implementation of specific control procedures.

The existence of the risk cannot be reasonably contested, while at least a portion of the Luxalpha share subscription forms included a limitation of liability precisely concerning the existence of a sub-custodian. The Luxalpha board of directors and custodian bank therefore were aware of a specific additional risk deriving from the existence of a sub-custodian. Entrusting management duties to this same sub-custodian significantly multiplied the risks incurred.

In accordance with professional standards, the corporate auditor should have identified this risk and insisted to the board of directors that it find adequate mitigating solutions. From 2004 to July 2006, the auditor should have insisted on segregating the duties of manager and sub-custodian or at least implementing effective control—not linked to Madoff—that would have obtained guarantees as to the actual existence of the deposit. As of August 2006, the only solution consistent with the law would have consisted of segregating the duties of manager and custodian. If the board of directors refused to follow up on its requests, EY should have immediately informed the CSSF. Moreover, EY should have included a comment in the 2004 and 2005 annual financial statements and refused to certify the annual financial statements starting in 2006. In all cases the risk, and particularly the irregularity, should have been clearly described in the long reports.

Thus, it is completely incomprehensible that the corporate auditor did not react. The corporate auditor failed in its basic contractual, legal and prudential obligations, whether in not correctly assessing the risks linked to the structure that had been implemented, or, if it did assess them correctly, in failing to point them out and demand the implementation of corrective measures.

EY seems, however, to have been aware of its obligations, since in its report on the annual financial statements at December 31, 2007, it described them absolutely correctly as follows: "*An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the judgment of the 'Réviseur d'entreprises,' including assessment of the risk of material misstatement of the financial statements, whether due to fraud or error. In making those assessments, the 'Réviseur d'entreprises' considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate under the circumstances (…), but not for the purpose of*

CONFIDENTIAL TREATMENT REQUESTED                                        UBSL 000869

*expressing an audit opinion on the effectiveness of the entity's internal control." (Emphasis ours.)*

EY also explains there that the corporate auditor takes into account existing internal controls at its client, and EY concludes that the "audit evidence we have obtained is sufficient and appropriate as to provide a basis for our audit opinion."

This was clearly not the case. The audit evidence obtained was neither sufficient nor appropriate as to lead EY to conclude that the published financial information did not correspond to the SICAV's actual financial situation.

It is necessary, therefore, to confirm that the information communicated by EY did not reflect a correct understanding, on its part, of the actual risk involved in Luxalpha's operations.

### 6.2.4. EY did not react to the lack of due diligence performed by UBS SA and/or UBSTPM, UMSFS and/or the Luxalpha board of directors:

We understand due diligence to mean the verification tasks that a reasonable person would take regarding the situation of a counterparty with which it enters into business relations. The notion covers both controls carried out at this start of the relationship, and those undertaken when continuing the relationship.[72]

By email dated August 31, 2009, Attorney Barbara DAVIDSON, in her capacity as legal counsel for the UBS entities, informed the trustees of documents that were supposed to describe the due diligence tasks carried out: "The due diligence documents collected and relied upon in respect of Bernard L. Madoff Securities LLC, Access International Advisers and the Luxalpha arrangement in general."

An examination of these documents leads to the finding that there was no consistent due diligence work carried out by the Luxalpha board of directors or by the entities of the UBS group. Specifically, one is struck by the following items:

- absence of control of BMIS' financial status and its operating methodology,
- failure to identify specific risks linked to the combining of duties of manager and custodian in the hands of BMIS,
- failure to reflect on the lack of continuous online access to deposits and current accounts held through BMIS,
- failure to identify the specific risks linked to the use of trade confirmations and portfolio statements by regular paper mail or fax.

To be effective, due diligence procedures must cover both the start of the business relationship, and the ongoing lifetime of that relationship.

[stamp:] 2 euros

---

[72]      We cite two general definitions: 1. Generally, due diligence refers to the care a reasonable person should take before entering into an agreement or a transaction with another party.
http://financial-dictionary.thefreedictionary.com/Due+diligence;
2. Due diligence is a somewhat technical phrase used to describe a range of assignments, legal obligations, reports and investigations which take place in business, manufacturing and law. Its most frequently heard version is the one pertaining to businesses, where "due diligence" refers to the steps taken by venture capitalists before investing a round of capital in a startup, the ongoing investigation as to how the funds are being distributed, or the precautionary steps taken by a larger company in deciding to acquire a small company. http://www.wisegeek.com/what-is-due-diligence.htm.

102

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000870

In documenting measures covering business relations with BMIS, in all, 13 documents were sent to the trustees, some of them without any connection whatsoever to the due diligence tasks.

During a meeting on September 29, 2009 with the trustees, UBS bank attorneys Couter and Davidson confirmed that the bank had no other due diligence documents to send to the trustees.

It must therefore be concluded that, overall, the due diligence consisted of 13 documents, which seems completely inconsistent, since the due diligence measures in question were supposed to cover a business relationship extending from 2004 to 2008 and applying to investments of over a billion and a half US dollars.

This would appear to be even more inconsistent since the fact of performing the due diligence constituted a legal obligation for the entities of the UBS group.[73]

The UBS group's corporate auditor, in this case EY, was necessarily aware of its legal obligations. It proves this in Chapter V, Page 19, of the long report of December 31, 2004 (Exhibit 42a). The following control is described there to mitigate "settlement risk:" "*In addition, all UBSL correspondants* [sic] *and custodians are carefully selected among a list authorized by UBS AG network management. UBSL* [sic] *relationship with these counterparts is properly documented, and the quality of their services is periodically reviewed according to established procedures.*"[74]

---

[73]    – Art. 37-1 (5) of the coordinated Law of April 5, 1993 on the financial sector expressly provides that "*When they entrust to third parties execution of the essential operating tasks to provide continuously and satisfactorily to clients, or to engage in activities continuously and satisfactorily, financial institutions and investment firms must take reasonable measures to avoid an excessive increase in operating risk. The externalization of important operating functions must not be done in such a way as to significantly harm the quality of internal control of financial institutions and investment firms, nor as to prevent the Commission from ensuring that financial institutions and investment companies respect the obligations incumbent upon them under this law.*"

        - The Grand-Duchy regulation of July 13, 2007, section 2, provides the following (Article 13. Purpose and scope of application):

        "*This section defines the provisions that Luxembourg financial institutions and investment firms, as well as the Luxembourg branches of financial institutions and investment firms with corporate headquarters in a third country, are required to take to meet the organizational requirements defined in Article 37-1, Paragraph (5) of the amended Law of April 5, 1993 relative to the financial sector,*" and again

        (Article 19 (1). Deposit of customer financial instruments) "Financial institutions and investment firms may deposit financial instruments held on behalf of their clients in one or more accounts opened with a **third party provided that they act with due competence, care and diligence required in the selection, designation and periodic examination of this third party and the provisions agreed to with this third party for the holding and maintaining of these financial instruments.**" (emphasis ours)

[74]    We note that in the "controls report of the independent auditor on the custodian bank function in the context of the CSSF circular 02/81" prepared by EY for 2004 to 2007, Luxalpha appears clearly as investment fund for which UBS serves as custodian bank, while on the other hand BMIS is not cited among the "list of the custodian network used by UBS (Luxembourg) S.A."

CONFIDENTIAL TREATMENT REQUESTED                                UBSL 000871

The party responsible for this control is the custodian bank (page 19 of the long report).

The same statement may be found in the 2005 long report (Exhibit 42b, page 21), while the 2006 long report (Exhibit 42c) states "The approved broker is constantly monitored by Legal & Compliance." (Page 2 of Appendix 3).

It is now found that UBS did not perform due diligence worthy of its name, and that it therefore violates article 37-1 (5) of the coordinated Law of April 5, 1993.

It falls to the corporate auditor EY to correct this shortcoming.

The absence of due diligence led to the failure to identify risks linked to BMIS's participation. This failure to identify risks resulted in the absence of implementation of specific controls intended to cover them.

Once again, EY did not fill the role entrusted to it, did not fill the gap in the risk control structure implemented for Luxalpha, consisting in not carefully examining the actions of BMIS to which it had—in violation of all rules of risk management and then, after 2006, in violation of the specific legal provisions—entrusted the management and custody of Luxalpha assets.

### 6.2.5. EY did not correctly describe the SICAV's operations in its long reports:

An analysis of the long reports issued by EY shows a flagrant contradiction between the information provided in the long form, and the actual operation of Luxalpha. EY raises a red herring and bogs itself down in details by bringing up relatively unimportant points while remaining silent on basic problems.

- The 2004 and 2005 reports include a diagram showing UBS SA combining the duties of bank custodian and manager. BMIS and Madoff do not appear.

Section 1 of the long report of December 31, 2006 (Exhibit 42c) includes a diagram of the SICAV's operations (organization chart, p. 5). This diagram shows UBS SA as custodian bank and UBSTPM as funds manager. However, there is no mention anywhere of BMIS or Madoff.

- As in the diagrams, the misinformation was supplemented in the text of the section "*relationship with the management company.*" In the 2004 and 2005 long reports, EY states: "*The Fund was created in the legal form of a SICAV and has no management company that performs functions related to central administrative functions or otherwise*" (page 10). When familiar with the role played by BMIS, this passage does not fail to surprise.

There is, however, even more serious misinformation in the 2006 report: After having explained that UBSTPM was designated as management company for the SICAV, responsible for all administrative and management activities, including, above all, investment management, administration and marketing, EY stipulates that the management company may delegate its duties while maintaining responsibility. EY adds: "*In this context, it has delegated the following functions, under its responsibility, to the following entity: Investment Management not*

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                              UBSL 000872

**delegated** Remark: Investment Advisory Services are delegated to Access International Advisory LLC" (emphasis ours).

The corporate auditor indicates, therefore, in its long report, that there had been no delegation of management duties to BMIS, while distracting the reader by expressly citing assignment of the advisory function to Access International Advisory LLC—a function much less sensitive and which was, moreover, reported in the prospectus.

