**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-04390 (SMB) |
| v. | |
| BAM L.P., MICHAEL MANN, and MERYL MANN, | |
| Defendants. | |

## [PROPOSED] JOINT PRETRIAL ORDER

Plaintiff Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated chapter 7 estate of Bernard L. Madoff ("Madoff"), and defendants BAM L.P., Michael Mann, and Meryl Mann (the "Defendants," and together with the Trustee, the "Parties") have conferred among themselves and with the Court pursuant to Federal Rule of Civil Procedure 16, made applicable herein by Federal Rule of Bankruptcy Procedure 7016, and the following statements, directions, and agreements are adopted as the Joint Pretrial Order herein.

I.    **NATURE OF THE CASE**

This adversary proceeding arises from a fraud perpetrated by Madoff through the investment advisory business of BLMIS (the "IA Business"). On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violating criminal securities statutes. On the same day, the United States Securities and Exchange Commission (the "SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against BLMIS and Madoff. On December 15, 2008, the SEC consented to a combination of its action with an application of the Securities Investor Protection Corporation ("SIPC"), the Trustee was appointed as trustee for the liquidation of the business of BLMIS under the Securities Investor Protection Act ("SIPA"), and the District Court removed the combined action (the "Liquidation Proceeding") to this Court.

In March 2010, Madoff pled guilty to the criminal charges filed against him, including securities fraud, investment adviser fraud, mail fraud, wire fraud, three counts of money laundering, false statements, perjury, false filing with the SEC, and theft from an employee benefit plan. At his plea allocution, Madoff admitted to operating a Ponzi scheme through the IA Business beginning in at least the early 1990s.

On November 30, 2010, the Trustee brought this adversary proceeding, pursuant to title 11 of the U.S. Code (the "Bankruptcy Code") and New York Debtor & Creditor Law, against Defendants seeking to avoid and recover fraudulent transfers from three separate customer accounts totaling $9,678,157 allegedly received by Defendants from BLMIS during the six years prior to the Filing Date. As a result of the *Section 546(e) Decision*, *see SIPC v. BLMIS*, (*In re Madoff Sec.*), No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013), *aff'd*, 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015) (the "*Section 546(e) Decision*"), the Trustee is limited to recovering the two-year transfers from BLMIS solely pursuant to sections

548(a)(1)(A) and 550(a) of the Bankruptcy Code.  As a result, the Trustee now seeks to avoid and

recover transfers to two accounts from and after December 11, 2006, totaling $2,813,000 (the

"Two-Year Transfers").  *See* [Original] Complaint, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390

(SMB) (Bankr. S.D.N.Y. Nov. 30, 2010), ECF No. 1.  Claims against a third account were

dismissed as a result of the *Section 546(e) Decision*.

Under section 548(c), Defendants may retain the transfers if they can show that they gave

value for the transfers.  But starting in October 2013 and continuing to October 2019, the District

Court and this Court have uniformly held that BLMIS customers are not entitled to retain avoidable

transfers they received from BLMIS under section 548(c) because such transfers did not constitute

the "satisfaction . . . of . . . antecedent debt" within the meaning of the statute.  *SIPC v. BLMIS*, (*In

re Madoff Sec.*), 499 B.R. 416, 423 (S.D.N.Y. 2013) (the "*Antecedent Debt Decision*"); *see also

Picard v. Nelson*, 610 B.R. 197, 236 (Bankr. S.D.N.Y. 2019) ("[A] transferee in a Ponzi scheme

does not give value beyond his deposit of principal."); *Picard v. BAM L.P.* (*In re BLMIS*), 608

B.R. 165, 180–81 (Bankr. S.D.N.Y. 2019) (the "*MSJ Decision*"); *Picard v. Goldenberg*, No. 10-

04946 (SMB), 2018 WL 3078149, at *4 (Bankr. S.D.N.Y. June 19, 2018); *Picard v. Lowrey* (*In

re BLMIS*), Nos. 10–04387, 10–04488, 10–04350, 10–05110 (SMB), 2018 WL 1442312, at *8

(SMB) (Bankr. S.D.N.Y. Mar. 26, 2018); *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016

WL 1695296, at *10–11 (Bankr. S.D.N.Y. April 25, 2016); *SIPC v. BLMIS (In re Bernard L.

Madoff)*, 531 B.R. 439 (Bankr. S.D.N.Y. 2015) (the "*Omnibus Good Faith Decision*").

The *Antecedent Debt Decision* was decided on a motion to dismiss, and the value defense

issue in that decision was not certified for direct appeal to the Second Circuit.  However, both the

Bankruptcy Court and District Court revisited the value defense in deciding the Trustee's motion

for summary judgment in *Lowrey*, 2018 WL 1442312, at *8.  The value defense in *Lowrey* is

currently under review by the Second Circuit. *See In re Bernard L. Madoff Inv. Sec. LLC (Picard v. Gettinger)*, No. 19-429. Other than this adversary proceeding, Defendants were not parties to any of the cases cited in the preceding paragraph.[1]

In April 2014, Defendants answered the Trustee's Complaint, and by the end of May 2014, the Parties stipulated to discovery deadlines.[2] In August 2015, the Parties entered into a Stipulation and Order dismissing the Trustee's counts seeking to avoid obligations pursuant to sections 548(a)(1) and 544 of the Bankruptcy Code with prejudice, and dismissing the Trustee's claims against defendants Betsy Mann Polatsch and Adam Mann (the "Dismissed Defendants") without prejudice.[3] The Parties concluded all discovery in December 2015, and engaged in an unsuccessful mediation in March 2016 and January 2017 before Deborah A. Reperowitz.[4]

On September 28, 2018, this Court scheduled trial for December 3, 2018 and directed Defendants to file any motion to withdraw the reference within thirty days.[5] On October 26, 2018,

---

[1] Defendants were part of a group of defendants who sought to intervene or to participate as *amicus curiae* in the *Cohen* matter before the Bankruptcy Court on limited common legal issues. The motion was opposed by the Trustee, *Cohen*, Adv. Pro. No. 10-04311 (Bankr. S.D.N.Y. Oct. 29. 2015), ECF No. 65, and denied by the Court. *See* Order Denying Motion To Intervene Or To Participate As Amicus Curiae, *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB) (Apr. 28, 2016), ECF No. 94. When this Court denied the motion to intervene, the Defendants unsuccessfully appealed the decision to the District Court. *See* Notice of Appeal, *Picard v. Cohen*, No. 16-cv-04462 (LAP) (S.D.N.Y. June 14, 2016), ECF No. 1; Order, *Lanx BM Invs. LLC v. Picard*, No. 16-cv-04462 (LAP) (S.D.N.Y. Nov. 2, 2016), ECF No. 24. The Defendants then sought recourse before the Second Circuit until voluntarily dismissing their notice of appeal. *See* Order, *Lanx BM Invs. LLC v. Picard*, No. 16-409 (2d Cir. Apr. 4, 2017), ECF No. 161.

[2] *See* Defs.' Answer To Am. Compl. And Affirmative Defenses (the "Answer"), *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. April 16, 2014), ECF No. 40; Case Management Notice, ECF No. 42. The discovery and other pre-trial deadlines were further amended in 2014 through 2016. *See* ECF No. 44 (Sept. 11, 2014); ECF No. 47 (Sept 16, 2015); ECF No. 53 (June 17, 2016); ECF No. 57 (July 22, 2016); ECF No. 59 (Sept 20, 2016); ECF No. 61 (Dec. 20, 2016).

[3] *See* Stip. and Order, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2015), ECF No. 46.

[4] *See* Mediator's Rpt., *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.NY. Jan. 24, 2017), ECF No. 63.

[5] *See* Order Setting Trial, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.NY. Sept. 28, 2018), ECF No. 108.

Defendants filed their motion to withdraw the reference to the District Court for a jury trial (the "Motion To Withdraw").[6]  The Motion to Withdraw was fully briefed by January 16, 2019.[7]

On November 16, 2018, Defendants requested by letter that this Court continue the trial pending the outcome of the Motion To Withdraw.  This Court denied Defendants' request, noting that absent the Trustee's consent, Defendants needed to move for a stay under Rule 5011(c) of the Federal Rules of Bankruptcy Procedure.[8]

On November 20, 2018, absent consent of the Trustee, Defendants moved for (1) an expedited determination of their motion for a stay of the trial pending the District Court's determination of the Motion To Withdraw, and (2) a stay of the trial (the "Motion for Stay").[9]  The Court entered an order to show cause, requiring any responses or objections to be filed and served a day before the hearing scheduled for November 28, 2018.[10]

At that hearing, at the invitation of the Court, the Defendants orally moved before this Court to withdraw with prejudice their customer claims (Claim Nos. 009823 and 009822), and their objections to the Trustee's determinations of those customer claims (ECF Nos. 461 and 815). This Court issued a bench ruling granting the Defendants' oral motion, and adjourned the trial *sine die*, but also requested supplemental briefing from the Parties on the legal effect of this withdrawal of claims on the Court's jurisdiction.[11]

---

[6] *See* Motion To Withdraw, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.NY. Oct. 26, 2018), ECF No. 114.

[7] Both the Trustee and SIPC opposed the Motion To Withdraw. *See Picard v. BAM L.P.*, No. 18-cv-09916 (VSB) (S.D.N.Y.), ECF Nos. 1, 17–19, 22.

[8] *See* So Ordered Letter, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Nov. 19, 2018), ECF No. 116.

[9] *See* Motion for Stay, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Nov. 20, 2018), ECF No. 121–1.

[10] *See* Order To Show Cause, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Nov. 20, 2018), ECF No. 123.

[11] *See* Order Withdrawing Claims and Objections with Prejudice and Finally Determining Net Equity, *Picard v. BAM*

In January 2019, this Court ruled that it had equitable jurisdiction over this adversary proceeding. *See Picard v. BAM L.P. (In re: Bernard L. Madoff)*, 597 B.R. 466, 486 (Bankr. S.D.N.Y. 2019) (the "*Jurisdiction Decision*"). Defendants then moved for leave to appeal the decision (the "Motion for Leave"), which was assigned to District Judge Vernon S. Broderick.[12] The Motion for Leave was fully briefed by February 2019.[13]

In December 2018, the Trustee moved for summary judgment on Count One of the Amended Complaint ("Trustee's Summary Judgment Motion").[14] The Defendants opposed the Trustee's Summary Judgment Motion and the Trustee and SIPC replied on March 27, 2019.[15]

In September 2019, the Court granted in part and denied in part the Trustee's Summary Judgment Motion under Federal Rule of Civil Procedure 56(g). *See generally MSJ Decision*, 608 B.R. 165. The Court subsequently entered an order on its *MSJ Decision*, as follows:

- The Trustee has established that there is no genuine disputed issue of fact that: (a) Madoff operated BLMIS as a Ponzi scheme; (b) the transfers of $2,813,000 to or for the benefit of Defendants within two years of December 11, 2008 (the "Two-Year Transfers") consisted of fictitious profits in the sense that the Defendants had exhausted the amounts of their deposits before the onset of the Two-Year Period; and (c) the Trustee is entitled to rely on the Ponzi scheme presumption and has demonstrated that the

---

*L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.NY. Dec. 20, 2018), ECF No. 138.

[12] *See* Mot. for Leave, *Picard v. BAM L.P.*, No. 19-cv-00812 (VSB) (S.D.N.Y. Jan. 28, 2019), ECF No. 1.

[13] *See Picard v. BAM L.P.*, No. 19-cv-00812 (VSB) (S.D.N.Y.), ECF Nos. 1, 4–6, 7.

[14] *See* Mot. for Summary Judgment, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.NY. Nov. 20, 2018), ECF No. 140–43. On February 5, 2019, by letter to the Court, the Defendants sought leave to file a cross motion for summary judgment and to extend the briefing schedule by two weeks. The Trustee opposed the motion. *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB), ECF Nos. 152-3. The Court granted the extension.

[15] *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB), ECF Nos. 158, 160, 163, 164, 166, 168.

Two-Year Transfers were made with the actual intent to hinder delay or defraud creditors within the meaning of 11 U.S.C. §§ 548(a)(1)(A) and 550(a);

- The criminal allocutions of Bernard L. Madoff and Frank DiPascali establish *prima facie* that Madoff ran BLMIS as a Ponzi scheme;

- The Court: (a) finds that the Defendants' voluntary withdrawal of their Customer Claims with prejudice was a final judgment meeting the first prong of res judicata and (b) rejects the Trustee's argument that the parties' prior litigation relating to the allowability of the Defendants' net equity claims (the "Claims Litigation") and this adversary proceeding (the "Avoidance Action") are the "same cause of action" that would bar the defenses raised by the Defendants in the Avoidance Action; and

- "The Court affirms its prior rulings rejecting the Defendants' argument that Defendants provided "value" within the meaning of section 548(c) of the Bankruptcy Code because the Two-Year Transfers satisfied (i) obligations incurred by BLMIS under the New York Uniform Commercial Code when BLMIS issued customer statements showing securities transactions, and (ii) state and federal securities fraud claims held by the Defendants against BLMIS."

The Order further directed the parties to schedule a pre-trial conference with respect to the remaining issue identified in the order: whether the Two-Year Transfers were transfers by the SIPA debtor within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548(a)(1)(A).[16]

---

[16] *See* Order Denying the Trustee's Mot. for Summary Judgment and Granting Relief Under Federal Rule of Civil Procedure 56(g), *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Sept. 11, 2019), ECF No. 175.

In February 2020, District Judge Broderick denied Defendants' Motion to Withdraw and Motion for Leave.  *See Picard v. BAM L.P. (In re BLMIS)*, 612 B.R. 257, 272 (S.D.N.Y. 2020) (the "*District Court Jurisdiction Decision*").

In March 2020, the Parties consented to a schedule for completion of all pre-trial matters in advance of the pre-trial conference set for May 27, 2020, including this Joint Pre-Trial Order.[17] The May 27, 2020 pre-trial conference was adjourned to July 1, 2020.

## II.    BASIS FOR JURISDICTION, WHETHER THE CASE IS CORE OR NON-CORE, AND WHETHER THE BANKRUPTCY COURT MAY ENTER FINAL ORDER OR JUDGMENT

The Trustee commenced this adversary proceeding in this Court before which the Liquidation Proceeding is also pending.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O).

As a threshold matter, this Court already held in a footnote that it "has subject matter jurisdiction over this adversary proceeding under SIPA § 78eee(b)(4), 28 U.S.C. §§ 1334(b), 157(a) & (b) and Order No. M 10-450 (S.D.N.Y. July 10, 1984), as amended by Amended Standing Order of Reference, No. M 10-468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012)."  *See Jurisdiction Decision*, 597 B.R. at 482 n.15.

Furthermore, this Court determined that it has equitable jurisdiction to hear and determine the Trustee's avoidance and recovery claims because "the Trustee commenced this adversary proceeding after the Defendants filed their claims (and after they objected to the Trustee's determinations), the avoidance of the transfers to the Defendants would result in the disallowance of their claims."  *Jurisdiction Decision*, 597 B.R. at 486.

---

[17] Not. of Adjournment of Final Pre-Trial Conf., *Picard v. BAM, L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Mar. 24, 2020), ECF No. 191.

III.    **STIPULATED FACTS**

For purposes of the trial of this adversary proceeding, the parties hereby stipulate as follows:

*Background and the Trustee*

1.    On the Filing Date, Madoff was arrested for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the SEC commenced proceedings against BLMIS and Madoff in the United States District Court for the Southern District of New York. *See* Compl., *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 11, 2008), ECF No. 1.

2.    On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to combining its action with an application by the SIPC. *See* Application of SIPC at 10, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 5. Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, among other things, that BLMIS was not able to meet its obligations to securities customers as they became due and thus its customers needed the protections afforded by SIPA. *See id.* at 2–3.

3.    Also, on December 15, 2008, the District Court granted the SIPC application and entered an order pursuant to SIPA which, in relevant part, (i) appointed the Trustee the trustee for the liquidation of BLMIS pursuant to section 78eee(b)(3) of SIPA; (ii) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA, and (iii) removed the case to this Court pursuant to section 78eee(b)(4) of SIPA. *See MSJ Decision*, 608 B.R. at 169 (citing Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Dec. 15, 2008), ECF No. 1).

4.    Shortly thereafter, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on

behalf of the BLMIS estate. *See* Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 11; Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No 08-01789 (SMB) (Bankr. S.D.N.Y. Feb. 4, 2009), ECF No. 69.

