**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF, | Adv. Pro. No. 10-04749 (SMB) |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | |
| v. | |
| PHILIP F. PALMEDO, | |
| Defendant. | |

**TRUSTEE'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ........................................................................................................................2

ARGUMENT .............................................................................................................................4

I.    SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE NO
      MATERIAL FACTS ARE IN DISPUTE.........................................................................4

      A.    Legal Standard ......................................................................................................4

      B.    The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year
            Transfers of Fictitious Profits Made by BLMIS to Defendant ...............................5

            1.    BLMIS Made Every Two-Year Transfer with Actual Fraudulent
                  Intent and in Furtherance of the Fraud.........................................................6

II.   THE DEFENSES CAN BE DETERMINED AS A MATTER OF LAW........................15

      A.    As a Matter of Law, Defendant Did Not Give Value for Fictitious Profits...........15

      B.    The Transfers Were an Interest of the Debtor in Property.....................................16

            1.    SIPA and SIPC.............................................................................................17

            2.    Becoming a Member of SIPC .......................................................................19

            3.    Initiating a SIPA Liquidation .......................................................................19

            4.    Customer Property Under SIPA.....................................................................20

            5.    Madoff's Business ........................................................................................22

            6.    Madoff's Registration as a Broker-Dealer ..................................................23

            7.    Substantive Consolidation ...........................................................................24

            8.    The Trustee Can Recover Any Transfers of Customer Property...............26

      C.    Madoff's Purported Purchase of Securities Does Not Create a Genuine
            Issue of Material Fact..........................................................................................32

CONCLUSION.........................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
  Nos. 05 Civ. 9050(LMM), 03, MDL 1529, 2011 WL 1419617 (S.D.N.Y. Apr.
  7, 2011), *aff'd*, 748 F.3d 110 (2d Cir. 2014)............................................................5

*In re Adler Coleman Clearing Corp.*,
  195 B.R. 266 (Bankr. S.D.N.Y. 1996)....................................................................19

*Alexander v. Compton (In re Bonham)*,
  229 F.3d 750 (9th Cir. 2000) ..................................................................................31

*Armstrong v. Collins*,
  Nos. 01 Civ. 2437(PAC), 02 Civ. 2796(PAC), 02 Civ. 3620(PAC), 2010 WL
  1141158 (S.D.N.Y. Mar. 24, 2010) ..........................................................................9

*Bayou Accredited Fund, LLC v. Redwood Growth Partners L.P. (In re Bayou
  Grp., LLC)*,
  396 B.R. 810, 835 (Bankr. S.D.N.Y. 2008), *rev'd in part on other grounds*,
  *Bayou IV*, 439 B.R. 304 ............................................................................9, 14, 15

*Bayou Superfund v. WAM Long/Short Fund II (In re Bayou Grp., LLC)*,
  362 B.R. 624 (S.D.N.Y. 2007)................................................................................16

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
  397 B.R. 1 (S.D.N.Y. 2007).......................................................................................6

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
  380 F. Supp. 2d 334 (S.D.N.Y. 2005).......................................................................5

*In re Bernard L. Madoff Inv. Sec. LLC*,
  654 F.3d 229 (2d Cir. 2011)....................................................................................18

*In re Bernard L. Madoff*,
  No. 09-11893 (SMB) (Bankr. S.D.N.Y. Apr. 21, 2009)..........................................25

*In re Bevill, Bresler & Schulman, Inc.*,
  83 B.R. 880 (Bankr. D.N.J. 1988) .......................................................................5, 22

*Carney v. Lopez*,
  933 F. Supp. 2d 365 (D. Conn. 2013).......................................................................9

*In re Cassandra Grp.*,
  338 B.R. 583 (Bankr. S.D.N.Y. 2006).......................................................................1

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................4, 5

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re*
    *Bayou Grp. LLC)*,
    439 B.R. 284 (S.D.N.Y. 2010).............................................................. *passim*

*Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*,
    97 B.R. 503 (E.D. Ark. 1987) ......................................................................21

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
    Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774 (Bankr.
    S.D.N.Y. Jan. 3, 2014) ..................................................................................9

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund)*,
    359 B.R. 510 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397 B.R. 1
    (S.D.N.Y. 2007)...........................................................................................14

*Hayes v. Palm Seedlings Partners (In re Agric. Research & Tech. Grp.)*,
    916 F.2d 528 (9th Cir. 1990) .........................................................................7

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995)...........................................................................9

*In re Lehman Bros. Holdings*,
    445 B.R. 143 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478
    B.R. 570 (S.D.N.Y. 2012).............................................................................21

*Leonhardt v. Madoff*,
    No. 09-2032 (S.D.N.Y. Mar. 5, 2009) .........................................................24

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).......................................................................................4

*McHale v. Boulder Cap. (In re 1031 Tax Grp., LLC)*,
    439 B.R. 47 (S.D.N.Y. 2010)..............................................................9, 16, 17

*Moran v. Goldfarb*,
    No. 09-cv-7667 (RJS), 2012 WL 2930210 (S.D.N.Y. July 16, 2012).......................9

*In re Old Naples Sec., Inc.*,
    223 F.3d 1296 (11th Cir. 2000) ...................................................................29

*Picard v. Avellino*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016)................................................17, 27, 28

*Picard v. BAM L.P.*,
    608 B.R. 165 (Bankr. S.D.N.Y. Sept. 11, 2019)........................................23, 30, 34

*Picard v. Chais*,
    445 B.R. 206 (Bankr. S.D.N.Y. 2011) ...................................................................7

*Picard v. Cohen*,
    Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
    25, 2016) .................................................................................................6, 16, 17

*Picard v. Cohmad Sec. Corp.*,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) ...................................................................6

*Picard v. Fairfield Greenwich Ltd.*,
    762 F.3d 199 (2d Cir. 2014).................................................................................22

*Picard v. Flinn Invs., LLC*,
    463 B.R. 280 (S.D.N.Y. 2011).................................................................................5

*Picard v. Goldenberg*,
    Adv. Pro. No. 10-04946 (SMB), 2018 WL 3078149 (Bankr. S.D.N.Y. June
    19, 2018) .............................................................................................................1, 16

*Picard v. Greiff*,
    476 B.R. 715 (S.D.N.Y. 2012)....................................................................7, 14, 16

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011)...........................................................................7, 16

*Picard v. Legacy Capital Ltd.*,
    603 B.R. 682 (Bankr. S.D.N.Y. 2019)...................................................7, 9, 16, 34

*Picard v. Lowrey*,
    596 B.R. 451 (S.D.N.Y. 2019).............................................................................20

*Picard v. Nelson*,
    610 B.R. 197 (Bankr. S.D.N.Y. 2019) ...................................................... *passim*

*In re Picard*,
    917 F.3d 85 (2d Cir. 2019)...................................................................................22

*In re Primeline Sec. Corp.*,
    295 F.3d 1100 (10th Cir. 2002) ...........................................................................30

*Rosenman Family, LLC v. Picard*,
    395 F. App'x 766 (2d Cir. 2010) .........................................................................18

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) ............................................................................9, 10

*Sec. Inv'r Prot. Corp. v. Barbour*,
    421 U.S. 412 (1975)...........................................................................................18

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    Adv. Pro. Nos. 10-04387 (SMB), 10-04488 (SMB), 10-04350 (SMB), 10-
    05110 (SMB), 2018 WL 1442312, (Bankr. S.D.N.Y. Mar. 22, 2018) ....................1

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
    Madoff)*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015) ...........................................................5, 6, 17

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
    Madoff)*,
    522 B.R. 41 (Bankr. S.D.N.Y. 2014).....................................................................29

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
    Madoff Inv. Sec. LLC)*,
    424 B.R. 122 (Bankr. S.D.N.Y. 2010) .................................................................7, 18

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015) ....................7, 23

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    499 B.R. 416 (S.D.N.Y. 2013).................................................................................18

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    No. 12 MC 115(JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013), *aff'd*, 773
    F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015) .................................3

*SEC v. F.O. Baroff Co.*,
    497 F.2d 280 (2d Cir. 1974).....................................................................................18

*Town of Fairfield v. Madoff*,
    No. 09-5023735 (Conn. Super. Ct. Mar. 30, 2009) ................................................24

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016).....................................................................................22

*In re Weis Sec., Inc.*,
    No. 73 Civil 2332, 1976 WL 820 (S.D.N.Y. Aug. 2, 1976).....................................18

*Ying Jing Gan v. City of New York*,
    996 F.2d 522 (2d Cir. 1993)...............................................................................5, 15

**Statutes**

11 U.S.C. § 101(41) .........................................................................................................20

11 U.S.C. § 105(a) ................................................................................................3

11 U.S.C. § 109(a) ..............................................................................................20

11 U.S.C. § 544 ....................................................................................................3

11 U.S.C. § 548 .............................................................................................16, 27

11 U.S.C. § 548(a) ...............................................................................................3

11 U.S.C. § 548(a)(1) ..........................................................................................17

11 U.S.C. § 548(a)(1)(A) ................................................................................5, 17

11 U.S.C. § 548(c) ..............................................................................................16

11 U.S.C. § 548(d)(2)(a) ....................................................................................16

11 U.S.C. § 550(a) ................................................................................................3

11 U.S.C. § 550(a)(1) ...........................................................................................3

11 U.S.C. § 551 ....................................................................................................3

15 U.S.C. § 78ccc(a) ..........................................................................................19

15 U.S.C. § 78ccc(a)(2)(A) ................................................................................19

15 U.S.C. § 78ddd(c)(2) .....................................................................................19

15 U.S.C. § 78eee(b)(1) ......................................................................................28

15 U.S.C. § 78eee(b)(2)(A)(1) ...........................................................................19

15 U.S.C. § 78eee(b)(3) ......................................................................................20

15 U.S.C. § 78eee(b)(4) ......................................................................................20

15 U.S.C. § 78fff-2(c)(1) ....................................................................................18

15 U.S.C. § 78fff-2(c)(3) ...............................................................................*passim*

15 U.S.C. § 78fff(a) ............................................................................................18

15 U.S.C. § 78*lll*(4) ..............................................................................18, 21, 26

15 U.S.C. § 78*lll*(4)(D) ....................................................................................21

15 U.S.C. § 78*lll*(5) .........................................................................................20

15 U.S.C. § 78*o*(b) ...................................................................................................19, 20

