**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-04749 (SMB) |
| Plaintiff, | |
| v. | |
| PHILIP F. PALMEDO, | |
| Defendant. | |

**TRUSTEE'S STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated chapter 7

estate of Bernard L. Madoff ("Madoff"), in support of his motion for summary judgment in the

above-referenced proceeding against defendant Philip F. Palmedo (the "Defendant"),

respectfully submits this statement of material facts for which there is no genuine issue to be

tried under Local Rule 7056-1.

## I.    Background and the Trustee

1.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced an action in the United States District Court for the Southern District of New York.  Compl., *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 11, 2008), ECF No. 1.

2.    On December 11, 2008, the United States Government initiated a criminal action against Madoff for criminal violations of federal securities laws, including, *inter alia*, securities fraud, investment advisor fraud, and mail and wire fraud.  Compl., *United States v. Madoff*, No. 08-mj-02735 (S.D.N.Y. 2008), ECF No. 1.

3.    On December 15, 2008, under 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Application of SIPC at 10, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 5.  Thereafter, under 15 U.S.C. § 78eee(a)(4)(B), SIPC filed an application in the district court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by the Securities Investor Protection Act ("SIPA").  *Id.* at 2–3.

4.    Also, on December 15, 2008, the district court granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

> i.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C. § 78eee(b)(3);
>
> ii.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15 U.S.C. § 78eee(b)(3); and
>
> iii.    removed the case to the bankruptcy court pursuant to 15 U.S.C. § 78eee(b)(4).

Order, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4 ("SIPC

Liquidation Order").

5.    By orders dated December 23, 2008 and February 4, 2009, respectively, the

bankruptcy court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789

(SMB) (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 11; Order, *Sec. Inv'r Prot. Corp. v. Bernard

L. Madoff Inv. Sec. LLC*, Adv. Pro. No 08-01789 (SMB) (Bankr. S.D.N.Y. Feb. 4, 2009), ECF

No. 69.

6.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, the bankruptcy court substantively consolidated the chapter 7 estate of

Madoff into the SIPA Proceeding.  Involuntary Petition, *In re Bernard L. Madoff*, Adv. Pro. No.

09-11893 (SMB) (Bankr. S.D.N.Y. Apr. 13, 2009), ECF No. 1; Consent Order, *Sec. Inv'r Prot.

Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y.

June 9, 2009), ECF No. 252.

## II.    BLMIS Operated a Ponzi Scheme Through Its Investment Advisory Business

### A.    BLMIS's Business

7.    In January 1960, Bernard L. Madoff registered as a broker-dealer with the SEC.

He was assigned registrant number 8-8132.  Through that registration, the broker-dealer became

a member of SIPC when SIPA was enacted in 1970.  SIPC Liquidation Order; Declaration of

Nicholas J. Cremona, dated August 28, 2020 ("Cremona Decl."), Ex. 1 (SEC Form BD for

Bernard L. Madoff dated Dec. 31, 1959 (PUBLIC0003607)).

8.    Beginning in 1960 and until January 1, 2001, BLMIS operated as a sole

proprietorship.  Declaration of Bruce G. Dubinsky, dated August 28, 2020 ("Dubinsky Decl."),

Attach. A (Expert Report of Bruce G. Dubinsky, dated January 16, 2019 ("Dubinsky Report")) ¶ 36.  During its existence, it operated under the names Bernard L. Madoff and Bernard L. Madoff Investment Securities and, after 2001, as Bernard L. Madoff Investment Securities LLC.  *Id.* ¶ 38.

9.    Effective as of January 1, 2001, BLMIS was registered as a New York single member limited liability company.  On January 12, 2001, BLMIS amended its SEC Form BD to reflect its change in corporate form from a sole proprietorship to a single member limited liability company and all the assets and liabilities of the sole proprietorship were transferred to the limited liability company.  Cremona Decl., Ex. 2 (Amended Form BD dated Jan. 12, 2001).

10.    In response to the direction in the Amended Form BD to "[b]riefly describe details of the *succession* including any assets or liabilities not assumed by the *successor* [BLMIS]," (emphasis in original), Madoff replied:

> EFFECTIVE JANUARY 1, 2001, PREDECESSOR WILL TRANSFER TO SUCCESSOR ALL OF PREDECESSOR'S ASSETS AND LIABILITIES, RELATED TO PREDECESSOR'S BUSINESS. THE TRANSFER WILL NOT RESULT IN ANY CHANGE IN OWNERSHIP OR CONTROL.

Cremona Decl., Ex. 2 (Amended Form BD) at Question 5 (emphasis in original).

11.    Madoff further certified that no "accounts, funds, or securities of customers of the *applicant* are held or maintained by such other *person*, firm, or organization."  *Id.* at Question 8(c) (emphasis in original).

12.    In 2006, BLMIS registered as an investment advisor.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 39.

13.    BLMIS operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business ("IA Business").  *Id.* ¶ 36.

14.     The proprietary trading business traded for its own account to make money for BLMIS. *Id.* ¶¶ 36, 46.

15.     The market-making business made markets in certain stocks, bonds, warrants and rights. *Id.*

16.     The proprietary trading and market-making businesses were referred to within BLMIS as "House 5" and are collectively referred to as the "Proprietary Trading Business." *Id.* ¶ 36.

17.     The IA Business was designed to purportedly trade stocks to buy equities and to buy options on behalf of its customer accounts. *Id.* ¶¶ 41–44.

18.     The Proprietary Trading Business and the IA Business were units of BLMIS, both operated by Madoff. *Id.* ¶¶ 36, 48.

**B.     BLMIS Was Not Trading Securities**

19.     Bruce Dubinsky, a forensic accountant with more than 30 years of experience in financial fraud investigations, was retained by the Trustee as an expert witness in this matter. Mr. Dubinsky conducted numerous analyses from which he concluded that BLMIS did not conduct any trading on behalf of its IA Business customers. *Id.* at Section VI.A.

20.     At various times, BLMIS reported to its IA Business customers that the money they deposited with BLMIS was invested in investment strategies called the "convertible arbitrage" strategy or the "split-strike conversion" strategy.   BLMIS did not execute either strategy on behalf of its IA Business customers. *Id.* ¶¶ 19–26.

21.     Mr. Dubinsky analyzed BLMIS's execution of the convertible arbitrage strategy and determined that trading never occurred dating back to the 1970s. *Id.* at Section VI.A.(1)(a).

22.     By 1992, the IA Business changed its primary purported investment strategy to

5

the split-strike conversion strategy. *Id.* at Section VI.A.(1)(b), specifically ¶ 155.

