# EXHIBIT 13

```
                                            Page 1

 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - - - - x

 4   SECURITIES INVESTOR PROTECTION

 5   CORPORATION

 6   v.                        CASE NO. 08-01789-smb

 7   BERNARD L. MADOFF INVESTMENT

 8   SECURITIES, LLC, et al,

 9        Debtors.

10   - - - - - - - - - - - - - - - - - x

11   IRVING H. PICARD, TRUSTEE FOR THE

12   LIQUIDATION OF BERNARD L. MADOFF,

13        Plaintiff,               ADV. PROC.

14   v                        CASE NO. 10-051430-smb

15   MARILYN BERNFELD TRUST, ET AL.,

16        Defendants.

17   - - - - - - - - - - - - - - - - - x

18   IRVING H. PICARD, TRUSTEE FOR THE

19   LIQUIDATION OF BERNARD L. MADOFF,

20        Plaintiff,               Adv. Proceeding

21   v                        CASE NO. 10-05390-smb

22   1096-1100 RIVER ROAD ASSOCIATION,

23        Defendant.

24   - - - - - - - - - - - - - - - - - x

25
```

```
 1   - - - - - - - - - - - - - - - - - x

 2   IRVING H. PICARD, TRUSTEE FOR THE

 3   LIQUIDATION OF BERNARD L. MADOFF,

 4            Plaintiff,              ADV. PROCEEDING

 5   v                               CASE NO. 10-04283-smb

 6   MENDELOW, ET AL.,

 7            Defendants.

 8   - - - - - - - - - - - - - - - - - x

 9   IRVING H. PICARD, TRUSTEE FOR THE

10   LIQUIDATION OF BERNARD L. MADOFF,

11            Plaintiff,              ADV. PROCEEDING

12   v                               CASE NO. 10-05286-smb

13   LEGACY CAPITAL, LTD., ET AL.,

14            Defendants.

15   - - - - - - - - - - - - - - - - - x

16                     U.S. Bankruptcy Court

17                     One Bowling Green

18                     New York, New York

19                     October 28, 2015

20                     10:02 AM

21   B E F O R E :

22   HON. STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  Unidentified
```

Page 3

1   Adversary proceeding: 10-05143-smb Irving H. Picard, Trustee

2   for the Liquidation of Bernard L. Madoff Investment

3   Securities LLC, and Bernard L. Madoff v. Marilyn Bernfeld

4   Trust et al Discovery Conference Pursuant to Local

5   Bankruptcy Rule 7007-1(b) (also applies to Adv. P. Nos. 10-

6   5143 & 10-4841)

7

8   Discovery Conference Pursuant to Local Bankruptcy Rule 7007-

9   1 (b)

10

11   Adversary proceeding: 10-04283-smb Picard, as Trustee for

12   the Liquidation of Bernard v. Mendelow et al

13   Discovery Conference pursuant to Local Bankruptcy Local

14   7007-1 (b)

15

16   Defendants' Motion for Judgment on the Pleadings

17

18   Adversary proceeding: 10-05286-smb Irving H. Picard, Trustee

19   for the Liquidation of Bernard v. Legacy Capital Ltd. et al

20   Defendant Khronos Motion to Dismiss

21

22   Defendant Legacy Capital's Motion to Dismiss

23

24

25

08-01789-cgm  Doc 20974-13  Filed 08/28/20  Entered 08/28/20 18:58:23  Ex. 13  Pg 5 of 125

Page 4

1  Adversary proceeding: 08-01789-smb Securities Investor

2  Protection Corporation v. Bernard L. Madoff Investment

3  Securities, LLC. et al

4  Trustees Motion and Memorandum to Affirm His Determinations

5  Denying Claims of Claimants' Holding Interests in 1973

6  Masters Vacation Fund, Bull Market Fund, and Strattham

7  Partners

8

9  Adversary proceeding: 10-04283-smb Picard, as Trustee for

10  the Liquidation of Bernard v. Mendelow et al

11  Pre-Trial Conference

12

13  Adversary proceeding: 10-05286-smb Irving H. Picard, Trustee

14  for the Liquidation of Bernard L. Madoff Investment

15  Securities LLC, and Bernard L. Madoff v. Legacy Capital Ltd.

16  et al

17  Pre-Trial Conference

18

19

20

21

22

23

24

25

Page 5

```
 1   A P P E A R A N C E S :

 2   BAKER HOSTETLER

 3        Attorneys for BLMIS, Trustee

 4        45 Rockefeller Plaza

 5        New York, NY  10111

 6

 7   BY:  JONATHAN B. NEW, ESQ.

 8        GEORGE KLIDONAS, ESQ.

 9        OREN WARSHAVSKY, ESQ.

10        ROBERTSON D. BECKERLEGGE, ESQ.

11        AMY W. VANDERWAL, ESQ.

12        FERVE OZTURK, ESQ.

13        FARRELL A. HOCHMUTH, ESQ.

14        PETER B. SHAPIRO, ESQ.

15        TATIANA MARKEL, ESQ.

16

17   DICKSTEIN SHAPIRO, LLP

18        Attorneys for Khronos, LLC

19        1633 Broadway

20        New York, New York 10019

21

22   BY:  ERIC B. FISHER, ESQ.

23        LINDSAY A. BUSH, ESQ.

24

25
```

```
 1   SECURITIES INVESTOR PROTECTION CORPORATION

 2        For SiPC

 3        1667 K Street, N.W.

 4        Suite 1000

 5        Washington, DC  20006

 6

 7   BY:  NATHANAEL S. KELLEY, ESQ.

 8

 9   STEVENS & LEE, P.C.

10        Attorneys for Legacy Capital

11        485 Madison Avenue, 20th Floor

12        New York, New York 10022

13

14   BY:  NICHOLAS F. KAJON, ESQ.

15

16   WEDEEN & KAVANAGH

17        Attorneys for Unspecified Party

18        41 Union Square West

19        Suite 325

20        New York, New York 10010

21

22   BY: TIMOTHY WEDEEN, ESQ.

23

24

25
```

1    ARKIN SOLBAKKEN, LLP

2         Attorneys for Mendelow, et al.

3         750 Lexington Avenue

4         New York, New York 10022

5

6    BY:  STANLEY S. ARKIN, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

```
 1                   P R O C E E D I N G S

 2            THE COURT:  Please be seated.  Good morning.

 3        (A chorus of good mornings)

 4            THE COURT:  Madoff.  Is anyone here from Mr.

 5    Picard's office?

 6            MS. HOCHMUTH:  Yes, Your Honor.

 7            Your Honor, would you like to take the first case

 8    of the agenda today?  It's actually a group of three --

 9            THE COURT:  Which is --

10            MS. HOCHMUTH:  -- cases.  It is the Marilyn

11    Bernfeld Trust, Michael Balimi (ph) and Ellen Bernfeld.

12            THE COURT:  Are they doing -- I think they have a

13    flat tire.  We received a call.

14            Is anyone here on that case?  All right.

15            MS. HOCHMUTH:  We're happy to give counsel time to

16    arrive, Your Honor.

17            THE COURT:  Good.

18            MS. HOCHMUTH:  I believe the second matter may be

19    Picard v. River Rose, so since it's also a discovery

20    conference --

21            THE COURT:  You know what?  Let's do the trust --

22    the seeking affirmation to -- of the trustee's determination

23    to deny claimants' claim.

24        (Pause)

25            THE COURT:  Go ahead.
```

1           MR. KLIDONAS:  Good morning, Your Honor.  George

2      Klidonas of Baker & Hostetler on behalf of Irving Picard,

3      the trustee for Madoff.

4           Your Honor, we're here this morning on the

5      trustee's motion to affirm the determination of 48 claims

6      relating to 47 docketed objections.  The claimants invested

7      indirectly with one of the three general partnerships:  1973

8      Masters Vacation Fund, the Bull Market Fund and Strattham

9      Partners.

10          The objecting claimants invested money in one of

11     these entities which invested in BLMIS.  The claimants did

12     not have a financial relationship with BLMIS and did not

13     have ownership over assets and trusts of BLMIS.  Thus,

14     denial of these claims is consistent with the 11 prior

15     decisions in this liquidation, including the Second

16     Circuit's decision in Cruz as well as the Morgan Kennedy

17     factors.

18          There was, however, an objection filed by George

19     and Linda Pallis (ph).  The basis of their objection is

20     premised solely on one fact that they argue is different

21     from other prior decisions in this liquidation.  That fact

22     is that checks from the Pallis's which were sent to the 1973

23     Masters Vacation Fund were made payable to Bernard L. Madoff

24     rather than to the vacation funds.

25          Your Honor, the trustee respectfully submits that

08-01789-smb Doc 20974-13 Filed 08/28/20 Entered 08/28/2018:58:23 Ex. 13
Pg 11 of 124

Page 10

1   there -- that this one fact alone does not change the

2   analysis and, therefore, does not afford the Pallis's

3   customer status.

4           The trustee relies on three sources to support his

5   position.  The customer files and the documents submitted to

6   the trustee showing that the vacation fund was, in fact, the

7   customer and not the Pallis's.

8           The second source is discovery responses served on

9   trustee's counsel showing that the Pallis's did not provide

10  sufficient facts to support their burden that they are

11  customers.

12          And the final source is New York general

13  partnership law showing what constitutes partnership

14  property.

15          Just to go deeper into these sources, Your Honor,

16  the customer file and the documents submitted again show

17  that the Pallis's wrote a check made payable to "Bernard L.

18  Madoff," and then sent that check to the authorized agents

19  of the vacation fund.  The --

20          THE COURT:  Do we know what happened to the check?

21          MR. KLIDONAS:  The check was sent to the vacation

22  fund and then that check was forwarded to Madoff for the

23  purposes of crediting the vacation fund's account.  The memo

24  line on that check reflects that a credit was to be applied

25  to the vacation fund's BLMIS account.  There's no indication

1    in the documents or the customer file showing that the

2    Pallis's believed that the funds were being credited in an

3    account in their name.

4            As the trustee has argued in prior customer

5    decisions, entrusting is the most critical factor.  And that

6    factor requires the entrustment of cash or securities to the

7    broker/dealer for the purpose of trading securities.

8            THE COURT:  But the argument is that's exactly

9    what this check did.

10           MR. KLIDONAS:  That's the argument, Your Honor,

11   but --

12           THE COURT:  Why isn't that correct?

13           MR. KLIDONAS:  Because the check was entrusted in

14   the hands of the authorized agent or the partnership which

15   was then put into the fund -- the BLMIS -- I'm sorry -- the

16   BLMIS vacation fund account.

17           Furthermore, the Court, in its ERISA decision,

18   more thoroughly explains this standard and says that the

19   party asserting that she was a BLMIS customer must show that

20   she entrusted her own assets directly through an account

21   maintained in her own name rather than indirectly through a

22   fund that then entrusted the fund's assets through an

23   account maintained in the fund's name.  And that's at page

24   168 of the ERISA decision.

25           The trustee also relies on the discovery responses

Page 12

1    provided by the Pallis's.  A review of those responses show

2    a number of things.

3              First, they admit that they did not have an

4    account in their name with BLMIS.  They did not receive

5    documents from the debtor, including correspondence, tax

6    statements and investment statements.  They did not enter

7    into any contracts with the debtor.  They admit that their

8    only relationship to BLMIS is by virtue of the fact of their

9    relationship to the vacation fund.

10             Finally, Your Honor, they admit that they lacked

11   control, investment discretion or decision-making authority

12   on behalf of the account.

13             THE COURT:  Okay.  Thank you.

14             Are the -- anyone representing the Pallis's here?

15   No.

16             All right.  The record should reflect there's no

17   response.

18             I'll grant the trustee's motion.  The only fact

19   that distinguishes this case from all of the other cases

20   involving investors in the fund which in turn invested in

21   Madoff is you have a check by these individuals made out to

22   Madoff but sent to the agent of the fund.  And it just

23   appears that the check was made out to the wrong payee and

24   it was -- the error was rectified by simply crediting the

25   fund for its investment.

10-05143-smb Doc 20-13 Filed 08/28/20 Entered 08/28/20 18:58:23 Ex. 13
1:09-cv-01789-cm Doc 20-13 Filed 10/30/15 Entered 11/13/15 18:22:24 Main Document
Pg 14 of 124

Page 13

 1          All the other criteria seen in these other cases

 2      exists here.  These Pallis's didn't have an account with

 3      Madoff -- with BLMIS, had no connection, received no

 4      correspondence or direct communications.  Their investment

 5      was through the fund that, in turn, invested in Madoff.

 6          So they fail to demonstrate that they were

 7      customers of Madoff and, accordingly, the motion is granted.

 8      You can submit an order.

 9          MR. KLIDONAS:  Thank you, Your Honor.

10          THE COURT:  Thank you.

11          Is anyone here on Bernfeld?

12          Okay.  How about 1096-1100 River Road?

13          MR. HOCHMUTH:  Defense counsel isn't here.

14          THE COURT:  Second call.

15          All right.  I'll hear the motion to dismiss in

16      Legacy.

17         (Pause)

18          THE COURT:  Go ahead.

19          MR. FISHER:  Good morning, Your Honor.  Eric

20      Fisher from Dickstein Shapiro on behalf of Defendant

21      Khronos, LLC.  Also appearing at counsel table is my

22      colleague Lindsay Bush on behalf of Khronos, LLC.

23          THE COURT:  How do you do?

24          MR. FISHER:  And Nicholas Kajon from Stevens & Lee

25      on behalf of Legacy Capital, Your Honor.

Page 14

1    Because of the substantial overlap in issues

2    between the two defendants I plan to handle most of the

3    issues and, of course, if Mr. Kajon has anything to add I'm

4    sure he will, Your Honor.

5         THE COURT:  Okay.  Go ahead.

6         MR. FISHER:  And if I may, I would like to hand up

7    a copy of the amended complaint in the event that the Court

8    does not have it handy.

9         THE COURT:  Thank you.

10    (Pause)

11         THE COURT:  Okay.  Go ahead.

12         MR. FISHER:  All right.  Your Honor, I'll begin

13   with the more straightforward simple argument on behalf of

14   Khronos, LLC only.  Khronos, LLC is sued as a subsequent

15   transferee.  And it's very easy to take a look at what it is

16   that the complaint says about these subsequent transfers

17   because it's so sparse.  All of the allegations that relate

18   to the subsequent transfers, all of the factual allegations

19   are found in paragraphs 147 through 151 of the amended

20   complaint.

21         And, Your Honor, taking a close look at those

22   allegations we submit that it is quite clear that they don't

23   satisfy either the obligation under Rule 8 to identify the

24   transfers by date and amount, the basic vital statistics,

25   what this Court has called the vital statistics of the

1    transfers.  And they also -- those allegations also fail to

2    allege facts from which it can plausibly be inferred that

3    the transfers we're talking about here were customer

4    property.

5            And just to provide a quick illustration of this

6    point -- and, again, this is a basis on which Khronos may be

7    dismissed from this case altogether without even getting to

8    the somewhat more involved issues of willful blindness and

9    actual knowledge.

10            Paragraph 147 says a portion of the transfers was

11    subsequently transferred either directly or indirectly to

12    Khronos.  It fails to specify --

13            THE COURT:  Let me stop you.  With respect to the

14    Legacy transfers -- I'll put Montpelier to the side -- the

15    allegations are that Legacy received transfers from BLMIS

16    and Legacy was fully invested in BLMIS.  So it's reasonable

17    to infer that any money it subsequently transferred to

18    Khronos originated with BLMIS, right?

19            MR. FISHER:  It is not, Your -- those facts are --

20            THE COURT:  Why can't I draw that inference on a

21    motion to dismiss?

22            MR. FISHER:  One thing that we point out in our

23    motion papers, for example, is the complaint itself alleges

24    that in 2004 a very substantial loan was made by B&P to

25    Legacy against the Legacy assets.

1:09-01739-smb Doc 20-13 Filed 08/28/20 Entered 08/28/20 18:58:23 Ex. 13
Doc 20-13 Filed 10/30/18 Entered 10/30/18 22:22:18 Main Document
Pg 17 of 124
Pg 17 of 125

Page 16

1           THE COURT:  I understand that.  And maybe they

2    won't be able to trace.  But for the purposes of a motion to

3    dismiss where you have a situation where a fund is paying an

4    investment advisor a fee and the fund is fully invested in

5    BLMIS, why isn't it plausible to argue that at least some of

6    the money that was paid by Legacy to Khronos originated with

7    BLMIS.  And here there is a specific -- there are specific

8    allegations about how much was paid, during what period and

9    for the purposes of -- I don't know -- you have to --

10           MR. FISHER:  Your Honor --

11           THE COURT:  In other words, this is not a

12    complaint which simply says, upon information and belief the

13    money was transferred to other people.  There's a specific

14    allegation of a specific amount that was transferred by

15    Legacy to Khronos over the period.  Why isn't that

16    sufficient?

17           MR. FISHER:  Your Honor, I do -- I certainly agree

18    that the transfers from Legacy to Khronos are different from

19    the transfers from Montpelier.

20           THE COURT:  They have a different issue with

21    Montpelier.  But let's just deal with the transfers from

22    Legacy to Khronos.  Why aren't the allegations sufficient?

23           MR. FISHER:  So to be clear just about those

24    allegations, the allegation is that $42,000 annually was

25    transferred to Khronos and paid monthly.

 1          THE COURT:  Right.

 2          MR. FISHER:  That information seems to come from

 3    the accounting services agreement which is attached to --

 4          THE COURT:  Right.

 5          MR. FISHER:  -- the declaration.  In other words,

 6    it's not an allegation about a transfer.  It's an allegation

 7    about investment fees that supposedly were owed by Legacy --

 8          THE COURT:  No.  No.  No.  The allegation --

 9          MR. FISHER:  -- to Khronos.

10          THE COURT:  -- is that Khronos received an annual

11    fee.  Now if you're telling me they weren't paid, that's an

12    issue of fact.  But I can't decide that on a motion to

13    dismiss.  There's an allegation that Legacy paid Khronos

14    $42,000 plus a one-time payment.

15          MR. FISHER:  And, Your Honor, even just the basics

16    of Rule 8, looking at these allegations it's not clear

17    whether we're talking about two years of transfers, six

18    years of transfers.  The paragraph 150 which is the only

19    paragraph that talks about the transfers Your Honor is

20    asking about --

21          THE COURT:  But it doesn't matter.  It's a

22    subsequent transfer.  It -- if Legacy is liable for the six

23    year transfers, then you're liable for the six year

24    transfers.  Here it says -- I guess it's -- I understand

25    what you're saying.  But, I mean, what more do you need but

1     an allegation that the money was transferred and a plausible

2     inference that the money came from BLMIS.

