**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF, | Adv. Pro. No. 10-04438 (SMB) |
| Debtor. | |

IRVING H. PICARD, Trustee for the Substantively
Consolidated SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and Bernard L. Madoff,

        Plaintiff,

v.

ESTATE OF SEYMOUR EPSTEIN,

MURIEL EPSTEIN, as beneficiary and of the Estate
of Seymour Epstein and/or the Trusts created by the
Last Will and Testament of Seymour Epstein, as
Executor of the Estate of Seymour Epstein, and as
trustee of Trusts created by the Last Will and
Testament of Seymour Epstein,

HERBERT C. KANTOR, as trustee of Trusts created
by the Last Will and Testament of Seymour Epstein,

RANDY EPSTEIN AUSTIN, as beneficiary of the
Estate of Seymour Epstein and/or the Trusts created
by the Last Will and Testament of Seymour Epstein,

ROBERT EPSTEIN, as beneficiary of the Estate of
Seymour Epstein and/or the Trusts created by the
Last Will and Testament of Seymour Epstein,

JANE EPSTEIN, as beneficiary of the Estate of
Seymour Epstein and/or the Trusts created by the
Last Will and Testament of Seymour Epstein,

SUSAN EPSTEIN GROSS, as beneficiary of the
Estate of Seymour Epstein and/or the Trusts created
by the Last Will and Testament of Seymour Epstein,
and

SHELBURNE SHIRT COMPANY, INC.,

Defendants.

## TRUSTEE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ......................................................................................................2

ARGUMENT ...........................................................................................................5

I.     SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE NO
       MATERIAL FACTS ARE IN DISPUTE ...........................................................5

       A.     Legal Standard ................................................................................5

       B.     The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year
              Transfers of Fictitious Profits Made by BLMIS to Defendants ............................6

              1.     BLMIS Made Every Two-Year Transfer with Actual Fraudulent
                     Intent and in Furtherance of the Fraud ....................................7

                     a.     BLMIS Was a Ponzi Scheme ........................................8

                     b.     BLMIS Paid Investor Redemptions from Customer Funds...........12

                     c.     BLMIS's Two-Year Transfers to Defendants Were in
                            Furtherance of the Fraud ..............................................15

                     d.     BLMIS Made the Transfers to Defendants Within the Two-
                            Year Period ...............................................................15

                     e.     Defendants Have Not Presented Any Countervailing
                            Evidence ...................................................................16

II.    THE DEFENSES CAN BE DETERMINED AS A MATTER OF LAW 16

       A.     As a Matter of Law, Defendants Did Not Give Value for Fictitious Profits ........16

       B.     The Transfers Were an Interest of the Debtor in Property ....................................17

              1.     SIPA and SIPC............................................................................18

              2.     Becoming a Member of SIPC ......................................................20

              3.     Initiating a SIPA Liquidation.......................................................20

              4.     Customer Property Under SIPA....................................................21

              5.     Madoff's Business .......................................................................23

              6.     Madoff's Registration as a Broker-Dealer ..................................24

              7.     Substantive Consolidation ..........................................................25

              8.     The Trustee Can Recover Any Transfers of Customer Property .............27

       C.     Madoff's Purported Purchase of Securities Does Not Create a Genuine
              Issue of Material Fact ........................................................................33

CONCLUSION .......................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
Nos. 05 Civ. 9050(LMM), 03, MDL 1529, 2011 WL 1419617 (S.D.N.Y. Apr.
7, 2011), *aff'd*, 748 F.3d 110 (2d Cir. 2014)............................................................................7

*In re Adler Coleman Clearing Corp.*,
195 B.R. 266 (Bankr. S.D.N.Y. 1996)....................................................................................20

*Alexander v. Compton (In re Bonham)*,
229 F.3d 750 (9th Cir. 2000) ..................................................................................................32

*Armstrong v. Collins*,
Nos. 01 Civ. 2437(PAC), 02 Civ. 2796(PAC), 02 Civ. 3620(PAC), 2010 WL
1141158 (S.D.N.Y. Mar. 24, 2010) .........................................................................................11

*Bayou Accredited Fund, LLC v. Redwood Growth Partners L.P. (In re Bayou
Grp., LLC)*,
396 B.R. 810, 835 (Bankr. S.D.N.Y. 2008), *rev'd in part on other grounds,
Bayou IV*, 439 B.R. 304 (S.D.N.Y. 2010)..................................................................10, 15, 16

*Bayou Superfund v. WAM Long/Short Fund II (In re Bayou Grp., LLC)*,
362 B.R. 624 (S.D.N.Y. 2007)................................................................................................17

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
397 B.R. 1 (S.D.N.Y. 2007)......................................................................................................7

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
380 F. Supp. 2d 334 (S.D.N.Y. 2005)......................................................................................6

*In re Bernard L. Madoff Inv. Sec. LLC*,
654 F.3d 229 (2d Cir. 2011)....................................................................................................19

*In re Bernard L. Madoff*,
No. 09-11893 (SMB) (Bankr. S.D.N.Y. Apr. 21, 2009).........................................................26

*In re Bevill, Bresler & Schulman, Inc.*,
83 B.R. 880 (Bankr. D.N.J. 1988) ......................................................................................6, 23

*Carney v. Lopez*,
933 F. Supp. 2d 365 (D. Conn. 2013)......................................................................................10

*In re Cassandra Grp.*,
338 B.R. 583 (Bankr. S.D.N.Y. 2006)......................................................................................2

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).....................................................................................................5, 6

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp. LLC)*,
    439 B.R. 284 (S.D.N.Y. 2010)...........................................................7, 10, 15, 17

*Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*,
    97 B.R. 503 (E.D. Ark. 1987).......................................................................22

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
    Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774 (Bankr.
    S.D.N.Y. Jan. 3, 2014)...............................................................................10

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund)*,
    359 B.R. 510 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397 B.R. 1
    (S.D.N.Y. 2007)........................................................................................15

*Hayes v. Palm Seedlings Partners (In re Agric. Rsch. & Tech. Grp.)*,
    916 F.2d 528 (9th Cir. 1990)..........................................................................8

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995)..........................................................................10

*In re Lehman Bros. Holdings*,
    445 B.R. 143 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478
    B.R. 570 (S.D.N.Y. 2012)............................................................................22

*Leonhardt v. Madoff*,
    No. 09-2032 (S.D.N.Y. Mar. 5, 2009) ...........................................................26

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)....................................................................................5

*McHale v. Boulder Cap. (In re 1031 Tax Grp., LLC)*,
    439 B.R. 47 (S.D.N.Y. 2010).............................................................10, 11, 17

*Moran v. Goldfarb*,
    No. 09-cv-7667 (RJS), 2012 WL 2930210 (S.D.N.Y. July 16, 2012)....................10

*In re Old Naples Sec., Inc.*,
    223 F.3d 1296 (11th Cir. 2000) ....................................................................31

*Picard v. Avellino*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016)..................................................18, 28, 29

*Picard v. BAM L.P.*,
    608 B.R. 165 (Bankr. S.D.N.Y. Sept. 11, 2019)....................................24, 31, 35

*Picard v. Chais*,
  445 B.R. 206 (Bankr. S.D.N.Y. 2011) .....................................................................8

*Picard v. Cohen*,
  Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
  25, 2016) ................................................................................................8, 17, 18

*Picard v. Cohmad Sec. Corp.*,
  454 B.R. 317 (Bankr. S.D.N.Y. 2011) .....................................................................8

*Picard v. Fairfield Greenwich Ltd.*,
  762 F.3d 199 (2d Cir. 2014)..................................................................................23

*Picard v. Flinn Invs., LLC*,
  463 B.R. 280 (S.D.N.Y. 2011)..................................................................................6

*Picard v. Goldenberg*,
  Adv. Pro. No. 10-04946 (SMB), 2018 WL 3078149 (Bankr. S.D.N.Y. June
  19, 2018) ...............................................................................................................2, 17

*Picard v. Greiff*,
  476 B.R. 715 (S.D.N.Y. 2012)...................................................................8, 15, 17

*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011)...........................................................................8, 17

*Picard v. Legacy Cap. Ltd.*,
  603 B.R. 682 (Bankr. S.D.N.Y. 2019) .................................................9, 10, 17, 35

*Picard v. Lowrey*,
  596 B.R. 451 (S.D.N.Y. 2019)................................................................................21

*Picard v. Marilyn Bernfeld Tr.*,
  Adv. Pro. No. 10-05143 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015)...........................7

*Picard v. Nelson*,
  610 B.R. 197 (Bankr. S.D.N.Y. 2019)...................................................... *passim*

*In re Picard*,
  917 F.3d 85 (2d Cir. 2019)......................................................................................24

*In re Primeline Sec. Corp.*,
  295 F.3d 1100 (10th Cir. 2002) ..............................................................................31

*Rosenman Family, LLC v. Picard*,
  395 F. App'x 766 (2d Cir. 2010) ............................................................................19

*Scholes v. Lehmann*,
  56 F.3d 750 (7th Cir. 1995) ........................................................................10, 11

*Sec. Inv'r Prot. Corp. v. Barbour*,
  421 U.S. 412 (1975)........................................................................................19

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  Adv. Pro. Nos. 10-04387 (SMB), 10-04488 (SMB), 10-04350 (SMB), 10-
  05110 (SMB), 2018 WL 1442312, (Bankr. S.D.N.Y. Mar. 22, 2018) ......................................2

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.*
  *Madoff)*,
  522 B.R. 41 (Bankr. S.D.N.Y. 2014) ....................................................................30

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.*
  *Madoff)*,
  531 B.R. 439 (Bankr. S.D.N.Y. 2015) ..........................................................6, 8, 19

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.*
  *Madoff Inv. Sec. LLC)*,
  424 B.R. 122 (Bankr. S.D.N.Y. 2010) ................................................................8, 19

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015)....................................8, 24

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  499 B.R. 416 (S.D.N.Y. 2013)............................................................................20

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  No. 12 MC 115(JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013), *aff'd*, 773
  F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015) ....................................4

*SEC v. F.O. Baroff Co.*,
  497 F.2d 280 (2d Cir. 1974)............................................................................19

