**CHAITMAN LLP**
Helen Davis Chaitman
465 Park Avenue
New York, New York 10022
Phone & Fax: 888-759-1114
hchaitman@chaitmanllp.com

*Attorneys for Defendant*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro No. 10-04749 (SMB) |
| Plaintiff, | |
| v. | |
| PHILIP F. PALMEDO, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO THE TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT DISMISSING THE**
<u>**COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION**</u>

{00045267 2 }

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ..................................................................................... 2

    The JPMC Accounts ............................................................................................. 3

    The Trustee's misrepresentations ........................................................................ 4

    Dubinsky's Testimony ......................................................................................... 4

    The Palmedo Account ......................................................................................... 5

LEGAL STANDARD ON SUMMARY JUDGMENT ............................................. 6

ARGUMENT ............................................................................................................. 7

    I.    THE TRUSTEE LACKS ARTICLE III STANDING ................................. 7

        A.    The Trustee's Debtor, the LLC, Never Owned the JPMC Accounts ...................... 8

        B.    The Trustee Cannot Demonstrate That the LLC Suffered An Injury in Fact ......... 9

        C.    SIPA Does Not Create Article III Injury ................................................. 10

        D.    Dubinsky Admitted that Madoff Bought T-Bills With IA Customers' Funds ......... 14

    II.    THE TRUSTEE'S MOTION RESTS ON INADMISSIBLE EVIDENCE ......... 15

        A.    The Expert Reports Are Not Admissible ................................................. 15

        B.    The Allocutions and Trial Testimony are Inadmissible ......................... 17

    III.    THE TRUSTEE CANNOT MAKE HIS PRIMA FACIE CASE ................. 20

        A.    Madoff Bought Actual T-Bills ............................................................... 21

        B.    The Trustee Cannot Show Intent: the Ponzi Scheme Presumption Does Not Apply ......... 23

            1.    Defendant Was a Creditor, Not an Equity "Investor" ................... 23

            2.    The LLC was not a Ponzi scheme ............................................. 24

3.    The IA Business was Profitable ...................................................... 25

4.    Deposits of New Customers ........................................................... 25

5.    Additional Factors ........................................................................ 26

C.    The Payments Were Not Made "In Furtherance of" a Ponzi Scheme
........................................................................................................ 27

IV.   DEFENDANT HAS STRONG AFFIRMATIVE DEFENSES THAT
PRECLUDE SUMMARY JUDGMENT ........................................................ 28

V.    DEFENDANT IS ENTITLED TO A CREDIT FOR TAXES PAID ........................... 29

VI.   THE TRUSTEE CANNOT PROVE HIS ALLEGED "LOSSES" ............................... 29

VII.  THE   TRUSTEE   IS   NOT   ENTITLED   TO   PREJUDGMENT
INTEREST .......................................................................................... 31

A.    Palmedo Disputed the Trustee's Claims in Good Faith ........................................ 33

CONCLUSION ...................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Wright*,
  468 U.S. 737 (1984)........................................................................................................7

*Armstrong v. Collins*,
  No.01 Civ. 2437 (PAC), 2010 WL 1141158 (S.D.N.Y. Mar 24, 2010),
  *reconsideration denied*, No. 01 Civ. 2437 (PAC), 2011 WL 308260 (S.D.N.Y.
  Jan. 31, 2011)...............................................................................................................23

*In re ATM Financial Services, LLC*,
  2011 WL 2580763 (Bankr. M.D. Fla. June 24, 2011)..............................................27

*Banque Worms v. BankAmerica Int'l*,
  77 N.Y.2d 362 (1991) ..................................................................................................30

*In re Bauman*,
  535 B.R. 289 (Bankr. C.D. Ill. 2015)........................................................................12

*In re Bayou Grp., LLC ("Bayou III")*,
  396 B.R. 810 (Bankr. S.D.N.Y. 2008), *rev'd in part*
  *In re Bayou Grp., LLC*, 439 B.R. 284 (S.D.N.Y. 2010). .........................................28

*Bellamy v. City of New York*,
  914 F.3d 727 (2d Cir. 2019).......................................................................................15

*In re Bernard L. Madoff Inv. Sec. LLC*,
  654 F.3d 229 (2d Cir. 2011)...................................................................................4, 31

*In re Bernard L. Madoff Inv. Sec. LLC*,
  721 F.3d 54 (2d Cir. 2013).......................................................................................7, 8

*In re Bernard L. Madoff Inv. Sec. LLC*,
  No. 19-0429-BK(L), 2020 WL 5666677 (2d Cir. Sept. 24, 2020) ..........................28

*In re Bernard L. Madoff Inv. Securities LLC*,
  2011 WL 3568936 (2d Cir. Aug. 16, 2011)..............................................................23

*In re Bernard L. Madoff Inv. Securities, LLC*,
  458 B.R. 87 (Bankr. S.D.N.Y. 2011).........................................................................27

*Board of County Comm'rs of the County of Jackson v. United States*,
  308 U.S. 343 (1939).....................................................................................................32

*Bogart v. Israel Aerospace Indus. Ltd.*,
  No. 09 Civ. 4783 (LAP), 2010 WL 517582 (S.D.N.Y. Feb. 5, 2010)......................7

*Boger v. New York State Office of Parks, Recreation & Historic Pres.*,
   2019 WL 2766897 (N.D.N.Y. July 2, 2019) ........................................................15

*Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*,
   567 F.3d 1291 (11th Cir. 2009) ..........................................................................32

*In re Cassandra Grp.*,
   338 B.R. 583 (Bankr. S.D.N.Y. 2006) ................................................................34

*Cent. States v. Merck-Medco Managed Care, L.L.C.*,
   433 F.3d 181 (2d Cir. 2005) ..................................................................................7

*Commodities Future Trading Commission v. Walsh*,
   17 N.Y.3d 162 (2011) ..........................................................................................30

*Costa v. Sears Home Imp. Products, Inc.*,
   65 F. Supp.3d 333 (W.D.N.Y. 2014) ..................................................................22

*In re DBSI, Inc.*,
   476 B.R 413 (Bankr. D. Del. 2012) ....................................................................27

*In re Deltacorp, Inc.*,
   179 B.R. 773 (Bankr. S.D.N.Y.1995) ..................................................................13

*Edwards v. Onondaga Cmty. Coll.*,
   No. 5:14-CV-1329, 2016 WL 3519619 (N.D.N.Y. June 22, 2016)......................15

*Fafel v. Dipaola*,
   399 F.3d 403 (1st Cir. 2005) ................................................................................13

*Ferguson v. Garden Ridge Corp.*,
   399 B.R. 135 ........................................................................................................13

*In re Foos*,
   188 B.R. 239 (Bankr. N.D. Ill. 1995) *aff'd in part, rev'd in part on other g'ds*,
   1996 WL 563503 (N.D. Ill. 1996) ..................................................................25, 27

*GE Inv. Private Placement Partners II v. Parker*,
   247 F.3d 543 (4th Cir. 2001) ..............................................................................26

*Germinaro v. Fid. Nat. Title Ins. Co.*,
   107 F. Supp. 3d 439 (W.D. Pa. 2015)..................................................................26

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
   2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014)........................................6, 18, 23

*JPMorgan Chase Bank, N.A. v. Yuen*,
   No. 11 Civ. 9192 (NRB), 2013 WL 2473013 (S.D.N.Y. June 3, 2013)................16

*Kramer v. Mahia (In re Khan)*,
  14-MC-01674 (PKC), 2016 WL 6652724 (E.D.N.Y. Nov. 10, 2016) ...................................32

*In re Lyondell Chemical Co.*,
  No. 13 Civ. 3881(RA), 2014 WL 975507 (S.D.N.Y. Mar. 11, 2014) ...................................32

*In re Madoff*,
  779 F.3d 74 (2d. Cir. 2015)...................................................................................................32

*In re Madoff*,
  No. 08-01789, ECF No. 4072 (Bankr. S.D.N.Y. May 16, 2011) ..........................................24

*In re Manhattan Inv. Fund Ltd*,
  359 B.R. 510 (S.D.N.Y. 2007), *affirmed in part, rev'd in part*,
  *In re Manhattan Inv. Fund Ltd.* 397 B.R. 1 (S.D.N.Y. 2007)................................................25

*In re Manhattan Inv. Fund Ltd.*,
  397 B.R. 1 (S.D.N.Y. 2007)...................................................................................................27

*McNamara v. Sher*,
  2012 WL 760531 (S.D. Cal. Mar. 8, 2012) ...........................................................................26

*Mecca v. Gibraltar Corp. of Am.*,
  746 F. Supp. 338 (S.D.N.Y. 1990).........................................................................................32

*Mendelsohn v. Jacobowitz*,
  394 B.R. 646 (Bankr. E.D.N.Y. 2008)...................................................................................21

*Morales v. Walt Disney Prods.*,
  361 F. Supp. 1157 (S.D.N.Y. 1973).......................................................................................32

*In re Murray Industries, Inc.*,
  125 B.R. 314 (Bankr. M.D. Fla. 1991) ..................................................................................12

*Parker v. Reda*,
  327 F.3d 211 (2d Cir. 2003)...................................................................................................16

*Perpetual Securities, Inc. v. Tang*,
  290 F.3d 132 (2d Cir. 2002)...................................................................................................13

*Picard v. Avellino* (*In re Bernard L. Madoff Inv. Securities LLC*),
  557 B.R. 89 (Bankr. S.D.N.Y. 2016), *reconsideration denied*,
  2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) ...................................................... *passim*

*Picard v. Goldenberg*,
  2018 WL 3078149 (Bankr. S.D.N.Y. June 19, 2018).............................................................34

*Picard v. Legacy Capital, Ltd.*,
  603 B.R. 682 (Bankr. S.D.N.Y. 2019) ...............................................................................6, 25

*Picard v. Mann*,
    608 B.R. 165 (Bankr. S.D.N.Y. 2019) ...................................................................................6

*In re Prebul Jeep, Inc.*,
    2009 WL 4581900 (Bankr. E.D. Tenn. 2009) ......................................................................25

*Preuss v. Kolmar Labs., Inc.*,
    970 F. Supp. 2d 171 (S.D.N.Y. 2013).................................................................................22

*Prymak v. Contemporary Fin. Sols., Inc.*,
    2007 WL 4250020 (D. Colo. Nov. 29, 2007) ......................................................................26

