**CHAITMAN LLP**
Helen Davis Chaitman
465 Park Avenue
New York, New York 10022
Phone & Fax: 888-759-1114
hchaitman@chaitmanllp.com

*Attorneys for Defendant*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                  Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                  Defendant. | Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                  Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                  Plaintiff,<br><br>v.<br><br>PHILIP F. PALMEDO,<br><br>                  Defendant. | Adv. Pro No. 10-04749 (SMB) |

**DEFENDANT'S COUNTERSTATEMENT OF MATERIAL FACTS IN OPPOSITION TO THE TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT DISMISSING THE COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION**

       Defendant Philip F. Palmedo ("Defendant"), submits this counterstatement of material

facts in opposition to the motion of the Plaintiff, Irving H. Picard (the "Trustee"), the Trustee for

{00045268 1}                  1

the Liquidation of Bernard L. Madoff Investment Securities, LLC (the "LLC"+-), for summary judgment, pursuant to Local Rule 56.1, and in support of Defendant's cross-motion for summary judgment dismissing the complaint for lack of subject matter jurisdiction.

**Madoff Business**

1. From the 1960s on, Madoff operated two separate business units through his sole proprietorship called Bernard L. Madoff Investment Securities ("BLMIS"). Madoff operated a legitimate trading business which, at times, executed trades equal to 10% of the daily volume on the New York Stock Exchange (the "Legitimate Trading Business"). The Legitimate Trading Business included both proprietary trading ("PT"), which traded securities for its own account, and market-making ("MM"), which created a market in certain securities and acted as a broker-dealer for all of the major investment firms. Declaration of Helen Davis Chaitman, executed on October 2, 2020 ("Chaitman"), **Ex. A** [Nelson Tr.[1] 5/8/19 at 63:6:11; 63:14-1], and an investment advisory business ("IA"). Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 63:3-4].

2. The Legitimate Trading Business was known internally as "House 5." Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 62:18-19].

3. The IA business was known internally as "House 17" since it was located on the 17th floor of the Lipstick Building. Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 63:4-6].

4. There were approximately 172 employees who worked in the Legitimate Trading Business and only 6 to 8 people who worked in the IA business. Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 168:14-17].

5. All of the banking activity of the Legitimate Trading Business was conducted at

---

[1] *Picard v. Carol & Stanley Nelson*, ("*Nelson*"), Adv. Pro. Nos. 10-04377 and 10-04658. The trial of this consolidated case was held on May 8 and 9, 2019 and references to the transcript of the trial appear as "Nelson Tr. [date] at [page reference]."

the Bank of New York ("BNY"). Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 161:5-8].

6. The PT and MM Businesses were legitimate, and were not involved in an alleged Ponzi scheme. Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 63:2-24 ("Q. So, was the prop side [PT and MM] of the business designed to buy and sell securities? A. Absolutely."); 64:10-14 ("Q. . . . So, the proprietary trading side of the business bought and sold securities? A. Absolutely. Q. The investment advisory side? A. Never."); 68:7-16 ("Q. So, the proprietary trading side of the business had a trading platform? A. It had a trading platform and it actually traded. That's what it did."); 122:15-21 ("Q. And was the proprietary trading business actually buying stock during that period? A. Yes. The proprietary trading business was buying stock for the proprietary trading desk and for the market-making clients of that side of the business."); 150:18-25 ("The proprietary trading, in fact, was investing…"); 168:8-17 (the PT and MM business were not involved in a Ponzi scheme, "Q. So out of the whole operation of 180 or so employees, it's 8 to 10 employees who, in your opinion, were involved in a Ponzi scheme; is that right? A. That's correct.")].

7. Madoff operated his entire business as a sole proprietorship until January 2001. Adv. Pro. No. 08-01789 (SMB), ECF Nos. 10089, 10679 and 10681; *see e.g.* Complaint ("Compl.") at ¶ 19, Adv. Pro. No. 10-04749 (Bankr. S.D.N.Y. December 1, 2010), ECF No. 1.

8. Madoff used the trade name "Bernard L. Madoff Investment Securities" for his sole proprietorship from at least the 1970's. Chaitman **Ex. A** [Nelson Tr. 5/8/19 172: 9:17 (Q. You're aware, are you not, that Mr. Madoff used the tradename Bernard L. Madoff Investment Securities prior to his formation of the LLC? A. Yes. I saw it on many documents, yes."]; Chaitman **Ex. B** [Confirmation Slips dating from 1979 showing the trade name Bernard L. Madoff Investment Securities [10-5420_Defendant_0002412-13]][2]; *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv.*

---

[2] Attached to the Chaitman Declaration as **Ex. B** are copies of confirmation slips dating from 1979 to the Unflats, who were Madoff customers, showing credits to their account from "Bernard L. Madoff Investment Securities."

