# EXHIBIT X

Page 1

1        UNITED STATES BANKRUPTCY COURT
          SOUTHERN DISTRICT OF NEW YORK
2
    ----------------------------------X
3                                     :
    In re:                            :
4                                     :
    SECURITIES INVESTOR PROTECTION    :
5   CORPORATION,                      :
                                      :
6              Plaintiff-Applicant,   :
                                      :
7          -vs-                       :  08-01789 (SMB)
                                      :
8   BERNARD L. MADOFF INVESTMENT      :
    SECURITIES, LLC,                  :
9                                     :
               Defendant.             :
10  ----------------------------------X
11                                    :
    In re:                            :
12                                    :
    BERNARD L. MADOFF,                :
13                                    :
               Debtor.                :
14  ----------------------------------X
15
16
17              VIDEOTAPED DEPOSITION
18                     OF
19              BERNARD L. MADOFF
20            (Taken by the Customers)
21            Butner, North Carolina
22              December 20, 2016
23
24  Reported by:  Lisa A. DeGroat, RPR
                  Notary Public
25

Page 2

```
 1          A P P E A R A N C E S
 2
    For the Customers:
 3
    HELEN DAVIS CHAITMAN, Esq.
 4  Chaitman, L.L.P.
    465 Park Avenue
 5  New York, New York  10022
    (908) 303-4568
 6  hchaitman@chaitmanllp.com
 7
    For the Trustee:
 8
    DAVID J. SHEEHAN, Esq.
 9  AMANDA E. FEIN, Esq.
    Baker & Hostetler, L.L.P.
10  45 Rockefeller Plaza
    New York, New York  10111
11  (212) 589-4616
    dsheehan@bakerlaw.com
12
13  For the Witness:
14  PETER A. GOLDMAN, Esq.
    Attorney at Law
15  12 Fairlawn Parkway
    Rye Brook, New York  10573
16  (914) 937-6857
    pagoldman45@gmail.com
17
18  The Videographer:
19  Robert Collier
20      VIDEOTAPED DEPOSITION OF BERNARD L.
21  MADOFF, taken by the Customers, at the Federal
22  Correctional Institution, Butner Medium I, Old NC
23  Highway 75, Butner, North Carolina, on the 20th day of
24  December, 2016, at 8:52 a.m., before Lisa A. DeGroat,
25  Registered Professional Reporter and Notary Public.
```

Page 3

C O N T E N T S

```
 2  The Witness:  Bernard L. Madoff        Examination
 3  By Ms. Chaitman . . . . . . . . . . . . . . .    6
 4
 5
 6    I N D E X   O F   T H E   E X H I B I T S
 7  Madoff                For Identification
 8  Exhibit 1   Order Authorizing the Deposition  .    4
 9  Exhibit 2   3/12/09 transcript . . . . . . . .   12
10  Exhibit 3   11/21/11 transcript . . . . . . .    21
11  Exhibit 4   8/11/09 transcript . . . . . . .     23
12  Exhibit 5   Handwritten notes  . . . . . . .     52
13  Exhibit 6   Lazard article . . . . . . . . . .   61
14  Exhibit 7   Dubinsky report . . . . . . . . . .  81
15  Exhibit 8   Order confirmation  . . . . . . .    97
16  Exhibit 9   14.4 "The Secondary Market" . . . .  113
17  Exhibit 10  Handwritten notes . . . . . . . . .  113
18  Exhibit 11  Freeman article . . . . . . . . .    143
19  Exhibit 12  Authorization letter  . . . . . . .  158
20  Exhibit 13  Authorization letter  . . . . . . .  158
21  Exhibit 14  Blecker account statement . . . . .  163
22
23
24
25
```

Page 4

```
 1      (MADOFF EXHIBIT 1 WAS MARKED FOR
 2  IDENTIFICATION.)
 3          * * * * *
 4      THE VIDEOGRAPHER:  We are now on the
 5  record.
 6      Please note that the microphones are
 7  sensitive, and they pick up whispering and
 8  private conversations.  Please turn off all
 9  cellphones or place them away from the
10  microphones, as they can interfere with the
11  deposition audio.  The recording will continue
12  until all parties agree to go off the record.
13      My name is Bob Collier, representing
14  Veritext Legal Solutions.  The date today is
15  December 20th, 2016, and the time is
16  approximately 8:52.
17      This deposition is being held at Butner
18  Federal Correction Facility, located at 3000 Old
19  75 Highway, Butner, North Carolina 27509 and is
20  being taken by counsel for the customers and
21  trustees.
22      The caption of this case is In re:
23  Securities Investor Protection Corporation,
24  Plaintiff-Applicant, v. Bernard L. Madoff
25  Investment Securities, L.L.C., Defendant.
```

Page 5

```
 1      And this case is being held in the
 2  United States Bankruptcy Court, Southern District
 3  of New York.  Case number 08-01789 (SMB).  The
 4  name of the witness is Bernard L. Madoff.
 5      At this time the attorneys present in
 6  the room and everyone attending remotely will
 7  identify themselves and the parties they
 8  represent.
 9      MS. CHAITMAN:  Helen Davis Chaitman, of
10  Chaitman, L.L.P., on behalf of various defendants
11  in the good faith clawback actions.
12      MR. GOLDMAN:  Peter A. Goldman.  I
13  represent Bernard Madoff.
14      MR. SHEEHAN:  David J. Sheehan, with
15  Baker Hostetler, attorneys for the trustee Irving
16  Picard.
17      MS. FEIN:  Amanda Fein, Baker
18  Hostetler, for the trustee.
19      THE VIDEOGRAPHER:  Our court reporter
20  is Lisa DeGroat, representing Veritext Legal
21  Solutions, and she will swear in the witness, and
22  we can proceed.
23
24          * * * * *
25
```

2 (Pages 2 - 5)

Page 10

1  any attorney/client privileged information between you
2  and Mr. Sorkin, but was Mr. Sorkin surprised when you
3  told him that you had been operating a Ponzi scheme?
4      A.   Yes.
5      Q.   In fact, had any family members of
6  Mr. Sorkin invested through you?
7      A.   I believe his -- his -- his mother and
8  father had an account with me through Avellino &
9  Bienes.
10     Q.   Okay.  And -- so he represented Avellino &
11 Bienes with respect to the 1992 SEC investigation?
12     A.   Yes.  That's correct.
13     Q.   And thereafter his parents invested with
14 you?
15     A.   Well, I think they were a client prior to
16 that.
17     Q.   Okay.  And did they -- did they continue to
18 be clients after that?
19     A.   Yes.
20     Q.   They did?
21     A.   I believe.
22     Q.   Okay.  So is it fair to say that if
23 Mr. Sorkin had come to learn that Avellino & Bienes
24 had done something illegal, that he would not have had
25 his parents continue to invest through you?

Page 11

1          MR. SHEEHAN:  Object to the form.
2          THE WITNESS:  I -- you know, I don't
3  know -- well, the -- the issue with Avellino &
4  Bienes really had nothing to do with any
5  wrongdoing by me.
6          It was the fact that they were deemed
7  to be operating an unregistered investment
8  partnership, and the SEC, you know, acknowledged
9  to me that there was nothing wrong with what I
10 was doing.
11         And that if they were willing to
12 register, I could continue register --
13 registering -- continue investing for them.  I
14 refused to at that time and insisted upon
15 returning their moneys and closing out their
16 account.
17         So, as far as the SEC, or as far as any
18 of Avellino & Bienes' clients are concerned,
19 based upon everything that happened, none of them
20 would have any reason to feel that I was doing
21 anything wrong.  It was Avellino & Bienes that
22 had the problem.
23 BY MS. CHAITMAN:
24     Q.   Now, you recall that you appeared before
25 Judge Chin and entered a guilty plea in June of 2009?

Page 12

1      A.   Yes.
2          MS. CHAITMAN:  Okay.  And I'm going to
3  mark the transcript of that proceeding as
4  Exhibit 2.
5          (MADOFF EXHIBIT 2 WAS MARKED FOR
6  IDENTIFICATION.)
7  BY MS. CHAITMAN:
8      Q.   Mr. Madoff, do you have a good recollection
9  of that day?
10     A.   Yes.
11     Q.   Okay.  If you'd be good enough to turn to
12 page 25.
13     A.   Okay.
14     Q.   Now, just to put this into context, you
15 confessed on December 11th, 2008, and Mr. Sorkin began
16 representing you at that time; right?
17     A.   Yes.
18     Q.   And you entered a guilty plea -- actually,
19 it was March 12th, 2009.  Do you see that, that's the
20 date --
21     A.   Uh-huh.
22     Q.   -- on the first page?
23     A.   Yeah.
24     Q.   Okay.  And during the period, from
25 December 11th until March 12th, you had been living in

Page 13

1  your apartment; is that right?
2      A.   Yes.
3      Q.   And is it fair to say that you had a lot of
4  time to think about what you had done?
5      A.   Yes.
6      Q.   When you spoke to Judge Chin on March 12th,
7  2009, did you tell the truth about what you had done?
8      A.   Yes.
9      Q.   I want to read, beginning on line 12 of page
10 25, the -- the one paragraph.  Quote, "To the best of
11 my recollection, my fraud began in the early 1990s.
12 At that time the country was in a recession, and this
13 posed a problem for investments in the securities
14 markets."
15         "Nevertheless, I had received investment
16 commitments from certain institutional clients and
17 understood that those clients, like all professional
18 investors, expected to see their investments
19 outperform the market."
20         "While I never promised a specific rate of
21 return to my client, I felt compelled to satisfy my
22 clients' expectations at any cost.  I, therefore,
23 claimed that I employed an investment strategy I had
24 developed called the split-strike conversion strategy
25 to falsely give the appearance to clients that I had

4 (Pages 10 - 13)

Page 14

1 achieved the results I believed they expected."
2     Is that statement 100 percent true?
3   A.   Yes.  However, there's -- if I understand
4 this statement, it said that -- that -- "to falsely
5 give the appearance," implies that I had achieved the
6 results.  When I took the money and I started the
7 strategy, the strategy -- there was nothing in the
8 strategy to give a false impression.
9     In other words, I was the -- you know, I
10 intended to invest the money.  The fact that I
11 invested -- that I couldn't invest it because of
12 market conditions, but then shorted the strategy to
13 the clients, then it was -- it -- it gave the false
14 impression, but that -- it was not my intention when I
15 first developed the strategy or made the commitments
16 to the clients to -- to not invest the money at that
17 time.
18   Q.   Okay.  So, if I understand you correctly,
19 when you developed the split-strike conversion
20 strategy, your intention was to carry it out --
21   A.   Correct.
22   Q.   -- honestly?
23   A.   Correct.
24   Q.   But you didn't have the money to do that,
25 and so you --

Page 15

1   A.   I didn't have the market conditions to do
2 that.
3   Q.   Okay.  So you started sending statements to
4 clients which were not accurate, because they
5 reflected purchases of securities that did not occur?
6   A.   Yes.  That's correct.
7   Q.   Okay.  Now, you understood that this was a
8 fraud on your customers; right?
9   A.   Yes.
10   Q.   And is it your testimony that you never
11 perpetrated a fraud on your customers prior to the
12 initiation of the split-strike conversion strategy?
13   A.   That's correct.
14     MR. SHEEHAN:  Object -- object to the
15 form.
16     THE WITNESS:  I'm sorry.  I didn't hear
17 what you just --
18     MR. SHEEHAN:  I said I objected to the
19 form.
20     THE WITNESS:  Oh.
21     MR. SHEEHAN:  We have an understanding
22 that all objections are preserved, as subject to
23 objections as to form.
24     MS. CHAITMAN:  Right, but what is your
25 objection to that form?  I just want to --

Page 16

1     MR. SHEEHAN:  You're testifying.
2     MS. CHAITMAN:  Okay.  Okay.
3     MR. SHEEHAN:  All right.
4 BY MS. CHAITMAN:
5   Q.   Mr. Madoff, can you tell us in your own
6 words whether you had ever -- prior to the
7 split-strike conversion strategy ever misrepresented a
8 purchase or a sale on a customer's statement so that
9 the customer was misled?
10   A.   Yes.
11   Q.   When?
12   A.   Well, basically after the market crashed in
13 1987, certain customers that were not doing the
14 split-strike conversion strategy, but were involved in
15 a -- in a normal market-hedging strategy, where there
16 were commitments on both my side and the client's side
17 to keep the strategy open, and -- because of the
18 market crash they were forcing me to liquidate part of
19 their -- their strategy in violation of a commitment
20 that -- that they had made to me and to others.
21     That was done, and that triggered in the
22 years after that, which I guess started primarily --
23 that went really from the early '90s on through, you
24 know, 2008, where those clients gave instructions to
25 do some backdating of transactions, and, you know,

Page 17

1 liquidating of securities or -- and so on to generate
2 certain losses that they deemed desirable for tax
3 purposes.
4     So I was aware of the fact that those --
5 and, you know -- and told the clients that they were,
6 you know, basically, you know, running into a tax
7 violation problem.  So that had nothing to do with the
8 split-strike conversion, and that was --
9     I don't know if I've answered your question.
10   Q.   Okay.  Well, we've gone into a different
11 subject, but let me, if I may, just come back to my
12 question, and perhaps I misstated it.
13     What I was really asking you -- I'm not
14 asking you whether a client directed you to do
15 something illegal.
16   A.   Right.
17   Q.   Because that would not be a fraud on that
18 client; right?
19   A.   No.
20   Q.   Yeah.
21   A.   That's correct.
22   Q.   Okay.  So I want you to limit --
23   A.   It was a violation for probably the SEC
24 regulations on my part, but it was not a fraud.  It
25 was -- it was the clients that, you know, instructed

5 (Pages 14 - 17)

Page 26

1 business.
2       He was also aware that what happened in '87
3 and -- and during the crash that, you know, there was
4 some -- there was some -- there was some clients that
5 were wanting to sell out of their positions that they
6 had had because of their concern about the market.
7       And that I had, you know, objected to that,
8 telling them that this was in violation of their
9 commitments that they had made originally.  So he was
10 aware of the fact that those discussions were taking
11 place.
12      And he was also aware of the fact that I was
13 doing -- actually doing the convertible arbitrage
14 transactions prior to that.
15      Q.   Okay.  But in terms of the -- the crime that
16 he's admitting to here --
17      A.   Right.
18      Q.   -- can you shed any light on whether, in
19 fact, this began in the late '80s or the early '90s?
20      A.   Oh, it -- it began, as I said, in the '90s.
21      Q.   Okay.  All right.  And when you say in the
22 '90s, are you fairly certain it was 1992?
23      A.   That was -- yes.  That was the date -- the
24 approximate date that I said it started, because
25 that's when I really started to take in the money to

Page 27

1 do the split-strike trades.
2      Q.   Okay.  All right.  Now I'd like to go to --
3           MS. CHAITMAN:  You-all have
4 Mr. DiPascali's transcript?
5           MR. SHEEHAN:  Mr. Kugel's.
6           MS. CHAITMAN:  I'm sorry.  Mr. Kugel's
7 transcript?
8           MR. SHEEHAN:  Yup.
9           THE WITNESS:  Uh-huh.
10          MS. CHAITMAN:  Okay.  Can I just have
11 Kugel's transcript for a second?
12 BY MS. CHAITMAN:
13      Q.   All right.  So I've marked this as
14 Exhibit 3.  Now, if you'd be good enough to look at
15 page 32.  I'm going to read, beginning on line four.
16 This is Mr. Kugel's plea, and he gave this plea on
17 November 21st, 2011.
18      "Specifically beginning" -- it should be --
19 "in the early '70s until the collapse of BLMIS in
20 December of 2008 I helped create fake backdated
21 trades."
22      "I provided historical trade information --
23 sorry -- first to Annette Bongiorno and later to Joann
24 Crupi and others, which enabled them to create fake
25 trades that when included on the account statements

Page 28

1 and trade confirmations of investment advisory clients
2 gave the appearance of profitable trading, when, in
3 fact, no trading had actually occurred."
4      "I helped Bongiorno, Crupi and others create
5 these fake backdated trades based on historical stock
6 prices and were executed only on paper."
7      Now, during the 1970s and '80s who within
8 the firm was responsible to deal with the clients that
9 you've described were involved in transactions that
10 you felt were violations of either the tax laws or the
11 securities laws?
12      A.   Well, first of all, I was the only one that
13 dealt with the clients, period, as far as doing the
14 trading.
15      Q.   Okay.
16      A.   So none of this makes sense to me, because I
17 think David Kugel started in the '70s working for me.
18 (The following pages were redacted pp. 28:18-29:8)
19
20
21
22
23
24
25

Page 29

1
2
3
4
5
6
7
8
9      Q.   Okay.
10     A.   And there were some others, but primarily
11 those.
12     Q.   Okay.  And --
13     A.   Those are my four big clients.
14     Q.   And did each of the four big clients have
15 multiple accounts?
16     A.   Yes.
17     Q.   So they might have had accounts for their
18 children or their --
19     A.   Yes.  They all did.
20     Q.   Okay.  So can I refer to them as the four
21 families?
22     A.   Yes.
23     Q.   Okay.  When did you begin doing business
24 with the four families?  Was it at different times?
25     A.   Varied times.  Yeah.  It started from the

8 (Pages 26 - 29)

Page 54

1    A.   The past four chairmen of the SEC have all
2   been up in my office, watching us trade and meeting
3   with us, as well as all of these foreign exchanges.
4        As a matter of fact, the -- the NASD used
5   our -- during the 9/11 crisis the SEC and the NASD
6   asked us, would we allow the NASD to -- to operate
7   their backer facility out of our backer facility that
8   we had in Queens, because that's the -- everybody was
9   having problems because of the -- you know, the -- the
10  bombing out of the -- the plane crashing into the
11  buildings.
12       So the NASD for a period of, I guess it was,
13  three months used our facilities to back up their
14  trades, and also their compliance people sat in my
15  office for a period of months, operating, you know,
16  because they didn't have -- their offices were
17  destroyed.
18       Q.   Now, Mr. Madoff, I think you know that the
19  trustee has taken the position in court he has not
20  conceded that you ever did any legitimate trading.
21  Can you explain to us -- starting in 1960 and then
22  ending on December 11th, 2008 can you explain to us
23  the volume of trading that you did in various periods
24  of time and the number of employees whose job was to
25  conduct real trades?

