**CHAITMAN LLP**
465 Park Avenue
New York, New York 10022
Phone & Fax: (888) 759-1114
Helen Davis Chaitman
hchaitman@chaitmanllp.com

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro No. 10-04438 (SMB) |
| Plaintiff, | |
| v. | |
| ESTATE OF SEYMOUR EPSTEIN, | |
| MURIEL EPSTEIN, as beneficiary and of the Estate of Seymour Epstein and/or the Trusts created by the Last Will and Testament of Seymour Epstein, as Executor of the Estate of Seymour Epstein, and as trustee of Trusts created by the Last Will and Testament of Seymour Epstein, | |

HERBERT C. KANTOR, as trustee of Trusts created
by the Last Will and Testament of Seymour Epstein,

RANDY EPSTEIN AUSTIN, as beneficiary of the
Estate of Seymour Epstein and/or the Trusts created
by the Last Will and Testament of Seymour Epstein,

ROBERT EPSTEIN, as beneficiary of the Estate of
Seymour Epstein and/or the Trusts created by the
Last Will and Testament of Seymour Epstein,

JANE EPSTEIN, as beneficiary of the Estate of
Seymour Epstein and/or the Trusts created by the
Last Will and Testament of Seymour Epstein,

SUSAN EPSTEIN GROSS, as beneficiary of the
Estate of Seymour Epstein and/or the Trusts created
by the Last Will and Testament of Seymour Epstein,
and

SHELBURNE SHIRT COMPANY, INC.,

                         Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO THE TRUSTEE'S
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THEIR CROSS-
MOTION FOR SUMMARY JUDGMENT DISMISSING THE
COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND ................................................................................ 2

    The JPMC Accounts ...................................................................................... 3

    The Trustee's misrepresentations .................................................................. 4

    Dubinsky's Testimony ................................................................................... 5

    The Epstein Account ...................................................................................... 6

    The Shelburne Account .................................................................................. 7

LEGAL STANDARD ON SUMMARY JUDGMENT ........................................ 7

ARGUMENT ........................................................................................................ 8

    I.    THE TRUSTEE LACKS ARTICLE III STANDING ............................. 8

        A.    The Trustee's Debtor, the LLC, Never Owned the JPMC
                Accounts ............................................................................... 10

        B.    The Trustee Cannot Demonstrate That the LLC Suffered An
                Injury in Fact ........................................................................ 11

        C.    SIPA Does Not Create Article III Injury ............................ 12

        D.    Dubinsky Admitted that Madoff Bought T-Bills With IA
                Customers' Funds ................................................................. 16

    II.    THE TRUSTEE'S MOTION RESTS ON INADMISSIBLE
        EVIDENCE ............................................................................................ 17

        A.    The Expert Reports Are Not Admissible ............................ 17

        B.    The Allocutions and Trial Testimony are Inadmissible ..... 19

    III.    THE TRUSTEE CANNOT MAKE HIS PRIMA FACIE CASE ............ 22

        A.    Madoff Bought Actual T-Bills ............................................ 23

B.   The Ponzi Scheme Presumption Does Not Apply Because the
     Trustee Cannot Show Intent ..................................................................... 25

     1.   Defendants Were Creditors, Not Equity "Investors" .......................... 26

     2.   The LLC was not a Ponzi scheme ........................................................ 27

     3.   The IA Business was Profitable ........................................................... 28

     4.   Deposits of New Customers ................................................................. 28

     5.   Additional Factors ............................................................................... 29

C.   The Payments Were Not Made "In Furtherance of" a Ponzi
     Scheme ..................................................................................................... 29

IV.   DEFENDANTS HAVE STRONG AFFIRMATIVE DEFENSES
      THAT PRECLUDE SUMMARY JUDGMENT ......................................... 31

V.    DEFENDANTS ARE ENTITLED TO A CREDIT FOR TAXES
      PAID ......................................................................................................... 32

VI.   THERE CAN BE NO "CROSS-LIABILITY" IN THIS CASE ................... 32

VII.  THE TRUSTEE CANNOT PROVE HIS ALLEGED "LOSSES" ............. 33

VIII. THE TRUSTEE IS NOT ENTITLED TO PREJUDGMENT
      INTEREST ................................................................................................ 35

      A.   Defendants Disputed the Trustee's Claims in Good Faith .............................. 38

CONCLUSION ....................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Wright*,
468 U.S. 737 (1984)................................................................................................................9

*Armstrong v. Collins*,
No.01 Civ. 2437 (PAC), 2010 WL 1141158 (S.D.N.Y. Mar 24, 2010),
*reconsideration denied*, No. 01 Civ. 2437 (PAC), 2011 WL 308260 (S.D.N.Y.
Jan. 31, 2011)....................................................................................................................26

*In re ATM Financial Services, LLC*,
2011 WL 2580763 (Bankr. M.D. Fla. June 24, 2011)..........................................................30

*Banque Worms v. BankAmerica Int'l*,
77 N.Y.2d 362 (1991)........................................................................................................34

*In re Bauman*,
535 B.R. 289 (Bankr. C.D. Ill. 2015).................................................................................14

*In re Bayou Grp., LLC ("Bayou III")*,
396 B.R. 810 (Bankr. S.D.N.Y. 2008) *rev'd in part*
*In re Bayou Grp., LLC,* 439 B.R. 284 (S.D.N.Y. 2010) .......................................................30

*Bellamy v. City of New York*,
914 F.3d 727 (2d Cir. 2019)................................................................................................17

*In re Bernard L. Madoff Inv. Sec. LLC*,
654 F.3d 229 (2d Cir. 2011)..........................................................................................4, 36

*In re Bernard L. Madoff Inv. Sec. LLC*,
721 F.3d 54 (2d Cir. 2013)...........................................................................................8, 9, 12

*In re Bernard L. Madoff Inv. Sec. LLC*,
779 F.3d 74 (2d. Cir. 2015)................................................................................................36

*In re Bernard L. Madoff Inv. Sec. LLC*,
No. 19-0429-BK(L), 2020 WL 5666677 (2d Cir. Sept. 24, 2020) .........................................32

*In re Bernard L. Madoff Inv. Securities LLC*,
2011 WL 3568936 (2d Cir. Aug. 16, 2011)..........................................................................26

*In re Bernard L. Madoff Inv. Securities, LLC*,
458 B.R. 87 (Bankr. S.D.N.Y. 2011)...................................................................................30

*Board of County Comm'rs of the County of Jackson v. United States*,
    308 U.S. 343 (1939)..................................................................................................36

*Bogart v. Israel Aerospace Indus. Ltd.*,
    No. 09 Civ. 4783 (LAP), 2010 WL 517582 (S.D.N.Y. Feb. 5, 2010).......................9

*Boger v. New York State Office of Parks, Recreation & Historic Pres.*,
    2019 WL 2766897 (N.D.N.Y. July 2, 2019) ...........................................................17

*Bonanni v. Horizons Inv'rs Corp.*,
    179 A.D.3d 995 (2d Dep't 2020) .............................................................................33

*Caplin v. Marine Midland Grace Trust Co.*,
    406 U.S. 416 (1972)..................................................................................................11

*Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*,
    567 F.3d 1291 (11th Cir. 2009) ...............................................................................37

*In re Cassandra Grp.*,
    338 B.R. 583 (Bankr. S.D.N.Y. 2006)......................................................................39

*Cent. States v. Merck-Medco Managed Care, L.L.C.*,
    433 F.3d 181 (2d Cir. 2005).......................................................................................9

*In re Chowaiki & Co. Fine Art Ltd.*,
    593 B.R. 699 (Bankr. S.D.N.Y. 2018)......................................................................11

*City of New York v. Venkataram*,
    2011 WL 2899092 (S.D.N.Y. July 13, 2011) ..........................................................11

*Commodities Future Trading Commission v. Walsh*,
    17 N.Y.3d 162 (2011) ..............................................................................................34

*Costa v. Sears Home Imp. Products, Inc.*,
    65 F. Supp.3d 333 (W.D.N.Y. 2014) .......................................................................25

*In re DBSI, Inc.*,
    476 B.R 413 (Bankr. D. Del. 2012) .........................................................................30

*In re Deltacorp, Inc.*,
    179 B.R. 773 (Bankr. S.D.N.Y.1995).......................................................................15

*Edwards v. Onondaga Cmty. Coll.*,
    No. 5:14-CV-1329, 2016 WL 3519619 (N.D.N.Y. June 22, 2016).........................17

*Fafel v. Dipaola*,
    399 F.3d 403 (1st Cir. 2005).....................................................................................15

*Ferguson v. Garden Ridge Corp.*,
   399 B.R. 135 ...................................................................................................................15

*In re Foos*,
   188 B.R. 239 (Bankr. N.D. Ill. 1995) *aff'd in part, rev'd in part on other g'ds*,
   1996 WL 563503 (N.D. Ill. 1996) .............................................................................27, 30

*Franklin St. Realty Corp. v. NYC Envtl. Control Bd.*,
   34 N.Y.3d 600 (2019) ......................................................................................................33

*GE Inv. Private Placement Partners II v. Parker*,
   247 F.3d 543 (4th Cir. 2001) ...........................................................................................29

*Germinaro v. Fid. Nat. Title Ins. Co.*,
   107 F. Supp. 3d 439 (W.D. Pa. 2015)...............................................................................29

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
   2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014)....................................................7, 8, 20, 26

*In re Int'l Pharmacy & Disc. II, Inc.*,
   443 F.3d 767 (11th Cir. 2005) ........................................................................................11

*JPMorgan Chase Bank, N.A. v. Yuen*,
   No. 11 Civ. 9192 (NRB), 2013 WL 2473013 (S.D.N.Y. June 3, 2013)............................18, 19

*Kramer v. Mahia (In re Khan)*,
   14-MC-01674 (PKC), 2016 WL 6652724 (E.D.N.Y. Nov. 10, 2016) ...................................36

*In re Lyondell Chemical Co.*,
   No. 13 Civ. 3881(RA), 2014 WL 975507 (S.D.N.Y. Mar. 11, 2014) ...................................36

*In re Madoff*,
   No. 08-01789, ECF No. 4072 (Bankr. S.D.N.Y. May 16, 2011) ..........................................26

*In re Manhattan Inv. Fund Ltd.*,
   359 B.R. 510 (Bankr. S.D.N.Y. 2007), *aff'd in part, rev'd in part*,
   *In re Manhattan Inv. Fund Ltd.* 397 B.R. 1 (S.D.N.Y. 2007)..................................................27

*In re Manhattan Inv. Fund Ltd.*,
   397 B.R. 1 (S.D.N.Y. 2007)...............................................................................................30

*McNamara v. Sher*,
   2012 WL 760531 (S.D. Cal. Mar. 8, 2012) ........................................................................29

*Mecca v. Gibraltar Corp. of Am.*,
   746 F. Supp. 338 (S.D.N.Y. 1990)......................................................................................36

*Mendelsohn v. Jacobowitz*,
    394 B.R. 646 (Bankr. E.D.N.Y. 2008)...................................................................23

*Miranda v. Smyrna Bldg. Corp.*,
    693 N.Y.S.2d 382 (Civ. Ct. 1998), *aff'd*, 692 N.Y.S.2d 910 (App. Term 1999)....................33

*Morales v. Walt Disney Prods.*,
    361 F. Supp. 1157 (S.D.N.Y. 1973)...................................................................36

*In re Murray Industries, Inc.*,
    125 B.R. 314 (Bankr. M.D. Fla. 1991) ...............................................................14

