# EXHIBIT H

                                                    **Page 1**

1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF NEW YORK

2

3

     In re:                          )
4                                    )
     SECURITIES INVESTOR             )
5    PROTECTION CORPORATION,         )
                                     )
6         Plaintiff-Applicant,       )
                                     )
7    vs.                             )   08-01789 (SMB)
                                     )
8    BERNARD L. MADOFF               )
     INVESTMENT SECURITIES, LLC,     )
9                                    )
          Defendant.                 )
10                                   )
                                     )
11   In re:                          )
                                     )
12   BERNARD L. MADOFF,              )
                                     )
13        Debtor.                    )
                                     )

14

15

16           Videotaped Deposition of BERNARD L.

17   MADOFF, VOLUME I, taken on behalf of the Customers,

18   before K. Denise Neal, Registered Professional

19   Reporter and Notary Public, at the Federal

20   Correctional Institution, 3000 Old Highway 75,

21   Butner, North Carolina, on the 26th day of April,

22   2017, commencing at 9:07 a.m.

23

24                      * * * * *

25

Page 2

1     APPEARANCES OF COUNSEL:

2          On Behalf of the Customers:

3                    HELEN DAVIS CHAITMAN, Esq.

4                    Chaitman, LLP

5                    465 Park Avenue

6                    New York, New York  10022

7                    (908) 303-4568

8                    hchaitman@chaitmanllp.com

9

10         On Behalf of the Trustee:

11                   DAVID J. SHEEHAN, Esq.

12                   AMANDA E. FEIN, Esq.

13                   Baker Hostetler

14                   45 Rockefeller Plaza

15                   New York, New York  10111-0100

16                   (212) 589-4621

17                   afein@bakerlaw.com

18

19         On Behalf of the Deponent:

20                   PETER A. GOLDMAN, Esq.

21                   12 Fairlawn Parkway

22                   Rye Brook, New York  10573

23                   (914) 935-6857

24                   pagoldman@gmail.com

25

Page 3

1    APPEARANCES OF COUNSEL:

2        Videographer:

3            Ken Morrison, CLVS

4

5                    * * * * *

6

7                    CONTENTS

8    THE WITNESS:  BERNARD L. MADOFF        EXAMINATION

9            BY MS. CHAITMAN                    6

10           BY MR. SHEEHAN                   132

11

12                   * * * * *

13

14               INDEX OF EXHIBITS

15   FOR THE CUSTOMERS:                    PAGE

16   Exhibit Number 15, Copies of Bloomberg    38

17      trade tickets

18   Exhibit Number 16, JPMorgan Chase         52

19      statement - 2-2001

20   Exhibit Number 17, 703 account statement  58

21      - 6-2001

22   Exhibit Number 18, JPMorgan Chase         60

23      statement - 10-2002

24   Exhibit Number 19, JPMorgan Chase         61

25      statement - 12-2003

1              INDEX OF EXHIBITS (Continued)

2      FOR THE CUSTOMERS:                        PAGE

3      Exhibit Number 20, JPMorgan Chase          61

4         statement - 12-2004

5      Exhibit Number 21, JPMorgan Chase          62

6         statement

7      Exhibit Number 22, Bear Stearns statement  64

8         - 8-1-05

9      Exhibit Number 23, Documents - composite   67

10     Exhibit Number 24, Morgan Stanley statement 70

11     Exhibit Number 25, JPMorgan Chase position 72

12        summary

13     Exhibit Number 26, Fidelity statement -    73

14        1-31-99

15     Exhibit Number 27, Clothmasters statement  74

16        - 8-31-91

17     Exhibit Number 28, Account Canada document 75

18     Exhibit Number 29, Appendix to Dubinsky    92

19        report

20     Exhibit Number 30, Copies of correspondence 94

21     Exhibit Number 31, Bill Feingold expert    109

22        report

23

24                    * * * * *

25

Page 11

1        Q.   (By Ms. Chaitman)   Now, to your knowledge
