# EXHIBIT I

PAUL E. KANJORSKI
11TH DISTRICT, PENNSYLVANIA

COMMITTEE ON
FINANCIAL SERVICES

CHAIRMAN:
SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE,
AND GOVERNMENT SPONSORED ENTERPRISES

COMMITTEE ON OVERSIGHT AND
GOVERNMENT REFORM

WASHINGTON OFFICE:
2188 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–3811
(202) 225–6511

DISTRICT OFFICES:
THE STEGMAIER BUILDING
7 NORTH WILKES-BARRE BOULEVARD
SUITE 400 M
WILKES-BARRE, PA 18702–5283
(570) 825–2200

546 SPRUCE STREET
SCRANTON, PA 18503–1808
(570) 496–1011

102 POCONO BOULEVARD
MOUNT POCONO, PA 18344–1412
(570) 895–4176

TOLL FREE HELP-LINE
(800) 222–2346

Website: http://kanjorski.house.gov
E-mail: paul.kanjorski@mail.house.gov

# Congress of the United States
## Washington, DC 20515–3811

August 20, 2010

Mr. Stephen P. Harbeck
President
Securities Investor Protection Corporation
805 Fifteenth Street, NW, Suite 800
Washington, DC 20005-2215

Dear Mr. Harbeck:

The Capital Markets Subcommittee will soon convene a hearing to assess the limitations of the Securities Investor Protection Act (SIPA). As you know, the liquidation of the Madoff estate has raised concerns by some about the fairness of how the Securities Investor Protection Corporation (SIPC) distributes the assets of failed broker-dealers and who, beyond the failed broker-dealer, SIPC seeks to obtain assets from in order to compensate investors and minimize outlays of SIPC's reserves. In addition, court documents and news reports have, at times, presented data that varies greatly by source regarding the scope of the Madoff Ponzi scheme, the pool of potential claimants, and SIPC's actions related to compensating Mr. Madoff's victims.

In order to prepare for this hearing and to generate a better public understanding of the actual experience and data related to resolving the Madoff fraud -- and so that Members of Congress can adequately respond to ongoing constituent questions about the liquidation of and claims processed on behalf of the victims of the Madoff Ponzi scheme -- please provide us with the following information as of August 1, 2010:

1. A schedule that details the total balance of the SIPC Fund as defined by SIPA. Of this balance, please identify how much is unallocated, reserved for the Madoff proceeding, and reserved for all other proceedings.

2. An explanation of how SIPC Members are presently assessed annually and an estimate of the aggregate assessment that will be added to the SIPC Fund during the remainder of 2010 and in 2011.

3. A schedule that details all lines of credit available to SIPC, outstanding borrowings, and remaining credit available. Also, please disclose whether any lines of credit have been closed during 2009 and 2010 and explain why.

4. For claims related to the Madoff Ponzi scheme, please provide a schedule that details the number and aggregate value of allowed claims and the number and aggregate value of allowed claims at or below the statutory limits of SIPC protection. Also, include the average disbursement per claim.

5. Please estimate how many Madoff Ponzi scheme claimants would be eligible for advances of up to $500,000 under the final statement method of calculating "net equity" as that term was defined in the

case considered by the U.S. Bankruptcy Court for the Southern District of New York (Case No. 08-01789-brl). Also, please estimate the aggregate value of advances that would have been made under this method.

6. Please estimate the total number and value of distributions made to Madoff investors in excess of their investments. Of these distributions, please estimate how many avoidance actions that the trustee has brought or expects to bring and the amount the trustee has recovered and expects to recover in the future. Further, please break out the number of and expected recoveries from avoidance actions between investors who may have known about or participated in the Ponzi scheme and those who were likely to be unaware of the Ponzi scheme.

7. For all Madoff-related SIPC claims, please provide a schedule stratified by claims of less than a million dollars, between one and three million dollars, between three and five million dollars, between five and ten million dollars and in excess of ten million dollars that details how many claims would be eligible under both the final statement method and the cash-in/cash-out method of calculating net equity. Further, please provide the aggregate amount that could be clawed backed from claimants under each method.

8. Please estimate the number of Madoff-related claims not yet determined and estimate the timeframe for when those claims will likely be determined. Also, for all claims filed since the liquidation proceedings started, please calculate the average time period expressed in months between the filing of the claim and the trustee's determination of the claim.

9. For all Madoff-related claims, please detail how many claims have been disallowed because the investors were not directly invested with Mr. Madoff's firm.

10. For each year, from 1992 until the liquidation of Bernard L. Madoff Investment Securities, please detail the aggregate funds that flowed into the firm and out to investors.

It is important for the Congress to receive this information in order to maintain transparency into the SIPC liquidation and claims process related to the Madoff matter. This information may also assist Congress as it considers options for modifying and updating SIPA. Consistent with all applicable laws and regulations, we look forward to receiving this information from you on or before September 8, 2010.

Sincerely,

Paul E. Kanjorski
Chairman, Subcommittee on Capital
    Markets, Insurance and Government
    Sponsored Enterprises

Scott Garrett
Ranking Member, Subcommittee on Capital
    Markets, Insurance and Government
    Sponsored Enterprises

cc:    The Honorable Mary L. Schapiro
       Chairman
       U.S. Securities and Exchange Commission
       100 F Street NE, Room 10700
       Washington, DC 20549



SECURITIES INVESTOR PROTECTION CORPORATION
805 FIFTEENTH STREET, N. W., SUITE 800
WASHINGTON, D. C. 20005-2215
(202) 371-8300    FAX (202) 371-6728
WWW.SIPC.ORG

September 7, 2010

**BY MESSENGER**

Honorable Paul E. Kanjorski
Chairman, Subcommittee on Capital
 Markets, Insurance and Government
 Sponsored Enterprises
2188 Rayburn House Office Building
Washington, DC 20515-3811

Honorable Scott Garrett
Ranking Member, Subcommittee on
 Capital Markets, Insurance and
 Government Sponsored Enterprises
2188 Rayburn House Office Building
Washington, DC 20515-3811

Dear Chairman Kanjorski and Ranking Member Garrett:

Below is the information that you requested in your letter dated August 20, 2010. The information follows each request and, as per your request, is as of August 1, 2010.

1.  A schedule that details the total balance of the SIPC Fund as defined by the Securities Investor Protection Act ("SIPA"). Of this balance, please identify how much is unallocated, reserved for the Madoff proceeding, and reserved for all other proceedings.

**Response:**

The SIPC Fund, as defined by SIPA, consists of cash on hand or on deposit and amounts invested in United States Government or agency securities.

As of August 1, 2010, rounded to the nearest $100,000, the SIPC Fund consisted of:

| | |
|---|---|
| US Government Securities maturing within 10 years at fair value (including accrued interest receivable) | $1,204,600,000 |
| Cash on hand or on deposit | $23,600,000 |
| Total | $1,228,200,000 |

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 2

The SIPC Fund does not have "reserves" established against it. All expenditures by SIPC are made out of the Fund as provided under SIPA. It is used to meet all SIPC obligations under SIPA as they occur.

2. An explanation of how SIPC Members are presently assessed annually and an estimate of the aggregate assessment that will be added to the SIPC Fund during the remainder of 2010 and in 2011.

**Response:**

Since April 1, 2009, the SIPC member assessment has been based on 0.25% of each member's net operating revenues as reflected on the members' financial reports filed with the Securities and Exchange Commission ("SEC" or "Commission") and the Financial Industry Regulatory Authority.

Members must complete a General Assessment Payment Form at their mid-year and a General Assessment Reconciliation Form at their year end. These filings and any assessment payments are due 45 and 75 days after the end of the period, respectively.

It is currently estimated that collection of member assessments will add an aggregate of approximately $500,000,000 to the SIPC Fund during the remainder of 2010 and in 2011.

3. A schedule that details all lines of credit available to SIPC, outstanding borrowings, and remaining credit available. Also, please disclose whether any lines of credit have been closed during 2009 and 2010 and explain why.

**Response:**

In the event the SIPC Fund is or may reasonably appear to be insufficient for the purposes of SIPA, the SEC is authorized to make loans to SIPC and, in that connection, the Commission is authorized to issue notes or other obligations to the Secretary of the Treasury in an aggregate amount not to exceed $2.5 billion. Currently SIPC has no other lines of credit available. There is currently no outstanding borrowing and to date there has not been. SIPC had a $500 million revolving line of credit with an international consortium of banks which expired effective March 1, 2009, and an additional $500 million revolving line of credit with that consortium of banks that expired effective March 1, 2010. Given the developing financial crisis, the consortium of lenders on SIPC's commercial credit lines was unwilling to renew the credit lines.

SIPC, by bylaw, increased the "target" for the SIPC Fund to $2.5 billion. Assessments based upon a percentage of net operating revenue will remain in place until that higher target is reached. Once the target is reached, together with the Government line of credit, SIPC will have access to $5 billion of funds.

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 3

I would note that SIPC, under current law, has demonstrated that it has sufficient resources for its statutory mission.

4.  For claims related to the Madoff Ponzi scheme, please provide a schedule that details the number and aggregate value of allowed claims and the number and aggregate value of allowed claims at or below the statutory limits of SIPC protection, Also, include the average disbursement per claim.

**Response:**

This question and those that follow use the term "claims" with respect to the information being sought. However, SIPA provides protection per "customer," as defined in SIPA, and not per claim. Two claims submitted by the same customer could be aggregated for purposes of SIPA protection if that customer held more than one account in the same capacity at the brokerage. For example, if John Jones had two accounts at a brokerage, both of which were in his name and held by him in the same capacity, the accounts would be combined for purposes of the SIPC advance.

The answers that follow are predicated upon an analysis of the customer accounts that have been determined, or remain to be determined, by the Trustee and the relationship of those customer accounts to the claims that have been filed. Wherever possible, the Madoff Trustee and SIPC encouraged claimants to file claims to preserve any rights the claimants might have. Consequently, there are many more claims than there are customer accounts. It also should be noted that much of the information relating to claims analyzed under a last fictitious statement approach are rough approximations at best. The claims have not been reviewed or analyzed on that basis and some adjustments to the information could become necessary upon actual review. With this background in mind, the answer to question 4 is as follows:

The Trustee has allowed 2,175 claims related to 1,893 accounts, with a total allowed claims value of $5,556,299,243.18. The 2,175 allowed claims include 282 amended and/or duplicate claims. With respect to these allowed claims, SIPC has committed $713,037,947.41 in SIPC advances to these claimants. Of these allowed claims, 1,330 claims representing 1,149 accounts were allowed for more than $500,000.00. 845 claims representing 744 accounts were allowed for $500,000.00 or less. The average SIPC protection committed per account with an allowed claim is $376,671. The claims review and determination process continues.

5.  Please estimate how many Madoff Ponzi scheme claimants would be eligible for advances of up to $500,000 under the final statement method of calculating "net equity" as that

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 4

term was defined in the case considered by the U.S. Bankruptcy Court for the Southern District of New York (Case No. 08- 01789-brl). Also, please estimate the aggregate value of advances that would have been made under this method.

**Response:**

The last fictitious statement approach assumes that claimants should be paid based on the last fictitious account statement issued to them by Bernard L. Madoff Investment Securities LLC ("BLMIS").   These statements reflect phony backdated securities positions chosen by Bernard Madoff to yield fake profits pre-determined by him.  Under an approach that honors the final fictitious statement, there could be 4,459 accounts eligible to share in customer property and to the extent not fully satisfied, eligible for a SIPC advance.  The holders of these 4,459 accounts could be entitled to a total of $2,010,467,854.23 in SIPC protection.   The $2,010,467,854.23 includes the $713,037,947.41 which SIPC already has committed in customer advances and an estimated additional amount of approximately $175,000,000.00 that the Trustee expects to ask SIPC to advance, after August 1, 2010, for the satisfaction of customers under the Trustee's cash-in/cash-out methodology.  Thus, if the Trustee were to use the final fictitious statement method of calculating "net equity," an additional $1,122,429,906.82 in SIPC advances could be made.

It should be noted that allowance of claims on this basis necessarily would reduce the amount of customer property available to satisfy those claimants who have yet to recover their principal. The SIPC advance supplements the distribution of customer property that the Trustee collects for the benefit of customers. Such property is shared pro rata by customers. Distribution to claimants based on a last fictitious statement approach means that customer property and a SIPC advance will be used to pay not only customers who have yet to recover the amount deposited with BLMIS, but those customers who, while the firm was in business, took out more than they put in. Enlarging the pool of claimants sharing in customer property necessarily means less property for those who have yet to recover their principal and more property for those who, while the firm was in business, withdrew their principal and received other investors' money in the form of fake profits. In other words, the fake profits of the investors who already recovered their principal continue to grow when the firm is in liquidation to the continued detriment of those investors still owed their principal.

6. Please estimate the total number and value of distributions made to Madoff investors in excess of their investments. Of these distributions, please estimate how many avoidance actions that the trustee has brought or expects to bring and the amount the trustee has recovered and expects to recover in the future. Further, please break out the number of and expected recoveries from avoidance actions between investors who may have known about or participated in the Ponzi scheme and those who were likely to be unaware of the Ponzi scheme.

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 5

**Response:**
There were approximately 90,000 disbursements totaling $18.5 billion made to Madoff investors in excess of their investments.

