# EXHIBIT D

FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription  12/18/2008

BERNARD MADOFF was interviewed pursuant to a proffer agreement in the presence of his attorneys Daniel Horowitz, Ira Sorkin, and Nicole DeBello, at the offices of the United States Attorney's Office, SDNY. Present were the following: SA Theodore Cacioppi (FBI), SA Keith D. Kelly (FBI), AUSA Marc Litt (USAO SDNY), AUSA William Johnson (USAO SDNY), Kevin Bell (SIPC), Harvey Kelly (Alix Partners), Daniel Zinman (RK&O), Tom Bioli (SEC), Israel Friedman (SEC), Michael Kress (SEC), Alexander Vasilescu (SEC), George Stamboulidis (Baker Hostetler, trustee's counsel). Certain individuals were not present for the entire interview, but each government agency had at least one representative present at all times. In addition to the standard SDNY proffer agreement, an analogous SEC civil agreement was executed. MADOFF provided the following information:

MADOFF is the sole owner of BERNARD L. MADOFF INVESTMENT SECURITIES, LLC (BLMIS). Many years ago MADOFF ran the entity as a sole proprietorship, but converted to the LLC form at some point. MADOFF SEURITIES INTERNATIONAL LIMITED (MSIL) is a London based entity founded by MADOFF in the early 1980s. He is the majority owner, with his wife and children owning small percentages of the firm. MADOFF contributed 100% of the capital that formed MSIL. To the extent his family contributed capital this capital was loaned to them by MADOFF. This entity is separate and distinct from BLMIS. KPMG audits MSIL.

MADOFF LIMITED is an inactive British entity. It does not appear on BLMIS FOCUS reports and has nothing to do with BLMIS.

COHMAD SECURITIES sublets space on the 17th floor of 885 3rd Avenue in Manhattan (the location of BLMIS) from BLMIS. MADOFF owns 15% of COHMAD and MADOFF's brother owns 9% of COHMAD. COHMAD is a general retail broker-dealer. MADOFF and his brother are passive investors with no management authority.

BLMIS maintains a market making business and a proprietary trading desk. BLMIS was founded in 1960 and the market making business started at that time. Upon founding BLMIS MADOFF also opened a number of retail clients. These clients were mainly family and friends of MADOFF. The market making business focused on new issues and OTC securities. The firm had very little money

---

Investigation on  12/16/2008  at  New York, NY

File # [redacted]                                      Date dictated

by  SA Theodore V. Cacioppi [redacted]
    SA Keith D. Kelly

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

USAO-MADOFF000015

USAVAC0000001

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of  BERNARD MADOFF , On 12/16/2008 , Page 2

at the time and MADOFF's wife RUTH acted as book keeper. Later, when RUTH MADOFF wanted to have children. MADOFF hired someone else to keep the books. After their children grew up RUTH MADOFF came back to work for BLMIS.

IRWIN LIPKIN was MADOFF's first hire. He replaced RUTH MADOFF as bookkeeper. Over the years MADOFF hired more traders and back office support. As time past the market making business grew significantly.

MADOFF's brother PETER MADOFF worked for MADOFF while PETER was in law school. After PETER graduated and passed the bar he came to work for MADOFF full time. PETER wanted to, and indeed did, build a technology platform at the firm tat allowed them to expand the market making business into other products, such as warrants and convertible bonds. The firm developed a niche trading odd lots that larger firms would not handle. They began to take business from floor exchanges. At the time the nature of the markets allowed them to arbitrage between exchanges. As a market maker, they needed order flow to generate revenue. Most of their order flow went to the floor of the NYSE.

BLMIS began to target more odd lot business from regional and discount firms. In order to be successful at this they needed to move small orders efficiently and at a good price.

PETER ultimately built a technology platform at the firm to automate order flow. The platform was successful and the market making business expanded. They took business from NYSE and regional exchanges, which traditionally made significant profits on the spread.

Later certain firm competitors began offering rebates to broker dealers to route order flow to them. This upset NYSE, which characterized the practice as a kickback. MADOFF's firm was a party to this practice with, as an example, SCHWAB. SCHWAB and similarly situated firms always, to MADOFF's knowledge, disclosed the practice to clients. NYSE was sufficiently politically influential to cause Congress to hold hearings on the matter. The practice ultimately disappeared as the spreads tightened as it simply became too expensive to continue the practice. BLMIS discontinued the practice.

