**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01565 (SMB) |
| Plaintiff, | |
| v. | |
| STANDARD CHARTERED FINANCIAL SERVICES (LUXEMBOURG) S.A. (f/k/a AMERICAN EXPRESS FINANCIAL SERVICES (LUXEMBOURG) S.A. and f/k/a AMERICAN EXPRESS BANK (LUXEMBOURG) S.A.), as represented by its Liquidator HANSPETER KRÄMER, HANSPETER KRÄMER, in his capacities as liquidator and representative of STANDARD | |

CHARTERED FINANCIAL SERVICES
(LUXEMBOURG) S.A., STANDARD
CHARTERED BANK INTERNATIONAL
(AMERICAS) LTD., f/k/a AMERICAN
EXPRESS BANK INTERNATIONAL, and
STANDARD CHARTERED
INTERNATIONAL (USA) LTD., f/k/a
AMERICAN EXPRESS BANK LTD.,

Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

I.      PROCEDURAL HISTORY.............................................................................................3

II.      THE PROPOSED AMENDED COMPLAINT ................................................................5

ARGUMENT ........................................................................................................................5

I.      LEGAL STANDARDS GOVERNING MOTIONS TO AMEND A PLEADING.............5

     A.      Motions to Amend a Pleading, Generally.................................................................5

     B.      Seeking Leave on the Basis of an Intervening Change in Law ..............................7

II.      DEFENDANTS WILL NOT BE PREJUDICED BY THE PROPOSED
AMENDMENT.............................................................................................................8

III.      AMENDING THE COMPLAINT WOULD NOT BE FUTILE BECAUSE THE
TRUSTEE HAS ALLEGED FACTS SUFFICIENT TO SURVIVE A MOTION
TO DISMISS ...............................................................................................................10

     A.      The Trustee Has Adequately Alleged that Defendants Lacked Good Faith..........10

         1.      Defendants Subjectively Believed There Was a High Probability of
Fraud at BLMIS ......................................................................................12

             a.      Defendants' Review of Fairfield Sentry's November 2004
Trade Confirmations Reflected Numerous Impossible
Trades Indicating There Was a High Probability Madoff
Was Not Trading Securities .........................................................12

             b.      Another Executive Concluded Fairfield Sentry Was "a
Scam" that Could "Explode" at Any Time ...................................13

             c.      Defendants Recognized Other Specific Risks of Investing
with Madoff ..................................................................................14

             d.      Defendants' Clients Repeatedly Questioned the Existence
of Their Assets and the Legitimacy of BLMIS's Reported
Trades...........................................................................................16

2.      The Trustee Sufficiently Pleads that Defendants Deliberately Avoided Confirming BLMIS's Fraud.......................................................16

      a.      Defendants Admitted to Performing Limited Initial Due Diligence on BLMIS......................................................................17

      b.      After Recognizing that Fairfield Sentry Would "Explode" Because Its Returns Reported by BLMIS Were Not Possible Defendants Turned a Blind Eye to Continue Promoting Fairfield Sentry for Fees from Their Clients and FGG........................................................................................19

      c.      Defendants' Perfunctory Meeting with Madoff After Their Acquisition by Standard Chartered.................................................21

B.      The Knowledge of Perruchoud, Heymann, and Friedman Is Imputed to Each of the Defendants, Which Acted Collectively as One Business ...................22

C.      Fairfield Sentry's Managers Had Actual Knowledge that Madoff Was Not Trading Securities Or, At A Minimum, Were Willfully Blind To Madoff's Fraud .............................................................................................................24

D.      The Initial Transfers from BLMIS to Fairfield Sentry Are Avoidable.................28

IV.      THE TRUSTEE HAS NOT ACTED WITH UNDUE DELAY OR BAD FAITH...........30

CONCLUSION................................................................................................................31

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
  626 F.3d 699 (2d Cir. 2010)............................................................................8

*Alexander Interactive, Inc. v. Adorama, Inc.*,
  No. 12-cv-6608 (PKC) (JCF), 2014 WL 113728 (S.D.N.Y. Jan. 13, 2014)............................7

*Anderson News, LLC v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)..........................................................................6, 7

*Anwar v. Fairfield Greenwich Limited*,
  No. 09-cv-118-VM-FM (S.D.N.Y.)...................................................................9, 12

*Anwar v. Fairfield Greenwich Ltd.*,
  728 F. Supp. 2d 372 (S.D.N.Y. 2010).........................................................13, 29, 30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................6, 7

*Baker v. Latham Sparrowbush Assocs.*,
  72 F.3d 246 (2d Cir. 1995)............................................................................22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................................6

*Blagman v. Apple, Inc.*,
  No. 12-cv-5453 (ALC) (JCF), 2014 WL 2106489 (S.D.N.Y. May 19, 2014) ........................7

*Block v. First Blood Assocs.*,
  988 F.2d 344 (2d Cir 1993)...........................................................................30

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)............................................................................6

*Cohen v. S.A.C. Trading Corp.*,
  711 F.3d 353 (2d Cir. 2013)............................................................................7

*Commander Oil Corp. v. Barlo Equip. Corp.*,
  215 F.3d 321 (2d Cir. 2000)...........................................................................30

*Degulis v. LXR Biotechnology, Inc.*,
  928 F. Supp. 1301 (S.D.N.Y. 1996)....................................................................23

*In re Dreier LLP*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011) ...................................................................11

*Fish v. GreatBanc Tr. Co.*,
    749 F.3d 671 (7th Cir. 2014) .............................................................................11

*Foman v. Davis*,
    371 U.S. 178 (1962).............................................................................................6

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011).........................................................................................10

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    No. 02-cv-5068 (JFK), 2008 WL 9359652 (S.D.N.Y. Mar. 17, 2008) ...................8

*Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*,
    665 F. Supp. 2d 239 (S.D.N.Y. 2009).....................................................................8

*HSBC Holdings PLC v. Picard*,
    No. 19-277, -- S. Ct. --, 2020 WL 2814770 (U.S. June 1, 2020)...............................5

*M.E.S., Inc. v. Safeco Ins. Co. of Am.*,
    No. 10-CV-02709 (PKC)(VMS), 2014 WL 2931398 (E.D.N.Y. June 27,
    2014) .....................................................................................................................8

*Mallis v. Bankers Tr. Co.*,
    717 F.2d 683 (2d Cir. 1983).................................................................................23

*Margel v. E.G.L. Gem Lab Ltd.*,
    No. 04-cv-1514 (PAC) (HBP), 2010 WL 445192 (S.D.N.Y. Feb. 8, 2010).......7, 30

*U.S. ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*,
    889 F.2d 1248 (2d Cir. 1989)...............................................................................7

*Milanese v. Rust-Oleum Corp.*,
    244 F.3d 104 (2d Cir. 2001).................................................................................5

*New York v. United Parcel Serv., Inc.*,
    253 F. Supp. 3d 583 (S.D.N.Y. 2017).............................................................16, 17

*In re Optimal U.S. Litig.*,
    No. 10-cv-4095 (SAS), 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011).......15, 16, 21

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012).............................................................22, 23

*In re Parmalat Sec. Litig.*,
    501 F. Supp. 2d 560 (S.D.N.Y. 2007)...................................................................23

*Patel v. L-3 Commc'ns Holdings Inc.*,
    No. 14-cv-6038-VEC, 2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) ..............................22, 23

*Picard v. ABN AMRO Bank N.A. (In re BLMIS)*,
    Adv. Pro. No. 10-05354 (SMB), 2020 WL 1584491 (Bankr. S.D.N.Y. Mar.
    31, 2020) ...................................................................................................................................10

*Picard v. Alpha Prime Fund Ltd. (In re BLMIS)*,
    Adv. Pro. No. 09-01364 (SMB) (Bankr. S.D.N.Y. Sept. 19, 2019) ........................................29

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018)......................................................................................10

*Picard v. Ceretti, et al. (In re BLMIS)*,
    Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Aug. 6, 2019) ...........................................5

*Picard v. Ceretti (In re BLMIS)*,
    Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug.
    11, 2015) ..............................................................................................................................28, 29

*Picard v. Ceretti (In re BLMIS)*,
    Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Mar. 17, 2014).........................................7

*Picard v. Citibank, N.A.*,
    608 B.R. 181 (Bankr. S.D.N.Y. 2019).......................................................................................8

*Picard v. Citibank, N.A., et al. (In re BLMIS)*,
    No. 19-4282 (2d Cir.)................................................................................................................5

*Picard v. Fairfield Sentry Ltd., et al.*,
    Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y.) .................................................................24

*Picard v. Legacy Capital Ltd. (In re BLMIS)*,
    No. 19-4283 (2d Cir.), ECF No. 29 .......................................................................................5, 12

*Picard v. Mendelow (In re BLMIS)*,
    560 B.R. 208 (Bankr. S.D.N.Y. 2016)............................................................................ *passim*

*Picard v. Merkin*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014)............................................................................ *passim*

