**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and for the Estate of Bernard L. Madoff, <br><br> Plaintiff, <br><br> v. <br><br> BAM L.P., MICHAEL MANN, and MERYL MANN, <br><br> Defendants. | Adv. Pro. No. 10-04390 (CGM) |

<u>**PLAINTIFF IRVING H. PICARD'S POST-TRIAL PROPOSED**</u>
<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

## TABLE OF CONTENTS

                                                                                    **Page**

I.    PROPOSED FINDINGS OF FACT ........................................................................1

    A.    Procedural History ............................................................................................1

    B.    Motions in Limine............................................................................................6

    C.    Trial..................................................................................................................6

    D.    Corporate Form of Bernard L. Madoff Investment Securities LLC ......................8

    E.    The IA Business's Bank Accounts ...................................................................12

    F.    Analyses of Defendants' Accounts..................................................................18

II.   EXHIBITS .........................................................................................................19

    A.    Exhibits Admitted............................................................................................19

    B.    Expert Reports .................................................................................................24

III.  PROPOSED CONCLUSIONS OF LAW .............................................................25

    B.    Under New York State Law, BLMIS was the Holder of the JPMorgan
        Accounts ..........................................................................................................25

        (1)    BLMIS Is the Presumptive Holder of the JPMorgan Accounts................26

        (2)    The Intent of the Parties Demonstrate BLMIS Held the Bank
               Accounts ..............................................................................................28

    C.    SIPA And The Bankruptcy Code Render The Holder Of The JPMorgan
        Accounts Irrelevant Because Customer Property, Wherever Held, Is
        Recoverable By The Trustee..............................................................................32

        (1)    SIPA and the Bankruptcy Code ..............................................................32

        (2)    SIPA and SIPC......................................................................................34

        (3)    Initiating a SIPA Liquidation.................................................................35

        (4)    Customer Property Under SIPA..............................................................36

        (5)    Madoff's Business .................................................................................38

        (6)    The Liquidation of BLMIS .....................................................................39

        (7)    Substantive Consolidation .....................................................................39

        (8)    The Trustee Can Recover Any Transfers of Customer Property .............41

    D.    The Two-Year Transfers Were Transfers By The SIPA Debtor Within The
        Meaning Of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548 (a)(1)(A ........................47

CONCLUSION...........................................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 650 Fifth Ave. & Related Prop.*,
  No. 08 Civ. 10934 (KBF), 2014 WL 1998233 (S.D.N.Y. May 15, 2014) ............................26

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
  Nos. 05 Civ. 9050(LMM), 03, MDL 1529, 2011 WL 1419617 (S.D.N.Y. Apr.
  7, 2011), *aff'd*, 748 F.3d 110 (2d Cir. 2014).............................................................48

*In re Adler Coleman Clearing Corp.*,
  195 B.R. 266 (Bankr. S.D.N.Y. 1996)..................................................................35

*Alexander v. Compton (In re Bonham)*,
  229 F.3d 750 (9th Cir. 2000) ..........................................................................46

*Bayou Superfund, LLC v. WAM Long/Short Fund II (In re Bayou Grp., LLC)*,
  362 B.R. 624 (Bankr. S.D.N.Y. 2007)..................................................................33

*In re Bernard L. Madoff Inv. Sec. LLC*,
  654 F.3d 229 (2d Cir. 2011)............................................................................35

*In re Bevill, Bresler & Schulman, Inc.*,
  83 B.R. 880 (D.N.J. 1988) .........................................................................38, 47

*Butner v. United States*,
  440 U.S. 48 (1979).......................................................................................26

*In re Chowaiki & Co Fine Art Ltd.*,
  593 B.R. 699 (Bankr. S.D.N.Y. 2017)..................................................................26

*Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*,
  97 B.R. 503 (E.D. Ark. 1987) ..........................................................................37

*Fitzgerald v. Fahnestock & Co., Inc.*,
  730 N.Y.S.2d 70 (N.Y. App. Div. 1st Dep't 2001) ..................................................29

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi
  Negara*,
  313 F.3d 70 (2d Cir. 2002)..............................................................................26

*Kolodziejczyk v. Wing*,
  689 N.Y.S.2d 825 (N.Y. App. Div. 4th Dep't 1999)................................................28

*In re Lehman Bros. Holdings*,
   445 B.R. 143 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478
   B.R. 570 (S.D.N.Y. 2012) .................................................................................................37

*LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*,
   274 B.R. 600 (Bankr. S.D.N.Y. 2002) ............................................................................26

*In re Matter of Costantino*,
   818 N.Y.S.2d 394 (N.Y. App. Div. 4th Dep't 2006) ......................................................29

*In re Matter of Farrar*,
   12 N.Y.S.3d 312 (N.Y. App. Div. 3d Dep't 2015) .........................................................29

*McHale, Jr. v. Boulder Cap. LLC (In re 1031 Tax Grp.)*,
   439 B.R. 47 (Bankr. S.D.N.Y. 2010) ........................................................................33, 34

*Merrill Lynch, Pierce Fenner & Smith Inc. v. Sohmer*,
   No. 16-CV-1856 (MKB), 2019 WL 1441126 (E.D.N.Y. Mar. 29, 2019) .......................28

*Noah's Ark Auto Accessories, Inc. v. First Nat'l Bank*,
   316 N.Y.S.2d 663 (N.Y. Sup. Ct. 1970) ........................................................................29

*In re Old Naples Sec., Inc.*,
   223 F.3d 1296 (11th Cir. 2000) ......................................................................................44

*Peoples Westchester Savings Bank v. Fed. Deposit Ins. Corp.*,
   961 F.2d 327 (2d Cir. 1992) ...........................................................................................30

*Picard v. Avellino*,
   557 B.R. 89 (Bankr. S.D.N.Y. 2016) ..............................................................................48

*Picard v. BAM L.P.*,
   612 B.R. 257 (S.D.N.Y. 2020) ..........................................................................................4

*Picard v. BAM L.P. (In re BLMIS)*,
   597 B.R. 466 (Bankr. S.D.N.Y. 2019) ...........................................................................1, 4

*Picard v. BAM L.P. (In re BLMIS)*,
   608 B.R. 165 (Bankr. S.D.N.Y. 2019) ....................................................................... *passim*

*Picard v. Cohen*,
   Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. April
   25, 2016) (report and recommendation), *adopted by* No. 16 Civ. 5513 (LTS),
   slip op. (S.D.N.Y. Feb. 24, 2016) ..............................................................................33, 34

*Picard v. Fairfield Greenwich Ltd.*,
   762 F.3d 199 (2d Cir. 2014) ...................................................................................33, 34, 37

*Picard v. Flinn Invs., LLC,*
    463 B.R. 280 (S.D.N.Y. 2011) ............................................................................47

*Picard v. Gettinger,*
    No. 19-0429-bk(L), 2020 WL 5666677 (2d Cir. Sept. 24, 2020) .................................... *passim*

*Picard v. Legacy Cap., Ltd.,*
    603 B.R. 682 (Bankr. S.D.N.Y. 2019) ..................................................................34

*Picard v. Lowrey,*
    Adv. Pro. No. 10-04387 (SMB), 2018 WL 1442312 (Bankr. S.D.N.Y. March
    22, 2018), *adopted by* 596 B.R. 451 (S.D.N.Y. 2019), *aff'd sub nom*.
    *Gettinger,* 2020 WL 5666677 ...........................................................................33, 36

*Picard v. Nelson,*
    610 B.R. 197 (Bankr. S.D.N.Y. 2019) ..............................................................25, 33

*In re Picard,*
    917 F.3d 85 (2d Cir. 2019) ...........................................................................34, 38

*Pollock v. Rapid Indus. Plastics Co.,*
    497 N.Y.S.2d 45 (N.Y. App. Div. 4th Dep't 1985) ..................................................26

*In re Primeline Sec. Corp.,*
    295 F.3d 1100 (10th Cir. 2002) ........................................................................44

*Rosenman Family, LLC v. Picard,*
    395 F. App'x 766 (2d Cir. 2010) .......................................................................35

*Sec. Inv'r Prot. Corp. v. Barbour,*
    421 U.S. 412 (1975) ...................................................................................34

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
    424 B.R. 122 (Bankr. S.D.N.Y. 2010) ................................................................34

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.*
    *Madoff),*
    531 B.R. 439 (Bankr. S.D.N.Y. 2015) .............................................................25, 47

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re BLMIS),*
    522 B.R. 41 (Bankr. S.D.N.Y. 2014), *aff'd,* 15 Civ. 1151 (PAE), 2016 WL
    183492 (S.D.N.Y. Jan. 14, 2016), *aff'd,* 697 F. App'x 708 (2d Cir. 2017) ......................30, 44

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),*
    No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013), *aff'd,*
    773 F.3d 411 (2d Cir. 2014), *cert. denied,* 135 S. Ct. 2859 (2015) ...........................................2

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
499 B.R. 416 (S.D.N.Y. 2013) ...............................................................................35

*SEC v. F.O. Baroff Co.*,
497 F.2d 280 (2d Cir. 1974) .................................................................................34

*Silverman Partners LP v. Verox Grp.*,
No. 08 CIV 3103(HB), 2010 WL 2899438 (S.D.N.Y. July 19, 2010) ...................29

*Societe Anonyme Dauphitex v. Schoenfelder Corp.*,
No. 07 Civ. 489, 2007 WL 3253592 (S.D.N.Y. Nov. 2, 2007) .............................29

*Swan Brewery Co. Ltd., v. U.S. Tr. Co. of N.Y.*,
832 F. Supp. 714 (S.D.N.Y. 1993) .......................................................................29

*Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*,
435 B.R. 866 (Bankr. S.D.N.Y. 2010) ..................................................................32

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
843 F.3d 561 (2d Cir. 2016) .................................................................................38

*United States v. $79,000 in Acct. Number 2168050/6749900 at the Bank of N.Y.*,
No. 96 Civ. 3493 (MBM), 1996 WL 648934 (S.D.N.Y. Nov. 7, 1996) ..........25, 26, 29

*United States v. All Funds on Deposit on or Before November 8, 1994 in Citibank
Account Number 42773634 in the Name Imtiaz Ahmed Kahn*,
955 F. Supp. 23 (E.D.N.Y. 1997) .........................................................................26

*In re Weis Sec., Inc.*,
No. 73 Civil 2332, 1976 WL 820 (S.D.N.Y. Aug. 2, 1976) ..................................35

**Statutes**

11 U.S.C. § 101(41) ...............................................................................................36

11 U.S.C. § 101(54) ...............................................................................................47

11 U.S.C. § 109(a) .................................................................................................36

11 U.S.C. § 541(a)(1) .............................................................................................34

11 U.S.C. § 548 ......................................................................................................32

11 U.S.C. § 548(a)(1) .............................................................................................33

11 U.S.C. § 548(a)(1)(A) ............................................................................... *passim*

11 U.S.C. § 548(c) ...................................................................................................5

11 U.S.C. § 550 ................................................................................................................32

11 U.S.C. § 550(a) ........................................................................................................2, 5

15 U.S.C. § 8eee(a)(3) ...................................................................................................36

15 U.S.C. §§ 78aaa–*lll* ...................................................................................................1

15 U.S.C. § 78ccc(a) ......................................................................................................35

15 U.S.C. § 78ccc(a)(2)(A) ...........................................................................................35

15 U.S.C. § 78eee ...........................................................................................................39

15 U.S.C. § 78eee(b)(1) .................................................................................................42

15 U.S.C. § 78eee(b)(2)(A)(1) .......................................................................................35

15 U.S.C. § 78eee(b)(3) .................................................................................................35

15 U.S.C. § 78eee(b)(4) .................................................................................................35

15 U.S.C. § 78fff-2(c)(1) ...............................................................................................35

15 U.S.C. § 78fff-2(c)(3) ....................................................................................... *passim*

15 U.S.C. § 78fff(a) .......................................................................................................34

15 U.S.C. § 78fff(b) .......................................................................................................32

15 U.S.C. § 78*lll*-4 ........................................................................................................32

15 U.S.C. § 78*lll*(4) ..........................................................................................34, 37, 41

15 U.S.C. § 78*lll*(4)(D) .................................................................................................37

15 U.S.C. § 78*lll*(5) .......................................................................................................36

15 U.S.C. § 78*o*(b) ............................................................................................8, 35, 36

## Rules

17 C.F.R. § 240.15c3-3 .......................................................................................... *passim*

17 C.F.R. § 240.15c3-3(f) ..............................................................................................37

## Other Authorities

37 Fed. Reg. 25224 (Nov. 29, 1972) ..............................................................................36

37 Fed. Reg. 25225 (Nov. 29, 1972).............................................................................................36

5 Collier's On Bankruptcy ¶ 548.01 ...........................................................................................33

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069 (2002)...........................36

Following trial in this matter on September 14, 2020, Plaintiff Irving H. Picard (the

"Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC

("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and

the substantively consolidated chapter 7 estate of Bernard L. Madoff, hereby submits his

Proposed Findings of Fact and Conclusions of Law.

