**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and for the Estate of Bernard L. Madoff,<br><br>    Plaintiff,<br><br>    v.<br><br>BAM L.P., MICHAEL MANN, and MERYL MANN,<br><br>    Defendants. | Adv. Pro. No. 10-04390 (CGM) |

**SECURITIES INVESTOR PROTECTION CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF THE TRUSTEE'S POST-TRIAL PROPOSED FINDINGS OF <u>FACT AND CONCLUSIONS OF LAW</u>**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT .......................................................................................................................... 2

    I.      How SIPA Defines "Customer Property" ............................................................. 2

           A.      The history and principles underlying SIPA ............................................. 2

           B.      The broad definition of "customer property" under SIPA ........................ 5

           C.      The money in the 703 account and the 509 account was customer property ........................................................................................................ 7

    II.     SIPA's Customer Property Principles Override Inconsistent New York Law on the Ownership of a Bank Account ........................................................................ 10

    III.    The Two-Year Transfers from the SIPA Debtor ................................................. 12

CONCLUSION ..................................................................................................................... 14

# **TABLE OF AUTHORITIES**

**CASES**                                                                                                          **PAGE**

*In re Adler, Coleman Clearing Corp.*, 204 B.R. 99 (Bankr. S.D.N.Y. 1997) ................................3

*In re Hanover Square Sec.*, 55 B.R. 235 (Bankr. S.D.N.Y. 1985) ..................................................4

*In re IFS Fin. Corp.*, 669 F.3d 255 (5th Cir. 2012) .......................................................................12

*In re John Dawson & Assocs. Inc.*, 289 B.R. 654 (Bankr. N.D. Ill. 2003)......................................6

*In re MJK Clearing, Inc.*, 286 B.R. 109 (Bankr. D. Minn. 2002), *aff'd.*, Civ No. 02-4775 RHK, 2003 WL 1824937 (D. Minn. Apr. 7, 2003), *aff'd.*, 371 F.3d 397 (8th Cir. 2004) .............6

*In re Motors Liquidation Co.*, 590 B.R. 39 (S.D.N.Y. 2018), *aff'd*, No. 18-1940, 2019 WL 6121345 (2d Cir. Nov. 19, 2019).......................................................................................10

*In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2004) .......................................................4

*In re New Times Sec. Servs., Inc.*, 463 F.3d 125 (2d Cir. 2006) .....................................................4

*In re Old Naples Sec., Inc.*, 223 F.3d 1296 (11th Cir. 2000) ......................................................4, 9

*In re Primeline Sec. Corp.*, 295 F.3d 1100 (10th Cir. 2002) ..........................................................9

*Peloro* v. *United States*, 488 F.3d 163 (3d Cir. 2007) .....................................................................6

*Perez v. Terrastar Corp.* (*In re Terrestar Corp.*), No. 16 Civ. 1421 (ER), 2017 WL 1040448 (S.D.N.Y. Mar. 16, 2017), *appeal dismissed*, No. 17-1117 (2d Cir. June 7, 2017)...........10

*Picard v. Carol Nelson,* (*In re Bernard L. Madoff Inv. Sec. LLC*), Adv. Pro. No. 10-04658 (Bankr. S.D.N.Y. December 9, 2019)................................................................................13

*Picard v. Carol and Stanley Nelson,* (*In re Bernard L. Madoff Inv. Sec. LLC*), Adv. Pro. No. 10-04377 (Bankr. S.D.N.Y. December 9, 2019)....................................................................13

*Picard v. Carol Nelson, et al.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 610 B.R. 197 (Bankr. S.D.N.Y. 2019) .................................................................................................................10

*Picard v. Gettinger*, No. 19-0429-bk(L), 2020 WL 5666677 (2d Cir. Sept. 24, 2020).................11

*Picard v. Legacy Capital, Ltd.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 603 B.R. 682 (Bankr. S.D.N.Y. 2019) .................................................................................................................10

*SEC v. F.O. Baroff Co.*, 497 F.2d 280 (2d Cir. 1974) .....................................................................4

# TABLE OF AUTHORITIES (*continued*)

**CASES (*continued*):**                                                                                      **PAGE**

*SIPC v. Austin Sec., Inc.*, No. 05-1144 DEM (Bankr. E.D.N.Y. 2007) ........................................... 7

