Dentons US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 768-6700
Fax: (212) 768-6800
arthur.ruegger@dentons.com
carole.neville@dentons.com
*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>           Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>           Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>           Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>           Plaintiff,<br><br>v.<br><br>BAM L.P., MICHAEL MANN and MERYL MANN,<br><br>           Defendants. | Adv. Pro. No. 10-04390 (CGM) |

**DEFENDANTS' PROPOSED POST TRIAL**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

I.    FINDINGS OF FACT.............................................................................................. 1

    A.    The SIPA Liquidation ............................................................................ 1

    B.    The Adversary Proceeding..................................................................... 2

    C.    Madoff's Business Operations ............................................................... 4

    D.    The Bank Accounts................................................................................. 9

    E.    The Customer Accounts and Withdrawals ........................................... 11

    F.    The 9/14/2020 Trial ............................................................................. 13

II.    PROPOSED CONCLUSIONS OF LAW ............................................................. 14

    A.    The Trustee Has Not Met His Burden Of Proving That BLMIS
Transferred An Interest Of The Debtor In Property To Defendants..................... 14

    B.    New York Law Establishes the Liability of the Sole Proprietorship on the
Checks.................................................................................................. 15

    C.    The Form BD Is Not Admissible Or Competent Evidence of a Change of
Ownership of the Investment Advisory Business. ............................... 18

    D.    The Defendants Discovery Requests Are Not Evidence That Bank or
Customer Accounts Were Assets of The Limited Liability Company ................ 22

    E.    Ownership of the Investment Advisory Business Assets Is Not Modified
By SIPA ............................................................................................... 24

    F.    The Transferred Property Was Not Property of the Debtor................. 27

    G.    Substantive Consolidation Does Not Alter the Ownership of the
Investment Advisory Business Assets. ................................................ 27

    H.    The Form ADV .................................................................................... 29

III.    CONCLUSION..................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. Metro N. Commuter R.R. Co.*,
  882 F.2d 705 (2d Cir. 1989)................................................................23

*Au New Haven v. Ykk Corp.*,
  5-CV-3411 (SN), 2019 WL1254763, 2019 U.S. Dist. LEXIS 45044 (S.D.N.Y.
  Mar. 19, 2019)................................................................21

*In re Bauman*,
  535 B.R. 289 (Bankr. C.D. Ill. 2015)................................................................28

*In re Bernard L. Madoff*,
  Case No. 09-11893 (SMB) ................................................................1, 2

*In re BLMIS*,
  Case No. 08-01789 (SMB) ................................................................2

*Buchwald v. Williams Energy Mktg. & Trading Co. (In re Magnesium Corp. of
  Am.)*,
  460 B.R. 360 (Bankr. S.D.N.Y. 2011)................................................................19

*In re Cahillane*,
  408 B.R. 175 (Bankr. .N.D. Ind. 2009)................................................................29

*Citibank Eastern, N. A. v. Minbiole*,
  50 A.D.2d 1052, 377 N.Y.S.2d 727 (3rd Dept. 1975)................................................................17

*In re Colonial Realty Co.*,
  980 F.2d 125 (2d Cir. 1992)................................................................26

*In re Deltacorp, Inc.*,
  179 B.R. 773 (Bankr. S.D.N.Y. 1995)................................................................29

*Gibbs ex rel. Estate of Gibbs v. CIGNA* Corp.,
  440 F.3d 571 (2d Cir. 2006................................................................23

*Gluck v. JPMorgan Chase Bank*,
  12 A.D.3d 305, 785 N.Y.S.2d 77 (Sup. Ct. 1st Dept. Nov. 23, 2004)................................................................15

*Golden Distributors, Ltd. v. Save All Tobacco, Inc.*,
  134 B.R. 770 (Bankr. S.D.N.Y, 1991)................................................................17

*Hope A. Costello, v. NBT BANK, N.A.*,
  2012 N.Y. Misc. LEXIS 6538 (Sup.Ct. Del. County, June 1, 2012)................................................................15

ii

*Howard L. Jacobs, P.C. v. Citibank, N.A.*,
  61 N.Y.2d 869, 462 N.E.2d 1182; 474 N.Y.S.2d 464 (Feb. 28, 1984).....................................15

*Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*,
  32 F.2d 195 (2d Cir. 1929)........................................................................................................23

*Lightbox Ventures, LLC v. 3RD Home Ltd.*,
  16 cv 2379, 2017 U.S. Dist. LEXIS 187202, 2017 WL 5312187 (S.D.N.Y.
  Nov, 13, 2017) .........................................................................................................................20

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y 2007).........................................................................................21

*Mattel, Inc. v. Adventure Apparel*,
  No. 00 CIV. 4085, 2001 WL 1035140 (S.D.N.Y. Sept. 7, 2001)................................................26

*In re McCormick*,
  381 B.R. 594 (Bankr. S.D.N.Y. 2008).........................................................................................18

*In re Murray Industries, Inc.*,
  125 B.R. 314 (Bankr. M.D. Fla. 1991) .......................................................................................29

*Picard v. Avellino (In re Bernard L. Madoff Inv. Secs. LLC)*,
  557 B.R. 89 (Bankr. S.D.N.Y. 2016), reconsideration denied, 2016 WL
  6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) .........................................................................25, 28

*Picard v. BAM L.P.*,
  Case No. 10-04390 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2015) ...........................................2, 3, 4

*Picard v. BAM L.P.*,
  608 B.R. 165 (Bankr. S.D.N.Y. 2019) .........................................................................4, 23, 30

*Picard v. Fairfield Greenwich Ltd.*,
  762 F.3d 199 (2d Cir. 2014).................................................................................................25, 26

*Picard v. Hein*,
  11 Civ. 04936 (JSR) (S.D.N.Y.) .................................................................................... *passim*

*Picard v. Ida Fishman Revocable Trust (In re BLMIS)*,
  773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015)..........................................3

*Picard v. NTC & Co. LLP et al.*,
  Case No. 10-04390 (SMB) (Bankr. S.D.N.Y. Nov. 12, 2010) ..................................................3

*Rovira v. N.Y. Apparel Sales*,
  01 CV 2231, 2002 WL 1471557, 2002 U.S. Dist. LEXIS 13543 (E.D.N.Y.
  May 31, 2002)............................................................................................................................17

iii

*Rubenstein v. Cosmos Holdings, Inc.*,
   19 Civ. 6976 (KPF), 2020 U.S. Dist. LEXIS 121773 (S.D.N.Y July 10, 2020) ...................18

*Savage & Assocs. v. Mandl (In re Teligent Inc.)*,
   380 B.R. 324 (Bankr. S.D.N.Y. 2002) ..................................................................................19

*SIPC v. BLMIS (In re Madoff Sec.)*,
   No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ....................................3

*Slayton v. Am. Express Co.*,
   460 F.3d 215 (2d Cir. 2006)..................................................................................................23

*Staehr v. Hartford Fin. Servs. Grp.*,
   547 F.3d 406 (2d Cir. 2008)..................................................................................................19

*Star Dairy, Inc. v. Roberts*,
   37 A.D.2d 1038, 326 N.Y.S.2d 85 (3d Dept. 1971) .............................................................16

*Tho Dinh Tran v. Alphonse Hotel Corp.*,
   281 F.3d 23 (2d Cir. 2002)....................................................................................................23

*United States v. Fox*,
   721 F.2d 32 (2d Cir.1983)....................................................................................................26

*United States v. McKeon*,
   738 F.2d 26 (2d Cir. 1984)...................................................................................................23

*United States v. Mejia*,
   545 F.3d 179 (2d Cir. 2008)..................................................................................................21

*UPS of Am., Inc. v. Net, Inc.*,
   225 F.R.D. 416 (E.D.N.Y. 2005) ..........................................................................................18

**Rule and Statutes**

Fed. R. Civ. P. 12(b)(6) ..............................................................................................................3

Fed. R. Civ. P. 56(g) ..................................................................................................................4

Fed. R. Evid. 703 .................................................................................................................20, 21

Fed. R. Evid. 801(d)(2) .............................................................................................................19

11 U.S.C. § 105 ................................................................................................................2, 3, 27

11 U.S.C. § 544 .......................................................................................................2, 3, 28, 29

11 U.S.C. § 546(e) .....................................................................................................................3

11 U.S.C. § 547 ...........................................................................................................2, 3, 24, 27

iv

11 U.S.C. § 548 ...........................................................................................................................29

11 U.S.C. § 548(a)(1) ...................................................................................................................14

11 U.S.C. § 548(a)(1)(A) ........................................................................................................ *passim*

