# EXHIBIT B

```
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No. 05-44481-rdd

 4   Adv. Case No. 14-02445-rdd

 5   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 6   In the Matter of:

 7   DPH HOLDINGS CORP., et al.,

 8           Debtors.

 9   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   SOLUS ALTERNATIVE ASSET MANAGEMENT LP et al.,

11               Plaintiffs,

12           v.

13   DELPHI AUTOMOTIVE LLP, et al.,

14               Defendants.

15   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16               U.S. Bankruptcy Court

17               300 Quarropas Street, Room 248

18               White Plains, NY 10601

19

20               March 24, 2017

21               12:34 PM

22

23   B E F O R E :

24   HON ROBERT D. DRAIN

25   U.S. BANKRUPTCY JUDGE
```

18-02489-rdm Doc 31987 Filed 05/10/17 Entered 05/10/17 20:06:08 Main Document Pg 2 of 67

1    Hearing re:   Pre Trial Conference – Motion for Summary

2    Judgment.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 3

```
 1    A P P E A R A N C E S :

 2

 3    FRIEDMAN KAPLAN

 4         Attorneys for the Defendants

 5         7 Times Square

 6         New York, NY 10036

 7

 8    BY:  EDWARD A. FRIEDMAN

 9         JEFFREY C. FOURMAUX

10

11    QUINN EMANUEL

12         Attorneys for the Plaintiffs

13         51 Madison Avenue, 22nd Floor

14         New York NY 10010

15

16    BY:  JAMES C. TECCE

17         ERIC M. KAY

18

19

20

21

22

23

24

25
```

18-04269-rdm Doc 13 9874 Filed 05/10/15 20 Entered 05/10/15 20:06:08 Main Document Exhibit B
Pg 5 of 67

```
1                    P R O C E E D I N G S

2            MR. TEECE:  Good afternoon, Your Honor.  For the

3    record, James Teece and Eric Kay for Solus Alternative Asset

4    Management, De Angelo Gold Funds and the Highland Funds,

5    Plaintiffs.

6            THE COURT:  Good afternoon.

7            MR. FRIEDMAN:  Good afternoon, Your Honor.  Edward

8    Friedman and Jeffrey Fourmaux, Friedman Kaplan Seiler &

9    Adelman for the Delphi Defendants.

10           THE COURT:  Good afternoon.  Okay, so this is the

11   hearing scheduled for the issue of prejudgment interest,

12   which was touched on towards the end of the summary judgment

13   motion process, but I concluded that I needed more input on

14   it from the parties after my bench ruling. And I appreciate

15   that you have, I believe, although I want to confirm this,

16   confirmed or agreed upon the actual dates when the payments

17   of the unsecured creditor distribution under the plan should

18   have been made under my prior ruling?  Obviously, the

19   defendants are reserving their rights in respect of the

20   appeal of that ruling if they want to appeal, but as far as

21   that ruling is concerned, you've agreed on when those

22   payments should have been made?

23           MR. TEECE:  That's correct, Your Honor.

24           MR. FRIEDMAN:  Yes, Your Honor.

25           THE COURT:  Okay, and they're laid out, among
```

1   other places, in the defendants' opening brief at Page 6, I

2   guess, in the chart.  All three payments would have been in

3   2015, March, June and September, in the amounts stated.

4          MR. FRIEDMAN:  Exactly right, Your Honor.

5          THE COURT:  Okay, so what we're really talking

6   about here, then, is simply the issue of whether prejudgment

7   interest should be payable on those amounts, as of those

8   respective dates, at all and if so, at what rate.

9          MR. TEECE:  That's correct, Your Honor.

10         THE COURT:  Okay.  Now, I've read the parties'

11  pleadings on this.  I'm happy to hear you with anything more

12  on that.

13         MR. TEECE:  Sure.  Again, Your Honor, James Teece

14  for the plaintiffs.  The request the plaintiffs have made is

15  for a 9 percent prejudgment rate, and, to be clear, and

16  stated with more precision, our request goes to the Court's

17  discretion and we're requesting the Court exercise its

18  discretion and look to New York law to award the 9 percent

19  rate, which relates to a plan which is governed by New York

20  law, and which has the statute that says that in disputes

21  over contracts, the presumptively appropriate rate is 9

22  percent.  To be clear, we are not arguing -- it has been

23  stated many times that our position is that the 9 percent

24  rate is mandatory -- that is not the plaintiffs' position.

25  We're not arguing that it's mandatory.

```
 1              THE COURT:  All right.

 2              MR. TEECE:  We're arguing that the Court -- given

 3     that -- the factors that are relevant to the exercise of

 4     your discretion, which are exceedingly broad, which include

 5     considerations of fairness, relative equities, other general

 6     principals, there are very few limitations on the exercise,

 7     that given that exercise, the 9 percent rate is appropriate.

 8     Now, this action, Your Honor, our complaint has two counts.

 9     The first count is for declaratory relief.  The second count

10     is for breach of contract.  And, in sum and substance, the

11     plaintiffs in this action requested declaratory relief that

12     was consistent with their reading of the plan,

13     implementation of the plan consistent with that reading, and

14     the payment of $300 million dollars under the plan.  In sum

15     and substance, that was the relief that was requested.

16              Defendants, in their brief, described the dispute

17     in a way that we think is appropriate.  They said on Page 3

18     of their -- or Page 9 of their answering brief, this is a

19     dispute about commercial actors -- this is a dispute between

20     commercial actors about the meaning of the contract.  And

21     that's correct in sum and substance.  What it is, there was

22     differing interpretations of a plan, which was a contract

23     governed by New York law.  And the action, while there is a

24     declaratory count, which, is by definition, neither legal

25     nor equitable as a procedural vehicle, there's a breach of
```

Page 7

1    contract count.  The action is neither entirely legal nor

2    entirely equitable, which is why we're arguing that Your

3    Honor should exercise his discretion.  We're not arguing

4    that it's a mandatory 9 percent rate, for that reason.

5          But it makes no difference that the action is both

6    legal and equitable because, either way, the Court can get

7    to 9 percent as the appropriate rate.  Obviously, if it's

8    entirely legal, this was a breach of contract dispute, the

9    statute applies.  But I'd refer the Court to the Lewis case,

10   which is cited by defendants, actually.  This is a Second

11   Circuit decision, 831 F.2d 37, and it cited within the

12   defendants' citation to a Rhodes case, which I'll speak to

13   in just a second.  This is a Second Circuit case.  There was

14   a shareholder derivative suit alleging a waste of corporate

15   assets.  The directors of, say, Company A, for simplicity's

16   sake, rented out their office space to Company B, in which

17   the directors also had a significant interest.

18         And the -- a claim -- a shareholder derivative

19   suit was brought for corporate waste.  The Second Circuit

20   said -- made the following observation, I'm reading from

21   Page 39: "A derivative action has a dual nature.  The

22   derivative mechanism invokes the equitable powers of the

23   court in that a stockholder is allowed to pursue a claim on

24   behalf of his corporation; but to the extent that the claim

25   itself would be viewed as one in law rather than in equity

Page 8

1    if asserted by the corporation itself, the action may

2    properly be viewed as one of a legal nature."  It then went

3    on to determine that the plaintiffs were entitled to 9

4    percent under the CPLR, because what it said is, and I'm

5    reading from Page 41 now, whether the claim would "be viewed

6    as a legal one for interference with SFE's enjoyment,"

7    that's the corporation, "of its property or as an equitable

8    one because the derivative mechanism was used, the District

9    Court should have awarded SFE prejudgment interest. We

10   believe that they were entitled to it as a matter of right."

11          So our point is, Your Honor, is whether -- this

12   may be a dual case where we have a declaratory relief and a

13   request to implement the plan under 1142, and a breach of

14   contract action, given that the Court reviewed the contract

15   under New York law, examined the context within which the

16   contract came to fruition through the bankruptcy

17   confirmation process, under New York law, and the 9 percent

18   rate can be avoided -- can be awarded, rather, either way.

19          And by analogy, Your Honor, we cite a number of

20   cases where only Federal claims are asserted.  No state law

21   breach of contract claims.  And this is the Alfano case that

22   we cite, the Dow Chemical case that we cite, the Livenet

23   case, Lehman Brothers Holdings, these are cases where only

24   Federal claims are asserted and the Court, on the question

25   of prejudgment interest, looks to the New York CPLR in the

1:08-cr-24789-rdgm Doc 13987 Filed 05/10/17 15:20 Entered 05/10/17 15:40:06 Main Document Pg 10 of 67

1   exercise of its discretion, and it awards 9 percent.  I

2   think Alfano is especially instructive.  This is an ERISA

3   benefits case at 2009 WL 890626, a request for long-term

4   benefits.  Claimant made the request, for three years the

5   request was pending.  Ultimately, the claimant prevailed,

6   and the claimant got 9 percent.  And if you think about it,

7   that's a very similar situation because ERISA is Federal

8   statute, and in essence, while they're arguing that the plan

9   entitled the claimant to benefits, there's a level of

10  injunctive relief that's wrapped up in that request because

11  you have to compel the plan to pay you your benefits.

12          So, we think that these cases are very similar to

13  our case in that it doesn't matter that it's not exclusively

14  a state law breach of contract claim, doesn't matter that

15  there's an element of Federal law.  The 9 percent rate can

16  be awarded.  Again, the Dow Chemical case, this is a COGSA,

17  Carriage of Goods by Sea Act, case.  The vessel was diverted

18  to another port, the Court awarded 9 percent instead of

19  just, you know what?  Exceptional circumstances, we'll award

20  9 percent under the CPLR.  Livenet was a securities fraud

21  case, 9 percent under the New York CPLR.  Lehman Brothers

22  was a declaratory judgment action arguing that Bank of

23  America violated the automatic stay by setting off against

24  funds that were supposedly in a special purpose account, to

25  satisfy all of this exposure.  We think those cases apply by

1-80-0124789-rdgm Doc 1319874 Filed 05/19/10/15/20 Entered 05/19/10/15/20:06:08 Main Document Exhibit B
Pg 11 of 67

1    analogy.  The defendant --

2         THE COURT:  There are plenty of cases applying

3    Federal law, though, that, contrary to those cases, apply

4    either the Federal postjudgment rate, by analogy, or, as in

5    the case with the 1031 opinion by Judge Glenn, the prime

6    rate in effect at the time.  And other than a few remarks

7    like the one Judge Glenn made, which is that the T-bill rate

8    just seemed too low, courts don't really explain in any

9    great detail why they choose one rate over another.