- The description of the Risk Management System, which is the responsibility of the board of directors, is detailed in the "long form report." There, we find a description of procedures completely foreign to Luxalpha:

- With regard to investment risk ("pre trade risk management"), the board of directors describes in Appendix I of the "long form report" how the SICAV portfolio is controlled before transactions are made: "*Risk system numbers are available for the most recent version of the portfolio (usually including previous day's executed trades, even if not yet settled). Current portfolio structure is monitored on a daily basis. In addition, **portfolio managers simulate the effect of anticipated trades in the system prior to trading**"* (emphasis ours) (page 5, Appendix 1 of the 2006 long report, Exhibit 42c).

The manager or portfolio manager was, at that time, UBSTPM. BMIS, however, did not communicate details of trades involving securities and options before their execution, but only in hard copy, after execution of the trade. The control described by the board of directors, therefore, could not have existed and was false. It therefore falls to the corporate auditor to demonstrate that the description provided by the corporate auditor could not have corresponded to the actual functioning of the SICAV.

- The way operational risk is managed is described as follows by the board of directors: "*Operational risk is the risk of loss resulting from inadequate or failed internal processes, people and systems, or from external causes (deliberate, accidental or natural). Operational risks are exposures that are not actively taken, but which are incurred as a consequence of the company's business activity. Operational risk that goes beyond risk categories already mentioned falls into the following main categories:
Transaction processing risk arises from errors, failures or shortcomings at any point in the transaction process, from deal execution and capture to final settlement. (...) **Any kind of compliance risk is checked pre trade by portfolio managers and Investment Support.** Portfolio management and accounting systems (Longview) support this task. The trading error handling process involves very strict timelines and set escalation rules. All trading errors are reported to Compliance, independent of the loss size*" (emphasis ours) (Page 6 of Appendix 1 of the 2006 long report, Exhibit 42c).

The board of directors, therefore, explains that this operational risk will be managed by the management company which, if a risk is detected, will communicate it to the compliance officer. We note once again that the management company was, at that time, UBSTPM. However, we know that BMIS was not sending details on portfolio trades prior to their execution, but only in the hard copy form <u>after</u> execution of the trade. The control described by the board of directors could not, then, have materially existed. Here again, it would have fallen to the corporate auditor to demonstrate that the description prepared by the board of directors could not have corresponded to the SICAV's actual functioning.

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000873

- Appendix 3 of the long report (006) discussing the "Portfolio Managers Risk Management System" prepared by the SICAV board of directors describes the controls applied by the Portfolio Manager, in this case UBSTPM. In the "credit risk/counterparty risk/settlement risk" point, the council confirms that trades must be executed quickly and appropriately ("timely and proper trade execution"). The information is formulated as follows: *"Any security and foreign exchange transaction is recorded by the portfolio manager in the front office system. The execution desk is in charge of a timely and proper trade execution according to the internal guidelines and the approved broker list within the UBS Group. The approved broker list is constantly monitored by Legal & Compliance. The approved broker list is cross-checked prior to an OTC trade. All other trades are executed via an official stock exchange. All trades are "delivery against payment" and are settled using well-known clearing systems like Clearstream and Euroclear."*

In the case of BMIS, no "well-known clearing system" has been used and the statement that "all trades are delivery against payment" no longer corresponds to reality. It would have then fallen to the corporate auditor to demonstrate that the description by the board of directors could not correspond to the actual functioning of the SICAV.

- We note, finally, that the conclusions applied by the corporate auditor in the various long reports were also either superficial or false. Thus, one may read the following in the conclusion **for 2006**: "*Based on the work we performed, nothing came to our attention except for the item referred to above,[75] to indicate that the controls surrounding the Fund's activity suffered significant shortcomings for the years* [sic] *ended December 31, 2006*" (Page 28 of the long report, Exhibit 42c).

**For 2005,** EY arrives at the following conclusion: "*During the course of our review, we noted the following matter, which we believe should be brought to the attention of the Board of Directors. We have noted that the Prospectus dated August 2004 does not mention that Late Trading and Market Timing are forbidden and that the Company reserves the right to reject any suspicious application in order to protect the investors[76] (see section 2.8.2).*
*Based on the work we performed, nothing came to our attention except for the item referred to above, to indicate that the controls surrounding the Fund's activity suffered significant shortcomings for the year ended December 31 2005*" (Page 36 of the long report, Exhibit 42b).

**For 2004,** EY concludes: "*During the course of our review, we noted the following matters, which we believe should be brought to the attention of the Board of Directors.*
*We have noted (in section 2.1.2) that with respect to Anti-Money Laundering procedures and KYC controls, the required documents were in some cases not available, had expired or were unreadable, or not in a certified form;*[77]

[stamp:] 2 euros

---

[75]        The reference corresponds to a paragraph entitled "Significant exceptions/weaknesses described in the management letter as of December 31, 2006," which includes the following text: "*In our management letter dated March 6, 2007, we have not raised any points.*"

[76]        This involves a prudential rule issued by the CSSF within the context of a circular letter intended to combat the use of certain reprehensible investment practices; late trading and market timing, while certainly important, are minimal, overall, with regard to the problems of which EY does not speak.

[77]        observation that the Luxalpha board of directors comments on as follows: "*the Board of Directors entrusts the Transfer Agent to verify the subscribers' identity insofar as legally required, and make all the necessary queries concerning the missing documents.*"

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000874

EY also concludes: "*We have noted (in section 2.3.2.) that the activities performed by the Board of Directors of the Fund with regard to their monitoring of the management of the various risks to which the Fund is exposed, performed by third parties (Investment Manager, Investment Advisor, Central Administration) are not formalized in writing (subject to comments in section 2.3.1.).*"[78]

EY then concludes: "*We noticed (in section 2.5.4.) that the description of the performance fee calculation may be subject to interpretations, resulting in non-material differences for the period ended December 31, 2004. We recommend obtaining written approval from the beneficiary of the performance fee, the administrative agent and the promoter on the way the performance fee is calculated.*"[79]

EY finally concludes: "*We have noted that the Prospectus dated August 2004 does not mention that Late Trading and Market Timing is* [sic] *forbidden and that the Company reserves the right to reject any suspicious application in order to protect the investors (see section 2.8.2.).*[80]

*Based on our work performed, nothing came to our attention except for those items referred to above, to indicate that the controls surrounding the activity of the Fund suffer significant deficiencies for the period ended December 31, 2004*" (Page 33 of the long report, Exhibit 42a).

It is surprising to see how the corporate auditor notes the gaps in the information provided in the prospectus on points which, overall, are minor, while failing to mention existing gaps between the announced structure and Luxalpha's actual functioning.

While EY was required to describe the gaps and weaknesses found in Luxalpha's functioning, the corporate auditor is content to describe points in detail while omitting the true problem: the assets entrusted to BMIS together with the authority to use them as it pleased.

Just as mentioned above, **ISA 315**, on familiarity with the entity and its environment and evaluation of the risk of significant anomalies, requires that the auditor not only assume knowledge of internal controls, but also verify their application in practice. EY should then have verified application of the procedures submitted to it by the board of directors and demonstrated that these procedures were not consistent with Luxalpha's actual functioning.[81]

### 6.2.6. Summary of EY's shortcomings and their causal link to the injury incurred by Luxalpha, its creditors and its investors:

---

[78]    an observation that the Luxalpha board of directors comments on as follows: "*there will be signed Circular resolutions very soon acting the controls performed by the Board of Directors* [sic]."

[79]    and the council comments: "*the method of calculation is fine for the Board of Directors.*"

[80]    *Comments from the Board of Directors: the amendments will be made in the next version of the Fund's Prospectus.*

[81]    In their analysis of the above long reports, the plaintiffs did not discuss the report for 2007 for the sole reason that this report was never signed. We note, however, that this report should have been sent to the CSSF within four months of the close of the fiscal year, thus no later than April 30, 2008, for the report for the year ending December 31, 2007. Nevertheless, on April 2, 2009, the date of the liquidation of Luxalpha, this report remained non-existent except in the form of a draft. One may question the value of a report intended to describe weaknesses found in the functioning of an OPC not yet subject to oversight authority eleven months after the deadline. It is also incontestable that reports concerning previous years gave so little information on the actual functioning of Luxalpha that their late submission was not likely to cause any additional harm.

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000875

EY has demonstrated, at least, the following serious violations in the exercise of its duties as auditor of Luxalpha:

-     EY certified without qualification the annual financial statements that were false,
-     EY failed in its mission of calling the attention of the board of directors, investors and the CSSF to the combined functions of the manager and sub-custodian of the SICAV's assets,
-     EY performed a poor assessment of the risk linked to the SICAV's functioning,
-     EY failed to react to the absence of due diligence performed by UBSSA and UBSFS,
-     EY did not correctly describe the functioning of the SICAV in its long reports.

In general, EY did not raise the alarm to warn the CSSF.

In dismissing its obligations, EY allowed the fraudulent Madoff system to prosper behind the anodyne façade of Luxalpha, implemented by its sponsors UBS AG and UBS SA, with the complicity of UBSTPM, UBSFS and ACCESS, the board of directors, and all those who were aware of its actual functioning.

The reputation of EY, a world-famous corporate auditor, combined with the violations it committed, allowed the various parties intervening in Luxalpha to communicate reassuring information to investors and thereby attract and retain significant amounts of capital. The corporate auditor, through the professional violations it committed, thus allowed Madoff to perpetuate his fraudulent system and thus increase the injury caused to Luxalpha and its creditors and investors.