5.      Madoff's creditors filed an involuntary bankruptcy petition against him individually in April 2009. *See* Involuntary Petition, *In re Bernard L. Madoff*, Adv. Pro. No. 09-11893 (SMB) (Bankr. S.D.N.Y. Apr. 13, 2009), ECF No. 1. The Court directed the appointment of an interim trustee pursuant to 11 U.S.C. § 303(g) (*see id.*, ECF No. 10), and the United States Trustee appointed Alan Nisselson, in that role. *See In re Bernard L. Madoff*, No. 09-11893 (SMB) (Bankr. S.D.N.Y. Apr. 21, 2009), ECF No. 13. Thereafter, the SIPA Trustee moved to substantively consolidate the SIPA liquidation and the Chapter 7 bankruptcy.[18]

6.      A month later, in June 2009, this Court entered an order substantively consolidating Madoff's estate with the BLMIS SIPA estate. *See* Consent Order Substantively Consolidating the Estate of Bernard L. Madoff into the SIPA Proceeding of Bernard L. Madoff Investment Securities LLC and Expressly Preserving All Rights Claims and Powers of Both Estates ("Consolidation Order"), *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 9, 2009), ECF No. 252; *see also* Adv. Pro. No. 09-11893, ECF No. 28. The Consolidation Order expressly states:

> Notwithstanding the substantive consolidation of the Madoff estate into the BLMIS SIPA Proceeding, the Chapter 7 Trustee shall remain Chapter 7 trustee of the Madoff estate and shall continue to have all powers, rights, claims and interests of a Chapter 7 trustee to bring claims under Chapters 5 and 7 of the Bankruptcy Code in consultation with the SIPA Trustee and SIPC. Further, all powers, rights, claims and interests of the Madoff estate are expressly

---

[18] *See* Mem. of Law in Supp. of Joint Mot. for Entry of Order Substantively Consolidating the Estate of Bernard L. Madoff into the SIPA Proceeding of Bernard L. Madoff Investment Securities, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 5, 2009), ECF No. 196.

> preserved, including without limitation all Chapter 5 and Chapter 7
> powers, rights, claims and/or interests.

***

> All powers, rights, claims and interests of the SIPA Trustee and the
> BLMIS estate are expressly preserved, including without limitation
> all Chapter 5 and Chapter 7 powers, rights, claims and/or interests,
> and the SIPA Trustee is authorized to pursue claims on behalf of
> the consolidated estate as the representative of and fiduciary for the
> BLMIS SIPA Proceeding and as subrogee and assignee of creditors'
> claims for, among other things, the avoidance and recovery of
> transferred property.

*Id.* ¶¶ 4, 7.

### Expert Witnesses

7.    The Parties stipulate that Bruce G. Dubinsky is qualified as an expert witness in the areas of forensic accounting, forensic fraud investigations, computer forensics, solvency analysis and business valuations, and investment theory and practices. Defendants reserve their right to challenge the admission, analyses and opinions of Mr. Dubinsky at trial.

8.    The Parties stipulate that Lisa M. Collura is qualified as an expert witness in the areas of forensic accounting and forensic fraud investigations. Defendants reserve their right to challenge the admission, analyses and opinions of Ms. Collura at trial.

## IV.    COURT'S FINDINGS OF FACT PURSUANT TO RULE 56(G)

9.    Prior to 2001, Madoff operated his brokerage as a sole proprietorship. In 2001, BLMIS was reorganized from a sole proprietorship (referenced by this Court as "Madoff Securities") to a single member limited liability company with Bernard Madoff as the sole member (referenced by this Court as "BLMIS"). "At that point, all of Madoff Securities' assets and liabilities were transferred to BLMIS." *MSJ Decision*, 608 B.R. at 170.[19]

---

[19]The Defendants stipulate that the MSJ Decision is correctly quoted. However, the statement regarding the transfer of assets may be traced to the Form BD (defined below). The Defendants object to the findings with respect to the

### *Defendants' BLMIS Accounts and Customer Claims*

10.    In December 1995, Defendants Michael Mann and Meryl Mann opened their first account with Bernard L. Madoff Investment Securities, which was assigned account number 1CM363 in the name of "Michael Mann and Meryl Mann J/T Wros." (the "Mann Account"). *See MSJ Decision*, 608 B.R. at 170. Defendants Michael Mann and Meryl Mann are joint tenants of the "Michael Mann and Meryl Mann Joint Tenancy with Right of Survivorship." *See id.*

11.    Defendant Michael Mann, as the sole general partner of Defendant BAM L.P., subsequently opened another account at Bernard L. Madoff Investment Securities in March 1999, assigned account number 1CM579 in the name of "BAM L.P." (the "BAM Account," and together with the Mann Account, the "Accounts"). *See MSJ Decision*, 608 B.R. at 170.

12.    Defendants made deposits and received withdrawals from the Accounts. Over the life of the Mann Account, Michael Mann deposited a total of $14,850,000 and withdrew a total of $20,650,000 from the account, of which $2,250,000 was withdrawn within two years of the Filing Date (the "Two-Year Period"). Over the life of the BAM Account, BAM L.P. deposited a total of $1,920,007 and withdrew a total of $3,551,000 from the account, of which $563,000 was withdrawn within the Two-Year Period. *See MSJ Decision*, 608 B.R. at 170.

13.    As to Defendants' defense, the Court held: "The Antecedent Debt Defense has been rejected by this Court or the District Court on no less than nine occasions,20 and the issue is *181 currently before the Second Circuit in a separate adversary proceeding. See Picard v. Lowrey, No. 19-429(L) (2d Cir.). Since the Court would again affirm the prior rulings as a matter of law, the Antecedent Debt Defense does not provide a defense under section 548(c) to the Trustee's claims." *MSJ Decision*, 608 B.R. at 176, 180–81.

_____

transfer of assets to the extent the Court relies on the Form BD or the affidavits of Linda Coribello as more fully set forth below on the grounds that these documents are incorrect and inadmissible.

14.    In June 2009, Defendants Michael Mann and Meryl Mann filed the Customer

Claims for the Accounts.  *See MSJ Decision*, 608 B.R. at 170–71.  In August and October 2009,

the Trustee issued the Determinations denying the Customer Claims.  *See id.* at 171.  The

Determinations were accompanied by a schedule which set forth the deposits into and the

withdrawals from the Accounts to support the Trustee's determinations that the Mann and BAM

Accounts were overdrawn.  *Id.*

15.    In September 2009 and November 2009, Defendants Michael Mann and Meryl

Mann filed their Objections.  *See MSJ Decision*, 608 B.R. at 171.

### *Bankruptcy Court's Jurisdiction*

16.    Defendants consented to the final adjudication of the avoidance claims by filing the

Customer Claims, thereby subjecting themselves to the equitable jurisdiction of the Bankruptcy

Court.  The subsequent withdrawal of the Customer Claims did not affect that jurisdiction.  The

Court possessed equitable jurisdiction over this avoidance action at the time it was commenced

based on the pending dispute over the allowance of the Customer Claims.  *See MSJ Decision*, 608

B.R. at 172 (citing *Jurisdiction Decision*, 597 B.R. at 486); *see also District Court Jurisdiction

Decision*, 612 B.R. at 270 ("Nothing in *Stern* suggests that the Bankruptcy Court's equitable

jurisdiction is negated by the voluntary withdrawal of a creditor's claim nine years after the filing

of an adversarial proceeding that, under federal bankruptcy law, would necessarily disallow the

claim if successful.").

17.    The Two-Year Transfers were made within two years of the Filing Date.  *See MSJ

Decision*, 608 B.R. at 173.

### *The Ponzi Scheme Presumption*

18.    The Trustee may rely on the Ponzi scheme presumption, which means that the Two-Year Transfers were made with the actual intent to hinder, delay or defraud creditors within the meaning of 11 U.S.C. § 548(a)(1)(A).  *See MSJ Decision*, 608 B.R. at 176.

19.    In March 2009, Madoff admitted to the fraudulent scheme and pled guilty to an eleven-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York, including securities fraud by the use of manipulative and deceptive devices in connection with the purchase or sale of a security pursuant to 15 U.S.C. §§78j(b) and 78 and C.F.R. section 240.10b-5, making a false filing with the SEC, and investment advisor fraud and on March 10, 2009, Madoff pled guilty to all counts and was sentenced on June 29, 2009 to 150 years in prison.  *See MSJ Decision*, 608 B.R. at 169 (citing Plea Allocution of Bernard L. Madoff ("Madoff Allocution"), *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009), ECF No. 50).

20.    In its decision, the Court held that Madoff admitted:

- he "operated a Ponzi scheme through the investment advisory side of [BLMIS]" for many years leading up to his arrest. *MSJ Decision*, 608 B.R. at 174 (citing Madoff Allocution at 23:14-16) (quotations and alteration in original);

- he "never invested" investment-advisory ("IA") customers' funds in securities as he had promised, and instead, deposited those funds into a "bank account at Chase Manhattan Bank." *Id.* (citing Madoff Allocution at 24:15-18) (quotations in original);

- when IA customers sought to redeem their "profits" or principal, he "used the money in the Chase Manhattan bank account that belonged to them or other

clients to pay the requested funds." *Id.* (citing Madoff Allocution at 24:18-22) (quotations in original);

- he fraudulently misrepresented that he utilized a "split strike conversion strategy" ("SSC Strategy") of purchasing a basket of stocks chosen to mimic the Standard & Poor's 100 Index, hedging the investments by buying and selling option contracts relating to those stocks, and opportunistically timing the sale of the securities investing the funds in U.S. Treasury bills ("T-Bills") during these periods. *Id.* (citing Madoff Allocution at 25:25-26:18) (quotations in original); and

- he fraudulently concealed the fraud by knowingly causing the dissemination of bogus trade confirmations and account statements to IA customers. *Id.* (citing Madoff Allocution at 27:9-19.).

21.     Former BLMIS employee, Frank DiPascali, admitted that the IA Business did not purchase or sell securities for its customers, and used historical stock prices to show backdated, profitable trades in customer accounts. *See MSJ Decision*, 608 B.R. at 174 (citing Plea Allocution of Frank DiPascali at 46:12–15, 47:16–22, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), ECF No. 11).

22.     Madoff's and DiPascali's allocutions establish that BLMIS was a Ponzi scheme. *See MSJ Decision*, 608 B.R. at 175.

23.     As set forth in the order on the Trustee's Summary Judgment Motion, the only remaining issue of disputed fact is whether the Two-Year Transfers were transfers by the SIPA debtor within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548 (a)(1)(A).[20]

---

[20] See Order Denying the Trustee's Motion for Summary Judgment and Granting Relief Under Federal Rule of Civil

## V.    PARTIES' CONTENTIONS

The following is an overview of the contentions of the Parties.  The Parties hereby stipulate the pleadings are deemed amended to embrace the following contentions of the Parties and only those contentions.

### A.    The Trustee's Contentions

#### *BLMIS's Business*

24.    In January 1960, Bernard L. Madoff registered as a broker-dealer with the SEC under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b).  He was assigned Registrant Number 8-8132.  Through that registration, the broker-dealer became a member of SIPC when SIPA was enacted in 1970.  In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration, which represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion.

25.    Beginning in 1960 and until January 1, 2001, BLMIS operated as a sole proprietorship.  During its existence, it operated under the names Bernard L. Madoff and Bernard L. Madoff Investment Securities and, after 2001, as Bernard L. Madoff Investment Securities LLC.

26.    BLMIS operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) the IA Business.

27.    Effective January 1, 2001, BLMIS was registered as a New York single member limited liability company, using the same SEC Registrant Number, 8-8132.  On January 12, 2001, BLMIS amended its SEC Form BD to reflect its change in corporate form from a sole proprietorship to a single member limited liability company and all the assets and liabilities of the sole proprietorship were transferred to the limited liability company.

---

Procedure 56(g*), Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Sept. 25, 2019), ECF No. 175.

28.     In response to the direction in the SEC Form BD to "[b]riefly describe details of the *succession* including any assets or liabilities not assumed by the *successor* [BLMIS]," (emphasis in original), Madoff replied:

> EFFECTIVE JANUARY 1, 2001, PREDECESSOR WILL TRANSFER TO SUCCESSOR ALL OF PREDECESSOR'S ASSETS AND LIABILITIES, RELATED TO PREDECESSOR'S BUSINESS. THE TRANSFER WILL NOT RESULT IN ANY CHANGE IN OWNERSHIP OR CONTROL.

SEC Form BD at Question 5.

29.     Madoff further certified that no "accounts, funds, or securities of customers of the *applicant* are held or maintained by such other *person*, firm, or organization." SEC Form BD at Question 8(c) (emphasis in original).

30.     As a result of the change reflected in the SEC Form BD, all of the bank accounts in which the customer funds were held by the sole proprietorship were transferred to BLMIS. All customers of the sole proprietorship, including the Defendants, became BLMIS customers. The sole proprietorship had no business-related assets and no customers with which to carry on the business of a broker-dealer.

31.     Defendants' Customer Agreement acknowledged that it inured to the benefit of the "Broker's present organization and any successor organization, irrespective of any change or changes at any time in the personnel thereof for any cause whatsoever."

32.     In 2006, BLMIS registered as an investment advisor. BLMIS was also continuously registered with the SEC as a broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b).

### The IA Business's Bank Accounts

33.     During at least the ten-year period before its collapse on December 11, 2008, BLMIS primarily used three commercial business accounts for customer deposits into and

withdrawals from the IA Business: JPMorgan Chase Bank, N.A. ("Chase") account #xxxxx1703
(the "703 Account"); Chase account #xxxxxxxxx1509 (the "509 Account"); and Bankers Trust
account #xx-xx0-599 (the "BT Account").

34.     The 703 and 509 Accounts were linked commercial checking accounts.  The 703
Account was the primary bank account used for BLMIS customer deposits and withdrawals and
the 509 Account was a controlled disbursement account that was entirely funded by the 703
Account and used to process BLMIS customer withdrawals.  An analysis of the 703 Account
showed that the money in that account consisted almost entirely of customer deposits.

35.     From December 1998 to August 2002, the bank statements for the 703 and 509
Accounts listed the account holder as "Bernard L. Madoff."  From December 1998 to August 2002,
checks drawn on the 509 Account listed "Bernard L. Madoff" as the drawer of the check.

36.     From September 2002 through December 2008, the bank statements on the 703 and
509 Accounts listed the account holder as "Bernard L. Madoff Investment Securities."  After
September 2002, BLMIS continued to use checks for the 509 Account that listed "Bernard L.
Madoff" as the drawer of the check.

37.     For the time period for which bank records were available, the face of the bank
statements for the 703 Account and 509 Account showed they were designated as "Commercial
Checking" accounts.  The statements were addressed to the attention of either Tony Tiletnick, a
BLMIS employee, or Daniel Bonventre, BLMIS's operations manager, at the BLMIS business
address at 885 Third Avenue, New York, New York.  None of the statements were addressed to
Madoff personally.

38.    For the time period for which bank records were available (December 1998 through December 2008), the 703 and 509 Accounts solely were used for customer deposits and withdrawals for the IA Business.

39.    IA Business customers' cash deposits were deposited into (and commingled in) the 703 Account.

40.    IA Business customer withdrawals were made primarily through two accounts: (1) the 509 Account (funded by the 703 Account); and, (2) the BT Account, which was a checking account also entirely funded by the 703 Account during the period for which bank records are available.

41.    There were no inflows into the 703 Account from sales of securities for customer accounts. Ninety-seven percent of all cash additions into the 703 Account came directly from IA Business customers. The other three percent of inflows into the 703 Account came from income earned on (1) short-term investment activity made directly from the 703 Account (including overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and Treasury Bills); and (2) investments of BLMIS customer funds made through bank and brokerage accounts held in the name of BLMIS or Madoff for cash management purposes.[21] Because the short-term investments, including overnight sweeps, were made directly out of the 703 Account, the source of the money for those investments was customer funds.

---

[21] Despite Defendants' assertions, the issue of whether treasury bills were purchased for particular customers is not an issue for trial. In any event, the IA Business did not purchase treasuries for IA Business customer accounts. The purchases of treasury bills did not match the allocation of treasury bill transactions that appeared on customer statements; the amount of treasury bills held by BLMIS's Proprietary Trading Business was negligible compared to those purportedly held on behalf of customers of the IA Business; 100% of the treasuries held by brokerage accounts at BLMIS were not the same treasuries as purportedly held by the IA Business accounts because of different maturity dates, different purchase and sales dates, and/or they had a different reported volume; and Frank DiPascali, a former BLMIS employee, now deceased confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.

42.    There were no outflows from the 703 Account to purchase securities for customer accounts.  Apart from two short-term loans, BLMIS received from JPMorgan totaling $145 million in November 2005 and January 2006—both of which were repaid by June 2006—the IA Business did not obtain loans from third parties or from the Proprietary Trading Business sufficient to pay the IA Business customer withdrawals.

43.    The IA Business also did not receive payments of any cash dividends.  According to the customer statements, the IA Business reported that it received cash dividends related to purported trading and paid or credited them to the accountholders.  Between 1998 and 2008, BLMIS reported that it had paid or credited its customers $4.3 billion in cash dividends.  Of the more than 8,300 IA Business dividend transactions identified on the customer account statements from 1998 to 2008, not one purported dividend payment matched to a cash addition to the 703 Account.  There is no record of any dividends being received by the IA Business.