**Rules**

17 C.F.R. § 240.15b1-3(b) ...........................................................................................19

17 C.F.R. § 240.15b6-1(b) ...........................................................................................19

17 C.F.R. § 240.15c3-3 ....................................................................................21, 26, 31

17 C.F.R. § 240.15c3-3(f) ............................................................................................21

17 C.F.R. § 249.501(a)..................................................................................................19

Fed. R. Bankr. P. 7056.................................................................................................1, 4

Fed. R. Bankr. P. 7056-1(a) ...........................................................................................4

Fed. R. Civ. P. 56 ............................................................................................................1

Fed. R. Civ. P. 56(a) .......................................................................................................4

Fed. R. Civ. P. 56(c)(1)...................................................................................................4

Fed. R. Evid. 803(22)......................................................................................................9

Fed. R. Evid. 807.............................................................................................................9

**Other Authorities**

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74
    (2002)...................................................................................................................20, 21

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff,

respectfully submits this memorandum of law in support of the Trustee's motion (the "Motion")

under Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 for

summary judgment as to Count One of the Trustee's complaint to avoid and recover the amounts

fraudulently transferred by BLMIS to defendant Philip F. Palmedo (the "Defendant").  The facts

underlying this Motion are fully set forth in the Trustee's Statement of Material Facts Pursuant to

Local Rule 7056-1 ("Stmt."), the Declaration of Nicholas J. Cremona ("Cremona Decl."), and

the Declarations of Bruce G. Dubinsky, Lisa M. Collura, and Matthew B. Greenblatt.

## PRELIMINARY STATEMENT

This avoidance and recovery action centers on the undisputable fact that in the two years

preceding the commencement of the SIPA liquidation (the "Two-Year Period"), Defendant

received $600,000 in fictitious profits from BLMIS.  As there are no material facts in dispute, the

Trustee is entitled to summary judgment to avoid and recover these transfers of fictitious profits.[1]

The Trustee has established his *prima facie* case that the transfers to Defendant were

made with the intent to hinder, delay, or defraud BLMIS's creditors and, therefore, are avoidable

and recoverable for the benefit of the BLMIS customer fund.  For decades, BLMIS perpetrated

the largest Ponzi scheme in history.  In their allocutions, Madoff and BLMIS employees

---

[1] The Trustee is also entitled to seek an award of prejudgment interest from the date the Trustee filed his complaint against Defendant on December 1, 2010 because "[f]ull compensation to the estate for the avoided transfer[s] normally requires prejudgment interest to compensate for the value over time of the amount recovered."  *In re Cassandra Grp.*, 338 B.R. 583, 599 (Bankr. S.D.N.Y. 2006) (awarding prejudgment interest from date of filed complaint "[t]o fully and fairly compensate [debtor's] creditors for their loss—not only of [the amount] that was fraudulently conveyed . . . but of the use of that money since the date of the demand"); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. Nos. 10-04387 (SMB), 10-04488 (SMB), 10-04350 (SMB), 10-05110 (SMB), 2018 WL 1442312, at *15 (Bankr. S.D.N.Y. Mar. 22, 2018) ("South Ferry R&R"); *Picard v. Goldenberg*, Adv. Pro. No. 10-04946 (SMB), 2018 WL 3078149, at *6 (Bankr. S.D.N.Y. June 19, 2018).

confirmed that BLMIS was a Ponzi scheme, starting at least in the 1970s and continuing through

BLMIS's collapse in December 2008.  Defendant admits he received $600,000 of fictitious

profits in the Two-Year Period.  The defenses invoked by Defendant—including value—fail as a

matter of law and thus do not defeat the Trustee's *prima facie* case.  Accordingly, as there are no

material facts in dispute, summary judgment should be granted in favor of the Trustee on Count

One in his Complaint.

## **BACKGROUND**

Defendant Philip F. Palmedo is a resident of St. James, New York.  Stmt. ¶ 107; Ans. ¶ 7,

*Picard v. Palmedo*, Adv. Pro. No. 10-04749 (SMB) (Bankr. S.D.N.Y. Aug. 13, 2015), ECF No.

41.[2]  Defendant was a customer of BLMIS's investment advisory business and held BLMIS

Account No. 1CM142 (the "Palmedo Account") in his name, "Philip F. Palmedo."  Stmt. ¶ 108;

Ans. ¶¶ 7, 34; *see also* Ex. B to Compl., ECF No. 1.

The Palmedo Account was opened on January 4, 1993 with an inter-account transfer from

BLMIS Account 1C0019 in the amount of $192,271.  Stmt. ¶ 126.  Based on documents

produced to the Trustee by Defendant, only $150,000 of principal was transferred from BLMIS

Account 1C0019 to the Palmedo Account.  *Id.*  Between January 4, 1993 and December 11,

2008, Defendant made two additional cash deposits via check in the aggregate amount of

$75,000.  Stmt. ¶ 127.  The one inter-account transfer and two cash deposits provided the

Palmedo Account with a total of $225,000 of principal.  Stmt. ¶ 128.

During the life of the Palmedo Account, Defendant made five cash withdrawals totaling

$1,010,000, which consisted of both principal and fictitious profits.  Stmt. ¶ 129.  Defendant

---

[2] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Palmedo*, Adv. Pro. No.
10-04749 (Bankr. S.D.N.Y.).

withdrew $785,000 of funds in excess of principal, representing fictitious profits over the life of the Palmedo Account.  Stmt. ¶ 130.  Within the Two-Year Period, Defendant made one cash withdrawal from the Palmedo Account totaling $600,000, which consisted entirely of fictitious profits.  Stmt. ¶ 131.

In 2010, the Trustee brought this adversary proceeding against Defendant to avoid and recover fraudulent transfers of fictitious profits.  Compl. ¶¶ 34–37.  Under Bankruptcy Code sections 105(a), 544, 548(a), 550(a), and 551 and the New York Debtor and Creditor Law, the Trustee sought to recover $785,000 of fictitious profits received by Defendant from BLMIS during the six years prior to the liquidation.  Compl. ¶ 37.  Under sections 548(a), 550(a)(1), and 551 of the Bankruptcy Code, the Trustee also sought to avoid and recover $600,000 of fictitious profits received by Defendant during the Two-Year Period prior to the liquidation ("Two-Year Transfers").  Stmt. ¶ 138; Compl. ¶ 37.  After the Trustee brought his complaint, the Second Circuit ruled that the Trustee is limited to recovery of the Two-Year Transfers. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12 MC 115(JSR), 2013 WL 1609154, at *3 (S.D.N.Y. Apr. 15, 2013), *aff'd*, 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015) ("*Section 546(e) Decision*").  On August 13, 2015, Defendant answered the Complaint.

On June 19, 2019, the Trustee served the expert reports of Bruce G. Dubinsky, Matthew B. Greenblatt, Lisa M. Collura, and Richard Diedrich.  Defendant did not seek to depose any of the Trustee's expert witnesses.  Discovery closed on December 16, 2019.

Following discovery, the case was ripe for mediation under the Order (1) Establishing Litigation Case Management Procedures for Avoidance Actions and (2) Amending the February 16, 2010 Protective Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re*

*Bernard L. Madoff*), Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Nov. 10, 2010), ECF No.

3141.  After a motion by Defendant to withdraw the reference to the bankruptcy court, to which

the Trustee consented, the district court referred the proposed motion for summary judgment to

this Court for proposed findings of fact and conclusions of law.  Memo Endorsement, *Picard v.

Palmedo*, No. 20-cv-01926 (PGG) (S.D.N.Y. June 8, 2020), ECF No. 5.  On June 9, 2020, the

Trustee requested a Local Rule 7056-1(a) pre-motion conference in order to file his motion for

summary judgment.  *See* Letter, ECF No. 93.  This Court held a pre-motion conference on July

29, 2020.  *See* Tr. of Hr'g, ECF No. 98.  This Motion follows.

## **ARGUMENT**

### I.     **SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE NO MATERIAL FACTS ARE IN DISPUTE**

#### A.     **Legal Standard**

Rule 56(a) of the Federal Rules of Civil Procedure, applicable to bankruptcy courts

pursuant to Fed. R. Bankr. P. 7056, provides that a court must grant summary judgment when

there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Factual positions are proven by either citing the record evidence—including declarations,

admissions, and interrogatory answers—or showing that an adverse party cannot produce

admissible evidence to support a fact.  Fed. R. Civ. P. 56(c)(1); *Matsushita Elec. Indus. Co. Ltd.

v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant need not show the absence of a

genuine dispute of material fact with respect to a point "on which the nonmoving party bears the

burden of proof."  *Celotex Corp.*, 477 U.S. at 325.

When the movant has discharged its burden, the non-movant must then "go beyond the

pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at

324 (internal quotation marks omitted). "[T]he nonmoving party may . . . not rely simply on

conclusory statements or on contentions that the affidavits supporting the motion are not

credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993). The non-

moving party may not oppose summary judgment "on the basis of an unreasonable view of the

facts." *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005).