23.     The split-strike conversion strategy, as purportedly executed by BLMIS, involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing treasury bills when the money was "out of the market."  The strategy was purportedly set up by BLMIS so that the purchase of put options and the sale of call options would create a collar around the stock to reduce the volatility of BLMIS's portfolio.  BLMIS did not conduct this strategy on behalf of its customers. *Id.* ¶¶ 156–58.

24.     Mr. Dubinsky's analysis demonstrated that BLMIS did not conduct any trading on behalf of its IA Business customers based on (a) the impossible reported volume of equity trades; (b) the impossible equity and options trades reported outside the daily price range; (c) the low volatility in its reported daily trading performance compared to the actual market behavior and the performance achieved by BLMIS in the Proprietary Trading Business unit as measured by the volume weighted average prices for its sales and purchases; (d) the consistently positive rates of returns that did not "mirror" the volatility of the markets; (e) a lack of any Depository Trust Corporation ("DTC") records to confirm the reported IA Business equity or treasury trades; and (f) a lack of Options Clearing Corporation ("OCC") records to confirm the reported IA Business options trades. *Id.* at Section VI.A.(1)(c)(i)-(vi), A.(1)(e)(i)-(iv).

### i.      Volume of Equity Trades

25.     Mr. Dubinsky analyzed equity trades that the IA Business reportedly made in the split-strike conversion strategy between January 2000 and November 2008.  His analysis compared the daily volumes for certain stocks reported as purchased or sold by the IA Business on the aggregated customer statements with the actual market volumes sold as reported by

Bloomberg. *Id.* ¶¶ 159–60.

26.    Mr. Dubinsky found many instances where the volume that BLMIS claimed to have purchased or sold on behalf of all IA Business customers exceeded the volume of equities traded for the entire market. *Id.*

27.    For example, on July 14, 2000, the aggregated IA Business customer statements reported purchases of 2,822,680 shares of AIG (as reflected in the column titled "IA Business Purported Value"), but the total market volume that traded that day for all of AIG shares in the market was only 1,692,800 (as reflected in the column titled "Actual Market Value"). Similarly, the IA Business reported trading 17,709,440 shares of GE on September 13, 2000, but the total market volume that traded all day for GE shares in the market was only 7,604,800. *Id.* ¶ 159, Ex. 11 to Dubinsky Report ("Split-Strike Conversion IA Business Equity Volume Analysis, Analyzed Time Period"); *see also* Ex. 12 to Dubinsky Report ("Split-Strike Conversion IA Business Options Volume Analysis, Analyzed Time Period").

28.    Mr. Dubinsky concluded that BLMIS's trading in excess of market volumes demonstrated that the IA Business did not trade on behalf of its customers. *Id.* at Section VI.A.(1)(c), ¶¶ 159–60, Exs. 11–12 to Dubinsky Report.

## ii.    Equity and Options Trades Priced Outside Daily Price Range

29.    For the analyzed period of 2000-2008, Mr. Dubinsky determined that there were 99,972 equity transactions executed outside the daily market traded price range. The purported prices for these transactions exceeded the daily high price by as much as $8.96 and were below the daily low by as much as $105.04. There was no evidence in the BLMIS books and records that the almost 100,000 transactions were mistakes, and there were no DTC records evidencing that the trades were actually executed. Mr. Dubinsky opined that equity trades that were reported as having been executed outside the daily price range of the entire U.S. equities market

could not have occurred. *Id.* ¶¶ 161–62, Ex. 13 to Dubinsky Report ("Split-Strike Conversion IA Business Equity Price Analysis, Analyzed Time Period").

30.    Mr. Dubinsky performed the same analysis on options trades for the same time period and identified 34,501 options transactions traded outside of the daily price range.  He found that the options traded above the daily high price by as much as $15.25 higher and by as much as $6.05 below the daily low price.  Mr. Dubinsky opined, as with the equity trades, that the reported options trades purportedly executed outside the daily price range could not have occurred. *Id.* ¶¶ 164–66, Ex. 14 to Dubinsky Report ("Split-Strike Conversion IA Business Options Price Analysis, Analyzed Time Period").

### iii.    Volume Weighted Average Price Analysis

31.    The absence of actual trading was also reflected in the prices at which the IA Business purportedly bought and sold shares using the split-strike conversion strategy.  Mr. Dubinsky conducted a Volume Weighted Average Price ("VWAP") analysis of the daily purchases and sales reported by the IA Business and the Proprietary Trading Business. *Id.* ¶¶ 168–72.

32.    VWAP is a trading benchmark that gives the average price a security has traded throughout the day, based on both volume and price.  The VWAP is a widely used industry benchmark that allows a firm to see how well its traders are doing compared to the rest of the market. *Id.* ¶¶ 168–69.

33.    Based on Mr. Dubinsky's analysis, he determined that the IA Business purportedly executed 83% of the daily buy transactions by share volume *below* the VWAP, and 72% of the daily sell transactions by share volume *above* the VWAP.   In other words, BLMIS had the uncanny ability to buy low and sell high at a remarkable rate compared to the rest of the market. *Id.* ¶ 170.

8

34.     Mr. Dubinsky further compared the IA Business's purchase and sale of the same stock actually traded by the Proprietary Trading Business on the same days.  The Proprietary Trading Business matched average VWAP of traders.  The IA Business, however, consistently outperformed VWAP by such wide margins that it evidenced the fictitious nature of the trades. *Id.* ¶¶ 171–72.

35.     Mr. Dubinsky concluded that the unrealistic VWAP results demonstrated that the IA Business did not trade on behalf of its customers.  *Id.* ¶¶ 170–72.

iv.     **Annual Rates of Return**

36.     To further test whether the IA Business engaged in trading, Mr. Dubinsky analyzed the volatility of the IA Business's reported average annual rate of return for the split-strike conversion strategy as compared with the volatility of the annual rate of return as reported by Bloomberg for the two major market indices, the S&P 100 Index and the Dow Jones Industrial Average (the "Dow Jones") from December 31, 1996 through December 11, 2008.  *Id.* ¶¶ 177–78.

37.     Because the IA Business's split-strike conversion strategy was supposedly engineered around the S&P 100, with a basket of stocks in the S&P 100 and using S&P index options, the IA Business's returns should have performed similarly to the S&P 100 Index.  In other words, if the market goes down, the returns should have gone down and vice versa.  *Id.* ¶ 177.