3                 MR. FISHER:  Well, Your Honor, the paragraph just

4     doesn't --

5                 THE COURT:  All right.

6                 MR. FISHER:  It's hard to make sense of it.  It

7     goes on to say, as of the end of 2004 Khronos received fees

8     from Legacy Capital totaling $154,690.  What is that number?

9     It's not divisible by 42,000.  There --

10                THE COURT:  Why don't you move on to your other --

11                MR. FISHER:  -- are no dates and amounts.

12                THE COURT:  Why don't you move on to your other

13    arguments, Mr. Fisher?

14                MR. FISHER:  Okay.  Your Honor, I'm going to move

15    on to the willful blindness and actual knowledge issues in

16    the case.  And as I said, those issues apply both to Khronos

17    and to Legacy Capital.

18                And just by way of context to explain how those

19    issues fit into this case, the law as it applies in these

20    Madoff cases has now become at least substantially more

21    settled.  And it is clear that it is the trustee's burden to

22    plead these issues.  And it is also now clear that in order

23    for the trustee to get around the 546(e) safe harbor, the

24    trustee has to plead facts that give rise to a plausible

25    inference of actual knowledge.  And in order for the trustee

1    to state a claim it is the trustee's burden to plead willful

2    blindness or lack of good faith.  And --

3              THE COURT:  Well, that's kind of for a different

4    reason to undercut a good faith argument.

5              MR. FISHER:  My point simply being that willful

6    blindness is also part of the trustee's burden and it does

7    not factor into 546(e).  It factors here -- with regard to

8    Legacy it's a 548(c) issue.  And with regard to Khronos as a

9    subsequent transferee it's a 550 issue.  And with regard to

10   Khronos as subsequent transferee, if the trustee has failed

11   to plead lack of good faith it's an absolute -- it's a total

12   defense.

13             THE COURT:  Tell me why the complain doesn't plead

14   actual knowledge.

15             MR. FISHER:  So, Your Honor, if these standards

16   exist on some kind of continuum and the standard when we're

17   not talking about a SIPA case is inquiry notice, a

18   negligence type standard.  And then you move to willful

19   blindness and then even just beyond on that you have actual

20   knowledge.

21             THE COURT:  Just tell me why the complaint doesn't

22   plead actual knowledge.  That's it.

23             MR. FISHER:  Your Honor, the --

24             THE COURT:  I'm familiar with -- I don't mean to

25   cut you off.  I'm familiar with the standards.

```
 1              MR. FISHER:  The complaint is a due diligence

 2   complaint.  It is an inquiry notice complaint.  Essentially,

 3   what is plead are red flags that Khronos allegedly became

 4   aware of by virtue of Rafael Mayer (ph) serving on the

 5   investment committee of a particular Renaissance fund.

 6              The complaint then goes on to tell essentially

 7   half of a story --

 8              THE COURT:  Well, is it just pleading red flags or

 9   is it pleading that he at least knew some of those red

10   flags?

11              MR. FISHER:  It's -- it pleads, Your Honor, that

12   Mr. Mayer became aware of some of those red flags by virtue

13   of serving on an investment --

14              THE COURT:  Right.

15              MR. FISHER:  -- committee at Meritach (ph).  It

16   makes much, for example, of what it calls the Renaissance

17   proposal, which is also a document that we attached as part

18   of our motion to dismiss.

19              And the Renaissance proposal was grappling with

20   the question of, well, how could it be that Madoff is

21   trading options in the volumes that we think he's trading,

22   and raises all kinds of possibilities.  It never -- the

23   Renaissance report itself never raises the possibility that

24   there were no securities transactions going on.

25              THE COURT:  You think it raises a suspicion?
```

1          MR. FISHER:  It raises -- no, Your Honor.  I think

2     the Renaissance study itself goes on to say essentially

3     there are different possibilities for why this isn't adding

4     up.  One possibility is that it must be that Madoff isn't

5     managing $6 billion.  He must be managing much less.  There

6     is never anything in that Renaissance report to suggest a

7     concern about a Ponzi scheme.

8          The complaint then goes on to allege that Mr.

9     Mayer became aware of concerns, for example, about options

10    volume; that Legacy then hired Khronos to perform some

11    additional due diligence for them with regard to the Madoff

12    investment.  So already, Your Honor, I think that's why this

13    is not a case like Merkin.  This is not a willful blindness

14    case.  We have an allegation that there was an awareness of

15    red flags and then steps were taken to investigate red

16    flags.  So this can't possibly--

17         THE COURT:  Why would they have hired Khronos to

18    do that if they didn't have some suspicion that something

19    was going on?

20         MR. FISHER:  They -- there's -- there was some

21    suspicion that something was going on.

22         THE COURT:  Right.

23         MR. FISHER:  I think that it's fair to say that

24    people at Renaissance, and Mr. Mayer was on that committee,

25    were scratching their heads saying, we're not sure how he

1   does what he does.  And what came up in the context -- and,

2   again, this is very clear from the documents that the

3   trustee relied on in preparing the complaint and quotes from

4   in preparing the complaint, the context was that Renaissance

5   wanted to try to replicate Madoff's trading strategy, not

6   concerns that there were no securities transactions going

7   on.  Words like that were never uttered.

8          So Khronos then -- Khronos is then hired by Legacy

9   to perform some additional due diligence, and the trustee

10  tries to make much of what they did although the complaint

11  actually has -- it sounds like facts.  It has the feeling of

12  facts because things are pled with a kind of specificity.

13  But when Your Honor really takes a close look at the

14  allegations, there are no allegations about any subjective

15  belief that anyone at Khronos or Legacy formed with regard

16  to the possibility that there were no securities being

17  traded.

18          And I'll give Your Honor just an example because

19  -- and it's an example because I think it shows how this

20  complaint is designed to obfuscate that issue.

21          If Your Honor looks, for example, at -- beginning

22  at paragraph 66 of the complaint, it's the bottom of page

23  16, Your Honor.  And this is just an example of how

24  allegations are being used to make it sound as though there

25  are facts that give rise to an inference, but really there

Page 23

1    are not.

2          So paragraph 66 says, Legacy's -- Legacy Capital's

3    account statements and trade confirmations demonstrated

4    Madoff was purportedly engaging in a possible option

5    transaction.  And then it goes on to say, Legacy Capital's

6    account statements reflect that over 26 percent of the time

7    the options volume of BLMIS reported trade for these

8    accounts exceeded the total number of OEX options.

9          So that is a red flag, right?  Then if you turn

10   there's a chart.  Okay.  This is not Khronos's --

11         THE COURT:  Where's the chart?

12         MR. FISHER:  On page 17, the next page.  There's a

13   chart embedded in the complaint.

14         This is not Khronos's chart.  There's no

15   allegation that Khronos prepared this chart on behalf of

16   Legacy.  And then in paragraph 67 and 68 it says, take a

17   look at what happened on February 19th.  Take a look at what

18   happened on January 17th.  There's no allegation that anyone

19   at Khronos or at Legacy was actually aware of those facts,

20   actually took a look at those facts.

21         And the premise of this whole chart is that the

22   options volume is in excess of trading on the Chicago Board

23   of Exchange.  But, Your Honor, all of the documents, the

24   Renaissance documents show that part of scratching their

25   heads was saying, well, maybe he's trading away from the

```
 1    exchange in private transactions.

 2              So, in other words, there were efforts to try to

 3    figure out what was going on.  But there are no facts from

 4    which it can be inferred which the trustee then tries to do.

 5    You know, each section like this concludes like it does in

 6    paragraph 71:  Based on its review of the trade

 7    confirmations and monthly statements defendants knew that

 8    BLMIS could not have been engaging in the options trading

 9    strategy.

10              Well, essentially, that is the trustee in 2015

11    doing work that any -- it's true.  Any sophisticated

12    investor could have done this work back in 2003 and 2004.

13    And it's the trustee saying, well, now that I know that

14    Madoff was a fraud, I look at this and I say to myself, any

15    sophisticated investor who would have done this work would

16    have known that there were no securities being traded or

17    would have known that there were no options being traded.

18              Well, that's what we mean when we say that this is

19    a complaint that is pled by hindsight.  And what's being

20    disguised here is that really even though they slap the

21    words, defendants knew, defendants knew as many times as

22    they can all over the complaint, really this is the same

23    complaint that these defendants faced in 2010 which was

24    under the old inquiry notice standard.

25              Really, when you cut through the allegations, Your
```

Page 25

1    Honor, these are allegations that there were red flags.

2    Khronos did something in response to those red flags,

3    therefore, it's not a willful blindness case.  And what

4    we're not told really is, well, what did Khronos actually

5    do, what view did they actually form, why.  That's what

6    would be required to get this case over into the zone of

7    willful blindness or actual knowledge, Your Honor.  There's

8    nothing about subjective belief.

9           And that's what makes this case quite unlike

10   Merkin because you don't have defendants hiding their head

11   in their sand and quite unlike Kingate because you don't

12   have any allegations that would demonstrate some sense of

13   culpability, some sense of we're dealing with a fraud here.

14   There was the sense of mystery that lots of sophisticated

15   investors grappled with, perhaps, at various points in time

16   and then put to rest in people who were -- you know, Harry

17   Markopoulos (ph) was saying this is a fraud and people

18   looked at him as though he was -- you know, he was some kind

19   of crack pot.

20          This was -- people looked at the problem of

21   options volumes, but that's a far cry from saying that these

22   defendants had any kind of subjective belief or concern that

23   there were no securities being traded.

24          Your Honor, the source of all the information --

25   what makes this complaint a little bit different, the story

      1    that the trustee tries to tell here is a story that involves

      2    Renaissance, and we demonstrated in our papers how when the

      3    Court takes a hard look at the documents that the trustee

      4    had by virtue of Rule 2004 discovery and relied on in

      5    preparing the complaint that story really falls apart.

      6          The essence of the story is that as -- the arch of

      7    the story as the trustee tells it is Renaissance became

      8    aware of these concerns.  Renaissance concluded it was a

      9    fraud.  Renaissance got out.  Khronos did the same thing,

     10    but Khronos did not get out.  And every part of that story,

     11    Your Honor, falls apart.

     12          Renaissance did not conclude it was a fraud.  The

     13    trustee makes much of what Renaissance -- of what there is

     14    Renaissance personnel said and did, but ignores the fact

     15    that in their SEC testimony to a person they said we did not

     16    suspect that his was --

     17          THE COURT:  What --

     18          MR. FISHER:  -- a Ponzi scheme.

     19          THE COURT:  What did you expect them to say to the

     20    SEC in 2009 or 2010?

     21          MR. FISHER:  Your Honor, I don't -- I mean, and

     22    that's -- the trustee tries to  --

     23          THE COURT:  All right.

     24          MR. FISHER:  -- essentially impugn the credibility

     25    --

```
 1                THE COURT:  Well --

 2                MR. FISHER:  -- of this -- of their own witness.

 3      I don't know that Renaissance wouldn't have been in a

 4      position to boast that --

 5                THE COURT:  But if you have --

 6                MR. FISHER:  -- they thought there was a Ponzi

 7      scheme.

 8                THE COURT:  -- two different contrary statements

 9      by the same person, I knew and I didn't know, you can't

10      resolve that on a motion to dismiss.

11                MR. FISHER:  I don't think Your -- well, I think

12      that -- I don't' think that Your Honor needs to get there at

13      all because --

14                THE COURT:  Well, you raised it.

15                MR. FISHER:  Fair enough.

16                THE COURT:  You want to withdraw that whole

17      argument about the SEC --

18                MR. FISHER:  I don't think I can withdraw it, Your

19      Honor, because it's part of our papers and it's --

20                THE COURT:  All right.

21                MR. FISHER:  -- part of our papers because that's

22      the complaint --

23                THE COURT:  If you would have filed a shorter

24      pleading then --

25                MR. FISHER:  If I had known that Your Honor was
```

```
 1    not interested in the Renaissance --

 2              THE COURT:  No.

 3              MR. FISHER:  -- part I certainly would have filed

 4    a shorter pleading.

 5         (Laughter)

 6              MR. FISHER:  So you have the Renaissance

 7    allegations.  There are not -- there are not facts

 8    indicating that Renaissance formed a subjective belief that

 9    it was a Ponzi scheme.  And if Renaissance did, there are

10    not facts indicating that Renaissance conveyed that belief

11    or that Khronos formed a similar belief.

12              And then most of the -- many of the allegations in

13    the complaint are generic, non-Renaissance, I would say, red

14    flags, the kinds of things that Your Honor has seen before,

15    allegations about one day Intel traded outside of  its price

16    range for that day.  On another day Mark traded outside of

17    the price range.  That's what makes this a generic inquiry

18    notice complaint where, at bottom, all its saying is what we

19    know now, if you had taken a hard look at all these things

20    you might have come to a different conclusion.

21              But the reality is there's no allegation from

22    which this Court can plausibly infer that anyone at either

23    of the two defendants subjectively formed any belief that

24    this was a Ponzi scheme.

25              And, Your Honor, it's also worth noting that if
```

1    both motions are granted in their entirety because Your

2    Honor finds that actual knowledge and willful blindness have

3    not been adequately pled, this is still a substantial case.

4    There is still an eighty-six-and-a-half-million dollar net -

5    profit case against Legacy.  So the defendants still have

6    much to contend with, but they should not have to contend

7    with a complaint that we think Judge Rakoff's opinions make

8    crystal clear is not a complaint that appropriately can be

9    characterized as a bad faith complaint.  It should have been

10   a straightforward net profits case, Your Honor.

11          THE COURT:  Thank you.

12          You don't even have notes.

13          MR. KAJON:  I make it up as I go along.  I'll be

14   brief, Your Honor.

15          Just going back to Renaissance for a moment, the

16   facts are clear that after raising all these questions, and

17   there was a report.  There were emails back and forth.

18   Renaissance didn't redeem its entire investment.  It

19   redeemed half of its investment and then months later

20   redeemed the other half.  And as the Renaissance

21   representative said, you don't leave half your capital at

22   risk if you think it's a fraud.

23          So maybe the guys when they were testifying before

24   the SEC had a convenient memory, but their actions at the

25   time speak very clearly.  They were asking questions.  They

1    were scratching their heads.  They were trying to figure

2    out, how does he do it, how does he make money for us, how

3    does he make money from us.  Those were the kinds of

4    questions that they were asking.  It doesn't say, he must be

5    a fraud, he was running a Ponzi scheme like Merkin was

6    saying.  Merkin was saying, you know, it will be known as

7    the Madoff scheme instead of a Ponzi scheme.  There is none

8    of that in there.

9              Asking questions is inconsistent with actual

10   knowledge.  If you have actual knowledge that no securities

11   are being traded, why are you asking questions as to how

12   does he do it.

13             THE COURT:  Well, it's consistent with willful

14   blindness, though, isn't it?

15             MR. KAJON:  Again, willful blindness, the trustee

16   alleges that we then did an investigation.  If Legacy did an

17   investigation --

18             THE COURT:  Couldn't --

19             MR. KAJON:  -- was it --

20             THE COURT:  -- it gather up --

21             MR. KAJON:  -- willfully blind?

22             THE COURT:  And it sold its securities.  So

23   couldn't you gather -- through the investigation couldn't

24   you get actual knowledge as a result of that investigation?

25             MR. KAJON:  Then why did they stay invested?

1          THE COURT:  Well, I mean --

2          MR. KAJON:  But the trustee doesn't allege -- when

3    trustee's counsel gets up ask him, show me where in the

4    complaint you allege plausible facts going to Legacy's

5    subjective state of mind that demonstrates either actual

6    knowledge or willful blindness.

7          THE COURT:  You should be sitting here.

8      (Laughter)

9          MR. KAJON:  Just basically, Your Honor, what -- as

10   Mr. Fisher said, this is a constructive notice pleading, you

11   know.  Legacy performed all this due diligence.  It must

12   have known.  That's not the standard in a SIPA case.

13          Thank you.

14          THE COURT:  Thank you.

15          MR. WARSHAVSKY:  Good morning, Your Honor.  Oren

16   Warshavsky, Baker Hostetler for the trustee.

17          Your Honor, if I may give to you and to counsel, I

18   -- to make it a little easier to follow I put -- we prepared

19   a little binder with some of the --

20          THE COURT:  A slide show?

21          MR. WARSHAVSKY:  It's not a slide show.  It's just

22   actually the different documents from the -- to make it a

23   little easier we highlighted a few portions which I think we

24   will use to answer some of the questions posed by our

25   adversaries.

```
 1              And, Your Honor, I think there are a few points

 2      where I would like to start with where I agree with some of

 3      the points Mr. Fisher made.  What he starts out by saying is

 4      that we all know that Madoff is a fraud.  We all know that

 5      he made mistakes.  We all know we can find that from the

 6      statements.  We agree with that.  And I -- I think where we

 7      start our argument as a result and where we started our

 8      complaint was actually Renaissance coming to this

 9      conclusion.

10              What we put together were just a few of the

11      documents that were relied on in the complaint which then

12      were submitted by both Mr. Fisher and Mr. Kajon in their

13      declaration.  And I thought I would -- you know, if you

14      would like to discuss Renaissance I'm happy to discuss that

15      first.

16              But I think, you know, what's interesting about

17      the proposal, about the Madoff proposal is what that really

18      was -- and I think both Mr. Fisher and Mr. Kajon asked it

19      properly.  The defendants -- Renaissance was trying to

20      figure out what was going on.  And it was when they were

21      going through that diligence that Renaissance realized there

22      were questions that it couldn't answer.

23              They have people who think they're smart doing an

24      analysis saying, just based on the Legacy -- now they didn't

25      have all the information Legacy and Khronos had, which were
```

1    the trade confirms and the -- but they had the end of the

2    month statements.  They had the end of the month statements

3    and they looked at it and they saw some irregularities and

4    they saw some qualms, including the options volume,

5    including what they didn't realize, for instance, was that

6    Madoff was purchasing -- I'm sorry.  I'm going to -- I

7    always get this wrong, puts in cells.  But purchasing puts

8    before selling calls.  Right.  They noticed it from the

9    statements.