*SEC v. Madoff*,
  No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008) ................................................25, 26

*Town of Fairfield v. Madoff*,
  No. 09-5023735 (Conn. Super. Ct. Mar. 30, 2009) ........................................................26

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
  843 F.3d 561 (2d Cir. 2016)............................................................................24

*United States v. Madoff*,
  No. 09-cr-213 (DC) (S.D.N.Y. Mar. 15, 2009) ........................................................25

*In re Weis Sec., Inc.*,
    No. 73 Civil 2332, 1976 WL 820 (S.D.N.Y. Aug. 2, 1976)...................................................19

*Ying Jing Gan v. City of New York*,
    996 F.2d 522 (2d Cir. 1993)...............................................................................................6, 16

**Statutes**

11 U.S.C. § 101(41) .................................................................................................................21

11 U.S.C. § 105(a) .....................................................................................................................4

11 U.S.C. § 109(a) ...................................................................................................................21

11 U.S.C. § 544 ..........................................................................................................................4

11 U.S.C. § 548 ...................................................................................................................18, 28

11 U.S.C. § 548(a) .....................................................................................................................4

11 U.S.C. § 548(a)(1) ...............................................................................................................18

11 U.S.C. § 548(a)(1)(A) .......................................................................................................7, 18

11 U.S.C. § 548(c) ...................................................................................................................17

11 U.S.C. § 548(d)(2)(a) .........................................................................................................17

11 U.S.C. § 550(a) .....................................................................................................................4

11 U.S.C. § 550(a)(1) .................................................................................................................4

11 U.S.C. § 551 ..........................................................................................................................4

15 U.S.C. § 78ccc(a) ...............................................................................................................20

15 U.S.C. § 78ccc(a)(2)(A) .....................................................................................................20

15 U.S.C. § 78ddd(c)(2) ..........................................................................................................20

15 U.S.C. § 78eee(b)(1) ..........................................................................................................29

15 U.S.C. § 78eee(b)(2)(A)(1) .................................................................................................21

15 U.S.C. § 78eee(b)(3) ..........................................................................................................21

15 U.S.C. § 78eee(b)(4) ..........................................................................................................21

15 U.S.C. § 78fff-2(c)(1) .........................................................................................................19

15 U.S.C. § 78fff-2(c)(3) ................................................................................ *passim*

15 U.S.C. § 78fff(a) ......................................................................................19

15 U.S.C. § 78*lll*(4) ...............................................................................19, 22, 27

15 U.S.C. § 78*lll*(4)(D) .................................................................................22

15 U.S.C. § 78*lll*(5) .....................................................................................21

15 U.S.C. § 78*o*(b) ...................................................................................20, 21

**Rules**

Fed. R. Bankr. P. 7056 ...................................................................................1, 5

Fed. R. Bankr. P. 7056-1(a) ..............................................................................5

Fed. R. Civ. P. 56 ..........................................................................................1

Fed. R. Civ. P. 56(a) ......................................................................................5

Fed. R. Civ. P. 56(c)(1) ...................................................................................5

Fed. R. Evid. 803(22) ....................................................................................10

Fed. R. Evid. 807 .........................................................................................10

**Other Authorities**

17 C.F.R. § 240.15b1-3(b) ...............................................................................20

17 C.F.R. § 240.15b6-1(b) ...............................................................................20

17 C.F.R. § 240.15c3-3 .................................................................22, 27, 32, 33

17 C.F.R. § 240.15c3-3(f) ................................................................................22

17 C.F.R. § 249.501(a) ...................................................................................20

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74
    (2002) ..............................................................................................21, 22

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff, respectfully submits this memorandum of law in support of the Trustee's motion (the "Motion") under Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 for summary judgment as to Count One of the Trustee's complaint to avoid and recover the amounts fraudulently transferred by BLMIS to defendants Estate of Seymour Epstein, Muriel Epstein, as executrix of the Estate of Seymour Epstein and as trustee of Trusts created by the Last Will and Testament of Seymour Epstein, Herbert C. Kantor, as trustee of the Trusts created by the Last Will and Testament of Seymour Epstein, and Shelburne Shirt Company, Inc. (the "Defendants"). The facts underlying this Motion are fully set forth in the Trustee's Statement of Material Facts Pursuant to Local Rule 7056-1 ("Stmt."), the Declaration of Nicholas J. Cremona ("Cremona Decl."), and the Declarations of Bruce G. Dubinsky, Lisa M. Collura, and Matthew B. Greenblatt.

## PRELIMINARY STATEMENT

This avoidance and recovery action centers on the undisputable fact that in the two years preceding the commencement of the SIPA liquidation (the "Two-Year Period"), Defendants received $2,622,438 in fictitious profits from BLMIS.  As there are no material facts in dispute,

the Trustee is entitled to summary judgment to avoid and recover these transfers of fictitious profits.[1]

The Trustee has established his *prima facie* case that the transfers to Defendants were made with the intent to hinder, delay, or defraud BLMIS's creditors and, therefore, are avoidable and recoverable for the benefit of the BLMIS customer fund. For decades, BLMIS perpetrated the largest Ponzi scheme in history. In their allocutions, Madoff and BLMIS employees confirmed that BLMIS was a Ponzi scheme, starting at least in the 1970s and continuing through BLMIS's collapse in December 2008. Defendants admit they received $2,622,438 of fictitious profits in the Two-Year Period. The defenses invoked by Defendants—including value—fail as a matter of law and thus do not defeat the Trustee's *prima facie* case. Accordingly, as there are no material facts in dispute, summary judgment should be granted in favor of the Trustee on Count One in his Complaint.

## **BACKGROUND**

Seymour Epstein was a customer of BLMIS's investment advisory business and held BLMIS Account No. 1CM049 (the "Seymour Account") in his name, "Seymour Epstein."[2] Stmt. ¶ 107; Ans. ¶ 7; *see also* Ex. B to Compl., ECF No. 1. Defendant Shelburne Shirt Company, Inc., a New York corporation of which Epstein was the president, held BLMIS

---

[1] The Trustee is also entitled to seek an award of prejudgment interest from the date the Trustee filed his complaint against Defendants on November 30, 2010 because "[f]ull compensation to the estate for the avoided transfer[s] normally requires prejudgment interest to compensate for the value over time of the amount recovered." *In re Cassandra Grp.*, 338 B.R. 583, 599 (Bankr. S.D.N.Y. 2006) (awarding prejudgment interest from date of filed complaint "[t]o fully and fairly compensate [debtor's] creditors for their loss—not only of [the amount] that was fraudulently conveyed . . . but of the use of that money since the date of the demand"); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 10-04387 (SMB), 10-04488 (SMB), 10-04350 (SMB), 10-05110 (SMB), 2018 WL 1442312, at *15 (Bankr. S.D.N.Y. Mar. 22, 2018) ("South Ferry R&R"); *Picard v. Goldenberg*, Adv. Pro. No. 10-04946 (SMB), 2018 WL 3078149, at *6 (Bankr. S.D.N.Y. June 19, 2018).

[2] Seymour Epstein died on December 19, 2008 before the Trustee filed his Complaint. *See* Stmt. ¶ 107; Ans. ¶ 7, *Picard v. Estate of Seymour Epstein*, Adv. Pro. No. 10-04438 (Bankr. S.D.N.Y. Sept. 16, 2015), ECF No. 43. Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Estate of Seymour Epstein*, Adv. Pro. No. 10-04438 (Bankr. S.D.N.Y.).

Account No. 1CM005 (individually, the "Shelburne Account," and together with the Seymour Account, the "Epstein Accounts"), in the name of "Shelburne Shirt Co. c/o Seymour Epstein." Stmt. ¶ 110–12; Ans. ¶ 13; *see also* Ex. B. to Compl.

The Seymour Account was opened on January 4, 1993 with an inter-account transfer from BLMIS Account 1C0061 in the amount of $329,987. Stmt. ¶ 129. Based on documents produced to the Trustee by the Defendants, only $200,000 of principal was transferred from BLMIS Account 1C0061 to the Seymour Account. Stmt. ¶¶ 129–30. Between January 4, 1993 and December 11, 20008, Epstein made no additional cash deposits and fifteen cash withdrawals totaling $1,861,538. Stmt. ¶ 131. Epstein withdrew $1,661,538 of funds in excess of principal, representing fictitious profits over the life of the Seymour Account. Stmt. ¶ 132. Within the Two-Year Period, Epstein made seven cash withdrawals from the Seymour Account totaling $1,110,538, which consisted entirely of fictitious profits. Stmt. ¶ 133.

The Shelburne Account was also opened on January 4, 1993 with a cash deposit via check in the amount of $100,000, all representing principal. Stmt. ¶ 134. Subsequent to this initial cash deposit, there were two additional cash deposits via checks in the aggregate amount of $200,000, all representing principal. Stmt. ¶ 135. These three cash deposits provided the Shelburne Account with a total of $300,000 of principal. Stmt. ¶ 136. Between January 4, 1993 and December 11, 2008, the Shelburne Account reflected five cash withdrawals totaling $1,876,900, which consisted of $1,576,900 of funds withdrawn in excess of principal, representing fictitious profits. Stmt. ¶¶ 137–38. Within the Two-Year Period, $1,511,900 of fictitious profits was withdrawn from Shelburne Account. Stmt. ¶ 139.

In 2010, the Trustee brought this adversary proceeding against Defendants to avoid and recover fraudulent transfers of fictitious profits. Compl. ¶¶ 40–43. Under Bankruptcy Code

sections 105(a), 544, 548(a), 550(a), and 551 and the New York Debtor and Creditor Law, the

Trustee sought to recover $3,132,438 of fictitious profits received by Defendants from BLMIS

during the six years prior to the liquidation.  Compl. ¶ 43.  Under sections 548(a), 550(a)(1), and

551 of the Bankruptcy Code, the Trustee also sought to avoid and recover $2,622,438 of

fictitious profits received by Defendants[3] during the Two-Year Period prior to the liquidation

("Two-Year Transfers"). Stmt. ¶ 140; Compl. ¶ 43.  After the Trustee brought his complaint, the

Second Circuit ruled that the Trustee is limited to recovery of the Two-Year Transfers. *Sec. Inv'r*

*Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12 MC 115(JSR), 2013

WL 1609154, at *3 (S.D.N.Y. Apr. 15, 2013), *aff'd*, 773 F.3d 411 (2d Cir. 2014), *cert. denied*,

135 S. Ct. 2859 (2015) ("*Section 546(e) Decision*").[4]  On September 16, 2015, Defendants

answered the Complaint.