*Redfield v. Bartels*,
    139 U.S. 694 (1891)...........................................................................................................33

*In re Rivas*,
    2010 WL 2265663 (Bankr. E.D. Tenn. June 3, 2010) .........................................................26

*Roberts v. Ground Handling, Inc*.,
    499 F. Supp. 2d 340 (S.D.N.Y. 2007)...............................................................................15

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    563 B.R. 737 (Bankr. S.D.N.Y. 2017)................................................................................6

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    Adv. Pro. Nos. 10-04387 (SMB), 10-04488 (SMB), 10-04350 (SMB),
    10-05110 (SMB), 2018 WL 1442312 (Bankr. S.D.N.Y. Mar. 22, 2018)..............................34

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    596 B.R. 451 (S.D.N.Y. 2019)..........................................................................................29

*SEC v. Byers*,
    637 F. Supp.2d 166 (S.D.N.Y. 2009)..........................................................................14, 33

*Siding and Insulation Co., Inc. v. Acuity Mut. Ins. Co.*,
    754 F.3d 367 (6th Cir. 2014) .............................................................................................13

*Simkin v. Blank*,
    19 N.Y.3d 46 (N.Y. 2012) .................................................................................................30

*Taveras v. City of New York*,
    2009 WL 10701924 (E.D.N.Y. Apr. 7, 2009) ....................................................................22

*Taylor v. Illinois*,
    108 S. Ct. 646 (1988).........................................................................................................22

*U.S. v. Blechman*,
    657 F.3d 1052 (10th Cir. 2011) .........................................................................................16

*U.S. v. Manufacturers Trust Co.*,
198 F.2d 366 (2d Cir. 1952)........................................................................................23

*U.S. v. McGaughy*,
670 F.3d 1149 (10th Cir. 2012) ..................................................................................13

*United States v. Dreer*,
740 F.2d 18 (11th Cir. 1984) ......................................................................................17

*United States v. Nixon*,
418 U.S. 683 (1974).....................................................................................................22

*United States v. Ron Pair Enterprises Inc.*,
489 U.S. 235 (1989).....................................................................................................31

*United States v. Samaniego*,
187 F.3d 1222 (10th Cir. 1999) ..................................................................................16

*United States v. Strother*,
49 F.3d 869 (2d Cir. 1995)...........................................................................................16

*United States v. Tropeano*,
252 F.3d 653 (2d Cir. 2001).........................................................................................18

*USA United Fleet, Inc. v. Ally Financial, Inc.*
("*In re USA United Fleet, Inc.*"), 559 B.R. 41, 57 (Bankr. E.D.N.Y. 2016)...........................21

*Victorinox AG v. The B & F Sys., Inc.*,
2015 WL 9256944 (S.D.N.Y. Dec. 15, 2015), *aff'd sub nom. Victorinox AG v.
B&F Sys., Inc.*, 709 F. App'x 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017) ...................5, 22

*Warth v. Seldin*,
422 U.S. 490 (1975).......................................................................................................7

*Whitmore v. Arkansas*,
495 U.S. 149 (1950).......................................................................................................7

*Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,
AFL-CIO*,
955 F.2d 831 (2d Cir. 1992)..............................................................................31, 32, 33

*Wight v. BankAmerica Corp.*,
219 F. 3d 79 (2d Cir. 2000)...........................................................................................8

**Statutes**

11 U.S.C. § 546(e) ........................................................................................................34

11 U.S.C. § 548.............................................................................................................32

11 U.S.C. § 548(a)(1) ................................................................................................9, 29

11 U.S.C. § 548(a)(1)(A) ........................................................................................20, 34

11 U.S.C. § 548(c) ..........................................................................................................29

11 U.S.C. § 550 ...............................................................................................................32

15 U.S.C. § 78eee(a)(4)(B) .............................................................................................10

15 U.S.C. § 78eee(b)(3) ..................................................................................................10

15 U.S.C. § 78fff(2)(c)(3) ...............................................................................................11

15 U.S.C. § 78fff-3(a)(2) ................................................................................................30

15 U.S.C. § 78iii(5) .........................................................................................................10

15 U.S.C. § 78*lll*(11)(B) ...............................................................................................30

15 U.S.C. § 78*lll*(11)(C) ...............................................................................................30

15. U.S.C. § 78eee(a)(3) ..................................................................................................10

**Other Authorities**

17 C.F.R. 240.15c3-3 ......................................................................................................10

17 C.F.R. 300.100(b) .......................................................................................................30

17 C.F.R. 300.103 ............................................................................................................30

17 C.F.R. 300.104(b) .......................................................................................................30

26 C.F.R. 6-1.105 ............................................................................................................29

6-1006 Weinstein's Fed. Ev. § 1006.07 (2015) ..............................................................16

Fed. R. Bankr. P. 7056 ......................................................................................................6

Fed. R. Civ. P. 26 ............................................................................................................22

Fed. R. Civ. P. 56(a) .........................................................................................................6

Fed. R. Civ. P. 56(c) .......................................................................................................15

Fed. R. Evid. 801 ............................................................................................................16

Fed.R. Evid. 802 .............................................................................................................16

Fed. R. Evid. 803(6) ........................................................................................................16

Fed. R. Evid. 803(22)(C) ...........................................................................................18

Fed. R. Evid. 804 .....................................................................................................18

Fed. R. Evid. 807(a)..................................................................................................16

https://www.madofftrustee.com/hardship-program-17.html .........................................33

*SEC Official Testifies on Best Method for Determining Madoff Distributions*, Sec.
  Exch. Comm'n. Today 10466961, 2009 WL 10466961 (Dec. 14, 2009)...............................26

Wright & Gold, 31 Fed. Practice and Procedure § 8043, at 527 ...................................16

Defendant Philip Palmedo respectfully submits this memorandum of law in opposition to the motion for summary judgment of Plaintiff Irving H. Picard, the Trustee for the Liquidation of Bernard L. Madoff Investment Securities, LLC (the "LLC"), and in support of his cross-motion for summary judgment dismissing the Complaint for lack of subject matter jurisdiction.

## PRELIMINARY STATEMENT

Palmedo was a customer of Bernard L. Madoff. The Trustee concedes that Palmedo acted in good faith but seeks to claw back withdrawals from Palmedo's Madoff account taken within the last two years of Madoff's operations on the theory (a) that the funds paid to Palmedo belonged to the LLC (and not Madoff) even though there is not a single piece of evidence indicating that the LLC owned the bank accounts from which Palmedo was paid; and (b) that Madoff never purchased any securities with his investment advisory ("IA") customers' money. *See* Compl. ECF No. 1.

Both contentions are demonstrably false. The uncontroverted evidence proves that the bank accounts through which Madoff operated the IA business were owned by Madoff personally and not by the LLC. And, as a matter of law and as this Court twice held in carefully reasoned decisions which Picard did not appeal, Picard has standing only to recover transfers made by the LLC. Here, the transfers at issue were made by Madoff, not by the LLC. Thus, Picard lacks Article III standing and the Court lacks subject matter jurisdiction of the complaint. In addition, Palmedo can prove, contrary to the Trustee's representations to the Second Circuit throughout his tenure, through reliable third party records and through admissions of the Trustee's $40 million expert witness, Bruce Dubinsky, that Madoff purchased and sold billions of dollars of T-bills, some of which were listed as investment assets on the Palmedo account statements. CMF ¶¶ 66-76. Thus, the Court should deny the Trustee's motion for summary judgment and grant Defendant's motion dismissing

this case in its entirety. This case—and others like it—have burdened the courts for ten years based upon the Trustee's misrepresentation of Article III injury.

## FACTUAL BACKGROUND

From the 1960s through 2008, Madoff operated a sole proprietorship which he called Bernard L. Madoff Investment Securities ("BLMIS"). The sole proprietorship comprised two separate businesses: a legitimate trading business (the "LTB"), consisting of proprietary trading ("PT"), which traded securities for its own account, and market-making ("MM") which created a market in certain securities and acted as a broker-dealer for those securities, servicing all of the world's major securities firms. CMF ¶ 1. BLMIS also operated an IA business which serviced individual investment customers, including Defendant.

Madoff, through BLMIS, employed approximately 172 people who worked in the LTB which was managed by Madoff's sons. They worked on the 18th and 19th floors of the Lipstick Building in Manhattan. BLMIS also employed 6 to 8 people who worked on the 17th floor of the Lipstick Building and handled the IA business under Madoff's supervision. CMF ¶¶ 1-7. The Trustee has conceded that the PT and MM Businesses were entirely legitimate. CMF ¶ 6. The Trustee has also conceded that Madoff used the trade name "BLMIS" for his sole proprietorship from the 1960s through 2008. CMF ¶ 8. Madoff formed the LLC in January 2001, at which time he transferred the LTB to the LLC. CMF ¶ 9. He notified the SEC, the Depository Trust Company (the "DTC"), the Bank of New York ("BNY") which serviced the LTB, and others, that the LTB would operate through the LLC. CMF ¶ 10. However, Madoff never transferred the IA business to the LTB. Instead, he continued to operate it as a sole proprietorship, utilizing the 6-8 people who worked on the 17th floor of the Lipstick Building. Although the LTB maintained its bank accounts with BNY, Madoff maintained the IA business' accounts at JPMorgan Chase ("JPMC"). CMF ¶¶ 5, 1-7. Thus, in January 2001, Madoff separated the LTB, operated by his sons, from the

fraudulent IA business which he alone managed.

**The JPMC Accounts**

Madoff was careful to separate the banking relationship of the IA business, with JPMC, from the banking relationship of the LTB with BNY. The IA business had nothing to do with BNY. All IA customer funds were deposited into the "703 Account" at JPMC and all checks written to IA customers were written from the "509 Account" at JPMC. CMF ¶ 18, 39. Through August 2002, the JPMC 703 Account statements indicated that the account was held in the name of "Bernard L. Madoff." CMF ¶ 20. From September 2002 on, the 703 account statements from JPMC indicated the customer as BLMIS, the trade name for Madoff's sole proprietorship. CMF ¶ 20. **There is not a single 703 Account statement or other JPMC document indicating that the account was owned by the LLC.** All customer deposits were placed in the 703 Account and, **through December 11, 2008, the endorsement stamp for the 703 Account read: "For deposit only Bernard L. Madoff."** CMF ¶ 21.