{00045268 1}                                3

*Sec. LLC*, 610 B.R. 197, 206 (Bankr. S.D.N.Y. 2019). Even the account statement for the 703 account for December 2008, the final month of the LLC's operations, lists the account as owned by the trade name "Bernard L. Madoff Investment Securities" without any reference to the LLC. Chaitman **Ex. C** [703 Account Statement for December 2008].

9. In January 2001, Madoff formed the LLC to which he transferred the PT and MM businesses, managed by his two sons. *See* Chaitman **Ex**. **D** [SEC Amended Form BD]; *see* Compl. at ¶ 19.

10. In January 2001, Madoff notified BNY and the governmental agencies with which the Legitimate Trading Business dealt that the LLC was formed and would operate the Legitimate Trading Business. *See* the following notification letters all dated January 1, 2001: Chaitman **Ex. E** [Letter from the LLC to BNY; Letter from LLC to the National Securities Clearing Corporation; Letter from the LLC to the Options Clearing Corporation; and Letter from the LLC to the Depository Trust Company].

11. Neither JPMC nor Madoff has any record of any such letter ever being sent to JPMC. Chaitman **Ex. F** [Email dated June 12, 2018 from counsel to Trustee, Maximillian Shifrin to Helen Davis Chaitman].

12. Madoff did not transfer the IA Business to the LLC. *See e.g.* Chaitman **Ex**. **D** [SEC Amended Form BD at 8-10].

13. Madoff did not register with the SEC as an investment advisor until late 2006. *Id.; In re Bernard L. Madoff Inv. Secs., LLC*, 424 B.R. 122, 127 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229 (2d Cir. 2011).

**The Bank Accounts**

    **The LLC Account**

14. As set forth above at ¶¶ 5 and 10, the Legitimate Trading Business maintained an account with BNY. Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 161:5-8]. In January 2001, Madoff

{00045268 1 }                                                       4

notified BNY that the LLC was formed and would operate the Legitimate Trading Business. Chaitman **Ex. E** [Letter from the LLC to BNY].

15.   The LLC account at BNY was used to fund all of the expenses of the Legitimate Trading Business, including the purchase of securities. Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 161:14-16].

16.   Between $700 and $800 million was transferred from the IA business to the Legitimate Trading Business just in the period from 2000 to 2008. Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 161:3-8 ("hundreds and hundreds of millions of dollars just since 2000 that was transferred from the 703 account [the IA business account] to the Bank of New York account"); *id.* at 161:20- (the money was "put over to the prop trading business."); *id.* at 161:21-162-:2 (Q. "[I]n the period from 2000 through 2008, how much money in total was transferred from the 703 account, which was exclusively investment advisory customers money, to the Bank of New York account, which was exclusively prop trading? A. [A]bout $700 or $800 million.")].

17.   The $700 - $800 million of transfers from the IA business' account at JPMC to the Legitimate Trading Business were used by the LLC for its business purposes. Madoff testified that transferring the money from the 703 Account to the BNY Account "allowed us to meet the margin calls of the clearing corporation. That is typical of the industry."  Chaitman **Ex. G** [Madoff Dep. Tr. 4/26/2017 at 24:6-25:13]; *see also, e.g.* Chaitman **Ex. H.** [Letter dated January 24, 2011 from Stephen P. Harbeck at SIPC to Scott Garett at The U.S. House of Representatives.

**The 703 Account**

18.   The IA Business placed its customer deposits into an account at JPMC ending in "703" (the "703 Account"). Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 81:20-82:1].