Page 55

1    A.   Well, when I started my firm in 1960, it was
2   basically myself.  And I operated at that time out of
3   my father-in-law's accounting office, because I was in
4   law school at the time.  So in those days it was very
5   common for small brokerage firms to operate.
6        As a matter of fact, I started with $500 of
7   capital.  And that was a small amount even by the
8   SEC's standard during that time.  So I was required to
9   meet with the New York office of the SEC to explain
10  how I basically had the nerve to present a handwritten
11  balance sheet with $500 cash assets and no
12  liabilities.
13       And, you know, so they wanted to make sure
14  that I was real.  And I started with the $500 of -- of
15  capital, which in those days didn't require much,
16  because I was -- my plan was just to do a small retail
17  business basically with my family as clients.
18       That, you know, eventually grew from a
19  one-man operation to, I guess, you know, 200 some odd
20  people here and in -- in London in 2008.
21       I started this small retail firm.
22  Relatively unsuccessful the first couple of years,
23  because I ran into the Cuban missile crisis, and the
24  marketplace collapsed in 2000 -- in 1962.
25       Required me to borrow $30,000 from my

Page 56

1   father-in-law in the form of -- of municipal bonds to
2   recapitalize my firm, which I paid back, you know, a
3   year or so later.
4        And then gradually just -- and then became a
5   market-making firm in the '70s, early '70, and became
6   a market-making firm for the rest of the balance of my
7   50 years in the business.
8        At one -- we -- at the -- by the time we
9   were finished in 2008 the firm was operating -- was
10  executing a few 100,000 trades, up to 600,000 trades a
11  day at the high, but we were averaging about 300,000
12  transactions a day, and we represented ten percent of
13  the United States' volume in -- in transactions.
14       Q.   Now, we're talking about legitimate
15  transactions?
16       A.   All market-making were legitimate
17  transactions.  The -- and the firm was operating
18  basically as -- primarily most of the time as a
19  market-making and proprietary trading firm.
20       It was -- the investment advisory firm
21  really came into -- you know, into being on a gradual
22  basis, and then was my undoing basically in the early
23  '90s, because of a problem that occurred originally in
24  '80 -- as I say, the crash in '87, but perpetuated a
25  fraud that started, as I said, in the '90s, which was,

Page 57

1   you know, a disaster.
2        Q.   And when -- the fraud in the '90s you're
3   referring to is the split-strike conversion?
4        A.   Correct.
5        Q.   Okay.  Now, can you just briefly explain
6   what the difference is between market-making and
7   proprietary trading?
8        A.   Well, market-making is -- in order to be a
9   market-maker, according to SEC and NASD regulations,
10  you have to maintain an inventory -- trading inventory
11  and making a two-sided market.  In other words, you --
12  you post bids and offers to the -- to the market in
13  general.
14       Originally that was done in the
15  over-the-counter market through what was called pink
16  sheets, where they were daily published bids and
17  offers of the brokerage firms in the United States,
18  listing what you were willing to buy and sell
19  securities.
20       And you had to be ready to buy and sell
21  securities, whether either long or short, for -- for
22  the market in general or for your clients.
23       Then with the development of NASDAQ, which
24  was an -- which was the first automated system,
25  basically we automated the pink sheets.

15 (Pages 54 - 57)

Page 82

1   IDENTIFICATION.)
2       MS. CHAITMAN: Oh, you know what? I'll
3   give this to the witness, and I'll give this to
4   you.
5       THE WITNESS: I already have a copy.
6       MS. CHAITMAN: I'm sorry?
7       THE WITNESS: I have a copy of this
8   one.
9       MS. CHAITMAN: You can just give it to
10  the reporter.
11      MR. GOLDMAN: David, here is one you
12  can look at.
13      MR. SHEEHAN: I'm fine. I brought my
14  own.
15      MR. GOLDMAN: Oh.
16      THE WITNESS: Are you still awake?
17      MR. SHEEHAN: Always.
18      THE WITNESS: The last time we were
19  together, I had a meeting with you, you fell
20  asleep during my testimony.
21      MR. SHEEHAN: Yeah, you warned me about
22  that. I remember that exchange.
23      THE WITNESS: That's okay. I --
24      MR. SHEEHAN: You told me the SEC fell
25  asleep in that meeting too. I remember that.

Page 83

1       THE WITNESS: I -- I can -- I can put
2   people to sleep. The chairman of the London
3   Stock Exchange fell asleep during one of my
4   meetings with him, but he said it was jet lag.
5   You don't have jet lag. So --
6       MR. SHEEHAN: I have no jet lag.
7   BY MS. CHAITMAN:
8       Q.  Mr. Madoff, I had sent you in advance of the
9   deposition a copy of Mr. Dubinsky's report. Have you
10  had a chance to review it?
11      A.  Yes, I have.
12      Q.  Okay. And did you agree with his
13  conclusions?
14      A.  Some of them.
15      Q.  Okay. Did you agree with all of them?
16      A.  No.
17      Q.  Okay. Did you find that overall there were
18  some mistakes that Mr. Dubinsky made?
19      MR. SHEEHAN: Objection as to the form.
20      THE WITNESS: Yes.
21  BY MS. CHAITMAN:
22      Q.  Okay. Before we go into detail with respect
23  to the report can you tell me some of the mistakes
24  that you found with Mr. Dubinsky's approach?
25      A.  Well, first of all, the majority of the

Page 84

1   report had to deal with the split-strike conversion
2   trades, which I was sort of at a loss for -- and this
3   report, from what I understand from -- cost a lot of
4   money to -- to produce.
5       And I had from day one acknowledged that
6   there was no split-strike trades being done and that
7   there was a fraud. So I couldn't understand why so
8   much money was --
9       Look, let me just say that from the time
10  that I plead guilty for this -- for this fraud, I've
11  had to live with the guilt of -- of knowing what I
12  did.
13      All right. And my decision basically to --
14  to plead guilty and to not go to trial was to be able
15  to recover as much money as possible to my -- for my
16  clients.
17      And the -- you know, rather than go to -- to
18  trial, which I knew that I was guilty of, and put my
19  family through a -- the horror of, you know, what
20  would -- what would occur with the trial, I -- I
21  decided that the best thing that I could do would be
22  to plead guilty, take my sentence and do everything
23  that I could to recover the money for the clients, who
24  I defrauded.
25      Q.  Let me just interrupt you there.

Page 85

1       When you saw in -- in 2008 that the economy
2   was collapsing, and you had -- you had out-of-ordinary
3   redemptions in 2008; isn't that true?
4       A.  Yes.
5       Q.  Okay. Would you say that the redemption
6   demand was extraordinary or --
7       MR. SHEEHAN: Object to form.
8       THE WITNESS: Well, yes. I mean, look,
9   unfortunately or fortunately, however you want to
10  look at it, my commitment to the people that I
11  took the money from for the split-strike was that
12  they could have their money back at anytime.
13      In other words, most hedge funds do
14  not -- do not allow people to withdraw their
15  money. They have what they call lockup periods.
16  They -- they say that you have to give them 90
17  days notice, sometimes six months notice before
18  you can get your money back.
19      Because of the way the split-strike
20  strategy was designed there was no reason to have
21  a lockup period if, in fact, I was doing it the
22  way I intended to do it originally.
23      So that people that gave me money,
24  whether it be an individual or whether it be a
25  hedge fund, to invest, had the ability to call me

22 (Pages 82 - 85)

Page 90

1    So my decision at that time was not to make
2  a plea bargain. I was convinced that I could get the
3  money back that was involved that people lost. I
4  couldn't get the profits back, for sure, but I
5  certainly felt I could recover the principal, you
6  know, back.
7    So -- and I knew that my clients had
8  withdrawn -- many of them over the earlier years
9  before the fraud started that they had -- they had
10  made and -- and withdrew legitimate profits over the
11  years.
12    So I felt that while people were not going
13  to make an average annual return of 12 percent, as
14  they thought that they made, they certainly would --
15  would do all right, and I certainly would be able to
16  recover everyone's principal.
17    So when I told my attorneys that, Ike
18  Sorkin, I said, look, I'm going to recover everybody's
19  money, you know, you know, but I -- have to do this
20  my way. I can't -- I can't establish a plea. I don't
21  want to make any deal.
22    I said, I'm the only one that really has the
23  knowledge of what happened and what people did to put
24  me in this situation and the wrongdoing that certain
25  people were involved in, I said.

Page 91

1    And if I go to these people and -- which
2  I've already done to a certain extent anyhow -- and
3  threaten them with -- you know, with their complicity,
4  I said, I'll get the money back. Now, nobody believed
5  that I could possibly do this.
6    MS. CHAITMAN: We're just running out
7  of the tape. So we have to --
8    THE WITNESS: Okay.
9    MS. CHAITMAN: -- take a break.
10    THE VIDEOGRAPHER: Okay. This ends
11  media number one in the deposition of Bernie
12  L. -- Bernard L. Madoff. Going off the record.
13  The time is 11:12.
14    (RECESS FROM 11:12 A.M. TO 11:27 P.M.)
15    THE VIDEOGRAPHER: Back on the record.
16  This begins media number two in the deposition of
17  Bernard L. Madoff. The time is 11:27.
18  BY MS. CHAITMAN:
19    Q. Mr. Madoff, we've been --
20    A. Okay. I --
21    Q. -- discussing a few other things, but I want
22  to come back, if I may, to the Dubinsky report.
23    A. Right.
24    Q. And my question is: Are there some
25  fundamental errors that you feel Mr. Dubinsky made?

Page 92

1    A. Yes.
2    Q. Okay. Let's -- let's go through them one at
3  a time.
4    A. Okay. All right. Basically what -- well,
5  I'd like to say is that I would -- I'm not going to
6  get involved in his -- the majority of the report that
7  deals with the split-strike conversion trades or
8  whether or not the trades were executed or not,
9  because the -- I have no objection to -- I can't find
10  fault with what he -- what his determination was,
11  because I was not executing the trades.
12    So there's no point in me, you know,
13  evaluating what he says was right or wrong. There may
14  be errors in there, but it doesn't matter. The fact
15  was the errors that I found were -- had to deal with
16  the beginning of the report dealing with the
17  convertible -- the trading that took place before
18  1992, which basically involved the convertible bond
19  arbitrage transactions.
20    So, first of all, let me start by saying
21  that it was quite -- I understand that his -- from his
22  CV that he has a very good CV. All right. In other
23  words, he seems to be -- have his references of fraud
24  reporting or -- I don't find any fault with that. He
25  seems to have a lot of experience.

Page 93

1    That being said, it became very obvious to
2  me that his knowledge of the market-making and the
3  dealer markets and the over-the-counter trading,
4  whether it be convertibles or so on, there -- he had
5  very little experience in that.
6    And that's not a great surprise to me,
7  because it's sort of a specialized marketplace. And
8  unless, you know, you -- you have firsthand experience
9  of how market-makers operate, how the dealer market
10  works and how the trading of convertible bonds takes
11  place, you know, that's a specialized kind of
12  marketplace.
13    And he had things that were really wrong.
14  For example, he makes the statement that Madoff sent a
15  confirmation to a client, where he -- you know, the
16  client -- he says that the client bought stock or sold
17  stock, which was opposite of what happened.
18    In other words, typically when a retail
19  client gets a confirmation from Merrill Lynch, for
20  example, it states the client bought IBM at a price or
21  sold IBM at a price.
22    When a dealer sends a confirmation to a
23  client, it says, we bought, we sold. Meaning the
24  dealer bought or sold to the client. So, for example,
25  there's a confirmation, and I have a -- a copy of one

24 (Pages 90 - 93)

Page 94

1  of our confirmations.
2       Well, I don't need that.  In other words,
3  our confirmation says we bought.  That means Madoff
4  bought for the customer or from the customer or sold
5  to the customer.
6  Q.  Okay.  You know what?  I don't know if this
7  is going to help you, but --
8  A.  Here is --
9  Q.  Okay.
10  A.  Here is a confirmation.  There's a
11  confirmation --
12       MR. SHEEHAN:  Let her mark that.
13       MS. CHAITMAN:  I will.
14       THE WITNESS:  It says in the box, "We
15  sold."  All right.  Or it would say, we bought.
16  "We," referring to the firm.  Madoff.
17       Now, if we had said you bought or you
18  sold, that would be the customer bought.  You
19  know -- you know what I'm saying?
20       MR. SHEEHAN:  Uh-huh.
21       THE WITNESS:  All right.  This is a
22  standard dealer confirmation.  It also has on
23  here codes, the transaction code and a capacity
24  code.  Meaning that it has a number.
25       Meaning what is -- what -- what

Page 95

1  capacity are we operating?  Where -- on the back
2  of the confirmation it says the capacity -- the
3  transaction is transacted over the counter in
4  New York and so on.  It also has a capacity code,
5  which is trading as principal or agent and so on.
6       Dubinsky -- okay -- is used to seeing a
7  retail confirmation, which would have the
8  opposite of that.  So he makes a big point in his
9  report of saying that Madoff reflected this wrong
10  for the customer.
11       All right.  He says that, you know --
12  now, that's -- there's -- nobody that was
13  familiar with the dealer markets would make that
14  kind of a statement.  It's -- it's -- quite
15  frankly, it's an embarrassment, you know, to --
16  to put that in the report.
17       All right.  He then says that it --
18  this was in violation of his agreement with the
19  customer to act as agent.  If you look at the
20  agreements that we have with our clients, and
21  there's a whole series of when a customer opens
22  an account agreement, where there's a trading
23  authorization and so on, it says that Madoff,
24  meaning Bernard L. Madoff, the client is giving
25  Madoff -- is appointing Madoff his agent to

Page 96

1  transact business for the customer.
2       So it says Madoff is the agent for the
3  customer.  It doesn't say that -- you know, so
4  that means that Bernard Madoff, myself, when --
5  he's authorizing me as the only person that is
6  authorized to transact the business with the
7  firm.
8       So the firm is transacting business as
9  principal for their own account, which it clearly
10  states that on the confirmation.  He -- this
11  totally confused him for some reason.
12  BY MS. CHAITMAN:
13  Q.  Mr. Madoff, can I just stop you for a
14  second.
15       I'm going to show you a statement, but if --
16  if a -- if a customer's statement says bought 100
17  shares of IBM --
18  A.  That means the customer bought it on the
19  statement.  The statement is showing it as the
20  customer bought.  Okay.  The statement is assuming the
21  customer -- that he's bought it from Madoff.
22       He knows it, because Madoff is sending the
23  confirmation -- is sending the statement to the
24  customer, saying, you -- he's reflecting the
25  customer -- what the customer bought and sold.  It's

Page 97

1  not reflecting who he --
2  Q.  Okay.
3  A.  -- bought and sold it from --
4  Q.  Okay.  So you're --
5  A.  -- because we already know that.
6  Q.  You're distinguishing between the
7  confirmation and the statements?
8  A.  The statement -- yes.  The statement is --
9  was -- the statement only shows a transaction on the
10  settlement date.  All statements are operated that way
11  with every brokerage firm.  The confirmation shows
12  both the trade date and the settlement date.
13       MS. CHAITMAN:  Okay.  Let me mark as
14  Exhibit 8 the document to which you've been
15  referring.
16       (MADOFF EXHIBIT 8 WAS MARKED FOR
17  IDENTIFICATION.)
18  BY MS. CHAITMAN:
19  Q.  And if I can just summarize this, this is
20  dated -- the trade date is October 14th, 2005.  The
21  settlement date is October 19th, 2005.  And it says --
22  you've crossed out the account number, but it says,
23  "Sold" -- "we sold 42 shares" --
24  A.  To the customer.
25  Q.  -- "of Wells Fargo"?

25 (Pages 94 - 97)

Page 98

1    A.    To the customer.  Right.
2    Q.    Okay.  So, "we," is Bernard L. Madoff?
3    A.    Right.
4    Q.    So -- so let me just understand something.
5    So if the customer was buying 42 shares of Wells
6    Fargo, you wouldn't go into the marketplace and -- and
7    buy it for the customer?
8    A.    Well, we -- we could, but we buy it -- we'd
9    go into the marketplace and buy it for our own account
10   and then resell it to the customer.
11   Q.    Okay.
12   A.    That's how principal trades work.
13   Q.    Okay.  As a general statement with respect
14   to the investment advisory customers --
15   A.    Uh-huh.
16   Q.    Now, obviously from whenever in 1992 you
17   stopped executing split-strike trades, there weren't
18   any purchases and sales?
19   A.    That's correct.
20   Q.    So --
21        MR. SHEEHAN:  Object to the form.
22   Sorry.  What I'm going to do in the future is
23   just say form or object.
24        MS. CHAITMAN:  That's fine.  It doesn't
25   matter.