*Parker v. Reda*,
    327 F.3d 211 (2d Cir. 2003)...........................................................................18

*Perpetual Securities, Inc. v. Tang*,
    290 F.3d 132 (2d Cir. 2002)...........................................................................15

*Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016), *reconsideration denied*,
    2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) ................................................ *passim*

*Picard v. Goldenberg*,
    2018 WL 3078149 (Bankr. S.D.N.Y. June 19, 2018)................................................38

*Picard v. Legacy Capital, Ltd.*,
    603 B.R. 682 (Bankr. S.D.N.Y. 2019).............................................................8, 28

*Picard v. Mann*,
    608 B.R. 165 (Bankr. S.D.N.Y. 2019) ..................................................................8

*In re Prebul Jeep, Inc.*,
    2009 WL 4581900 (Bankr. E.D. Tenn. 2009) ........................................................27

*Preuss v. Kolmar Labs., Inc.*,
    970 F. Supp. 2d 171 (S.D.N.Y. 2013)...................................................................25

*Prymak v. Contemporary Fin. Sols., Inc.*,
    2007 WL 4250020 (D. Colo. Nov. 29, 2007) .........................................................29

*Redfield v. Bartels*,
    139 U.S. 694 (1891).......................................................................................38

*In re Rivas*,
    2010 WL 2265663 (Bankr. E.D. Tenn. June 3, 2010) ..............................................29

*Roberts v. Ground Handling, Inc.*,
    499 F. Supp. 2d 340 (S.D.N.Y. 2007)...................................................................17

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    Adv. Pro. Nos. 10-04387 (SMB), 10-04488 (SMB), 10-04350 (SMB),
    10-05110 (SMB), 2018 WL 1442312 (Bankr. S.D.N.Y. Mar. 22, 2018)................................38

*Sec. Inv'r. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    563 B.R. 737 (Bankr. S.D.N.Y. 2017)....................................................................................8

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    596 B.R. 451 (S.D.N.Y. 2019)..............................................................................................32

*SEC v. Byers*,
    637 F. Supp.2d 166 (S.D.N.Y. 2009)..............................................................................16, 37

*Siding and Insulation Co., Inc. v. Acuity Mut. Ins. Co.*,
    754 F.3d 367 (6th Cir. 2014) ................................................................................................15

*Simkin v. Blank*,
    19 N.Y.3d 46 (N.Y. 2012) ....................................................................................................34

*In re Stage Presence, Inc.*,
    592 B.R. 292 (Bankr. S.D.N.Y. 2018), *aff'd*, No. 12-10525 (MEW), 2019 WL
    2004030 (S.D.N.Y. May 7, 2019).........................................................................................33

*Taveras v. City of New York*,
    2009 WL 10701924 (E.D.N.Y. Apr. 7, 2009) ......................................................................25

*Taylor v. Illinois*,
    108 S. Ct. 646 (1988)............................................................................................................25

*U.S. v. Blechman*,
    657 F.3d 1052 (10th Cir. 2011) ............................................................................................19

*U.S. v. Manufacturers Trust Co.*,
    198 F.2d 366 (2d Cir. 1952)..................................................................................................26

*U.S. v. McGaughy*,
    670 F.3d 1149 (10th Cir. 2012) ............................................................................................15

*United States v. Dreer*,
    740 F.2d 18 (11th Cir. 1984) ................................................................................................19

*United States v. Nixon*,
    418 U.S. 683 (1974)..............................................................................................................25

*United States v. Ron Pair Enterprises Inc.*,
    489 U.S. 235 (1989)..............................................................................................................35

*United States v. Samaniego*,
  187 F.3d 1222 (10th Cir. 1999) ...............................................................18

*United States v. Strother*,
  49 F.3d 869 (2d Cir. 1995).......................................................................18

*United States v. Tropeano*,
  252 F.3d 653 (2d Cir. 2001)......................................................................21

*USA United Fleet, Inc. v. Ally Financial, Inc.*
  ("*In re USA United Fleet, Inc.*"), 559 B.R. 41 (Bankr. E.D.N.Y. 2016)................................23

*Victorinox AG v. The B & F Sys., Inc.*,
  2015 WL 9256944 (S.D.N.Y. Dec. 15, 2015), *aff'd sub nom. Victorinox AG v.
  B&F Sys., Inc.*, 709 F. App'x 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017) ....................5, 25

*Warth v. Seldin*,
  422 U.S. 490 (1975)....................................................................................8

*Whitmore v. Arkansas*,
  495 U.S. 149 (1950)....................................................................................8

*Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,
  AFL-CIO*,
  955 F.2d 831 (2d Cir. 1992).........................................................35, 36, 38

*Wight v. BankAmerica Corp.*,
  219 F. 3d 79 (2d Cir. 2000)........................................................................9

**Statutes**

11 U.S.C. § 546(e) ..........................................................................................39

11 U.S.C. § 548 ..............................................................................................36

11 U.S.C. § 548(a)(1)................................................................................11, 32

11 U.S.C. § 548(a)(1)(A) ..........................................................................22, 38

11 U.S.C. § 548(c) ..........................................................................................32

11 U.S.C. § 550 ..............................................................................................36

15 U.S. C. § 78eee(a)(3) ................................................................................12

15 U.S.C. § 78eee(a)(4)(B) ............................................................................12

15 U.S.C. § 78eee(b)(3) ..................................................................................12

15 U.S.C. § 78fff(2)(c)(3) ...................................................................................13

15 U.S.C. § 78fff-3(a)(2) ...................................................................................34

15 U.S.C. § 78iii(5) ...........................................................................................12

15 U.S.C. § 78*lll*(11)(B) ..................................................................................34

15 U.S.C. § 78*lll*(11)(C) ..................................................................................34

**Other Authorities**

17 C.F.R. 240.15c3-3 .........................................................................................12

17 C.F.R. 300.100(b) ..........................................................................................35

17 C.F.R. 300.103 ..............................................................................................35

17 C.F.R. 300.104(b) ..........................................................................................35

26 C.F.R. 6-1.105 ...............................................................................................32

6-1006 Weinstein's Fed. Ev. § 1006.07 (2015) ................................................18

Fed. R. Bankr. P. 7056 .........................................................................................7

Fed. R. Civ. P. 26 ...............................................................................................25

Fed. R. Civ. P. 56(a) ............................................................................................7

Fed. R. Civ. P. 56(c) ..........................................................................................17

Fed. R. Evid. 801 ...............................................................................................18

Fed. R. Evid. 802 ...............................................................................................18

Fed. R. Evid. 803(6) ...........................................................................................18

Fed. R. Evid. 803(22)(C) ....................................................................................20

Fed. R. Evid. 804 ...............................................................................................21

Fed. R. Evid. 807(a) ...........................................................................................18

https://www.madofftrustee.com/hardship-program-17.html ............................37

*SEC Official Testifies on Best Method for Determining Madoff Distributions*, Sec.
    Exch. Comm'n. Today 10466961, 2009 WL 10466961 (Dec. 14, 2009)...............29

Wright & Gold, 31 Fed. Practice and Procedure § 8043 ..................................18

Defendants Estate of Seymour Epstein, Muriel Epstein as Executrix of the Estate of

Seymour Epstein and the Trustee of the Trusts created by the Last Will and Testament of Seymour

Epstein (the "Trusts"), Herbert C. Kantor, as trustee of the Trusts, and Shelburne Shirt Company,

Inc. ("Shelburne") respectfully submit this memorandum of law in opposition to the motion for

summary judgment of Plaintiff Irving H. Picard, the Trustee for the Liquidation of Bernard L.

Madoff Investment Securities, LLC (the "LLC"), and in support of their cross-motion for summary

judgment dismissing the Complaint for lack of subject matter jurisdiction.

## PRELIMINARY STATEMENT

Defendants were customers of Bernard L. Madoff. The Trustee concedes that they acted in

good faith but seeks to claw back withdrawals from the accounts of Epstein and  Shelburne taken

within the last two years of Madoff's operations on the theory (a) that the funds paid to each

Defendant belonged to the LLC (and not Madoff) even though there is not a single piece of

evidence indicating that the LLC owned the bank accounts from which they were paid; and (b)

that Madoff never purchased any securities with his investment advisory ("IA") customers' money.

*See* Compl. ECF No. 1.[1]

Both contentions are demonstrably false. The uncontroverted evidence proves that the bank

accounts through which Madoff operated the IA business were owned by Madoff personally and

not by the LLC. And, as a matter of law and as this Court twice held in carefully reasoned decisions

which Picard did not appeal, Picard has standing only to recover transfers made by the LLC. Here,

the transfers at issue were made by Madoff, not by the LLC. Thus, Picard lacks Article III standing

and the Court lacks subject matter jurisdiction of the complaint. In addition, Defendants can prove,

contrary to the Trustee's representations to the Second Circuit throughout his tenure, through

---

[1] All Citations to "ECF No. __" are to this case, *Picard v. Estate of Epstein, et al.,* Adv. Pro. No. 10-04438
(SMB), except where otherwise stated.

reliable third party records and through admissions of the Trustee's $40 million expert witness, Bruce Dubinsky, that Madoff purchased and sold billions of dollars of T-bills, some of which were listed as investment assets on Defendants' account statements. CMF ¶¶ 75-93. Thus, the Court should deny the Trustee's motion for summary judgment and grant Defendants' motion dismissing this case in its entirety. This case—and others like it—have burdened the courts for ten years based upon the Trustee's misrepresentation of Article III injury.

## FACTUAL BACKGROUND

From the 1960s through 2008, Madoff operated a sole proprietorship which he called Bernard L. Madoff Investment Securities ("BLMIS"). The sole proprietorship comprised two separate businesses: a legitimate trading business (the "LTB"), consisting of proprietary trading ("PT"), which traded securities for its own account, and market-making ("MM") which created a market in certain securities and acted as a broker-dealer for those securities, servicing all of the world's major securities firms. CMF ¶ 1. BLMIS also operated an IA business which serviced individual investment customers, including Defendants.

Madoff, through BLMIS, employed approximately 172 people who worked in the LTB which was managed by Madoff's sons. They worked on the 18th and 19th floors of the Lipstick Building in Manhattan. BLMIS also employed 6 to 8 people who worked on the 17th floor of the Lipstick Building and handled the IA business under Madoff's supervision. CMF ¶¶ 1-7. The Trustee has conceded that the PT and MM Businesses were entirely legitimate. CMF ¶ 6. The Trustee has also conceded that Madoff used the trade name "BLMIS" for his sole proprietorship from the 1960s through 2008. CMF ¶ 8. Madoff formed the LLC in January 2001, at which time he transferred the LTB to the LLC. CMF ¶ 9. He notified the SEC, the Depository Trust Company (the "DTC"), the Bank of New York ("BNY") which serviced the LTB, and others, that the LTB would operate through the LLC. CMF ¶ 10. However, Madoff never transferred the IA business

to the LTB. Instead, he continued to operate it as a sole proprietorship, utilizing the 6-8 people

who worked on the 17th floor of the Lipstick Building. Although the LTB maintained its bank

accounts with BNY, Madoff maintained the IA business' accounts at JPMorgan Chase ("JPMC").

CMF ¶¶ 5, 1-7. Thus, in January 2001, Madoff separated the LTB, operated by his sons, from the

fraudulent IA business which he alone managed.

### The JPMC Accounts

Madoff was careful to separate the banking relationship of the IA business, with JPMC,

from the banking relationship of the LTB with BNY. The IA business had nothing to do with BNY.