2   has the Trustee settled with each of these four
3   families?
4        A.   I believe so.
5        Q.   Okay.   You testified the last time you were
6   deposed by me that the fraud did not begin until you
7   began doing the split strike conversion strategy in
8   1992?
9        A.   Correct.
10        Q.   Now, was it, as Judge Bernstein used the
11   expression, a light switch?   When you started doing
12   a split strike, did you stop buying any securities
13   for the split strike customers?
14        A.   No.   I had started -- I had started buying
15   -- doing the strategy for probably through 1993; but
16   as more money came in, that's when my problem began
17   because I couldn't put it all to work in the
18   strategy.   And I had committed that I would keep all
19   the money working.
20        Q.   Okay.   I just want to say one thing.   I
21   have seen statements as early as July 1991 which
22   seem to be in split strike.   Are you saying that it
23   wasn't -- I'd like you to give me your best
24   recollection of when you stopped buying securities
25   for the split strike customers.

Page 12

1        A.   Sometime post-'92.  As I started, you know,

2   I was still buying it in '92 and also through most

3   of '93.  After that, that's when I stopped buying

4   securities for split strike.

5        Q.   Okay.  Now, you continued to have some

6   customers who were in convertible arbitrage?

7        A.   Correct.

8        Q.   Did you continue so long as people were in

9   convertible arbitrage, did you actually buy those

10  securities?

11       A.   Yes.

12       Q.   Okay.  So it was only in the split strike

13  that you stopped buying the securities?

14       A.   Correct.

15       Q.   Okay.  Do you derive any kind of benefit

16  from your testimony as to when the fraud started?

17       A.   No.

18       Q.   Does it benefit anyone in your family?

19       A.   No.

20       Q.   If the Trustee claims you're lying as to

21  when the fraud started, is there any conceivable

22  benefit that you enjoy by virtue of that testimony?

23       A.   No.

24       Q.   Does this testimony benefit any of your

25  family members?

1          Q.   Okay.  So you took the money --

2          A.   Which is part of the strategy as well.

3          Q.   Right.  So you basically took the money

4     that went into the 703 account?

5          A.   Correct.

6          Q.   Which was the investment advisory

7     customers' money?

8          A.   Correct.

9          Q.   And you purchased Treasury bills with that?

10         A.   Correct.

11         Q.   And in the early '90s the Treasury bills

12    were bearing an interest rate of about six percent;

13    isn't that true?

14         A.   No.  They probably were -- you know, they

15    were short-term T bills, so they were probably, you

16    know, closer to three to four percent.

17         Q.   Okay.  And that three to four percent was

18    money that was earned by the customers --

19         A.   Correct.

20         Q.   -- whose money you were using?

21         A.   Correct.

22         Q.   And, in fact, the statements reflected the

23    ownership of those Treasury securities?

24         A.   Correct.  And they -- well, they also, you

25    know, reflected the ownership of the securities that

Page 20

1    I wasn't buying.

2        Q.   Right.  Now, in late 1993 or early 1994 was

3    your business, you were operating at that point as a

4    sole proprietorship; is that right?

5        A.   Yes.

6        Q.   Was your business insolvent?

7        A.   No.

8        Q.   At what point in time did you become

9    insolvent?  And when I say you, I mean your sole

10   proprietorship or the limited liability company.

11       A.   I would say probably in the early 2000s,

12   maybe somewhere between let's say '98 and 2002.

13       Q.   Okay.  And what --

14            MR. SHEEHAN:  Can I just -- before you get

15   an answer, two things.  One is I don't know what

16   insolvency means.

17            MS. CHAITMAN:  Oh, okay.

18            MR. SHEEHAN:  I'm going to ask to define

19   that.