The Trustee has brought 19 avoidance actions under the Bankruptcy Code seeking to recover approximately $15,000,000,000.00.

The Trustee advises that he anticipates bringing avoidance actions in two categories. One category would involve customers who received other customers' money, withdrew more than they deposited with Madoff, and as to whom knowledge is not a factor. At this time, the Trustee is reviewing the facts of approximately 1,000 possible avoidance actions that could result in the recovery of approximately $4,800,000,000.00 for the benefit of customers who have yet to be repaid their principal.

The other category consists of avoidance actions in which the Trustee alleges that the customer had enough information to be on inquiry notice of the fraud. At this time, the Trustee is considering the commencement of about 100 avoidance actions seeking the recovery of at least $2,000,000,000.00 for the benefit of customers who have yet to recover their principal.

7. For all Madoff-related SIPC claims, please provide a schedule stratified by claims of less than a million dollars, between one and three million dollars, between three and five million dollars, between five and ten million dollars and in excess of ten million dollars that details how many claims would be eligible under both the final statement method and the cash-in/cash-out method of calculating not equity. Further, please provide the aggregate amount that could be clawed backed from claimants under each method.

**Response:**
Under the Cash In/Cash Out Methodology, below is a stratified schedule of accounts potentially eligible for SIPC protection:

| Category | Accounts | Total Combined Amount |
|---|---|---|
| Less Than $1,000,000 | 1,204 | $381,921,324.59 |
| $1,000,000 to $2,999,999 | 626 | $1,096,526,388.57 |
| $3,000,000 to $5,000,000 | 198 | $754,646,856.41 |
| $5,000,000 to $9,999,999 | 153 | $1,027,403,169.73 |
| Greater Than $10,000,000 | 138 | $14,026,555,101.15 |
| | **2,319** | **$17,287,052,840.45** |

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 6

The following is a stratified schedule of accounts that potentially would be allowed under a last fictitious statement approach:[1]

| Category | Accounts | Total Combined Amount |
|---|---|---|
| Less Than $1,000,000 | 1,485 | $670,889,986.09 |
| $1,000,000 to $2,999,999 | 1,372 | $2,522,097,200.08 |
| $3,000,000 to $5,000,000 | 569 | $2,172,486,413.62 |
| $5,000,000 to $9,999,999 | 529 | $3,690,585,075.03 |
| Greater Than $10,000,000 | 499 | $48,055,627,602.00 |
| Dec 2008 Accts[2] | 5 | $76,905,772.00 |
| | 4,459 | $57,188,592,048.82 |

For the answer to the final part of question 7 as to the transfers that the Trustee might seek to avoid under the Bankruptcy Code, please see the answer to question 6 above.

8. Please estimate the number of Madoff- related claims not yet determined and estimate the timeframe for when those claims will likely be determined. Also for all claims filed since the liquidation proceedings started, please calculate the average time period expressed in months between the filing of the claim and the trustee's determination of the claim.

**Response:**
Of the 16,374 filed claims, 13,189 have been determined and 3,185 claims remain to be determined. The Trustee has advised that he expects to have all claims determined before the end of this year. For the 13,189 determined claims, the average time period between the filing of the claim and determination is 7.55 months.

In analyzing the foregoing information, there are certain facts that are very important for a complete understanding of these statistics. First, this is not a typical SIPC proceeding in which securities or cash were on hand at the time of the failure of the brokerage house. As is well known, this was a Ponzi scheme in which the only assets were other people's money or assets derived from such funds.

Furthermore, this was a Ponzi scheme of long standing, going back over at least 30 years. Since the traditional approach in all Ponzi scheme matters and the one consistent with SIPA is to return to the investor what the investor put into the scheme, the Trustee was

---

[1] This analysis excludes the potential results of settlements negotiated by the Trustee.

[2] This category relates to accounts that were opened after November 30, 2008. These accounts did not receive a November 30, 2008 Customer Statement.

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 7

required to do a full forensic analysis of all the books and records of the debtor, going back to at least the early 1980s in order to fully determine the amount of money which might be due to each customer based upon the customer's investment.

This forensic analysis included not only a complete review of the books and records of the failed brokerage house, but also documents received from third parties, such as banking institutions, clearing houses and other brokerage houses, as well as documents received from the customers themselves. There are literally millions of documents that have been reviewed by the Trustee and his staff in connection with the evaluation of each of the customer claims filed. Furthermore, access to books and records required coordination and sharing with law enforcement authorities which complicated and, in some instances, necessarily delayed the review.

Moreover, in order to reach out to customers who might be in financial distress, the Trustee instituted a Hardship Program early in the case which gave every customer the opportunity to advise the Trustee of his or her financial circumstances so that the claim could be processed as quickly as possible. Hundreds of customers filed hardship applications, and as a result of the Trustee's actions, many of these hardship applications were granted and the Trustee determined those claims as promptly as possible.

In addition, it should also be noted that due to the long term nature of this Ponzi scheme, many of the customer accounts presented multiple generational investments by customers with Mr. Madoff. Thus, it was not simply a matter of examining a single account for a short period of time, but in many instances, it required an analysis of multiple accounts going back several decades in order to fully determine the amount of money invested by the customer and whether the customer had invested more money than he or she had received from Mr. Madoff.

Notwithstanding these extreme difficulties, the Trustee has determined over 80% of the customer claims filed. The review and determination of customer claims is an ongoing process. The remaining claims include the most difficult ones, such as those of members of the Madoff family and extended family, insiders (former employees), feeder funds and others.

9. For all Madoff- related claims, please detail how many claims have been disallowed because the investors were not directly invested with Mr. Madoff's firm.

**Response:**
There are 8,489 determined claims submitted by claimants who had no account at Madoff that were disallowed. There are an additional 2,094 undetermined claims that tentatively are in this category but may be re-categorized upon further review.

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 8

10. For each year, from 1992 until the liquidation of Bernard L. Madoff Investment Securities,
please detail the aggregate funds that flowed into the firm and out to investors.

**Response:**

For each year from 1992 through 2008, the following represents the aggregate funds that
flowed into and out of BLMIS:

| Year | Cash In | Cash Out |
|------|---------|----------|
| 1992 | ($2,097,318,423.98) | $2,077,513,621.46 |
| 1993 | ($2,018,244,086.41) | $2,127,095,135.34 |
| 1994 | ($2,784,953,707.68) | $2,784,003,353.00 |
| 1995 | ($4,346,500,359.97) | $4,407,047,285.35 |
| 1996 | ($6,669,384,242.44) | $6,549,481,308.31 |
| 1997 | ($9,046,919,591.00) | $8,636,920,182.65 |
| 1998 | ($12,826,039,594.36) | $11,697,071,675.76 |
| 1999 | ($17,917,907,439.09) | $17,094,507,049.12 |
| 2000 | ($25,629,825,795.12) | $25,702,346,740.45 |
| 2001 | ($37,404,909,113.36) | $37,580,315,488.37 |
| 2002 | ($3,315,517,149.06) | $3,564,299,618.83 |
| 2003 | ($3,162,410,682.31) | $3,667,760,430.70 |
| 2004 | ($4,045,509,142.92) | $3,528,053,488.39 |
| 2005 | ($3,616,828,561.93) | $4,803,025,580.01 |
| 2006 | ($5,951,217,967.82) | $4,403,608,692.87 |
| 2007 | ($7,284,216,531.24) | $4,488,987,554.54 |
| 2008 | ($6,308,482,583.89) | $10,556,145,532.54 |

Respectfully submitted,

Stephen P. Harbeck
President

SPH:ved

cc: Hon. Barney Frank
Hon. Spencer Bachus

SCOTT GARRETT
5TH DISTRICT, NEW JERSEY

FINANCIAL SERVICES COMMITTEE
RANKING MEMBER
CAPITAL MARKETS, INSURANCE, AND
GOVERNMENT SPONSORED ENTERPRISES
SUBCOMMITTEE
FINANCIAL INSTITUTIONS AND CONSUMER
CREDIT SUBCOMMITTEE

BUDGET COMMITTEE

# Congress of the United States
## House of Representatives
### Washington, DC 20515–3005

December 9, 2010

137 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-4465
FAX: (202) 225-9048

266 HARRISTOWN ROAD
SUITE 104
GLEN ROCK, NJ 07452
(201) 444-5454
FAX: (201) 444-5488

93 MAIN STREET
NEWTON, NJ 07860
(973) 300-2000
FAX: (973) 300-1051

www.house.gov/Garrett

Stephen Harbeck
President and Chief Executive Officer
Securities Investor Protection Corporation
805 Fifteenth St., NW, Suite 800
Washington, DC 20005-2215

Dear Mr. Harbeck,

Thank you for your letter of September 7, 2010, which responded to a letter I sent with Chairman Kanjorski to you dated August 20, 2010. While I appreciate the answers you have provided to our questions, Section One below is a set of follow-up questions to some of the questions from our August 20th letter, as well as some additional requests for information where I am seeking an amplification or clarification of your original responses. In Section Two below, some new questions and information requests are included to which I would appreciate your timely response.

Reform of SIPC's administration of the Securities Investor Protection Act, with a particular focus on what expectations investors should have under SIPA, as well as the treatment of investors in carrying out that statute, continues to be a priority of mine and many of my colleagues. The information you provide will be very helpful as we continue to engage in oversight of SIPC in the 112th Congress.

## SECTION ONE

1. (Regarding question 1 of the August 20 letter) Please update the data showing the balance sheet of the SIPC fund, as of December 1, 2010. Additionally, provide the total paid in advances to Madoff customers, the number of accounts paid, the average payment, and the average elapsed time between claim filing and advance payment.

2. (Regarding question 4 of the August 20 letter) For the 1149 approved accounts with claims of $500,000 or greater, provide the aggregate sum for these claims and the aggregate sum of claims using the Final Statement Method (FSM).

    For the 744 approved accounts with claims of less than $500,000, provide the aggregate sum of those claims and the aggregate sum of those claims using the FSM. Prepare a stratification table in segments of $100,000, and for each segment show total number of accounts, total claims using the Net Investment Method (NIM), and total claims using FSM.

3. (Regarding question 5 of the August 20 letter) With respect to the payment of advances, explain the process by which SIPC, through subrogation, establishes a claim to share in customer property. In the priority ranking of claims, where do these claims, as subrogee, stand in relationship to the customer claims? Please cite the authority in SIPA.

It is reported that in the payment of advances to Madoff customers, SIPC is demanding that recipients execute assignment of claims to customer property. Does such assignment give SIPC a higher priority to customer property than is accorded through subrogation? If so, provide the statutory authority for this improvement in claims priority.

4.  (Regarding question 6 of the August 20 letter) How many accounts are involved in the receipt of the 90,000 disbursements? Beginning with the first year in which these disbursements occurred, list for that year and each succeeding year the number of disbursements, the aggregate value of the disbursements, the number of accounts, the number of disbursements related to account closing and the average amount involved in each such transaction.

5.  (Regarding question 7 of the August 20 Letter) How many applications for hardship relief have been filed, how many have been granted, and how many have been denied? In the case of denials, what is the average size of the account, and what are the Trustee's reasons for denial? Also, what is the standard being used to identify "hardship" cases? Is the standard objective or subjective?

6.  (Regarding question 10 of the August 20 letter) The Table presented shows that in years 1998 through 2001 deposits and withdrawals were significantly higher than in other years. Please provide a detailed explanation for this change in fund flows. Were these the transactions of institutional investors? If so, provide detailed information in tabular form for each year by type of institution (hedge fund, mutual fund, etc., and whether foreign or domestic) showing sums deposited and withdrawn and rates of return. Were there any relationships presenting unusual characteristics (short-term with high return, etc)? If so, provide detail.

## SECTION TWO

1.  For each year, beginning on January 1, 1992, through the closing of Bernard L. Madoff Investment Securities LLC (BLMIS) in December, 2008, provide opening and closing balances and annual average balances in the Madoff 703 Account at Chase Bank (later JPMorgan Chase). For each of those years, provide the annual earnings and the source of those earnings. Have those earnings been credited to customers in the application of the NIM?

    If, for the same period, Madoff, BLMIS, or other Madoff-controlled businesses had other accounts at U.S. or foreign banks or other financial institutions, provide annual balance data for these accounts. Provide the annual earnings for each year, and the amount of those earnings credited to BLMIS customers in the application of NIM.

2.  During the period 1992 – 2008, when Madoff was actively pursuing his Ponzi fraud, he was engaged in market making and proprietary trading. For each of these years provide data on trading volumes and the annual gross and net revenues from this trading activity. Did any of this trading involve the "split-strike conversion" strategy? Can the funding for this trading be traced to customer deposits in BLMIS?

3.  Provide up-to-date and projected total aggregate cost data, by entity, for amounts billed and amounts paid to Trustee Picard, the Baker Hostetler law firm, and all other entities involved in the SIPC liquidation of BLMIS and its related businesses.

4.  During a recent Capital Markets Subcommittee hearing, at which testimony was presented by several members of SIPC's Modernization Task Force, there was general agreement that avoidance actions by the Trustee were limited to two years prior to the debtor's bankruptcy under

the Federal Bankruptcy code and to six years under applicable New York statutes. Accordingly, in the BLMIS case, it would appear that disbursements made prior to December, 2002, would be protected from avoidance actions by the statutes of limitation.