BLMIS is still a major market maker. They handle up to 700,000 orders per day.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of __BERNARD MADOFF__ , On __12/16/2008__ , Page __3__

At some point while growing BLMIS MADOFF decided to open a proprietary trading arm. He hired traders from other firms and, pursuant to industry practice and regulation, walled off the market making business from the proprietary desk. For a number of years MARK MADOFF, one of MADOFF's sons, ran the market making business and ANDREW MADOFF, another son, ran the proprietary desk. In recent years these roles reversed because ANDREW contracted lymphoma and after he regained his health began to pursue outside business, personal, and charitable interests. MARK turned the market making business over to other MADOFF employees and took over most of the proprietary trading business.

PETER is the chief compliance officer and plays a major role in the firm. He was the point person in the development of technology at the firm, to include PRIMEX, an automated trading system. PRIMEX was never fully implemented. PETER sold a portion of PRIMEX to NASDAQ. MADOFF is not certain if BLMIS still owns any part of PRIMEX, but does know that BLMIS holds certain patents for portions of PRIMEX.

The 18th floor of BLMIS is dedicated to operations, including clearing and processing for both the market making and proprietary trading operations.

Since the inception of BLMIS MADOFF has managed a retail business associated with the firm. The business was initially quite small. When MADOFF first started the retail business most of the accounts were discretionary. MADOFF would, however, still generally consult clients with trade decisions prior to execution. The retail business grew and by the 1970s MADOFF was paying ridiculously high returns, in the range of 30% 50 40% per year, in order to attract business. At the time these rates of return were not unheard of at legitimate firms.

When MADOFF first began the retail business he did initially engage in some actual trades. Soon, however, he began to engage in fraud as to the entire retail business. He stopped engaging in any actual trading. For virtually the entire life of the retail business MADOFF simply did not trade and sent investors false account statements and false trade confirmations.

The market making and proprietary desk units of the firm were always profitable and always conducted legitimately. All salaries, including MADOFF's, came from the legitimate side of the firm. MADOFF's compensation was always structured as a draw. The

USAO-MADOFF000017

USAVAC0000003

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of  BERNARD MADOFF , On 12/16/2008 , Page 4

only funds that were extracted from the client (i.e. fraudulent) side of the business, other than funds going back to investors, were funds used to operate the client side of the business. This was structured as a four cent per share commission.

The books and records of client business of BLMIS reflect only the false trades and fund flows pursuant to these purported trades. There is no second set of books and records. The fraud entailed MADOFF taking in funds from investors, holding those funds, and paying them out to investors seeking redemptions. It was essentially a Ponzi scheme. Customers received both monthly account statements and trade confirmation reflecting trades the never took place. MADOFF began engaging in fraud in earnest in the 1970s. The 1980s saw a large expansion in the retail (i.e. fraudulent) portion of the business. As there was no actual trading, nothing cleared through DTCC or any clearing firm, and the only records of the purported trades are the paper confirmations.

The incoming funds for the phantom purchases stayed with the firm. Part of these funds paid the operational expenses of the fraudulent operation. Part of the funds went back to customers who sought redemptions. At all times the funds were kept in CDs, cash, or treasuries.

MADOFF controls no bank accounts that he has not revealed to the government. MADOFF controls no money that he has secreted from the government.

Many MADOFF clients, particularly long term clients, made money as a result of the fraud. They would keep the initial investment with the firm and withdraw profits regularly. When a client told MADOFF to sell MADOFF would look at the market and create false documents showing the sale at the market price, and then return funds to the client matching the sale price.

Funds coming into the fraud were routed to an account at CHASE. BLMIS had an operating account at BANK OF NEW YORK (BONY), as well as a number of other accounts at other banks. The fraud was always effectuated through one or more CHASE accounts.

The product the clients were purportedly purchasing consisted of a basket of securities that were hedged by a put option. The put option was purportedly funded by the sale of a call option that would limit the potential of the product to appreciate. Had the transactions been real, the only purpose of

USAO-MADOFF000018

USAVAC0000004

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ▮▮▮▮ BERNARD MADOFF ,On 12/16/2008 ,Page 5

the sale of the call would have been to fund the purchase of the put. No securities or options were, however, ever actually purchased. MADOFF would monitor the status of the hypothetical baskets of securities and generate false trade reports when the product hit the strike price of the false options. MADOFF would not always permit the product to reach the strike price. At times he would decide to sell the product (i.e. the basket of securities), and would generate false confirmations and matching false monthly account statements as a result of this false sale. Nearly all of MADOFF's professional time was consumed by managing the fraud. MADOFF would only have the product turn over (i.e. engage in a false transaction) every few months, but each turnover would generate a great deal of paper.