*Picard v. Merkin (In re BLMIS)*,
    440 B.R. 243 (Bankr. S.D.N.Y. 2010).....................................................................................23

*Picard v. Square One Fund Ltd. (In re BLMIS)*,
    Adv. Pro. No. 10-04330 (SMB) (Bankr. S.D.N.Y. May 30, 2019) ........................................11

*Picard v. Standard Chartered Financial Services (Luxembourg) S.A.*,
    Adv. Pro. No. 12-01565 (SMB) (Bankr. S.D.N.Y. Apr. 26, 2012) ..........................................3

*In re Picard*,
    917 F.3d 85 (2d Cir. 2019).................................................................................................5

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*,
    46 F.3d 230 (2d Cir. 1995)...............................................................................................30

*Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*,
    No. 13 Civ. 1654 (RA), 2015 WL 4097927 (S.D.N.Y. July 6, 2015) ....................................31

*Silverman v. A-Z Rx., LLC (In re Allou Distribs., Inc.)*,
    Adv. No. 04-8369-ESS, 2012 WL 6012149 (Bankr. E.D.N.Y. Dec. 3, 2012) .......................11

*Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*,
    446 B.R. 32 (Bankr. E.D.N.Y. 2011).................................................................................11

*SIPC v. BLMIS (In re Madoff)*,
    Adv. Pro. No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016..........................................................................................................................4

*SIPC v. BLMIS (In re Madoff Sec.)*,
    513 B.R. 222 (S.D.N.Y. 2014)............................................................................................4

*SIPC v. BLMIS (In re Madoff Sec.)*,
    516 B.R. 18 (S.D.N.Y. 2014)..........................................................................................4, 5

*State Teachers Ret. Bd. v. Fluor Corp.*,
    654 F.2d 843 (2d Cir. 1981)................................................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S 308 (2007)............................................................................................................7

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)................................................................................................6

*United States v. A 10th Century Cambodian Sandstone Sculpture*,
    No. 12-cv-2600 (GBD), 2013 WL 1290515 (S.D.N.Y. Mar. 28, 2013)..................................8

*United States v. Fofanah*,
    765 F.3d 141 (2d Cir. 2014) (Leval, J., concurring)...........................................................17

*United States v. Giovannetti*,
    919 F.2d 1223 (7th Cir. 1990) ..........................................................................................11

*United States v. Kozeny*,
   664 F. Supp. 2d 369 (S.D.N.Y. 2009), *aff'd*, 667 F.3d 122 (2d Cir. 2011) ............................11

*United States v. Reyes*,
   302 F.3d 48 (2d Cir. 2002)...................................................................................................10

**Statutes**

11 U.S.C. § 550(a)(2)..............................................................................................................10

11 U.S.C. § 550(b) ...........................................................................................................3, 4, 10

11 U.S.C. § 550(b)(1) .............................................................................................................10

15 U.S.C. §§ 78aaa–*lll* ............................................................................................................1

28 U.S.C. § 157.........................................................................................................................4

**Rules**

Fed. R. Bankr. P. 7012.............................................................................................................6

Fed. R. Bankr. P. 7015.........................................................................................................1, 5

Fed. R. Civ. P. 9(b) .................................................................................................................7

Fed. R. Civ. P. 12(b)(6)......................................................................................................6, 11

Fed. R. Civ. P. 15..............................................................................................................5, 30

Fed. R. Civ. P. 15(a)(2)...........................................................................................................5

**Other Authorities**

6 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice
   and Procedure § 1487 (2d ed. 1990) .......................................................................................9

Plaintiff Irving H. Picard (the "Trustee"), as Trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa–*lll*, and the consolidated chapter 7 estate of Bernard L. Madoff, respectfully submits this Memorandum of Law in Support of the Trustee's Motion for Leave to File an Amended Complaint under Rule 15 of the Federal Rules of Civil Procedure and Rule 7015 of the Federal Rules of Bankruptcy Procedure.  With this motion, the Trustee submits a proposed amended complaint (the "PAC") against Standard Chartered Financial Services (Luxembourg) S.A. (formerly known as American Standard Chartered Financial Services (Luxembourg) S.A. (f/k/a American Express Financial Services (Luxembourg) S.A. and f/k/a American Express Bank (Luxembourg) S.A.), as represented by its liquidator Hanspeter Krämer, Hanspeter Krämer, in his capacities as liquidator and representative of Standard Chartered Financial Services (Luxembourg) S.A., Standard Chartered bank International (Americas) Ltd., f/k/a American Express Bank International, and Standard Chartered International (USA) Ltd., f/k/a American Express Bank Ltd., "Defendants").  The PAC seeks to recover subsequent transfers made to Defendants from Fairfield Sentry, Ltd. ("Fairfield Sentry"), the BLMIS feeder fund created and managed by the Fairfield Greenwich Group ("FGG").

## INTRODUCTION

Soon after Defendants purchased Fairfield Sentry shares to create their own fund of funds, Samuel Perruchoud, Defendants' Chief Investment Officer of Funds of Hedge Funds, analyzed Fairfield Sentry's detailed financial information, including its BLMIS trade confirmations from November 2004, which revealed inescapable evidence of fraud.  Upon his review, Perruchoud told his colleagues that he concluded Fairfield Sentry eventually would

"explode" because it was "not possible" to achieve the returns reported by BLMIS with such low volatility.

Due to its overall poor performance, Defendants closed its fund of funds in 2005 but chose not to redeem the Fairfield Sentry shares they had previously purchased for it. Instead, Defendants marketed the Fairfield Sentry shares to their private wealth clients. In doing so, Defendants required their clients to execute various fine print boilerplate documents to protect Defendants from any liability for losses from the Fairfield Sentry investments. Defendants also charged their clients management fees and commissions while they also received fees from a fee sharing agreement with FGG that was not disclosed to Defendants' clients. Under the fee sharing agreement, FGG paid Defendants based on the number of Fairfield Sentry shares purchased and held by Defendants on behalf of their clients.

Later, when Standard Chartered purchased American Express Bank, Arnaud Heymann, Defendants' Global Co-Head of Hedge Fund Investments, reviewed Fairfield Sentry's performance. Heymann warned another Standard Chartered executive—Robert Friedman, the Executive Director of Defendants' New York office and a member of the two committees that approved the promotion of Fairfield Sentry to Defendants' clients—that Fairfield Sentry was a "scam" and that it could "explode" at any time.

Defendants never warned their clients of their executives' conclusions that Fairfield Sentry would "explode" or was a "scam." Instead, Defendants avoided confirming or dispelling their suspicions so they could continue receiving fees from their clients and FGG for doing nothing more than funneling money to Madoff. Defendants promoted more and more Fairfield Sentry shares to their clients and ultimately became Fairfield Sentry's biggest distributor.

Leave to amend should be granted because the PAC plausibly alleges that Defendants received subsequent transfers from BLMIS while willfully blind to the fact that Madoff was not engaged in trading securities. There is also no undue prejudice, delay, or bad faith in filing the PAC. The PAC addresses a new pleading burden imposed by the district court after the Trustee filed his initial complaint. And given the numerous appeals and withdrawals of the reference, the Trustee's request to amend is timely. Accordingly, the Trustee's motion should be granted and the Trustee should be permitted to recover the subsequent transfers at issue for the benefit of the BLMIS estate.

## BACKGROUND

## I.    PROCEDURAL HISTORY

On April 26, 2012, the Trustee filed his complaint against Defendants seeking the recovery of more than $329 million of subsequent transfers of customer property.[1] At that time, the applicable standard for recovering a subsequent transfer was "inquiry notice"—whether the defendant knew or should have known of information triggering a duty to investigate, and whether diligent inquiry would have uncovered fraudulent activity. In addition, there was no duty on the Trustee to plead a subsequent transferee's lack of good faith. Instead, the burden was on the defendant to refute a showing of inquiry notice by pleading and proving the good faith affirmative defense under section 550(b) of the Bankruptcy Code.

Since then, through the collective action of hundreds of defendants in Madoff-related cases, the pleading standard for recovery of subsequent transfers has changed. In 2012, prior to filing any responsive pleading to the Trustee's Complaint, Defendants joined numerous other

---

[1] *Picard v. Standard Chartered Financial Services (Luxembourg) S.A.*, Adv. Pro. No. 12-01565 (SMB) (Bankr. S.D.N.Y. Apr. 26, 2012), ECF No. 1. References to docket entries from *Picard v. Standard Chartered Financial Services (Luxembourg) S.A.*, Adv. Pro. No. 12-01565 (SMB) (Bankr. S.D.N.Y.) shall be identified as "SC Docket."

defendants in the Trustee's adversary proceedings in moving to withdraw the reference under 28 U.S.C. § 157.[2]  The motions sought to allow the District Court to consider numerous issues involving the Trustee's claims, including whether the Trustee bears the burden of pleading lack of "good faith" under section 550(b) (the "Good Faith Issue") and whether the Trustee's claims to recover subsequent transfers are barred by the presumption against extraterritoriality (the "Extraterritoriality Issue").