## I.    PROPOSED FINDINGS OF FACT

### A.    Procedural History

1.    On December 11, 2008, Madoff was arrested for violating numerous federal

statutes and the Securities and Exchange Commission commenced proceedings against him and

BLMIS in the United States District Court for the Southern District of New York.  Amended

Joint Pretrial Order ("JPTO") ¶ 1, Adv. Pro. No. 10-04390 (CGM) (Bankr. S.D.N.Y. Aug. 12,

2020), ECF No. 209.[1]

2.    On December 15, 2008, the SEC consented to a combination of its own action

with an application of the Securities Investor Protection Corporation ("SIPC").  The District

Court granted SIPC's application, appointed the Trustee as the trustee for the liquidation of

BLMIS, and removed the combined action to this Court.  JPTO ¶ 1.

3.    Shortly thereafter, the Court established a procedure for resolving the net equity

claims of former BLMIS customers.  Order on Application for an Entry of an Order Approving

Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing,

Determination, and Adjudication of Claims; and Providing other Relief, dated Dec. 23, 2008

("Claims Procedure Order").  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv.

Pro. No. 08-01789 (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 12; *see also Picard v. BAM L.P.*

---

[1] Unless otherwise noted, all ECF references are to the docket of *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390
(CGM) (Bankr. S.D.N.Y.).

*(In re BLMIS)*, 597 B.R. 466, 471–72 (Bankr. S.D.N.Y. 2019) (describing the Claims Procedure Order).

4.      Pursuant to the Claims Procedure Order, Michael and Meryl Mann submitted a customer claim as former BLMIS customers (the "Mann Customer Claim") on June 16, 2009 to the Trustee in the amount of $7,192,467.45, representing the amount that they asserted they were entitled to from BLMIS.  Similarly, BAM L.P. submitted a customer claim to the Trustee in the amount of $714,333.85, representing the amount that it asserted it was entitled to from BLMIS. *Picard v. BAM L.P. (In re BLMIS)*, 608 B.R. 165, 176–77, nn.6–7 (Bankr. S.D.N.Y. 2019) ("*MSJ 56(g) Decision*").  Defendants' customer claims acknowledged they entrusted money to the broker-dealer, BLMIS, for purposes of investment. *Id.* at nn.6–7.

5.      On November 30, 2010, the Trustee commenced this adversary proceeding, pursuant to title 11 of the U.S. Code (the "Bankruptcy Code") and New York Debtor & Creditor Law, against Defendants seeking to avoid and recover fraudulent transfers allegedly received by Defendants through the investment advisory business of BLMIS (the "IA Business").  JPTO ¶¶ 1–2.

6.      As a result of the decision in *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013), *aff'd*, 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015), the Trustee is limited to recovering the two-year transfers made by BLMIS solely pursuant to sections 548(a)(1)(A) and 550(a) of the Bankruptcy Code (the "Two Year Period").  JPTO ¶ 2.

7.      In this case, the Trustee seeks to avoid and recover transfers in the amount of $563,000 from BAM L.P. (BLMIS Account 1CM579) and $2,250,000 from Michael and Meryl

Mann (BLMIS Account 1CM363) made between December 11, 2006 and December 11, 2008

(the "Two-Year Transfers").[2]  JPTO ¶ 2.

8.    On April 16, 2014, Defendants filed their Answer in which they admitted that

they received the Two-Year Transfers from BLMIS.  *MSJ 56(g) Decision*, 608 B.R. at 176–77

(citing Answer ¶ 43, ECF No. 40 ("Defendants admit that it [sic] . . . received transfers from

BLMIS . . . [and] respectfully refers [sic] the Court to [Exhibit B of the *Amended Complaint*] for

the complete contents thereof."); Defendants' Response and Objections to Trustee's Motions in

*Limine* at 4, ECF No. 126 ("[F]or purposes of this [Avoidance Action] Michael Mann and BAM

L.P. have admitted that the transactions listed in the Complaint are accurate.")); TX-014

(1/29/2015 Michael Mann's Responses And Objections To Trustee's First Set Of Interrogatories

To Defendant Michael Mann).

9.    In 2018, Defendants set forth in their contentions to the first Joint Pretrial Order

submitted to Judge Bernstein that they contested the Trustee's standing to bring the avoidance

action transfers because their checks indicated "Bernard L. Madoff" in the top left corner.  *MSJ

56(g) Decision*, 608 B.R. at 176.

10.    In November of 2018, Defendants made an oral motion to withdraw their

customer claims and related objections, and the Bankruptcy Court granted the motion, which was

memorialized in the Order Withdrawing Claims and Objections With Prejudice And Finally

Determining Net Equity filed on December 20, 2018.  ECF No. 138.

11.    The order granting Defendants' withdrawal of their customer claims and

objections did not determine the Bankruptcy Court's jurisdiction over the adversary proceeding,

---

[2] The BLMIS accounts at issue in the adversary proceeding are BLMIS account No. 1CM579 ("Account 1CM579")
held in the name of "BAM LP" and No. 1CM363 ("Account 1CM363") held in the name of  "Michael Mann and
Meryl Mann J/T WROS" (collectively, the "Mann BLMIS Accounts").

for which the parties submitted separate briefing on December 5, 2018 and December 12, 2018, as directed by the Bankruptcy Court.  ECF Nos. 132, 137.

12.    On January 18, 2019, the Court issued its Memorandum Decision and Order holding that the court has equitable jurisdiction over the adversary proceeding despite Defendants' withdrawal of their customer claims and objections, noting that such claims "were pending for nearly ten years, but [Defendants] sought to withdraw them with prejudice at the Court's invitation only a few days before the trial was scheduled to begin."  *Picard v. BAM L.P.*, 597 B.R. 466, 484 (Bankr. S.D.N.Y. 2019) (the "Jurisdictional Decision").

13.    On January 25, 2019, Defendants moved for leave to appeal the Jurisdictional Decision (the "Motion for Leave"), which the Trustee opposed.  *Picard v. BAM L.P.*, No. 19-cv-00812 (S.D.N.Y.), ECF Nos. 1, 4–7.

14.    On February 26, 2020, District Judge Vernon S. Broderick denied the Second Motion to Withdraw and Motion for Leave, finding Defendants' "jurisdictional rule that the Bankruptcy Court's authority is contingent on the continued presence of a contested proof of claim . . . would permit gamesmanship and the sandbagging of a bankruptcy Trustee after she expended resources and time litigating only to have a putative creditor pull the plug on its proof of claim when faced with a potential adverse ruling and/or on the eve of trial."  *Picard v. BAM L.P.*, 612 B.R. 257, 271 (S.D.N.Y. 2020).

15.    On September 11, 2019, the Court granted in part and denied in part the Trustee's Summary Judgment Motion under Federal Rule of Civil Procedure 56(g).  *MSJ 56(g) Decision*, 608 B.R. 165.

16.    The *MSJ 56(g) Decision* determined that (1) the Trustee has established that there is no genuine disputed issue of fact that Madoff operated BLMIS as a Ponzi scheme; (2) the

Trustee is entitled to rely on the Ponzi scheme presumption and has demonstrated that the Two-Year Transfers were made with the actual intent to hinder delay or defraud creditors within the meaning of 11 U.S.C. §§ 548(a)(1)(A) and 550(a); (3) the Parties have stipulated to the amount of the deposits into and withdrawals from their respective accounts, and to the amounts of the transfers made during the Two-Year Period; and (4) consistent with prior rulings, there is no value defense under Section 548(c) to the Trustee's claims. *See id.*; *see also* Order Denying the Trustee's Motion for Summary Judgment and Granting Relief Under Federal Rule of Civil Procedure 56(g*), ECF No. 175.

17.     As a result of the *MSJ 56(g) Decision*, the only remaining issue of disputed fact for trial, along with the question of prejudgment interest, was whether the Two-Year Transfers were transfers by the SIPA debtor within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548(a)(1)(A). *See* Order Denying the Trustee's Motion for Summary Judgment and Granting Relief Under Federal Rule of Civil Procedure 56(g*), ECF No. 175.

18.     An order embodying the *MSJ 56(g) Decision* was entered on September 25, 2019. ECF No. 175.  Thereafter, the Court scheduled the final pre-trial conference for October 30, 2019.  ECF No. 176.

19.     After a series of motions filed by Defendants were resolved by the District Court and the Bankruptcy Court, the final pre-trial conference was held on July 1, 2020 before Judge Stuart M. Bernstein.  ECF No. 204.  On August 19, 2020, this case was reassigned to Chief Judge Cecelia G. Morris, ECF No. 213, and the Court set trial for September 14, 2020.  ECF No. 214.

20.     On August 21, 2020, the Court entered the Order Establishing Procedures for Remote Evidentiary Hearing/Trial on September 14, 2020 ("Trial Procedures Order"), setting

forth deadlines and other requirements for the parties related to the remote hearing on September

14, 2020.  ECF No. 216.

21.     On September 14, 2020 the Court conducted a remote trial on the remaining

issues.  *See generally* Tr. of Evidentiary Hr'g, ECF No. 225 ("Trial Tr."); *see also* Trial

Procedures Order, ECF No. 216.

### B.     Motions in Limine

22.     On June 17, 2020, the Trustee filed his motion in *limine* to exclude testimony and

exhibits related to Defendants' asserted tax obligations to governmental taxing authorities and

accrued interest on principal deposits with BLMIS.  *See* ECF Nos. 198–99.

23.     After hearing arguments at the final pretrial conference on July 1, 2020, Judge

Bernstein granted the Trustee's motion from the bench.  *See* July 1, 2020 Hr'g Tr., ECF No. 204.

24.     On August 27, 2020, Defendants filed a motion in *limine* to exclude the testimony

of the Trustee's expert witness, Lisa Collura as irrelevant to the remaining issue for trial.   *See*

Defendants' Memorandum of Law in Support of Motion in *Limine* to Exclude the Testimony of

Lisa Collura, ECF No. 219 (Aug. 27, 2020).

25.     After hearing arguments, the Court denied Defendants' motion to exclude Ms.

Collura's testimony, finding that her testimony was relevant to the proceeding, including

"demonstrating where the Defendants' investment might have been moved."  Trial Tr. 14:4–

18:9.

### C.     Trial

26.     At trial, the Trustee called two expert witnesses: Bruce G. Dubinsky and Ms.

Collura.

27.     Mr. Dubinsky is a forensic accountant with more than 30 years of experience in

financial fraud investigations and cases.  Trial Tr. 23:1–24:17.  The parties stipulated that Mr.

Dubinsky was qualified as an expert witness in the areas of forensic accounting, forensic fraud investigations, computer forensics, solvency analysis and business valuations, and investment theory and practices.  JPTO ¶ 6.  Defendants raised no objections to his qualifications at trial. *Id.*; Trial Tr. 20:23–24.  Mr. Dubinsky was qualified as an expert by the Court.  Trial Tr. 20:12–21:2.

28.      Mr. Dubinsky testified that he had access to all the documents and other materials he required and that his analyses, conclusions and opinions were based on recognized methodologies and made to a reasonable degree of certainty in each of his qualified fields.  Trial Tr. 30:17–33:8, 37:2–37:7 (Dubinsky); TX-039 (Dubinsky Expert Report).[3]

29.      Mr. Dubinsky testified that he was made aware of the dispute as to the ownership of the JPMorgan Accounts (as defined below) sometime in 2019, after he had issued his expert report in the matter.  Trial Tr. 106:14–107-5 (Dubinsky).  In his expert report, and based on his investigation, Mr. Dubinsky discussed *inter alia* the conversion of the sole proprietorship to the limited liability company, the structure of BLMIS, and the movement of funds in the IA Business.  TX-039 (Dubinsky Expert Report).

30.      Ms. Collura is a forensic accountant with more than 20 years of experience in financial fraud investigations and cases.  The parties previously stipulated that Ms. Collura was qualified as an expert in the area of forensic accounting and forensic fraud investigations.  JPTO ¶ 7.  At trial, Ms. Collura was qualified as an expert in the areas of forensic accounting and forensic fraud investigation. Trial Tr. 169:17–170:5.

---

[3] Citations to the trial transcript are presented here as "Trial Tr. page: lines (witness)" (*e.g.*, Trial Tr. ____ (Dubinsky)).  The Trustee's exhibits are cited as TX-___ and Defendants' exhibits are cited as DX-___.

31.     Ms. Collura testified that her analyses, conclusions and opinions were based on recognized methodologies and made to a reasonable degree of certainty in her qualified field. Trial Tr. 204:9–18 (Collura); TX-024 (Collura Expert Report).

32.     Ms. Collura testified that she was made aware of the dispute as to the ownership of the JPMorgan Accounts sometime in 2019, after she had issued her expert report in the matter.  Trial Tr. 216:2–9 (Collura).  In her expert report, Ms. Collura discussed *inter alia* her reconciliation of the books and records of BLMIS, her analyses of the JPMorgan Accounts associated with the IA Business, and the flow of customer funds into and out of the IA Business accounts to pay customer redemptions, including those transfers to Defendants.  TX-024 (Collura Expert Report).