*Sec. Inv'r Prot. Corp. v. Barbour*, 421 U.S. 412 (1975) ............................................................. 3

**STATUTES:**

Securities Investor Protection Act, as amended, 15 U.S.C. §

78aaa ............................................................................................................................ 1
78ccc(a) ........................................................................................................................ 7
78eee(d) ........................................................................................................................ 1
78fff-3 ........................................................................................................................... 4
78fff-2(c)(3) ......................................................................................................... 1, 10-13
78kkk(g) ....................................................................................................................... 3
78*lll* ............................................................................................................................. 1
78*lll*(4) ..................................................................................................................... 5, 11
78*lll*(4)(E) ................................................................................................................. 6, 8

Securities Exchange Act of 1934, 15 U.S.C. §

78a *et seq*… .................................................................................................................. 1

United States Bankruptcy Code, 11 U.S.C. §

101 *et seq*. ..................................................................................................................... 1
548 ..................................................................................................................... 1, 13-14
550 ............................................................................................................................ 13

**OTHER AUTHORITIES:**

17 C.F.R. § 240.15c3-3 ............................................................................................. 3, 5

Exchange Act Release No. 34-9856, 37 Fed. Reg. 25,224 (1972) ................................. 3

Exchange Act Release No. 9856, [1972-73 Transfer Binder] Fed. Sec. L. Rep. (CCH)
    ¶ 79,083 (Nov. 13, 1972) ........................................................................................... 3

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069 (2002) ............ 3

*Hearings Before the Subcomm. on Consumer Protection & Finance of the Comm. on Interstate
    & Foreign Commerce*, 95th Cong., 1st Sess., 167 (Aug. 1, 2, and 3, 1977) (Hearings on
    H.R. 8331) (Section by Section Explanation of H.R. 8331 Amendments to SIPC) ............. 5

# TABLE OF AUTHORITIES (*continued*)

**OTHER AUTHORITIES (*continued*):**  **PAGE**

*Report of the Special Study of the Securities Markets of the Securities and Exchange Commission*, H.R Doc. No. 95, pt. 1 (1st Sess. 1963) ............................................................. 2

*Study of Unsafe and Unsound Practices of Brokers and Dealers of the Securities and Exchange Commission,* H.R. Doc. No. 92-231 (1971) ........................................................................ 2-3

Following trial in this matter on September 14, 2020, the Securities Investor Protection Corporation ("SIPC")[1] hereby submits this Memorandum of Law in Support of the Proposed Findings of Fact and Conclusions of Law, filed by Irving H. Picard, trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS" or "Debtor") under the Securities Investor Protection Act, 15 U.S.C. §§ 78*aaa-78lll* ("SIPA"),[2] and Bernard L. Madoff ("Madoff"), against BAM L.P., Michael Mann, and Meryl Mann ("Defendants"), as to the following issues: (1) the definition of Customer Property under SIPA § 78*lll*, and how the evidence proves that the funds in the 703 account and the 509 account are "customer property" as defined in SIPA §78*lll*(4); (2) whether any federal law, the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, SIPA, or the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, displaces New York law on the ownership of a bank account, and (3) whether the two-year transfers were transfers by the SIPA debtor within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548(a)(1)(A).

## PRELIMINARY STATEMENT

Investor confidence is essential to the health and success of U.S. securities markets. SIPA and complementary Securities and Exchange Commission ("SEC") customer protection rules ensure that customers receive the maximum protection possible in the event their broker-dealer fails financially and is liquidated.

BLMIS's customers relied on this federal scheme of customer protection when they entrusted cash to BLMIS as a regulated broker-dealer and SIPC member. Correct allocation of "customer property" in accordance with SIPA and other applicable statutory provisions, rules

---

[1] SIPC is a party-in-interest and a statutory intervenor in all liquidations under the Securities Investor Protection Act. *See* 15 U.S.C. § 78eee(d).

[2] For convenience, further references to SIPA shall omit "15 U.S.C."

1

and regulations, is necessary both to meet the justified expectations of BLMIS's customers, and to demonstrate that customer protection under the carefully constructed federal scheme is not just protection in theory, but protection in fact.