11 U.S.C. § 548(a)(1)(B) ....................................................................................................2, 24, 27

11 U.S.C. § 550 ...................................................................................................................... *passim*

11 U.S.C. § 551 ...............................................................................................................2, 24, 27

15 U.S.C. § 78eee(a)(3) ...........................................................................................................25, 26

15 U.S.C. § 78fff-2(c)(3) ...............................................................................................4, 14, 24, 26

15 U.S.C. § 78fff-2(e)(3) ..............................................................................................................25

15 U.S.C. § 78lll(5) ......................................................................................................................25

15 U.S.C. § 78lll (b) .....................................................................................................................27

15 U.S.C. § 80b-1 .........................................................................................................................29

15 U.S.C. § 80b-3(a) ....................................................................................................................29

15 U.S.C. § 78111(5) ....................................................................................................................26

17 C.F.R. § 275.203(l) .................................................................................................................29

17 C.F.R. § 275.204-1 ..................................................................................................................29

17 C.F.R. § 279.1 .........................................................................................................................29

N.Y. Debt. & Cred. L, Art 10, §§ 270-281 ...................................................................................3

N.Y. U.C.C. § 3-401 ....................................................................................................................16

N.Y. U.C.C. § 3-402 ....................................................................................................................16

N.Y. U.C.C. § 3-403 ...............................................................................................................16, 17

N.Y. U.C.C. § 4-103 ....................................................................................................................15

**Other Authorities**

Black's Law Dictionary 1398 (7th ed. 1999) .........................................................................17, 18

v

Following trial in this matter on September 14, 2020, Defendants BAM L.P and Michael

and Meryl Mann hereby submit their Proposed Findings of Fact and Conclusions of Law.

## I.    FINDINGS OF FACT

### A.    The SIPA Liquidation

1.    On December 11, 2008, Bernard L. Madoff ("Madoff") was arrested for violating

numerous federal statutes.   The Securities and Exchange Commission ("SEC") commenced

proceedings against him and Bernard L. Madoff Investment Securities LLC ("BLMIS" or the

"LLC") in the United States District Court for the Southern District of New York.   *SEC v. Bernard*

*L. Madoff Inv. Sec. LLC, et al.* (the "Liquidation Proceeding"), No. 08 Civ. 10791 [ECF No. 1].

2.    On December 15, 2008, the Securities Investor Protection Corporation ("SIPC")

filed an application solely for liquidation of BLMIS under the Securities Investor Protection Act

("SIPA"), No. 08 Civ. 10791 [ECF No. 5].   The District Court granted SIPC's application, with

the consent of BLMIS [ECF No. 7], appointed the Irving H. Picard (the "Trustee"), as the trustee

for the liquidation of BLMIS, and removed the case to this Court.   Order, Liquidation Proceeding,

No. 08 Civ. 10791 [ECF No. 4].

3.    On March 12, 2009, Madoff pled guilty to the eleven-count criminal information

filed against him, including charges of securities fraud, investment adviser fraud, mail fraud, wire

fraud, three counts of money laundering, false statements, perjury, making false filings with the

SEC, and theft from an employee benefit plan. (*See* Transcript of March 12, 2009 Hr'g in *United*

*States v. Madoff*, No. 09 CR 213 (DC) ("Madoff Allocution") at 7:23-8:12.)

4.    On April 13, 2009 certain customers of Madoff's investment advisory business

filed an involuntary petition against Madoff.   *See* Involuntary Petition, *In re Bernard L. Madoff*,

Case No. 09-11893 (SMB) [ECF No. 1].   On April 21, 2009, pursuant to an Order of the Court

dated April 20, 2009 directing the appointment of an interim chapter 7 trustee, the United States

Trustee's Office for the Southern District of New York appointed Alan Nisselson as interim trustee for the Madoff Chapter 7 Case. *See* Case No. 09-11893 (SMB) [ECF No. 18].

5.      On April 5, 2009, the Trustee and SIPC filed a joint motion to substantively consolidate the estates of BLMIS and Madoff. *See* Case No. 09-11893 (SMB) [ECF No. 25 ]; *In re BLMIS*, Case No. 08-01789 (SMB) [ECF No. 195].

6.      On June 9, 2009, with the consent of the Madoff trustee, the Bankruptcy Court entered an order substantively consolidating the Madoff bankruptcy estate with the BLMIS bankruptcy estate with the following limitation:

> Notwithstanding the substantive consolidation of the Madoff estate into the BLMIS SIPA Proceeding, the Chapter 7 Trustee shall remain Chapter 7 trustee of the Madoff estate and shall continue to have all powers, rights, claims and interests of a Chapter 7 trustee to bring claims under Chapters 5 and 7 of the Bankruptcy Code in consultation with the SIPA Trustee and SIPC. Further, all powers, rights, claims and interests of the Madoff estate are expressly preserved, including without limitation all Chapter 5 and Chapter 7 powers, rights, claims and/or interests.
>
> All powers, rights, claims and interests of the SIPA Trustee and the BLMIS estate are expressly preserved, including without limitation all Chapter 5 and Chapter 7 powers, rights, claims and/or interests, and the SIPA Trustee is authorized to pursue claims on behalf of the consolidated estate as the representative of and fiduciary for the BLMIS SIPA Proceeding and as subrogee and assignee of creditors' claims for, among other things, the avoidance and recovery of transferred property.

*See In re Bernard L. Madoff*, Case No. 09-11893 (SMB) [ECF No. 228]; *In re BLMIS*, Case No. 08-01789 (SMB) [ECF No. 252].

**B.      The Adversary Proceeding**

7.      The Trustee originally commenced this adversary proceeding against Defendants and NTC & Co. LLP, as former custodian of an individual retirement account to avoid and recover transfers from three separate customer accounts within six years of the collapse on December 11, 2008 (the "Filing Date") seeking to recover transfers pursuant to pursuant to sections 105, 544, 547, 548(a)(1)(A) and (B), 550, and 551 of title 11 of the U.S. Code (the "Bankruptcy Code") and

2

New York Debtor & Creditor Law, Article 10, §§270-281. Complaint at ¶ 3, *Picard v. NTC & Co. LLP et al.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Nov. 12, 2010) [ECF No. 1].

8.      The Trustee amended the Complaint on January 25, 2012, *inter alia*, to add claims to avoid obligations.  *Picard v. BAM L.P* ., Consolidated Cases, *Picard v. Hein*, 11 Civ. 04936 (JSR) (S.D.N.Y.) [ECF. No. 52] (the "Amended Complaint").

9.      As a result of the decisions by the United States District Court and the Court of Appeals for the Second Circuit, *SIPC v. BLMIS, (In re Madoff Sec.)*, No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013), *Picard v. Ida Fishman Revocable Trust (In re BLMIS)*, 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015) ("*Section 546(e) Decision*") and application of section 546(e) of the Bankruptcy Code, the Trustee's claims against all good faith defendants were dismissed with the exception of claims pursuant sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

10.      By means of the Stipulation and Order dated August 19, 2015, the Trustee and the Defendants stipulated to substantial amendments to the Amended Complaint reflecting the limitation of the Trustee's avoidance powers under section 546(e) and limitations of the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Specifically, the parties stipulated to (a) dismissal of all claims to avoid obligations with prejudice, (b) dismissal of subsequent transferees of BAM L.P. without prejudice, and (c) dismissal of all claims against the individual retirement account with prejudice, and (d) dismissal of all claims under New York Debtor and Creditor Law and sections 105, 544, and 547 of the Bankruptcy Code with prejudice. *See* Stip. and Order, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2015) [ECF No. 46].

11.      Based on the above, the Trustee now seeks to recover transfers within two years of the Filing Date (the "Two-Year Transfers") under federal law.  Specifically, the Trustee seeks to

3

avoid and recover transfers in the amount of $563,000 from BAM L.P. and $2,250,000 from

Michael and Meryl Mann pursuant to sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

12.      In December 2018, the Trustee moved for summary judgment on Count One (the

only remaining count) of the Amended Complaint ("Trustee's Summary Judgment Motion").

*Picard v. BAM L.P.* [ECF No. 140–43].    The Defendants thereafter opposed the Trustee's

Summary Judgment Motion and the Trustee and SIPC replied on March 27, 2019. *Picard v. BAM*

*L.P.,* 10-04390 (CMG) [ECF Nos. 140–143, 158–160, 163–164, 166–168].