10        MR. TEECE:  May I respond to that?

11        THE COURT:  Yeah.

12        MR. TEECE:  So, let's take the 1031 --

13        THE COURT:  I mean, they list the factors, but

14   they don't really, based on my review, spend a lot of time

15   analyzing the rates in light of those factors.

16        MR. TEECE:  Well, there are -- I'll speak to -- I

17   want to talk about the 1031 case first because that case,

18   where Judge Glenn doesn't apply the CPLR, but he sets the

19   rate at between 6 and 8.25 percent.

20        THE COURT:  Well, he applies the prime rate.

21        MR. TEECE:  He does, and that's the prime rate at

22   the time.

23        THE COURT:  Right.

24        MR. TEECE:  There are myriad cases cited by

25   defendants which have Chapter 5 claims.  These are pure

1   Federal claims as well.  They reflexively apply the Federal

2   judgment rate.

3          THE COURT:  Right.

4          MR. TEECE:  Okay?  And those cases, Colonial Wil -

5   -

6          THE COURT:  And maybe there's a distinction

7   between those cases where, you know, we all -- you all, I'm

8   sure, still do, tell our clients, there's nothing wrong with

9   taking a preference.  There's nothing improper.  You don't

10  want to discourage people from taking preferences.  You do

11  want to discourage people from violating the automatic stay

12  or sending a ship where it's not supposed to go.  So, maybe

13  that's behind the difference, I don't know.  You tell me.

14         MR. TEECE:  Well, the ca -- on the Federal

15  judgment rate cases, with respect to the preference, the

16  fraudulent transfer claims, if you look at the rates that

17  are awarded, the dates of the cases that are cited, they're

18  -- these are 5 percent rates, okay?

19         THE COURT:  Right.

20         MR. TEECE:  And my point is that, in different

21  environments, the Federal judgment rate may make more sense,

22  but it makes no sense today, and that is what the defendants

23  are asking for is 50 basis points or 62 basis points, and

24  Your Honor, to your point that the courts don't analyze why

25  they award interest at the rate that they do, I -- some of

1    the decisions that we cited I think do make that analysis.

2    For example, the -- in the Alfano case, the argument was

3    made by CIGNA on the ERISA benefits case that the Treasury

4    rate was too low, and in that case, the Court says, although

5    CIGNA -- and I'm reading from Star 6, I guess, it's a

6    Westlaw decision -- "Although CIGNA argues that the Treasury

7    rate constitutes a more appropriate rate, there is no reason

8    to think that that rate more accurately captures the time

9    value of money in New York, or the true loss to plaintiff,

10   particularly given the New York State Legislature's

11   determination otherwise."  Now, the point is that the Court

12   is deferring, in that particular case, to a determination

13   that's made by the Legislature --

14          THE COURT:  Right.

15          MR. TEECE:  -- and then, in the Schleben case,

16   which is cited by the defendants, this is an Eastern

17   District of Michigan case, 2016 -- 2016 WL 806707.  This is

18   an ERISA action, plan amendment reduced the plaintiff's

19   benefits, the plaintiff argued that that violated the plan.

20   The plaintiff asked for 15 percent because they tried to

21   average the returns that they would get under the plan, and

22   the plan asked for the 1 percent Treasury rate.  The Court

23   said, quote, "it's unsurprising that during a period marked

24   by low interest rates in the wake of the global financial

25   crisis of 2008, some courts have recognized that the one-

1    year Treasury rate has limited relevance for calculating

2    prejudgment interest."  The point is, is that --

3            THE COURT:  On the other hand, I think -- well,

4    maybe not a hedge fund manager but a lot of fund managers

5    would be absolutely delighted if they had a 9 percent rate

6    of return in 2015 or 2016.

7            MR. TEECE:  But Your Honor, I think that the --

8            THE COURT:  I mean, that -- they'd be a hero,

9    wouldn't they?

10            MR. TEECE:  I think the point is, is that if you

11    take a legal position, if you advance the legal position

12    based on your reading of the contract, and --

13            THE COURT:  Yeah, but they lost on that.

14            MR. TEECE:  Right, but there was a risk that -

15    that, in advancing a legal position and having a breach of

16    contract dispute, that a prejudgment interest rate of 9

17    percent would be payable.  That's what the statute has said.

18    That's what the Legislature in this jurisdiction says is the

19    rate.  If you have an argument about a breach of contract

20    and one party prevails and the other does not, that is the

21    rate that's awarded, and there's no qualitative disclaimer

22    in the statute, Judge Drain.  There's no -- the New York

23    CPLR doesn't --

24            THE COURT:  No, but we're already saying that the

25    statute is not mandatory.  I mean, that's -- that's how you

1    began, so what I'm looking at, and I think what the various

2    courts that you've been citing properly looked at, was

3    whether the 9 percent rate for the period at issue here fits

4    the factors that courts generally say need to be considered

5    under Federal law, i.e., the need to fully compensate the

6    wronged party for actual damages suffered, we need the time

7    value of money here before the money went in the unsecured

8    creditors' pocket, considerations of fairness and the

9    relative equities of the reward, the remedial purpose of the

10    statute involved, and such other general principals as are

11    deemed relevant by the Court.

12            I think we haven't really gotten into remedial

13    purposes or fairness or maybe you're sort of trying to get

14    into it just now, fairness and relative equities, but just

15    focusing on fully compensating the wronged party, again, I

16    mean, 9 percent --

17            MR. TEECE:  Well, I'll speak to that, Your Honor.

18    The -- first of all, the Court is entitled, and I cite to

19    the Jones case on this, another case by the defendants, 223

20    F.3d 130, you're entitled to determine if a party could have

21    invested the money at a higher rate than the Treasury rate,

22    and we've attached submissions showing the S&P 500 rate was

23    8.4, the Russell 2000 Index was a little higher than that.

24    So, the money could have been deployed in other ways.  The

25    money -- the $300 million dollars, under the Court's ruling,

1     became due and payable in installments starting on March

2     9th.  At that point in time, the money could have been

3     invested.  Now, again, the case law says that the 9 percent

4     rate, I'm not arguing that it's mandatory, but it says that

5     it's compensatory and it's not punitive.  And so, the

6     position that, well, unless I can get you up to 9 percent,

7     unless I can convince you to exercise your discretion up to

8     9 percent --

9               THE COURT:  But again, isn't that really in the

10    same context when people say, at the time, it seems okay, as

11    opposed to it's always okay?  Just the same logic that says

12    that the T-bill rate may be fine at some times and not at

13    others because there's some sort of disconnect in the world.

14              MR. TEECE:  The statute, Your Honor, if it becomes

15    -- if its application becomes unworkable, for some reason,

16    then I presume the Legislature will amend it, but it's --

17              THE COURT:  But we have two different

18    Legislatures.  We have the Congress, that says that at least

19    the postjudgment rate is T-bills, and we have the New York

20    State Legislature that says it's 9 percent, so even they

21    don't agree.

22              MR. TEECE:  But we're not talking about

23    postjudgment interest only.

24              THE COURT:  I know, but a lot of Federal Courts

25    have been perfectly happy to apply it in a prejudgment

1   context, too.

2           MR. TEECE:  The only -- I would disagree with that

3   statement only to say -- I don't -- I've only -- I don't

4   believe I've seen the case, or maybe I've seen only one

5   case, where the Judge simply said, you know, this is the

6   postjudgment rate and I'm also just applying it as the

7   prejudgment rate.  I don't think so.  I think the point is,

8   is that the --

9           THE COURT:  They don't spend a lot of analysis.

10          MR. TEECE:  -- the Federal judgment rate --

11          THE COURT:  I mean, in Lehman Brothers, for

12   example, there was hardly any analysis.

13          MR. TEECE:  Well, the --

14          THE COURT:  It just said interest, and then the

15   order had the number in it.

16          MR. TEECE:  No, but I think Lehman Brothers is

17   worthy of note, Your Honor.  That's clearly a declaratory

18   relief action where the Court, using New York law,

19   interpreted a security agreement --

20          THE COURT:  Right, but it was for violation of the

21   automatic stay and, clearly, that factor here would go into

22   factor three, the remedial purpose of the statute involved.

23   You know, violating the stay is pretty serious.  You don't

24   want to encourage the -- I forget, who was the defendant --

25          MR. TEECE:  It was Bank of America, Your Honor.

1           THE COURT:  -- you don't want to encourage the

2   Bank of Americas of the world to improperly set off hundreds

3   of millions of dollars when Debtors are in financial

4   trouble.

5           MR. TEECE:  But --

6           THE COURT:  So, the consequences really should be

7   pretty serious there.

8           MR. TEECE:  But now -- Your Honor, they could have

9   been fined, they could have been given -- could have

10  assessed a fine against them.  The Court awarded interest as

11  a component of the judgment.

12          THE COURT:  Didn't say why, though.

13          MR. TEECE:  But -- just, Your Honor, as going back

14  to the point, though, of the first prong, which is what you

15  said, compensate the claimant.

16          THE COURT:  Right.

17          MR. TEECE:  So, I believe we've introduced, you

18  know, the argument and -- with screenshots of what some

19  equities and debt returns would have been.

20          THE COURT:  Right.

21          MR. TEECE:  I also note, Your Honor, that --

22          THE COURT:  What would -- can I interrupt you?

23  What would the prime rate have been during this period, on

24  an average basis?