EY's shortcomings thus have a clear causal relationship to this injury, and EY must address this. If EY had complied with its legal and contractual obligations, then Bernard L. Madoff would not have dared to appropriate Luxalpha's assets after 2004. Bernard L. Madoff might have invented an argument to refuse a business relationship with Luxalpha and in any case Luxalpha would not have incurred losses.

### 6.3. Aggravating circumstances:

EY is not just any corporate auditor; we note that this is one of the four largest auditing and consulting firms in the world, with a worldwide reputation for know-how. Its goals of competency and a job well done are clearly posted: "quality in everything we do."[82]

It is, therefore, a corporate auditor that should, in all rights, perform serious and well-done work. Nevertheless, it failed in executing its mission, by ignoring errors and serious violations by its clients, and it thus contributed to creating, perpetuating and multiplying the financial disaster that Luxalpha became.

Finally, we note that EY was the corporate auditor for all UBS entities linked to Luxalpha, with the exception of UBSTPM. It thus controlled: UBS AG, UBS SA, UBSFS and Luxalpha.

It was therefore particularly well-placed to fulfill its mandate with a maximum of effectiveness, since it had the opportunity:
    - to verify all the information available in the UBS group,
    - to examine all the procedures implemented in the UBS group,
    - to verify all the controls implemented in the UBS group,
    - to note that the functioning and structure communicated to investors did not in any way correspond to the actual functioning and structure, and
    - to raise the alarm with each UBS partner, with CSSF and with investors.

[stamp:] 2 euros

---

[82]     Extract from the EY website: "*At Ernst & Young, we are committed to delivering quality in everything we do. Our Global Code of Conduct provides an ethical framework on which we base our decisions and our actions—as individuals and as members of our global organization.*"
    https://secure.ethicspoint.com/domain/media/en/gui/6483/index.html

CONFIDENTIAL TREATMENT REQUESTED    UBSL 000876

EY not only had this power, but it also had the obligation to do so. EY had the obligation to verify and to put on notice. It had the means, since the corporate auditor has the authority to access all contractual information and all documents; it is not hampered by any secrecy. The books and archives of the UBS group were open to EY and nevertheless EY failed in its basic professional obligations.

### 6.4. The type of non-liability clauses in commitment letters:

As explained in Point 6.1. d), the agreement between the corporate auditor and its client takes the form of a commitment letter. Signed commitment letters between Luxalpha and EY stipulated a clause limiting liability, either directly, or through general conditions attached to the commitment letter. These clauses were not, however, accepted by Luxalpha, the signatories of which made the effort to manually cross them out.[83]

The trustees found the following commitment letters:

| date of the commitment letter | audit in question | liability limitation clause in the letter | liability limitation clause in the general conditions |
|---|---|---|---|
|  |  |  |  |
| 2/26/2009 | 12/31/2008 | clause accepted | clause struck |
| 11/8/2007 | 12/31/2007 | clause absent | clause struck |
| 11/6/2006 | 12/31/2006 | clause absent | no general conditions in the Luxalpha files |
| 10/27/2005 | 12/31/2005 | clause absent | general conditions struck |
| 1/17/2005 | 12/31/2004 | clause absent | clause struck |

(Exhibits 46a–46e)

The table above clearly shows that Luxalpha representatives refused the limitation on liability offered them by EY. There was only one exception to this finding: the commitment letter concerning the financial statements at December 31, 2008. This commitment and the corresponding letter, however, remain invalid, since EY did not perform any more work on these financial statements and has not submitted the corresponding report.

In any event, the validity of such clauses, and their enforceability by the trustees, are being contested.

---

[83]    The commitment letter for 2008 was an exception to this rule; it will be described in the course of the text.

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000877

**6.5 The petitioned judgment:**

It is necessary to order the auditor Ernst & Young SA as follows:

1. Principally:

a) (i) The plaintiffs, acting on behalf of the company, seek to obtain a judgment against EY on a contractual basis in the form of complete reparation for the injury incurred by Luxalpha due to the loss of all its assets, the total US dollar value of which is USD 1,323,852,143.93, valued for purposes of recording and competency at 881,216,896.71 euros, if not some higher amount to be decided upon by the court or at the recommendation of an expert,

(ii) on a subsidiary basis, and specifically for the case where their capacity to act as invoked in the principal plea above is contested, the plaintiffs file the same petition for sentencing, this time on a criminal or quasi-criminal basis pursuant to articles 1382 and thereafter of the Civil Code, in their capacity as shareholders and creditors of Luxalpha,

in all cases it is therefore necessary to order EY to pay the plaintiffs the sum of USD 1,323,852,143.93, valued for purposes of recording and competency at 881,216,896.71 euros, if not some higher amount to be determined by the court or at the recommendation of an expert, representing the cash compensation of the securities that were supposed to exist in the Luxalpha portfolio on the date of liquidation, plus the result of diligent management in accordance with investment policy from November 30, 2008 until execution, and otherwise, on a subsidiary basis, augmented by legal interest starting November 30, 2008 up to the settlement date, and again otherwise, on a subsidiary basis, from the date of this legal claim until settlement.

b). If not, on a subsidiary basis and on all principal and subsidiary bases that follow, based on the same legal capacities and grounds as are invoked on a principal and subsidiary basis, i.e., to order EY to pay the plaintiffs the sum of USD 762,484,886, valued for purposes of recording and competency at 504,545,021.63 euros, otherwise any greater amount to be decided upon by the court or at the recommendation of an expert, representing the share capital sent to BMIS, less the amounts repatriated from BMIS, plus the results of diligent management in accordance with the investment policy, starting on the date of delivery of the funds, until execution, otherwise on a more subsidiary basis, the same amount plus legal interest starting on the date of delivery of the funds until their return, and otherwise on an even more subsidiary basis, from the date of this legal claim until the settlement date.

2. On a more subsidiary basis, in the event it is determined that Ernst & Young is no longer liable for the loss of Luxalpha's assets, it would be necessary to return to the plaintiffs fees totaling 85,302.50 euros or any other amount, even a higher one, at the recommendation of the expert or to be negotiated by the court, while the fees are not in return for any asset, especially on a contractual basis, but rather are based on the absence of the object and/or cause, with the plaintiffs acting on behalf of Luxalpha, if not on a subsidiary basis based on criminal and quasi-criminal liability as provided for in articles 1382 and thereafter of the Civil Code, with the trustees acting on behalf of the creditors and shareholders.

3. In all cases EY seeks the judgment to be joint and several, if not in solidum with the obligation to repay BMIS, which was the subject of the receivable statement of February 27, 2009 that Luxalpha filed as a preventive measure.

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000878

4. The judgment must also be rendered against EY jointly and severally if not in solidum with the other summoned parties.

### 7. The control authority: the CSSF:

### 7.1. The purpose of its involvement:

The CSSF's presence in the context of this proceeding is justified with regard to the essential role it played *vis-à-vis* Luxalpha and its various participants. The actions legally falling to the CSSF by law are of three kinds:

- It decrees financial regulations pursuant to article 9 (2) of the amended Law of December 23, 1988; it has the authority to interpret texts relative to the financial sector by issuing interpretative circulars and recommendations;

- it grants approvals to entities requesting from it the opportunity to engage in a financial activity regulated in Luxembourg;

- it oversees the various market participants. In this capacity it specifically receives any notifications from corporate auditors. For OPCs—contrary to the case with other PSFs—the CSSF does not personally exercise all prudential oversight. This is largely delegated to the corporate auditor. To this end, the latter drafts the long report mentioned in Paragraph 6 above. As applicable, it penalizes participants in case of an error committed by the latter.

With regard to these various assignments, the CSSF has assumed a specific role *vis-à-vis* Luxalpha and its participants. Specifically, it:

- used its regulatory authority to create a long-term institution specific to Luxembourg law, the sponsor;

- accepted, among other documents, a commitment letter from UBS SA—and not from UBS AG, as had been stipulated in the Luxalpha prospectus—as sponsor;

- exercised ongoing control over Luxalpha and the various participants in the SICAV, which specifically led it to approve documents concerning the SICAV. It prepared a recent survey report on the liability of UBS SA as custodian bank for the SICAV (Exhibits 29 and 30 sent from the CSSF on February 6 and 25, 2009, respectively).

- With regard to ongoing control, it has or should have received from EY each year, on April 30 at the latest, the long-form report on Luxalpha. Barring error on the part of the trustees, the 2007 version was never filed, which has not, however, elicited any reaction by the CSSF.

CONFIDENTIAL TREATMENT REQUESTED                                UBSL 000879

The disastrous financial situation in which Luxalpha currently finds itself compels us to inquire into the CSSF's execution of its tasks. Because of these various interventions, the CSSF therefore is called upon to be party to a lawsuit which opposes the plaintiff against the various defendants:

**- First of all** to allow the CSSF to take a position with regard to the arguments that have been raised.

**- Second of all,** because the CSSF is in possession of various documents, of which the plaintiffs requested copies on July 10, 2009 following a meeting held June 19, 2009. This letter was then supplemented by other letters sent by the trustees to the CSSF on July 27, 2009, October 8, 2009 and finally October 30, 2009. The CSSF responded by letter on July 22, 2009, August 3, 2009 and November 5, 2009. On February 25, 2009 the CSSF, in effect, made public a press release stating, among other things, that it had specifically demonstrated in the UBSL-Luxalpha case that "*poor execution of the due diligence obligation constitutes a serious breach of the oversight duties of a custodian bank and may consequently constitute a violation of a substantial contractual obligation in the context of the UBSL's responsibility under Article 36 of the Law of December 20, 2002.*"

The trustees then requested on July 27, 2009 that the CSSF send them a copy of the conclusions of the investigation carried out by the CSSF.