44.    The IA Business did not have any legitimate income-producing activities.  The only source of cash available for the IA Business to pay purported investment profits as well as redemption requests from its customers was from cash that other IA Business customers deposited in the 703 Account.

45.    At the time Defendants received the Two-Year Transfers, BLMIS controlled all funds deposited into and withdrawn from the 703 and 509 Accounts, which were customer property.  These commingled funds were the source of the transfers made by BLMIS to Defendants.

46.    Defendants received debit memos along with the withdrawals during the Two-Year Period that identified the owner of the 509 Account as BLMIS.  The fact that Madoff's personal

name was on the checks "proves nothing" because it was BLMIS that made disbursements from the account. *Nelson*, 610 B.R. at 218.

47.     The funds in the 509 Account consisted of customer property and therefore the Trustee can recover it regardless of which variation of the BLMIS name appears on the check.

48.     Defendants admitted to receipt of the fraudulent transfers from BLMIS that the Trustee seeks to avoid and recover in this action, and thus are bound by such judicial admissions. *See* Answer ¶ 43 ("Defendants admit that it made certain transfers and received certain transfers from BLMIS prior to December 8, 2008. Defendants respectfully refers the Court to Columns 10 and 11 [of the Amended Complaint] for the complete contents thereof."); Defendant Michael Mann's Responses and Objections to Trustee's First Set of Interrogatories at 10 ("Mr. Mann states that based on the documents produced by the Trustee, the dates transfers were made and the amount of the transfers in Account 1CM363 are accurate."); *see also Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer . . . are judicial admissions that bind the defendant throughout [the] litigation."); *United States v. Bedford Assocs.*, 713 F.2d 895, 905 (2d Cir. 1983) (statements in answers to interrogatories are admissions admissible against the party that made them); *In re Rezulin Products Liability Litig. Eyeglasses*, 361 F. Supp. 2d 268, 272 (S.D.N.Y. 2005) (citing Fed. R. Evid. 801(d)(2)(A)) ("interrogatory answers, are admissions and therefore admissible in evidence").

### Consolidation of SIPA Liquidation and Chapter 7 Bankruptcy

49.     When Madoff's creditors filed an involuntary bankruptcy petition against him individually in April 2009, the Court directed the appointment of Alan Nisselson as interim trustee pursuant to 11 U.S.C. § 303(g). *See In re Bernard L. Madoff*, Adv. Pro. No. 09-11893 (SMB), ECF Nos. 1, 10, 13. Thereafter, the SIPA Trustee moved to substantively consolidate the SIPA liquidation and the Chapter 7 bankruptcy because BLMIS and Madoff were the alter ego of the

other, Madoff used BLMIS as his "personal piggy bank," and Madoff did not have any other

significant source of income other than that derived from his broker-dealer subject to liquidation

under SIPA.[22]    In June 2009, this Court entered the Consolidation Order substantively

consolidating Madoff's estate with the BLMIS SIPA estate.  *See Sec. Inv'r Prot. Corp. v. Bernard

L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 9, 2009), ECF

No. 252; *see also* Adv. Pro. No. 09-11893 (SMB), ECF No. 28.

### Jurisdiction of the Bankruptcy Court

50.    In addition to Section II above, this Court has further held that the Trustee

demonstrated Article III standing as he brought these actions on behalf of an insolvent customer

property estate and the Trustee's actions will redress injuries suffered by the net loser victims.  See

Nelson, 610 B.R. at 215.  This Court has also held that the Trustee has statutory and prudential

standing under 15 U.S.C. § 78fff-2(c)(3).  *Id.*

### Defendants' Customer Claims and Objections

51.    In December 2008, this Court entered the Claims Procedures Order,[23] which sets

forth "a systematic framework for the filing, determination and adjudication of claims in the

BLMIS liquidation proceeding."  *Peskin v. Picard*, 413 B.R. 137, 143 (Bankr. S.D.N.Y. 2009).

"The procedures therein have been consistently approved and utilized in SIPA proceedings since

its enactment in 1970."  *Id.*  Under this order, customers were required to file claims with the

Trustee by the statutory bar date.  *See* Claims Procedures Order at *3; SIPA § 78fff–2(a)(2). The

---

[22] *See* Mem. of Law in Supp. of Joint Mot. for Entry of Order Substantively Consolidating the Estate of Bernard L. Madoff into the SIPA Proceeding of Bernard L. Madoff Investment Securities, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 5, 2009), ECF No. 196.

[23] *See* Order on Appl. For An Entry Of An Order Approving Form And Manner Of Publication And Mailing Of Notices, Specifying Procedures For Filing, Determination, And Adjudication Of Claims; And Providing Other Relief (the "Claims Procedures Order"), *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 12.

Trustee satisfies customer claims by allocating customer property supplemented by SIPC advances. *Id.* at \*5 (citing SIPA § 78fff–2(b)). If BLMIS's books and records failed to support a claim or the claim was not otherwise established to the Trustee's satisfaction, the Trustee denied it and notified the claimant of the determination in writing. *Id.* at \*5–7 (citing SIPA § 78fff-2(b)).

52.    In the present action, Defendants filed customer claims in the BLMIS SIPA proceeding in June 2009, seeking to recover the purported balance in their BLMIS accounts as stated on their last account statements as of November 30, 2008. In June 2009, Defendants Michael Mann and Meryl Mann filed a customer claim for BLMIS Account No. 1CM363 based on an account balance as of the last statement in the amount of $7,192,467, which the Trustee designated as Claim #009823 (the "Mann Customer Claim"), and Defendant Michael Mann filed claim #009822 on behalf of BAM L.P. for Account No. 1CM579 based on an account balance as of the last statement of $724,533.85 (the "BAM Customer Claim," and together with the Mann Customer Claim, the "Customer Claims"). *See* Answer ¶¶ 51–52. In August 2009, the Trustee issued a Notice of Trustee's Determination of Claim with respect to the Mann Customer Claim (the "Mann Determination"). *Id.* ¶ 53. In October 2009, the Trustee issued a Notice of Trustee's Determination of Claim with respect to the BAM Customer Claim (the "BAM Determination," and together with the Mann Determination, the "Determinations"). *Id.*

53.    In September 2009, Defendants Michael Mann and Meryl Mann filed an objection to the Mann Determination (the "Mann Objection"), and Defendant Michael Mann filed an objection to the BAM Determination on behalf of BAM L.P. (the "BAM Objection," and together with the Mann Objection, the "Objections"). *Id.* ¶ 54. In the Objections, Defendants argued, among other things, that the Trustee's use of the Net Investment Method was improper, his calculation of the money deposited less subsequent withdrawals is "completely unsubstantiated

and incorrect," and goes "beyond any limitations period for avoidance of a claim under either state or federal law," and even if his methodology is adopted, the Trustee should have adjusted his calculation to account for interest and damages caused by Madoff.  *Id.* ¶ 54.

54.     In March 2010, Judge Lifland granted the Trustee's Motion For Order (1) Upholding Trustee's Determination Denying Customer Claims For Amount Listed On Last Customer Statement; (2) Affirming Trustee's Determination Of Net Equity; And (3) Expunging Objection To Determinations Relating To Net Equity.  *See* ECF No. 1999.  Following that decision, the Bankruptcy Court ordered that: (a) "each customer's Net Equity with respect to their customer claims in this SIPA liquidation proceeding shall be calculated using the Net Investment Method rather than the balances listed on the Final Customer Statements," and (b) "the objections to the determinations of customer claims, as listed on Exhibit A to the Trustee's Motion [Dkt530], are expunged insofar as those objections are based upon using the Final Customer Statements rather than the Net Investment Method to determine Net Equity."  ECF No. 2020 (the "Net Equity Order").  Under the Net Equity Order, the Customer Claims were disallowed to the extent they exceed net equity and the portions of the Objections based on the last customer statement were expressly expunged.  Defendants' remaining objections were left pending and unresolved.  The Net Equity Order provided further that the Bankruptcy Court "shall retain jurisdiction with respect to the remainder of the claimants' objections" and "the Trustee shall in due course schedule a hearing or hearings regarding the remainder of the claimants' objections in accordance with the Claims Procedures Order."  *Id.*

55.     In June 2018, Defendants sought to withdraw their Objections.[24]  The Trustee then moved to strike the withdrawals, asserting that a claimant may not unilaterally withdraw its claim

---

[24] *See* Not. of Withdrawal Of Objection To Determination Of Claim, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 1, 2018), ECF Nos. 17630, 17623. These notices

or objection under Rule 3006 of the Federal Rules of Bankruptcy Procedure and Rule 41 of the

Federal Rules of Civil Procedure.[25]  This Court agreed and, in granting the Trustee's motion, held

the withdrawals were "stricken and have no legal effect."[26]

56.    In February 2020, the District Court considered the question of the Bankruptcy

Court's jurisdiction post-*Stern* in denying the Second Motion to Withdraw and adopting this

Court's *Jurisdiction Decision*.  *See District Court Jurisdiction Decision*, 612 B.R. at 266–71.  The

District Court rejected Defendants' argument that their voluntary withdrawal of their customer

claim on the eve of trial negated the Bankruptcy Court's jurisdiction because "at the moment

Defendants filed claims against the bankruptcy estate, [they] trigger[ed] the process of 'allowance

and disallowance of claims,' thereby subjecting [themselves] to the bankruptcy court's equitable

power."  *Id.* at 267 (citations omitted); *see also Katchen v. Landy*, 382 U.S. 323, 333 n.9 (1966)

("[H]e who invokes the aid of the bankruptcy court by offering a proof of claim and demanding

its allowance must abide the consequences of that procedure.").

---

were filed after the District Court denied motions to withdraw the reference to the Bankruptcy Court on their asserted right to a jury trial filed in three of the Trustee's other avoidance actions.  *See Picard v. Saren-Lawrence*, No. 17 Civ. 5157 (GBD), 2018 WL 2383141 (S.D.N.Y. May 15, 2018), *recons. denied sub nom.*, 2018 WL 4659476 (S.D.N.Y. Sept. 11, 2018).  District Judge George B. Daniels ruled that because defendants filed claims against the BLMIS estate and objections to the Trustee's determinations of those claims, for which "the Bankruptcy Court will have to determine whether the transfers to the [d]efendants are voidable on the grounds that they are actually or constructively fraudulent under 28 U.S.C. § 548. The resolution of that issue will also determine the result of the Adversary Proceedings, which seek the return of a portion of the funds transferred to the [d]efendants on the same grounds."  *Id.* at *5.  Defendants were not parties to this proceeding.

[25] *See* Trustee's Mot. To Strike The Notices Of Withdrawal Of Claim And Notices Of Withdrawal Of Objection To Determination Of Claim Filed By Chaitman LLP And Dentons US LLP, *In re: Bernard L. Madoff*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. July 27, 2018), ECF No. 17864.

[26] Order Granting Trustee's Mot. to Strike The Notices of Withdrawal of Claim and Notices of Withdrawal of Objection to Determination of Claim filed by Chaitman LLP and Dentons US LLP (the "Order Granting Motion To Strike"), *In re Bernard L. Madoff Inv. Sec., LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Oct. 4, 2018), ECF No. 18051.

### *Summary Judgment Motion*

57.    In September 2019, the Court granted in part and denied in part the Trustee's

Summary Judgment Motion under Federal Rule of Civil Procedure 56(g).  *See generally MSJ*

*Decision*, 608 B.R. 165.

58.    The Court rejected Defendants' arguments that BLMIS was not a Ponzi scheme.

First, while the promise of exorbitant returns is often a characteristic of a Ponzi scheme, it is not

the sine qua non of a Ponzi scheme.  Madoff operated BLMIS as a classic Ponzi scheme

notwithstanding the purported absence of the promise of high returns:

> he misrepresented to clients and prospective clients that he would invest their
> funds using the SSC Strategy, those funds were instead put into a commingled
> bank account, he never invested those funds as he had promised, he sent bogus
> statements showing fictitious profits to conceal the fraud, BLMIS's IA division
> engaged in little or no real business making little or no real profits, and he paid
> out redemptions using other clients' deposits from the same commingled bank
> account.

*MSJ Decision*, 608 B.R. at 175.

59.    Second, the Court rejected Defendants' argument that Madoff's ability to pay

redemptions and stave off collapse of the Ponzi scheme for fifteen-plus years shows that Madoff

did not need additional deposits.  "The longevity of the Ponzi scheme simply proves that Madoff

was able to swindle new investors at a faster rate than old investors were redeeming their funds."

*MSJ Decision*, 608 B.R. at 175.  The Ponzi scheme collapsed because redemptions outpaced new

investments and the shortfall amounted to nearly $20 billion, obviously demonstrating that

deposits were insufficient to cover redemptions.  *Id.*

60.    And last, the Court rejected Defendants' argument that BLMIS was not a Ponzi

scheme because no one at BLMIS was charged with operating a Ponzi scheme.  There is no specific

crime entitled "Ponzi scheme," and the allocutions of Madoff and DiPascali established the

elements as a predicate for their crimes and for the District Court's acceptance of their guilty pleas.
*See MSJ Decision*, at 175.

61.     The Court also rejected Defendants' argument that BLMIS's purchase of treasury
bills constituted active trading, determining that the purchase of the treasury bills was part of the
cash management system used by BLMIS to sustain the Ponzi scheme and "did not transform
BLMIS into a legitimate enterprise or prohibit the Trustee's reliance on the Ponzi scheme
presumption." *MSJ Decision*, 608 B.R. at 175 n.15 (citing *Picard v. Legacy Capital Ltd. (In re
BLMIS)*, 603 B.R. 682, 691 (Bankr. S.D.N.Y. 2019)).

62.     The Court further rejected the Defendants' defense that they provided "value"
within the meaning of section 548(c) of the Bankruptcy Code because the Two-Year Transfers
satisfied (i) obligations incurred by BLMIS under the New York Uniform Commercial Code when
it issued customer statements showing securities transactions, and (ii) state and federal securities
fraud claims held by Defendants against BLMIS (collectively, the "Antecedent Debt Defense").
The Antecedent Debt Defense has been rejected by this Court or the District Court on no less than
nine occasions, and does not provide a defense to the Trustee's claims against the Defendants here.
*See MSJ Decision*, 608 B.R. at 181.

63.     The Trustee has shown that there are no genuine material issues of fact that the
transfers at issue were made within two years of the Filing Date with fraudulent intent, and these
facts are deemed established for the purposes of this avoidance action.  *See MSJ Decision*, 608
B.R. at 181.

### *Prejudgment Interest*

64.     Under Section 550(a), the Trustee is entitled to recover the Two-Year Transfers, or
the value thereof, from the Defendants.  The Trustee is additionally entitled to prejudgment interest
on each of the Transfers.

65.     The Court has discretion when deciding the appropriateness of an award of prejudgment interest and in setting the appropriate rate, "and absent a sound reason to deny it, it should be awarded." *Lowrey*, 2018 WL 1442312, at *15; *see also Goldenberg*, 2018 WL 3078149, at *6 (citing *Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods., Inc. (In re Hechinger Inv. Co. of Del., Inc.)*, 489 F.3d 568, 579–80 (3d Cir. 2007); *In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir. 1997); *Savage & Assocs., P.C. v. Mandl (In re Teligent Inc.)*, 380 B.R. 324, 344 (Bankr. S.D.N.Y 2008) ("The award of pre-judgment interest is discretionary, and absent a sound reason to deny it, it should be awarded.")).

66.     In determining whether to award prejudgment interest, the courts consider four factors:

> (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

*Lowrey*, 2018 WL 1442312, at *15 (citing *McHale v. Boulder Capital LLC (In re 1031 Tax Grp., LLC )*, 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010) (quoting and applying the criteria set forth in *Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833–34 (2d Cir. 1992) to an award of prejudgment interest in connection with an avoided fraudulent transfer)).

67.     Under the first *Wickham* factor, the customer property estate and its net loser victims have been deprived of the value of the avoidable transfers for more than nine years. Section 550(a) of the Bankruptcy Code provides that "to the extent a transfer is avoided under section 548 . . . the trustee may recover . . . the value of such property." *Nelson*, 610 B.R. at 238. "To obtain such value, [the Trustee] needs some accommodation for the time value of money.

Prejudgment interest fulfills this purpose." *In re CNB Int'l*, 393 B.R. 306, 336 (Bankr. W.D.N.Y. 2008), *aff'd on other grounds*, 440 B.R. 31 (W.D.N.Y. 2010). Although there is no specific reference to prejudgment interest in the Bankruptcy Code, "courts have typically relied on the word 'value' in section 550(a) as authorizing an award of interest." *In re 1031 Tax Grp., LLC*, 439 B.R. at 86; *see also Pereira v. United Parcel Service of America, Inc., (In re Waterford Wedgwood USA, Inc.)*, 508 B.R. 821, 837–38 (Bankr. S.D.N.Y. 2014) ("The time value of money is an asset of the estate that should be recovered for the benefit of all creditors . . . of a bankruptcy estate.").