### B.     The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year Transfers of Fictitious Profits Made by BLMIS to Defendant

Under SIPA § 78fff-(2)(c)(3), the Trustee may recover any transfers by the debtor

whenever customer property is insufficient to pay customer claims. To date, the Trustee has

recovered $14.345 billion of $20 billion owed to customers by the estate. *See* Trustee's Twenty-

Third Interim Report for the Period October 1, 2019 Through March 31, 2020, *Sec. Inv'r Prot.

Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789

(SMB) (Bankr. S.D.N.Y. Apr. 28, 2020), ECF No. 19502. Because customer property is

insufficient to pay the outstanding customer claims, the Trustee is authorized to recover the

transfers to Defendant. S*ec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard

L. Madoff)*, 531 B.R. 439, 453–54 (Bankr. S.D.N.Y. 2015) ("*Omnibus Good Faith Decision*");

*see also Picard v. Flinn Invs., LLC*, 463 B.R. 280, 284 (S.D.N.Y. 2011); *In re Bevill, Bresler &

Schulman, Inc*., 83 B.R. 880, 898 (Bankr. D.N.J. 1988).

The Trustee seeks to avoid and recover transfers of fictitious profits made to Defendant

under 11 U.S.C. § 548(a)(1)(A). The elements of this claim are: (i) a transfer of an interest of the

debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to

hinder, delay, or defraud" a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, Nos. 05 Civ.

9050(LMM), 03, MDL 1529, 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd*, 748 F.3d

110 (2d Cir. 2014). This Court has recognized that fictitious profit cases are strict liability cases.
Cremona Decl., Ex. 13 (Tr. of Oral Arg. at 114:10–11, *Picard v. Marilyn Bernfeld Tr.*, Adv. Pro.
No. 10-05143 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015), ECF No. 20); *see also id.* (Tr. of Oral
Arg. at 100:19, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (SMB) (Bankr. S.D.N.Y. Oct. 28,
2015, ECF No. 85) (fictitious profit count is "almost a strict liability count")). This is especially
true where, as here, Defendant admits receipt of the Two-Year Transfers. Stmt. ¶¶ 109–10; *see
also* Cremona Decl., Ex. 11 (Responses and Objections of Defendant Philip F. Palmedo to
Trustee's First Set of Interrogatories No. 9), Ex. 12 (Defendant Philip F. Palmedo Dep. Tr.) at
31:15–52:21; 65:15–24; Ex. B to Compl.

There is no genuine dispute regarding BLMIS's: (1) payment of fictitious profits within
the Two-Year Period to or for the benefit of Defendant, (2) interest in the transferred funds, and
(3) actual intent to hinder, delay, or defraud its creditors.

### 1.    BLMIS Made Every Two-Year Transfer with Actual Fraudulent Intent and in Furtherance of the Fraud

Starting with the last element of the Trustee's *prima facie* case, intent to defraud can be
established by showing that the debtor operated a Ponzi scheme. *See Christian Bros. High Sch.
Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp. LLC)*, 439 B.R. 284, 304–05
(S.D.N.Y. 2010) ("*Bayou IV*"); *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund
Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007) (citations omitted) (internal quotation marks omitted); *see
also Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr.
S.D.N.Y. Apr. 25, 2016) (citing *Omnibus Good Faith Decision*, 531 B.R. at 471) ("the Trustee is
entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to
have been made with actual fraudulent intent"); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330
(Bankr. S.D.N.Y. 2011) ("the fraudulent intent on the part of the debtor/transferor . . . is

established as a matter of law by virtue of the 'Ponzi scheme presumption'"); *Hayes v. Palm
Seedlings Partners (In re Agric. Rsch. & Tech. Grp.)*, 916 F.2d 528, 535 (9th Cir. 1990) ("the
debtor's actual intent to hinder, delay or defraud its creditors may be inferred by the mere
existence of a Ponzi scheme").

a.      <strong>BLMIS Was a Ponzi Scheme</strong>

BLMIS was engaged in a Ponzi scheme.  As the bankruptcy court held, "[t]he breadth
and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the
Ponzi scheme presumption, particularly in light of Madoff's criminal admission."  *Picard v.
Chais*, 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011); *see also Picard v. Katz*, 462 B.R. 447, 453 &
n.5 (S.D.N.Y. 2011) ("it is patent that all of Madoff Securities' transfers during the two-year
period were made with actual intent to defraud present and future creditors").  The existence of
the scheme has also been recognized by the district court and the Second Circuit.  *See, e.g.*, *Sec.
Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*,
424 B.R. 122, 125–33 (Bankr. S.D.N.Y. 2010); *Picard v. Greiff*, 476 B.R. 715, 718 (S.D.N.Y.
2012); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 773 F.3d
411, 415–16 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015) ("*Section 546(e) Decision*").

The relevant facts concerning the BLMIS Ponzi scheme are substantiated by the
allocutions of Madoff and BLMIS employees.  Stmt. ¶ 89; *see also Picard v. Nelson*, 610 B.R.
197, 208 (Bankr. S.D.N.Y. 2019) (relying on plea allocutions in finding that BLMIS was a Ponzi
scheme); *Picard v. Legacy Cap. Ltd.*, 603 B.R. 682, 691 (Bankr. S.D.N.Y. 2019) ("The
allocutions establish *prima facie* that Madoff ran BLMIS as a Ponzi scheme.").  Madoff admitted
to running a Ponzi scheme through BLMIS and that he did not execute trades on behalf of his
investment advisory clients.  Stmt. ¶¶ 90–97.  Frank DiPascali, Madoff's chief financial officer
and co-conspirator, admitted that Madoff had not executed trades on behalf of BLMIS's

7

investment advisory business ("IA Business") customers and that he knowingly caused false

account statements to be created reflecting false transactions: "[f]rom at least the early 1990s

through December of 2008 . . . [n]o purchases of [sic] sales of securities were actually taking

place in [customers'] accounts."  Stmt. ¶ 98.  DiPascali explained that he "used hindsight to file

historical prices on stocks then [he] used those prices to post purchase of [sic] sales to customer

accounts as if they had been executed in realtime.  On a regular basis [he] added fictitious trade

data to account statements of certain clients to reflect the specific rate of earn return that Bernie

Madoff had directed for that client."  Stmt. ¶ 99.

David Kugel, a manager and trader at BLMIS, admitted that he falsified trading records

as far back as the early 1970s.  Stmt. ¶¶ 100–01.  Kugel provided historical trade information to

create fake trades that, when included on the BLMIS account statements and trade confirmations

of IA Business clients, gave the appearance of profitable trading when no trading had actually

occurred.  Stmt. ¶ 101.  Irwin Lipkin, BLMIS's accountant, admitted BLMIS's revenue was

falsely inflated through fraudulent bookkeeping entries and annual audited reports.  Stmt. ¶ 102.

Eric Lipkin, payroll clerk at BLMIS, admitted BLMIS created fake reports replicating those of

the Depository Trust & Clearing Corporation in order to purportedly confirm non-existent

positions in the investment advisory accounts for auditors and the Securities and Exchange

Commission ("SEC").  Stmt. ¶¶ 103–04.  And Enrica Cotellessa-Pitz, BLMIS accountant and

comptroller, admitted investment advisory customer money was funneled to BLMIS's

proprietary trading and market making businesses to falsely inflate revenue and hide losses.

Stmt. ¶¶ 105–06.

Guilty pleas and admissions under oath are admissible to prove the existence of a Ponzi

scheme.  *See Nelson*, 610 B.R. at 209–10 ("Criminal plea allocutions are admissible under the

exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a judgment of a previous

conviction and FED. R. EVID. 807's residual exception to hearsay."); *Legacy*, 603 B.R. at 689

n.8 (collecting cases) ("The Court may rely on a plea allocution as evidence to support a fact.");

*Moran v. Goldfarb*, No. 09-cv-7667 (RJS), 2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012);

*Carney v. Lopez*, 933 F. Supp. 2d 365, 380 (D. Conn. 2013); *Bayou Accredited Fund, LLC v.

Redwood Growth Partners L.P. (In re Bayou Grp., LLC)*, 396 B.R. 810, 835 (Bankr. S.D.N.Y.

2008) ("*Bayou III*"), *rev'd in part on other grounds, Bayou IV*, 439 B.R. at 304; *McHale v.

Boulder Cap. (In re 1031 Tax Grp., LLC)*, 439 B.R. 47, 72 (S.D.N.Y. 2010); *Scholes v.

Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995); *Gowan v. Amaranth Advisors L.L.C. (In re Dreier

LLP)*, Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774, at *11 (Bankr.

S.D.N.Y. Jan. 3, 2014); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir.

1995) (taking judicial notice of guilty pleas in subsequent civil action by bankruptcy trustee).

Summary judgment on BLMIS's Ponzi scheme is appropriate based on these admissions

as they support a finding that "there is no genuine disputed issue of fact that BLMIS was a Ponzi

scheme . . . ." *Legacy*, 603 B.R. at 693; *see also Moran*, 2012 WL 2930210, at *4 (motion for

summary judgment granted and based on plea transcript from related Department of Justice

action where perpetrator admitted to orchestrating the Ponzi scheme under oath); *Bayou IV*, 439

B.R. at 307–08 (affirming summary judgment on fictitious profits from Ponzi scheme based on

evidence including guilty pleas of fraudsters); *In re 1031 Tax Grp., LLC*, 439 B.R. at 72

(granting summary judgment in part and concluding that Ponzi scheme existed with reliance on

evidence including perpetrator's superseding indictment and plea agreements); *Armstrong v.