38.     Mr. Dubinsky's analysis showed, however, that the volatility in the IA Business rates of return did not mirror the volatility of the rates of returns of the major indices.  The IA Business rates of return stayed within a small range, generally between 10-12% for most years and going up to 20% for the year of 1999.  *Id.* ¶¶ 178, 180.  The returns for the major market indices ranged from a high of 31% to a low of -37% (specifically, the S&P 100 swinging widely

9

from a high of 31% to a low of -37%, and the Dow Jones from a high of 25% to a low of -34%).

*Id.* ¶ 179.

39.    While the returns available in the major indices went up and down, representing

the volatility in the market, the IA Business returns stayed steady for the twelve-year period

examined, never having a negative year or month (even throughout 2008). *Id.* ¶¶ 180–81.

40.    Mr. Dubinsky concluded that the lack of volatility in the IA Business

demonstrated that the IA Business was not engaged in trading. *Id.* ¶ 181.

> **v.    Securities Listed on the IA Business Customer Statements Did Not
> Reconcile with DTC Records**

41.    Mr. Dubinsky compared the trades purportedly executed for the customer

accounts in the IA Business with the records maintained by the DTC, an organization in the

United States that clears and settles equity transactions in the U.S. market. *Id.* at Section

VI.A.(1)(e).

42.    When equity trades are recorded at the DTC it creates the official record of where

that stock is held.   The ownership of the stock can be confirmed with the DTC. *Id.* ¶¶ 194–95.

43.    BLMIS had a single account with the DTC, the "646 account."    All equity trades

made by BLMIS should have been reflected in the DTC records pertaining to its account. *Id.* ¶

209.

44.    Mr. Dubinsky's analysis confirmed that the securities that were cleared through

BLMIS's DTC account, the 646 account, were traded by the Proprietary Trading business.  No

IA Business trades were cleared through BLMIS's DTC account. *Id.* ¶¶ 209–13.

45.    The Proprietary Trading Business shares reflected in the DTC records matched

the BLMIS records evidencing those trades. *Id.* ¶¶ 209, 211, 213.

46.    Mr. Dubinsky concluded that the Proprietary Trading Business actually executed

those trades in the marketplace, as confirmed by the DTC records.  For the IA Business, however, Mr. Dubinsky could not account for the stock purportedly traded for the customers in the IA Business in any DTC records.  *Id.* ¶ 209.

47.    Based on his analysis, Mr. Dubinsky concluded that the IA Business did not execute the equity trades reflected on the customer statements.  *Id.* ¶ 212.

48.    Because there were no records from the DTC showing that BLMIS owned the securities listed on the IA Business customer statements, BLMIS created fake DTC records for the IA Business.  Mr. Dubinsky discovered dozens of fake DTC screen inquiries to document purported trading activity of the IA Business.  *Id.* ¶¶ 199–208.

49.    BLMIS installed software on the IA Business computer system that recreated fake DTC reports that were meant to look like official reports.  *Id.* ¶¶ 206–07.

50.    Mr. Dubinsky explained that there would be no reason, if one were doing legitimate trading and had owned the stocks, to go into a computer system and write code that used form-printing software to print out a report that mimicked what the DTC puts out, because there would instead be a real DTC report.  *Id.* ¶ 208.  Mr. Dubinsky made this determination by examining the metadata of the fake DTC screens, the code embedded in the document to record characteristics of the document, including when it was created.  *Id.* ¶¶ 199–205.

51.    Based on Mr. Dubinsky's analysis of the DTC records, Mr. Dubinsky concluded that BLMIS was not trading equities for its IA Business customers.  *Id.* ¶ 208.

### vi.    Reported Options Trades Could Not be Reconciled to OCC Records

52.    The options purportedly executed for the customer accounts in the IA Business could not be reconciled with the records of the OCC, an organization that clears and settles options transactions in the U.S. market.  *Id.* ¶¶ 196–98.

53.    Mr. Dubinsky explained that BLMIS had a single account with the OCC, and the

IA Business purportedly traded S&P Index options ("OEX"), which are "proprietary options" traded exclusively on the Chicago Board of Option Exchange ("CBOE"). These proprietary options can only be traded on the CBOE, but there would be a record of them both from the CBOE and the OCC. *Id.* ¶¶ 166, 219.

54.     Mr. Dubinsky reviewed the OCC records for the BLMIS account from October 31, 2002 through October 31, 2008. Based on his review of those records, Mr. Dubinsky was able to reconcile and confirm the options that were traded by the Proprietary Trading Business but could not account for the options purportedly traded for the customers in the IA Business. *Id.* ¶¶ 220–21. Mr. Dubinsky found that the options purportedly traded on behalf of the IA Business customers, as recorded in the IA Business trading records, were not shown on OCC records and were not cleared through the OCC. *Id.* ¶ 222.

55.     For example, on October 31, 2005, records for the Proprietary Trading Business and the OCC indicate that 20 options described as "S&P 100 INDEX November 590 Call" were purchased and held by BLMIS. The aggregate number of "S&P 100 INDEX NOVEMBER 590 CALL" options reported on IA Business customer statements for the same date totaled 658,342. *Id.* ¶ 223.

56.     Based on his analyses, Mr. Dubinsky concluded that BLMIS did not conduct any options trading on behalf of its IA Business customers. *Id.* ¶ 222.

**C.     The IA Business Did Not Purchase Treasuries for IA Business Customer Accounts**

57.     In addition to purchasing stocks and options collars, BLMIS claimed it would intermittently invest IA Business customer funds in U.S. treasury bills as part of the split-strike conversion strategy. *Id.* ¶ 44.

58.     Mr. Dubinsky found no evidence of such purchases having been made on behalf

of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these

purchases did not match the allocation of treasury bill transactions that appeared on customer

statements.  *Id.* ¶¶ 224, 218.

59.    For the period of 2002 through 2007, Mr. Dubinsky reviewed the BLMIS books

and records to identify the unique treasury bills held by the Proprietary Trading Business on

December 31 of each of those years.  He then compared those holdings to (i) those treasury bill

positions held at BLMIS's account at the DTC, which serves as the custodian or the clearing

house for treasuries, and (ii) the treasury bills purportedly held by the IA Business for its

customers.  *Id.* ¶¶ 225–27.