10            What they didn't know, but what Legacy and Khronos

11   knew, was that there was no margin to do that.  There was no

12   Madoff could do that.  So there are little points like that.

13   But the --

14            THE COURT:  Let me --

15            MR. WARSHAVSKY:  -- major point --

16            THE COURT:  -- stop you.  I read the --

17            MR. WARSHAVSKY:  yeah.

18            THE COURT:  You know, I read the --

19            MR. WARSHAVSKY:  Sure.

20            THE COURT:  -- Renaissance report.

21            MR. WARSHAVSKY:  Yeah.

22            THE COURT:  And while there are questions raised

23   about how Madoff did it, the entire report is taken from the

24   view that he's actually trading securities.

25            MR. WARSHAVSKY:  Yeah.  I think that's right.  And

```
1    I think --

2              THE COURT:  Except at the end they say, well, you

3    know, we're going to try and come up with a program and put

4    together a portfolio for it.

5              MR. WARSHAVSKY:  Well, I think that's right, and I

6    think what you see, what happens, the analogy that I use in

7    the office, and I hope you're not a Carbuck, you know, it's

8    poke holes.  But the analogy I came up with is, Volkswagen.

9    You know, we recently heard about the Volkswagen software

10   fraud.  And you're a competitive car manufacturer, first

11   you're going to look and you're going to say, well,

12   Volkswagen has this great mileage and low emissions, go

13   figure out what Volkswagen is doing.

14             Your first assumption isn't that Volkswagen has

15   rigged the system, right.  But what happens is, as you start

16   to reverse engineer, as you start to do an analysis, you do

17   understand it.  And I think that's what we see as we go

18   through the Renaissance e-mails and Meritage oversight e-

19   mails, which then begin at tab 2 and are also cited.

20             And it starts with Nat Simons.  And what's

21   interesting here, I think that the defendants have

22   characterized or suggested we characterize as Renaissance as

23   a white knight, we certainly not.  Renaissance was in it to

24   make money.  That's Renaissance's job, it's going to try and

25   reverse engineer it.
```

```
 1              And Renaissance comes and looks and says, first

 2    question is how does Madoff -- and if you look at the

 3    November 13th e-mail from Nat Simons, he points -- there are

 4    a few basic points.  One is, is what he's doing illegal,

 5    that's the first paragraph is all about, is what Madoff is

 6    doing illegal.

 7              We've heard rumors that it's illegal.  And then he

 8    says, how is he making his money, why is he doing this for

 9    free.  All right.  And then you raised a few other points,

10    which I won't go in, but I think one point which is

11    interesting, they say it's a generic red flag that we raise,

12    and I'll show you because it keeps coming up, is the lack of

13    an independent auditor, right there in the middle of the

14    second full paragraph.  "We have no idea if there are

15    conflicts in his business that come to some regulator's

16    attention, throw in that his brother-in-law is his auditor."

17              Well, they were wrong about that, but they were

18    right to start questioning his auditor.  And they were

19    looking at all the different pieces.  That starts on a

20    Thursday.  By Friday, you start to see the chain go through,

21    right.

22              And then you say, well, wait a -- the next e-mail

23    is from Henry Lauffer (ph) on Friday, goes back to this idea

24    of cherry-picking.

25              THE COURT:  This is the one that didn't go to
```

```
 1    Mayer (ph).

 2            MR. WARSHAVSKY:  No, this one went to Mayer,

 3    Raphael Mayer is right there in the --

 4            THE COURT:  And the first one.

 5            MR. WARSHAVSKY:  The first one to Raphael Mayer as

 6    well.

 7            THE COURT:  Does 14 point to Mayer?

 8            MR. WARSHAVSKY:  Yeah.

 9            THE COURT:  Oh, I see Mayer.

10            MR. WARSHAVSKY:  I'll show you one that didn't go

11    to Mayer.  We acknowledge there is one that didn't go to

12    Mayer, but Mayer is on all these.  And he then talks about -

13    - he says, look, this cherry-picking allegation, which we

14    don't know how he gets these -- he gets these ridiculous

15    places.  He's always able to -- what the Renaissance report

16    said, the other report says, he's always able to trade his

17    options at the 4 o'clock price.  He's always able to get

18    these extraordinary fills, where he can somehow buy all the

19    stocks at a great price.

20            He can buy -- he can only buy low, he always sell

21    high, how does he do it.  Right.  And here what Henry

22    Lauffer first says is first he says, that yes, my sense is

23    there something illegal, because we can't figure out, and we

24    have total independent evidence that Madoff's executions are

25    highly unusual.  And they go back to the fact that they're
```

Page 37

1    worried about Elliott Spitzer.

2              I want to turn ahead a couple of e-mails to one

3    later that day, it's at about 12:30.  It's from Carl Broder

4    (ph) and it's Rand VA 00001, which Your Honor can see it.

5    And that's where he refers to Madoff as background

6    radiation, he's always had a concern.  He refers to articles

7    that he's read that are now -- and again, Raphael Mayer is

8    on this.

9              And then he says, ah, but what if cherry-picking

10   isn't part of this.  Who the heck is on the other side of

11   all these trades of Madoff who's willing to lose every

12   trade.  How can somebody be on the other side be willing to

13   lose every trade, how do they have a compensation model that

14   has nothing to do with performance.  There is no plausible

15   information for that, and that's where he continued to see -

16   - you also see further e-mails that day where different

17   individuals say they're in favor of redemption.  And if they

18   can't get answers.

19             So this is in about a month of the report coming

20   down, and all this is over the course of one day.  So

21   clearly it starts with, should we redeem to -- if he can't

22   answer this, he better -- that's one day they figured out.

23             Now, during that day, we turn to tab 3, and this

24   is what -- this is the e-mail that Raphael Mayer isn't on,

25   but I'd like to go through it for one moment, because I do

1    think what you'll see are the strands of how they were

2    connecting it at Renaissance, to the next e-mail which

3    Raphael Mayer himself composes, right, and that's the key

4    point.

5              Is that -- so Paul Berger (ph) then decides to

6    write off line, and he says that Khronos is going to start

7    preparing some questions for Madoff.  That's the defendant

8    and as we'll see later, it's Raphael Mayer, all right.

9              And oh, I'm sorry, I think I skipped one, Your

10   Honor, I apologize.  I'm sorry.  The e-mail that Raphael

11   Mayer is -- I apologize for that, Your Honor, I'm looking at

12   number 3, which is tab 3, which Raphael Mayer is not on

13   there.

14             All right.  And the point here is that Renaissance

15   starts making some conclusions about Madoff, right, and what

16   he says when he goes through is that the study that was

17   done, which was from '95 to '01 shows that there's not

18   enough options, it shows that there are real problems, it

19   shows that they can't figure out how he's getting these

20   trades, how is he actually being able to trade at these

21   prices.

22             And he looks and he says -- and when he goes

23   through the analysis, what he tells you is that, and we've

24   actually pled this in the complaint, that when you do the

25   extrapolation -- he says here that if you were to take a

Page 39

1    look at Madoff's trades, would actually take up the entire

2    OEX for three full days.  Every time Madoff does a trade, it

3    would take the entire OEX not just in that share, the entire

4    OEX, right.

5              And if you actually extrapolate out as we pled in

6    the complaint, because the sale was from 95 to owen (ph), if

7    you extrapolate it out, we're not getting to the point yet

8    where we see the defendants do, but actually take anywhere

9    from 9 to like 18 days.

10             What they also -- and point 5, and this is again,

11   we're going to see, I'm sorry, in the paragraph 5 here, it

12   says recall point 2.  And when you look at it, this refers

13   back to the discussion of who's on the other side of the

14   trades, and we're going to see this in Raphael Mayer's later

15   e-mail.

16             He says, who's big enough to be on -- if he's

17   doing this over the counter, who's big enough to be on the

18   other side, and I'm going to come back to the over the

19   counter and the OEX issue.  You know, there's two options,

20   right, it's either on the -- or two choices, it's either on

21   the exchange or it's over the counter.

22             THE COURT:  Where's the evidence that Legacy or

23   Mayer knew all this?

24             MR. WARSHAVSKY:  Well, I think it's --

25             THE COURT:  The allegations.

Page 40

1           MR. WARSHAVSKY:  Well, I think you can turn to the

2    next e-mail, Your Honor, which is one written by Raphael

3    Mayer, and then you have Broder on the other side of it.

4           And there are more than just this, by the way, and

5    I'll get to those in a moment.  But Raphael Mayer starts

6    point, you know, number two on this is about the options.

7           And what you see is that this is being prepared by

8    Khronos, and then Paul Broder -- by Raphael Mayer on behalf

9    of Khronos, it -- Raphael Mayer says, "Greetings, all, I

10    thought it would be useful for today's meeting for us,

11    Khronos, to share what we see are the open issues for

12    research."

13           Right.  So when there's a suggestion that Khronos

14    wasn't doing their research, Khronos is saying here it's

15    doing their research, right.  Raphael Mayer is the one who's

16    saying it.  And then he lists out everything.  What we have

17    is Paul Broder --

18           THE COURT:  So after regards raft, that's also his

19    --

20           MR. WARSHAVSKY:  Yes.  You're talking about at the

21    --

22           THE COURT:  Where it starts, financial research

23    and then lists all these concerns, that's something Mayer

24    wrote?

25           MR. WARSHAVSKY:  Everything that has the -- yes.

Page 41

```
 1    Everything that has the arrow in front of it, because I
 2    guess Paul Broder responded.  Unfortunately that's the way
 3    they did it.  Paul Broder, you can see where there's not a -
 4    -
 5              THE COURT:  Where does Mayer's e-mail end and
 6    Broder's begin?
 7              MR. WARSHAVSKY:  I think Mayer's begins at the
 8    very top, where it says Mayer Raphael wrote --
 9              THE COURT:  Yes.
10              MR. WARSHAVSKY:  And then --
11              THE COURT:  But this is all Broder.
12              MR. WARSHAVSKY:  No, no, this is all --
13              THE COURT:  This is Broder writing what Raphael
14    wrote.  And that's just that one paragraph, isn't it?
15              MR. WARSHAVSKY:  No, no.  Your Honor, what he did
16    was he wrote over it -- I think where you can tell the
17    difference is where there's not a little arrow beginning,
18    Broder states --
19              THE COURT:  There's arrows through every line on
20    this entire e-mail chain.
21              MR. WARSHAVSKY:  No, there's not.  If you go down
22    to let's say options, which is about a third of the way
23    down.
24              THE COURT:  Yes.
25              MR. WARSHAVSKY:  Right below that, you see
```

1 confirmed with him that the options trades, that was written

2 by Broder to Raphael. But Raphael does the first --

3 anything with the arrows is what Raphael did. So Raphael

4 does --

5         THE COURT: I am very confused about who was it at

6 what portions of this e-mail. It seems to be one e-mail

7 from Broder to Raphael and others, and I just don't know

8 what's --

9         MR. WARSHAVSKY: All I can tell you is when you --

10 what happens to us, Your Honor, when we forward an e-mail, I

11 think it's the same with any others, that when we forward an

12 e-mail from like an IPhone or something like that, the part

13 that's -- you're forwarding has like either an arrow or a

14 line in front of it.

15         THE COURT: But you can always tell where one e-

16 mail ends and the next one begins.

17         MR. WARSHAVSKY: Unless somebody comments and

18 interspersed. But it wasn't -- it wasn't made for today.

19 Unfortunately, it wasn't made as part of evidence, it was

20 part of a discussion, and we do the same thing where we

21 sometimes respond in caps or different colors. But when

22 it's a plain text e-mail, this is how -- I don't think the

23 defendants would disagree with this.

24         But in any event, even if it's from Broder to Rah

25 (ph), you know, we would suggest to you that Khronos is

Page 43

1   actually -- the way e-mail works is that anything with the

2   arrow in front of it is Raphael, right, because it's -- and

3   it all starts with Mayer Raphael wrote, and it goes all the

4   way through the bottom until we get -- and you can see where

5   it's forwarding the Nat Simon's e-mail for instance, which

6   said, "we'd like to prepare for this."

7           THE COURT:  So if Raphael wrote it, why is this e-

8   mail being sent to Raphael with cc's to everybody else?

9   He's telling him what he wrote?

10          MR. WARSHAVSKY:  No, I think what's happening

11  here, much to any group discussion works, Your Honor -- I

12  know we do it this way, I don't know how -- but when you're

13  commenting on somebody else's -- or somebody else has

14  written above instead of writing an entire narrative above

15  it, you go to each point, this is how they -- this is what

16  we see in the other -- in some of the other e-mail trails.

17  But --

18          THE COURT:  Is there an issue whether Raphael

19  wrote all this?

20          MR. FISHER:  Your Honor, I would like an

21  opportunity to explain what we think this e-mail --

22          THE COURT:  Well, if anything else, we're trying

23  to gauge its importance.

24          MR. FISHER:  Well, just -- so just on the factual

25  question of who's the author here, this is an e-mail that

08-01789-cgm  Doc 20174-13  Filed 08/28/20  Entered 08/28/20 18:58:23  Main Document
Pg 45 of 124

Page 44

1    Paul Broder sent to Mr. Mayer.

2              THE COURT:  I see that.

3              MR. FISHER:  In its entirety.  But what we

4    believe, and of course this is not an evidentiary hearing,

5    but we're just laying allegations, but what we believe this

6    is, is Mr. Broder took an e-mail that Mr. Mayer had sent to

7    him, and then interpolated into that e-mail his own

8    commentary on Mr. Mayer's points.

9              So, in fact, Mr. Mayer's e-mail is not sarcastic

10   at all, for example.  It's a very just straight forward, and

11   it is as Mr. Warshavsky said, where you see an arrow, that

12   likely is Mr. Mayer writing.  And it's a straight forward

13   description of here's what I think we should do as follow-

14   up.

15             And then you see some interpolations that Mr.

16   Broder made --

17             THE COURT:  Oh, I see.

18             MR. FISHER:  -- to that e-mail.  And then Mr.

19   Broder copied that e-mail to other colleagues at

20   Renaissance, as part of this discussion about what people

21   were seeing with regards to Madoff's accounts, and what

22   people were thinking about in terms of next steps.

23             THE COURT:  Okay.  Thank you.  Go ahead.

24             MR. WARSHAVSKY:  So again, if we look at what the

25   bullet -- the numbered points are.  We start first again,

08-01789-smb Doc 20174-13 Filed 08/28/20 Entered 08/28/20 18:58:23 Ex. 13 Pg 46 of 124

1   that Khronos is actually preparing that.  Mr. Mayer is

2   sending it over.  Number one, he wants to know the assets

3   and the strategy.  And the only reason to know about assets

4   under management is to do extrapolations and to figure out

5   what the trading volumes are.  Right.

6        The next thing is, they go into the options.  Now,

7   putting aside Mr. Broder's commentary and some of the

8   sarcastic remarks, the point was, what Mr. Mayer was going

9   to ask was, to know about the options, and he wanted to know

10  how does he get the prices, and what are the strikes

11  relative to the underlying stock.

12       And again, that goes back to the fact that the

13  options were traded on -- puts were bought, and then the

14  calls were sold, separate from the underlying securities

15  trade, which is noted in the Renaissance proposal.  It's

16  noted throughout the other e-mails.

17       That's the reason for trying to understand how

18  does he set his prices, how does he pay.  But then we get

19  through the discussion, you know, and Raphael Mayer says he

20  wants to know who's on the other side, and then we see Mr.

21  Broder's response as to what Raphael Mayer should say,

22  should he speak to Madoff, which is all about, what banks --

23  who would be willing to do this, who's willing to lose every

24  trade, who's big enough to be on the -- if you're really

25  doing this over the counter because you couldn't do it on

1       the exchange, who's big enough to be on the other side of

2       these trades and willing to lose all the time.

3                 These all -- look, these are great rhetorical --

4       for the trustee, this is terrific, because it shows that

5       there is no legitimate answer.  And as Mr. Fisher states, we

6       know that there was no one on the other side, we know there

7       was no legitimate answer to any of these questions.

8                 But the point is, for our purposes, what we've

9       heard from both sets of counsels, there's no truth that

10      there was anybody doing any diligence.  This e-mail and if

11      we turn to the next page, you see more of it.  They're going

12      through volumes, how does he do pricing, who's on the other

13      side --

14                THE COURT:  Where do you allege or is it

15      reasonable to infer that they knew that he was not trading

16      securities, that actually Legacy knew not Renaissance?

17                MR. WARSHAVSKY:  Well, we don't have an allegation

18      flat out that they knew he was trading those securities, and

19      if we did have that, they would tell you it was conclusory.

20      What we actually say --

21                THE COURT:  But I mean the facts.  Okay.  So

22      there's a lot of stuff in here, they have a lot of questions

23      about Madoff how he does it.

24                MR. WARSHAVSKY:  Well --

25                THE COURT:  And Legacy's point of view, is they

1    then -- is that it then conducts an investigation.

2            MR. WARSHAVSKY:  And what would I turn to then,

3    Your Honor, is --

4            THE COURT:  Where do you allege or imply that as a

5    result of that investigation, they learn he was not actually

6    engaged in the trading of securities?

7            MR. WARSHAVSKY:  Okay.  So one example, for

8    instance, would be the discussion about where Mr. Fisher

9    drew Your Honor's attention earlier.  I'll go first to the

10   option, but then I'll go to other facts as well.

11           But -- because the options tends to be an easier -

12   - so you can't trade options that weren't there.  And if

13   you'd turn to the options --

14           THE COURT:  But that assumes you know externally

15   how many options are being traded.

16           MR. WARSHAVSKY:  Well, that's true --

17           THE COURT:  We know that just from the statements.

18           MR. WARSHAVSKY:  Well okay.

19           THE COURT:  And you allege that based upon the

20   review of the confirmations and the monthly statements they

21   knew, and I don't know how they would know that based on the

22   review of the confirmations and monthly statements.

23           MR. WARSHAVSKY:  Okay.  So what they would know

24   from just the confirmations, I'll start with that, is that

25   they are traded over the exchange.  And we have the

1    allegation in the complaint, I'll ask one of my colleagues

2    to pull it up, I think it's -- but the point is, that they

3    had a QSIP identification and while Renaissance didn't know

4    that, Legacy certainly did, because it was receiving the

5    confirmations.  And what the QSIP code means is that it's

6    being traded on the exchange, okay.