On June 28, 2019, the Trustee served the expert reports of Bruce G. Dubinsky, Matthew

B. Greenblatt, Lisa M. Collura, and Richard Diedrich.  Defendants did not seek to depose any of

the Trustee's expert witnesses.  Discovery closed on December 16, 2019.

Following discovery, the case was ripe for mediation under the Order (1) Establishing

Litigation Case Management Procedures for Avoidance Actions and (2) Amending the February

16, 2010 Protective Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re*

*Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Nov. 10, 2010), ECF No.

3141.  After a motion by Defendants to withdraw the reference to the bankruptcy court, to which

the Trustee consented, the district court "refer[red] the proposed motion for summary judgment

---

[3] Defendant Herbert C. Kantor died during the pendency of this adversary proceeding.

[4] The subsequent transfer counts against defendants Randy Epstein Austin, Robert Epstein, Jane Epstein, and Susan Epstein Gross, as beneficiaries of the Estate of Seymour Epstein and/or the Trusts created by the Last Will and Testament of Seymour Epstein, were dismissed pursuant to the Court's Order granting in part and denying in part defendants' motion to dismiss.  *See* Order, ECF No. 42.

for proposed findings of fact and conclusions of law." Order, *Picard v. Estate of Seymour Epstein*, No. 20-cv-01377 (GHW) (S.D.N.Y. June 8, 2020), ECF No. 8.[5]  On June 15, 2020, the Trustee requested a Rule 7056-1(a) pre-motion conference in order to file his motion for summary judgment.  *See* Letter, ECF No. 105.  This Court held a pre-motion conference on July 29, 2020.  *See* Tr. of Hr'g, ECF No. 110.  This Motion follows.

## **ARGUMENT**

## I.    **SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE NO MATERIAL FACTS ARE IN DISPUTE**

### A.    **Legal Standard**

Rule 56(a) of the Federal Rules of Civil Procedure, applicable to bankruptcy courts pursuant to Fed. R. Bankr. P. 7056, provides that a court must grant summary judgment when there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Factual positions are proven by either citing the record evidence—including declarations, admissions, and interrogatory answers—or showing that an adverse party cannot produce admissible evidence to support a fact.  Fed. R. Civ. P. 56(c)(1); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant need not show the absence of a genuine dispute of material fact with respect to a point "on which the nonmoving party bears the burden of proof."  *Celotex Corp.*, 477 U.S. at 325.

---

[5] On June 22, 2020, Defendants requested leave from the district court to file a second motion to withdraw the reference.  Letter, *Picard v. Estate of Seymour Epstein*, No. 20-cv-01377 (GHW) (S.D.N.Y. July 22, 2020), ECF No. 10.  District Judge Gregory H. Woods granted Defendants' request, Order, *Picard v. Estate of Seymour Epstein*, No. 20-cv-01377 (GHW) (S.D.N.Y. July 30, 2020), ECF No. 15, however, Defendants subsequently abandoned their efforts in district court, instead moving forward with summary judgment briefing before this Court.  *See* Letter, *Picard v. Estate of Seymour Epstein*, No. 20-cv-01377 (GHW) (S.D.N.Y. Aug. 12, 2020), ECF No. 16.

When the movant has discharged its burden, the non-movant must then "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted). "[T]he nonmoving party may . . . not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993). The non-moving party may not oppose summary judgment "on the basis of an unreasonable view of the facts." *Berk v. St. Vincent's Hosp. & Med. Ctr*., 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005).

### B.    The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year Transfers of Fictitious Profits Made by BLMIS to Defendants

Under SIPA § 78fff-(2)(c)(3), the Trustee may recover any transfers by the debtor whenever customer property is insufficient to pay customer claims. To date, the Trustee has recovered $14.345 billion of $20 billion owed to customers by the estate. *See* Trustee's Twenty-Third Interim Report for the Period October 1, 2019 Through March 31, 2020, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Apr. 28, 2020), ECF No. 19502. Because customer property is insufficient to pay the outstanding customer claims, the Trustee is authorized to recover the transfers to Defendants. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 531 B.R. 439, 453–54 (Bankr. S.D.N.Y. 2015) ("*Omnibus Good Faith Decision*"); *see also Picard v. Flinn Invs., LLC*, 463 B.R. 280, 284 (S.D.N.Y. 2011); *In re Bevill, Bresler & Schulman, Inc*., 83 B.R. 880, 898 (Bankr. D.N.J. 1988).

The Trustee seeks to avoid and recover transfers of fictitious profits made to Defendants under 11 U.S.C. § 548(a)(1)(A). The elements of this claim are: (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to

hinder, delay, or defraud" a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, Nos. 05 Civ.

9050(LMM), 03, MDL 1529, 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd*, 748 F.3d

110 (2d Cir. 2014). This Court has recognized that fictitious profit cases are strict liability cases.

Cremona Decl., Ex. 12 (Tr. of Oral Arg. at 114:10–11, *Picard v. Marilyn Bernfeld Tr.*, Adv. Pro.

No. 10-05143 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015), ECF No. 20); *see also id.* (Tr. of Oral

Arg. at 100:19, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (SMB) (Bankr. S.D.N.Y. Oct. 28,

2015, ECF No. 85) (fictitious profit count is "almost a strict liability count")). This is especially

true where, as here, Defendants admit receipt of the Two-Year Transfers. Stmt. ¶ 113; *see also*

Cremona Decl., Ex. 11 (Responses and Objections of Defendants Estate of Seymour Epstein and

Muriel Epstein to Trustee's First Set of Interrogatories No. 9); *id.* (Responses and Objections of

Defendant Shelburne to Trustee's First Set of Interrogatories No. 10); Ex. B to Compl.

There is no genuine dispute regarding BLMIS's: (1) payment of fictitious profits within

the Two-Year Period to or for the benefit of Defendants, (2) interest in the transferred funds, and

(3) actual intent to hinder, delay, or defraud its creditors.

### 1.    BLMIS Made Every Two-Year Transfer with Actual Fraudulent Intent and in Furtherance of the Fraud

Starting with the last element of the Trustee's *prima facie* case, intent to defraud can be

established by showing that the debtor operated a Ponzi scheme. *See Christian Bros. High Sch.*

*Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp. LLC)*, 439 B.R. 284, 304–05

(S.D.N.Y. 2010) ("*Bayou IV*"); *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund*

*Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007) (citations omitted) (internal quotation marks omitted); *see*

*also Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr.

S.D.N.Y. Apr. 25, 2016) (citing *Omnibus Good Faith Decision*, 531 B.R. at 471) ("the Trustee is

entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to

have been made with actual fraudulent intent"); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330

(Bankr. S.D.N.Y. 2011) ("the fraudulent intent on the part of the debtor/transferor . . . is

established as a matter of law by virtue of the 'Ponzi scheme presumption'"); *Hayes v. Palm*

*Seedlings Partners (In re Agric. Rsch. & Tech. Grp.)*, 916 F.2d 528, 535 (9th Cir. 1990) ("the

debtor's actual intent to hinder, delay or defraud its creditors may be inferred by the mere

existence of a Ponzi scheme").

### a.    BLMIS Was a Ponzi Scheme

BLMIS was engaged in a Ponzi scheme.  As the bankruptcy court held, "[t]he breadth

and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the

Ponzi scheme presumption, particularly in light of Madoff's criminal admission."  *Picard v.*

*Chais*, 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011); *see also Picard v. Katz*, 462 B.R. 447, 453 &

n.5 (S.D.N.Y. 2011) ("it is patent that all of Madoff Securities' transfers during the two-year

period were made with actual intent to defraud present and future creditors").  The existence of

the scheme has also been recognized by the district court and the Second Circuit.  *See, e.g.*, *Sec.*

*Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*,

424 B.R. 122, 125–33 (Bankr. S.D.N.Y. 2010); *Picard v. Greiff*, 476 B.R. 715, 718 (S.D.N.Y.

2012); *Section 546(e) Decision*, 773 F.3d at 415–16 (2d Cir. 2014).

The relevant facts concerning the BLMIS Ponzi scheme are substantiated by the

allocutions of Madoff and BLMIS employees.  Stmt. ¶ 89; *see also Picard v. Nelson*, 610 B.R.

197, 208 (Bankr. S.D.N.Y. 2019) (relying on plea allocutions in finding that BLMIS was a Ponzi

scheme); *Picard v. Legacy Cap. Ltd.*, 603 B.R. 682, 691 (Bankr. S.D.N.Y. 2019) ("The

allocutions establish *prima facie* that Madoff ran BLMIS as a Ponzi scheme.").  Madoff admitted

to running a Ponzi scheme through BLMIS and that he did not execute trades on behalf of his

investment advisory clients.  Stmt. ¶¶ 90–97.  Frank DiPascali, Madoff's chief financial officer

8

and co-conspirator, admitted that Madoff had not executed trades on behalf of BLMIS's

investment advisory business ("IA Business") customers and that he knowingly caused false

account statements to be created reflecting false transactions: "[f]rom at least the early 1990s

through December of 2008 . . . [n]o purchases of [sic] sales of securities were actually taking

place in [customers'] accounts." Stmt. ¶ 98. DiPascali explained that he "used hindsight to file

historical prices on stocks then [he] used those prices to post purchase of [sic] sales to customer

accounts as if they had been executed in realtime. On a regular basis [he] added fictitious trade

data to account statements of certain clients to reflect the specific rate of earn return that Bernie

Madoff had directed for that client." Stmt. ¶ 99.