**Through 2008, the statements for the 509 Account indicated that it was owned by Bernard L. Madoff.** CMF ¶¶ 27-28. **All withdrawal checks sent to IA customers were from the 509 Account and indicated that the account was owned by "Bernard L. Madoff."** CMF ¶ 39. Where IA customers requested wire transfers, the funds were transferred from the 703 Account which, again, was in the name of BLMIS, the sole proprietorship, from September 2002 on. Defendant never received funds from an account owned by the LLC.

The Trustee has admitted that he does not possess any documentary evidence that the 509 Account was ever owned by the LLC. CMF ¶ 11. And there is incontrovertible evidence that both the 509 Account and the 703 Account were always owned by Madoff individually. *E.g.* CMF ¶¶ 18-29. Despite their $40 million excursion through Madoff's and the LLC's books and records, both of the Trustee's experts (Dubinsky and Lisa Collura) admitted that they never saw a bank

statement for either the 509 Account or the 703 Account in the name of the LLC. CMF ¶ 26.

## The Trustee's misrepresentations

The Trustee represented to every court before which he appeared that, for the entire period from 1980 through 2008, Madoff never purchased any securities with IA customers' money and it was on the basis of that representation that the 2d Circuit issued its "net equity" decision. CMF ¶ 83; *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) ("*Net Equity Decision*"). It took years of discovery to prove that the Trustee's representations were a patent lie. Dubinsky finally admitted, in May 2019, that Madoff purchased billions of dollars of T-bills with IA customers' money through investment accounts that he maintained at firms like Bear Stearns, Lehman Brothers, JPMC, and Morgan Stanley (the "Brokerage Firms"). CMF ¶¶ 61-62. While Madoff acknowledged that the IA customer statements often reflected the ownership of Fortune 100 company stocks that had not been bought in connection with the fraudulent "split-strike conversion strategy," the account statements reflected that the most consistent investment for the IA customers' accounts was T-bills and the Brokerage Firms records prove that Madoff did actually purchase billions of dollars of  T-bills which appeared on customer statements. CMF ¶¶ 45, 66-76.

## Dubinsky's Testimony

Dubinsky has been the kingpin of the Trustee's bedrock contention that Madoff never purchased securities with IA customers' money. At the Nelsons' trial in May 2019, the Trustee's counsel, Dean Hunt, repeatedly elicited statements from Dubinsky that he had "scoured every bank record" and didn't find **any** use of IA customer funds other than payments to customers and bank sweeps at night at JPMC. CMF ¶ 59. The Trustee bases his right to claw back funds from innocent customers on this false contention. Yet, on cross-examination, Dubinsky was forced to admit that Madoff did purchase tens of billions of dollars of T-bills with IA customers' money that came

from the 703 Account. CMF ¶ 60. Finally, after repeated and staged perjury on his direct examination, Dubinsky conceded that funds were taken from the 703 Account at JPMC – funds paid to Madoff by the IA customers – and were transferred to Madoff's accounts at the Brokerage Firms through which Madoff purchased T-bills. CMF ¶ 62.

These T-bills appeared on some of the IA customers' statements, including Palmedo's CMF ¶¶ 66-76. And although Dubinsky contends that, if all of the T-bills that appear on Madoff's IA customer statements were added up, they would dwarf the number of T-bills that Madoff owned (*e.g.* Tr. Br. at 33), the Trustee flatly refused Defendants' document demand for production of all of the IA customers' account statements and this Court ruled that it would not force the Trustee to produce this evidence. CMF ¶ 79. Thus, any contention by the Trustee that the same T-bills appeared on every IA customer's statements is inadmissible. *See, e.g., Victorinox AG v. The B & F Sys., Inc*., 2015 WL 9256944, at *2, n.2 (S.D.N.Y. Dec. 15, 2015), *aff'd sub nom. Victorinox AG v. B&F Sys., Inc*., 709 F. App'x 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017) (refusing to consider cost data estimates because they were not produced during discovery). Moreover, we know it is false because Defendant's T-bill positions are not identical to the T-bill positions of all other Madoff customers represented by this law firm. CMF ¶ 71. Finally, given the shocking perjury elicited by the Trustee's counsel at the Nelsons' trial, Dubinsky's credibility cannot be relied upon.

**The Palmedo Account**

The Trustee concedes that, at all times, Palmedo operated in good faith and had no knowledge that Madoff was operating a fraudulent IA business. Palmedo opened his account (the "Palmedo Account") on January 4, 1993 when he transferred $192,270.99 from another Madoff account in the name of Bernard L. Madoff C&M 19, but the Trustee has only credited Palmedo with $150,000 of the money transferred. CMF ¶ 34. The Trustee claims that the uncredited amount constitutes a transfer of "fictitious profits." CMF ¶ 35. The Trustee has no evidence of this

contention other than Dubinsky's testimony which is patently incredible because of his repeated perjury at the Nelsons' trial.

Palmedo made two subsequent deposits into the Account by check, one for $25,000 on June 1, 1993 and the other, for $50,000 on December 20, 1995. CMF ¶ 31. The Trustee contends that Palmedo made withdrawals of $1,010,000. All of the withdrawal checks were written from the 509 Account in the name of Bernard L. Madoff. CMF ¶ 39. The Trustee claims that, of the total amount withdrawn, $600,000 was withdrawn "in excess of principal" since December 11, 2006. He seeks judgment for this amount. *See e.g.* Compl. Exhibit B, ECF No. 1.

## LEGAL STANDARD ON SUMMARY JUDGMENT

Federal Rule of Civil Procedure Rule 56(a),  which is applicable to bankruptcy courts pursuant to Fed. R. Bankr. P. 7056, provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law. *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, 2014  WL 47774, at *8 (Bankr. S.D.N.Y. Jan. 3, 2014) (internal quotations omitted). "If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials." *Id*. "In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 563 B.R. 737, 742 (Bankr. S.D.N.Y. 2017).

This Court has repeatedly held that summary judgment in favor of the Trustee is not appropriate in the claw back cases. *See e.g. Picard v. Legacy Capital, Ltd.,* 603 B.R. 682 (Bankr. S.D.N.Y. 2019); *Picard v. Mann,* 608 B.R. 165 (Bankr. S.D.N.Y. 2019). Indeed, at one hearing, this Court told the Trustee: "[y]ou know my view on these summary judgment . . . motions,

particularly on the issues I've identified, [whether the JPMC Accounts were held by Madoff personally or by the LLC, whether the LLC was a Ponzi scheme, and if so, when it began, whether the LLC was allocating T-bills purchased by the proprietary trading arm to customers of the IA business, deposits and withdrawals] . . . I have to try it." CMF ¶ 81.

## ARGUMENT

### I.    THE TRUSTEE LACKS ARTICLE III STANDING

There are no exceptions to the rule that a federal court cannot exercise jurisdiction over a case where the plaintiff lacks Article III injury. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) (Article III of the constitution requires that "plaintiff . . . allege a distinct and palpable injury to himself[.]"); *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 66 (2d Cir. 2013) ("Standing depends, first, on whether the plaintiff has identified a 'case or controversy' between the plaintiff and the defendants within the meaning of Article III of the Constitution."); *Whitmore v. Arkansas,* 495 U.S. 149, 161 (1950) (nature of death penalty and society's interest in its 'proper' imposition do not justify a relaxation of principles governing Article III standing). Thus, before considering the summary judgment motions, the Court must determine that the Trustee has asserted an Article III injury.

The plaintiff bears the burden of proving that he has standing to bring his claims. *See Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984); *see also Cent. States v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005). To meet his burden, the Trustee must show "(i) a concrete and particularized "injury in fact" (ii) that can be fairly traced to the defendant's conduct, and (iii) that can be redressed by a favorable decision. *Bogart v. Israel Aerospace Indus. Ltd.*, No. 09 Civ. 4783 (LAP), 2010 WL 517582, at *3-4 (S.D.N.Y. Feb. 5, 2010) (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006)); *Picard v. HSBC Bank PLC*, 454 B.R. 25, 29 (S.D.N.Y. 2011) ("*HSBC Bank II"), amended sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, No. 11 CIV.

763 JSR, 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*., 721 F.3d 54 (2d Cir. 2013), and *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*., 721 F.3d 54 (2d Cir. 2013). To establish Article III standing, the plaintiff must "assert his own legal rights and interests," and cannot rest his claim to relief on the legal rights or interests of third parties. *Wight v. BankAmerica Corp*., 219 F. 3d 79, 86 (2d Cir. 2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *HSBC Bank II,* 454 B.R. at 29.

Thus, the Trustee must prove that the LLC owned the funds he alleges were transferred to Defendant. This he cannot do. There is no evidence whatsoever that the JPMC Accounts from which the transfers were made were ever the property of the LLC. Since the Trustee is only the Trustee for the LLC, he only has standing to recover transfers made by the LLC. Only Alan Nisselson, the Trustee for Madoff individually, can seek to claw back transfers made by the sole proprietorship, and he did not do so within the time required by the Bankruptcy Code. As this Court clearly and unequivocally held in two carefully reasoned decisions which the Trustee did not appeal, *Picard v. Avellino* (*In re Bernard L. Madoff Inv. Securities LLC),* 557 B.R. 89, 109, 110 (Bankr. S.D.N.Y. 2016) ("*Avellino*"), *reconsideration denied,* 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016), "[o]nly the Madoff trustee [Alan Nisselson] can recover actual transfers by the sole proprietorship." Thus, this case must be dismissed for lack of subject matter jurisdiction.

### A.     The Trustee's Debtor, the LLC, Never Owned the JPMC Accounts

It is undisputed that IA customer funds were deposited into the 703 Account and that IA customer withdrawals were made from the 509 Account or the 703 Account. Both Accounts were owned by Madoff and/or Madoff's sole proprietorship for decades before the LLC was created in 2001 and continued as such through 2008. CMF ¶¶ 18-28. As the Trustee has admitted, there is no evidence that the LLC ever owned the 703 or 509 Account. CMF ¶¶ 11, 25, 26.