19.   As of December 2001, almost a year after the LLC was formed, JPMC customer statements for the 703 Account indicated that the account was held in the name of "Bernard L. Madoff." Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 14:1-23]; Chaitman **Ex. I** [703 Account Statement

{00045268 1 }                                                                           5

for December 2001]. Thereafter, the 703 Account name was in Madoff's trade name, Bernard L. Madoff Investment Securities. The 703 Account was never in the name of the LLC and there is not a single document produced by JPMC which suggests that the LLC owned the 703 Account. *See e.g.* Chaitman **Ex. F** [Email dated June 12, 2018 from counsel to Trustee, Maximillian Shifrin to Helen Davis Chaitman]; Chaitman **Ex. J** [Compilation of 509 Account Statements]; Chaitman **Ex. K** [Compilation of 703 Account Statements]; Chaitman **Ex. E** [Letter from the LLC to BNY; Letter from LLC to the National Securities Clearing Corporation; Letter from the LLC to the Options Clearing Corporation; Letter from the LLC to the Depository Trust Company].

20. Moreover, through August 2002, the JPMC customer statements for the 703 account indicated that the account was held in the name of "Bernard L. Madoff." Chaitman **Ex. L** [703 Account Statement August 1 – August 30, 2002 in the name of "Bernard L. Madoff"]. In September 2002, the 703 account statements from JPMC indicated the customer as BLMIS, the trade name for Madoff's sole proprietorship. Chaitman **Ex. M** [703 Account Statement August 31- September 30, 2002 in the trade name of "Bernard L. Madoff Investment Securities"].

21. Through 2008, the endorsement stamp for checks deposited into the 703 Account read "For deposit only Bernard L. Madoff." Chaitman **Ex. N** [Check dated July 16, 2008 [3] paid to "Bernard Madoff Securities" [JPMSA10013257]].

22. As late as December 2008, the statements for the 703 Account continue to list the account as owned by the sole proprietorship, BLMIS, without any reference to the LLC. Chaitman **Ex. C** [703 Account Statement for December 2008].

---

[3] The deposit check referenced is merely an example, and belongs to the account of Zieses Investment Partnership, since of the two deposit checks made to fund Account No. 1CM142 (the "Palmedo Account") only a copy of the front of the deposit check dated December 20, 1995 in the amount of $50,0000 was produced. *See* Chaitman **Ex. O** [Check dated December 16, 1995 paid to "Bernard L. Madoff Investment Securities" in the amount of $50,000 [PALMEDO 000014]; *see also* Compl., Ex. B.

{00045268 1}                                    6

**The 509 Account**

23.     Madoff held an account at JPMC ending in "509" (the "509 Account"). Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 81:20-82:1].

24.     The 509 Account was opened and held by Madoff's sole proprietorship long before the LLC came into existence in 2001. *See e.g.* Chaitman **Ex. P** [509 Account Statement from 1998].

25.     There is not a shred of evidence that either the 703 or the 509 Account was ever held in the name of the LLC. On the contrary, all of the evidence indicates that these accounts were always held by Madoff individually. Chaitman **Ex. Q** [Nelson Tr. 5/9/19 at 8:14-19, 9:12-10:5-21, 12:5-18:6; 26:24-29:11].

26.     The Trustee's expert witnesses, Bruce Dubinsky and Lisa Collura (whose firm was paid over $40 million by the Trustee) have never seen a bank statement for either the 509 Account or the 703 Account in the name of the LLC. Chaitman **Exs. A and Q** [Nelson Tr. 5/8/19 at 171:23-172:8, Nelson Tr. 5/9/19 at 13:7-20].

27.     The 509 account statements and checks were always in the name of Bernard L. Madoff. *See* Chaitman **Ex. J** [Compilation of 509 Account Statements]; Chaitman **Ex. R** [Compilation of Checks written from "Bernard L. Madoff" to "Philip F. Palmedo"].

28.     The designation "LLC" never appeared on the statements for either the 703 or the 509 Account. Chaitman **Ex. J** [Compilation of 509 Account Statements]; Chaitman **Ex. K** [Compilation of 703 Account Statements].

29.     Madoff used the trade name "Bernard L. Madoff Investment Securities" for his sole proprietorship interchangeably with the name "Bernard L. Madoff", (Chaitman **Ex. Q** [Nelson Tr. 5/9/19 at 18:23-19:10]; Chaitman **Ex. B** [Confirmation Slips dating from 1979 showing the trade name Bernard L. Madoff Investment Securities [10-5420_Defendant_0002412-13]]; Chaitman

{00045268 1 }                                                    7

**Ex. S** [July 17, 1991 letterhead of Bernard L. Madoff Investment Securities]), and for years prior to the formation of the LLC. Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 172:9-12].