Page 99

1        MR. SHEEHAN:  I don't want to interrupt
2    the flow.
3        MS. CHAITMAN:  Yeah, that's all right.
4    BY MS. CHAITMAN:
5    Q.    I want to exclude the period after you
6    stopped executing trades that were reflected on the
7    statement.  So whenever that was.  Okay.  Whether --
8    you know, whatever month of --
9    A.    Okay.
10   Q.    -- 1992 it was.  Let me take the time before
11   that.
12   A.    Yeah.  Well, he's -- the Dubinsky report
13   that was making the statement of a trade that was a
14   convertible bond trade that was actually made.  So the
15   example he's using -- he's not talking about a
16   split-strike.
17        He's talking -- he's saying that -- on the
18   convertible bond trade didn't really exist, because
19   Madoff's confirmation is incorrect.
20   Q.    Okay.
21   A.    So --
22   Q.    So let me -- so let me just try to
23   understand something.  I want to take the period -- I
24   want to limit my questions and your answers to the
25   period when you -- before the split-strike fraud

Page 100

1    began.
2    A.    Correct.
3    Q.    Okay.  So we're going to go earlier than
4    whatever date that was in 1992, when the split-strike
5    trades were not executed.
6    A.    And the Dubinsky report that's making this
7    statement is referring to a convertible bond trade
8    that was in the period that you're talking about.
9    Q.    Okay.  So as to the convertible bond trades,
10   is it generally true that the customers were buying
11   from Madoff and selling to Madoff?
12   A.    Correct.  From Madoff's inventory that he
13   already had or that he just bought or sold.
14   Q.    Is -- is that true for everyone in the --
15   if -- if I take the convertible --
16   A.    Operating as a dealer.  Yes.
17   Q.    So with your investment advisory customers,
18   who were doing convertible arbitrage --
19   A.    Uh-huh.
20   Q.    -- their transactions always were with
21   Madoff?
22   A.    Correct.
23   Q.    So --
24   A.    All of our customers -- we always traded
25   for --

Page 101

1    Q.    From your own inventory?
2    A.    Other than theoretically in options, we
3    traded from our own inventory.
4        Now, again, a dealer operates -- you -- a
5    customer may tell the -- we may decide to sell stock
6    to a customer or buy stock from a customer.
7        Now, we may already have that stock in our
8    inventory, and we're selling it to the customer from
9    inventory or the customer may -- we may not have the
10   stock in inventory.
11       So we have to go out and buy it into -- from
12   Wall Street, from the marketplace, into our inventory
13   and then resell it to the customer.  So that might
14   happen over a period of the same day or it might
15   happen over a period of a week and so on.
16       Which brings me to the next point.  Okay?
17   That --
18   Q.    Can you -- can you remember that?  Because I
19   have a question about this.
20   A.    Okay.  Go ahead.  Then give me that then.
21   Q.    Give me a word, so I can remind you about
22   your next point.
23   A.    I'll remember.
24   Q.    You promise?
25   A.    Yes.

26 (Pages 98 - 101)

Page 102

1    Q.   Okay.  So -- so let's say that in the
2   convertible arbitrage strategy you had a need for
3   5,000 shares of IBM, because you were going to sell
4   them to the convertible arbitrage customers.
5    A.   Right.
6    Q.   Okay.  Mr. Dubinsky was looking for the
7   purchase of 5,000 shares of IBM on a specific date in
8   the market; right?
9        MR. SHEEHAN:  Objection.
10       THE WITNESS:  Uh-huh.
11  BY MS. CHAITMAN:
12   Q.   Is that what he should have been doing?
13   A.   I'm not sure I understand your question.
14   Q.   Okay.  Well, let me start it over again.
15       Dubinsky made the point in several instances
16  that with the convertible arbitrage strategy the
17  statements all together showed more purchases of a
18  particular security than he could find records for --
19   A.   Okay.
20   Q.   -- on the New York Stock Exchange.
21   A.   Okay.  All right.  So that's a -- that's a
22  different subject, but -- all right.  He -- if
23  we're -- he -- what Dubinsky was -- was trying to
24  establish or -- was that the -- the number of bonds
25  that we -- let's say convertible bonds, because we're

Page 103

1   talking about convertibles, because we're referring to
2   bonds rather than stock.
3    Q.   Okay.
4    A.   Okay?  So Dubinsky is claiming that if we
5   show on a confirmation or in a customer account that
6   we bought stock -- we sold stock to a customer or
7   bonds to -- to a customer, that he looks to try and
8   establish that there weren't enough bonds that
9   actually traded in the marketplace at the time that we
10  claim that we bought the bonds for the customer.
11      All right.  So the way he researches that is
12  he looks on the New York Stock Exchange, you know,
13  number of bonds that traded on the New York Stock
14  Exchange, and shows that that was, let's say, 100
15  bonds, and Madoff bought 200 bonds for a customer.
16      So, therefore, he couldn't have possibly
17  bought 200 bonds for a customer, because only 100
18  bonds traded on the -- on the New York Stock Exchange.
19      All right.  Now, the -- the fallacy of that
20  is that, number one, convertible bonds, which is what
21  he's researching here, do not trade on the New York
22  Stock Exchange.  They trade over the counter.
23      And to demonstrate that I happen to -- I
24  brought this.  This is a very expensive book, I was
25  told.  I happened to find it in the library here, for

Page 104

1   some strange reason.  It's the -- it's the Bible of --
2   of the bond markets.  All right.
3        MR. GOLDMAN:  Tell us the title, so we
4   have it.
5        THE WITNESS:  It's the, "Bond and Money
6   Markets:  Strategy, Trading, Analysis."
7   BY MS. CHAITMAN:
8    Q.   And who is the author?
9    A.   Moorad Choudhry or something of that sort.
10       MR. SHEEHAN:  Could we have the
11  spelling of that since we won't be able to take
12  the book with us?
13       THE WITNESS:  Moorad --
14       MS. CHAITMAN:  Okay.  So the -- the
15  book is written by, M-o-o-r-a-d, and then his
16  last name is, C-h-o-u-d-h-r-y.  And it's
17  published by Butterworth-Heinemann Finance, and
18  it's called the, "Bond and Money Markets."
19       MR. SHEEHAN:  What edition is it?
20  Sorry.  So I don't want to have the wrong book.
21       MS. CHAITMAN:  You know what?  I'll let
22  you look at it.  It -- it's -- it's first
23  edition.
24       MR. SHEEHAN:  Okay.  Fine.
25       MS. CHAITMAN:  First edition.

Page 105

1        THE WITNESS:  All right.  You know, I
2   happened to have made a copy of this.  It's
3   discussing the secondary market, which is
4   what's -- you know, when you -- when you buy and
5   sell stock for clients, you're buying in the
6   secondary market, as opposed to the primary
7   market.
8        The primary market is when a company
9   goes public, they sell stock in the primary
10  market.  All right.  Then after the company sells
11  that stock to the public, it then trades -- the
12  stock trades for the rest of the -- its life in
13  the secondary market.  All right.
14       MR. GOLDMAN:  Bernie, you keep saying,
15  "stock."  You mean bond too; right?
16       THE WITNESS:  Same thing.
17       MR. GOLDMAN:  Okay.
18       THE WITNESS:  You know.  So, you know,
19  it basically is talking about -- you know, this
20  section was -- was talking about convertible
21  bonds.
22       It says here -- it says, "Corporate
23  bonds virtually everywhere are traded on an
24  over-the-counter, OTC, basis.  That is directly
25  between counterparties over the telephone."

27 (Pages 102 - 105)

Page 106

1   Meaning people like Madoff.
2       "Bonds are usually listed on the
3   exchange." I'll read what it says. "On the New
4   York Stock Exchange a low volume of trading in
5   bonds takes place on the exchange itself, but
6   this is dwarfed by the volume of trading in the
7   bonds in the over-the-counter market."
8       In other words, what they're stating is
9   that, although, this is a bond that is listed on
10  the New York Stock Exchange, you know, most of
11  the trading takes place in that bond in the
12  over-the-counter market.
13      It's a listed bond. So you can buy it
14  on the New York Stock Exchange, but no one does
15  that. It's traded over the counter. So
16  Dubinsky, you know, looks -- when he looks -- for
17  example, it would be the same thing if he looked
18  on the equity side of the market.
19      Let's say in -- in a split-strike
20  trade. If he looked in -- because IBM trades on
21  the New York Stock Exchange, if you just looked
22  at the volume on the New York Stock Exchange to
23  try and account for that -- for the customer
24  trading, if the customer traded in the
25  over-the-counter market, which is where we trade,

Page 107

1   and where everybody else trades today, where it
2   used to be 99 percent of the market, as I said
3   earlier, traded on the floor of the exchange, now
4   ten percent trades on the floor of the exchange,
5   and the rest of it trades everywhere else.
6       And the convertible bonds have always
7   been that way. In other words, so that Dubinsky
8   looks at the -- in order to say, well, Madoff
9   says he bought 200 bonds for a client.
10      Now, I'm looking on -- you know, in his
11  report. He -- he looks on the New York Stock
12  Exchange, and clearly he sees that that doesn't
13  match.
14      He's ignoring the over-the-counter
15  market. Even though in one of his examples it
16  says the bond trading on the New York, and then
17  it also says OTC market.
18      But bonds -- that was the price range
19  he was trying to establish in that. There is --
20  if you spoke to anybody that knew anything -- you
21  know, and I'm not trying to be -- I'm not trying
22  to, you know, be sarcastic with him, but if you
23  spoke to any other person, you know, that -- that
24  understood how the markets work, and you said,
25  I -- I just looked at the New York Stock

Page 108

1   Exchange, and he said, well, wait a minute.
2   Nobody trades bonds on the New York Stock
3   Exchange. They trade them in the
4   over-the-counter market.
5       So, you know, that was to me sort of
6   surprising, that anybody would do that. It -- it
7   demonstrated, you know, a total lack of
8   understanding.
9       Again, this is not -- I don't want to
10  be unfair to the man. I've had 50 years of
11  experience dealing in things like this, where
12  people who, you know, understand -- I wouldn't
13  understand how lawyers operate.
14      Okay. So if you asked me how I'm
15  supposed to give a deposition or anything else, I
16  would not know. Of course, now I'm becoming an
17  expert on that also, but it would not be -- I
18  wouldn't -- you know, it wouldn't mean that --
19      I'm not saying Dubinsky is not a smart
20  guy. He may be a very smart guy. He -- his CV
21  is very good, but I've -- I've dealt with tons of
22  people that are smart people and are experienced
23  people, but, you know, it's like a brain surgeon
24  going to a dentist for -- to have a brain surgery
25  done.

Page 109

1       All right. So, to get back to your
2   statement, his -- his lack of understanding how a
3   confirmation in a dealer market works, which is
4   clearly a mistake, or where the volume were
5   traded is another mistake.
6       He -- he goes on to make another
7   mistake when he talks about the price range.
8   Now, that's a little bit more complicated. Now,
9   all of our transactions are -- are what's called
10  average price transactions.
11      If you look on the back of my
12  confirmation -- I'm going to take this for a
13  second again -- it states, "Customer equity
14  transactions" -- because this is an equity, being
15  it says -- so it doesn't matter. It would be the
16  same thing with bonds.
17      It says, "As per your authorization and
18  instructions, we have executed this transaction
19  for your account."
20      All right. It says, "Unless stated
21  otherwise on the front of this confirmation, the
22  trade price of your transaction is an average
23  price and includes a commission equivalent of
24  four cents per share markup. Full details of
25  this transaction on request."

28 (Pages 106 - 109)

Page 110

1  In other words, an average price
2  transaction is when we buy stock for a customer
3  or, you know, we buy stock. We -- we may start
4  buying the stock on a Monday, and we may buy that
5  Monday, Tuesday, Wednesday, Thursday, Friday. So
6  we may buy a -- 1,000 shares over a period of
7  three days, four days or five days.
8  We start on a Monday. We may finish on
9  a Friday. That's typically because we're buying
10 a large amount of bonds or stock for a client.
11 And we may start buying the -- let's say, the
12 bond at 98, and then we may wind up paying 100 by
13 the time Friday is, because as the market moves.
14 So we're accumulating stock, a number
15 of shares or bonds, over an average number of
16 days at an average price.
17 So if we start buying a bond, let's
18 say, at 98, and we wind up finishing buying it at
19 100, as the market moves up, we bought stock --
20 the bonds at 98, 99, 99 and a quarter and so on
21 and so forth.
22 When we report the trade for the
23 customer on Friday, which is when we're finished,
24 we may have paid 90 -- 99 and three-quarters on
25 the bond. All right. What Dubinsky -- you know,

Page 111

1  that was the average that we accumulated for the
2  customer.
3  Now, the 99 and three-quarters was
4  bought over a period of three days. If -- if you
5  look at -- if he looks at the price, the range of
6  the stock, the price on the day that appears on
7  the confirmation, it may show 100, which was
8  where this -- the closing price was on that day.
9  All right. But, you know, we may -- we
10 may sell it to the customer at 99 and
11 three-quarters, which was the average price of
12 that stock. He -- he thinks that that's a
13 mistake.
14 How could we have bought the stock for
15 the customer at 99 and three-quarters, when it
16 shows that -- it shows that the cheapest price
17 the stock traded was 100.
18 So he's saying that Madoff is -- is
19 buying stock cheaper than he could have bought it
20 in the marketplace. He's not accounting for the
21 fact that we started buying it, you know, three
22 days.
23 In other words, it wasn't -- he thinks
24 it was all bought at one price on that day.
25 Okay. If he -- if he bothered to read the back

Page 112

1  of the confirmation, which he probably never did,
2  you know, it clearly states that these are
3  average price transactions. They're not one
4  price.
5  Okay? We're --
6  MR. SHEEHAN: I just have a little
7  housekeeping.
8  MS. CHAITMAN: Yeah.
9  MR. SHEEHAN: I'd like -- he read from
10 that. I'd like to get that marked. That.
11 MS. CHAITMAN: This -- this marked.
12 MR. GOLDMAN: The photocopy.
13 MR. SHEEHAN: And his notes too. He's
14 reading from notes.
15 THE WITNESS: This is just --
16 MS. CHAITMAN: That page. Okay. Good.
17 Okay. So I'm going to mark as Exhibit 9, this is
18 a page from the volume that we've just described.
19 It's page 323.
20 MR. SHEEHAN: Great. And I think he
21 had his notes that he was reading from too.
22 So --
23 MS. CHAITMAN: Did you have notes that
24 you were reading from?
25 MR. SHEEHAN: Yeah.

Page 113

1  MR. GOLDMAN: Yeah, there was.
2  THE WITNESS: Where did I put them?
3  MS. CHAITMAN: Were there -- I did mark
4  notes before. Are there new notes? I didn't
5  notice.
6  MR. SHEEHAN: Yeah, there were notes
7  that were part of the --
8  THE WITNESS: Here they are.
9  MS. CHAITMAN: Okay.
10 MR. GOLDMAN: There they are.
11 MS. CHAITMAN: Can I mark that?
12 THE WITNESS: You can have it, but it's
13 my only copy. Okay. I am not finished with it
14 yet. So don't -- don't take it.
15 MS. CHAITMAN: No. I'm not taking it.
16 (MADOFF EXHIBIT 9 WAS MARKED FOR
17 IDENTIFICATION.)
18 MS. CHAITMAN: I'm going to mark as
19 Exhibit 10 some handwritten notes that Mr. Madoff
20 has been referring to, and I'm going to give it
21 back to Mr. Madoff.
22 (MADOFF EXHIBIT 10 WAS MARKED FOR
23 IDENTIFICATION.)
24 MR. SHEEHAN: For the record, there's
25 notes on the back of that page too.

29 (Pages 110 - 113)

Page 114

1        MS. CHAITMAN:  Yeah, yeah.
2        MR. SHEEHAN:  That'll be fine.
3        MS. CHAITMAN:  But it's all one
4    exhibit.
5        MR. SHEEHAN:  Yes.  It is one exhibit.
6        MS. CHAITMAN:  Yeah.
7        THE WITNESS:  Okay.  So --
8    BY MS. CHAITMAN:
9    Q.    So let -- just to catch up.  One mistake he
10   made was not understanding that on the trade
11   confirmations it -- Madoff -- the firm is buying -- if
12   it says, "bought," it means Madoff, the firm, bought?
13   A.    It means that -- it means -- yes.  The,
14   "we," refers to the firm, Madoff, bought from the
15   customer or sold to the customer.
16   Q.    To the customer.  Okay.  And -- and sold
17   from the firm's own inventory?
18   A.    That's correct.
19   Q.    Okay.  And then you've made the point that
20   Dubinsky looked for confirmation of the volume on the
21   New York Stock Exchange or the London Stock Exchange,
22   and, in fact, the convertible bonds were not sold on
23   the -- you didn't buy them on the --
24   A.    We traded in the over-the-counter market.
25   Q.    Right.