All IA customer funds were deposited into the "703 Account" at JPMC and all checks written to

IA customers were written from the "509 Account" at JPMC. CMF ¶ 18, 40, 49. Through August

2002, the JPMC 703 Account statements indicated that the account was held in the name of

"Bernard L. Madoff." CMF ¶ 20. From September 2002 on, the 703 account statements from

JPMC indicated the customer as BLMIS, the trade name for Madoff's sole proprietorship. CMF ¶

20. **There is not a single 703 Account statement or other JPMC document indicating that the**

**account was owned by the LLC.** All customer deposits were placed in the 703 Account and,

**through 2008, the endorsement stamp for the 703 Account read: "For deposit only Bernard**

**L. Madoff."** CMF ¶ 21.

**Through 2008, the statements for the 509 Account indicated that it was owned by**

**Bernard L. Madoff.** CMF ¶¶ 27-28. **All withdrawal checks sent to IA customers were from**

**the 509 Account and indicated that the account was owned by "Bernard L. Madoff**. CMF ¶¶

40, 49. Where IA customers requested wire transfers, the funds were transferred from the 703

Account which, again, was in the name of BLMIS, the sole proprietorship, from September 2002

on. Defendant never received funds from an account owned by the LLC.

The Trustee has admitted that he does not possess any documentary evidence that the 509

Account was ever owned by the LLC. CMF ¶ 11. And there is incontrovertible evidence that both the 509 Account and the 703 Account were always owned by Madoff individually. *E.g.* CMF ¶¶ 18-29. Despite their $40 million excursion through Madoff's and the LLC's books and records, both of the Trustee's experts (Dubinsky and Lisa Collura) admitted that they never saw a bank statement for either the 509 Account or the 703 Account in the name of the LLC. CMF ¶ 26.

## The Trustee's misrepresentations

The Trustee represented to every court before which he appeared that, for the entire period from 1980 through 2008, Madoff never purchased any securities with IA customers' money and it was on the basis of that representation that the 2d Circuit issued its "net equity" decision. CMF ¶ 98; *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) ("*Net Equity Decision*"). It took years of discovery to prove that the Trustee's representations were a patent lie. Dubinsky finally admitted, in May 2019, that Madoff purchased billions of dollars of T-bills with IA customers' money through investment accounts that he maintained at firms like Bear Stearns, Lehman Brothers, JPMC, and Morgan Stanley (the "Brokerage Firms"). CMF ¶¶ 72-73. While Madoff acknowledged that the IA customer statements often reflected the ownership of Fortune 100 company stocks that had not been bought in connection with the fraudulent "split-strike conversion strategy," the account statements reflected that the most consistent investment for the IA customers' accounts was T-bills and the Brokerage Firms records prove that Madoff did actually purchase T-bills. CMF ¶¶ 75-93.[2]

---

[2] The Trustee's dishonesty extended to his attempted fabrication of evidence in the *Nelson* trial through a belated JPMC records custodian affidavit which stated – contrary to all of the documentary evidence and with a total absence of personal knowledge – that the 703 account and the 509 account were in the name of the LLC. *See e.g.* Nelson Exhibit Tx-028, *Picard v. Nelson,* 10-04377 (SMB) (Bankr. S.D.N.Y.) ECF No. 162-7.

**Dubinsky's Testimony**

Dubinsky has been the kingpin of the Trustee's bedrock contention that Madoff never purchased securities with IA customers' money. At the Nelsons' trial in May 2019, the Trustee's counsel, Dean Hunt, repeatedly elicited statements from Dubinsky that he had "scoured every bank record" and didn't find **any** use of IA customer funds other than payments to customers and bank sweeps at night at JPMC. CMF ¶ 69. The Trustee bases his right to claw back funds from innocent customers on this false contention. Yet, on cross-examination, Dubinsky was forced to admit that Madoff did purchase tens of billions of dollars of T-bills with IA customers' money that came from the 703 Account. CMF ¶ 71. Finally, after repeated perjury on his direct examination, Dubinsky conceded that funds were taken from the 703 Account at JPMC – funds paid to Madoff by the IA customers – and were transferred to Madoff's accounts at the Brokerage Firms through which Madoff purchased T-bills. CMF ¶ 71. These T-bills appeared on some of the IA customers' statements. CMF ¶¶ 75-93.

Defendants can prove, with reliable third party records, that Madoff actually owned and traded T-bills that were credited to the Accounts belonging to Epstein and Shelburne. CMF ¶¶ 75-93. And although Dubinsky contends that, if all of the T-bills that appear on Madoff's IA customer statements were added up, they would dwarf the number of T-bills that Madoff owned (*e.g.* Tr. Br. at 34), the Trustee flatly refused Defendants' document demand for production of all of the IA customers' account statements and this Court ruled that Defendants were not entitled to this evidence. CMF ¶ 99. Thus, any contention by the Trustee that the same T-bills appeared on every IA customer's statements is inadmissible. *See, e.g., Victorinox AG v. The B & F Sys., Inc.*, 2015 WL 9256944, at *2, n.2 (S.D.N.Y. Dec. 15, 2015), *aff'd sub nom. Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017) (refusing to consider cost data estimates because they were not produced during discovery). Moreover, we know any such contention is

false because Defendants' T-bill positions are not identical to the T-bill positions of all other Madoff customers represented by this law firm. *E.g.* CMF ¶ 94. Finally, given the shocking perjury elicited by the Trustee's counsel at the Nelsons' trial, Dubinsky's testimony is incredible.

## Defendants

Epstein died on December 19, 2008. Answer at ¶ 7, ECF. No. 43; SMF ¶ 107. The Trustee has sued his Estate, his widow Muriel Epstein, as beneficiary of the Estate and/or of the various Trusts created by Epstein's will (the "Trusts"), as Executrix of the Estate, and as Trustee of the Trusts, Kantor, as Trustee of the Trusts, and Shelburne. Kantor died on February 18, 2014. *See* CMF n1. The Trustee sued Muriel Epstein, Randy Epstein Austin, Jane Epstein and Susan Epstein Gross as Subsequent Transferee Defendants. This Court has dismissed all claims against the Subsequent Transferee Defendants by the Decisions and Orders of the Bankruptcy Court dated June 2, 2015 and July 16, 2015, Adv. Pro. No. 08-01789 (SMB), ECF Nos. 10089, 10679 and 10681.

The Trustee has not sued the Trusts. There is no basis whatsoever for asserting claims against Muriel Epstein individually or as Trustee, or against Kantor, except as Subsequent Transferees. Moreover, Shelburne, a New York corporation, was dissolved on December 28, 2009, a year before this complaint was filed. CMF ¶ 48. The Trustee has alleged, without any evidence, that Epstein was a direct beneficiary of the Shelburne Account. *See e.g.* Compl. ¶13. ECF No. 1.

## The Epstein Account

The Trustee concedes that, at all times, Epstein operated in good faith and had no knowledge that Madoff was operating a fraudulent IA business. The Epstein Account was opened on January 4, 1993 when Epstein transferred $329,987 from another Madoff account in the name of Bernard L. Madoff C&M 19, but the Trustee has only credited Epstein with $200,000 of the

money transferred. CMF ¶ 34. The Trustee claims that the uncredited amount constitutes a transfer of "fictitious profits." CMF ¶ 35. The Trustee has no evidence of this contention other than Dubinsky's testimony which, as the experience of this Court attests, is patently incredible.

The Trustee claims that, of the total amount withdrawn, $1,110,538 was withdrawn "in excess of principal" since December 11, 2006. He seeks judgment against Defendants for this amount. *See e.g.* Compl. Exhibit B, ECF No. 1.

**The Shelburne Account**

The Shelburne Account was opened on December 17, 1992. CMF ¶ 45. It was credited with a check in the amount of $100,000 on January 4, 1993. CMF ¶ 45. It was closed on October 23, 2007. CMF ¶ 47. Withdrawals through the life of the account were made by checks written by "Bernard L. Madoff" from the 509 Account and paid to "Shelburne Shirt." CMF ¶ 49. The Trustee claims that, of the total amount withdrawn, $1,511,900 was withdrawn "in excess of principal" since December 11, 2006. He seeks judgment against Defendants for this amount. *See e.g.* Compl. Exhibit B, ECF No. 1. All alleged withdrawals were paid by check from the 509 Account from "Bernard L. Madoff" to Shelburne. CMF ¶ 49. As set forth in VII below, Shelburne is a corporation. Under New York law, a corporation's shareholders are not liable for the debts of the corporation. Nor has the Trustee pled such liability.

## LEGAL STANDARD ON SUMMARY JUDGMENT

Fed. R. Civ. P. 56(a) is applicable to bankruptcy courts pursuant to Fed. R. Bankr. P. 7056. This Rule provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law. *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, 2014 WL 47774, at *8 (Bankr. S.D.N.Y. Jan. 3, 2014) (internal quotations omitted). "If the movant

carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials." *Id*. "In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party." *Sec. Inv'r. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 563 B.R. 737, 742 (Bankr. S.D.N.Y. 2017).

This Court has repeatedly held that summary judgment in favor of the Trustee is not appropriate in the claw back cases. *See e.g. Picard v. Legacy Capital, Ltd.,* 603 B.R. 682 (Bankr. S.D.N.Y. 2019); *Picard v. Mann,* 608 B.R. 165 (Bankr. S.D.N.Y. 2019). Indeed, at a hearing on a proposed similar motion, this Court told the Trustee: "[y]ou know my view on these summary judgment . . . motions, particularly on the issues I've identified, [whether the JPMC Accounts were held by Madoff personally or by the LLC, whether the LLC was a Ponzi scheme, and if so, when it began, whether the LLC was allocating T-bills purchased by the proprietary trading arm to customers of the IA business, deposits and withdrawals] . . . I have to try it." CMF ¶ 101.

## ARGUMENT

## I.    THE TRUSTEE LACKS ARTICLE III STANDING

There are no exceptions to the rule that a federal court cannot exercise jurisdiction over a case where the plaintiff lacks Article III injury. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) (Article III of the constitution requires that "plaintiff . . . allege a distinct and palpable injury to himself[.]"); *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 66 (2d Cir. 2013) ("Standing depends, first, on whether the plaintiff has identified a 'case or controversy' between the plaintiff and the defendants within the meaning of Article III of the Constitution."); *Whitmore v. Arkansas,* 495 U.S. 149, 161 (1950) (nature of death penalty and society's interest in its 'proper' imposition do not justify a relaxation of principles governing Article III standing). Thus, before

considering the summary judgment motions, the Court must determine that the Trustee has asserted an Article III injury.

The plaintiff bears the burden of proving that he has standing to bring his claims. *See Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984); *see also Cent. States v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005). To meet his burden, the Trustee must show "(i) a concrete and particularized "injury in fact" (ii) that can be fairly traced to the defendant's conduct, and (iii) that can be redressed by a favorable decision. *Bogart v. Israel Aerospace Indus. Ltd.*, No. 09 Civ. 4783 (LAP), 2010 WL 517582, at *3-4 (S.D.N.Y. Feb. 5, 2010) (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006)); *Picard v. HSBC Bank PLC*, 454 B.R. 25, 29 (S.D.N.Y. 2011) ("*HSBC Bank II*"), amended sub nom. *In re Bernard L. Madoff Inv. Sec. LLC*, No. 11 CIV. 763 JSR, 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54 (2d Cir. 2013), and *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54 (2d Cir. 2013). To establish Article III standing, the plaintiff must "assert his own legal rights and interests," and cannot rest his claim to relief on the legal rights or interests of third parties. *Wight v. BankAmerica Corp.*, 219 F. 3d 79, 86 (2d Cir. 2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *HSBC Bank II,* 454 B.R. at 29.