20            MS. CHAITMAN:  Okay.

21            MR. SHEEHAN:  And I'm not going to

22   interrupt you again because I'm just going to have a

23   continuing objection to leading questions, which is

24   you're testifying more than he is, but I don't care

25   about that.  Just objecting.  All right.

```
                                              Page 24

1            Q.   For all of the employees at first the sole

2       proprietorship?

3            A.   Right, right.

4            Q.   And then all of the employees at the LLC?

5            A.   Yes.  It never changed, right.

6            Q.   Okay.  And is it fair to say that at times

7       money went from the 703 account to the Bank of New

8       York account?

9            A.   Yes.  There were some instances that --

10      that I used that, but the issue is because all of

11      these clients had margin accounts because they were

12      short securities, whether it be convertible

13      securities or whether it be the split strike trades,

14      their -- the assets of the client is fungible with

15      the firm because the long positions, whether it be

16      Treasury bonds or whatever, is the collateral for

17      the exposure on the short side of the firm.

18            So there were sometimes where relatively

19      small amounts of money, I think, in the late '90s

20      went from the 703 account into the Bank of New York

21      account to cover -- what was not, I don't think,

22      understood in the Dubinsky report among a lot of

23      other things was that customers have short

24      positions.  They're mark to market from the clearing

25      corporation every day and short position being the
```

Page 25

1    difference in the market.  As the stock market goes

2    up, the short position goes up.  The customer gets a

3    call which is called a margin call.

4           So typically the money would come from the

5    customer account to meet those margin calls.  So we

6    had -- we had margin calls that we had to make to

7    the clearing corporation, which all that which was

8    done through the Bank of New York account.

9           So by taking the money from the client

10   account, putting it into the Bank of New York

11   account, that allowed us to meet the margin calls of

12   the clearing corporation.  That is typical of the

13   industry.

14       Q.  Okay.  Now, I want to ask you something

15   else since you've mentioned the margin.  If you --

16   if someone had a margin loan and you bought stock

17   for them --

18       A.  Right.

19       Q.  -- would that stock be segregated in a

20   clearing or custody account for that customer?

21       A.  No.

22       Q.  Why is that?

23       A.  Because margin, the whole concept of a

24   margin account is the firm is allowed to use those

25   securities to borrow money to cover, you know, what

Page 28

1    buying treasuries when we start the split strike

2    conversions.  So that would have been, you know, in

3    the '90s.

4         Q.  Okay.  And to the best of your recollection

5    at any given time how much investment advisory

6    customers' money was held in U.S. treasuries?

7         A.  Well, I would say basically the maximum

8    that we had was between five firms we had about

9    two-and-a-half billion dollars between Morgan

10   Stanley, Lehman Brothers, Bear Stearns and Fidelity.

11   Was that five firms?  Four firms.  And JP Morgan.

12        Q.  Okay.

13        A.  So I would say probably the maximum was

14   probably about $6 billion held in treasuries.

15        Q.  Okay, okay.  Did it fluctuate or did you

16   instruct your staff to maintain that amount?

17        A.  No.  It pretty much fluctuated depending

18   upon the monies that came in and the monies that --

19   monies that came out.

20        Q.  What percentage of the investment advisory

21   customers' money was put in Treasury securities, if

22   you can estimate that?

23        A.  Well, I mean, the most we had -- I mean,

24   the customer statements depending, you know, at the

25   end was 60 some odd billion dollars.

Page 29

1          Q.   Not what the statements showed, but what
2     you actually did.
3          A.   What we actually did?
4          Q.   Yeah.  How --
5          A.   I don't understand your question.
6          Q.   Let me step back a minute.  Were the people
7     on the 17th, were any of the people on the 17th
8     floor authorized to buy Treasury securities?
9          A.   Yes.
10         Q.   Who was authorized to buy Treasury
11    securities?
12         A.   Frank DiPascali, Eric Lipkin and a fellow
13    by the name of Robert Romer.
14         Q.   And they were -- what money were they
15    authorized to use to buy the Treasury securities?
16         A.   Whatever -- they followed the instructions
17    of basically Frank DiPascali, who was the manager of
18    that department.  And the money, the money to buy
19    the securities always came from customer money
20    except for a small amount of treasuries or financial
21    instruments that came from the operating operations
22    of the market making proprietary trading side.
23         Q.   Okay.  So the money came from the 703
24    account, is that what you're saying, except for
25    the --

Page 30

1          A.   For the most part, yes.

2          Q.   Except for the money that came from the BNY

3     account?

4          A.   Right.

5          Q.   Okay.  Now, did you ever have a lock-in

6     period like hedge funds would have which would

7     prevent a customer from immediately demanding a

8     redemption on their money?

9          A.   No.

10         Q.   Was there any period of time from the end

11    of 1993 to 2008 when you were unable to honor a

12    customer redemption?