Since most of the accounts subject to avoidance actions are those determined to have a negative "net equity" under the Trustee's NIM, a very serious consideration is the propriety of using disbursements made earlier than December, 2002, in the calculation of net equity, which, depending on the outcome, may cause the account to be subject to an avoidance action.

Given the seriousness of this issue, as it relates to proper adherence to the protections intended and accorded by the statutes of limitation, I ask that the following information be provided with the greatest precision possible. For the 1000 accounts under review by the Trustee for possible avoidance actions, indicate the number of accounts for which disbursements prior to December, 2002, were used in the NIM calculation of net equity, the year/s of disbursement/s, and the aggregate amount disbursed in each year.

5. How many accounts under consideration for avoidance action were established with Madoff prior to the inception of the Ponzi scheme? In making the NIM determination of net equity for these accounts, has the Trustee used any of the pre-Ponzi disbursements? If so provide details: number of accounts, year and amount of disbursements.

6. During its existence, how many broker-dealer bankruptcies has the SIPC resolved? In how many of those cases has the NIM been used to determine customer net equity? If there are such cases, describe the circumstances. In assembling customer property in any of the previous resolutions, has SIPC ever resorted to avoidance actions against the debtor's customers based on a NIM calculation or any legal basis other than complicity with the debtor?

Thank you for your consideration and response to the information requested.

Sincerely,

Scott Garrett
Member of Congress



**SECURITIES INVESTOR PROTECTION CORPORATION**
**805 FIFTEENTH STREET, N. W., SUITE 800**
**WASHINGTON, D. C. 20005-2215**
**(202) 371-8300     FAX (202) 371-6728**
**WWW.SIPC.ORG**

January 24, 2011

**BY MESSENGER**

The Honorable Scott Garrett
Chairman
Subcommittee on Capital Markets and
 Government-Sponsored Enterprises
House Financial Services Committee
United States House of Representatives
2244 Rayburn House Office Building
Washington, D. C. 20515

RE:  **Request for Additional Information on Madoff Matter**

Dear Chairman Garrett:

This is in response to your letter of December 9, 2010, requesting additional information in connection with the failure of the Bernard L. Madoff Investment Securities LLC ("BLMIS") brokerage firm. Members of the SIPC staff and the Trustee's staff have assembled data in response. Before answering your specific inquiries, I believe it makes sense to bring you up to date on a number of recent events, all of which are very positive for the customers of BLMIS firm. Also provided is some background information on the use of avoiding powers.

**Settlements Which Will Increase The Distribution To Customers**

The Securities Investor Protection Act, 15 U.S.C. §78aaa et seq. ("SIPA"), provides that cases under SIPA are to be conducted in accordance with specified provisions of the Bankruptcy Code, to the extent the two statutes are consistent. This allows Irving Picard, the trustee in the BLMIS case, to use the tools that are available to a bankruptcy trustee to recover assets, in order to make the equitable distribution called for under SIPA. Among those tools is the ability to reverse, or, in the statutory parlance, "avoid" transfers of assets made prior to the initiation of the liquidation.

The Honorable Scott Garrett
January 24, 2011
Page 2

Mr. Picard's use of the avoidance powers has been very successful. But Mr. Picard and his attorneys are mindful of the human toll of such lawsuits, and have used discretion and compassion in dealing with the unprecedented realities presented by the largest Ponzi scheme in history.

Successful Negotiations

• Mr. Picard negotiated a settlement with Swiss bank Union Bancaire Privée, which was approved by the Bankruptcy Court. The settlement will result in the addition of approximately $500 million to "customer property" for distribution to customers of BLMIS.

• Mr. Picard negotiated a $550 million settlement with Carl Shapiro, Robert Jaffe, and related entities, which was approved by the Bankruptcy Court. In conjunction with the United States Attorney for the Southern District of New York, the $550 million and an additional $75 million will be distributed by Mr. Picard as Special Master, to Madoff victims as part of a civil forfeiture.

• Mr. Picard negotiated settlements with a number of charitable and nonprofit institutions that received avoidable transfers, in the sum of $80 million. These settlements are practical and equitable solutions to the terrible problems caused by Bernard Madoff. These settlements balance the concerns of both the charities that innocently received stolen funds, and the people whose money was stolen and who will receive distributions as a result of these agreements.

• Teaming with the United States Attorney for the Southern District of New York, Mr. Picard negotiated a settlement with the Estate of Jeffry Picower in the total amount of $7.2 billion. Under the agreement with the Trustee, which was approved by the Bankruptcy Court, $5 billion will come to the Trustee for distribution to customers in the SIPA proceeding. The $2.2 billion received by the United States Attorney also will benefit the victims. This will be distributed by Mr. Picard in the separate capacity of Special Master.

The Trustee will need Bankruptcy Court approval to distribute the funds to customers. The preparation of an application for such relief is underway.

The benefits of these settlements, in both dollars to the victims, and as a template for other future settlements in the BLMIS case, cannot be overstated. It must be emphasized that persons whom the Trustee is suing in avoidance are persons who received other investors' money. In a Ponzi scheme, a dollar more for one victim means a dollar less for another victim. Thus, in the BLMIS case, every dollar received by an investor above the amount that the investor deposited with BLMIS is one dollar less for the investor to whom the money actually belonged. Unless the Trustee is allowed to pursue the avoidance suits, some investors will continue to benefit at the expense of others, even if all are equally innocent.

It also must be emphasized that the customer's "net equity" under SIPA will not necessarily govern a trustee's ability to bring avoidance actions. What a customer is owed in a

The Honorable Scott Garrett
January 24, 2011
Page 3

SIPA case, that is, the customer's "net equity," is as defined in SIPA.  Conversely, a trustee's power to avoid transfers is pursuant to provisions of the Bankruptcy Code made applicable under SIPA to a SIPA proceeding.

**The Practical Aspects of Using the Avoiding Powers**

The Trustee is using the avoidance powers rationally, with discretion and compassion, and with tangible results.  As is evidenced by the settlements with the various charities, there is a balance to be struck here, and I believe the Trustee has done an excellent job of finding the correct solutions on a case by case basis.

The Trustee's balanced approach is evidenced by the Hardship Program implemented before the "avoidance action" complaints were filed.  At the start of the liquidation proceeding, in December, 2008, the Trustee instituted a Hardship Program to identify the BLMIS claimants suffering hardship and to accelerate the processing and payment of their claims in the proceeding.  The Trustee has announced that he will continue the Hardship Program in connection with the avoidance actions.  The Program is designed to encourage investors who have been sued to come forward and to explain to the Trustee why he should not continue the suit against them.  Among the factors that the Trustee has announced he will consider are the investor's age, financial condition, medical situation, need to return to work after having retired, inability to pay for the care of dependents, the extent to which withdrawals were made from a BLMIS account to pay for taxes on fictitious sums, and other demonstrated hardship.  The Trustee also has set up a toll-free hotline to answer any concerns investors have with respect to avoidance suits.  All of this information, as well as the hardship application, is available on the Trustee's web site at www.madofftrustee.com.

In addition, together with each complaint, the Trustee has sent to each "good faith" investor a letter containing the above information and urging the investor to contact the Trustee to discuss the complaint.  The Trustee is mindful of the fact that some people who have withdrawn assets periodically over an extended period of time simply have no ability to make any return of assets.  Neither SIPC nor the Trustee has any interest in pursuing litigation that is as distressing as it is pointless.  But the Trustee also must investigate the facts of each such case, and has established a mechanism to do so.

Further, in anticipation of the "avoidance actions," the Trustee obtained a procedural order in the liquidation proceeding, sent to every party who has been sued, which provides for confidentiality of financial information and mediation of the suits.  In most instances, the costs of mediation will be paid for not by the party who has been sued, but by the debtor's estate, with funds advanced by SIPC.

In short, the Trustee is doing, and will do, everything possible to dismiss or settle suits where the financial situation of a party warrants such relief, and otherwise to resolve as expeditiously as possible, all other suits against investors who unknowingly received other investors' money.

The Honorable Scott Garrett
January 24, 2011
Page 4

**The Use of Avoidance Powers In a SIPA Case**

It also should be noted that there are reasons unique to SIPA why an "innocent investor" is less often the subject of an avoidance action in a SIPA case than in ordinary bankruptcy.

When a party receives a distribution prior to the collapse of a brokerage firm, it is less likely that the facts are such that a preference or fraudulent transfer may be recovered, at least when all allowed claims are within the limits of SIPA protection.

Here is why:

1. A trustee may recover, in an avoidance action, an amount that exceeds what that person would have received in the liquidation had the distribution not been made. See, for example, 11 U.S.C. §547(b)(5), made applicable to the BLMIS case by 15 U.S.C. §78fff-2(c)(3).

2. In the overwhelming majority of SIPA cases, a theft is identified before a high percentage of customer property is missing. The combination of (i) SIPC advances and (ii) a high percentage of customer property distribution means that the person receiving the pre-liquidation distribution would have received the same amount in the liquidation. Thus, it makes no sense to initiate an avoidance action when the target of such a suit would get the assets back.

To illustrate:

John has a securities account worth $1,000,000 at Brokerage X. He has had that balance for years. He sells his securities, closes the account, and receives a check for $1 million, on December 1. After John cashes the check, Brokerage X is placed into a SIPA proceeding on December 15. At the time of the failure, 10% of all assets owed to customers is missing, and therefore 90% of the assets that are supposed to be held for customers are in fact secure.

What does this mean for John, who received a $1,000,000 distribution during the avoidance period? It means that even if the statutory criteria for bringing an avoidance suit were met, it would make no sense for the trustee to initiate an avoidance action, so long as all allowed customer claims do not exceed the limits of SIPA protection. If John were to return the funds, the trustee would immediately return the exact same amount to him. John would receive $900,000 from customer property, and SIPC would advance $100,000 to the trustee for subsequent distribution to John.[1]

---

[1] An avoidance suit would be necessary if there were over-the-limits customers in the proceeding, that is, customers who would not be made whole through a distribution of customer property in the possession of the trustee combined with the advance of SIPC funds. For example, assume all of the facts in the above hypothetical, except that in addition to John, there is a second customer named Joan with a valid $12 million claim. A 90% distribution of customer property would result in Joan receiving $10.8 million. Coupled with a SIPC advance of $500,000, Joan's total recovery would be $11.3 million, leaving her still owed $700,000. If the trustee were to sue John in avoidance, John, based on the above analysis, would still be made whole because of the SIPC

The Honorable Scott Garrett
January 24, 2011
Page 5

The foregoing example, and innumerable others that could be constructed, show that it would typically take a huge shortfall in customer property, coupled with a very large withdrawal, before an avoidance action is meaningful. That is why avoidance actions in SIPA cases are less common.

3. As illustrated above, the availability of SIPC funds in a SIPA proceeding often reduces the need for avoidance suits unlike the situation in ordinary bankruptcy, where avoidance of preferences is more common. Unfortunately, because of the large sums at stake in BLMIS, and the substantial amounts by which some investors will benefit at the expense of others if he fails to act, the Trustee has no choice but to seek to recover funds by means of avoidance.

A final point before proceeding to the answers to your questions.

As noted above, the Trustee is empowered by both SIPA and the Bankruptcy Code, to the extent consistent with SIPA, to gather assets of the estate for the benefit of all of the creditors, including customers, to the proceeding. The SIPA statutory scheme provides for a priority to be given to those customers who have positive net equity balances in their customer accounts. The BLMIS matter being a Ponzi scheme, there were no earnings or profits, but only other people's money. Thus, the customers who had a positive net equity in their BLMIS accounts are those who did not get all of their money back from BLMIS. These are the customers who are entitled to priority under the SIPA statute. The Trustee utilizes his powers under SIPA and the Bankruptcy Code to gather in assets to form a fund of customer property to take care of these priority claimants in the first instance.

However, as the Trustee for BLMIS, the Trustee is also the representative of all other creditors, including customers, to the proceeding. Once he has fulfilled his obligations to the priority claimants by assembling a customer fund sufficient to return to them all of the money they invested in BLMIS, he can then turn to the effort of satisfying those customers and creditors who were not given priority. In the BLMIS case, the customers and creditors who were not given priority are those "net winners" who were customers of BLMIS but who in fact received more money than they put in. Once the Trustee has satisfied all of the "net losers" who did not get all of their money out, those net losers will then be on the same footing as the net winners, and thereafter, both the net winners and the net losers will be treated as general unsecured creditors who have claims for fraud to the extent of any damages.

The claims for fraud by both the net losers and net winners are predicated upon the fact that Mr. Madoff misrepresented to all of them that he was in fact engaging in a legitimate securities business when in fact he was actually operating a Ponzi scheme. As a result of Mr. Madoff's misrepresentations, all of the customers of BLMIS may have suffered damages which can be recognized as general creditor claims in the BLMIS proceeding.

---

advance. However, Joan would fare better because the additional sum recovered in avoidance from John would be added to the fund of customer property, and result in a larger distribution to Joan. No actual harm comes to John, and SIPC pays a higher amount. That is the situation in the Madoff case.