MADOFF would tell FRANK DIPASCALI which products MADOFF had bought or sold and DIPASCALI would generate the confirmations and monthly account statements. MADOFF would tell DIPASCALE the prices at which the transaction occurred. DISPASCALI would assume that MADOFF had engaged in the transactions on overseas exchanges. MADOFF told DIPASCALI at various times that all the transaction occurred on overseas exchanges. MADOFF told DISPASCALI and others that they did this to avoid conflict of interest issues with the proprietary desk and the market making business. When pressed MADOFF would admit that they could have done the transactions at other domestic market making firms but that this would be difficult.

DIPASCALI had systems on the 17th floor that generated confirmations for clients. DISPASCALI and others assumed that MADOFF had engaged in the transaction during off hours on offshore exchanges.

DIPASCALI had a computer model that would assemble the baskets of hypothetical securities. Having these baskets of hypothetical securities would have been necessary for the model even if MADOFF were legitimately trading. MADOFF would normally inform DISPASCALI that MADOFF wanted to purchase a given basket at a given price in the afternoon. MADOFF would report to DISPASCALI the next morning that MADOIFF had indeed purchased the basket of securities at a given price. MADOFF lied to DIPASCALI about the price at times so as to not look ridiculous. MADOFF would read a list of securities that he said he had purchased to DIPASCALI and DIPASCLI would hand to MADOFF a written list memorializing this list. MADOFF would then fill in the prices of the false purchases on this document and give it back to DIPASCALI.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of  BERNARD MADOFF  ,On  12/16/2008  ,Page  6

MADOFF's office was on the 19th floor. He normally worked on the 19th floor. The books, records, and computers that were used by the fraudulent operation are all on the 17th floor. About half of the 17th floor was dedicated to the fraudulent activities. There is also a small trading room and about five employees in addition to DIPASCALI. There is a computer room on 17 that contain IBM servers that handle the operations of the entire firm. There is a segregation within the servers between the legitimate and fraudulent business of the firm.

MADOFF would give DIPASCALI prices for the fake trades that matched actual market prices. MADOFF made sure that he was virtually always reachable by DIPASCALI in order to effectuate the false trades as needed.

Other than the documents generated by DIPASCALI there are no records of the false trades. People at the firm were afraid of MADOFF and would not question him. MADOFF would never identify counter parties to the false trades. Eventually it seemed as if everyone knew that MADOFF had a large client base. MADOFF registered as an Investment Advisor (IA) in 2006.

MADOFF began the fraud as a result of his instinct as a market maker to short stock. He does not know why he continued after he was obviously in too deep to extricate himself. MADOFF panicked every time a regulator looked at the firm. No regulator ever asked MADOFF where the stock was custodied. Had a regulator asked this question the scheme likely would have unraveled. MADOFF would not answer that question. The fraud eventually did unravel as a result of a large number of redemption requests that, in turn, were a result of the poor economy. MADOFF concluded at some point fairly recently that he could not have kept up with redemptions through the end of the year. He did not have enough money on hand as people would constantly withdraw funds because the reported returns were so good. Normally if MADOFF saw himself becoming short on funds needed for redemptions he would allow more investors or more money from existing investors into the fund. His reported returns were so good people were virtually throwing money at him. MADOFF became greedy and did not know how to get out of the scheme.

MADOFF probably could have raised funds sufficient to cover the recent redemptions. He could have simply permitted existing customers to invest more money. Existing customers always wanted to invest more. MADOFF concocted a story about a new model

USAO-MADOFF000020

USAVAC0000006

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of  BERNARD MADOFF  , On 12/16/2008 , Page 7

he was using and a number of investors committed to put new money into the fund based on this. A number of new investors also committed to put money into the fund based on this. MADOFF did not know the scheme would come apart until it did. MADOFF had been under pressure due to the nature of the deception for years.

When MADOFF began a retail business in about 1960 he had about a dozen clients all of whom were family and friends. The retail business morphed into a fraud as time went by. In 1962 MADOFF's retail business was wiped out in the new issue collapse. All his clients lost virtually their entire investment, which amounted to a total of about $30,000. MADOFF felt he had to pay them back, so he borrowed $30,000 from his father in law to do so. His father in law was not pleased by this development. MADOFF was able to pay all these clients back and start the market making business. At about this time he took in new retail clients. These clients were also family and friends. He began to falsely report returns of 30% to 40% annual to these customers. All or virtually all of these accounts were discretionary and MADOFF had power of attorney over them.