In April 2014, the District Court issued its decision on the Good Faith Issue and ruled that in a SIPA proceeding, the Trustee bears the burden of pleading that both the initial and subsequent transferees willfully blinded themselves to circumstances suggesting a high probability of fraud.[3]  And in July 2014, the District Court issued its decision on the Extraterritoriality Issue and concluded that because section 550(b) does not apply extraterritorially, the Trustee must plead facts to establish that the subsequent transfers he seeks to recover are "domestic" transfers.[4]  The District Court further held that subsequent transfers received from an entity in foreign liquidation proceedings should be dismissed based on principles of international comity.[5]

Following these decisions, in December 2014, Defendants filed a motion to dismiss in this Court based on the *District Court ET Decision*.[6]  In November 2016, the Court issued its ruling on extraterritoriality[7] and subsequently dismissed the Trustee's claims against

---

[2] SC Docket (Bankr. S.D.N.Y. Aug. 16, 2012), ECF No. 29.

[3] *SIPC v. BLMIS (In re Madoff Sec.)*, 516 B.R. 18, 22–24 (S.D.N.Y. 2014) (the "*Good Faith Decision*").

[4] *SIPC v. BLMIS (In re Madoff Sec.)*, 513 B.R. 222, 232 n.4 (S.D.N.Y. 2014) ("*District Court ET Decision*").

[5] *Id.* at 231–32.

[6] SC Docket (Bankr. S.D.N.Y. Dec. 31, 2014), ECF No. 75.

[7] *See SIPC v. BLMIS (In re Madoff)*, Adv. Pro. No. 08-01789 (SMB), 2016 WL 6900689, at *36 (Bankr. S.D.N.Y. Nov. 22, 2016).

Defendants.[8]  On appeal, the Second Circuit held the Trustee's actions were not barred by the

presumption against extraterritoriality or by principles of international comity.[9]  After the

Supreme Court denied certiorari in June 2020,[10] this adversary proceeding was returned to this

Court.

## II.    THE PROPOSED AMENDED COMPLAINT

The Trustee now seeks leave to file an amended complaint to meet the new pleading

burden as required by the *Good Faith Decision*.  The Trustee's PAC alleges that Defendants

willfully blinded themselves to circumstances indicating a high probability that Madoff was not

engaged in trading securities.[11]  For the reasons set forth below, the Trustee should be permitted

to file the Amended Complaint.

## ARGUMENT

## I.    LEGAL STANDARDS GOVERNING MOTIONS TO AMEND A PLEADING

### A.    Motions to Amend a Pleading, Generally

Federal Rule of Civil Procedure 15, made applicable here by Federal Rule of Bankruptcy

Procedure 7015, provides that when a party requires leave of court to amend its pleading, "[t]he

court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Leave "should

not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-

movant, or futility."  *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing

---

[8] *Id.* at *15–16, *36-37; *see* Stipulated Final Order, SC Docket (Bankr. S.D.N.Y. March 3, 2017), ECF No. 110.

[9] *In re Picard*, 917 F.3d 85 (2d Cir. 2019).

[10] *HSBC Holdings PLC v. Picard*, No. 19-277, -- S. Ct. --, 2020 WL 2814770 (U.S. June 1, 2020).

[11] By seeking to file an amended pleading, the Trustee does not concede that the District Court's decisions regarding the pleading burden and standards for Defendants' good faith are correct.  The Second Circuit has agreed to a direct appeal of those issues. *See Picard v. Legacy Capital Ltd. (In re BLMIS)*, No. 19-4283 (2d Cir.), ECF No. 29; *Picard v. Citibank, N.A., et al. (In re BLMIS)*, No. 19-4282 (2d Cir.), ECF No. 45.  The Trustee's PAC also removes certain claims that have been resolved by the Trustee's Court-approved settlement in the case, *Picard v. Ceretti, et al. (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Aug. 6, 2019), ECF No. 417.

*Foman v. Davis*, 371 U.S. 178, 182 (1962)).  As this Court has explained, "amendments are favored because they 'tend to facilitate a proper decision on the merits.'"  *Picard v. Mendelow (In re BLMIS)*, 560 B.R. 208, 221 (Bankr. S.D.N.Y. 2016) (citations omitted).

When evaluating for futility on a motion for leave to amend, a court must determine whether the amended pleading could survive a Rule 12(b)(6) motion to dismiss.  The motion to dismiss standard under Rule 12(b)(6), made applicable to this proceeding under Federal Rule of Bankruptcy Procedure 7012, is well settled: the court "must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences" in the Trustee's favor.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  At this stage, "the issue is not whether a plaintiff will ultimately prevail but whether the [plaintiff] is entitled to offer evidence to support the claims."  *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . .  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While the plausibility test "asks for more than a sheer possibility that a defendant has acted unlawfully," it "is not akin to a 'probability requirement.'"  *Id.*; *accord Twombly*, 550 U.S. at 556.  "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible," and, for that reason, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."  *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162,

184-85 (2d Cir. 2012); *cf. Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S 308, 324 (2007)

(holding that even under the securities laws, "[t]he inference that the defendant acted with

scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of

competing inferences"). Thus, a court "may not properly dismiss a complaint that states a

plausible version of the events merely because the court finds a different version more

plausible." *Anderson News*, 680 F.3d at 185; *see also Cohen v. S.A.C. Trading Corp.*, 711 F.3d

353, 360 (2d Cir. 2013) (holding even under Rule 9(b), "*Iqbal* requires that the complaint assert

facts that plausibly support the inference of fraud. It does not require that all other conceivable

possibilities be excluded.").

The burden is on the party opposing leave to amend to demonstrate that one or more of

the grounds supporting denial exists. *See, e.g., Blagman v. Apple, Inc.*, No. 12-cv-5453 (ALC)

(JCF), 2014 WL 2106489, at *3 (S.D.N.Y. May 19, 2014) (bad faith); *Alexander Interactive, Inc.

v. Adorama, Inc.*, No. 12-cv-6608 (PKC) (JCF), 2014 WL 113728, at *3 (S.D.N.Y. Jan. 13,

2014) (futility); *Margel v. E.G.L. Gem Lab Ltd.*, No. 04-cv-1514 (PAC) (HBP), 2010 WL

445192, at *3 (S.D.N.Y. Feb. 8, 2010) (undue prejudice).

## B.    Seeking Leave on the Basis of an Intervening Change in Law

Beyond the general standard for seeking leave to amend, "[a]n intervening change in

pleading standards may justify leave to amend." *Mendelow*, 560 B.R. at 221; *see U.S. ex rel.

Maritime Admin. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 889 F.2d 1248, 1255 (2d Cir. 1989).

Here, the Trustee seeks leave to amend his Complaint on the well-accepted grounds of an

intervening change in pleading standards.

This Court has recognized that there was good cause in granting motions brought on

similar grounds to the instant motion. *See, e.g., Mendelow*, 560 B.R. at 224; *see also* Order,

*Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Mar. 17,

2014), ECF No. 99. *But see, e.g.*, *Picard v. Citibank, N.A.*, 608 B.R. 181 (Bankr. S.D.N.Y.

2019). In particular, as here, where the original complaint has grown "stale due to the unusually

drawn out procedural history" of a case, the Trustee should be permitted to add new facts and

allegations. *Grand River Enters. Six Nations, Ltd. v. Pryor*, No. 02-cv-5068 (JFK), 2008 WL

9359652, at *3 (S.D.N.Y. Mar. 17, 2008) (granting leave to add allegations related to extant

claims). Moreover, leave to amend should be permitted because this would be the Trustee's first

amendment in this action. *See United States v. A 10th Century Cambodian Sandstone Sculpture*,

No. 12-cv-2600 (GBD), 2013 WL 1290515, at *10 (S.D.N.Y. Mar. 28, 2013) (granting leave

where it was "the Government's first request to amend its complaint with facts collected

pursuant to its ongoing investigation").

## II.    **DEFENDANTS WILL NOT BE PREJUDICED BY THE PROPOSED AMENDMENT**

Prejudice turns on whether an amendment "would require the opponent to expend

significant additional resources to conduct discovery and prepare for trial or significantly delay

the resolution of the dispute." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,

626 F.3d 699, 725–26 (2d Cir. 2010) (internal quotation marks and citation omitted).

The party opposing amendment has the burden of proving that leave to amend would

result in "actual prejudice, not the possibility of prejudice." *Mendelow*, 560 B.R. at 224.

Whether a party had prior notice of the amended content and whether the amended complaint

considers the same transactions as the original pleading are central to analyzing prejudice. *See*

*M.E.S., Inc. v. Safeco Ins. Co. of Am.*, No. 10-CV-02709 (PKC)(VMS), 2014 WL 2931398, at *3

(E.D.N.Y. June 27, 2014) (granting leave to amend and rejecting the defendant's claim of

"surprise" where the proposed amended pleading "mostly elaborate[d]" on the earlier pleading);

*see also Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 262

(S.D.N.Y. 2009); 6 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal

Practice and Procedure § 1487 (2d ed. 1990) (noting that courts allow amendments when the

"opponent could not claim surprise, but effectively should have recognized that the new matter

included in the amendment would be at issue").