33.     Defendants called no witnesses.  Trial Tr. 232:3–25.

**D.     Corporate Form of Bernard L. Madoff Investment Securities LLC**

34.     From 1960 to 2008 BLMIS was continuously registered with the SEC as a broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b).  Trial Tr. 39:9–46:23 (Dubinsky); TX-001 (SEC Form BD Attestation); TX-002 (1959 SEC Form BD); TX-003 (2001 SEC Amended Form BD); Answer to Amended Complaint and Affirmative Defenses ¶ 23, ECF No. 40.

35.     From 1960 until 2001, BLMIS operated as a sole proprietorship.  JPTO ¶ 12; Trial Tr. 38:16–39:8 (Dubinsky); TX-002 (1959 SEC Form BD); TX-003 (2001 SEC Amended Form BD).

36.     The 1959 Form BD was signed by Madoff in his capacity as the sole proprietor and indicated that his business had made no prior registration with the SEC.  Trial Tr. 41:9–42:6 (Dubinsky); TX-002 (1959 SEC Form BD).

37.     At the time of filing of the 1959 Form BD, SEC filing number 8-8132 was assigned to the sole proprietorship.  Trial Tr. 43:4–43:12 (Dubinsky); TX-002 (1959 SEC Form BD).

38.     Effective as of January 1, 2001, BLMIS was registered as a New York single member limited liability company.  JPTO ¶ 14; TX-004 (Articles of Organization).

39.     On January 12, 2001, BLMIS amended its SEC Form BD to reflect its change in corporate form from a sole proprietorship to a single member limited liability company.  Trial Tr. 43:23–44:15 (Dubinsky); TX-003 (2001 SEC Amended Form BD).

40.     The same SEC file number, 8-8132, that appeared in the 1959 SEC Form BD appeared on the 2001 SEC Amended Form BD.  Trial Tr. 44:16–45:8 (Dubinsky); TX-003 (2001 SEC Amended Form BD).

41.     Under "BD Successions," the 2001 SEC Amended Form asked:  "Briefly describe details of the *succession*, including any assets or liabilities not assumed by the successor."  TX-003 (2001 SEC Amended Form BD at 10) (emphasis in original).  In response, Madoff affirmed:

> EFFECTIVE JANUARY 1, 2001, PREDECESSOR WILL TRANSFER TO SUCCESSOR ALL OF PREDECESSOR'S ASSETS AND LIABILITIES, RELATED TO PREDECESSOR'S BUSINESS.  THE TRANSFER WILL NOT RESULT IN ANY CHANGE IN OWNERSHIP OR CONTROL.

Trial Tr. 46:4–56:21 (Dubinsky); TX-003 (2001 SEC Amended Form BD at 10–11); JPTO ¶¶ 14–16.  No assets or liabilities of the sole proprietorship were listed as "not assumed by the successor."  TX-003 (2001 SEC Amended Form BD at 10–11; *see also* Question 5).

42.     Mr. Dubinsky testified that the purpose of the successor section quoted above was to provide the SEC with notice that a different entity was taking over control of the assets and clients of a business. Trial Tr. 50:8–18 (Dubinsky).

9

43.    The predecessor identified on the 2001 SEC Amended Form BD is Bernard L.

Madoff and the successor is identified as BLMIS.  TX-003 (2001 SEC Amended Form BD).

Drawing on his expertise as a forensic accountant, Mr. Dubinsky concluded that this succession

provision meant that, without exception, all of the assets and liabilities of the sole proprietorship

were transferred to BLMIS and the sole proprietorship ceased to exist.  Trial Tr. 55:5–57:5

(Dubinsky).

44.    In reaching this conclusion, Mr. Dubinsky also relied on the statement on the

2001 SEC Amended Form BD which indicated that no "accounts, funds or securities of

customers of the applicant are held or maintained by [any] other person, firm or organization."

Trial Tr. 58:10–59:3 (Dubinsky); TX-003 (2001 SEC Amended Form BD).

45.    Mr. Dubinsky clarified that the fact that Madoff had not checked a box on the

2001 SEC Amended Form BD indicating that he operated an investment advisory business had

no bearing on the transfer of all assets and liabilities by the sole proprietorship to BLMIS.  Trial

Tr. 62:3–62:12 (Dubinsky); TX-003 (2001 SEC Amended Form BD).  Similarly, Mr. Dubinsky

confirmed that the fact that BLMIS may not have notified every third-party with which it did

business had no effect on the transfer of all of the assets and liabilities from the sole

proprietorship to BLMIS. Trial Tr. 66:18–68:8 (Dubinsky).

46.    In addition to the 2001 SEC Amended Form BD, Mr. Dubinsky testified that he

had reviewed an amended and restated operating agreement for BLMIS which also provided that

all assets and liabilities of the sole proprietorship were transferred by Madoff to BLMIS.  Mr.

Dubinsky confirmed that "all assets" would include the JPMorgan Accounts.  Trial Tr. 165:23–

166:16, 167:13–23 (Dubinsky).

47.    From 2001 until 2008, BLMIS operated as a single member limited liability company.  Trial Tr. 55:25–56:21 (Dubinsky); TX-003 (2001 SEC Amended Form BD).

48.    In 2006, BLMIS registered as an investment advisor.  Trial Tr. 135:24–136:13 (Dubinsky); JPTO ¶ 19.

49.    Before the change in corporate form, the sole proprietorship operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business.  Trial Tr. 63:2–70:11 (Dubinsky); JPTO ¶ 13.

50.    After the change in corporate form, BLMIS operated the same three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business. Trial Tr. 68:9–70:11 (Dubinsky); JPTO ¶ 13.

51.    None of these units was ever a separate corporate entity but rather a part of the single business of the sole proprietorship before January 2001 and of BLMIS after January 2001.  Trial Tr. 68:9–70:11 (Dubinsky).

52.    The proprietary trading business traded for its own account to make money for BLMIS.  Trial Tr. 68:9–69:6 (Dubinsky).

53.    The market-making business made markets in certain stocks, bonds, warrants and rights.  *Id.*

54.    The proprietary trading and market-making businesses were referred to within BLMIS as "House 5" and are collectively referred to in the trial testimony as the "Proprietary Trading Business."  Trial Tr. 103:9–20 (Dubinsky).

55.    The investment advisory business, the "IA Business," or "House 17" was designed to purportedly trade stocks on behalf of customer accounts.  Trial Tr. 70:12–71:14 (Dubinsky).

E.     **The IA Business's Bank Accounts**

56.     Ms. Collura reviewed "third-party bank records as well as other documents that were produced to the Trustee by Defendants and other third parties." Trial Tr. 174:16–21 (Collura). These bank records include hundreds of thousands of pages of BLMIS bank statements, wire transfer data, cancelled checks, and deposit slips. Trial Tr. 172:19–173:2 (Collura).

57.     During at least the ten-year period before its collapse on December 11, 2008, BLMIS primarily used three bank accounts for the IA Business: JP Morgan Chase Bank, N.A. ("JPMorgan") account #xxxxx1703 (the "703 Account"); JPMorgan account #xxxxxxxxx1509 (the "509 Account," together with the 703 Account, the "JPMorgan Accounts"); and Bankers Trust account #xx-xx0-599 (the "599 Account"). Trial Tr. 77:21–78:10 (Dubinsky); Trial Tr. 177:15–2 (Collura); TX-006 (Custodians of Record Affidavits); JPTO ¶ 20.

58.     Both Mr. Dubinsky and Ms. Collura testified that the change in organizational structure from a sole proprietorship to an LLC did not result in any change to how the JPMorgan Accounts were used: "[t]here wasn't a hiccup at all. . . . Nothing changed." Trial Tr. 94:15–25 (Dubinsky); *see also* Trial Tr. 201:24–202:5 (Collura) ("The transactions remained consistent, meaning they were inflows from customers and outflows to customers throughout the whole 10-year time period for which I had bank records.").

59.     From December 1998 to August 2002, the bank statements for the JPMorgan Accounts listed the account holder as "Bernard L. Madoff." JPTO ¶ 22; Trial Tr. 133:24–134:20 (Dubinsky); Trial Tr. 193:11–195:4 (Collura); TX-032, TX-034 (703 Account Statements); TX-033, TX-035 (509 Account Statements).

60.     Checks drawn on the 509 Account had "Bernard L. Madoff" listed in the top left-hand corner of the check. Trial Tr. 199:1–12 (Collura); TX-111, TX112 (509 Account Checks).

12

61.     From September 2002 through December 2008, the bank statements on the

JPMorgan Accounts listed the account holder as "Bernard L. Madoff Investment Securities."

Trial Tr. 193:11–195:4 (Collura); TX-036 (703 Account Statement); TX-037 (509 Account

Statement).

62.     After September 2002, BLMIS continued to use checks for the 509 Account that

listed "Bernard L. Madoff" as the drawer of the check.  Trial Tr. 199:4–12; TX-112 (Collura)

(April 2007 509 Account Check to BAM LP).

63.     Ms. Collura testified that the holder of a bank account is typically the name that

appears on the monthly bank statement.  Trial Tr. 193:7–10 (Collura).

64.     For the time period for which bank records were available, the face of the bank

statements for the JPMorgan Accounts showed they were designated as "Commercial Checking"

accounts.  Trial Tr. 195:6–23 (Collura); TX-032, TX-034, TX-036 (703 Account Statements);

TX-033, TX-035, TX-037 (509 Account Statements).

65.     The statements were addressed to the attention of either Tony Tiletnick, a BLMIS

employee, or Daniel Bonventre, BLMIS's operations manager, at the BLMIS business address of

885 Third Avenue, New York, New York.  None of the statements were addressed to Madoff

personally.  Trial Tr. 195:6–196:23 (Collura); TX-032, TX-034, TX-036 (703 Account

Statements); TX-033, TX-035, TX-037 (509 Account Statements).

66.     Prior to January 2001, the JPMorgan Accounts were owned by the sole

proprietorship.  After January 2001, those accounts were owned by BLMIS.  Trial Tr. 155:15–

158:5, 159:2–160:18 (Dubinsky).

67.     For the time period for which bank records were available (December 1998

through December 2008), the JPMorgan Accounts solely were used for customer deposits and

withdrawals for the IA Business.  Trial Tr. 77:21–79:5 (Dubinsky); Trial Tr. 179:8–180:7

(Collura); TX-040 (Sources of Funds into IA Business); TX-032, TX-034, TX-036 (703 Account

Statements); TX-033, TX-035, TX-037 (509 Account Statements).

68.    IA Business customers' cash deposits were deposited (and commingled) into the

703 Account.  Trial Tr. 77:21–79:5 (Dubinsky); Trial Tr. 179:8–180:7 (Collura); TX-043

(Madoff Plea Allocution); TX-011 (DiPascali Allocution); TX-040 (Sources of Funds into IA

Business); TX-041 (Cash Additions to 703 Account).

69.    IA Business customer withdrawals were made through two accounts: the 703

Account and the 509 Account (funded by the 703 Account).  JPTO ¶ 27; Trial Tr. 179:8–190:7

(Collura) (referencing TX-DEM001 (Flowchart of Activity in IA Business Bank Accounts), TX-

DEM002 (Flowchart of Activity in the 703 Account)); TX-040 (Sources of Funds into IA

Business); TX-032, TX-034, TX-036 (703 Account Statements); TX-033, TX-035, TX-037 (509

Account Statements).

70.    The JPMorgan Accounts were linked commercial checking accounts.  The 509

Account was a controlled disbursement account that was entirely funded by the 703 Account.

JPTO ¶ 21; Trial Tr. 77:21–79:1 (Dubinsky); Trial Tr. 179:8–190:7 (Collura).

71.    Using the November 2008 bank statements as an example, Ms. Collura explained

how the controlled disbursement account worked.  TX-036 (703 Account Statement).  The

November 2008 bank statement for the 703 Account reflected that a funding transfer out of the

703 Account and on that same day, the 509 Account statement shows receipt of that transfer in

that same dollar amount.  These received amounts are then distributed to customers.  Trial Tr.

185:20–186:11 (Collura); TX-037 (509 Account Statement).

72.    Ninety-seven percent of all cash additions into the 703 Account came directly from IA Business customers. JPTO ¶ 28; Trial Tr. 84:10–85:3 (Dubinsky); Trial Tr. 181:2– 182:6 (Collura) (referencing TX-DEM002 (Flowchart of Activity in the 703 Account)); TX-040 (Sources of Funds into IA Business); TX-041 (Cash Additions to 703 Account).

73.    The other three percent of inflows into the 703 Account came from income earned on (1) short-term investment activity made directly from the 703 Account (including overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and Treasury Bills); and (2) investments of BLMIS customer funds made through bank and brokerage accounts held in the name of BLMIS or Madoff for cash management purposes.  Because the short-term investments, including overnight sweeps, were made directly out of the 703 Account, the source of the money for those investments was customer funds. JPTO ¶ 28; Trial Tr. 84:10–85:20 (Dubinsky); Trial Tr. 181:2–182:6 (Collura); TX-040 (Sources of Funds into IA Business); TX-041 (Cash Additions to 703 Account).