## ARGUMENT

### I. How SIPA Defines "Customer Property"

#### A. The history and principles underlying SIPA

As described in the *Study of Unsafe and Unsound Practices of Brokers and Dealers of the Securities and Exchange Commission,* H.R. Doc. No. 92-231, at 11-12 (1971) ("*SEC Study*"), in the years leading to the enactment of SIPA, little attention was paid to the creation of brokerage back-office systems and appropriate staffing of back-offices in order to ensure the maintenance of accurate records in real time. As a consequence, there developed "an absence of control of securities traffic to provide assurance for prompt deliveries of securities and remittances of payments." *Id.* at 11. Furthermore, until the enactment of SIPA, broker-dealers could use without restraint credit balances of customers, including free credit balances. These credit balances are sums from a customer account to which the customer was entitled upon demand. *SEC Study* at 16 (citing to *Report of the Special Study of the Securities Markets of the Securities and Exchange Commission*, H.R Doc. No. 95, pt. 1, at 393-98 (1st Sess. 1963)). Broker-dealers increasingly used their customer business to leverage their proprietary business, which put customer property at risk. *SEC Study* at 51-53.

Because an undue portion of the industry's assets was invested in securities, the brokerage itself was vulnerable to market downturn. *SEC Study* at 18. By the late 1960s, these circumstances and changes in market conditions converged to result in a virtual breakdown in many firms of the control over the possession, custody, location, and delivery of securities, and

2

the payment of money obligations to customers. *Id* at 11-12. There followed a collapse of broker-dealers which led to the enactment of SIPA in 1970, and to a directive in SIPA that the SEC compile a list of unsafe and unsound practices in the securities industry and recommendations to eliminate them. *See SEC Study* at 27-30, 42; SIPA § 78kkk(g). One Rule adopted pursuant to this mandate was SEC Rule 15c3-3, also known as the "Customer Protection Rule,"[3] which required the segregation of certain customer property. *See SEC Study* at 30; *see also* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1070 (2002) ("The rule, which can be loosely described as a 'segregation rule,' divides the customer and proprietary activities of the firm"); *and* 17 C.F.R. § 240.15c3-3.

SIPA was enacted, *inter alia,* to "restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers." *See Sec. Inv'r Prot. Corp. v. Barbour*, 421 U.S. 412, 415 (1975). This statutory scheme is "necessary to a comprehensive program of investor protection consistent not only with express congressional intent but with the high standards of financial responsibility which must prevail in the brokerage community." *See* Exchange Act Release No. 34-9856, 37 Fed. Reg. 25,224 at 25,225 (1972). Together, SIPA and SEC Rule 15c3-3 serve the objective of SIPA "that customer funds and securities not be exposed to risk of loss through broker-dealer insolvency." *Id.*

The primary purpose of SIPA, and one of the principal responsibilities of a SIPA trustee, is to protect the customers of a broker-dealer in a SIPA liquidation proceeding. *See Barbour*, 421 U.S. at 417; *In re Adler, Coleman Clearing Corp.*, 204 B.R. 99, 105-06 (Bankr. S.D.N.Y. 1997). SIPA advances this purpose "by according those claimants in a SIPA liquidation proceeding who qualify as 'customers' of the debtor priority over the distribution of 'customer

---

[3] Exchange Act Release No. 9856, [1972-73 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,083 (Nov. 13, 1972).

3

property.' Each customer shares ratably in this fund of assets to the extent of the customer's net equity at the time of filing." *In re New Times Sec. Servs., Inc.*, 463 F.3d 125, 127 (2d Cir. 2006) (internal citations omitted). In the event the fund of customer property proves insufficient to make the customers whole, SIPC provides protection – subject to statutory limitations – from the SIPC Fund. SIPA § 78fff-3. In this way, Congress sought to insulate public customers, and the financial markets, from the adverse effects of the failure of a broker-dealer. *See In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985); *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 281 (2d Cir. 1974) ("The object of [SIPA], and the function of [SIPC], is to protect the public customers of securities dealers from suffering the consequences of financial instability in the brokerage industry"); *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 84 (2d Cir. 2004) (identifying SIPA's "statutory goals" as "promoting investor confidence and providing protection to investors . . . ," and noting that "remedial legislation should be construed broadly to effectuate its purposes." (internal citation omitted)); *In re Old Naples Sec., Inc.*, 223 F.3d 1296, 1300 (11th Cir. 2000) ("Congress passed SIPA in 1970 . . . to protect investors when their brokerages fail. The statute established SIPC to maintain a fund for investor protection, oversee the liquidation of brokerages in a manner similar to bankruptcy proceedings, and, under certain circumstances, reimburse customers of a failed brokerage.").