13.      In September 2019, the Court granted in part and denied in part the Trustee's

Summary Judgment Motion under Federal Rule of Civil Procedure 56(g).   *Picard v. BAM L.P.*,

608 B.R. 165 (Bankr. S.D.N.Y. 2019).   The remaining issue for trial is whether the Two-Year

Transfers were transfers by the debtor within the meaning of SIPA § 78fff-2(c)(3) and Bankruptcy

Code § 548(a)(1)(A).   The Trustee has the burden of proof on the issue.

### C.      Madoff's Business Operations

14.      On or about December 31, 1959, Madoff, as a sole proprietor, filed an application

to register as a broker-dealer with the SEC. SEC Form BD for Bernard L. Madoff, dated December

31, 1959. TX 2, pp. 1-8.[1]

15.      Until January 2001, Madoff operated three business units through his sole

proprietorship -- (a) a proprietary trading business, which traded securities for its own account, (b)

a market-making business, which created a market in certain securities and acted as a broker-dealer

for investment firms (collectively referred to herein with the proprietary trading business, the

"Proprietary Trading Businesses"), and (c) an investment advisory business (the "Investment

Advisory Business"). Dubinsky Report, TX 39, p. 17; 9/14/2020 [Dubinsky] 69:7-21.

---

[1] References to exhibits herein are to exhibits that have been admitted into evidence at trial and are identified as
"DX" for Defendants' exhibits and "TX" for the Trustee's exhibits.

US_Active\115679951\V-2

16.     Madoff conducted the sole proprietorship under his own name, Bernard L. Madoff or "Bernard L. Madoff Investment Securities." Pretrial Order dated 8/12/20, Adv. No. 10-04390 (CGM) [ECF No. 209] ¶12; BAM Account Agreement Documents (1998) DX 4; Mann Account Agreement Documents (1995) DX 5.

17.     On or about January 1, 2001, Madoff formed a limited liability company to operate under the name "Bernard L. Madoff Investment Securities LLC." Articles of Organization. TX 4.

18.     On January 12, 2001, Madoff filed an Amended SEC Form BD to register Bernard L. Madoff Investment Securities LLC as a broker-dealer and reflect a change in corporate form for the Proprietary Trading Businesses from a sole proprietorship to a limited liability company.  Form BD Uniform Application for Broker-Dealer Registration. TX 3, pp. 2-16

19.     Peter Madoff was identified as Director of Trading and Chief Compliance Officer, and designated as the contact employee on the Form BD. Form BD, section 1(H), p.3, TX 3.

20.     In response to the direction in the Amended Form BD question 12 to "Check the types of businesses engaged in (or to be engaged in, if not yet active) by applicant," Madoff checked:  (C) "Broker or dealer making inter-dealer markets in corporate securities over the counter"; (V) "Trading securities for own account"; and (Z) Other.  Form BD, pp. 8-9, TX 3; 9/14/2020 [Dubinsky] 46:17-23.

21.     Madoff did not check the box (S) Investment advisory services.  Form BD, p. 9, TX 3, 9/14/2020 [Dubinsky] 47:1-4.

22.     At the time of the filing, the Investment Advisory Business had approximately 5000 customers.  9/14/2020 [Dubinsky] 118:5-8

23.     In response to the direction in the Amended Form BD to "[b]riefly describe details of the *succession* including any assets or liabilities not assumed by the *successor* [BLMIS]," (emphasis in original), Madoff replied:

5

EFFECTIVE JANUARY 1, 2001, PREDECESSOR WILL TRANSFER TO
SUCCESSOR ALL OF PREDECESSOR'S ASSETS AND LIABILITIES,
**RELATED TO PREDECESSOR'S BUSINESS**. THE TRANSFER WILL
NOT RESULT IN ANY CHANGE IN OWNERSHIP OR CONTROL.
(emphasis added)

Form BD, p.11, TX 3.

24.    Although Peter Madoff was identified as the compliance officer of the newly

formed limited liability on the Form BD, he was not associated with the Investment Advisory

Business until 2006 when that business was first registered with the SEC.  At his plea hearing,

Peter Madoff testified that he "dedicated almost 40 years to building a legitimate securities market-

making business.  In July 2006, my brother informed me that BLMIS was going to register with

the SEC as an investment adviser because of my brother's management of customer accounts.  In

September 4 of 2006, when BLMIS first registered as an investment adviser, I was designated as

the chief compliance officer of the chief compliance officer of the customer business."  June 21,

2012, Peter Madoff , Criminal Plea Allocution p. 36. DX11.

25.    On January 1, 2001, Madoff sent notification letters of the formation of the limited

liability company to all of the business and governmental entities with which the Proprietary

Trading Businesses dealt.  *See, e.g.*, the following notification letters all dated January 1, 2001:

Letter from LLC to the National Securities Clearing Corporation, TX 9; Letter from the LLC to

the Depository Trust Company, TX 10; Letter from the LLC to the Options Clearing Corporation.[2]

TX 10; 9/14/2020 [Dubinsky] 63:1-24.[3]

---

[2] The Trustee identified an additional letter to the Bank of New York (Bates No. MESTABL0005744) reporting the
change in form from a sole proprietorship to a limited liability company in its pretrial submission for the Proprietary
Trading Businesses and it was stipulated to by the Defendants in the Pretrial Order dated and ordered on August 12.
10-04390 [ECF No. 209].  The Bank of New York account is solely associated with the Proprietary Trading
Businesses and its omission at trial by the Trustee is telling.  There are no similar writings to Chase in the record of
this case.

[3] References to the trial transcript are presented herein as "date of testimony" [witness] page:line (e.g.9/14/2020
[Dubinsky] 210: 4-10)

26.     The Trustee did not produce any document notifying the customers, business partners or banks associated with the Investment Advisory Business of a change in corporate form or name.

27.     Ms. Collura conducted an extensive review of records relating to the banking accounts.   9/14/2020 [Collura] 173:5-13.   Ms. Collura testified that she did not see any correspondence that reflected a request to Chase to change any bank accounts from sole proprietorship to the limited liability company.  9/14/2020 [Collura] 210:5-12.

28.     Exhibit 3 of the Collura Report is a list of the bank and brokerage accounts, the names in which the accounts were originally held, the dates of the change in the name, if any, and the names of the new holder. Collura Report  TX 24, Exhibit 3.  The Exhibit 3 confirms that the names on the Investment Advisory Business accounts changed in 2002 from Bernard L. Madoff to Bernard L. Madoff Investment Securities, but not to name "Bernard L. Madoff Investment Securities LLC."  However, Ms. Collura acknowledged that name of the Bank of New York 621 Account (defined below) changed in May 2001 to "Bernard L. Madoff Investment Securities LLC."  9/14/2020 [Collura] 213:5-25, 214:1-21.

29.     The Exhibit identifies other accounts that were originally in the name of "Bernard L. Madoff" that were changed to "Bernard L. Madoff Investment Securities LLC" as well as accounts that were either opened in or changed to the name "Bernard L Madoff Investment Securities", without the LLC, after 2001. 9/14/2020 [Collura] 214:22-25-215:1-11.  In sum, the bank and brokerage accounts associated with the Proprietary Trading Businesses  were changed to or opened in the "Bernard L Madoff Investment Securities LLC" after 2001. Those that were associated with the Investment Advisory Business remained in the name of "Bernard L. Madoff" of were changed to or opened in the substantially similar, but not identical name, "Bernard L. Madoff Investment Securities."

US_Active\115679951\V-2

30.     The notifications of the change in form and name went to the trading associations and bank that were necessary for the conduct of the Proprietary Trading Businesses, which actually conducted trades.

31.     Transfers of securities between licensed brokers are conducted through the Depository Trust Company ("DTC").  Dubinsky Report, TX 38 ¶156.  Dubinsky reported that the securities that were cleared from 2001 through 2008 through BLMIS's DTC account, the 646 account, were traded solely by the Proprietary Trading Businesses.  No Investment Advisory Business trades were cleared through BLMIS's DTC account.  Dubinsky Report, TX 39 ¶¶135, 156, 161, 271.

32.     BLMIS had a single account with the Options Clearing Corporation ("OCC"), an organization that clears and settles options transaction in the U.S. market.  Dubinsky reported that the OCC records for the BLMIS account from October 31, 2002 through October 31, 2008 confirm the options that were traded by the Proprietary Trading Businesses, but not by the Investment Advisory Business.  Dubinsky Report, TX 39, ¶¶159,185,187,188.

33.     Madoff's sons, Mark and Andrew Madoff managed the Proprietary Trading Businesses.  9/14/2020 [Dubinsky] 102:21-25-103:1-6.