25          MR. TEECE:  Your Honor, I must say, I don't know

1    the answer off the top of my head.  I don't.  But what --

2    where I was going with this was, putting aside the equity

3    investment and then the debt index that we cited to, when

4    the money became owing in March, and to the plaintiffs'

5    mind, was not being paid, the plaintiffs, essentially, were

6    lending it to the company because, from and after March 9th,

7    the contingencies to their recovery, the benefit of their

8    bargain was, we have a contingent right to recovery if

9    distribution exceeds $7.2 billion dollars and that, in point

10   of fact, happened on March 9th.  That's not in dispute.

11           And from and after that period, the money became

12   owing and it wasn't paid, and, to that end, it's fair to say

13   that the company was essentially borrowing the money.  The

14   company was borrowing money from other noteholders at the

15   same time, at or about the same time.  And it was issuing

16   notes, unsecured notes, at different percentages, 4.15

17   percent, 3.1 -- and one issue was a combination 3.15, 4.4,

18   4.25.  These are 4 percent numbers for money that is being

19   extended by noteholders that have covenants,that have

20   affirmative protections in their indenture, reps and

21   warranties, things of that nature.  And at the same time,

22   not just in theory, I think, in fact, the -- to the extent

23   that the judgment is unpaid during that period of time, it's

24   a form of a loan to the company, so there's another -- we

25   could have been noteholders of the company and gotten those

1       returns during that period.

2              Now, with respect to the other factors that Your

3       Honor mentioned, the -- at the last hearing, Your Honor,

4       observed, well, this is a close call, so it's going to be

5       very difficult for me to, you know, get far beyond -- I

6       don't want to put words in your mouth, but you recognized

7       that -- your view that you thought this was a close call in

8       terms of the readings.  But again, that's a point that goes

9       to the merits.  When you consider the contract -- that the

10      contract was one under New York law, and you consider the

11      context under which the contracts came into being, which is

12      the confirmation hearing, and the confirmation of the

13      plan.And at the confirmation hearing, to be clear, the

14      defendants argued that they weren't present at the

15      confirmation hearing.  I would take issue with that because

16      more precisely, the collective of Tranche DIP lenders were

17      present at the DIP hearing -- or at the confirmation

18      hearing, rather.  Their counsel was present, they made an

19      appearance on the record, and the -- they were essentially

20      the members of DIP HoldCo 3, LLC, which was the "company

21      buyer," and ultimately became new Delphi.  The members

22      didn't change during that period.  Perhaps these entities

23      came into existence, DAL, DAP, after the confirmation

24      hearing, but the ownership remained the same during that

25      period of time.

```
 1              And in the connection with the confirmation

 2      hearing, the reading that is being put forth by these

 3      defendants, that distributions, for purposes of a threshold,

 4      will not include share repurchases, will not include

 5      redemptions, they will only include dividends, that was not

 6      a reading that was put forth at the confirmation hearing.

 7      It was not stated on the record by any party.  The evidence

 8      that the Court invited the parties to adduce, with respect

 9      to the attendant parties at that point in time, did not

10      yield any -- that exercise, that discovery exercise, did not

11      yield any evidence that that reading was in anyone's

12      contemplation at that time.  There's no contemporaneous

13      extrinsic evidence of that.

14              So, what's the point here?  There are general

15      principles the Court can consider, which go to disclosure,

16      to bankruptcy disclosure.  The reading that's being advanced

17      is inconsistent with the disclosures to the Court at the

18      time.  The reading being the defendants' position and their

19      interpretation of the contract.  And how does that flow

20      through to prejudgment interest?  The point is that either

21      it was something that was known at the time and wasn't

22      disclosed, we don't have to go there, but at some point in

23      time, at some point in time, the idea came up to advance a

24      reading of the plan that it's, number one, governed by the

25      distribution definition in the company-buyer operating
```

1   agreement, number two, that that means that only dividends

2   count.

3          At some point in time, that idea came into

4   existence, that the document should be read that way and

5   that the position of the defendants will be based on that

6   reading of the document.  So, that was not consistent with

7   what took place at the confirmation hearing in terms of what

8   was represented to the record, that's not consistent with

9   the evidentiary record that was developed with respect to

10  the contemporaneous evidence of the document.  It was a

11  reading that came into existence at some point in time.  So,

12  perhaps 2011, I believe defendants say, it might have been

13  at or about this point in time that that reading came into

14  existence.  Well, a decision was made to adopt that reading

15  and to advance it for the purpose of not paying the general

16  unsecured MDA distribution when it was demanded.  It wasn't

17  even demanded by our plaintiffs, it was demanded previously

18  in connection with the IPL litigation.  We understand that

19  issue was litigated.

20         But at least from that point on, this issue was

21  known, that the unsecured creditors' view of the documents

22  differently.  The company made a decision that it would

23  persist with this reading of the documents and argue that an

24  alternative interpretation, which was litigated initially

25  once before this Court and then again by us, and New York

1    law was applied.  New York law was applied in interpreting

2    the document, New York law was applied in running to ground

3    the competing interpretations of these documents under New

4    York law, and again, we go back to the exercise of your

5    discretion to look to the law that governs the contract, the

6    law that applies to the jurisdiction in cases such as these.

7    Because in essence, again, as the def -- I don't think the

8    defendants dispute this, this was a dispute about the

9    meaning of the contract and two different interpretations.

10   It was decided under New York law.

11             The defendants argue that we can't -- and I don't

12   know -- I don't know how much Your Honor wants me to address

13   this point.  I don't want to address it too much.  I mean,

14   I'm happy to get into it but it's quite technical, that

15   because DPH Holdings was the only party -- this is the

16   defendant's position -- because DPH Holdings was the only

17   party that has standing to enforce the MDA, we don't really

18   have a contract claim here, so it's for some -- I'll just

19   read directly --

20             THE COURT:  But -- I -- look, to me, given that

21   you opened by saying that application of New York law's 9

22   percent rate is not mandatory, I don't think we need to get

23   into that.

24             MR. TEECE:  Okay, I don't -- I just don't -- I

25   want it to be clear that our position --

1         THE COURT:  I think you're basically saying that

2    it would be fair to apply New York law because there's a New

3    York context to this, but it's not mandated because it's not

4    really -- because it's a Federal question, ultimately.

5         MR. TEECE:  Okay.  But to be clear, the only point

6    I wanted to make, Your Honor, was that if, again, it's not

7    mandatory, that is the argument we're making, but if Your

8    Honor wanted -- I don't want to leave unresponded the idea

9    that our clients don't have direct contractual claims under

10   the plan, because they do, because the company buyers

11   defined as DIP HoldCo 3, LLC, the dispersing agent defined

12   as DIP HoldCo 3, LLC, we have claims under the plan.  But if

13   -- we're not arguing that it's mandatory because it's a

14   breach of contract case, so we can move off of that.

15        THE COURT:  Okay.

16        MR. TEECE:  The narrative, I think, that the

17   defendants have tried to construct, and Your Honor touched

18   on a little bit was, that the 9 percent rate is a punitive

19   rate, that there's something punitive about awarding the

20   rate in this particular environment, but that is an issue

21   that's been submitted to courts, and the courts have

22   rejected, saying that the 9 percent rate is a compensatory

23   rate, and not one that is designed to punish people.  It's

24   just the rate that has been determined to properly

25   compensate people in a breach of contract case.

08-01789-cgm    Doc 13987-12    Filed 05/10/17    Entered 05/10/15 20:06:08    Main Document
Pg 25 of 67

```
1              THE COURT:  I don't think they ever used the word

2      "punitive."  I think just state -- just say it's not --

3      under this context, it's not reasonable.  I mean, clearly, a

4      9 percent rate isn't a punitive rate.  If it were the case,

5      then people would never get paid default interest under 506

6      of the Bankruptcy Code, for example.

7              MR. TEECE:  I think the point is that --

8              THE COURT:  It's not a penalty rate.  Put it that

9      way.

10             MR. TEECE:  I thought that --

11             MR. FRIEDMAN:  I think at some point, Your Honor,

12     in the briefing, we might have characterized 9 percent in

13     these circumstances as a punitive rate in this environment.

14             THE COURT:  Well, the issue is whether it's

15     properly compensatory under all the facts.

16             MR. TEECE:  Right.  It --

17             MR. FRIEDMAN:  Correct.

18             MR. TEECE:  -- it is on -- I'm reading on Page 9

19     that it's punitive --

20             THE COURT:  Okay.

21             MR. TEECE:  -- that Plaintiffs assert that the

22     interest is a punitive 9 percent rate -- the point, Your

23     Honor, is that --

24             THE COURT:  Well, I don't think of it as punitive,

25     I mean, but I don't think that's really the issue.  I don't
```

08-01789-rdm Doc 13987 Filed 05/10/17 Entered 05/10/15 20:06:08 Main Document
Pg 26 of 67

1     think, you know, it's hard to argue that any rate chosen by

2     a Legislature is an unenforceable penalty.  On the other

3     hand, it may not be the rate that one should apply in

4     exercising the broad discretion that Federal trial courts

5     are given.

6         MR. TEECE:  But the problem -- Your Honor, the

7     issue we have of the description of the rate as punitive is

8     not just that courts have found this compensatory and not

9     punitive.  It's that it changes the narrative to arguing

10     that the plaintiffs somehow have to show that defendants

11     acted in bad faith for us to get up to 9 percent.

12         THE COURT:  No, I mean, I don't think that's

13     right.

14         MR. TEECE:  But the defendants' briefs are replete

15     with the argument that defendants have done nothing wrong,

16     defendants prosecuted a legal position in good faith.