In the letter of September 22, 2009, the CSSF took the following positions: "*…Since the Madoff affair came to light, the CSSF has also opened an investigation into the prudential obligations of entities subject to oversight. In its investigation, the CSSF, at all times in accordance with its legal responsibilities, specifically monitored the quality of the general administrative organization and internal control of entities subject to oversight (with a view to ensuring the general protection of all investors doing business with these entities). As the oversight authority, this task involved determining, in this context, any violations by the various participants and service providers of their respective legal obligations.*
*The research and controls we have put in place also specifically provided the information needed to yield a conclusion as to the obligations of UBS (Luxembourg) SA ("UBSL") on February 25, 2009. Thus, in accordance with its legal authority, the CSSF enjoined UBSL to implement "the necessary infrastructure, i.e., sufficient human and technical means, and the necessary internal rules, to fulfill all tasks related to its duties as custodian bank for Luxembourg OPCs" in accordance with the Law of December 20, 2002 and IML Circular 91/75. We are of the opinion that through the publication of our press release dated February 25, 2009—specifying, among other things, that the CSSF has specifically demonstrated in the UBSL/Luxalpha SICAV case that "poor execution of the due diligence obligation constitutes a serious breach of the oversight duty of a custodian bank and may consequently constitute a violation of a material contractual obligation in the context of UBSL's liability under Article 36 of the Law of December 20, 2002:—we clearly indicated the CSSF's position with regard to the organizational shortcomings of the custodian bank. It has also been clarified that the CSSF has enjoined UBSL "to analyze and correct all structures and procedures in relation to its oversight obligation deriving from its status as custodian bank, and UBSL must seek to repair the injury in relation to the above breaches in accordance with the obligations of a custodian bank subject to the provisions of Luxembourg law, notwithstanding any contractual clauses to the contrary that are valid and binding and/or, as applicable, any relevant court ruling." In May 2009,*

[stamp:] 2 euros

112
CONFIDENTIAL TREATMENT REQUESTED

UBSL 000880

*UBSL sent the CSSF a detailed final report concerning improvements made to its infrastructure and significant changes to its internal procedures related to the function of custodian bank. After analyzing this report, the CSSF ruled that UBSL had provided the evidence and guarantees to put in place the necessary infrastructure and internal organizational rules in accordance with the injunction sent to it, and in accordance with the professional standards applicable in the Grand Duchy of Luxembourg. As prudential oversight authority, the CSSF will ensure ongoing practical compliance with these measures, specifically through site inspections.*
*The CSSF's investigations are not limited only to the custodian banks in question. Site inspections have also been carried out of UBS Third Party Management Company SA., UBS Fund Services Luxembourg, and Access Management Luxembourg.*"

As the trustees then insisted in their letter of October 8, 2009 and October 30, 2009, to obtain a copy of the investigations carried out by the CSSF, respectively UBS' response, the CSSF took the following position in its letter of 11/5/2009: "*In response to your request, we must inform you that the exhibits and information sent to the CSSF in the context of the legal obligation and in accordance with its duties and competencies are subject to professional secrecy, to which the CSSF is bound by law. We refer you, in this context, specifically to Article 16, on professional secrecy, of the Law of December 23, 1998 creating a Financial Sector Supervisory Committee as amended.*
*We might add that the CSSF, as public oversight authority, is investigating the responsibilities of the various participants in accordance with the legal and regulatory texts. In general, the CSSF cannot, however, within the framework of its investigations, communicate evaluations of the administered parties that are under its oversight…*"

Since the trustees represent the interests of the contractual party whose rights were violated, they believe the professional secrecy invoked by the CSSF is not binding on them.

One might add that the CSSF may also be in possession of documents about which the plaintiffs were not necessarily aware on the date of the notification of this summons, or of documents that are critical or that might come to be critical regarding legal cases the court might be hearing.

All while reserving the right to pursue their claim in the corresponding appeals courts, the plaintiffs request that the CSSF now be ordered, based on articles 279 and thereafter of the New Code of Civil Procedure, to submit to the court the following document(s):

(i)  A copy of the conclusions of the investigation carried out by the CSSF—and more broadly cited in the CSSF letter of 9/22/2009 sent to the trustees—on the quality of the administrative and general organization and the internal control of the entities subject to oversight, i.e., UBS SA, UBS TPM, UBS FS and Access Management Luxembourg SA—with a view to guaranteeing, in general, the protection of all investors in relation to legal cases involving their entities—which investigation ended with a conclusion as to the obligations of UBS SA on 2/25/2009 and the press release on the same date.

(ii) A copy of the injunction sent by the CSSF to UBS SA to implement "the necessary infrastructure, i.e., sufficient human and technical resources and necessary internal rules to complete all tasks

CONFIDENTIAL TREATMENT REQUESTED                                          UBSL 000881

related to the functioning of Luxembourg OPC custodian banks" in accordance with the Law of 12/20/2002 and IML Circular 91-75.

(iii) A copy of the injunction sent by the CSSF to UBS SA "to analyze and rectify all structures and procedures in relation to its oversight obligation deriving from its status as custodian bank, pursuant to which UBSL must ensure reparation for injury in relation to the violation described above in accordance with the obligations of a custodian bank subject to the provisions of Luxembourg law, notwithstanding valid and binding contractual clauses to the contrary and/or any legal decision in this regard."

(iv) A copy of the detailed final report dated May 2009 that UBS SA sent to the CSSF concerning improvements made to its infrastructure and material changes in its internal procedures related to the custodian bank function that allowed the CSSF to claim that UBSL had provided evidence and guarantees of having implemented the necessary internal infrastructure and organizational rules in accordance with the injunction sent to it and in accordance with professional standards applicable in the Grand Duchy of Luxembourg.

- **In the third place**, it is indispensable that the judgment to come be at least declared binding on the CSSF.

At the time that this notification is delivered, the plaintiffs cannot definitively discard the possibility that it was necessary for them, at one time or another, to inquire into the conditions under which the CSSF was able to fulfill its mission regarding Luxalpha and other participants in the SICAV, specifically with respect to the provisions of article 20 (2) of the Law of December 23, 1988 providing for creation of the CSSF.

They now expressly reserve the right to serve notice of a new filing against the CSSF.

### 7.2. The petitioned judgment:

The plaintiffs seek to have the forthcoming judgment declared as common to CSSF.

They also seek to have an injunction issued to the CSSF to send the following documents:

(i) Copy of the conclusions of the investigation carried out by the CSSF—and more broadly as cited in the CSSF letter of 9/22/2009 sent to the trustees—on the quality of the administrative and general organization and internal control of the supervisory entities, i.e., UBS SA, UBS TPM, UBS FS and ACCESS MANAGEMENT Luxembourg SA—with a view to guaranteeing, in general, the protection of all investors with regard to matters involving these entities—which investigation ended with a conclusion with regard to the obligations of UBS SA on 2/25/2009 and the press release of the same date.

(ii) Copy of the injunction sent by the CSSF to UBS SA to implement *"the necessary infrastructure, i.e., sufficient human and technical means and the necessary internal rules, as to complete all the tasks related to its duty as a Luxembourg OPC custodian bank,"* in accordance with the Law of 12/20/2002 and IML Circular 91-75.

(iii) Copy of the injunction sent by the CSSF to UBS SA *"to analyze and correct all structures and procedures in relation to its supervisory obligation*

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                    UBSL 000882

*deriving from its status as a custodian bank, and that UBSL should seek to provide reparations for the damage caused in relation to the breach described above in accordance with the obligations of a custodian bank subject to Luxembourg law, notwithstanding any valid and binding contractual clauses to the contrary and/or any relevant court ruling, as applicable.*"

(vi) Copy of the detailed final report dated May 2009 that UBS SA sent to the CSSF concerning improvements made to its infrastructure and substantial changes to its internal procedures related to its duty as custodian bank which allowed the CSSF to claim that UBSL had provided proof and guarantees of assets in place [of] the infrastructure and the necessary internal organizational rules, in accordance with the injunction sent to it and consistent with professional standards applicable in the Grand Duchy of Luxembourg.

The plaintiffs seek to reserve the right to request an injunction against the CSSF for all exhibits demonstrated as being of significance during the course of the proceeding.

The plaintiffs also seek to reserve the right to serve new notice against the CSSF in the event that material evidence is brought to the attention of the plaintiffs during the course of the proceeding, involving the civil liability of the CSSF.

## FOR THESE REASONS

The summoned parties seek for this claim to be considered as having merit with regard to form, and justified with regard to grounds,

therefore, by reason of the statements set forth above, the notified parties I -X seek the following judgment:

### I. UBS SA, in its capacity as custodian:

1. (i) <u>Principally</u>, the plaintiffs, acting on behalf of the company, seek to obtain judgment against UBS SA—on a contractual basis—for the return, regardless of the name, and in the quantities and/or amounts set forth below, of the following securities and financial instruments:

| Security Name | BMIS Quantity | BMIS market price | Value |
|---|---|---|---|
| AT&T INC COM | 1 872 746,00 | 28,56 | 53 485 625,76 |
| ABBOTT LABS COM | 498 404,00 | 52,39 | 26 111 385,56 |
| ALTRIA GROUP INC COM | 654 154,00 | 16,08 | 10 518 796,32 |
| AMGEN INC COM | 342 653,00 | 55,54 | 19 030 947,62 |
| APPLE INC | 280 352,00 | 92,67 | 25 980 219,84 |
| BANK OF AMERICA CORPORATION COM | 1 610 836,00 | 16,25 | 26 176 085,00 |
| BK OF NY MELLON CP COM STK USD0.01 | 365 495,00 | 30,21 | 11 041 603,95 |
| BAXTER INTL INC COM | 197 077,00 | 52,90 | 10 425 373,30 |