68.    Following BLMIS's collapse, Defendants had the use of $2,813,000 in Avoidable Transfers for more than a decade. Defendants may have unwittingly invested in the Ponzi scheme, but they "still received money that was never in fact [his] to spend." *Moran v. Goldfarb*, No. 09 Civ. 7667 (RJS), 2012 WL 2930210, at *9 (S.D.N.Y. July 16, 2012). Defendants "received profits that belong to all of [Madoff's] victims on a pro rata basis." *Id.* (emphasis in original) (granting prejudgment interest where fraudulent transfers from Ponzi scheme had deprived the estate of the use of the funds and the estate could only be made whole by an award of interest).

69.    Awarding prejudgment interest is proper even if Defendants received the Avoidable Transfers in good faith. In *Moran*, the District Court awarded prejudgment interest against a "good faith" investor who received fictitious profits from a $55 million Ponzi scheme that spanned a period of roughly twenty years. 2012 WL 2930210, at *9. "[A]wards of prejudgment interest are essentially compensatory . . . and wrongdoing by a defendant is not a prerequisite to an award." *Lodges 743 & 1746, Int'l Ass'n of Machinists & Aerospace Workers v. United Aircraft Corp.*, 534 F.2d 422, 447 (2d Cir. 1976) (citation omitted); *see also Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 640 F. Supp. 882, 886 (S.D.N.Y. 1986).

70.     The relative equities also favor an award of prejudgment interest where there has never been any serious dispute as to Defendants' liability for the avoidable transfers.  As this Court has recognized, fictitious profits cases "are strict liability cases unless the law changes."  Tr. of Oral Arg. at 114:10–11, *Picard v. Marilyn Bernfeld Tr.*, Adv. Pro. No. 10-05143 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015); *see also* Tr. of Oral Arg. at 100:19, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015) (fictitious profit count is "almost a strict liability count").  Here, Defendants' Answer admitted they were beneficiaries of the Accounts, made withdrawals from those Accounts, and received the withdrawals.  Answer ¶ 43.

71.     The equities also weigh in favor of prejudgment interest "where liability and the amount of damages are fairly certain" because it motivates the parties to reduce the cost of litigation, engage in meaningful settlement discussions, and "deters an attempt to benefit unfairly from the inherent delays of litigation."  *Gen. Facilities, Inc. v. Nat'l Marine Serv., Inc.*, 664 F.2d 672, 674 (8th Cir. 1981); *see also Moore v. CapitalCare, Inc.*, 461 F.3d 1, 13 (D.C. Cir. 2006) (reversing trial court for not awarding prejudgment interest, in part, because "prejudgment interest promotes settlement and deters any attempt to benefit unfairly from inevitable litigation delay").

72.     As to the third *Wickham* factor, the Trustee is appointed under SIPA, charged with recovering and paying out customer property to BLMIS's customers.  However, as of the filing date of this SIPA liquidation proceeding and to date, BLMIS's customer property "is not sufficient to pay in full the claims set forth in" SIPA § 78fff-2(c)(1)(A)–(D), including the claims of customers who have not yet recovered the principal they lost in the Ponzi scheme.  15 U.S.C. § 78fff-2(c)(3).  Consequently, the Trustee brought this Adversary Proceeding against Defendants to recover fictitious profits and to distribute on a pro-rata basis the recovered profits to those BLMIS customers who, as net losers, did not receive the return of their lost principal from BLMIS.

Accordingly, the *Wickham* factors militate in favor of the Court awarding the Trustee prejudgment interest on the amount of the avoidable transfers.

73.     After a court decides to award prejudgment interest, it also has considerable "discretion in selecting the interest rate to be applied in calculating prejudgment interest." *In re 1031 Tax Grp., LLC*, 439 B.R. at 87.

74.     Finally, the Court also has discretion in its determination of the appropriate date for accruing prejudgment interest; whether it is "the date on which the fraudulent transfer occurred," or "the date of the commencement of the adversary proceeding."  *In re 1031 Tax Grp., LLC*, 439 B.R. at 89 n.3; *see also Bruno Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.)*, 435 B.R. 819, 850 (Bankr. N.D.N.Y. 2010) ("In this context, interest accrues from the date of the demand, or from the date of the commencement of the adversary proceeding." (internal quotation marks omitted)).

75.     Defendants have been on notice of the Ponzi scheme since the day BLMIS collapsed and Madoff was arrested on December 11, 2008.  At the very latest, Defendants knew they were "net winners," or in possession of funds that belonged to other people, or otherwise were recipients of avoidable transfers, when the Trustee filed his avoidance actions against Defendants in 2010.  Thus, at a minimum, the Defendants have known for nearly ten years that the transfers they received (1) were sought by the Trustee as fraudulent transfers, and (2) were not generated from any purported securities investments, but rather were funds that Madoff took from other people to pay Defendants and other net winners.

76.     While there is no federal statute that governs the appropriate rate of prejudgment interest, it may be awarded in avoidance actions at the discretion of the court, *see, e.g.*, *Pereira v. Private Brands, Inc. (In re Harvard Knitwear, Inc.)*, 193 B.R. 398, 399 (Bankr. E.D.N.Y. 1996),

and "the majority approach has been to apply the pre-judgment interest rate of the state in which

the district court sits—in the case of New York law, nine percent per annum." *Deng v. 278

Gramercy Park Grp. LLC*, No. 12 Civ. 7803 (DLC)(JLC), 2014 WL 1016853, *11 (S.D.N.Y. Mar.

14, 2014); *see also Lyman Commerce Solutions, Inc. v. Lung*, No. 12 Civ. 4398 TPG, 2015 WL

4545089, at *4 (S.D.N.Y. July 16, 2015) (in action seeking to recover fraudulent transfers, found

award of prejudgment interest to be meritorious and the appropriate rate of interest is 9% per

annum); *Strobl v. N.Y. Mercantile Exch.*, 590 F. Supp. 875, 882 (S.D.N.Y. 1984) (relying on N.Y.

C.P.L.R. "as a suitable guide" and awarding 9% per year in an antitrust action); *Geltzer v. Artists*

*Mktg. Corp. (In re Cassandra Grp.)*, 338 B.R. 583, 600 (Bankr. S.D.N.Y. 2006) (awarding 9%

interest in action seeking to avoid fraudulent conveyances under the Bankruptcy Code and N.Y.

Debtor & Creditor Law); *Ackerman v. Kovac (In re All Am. Petroleum Corp.)*, 259 B.R. 6, 20

(Bankr. E.D.N.Y. Jan. 31, 2001) (same).

77.    Accordingly, and consistent with prior decisions, the Trustee is entitled to an award

of prejudgment interest in the amount of the avoidable transfers received by Defendants at the New

York statutory rate of 9% per year, beginning on December 11, 2010.  *See* Judgment, *Picard v.*

*Nelson*, Adv. Pro. Nos. 10-04658, 10-04377 (SMB) (Bankr. S.D.N.Y. Nov. 21, 2019), ECF Nos.

205, 203 (awarding Trustee pre-judgment interest at the New York State statutory rate of nine

percent (9%) per annum from the date the complaints were filed along with costs).

## B.    The Defendants' Contentions

78.    The pleadings are deemed amended to embrace the following, and only the

following, contentions of the Defendants.

### *Preliminary Observations*

79.    Over the objection of the Defendants, the Trustee has included a lengthy diversion

into the Claims Litigation (see ¶¶51-56), which was thoroughly reviewed and disposed of in the

Court's Jurisdiction Decision and affirmed on appeal. This Court has already held that the Claims

Litigation and this Adversary Proceeding were not the same cause of action and did not necessarily

involve the same evidence. *See MSJ Decision*, 608 B.R. at 23–24 ("On further consideration,

however, the Claims Litigation and the Avoidance Action do not involve the same cause of action

or necessarily the same evidence. The former concerned the Defendants' net equity claims under

SIPA against the BLMIS estate. The Defendants are not making a claim for anything in the

Avoidance Action. The Trustee is essentially arguing that their claim in the Claims Litigation and

their defense in the Avoidance Action involve the same facts (netting deposits and withdrawals)

and are the same cause of action. He does not, however, cite authority to support his proposition

that a claim for affirmative relief in one action and a defense based on the same facts in a second

action constitute the same cause of action for res judicata purposes….More importantly, the issues

and evidence are not necessarily the same.") There is no legitimate reason to revive the details of

the Claims Litigation.

80.     In the absence of documentary evidence that the 509 and 703 Accounts were

transferred to BLMIS, the Trustee also revives his effort to hold the Defendants to pre-discovery

admissions and other pleadings. See paragraph [52] above. These admissions were superseded

by the Joint Pre-Trial Order jointly submitted by the Parties in connection with the Trustee's

Summary Judgment Motion, which has been treated as an Order of the Court. See *MSJ Decision*,

608 B.R. at n. 4. In that same decision, the Court addressed the issue again as follows:

> Ordinarily, "[f]acts admitted in an answer, as in any pleading, are judicial
> admissions that bind the defendant throughout [the] litigation." *Gibbs ex rel. Estate
> of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006). "The amendment of a
> pleading does not make it any the less an admission of the party." *Andrews v. Metro
> N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989) (citations omitted); accord
> *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) ("A party thus cannot
> advance one version of the facts in its pleadings, conclude that its interests would be
> better served by a different version, and amend its pleadings to incorporate that

version, safe in the belief that the trier of fact will never learn of the change in stories."). Nevertheless, an admission in a withdrawn or superseded pleading ceases to be a "conclusive judicial admission." *Tho Dinh Tran v. Alphonse Hotel Corp*., 281 F.3d 23, 32 (2d Cir. 2002) (citing *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 198 (2d Cir. 1929)), overruled on other grounds by *Slayton v. Am. Express Co*., 460 F.3d 215, 226-28 (2d Cir. 2006). Here, the parties stipulated that their prior pleadings would be deemed amended by the JPTO. (JPTO at 20 ("The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties.").) Through the JPTO, the Defendants now contend, consistent with the Objection, that the 509 Account belonged to Madoff. (JPTO at 29, ¶ 10; 36, ¶ 27.) Hence, the prior admissions are no longer "conclusive judicial admissions," although the fact finder may consider them in deciding the issue at trial. *See MSJ Decision*, 608 B.R. at n. 18.

81.    Moreover, even if the factual recitations in the JPTO did not supersede the early pleadings with the Trustee's express consent, the Defendants' should be allowed to amend their early pleadings to conform to the evidence pursuant to the federal Rules. Rule 15 of the Federal Rules of Civil Procedure, which applies to this adversary proceeding under Federal Rule of Bankruptcy Procedure 7015, allows a party to amend its pleading upon leave of court, which should be "freely give[n] ... when justice so requires." Fed. R. Civ. P. 15(a)(2). The issue of ownership of the account was raised in detail in mediation, again in the PTO and again in connection with the Trustee's Summary Judgment Motion. The Trustee had adequate prior notice of the Defendants' contention that the transfers were not transfers of BLMIS property. Accordingly, there is no prejudice to the Trustee by accepting superseding contentions and evidence. There is no basis for holding the Defendants to pre-discovery answers or admissions in the light of later discovered evidence supporting the ownership of the accounts by Bernard Madoff.

### The Businesses

82.    Beginning in 1960 and until January 1, 2001, Madoff operated his business as a sole proprietorship. During that period, it operated under the names Bernard L. Madoff and Bernard L. Madoff Investment Securities. In or about January 1, 2001, Madoff officially converted a substantial part of his businesses to a limited liability company. Effective January 1, 2001,

Madoff registered his brokerage business as a New York single member limited liability company. However, it was not until September 12, 2006 that, BLMIS' registration with the SEC as investment advisory business first became effective. *See* Bernard L. Madoff Investment Securities LLC., advisorinfo.sec.gov.

83.    In December 1995, Defendants Michael Mann and Meryl Mann opened their account with the Investment Advisory business of Madoff Securities, which was assigned account number 1CM363 in the name of "Michael Mann and Meryl Mann J/T Wros." During the ten-year period between 1998 and 2008 for which the Trustee has bank records, Michael Mann apparently made deposits into and received withdrawal payments for the Mann Account from two bank accounts: JPMorgan Chase Bank, N.A. ("Chase") account #xxxxx1703 (the "703 Account") and Chase account #xxxxxxxxx1509 (the "509 Account").

84.    In March 1999, Michael Mann opened an account with Madoff Securities, which was assigned account number 1CM379 in the name of "BAM L.P." During the period between 1999 and 2008, Michael Mann apparently made deposits into and received withdrawal payments for the BAM Account from two Chase accounts: the 703 Account and the 509 Account.

85.    From December 1998 to August 2002, the bank statements for the 703 and 509 Accounts listed the account holder as "Bernard L. Madoff." From December 1998 to December 2008, checks drawn on the 509 Account listed "Bernard L. Madoff" as the payor of the checks. See DX.

86.    From 1998 through 2002, all bank statements for the Chase 703 account were sent to the same address, Bernard L. Madoff, Att: Tony Tilenick, 885 Third Avenue, 18 Floor, New York, New York 10002  See   DX  From September 2002 through December 2008, the bank

statements on the 703 and 509 Accounts listed the account holder as "Bernard L. Madoff Investment Securities." The address remained the same.

87.    All the banks statements for the 509 Account were sent to the same address Att: Daniel Benventre [sic], 885 Third Avenue, 18 Floor, New York, New York 10002 during the relevant period.  See DX.

88.    Both Tilenick and Bonventre were employees of Madoff Securities before the formation of the LLC.  Tilenick received the 703 Account statements well before the formation of the LLC.  Bonventre began working for Madoff as an auditor in 1968, and was the firm's Director of Operations from at least 1978 until shortly after fraud came to light in December 2008. According to the records of his criminal trial, Bonventre was charged with failing to disclose the 703 Account and IA side of the business in regular accounting and SEC reporting. See *U.S. v. Bonventre et al*., 10 cr. 00228 (LTS), Bonventre Sentencing transcript, ECF 1441 at 56.

89.    In sum, nothing in the statements for the 703 and 509 Accounts provides evidence of a change in ownership.

90.    The failure to transfer the 703 Account and the 509-disbursement account to BLMIS does not appear to be accidental, a matter of oversight or plain carelessness.   The Bonventre trial testimony, cited above, disclosed that the 703 Account was consciously omitted from SEC and other business accounting records.  According to DiPascali and Madoff himself, the 703 Account was exclusively under Madoff's control.

91.    All the bank statement produced by the Trustee for the period during which the Mann Account was active showed billions of dollars in credits and debits, many of which did not involve customer depositors' transactions.  The bank statement for the month of January 2007, for example, shows total credits of $16,051,080,279--nearly the amount of total principal deposits for

those customers holding accounts in December 2008.  It also showed debits of $16,051,537,519,
including a wire transfer to the Mann Account on January 4, 2007 and billions of dollars in
additional investments.  See DX.

92.     However, the customer transactions constitute only a fraction of the dollar value of
the total transactions for that month.  The majority of the transactions -- often in amounts of
$300,000,000 to $500,000,000 -- were investments made in the name of Bernard Madoff or
Bernard Madoff Inc.   In contrast, the deposits that appear to be customer deposits were in
dramatically smaller amounts and during that month never exceeded $30,000,000.  Madoff used
CHUSA Caymen, which was a service offered by a branch of Chase that arranged for the automatic
investment of customer funds, the return of the funds, and the credit of interest to the main or sub-
account.  Madoff selected an arrangement offered by Chase for overnight investments on the books
of the Bank's Nassau Branch in his name. (For the CHUSA, *see* JPMorgan Chase, End of Day
Investment and Loan Sweep Service).  Madoff also used the services of AIP Investment, which is
or was a platform offered by DTCC to support investments in alternative investment products like
hedge funds, funds of funds and private equity.   He purchased Treasury bills, which appear
monthly on the Mann Account and BAM account statements throughout the ten year period, as
well as on the statements of other customers. Hundreds of millions of dollars went into these
investments.[27]   DX

93.     The 703 Account bank statement for November, 2008, showed credits of
$10,419,099,300 and debits of $10,418,920,392, most of which went into investment vehicles.

---

[27] The CUSIP numbers on customer trade confirmations match the CUSIP numbers for certain of the Treasury
securities.  DX

The substantial transactions listed on the November 2008 statement were investment transactions similar to those on the January 2007 statement.  DX

### *The January 12, 2001 Form BD*

94.    There is no evidence, let alone credible and admissible evidence, that Madoff transferred the 703 and the 509 accounts to BLMIS.

95.    On January 12, 2001, Madoff and his brother, Peter Madoff who is described on the form as the Director of Trading and Chief Compliance Officer and the contact employee, filed a Form BD Uniform Application for Broker Dealer Registration (the "Form BD") with the SEC to identify a change in corporate form from a sole proprietorship to a single member limited liability company for the market making and proprietary trading business.  DX [   ].