Collins*, Nos. 01 Civ. 2437(PAC), 02 Civ. 2796(PAC), 02 Civ. 3620(PAC), 2010 WL 1141158,

at *24 (S.D.N.Y. Mar. 24, 2010) (motion for summary judgment granted and existence of Ponzi

9

scheme found where evidence was submitted including transcripts from perpetrator's allocution and sentencing); *Scholes*, 56 F.3d at 762–63 (affirming district court's reliance on guilty plea in finding actual intent to defraud).

Bruce Dubinsky, one of the Trustee's disclosed experts in this action, confirmed that the IA Business was a Ponzi scheme. *See Nelson*, 610 B.R. at 210–14. As set forth in Dubinsky's unrebutted report, BLMIS operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) the IA Business. Stmt. ¶ 13. The proprietary trading business traded for its own account to make money for BLMIS. The market-making business made markets in certain stocks, bonds, warrants and rights. Stmt. ¶¶ 14–15. The proprietary trading and market-making businesses were referred to within BLMIS as "House 5" and are collectively referred to as the "Proprietary Trading Business." Stmt. ¶ 16. The IA Business was designed to purportedly trade stocks to buy equities and to buy options on behalf of its customer accounts. Stmt. ¶ 17. The Proprietary Trading Business and IA Business were units of BLMIS both operated by Madoff. Stmt. ¶ 18.

At various times, BLMIS reported to its IA Business customers that the money they deposited with BLMIS was invested in investment strategies called the "convertible arbitrage" strategy or the "split-strike conversion" strategy. Stmt. ¶ 20. The evidence establishes that BLMIS did not execute either of the strategies on behalf of its IA Business customers. *Id*. Rather, Dubinsky analyzed BLMIS's trading records and determined that as far back as the 1970s, BLMIS used historical trade information to fabricate false trades for IA Business customers and reported those fake trades on customer statements. Stmt. ¶ 21.

By 1992, the IA Business changed its primary purported investment strategy to the split-strike conversion strategy, the strategy purportedly executed in the BLMIS account held by

10

Defendant.  Stmt. ¶ 22.  The split-strike conversion strategy, as purportedly executed by BLMIS,

involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b)

buying put options and selling call options to hedge against price changes in the underlying

basket of stocks, and (c) purchasing U.S. treasury bills ("T-Bills") when the money was "out of

the market."  Stmt. ¶ 23.  BLMIS never executed this strategy on behalf of its customers,

including Defendant.  In addition to evidence of the fabricated trades across all BLMIS IA

Business customer accounts, Dubinsky's analysis further confirmed the lack of any trading by

BLMIS on behalf of its IA Business customers based on (a) the impossible reported volume of

equity trades; (b) impossible equity and options trades reported outside the daily price range;

(c) the low volatility in its reported daily trading performance compared to the actual market

behavior and the performance achieved by BLMIS in the Proprietary Trading Business unit as

measured by the volume weighted average prices for its sales and purchases; (d) the consistently

positive rates of returns that did not "mirror" the volatility of the markets; (e) a lack of any

Depository Trust Corporation ("DTC") records to confirm the reported IA Business equity or

treasury trades; and (f) a lack of Options Clearing Corporation ("OCC") records to confirm the

reported IA Business options trades.  Stmt. ¶ 24.  And, Dubinsky verified that no T-Bills,

purportedly part of the split-strike conversion strategy, were purchased on behalf of IA Business

customers.  Stmt. ¶¶ 57–63.

### b.    BLMIS Paid Investor Redemptions from Customer Funds

The Trustee's expert, Lisa Collura, a forensic accountant and certified fraud examiner,

also analyzed the books and records of BLMIS.  *See Nelson*, 610 B.R. at 220–21.  Collura's

analysis shows that during the ten-year period before its collapse on December 11, 2008, BLMIS

primarily used three bank accounts for the IA Business: JPMorgan Chase Bank, N.A.

("JPMorgan") account #xxxxx1703 (the "703 Account"); JPMorgan account #xxxxxxxxx1509

(the "509 Account", together with the 703 Account, the "JPMorgan Accounts")); and Bankers

Trust account #xx-xx0-599 (the "BT Account").  Stmt. ¶ 69.  IA Business customers' cash

deposits were deposited (and commingled) into the 703 Account.  Stmt. ¶ 70.  IA Business

customer withdrawals were made through the JPMorgan Accounts and the BT Account, which

was a checking account entirely funded by the 703 Account during the period for which bank

records are available.  Stmt. ¶ 71.  The JPMorgan Accounts were linked commercial business

accounts.  Stmt. ¶ 72.  The 509 Account was a commercial controlled disbursement account that

was entirely funded by the 703 Account.  *Id.*

   The money in the 703 Account consisted almost entirely of customer deposits.  Stmt. ¶¶

72, 87.  Both Dubinsky and Collura confirmed that ninety-seven percent of all cash additions

into the 703 Account came directly from IA Business customers.  Stmt. ¶ 73.  The other three

percent of inflows into the 703 Account came from income earned from cash management

activities including (1) short-term investment activity made directly from the 703 Account

(including overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and

T-Bills); and (2) investments of BLMIS customer funds made through bank and brokerage

accounts held in the name of BLMIS or Madoff.  Stmt. ¶ 74.  Because the short-term

investments, including overnight sweeps, were made directly out of the 703 Account, the source

of the money for those investments was customer funds.  Stmt. ¶ 75.

   There were no inflows into the 703 Account from sales of securities for customer

accounts.  Stmt. ¶ 76.  There were no outflows from the 703 Account to purchase securities for

customer accounts.  Stmt. ¶ 77.  Apart from two short-term loans BLMIS received from

JPMorgan totaling $145 million in November 2005 and January 2006—both of which were

repaid by June 2006—the IA Business did not obtain loans from third parties or from the

Proprietary Trading Business sufficient to pay the IA Business customer withdrawals.  Stmt.

¶ 78.

The IA Business also did not receive payments of any cash dividends.  According to the

customer statements, the IA Business reported that it received cash dividends related to

purported trading and paid or credited them to the accountholders.  Stmt. ¶ 79.  Between 1998

and 2008, BLMIS reported that it had paid or credited its customers $4.3 billion in cash

dividends.  *Id*.  Of the more than 8,300 IA Business dividend transactions identified on the

customer account statements from 1998 to 2008, not one purported dividend payment matched to

a cash addition to the 703 Account.  Stmt. ¶ 80.  Dubinsky found no record of any dividends

being received by the IA Business.  Stmt. ¶ 81.

The IA Business did not have any legitimate income-producing activities.  The only

source of cash available for the IA Business to pay purported investment profits as well as

redemption requests was from cash that other IA Business customers deposited in the 703

Account.  Stmt. ¶ 82.  These transactions rendered BLMIS insolvent.  By no later than December

2002, BLMIS's assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion.

Stmt. ¶ 83.  By December 2008, the customer property on hand at BLMIS was grossly

insufficient to pay the claims of its customers.  Stmt. ¶ 84.

Defendant did not serve a rebuttal to the Trustee's experts' opinions that the funds in the

703 Account consisted of customer money, that the IA Business had no other source of funds, or

that customer redemptions were paid with funds from the 703 Account.  Nor did he depose the

Trustee's experts or identify any evidence—admissible or otherwise—to rebut the substantial

evidence demonstrating that Madoff was running a Ponzi scheme through BLMIS's IA Business

and that the transfers of fictitious profits received by Defendant comprised other customer deposits. Accordingly, the transfers were made with the intent to defraud.

### c. BLMIS's Two-Year Transfers to Defendant Were in Furtherance of the Fraud

In a Ponzi scheme, the Trustee need not prove that the debtor intended to hinder, delay, or defraud a *particular* creditor, but rather he must only establish that the transfers made to the transferee were in furtherance of a fraudulent scheme. *See Bayou IV*, 439 B.R. at 304; *Bayou III*, 396 B.R. at 826.

"Every payment made by the debtor to keep the scheme on-going was made with the actual intent to hinder, delay or defraud creditors, primarily the new investors." *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund)*, 359 B.R. 510, 518 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397 B.R. 1 (S.D.N.Y. 2007) (citation omitted). This is because, in a Ponzi scheme, the failure to honor an investor's withdrawal request "would promptly have resulted in demand, investigation, the filing of a claim and disclosure of the fraud." *Bayou III*, 396 B.R. at 843; *see also Greiff*, 476 B.R. at 723. Every redemption payment "in and of itself constituted an intentional misrepresentation of fact" of the investor's rights to their falsely inflated account statement and "an integral and essential part" of the fraud. *Bayou III*, 396 B.R. at 843 (emphasis in original). Thus, the transfers to Defendant were in furtherance of the fraudulent Ponzi scheme.

### d. BLMIS Made the Transfers to Defendant Within the Two-Year Period

The uncontroverted evidence shows that BLMIS transferred fictitious profits to or for the benefit of Defendant between December 11, 2006 and December 11, 2008, and Defendant does not dispute the date, receipt, and amount of the transfers. Stmt. ¶¶ 113–14, 117–38.

e.      **Defendant Has Not Presented Any Countervailing Evidence**

The Defendant has not and cannot come forward with evidence to rebut the Trustee's

*prima facie* case.  During discovery, Defendant failed to present any evidence, fact or expert, to

rebut the Trustee's proofs that BLMIS was a Ponzi scheme.  Defendant did not serve rebuttal

reports disputing the existence of a Ponzi scheme and took no depositions of any of the Trustee's

expert witnesses.  Absent such evidence, any attempt by Defendant to offer vague assertions,

unfounded credibility attacks, or proffers of evidence he would elicit on cross-examination of the

Trustee's expert witnesses is unavailing and does not present a genuine dispute of material fact

to withstand summary judgment.  *See Ying Jing Gan*, 996 F.2d at 532 (explaining that the

nonmoving party "may not rely simply on conclusory statements or on contentions that the

affidavits supporting the motion are not credible"); *see also Bayou III*, 396 B.R. at 825

(explaining that conjecture, surmise, or "metaphysical doubt," as well as self-serving conclusory

statements will not defeat summary judgment).