60.    Mr. Dubinsky prepared a summary chart of his review of these voluminous

records, which accurately represents his comparison of the treasury bill positions in the

Proprietary Trading Business and the positions purportedly purchased by the IA Business for its

customers:

Table 5
Comparison of Year-End US Treasury Positions: Proprietary Trading Business vs. IA
Business

| Year-End | Proprietary Trading Business | IA Business | Proprietary Trading Business positions as a percent of IA Business positions |
|---|---|---|---|
| 2002 | $84,000,000 | $30,975,765,000 | 0.27% |
| 2003 | $70,000,000 | $33,643,020,000 | 0.21% |
| 2004 | $70,000,000 | $37,935,258,000 | 0.18% |
| 2005 | $75,000,000 | $40,913,910,000 | 0.18% |
| 2006 | $70,000,000 | $48,342,420,000 | 0.14% |
| 2007 | $80,000,000 | $56,990,055,000 | 0.14% |

*Id.* ¶ 227, Table 5.

61.    The amount of treasury bills held by the Proprietary Trading Business was

negligible compared to those purportedly held on behalf of customers of the IA Business.  For

example, by the end of 2007, the $80 million in treasury positions held by the Proprietary

Trading Business (as recorded on the DTC records) was only 0.14 percent of the approximately

$57 billion in treasury positions purportedly held by the IA Business.  *Id.*

62.    Mr. Dubinsky further analyzed whether treasury bills purportedly purchased for

IA Business customers matched those treasury bills reported as being purchased and held by

BLMIS's brokerage accounts.  Mr. Dubinsky determined that 100% of the treasuries held by the

brokerage accounts were not the same treasuries as purportedly held by the IA Business accounts

because of different maturity dates, different purchase and sale dates, and/or they had a different

reported volume.  *Id.* ¶¶ 232–40.

63.    Mr. Dubinsky additionally determined that even if one were to add up all of the

treasuries in those eight brokerage accounts and the Proprietary Trading Business, they would be

short of what was reported on the IA Business customer statements.  *Id.* ¶¶ 230–31 and Figure

36; *see also* Ex. 22 to Dubinsky Report ("Purported IA Business Treasuries versus Actual

Treasuries Held by BLMIS").

64.    Frank DiPascali, a former BLMIS employee, now deceased, gave certain

testimony at the multi-day criminal trial held in *United States v. Bonventre*, 10-CR-228 (LTS)

(S.D.N.Y.) ("DiPascali Testimony"), ECF Nos. 858, 862, 884 (attached as Exhibit 3 to Cremona

Decl.)  In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with

the IA Business money were for BLMIS's cash management and were not purchased for any

customer account:

> **Q.** From time to time did you get real treasury bills?
> **A.** Yes.
> **Q.** And what were those real treasury bills for?
> **A.** To invest the excess cash in the IA checking account.
> **Q.** And when you say to invest the excess cash in the IA checking
> account, for what reason did you get a treasury bill to do that?

**A.** So as to provide safety and an enhanced yield to what the
checking account interest rate was.
**Q.** So it would be fair to say it would be a way of getting interest
on the checking account?
**A.** More or less, yes.

Cremona Decl., Ex. 3 (DiPascali Testimony) at 4931:12–23 (Dec. 5, 2013); *see also id.*

at 4921:7–12, 4930:6–4931:5, 4934:3–25; *id.* at 5345:1–5346:3 (Dec. 10, 2013).

65.    DiPascali differentiated between the treasury bills actually purchased for cash

management purposes and those fabricated for customers of the IA Business:

**Q.** And when you bought those real treasury bills to earn interest on
the Madoff checking account, what did you have to do?
**A.** I had to call my broker.
**Q.** And after you called your broker, was there a process to going
out and buying the treasury bill?
**A.** Yeah, I would tell the broker how much dollars I wanted to
commit to treasury bills and typically which one I wanted to buy,
and he would take down that information and call me back and
typically give me a report that I bought X amount of treasury bills
at this price.
**Q.** And then that would – you would actually get a real treasury bill?
**A.** Yeah.
**Q.** Now, for on the IA side, when you had to provide – when you
would provide the fake information, what would you do there?
**A.** I'd look at a pricing service of historical prices of treasury bills,
ascertain the price on the date that I needed and write a ticket and
put it into the AS/400.

\*\*\*

**Q.** Now, what was your understanding of what Ms. Bongiorno
would do with the treasury information that you gave to her?
**A.** She would put through a buy ticket that was approximately equal
to the cash credit balance reflected in the account she was working
on, and it would produce a confirmation and an entry on the
customer statement that he was now – owned treasuries.
**Q.** And as with the other trading that was on those accounts, was
any of it real?
**A.** No.

*Id.* at 4931:24–4934:13 (Dec. 5, 2013).

66.    DiPascali further testified that the treasury bill purchases in the eight brokerage

accounts (held at Bank of New York, Bear Stearns, Fidelity, Lehman, and Morgan Stanley) were

made at the direction of Mr. Madoff to earn interest on the cash held in JP Morgan Chase Bank,

N.A. ("JPMorgan") account #xxxxx1703 (the "703 Account") (further discussed below in ¶ 69):

> **Q.** Did Mr. Madoff propose a solution for how to deal with this?
> **A.** He either already had an account or two open or was about to open a new account or a series of them, I don't recall. He was basically giving that responsibility to me. He wanted treasury notes, treasury bills only. As the CDs would get unwound or, I don't remember, they might have unwound them immediately, I'm not sure, but in short order I managed a group of Bernard L. Madoff brokerage accounts that were held at other brokerage firms for the purpose of purchasing short-term U.S. government securities.
> **Q.** These short-term U.S. securities were real, right?
> **A.** Yes.
> **Q.** This was just a way of getting interest on the real cash that was in the 703 account?
> **A.** Yes.
> **Q.** What were some of the firms that you now had responsibility for that had these brokerage accounts?
> **A.** Bear Stearns, Fidelity, Bank of New York, Morgan Stanley, Lehman Brothers.
> **Q.** We talked a little bit about this earlier, when you were buying these short-term securities, what steps would you have to take to buy these real securities on those brokerage accounts?
> **A.** I typically picked up the phone and called the broker or the representative of each of those organizations and communicated my needs. Then he typically got or she typically got back to me and told me what I had done. Sometimes those conversations occurred in the form of faxes. Most of the time they were on the telephone.
> **Q.** This was different than just looking at historical prices and writing something up for the fake trades, right?
> **A.** Yes.

*Id.* at 4961:15–4962:22 (Dec. 5, 2013).

  67. DiPascali explained the nuts and bolts of his process that resulted in treasury bill

transactions showing up on the IA Business customer statements, and further confirmed that they

were all fake:

> **Q.** Now can we go to the second page of this document. What is this that we are looking at?