7              And then what I would turn Your Honor's attention

8    to, and we allege it in the complaint, and the defendants

9    have given you the actual documents, I'll go to it, which is

10   at tab 5 of what I've given you, which is the account

11   services agreement.  I'm sorry, it's paragraph 57 is the one

12   about the -- is the paragraph.

13             THE COURT:  57?

14             MR. WARSHAVSKY:  Is the paragraph at the QSIP

15   identification notes.  And so we certainly do allege it, and

16   every confirmation that they received how the QSIP --

17             THE COURT:  I understand it was in there, but

18   where does it say or imply, ah-ha, that meant to them that

19   he was not trading in securities?

20             MR. WARSHAVSKY:  Well, I think you have to look at

21   the facts together.  So you know they're being traded over

22   the exchange, and then if you look at the account services

23   agreement, you know, and there's already been a discussion

24   about the problem with the exchange.

25             But if we turn to the account services agreement,

1    and in particular, I would turn you to the services

2    schedule, which is at page 6.  All right.  And if you look

3    at paragraphs 2, 3, and 4, which talk about historical load

4    data, which was from 2000 to 2004, then a different

5    historical load data, which was going back in time from --

6    '92 to '99, and then the ongoing services, right.  And all

7    of them require entering trades on a daily basis.

8            And then valuing the portfolio daily, based on the

9    end of day pricing, and store price volume statistics from

10   IDC, that's how I know, because they said -- because they've

11   said that Khronos agreement with the defendants was to do

12   price volume statistics at the end of every day, each time

13   they got a confirm, and they were supposed to continue

14   valuing it even when they did it.

15           So any time they got a confirmation from Madoff,

16   whether he was trading above it, they were doing a volume

17   analysis according to this.  When they -- every day when

18   they got a price out of range, which is another red flag

19   that we've gone to, and it's a hallmark where he's trading

20   outside of the range, they know it's not -- that the -- that

21   it's -- that it's not trading at that price.

22           When they get 155 out of 159 of their dividend

23   payments are on the wrong day and they go to verify it

24   against Fidelity, they know that there's nothing in the

25   market when they go to confirm it with Fidelity that shows

1    that that money is coming.

2              And ultimately what that means is they know that

3    what's showing up on those statements and in those confirms,

4    and the money that's showing up in their account is money

5    coming from another source.  Wherever it's coming from is

6    not what Madoff -- it's not on these trades that Madoff is

7    reporting to do for them.

8              And I think that when you look at those together,

9    and so Mr. Fisher's quite right when he says, Renaissance

10   didn't -- I'm sorry, not Renaissance -- Legacy, neither

11   Legacy nor Khronos created the chart, and we've included a

12   slightly bigger one at tab 7 I think.  But what you can see

13   from those charts, very clearly what they were seeing every

14   day.

15             We did it as a demonstrative.  We can list out

16   every day where the 26 percent of the trades, but I think

17   it's enough.  They certainly received it.  At the end of the

18   day, this is a notice pleading, and we've listed examples,

19   and those examples, there's no explanation for it.

20             In particular, there's no explanations for days

21   where there's trades or where Madoff is trading in a

22   security that doesn't show up in anything that they can

23   confirm.

24             I'd also turn Your Honor's attention --

25             THE COURT:  Let me ask a question.

1              MR. WARSHAVSKY:  Yeah.

2              THE COURT:  Why is plausible to infer that someone

3    who knows there's a Ponzi Scheme continues to invest in it?

4    They're not insiders of Madoff and part of the inner circle,

5    there's no allegation that we've seen in some of the other

6    cases of people warning them before the fact that this is a

7    scam.

8              MR. WARSHAVSKY:  I agree that --

9              THE COURT:  Why does someone do that?

10             MR. WARSHAVSKY:  You know, I don't know, and we

11   haven't had discovery here, and the answer -- the simple

12   answer is greed.

13             THE COURT:  Well, explain to me why it's plausible

14   influence.

15             MR. WARSHAVSKY:  Well, because simple answer is

16   greed.  And it starts with the fact that Madoff is walking

17   away from the money and point of fact, you can really see

18   them at Renaissance e-mails, but let me just talk about the

19   money.

20             Madoff walks away from the fee, and these

21   defendants made $36 million.  Right.  That's a pretty good

22   motive perhaps.  You know, at this stage, we don't know what

23   they were thinking, we didn't get 2004 discovery from --

24             THE COURT:  So you're saying that they're doing it

25   for the thing, not for whatever money is invested with

1:09-cv-01789-nrb Doc 2019742-13 Filed 10/30/15 Entered 10/30/15 18:22:24 Main Document
Pg 53 of 125
08-01789-nrb Doc 20974-13 Filed 08/28/20 Entered 08/28/20 18:58:23 Ex. 13
Pg 53 of 124

Page 52

 1   Madoff?

 2          MR. WARSHAVSKY:  I'm giving you what I think is a

 3   plausible answer.  They could be doing it for money with

 4   Madoff, but I think --

 5          THE COURT:  But sooner or later it's going to

 6   collapse and everybody's going to figure this out.

 7          MR. WARSHAVSKY:  You know, good -- Ponzi Schemes

 8   don't last because of good judgment.  And people -- lots of

 9   people think they can do things that are too good to be

10   true.  If you ask, you know, if you ever look at these

11   surveys, 90 percent of people think they're above average

12   drivers, the other 40 percent are wrong.  95 percent think

13   that a broker or whatever those studies are, if you look at

14   Forbes, think that when a broker says that they have

15   something where they can trade better than the market,

16   people believe it.

17          People think they can stay involved in schemes

18   that are too good to be true, and point of fact, if you look

19   at Renaissance, which is kind of interesting, the very first

20   Nat Simons e-mail, he's actually doing an analysis.  Why?

21   It's money.  Right.  He's saying, he doesn't know if it's

22   worth the risk, but acknowledging the risk, he's still

23   saying yeah, but it's 18 percent, maybe we should stay,

24   maybe we should just keep getting our money and we'll deal

25   with it when it comes.  Now --

1          THE COURT:  But her never thought it was a Ponzi

2     Scheme.

3          MR. WARSHAVSKY:  But he still thought it was

4     illegal.  He still thought it was going to zero, he's still

5     in the e-mails, that it could go to zero.  All right.  Now -

6     -

7          THE COURT:  But that's to a better investment.

8          MR. WARSHAVSKY:  Well, but he thought because --

9     but he was saying in a connection way, Elliot Spitzer coming

10    in and freezing it.  And then later on, Paul Broder does say

11    in the e-mail to Nat Simons, maybe he's not trading at all,

12    none of this adds up, and they stayed an investor.  Why?  I

13    don't know that at this stage where -- you know, and that's

14    part of the problem with -- when you're at the pleading

15    stage is some of the questions that are being asked here --

16    what we've pled is that they've looked at it, they saw the

17    evidence.

18          Again, what's interesting is nobody disputes that

19    Madoff never traded.  Nobody disputes that the evidence was

20    all there.  The defendants accuse us of looking at it in

21    hindsight, but the fact is, the same -- what they're saying

22    are generic red flags.  We can show you at the time, not

23    only was Renaissance looking at it, not only was Renaissance

24    raising it to Raphael Mayer, but afterwards and Khronos then

25    says, you know what, we'll take over everything, we'll do

1    it, nobody gets to look at it, we'll be our own service

2    provider from now on.  We'll do our own accounting, we'll do

3    our own analysis.

4            Another company owned by the Mayers, they've

5    actually listed everything, every single that they have, but

6    a lot of what they have here, all shows it clearly, and

7    there's no alternative explanation.  There's no -- and so

8    the question why, I don't know why people would do it.  I

9    mean, and I don't think we can plead that, we could satisfy

10   a Rule 11 obligation for pleading it here without any

11   discovery.

12           THE COURT:  Let me ask you a different question.

13           MR. WARSHAVSKY:  Sure.

14           THE COURT:  It has to do with the subsequent

15   transfer allegation --

16           MR. WARSHAVSKY:  Yeah.

17           THE COURT:  -- involving Mount Pelier (ph).

18           MR. WARSHAVSKY:  Yeah.

19           THE COURT:  How do you get from BLMIS to Mount

20   Pelier to Khronos?

21           MR. WARSHAVSKY:  So from -- I'd take one step

22   back, if that's okay for one moment, which is that Mount

23   Pelier and HCH originally had their own accounts, and that's

24   pled in the complaint, and then they get covered by Legacy.

25           Legacy has two investors, from what we can tell,

1   Mount Pelier and HCH.  All the money coming out of Legacy

2   and going from Legacy to Mount Pelier is going to be coming

3   from BLMIS.

4          What we have, and again this is part of -- but if

5   you take a look at what I have as Exhibit 6, the hand-out,

6   it's the Mount Pelier offering memorandum, and you go to

7   Roman numeral 4.

8          THE COURT:  What page is that?

9          MR. WARSHAVSKY:  It's Exhibit 6, Roman numeral 4

10  on the bottom.  It's before page 1.

11         THE COURT:  Oh, Romanet 4?  Okay.

12         MR. WARSHAVSKY:  Yeah, Romanet 4, I'm sorry.

13         And you'll see under structure, it talks about HCH

14  and Khronos being the investment managers up at the top, and

15  then under fees and expenses, a management fee at the end --

16  and this is what's pled in the complaint, but here's where

17  we take it from, "a management fee at the annual rate of 1.2

18  percent of the net asset value of shares is paid monthly in

19  advance to the investment managers.  A performance fee of 5

20  percent of each shareholder's new investment profits with

21  respect to each share at the end of each quarter is paid to

22  Khronos subject to loss carrying forward."

23         THE COURT:  The question I had is, where do you

24  get that the money's that paid by Mount Pelier to Khronos

25  originated with BLMIS in the complaint, where do you allege

1    that?  What facts?

2            MR. WARSHAVSKY:  What we allege in the complaint

3    is that the money went out from BLMIS to Legacy and then I'm

4    just going to consult with my colleague.

5            THE COURT:  All right.

6        (Pause)

7            MR. WARSHAVSKY:  I think what we've -- Your Honor,

8    we -- I don't think we know, and so that was why I started

9    with it, so.

10           THE COURT:  But you have to allege --

11           MR. WARSHAVSKY:  Right.

12           THE COURT:  You have to have allegations that -- I

13   would assume, that BLMIS made a transfer to Renaissance and

14   Renaissance -- I'm sorry, Mount Pelier and --

15           MR. WARSHAVSKY:  Well, BLMIS to Legacy.

16           THE COURT:  Okay.  So where's the allegation that

17   Legacy made transfers to Mount Pelier?

18           MR. WARSHAVSKY:  We don't have them, Your Honor.

19           THE COURT:  So how can I conclude that the money

20   that Mount Pelier paid to Khronos originated with BLMIS on

21   the basis of these pleadings?

22           MR. WARSHAVSKY:  I'm sorry.  Yeah, that's -- the

23   only answer we have is who the Legacy investors were, which

24   were Mount Pelier and HCH.

25           THE COURT:  But there's no allegation that Legacy

```
 1    actually paid money or made a distribution to Mount Pelier.

 2              MR. WARSHAVSKY:  That's correct, Your Honor.

 3              THE COURT:  Okay.

 4              MR. WARSHAVSKY:  Does Your Honor have any other

 5    questions?

 6              THE COURT:  No, thank you.

 7              MR. WARSHAVSKY:  Okay.

 8              MR. FISHER:  Your Honor, I think that in Merkin

 9    (ph) and in Kingate (ph) the Court started to provide some

10    real clarity about the difference between willful blindness

11    and actual knowledge.  And I think that to let this

12    complaint squeak through would really throw that standard

13    into disarray.

14              Because really all Mr. Warshavsky has argued is

15    that when you look at the accounting services agreement, and

16    the fairly generic types of services that Khronos said it

17    was providing to Legacy, the fact that for example, it said,

18    we'll look closely at all of your statements and so on, that

19    because they looked closely at that information, it must be

20    that they concluded that this was a fraud.  And any

21    sophisticated investor with the benefit of hindsight, the

22    trustee could say the same thing.  It was your job to look

23    at the account statements.

24              Now in 2015, we've looked at the account

25    statements, we see these anomalies, therefore, you must have
```

1   known it was a fraud.

2          THE COURT:  For example, they're saying if they're

3   looking at the account statements on a daily basis and

4   comparing the reported trades to what the actual trades

5   were, they would've seen hundreds of times that the trades

6   were outside the daily price range.

7          MR. FISHER:  And it would've caused one to ask

8   questions.  To get -- I think what they've essentially pled

9   is that now that we analyze this kind of information, we see

10  paths that could have led certain kinds of sophisticated

11  investors to posit that this was a Ponzi Scheme as one of

12  other possible theories as to how it was that Madoff was

13  doing what he did.

14         What they have not pled is that Khronos and/or

15  Legacy actually pursued some path that led them towards any

16  subjective belief or concern that this was a Ponzi Scheme.

17         THE COURT:  Without using the phrase Ponzi Scheme

18  and just referring to not trading securities, why wouldn't

19  the comparison, for example, of the daily prices that were

20  being reported by Madoff to be actual prices alert them that

21  these can't possibly be trades.

22         MR. FISHER:  So in the documents, including in the

23  Renaissance proposal, there's talk, for example, maybe he's

24  using average prices.

25         THE COURT:  But I'm talking about -- we're talking

1    now about that Khronos is doing -- and this came up in

2    Kingate also where you have people who were making actual

3    comparisons and they're going to information outside of the

4    statements to see if they're consistent with the statements.

5    So why can't I infer that they learn whatever that

6    comparison would have shown even though the trustee is now

7    able to accumulate this information in hindsight?

8            MR. FISHER:  I mean, without the using the word

9    "Ponzi scheme", I think you can infer that had any of those

10   issues been scrutinized, which is something the trustee is

11   asserting they should have done, must have done, had any of

12   those anomalies been scrutinized, it would have caused them

13   to scratch their heads.  How you get from there to say there

14   were no securities being traded, I don't think that that's a

15   fair inference from the facts that have been alleged.  It

16   can be alleged as to anyone.  You can allege that any

17   sophisticated investor that studied their Madoff statements

18   would have realized it was --

19           THE COURT:  Well, maybe he's not.  Maybe the

20   answer is you can.

21           MR. FISHER:  That's right.  And I think that under

22   the old standard, under the standard that applied the non-

23   SIPC cases, that would be enough.  You would then look at,

24   under that standard, the standard that doesn't apply in the

25   SIPC case, you would then look at the nature of the due

1    diligence itself and say in light of the red flags, was the

2    inquiry reasonable.

3         The trustee doesn't even meet the old standard

4    because the trustee doesn't finish the story and say, well,

5    so what due diligence was conducted.  In fact, the trustee -

6    - when Mr. Warshavsky points you to the accounts services

7    agreement, he's conflating a lot of things.  That account

8    services agreement was not part of some due diligence

9    investigation that was triggered by red flags.  That was the

10   routine document.

11        THE COURT:  I understand that.  But isn't it

12   reasonable to infer that Khronos did whatever they agreed to

13   do in the accounts services agreement?

14        MR. FISHER:  Yes.

15        THE COURT:  And if it did that, wouldn't it have

16   discovered impossible option trades, trades outside the

17   daily price range?  And when you start to accumulate all

18   these things, wouldn't it lead to the conclusion that these

19   are not real trades?

20        MR. FISHER:  If it had done that work, it may

21   have.  It may have seen those things.  These allegations

22   are, essentially, that if it did that work, Khronos saw

23   those things.

24        THE COURT:  If Khronos saw those things, would

25   that permit the inference that they knew that these were

```
1     fictitious trades?

2              MR. FISHER:  No, Your Honor.

3              THE COURT:  Why not?

4              MR. FISHER:  Because the prices might have been

5     misreported.  There's a theory that they might have been

6     reporting average prices or averages over a few days.  There

7     are a host of explanations that people might have considered

8     in response to those kinds of anomalies.  And even that

9     question is already far afield --

10             THE COURT:  Is there any evidence that they

11    followed up on these inconsistencies that one might infer

12    they noticed?

13             MR. FISHER:  There are no allegations in the

14    complaint one way or the other.

15             THE COURT:  So why against the minimum?  It was

16    suspicious -- I mean, I think certainly the papers lay out a

17    strong basis to conclude that everybody was suspicious that

18    there was something highly unusual going on here.  And

19    either they discovered this and didn't do anything or they

20    didn't discover it.  But why isn't that a willful blindness?

21             MR. FISHER:  Well, because the premise to the

22    question is already that they saw these things which is not

23    --

24             THE COURT:  Well, certainly, the premise is

25    everybody was suspicious or there was enough suspicion about
```

Page 62

1   Madoff that people were going out and hiring experts or

2   doing their own internal analysis that they -- he did what

3   he said he did.

4           MR. FISHER:  Right.

5           THE COURT:  There's no need to figure it out.  And

6   if Khronos performed the account services it had agreed to

7   perform, it would have noticed these anomalies.  Generally

8   speaking, anomalies in the pricing, in the options.  And you

9   said, though, if they had noticed it, they would have

10  followed it up.  But there's no evidence and no allegation

11  that they followed it up.  So why isn't that sufficient for

12  a willful blindness?  And that's really Merkin who didn't

13  follow up anything.

14          MR. FISHER:  Right, except Merkin said, and the

15  allegation was, I've made my peace with Madoff and --

16          THE COURT:  Well, there was a lot to it but the

17  bottom line was that Merkin was making statements about what

18  everybody should be doing but didn't do anything.

19          MR. FISHER:  Right.  Well, this complaint is

20  strange in that it seems to allege that Khronos did a lot of

21  due diligence.  So it sort of skips over the willful

22  blindness stage --

23          THE COURT:  Well, no.

24          MR. FISHER:  -- and tries to get right to actual

25  knowledge.

1           THE COURT:  It's suggesting that they discovered

2      the things -- even if they didn't know and they were just

3      suspicious initially.  They discovered all these things.

4      And you're saying it would have raised questions and they

5      probably would have followed up.  But there's no evidence

6      they did that.  And that sounds like willful blindness.

7           MR. FISHER:  But what's strange about the

8      question, Your Honor, is that there's no allegation that

9      they did not follow up.  The allegation in the complaint --

10     it's replete with allegations that what they did in response

11     was follow up.  And that's -- willful blindness requires

12     subjectivity.  That's where this -- this complaint never

13     comes close to anything suggesting some kind of subjective

14     culpable conduct on the part of Khronos or Legacy.