David Kugel, a manager and trader at BLMIS, admitted that he falsified trading records

as far back as the early 1970s. Stmt. ¶¶ 100–01. Kugel provided historical trade information to

create fake trades that, when included on the BLMIS account statements and trade confirmations

of IA Business clients, gave the appearance of profitable trading when no trading had actually

occurred. Stmt. ¶ 101. Irwin Lipkin, BLMIS's accountant, admitted BLMIS's revenue was

falsely inflated through fraudulent bookkeeping entries and annual audited reports. Stmt. ¶ 102.

Eric Lipkin, payroll clerk at BLMIS, admitted BLMIS created fake reports replicating those of

the Depository Trust & Clearing Corporation in order to purportedly confirm non-existent

positions in the investment advisory accounts for auditors and the Securities and Exchange

Commission ("SEC"). Stmt. ¶¶ 103–04. And Enrica Cotellessa-Pitz, BLMIS accountant and

comptroller, admitted investment advisory customer money was funneled to BLMIS's

proprietary trading and market making businesses to falsely inflate revenue and hide losses.

Stmt. ¶¶ 105–06.

9

Guilty pleas and admissions under oath are admissible to prove the existence of a Ponzi

scheme. *See Nelson*, 610 B.R. at 209–10 ("Criminal plea allocutions are admissible under the

exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a judgment of a previous

conviction and FED. R. EVID. 807's residual exception to hearsay."); *Legacy*, 603 B.R. at 689

n.8 (collecting cases) ("The Court may rely on a plea allocution as evidence to support a fact.");

*Moran v. Goldfarb*, No. 09-cv-7667 (RJS), 2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012);

*Carney v. Lopez*, 933 F. Supp. 2d 365, 380 (D. Conn. 2013); *Bayou Accredited Fund, LLC v.

Redwood Growth Partners L.P. (In re Bayou Grp., LLC)*, 396 B.R. 810, 835 (Bankr. S.D.N.Y.

2008) ("*Bayou III*"), *rev'd in part on other grounds, Bayou IV*, 439 B.R. at 304; *McHale v.

Boulder Cap. (In re 1031 Tax Grp., LLC)*, 439 B.R. 47, 72 (S.D.N.Y. 2010); *Scholes v.

Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995); *Gowan v. Amaranth Advisors L.L.C. (In re Dreier

LLP)*, Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774, at *11 (Bankr.

S.D.N.Y. Jan. 3, 2014); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir.

1995) (taking judicial notice of guilty pleas in subsequent civil action by bankruptcy trustee).

Summary judgment on BLMIS's Ponzi scheme is appropriate based on these admissions

as they support a finding that "there is no genuine disputed issue of fact that BLMIS was a Ponzi

scheme . . . ." *Legacy*, 603 B.R. at 693; *see also Moran*, 2012 WL 2930210, at *4 (motion for

summary judgment granted and based on plea transcript from related Department of Justice

action where perpetrator admitted to orchestrating the Ponzi scheme under oath); *Bayou IV*, 439

B.R. at 307–08 (affirming summary judgment on fictitious profits from Ponzi scheme based on

evidence including guilty pleas of fraudsters); *In re 1031 Tax Grp., LLC*, 439 B.R. at 72

(granting summary judgment in part and concluding that Ponzi scheme existed with reliance on

evidence including perpetrator's superseding indictment and plea agreements); *Armstrong v.

10

*Collins*, Nos. 01 Civ. 2437(PAC), 02 Civ. 2796(PAC), 02 Civ. 3620(PAC), 2010 WL 1141158,

at *24 (S.D.N.Y. Mar. 24, 2010) (motion for summary judgment granted and existence of Ponzi

scheme found where evidence was submitted including transcripts from perpetrator's allocution

and sentencing); *Scholes*, 56 F.3d at 762–63 (affirming district court's reliance on guilty plea in

finding actual intent to defraud).

 Bruce Dubinsky, one of the Trustee's disclosed experts in this action, confirmed that the

IA Business was a Ponzi scheme. *See Nelson*, 610 B.R. at 210–14. As set forth in Dubinsky's

unrebutted report, BLMIS operated three business units: (i) a proprietary trading business; (ii) a

market-making business; and (iii) the IA Business. Stmt. ¶ 13. The proprietary trading business

traded for its own account to make money for BLMIS. The market-making business made

markets in certain stocks, bonds, warrants and rights. Stmt. ¶¶ 14–15. The proprietary trading

and market-making businesses were referred to within BLMIS as "House 5" and are collectively

referred to as the "Proprietary Trading Business." Stmt. ¶ 16. The IA Business was designed to

purportedly trade stocks to buy equities and to buy options on behalf of its customer accounts.

Stmt. ¶ 17. The Proprietary Trading Business and IA Business were units of BLMIS both

operated by Madoff. Stmt. ¶ 18.

 At various times, BLMIS reported to its IA Business customers that the money they

deposited with BLMIS was invested in investment strategies called the "convertible arbitrage"

strategy or the "split-strike conversion" strategy. Stmt. ¶ 20. The evidence establishes that

BLMIS did not execute either of the strategies on behalf of its IA Business customers. *Id*.

Rather, Dubinsky analyzed BLMIS's trading records and determined that as far back as the

1970s, BLMIS used historical trade information to fabricate false trades for IA Business

customers and reported those fake trades on customer statements. Stmt. ¶ 21.

By 1992, the IA Business changed its primary purported investment strategy to the split-strike conversion strategy, the strategy purportedly executed in the BLMIS accounts held by Defendants. Stmt. ¶ 22. The split-strike conversion strategy, as purportedly executed by BLMIS, involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. treasury bills ("T-Bills") when the money was "out of the market." Stmt. ¶ 23. BLMIS never executed this strategy on behalf of its customers, including Defendants. In addition to evidence of the fabricated trades across all BLMIS IA Business customer accounts, Dubinsky's analysis further confirmed the lack of any trading by BLMIS on behalf of its IA Business customers based on (a) the impossible reported volume of equity trades; (b) impossible equity and options trades reported outside the daily price range; (c) the low volatility in its reported daily trading performance compared to the actual market behavior and the performance achieved by BLMIS in the Proprietary Trading Business unit as measured by the volume weighted average prices for its sales and purchases; (d) the consistently positive rates of returns that did not "mirror" the volatility of the markets; (e) a lack of any Depository Trust Corporation ("DTC") records to confirm the reported IA Business equity or treasury trades; and (f) a lack of Options Clearing Corporation ("OCC") records to confirm the reported IA Business options trades. Stmt. ¶ 24. And, Dubinsky verified that no T-Bills, purportedly part of the split-strike conversion strategy, were purchased on behalf of IA Business customers. Stmt. ¶¶ 57–63.

### b.    BLMIS Paid Investor Redemptions from Customer Funds

The Trustee's expert, Lisa Collura, a forensic accountant and certified fraud examiner, also analyzed the books and records of BLMIS. *See Nelson*, 610 B.R. at 220–21. Collura's analysis shows that during the ten-year period before its collapse on December 11, 2008, BLMIS

primarily used three bank accounts for the IA Business: JPMorgan Chase Bank, N.A.

("JPMorgan") account #xxxxx1703 (the "703 Account"); JPMorgan account #xxxxxxxxx1509

(the "509 Account", together with the 703 Account, the "JPMorgan Accounts")); and Bankers

Trust account #xx-xx0-599 (the "BT Account").  Stmt. ¶ 69.  IA Business customers' cash

deposits were deposited (and commingled) into the 703 Account.  Stmt. ¶ 70.  IA Business

customer withdrawals were made through the JPMorgan Accounts and the BT Account, which

was a checking account entirely funded by the 703 Account during the period for which bank

records are available.  Stmt. ¶ 71.  The JPMorgan Accounts were linked commercial business

accounts.  Stmt. ¶ 72.  The 509 Account was a commercial controlled disbursement account that

was entirely funded by the 703 Account.  *Id*.

   The money in the 703 Account consisted almost entirely of customer deposits.  Stmt. ¶¶

72, 87.  Both Dubinsky and Collura confirmed that ninety-seven percent of all cash additions

into the 703 Account came directly from IA Business customers.  Stmt. ¶ 73.  The other three

percent of inflows into the 703 Account came from income earned from cash management

activities including (1) short-term investment activity made directly from the 703 Account

(including overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and

T-Bills); and (2) investments of BLMIS customer funds made through bank and brokerage

accounts held in the name of BLMIS or Madoff.  Stmt. ¶ 74.  Because the short-term

investments, including overnight sweeps, were made directly out of the 703 Account, the source

of the money for those investments was customer funds.  Stmt. ¶ 75.

   There were no inflows into the 703 Account from sales of securities for customer

accounts.  Stmt. ¶ 76.  There were no outflows from the 703 Account to purchase securities for

customer accounts.  Stmt. ¶ 77.  Apart from two short-term loans BLMIS received from

JPMorgan totaling $145 million in November 2005 and January 2006—both of which were repaid by June 2006—the IA Business did not obtain loans from third parties or from the Proprietary Trading Business sufficient to pay the IA Business customer withdrawals.  Stmt. ¶ 78.

The IA Business also did not receive payments of any cash dividends.  According to the customer statements, the IA Business reported that it received cash dividends related to purported trading and paid or credited them to the accountholders.  Stmt. ¶ 79.  Between 1998 and 2008, BLMIS reported that it had paid or credited its customers $4.3 billion in cash dividends.  *Id.*  Of the more than 8,300 IA Business dividend transactions identified on the customer account statements from 1998 to 2008, not one purported dividend payment matched to a cash addition to the 703 Account.  Stmt. ¶ 80.  Dubinsky found no record of any dividends being received by the IA Business.  Stmt. ¶ 81.

The IA Business did not have any legitimate income-producing activities.  The only source of cash available for the IA Business to pay purported investment profits as well as redemption requests was from cash that other IA Business customers deposited in the 703 Account.  Stmt. ¶ 82.  These transactions rendered BLMIS insolvent.  By no later than December 2002, BLMIS's assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion. Stmt. ¶ 83.  By December 2008, the customer property on hand at BLMIS was grossly insufficient to pay the claims of its customers.  Stmt. ¶ 84.