The 703 Account was in Madoff's individual name until September 2002, when the name was changed to Madoff's sole proprietorship, BLMIS, without the LLC designation. Although the LLC was not formed until January 2001, Madoff used the BLMIS trade name since at least the 1970s. CMF ¶ 29. Even in 2008, the endorsement stamp for checks deposited into the 703 Account read "For deposit only Bernard L. Madoff." CMF ¶ 21. According to JPMC's records, the 509 Account was always held in the name of Bernard L. Madoff. CMF ¶ 27. The Trustee's experts have admitted that they never saw a JPMC bank statement in the name of the LLC. CMF ¶ 26.

When Madoff formed the LLC to own the LTB operated by his sons, he made very clear that he was transferring only the LTB to the LLC. He wrote letters only to entities that did business with the LTB to inform them of the transfer. Madoff sent a letter to BNY, the bank that had always serviced the LTB; he wrote to the DTC; he wrote to the NSCC; and others. CMF ¶ 10. The letter to BNY stated that the LLC had been formed and that ownership of Madoff's BNY accounts should be re-titled in the name of the LLC. However, Madoff wrote no such letter to JPMC, which held the IA accounts; or to anyone else who did business with the IA business. There is no evidence whatsoever of a transfer of the IA business or of the 703 and 509 Accounts to the LLC. Thus, this Court lacks Article III jurisdiction of the Trustee's complaint.

### B.        The Trustee Cannot Demonstrate That the LLC Suffered An Injury in Fact

The Trustee's avoidance powers are limited under the Bankruptcy Code to seeking to recover transfers of "an interest of the debtor in property." 11 U.S.C. § 548(a)(1). The transfers at issue here were not made by the LLC, the Trustee's "debtor," but rather by Madoff individually. Thus, the Trustee lacks Article III standing to avoid the transfers. The Trustee relies upon arguments this Court rejected in *Avellino*. But the Trustee never appealed *Avellino* and, thus, he is bound by its holding. *Picard v. Avellino (In re Bernard L. Madoff Inv. Secs. LLC),* 557 B.R. 89 (Bankr. S.D.N.Y. 2016) ("*Avellino*"), *reconsideration denied,* 2016 WL 6088136 (Bankr.

S.D.N.Y. Oct. 18, 2016) (*"Avellino Reconsideration Decision"*) (The Trustee has no standing to avoid transfers made by Madoff individually; only Madoff's individual trustee has such standing.).

### C.   SIPA Does Not Create Article III Injury

The Trustee makes numerous arguments that this Court properly rejected in *Avellino*. For example, he argues that the Securities Investor Protection Act ("SIPA") somehow authorizes him to sue to recover a transfer made by Madoff, based on a broad definition of "customer property" under SIPA and, by implication, Rule 15c3-3 of the Securities Exchange Act of 1934 (*See* 17 CFR 240.15c3-3.) However, the Trustee's strained attempt to alter the statute is doomed to fail. As Judge Rakoff held in *HSBC Bank II,* SIPA does not confer a "vast power on such a trustee to commence lawsuits he could not otherwise bring" and Rule 15c3-3 is "undisputedly not a part of SIPA" and does not "grant the Trustee additional standing." *HSBC Bank II,* 454 B.R. at 29-31.

SIPC filed an application pursuant to 15 U.S.C. § 78eee(a)(4)(B) alleging that the LLC was not able to meet its obligations to its customers and the customers needed protection under SIPA. SMF ¶ 3. The District Court appointed Picard as Trustee for the liquidation of the LLC pursuant to 15 U.S.C. § 78eee(b)(3) and transferred the case to the bankruptcy court. *See* SMF ¶¶ 4-5. *See also* 15 U.S.C. § 78iii(5) ("The term 'debtor' means a member of SIPC with respect to whom an application for a protective decree has been filed under § 78eee(a)(3)."). As SIPA Trustee for the LLC, the Trustee has no power to void transfers made by Madoff individually. *See Avellino* at 108, 110 (The "SIPA debtor was [the LLC], the limited liability company, and not Madoff's sole proprietorship . . . ." "SIPA authorizes the trustee to avoid and recover transfers of customer property. 'Customer property' includes [property of the debtor]."); *Avellino Reconsideration Decision*; *Mendelow* 560 B.R. at 227. The Trustee's "debtor" is only the LLC.

The Trustee argues that the scope of the Protective Decree, by which Picard was appointed SIPA Trustee of the LLC, should be construed to include both Madoff and the LLC. (*e.g.,* Tr. Br.

at 28). But the argument that the Protective Order covered Madoff as well as BLMIS was rejected in *Avellino*. *See Avellino reconsideration decision* at *3. Again, Picard did not appeal either decision in *Avellino*. Moreover, the Protective Decree states in ¶ I that the customers of the LLC are in need of the protections of SIPA, not the customers of Madoff individually. Similarly, in ¶ II, the Protective Decree notes that the Trustee was appointed as the "trustee for the liquidation of the Defendant," referring to the LLC and with no mention whatsoever of Madoff individually or his sole proprietorship.

The Trustee argues that he was appointed for the liquidation of the *business* of the broker-dealer, rather than for the liquidation of the LLC. (Tr. Br. at 29). But this doesn't help the Trustee because the business of the broker-dealer was the LTB. Although he argues that the LLC took over the business of the sole proprietorship as a single business, *id.,* there is no evidence to support this statement. On the contrary, not a single employee of the LTB had any role in the operation of the IA business. Inexplicably, the Trustee relies upon Amended Form BD which the LLC filed in January 2001 with the SEC. (*E.g.,* Tr. Br. at 23, 26). However, in this document Madoff described the business of the LLC as only MM and PT and expressly stated that the LLC does not engage in IA services. At pages 8 and 9, the LLC was asked to check all of the "types of business[it] engaged in" (unless that business accounted for less than 1% of annual revenue). It checked "C," its MM activities, "V," its PT activities, and "Z," "Other" activities are described on page 10 of the form as Madoff's membership in the Cincinnati Stock Exchange where he was a designated market maker. **Madoff did not check "S," which referenced "investment advisory services."**

The Trustee argues that "as long as a trustee can show that the property [he seeks to recover] was customer property received by the broker-dealer, he has the authority to recover it, wherever it lies." (Tr. Br. at 30); SIPA § 78fff(2)(c)(3). But that is precisely what the Trustee cannot prove. The evidence is indisputable that Defendant's property was never received by the

broker-dealer; on the contrary, it was received by Madoff and deposited into the 703 Account with an endorsement statement that read: "For deposit only Bernard L. Madoff." In desperation, the Trustee argues that, even if Madoff operated a sole proprietorship before the Trustee was appointed, the Trustee still has the right to recover funds paid by Madoff individually. This Court properly rejected this argument entirely in *Avellino*.

The Trustee argues that the Substantive Consolidation Order entered by the District Court on July 9, 2009, which expressly orders that Madoff's own trustee has standing to void transfers by Madoff and Picard has standing to void transfers by the LLC, is just a "belt and suspenders" order to ensure that none of Madoff's assets slipped through the cracks since various entities were pursuing them, and the reservations in the order were necessary because, unless they were expressly preserved, the substantive consolidation of the two estates could extinguish both trustees' avoidance powers altogether. (Tr. Br. at 30-31). This Court flatly rejected this argument, and for good reason. *See Avellino reconsideration decision at *2-3.* Moreover, any reliance by the Trustee on the substantive consolidation of the LLC's estate and Madoff's estate is constrained by the limitations of the substantive consolidation doctrine and the Court's order authorizing the consolidation, which expressly preserves the exclusive power of Madoff's individual trustee to file fraudulent transfer actions relating to transfers by Madoff. Substantive consolidation does not merge the debtors or retroactively transform property of someone other than the debtor into property of the debtor. *See, e,g, In re Bauman*, 535 B.R. 289, 301 (Bankr. C.D. Ill. 2015) ("Most significantly, substantive consolidation should not be deemed to have a retroactive effect of transforming property owned by an entity separate from a debtor into property of that debtor as of the prepetition date of the challenged transfer . . . The facts of property ownership as they existed prepetition remain unchanged, as do the elements of proof under sections 548 and 544.") *In re Murray Industries, Inc*., 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991) ("substantive consolidation

of several estates means one thing and one thing only—that all assets of the several entities are pooled and all creditors of the several entities are entitled to share in the pooled assets in accord with their respective rights. It would certainly be a violation of due process if the order of substantive consolidation would operate to destroy defenses and rights which existed prior to the entry of the order of substantive consolidation."); *Ferguson v. Garden Ridge Corp.*, 399 B.R. 135. 140 (D. Del. 2008) (same in context of set rights); *In re Deltacorp, Inc.*, 179 B.R. 773 (Bankr. S.D.N.Y.1995) ("estates are merged for the purposes of bankruptcy administration, but the consolidation alone does not effect a corporate merger.")

Thus, the Consolidation Order could not create subject matter jurisdiction where none exists because subject matter jurisdiction cannot be expanded by judicial fiat, the consent of the parties, or any other artifice. *See, e.g. Perpetual Securities, Inc. v. Tang,* 290 F.3d 132, 136 (2d Cir. 2002); *Siding and Insulation Co., Inc. v. Acuity Mut. Ins. Co.*, 754 F.3d 367, 373-374 (6th Cir. 2014) ("Necessarily, then, the parties enjoy no more discretion to expand our bailiwicks than we do . . . In light of this teaching, the parties' consent to jurisdiction matters not.") *Fafel v. Dipaola*, 399 F.3d 403, 410 (1st Cir. 2005) ("A court without subject matter jurisdiction may not acquire it by consent of the parties."). Subject matter jurisdiction cannot be conferred or waived by consent, estoppel, or failure to raise the issue early in the proceedings. Indeed, lack of subject matter jurisdiction can be raised at any time. *U.S. v. McGaughy,* 670 F.3d 1149, 1155 (10th Cir. 2012) ("Although the government did not raise any jurisdictional objections below, it is not precluded from raising them here.").

Finally, the Trustee argues that, if Defendant is correct, there is no one that can recover the withdrawals and that this is not the intention of SIPA. (Tr. Br. at 31). This is not the case at all and it has nothing to do with SIPA. As this Court held, Madoff's individual trustee, Alan Nisselson, could have asserted a claim to recover the transfers, but he simply chose not to do so. *See Avellino*,

557 B.R. at 110 ("Only the Madoff trustee can recover actual transfers by the sole proprietorship."). Perhaps Nisselson recognized, as did Judge Chin, that clawing back funds from innocent customers is "cruel." *SEC v. Byers,* 637 F. Supp.2d 166, 182 (S.D.N.Y. 2009). The fact that Nisselson failed to sue Defendant does not give the Trustee Article III standing to sue him.