**Account No. 1CM142 (the "Palmedo Account")**

30.  The Palmedo Account was opened on January 4, 1993 with an inter-account transfer in the amount of $192,271 from BLMIS account no. 1C0019-30, a C & M Trading Account (the "Transferor Account") held by Palmedo. *See* Chaitman **Ex. T** [Portfolio Management Report as of December 31, 1993 reflecting a starting equity of $192,270.99 on January 4, 1993 [PALMEDO000034]; *see also* Compl., Ex. B, line 1. However, the Trustee has failed to fully credit this transfer. *See infra* at ¶¶ 33-35.

**Deposits into the Palmedo Account**

31.  Subsequent deposits into the Palmedo Account were made by check paid to "Bernard L. Madoff Investment Securities". *See* Chaitman **Ex. O** [Check dated December 20, 1995 paid to "Bernard L. Madoff Investment Securities" in the amount of $50,000 [PALMEDO 000014]]; *see also* Compl., Ex. B, noting a deposit made by check dated April 1, 1993 in the amount of $25,000.

32.  The total cash deposits credited were $75,000. *See* Compl., Ex. B, Column 4. However, the Trustee has failed to fully credit the opening deposit in the amount of $192,271. *See supra* at ¶ 30 and *infra* at ¶¶ 33-35.

**The Trustee Has Failed to Properly Credit the Palmedo Account's Inter-Account Transfer**

33.  The Trustee has failed to fully credit the Palmedo Account's opening deposit, consisting of an inter-account transfer in the amount of $192,271 dated January 4, 1993. *See* Chaitman **Ex. T** [Portfolio Management Report as of December 31, 1993 reflecting a starting equity of $192,270.99 on January 4, 1993 [PALMEDO000034]]; *see also* Complaint at Ex. B, line 1.

34. The Trustee has only credited the Palmedo Account with $150,000 of this inter-account transfer. *See* Greenblatt Report, ECF 105-10 at ¶¶ 14-15; *and see* Greenblatt Report. Ex. 4a, ECF No. 105-14 and 4b, ECF No. 105-15; *see* Compl., Ex. B, line 1.

35. The Trustee claims that the uncredited amount constitutes a transfer of "fictitious profits." *See* Compl., Ex. B, n.1.

**The Transferor Account (C & M Trading Account No. 1C0019-30)**

36. The Transferor Account was opened in June 1991 with an initial deposit of $100,000. *See* Chaitman **Ex. V** [Account Agreement and Letter from Palmedo to Cohn dated June 18, 1991 requesting to open an account with a deposit in the amount of $100,000; and Letter from Cohn to Palmedo dated June 19, 1991 acknowledging deposit [PALMEDO000020-22]].

37. A subsequent deposit was made in December 1991 by check in the amount of $50,000. *See* Chaitman **Ex. W** [Letter from Cohn to Palmedo dated December 9, 1991 acknowledging a subsequent check deposit in the amount of $50,000 [PALMEDO000016]].

38. The total equity in the Transferor Account as of December 31, 1992 was $191,960.18. *See* Chaitman **Ex. U** [Portfolio Management Report as of December 31, 1992 reflecting a total equity of $191,960.18 [PALMEDO000015]].

**Withdrawals from the Palmedo Account**

39. Throughout the life of the Palmedo Account, withdrawals were paid by checks drawn from the 509 Account paid by "Bernard L. Madoff" to "Philip F. Palmedo". *See* Chaitman **Ex. R** [Compilation of Withdrawal Checks [MADWAA00048660; MADWAA00073133; MADWAA0222573; MADWAA00293605]. The Trustee is missing third-party evidence of an alleged withdrawal in the amount of $60,000 dated October 21, 1998. *See* Collura Report at Ex. 3, ECF No. 103-24; *see e.g.* Compl., Ex. B.

40. Defendant never received any payments from the LLC. *See id*.

**T-Bill Purchases**

41. Madoff testified that he consistently purchased T-Bills with IA customer funds:

> Q. So you basically took the money that went into the 703 account?
> A. Correct.
> Q. Which was the investment advisory customers' money?
> A. Correct.
> Q. And you purchased Treasury bills with that?
> A. Correct…

Chaitman **Ex. G** [Madoff Dep. Tr. 4/26/17 at 19:1-21].

> Q. . . Let's say that customer A sent you a million dollars for the split-strike program.
> A. It went into - - -
> Q. What - -
> A. - - treasury bills." . . .

Chaitman **Ex. X** [Madoff Dep. Tr. 12/20/16 at 161:12-25].