Page 115

1    A.    And there was not even volume reported -- in
2    the days -- the period of time he's looking for there
3    was no volume -- actually, the majority of the volume
4    was never reported in the over-the-counter market,
5    because there was no volume requirements to report
6    volume in bonds in the over-the-counter market until a
7    later date.
8    Q.    Okay.  Do you --
9    A.    It was very -- it was a very -- I don't --
10   it was very hazy, the -- the volume reporting
11   requirements on -- on bond -- in the bond market was
12   never really -- it was that way -- to this day it's
13   sort of a gray area.
14   Q.    Okay.  All right.  Now -- now you want to
15   go -- do you have another area that you want to cover?
16   A.    We've covered the confirmations and the
17   statements, and we've covered the volume, and we've
18   covered the price.  So basically what I'm saying is
19   his -- his criticism of the price of the volume and of
20   the confirmations and statements are inaccurate.
21   Q.    Now, Mr. Dubinsky says that there's no proof
22   that the bonds were converted.
23   A.    Okay.  A -- the -- typical strategy on
24   convertible bonds is not to convert.  In other words,
25   nobody in their right mind should ever -- if a

Page 116

1    convertible bond exists, you would never buy the
2    stock, as opposed to buying the bond, if you could buy
3    the bond at a discount.
4        In other words, a convertible bond trade --
5    a convertible bond -- let's say a bond is convertible
6    into 100 shares of stock at $10 a share.  All right.
7    The -- the convertible bond always should trade at a
8    premium above what it's convertible into the price of
9    the stock at, because it has a coupon attached.  It
10   pays interest.
11       So convertible bonds typically trade at a
12   premium.  In other words, the bond theoretically would
13   be worth 100 based upon the price of the stock at ten.
14   The bond should always trade above 100.
15       It should trade at 101, 100 and a half and
16   so on, because of the fact that the convertible bond
17   is always -- is always going to be worth more than the
18   stock, you know, because of the coupon that it has to
19   it.
20       So convertible bonds sometimes trade at a
21   discount, but rarely.  Usually they trade at a
22   premium.  All right.  When you combine a bond at -- a
23   convertible bond at a -- at a discount, you could
24   theoretically buy the bond, let's say, at 98, when it
25   really should be selling at 100.

Page 117

1        All right.  Because you could buy the bond
2    at 98.  Sell the stock at ten.  Would be -- you'd make
3    a two point profit by converting it.  So ideally you
4    would say, okay.  If you -- because then you'd have no
5    risk.
6        You'd immediately buy the bond at a
7    discount, sell the common stock simultaneously at a
8    profit, and then convert one into the other.  You
9    exchange the bond by selling -- sending it to the
10   conversion agent and say, here is your bond back.  You
11   know, I want stock back.  And then you'd deliver the
12   stock out, and you'd make a profit.
13       But most bonds trade at premiums, which is
14   what they shouldn't be doing.  All right.  So the
15   typical strategy of a convertible bond trader would be
16   to -- to buy the bond either at a discount, which
17   allows you to convert it immediately and make a
18   profit, or hold the bond open and wait for the bond to
19   go to a premium, where it historically should trade
20   at, and then you sell out the bond, cover the stock
21   and un -- what's called unwinding the transaction.
22       Which Dubinsky in his report does state that
23   that is one of the -- he has that right.  That that is
24   the -- you do that kind of trading, you know, either
25   buying it and converting it or unwinding the

30 (Pages 114 - 117)

Page 118

1 transaction. He acknowledges -- he has that -- that
2 part right.
3        He doesn't go into the fact that most bonds
4 should not be converted, but anybody that is familiar
5 with convertible bond trading would know that.
6        All right. The -- so what Dubinsky then
7 does is he says that Madoff, you know, who -- who did
8 buy bonds at a discount and sell the stock, you know,
9 accordingly, it had a locked-in profit, he never
10 physically converted -- he never sent the bonds in to
11 be converted, you know, and take the profit that way,
12 which he should have -- he should have done, you know.
13        But he said, there's no evidence that he
14 ever put the bonds into conversion, because typically
15 he would have found in our records, he assumes, some
16 sort of instructions to the conversion agent to
17 convert the bonds into stock.
18        All right. And if, in fact, we did that, he
19 would -- he would find those instructions, but our
20 strategy, as he acknowledges, as most people's
21 strategy would be, to -- to not convert. He doesn't,
22 you know, really go into the details of that.
23        So our strategy is basically buy the bond,
24 sell the stock. And even though we have a profit and
25 could convert it and lock in the profit, is we don't

Page 119

1 convert it. We hold it open, and then we undo the
2 whole transaction when the premium goes back to where
3 it should be.
4        As a matter of fact, when David Kugel was
5 first hired by me his job was to track all of the
6 convertible bonds that traded in the marketplace. And
7 we had a -- a whole spreadsheet that -- that we
8 developed for him that tracked what every bond that
9 was trading in the marketplace historically traded at.
10        So it would look and see that -- let's say
11 IBM bonds traded over this past two years always went
12 to a two point premium. It always traded at a two
13 point premium.
14        You know, every now and then it -- it would
15 go to a -- a discount or a one point premium, and
16 then, you know, it would go back to that premium. So
17 we would track them historically.
18        And we would always look to see when the
19 bond was -- you know, was changing its relationship.
20 And then we would go into the marketplace and buy
21 those bonds. And that's what all convertible bonds
22 traded, but that was our specialty, was trading this
23 way.
24        All right. But anybody that was a good
25 convertible bond trader did the same thing. It was

Page 120

1 not unique to us. We happened to do more of it than
2 most people.
3        All right. So our goal was to not convert.
4 It was -- it was basically to unwind the transaction.
5 All right. So because he -- he could never see that
6 we were actually converting, and -- and he did find
7 some that we converted, but not -- you know, but there
8 were instances -- he made the assumption that we would
9 always convert, and that -- that's totally untrue.
10        All right. Because what we would do would
11 be when -- when the premium went to where we expected
12 it to go to, we would, what's known as, unwind it or
13 swap the transaction, which another dealer that had
14 the transaction.
15        The problem -- the customer would make -- he
16 could make more money theoretically, you know, within
17 what we -- than what he made had we actually converted
18 it. He could make a greater profit or he could make
19 the same profit. It didn't matter.
20        But as a dealer our goal was to keep bonds
21 out of conversion, because the more you kept the bonds
22 out of conversion, you kept them open in the
23 marketplace to trade at a -- at a future time.
24        So -- because once you convert a bond it's
25 out of existence any longer. So the goal of all

Page 121

1 traders is to keep these bonds in circulation. So you
2 could --
3        It would be like if a customer -- if
4 everybody took the stock that they bought, and they --
5 and they -- the company bought back more of their
6 stock, when a company, like IBM, buys back their stock
7 in the marketplace, they're taking it out of existence
8 anymore. Nobody can trade that stock. So everybody
9 wants to keep these bonds in circulation.
10        All right. Now, another mistake that he
11 makes is if, in fact, we did convert -- you know, he
12 makes the assumption that we would physically put the
13 bonds ourselves into conversion, which, you know, I
14 can understand him thinking that we would do that.
15        All right. But he makes the assumption that
16 because he didn't see any instructions from Madoff to
17 the conversion agent, that we didn't convert.
18        What he seems to not understand, which I can
19 understand him not understanding, is we had -- he
20 thinks our only bank was J.P. Morgan and Bank of
21 New York, which -- in the 2000's those were our main
22 banks.
23        J.P. Morgan was our primary bank when we
24 were dealing with customers in split-strike, and our
25 operating bank when we were dealing with our

31 (Pages 118 - 121)

Page 122

1  market-making and dealer in -- in general, doing
2  hundreds of thousands of trades, were handled through
3  Bank of New York, which was our operating bank.
4      All right. In the period that he's looking
5  at the convertible bonds in the '70s and the '80s, we
6  had -- our banks were Chase Manhattan Bank,
7  Continental Bank, Commercial Bank of North America,
8  Meadowbrook National Bank, Marine Midland Bank.
9      You know, we also had clearing arrangements
10  with -- with Barclays, with Carlo LaBorde (PHONETIC) &
11  Company, Edwards & Hanley (PHONETIC) and others. In
12  other words --
13  Q.   Bear Stearns?
14  A.   Huh?
15  Q.   Bear Stearns?
16  A.   Bear Stearns. So he like -- he doesn't see
17  any of that, because he wouldn't. He's looking at --
18  you know, in the -- in the more recent period those
19  banks have already been merged out or don't exist any
20  longer.
21      You know, when we -- when we did convert
22  bonds -- and we did convert bonds, you know. We
23  didn't -- you know, the -- the majority of what we
24  unwound, but we looked -- when we did convert a bond,
25  we would convert the bond through one of those agents,

Page 123

1  like Commercial Bank of North America, because if the
2  bank's conversion agent was in Chicago, and we wanted
3  to convert it, we would have -- we would have had
4  to either send somebody out to Chicago or a messenger
5  to convert the bond or mail it and hope that the
6  mail -- the bonds actually got there.
7      You would never do that. You would -- you
8  would give it to a bank, you know, and the bank would
9  convert it for you. So we would give it to the
10  Commercial Bank of North America.
11      They had -- they were a large clearing bank,
12  and they would physically convert it with arrangements
13  through whoever the conversion agent was doing that.
14      All right. He doesn't -- he has no way of
15  knowing that, because those banks weren't -- he
16  doesn't even know those banks existed when they were
17  there. So the banks themselves, which we would
18  convert, would -- would draft out.
19      It was the same thing like when we would
20  deliver -- before we formed the clearing corporation
21  on equities, if you sold stock to a brokerage firm in
22  Chicago, in order to get paid for that you would have
23  to mail that stock to Chicago and hope that they sent
24  you a check while the bank -- you know, when they
25  finally got it.

Page 124

1      All right. As opposed to when we developed
2  a clearing corporation, meaning the National
3  Securities Clearing -- Clearing Corporation, NTTC, you
4  know, we would -- they would clear the whole
5  transaction.
6      So it would -- you know, of course, the
7  industry -- another thing I got blamed for was
8  founding the clearing corporation, because Wall Street
9  cleared all of their transactions through basically a
10  couple of major banks, like Citicorp, Chase and so on.
11      Nobody -- they handled -- they -- brokerage
12  firms themselves didn't all have the facilities --
13  back office facility. So a bank used to clear those
14  trades for them. The banks -- that was a great
15  business for banks.
16      So the industry, because of the paperwork
17  crisis, decided they had to have a -- they had to have
18  a clearing corporation developed to clear the trades
19  for the industry.
20      The major banks in the United States went
21  crazy with that concept, because they wanted to keep
22  all of the business themselves. They wanted brokerage
23  firms to be required to -- to use the banks to clear
24  the transactions rather than have a clearing
25  corporation.

Page 125

1      But finally we -- you know, the SEC put
2  enough pressure on people to develop a clearing
3  corporation. So we formed the National Securities
4  Clearing Corporation, which I became the chairman of.
5      And then we merged also Depository Trust
6  into that. So that brokerage firms would send their
7  deliveries of stocks rather than through the mail,
8  where you have to use the bank to do that, to use a
9  clearing corporation, which settled all of the trades
10  for the whole industry.
11      So what -- what happens today -- I'm telling
12  you more than you probably are interested or wanting
13  to know, but if I -- I may buy stock -- you know, sell
14  10,000 shares to Merrill Lynch and 10,000 shares to
15  someone else and so on and so forth.
16      And buy and sell all day long with -- you
17  know, like we did hundreds of thousands of
18  transactions as -- as the report points out. The
19  clearing corporation nets all of these transactions,
20  you know, among the Wall Street brokerage firms.
21      And at the end of the day they net out -- I
22  may have bought and sold a million shares during the
23  day, but the net comes out to 500 shares between all
24  my buys and sells.
25      They send me a bill at the end of the day

32 (Pages 122 - 125)

Page 122

1  market-making and dealer in -- in general, doing
2  hundreds of thousands of trades, were handled through
3  Bank of New York, which was our operating bank.
4       All right.  In the period that he's looking
5  at the convertible bonds in the '70s and the '80s, we
6  had -- our banks were Chase Manhattan Bank,
7  Continental Bank, Commercial Bank of North America,
8  Meadowbrook National Bank, Marine Midland Bank.
9       You know, we also had clearing arrangements
10  with -- with Barclays, with Carlo LaBorde (PHONETIC) &
11  Company, Edwards & Hanley (PHONETIC) and others.  In
12  other words --
13  Q.   Bear Stearns?
14  A.   Huh?
15  Q.   Bear Stearns?
16  A.   Bear Stearns.  So he like -- he doesn't see
17  any of that, because he wouldn't.  He's looking at --
18  you know, in the -- in the more recent period those
19  banks have already been merged out or don't exist any
20  longer.
21       You know, when we -- when we did convert
22  bonds -- and we did convert bonds, you know.  We
23  didn't -- you know, the -- the majority of what we
24  unwound, but we looked -- when we did convert a bond,
25  we would convert the bond through one of those agents,

Page 123

1  like Commercial Bank of North America, because if the
2  bank's conversion agent was in Chicago, and we wanted
3  to convert it, we would have -- we would have had
4  to either send somebody out to Chicago or a messenger
5  to convert the bond or mail it and hope that the
6  mail -- the bonds actually got there.
7       You would never do that.  You would -- you
8  would give it to a bank, you know, and the bank would
9  convert it for you.  So we would give it to the
10  Commercial Bank of North America.
11       They had -- they were a large clearing bank,
12  and they would physically convert it with arrangements
13  through whoever the conversion agent was doing that.
14       All right.  He doesn't -- he has no way of
15  knowing that, because those banks weren't -- he
16  doesn't even know those banks existed when they were
17  there.  So the banks themselves, which we would
18  convert, would -- would draft out.
19       It was the same thing like when we would
20  deliver -- before we formed the clearing corporation
21  on equities, if you sold stock to a brokerage firm in
22  Chicago, in order to get paid for that you would have
23  to mail that stock to Chicago and hope that they sent
24  you a check while the bank -- you know, when they
25  finally got it.

Page 124

1       All right.  As opposed to when we developed
2  a clearing corporation, meaning the National
3  Securities Clearing -- Clearing Corporation, NTTC, you
4  know, we would -- they would clear the whole
5  transaction.
6       So it would -- you know, of course, the
7  industry -- another thing I got blamed for was
8  founding the clearing corporation, because Wall Street
9  cleared all of their transactions through basically a
10  couple of major banks, like Citicorp, Chase and so on.
11       Nobody -- they handled -- they -- brokerage
12  firms themselves didn't all have the facilities --
13  back office facility.  So a bank used to clear those
14  trades for them.  The banks -- that was a great
15  business for banks.
16       So the industry, because of the paperwork
17  crisis, decided they had to have a -- they had to have
18  a clearing corporation developed to clear the trades
19  for the industry.
20       The major banks in the United States went
21  crazy with that concept, because they wanted to keep
22  all of the business themselves.  They wanted brokerage
23  firms to be required to -- to use the banks to clear
24  the transactions rather than have a clearing
25  corporation.