Thus, the Trustee must prove that the LLC owned the funds he alleges were transferred to Defendants. This he cannot do. There is no evidence whatsoever that the JPMC Accounts from which the transfers were made were ever the property of the LLC. Since the Trustee is only the Trustee for the LLC, he only has standing to recover transfers made by the LLC. Only Alan Nisselson, the Trustee for Madoff individually, can seek to claw back transfers made by the sole proprietorship, and he did not do so within the time required by the Bankruptcy Code. As this Court clearly and unequivocally held in two carefully reasoned decisions which the Trustee did

not appeal, *Picard v. Avellino* (*In re Bernard L. Madoff Inv. Securities LLC),* 557 B.R. 89, 109,

110 (Bankr. S.D.N.Y. 2016) ("*Avellino*"), *reconsideration denied,* 2016 WL 6088136 (Bankr.

S.D.N.Y. Oct. 18, 2016), "[o]nly the Madoff trustee [Alan Nisselson] can recover actual transfers

by the sole proprietorship." Thus, this case must be dismissed for lack of subject matter

jurisdiction.

### A.    The Trustee's Debtor, the LLC, Never Owned the JPMC Accounts

It is undisputed that IA customer funds were deposited into the 703 Account and that IA

customer withdrawals were made from the 509 Account or the 703 Account. Both Accounts were

owned by Madoff and/or Madoff's sole proprietorship for decades before the LLC was created in

2001 and continued as such through 2008. CMF ¶¶ 18-28. As the Trustee has admitted, there is no

evidence that the LLC ever owned the 703 or 509 Account. CMF ¶¶ 11, 25, 26.

The 703 Account was in Madoff's individual name until September 2002, when the name

was changed to Madoff's sole proprietorship, BLMIS, without the LLC designation. Although the

LLC was not formed until January 2001, Madoff used the BLMIS trade name since at least the

1970s. CMF ¶ 29. Even in 2008, the endorsement stamp for checks deposited into the 703 Account

read "For deposit only Bernard L. Madoff." CMF ¶ 21. According to JPMC's records, the 509

Account was always held in the name of Bernard L. Madoff. CMF ¶¶ 25-27. The Trustee's experts

have admitted that they never saw a JPMC bank statement in the name of the LLC. CMF ¶ 26.

When Madoff formed the LLC to own the LTB operated by his sons, he made very clear

that he was transferring only the LTB to the LLC. He wrote letters only to entities that did business

with the LTB to inform them of the transfer. Madoff sent a letter to BNY, the bank that had always

serviced the LTB; he wrote to the DTC; he wrote to the NSCC; and others. CMF ¶ 10. The letter

to BNY stated that the LLC had been formed and that ownership of Madoff's BNY accounts should

be re-titled in the name of the LLC. However, Madoff wrote no such letter to JPMC, which held

the IA accounts; or to anyone else who did business with the IA business. There is no evidence whatsoever of a transfer of the IA business or of the 703 and 509 Accounts to the LLC.

Since the 509 Account and the 703 Account were not owned by the LLC, they were not the property of the LLC. *In re Chowaiki & Co. Fine Art Ltd.*, 593 B.R. 699, 713 (Bankr. S.D.N.Y. 2018) ("New York law presumes that 'once funds are deposited in a bank account, the account holder has title to and control over those funds.'"); *City of New York v. Venkataram*, 2011 WL 2899092, at *5,n.6 (S.D.N.Y. July 13, 2011) ("'Under New York law, the party who possesses property is presumed to be the party who owns it.'"); *see also In re Int'l Pharmacy & Disc. II, Inc.,* 443 F.3d 767, 771 (11th Cir. 2005) ("In most states, the name or title to a bank account creates a presumption of ownership in the titleholder.") *See also Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 428-30 (1972) (Chapter X trustee had no standing to assert claims against a third party on behalf of the debtor's debenture holders because, *inter alia,* the Bankruptcy Act did not authorize a trustee to collect money not owed to the estate.) Thus, this Court lacks Article III jurisdiction of the Trustee's complaint.

### B.        The Trustee Cannot Demonstrate That the LLC Suffered An Injury in Fact

The Trustee's avoidance powers are limited under the Bankruptcy Code to seeking to recover transfers of "an interest of the debtor in property." 11 U.S.C. § 548(a)(1). The transfers at issue here were not made by the LLC, the Trustee's "debtor," but rather by Madoff individually. Thus, the Trustee lacks Article III standing to avoid the transfers. The Trustee relies upon arguments this Court rejected in *Avellino*. But the Trustee never appealed *Avellino* and, thus, he is bound by its holding. *Picard v. Avellino (In re Bernard L. Madoff Inv. Secs. LLC),* 557 B.R. 89 (Bankr. S.D.N.Y. 2016) ("*Avellino*"), *reconsideration denied,* 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) (The Trustee has no standing to avoid transfers made by Madoff individually; only Madoff's individual trustee has such standing.).

### C.    SIPA Does Not Create Article III Injury

The Trustee makes numerous arguments that this Court properly rejected in *Avellino*. For example, he argues that the Securities Investor Protection Act ("SIPA") somehow authorizes him to sue to recover a transfer made by Madoff, based on a broad definition of "customer property" under SIPA and, by implication, Rule 15c3-3 of the Securities Exchange Act of 1934 (*See* 17 C.F.R. 240.15c3-3.) However, the Trustee's strained attempt to alter the statute is doomed to fail. As Judge Rakoff held in *HSBC Bank II,* SIPA does not confer a "vast power on such a trustee to commence lawsuits he could not otherwise bring" and Rule 15c3-3 is "undisputedly not a part of SIPA" and does not "grant the Trustee additional standing." *HSBC Bank II,* 454 B.R. at 29-31.

SIPC filed an application pursuant to 15 U.S.C. § 78eee(a)(4)(B) alleging that the LLC was not able to meet its obligations to its customers and the customers needed protection under SIPA. SMF ¶ 3. The District Court appointed Picard as Trustee for the liquidation of the LLC pursuant to 15 U.S.C. § 78eee(b)(3) and transferred the case to the bankruptcy court. *See* SMF ¶¶ 4-5. *See also* 15 U.S.C. § 78iii(5) ("The term 'debtor' means a member of SIPC with respect to whom an application for a protective decree has been filed under § 78eee(a)(3)."). As SIPA Trustee for the LLC, the Trustee has no power to void transfers made by Madoff individually. *See Avellino* at 108, 110 (The "SIPA debtor was [the LLC], the limited liability company, and not Madoff's sole proprietorship . . . ." "SIPA authorizes the trustee to avoid and recover transfers of customer property. 'Customer property' includes [property of the debtor]."); *reconsideration denied*, 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) ("*Avellino Reconsideration Decision*"); *Mendelow* 560 B.R. at 227. The Trustee's "debtor" is only the LLC.

The Trustee argues that the scope of the Protective Decree, by which Picard was appointed SIPA Trustee of the LLC, should be construed to include both Madoff and the LLC. (*E.g.,* Tr. Br. at 28). But the argument that the Protective Order covered Madoff as well as BLMIS was rejected

in *Avellino*. *See Avellino reconsideration decision* at *3. Again, Picard did not appeal either decision in *Avellino*. Moreover, the Protective Decree states in ¶ I that the customers of the LLC are in need of the protections of SIPA, not the customers of Madoff individually. Similarly, in ¶ II, the Protective Decree notes that the Trustee was appointed as the "trustee for the liquidation of the Defendant," referring to the LLC and with no mention whatsoever of Madoff individually.

The Trustee argues that he was appointed for the liquidation of the *business* of the broker-dealer, rather than for the liquidation of the LLC. (Tr. Br. at 29). But this doesn't help the Trustee because the business of the broker-dealer was the LTB. Although he argues that the LLC took over the business of the sole proprietorship as a single business, *id.,* there is simply no evidence to support this statement. On the contrary, not a single employee of the LTB had any role in the operation of the IA business. Inexplicably, the Trustee relies upon Amended Form BD which the LLC filed in January 2001 with the SEC. (*E.g.,* Tr. Br. at 24, 27) However, in this document Madoff described the only business of the LLC as MM and PT and expressly stated that the LLC does not engage in IA services. At pages 8 and 9, the LLC was asked to check all of the "types of business[it] engaged in" (unless that business accounted for less than 1% of annual revenue). It checked "C," its MM activities, "V," its PT activities, and "Z," "Other" activities are described on page 10 of the form as Madoff's membership in the Cincinnati Stock Exchange where he was a designated market maker. **Madoff did not check "S," which referenced "investment advisory services." Finally, the Trustee's own expert, Bruce Dubinsky, admitted that the LLC was not engaged in any fraud.** . CMF ¶ 6, 12**.**

The Trustee argues that "as long as a trustee can show that the property [he seeks to recover] was customer property received by the broker-dealer, he has the authority to recover it, wherever it lies." (Tr. Br. at 31); SIPA § 78fff(2)(c)(3). But that is precisely what the Trustee

cannot prove. The evidence is indisputable that the property of Epstein or Shelburne was never received by the broker-dealer; on the contrary, it was received by Madoff and deposited into the 703 Account with an endorsement statement that read: "For deposit only Bernard L. Madoff." In desperation, the Trustee argues that, even if Madoff operated a sole proprietorship before the Trustee was appointed, the Trustee still has the right to recover funds paid by Madoff individually. This Court properly rejected this argument entirely in *Avellin*o.

The Trustee argues that the Substantive Consolidation Order entered by the District Court on July 9, 2009, which expressly orders that Madoff's own trustee has standing to void transfers by Madoff and Picard has standing to void transfers by the LLC, is just a "belt and suspenders" order to ensure that none of Madoff's assets slipped through the cracks since various entities were pursuing them, and the reservations in the order were necessary because, unless they were expressly preserved, the substantive consolidation of the two estates could extinguish both trustees' avoidance powers altogether. (Tr. Br. at 31). This Court flatly rejected this argument, and for good reason. *See Avellino reconsideration decision at* *2-3*. Moreover, any reliance by the Trustee on the substantive consolidation of the LLC's estate and Madoff's estate is constrained both by the limitations of the substantive consolidation doctrine and the Court's order authorizing the consolidation, which does not expand it. Substantive consolidation does not merge the debtors or retroactively transform property of someone other than the debtor into property of the debtor. *See, e,g, In re Bauman*, 535 B.R. 289, 301 (Bankr. C.D. Ill. 2015) ("Most significantly, substantive consolidation should not be deemed to have a retroactive effect of transforming property owned by an entity separate from a debtor into property of that debtor as of the prepetition date of the challenged transfer . . . The facts of property ownership as they existed prepetition remains unchanged, as do the elements of proof under sections 548 and 544.") *In re Murray Industries,*

*Inc.*, 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991) ("substantive consolidation of several estates means one thing and one thing only—that all assets of the several entities are pooled and all creditors of the several entities are entitled to share in the pooled assets in accord with their respective rights. It would certainly be a violation of due process if the order of substantive consolidation would operate to destroy defenses and rights which existed prior to the entry of the order of substantive consolidation."); *Ferguson v. Garden Ridge Corp.*, 399 B.R. 135. 140 (D. Del. 2008) (same in context of set rights); *In re Deltacorp, Inc.*, 179 B.R. 773 (Bankr. S.D.N.Y.1995) ("estates are merged for the purposes of bankruptcy administration, but the consolidation alone does not effect a corporate merger.")