13         A.   No.

14         Q.   Was there anytime between 1993 and 2008

15    when you felt that you couldn't redeem a customer's

16    account unless you brought in new investment

17    advisory customers?

18         A.   No.  Well, I would say during -- in 2008

19    probably that half the market was -- was collapsing.

20    There would have been -- had customers requested

21    money, I wouldn't have been able to do it, but no

22    one had ever requested it.

23         Q.   Okay.  So, well, you did have significant

24    redemptions in 2008?

25         A.   Yes, at the very end in December.

Page 31

1          Q.  Okay.  And prior to December 2008 --

2          A.  But there was always -- there was -- you

3      know, I never got an official request for redemption

4      that I didn't have money to cover it to my

5      recollection other than maybe the last week in

6      December.

7          Q.  Okay.

8          A.  The last, you know, week that I was in

9      business.

10         Q.  Okay.  So in the entire period when you

11     were not buying the split strike securities starting

12     say late 1993 or early 1994, had you ever received a

13     redemption request where you thought oh, my God,

14     I've got to bring in a new customer to have the

15     money to pay this?

16         A.  No.

17         Q.  Did you actively solicit new investment

18     advisory customers?

19         A.  No.

20         Q.  Why not?

21         A.  Because the firm was in a position that we

22     were always turning away investors.  We never --

23     never solicited, you know, new monies coming in.  As

24     a matter of fact, we tried to return monies at times

25     but met resistance with clients.

Page 34

1          Whether or not we executed the transaction

2    or not, they had opened up, you know, accounts, what

3    would be deemed as a margin account, and that

4    automatically allows you to commingle the

5    securities.

6          Q.   Okay.  So you did have -- you did have

7    physical possession of the securities with the

8    margin accounts?

9          A.   When we were buying them, yes.

10         Q.   Okay.  Now, you referenced the change from

11   physical securities to electronic securities.  Can

12   you pinpoint when that occurred?

13         A.   I don't remember any longer.  I would say

14   sometime during the '90s.

15         Q.   Would it help if I told you that the

16   Securities Investor Protection Act was enacted in

17   1970?

18         A.   No.

19         Q.   Okay.  Now, when you were doing the

20   convertible arbitrage, did you ever use a strategy

21   called legging in?

22         A.   Always.

23         Q.   Okay.  And can you explain what legging in

24   means?

25         A.   Legging in means that when you're doing a

Page 35

1    strategy, whether it be for convertible securities

2    or for the split strike, you go in and you don't buy

3    everything typically in one day.

4         You start -- when the firm makes a decision

5    to effect a strategy, whether it be convertible

6    bonds or whether it be a basket strategy and a split

7    strike where you're buying, you know, a portfolio of

8    securities, the skill of the strategy is to being

9    able to judge the market.

10         So you -- if when you're going out and

11   buying securities, you would start buying it let's

12   say on a Monday, Tuesday, Wednesday, Thursday.

13   Typically you would buy it over a four-day period

14   was basically what our practice is.  And you would

15   have different prices during the four-day period.

16         And all of our strategies use what's

17   defined as an average price transaction, which means

18   we would then take the average price that we bought

19   stock during that four-day period and that would be

20   the -- you know, we'd figure what the average was

21   that we paid and then we would -- we would send the

22   customer a confirmation on the last day.

23         So let's say on a Thursday, we started on

24   Monday.  And if you start -- to make a simple

25   example, let's say you did it over four days and you

Page 36

1    paid -- you started buying stock at 50 and you wound

2    up buying it at, you know, up to 51 and you had an

3    average of 50-and-a-half, you would -- you would

4    place five-and-a-half.

5        Q.  Was that unique to you or was this

6    something --

7        A.  No.  That's typical for any firm that is

8    investing in a strategy and treating -- you know,

9    that's treatable to customers the same in a

10   particular strategy.

11       Q.  Now, you testified last time that Mr.

12   Dubinsky apparently lacked an understanding of that

13   strategy?

14       A.  Well, he -- he must have.  He must have not

15   understood the strategy because his report failed to

16   -- failed to state that.  So, for example, where

17   Dubinsky, when he was trying to analyze the prices

18   that a customer paid in relationship to the market,

19   he would look on whatever the trade date was on the

20   confirmation.