The Honorable Scott Garrett
January 24, 2011
Page 6

As you know, according to the falsified books and records maintained by Mr. Madoff, BLMIS owed all of its customers the purported sum of at least $65 billion. It is currently the Trustee's estimate that a customer fund of at least $20 billion will be necessary to satisfy the net losers and put them on an equal footing with the net winners in the BLMIS proceeding. Once the Trustee has achieved the $20 billion figure, he will then continue to pursue his avoidance actions and his claims for damages against financial institutions and related entities for the purpose of seeking to obtain additional sums in order to satisfy all of the general creditor claims in the proceeding, including claims for fraud. As has been well publicized, the Trustee has instituted suits against a variety of institutions pursuing avoidance actions and seeking damages in excess of $90 billion. While the outcome of litigations cannot be predicted with any degree of accuracy, it is the goal of the Trustee and his counsel to vigorously pursue all of these litigations in order to recover as much of the damages that have been suffered by all of the customers and creditors of BLMIS. As noted above, the Trustee has had some degree of success already, and it is respectfully submitted that his goal is not only a worthy one, but one which he has demonstrated that if given the opportunity to utilize all of the avoidance powers and litigation authority available to him, he will do his very best to achieve the result. Thus, if the powers afforded the Trustee are left unfettered, he will be in the best position to help all of the victims in BLMIS.

Set forth below is each of your requests for information, followed by the response.

## SECTION ONE

**1a.** **(Regarding question 1 of the August 20 letter) Please update the data showing the balance sheet of the SIPC fund, as of December 1, 2010.**

**Response**:

The SIPC Fund, as defined under SIPA, consists of cash on hand or on deposit and amounts invested in United States Government or agency securities.

As of December 1, 2010, rounded to the nearest $100,000, the SIPC Fund consisted of:

| | |
|---|---|
| US Government Securities maturing within 10 years at fair value (including accrued interest receivable) | $1,228,500,000 |
| Cash on hand or on deposit | $7,700,000 |
| Total | $1,236,200,000 |

**1b.** **Additionally, provide the total paid in advances to Madoff customers, the number of accounts paid, the average payment, and the average elapsed time between claim filing and advance payment.**

The Honorable Scott Garrett
January 24, 2011
Page 7

**Response:**

This question and those that follow use the term "claims" with respect to the information being sought. The answers that follow are predicated upon an analysis of the customer accounts that have been determined, or remain to be determined, by the Trustee and the relationship of those customer accounts to the claims that have been filed. Wherever possible, the Trustee and SIPC encouraged claimants to file claims to preserve any rights the claimants might have. Consequently, there are many more claims than there are customer accounts. It also should be noted that much of the information relating to claims analyzed under a last fictitious statement approach are rough approximations at best. The claims have not been reviewed or analyzed on that basis and some adjustments to the information could become necessary upon actual review. With this background in mind, the answer to question 1b as well as subsequent questions is as follows:

i. As of December 31, 2010[2], the total in advances committed by SIPC to BLMIS customers was $780,193,242.27 and the total advances paid to claimants was $762,259,841.26. The difference between the SIPC advances committed and the SIPC advances paid is due to the fact that after determination letters are issued, the payments are pending the receipt of fully executed documentation.

ii. As of December 31, 2010, the total number of accounts committed to be satisfied was 2,053. The number of allowed claims associated with these 2,053 accounts was 2,363 and the total number of accounts for which a payment was made was 1,992 which relate to 2,283 allowed claims. The difference between the SIPC advances committed and the SIPC advances paid arises from the fact that after determination letters are issued, the payments are pending the receipt of fully executed documentation.

iii. As of December 31, 2010, the average of the SIPC advances committed to these 2,053 accounts was $380,025.93 and the average SIPC advance paid to the 1,992 accounts was $382,660.56. The difference between the SIPC advances committed and the SIPC advances paid arises from the fact that after determination letters are issued, the payments are pending the receipt of fully executed documentation.

iv. As of December 31, 2010, the average elapsed time between the filing of the claims related to the 2,053 allowed accounts and the commitment of advance payment was 8.8 months.

As discussed in earlier correspondence with Congressman Kanjorski and you, there are certain facts that are very important for a complete understanding of the time needed to determine claims. First, this is not a typical SIPA proceeding in which most customer securities or cash are accounted for, because they are on hand at the time of the failure of

---

[2] Where available, data as of December 31, 2010 has been used in compiling responses to your questions.

The Honorable Scott Garrett
January 24, 2011
Page 8

the brokerage house. Instead, BLMIS involved a Ponzi scheme in which the principal assets were other people's money. Furthermore, the Ponzi scheme was of long standing, extending back over at least 30 years. Since SIPA requires that the investor get back what he put into the scheme, the Trustee was required to do a full forensic analysis of all the books and records of the debtor, going back to at least the early 1980s in order to fully determine the amount of money due to each customer.

More than 16,000 "customer" claims were filed in the proceeding. The forensic analysis for many of the claims involved not only a complete review of the books and records of the failed brokerage house, but also documents received from third parties, such as banking institutions, clearing houses and other brokerage houses, as well as documents received from the customers themselves. There are literally millions of documents that have been reviewed by the Trustee and his staff in connection with the evaluation of each of the customer claims filed. Furthermore, access to books and records required coordination and sharing with law enforcement authorities which complicated and, in some instances, necessarily delayed the review.

Because of the longstanding nature of the Ponzi scheme, many of the customer accounts presented multiple generational investments by customers with Mr. Madoff. Thus, it was not simply a matter of examining a single account for a short period of time, but in many instances, an extensive analysis of multiple accounts going back several decades was required, in order to fully determine the amount of money invested by the customer and whether the customer had invested more money than he or she had received from Mr. Madoff.

Finally, the length of time needed to determine claims was not only impacted by the above factors, but significantly, by the fact that a widespread and serious fraud was involved. Determining who was a participant in and beneficiary of the fraud required the Trustee to scrutinize each claim carefully against the firm's books and records and against the information learned in his investigation of BLMIS and its activities.

**2a.    (Regarding question 4 of the August 20 letter)  For the 1149 approved accounts with claims of $500,000 or greater, provide the aggregate sum for these claims and the aggregate sum of claims using the Final Statement Method (FSM).**

**Response**:

As discussed in more detail below in the response to Question 2c of Section 1, the "Final Statement Method" is based on the last account statement issued by BLMIS to investors. Uniformly, the statements in question reflect non-existent securities "trades" invented by Bernard Madoff to yield fake profits that he decided investors should "receive." When withdrawn, the fake profits that the customers received were actually other investors' money.

The Honorable Scott Garrett
January 24, 2011
Page 9

Between August 1, 2010, and December 31, 2010, the number of allowed accounts valued
over $500,000 increased to 1,207, and accordingly, 1,207, instead of 1,149, is used below:

    i.   Total Number of Allowed Accounts over $500K: 1,207
   ii.   Total Allowed Net Equity: $5,762,794,392.30
  iii.   Total Fictitious Equity under a final fictitious statement method:
        $12,045,355,425.58

**2b.**    **For the 744 approved accounts with claims of less than $500,000, provide the
aggregate sum of those claims and the aggregate sum of those claims using the FSM.**

**Response**:

Between August 1, 2010, and December 31, 2010, the number of allowed accounts valued
at less than or equal to $500,000 increased from 744 to 846. Accordingly, 846, instead of
744, is used below:

    i.   Total Number of Allowed Accounts under and equal to $500K: 846
   ii.   Total Allowed Net Equity: $176,538,242.27
  iii.   Total Fictitious Equity under a final fictitious statement method:
        $1,577,286,679.78

**2c.**    **Prepare a stratification table in segments of $100,000, and for each segment show
total number of accounts, total claims using the Net Investment Method (NIM), and
total claims using FSM.**

**Response:**

The term "Net Investment Method" ("NIM") is a term that has been used by certain
claimants in the BLMIS case. It refers to the calculation of a customer's net equity based
on the total amount deposited by the customer into his account, less the total amount of
withdrawals from the account.

As mentioned above, the Final Statement Method ("FSM") refers to the value of the
customer's account as shown on the customer's last account statement which in this case,
includes fictitious profits invented by Bernard Madoff and non-existent trades fabricated by
him that do not reflect market reality.

This question seeks a comparison of the net equity value and the fictitious statement value
of all allowed accounts with an adjusted cash balance less than or equal to $500,000.
However, this comparison is not reliable. The number of accounts that would be allowed
under a fictitious statement approach obviously is significantly higher than the number of
accounts that have been allowed under the net equity approach. Under the fictitious
statement approach, the amount allowed will be higher on an account by account basis
because claimants would be entitled to recover the fake profit in addition to their principal.

The Honorable Scott Garrett
January 24, 2011
Page 10

It should be noted that allowance of claims under a fictitious statement approach necessarily reduces the amount of customer property available to satisfy those claimants who have yet to recover their principal since such property is shared pro rata by customers. Enlarging the pool of claimants sharing in customer property means less property for those who have yet to recover their principal and more property for those who, while the firm was in business, withdrew their principal and received other investors' money in the form of fake profits. In other words, investors who already recovered their principal continue to receive fake profits when the firm is in liquidation to the continued detriment of those investors still owed their principal. In addition, because the SIPC advance supplements the distribution of customer property, under a fictitious statement approach, SIPC funds are used to pay customers fake profits the amount of which has been determined by the thief.

Based on the 11/30/2008 customer monthly statements, there were 4,881 customer accounts with a positive fictitious statement method balance, totaling $73,481,352,153.68.[3] The table below provides a stratification of these 4,881 accounts based on their fictitious balance. It should be noted that claims were not filed for some of these 4,881 accounts.

| Category | Accounts | Fictitious Statement Balance |
|---|---|---|
| $0K up to $100K | 222 | $9,236,502.70 |
| $100K up to $200K | 236 | $34,942,027.78 |
| $200K up to $300K | 214 | $52,391,337.08 |
| $300K up to $400K | 177 | $61,967,863.82 |
| $400K up to $500K | 161 | $72,718,064.15 |
| Sub-Total | 1,010 | $231,255,795.53 |
| Greater than $500K | 3,871 | $73,250,096,358.15 |
| Grand Total | 4,881 | $73,481,352,153.68 |

3a.    (Regarding question 5 of the August 20 letter) With respect to the payment of advances, explain the process by which SIPC, through subrogation, establishes a claim to share in customer property. In the priority ranking of claims, where do these claims, as subrogee, stand in relationship to the customer claims? Please cite the authority in SIPA.

---

[3] The $73.5 billion figure represents the fictitious equity shown on the final fictitious statement for the 4,881 customer accounts with "positive" FSM balances. The difference between this amount and the well-documented figure of $64.8 billion reflects certain accounts with reported negative "equity" balances totaling in excess of $8 billion, 99% of which are in accounts in the name of Jeffry Picower and the children of Norman Levy.

The Honorable Scott Garrett
January 24, 2011
Page 11

**Response**:

Under 15 U.S.C. section 78fff-3(a), SIPC is subrogated, to the extent of its advances, to the claim of any fully satisfied customer. SIPC may not exercise its right of subrogation as to a customer until that customer has been fully satisfied.

Subrogation works as follows:
If all customer property were immediately available to a SIPA trustee at the start of a liquidation proceeding, customer claims would be satisfied first, through the pro rata distribution of customer property, and second, to the extent of any shortfall, through advances of funds from SIPC, within statutory limits. See 15 U.S.C. §§78fff-2(c)(1)(B) and 78fff-3(a). In that situation, SIPC would never share as subrogee in customer property because all customer property would have been distributed initially to customers and none would remain for distribution to SIPC.

In practice, however, because assembling customer property may require the trustee to investigate the debtor's business and to sue third parties – all of which takes time -- SIPC advances may be used initially to satisfy customers notwithstanding that there has been no showing or determination that customer property would be insufficient. 15 U.S.C. §78fff-2(b)(1). Customers may thus be satisfied promptly and not made to wait while the collection of customer property is achieved.

If a customer has been fully satisfied through a SIPC advance by the time customer property becomes available for distribution, then allowing that customer to receive his pro rata share of the property would result in the customer receiving a double recovery on his claim. Instead, SIPC stands in the customer's shoes in the distribution of such property. In that manner, the end result is the same as if customer property first had been fully collected and distributed, and SIPC funds used only to make up the difference between the amounts owed to customers and the customer property available to them.

**3b.     It is reported that in the payment of advances to Madoff customers, SIPC is demanding that recipients execute assignment of claims to customer property. Does such assignment give SIPC a higher priority to customer property than is accorded through subrogation? If so, provide the statutory authority for this improvement in claims priority.**

**Response:**

A report that SIPC is demanding the execution of assignments is incorrect. The Trustee is an independent fiduciary and it is he who determines claims and in consideration of the satisfaction of claims requests assignments from the satisfied customers. The request for an assignment is consistent with and as provided under 15 U.S.C. §78fff-2(b). The assignment does not give SIPC a higher priority in the distribution of customer property. Rather, a central purpose of the assignment is to give the trustee the capacity to sue,

The Honorable Scott Garrett
January 24, 2011
Page 12

standing in the shoes of the person whose claim he has satisfied, in order to recover
property from third parties for distribution to all customers.