Institutions began to invest in earnest in MADOFF's fraudulently managed fund in the 1980s. At about this time MADOFF came up with the model he claimed to use as a trading vehicle at about this time. He termed the model "split strike forward conversion." MADOFF never marketed to anyone. People and institutions came to him through word of mouth with requests to permit them into the fund. When people approached him he extolled the virtues of the model.

The incoming funds would essentially just sit in the CHASE account and be withdrawn as needed to manage the fund. MADOFF always kept funds in reserve to hedge against redemptions. When redemptions ate away at the reserve MADOFF could cause new funds to come into the fund by calling existing clients and permitting them to invest more money. He never solicited new clients.

There were no intermediaries between MADOFF and his clients. MADOFF was aware that certain funds were investing the funds of their investors, but MADOFF did not want to know who these investors were. He only wanted to deal with the direct investor. In about 2000 COHMAD SECURITIES invested some of their clients' funds with MADOFF.

USAO-MADOFF000021

USAVAC0000007

FD-302a (Rev. 10-6-95)

▮

Continuation of FD-302 of  BERNARD MADOFF  ,On 12/16/2008 ,Page 8

    Various funds engaged in differing degrees of due diligence before investing with MADOFF. This generally involved meeting with MADOFF and having MADOFF explain the model. MADOFF never wanted to meet the investors in these funds. He did not want the fund to get into some kind of trouble and inform the government about anything they might know about MADOFF. MADOFF felt that not knowing the investors insulated him. The only time MADOFF met any given fund's investors was when the fund insisted on bringing one or more large investors to a meeting with MADOFF. Sometimes potential investors asked MADOFF what would happen in the even of his death. MADOFF told them that there were procedures in place to liquidate their position.

    MADOFF saw most due diligence efforts as a purely ministerial act that did not entail any actual investigation. MADOFF would tell potential investors that, in essence, he traded through a proprietary black box system.

    All of MADOFF's investors thought that MADOFF was self clearing. They were sent monthly account statements showing that BLMIS had custody of the assets. MADOFF said that he had various sub custody arrangements with a number of banks. Certain clients wanted to see third party custody documentation. MADOFF told these clients that he needed immediate control of the assets to work the model. He told these clients that third party custody arrangements were costly and cumbersome. MADOFF also said that he was concerned about a third party custodian pledging or otherwise encumbering the assets. He also told clients, at least in the early days of the fraud, that he did not want to leverage the assets. Most potential clients accepted these explanations.

    Hedge funds engaging in due diligence did not ask MADOFF where he traded. They knew BLMIS to be a global firm. MADOFF told various investors and potential investors who asked that he traded overseas and had sub custody arrangements with overseas banks.

    MADOFF did not hold himself out as a hedge fund manager. Certain potential customers asked MADOFF to trade their custodial assets through prime brokers. MADOFF said that he would not do this. He said that he was offering a product, only part of which was his expertise.

    MADOFF told people that he traded overseas to avoid conflict of interest issues with the marketing making operation and proprietary trading desk. Nobody seriously challenged him as to

USAO-MADOFF000022

USAVAC0000008

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of  BERNARD MADOFF  , On 12/16/2008  , Page 9

this assertion. A reasonably astute due diligence operation would have realized that MADOFF could have easily set of a Chinese wall to avoid conflict of interest issues.

When MADOFF decided to turn himself in he began to clean out his office. He removed personal items, out dated regulatory notices, and other non-relevant documents. All documentation concerning the fraud had always been kept on the 17th floor. Such documents were not kept in the cage.

BLMIS maintains a storage facility in Queens as a records archive. MADOFF's best recollection is that documents regarding the CHASE account are not stored at this facility. This facility is subject to regular document destruction cycles, and periodically a BLMIS employee goes to the facility and shreds outdated documents.

BLMIS prepared its own financials, which were reviewed and approved by an outside accountant. The name of the firm was FRIEHLING & HOROWITZ. This firm has had MADOFF's account for twenty five to thirty years. They were supposed to review everything, including the client business (i.e. the fraud). The firm never checked on the client business. They never checked on custody of the assets. They only made sure that BLMIS books and records matched the customer records. The accounting firm never asked MADOFF about asset custody, had they MADOFF would have said that the assets were custodied overseas. The FOCUS reports and financials simply never dealt with the custody issue. MADOFF uses this firm simply because he has used them for years. FRIEHLING is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ MADOFF never referred anyone to FRIEHLING.