Granting leave to amend here would not prejudice Defendants, much less cause the undue

prejudice required to deny amendment, particularly at such an early stage in this case. *See, e.g.*,

*State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981). The PAC does not add

claims or parties, nor does it change the Trustee's approach in a way that would prejudice

Defendants. The Trustee has always sought to recover subsequent transfers from Defendants. It

is only the altered pleading standard that now necessitates the Trustee's amendment to "facilitate

a proper decision on the merits." *Mendelow*, 560 B.R. at 221.

Further, Defendants were subject to several cases filed by their private wealth clients

seeking damages for promoting Fairfield Sentry to them. The cases were transferred to the

United States District Court for the Southern District of New York by the Judicial Panel on

Multidistrict Litigation under the consolidated caption *Anwar v. Fairfield Greenwich Limited*,

Case No. 09-cv-118-VM-FM. Defendants participated in discovery, including producing

documents and having current and former employees sit for depositions.[12] In those cases,

plaintiffs alleged that defendants had fiduciary duties to their private wealth clients and violated

those duties by promoting Fairfield Sentry but not warning the clients about the information that

Defendants had uncovered about Madoff, BLMIS, FGG, and Fairfield Sentry. Given their

involvement in the *Anwar* MDL cases, Defendants have long been aware of the factual issues

now included in the PAC that are relevant to the good faith issue in this case.

---

[12] Due to confidentiality orders in the *Anwar* cases, the Trustee has not had the opportunity to review any of that evidence except for what is in the public record.

III.    **AMENDING THE COMPLAINT WOULD NOT BE FUTILE BECAUSE THE
TRUSTEE HAS ALLEGED FACTS SUFFICIENT TO SURVIVE A MOTION TO
DISMISS**

"Section 550(b) of the Bankruptcy Code provides a defense to a subsequent transferee

who '[took] for value, . . . in good faith, and without knowledge of the voidability' of the initial

transfer." *Picard v. ABN AMRO Bank N.A. (In re BLMIS)*, Adv. Pro. No. 10-05354 (SMB),

2020 WL 1584491, at *8 (Bankr. S.D.N.Y. Mar. 31, 2020) (quoting 11 U.S.C. § 550(b)(1)).  In

an ordinary case, to plead a subsequent transfer claim under section 550(a)(2) of the Bankruptcy

Code, "the Trustee must plead that the initial transfer is avoidable, and the defendant is a

subsequent transferee of that initial transferee[.]" *Id.*  The transferee then raises its affirmative

defenses under section 550(b).  *Id.*  But in this liquidation, "the Trustee must plead that (1) the

initial transfer is avoidable, and either (2) the subsequent transferee lacked good faith or

(3) received the subsequent transfer with knowledge that the initial transfer was avoidable."

*Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 196 (Bankr. S.D.N.Y. 2018).  The

allegations in the PAC satisfy each of these requirements, and the PAC is therefore not futile.

A.    **The Trustee Has Adequately Alleged that Defendants Lacked Good Faith**

To plead a lack of good faith, the Trustee must "allege that each Defendant willfully

blinded itself to facts suggesting a high probability of fraud at BLMIS." *BNP Paribas*, 594 B.R.

at 197.  Willful blindness requires the Trustee to plead that Defendant: (1) subjectively believed

there was a high probability that a fact existed; and (2) took deliberate actions to avoid learning

of that fact. *Id.* (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)).

The doctrine of willful blindness, also known as deliberate ignorance or conscious

avoidance, comes from criminal law.  *United States v. Reyes*, 302 F.3d 48, 54 (2d Cir. 2002);

*accord Picard v. Merkin*, 515 B.R. 117, 139 n.15 (Bankr. S.D.N.Y. 2014) ("*Merkin II*")

("Willful blindness is equivalent to the criminal law concept of 'conscious avoidance.'").  The

10

"ostrich instruction" is "designed for cases in which there is evidence that the defendant,

knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure

that he does not acquire full or exact knowledge of the nature and extent of those dealings."

*United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990); *see also United States v.*

*Kozeny*, 664 F. Supp. 2d 369, 388 (S.D.N.Y. 2009), *aff'd*, 667 F.3d 122 (2d Cir. 2011); *In re*

*Dreier LLP*, 452 B.R. 391, 450 (Bankr. S.D.N.Y. 2011).  As this Court has described it, willful

blindness "connotes a strong suspicion but *some* level of doubt or uncertainty of the existence of

a fact and the deliberate failure to acquire knowledge of its existence."  *Merkin II*, 515 B.R. at

140 (emphasis in original).  In deciding a motion to dismiss under Rule 12(b)(6), all reasonable

inferences must be drawn in favor of the plaintiff with respect to facts pleaded about a

defendant's knowledge or state of mind, as such elements are rarely proven by direct evidence.

*See, e.g.*, *Silverman v. A-Z Rx., LLC (In re Allou Distribs., Inc.)*, Adv. No. 04-8369-ESS, 2012

WL 6012149, at *16 (Bankr. E.D.N.Y. Dec. 3, 2012) (quoting *Silverman v. United Talmudical*

*Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*, 446 B.R. 32, 51–52 (Bankr. E.D.N.Y.

2011)).  "Obviously specific allegations of what the defendant actually knew and heard are the

most important.  But more likely, the court must rely on certain badges of scienter [where it is

alleged] that the defendant connected the dots in real time."  Transcript at 40:5-8, 24-25, *Picard*

*v. Square One Fund Ltd. (In re BLMIS)*, Adv. Pro. No. 10-04330 (SMB) (Bankr. S.D.N.Y. May

30, 2019), ECF No. 181 ("*Square One* Tr.").

Significantly, willful blindness can rarely be determined as a matter of law.  *Fish v.*

*GreatBanc Tr. Co.*, 749 F.3d 671, 685 (7th Cir. 2014) ("Consistent with these observations, we

have said that finding the line between 'willful blindness' and 'reason to know' may be like

finding the horizon over Lake Michigan in a snowstorm. . . . In other words, only rarely could

11

that line be drawn as a matter of law." (citations omitted)).  Accordingly, this Court should not prematurely determine whether Defendants were willfully blind.  Instead, it should accept the Trustee's well-pleaded allegations as true, draw all reasonable inferences in his favor, and only determine whether the PAC plausibly alleges Defendants were willfully blind.

### 1.    Defendants Subjectively Believed There Was a High Probability of Fraud at BLMIS

To satisfy the first prong of willful blindness, the Trustee must allege facts that, viewed in their totality, plausibly show that Defendants suspected BLMIS was a fraud.  *Merkin II*, 515 B.R. at 139–40.  This Court has previously held that an "objective standard of knowledge" (*i.e.*, that a transferee knew or should have known that BLMIS was a fraud) does not apply.  *Legacy*, 548 B.R. at 34.  Instead, the Trustee "must allege that the defendant discovered the red flags, *i.e.* that the defendant connected the dots in real time."  *Square One Tr.* at 40:20-25.

Based on testimony in the *Anwar* cases that was referenced in public filings,[13] two of Defendants' executives who were responsible for reviewing Fairfield Sentry, Samuel Perruchoud and Arnaud Heymann, respectively concluded that Fairfield Sentry would "explode" because its returns, as reported by BLMIS, were "not possible" or that Fairfield Sentry was a "scam."

### a.    Defendants' Review of Fairfield Sentry's November 2004 Trade Confirmations Reflected Numerous Impossible Trades Indicating There Was a High Probability Madoff Was Not Trading Securities

In December 2004, Defendants were confronted with inescapable evidence of fraud at BLMIS when their Chief Investment Officer of Funds of Hedge Funds, Samuel Perruchoud, reviewed Fairfield Sentry's November 2004 portfolio and trade confirmations, which reflected numerous impossible trades made by BLMIS.  (PAC ¶¶ 99, 126–31.)  These trade confirmations

---

[13] *Anwar v. Fairfield Greenwich Limited*, 09-cv-118-VM-FM (S.D.N.Y.).

showed (i) trades at impossible prices outside of the daily trading range all in Madoff's favor (PAC ¶ 126), (ii) daily options trading that impossibly exceeded the total volume on the exchange on which they were purportedly made (PAC ¶¶ 127-28), and (iii) receipt of multiple dividend payments within the month when such payments are only made once in any given month. (PAC ¶ 129.) Significantly, each of these trading impossibilities increased the investment return that BLMIS reported to Fairfield Sentry, which in turn increased Fairfield Sentry's assets under management and the fees that FGG shared with Defendants. (PAC ¶¶ 126-29.)