74.    Prior to January 2001, the brokerage accounts were owned by the sole proprietorship.  After January 2001, those same brokerage accounts, identified on statements as held under the name of either Madoff or BLMIS, were owned by BLMIS.  Trial Tr. 155:15– 158:5, 159:2–160:18 (Dubinsky).

75.    There were no inflows into the 703 Account from sales of securities for customer accounts.  JPTO ¶ 28; Trial Tr. 82:17–87:6 (Dubinsky); Trial Tr. 181:2–182:6 (Collura); TX-040 (Sources of Funds into IA Business); TX-041 (Cash Additions to 703 Account).

76.    Mr. Dubinsky testified that the overnight sweeps and short-term investments were used to "earn a little bit more money, and that's what the 703 account was doing routinely every night. It would sweep all the excess, hundreds of millions of dollars. It would go into an

overnight investment back in the account the next morning and available for Mr. Madoff to pay

customer withdrawals." Trial Tr. 80:10–82:7 (Dubinsky); *see also* Trial Tr. 181:2–182:6

(Collura); TX-041 (Cash Additions to 703 Account).

77.    Mr. Dubinsky testified that the overnight sweeps were "an income producing

vehicle. It's short-term investments. It's de minimis type income." Trial Tr. 80:10–82:7

(Dubinsky).

78.    There were no outflows from the 703 Account to purchase securities for customer

accounts.  JPTO ¶ 29; Trial Tr. 86:1–87:2, 90:15–91:18 (Dubinsky); Trial Tr. 179:8–180:7

(Collura).

79.    Apart from two short-term loans BLMIS received from JPMorgan totaling $145

million in November 2005 and January 2006—both of which were repaid by June 2006—the IA

Business did not obtain loans from third parties or from the Proprietary Trading Business

sufficient to pay the IA Business customer withdrawals.  JPTO ¶ 29; Trial Tr. 90:15–91:18

(Dubinsky); TX-040 (Sources of Funds into IA Business); TX-041 (Cash Additions to 703

Account).

80.    The IA Business also did not receive payments of any cash dividends.  JPTO ¶

30; Trial Tr. 86:1–88:20 (Dubinsky); TX-041 (Cash Additions to 703 Account); TX-042 (IA

Business Dividends Table).

81.    According to the customer statements, the IA Business reported that it received

cash dividends related to purported trading and paid or credited them to the accountholders.

Between 1998 and 2008, BLMIS reported that it had paid or credited its customers $4.3 billion in

cash dividends.  Mr. Dubinsky testified that he prepared a summary exhibit, TX-042, which

accurately reflects the IA Business's reported cash dividends. Trial Tr. 86:1–88:20 (Dubinsky); TX-042 (IA Business Dividends Table).

82.    Mr. Dubinsky analyzed BLMIS records and bank records to determine if the $4.3 billion the IA Business reported as cash dividends on the customer statements corresponded with any inflows of cash into the 703 Account. Trial Tr. 86:1–88:20 (Dubinsky).

83.    If BLMIS had traded for its IA Business customers as reported on the customer statements, these dividends would have been deposited into the 703 Account. Of the more than 8,300 IA Business dividend transactions identified on the customer account statements from 1998 to 2008, not one purported dividend payment matched to a cash addition to the 703 Account. Trial Tr. 86:1–90:14 (Dubinsky); TX-042 (IA Business Dividends Table).

84.    Mr. Dubinsky found no record of any dividends being received by the IA Business bank account or any other bank accounts at BLMIS. There is no evidence of communication between the IA Business and the transfer agents or corporations that would have disbursed the dividends. "That didn't occur. It's -- this is all fictitious. This is -- it just never happened, and that's why you don't see it going into the bank account. This was just a fraud." Trial Tr. 86:1–90:14 (Dubinsky); TX-040 (Sources of Funds into IA Business); TX-042 (IA Business Dividends Table).

85.    Based on his analysis, Mr. Dubinsky concluded that the IA Business did not have any legitimate income-producing activities. The only source of cash available for the IA Business to pay purported investment profits as well as redemption requests from its customers was from cash that other IA Business customers deposited in the 703 Account. Trial Tr. 93:6–94:14 (Dubinsky); TX-040 (Sources of Funds into IA Business).

86.    Defendants did not present testimony or evidence to rebut Mr. Dubinsky's

conclusion that the funds in the BLMIS 703 Account consisted of customer money, that the IA

Business had no other source of funds, or that customer redemptions were paid with funds from

the 703 Account via the 509 Account.

87.    Based on the foregoing, the evidence supports a finding that the JPMorgan

Accounts were held by BLMIS at the time of the Two-Year Transfers and that at all relevant

times, the funds in the JPMorgan Accounts constituted customer property.

**F.    <u>Analyses of Defendants' Accounts</u>**

88.    The Mann BLMIS Accounts were held in the IA Business side of BLMIS.  Trial

Tr. 71:15–21 (Dubinsky).

89.    Mr. Dubinsky confirmed, as a result of his forensic analyses, that the trades

reported in the Mann BLMIS Accounts, like the other customers of the IA Business, were not

executed.  Trial Tr. 71:22–24 (Dubinsky).

90.    Ms. Collura was specifically tasked with reconciling the cash transactions

reflected on the Defendants' customer statements with available records and to then trace the

flow of those funds.  Trial Tr. 172:11–173:13 (Collura).  As part of her analyses, Ms. Collura

reviewed "customer statements for the customer accounts" and "customer files related to those

customer accounts as well as BLMIS bank records."  Trial Tr. 174:16–175:4 (Collura).

91.    Ms. Collura determined that all of the Two-Year Transfers were made to the

Defendants via checks from the 509 Account.  Trial Tr. 185:3–8 (Collura).

92.    As part of her review of the Defendants' customer files, Ms. Collura reviewed

customer agreements executed by Defendants.  Trial Tr. 189:1–11, 190:19–25, 191:20–192:4

(Collura); TX-021; TX-022.  The customer agreements for both Defendants contain the

following provision:

**9. SUCCESSORS** Customer hereby agrees that this Agreement and all the terms thereof shall be binding upon Customer's heirs, executors, administrators, personal representatives and assigns. This Agreement shall enure to the benefit of the Broker's present organization, and any successor organization, irrespective of any change or changes at any time in the personnel thereof, for any cause whatsoever.

TX-021 at 30; TX-022 at 46.

93.    Based on her review of customer statements produced to the Trustee by the Defendants, Ms. Collura testified that the customer statements sent to the Defendants during the Two-Year Period prior to the start of the liquidation all had the name "Bernard L. Madoff Investment Securities LLC" in the top, left-hand corner of the customer statement.  Trial Tr. 202:9–203:10 (Collura); TX-071; TX-066, TX-067, TX-070, TX-071, TX-110, TX-111, TX-114, TX-115, TX-118, TX-119, TX-122, TX-123, TX-126, TX-127 (BLMIS Customer Statements).

## II.    EXHIBITS

### A.    Exhibits Admitted

94.    At the trial, the following exhibits were admitted into evidence:

| Trustee's Admitted Exhibits | |
| --- | --- |
| Ex No. TX__ | Document Description |
| 002 | 12/31/1959 Form BD for Bernard L. Madoff |
| 003 | 1/12/2001 Form BD for Bernard L. Madoff Investment Securities LLC |
| 009 | 1/1/2001 BLMIS letter to NSCC |
| 014 | 1/29/2015 Michael Mann's Responses And Objections To Trustee's First Set Of Interrogatories To Defendant Michael Mann |
| 015 | 1/29/2015 Meryl Mann's Objections And Responses To Trustee's First Set of Interrogatories |
| 016 | 1/05/2015 Trustee's First Set of Requests For Admission To Defendant Michael Mann |
| 017 | 1/05/2015 Trustee's First Set of Requests For Admission To Defendant Meryl Mann |
| 018 | 1/05/2015 Trustee's First Set of Requests For Admission To Defendant BAM L.P. |

| Trustee's Admitted Exhibits | |
| --- | --- |
| **Ex No. TX__** | **Document Description** |
| 021 | BLMIS Customer File for Account 1CM363 |
| 022 | BLMIS Customer File for Account 1CM579 |
| 024 | 6/12/2015 Expert Report of Lisa Collura |
| 032 | 8/1/2002 - 8/30/2002 703 Account Statement |
| 033 | 8/1/2002 - 8/30/2002 509 Account Statement |
| 034 | 8/31/2002 - 9/30/2002 703 Account Statement |
| 035 | 8/31/2002 - 9/30/2002 509 Account Statement |
| 036 | 11/1/2008 - 11/28/2008 703 Account Statement |
| 037 | 11/1/2008 - 11/28/2008 509 Account Statement |
| 039 | 8/20/2013 Expert Report of Bruce Dubinsky, served 6/12/2015 |
| 040 | 8/20/2013 Expert Report of Bruce Dubinsky, Figure 39 |
| 041 | 8/20/2013 Expert Report of Bruce Dubinsky, Figure 37 |
| 042 | 8/20/2013 Expert Report of Bruce Dubinsky, Table 8 |
| 044 | 12/30/1997 Debit Memo for Account 1CM363 |
| 045 | 12/22/1998 Credit Memo for Account 1CM363 |
| 046 | 11/31/2000 BLMIS Customer Statement for Account 1CM363 |
| 047 | 4/30/2003 BLMIS Customer Statement for Account 1CM363 |
| 048 | 4/30/2003 BLMIS Customer Statement for Account 1CM363 |
| 049 | 4/16/2003 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS |
| 050 | 4/16/2003 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS |
| 051 | 2/29/2004 BLMIS Customer Statement for Account 1CM363 |
| 052 | 2/29/2004 BLMIS Customer Statement for Account 1CM363 |
| 053 | 1/31/2004 - 2/27/2004 703 Account Statement |
| 054 | 1/31/2004 - 2/27/2004 703 Account Statement |
| 055 | 12/31/2004 BLMIS Customer Statement for Account 1CM363 |
| 056 | 12/31/2004 BLMIS Customer Statement for Account 1CM363 |
| 057 | 12/16/2004 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS |
| 058 | 12/16/2004 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS |
| 059 | 12/31/2005 BLMIS Customer Statement for Account 1CM363 |
| 060 | 12/31/2005 BLMIS Customer Statement for Account 1CM363 |
| 061 | 12/1/2005 - 12/30/2005 703 Account Statement |
| 062 | 3/31/2006 BLMIS Customer Statement for Account 1CM363 |
| 063 | 3/31/2006 BLMIS Customer Statement for Account 1CM363 |
| 064 | 3/20/2006 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS |
| 065 | 3/20/2006 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS |
| 066 | 3/31/2007 BLMIS Customer Statement for Account 1CM363 |

| Trustee's Admitted Exhibits | |
|---|---|
| **Ex No. TX__** | **Document Description** |
| 067 | 3/31/2007 BLMIS Customer Statement for Account 1CM363 |
| 068 | 3/7/2007 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS |
| 069 | 3/7/2007 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS |
| 070 | 10/31/2007 BLMIS Customer Statement for Account 1CM363 |
| 071 | 10/31/2007 BLMIS Customer Statement for Account 1CM363 |
| 072 | 10/24/2007 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS |
| 073 | 10/24/2007 509 Account 1CM363 Check to Michael Mann and Meryl Mann J/T WROS |
| 074 | 4/30/2000 BLMIS Customer Statement for Account 1CM579 |
| 075 | 4/25/2000 509 Account 1CM579 Check to BAM LP |
| 076 | 10/31/2000 BLMIS Customer Statement for Account 1CM579 |
| 077 | 10/12/2000 509 Account 1CM579 Check to BAM LP |
| 078 | 11/30/2000 BLMIS Customer Statement for Account 1CM579 |
| 079 | 11/1/2000 - 11/30/2000 703 Account Statement |
| 080 | 4/30/2002 BLMIS Customer Statement for Account 1CM579 |
| 081 | 4/23/2002 509 Account 1CM579 Check to BAM LP |
| 082 | 4/23/2002 509 Account 1CM579 Check to BAM LP |
| 083 | 6/30/2002 BLMIS Customer Statement for Account 1CM579 |
| 084 | 6/25/2002 509 Account 1CM579 Check to BAM LP |
| 085 | 6/25/2002 509 Account 1CM579 Check to BAM LP |
| 086 | 4/30/2003 BLMIS Customer Statement for Account 1CM579 |
| 087 | 4/30/2003 BLMIS Customer Statement for Account 1CM579 |
| 088 | 4/16/2003 509 Account 1CM579 Check to BAM LP |
| 089 | 4/16/2003 509 Account 1CM579 Check to BAM LP |
| 090 | 1/31/2004 BLMIS Customer Statement for Account 1CM579 |
| 091 | 1/31/2004 BLMIS Customer Statement for Account 1CM579 |
| 092 | 1/6/2004 509 Account 1CM579 Check to BAM LP |
| 093 | 1/6/2004 509 Account 1CM579 Check to  BAM LP |
| 094 | 3/31/2005 BLMIS Customer Statement for Account 1CM579 |
| 095 | 3/31/2005 BLMIS Customer Statement for Account 1CM579 |
| 096 | 3/2/2005 509 Account 1CM579 Check to BAM LP |
| 097 | 3/2/2005 509 Account 1CM579 Check to BAM LP |
| 098 | 4/30/2005 BLMIS Customer Statement for Account 1CM579 |
| 099 | 4/30/2005 BLMIS Customer Statement for Account 1CM579 |
| 100 | 4/8/2005 509 Account 1CM579 Check to BAM LP |
| 101 | 4/8/2005 509 Account 1CM579 Check to BAM LP |
| 102 | 12/31/2005 BLMIS Customer Statement for Account 1CM579 |
| 103 | 12/31/2005 BLMIS Customer Statement for Account 1CM579 |
| 104 | 12/8/2005 509 Account 1CM579 Check to BAM LP |