### B. The broad definition of "customer property" under SIPA

The definition of customer property in SIPA § *78lll*(4)[4] is expansive and mirrors the customer protection rules that govern the pre-liquidation operation of the broker-dealer. By amending § 78*lll*(4) in 1978 to add subpart (E), Congress explicitly created protections where property had not been properly segregated, or cash deposits had not been made by the broker-dealer as required by applicable laws, rules, and regulations (namely SEC Rule 15c3-3). *See Hearings Before the Subcomm. on Consumer Protection & Finance of the Comm. on Interstate & Foreign Commerce*, 95th Cong., 1st Sess., 167 (Aug. 1, 2, and 3, 1977) (Hearings on H.R. 8331) (Section by Section Explanation of H.R. 8331 Amendments to SIPC).

---

[4] SIPA § 78*lll*(4) provides:

The term "customer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted. The term "customer property" includes –

(A) securities held as property of the debtor to the extent that the inability of the debtor to meet its obligations to customers for their net equity claims based on securities of the same class and series of an issuer is attributable to the debtor's noncompliance with the requirements of section 78o(c)(3) of this title and the rules prescribed under such section;

(B) resources provided through the use or realization of customers' debit cash balances and other customer-related debit items as defined by the Commission by rule;

(C) any cash or securities apportioned to customer property pursuant to section 78fff(d) of this title;

(D) in the case of a portfolio margining account of a customer that is carried as a securities account pursuant to a portfolio margining program approved by the Commission, a futures contract or an option on a futures contract received, acquired, or held by or for the account of a debtor from or for such portfolio margining account, and the proceeds thereof; and

(E) any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers, unless the trustee determines that including such property within the meaning of such term would not significantly increase customer property.

5

Courts interpret "customer property" broadly. For example, in the SIPA liquidation proceeding of MJK Clearing, Inc., all of the cash in the possession of the debtor on the filing date, including money derived from stock loan transactions with plaintiff-creditor, constituted customer property under § 78*lll*(4)(E) of SIPA. *See In re MJK Clearing, Inc.*, 286 B.R. 109, 129-32 (Bankr. D. Minn. 2002), *aff'd.*, Civ No. 02-4775 RHK, 2003 WL 1824937 (D. Minn. Apr. 7, 2003), *aff'd.*, 371 F.3d 397 (8th Cir. 2004). In that case, because there was a shortfall in the fund of customer property, the court applied what it characterized as the "plain meaning" of the customer property definition as:

> [A] means to rectify any actions taken by, or with respect to, the debtor, that results in a shortfall. *This clearly entails looking to the debtor's other, non-customer accounts such as banking accounts containing funds ... to remedy the shortfall for the protection of customers*.

*Id.* at 132 (emphasis added).

Similarly, in *Peloro* v. *United States*, 488 F.3d 163, 170, 173-74 (3d Cir. 2007), bearer bonds held by a debtor broker-dealer for an investor's account that had been seized by the FBI prior to being deposited into the account were deemed customer property, because, under SIPA, customer property includes not only securities actually allocated to customer accounts but "any cash and securities at any time received, acquired, or held" for the securities accounts of a customer.

In *In re John Dawson & Assocs. Inc.*, 289 B.R. 654, 662 (Bankr. N.D. Ill. 2003), the Court held that an investor could share in the fund of customer property where losses resulted from the broker-dealer's unauthorized trading of cash or securities from the investor's account, because customer property includes "the proceeds of any such property transferred by the debtor, including property unlawfully converted."

6

In *SIPC v. Austin Sec., Inc.*, No. 05-1144 DEM (Bankr. E.D.N.Y. 2007), the Court approved the trustee's allocation of the following to the fund of customer property: (a) assets in brokerage accounts of a former principal who had engaged in unauthorized trading; (b) proceeds from the sale of the former principal's luxury watches and of his wife's jewelry; (c) proceeds from sale of the principal's television set; and (d) the debtor's proprietary brokerage accounts and clearing deposit. Indeed, with the exception of proceeds realized from the surrender of the life insurance policies owned by the debtor and trail commissions owed to the debtor and received by the trustee after commencement of the liquidation, all property recovered by the trustee from the debtor and third parties was determined to "constitute property which was, or should have been, held by the Debtor for the account of its customers; the proceeds of such property; or substitutes therefor."[5]