34.     In August 2006, Madoff first registered the Investment Advisory Business with the SEC by filing a Form ADV- Uniform Application For Investment Adviser Registration , a form that is required to be filed by any entity operating as an investment advisory business under federal law.  Dubinsky Rep.  TX 39 n. 22.  DX 13-A.

35.     The Trustee's experts depicted the Investment Advisory Business as a completely separate, self-contained financial business. *See* IA Business Chart TX 040; 9/14/2020 [Collura] 181:13-25-182:1-6.  The flow of funds through the Investment Advisory Business remained the same over the ten year period from 1998 through 2008.  9/14/2020 [Collura] 181:15-25-182:1-6.

8

36.     With the exception of two small loans, the Investment Advisory Business was not funded by third party loans, the Proprietary Trading Businesses, dividends from corporate securities or trading.  IA Business Chart. TX 40.

37.     The funds in the 703 Account (defined below) were not included in the Financial and Operational Combined Uniform Single Reports ("Focus Reports") required to be filed with the SEC by broker-dealers and by the limited liability company, and actually filed by BLMIS. 9/12/2020 [Dubinsky] 141:9-12; 144:1.

38.     According to the testimony of Mr. Dubinsky, the Investment Advisory Business and the Proprietary Trading Businesses had substantially separate operations.  That separation was illustrated by the following facts: each business had different customers, 9/14/2020 [Dubinsky] 104:17-19; each business had its own computer system, 9/14/2020 [Dubinsky] 104: 8-16; each business had separate bank accounts, e.g., the Proprietary Trading Businesses used the Bank of New York 621 account, 9/14/2020 [Dubinsky] 103:21-24; 9/14/2020 [Collura] 215:20-25-216:1; and the businesses were located on separate floors of 885 Third Avenue.  9/14/2020 [Dubinsky] 103:12-20.

39.     The activity in the 703 Account (defined below) was robust during the two years before the fraud was uncovered.  Mr. Dubinsky agreed that the 703 Account showed a number of investments and reinvestments in the hundreds of millions of dollars on almost a daily basis. 9/14/2020 [Dubinsky] 147:8-15; 145:12-25-147:1-4.  The 703 Account statements evidence show billions of dollars in total transactions every month, summarized on the first page of each account statement.  DX 2-A to 2-V.

### D.     The Bank Accounts

40.     At all relevant times, the Investment Advisory Business primarily used three bank accounts: JP Morgan Chase Bank, N.A. ("JPMorgan") account #xxxxx1703 (the "703 Account");

9

JPMorgan account #xxxxxxxxx1509 (the "509 Account"); and Bankers Trust account #xx-xx000599 (the "599 Account")[4].  9/14/2020 [Dubinsky] 78:3-12; 9/14/2020 [Collura]177:24-225-178:1-2.  The 509 Account was a controlled disbursement account used by businesses for purposes of cash management.  9/14/2020 [Collura] 184:4-13.

41.    In the Proprietary Trading Businesses, the primary operating account was the Bank of New York ("'BONY'') account number 8661126621 (the "621 Account"). Dubinsky Rpt. TX 39, p. 27, ¶77; 9/14/2020 [Dubinsky] 103:21-24.

42.    Ms. Collura testified that the holder of a bank account "is an individual or an entity that possesses either a bank or brokerage account at a bank or other financial institution." "The account holder is typically the name that appears on the monthly statement." 9/14/2020 [Collura] 193:3-10.

43.    Ms. Collura identified the holder of the 509 Account and the 703 Account as either "Bernard L. Madoff" or "Bernard L. Madoff Investment Securities."  9/14/2020 [Collura] 197:25-198:1-8.  Both are names used by the sole proprietorship in the conduct of its business. The holder of the 703 Account and the 509 Account was the sole proprietary business.

44.    The bank statements for the 703 Account identified "Bernard L. Madoff" as the account holder until August 2002, more than one and half years after the formation of the LLC. Thereafter, the bank statements for the 703 Account bore the trade name of the sole proprietorship "Bernard L. Madoff Investment Securities."  DX 2-A to 2-GG; 9/14/2020 [Dubinsky] 134:10-14; 9/14/2020 [Collura] 193:15-23.

45.    The bank statements for the 509 Account identified "Bernard L. Madoff" as the account holder until September 2002, more than one and half years after the formation of the LLC.

---

[4] Records for the 599 Account were only available through 2000 and were not the source of funds for the accounts in question. 9/14/2020 [Collura] 179:1-3; 180:23-25-1.

Thereafter, the bank statements for the 509 Account bore the trade name of the sole proprietorship

"Bernard L. Madoff Investment Securities." DX 1-A to 1-E; 9/14/2020 [Dubinsky] 134:10-14;

9/14/2020 [Collura] 196:6-23.

46.    Mr. Dubinsky could not recall ever seeing a 509 Account statement that had the

words "limited liability company" or "LLC" on it. 9/14/2020 [Dubinsky] Tr. 129-16-21.

47.    There was no difference in the handling of transactions in the 703 Account or 509

Account after January 2001 formation of the limited liability company. 9/14/2020 [Collura]

201:24-25-202:1-5.

48.    Neither of the Trustee's witnesses focused on the change in corporate form or

analyzed it in the preparation of their reports.  Mr. Dubinsky did not discuss the ownership change

in his report. 9/14/2020 [Dubinsky] 107:17-23.  Ms. Collura did not analyze the corporate

structures or history of the Madoff entities.  9/14/2020 [Collura] 216:24-25-217:1-3.

49.    Taken together, these facts show that for the time period for which there are bank

statements (December 1995 through December 2008), the 703 and 509 Accounts were used as

business accounts for the Investment Advisory Business in the form of the sole proprietorship

without any change over a ten-year period.

### E.    The Customer Accounts and Withdrawals

50.    In December 1995, Defendants Michael Mann and Meryl Mann opened their

account with the sole proprietorship, which account was assigned number 1CM363 in the name of

"Michael Mann and Meryl Mann J/T Wros" (the "Mann Account"). The documents used to open

the account were on the letterhead of the sole proprietorship and bore the name "Bernard L. Madoff

Investment Securities."  TX 19 pp. 1-3, TX 20 pp. 1-3, Customer Agreement, TX 21 p. 29.

51.    The name "Bernard L. Madoff Investment Securities" was apparent on every

account document:  *See, e.g.*, "CM" Account at Bernard L. Madoff Investment Securities dated

12/23/1997, TX 21, p. 22; Account assignment, TX 21 , p. 25; Joint Account Agreement dated 12/16/1995. TX 21, p. 26; Trading Authorization dated 12/16/1995 TX 21, p. 32; Option Agreement, TX 21, p. 33. DX 6.

52.    Neither witness had seen any other customer agreements executed by the Defendants, Michael and Meryl Mann or BAM L.P.  9/14/2020 [Dubinsky] 111:8-11; 9/14/2020 [Collura] 223:10-12.

53.    During the period between 1998 and 2008, Michael Mann apparently made deposits into and received withdrawal payments for the Mann Account from two bank accounts: the 703 Account and the 509 Account.

54.    In March 1999, Michael Mann opened an account with sole proprietorship, which was assigned account number 1CM379 in the name of "BAM L.P."  (the "BAM L.P. Account"). The name "Bernard L. Madoff Investment Securities," the trade name of the sole proprietorship, was on the documents. DX 4; 9/14/2020 [Dubinsky] 110:7-25-111:1-7.[5]

55.    From April 16, 2003 through October 24, 2007, when the last check was sent to the Manns, checks drawn to order of Michael and Meryl Mann J/T WROS. on the 509 Account bore the printed name of the sole proprietorship, "Bernard L. Madoff," as the drawer of the checks on both the upper left corner of the check where the name of the drawer typically appears and above the signature line.  DX 8-A to 8-E.  There was never any time when a different name appeared on the checks. 9/14/2020 [Collura] 199:10-12.

---

[5] Meryl Mann had no interest in the BAM account or BAM L.P.  Amended Complaint, No. 10-04390, ¶¶8, 10-11 (identifying the general partner and limited partners of BAM L.P.).  The Limited Partnership Agreement in the BAM L.P. account file identified by Ms. Collura confirms that Meryl Mann was not a partner in the limited partnership.