17     That's -- okay, we're not arguing the defendants acted in

18     bad faith.  But, even when you prosecute a theory in good

19     faith, and you don't prevail, 9 percent is awarded.  This

20     J.K. Walkden, Ltd. case v. Lord & Taylor, Your Honor, 2000

21     WL 36266046, this is a case, I believe we cited.  This is a

22     9 percent rate, albeit under conversion, statutorily CPLR,

23     the rate for conversion.  There was a licensing agreement

24     for the sale of furs, it was Lord & Taylor department store.

25     It's an argument over how the fees should be allocated and 9

Page 26

1    percent interest was awarded and the Court made the

2    following observation: "Although the jury determined Lord &

3    Taylor was liable for conversion, the jury made no finding

4    that Lord & Taylor acted without the good faith belief that

5    it was entitled to the monies it retained as payment for

6    Ferrari's expenses, even if it was not, in fact, entitled to

7    retain the proceeds."  The point is, even if you, in good

8    faith, advance a theory, if you don't prevail, CPLR applies

9    and the rate is set by the statute.

10            THE COURT:  No one really knows what the prime

11   rate was for this period?  Okay.

12            MR. FRIEDMAN:  The prime rate was about 3.25

13   percent.

14            THE COURT:  Okay.  Now, I appreciate it's a

15   different context, but there is similar language in some of

16   these cases.  In your discussion about the loans that were

17   made to the company buyer, DPH, during this period, you

18   know, reflect the credit risk of DPH.  I mean, why don't I

19   apply the prime rate plus a point or a point and a half,

20   consistent with Till?  I mean, that's -- that's a risk-free

21   rate adjusted to reflect this Debtor.  Maybe it wouldn't

22   need to be adjusted at all.  Maybe it's just the prime rate.

23   Maybe adjust it by a point.

24            MR. TEECE:  Well, it --

25            THE COURT:  But, you know, you're going to get the

```
 1   money.  It's going to be paid.  There's no question it's

 2   going to be paid, subject to a stay pending appeal.  So, why

 3   shouldn't it be the prime rate?

 4           MR. TEECE:  Your Honor, the point I was making

 5   about the money that was loaned, to answer your question is,

 6   I respectfully submit that that would be the floor, in the

 7   sense that the people who were to be paid those coupons,

 8   they had a contract in place that gave them a host of

 9   protections --

10           THE COURT:  Right.

11           MR. TEECE:  -- and so --

12           THE COURT:  But you're going to get paid.

13           MR. TEECE:  Well, but the point is, is that --

14           THE COURT:  You're going to get paid faster than

15   they will.

16           MR. TEECE:  The Court is entitled to look at how

17   it would have invested the money.  I could have been a

18   noteholder of Delphi during that period and --

19           THE COURT:  Well, should I also ask whether they

20   bought the unsecured debt at less than 100 cents on the

21   dollar?

22           MR. TEECE:  No, I don't --

23           THE COURT:  (Laughs) Just asking, should I ask

24   whether the company buyers people bought the debt for less

25   than 100 cents on the dollar?
```

```
 1              MR. TEECE:  I'm sorry --
 2              THE COURT:  I mean, I would be more sympathetic to
 3    that argument, I guess, if it was an original holder.  On
 4    the other hand, if it's a hedge fund, isn't that kind of a
 5    flipside to the argument that they'd be making more money if
 6    they had the money, that they probably are also, therefore,
 7    making money that -- just on the fact that they bought the
 8    debt at a discount?
 9              MR. TEECE:  I think, Your Honor, if you want to --
10    if the analysis goes into what money would they have made,
11    had they had the money, we've put in evidence about equity
12    indices and debt indices during that period of time.  I've
13    also pointed to the interest rates that the company paid its
14    own unsecured creditors, which were better situated, I
15    respectfully submit, they had protections in their
16    documents, than our clients who, by definition, were just
17    lenders at that point in time.  So, the rates that are set
18    by the indenture of Delphi notes, we respectfully submit,
19    are the floor.
20              THE COURT:  Okay.
21              MR. TEECE:  I want to talk briefly about the
22    Rhodes case, because I suspect that it may come up.  The
23    Rhodes case is the one that is prominently featured in the
24    defense brief.  I might argue that it's, perhaps, their
25    central case.  Rhodes is -- was a breach of contract case.
```

1    The parties settled the case and entered into a stipulation

2    of dismissal, and when they went forward to execute on the

3    stipulation of dismissal, the stipulation of dismissal

4    provided for the transfer of 50 percent interest of the

5    company for $2.5 million dollars from -- transfer -- at --

6    before the closing on that transaction, the defendant made a

7    $250,000 down payment and then argued that it wanted all the

8    transfer documents for the securities up front, all the

9    transfer information that would have been necessary, there's

10   a stockholders agreement that it wanted signed.

11          And the defendant said, I'm not going to go

12   forward, not going to pay you the balance until I get these

13   pre-conditions, and the Court said, well, that's beyond the

14   scope of the stipulation of dismissal.  The stipulation of

15   dismissal just said, there's going to be a transfer of stock

16   in exchange for money, and there'll be transfer documents

17   executed whenever.  There's no -- you're not entitled to

18   argue that's a pre-condition.  And then the question of

19   prejudgment interest came up in terms of how much the

20   plaintiff was entitled because it didn't get the money, and

21   the Court simply said, it cites a series of specific

22   performance cases, which are New York State cases involving

23   parcels of real estate, and it says, to the extent that this

24   was in the nature of specific performance, the Court has

25   broad equitable discretion to set the rate, and the Second

1   Circuit just remanded the case back to the trial court for a

2   determination of the rate.

3           And it said, the rate's not mandatory.  So, to

4   that end, Rhodes is not really controverted by us.  We don't

5   disagree that, in an equitable case or even a specific

6   performance case, which this case is not, it's close, it's

7   an injunctive case, the 9 percent rate is not mandatory.  I

8   think it's telling that, on remand, before Judge Daniels,

9   the parties actually settled the lawsuit, and they

10  negotiated, and the negotiated resolution, they negotiated a

11  5.5 percent rate for prejudgment interest on remand, in that

12  specific performance case, and that agreement appears at ECF

13  No. 171, and that's Case No. 08-9681 for the Southern

14  District of New York.  So, even through consensus, without

15  the Court imposing a rate, the parties arrived at 5.5

16  percent.

17          THE COURT:  And what was the date of that

18  settlement or that decision that recorded the settlement?

19          MR. TEECE:  I have a copy of it with me, Your

20  Honor, I'm happy to hand it to you.  I'll give you the date

21  in a second.  I believe it's (indiscernible).  The order was

22  entered March 28th, 2016, and I have a copy, if Your Honor

23  would like it.

24          THE COURT:  And so --

25          MR. TEECE:  This is --

1              THE COURT:  -- rates have gone up a little bit,

2      then, right?  This is from 2015?

3              MR. TEECE:  No, Your Honor, this is dated March

4      11th, 2016.  Oh, I -- oh, okay, I'm sorry.

5              THE COURT:  So, rates have gone up since 2015.

6              MR. TEECE:  (Indiscernible) Your Honor --

7              THE COURT:  Maybe half a point, quarter of a

8      point, I don't know.  Isn't that what -- how rates have gone

9      up since then?

10             MR. TEECE:  But --

11             THE COURT:  And it was $2 million dollars was at

12     issue?

13             MR. TEECE:  $2.5 million dollars, so 5.5 percent.

14             THE COURT:  So, why -- so, the spread that you're

15     talking about here is probably eaten up by continuing to

16     litigate over that issue.

17             MR. TEECE:  Your Honor, look, on remand --

18             THE COURT:  So, I can see why they would have

19     settled it.

20             MR. TEECE:  -- but on remand from the Second

21     Circuit Court of Appeals, the --

22             THE COURT:  They cited it, basically, for the

23     proposition that I'm not bound by 9 percent.

24             MR. TEECE:  That's correct.  That's correct.

25             THE COURT:  But as far as picking a rate, I don't

| 1 | think it's particularly instructive because again, I mean, |
| 2 | you're going to settle that.  Anyone would settle that, over |
| 3 | $2 million dollars.  Why would you spend -- the difference |
| 4 | on a point of interest or two on $2 million dollars is going |
| 5 | to get eaten up with the attorneys' fees of litigating it. |
| 6 | MR. TEECE:  But Your Honor, they took the case to |
| 7 | the Second Circuit Court of Appeals. |
| 8 | THE COURT:  Well, I know.  They probably realized |
| 9 | that they were stupid in doing so. |
| 10 | MR. TEECE:  They took the -- I -- the rate that |
| 11 | was agreed to in this case, Your Honor, on remand -- |
| 12 | THE COURT:  Right. |
| 13 | MR. TEECE:  -- is ten times the rate that the |
| 14 | defendants are proposing, and this is their seminal case. |
| 15 | That's really kind of my point. |
| 16 | THE COURT:  Well, all right, I understand -- I |
| 17 | have a problem with the T-bill rate, as you could probably |
| 18 | tell.  I kind of -- I'm in agreement with Judge Glenn on |
| 19 | that point.  It's a very low rate (indiscernible). |
| 20 | MR. TEECE:  But Your Honor referred to the prime |
| 21 | rate as an alternative, and Judge Glenn employed the prime |
| 22 | rate, but it was 6 to 8 percent at the time when Judge Glenn |
| 23 | employed the prime rate. |
| 24 | THE COURT:  Actually, yeah.  It's 6 to 8 percent, |
| 25 | you're right. |

18-02449-rdm Doc 3187-1 Filed 05/10/19 Entered 05/10/19 20:06:08 Main Document Exhibit B
Pg 34 of 67

1          MR. TEECE:  I'm reading from Judge Glenn's

2    decision, Your Honor --

3          THE COURT:  Yes, 6 to 8 percent.  That was pre-

4    financial crisis.

5          MR. TEECE:  Sure.

6          THE COURT:  Yeah, no, I understand.

7          MR. TEECE:  So, at 8.25 percent, he's 75 basis

8    points from the rate that we're asking for on Page 91.  You

9    have three rates, one for each transfer, 6.58 and 8.25 --

10         THE COURT:  Yeah, but he's not at all moved by the

11   9 percent, and again, this was in 2005 and 2006, so, it's a

12   much bigger spread from general borrowing rates.