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000883

| | | | |
|---|---|---|---|
| BOEING CO COM | 243 874,00 | 42,63 | 10 396 348,62 |
| BRISTOL MYERS SQUIBB CO COM | 633 180,00 | 20,70 | 13 106 826,00 |
| CVS/CAREMARK CORP COM STK USD0.01 | 458 945,00 | 28,93 | 13 277 278,85 |
| CHEVRON CORP NEW COM | 664 330,00 | 79,01 | 52 488 713,30 |
| CISCO SYS INC COM | 1 882 880,00 | 16,54 | 31 142 835,20 |
| CITIGROUP INC COM | 1 739 302,00 | 8,29 | 14 418 813,58 |
| COCA COLA CO COM | 633 180,00 | 46,87 | 29 677 146,60 |
| COLGATE PALMOLIVE CO | 3 330,00 | 65,07 | 216 683,10 |
| COMCAST CORP NEW CL A | 925 532,00 | 17,34 | 16 048 724,88 |
| CONOCOPHILLIPS COM | 490 095,00 | 52,52 | 25 739 789,40 |
| WALT DISNEY CO. DISNEY COM USD0.01 | 603 855,00 | 22,52 | 13 598 814,60 |
| EXELON CORP | 4 662,00 | 56,21 | 262 051,02 |
| EXXON MOBIL CORP COM | 1 673 803,00 | 80,15 | 134 155 310,45 |
| FIDELITY HEREFORD STREET TRUST-SPARTAN US TREASURY MMKT | 37 019,00 | 1,00 | 37 019,00 |
| GENERAL ELECTRIC CO COM | 3 338 803,00 | 17,17 | 57 327 247,51 |
| GOLDMAN SACHS GROUP INC COM | 132 113,00 | 78,99 | 10 435 605,87 |
| GOOGLE INC CL A | 62 301,00 | 292,96 | 18 251 700,96 |
| HEWLETT PACKARD CO COM | 788 931,00 | 35,28 | 27 833 485,68 |
| HOME DEPOT INC COM | 551 730,00 | 23,11 | 12 750 480,30 |
| INTEL CORP COM | 1 788 270,00 | 13,80 | 24 678 126,00 |
| INTERNATIONAL BUSINESS MACHS COM | 436 103,00 | 81,60 | 35 586 004,80 |
| JP MORGAN CHASE & CO COM | 1 183 708,00 | 31,66 | 37 476 195,28 |
| JOHNSON & JOHNSON COM | 895 048,00 | 58,58 | 52 431 911,84 |
| KRAFT FOODS INC CL A | 489 429,00 | 27,21 | 13 317 363,09 |
| MCDONALDS CORP COM | 364 829,00 | 58,75 | 21 433 703,75 |
| MEDTRONIC INC COM | 365 495,00 | 30,52 | 11 154 907,40 |
| MERCK & CO INC COM | 685 305,00 | 26,72 | 18 311 349,60 |
| MICROSOFT CORP COM | 2 514 192,00 | 20,22 | 50 836 962,24 |
| OCCIDENTAL PETE CORP DEL COM | 272 044,00 | 54,14 | 14 728 462,16 |
| ORACLE CORP COM | 1 268 184,00 | 16,09 | 20 405 080,56 |
| PEPSICO INC COM | 498 404,00 | 56,70 | 28 259 506,80 |
| PFIZER INC COM | 2 161 406,00 | 16,43 | 35 511 900,58 |
| PHILIP MORRIS INTL COM STK NPV 'WI' | 666 155,00 | 42,16 | 28 085 094,80 |
| PROCTER & GAMBLE CO COM | 964 990,00 | 64,35 | 62 097 106,50 |
| QUALCOMM INC COM | 529 554,00 | 33,57 | 17 777 127,78 |
| SCHLUMBERGER COM USD0.01 | 383 978,00 | 50,74 | 19 483 043,72 |
| 3M CO COM | 218 052,00 | 66,93 | 14 594 220,36 |
| TIME WARNER INC COM | 545 974,00 | 9,05 | 4 941 064,70 |
| US BANCORP DEL COM NEW | 560 704,00 | 26,98 | 15 127 793,92 |
| UNITED PARCEL SERVICE INC CL B | 311 502,00 | 57,60 | 17 942 515,20 |
| UNITED TECHNOLOGIES CORP | 311 502,00 | 48,53 | 15 117 192,06 |

116

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED

UBSL 000884

| | | | |
|---|---|---|---|
| COM | | | |
| VERIZON COMMUNICATIONS | | | |
| COM | 905 223,00 | 32,65 | 29 555 530,95 |
| WAL MART STORES INC COM | 716 455,00 | 55,88 | 40 035 505,40 |
| WELLS FARGO & CO NEW COM | 1 062 437,00 | 28,89 | 30 693 804,93 |
| WYETH | 9 324,00 | 36,01 | 335 757,24 |

**Total BMIS portion:**                                     **1,323,852,143.93**

The total value of which, in USD, is 1,323,852,143.93 US dollars, which amount is valued for recording and competency purposes at EUR 881,216,896.71.

(ii) On an alternative basis, and in the event that their capacity to act is challenged in this capacity, the plaintiffs file the same petition for judgment, this time on a tort or quasi-tort basis, pursuant to articles 1382 and thereafter of the Civil Code in their capacity as representatives of Luxalpha creditors and shareholders.

a) in both cases, it is necessary to order UBS SA to return all securities and financial instruments listed in Subsection (i) above to the plaintiffs, or if not, their cash value of USD 1,323,852,143.93, which is valued for recording and competency purposes at EUR 881,216,896.71; this petition is for restitution or payment, plus the results of diligent management in accordance with the investment policy dated November 30, 2008, until restitution or payment, if not more alternatively, plus legal interest from November 2008 until settlement, if not further alternatively from the date of this claim in court until settlement.

To couple the judgment for restitution with a fine of 10 million euros per day of late payment starting from notice of the forthcoming judgment.

b) If not alternatively on the legal capacities and grounds cited under 1. (i) alternatively, under 1. (ii) it is necessary to order UBS SA to pay the plaintiffs the sum of USD 1,323,852,143.93, valued for recording and competency purposes at EUR 881,216,896.71, if not any other greater amount to be negotiated by the court or appointed expert, if not further increased by legal interest from November 30, 2008 until settlement, representing the cash value of the securities supposed to have been found in the Luxalpha portfolio on the date of the liquidation, and for which the manager cannot reasonably respond that they would have (and should have) been able to be acquired with the principal provided by the shareholders and entrusted thereto by Luxalpha, with this claim increased by the results of diligent management and in accordance with the investment policy from November 30, 2008 until execution, unless, even further alternatively, increased by legal interest from November 30, 2008 until settlement, if not even further alternatively from the date of this legal claim until settlement.

c) Also alternatively (i) it is necessary to render judgment against UBS SA primarily based on the claim made by the plaintiffs acting on behalf of Luxalpha on a contractual basis, (ii) unless based on the claim filed by the plaintiffs in their capacity as representatives of Luxalpha creditors and shareholders on a tort basis, to pay the plaintiffs a total of USD 762,484,886, representing the cash value of the securities deposited to account with UBS SA, transferred by the latter to its sub-custodian and diverted by BMIS and/or Bernard L. Madoff, less the sums returned from the sub-custodian and increased by the results of diligent management in accordance with the investment policy from February 5, 2004 until execution, unless more alternatively increased by legal interest from November 17, 2008 until

CONFIDENTIAL TREATMENT REQUESTED                                               UBSL 000885

execution, if not even more alternatively from the date of this legal claim, until execution.

d) Also alternatively, it is necessary to apply the same judgment to UBS SA based on the same principal and alternative legal capacities and based on the legal grounds as claimed on a principal and alternative basis in Subsection c), for failure to comply with its contractual obligations, specifically by entrusting to BMIS, a company that did not meet the legal criteria, nor those of article B.1.1.1 of the agreement of September 22, 2006, respectively, for not having complied with its other contractual obligations discussed in Point 1.2.1.2. above, by not ensuring effective investment, consistent with the investment policy and legal restrictions, of the amounts transferred to the sub-custodian and/or even for not having assured the custody of the assets on its own behalf or on that of the SICAV, nor delivery of the corresponding funds from securities transactions carried out on behalf of Luxalpha within normal timeframes.

e) Also alternatively, in the event it is decided that UBS SA is not to be held liable, it would be necessary to order it to return fees totaling USD 10,539,560.33, valued for recording and competency purposes at EUR 7,015,616.28, if not any other higher amount to be negotiated by the court or the appointed expert, if not also alternatively increased by legal interest from November 30, 2008 until settlement, even though the fees in question were not subject to services in return, principally based on the contractual liability of UBS SA, if not based on the absence of object and/or cause, with the plaintiffs acting on behalf of the company, if not alternatively based on tort and quasi-tort liability pursuant to articles 1382 and thereafter of the Civil Code, with the plaintiffs acting on behalf of the creditors and shareholders, in addition to legal interest from the date of notification until settlement.

2. In all cases, based on the same principal and alternative qualities and based on the same legal grounds as raised on a principal and alternative basis, under Subsection c), it is also necessary to order UBS SA to pay damages/interest for expenses incurred, subscription fees paid, and other expenditures based on the same principal and alternative legal grounds as mentioned above, in the amount of 10 million euros, or any higher amount to be calculated by certified accountant, with interest at the legal rate as of the date of this claim, until settlement.

3. In all cases, based on the same principal and alternative qualities and based on the same legal grounds as invoked on a principal and alternative basis, under Point c), the judgment against UBS SA should be considered as rendered jointly and severally, if not in solidum, with the obligation of restitution of BMIS, which was the object of the receivable declaration dated February 27, 2009 that Luxalpha filed for preservation purposes, in a restricted and forced manner, given its custodian's failure to act.

4. The judgment against UBS SA must also be rendered in all cases jointly and severally if not in solidum with that of the other summoned parties.