96.    The Form BD, on its face, does not document a change for the investment advisory business.  In answering question 12 of the Form BD, which asks the applicant to identify which businesses it will be engaged in, the Madoffs checked "Broker or dealer making inter-dealer markets in corporate securities over-the-counter" and "trading securities for own account:" Investment advisory services was **not** checked on the form.

97.    In addition, Peter Madoff -- who is designated on the 01/12/2001 Form BD as Director of Trading, Chief Compliance Officer, the contact employee for the Form and its authorized signatory -- was not associated with the investment advisory business until 2006 when that business was first registered with the SEC.  At his plea hearing, Peter Madoff testified that he "dedicated almost 40 years to building a legitimate securities market-making business.  In July 2006, my brother informed me that BLMIS was going to register with the SEC as an investment adviser because of my brother's management of customer accounts.  In September 4 of 2006, when BLMIS first registered as an investment adviser, I was designated as the chief compliance officer of the chief compliance officer of the customer business."  Peter Madoff Plea Testimony at 36.

98.    Putting aside the facts that the Form BD itself does not even purport to address the assets of the investment advisory business and that both Madoffs were convicted of falsifying documents for the SEC, the 01/12/2001 Form BD is not admissible evidence of the ownership and/or transfer of the bank accounts or any assets of any of the BLMIS businesses.   The SEC filings are inadmissible hearsay.   See *In re Teligent*, 380 B.R.324, n.2 (Bankr. S.D.N.Y. 2008)("The Teligent SEC filings represent admissions by Teligent.   The plaintiff is the successor to Teligent, and the contents are non-hearsay as to her. The contents are not, however, admissible against Mandl.   The contents of IDT's SEC filings are not admissible because they are hearsay, and the plaintiff has failed to show that they arc admissible under an exception to the hearsay rule.")   The Court's analysis is applicable here.

99.    The *MSJ Decision* references the language in the Form BD with respect to the transfer of assets.   See *MSJ Decision*, 608 B.R. at 170 ("At that point, all of Madoff Securities' assets and liabilities were transferred to BLMIS.")   The *MSJ Decision* cites *SIPC v. BLMIS (In re BLMIS)*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017)(the "Inter-Account Decision") as the basis of the statement.   The Inter-Account Decision, in turn, relies on the Declaration of Kevin Bell and the language on the Form BD.   Although it was accepted as evidence in the prior decision, the Form BD is inadmissible in this adversary proceeding.

### Linda Coribello Statements

100.   In December 2017, the Trustee procured additional sworn statements from Linda Coribello in which she stated under oath for the very first time that "Bernard L. Madoff Investment Securities LLC ('BLMIS') maintained account numbers 140081703 and 6301428151509 (the 'accounts') at JPMorgan.   There is no personal knowledge or other factual basis for Coribello to make this statement, which therefore is inadmissible under Federal Rules of Evidence ("Fed. R.

Evid.") 601 and 602. As far as the record shows, her role was solely as custodian of records. She had no stated or apparent involvement with the referenced accounts – the 509 Account or the 703 Account -- and, appropriately, none of her prior sworn statements as records custodian had made this statement.

101.    The purpose of a custodian's affidavit is to authenticate documents. Custodians like Coribello do not have personal knowledge concerning specific accounts; they simply verify that documents produced in response to a subpoena constitute bank documents. *See* Fed. R. Evid. 803(6) and 902(11); *United States v. Edwards*, 2012 WL 5522157, at *3 (D.D.C. Nov. 15, 2012) ("certifications used pursuant to Federal Rule of Evidence 902(11) to authenticate business records are not testimonial . . . ." They "merely establish the procedures through which the underlying records were made. The business records--not the certifications—are used to establish facts against the defendant at trial.")(emphasis added).

102.    Fed. R. Evid. 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The Trustee put in no evidence that Coribello had personal knowledge as to the ownership of the 703 and 509 Accounts.

103.    In contrast to the lack of documentation for a change in ownership of the 509 Account and 703 Account, there is ample evidence that Madoff notified the relevant financial institutions and agencies of the change from the sole proprietorship. On January 1, 2001, Madoff sent notification letters of the formation of the LLC to all of the business and governmental entities with which the trading businesses dealt. *See, e.g.,* the following notification letters all dated January 1, 2001: DX-[   ] (letter from the LLC to BNY), DX-[   ] (letter from LLC to the

National Securities Clearing Corporation), DX-[   ] (letter from the LLC to the Options Clearing
Corporation), DX-[   ] (letter from the LLC to the Depository Trust Company).

104.    In contrast, the evidence clearly demonstrates that Madoff kept the 703 and 509
Accounts in his own name and under his exclusive control to manage funds from a variety of
sources.

### *Substantive Consolidation Does Not Resolve the Ownership Issue*

105.    The orders of the District Court and the Bankruptcy Court dealing with BLMIS and
Madoff's assets relate solely to the administration of the respective assets and not the ownership
of those assets for purposes of resolving the issue in this adversary proceeding.

106.    The District Court entered orders regarding the administration of Madoff's assets,
without ruling on the issue of ownership, well before the Bankruptcy Court entered the substantive
consolidation order. On December 11, 2008, the SEC filed a complaint against both Bernard
Madoff and BLMIS, alleging violations of securities laws and rules and seeking an injunction
restraining the defendants from further violations of the laws and directing them to disgorge their
"ill-gotten gains." *See SEC v. Madoff, et al.*, 08-cv-10791-LLS (S.D.N.Y., Dec. 11, 2008)[ECF
No.1]. On December 12, 2008, the District Court entered a temporary restraining order freezing
the defendants' assets, and appointing Lee Richards as receiver for BLMIS.and specifically
identifying and freezing 5 bank accounts, including the 703 Account; Chase Account No.
000000066709466,[28] and Bank of New York Mellon Account No. 890 0402 393, each in the name
of Bernard L.Madoff Investment Securities; Bank of New York Mellon Account No. 0300951050
in the name of Bernard L. Madoff; and Bank of New York Mellon Account No. 866-1126-621 in
the name of BLMIS. [ECF No.3]

---

[28] This appears to be another Chase account that was not transferred to BLMIS.

107.    On February 9, 2009, the District Court entered a partial judgment on consent granting a permanent injunction against further violations of the securities laws and freezing Madoff's assets. [ECF No. 18].  However, on March 2, 2009, the District Court entered a Stipulated Order Partially Lifting The Freeze On Defendant Bernard L. Madoff's Assets, ordering relief from the asset freeze for "Madoff, and each of his financial and brokerage institutions, agents, servants, employees, attorneys and those persons in active concert or participation with him, to the extent needed to cooperate with the Trustee in transferring, pledging or assigning, or causing to be transferred, pledged or assigned, to or for the benefit of the Trustee, assets, funds or other property (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever) of, held by, or under the direct control of, Madoff, whether held in the name of Madoff, BLMIS, Madoff International, or Madoff Ltd., or for the direct or indirect beneficial interest of Madoff, wherever situated, in whatever form such assets may presently exist and wherever located."

108.    On April 1, 2009, certain customers sought relief from the partial judgment to the extent that it precluded parties from filing an involuntary proceeding against Madoff personally. On April 10, the District Court entered an order modifying article V of the Order on Consent Imposing Preliminary Injunction, Freezing Assets and Granting Other Relief Against Defendants, dated December 18, 2008, to allow the customers to file an involuntary bankruptcy petition against Madoff for the administration under the Bankruptcy Code of Madoff's assets that were not previously turned over to the Trustee for administrative purposes.  ECF Nos.47, 48.  The District Court  in its  Decision found that: "A Bankruptcy Trustee has direct rights to Mr. Madoff's individual property, with the ability to maximize the size of the estate available to Mr. Madoff's creditors through his statutory authority to locate assets, avoid fraudulent transfers, and preserve

or increase the value of assets through investment or sale, as well as provide notice to creditors,
process claims, and make distributions in a transparent manner under the procedures and
preferences established by Congress, all under the supervision of the Bankruptcy Court."

109.    The order paved the way for the filing of an involuntary proceeding against Madoff
personally on April 13, 2009.  *See* Involuntary Petition, Case No. 09-11893(SMB). [ECF No. 1].
On April 21, 2009, pursuant to an Order of the Court dated April 20, 2009 directing the
appointment of an interim chapter 7 trustee, the United States Trustee's Office for the Southern
District of New York appointed Nisselson as interim trustee for the Madoff Chapter 7 Case. *See*
Case No. 09-11893(SMB). [ECF No. 18].

110.    On May 5, 2009, the Trustee and Nisselson filed a Joint Motion For Entry Of Order
Substantively Consolidating The Estate Of Bernard L. Madoff Into The SIPA Proceeding Of
Bernard L. Madoff Investment Securities LLC.  On June 9, the Bankruptcy Court entered an order
substantively consolidating the Madoff bankruptcy estate with the BLMIS bankruptcy estate for
administration purposes without determining ownership of any asset as follows:

> Pursuant to section §105(a) of the Bankruptcy Code, the Madoff estate is
> substantively consolidated into the BLMIS SIPA Proceeding and the BLMIS
> estate, and all assets and   liabilities of the Madoff  estate shall be deemed
> consolidated into the BLMIS SIPA Proceeding and the BLMIS estate,  which
> shall be administered in accordance with SIPA and the Bankruptcy Code under
> the jurisdiction of this Court
>
> Notwithstanding the substantive consolidation of the Madoff estate into the
> BLMIS SIPA Proceeding, the Chapter 7 Trustee shall remain Chapter 7 trustee
> of the Madoff estate and shall continue to have all powers, rights, claims and
> interests of a Chapter 7 trustee to bring claims under Chapters 5 and 7 of the
> Bankruptcy Code in consultation with the SIPA Trustee and SIPC.  Further,  all
> powers, rights, claims and interests of the Madoff estate are expressly preserved,
> including without limitation all Chapter 5 and Chapter 7 powers, rights, claims
> and/or interests.
>
> All powers, rights, claims and interests of the SIPA Trustee and the BLMIS
> estate are expressly preserved, including without limitation all Chapter 5 and

> Chapter 7 powers, rights, claims and/or interests, and the SIPA Trustee is
> authorized to pursue claims on behalf of the consolidated estate as the
> representative of and fiduciary for the BLMIS SIPA Proceeding and as
> subrogee and assignee of creditors' claims for, among other things, the
> avoidance and recovery of transferred property.

See *In re Bernard L.Madoff*, Case No. 09-11893 (SMB) [ECF No. 228]; *In re BLMIS*, Case

No. 08-01789(SMB) [ECF No. 252]

111.    The Trustee's reliance on the substantive consolidation of the BLMIS estate and

the Madoff estate must be constrained by the limitations of the substantive consolidation doctrine

itself and Court's order authorizing that consolidation.    It is widely held that substantive

consolidation deals with the administration of post-filing bankruptcy estates.    That consolidation

does not alter the pre-petition structures of the consolidated entities or eliminate the obligations of

the Trustee to prove each element of his fraudulent transfer case with respect to the pre-petition

entities or the Defendants' defense that the property transferred was not BLMIS property.    The

Court's order does not expand the consolidation doctrine.    See *Kelly v.Opportunity Fin. LLC*, 550

B.R. 438 (Bankr. D. Minn. 2016).    In that case involving the Petters Ponzi scheme, the Trustee

tried to import an existing creditor from one consolidated estate to the other.    The court rejected

the argument:"

> The Trustee's argument ignored the historical and separate pre-petition
> existence of the debtors.  Additionally, the Trustee's argument was inconsistent
> with the text of the  substantive consolidation order, itself, which did not change
> the status or structure of the Debtor-entities as separate persons under non-
> bankruptcy law but rather altered only the structure of the bankruptcy estates
> that were associated with those Debtor-entities. Finally, substantive
> consolidation did not alter the underlying substantive law governing avoidance
> rights held by the consolidated estate in the PCI cases. The first is that the
> argument ignores the separate pre-petition existence of the Debtors as entities
> themselves, and the estates (ultimately the one consolidated estate) as entities
> created only by operation of law on the bankruptcy filings. The Debtors had their
> own historical and separate existence pre-petition; the creation of a bankruptcy
> estate did not terminate that existence for any of them.

112.    The court further held: "Consolidation of the bankruptcy estates would not affect the substantive merits of any right of avoidance brought into the pooling of the estates' fortunes." *Id* at 456.  *See also In re Bauman*, 535 B.R. 289, 301 (Bankr. C.D.Ill. 2015) ("Fraudulent transfer avoidance actions under sections 548 and 544 are limited, by statute, to recovery of prepetition transfers of property of the debtor. Operating to combine the estates of separate debtors, substantive consolidation is inconsistent with the individual ownership of property that the avoiding powers must recognize. That apparent inconsistency is readily reconciled, however, by simply clarifying that substantive consolidation operates only to combine the assets of the bankruptcy estates for distributional purposes. It does not serve to merge or consolidate the debtors themselves. Most significantly, substantive consolidation should not be deemed to have a retroactive effect of transforming property owned by an entity separate from a debtor into property of that debtor as of the prepetition date of the challenged transfer. *In re Cahillane*, 408 B.R. 175, 211-12 (Bankr.N.D.Ind. 2009). The facts of property ownership as they existed prepetition remain unchanged, as do the elements of proof under sections 548 and 544."); *In re Murray Industries, Inc.*, 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991) ("The substantive consolidation of several estates means one thing and one thing only -- that all assets of the several entities are pooled and all creditors of the several entities are entitled to share in the pooled assets in accord with their respective rights. It would certainly be a violation of due process if the order of substantive consolidation would operate to destroy defenses and rights which existed prior to the entry of the order of substantive consolidation."); *Ferguson v. Garden Ridge Corp.*, 399 B.R. 135. 140 (D.Del. 2008)(same in context of set rights).

113.    In sum, the Trustee's obligation to prove that the transfers to the Defendants were

transferred of BLMIS property remains unchanged by the consolidation of the estates and the

consolidation order.[29]

### Statute of Repose

114.    Section 546(a) of the Bankruptcy Code is a statute of limitations that establishes

the two-year time period within which the avoidance action must be filed.  Section 548(a), which

is a fundamental element of the Trustee's only claim against the Defendants, is a statute of repose

that sets forth the two-year period of transfers or obligations that may be challenged.  Transfers

and obligations before that two-year reach-back period may not be challenged by the Trustee.

115.    The bankruptcy case was commenced on December 10, 2008.  The calculation of

any alleged liability, determined by section 548(a)(1), is limited to the transfers during the two

year period before the filing of the bankruptcy case against the account balances as of November

30, 2006.  On November 30, 2006, the Statement for the Mann Account showed securities with a

stated value of $6,305,190.  Thereafter, on January 5, 2007, Michael Mann deposited an additional

$1,500,000 by wire transfer into the Mann Account.  Accordingly, as of December 11, 2008,

BLMIS had outstanding, unavoidable obligations to the Mann Account holders of more than

$7,800,000.  Marked as trial exhibit [DX-0000X-DX-00000X] is a true and accurate copy of the

Account Statement for the Mann Account as of 11/30/2006.  From December 11, 2006 through

December 11, 2008, Michael Mann withdrew only $2,250,000.  The last withdrawal from the

Mann Account was on October 24, 2007. The Trustee can only recover withdrawals taken in the

---

[29] The process leading to the substantive consolidation of the estate confirms that the all business assets held by Madoff were not transferred at the formation of BLMIS.  The order of the District Court identifies another Chase account that remained in the name of the sole proprietorship.  The Trustee's motion for consolidation reveals that the lease for the Lipstick Building offices remained in the name of Bernard L. Madoff.

last two years of Madoff's operation if they exceed the November 30, 2006 balances, which they do not.

116.    On November 30, 2006, the statement for the BAM Account at BLMIS evidenced obligations to BAM of $1,091,836.  Thereafter, from December 11, 2006 through December 11, 2008, BAM withdrew only $563,000.  Marked as trial exhibit [DX-0000X-DX-00000X] is a true and accurate copy of the Statement Report for the BAM Account as of 11/31/2006. The Trustee can only recover withdrawals taken in the last two years of Madoff's operation if they exceed the November 30, 2006 balances, which they do not.

### Preservation of Legal Defenses

117.    The Trustee and the Court contend that the Defendants' legal defenses have been finally and irrevocably determined.  However, the fact is that the identical defenses remain subject to appellate review and are currently *sub judice* in the Second Circuit in the consolidated *Lowrey* cases.  *See Picard v. Gettinger*, 19-0429-BK.  Accordingly, although the Bankruptcy Court summarily dismissed the defenses in Rule 56G Order, if the Second Circuit decides in favor of the appellants on any of the defenses, the same defense applicable here as well would completely dispose of the Trustee's claims against the Defendants.