## II.      THE DEFENSES CAN BE DETERMINED AS A MATTER OF LAW

Defendant raises certain legal defenses, many of which have already been addressed and

rejected by this Court in many prior opinions in this liquidation.  Defendant cannot meet his

burden of establishing a triable issue of fact to defeat the Trustee's Motion.

### A.      As a Matter of Law, Defendant Did Not Give Value for Fictitious Profits

Having established that BLMIS transferred at least $600,000 in fictitious profits within

the Two-Year Period to Defendant with actual fraudulent intent, the Trustee is entitled to avoid

and recover the Two-Year Transfers.  To defeat the avoidance of a transfer on summary

judgment, Defendant must offer evidence sufficient to create a material issue of fact as to

whether he took (1) "for value . . . to the extent that [it] gave value to the debtor in exchange for

such transfer" and (2) "in good faith."  *Bayou IV*, 439 B.R. at 308 (alteration in original) (placing

15

burden of proving affirmative defense on transferee in trustee's motion for summary judgment);

11 U.S.C. § 548(c); *In re 1031 Tax Grp., LLC*, 439 B.R. at 73. Fictitious profits "may be

recovered regardless of the customers' good faith." *Katz*, 462 B.R. at 453; *see also Greiff*, 476

B.R. at 722–24.

"Value" includes satisfaction of an antecedent debt of the debtor. *See* 11 U.S.C.

§ 548(d)(2)(a). However, as a matter of law, Defendant cannot establish that he took the

transfers of fictitious profits "for value" because such false profits were not on account of a valid

antecedent debt. *Cohen*, 2016 WL 1695296, at *11. Courts uniformly hold that any payments

received by an investor in excess of the amount he or she originally invested are avoidable as a

fraudulent transfer. *See Bayou Superfund v. WAM Long/Short Fund II (In re Bayou Grp., LLC)*,

362 B.R. 624, 636 (S.D.N.Y. 2007); *see also Bayou IV*, 439 B.R. at 337 ("[V]irtually every court

to address the question has held unflinchingly that to the extent that investors have received

payments in excess of the amounts they have invested, those payments are voidable as fraudulent

transfers." (internal quotation marks omitted)); *Katz*, 462 B.R. at 453 (fictitious profits—

transfers made by BLMIS to its customers in excess of principal—were in excess of value);

*Nelson*, 610 B.R. at 233–37; *Legacy*, 603 B.R. at 693–700; *Goldenberg*, 2018 WL 3078149, at

*4 (collecting cases) ("the argument that BLMIS customers gave value under section 548(c) . . .

has been rejected by the District Court and this Court no less than six times"); *Cohen*, 2016 WL

1695296, at *10 (it is a bedrock principle of fraudulent transfer law that "[a] transferee does not

give value beyond his deposits of principal").

Defendant offers no reason or evidence to permit this Court to alter this universal rule.

## B.    The Transfers Were an Interest of the Debtor in Property

For purposes of avoidance and recovery, BLMIS is deemed under SIPA to have an

interest in the transferred property; thus, the transfers here are avoidable under section 548 of the

Bankruptcy Code. *See* 15 U.S.C. § 78fff-2(c)(3) (transferred customer property is "deemed to have been the property of the debtor"); *Cohen*, 2016 WL 1695296, at \*5 ("BLMIS transferred customer property to [defendant], and under SIPA § 78fff-2(c)(3) such property is 'deemed to have been property of the debtor'"); *In re 1031 Tax Grp., LLC*, 439 B.R. at 68–70 (finding that, in a Ponzi scheme, money reflected in bank account statements "in the name of a debtor is presumed to be property of the bankruptcy estate" for purposes of 11 U.S.C. § 548(a)(1)).

The Trustee anticipates that Defendant will challenge whether the transfers were "an interest of the debtor in property." *See* 11 U.S.C. § 548(a)(1)(A). Pointing to checks that list the name Bernard L. Madoff instead of BLMIS, Defendant will argue that the transfers he received came from Bernard L. Madoff, rather than BLMIS, and are therefore unrecoverable by the Trustee. In support, Defendant will point to *Picard v. Avellino*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016), which held that the Trustee could not recover transfers prior to 2001, when BLMIS was converted from a sole proprietorship to an LLC. But unlike the Trustee's case in *Avellino*, in which he sought to recover transfers prior to 2001, here, the Trustee only seeks to avoid transfers of fictitious profits within the Two-Year Period. Indeed, this Court has already ruled that the Trustee may avoid and recover Two-Year Transfers, regardless of the change in the Debtor's corporate form from a sole proprietorship to a limited liability company in 2001. *See Omnibus Good Faith Decision*, 531 B.R. at 485. Defendant's argument mischaracterizes the statutory framework created by SIPA and the relevance of his receipt of customer property.

### 1.    SIPA and SIPC

In enacting SIPA, Congress fashioned a program for protecting customer property—that is, property placed with a broker-dealer for the purchase of securities where title to such property always remained with the customer.

This program included the creation of SIPC, a nonprofit, private membership corporation to which most registered broker-dealers are required to belong. When one of its members fails, SIPC protects those customers by initiating a SIPA liquidation, a form of liquidation proceeding applicable only to SIPC member firms. *See SEC v. F.O. Baroff Co.*, 497 F.2d 280, 281 (2d Cir. 1974) (holding that the object of SIPA and SIPC is to protect customers in the brokerage industry). Although a SIPA liquidation is similar to a bankruptcy and incorporates certain provisions of the Bankruptcy Code, it is "tailored to achieve SIPA's objectives," *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 133, one of which is the prompt return of customer property to customers. SIPA § 78fff(a); *see also Sec. Inv'r Prot. Corp. v. Barbour*, 421 U.S. 412, 416 (1975).

To do so, SIPC specifies a trustee to liquidate the business and any assets of the member-broker and recover customer property wrongfully transferred or unlawfully converted by the broker. SIPA §§ 78*lll*(4), 78fff-2(c)(3). These funds form the corpus of the customer property estate, from which the trustee makes distributions to customers of their ratable share of customer property. SIPA § 78fff-2(c)(1). SIPA prioritizes this customer property estate, which is distinct from the general bankruptcy estate for the broker-dealer member firm. SIPA § 78fff-2(c)(1); *see In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011) ("*Net Equity Decision*"); *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010); *In re Weis Sec., Inc.*, No. 73 Civil 2332, 1976 WL 820, at *6−7 (S.D.N.Y. Aug. 2, 1976); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 499 B.R. 416, 420 (S.D.N.Y. 2013) ("*Antecedent Debt Decision*"). The customer property estate is composed of customer property, including recovered assets, which are earmarked to satisfy customers' net equity claims. By contrast, the general estate is made up of the broker-dealer's assets available to

satisfy the claims of general creditors. *See In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 270 (Bankr. S.D.N.Y. 1996).

### 2.    Becoming a Member of SIPC

The "members" of SIPC include "all persons registered as broker-dealers" with the SEC under section 78*o*(b) of Title 15.  SIPA § 78ccc(a)(2)(A).  SIPC membership, and thus SIPA protection, arises from a broker-dealer's registration with the SEC, without regard to the corporate form of the broker-dealer.  SIPA § 78ccc(a).

Under section 78*o*(b), a broker-dealer applies for registration with the SEC on SEC Form BD (the uniform form for broker-dealer registrations).  *See* 17 C.F.R. § 249.501(a).  Once registered with the SEC, the broker-dealer is assigned a registrant number, becomes a member of SIPC, and is required to pay into the SIPC fund by annual assessments.  SIPA § 78ddd(c)(2).

If an entity succeeds to and continues the business of a broker-dealer previously registered with the SEC, and the succession is based on a change in the predecessor's form of organization, it files a Form BD Amendment.  SEC Rule 15b1-3(b), 17 C.F.R. § 240.15b1-3(b).  The successor entity continues the business and SIPC membership of its predecessor.  When a firm ceases to do business as a broker-dealer, it withdraws from registration with the SEC by filing an SEC BDW form (the uniform request form for broker-dealer withdrawal) through the Central Registration Depository.  17 C.F.R. § 249.501(a); 17 C.F.R. § 240.15b6-1(b).  Once it is de-registered, the former broker-dealer ceases being a SIPC member.

### 3.    Initiating a SIPA Liquidation

If SIPC determines that one of its members has failed or is danger of failing to meet its obligations to customers, it applies for a customer protective decree in district court.  The district court acquires jurisdiction over the broker-dealer and its property wherever located.  SIPA § 78eee(b)(2)(A)(1).  The decree places the firm in liquidation and appoints a trustee specified by

19

SIPC to liquidate the business of the debtor-broker.  SIPA § 78eee(b)(3).  The liquidation is then

removed to the bankruptcy court.  *Id*. § 78eee(b)(4).

The term "debtor" has a special definition under SIPA: "a *member* of SIPC with respect

to whom an application for a protective decree has been filed under section 78eee(a)(3) of this

title."  SIPA § 78*lll*(5) (emphasis added).  This differs from the Bankruptcy Code, where a

"debtor" is an individual, partnership, or corporation.  11 U.S.C. §§ 109(a), 101(41).  Because

SIPC membership tracks SEC registration, SIPC names the SEC-registered broker-dealer that is

at risk of failing as the "debtor" in the application for the protective decree.  Thus, registration

under 15 U.S.C. § 78*o*(b) is the key to who the SIPC member is, and, if the member is placed

into liquidation, who the debtor is.