**A.** It's a spreadsheet that I created that was going to be the nuts and bolts of this exercise.  It was going to do a lot of the calculation for me and allow the process to progress swiftly instead of from month to month to month and client to client to client calculate all sorts of stuff, and then have to then create another side to that. This spreadsheet, which is an Excel-based spreadsheet, is identifying certain treasury bills across the top column. The top row is the CUSIP of treasury bills and options.  The second row are the symbols of options and then a string of treasury bills. Going on the far left column are a string of account numbers. Those are the accounts that Bernie told us he wanted to use to be the counterparties of the customer option positions. What this is doing is it's allowing me to randomly assign, once I know the total of my customer option positions, a quantity to each of those counterparties. Then, once I've randomly defined what each counterparty's position is, this is calculating what its margin or collateral requirement would be. Once I established that, this spreadsheet allows me to randomly pick a group of treasuries that were going to represent that collateral, and then the whole total number would circle back to what I needed. It's fairly complicated, but it did all the grind work necessary to accomplish what Bernie wanted.

**Q.** Were any of the treasury bills that are reflected on this real?

**A.** No.

*Id.* at 5344:24–5346:3 (Dec. 10, 2013).

68.     DiPascali also confirmed that the Proprietary Trading Business did not have an inventory of treasury bills "that was equivalent to the amount that was on the statements" for IA Business customers.  *Id.* at 6950:25–6951:9 (Jan. 13, 2014).

**D.     The IA Business Had No Other Sources of Funds**

69.     During at least the ten-year period before its collapse on December 11, 2008, BLMIS primarily used three bank accounts for the IA Business: the 703 Account; JPMorgan account #xxxxxxxxx1509 (the "509 Account", together with the 703 Account, the "JPMorgan Accounts"); and Bankers Trust account #xx-xx0-599 (the "BT Account").  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285; Declaration of Lisa M. Collura, dated August 28, 2020 ("Collura Decl."), Attach. A (Expert Report of Lisa M. Collura, CPA, CFE, CFF, dated

January 16, 2019 ("Collura Report")) ¶ 17.

70.    IA Business customers' cash deposits were deposited (and commingled) into the 703 Account.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura Decl., Attach. A (Collura Report) ¶¶ 20–24.

71.    IA Business customer withdrawals were made through the JPMorgan Accounts and the BT Account, which was a checking account entirely funded by the 703 Account during the period for which bank records are available.  Collura Decl., Attach. A (Collura Report) ¶¶ 25–30.

72.    The 703 and 509 Accounts were linked commercial business accounts.  The 509 Account was a controlled disbursement account that was entirely funded by the 703 Account.  *Id.* ¶ 25.  An analysis of the 703 Account showed that the money in that account consisted almost entirely of customer deposits.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285; Collura Decl., Attach. A (Collura Report) ¶ 27.

73.    Ninety-seven percent of all cash additions into the 703 Account came directly from IA Business customers.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure 52; Collura Decl., Attach. A (Collura Report) ¶ 24, Figure 1.

74.    The other three percent of inflows into the 703 Account came from income earned on (1) short-term investment activity made directly from the 703 Account (including overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and Treasury Bills); and (2) investments of BLMIS customer funds made through bank and brokerage accounts held in the name of BLMIS or Madoff.  Collura Decl., Attach. A (Collura Report) ¶¶ 45–62; Dubinsky Decl., Attach. A (Dubinsky Report) Figure 52 & n.286.

75.    Because the short-term investments, including overnight sweeps, were made

18

directly out of the 703 Account, the source of the money for those investments was customer

funds.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura Decl., Attach. A (Collura

Report) ¶¶ 24, 46–47.

76.    There were no inflows into the 703 Account from sales of securities for customer

accounts.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura Decl., Attach. A

(Collura Report) ¶¶ 24, 32.

77.    There were no outflows from the 703 Account to purchase securities for customer

accounts.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 350; Collura Decl., Attach. A

(Collura Report) ¶ 32.

78.    Apart from two short-term loans BLMIS received from JPMorgan totaling $145

million in November 2005 and January 2006—both of which were repaid by June 2006—the IA

Business did not obtain loans from third parties or from the Proprietary Trading Business

sufficient to pay the IA Business customer withdrawals.  Dubinsky Decl., Attach. A (Dubinsky

Report) ¶¶ 342–44.

79.    The IA Business also did not receive payments of any cash dividends.  According

to the customer statements, the IA Business reported that it received cash dividends related to

purported trading and paid or credited them to the accountholders.  Between 1998 and 2008,

BLMIS reported that it had paid or credited its customers $4.3 billion in cash dividends.  *Id.*

*¶¶* 247–55.

80.    Of the more than 8,300 IA Business dividend transactions identified on the

customer account statements from 1998 to 2008, not one purported dividend payment matched to

a cash addition to the 703 Account.  *Id. ¶¶* 253–54.

81.    There is no record of any dividends being received by the IA business.  *Id. ¶* 248.

82.    The IA Business did not have any legitimate income-producing activities.  The only source of cash available for the IA Business to pay purported investment profits as well as redemption requests from its customers was from cash that other IA Business customers deposited in the 703 Account.  *Id.* ¶¶ 330–37.

83.    These transactions rendered BLMIS insolvent.  By no later than December 2002, its assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion.  *Id.* at Section VII., ¶¶ 432–33, Table 13.

84.    In December 2008, BLMIS's capital had dwindled to the point where customer redemptions or withdrawal requests grossly exceeded the amounts it had on hand.  The customer property on hand at BLMIS as of December 11, 2008 was not sufficient to pay the claims of its customers.  *Id.* ¶¶ 40, 440–41.

> ### i.    The Transfers Were Made by Bernard L. Madoff Investment Securities LLC

85.    BLMIS operated as a sole proprietorship prior to 2001.  In January 2001, the sole proprietorship was converted to a single member LLC, using the same SEC registrant number, 8-8132.  Cremona Decl., Ex. 2 (Amended Form BD).

86.    The bank statements for the 703 and 509 Accounts listed the account holder as "Bernard L. Madoff" from December 1998 to September 2002, when the name was changed to "Bernard L. Madoff Investment Securities." Collura Decl., Attach. A (Collura Report) ¶¶ 20 n.7, 25 n.9.

87.    For the time period for which bank records were available (December 1998 through December 2008), the 703 and 509 Accounts were used for customer deposits and withdrawals—the business of the IA Business.  *Id.* ¶¶ 24–30; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure 52.