15          And, Your Honor, I appreciate all the time Your

16     Honor's devoted to this argument.  Very quickly, I would

17     like to just draw attention to a few points that emerged

18     from the binder that Mr. Warshavsky shared with you.  The

19     Renaissance proposal, which I know Your Honor has looked at

20     in tab 1, at the bottom of page 3, I think that this is a

21     good illustration of what I meant when I said that

22     Renaissance did not posit that there were no securities

23     transactions going on as a theory.

24          THE COURT:  No.  I mean, that comes out of the

25     report.

10-05143-smb   Doc 20-974   Filed 10/30/15   Entered 10/30/15 18:22:24   Main Document
Pg 65 of 124
08-01789-cgm   Doc 20174-13   Filed 08/28/20   Entered 08/28/20 18:58:23   Ex. 13
Pg 65 of 124

Page 64

1           MR. FISHER:  Right.

2           THE COURT:  They do think there were securities

3     transactions.  They just can't figure out how he does it.

4           MR. FISHER:  Exactly, even though --

5           THE COURT:  And there are some questions raised

6     about the options trading.

7           MR. FISHER:  And even though the options volume

8     doesn't make sense, they don't infer from that that there

9     must be no options trading going on.  They raise all kinds

10    of possibilities for further investigation.

11          Tab 2, which is the e-mail from Mr. Simons of

12    Renaissance to a group of people, the concern -- the

13    reference there that Elliot Spitzer -- this is all based on

14    Mr. Simons reporting something that he heard from an ex-

15    Madoff trader.  And there's, again, all kinds of concerns

16    about whether he's cherry-picking trades, how he's doing it

17    and whether that could give rise to an investigation by the

18    attorney general.  It shed no light on this idea that there

19    were no securities transactions.

20          THE COURT:  Well, cherry-picking implies that

21    there was trading.

22          MR. FISHER:  That's for sure.  In fact, speaking

23    to an ex-trader, when I lived here, it was traded.

24          Tab 3, as Your Honor knows, that's not an e-mail

25    that was shared with Mr. Mayer.  And I think the trustee has

1    corrected that point today on the record.

2         Tab 4.  That's the very confusing e-mail where Mr.

3    Broder provides insertions to Mr. Mayer's e-mail.  All it

4    shows is, again, there were questions about options volume

5    and Mr. Mayer was coming up with some plan to continue to

6    further investigate it.

7         And that's why I say the complaint tells half the

8    story.  And so?  And so, at what point did Mr. Mayer form

9    any subjective belief about what was or wasn't happening?

10   And what facts have you alleged to show that his subjective

11   belief was that there were no securities transactions going

12   on?

13        On the question Your Honor asked about tracing

14   transfers to Montpellier back to customer property, Mr.

15   Warshavsky talked about the offering memorandum for

16   Montpellier, which is tab 6.  The offering memorandum says

17   really clearly that Montpellier was a diversified find that

18   invested in a host of other matters.  So adding even another

19   layer of problem to the Montpellier subsequent transfer

20   allegations is that they don't even try to allocate some

21   portion of the transfer back to --

22        THE COURT:  I think that was at issue in Dreyer.

23   I don't think I have to do that for pleading purposes.  As

24   long as there's a reasonable basis to infer that at least

25   some of the money originated with BLMIS.  But there's no

```
 1    allegation in the complaint that Legacy ever made a transfer

 2    to Montpellier.

 3              MR. FISHER:  No, there's not, Your Honor.

 4              THE COURT:  All right.  Thank you very much.

 5              MR. FISHER:  Thank you.

 6              THE COURT:  I'll reserve decision.

 7              Let's take a ten minute recess and then I'll hear

 8    the argument in the other matter.

 9         (Recess from 11:10 a.m. until 11:24 a.m.)

10              THE COURT:  Please be seated.  Next, Mendelow.

11              MR. ARKIN:  Good morning, Your Honor.

12              THE COURT:  Good morning.

13              MR. REISEN:  You want to speak first?

14              MR. ARKIN:  I just want to say I'm Stanley Arkin.

15              THE COURT:  How do you do?

16              MR. ARKIN:  I appear for Mr. Mendelow.  And my

17    colleague, Alex Reisen, who will be speaking mainly to --

18              THE COURT:  Right.

19              MR. ARKIN:  -- (indiscernible) here.

20              THE COURT:  Okay.  Go ahead.

21              MR. REISEN:  Alex Reisen from Arkin Solbakken

22    representing defendants, Steven Mendelow, Nancy Mendelow,

23    Cara Mendelow, Pam Christian and C&P Associates, Ltd. and

24    Inc.

25              I'm sure we're going to talk about the actual
```

1   knowledge exception.  I just wanted to bring to the Court's

2   attention certain language in Ida Fishman that actually

3   raises the question about whether even an actual knowledge

4   exception still could persist.  And that -- in the

5   beginning, the third and fourth paragraph of that, they

6   define the class of people that they're trying to claw back

7   from as people that profited from Madoff's Ponzi scheme,

8   whether knowingly or not.  And then they define the question

9   -- they don't define the class as we all know it's -- you

10  know, good faith defendants.  But -- and also, they define

11  the question as whether they can claw back, whether the

12  types of transfers are the type that are securities.

13          And then at the last paragraph, they talk about

14  Congress' balance between finality and equity and that you

15  have to respect Congress' balance.  And then there's this

16  wording, cannot go past two years at all.

17          So I just want to raise that.  I don't think we'll

18  have to reach it.  It's an alternative --

19          THE COURT:  That's in (indiscernible) with the

20  safe harbor, though.

21          MR. REISEN:  Yes.  And that's what we're talking

22  about, the safe harbor, the 546(e) safe harbor.

23          THE COURT:  Are you saying -- are you arguing that

24  even if the defendants had actual knowledge that Madoff was

25  conducting a Ponzi scheme that the trustee can't go back

1    more than two years?

2            MR. REISEN:  I'm saying that potentially you can

3    read Ida Fishman that way.  That is -- we all understand

4    that those were good faith plaintiffs, what Cohmad says.  I

5    understand what can -- I understand what was just argued.  I

6    just want to bring that language to the Court's attention.

7    I haven't seen it argued that way.

8            THE COURT:  I thoroughly -- I'm familiar with the

9    language.

10           MR. REISEN: Fair enough.  Okay.  Very good.  So

11   you're also quite familiar clearly with the strictness of

12   the Cohmad standard.  It is at a minimum so it's not an

13   exemplar.  Actual knowledge is the high degree of certainty

14   beyond high probability of known securities trades.  So

15   extraordinarily high standard.

16           Then I think, really, the key message here is that

17   we are cabined in by Merkin.  I think this decision really

18   could be a one-word decision.  It could be Merkin, motion

19   granted.  And I think the key difference between Merkin is

20   that he -- in the words that Your Honor used.  He developed

21   an understanding and appreciation of what the red flags

22   could mean.  That is, that indicated a potential Ponzi

23   scheme.  He said this appears to be a Ponzi scheme.  He was

24   aware of the impossibility of trades.  He was told of the

25   possibilities.

Page 69

```
 1              THE COURT:  Is this really a red flags case?  This
 2       sounds like --
 3              MR. REISEN:  Can it --
 4              THE COURT:  The sense I get from the complaint is
 5       it's almost an allegation of an aiding and abetting type.
 6              MR. REISEN:  Solely red flags.  No allegations of
 7       any subjective interpretation of the red flags.  And, in
 8       fact, to the extent that you want to say what is a
 9       reasonable inference, they're sort of -- and I understand
10       that this is not in the complaint but, as Your Honor knows,
11       when you judge whether something's plausible, you use all
12       your experience and things like that.
13              We have this funny thing.  We're actually
14       Preet Bharara.  And Judge Swain from the southern district
15       actually say that Paul Konigsberg comes out and files in the
16       southern district of New York, someone who has all the red
17       flags that Mendelow had, guaranteed rates of return,
18       referral fees, paybacks and more.  He had (indiscernible) in
19       fraudulent transaction and he personally backdated options
20       trade.  Both of them come out.  It's totally in an
21       unsurprised and conclusion.  They don't feel the need to
22       explain themselves.  That -- he had known we're at zero.
23       High degree of certainty, high probability, known suspicion
24       of a Ponzi scheme.  So Mendelow was actually less than zero
25       to some extent.
```

```
 1              THE COURT:  So you're saying that Mendelow -- I

 2    mean, Madoff got together and said let's really cook up

 3    these account statements so I can make money.  That's not an

 4    indication that they knew that.  No actual securities were

 5    being traded.

 6              MR. REISEN:  Where is that allegation?

 7              THE COURT:  I'm asking you a hypothetical

 8    question.  I do that.

 9              MR. REISEN:  Of course.  If they got together and

10    -- can you ask the question again?

11              THE COURT:  Yeah.  Mendelow and Madoff got

12    together and said let's create some fictional account

13    statements so that that will justify more payments to me.

14    That wouldn't support an inference that he knew that Madoff

15    is not engaged in the trading of securities?

16              MR. REISEN:  I don't even think that would be a

17    high degree of certainty of (indiscernible).  But --

18              THE COURT:  I think we have a basic disagreement

19    on the state of the law.  But --

20              MR. REISEN:  Okay.

21              THE COURT:  -- with all due respect to the U.S.

22    attorney.

23              MR. REISEN:  Fair enough.  Fair enough.  But let's

24    talk about the one big move that they make in their motion

25    which is that they say that Mendelow personally directed --
```

1:08-01789-smb Doc 20174-13 Filed 08/28/20 Entered 08/28/2018 58:23 Ex 13
Pg 72 of 124

1    personally participated in the fraud by directing --

2          THE COURT:  It's all in paragraph 94 of the

3    complaint.  So why isn't paragraph 94 -- why isn't that

4    sufficient to -- and you can get a copy of the complaint.

5          MR. REISEN:  Sure.  That would be great.

6          THE COURT:  But why isn't that a sufficient

7    allegation to support --

8          MR. REISEN:  Well, what --

9          THE COURT:  -- the -- let me -- please, let me

10    finish.

11          MR. REISEN:  Sure.  I'm sorry.

12          THE COURT:  Why isn't that a sufficient allegation

13    to support the conclusion for purposes of the motion to

14    dismiss that the complaint pleads that Mendelow directed

15    BLMIS to create fictitious trades to catch up with the

16    shortfall between he was promised and what the statements

17    showed.

18          MR. REISEN:  Right.  So what is actually alleged

19    is three things.  He calculated what he was owed in referral

20    fees, a straight percentage of what he referred from

21    Telfran; that he looked at his account balance at the end of

22    the year, or whatever, do I get my 230 grand.  And if he

23    didn't, he calls him and says can you make this up.  No

24    allegation (indiscernible) he did it by trading, that they

25    did it by fake trading.  In fact, it's just the opposite.

1     They allege that they did it secretly and independently.

2     The Schupt process which they did it for dozens of people

3     and it was handwritten.

4          Now let me -- if I can make --

5          THE COURT:  Can I ask you a question?

6          MR. REISEN:  Sure.

7          THE COURT:  And it's not in the complaint but how

8     did -- how was Mendelow paid his commissions?  You know,

9     through a voting clients or customers, whatever.

10          MR. REISEN:  In this case, it is alleged that --

11          THE COURT:  I'm asking how it really happened.  In

12     other words, normally, I would think that if somebody was

13     earning a commission for referring investors --

14          MR. REISEN:  Right.

15          THE COURT:  -- they receive a check --

16          MR. REISEN:  Right.

17          THE COURT:  -- at some point.

18          MR. REISEN:  Right.

19          THE COURT:  The complaint seems to say that the

20     way Mendelow was compensated was that value --

21          MR. REISEN:  That's exactly right.

22          THE COURT:  -- was added to his account.  Now I

23     suppose that that could be done legitimately by --

24          MR. REISEN:  Yeah.  Well, they allocate winning

25     trades.

1              THE COURT:  Let me --

2              MR. REISEN:  I'm sorry.

3              THE COURT:  I suppose that could be done

4    legitimately by putting money into the account or putting

5    securities into the account.  Is that the way he was

6    compensated, though, through his accountant?

7              MR. REISEN:  Exactly right.  Exactly right.  So he

8    just looked at it and that's where the (indiscernible) are.

9    And you could see that he has an injunction from the SEC

10   saying do not trade securities.  Do not refer securities

11   without a registered -- so -- and I think Mr. Warshavsky

12   actually said --

13             THE COURT:  Isn't that an unusual way to

14   compensate somebody?

15             MR. REISEN:  Is it unusual.

16             THE COURT:  In other words, unless you actually

17   see somebody putting cash in -- a cash deposit were the

18   deposit of securities, how do you get compensated by -- how

19   do you get compensated?  I don't understand.

20             MR. REISEN:  Yes.  I agree it's not maybe the

21   usual way.  Does it lead to any sort of -- one single

22   factual allegation that he recognized this as unusual, that

23   he went from high degree of probability to a certainty or

24   actual knowledge that he's not trading securities.  And Mr.

25   Warshavsky said he'll see something strange, the Volkswagen.

1    You don't immediately see it's the thing but you start

2    conversing (indiscernible).  If you have a strange way of

3    paying referral fees, you don't say, oh, I'm absolutely

4    certain that this is a totally implausible thing that's

5    never happened before that it's been doing for 20 years with

6    billions of dollars, no one's figured it out, that's not

7    good, it's not plausible that that's a -- the

8    non-speculative strong imprints that's pled with

9    particularity.  Whereas in Merkin, you have a subjective

10   interpretation of such an unusual thing.  You know, one

11   after the other.  He actually talks to Bernie Madoff and

12   says what about these daily trades, the (indiscernible)

13   trades?  What about the lack of self-clearing.  He's told

14   that it's impossible.  He has all of that stuff and even

15   Merkin does not reach the actual knowledge.  So Mendelow

16   doesn't even reach Merkin.  He never forms any suspicion

17   about that this is unusual.  Yes, it's inquiry notice,

18   that's correct.  It is an unusual way to do it.

19              THE COURT:  Go ahead.

20              MR. REISEN:  Okay.  So the big -- and this is

21   their big move.  And so, they're asking to infer from those

22   facts checks and balances, it's not enough.  Give it back.

23   It's analogous to if Mendelow looks at his drying cleaning

24   bill and says, oh, you've been overcharging me 200 dollars.

25   I'm going to call up the dry cleaner and says, hey, pay me

1    back 200 dollars; you overcharged me.  Now unbeknownst to

2    Mendelow, the dry cleaner is a drug addict.  She's been

3    stealing from the till and overcharging customers.  She goes

4    out on the street and knifes someone to death for

5    (indiscernible) 200 dollars and pays back Mendelow.  Did

6    Mendelow personally participate in the street murder by

7    personally directing him to commit street murder?  Of course

8    not.  But that's exactly the trustee's logic.

9           So that's the jump.  So we're cabined in by

10   Merkin.  We're cabined in by Konigsberg.  We're less than

11   zero.  And the other allegations are referral fees

12   generally.  We already know that Judge Stanton says no

13   indication of fraud.  And in general, you have guaranteed

14   rates of returning the same way of paying you back at the

15   end of the year.  You get up to the percentage by basically

16   allocating you winners, I suppose.  If it was even alleged

17   that Mendelow looked and saw that it was trades being done -

18   - he just looked at his balances, right?

19          So that -- again, if we guaranteed rates of return

20   matter, the SEC would have known when they looked at the

21   Telfran thing.  They knew the guaranteed rates which were --

22          THE COURT:  Well, obviously, the SEC was wrong.

23          MR. REISEN:  Yes, clearly.  Right.  But I guess

24   the question is was it a plausible inference.  And they even

25   think of it as for a second.

1           And we have in both Prickett and in Merkin, highly

2    -- impossibly high rates and consistent rates.  Still,

3    unless

4    you --

5           THE COURT:  Well, I think it's a difference

6    between generally performing at an unusually high rate and

7    you guarantee those rates.

8           MR. REISEN:  Yes.  Well, let's talk about that.  I

9    guess the idea is that, yes, if you're -- if at the end of

10   the year you're at 16 percent, I'm going to bring you up to

11   17 percent, right, by allocating you trades.  It's not --

12   it's

13   a -- the plausible non-speculative imprint is not that Steve

14   Mendelow suddenly had actual knowledge that it's the thing

15   that's never happened before.  And again, there's not even

16   any -- even if that was, there's no -- again, it's inquiry

17   knowledge.  There's no allegation that he ever interpreted

18   this and had an understanding and appreciation, the words

19   that Your Honor used.

20          And this is the same language used in Prickett.

21   You never even get to the middle level of requisite.

22          THE COURT:  Bridget?

23          MR. REISEN:  Prickett.  It's actually a 10(b)(5)

24   in the Madoff context.  But it's the same thing in the --

25   the Court there said that you don't -- unless you interpret

1    such a red flag with a high degree to have -- be some sort

2    of subjective indication.  Unless you translate it, you

3    don't even get to recklessness.  It's not probative.

4           So -- and then we have the Fifth Amendment

5    imprints, which we've already looked at Judge Stanton.  It

6    says you don't even need it to draw the inference.  If you

7    do, it's weak.  Everyone was thought to be brought into a

8    criminal vogue.  In this case, I suppose if you were going

9    to think of, well, what was Mendelow thinking, he was

10   probably afraid of criminal contempt on the injunction

11   perhaps.  But, again, it's not -- the trustee offered

12   nothing that could ever make such a jump.  I plead the

13   Fifth.  All of a sudden, he had actual knowledge that Bernie

14   Madoff never traded any securities.

15          And this is also distinguishable -- I think the

16   line that Your Honor has brought in is in the Kingate and

17   Surretti (ph) case.  And the difference there is that not

18   only did they not have a subjective interpretation of Merkin

19   but now in Surretti, they actually do the comparison, figure

20   out he's doing fictitious trades, talk to each other about

21   how it's a scam and all the reasons for it.  And then make

22   up stories.  Try and keep other people out.  Right?  I mean,

23   they list all the different things.  What are they going to

24   ask?  What stories are they going -- you going to tell?