Defendants did not serve a rebuttal to the Trustee's experts' opinions that the funds in the 703 Account consisted of customer money, that the IA Business had no other source of funds, or that customer redemptions were paid with funds from the 703 Account.  Nor did they depose the Trustee's experts or identify any evidence—admissible or otherwise—to rebut the substantial

evidence demonstrating that Madoff was running a Ponzi scheme through BLMIS's IA Business

and that the transfers of fictitious profits received by Defendants comprised other customer

deposits.  Accordingly, the transfers were made with the intent to defraud.

### c.    BLMIS's Two-Year Transfers to Defendants Were in Furtherance of the Fraud

In a Ponzi scheme, the Trustee need not prove that the debtor intended to hinder, delay,

or defraud a *particular* creditor, but rather he must only establish that the transfers made to the

transferee were in furtherance of a fraudulent scheme.  *See Bayou IV*, 439 B.R. at 304; *Bayou III*,

396 B.R. at 826.

"Every payment made by the debtor to keep the scheme on-going was made with the

actual intent to hinder, delay or defraud creditors, primarily the new investors."  *Gredd v. Bear,*

*Stearns Sec. Corp. (In re Manhattan Inv. Fund)*, 359 B.R. 510, 518 (Bankr. S.D.N.Y.), *rev'd in*

*part on other grounds*, 397 B.R. 1 (S.D.N.Y. 2007) (citation omitted).  This is because, in a

Ponzi scheme, the failure to honor an investor's withdrawal request "would promptly have

resulted in demand, investigation, the filing of a claim and disclosure of the fraud."  *Bayou III*,

396 B.R. at 843; *see also Greiff*, 476 B.R. at 723.  Every redemption payment "in and of itself

constituted an intentional misrepresentation of fact" of the investor's rights to their falsely

inflated account statement and "an integral and essential part" of the fraud.  *Bayou III*, 396 B.R.

at 843 (emphasis in original).  Thus, the transfers to Defendants were in furtherance of the

fraudulent Ponzi scheme.

### d.    BLMIS Made the Transfers to Defendants Within the Two-Year Period

The uncontroverted evidence shows that BLMIS transferred fictitious profits to or for the

benefit of Defendants between December 11, 2006 and December 11, 2008, and Defendants do

not dispute the date, receipt, and amount of the transfers.  Stmt. ¶¶ 113, 120–40.

15

   **e.**  **Defendants Have Not Presented Any Countervailing Evidence**

Defendants have not and cannot come forward with evidence to rebut the Trustee's *prima facie* case. During discovery, Defendants failed to present any evidence, fact or expert, to rebut the Trustee's proofs that BLMIS was a Ponzi scheme. Defendants did not serve rebuttal reports disputing the existence of a Ponzi scheme and took no depositions of any of the Trustee's expert witnesses. Absent such evidence, any attempt by Defendants to offer vague assertions, unfounded credibility attacks, or proffers of evidence they would elicit on cross-examination of the Trustee's expert witnesses is unavailing and does not present a genuine dispute of material fact to withstand summary judgment. *See Ying Jing Gan*, 996 F.2d at 532 (explaining that the nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"); *see also Bayou III*, 396 B.R. at 825 (explaining that conjecture, surmise, or "metaphysical doubt," as well as self-serving conclusory statements will not defeat summary judgment).

**II.**  **THE DEFENSES CAN BE DETERMINED AS A MATTER OF LAW**

Defendants raise certain legal defenses, many of which have already been addressed and rejected by this Court in many prior opinions in this liquidation. Defendants cannot meet their burden of establishing a triable issue of fact to defeat the Trustee's Motion.

   **A.**  **As a Matter of Law, Defendants Did Not Give Value for Fictitious Profits**

Having established that BLMIS transferred at least $2,622,438 in fictitious profits within the Two-Year Period to Defendants with actual fraudulent intent, the Trustee is entitled to avoid and recover the Two-Year Transfers. To defeat the avoidance of a transfer on summary judgment, Defendants must offer evidence sufficient to create a material issue of fact as to whether they took (1) "for value . . . to the extent that [it] gave value to the debtor in exchange for such transfer" and (2) "in good faith." *Bayou IV*, 439 B.R. at 308 (alteration in original)

(placing burden of proving affirmative defense on transferee in trustee's motion for summary judgment); 11 U.S.C. § 548(c); *In re 1031 Tax Grp., LLC*, 439 B.R. at 73. Fictitious profits "may be recovered regardless of the customers' good faith." *Katz*, 462 B.R. at 453; *see also Greiff*, 476 B.R. at 722–24.

"Value" includes satisfaction of an antecedent debt of the debtor. *See* 11 U.S.C. § 548(d)(2)(a). However, as a matter of law, Defendants cannot establish that they took the transfers of fictitious profits "for value" because such false profits were not on account of a valid antecedent debt. *Cohen*, 2016 WL 1695296, at *11. Courts uniformly hold that any payments received by an investor in excess of the amount he or she originally invested are avoidable as a fraudulent transfer. *See Bayou Superfund v. WAM Long/Short Fund II (In re Bayou Grp., LLC)*, 362 B.R. 624, 636 (S.D.N.Y. 2007); *see also Bayou IV*, 439 B.R. at 337 ("[V]irtually every court to address the question has held unflinchingly that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers." (internal quotation marks omitted)); *Katz*, 462 B.R. at 453 (fictitious profits— transfers made by BLMIS to its customers in excess of principal—were in excess of value); *Nelson*, 610 B.R. at 233–37; *Legacy*, 603 B.R. at 693–700; *Goldenberg*, 2018 WL 3078149, at *4 (collecting cases) ("the argument that BLMIS customers gave value under section 548(c) . . . has been rejected by the District Court and this Court no less than six times"); *Cohen*, 2016 WL 1695296, at *10 (it is a bedrock principle of fraudulent transfer law that "[a] transferee does not give value beyond his deposits of principal").

Defendants offer no reason or evidence to permit this Court to alter this universal rule.

### B.    The Transfers Were an Interest of the Debtor in Property

For purposes of avoidance and recovery, BLMIS is deemed under SIPA to have an interest in the transferred property; thus, the transfers here are avoidable under section 548 of the

Bankruptcy Code.  *See* 15 U.S.C. § 78fff-2(c)(3) (transferred customer property is "deemed to have been the property of the debtor"); *Cohen*, 2016 WL 1695296, at *5 ("BLMIS transferred customer property to [defendant], and under SIPA § 78fff-2(c)(3) such property is 'deemed to have been property of the debtor'"); *In re 1031 Tax Grp., LLC*, 439 B.R. at 68–70 (finding that, in a Ponzi scheme, money reflected in bank account statements "in the name of a debtor is presumed to be property of the bankruptcy estate" for purposes of 11 U.S.C. § 548(a)(1)).

The Trustee anticipates that Defendants will challenge whether the transfers were "an interest of the debtor in property."  *See* 11 U.S.C. § 548(a)(1)(A).  Pointing to checks that list the name Bernard L. Madoff instead of BLMIS, Defendants will argue that the transfers they received came from Bernard L. Madoff, rather than BLMIS, and are therefore unrecoverable by the Trustee.  In support, Defendants will point to *Picard v. Avellino*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016), which held that the Trustee could not recover transfers prior to 2001, when BLMIS was converted from a sole proprietorship to an LLC.  But unlike the Trustee's case in *Avellino*, in which he sought to recover transfers prior to 2001, here, the Trustee only seeks to avoid transfers of fictitious profits within the Two-Year Period.  Indeed, this Court has already ruled that the Trustee may avoid and recover Two-Year Transfers, regardless of the change in the Debtor's corporate form from a sole proprietorship to a limited liability company in 2001.  *See Omnibus Good Faith Decision*, 531 B.R. at 485.  Defendants' argument mischaracterizes the statutory framework created by SIPA and the relevance of their receipt of customer property.

### 1.    SIPA and SIPC

In enacting SIPA, Congress fashioned a program for protecting customer property—that is, property placed with a broker-dealer for the purchase of securities where title to such property always remained with the customer.

This program included the creation of SIPC, a nonprofit, private membership corporation to which most registered broker-dealers are required to belong. When one of its members fails, SIPC protects those customers by initiating a SIPA liquidation, a form of liquidation proceeding applicable only to SIPC member firms. *See SEC v. F.O. Baroff Co.*, 497 F.2d 280, 281 (2d Cir. 1974) (holding that the object of SIPA and SIPC is to protect customers in the brokerage industry). Although a SIPA liquidation is similar to a bankruptcy and incorporates certain provisions of the Bankruptcy Code, it is "tailored to achieve SIPA's objectives," *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 133, one of which is the prompt return of customer property to customers. SIPA § 78fff(a); *see also Sec. Inv'r Prot. Corp. v. Barbour*, 421 U.S. 412, 416 (1975).

To do so, SIPC specifies a trustee to liquidate the business and any assets of the member-broker and recover customer property wrongfully transferred or unlawfully converted by the broker. SIPA §§ 78*lll*(4), 78fff-2(c)(3). These funds form the corpus of the customer property estate, from which the trustee makes distributions to customers of their ratable share of customer property. SIPA § 78fff-2(c)(1). SIPA prioritizes this customer property estate, which is distinct from the general bankruptcy estate for the broker-dealer member firm. SIPA § 78fff-2(c)(1); *see In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011) ("*Net Equity Decision*"); *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010); *In re Weis Sec., Inc.*, No. 73 Civil 2332, 1976 WL 820, at *6−7 (S.D.N.Y. Aug. 2, 1976); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 499 B.R. 416, 420 (S.D.N.Y. 2013) ("*Antecedent Debt Decision*"). The customer property estate is composed of customer property, including recovered assets, which are earmarked to satisfy customers' net equity claims. By contrast, the general estate is made up of the broker-dealer's assets available to

satisfy the claims of general creditors.  *See In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 270 (Bankr. S.D.N.Y. 1996).

### 2.    Becoming a Member of SIPC

The "members" of SIPC include "all persons registered as broker-dealers" with the SEC under section 78*o*(b) of Title 15.  SIPA § 78ccc(a)(2)(A).  SIPC membership, and thus SIPA protection, arises from a broker-dealer's registration with the SEC, without regard to the corporate form of the broker-dealer.  SIPA § 78ccc(a).