### D.    Dubinsky Admitted that Madoff Bought T-Bills With IA Customers' Funds

Underlying all of the Trustee's claims is his repeated representation from inception of this case  that Madoff never purchased any securities with IA customers' money. Confronted with the third party documentary evidence, however, Dubinsky admitted that Madoff *did* purchase T-bills with IA customers' money taken from the 703 Account and, indeed, T-bills were the most common investment in IA customers' accounts. Thus, Dubinsky flatly contradicted his own perjured testimony at the Nelsons' trial.

Despite Dubinsky's admissions of perjury,  the Trustee continues to rely upon Dubinsky's false contention that Madoff never used IA customers' funds to purchase securities. On direct examination, Dubinsky repeatedly testified that Madoff never used IA customers' money to purchase securities. CMF ¶ 57. When questioned by Dean Hunt, Dubinsky testified that there is "no evidence [of activity in the 703 account] other than money coming in from customers and money going out to customers," *id*. at 92:16-17, and a minimal amount (3% of the total monies in the 703 Account) from overnight sweeps. CMF ¶ 58. He swore that there was "never any addition to the 703 Account representing trading profits." *Id*. Dubinsky testified that he "scoured every bank record and didn't find any other use of customer funds other than payments to customers and bank sweeps at night at JPMC." CMF ¶ 59.

On cross-examination, Dubinsky got religion. He admitted that Madoff used IA customers' money, taken from the 703 Account, to purchase T-bills through accounts Madoff held at the

Brokerage Firms, that the T-bills paid interest, and that the T-bills appeared on customer

statements. Dubinsky testified:

> Q. But in any event, you're now telling us that you're aware that there were
> approximately eight accounts at which Madoff was using investment
> advisory customers' money to purchase T bills. Isn't that true?
>
> **A.** That is correct, yes.

CMF ¶ 62. He further testified:

> A.. There was money taken out of the 703 account, transferred to these
> accounts, these various accounts, and then these securities were purchased,
> yes.

CMF ¶ 61.

## II.    THE TRUSTEE'S MOTION RESTS ON INADMISSIBLE EVIDENCE

The evidence submitted on a motion for summary judgment must be admissible. *Bellamy*

*v. City of New York,* 914 F.3d 727, 750 (2d Cir. 2019); *Edwards v. Onondaga Cmty. Coll*., No.

5:14-CV-1329, 2016 WL 3519619, at *4 (N.D.N.Y. June 22, 2016); *Boger v. New York State*

*Office of Parks, Recreation & Historic Pres*., 2019 WL 2766897, at *6 (N.D.N.Y. July 2, 2019);

*Roberts v. Ground Handling, Inc*., 499 F. Supp. 2d 340, 360 (S.D.N.Y. 2007). *See also* Fed. R.

Civ. P. 56(c). The evidence on which the Trustee relies is inadmissible.

### A.    The Expert Reports Are Not Admissible

The Trustee's expert witness testimony is inadmissible because it is based, in large part, on

BLMIS books and records. *See, e.g.* Dubinsky Report Jan 2019 Appendix B, citing "SQL

Compilation of BLMIS Data," and "AS/400 Tapes." *Picard v. JABA et. al,* Case No. 1:20-cv-

03836-JGK, ECF No. 15-4. Dubinsky relies in his testimony on the very records that Dubinsky

told the Second Circuit were "permeated with fraud." *See, e.g.,* Expert Report of Bruce G.

Dubinsky (*In re Bernard L. Madoff,* Adv. Pro. No. 08-1789 (SMB), ECF Doc. No. 12137-1)

("[F]raud permeated BLMIS to the extent that the company's books and records could not be relied

upon by a hypothetical buyer."); Trustee's Supp. Br. (Aug. 12, 2016) (ECF Doc. No. 13876) at 5

(referring to fraudulent and "fictitious" notations in the customer statements that "were irreconcilable with any trading records," and warning against giving "undue credence to fictitious amounts engineered by Madoff"); *id.* at 6 ("the securities transactions reflected on BLMIS books and records were fictitious"); *id.* at 63 ("the fraudulent nature of BLMIS's business . . . ").

Where the source of information is inadmissible because it is permeated with fraud, any analyses or testimony based on the fraudulent records is also inadmissible. *See, e.g.*, 6-1006 Weinstein's Fed. Ev. § 1006.07 (2015); *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999) (summary evidence cannot be admitted if the underlying materials are inadmissible); Fed. R. Evid. 801 and 802. Even where only portions of the underlying source material constitute improper hearsay, those defects may be imputed to the summary or demonstrative exhibit as a whole. *See* Wright & Gold, 31 Fed. Practice and Procedure § 8043, at 527.

Madoff's books and records are not admissible as business records under Fed. R. Evid. 803(6) or under the residual exception to the rule against hearsay, Fed. R. Evid. 807(a). Courts applying Rule 803(6) have stressed that the "trustworthiness" of the information is the "principal precondition to admissibility." *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995) (internal quotation marks omitted); *JPMorgan Chase Bank, N.A. v. Yuen*, No. 11 Civ. 9192 (NRB), 2013 WL 2473013, at *6 (S.D.N.Y. June 3, 2013). While some courts have found, in specific instances, that particular documents satisfy this trustworthiness requirement even though the proponent could not identify the author or date of the entry, courts have always required other indicia of reliability and trustworthiness for admission. *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003).

Here, there are no indicia of reliability. According to the Trustee, there was an "incentive to falsify or alter" the records, making them absolutely inadmissible. *See Yuen*, 2013 WL 2473013, at *7; *see also U.S. v. Blechman*, 657 F.3d 1052, 1066 (10th Cir. 2011) ("an essential link in the trustworthiness chain fails" when the supplier of the information was not acting in the regular

course of business). When considering whether a document was prepared by an untrustworthy source, courts examine whether the party providing the information had an incentive to misrepresent. In *United States v. Dreer*, the court held business records inadmissible because other records in the business were falsified. 740 F.2d 18 (11th Cir. 1984). The court explained that, "[a]lthough the proponent of the records did not admit that the records were falsified, there was an extremely strong inference arising from evidence of numerous other forged financial documents that the proffered evidence was not genuine." *Id.* at 20. Here, the Trustee himself has asserted, when it furthered his interests, that Madoff's records are "permeated with fraud." Yet, he wants this Court to grant judgment against Defendant based upon those fraudulent records.

Not only are Madoff's records inadmissible but Dubinsky flatly lied in his expert report about what he found in his $40 million review of Madoff's records and in his testimony at the Nelsons' trial. It was only when, on cross-examination, he was confronted with third party documentary evidence, that Dubinsky admitted that Madoff purchased T-bills with IA customers' money, thereby proving his own repeated perjury on his direct examination by the Trustee.

**B.    The Allocutions and Trial Testimony are Inadmissible**

Frank DiPascali ran the IA Business for Madoff. Madoff testified that DiPascali purchased T-bills with IA customers' money. Documentary evidence demonstrates that the receipts from the sale or redemption of T-bills were paid directly into the 703 Account. CMF ¶ 51. And Joann Crupi, one of the Madoff employees that reported to DiPascali, testified that DiPascali would tell her to which of Madoff's IA customers specific T-bill transactions should be credited. CMF ¶ 52. Defendant never had the opportunity to depose DiPascali because he died before Defendant was permitted to take depositions. While the Trustee relies upon DiPascali's testimony that the IA business made no trades, this testimony is obviously false because the third party evidence produced by the Brokerage Firms establishes that Madoff purchased T-bills with IA customers'

money and Dubinsky admitted this on cross-examination at the Nelsons' trial. For this reason, the criminal trial testimony of DiPascali that the IA Business made no trades is demonstrably false.

Moreover, DiPascali's testimony is inadmissible against Defendant. In order to be admissible, the facts contained therein must be "essential to the judgment." FRE 803(22)(C); *In re Dreier LLP*, 2014 WL 47774 at * 11 (Bankr. S.D.N.Y. Jan. 3, 2014) (Bernstein, J.) ("A prior judgment of conviction may be used as prima facie evidence in a subsequent civil suit only with respect to matters of fact or law 'necessarily decided by the conviction and the verdict on which it was based.'"). Here, the Trustee seeks to admit the allocutions on the question of whether a Ponzi scheme presumption may apply. (Tr. Br. at 6-11). Yet, in the criminal trial, none of the defendants was charged with operating a Ponzi scheme. Although Madoff used the term "Ponzi scheme" in his allocution, he did not testify to his understanding of what a Ponzi scheme is and he did not describe a Ponzi scheme; instead, he simply described a fraud. Moreover, in his deposition testimony, Madoff negated virtually all of the elements of a Ponzi scheme. For example, he testified that, until the fall of 2008, when Lehman Brothers filed in bankruptcy, he had never had difficulty funding customer redemptions. CMF ¶ 48. He testified concerning his investment of customer funds in T-bills. CMF ¶ 41. And his testimony is validated by the third party records in the Trustee's possession. CMF ¶¶ 66-76.

Under Fed. R. Evid. 804, a plea statement is admissible as an exception to the hearsay rule if, when made, it would expose the declarant to criminal liability or, if supported by corroborating circumstances that clearly indicate its trustworthiness, it is offered in a criminal case as one that tends to expose the declarant to criminal liability. However, here, DiPascali was trying to curry favor with the government in order to avoid imprisonment. Statements made to shift the blame or curry favor are not sufficiently self-incriminatory to be admissible. *United States v. Tropeano,* 252 F.3d 653 (2d Cir. 2001).

Moreover, there is reliable third party documentary evidence proving the falsity of DiPascali's testimony. While Palmedo has not been able to cross-examine DiPascali, his counsel did cross-examine Dubinsky who then admitted his perjury at the Nelsons' trial and admitted that Madoff purchased T-bills through the Brokerage Firms, using IA customers' money. None of this evidence was put before the jury in the criminal trial. Nor did the government or the criminal defendants introduce JPMC statements showing transfers from the 703 Account to the Brokerage Firms and from the Brokerage Firms to the 703 Account (although DiPascali did testify that Madoff told him to which customer accounts the T-bills should be credited). Obviously, the government had no interest in proving that Madoff conducted legitimate trading for any of his IA customers.