42. Madoff testified that he purchased T-bills through accounts that he maintained at Bear Stearns, Fidelity, Lehman Brothers, JPMorgan Chase, and Morgan Stanley. *See* Chaitman **Ex. G** [Madoff Dep. Tr. 4/26/17 at 46:9-47:12].

43. Madoff's testimony concerning his investment of customer funds in T-bills is validated by the third-party records in the Trustee's possession. *See* Chaitman **Ex**. **Y** [Compilation of Bear Stearns Statements and 703 Account Statements].

44. Madoff explained that these bore an interest rate of approximately 3%-4%, which was money earned with the IA customers' funds. Chaitman **Ex. G** [Madoff Dep. Tr. 4/26/17 at 19:1-21].

45. While Madoff acknowledged that the IA customer statements often reflected the ownership of Fortune 100 company securities that had not been bought in connection with the purported split-strike conversion strategy, the account statements also reflected the ownership of T-bills that he actually did purchase. *Id. at* 19:22-20:1.

46. Madoff testified that "by the time we were finished in 2008 . . . we [the LLC] represented ten percent of the United States' volume in – in [legitimate, market-making] transactions." Chaitman **Ex. X** [Madoff Dep. Tr. 12/20/16 at 54:21-56:25, quote at 56:8-17].

47. The Trustee's witnesses testified to having seen "anecdotal evidence" that Madoff [the LLC] conducted trades equal to approximately 10 percent of the daily volume of the New York Stock Exchange as a whole. Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 162:7-11].

48. Madoff testified that he never required the deposits of other customers to pay out existing customers, and until the market was collapsing when no one ever requested it. *See* Chaitman **Ex**. **G** [Madoff Dep. Tr. 4/26/17 at 30:10-22; 31:2-25].

49. Madoff testified that his fraud began post-1992, likely 1993. *Id.* at 11:10-12:4.

50. Madoff testified that Frank DiPascali purchased T-Bills with IA customers' money. *Id.* at 29:10-30:1; *see e.g. id. at* 28:4-30:1.

51. The receipts from the sale or redemption of T-bills were paid into the 703 Account by the brokerage houses, including Bear Stearns and JPMC. Chaitman **Ex. Y** [Bear Stearns March 2005 Statement, *see* Deposits and Withdrawals entry for March 30, 2005; Bear Stearns September 2005 Statement, *see* Deposits and Withdrawals entry for September 30, 2005; Bear Stearns December 2005 Statement, *see* Deposits and Withdrawals entry for December 21, 2005; June 2008 703 Account Statement, *see* first of four entries for 6/26].

52. Joann Crupi, a Madoff employee who worked on the 17th floor of the Lipstick Building, testified that Frank DiPascali used to tell her when he was about to buy T-Bills and would then tell her to whom to allocate them. Chaitman **Ex. Z** [Crupi Tr. 165:6-22].

53. Frank DiPascali testified that Madoff told him to which accounts the T-Bills should be credited. *See generally,* Chaitman **Ex**. **AA** [DiPascali Tr. 5344:9-5346:2; 5345:7-25].

54. DiPascali further testified that a spreadsheet bore the account numbers "that Bernie told us he wanted to use to be the counterparties of the customer option positions" and that "this

{00045268 1 }                                          11

spreadsheet allows me to randomly pick a group of treasuries that were going to represent that collateral." Chaitman **Ex**. **AA** [DiPascali Trial Testimony, 12/10/13 at 5345:7-25]; and Chaitman **Ex. AB** [the spreadsheet to which DiPascali referred, Government Exhibit 105-c171].

55. Madoff testified that, as with other entities in the industry, he maintained records for only six years, so there would not always be trade confirmations in their records. Chaitman **Ex. X** [Madoff Dep. Tr. 12/20/16 at 133:12-134:2]. Madoff testified that, during the 1980's, there would not always be third party confirmations because there were clearing houses that issued continuous net settlement printouts. *Id.* at 130:20-23; 132:12-24.

56. Madoff testified that when he was dealing as principal there was no counterparty since he was on both sides of the trade. *Id*. at 128:7-12.

**Dubinsky's Testimony**

57. On direct examination at the *Nelson* trial, Dubinsky repeatedly testified that no securities were ever purchased with IA customers' money.

> Q. . . . So, the proprietary trading side of the business bought and sold securities?
> A. Absolutely.
> Q. The investment advisory side?
> A. Never.

Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 64:10-14, *see also* Nelson Tr. 5/8/19 at 73:6-14; 74:1-3; 74:19-23; 75:17-20].

> Q. I think you've answered this question but based on your review of the computer systems at BLMIS, were you able to determine if any trades were being processed through the investment advisory business computers?
> A. I was able to make that determination and the answer is they were not. There was no evidence, Your Honor, of any trades being executed through the IA business computer systems whatsoever.

*Id*. at 80:4-15.

> Q. So, to wrap up this issue, please summarize your conclusions concerning the source of funds flowing out of the investment advisory business to customers. Where was that money coming from?
> A. Customer money. Just other customers' money.

> Q. Did your conclusion that the BLMIS investment advisory business did not have a connected trading platform have anything to do with your conclusion that the investment advisory business was being operated as a Ponzi scheme?
> A. Absolutely.
> Q. Why?
> A. Because without the ability to actually connect to the market and trade and no evidence of those trades ever occurring, coupled with what I just testified about, that the only money I saw was customer money in and customer money out, no accretion to that 703 account from any sort of trading profit dividends -- that's the classic example of a Ponzi. There's nothing going on. You're taking money from people, you're promising that you're going to do something with it, and then you pay them back as if you're fulfilling your promise.
> Q. So, in addition to the not-connected trading platform, did your conclusion that the customer deposits were used to pay customer redemptions have any bearing on your conclusion that the investment advisory business was being operated as a Ponzi scheme?
> A. It did. As I just said, the lack of other funds from trading profits, from dividends, from real results of actual trading -- the lack of that played into the conclusion that this was simply a Ponzi. Just taking money in and paying it back.

*Id.* at 94:6 – 95:11.

> Q. Were you able to obtain DTC treasury records for BLMIS?
> A. I was. For the period of 2002 through 2007, I was able to obtain those records, and then I performed an analysis, identified the -- first I went and identified the unique treasury bills held by the prop trading business on December 31 of every year. I compared those holdings to the holdings at DTC, and I also compared those holdings to the IA business. And what I found, similar to the equities, is that the prop trading that the -- and the treasury bills weren't a big part of the prop trading, but the treasury bills that were held by the prop trading matched to the DTC records, and that was based on the treasury CUSIP, and in contrast none of the CUSIPs held at the DTC matched those that were supposed to have been bought for the IA customers. So, again, it was a process of elimination. Once I matched everything to the prop trading, to the DTC -- were there any other DTC records left? No. Now I'm left with this tranche of purported treasuries for the IA business that have no support, no evidence of ever being purchased.

*Id.* at 128:19 – 129:12.

> Q. . . .please summarize your conclusions concerning the source of funds flowing out of the investment advisory business to customers. Where was that money coming from?
> A. Customer money. Just other customers' money."

*Id.* at 92:16-93:3.

> Q. Based on your review of the BLMIS Investment Advisory books and records, were you able to determine if Mr. Madoff's allocation concerning treasuries was accurate?

{00045268 1}                                    13

> A. It confirmed my analysis in finding that no treasuries were bought or traded for any of the investment advisory clients.

*Id*. at 129:9-14.

> A. There was no evidence of treasuries being purchased for the IA business customers, plain and simple.

*Id*. at 132:9-14.

58. Dubinsky testified on direct examination that there is "no evidence [of activity in the 703 account] other than money coming in from customers and money going out to customers," *id*. at 92:16-17, and a minimal amount (3% of the total monies in the 703 Account) from overnight sweeps, *id*. at 83:3-15; 85:3-21. He swore that there was "never any addition to the 703 Account that [he] saw when [he] examined the bank accounts to show that money was coming from trading profits." *Id.* at 84:1-3.

59. Dubinsky testified that he "scoured every bank record and didn't find any other use of customer funds other than payments to customers and bank sweeps at night at JPMC." *Id*. at 153:14-16.

60. On cross examination, however, Dubinsky admitted that reliable third-party records show that the IA business did, in fact, buy T-bills with money from the 703 Account and that the T-bills paid interest. *Id.* at 166:17-18 ("Q. And those T-bills paid interest, right? A. Those T-bills paid interest.").

61. Dubinsky admitted that he knew that Madoff maintained several brokerage accounts through which he purchased T-bills using money taken from the 703 Account. *Id.* at 90:25-91:2 ("A. No. There were several brokerage accounts, that money was taken from the 703 account and put into, that purchased some treasuries."); 155:2-4 ("A. There was money taken out of the 703 account, transferred to these accounts, these various accounts, and then these securities were purchased, yes.").