Page 125

1       But finally we -- you know, the SEC put
2  enough pressure on people to develop a clearing
3  corporation.  So we formed the National Securities
4  Clearing Corporation, which I became the chairman of.
5       And then we merged also Depository Trust
6  into that.  So that brokerage firms would send their
7  deliveries of stocks rather than through the mail,
8  where you have to use the bank to do that, to use a
9  clearing corporation, which settled all of the trades
10  for the whole industry.
11       So what -- what happens today -- I'm telling
12  you more than you probably are interested or wanting
13  to know, but if I -- I may buy stock -- you know, sell
14  10,000 shares to Merrill Lynch and 10,000 shares to
15  someone else and so on and so forth.
16       And buy and sell all day long with -- you
17  know, like we did hundreds of thousands of
18  transactions as -- as the report points out.  The
19  clearing corporation nets all of these transactions,
20  you know, among the Wall Street brokerage firms.
21       And at the end of the day they net out -- I
22  may have bought and sold a million shares during the
23  day, but the net comes out to 500 shares between all
24  my buys and sells.
25       They send me a bill at the end of the day

32 (Pages 122 - 125)

Page 126

1  that I either have to pay on the 500 shares or get a
2  check for the 500 shares of stock. And all of the
3  banks went out of the clearing business, and now it's
4  all handled by the National Securities Clearing
5  Corporation Depository Trust.
6  Q. Okay. I want to go back, because that's one
7  of the things that Dubinsky talks about, that he can't
8  find trade confirmations. Now, we're dealing with --
9  A. So --
10  Q. -- the convertible arbitrage strategy --
11  strategy in the 1980s.
12  THE COURT REPORTER: Can I ask for a
13  break?
14  MS. CHAITMAN: Of course. Of course.
15  THE VIDEOGRAPHER: Going off the
16  record. The time is 12:09.
17  (RECESS FROM 12:09 P.M. TO 12:16 P.M.)
18  THE VIDEOGRAPHER: Back on the record.
19  The time is 12:16.
20  THE WITNESS: Okay. So I think we were
21  at the -- the clearing of -- oh, so that his
22  inability to find instructions to convert bonds,
23  you know, all the time was that he was not aware
24  of the fact that if we did convert bonds we had
25  the ability and did convert bonds through other

Page 127

1  clearing -- other clearing banks.
2  BY MS. CHAITMAN:
3  Q. So that you wouldn't have the records for
4  that?
5  A. Wouldn't -- they would not exist, because
6  there would be no way that we would put the bonds
7  physically for the most part -- we did some -- some of
8  them, depending upon what the year it was and what he
9  was looking for, but, as I say, the idea was not to --
10  to actually convert, but --
11  Q. Right.
12  A. -- to arrange a swap arrangement --
13  Q. Right.
14  A. -- or a clearing arrangement.
15  Q. Okay. Now, he also makes the point that he
16  couldn't find trade confirmations.
17  A. Okay. That -- when -- one of the times
18  that -- when you first came down, if you still
19  remember --
20  Q. And when you say, "you," are you --
21  A. Meaning David Sheehan --
22  Q. Sheehan.
23  A. -- and his staff of attorneys came down
24  here. I think it was at that time that they mentioned
25  to me that they could not find confirmations --

Page 128

1  counterparty confirmations on transactions.
2  So -- and we were buying and selling stock
3  through other brokerage firms for clients. They
4  expected us to -- they saw that we had confirmations
5  selling and buying stocks from the customer, but they
6  did not find any confirmations to the broker.
7  All right. Now, number one, if we were
8  dealing as principal, which clearly our confirmations
9  stated, and we always did it as principal, we would --
10  there wouldn't be a counterparty on the other side of
11  the trade, because we were the counterparty on the
12  other side of the trade.
13  But when we did go out into the street to
14  buy the stock, you know, there would be a
15  counterparty, you know, on the other side of the
16  trade. He couldn't find the confirmation. So he saw
17  thousands of confirmations with clients, but he never
18  saw any broker confirmations, period.
19  So he said to the -- you weren't buying and
20  selling stock from anywhere. You know, there were no
21  confirmations. And I looked at him, and I said, well,
22  no. You know, I was sort of -- didn't understand the
23  question, because I didn't understand why he expected
24  there to find confirmations.
25  Q. When you say, "him," to whom are you

Page 129

1  referring?
2  A. The trustee.
3  Q. Okay.
4  A. And -- so it was that -- you know, I then
5  realized that, you know, he expected to find -- you
6  know, just as he found a broker confirmation, he
7  assumed that every time we went and sold or bought
8  stock from a customer we bought it from another
9  broker, which sometimes we did.
10  Sometimes we bought it out of inventory. If
11  it was bought out of inventory, there wouldn't be --
12  there would be a customer confirmation at an earlier
13  date that -- that we put it into our inventory, but --
14  All right. But, I said, there -- there are
15  no confirmations. And that sort of went on deaf ears.
16  Now, number one, I said, first of all, you're looking
17  at -- we don't -- we don't keep any records of
18  customer confirmations from the past six years.
19  I said, the record retention period for the
20  industry is six years. So after six years everybody
21  gets rid of all of their records. You can imagine, we
22  do hundreds of thousands of trades everyday.
23  If we -- if we kept paperwork for all of
24  those transactions, you know, it would be impossible.
25  I said, so we keep customer confirmations for, you

33 (Pages 126 - 129)

Page 130

1  know, a longer period of time, because customers need
2  that for tax purposes, audits and so on and so forth.
3        But a general policy, we don't keep records
4  for more than six years, because that's what the
5  record retention period does.  Even though we did have
6  records, because -- and I used to always yell at my
7  people.
8        I used to say, after six years, get rid of
9  everything, because I'm paying for storage on this
10 stuff.  But I said, wait a minute.  I said, you
11 won't -- you won't find confirmations for any of my
12 trades.
13       I said, I do hundreds of thousands of
14 shares -- of trades everyday.  I said, you don't
15 find -- you can't find any of those confirmations.  I
16 said, so are you now assuming because you can't find a
17 confirmation when my market-makers or proprietary
18 traders bought hundreds of thousands of trades
19 everyday that those trades didn't take place either?
20       And there was no answer.  I said, first of
21 all, are you aware of the fact that brokers stopped
22 issuing confirmations years ago?
23 Q.   How --
24 A.   Because of the clearing corporation.
25 Q.   How many years ago?

Page 131

1  A.   Well, there's what's called a continuous net
2  settlement, which I started to say.  In other words,
3  when we buy and sell stock all day long, anybody buys
4  and sell stocks when they're long, they don't issue a
5  counterparty confirmation to Merrill Lynch, because
6  those trades are reported automatically through the
7  clearinghouse, and you get -- you don't get
8  confirmations.
9        Customers get -- confirmations get mailed
10 out back and forth, but the industry does not issue
11 confirmations to each other, you know, as a general
12 rule.  You can, if you want, but nobody would do that.
13       So I said, so making your supposition that
14 you can't find a confirmation from a brokerage firm on
15 the other side of a customer trade, and you can't
16 find -- you won't find a confirmation on the other
17 side of a - of a non-customer trade either, because
18 they don't -- I don't have any customer confirmations
19 in my records.
20       I said, how can you not understand that?
21 Now, maybe -- like my lawyers -- you can't expect him
22 to understand.  They're lawyers.  They're not
23 brokerage firms.
24       I said, all right, but you're asking me
25 questions -- you know, they're asking me questions

Page 132

1  that they have to get somebody that explains that.
2        Now, certainly Dubinsky would know that, but
3  he doesn't even mention -- in fairness to Dubinsky, he
4  doesn't -- he doesn't mention anything about this
5  confirmation issue, because he clearly knows that
6  much.
7        This was the trustee, Irving Picard, and his
8  attorneys, or, I guess, and David's partners or
9  whatever.  And maybe they had no reason to know that
10 either, because the average person would not know
11 that.
12 Q.   When did the continuous net settlement
13 system come into place?  Was it in place in the '80s?
14 A.   Yes.  Probably in the '80s.
15 Q.   Okay.
16 A.   So --
17 Q.   So how -- how does that work?  At the end of
18 the day you just get a computerized printout --
19 A.   Right.
20 Q.   -- with -- with the net amount that you have
21 to sell --
22 A.   Right.
23 Q.   -- or receive?
24 A.   Right.
25 Q.   Okay.  Okay.  And if you were doing

Page 133

1  over-the-counter purchases and sales of subordinated
2  bonds, convertible bonds --
3  A.   Yeah.
4  Q.   -- was that done on a continuous net
5  settlement basis also?
6  A.   No.
7  Q.   How was that done?
8  A.   It was just -- it was -- you wouldn't issue
9  a confirmation.  It was -- well, it depends -- you
10 want to know about a convertible bond for a -- for a
11 claim?
12 Q.   When you were doing the investment -- I'm
13 focusing on the 1980s.
14 A.   Right.
15 Q.   The convertible arbitrage transactions.
16 A.   Uh-huh.  We wouldn't have -- there wouldn't
17 be -- it -- we would issue, you know, a -- we would
18 issue a confirmation there, but we wouldn't have those
19 in our records in the '80s, because we don't hold the
20 confirmations after six years.
21 Q.   Right.  And the -- if you were -- you were
22 selling to the customer, you had a confirmation, but
23 when you were buying it --
24 A.   There wouldn't be a confirmation.
25 Q.   -- for inventory, there wouldn't be a

34 (Pages 130 - 133)

Page 134

1  confirmation?
2  A.   No.  Not -- not after six years.
3  Q.   Okay.  Okay.  So we're -- we're going -- we
4  started out listing the mistakes that you felt --
5  A.   Right.
6  Q.   -- Dubinsky made.  Did he make a mistake
7  with respect to using the trade date versus the
8  settlement date; is that what you covered already?
9  A.   The average price.  Yes.
10 Q.   Okay.
11 A.   On the ranges?
12 Q.   Yeah.
13 A.   Well, it's -- if you look at the range on --
14 you wouldn't have -- there wouldn't be a -- there
15 wouldn't be a record of the ranges.
16    Well, first of all, you can't even use the
17 ranges, because you'd have to -- well, he -- in order
18 to -- in order -- in other words, if the SEC was doing
19 an audit, which they did all of the time as to, you
20 know, best -- what's called best execution, they would
21 actually look and see, you know, what dates you bought
22 this stock.
23    Okay.  You know, if it was an average price
24 transaction, they would have to go back and look at
25 all of the days, you know, that you accumulated the

Page 135

1  stock, not just use the last day that you reported the
2  trade to the customer, because they understand what an
3  average price is.
4     Now, the only ones -- typically if you call
5  up a broker, and you tell him, buy me, you know, 50
6  shares of IBM or 200 shares of IBM, they would
7  actually -- they wouldn't do that over the course of a
8  day.
9     All right.  Because that -- you know, they
10 would just buy -- it's a small amount of a lot, but if
11 you're dealing with -- with discretionary accounts or
12 you're accumulating a larger -- with a a -- portfolio
13 of accounts, the way we always traded, you would
14 always do an average price transaction.
15    So they -- what they would have to do is go
16 back, which they would do, and see what was your real
17 average price.  They would verify what the average
18 price was, not just look at the last day, because they
19 would realize that you would never be able to find
20 a -- you would rarely be able to find a match, because
21 you'd --
22 Q.   Right.
23 A.   -- have done it, you know, at different
24 periods of time.
25 Q.   Right, right.  Are there other general

Page 136

1  mistakes that you can recall from --
2  A.   Well, we -- he mentions that David -- well,
3  he talks about David Kugel as -- you know, he mentions
4  in the report David Kugel -- in other words, he
5  acknowledges that they don't have records going back
6  to the time that David -- he's talking about David
7  Kugel, because we don't -- there are no records.
8     So he's -- he points out as a footnote that
9  he's using David Kugel's information to plea bargain
10 that he created fictitious trades.  Now, as I stated
11 before, that makes no sense to me at all.
12    And I think that David Kugel -- I'm not
13 even -- I'm not saying that he's lying.  I'm saying
14 that he misinterpreted -- what he said when he created
15 a trade, he's misinterpreting what he's saying.
16    In other words, if -- if -- if I -- if I
17 give instructions to -- you know, if I wanted -- if I
18 decide I want to sell stock to a customer out of my
19 inventory, I -- I could say to someone like David
20 Kugel, you know, I want to sell stock to -- I want to
21 sell, you know, IBM to the client.
22    So we have 100 bonds in -- 100 convertible
23 bonds in the account.  I want to sell to Carl Shapiro,
24 you know, 20 bonds.  You know, I want to do a
25 convertible trade for him.

Page 137

1     Give instructions, you know, to Annette to
2  buy, you know, convertible bond, you know, for -- for
3  Carl Shapiro, and, you know, just tell her what a --
4  tell them what the formula -- what the formula is, so
5  she knows how many bonds -- how to set the trade up.
6     He -- you know, he would write these
7  instruction sheet -- this -- this convertible bond,
8  you've got to -- if you're going to do 50 bonds, you
9  know, this is -- this is how many bonds, and this is
10 how much stock you sell.
11    And it gives her like -- she then looks at
12 my inventory record and sees, okay.  He -- he has X
13 number of bonds he can convert.  Takes it out of --
14 out of the investment account or the firm's trading
15 account into this customer account.
16    So David Kugel has no idea, nor has any
17 other trader, what the -- what the firm's net
18 inventory.  We could have -- we could have -- we have
19 five different traders trading IBM convert.  They're
20 all competing with each other.
21    They don't want to -- they never want David
22 to know what his position is, because he -- you know,
23 they're competing with him.  That's part of the
24 strategy of the firm, all market-making firms.
25    So he -- if -- if -- if someone says, well,

35 (Pages 134 - 137)

Page 138

1  give them instructions, he'll give -- he'll give
2  Annette or Jodi instructions of how many bonds to --
3  to buy and sell for this customer.
4        He has no idea after that where that --
5  where it's coming from.  He doesn't know whether it's
6  coming from the firm's inventory, from his inventory
7  or someone else's inventory.  He would not know that.
8        So if -- if he says to somebody, which is a
9  very -- I'm going back to like when I told in my
10  proffer agreement that I short stock to a customer.
11  And they said, you sold stock to a customer?  How can
12  you short stock a customer?  You're selling them stock
13  that you don't own.
14        And I say, yeah, market-makers do that all
15  day long.  That's part of our business.  We're
16  shorting stock to a customer.  And he -- an alarm
17  bell goes off and says, well, how can you sell stock
18  to a customer you don't own?
19  Q.   Okay.  Well, that --
20  A.   You know --
21  Q.   Let me ask you that.
22  A.   Okay.
23  Q.   Was that illegal, for you to be selling
24  stock to a customer that you didn't own?
25  A.   No.  I'll -- I'll -- I'll explain that too,

Page 139

1  because that's -- that's another issue, but let me
2  just finish this thing.
3        So that if, in fact, David Kugel or anybody
4  is -- is giving instructions to the operations side of
5  the business, meaning Annette or Jodi, of -- of how to
6  do a trade, that doesn't mean that's a fictitious
7  trade.
8        He -- you know, he has no idea.  He's just
9  telling her how to do the allocation of the trade.
10  Not -- he doesn't know if -- you know, whether or not
11  the firm has it in inventory or doesn't have it in
12  inventory.
13        But even if I wanted to short it to the
14  customer, let's say I didn't have it in inventory,
15  there's nothing wrong with that.  I am allowed to
16  short stock to a customer.
17        Theoretically I could have shorted all of
18  these split-strike trades to the customer forever.  My
19  violation was not going short.  It was not recording
20  the short on my financial records as a liability,
21  which I guarantee you, nobody understands that.
22        To this day if I called up the prosecutor,
23  Litt, and I said to him, you know, I don't have --
24  there's nothing wrong with me shorting stock.  He
25  would look at me and say, that's not true.  You can't

Page 140

1  short to a customer.
2        And I can prove that to you, because I don't
3  know how many times, you know, I had to -- I had to
4  argue this case in front of the SEC and with the
5  issuing companies, like Apple computer and everything
6  at -- when we were at board meetings with the IBM.
7        Average company does not want you to ever
8  short stock.  In other words, every company that
9  trades on an exchange does not want a brokerage firm
10  to sell stock that he doesn't own.
11        They think that short selling is illegal, is
12  immoral and should never be done.  All right.  That's
13  what they want.  They don't want ever -- they don't
14  want anybody to be able to short stock.
15        Just like nobody wanted, you know, George
16  Soros to short Sterling and make a billion dollars
17  shorting -- you know, breaking the market on -- on
18  shorting.
19        But what they don't understand is that
20  shorting is a very -- you know, a very, you know,
21  legitimate market, you know, thing to do in the
22  marketplace, and it's required, because it keeps
23  stocks from going to artificially high prices.
24        All right.  And the -- it certainly happens
25  that as I was -- when I was looking for -- reading

Page 141

1  another book, one of the things I do here is I tutor
2  people on finance and the marketplace.
3        Of course, the Bureau of Prisons only big
4  concern is that I'm teaching them a fraud.  All right.
5  So originally I was told, no, you can't tutor or teach
6  anybody here, you know, but I said, listen, I said,
7  they -- you have outside people coming in here,
8  professors, to -- to lecture, you know, as part of,
9  you know, the justice department, and they're all
10  asking, can Bernie Madoff -- you have Bernie Madoff
11  sitting here.  Let him lecture people.
12        And the Bureau of Prisons says, the
13  newspapers are going to say that Bernie Madoff is --
14  is perpetuating a fraud.  Just like when they put me
15  in charge -- when I first got here, my first job was
16  in the engraving department.
17        I was engraving signs, you know, that they
18  hung on walls here.  So the -- the Wall Street Journal
19  said, Bernie's first job is engraving, you know.  So
20  they said, take him away from the engraving
21  department.
22        And they -- I had seven jobs in seven days,
23  because no matter what I was doing, including I was in
24  charge of cleaning the computers, you know, can't do
25  that, you know, because you're reprogramming the

36 (Pages 138 - 141)

Page 142

1    computer.
2         I couldn't reprogram my telephone number.
3    You know, that's not my -- not my strengths here. So
4    I'm now -- my job is now cleaning the laundry room.
5    That's my job here.
6         The -- I'll -- I'll -- there's a book that
7    was written by someone like Dubinsky. He has a very
8    big -- and he talks about --
9         MR. GOLDMAN: Tell us the name of the
10   book and the author, Bernie.
11        THE WITNESS: I don't even know what
12   it --
13        MS. CHAITMAN: May I mark that whole
14   thing as --
15        THE WITNESS: "Secret Weapon."
16        MS. CHAITMAN: -- the next exhibit?
17        MR. SHEEHAN: Could you just mark it as
18   an exhibit?
19        MS. CHAITMAN: Yeah. Let me just mark
20   it.
21        Can I mark this whole thing?
22        THE WITNESS: Yeah.
23        MS. CHAITMAN: Is it all connected?
24        THE WITNESS: Yeah.
25        MS. CHAITMAN: Is it all one --

Page 143

1         THE WITNESS: Yeah, yeah.
2         MS. CHAITMAN: Okay.
3         THE WITNESS: Anyhow --
4         MS. CHAITMAN: So I'm marking as
5    Exhibit 11 --
6         (MADOFF EXHIBIT 11 WAS MARKED FOR
7    IDENTIFICATION.)
8    BY MS. CHAITMAN:
9    Q.   -- a -- it says the author is Kevin Freeman,
10   and the title is, "Secret Weapon." And it's pages --
11   I don't know what the first page is, but the --
12        MR. SHEEHAN: It's the inside cover.
13   Q.   The inside cover is 78. 78 to 83, and then
14   123 and 124.
15   A.   He's talking about how the markets work. He
16   talks about bear runs, and he talks about naked short
17   selling, and he talks about the Madoff exemption.
18   Q.   Is that a term that's in the industry?
19   A.   Naked -- yeah, naked --
20   Q.   No, but the Madoff exemption?
21   A.   Yes. In other words, he goes on to state,
22   "Long before he was convicted of defrauding the
23   American public of some 50 billion through a Ponzi
24   scheme, Bernie Madoff was chairman of the National
25   Association of Securities Dealers, NASD. In that