The Consolidation Order could not create subject matter jurisdiction where none exists because subject matter jurisdiction cannot be expanded by judicial fiat, the consent of the parties, or any other artifice. *See, e.g. Perpetual Securities, Inc. v. Tang,* 290 F.3d 132, 136 (2d Cir. 2002); *Siding and Insulation Co., Inc. v. Acuity Mut. Ins. Co.*, 754 F.3d 367, 373-374 (6th Cir. 2014) ("Necessarily, then, the parties enjoy no more discretion to expand our bailiwicks than we do . . . In light of this teaching, the parties' consent to jurisdiction matters not.") *Fafel v. Dipaola*, 399 F.3d 403, 410 (1st Cir. 2005) ("A court without subject matter jurisdiction may not acquire it by consent of the parties."). Subject matter jurisdiction cannot be conferred or waived by consent, estoppel, or failure to raise the issue early in the proceedings. Indeed, lack of subject matter jurisdiction can be raised at any time. *U.S. v. McGaughy,* 670 F.3d 1149, 1155 (10th Cir. 2012) ("Although the government did not raise any jurisdictional objections below, it is not precluded from raising them here.").

Finally, the Trustee argues that, if Defendants are correct, there is no one that can recover the withdrawals and that this is not the intention of SIPA. (Tr. Br. at 32). This is not the case at all

and it has nothing to do with SIPA. As this Court held, Madoff's individual trustee, Alan Nisselson, could have asserted a claim to recover the transfers, but he simply chose not to do so. *See Avellino*, 557 B.R. at 110 ("Only the Madoff trustee can recover actual transfers by the sole proprietorship."). Perhaps Nisselson recognized, as did Judge Chin, that clawing back funds from innocent customers is "cruel" and perhaps the Byers Trustee did not want to be cruel. *SEC v. Byers,* 637 F. Supp.2d 166, 182 (S.D.N.Y. 2009). In any event, the fact that Nisselson failed to sue Defendants does not give the Trustee Article III standing to sue them.

### D.      Dubinsky Admitted that Madoff Bought T-Bills With IA Customers' Funds

Underlying all of the Trustee's claims is the single premise that Madoff never purchased any securities with IA customers' money. Confronted with the third party documentary evidence, however, Dubinsky admitted that Madoff *did* purchase T-bills with IA customers' money taken from the 703 Account and, indeed, T-bills were the most common investment in IA customers' accounts. Thus, Dubinsky flatly contradicted his own perjured testimony at the Nelsons' trial.

Despite the fact that his subornation of perjury was proven by Dubinsky's testimony on cross-examination,  the Trustee continues to rely upon Dubinsky's false contention that Madoff never used IA customers' funds to purchase securities. On direct examination, Dubinsky repeatedly testified that Madoff never used IA customers' money to purchase securities. CMF ¶ 67. When questioned by Dean Hunt, Dubinsky testified that there is "no evidence [of activity in the 703 account] other than money coming in from customers and money going out to customers," *id*. at 92:16-17, and a minimal amount (3% of the total monies in the 703 Account) from overnight sweeps. CMF ¶ 68. Dubinsky testified that he "scoured every bank record and didn't find any other use of customer funds other than payments to customers and bank sweeps at night at JPMC." CMF ¶ 69.

On cross-examination, Dubinsky got religion. He admitted that Madoff used IA customers' money, taken from the 703 Account, to purchase T-bills through accounts Madoff held at the Brokerage Firms, that the T-bills paid interest, and that the T-bills appeared on customer statements. Dubinsky testified:

> Q. But in any event, you're now telling us that you're aware that there were approximately eight accounts at which Madoff was using investment advisory customers' money to purchase T bills. Isn't that true?
>
> **A.** That is correct, yes.

CMF ¶ 72. He further testified:

> A.. There was money taken out of the 703 account, transferred to these accounts, these various accounts, and then these securities were purchased, yes.

CMF ¶ 71.

## II.    THE TRUSTEE'S MOTION RESTS ON INADMISSIBLE EVIDENCE

The evidence submitted on a motion for summary judgment must be admissible. *Bellamy v. City of New York,* 914 F.3d 727, 750 (2d Cir. 2019); *Edwards v. Onondaga Cmty. Coll.*, No. 5:14-CV-1329, 2016 WL 3519619, at *4 (N.D.N.Y. June 22, 2016); *Boger v. New York State Office of Parks, Recreation & Historic Pres.*, 2019 WL 2766897, at *6 (N.D.N.Y. July 2, 2019); *Roberts v. Ground Handling, Inc.*, 499 F. Supp. 2d 340, 360 (S.D.N.Y. 2007). *See also* Fed. R. Civ. P. 56(c). The evidence on which the Trustee relies is inadmissible.

### A.    The Expert Reports Are Not Admissible

The Trustee's expert witness testimony is inadmissible because it is based, in large part, on BLMIS books and records. *See, e.g.* Dubinsky Report Jan 2019 Appendix B, citing "SQL Compilation of BLMIS Data," and "AS/400 Tapes." *Picard v. JABA et. al,* Case No. 1:20-cv-03836-JGK, ECF No. 15-4. Dubinsky relies in his testimony on the very records that Dubinsky told the Second Circuit were "permeated with fraud." *See, e.g.,* Expert Report of Bruce G.

Dubinsky (*In re Bernard L. Madoff*, Adv. Pro. No. 08-1789 (SMB), ECF Doc. No. 12137-1) ("[F]raud permeated BLMIS to the extent that the company's books and records could not be relied upon by a hypothetical buyer."); Trustee's Supp. Br. (Aug. 12, 2016) (ECF Doc. No. 13876) at 5 (referring to fraudulent and "fictitious" notations in the customer statements that "were irreconcilable with any trading records," and warning against giving "undue credence to fictitious amounts engineered by Madoff"); *id.* at 6 ("the securities transactions reflected on BLMIS books and records were fictitious"); *id.* at 63 ("the fraudulent nature of BLMIS's business . . . ").

Where the source of information is inadmissible because it is permeated with fraud, any analyses or testimony based on the fraudulent records is also inadmissible. *See, e.g.*, 6-1006 Weinstein's Fed. Ev. § 1006.07 (2015); *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999) (summary evidence cannot be admitted if the underlying materials are inadmissible); Fed. R. Evid. 801 and 802. Even where only portions of the underlying source material constitute improper hearsay, those defects may be imputed to the summary or demonstrative exhibit as a whole. *See* Wright & Gold, 31 Fed. Practice and Procedure § 8043, at 527.

Madoff's books and records are not admissible as business records under Fed. R. Evid. 803(6) or under the residual exception to the rule against hearsay, Fed. R. Evid. 807(a). Courts applying Rule 803(6) have stressed that the "trustworthiness" of the information is the "principal precondition to admissibility." *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995) (internal quotation marks omitted); *JPMorgan Chase Bank, N.A. v. Yuen*, No. 11 Civ. 9192 (NRB), 2013 WL 2473013, at *6 (S.D.N.Y. June 3, 2013). While some courts have found, in specific instances, that particular documents satisfy this trustworthiness requirement even though the proponent could not identify the author or date of the entry, courts have always required other indicia of reliability and trustworthiness for admission. *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003).

Here, there are no indicia of reliability. According to the Trustee, there was an "incentive to falsify or alter" the records, making them absolutely inadmissible. *See Yuen*, 2013 WL 2473013, at *7; *see also U.S. v. Blechman*, 657 F.3d 1052, 1066 (10th Cir. 2011) ("an essential link in the trustworthiness chain fails" when the supplier of the information was not acting in the regular course of business). When considering whether a document was prepared by an untrustworthy source, courts examine whether the party providing the information had an incentive to misrepresent. In *United States v. Dreer*, the court held business records inadmissible because other records in the business were falsified. 740 F.2d 18 (11th Cir. 1984). The court explained that, "[a]lthough the proponent of the records did not admit that the records were falsified, there was an extremely strong inference arising from evidence of numerous other forged financial documents that the proffered evidence was not genuine." *Id*. at 20. Here, the Trustee himself has asserted, when it furthered his interests, that Madoff's records are "permeated with fraud." Yet, he wants this Court to grant judgment against Defendant based upon those fraudulent records.

Not only are Madoff's records inadmissible but Dubinsky flatly lied in his expert report about what he found in his $40 million review of Madoff's records and in his testimony at the Nelsons' trial. It was only when, on cross-examination, he was confronted with third party documentary evidence, that Dubinsky admitted that Madoff purchased T-bills with IA customers' money, thereby proving his own repeated perjury on his direct examination by the Trustee's counsel, Dean Hunt.

### B.    The Allocutions and Trial Testimony are Inadmissible

Frank DiPascali ran the IA Business for Madoff. Madoff testified that DiPascali purchased T-bills with IA customers' money. CMF ¶ 60. Documentary evidence demonstrates that the receipts from the sale or redemption of T-bills were paid directly into the 703 Account. CMF ¶ 61. And Joann Crupi, one of the Madoff employees that reported to DiPascali, testified that DiPascali

would tell her to which of Madoff's IA customers specific T-bill transactions should be credited.

CMF ¶ 62. Defendant never had the opportunity to depose DiPascali because he died before

Defendant was permitted to take depositions. While the Trustee relies upon DiPascali's testimony

that the IA business made no trades, this testimony is obviously false because the third party

evidence produced by the Brokerage Firms establishes that Madoff purchased T-bills with IA

customers' money and Dubinsky admitted this on cross-examination at the Nelsons' trial. For this

reason, the criminal trial testimony of DiPascali that the IA Business made no trades is

demonstrably false.

Moreover, DiPascali's testimony is inadmissible against Defendant. In order to be

admissible, the facts contained therein must be "essential to the judgment." Fed. R. Evid.

803(22)(C); *In re Dreier LLP*, 2014 WL 47774 at * 11 (Bankr. S.D.N.Y. Jan. 3, 2014) (Bernstein,

J.) ("A prior judgment of conviction may be used as prima facie evidence in a subsequent civil suit

only with respect to matters of fact or law 'necessarily decided by the conviction and the verdict

on which it was based.'"). Here, the Trustee seeks to admit the allocutions on the question of

whether a Ponzi scheme presumption may apply. (Tr. Br. at 8-12). Yet, in the criminal trial, none

of the defendants was charged with operating a Ponzi scheme. Although Madoff used the term

"Ponzi scheme" in his allocution, he did not testify to his understanding of what a Ponzi scheme

is and he did not describe a Ponzi scheme; instead, he simply described a fraud. Moreover, in his

deposition testimony, Madoff negated virtually all of the elements of a Ponzi scheme. For example,

he testified that, until the fall of 2008, when Lehman Brothers filed in bankruptcy, he had never

needed new investment customers in order to fund customer redemptions. CMF ¶ 58. He testified

concerning his investment of customer funds in T-bills. CMF ¶ 53. And his testimony is validated

by the third party records in the Trustee's possession. CMF ¶¶ 75-93.

Under Fed. R. Evid. 804, a plea statement is admissible as an exception to the hearsay rule if, when made, it would expose the declarant to criminal liability or, if supported by corroborating circumstances that clearly indicate its trustworthiness, it is offered in a criminal case as one that tends to expose the declarant to criminal liability. However, here, DiPascali was trying to curry favor with the government in order to avoid imprisonment. Statements made to shift the blame or curry favor are not sufficiently self-incriminatory to be admissible. *United States v. Tropeano,* 252 F.3d 653 (2d Cir. 2001).