21           And the trade date on the confirmation, for

22   example, would be -- an example I use would be the

23   trade date would be Thursday's trade date.  If the

24   stock had traded at 51 and on that day if that was

25   the higher, the lower the stock and the average was

Page 37

1    50-and-a-half for the customer, there would be a

2    difference.  So it wouldn't match up.  Now, the

3    customer, the customer confirmation always stated --

4    there was a legend on it that said that the

5    transactions effected for the customer was an

6    average price transaction.

7             So right away that would -- that would

8    illustrate that he wasn't accounting for the -- for

9    the fact that the transaction was an average price

10   transaction.

11            The same thing would happen when you -- the

12   same error he made when he accounted for volume

13   because he would just look at the volume that

14   occurred on the one day, on the date of the trade

15   date, as opposed to the volume that happened on the

16   four days.  So, obviously, he's looking at the

17   volume on one day when you should be looking at the

18   volume on four days.

19        Q.  Now, Mr. Madoff, Mr. Dubinsky testified at

20   the Bonventry trial that the Trustee paid him over

21   $30 million to do his report.  Did he at any time

22   ever seek to talk to you?

23        A.  No.

24        Q.  To your knowledge did he or anyone on his

25   behalf ever seek to meet with you to discuss how you

Page 38

1    operated the business?

2         A.  No.

3         Q.  Did anyone working with the Trustee ever

4    ask you any questions about how your convertible

5    arbitrage trades were done?

6         A.  No.

7         Q.  Did anyone working with the Trustee ever

8    question you about any activity of the firm that

9    predated 1992?

10        A.  No.

11        Q.  Now, you mentioned with respect to the

12   purchase of Treasury securities with the investment

13   advisory customers' money that the purchases were

14   done through Bear Stearns, Morgan Stanley, Fidelity,

15   Lehman Brothers and JPMorgan Chase?

16        A.  Right.

17        Q.  Were there also purchases done directly by

18   Frank DiPascali, Eric Lipkin and Robert Romer?

19        A.  Correct.

20             MS. CHAITMAN:  I'm going to mark as

21   Exhibit 15, which is the next number from our last

22   deposition, a compilation of trade tickets.  I have

23   two if you each want one.

24             (Customers Exhibit 15 was marked for

25   identification.)

Page 40

1        A.   Yes.
2        Q.   And it would have been held for the benefit
3   of the investment advisory customers?
4        A.   It would have been -- it would have been
5   held at the firm for the benefit of the firm.  We
6   didn't segregate, you know, these securities.
7        Q.   But if the money that was used to purchase
8   this --
9        A.   Uh-huh.
10        Q.   -- came from the 703 account, would this
11   show up, for example, on your focus reports?
12        A.   This particular -- I don't know.  I mean,
13   the only trades that -- if it went through the
14   Bloomberg terminal, typically that would show up --
15   I don't know if it would show up on the focus
16   report.
17           It depends upon whether the trade was
18   bought for -- there were some trades that were
19   bought -- well, not if it was bought by the people
20   that you mentioned.  They only have the authority to
21   execute trades for client accounts, not for the
22   firm's account.
23        Q.   Okay.  So I'm confused.
24        A.   These securities would be held either at --
25   typically it would be held at DTC or the Bank of New

Page 41

1    York.

2         Q.  Okay.

3         A.  I mean, I can't tell from that.  It depends

4    upon where the trade would settle.  Any of these

5    Bloomberg trades that went through the Bloomberg

6    terminal, it would actually be a money settlement

7    for the transaction.  Otherwise, you couldn't -- you

8    couldn't do it.

9         Q.  Okay.  And that would be done through some

10   ins --

11        A.  It would be done through some -- typically

12   through Bank of New York.

13        Q.  Okay.

14        A.  It could also have been done through JP

15   Morgan as well in delivery.

16        Q.  Okay, okay.  You didn't have the ability

17   yourself to clear Treasury security purchases?

18        A.  Correct.  We didn't have the authority to

19   execute and clear.