4.    **(Regarding question 6 of the August 20 letter)  How many accounts are involved in
the receipt of the 90,000 disbursements?  Beginning with the first year in which these
disbursements occurred, list for that year and each succeeding year the number of
disbursements, the aggregate value of the disbursements, the number of accounts, the
number of disbursements related to account closing and the average amount involved
in each such transaction.**

**Response**:

The table that follows includes the number of disbursements in excess of deposits, the
aggregate value of disbursements in excess of deposits, the average disbursement amount,
the number of accounts, and the number of disbursements related to the closing of an
account.

| Year | Number of Disbursements in Excess of Deposits | Aggregate Value of Disbursements in Excess of Deposits | Average Disbursement Amount | Number of Accounts | Account Closing Related Disbursements[4] |
|---|---|---|---|---|---|
| 1981 | 10 | $239,466 | $23,947 | 9 | 6 |
| 1982 | 36 | 487,199 | 13,533 | 23 | 13 |
| 1983 | 37 | 2,431,473 | 65,715 | 19 | 13 |
| 1984 | 38 | 782,991 | 20,605 | 23 | 9 |
| 1985 | 192 | 7,135,066 | 37,162 | 71 | 14 |
| 1986 | 375 | 18,858,068 | 50,288 | 92 | 14 |
| 1987 | 497 | 14,174,763 | 28,521 | 111 | 5 |
| 1988 | 722 | 35,995,555 | 49,855 | 164 | 23 |
| 1989 | 992 | 49,914,278 | 50,317 | 184 | 18 |
| 1990 | 1,122 | 45,713,503 | 40,743 | 225 | 19 |
| 1991 | 1,469 | 71,552,235 | 48,708 | 283 | 33 |
| 1992 | 1,858 | 519,368,321 | 279,531 | 313 | 27 |
| 1993 | 2,500 | 228,463,943 | 91,386 | 424 | 74 |
| 1994 | 2,667 | 282,226,802 | 105,822 | 447 | 74 |
| 1995 | 3,133 | 479,946,926 | 153,191 | 456 | 54 |
| 1996 | 3,932 | 539,182,466 | 137,127 | 528 | 98 |
| 1997 | 3,003 | 668,343,286 | 222,559 | 703 | 344 |
| 1998 | 2,443 | 786,614,902 | 321,987 | 483 | 90 |
| 1999 | 2,995 | 999,865,155 | 333,845 | 625 | 51 |

[4] There could be more than one disbursement related to closing a single account.  However, the
table above only includes the final disbursement for each respective account.

The Honorable Scott Garrett
January 24, 2011
Page 13

| 2000 | 3,848 | 1,149,561,399 | 298,743 | 848 | 65 |
|---|---|---|---|---|---|
| 2001 | 4,340 | 1,352,096,251 | 311,543 | 922 | 70 |
| 2002 | 4,974 | 1,391,790,937 | 279,813 | 1,082 | 61 |
| 2003 | 6,278 | 1,675,967,743 | 266,959 | 1,288 | 40 |
| 2004 | 6,913 | 1,572,900,380 | 227,528 | 1,439 | 61 |
| 2005 | 7,453 | 1,576,183,767 | 211,483 | 1,627 | 72 |
| 2006 | 8,739 | 1,227,904,383 | 140,509 | 1,840 | 79 |
| 2007 | 9,573 | 1,732,389,729 | 180,966 | 2,072 | 80 |
| 2008 | 9,220 | 1,901,590,538 | 206,246 | 2,090 | 82 |
| **Total** | **89,359** | **$18,331,681,525** | | | **1,589** |

5.    **(Regarding question 7 of the August 20 Letter) How many applications for hardship relief have been filed, how many have been granted, and how many have been denied? In the case of denials, what is the average size of the account, and what are the Trustee's reasons for denial? Also, what is the standard being used to identify "hardship" cases? Is the standard objective or subjective?**

**Response**:

As of December 31, 2010, 394 hardship applications had been received. Of these 394 applications, 44 did not meet the qualifications to participate in the Hardship Program. Most of the ineligible applications were filed on behalf of entities or were filed by individuals who were indirect investors. Of the 350 eligible applications, 275 (78.5%) were approved and 75 (21.5%) were not approved.

The 75 applications that were not approved relate to 77 customer accounts. Of these 77 accounts,

- 22 were net losers with a net equity of $41,605,142.23 at an average of $1,891,142.83. The claims of these claimants were allowed outside of the hardship program.

- 52 were net winners with a net equity of negative $29,648,007.42 at an average of negative $570,153.99.

- 3 were net zeros with a net equity of $0.00 at an average of $0.00.

The standards are by and large objective and the criteria that are the basis for hardship relief are identified in the Trustee's web site at www.madofftrustee.com. As previously discussed, they include:

a.  Advanced age.

b.  Inability to pay for necessary living expenses, such as housing (including loss of home to foreclosure), food, utilities and transportation.

The Honorable Scott Garrett
January 24, 2011
Page 14

    c.  Inability to pay for necessary medical expenses.

    d.  Necessity to return to work after having previously retired from former employment (special consideration will be given to individuals who can no longer return to their former work).

    e.  Declaring personal bankruptcy.

    f.  Inability to pay for the care of dependents.

    g.  The extent to which withdrawals of fictitious profits were used to pay taxes on fictitious sums.

    h.  Otherwise suffering from extreme financial hardship as demonstrated by other circumstances not addressed by the foregoing.

6.    **(Regarding question 10 of the August 20 letter)  The Table presented shows that in years 1998 through 2001 deposits and withdrawals were significantly higher than in other years.  Please provide a detailed explanation for this change in fund flows.  Were these the transactions of institutional investors?  If so, provide detailed information in tabular form for each year by type of institution (hedge fund, mutual fund, etc., and whether foreign or domestic) showing sums deposited and withdrawn and rates of return.  Were there any relationships presenting unusual characteristics (short-term with high return, etc)?  If so, provide detail.**

**Response**:

The Table presented under question 10 of the August 20 letter related to the years 1992 through 2008. The below tables therefore relate to years 1992 through 2008.  The years specifically addressed for 1998 through 2001 are in bold print.  The significant increase in deposits and withdrawals in years 1998 through 2001 was due to the activity in one Investment Advisory account: No. 1L0027 – Norman F. Levy.   The first table below shows the cash in/cash out activity for just Account No. 1L0027 and the second table shows the total activity in all accounts, with the cash activity for Account No. 1L0027 ***excluded*** from the results.  Norman Levy, now deceased, was an individual investor and not an institutional investor.

### Norman Levy Account 1L0027

| Year | Cash In | Cash Out |
|------|---------|----------|
| 1992 | $1,108,364,660 | ($994,048,201) |
| 1993 | $1,387,358,368 | ($1,517,903,726) |
| 1994 | $2,279,645,611 | ($2,128,805,955) |
| 1995 | $3,542,773,369 | ($3,453,047,453) |
| 1996 | $5,372,928,546 | ($5,471,231,206) |
| 1997 | $7,067,467,981 | ($7,377,869,833) |
| **1998** | **$10,102,787,010** | **($10,039,234,425)** |
| **1999** | **$15,316,343,975** | **($15,227,808,969)** |

The Honorable Scott Garrett
January 24, 2011
Page 15

| | | |
|---|---|---|
| **2000** | **$23,044,584,696** | **($23,103,627,635)** |
| **2001** | **$35,095,634,103** | **($35,154,090,159)** |
| 2002 | $862,232,070 | ($898,796,993) |
| 2003 | $307,000,000 | ($246,934,119) |
| 2004 | $161,511 | ($49,478,915) |
| 2005 | $137,576 | ($35,629,433) |
| 2006 | $0 | $0 |
| 2007 | $0 | $0 |
| 2008 | $0 | $0 |

### All Accounts Excluding No. 1L0027

| Year | Cash In | Cash Out |
|---|---|---|
| 1992 | $904,272,560 | ($1,018,689,670) |
| 1993 | $664,370,878 | ($609,219,797) |
| 1994 | $577,959,780 | ($651,932,259) |
| 1995 | $884,907,897 | ($955,450,002) |
| 1996 | $1,303,802,139 | ($1,076,280,471) |
| 1997 | $1,995,752,125 | ($1,259,163,989) |
| **1998** | **$2,718,098,944** | **($1,657,646,062)** |
| **1999** | **$2,606,597,014** | **($1,866,578,080)** |
| **2000** | **$2,584,913,116** | **($2,598,132,080)** |
| **2001** | **$2,309,389,766** | **($2,425,894,417)** |
| 2002 | $2,453,094,123 | ($2,664,015,048) |
| 2003 | $2,855,614,441 | ($3,423,072,194) |
| 2004 | $4,045,208,942 | ($3,477,761,846) |
| 2005 | $3,616,547,123 | ($4,767,292,175) |
| 2006 | $5,950,968,943 | ($4,385,862,882) |
| 2007 | $7,284,217,506 | ($4,506,919,231) |
| 2008 | $6,308,498,696 | ($10,556,646,750) |

## SECTION TWO

1a.     For each year, beginning on January 1, 1992, through the closing of Bernard L. Madoff Investment Securities LLC (BLMIS) in December, 2008, provide opening and closing balances and annual average balances in the Madoff 703 Account at Chase Bank (later JPMorgan Chase). For each of those years, provide the annual earnings and the source of those earnings. Have those earnings been credited to customers in the application of the NIM?

The Honorable Scott Garrett
January 24, 2011
Page 16

**Response**:

Monthly account statements for the Madoff 703 Account are available to the Trustee for the period from December 1998 through December 2008. The table below shows the annual and monthly average Closing Ledger Balance in the account.[5] These balances *exclude* any short term or other investments related to the Madoff 703 Account (discussed in further detail below).

| As of: | Madoff 703 Account Only | |
|---|---|---|
| | Closing Ledger Balance | Average Monthly Closing Ledger Balance |
| 12/31/1999 | $2,320,237 | $5,061,827 |
| 12/31/2000 | $20,493,643 | $6,707,467 |
| 12/31/2001 | $26,581,003 | $8,599,687 |
| 12/31/2002 | $2,401,631 | $1,492,461 |
| 12/31/2003 | $4,061,657 | $1,369,215 |
| 12/31/2004 | $1,084,601 | $1,262,028 |
| 12/31/2005 | $323,218 | $1,238,669 |
| 12/31/2006 | $394,700 | $498,220 |
| 12/31/2007 | $742,309 | $633,968 |
| 12/31/2008 | $229,407,266 | $20,116,566 |

Available funds in the Madoff 703 Account were invested in various short term investments, including:

- Overnight Investment Sweeps;
- Overnight Deposits;
- Certificates of Deposit (approximately 1 week outstanding);
- Commercial Paper (approximately 3-4 days outstanding); and
- Treasury Bills (approximately 1-6 months outstanding).[6]

In addition to the short term investments noted above, certain investors deposited Federal Home Loan Bank Notes into Madoff custody accounts held at JPMorgan Chase (account nos. G 54276 and G 13414). The proceeds from redemption and the related interest were

---

[5]    Because only one month of records is available for December 1998, information relating to 1998 is not included.

[6]    Prior to 2002, BLMIS held treasury notes with maturities ranging from 3-10 years. Due to incomplete records for Madoff accounts held at JPMorgan Chase, the date, amount and source of funding for the initial purchase cannot be confirmed for all of these treasury notes. However, as the related interest was received by the Madoff 703 Account, the outstanding balances of the treasury notes are included in this analysis. In the event that the purchase price could not be confirmed, the face value of the treasury notes was used to estimate the outstanding balance.

The Honorable Scott Garrett
January 24, 2011
Page 17

received by Madoff and recorded in the Madoff 703 Account. The face value and related interest of these securities are included in the amounts in the table below.

The following table shows the combined ending balances including the Closing Ledger Balance of the Madoff 703 Account and the outstanding amounts of short term investments and Federal Home Loan Bank Notes. The table also includes the average monthly combined ending balances and the combined annual earnings on the short term investments and the Federal Home Loan Bank Notes.

| As of: | Madoff 703 Account and Related Investments | | |
|---|---|---|---|
| | Combined Ending Balances | Average Monthly Combined Ending Balances | Combined Annual Earnings |
| 12/31/1999 | $794,791,409 | $718,345,089 | $47,122,618 |
| 12/31/2000 | $281,064,815 | $664,061,973 | $43,085,153 |
| 12/31/2001 | $415,806,003 | $311,525,813 | $12,409,793 |
| 12/31/2002 | $403,674,195 | $400,460,464 | $8,895,959 |
| 12/31/2003 | $270,130,888 | $328,438,232 | $5,045,753 |
| 12/31/2004 | $766,510,629 | $522,076,623 | $6,885,896 |
| 12/31/2005 | $231,086,387 | $441,768,824 | $12,460,792 |
| 12/31/2006 | $1,965,795,098 | $888,512,252 | $41,626,409 |
| 12/31/2007 | $4,432,658,084 | $3,992,008,548 | $184,030,207 |
| 12/31/2008 | $229,407,266 | $4,056,000,343 | $106,121,744 |
| | | TOTAL: | $467,684,323 |

Property in the 703 Account was customer property, as defined in 15 U.S.C. §78lll(4), and therefore, interest earned on such property would be customer property as well, to be shared pro rata by customers. Indeed, such property was used as customer property throughout the operation of the Ponzi scheme as the liquidity generated from such interest earned was made available to pay customers and the income still held in the 703 account, upon the liquidation of BLMIS, was part of the customer property seized by the Trustee. Although any earnings would be shared by customers in satisfaction of their net equity claims, the amount of customers' net equities would not be increased due to the fact that interest may have been earned on the 703 Account. There is no basis in the law for such an adjustment. See the definition of net equity at 15 U.S.C. §78lll(11). Moreover, the exercise would be impossible. Tracing dollars into and out of the account as to each and every customer would be impossible given the level of activity in the account and the fungible nature of dollars.