As of the date of MADOFF's arrest there was several hundred million in the CHASE account. MADOFF would calculate the four cent per share commission based on the trading he claimed to engage in. Once he calculated this figure he would inform the cage, and someone there would cause that amount to be transferred from the CHASE account to the firm's operating account at BONY. These commissions were calculated in bulk at the end of each month and booked as of the ostensible time of the trade. DIPASCALI would generally cause the wire transfer to take place. ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ did this if DIPASCALI was unavailable.

MADOFF has about 3,200 active clients. About twenty eight of these clients are large hedge funds. The $50 billion

USAO-MADOFF000023

USAVAC0000009

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____BERNARD MADOFF_____, On _12/16/2008_, Page __10__

figure represents MADOFF's best estimate of the total falsely reported value of the fund. MADOFF's model required that the fund not be invested in securities all of the time. As of the date of the arrest he had been telling clients that the fund was wholly invested in securities.

In recent years MADOFF generally took in about $250 million annually into the fraud. The four cents per share commission represented generally generated about 1% of this per year. As many as twenty four people worked in support roles in the fraud and needed to be paid. The commissions, however, were as fake as the trades.

PETER MADOFF's operating budget for the two legitimate businesses at BLMIS is about $20,000,000 per year. This includes all salaries but does not include a 25% of profits commission for the traders. Compensation for MADOFF and PETER MADOFF was structured as a draw, and they normally took between $2 million and $5 million per year. MADOFF's sons each were paid about $1 million per year and received a bonus of between $1 million and $2 million based on firm performance.

The expenses for the fraudulent operation tended to be somewhat higher than for the rest of BLMIS. They tended to be between $20 million and $25 million. MADOFF allocated a number of employee salaries to the fraudulent operation even if they worked for the market making operation or the proprietary desk. He did this because he wanted the working budget to be high as a cushion against redemptions.

Funds generally flowed out of the CHASE account at about the same pace that they flowed into the CHASE account. Clients would withdraw their falsely reported profits on a regular basis. Everything, however, was fake.

MADOFF's model does work, but it does not generate the returns reported by MADOFF. MADOFF tried the model with actual trades many years ago. MADOFF estimates that expenses related to the fraud averaged $39 million per month. This is inclusive of redemptions.

The reported returns were not exactly the same year to year, but averaged about 15% a year during many periods. Most of the damage to MADOFF's ability to extricate himself from the Ponzi scheme was done by long term account holders who accrued interest

USAO-MADOFF000024

USAVAC0000010

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of  BERNARD MADOFF , On 12/16/2008 , Page 11

over many years. The $50 billion figure represents falsely reported accrued interest. MADOFF may have taken $2 billion out of the fraud over the years so most of what he took in was paid out to investors.

All records of the fraud are either on the 17th floor or at the archive warehouse. MADOFF has no documents relevant to the fraud at his home.

MSIL maintains an account with BARKLAY'S for the purpose of clearing trades. MSIL trades US securities. The Barclay's account was not involved in the fraud.

The proprietary trading desk only traded the firm's money. It did not have outside clients. MADOFF had funds transferred from the MSIL to BLMIS in order to fool regulators. He told the SEC that the MSIL helped facilitate trades so he felt he had to show the SEC funds coming from MSIL to BLMIS. MSIL always had a great deal of liquid cash, so MADOFF would have MSIL send funds to the BLMIS operating account at BONY in exchange for a fake treasury transaction confirmation. When he felt the time was right he would unwind this transaction by sending the money back to MSIL and generating another fake confirmation reversing the trade. MADOFF would tell DISPACALI or someone else form the 17th floor to generate the confirmations. ▮▮▮▮ is the operations person at MSIL who handled the transactions.

Currently ▮▮▮▮ reconciles the CHASE account. RUTH MADOFF reconciled this account before ▮▮▮▮.

RUTH MADOFF first learned of MADOFF's long running fraud when he told ▮▮▮▮ at MADOFF's upper east side apartment last week. MADOFF told PETER MADOFF before he told his wife and children. When MADOFF told his brother about the fraud PETER MADOFF told him that he should tell his sons.

MADOFF was planning on paying back as much money as he could to employees who were investors and relatives before turning himself in. In order to effectuate this MADOFF told his son MARK MADOFF to prepare bonus information for employees and said that they would be paying bonuses early. When initially questions by MARK MADOFF about tax consequences of this MADOFF made up an excuse as to why he wanted to pay bonuses immediately.