Shortly after reviewing these trade confirmations, Perruchoud warned his colleagues that Fairfield Sentry would "explode" and that it was "not possible [for Fairfield Sentry] to achieve such high returns with such low volatility." (PAC ¶ 99.) Perruchoud's reaction demonstrates that he "saw and appreciated" the significance of the impossibilities reflected in the November 2004 trade confirmations. *See Merkin II*, 515 B.R. at 141 (finding willful blindness where defendant "saw and appreciated" quantitative facts including that the purported volume of option transactions was impossible); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 408-11 (S.D.N.Y. 2010) (scienter adequately pleaded in complaint that alleged defendants had access to and reviewed BLMIS trade confirmations and other documents reflecting trading impossibilities and other indicia of fraud). The PAC, therefore, plausibly alleges that Perruchoud "connected the dots in real time" between these impossibilities and the other evidence of fraud to form the strong suspicion that Madoff was not trading securities. *Square One* Tr. at 40:20-25.

### b.    Another Executive Concluded Fairfield Sentry Was "a Scam" that Could "Explode" at Any Time

Defendants' views as to Madoff's illegitimacy remained consistent up until the public revelation of the fraud. In 2008, Arnaud Heymann strongly suspected that Madoff was not

engaged in trading securities. Based on information provided to him by FGG that he reviewed in

his position as the Global Co-Head of Hedge Fund investments for Defendants, Heymann

similarly told his boss, Robert Friedman, that Fairfield Sentry was "a scam" that could "explode"

at any time. (PAC ¶¶ 101, 138.) Like Perruchoud, both Heymann and Friedman were

executives intimately involved with Defendants' promotion of Fairfield Sentry shares to

Defendants' clients. Heymann was a Senior Director who participated in the quarterly Client

Investment Committee meetings that discussed Fairfield Sentry. (PAC ¶ 100.) Friedman was

the Executive Director of Defendants' New York office, the head of the Global Investment

Group, which was responsible for due diligence on Fairfield Sentry and BLMIS, and a member

of both the Client Investment and the Product Approval Committees, the two committees that

approved the promotion of Fairfield Sentry to Defendants' clients. (PAC ¶¶ 96-97.)

### c. Defendants Recognized Other Specific Risks of Investing with Madoff

Even prior to purchasing Fairfield Sentry shares, Defendants recognized investing with

single-manager hedge funds like Fairfield Sentry "entails significant 'manager risk'" relating to

the "integrity of the underlying managers themselves"—namely Madoff. (PAC ¶ 114.) Beyond

this general risk, Defendants were aware of the specific risks relating to Madoff based on

reported: (i) doubts that the investment industry had about BLMIS's investment returns,

(ii) concerns that Madoff was not investing as he purported to, and (iii) questions about Madoff's

willingness to forego large investment fees that he inexplicably allowed the managers of BLMIS

feeder funds, like FGG, to collect even though they provided no investment adviser services.

(PAC ¶¶ 109-11.) Defendants recognized that FGG collected these fees even though it was not

acting as an investment manager, but, as they put it, was merely "a marketing organization that

distributes private labeled hedge funds to institutional clients." (PAC ¶ 167.) In fact, Defendants

later took advantage of the unusual fee arrangement by obtaining an agreement with an FGG entity to share the fees it charged Fairfield Sentry.

Defendants also knew there was no independent verification that Madoff had the assets he purported to custody or trade as he reportedly did because BLMIS simultaneously acted as the investment manager, custodian, and executing broker for the BLMIS Feeder Funds.  (PAC ¶¶ 6, 89, 108.)  For example, one client questioned the safety of the assets being held by BLMIS as there was no independent custodian to verify the existence of the assets nor an independent broker to confirm the legitimacy of the reported trades.  (PAC ¶ 132.)  Defendants recognized and understood that this consolidation of responsibilities contradicted industry norms that promote independent verification of reported assets and trades to address this conflict of interest that allows for misappropriation of assets.  (PAC ¶¶ 6, 89, 113.); *see Square One* Tr. at 42:1-6 (recognizing that self-custody "is always a concern because it increases the chance for fraud").

When approving Fairfield Sentry and two other non-Madoff FGG funds for their own fund of funds, Defendants pointed out that, unlike Fairfield Sentry, the other two non-Madoff FGG funds had independent prime brokers.  (PAC ¶ 113.)  Courts have found scienter adequately pleaded in related proceedings where a defendant raised "critical questions" about risk at BLMIS, including issues that "went to the heart of Madoff's Ponzi scheme because they concerned the existence of the assets supposedly held by Madoff, Madoff's self-custody and Madoff's secrecy."  *See, e.g.*, *In re Optimal U.S. Litig.*, No. 10-cv-4095 (SAS), 2011 WL 4908745, at *7 (S.D.N.Y. Oct. 14, 2011).

Defendants also knew that Madoff purportedly traded "15% of the volume of listed stocks in the US" but refused to meet with financial institutions for due diligence purposes. (PAC ¶ 112.)  Defendants' knowledge of the lack of independent verification and their own

inability to meet with Madoff to conduct due diligence directly on BLMIS pursuant to their own standard procedures (PAC ¶ 123) contextualizes their suspicion and response as they repeatedly were confronted with additional evidence of fraud at BLMIS.  (PAC ¶¶ 135-85.)

> **d.** **Defendants' Clients Repeatedly Questioned the Existence of Their Assets and the Legitimacy of BLMIS's Reported Trades**

Defendants' clients also repeatedly raised serious questions and concerns about BLMIS that Defendants were unable to adequately address based on their admittedly limited due diligence of BLMIS which did not fulfill their standard procedures.  (PAC ¶¶ 7, 89, 119, 132-33.)  For example, one client questioned how Fairfield Sentry made its large options trades at a time when most financial institutions were reluctant to trade with each other.  (PAC ¶ 133.) Questions from clients were circulated amongst Defendants, leading at least one salesperson to stress to his supervisor that Defendants needed to "know a lot more about the[] risk management / compliance procedures in place" for FGG and BLMIS and that Defendants should verify the existence of their clients' investments in Fairfield Sentry.  (PAC ¶ 133.)  These were "critical questions" that Defendants saw and heard that "went to the heart of Madoff's Ponzi scheme." *See In re Optimal U.S. Litig.*, 2011 WL 4908745, at *7.  Yet, Defendants did not conduct a meaningful review of BLMIS to accurately respond to these questions and instead answered these pointed inquiries with canned responses from FGG, containing statements they knew to be incorrect.  (PAC ¶ 133.)

> **2.** **The Trustee Sufficiently Pleads that Defendants Deliberately Avoided Confirming BLMIS's Fraud**

The well-pleaded allegations in the PAC also establish the second prong of willful blindness.  "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *New York v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 667 (S.D.N.Y. 2017)

(citations omitted). Importantly, "the standard does not require proof of an identifiable 'affirmative act'" and merely refers to a requisite state of mind. *Id.*; *see also United States v. Fofanah*, 765 F.3d 141, 150 (2d Cir. 2014) (Leval, J., concurring) ("Our statements that the evidence must support a finding that the defendant 'consciously' or 'deliberately' avoided referred to a requisite state of mind, not to a need for affirmative acts," and "finding that a defendant's ignorance of incriminating facts was a conscious choice on the defendant's part in no way requires a finding that the defendant took affirmative steps to avoid gaining the knowledge.").

Defendants consciously avoided confirming that Madoff was not engaged in trading securities. When Perruchoud was confronted with evidence of fraud at BLMIS, Defendants did not investigate further. Instead, Defendants shut down the Concentrated Elite Fund in 2005, held on to the Fairfield Sentry shares, and promoted them to their clients for investment so they could share in the management fees charged by FGG to Fairfield Sentry for doing nothing more than funneling their money to Madoff. (PAC ¶¶ 192-94.) Defendants ultimately became the biggest distributor of Fairfield Sentry. *See Square One* Tr. at 43:12-13, 20-23 (denying motion to dismiss where defendants "earn[] management fees based on amounts ostensibly invested with [a BLMIS feeder fund], although [the fund] was not doing any managing except for turning over [its] investors' monies to Madoff").

### a. Defendants Admitted to Performing Limited Initial Due Diligence on BLMIS

Defendants admitted to performing "limited" due diligence because they did "not have access to Madoff for due diligence purposes" (PAC ¶ 89) prior to the approval of Fairfield Sentry by both the Product Approval Committee for an investment by the Concentrated Elite Fund (PAC ¶ 93) and the Client Investment Committee for promotion to clients as a third-party

investment product.  (PAC ¶ 92.)  In both instances, the Global Investment Group, which was

charged with conducting due diligence on Fairfield Sentry and BLMIS, prepared reports

recommending that each committee approve Fairfield Sentry for promotion to Defendants'

clients.  (PAC ¶¶ 114, 117.)

Friedman led the Global Investment Group and was a member of the Product Approval

Committee when Perruchoud presented the report recommending Fairfield Sentry to the Product

Approval Committee.  (PAC ¶ 114.)  In that January 2003 report, Friedman and Perruchoud

emphasized how attractive Fairfield Sentry would be to Defendants' clients.  (PAC ¶ 114.)