| Trustee's Admitted Exhibits | |
|---|---|
| **Ex No. TX__** | **Document Description** |
| 105 | 12/8/2005 509 Account 1CM579 Check to BAM LP |
| 106 | 1/31/2006 BLMIS Customer Statement for Account 1CM579 |
| 107 | 1/31/2006 BLMIS Customer Statement for Account 1CM579 |
| 108 | 1/5/2006 509 Account 1CM579 Check to BAM LP |
| 109 | 1/5/2006 509 Account 1CM579 Check to BAM LP |
| 110 | 4/30/2007 BLMIS Customer Statement for Account 1CM579 |
| 111 | 4/30/2007 BLMIS Customer Statement for Account 1CM579 |
| 112 | 4/17/2007 509 Account 1CM579 Check to BAM LP |
| 113 | 4/17/2007 509 Account 1CM579 Check to BAM LP |
| 114 | 7/31/2007 BLMIS Customer Statement for Account 1CM579 |
| 115 | 7/31/2007 BLMIS Customer Statement for Account 1CM579 |
| 116 | 7/25/2007 509 Account 1CM579 Check to BAM LP |
| 117 | 7/25/2007 509 Account 1CM579 Check to BAM LP |
| 118 | 10/31/2007 BLMIS Customer Statement for Account 1CM579 |
| 119 | 10/31/2007 BLMIS Customer Statement for Account 1CM579 |
| 120 | 10/24/2007 509 Account 1CM579 Check to BAM LP |
| 121 | 10/24/2007 509 Account 1CM579 Check to BAM LP |
| 122 | 1/31/2008 BLMIS Customer Statement for Account 1CM579 |
| 123 | 1/31/2008 BLMIS Customer Statement for Account 1CM579 |
| 124 | 1/23/2008 509 Account 1CM579 Check to BAM LP |
| 125 | 1/23/2008 509 Account 1CM579 Check to BAM LP |
| 126 | 4/30/2008 BLMIS Customer Statement for Account 1CM579 |
| 127 | 4/30/2008 BLMIS Customer Statement for Account 1CM579 |
| 128 | 4/23/2008 509 Account 1CM579 Check to BAM LP |
| 129 | 4/23/2008 509 Account 1CM579 Check to BAM LP |
| 130 | 4/23/2008 509 Account 1CM579 Check to BAM LP |

| Defendants' Admitted Exhibits | |
|---|---|
| **Defendants' Ex. No.** | **Defendants' Document Description** |
| 1-A | 509 Account Statements |
| 1-B | 509 Account Statements |
| 1-C | 509 Account Statements |
| 1-D | 509 Account Statements |
| 1-E | 509 Account Statements |
| 2-A | 703 Account Statements |
| 2-B | 703 Account Statements |
| 2-C | 703 Account Statements |
| 2-D | 703 Account Statements |
| 2-E | 703 Account Statements |
| 2-F | 703 Account Statements |
| 2-G | 703 Account Statements |

| Defendants' Admitted Exhibits | |
| --- | --- |
| Defendants' Ex. No. | Defendants' Document Description |
| 2-H | 703 Account Statements |
| 2-I | 703 Account Statements |
| 2-J | 703 Account Statements |
| 2-K | 703 Account Statements |
| 2-L | 703 Account Statements |
| 2-M | 703 Account Statements |
| 2-N | 703 Account Statements |
| 2-O | 703 Account Statements |
| 2-P | 703 Account Statements |
| 2-Q | 703 Account Statements |
| 2-R | 703 Account Statements |
| 2-S | 703 Account Statements |
| 2-T | 703 Account Statements |
| 2-U | 703 Account Statements |
| 2-V | 703 Account Statements |
| 2-W | 703 Account Statements |
| 2-X | 703 Account Statements |
| 2-Y | 703 Account Statements |
| 2-AA | 703 Account Statements |
| 2-BB | 703 Account Statements |
| 2-CC | 703 Account Statements |
| 2-DD | 703 Account Statements |
| 2-EE | 703 Account Statements |
| 2-FF | 703 Account Statements |
| 2-GG | 703 Account Statements |
| 3-A | BAM Checks |
| 3-B | BAM Checks |
| 3-C | BAM Checks |
| 3-D | BAM Checks |
| 3-E | BAM Checks |
| 3-F | BAM Checks |
| 3-G | BAM Checks |
| 3-H | BAM Checks |
| 3-I | BAM Checks |
| 3-J | BAM Checks |
| 3-K | BAM Checks |
| 3-L | BAM Checks |
| 3-M | BAM Checks |
| 3-N | BAM Checks |
| 3-O | BAM Checks |
| 4 | BAM Account Documents |
| 6 | Mann Account Documents |

| Defendants' Admitted Exhibits | |
|---|---|
| **Defendants' Ex. No.** | **Defendants' Document Description** |
| 8-B | Mann Checks |
| 8-D | Mann Checks |
| 9-A | 703 Account Checks |
| 9-B | 703 Account Checks |
| 9-C | 703 Account Checks |
| 9-D | 703 Account Checks |
| 9-F | 703 Account Checks |
| 9-G | 703 Account Checks |
| 9-H | 703 Account Checks |
| 9-J | 703 Account Checks |
| 10 | *U.S. v. Bonventre et al.*, 10 cr. 00228 (LTS) |
| 11 | *U.S. v Peter Madoff*, 10 cr 0228 (LTS) June 29, 2012 |
| 13-A | Bernard L. Madoff Investment Securities LLC., Registration of investment advisory business (2006) |

95.     The following exhibit was offered for identification.  It was made part of the

record but not admitted into evidence:

| Trustee's Exhibits | |
|---|---|
| **Ex No. TX__** | **Document Description** |
| 38 | Curriculum vitae of Bruce Dubinsky |

96.     The following demonstratives were admitted by the Court as demonstrative aids:

| Trustee's Demonstratives | |
|---|---|
| **Ex. No. TX__** | **Document Description** |
| TX-DEM001 | Flowchart of Activity in IA Business Bank Accounts |
| TX-DEM002 | Flowchart of Activity in the 703 Account |
| TX-DEM003 | 703 Account Funds the 509 Account |
| TX-DEM004 | 703 Account and 509 Account Name Change |

## B.   Expert Reports

97.     The Trustee submitted and laid the foundation for admission of the written reports

of his two expert witnesses, Bruce G. Dubinsky and Lisa M. Collura as exhibits.  TX-024; TX-

039.  These expert reports were admitted into evidence.  Trial Tr. 162:14–163:10, 175:5–176:2.

24

### III.   PROPOSED CONCLUSIONS OF LAW

#### A.   Overview

98.   The evidence demonstrates that the Two-Year Transfers to Defendants were transfers by the SIPA debtor within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548(a)(1)(A).

99.   Defendants' argument that Madoff, and not BLMIS, made the relevant transfers is not borne out by the evidence before this Court.  Defendants rely on two facts: (1) the JPMorgan Accounts statements do not list the word "LLC" after "Bernard L. Madoff Investment Securities;" and (2) the checks drawn on the 509 Account list "Bernard L. Madoff" on the top left corner.

100.   The Bankruptcy Court has already found that these facts do not controvert the substantial evidence that the 509 Account—the account from which the avoidable transfers were made to Defendants—was a business account held by BLMIS after January 2001.  *See Picard v. Nelson*, 610 B.R. 197, 216–18 (Bankr. S.D.N.Y. 2019); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 531 B.R. 439, 485 (Bankr. S.D.N.Y. 2015) ("*Omnibus Good Faith Decision*").

101.   There is no legal authority to the contrary.  Under state law, federal bankruptcy law, and SIPA, BLMIS was the holder of the JPMorgan Accounts at the time of the transfers to Defendants.  In any event, at all relevant times, the Two-Year Transfers constituted customer property and are thus recoverable by the Trustee under SIPA.

#### B.   Under New York State Law, BLMIS was the Holder of the JPMorgan Accounts

102.   To determine the lawful owner of a bank account, courts at both the state and federal level apply state law.  *See United States v. $79,000 in Acct. Number 2168050/6749900 at*

*the Bank of N.Y.*, No. 96 Civ. 3493 (MBM), 1996 WL 648934, at *4 (S.D.N.Y. Nov. 7, 1996)

("Courts look to state law to determine the existence of title or other ownership or possessory

interest."); *United States v. All Funds on Deposit on or Before November 8, 1994 in Citibank*

*Account Number 42773634 in the Name Imtiaz Ahmed Kahn*, 955 F. Supp. 23, 26 (E.D.N.Y.

1997) ("Since the funds at issue are held in bank accounts in New York, the requirement of

establishing an ownership interest over the funds is determined by New York law."); *In re 650*

*Fifth Ave. & Related Prop.*, No. 08 Civ. 10934 (KBF), 2014 WL 1998233, at *5 (S.D.N.Y. May

15, 2014).

103.    Bankruptcy courts in the Southern District of New York likewise consult state law

in this context.  *See LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores,*

*Inc.)*, 274 B.R. 600, 617 (Bankr. S.D.N.Y. 2002) (applying New York state law finding "once

funds are deposited in a bank account, the account holder is presumed to have title and control

over those funds" (citing *$79,000*, 1996 WL 648934, at *4)); *In re Chowaiki & Co Fine Art Ltd*.,

593 B.R. 699, 714 (Bankr. S.D.N.Y. 2017) (applying New York state law to determine

ownership interest); *see also generally Butner v. United States*, 440 U.S. 48, 55 (1979) (property

rights created by state law will be honored unless a specific bankruptcy provision or policy

requires differently).

104.    In this case, the JPMorgan Accounts were New York-based accounts (Trial Tr.

195:13–18 (Collura)) and New York law thus applies.

### (1)    BLMIS Is the Presumptive Holder of the JPMorgan Accounts

105.    The general presumption under New York law is that the party who possesses the

property is presumed to be the party who owns it.  *See Karaha Bodas Co., L.L.C. v. Perusahaan*

*Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 86 (2d Cir. 2002); *see also Pollock*

*v. Rapid Indus. Plastics Co.*, 497 N.Y.S.2d 45 (N.Y. App. Div. 4th Dep't 1985) (noting that

"possession of tangible property . . . creates a rebuttable presumption of ownership").

106.    Based on the evidence presented in this case, BLMIS is presumed to be the holder

of the JPMorgan Accounts.

107.    Madoff began operating in the early 1960's as a sole proprietorship under the

names of Bernard L. Madoff and Bernard L. Madoff Investment Securities.  For purposes of

registration with SEC, a Form BD was filed on behalf of the sole proprietorship under file

number 8-8132 in January of 1960.  Through that registration, the broker-dealer became a

member of SIPC when SIPA was enacted in 1970.  TX-002 (1959 SEC Form BD).

108.    There is no dispute that prior to 2001, the JPMorgan Accounts were held by

Madoff's sole proprietorship.

109.    When Madoff changed the corporate form of his broker-dealer business to an

LLC in January of 2001, he filed an SEC Amended Form BD to reflect that change using the

same SEC registrant number 8-8132; he did not file a new application for registration.  TX-003

(2001 SEC Amended Form BD).

110.    Under "BD Successions" of the 2001 SEC Amended Form BD, it asked:  "Briefly

describe details of the succession, including any assets or liabilities not assumed by the

successor."  In response, Madoff attested that "[e]ffective January 1, 2001, predecessor will

transfer to successor all of predecessor's assets and liabilities related to predecessor's business.

The transfer will not result in any change in ownership or control."  TX-003 (2001 SEC

Amended Form BD at 10–11, *see also* Question 5).  No assets or liabilities of the sole

proprietorship were listed as "not assumed by the successor."  *Id.*

111.    Madoff further certified that no "accounts, funds, or securities of customers of the *applicant* are held or maintained by such other *person*, firm, or organization." *Id.* (2001 SEC Amended Form BD at 10) (emphasis in original).

112.    BLMIS succeeded to the sole proprietorship's SEC registrant number 8-8132. Trial Tr. 42:16–45:8, 54:22–55:4 (Dubinsky); TX-002 (1959 SEC Form BD); TX-003 (2001 SEC Amended Form BD at 10).