### C. The money in the 703 account and the 509 account was customer property

SIPC membership, and thus SIPC protection, arises from a broker-dealer's registration with the SEC, without regard to the corporate form of the broker-dealer. SIPA § 78ccc(a). Likewise, SIPC protection covers customer property entrusted to that SIPC member, regardless of whether the SIPC member maintains custody of the customer property in accordance with federal law. A SIPC member's non-compliance with laws and regulations does not remove customer property from SIPA's protective scheme. If it were otherwise, any Madoff-like fraudster could shield his stolen customer property from a SIPA Trustee simply by running the

---

[5] Trustee's Investigatory & Final Reports and Account at 10-18, *SIPC v. Austin Sec., Inc.*, No. 05-1144 DEM (Bankr. E.D.N.Y. Oct. 22, 2007) (emphasis added); *accord,* Order Granting Motion for Approval of Trustee's Investigatory & Final Reports & Account & For Assignment of Judgment to SIPC, at 1-2, *Austin Sec., Inc.*, No. 05-1144 DEM (Bankr. E.D.N.Y. Nov. 20, 2007).

scheme through a bank account held in a different name, or transferring the customer property to a new, separate and distinct legal entity.

Here, the funds in the 703 and 509 accounts constituted customer property precisely because BLMIS received, acquired and took possession and control of customer property entrusted to it, placed the entrusted funds in the 703 and 509 accounts, and then failed to return the property to the owners. Under SIPA § 78*lll*(4)(E), the 703 and 509 account funds are customer property even if BLMIS failed to set them aside in compliance with federal law and regulations. The manner in which BLMIS maintained custody of the customer property and the fraudulent pathway, through which it transferred the funds to the Defendants in furtherance of its Ponzi scheme, is irrelevant. The name on the bank accounts is not dispositive where the Trustee can show – as he has in this case – that the transfers consist of customer property. Indeed, the evidence proves that any transfer from the commingled pool of assets was a transfer of customer property recoverable by the Trustee.

More specifically, and as detailed in the Trustee's Proposed Findings of Fact and Conclusions of Law, the evidence in this case demonstrates that Madoff registered BLMIS as a broker-dealer with the SEC in January 1960, first as a sole proprietorship and then, beginning January 1, 2001, as an LLC. When Madoff converted his business from a sole proprietorship into an LLC, the LLC filed an "SEC Form BD" document to inform the Commission (and SIPC, through the Commission) of the nominal change in corporate structure. The brokerage's SEC registrant number, used to identify brokerages in the SEC's records, remained the same. The SEC Form BD affirmed that all assets and liabilities related to the sole proprietor business were transferred to the limited liability company, and that the transfer would not result in any change of ownership or control. In other words, the customer property entrusted to the sole

8

proprietorship became entrusted to BLMIS. There was no gap, or change in custody of customer property other than the change in corporate vehicle. Madoff continued the same ongoing Ponzi scheme under the veil of an LLC.

Once the Defendants entrusted their property to BLMIS for investment purposes, it became "customer property", and Madoff's machinations could not change that legal designation. SIPA protection applied and continues to apply until the property is returned to the customer – from wherever the property is located, and by or through whomever was the custodian of the customer property. *See, e.g.*, *In re Primeline Sec. Corp.*, 295 F.3d 1100, 1107 (10th Cir. 2002) ("Whether a claimant deposited funds 'with the debtor' does not depend simply on to whom claimants made their checks payable . . . [t]he relevant inquiry is whether the brokerage firm actually received, acquired or possessed Claimants' property" (citing *In re Old Naples Sec.*, 223 F.3d at 1302)); *In re Old Naples Sec., Inc.* 223 F.3d at 1302 (SIPA protection focuses not solely on "[w]hether a claimant deposited cash with the debtor," but also on "whether there was actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation" (internal quotes and citations omitted)).