US_Active\115679951\V-2

56.     During the period from December 11, 2006 through December 11, 2008, Michael

Mann deposited $1,500,000 into Mann Account and received two checks from the 509 Account in

the aggregate amount of $2,250,000. Amended Complaint, 10-04390, 11-cv-04936 (Exhibit B)

57.     From April 25, 2000 through April 23, 2008, when the last check was sent to BAM

L.P., checks drawn to the order of BAM L.P. on the 509 Account bore the printed name of the sole

proprietorship, "Bernard L. Madoff," as the drawer of the checks on both the upper left hand corner

of the check where the name of the drawer typically appears and above the signature line.  DX 3-

A to 3-O.  9/14/2020 [Collura] 199:10-12

58.     Checks written directly on the 703 Account also bore the name of the sole

proprietorship, "Bernard L. Madoff," as the drawer of the checks on both the upper left hand corner

of the check where the name of the drawer typically appears and above the signature line.  DX 9-

A, 9-B, 9-C, 9-D, 9-F, 9-G, 9-H and 9-J.

59.     The only evidence introduced by the Trustee that the Defendants could have

become customers of BLMIS was the BLMIS logo on the customer statements in the two year

period ending in 2008.  9/14/2020 [Collura] 203:6-10.  One of the very few computer programs

used by both the Proprietary Trading Businesses and the Investment Advisory Business was forms

print -- a commercially available software used to generate forms and populate with data. Dubinsky

Report, TX 39 p. 29.  Use of the same program could explain the use of the same name.

**F.      The 9/14/2020 Trial**

60.     At the trial on September 14, 2020, the Trustee produced two witnesses:  Bruce G.

Dubinsky and Lisa M. Collura.

61.     The Parties stipulated that Mr. Dubinsky is qualified as an expert witness in the

areas of forensic accounting, forensic fraud investigations, computer forensics, solvency analysis

and business valuations, and investment theory and practices. *See* Amended Pretrial Order, 10-0439 (CGM), Aug. 11, 2020 [ECF 209, ¶6].

62.    The Parties stipulated that Ms. Collura is qualified as an expert witness in the areas of forensic accounting and forensic fraud investigations. *See* Amended Pretrial Order, 10-0439 (CGM), Aug. 11, 2020 [ECF 209, ¶7].

63.    Neither expert was qualified as a witness to testify with respect to corporate matters or securities filing. Neither witness considered or analyzed the central issue of the trial in the preparation of their respective reports.

64.    The Trustee did not produce a competent witness to testify on New York banking law and account management requirements generally or with respect to JP Morgan Chase in particular.

65.    At trial, Defendants questioned the testimony and reports of the Trustee's expert witnesses.

## II.    PROPOSED CONCLUSIONS OF LAW

### A.    The Trustee Has Not Met His Burden Of Proving That BLMIS Transferred An Interest Of The Debtor In Property To Defendants

66.    The primary issue for trial is whether the transfers constituted transfers of an interest of the debtor in property or were made by the debtor, BLMIS, within the meaning of section 548(a)(1) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA. *See* 11 U.S.C §548(a)(1); SIPA 78fff-2(c)(3).

67.    The Trustee has the burden of proof on the issue. He has not met that burden under any standard of proof.

68.    In the absence of direct, competent and admissible evidence that the sole proprietorship became part of the debtor, BLMIS, in 2001 or at any time thereafter, the Trustee relies on inference, prior opinions of this Court and others that did not directly address the issue

14

of ownership of the Investment Advisory Business assets, the testimony of experts who did not consider the issue in their reports, and strained interpretations of SIPA and the Bankruptcy Code.

### B. New York Law Establishes the Liability of the Sole Proprietorship on the Checks

69.     The Trustee did not submit any documentation of the formal banking relationship between any Madoff-related individual or entity, including the sole proprietorship and/or the limited liability company, with JP Morgan Chase or the Bank of New York to establish account ownership.

70.     Under New York law, the holder of an account and the respective rights of the bank and the account holder are typically established in an agreement with the bank when the account is opened and as same may be modified.  *See Howard L. Jacobs, P.C. v. Citibank, N.A.*, 61 N.Y.2d 869, 462 N.E.2d 1182; 474 N.Y.S.2d 464 (Feb. 28, 1984) (fees for dishonoring checks); *Hope A. Costello, v. NBT BANK, N.A.*, 2012 N.Y. Misc. LEXIS 6538 (Sup.Ct. Del. County, June 1, 2012)(account agreement documentary evidence re contract claim); *Gluck v. JPMorgan Chase Bank*, 12 A.D.3d 305, 785 N.Y.S.2d 77 (Sup. Ct. 1st Dept. Nov. 23, 2004) (agreement with customer modified state law condition precedent to lawsuit:  "The banks have customer agreements for their accounts which provide deadlines by which a customer is required to report any claim of unauthorized payment of checks. Such agreements are enforceable.").  *See also* NY UCC §4-103.

71.     In lieu of such documentation, the evidence of the account ownership must be found on the bank statement, which is sent to account holders and the printed information on the checks. It is undisputed that the bank statements for the entire decade that bank records were available were sent to the same business address for the sole proprietorship under one or another of the two names it used: "Bernard L. Madoff" or Bernard L. Madoff Investment Securities."

72.     All the checks received by the Defendants were imprinted in two places with the name of the sole proprietorship, "Bernard L. Madoff". The printed name on a checks is significant in establishing the obligation of the sole proprietorship as the obligor under New York law.

73.     NY UCC §3-401 places personal liability for the payment of a check on the person who signs the check unless either the person signs in a representative capacity and the instrument names the obligor (NY UCC §3-403) or the instrument indicates the obligator and the signatory can establish representative capacity by agreement or course of dealing. (NY UCC §3-402). In this case, the name of the sole proprietorship ("Bernard L. Madoff") is printed on the check in two places, together with evidence of the regular practice of signing by various representatives, establishes that it is the sole proprietorship that is liable on the checks, not the signatories, none of whom were Madoff personally.

74.     NY UCC §3-401 provides in relevant part: 1) No person is liable on an instrument unless his signature appears thereon. NY UCC § 3-401 (2014). Pursuant to section 3-403 ("Signature By Authorized Representative"), a representative or agent of an entity who signs the check, without designating his or her representative capacity on a check and does not indicate the entity represented, remains personally obligated: "An authorized representative who signs his own name to an instrument (a) is personally obligated if the instrument neither names the person represented nor shows that the representative signed in a representative capacity." However, section 3-402[6] opens the way for an indication on the instrument that signatory is not the obligor on the check provided that the instrument itself identifies the obligor and the representative can establish that he or she is acting in a representative capacity by course of dealing or agreement. *See  Star Dairy, Inc. v. Roberts*, 37 A.D.2d 1038, 1039, 326 N.Y.S.2d 85 (3d Dept. 1971) ("[I]t

---

[6] Section 3-402 provides: "Unless the instrument clearly indicates that a signature is made in some other capacity it is an indorsement." NYUCC 3-402 (2014)

has been held that where the signature appears under the corporate name without words of agency, parole evidence may be introduced in a suit between the parties to show the capacity in which the individual signed the instrument."); *Citibank Eastern, N. A. v. Minbiole*, 50 A.D.2d 1052, 1053, 377 N.Y.S.2d 727 (3rd Dept. 1975)("Pursuant to subdivision (2) of section 3-403 of the Uniform Commercial Code, if the name of the person represented appears on the instrument, but the signature does not show that the representative signed in a representative capacity, parole evidence will be allowed to establish that the agent signed in a representative capacity." *Golden Distributors, Ltd. v. Save All Tobacco, Inc.*, 134 B.R. 770, 772 (Bankr. S.D.N.Y, 1991) (exception established by course of dealing with business name imprinted on check.)

75.     The checks sent to the Defendants on both of their accounts for more than a decade clearly name the sole proprietorship "Bernard L. Madoff" and are signed by parties, none of whom are Madoff.  No one has suggested that the signatories would be personally liable on the checks. It is undisputed that the name of the limited liability company was never substituted on the checks. Under New York law the sole proprietorship was the obligor.

76.     The Trustee argues that the annotation on the account statements for the 703 Account after 2007 and the reference to the Uniform Commercial Code on the 509 Account statements demonstrate that the accounts were commercial and thus held by BLMIS and not Madoff personally.  The argument ignores the fact that a sole proprietorship, although owned by an individual, can operate as a commercial enterprise.  *See Rovira v. N.Y. Apparel Sales*, 01 CV 2231 (ILG), 2002 WL 1471557, 2002 U.S. Dist. LEXIS 13543, n 7, (E.D.N.Y. May 31, 2002) ("A sole proprietorship is simply '[a] business in which one person owns all the assets, owes all the liabilities, and operates in his or her personal capacity.' Black's Law Dictionary 1398 (7th ed. 1999). There is no reason a sole proprietorship cannot employ more than fifteen people . A sole proprietorship is simply '[a] business in which one person owns all the assets, owes all the

17

liabilities, and operates in his or her personal capacity.' Black's Law Dictionary 1398 (7th ed.