13         MR. TEECE:  The rate he was --

14         THE COURT:  The "spread" meaning between the T-

15   bill rate and the -- the current T-bill rate at the time he

16   was doing this opinion in 2010, and the prime rate when the

17   transfers were made.

18         MR. TEECE:  Your Honor, I note, to your point

19   earlier that some judges simply adopt the postjudgment rate,

20   he -- Judge Glenn's decision breaks out his prejudgment rate

21   and postjudgment rate amount --

22         THE COURT:  No, I understand, I get that.

23         MR. TEECE:  And he went to 8.25 percent when the

24   defendants were proposing spot 6.4 percent.

25         THE COURT:  Right.

1        MR. TEECE:  And the postjudgment interest -- the

2   Federal postjudgment interest rates on the dates of the

3   transfers were 3.76 percent and 4.9 percent.  I'm reading

4   from Page 90 of the decision.  So, he went far over what

5   Your Honor has mentioned was the prime rate in question for

6   us.

7        THE COURT:  Okay.  But yeah, of course, it was a

8   different time, before the financial crisis.

9        MR. TEECE:  But now we're going back to my point,

10  which is that -- which is that the fluctuations of the

11  public debt markets are not controlling, for purposes of

12  prejudgment interest.

13        THE COURT:  What, with the fluctuations of the

14  markets themselves?  I -- this is -- it's almost -- I think

15  you can only do rough equity here.  That's basically what I

16  come down to.  And the context is important, I think.  I

17  think it is important to figure out how much of a New York

18  context there is to it.  I think that is an element.  How

19  much of a Federal context.  What the remedial purpose is.

20  How -- you know, I think there is a clear remedial purpose

21  in stopping people from violating the automatic stay or

22  doing an intentional fraudulent transfer or sending a ship

23  to the wrong place on purpose.  You know, those are all,

24  pretty much, you know what you're doing there.

25        Obviously, the decisions that the defendants made

1    here were conscious, but I'm not sure they were pretty

2    clearly wrongful.

3              MR. TEECE:  Yeah, but again, this goes back to my

4    point, Your Honor, is that they don't have to engage in

5    wrongful conduct for the 9 percent to apply --

6              THE COURT:  No, but --

7              MR. TEECE:  -- it doesn't have to be about bad

8    faith --

9              THE COURT:  I understand, but this case refers to

10   a remedial purpose, and I think that includes the notion

11   that you want to stop people from doing something.  Because

12   otherwise, it's just compensation, and that's already

13   covered in the first factor.

14             MR. TEECE:  Well, I mean, the --

15             THE COURT:  And I don't know if I -- we should be

16   stopping people from asserting the meaning of a contract.

17             MR. TEECE:  No, your -- well, Your Honor,

18   presumably, the Legislature, when it passed the 9 percent --

19             THE COURT:  No, no, that's New York.  We're not

20   covered by New York.

21             MR. TEECE:  Well, we are --

22             THE COURT:  It's just a factor.

23             MR. TEECE:  The plan was covered by New York.  The

24   plan was confirmed --

25             THE COURT:  No, but you -- but you've already

1   said, New York law is not controlling here.  It's just a

2   factor.

3           MR. TEECE:  Your Honor --

4           THE COURT:  I'm not -- I'm not -- the first thing

5   you said today was, I'm not required to apply 9 percent. I

6   inferred from that, that that means that New York law is not

7   necessarily the applicable law here.  In fact, it isn't.

8   It's Federal law.

9           MR. TEECE:  All right, so, the final point I would

10  make, Your Honor, and then I will sit down and ask, perhaps,

11  if (indiscernible) on rebuttal, if appropriate --

12          THE COURT:  Okay.

13          MR. TEECE:  -- is that, to the extent -- I

14  respectfully submitted, the prime rate, if it is in the

15  threes, is not an appropriate rate, given what the company

16  in question was receiving in connection with the debt that

17  it issued at the time, and I -- those amounts are for --

18  Your Honor doesn't have to get -- I cite you to the indices

19  at 8 percent and the equity indices.  The unsecured debt

20  that the company was issuing was in the 4 percent range.

21  I'd submit that those creditors were better-positioned than

22  our creditors, so -- and that is above the prime rate at the

23  time, so I --

24          THE COURT:  Okay.

25          MR. TEECE:  Thank you.

1          THE COURT:  Thanks.

2          MR. FRIEDMAN:  Good afternoon, Your Honor.

3          THE COURT:  Good afternoon.

4          MR. FRIEDMAN:  Edward Friedman, Friedman Kaplan

5    Sadler and Adelman for the defendants.  There are a few

6    bullet points I'd like to articulate so we have them in the

7    record and obviously, I'm prepared to answer any questions

8    Your Honor has.

9          THE COURT:  Okay.

10         MR. FRIEDMAN:  First, to the extent that New York

11   law is a factor, I think it's important to note that the

12   CPLR provision, § 5001(a) specifically provides that in an

13   action of an equitable nature, interest and the rate and

14   date from which it shall be computed shall be in the Court's

15   discretion.

16         THE COURT:  Right.

17         MR. FRIEDMAN:  So that, even in a case under New

18   York law where, as here, the action is of an equitable

19   nature, the New York courts would have discretion.

20         THE COURT:  Although it's a little different than

21   ordering specific performance and just compensating people

22   for the delay in it.  I mean, it's -- here, it's payment of

23   money.

24         MR. FRIEDMAN:  I understand that, but -- and that

25   discretion, however, which of course, Your Honor has under

1      Federal law, that discretion is accorded to New York state

2      courts, under New York state courts --

3               THE COURT:  But I think everyone agrees that I

4      have discretion here.

5               MR. FRIEDMAN:  Yes.  And with respect to Your

6      Honor's exercise of discretion, the factors are set out in

7      numerous of the cases cited by both parties.  The first

8      factor is, and I'm quoting from one of the cases: "the need

9      to fully compensate the wronged party for actual damages

10     suffered."  First point I'd like to make about that is,

11     compensation for the plaintiffs is, in part, a function of

12     market conditions.  We now are in an environment when

13     interest rates happen to be low.  What constitutes full

14     compensation for a plaintiff in a low-interest rate

15     environment is different from what constitutes full

16     compensation in a higher interest rate environment.  And the

17     Second Circuit has actually said this repeatedly in the

18     cases that the parties have cited, the Second Circuit has

19     said, generally, the prejudgment interest shall be measured

20     by interest on short-term, risk-free obligations.

21               THE COURT:  Right.

22               MR. FRIEDMAN:  Namely --

23               THE COURT:  That's the Till concept.

24               MR. FRIEDMAN:  -- and they're referring to --

25     right, the Treasury bill or the postjudgment rate, which

08-01789-cgm Doc 19874 Filed 05/10/17 Entered 05/10/15 20:06:08 Main Document
Pg 40 of 67

1    Federal courts often apply.

2              THE COURT:  Although, again, I think that the same

3    logic that says that full compensation for actual damages in

4    a low-interest rate environment argues against applying a

5    rate that, albeit, it may be required under state law, you

6    can flip that over and say that, where a statutory rate is

7    lower than what is generally recognized to be a risk-free

8    rate is also -- you know, you also look at that rate with a

9    grain of salt, too.

10             MR. FRIEDMAN:  Well, I think the -- when the

11   Second Circuit said --

12             THE COURT:  i.e., T-bill rates are artificially

13   low or just not -- there's disconnect between the market and

14   T-bill rate, then you don't -- you know, when you have

15   discretion, you don't apply the T-bill rate.

16             MR. FRIEDMAN:  I would just say, in the exercise

17   of your discretion, as a starting point, I would think, Your

18   Honor, we look at the T-bill rate because that is the

19   Federal postjudgment rate, and Federal courts often apply

20   that prejudgment.  And I think deciding whether to apply the

21   postjudgment rate or something different, we get into the

22   factors that are available for Your Honor's consideration.

23             THE COURT:  Right.

24             MR. FRIEDMAN:  And I'd like to talk about how

25   those factors should be considered in the context of this

Page 40

1   case, but there's actually just one other small point I'd

2   like to make first, so I don't lose it.  In the reply brief

3   from the plaintiffs and in Mr. Teece's argument today, Your

4   Honor heard about Delphi's borrowing costs, and the reply

5   brief was submitted to the Court along with an exhibit that

6   was a Delphi 10K, reporting on bond issuances, credit

7   obtained by Delphi.  And the simple point I'd like to make

8   is that, Mr. Teece and the plaintiffs in their brief, refer

9   to Delphi's borrowing cost with respect to bonds issued with

10  maturities of 5 to 30 years, and those borrowing costs for

11  Delphi with those maturities, are in the range of 3 to 4

12  percent, but the better comparison in thinking about

13  Delphi's borrowing costs are the references in the same

14  document, in the 10K, to Delphi's borrowing under a term

15  loan and revolving credit agreement where the borrowing

16  costs during the relevant period with a term of 3 to 4 years

17  is in the range of 2 percent.  Even a little bit less than 2

18  percent.

19          THE COURT:  Is that a secured loan or an unsecured

20  loan?

21          MR. FRIEDMAN:  That would be an unsecured loan,

22  Your Honor.  So, I mention that simply as a data point to

23  the extent Your Honor looks at Delphi's borrowing cost.  We

24  think those would be the relevant costs to consider.  Now,

25  the biggest question, I believe, for the Court is to

Page 41

1  consider the particular circumstances of this case, because

2  we know from the briefing here, that the Federal courts have

3  broad discretion and every case is decided on its facts,

4  based on, how do we compensate the plaintiff, what's the

5  remedial purpose, and the other factors enumerated.  And I

6  can find cases with the very low interest rates, Mr. Teece

7  can find cases with higher interest rates.  The question is,

8  what is an appropriate exercise of the Court's discretion in

9  this case?