**II. UBS SA in its capacity as manager:**

1. (i) Principally, the plaintiffs, acting on behalf of the company, seek to obtain judgment against UBS SA on contractual grounds to provide complete reparation for the injury incurred by Luxalpha by reason of loss of all its assets, the total value of which in USD amounts to USD 1,323,852,143.93, which amount is valued for recording and competency purposes at EUR 881,216,896.71, if not any other greater amount to be negotiated by the court or the appointed expert.

[stamp:] 2 euros

118

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000886

(ii) alternatively, and in the event that their capacity to act is challenged to the extent of such capacity, the plaintiffs file the same petition for judgment, this time on tort or quasi-tort grounds based on articles 1382 and thereafter of the Civil Code in their capacity as representatives of the Luxalpha creditors and shareholders,

a) in both cases, therefore, it is necessary to order UBS SA to pay to the plaintiffs the sum of USD 1,323,852,143.93 valued under all reserves at EUR 881,216,896.71, representing the cash value of the securities supposed to have been found in the Luxalpha portfolio on the date of the liquidation, and for which the manager cannot reasonably respond that they would have (and should have) been acquired with the principal contributed by the shareholders and entrusted thereto by Luxalpha, plus the result of diligent management consistent with the investment policy from November 30, 2008 until execution, if not any other greater amount to be negotiated by the court or the appointed expert, if not also alternatively increased by legal interest from November 30, 2008 until settlement, if not even further alternatively from the date of this claim in the courts, until settlement.

b) If not alternatively, on the legal capacities and grounds cited as claimed on principal and alternative bases under 1. (i) and 1. (ii) it is necessary to order UBS SA to pay the plaintiffs the sum of USD 1,136,780,477, representing the cash value of the securities supposed to have been found in the Luxalpha portfolio on August 1, 2006, the date of its replacement by UBSTPM, and for which the manager cannot reasonably respond that they would have (and should have) been able to be acquired with the principal contributed by the shareholders and entrusted thereto by Luxalpha, valued for recording and competency purposes at EUR 756,693,388.14, if not any greater amount to be negotiated by the court or the appointed expert, increased by the result of diligent management and in accordance with the investment policy from November 30, 2008 until settlement, if not even further alternatively, increased by the legal interest rate from August 1, 2006 until settlement, if not, even further alternatively, from the date of this request until settlement.

c) If not further alternatively, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1.(ii), the total of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, if not any greater amount to be negotiated by the court or the appointed expert, representing the principal entrusted thereto and transferred to BMIS less the amounts returned from BMIS and increased by the results of diligent management consistent with the investment policy from the date of remittance of the funds until execution,

d) If not even further alternatively based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1. (ii), the sum of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, if not any other greater amount to be negotiated by the court or the appointed expert representing the principal entrusted thereto and transferred to BMIS, less the amounts returned from BMIS and increased by the results of diligent management consistent with the investment policy from the date of remittance of the funds to August 1, 2006.

e) If not on a more alternative basis, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1. (ii), the total of USD 762,484,886 valued for recording and competency purposes at EUR 507,545,021.63, if not any other greater amount to be negotiated by the court or the appointed expert, representing the principal entrusted thereto and transmitted to BMIS, less the amounts returned from BMIS, plus legal interest from

CONFIDENTIAL TREATMENT REQUESTED                                        UBSL 000887

the date of remittance of the funds until execution, if not from the date of this claim in court until settlement.

2. <u>On a more alternative order,</u> in the event it is decided that UBS Luxembourg S.A. bears no liability for the loss of Luxalpha's assets, it would be necessary to order it to return the fees totaling USD 14,464,522.57 (management fees) + USD 13,470,388.36 (performance fees), i.e., USD 27,934,910.93 valued for recording and competency purposes at EUR 18,594,761.98, if not any other greater amount to be negotiated by the court or the appointed expert, while the fees in question are not offset by any equivalent service, primarily based on the contractual liability of UBS SA, if not based on the absence of object and/or cause, with the plaintiffs acting on behalf of Luxalpha, if not alternatively based on the tort and quasi-tort liability as provided for in articles 1382 and thereafter of the Civil Code, with the plaintiffs acting on behalf of the creditors and shareholders, plus legal interest from the date of this claim in the courts, until settlement.

3. <u>In all cases</u>, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1. (ii), it is also necessary to order UBS SA to pay damages and interest for expenses incurred, subscription fees paid and other expenditures on the basis of the same principal and alternative legal grounds cited above, in the amount of 10 million euros or any greater amount to be determined by certified accountant, with interest at the legal rate from the date of this claim until settlement.

4. <u>In all cases equally,</u> based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1. (ii), the judgment against UBS SA should be understood as rendered jointly and severally if not in solidum with the obligation of restitution of BMIS which was the subject of the declaration of receivable of February 27, 2009, which Luxalpha has filed for preservation purposes.

5. The judgment against UBS SA must also be declared <u>in all cases</u> jointly and severally if not in solidum with that of the other managers involved in Luxalpha, as well as the other summoned parties.

### III. UBSTPM in its capacity as manager:

1. (i) Principally, the plaintiffs, acting on behalf of the company, seek to obtain judgment against UBSTPM on contractual grounds to provide complete reparation for the injury incurred by Luxalpha by reason of loss of all its assets, the total value of which in USD amounts to USD 1,323,852,143.93, which amount is valued for recording and competency purposes at EUR 881,216,896.71, if not any other greater amount to be negotiated by the court or the appointed expert.

(ii) alternatively, and in the event that their capacity to act is challenged to the extent of such capacity, the plaintiffs file the same petition for judgment, this time on tort or quasi-tort grounds based on articles 1382 and thereafter of the Civil Code in their capacity as representatives of the Luxalpha creditors and shareholders,

a) <u>in both cases,</u> therefore, it is necessary to order UBSTPM to pay to the plaintiffs the sum of USD 1,323,852,143.93, valued for recording and competency purposes at EUR 881,216,896.71, representing the cash value of the securities supposed to have been found in the Luxalpha portfolio on the date of the liquidation, and for which the manager cannot reasonably respond that they would have (and should have) been acquired with the principal contributed by the shareholders and entrusted thereto by Luxalpha, plus the results

[stamp:] 2 euros

120

CONFIDENTIAL TREATMENT REQUESTED                                        UBSL 000888

of diligent management consistent with the investment policy from November 30, 2008 until execution, if not also alternatively increased by legal interest from November 30, 2008 until settlement, if not even further alternatively from the date of this claim in the courts, until settlement.

b) If not alternatively, on the principal and alternative grounds that follow, based on the same legal qualities and grounds as claimed principally and alternatively under 1. (i) and 1. (ii), it is necessary to order UBSTPM to pay the plaintiffs the sum of USD 1,285,693,575.09, valued for recording and competency purposes at EUR 855,816,731.07, if not any greater amount to be negotiated by the court or the appointed expert, representing the cash value of the securities supposed to have been found in the Luxalpha portfolio on November 17, 2008, the date of its replacement by AML, and for which the manager cannot reasonably respond that they would have (and should have) been able to be acquired with the principal contributed by the shareholders and entrusted thereto by Luxalpha, increased by the results of diligent management and in accordance with the investment policy from November 30, 2008 until settlement, if not further increased by legal interest from August 1, 2006 until settlement, if not even further alternatively from the date of this legal claim until settlement.

c) If not further alternatively, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1.(ii), the total of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, if not any greater amount to be negotiated by the court or the appointed expert, representing the principal entrusted thereto and transferred to BMIS, less the amounts returned from BMIS and increased by the results of diligent management consistent with the investment policy from the date of remittance of the funds until execution,

d) If not even further alternatively based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1. (ii), the sum of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, if not any other greater amount to be negotiated by the court or the appointed expert representing the principal entrusted thereto and transferred to BMIS, less the amounts returned from BMIS and increased by the results of diligent management consistent with the investment policy from the date of remittance of the funds until November 17, 2008.

e) If not on a more alternative basis, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1. (ii), the total of USD 762,484,886, if not any other greater amount to be negotiated by the court or the appointed expert, valued for recording and competency purposes at EUR 507,545,021.63, representing the principal entrusted thereto and transmitted to BMIS, less the amounts returned from BMIS, plus legal interest from the date of remittance of the funds until execution.

2. On a more alternative order, in the event it is decided that UBSTPM bears no liability for the loss of Luxalpha's assets, it would be necessary to order it to return the management fees totaling USD 27,167,047.71, as well as the performance fee of USD 15,482,220.05, i.e., a total of USD 42,649,267.76, valued for recording and competency purposes at EUR 28,389,314.89, if not any other greater amount to be negotiated by the court or the appointed expert, while the fees in question are not offset by any equivalent service, primarily based on the contractual liability of UBS SA, If not based on the absence of object and/or cause, with the plaintiffs acting on behalf of Luxalpha based on contractual liability, if not alternatively based on

CONFIDENTIAL TREATMENT REQUESTED                                                    UBSL 000889

tort and quasi-tort liability as provided for in articles 1382 and thereafter of the Civil Code, with the plaintiffs acting on behalf of the creditors and shareholders, plus legal interest from the date of this claim in the courts, until settlement.

3. In all cases, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1. (ii), the judgment against UBSTPM is to be understood as rendered jointly and severally if not in solidum with the obligation of restitution of BMIS which was the subject of the declaration of receivable of February 27, 2009, which Luxalpha has filed for preservation purposes.

5. The judgment against UBSTPM must also be rendered in all cases jointly and severally if not in solidum with that of the other managers intervening in Luxalpha, as well as the other summoned parties.