118.    For the sake of clarity, the Defendants briefly set forth and adopt the defenses stated on appeal in the consolidated *Lowrey* cases that are common to this case.  The defenses raised on appeal are:

> 1.    Whether the securities account payments made by the broker to Appellants -- which this [Circuit] Court has found are shielded from clawback under § 546(e) -- constitute the "satisfaction of a present or antecedent debt" which likewise shield those same payments from clawback under § 548(c).

2.      Whether, since the broker's obligations to Appellants arose prior to
the § 548(a)(1) two-year reach-back period and are therefore
unavoidable, the subsequent account payments - which are based on
those obligations - are likewise unavoidable and outside the reach of
the Trustee's claims.

3.      Whether § 548(a)(1), which limits the Trustee's avoidance claims to
obligations incurred and transfers made within two years before the
filing of the petition: (a) prohibits the Trustee from suing for amounts
based on time periods that predate his statutory authority; and (b)
therefore requires a recalculation of the Trustee's avoidance claims.

*See* Appellants' Brief on Appeal, Consolidated Lowrey Cases, 19-0429-BK [ECF No. 141 at 2]

119.    The legal arguments in support of these defenses were set forth in the Defendants'
Memorandum in opposition to Trustee's Motion for Summary Judgment and is incorporated by
reference.  The factual support is set forth below.

120.    The Trustee's claims to avoid obligations were dismissed with prejudice by a so-
ordered stipulation.  The withdrawal payments satisfied unavoidable obligations to the Defendants.
Each time Michael Mann requested a withdrawal from the Mann account, the account statement
reflected a substantial balance, which represented the broker's unavoidable obligation under state
and federal law. This is shown on the chart below:

| Date | Withdrawal Amount | Statement Obligation |
|------|-------------------|----------------------|
| 11/07/2000 | $7,500,000 | $11,612,339 |
| 04/16/2003 | $400,000 | $13,380,916 |
| 02/23/2004 | $4,000,000 | $14,122,213 |
| 03/20/2006 | $500,000 | $6,161,058 |
| 03/07/2007 | $250,000 | $7,665,327 |
| 10/24/2007 | $2,000,000 | $8,327,789 |

121.    Each time Michael Mann requested a withdrawal from the BAM account, its account statement reflected a substantial balance, which represented the broker's unavoidable obligation under state and federal law.  This is shown on the chart below.

| Date | Withdrawal Amount | Statement Obligation |
|------|-------------------|----------------------|
| 04/25/2000 | $52,000 | $1,216,468 |
| 10/12/2000 | $43,000 | $1,185,089 |
| 11/07/2000 | $750,000 | $1,594,424 |
| 06/25/2002 | $15,000 | $1,966,732 |
| 04/16/2003 | $70,000 | $2,367,470 |
| 01/06/2004 | $100,000 | $2,482,385 |
| 03/02/2005 | $275,000 | $2,631,694 |
| 04/08/2005 | $1,400,000 | $2.417.246 |
| 01/05/2006 | $60,000 | $1,037,629 |
| 04/17/2007 | $88,000 | $1,132,452 |
| 07/25/2007 | $300,000 | $1,075,738 |
| 10/24/2007 | $50,000 | $801,193 |
| 01/23/2008 | $15,000 | $775,127 |
| 04/23/2008 | $110,000 | $762,516 |

*See also* Sur-Reply Of Legacy Capital Ltd. In Response To Reply Memorandum Of Law Of The Securities Investor Protection Corporation In Support Of The Trustee's Motion For Summary Judgment, Adv. 10-05286 [ECF #212].

### ***Summary Judgment Motion***

122.    In December 2018, the Trustee filed his Summary Judgment Motion.[30]    On February 5, 2019, by letter to the Court, the Defendants sought leave to file a cross motion for summary judgment and to extend the briefing schedule by two weeks.[31]    The Trustee opposed the Defendants' request.[32]    The Bankruptcy Court granted Defendants' request to extend the briefing

---

[30] *See* Mot. for Summary Judgment, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Nov. 20, 2018), ECF No. 140–43.  The Defendants object to the findings with respect to the transfer of assets to the extent the Court relies on the Form BD or the affidavits of Linda Coribello as more fully set forth below.

[31] See Letter of Arthur H. Ruegger, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Feb. 5, 2019), ECF No. 152.

[32] See Letter Response of Trustee, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Feb. 6, 2018), ECF No. 153.

schedule deadlines, but rejected Defendants' request to file a cross motion for summary judgment. The Defendants thereafter opposed the Trustee's Summary Judgment Motion, and the Trustee and SIPC filed their reply briefs.[33]

123.    By letter to the Court dated April 8, 2019,[34] the Defendants argued that the Trustee and SIPC were using the right to reply as an opportunity to introduce new evidence and arguments. Accordingly, the Defendants asked the Court to (i) to strike the Sheehan Reply Declaration and related arguments made in the reply briefs (the "Request to Strike") and (ii) to allow Defendants to adopt the Sur-Reply of Legacy Capital Ltd. in Response to Reply Memorandum of Law of the Securities Investor Protection Corporation in Support of the Trustee's Motion for Summary Judgment, dated April 4, 2019 (Adv. Proc. No. 10-05286, ECF No. 212) in response to certain arguments made by SIPC in its reply brief (the "Request to Adopt"). On April 16, 2019, the Bankruptcy Court entered an Order directing the Parties to address the Request to Strike at the hearing to consider the Trustee's Summary Judgment Motion; and granting the Request to Adopt.[35]

### *Prejudgment Interest*

124.    Even if the Trustee is successful in this adversary proceeding, there should be no prejudgment interest awarded. As shown below, the Trustee is not entitled to more than recovery of the dollar amount withdrawn within the two years before the filing if he prevails as a matter of law and equity. Furthermore, there is no precedent for awarding prejudgment interest in the hundreds of cases that either settled with the Trustee after litigation or ended in judgment for the

---

[33] *See* Defendants' Memorandum in Opposition to Trustee's Motion for Summary Judgment, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Feb. 22, 2019), ECF Nos. 158–160; Reply Briefs, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. March 27, 2019), ECF Nos. 163–164, 166–168.

[34] *See* Letter of Arthur H. Ruegger, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Apr. 8, 2019), ECF No.169.

[35] Order Regarding Defendants' Letter Dated April 8, 2019, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Apr. 16, 2019), ECF No.172.

Trustee, except for the *Nelson* case. The award in that case is directly at odds with Second Circuit law in both form and substance.

125.    The Second Circuit stated in *Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO,*, 955 F.2d 831, 834 (2d Cir. 1992) that although discretionary awards of prejudgment interest are permissible under federal law in certain circumstances, the award should be a function of (1) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other principles as are deemed relevant by the court. The *Wickham* court cautioned that prejudgment interest should not result in over-compensation of the plaintiff, such as when the statute, as here, fixes damages deemed fully compensatory, *Id.* Similarly, prejudgment interest is inappropriate when the defendants, like the Defendants here, acted innocently and had no reason to know the wrongfulness of their actions, *Id*. Finally, interest should not be awarded when there was a legitimate dispute about liability. *Id*. As shown below, each of these considerations serves as a basis for denying interest in this case.

126.    First, the applicable bankruptcy statute fixes damages at the return of property transferred. Pursuant to the Bankruptcy Code, once it is established that a transfer or obligation is avoidable, section 550 limits the recovery to the property transferred or its equivalent value.[36] The plain language of the provision does not include an upward adjustment. While some courts may rely on the word "value" in the provision to justify addition of interest to the recovery[37], courts

---

[36] Section 550(a) provides: "[E]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, 11 U.S.C. §550.

[37] See, e.g., *CNB Int'l, Inc. v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 335–36 (Bankr.W.D.N.Y.2008) (finding that because "the right to recover prejudgment interest on a fraudulent conveyance arises from that language in 11

generally agree the "value" alternative actually only affords the bankruptcy court discretion to award the trustee either the actual fraudulently transferred property or its pre-transfer value where the property transferred is not money and presents practical issues for the trustee to manage.. *See, e.g., In re Bruno Machinery Corp.* , 569 B.R.819 (Bankr. N.D.N.Y.2010)(avoidance nullifies the transfer; a recovery under section 550 forces the transferee to return the property or its value); *Littleton v. Lanac Invs. LLC (In re Kudzu Marine, Inc)*, (Bankr. S.D. Ala. 2017) (listing practical factors for determining whether to take property [a barge] in satisfaction or its value); *In re Centennial Textile, Inc*., 220 B.R. 165 (Bankr. S.D.N.Y. 1998)(same as to shares). Prejudgment interest in addition to the statutory damages would overcompensate the Trustee.

127.    Second, prejudgment interest should not be awarded because the Defendants in this case acted innocently without knowledge of the fraud. The Trustee has never disputed the fact that the Defendants in this case were innocent customers who used their brokerage accounts without knowledge of or complicity in the fraud.

128.    In fact, the Defendants in this case are also victims of the fraud. Their funds were deposited for more than a decade in case of the Mann Account and nearly a decade in the case of the BAM Account. The Portfolio Management Reports for Mann Account for the period from 12/96 to 12/31/08 show an annualized rate of return of approximately 14%. According to the Portfolio Management Reports sent to Michael Mann for the BAM Account, for the period from 1/31/00 to 12/31/08 the annualized rate of return on the BAM Account from their deposits with Madoff Securities was approximately 13%. Marked as trial exhibits DX-0000X-DX-00000X are

---

U.S.C. § 550(a) which allows a trustee to recover 'the value' of the transferred property," but any prejudgment interest must be determined by reference to federal law)

true and accurate copies of the Portfolio Management Reports for the Mann Account and BAM Account produced by the Trustee.

129.     As evidenced by publicly available reports, the average annualized rate return for S&P 500 stocks for the period from 1997 through 2007 was 10.73%.  See DX-00000x (chart of annualized return for S&P500.  Thus, the balances in their account in 2008, as reflected on their last statements, $7,297867.45 for the Mann Account $714,333 for the BAM Account, represent a substantial part of the money they would have earned had they deposited their money with a legitimate broker and the loss they suffered as a result of the fraud.. .DX     .

130.     In addition, the Defendants paid taxes on their gains totaling more than $3,000,000 that was never recouped as demonstrated by the accounting prepared by the Defendants' accountant based on returns for the investment period  See DX [     ].  To add prejudgment interest in the face of real out-of-pocket losses on the part of the Defendants would be unnecessarily punitive and inequitable.

131.     Furthermore, contrary to the Trustee's assertion the outcome of his original lawsuit was a given, there have been legitimate disputes throughout the pendency of this case concerning the nature and extent of liability.  The Trustee's contention that the Defendants should have known they were "net winners," or in possession of funds that belonged to other people, or otherwise were recipients of avoidable transfers, when the Trustee filed his avoidance actions against the Defendants in 2010 is untenable for several reasons.  First, the Defendants could legitimately question the validity of the Trustee's lawsuit because prior to the initiation of the lawsuits in this SIPA proceeding, to the best of the Defendants' knowledge, no SIPA trustee had pursued a recovery against hundreds of innocent customers of a defrauding broker.  In the Defendants' view,

SIPA is a statute that professes to be a depositor's protection against a broker's fraud, not one that uses the broker's fraud to pursue recovery of legitimate account withdrawals.

132.   Second, although the Trustee argues that liability was well established from the early days of this case, nothing in the underlying bankruptcy case or in the adversary proceeding could be legitimately called well settled.  The Trustee's basic methodology for determining net equity for claims was not resolved until 2012.  *See In re Bernard L. Madoff Investment Securities LLC*, 654 F.3d 229 (2d Cir. 2011), cert den. sub nom. *Velvel v. Picard*, 567 U.S. 934 (2012). Similarly, the Bankruptcy Court's Memorandum Decision denying claimants the right to adjust deposits based on either the present value of the dollar or the lost value on deposits over time (time-based damages) involving multiple claimants was not determined until 2015.  .  *See In re Bernard L. Madoff Inv. Sec. LLC*, 779 F.3d 74 (2d Cir. 2015), *cert denied*, 136 S. Ct. 2018 (2015). The Trustee's right to use the same methodology for calculating liability is assumed by the Trustee but remains subject to challenge.

133.   Moreover, there was legitimate dispute regarding the scope of the Trustee's claims. The Trustee originally sought to recover transfers made within six years of the BLMIS filing under section 544 of the Bankruptcy Code and New York Debtor and Creditor Law.  The Trustee's claims in this adversary proceeding and all those involving innocent customers were substantially reduced the decision of the Second Circuit in the *Section 546(e) Decision* in 2015.  The *Section 546(e) Decision* not only reduced the amount the Trustee could arguably recover from the Defendants' accounts, it also completely eliminated claims against a third account that had been closed outside the limitations period.

134.    Similarly, by stipulation, following the Bankruptcy Court order dismissing the Trustee's claims to avoid obligations, the Trustee agreed to the dismissal of such claims in the Amended Complaint with prejudice in 2015, five years after the original Complaint was filed.

135.    Finally, as stated above, the value defense raised in the *Lowrey* case is currently *sub judi*ce in the Second Circuit.  Thus, it is clear that there have been legitimate disputes regarding the nature and amount of liability at all times, notwithstanding the fact that the Trustee has managed to succeed in several cases.

136.    Although the Trustee tries to convey the impression that the timing in the litigation is somehow the Defendants' fault, the resolution of this individual adversary proceedings was put on the back burner while the Trustee and multiple parties addressed and appealed various legal issues, described above, from the Bankruptcy Court through the levels of appellate review to the Supreme Court.  As stated above, the Trustee opposed consolidated briefing on the common legal issues in connection with the *Cohen* case in 2016.

137.    Contrary to the Trustee's assertion, there is no legitimate precedent in this case for the award of interest.  The Defendants are unaware of a single case involving the innocent investor (other than *Nelson*), resolved by settlement or litigation where the Trustee was awarded prejudgment interest.  *See, e.g.*, *Picard v. Cohen*, 16-cv-5513 (LTS) Judgment dated Feb. 27 2007 [ECF. No. 26] (Judgment in the amount of two-year liability without interest); *Picard v. Lowrey*, 18-cv-5433 (PAE) Feb. 8, 2019 [ECF 30](Judgment in the amount of two-year liability).

138.    At a minimum, the *Nelson* award of interest would have been subject to review by an appellate and remand because the Order, prepared by the Trustee, failed to provide a rationale for the award of prejudgment interest.  In this Circuit, the court must articulate and explain its reasons for any decision regarding prejudgment interest.  *In re Palermo*, 739 F.3d 99 (2d Cir.

2014). *See also Henry v. Champlain Enters., Inc*., 445 F.3d 610, 623 (2d Cir. 2006) (vacating the award of prejudgment interest because the court failed to explain and articulate its reasons for any decision regarding prejudgment interest). In the *Nelson* case, the Court did not explain its rationale for prejudgment interest.

139.    More important, the state law rate of interest imposed in the *Nelson* case is at odds with the Second Circuit law on prejudgment interest.   In the *Palermo* case the Second Circuit approved a framework for determining what rate of interest should apply that would call for, at best for the Trustee, a federal interest rate:"  The Court stated:

> The question of whether prejudgment interest should be awarded in an avoidance and recovery action brought under federal bankruptcy law is an open one in our Court.   Many of the courts in this Circuit look to the source of the law underlying plaintiff's claims: claims that arise out of federal law are governed by federal rules, claims arising out of state law are governed by state rules. (citations omitted).   We agree this is the proper framework for the analysis."

*see also Goldman Sachs Execution & Clearing, L.P. v. The Official Unsecured Creditors' Comm*., No. 10 Civ. 5622, 2011 WL 2224629, at *2 (S.D.N.Y. May 31, 2011) (if a case "ar[ises] under federal bankruptcy law[,] ... the federal interest rate should apply."), aff'd,491 Fed.Appx. 201, 206 (2d Cir.2012) (summary order).

140.    The case against the Defendants arises solely under a federal statute 11 U.S.C §548(a)(1)(A).   Therefore, federal law should apply.   28 U.S.C. section 1961 fixes a rate for post judgment interest that would be applicable for prejudgment interest, if the court determined to award it.   The Code provides: "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."   The current rate is slightly above .18%.   This is the

appropriate rate for an award of prejudgment interest in those cases arising under federal law in a case where prejudgment interest is appropriate.

141.    The cases relied upon by the Trustee as to the rate of any prejudgment interest actually prove Defendants' point:  that any applicable rate should be the federal rate.  The Trustee's cases are not  Section 548(a)(1)(A) cases.  Instead, the Trustee's cases are  based solely on New York substantive law where the courts expressly relied on that New York law for the rate,[38] or the cases are not fraudulent transfer cases at all.[39]

142.    Finally, as shown above, the issues in this adversary proceeding have been (and remain) in legitimate dispute.  Accordingly, if interest is imposed it should be imposed at the federal interest rate from the date of this pretrial order to the date of payment.  *See Ames Merch. Corp. v. Cellmark Paper Inc. (Ames Dep't Stores, Inc.)*, 450 B.R. 24 (Bankr. S.D.N.Y 2011) (interest only for the period from the time of submission of the pretrial order to its payment of the amount found to be preferential at trial.)