### 4.      Customer Property Under SIPA

Customer property is a term of art in the securities industry, and means property held by a

broker-dealer but that belongs to customers.  *See* Michael P. Jamroz, *The Customer Protection*

*Rule*, 57 Bus. Law. 1069, 1071–74 (2002); *see, e.g.*, *Picard v. Lowrey*, 596 B.R. 451, 469–70

(S.D.N.Y. 2019).  When customers invest their cash and securities with a broker, they transfer

possession, but not title, of their money to the broker.  The broker never owns that money, but

rather is legally bound to hold that money in reserve for its customers.  *See Lowrey*, 596 B.R. at

469–70 (noting that "customer property" in securities industry refers to property held by broker-

dealer but belongs to its customers).

Customer protection rules, promulgated by the SEC as required by SIPA, require broker-

dealers to safeguard customers' securities and cash in a reserve fund.  This reserve would form

the corpus of the firm's estate for distribution to customers if the firm went into liquidation under

SIPA.  Exchange Act Release No. 34-9856, Adoption of Rule 15c3-3, 37 Fed. Reg. 25224,

25225 (Nov. 29, 1972), 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3"); *see also* Jamroz, 57 Bus. Law. at 1071–74.

Customer property includes securities and cash held for customers under Rule 15c3-3; assets derived from or traceable to customer property; and, under SIPA § 78*lll*(4)(D), other debtor property that a trustee must allocate to the fund of customer property as necessary to remedy the debtor's non-compliance with the segregation requirements of Rule 15c3-3. Customer property retains its nature and special protections under SIPA, even if the broker transfers that property to others.  SIPA § 78*lll*(4) (including in the definition of customer property "the proceeds of any such property transferred by the debtor, including property *unlawfully converted*" (emphasis added)); *see also Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*, 97 B.R. 503, 508 (E.D. Ark. 1987) (Rule 15c3-3 deposit is not subject to bank's setoff claim because it is customer property); Rule 15c3-3(f) (Rule 15c3-3 account cannot be subject to bank lien because it consists of customer property).  This broad definition recognizes customers' enduring rights to the property they gave to their broker for safekeeping.  Indeed, once a broker-dealer goes into liquidation under SIPA, the SIPA designation of customer property is the seamless continuation of Rule 15c3-3, taking effect the moment the broker-dealer fails.  *In re Lehman Bros. Holdings*, 445 B.R. 143, 191–92 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012).

Because customer property is not the broker's property, when a broker goes into liquidation, it is also not "debtor" property, which places it outside the reach of Bankruptcy Code provisions for avoidance and recovery of transfers.  SIPA § 78fff-2(c)(3) circumvents this prohibition by creating a legal fiction that confers standing on SIPA trustees to recover customer property by treating such property as though it were "property of the debtor" in an ordinary

bankruptcy.  *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014).  SIPA

§ 78fff-2(c)(3) allows a trustee to "recover any property transferred by the debtor which, except

for such transfer, would have been customer property."  This provision is designed "to recover

securities that would have been part of the fund of customer property but for a prior transfer to a

customer."  *In re Bevill, Bresler & Schulman*, 83 B.R. at 893.  "The inquiry in an avoidance

action, therefore, is: if the transfer did not occur, would the securities have been part of the fund

of customer property?"  *Id.*  If the answer is yes, then that cash or securities are customer

property subject to recovery by SIPA trustees.

### 5.    Madoff's Business

Madoff operated his firm from January 1960 until it collapsed in 2008.  It began as a sole

proprietorship and was then converted to a single member LLC in 2001.  Stmt. ¶¶ 7–8, 85.

During its existence, it operated under the names Bernard L. Madoff and Bernard L. Madoff

Investment Securities and, after 2001, as Bernard L. Madoff Investment Securities LLC.  Stmt.

¶ 8.

Although Madoff operated three business units at his firm: proprietary trading, market

making, and investment advisory, the IA Business was the vehicle through which he ran the

Ponzi scheme.  Stmt. ¶¶ 13, 19–24.  When IA Business customers sent him money to purchase

securities, Madoff did not reserve it but converted and commingled customer money into a single

JPMorgan checking account.  Stmt. ¶¶ 70, 92.  This pool of commingled funds was used to pay

customer redemptions.  Stmt. ¶¶ 82, 92; *see also In re Picard*, 917 F.3d 85, 92 (2d Cir. 2019)

(noting that Madoff commingled funds into JPMorgan checking account and sent customers

redemptions from commingled account); *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset

Mgmt.*, 843 F.3d 561, 564 (2d Cir. 2016) ("BLMIS deposited customer investments into a single

commingled checking account and . . . [w]hen customers sought to withdraw money from their

accounts, including withdrawals of the fictitious profits that BLMIS had attributed to them,

BLMIS sent them cash from the commingled checking account."); *Picard v. BAM L.P.*, 608 B.R.

165, 174  (Bankr. S.D.N.Y. Sept. 11, 2019) (citing *Section 546(e) Decision*, 773 F.3d at 415

(customer funds were put into commingled bank account used to pay redemptions)).

### 6.      Madoff's Registration as a Broker-Dealer

In January 1960, Bernard L. Madoff registered as a broker-dealer with the SEC.  He was

assigned Registrant Number 8-8132.  Stmt. ¶ 7; Cremona Decl., Ex. 1 (SEC Form BD).  Through

that registration, the broker-dealer became a member of SIPC when SIPA was enacted in 1970.

*Id.*

When Madoff changed the corporate form of his broker-dealer business to an LLC, he

filed an Amended Form BD to reflect that change using the same SEC registrant number, 8-

8132; he did not file a new application for registration.  Stmt. ¶ 9.  Madoff attested that

"[e]ffective January 1, 2001, predecessor will transfer to successor all of predecessor's assets and

liabilities related to predecessor's business.  The transfer will not result in any change in

ownership or control."  Stmt. ¶ 10; Cremona Decl., Ex. 2 (Amended Form BD).  He further

certified that no "accounts, funds, or securities of customers of the *applicant* are held or

maintained by such other *person*, firm, or organization."  Stmt. ¶ 11 (quoting Cremona Decl., Ex.

2 (Amended Form BD) (emphasis in original)).  Accordingly, the LLC succeeded to the sole

proprietorship's SEC registrant number 8-8132.  *See id*.  After these steps were taken—forming

the LLC and transferring the assets, liabilities, and ability to conduct securities trading from the

sole proprietorship to the LLC—the sole proprietorship no longer operated as a broker-dealer or

in any other capacity.  *See id*.

In December 2008, SIPC sought a protective decree under SIPA § 78eee that the

customers of a member broker-dealer needed protection under SIPA.  Application of SIPC ¶ 2,

*SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 5 ("SIPC

Application"). The SIPC Application named the member broker-dealer that was registered with

the SEC as of December 2008 under Registrant Number 8-8132: Bernard L. Madoff Investment

Securities LLC. *See id*. The district court entered the decree and appointed the Trustee "for the

liquidation of the *business of the Defendant* with all the duties and powers of a trustee as

prescribed in SIPA." Order ¶ 2, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15,

2008), ECF No. 4 ("Protective Decree") (emphasis added).

### 7.    Substantive Consolidation

In the days and months immediately following the revelation of Madoff's Ponzi scheme,

an SEC receiver was appointed for BLMIS,[3] the SIPA Trustee was appointed for BLMIS, a Joint

Provisional Liquidator was appointed for Madoff's London entity, and the United States

Government instituted a criminal proceeding against Madoff. Stmt. ¶¶ 1–6. By March 15, 2009,

the Government indicated its intent to forfeit certain of Madoff's personal assets. *See*

Government's Notice of Intent to Seek Forfeiture of Certain Assets, *United States v. Madoff*, No.

09-cr-213 (DC) (S.D.N.Y. Mar. 15, 2009), ECF No. 59. But as of April 2009, no chapter 7 case

had been initiated against Madoff personally. Creditors sued him in various jurisdictions outside

the bankruptcy court. *See, e.g.*, *Leonhardt v. Madoff*, No. 09-2032 (S.D.N.Y. Mar. 5, 2009);

*Town of Fairfield v. Madoff*, No. 09-5023735 (Conn. Super. Ct. Mar. 30, 2009).

In response, certain creditors filed an involuntary bankruptcy petition against Madoff,

citing the need for his personal estate to be marshaled and distributed in a coordinated,

consistent, and efficient manner alongside the liquidation of his company. These creditors were

concerned with the "specter of overlapping asset administrations which could delay or prejudice

---

[3] The receivership was terminated upon the appointment of a SIPA Trustee.

distributions to creditors," in light of the Government's forfeiture of assets and the SEC seeking

disgorgement and civil penalties of Madoff and his firm.  Pet. at 7, *SEC v. Madoff*, No. 08-cv-

10791 (LLS) (S.D.N.Y. Apr. 1, 2009), ECF No. 37.  The district court agreed that the

appointment of a chapter 7 trustee for Madoff would stem the proliferation of lawsuits against

Madoff and enable an orderly and equitable administration of his personal estate.  Order at 3-4,

*SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Apr. 10, 2009), ECF No. 47.  In allowing the

creditors to commence the involuntary case against Madoff, the district court specifically

referenced that they should be able to target "that portion of Mr. Madoff's property that is neither

forfeitable criminally nor subject to the liquidation of BLMIS under SIPA."  *Id*. at 4.