88.     For the time period for which bank records were available, the face of the bank statements for the 703 Account and 509 Account showed they were designated as "Commercial Checking" accounts.  The statements were addressed to the attention of either Tony Tiletnick, a BLMIS employee, or Daniel Bonventre, BLMIS's operations manager, at the BLMIS business address at 885 Third Avenue, New York, New York.  None of the statements were addressed to Madoff personally.  Cremona Decl., Ex. 4 (Exemplar BLMIS Bank Statements 1998-2008); Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340, Exs. 31, 32.

### E.     The Plea Allocutions

89.     The plea allocutions of Madoff and BLMIS employees Frank DiPascali, David Kugel, Irwin Lipkin, and Eric Lipkin, attached as Exhibits 5–10 to the Cremona Decl., further establish that BLMIS did not conduct legitimate operations from its IA Business.

**Bernard L. Madoff**

90.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal action filed against him by the United States Attorney for the Southern District of New York.  Plea Allocution of Bernard L. Madoff, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (the "Madoff Allocution"), ECF No. 57 (attached as Exhibit 5 to Cremona Decl.).

91.     At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  Cremona Decl., Ex. 5 (Madoff Allocution) at 23:14–23; 31:25–32:1.

92.     Madoff further testified at the plea hearing that he never invested his clients' funds in securities, that he used funds on hand in the JP Morgan account to pay customer redemptions, and that he created false trading confirmations and client account statements to cover up the fact that he had not executed trades on behalf of BLMIS investment advisory clients.  Madoff stated:

The essence of my scheme was that I represented to clients and prospective
clients who wished to open investment advisory and individual trading accounts
with me that I would invest their money in shares of common stock, options, and
other securities of large well-known corporations, and upon request, would return
to them their profits and principal.  Those representations were false for many
years.  Up until I was arrested on December 11, 2008, I never invested these funds
in the securities, as I had promised.  Instead, those funds were deposited in a bank
account at Chase Manhattan Bank.  When clients wished to receive the profits
they believed they had earned with me or to redeem their principal, I used the
money in the Chase Manhattan bank account that belonged to them or other
clients to pay the requested funds.  The victims of my scheme included
individuals, charitable organizations, trusts, pension funds, and hedge funds.

*Id.* at 24:9–24.

93.    Beginning in the early 1990s, Madoff represented to IA Business customers that he

was using a split strike conversion strategy based on blue-chip securities.  *Id.* at 25:18–24.

94.    Madoff further detailed his strategy as follows:

Through the split strike conversion strategy I promised to clients and prospective
clients that client funds would be invested in a basket of common stocks within
the Standard & Poors 100 index, a collection of the 100 largest publicly-traded
companies in terms of their market capitalization.  I promised that I would select a
basket of stocks that would closely mimic the price movements of the Standard &
Poors 100 index. I promised that I would opportunistically time those purchases
and would be out of the market intermittently, investing client funds during these
periods in United States Government-issued securities, such as United States
Treasury bills.  In addition, I promised that as part of the split strike conversion
strategy, I would hedge the investments I made in the basket of common stocks by
using client funds to buy and sell option contracts related to those stocks, thereby
limiting the potential client losses caused by unpredictable changes in stock
prices.  In fact, I never made those investments I promised clients, who believed
they were invested with me in the split strike conversion strategy.

*Id.* at 25:25–26:18.

95.    BLMIS investment advisory customers received account statements from BLMIS

that purported to reflect securities transactions and investment returns that appeared as though their

investments with BLMIS were profitable.  Madoff explained:

To further cover up the fact that I had not executed trades on behalf of my
investment advisory clients, I knowingly caused false trading confirmations and
client account statements that reflected the bogus transactions and positions to be

created and sent to clients purportedly involved in the split strike conversion
strategy, as well as other individual clients I defrauded who believed they had
invested in securities through me.

*Id.* at 27:9–16.

96.     Madoff stated that the proprietary trading and market making businesses were

engaged in legitimate trading.  *Id.* at 25:6–11.

97.     Madoff also stated that funds from his investment advisory business were

transferred to the proprietary trading and market making businesses, via his affiliated London

entity.  *Id.* at 29:12–22.

**Frank DiPascali**

98.     At a plea hearing on August 11, 2009, in the case captioned *United States v.
DiPascali*, No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to

a ten-count criminal action charging him with participating in and conspiring to perpetuate the

Ponzi scheme.  Plea Allocution of Frank DiPascali, Jr., *United States v. DiPascali*, No. 09-CR-

764 (RJS) (S.D.N.Y. Aug. 11, 2009) (the "DiPascali Allocution"), ECF No. 12 (attached as

Exhibit 6 to Cremona Decl.).  Mr. DiPascali confirmed Madoff's explanation of the split-strike

conversion strategy and that BLMIS never engaged in the strategy or executed the purported

trades reported on customer statements.  DiPascali stated:

> By the early 1990s Bernie Madoff had stable clients whose accounts he managed
> as an investment adviser.  He attracted a lot of these clients by telling them that
> the firm would apply a hedged investment strategy to their money.  The clients
> were told that the strategy involved purchasing what we call basket of blue chip
> common stocks. Hedging those investments by buying and selling option
> contracts, getting in and out of the market at opportune times and investing in
> government securities at other times. . . .  From at least the early 1990s through
> December of 2008, there was one simple fact that Bernie Madoff knew, that I
> knew, and that other people knew but that we never told the clients nor did we tell
> the regulators like the SEC.  No purchases of [sic] sales of securities were actually
> taking place in their accounts.  It was all fake.  It was all fictitious.  It was wrong
> and I knew it was wrong at the time, sir.

Cremona Decl., Ex. 6 (DiPascali Allocution) at 45:21–46:15.

99.    At the plea hearing, DiPascali testified that he had been instructed to falsely

represent to clients that security trading was occurring in their investment accounts when in fact,

no trades were being made.  DiPascali explained:

> From our office in Manhattan at Bernie Madoff's direction, and together with
> others, I represented to hundreds, if not thousands, of clients that security trades
> were being placed in their accounts when in fact no trades were taking place at all.

*Id.* at 46:21–25.

> ***Most of the time the clients' money just simply went into a bank account in
> New York that Bernie Madoff controlled.  Between the early '90s and December
> '08 at Bernie Madoff's direction, and together with others, I did [the] follow[ing]
> things: On a regular basis I told clients over the phones and using wires that
> transactions on national securities exchanges were taking place in their account
> when I knew that no such transactions were indeed taking place.  I also took steps
> to conceal from clients, from the SEC, and from auditors the fact that no actual
> security trades were taking place and to perpetuate the illusion that they actually
> were.  On a regular basis I used hindsight to file historical prices on stocks then I
> used those prices to post purchase of sales to customer accounts as if they had been
> executed in realtime.  On a regular basis I added fictitious trade data to account
> statements of certain clients to reflect the specific rate of earn return that Bernie
> Madoff had directed for that client.