25   They fabricate the stories.  They don't go and investigate.

```
 1                So -- and, of course, there's -- I mean, the

 2       relationship of both Merkin, very close inner circles,

 3       Surretti, Mendelow.  The sole allegation of his special

 4       access is he can refer clients.  He can get them in contact,

 5       you know, give him his phone number, type of thing.  Not

 6       inner circle.  Not a special access type of case.

 7                So that's Surretti.  That's -- I believe that's

 8       all of the allegations of actual knowledge.

 9                And then I guess we've asked that Your Honor not

10       give them the leave to amend.  I think we have delay.  We

11       have futility.  They're not even close.  They haven't even

12       offered a possible new allegation.  They've had tons of

13       discovery.  They've had all of our documents for five years.

14       There's nothing that they can add.

15                THE COURT:  Well, this complaint is obviously

16       drafted before these various cases came down explaining the

17       standard.

18                MR. REISEN:  Yes.

19                THE COURT:  Why not give him another chance to

20       plead in accordance with the standard that's now been

21       established?

22                MR. REISEN:  Yes.  If it wouldn't be futile, of

23       course.

24                THE COURT:  Well,  how do I know if --

25                MR. REISEN:  If they could offer an allegation.
```

1   But there isn't -- there's no facts.  We know that there's

2   no facts.  They have the documents.  They've been doing

3   discovery that no plaintiff has ever dreamed of --

4           THE COURT:  Well, maybe --

5           MR. REISEN:  -- for five years.

6           THE COURT:  Maybe when they drafted this

7   complaint, they thought that what they drafted was

8   sufficient and what they thought the state of the law was

9   then.

10          MR. REISEN:  Oh, I think they did.  I think that's

11  right.  But I think the problem is that they -- you need to

12  actually propose a fact that would make it not futile,

13  right?  They had represented to this Court even after Ida

14  Fishman that they're not thinking of amending.  Now if they

15  thought

16  actual -- remember, back in when Katz was decided, if they

17  knew this was an actual knowledge case, they could have just

18  gone ahead.  Why did they give us four years of extensions

19  if Katz wasn't going to matter, if they were pleading actual

20  knowledge anyway?  They could have just gone ahead.  We're

21  going to be prejudiced.  We thought we were going to have to

22  do objective notice which is essentially the only reason a

23  person would have done.  Now all of a sudden, we've got to

24  go back five years.  How are we going to prove subjective

25  state of mind.  Totally different set of evidence.  We are

```
 1   prejudiced.

 2            THE COURT:  Why didn't you move to dismiss the

 3   complaint four years ago?

 4            MR. REISEN:  Well, because -- that's a great

 5   question.  Because we didn't want to waste the resources.

 6   What if Katz and Ida Fishman goes the other way?  It's

 7   useless.  The whole point is -- our whole understanding was

 8   that we're waiting to see -- of course, you're not --

 9            THE COURT:  Well, can't you make the same argument

10   as to why they didn't amend the complaint?  If you're

11   waiting before you make the motion to dismiss, why isn't it

12   fair for them to wait in order to make a decision to amend

13   the complaint?  For instance, the court of appeals could

14   have said (indiscernible) notice was enough.

15            MR. REISEN:  Well, they -- yes.  They thought that

16   they were going under actual -- they're claiming to believe

17   that they've always had actual knowledge.  If they had

18   actual knowledge, they could have gone ahead and -- anyway,

19   there would have been no reason to wait if they thought they

20   had actual knowledge.

21            Now -- and either way, the point is that it's

22   their burden to plead.  It's not our burden to inform or

23   move to dismiss when it's going to be a waste of time.

24            THE COURT:  So why not let them re-plead and see

25   if they can re-plead the complaint?
```

Page 81

```
 1              MR. REISEN:  Well, because we're prejudiced.

 2   Because --

 3              THE COURT:  How are you prejudiced?

 4              MR. REISEN:  Because we're not -- mostly because

 5   of the time that we've been forced -- we won't be able to go

 6   and get subjective evidence.

 7              THE COURT:  What do you mean?

 8              MR. REISEN:  Evidence as -- it's a totally

 9   different set of evidence that -- we're on notice five years

10   ago that their complaint is -- they never even claimed

11   (indiscernible) any subjective notice at all.  There's no

12   facts at all.  We've never been -- so we're waiting -- we're

13   trying to get evidence on, I guess, object of notice.  All

14   of a sudden, five years down the line, we've got -- oh, it's

15   a totally different thing.

16              THE COURT:  But you knew that was the standard at

17   the test.  Didn't you start to gather that evidence?

18              MR. REISEN:  We're not on notice that there's any

19   possibility that we could ever even face a claim.  There's

20   not even a conclusory statement of anything like actual

21   knowledge --

22              THE COURT:  So what kind of evidence would you

23   have to gather?

24              MR. REISEN:  -- let alone facts.

25              THE COURT:  What kind of evidence would you have
```

1    gathered that you can no longer gather?

2            MR. REISEN:  Well, I suppose everyone's testimony,

3    everyone's memory, what did Steve tell you, what was his

4    thoughts, subjective thoughts about this.  His memory fades.

5    People -- I mean, for example, DiPasceli is now dead, right?

6    We want to ask, well, were there any conversations that

7    Mendelow --

8            THE COURT:  Did he have any conversations with --

9            MR. REISEN:  I think --

10           THE COURT:  -- DiPasceli?

11           MR. REISEN:  I don't believe so but --

12           THE COURT:  So --

13           MR. REISEN:  But we could ask DiPasceli did you

14   ever have any conversations with Mendelow, right?

15           THE COURT:  Well, Mendelow will say I didn't and

16   they won't be able to say anything else, will they?

17           MR. REISEN:  Well, I suppose that's right.  But

18   the bottom line, I guess, is that they've had so much

19   evidence.  They've made this motion that we believe is

20   actually -- there's no basis for.  We've had to defend

21   against it.  They claim that they're not going to amend it.

22   They don't even have a basis to amend.  They still don't

23   even propose in their complaint what they could possibly

24   add.  So how can we even argue futility.  And the case law

25   actually says that you can infer that it's going to be

1:09-cv-01789-mdm Doc 20-974 Filed 10/30/15 Entered 10/30/15 18:22:24 Main Document
Pg 84 of 124
08:51:789.com Doc 20-9742-13 Filed 08/28/20 Entered 08/28/2018:58:23 Ex. 13
Page 3 of 1254

Page 83

1    futile.

2              And again, we're not even close.  We're way down

3    below zero.  They've got to get up to 99.  They've got to

4    pass Konigsberg and Merkin, all the way up.  What are they

5    going to allege?  There's nothing -- there's no facts --

6              THE COURT:  Let's find out.

7              MR. REISEN:  Very good.  Very good.  Thank you.

8              MR. ARKIN:  You want to mention Konigsberg?

9              MR. REISEN:  I think we did speak about

10    Konigsberg, is that correct?  Konigsberg and Preet Bharara

11    and about how he had more red flags and still be --

12              THE COURT:  Well, but that's what the U.S.

13    attorney says.

14              MR. REISEN:  Fair enough.  Fair enough.

15              THE COURT:  Okay.

16              MR. REISEN:  It just goes --

17              THE COURT:  We may disagree on that.

18              MR. REISEN:  Fair enough.

19              MR. ARKIN:  Why do you say, Your Honor --

20              THE COURT:  Sure.  Speak into the microphone,

21    please.

22              MR. ARKIN:  I'm sorry.  I should be closer.  I

23    just want to say Preet is the U.S. attorney.

24              THE COURT:  Yes.  I understand --

25              MR. ARKIN:  A responsible public official for law

```
1    enforcement, a man who had a number of these cases passed

2    through its office.  He comes out and he says what he says.

3    And in the period of time we've had this case in our office,

4    five years, six years, there's been nothing coming from them

5    remotely suggesting actual knowledge on the part of our

6    clogged (indiscernible).  He was getting commissions for

7    clients or investors he -- starting in 1993 he recommended

8    to the company, New York (indiscernible).  There was

9    nothing, six years, which has emerged which shows what

10   Merkin and Konigsberg demonstrate actual knowledge is on the

11   part of Mr. Mendelow.  Just nothing.

12              THE COURT:  Thank you.

13              MR. NEW:  Good morning, Your Honor.  Jonathan New

14   from Baker Hostetler for the trustee.  With me at counsel

15   table this morning is Robertson Beckerlegge also of Baker

16   Hostetler.

17              THE COURT:  How do you do?

18              MR. NEW:  Your Honor, as I think the standard has

19   been clearly set out here.  The standard to overcome the

20   546(e) safe harbor is the complaint has to plausibly allege

21   facts suggesting that the defendants had actual knowledge

22   that there were no legitimate securities transactions

23   occurring in the accounts.  And while I am prepared to

24   discuss, Your Honor, I think there are several different

25   facts in this complaint that support that allegation going
```

1    all the way back to his relationship with Telfran and the

2    SEC action through the guaranteed rates of return.

3              THE COURT:  Yeah.  I read all that.  And I read

4    the Avellino again in his motion.  I don't know what that

5    has to do with actual knowledge there were no securities

6    being traded.

7              MR. NEW:  Your Honor, I think it's context.  And

8    it goes to what their state of mind was at the time that

9    they did enter into the transactions that Your Honor

10   (indiscernible) which is what is the key fact here, which is

11   what's alleged in paragraphs 94 through 96 of the complaint.

12             THE COURT:  See, the way I read paragraph 94,

13   Mendelow says there's a shortfall.  You owe me money.  Make

14   it up.  That's all that paragraph 24 (sic) alleges.  And

15   then -- 94.  And then it goes on to allege in the last

16   sentence that the way BLMIS did it is it created fictitious

17   trades in the accounts.  But unlike some of the other cases

18   we've seen where -- and I'll use Cohmad as an example that

19   the defendant

20   Jaffe -- he actually participated in directing the creation

21   of fictitious and backdated trades.  That's not -- I don't

22   read 94 to allege that.  Can you allege in words or

23   substance that Mendelow actually got together with

24   representatives of BLMIS, whether it's Madoff or somebody

25   else, and said, you know what, I want you to create these

Page 86

1    fictitious trades as a way to compensate me?  Can you make

2    that allegation?

3            MR. NEW:  Well, Your Honor, what we do allege --

4    and then --

5            THE COURT:  I guess the answer is no.

6            MR. NEW:  No.  Your Honor, I think we can in the

7    sense that I think it's here.  And I'm stuck to what's in

8    the complaint.

9            THE COURT:  I don't agree that it is.  I just

10   don't see it.

11           MR. NEW:  Your Honor, may I proceed?

12           THE COURT:  Go ahead.

13           MR. NEW:  I think first you have to understand

14   what is the nature of these -- what we call fraudulent side

15   payments but they were co-worker (indiscernible) --

16           THE COURT:  They're -- you can call them

17   fraudulent side payments.  And that's --

18           MR. NEW:  But I think, Your Honor --

19           THE COURT:  -- you know, that's an inflammatory

20   phrase.  I didn't -- it looks like they're commissions.

21           MR. NEW:  Your Honor, if you prefer to call them

22   commissions --

23           THE COURT:  Well --

24           MR. NEW:  -- you can call them commissions but --

25           THE COURT:  If you want to call it fraudulent side

1    payments --

2            MR. NEW:  But --

3            THE COURT:  -- go ahead.

4            MR. NEW:  But the key issue is the nature of them.

5    And I think Your Honor had this colloquy with Mr. Reisen as

6    to exactly how they occurred every year, every December, in

7    the accounts that he was monitoring.  And so, from the very

8    beginning when he first started receiving these commissions,

9    if you'd like to call them that, they weren't payments.

10   They weren't checks.  They weren't cash.  They weren't

11   securities deposited into the accounts.  They weren't, as

12   Mr. Reisen seems to suggest, some allocation of winning

13   transactions from someplace else in BLMIS.

14            What were they?  They were trades in these

15   accounts based upon the principal supposedly in those

16   accounts that yielded the magic pre-determined amount every

17   single time.  And it was done through these options

18   transactions.  The allegations here are that Mr. Mendelow

19   knew that he was receiving them, that he tracked his

20   accounts, he monitored whether he received it, he was

21   looking at his accounts.  He would not have seen any other

22   way he was receiving these fees other than through such

23   fictitious transactions.

24            So with that as background, when you get to the

25   point that he tracks and monitors those accounts, does a

1    calculation which is based upon his understanding of a 17

2    percent guaranteed return and also the amounts of these

3    transactions.  And he says that should have been my return,

4    my yield on my account.  And then he compares that to what

5    he actually got as returns on the account.  And then he says

6    no, you need to make it up to me.  There's no other way that

7    that could have been made up to him given his knowledge of

8    what's been going on in these accounts other than through

9    these fictitious transactions.

10           THE COURT:  Well, but, you know, your brief in

11   several places says that Mendelow directed BLMIS and Madoff

12   to do this.  He may have acquiesced to it but I don't see

13   where he directed --

14           MR. NEW:  Your Honor --

15           THE COURT:  -- Madoff to do certain things other

16   than make up the shortfall.

17           MR. NEW:  Your Honor, that's a straight quote

18   practically from paragraph 96 which says "The fact that

19   Mendelow was able to direct the value of his accounts at

20   BLMIS based upon his own calculations and to ensure he

21   received specific amounts through fictitious options

22   transactions is indicative of his knowledge of fraudulent

23   trading activity."

24           THE COURT:  I don't read 94 as directing the value

25   in his accounts.  Again, it's just saying you owe me money,

1    make up the shortfall.  And then it says the way BLMIS did

2    it is it added these fictitious trades to the account to

3    generate the "profits" necessary to make up the difference.

4              MR. NEW:  Well, Your Honor, in ways --

5              THE COURT:  That's really what is alleged.

6              MR. NEW:  Well, I think it alleges that but there

7    is -- if it's not explicit, and I think it is more explicit

8    than that, but there is the inference of how was that done

9    because if he's looking at his accounts before, as we say

10   he's closely monitoring them, and he sees that the only way

11   he's getting these gains is through securities transactions

12   and then he says make it up to me, and it's corrected, and

13   he looks back at his accounts and he sees there's no inflows

14   of money, there's no inflows of securities.  (Indiscernible)

15   fictitious options transactions.

16             THE COURT:  Okay.  But there were options

17   transactions listed in the statements which generated the

18   profits, right -- the shortfall?

19             MR. NEW:  Correct.  The exact amounts of profits.

20             THE COURT:  So why isn't it plausible for him to

21   assume that Madoff gave to these transactions, allocated

22   them and that's how he made up the difference?

23             MR. NEW:  Well, Your Honor, I think there's

24   several reasons why that's not plausible.  I think, first of

25   all, the fact that he's engaging in speculative options

1    transactions over a number of years that always hits on a

2    pre-determined amount is not plausible.

3            Second, he has various accounts that he's

4    monitoring.  Some of these accounts, for his daughters, for

5    example, do not receive these fictitious options

6    transactions.  All these accounts are supposedly engaging in

7    the same strategy.  If Madoff is able to invest his funds in

8    such a way to get a return of 20 percent or more in his

9    accounts, why isn't he doing that in all the accounts?  It's

10   not plausible to imagine that a broker could go out in the

11   securities market and always, in the same month, in every

12   year engage in securities transactions that only -- that

13   always yield the pre-determined amounts.

14           THE COURT:  Actually, you just raised an issue

15   about the other accounts.  Don't -- doesn't the liability of

16   some of those account holders depend on the imputation of

17   Mendelow's knowledge?

18           MR. NEW:  That's correct, Your Honor.

19           THE COURT:  All right.  I understand

20   (indiscernible) C&P.  But as to the other transferees, where

21   are the allegations it's (indiscernible) imputation?

22           MR. NEW:  Your Honor, the other allegations with

23   regard to (indiscernible) C&P are that, effectively, that

24   Mr. Mendelow acted as their agent.

25           THE COURT:  That's a conclusion.  What are the --

    1            MR. NEW:  Yes, Your Honor.  The only allegation in

    2    the complaint -- and again, you know, we pled this at a

    3    time, Your Honor, when we did not believe we had factual

    4    knowledge for all the defendants.

    5            THE COURT:  Do you want to re-plead your

    6    complaint?

    7            MR. NEW:  Well, Your Honor, we think it's

    8    sufficient.

    9            THE COURT:  All right.

   10            MR. NEW:  But if it's not, we were going to ask

   11    for leave to re-plead.

   12            I would point, Your Honor, to paragraph 6 of the

   13    complaint which says that all the BLMIS accounts basically

   14    were managed and overseen by Mr. Mendelow.

   15            THE COURT:  That's -- that just sounds like a

   16    conclusion to me.

   17            MR. NEW:  It may be, Your Honor.  It --

   18            THE COURT:  I've had other cases where, for

   19    example, the principal or the agent is getting all the

   20    account statements and reviewing all the account statements

   21    and giving directions relating to all the account

   22    statements.  And that's not in this complaint.

   23            MR. NEW:  It's not, Your Honor, quite frankly,

   24    because we didn't, at the time, believe we needed to plead

   25    that.  If we do need to plead that, Your Honor, we can re-

1    plead and include allegations --

2              THE COURT:  But don't think you have to plead

3    that?  I mean, this -- the entire complaint is sprinkled

4    with knew or should have known and know or should know, but

5    that's not the standard.  At least for now.

6              MR. NEW:  That's correct, Your Honor.

7              THE COURT:  All right.

8              MR. NEW:  Although it does say "knew" so there is

9    --

10             THE COURT:  Well --

11             MR. NEW:  --  an alternative.  It is an

12   alternative argument.

13             THE COURT:  But then again, that's a conclusion

14   that something knew something.  You'd have to allege facts.

15             MR. NEW:  Yes, Your Honor.  And I believe, as we

16   are -- we've been discussing the facts there are to support

17   that knowledge.

18             The one thing we haven't touched on, Your Honor,

19   is the guaranteed rates of return which, similarly, the

20   allegations in the complaint are that he knew he was going

21   to be receiving a guaranteed return on his accounts of at

22   least 17 percent.  He obviously knew before that in Telfran

23   that he was getting a guaranteed return from Madoff as well.

24   And when you're dealing with securities transactions in the

25   market, it is just implausible for anyone to believe that

10-05143-smb  Doc 20-1  Filed 10/30/15  Entered 10/30/15 18:22:21  Ex. 13
08-01789-cgm  Doc 20174-13  Filed 08/28/20  Entered 08/28/2018:58:23  Ex. 13
Pg 94 of 124
Pg 93 of 124

Page 93

1    you can get a guaranteed return.  And that's what he was

2    guaranteed here.  And not only did he know that, he was

3    tracking it.  So it wasn't that he was hopeful that he would

4    get it or that he was monitoring.  He expected to get it.