Under section 78*o*(b), a broker-dealer applies for registration with the SEC on SEC Form BD (the uniform form for broker-dealer registrations).  *See* 17 C.F.R. § 249.501(a).  Once registered with the SEC, the broker-dealer is assigned a registrant number, becomes a member of SIPC, and is required to pay into the SIPC fund by annual assessments.  SIPA § 78ddd(c)(2).

If an entity succeeds to and continues the business of a broker-dealer previously registered with the SEC, and the succession is based on a change in the predecessor's form of organization, it files a Form BD Amendment.  SEC Rule 15b1-3(b), 17 C.F.R. § 240.15b1-3(b). The successor entity continues the business and SIPC membership of its predecessor.  When a firm ceases to do business as a broker-dealer, it withdraws from registration with the SEC by filing an SEC BDW form (the uniform request form for broker-dealer withdrawal) through the Central Registration Depository.  17 C.F.R. § 249.501(a); 17 C.F.R. § 240.15b6-1(b).  Once it is de-registered, the former broker-dealer ceases being a SIPC member.

### 3.    Initiating a SIPA Liquidation

If SIPC determines that one of its members has failed or is danger of failing to meet its obligations to customers, it applies for a customer protective decree in district court.  The district court acquires jurisdiction over the broker-dealer and its property wherever located.  SIPA § 78eee(b)(2)(A)(1).  The decree places the firm in liquidation and appoints a trustee specified by

SIPC to liquidate the business of the debtor-broker.  SIPA § 78eee(b)(3).  The liquidation is then removed to the bankruptcy court.  *Id*. § 78eee(b)(4).

The term "debtor" has a special definition under SIPA: "a *member* of SIPC with respect to whom an application for a protective decree has been filed under section 78eee(a)(3) of this title."  SIPA § 78*lll*(5) (emphasis added).  This differs from the Bankruptcy Code, where a "debtor" is an individual, partnership, or corporation.  11 U.S.C. §§ 109(a), 101(41).  Because SIPC membership tracks SEC registration, SIPC names the SEC-registered broker-dealer that is at risk of failing as the "debtor" in the application for the protective decree.  Thus, registration under 15 U.S.C. § 78*o*(b) is the key to who the SIPC member is, and, if the member is placed into liquidation, who the debtor is.

### 4.    Customer Property Under SIPA

Customer property is a term of art in the securities industry, and means property held by a broker-dealer but that belongs to customers.  *See* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74 (2002); *see, e.g.*, *Picard v. Lowrey*, 596 B.R. 451, 469–70 (S.D.N.Y. 2019).  When customers invest their cash and securities with a broker, they transfer possession, but not title, of their money to the broker.  The broker never owns that money, but rather is legally bound to hold that money in reserve for its customers.  *See Lowrey*, 596 B.R. at 469–70 (noting that "customer property" in securities industry refers to property held by broker-dealer but belongs to its customers).

Customer protection rules, promulgated by the SEC as required by SIPA, require broker-dealers to safeguard customers' securities and cash in a reserve fund.  This reserve would form the corpus of the firm's estate for distribution to customers if the firm went into liquidation under SIPA.  Exchange Act Release No. 34-9856, Adoption of Rule 15c3-3, 37 Fed. Reg. 25224,

25225 (Nov. 29, 1972), 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3"); *see also* Jamroz, 57 Bus. Law.
at 1071–74.

Customer property includes securities and cash held for customers under Rule 15c3-3;
assets derived from or traceable to customer property; and, under SIPA § 78*lll*(4)(D), other
debtor property that a trustee must allocate to the fund of customer property as necessary to
remedy the debtor's non-compliance with the segregation requirements of Rule 15c3-3.
Customer property retains its nature and special protections under SIPA, even if the broker
transfers that property to others.  SIPA § 78*lll*(4) (including in the definition of customer
property "the proceeds of any such property transferred by the debtor, including property
*unlawfully converted*" (emphasis added)); *see also Dowden v. Cross Cty. Bank (In re Brittenum
& Assocs., Inc.)*, 97 B.R. 503, 508 (E.D. Ark. 1987) (Rule 15c3-3 deposit is not subject to bank's
setoff claim because it is customer property); Rule 15c3-3(f) (Rule 15c3-3 account cannot be
subject to bank lien because it consists of customer property).  This broad definition recognizes
customers' enduring rights to the property they gave to their broker for safekeeping.  Indeed,
once a broker-dealer goes into liquidation under SIPA, the SIPA designation of customer
property is the seamless continuation of Rule 15c3-3, taking effect the moment the broker-dealer
fails.  *In re Lehman Bros. Holdings*, 445 B.R. 143, 191–92 (Bankr. S.D.N.Y. 2011), *rev'd in part
on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012).

Because customer property is not the broker's property, when a broker goes into
liquidation, it is also not "debtor" property, which places it outside the reach of Bankruptcy Code
provisions for avoidance and recovery of transfers.  SIPA § 78fff-2(c)(3) circumvents this
prohibition by creating a legal fiction that confers standing on SIPA trustees to recover customer
property by treating such property as though it were "property of the debtor" in an ordinary

bankruptcy.  *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014).  SIPA

§ 78fff-2(c)(3) allows a trustee to "recover any property transferred by the debtor which, except

for such transfer, would have been customer property."  This provision is designed "to recover

securities that would have been part of the fund of customer property but for a prior transfer to a

customer."  *In re Bevill, Bresler & Schulman*, 83 B.R. at 893.  "The inquiry in an avoidance

action, therefore, is: if the transfer did not occur, would the securities have been part of the fund

of customer property?"  *Id.*  If the answer is yes, then that cash or securities are customer

property subject to recovery by SIPA trustees.

### 5.    Madoff's Business

Madoff operated his firm from January 1960 until it collapsed in 2008.  It began as a sole

proprietorship and was then converted to a single member LLC in 2001.  Stmt. ¶¶ 7–8, 85.

During its existence, it operated under the names Bernard L. Madoff and Bernard L. Madoff

Investment Securities and, after 2001, as Bernard L. Madoff Investment Securities LLC.  Stmt.

¶ 8.

Although Madoff operated three business units at his firm: proprietary trading, market

making, and investment advisory, the IA Business was the vehicle through which he ran the

Ponzi scheme.  Stmt. ¶¶ 13, 19–24.  When IA Business customers sent him money to purchase

securities, Madoff did not reserve it but converted and commingled customer money into a single

JPMorgan checking account.  Stmt. ¶¶ 70, 92.  This pool of commingled funds was used to pay

customer redemptions.  Stmt. ¶¶ 82, 92; *see also In re Picard*, 917 F.3d 85, 92 (2d Cir. 2019)

(noting that Madoff commingled funds into JPMorgan checking account and sent customers

redemptions from commingled account); *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset

Mgmt.*, 843 F.3d 561, 564 (2d Cir. 2016) ("BLMIS deposited customer investments into a single

commingled checking account and . . . [w]hen customers sought to withdraw money from their

accounts, including withdrawals of the fictitious profits that BLMIS had attributed to them,

BLMIS sent them cash from the commingled checking account."); *Picard v. BAM L.P.*, 608 B.R.

165, 174  (Bankr. S.D.N.Y. Sept. 11, 2019) (citing *Section 546(e) Decision*, 773 F.3d at 415

(customer funds were put into commingled bank account used to pay redemptions)).

### 6.    Madoff's Registration as a Broker-Dealer

In January 1960, Bernard L. Madoff registered as a broker-dealer with the SEC.  He was

assigned Registrant Number 8-8132.  Stmt. ¶ 7; Cremona Decl., Ex. 1 (SEC Form BD).  Through

that registration, the broker-dealer became a member of SIPC when SIPA was enacted in 1970.

Cremona Decl., Ex. 1 (SEC Form BD).

When Madoff changed the corporate form of his broker-dealer business to an LLC, he

filed an Amended Form BD to reflect that change using the same SEC registrant number, 8-

8132; he did not file a new application for registration.  Stmt. ¶ 9.  Madoff attested that

"[e]ffective January 1, 2001, predecessor will transfer to successor all of predecessor's assets and

liabilities related to predecessor's business.  The transfer will not result in any change in

ownership or control."  Stmt. ¶ 10; Cremona Decl., Ex. 2 (Amended Form BD).  He further

certified that no "accounts, funds, or securities of customers of the *applicant* are held or

maintained by such other *person*, firm, or organization."  Stmt. ¶ 11 (quoting Cremona Decl.,

2 (Amended Form BD) (emphasis in original)).  Accordingly, the LLC succeeded to the sole

proprietorship's SEC registrant number 8-8132.  *See id.*  After these steps were taken—forming

the LLC and transferring the assets, liabilities, and ability to conduct securities trading from the

sole proprietorship to the LLC—the sole proprietorship no longer operated as a broker-dealer or

in any other capacity.  *See id.*

In December 2008, SIPC sought a protective decree under SIPA § 78eee that the

customers of a member broker-dealer needed protection under SIPA.  Application of SIPC ¶ 2,

24

*SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 5 ("SIPC

Application"). The SIPC Application named the member broker-dealer that was registered with

the SEC as of December 2008 under Registrant Number 8-8132: Bernard L. Madoff Investment

Securities LLC. *See id*. The district court entered the decree and appointed the Trustee "for the

liquidation of the *business of the Defendant* with all the duties and powers of a trustee as

prescribed in SIPA." Order ¶ 2, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15,

2008), ECF No. 4 ("Protective Decree") (emphasis added).

### 7.    Substantive Consolidation

In the days and months immediately following the revelation of Madoff's Ponzi scheme,

an SEC receiver was appointed for BLMIS,[6] the SIPA Trustee was appointed for BLMIS, a Joint

Provisional Liquidator was appointed for Madoff's London entity, and the United States

Government instituted a criminal proceeding against Madoff. Stmt. ¶¶ 1–6. By March 15, 2009,

the Government indicated its intent to forfeit certain of Madoff's personal assets. *See*

Government's Notice of Intent to Seek Forfeiture of Certain Assets, *United States v. Madoff*, No.