While DiPascali testified that he bought T-bills from the major brokerage houses like Bear Stearns, Fidelity, Bank of New York, Morgan Stanley and Lehman Brothers, to get "interest on the checking account," he also testified that none of the T-bill purchases were real. *See* DiPascali Trial Testimony, December 10, 2013, 5346:1-2 and, for context, 5344:9-5346:2, ECF No. 15-2. Obviously, both statements cannot be true; and the statements from the Brokerage Firms prove that Madoff did purchase T-bills and that some of these T-bills were credited to Defendant's account. CMF ¶¶ 66-76. While DiPascali testified that he falsified the appearance of T-bills on *certain* customer statements, DiPascali was not questioned about Defendant's statements and the profits on the T-bills which were credited to his account. Obviously, no defense counsel had a motivation to question DiPascali on this subject.

The Trustee relies on a statement that DiPascali made at the criminal trial that he prepared an Excel spreadsheet which contained the CUSIP numbers of certain T-bills and options. DiPascali testified that the spreadsheet also bore the account numbers "that Bernie told us he wanted to use to be the counterparties of the customer option positions" and that the spreadsheet "allows me to

randomly pick a group of treasuries that were going to represent that collateral." *See* CMF ¶ 54; That spreadsheet, Government Exhibit 105-c171, is attached to the Chaitman Dec. as **Ex**. **AB**. CMF ¶ 54. There is not a single reference to Defendant's account on that spreadsheet and there is no third party document suggesting that the T-bills in Defendant's Account were used for collateral. At the criminal trial, no defense counsel questioned DiPascali about the inconsistencies in his testimony and which customers' accounts he was talking about.

Joann Crupi testified that DiPascali told her when he was about to buy T-bills and to whom the T-bills should be allocated. CMF ¶ 52. This refutes DiPascali's testimony that he purchased T-bills as a cash management tool only and that the T-bills that were allocated to customers were from a spreadsheet and none of them were "real."

## III.   THE TRUSTEE CANNOT MAKE HIS PRIMA FACIE CASE

Aside from the fact that Dubinsky's perjury disqualifies him as a credible witness, the Trustee cannot make out a prima facie case. The elements of the Trustee's claims under 11 U.S.C. § 548(a)(1)(A) are that the LLC made (1) a transfer of an interest of the debtor in property; (2) within two years before the date of the bankruptcy petition, with (3) "actual intent to hinder, delay or defraud" a creditor. (Tr. Br. at 5). As we have demonstrated, the Trustee cannot prove a "transfer of an interest of the debtor in property" because the Trustee's "debtor," the LLC, never owned the funds in the 703 and 509 Accounts.

Ignoring his lack of standing to sue on behalf of Madoff or the sole proprietorship, BLMIS, the Trustee argues that the "Ponzi scheme presumption" allows the court to presume a fraudulent intent. However, he has no evidence to support a finding of intent as a matter of law. And, since Defendant can show, through reliable third-party records, that Madoff did buy T-bills for his account and for others, the Trustee cannot prove that Madoff operated a Ponzi scheme.

Moreover, the Trustee must demonstrate actual intent to defraud by clear and convincing

evidence. *See, e.g. Mendelsohn v. Jacobowitz ("In re Jacobs")* 394 B.R. 646, 661 (Bankr. E.D.N.Y. 2008) ("The trustee has the burden of showing that the challenged transfer was made with actual intent to hinder, delay, or defraud, and he or she must do so under the clear and convincing standard."); *USA United Fleet, Inc. v. Ally Financial, Inc. ("In re USA United Fleet, Inc.")*, 559 B.R. 41, 57 (Bankr. E.D.N.Y. 2016) (same). Here, the Trustee has not shown actual intent, either by clear and convincing evidence or by any other standard. On the contrary, the evidence shows that Madoff used customer funds to purchase securities he credited to customers' accounts.  Thus, the Trustee's  motion for summary judgment must fail.

## A.    **Madoff Bought Actual T-Bills**

Defendant can prove that Madoff used IA customers' funds to purchase T-bills, some of which were credited to Defendant's account. CMF ¶¶ 66-76. For example, as of December 31, 2007, the Palmedo Account held T-bill positions in the amount of $1,165,000.75. CMF ¶ 67. And Defendant can prove, through third party evidence, that Madoff owned those T-bills at the time they appeared on the Palmedo Account statement. CMF ¶ 70. Similarly, Defendant can prove that, as of June 26, 2007, the Palmedo Account held T-bill positions in the amount of $1,069,205.75. . CMF ¶ 73.  And Defendant can prove, through third party evidence, that Madoff owned those T-bills at the time they appeared on the Palmedo Account statement. CMF ¶ 75.  Thus, there is no basis for the Trustee's claims against Palmedo.

Ignoring his own counsel's subornation of perjury, the Trustee argues that Dubinsky "verified that no U.S. treasury bills . . . were purchased on behalf of IA business customers." (Tr. Br. at 11). However, on cross-examination at the Nelsons' trial, Dubinsky admitted that Madoff did buy T-bills with IA customers' money. Now the Trustee argues that Madoff did not own enough T-bills to cover the more than 5,000 customer accounts he held in the IA business. This is an argument that the Trustee is barred from making because the Trustee refused to produce the

account statements of all of Madoff's IA customers in response to Defendant's document demand, thus making it impossible for Defendant to test the veracity of the Trustee's contention. *See Picard v. Wilenitz*, Adv. Pro. No. 10-04995 ECF No. 70-2. Similarly, the Trustee stated that he would not provide "direct access" to a database "because it contains documents relating to thousands of customers, many of which are not relevant to this proceeding." *See id.* at § 1. The Trustee would not produce, or even log, documents that were received that he deemed not relevant. *See id.* at § 1.

Where a party refuses to produce evidence requested in discovery, that party is precluded from using such evidence at trial. In *Taylor v. Illinois*, 108 S. Ct. 646 (1988), the Supreme Court affirmed an order precluding testimony where a witness had not been identified in pretrial discovery. In *United States v. Nixon,* 418 U.S. 683 (1974), the Court wrote that the "very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence." *See also, Victorinox AG v. The B & F Sys., Inc.*, 2015 WL 9256944, at *2, n.2 (S.D.N.Y. Dec. 15, 2015), *aff'd sub nom. Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017) (refusing to consider cost data estimates because they were not produced during discovery); *Taveras v. City of New York*, 2009 WL 10701924, at *7 (E.D.N.Y. Apr. 7, 2009) (precluding defendants from relying on charts that were not produced during discovery); *cf. Costa v. Sears Home Imp. Products, Inc.,* 65 F. Supp.3d 333*, 346 (W.D.N.Y. 2014) (holding on summary judgment that a party could not rely on an affidavit the other party did not know about); *Preuss v. Kolmar Labs., Inc.,* 970 F. Supp. 2d 171, 178-79 (S.D.N.Y. 2013) (striking affirmation for failure to disclose pursuant to Fed. R. Civ. P. 26).

Moreover, there is no evidence to suggest that every IA customer had precisely the same T-bills in his account. In fact, we know the opposite is true. This firm has represented the defendants in more than 60 different clawback actions. From our review of the Trustee's records,

the Palmedo Account held T-bills that were not held simultaneously by all our other clients. CMF ¶ 71.

### B.    The Trustee Cannot Show Intent: the Ponzi Scheme Presumption Does Not Apply

Courts apply a four-factor test to determine the existence of a Ponzi scheme: (1) deposits were made by investors, (2) the debtor conducted little or no legitimate business, (3) the purported business operation of the debtor produced little or no profits or earnings, and (4) the source of payments to investors was from cash infused by new investors. *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Case No. 08-15051, 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 3, 2014); *Armstrong v. Collins*, No.01 Civ. 2437 (PAC), 2010 WL 1141158 at * 22 (S.D.N.Y. Mar 24, 2010), *reconsideration denied*, No. 01 Civ. 2437 (PAC), 2011 WL 308260 (S.D.N.Y. Jan. 31, 2011). The Trustee cannot meet any of these criteria.

### 1.    Defendant Was a Creditor, Not an Equity "Investor"

While fraudulent transfer actions against **equity** investors in a Ponzi scheme are justified because those investors are owners of the business who received dividends when there was no source of revenue for the business and its creditors were unpaid, such actions are not justified against creditors of the debtor, such as Defendant, who simply received the money to which they were contractually and legally entitled. *See, e.g. U.S. v. Manufacturers Trust Co.*, 198 F.2d 366, 367 (2d Cir. 1952) ("The relationship between the bank and its depositor is that of debtor and creditor.") (citation omitted). The Second Circuit has recognized that customers such as Defendant are creditors, not owners. *In re Bernard L. Madoff Inv. Securities LLC*, 2011 WL 3568936, 6 (2d Cir. Aug. 16, 2011) ("BLMIS claimants are customers with claims for securities within the meaning of SIPA.")

Obviously, Madoff held Defendant's funds as a custodian and fiduciary, to purchase securities in Defendant's name. Moreover, the Trustee has acknowledged that all "BLMIS

customers who filed claims—whether their net equity customer claims were allowed or denied—
are general creditors of the BLMIS estate." Trustee's Fifth Interim Report ¶ 76, *In re Madoff*, No.
08-01789, ECF No. 4072 (Bankr. S.D.N.Y. May 16, 2011).

2.    **The LLC was not a Ponzi scheme**

The Trustee can only prevail if he can prove that the LLC was a Ponzi scheme. He cannot
prove this. In fact, Dubinsky conceded in cross-examination at the Nelsons' trial, that the LLC did
not operate a Ponzi scheme and that it was a legitimate business. CMF ¶ 6. In order to avoid dealing
with this obvious failure of proof, the Trustee frames the issue as whether the **IA Business**, which
he magically views as part of the LLC, engaged in trading. *E.g.*, Tr. Br. at 9-10. But there is no
evidence that the IA Business was part of the LLC. Certainly, the LLC's Amended Form BD, filed
in 2001, did not indicate that Madoff was transferring the IA business to the LLC; or that the LLC
would be engaging in any IA services.