62. Dubinsky named the following firms that held these accounts: Lehman Brothers, Bear Stearns, JPMorgan Chase and Morgan Stanley and he acknowledged that "those T-bills paid interest." *Id.* at 154:2-9; 166:17-18.

> Q. But in any event, you're now telling us that you're aware that there were approximately eight accounts at which Madoff was using investment advisory customers' money to purchase T bills. Isn't that true?
> A. That is correct, yes.
> Q. Okay. And those accounts included Lehman Brothers.
> A. Correct.
> Q. Bear Sterns.
> A. That's correct.
> Q. JP Morgan Chase.
> A. Correct.
> Q. Morgan Stanley.
> A. There was a Morgan Stanley account, yes.

*Id.* at 154:2-9.

63. While, on direct examination, Dubinsky testified that he found no evidence of IA customer T-bills in the DTC records, he admitted on cross-examination that Madoff kept securities with the financial institutions from which he had purchased them:

> Q. Well, you testified that in trying to analyze Madoff's stock and T-bill position, you went only to the DTC records.
> A. Correct.
> Q. But isn't a fact that Mr. Madoff also kept securities with financial institutions from which he bought them?
> A. As in the eight brokerage accounts, yes.

*Id.* at 177:16-18-21.

64. Additionally, while another analysis allegedly performed by Dubinsky addresses the T-bills held by the Brokerage Firms, Dubinsky did not add up all those T-bills. *See e.g.* Dubinsky Report ¶ 227, Table 5; and ¶¶ 232-240, ECF No. 104-1.

**T-Bill Purchases for the Palmedo Account**

65. Madoff purchased significant amounts of T-Bills for the Palmedo Account and held them throughout the time they were credited to the Palmedo Account, for example:

**T-Bills (due 4/3/08) CUSIP No. 912795D65**

66. On December 13, 2007, Madoff purchased $300,000,000 of a T-Bill (due 4/32008) (CUSIP No. 912795D65[4]) from JPMorgan. Chaitman **Ex. AC** [Chart, JPMSAA0020018].

67. On December 31, 2008, Madoff credited $1,175,000 of those T-Bills to the Palmedo Account, with a value of $1,165,000.75. Chaitman **Ex. AC** [Chart, MDPTPP00816225].

68. On March 19, 2008, Madoff sold all $1,175,000 of those T-Bills and credited the Palmedo Account with $ 1,174,459.50. Chaitman **Ex. AC** [Chart, MDPTPP00816233].

69. On the maturity date of April 3, 2008, Madoff redeemed all $300,000,000 of those T-Bills at face value. Chaitman **Ex. AC** [Chart, JPMSAB0003961].

70. Third-party records show that Madoff held these T-Bills throughout the period during which they appeared on the Palmedo Account customer statement, buying $300,000,000 of them on December 13, 2007 for a total of $297,312,000, and redeeming them on the maturity date of April 3, 2008 at face value of $300,000,000. Chaitman **Ex. AC** [Chart, JPMSAB0003961].

71. These T-Bills (CUSIP No. 912795D65) were not held by our other clients at the

---

[4] The CUSIP numbers listed herein may not all appear on the customer statements. The maturity dates of the T-bills, however, have been matched to the CUSIP numbers available on https://www.treasurydirect.gov/instit/annceresult/annceresult_query.htm. This Court may take judicial notice of this pursuant to Fed. R. Evid. 201(b)(2) (The court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.). *See Abely v. Aeterna Zentaris Inc.,* 2013 WL 2399869, at *21 (S.D.N.Y. May 29, 2013) (documents on a government website "are published by government sources from which the Court may appropriately take judicial notice."); *see also Lilakos v. New York City,* 2020 WL 1696118, at *4, n.4 (2d Cir. Apr. 8, 2020) (taking judicial notice of a form available online at nyc.gov website); *Apotex Inc. v. Acorda Therapeutics, Inc.,* 823 F.3d 51, 60, n.3 (2d Cir. 2016) (taking judicial notice of a document published on regulations.gov, a government website, "because the Guidance is publicly available and its accuracy cannot reasonably be questioned."); *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.,* 638 F. App'x 43, 47, n.2 (2d Cir. 2016) (taking judicial notice of public records contained on the Georgia Secretary of State's website).

same time: Chaitman Ex. **AD** [December 2007 customer statements for Lisa B. Nissenbaum, Doron Tavlin, Boyer Palmer, and Harry Smith.]