Page 144

1    capacity he appeared regularly at the SEC and served
2    on agency panels."
3         And then he quotes them as saying, "When it
4    came to Bernie, people paid more attention, said
5    Georgetown University law school professor, Donald
6    Langevoort, who worked on an SEC panel with Madoff."
7         He quoted -- then goes on to quote, saying,
8    "This was a guy who really knew how markets worked.
9    He was the grownup in the room. If there was a
10   confession" -- "if there was confusion or a question
11   or two people on opposite sides going at each other,
12   Bernie would speak up and explain what the deal was.
13   I'm sure in some ways that may have thrown even the
14   commission off their guard."
15        "One of Madoff's key accomplishments at the
16   SEC was to get a rule approved, the so-called Madoff
17   exemption, that allowed market-makers to naked short
18   sell. Market-makers are broker-dealer firms that gain
19   fees by holding shares of securities in order to help
20   grease the wheels of trading."
21        "If someone buys stock in a company, it is
22   the market-maker who sells the stock and then finds an
23   offsetting order. This keeps the markets flowing
24   smoothly."
25        "In the case of short selling if the

Page 145

1    market-maker has no inventory of the shares sold, the
2    firm is allowed to create an IOU for the shares. This
3    is a form of naked short selling legalized by the
4    Madoff market exemption."
5         Basically what he's stating, this is the --
6    he's quoting this law professor at Georgetown, who
7    served on a panel with me, that says that I could sell
8    stock short.
9         So selling stock short, not only is it
10   something that is to the benefit of the marketplace,
11   market-makers are required to sell stock short. So
12   theoretically I don't ever have to, you know, buy
13   stock for a customer.
14        I'm responsible for producing that stock if
15   the customer ever wants it. And any profit that the
16   customer makes in the trade I'm responsible for.
17        So in theory, which my attorney said to me,
18   Bernie, you know, you can -- you're not doing anything
19   wrong with being short these split-strike trades to
20   the client, you know. You know, I can short all day
21   long, and I do short stock at times. Every brokerage
22   firm short stocks to a customer.
23        My violation was not showing the IOU, the
24   liability, you know, on my balance sheet. That's what
25   the violation was. I would have also been out of

Page 146

1  ratio, you know, by not -- if I did show that.  So --
2      Q.   So you mean that there was -- do you -- if
3  you sell short, do you have an obligation -- is it
4  your understanding that you have an obligation to the
5  customer?
6      A.   To produce that stock if the customer wants
7  it.
8      Q.   Right, but do you have an obligation -- and
9  we're talking about the investment advisory customer.
10     A.   Yes.
11     Q.   Did you have an obligation to tell the
12 customer, your statement shows 30 shares of IBM, but
13 I'm actually short that --
14     A.   No.
15     Q.   -- position?
16     A.   No.
17     Q.   So it was --
18     A.   No.  You don't -- you're not --
19     Q.   So if -- if a customer is -- if a securities
20 customer is dealing with a market-maker --
21     A.   Or anybody.
22     Q.   Well, only the market-makers have the
23 exemption.
24     A.   No, no.  That's -- that's wrong.  The
25 market -- the -- the -- anybody can sell stock short

Page 147

1  to a customer, you know.  The -- it's -- they always
2  can sell stock through shorting, but he --
3          You know, what he's talking about is -- you
4  know, is that, you know, I was the one that argued for
5  the short stock selling, because what he -- he
6  confuses the situation, because there are certain
7  requirements that a market -- if a market-maker is
8  shorting stock to a customer or to anybody, he has
9  to -- his records have to show that he shorted the
10 stock.
11         MR. SHEEHAN:  Who is, "he"?
12         THE WITNESS:  Meaning the brokerage
13 firm.
14         MR. SHEEHAN:  Okay.
15 BY MS. CHAITMAN:
16     Q.   Okay.  So the brokerage -- so let's just
17 take the split-strike.  Okay?
18         MR. GOLDMAN:  Wait.  Before -- before
19 you ask the question, I think he said -- and the
20 transcript will speak for itself, obviously, but
21 I think he said that the -- the market-maker was
22 required to sell short.  Did you mean permitted
23 to sell short?
24         THE WITNESS:  Well, you -- you're
25 required to make a two-sided market.  So if, in

Page 148

1  fact, you -- you're not required to sell stock to
2  the customer short.  You're allowed to sell stock
3  to a customer short.
4          MR. GOLDMAN:  That's --
5          THE WITNESS:  If -- in other words,
6  that's the difference.  You have to be -- you
7  have to sell it at a price that's related to the
8  marketplace, you know.
9          And you have to -- you -- you -- you
10 would put it on your records that you're selling
11 short on the original order ticket.  You have to
12 mark it, because it's what they call an uptake
13 rule and so on, which means you have to -- it's
14 not important.  It's confusing.
15 BY MS. CHAITMAN:
16     Q.   Okay.  So -- so basically if you take John
17 Smith.  He's a split-strike customer.  His statement
18 shows that he owns a portfolio of securities, and, in
19 fact, you don't at that time own them.
20     A.   No.
21     Q.   Are you saying that there's nothing
22 fraudulent about issuing a statement to an IA
23 customer --
24     A.   Uh-huh.
25     Q.   -- an investment advisory customer, showing

Page 149

1  securities as having been purchased for the customer,
2  when, in fact, they haven't been purchased?
3      A.   That's correct.
4          MR. SHEEHAN:  Object.
5          THE WITNESS:  You don't have to --
6  you're not required.  It's not the customer's
7  business whether or not you're selling the stock
8  from long or whether you're selling it short.
9  BY MS. CHAITMAN:
10     Q.   Okay.  So what you're saying is that the
11 fact that the split-strike conversion strategy was
12 carried out from sometime in 1992 until December of
13 2008 without your actually owning the securities that
14 showed up on the statements, that was not a fraud, but
15 the fraud was that you didn't disclose to the SEC on
16 your focus reports --
17     A.   That's correct.
18     Q.   -- that you had that debt?
19     A.   Right.
20         MR. SHEEHAN:  Objection.  Objection,
21 but go ahead.
22         THE WITNESS:  That's correct.
23 BY MS. CHAITMAN:
24     Q.   Okay.  Can you put this in your own words,
25 so we don't have any confusion about it?  I just want

Page 150

1  it to be very clear on the record.
2      A.    That there is nothing wrong with selling
3  stock to a customer out of a short position.  In other
4  words, you do not have -- that is not a violation.
5  The violation -- and it is typical for a brokerage
6  firm to at times sell stock to a customer short.  That
7  is not a violation itself.
8          And the customer doesn't care whether the
9  stock that you are selling him is stock that you
10 actually are long or short.  You know, the customer
11 assumes, as -- and, rightfully so, that if he wants --
12 if wants delivery of those securities, or he wants the
13 profit made from the transaction, that you're still
14 obligated to do that.
15         So had I reported this transaction on my
16 financial records as a liability, that would be --
17 that would be all right, but because I didn't, that's
18 where the violation was.
19         Now, obviously, I couldn't do that, because
20 my -- my liabilities would have been too great.  Which
21 brings me to another error, you know, that I find in
22 the Dubinsky report.  See if I can remember where it
23 was.  Related to that.  The -- well --
24     Q.    Do you -- do you want -- do you want her to
25 read back your last comment?  Maybe it'll prompt you

Page 151

1  to --
2      A.    No.
3      Q.    -- to recall.
4      A.    No.  I'll think of it.  First of all, here
5  is this.  This is yours, and this is yours, I think.
6  I have too much paperwork here.
7      Q.    I just want to go back -- back to this.
8  Forgive me, but it intrigues me.
9          So the entire portfolio that was purportedly
10 owned by the investment advisory customers from 19 --
11 from whenever it was in 1992 that you stopped buying
12 the securities that showed up on the statements until
13 2008, you had always honored withdrawals?
14     A.    Right.
15     Q.    You never defaulted in any of your
16 obligations to the customers?
17     A.    Not until, you know, I went out of business.
18     Q.    Right.  Okay.  So the only violation of law
19 that you understand you committed was not disclosing
20 on your focus reports that you had sold short; is that
21 right?
22     A.    Not that I had sold short.  That I didn't --
23 I did not reflect my liabilities.  That was because of
24 the short position.
25     Q.    Right.

Page 152

1      A.    The short position would have reflected a
2  liability to the customer.
3      Q.    To purchase the shares?
4      A.    I did not show that.
5      Q.    Okay.  Okay.  And I just want to ask you one
6  other thing, which is not related, except it came into
7  my mind.
8      A.    Okay.  Before you do that --
9      Q.    Oh, okay.
10     A.    -- I remembered what I was going to say.
11     Q.    Go ahead.
12     A.    Dubinsky states that -- well, he -- he -- he
13 acknowledges that he -- he doesn't have records to
14 prove this, but he infers in some language that
15 because I did not on my focus reports --
16         One of the -- one of the things that he --
17 points he makes to demonstrate that I was -- he was
18 trying to establish his theory, obviously, initiated
19 by the trustee, that my fraud went back almost to the
20 beginning of time.
21         All right.  That I didn't do any business,
22 because I did not reflect any customer business on my
23 financials -- on my focus reports.  Customers that
24 were -- you know, activity, long and shorts.
25         So -- because he says that, you know, I

Page 153

1  mean, he -- he's saying he could have been doing
2  business in -- for customers in the '80s or '70s or
3  '60s, the '70s even, because my focus reports, which
4  he doesn't have, by the way, because he doesn't -- he
5  can't get that, but he's assuming that there was no
6  customer, you know, business -- no customer positions
7  shown on my focus reports.
8          All right.  But this is a common error made
9  in -- by customers in general.  I used to get calls
10 from people that would say, listen, Merrill Lynch
11 doesn't show, you know, my assets on a position.
12         He's doing all of this business with -- with
13 me or with all of these customers, and it doesn't show
14 on Merrill Lynch's financial statements, you know, any
15 of this business.
16         I said, well, are you talking about his
17 balance sheet?  He says, yeah.  I said, brokerage
18 firms do not show customer assets fully paid for
19 securities on their balance sheets.  Otherwise,
20 Merrill Lynch would have trillions and trillions of
21 dollars.
22         I said, you know, when a brokerage firm
23 files a focus report or any balance sheet, when they
24 send you, you know, they do not -- they do not show or
25 record customers' fully paid for securities.

39 (Pages 150 - 153)

Page 154

1    So if a customer had a margin account or
2 a -- you know, a liability, he would have to show a
3 payable or a receivable from a customer.
4    But if a customer buys IBM, pays for the
5 IBM, and the brokerage firm has that IBM in his -- you
6 know, in his box or at the clearing corporation, that
7 doesn't appear on his records anywhere. So, you know,
8 as long -- if I was -- if I had a -- a liability, and
9 not from a short sale, because, you know, the short
10 sale -- the short sale, if it's a liability, would
11 appear on it, but if he was long and short, the
12 same -- it's another thing.
13    When you're trading in convertible
14 securities, you're -- you're allowed to net the -- the
15 receivable and payable for the same customer against
16 each other. So that stuff does not appear on a focus
17 report.
18    Now, that's a basic accounting. Anybody
19 that's a -- anybody that's familiar with any brokerage
20 firm accounting would know that question. So why he
21 would think there would be a -- that would be on my --
22 on my balance sheet, it's not certain.
23    What would be on my balance sheet would be
24 if the customer owed me money, which is another thing.
25 There's a -- there's a major flaw. And this I have to

Page 155

1 address, even though you didn't ask me about it.
2    The trustee somehow or other when I read the
3 GAO report -- and I actually spoke to the treasury
4 secretary -- the inspector general of the treasury
5 department about this.
6    In the -- in the -- in the GAO report,
7 issued by the government, which is a report that he
8 issues from the general accounting -- accountability
9 office, based upon the trustee's report, there's a --
10    I have a -- this is something that -- David,
11 you might ask Irving Picard how he had managed to get
12 this thing slipped through.
13    Jeffry Picower --
14    MR. GOLDMAN: Tell us what you're
15 looking at, Bernie.
16    THE WITNESS: Oh, this is the GA -- a
17 copy -- part of the G -- the SIPC report, the GAO
18 report, which is -- took seven years to -- to
19 finally get, which my attorneys assured me was
20 going to be done immediately. It took seven
21 years to finally get them to do the results of --
22 of the trustee's report.
23    There's a 6.3 billion dollar liability
24 to the debit balance in Jeffrey Picower's
25 account, which was a -- a major issue was one of

Page 156

1 the things that created my whole problem. This
2 relates to them -- them not honoring their
3 commitments with me when -- and --
4    Okay. This is on -- and I can't give
5 you -- this is my only copy, but you can find it.
6 It's on page 37 of the -- of the GAO report.
7    And I'm quoting now the General
8 Account -- Accounting Office. It says, "As part
9 of our review of the records provided by the
10 trustee, we noted some customer accounts having a
11 negative balance."
12    "For example, in the Picower case the
13 records showed a negative balance of 6.3 billion
14 dollars. In theory this reflected some kind of
15 margin account or debit balance."
16    "The trustee told us even though such
17 an account would not be in keeping with the
18 standard industry practice, such negative
19 balances raised the question of whether the
20 reported amounts represent a debt owed by the
21 customers to the Madoff firm."
22    Now, that clearly is a debt. All
23 right. Jeffry Picower owed me 6.3 billion
24 dollars. All right. The trustee -- I mean, the
25 GAO -- thank God. He questioned the trustee,

Page 157

1 what about the 6.3 billion dollars?
2    And for some reason the trustee
3 claimed, well, we can ignore that, you know.
4 That's not typical.
5    All right. Now, if you look at my
6 records or any brokerage firm's records or
7 account agreements with customers, it clearly
8 states that, you know, they're responsible for
9 any debit balances or margin accounts that they
10 have with the firm.
11    It says here on my trading
12 authorization, which clients sign, it says, "The
13 undersigned hereby agrees to indemnify and hold
14 you harmless from and to pay you promptly on
15 demand any and all losses arising thereof or
16 debit balance due hereon."
17    In other words, every customer that
18 opens a margin account or has any debt with a
19 brokerage firm owes them that money. All right.
20    MS. CHAITMAN: Okay. Can I just
21 mark -- okay. I'm going to mark as Exhibit 12 --
22 can I take that? Is that one document, the one
23 you just read from?
24    THE WITNESS: Yeah.
25    MS. CHAITMAN: Okay. So I'm marking as

40 (Pages 154 - 157)

Page 158

1  Exhibit 12 -- this is a trading authorization.
2      THE WITNESS:  Here, what -- use this
3  one, because this one is -- this copy is better.
4  It's the same type of thing.
5      MS. CHAITMAN:  Okay.  So I'm -- you
6  know what?  Can I mark them both?  Because you
7  read this one.  So --
8      THE WITNESS:  It's the same -- it says
9  the same thing.
10     MS. CHAITMAN:  Okay.  All right.  So
11 I'm marking as Exhibit 12 the one you read.
12     (MADOFF EXHIBIT 12 WAS MARKED FOR
13 IDENTIFICATION.)
14     MS. CHAITMAN:  And I'm going to mark as
15 Exhibit 13 something called, "Trading
16 authorization limited to purchases and sales."
17     (MADOFF EXHIBIT 13 WAS MARKED FOR
18 IDENTIFICATION.)
19 BY MS. CHAITMAN:
20     Q.   And can you just read in whatever the
21 language is that you want?
22     A.   Uh-huh.  All right.  So for some reason, you
23 know, the trustee convinced the GAO -- I don't --
24 maybe they didn't care that much about it -- that this
25 six -- that this debit balance was not typical at a

Page 159

1  brokerage firm or that they weren't.  Now --
2      Q.   Wait.  I just want to go back to this.  I
3  don't want to lose track of it.
4      MR. SHEEHAN:  Sure.
5  BY MS. CHAITMAN:
6      Q.   You -- you said that this has better
7  language on the points.
8      A.   It doesn't -- it just shows the customer --
9  every customer agreement always has that customers are
10 responsible for any debit balance --
11     Q.   Okay.
12     A.   -- they owe the brokerage firm.
13     Q.   Okay.  Okay.
14  (The following pages were redacted pp. 159:14-160:18)
15
16
17
18
19
20
21
22
23
24
25

Page 160

19     Q.   Okay.
20     A.   All right.
21     Q.   So I want to go back to one other question.
22 When you stopped buying securities on the split-strike
23 customer accounts, and you said you did that for a
24 short period of time, and then you stopped.
25     A.   It wasn't a short period of time.  It was

Page 161

1  from 1992 to 2008.
2      Q.   Right, but I understood your testimony to be
3  that when you initiated that program you actually were
4  buying.
5      A.   Oh.
6      Q.   Am I correct about that?
7      A.   Yes, but that was prior to that.  That was
8  before the hedge funds.  That was prior to '92.
9      Q.   Oh, okay.  Okay.  Okay.  I'm glad you
10 clarified that.
11     So what -- what were you doing with the
12 money?  Let's say that Customer A sent you a million
13 dollars for the split-strike program.
14     A.   It went into --
15     Q.   What --
16     A.   -- treasury bills.
17     Q.   It went into U.S. treasury bills?
18     A.   Well, some of it went into treasury bills.
19 Some of it went back to customers when they withdrew
20 profits --
21     Q.   Okay.
22     A.   -- that didn't exist.
23     Q.   The -- the portion that went into treasury
24 bills, were those interest-paying treasury bills?
25     A.   Yeah.