Moreover, there is reliable third party documentary evidence proving the falsity of the Trustee's contentions and of DiPascali's testimony. While Defendants have not been able to cross-examine DiPascali, their counsel did cross-examine Dubinsky who then admitted his perjury at the Nelsons' trial and admitted that Madoff purchased T-bills through the Brokerage Firms, using IA customers' money. None of this evidence was put before the jury in the criminal trial. Nor did the government or the criminal defendants introduce JPMC statements showing transfers from the 703 Account to the Brokerage Firms and from the Brokerage Firms to the 703 Account (although DiPascali did testify that Madoff told him to which customer accounts the T-bills should be credited). Obviously, the government had no interest in proving that Madoff conducted legitimate trading for any of his IA customers.

While DiPascali testified that he bought T-bills from the major brokerage houses like Bear Stearns, Fidelity, Bank of New York, Morgan Stanley and Lehman Brothers, to get "interest on the checking account," he also testified that none of the T-bill purchases were real. *See* DiPascali Trial Testimony, December 10, 2013, 5346:1-2 and, for context, 5344:9-5346:2, ECF No. 15-2. Obviously, both statements cannot be true; and the statements from the Brokerage Firms prove that Madoff did purchase T-bills and that some of these T-bills were credited to Defendant's

account. CMF ¶¶ 75-93. While DiPascali testified that he falsified the appearance of T-bills on *certain* customer statements, (*id.*), DiPascali was not questioned about Defendants' statements and the profits on the T-bills which were credited to his account. Obviously, no defense counsel had a motivation to question DiPascali on this subject.

The Trustee relies on a statement that DiPascali made at the criminal trial that he prepared an Excel spreadsheet which contained the CUSIP numbers of certain T-bills and options. DiPascali testified that the spreadsheet also bore the account numbers "that Bernie told us he wanted to use to be the counterparties of the customer option positions" and that the spreadsheet "allows me to randomly pick a group of treasuries that were going to represent that collateral." *See* CMF ¶ 64; That spreadsheet, Government Exhibit 105-c171, is attached to the Chaitman Dec. as **Ex**. **AK**. CMF ¶ 64. There is not a single reference to the Epstein or Shelburne Accounts on that spreadsheet and there is no third party document suggesting that the T-bills in their Accounts were used for collateral. At the criminal trial, no defense counsel questioned DiPascali about the inconsistencies in his testimony and which customers' accounts he was talking about. Finally, if the T-bills were used as collateral, that proves that they existed and were owned by Madoff.

Joann Crupi testified that DiPascali told her when he was about to buy T-bills and to whom the T-bills should be allocated. CMF ¶ 62. This refutes DiPascali's testimony that he purchased T-bills as a cash management tool only and that the T-bills that were allocated to customers were from a spreadsheet and none of them were "real." *E.g* SMF ¶ 67.

## III.   THE TRUSTEE CANNOT MAKE HIS PRIMA FACIE CASE

Aside from the fact that Dubinsky's perjury disqualifies him as a credible witness, the Trustee cannot make out a prima facie case. The elements of the Trustee's claims under 11 U.S.C. § 548(a)(1)(A) are that the LLC made (1) a transfer of an interest of the debtor in property; (2) within two years before the date of the bankruptcy petition, with (3) "actual intent to hinder, delay

or defraud" a creditor. (Tr. Br. at 6). As we have demonstrated, the Trustee cannot prove a "transfer of an interest of the debtor in property" because the Trustee's "debtor," the LLC, never owned the funds in the 703 and 509 Accounts.

Ignoring his lack of standing to sue on behalf of Madoff or the sole proprietorship, BLMIS, the Trustee argues that the "Ponzi scheme presumption" allows the court to presume a fraudulent intent. However, he has no evidence to support a finding of intent as a matter of law. And, since Defendants can show, through reliable third-party records, that Madoff did buy T-bills for the Epstein and Shelburne accounts, the Trustee cannot prove that Madoff operated a Ponzi scheme.

The Trustee must demonstrate actual intent to defraud by clear and convincing evidence. *See, e.g. Mendelsohn v. Jacobowitz ("In re Jacobs")* 394 B.R. 646, 661 (Bankr. E.D.N.Y. 2008) ("The trustee has the burden of showing that the challenged transfer was made with actual intent to hinder, delay, or defraud, and he or she must do so under the clear and convincing standard."); *USA United Fleet, Inc. v. Ally Financial, Inc. ("In re USA United Fleet, Inc.")*, 559 B.R. 41, 57 (Bankr. E.D.N.Y. 2016) (same). Here, the Trustee has not shown actual intent, either by clear and convincing evidence or by any other standard. Thus, his motion for summary judgment must fail.

### A.    Madoff Bought Actual T-Bills

Defendants can prove that Madoff used IA customers' funds to purchase T-bills, some of which were credited to Epstein and Shelburne's Accounts. CMF ¶¶ 75-93. For example, as of December 10, 2004, the Epstein Account held T-bill positions in the amount of $473,499. CMF ¶¶ 76-78. And Defendants can prove, through third party evidence, that Madoff owned those T-bills at the time they appeared on the Epstein Account statement. CMF ¶ 79.  Further, Defendants can prove that, as of September 22, 2004, the Epstein Account held T-bill positions in the amount of $498,065, which Madoff owned at the time they appeared on the Epstein Account Statement. CMF ¶¶ 80-83.

Similarly, on June 26, 2007, the Shelburne Account held T-bill positions in the amount of $1,417,319.25. CMF ¶¶ 86-88. And Defendants can prove, through third party evidence, that Madoff owned those T-bills at the time they appeared on the Shelburne Account statement. CMF ¶ 89. Similarly, Defendants can prove that, as of December 10, 2004, the Shelburne Account held T-bill positions in the amount of $523,341. And Defendants can prove, through third party evidence, that Madoff owned those T-bills at the time they appeared on the Shelburne Account statement. CMF ¶¶ 90-93.

Ignoring his own counsel's subornation of perjury, the Trustee argues that Dubinsky "verified that no U.S. treasury bills . . . were purchased on behalf of IA business customers." (Tr. Br. at 12). However, on cross-examination at the Nelsons' trial, Dubinsky admitted that Madoff did buy T-bills with IA customers' money. Now the Trustee argues that Madoff did not own enough T-bills to cover the more than 5,000 customer accounts he held in the IA business. This is an argument that the Trustee is barred from making because the Trustee refused to produce the account statements of all of Madoff's IA customers in response to Defendants' document demand, thus making it impossible for Defendants to test the veracity of the Trustee's contention. *See Picard v. Wilenitz*, Adv. Pro. No. 10-04995 ECF No. 70-2. Similarly, the Trustee stated that he would not provide "direct access" to a database "because it contains documents relating to thousands of customers, many of which are not relevant to this proceeding." *See id.* at § 1. The Trustee would not produce, or even log, documents that were received that he deemed not relevant. *See id.* at § 1. It is impossible to conjure up a legitimate reason for the Trustee's refusal to produce Madoff's records. Indeed, the conclusion is inescapable that the Trustee wanted to conceal the fact that he had misrepresented the facts concerning Madoff's fraud to every court before which he appeared.

Where a party refuses to produce evidence requested in discovery, that party is precluded from using such evidence at trial. In *Taylor v. Illinois*, 108 S. Ct. 646 (1988), the Supreme Court affirmed an order precluding testimony where a witness had not been identified in pretrial discovery. In *United States v. Nixon,* 418 U.S. 683 (1974), the Court wrote that the "very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence." *See also, Victorinox AG v. The B & F Sys., Inc.*, 2015 WL 9256944, at *2, n.2 (S.D.N.Y. Dec. 15, 2015), *aff'd sub nom. Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017) (refusing to consider cost data estimates because they were not produced during discovery); *Taveras v. City of New York*, 2009 WL 10701924, at *7 (E.D.N.Y. Apr. 7, 2009) (precluding defendants from relying on charts that were not produced during discovery); *cf. Costa v. Sears Home Imp. Products, Inc.,* 65 F. Supp.3d 333, 346 (W.D.N.Y. 2014) (holding on summary judgment that a party could not rely on an affidavit the other party did not know about); *Preuss v. Kolmar Labs., Inc.,* 970 F. Supp. 2d 171, 178-79 (S.D.N.Y. 2013) (striking affirmation for failure to disclose pursuant to Fed. R. Civ. P. 26).

Moreover, there is no evidence to suggest that every IA customer had precisely the same T-bills in his account. In fact, we know the opposite is true. This firm represents the defendants in 60 different clawback actions. As just one example, from our review of the Trustee's records, the Epstein and Shelburne Accounts held T-bills that were not held simultaneously by all our other clients. CMF ¶¶ 79, 94.

**B.**     **The Ponzi Scheme Presumption Does Not Apply Because the Trustee Cannot Show Intent**

Courts apply a four-factor test to determine the existence of a Ponzi scheme: (1) deposits were made by investors, (2) the debtor conducted little or no legitimate business, (3) the

purported business operation of the debtor produced little or no profits or earnings, and (4) the source of payments to investors was from cash infused by new investors. *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Case No. 08-15051, 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 3, 2014); *Armstrong v. Collins*, No.01 Civ. 2437 (PAC), 2010 WL 1141158 at * 22 (S.D.N.Y. Mar 24, 2010), *reconsideration denied*, No. 01 Civ. 2437 (PAC), 2011 WL 308260 (S.D.N.Y. Jan. 31, 2011). The Trustee cannot meet any of these criteria.

## 1.   Defendants Were Creditors, Not Equity "Investors"

While fraudulent transfer actions against **equity** investors in a Ponzi scheme are justified because those investors are owners of the business who received dividends when there was no source of revenue for the business and its creditors were unpaid, such actions are not justified against creditors of the debtor, such as Defendants, who simply received the money to which they were contractually and legally entitled. *See, e.g. U.S. v. Manufacturers Trust Co.*, 198 F.2d 366, 367 (2d Cir. 1952) ("The relationship between the bank and its depositor is that of debtor and creditor.") (Citation omitted). The Second Circuit has recognized that customers such as Defendants are creditors, not owners. *In re Bernard L. Madoff Inv. Securities LLC*, 2011 WL 3568936, 6 (2d Cir. Aug. 16, 2011) ("BLMIS claimants are customers with claims for securities within the meaning of SIPA.")

Obviously, Madoff held Epstein and Shelburne's funds as a custodian and fiduciary, to purchase securities in their names.   Moreover, the Trustee has acknowledged that all "BLMIS customers who filed claims—whether their net equity customer claims were allowed or denied— are general creditors of the BLMIS estate." Trustee's Fifth Interim Report ¶ 76, *In re Madoff*, No. 08-01789, ECF No. 4072 (Bankr. S.D.N.Y. May 16, 2011).

### 2.    **The LLC was not a Ponzi scheme**

The Trustee can only prevail if he can prove that the LLC was a Ponzi scheme. He cannot prove this. In fact, Dubinsky conceded in cross-examination at the Nelsons' trial, that the LLC did not operate a Ponzi scheme and that it was a legitimate business. CMF ¶ 6. In order to avoid dealing with this obvious failure of proof, the Trustee frames the issue as whether the **IA Business**, which he magically views as part of the LLC, engaged in trading. (*E.g.*, Tr. Br. at 9-11.) But there is no evidence that the IA Business was part of the LLC. Certainly, the LLC's Amended Form BD, filed in 2001, did not indicate that Madoff was transferring the IA business to the LLC; or that the LLC would be engaging in any IA services.