20        Q.  Treasury security purchases?

21        A.  Right.

22            MS. CHAITMAN:  Okay.

23            MR. SHEEHAN:  Helen, just for the record,

24   this seems to be -- you did call it a compilation,

25   but since there were different productions, one is

Page 46

1          Q.   The feeder funds?

2          A.   Those are the hedge funds.

3          Q.   Those are the hedge funds.  Okay.  So were

4     you buying the Treasury securities then to protect

5     the private customers as opposed to the hedge funds?

6          A.   I didn't look at it, you know.  I didn't

7     isolate it one over the other because I knew I was

8     basically obligated for -- you know, for all of it.

9          Q.   Okay.  Now, you said that you purchased

10    Treasury securities with the 703 account money

11    through the five institutions that you named?

12         A.   Right.

13         Q.   Bear Stearns, Fidelity, Lehman Brothers,

14    JPMorgan Chase and Morgan Stanley --

15         A.   Right.

16         Q.   -- is that right?

17         A.   Yes.

18         Q.   Okay.  It was only those five firms?

19         A.   Yes.

20         Q.   Okay.  And did you maintain a consistent

21    portfolio of Treasury securities at each of those

22    institutions?

23         A.   They were rarely sold unless they matured

24    and then we repurchased, you know, different, you

25    know, Treasury bills.  Yes, I mean, for the most

Page 47

1   part the monies in those accounts built and became,

2   you know, more and more up to the maximum, which

3   was, I think, $500 million pretty much in each

4   account.

5        Q.  So you maintained 500 million of Treasury

6   securities at each of those five firms?

7        A.  Pretty much, yes.

8        Q.  Okay.  And then in addition you had the

9   portfolio that was purchased directly --

10       A.  Correct.

11       Q.  -- by the 17th floor people?

12       A.  Right.

13       Q.  Now, the market making and proprietary

14  trading people were buying and selling securities;

15  right?

16       A.  Yes.

17       Q.  And what kind of records were kept of the

18  securities that were held by the firm as of say

19  month end of each month?  Was there a record kept of

20  an inventory of securities that were owned by the

21  firm as of the end of each month?

22       A.  That the firm was long you're talking

23  about?

24       Q.  Yes.

25       A.  Yeah.  That was -- you know, you were

1          Q.  I'd have to look at -- were there other

2     places that you held securities?  Would I have to

3     look at, say, your account at Bear Stearns?

4          A.  You would have to look at the banks if

5     there were -- if there were bank loans.

6          Q.  Because if you borrowed from a bank, you

7     would have pledged the securities to the bank?

8          A.  Right.  Typically they would be held at

9     DTC, but they would be in the bank's account at DTC.

10     They would be journaled over to the bank.  So you'd

11     have to look at the DTC -- you'd have look at the --

12     you would have to get that from the bank themselves

13     because DTC would not give them to you.

14          Q.  What banks did you borrow money from where

15     you pledged the securities to the banks?

16          A.  It could be JP Morgan.  It could be Bank of

17     New York, you know, depending on what period; but if

18     you were looking at 2008 or 2000s, it would be

19     typically Bank of New York, M&T, it could be JP

20     Morgan.  I think that's -- those are the banks that

21     we used at that time.

22          Q.  And if it's earlier?

23          A.  You'd have to look at any one of the -- you

24     probably couldn't get them, you know, but it would

25     be the banks that I mentioned to you.

Page 210

1                    C E R T I F I C A T E

2    NORTH CAROLINA:

3    GUILFORD COUNTY:

4            I hereby certify that the foregoing

5    deposition was reported, as stated in the caption,

6    and the questions and answers thereto were reduced

7    to the written page under my direction; that the

8    foregoing pages 1 through 209 represent a true and

9    correct transcript of the evidence given.  I further

10   certify that I am not in any way financially

11   interested in the result of said case.

12           I have no written contract to provide

13   reporting services with any party to the case, any

14   counsel in the case, or any reporter or reporting

15   agency from whom a referral might have been made to

16   cover this deposition.  I will charge my usual and

17   customary rates to all parties in the case.

18           This, the 10th day of May, 2017.

19

20

21                    K. Denise Neal

22

23                    K. Denise Neal, RPR

                     Registered Professional Reporter

24                    Notary Public No. 200517500101

25