**1b.**   **If, for the same period, Madoff, BLMIS, or other Madoff-controlled businesses had other accounts at U.S. or foreign banks or other financial institutions, provide annual balance data for these accounts. Provide the annual earnings for each year, and the amount of those earnings credited to BLMIS customers in the application of NIM.**

The Honorable Scott Garrett
January 24, 2011
Page 18

**Response**:

    In addition to the Madoff 703 Account and the two BLMIS custody accounts held at JPMorgan Chase as discussed in response to Section Two, Question 1a above, an additional 127 accounts held by Madoff, BLMIS or other Madoff related entities have been identified to date as a result of the investigation. It is important to note that the records available to the Trustee are incomplete and the Trustee does <u>not</u> have a complete population of monthly statements for these 127 accounts. In fact, the level of completeness varies significantly for each account and in some cases, the Trustee has statements for only a few months, or in some cases, no monthly statements for accounts that have been identified. As such, the data presented below and the ability to respond to your inquiry is limited to the information available to the Trustee as of the date of this letter.

    Of these 127 accounts, there were eleven (11) accounts which had transfers to and from the Madoff 703 Account, and the year-end balances and annual earnings information is shown on the schedule attached hereto as Exhibit A to the extent the information is available.

    Of the remaining 116 accounts that have been identified, there are ten (10) accounts that had a balance greater than $1 million during at least one year-end period for which the Trustee has available records. The other accounts identified either had no available monthly statements or did not report a balance at any year-end date of $1 million or more during the period that monthly statements are available.

    It should also be noted that, in addition to these 127 accounts, there were accounts held by Madoff Securities International Ltd. ("MSIL") at various banks and other financial institutions in London. Transfers to and from the Madoff 703 Account and MSIL were through two primary banking institutions in London: Barclays Capital and Royal Bank of Scotland. The average year-end balance in MSIL's USD account at Barclays Capital between 2002 and 2008 was approximately £1.9 million and the average year-end balance in MSIL's USD account at Royal Bank of Scotland between 1996 and 2008 was approximately £1.8 million. Based on the available MSIL records, the combined interest earned on all bank accounts was approximately £8.8 million from 1999 to 2008.[7]

    To the extent that the interest earned on these additional Madoff related accounts was transferred into the 703 Account, those amounts have been considered customer property, as defined in 15 U.S.C. §78<u>lll</u>(4), and made available to pay customer claims. However, as noted above, tracing these dollars into and out of the account as to each and every

---

[7] Available MSIL records report interest on USD bank accounts separately for years 2000 to 2002 only. The total interest earned during these years on USD accounts was approximately £125,000. In all other years, interest received from all bank accounts, including accounts denominated in currencies other than USD, were grouped together in one line in MSIL's accounting records. Therefore, the amount included in the response above includes interest earned on all MSIL bank accounts.

The Honorable Scott Garrett
January 24, 2011
Page 19

customer would be impossible given the level of activity in the 703 Account and the fungible nature of cash in the account.

2.    **During the period 1992 – 2008, when Madoff was actively pursuing his Ponzi fraud, he was engaged in market making and proprietary trading. For each of these years provide data on trading volumes and the annual gross and net revenues from this trading activity.   Did any of this trading involve the "split-strike conversion" strategy?   Can the funding for this trading be traced to customer deposits in BLMIS?**

<u>Answer</u>:

The table below includes annual revenue, net income and trading volumes as reported in the FOCUS Reports filed by Madoff with regulatory authorities.  Madoff FOCUS Reports were available back to 1983. Therefore, the chart includes data from 1983 to 2008.

| Calendar Year | Reported Revenue | Reported Net Income | Average Monthly Reported Trade Ticket Executions |
|---|---|---|---|
| 1983 | $16,199,780 | $7,478,860 | 8,135 |
| 1984 | 17,111,112 | 2,768,562 | 11,961 |
| 1985 | 19,134,313 | 5,050,340 | 18,588 |
| 1986 | 24,482,469 | 9,006,605 | 34,312 |
| 1987 | 23,826,151 | 6,748,913 | 44,240 |
| 1988 | 25,993,191 | 7,656,011 | 61,382 |
| 1989 | 29,820,883 | 7,291,998 | 147,796 |
| 1990 | 36,381,387 | 5,815,034 | 206,892 |
| 1991 | 45,445,605 | 11,581,744 | 328,892 |
| 1992 | 53,883,499 | 13,218,255 | 403,789 |
| 1993 | 67,365,633 | 16,011,925 | 438,867 |
| 1994 | 82,193,420 | 19,242,696 | 398,360 |
| 1995 | 94,534,180 | 29,896,450 | 506,476 |
| 1996 | 93,155,506 | 25,692,597 | 563,095 |
| 1997 | 102,105,686 | 31,403,757 | 781,390 |
| 1998 | 104,842,134 | 30,000,000 | 1,213,357 |
| 1999 | 164,600,984 | 50,000,000 | 1,932,106 |
| 2000 | 209,788,597 | 41,000,000 | 2,300,629 |
| 2001 | 169,110,236 | 47,000,000 | 2,015,081 |
| 2002 | 106,009,938 | 27,000,000 | 2,238,367 |
| 2003 | 128,868,567 | 40,000,000 | 2,986,238 |
| 2004 | 138,684,401 | 49,000,000 | 3,173,810 |
| 2005 | 113,506,829 | 27,000,000 | 3,217,668 |
| 2006 | 163,150,034 | 57,000,000 | 3,527,327 |

The Honorable Scott Garrett
January 24, 2011
Page 20

| | | | |
|---|---|---|---|
| 2007 | 167,439,512 | 63,000,000 | 3,489,387 |
| 2008[8] | 98,344,669 | 34,000,000 | 5,930,580 |

**In response to the question "Did any of this trading involve the "split-strike conversion" strategy?"**

No. The trading within the market making and proprietary trading businesses did not involve BLMIS's purported "split-strike conversion" strategy.

**In response to the question "Can the funding for this trading be traced to customer deposits in BLMIS?"**

The table below includes amounts transferred directly or indirectly from the Madoff 703 Account at Chase Bank, the primary bank used by House 17 (the investment advisory business), to the Madoff 621 Account at The Bank of New York, the primary bank account used by House 5 (the proprietary trading and market making business). House 5 received funds directly and indirectly from the IA business. The direct payments were in the form of checks from the Madoff 703 account that were deposited directly to the Madoff 621 Account. The indirect payments were wire transfers from the Madoff 703 Account to Madoff affiliated domestic brokerage accounts and/or to Madoff Securities International Limited ("MSIL") and subsequent wire transfers from the domestic brokerage accounts and/or MSIL to the Madoff 621 Account. As data is unavailable for complete calendar years prior to 2000, the chart includes data from 2000 to 2008.

| Calendar Year | Direct Transfers | Indirect Transfers | Total |
|---|---|---|---|
| 2000 | $42,996,679 | $32,500,000 | $75,496,679 |
| 2001 | $12,410,095 | $59,993,500 | $72,403,595 |
| 2002 | $8,855,299 | $51,628,142 | $60,483,441 |
| 2003 | $4,982,025 | $92,384,791 | $97,366,815 |
| 2004 | $6,852,980 | $82,113,022 | $88,966,002 |
| 2005 | $5,406,024 | $63,901,013 | $69,307,037 |
| 2006 | $0 | $73,217,622 | $73,217,622 |
| 2007 | $0 | $121,243,288 | $121,243,288 |
| 2008[9] | $0 | $75,459,701 | $75,459,701 |
| **Total** | **$81,503,101** | **$652,441,077** | **$733,944,178** |

---

[8] Reported revenue and net income amounts represent year-to-date information through October 31, 2008, the date of the last filed FOCUS Report.

[9] $19,087,449 was received after the last FOCUS Report was filed for October 31, 2008.

The Honorable Scott Garrett
January 24, 2011
Page 21

Because the direct and indirect transfers from House 17 to House 5 were in cash, which is fungible, the transfers cannot be directly traced to House 5 trades. However, the funds transferred from House 17 were recorded by House 5 as revenue and represented a substantial portion of House 5's liquidity. Without these funds from the IA business, House 5 would have incurred annual net losses (i.e., reported net income less funds from the IA business results in a net loss for each period with available data). Notwithstanding the inability to trace these funds to House 5 trades or individual BLMIS customer accounts, the Trustee has treated the proceeds of the sale of the market making and proprietary trading businesses as customer property, and therefore those funds will be included in the amounts distributed to customers with approved claims.

3. **Provide up-to-date and projected total aggregate cost data, by entity, for amounts billed and amounts paid to Trustee Picard, the Baker Hostetler law firm, and all other entities involved in the SIPC liquidation of BLMIS and its related businesses.**

**Response**:

The amounts are as follow:

|  | Entity | Amounts Paid Through 12/31/10 |
|---|---|---|
| *Trustee* | Trustee | $3,275,173.77 |
| *Trustee's Counsel* | Baker & Hostetler LLP | $127,938,847.58 |
| *Special Counsel* | Attias & Levy | $631,183.64 |
|  | Eugene F. Collins | $216,383.85 |
|  | Higgs & Johnson | $238,793.40 |
|  | Kugler Kandestin, LLP | $19,013.09 |
|  | Hogan Lovells International LLP | $2,392,861.22 |
|  | Mishcon de Reya | $65,926.23 |
|  | SCA Creque | $153,197.02 |
|  | Schifferli Vafadar Sivilotti | $13,928.00 |
|  | Schiltz & Schiltz | $341,908.01 |
|  | Williams, Barristers & Attorneys | $644,767.61 |
|  | Windels, Marx, Lane & Mittendorf, LLP | $6,004,460.48 |
|  |  |  |
| *Consultants* | AlixPartners | $48,554,739.11 |
|  | FTI Consulting | $84,590,786.44 |
|  | Renaissance Assoc., Ltd. | $2,580,432.16 |
|  |  |  |
| *Other Consultants* |  | $8,974,193.33 |
|  |  |  |
| *Other* |  | $1,683,848.95 |
|  |  |  |

The Honorable Scott Garrett
January 24, 2011
Page 22

| Total: | | $288,320,443.89 |
|---|---|---|

**Estimated Future Costs  (2011 – 2014)**

| Entity | Amount |
|---|---|
| Irving H. Picard, Trustee | $12,523,164.81 |
| Baker & Hostetler LLP | $603,217,651.28 |
| Special Counsel | $39,893,950.00 |
| Consultants | |
|   AlixPartners | $123,028,096.57 |
|   FTI | $250,327,741.98 |
|   Renaissance | $1,275,000.00 |
| Other Consultants | $65,362,500.00 |

**Total:**                                            **$1,095,628,104.64**

I would note that these administrative expenses are not paid for by using "customer property." SIPC advances the funds for these costs.

4.      **During a recent Capital Markets Subcommittee hearing, at which testimony was presented by several members of SIPC's Modernization Task Force, there was general agreement that avoidance actions by the Trustee were limited to two years prior to the debtor's bankruptcy under the Federal Bankruptcy Code and to six years under applicable New York statutes. Accordingly, in the BLMIS case, it would appear that disbursements made prior to December, 2002, would be protected from avoidance actions by the statutes of limitation.**

**Since most of the accounts subject to avoidance actions are those determined to have a negative "net equity" under the Trustee's NIM, a very serious consideration is the propriety of using disbursements made earlier than December, 2002, in the calculation of net equity, which, depending on the outcome, may cause the account to be subject to an avoidance action.**

**Given the seriousness of this issue, as it relates to proper adherence to the protections intended and accorded by the statutes of limitation, I ask that the following information be provided with the greatest precision possible. For the 1000 accounts under review by the Trustee for possible avoidance actions, indicate the number of accounts for which disbursements prior to December, 2002, were used in the NIM calculation of net equity, the year/s of disbursement/s, and the aggregate amount disbursed in each year.**

The Honorable Scott Garrett
January 24, 2011
Page 23

**Response**:

It is important to understand that as previously mentioned, the calculation of a customer's net equity and the trustee's use of the avoidance powers are pursuant to separate statutory authority, and involve different concepts. Each customer's "net equity" as of the filing date is based upon the account activity for the entire account history, and is not and cannot be limited to the final two-year and/or six-year period preceding the bankruptcy. Computation of net equity merely measures the account holder's total cash deposits less withdrawals. Once the calculation of each customer's net equity is determined, the trustee can then determine which transfers made by the Estate are avoidable during the two-year and/or six-year period preceding the filing date.

Under SIPA, the customer's net equity reflects the amount of property on deposit with a broker-dealer and therefore owed by the broker-dealer to the customer when the firm fails financially. Disbursements made by a broker to a customer in the ordinary course of business and according to ordinary business terms would not be subject to avoidance by a trustee and, by the same token, would not factor into what the customer is owed as his "net equity," because the disbursed property is no longer in the broker's possession and therefore no longer owed by the broker to the customer.

As a matter of law, in the case of a Ponzi scheme, however, there is no ordinary course of business. In that situation, under SIPA, what the customer is owed is still the property custodied by the customer with the broker. But to the extent the investor received transfers of property from the broker, before the broker failed, which, for example, were for less than reasonably equivalent value or would result in the customer receiving more than he would in liquidation, then the trustee may seek to avoid such transfers.