USAO-MADOFF000025

USAVAC0000011

08-01789-cgm    Doc 19853-4    Filed 10/14/20    Entered 10/14/20 14:57:34    Exhibit D
Pg 13 of 15

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of   BERNARD MADOFF   , On 12/16/2008 , Page 12

When MADOFF's sons pressed him to explain why he needed to disburse bonuses early he told them that they needed to talk about it at his home. They took a cab to his apartment. After he told his sons about the fraud he told them that they should get an attorney. His younger son came back later in the day and told him that that had seen an attorney at PAUL WEISS but that the firm was deciding if it should not take the business due to a conflict of interest. He said that he was to report back to PAUL WEISS at four in the afternoon.

MADOFF also called DIPASCALI for a list of employees and relatives with accounts. DISPASCALI asked why and MADOFF made an excuse about some new regulation that made it necessary to liquidate the accounts of the employees and family members and pay them all back. Based on information that came back from DIPASCALI, MADOFF wrote about $174,000,000 worth of checks to family members and employees who were investors. MADOFF thought that he did not, a the time, have enough money in the CHASE account to cover these checks. MADOFF was unable to send out the checks or make any wire transfers to employees or family members before he was arrested. He was able to cover most or all of the redemptions that were pressuring the scheme before he was arrested. These redemptions totaled between about $6.5 billion and about $7 billion.

DIPASCALI was not an investor in MADOFF's fund.

MADOFF and his wife maintain a safe deposit box at the Madison Avenue BONY branch that contains some jewelry belonging to RUTH MADOFF. They also maintain a safe deposit box at a WACHOVIA bank in Florida. This box also contains jewelry. MADOFF does not know why his wife accessed the New York safe deposit box the day that he was arrested. MADOFF does not know why and does not know if the $11,000 figure has any significance.

MADOFF owns an 89 foot long yacht in France named BULL. MADOFF has owned this boat for about four years, and maintain a full time crew for the boat for this time. He recently fired the crew with the exception of the captain. It is necessary for the captain to continue to work in order to maintain the boat until it can be sold

MADOFF owns a 56 foot sport fishing boat in Palm Beach also named BULL. He recently had a captain move the boat to Ft.

USAO-MADOFF000026

USAVAC0000012

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of  BERNARD MADOFF  , On 12/16/2008  , Page 13

Lauderdale because he was concerned it would be vandalized in Palm Beach. The boat used to be in dockage behind his house in Palm Beach. The Palm Beach home is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

MADOFF owns a 39 foot sport fishing boat in Montauk. It is currently in winter storage at the Montauk Marine Basin.

FAIRFIELD SENTRY (FS) is MADOFF's biggest fund client. They have about $7 billion invested with MADOFF. FS never verified any of MADOFF's purported trading activity. They never asked for any documentation other than the documents every other MADOFF customer received from MADOFF. They never asked about auditing MADOFF's fund. MADOFF does not know what FS is or was telling its investors about due diligence. FS and GREENWICH FAIRFIELD (GF) are the same entity. MADOFF believes that GF is the holding company. MADOFF dealt with ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ at FS. More recently he began dealing with ▓▓▓▓▓▓▓▓ at FS.

MADOFF did not invest in FS. MADOFF is not aware of any of his relatives investing in FS. FS was never paid any sort of compensation or given any special favors by MADOFF in return for investing.

MADOFF's model worked in theory inasmuch as the baskets of securities that were not purchased showed returns that MADOFF reported to his customers as if the securities had, in fact, been purchased. The confirmations were generated in real time (i.e. T+1). The purported exits to treasuries were reported in a timely manner. The only real advantage MADOFF had was that the securities in the model were not actually purchased and thus there were no transactions that moved the market. This worked in a down market because MADOFF was purportedly in treasuries about half the time in any event. The model requires good timing inasmuch as it requires that the purchased occur on upward market spikes.

At one point this year MADOFF had about $5.5 billion liquid in the fraud.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ controls a bond account. It was left to ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ sold the bonds recently because ▓▓▓ thought MADOFF would require bail money. The day that MADOFF was arrested ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ got certain jewelry ▓▓▓▓▓▓▓▓▓▓▓▓ from the New York safe deposit box.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of  BERNARD MADOFF ,On 12/16/2008 , Page 14

    MADOFF acted wholly alone in the fraud detailed above. No one else played a knowing role. MADOFF has not spoken to his sons since his arrest. Their attorney advised them not to speak with their father. Virtually all of MADOFF's family members and close friends were investors.

USAO-MADOFF000028

USAVAC0000014