The Global Investment Group then piggy-backed this limited due diligence to

recommend Fairfield Sentry to the Client Investment Committee in September 2003. (PAC

¶ 117.)  That report was authored by Friedman, who was also a member of the Client Investment

Committee, and Joseph Hardiman, who was a member of the Global Investment Group and at

that time its Senior Director of Hedge Fund Products was also present at the January 2003

Product Approval Committee meeting that approved Fairfield Sentry.  (PAC ¶ 92.)  Despite the

Global Investment Group's inability to conduct its standard due diligence on Fairfield Sentry,

Friedman and Hardiman's report falsely stated that the Global Investment Group had conducted

a "full due diligence review" of Fairfield Sentry and BLMIS.  (PAC ¶ 118.)

Yet, in a January 2004 email, Perruchoud noted to Friedman and Hardiman that, as they

were likely aware, the Global Investment Group's due diligence on Fairfield Sentry was

"limited" because they did "not have access to Madoff for due diligence purposes."  (PAC ¶ 89.)

This limited due diligence deviated from Defendants' standard practices, which "demand[ed] full

transparency" and required face-to-face visits and interviews with the underlying investment

managers—in this case, Madoff.  (PAC ¶ 87.)  As a result, Defendants were unable to

independently verify the existence of their clients' assets and the legitimacy of the trades that

Madoff claimed to make.  As described above, these were specific risks of Madoff not trading

securities presented by the evidence Defendants saw and appreciated prior to purchasing

Fairfield Sentry shares.  *See Square One* Tr. at 42:1-6 (recognizing that self-custody "is always a

concern because it increases the chance for fraud").

> **b.**    **After Recognizing that Fairfield Sentry Would "Explode"**
> **Because Its Returns Reported by BLMIS Were Not Possible**
> **Defendants Turned a Blind Eye to Continue Promoting**
> **Fairfield Sentry for Fees from Their Clients and FGG**

After Perruchoud reviewed Fairfield Sentry's November 2004 trade confirmations that

showed impossible trades, he concluded that Fairfield Sentry would "explode" because it was

"not possible [for Fairfield Sentry] to achieve such high returns with such low volatility."  (PAC

¶ 99.)  Perruchoud's words echoed the very risk of "a manager blowing up" that he and Friedman

cautioned in their report recommending Fairfield Sentry to Defendants' Product Approval

Committee.  (PAC ¶ 114.)  Defendants' actions from that point forward demonstrate that they

took deliberate steps to avoid confirming their strong suspicions that Madoff was not trading

securities.  *See Square One* Tr. at 42:16-18 ("The 2003 events involving the diligence officer

give me more pause, not just because of what Estenne learned, but also because of what he

did.").

Like Square One's investment adviser, Defendants were composed of "highly-qualified

investment professional[s]" who "did not bother to conduct any further due diligence regarding

BLMIS" so as to continue to "earn[] management fees based on amounts ostensibly invested

with [a BLMIS feeder fund], although [the fund] was not doing any managing except for turning

over [its] investors' monies to Madoff."  *Id.* at 35:23, 43:12-13, 20-23.  Defendants did not

immediately demand to meet with Madoff.  Nor did they increase their due diligence efforts to

protect against being invested in BLMIS when it blew up as Friedman and Perruchoud had noted in their report to the Product Approval Committee, as Perruchoud and later Heymann both concluded would happen, and as Heymann warned Friedman would happen. (PAC ¶¶ 99, 101, 114, 138.)

Instead, Defendants shut down their Concentrated Elite Fund in 2005, held on to the Fairfield Sentry shares, and promoted those shares to their clients for investment. Defendants recommended and sold the shares to their private wealth clients so Defendants could share in the management fees that FGG charged Fairfield Sentry for doing nothing more than funneling their money to Madoff. (PAC ¶¶ 192-94.) Over time, Defendants promoted more and more Fairfield Sentry shares to their clients and ultimately became the biggest distributor of Fairfield Sentry. (PAC ¶ 182.)

In doing so, Defendants structured their promotion of Fairfield Sentry so their clients' shares were unknowingly held by the clients in non-discretionary accounts (PAC ¶¶ 192-94), thereby eliminating Defendants' risk while continuing to receive fees from both their clients and FGG. *Square One* Tr. at 41:10-15 ("[I]t is more plausible that a professional who reaps substantial management and/or performance fees from the investment of others in BLMIS feeder fund without risking his own money will be willing to overlook evidence that BLMIS's trades are likely fictitious.").

All the while, Defendants overlooked the inescapable evidence of fraud and did not bother to conduct meaningful due diligence on BLMIS even though their standard practices required that they do so for underlying investment managers and custodians, like BLMIS. (PAC ¶ 87.) As they had from the beginning, Defendants instead focused on Fairfield Sentry's steady returns that helped them promote Fairfield Sentry to their clients. (PAC ¶ 117.) And when their

20

own clients raised "critical questions" that "went to the heart of Madoff's Ponzi scheme," *In re Optimal U.S. Litig.*, 2011 WL 4908745, at *7, Defendants answered them with canned responses from FGG containing statements they knew to be incorrect. (PAC ¶ 133.) Defendants did this even though they owed a duty to their clients as their investment professionals to provide accurate information. *See Square One* Tr. at 40:12–13 ("[W]illful blindness will be inferred when defendant . . . shielded Madoff from third-party inquiries.").

### c.    Defendants' Perfunctory Meeting with Madoff After Their Acquisition by Standard Chartered

Prior to acquiring Defendants in February 2008, Standard Chartered PLC had conducted its own due diligence on certain BLMIS-related investment products and based on that due diligence did not pursue any of them. (PAC ¶ 181.) After the acquisition, Standard Chartered PLC insisted that the Global Investment Group meet with Madoff to comply with Defendants' own due diligence requirements because they had never met with Madoff after over nearly five years of promoting BLMIS through Fairfield Sentry. (PAC ¶ 182.) On April 15, 2008, Friedman and two other members of the Global Investment Group met with Madoff and two FGG partners at BLMIS's office in New York. (PAC ¶ 183.) During this meeting, Madoff provided Defendants with information that directly contradicted public information and information that FGG had previously reported about BLMIS. (PAC ¶ 183.) For example, although BLMIS's Form ADV as of December 2007 reported that it had $17.1 billion in assets under management, Madoff claimed that he managed between $20 and $50 billion and that the outsized amount of assets under management was not causing diminished returns. (PAC ¶ 183.) Yet, during their brief meeting with Madoff, Defendants did not challenge his representations or ask the critical questions that their clients posed about the existence of their assets and the legitimacy of Madoff's reported trades. (PAC ¶ 185.) *See Merkin II*, 515 B.R. at 141 (holding

complaint adequately alleged Merkin "took deliberate actions to avoid learning the truth about

BLMIS" by, for example, "not press[ing]" Madoff to answer questions).  Instead, Defendants

used the meeting to paper their own compliance record without any meaningful review or

oversight of Madoff so they could continue to receive lucrative fees.  (PAC ¶ 185.)

All of Defendants' actions point to one conclusion: they made a conscious choice to

neither confirm nor dispel their and/or their clients' suspicions regarding Madoff and whether he

was actually trading securities.

### B. The Knowledge of Perruchoud, Heymann, and Friedman Is Imputed to Each of the Defendants, Which Acted Collectively as One Business

Perruchoud served as Defendants' Chief Investment Officer of Funds of Hedge Funds

and the Global Investment Group member primarily responsible for conducting due diligence on

Fairfield Sentry that was reported to the Client Investment Committee, Product Approval

Committee, and Risk Management Committee.  (PAC ¶¶ 90-95, 98.)  As such, his knowledge of

this inescapable evidence of fraud and his subjective belief of a high probability that Madoff was

not engaged in trading securities should be imputed to each Defendant.  *See, e.g.*, *Baker v.

Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) (holding "knowledge of a

director, officer, sole shareholder or controlling person of a corporation is imputable to that

corporation"); *Mendelow*, 560 B.R. at 228-29 (imputing knowledge of a corporate officer to the

corporation); *Patel v. L-3 Commc'ns Holdings Inc.*, No. 14-cv-6038-VEC, 2016 WL 1629325, at

*12-15 (S.D.N.Y. Apr. 21, 2016) (same); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,

874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) ("Courts routinely impute to the corporation the intent

of officers and directors acting within the scope of their authority.").  Like Perruchoud, and

based on their roles, Heymann's and Friedman's knowledge and subjective beliefs of a high

probability of Madoff not trading securities also must be imputed to each Defendant.  *See, e.g.*,

*Mendelow*, 560 B.R. at 228-29; *Patel*, 2016 WL 1629325, at *12–15; *Pa. Pub. Sch. Emps.' Ret. Sys.*, 874 F. Supp. 2d at 363.