113.    Upon the filing of the 2001 SEC Amended Form BD, the sole proprietorship no longer operated as a broker-dealer or in any other capacity.  Mr. Dubinsky made clear that based on his training and experience as a forensic accountant, the sole proprietorship "no longer exists" upon the filing of the Form BD amendment.  Trial Tr. 55:25–56:21 (Dubinsky); TX-003 (2001 SEC Amended Form BD at 10–11).  The JPMorgan Accounts simply could not be held by a business that ceased to exist.

114.    As a result, after January 1, 2001 and at all times relevant to this action, BLMIS was the holder of the JPMorgan Accounts, triggering the general presumption of ownership. Upon the transfer of all of the sole proprietorship's assets and liabilities to BLMIS, the sole proprietorship ceased to exist, losing both its possession and ultimate ownership interests in the underlying bank accounts.  *See Kolodziejczyk v. Wing*, 689 N.Y.S.2d 825 (N.Y. App. Div. 4th Dep't 1999) (joint bank account creates rebuttable presumption of ownership in joint possessors).

### (2)    The Intent of the Parties Demonstrate BLMIS Held the Bank Accounts

115.    Courts applying New York law to questions of bank account ownership also review the parties' intent irrespective of any applicable presumption.  *See Merrill Lynch, Pierce Fenner & Smith Inc. v. Sohmer*, No. 16-CV-1856 (MKB), 2019 WL 1441126, at *8 (E.D.N.Y.

Mar. 29, 2019); *In re Matter of Farrar*, 12 N.Y.S.3d 312 (N.Y. App. Div. 3d Dep't 2015); *In re Matter of Costantino*, 818 N.Y.S.2d 394 (N.Y. App. Div. 4th Dep't 2006).  Intent is determined through statements contained in operative documents and correspondence, control over the relevant account, and whether the account is being used for its designed purpose. *Swan Brewery Co. Ltd., v. U.S. Tr. Co. of N.Y.*, 832 F. Supp. 714, 719–20 (S.D.N.Y. 1993) (review of correspondence to show intent); *$79,000*, 1996 WL 648934, at \*4  (review of control over the account to show intent); *Noah's Ark Auto Accessories, Inc. v. First Nat'l Bank*, 316 N.Y.S.2d 663 (N.Y. Sup. Ct. 1970) (review of use of account for designed purpose).

116.    Here, a consideration of these factors reveals that Madoff intended to cede ownership of all of the assets of the sole proprietorship to the LLC, thereby stripping any ownership interest of the sole proprietorship in any assets.  As Mr. Dubinsky further testified, "all assets and liabilities" would include the JPMorgan Accounts.  Trial Tr. 156:17–157:17, 165:23–166:16, 167:13–23 (Dubinsky); *see also Societe Anonyme Dauphitex v. Schoenfelder Corp.*, No. 07 Civ. 489, 2007 WL 3253592, at \*4 (S.D.N.Y. Nov. 2, 2007) (corporation transferred all of its assets to its successor (citing *Fitzgerald v. Fahnestock & Co., Inc.*, 730 N.Y.S.2d 70 (N.Y. App. Div. 1st Dep't 2001)) (corporation transferred all of its assets to its successor); *Silverman Partners LP v. Verox Grp.*, No. 08 CIV 3103(HB), 2010 WL 2899438, at \*3 (S.D.N.Y. July 19, 2010) (without a specific carve-out, all liabilities will be deemed to have been transferred).

117.    In addition to the 2001 SEC Amended Form BD discussed above, an expression of this intent is found in BLMIS's operating agreement.  As Mr. Dubinsky testified, he reviewed BLMIS's amended and restated operating agreement which specifically provided that all assets and liabilities of the sole proprietorship were transferred by Madoff to the LLC (BLMIS),

effective January 1, 2001. Trial Tr. 165:23–167:23 (Dubinsky). The intent evidenced in the

2001 SEC Amended Form BD and the operating agreement alone is sufficient to end the inquiry.

*See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re BLMIS)*, 522 B.R. 41, 60

(Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016),

*aff'd*, 697 F. App'x 708 (2d Cir. 2017) (all of Madoff Securities' assets and liabilities were

transferred to BLMIS upon the reorganization to a single member limited liability company); *see*

*also See Peoples Westchester Savings Bank v. Fed. Deposit Ins. Corp*., 961 F.2d 327 (2d Cir.

1992) (reviewing account opening documents to determine intent regarding ownership interest).

118.    BLMIS also issued customer statements related to transactions in the JPMorgan

Accounts that bore the "BLMIS" moniker. Indeed, all statements received by Defendants during

the Two-Year Period prior to the commencement of the liquidation, including those statements

detailing the Two-Year Transfers at issue here, had the full name of BLMIS in the top left hand

corner. *See* TX-047, TX-048, TX-051, TX-052, TX-055, TX-056, TX-059, TX-060, TX-062,

TX-063, TX-066, TX-067, TX-070, TX-071 (BLMIS Customer Statements for Account

1CM363); TX-080, TX-083, TX-086, TX-090, TX-091, TX-094, TX-095, TX-098, TX-099,

TX-102, TX-103, TX-106, TX-107 TX-110, TX-111, TX-114, TX-115, TX-118, TX-119, TX-

122, TX-123, TX-126, TX-127 (BLMIS Customer Statements for Account 1CM579). And Ms.

Collura's review of the bank account statements revealed that the name on the statements

changed from "Bernard L. Madoff" to "Bernard L. Madoff Investment Securities" in 2002. Trial

Tr. 193:11–23, 197:21–198:8 (Collura) (referencing TX-DEM004 (703 Account and 509

Account Name Change), which features TX-033 and TX-035)). BLMIS was therefore holding

itself out as the operative legal entity, leading to the conclusion that the LLC was the owner of

the JPMorgan Accounts.

119.    The evidence also demonstrates that the JPMorgan Accounts were controlled by BLMIS and used to make cash transfers to customers of the IA Business.  As Dubinsky testified, the 509 Account was a controlled disbursement account and if a customer "asked Mr. Madoff to get some money back, money would be moved from the 703 account to the 509 account at Mr. Madoff's direction.  A check would be written out of the 509 account."  Trial Tr. 77:25–79:1 (Dubinsky).

120.    This analysis is not impacted by the fact that the checks issued in connection with the 509 Account had Madoff's name on them.  This Court credits Mr. Dubinsky's testimony that, because of the transfer of all assets from the sole proprietor to BLMIS, for each check issued after January 1, 2001, BLMIS was the owner of the 509 Account.  Trial Tr. 156:17–157:1 (Dubinsky).

121.    Defendants' argument regarding the name on the top of the check is also unsupported by the law of negotiable instruments.  To be considered a negotiable instrument under the Uniform Commercial Code ("U.C.C."), a written check must be: (a) signed by the maker; (b) an "unconditional promise" to pay a sum certain in money; (c) payable for a fixed amount; (d) payable on demand or at a definite time; and (e) payable to bearer.  N.Y.U.C.C. § 3–104(1).  The name on the top of a check is not dispositive under the U.C.C. and is likewise irrelevant to the issue of whether the Trustee can recover the Two-Year Transfers to Defendants.

122.    Finally, the evidence introduced at trial shows that the JPMorgan Accounts were used for their intended purposes.  Prior to 2001, the 703 Account was used primarily for customer deposits, and the 509 Account was used for customer withdrawals.  After the creation of the LLC in 2001, Ms. Collura testified that none of these operational practices changed in any respect. Trial Tr. 201:24–202:5 (Collura).  "There wasn't a hiccup" in how the JPMorgan

Accounts functioned according to Mr. Dubinsky.  Indeed, the change from sole proprietorship to

LLC was "invisible to anybody . . . . [n]othing changed."  Trial Tr. 94:15–25 (Dubinsky).

123.    Thus, as a matter of New York law, BLMIS was the holder of the JPMorgan

Accounts.

### C.    SIPA And The Bankruptcy Code Render The Holder Of The JPMorgan Accounts Irrelevant Because Customer Property, Wherever Held, Is Recoverable By The Trustee

124.    The Court has posed the questions of (1) whether SIPA, the Bankruptcy Code or

other federal law displaces the New York law on the possessor of a bank account, and (2) under

SIPA, how customer property is defined and how the evidence adduced at trial proves whether

any monies in the JPMorgan Accounts are customer property.  The analyses of these questions,

the applicable law and the relevant facts are intertwined.  Under SIPA and the Bankruptcy Code,

the funds held in the JPMorgan Accounts were customer property (not debtor property) within

the meaning of SIPA §§ 78fff-2(c)(3) and 78*lll*-4, rendering them recoverable by the Trustee

regardless of the account ownership issue.

### (1)    SIPA and the Bankruptcy Code

125.    SIPA incorporates certain provisions of the Bankruptcy Code, including the

avoidance provisions to the extent consistent with SIPA.  SIPA § 78fff(b).  As the Second Circuit

recently confirmed, "A trustee therefore can invoke the fraudulent transfer provisions in the

Bankruptcy Code to recover customer property."  *Picard v. Gettinger*, No. 19-0429-bk(L), 2020

WL 5666677 (2d Cir. Sept. 24, 2020).

126.    The Trustee has standing to seek to avoid and recover the Two-Year Transfers

under sections 548 and 550 of the Bankruptcy Code.  *See Togut v. RBC Dain Correspondent

Servs. (In re S.W. Bach & Co.)*, 435 B.R. 866, 875–76 (Bankr. S.D.N.Y. 2010) ("[F]raudulent

transfer law allows [the Trustee] to avoid transactions which unfairly or improperly deplete [the]

debtor's assets or that unfairly or improperly dilute the claims against those assets." (quoting 5

Collier's On Bankruptcy ¶ 548.01)); *Bayou Superfund, LLC v. WAM Long/Short Fund II (In re*

*Bayou Grp., LLC)*, 362 B.R. 624, 629 (Bankr. S.D.N.Y. 2007).

127.    For purposes of avoidance and recovery, BLMIS is deemed under SIPA to have

an interest in the avoidable transfers.  *See* SIPA § 78fff-2(c)(3); *Gettinger*, 2020 WL 5666677, at

*3.  Although customer funds held by a broker (such as BLMIS) are not the broker's property

under state law, and an ordinary bankruptcy trustee cannot avoid a transfer of non-debtor

property, "SIPA circumvents this problem through a statutorily created legal fiction that confers

standing on a SIPA trustee by treating customer property as though it were 'property of the

debtor' in an ordinary liquidation."  *Picard v. Lowrey*, Adv. Pro. No. 10-04387 (SMB), 2018 WL

1442312, at *4 (Bankr. S.D.N.Y. March 22, 2018) ("*Lowrey I*"), *adopted by* 596 B.R. 451

(S.D.N.Y. 2019) ("*Lowrey II*"), *aff'd sub nom. Gettinger*, 2020 WL 5666677 (citing *Picard v.

Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014)); *Picard v. Cohen*, Adv. Pro. No. 10-

04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. April 25, 2016) (report and

recommendation), *adopted by* No. 16 Civ. 5513 (LTS), slip op. (S.D.N.Y. Feb. 24, 2016)

("BLMIS transferred customer property to [defendant], and under SIPA § 78fff-2(c)(3) such

property is 'deemed to have been property of the debtor'"); *McHale, Jr. v. Boulder Cap. LLC (In

re 1031 Tax Grp.)*, 439 B.R. 47, 68–70 (Bankr. S.D.N.Y. 2010) (finding that, in a Ponzi scheme,

money reflected in bank account statements "in the name of a debtor is presumed to be property

of the bankruptcy estate" for purposes of 11 U.S.C. § 548(a)(1)).

128.    As numerous courts, including this one, have found "customer deposits are

deemed to be BLMIS's property for the purposes" of these adversary proceedings.  *Nelson*, 610

B.R. 197 at 233 (concluding that the transfers from December 11, 2006 to December 11, 2008

were made from property of BLMIS); *Picard v. Legacy Cap., Ltd.*, 603 B.R. 682, 687, n.4

(Bankr. S.D.N.Y. 2019); 11 U.S.C. § 541(a)(1) (property of the estate includes all legal or

equitable interests of the debtor in property); SIPA § 78fff-2(c)(3) (transferred customer property

is "deemed to have been the property of the debtor."); *Cohen*, 2016 WL 1695296, at *5

("BLMIS transferred customer property to [defendant], and under SIPA § 78fff-2(c)(3) such

property is 'deemed to have been property of the debtor'"); *In re 1031 Tax Grp.*, 439 B.R. at 70.

### (2)    SIPA and SIPC

129.    In enacting SIPA, Congress fashioned a program for protecting customer

property—that is, property placed with a broker-dealer for the purchase of securities where title

to such property always remained with the customer. This program included the creation of

SIPC, a nonprofit, private membership corporation to which most registered broker-dealers are

required to belong.

130.    When one of its members fails, SIPC protects those customers by initiating a

SIPA liquidation, a form of liquidation proceeding applicable only to SIPC member firms. *See*

*SEC v. F.O. Baroff Co.*, 497 F.2d 280, 281 (2d Cir. 1974) (holding that the object of SIPA and

SIPC is to protect customers in the brokerage industry). Although a SIPA liquidation is similar

to a bankruptcy and incorporates certain provisions of the Bankruptcy Code, it is "tailored to

achieve SIPA's objectives," *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 424 B.R.