In the present case, the Defendants originally admitted that they had accounts with Bernard L. Madoff Investment Securities LLC, when they filed claims for customer property that they entrusted to BLMIS for those accounts. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 08-01789-smb (Bankr. S.D.N.Y.), ECF No. 461 ("In or about December 1995, the Manns opened an account… with Bernard L. Madoff Investment Securities LLC ('Madoff') in the name of Michael Mann and Meryl Mann, JT WROS (the 'Mann Customer Account'). The Manns are 'customers' of BLMIS, as defined by [SIPA]"). Despite the Defendants' withdrawal of that admission more than eight years later, the evidence at trial makes clear that customer

9

property was entrusted to an SEC-registered broker-dealer, held in a commingled account and then fraudulently transferred to the Defendants under the guise of fictitious profits.

The Defendants' arguments in this case are not novel, and fly in the face of the established law of this case. For example, this Court recently held that the cash transferred from the 703 and the 509 accounts was recoverable customer property. *Picard v. Carol Nelson, et al.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 610 B.R. 197, 238 (Bankr. S.D.N.Y. 2019) ("Similarly, SIPA § 78fff-2(c)(3) allows a trustee to 'recover any property transferred by the debtor which, expect for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11' ... The Trustee has avoided the Two-Year Transfers and is entitled to recover a judgment for their value."). Defendants have offered no reason to revisit that conclusion here. *See Id.* at 237 ("The prior decisions within this SIPA proceeding constitutes law of the case….") (citing *Picard v. Legacy Capital, Ltd.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 603 B.R. 682, 700 (Bankr. S.D.N.Y. 2019); *In re Motors Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018) (law of the case doctrine applies across adversary proceedings within the same bankruptcy case), *aff'd*, 943 F.3d 125 (2d Cir. 2019); *Perez v. Terrastar Corp.* (*In re Terrastar Corp.*), No. 16 Civ. 1421 (ER), 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017) (applying the law of the case doctrine because "[a]dversary proceedings filed in the same bankruptcy case do not constitute different cases"), *appeal dismissed*, No. 17-1117 (2d Cir. June 7, 2017).

## II. SIPA's Customer Property Principles Override Inconsistent New York Law on the Ownership of a Bank Account

The accounts held customer property that was entrusted to the sole proprietorship, and then entrusted to BLMIS. There was a nominal change in the broker-dealer's corporate structure, but no change in custody of customer property. Madoff then continued the same

10

ongoing Ponzi scheme under the veil of an LLC. As detailed in the Trustee's Findings of Facts and Conclusions of Law, the facts reveal that BLMIS was the holder of the JPMorgan accounts under New York State Law throughout the relevant time period.

Even if this Court were to conclude otherwise, SIPA and the securities laws would still govern ownership of and dominion over the account funds. By defining "customer property" broadly in SIPA § 78*lll*(4), and by explicitly authorizing the recovery of misappropriated customer property in SIPA § 78fff-2(c)(3), SIPA effectively renders the issue of account ownership irrelevant to the final analysis. The central issue becomes property ownership, not account ownership. The Second Circuit recently highlighted that focus on property rights in *Picard v. Gettinger*, No. 19-0429-bk(L), 2020 WL 5666677, at *11 (2d Cir. Sept. 24, 2020) ("It follows that regardless of whether the defendants-appellants had securities entitlements as a result of the account statements, they did not have property rights to the values in excess of principal reflected there") *and* at *13 ("… BLMIS never traded in securities and, as a result, never generated any legitimate profits. The defendants-appellants therefore had no rights to the transfers….").

The focus on customer property rights is all the more important when a fraudster is involved. A Court that focuses on a fraudster's shell game only gives the fraudster a chance to determine the final outcome of his fraudulent scheme. On the other hand, a Court that focuses on the identification and return of customer property effectively neutralizes the fraudster's scheming, obfuscation and redirection.

If the good faith recipients of other customers' money had no "property rights" to the money they received, and a fraudster created a fictional story to justify those fraudulent transfers in the first place, then the law requires the return of the misappropriated funds. Indeed, the entire

11

purpose of this litigation is to effectuate that fundamental goal of SIPA: protection of the custodial function of an insolvent broker-dealer by securing the return of customer property entrusted to the broker-dealer. SIPA promotes that outcome by: (1) defining customer property in such broad terms, *supra* II(B), and (2) creating a broad recovery mechanism that maximizes customer estate recoveries, notwithstanding state law. SIPA § 78fff-2(c)(3).

Accordingly, SIPA displaces or overrides, to the extent necessary, any inconsistent federal or state law that would undermine or limit the SIPA trustee's ability to bring about the return of the stolen property to the customers who hold valid claims for the return of their stolen property.