1999). There is no reason a sole proprietorship cannot employ more than fifteen people."); *In re*

*McCormick*, 381 B.R. 594, 600 (Bankr. S.D.N.Y. 2008) (same); *UPS of Am., Inc. v. Net, Inc.*, 225

F.R.D. 416, 421 (E.D.N.Y. 2005)("An owner can establish that it has operated an entity as a going

business concern by showing, among other things: (1) that it is doing business under a certain

name; (2) the use of a checking account for the payment of business expenses; (3) the maintenance

of an office; (4) the funding of and borrowing from an account; or (5) bank transactions that would

support a business.")

77.     The argument that the bank accounts after were identified as commercial accounts

has no bearing on the issue of whether the accounts were held at all times by a sole proprietorship

doing business under either the name "Bernard L. Madoff" or "Bernard L. Madoff Investment

Securities."

### C.    The Form BD Is Not Admissible Or Competent Evidence of a Change of Ownership of the Investment Advisory Business.

78.     The centerpiece of the Trustee's argument that Madoff transferred his Investment

Advisory Business to the LLC in January 2001 is the Form BD filed with the SEC. TX 3.  For

several reasons set forth below, the Trustee's reliance on the Form and Mr. Dubinsky's testimony

with respect to the Form's contents must be rejected.

79.     The Defendants acknowledge that the Court may take judicial notice of the

authenticity of the SEC Forms and the fact that they were filed with the agency.  Judicial notice

can be used to establish, among other things, the fact that the document was filed, but it cannot be

used to establish the truth of the matters stated.  *See Rubenstein v. Cosmos Holdings, Inc.*, 19 Civ.

6976 (KPF), 2020 U.S. Dist. LEXIS 121773, n 6 (S.D.N.Y July 10, 2020) ("But though the Court

may take judicial notice of public filings, like SEC filings, to establish the fact that they contain

information, it may not accept them as establishing the truth of the matters asserted therein" citing

18

*Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (summary order)); *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents.") (emphasis omitted).

80.    The Trustee's primary evidence that the Investment Advisory Business became part of the limited liability company in 2001 is the Form BD, which has been admitted into evidence through judicial notice and the testimony of the Trustee's expert witness, Mr. Dubinsky. The Form BD itself may be admissible as a statement of what "Bernie said at the time." 9/14/2020 at 53:234. However, the statements regarding the transfer of the sole proprietorship assets are not admissible to establish that Madoff actually transferred the Investment Advisory Business to the limited liability company, for several reasons.

81.    First, the statements are not admissible against the Defendants. The taking of judicial notice does not automatically render the document completely admissible in the face of a unique evidentiary objection. In this case, the SEC forms are inadmissible hearsay against the Defendants, but admissible against the Trustee who is in effect the successor to BLMIS. *See Buchwald v. Williams Energy Mktg. & Trading Co. (In re Magnesium Corp. of Am.),* 460 B.R. 360, n. 67 (Bankr. S.D.N.Y. 2011). While SEC filings may be introduced by an opponent as admissions of the party that filed them, *see* Fed. R. Evid. 801(d)(2), they are hearsay when offered by the party that prepared them; *Savage & Assocs. v. Mandl (In re Teligent Inc.)*, 380 B.R. 324 n. 2 (Bankr. S.D.N.Y. 2002) ("The Teligent SEC filings represent admissions by Teligent. The plaintiff is the successor to Teligent, (internal citation omitted), and the contents are non-hearsay as to her. The contents are not, however, admissible against Mandl. The contents of IDT's SEC filings are not admissible because they are hearsay, and the plaintiff has failed to show that they are admissible under an exception to the hearsay rule.")

19

82.     The Trustee has attempted to circumvent the objection that the statements in the SEC filings were inadmissible hearsay by introducing the filings through his expert, Bruce Dubinsky, as his opinion.  However, as Mr. Dubinsky testified at trial the change in corporate form is only touched on tangentially in the Dubinsky report and not analyzed.  It was not an issue on his mind when he prepared the report.  9/14/2020 [Dubinsky] 107:6-23.  In fact, the references to the corporate history of the Madoff operations, including the formation of the limited liability company and the subsequent registration of the Investment Advisory Business five years later take up less than a page of Mr. Dubinsky's 169-page report only as background. DX 39 at 16-17. Furthermore, Mr. Dubinsky could not recall if he had ever seen the Form BD before he submitted his report.  9/14/2020 [Dubinsky] 114:15-19.  Although other SEC filings are referenced in the Dubinsky Report, the Form BD was not referenced in his report. 9/14/2020 [Dubinsky] 113:15-20.  Mr. Dubinsky did know why the investment advisory business was not checked on the Form BD.  9/14/2020 [Dubinsky] 48:10-11.  According to his testimony, his familiarity with SEC documents was with the Form ADV that must be filed by investment advisors.  9/14/2020 [Dubinsky] 24:9-25.  Under these facts, it cannot be said that Mr. Dubinsky relied on the Form BD in the preparation or analysis of his report or the opinions therein.

83.     Mr. Dubinsky's opinions summarized on page 12 of his report and the lengthy list of tasks he undertook to reach his opinions have nothing to do with the ownership of the Investment Advisory Business assets.  Although experts may rely on hearsay or other inadmissible evidence if experts in their field reasonably rely on such evidence in forming their opinions under Fed. R. Evid. 703, it is inappropriate for an expert to serve as a conduit for inadmissible evidence. *See Lightbox Ventures, LLC v. 3RD Home Ltd.*, 16 cv 2379 (DLC), 2017 U.S. Dist. LEXIS 187202, *24, 2017 WL 5312187 (S.D.N.Y. Nov, 13, 2017) ("Experts may rely upon otherwise inadmissible facts or data in reaching conclusions "[i]f experts in the particular field would reasonably rely on

those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703.") citing

*United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008).

84.    Based on the facts discussed above, it cannot be legitimately asserted that Mr.

Dubinsky relied on the Form BD in forming his opinion or that his opinion about the fraud involves

in any part change in corporate form or securities filings.   An expert's testimony should be

excluded when that testimony is being used to introduce inadmissible hearsay, and particularly so

when that that hearsay and opinion were not contained in his report. *Au New Haven v. Ykk Corp*.,

5-CV-3411 (GHW)(SN), 2019 WL1254763, 2019 U.S. Dist. LEXIS 45044, *30 (S.D.N.Y. Mar.

19, 2019)("Although experts are free to rely on otherwise inadmissible evidence, parties also

cannot use experts as a Trojan Horse of hearsay."); *Louis Vuitton Malletier v. Dooney & Bourke,

Inc*., 525 F. Supp. 2d 558, 666 (S.D.N.Y 2007) ("Under Rule 703, experts can rely on hearsay in

reaching their own opinions. But a party cannot call an expert simply as a conduit for introducing

hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.")

85.    Mr. Dubinsky speculated that the Proprietary Trading Businesses and the

Investment Advisory Business were one entity by analogy and inference, not based upon

admissible fact or special expertise and knowledge.  9/14/2020 [Dubinsky] 69-70.  His testimony

with respect to the change of ownership was a legal conclusion that went well beyond his expertise

as a forensic fraud accountant.

86.    It must also be noted that the statements in the SEC Form BD (TX 3) are subject to

different reasonable interpretations, and were made by two individuals who were charged with and

pled guilty to making false statements to the SEC.

87.    The statement regarding the transfer, which states "Effective January 1, 2001,

Predecessor Will Transfer To Successor All Of Predecessor's Assets And Liabilities, **Related To

Predecessor's Business**. The Transfer Will Not Result In Any Change In Ownership Or Control"

(emphasis added), can logically apply only to the Proprietary Trading Businesses, the two businesses that were checked in response to question 12 and subject to the registration, not all assets of the sole proprietorship.

88.    Finally, it is undisputed that Peter and Bernard Madoff confessed to making false statements to the SEC. Mr. Dubinsky acknowledged that Madoff lied in the Form ADV filed with the SEC regarding the number of accounts in the Investment Advisory Business and the money under management. 9/14/2020 [Dubinsky] 138:6-14. Nevertheless, Mr. Dubinsky based his entire testimony regarding the transfer of the Investment Advisory Business assets solely on twisting select representations in the Form BD.

89.    In sum, the Form BD is inherently unreliable as evidence that Madoff transferred the assets of the Investment Advisory Business to the newly created limited company, BLMIS.