10        Now, I appreciate that Mr. Teece said, in the

11  argument today, that there's no accusation of bad faith

12  aimed at the defendants.  I don't believe that the

13  plaintiffs' papers, in fact, accuse the defendants of bad

14  faith.  I think, just the opposite is true and I think this

15  is directly relevant to thinking about what is appropriate

16  in this case.  So, here, we have a situation where the Court

17  has ruled -- obviously, the Court has ruled against Delphi

18  on the plaintiffs' summary judgment motion, but the Court

19  ruled that, upon reading the words of the relevant

20  agreements, Delphi had the superior construction.  And the

21  significance of that, Your Honor, is that, when we step back

22  and think about, what could Delphi have done, what should

23  Delphi have done, in thinking about whether the payment to

24  the unsecured creditors has come due.  We have a situation

25  where a fair reading, a superior reading of the words of the

1   agreement would be that the payment has not yet become due,

2   and that certainly has been Delphi's reading.  It's not a

3   litigation strategy.  It's the reading of the words of the

4   agreement, which, even though the Court has ruled against

5   Delphi, the Court has stated, is the superior reading of the

6   words of the agreement.

7          And second, when we think about Your Honor's

8   reasons for deciding against Delphi and granting plaintiffs'

9   motion for summary judgment, I think those reasons

10  illustrate how it would have been unreasonable to even

11  expect Delphi to consider the possibility of making the

12  payment earlier, prior to a ruling by the Court, because a

13  public -- Delphi's a public company, but this would apply

14  even if it weren't a public company, but it's a public

15  company, has a Board of Directors, it has shareholders.  The

16  Board of Directors reads the agreement, the Board of

17  Directors has the same interpretation of the words of the

18  agreement as Your Honor.  When the Board of Directors could

19  not have done was to come to the conclusion that Your Honor

20  came to for the reasons that Your Honor came to.  That just

21  was not reasonable for the Board.

22          THE COURT:  Well --

23          MR. FRIEDMAN:  It would have --

24          THE COURT:  -- you could have talked to the people

25  who were at the hearing and then say, what was the deal?

Page 43

1          MR. FRIEDMAN:  Well, Your Honor --

2          THE COURT:  But I understand your point.  There's

3     a written document, so they have to deal with that, too.

4          MR. FRIEDMAN:  And in terms of talking to the

5     people at the hearing, although Mr. Teece has disparaging

6     things to say about various parties, the fact is that the

7     parties at the hearing did not discuss the issue that is

8     presented to the Court in this case.

9          THE COURT:  Well, that's where we disagree, but I

10    do -- I do agree with you that, in terms of general

11    considerations of whether the defendants here were using the

12    fact that they had the money, to, in essence, exert undue

13    leverage on the other side or you know, jerk them around,

14    knowing the time value of money was out there, I don't see

15    that here.

16         MR. FRIEDMAN:  Okay.  Your Honor, I just have to

17    correct one thing I said.  The term loan and revolver were

18    secured.

19         THE COURT:  Okay.

20         MR. FRIEDMAN:  The five-year note bond issued by

21    Delphi that was unsecured had a rate of 3.15 percent --

22         THE COURT:  Okay.

23         MR. FRIEDMAN:  -- and that was unsecured

24    borrowing.  That's all I have, subject to any questions that

25    Your Honor has.

1          THE COURT:  Okay.  All right.  Anything else?

2          MR. TEECE:  Just 30 seconds, Your Honor.

3          THE COURT:  Sure.

4          MR. TEECE:  So, the -- I was going to make the

5   point about the note.  Those that I've mentioned, the 4.15

6   percent, 4.4, 3.15, 4.25, were all unsecured notes.  And

7   just lastly, I --

8          THE COURT:  These are higher rate for longer-term

9   debt, like ten-year debt?

10         MR. TEECE:  I don't know the maturities, exactly,

11  but I think the point about the 2 percent, which is closer

12  to --

13         THE COURT:  No, no, I understand -- I understand

14  that.

15         MR. TEECE:  -- is a secured loan, I mean, that's -

16  -

17         THE COURT:  Right, right.

18         MR. TEECE:  -- and that's close to the -- the 2

19  percent is close to the prime rate.

20         THE COURT:  There's a pretty big spread between

21  3.1 and the 5, and I'm assuming that that's because there's

22  either a subordination agreement or there's a -- you know,

23  it's a 20-year note or something like that.

24         MR. TEECE:  Well, they were issued at different

25  points in time, actually.  The --

18-02449-rdm Doc 1319874 Filed 05/18/10/15/20 Entered 05/18/10/15/20 06:08 Main Document
Pg 46 of 67

1            THE COURT:  Okay.  All right.

2            MR. TEECE:  -- the 4.15 I think is 2014 -- or no -

3    - actually, I have the --

4            MR. FRIEDMAN:  Your Honor, I have all the dates

5    and rates.

6            MR. TEECE:  The issue date is relevant, I think

7    the 4.15 is 2014, the 3.15 and the 4.4 issued at the same

8    time in 2016, I think -- in March of 2015, rather, or -- or

9    November of 2015 --

10            THE COURT:  All right.

11            MR. TEECE:  -- and then the September 2016 --

12            THE COURT:  They're probably pretty close to the

13    prime rate, though, with a slight bump up.  That's my guess.

14            MR. FRIEDMAN:  Well, it's also --

15            THE COURT:  Just, you know, off of the top of my

16    head --

17            MR. FRIEDMAN:  Your Honor, the --

18            THE COURT:  -- in each case.

19            MR. FRIEDMAN:  The term is important, as Your

20    Honor noted, because the five-year note is at 3.15 percent.

21    The ten-year note is at 4.15 percent.  Eleven years, 4.25

22    and 30 years, 4.40.

23            THE COURT:  By those -- those last three all were

24    recent issuances?

25            MR. FRIEDMAN:  The -- no, it's not.  The five-year

1    note was issued November 2015, 3.15 percent.  The ten-year

2    note was March 2014, 4.15 percent.  The eleven-year was

3    November 2015, 4.25, and the thirty-year was September 2016,

4    4.40 --

5              THE COURT:  All right.

6              MR. FRIEDMAN:  -- just so the facts are in the

7    record.

8              THE COURT:  That's fine.  Okay.  All right.  Okay.

9              MR. TEECE:  Just going back to the remedial

10   purpose, Your Honor, the Court's decision looked at,

11   obviously, New York law in interpreting the agreement,

12   looked at context, which New York law entitles the Court to

13   do, and then that context was the doorway into facts and

14   circumstances surrounding the confirmation of the plan.  The

15   plan that was negotiated by unsecured creditors and our

16   clients, some were legacy holders of claims at the time,

17   some acquired their claims (indiscernible). The plan that

18   was negotiated by Creditors' Committee had a contingent

19   right to recovery, and that was the settlement of their

20   objection to the plan.  The plan was confirmed under 1129,

21   and that was their bargain.  Their bargain was, if the

22   company turns around, we get a contingent right to recovery.

23             And in bringing the lawsuit, having demanded the

24   company pay the distribution in November 2014 as they pose

25   up to 7.2 and having been rebuffed at that, plaintiffs

Page 47

1    brought the lawsuit to vindicate their rights under that

2    plan, and to assert and realize their rights under the plan

3    that the Court had confirmed in a way that was consistent

4    with the way the Court -- the plan was confirmed.  So, there

5    is a Chapter 11 purpose that's being advanced by plaintiffs

6    that are vindicating their rights under the plan.

7              The final point I would make, and this is the

8    final point, Your Honor, the defendants argued that the

9    Treasury rate is the starting point of the analysis and I

10   would just -- I'm reading now from the Jones v. Unum Life

11   Insurance Company, this is a Second Circuit case, 223 F.3d

12   130 -- 139, it says that: "The suitability of that

13   postjudgment rate for an award of prejudgment interest will

14   depend," because Your Honor asked about this question, "on

15   the circumstances of the individual case, and the court need

16   not limit the award of prejudgment interest to the rate at

17   which the injured party would have lent money to the

18   government."  That's the T rate.  "The court may, for

19   example, consider whether the plaintiff would have invested

20   the money at some higher rate..." "or it may take into

21   account the rate of interest the defendant would have had to

22   pay to borrow the money if it had withheld from the

23   Plaintiff."

24             So, the idea that the -- we start at the T rate

25   and we cap out at 9 percent if we can show bad faith, that's

1    -- we respectfully disagree with that narrative and the

2    construct of the goalposts for this issue.

3              THE COURT:  Okay.

4              MR. FRIEDMAN:  Your Honor, very, very briefly, a

5    year after the case mentioned by Mr. Teece, the Second

6    Circuit said that interest is intended to -- and this is

7    cited in our brief, New York Marine and General Insurance

8    Co., 266 F.3d 112 at 131, quote, "Interest is intended to

9    make the injured party whole, and generally should be

10   measured on interest on short-term, risk-free obligations."

11   And I mention that --

12             THE COURT:  But there's no presumption in favor of

13   one of the other -- either the 9  and applicable and -- a

14   rate that would be applicable if this were governed by state

15   law or the Federal postjudgment rate.  There's no

16   presumption in favor of one or the other.

17             MR. FRIEDMAN:  I don't think the Court's talking

18   in terms of presumptions, but --

19             THE COURT:  Right.

20             MR. FRIEDMAN:  -- to the extent that Mr. Teece is

21   arguing for 9 percent or the prime rate, those are higher

22   than what would be --

23             THE COURT:  It's supposed to be a safe investment.

24   A safe -- well, it depends on how long you wait.  I mean, if

25   the lawsuit goes on ten years, I don't think it should be a

1  short-term investment.  If you're waiting 9 months to get

2  the answer, it's probably a short-term investment.