## IV. AML:

1. (i) Principally, the plaintiffs, acting on behalf of the company, seek to obtain judgment against AML on contractual grounds to provide complete reparation for the injury incurred by Luxalpha by reason of the loss of all its assets, the total value of which in USD amounts to USD 1,323,852,143.93, which amount is valued for recording and competency purposes at EUR 881,216,896.71, if not any other greater amount to be negotiated by the court or the appointed expert.

(ii) alternatively, and in the event that their capacity to act was challenged to the extent of such capacity, the plaintiffs file the same petition for judgment, this time on tort or quasi-tort grounds based on articles 1382 and thereafter of the Civil Code in their capacity as representatives of the Luxalpha creditors and shareholders,

a) in both cases, therefore, it is necessary to order AML to pay to the plaintiffs the sum of USD 1,323,852,143.93 valued for recording and competency purposes at EUR 881,216,896.71, or any other greater amount to be negotiated by the court or the appointed expert, representing the cash value of the securities supposed to have been found in the Luxalpha portfolio on the date of the liquidation, and for which the manager cannot reasonably respond that they would have (and should have) been acquired with the principal contributed by the shareholders and entrusted thereto by Luxalpha, plus the result of diligent management consistent with the investment policy from November 30, 2008 until execution, if not also alternatively increased by legal interest from November 30, 2008 until settlement, if not even further alternatively from the date of this claim in the courts, until settlement.

b) If not alternatively, on principal and alternative grounds, based on the same legal qualities and grounds as claimed on a principal and alternative order under 1. (i) and 1. (ii), it is necessary to order AML to pay the plaintiffs the sum of USD 1,285,693,475.09, valued for recording and competency purposes at EUR 855,816,731.07, if not any greater amount to be negotiated by the court or the appointed expert, representing the cash value of the securities supposed to have been found in the Luxalpha portfolio on November 17, 2008, the date of the start of activity of AML, and for which the manager cannot reasonably respond that they would have (and should have) been able to be acquired with the principal contributed by the shareholders and entrusted thereto by Luxalpha, increased by the result of diligent management and in accordance with the investment policy from November 17, 2008 until execution, if not further increased by legal interest from November 30, 2008 until settlement, if not even further alternatively from the date of this legal claim until settlement.

c) If not further alternatively, based on the same principal and alternative qualities and based on

[stamp:] 2 euros

122

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000890

the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1.(ii), the total of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, if not any greater amount to be negotiated by the court or the appointed expert, representing the principal entrusted thereto and transferred to BMIS, less the amounts returned from BMIS and increased by the results of diligent management consistent with the investment policy from the date of remittance of the funds until execution,

d) If not even further alternatively based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1. (ii), the sum of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, if not any other greater amount to be negotiated by the court or the appointed expert, representing the principal entrusted thereto and transferred to BMIS and increased by the results of diligent management consistent with the investment policy from the date of remittance of the funds until November 17, 2008.

e) If not, on a more alternative basis, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1. (ii), the total of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, entrusted thereto and transmitted to BMIS, representing the principal entrusted thereto and transmitted to BMIS less the amounts returned from BMIS, plus legal interest from the date of remittance of the funds until execution.

2. In all cases, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1. (ii), the judgment against AML is to be understood as rendered jointly and severally if not in solidum with the obligation of restitution of BMIS which was the subject of the declaration of receivable of February 27, 2009, which Luxalpha has filed for preservation purposes.

5. The judgment against AML must also be declared in all cases jointly and severally if not in solidum with that of the other managers intervening in Luxalpha, as well as the other summoned parties.

### V. UBSFS:

1. (i) Principally, the plaintiffs, acting on behalf of the company, seek to obtain judgment against UBSFS on contractual grounds to provide complete reparation for the injury incurred by Luxalpha by reason of the loss of all its assets, the total value of which in USD amounts to USD 1,323,852,143.93, which amount is valued for recording and competency purposes at EUR 881,216,896.71, if not any other greater amount to be negotiated by the court or the appointed expert.

(ii) Alternatively, and in the event that their capacity to act was challenged to the extent of such capacity, the plaintiffs file the same petition for judgment, this time on tort or quasi-tort grounds based on articles 1382 and thereafter of the Civil Code in their capacity as representatives of the Luxalpha creditors and shareholders,

a) in both cases, therefore, it is necessary to order UBSFS to pay to the plaintiffs the sum of USD 1,323,852,143.93, valued for recording and competency purposes at EUR 881,216,896.71, if not any other greater amount to be negotiated by the court or the appointed expert, representing the cash value of the securities supposed to have been found in the Luxalpha portfolio on the date of the liquidation, and for which the administrator cannot reasonably respond that they would have (and should have) been acquired with the principal contributed by the shareholders and entrusted thereto by Luxalpha, plus

CONFIDENTIAL TREATMENT REQUESTED                                                    UBSL 000891

the result of diligent management consistent with the investment policy from November 30, 2008 until execution, if not also alternatively increased by legal interest from November 30, 2008 until settlement, if not even further alternatively from the date of this claim in the courts, until settlement.

b) If not alternatively, and particularly on the following principal and alternative grounds, based on the same legal qualities and grounds as claimed on a principal and alternative basis under 1. (i) and 1. (ii), it is necessary to order UBSFS to pay the plaintiffs the sum of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, if not any greater amount to be negotiated by the court or the appointed expert, representing the principal sent to BMIS less amounts returned from BMIS and plus the result of diligent management consistent with the investment policy from the date of remittance of the funds until execution, if not further alternatively this same amount increased by legal interest from the date of remittance of the funds until restitution, if not even further alternatively from the date of this legal claim until settlement.

2. In all cases, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1. (ii), the judgment against UBSFS is to be understood as rendered jointly and severally if not in solidum with the obligation of restitution of BMIS, which was the subject of the declaration of receivable of February 27, 2009, which Luxalpha has filed for preservation purposes.

3. The judgment against UBSFS must also be rendered in all cases jointly and severally if not in solidum with the other summoned parties.

### VI. UBSTPM in its capacity as administrator:

1. (i) Principally, the plaintiffs, acting on behalf of the company, seek to obtain judgment against UBSTPM on contractual grounds to provide complete reparation for the injury incurred by Luxalpha by reason of the loss of all its assets, the total value of which in USD amounts to USD 1,323,852,143.93, which amount is valued for recording and competency purposes at EUR 881,216,896.71, if not any other greater amount to be negotiated by the court or the appointed expert.

(ii) alternatively, and in the event that their capacity to act was challenged to the extent of such capacity, the plaintiffs file the same petition for judgment, this time on tort or quasi-tort grounds based on articles 1382 and thereafter of the Civil Code in their capacity as representatives of the Luxalpha creditors and shareholders,

a) in both cases, therefore, it is necessary to order UBSTPM to pay to the plaintiffs the sum of USD 1,323,852,143.93, valued for recording and competency purposes at EUR 881,216,896.71, if not any other greater amount to be negotiated by the court or the appointed expert, representing the cash value of the securities supposed to have been found in the Luxalpha portfolio on the date of the liquidation, and for which the administrator cannot reasonably respond that they would have (and should have) been acquired with the principal contributed by the shareholders and entrusted thereto by Luxalpha, plus the result of diligent management consistent with the investment policy from November 30, 2008 until execution, if not also alternatively increased by legal interest from November 30, 2008 until settlement, if not even further alternatively from the date of this claim in the courts, until settlement.

b) If not alternatively, and on all the principal and alternative grounds, based on the same legal qualities and grounds as claimed on a principal and alternative basis under

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                                      UBSL 000892

Subsections 1. (i) and 1. (ii), it is necessary to order UBSTPM to pay the plaintiffs the sum of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, if not any greater amount to be negotiated by the court or the appointed expert, representing the principal sent to BMIS less amounts returned from BMIS and plus the result of diligent management consistent with the investment policy from the date of the remittance of the funds until execution, if not further alternatively this same amount increased by legal interest from the date of remittance of the funds until restitution, if not even further alternatively from the date of this legal claim until settlement.

2. In all cases, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1.(i) and 1. (ii), the judgment against UBSTPM is to be understood as rendered jointly and severally if not in solidum with the obligation of restitution of BMIS, which was the subject of the declaration of receivable of February 27, 2009, which Luxalpha has filed for preservation purposes.

3. The judgment against UBSTPM must also be rendered in all cases jointly and severally if not in solidum with the other summoned parties.

### VII. Members of the board of directors:

### 1. Principally:

The plaintiffs file their civil liability action against the directors pursuant to article 59, section 2,
(i) principally on behalf of Luxalpha, which according to case law involves contractual liability if not alternatively tort liability, and
(ii) alternatively on behalf of the creditors and investors based on the liability in tort described in articles 1382 and 1383 and thereafter of the Civil Code and also alternatively for completion on a contractual basis.

### 2. Alternatively:

The plaintiffs file an "actio mandati" on behalf of Luxalpha pursuant to article 59, section 1, as by committing the violations mentioned above, the directors are in serious breach of their obligation to execute their mandate with all due diligence.
The directors, therefore, are to be ordered on a contractual basis, in solidum, if not each for its share in the injury which must, however, be entire for each convicted party, given their role in causing the injury.

### 3. In all the above cases, on the same principal and alternative bases as claimed above, and based on the same legal capacity and grounds as claimed above, the judgment against the directors must be rendered jointly and severally, in solidum, if not each for its share in the injury which must, however, be entire for each convicted party, given their role in causing the injury.

a. principally, the sum of USD 1,323,852,143.93, valued for recording and competency purposes at EUR 881,216,896.71, if not any other greater amount to be negotiated by the court or the appointed expert, plus the result of diligent management consistent with the investment policy from November 30, 2009 [sic], if not also alternatively increased by legal interest from November 30, 2008 until settlement, if not even further alternatively from the date of this claim in the courts, until settlement;

CONFIDENTIAL TREATMENT REQUESTED                                                    UBSL 000893

b. alternatively, the sum of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, if not any greater amount to be negotiated by the court or the appointed expert, representing the principal sent to BMIS plus the result of diligent management consistent with the investment policy from the date of remittance of the funds until execution;

c. also alternatively, the sum of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, if not any greater amount to be negotiated by the court or the appointed expert, representing the principal entrusted to it and sent to BMIS plus legal interest from the date of remittance of the funds until execution, if not alternatively from the date of this legal claim until settlement;

4. In all cases, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1 and 2, the judgment against the directors must be rendered jointly and severally, if not in solidum, with the obligation of restitution of BMIS, which was the subject of the declaration of receivable of February 27, 2009, which Luxalpha has filed for preservation purposes and in forced and restricted fashion, given its custodian's failure to act.