### *Pretrial Preparation*

143.    Beginning in March 2020 and continuing to the present, the Defendants' counsel's office has been closed and inaccessible on account of the coronavirus pandemic.  Accordingly, defendants' counsel have had no access to the documents and files related to this case other than

---

[38] *Pereira v. Private Brands, Inc. (In re Harvard Knitwear, Inc.)*, 193 B.R. 389, 399 (Bankr. E.D.N.Y. 1996) ("[B]ecause the judgments are predicated on New York substantive law, [pre-judgment interest will be] at the New York rate"); *Lyman Commerce Solutions, Inc. v. Lung*, No. 12 Civ. 4398 TPG, 2015 WL 4545089 (S.D.N.Y. July 16, 2015) (sole fraudulent transfer claim under N.Y. Debtor and Creditor Law; parties agreed New York state law applied); *Geltzer v. Artists Mktg. Corp. (In re Cassandra Grp.)*, 338 B.R. 583, 600 (Bankr. S.D.N.Y. 2006) (prejudgment interest on claim based on N.Y. Debtor and Creditor Law awarded at New York rate because the claim is "predicated on New York substantive law"); *Ackerman v. Kovac (In re All Am. Petroleum Corp.)*, 259 B.R. 6 (Bankr. E.D.N.Y. 2001) (fraudulent conveyance claim based on N.Y. Debtor and Creditor Law).

[39] *Deng v. 278 Gramercy Park Grp. LLC*, No. 12 Civ. 7803 (DLC)(JLC), 2014 WL 1016853, *11 (S.D.N.Y. Mar. 14, 2014) (Magistrate's report and recommendation upon default by all defendants recognized a failure-to-register claim under the Securities Act of 1933, to which no objections were filed before adoption, 2014 WL 4996255 (S.D.N.Y. Oct. 17, 2014)); *Strobl v. N.Y. Mercantile Exch.*, 590 F. Supp. 875 (S.D.N.Y. 1984) (antitrust, commodities law and New York common law fraud claims, prejudgment interest awarded on fraud and commodities claims).

those that could be retrieved online from digital files, resources available on the Internet, or

requests to and records produced by the Trustee.

## VI.   ISSUES TO BE TRIED

144.   The Parties anticipate that the following issues will be tried before this Court:

- Whether the Two-Year Transfers were transfers by the debtor within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548 (a)(1)(A); and

- Whether the Trustee should be awarded prejudgment interest based on establishing the factors emphasized by courts in this District.

## VII.   THE PARTIES' ANTICIPATED TRIAL EXHIBITS

Exhibit A to the Joint Pre-Trial Order reflects the Trustee's anticipated exhibits during his

case-in-chief.[40]  Exhibit B reflects the Defendants' anticipated exhibits during their direct case-in-

chief.  The Trustee reserves the right to rely upon and introduce any of the Defendants' exhibits,

identified in Exhibit B, and/or additional exhibits on the issue of whether the Trustee is entitled to

an award of prejudgment interest.  Similarly, the Defendants reserve the right to rely upon and

introduce any of the Trustee's exhibits, identified in Exhibit A in defense of the Trustee's claims.

## VIII.   STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

The Trustee's stipulations and objections with respect to Defendants' exhibits are set

forth in Exhibit B.

## IX.   THE TRUSTEE'S NON-EXPERT WITNESS

During his direct case-in-chief, the Trustee does not intend to call any non-expert

witnesses.

---

[40] A description of each exhibit is provided followed by, where applicable, a parenthetical identifying the source of the document or documents.

## X.   THE DEFENDANTS' NON-EXPERT WITNESSES

During their case-in-chief, the Defendants anticipate calling the following witnesses:

- Michael Mann

- Steve Landau

## XI.   THE TRUSTEE'S EXPERT WITNESSES

During his case-in-chief, the Trustee will call:

- Lisa M. Collura, who will testify on the Trustee's proof of transfers to the Defendants as set forth in her expert report dated June 12, 2015;

- Bruce G. Dubinsky, who will testify on the BLMIS businesses and structure, bank accounts, sources of income as set forth in his expert report dated August 20, 2013.

## XII.   THE DEFENDANTS' EXPERT WITNESSES

The Defendants will not call any expert witnesses at trial and intend to dispute the admissibility of the Trustee's expert reports and witness testimony.

## XIII.   RELIEF SOUGHT BY THE TRUSTEE

The Trustee seeks to avoid and recover from Defendants $2,813,000.00 in fraudulent transfers, or the value thereof, pursuant to §§ 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code and various provisions of SIPA, including § 78fff-2(c)(3).  The Trustee seeks, pursuant to federal common law and/or New York Civil Practice Laws and Rules §§ 5001 and 5004, prejudgment interest on the avoidable transfers.  Finally, the Trustee seeks such other and further relief as the Court deems just, proper and equitable.

## XIV.   RELIEF SOUGHT BY THE DEFENDANTS

Defendants seek dismissal of the Trustee's remaining avoidance claim.  Defendants also seek such other and further relief as the Court deems just, proper and equitable.

## XV.    ESTIMATED TIME OF TRIAL

This Court scheduled the trial of this matter to commence at [TIME] on [DATE], and continue to the next day, [DATE], if necessary.  The Trustee estimates it will take two to six hours to present his case-in-chief.  Defendants estimate that it will take two to six hours to present their direct case-in-chief at trial and to cross-examine the Trustee's witnesses.

Dated:  June 24, 2020
         New York, New York

**BAKER & HOSTETLER LLP**                    **DENTONS US LLP**

By: /s/ Nicholas J. Cremona                    By: _____
45 Rockefeller Plaza                           Arthur H. Ruegger
New York, New York 10111                       Carole Neville
Telephone:  212.589.4200                       1221 Avenue of the Americas
Facsimile:  212.589.4201                       New York, New York 10020
David J. Sheehan                               Telephone: (212) 768-6700
Email:  dsheehan@bakerlaw.com                  Facsimile: (212) 768-6800
Nicholas J. Cremona                            Email: arthur.ruegger@dentons.com
Email:  ncremona@bakerlaw.com                  Email: carole.neville@dentons.com
Lan Hoang                                      *Attorneys for Defendants*
Email:  lhoang@bakerlaw.com

Dated: _____, 2020

**IT IS SO ORDERED:**

                              _____
                              **HONORABLE STUART M. BERNSTEIN**
                              **UNITED STATE BANKRUPTCY JUDGE**

# EXHIBIT A

**TRUSTEE'S [PROPOSED] TRIAL EXHIBIT LIST**

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | OBJECTION |
|---|---|---|---|
| 1 | Attestation of Kevin O'Neill, SEC | | |
| 2 | 12/31/1959 Form BD for Bernard L. Madoff | PUBLIC0003607–3614 | |
| 3 | 1/12/2001 Form BD for Bernard L. Madoff Investment Securities LLC | | |
| 4 | Articles of Organization for BLMIS | MADTSS01160346–0349 | |
| 5 | Chain of Custody Affidavit—Meaghan Schmidt | | |
| 6 | 12/13/2017 Certification of Domestic Records by JP Morgan Chase [Five Declarations] | | |
| 7 | 7/29/2015 Certification of Domestic Records by Deutsche Bank Trust Company Americas | | |
| 8 | 2/03/2015 Certification of Domestic Records by State Street Bank & Trust Company | | |
| 9 | 1/1/2001 BLMIS letter to NSCC | MADTEE00544438 | |
| 10 | 1/1/2001 BLMIS letter to OCC | MADTEE00544720–4730 | |
| 11 | 8/11/2009 Frank DiPascali Plea Allocution | 09-CR-764_FDIPASCALI0000001–0095 | |
| 12 | 11/21/2011 David Kugel Plea Allocution | 10-CR-228_DKUGEL0000001–0052 | |
| 13 | 11/8/2012 Irwin Lipkin Plea Allocution | S9-10CR-228_ILIPKIN0000001–0053 | |

| EX. NO. | DOCUMENT DESCRIPTION | BATES NO. | OBJECTION |
|---|---|---|---|
| 14 | 1/29/2015 Michael Mann's Responses And Objections To Trustee's First Set Of Interrogatories To Defendant Michael Mann | | |
| 15 | 1/29/2015 Meryl Mann's Objections And Responses To Trustee's First Set of Interrogatories | | |
| 16 | 1/05/2015 Trustee's First Set of Requests For Admission To Defendant Michael Mann | | |
| 17 | 1/05/2015 Trustee's First Set of Requests For Admission To Defendant Meryl Mann | | |
| 18 | 1/05/2015 Trustee's First Set of Requests For Admission To Defendant BAM L.P. | | |
| 19 | Customer Agreement for Account 1CM363 | AMF00256539–6541 | |
| 20 | Customer Agreement for Account 1CM579 | AMF00267048–7050 | |
| 21 | BLMIS Customer File for Account 1CM363 | AMF00256511–6547 | |
| 22 | BLMIS Customer File for Account 1CM579 | AMF00267004–7081 | |
| 23 | Curriculum vitae of Lisa Collura | | |
| 24 | 4/7/2017 Expert Report of Lisa Collura | | |
| 25 | 4/7/2017 Expert Report of Lisa Collura, Exhibit 7 | | |
| 26 | 4/7/2017 Expert Report of Lisa Collura, Exhibit 9 | | |
| 27 | 4/7/2017 Expert Report of Lisa Collura, Exhibit 10 | | |

| EX. NO. | DOCUMENT DESCRIPTION | BATES NO. | OBJECTION |
|---|---|---|---|
| 28 | Summary of Tracing 1CM363 | *See* Expert 4/7/2017 Expert Report of Lisa Collura, Exhibits 7, 9–10 | |
| 29 | Summary of Tracing 1CM579 | *See* Expert 4/7/2017 Expert Report of Lisa Collura, Exhibits 7, 9–10 | |
| 30 | Summary of Reconciliation 1CM363 | *See* Expert 4/7/2017 Expert Report of Lisa Collura, Exhibits 7, 9–10 | |
| 31 | Summary of Reconciliation 1CM579 | *See* Expert 4/7/2017 Expert Report of Lisa Collura, Exhibits 7, 9–10 | |
| 32 | 8/1/2002 - 8/30/2002 703 Account Statement | JPMSAB0000100–0151 | |
| 33 | 8/1/2002 - 8/30/2002 509 Account Statement | JPMTAA0000026–0028 | |
| 34 | 8/31/2002 - 9/30/2002 703 Account Statement | JPMSAB0000624–0672 | |
| 35 | 8/31/2002 - 9/30/2002 509 Account Statement | JPMTAA0000029–0032 | |
| 36 | 11/1/2008 - 11/28/2008 703 Account Statement | JPMSAB0004407–4454 | |
| 37 | 11/1/2008 - 11/28/2008 509 Account Statement | JPMTAA0000310–0315 | |
| 38 | Curriculum vitae of Bruce Dubinsky | | |
| 39 | 8/20/2013 Expert Report of Bruce Dubinsky, served 4/7/2017 | | |
| 40 | 8/20/2013 Expert Report of Bruce Dubinsky, Figure 39 | | |
| 41 | 8/20/2013 Expert Report of Bruce Dubinsky, Figure 37 | | |
| 42 | 8/20/2013 Expert Report of Bruce Dubinsky, Table 8 | | |
| 43 | 3/12/2009 Bernard L. Madoff Plea Allocution | | |
| 44 | 12/30/1997 Debit Memo for Account 1CM363 | 10-04390_Mann0000890–0915 | |
| 45 | 12/22/1998 Credit Memo for Account 1CM363 | 10-04390_Mann0000890–0915 | |
| 46 | 11/31/2000 BLMIS Customer Statement for Account 1CM363 | MDPTPP01250906–0909 | |

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | OBJECTION |
|---|---|---|---|
| 47 | 4/30/2003 BLMIS Customer Statement for Account 1CM363 | MDPTPP01251218–1220 | |
| 48 | 4/30/2003 BLMIS Customer Statement for Account 1CM363 | 10-04390_Mann0000475–0477 | |
| 49 | 4/16/2003 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS | MADWAA00306470–6471 | |
| 50 | 4/16/2003 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS | JPMSAF0013965 | |
| 51 | 2/29/2004 BLMIS Customer Statement for Account 1CM363 | MDPTPP01251283–1286 | |
| 52 | 2/29/2004 BLMIS Customer Statement for Account 1CM363 | 10-04390_Mann0000540–0543 | |
| 53 | 1/31/2004 - 2/27/2004 703 Account Statement | MADWAA00229293–9398 | |
| 54 | 1/31/2004 - 2/27/2004 703 Account Statement | JPMSAB0001515–1567 | |
| 55 | 12/31/2004 BLMIS Customer Statement for Account 1CM363 | MDPTPP01251343–1348 | |
| 56 | 12/31/2004 BLMIS Customer Statement for Account 1CM363 | 10-04390_Mann0000607–0612 | |
| 57 | 12/16/2004 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS | MADWAA00333863–8634 | |
| 58 | 12/16/2004 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS | JPMSAF0029657 | |
| 59 | 12/31/2005 BLMIS Customer Statement for Account 1CM363 | MDPTPP01251413–1418 | |

4

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | OBJECTION |
|---|---|---|---|
| 60 | 12/31/2005 BLMIS Customer Statement for Account 1CM363 | 10-04390_Mann0000677–0682 | |
| 61 | 12/1/2005 - 12/30/2005 703 Account Statement | JPMSAB0002089–2149 | |
| 62 | 3/31/2006 BLMIS Customer Statement for Account 1CM363 | MDPTPP01251432–1438 | |
| 63 | 3/31/2006 BLMIS Customer Statement for Account 1CM363 | 10-04390_Mann0000696–0702 | |
| 64 | 3/20/2006 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS | MADWAA00367011–7012 | |
| 65 | 3/20/2006 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS | JPMSAF0043602 | |
| 66 | 3/31/2007 BLMIS Customer Statement for Account 1CM363 | MDPTPP01251510–1515 | |
| 67 | 3/31/2007 BLMIS Customer Statement for Account 1CM363 | 10-04390_Mann0000774–0779 | |
| 68 | 3/7/2007 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS | MADWAA00203642–3643 | |
| 69 | 3/7/2007 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS | JPMSAF0054281 | |
| 70 | 10/31/2007 BLMIS Customer Statement for Account 1CM363 | MDPTPP01251551–1552 | |
| 71 | 10/31/2007 BLMIS Customer Statement for Account 1CM363 | 10-04390_Mann0000815–0816 | |
| 72 | 10/24/2007 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS | MADWAA00266152–6153 | |

| EX. NO. | DOCUMENT DESCRIPTION | BATES NO. | OBJECTION |
|---|---|---|---|
| 73 | 10/24/2007 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS | JPMSAF0061485 | |
| 74 | 4/30/2000 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665258–5260 | |
| 75 | 4/25/2000 509 Account 1CM579 Check to BAM LP | MADWAA00048606–8607 | |
| 76 | 10/31/2000 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665291–5295 | |
| 77 | 10/12/2000 509 Account 1CM579 Check to BAM LP | MADWAA00242399–2400 | |
| 78 | 11/30/2000 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665297–5302 | |
| 79 | 11/1/2000 - 11/30/2000 703 Account Statement | MADWAA00242269–2350 | |
| 80 | 4/30/2002 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665398–5403 | |
| 81 | 4/23/2002 509 Account 1CM579 Check to BAM LP | MADWAA00064596–4597 | |
| 82 | 4/23/2002 509 Account 1CM579 Check to BAM LP | JPMSAF0004164 | |
| 83 | 6/30/2002 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665412–5416 | |
| 84 | 6/25/2002 509 Account 1CM579 Check to BAM LP | MADWAA00110010–0011 | |
| 85 | 6/25/2002 509 Account 1CM579 Check to BAM LP | JPMSAF0005242 | |
| 86 | 4/30/2003 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665474–5476 | |

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | OBJECTION |
|---|---|---|---|
| 87 | 4/30/2003 BLMIS Customer Statement for Account 1CM579 | 10-04390_Mann0000047–0049 | |
| 88 | 4/16/2003 509 Account 1CM579 Check to BAM LP | MADWAA00306476–6477 | |
| 89 | 4/16/2003 509 Account 1CM579 Check to BAM LP | JPMSAF0013968 | |
| 90 | 1/31/2004 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665529–5534 | |
| 91 | 1/31/2004 BLMIS Customer Statement for Account 1CM579 | 10-04390_Mann0000102–0107 | |
| 92 | 1/6/2004 509 Account 1CM579 Check to BAM LP | MADWAA00235780–5781 | |
| 93 | 1/6/2004 509 Account 1CM579 Check to  BAM LP | JPMSAF0019901–9902 | |
| 94 | 3/31/2005 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665613–5617 | |
| 95 | 3/31/2005 BLMIS Customer Statement for Account 1CM579 | 10-04390_Mann0000184–0188 | |
| 96 | 3/2/2005 509 Account 1CM579 Check to BAM LP | MADWAA00159427–9428 | |
| 97 | 3/2/2005 509 Account 1CM579 Check to BAM LP | JPMSAF0032193 | |
| 98 | 4/30/2005 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665619–5621 | |
| 99 | 4/30/2005 BLMIS Customer Statement for Account 1CM579 | 10-04390_Mann0000190–0192 | |
| 100 | 4/8/2005 509 Account 1CM579 Check to BAM LP | MADWAA00165503–5504 | |