The bankruptcy court subsequently appointed Alan Nisselson as Chapter 7 Trustee for

Madoff.  Notice of Appointment of Trustee Alan Nisselson, *In re Bernard L. Madoff*, No. 09-

11893 (SMB) (Bankr. S.D.N.Y. Apr. 21, 2009), ECF No. 13.  Thereafter, the SIPA Trustee

moved to substantively consolidate the SIPA liquidation and the chapter 7 bankruptcy because

BLMIS and Madoff were the alter ego of the other, Madoff used BLMIS as his "personal piggy

bank," and Madoff did not have any other significant source of income other than that derived

from his broker-dealer subject to liquidation under SIPA.  Memorandum of Law in Support of

Joint Motion for Entry of Order Substantively Consolidating the Estate of Bernard L. Madoff

into the SIPA Proceeding of Bernard L. Madoff Investment Securities, *Sec. Inv'r Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 5,

2009), ECF No. 196.

The Chapter 7 Trustee consented to the relief sought and the two trustees established a

protocol that was embodied in the bankruptcy court's order substantively consolidating the

BLMIS and the Bernard L. Madoff estates.  *See* Consent Order Substantively Consolidating the

Estate of Bernard L. Madoff into the SIPA Proceeding of Bernard L. Madoff Investment

Securities LLC and Expressly Preserving All Rights, Claims and Powers of Both Estates, *Sec.

Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr.

S.D.N.Y. June 10, 2009), ECF No. 252 (the "Substantive Consolidation Order").  The

Substantive Consolidation Order merged the chapter 7 estate of Bernard L. Madoff into the

BLMIS SIPA proceeding *nunc pro tunc*, and all assets and liabilities of the two estates were

deemed consolidated as of the date of the filing of the liquidation proceedings.  The Substantive

Consolidation Order expressly preserved the SIPA Trustee's powers to avoid and recover

fraudulent transfers of customer property and the Chapter 7 Trustee's powers to pursue recovery

of Madoff's non-customer property.  *Id.* ¶¶ 4, 7 ("the SIPA Trustee is authorized to pursue

claims on behalf of the consolidated estate as representative of and fiduciary for the BLMIS

SIPA Proceeding and as subrogee and assignee of creditors' claims for, among other things, the

avoidance and recovery of transferred property").

### 8.    The Trustee Can Recover Any Transfers of Customer Property

When IA Business customers sent money to BLMIS for the purpose of purchasing

securities, it became "customer property" under SIPA.  SIPA § 78*lll*(4).  BLMIS used the

JPMorgan Accounts as the firm's Rule 15c3-3 account.  Stmt. ¶¶ 69–82, 87–88; 17 C.F.R. §

240.15c3-3.  Whether operated as a sole proprietorship or as an LLC, BLMIS's assets were

composed primarily of customer property and its liabilities were composed primarily of amounts

owed to customers.  As indicated in the Amended Form BD, all assets and liabilities were

transferred from the sole proprietorship to the LLC.  *See* Stmt. ¶¶ 9–11 (citing Amended Form

BD).

The protections provided by SIPA mandate that the Trustee can recover transfers of

customer property by the SIPC member, regardless of its corporate form.  Despite this, in another

of the Trustee's avoidance actions, this Court ruled that the SIPA Trustee did not have the power

to recover transfers made before 2001 when BLMIS was converted to an LLC from a sole

proprietorship. *See Avellino*, 557 B.R. at 110.[4]  Because the SIPC Application and the Protective

Decree only named the LLC (rather than the LLC *and* the defunct predecessor sole

proprietorship), the only "debtor" for purposes of the avoidance and recovery provisions of SIPA

and the Bankruptcy Code was the LLC.[5]  Under that rationale, the SIPA Trustee can only recover

transfers made after the broker-dealer business was converted to an LLC in 2001.  Any customer

property transferred prior to that time is unrecoverable—because the Chapter 7 Trustee cannot

recover it either, as he can only recover *Madoff's* non-customer property.

    The Trustee anticipates that Defendant will improperly extrapolate from this ruling to

argue that the Trustee cannot recover the transfers made to them between 2006-2008 because the

drawer of those checks listed Bernard L. Madoff rather than Bernard L. Madoff Investment

Securities LLC and the SIPA Trustee can only recover those transfers made by the LLC.

However, the *Avellino* decision was limited to the Trustee's standing to recover transfers prior to

2001.  It did not address ownership of transferee bank accounts at the time avoidable transfers

were made to Defendant.  There are additional problems with Defendant's position addressed

herein—most notably, that the LLC was the holder of the JPMorgan Accounts from which the

transfers were made, as this Court so found and as the evidence presented to this Court shows.

---

[4] In *Avellino*, unlike the instant case, the Trustee alleged that the defendants lacked good faith when they received the transfers.  On that basis, the Trustee sought to recover all transfers made to those defendants during the life of their BLMIS accounts, which dated back to 1978.  Here, the Trustee is only seeking to recover transfers made between 2006-2008 when BLMIS was an LLC.

[5] SIPA and the Bankruptcy Code work in tandem to allow the Trustee to recover transfers of customer property.  Under § 548, a trustee may recover a "transfer of the debtor."  Under SIPA § 78fff-2(c)(3), a SIPA trustee may recover "any property transferred by the debtor which, except for such transfer, would have been customer property."

*See Nelson*, 610 B.R. at 207; *see supra* Part I.B.1.b.  But the factual and legal predicates

underpinning *Avellino* are wrong, making Defendant's argument nothing but a diversion.

First, there was no error in naming only the LLC in the Protective Decree.  SIPA requires

a protective decree when a SIPC-member broker-dealer fails.  SIPA § 78eee(b)(1).  The *only*

SIPC *member* at the time of failure was the LLC, as the sole proprietorship had ceased to operate

almost eight years prior, and thus the LLC was the only entity that *could have been* named in the

Protective Decree.  There is no requirement in SIPA that a protective decree identify every name

or form of organization under which the broker-dealer member of SIPC formerly operated to

provide the broker-dealer's customers with the protections of SIPA.  The protective decree

names the SEC registrant/SIPC member, which is sufficient to encompass all customer

property—in whatever form—ever possessed by that member.

With no monitoring function over broker-dealers, SIPC steps in only when a member is

in danger of failing—usually in precipitous circumstances leading to the failure.  In order to

protect customers and return their property promptly, SIPC must act quickly to commence the

liquidation proceeding.  Imposing a requirement on SIPC to name every predecessor entity when

commencing a liquidation—before there is an investigation by a SIPA trustee into the member's

operations—would place SIPC in a Catch-22.  By waiting to file a liquidation proceeding to

investigate a member's corporate structure and operations, customers are placed in greater risk

through delay and dissipation of customer assets.  But filing a liquidation proceeding without

doing so means that the eventual trustee that is appointed may not be able to fully recover all

customer property.  Imposing an extra statutory requirement to name not only the current

member but any predecessor entities on SIPC is at odds with Congress' intent in passing SIPA:

customer protection.  Not surprisingly then, there is no such requirement in the statute itself.

Second, when the Trustee was appointed, it was for the liquidation of the *business* of the broker-dealer. There are numerous undisputed facts that show that the sole proprietorship and the LLC continued uninterrupted as a single business dealing with customer property since Madoff registered as a broker-dealer with the SEC in 1960, including:

- Customer property was deposited into the same JPMorgan commercial banking account when BLMIS operated as a sole proprietorship and as an LLC. Stmt. ¶¶ 69–82, 87–88.

- The customers of the sole proprietorship became the customers of the LLC when it changed corporate form. Stmt. ¶¶ 9–11.

- When Madoff converted the sole proprietorship to an LLC, he expressly identified it to the SEC as an amendment to an existing broker-dealer's registration—not a new application of a separate broker-dealer seeking to register with the SEC. *Id.*

- The SEC registration number of BLMIS has always remained 8-8132 throughout the entire course of its business. Stmt. ¶¶ 7–11.

- Madoff reported to the SEC that he transferred all assets and liabilities, which by definition includes bank accounts, from the sole proprietorship to the LLC. Stmt. ¶¶ 9–11.

Indeed, this Court recognized as much, stating that Madoff has always been a member of SIPC, and "the incorporation of BLMIS as a limited liability company continued his business without change . . . . Thus, nothing has changed since 1960 except for the business form that Madoff used to conduct his Ponzi scheme." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014). Because the Trustee is appointed for the liquidation *of the business* of the debtor, such liquidation necessarily entails the liquidation of any predecessor conducting the same business, using the same SEC registrant number, on behalf of its customers with their customer property.

Third, SIPA makes clear that a SIPA trustee is authorized to recover customer property wherever it lies. SIPA protection focuses on "whether there was actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation." *In re Old*

*Naples Sec., Inc.*, 223 F.3d 1296, 1302 (11th Cir. 2000) (internal quotation marks omitted); *see also In re Primeline Sec. Corp.*, 295 F.3d 1100, 1107 (10th Cir. 2002) ("Whether a claimant deposited funds 'with the debtor' does not depend simply on to whom claimants made their checks payable . . . [t]he relevant inquiry is whether the brokerage firm actually received, acquired or possessed claimants property."). Thus, as long as a trustee can show that the property in question was customer property received by the broker-dealer, he has the authority to recover it, wherever it lies. SIPA § 78fff-2(c)(3); *see also BAM L.P.*, 608 B.R. at 176 ("I do not mean to suggest that the deposit of customer funds into a Chase account in the name of Madoff or Madoff Securities changes the nature of customer funds or prevents the Trustee from avoiding and recovering the Two-Year Transfers.").