*Id.* at 47:5–22.

> ***… I knew no trades were happening.  I knew I was participating in a
> fraudulent scheme.  I knew what was happening was criminal and I did it anyway.

*Id.* at 52:2–5.

**David Kugel**

100.    At a plea hearing on November 21, 2011, in the case captioned *United States v.
Kugel*, No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty

to a six-count criminal action charging him with securities fraud, falsifying the records of BLMIS,

conspiracy, and bank fraud.  Plea Allocution of David L. Kugel, *United States v. Kugel*, No. 10-

CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011) (the "Kugel Allocution"), ECF No. 188 (attached as

Exhibit 7 to Cremona Decl.).

24

101.    As far as back as the 1970s, there is no evidence that the purported investment transactions reflected in the customer statements of BLMIS's IA Business customers ever occurred, and in fact the evidence reveals that those transactions did not and could not have occurred. Cremona Decl., Ex. 7 (Kugel Allocution) at 32:4–12 ("Specifically, beginning the early '70s, until the collapse of BLMIS in December 2008, I helped create fake, backdated trades. I provided historical trade information . . . to create fake trades that, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred.").

**Irwin Lipkin**

102.    At a plea hearing on November 8, 2012, in the case captioned *United States v. Irwin Lipkin*, No. 10-CR-228 (LTS), Irwin Lipkin, a former BLMIS accountant, pleaded guilty to a two-count criminal action charging him with securities fraud, falsifying the records of BLMIS, and making false statements in relation to documents required by ERISA. Plea Allocution of Irwin Lipkin, *United States v. Irwin Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 8, 2012) (the "Irwin Lipkin Allocution"), ECF No. 288 (attached as Exhibit 8 to Cremona Decl.). Mr. Lipkin admitted that BLMIS's revenue was falsely inflated through fraudulent bookkeeping entries and annual audited reports. Cremona Decl., Ex. 8 (Irwin Lipkin Allocution) at 30:23–31:3, 31:10–18, 31:24–32:5.

**Eric S. Lipkin**

103.    At a plea hearing on June 6, 2011, in the case captioned *United States v. Eric S. Lipkin*, No. 10-CR-228 (LTS), Eric Lipkin, a former BLMIS payroll clerk, pleaded guilty to a six-count criminal action charging him with bank fraud, falsifying the records of BLMIS,conspiracy, and making false statements to facilitate a theft concerning ERISA. Plea Allocution of Eric S.

25

Lipkin, *United States v. Eric S. Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. June 6, 2011) (the "Eric

Lipkin Allocution"), ECF No. 148 (attached as Exhibit 9 to Cremona Decl.).

104.    Mr. Eric Lipkin admitted that BLMIS created fake reports that replicated those of

the DTC, which provides clearance for nearly all equity, bond, government securities, mortgage-

backed securities, money market instruments, and over-the-counter derivative transactions in the

U.S. Market.  The purpose of these fake DTC reports was to purportedly confirm non-existent

positions in the IA accounts, and the fake reports were given to auditors and the SEC to mislead

them.  Cremona Decl., Ex. 9 (Eric Lipkin Allocution) at 32:4–10, 33:22–34:8.

**Enrica Cotellessa-Pitz**

105.    At a plea hearing on December 19, 2011, in the case captioned *United States v.*

*Cotellessa-Pitz,* No. 10-CR-228 (LTS), Enrica Cotellessa-Pitz, a former BLMIS accountant and

comptroller, pleaded guilty to a four-count criminal action charging her with conspiracy to falsify

the records of BLMIS, conspiracy to obstruct the IRS in the collection of income taxes, and

conspiracy to make false filings with the SEC.  Plea Allocution of Enrica Cotellessa-Pitz, *United*

*States v. Cotellessa-Pitz*, No. 10-CR-228 (LTS) (S.D.N.Y. Dec. 19, 2011) (the "Cotellessa-Pitz

Allocution"), ECF No. 1512 (attached as Exhibit 10 to Cremona Decl.).

106.    Ms. Cotellessa-Pitz admitted that IA Business customer money was funneled to

BLMIS's proprietary trading and market making businesses to falsely inflate their revenue and

hide their losses.  Cremona Decl., Ex. 10 (Cotellessa-Pitz Allocution) at 31:12–32:12.

**III.    The Palmedo Account BLMIS Transactions**

107.    Defendant is a resident of St. James, New York.  Ans. ¶ 7 *Picard v. Palmedo*,

Adv. Pro. No. 10-04749 (SMB) (Bankr. S.D.N.Y. Aug. 13, 2015), ECF No. 41.[1]

108.    Defendant was a customer of the IA Business and held BLMIS Account No.

1CM142 (the "Palmedo Account") in the name of "Philip F. Palmedo." *Id.* ¶¶ 7, 34; *see also* Ex.

B to Compl., ECF No. 1.

109.    Defendant does not dispute the deposits and withdrawals as reflected on Exhibit B

to the Complaint from December 11, 2006 to December 11, 2008.  Cremona Decl., Ex. 11

(Responses and Objections of Defendant Philip F. Palmedo to Trustee's First Set of

Interrogatories No. 9); *see also* Ex. B to Compl..

110.    On June 21, 2017, Defendant testified that he received the withdrawals from

BLMIS for the Palmedo Account between January 4, 1993 to May 22, 2008 (the date of the last

withdrawal), as accurately reflected on Exhibit B to the Complaint.  Cremona Decl., Ex. 12

(Defendant Philip F. Palmedo Dep. Tr.) at 31:15–52:21, 65:15–24.

### A.    Analysis of the Palmedo Account

111.    Lisa Collura was retained by the Trustee to reconcile the cash transactions

reflected on the statements of the BLMIS customer accounts with available records and trace the

flow of those funds.  Collura Decl., Attach. A (Collura Report) ¶ 7; Collura Decl., Attach. B

(Expert Report of Lisa M. Collura, CPA, CFE, CFF, dated June 19, 2019 ("Collura Palmedo

Report")) ¶ 7.

112.    For both reconciliation and tracing analyses, Ms. Collura reviewed available

third-party bank records.  These bank records include hundreds of thousands of pages of BLMIS

bank statements, wire transfer data, cancelled checks, and deposit slips.  Collura Decl., Attach. A

(Collura Report) ¶ 10.

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Palmedo*, Adv. Pro. No.
10-04749 (Bankr. S.D.N.Y.).