5    And when he didn't get it, that was part of what he asked

6    them to correct.

7            So again, that goes to the fact that he had actual

8    knowledge that they were not securities transactions that

9    were occurring in his account.  And I think it also goes

10   without saying, Your Honor, although it's not an independent

11   basis to conclude this that when Mr. Mendelow was deposed on

12   these issues, he was specifically asked about the fraudulent

13   side payments and the guaranteed rates of return and other

14   things, he did invoke his Fifth Amendment rights and refused

15   to answer.

16           THE COURT:  All he's told me is that he invoked

17   the Fifth Amendment right.  So I don't know what he was

18   asked as to which he invoked his Fifth Amendment privilege.

19           MR. NEW:  Well, there is an allegation, and it is

20   general, Your Honor, that he was asked questions

21   specifically about fraudulent side payments and about the

22   guaranteed returns and about Avellino and Bienes and he

23   refused to answer those questions.

24           Again, Your Honor, this complaint --

25           THE COURT:  I don't know what it says.  Anybody

1    who was being deposed or questioned by the U.S. attorney or

2    the SEC at the time might very well have invoked the Fifth

3    Amendment privilege even though it had -- they had no

4    participation or level of participation that's needed to

5    support an inference of actual knowledge.

6              MR. NEW:  Your Honor, again, it's a permissible

7    inference; it's not a mandatory inference.  We would suggest

8    that that is not by itself enough, but given the other facts

9    that we have alleged that show actual knowledge, that

10   factually it's the fraudulent side payments, the facts

11   allege the guaranteed rates of return, that given that, his

12   refusal to answer is sufficient to add to that inference

13   that we've pled enough to meet the actual knowledge

14   standard.

15             And with regard to leave to re-plead, Your Honor,

16   obviously, we believe that the complaint is sufficient.  If

17   it's not, we would ask for leave to re-plead.  Some of the

18   issues that we've discussed this morning, Your Honor, are

19   things that could be addressed if necessary in an amended

20   complaint.  And --

21             THE COURT:  So why don't you just re-plead the

22   complaint if you think you can make those allegations?

23             MR. NEW:  Your Honor, quite honestly, we think

24   that it's sufficient and it would be a waste of not only

25   judicial resources but our own resources --

```
1              THE COURT:  Got it.

2              MR. NEW:  -- to file an amended complaint and go

3       through another briefing schedule if this complaint is

4       sufficient.

5              Also, Your Honor, at this time, we don't have the

6       ability to amend as of right.  Given the way that the

7       defendants have proceeded in this case, we would need to

8       seek leave of Court to amend.

9              THE COURT:  So why don't you make a motion for

10      leave to amend and attach your proposed complaint.  And

11      they'll argue it's few words not (indiscernible) and deal

12      with it that way.

13             MR. NEW:  Again, Your Honor, we could do that but

14      it would be a waste -- we think it would be a waste of

15      resources.

16             THE COURT:  Well, I think it's -- I'm not

17      convinced that this is a sufficient complaint.  And I think

18      it's a waste of resources to have to go through this

19      exercise to then grant you leave to amend and then go

20      through the exercise a second time.  But all right.

21             Certainly, there are valid claims, I think, under

22      the first claim which is just a fictitious profits claim

23      (indiscernible).  I wouldn't dismiss that claim.

24             MR. NEW:  Yes, Your Honor.  Well, we believe it's

25      sufficient on all the counts.
```

```
 1              THE COURT:  All right.  I got it.

 2              MR. NEW:  If Your Honor is inclined, we would seek

 3     to make a motion for leave to amend.

 4              THE COURT:  I just think it'll save a lot of time.

 5     If you think that you can make -- if you can allege that he

 6     actually knew or maybe he willfully blinded himself, because

 7     that's another distinction that has arisen over the last

 8     four years, that you should allege it.  But this complaint

 9     replete with knew or should have known.  It was just -- and

10     I understand why it was done.  It was done when everybody

11     thought that's what the state of the law was.

12              All I'm suggesting is when I review this, I'm

13     probably going to conclude that except for the first claim

14     for relief, it probably is insufficient the way it's pleaded

15     under the old standard.  And it'll expedite things if you

16     just make a motion for leave to amend and attach the

17     complaint that it meets the pleading standards

18     (indiscernible).

19              MR. NEW:  Your Honor, we will definitely do that.

20     Should we -- do we need to, at this time, address a briefing

21     schedule on that or should we discuss it with the parties?

22              THE COURT:  I think you should just -- well, you

23     can discuss it with your colleague but I just think that's

24     the best way to handle this.  And if you can really plead

25     it, then you can plead it and we'll deal with that complaint
```

1      'cause most of the complaints I've seen have been amended to

2      comply with the pleading requirements that have been

3      enunciated in the various cases.  This one wasn't for some

4      reason.  And I understand that the defendant didn't answer

5      until November 2014, I think.  And they said they didn't

6      want to waste my time.  But, you know, at the same token, I

7      understand you don't want to waste the time.  But just

8      judging from what's pleaded here, I think it would make

9      sense to seek leave to re-plead.  But you don't have to.  I

10     will decide this.

11              MR. NEW:  Your Honor, I think we will be seeking

12     leave to re-plead.

13              THE COURT:  Can we leave it at that?  You'll make

14     a motion, you'll attach an amended complaint, and you can

15     argue that you're prejudiced or it's futile or there's been

16     an undue delay although for the reasons I've discussed,

17     you've already told me you wanted to wait.  So, you know, I

18     suppose they're entitled to wait.

19              MR. NEW:  We can make that argument in the

20     briefing but, yes, that's fine.

21              THE COURT:  'Cause you haven't convinced me about

22     prejudice.  You may have to put in --

23              MR. NEW:  Fair enough.

24              THE COURT:  -- some affidavit explaining

25     somebody's died or some evidence has been destroyed and you

1    can't defend the action for that reason.

2              MR. NEW:  Okay.

3              THE COURT:  And if I deny the motion for leave to

4    re-plead then maybe I'll decide this motion.  All right.

5    Does that make sense?

6              MR. ARKIN:  Makes sense.

7              THE COURT:  Okay.  So I will hold this one in

8    abeyance and I look forward to your motion.

9              MR. ARKIN:  Only one thing --

10             MR. NEW:  Thank you, Your Honor.

11             MR. ARKIN:  -- Your Honor.

12             THE COURT:  Yes, sir?

13             MR. ARKIN:  Somebody used the word "imagine".

14             THE COURT:  Pardon?

15             MR. ARKIN:  Somebody used the word "imagine" just

16    a few moments ago.  I think Mr. New.  No imaginary

17    allegations.

18             THE COURT:  Well, we can't sensor what they plead

19    beforehand.  Only after, I guess.  So we'll see what they

20    say.

21             MR. NEW:  Your Honor, we --

22             MR. ARKIN:  It's a prayerful admonition.

23             MR. NEW:  Your Honor, we are mindful --

24             THE COURT:  I join in that.  These complaints are

25    very long.

1:05-14:89-nbm Doc 2d-9742-13 / Filed 08/28/20 Entered 08/28/2018 58:23 Ex 13
1:05-14:89-nbm Doc 2d-9742-13 Filed 10/30/15 Entered 10/13/15 18:22:24 Main Document
Pg 100 of 125

Page 99

```
 1              MR. NEW:  Your Honor, we're mindful of Rule 11

 2    and, obviously, we're not going to make any imaginary

 3    allegations.

 4              THE COURT:  No.  No.  I -- okay. Thank you very

 5    much.

 6              MR. NEW:  Your Honor, there is also a discovery

 7    issue --

 8              THE COURT:  Yes.

 9              MR. NEW:  -- in this.

10              THE COURT:  Let me just mark -- make a note of

11    that that's --

12              MR. ARKIN:  Good morning, Your Honor.

13              THE COURT:  Thank you very much.

14              MR. ARKIN:  Thank you very much.

15              THE COURT:  You're excused.  You're welcome to

16    stay but you're excused.

17              MR. NEW:  Your Honor, the discovery dispute

18    includes that as well.

19              THE COURT:  Oh, okay.  Yeah.  Why don't we take

20    yours -- well, it's really tied up -- and I understand that

21    they didn't understand or maybe they should move for a

22    protective order.  I didn't see the -- did you file an

23    objection?

24              MR. REISEN:  We didn't -- oh, sure.  We objected.

25    And then we want to move for a stay if we needed to.  But I
```

1    think the hope is that we will just wait and see whether

2    they --

3              THE COURT:  Doesn't the objection -- don't you

4    have to do something if they object to the document request

5    like make a motion compel discovery?

6              MR. NEW:  Well, Your Honor, that's what we

7    actually noted -- notified the Court --

8              THE COURT:  Yeah.

9              MR. NEW:  -- that it was a pre-motion conference

10   and a motion to compel.

11             THE COURT:  Doesn't it make sense to see if the

12   complaint survives in this case?

13             MR. NEW:  Your Honor, the complaint is going to

14   survive, as you said, at least with respect to one count.

15   They --

16             THE COURT:  So you want to take discovery on that

17   one count?

18             MR. NEW:  Well,  Your Honor, I think --

19             THE COURT:  It's almost a strict liability count.

20             MR. NEW:  Well, Your Honor, they're refusing to

21   provide any discovery at all.

22             THE COURT:  Right.  Well, you --

23             MR. NEW:  They refuse to answer any of the

24   interrogatories.  And with regard to the documents that

25   they've previously produced, they won't stipulate to the

10-05143-smb Doc 20-974-13 Filed 10/30/15 Entered 11/13/15 18:22:24 Main Document Pg 102 of 124
1:08-cv-01789-rmb Doc 20-974-13 Filed 08/28/20 Entered 08/28/2018:58:23 Ex. 13 Pg 102 of 124

Page 101

```
 1     fact that they can be used in this case.  So we don't have

 2     any documents other than eight pages of documents that

 3     they've produced.  And no interrogatory responses at all.

 4               THE COURT:  But at the --

 5               MR. REISEN:  Your Honor --

 6               THE COURT:  -- end of the day, the only case may

 7     be the case that's alleged in Count I.

 8               MR. REISEN:  We've given all discovery on Count I.

 9     In fact, we produced it all.  That shows all of the two-year

10     transfers.  We'll wait completely.  And we're willing to do

11     that.  We can --

12               THE COURT:  My suggestion is that rather than get

13     involved in discovery before we know whether we have a

14     sufficient -- legally sufficient complaint that we determine

15     that first.

16               MR. NEW:  Your Honor --

17               THE COURT:  And you're right.  You can take

18     discovery on the first claim and then if, as you -- when you

19     seek more discovery, they're going to say, hey, wait a

20     minute.  You know, this is becoming -- they're onerous --

21     you're seeking discovery in stages.

22               MR. NEW:  Your Honor, I would simply ask that they

23     actually comply with the local rule and respond to the

24     interrogatory requests that were sent to them.  They gave no

25     responses to any of the interrogatory requests.
```

Page 102

```
 1              THE COURT:  Oh, you didn't object?

 2              MR. REISEN:  Oh, we did.  Sure.  We objected --

 3              THE COURT:  In the interrogatory responses?

 4              MR. REISEN:  Yes.

 5              MR. NEW:  It was a general objection, Your Honor.

 6              MR. REISEN:  We're happy to give all objections if

 7     they want.  We just think that that would be extra work.

 8              THE COURT:  Well --

 9              MR. REISEN:  And we may actually move for a stay.

10     But we're perfectly willing to give discovery on

11     (indiscernible).  We already have.

12              THE COURT:  My concern is if you're taking

13     discovery before you have a legally sufficient claim and

14     might argue we use that discovery to bolster the allegations

15     which is exactly what you're not supposed to do.

16              MR. NEW:  Except, Your Honor, the only thing I

17     would point out is if this case does not arrive -- what's

18     present before Your Honor is not a motion to dismiss.

19     What's present before Your Honor is a motion for judgment on

20     the pleadings.  There is a case management order in place in

21     which they agreed to proceed on discovery.  We would have

22     had -- if they had not been obstructionists, we would have

23     actually had the benefit of that discovery to use going

24     forward.

25              This -- and even in a motion to dismiss, Your
```

```
 1    Honor, the state of the law is generally a stay is not

 2    appropriate.  And there needs to be good cause for a stay.

 3    In this case, we don't think that they've established good

 4    cause.  And they haven't even moved for a stay, Your Honor.

 5    And they have entered into a case management order in which

 6    they agreed to proceed with discovery.

 7              MR. REISEN:  If I could, Your Honor, as I

 8    understand that we're contemplating dismissing everything

 9    but Count I in the -- and we're having --

10              THE COURT:  Well --

11              MR. REISEN:  -- to give discovery on the one count

12    that's legally sufficient.  And then if they get to plead,

13    of course give discovery on that as well.

14              THE COURT:  Well, but he's saying, look, you know,

15    it's a case management order.  The motion itself doesn't

16    stay discovery.  And you were required to give discovery a

17    long time ago and you never did it.

18              MR. REISEN:  Well, for what it's worth, actually,

19    we've given them essentially everything five years ago.  But

20    -- in the 2004.  But for what it's worth, it's my

21    understanding that, yes, we will give full discovery on

22    everything that's still a valid pleading on file which will

23    be just that one --

24              THE COURT:  But there is a valid pleading on file.

25              MR. REISEN:  That's right.  Count I.
```

Page 104

1           THE COURT:  Well, no.  There's a valid pleading.

2    And all I suggested was, if you want, I'll decide this

3    pleading and then I'll grant the leave to re-plead.  If I

4    dismiss it, all I'm suggesting is to cut through that

5    because I do have questions about the sufficiency of the

6    pleading and have them make a motion to re-plead and then

7    you can make your futility and delay and prejudice

8    arguments.

9           MR. REISEN:  Yeah.  So -- but at that point, the

10   only -- you will have dismissed --

11          THE COURT:  I'm not dismissing their complaint.

12          MR. REISEN:  Fair enough.  Well, I guess the idea

13   would be that you would dismiss all but Count I and then you

14   would see whether they have a right to re-plead and at that

15   point, we'll give full discovery on the one count that's

16   remaining.  And then if you give them lead to re-plead,

17   we'll, of course, give discovery on that as well.

18          THE COURT:  Look, I'm going to hold the discovery

19   in abeyance.  Let's just see if you have a valid complaint

20   or if it's just a claim for fictitious profits which is a

21   much different claim from the type of claim you're trying to

22   plead.

23          MR. NEW:  Yes, it is, Your Honor.  Thank you, Your

24   Honor.

25          MR. REISEN:  Thank you, Your Honor.

Page 105

```
 1                 THE COURT:  We have a couple other discovery

 2     issues, though.

 3                 All right.  Yes?  Go ahead.

 4                 This is -- let's start with Bernfeld.

 5                 MS. HOCHMUTH:  Yes, Your Honor.

 6                 THE COURT:  Okay.  I called your case early.  I

 7     know you had a flat tire.

 8                 MR. WEDEEN:  I apologize, Judge.

 9                 THE COURT:  No, no.  That's all right.  But --

10                 MR. WEDEEN:  I got a flat tire (indiscernible)

11     tow.

12                 THE COURT:  That's the reason why you got behind

13     some long cases.  Go ahead.

14                 MS. HOCHMUTH:  Thank you, Your Honor.

15                 Your Honor, I'm here today on three cases.  My

16     name is Farrell Hochmuth of Baker Hostetler on behalf of the

17     plaintiff, Irving Picard.  The three cases we're here on is

18     the Marilyn Bernfeld Trust, Michael Bellini and Ellen

19     Bernfeld.  These cases -- all of these cases, opposing

20     counsel is Mr. Wedeen.

21                 The parties held an initial case conference in

22     June of 2014.  There was -- a case management notice was

23     filed in each of the cases requiring initial disclosures by

24     August 27th of 2014.  I have requested that counsel provide

25     those initial disclosures numerous times.  We have now
```

1   propounded requests for admission, requests for production

2   and interrogatories.  We have not --

3                THE COURT:  Is this an innocent investor case?

4                MS. HOCHMUTH:  Yes, Your Honor.  These are -- all

5   three cases are good faith investors.

6                No responses have been received to any of the

7   discovery.  We extended the deadlines based on the request

8   of counsel a couple times.  We still don't have discovery

9   responses.

10               Yesterday, I did receive initial disclosures in

11  each of the three cases so we are no longer asking that Your

12  Honor order that those initial disclosures be made.  But we

13  are requesting an order deeming the request for admissions

14  admitted pursuant to Federal Rule of Civil Procedure

15  36(a)(3).  And we would also seek an order compelling

16  responses to discovery by a date certain in each of the

17  cases.

18               MR. WEDEEN:  Judge, once again, I certainly would

19  agree that we need an order compelling discovery.  It's just

20  --

21               THE COURT:  What about the deemed admissions?

22               MR. WEDEEN:  Well -- I was going to get to that,

23  Your Honor.  If you'd like me to address it first, I would

24  request an extension of time.

25               THE COURT:  Why didn't you answer -- when were

Page 107

1    they served?

2              MS. HOCHMUTH:  Your Honor, the request for

3    admissions --

4              MR. WEDEEN:  July

5              MS. HOCHMUTH:  -- were served in July of 2015.

6              THE COURT:  Okay.  So tell me why you weren't able

7    to respond to them?

8              MR. WEDEEN:  Your Honor, I've been trying to

9    communicate with my clients.  My clients -- once again,

10   Judge, these investors were effectively reduced in state --

11   financial standing significantly with very limited liquid

12   assets.  Getting -- none of them are under the senior

13   citizen age.  And I've been trying.  I did receive

14   ultimately from the Bernfeld defendants, Judge, that's the

15   Marilyn Bernfeld Trust and Ellen Bernfeld.  Literally, a few

16   days ago, I received by e-mail responses to the admission

17   requests.  I did meet with Ms. Bernfeld, this Ellen

18   Bernfeld, but they were -- it's not properly formatted.  I

19   just didn't have a chance to put them together and I didn't

20   want to send over (indiscernible).