09-cr-213 (DC) (S.D.N.Y. Mar. 15, 2009), ECF No. 59. But as of April 2009, no chapter 7 case

had been initiated against Madoff personally. Creditors sued him in various jurisdictions outside

the bankruptcy court. *See, e.g.*, *Leonhardt v. Madoff*, No. 09-2032 (S.D.N.Y. Mar. 5, 2009);

*Town of Fairfield v. Madoff*, No. 09-5023735 (Conn. Super. Ct. Mar. 30, 2009).

In response, certain creditors filed an involuntary bankruptcy petition against Madoff,

citing the need for his personal estate to be marshaled and distributed in a coordinated,

consistent, and efficient manner alongside the liquidation of his company. These creditors were

concerned with the "specter of overlapping asset administrations which could delay or prejudice

---

[6] The receivership was terminated upon the appointment of a SIPA Trustee.

distributions to creditors," in light of the Government's forfeiture of assets and the SEC seeking

disgorgement and civil penalties of Madoff and his firm.  Pet. at 7, *SEC v. Madoff*, No. 08-cv-

10791 (LLS) (S.D.N.Y. Apr. 1, 2009), ECF No. 37.  The district court agreed that the

appointment of a chapter 7 trustee for Madoff would stem the proliferation of lawsuits against

Madoff and enable an orderly and equitable administration of his personal estate.  Order at 3-4,

*SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Apr. 10, 2009), ECF No. 47.  In allowing the

creditors to commence the involuntary case against Madoff, the district court specifically

referenced that they should be able to target "that portion of Mr. Madoff's property that is neither

forfeitable criminally nor subject to the liquidation of BLMIS under SIPA."  *Id*. at 4.

The bankruptcy court subsequently appointed Alan Nisselson as Chapter 7 Trustee for

Madoff.  Notice of Appointment of Trustee Alan Nisselson, *In re Bernard L. Madoff*, No. 09-

11893 (SMB) (Bankr. S.D.N.Y. Apr. 21, 2009), ECF No. 13.  Thereafter, the SIPA Trustee

moved to substantively consolidate the SIPA liquidation and the chapter 7 bankruptcy because

BLMIS and Madoff were the alter ego of the other, Madoff used BLMIS as his "personal piggy

bank," and Madoff did not have any other significant source of income other than that derived

from his broker-dealer subject to liquidation under SIPA.  Memorandum of Law in Support of

Joint Motion for Entry of Order Substantively Consolidating the Estate of Bernard L. Madoff

into the SIPA Proceeding of Bernard L. Madoff Investment Securities, *Sec. Inv'r Prot. Corp. v.

Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 5,

2009), ECF No. 196.

The Chapter 7 Trustee consented to the relief sought and the two trustees established a

protocol that was embodied in the bankruptcy court's order substantively consolidating the

BLMIS and the Bernard L. Madoff estates.  *See* Consent Order Substantively Consolidating the

Estate of Bernard L. Madoff into the SIPA Proceeding of Bernard L. Madoff Investment

Securities LLC and Expressly Preserving All Rights, Claims and Powers of Both Estates, *Sec.*

*Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr.

S.D.N.Y. June 10, 2009), ECF No. 252 (the "Substantive Consolidation Order").  The

Substantive Consolidation Order merged the chapter 7 estate of Bernard L. Madoff into the

BLMIS SIPA proceeding *nunc pro tunc*, and all assets and liabilities of the two estates were

deemed consolidated as of the date of the filing of the liquidation proceedings.  The Substantive

Consolidation Order expressly preserved the SIPA Trustee's powers to avoid and recover

fraudulent transfers of customer property and the Chapter 7 Trustee's powers to pursue recovery

of Madoff's non-customer property.  *Id.* ¶¶ 4, 7 ("the SIPA Trustee is authorized to pursue

claims on behalf of the consolidated estate as representative of and fiduciary for the BLMIS

SIPA Proceeding and as subrogee and assignee of creditors' claims for, among other things, the

avoidance and recovery of transferred property").

### 8.    The Trustee Can Recover Any Transfers of Customer Property

When IA Business customers sent money to BLMIS for the purpose of purchasing

securities, it became "customer property" under SIPA.  SIPA § 78*lll*(4).  BLMIS used the

JPMorgan Accounts as the firm's Rule 15c3-3 account.  Stmt. ¶¶ 69–82, 87–88; 17 C.F.R. §

240.15c3-3.  Whether operated as a sole proprietorship or as an LLC, BLMIS's assets were

composed primarily of customer property and its liabilities were composed primarily of amounts

owed to customers.  As indicated in the Amended Form BD, all assets and liabilities were

transferred from the sole proprietorship to the LLC.  *See* Stmt. ¶¶ 9–11 (citing Amended Form

BD).

The protections provided by SIPA mandate that the Trustee can recover transfers of

customer property by the SIPC member, regardless of its corporate form.  Despite this, in another

of the Trustee's avoidance actions, this Court ruled that the SIPA Trustee did not have the power

to recover transfers made before 2001 when BLMIS was converted to an LLC from a sole

proprietorship. *See Avellino*, 557 B.R. at 110. Because the SIPC Application and the Protective

Decree only named the LLC (rather than the LLC *and* the defunct predecessor sole

proprietorship), the only "debtor" for purposes of the avoidance and recovery provisions of SIPA

and the Bankruptcy Code was the LLC.[7] Under that rationale, the SIPA Trustee can only recover

transfers made after the broker-dealer business was converted to an LLC in 2001. Any customer

property transferred prior to that time is unrecoverable—because the Chapter 7 Trustee cannot

recover it either, as he can only recover *Madoff's* non-customer property.

The Trustee anticipates that Defendants will improperly extrapolate from this ruling to

argue that the Trustee cannot recover the transfers made to them between 2006-2008 because the

drawer of those checks listed Bernard L. Madoff rather than Bernard L. Madoff Investment

Securities LLC and the SIPA Trustee can only recover those transfers made by the LLC.

However, the *Avellino* decision was limited to the Trustee's standing to recover transfers prior to

2001. It did not address ownership of transferee bank accounts at the time avoidable transfers

were made to Defendants. There are additional problems with Defendants' position addressed

herein—most notably, that the LLC was the holder of the JPMorgan Accounts from which the

transfers were made, as this Court so found and as the evidence presented in this Court shows.

*See Nelson*, 610 B.R. at 207; *see also supra* Part I.B.1.b. But the factual and legal predicates

underpinning *Avellino* are wrong, making Defendants' argument nothing but a diversion.

---

[7] SIPA and the Bankruptcy Code work in tandem to allow the Trustee to recover transfers of customer property. Under § 548, a trustee may recover a "transfer of the debtor." Under SIPA § 78fff-2(c)(3), a SIPA trustee may recover "any property transferred by the debtor which, except for such transfer, would have been customer property."

First, there was no error in naming only the LLC in the Protective Decree.  SIPA requires a protective decree when a SIPC-member broker-dealer fails.  SIPA § 78eee(b)(1).  The *only* SIPC *member* at the time of failure was the LLC, as the sole proprietorship had ceased to operate almost eight years prior, and thus the LLC was the only entity that *could have been* named in the Protective Decree.  There is no requirement in SIPA that a protective decree identify every name or form of organization under which the broker-dealer member of SIPC formerly operated to provide the broker-dealer's customers with the protections of SIPA.  The protective decree names the SEC registrant/SIPC member, which is sufficient to encompass all customer property—in whatever form—ever possessed by that member.

With no monitoring function over broker-dealers, SIPC steps in only when a member is in danger of failing—usually in precipitous circumstances leading to the failure.  In order to protect customers and return their property promptly, SIPC must act quickly to commence the liquidation proceeding.  Imposing a requirement on SIPC to name every predecessor entity when commencing a liquidation—before there is an investigation by a SIPA trustee into the member's operations—would place SIPC in a Catch-22.  By waiting to file a liquidation proceeding to investigate a member's corporate structure and operations, customers are placed in greater risk through delay and dissipation of customer assets.  But filing a liquidation proceeding without doing so means that the eventual trustee that is appointed may not be able to fully recover all customer property.  Imposing an extra statutory requirement to name not only the current member but any predecessor entities on SIPC is at odds with Congress' intent in passing SIPA: customer protection.  Not surprisingly then, there is no such requirement in the statute itself.

Second, when the Trustee was appointed, it was for the liquidation of the *business* of the broker-dealer.  There are numerous undisputed facts that show that the sole proprietorship and

the LLC continued uninterrupted as a single business dealing with customer property since

Madoff registered as a broker-dealer with the SEC in 1960, including:

- Customer property was deposited into the same JPMorgan commercial banking account when BLMIS operated as a sole proprietorship and as an LLC.  Stmt. ¶¶ 69–82, 87–88.

- The customers of the sole proprietorship became the customers of the LLC when it changed corporate form.  Stmt. ¶¶ 9–11.

- When Madoff converted the sole proprietorship to an LLC, he expressly identified it to the SEC as an amendment to an existing broker-dealer's registration—not a new application of a separate broker-dealer seeking to register with the SEC.  *Id.*

- The SEC registration number of BLMIS has always remained 8-8132 throughout the entire course of its business.  Stmt. ¶¶ 7–11.

- Madoff reported to the SEC that he transferred all assets and liabilities, which by definition includes bank accounts, from the sole proprietorship to the LLC.  Stmt. ¶¶ 9–11.

Indeed, this Court recognized as much, stating that Madoff has always been a member of

SIPC, and "the incorporation of BLMIS as a limited liability company continued his business

without change . . . . Thus, nothing has changed since 1960 except for the business form that

Madoff used to conduct his Ponzi scheme." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv.

Sec. LLC (In re Bernard L. Madoff)*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014).  Because the

Trustee is appointed for the liquidation *of the business* of the debtor, such liquidation necessarily

entails the liquidation of any predecessor conducting the same business, using the same SEC

registrant number, on behalf of its customers with their customer property.