On the contrary, it is clear that Madoff formed the LLC in 2001 to insulate the LTB
operated by his sons from the fraudulent IA business which he operated. But even if the LLC
operated the IA Business, the fraudulent part of Madoff's entire operation was very small
compared to the legitimate trading done by the LLC. The LLC conducted a massive legitimate
trading business. Madoff testified that "by the time we were finished in 2008 . . . we represented
ten percent of the United States' volume in – in [legitimate, market-making] transactions." CMF
¶ 46. The Trustee's witnesses admitted to having seen "anecdotal evidence" that Madoff conducted
trades equal to approximately 10% of the daily volume of the New York Stock Exchange as a
whole. CMF ¶ 47. Over 96% of the staff employed by Madoff/the LLC worked in the LTB. The
Trustee admitted that only "six to eight people" worked in the IA Business and the remaining 172
people worked in the LTB. CMF ¶ 4.

Where the Ponzi scheme constitutes "a small part of a larger, legitimate business" the Ponzi scheme presumption is inappropriate. *In re Prebul Jeep, Inc.*, 2009 WL 4581900 (Bankr. E.D. Tenn. 2009); *In re Foos*, 188 B.R. 239 (Bankr. N.D. Ill. 1995) *aff'd in part, rev'd in part on other g'ds*, 1996 WL 563503 (N.D. Ill. 1996). In *In re Manhattan Inv. Fund Ltd*, 359 B.R. 510 (S.D.N.Y. 2007), *affirmed in part, rev'd in part, In re Manhattan Inv. Fund Ltd.* 397 B.R. 1 (S.D.N.Y. 2007), the court cited its earlier ruling that the Ponzi scheme presumption may still be applied where there is also legitimate business; "[w]hen a debtor operating a Ponzi scheme makes a payment with the knowledge that future creditors will not be paid, that payment is presumed to have been made with actual intent . . . regardless of whether the payments were made to early investors, or whether the debtor was engaged in a strictly classic Ponzi scheme." However, this holding is inapplicable here because the Trustee has no evidence to show that Madoff made any payments to Defendant with knowledge that any other customers would not be paid. Indeed, Madoff testified that he never had difficulty funding a customer withdrawal until November 2008, after Lehman Brothers filed in bankruptcy and the entire financial world was in a state of collapse. CMF ¶ 48.

### 3.   **The IA Business was Profitable**

The Trustee has also failed to prove that the IA Business was not profitable. On the contrary, at the Nelsons' trial, Dubinsky admitted that between $700 and $800 million was transferred from the IA business account at JPMC to the BNY account servicing the legitimate trading operations of the LLC following its formation in 2001. CMF ¶ 16. We have not found a single Ponzi scheme case where a Ponzi scheme funded a legitimate affiliate to the tune of $700-$800 million.

### 4.   **Deposits of New Customers**

The Trustee has not shown that the LLC relied on "after-acquired investment funds to pay off previous investors" to "forestall disclosure of the fraud." *See Legacy,* 2019 WL 2593008 at *4,

(in addition to the four factor test, the "Ponzi scheme label applies 'to any sort of inherently fraudulent arrangement under which the debtor transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud'") (*quoting In re Manhattan Inv. Fund Ltd.*, 397 Bankr. 1, 12 (S.D.N.Y. 2007). Madoff repeatedly testified that he did not require the deposits of other customers to pay out existing customers, CMF ¶ 48, and the Trustee cannot refute this testimony.

5.    **Additional Factors**

Courts nationwide recognize that a classic Ponzi scheme is short-lived. "[M]ost Ponzi schemes are of relatively short duration." *SEC Official Testifies on Best Method for Determining Madoff Distributions*, Sec. Exch. Comm'n. Today 10466961, 2009 WL 10466961 (Dec. 14, 2009); *Prymak v. Contemporary Fin. Sols., Inc.,* 2007 WL 4250020, at *2 (D. Colo. Nov. 29, 2007) (a Ponzi scheme "is a fraudulent scheme that can be profitable for only a short period of time [.]"); *see e.g., McNamara v. Sher*, 2012 WL 760531, at *1 (S.D. Cal. Mar. 8, 2012) (Ponzi scheme lasting two years); *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549-50 (4th Cir. 2001) (Ponzi scheme lasting 17 months); *Germinaro v. Fid. Nat. Title Ins. Co.,* 107 F. Supp. 3d 439, 450 (W.D. Pa. 2015) (Ponzi scheme lasting nine months); *In re Rivas*, 2010 WL 2265663, at *1 (Bankr. E.D. Tenn. June 3, 2010) (Ponzi scheme lasting 14 months).

Although the Trustee has claimed (incredibly) that Madoff operated a Ponzi scheme from the early 1960s on, Madoff has testified that his fraud began post-1992, likely 1993. CMF ¶ 49. Even if Madoff's fraud began in 1993, that would mean it lasted for 15 years. We have not found a single case where a court found the existence of a Ponzi scheme that spanned 15 years. Such a long duration, by itself, contradicts the contention that the IA business was a Ponzi scheme.

### C.   **The Payments Were Not Made "In Furtherance of" a Ponzi Scheme**

The Trustee suggests that the fact that Madoff commingled customer funds proves he operated a Ponzi scheme. This argument is absurd. The fact that Madoff made legitimate trades for the Palmedo Account cannot be disregarded on the spurious basis that the monies to purchase those T-bills necessarily came from the commingled funds of other customers. Merrill Lynch does not maintain a separate bank account for each of its securities customers. It commingles customer funds in its bank account. Yet that does not invalidate the purchase of securities for a particular account. Indeed, we have found no evidence that any securities firm maintains a separate bank account for each of its customers. The Trustee's suggestion is preposterous.

The requirement that, to be clawed back, a payment must have been made "in furtherance of" a Ponzi scheme reflects the fact that even an entity running a Ponzi scheme can engage in legitimate transactions. *In re Bernard L. Madoff Inv. Securities, LLC,* 458 B.R. 87, 105 (Bankr. S.D.N.Y. 2011) ("it is conceivable that certain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply"). The "in furtherance" element is *in addition to* the first requirement that the debtor operate as a Ponzi scheme, which supplies the basis for finding intent. Accordingly, it restricts the operation of the Ponzi scheme presumption to transfers that are both made by a Ponzi schemer *and* needed to continue that scheme. *In re DBSI, Inc.,* 476 B.R 413, 422 (Bankr. D. Del. 2012); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1 at 13 (S.D.N.Y. 2007); *Foos*, 188 B.R. at 244; *In re ATM Financial Services, LLC*, 2011 WL 2580763, *5 (Bankr. M.D. Fla. June 24, 2011) ("The Ponzi presumption must have some limitations, lest it swallow every transfer made by a debtor, whether or not such transfer has anything to do with the debtor's Ponzi scheme").

Rather than establish that there was a Ponzi scheme and then show that the payments to Defendant were made in furtherance of it, the Trustee starts with his contention that Madoff conducted a Ponzi scheme and then assumes that the payments made to Defendant must constitute

payments "in furtherance of" it, relying on cases that apparently cannot find "any other explanation" for the payments. *In re Bayou Grp., LLC ("Bayou III"),* 396 B.R. 810, 843 (Bankr. S.D.N.Y. 2008), *rev'd in part In re Bayou Grp., LLC*, 439 B.R. 284 (S.D.N.Y. 2010). (Tr. Br. at 14). He then claims that there is "no dispute" that the payments made to Defendant were made with the actual intent to defraud. Here, the Trustee's reasoning is insupportable. Defendant had a written contract with Madoff pursuant to which he had a right to make withdrawals. Madoff was simply fulfilling his contractual obligations to Defendant when he honored his requests to withdraw funds. If he failed to honor a redemption request, Defendant could have quickly obtained a court order compelling Madoff to comply. Compliance with a legal contractual obligation cannot possibly be the basis for a Ponzi scheme finding.

The Trustee's only "evidence" of such "furtherance" appears to be Dubinsky's statement that the total T-bills appearing on customer statements dwarfed the aggregate volume of T-bills actually purchased and held by BLMIS." (Tr. Br. at 33). But the Trustee refused to produce the statements of all Madoff's IA customers and Dubinsky committed perjury and is totally incredible. And the "chart" the Trustee relies upon references only those T-bills held by the PT Business, and not the T-bills held by the Brokerage Firms. While another analysis allegedly performed by Dubinsky addresses the T-bills held by the Brokerage Firms, Dubinsky admitted that he never bothered to add up those T-bills. Given Dubinsky's dishonesty, one can only assume that he added up those T-bills and the result of that exercise did not further the Trustee's fraud. Finally, as explained *infra,* not every IA customer had the same T-bills at the same time.

## IV.    DEFENDANT HAS STRONG AFFIRMATIVE DEFENSES THAT PRECLUDE SUMMARY JUDGMENT

The Trustee argues that Defendant could not have given "value" as a matter of law (Tr. Br. at 15).  On September 24, 2020 in *In re Bernard L. Madoff Inv. Sec. LLC,* No. 19-0429-BK(L), 2020 WL 5666677 (2d Cir. Sept. 24, 2020), a three-judge panel of the Second Circuit affirmed

Judge Engelmayer's decision in *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 596 B.R. 451, 459 (S.D.N.Y. 2019), holding that defendants did not give "value" for the alleged transfers. We believe the Second Circuit's decision is inconsistent with the Bankruptcy Code and that 11 U.S.C. Section 548(c) provides a complete defense to the Trustee's claims.   The Second Circuit also held that Section 548(a)(1) of the Bankruptcy Code is not a statute of repose limiting any potential recovery by the Trustee. We hope these errors will be corrected in further proceedings.

## V.    DEFENDANT IS ENTITLED TO A CREDIT FOR TAXES PAID

It is grossly inequitable to charge Palmedo for purported withdrawals from the Account where they were utilized to pay federal and state taxes on the fictitious profits that Madoff declared. In 2009, the Internal Revenue Service ("IRS") issued a ruling allowing Madoff customers to file for a tax refund for taxes paid in the five years prior to 2008—that is, 2003 to 2007. *See* 26 CFR 6-1.105. Thus, the IRS has recognized that innocent victims of Madoff's fraud like Defendant should never have paid these taxes and it agreed to a simplified and uncontested process for obtaining refunds dating back five years. However, there are no refunds available for any amounts paid before 2003. In the years from 1993 through 2007, Palmedo paid taxes totaling $587,607. He received a refund in the amount of $143,609 pursuant to the IRS ruling. Accordingly, Palmedo paid unrefunded taxes based on the allegedly fictitious profits of $443,998. CMF ¶ 77.  He is entitled to a credit for this amount against any amount for which the court might find Palmedo liable.