### T-Bills (due 8/9/07) CUSIP No. 912795ZU8

72. On May 9, 2007, Madoff purchased $300,000,000 of a T-Bill (due 8/9/07) (CUSIP No. 912795ZU8) from JPMorgan. Chaitman **Ex. AC** [Chart, JPMSAA0015295].

73. On June 26, 2007, Madoff credited $1,075,000 of those T-Bills to the Palmedo Account, with a value of $1,069,205.75. Chaitman **Ex. AC** [Chart, MDPTPP00816196].

74. On July 31, 2007, Madoff sold all $1,075,000 of those T-Bills and credited the Palmedo Account with $1,073,688.50 Chaitman **Ex. AC** [Chart, MDPTPP00816200].

75. Third-party records show that Madoff held these T-Bills throughout the period during which they appeared on the Palmedo Account customer statement, buying $300,000,000 of them on May 9, 2007 for a total of $296,373,666.66, and redeeming them on the maturity date of August 9, 2007 at face value of $300,000,000. Chaitman **Ex. AC** [Chart, JPMSAB0003373].

76. The Palmedo Account held securities in the amount of $1,033,504.12 two years prior to Madoff's confession on December 11, 2008. Chaitman **Ex. AE** [Customer Statement dated 11/30/06 [MDPTPP00816154-158 at MDPTPP00816156]].

**Defendant Paid Taxes on Alleged Fictitious Profits in the Palmedo Account**

77. In the years from 1993 through 2007, Palmedo paid taxes totaling $587,607 and received a refund in the amount of $143,609 for the years 2003 through 2007 pursuant to Internal Revenue Service ruling pursuant to 26 CFR 6-1.105. Accordingly, Palmedo paid un-refunded taxes based on the allegedly fictitious profits of $443,998. *See* Chaitman **Ex. AF** [Declaration of Steven Albanese, C.P.A. dated May 22, 2017 at ¶ 8 and Ex. A].

**The Trustee's Misrepresentations**

78. The Trustee has consistently represented, from 2008 to the present, that Madoff never purchased any securities with IA customers' money. Declaration of Helen Davis Chaitman dated 5/6/2019, *Picard v. Nelson*, Adv. Pro. No. 10-04377, ECF No. 156-1, Ex. A.

79. The Trustee has refused to produce trading records and all of the customers' account statements. Declaration of Helen Davis Chaitman dated 4/11/2018, *Picard v. Nelson*, Adv. Pro. No. 10-04377, ECF No. 86-1; s*ee also* Trustee Response to Defendants' Document Demands and Interrogatories served in Adv. Pro. No. 10-04995 and dated April 8, 2016, [Response to Request No. 2], *Picard v. Wilenitz*, Adv. Pro. No. 10-04995 ECF No. 70-2].

**This Court's View That Summary Judgment is Not Appropriate**

80. This Court has held that summary judgment is not appropriate in the claw back cases, *see e.g. Picard v. Legacy Capital, Ltd.,* 603 B.R. 682 (Bankr. S.D.N.Y. 2019); *Picard v. Mann,* 608 B.R. 165 (Bankr. S.D.N.Y. 2019).

81. This Court has expressed the same concerns at a recent hearing regarding the Trustee's announced intention to move for summary judgment in another, similar case, *Picard v. Savin,* Adv. Pro. No. 10-04889. *See* March 17, 2020 Hearing Tr. 9:23-10:15; 12:11-15, *id.* at ECF No. 96 ("[y]ou know my view on these summary judgment . . . , motions, particularly on the issues I've identified, [whether the JPMC Accounts were held by Madoff personally or by the LLC, whether the LLC was a Ponzi scheme, and if so, when it began, whether the LLC was allocating T-bills purchased by the proprietary trading arm to customers of the IA business, deposits and withdrawals] . . . I have to try it.").

Dated: October 2, 2020
      New York, New York

                    **CHAITMAN LLP**
                    By: */s/ Helen Davis Chaitman*
                    Helen Davis Chaitman
                    hchaitman@chaitmanllp.com
                    465 Park Avenue
                    New York, New York 10022
                    Phone & Fax: 888-759-1114
                    *Attorney for Defendant*