41 (Pages 158 - 161)

Page 162

1    Q.   And do you remember in 1992 what the
2  interest rate was -- was on the treasury bills?
3    A.   Probably like two percent, something like
4  that, on -- you know, one and a half, two percent.
5    Q.   Okay.  And is it fair to say that for the
6  whole period up until 2008 that the money that wasn't
7  used to redeem customer accounts was in treasury
8  bills?
9    A.   Probably, yeah.
10    Q.   And that would have been interest-earning
11  treasury bills?
12    A.   Yeah.
13    Q.   Whatever the current interest rate was; is
14  that right?
15    A.   Uh-huh, uh-huh.
16    Q.   Were these longer-term treasury bills --
17    A.   No.
18    Q.   -- or shorter term?
19    A.   No.  They were short term.  They were
20  T-bills, you know.  You know, the short term.  One to
21  two years.
22    Q.   Okay.  So the customers' money was earning
23  some percentage?
24    A.   Yeah.
25    Q.   Whatever the treasury bill rate was?

Page 163

1    A.   Yeah, but there wasn't enough treasury bills
2  to cover all of the liabilities.
3        MS. CHAITMAN:  Okay.  Does everybody --
4  do you want to take a break, and then we'll go
5  through until --
6        MR. SHEEHAN:  Sure.  As a --
7        MS. CHAITMAN:  Because I'm about to --
8  to go through the Dubinsky report, which is going
9  to be tedious.  Why don't we take --
10        MR. SHEEHAN:  Whatever.
11        MS. CHAITMAN:  -- five minutes.
12        MR. SHEEHAN:  Five minutes?
13        MS. CHAITMAN:  Yeah.
14        MR. SHEEHAN:  That's good.
15        THE VIDEOGRAPHER:  Going off the
16  record.  The time is 13:01.
17        (RECESS FROM 1:01 P.M. TO 1:18 P.M.)
18        (MADOFF EXHIBIT 14 WAS MARKED FOR
19  IDENTIFICATION.)
20        THE VIDEOGRAPHER:  Back on the record.
21  This begins media number three in the deposition
22  of Bernard L. Madoff.  The time is 13:18.
23  BY MS. CHAITMAN:
24    Q.   Mr. Madoff, I've just given you what had
25  previously been marked in your -- in a -- your

Page 164

1  deposition in June, but I've renumbered it as Madoff
2  Exhibit 14.
3        This is a statement for one of my clients,
4  Arthur Blecker.  It's dated June 30th, 1986.  And what
5  is the trading strategy on this statement?
6    A.   It looks like a convertible bond, buying
7  convertible bonds and selling the -- the related
8  stock.
9    Q.   Okay.  And where it says long --
10    A.   Uh-huh.
11    Q.   On this statement, which was sent to the
12  customer, long means that the customer owns it; right?
13    A.   Correct.
14    Q.   Whereas, on the confirmation, the actual
15  trade confirmation, it would be the opposite; right?
16  It would show --
17    A.   That -- that Madoff sold it to the customer.
18  "We sold," it would say.
19    Q.   It would say the firm --
20    A.   The firm sold it to the customer.
21    Q.   -- sold to the customer.
22        Okay.  And, conversely, where it says,
23  "Short, Interco, Inc." --
24    A.   It would show we bought from the customer.
25    Q.   Okay.  And am I correct that your testimony

Page 165

1  is that all of the long positions reflected on the
2  arbitrage strategy statements were actual positions
3  that you held?
4    A.   That's correct.
5    Q.   Okay.  So, if you can, I want you to take a
6  look in the Dubinsky report, which we've marked as
7  Exhibit --
8        MS. CHAITMAN:  What did we mark it as?
9        MS. FEIN:  7.
10        MS. CHAITMAN:  Dubinsky --
11        MS. FEIN:  7.
12        MR. SHEEHAN:  7.
13  BY MS. CHAITMAN:
14    Q.   7.  As Exhibit 7.  If you could, look at
15  page 16.
16    A.   Okay.
17    Q.   In paragraph 35, this is the beginning of
18  Dubinsky's factual background, and it says, "BLMIS."
19  "In 1960 Madoff founded BLMIS as a sole
20  proprietorship.  BLMIS" --
21        MS. CHAITMAN:  Page 16.
22        MR. GOLDMAN:  Okay.
23  BY MS. CHAITMAN:
24    Q.   -- "a market-making business in
25  over-the-counter stocks was registered as a

42 (Pages 162 - 165)

Page 166

1  broker-dealer with the Securities and Exchange
2  Commission as of January 19th, 1960 and operated three
3  business units."
4         "One, a market-making business, two, a
5  proprietary trading business, and then," parentheses,
6  "together with the market-making business, known
7  inside BLMIS as House Five," end paren, "and, three,
8  an investment advisory business," paren, "known inside
9  BLMIS as House 17."
10 A.   Right.
11 Q.   Now, did people at your firm use the phrase
12 House 17?
13 A.   In the firm?
14 Q.   Yes.
15 A.   Yes.
16 Q.   And during what period of time?  From 1960
17 on?
18 A.   No.  Because the 17th floor wasn't in
19 existence in 1960.  It only came into existence, you
20 know, in the '80s.  It was -- House 17 just refers
21 to -- that was the business that operated out of the
22 17th floor.
23 Q.   Okay.  But -- and that was the business that
24 was --
25 A.   The IA business.  It was basically just

Page 167

1  split-strike business, because that was -- that did --
2  I think the 17th floor came into existence after 19 --
3  in -- after '92.
4  Q.   Right.  So isn't -- isn't it a fact that
5  when you -- when you started doing the -- we'll call
6  it, the fraudulent investment advisory business, that
7  you moved the people who did that down to a separate
8  floor?
9  A.   That's correct.
10 Q.   And was your idea to separate them from
11 everyone else, so that there wouldn't be --
12 A.   Well, what happened was when we closed the
13 Avellino & Bienes' accounts in '92, the -- when we --
14 when -- I decided to take the -- those clients back
15 directly into the account.
16        So the -- in other words, after I -- I
17 returned the money to Avellino & Bienes' accounts,
18 there was an uproar from those accounts, as well as my
19 father-in-law, because they were all basically -- most
20 of them were -- were his accounting clients, and
21 they -- you know, they all wanted to continue to do
22 business.
23        The SEC had told me at the time, they said,
24 look, you -- you want to -- you want to still do
25 business with these people.  That's fine, because

Page 168

1  there's nothing wrong with you doing business with
2  these people.
3         As a matter of fact, they said, if you want
4  to do business with the Avellino & Bienes' people,
5  that's -- that's fine too.  They just have to register
6  as an -- as a registered investment company, you know.
7  I said, no.  I said, I'm -- I was furious
8  with -- with them at the time, because they had never
9  told me that they had changed their mode of operation,
10 where they were now paying them, you know, interest
11 on -- on a loan.
12        That was not something that was ever agreed
13 upon with me.  So I said, I'm -- you know, I decided
14 I'm sending the money back, closing those accounts,
15 but, of course, I started getting, you know, a lot of
16 pressure from these people, who were relying upon that
17 money, you know, to live on, you know.
18        They said, no.  Why -- why can't we open a
19 direct account with you, you know?  I said, well,
20 because I'm not really equipped to handle all of these
21 individual accounts, you know.  I -- they had like 500
22 customers, you know, clients, you know.
23        So I said, look, you know, I don't want to
24 do that.  But then it was Frank DiPascali basically
25 who said -- because he was, you know, handling that

Page 169

1  stuff at the time.  He said to me, look, let's -- you
2  know, let's take these -- these new clients.
3         And I said, well, you know, it's like, you
4  know -- it's -- who the hell is going to handle all of
5  that stuff?  And he was the one that said, well, you
6  know, we'll just computerize the trading, and, you
7  know, I -- I can handle all of that stuff.
8         So I operated -- I said, all right.  You
9  want to start doing that, we'll -- we'll start doing
10 that.  And that's when I -- I needed more space and
11 operated and put them on the 17th floor.
12 Q.   Okay.  So House 17 was only a term used
13 after 1992?
14 A.   Pretty much.  It's -- to my recollection,
15 yes.
16 Q.   Okay.
17 A.   Because it didn't exist, the 17th floor --
18 Q.   Okay.
19 A.   -- before then.
20 Q.   Okay.  And is it fair to say that it was
21 only after House 17 was formed, by that is you moved
22 people downstairs, that it was only after that that
23 you first began the investment advisory fraud?
24 A.   Correct.
25        MR. SHEEHAN:  Objection.  Go ahead.

43 (Pages 166 - 169)

Page 170

1  BY MS. CHAITMAN:
2    Q.   Let me ask that in a way that Mr. Sheehan
3  won't object.
4         Was there any investment advisory fraud done
5  by your firm prior to the formation of House 17?
6    A.   No.  I mean, I'm not exactly sure how you're
7  using House 17, like in what reference, you know.
8    Q.   Well, the -- when you moved people down to
9  the 17th floor --
10   A.   Uh-huh.
11   Q.   -- it was Frank DiPascali, Jodi Crupi,
12 Annette Bongiorno?
13   A.   Yes.  And then the -- the whole -- the
14 mailroom was down there and the -- you know, part of
15 the computer operation was down there.  Anything
16 that -- anybody that was going to be related to all of
17 these accounts basically.
18   Q.   Okay.  And -- but that was -- that was done
19 sometime in 1992 --
20   A.   Right.
21   Q.   -- or '93?
22        Well, do you remember when?
23   A.   No.  I don't remember.  It was like -- I --
24 you know, I'd have to look at the leases, but
25 basically it was -- it all started basically after

Page 171

1  the -- I know it was '92, because that was when the
2  Avellino & Bienes thing blew up.
3    Q.   Okay.  Okay.
4    A.   It was the summer of '92, was when the
5  Avellino & Bienes started.  So it would have to be
6  sometime after that.
7    Q.   Okay.  Now, during the period prior to 1992
8  was the investment advisory operation handled
9  separately from the market-making and proprietary
10 trading?
11   A.   Yes.  Yeah, it always was.
12   Q.   It was always handled separately?
13   A.   (WITNESS NODS HEAD UP AND DOWN.)
14   Q.   But --
15        MR. SHEEHAN:  The witness nodded yes.
16        THE WITNESS:  Huh?
17        MR. SHEEHAN:  You nodded yes.
18        MR. GOLDMAN:  You have to verbalize
19 your answer.
20        THE WITNESS:  Oh.
21        MR. GOLDMAN:  You seemed to indicate
22 while you're nodding your head.
23        THE WITNESS:  Yes.
24        MR. SHEEHAN:  Thank you.
25 BY MS. CHAITMAN:

Page 172

1    Q.   During the 1980s who was responsible for the
2  investment advisory accounts, like we just looked at
3  the -- the Blecker statement, June 30th?
4    A.   Me.
5    Q.   You handled that?
6    A.   Right.
7    Q.   Okay.  Did you have traders who were in the
8  market-making or proprietary trading groups that
9  actually did the trading for the investment advisory
10 customers in the '80s?
11   A.   No.  The only one that handled the -- that
12 spoke to the clients and that made the decision of
13 what to buy and sell for the clients was myself.
14   Q.   Okay.
15   A.   Not -- none of the market-makers.  I mean,
16 market-makers might have bought stock into the
17 firm's -- into the firm's inventory, but I was the one
18 that actually made the decision as to put the -- put
19 the trade through to a client account.
20   Q.   Okay.  And since you were buying from
21 inventory, you could just look at the inventory and
22 decide what --
23   A.   Yeah.
24   Q.   -- to sell to the --
25   A.   Or if I went out and -- you know, or if it

Page 173

1  went -- or if the market-maker bought it from the
2  street into -- into his account, and then I would make
3  the decision --
4    Q.   Okay.
5    A.   -- to put it into a client account.
6    Q.   Okay.  If you'd be good enough to look at
7  paragraph 119 of Dubinsky's report.
8        MR. GOLDMAN:  One -- one --
9        MS. CHAITMAN:  It's paragraph 119.
10       MR. GOLDMAN:  Paragraph 119.  Okay.
11       THE WITNESS:  Where the hell is
12 paragraph 119?
13       MS. CHAITMAN:  The --
14       MR. GOLDMAN:  Page 51.
15       THE WITNESS:  What page?
16       MR. GOLDMAN:  51.
17       THE WITNESS:  Okay.  Uh-huh.
18 BY MS. CHAITMAN:
19   Q.   If you could, just read paragraphs 185
20 through 190.  I just want to ask you some questions
21 about --
22   A.   Paragraph one --
23   Q.   185.
24       MR. SHEEHAN:  Okay.  So we're --
25       MS. CHAITMAN:  You know what?  Oh,

44 (Pages 170 - 173)

Page 174

1  we're looking at different --
2       THE WITNESS:  I'm not with you.
3       MS. CHAITMAN:  You know what?  I've got
4  different versions of the Dubinsky report.
5  Let -- let me do it differently.  Hold on one
6  second.
7  BY MS. CHAITMAN:
8       Q.  Okay.  If you'd be good enough to turn to
9  page 35.  So Mr. Dubinsky's -- the heading on
10  subparagraph two is that, "Purported convertible
11  security exceeded the entire reported market
12  volume for certain days."
13      A.  Uh-huh.
14      Q.  Do you see that heading?
15      A.  Right.
16      Q.  Okay.  And then he explains that he looked
17  at reported records on the New York Stock Exchange,
18  the daily stock price record, the --
19      A.  Uh-huh.
20      Q.  -- American Stock Exchange and the daily
21  price record from the New York Stock Exchange; do you
22  see that?
23      A.  Right.
24      Q.  And he reached the conclusion that these had
25  to be fraudulent trades, because there weren't that

Page 175

1  many trades done on those days?
2       A.  Right.
3       Q.  And I believe you've already explained, but
4  can you just explain again why this conclusion is not
5  correct?
6       A.  Well, he's -- he's making -- he's
7  referencing in his footnote that the data was
8  collected from the daily stock price record from the
9  New York Stock Exchange, from the daily stock record
10  price and the American Stock Exchange, which provided
11  the month and short position of the data.
12      These trades were not executed.  There's no
13  relevance to looking at the New York Stock Exchange or
14  the American Stock Exchange, because they wouldn't
15  be -- stock would never have been transacted on
16  those -- on those exchanges anyhow.
17      Q.  Okay.  And is that a fact that's generally
18  known or -- I mean --
19      A.  Well --
20      Q.  If you --
21      MR. SHEEHAN:  Object to the form.
22      THE WITNESS:  Anybody that knew
23  Madoff's business -- I mean, anybody, including
24  the clients, it would be hard -- I mean, we were
25  relatively famous for, you know, trading off the

Page 176

1  floor of the exchanges.
2       So, I mean, with -- anybody that was a
3  client of ours or that was a regulator or that
4  was in the industry would know that our business
5  was not transacted on the floor of the New York
6  Stock Exchange.
7  BY MS. CHAITMAN:
8       Q.  Okay.  Now, looking at page 36.
9       A.  Uh-huh.
10      Q.  Dubinsky has a chart showing that most of
11  the trades that -- you know, 41 percent, there were no
12  trades occurred in the market that -- that exceeded
13  one to two times the number of trades on the account
14  statements.
15      Is that again because he's not looking at
16  the right place, he doesn't have the records to show
17  the trades?
18      MR. SHEEHAN:  Object.
19      THE WITNESS:  Yes.
20  BY MS. CHAITMAN:
21      Q.  Okay.  Now, on page 37 Mr. Dubinsky is
22  saying that the transactions reported on the
23  Avellino & Bienes' statements were -- were not
24  possible because of the volume in the market.
25      Did you make up the trades for the

Page 177

1  Avellino & Bienes' clients, or were those actual
2  trades?
3       A.  You talk -- what period of time are you
4  talking about?
5       Q.  Well, the Avellino & Bienes' clients during
6  the 1980s on the convertible --
7       A.  Right.
8       Q.  -- arbitrage, were those actual trades or
9  were those made-up trades?
10      A.  Those were actual trades.
11      Q.  Okay.  If you look on page 38.
12      A.  Uh-huh.  All right.
13      Q.  Mr. Dubinsky opines that the -- the purchase
14  prices of the convertible securities did not represent
15  market prices?
16      A.  Right.
17      Q.  I think you've spoken to this, but can you
18  just briefly summarize your position on this.
19      A.  He's -- he -- he's -- he's referencing the
20  New York Stock Exchange bonds, and none of these
21  trades would have -- you know, were executed on the
22  New York Stock Exchange.
23      Q.  Okay.  Would it be possible for someone to
24  actually check the prices?  Are there records that
25  exist or that even existed as of 2008 which would have

45 (Pages 174 - 177)