On the contrary, it is clear that Madoff formed the LLC in 2001 to insulate the LTB operated by his sons from the fraudulent IA business which he operated. But even if the LLC operated the IA Business, the fraudulent part of Madoff's entire operation was very small compared to the legitimate trading done by the LLC. The LLC conducted a massive legitimate trading business. Madoff testified that "by the time we were finished in 2008 . . . we represented ten percent of the United States' volume in – in [legitimate, market-making] transactions." CMF ¶ 56. The Trustee's witnesses admitted to having seen "anecdotal evidence" that Madoff conducted trades equal to approximately 10% of the daily volume of the New York Stock Exchange as a whole. CMF ¶ 57. Over 96% of the staff employed by Madoff/the LLC worked in the LTB. The Trustee admitted that only "six to eight people" worked in the IA Business and the remaining 172 people worked in the LTB. CMF ¶ 4.

Where the Ponzi scheme constitutes "a small part of a larger, legitimate business" the Ponzi scheme presumption is inappropriate. *In re Prebul Jeep, Inc.*, 2009 WL 4581900 (Bankr. E.D. Tenn. 2009); *In re Foos*, 188 B.R. 239 (Bankr. N.D. Ill. 1995) *aff'd in part, rev'd in part on other g'ds*, 1996 WL 563503 (N.D. Ill. 1996). In *In re Manhattan Inv. Fund Ltd.*, 359 B.R. 510 (Bankr.

S.D.N.Y. 2007), *aff'd in part, rev'd in part, In re Manhattan Inv. Fund Ltd.* 397 B.R. 1 (S.D.N.Y. 2007), the court cited its earlier ruling that the Ponzi scheme presumption may still be applied where there is also legitimate business; "[w]hen a debtor operating a Ponzi scheme makes a payment with the knowledge that future creditors will not be paid, that payment is presumed to have been made with actual intent . . . regardless of whether the payments were made to early investors, or whether the debtor was engaged in a strictly classic Ponzi scheme." However, this holding is inapplicable here because the Trustee has no evidence to show that Madoff made any payments to Defendants with knowledge that any other customers would not be paid. Indeed, Madoff testified that he never had difficulty funding a customer withdrawal until November 2008, after Lehman Brothers filed in bankruptcy and the entire financial world was in a state of collapse. CMF ¶ 58.

### 3.    The IA Business was Profitable

The Trustee has also failed to prove that the IA Business was not profitable. On the contrary, at the Nelsons' trial, the Trustee's expert, Bruce Dubinsky, admitted that between $700 and $800 million was transferred from the IA business account at JPMC to the BNY account servicing the legitimate trading operations of the LLC following its formation in 2001. CMF ¶ 16. We have not found a single Ponzi scheme case where a Ponzi scheme funded a legitimate affiliate to the tune of $700-$800 million.

### 4.    Deposits of New Customers

The Trustee has not shown that the LLC relied on "after-acquired investment funds to pay off previous investors" to "forestall disclosure of the fraud." *See Legacy,* 2019 WL 2593008 at *4, (in addition to the four factor test, the "Ponzi scheme label applies 'to any sort of inherently fraudulent arrangement under which the debtor transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud'") (*quoting In re*

*Manhattan Inv. Fund Ltd.*, 397 Bankr. 1, 12 (S.D.N.Y. 2007). Madoff repeatedly testified that he did not require the deposits of other customers to pay out existing customers, CMF ¶ 58, and the Trustee cannot refute this testimony.

### 5.    Additional Factors

Courts nationwide recognize that a classic Ponzi scheme is short-lived. "[M]ost Ponzi schemes are of relatively short duration." *SEC Official Testifies on Best Method for Determining Madoff Distributions*, Sec. Exch. Comm'n. Today 10466961, 2009 WL 10466961 (Dec. 14, 2009); *Prymak v. Contemporary Fin. Sols., Inc.,* 2007 WL 4250020, at *2 (D. Colo. Nov. 29, 2007) (a Ponzi scheme "is a fraudulent scheme that can be profitable for only a short period of time [.]"); *see e.g., McNamara v. Sher*, 2012 WL 760531, at *1 (S.D. Cal. Mar. 8, 2012) (Ponzi scheme lasting two years); *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549-50 (4th Cir. 2001) (Ponzi scheme lasting 17 months); *Germinaro v. Fid. Nat. Title Ins. Co.,* 107 F. Supp. 3d 439, 450 (W.D. Pa. 2015) (Ponzi scheme lasting nine months); *In re Rivas*, 2010 WL 2265663, at *1 (Bankr. E.D. Tenn. June 3, 2010) (Ponzi scheme lasting 14 months).

Although the Trustee has claimed (incredibly) that Madoff operated a Ponzi scheme from the early 1960s on, Madoff has testified that his fraud began post-1992, likely 1993. CMF ¶ 59. Even if Madoff's fraud began in 1993, that would mean it lasted for 15 years. We have not found a single case where a court found the existence of a Ponzi scheme that spanned 15 years. Such a long duration, by itself, contradicts the contention that the IA business was a Ponzi scheme.

### C.    The Payments Were Not Made "In Furtherance of" a Ponzi Scheme

The Trustee makes the absurd suggestion  that the fact that Madoff commingled customer funds proves he operated a Ponzi scheme. The fact that Madoff made legitimate trades for Epstein's and Shelburne's Accounts cannot be disregarded on the spurious basis that the monies to purchase those T-bills necessarily came from the commingled funds of other customers. Merrill

Lynch does not maintain a separate bank account for each of its securities customers. It commingles customer funds in its bank account. Yet that does not invalidate the purchase of securities for a particular account. Indeed, we have found no evidence that any securities firm maintains a separate bank account for each of its customers. The Trustee's suggestion is preposterous.

The requirement that, to be clawed back, a payment must have been made "in furtherance of" a Ponzi scheme reflects the fact that even an entity running a Ponzi scheme can engage in legitimate transactions. *In re Bernard L. Madoff Inv. Securities, LLC,* 458 B.R. 87, 105 (Bankr. S.D.N.Y. 2011) ("it is conceivable that certain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply"). The "in furtherance" element is *in addition to* the first requirement that the debtor operate as a Ponzi scheme, which supplies the basis for finding intent. Accordingly, it restricts the operation of the Ponzi scheme presumption to transfers that are both made by a Ponzi schemer *and* needed to continue that scheme. *In re DBSI*, *Inc.,* 476 B.R 413, 422 (Bankr. D. Del. 2012); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1 at 13 (S.D.N.Y. 2007); *Foos*, 188 B.R. at 244; *In re ATM Financial Services, LLC*, 2011 WL 2580763, *5 (Bankr. M.D. Fla. June 24, 2011) ("The Ponzi presumption must have some limitations, lest it swallow every transfer made by a debtor, whether or not such transfer has anything to do with the debtor's Ponzi scheme").

Rather than establish that there was a Ponzi scheme and then show that the payments to Epstein and to Shelburne were made in furtherance of it, the Trustee starts with his contention that Madoff conducted a Ponzi scheme and then assumes that the payments made to Epstein and to Shelburne must constitute payments "in furtherance of" it, relying on cases that apparently cannot find "any other explanation" for the payments. *In re Bayou Grp., LLC ("Bayou III"),* 396 B.R. 810, 843 (Bankr. S.D.N.Y. 2008), *rev'd in part In re Bayou Grp., LLC,* 439 B.R. 284 (S.D.N.Y.

2010). (Tr. Br. at 15). He then claims that there is "no dispute" that the payments made to Epstein

and Shelburne Shirt were made with the actual intent to defraud. Here, the Trustee's reasoning is

insupportable. Epstein and Shelburne each had a written contract with Madoff pursuant to which

they had a right to make withdrawals. Madoff was simply fulfilling his contractual obligations to

Epstein and Shelburne when he honored requests to withdraw funds. If he failed to honor a

redemption request, Epstein or Shelburne could have quickly obtained a court order compelling

Madoff to comply. Compliance with a legal contractual obligation cannot possibly be the basis for

a Ponzi scheme finding.

The Trustee's only "evidence" of such "furtherance" appears to be Dubinsky's statement

that the total T-bills appearing on customer statements dwarfed the aggregate volume of T-bills

actually purchased and held by BLMIS." (Tr. Br. at 34). But the Trustee refused to produce the

statements of all Madoff's IA customers and Dubinsky committed perjury and is totally incredible.

And the "chart" the Trustee relies upon references only those T-bills held by the PT Business, and

not the T-bills held by the Brokerage Firms. While another analysis allegedly performed by

Dubinsky addresses the T-bills held by the Brokerage Firms, Dubinsky admitted that he never

bothered to add up those T-bills. Given Dubinsky's dishonesty, one can only assume that he added

up those T-bills and the result of that exercise did not further the Trustee's fraud. Surely, if the

statements of all of Madoff's customers would have supported the Trustee's claims, he would have

produced those documents in discovery.  Obviously he did not because he wanted to conceal them

from the Defendants.  Finally, as explained *infra,* not every IA customer had the same T-bills at

the same time.

## IV.   **DEFENDANTS HAVE STRONG AFFIRMATIVE DEFENSES THAT PRECLUDE SUMMARY JUDGMENT**

The Trustee argues that Defendants could not have given "value" as a matter of law (Tr.

Br. at 16).  On September 24, 2020 in *In re Bernard L. Madoff Inv. Sec. LLC,* No. 19-0429-BK(L), 2020 WL 5666677 (2d Cir. Sept. 24, 2020), a three-judge panel of the Second Circuit affirmed Judge Engelmayer's decision in *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 596 B.R. 451, 459 (S.D.N.Y. 2019), holding that defendants did not give "value" for the alleged transfers. We believe the Second Circuit's decision is inconsistent with the Bankruptcy Code and that 11 U.S.C. § 548(c) provides a complete defense to the Trustee's claims. The Second Circuit also held that § 548(a)(1) of the Bankruptcy Code is not a statute of repose limiting any potential recovery by the Trustee. We hope these errors will be corrected in further proceedings.

## V.    DEFENDANTS ARE ENTITLED TO A CREDIT FOR TAXES PAID

It is grossly inequitable, if not "cruel," to charge Defendants for purported withdrawals from the Accounts where they were utilized to pay federal and state taxes on the fictitious profits that Madoff declared. In 2009, the Internal Revenue Service ("IRS") issued a ruling allowing Madoff customers to file for a tax refund for taxes paid in the five years prior to 2008—that is, 2003 to 2007. *See* 26 C.F.R. 6-1.105. Thus, the IRS recognized that innocent victims of Madoff's fraud like Defendants should never have paid these taxes since it agreed to a simplified and uncontested process for obtaining refunds dating back five years. However, there are no refunds available for any amounts paid before 2003. In the years from 1993 through 2002, Defendants paid taxes of $463,854 on gains in the Epstein Account and $406,629 on gains in the Shelburne Account. CMF ¶ 97.  These sums should be credited against any liability of the Defendants.