In the BLMIS case, with the exception of the avoidance of preferential transfers made during the 90 days preceding the filing date, the Trustee is not seeking to recover from any innocent transferee any amount of the customer's principal, that is, the amount deposited by the transferee as a customer with the broker. Instead, against such transferees, the recovery is limited only to fake profits constituting other investors' money. Even assuming that, for the sake of argument only, the Trustee were to seek to recapture principal and be successful, the transferee would have a customer claim for the returned principal, as discussed above under the Use of Avoidance Powers In a SIPA Case.

5.    **How many accounts under consideration for avoidance action were established with Madoff prior to the inception of the Ponzi scheme? In making the NIM determination of net equity for these accounts, has the Trustee used any of the pre-Ponzi disbursements? If so provide details: number of accounts, year and amount of disbursements.**

**Response**:

Based on the Trustee's investigation and upon review of the earliest records available to him, the Trustee has found no evidence indicating that the BLMIS Investment Advisory

The Honorable Scott Garrett
January 24, 2011
Page 24

business has been operated as anything but a Ponzi scheme. Therefore, the Trustee does not believe that there are any accounts under consideration for avoidance action that were established with BLMIS prior to the inception of the Ponzi scheme. However, it should be noted that there were 380 accounts that were established with BLMIS prior to the earliest document/customer account statement included in the net equity calculation. For these accounts, the trustee has taken the most conservative approach – and most beneficial to the account holder – for the dollars allegedly held in such accounts at the time of the earliest records. The net equity determination grants a "Principal Credit" to the account holder for the cash and reported cost basis of the securities allegedly held on behalf of those customers on the first statements included in the net equity determination as if the "equity" in the account had been real. A total of $164,023,720 of initial "Principal Credit" has been credited to these 380 accounts established prior to the earliest customer account statement included in the net equity determination.

**6a.** **During its existence, how many broker-dealer bankruptcies has the SIPC resolved? In how many of those cases has the NIM been used to determine customer net equity? If there are such cases, describe the circumstances.**

**Response:**

Since its inception, SIPC has resolved to completion 314 liquidation proceedings and Direct Payment Procedures under SIPA. A calculation of net equity representing the difference between what the broker owes the customer and what the customer owes the broker is consistent with SIPA, see 15 U.S.C. §78lll(11), and therefore, has been applied in determining net equity in every SIPA case.

In the BLMIS case, the Trustee gave effect to the last account statement to the extent of treating the customers' claims as ones for securities instead of cash. The statement provided proof of the customer's reasonable expectation that securities were being held for him. As such, consistent with the law in the Second Circuit, the customer became eligible for up to $500,000 of protection from SIPC, instead of $100,000 which was the limit of protection for cash claims at that time. The Trustee did not honor the last account statement beyond that, because the statements reflected fake profits and non-existent securities transactions invented by Bernard Madoff to yield fake returns pre-determined by him.

SIPC does not keep a record of the number of cases in which the last account statement was not followed because it did not reflect market reality. However, below are some cases presenting such facts:

In re First Ohio Secs. Co. (Plumbers & Steamfitters Local No. 490 Severance and Ret. Fund v. Appleton, Case No. 93-3313, 1994 U. S. App. LEXIS 31347 (6th Cir. Nov. 1, 1994) (sale of fictitious CDs));

The Honorable Scott Garrett
January 24, 2011
Page 25

In re New Times Securities Servs. Inc., 371 F.3d 68 (2d Cir. 2004) (non-existent money market funds). The Court noted the "potential absurdities created by reliance on the entirely artificial numbers contained in the fictitious account statements." 371 F.3d at 88.

Northstar Securities, Inc., Case No. 01-3722-BJH (Bankr. N. D. Tex.): A fictitious bank CD sold by a principal of the brokerage involving a Ponzi scheme. The trustee allowed customer claims for the "CDs" based upon the amount of cash deposited with the brokerage for investment in the CD, minus withdrawals made by the customer in the form of redemptions. Payments of fictitious interest to the customer were deemed by the trustee to be a return of principal.

In re Old Naples Securities, Inc., 311 B. R. 607 (M. D. Fla. 2002): A Ponzi scheme involving the fake "sale" of bonds yielding fictitious returns. The Court characterized as "illogical" "permitting claimants to recover not only their initial capital investment but also the phony 'interest' payments they received and rolled into another transaction...." 311 B.R. at 617.

In re C. J. Wright & Co., 162 B. R. 597 (Bankr. M.D. Fla. 1993): Case involving a Ponzi scheme in which claimants were issued documents showing their participation in a "Deposit Account" investment program, with a fixed interest rate to be received by the investor. The Court held the claimants to be customers, entitled to receive only the principal they invested since that was the amount converted by the broker. Claimants would not be entitled to the purported interest on their investments and any such interest received would be a reduction against the amount recoverable in the SIPA case.

Cases discussed below in Question 6b.

**6b.** **In assembling customer property in any of the previous resolutions, has SIPC ever resorted to avoidance actions against the debtor's customers based on a NIM calculation or any legal basis other than complicity with the debtor?**

The below information may be incomplete because SIPC does not keep a record of such data. However, examples of cases in which trustees have initiated such avoidance suits include the following:

Adler Coleman Clearing Corp.: Hanover Sterling, a brokerage that cleared its trades through Adler Coleman, made a market in "house stocks." Shortly before its demise, Hanover caused Adler to send statements to Hanover customers purporting to show the sale in these customers' accounts of the house stocks at very high prices. The stocks supposedly were bought by other customers, but those customers never ordered the purchases. The trustee sought to avoid the trades. The Bankruptcy Court upheld the position of the trustee, noting that the trades were unenforceable, among other reasons, because they were subject to avoidance under the Bankruptcy Code, New York State law, and SIPA, and because they were illegal transactions under New York State law and as a matter of contract. See In re Adler Coleman Clearing Corp., 218 B. R. 689 (Bankr.

The Honorable Scott Garrett
January 24, 2011
Page 26

S.D.N.Y. 1998).   See also In re Adler Coleman Clearing Corp., 247 B. R. 51 (Bankr. S.D.N.Y. 1999), aff'd, 263 B. R. 406 (S.D.N.Y. 2001).

Donahue Securities, Inc. and S. G. Donahue & Co., Inc., Adv. Case No. 01-1027 (Bankr. S.D. Ohio): 26 former customers received payments to which they were not entitled. The payments consisted of false profits and were of amounts that exceeded the customers' cash investment. The trustee sent letters to the 26 former customers asking for repayment of the false profits. Nine customers negotiated repayment amounts with the trustee. The remaining 17 customers were sued by the trustee. All of the cases were settled.

Park South Securities, LLC: Trustee sued to avoid transfers made to investors who had received payments from the broker that actually consisted of other investors' money. Following the denial of a motion to dismiss most counts of the complaint, the matter was settled. See In re Park South Securities, LLC, 326 B. R. 505 (Bankr. S.D.N.Y. 2005).

S. J. Salmon & Co. Inc.: The firm was placed in liquidation in 1972, shortly after the enactment of SIPC on December 30, 1970. The firm was a market maker for securities sold to some of its customers. With its closure imminent, the firm recorded on the firm's books and records purported sales of the customers' securities positions, knowing that the securities would plunge in value upon the demise of the firm. Following the initiation of the SIPA proceeding, the customers demanded the inflated cash that had been credited to their accounts as a result of the fictional transactions. The trustee sought to avoid the phony sales as fraudulent and void under the Bankruptcy Act and New York State law. The Bankruptcy Court (then Referee in Bankruptcy) upheld the trustee's position, among other things, rejecting the claimants' argument of "fair consideration" and remarking that the evidence showed that the purported "market value had no relationship to reality and that the securities in question simply could not be sold at the purported 'market' quotation." See SIPC v. S. J. Salmon & Co., 1973 U. S. Dist. LEXIS 15606, *32 (S.D.N.Y. Aug. 8, 1973). See also SIPC v. S. J. Salmon & Co., No. 72 Civ. 560, Decision #2 on Trustee Motion for Summary Judgment Avoiding Certain Transactions Which Occurred February 2d, 1972 (S.D.N.Y. Feb. 5, 1974).

The Honorable Scott Garrett
January 24, 2011
Page 27

     I apologize for the time that it has taken to reply to your letter, however, assembling the information and data that you requested required a sizeable commitment of time and resources by both the SIPC and Trustee staffs.  If we can assist in any other way, please let me know.

        Sincerely,

        Stephen P. Harbeck
        President and Chief Executive Officer

SPH/pmd

cc:  The Hon. Spencer Bachus
The Hon. Barney Frank
The Hon. Maxine Waters
Irving H. Picard, Trustee
David J. Sheehan, Esq.

Att.

Madoff Related Accounts – Year End Balances and Annual Earnings
Accounts with Transfers to and from the Madoff 703 Account
*Amounts are limited to account statements available to the Trustee*

EXHIBIT A

| Name on Account | Bank Name | Acct Number(s) | Purpose of Account | Date Range of Available Statements | Description of Amount | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bernard L. Madoff / Ruth Madoff | Bank of New York | 1200202690 | Bernie and Ruth Personal Checking | 12/97-7/10 | Year End Balance | 39,655 | 65,919 | 93,922 | 239,081 | 29,692 | 773,102 | 3,278,144 | 1,297,373 | 1,171,094 | 1,999,211 | 852,506 | 52,842 | - |
| | | | | | Annual Earnings | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bernard L. Madoff [2] | Bank of New York | 866-1126-621 | Primary Account (House 5) | 1/98-1/09 | Year End Balance | | 680,335 | 6,364,198 | 1,498,833 | 6,131,902 | 5,209,602 | 4,139,060 | 6,410,529 | 16,366,286 | 2,617,740 | 8,129,987 | 6,439,530 | |
| | | | | | Annual Earnings | | - | - | - | - | - | - | - | - | - | - | - | |
| Bernard L Madoff Investment Securities LLC | Bank of New York | 234239 | Investment Counsel Account | 3/05-5/07 | Year End Balance | | | | | | | | | (168) | | | | |
| | | | | | Annual Earnings | | | | | | | | | - | | | | |
| Bernard L. Madoff | Bankers Trust Company | 00-810-599 | Funded by 703; outflows primarily to IA customers | 12/98-7/00 | Year End Balance | | 708,926 | - | - | | | | | | | | | |
| | | | | | Annual Earnings | | - | | | | | | | | | | | |
| Bernard L Madoff | Barclays (Lehman) | 831-04598 | Brokerage Account | 1/01-11/08 | Year End Balance [4] | | | | 371,006,169 | 340,367,242 | 220,083,832 | 28,234,070 | 26,939,179 | 11,569,885 | 48,908 | 51,395 | 3.70 | |
| | | | | | Annual Earnings | | | | 20,497,464 | 19,908,743 | 12,358,038 | 7,106,281 | 2,102,391 | 1,529,473 | 192,504 | 2,508 | 1,162.23 | 63,698,564 |
| Bernard L Madoff | Barclays (Lehman) | 831-76152 | Brokerage Account | 6/03-5/06 | Year End Balance | | | | | | | 49,960,815 | 50,693,956 | 16,368,041 | - | | | |
| | | | | | Annual Earnings | | | | | | | 1,892,500 | 7,515,958 | 4,261,230 | 131,311 | | | 13,800,999 |
| Bernard L Madoff Investment Securities LLC | Barclays (Lehman) | 831-04435 | Brokerage Account | 5/07-11/08 | Year End Balance [4] | | | | | | | | | | | 103,078,880 | 317 | |
| | | | | | Annual Earnings | | | | | | | | | | | 53,602 | 87,460 | 141,062 |
| Bernard L Madoff [3] | Bear Stearns | 037-72698-163 | Brokerage Account | 6/98-4/06 | Year End Balance | | 561,631,631 | 551,753,445 | 536,818,066 | 385,049,812 | 372,993,578 | 342,554,863 | 267,351,560 | 21,573,290 | - | | | |
| | | | | | Annual Earnings | | 15,679,551 | 31,191,962 | 32,524,644 | 34,727,625 | 25,939,695 | 12,594,129 | 10,623,376 | 9,595,758 | 30,886 | | | 172,907,626 |
| Bernard L Madoff | Fidelity | X08-289043 | Brokerage Account | 12/99-1/09 | Year End Balance | | | 205,555,278 | 411,010,358 | 386,650,402 | 342,929,789 | 229,658,251 | 71,345,053 | 79,573,671 | 44,968,642 | 3,254 | 3,309 | |
| | | | | | Annual Earnings | | | | 2,695,654 | 16,320,420 | 24,445,254 | 23,523,790 | 10,936,631 | 7,682,045 | 7,213,623 | 8,963,020 | 19,296 | 101,799,888 |
| Bernard L Madoff Investment Securities LLC | M & T Securities | AZD474039 | Brokerage Account | 5/07-3/09 | Year End Balance | | | | | | | | | | | 101,845,006 | 4,030,782 | |
| | | | | | Annual Earnings | | | | | | | | | | | 23,048 | 33,467 | 56,515 |
| Bernard L Madoff | Morgan Stanley | 663010719 | Brokerage Account | 12/99-1/09 | Year End Balance | | | 99,250,006 | 578,186,906 | 503,465,897 | 500,026,904 | 359,306,226 | 359,126,442 | 149,439,444 | 347,670 | 364,447 | 370,913 | |
| | | | | | Annual Earnings | | | | 52,301 | 2,687,559 | 74,657 | 7,355,485 | 1,600,245 | 3,235,279 | 1,859,351 | 16,867 | 6,555 | 16,888,300 |

$ 369,292,955

NOTES:
[1] The earliest available statement was in 1997. Therefore, 1997 is the first period shown in this schedule.
[2] The name on this account changed to Bernard L Madoff Investment Securities LLC in May 2001.
[3] The name on this account changed to Bernard L Madoff Investment Securities LLC in May 2004.
[4] The 2008 Year End Balance represents account balance as of 11/30/2008.