The PAC describes in detail how, both before and after their acquisition by Standard Chartered Bank, Defendants collectively acted as one business using the marketing name American Express Bank ("AEB").  (PAC ¶¶ 81-83.)  For example, the Global Investment Group, Client Investment Committee, Product Approval Committee, and Risk Management Committee were each composed of members from different offices all operating together to serve Defendants' institutional, high net worth, and retail clients.  (PAC ¶¶ 84-103.)  Because these operations remained the same throughout the relevant time period (PAC ¶ 82), the knowledge of each Defendant may be imputed to the other Defendants as each other's agents.  *See Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 689 n.9 (2d Cir. 1983) ("It is a basic tenet of the law of agency that knowledge of an agent, or for that matter a partner or joint venturer, is imputed to the principal."); *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 590 (S.D.N.Y. 2007) ("Knowledge of a joint adventurer is imputed to its co-adventurers.").  In any event, given their highly fact-specific nature, questions of imputation are not generally decided as a matter of law prior to discovery.  *See, e.g.*, *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1312 (S.D.N.Y. 1996) (holding imputation of director's knowledge to company "a matter of fact that cannot be determined on a motion to dismiss"); *see also Picard v. Merkin (In re BLMIS)*, 440 B.R. 243, 260 (Bankr. S.D.N.Y. 2010) ("At the motion to dismiss stage, where the Trustee has not had the opportunity to conduct discovery concerning the relationships between the Moving Defendants, the question is not whether [the Trustee] ha[s] proved the existence of an agency relationship, merely whether [he] should have the chance to do so." (internal quotation omitted)).

### C.   Fairfield Sentry's Managers Had Actual Knowledge that Madoff Was Not Trading Securities Or, At A Minimum, Were Willfully Blind To Madoff's Fraud

The PAC alleges the avoidability of the initial transfers to the Fairfield Funds because the PAC, which incorporates the Second Amended Complaint against the FGG defendants (the "FSAC"),[14] alleges that the Fairfield Funds, through their managers and the FGG partners, had actual knowledge that Madoff was not trading securities. Alternatively, the PAC alleges that the Fairfield Funds, through their managers and FGG partners, were willfully blind to Madoff's fraud.

No investment firm in BLMIS's infamous history was more intertwined with Madoff than FGG. (FSAC ¶ 1) Madoff needed FGG's international connections and the billions of dollars it collected from FGG investors to sustain the Ponzi scheme. (FSAC ¶ 1.) The FGG partners needed Madoff to grow their spectacular wealth and support their extravagant lifestyles. (FSAC ¶¶ 1, 5-6.) As one founding partner admitted, his goal was to live better than any of his clients. (FSAC ¶ 7.) The FGG partners were paid handsomely for their efforts—receiving hundreds of million dollars in fees. (FSAC ¶ 333.) Thus motivated, the FGG partners worked with Madoff to hide his fraud. (FSAC ¶¶ 151-56, 165-67, 186, 236-62.)

In 1990, FGG incorporated Fairfield Sentry as its first BLMIS feeder fund. (FSAC ¶ 88.) To comport with Madoff's demands, Fairfield Sentry ceded control of all investment decisions to BLMIS. (FSAC. ¶¶ 91-92.) FGG further arranged for Citco Global Custody N.V. to be listed as

---

[14] In July 2010, the Trustee filed an Amended Complaint against Fairfield Sentry Limited, Fairfield Lambda Limited, Fairfield Sigma Limited (collectively, the "Fairfield Funds"), and other defendants to avoid and recover over $3 billion of initial transfers of BLMIS customer property. *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y.), ECF 23. In May 2011, the Trustee settled with the Fairfield Funds, through their liquidators, *id.*, ECF 69-2, and on August 28, 2020, the Trustee filed the FSAC against certain FGG partners and related FGG entities. *Id.*, ECF 286.

Fairfield Sentry's purported custodian, with the understanding that Citco would hold that position in name only, because all custodial duties were delegated to BLMIS. (FSAC ¶ 91.)

Over the course of Fairfield Sentry's investments with BLMIS, FGG reviewed customer statements, trade tickets, and other information from BLMIS that reflected obvious trading impossibilities and other indications of BLMIS's fraud. (FSAC ¶¶ 137, 142-45, 271, 287, 296, 307.) In 1990, FGG hired Gil Berman, a former options trader, as an independent contractor to analyze BLMIS's trading activity. (FSAC ¶ 143.) Beginning in the mid-1990s, Berman recognized trading impossibilities on Fairfield Sentry's account statements. (FSAC ¶¶ 144, 285-87.) Berman informed FGG that prices BLMIS reported were above the highest trading prices reported for the day, which was impossible. (FSAC ¶ 145.) Over the years, Berman informed FGG that BLMIS's reported options trades were "unusual and difficult to explain" and inconsistent with the SSC Strategy. (FSAC ¶ 285.) By 2008, Berman was pleading with FGG to investigate BLMIS's purported options trades. (FSAC ¶ 283.) Berman even discussed with Amit Vijayvergiya, FGG's partner and Chief Risk Officer, that Madoff could be backdating trade confirmations. (FSAC ¶ 287.)

FGG's knowledge that BLMIS purported to trade securities outside their reported price ranges was further confirmed by a prominent investment consultant. (FSAC ¶¶ 308-12.) In May 2005, Vijayvergiya received a report authored by Prime Buchholz & Associates analyzing trades BLMIS purportedly made on April 6, 2004. (FSAC ¶ 309.) The report noted that "in 27 out of 38 trades placed on April 6, 2004, Madoff Securities posted purchases below the reported lowest price available on the exchange that day." (FSAC ¶ 310.) Vijayvergiya ignored BLMIS's inexplicable pricing, writing to a co-worker, "feel free to file this under 'completely useless'…" (FSAC ¶ 312.)

In 2001 MAR/Hedge and Barron's published articles that openly questioned BLMIS's legitimacy.  (FSAC ¶¶ 132-34.)  Following publication, Citco, FGG's agent and custodian, acknowledged grave doubts about Madoff and feared that its risk exposure was approximately $3 billion, which was the full amount of Fairfield Sentry's investments with BLMIS.  (FSAC ¶¶ 138-39.)  In response, FGG arranged a site visit to BLMIS with procedures agreed upon in advance to confirm the existence of Fairfield Sentry's assets.  (FSAC ¶ 140.)  But when the visit finally took place, the agreed upon procedures were ignored.  (FSAC ¶ 140.)  Citco was forbidden to review BLMIS's back office, interview certain BLMIS employees, or perform other basic procedures.  (FSAC ¶ 140.)  Nor was Citco given "evidence about the existence of the US T bills (e.g., stock record reconciliation / clearing confirmation)," as they had requested.  (FSAC ¶ 140.)  In short, Citco was unable to verify the existence of Sentry's assets, which it purportedly held as Fairfield Sentry's custodian.  (FSAC ¶¶ 140-41.)  According to Citco, the site visit was a failure.  (FSAC ¶ 140.)  Over the next six years, FGG never took any steps to confirm the existence of Fairfield Sentry's assets with BLMIS.  (FSAC ¶¶ 148, 167, 213, 226, 229-34.)

In an example of FGG's complicity in Madoff's Ponzi scheme, FGG lied to the SEC about BLMIS to protect Madoff from scrutiny.  (FSAC ¶¶ 233-62.)  In 2005, FGG became aware of an SEC investigation into the trading practices of certain BLMIS feeder funds for potential violations of federal securities laws.  (FSAC ¶ 238.)  After the SEC contacted FGG to schedule a meeting, Madoff spoke with Vijayvergiya and Mark McKeefry, FGG's Chief Legal Officer, to plan what they would tell the SEC.  (FSAC ¶¶ 238-41.)  Madoff began by stating: "Obviously, first of all, this conversation never took place."  (FSAC ¶ 242.)  Madoff then coached Vijayvergiya and McKeefry how to obfuscate BLMIS's role with regard to the Fairfield Funds.  (FSAC ¶¶ 243-53.)  For example, Madoff told them to tell the SEC that BLMIS was merely the

26

Fairfield Funds' executing broker that took orders from FGG.  (FSAC ¶¶ 245-47.)  This was

false.  Madoff also reviewed the notes FGG had drafted for the SEC meeting and edited the

remarks FGG planned to deliver.  (FSAC ¶ 252.)  The SEC meeting occurred in December 2005,

and Vijayvergiya and McKeefry performed as instructed, telling the SEC that an FGG affiliate—

not BLMIS—made investment decisions for the Fairfield Funds.  (FSAC ¶¶ 254-56.)  They said

nothing about Madoff's extensive coaching prior to the meeting.  (FSAC ¶ 258.)  And when

asked by the SEC whether they had spoken to Madoff in advance, they lied and said that their

conversation had been "mostly in regards to reproducing binders."  (FSAC ¶ 257.)

Another example of FGG's complicity concerns Friehling & Horowitz.  (FSAC ¶¶ 188-

213.)  FGG knew that Friehling & Horowitz was not certified to perform audits by the American

Institute of Certified Public Accountants.  (FSAC ¶ 189.)  Nevertheless, FGG represented to

clients that Friehling & Horowitz audited BLMIS, an impossibility.  (FSAC ¶ 189.)  When

pressed, FGG told at least one investor that PricewaterhouseCoopers audited BLMIS's returns

(while acknowledging internally that this was a lie).  (FSAC ¶ 193.)  FGG told other investors—

as Madoff had instructed—that Friehling & Horowitz was a large, reputable firm with hundreds

of clients.  (FSAC ¶¶ 192, 201.)  FGG knew this too was a lie.  (FSAC ¶ 201.)  FGG's founding

partner, Jeffrey Tucker, had a Dun & Bradstreet report, which FGG had requested, that showed

Friehling & Horowitz had only one employee, receipts of a mere $180,000, and operated out of

Mr. Friehling's home.  (FSAC ¶ 204.)