122, 133 (Bankr. S.D.N.Y. 2010), one of which is the prompt return of customer property to

customers. SIPA § 78fff(a); *see also In re Picard*, 917 F.3d 85, 92 (2d Cir. 2019); *Sec. Inv'r*

*Prot. Corp. v. Barbour*, 421 U.S. 412, 416 (1975).

131.    SIPC specifies a trustee to liquidate the business and any assets of the member-

broker and recover customer property wrongfully transferred or unlawfully converted by the

broker. SIPA §§ 78*lll*(4), 78fff-2(c)(3). These funds form the corpus of the customer property

estate, from which the trustee makes distributions to customers of their ratable share of customer property.  SIPA § 78fff-2(c)(1).

132.    SIPA prioritizes this customer property estate, which is distinct from the general bankruptcy estate.  SIPA § 78fff-2(c)(1); *see Gettinger*, 2020 WL 5666677 at *11; *see In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011); *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010); *In re Weis Sec., Inc.*, No. 73 Civil 2332, 1976 WL 820, at *6−7 (S.D.N.Y. Aug. 2, 1976); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 499 B.R. 416, 420 (S.D.N.Y. 2013).

133.    The customer property estate is composed of customer property, including recovered assets, which are earmarked to satisfy customers' net equity claims.  By contrast, the general estate is made up of the broker-dealer's assets available to satisfy the claims of general creditors.  *See Gettinger*, 2020 WL 5666677 at *11; *In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 270 (Bankr. S.D.N.Y. 1996).

134.    The "members" of SIPC include "all persons registered as broker-dealers" with the SEC under section 78*o*(b) of Title 15.  SIPA § 78ccc(a)(2)(A).  SIPC membership, and thus SIPA protection, arises from a broker-dealer's registration with the SEC, without regard to the corporate form of the broker-dealer.  SIPA § 78ccc(a).

### (3)    Initiating a SIPA Liquidation

135.    If SIPC determines that one of its members has failed or is in danger of failing to meet its obligations to customers, it applies for a customer protective decree in district court. The district court acquires jurisdiction over the broker-dealer and its property wherever located. SIPA § 78eee(b)(2)(A)(1).  The decree places the firm in liquidation and appoints a trustee specified by SIPC to liquidate the business of the debtor-broker.  SIPA § 78eee(b)(3).  The liquidation is then removed to the bankruptcy court.  SIPA § 78eee(b)(4).

136.    The term "debtor" has a special definition under SIPA: "a *member* of SIPC with respect to whom an application for a protective decree has been filed under section 78eee(a)(3) of this title." SIPA § 78*lll*(5) (emphasis added). This differs from the Bankruptcy Code, where a "debtor" is an individual, partnership, or corporation. 11 U.S.C. §§ 109(a), 101(41). Because SIPC membership tracks SEC registration, SIPC names the SEC-registered broker-dealer that is at risk of failing as the "debtor" in the application for the protective decree. Thus, registration under 15 U.S.C. § 78*o*(b) is the key to who the SIPC member is, and, if the member is placed into liquidation, who the debtor is.

### (4)    Customer Property Under SIPA

137.    Customer property is a term of art in the securities industry, and means property held by a broker-dealer but that belongs to customers. *See* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74 (2002); *see, e.g.*, *Lowrey II*, 596 B.R. at 469–70.

138.    When customers invest their cash and securities with a broker, they transfer possession, but not title, of their money to the broker. The broker never owns that money, but rather is legally bound to hold that money in reserve for its customers. *See Lowrey II*, 596 B.R. at 470 (noting that "customer property" in securities industry refers to property held by broker-dealer but belongs to its customers).

139.    Customer protection rules, promulgated by the SEC as required by SIPA, require broker-dealers to safeguard customers' securities and cash in a reserve fund. This reserve would form the corpus of the firm's estate for distribution to customers if the firm went into liquidation under SIPA. Exchange Act Release No. 34-9856, Adoption of Rule 15c3-3, 37 Fed. Reg. 25224, 25225 (Nov. 29, 1972), 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3"); *see also* Jamroz, 57 Bus. Law. at 1071–74.

140.    Customer property includes securities and cash held for customers under Rule

15c3-3; assets derived from or traceable to customer property; and, under SIPA § 78*lll*(4)(D),

other debtor property that a trustee must allocate to the fund of customer property as necessary to

remedy the debtor's non-compliance with the segregation requirements of Rule 15c3-3.

141.    Customer property retains its nature and special protections under SIPA, even if

the broker transfers that property to others.  SIPA § 78*lll*(4) (including in the definition of

customer property "the proceeds of any such property transferred by the debtor, including

property *unlawfully converted*" (emphasis added)); *see also Dowden v. Cross Cty. Bank (In re*

*Brittenum & Assocs., Inc.)*, 97 B.R. 503, 508 (E.D. Ark. 1987) (Rule 15c3-3 deposit is not

subject to bank's setoff claim because it is customer property); Rule 15c3-3(f) (Rule 15c3-3

account cannot be subject to bank lien because it consists of customer property).  This broad

definition recognizes customers' enduring rights to the property they gave to their broker for

safekeeping.

142.    Once a broker-dealer goes into liquidation under SIPA, the SIPA designation of

customer property is essentially a continuation of Rule 15c3-3, which serves to prioritize

customers over all other creditors.  *In re Lehman Bros. Holdings*, 445 B.R. 143, 191–92 (Bankr.

S.D.N.Y. 2011), *rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012).

143.    As discussed above, SIPA § 78fff-2(c)(3) creates a legal fiction that confers

standing on SIPA trustees to recover customer property by treating such property as though it

were "property of the debtor" in an ordinary bankruptcy even though it is not the property of the

broker.  *Gettinger*, 2020 WL 5666677 at *11; *Fairfield Greenwich Ltd*., 762 F.3d at 213.  SIPA

§ 78fff-2(c)(3) allows a trustee to "recover any property transferred by the debtor which, except

for such transfer, would have been customer property."

144.    This provision is designed "to recover securities that would have been part of the fund of customer property but for a prior transfer to a customer." *In re Bevill, Bresler & Schulman, Inc.*, 83 B.R. 880, 893 (D.N.J. 1988).  "The inquiry in an avoidance action, therefore, is: if the transfer did not occur, would the securities have been part of the fund of customer property?" *Id.*  If the answer is yes, then that cash or securities are customer property subject to recovery by SIPA trustees.

### (5)    Madoff's Business

145.    When IA Business customers sent him money to purchase securities, Madoff did not reserve it but converted and commingled customer money into the 703 Account.  Trial Tr. 77:21–80:9 (Dubinsky) (referencing TX-040 (Sources of Funds into IA Business)); Trial Tr. 179:18–180:12, 181:13–182:6 (Collura) (referencing TX-DEM001 (Flowchart of Activity in IA Business Bank Accounts), TX-DEM002 (Flowchart of Activity in the 703 Account)).

146.    This pool of commingled funds was used to pay customer redemptions.  Trial Tr. 77:21–80:9 (Dubinsky) (referencing TX-040 (Sources of Funds into IA Business)); Trial Tr. 179:18–180:12, 181:13–182:6, 183:24–185:2 (Collura) (referencing TX-DEM001 (Flowchart of Activity in IA Business Bank Accounts), TX-DEM002 (Flowchart of Activity in the 703 Account)); *see also BAM L.P.*, 608 B.R. at 174–75; *In re Picard*, 917 F.3d 85, 92 (2d Cir. 2019) (noting that Madoff commingled funds into JPMorgan checking account and sent customers redemptions from commingled account); *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 564 (2d Cir. 2016) ("BLMIS deposited customer investments into a single commingled checking account and . . . [w]hen customers sought to withdraw money from their accounts, including withdrawals of the fictitious profits that BLMIS had attributed to them, BLMIS sent them cash from the commingled checking account.").

### (6)     The Liquidation of BLMIS

147.    In December 2008, SIPC sought a protective decree under SIPA § 78eee that the

customers of a member broker-dealer needed protection under SIPA.  *SEC v. Madoff*, No. 08-cv-

10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 5 ("SIPC Application").

148.    The SIPC Application named the member broker-dealer that was registered with

the SEC as of December 2008 under Registrant Number 8-8132: Bernard L. Madoff Investment

Securities LLC.  Trial Tr. 42:16–45:8, 54:22–55:4 (Dubinsky); TX-002 (1959 SEC Form BD);

TX-003 (2001 SEC Amended Form BD).

149.    The district court entered the decree and appointed the Trustee "for the liquidation

of the *business of the Defendant* with all the duties and powers of a trustee as prescribed in

SIPA."  Order ¶ 2, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4

("Protective Decree") (emphasis added).

### (7)     Substantive Consolidation

150.    In the days and months immediately following the revelation of the Ponzi scheme,

an SEC receiver was appointed for BLMIS,[4] the SIPA Trustee was appointed for BLMIS, a Joint

Provisional Liquidator was appointed for Madoff's London entity, and the United States

Government instituted a criminal proceeding against Madoff.  Stmt. ¶¶ 1–6.  By March 15, 2009,

the Government indicated its intent to forfeit certain of Madoff's personal assets.  *See*

Government's Notice of Intent to Seek Forfeiture of Certain Assets, *United States v. Madoff*, No.

09-cr-213 (DC) (S.D.N.Y. Mar. 15, 2009), ECF No. 59.  But as of April 2009, no chapter 7 case

had been initiated against Madoff personally.  Creditors sued him in various jurisdictions outside

---

[4] The receivership was terminated upon the appointment of a SIPA Trustee.

the bankruptcy court.  *See, e.g.*, *Leonhardt v. Madoff*, No. 09-2032 (S.D.N.Y. Mar. 5, 2009);

*Town of Fairfield v. Madoff*, No. 09-5023735 (Conn. Super. Ct. Mar. 30, 2009).

151.    In response, certain creditors filed an involuntary bankruptcy petition against

Madoff, citing the need for his personal estate to be marshaled and distributed in a coordinated,

consistent, and efficient manner alongside the liquidation of his company.  These creditors were

concerned with the "specter of overlapping asset administrations which could delay or prejudice

distributions to creditors," in light of the Government's forfeiture of assets and the SEC seeking

disgorgement and civil penalties of Madoff and his firm.  Pet. at 7, *SEC v. Madoff*, No. 08-cv-

10791 (LLS) (S.D.N.Y. Apr. 1, 2009), ECF No. 37.

152.    The district court agreed that the appointment of a chapter 7 trustee for Madoff

would stem the proliferation of lawsuits against Madoff and enable an orderly and equitable

administration of his personal estate.  Order at 3–4, *SEC v. Madoff*, No. 08-cv-10791 (LLS)

(S.D.N.Y. Apr. 10, 2009), ECF No. 47.  In allowing the creditors to commence the involuntary

case against Madoff, the district court specifically referenced that they should be able to target

"that portion of Mr. Madoff's property that is neither forfeitable criminally *nor subject to the*

*liquidation of BLMIS under SIPA*."  *Id.* at 4 (emphasis added).

153.    The bankruptcy court subsequently appointed Alan Nisselson as Chapter 7

Trustee for Madoff.  Notice of Appointment of Trustee Alan Nisselson, *In re Bernard L. Madoff*,

No. 09-11893 (SMB) (Bankr. S.D.N.Y. Apr. 21, 2009), ECF No. 13.

154.    On June 10, 2009, the bankruptcy court entered a consent order that merged the

chapter 7 estate of Bernard L. Madoff into the BLMIS SIPA proceeding *nunc pro tunc*, and all

assets and liabilities of the two estates were deemed consolidated as of the date of the filing of

the liquidation proceedings.  Consent Order Substantively Consolidating the Estate of Bernard L.

Madoff into the SIPA Proceeding of Bernard L. Madoff Investment Securities LLC and

Expressly Preserving All Rights, Claims and Powers of Both Estates, *Sec. Inv'r Prot. Corp. v.

Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 10,

2009), ECF No. 252 (the "Substantive Consolidation Order").

155.    The Substantive Consolidation Order merged the chapter 7 estate of Bernard L.

Madoff into the BLMIS SIPA proceeding *nunc pro tunc*, and all assets and liabilities of the two

estates were deemed consolidated as of the date of the filing of the liquidation proceedings.

156.    The Substantive Consolidation Order expressly preserved the SIPA Trustee's

powers to avoid and recover fraudulent transfers of customer property and the Chapter 7

Trustee's powers to pursue recovery of Madoff's non-customer property.  *Id.* ¶¶ 4, 7 ("[T]he

SIPA Trustee is authorized to pursue claims on behalf of the consolidated estate as representative

of and fiduciary for the BLMIS SIPA Proceeding and as subrogee and assignee of creditors'

claims for, among other things, the avoidance and recovery of transferred property.").  However,

the Substantive Consolidation Order did not alter the Trustee's powers to recover customer

property that he already possessed under SIPA.