### III.    The Two-Year Transfers from the SIPA Debtor

BLMIS controlled these funds and must be said to have made the transfers at issue in this case. *See In re IFS Fin. Corp.*, 669 F.3d 255, 262–64 (5th Cir. 2012) ("[R]egardless of its legal title, [the debtor] had the ultimate power to transfer funds to others, who included the [defendants]. That it obscured its power to transfer in an intentionally complicated corporate structure suggests that control is decisive, and that legal title is irrelevant where, as here, a debtor organization has taken care to mask its activities through fictional divisions."). Madoff's misuse of customer property, whether placing it in a personal account or under his mattress, should not hinder the Trustee's goal of recovering customer property, and maximizing protection for all victims of the scheme. This Court can look beyond title to determine whether the debtor ultimately had power and control to transfer the property, and this court should find that BLMIS had power and control here because the transfers were of customer property to BLMIS customers in furtherance of the BLMIS scheme.

12

In a case involving very similar facts, this Court recently stated that "the Trustee is duly qualified to serve and act on behalf of the consolidated estate of BLMIS and Madoff," and ordered that similar transfers were "avoided under section 548 of the Bankruptcy Code and recoverable under section 550." *See* Judgment, *Picard v. Carol Nelson*, (*In re Bernard L. Madoff Inv. Sec. LLC*), Adv. Pro. No. 10-04658 (Bankr. S.D.N.Y. December 9, 2019), ECF No. 205 *and* Judgment, *Picard v. Carol and Stanley Nelson*, (*In re Bernard L. Madoff Inv. Sec. LLC*), Adv. Pro. No. 10-04377 (Bankr. S.D.N.Y. December 9, 2019), ECF No. 203. This case is no different. Customer property was fraudulently transferred to the Defendants, and SIPA enables the Trustee to recover those funds even if the perpetrator masked the scheme through different accounts.

Moreover, to the extent the Defendants assert that Madoff perpetrated the fraud as sole proprietor, even after creating an LLC, the express language of SIPA, the Protective Decree and the Bankruptcy Code all make clear that the District Court properly entered an order substantively consolidating the non-debtors into the debtor's bankruptcy estate. More importantly, the Court's orders did not create or assign any powers to recover "customer property" that the trustees did not already possess by Federal statute. The SIPA Trustee had the power to pursue customer property fraudulently conveyed by BLMIS pursuant to the Protective Decree and SIPA. The Substantive Consolidation Order merely specified that the SIPA Trustee should exercise those statutory powers to recover customer property upon substantive consolidation of the Madoff estate into the SIPA liquidation proceeding. Finally, the SIPA Trustee's authority to pursue customer property conveyed by BLMIS and Madoff flows from the Protective Decree entered by the District Court - which created a SIPA liquidation proceeding and appointed Mr. Picard as SIPA trustee for the "business" operated by Madoff as the broker-dealer member of SIPC - regardless of the form that business may have taken.

Accordingly, the two years transfers were, indeed, "transfers [of customer property] by a SIPA debtor within the meaning of § 78fff-2(c)(3) and 11 U.S.C. § 548 (a)(1)(A)," and should be avoided and promptly recovered for the benefit of customers with valid claims.

## CONCLUSION

For the reasons set forth above, and in the Trustee's Proposed Findings of Fact and Conclusions of Law, SIPC respectfully requests that the Court enter a Judgment in favor of the Trustee, on behalf of the consolidated estate of BLMIS and Madoff, in the full amount of the Avoidable Transfers, plus prejudgment interest from Dec. 1, 2010 to the date of entry of such judgment, and for the Trustee's costs.

Dated:  October 15, 2020
        Washington, D.C.

Respectfully submitted,

*/s/ Kenneth J. Caputo*
KENNETH J. CAPUTO
General Counsel

KEVIN H. BELL
Senior Associate General Counsel for Dispute Resolution

NATHANAEL S. KELLEY
Associate General Counsel

NICHOLAS G. HALLENBECK
Assistant General Counsel
(*pro hac vice* admission pending)

SECURITIES INVESTOR PROTECTION CORPORATION
1667 K St., NW, Suite 1000
Washington, D.C. 20006
Telephone: (202) 371-8300
Email: kcaputo@sipc.org
Email: kbell@sipc.org
Email: nkelley@sipc.org
Email: nhallenbeck@sipc.org

14