90.    Significantly, Mr. Dubinsky's contorted testimony also ignored several rationales Madoff had for not transferring the Investment Advisory business to the LLC. One achievement was that the separate structures insulated Madoff's sons and his brother, who ran the Proprietary Trading Businesses, from the fraud in the Investment Advisory Business. Another benefit from the separation of the businesses was it made it easier for Madoff and his employees to conceal the fraud in the Investment Advisory Business from the regulatory authorities.

### D.    The Defendants Discovery Requests Are Not Evidence That Bank or Customer Accounts Were Assets of The Limited Liability Company

91.    The Trustee seeks to use the Defendants' now-superseded discovery requests (DX 14, 15, 16, 17, 18 ) as evidence that the customer accounts and bank statements were assets of BLMIS, the limited liability company. These response are not competent evidence of the Trustee's contention for several reasons.

92.    First, the responses were submitted before discovery of evidence that the transfer of the Investment Advisory Business to BLMIS never actually occurred. The recitations in the

US_Active\115679951\V-2

2018 pretrial order jointly agreed to for trial, before the Trustee filed the Trustee's Summary

Judgment Motion, expressly stated the parties' contentions superseded prior discovery responses.

Although that pretrial order was not signed by the Court, it represented an agreement between the

parties that pleadings were superseded by the contentions in the pretrial order. Judge Bernstein

recognized that those discovery responses were no longer conclusive judicial admissions:

> Ordinarily, "[f]acts admitted in an answer, as in any pleading, are judicial
> admissions that bind the defendant throughout [the] litigation." *Gibbs ex rel.*
> *Estate of Gibbs v. CIGNA* Corp., 440 F.3d 571, 578 (2d Cir. 2006). "The
> amendment of a pleading does not make it any the less an admission of the
> party." *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir.
> 1989) (citations omitted); accord *United States v. McKeon*, 738 F.2d 26, 31 (2d
> Cir. 1984) ("A party thus cannot advance one version of the facts in its pleadings,
> conclude that its interests would be better served by a different version, and
> amend its pleadings to incorporate that version, safe in the belief that the trier of
> fact will never learn of the change in stories."). Nevertheless, an admission in a
> withdrawn or superseded pleading ceases to be a "conclusive judicial
> admission." *Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 32 (2d Cir.
> 2002) (citing *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d
> 195, 198 (2d Cir. 1929)), overruled on other grounds *by Slayton v. Am. Express*
> *Co.*, 460 F.3d 215, 226-28 (2d Cir. 2006).
>
> Here, the parties stipulated that their prior pleadings would be deemed amended
> by the JPTO. (JPTO at 20 ("The pleadings are deemed amended to embrace the
> following, and only the following, contentions of the parties.").) Through the
> JPTO, the Defendants now contend, consistent with the Objection, that the 509
> Account belonged to Madoff. (JPTO at 29, ¶ 10; 36, ¶ 27.) Hence, the prior
> admissions are no longer "conclusive judicial admissions," although the fact
> finder may consider them in deciding the issue at trial.

*Picard v. BAM L.P*, 608 B.R. 165, n.17 (Bankr. S.D. N.Y 2018)

93.     There is an additional reason that the use of the term "BLMIS" in the discovery

responses does not serve as evidence that the Defendants acknowledged ownership of the

Investment Advisory Business assets by the limited liability company, BLMIS. The Trustee

defined "BLMIS" in his discovery requests very broadly as follows: "BLMIS means "Bernard L.

Madoff Investment Securities LLC., Bernard L. Madoff Investment Securities LLC, Madoff

Securities International Ltd., Madoff Securities International LLC, Bernard L. Madoff, Ruth

Madoff, and all affiliated Persons and entities, including, but not limited to, any officers, directors,

agents, representatives, employees, partners, parent companies, subsidiaries, predecessor or

successor and related entities, and affiliates of the above specifically identified Persons and

entities.  Request for Admissions. TX016,p.3 ¶4"  The Defendants objected to the definition and

limited the term to include both the limited liability company and the sole proprietorship, as well

as other entities not at issue here, as follows:

> Mrs. Mann objects to the definition of "BLMIS" as overly broad and unduly
> burdensome. In responding to these Interrogatories, Mrs. Mann understand this
> term to mean only Bernard L. Madoff Investment Securities LLC, Madoff
> Securities International Ltd., Madoff Securities International LLC, Bernard L.
> Madoff, and all affiliated persons and entities to the extent they were acting on
> behalf of the above entities and/or Bernard L. Madoff. To the extent the
> Trustee's definition of "BLMIS" seeks information outside this scope,
> Interrogatories containing the term "BLMIS" are not reasonably calculated to
> lead to the discovery of admissible evidence, are overly broad, and unduly
> burdensome.

TX 15, ¶10.

94.     In sum, the term "BLMIS" in the responses is not a straightforward

acknowledgement or evidence of ownership by the limited liability company.

### E.     Ownership of the Investment Advisory Business Assets Is Not Modified By SIPA

95.     In the absence of admissible evidence that the bank, trading and customer accounts

of the investment advisory business became part of BLMIS in 2001, the Trustee will turn to legal

arguments and in particular, section 78fff-2(c)(3).

96.     Section 78fff-2(c)(3) provides:

> Whenever customer property is not sufficient to pay in full the claims set forth
> in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any
> property transferred **by the debtor** which, except for such transfer, would have
> been customer property **if and to the extent that such transfer is voidable or
> void under the provisions of Title 11.** Such recovered property shall be treated
> as customer property. For purposes of such recovery, the property so transferred
> shall be deemed to have been the property of the debtor and, if such transfer was
> made to a customer or for his benefit, such customer shall be deemed to have

24

been a creditor, the laws of any State to the contrary notwithstanding.

15 U.S.C. § 78fff-2(e)(3) (emphasis added).

97.    It is well established that this provision is intended to work around the problem that money deposited with a broker is not the debtor's property and therefore, would not be avoidable and recovered by an ordinary bankruptcy trustee under the bankruptcy avoidance provisions. "SIPA circumvents this problem through a statutorily created legal fiction that confers standing on a SIPA trustee by treating customer property as though it were "property of the debtor" in an ordinary liquidation. *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014).

98.    However, the Trustee's ability to use the provision to recover transfers depends in the first instance on his proof that the transfers were made by the SIPA debtor.  BLMIS, not the sole proprietorship, is the SIPA debtor.

99.    The term "debtor" is precisely defined in SIPA as "a member of SIPC with respect to whom an application for a protective decree has been filed under section 78eee(a)(3) of this title…"  SIPA § 78*lll*(5).  It is undisputed that SIPC filed an application for a protective decree solely against "Bernard L. Madoff Investment Securities LLC"  on December 15, 2008 in the District Court.  *SEC v. Bernard L. Madoff, et al.*,  08 Civ 10791 [ECF No.5].  Assets outside the limited liability company held by Madoff were excluded from the request and the resulting protective order and separately addressed.

100.    Despite the clear language of the SIPA provision defining the debtor as the subject of an application, the Trustee will argue, as he has in the past, that the definition of debtor should be read expansively to include the sole proprietorship because both were members of SIPC (or had the same membership and SEC registration number) or BLMIS somehow includes the sole proprietorship as its alleged successor.  These arguments have been rejected by the Bankruptcy Court in a strong initial decision and again on reargument in *Picard v. Avellino (In re Bernard L.*

25

*Madoff Inv. Secs. LLC*), 557 B.R. 89 (Bankr. S.D.N.Y. 2016) ("*Avellino*"), reconsideration denied,

2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016)

101.    It is not SIPC membership that defines the debtor, but the applicant's name in the

te SIPC application for protection.    As the Court noted that sole proprietorship was not named as

a defendant or mentioned in the application or the protective order:

> The "debtor" in a SIPA liquidation proceedings is "a member of SIPC with respect to whom an application for a protective decree has been filed under section 78eee(a)(3) of this title." SIPA § 78111(5).    SIPC filed an application for a protective decree against "Bernard L. Madoff Investment Securities LLC," and the District Court's order identifies the Defendant as "Bernard L. Madoff Investment Securities LLC."    The predecessor business, which was not a defendant or even mentioned in the District Court's Order, was conducted in the name of Bernard L. Madoff. (Uniform Application for Broker-Dealer Registration (Form BD), dated Jan. 12, 2001, at 9.)    The SIPA debtor was BLMIS, the limited liability company, and not Madoff's sole proprietorship, an entity that had no legal existence separate from Madoff. See *United States v. Fox*, 721 F.2d 32, 36 (2d Cir.1983); *Mattel, Inc. v. Adventure Apparel*, No. 00 CIV. 4085, 2001 WL 1035140, at *5 n. 2 (S.D.N.Y. Sept. 7, 2001)

*Id.* at 108.    The significance of the distinction is that the legal fiction of SIPA section § 78fff —

2(c)(3) that converts transferred customer property to property of the debtor for avoidance and

recovery purposes does not apply to transfers made by the sole proprietorship, a non SIPA debtor,

or to property that was not transferred by BLMIS, the SIPA debtor.