3          MR. FRIEDMAN:  Well, and here we're talking about

4  two years from the date --

5          THE COURT:  Two, two and a half years.

6          MR. FRIEDMAN:  -- the first payment was due --

7          THE COURT:  Yeah.

8          MR. FRIEDMAN:  -- to the judgment and --

9          THE COURT:  Right.

10         MR. FRIEDMAN:  -- the Second Circuit is not simply

11  saying a safe investment, it says the interest should be

12  measured by interest on short-term, risk-free obligations.

13         THE COURT:  Right.

14         MR. FRIEDMAN:  Thank you.

15         MR. TEECE:  Thank you, Your Honor.

16         THE COURT:  Although, what the Supreme Court has

17  said as far as risk-free obligations in the bankruptcy

18  context, and of course, Delphi is out of bankruptcy, is

19  prime plus some risk factor of between one and three because

20  it's not a bank.  And it's an emerged -- it's a company

21  emerging from bankruptcy.  It's different (indiscernible).

22         MR. FRIEDMAN:  Right, but when you can -- we have

23  in the record Delphi's creditworthiness and its actual

24  borrowing cost.

25         THE COURT:  Yeah.  That's true.  I agree.  All

1    right.

2              MR. TEECE:  Do we have its creditworthiness?  We

3    have its borrowing cost, but do we have its creditworthiness

4    in the record?  I didn't know --

5              THE COURT:  Well, I mean, some smart people lent

6    it money, obviously, for --

7              MR. TEECE:  Okay, but we have rates?  We have

8    rates --

9              THE COURT:  -- at the rates that are in the

10   record.

11             MR. TEECE:  -- okay, thank you.

12             MR. FRIEDMAN:  Right, exactly.

13             MR. TEECE:  It's reflected (indiscernible).

14             THE COURT:  So, for what that's worth.  All right,

15   I have before me, as I said at the start of this hearing,

16   the remaining issue, as far as I'm concerned, in this

17   adversary proceeding, which is whether I should award

18   prejudgment interest to the plaintiffs, having already

19   concluded in a formal bench ruling that they are entitled to

20   the unsecured distribution under the Debtors' Chapter 11

21   plan.  And if I conclude that they're entitled to

22   prejudgment interest, what the proper rate of that interest

23   should be.

24             The parties spent a fair amount of time arguing

25   whether I should be bound by -- or whether or not I am bound

1   by the New York State statutory interest rate, which except

2   in the case of judgments based on equity, is 9 percent for

3   all purposes, or rather, whether, instead, I am bound by the

4   Federal law regarding prejudgment interest, which provides

5   for fairly broad discretion to the trial court. For that

6   proposition, see Mendez v. Teachers Insurance and Annuities

7   Association, 92 F.2d 783 (2d Cir. 1992) and In re 1031 Tax

8   Group, LLC., 439 B.R. 84,87 (Bankr. S.D.N.Y. 2010).

9           If it wasn't clear before, and I think it probably

10  was clear, at oral argument, the plaintiffs made it crystal

11  clear that they are not arguing that I must, as a matter of

12  law, apply the New York State 9 percent statutory rate.  To

13  me, that leads to the very clear inference that I am

14  governed by the Federal case law, because there's no

15  statutory -- there's no Federal statute that governs here

16  regarding the award of prejudgment interest.  It's either

17  State or Federal law, after all, and the plaintiffs have

18  clarified that they are not saying that State law requires

19  the imposition of 9 percent New York State prejudgment

20  interest.

21          For the record, I, independently, have reached

22  that conclusion, given the nature of the action before me.

23  I appreciate that there is one case recorded which takes the

24  view that in enforcing the terms of a Chapter 11 plan,

25  including under 11 U.S.C. § 1142(a), the Court is governed

Page 52

1    by State contract law, including the law pertaining to

2    prejudgment interest.  See In re Pearson Industries, Inc.,

3    152 B.R. 546 557-60 (Bankr. C.D. Ill. 1993).  However, I

4    think the analysis is more nuanced than that court applied

5    in that context, in which it found that there would be no

6    interest whatsoever owing on a prejudgment basis, because

7    for the type of action involved, there was an issue there,

8    there was no governing Illinois law that would have provided

9    for prejudgment interest.

10           Rather, I believe that while interpretation of a

11   plan is generally governed by the applicable law of the

12   state where the plan was confirmed, or the choice of law

13   provisions within the plan, the governing law for enforcing

14   a right under a plan may well, and probably is, viewed as an

15   issue of Federal law.  Even on the first proposition, there

16   are courts that take the view that Federal common law

17   contract interpretation should apply in construing the

18   Chapter 11 plan, see, for example, the discussion in In re

19   Tres Hermanos Dairy, LLC., 2014 Bankr. LEXIS 198, 19-20

20   (Bankr. D.N.M. January 16, 2014).  Most courts say that, for

21   interpretation purposes, you would apply general principles

22   of the state where the plan was confirmed, or the plan's

23   choice of law provision.  And that's what I've generally

24   done in this case, including in in re DPH Holdings, Corp.,

25   553 B.R. 20 (Bankr. S.D.N.Y. 2016), at 25 note 7.

1    But, it has been held, and I think cogently, that

2    a cause of action for enforcement of a confirmed plan is

3    Federal in origin, notwithstanding that an interpretation of

4    the plan may require an application of state law contract

5    principles. See Booth Oil Site Administrative Group v.

6    Safety-Kleen Corp, Kleen is K-L-E-E-N, 532 F.Supp. 2d 477,

7    515 (W.D.N.Y. June 29, 2007)and Simonetti Development, Ltd.

8    v. Hillard Development Corp. (In re Hillard Development

9    Corp.), 238 B.R. 857, 872 (Bankr. S.D. Fla. 1998).

10   Moreover, here, the Federal bankruptcy context was critical

11   to the Court's decision on the merits of the summary

12   judgment motion, and specifically with respect to the

13   equivalent of a disclosure statement, which was the

14   disclosure or lack thereof, regarding the position taken by

15   the defendants in this action at the time that amended plan

16   was proposed and described to parties in interest, including

17   at the confirmation hearing.

18   That context is unique in the bankruptcy area and

19   has been recognized as cutting off parties' rights to assert

20   positions that are contrary to what was laid out to a court

21   and parties in interest in a bankruptcy case in the

22   disclosure statement or at confirmation or the equivalent.

23   See, for example, Adelphia Recovery Trust v. Goldman Sachs

24   and Co., 748 F.3d 110 (2d Cir. 2014), and Penberthy v.

25   Chickering, 2017 U.S. District LEXIS 6153 (S.D.N.Y. January

Page 54

1    13, 2017).  So, I believe, with regard to the issue of

2    whether interest -- prejudgment interest, that is, should

3    apply and how it should apply here, I should apply Federal

4    principles since, this present action, I believe, is

5    properly viewed as Federal in origin, particularly given the

6    basis for the Court's decision, which took into account, as

7    I believe must be the case, not only the language of the

8    contracts at issue but their bankruptcy context and what was

9    disclosed to the Bankruptcy Court and parties in interest

10   when the plan that incorporated those agreements was

11   confirmed.

12          That leaves the question, then, as to whether

13   prejudgment interest applies and if so, in what amount.

14   It's probably no surprise here that there's a wide

15   difference between the parties' positions on those issues.

16   The defendants take the position that it really shouldn't be

17   awarded at all, but, if it is to be awarded, it should be

18   awarded at the Federal postjudgment interest rate, i.e. the

19   short-term, T-bill rate, starting at the applicable time

20   when the payments are agreed to be owing, assuming the

21   validity of the Court's prior ruling on the merits.

22          The plaintiffs, to the contrary, contend that --

23   although I'm not bound to apply, under the choice of law

24   principles discussed, the New York State rate -- because

25   that rate is applicable to contract disputes in the state of

Page 55

1    New York, which is where we are, and what I've been asked to

2    construe, I should apply that rate here.

3          As I noted, the Federal courts have broad

4    discretion on whether, and if so, in what amount, to award,

5    prejudgment interest. It is clear that, in exercising that

6    discretion, they're not bound by analogy to any particular

7    statute, and, further, that they should take into account,

8    in the context of the particular facts at issue, fairly

9    broad factors, which are, (1), the need to fully compensate

10   the wronged party for damages suffered, (2), considerations

11   of fairness and the relative equities of the award, (3), the

12   remedial purpose of the statute involved and/or (4) such

13   other general principles as are deemed relevant by the

14   Court.  Wickham Contracting Company v. Local Union No.

15   3,International Brotherhood of Electrical Workers, 955 F.2d

16   831, 834 (2d Cir. 1992).  "The purpose of prejudgment

17   interest is compensatory, not penal," close quote, United

18   States v. Seaboard Surety Company, 817 F.2d 956, 966 (2d

19   Cir. 1987).

20          The analysis is even more complicated here because

21   the $300 million dollars that, over a several-month period

22   in 2015 should have been paid over for distribution to

23   Delphi's unsecured creditors, was, as I've just said, to be

24   paid over to a large group of unsecured creditors who

25   differed dramatically in terms of their own investment

Page 56

1    profiles, goals, risk aversion or risk propensities and the

2    like.  What might compensate one would not necessarily

3    compensate another, therefore -- in other words, it's not a

4    simple two-party dispute.

5             It is true that the Second Circuit, as noted by

6    the defendants, has also, perhaps in light of considerations

7    like that, stated that, generally speaking, the Court should

8    focus on what is a proper risk-free, short-term rate, albeit

9    that clearly must be governed by the facts of the situation,

10   i.e. the length of the litigation, the nature of the

11   parties, the nature of, in essence, the forced borrowing, et

12   cetera.

13            The other factors, before going back to the "fully

14   compensate" point, do not particularly argue for imposing a

15   rate beyond a reasonably fair risk-free rate, adjusted,

16   perhaps, to reflect the nature of the entity to which the

17   unsecured creditors were, in essence, making a forced loan.