5. The judgment against the directors must also be ordered in all cases jointly and severally, if not in solidum with the other summoned parties.


**VIII. The sponsors:**

1. Principally, as guarantors:

The plaintiffs are filing this action principally on behalf of Luxalpha, if not alternatively on behalf of the investors and creditors,

(i)  principally, on a contractual basis, and

(ii) alternatively, on a tort or quasi-tort basis pursuant to articles 1382 and thereafter of the Civil Code.

2. Alternatively, as de facto directors:

The plaintiffs seek, first of all, to take the action to which Luxalpha is entitled, and also alternatively, the action corresponding to creditors and shareholders,

(i) principally based on article 59, section 2 of the Law of August 10, 1915, and
(ii) alternatively based on articles 1382 and thereafter of the Civil Code, and
(iii) also alternatively, for completion on a contractual basis.

In all cases, the sponsors seek judgment jointly and severally, if not in solidum, each for its share of the injury, which judgment must, however, be entire for each notified party and UBS AG and for all the principal and alternative bases claimed therein and based on the same legal capacity and grounds as claimed above, to pay to the plaintiffs:

a. principally, the sum of USD 1,323,852,143.93, valued for recording and competency purposes at EUR 881,216,896.71, if not any other greater amount to be negotiated by the court or the appointed expert, plus the result of diligent management consistent with the investment policy from

[stamp:] 2 euros

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000894

November 30, 2009 [sic], if not also alternatively increased by legal interest from November 30, 2008 until settlement, if not even further alternatively from the date of this claim in the courts, until settlement;

b. alternatively, the sum of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, if not any greater amount to be negotiated by the court or the appointed expert, representing the principal sent to BMIS, plus the result of diligent management consistent with the investment policy from the date of remittance of the funds until execution;

c. also alternatively, the sum of USD 762,484,886, valued for recording and competency purposes at EUR 507,545,021.63, if not any greater amount to be negotiated by the court or the appointed expert, representing the principal sent to BMIS plus legal interest from the date of remittance of the funds until execution, if not alternatively from the date of this legal claim until settlement;

3. In all cases, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1 and 2, the judgment against the sponsors must be ordered jointly and severally, if not in solidum, with the obligation of restitution of BMIS, which was the subject of the declaration of receivable of February 27, 2009, which Luxalpha has filed for preservation purposes and in forced and restricted fashion given its custodian's failure to act.

4. The judgment against the sponsors must also be rendered in all cases jointly and severally if not in solidum with the other summoned parties.


**IX. Ernst & Young:**

There is cause to order Ernst & Young as follows:

1. (i) Principally, the plaintiffs, acting on behalf of the company, seek to obtain judgment against EY on contractual grounds, if not alternatively on the tort or quasi-tort basis of articles 1382 and thereafter of the Civil Code, to provide complete reparation for the injury incurred by Luxalpha by reason of the loss of all its assets, the total value of which in USD amounts to USD 1,323,852,143.93, valued for recording and competency purposes at EUR 881,216,896.71, if not any other greater amount to be negotiated by the court or the appointed expert.

(ii) alternatively, and in the event that their capacity to act as claimed above was challenged to the extent of such capacity, the plaintiffs file the same petition for judgment, this time on the tort or quasi-tort grounds of articles 1382 and thereafter of the Civil Code, in their capacity as representatives of the Luxalpha creditors and shareholders,

a) in all cases, therefore, it is necessary to order EY to pay to the plaintiffs the sum of USD 1,323,852,143.93, valued for recording and competency purposes at EUR 881,216,896.71, if not any other greater amount to be negotiated by the court or the appointed expert, representing the cash value of the securities supposed to have been found in the Luxalpha portfolio on the date of the liquidation, plus the result of diligent management consistent with the investment policy from November 30, 2008 until execution, if not also alternatively increased by legal interest from November 30, 2008 until settlement, if not even further alternatively from the date of this claim in the courts, until settlement.

b) If not alternatively, and on all the principal and alternative grounds, based on the

CONFIDENTIAL TREATMENT REQUESTED                                    UBSL 000895

same legal qualities and grounds as claimed on a principal and alternative basis under Points 1. (i) and 1. (ii), it is necessary to order EY to pay the plaintiffs the sum of USD 762,484,886, valued for recording and competency purposes at EUR 504,545,021.63, if not any greater amount to be negotiated by the court or the appointed expert, representing the principal sent to BMIS less amounts returned from BMIS and plus the result of diligent management consistent with the investment policy from the date of the remittance of the funds until execution, if not further alternatively this same amount increased by legal interest from the date of remittance of the funds until restitution, if not even further alternatively from the date of this legal claim until settlement.

2. Also alternatively, in the event it is decided that EY bears no liability for the loss of Luxalpha's assets, it would be necessary to order it to return to the plaintiffs fees totaling EUR 85,302.50 or any other greater amount to be negotiated by the court or the appointed expert, while the fees in question are not offset by any equivalent service, primarily on a contractual basis, if not based on the absence of object and/or cause, with the plaintiffs acting on behalf of Luxalpha, if not alternatively based on the tort and quasi-tort liability as provided for in articles 1382 and thereafter of the Civil Code, with the trustees acting on behalf of the creditors and shareholders.

3. In all cases, based on the same principal and alternative qualities and based on the same legal grounds as claimed on a principal and alternative basis under Subsections 1. (i) and 1. (ii), the judgment against EY is to be understood as rendered jointly and severally, if not in solidum, with the obligation of restitution of BMIS, which was the subject of the declaration of receivable of February 27, 2009, which Luxalpha has filed for preservation purposes.

4. The judgment against EY must also be ordered in all cases jointly and severally if not in solidum with the other notified parties.


### X. The CSSF:

Declare the forthcoming judgment common to the CSSF.

Issue an order to the CSSF to send the following documents:

(i) Copy of the conclusions of the investigation carried out by the CSSF—and more broadly as cited in the CSSF letter of 9/22/2009 sent to the trustees—on the quality of the administrative and general organization and internal control of the supervisory entities, i.e., UBS SA, UBS TPM, UBS FS and ACCESS MANAGEMENT Luxembourg SA—with a view to guaranteeing, in general, the protection of all investors in matters involving these entities—which investigation ended with a conclusion regarding the obligations of UBS SA on 2/25/2009 and the press release of the same date.

(ii) Copy of the order sent by the CSSF to UBS SA to implement "*the necessary infrastructure, i.e., sufficient human and technical means and the necessary internal rules, as to complete all the tasks related to its duty as a Luxembourg OPC custodian bank,*" in accordance with the Law of 12/20/2002 and IML Circular 91-75.

(iii) Copy of the order sent by the CSSF to UBS SA "*to analyze and correct all structures and procedures in relation to its supervisory obligation deriving from its status as a custodian bank, and that UBSL should*

[stamp:]  2 euros

128

CONFIDENTIAL TREATMENT REQUESTED

UBSL 000896

*seek to provide reparations for the damage caused in relation to the breach described above in accordance with the obligations of a custodian bank subject to Luxembourg law, notwithstanding any valid and binding contractual clauses to the contrary and/or any relevant court ruling, as applicable.*"

(vi) Copy of the detailed final report dated May 2009 that UBS SA sent to the CSSF concerning improvements made to its infrastructure and substantial changes to its internal procedures related to its duty as custodian bank, which allowed the CSSF to claim that UBSL had provided proof and guarantees of assets in place [of] the infrastructure and the necessary internal organizational rules, in accordance with the order sent to it and consistent with professional standards applicable in the Grand Duchy of Luxembourg.

Reserve the right to request an order against the CSSF for all exhibits demonstrated as being of significance during the course of the proceeding.

Reserve the right to serve new notice against CSSF in the event that material evidence is brought to the attention of the plaintiffs during the course of the proceeding, involving the civil liability of the CSSF.

For all the above parties, with the exception of the CSSF:

- to find that the legal interest rate shall be increased by three points three months after the date of notification of the forthcoming decision;

- to henceforth order the summoned parties jointly and severally, if not in solidum, to a provision of EUR 500,000,000, which amount is currently not subject to appeal; to support the enforcement of this judgment by provision and without bond;

- the summoned parties further are to be ordered to pay to the plaintiff a procedural penalty of EUR 50,000 under article 240 of the NCPC for any amounts the plaintiff has disbursed and that are not included in expenses, and that it would be unfair to leave it to cover at its expense;

- the summoned parties are to be ordered to pay all court expenses and expenditures less the fees of the attorney to the Court ruled affirmatively as having made an advance;

- to order provisional execution of the forthcoming judgment, notwithstanding any means of appeal, without bond, pursuant to the official record and prior to recording;

- to reserve to the plaintiffs the right to produce any other exhibit at such time and place as may be applicable;

- to reserve to the plaintiffs any other rights, entitlements, means and actions, and specifically the right to expand their claims in the corresponding court;

Duly noted.

In support of this claim, the following exhibits are submitted (subject to the production of others in the corresponding court instances, as applicable).

129

CONFIDENTIAL TREATMENT REQUESTED

UBSL 000897