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | OBJECTION |
|---|---|---|---|
| 101 | 4/8/2005 509 Account 1CM579 Check to BAM LP | JPMSAF0033999 | |
| 102 | 12/31/2005 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665662–5667 | |
| 103 | 12/31/2005 BLMIS Customer Statement for Account 1CM579 | 10-04390_Mann0000233–0238 | |
| 104 | 12/8/2005 509 Account 1CM579 Check to BAM LP | MADWAA00364392–4393 | |
| 105 | 12/8/2005 509 Account 1CM579 Check to BAM LP | JPMSAF0040437 | |
| 106 | 1/31/2006 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665669–5675 | |
| 107 | 1/31/2006 BLMIS Customer Statement for Account 1CM579 | 10-04390_Mann0000240–0246 | |
| 108 | 1/5/2006 509 Account 1CM579 Check to BAM LP | MADWAA00361956–1957 | |
| 109 | 1/5/2006 509 Account 1CM579 Check to BAM LP | JPMSAF0041744 | |
| 110 | 4/30/2007 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665766–5771 | |
| 111 | 4/30/2007 BLMIS Customer Statement for Account 1CM579 | 10-04390_Mann0000332–0337 | |
| 112 | 4/17/2007 509 Account 1CM579 Check to BAM LP | MADWAA00267722–7723 | |
| 113 | 4/17/2007 509 Account 1CM579 Check to BAM LP | JPMSAF0056254 | |
| 114 | 7/31/2007 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665785–5787 | |

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | OBJECTION |
|---|---|---|---|
| 115 | 7/31/2007 BLMIS Customer Statement for Account 1CM579 | 10-04390_Mann0000352–0354 | |
| 116 | 7/25/2007 509 Account 1CM579 Check to BAM LP | MADWAA00279600–9601 | |
| 117 | 7/25/2007 509 Account 1CM579 Check to BAM LP | JPMSAF0058939 | |
| 118 | 10/31/2007 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665799–5800 | |
| 119 | 10/31/2007 BLMIS Customer Statement for Account 1CM579 | 10-04390_Mann0000365–0366 | |
| 120 | 10/24/2007 509 Account 1CM579 Check to BAM LP | MADWAA00266160–6161 | |
| 121 | 10/24/2007 509 Account 1CM579 Check to BAM LP | JPMSAF0061489 | |
| 122 | 1/31/2008 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665814–5816 | |
| 123 | 1/31/2008 BLMIS Customer Statement for Account 1CM579 | 10-04390_Mann0000383–0385 | |
| 124 | 1/23/2008 509 Account 1CM579 Check to BAM LP | MADWAA00290613–0614 | |
| 125 | 1/23/2008 509 Account 1CM579 Check to BAM LP | JPMSAF0064380 | |
| 126 | 4/30/2008 BLMIS Customer Statement for Account 1CM579 | MDPTPP01665821–5827 | |
| 127 | 4/30/2008 BLMIS Customer Statement for Account 1CM579 | 10-04390_Mann0000390–0396 | |
| 128 | 4/23/2008 509 Account 1CM579 Check to BAM LP | MADWAA00298075–8076 | |

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | OBJECTION |
|---|---|---|---|
| 129 | 4/23/2008 509 Account 1CM579 Check to BAM LP | JPMSAF0066967 | |
| 130 | 4/23/2008 509 Account 1CM579 Check to BAM LP | DBTCA_2_000048 | |

The Trustee reserves the right to rely upon and introduce any of the Defendants' exhibits, identified in Exhibit B, to amend or supplement the foregoing list of exhibits at any time prior to the time of trial, to identify additional exhibits for purposes of rebuttal or impeachment, whether or not designated herein, and to further supplement the foregoing list of exhibits as necessary in connection therewith.

# EXHIBIT B

## DEFENDANTS' [PRELIMINARY DRAFT PROPOSED] TRIAL EXHIBIT LIST

**The Defendants' counsel has not had access to their office since March where their trial notes and documents for this adversary proceeding and the BLMIS are kept. The Defendants have been forced to rely on whatever documents were preserved online and reproduced initial disclosure documents sent by the Trustee. The documents on the disks were identified only by data base and bates stamp. The result of the restricted access is evident from the Trustee's complaint that documents were incomplete or incorrectly cited. In contrast, the Trustee, whose counsel is also working remotely, has unrestricted assets to the entire case data base and its guide.**

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | TRUSTEE'S OBJECTION(S) |
|--------|---------------------|-----------|------------------------|
| 1-A | 509 Account Statements | JPMTAA0000184-186 | |
| 1-B | | JPMTAA0000220-222 | |
| 1-C | | JPMTAA0000251-253 | |
| 1-D | | MADWAA00332939-40 | |
| 1-E | | JPMTAA0000051-53 | |
| 2-A | 703 Account Statements | JPMSAB0004463-4 | Incomplete document; Correct bates: JPMSAB0004455–4517 |
| 2-B | | JPMSAB0004547 | Incomplete document; Correct bates: JPMSAB0004518–4570 |
| 2-C | | JPMSAB0004217-8 | Incomplete document; Correct bates: JPMSAB0004195–4256 |
| 2-D | | JPMSAB0009515-1567 | Document does not exist; Trustee reserves the right to object upon proper identification of the exhibit. |

1

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | TRUSTEE'S OBJECTION(S) |
|---|---|---|---|
| 2-E | | JPMSAB0003510-3579 | Incomplete document; Correct bates: JPMSAB0003510–3580 |
| 2-F | | JPMSAB0000152-210 | Incomplete document; Correct bates: JPMSAB0000152–0211 |
| 2-G | | JPMSAB0003129-3179 | |
| 2-H | | JPMSAB000001-48 | |
| 2-I | | JPMSAB0004518-4570 | |
| 2-J | | JPMSAB0009455- | Document does not exist; Trustee reserves the right to object upon proper identification of the exhibit. |
| 2-K | | JPMSAB0004195 | Incomplete document; Correct bates: JPMSAB0004195–4256 |
| 2-L | | MADWAA00048071-162 | |
| 2-M | | MADWAA000378499-566 | Document does not exist; Trustee reserves the right to object upon proper identification of the exhibit. |
| 2-N | | MADWAA000139882-975 | Document does not exist; Trustee reserves the right to object upon proper identification of the exhibit. |

2

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | TRUSTEE'S OBJECTION(S) |
|---|---|---|---|
| 2-O | | MADWAA00378501 | Incomplete document; Correct bates: MADWAA00378499–8566 |
| 2-P | | MADWAA01072688-714 | |
| 2-Q | | MADWAA00147886-000 | |
| 2-R | | MADWAA00389854-923 | |
| 3-A | BAM Checks | JPMSAF0004164 | |
| 3-B | | JPMSAF0005242 | |
| 3-C | | JPMSAF0013968 | |
| 3-D | | JPMSAF0019901 | Incomplete document; Correct bates: JPMSAF0019901–9902 |
| 3-E | | JPMSAF0032193 | |
| 3-F | | JPMSAF0040437 | |
| 3-G | | JPMSAF0041744 | |
| 3-H | | JPMSAF0056254 | |
| 3-I | | JPMSAF0058939 | |
| 3-J | | JPMSAF0061489 | |
| 3-K | | JPMSAF0064380 | |
| 3-L | | JPMSAF0066967 | |
| 3-M | | MADWAA000048606 | Incomplete document; Correct bates: MADWAA000048606–8607 |

3

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | TRUSTEE'S OBJECTION(S) |
|---|---|---|---|
| 4-A | BAM Account Documents | AMF00267043-51 | Incomplete document; Correct bates: AMF00267004–7081 |
| 5-A | BAM Account Statements | MDPTPP01667946-51 | Incomplete document; Correct bates: MDPTPP01667946–7969 |
| 5-B | | MDPTPP01667794-97 | Incomplete document; Correct bates: MDPTPP01667794–7801 |
| 5-C | | MDPTPP01667750-54 | Incomplete document; Correct bates: MDPTPP01667750–7769 |
| 5-D | | MDPTPP01667662-66 | Incomplete document; Correct bates: MDPTPP01667662–7685 |
| 5-E | | MDPTPP01667602-06 | Incomplete document; Correct bates: MDPTPP01667602–7625 |
| 5-F | | MDPTPP01667502-06 | Incomplete document; Correct bates: MDPTPP01667502–7521 |
| 5-G | | MDPTPP01677410-14 | Incomplete document; Correct bates: MDPTPP01677407–7411 |
| 5-H | | MDPTPP01667438-42 | Incomplete document; Correct bates: MDPTPP01667438–7457 |

4

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | TRUSTEE'S OBJECTION(S) |
|---|---|---|---|
| 5-I | | MDPTPP01667070-73 | Incomplete document; Correct bates: MDPTPP01667070–7085 |
| 5-J | | MDPTPP01666894-98 | Incomplete document; Correct bates: MDPTPP01666894–6913 |
| 5-K | | MDPTPP01666874-77 | Incomplete document; Correct bates: MDPTPP01666874–6889 |
| 5-L | | MDPTPP01666590-92 | Incomplete document; Correct bates: MDPTPP01666590–6595 |
| 5-M | | MDPTPP01666470-76 | Incomplete document; Correct bates: MDPTPP01666470–6485 |
| 5-N | | MDPTPP01666338-43 | Incomplete document; Correct bates: MDPTPP01666338–6349 |
| 5-O | | MDPTPP01666308-13 | Incomplete document; Correct bates: MDPTPP01666308–6319 |
| 5-P | | MDPTPP01666069-74 | Incomplete document; Correct bates: MDPTPP01666069–6086 |
| 5-Q | | MDPTPP01666013-18 | |

4827-6247-0589.8

| EX. NO. | DOCUMENT DESCRIPTION | BATES NO. | TRUSTEE'S OBJECTION(S) |
|---|---|---|---|
| 6-A | BAM Portfolio Management Reports | MDPTQQ00159830 | |
| 6-B | | MDPTQQ00159818 | |
| 6-C | | MDPTQQ00159807 | |
| 6-D | | MDPTQQ00159795 | |
| 6-E | | MDPTQQ00159783 | |
| 6-F | | MDPTQQ00159771 | |
| 6-G | | MDPTQQ00159759 | |
| 6-H | | MDPTQQ00159747 | |
| 6-I | | MDPTQQ00159735 | |
| 6-J | | MDPTQQ00159723 | |
| 7-A | Mann Account Documents | AMF00256536-45 | Incomplete document; Correct bates: AMF00256511–6547 |
| 8-A | Mann Account Statements | MDTPP01254892-97 | Incomplete document; Correct bates: MDPTPP01254892–4903 |
| 8-B | | MDTPP01254626-34 | Incomplete document; Correct bates: MDPTPP01254626–4635 |
| 8-C | | MDTPP01254658-63 | Incomplete document; Correct bates: MDPTPP01254658–4669 |
| 8-D | | MDTPP01254494-97 | Incomplete document; Correct bates: MDPTPP01254494–4501 |

6

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | TRUSTEE'S OBJECTION(S) |
|---|---|---|---|
| 8-E | | MDTPP01254298-303 | Incomplete document; Correct bates: MDPTPP01254298–4315 |
| 8-F | | MDTPP01254149-54 | Incomplete document; Correct bates: MDPTPP01254149–4160 |
| 8-G | | MDTPP01254015-22 | Incomplete document; Correct bates: MDPTPP01254015–4030 |
| 8-H | | MDTPP01253315-26 | Incomplete document; Correct bates: MDPTPP01253315–3353 |
| 9-A | Mann Checks | MADWAA00203642 | Incomplete document; Correct bates: MADWAA00203642–3643 |
| 9-B | | MADWAA00266152 | Incomplete document; Correct bates: MADWAA00266152–6153 |
| 9-C | | MADWAA00306470 | Incomplete document; Correct bates: MADWAA00306470–6471 |
| 9-D | | MADWAA00333863 | Incomplete document; Correct bates: MADWAA00333863–3864 |
| 9-E | | MADWAA00367011 | Incomplete document; Correct bates: MADWAA00367011–7012 |
| 10-A | Mann Portfolio Management Reports | MDPTQ00131127 | Incorrect bates number; Correct bates: MDPTQQ00131127 |

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | TRUSTEE'S OBJECTION(S) |
|---|---|---|---|
| 10-B | | MDPTQ00131116 | Incorrect bates number; Correct bates: MDPTQQ00131116 |
| 10-C | | MDPTQ00131104 | Incorrect bates number; Correct bates: MDPTQQ00131104 |
| 10-D | | MDPTQ00131092 | Incorrect bates number; Correct bates: MDPTQQ00131092 |
| 10-E | | MDPTQ00131080 | Incorrect bates number; Correct bates: MDPTQQ00131080 |
| 10-F | | MDPTQ00131068 | Incorrect bates number; Correct bates: MDPTQQ00131068 |
| 10-G | | MDPTQ00131056 | Incorrect bates number; Correct bates: MDPTQQ00131056 |
| 10-H | | MDPTQ00131044 | Incorrect bates number; Correct bates: MDPTQQ00131044 |
| 10-I | | MDPTQ00131032 | Incorrect bates number; Correct bates: MDPTQQ00131032 |
| 10-J | | MDPTQ00131020 | Incorrect bates number; Correct bates: MDPTQQ00131020 |
| 10-K | | MDPTQ00131008 | Incorrect bates number; Correct bates: MDPTQQ00131008 |
| 10-L | | MDPTQ00131984 | Incorrect bates number; Correct bates: MDPTQQ00131984 |
| 11-A | U.S. v. Bonventre et al., 10 cr. 00228 (LTS) | Bonventre Sentencing transcript, ECF 1441 | Relevancy; Lack of Probative Value |
| 12-A | U.S. v Peter Madoff, 10 cr 0228 (LTS) June 29, 2012 | Peter Madoff Plea Transcript | Relevancy; Lack of Probative Value |
| 13-A | JPMorgan Chase, End of Day Investment and Loan Sweep Service | www.jpmorgan.com | Require additional information, reserve objection |

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | TRUSTEE'S OBJECTION(S) |
|---|---|---|---|
| 14-A | S & P 500 historical performance | www.Macrotrends.net | Require additional information, reserve objection |
| 15-A | Bernard L. Madoff Investment Securities LLC., Registration of investment advisory business (2006) | advisorinfo.sec.gov | Require additional information, reserve objection |
| 16-A | Trading records for US Treasury securities | Unavailable due to lack of office access | Require additional information, reserve objection |
| 17-A | Customer Trade confirmations | Unavailable due to lack of office access | Require additional information, reserve objection |
| 18-A | BAM Investment Returns (9%) chart | Unavailable due to lack of office access | Lack of foundation; improper expert opinion; authentication; require additional information, reserve further objection |
| 19-A | Mann Investment Returns (9%) chart | Unavailable due to lack of office access | Lack of foundation; improper expert opinion; authentication; require additional information, reserve further objection |
| 20-A | Tax Cost Analysis-Mann | 002310-211 | Relevancy; Lack of Probative Value |
| 21-A | 1997 Mann Tax Return | 0001453-1561 | Relevancy; Lack of Probative Value |
| 21-B | 1998 Mann Tax  Return | 0001563-1697 | Relevancy; Lack of Probative Value |
| 21-C | 2000 Mann Tax Return | 0001695-1797 | Relevancy; Lack of Probative Value |
| 21-D | 2001 Mann Tax Return | 0001798-1951 | Relevancy; Lack of Probative Value |
| 21-E | 2002 Mann Tax Returns | 0001952-2110 | Relevancy; Lack of Probative Value |

9

| EX NO. | DOCUMENT DESCRIPTION | BATES NO. | TRUSTEE'S OBJECTION(S) |
|---|---|---|---|
| 21-F | **TRUSTEE EXHIBITS** | | |
| 22-A | 1/12/2001 Form BD for Bernard L. Madoff Investment Securities LLC | | |
| 23-A | 1/1/2001 BLMIS letter to Bank of NY | MESTABL00005744 | |
| 24-A | 1/1/2001 BLMIS letter to NSCC | MADTEE00544438 | |
| 25-A | 1/1/2001 BLMIS letter to OCC | MADTEE00544720–4730 | |
| 26-A | 1/1/2001 BLMIS letter to DTC | MESTABL00005745 | |

10