The fact that a broker-dealer may have operated under a different legal form many years prior to the SIPA liquidation does not change a SIPA trustee's rights and powers to recover that customer property for the benefit of its owners—the customers. Focusing on the name on a check or the corporate from of the broker-dealer at a particular time shifts the focus away from SIPA's customer property regime and instead allows the fraudster to determine the circumstances under which customer property can be recovered. Where, as here, there is no dispute that the Trustee is seeking to recover transfers comprising customer property, the form of the broker-dealer at the time of transfer is simply irrelevant.

Fourth, the Substantive Consolidation Order changed nothing about the SIPA Trustee's rights to customer property. If anything, it was a "belt and suspenders" order to ensure that none of Madoff's assets slipped through the cracks given that the Government was pursuing forfeiture, the SIPA Trustee was pursuing customer property, and the Joint Provisional Liquidators were marshaling the assets of Madoff's London entity. The order expressly states that the SIPA

Trustee will retain his powers to recover customer property notwithstanding the consolidation of the estates. Such reservations did not in any way change the rights and powers that were conferred on the SIPA Trustee as a result of the commencement of the SIPA liquidation. Instead, those reservations in the order were necessary because absent express preservation, the substantive consolidation of two debtors' estates could have extinguished both trustees' avoidance powers altogether. *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 768–69 (9th Cir. 2000) ("Absent express preservation of the trustee's avoidance power, an order of substantive consolidation would ordinarily eliminate that power.").

Finally, taken to its logical conclusion, because BLMIS's only assets were funds in the JPMorgan Accounts, Defendant's argument means that there is no customer property in the SIPA liquidation and there is no estate representative who can recover the funds transferred out of that bank account. Such an outcome would leave a vast amount of customer property outside the reach of the SIPA liquidation, something SIPA does not intend. This result cannot be reconciled with the order appointing the Trustee, the Substantive Consolidation Order, prior precedent in this case, nor with the plain language of SIPA.

In sum, as long as the SIPA Trustee can show that the property he is seeking to recover is customer property, he has the power to recover it, whether that property is held in an account with the letters "LLC" or not. Such property never belonged to Madoff, the sole proprietorship, or the LLC, regardless of whose name was on the bank account. That is what SEC Rule 15c3-3 (promulgated at the direction of SIPA) means. Whatever particular bank account a fraudster chooses to park customer property in or however that particular bank account is denominated cannot change the nature of customer property or the Trustee's duty to recover that property and return it to its rightful owners. That is what SIPA and SEC Rule 15c3-3 intend.

31

C.     **Madoff's Purported Purchase of Securities Does Not Create a Genuine Issue
of Material Fact**

The Trustee also anticipates that Defendant will argue that Madoff used money from his

investment advisory customers to purchase securities, which appeared on Defendant's BLMIS

statements.  Defendant has offered no witnesses—fact or expert—to support this argument.  In

contrast, the Trustee's expert witness, Dubinsky—a certified fraud examiner and forensic

accountant with more than thirty years of experience in financial fraud investigations—

conducted several analyses upon which he concluded that BLMIS did not conduct any trading on

behalf of its IA Business customers.  Stmt. ¶¶ 19–24.

Dubinsky found many instances where the volume that BLMIS claimed to have

purchased or sold on behalf of all IA Business customers exceeded the volume of equities traded

for the entire market.  Stmt. ¶¶ 25–28.  Dubinsky also analyzed the equity and options trades that

were priced outside the daily price range.  Stmt. ¶¶ 29–30.  For the period of 2000-2008,

Dubinsky determined that there were 99,972 equity transactions executed outside the daily

market traded price range, and 34,501 options transactions traded outside of the daily price

range.  *Id.*  The absence of actual trading was also reflected in the prices at which the IA

Business purportedly bought and sold shares using the split-strike conversion strategy.  Stmt. ¶¶

31–35.  To further test whether the IA Business engaged in trading, Dubinsky analyzed the

volatility of the IA Business's reported average annual rate of return for the split-strike

conversion strategy as compared with the volatility of the annual rate of return reported by

Bloomberg for the two major market indices—the S&P 100 Index and the Dow Jones Industrial

Average.  Stmt. ¶ 36.  Because the IA Business's split-strike conversion strategy was supposedly

engineered around the S & P 100, the IA Business's returns should have performed similarly to

the S&P 100 Index.  Stmt. ¶ 37.  This analysis showed that the volatility in the IA Business rates of return did not mirror the volatility of the rates of return of the major indices.  Stmt. ¶¶ 38–40.

Additionally, all equity trades made by BLMIS should have been reflected in the DTC records pertaining to BLMIS's single account with the DTC—an organization in the United States that clears and settles equity transactions in the U.S. market.  Stmt. ¶ 41.  Dubinsky's analysis confirmed that the equity securities that were cleared through BLMIS's DTC account were traded by the Proprietary Trading Business; no IA Business trades were cleared through BLMIS's DTC account.  Stmt. ¶¶ 42–46.  He concluded that the IA Business did not execute the equity trades reflected on the customer statements.  Stmt. ¶ 47; *see also* Stmt. ¶¶ 48–51.  Similarly, the options purportedly executed for the customer accounts in the IA Business could not be reconciled with the records of the OCC, an organization that clears and settles options transactions in the U.S. market.  Stmt. ¶¶ 52–55.  Based on Dubinsky's analysis of these records, he concluded that BLMIS did not conduct any options trading on behalf of its IA Business customers.  Stmt. ¶ 56.

Besides purchasing equity securities and options, BLMIS also claimed it would intermittently invest IA Business customer funds in T-Bills as part of the split-strike conversion strategy.  Stmt. ¶ 57.  While BLMIS purchased T-Bills with customer funds as a way to obtain interest on all the customer cash it was holding, these purchases did not match the allocation of T-Bill transactions that appeared on customer statements.  Stmt. ¶ 58.  Dubinsky's analysis confirmed that although BLMIS purchased T-Bills for cash management purposes, the volume of T-Bills that appeared on the customer statements dwarfed the aggregate volume of T-Bills actually purchased and held by BLMIS.  Dubinsky prepared a summary chart of his review of these voluminous records, which accurately represents his comparison of the T-Bill positions:

Table 5
Comparison of Year-End US Treasury Positions: Proprietary Trading Business vs. IA Business

| Year-End | Proprietary Trading Business | IA Business | Proprietary Trading Business positions as a percent of IA Business positions |
|---|---|---|---|
| 2002 | $84,000,000 | $30,975,765,000 | 0.27% |
| 2003 | $70,000,000 | $33,643,020,000 | 0.21% |
| 2004 | $70,000,000 | $37,935,258,000 | 0.18% |
| 2005 | $75,000,000 | $40,913,910,000 | 0.18% |
| 2006 | $70,000,000 | $48,342,420,000 | 0.14% |
| 2007 | $80,000,000 | $56,990,055,000 | 0.14% |

Stmt. ¶¶ 59–63.  Accordingly, the T-Bill positions that appeared on the customer statements were fictitious.  *Id.*; *see also Nelson*, 610 B.R. at 214, 234 n.37 ("Dubinsky's analysis demonstrated that the T-Bill transactions that appeared in the customer statements were fictitious and bore no relationship to the actual T-Bills purchased by BLMIS and documented in the DTC records.").

Frank DiPascali, Madoff's right-hand employee, testified that the IA Business used funds in the 703 Account to purchase T-Bills as a cash management tool but the T-Bills were not purchased for IA Business customers, and he and other BLMIS employees created fictitious T-Bill positions in customer statements.  Stmt. ¶¶ 64–68; *see also Nelson*, 610 B.R. at 226, 234 n.37.  "[T]he purchase of T-Bills was part of the cash management system used by BLMIS to sustain the Ponzi scheme and 'did not transform BLMIS into a legitimate enterprise or prohibit the Trustee's reliance on the Ponzi scheme presumption.'"  *BAM L.P.*, 608 B.R. at 175 n.15 (quoting *Legacy*, 603 B.R. at 691).  The operators of Ponzi schemes "often engage in some legitimate transactions.  If the legitimate transactions further the scheme or are funded by the scheme they are part of the scheme and do not insulate the legitimate transactions from the taint of the scheme."  *Nelson*, 610 B.R. at 234 (citing *Legacy*, 603 B.R. at 691–93).

The evidence and opinions of the Trustee's expert witness and Mr. DiPascali's testimony unequivocally demonstrate that no securities or T-Bills were purchased by BLMIS for its IA

34

Business customers, including Defendant.  Absent expert opinion, the Defendant cannot create

an issue of material fact where none exists simply because he disagrees.  Accordingly, this

anticipated defense fails as a matter of law.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant summary

judgment on Count One of the Trustee's Complaint and enter an order avoiding the transfers of

fictitious profits that BLMIS made to Defendant within the Two-Year Period, and requiring

Defendant to return such transfers or the value thereof to the Trustee.

Dated: August 28, 2020
      New York, New York

                           */s/ Nicholas J. Cremona*
                           Baker & Hostetler LLP
                           45 Rockefeller Plaza
                           New York, New York 10111
                           Telephone: (212) 589-4200
                           Facsimile: (212) 589-4201
                           David J. Sheehan
                           Email: dsheehan@bakerlaw.com
                           Nicholas J. Cremona
                           Email: ncremona@bakerlaw.com
                           Seanna R. Brown
                           Email: sbrown@bakerlaw.com
                           Maximillian S. Shifrin
                           Email: mshifrin@bakerlaw.com

                           *Attorneys for Irving H. Picard, Trustee*
                           *for the Substantively Consolidated SIPA*
                           *Liquidation of Bernard L. Madoff Investment*
                           *Securities LLC and the Chapter 7 Estate of*
                           *Bernard L. Madoff*