113.    The reconciliation of the customer statements and bank records was conducted to determine whether the cash transactions on the BLMIS customer statements were accurately reflected as cash transactions—cash deposits or cash withdrawals. *Id.* ¶¶ 15, 31.

114.    Ms. Collura confirmed that the deposit and withdrawal transactions identified on the BLMIS customer statements corresponded to transactions on the available third-party bank records in the same amount, on or around the same date, and to or for the benefit of the same customer. *Id.* ¶ 22, Collura Decl., Attach. B (Collura Palmedo Report) ¶ 13.

115.    Ms. Collura reviewed over 225,000 transactions on the customer statements, and over 150,000 transactions on the bank records. She kept track of these transactions by assigning a unique identifier to each of the cash transactions on the customer statements and a different unique identifying number to all of the transactions in the bank records. Collura Decl., Attach. A (Collura Report) ¶¶ 10, 23.

116.    Of the over 225,000 transactions reflected on BLMIS customer statements from December 1998 to December 2008, Ms. Collura was able to reconcile 99.01% of these cash transactions to BLMIS bank records. *Id.* ¶¶ 15, 31.

117.    For Ms. Collura's reconciliation analysis with respect to Defendant, she analyzed the cash transactions in the Palmedo Account from January 1993 to December 2008. During this time period, the customer statements for the Palmedo Account reflected seven cash deposit and withdrawal transactions, four of which occurred in the ten-year period, December 1998 to December 2008, for which there were available BLMIS records. Collura Decl., Attach. B (Collura Palmedo Report) ¶¶ 14–16.

118.    She reconciled both cash transactions reflected on the customer statements for the Palmedo Account to available BLMIS bank records, documentation contained in BLMIS

28

customer files, and/or documents produced to the Trustee related to the Palmedo Account.  *Id.* ¶¶

14–21; Ex. B. to Compl.

119.    Based on her review of documents contained in the customer file maintained at

BLMIS for the Palmedo Account, Ms. Collura did not find any instance of the Defendant

communicating to BLMIS any disagreement with respect to the accuracy of any cash transaction

reflected on the customer statements for the Palmedo Account.  Collura Decl., Attach. B (Collura

Palmedo Report) ¶¶ 20, 23.

120.    For Ms. Collura's tracing analysis with respect to the Defendant, she analyzed the

one cash withdrawal from the Palmedo Account during the two years prior to December 11, 2008

(the "Two-Year Period") totaling $600,000.   *Id.* ¶¶ 25–28, Exs. 5–6.

121.    Based on available bank records from BLMIS, she traced 100% of the total

amount of cash withdrawals reflected on the customer statements for the Palmedo Account

during the Two-Year Period to bank accounts held by or for the benefit of Defendant.  *Id.* ¶¶ 25–

28, Exs. 5–6.

122.    Matthew Greenblatt oversaw the task of reconstructing BLMIS's books and

records and calculating the principal balance for each BLMIS account (the "Principal Balance

Calculation").  Mr. Greenblatt calculated the ending principal balance by applying the Net

Investment Method (the Trustee's cash in/cash out net equity methodology), which takes into

account all of the customer deposits as additions to principal and all of the customer withdrawals

or inter-account transfers as reductions to principal.  Declaration of Matthew B. Greenblatt, dated

August 28, 2020 ("Greenblatt Decl."), Attach. A (Expert Report of Matthew G. Greenblatt,

CPA/CFF, CFE dated November 15, 2012 ("Greenblatt Report")) ¶¶ 4–5; *see also Sec. Inv'r*

*Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec.)*, 424 B.R.

122 (Bankr. S.D.N.Y. 2010).

123.    Mr. Greenblatt prepared a chronological listing of cash and principal transactions reflected in the BLMIS customer statements.  Mr. Greenblatt relied on the customer statements because they are the most comprehensive and complete accounting of the debtor's books and records with respect to transaction-by-transaction line item detail of the cash and principal transactions and because the customer statements were sent to customers, giving customers the opportunity to correct errors on the statements.  Greenblatt Decl., Attach. A (Greenblatt Report) ¶¶ 10–12, 40–43.

124.    Mr. Greenblatt explained that the Principal Balance Calculation covers the time period from April 1, 1981 through December 11, 2008, an approximately 27-year period for which Mr. Greenblatt had BLMIS's books and records.  *Id.* ¶ 5.  The first monthly customer statement which reported dollar amounts for any securities allegedly held at month end was March of 1981.  Therefore, the full period in which the Principal Balance Calculation could be performed covered the time period from April 1, 1981 through December 11, 2008.  *Id.* ¶ 5 n.1.

125.    For Mr. Greenblatt's analysis with respect to Defendant, his Principal Balance Calculation covered the period from the Palmedo Account opening through December 11, 2008.  Greenblatt Decl., Attach. B (Expert Report of Matthew B. Greenblatt, CPA/CFF, CFE dated June 19, 2019 ("Greenblatt Palmedo Report")) ¶¶ 7–12.

126.    Mr. Greenblatt determined that on January 4, 1993, the Palmedo Account was opened with an inter-account transfer of $150,000 of principal from BLMIS Account 1C0019.  *Id.* ¶¶ 13–16, Exs. 4A–4B.

127.    Subsequent to this initial inter-account transfer, there were two cash deposits via checks into the Palmedo Account in the aggregate amount of $75,000, all representing principal.

*Id.* ¶ 17.

128.    In sum, this one inter-account transfer and two cash deposits provided the Palmedo Account with $225,000 of principal.  *Id.* ¶ 18, Ex. 3.

129.    Between January 4, 1993 and December 11, 2008, the Palmedo Account reflected a total of five cash withdrawals totaling $1,010,000, which consisted of both principal and fictitious profits.  *Id.* ¶¶ 19–20.

130.    The Principal Balance Calculation for the Palmedo Account demonstrated that between January 4, 1993 and December 11, 2008, $1,010,000 was withdrawn from BLMIS, which consisted of $225,000 of principal and an additional $785,000 of funds withdrawn in excess of principal, representing fictitious profits over the life of the Palmedo Account.  *Id.* ¶ 20, Ex. 4B.

131.    Within the Two-Year Period prior to December 11, 2008, $600,000 of fictitious profits was withdrawn from the Palmedo Account.  *Id.* ¶ 20, Ex. 4B.

132.    It is therefore undisputed that, during the Two-Year Period, Defendant withdrew $600,000 in excess of principal deposited in the Palmedo Account. *Id.*

Dated: August 28, 2020
     New York, New York

/s/ Nicholas J. Cremona
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Nicholas J. Cremona
ncremona@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*