21             THE COURT:  What about the Bellinis?

22             MR. WEDEEN:  The Bellinis, Judge, I have a meeting

23   scheduled with them early next week.  If the Court would

24   indulge me and give me two weeks on the admissions and six

25   weeks on the rest.  I mean, I would advise the Court

1    regarding the documents.  And so, though we did not produce

2    -- although we did not object, the only documents my clients

3    will have -- they're not sophisticated parties, Judge, or

4    information they received from Madoff that they have no

5    doubt -- no.  Now go and retrieve and send back to them -- I

6    mean --

7              THE COURT:  The account schedules?

8              MR. WEDEEN:  Yeah.  That's really all they have.

9              THE COURT:  What other documents were you seeking?

10             MS. HOCHMUTH:  Your Honor, in the Marilyn Bernfeld

11   Trust, there are seven defendants.  And they include a joint

12   venture, two partnerships and trusts.  So we are seeking

13   trust documents that will help the trustee to determine if

14   there have been subsequent transfers of these.  We would

15   like those.  We would like customer statements.  Any

16   information regarding organizational structure of these

17   entities.  If the requests are deemed admitted, which we

18   believe they are by operation of Federal Rule 36, at that

19   point, we would no longer need to do discovery on the

20   initial transfers because we believe that the receipt of the

21   transfers would be proved as a matter of law.

22             THE COURT:  Give me the chronology of when you

23   were reminding counsel that he had not responded to the

24   discovery, and specifically, the request for admissions.

25             MS. HOCHMUTH:  Absolutely, Your Honor.  If I can

1    point you to the letter that we filed on September 28th --

2              THE COURT:  Yeah.

3              MS. HOCHMUTH:  -- attached to that letter, we have

4    each of the instances in which we've asked counsel to

5    respond to the requests for admission.  Initially, it was

6    the e-mail correspondences regarding disclosures.

7              THE COURT:  What about the August 6th letter?

8              MS. HOCHMUTH:  I have --

9              THE COURT:  Does it remind him --

10             MS. HOCHMUTH:  Yes, Your Honor.  When we sent the

11   --

12             THE COURT:  I see.  On June --

13             MS. HOCHMUTH:  I have here, Your Honor, when we

14   sent -- we sent the request for admission on July 6th.  We

15   communicated with counsel as per the letter regarding an

16   extension of time.  We did allow counsel -- we're not taking

17   a hard line stance but we didn't agree to extend --

18             THE COURT:  What was the extension to?

19             MS. HOCHMUTH:  We extended the time -- counsel

20   asked when the responses were due in August that we extend

21   to the end of September.  Because of the fact discovery

22   deadline at that time, we agreed to extend it to September

23   4th.  We reminded counsel on September 1st that the

24   responses would be due on the 4th and that we looked forward

25   to receiving them.  We never did receive them.  I have a

08-01789-cgm  Doc 20974-13  Filed 08/28/20  Entered 08/28/20 18:58:23  Main Document
Pg 111 of 124

Page 110

1     letter here, September 1st.

2              THE COURT:  I see that.

3              MS. HOCHMUTH:  That's the final attempt.  And then

4     --

5              THE COURT:  I see you always had previously

6     written to me about requesting a conference in this case.

7              MS. HOCHMUTH:  Actually, what we did -- in that

8     letter of September 1st, we had taken your ruling in the

9     River Road matter where you had discussed deeming requests

10    for admissions and providing that to counsel as a warning.

11    This is three days before these were due saying Judge

12    Bernstein has just ruled in favor of deeming admissions in a

13    case.  If you don't do this, you need to do this.  This is

14    three days before they were due.  And still with that, Your

15    Honor, he didn't respond.

16             MR. WEDEEN:  May I respond?

17             THE COURT:  Well, let me just -- I just want to

18    understand the number of times you were warned.

19             MR. WEDEEN:  Judge, I --

20             THE COURT:  Let me just.  I don't think she's

21    done.  Go ahead.

22             MS. HOCHMUTH:  That would be it, Your Honor, is

23    that we gave counsel plenty of notice, three days before

24    they were due, and despite that, and attached to the

25    (indiscernible) hearing -- order.

```
 1            THE COURT:  What's the December 4th letter?

 2            MS. HOCHMUTH:  I'm sorry, Your Honor, on December

 3     4 -- Your Honor, December 4th of 2014, this was just in

 4     reference at that time to the initial disclosures that had

 5     been due as per the case management notices that were filed

 6     in each of the cases at the end of August.  At this time we

 7     had not served additional discovery.

 8            We prefer to be able to get disclosures, so that

 9     at that time, we can focus our discovery.  But when we

10     didn't get those initial disclosures, we eventually said

11     well, let's move forward with this, let's do our discovery.

12            I guess the problem I have, and the question I

13     have is there's a lot of reminders here that you're late,

14     and all you're telling me is your clients are not

15     sophisticated people, but you haven't told me what you did

16     to try and get the information, assuming that's enough,

17     because you're the agent and they're the principal, and they

18     ultimately have to suffer for failure to comply.

19            MR. WEDEEN:  May I respond?  First, Judge, counsel

20     was very diligent in reminding me; however, the reason I

21     requested until the least the end of September is I was away

22     for the latter part of August and early September with my

23     family.  We then returned from the South Pacific and my

24     daughter had pneumonia.

25            I tried to reason with counsel, and say September
```

1   3rd is Labor Day weekend, that's really not sufficient

2   between having very observant clients and other things I

3   need some time. The response was September 3rd and was told

4   that was it.

5        I was then forwarded these letter with the order

6   in the Davies (ph) matter, I happen to be acquainted with

7   the attorney, Mr. Abramson in that matter. I took a look at

8   the order, and I don't have it in front of me, Your Honor,

9   but if memory serves me, the order you entered gave an

10   extension of time for the notice -- the admissions. And so

11   I assumed that they were saying this is what we're going to

12   ask for, and the short extension of time in the answering

13   notices to admit seemed fair to me --

14        THE COURT: They told you that they weren't going

15   to do it, right?

16        MR. WEDEEN: Right, Judge. But then they said

17   this is the order, this is what we're going to ask for, and

18   this is what the Judge gave us in the very similar case.

19   And in that particular order, Your Honor extended the time

20   to answer the unanswered admissions, if memory serves.

21        THE COURT: So when did you think that your

22   responses were due?

23        MR. WEDEEN: Judge, I thought it was --

24        THE COURT: You just thought it was an open-ended

25   extension?

```
 1              MR. WEDEEN:  No, Your Honor.  I thought that I
 2   would come in today, having met with some clients, and
 3   having gotten two-thirds of them done in the sense that I
 4   have the information that I need, that Your Honor would
 5   entertain a short extension as Your Honor did in the case
 6   that they cited with the order they presented.
 7              THE COURT:  I don't remember the facts.
 8              MR. WEDEEN:  But I'm just saying, Your Honor, so
 9   when --
10              THE COURT:  How long the delay was, I just don't
11   remember that.
12              MR. WEDEEN:  And Mr. Davies, I -- for the record,
13   Judge, the defendant in that particular case, developed
14   (indiscernible) is a fairly sophisticated litigant.  So they
15   were extended that courtesy, I would request the same for my
16   clients.
17              THE COURT:  Again, I don't know what the facts of
18   that case are, but I'm not inclined to extend the date for
19   the request for admissions.  Counsel continually reminded
20   you, and I appreciate your telling me that you have
21   difficulty getting information from your clients, but it's
22   -- you know, it's months and months that have gone by and so
23   what I'll do is, I will deem the admissions admitted, I
24   don't even know what they are because I haven't seen them.
25   And the -- I'll enter an order compelling discovery through
```

Page 114

```
 1    -- what do you have outstanding, document demands, what

 2    else?

 3            MS. HOCHMUTH:  We have a request for production

 4    and interrogatories as well, Your Honor.

 5            THE COURT:  Answer the interrogatories within 30

 6    days, and produce all the documents within 30 days.  I don't

 7    know if you have enough to move for summary judgment or not,

 8    but you can make that determination, based on their request

 9    for admission, but it's a fictitious profits case, it's --

10    as I said before, there are strict liability cases unless

11    the law changes.

12            So you can submit an order to -- you can submit an

13    order with a consent, not that you consent to the relief,

14    but you consent that the order accurately reflects the

15    disposition of the conference or if not, just

16    (indiscernible) whatever in notice.

17            MS. HOCHMUTH:  Yes, Your Honor.

18            THE COURT:  Okay.

19            MS. HOCHMUTH:  Thank you very much.

20            MR. WEDEEN:  Thank you.

21            THE COURT:  Pardon?

22            UNIDENTIFIED:  (indiscernible)

23            PHONE OPERATOR:  Excuse me, Your Honor.

24            THE COURT:  Uh-huh.

25            PHONE OPERATOR:  This is the operator, may I
```

Page 115

1   disconnect the lines?

2            THE COURT:  I'm sorry, I can't -- it's just coming

3   in a little garbled.

4            PHONE OPERATOR:  May I disconnect the lines?  May

5   I disconnect?

6            THE COURT:  Oh, is there anybody on the line in

7   relation to the conference, relating to Picard versus 1096-

8   1100 River Road Associates?

9            PHONE OPERATOR:  No, Your Honor, there's no one on

10  the line.

11           THE COURT:  Then you can disconnect the line,

12  thank you.

13           PHONE OPERATOR:  Then have a good day, bye-bye.

14           THE COURT:  All right.  Go ahead.

15           MS. OZTURK:  Good morning, Your Honor, my name is

16  Ferve Ozturk and I represent the Trustee in the Picard v

17  1096-1100 River Road Associates case.

18           I'm here before you today to request similar

19  relief to my colleague in the Bernfeld case.  We're

20  requesting permission to file a motion to deem the matters

21  and the Trustee's request for admissions to the defendants

22  admitted.

23           THE COURT:  You know, all I got was the

24  admissions, I didn't see what the questions were, what the

25  requests were.

```
 1              MS. OZTURK:  I can hand over a copy of the --

 2              THE COURT:  So in order to determine whether or

 3    not the response is reasonable, I'd have to take a look at

 4    the questions.

 5              MS. OZTURK:  Certainly.  Would you like our copy

 6    of those now?

 7              THE COURT:  I'll take them now, but have you

 8    received any response to your letter?

 9              MS. OZTURK:  No.  We've received no response.

10         May I approach the bench?

11              THE COURT:  Is there anyone here today on 1096-

12    1100 River Road Associates, representing the defendants?

13         (No response)

14              THE COURT:  The record should reflect there's no

15    response.  Did anybody say they were coming?

16              MS. OZTURK:  No.  Mr. Abramson's associate told me

17    that this date was fine for Mr. Abramson.

18              So, Judge, you'll see there's three sets of

19    requests for admissions.  We served one on each of the

20    defendants.  We received only one response.  It's unclear

21    which defendant is responding to which request for

22    admission.

23              THE COURT:  Don't they have to be signed by

24    somebody?

25              MS. OZTURK:  No, we -- they --
```

1    THE COURT:  It's signed by the attorney, but he

2    doesn't say who he's signing it for?

3    MS. OZTURK:  No.  He represents that he's the

4    attorney for a friend Davies (ph) apparently is the

5    individual, but there's no signature from the defendant,

6    Parhe (ph).

7    THE COURT:  Who represents 1096-1100 River Road?

8    MS. OZTURK:  Mr. Abramson has appeared as attorney

9    of counsel for all the three defendants, 1096 River Road,

10   Fred Davies LLC.

11   THE COURT:  Let me ask you this, and I asked in

12   the last case, are the admissions sufficient to make a

13   motion for summary judgment?  This is a fictitious profits

14   case?

15   MS. OZTURK:  Yes, it's a good faith fictitious

16   profits case, and yes, the admissions are sufficient to --

17   THE COURT:  Why don't you do this, and really, I

18   mean, you can do this with all the cases.  Make a motion for

19   summary judgment, based on the admissions and whatever else

20   you have obviously, and let them come in and explain why the

21   admission shouldn't be deemed admissions.  I'm just a little

22   uncomfortable to deal with this with nobody here, and not

23   having reviewed the questions, and you know, next time it

24   would be helpful, if you write me one of these letters, to

25   send me the discovery as to which things no response or the

1    case of this one, send me the requests, so I can read

2    together.  Usually they repeat the requests, and then they

3    put in the answer, but they didn't do it in this case.

4              MS. OZTURK:  Certainly.  In this case, there is

5    only one response, it's not clear which defendant is

6    responding.

7              THE COURT:  Well, if I assume it's a response for

8    all the defendants, you're still saying it's insufficient,

9    right?

10             MS. OZTURK:  Yes, that it's insufficient under

11   Rule 36.

12             THE COURT:  I'm looking at some of these requests,

13   and they're pretty specific in terms of the amount of money

14   that was withdrawn.

15             MS. OZTURK:  The request for admissions asks for

16   admissions concerning the trustee's -- you know, the first

17   (indiscernible) the trustee's exhibit to the complaint,

18   which sets out the amount of the transfers --

19             THE COURT:  Right.

20             MS. OZTURK:  -- deposits and withdrawals.  And you

21   know as for Mr. Davies himself, we allege he's a subsequent

22   transferee and we ask in our admissions that he received

23   subsequent transfers.

24             THE COURT:  Yeah, you know, on second thought, I'm

25   looking through these request for admissions.  They're very

10-05143-smb Doc 20-1 Filed 10/30/15 Entered 10/30/15 18:22:24 Ex. 13
Pg 120 of 125
08-01789-cgm Doc 20974-13 Filed 08/28/20 Entered 08/28/20 18:58:23 Ex. 13
Pg 120 of 125

Page 119

1   specific and they're not key to the account statements.

2   They're key, which they're claiming are bogus, they are key

3   to the schedules that the trustee has prepared, and one

4   would think that an investor would know how much money they

5   put in and how much they put out.  Or if they weren't, at

6   least be in a position to say, look, I no longer have my

7   personal records and I can't answer these questions, which

8   is not what the substance of the responses are.  Simply the

9   responses are all the same, that the account statements are

10  bogus, but the request doesn't go to the account statements,

11  they go to the schedulings that the trustee has prepared,

12  and just specifically ask him, admit that you took it, put

13  in this much or admit that you took out this much.

14          So on second thought I will deem these admissions

15  -- the responses are wholly insufficient in light of the

16  request and based upon the insufficiency of the responses,

17  and also based upon the failure to even appear at this

18  conference to defend the responses, I'll deem the admissions

19  (indiscernible).  You can submit an order on that.

20          MS. OZTURK:  Thank you, Your Honor.

21          THE COURT:  All right.

22          MS. OZTURK:  We're also seeking sanctions.  You'll

23  recall the last time we were here before the Court, the

24  Court entered an order compelling discovery.  Defendants

25  violated that order.  They were directed by this Court to

Page 120

```
 1    serve initial disclosures on September 4th and responses to

 2    the trustee's interrogatories, request for admissions, and

 3    document requests on September 18.

 4           On September 18, we received the one set of

 5    insufficient responses to our RFAs and nothing else.  We

 6    haven't had any communication with the counsel since then.

 7           Your Honor put --

 8           THE COURT:  What kind of sanctions are you

 9    seeking?

10           MS. OZTURK:  We're seeking two types of sanctions.

11    First, we would ask for an order precluding the defendants

12    from introducing any documents or witnesses to controvert

13    the trustee's claims at the summary judgment stage.  We

14    believe that that order would be supported by the rules.

15    There's several grounds for that.

16           THE COURT:  Where do you ask for that in your

17    letter?  I just see a general request for sanctions under

18    37(b)(2)(A), sanctions against the defendants for failure to

19    comply with discovery order and that provision you cite as a

20    host of sanctions.

21           MS. OZTURK:  That's right, Your Honor.  You know,

22    we're ready to proceed today here as a conference and then

23    bring a motion setting out the --

24           THE COURT:  You can make a motion for sanctions.

25    Why don't you make a motion for summary judgment and see
```

1    what occurs as a possibility, I'm not suggesting you have to

2    do that, let's just see why the defendants aren't doing very

3    much to defend this case anyway.

4              MS. OZTURK:  Right.  The --

5              THE COURT:  You're free to make a motion to compel

6    discovery, I just wouldn't strike the answer, or preclude

7    anything in response to the letter, which is not even

8    clearly requested.

9              MS. OZTURK:  Understood, Your Honor.  We're also

10   seeking attorney's fees and expenses.

11             THE COURT:  Same motion, it's a form of sanctions,

12   it's the same motion.  If you want to make a motion to

13   compel discovery and seek or rather to seek sanctions under

14   Rule 37, make a motion, but just make clear what it is

15   you're seeking.

16             MS. OZTURK:  Okay.  That's understood.

17             THE COURT:  And obviously the basis for it.

18             MS. OZTURK:  Okay.

19             THE COURT:  All right.

20             MS. OZTURK:  I can argue it here, but.

21             THE COURT:  I'm not going to do it in response to

22   a letter.  That's a little different from simply asking for

23   (indiscernible) admissions which is what the rule says

24   anyway.

25             MS. OZTURK:  Certainly.

1          THE COURT:  That's it.

2          MS. OZTURK:  Thank you, Your Honor.

3          THE COURT:  Thank you.  You can submit an order on

4    the other one.  Actually, no, settle an order on your

5    adversary.

6          All right.  Thank you very much.

7          MS. OZTURK:  Thank you, Your Honor.

8    (Proceedings concluded at 12:26 PM)

9                      * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 123

1                    I N D E X

2

3                  R U L I N G S

4   IDENTIFICATION                                    PAGE

5   Trustees Motion and Memorandum to Affirm His        13

6   Determinations Denying Claims of Claimants' Holding

7   Interests in 1973 Masters Vacation Fund, Bull Market

8   Fund, and Strattham Partners

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         CERTIFICATE

2

3       I, Sherri L. Breach, certify that the foregoing transcript

4       is a true and accurate record of the proceedings.

5

6       **Sherri L**      Digitally signed by Sherri L Breach
                         DN: cn=Sherri L Breach, o, ou,
                         email=digital1@veritext.com,
7       **Breach**        c=US
                         Date: 2015.10.30 15:40:37 -04'00'
        _____

8       Sherri L. Breach

9       AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10

11      I, Lisa Beck, certify that the foregoing transcript is a

12      true and accurate record of the proceedings.

13      **Lisa Beck**    Digitally signed by Lisa Beck
                         DN: cn=Lisa Beck, o, ou,
                         email=digital1@veritext.com, c=US
14                       Date: 2015.10.30 15:41:28 -04'00'
        _____

15      Lisa Beck (CET**D 486)

16      AAERT Certified Electronic Transcriber

17

18      DATE:  October 30, 2015

19

20

21

22      Veritext Legal Solutions

23      330 Old Country Road

24      Suite 300

25      Mineola, NY 11501