Third, SIPA makes clear that a SIPA trustee is authorized to recover customer property

wherever it lies.  SIPA protection focuses on "whether there was actual receipt, acquisition or

possession of the property of a claimant by the brokerage firm under liquidation."  *In re Old

Naples Sec., Inc.*, 223 F.3d 1296, 1302 (11th Cir. 2000) (internal quotation marks omitted); *see

also In re Primeline Sec. Corp.*, 295 F.3d 1100, 1107 (10th Cir. 2002) ("Whether a claimant

deposited funds 'with the debtor' does not depend simply on to whom claimants made their checks payable . . . [t]he relevant inquiry is whether the brokerage firm actually received, acquired or possessed claimants property.").  Thus, as long as a trustee can show that the property in question was customer property received by the broker-dealer, he has the authority to recover it, wherever it lies.  SIPA § 78fff-2(c)(3); *see also BAM L.P.*, 608 B.R. at 176 ("I do not mean to suggest that the deposit of customer funds into a Chase account in the name of Madoff or Madoff Securities changes the nature of customer funds or prevents the Trustee from avoiding and recovering the Two-Year Transfers.").

The fact that a broker-dealer may have operated under a different legal form many years prior to the SIPA liquidation does not change a SIPA trustee's rights and powers to recover that customer property for the benefit of its owners—the customers.  Focusing on the name on a check or the corporate from of the broker-dealer at a particular time shifts the focus away from SIPA's customer property regime and instead allows the fraudster to determine the circumstances under which customer property can be recovered.  Where, as here, there is no dispute that the Trustee is seeking to recover transfers comprising customer property, the form of the broker-dealer at the time of transfer is simply irrelevant.

Fourth, the Substantive Consolidation Order changed nothing about the SIPA Trustee's rights to customer property.  If anything, it was a "belt and suspenders" order to ensure that none of Madoff's assets slipped through the cracks given that the Government was pursuing forfeiture, the SIPA Trustee was pursuing customer property, and the Joint Provisional Liquidators were marshaling the assets of Madoff's London entity.  The order expressly states that the SIPA Trustee will retain his powers to recover customer property notwithstanding the consolidation of the estates.  Such reservations did not in any way change the rights and powers that were

31

conferred on the SIPA Trustee as a result of the commencement of the SIPA liquidation.
Instead, those reservations in the order were necessary because absent express preservation, the
substantive consolidation of two debtors' estates could have extinguished both trustees'
avoidance powers altogether. *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 768–69 (9th
Cir. 2000) ("Absent express preservation of the trustee's avoidance power, an order of
substantive consolidation would ordinarily eliminate that power.").

Finally, taken to its logical conclusion, because BLMIS's only assets were funds in the
JPMorgan Accounts, Defendants' argument means that there is no customer property in the SIPA
liquidation and there is no estate representative who can recover the funds transferred out of that
bank account. Such an outcome would leave a vast amount of customer property outside the
reach of the SIPA liquidation, something SIPA does not intend. This result cannot be reconciled
with the order appointing the Trustee, the Substantive Consolidation Order, prior precedent in
this case, nor with the plain language of SIPA.

In sum, as long as the SIPA Trustee can show that the property he is seeking to recover is
customer property, he has the power to recover it, whether that property is held in an account
with the letters "LLC" or not. Such property never belonged to Madoff, the sole proprietorship,
or the LLC, regardless of whose name was on the bank account. That is what SEC Rule 15c3-3
(promulgated at the direction of SIPA) means. Whatever particular bank account a fraudster
chooses to park customer property in or however that particular bank account is denominated
cannot change the nature of customer property or the Trustee's duty to recover that property and
return it to its rightful owners. That is what SIPA and SEC Rule 15c3-3 intend.

C.    **Madoff's Purported Purchase of Securities Does Not Create a Genuine Issue
of Material Fact**

The Trustee also anticipates that Defendants will argue that Madoff used money from his

investment advisory customers to purchase securities, which appeared on Defendants' BLMIS

statements.  Defendants have offered no witnesses—fact or expert—to support this argument.  In

contrast, the Trustee's expert witness, Dubinsky—a certified fraud examiner and forensic

accountant with more than thirty years of experience in financial fraud investigations—

conducted several analyses upon which he concluded that BLMIS did not conduct any trading on

behalf of its IA Business customers.  Stmt. ¶¶ 19–24.

Dubinsky found many instances where the volume that BLMIS claimed to have

purchased or sold on behalf of all IA Business customers exceeded the volume of equities traded

for the entire market.  Stmt. ¶¶ 25–28.  Dubinsky also analyzed the equity and options trades that

were priced outside the daily price range.  Stmt. ¶¶ 29–30.  For the period of 2000-2008,

Dubinsky determined that there were 99,972 equity transactions executed outside the daily

market traded price range, and 34,501 options transactions traded outside of the daily price

range.  *Id*.  The absence of actual trading was also reflected in the prices at which the IA

Business purportedly bought and sold shares using the split-strike conversion strategy.  Stmt. ¶¶

31–35.  To further test whether the IA Business engaged in trading, Dubinsky analyzed the

volatility of the IA Business's reported average annual rate of return for the split-strike

conversion strategy as compared with the volatility of the annual rate of return reported by

Bloomberg for the two major market indices—the S&P 100 Index and the Dow Jones Industrial

Average.  Stmt. ¶ 36.  Because the IA Business's split-strike conversion strategy was supposedly

engineered around the S & P 100, the IA Business's returns should have performed similarly to

the S&P 100 Index.  Stmt. ¶ 37.  This analysis showed that the volatility in the IA Business rates

of return did not mirror the volatility of the rates of return of the major indices.  Stmt. ¶¶ 38–40.

Additionally, all equity trades made by BLMIS should have been reflected in the DTC

records pertaining to BLMIS's single account with the DTC—an organization in the United

States that clears and settles equity transactions in the U.S. market.  Stmt. ¶ 41.  Dubinsky's

analysis confirmed that the equity securities that were cleared through BLMIS's DTC account

were traded by the Proprietary Trading Business; no IA Business trades were cleared through

BLMIS's DTC account.  Stmt. ¶¶ 42–46.  He concluded that the IA Business did not execute the

equity trades reflected on the customer statements.  Stmt. ¶ 47; *see also* Stmt. ¶¶ 48–51.

Similarly, the options purportedly executed for the customer accounts in the IA Business could

not be reconciled with the records of the OCC, an organization that clears and settles options

transactions in the U.S. market.  Stmt. ¶¶ 52–55.  Based on Dubinsky's analysis of these records,

he concluded that BLMIS did not conduct any options trading on behalf of its IA Business

customers.  Stmt. ¶ 56.

Besides purchasing equity securities and options, BLMIS also claimed it would

intermittently invest IA Business customer funds in T-Bills as part of the split-strike conversion

strategy.  Stmt. ¶ 57.  While BLMIS purchased T-Bills with customer funds as a way to obtain

interest on all the customer cash it was holding, these purchases did not match the allocation of

T-Bill transactions that appeared on customer statements.  Stmt. ¶ 58.  Dubinsky's analysis

confirmed that although BLMIS purchased T-Bills for cash management purposes, the volume of

T-Bills that appeared on the customer statements dwarfed the aggregate volume of T-Bills

actually purchased and held by BLMIS.  Dubinsky prepared a summary chart of his review of

these voluminous records, which accurately represents his comparison of the T-Bill positions:

Table 5
Comparison of Year-End US Treasury Positions: Proprietary Trading Business vs. IA Business

| Year-End | Proprietary Trading Business | IA Business | Proprietary Trading Business positions as a percent of IA Business positions |
|---|---|---|---|
| 2002 | $84,000,000 | $30,975,765,000 | 0.27% |
| 2003 | $70,000,000 | $33,643,020,000 | 0.21% |
| 2004 | $70,000,000 | $37,935,258,000 | 0.18% |
| 2005 | $75,000,000 | $40,913,910,000 | 0.18% |
| 2006 | $70,000,000 | $48,342,420,000 | 0.14% |
| 2007 | $80,000,000 | $56,990,055,000 | 0.14% |

Stmt. ¶¶ 59–63.  Accordingly, the T-Bill positions that appeared on the customer statements were fictitious.  *Id.*; *see also Nelson*, 610 B.R. at 214, 234 n.37 ("Dubinsky's analysis demonstrated that the T-Bill transactions that appeared in the customer statements were fictitious and bore no relationship to the actual T-Bills purchased by BLMIS and documented in the DTC records.").

Frank DiPascali, Madoff's right-hand employee, testified that the IA Business used funds in the 703 Account to purchase T-Bills as a cash management tool but the T-Bills were not purchased for IA Business customers, and he and other BLMIS employees created fictitious T-Bill positions in customer statements.  Stmt. ¶¶ 64–68; *see also Nelson*, 610 B.R. at 226, 234 n.37.  "[T]he purchase of T-Bills was part of the cash management system used by BLMIS to sustain the Ponzi scheme and 'did not transform BLMIS into a legitimate enterprise or prohibit the Trustee's reliance on the Ponzi scheme presumption.'"  *BAM L.P.*, 608 B.R. at 175 n.15 (quoting *Legacy*, 603 B.R. at 691).  The operators of Ponzi schemes "often engage in some legitimate transactions.  If the legitimate transactions further the scheme or are funded by the scheme they are part of the scheme and do not insulate the legitimate transactions from the taint of the scheme."  *Nelson*, 610 B.R. at 234 (citing *Legacy*, 603 B.R. at 691–93).

The evidence and opinions of the Trustee's expert witness and Mr. DiPascali's testimony unequivocally demonstrate that no securities or T-Bills were purchased by BLMIS for its IA

35

Business customers, including Defendants.  Absent expert opinion, Defendants cannot create an issue of material fact where none exists simply because they disagree.  Accordingly, this anticipated defense fails as a matter of law.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant summary judgment on Count One of the Trustee's Complaint and enter an order avoiding the transfers of fictitious profits that BLMIS made to Defendants within the Two-Year Period, and requiring Defendants to return such transfers or the value thereof to the Trustee.

Dated: September 4, 2020
       New York, New York

/s/ Nicholas J. Cremona
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Maximillian S. Shifrin
Email: mshifrin@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*