## VI.    THE TRUSTEE CANNOT PROVE HIS ALLEGED "LOSSES"

The Trustee does not have any evidence to support $60,000 of alleged withdrawals. CMF ¶ 39. While this withdrawal was allegedly made prior to the transfer the Trustee seeks to recover, it renders the principal balance the Trustee bases his claims upon unsubstantiated. Similarly, the

Palmedo Account received only partial credit in the amount of $150,000 for an "inter-account" transfer of $192,271 made on January 4, 1993 from another account which was opened on April 1, 1991. CMF ¶ 33-34. It is improper for the Trustee to fail to give the Palmedo Account full credit for certain transfers. Disallowing transactions made 15 years before Madoff's fraud was uncovered violates not only the Bankruptcy Code but also New York State law. *See, e.g., Simkin v. Blank*, 19 N.Y.3d 46 (N.Y. 2012) (court declined to reform property settlement incorporated into a divorce decree, even though spouse who received Madoff account ultimately received nothing). *See also Commodities Future Trading Commission v. Walsh,* 17 N.Y.3d 162, 173 (2011) (rejecting clawback in divorce, and holding that "[a]t its core, our rule favoring innocent transferees of stolen funds over defrauded owners is rooted in New York's "concern for finality in business transactions."); *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362 (1991) (on certification, even if the source is questionable, absent fraud by the recipient, the funds cannot be clawed back). .

Separate treatment of accounts is a basic concept of SIPA. "[A] customer who holds accounts with the debtor in separate capacities shall be deemed to be a different customer in each capacity" for purposes of distribution. 15 U.S.C. § 78fff-3(a)(2); *see also* 15 U.S.C. § 78*lll*(11)(C) ("In determining net equity . . ., accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers.") 15 U.S.C. § 78*lll*(11)(B) (a customer's net equity is based on the amounts owed to "customer," the securities positions of "such customer," and any indebtedness of "such customer"). Under the SIPA Rules, "[a]ccounts held by a customer in different capacities, as specified by these rules, shall be deemed to be accounts of 'separate' customers." 17 C.F.R. 300.100(b). Thus, accounts held by partnerships and corporations are treated as separate from the partners or owners of the entity. *Id*. at 300.103. Trust accounts are distinct from their trustee, settlor or beneficiary. *Id.* at 300.104(b). By charging customers with the withdrawals made by transferor account holders, the Trustee is violating the plain language of

SIPA. *See e.g. United States v. Ron Pair Enterprises Inc*., 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, 'the sole function of the court is to enforce it according to its terms'"). As set forth above at III.B.5, even if the Trustee could prove that the Defendant is liable for his own withdrawals, Defendant cannot be held liable for an alleged negative net equity in another Madoff account, not owned by him, from which he received funds 15 years before Madoff confessed.

## VII.    THE TRUSTEE IS NOT ENTITLED TO PREJUDGMENT INTEREST

In a footnote, the Trustee argues that he is "entitled to seek an award of prejudgment interest." (Tr. Br. at 1 n.1). While he may be entitled to "seek" such an award, he is not entitled to it. In *Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992), the Court held that, although discretionary awards of prejudgment interest are permissible under federal law in certain circumstances, the award should be a function of (1) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other principles as are deemed relevant by the court.

The Second Circuit explained that prejudgment interest should not result in over-compensation of the plaintiff, such as when the statute, as here, fixes damages deemed fully compensatory. *Id.* This principle is particularly relevant here because the Trustee's position through these cases has been that no Madoff customer is entitled to any interest or appreciation <u>since 1980</u>. The Second Circuit has approved the Trustee's position. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011). Consistent with that view, although the Trustee allowed some claims in 2009, the Trustee has refused to pay any interest to claimants on their allowed claims although customers have had to wait ten years for full payment of those claims. Indeed, when customers sought allowance of appreciation, since 1980, in the form of an inflation

adjustment, the Trustee successfully opposed that relief. *In re Madoff*, 779 F.3d 74 (2d. Cir. 2015).

Thus, the law of this case is that innocent customers with allowed claims are not entitled to any

interest or appreciation on their money over a 40-year period.  How, then, can the Trustee possibly

demand that innocent customers whose claims the Trustee denied be liable for interest?

The Trustee sues Palmedo under 11 USC § 548 which does not provide for an award of

interest. Section 550 prescribes the remedy for the avoidance of a fraudulent transfer: the statute

limits the recovery to the property transferred or the value of that property. The plain language of

the provision does not include an award of interest. Surely, if Congress had intended that the

plaintiff be awarded interest, Congress would have so mandated.

Prejudgment interest is inappropriate when the defendants, like the Defendant here, did

nothing wrong. *Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,

AFL-CIO,*, 955 F.2d 831, 834 (2d Cir. 1992). *See also Board of County Comm'rs of the County of

Jackson v. United States,* 308 U.S. 343, 352 (1939) ("interest is not recovered according to a rigid

theory of compensation for money withheld, but is given in response to considerations of fairness.

It is denied when its exaction would be inequitable"); *Mecca v. Gibraltar Corp. of Am.,* 746 F.

Supp. 338, 349 (S.D.N.Y. 1990) (same); *Morales v. Walt Disney Prods.,* 361 F. Supp. 1157, 1158

(S.D.N.Y. 1973); *In re Lyondell Chemical Co.,* No. 13 Civ. 3881(RA), 2014 WL 975507, at *10

(S.D.N.Y. Mar. 11, 2014) (affirming award of administrative expense but declining to impose

prejudgment interest). *See also Kramer v. Mahia (In re Khan)*, 14-MC-01674 (PKC), 2016 WL

6652724 at *2-3 (E.D.N.Y. Nov. 10, 2016)(declining to impose prejudgment interest in a case

where the transferee had not made the transfer with actual intent to hinder, delay, or defraud his

creditors or wrongfully retained or secreted away the transferred funds); *Carrier Corp. v. Buckley

(In re Globe Mfg. Corp.)*, 567 F.3d 1291, 1300 (11th Cir. 2009)(affirming the bankruptcy court's

denial of prejudgment interest where the defendant's position was reasonable, the parties' dispute

was genuine, and there was no evidence that either party was responsible for delaying the dispute's resolution.)

As Judge Chin recognized in approving a receiver's decision not to claw back funds from innocent investors, clawback actions can be "cruel." *SEC v. Byers,* 637 F. Supp.2d 166 (S.D.N.Y. 2009) ( "[m]any of the investors may not have the money, and litigation to collect it would be expensive, time-consuming and, in some instances, cruel."). Here, the Trustee made the "cruel" decision to seek to claw back withdrawals taken by innocent Madoff customers who, in many instances, lost their life's savings and paid capital gains taxes on fictitious profits, in some instances, for decades. In the process of this proceeding, the Trustee has enriched himself and his law firm to an unprecedented extent. Remarkably, the Trustee has even been so callous as recently to terminate the "hardship" program he instituted in 2009. *See.* https://www.madofftrustee.com/hardship-program-17.html.

As the Trustee knows, Palmedo is, himself, a victim of fraud: his funds were deposited with Madoff for 15 years. In each year, he paid state and federal taxes on the purported gains in his account. It would be "cruel" to add prejudgment interest on top of this loss. Indeed, the Trustee has never been paid any interest by any former Madoff customer.

### A.    Palmedo Disputed the Trustee's Claims in Good Faith

Prejudgment interest should not be imposed where, as here, there is a good-faith dispute regarding whether a defendant is liable, or where it is the plaintiff who is responsible for any delay. *Wickham,* 955 F.2d at 834. *See also Redfield v. Bartels,* 139 U.S. 694 (1891) (suit to recover duties wrongfully imposed; interest denied since plaintiff neglected to bring suit for years).

While we anticipate that the Trustee will claim that liability was clear at the outset, nothing could be further from the truth. The Trustee filed suit against Palmedo in December 2010 but it was not until 2015 that the Supreme Court denied the Trustee's cert petition seeking review of the

Second Circuit's decision dismissing all of the Trustee's claims under New York law and under provisions of the Bankruptcy Code other than 11 U.S.C. Section 548(a)(1)(A). Moreover, the Bankruptcy Court did not decide Palmedo' motion to dismiss until July 2015. After issue was joined, the Trustee delayed discovery unconscionably – in a concerted effort to conceal the material evidence that Madoff (not the LLC) owned the JPMC accounts from which Palmedo was paid and that Madoff actually purchased securities with IA customers' money.

Even the cases cited by the Trustee do not mandate the imposition of prejudgment interest. In *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. Nos. 10-04387 (SMB), 10-04488 (SMB), 10-04350 (SMB), 10-05110 (SMB), 2018 WL 1442312, at *15 (Bankr. S.D.N.Y. Mar. 22, 2018), this Court noted that the Trustee had, as here, only addressed his claim for prejudgment interest in footnotes. Accordingly, this Court held that the parties could "address in a more conventional manner whether a discretionary award of interest is appropriate" after any judgment had been entered. Similarly, in *Picard v. Goldenberg*, Adv. Pro. No. 10-04946 (SMB), 2018 WL 3078149, at *6 (Bankr. S.D.N.Y. June 19, 2018), where the Trustee once again raised the issue in a footnote, this Court told the Trustee to "seek to raise the issue in the event the District Court enters a final judgment in his favor." Finally, in *In re Cassandra Grp.*, 338 B.R. 583, 599 (Bankr. S.D.N.Y. 2006), the court imposed prejudgment interest based on avoidance under New York substantive law. Here, to the contrary, the Trustee's claims under New York law were dismissed as violative of 11 U.S.C. § 546(e).

## <u>CONCLUSION</u>

For all of the foregoing reasons, this Court should deny the Trustee's motion for summary

judgment and should enter judgment dismissing the complaint with prejudice.

Dated:    October 2, 2020          **CHAITMAN LLP**
New York, New York

By:    */s/ Helen Davis Chaitman*
      Helen Davis Chaitman
      465 Park Avenue
      New York, New York 10022
      Phone & Fax: 888-759-1114
      hchaitman@chaitmanllp.com

      *Attorneys for Defendant*