Page 178

1  shown what the trade prices were on the
2  over-the-counter market in the 1980s?
3      A.   Would there be --
4      Q.   Is there anyplace that one could have looked
5  for that?
6      A.   On a -- if it was a convertible bond?
7      Q.   Yes.
8      A.   Probably not, because -- well, certainly you
9  wouldn't reference the New York Stock Exchange.  The
10  trade didn't take place on that.  As to -- there
11  were --
12          It depends upon -- I'm not sure when -- when
13  there was any records kept as to over-the-counter bond
14  transactions.  That was always sort of a sketchy area.
15          There was confusion in the industry whether
16  bonds that trades -- the bonds that were traded over
17  the counter were reported or not reported.  The -- I'm
18  not sure about what date that was.
19          And, then again, it depended upon how they
20  were reported, because if the bonds were done after
21  hours, they wouldn't be reported to any facility.
22          Sometimes you would have to call up the --
23  for awhile the NASD put a system in where you would
24  call them up and report them over the phone, you know,
25  after the close of the day, but there was always sort

Page 179

1  of confusion about that.
2      Q.   Did the trustee or any attorney working for
3  the trustee ever ask you whether you purchased the
4  convertible bonds --
5      A.   Not to my recollection.
6      Q.   -- through the New York Stock Exchange?
7      A.   No.
8      Q.   Did they ever ask you anything about how you
9  acquired the bonds?
10      A.   I don't think so.
11      Q.   Did they ever talk to you about how the
12  bonds were priced?
13      A.   No.
14      Q.   Now, on page 40 Mr. Dubinsky states at the
15  top of the page that, "Convertible securities were
16  purportedly traded by the IA business even after they
17  was called for conversion."
18      A.   Correct.
19      Q.   Do you have any comment on that conclusion?
20      A.   No, because, you know, I don't -- I don't
21  remember this particular trade.  You know, I wouldn't
22  have -- it was so long ago that I wouldn't have
23  record.
24          And, again, I'm not sure that you -- I'm not
25  sure of whether or not you are able to trade a bond

Page 180

1  after the fact that it was converted, called for
2  conversion.  I mean, you weren't forced to convert, to
3  my knowledge.
4      Q.   Okay.  Well, he only gives one example, and
5  it's McMillan.  And he writes in paragraph 100, "The
6  IA business purportedly closed out its position on
7  March 14th, 1985.  However, this" -- "the subordinated
8  debentures were converted into 1.6 million shares of
9  common stock in January 1985."
10      A.   He said it was -- it was -- it was -- what?
11  It was converted -- it was --
12      Q.   Look at paragraph 100.
13      A.   Uh-huh.  Is he saying they were called or
14  converted?
15      Q.   He's saying that the subordinated debentures
16  were converted.
17      A.   Oh, he's saying called, I think.  He said
18  they were -- they were called.  Right.  He -- he --
19  what he's pointing out to is these bonds were -- were
20  called, but it was closed out on the customer account
21  in March.
22          Now, that, to me, looks like that this bond
23  was -- was -- was unwound or swapped, and it may have
24  not been closed out.  And the customer -- looking at
25  the customer account, it just says, "Received and

Page 181

1  delivered."
2          It doesn't say converted, which -- which is
3  the way it would always appear, because when we
4  were -- it means that we were unwinding the customer
5  position from -- into the firm's trading account.  It
6  was an internalized trade.
7          So, as far as -- you know, they may have
8  called the bonds, you know, then, but he was -- but he
9  was basically pointing out that we would have had to
10  physically convert it, you know, transfers, if, in
11  fact -- you know, obviously, you couldn't physically
12  convert it after the bond was called, because --
13      Q.   Right.
14      A.   -- they wouldn't do that.
15      Q.   Right.
16      A.   So that -- that points out to me that that
17  was a trade that was unwound internally.  That we were
18  just closing out the trade and the customer account
19  transaction.
20      Q.   Okay.
21      A.   It wasn't a bond that was issued to me.  You
22  know, it wasn't -- wasn't turned into the company
23  itself.
24      Q.   Okay.
25      A.   Like a conversion.

46 (Pages 178 - 181)

Page 182

1    Q.   Okay.  In the heading above paragraph 101,
2  he wrote, "The IA business did not account for
3  dividend payments or accrued interest on the
4  convertible securities."
5    A.   Uh-huh.
6    Q.   "Thereby evidencing the fictitious" --
7  "fictitious nature of the underlying transactions."
8    A.   It depends upon whether the bond -- you
9  know, there are instances where a bond is -- is
10  bought, you know, what they call traded flat.  It
11  means traded without -- without interest.
12        It's like that with dividends also.  You can
13  trade a stock flat X dividend.  You buy it at a lower
14  price, because you're buying it without the dividend.
15        It's -- it's a transaction that you would --
16  you know, typically it would be done between dealers
17  and professionals, not for the average customer,
18  because these -- these instruments are bought to
19  trade.
20        They're not interested -- they're not bought
21  as an investment purpose to be held, which is the
22  way -- you know, which is -- if you were doing that as
23  typically an investment type of account, then,
24  obviously, you would want to, you know, get the
25  dividend for income and so on and so forth.

Page 183

1        But professionals will trade what they call
2  flat -- or just like you could buy a zero coupon bond.
3  Most customers don't buy zero coupon bonds, but -- but
4  dealers, traders, like ourselves, typically will
5  trade, you know -- you know, zero coupon bonds are
6  flat, because what you're really doing is you're
7  not --
8        The idea of the trade is not to cash the
9  dividend or the interest, but basically to use the
10  instrument as a trading vehicle, but you -- when you
11  do that, obviously, you account for the dividend in
12  the price of the stock.
13        So you're -- you adjust the price of the
14  stock to the client based upon the fact that you're
15  not getting a dividend.
16    Q.   So --
17    A.   And, also, one of the things Dubinsky
18  doesn't seem to account for is that brokerage firms
19  trade what they call due bills.
20        In other words, most -- when you buy stock
21  frequently, you're not getting the -- the dividend
22  from the company, because you're buying the stock --
23  it's coming -- it's being transacted in what's known
24  as street name, which is -- it's not in -- registered
25  in -- in the client's name and so on.

Page 184

1        So you -- a lot of times -- very frequently
2  you'll buy stock from a customer that pays a dividend
3  or declared a dividend, and you won't get the
4  dividend.  The company is going to pay the dividend to
5  whoever the stock's name is registered in.
6        And most stocks are not registered in
7  clients' names anymore.  They're -- they're registered
8  in a street name.  So the brokerage firms will issue
9  due bills to each other to get the monies, and then
10  you just journal it into a client account.
11        He doesn't go into any of that, which is --
12  I can understand, you know.  I'm not faulting him for
13  that.  It's not that the customer didn't -- didn't get
14  the price.
15        So our customer -- if they weren't getting
16  the dividend, they were -- they were getting a lower
17  price on the stock, you know, to account for that,
18  because the firm is going to get the dividend.
19        So you have to make the customer whole some
20  way.  When you're internalizing trades as principal,
21  that's a common way of doing business.
22    Q.   Did Mr. Dubinsky ever talk to you?
23    A.   No.  I never knew he existed until I saw the
24  report.
25    Q.   Okay.  Did anyone from the trustee's side,

Page 185

1  any expert, ever question you about any of the --
2    A.   To my recollection --
3    Q.   Let me just finish the question.
4        -- any of the convertible arbitrage trade?
5    A.   No.  I never had any conversation with the
6  trustees regarding any of this trading, other than
7  when they came down here to speak to me, but I don't
8  think they ever really got into -- into the trading.
9    Q.   Okay.  Mr. Dubinsky reaches the conclusion
10  on page 41, just above paragraph 105, that there's no
11  evidence that the IA business converted the
12  convertible securities into common shares; do you see
13  that?
14    A.   Yeah.
15    Q.   And then he says, "Companies that have
16  publicly-traded securities typically use third-party
17  institutions, known as transfer agents, to keep track
18  of the individuals and entities that own their stocks
19  and bonds."
20        "Most transfer agents are banks or trust
21  companies.  Although, companies sometimes act as its
22  own transfer agent.  The transfer agent maintains
23  records of the shareholder information."
24        And then in paragraph 109, he says, "In
25  order to have converted preferred convertible stock

47 (Pages 182 - 185)

Page 186

1 and convertible debt into common stock, the IA
2 business would have needed documentation regarding the
3 conversion of the securities."
4    A. Uh-huh.
5    Q. Now, did you have that documentation, or did
6 you --
7    A. No. As I stated earlier, if -- if we
8 converted -- when we converted stock, we typically
9 would have one of our clearing facilities convert the
10 stock.
11    Meaning, Commercial Bank of North America,
12 Bankers Trust, Irving, any one of those people.
13 Marine Midland that -- that provided that facility for
14 us.
15    So we would not, except under rare
16 occasions, physically convert the stock ourselves.
17 Doesn't mean the stock wasn't converted.
18    Q. Okay.
19    A. And, as far as him relating to the transfer
20 agents, the stock trades in street name. So --
21 meaning it's -- it's traded as a negotiable
22 instrument. It's not -- it's very rarely put in a
23 customer's name, unless the customer is going to
24 request delivery of the securities.
25    So if a customer wants to hold the

Page 187

1 securities themselves, which now doesn't exist -- as a
2 matter of fact, they're eventually going to -- that's
3 never going to happen, because nobody wants to go
4 through transfer agents.
5    So I don't even know why that's in the
6 report, because very few brokerage firms put stock in
7 a customer's name. Customers don't want to hold it.
8    If the brokerage firm is holding their
9 security, they always -- they never hold it in a
10 customer's name. They hold it in -- in the street
11 name. And the dividends don't -- do not go to the
12 customer directly from the -- from the company --
13    Q. Right.
14    A. -- transfers. They get paid to the broker,
15 and then the broker would make the customer whole.
16    Q. And that would have been true for the 1980s?
17    A. Yes.
18    Q. Okay. Now, in paragraph 115 Dubinsky wrote,
19 "Trade confirmations fabricated by the IA business to
20 support the convertible arbitrage trades were actually
21 prepared backwards, as though BLMIS was trading as a
22 principal, rather than an agent."
23    A. Oh, that's true. I mean, we always trade as
24 principal, as I said before. Doesn't mean they were
25 created backwards.

Page 188

1    Q. Right.
2    A. I mean, it says right on the customer
3 confirmation that we're trading as principal.
4    Q. Right.
5    A. And that's not -- that has nothing to do
6 with whether you're trading it backwards or not.
7    Q. Right.
8    A. He's almost insinuating that -- from that
9 statement that trading as a principal, there was
10 something wrong with it. That would be great news to
11 the industry.
12    Q. I want to just interject some questions on
13 another subject. Can you describe for us what kinds
14 of trading you did with Bear Stearns?
15    A. Mostly market-making, proprietary trading or
16 for Bear Stearns' customers. There's -- our trades
17 with Bear Stearns were typical of what we traded with
18 everybody.
19    It was -- we were trading basically for Bear
20 Stearns' own account or for their customers' accounts.
21 If Bear Stearns got -- wanted to buy and sell stock
22 for -- for one of their clients, they had to go to a
23 market-maker, like myself, unless Bear Stearns traded
24 the stock himself. Then he would internalize the
25 stock himself, just as I'm doing.

Page 189

1    Q. Okay. So Bear -- but Bear Stearns was a
2 market-maker; right?
3    A. Some -- in some of the securities. Yeah.
4    Q. Okay. And they were doing convertible bond
5 trades in the 1980s?
6    A. Yes.
7    Q. Okay. So why would they need you?
8    A. Well, because they may have not been making
9 a market in the convertible bond that we were making
10 the market in. In other words, they -- you know,
11 there are times when we were a market-maker in a
12 convertible bond, and we bought it from somebody else
13 as well.
14    If -- if we didn't -- if we didn't have the
15 stock in inventory, and we didn't want to short it to
16 a client, we might go to Bear Stearns, and they might
17 do the same thing to us.
18    But Bear Stearns was a competitor at times,
19 and they were not a competitor, you know, at times.
20 But Bear Stearns was -- was one of our big clients.
21    Q. Did they buy securities for you and hold --
22 and hold those securities?
23    A. Did Bear Stearns? We had accounts at Bear
24 Stearns. Yes.
25    Q. So there would have been times when you

48 (Pages 186 - 189)

Page 190

1  purchased securities through them, and they would hold
2  those securities?
3      A.    Bear Stearns?
4      Q.    Yeah.
5      A.    Probably not.  You know, usually they would,
6  you know -- it depends upon what -- what kind of stock
7  it was and whether it was a stock that went through
8  the clearinghouse or not.
9      Q.    Or convertible bonds, would they sometimes
10 be holding some of your inventory?
11     A.    No.  They wouldn't typically be holding
12 convertible bonds for us.
13     Q.    Would you be holding convertible bonds for
14 them?
15     A.    Probably not.
16     Q.    Okay.  I'd -- I'd like to look at pages 48
17 and 49 of the report.
18     A.    Uh-huh.
19     Q.    This is -- in paragraph 117, if you can just
20 read it to yourself, and then I'll ask you some
21 questions.
22     A.    This -- this was an example that I pointed
23 to earlier where he fails to understand he's reading
24 the confirmations wrong.  He's reversing -- he's
25 confusing the we -- we to -- to you.

Page 191

1      Q.    Okay.  Okay.  And he's -- he's concluding
2  that this is -- this is evidence of your fraud; right?
3      A.    Yeah.  He's -- right.  I mean, it's --
4  clearly he's -- he's not understanding that when we
5  say, "We bought," it's we bought from the customer or
6  we sold to the customer.
7         Not as he's -- so he's saying that if we --
8  if we wrote the confirmation wrong, the trade never
9  could have taken place, because he's -- he's not
10 reading it properly.
11     Q.    Right.  Can you describe for us the kinds of
12 transactions you did for Carl Shapiro's various
13 accounts that you felt uncomfortable about doing?
14         MR. SHEEHAN:  Object.
15         THE WITNESS:  Okay.  Well, I -- it
16 would be easier for me to explain the strategies
17 that I initiated for the big four accounts, which
18 Carl Shapiro would be included in that.
19         The -- we have to go back to -- this is
20 going to take a little bit of time.  How much
21 time do we have?
22         MR. SHEEHAN:  The rest of the
23 afternoon.
24         THE WITNESS:  Oh, okay.  That's fine
25 with me.  Unfortunately, I have nowhere to go.

Page 192

1          MS. CHAITMAN:  Yeah.  Do you -- are you
2  getting tired?
3          THE WITNESS:  No.  I'm -- I'm fine.
4          MS. CHAITMAN:  Are you getting tired?
5          MR. SHEEHAN:  No.
6          MS. CHAITMAN:  Okay.  Everybody is
7  okay?
8          MR. SHEEHAN:  I haven't fallen asleep
9  once.
10         MS. CHAITMAN:  You're okay?
11         THE WITNESS:  I'm okay.
12         MS. CHAITMAN:  You're okay?  Everybody
13 is okay?
14         MR. SHEEHAN:  Yeah.  We --
15         MS. CHAITMAN:  You're getting tired?
16         MR. SHEEHAN:  We can go for a little
17 while longer.  I'm okay.
18         THE WITNESS:  Yeah, I have nowhere to
19 go.  So --
20         MR. SHEEHAN:  Sure.  That's true, but
21 it's your call.  It's your dep.
22         THE WITNESS:  No.  I'm all right.
23         MS. CHAITMAN:  Is everybody else okay?
24         MR. SHEEHAN:  Sure.
25         THE WITNESS:  Okay.

Page 193

1          MS. CHAITMAN:  Why don't we -- why
2  don't we say we'll go to 2:30 and evaluate how
3  everybody is?
4          MR. SHEEHAN:  That's fine.
5          MS. CHAITMAN:  Okay.  Good.  Okay.
6          THE WITNESS:  All right.  This goes
7  back to the -- the Madoff misery.  All right.  In
8  1980 I was approached by some foreign clients,
9  basically French clients, institutional clients,
10 to -- for those of you that are old enough to
11 remember this -- that excludes you.
12         MS. CHAITMAN:  Amanda, we're excluding
13 you.
14         THE WITNESS:  That excludes you.
15         In 1980 Mitterrand came in to be -- to
16 be president of the premier of France, and
17 basically was a socialist, but, you know, also
18 being accused of being communist, and decided to
19 nationalize the banks and the industries in
20 France.
21         So there was a hysteria in France,
22 because everybody thought that France was going
23 to go down the tubes.  At -- and what -- he put
24 into place currency controls, so that French
25 citizens were not allowed to own any currencies,

49 (Pages 190 - 193)

Page 226

1  STATE OF NORTH CAROLINA
2  COUNTY OF PERSON
3
4        CERTIFICATE OF TRANSCRIPT
5
6      I, Lisa A. DeGroat, a Court Reporter and
7  Notary Public in and for the aforesaid county and
8  state, do hereby certify that the foregoing deposition
9  of BERNARD L. MADOFF, was taken by me and reduced to
10 typewriting under my direction; and the transcript is
11 a true record of the testimony given by the witness.
12      I further certify that I am neither attorney
13 or counsel for, nor related to or employed by any
14 attorney or counsel employed by the parties hereto or
15 financially interested in the action.
16      This the 3rd day of January, 2017.
17
18
19
20
21  _Lisa A. DeGroat_
22   LISA A. DeGROAT
     Registered Professional Reporter
23   Notary Public #19952760001
     Expiration Date:  December 8, 2020
24   1-888-656-DEPO
25

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400