## VI.    THERE CAN BE NO "CROSS-LIABILITY" IN THIS CASE

Despite the Trustee's misguided attempt to lump his claims together, none of the defendants here could even conceivably be liable for any damages awarded against the others. Shelburne is a New York Corporation.  Under New York law, a corporation is a separate legal

entity. Shareholders are not liable for its debts, and a plaintiff must seek to pierce the corporate veil to reach them. "Under New York law, the separate existence and status of a corporation is not lightly disregarded." *In re Stage Presence, Inc.,* 592 B.R. 292, 302 (Bankr. S.D.N.Y. 2018), *aff'd,* No. 12-10525 (MEW), 2019 WL 2004030 (S.D.N.Y. May 7, 2019); *see also Franklin St. Realty Corp. v. NYC Envtl. Control Bd.*, 34 N.Y.3d 600, 604 (2019) "essential purpose behind corporations and other fictive entities is to give them a separate legal existence from the natural persons who own them and from other legal entities"); *see also Miranda v. Smyrna Bldg. Corp.*, 693 N.Y.S.2d 382, 385 (Civ. Ct. 1998), *aff'd,* 692 N.Y.S.2d 910 (App. Term 1999) (citing cases) (piercing veil and holding that "[t]he generally accepted principle in New York is that a corporation exists as a separate legal entity, independent of its owners and, as such, said owners or shareholders are not individually responsible for the debts of the corporation. Additionally, it is well established that a corporation may be incorporated for the express purpose of limiting the liability of its shareholders"); *Bonanni v. Horizons Inv'rs Corp.*, 179 A.D.3d 995, 1001 (2d Dep't 2020) ("a corporation exists independently of its owners, who are not personally liable for its obligations, and that individuals may incorporate for the express purpose of limiting their liability' "). The Trustee has not pled any basis on which to pierce the corporate veil; nor has he proven that any person or entity received the benefit of any withdrawal from the Shelburne Account.

Similarly, the Complaint reveals no basis on which Shelburne could be held liable for any withdrawal from the Epstein Account, and no basis whatsoever for liability on the part of Kantor or Muriel Epstein as Trustees. To the extent that the Trustee has sued these individuals as subsequent transferees, this Court has already dismissed all such claims. CMF n1.

## VII.    THE TRUSTEE CANNOT PROVE HIS ALLEGED "LOSSES"

The Trustee does not have any third party evidence to support $125,000 of alleged withdrawals from the Epstein Account ($25,000 on July 1, 1994, and $100,000 on July 17, 1997).

CMF ¶ 43. While these withdrawals were allegedly made prior to the transfers the Trustee seeks to recover, it renders the principal balance the Trustee bases his claims upon unsubstantiated. Similarly, the Epstein Account received only partial credit in the amount of $150,000 for an "inter-account" transfer of $329,987 made on January 4, 1993 from another account which was opened on October 2, 1989. CMF ¶ 33. It is improper for the Trustee to fail to give the Epstein Account full credit for certain transfers. Disallowing transactions made 15 years before Madoff's fraud was uncovered violates not only the Bankruptcy Code but also New York State law. *See, e.g., Simkin v. Blank*, 19 N.Y.3d 46 (N.Y. 2012) (court declined to reform property settlement incorporated into a divorce decree, even though spouse who received Madoff account ultimately received nothing). *See also Commodities Future Trading Commission v. Walsh,* 17 N.Y.3d 162, 173 (2011) (rejecting clawback in divorce, and holding that "[a]t its core, our rule favoring innocent transferees of stolen funds over defrauded owners is rooted in New York's "concern for finality in business transactions."); *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362 (1991) (on certification, even if the source is questionable, absent fraud by the recipient, the funds cannot be clawed back).

Separate treatment of accounts is a basic concept of SIPA. "[A] customer who holds accounts with the debtor in separate capacities shall be deemed to be a different customer in each capacity" for purposes of distribution. 15 U.S.C. § 78fff-3(a)(2); *see also* 15 U.S.C. § 78*lll*(11)(C) ("In determining net equity . . ., accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers.") 15 U.S.C. § 78*lll*(11)(B) (a customer's net equity is based on the amounts owed to "customer," the securities positions of "such customer," and any indebtedness of "such customer"). Under the SIPA Rules, "[a]ccounts held by a customer in different capacities, as specified by these rules, shall be deemed to be accounts of 'separate'

customers." 17 C.F.R. 300.100(b). Thus, accounts held by partnerships and corporations are treated as separate from the partners or owners of the entity. *Id*. at 300.103. Trust accounts are distinct from their trustee, settlor or beneficiary. *Id.* at 300.104(b). By charging customers with the withdrawals made by transferor account holders, the Trustee is violating the plain language of SIPA. *See e.g. United States v. Ron Pair Enterprises Inc*., 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, 'the sole function of the court is to enforce it according to its terms'"). Even if the Trustee could prove that the Defendants were liable for their own withdrawals, he cannot simply assume that all monies deposited into the Epstein Account from another Madoff account constitute fraudulent profits because he has not proven that Madoff perpetuated a fraud during the existence of the transferor account.

## VIII.    THE TRUSTEE IS NOT ENTITLED TO PREJUDGMENT INTEREST

In a footnote, the Trustee argues that he is "entitled to seek an award of prejudgment interest." (Tr. Br. at 2 n.1). While he may be entitled to "seek" an award of prejudgment interest, he is not entitled to such an award. In *Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992), the Court held that, although discretionary awards of prejudgment interest are permissible under federal law in certain circumstances, the award should be a function of (1) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other principles as are deemed relevant by the court.

The Second Circuit explained that prejudgment interest should not result in over-compensation of the plaintiff, such as when the statute, as here, fixes damages deemed fully compensatory. *Id.* This principle is particularly relevant here because the Trustee's position through these cases is that no Madoff customer is entitled to any interest or appreciation <u>since</u>

1980. The Second Circuit has approved the Trustee's position. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011). Consistent with that view, although the Trustee allowed some claims in 2009, the Trustee has refused to pay any interest to claimants on their allowed claims although customers have had to wait ten years for full payment of those claims. Thus, in the Trustee's view, allowed claimants who invested in 1980 are entitled to receive, by 2020 (40 years later), only their net investment. Indeed, when customers sought allowance of appreciation, since 1980, in the form of an inflation adjustment, the Trustee successfully opposed that relief. *In re Bernard L. Madoff Inv. Sec. LLC,* 779 F.3d 74 (2d. Cir. 2015).

The Trustee sues Defendants under 11 U.S.C. § 548 which does not provide for an award of interest. Section 550 prescribes the remedy for the avoidance of a fraudulent transfer: the statute limits the recovery to the property transferred or the value of that property. The plain language of the provision does not include an award of interest. Surely, if Congress had intended that the plaintiff be awarded interest, Congress would have so mandated.

Prejudgment interest is inappropriate when the defendants, like the Defendants here, did nothing wrong. *Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO,*, 955 F.2d 831, 834 (2d Cir. 1992). *See also Board of County Comm'rs of the County of Jackson v. United States,* 308 U.S. 343, 352 (1939) ("interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable"); *Mecca v. Gibraltar Corp. of Am.,* 746 F. Supp. 338, 349 (S.D.N.Y. 1990) (same); *Morales v. Walt Disney Prods.,* 361 F. Supp. 1157, 1158 (S.D.N.Y. 1973); *In re Lyondell Chemical Co.,* No. 13 Civ. 3881(RA), 2014 WL 975507, at *10 (S.D.N.Y. Mar. 11, 2014) (affirming award of administrative expense but declining to impose prejudgment interest). *See also Kramer v. Mahia (In re Khan)*, 14-MC-01674 (PKC), 2016 WL

6652724 at *2-3 (E.D.N.Y. Nov. 10, 2016)(declining to impose prejudgment interest in a case where the transferee had not made the transfer with actual intent to hinder, delay, or defraud his creditors or wrongfully retained or secreted away the transferred funds); *Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*, 567 F.3d 1291, 1300 (11th Cir. 2009)(affirming the bankruptcy court's denial of prejudgment interest where the defendant's position was reasonable, the parties' dispute was genuine, and there was no evidence that either party was responsible for delaying the dispute's resolution.)

As Judge Chin recognized in approving a receiver's decision not to claw back funds from innocent investors, clawback actions can be "cruel." *SEC v. Byers,* 637 F. Supp.2d 166 (S.D.N.Y. 2009) ("[m]any of the investors may not have the money, and litigation to collect it would be expensive, time-consuming and, in some instances, cruel.") Here, the Trustee made the "cruel" decision to seek to claw back withdrawals taken by innocent Madoff customers who, in many instances, lost their life's savings and paid capital gains taxes on fictitious profits, in some instances, for decades.  In the process of this proceeding, the Trustee has enriched himself and his law firm to an unprecedented extent. Remarkably, the Trustee has even been so callous as recently to terminate the "hardship" program he instituted in 2009. *See.* https://www.madofftrustee.com/hardship-program-17.html.

As the Trustee knows, Defendants are themselves victims of fraud: Epstein and Shelburne's funds were deposited with Madoff for 15 years. In each year, they paid state and federal taxes on the purported gains in the accounts. It would be "cruel" to add prejudgment interest on top of this loss. Indeed, the Trustee has never been paid any interest by any former Madoff customer. *Picard v. Cohen*, 16-cv-5513 (LTS) ECF. No. 26 (judgment in the amount of two-year

liability without interest); *Picard v. Lowrey*, 18-cv-5433 (PAE) Feb. 8, 2019 ECF 30 (judgment in the amount of two-year liability without interest).

### A.    Defendants Disputed the Trustee's Claims in Good Faith

Prejudgment interest should not be imposed where, as here, there is a good-faith dispute regarding whether a defendant is liable, or where it is the plaintiff who is responsible for any delay. *Wickham,* 955 F.2d at 834. *See also Redfield v. Bartels,* 139 U.S. 694 (1891) (suit to recover duties wrongfully imposed; interest denied since plaintiff neglected to bring suit for years).

While we anticipate that the Trustee will claim that liability was clear at the outset, nothing could be further from the truth. The Trustee filed suit against Defendants in November 2010 but it was not until 2015 that the Supreme Court denied the Trustee's cert petition seeking review of the Second Circuit's decision dismissing all of the Trustee's claims under New York law and under provisions of the Bankruptcy Code other than 11 U.S.C. Section 548(a)(1)(A). Moreover, the Bankruptcy Court did not decide Defendants' motion to dismiss until July 2015. After issue was joined, the Trustee delayed discovery unconscionably – in a concerted effort to conceal the material evidence that Madoff (not the LLC) owned the JPMC accounts from which Defendants were paid and that Madoff actually purchased securities with IA customers' money

Even the cases cited by the Trustee do not mandate the imposition of prejudgment interest. In *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. Nos. 10-04387 (SMB), 10-04488 (SMB), 10-04350 (SMB), 10-05110 (SMB), 2018 WL 1442312, at *15 (Bankr. S.D.N.Y. Mar. 22, 2018), this Court noted that the Trustee had, as here, only addressed his claim for prejudgment interest in footnotes. Accordingly, this Court held that the parties could "address in a more conventional manner whether a discretionary award of interest is appropriate" after any judgment had been entered. Similarly, in *Picard v. Goldenberg*, Adv. Pro. No. 10-04946 (SMB), 2018 WL 3078149, at *6 (Bankr. S.D.N.Y. June 19, 2018), where the Trustee once again raised

the issue in a footnote, this Court told the Trustee to "seek to raise the issue in the event the District

Court enters a final judgment in his favor." Finally, in *In re Cassandra Grp.*, 338 B.R. 583, 599

(Bankr. S.D.N.Y. 2006), the court imposed prejudgment interest based on avoidance under New

York substantive law. Here, the Trustee's claims under New York law were dismissed as violative

of 11 U.S.C. § 546(e).

<u>**CONCLUSION**</u>

For all of the foregoing reasons, this Court should deny the Trustee's motion for summary

judgment and should enter judgment dismissing the complaint with prejudice.

Dated:   October 9, 2020                  **CHAITMAN LLP**
          New York, New York

By:   */s/ Helen Davis Chaitman*
       Helen Davis Chaitman
       465 Park Avenue
       New York, New York 10022
       Phone & Fax: 888-759-1114
       hchaitman@chaitmanllp.com

       *Attorneys for Defendants*