SCOTT GARRETT
5TH DISTRICT, NEW JERSEY

FINANCIAL SERVICES COMMITTEE
CHAIRMAN
CAPITAL MARKETS, INSURANCE, AND
GOVERNMENT SPONSORED ENTERPRISES
SUBCOMMITTEE

BUDGET COMMITTEE

CONSTITUTION CAUCUS
CHAIRMAN

## Congress of the United States
## House of Representatives
### Washington, DC 20515—3005

2244 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-4465

266 HARRISTOWN ROAD
SUITE 104
GLEN ROCK, NJ 07452
(201) 444-5454

83 SPRING STREET
NEWTON, NJ 07860
(973) 300-2000

www.house.gov/Garrett

February 16, 2011

Stephen Harbeck
President and Chief Executive Officer
Securities Investor Protection Corporation
805 Fifteenth St., NW, Suite 800
Washington, DC  20005-2215

Dear Mr. Harbeck,

Thank you for your letter of January 24, 2011, which responded to a letter I sent to you dated December 9, 2010. I have one additional line of inquiry to which I look forward to you providing the information requested.

I have reviewed the recent exchange of correspondence between you and Mr. Ron Stein of the Network for Investor Action and Protection (NIAP). The first paragraph of your letter of December 22, 2010, indicating a current estimate of allowable claims totaling $20 billion, has refocused our attention to your correspondence of September 7, 2010 to the Subcommittee and, specifically, to the first table presented in response to the Subcommittee's Question 7. The last subgroup of accounts in that table indicates that 138 accounts have "potentially eligible" claims for SIPC protection with an aggregate value of approximately $14 billion. Assuming that all or most of your recent $20 billion estimate is explained by the approved eligibility of those 138 accounts, the Subcommittee has an urgent need for detailed information concerning these accounts.

For each of the 138 accounts, The Subcommittee requests the following information:

The CICO valuation of the claim; the Final Statement value at closing; the duration of the account relationship (inception to closing); the number and aggregate value of distributions over the duration of the account relationship; and a description, by legal type, of the account holder (individual, partnership, trust, charitable trust, foundation, feeder fund, hedge fund, bank, or other institutional investor, etc.); the domicile of the investor; and in the case of institutions, any information as to numbers of foreign customers.

Thank you for your consideration and prompt response to the information requested.

Sincerely,

Scott Garrett
Member of Congress



**SECURITIES INVESTOR PROTECTION CORPORATION**
805 FIFTEENTH STREET, N.W., SUITE 800
WASHINGTON, D.C. 20005-2215
(202) 371-8300    FAX (202) 371-6728
WWW.SIPC.ORG

March 4, 2011

The Honorable Scott Garrett
Chairman
Subcommittee on Capital Markets and
 Government-Sponsored Enterprises
House Financial Services Committee
United States House of Representatives
2244 Rayburn House Office Building
Washington, D. C. 20515

**RE: <u>Information Relating to Bernard L. Madoff Investment Securities LLC</u>**

Dear Chairman Garrett:

This is in reply to your letter dated February 16, 2011, requesting information relating to accounts with undetermined claims in the Madoff case. In that regard, you refer to my September 7, 2010 correspondence to the Subcommittee, in which I indicated that 138 accounts, each valued at more than $10 million, were potentially eligible for SIPC protection. In your February 16 letter, you ask for detailed information with respect to the 138 accounts.

Please be advised that because the September 7 letter sought information relating to "all Madoff-related SIPC claims" exceeding $10 million, as of August 1, 2010, the 138 figure included accounts that already had been fully resolved, as well as others that had yet to be resolved but that might be eligible for SIPC protection. The Madoff Trustee's staff informs me that since August 1, 2010, an additional number of such accounts has been determined or otherwise resolved.

Below is a chart that indicates the current status of the 138 accounts. The accounts have been broken out by date – that is, by number of accounts resolved before August 1, 2010, versus those resolved on or after August 1, 2010. Also shown are the values of the accounts or their "net equity" calculated under the cash in/cash-out methodology in real dollars as opposed to the last statement methodology reflecting fictitious amounts fabricated by Bernard Madoff.

Honorable Scott Garrett
March 4, 2011
Page 2

| Category | No. of Accts. | Net Equity as of Sept. 2010 |
|---|---|---|
| **Accounts with Net Equity Greater Than $10M** | **138** | **$14,026,555,101.15** |
| Allowed prior to August 2010 | 65 | $1,260,650,605.41 |
| Resolved by Settlement prior to August 2010 | 6 | $1,474,109,474.57 |
| **Determined prior to August 2010** | **71** | **$2,734,760,079.98** |
| Allowed during or after August 2010 | 9 | $178,527,974.31 |
| Denied during or after August 2010 | 1 | $158,739,861.02 |
| Resolved by Settlement during or after August 2010 | 10 | $760,420,773.14 |
| Withdrawn during or after August 2010 | 3 | $62,260,601.00 |
| **Determined during or after August 2010** | **23** | **$1,159,949,209.47** |
| **Total Determined/Resolved** | **94 out of 138** | **$3,894,709,289.45** |
| **Total Unresolved Pending Litigation** | **44 out of 138** | **$10,131,845,811.70** |

As shown above, 94 of the 138 accounts, with an approximate value of $3.9 billion, have been fully determined and resolved.   44 unresolved accounts remain which are subject to pending litigation and  which the Trustee's staff indicates have an approximate value of $10.1 billion.  Since you have asked for information regarding unresolved accounts, the information is provided below with respect to the 44 remaining accounts.  The Trustee's staff advises that information as to the number of foreign customers, if any, cannot be readily obtained.

Honorable Scott Garrett
March 4, 2011
Page 3

| ID | Net Equity | 11-30-08 Fictitious Equity | Length of Acct in Years (12/11/08 - Date of 1st Cash Trans-action) | Num-ber of With-draw-als | Total Withdrawals | Type of Entity | Investor Domicile |
|---|---|---|---|---|---|---|---|
| 1 | $10,490,000.00 | $18,467,670.16 | 4.56 | 12 | ($5,850,000.00) | LP | CA |
| 2 | $10,925,000.00 | $35,973,103.15 | 13.34 | 24 | ($30,070,000.00) | GP | FL |
| 3 | $10,936,341.00 | $17,306,734.01 | 7.80 | 32 | ($9,879,000.00) | NPO | NY |
| 4 | $10,957,335.92 | $20,359,013.65 | 4.16 | 56 | ($9,477,000.00) | LLP | NY |
| 5 | $11,325,000.00 | $20,609,224.15 | 3.92 | 6 | ($2,700,000.00) | Indiv. | FL |
| 6 | $11,803,944.00 | $12,278,867.08 | 0.47 | 1 | ($633,556.00) | LLC | NY |
| 7 | $12,043,572.91 | $29,051,570.90 | 9.30 | 835 | ($3,838,327.09) | LP | NL |
| 8 | $13,951,902.49 | ($94,421,930.00) | 13.86 | 132 | ($2,361,743,551.25) | Int'l Bus. Co. | BVI |
| 9 | $14,800,000.00 | $0.00 | 0.02 | 0 | $0.00 | LLC | DEL |
| 10 | $18,034,620.00 | $29,554,606.09 | 2.38 | 8 | ($51,102,500.00) | LLC | NY |
| 11 | $18,490,000.00 | $33,843,301.80 | 7.71 | 2 | ($9,100,000.00) | NPO | NY |
| 12 | $22,522,000.00 | $32,548,452.96 | 3.93 | 5 | ($7,675,000.00) | LLC | VA |
| 13 | $24,523,164.00 | $29,097,840.23 | 1.69 | 25 | ($4,095,000.00) | LLC | NY |
| 14 | $33,776,662.20 | $153,819,492.58 | 10.28 | 1,076 | ($182,423,849.07) | Investmt Co. | GG |
| 15 | $36,728,168.21 | $49,532,366.02 | 1.90 | 27 | ($8,162,450.00) | LLC | NY |
| 16 | $38,021,464.82 | $42,898,979.96 | 1.77 | 182 | ($101,535.18) | Foreign Corp. | CH |
| 17 | $40,000,000.00 | $40,667,283.52 | 0.19 | 0 | $0.00 | LP | NY |
| 18 | $62,307,823.13 | $238,456,305.06 | 11.80 | 1,182 | ($214,642,176.87) | LP | NY |
| 19 | $95,245,335.43 | $133,576,322.15 | 3.44 | 451 | ($29,077,433.57) | Int'l Bus. Co. | BWI, LC |
| 20 | $116,149,513.51 | $189,128,047.45 | 5.85 | 695 | ($135,067,486.49) | Banking | LU |
| 21 | $138,324,742.00 | $357,739,733.97 | 13.85 | 8 | ($25,150,000.00) | LLC | NY |
| 22 | $140,439,146.45 | $314,053,923.63 | 16.06 | 92 | ($281,122,629.00) | LP | DE |
| 23 | $143,291,728.67 | $215,615,947.48 | 2.11 | 265 | ($40,896,026.46) | BVI Bus. Co. | LU |
| 24 | $161,707,291.52 | $182,491,990.24 | 2.26 | 224 | ($95,542,688.48) | Banking | LU |
| 25 | $163,700,000.00 | $308,092,181.62 | 8.36 | 11 | ($119,700,000.00) | LP | NY |
| 26 | $172,981,303.01 | $308,611,739.21 | 8.36 | 895 | ($93,918,696.99) | Mutual Fund | NY |
| 27 | $210,399,382.69 | $734,956,539.95 | 12.94 | 1,336 | ($546,040,617.31) | Int'l Bus. Co. | BVI |
| 28 | $215,287,000.00 | $271,295,062.05 | 2.44 | 9 | ($97,800,000.00) | LP | CT |
| 29 | $225,920,362.16 | $1,861,885,900.21 | 15.93 | 36 | ($748,344,709.00) | LP | NY |

Honorable Scott Garrett
March 4, 2011
Page 4

| ID | Net Equity | 11-30-08 Fictitious Equity | Length of Acct in Years (12/11/08 - Date of 1st Cash Trans-action) | Number of With-draw-als | Total Withdrawals | Type of Entity | Investor Domicile |
|---|---|---|---|---|---|---|---|
| 30 | $248,016,286.22 | $349,007,258.01 | 5.50 | 624 | ($152,074,713.78) | Banking | LU |
| 31 | $251,360,547.82 | $403,394,134.41 | 6.61 | 756 | ($49,936,142.84) | Int'l Bus. Co. | BVI |
| 32 | $255,466,043.17 | $251,170,208.48 | 0.74 | 77 | ($133,956.83) | Banking | LU |
| 33 | $256,497,505.86 | $414,017,644.69 | 3.26 | 475 | ($502,321,919.14) | Co. Sub. | LU |
| 34 | $272,145,044.50 | $733,620,822.37 | 12.04 | 1,186 | ($261,924,223.80) | Int'l Bus. Co. | BVI |
| 35 | $294,731,454.85 | $1,100,277,442.97 | 12.45 | 1,301 | ($751,965,969.08) | Banking | LU |
| 36 | $385,971,272.11 | $730,244,947.24 | 11.62 | 1,157 | ($81,362,748.49) | Banking | LU |
| 37 | $440,094,880.88 | $490,879,411.39 | 1.59 | 166 | ($93,905,119.12) | Investmt Co. | BVI |
| 38 | $450,354,615.55 | $3,226,053,294.61 | 18.03 | 1,925 | ($4,047,046,338.10) | Int'l Bus. Co. | BVI |
| 39 | $496,226,989.43 | $3,247,736,777.14 | 16.15 | 1,856 | ($3,985,600,930.85) | Int'l Bus. Co. | BVI |
| 40 | $498,490,090.88 | $1,073,151,344.67 | 7.27 | 814 | ($628,231,909.12) | LP | NY |
| 41 | $540,158,887.54 | $2,714,140,694.49 | 14.78 | 1,503 | ($447,701,112.46) | Int'l Bus. Co. | BVI |
| 42 | $747,572,668.80 | $1,299,399,404.86 | 4.72 | 577 | ($766,477,097.55) | Investmt Co. | GB |
| 43 | $1,161,989,094.97 | $1,894,066,134.64 | 4.70 | 536 | ($578,033,846.60) | Banking | LU |
| 44 | $1,647,687,625.00 | $2,346,123,780.12 | 14.93 | 29 | ($395,390,000.00) | LP | NY |
| Totals | $10,131,845,811.70 | $25,860,773,569.37 | | | ($17,856,260,260.52) | | |

Very truly yours,

Stephen P. Harbeck
President and Chief Executive Officer

SPH/pmd

cc: Irving H. Picard, Trustee
David J. Sheehan, Esq.