FGG touted its sophisticated due diligence practices, but by its own admission, FGG did

not apply them to BLMIS.  (FSAC ¶¶ 142, 148-49, 157.)  For example, although FGG claimed

its due diligence practices would have uncovered the Bayou Ponzi scheme, FGG declined to

apply those standards to BLMIS—even as FGG recognized the similarities between BLMIS and

Bayou in that both used an obscure and unqualified auditor, had a fee structure contrary to industry standard, and lacked independent service providers. (FSAC ¶¶ 196-200, 207-10, 214-19.) After dismissing investor concerns about BLMIS and Bayou, an FGG employee joked with Vijayvergiya about the obvious similarities between the two frauds. (FSAC ¶ 199.) For FGG, concerns about BLMIS were a branding, as opposed to, a diligence issue. (FSAC ¶¶ 145, 156, 168, 210.)

In sum, and as further alleged in the FSAC, the Fairfield Funds knew that BLMIS was not trading securities. They knew BLMIS's returns could not be the result of the SSC Strategy. (FSAC ¶¶ 9, 281-89.) They knew BLMIS's equities and options trading volumes were impossible. (FSAC ¶¶ 278-80, 290-97.) They knew that BLMIS reported impossible, out-of-range trades, which always were in Madoff's favor. (FSAC ¶¶ 145, 307-13.) They knew Madoff's auditor was not certified and lacked the ability to audit BLMIS. (FSAC ¶¶ 188-213.) They knew BLMIS did not use an independent broker or custodian. (FSAC ¶¶ 22-35.) They knew Madoff refused to identify any of BLMIS's options counterparties. (FSAC ¶¶ 165, 264-65, 287, 298-300.) They knew Madoff lied about whether he traded options over the counter or through an exchange. (FSAC ¶¶ 303-06.) They knew their clients and potential clients raised numerous due diligence questions they would not and could not answer. (FSAC ¶¶ 156, 165-69, 175-83, 186-87, 190, 200-03, 223-26, 229-30, 233.) They knew Madoff refused to provide them with honest answers to due diligence questions because it would have confirmed the details of his fraud. (FSAC ¶¶ 192, 265, 298-299, 303-05.)

### D.    The Initial Transfers from BLMIS to Fairfield Sentry Are Avoidable

The PAC alleges the avoidability of the initial transfers from BLMIS to the Fairfield Funds because the FSAC alleges facts showing that the Fairfield Funds knew that BLMIS was not trading securities. In *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB), 2015

WL 4734749, at *14-15 (Bankr. S.D.N.Y. Aug. 11, 2015) ("Kingate"), the Court found

defendants had actual knowledge of Madoff's fraud where they deliberately prevented access to

Madoff, deflected investors' inquiries, and ignored warnings of fraud brought by their own

agents. *Kingate*, 2015 WL 4734749, at *14; *see also id.* at *5 (finding actual knowledge based

on defendants' statements about BLMIS that were "plainly made up, intended to soothe

shareholder anxieties, and did not result from any investigation or inquiry").  Like *Kingate*, FGG

blatantly lied to third parties—including the SEC—to prevent further inquiry into Madoff.

(FSAC ¶¶ 155, 158-59, 165-67, 175, 186, 189, 193-94, 201, 212, 224, 228, 230, 242, 255-58,

266, 268, 297.); *see also* Transcript at 55:20-23, *Picard v. Alpha Prime Fund Ltd. (In re BLMIS)*,

Adv. Pro. No. 09-01364 (SMB) (Bankr. S.D.N.Y. Sept. 19, 2019), ECF 569 (finding directors

and service providers "deflected inquiries and provided false information" to mitigate concerns

about BLMIS); *Anwar*, 728 F. Supp. 2d at 407 (finding FGG defendants "engaged in deliberately

illegal behavior by attempting to stymie a SEC investigation into Madoff's operation").  FGG

also ignored its own diligence and warnings from its own agents that Madoff's trades were

impossible.  (FSAC ¶¶ 137, 142-45, 271, 274-75, 278-79, 283-88, 292-96, 303.)  As in *Kingate*,

the FSAC pleads actual knowledge because the allegations in the FSAC "paint a picture of a

sophisticated financial professional who knew that Madoff was reporting fictitious transactions

and took steps to prevent any inquiry."  2015 WL 4734749, at *15.

Alternatively, the FSAC plausibly alleges that the Fairfield Funds were willfully blind to

BLMIS's fraud.  As in *Merkin*, FGG saw various warning signs indicating that BLMIS was a

fraud, which this Court has held is sufficient to allege the first prong of willful blindness.

*Merkin*, 515 B.R. at 141.  For example, the Trustee alleges that FGG appreciated the

impossibilities of BLMIS's purported trading activities.  (FSAC ¶¶ 137, 142-45, 271, 287, 296,

307.)  FGG knew that the volume of trades reported by BLMIS were impossible.  (FSAC ¶¶ 278-86, 290-97.)  And, FGG knew it was impossible for Friehling & Horowitz to audit BLMIS. (FSAC ¶¶ 188-213.)

The FSAC also plausibly alleges the second prong of willful blindness.  *See Anwar*, 728 F. Supp. 2d at 411 ("Defendants' 'fraud alert' should have been flashing red.  A fair inference that flows from the facts alleged is that if they failed to see the perceptible signs of fraud, it may have been because they chose to wear blinders.").  The FGG partners had a close relationship and special access to Madoff and BLMIS.  (FSAC ¶¶ 1-3.)  They referred to Madoff as "Uncle Bernie" and attended birthdays, anniversaries, retirements, holidays, yacht trips, and vacations in exotic locales with him.  (FSAC ¶¶ 1-3.)  Despite their close relationships, as in *Merkin*, the FGG partners refused to ask Madoff hard questions that might confirm and expose the fraud, and instead focused on appeasing Madoff, finding more investors, and earning more fees.  *Merkin*, 515 B.R. at 128; (FSAC ¶¶ 192, 265, 289-90, 303-05.).  Not only did the FGG partners deliberately take steps to avoid exposing the truth about BLMIS, they prevented others from doing so as well, including the SEC.  (FSAC ¶¶ 155, 158-59, 165-67, 175, 186, 189, 193-94, 201, 212, 224, 228, 230, 242, 255-58, 266, 268, 297.)

In summary, the initial transfers from BLMIS to the Fairfield Funds are avoidable.

## IV.    **THE TRUSTEE HAS NOT ACTED WITH UNDUE DELAY OR BAD FAITH**

The mere passage of time, in the absence of bad faith, does not warrant a denial of leave to amend.  *See, e.g.*, *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 333 (2d Cir. 2000); *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d Cir. 1995); *Block v. First Blood Assocs.*, 988 F.2d 344, 350–51 (2d Cir 1993); *Margel*, 2010 WL 445192, at *10–11.  This factor largely turns on whether the party acted in good faith during the delay, rather than the length of the delay.  *Commander Oil Corp.*, 215 F.3d at 333.  "Delay is rarely fatal to a Rule 15

motion if it can be explained." *Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*, No. 13 Civ. 1654 (RA) (HBP), 2015 WL 4097927, at *7 (S.D.N.Y. July 6, 2015).

The Trustee has acted in good faith and has not delayed in seeking leave to amend. Between April 2012 and now, the Trustee has actively litigated case-wide issues of law pertaining to this proceeding, including the good faith standard and the extraterritorial application of SIPA without any opportunity to amend his Complaint to comply with the new pleading standards issued by the District Court after he filed his Complaint.

The timing of the Trustee's request merely reflects the complex procedural history of this proceeding. This Court found in *Mendelow* that the dramatic change in the legal landscape, spanning several years, "explains the delay in moving for leave to amend." *Mendelow*, 560 B.R. at 223. "The Trustee should not be penalized, and the defendants should not be rewarded for a delay in which everyone acquiesced." *Id.*

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that this Court grant his motion for leave to file his Amended Complaint.

Dated: October 14, 2020
New York, New York

By:   /s/*David J. Sheehan*

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:   212.589.4200
Facsimile:   212.589.4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Thomas L. Long
Email: tlong@bakerlaw.com
Robertson D. Beckerlegge
Email: rbeckerlegge@bakerlaw.com
Jonathan A. Forman
Email: jforman@bakerlaw.com

**Baker & Hostetler LLP**
200 Civic Center, Suite 1200
Columbus, Ohio 43215
Telephone:   (614) 228-1541
Facsimile:   (614) 462-2616
Damon M. Durbin
Email: ddurbin@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and the Estate
of Bernard L. Madoff*