### (8)    The Trustee Can Recover Any Transfers of Customer Property

157.    When IA Business customers entrusted money with BLMIS for the purpose of

purchasing securities, it became "customer property" under SIPA.  SIPA § 78*lll*(4).  Thus, upon

deposit into the JPMorgan Accounts, that money was "customer property" under SIPA.  When

BLMIS transferred that property, such property remains "customer property" subject to the

special protections of SIPA.  SIPA § 78lll(4).

158.    BLMIS used the JPMorgan Accounts as the firm's de facto Rule 15c3-3 account.

Trial Tr. 77:21–80:9 (Dubinsky) (referencing TX-040 (Sources of Funds into IA Business));

Trial Tr. 179:18–180:12, 181:13–182:6, 183:24–185:2 (Collura) (referencing TX-DEM001

41

(Flowchart of Activity in IA Business Bank Accounts), TX-DEM002 (Flowchart of Activity in the 703 Account)); 17 C.F.R. § 240.15c3-3.

159.    Whether operated as a sole proprietorship or as an LLC, BLMIS's assets were composed of customer property and its liabilities were composed of amounts owed to customers. As indicated in the 2001 SEC Amended Form BD, all assets and liabilities were transferred from the sole proprietorship to the LLC.  TX-003 (2001 SEC Amended Form BD).

160.    The protections provided by SIPA mandate that the Trustee can recover transfers of customer property by the SIPC member, regardless of its corporate form.  There was no error in naming only the LLC in the Protective Decree.  SIPA requires a protective decree when a SIPC-member broker-dealer fails.  SIPA § 78eee(b)(1).  The *only* SIPC *member* at the time of failure was the LLC, as the sole proprietorship had ceased to operate almost eight years prior, and thus the LLC was the only entity that *could have been* named in the Protective Decree.

161.    There is no requirement in SIPA that a protective decree identify every name or form of organization under which the broker-dealer member of SIPC formerly operated to provide the broker-dealer's customers with the protections of SIPA.  The protective decree names the SEC registrant/SIPC member, which is sufficient to encompass all customer property—in whatever form—ever possessed by that member.  Otherwise, customer property could be transferred to a bank account held in a different name, or to a new entity, leaving a broker-dealer's customers unprotected by SIPA.

162.    With no monitoring function over broker-dealers, SIPC steps in only when a member is in danger of failing—usually in precipitous circumstances leading to the failure.  In order to protect customers and return their property promptly, SIPC must act quickly to commence the liquidation proceeding.  Imposing a requirement on SIPC to name every

predecessor entity when commencing a liquidation—before there is an investigation by a SIPA

trustee into the member's operations—would place SIPC in a Catch-22.  By waiting to file a

liquidation proceeding to investigate a member's corporate structure and operations, customers

are placed in greater risk through delay and dissipation of customer assets.  But filing a

liquidation proceeding without doing so means that the eventual trustee that is appointed may not

be able to fully recover all customer property.  Imposing an extra-statutory requirement to name

not only the current member but any predecessor entities on SIPC is at odds with Congress'

intent in passing SIPA: customer protection.  Not surprisingly then, there is no such requirement

in the statute itself.

163.    When the Trustee was appointed, it was for the liquidation of the *business* of the

broker-dealer.  There are numerous undisputed facts that show that the sole proprietorship and

the LLC continued uninterrupted as a single business dealing with customer property since

Madoff registered as a broker-dealer with the SEC in 1960, including:

- Customer property was deposited into the same JPMorgan commercial banking account (the 703 Account) when BLMIS operated as a sole proprietorship and as an LLC.  Trial Tr. 197:21–198:8 (referencing TX-DEM004 (703 Account and 509 Account Name Change), which features TX-033 and TX-035), 201:24–202:5 (Collura).

- Madoff reported to the SEC that he transferred all assets and liabilities, which by definition includes the JPMorgan Accounts, from the sole proprietorship to the LLC. TX-003 (2001 SEC Amended Form BD).

- The customers of the sole proprietorship became the customers of the LLC when it changed corporate form.  Trial Tr. 55:5–57:5, 69:22–70:11 (Dubinsky); TX-003 (2001 SEC Amended Form BD).

- When Madoff converted the sole proprietorship to an LLC, he expressly identified it to the SEC as an amendment to an existing broker-dealer's registration—not a new application of a separate broker-dealer seeking to register with the SEC.  TX-003 (2001 SEC Amended Form BD).

- The SEC registration number of BLMIS has always remained 8-8132 throughout the entire course of its business. Trial Tr. 42:16–45:8, 54:22–55:4 (Dubinsky); TX-002 (Form BD); TX-003 (2001 SEC Amended Form BD).

164.    Indeed, Judge Bernstein has recognized as much, stating that Madoff has always been a member of SIPC, and "the incorporation of BLMIS as a limited liability company continued his business without change . . . . Thus, nothing has changed since 1960 except for the business form that Madoff used to conduct his Ponzi scheme." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014).

165.    It is also telling that Defendants filed their customer claims in the SIPA liquidation of BLMIS. While they now argue that they did not receive transfers from BLMIS, they sought to recoup the amounts that appeared on their customer statements as part of the claims process established for the liquidation of BLMIS. *MSJ 56(g) Decision*, 608 B.R. at 176–77.

166.    Because the Trustee is appointed for the liquidation *of the business* of the debtor, such liquidation necessarily entails the liquidation of any predecessor conducting the same business, using the same SEC filing number, on behalf of its customers with their customer property.

167.    SIPA makes clear that a SIPA trustee is authorized to recover customer property wherever it lies. SIPA protection focuses on "whether there was actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation." *In re Old Naples Sec., Inc.*, 223 F.3d 1296, 1302 (11th Cir. 2000) (internal quotation marks omitted); *see also In re Primeline Sec. Corp.*, 295 F.3d 1100, 1107 (10th Cir. 2002) ("Whether a claimant deposited funds 'with the debtor' does not depend simply on to whom claimants made their checks payable . . . [t]he relevant inquiry is whether the brokerage firm actually received, acquired or possessed claimants property.").

44

168. Thus, as long as a trustee can show that the property in question was customer property received by the broker-dealer, he has the authority to recover it, wherever it lies. *Gettinger*, 2020 WL 5666677 at *11 (citing SIPA § 78fff-2(c)(3)); *see also BAM L.P.*, 608 B.R. at 176 ("I do not mean to suggest that the deposit of customer funds into a Chase account in the name of Madoff or Madoff Securities changes the nature of customer funds or prevents the Trustee from avoiding and recovering the Two-Year Transfers.").

169. The fact that a broker-dealer may have operated under a different legal form many years prior to the SIPA liquidation does not change a SIPA trustee's rights and powers to recover that customer property for the benefit of its owners—the customers.

170. Focusing on the name on a check or the corporate from of the broker-dealer at a particular time shifts the focus away from SIPA's customer property regime and instead allows the fraudster to determine the circumstances under which customer property can be recovered. Where, as here, there is no dispute that the Trustee is seeking to recover transfers comprising customer property, the form of the broker-dealer at the time of transfer is simply irrelevant.

171. The Substantive Consolidation Order changed nothing about the SIPA Trustee's rights to customer property. If anything, it was a "belt and suspenders" order to ensure that none of Madoff's assets slipped through the cracks given that the Government was pursuing forfeiture, the SIPA Trustee was pursuing customer property, and the Joint Provisional Liquidators were marshaling the assets of Madoff's London entity.

172. The order expressly states that the SIPA Trustee will retain his powers to recover customer property notwithstanding the consolidation of the estates. Such reservations did not in any way change the rights and powers that were conferred on the SIPA Trustee as a result of the commencement of the SIPA liquidation.

173.    Instead, those reservations in the order were necessary because absent express preservation, the substantive consolidation of two debtors' estates could have extinguished both trustees' avoidance powers altogether. *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 768–69 (9th Cir. 2000) ("Absent express preservation of the trustee's avoidance power, an order of substantive consolidation would ordinarily eliminate that power.").

174.    Finally, taken to its logical conclusion, because BLMIS's only assets were funds in the JPMorgan Accounts, Defendants' argument means that there is no customer property in the SIPA liquidation and there is no estate representative who can recover the funds transferred out of that bank account.  Such an outcome would leave a vast amount of customer property outside the reach of the SIPA liquidation, something SIPA does not intend.  This result cannot be reconciled with the order appointing the Trustee, the Substantive Consolidation Order, prior precedent in this case, nor with the plain language of SIPA

175.    This Court concludes that the Trustee has shown that the property he is seeking to recover is customer property, and he has the power to recover it, whether that property is held in an account with the letters "LLC" or not.  Such property never belonged to Madoff, the sole proprietorship, or the LLC, regardless of whose name was on the bank account, it only belonged to customers.  That is what SIPA's definition or customer property and SEC Rule 15c3-3 (promulgated at the direction of SIPA), which work hand-in-hand to protest customer assets, mean.  Whatever particular bank account a fraudster chooses to park customer property in or however that particular bank account is denominated cannot change the nature of customer property or the Trustee's duty to recover that property and return it to its rightful owners.  That is what SIPA and SEC Rule 15c3-3 intend.

176.     Based on the foregoing, the Trustee has demonstrated that the Two-Year Transfers he seeks to recover were made by BLMIS, the SIPA debtor within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548(a)(1)(A) and that he is entitled to recover those Transfers.

**D.    The Two-Year Transfers Were Transfers By The SIPA Debtor Within The Meaning Of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548 (a)(1)(A**

177.     The Trustee seeks to avoid and recover the Two-Year Transfers in the amount of $563,000 from BAM L.P. relating to Account No. 1CM579, and $2,250,000, from Michael Mann and Meryl Mann relating to Account No. 1CM363.  *MSJ 56(g) Decision,* 608 B.R. at 176.

178.     Each of the avoidable transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 78fff-2(c)(3) of SIPA and section 101(54) of the Bankruptcy Code.  SIPA § 78fff-2(c)(3); 11 U.S.C. § 101(54).

179.     Under SIPA § 78fff-(2)(c)(3), the Trustee may recover any transfers by the debtor whenever customer property is insufficient to pay customer claims.  To date, the Trustee has recovered $14.345 billion of $20 billion owed to customers by the estate.  *See* Trustee's Twenty-Third Interim Report for the Period October 1, 2019 Through March 31, 2020, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Apr. 28, 2020), ECF No. 19502.  Because customer property is insufficient to pay the outstanding customer claims, the Trustee is authorized to recover the Two-Year Transfers to Defendants.  *Omnibus Good Faith Decision*, 531 B.R. at 453–54; *see also Picard v. Flinn Invs., LLC*, 463 B.R. 280, 284 (S.D.N.Y. 2011); *In re Bevill, Bresler & Schulman, Inc*., 83 B.R. at 898.

180.     The Trustee seeks to avoid and recover transfers of fictitious profits made to Defendants under 11 U.S.C. § 548(a)(1)(A). The elements of this claim are: (i) a transfer of an

interest of the debtor in property; (ii) made within two years of the petition date; (iii) with "actual

intent to hinder, delay, or defraud" a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, Nos.

05 Civ. 9050(LMM), 03, MDL 1529, 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd*,

748 F.3d 110 (2d Cir. 2014).

181.    This Court already determined that the Trustee has demonstrated that the Two-

Year Transfers were made with the actual intent to hinder, delay or defraud creditors within the

meaning of 11 U.S.C. § 548(a)(1)(A). *MSJ 56(g) Decision*, 608 B.R. at 176.

182.    Defendants previously stipulated to the amount of the deposits into and

withdrawals from their respective BLMIS accounts, and to the amount of the transfers made

during the Two-Year Period. *Id.* Defendants Michael Mann and Meryl Mann withdrew

$2,250,000.00 and Defendant BAM L.P. withdraw $563,000 during the Two-Year Period. *Id.*

As this Court stated, "[a]ll of the Two-Year Transfers consisted of fictitious profits in the sense

that the Defendants had exhausted the amounts of their deposits before the onset of the Two-

Year Period." *Id.*

183.    Defendants are likely to rely on *Picard v. Avellino*, 557 B.R. 89 (Bankr. S.D.N.Y.

2016), which held that the Trustee could not recover transfers prior to 2001, when BLMIS was

converted from a sole proprietorship to an LLC but their reliance is misplaced.  Unlike the

Trustee's case in *Avellino*, in which he sought to recover transfers prior to 2001, here, the

Trustee only seeks to avoid transfers of fictitious profits within the Two-Year Period.

184.    Because this Court finds that: (1) the transfers that the Trustee seeks to recover in

this case were made between 2006 and 2008, after the LLC was formed and acquired all of the

assets of the sole proprietorship; and (2) the transfers consisted of customer property, the

transfers were interests of BLMIS in property.

## <u>CONCLUSION</u>

The Trustee respectfully requests that this Court enter judgment that transfers in the amount of $2,813,000 are avoided and recoverable from Defendants as follows: (1) $563,000 from BAM L.P. relating to Account No. 1CM579, and (2) $2,250,000, from Michael Mann and Meryl Mann relating to Account No. 1CM363.

Dated:    October 15, 2020
         New York, New York

Respectfully submitted,

*/s/ Nicholas J. Cremona*
David J. Sheehan
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Lan Hoang
Email:  lhoang@bakerlaw.com
Amy Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*