102.    In addition, the provision of SIPA relied upon by the Trustee does not change the

basic rule of fraudulent transfers under the Bankruptcy Code that assets sought to be reclaimed as

a result of an alleged fraudulent transfer to an innocent recipient do not become part of the pool of

"customer property" unless and until the Trustee succeeds in avoiding both the obligation incurred

and the transfer of the assets in question. As the Court explained in *Fairfield* case, "our case law

is clear that assets targeted by a fraudulent conveyance action do not become property of the

debtor's estate under the Bankruptcy Code until the Trustee obtains a favorable judgment." 762

F.3d at 212 (citing *Colonial Realty*, 980 F.2d at 181).    The express language of the provision makes

it clear that the fiction is not automatically applicable; it is only triggered **if and to the extent that such transfer is voidable or void under the provisions of Title 11.**

103.    In sum, SIPA does not convert property of Investment Advisory Business to property of the debtor, BLMIS.

### F.    The Transferred Property Was Not Property of the Debtor

104.    SIPA defines customer property to mean "cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted." 15 U.S.C.§78lll (b). The Trustee will argue that as long as a Trustee can show that the property that he seeks to recover was customer property received by the debtor, he has the authority to recover it, wherever it was transferred. But that is precisely what the Trustee cannot prove, as shown above. The evidence, as discussed above, is indisputable that Defendants' property was never transferred or received by the SIPA debtor. It is also clear that the Defendants did not become customers of the debtor. The boiler plate language in the customer agreement that authorization and indemnity commitments inures to any successor of the broker does not convert a separate business, BLMIS, to a successor.

105.    Moreover, the only evidence that the Trustee adduced at trial that the customer accounts may have ever been administered by BLMIS was customer account statements for the two years before the filing bore the BLMIS logo. However, this form and others may have been produced on the same form program used by BLMIS for its customers. Moreover, as stated herein there is no evidence that BLMIS became the successor to the sole proprietorship in 2001.

### G.    Substantive Consolidation Does Not Alter the Ownership of the Investment Advisory Business Assets.

106.    The Trustee will also argue, as he has in the past, that substantive consolidation of the BLMIS and Madoff estates joined the sole proprietorship with the limited liability company as

a SIPA debtor or expanded his rights to recover transfers made by the sole proprietorship. [7] The

Bankruptcy Court also rejected these arguments in the *Avellino* reconsideration decision cited

above.  First, the Court held that the substantive consolidation was not complete. *Avellino, Id*. at

109.  In addition, the order of the Court consolidating the bankruptcy estates (quoted above ¶6)

preserved Alan Nisselson's authority to bring avoidance actions on behalf of the Madoff estate.

The Trustee's avoidance powers were limited by the authority retained by the Madoff trustee.

*Avellino,*557 B.R at 109.

107.    Finally, substantive consolidation does not alter the ownership of the pre-filing

assets of the Investment Advisory Business.    Substantive consolidation deals with the

administration of post-filing bankruptcy estates.  It does not alter the pre-petition structures of the

consolidated entities or eliminate the obligations of the Trustee to prove each element of his

fraudulent transfer case with respect to the pre-petition entities, including that the property

transferred was property of the debtor.  The Court's consolidation order does not expand the

doctrine.  *See In re Bauman*, 535 B.R. 289, 301 (Bankr. C.D. Ill. 2015) ("Fraudulent transfer

avoidance actions under sections 548 and 544 are limited, by statute, to recovery of prepetition

transfers of property of the debtor. Operating to combine the estates of separate debtors,

substantive consolidation is inconsistent with the individual ownership of property that the

avoiding powers must recognize. That apparent inconsistency is readily reconciled, however, by

simply clarifying that substantive consolidation operates only to combine the assets of the

bankruptcy estates for distributional purposes. It does not serve to merge or consolidate the debtors

themselves. Most significantly, substantive consolidation should not be deemed to have a

retroactive effect of transforming property owned by an entity separate from a debtor into property

---

[7] In an effort to correct the error of seeking a protective order solely for BLMIS, SIPA joined the Trustee's motion
for substantive consolidation.

of that debtor as of the prepetition date of the challenged transfer."); *In re Cahillane*, 408 B.R.

175, 211-12 (Bankr. .N.D. Ind. 2009)("The facts of property ownership as they existed prepetition

remain unchanged, as do the elements of proof under sections 548 and 544."); *In re Murray*

*Industries, Inc.*, 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991) ("The substantive consolidation of

several estates means one thing and one thing only -- that all assets of the several entities are pooled

and all creditors of the several entities are entitled to share in the pooled assets in accord with their

respective rights. It would certainly be a violation of due process if the order of substantive

consolidation would operate to destroy defenses and rights which existed prior to the entry of the

order of substantive consolidation."); *In re Deltacorp, Inc.*, 179 B.R. 773 (Bankr. S.D.N.Y. 1995)

("With substantive consolidation the estates are merged for the purposes of bankruptcy

administration, but the consolidation alone does not effect a corporate merger.")

## H.      The Form ADV

108.    Section 203(a) of the Investment Advisers  Act of 1940, 15 U.S.C. § 80b-3(a),

prohibits any investment adviser from using instrumentalities in interstate commerce in connection

with his or its business as an investment adviser unless registered with the SEC.  The Form ADV

is the form that must be filed under section 203; 17 C.F.R. § 279.1 ("This form shall be filed

pursuant to Rule 203-1 (§ 275.203-1 of this chapter) as an application for registration of an

investment adviser pursuant to sections 203(c) or 203(g) of the Investment Advisers Act of 1940,

and also as an amendment to registration pursuant to Rule 204-1 (§ 275.204-1 of this chapter)".

109.    Madoff did not file a Form ADV in 2001 to register the Investment Advisory

Business although it was clearly running based on the number of customers that Mr. Dubinsky

testified that business had.  Although there is no evidence that Madoff took any steps to transfer

the assets of the Investment Advisory Business to BLMIS and nothing changed in the operation of

the businesses, nevertheless, the Form ADV approved in September 2006 is the first and only identification of the Investment Advisory Business with BLMIS.

110.    If and to the extent that ADV filing is deemed to constitute a transfer of the Investment Advisory Business to BLMIS, the Court should look at the Mann and the BAM L.P Accounts from that point in time and the consequence of a later transfer of the business on the calculation of liability.  *See Picard v. BAM L.P.*, 608 B.R.at 180. ("A claimant who could show that some of the withdrawals came from third parties might still have a zero net equity claim but the withdrawals paid by non-debtors would reduce the fictitious profits he received and his liability for a fraudulent transfer.")

111.    During the period from December 11, 2006 through December 11, 2008, Michael Mann deposited $1,500,000 into Mann Account and received two checks from the 509 Account in the aggregate amount of $2,250,000.  *See* Amended Complaint,

112.    Alternatively, the Court may calculate liability beginning with the account statement of the SIPA debtor on or about the date that the Investment Advisory Business became part of BLMIS, the SIPA debtor.  SIPA directs the Trustee to calculate claims based on the books and records of the debtor.  In or about December 2006, the Mann Account showed securities of $6,305,190 from which $2,250,000 was withdrawn. *See* DX 7-B; Complaint, Exhibit B.  The BAM L.P. Account statement showed $1,107,415 in securities from which $563,000 was withdrawn. See DX 5-G, Complaint Exhibit B.  In either case, the Trustee's request for to avoid and recover $2,250,000 from the Defendants is improper.

## III.    <u>CONCLUSION</u>

Although there was unquestionably fraud in the operation of the Investment Advisory Business and the omission of the sole proprietorship in the SIPA application may have been an

US_Active\115679951\V-2

error, the problem cannot be remediated by reinventing a history of the Investment Advisory Business in order to facilitate an action against innocent customers of a broker-dealer.

Based on the above, the Defendants respectfully request that the Court deny the Trustee's request for judgment and grant such other and further relief as this court deems just and proper.

Respectfully submitted,

Dated: October 15, 2020
        New York, New York

DENTONS US LLP

By: */s/ Arthur H. Ruegger*
Arthur H. Ruegger
Carole Neville
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
arthur.ruegger@denton.com
carole.neville@dentons.com

*Attorneys for Defendants*

31