18   And those factors, again, are considerations of fairness,

19   the relative equities of the award, the remedial purpose of

20   the statute involved, and such other general principles as

21   are deemed relevant by the Court.  Well, there's no

22   particular statute involved here.  This is not a case where

23   the automatic stay, which has a clear remedial purpose, is

24   being violated, for example.  It's merely enforcing the

25   terms of a plan.  One should not denigrate living up to the

1   terms of a Chapter 11 plan, but where there's a legitimate

2   dispute involved, the remedial purpose point is, I believe,

3   largely conflated with the first factor of full compensation

4   for actual damages suffered.

5           As far as the fairness and relative equities are

6   concerned, that factor is, in my view, also relatively

7   neutral here.  The defendants, as I previously noted, have a

8   strong contractual, plain-language position, and one should

9   not clearly discourage parties from asserting their rights

10  under the apparent plain language of their contracts.  On

11  the other hand, while I won't ask the defendants to

12  acknowledge this, I found, and I believe it's

13  incontrovertible, that the plain language of the statute as

14  asserted by the plaintiffs, makes no economic sense in the

15  context of this bargained-for right of the unsecured

16  creditors, and, moreover, was not -- whereas I believe it

17  should have been, if it was to apply -- revealed to the

18  other parties at interest or the Court at the time that the

19  plan was approved or noticed up to creditors.

20          So, I believe that neither side has much argument

21  to complain about the other taking a position that wasn't

22  warranted, or, more specifically, I don't find that the

23  defendants here used the fact that they had the money

24  improperly as a leverage point, or an improper leverage

25  point, during the course of this litigation.  That still

Page 58

1   leaves, however -- and I don't believe that any other

2   general principles that are relevant here -- so, that still

3   leaves the first and, frankly, I think, at least under these

4   facts, by far the most important point, which is the need to

5   fully compensate the wronged party for actual damages

6   suffered.

7           I think, given all the facts and circumstances, it

8   is proper to look at the issue here as one where the

9   plaintiffs, at a minimum, were making an, in essence,

10  coerced or forced loan to the defendant or defendants during

11  the roughly two years at issue, and they should be

12  compensated for making that forced loan by being paid what

13  someone who made a forced loan should be paid.  They should

14  not, therefore, be compensated for an amount that's

15  materially above that amount, or based upon what they

16  themselves, or some of them, more aptly, could have done

17  with the money, i.e. investing it in the stock market, the

18  bond market, the horse races or anywhere else.

19          There is evidence in the record as to what the

20  company buyer's loans on an unsecured basis were during this

21  period, and that helps guide the Court, but, ultimately, I

22  think it is important to have a more general principal,

23  based upon a relatively riskless rate, as opposed to

24  focusing on individual loans here, which would open the door

25  for a much broader inquiry, if used here, as to the nature

1    and the subtext behind those loans and all of their

2    features, but rather also going forward into the -- for

3    future precedential purposes, inviting this inquiry to be

4    much more complicated than I believe the courts have treated

5    it.  And I will state that, it appears to me that this bench

6    ruling is already about 75 percent longer than most of the

7    sections of opinions that deal with the prejudgment interest

8    issue ascribe to that issue, that I've read.

9            So, rather than take that approach, I will take a

10   cue from Judge Glenn in In re 1031 Tax Group, LLC., 439 B.R.

11   84 (Bankr. S.D.N.Y. 2010), and start with the prime rate in

12   effect during this period, as it would float during the

13   course of the period from the three dates that the parties

14   have agreed to, until the date of entry of the judgment.

15           The Supreme Court, in a somewhat different context

16   but frankly, quite similar, ultimately, to the directives

17   that the Second Circuit has  focused on, at least initially

18   -- a short-term, risk-free rate -- has noted that, Debtors

19   that have emerged from bankruptcy have somewhat more of a

20   risk factor than banks do in lending to their prime

21   customers,  and in the Till case, have, therefore, said

22   that, while one would start with the prime rate, one would

23   adjust it for a risk factor of between one and three

24   percent.  I'm not doing exactly the same analysis here, but

25   in the exercise of my discretion, I believe it would be fair

Page 60

1   to add another 1.5 percent to the prime rate on a floating

2   basis and have that be the rate that would apply here for

3   prejudgment purposes.

4           So, I'm going to ask counsel for the plaintiffs to

5   prepare a judgment consistent with my two rulings in this

6   case, the first one being granting their motion for summary

7   judgment on the merits and finding the unsecured creditor

8   distribution was owing on the agreed dates that are set

9   forth in the papers before me now, including on Page 6 of

10  the defendants' memorandum of law, and awarding prejudgment

11  interest from each of those dates at the rate that I've laid

12  out, as well as postjudgment interest at the Federal rate

13  under section 1961.

14          I had told you when I gave you my bench ruling

15  that I would give you a somewhat, hopefully, at least, more

16  complete ruling on the merits, and I still intend to do

17  that, but I won't be able to do that for about a month,

18  given my calendar.  So, that's still to come, but you could

19  circulate the judgment in the meantime and submit it to

20  chambers and I expect that'll get entered in April.

21          Any questions about what to put in the judgment?

22          MR. TEECE:  I don't think so, Your Honor, I --

23          THE COURT:  Okay.  Well, if there's some dispute

24  about it, you can send me dueling orders with an

25  explanation.

1          MR. TEECE:  As I understand it, we have three

2     dates that we agree upon.

3          THE COURT:  Right.

4          MR. TEECE:  We need to identify the prime rate on

5     each of those dates and add 1.5 percent to that.

6          THE COURT:  Yeah, but I had it fluctuates

7     thereafter.  I had it to be floating so no one gets caught

8     with some sort of strange interest rate.  That's the one --

9     that's the main problem with Till.  It can catch you at an

10    anomalous point, whether too high or too low.  This would

11    just follow it through.  And I guess whenever, you know,

12    that's adjusted, generally under loan agreements, either

13    quarterly, semi-annually or annually.

14         MR. TEECE:  Right.  Okay, well, we'll take a look

15    at this --

16         THE COURT:  If the company's already monitoring

17    that, you know, it's easily tracked.  You just do it -- you

18    adjust it -- I guess you could adjust it annually, is my

19    thought.  It hasn't moved that much over the last two years.

20    Mr. Friedman, do you have any --

21         MR. FRIEDMAN:  Sorry.  Your Honor, just first of

22    all, in terms of sequence, is it the Court's plan to issue

23    the judgment and the written decision --

24         THE COURT:  Yeah, the judgment may come first.

25         MR. FRIEDMAN:  Oh, the ju -- okay.

Page 62

1            THE COURT:  Yeah, I had hoped to have -- I'm going

2       to have an operation in a couple days --

3            MR. FRIEDMAN:  Oh, sorry.

4            THE COURT:  -- so I'm not quite sure of my

5       schedule.  But so, you know, I'm assuming with $300 million

6       dollars at stake, you're going to appeal.  There will

7       certainly be a written opinion before the District Court

8       hears the appeal.  I'm not going to hold up the judgment.  I

9       would hope to have it in May.  I mean, not the judgment.  I

10      would hope to have the opinion in May.  The judgment, you

11      can send to me and it'll get entered in early April, is my

12      sense.

13           MR. FRIEDMAN:  And Your Honor, just, you know, for

14      the record, we think in terms of fully compensating the

15      plaintiffs, the idea of imposing a prejudgment rate for the

16      two years or so in question, that's above even Delphi's

17      long-term unsecured borrowing (indiscernible).

18           THE COURT:  I don't know what it is.  No one would

19      tell me what prime was, so I'm just going by what I think it

20      -- is generally.

21           MR. FRIEDMAN:  No, we said, during the hearing

22      today --

23           THE COURT:  Oh, oh, oh, yeah.  Well, it may be or

24      it may not be, but I'm not going to put a cap on it.  I

25      think that that's fair.  The Supreme Court said it's fair

1    for people who are exiting Chapter 11 and have secured debt.

2    It's certainly fair for people who have unsecured debt.

3            MR. FRIEDMAN:  But Delphi exited six years ago.

4    It's been borrowing at much lower levels since then,

5    unsecured.

6            THE COURT:  Well, I don't know.  No one would tell

7    me what prime is.  It's borrowing at less than prime?

8            MR. FRIEDMAN:  It's borrowing at about prime

9    because prime is --

10           THE COURT:  Well, I don't know.  No one would tell

11   me that.

12           MR. FRIEDMAN:  I did, Your Honor, prime, I said

13   during the hearing, prime is about 3.25 percent.

14           THE COURT:  I don't know what that's based on.

15           MR. FRIEDMAN:  Well, I mean, that -- that's --

16           THE COURT:  In any event, if it's 4, it's in

17   between the dates that you gave me -- the numbers you gave

18   me.

19           MR. FRIEDMAN:  Yeah, but Delphi's longer-term

20   borrowing is under 4 percent.

21           THE COURT:  It's fair.  I believe it's fair.  They

22   don't have a contract, the others have a contract.  It's a

23   fair rule.  It's certainly -- the Supreme Court was quite

24   confident it was fair in the Till context.  That was for

25   secured loans.  Okay.

08-01789-rdd   Doc 13987-2   Filed 05/10/17   Entered 05/10/17 20:06:08   Main Document
Pg 65 of 67

1                MR. TEECE:   Thank you very much, Judge.

2                (Whereupon these proceedings were concluded at

3     2:13 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      I N D E X

2

3                       RULINGS

4                                    Page      Line

5    Granted Motion for Summary Judgment      60        2

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                   C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4  transcript is a true and accurate record of the proceedings.

5    **Sonya**

Digitally signed by Sonya Ledanski Hyde

6    **Ledanski Hyde**

DN: cn=Sonya Ledanski Hyde, o=Veritext, ou, email=digital@veritext.com, c=US

7  Date: 2017.05.15 15:08:16 -04'00'

8  Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20  Veritext Legal Solutions

21  330 Old Country Road

22  Suite 300

23  Mineola, NY 11501

24

25  Date:  March 28, 2017