# EXHIBIT D

Page 1

```
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 4   In the Matter of:

 5   SECURITIES INVESTOR PROTECTION

 6   CORPORATION,

 7                   Plaintiff,

 8       vs.                    Case No. 08-01789(SMB)

 9   BERNARD L. MADOFF INVESTMENT

10   SECURITIES, LLC, ET AL.,

11                   Defendants.

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

13   In the Matter of:

14   IRVING H. PICARD, TRUSTEE FOR

15   LIQUIDATION OF BERNARD L. MADOFF

16   INVESTMENT SECURITIES LLC,

17                   Plaintiff,

18           v.                 Case No. 10-04336(SMB)

19   THE ESTATE (SUCCESSION) OF

20   DORIS IGION, ET AL.,

21                   Defendants.

22   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

23

24

25
```

1                  U.S. Bankruptcy Court

2                  One Bowling Green

3                  New York, New York

4

5                  August 6, 2014

6                  10:07 AM

7

8

9    B E F O R E :

10   HON STUART M. BERNSTEIN

11   U.S. BANKRUPTCY JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Hearing re:  Letter filed by Mr. Lamar Ellis on Notice Of

2    Trustee's December 11, 2008 Determination Of Claim

3

4    Hearing re:  (cc-19) Defendants Estate (Succession) of Doris

5    Igoin, Laurence Apfelbaum, and Emilie Apfelbaum, Motion to

6    Dismiss Adversary Proceeding

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South, William J. Garling

Page 4

```
 1    A P P E A R A N C E S :
 2    BAKER HOSTETLER
 3         Attorneys for the Trustee
 4         45 Rockefeller Plaza
 5         New York, NY 10111
 6
 7    BY:  NICHOLAS J. CREMONA, ESQ.
 8
 9
10    KELLEY, DRYE & WARREN LLP
11         Attorney for Apfelbaum & Igoin
12         101 Park Avenue
13         New York, NY 10178
14
15    BY:  JONATHAN COOPERMAN, ESQ.
16
17    ALSO APPEARING TELEPHONICALLY:
18         LAMAR ELLIS
19
20
21
22
23
24
25
```

Page 5

1                    P R O C E E D I N G S

2                         THE CLERK:  All rise.

3              THE COURT:  Mr. Ellis, are you on the line?

4              THE OPERATOR:  Mr. Ellis is not connected yet.

5              THE COURT:  He is not connected yet, all right.

6         (Recess at 10:07 a.m.)

7              THE COURT:  All right.  Madoff and Apfelbaum.

8    Sorry.

9         (Pause)

10             THE COURT:  Go ahead.

11             MR. COOPERMAN:  Would you like me to speak from

12   the podium or here?

13             THE COURT:  Yes, please.

14             MR. COOPERMAN:  Thank you, Your Honor.

15             May it please the Court, we are here today -- my

16   name is Jonathan Cooperman from the law firm of Kelley, Drye

17   & Warren and I represent the defendants in this adversary

18   proceeding and we're here on our motion to dismiss for lack

19   of personal jurisdiction and for form non-convenience.

20             Your Honor undoubtedly has seen a lot of Madoff

21   cases with unique facts.  Your Honor, this is one of them.

22   My clients are a French psychologist and a student, their

23   names are Laurence Apfelbaum and Emilie Apfelbaum.

24   Laurence, Your Honor is a female name, just for the record

25   to be clear.

Page 6

1           THE COURT:  I figured that one out after a while.

2           MR. COOPERMAN:  Okay.  Thank you, Your Honor.  A

3    lot of people -- a lot of people don't at first.

4           They're French citizens, they live and work and

5    reside in Paris, France.

6           The trustee makes no allegation that my clients

7    have any connections anywhere in the United States --

8           THE COURT:  Well they have New York accounts

9    though, right?

10          MR. COOPERMAN:  Aside from their BLMIS accounts.

11   It's important, Your Honor, I want to get to that

12   jurisdiction, but I want that record to be clear.

13          The trustee attempts to lump together my clients

14   with Albert Igoin, I-G-O-I-N, who is the late deceased

15   father of Laurence Apfelbaum.

16          Your Honor, they're very different.  Mr. Igoin

17   died in 1995.  At that time his daughter, Laurence, his

18   granddaughter, Emilie -- Emilie was only 11 years old at the

19   time -- inherited the BLM -- inherited money and those --

20   that money largely was BLMIS accounts.

21          Now, Your Honor, at that time Laurence Apfelbaum

22   was free to choose to invest what she wanted -- to invest

23   her money where she wanted.  Emilie, Your Honor, was 11

24   years old, and her inheritance was subject to a French

25   guardianship judge, which is equivalent to a French -- a

Page 7

1    family law judge here in New York.

2         The evidence shows, Your Honor, that the French

3    guardianship judge required that Emilie Apfelbaum invest

4    half of her money in French treasury bills because that was

5    a safe investment and that's what --

6         THE COURT:  When did she turn 21?

7         MR. COOPERMAN:  She was 11 years old in 1995, Your

8    Honor, so she would have turned 21 in 2006.

9         THE COURT:  All right.  And she determined to

10   leave her money in BLMIS at that point, right?

11        MR. COOPERMAN:  She did, Your Honor.  She did,

12   there's no question about that, but I'd like to focus a

13   second on what happened in 1995, because I think that's

14   relevant to the issue of jurisdiction.

15        The reason is, Your Honor, is that what the French

16   guardianship -- judge required is for Emilie Apfelbaum, if

17   she wanted to leave her money with BLMIS then Madoff had to

18   give guarantees that the money was safe.  And what happened

19   is, Your Honor --

20        THE COURT:  Well she could lose five percent.  I

21   think that's what it was.

22        MR. COOPERMAN:  That's right, Your Honor.  That it

23   couldn't lose more than five percent in any one year, but

24   for purpose of jurisdiction what's very important, Your

25   Honor, is that Madoff came to France -- Paris, France, he

Page 8

1    negotiated a special contract which Your Honor has in front

2    of you, with a French what's called a notaire, which is a

3    cross I guess between a notary and lawyer.

4              THE COURT:  I know the argument, but this isn't a

5    contract case, this is a fraudulent transfer case.  Contract

6    has nothing to do with the trustee's claim, or tell me how

7    it has something to do with -- not the jurisdictional issue,

8    but the claim.

9              MR. COOPERMAN:  Well, I'm focusing right now on

10   jurisdiction, Your Honor.  I understand the trustee's

11   theory, but the fact is, is that -- and I want to go through

12   this with you, all of -- some other facts that go to

13   jurisdiction if Your Honor will let me --

14             THE COURT:  Go ahead.

15             MR. COOPERMAN:  -- that merely -- what the cases

16   hold for jurisdiction is that merely maintaining the account

17   in New York by itself is not sufficient for jurisdiction.

18             THE COURT:  Let me ask you a question.  There

19   wasn't -- I didn't see it in anybody's papers.

20             MR. COOPERMAN:  Yes, Your Honor.

21             THE COURT:  I see all these withdrawals from the

22   accounts.

23             MR. COOPERMAN:  Understood, Your Honor.

24             THE COURT:  How did they come about?  Did somebody

25   make a request for money?

Page 9

1                MR. COOPERMAN:  Yeah.  Your Honor, so what I was

2      going to say is the contacts with New York are largely

3      because of France you have to pay wealth taxes and --

4                THE COURT:  No, no, I'm asking a different

5      question.  If I look at Exhibit B -- I think it's Exhibit B

6      to the complaint --

7                MR. COOPERMAN:  Understood.

8                THE COURT:  -- it lists a lot of withdrawals --

9                MR. COOPERMAN:  Yes, Your Honor.

10               THE COURT:  -- with some deposits, a lot of

11     withdrawals.  And the question I had is how did these

12     withdrawals come about?  Did somebody send a request to

13     BLMIS to withdraw money?

14               MR. COOPERMAN:  What was -- there was a request

15     made, yes, to withdraw money --

16               THE COURT:  So every time there's a withdrawal

17     that means that a request came into BLMIS in New York to

18     withdraw money.

19               MR. COOPERMAN:  That's correct, Your Honor.

20               THE COURT:  All right.

21               MR. COOPERMAN:  That's correct.  So that is

22     clearly what happened here.

23               I want to call your attention to one thing -- a

24     couple things on the French language contract and then

25     address some of the other context aside from calling in

1    to -- to request money for French wealth taxes.

2           These agreements they're in French, they're simple

3    one-page agreements, they're very different from the other

4    BLMIS agreements that have been in adversary proceedings

5    before this Court.  The agreements do not contain a New York

6    choice of law clause, they don't contain the clause

7    appointing a New York agent, there's nothing in the

8    agreements of the accounts even being held in New York

9    beside from Mr. Madoff's address New York is not mentioned.

10   It's unrebutted, Your Honor, that these particular

11   agreements are subject -- they were negotiated in France and

12   they're subject to French law.

13           THE COURT:  But it's not a contract.  I keep

14   coming back to the same question.  Are you telling me that

15   if somebody receives a -- well this may answer the

16   question -- but if somebody receives a fraudulent transfer

17   from a New York account that's governed by French law?

18           MR. COOPERMAN:  Well what I'm saying, Your Honor,

19   is the differences here is that that's not quite the point I

20   was trying to make.  The difference here is that in many of

21   the personal jurisdiction cases in Madoff the issue came

22   down to the defendants signed a Madoff classic account

23   agreement, and that person whether they be in Europe, Asia,

24   what have you, that agreement said you subject yourself to

25   New York jurisdiction.

Page 11

```
 1            My bigger point here is this is a special one-page

 2    French document which does not contain that.

 3            THE COURT:  All right.  And I agree with you on

 4    that.  I've seen those cases.  I've also seen other cases

 5    that say simply maintaining an account in New York is

 6    enough.

 7            MR. COOPERMAN:  Well, I want to -- I want to go to

 8    that in one second, Your Honor.

 9            THE COURT:  Let me ask you the question

10    differently.

11            MR. COOPERMAN:  Please.

12            THE COURT:  Are you saying that the choice of law

13    clause -- New York choice of law clause is a sine qua non of

14    personal jurisdiction in the case?

15            MR. COOPERMAN:  It's one important factor in a lot

16    of these cases.

17            If I may, Your Honor, let me address the law, then

18    let me come back to some of the facts, because I think the

19    law is very important.

20            In -- the trustee's amended complaint states that

21    jurisdiction in this case is based on CPLR 302(a).  That's

22    right --

23            THE COURT:  Actually I had a question about

24    that --

25            MR. COOPERMAN:  Please.
```

Page 12

1            THE COURT:  -- for both sides.

2            The only claim -- as the law now stands the only

3    claim that the trustee has is a bankruptcy claim going back

4    two years.  Does the CPLR apply to that or is there some

5    federal law of specific jurisdiction that applies to that

6    and are they different?

7            MR. COOPERMAN:  I don't think, Your Honor, there's

8    any practical difference, and the reason is, is because the

9    trustee has not identified any -- because there are none --

10   any contacts that my clients have anywhere else in the

11   United States that would support federal jurisdiction.  The

12   only contacts in the entire United States that my clients

13   have are these accounts here in New York.

14           THE COURT:  But under federal non-CPLR specific

15   jurisdiction law.  If somebody never comes into the state

16   but avails themselves of activities in the state or does

17   something outside the state that has a consequence inside

18   the state, which is generally my understanding of the CPLR

19   specific jurisdiction, does the same law apply under more

20   general federal specific jurisdiction law?

21           MR. COOPERMAN:  Yes, Your Honor.

22           THE COURT:  Okay.

23           MR. COOPERMAN:  It does.  In fact the -- every --

24   even under the long arm statute the cases the trustee cite

25   hold that specific jurisdiction requires that the claims

1    alleged arise out of the federal activities.  And that's in

2    the In re: Bozell (ph) case cite by the trustee.

3              The point is, Your Honor, that in this situation

4    what we have here is this action does not arise out of the

5    Apfelbaum's accounts.  What it arises out of is Madoff's

6    activities.

7              THE COURT:  I thought it arose out of transfers

8    from the Apfelbaum accounts?

9              MR. COOPERMAN:  Well let me read to you paragraph

10   1 of the amended complaint, Your Honor.  It says, "This

11   adversary proceeding arises from the massive Ponzi scheme

12   perpetrated by Madoff."

13             Your Honor, in every case that has been cited

14   either by the trustee or by my clients in the briefs before

15   you, there is more activity in New York to support personal

16   -- let me start again.  In cases where personal jurisdiction

17   is found, Your Honor, in every case cited by either the

18   trustee or myself, there was more activity in New York, more

19   connections in New York than simply maintaining an account

20   here.

21             If I can walk you through just a couple of the

22   cases to show you some examples, Your Honor.  In the Maximum

23   Absolute Return Fund case, which was a Madoff case, in that

24   case it was a Connecticut-based feeder fund, there was a

25   BLMIS contract with a New York choice of law clause, and the

Page 14

1    court stated, quote:

2          "The Second Circuit has indicated that entering

3    into a contract with a New York choice of law clause is a

4    significant factor in a personal jurisdiction (indiscernible

5    - 00:10:26), because the parties invoke the benefits and

6    protections of New York law."

7          The Picard versus Chase case, Your Honor, which

8    was cited by the trustees, there was a designation of a New

9    York agent and also this was only looking federal contacts

10   as a whole, there was also a California bank account

11   maintained.

12         In the Picard versus Comad (ph) Securities Corp.

13   case, another case cited by the trustees, there was a New

14   York choice of law clause and also a designated New York

15   agent.

16         In Malachi versus Lebanese Bank case, which was

17   cited just -- New York Court of Appeals case, it was cited

18   in our briefs.  You had a situation where a corresponding

19   bank in New York was getting millions of dollars transferred

20   here into New York, I think it was on dozens of transactions

21   in New York, with the express purpose to use the New York

22   account to benefit the Hezzbollah terrorist group, so --

23         THE COURT:  But to benefit the Hezzbollah

24   terrorist group that may have had something to do with the

25   causation, the second part of the test, but here when I look

1    at Schedule B I see a lot of money going in and more money

2    coming out of the account.  So it wasn't a one-time deposit

3    or a one-time withdrawal, these were very active accounts.

4            MR. COOPERMAN:  Your Honor, there is no question

5    that money came out of the accounts.  It's unrebutted in the

6    jurisdictional discovery that every dollar that came out of

7    the Doris Igoin account and out of the Emilie Apfelbaum

8    account were to pay French wealth taxes based on the

9    presumed value of the Madoff account.

10           THE COURT:  But that's -- you know, that's the

11   unfortunate truth of just about every defendant in every one

12   of these net profit cases, they all had to pay taxes, and I

13   guess I assume that they had to withdraw money to pay taxes.

14   Maybe not as much as your clients had to pay because of the

15   French tax laws, but it's an unfortunate truth in every one

16   of these situation.

17           MR. COOPERMAN:  Your Honor, I told you about the

18   law in which the trustees cite where there's more activity

19   than just maintaining an account in New York.

20           Let me focus, Your Honor, which this is a very

21   crucial part of our argument, on other cases in which all

22   that they had was our situation where there was a bank

23   account in New York and the passive receipt of income from

24   that account, and the outcome is very different.

25           I call Your Honor's attention to several cases we

Page 16

```
 1    cited.  First I'll start with the Societe Generale versus

 2    Florida Health Science Center case, this was a 2003 case

 3    decided by Judge Cedarbaum in the South District.  In that

 4    case a Florida bonding company which was issuing bonds for a

 5    Tampa-based hospital had a $12.9 million account here in New

 6    York with Societe Generale.  The purpose of that account the

 7    court found was to make money for the bonding company.  It

 8    had a guaranteed interest rate of seven percent.

 9             And what Judge Cedarbaum said, Your Honor, is if I

10    can quote"

11             "Contrary to Societe Generale's contentions,

12    maintenance of a bank account in New York is usually

13    insufficient to confer personal jurisdiction over a non-

14    domiciliary defendant even in suites arising from that

15    account."

16             THE COURT:  Isn't that pre-Leechy (ph) law though?

17             MR. COOPERMAN:  I don't see how it changes though,

18    Your Honor, because if I can continue to talk about this --

19             THE COURT:  Because I think you have to look at

20    the quality and the quantity --

21             MR. COOPERMAN:  Absolutely.

22             THE COURT:  -- of the account.

23             MR. COOPERMAN:  Absolutely, Your Honor.  But I

24    think what Leechy stood for is that somebody who is not in

25    New York -- well let me give a different analogy.  That if
```

1  my clients never dealt with Madoff but only had a French

2  correspondence bank that's I believe what Leechy stood for.

3  What Leechy did not stand for is to say that if you just

4  maintain an account in New York and have nothing else and do

5  nothing else --

6           THE COURT:  I agree with the if you do nothing

7  else, but I come back to my question that your clients did

8  more than nothing else, because at a minimum there are

9  hundreds of deposits and withdrawals over the years in these

10 accounts, and even if I looked more recently and I don't go

11 back to 1995, and you're telling me that everyone of those

12 was proceeded by some sort of request to send money.

13          MR. COOPERMAN:  But, Your Honor, if I can also --

14 I'd like to continue talking about that Societe Generale

15 case, but before I do I'd address Your Honor to the Divinsky

16 (ph) versus Kingsford case, a Judge Carati (ph) case from

17 2008.  That was a situation where there were claims to

18 recovery monies wrongfully -- allegedly wrongfully obtained

19 by a defendant in Florida as part -- that they received as

20 part of a New York fraudulent scheme, and the claims were

21 sought based on the same debtor and creditor laws as the

22 trustee has asserted in this case against my client.

23          And what Judge Carati said was -- he said, quote:

24          "It is settled however that passive receipt of

25 allegedly stolen funds absent evidence of knowledge or

Page 18

1    intent is an inadequate basis for the court's exercise of

2    jurisdiction under 302(a)(2)."

3              THE COURT:  Knowledge or intent -- knowledge of

4    the Ponzi scheme.

5              MR. COOPERMAN:  Yes.  Exactly, Your Honor.

6              So I think that's a very relevant case.  It's no

7    different than with the Société Générale case.  I wanted to

8    call Your Honor's attention to other parts of the Société

9    Générale case because in that case the Court distinguished

10   the very type of cases the trustee cites here.  The Court in

11   the Société Générale case talked about other cases where

12   there was a foreign selection clause, where there was a

13   promissory note with actually New York connection.

14             And what the Court said is that after the Florida

15   bonding company in that case deposited the money into New

16   York, their New York connections were, quote, "limited to

17   passive acceptance of interest payments and monthly

18   statements in Florida."

19             THE COURT:  I guess I'm hung up on the word

20   "passive" because you've used it a couple of times.  Here,

21   as I understand it, your clients weren't just receiving

22   monthly statements and interest payments that were

23   automatically generated without request.  They were

24   receiving a significant number of payments or checks or wire

25   transfers over the years.

1           MR. COOPERMAN:  With all due respect, Your Honor,

2    I think that's a distinction without a difference here.  I

3    think what the cases say is that on the one hand, if you

4    have an account in New York and an out-of-state person does

5    nothing more than have that account and get monies from that

6    account versus the other cases that the trustee largely

7    relies on where a much greater deal of activity was done

8    within New York, which leads me, Your Honor, for -- I'd like

9    to focus on that because that's the other important part of

10   my presentation.

11          What the trustee has alleged, they made very

12   sweeping statements, especially, as Your Honor knows, we had

13   briefing in 2012 and then we had 18 months of jurisdictional

14   discovery.  If you look especially at the briefs of 2012,

15   there are sweeping statements made by the trustee that my

16   clients were, quote, "anything but ordinary investors; they

17   were acutely aware of the purported activity in the

18   accounts.  They acted deliberately, and so forth."

19          THE COURT:  I don't pay attention to conclusory

20   statements like that.  And I do have a question.  There's

21   been a lot of smoke and heat over the years in this case

22   about the facts and I question whether there's really a

23   dispute regarding the facts, supposed to the adverbs, the

24   adjectives, and the conclusory statements.  The trustee

25   basically has a summary of facts in his supplemental memo,

Page 20

1    which I guess he filed after the jurisdictional discovery --

2              MR. COOPERMAN:  Correct, Your Honor.

3              THE COURT:  -- in response to yours, and he cites

4    a lot to Mrs. Apfelbaum's deposition, and I'm just wondering

5    if there's any dispute as to those facts.

6              MR. COOPERMAN:  Well, there's actually a huge

7    dispute, Your Honor, because --

8              THE COURT:  Okay.  So you're tell me there's a

9    fact -- let me stop you -- and here's an issue I have with

10   this case.  You're telling me there's factual dispute

11   regarding personal jurisdiction?

12             MR. COOPERMAN:  No, I'm not, Your Honor.

13             THE COURT:  I just asked you.

14             MR. COOPERMAN:  I misstated what I said.

15             THE COURT:  Okay.

16             MR. COOPERMAN:  There is no dispute.  The record

17   speaks for itself.

18             THE COURT:  Well, the record is long at this point

19   and there are a lot of papers.

20             MR. COOPERMAN:  But it's not, Your Honor, because

21   I think if you examine fairly very sweeping statements made

22   by the trustee and compare it to the evidence cited, the

23   evidence doesn't support it.

24             Your Honor, if I can -- just as an example, Your

25   Honor, the trustee is to show our -- my client's active

Page 21

1    participation in New York.  The trustee has cited a total of

2    four documents over a 13-year period.  Your Honor, they've

3    made big statements in 2012, briefing as to what they meant.

4    All of those statements are demonstrated by future -- by

5    subsequent discovery not to be accurate.

6            Your Honor, if I could just point to you, three of

7    those faxes are from 1999.  They are all handwritten

8    documents.  The first one is a May 10th, 1999, fax which

9    simply in that, Laurence Apfelbaum wrote to Frankie

10   DePasquale (ph) and said essentially the French tax

11   authorities made a mistake.  They undercalculated their tax

12   and she has to withdraw a lot more money than anticipated.

13   That's it.

14           A second fax, Your Honor, is an October 12th,

15   1999, fax, and in that case, what Laurence Apfelbaum

16   testified was that she was merely telling -- reminding Mr.

17   DePasquale to sell a French Treasury bill before it matured.

18   And what the -- the trustee makes a big deal out of it, but

19   the trustee doesn't cite the testimony to put this in

20   context.

21           And what that testimony said, Your Honor, was Ms.

22   Apfelbaum was informed under French law that if a Treasury

23   bill was held to maturity it was taxed at a high rate, I

24   think 50 percent.  If it was sold the day before maturity,

25   it was taxed at 25 percent.

1           THE COURT:  Well, what does that have to do with

2    the fact of the contact?

3           MR. COOPERMAN:  Because, Your Honor, the -- I

4    believe -- well, the law provides, as we've cited, that what

5    the trustee needs to do to establish jurisdiction here is

6    not simply to say there's a maintenance of account, but

7    somehow that we were active participants in the strategies

8    of the account and investing, which is what they're trying

9    to do, Your Honor.  And that's why as a total, they cited

10   four faxes to show that, but that doesn't show it.

11          THE COURT:  The trustee's supplemental memorandum

12   of law --

13          MR. COOPERMAN:  Yes, Your Honor?

14          THE COURT:  -- lists from pages 5 to 11, what it

15   calls -- what he calls supplemental statement of facts

16   derived, I guess, from the discovery -- largely from Mrs.

17   Apfelbaum's -- Dr. Apfelbaum's deposition.

18          Do the Defendants dispute any of those facts?

19          MR. COOPERMAN:  We do, Your Honor.  Just give me

20   one second.

21          THE COURT:  But if you do, don't I have to have an

22   evidentiary hearing to decide the issue?

23          MR. COOPERMAN:  Well --

24          THE COURT:  That's one of the problems here.  I

25   understand the tension of dragging -- I shouldn't say

Page 23

1    dragging -- bringing your clients in to participate in an

2    evidentiary hearing to prove that they shouldn't be here in

3    the first place, but how do I resolve this evidentiary

4    dispute?

5              MR. COOPERMAN:  Well, if that's what Your Honor

6    wants --

7              THE COURT:  That's the question I have.  I'm

8    asking you.

9              MR. COOPERMAN:  Thank you, Your Honor.

10             I wasn't meaning to be smart there.

11             THE COURT:  No.

12             MR. COOPERMAN:  The -- in my view, if you look at

13   the statements made in the trustee's supplemental

14   memorandum, and then if you look at the evidence and the

15   factual citations, those factual citations do not support

16   what the trustee says, and, in fact, Your Honor, if you then

17   look at our supplemental papers, we put all of these

18   statements into context.

19             As an example, Your Honor, I just mentioned about

20   the point where what the trustee is talking about, these

21   sales of French Treasury bills, and the trustee would

22   present this as if this was some, you know, a financial guru

23   who was sitting there saying sell, buy, at different times,

24   when all that she was doing in context was -- and she

25   testified, she said if she saw in his statement that Frank

Page 24

1    DePasquale, that a Treasury bill was coming up due in a week

2    and it hadn't been sold, she would let him know to sell it.

3              THE COURT:  But I saw another fax or e-mail in

4    which there was a much more-detailed plan about minimizing

5    Emilie's taxes.

6              MR. COOPERMAN:  Oh, that's a perfect example, Your

7    Honor, of what I talked about of the record not being stated

8    properly.  Because that fax was part of the trustee's 2012

9    submission.  And if you look at the trustee's 2012

10   submission, the trustee said that that fax shows -- I wrote

11   it down here -- quote, "actively directed trading strategy,"

12   okay?

13             Curious, Your Honor, that the trustee has not then

14   relied on that fax in their post-jurisdictional discovery, a

15   briefing, and the reason is it's explained in our post-

16   discovery brief at pages 20 to 21, because what the

17   testimony was is Laurence Apfelbaum's tax advisor was trying

18   to figure out what Bernie Madoff was doing because he put a

19   put and hold strategy in place, supposedly, to comply with

20   the Emilie Apfelbaum French law contracts, and you can't

21   lose more than five percent.

22             What Laurence Apfelbaum testified is that actively

23   directing strategy memo, simply, her tax advisor dictated it

24   to her and said, Run it past Madoff; is this what they're

25   doing?  So, you know, there's a sweeping statement that

Page 25

1    somehow my client is somehow engaged in active strategy,

2    but, again, I think the big takeaway that I would ask Your

3    Honor from this oral argument was to please closely examine

4    the evidence.  I know Your Honor does all the time, but I

5    think that you will find that our statements and our putting

6    the evidence in context shows this is a French psychologist.

7    It's not somebody who had a trading strategy.

8              In fact, I think it's also interesting, Your

9    Honor, for the two days of depositions they took of Laurence

10   Apfelbaum, nowhere are there in there any quotes about

11   discussions of her expertise in finances.  In fact, Ms.

12   Apfelbaum testified, quote, "I've never known exactly what

13   the strategy was.  I only noticed that on the monthly

14   account statements there were dividends or equities.  I

15   don't know anything about the stock exchange.  All I know is

16   that I was told they were either Treasury bills or equities,

17   stocks.  I've never seen anything else."

18             The point is I've gone in various ways here, but I

19   believe that in order to prove 302 jurisdiction or the

20   federal specific jurisdiction, it doesn't make a difference

21   here because only the BLMIS accounts are the only New York

22   issues here, either way you've got to show that your claim

23   arises out of those accounts.  The case law is -- we've

24   cited the Dovinsky (ph) case.  There's also a case that's

25   Judge Koeltl's case, the International Customs Associates,

Page 26

1   which is cited by the Société Générale case.  In that case

2   you had a situation where Judge Koeltl declined to find

3   jurisdiction over a Taiwanese company where all meetings

4   regarding the parties' contract were in Taiwan and it

5   involved what business the New York company would do for the

6   Taiwanese company and were subsequently, there were only

7   phone calls into New York.

8            The point is, Your Honor, that all of these cases

9   say that simply having a BLMIS account here is not

10  sufficient.  What their case arises out of the fraud and

11  as -- if I can quote one other -- on the late Judge Bayer

12  (ph) in the online market case which we cited, he states,

13  quote, "The relevant focus under CPLR 302 is on what the

14  Defendant did in New York in connection with the cause of

15  action, not the Plaintiff's actions."  So the cause of

16  action here is the massive fraud that Mr. Madoff

17  perpetrated.

18            THE COURT:  No, the cause of action are the

19  fraudulent transfers.  That's what this case is about.

20            MR. COOPERMAN:  That's right and that still, it's

21  the activity of Mr. Madoff, as opposed to our activity of

22  our -- any -- our receipt, my client's receipt of those

23  fraudulent transfers was not here in New York and that's

24  what Judge Prodding (ph) focused on in the Dovinsky case,

25  and so we think this is a very, very different situation.

1            I'd like to move on if --

2            THE COURT:  I have one question for you.

3            MR. COOPERMAN:  Of course.

4            THE COURT:  Are any of the jurisdictional facts

5    implicated in the merits of the case?

6            MR. COOPERMAN:  Yes and no, Your Honor.

7            THE COURT:  What's the yes part?

8            MR. COOPERMAN:  I'm thinking about this.  It's a

9    good question.

10            THE COURT:  I'm going to give you a chance to

11   think about it because if I do decide to have a trial on the

12   issue of personal jurisdiction, it may depend on whether I

13   have a separate trial or try it with the merits.

14            MR. COOPERMAN:  I see where Your Honor is going on

15   that.  You know, this goes to what I want to talk about

16   before the forum non conveniens, and I will go out of turn

17   here because I also want to cover the SIPA matter -- the

18   SIPA filings.

19            Would Your Honor like me to --

20            THE COURT:  Well, that's part of the

21   jurisdictional argument.

22            MR. COOPERMAN:  It is, Your Honor.  So, should --

23            THE COURT:  You've got the floor.

24            MR. COOPERMAN:  Okay.  If you don't mind, I would

25   like to cover SIPA and then go to the forum non conveniens.

Page 28

```
 1                THE COURT:  Okay.

 2                MR. COOPERMAN:  The trustee has alleged that the

 3       filing of the SIPA forms is, itself, good enough by itself

 4       for jurisdiction and Your Honor --

 5                THE COURT:  And I wanted to ask you on that one:

 6       What happened to the claims that your client submitted?  Is

 7       there still a claims that allowance dispute, I guess?

 8                MR. COOPERMAN:  I believe they were denied.  The

 9       trustee may --

10                THE COURT:  And the Defendants never objected to

11       that denial?

12                MR. COOPERMAN:  We didn't do anything after that

13       point.

14                THE COURT:  Okay.

15                MR. COOPERMAN:  So what happened, Your Honor, is

16       Laurence Apfelbaum was not represented by counsel at the

17       time that she filed these SIPA forms; that's her testimony.

18       The trustee's cases, which they have, have cited do not --

19       none of them are situations in which a SIPA form filing

20       gives rise to jurisdiction.  The cases they have cited are

21       different if you submit a bankruptcy proof of claim.

22                THE COURT:  So what's the difference?

23                MR. COOPERMAN:  Big difference, Your Honor.

24                So the bankruptcy proof of claim, it's clear on

25       there.  Bankruptcy proof of claim, the form has the name of
```

1    the court, the title, the docket number, under bankruptcy

2    rules, Form F9, the form has to say the following statement:

3    Filing a proof of claim submits the creditor to the

4    jurisdiction of the Bankruptcy Court --

5                THE COURT:  Can I ask you a question?

6                If you were litigating the allowance of your

7    client's claim, based on what your client had sent in to

8    Texas or wherever, would you be arguing that this Court

9    lacks jurisdiction to determine the allowability of that

10   claim because this is a SIPA case?

11               MR. COOPERMAN:  I haven't considered that issue

12   yet.  I mean I --

13               THE COURT:  I'm asking you to consider it.

14               MR. COOPERMAN:  They might.

15               THE COURT:  So you submit a claim and when it's

16   disputed, you say the Court can't hear it?

17               MR. COOPERMAN:  There's a difference, though, Your

18   Honor.  Because the difference is that if I was representing

19   Mrs. Apfelbaum from day one, I would have talked to her and

20   we would have perhaps more closely considered what we were

21   going to do.  I might have advised her about what a net

22   winner is, what a net loser is.  I would have given her all

23   of her options.  Frankly, Your Honor -- and I'm not a French

24   law expert -- but I do not know what options she might have

25   in France about this.  So, you know, I would not only have

Page 30

1    given her my thoughts on bankruptcy law, but I would have

2    involved French counsel.

3          So Your Honor is asking a simple question and one

4    obvious answer, I guess would be yes, but I think that it's

5    too simple a question for this situation.  There are just a

6    lot of moving parts.  The fact is, Your Honor, that unlike a

7    bankruptcy form where it says -- it says that you should

8    hire a lawyer -- you should consider it.  The form says

9    you're going to submit yourself to the jurisdiction of the

10   Bankruptcy Court with the consequences that a lawyer can

11   explain.

12         Obviously Your Honor has seen those forms before

13   and, you know, whether you are the most serious investor in

14   the world or whether you're like my clients, a psychologist

15   and a student whose second language is English, you'd read

16   that and you'd say, gotta be careful.  There's nothing here

17   like that, nothing at all in our situation.

18         So the fact is that that SIPA form claim should

19   not subject a jurisdiction.  Again, none of the trustee's

20   cases --

21         THE COURT:  But aren't you just saying she's

22   ignorant of the law or are you saying that there's some due

23   process argument somewhere in this case?

24         MR. COOPERMAN:  That was an eloquent way to put my

25   argument, Your Honor, because I think -- well, I know what

Page 31

1    the argument is.  In order to have jurisdiction, you have to

2    have a conscious decision to submit yourself to the

3    jurisdiction of the Court.

4             The case we cited, the In Re Petrucci case, which

5    was a District of New Jersey case, talked about the fact

6    that even looking at a bankruptcy proof of claim form with

7    the bells and whistles saying, warning, you may be subject

8    to jurisdiction, even in that situation, its allowance is

9    equitable based upon the facts of the case.  It's an

10   equitable decision, even in a bankruptcy proof of claims

11   situation.

12            And I would say here, Your Honor, if we consider

13   the facts, you had a French psychologist, no experience with

14   investing.  Clearly at the time she was vulnerable, she just

15   lost her presumed fortune.  She hadn't even consulted an

16   attorney.  What she received actually contrary to saying

17   warning, you may be sued in New York when she sent something

18   to Texas, it said SIPA is there to protect you.  I don't

19   think that she understood the difference.  That's a big

20   point, Your Honor, whether you consciously subject yourself

21   to jurisdiction.

22            And, again, coming back to Your Honor's question,

23   the more I think about it, it's not a simple answer.

24            THE COURT:  I think it is, but why don't you move

25   on to forum non conveniens.

```
 1              MR. COOPERMAN:  Okay.  May I say -- before I --
 2     may I say five sentences on magnify?
 3              THE COURT:  Yeah, I don't know -- I've read the
 4     papers.  It's not clear to me what that has to do with this
 5     case, but --
 6              MR. COOPERMAN:  No me.
 7              THE COURT:  -- maybe you can save that for
 8     rebuttal.
 9              MR. COOPERMAN:  Okay.  We spent 18 months of
10     jurisdictional discovery on it.  I'm not clear as well.
11              I'll move on to forum non conveniens, Your Honor.
12              THE COURT:  Thank you.
13              First question on forum non conveniens:  Your
14     expert says that there's a five-year statute of limitations
15     on fraud claims.  It's now more than five years since
16     December 11th, 2008 --
17              MR. COOPERMAN:  Right.
18              THE COURT:  -- so aren't all of these claims time-
19     barred in France?
20              MR. COOPERMAN:  No, Your Honor.
21              This was raised by the trustee in the last
22     supplemental memo.  We have not had a chance to respond to
23     it.  What I would like to do, Your Honor, and it's
24     noteworthy that they didn't put any sort of affidavit from
25     their French law expert in about this, but Mr. Quint, I've
```

Page 33

1    talked to him, he's our French law expert, he will say that

2    in France, statute of limitations is a defense which you can

3    assert.  It's up to the Defendant whether to assert it.

4              THE COURT:  Well, the same is true here.

5              MR. COOPERMAN:  Well, okay, but I want to make

6    sure that's the law in France.  So my point is, Your Honor,

7    when you have this forum non conveniens dismissal, it's

8    always based on conditions and as one condition we would, of

9    course, stipulate that we would not assert or my clients in

10   France -- I won't be part of it then -- will not assert a

11   statute of limitations defense.

12             THE COURT:  Okay.

13             MR. COOPERMAN:  And that is clear, and we would

14   like the opportunity to put in a supplemental statement if

15   Your Honor would allow us to do so.  For Mr. Quint to

16   complete the record that shows that, in fact, just like in

17   America, it's a waivable defense and (indiscernible -

18   10:42:57).

19             If I can continue forum non conveniens, Your

20   Honor?

21             THE COURT:  I had that initial question.

22             MR. COOPERMAN:  Oh, it's a good -- it's a perfect

23   question, Your Honor.  You know, talking about whether

24   France is an adequate forum, you don't take my word for it,

25   Your Honor, please take the trustee's word for it.  When

Page 34

1    they submitted their -- when the trustee submitted his

2    application for a French law firm, UGCC & Associates, what

3    he -- the stated reason for hiring -- for this Court to hire

4    that French law firm was it's necessary -- this is a quote

5    from their application, "It's necessary to engage special

6    counsel to represent the trustee in connection with

7    litigation --" one -- and that's my one -- "where French law

8    is implicated or the Defendants are located in France."

9           Now, clearly, Your Honor, we have the or.  The

10   Defendants here are located in France.  That's the exact

11   stated reason for the trustee.

12          THE COURT:  Are you saying it's a concession that

13   the trustee has agreed to try this case in France?

14          MR. COOPERMAN:  No, I think it's a concession,

15   Your Honor, that this is a very unusual, which is an

16   understatement, bankruptcy situation where you have

17   Defendants all throughout the world, and in this situation,

18   I think it's a concession by the trustee that where

19   Defendants are in France, it may be well appropriate to have

20   the trustee's eminent French counsel participate in this.

21          Your Honor, if you look --

22          THE COURT:  It certainly may well be appropriate,

23   but it may also be well appropriate to have their eminent

24   counsel in New York try the case.

25          MR. COOPERMAN:  Well, let me explain why I

Page 35

1    think --

2            THE COURT:  And the Defendant's eminent counsel in

3    New York.

4            MR. COOPERMAN:  Well, I prefer not to, Your Honor.

5    But in all seriousness, there are a couple of reasons I

6    think which heavily weigh in favor of France.  First of all,

7    just on UGCC for one second.  This is not some counsel who's

8    been on the back shelf doing nothing.  Since our last

9    October, 2012, appearance before Judge Lifland, they put in

10   fee applications for $750,000.  I can't tell if that's U.S.

11   dollars.  I can't tell what they're doing because that's not

12   in the fee application, but for that amount of money they're

13   either litigating cases just as they said they would or

14   they're certainly up to speed in order to do so.

15           THE COURT:  What does that have to do with forum

16   non conveniens?  I'm sure that the trustee can go out and

17   hire the finest French counsel --

18           MR. COOPERMAN:  What it has to do, Your Honor --

19           THE COURT:  -- if he had to.

20           MR. COOPERMAN:  -- because ordinarily in a forum

21   non conveniens situation, the Plaintiff's choice of forum is

22   given deference.  My point here is that the trustee, the

23   Plaintiff here, has made applications to this Court to say

24   that, in essence, to say I've got great New York counsel and

25   I've got great French counsel and I am going to -- when I

1    have situations when Defendants are in France, I'm going to

2    use my great French counsel.

3            So my point about saying this, Your Honor, is to

4    the extent the trustee is going to argue, and has argued in

5    its papers, that their choice of a New York forum be given

6    deference, it should be in this situation.  That's my point,

7    Your Honor.

8            If I can continue, the public and private factors

9    strongly weigh in favor of my client, and let me give you

10   two concrete reasons.  First of all, Your Honor, let's talk

11   about witnesses.  When we go to the merits of this case --

12           THE COURT:  What are the merits of this case?

13   This is a strict liability case.  It's a fictitious profits

14   case, isn't it?

15           MR. COOPERMAN:  Well, it's not, Your Honor.

16           THE COURT:  What are the defenses to a fictitious

17   profits case?

18           MR. COOPERMAN:  It depends on when value was given

19   to the account.  If you --

20           THE COURT:  But no value was given beyond the

21   principal.  That's said of law, and maybe there's a time

22   value of money attributable to it and that is an argument.

23   I understand that's in the circuit.

24           MR. COOPERMAN:  Okay.  When the trustee -- if you

25   read the amended complaint, the trustee would say the value

1    of this account goes back to the 1970s when Albert Igoin put

2    in whatever money he did.

3              THE COURT:  But that's for the purposes of

4    determining the net investment method.  That's all resolved.

5              All that the trustee can recover, as the law

6    presently stands, is up to the transfers made within two

7    years of the filing date.

8              MR. COOPERMAN:  Right.  But there's a value

9    component in there too, what value was given to -- what the

10   value was given, and my point is, Your Honor, if you measure

11   the value from 1970 versus if you measure the value from

12   when Emilie Apfelbaum, who inherited money, put in 1995, you

13   come up with a very different net winner versus net loser

14   equation.

15             THE COURT:  I don't understand that.  The trustee

16   had seen the calculations.  You haven't told me that you

17   have evidence that shows different calculations of the cash

18   in and cash out of the account, so I'm not understanding how

19   you come up with a different number.

20             MR. COOPERMAN:  Well, we haven't gotten to that

21   point yet, Your Honor.  So I see what's in the complaint.

22             THE COURT:  The question -- the reason -- well, a

23   lot of stuff has happened in terms of the law since even the

24   amended complaint.

25             MR. COOPERMAN:  Oh, sure.

1            THE COURT:  But, you know, I hear things about

2     witnesses in France, but to me this is a relatively

3     straightforward case because the trustee is not alleging,

4     for example, that your clients knew that BLMIS was a Ponzi

5     scheme which would open them up or subject them to liability

6     for the principal, as well as the net profits.

7            And in terms of what net profits are and how

8     they're calculated, that's been resolved by the Second

9     Circuit.

10           MR. COOPERMAN:  Well, it has been resolved by the

11    Second Circuit, Your Honor, and I don't have a formula right

12    here in my outline, so I don't want to --

13           THE COURT:  It's cash in and cash out over the

14    life of the account.

15           MR. COOPERMAN:  Yeah, but it's also -- yes, Your

16    Honor --

17           THE COURT:  Or at least that's what some other

18    circuits have said.  The circuit -- more circuits didn't

19    quite say that.

20           MR. COOPERMAN:  Right.  But there's also a

21    component of how much value you gave to the account in the

22    first place.

23           THE COURT:  But beyond the cash in, what's the

24    value?

25           MR. COOPERMAN:  It depends on when the cash -- it

1    depends on when the cash was put in when you measure it

2    from.

3              THE COURT:  Not under the net investment method,

4    though, that's what I'm saying.

5              MR. COOPERMAN:  But the document you're flipping

6    through, Your Honor, brings us back to the 1970s.

7              THE COURT:  That's right.

8              MR. COOPERMAN:  My point is that's erroneous and

9    that's what we want to show.  That's a different account.

10   The account that Your Honor -- I can't tell what page you're

11   on, of course, but --

12             THE COURT:  Well, I will say that the account with

13   most of the transactions which goes back to 1988 doesn't

14   show any transfers within two years, so chances are, unless

15   the law changes, the trustee is not going to be able to

16   recover anything in connection with that account.

17             MR. COOPERMAN:  I'm not trying to recover anything

18   in this position.

19             THE COURT:  The trustee is.

20             MR. COOPERMAN:  I'm sorry.  I thought you said me.

21   I'm sorry.

22             THE COURT:  No, the trustee can only go back --

23             MR. COOPERMAN:  I am sorry.  I misheard you.

24             THE COURT:  -- recover in an amount up to what was

25   transferred out in the last -- in the two years before the

Page 40

```
 1    filing date, although he computed net profits or net losses,

 2    the trustee can go all the way back to the origin of the

 3    account or at least until a Ponzi scheme began.

 4              MR. COOPERMAN:  Right.  But the document you have

 5    before you is a conglomeration of several accounts.  The

 6    accounts at issue, my client, as I said when I first started

 7    talking, my client's account started in 1995, okay?

 8              THE COURT:  Okay.

 9              MR. COOPERMAN:  And the accounts that you have

10    flipping through -- I don't have that right in front of me,

11    but you just said 1988, for example.

12              THE COURT:  Yeah, but the trustee -- I hear you,

13    but the trustee hasn't -- the trustee has given me

14    information regarding four separate accounts.  The first

15    account, which is the one that goes back to 1988 has no

16    transfers within the last -- within the two years before the

17    filing date.  So unless the law changes, that account is

18    essentially irrelevant.

19              MR. COOPERMAN:  But the trustee's view is that

20    every single penny that my client had were from day one,

21    fictitious money that wasn't there.  My point is different,

22    which is that we -- my clients inherited in 1995.

23              THE COURT:  All right.  But I guess there was an

24    interaccount transfer which is a separate issue that is

25    being litigated.
```

1           MR. COOPERMAN:  Okay, Your Honor, but we don't

2    even think it's an interaccount transfer; it's a separate

3    account.  It may have been an interaccount transfer based on

4    whatever bookkeeping Mr. Madoff did, but it's very different

5    from our account.  What we would like the chance to prove,

6    Your Honor, is the facts that happened in France, very

7    relevant to our case.  The fact that --

8           THE COURT:  But whether or not -- isn't it really

9    depend on what the books and records of BLMIS show?

10          MR. COOPERMAN:  I don't think so, Your Honor, and

11   let me explain why.  It's one thing if, you know, I had a

12   relative who passed away and the same account, I just

13   assumed that account.  You had a whole different situation

14   here in 1995 based on the French law, based on the fact that

15   unless there were negotiations -- unless basically Madoff

16   satisfied what the French judge was requiring for the Emilie

17   Apfelbaum account, and, Ms. Apfelbaum testified and it's

18   perfectly logical, they would have taken the money and gone

19   elsewhere.

20          I think this is a very unique situation.  It's

21   much different than somebody who just inherited it.  My

22   point --

23          THE COURT:  I don't mean to be glib, but your

24   clients were defrauded by Madoff like everybody else.

25          MR. COOPERMAN:  They were, Your Honor.

Page 42

1            THE COURT:  I understand that.

2            MR. COOPERMAN:  But in the way it's calculated can

3    make a difference based upon the value that they gave to

4    these accounts in 1995.

5            And my point is that the trustee is going to

6    put -- what they would like to do, Your Honor, I think --

7    and we haven't really addressed the merits here yet because

8    this is only in jurisdiction -- but I can imagine the

9    trustee would spend about, you know, 20 minutes of an

10   evidentiary presentation and say strict liability, that's

11   it.

12           THE COURT:  Right.

13           MR. COOPERMAN:  Whereas we envision a much

14   different situation showing sort of our unique situation and

15   the choices that our clients had.

16           THE COURT:  Well, you mentioned Emilie's

17   account --

18           MR. COOPERMAN:  Yes, Your Honor?

19           THE COURT:  -- and it shows that on May 1st, 1995,

20   a transfer of $33,150,157 occurred presumably from some

21   other account.  Are you saying that that number is not

22   correct?

23           MR. COOPERMAN:  I am not saying one way or the

24   other.  I haven't done the math.

25           THE COURT:  Well, you're making a forum non

Page 43

1    conveniens argument based upon the availability of witnesses

2    and what I'm getting at is whether you have any other

3    evidence in France or anywhere else which is going to

4    undercut that assertion?

5              MR. COOPERMAN:  I think the -- well, the evidence

6    in France, which I would like to show, is that Emilie

7    Apfelbaum at the time basically could have taken her money

8    elsewhere, and had she done that, had she done that for a

9    year -- had -- just hypothetically, for example, Your Honor,

10   if the French guardianship judge said take all that BLMIS

11   money and put it in French Treasury bonds for four years and

12   then -- and she did that, and then at the end of the four-

13   year period, again, just hypothetically, she took that money

14   and she put it into BLMIS, I think we would all be saying,

15   well, that's when the value of her account should --

16             THE COURT:  That's not what happened.

17             MR. COOPERMAN:  I'm sorry?

18             THE COURT:  That's not what happened.

19             MR. COOPERMAN:  I know it's not happened, but what

20   we're trying to say is that it's a roughly analogous

21   situation.  We would like the chance to show in France that

22   what happened, this wasn't some bookkeeping quick entry

23   where Emilie inherited.  There was a very conscious decision

24   going on, a to-ing and fro-ing, so to speak, Your Honor,

25   with the judge about the -- about how to act.

1          THE COURT:  But how does that affect the

2    computation of the net profits?

3          MR. COOPERMAN:  Well, as --

4          THE COURT:  For whatever reason, and I will accept

5    your reason, that BLMIS and withdrawals were made, which

6    based upon the calculations of the trustee under the net

7    investment method resulted in the receipt of net profits,

8    how does the reason why you left the money in the account

9    affect that analysis?

10         MR. COOPERMAN:  Because --

11         THE COURT:  And I'm not even sure the trustee

12   disagrees with you or disputes that that's why the money was

13   left in the account.

14         MR. COOPERMAN:  Well, we haven't gotten to this

15   merits point in very much detail, Your Honor, but I think

16   the way it does is because there is a component of value,

17   you know, just hypothetically, Your Honor, if a BLMIS

18   investor originally put in a hundred million dollars and

19   took out ten million dollars, you know, that would be

20   different if he put in a hundred million dollars and took

21   out two hundred million dollars.

22         And so the value here, it's the say way, that to

23   us, what's very important is that this is a very unusual

24   French situation where French law was implicated based on

25   what the (indiscernible - 10:55:46) was doing at the time

Page 45

```
1    and his allowing the money to -- and the judge allowing the

2    money to be with --

3              THE COURT:  Just, if you can tell me how French

4    law affects what -- the amount of money that went in and the

5    amount of money that came out.

6              MR. COOPERMAN:  So, I think, Your Honor, that the

7    French -- what -- my point is more.  It goes to the

8    conscious decisions of my client at the time as to whether

9    to continue to invest with Madoff or not.

10             THE COURT:  That's true in every one of these

11   cases.

12             The argument I thought you were going to make,

13   which is made in a lot of these cases, is had they pulled

14   the money out in 1995, there would be no fraudulent

15   conveyance.

16             MR. COOPERMAN:  Well, that's true, too, Your

17   Honor.

18             THE COURT:  That's argued in every case I have.

19             MR. COOPERMAN:  Okay.  Well, I guess not

20   successfully, so I have --

21             THE COURT:  But that's not happened.  That's not

22   what happened.  I have to deal with what happened.

23             MR. COOPERMAN:  I understand.  I understand.

24             I think we have not gotten to merits discovery at

25   all here.  We are just talking about personal jurisdiction
```

1    and that's the avenue that I would like to go down, and I

2    don't think -- and, Your Honor, for me to have any defense

3    in this case that would require French witnesses, I'm not

4    going to get their testimony and the reason is, is because

5    the French blocking statute, which has been briefed in this

6    case, the trustee points out that the French blocking

7    statute will not necessarily prevent my client from

8    testifying, and Your Honor could -- but there are some cases

9    potentially where Your Honor could order Laurence Apfelbaum

10   to testify, despite that.

11          But the fact is that for any non-party witness who

12   all in France, they will be affected by that.

13          THE COURT:  I thought I saw -- and may be it

14   wasn't in France -- a lawyer who was deposed.  Was that in

15   Switzerland or in France?

16          MR. COOPERMAN:  That was in a magnify case, Your

17   Honor, and it was actually a Swiss attorney who was deposed

18   in the UK, and so it's not in our case.  That's in the

19   magnify case, Your Honor.

20          So the other reason, Your Honor, about this is two

21   other reasons, Your Honor, about forum non conveniens.  One

22   is hardship, and I hope nobody minimizes the hardship here.

23   We are talking about a French -- this is a French person who

24   doesn't come to the U.S.  She speaks English.  I will give

25   you that.  She's not comfortable conversing in the situation

1    like we're having today.

2            THE COURT:  Well, she can testify through an

3    interpreter as she did in her deposition.

4            MR. COOPERMAN:  She has lost her money.  I

5    guarantee you, Your Honor, that whatever the fee

6    applications we've put in, in this case, the trustee, I'm

7    charging a fraction of that amount.  This is a huge

8    imposition.  Her means of livelihood now -- she's a

9    psychologist, having to come here, she would have to give

10   that up.  Her husband is an elderly person; he's 20 years

11   older.  She would have to care for him.  Her daughter is an

12   art gallery worker.

13           THE COURT:  Let me ask you a question.  I see you

14   videotaped her deposition once, couldn't we have a

15   videoconference trial or just videotape her deposition and

16   use it as if she's an unavailable witness?  She doesn't

17   really have to come in on the merits.

18           MR. COOPERMAN:  You know, in theory, Your Honor,

19   but I look at it a little differently, and the way I look at

20   it is you're talking about a person who, the day before

21   bankruptcy, thought they had a lot of money.  Now they're

22   being sued for a lot of money.

23           THE COURT:  Unfortunately true of many people.

24           MR. COOPERMAN:  Understood.  I'm not minimizing

25   any other person, but my point about this is, is that what

Page 48

1    the trustee -- if the trustee's case is successful, this

2    will be something that will haunt both my clients for the

3    rest of their lives.  They deserve -- I'm all for videotape

4    depositions.  I'm for calls with Courts.

5            But when you're talking about the substance, when

6    you're talking about something of value to a person's

7    livelihood, I think it's only fair that the person does it

8    the traditional way.  So I think that Your Honor, that

9    certainly, can you do it?  Yes, of course, we can do it.

10           Is it fair and appropriate in this situation to do

11   it?  I don't think so.

12           THE COURT:  Well, I mentioned it because you

13   raised -- and I appreciate the argument -- the cost of

14   having to come to the United States, and it just seems to me

15   that there are ways to avoid that costs with videoconference

16   trials, video depositions, and you use that as her

17   testimony.

18           MR. COOPERMAN:  But you give up something, Your

19   Honor.  You give up -- you give up the fact that -- I've had

20   many trials, Your Honor, I'm sure you've had them before you

21   here where the witness tugs on your sleeve and tells you

22   something that you hadn't thought of.  I lose that in that

23   situation, just as an example, Your Honor.

24           The bigger reason, Your Honor, and I think going

25   along with the hardship is this case is not going to be over

Page 49

1    in New York.  This case would have to go to France

2    afterwards and the reason is, of course, that my clients

3    have no assets here, none whatsoever.  So basically, if we

4    have a case here in New York and if the trustee is

5    successful, Your Honor is basically sanctioning two cases,

6    one here and another in France.

7              THE COURT:  But that's true every time you have

8    foreign assets.

9              MR. COOPERMAN:  Yes, Your Honor, but -- and

10   there's a big but here -- and the but is that the trustee,

11   when the trustee applied to have UGCC as its French counsel,

12   it gave the exact reason to avoid that.  So the exact reason

13   was given to this Court that the trustee is going to hire

14   eminent counsel to deal with French Defendants.  Frankly,

15   Your Honor, when you look at the equities and public

16   interest factors, I think that it's not only fair for my

17   client, I think a French Court will have whether it's on the

18   merits or whether it's having forcing a judgment that may

19   come out of this court, a French court is going to have

20   great interest in protecting French citizens.  Mr. Quint put

21   in his declaration several pieces of French law where what

22   Madoff did, in fact, of coming to France and soliciting

23   business is contrary to French law, these issues are going

24   to be adjudicated in France, no matter what.

25              So, to me, the question is not only is it more

1    fair for my client to be in France where she signed the

2    French contracts, and for all of the reasons that I just

3    said, but it's fair, frankly, for the trustee.  The point

4    about --

5              THE COURT:  The trustee may disagree with you on

6    that.

7              MR. COOPERMAN:  Well, I suspect their New York

8    counsel will, but the fact is that the trustee is -- the

9    interests of the trustee is to gather assets of the estate.

10   It doesn't really make a difference whether those assets

11   were gathered --

12             THE COURT:  Would a French court apply U.S.

13   Bankruptcy fraudulent transfer law?

14             MR. COOPERMAN:  I'm not an expert in French law.

15   I'm not an expert, Your Honor.

16             THE COURT:  Maybe that's why the trustee selected

17   the New York forum.     THE COURT:  Maybe that's why the

18   trustee selected the New York forum.

19             MR. COOPERMAN:  Could be, Your Honor, I don't know

20   one way or the other, I think it's just easier because they

21   sued an awful lot of people here.  But the fact is, is that

22   there are avenues in France, and whether -- you know, if --

23   and I'm no expert in French law, but I assume that if

24   whatever -- if whatever New York bankruptcy law is, is

25   contrary to French law, whether this be France, England,

1    Germany, what have you, that would be a consideration into

2    whether to enforce a judgment or not, just as it is here in

3    the United States.

4           So, you know, I think the point is -- what I'm

5    trying to say is that the trustee made a conscience decision

6    to apply to this Court and say I'm going to have eminent

7    counsel in both ways, and the eminent counsel they said was

8    for exactly this situation, Your Honor.  If I could just say

9    it one more time because I think it's important.  Their

10   application says that they're going to use French -- they

11   may use -- not going to -- but may use French counsel when

12   French law is implicated or when defendants are located in

13   France.

14          So based on all of those, Your Honor, the reasons

15   and other reasons I've said, we respectfully ask that the

16   case be transferred, and I'd respectfully ask again the

17   opportunity to put in an affidavit from -- a declaration

18   from Mr. Quinn about the statute of limitations --

19          THE COURT:  Is that really necessary?  Because

20   you're telling me that if I agreed with you I could still

21   grant the motion on the condition that the defendants waived

22   the statute of limitations defense, put this case in

23   suspense, and if they don't just keep it open so there's no

24   statute of limitations problem.

25          MR. COOPERMAN:  We can certainly do that.  I just

1    wanted Your Honor to have the comfort of knowing that that's

2    what French law was.

3              THE COURT:  Okay.

4              MR. COOPERMAN:  Thank you, Your Honor.

5              MS. COLE:  Good morning, Your Honor.

6              THE COURT:  Good morning.

7              MS. COLE:  Tracy Cole for the trustee.

8              THE COURT:  Go ahead.

9              MS. COLE:  I just wanted to respond a little bit

10    to some of the things that Mr. Cooperman was discussing.

11              As Your Honor recognizes this is a fraudulent

12    transfer case, there -- currently as the law stands right

13    now we are only suing for the two-year fraudulent transfer

14    of fictitious profit, there's no allegation of bad faith,

15    it's a strict liability case, the evidence and the witnesses

16    are all in New York.

17              I don't believe that the crucial facts are in

18    dispute here.  They -- they acknowledge that they've

19    received -- the two-year number is $25 million.

20              THE COURT:  Well let's talk about the contacts

21    that these defendants have with the United States.

22              MS. COLE:  Sure.

23              THE COURT:  Go ahead.

24              MS. COLE:  The contacts include that they have --

25    they've received the $25 million within the last two years

1    of the transfers, they directed -- they know -- well let's

2    go back.

3              THE COURT:  But they received it in France.

4              MS. COLE:  They did receive it in France, but the

5    transfers came from New York, and they knowingly invested in

6    New York.

7              So when -- when Albert Igoin died in 1995 they had

8    Bernie Madoff as is uncontested come out for the purpose of

9    allowing them to maintain these accounts in New York.  And

10   the account agreements that they executed, it's important

11   because that's come up a lot, the account agreements that

12   they executed don't specify any choice of law whatsoever,

13   but what they do specify is that the client wishes to make

14   certain securities investments through Madoff, who's located

15   in New York, that Madoff was to make these, they've

16   requested specific insurances and conditions that he's

17   willing to give, that Madoff will invest these funds and

18   securities listed on the United States stock market, and to

19   invest the returns therefrom in the clients' behalf, and

20   that he will be prepared -- he will be paid a commission

21   based on UST bills and a share of those and in accordance

22   with the U.S. registered broker/dealer law.

23              So the agreement contemplates that this will be

24   investment of a brokerage account in New York, that they

25   will be putting money in, directing investments into it, and

Page 54

1    that they will be receiving transfers from it, and that

2    firmly establishes in itself personal jurisdiction under law

3    of this case and CPLR, and I don't think any of that is in

4    dispute.

5            The case law that Mr. Cooperman was discussing, he

6    talked a lot about just maintaining an account and passive

7    receipt of income.  That's not what this case is about.

8            He cited one case, the Societe Generale case was a

9    correspondence bank account case which even under New York

10   law apparently having a correspondent bank account does

11   appear to subject you to jurisdiction, but that's not what

12   we're dealing with here, we're dealing with a brokerage

13   account where they're actively seeking to invest in the

14   United States, actively seeking to benefit from that

15   investment, make profit from that investment, and are in

16   fact receiving the profits from that investment.

17           The Divinsky case that he talked about where he

18   talked about the passive receipt of funds, that was under

19   the tortious activity prong of the CPLR, that wasn't a case

20   like this is where we're talking about transacting business

21   in the State of New York, and that's what was happening

22   here.

23           There's no case law that I'm aware of that

24   suggests that purposefully investing in a brokerage account

25   in New York and taking the money out of that brokerage

Page 55

1    account over a period of years doesn't subject you to the

2    personal jurisdiction of this Court.  And I don't believe

3    any of those facts are in dispute.  I don't think there's

4    any need for an evidentiary hearing.

5            For example, I think one of the things

6    Mr. Cooperman talked about was well, there are only a few

7    documents so the trustee is incorrect when he says that --

8    when he characterizes Ms. Apfelbaum's activity in her

9    account.  But I think what he's objecting to is our

10   characterization.  I don't think it's disputed, she

11   testified that she communicated with Mr. (indiscernible -

12   01:00:52) at least twice a year to make sure that he was on

13   top of the accounts.  She was directing withdrawals of the

14   accounts from the accounts.  And she was making sure that

15   they complied with the rules that she thought were necessary

16   to maximize her advantage and minimize her tax consequences.

17           So I think he thinks that that characterization --

18   he doesn't like our characterization, he thinks the fact

19   that it had to do with tax consequences in France should

20   matter, but those are a legal argument.  The facts I don't

21   believe are in dispute.

22           I want to be clear, something -- he said something

23   was not contested.  Anything about their tax liabilities or

24   what they used the money for we cannot attest because we

25   have not seen their financial records or their tax returns.

1    They have withheld those based on the French blocking

2    statute.  We do intend to litigate that when we get to the

3    merits of this case, but that has nothing to do with

4    personal jurisdiction right now.  I just wanted to be clear

5    when he says it's unrebutted or undisputed we don't have

6    evidence on it.

7             I think he made a reference to French treasury

8    bills.  I just want to be clear the bills in this case were

9    all U.S. treasury bills.

10            THE COURT:  I thought that the French court

11   required that 50 percent of Emilie's account be invested

12   into French treasury bills?

13            MS. COLE:  Those were taken out of Madoff.

14            THE COURT:  There was nothing was there?  There

15   were no actual investments were there?

16            MS. COLE:  That money was taken out of Madoff and

17   that's not the subject of this lawsuit.

18            THE COURT:  Okay.  Okay.

19            MS. COLE:  So the half that remained in Madoff is

20   the subject of (indiscernible - 01:02:21).

21            Right.  Similar with the trading strategies.  I

22   don't think that there is a dispute that, you know, how

23   sophisticated she was about trading strategy --

24            THE COURT:  Well but you see there is and that's

25   because you make the statement that they were ordered.  I

1    guess you made the statement that they were sophisticated

2    investors, and that's when I say it's not clear to me

3    whether there's a dispute regarding the basic facts that she

4    wrote three faxes or that she requested withdrawals on some

5    basis or any of the other stuff you have in your

6    supplemental memorandum.

7             MS. COLE:  Not in the supplemental memorandum.  I

8    think the supplemental memorandum is based on the discovery

9    that we took.  We -- the statement she was a sophisticated

10   investor, we definitely have the facts showing that she's

11   trying to figure out the strategy of the account.

12            THE COURT:  But that's a conclusion.

13            MS. COLE:  But that conclusion, right, you can

14   disagree with the conclusion, but I think the facts

15   underlying our conclusions are not in dispute.

16            The forum non-convenience argument I think Your

17   Honor understands.  This is a -- this is a fraudulent

18   transfer case, this has nothing to do with anything going on

19   in France.  The agreement doesn't transform this into some

20   kind of French case.

21            For the record our hiring of a French counsel was

22   not a concession that we intend to go to a foreign

23   jurisdiction every time that one of our defendants is in a

24   foreign jurisdiction, if there's an avoidance action it

25   belongs here and we intend to litigate it here and we have a

1    right to do that.  Our choice of forum.  There's been no

2    suggestion that there was an improper impropriety in our

3    choice of forum.

4              These are all inter-account transfers.  I believe

5    the argument that Mr. Cooperman was trying to make is the

6    argument that was rejected in the antecedent debt decision.

7    A defendant named Hinti (ph) made a similar argument that

8    his -- he had entered into a divorce settlement with his

9    wife, that but for Madoff's representations he would have

10   withdrawn the money from BLMIS and would have taken that

11   divorce settlement somewhere else, but because Madoff

12   persuaded him to keep the money in BLMIS it was funded as an

13   inter-account transfer and that that should be something

14   different and treated differently, and that was rejected in

15   (indiscernible - 01:04:39) antecedent debts decision.

16             THE COURT:  I don't know what the argument is.

17             MS. COLE:  But I don't believe that it requires a

18   separate -- a separate case.

19             Unless you have further questions about the

20   record.

21             THE COURT:  No.

22             MS. COLE:  Okay.

23             THE COURT:  I'll give you the last shot,

24   Mr. Cooperman, not that there's much to respond to.

25             MR. COOPERMAN:  No, there's not.  Actually, Your

1   Honor, I -- one question I thought Your Honor was going to

2   ask Ms. Cole was on UGC are they litigating any cases in

3   France?

4            THE COURT:  But how is that relevant?

5            MR. COOPERMAN:  Because she just said that we, the

6   trustee, wants to litigate everything here in the United

7   States, so I don't know the answer to that, I can't tell

8   from the fee application --

9            THE COURT:  Well but how is it relevant?

10           MR. COOPERMAN:  Because I think it undercuts the

11  trustee's current argument that everything should be in the

12  United States, forum non-convenience is a discretionary

13  situation where the judge can have discretion, and if the

14  French trustee has -- I mean, I'm sorry -- if the French

15  counsel is litigation cases there and the trustee has hired

16  the -- you know, French counsel and the application for that

17  very purpose I think it is relevant to say it can be done.

18           THE COURT:  Well obviously -- obviously the

19  trustee has hired French counsel.

20           MR. COOPERMAN:  Obviously.

21           THE COURT:  Obviously the trustee is not

22  litigating this case there.

23           MR. COOPERMAN:  I understand.

24           THE COURT:  And I guess what you're saying is it's

25  equally convenient for the trustee to litigate there as

Page 60

1    here.

2              MR. COOPERMAN:  That's correct.

3              THE COURT:  Whereas the same is not true of your

4    clients.

5              MR. COOPERMAN:  That's correct, Your Honor.

6              THE COURT:  I understand.

7              MR. COOPERMAN:  I'm violating every -- yeah, I'm

8    -- that's it.

9              The only other thing I'd want to say, Your Honor,

10   is the Divinsky case, it's under a different prong of CPLR

11   302(a); however, it still requires the same arising under as

12   we said as in any of the other cases.  It's a very on point

13   case.

14             THE COURT:  But my recollection of the tort

15   provision in the CPLR is it had to have foreseeable

16   consequences in the state that's applicable to the CPLR

17   provision a long time, but that's my --

18             MR. COOPERMAN:  They are different --

19             THE COURT:  -- but there is a distinction or

20   difference between the tort long arm jurisdiction and the --

21             MR. COOPERMAN:  I think it's a slight --

22             THE COURT:  -- general long arm jurisdiction.

23             MR. COOPERMAN:  I think it's a slight distinction

24   because the practical -- the practical effect is in both

25   situations unlike general jurisdiction you're looking at the

Page 61

1    event in New York and does the claim arise out of that event

2    in New York?  The tort is saying it differently, but that's

3    really what it comes down to.

4              THE COURT:  Okay.

5              MR. COOPERMAN:  And the last thing I would say,

6    Your Honor, is again, Your Honor looks like you're very

7    thoughtful about this.  I would simply ask that to the

8    extent you think there's any dispute on the facts that to

9    please carefully look at the record evidence, because I do

10   not believe it supports a lot of what Ms. Cole said about

11   our act of involvement and what we did.

12             THE COURT:  All right.  Let me try this with the

13   facts to avoid the possible need to bring your clients in,

14   although this is not a motion for summary judgment, I'm

15   going to adopt that procedure.

16             I'm going to ask the trustee to submit a statement

17   of what he considers to the material jurisdictional facts.

18   Avoid the adverbs, avoid the adjectives, avoid the

19   conclusory statements, with a citation to some evidence that

20   I already have.  I'll give you a chance then, Mr. Cooperman,

21   to either say, yeah, I admit that that's what the fact is,

22   add additional facts or deny, but explain if you're going to

23   deny a citation to authority.

24             MR. COOPERMAN:  Sure.

25             THE COURT:  If I can resolve it that way and I

1    don't need to have a further evidentiary hearing that's

2    fine, but if there are disputes regarding material issues of

3    fact then we'll have to talk about a practical way to -- you

4    know, to deal -- to resolve that issue.

5              MR. COOPERMAN:  It seems very fair to me, Your

6    Honor.

7              THE COURT:  All right.

8              MR. COOPERMAN:  When would you like the

9    submissions?

10             THE COURT:  That's what I'm going to ask.  When

11   can you submit -- all I want is a statement, each separately

12   numbered paragraphs, short statement with the citations of

13   authority of the undisputed material facts regarding

14   personal jurisdiction?

15             MS. COLE:  Just vacation schedules.

16             THE COURT:  Okay.

17             MS. COLE:  Just one second.  Sorry.

18             THE COURT:  This case has been going on for years.

19   I appreciate the fact that it's August.

20             MS. COLE:  Two weeks just because of vacation

21   schedules would be helpful.

22             THE COURT:  All right.  Let's say two weeks from

23   today is the 20th.  And when can you submit your response?

24             MR. COOPERMAN:  May I just turn this on to look at

25   my calendar a second?

Page 63

1            THE COURT:  Sure.

2            MR. COOPERMAN:  I'm happy to report, Your Honor,

3    that the brains behind the operations, Ms. Clarkdale (ph),

4    is getting married in September.

5            THE COURT:  Congratulations.

6            MS. CLARKDALE:  Thank you.

7            MR. COOPERMAN:  So I want to make sure --

8            THE COURT:  So it'll before that.

9            MS. CLARKDALE:  Before then, yeah.

10           MS. COOPERMAN:  I don't think she wants to do this

11   on her honeymoon.  How about by September 5th, Your Honor?

12           THE COURT:  That's fine.

13           MR. COOPERMAN:  Okay.  Yeah, that's perfect.

14           THE COURT:  Okay.  And then I'll deem the matter

15   submitted.

16           MR. COOPERMAN:  Thank you, Your Honor.

17           THE COURT:  Thank you.

18           MS. CLARKDALE:  Thank you, Your Honor.

19           THE COURT:  Unless I need a further conference

20   regarding the facts.

21           Thank you very much.

22           MR. COOPERMAN:  Thank you, Your Honor.

23        (Recess at 11:16 AM)

24           THE COURT:  Hello?

25           MR. ELLIS:  Hello?

1              THE COURT:  Is this Mr. Ellis?

2              MR. ELLIS:  Yes, it is.

3              THE COURT:  Okay.  I'm sorry.  You got behind a

4     long matter.  I called your matter first.

5              This is Judge Bernstein and I have a

6     representative of the Trustee here, Mr. Cremona.

7              I scheduled this hearing because I received your

8     letter and your letter raised an issue about the Trustee's

9     disallowance of the claim and you seem to be confused

10    between the fund that the trustee is beginning to administer

11    and the fund that the Department of Justice or Richard

12    Breeden, which is a victim's fund, is going to be

13    administered.

14             So tell me about -- tell me about your claim.

15             MR. ELLIS:  Well, I don't know much about it.  I

16    had -- earlier this year I was receiving some kind of

17    threats, what I took to be threats and I hired an attorney

18    and I went through what was going on with him and he

19    suggested that I contact your court or at least the trustee

20    and try to explain to the Court what was going on.  In other

21    words, after I had also received that Bernard Madoff Victim

22    Fund notice and so forth.  And so it left me totally

23    confused as to if they were connected because I had sent the

24    same information in originally on the original claim back in

25    2008 or '09 as sent to the Madoff Victim Fund claim and it

Page 65

1    left me totally confused and, of course, at my age, it

2    doesn't take much for that anymore.

3            But anyway, the confusion was on my end.  I'm sure

4    I just didn't understand how the connections, if there were

5    any connections at all, how that worked.

6            THE COURT:  Okay.  Do you understand that there's

7    a separate victim's fund that has nothing to do with this

8    case, except that it obviously is designed to compensate

9    victims of Madoff's fraud?

10           MR. ELLIS:  I understand it now, I believe.  Yes,

11   sir.

12           THE COURT:  And the trustee, as I understand it,

13   disallowed your claim because there was no evidence that

14   the, I think it's the Lawrence Ellis Trust ever had an

15   account with Madoff.

16           Do you recall ever having an account with Madoff?

17           MR. ELLIS:  I don't claim to have an account with

18   Madoff, no, sir.  That's not what I was claiming.

19           THE COURT:  Okay.  But you claim that you were a

20   victim of Madoff's fraud?

21           MR. ELLIS:  Yes, I am a victim of Madoff's fraud.

22           THE COURT:  And how so?

23           MR. ELLIS:  Well, it seems that my bank at the

24   time that held my assets in trust used those assets to

25   eventually get them into the hands of Madoff.

1          THE COURT:  Okay.  So you invested in a trust or

2     had an interest in the trust and the trust invested?

3          MR. ELLIS:  Well, no.  It was me as an individual.

4     The trust was actually performing along with another

5     organization as the transfer agents of those assets from one

6     position with Bank of America in California to a bank, a

7     National Bank in Mississippi.

8          THE COURT:  Did you -- Mr. Ellis, did you ever

9     receive a monthly statement from Bernard Madoff?

10          MR. ELLIS:  Not to my recollection.  I don't

11     recall that.

12          THE COURT:  Okay.  It sounds to me like the

13     Trustee properly denied your claim as to the fund that he's

14     administering because you didn't have an account with

15     Bernard L. Madoff Investment Securities, but you may have

16     claims to the victim fund that's being administered by

17     Mr. Breeden, and I think his address was in the letter that

18     the Trustee sent to you.

19          MR. ELLIS:  Yes, we have been in touch with them,

20     but like I said, I was so confused.

21          THE COURT:  Yeah.  Well, it's confusing.

22          MR. ELLIS:  But I was confused about how it would

23     work.

24          THE COURT:  Okay.  Do you understand it now, that

25     you should be communicating with Mr. Breeden about your

Page 67

1    victim fund claim?

2              MR. ELLIS:  Yes, sir.  I think the Trustee sent me

3    a letter and explained the difference between the two parts

4    and that was sufficient and I took that at word, as was

5    written.

6              THE COURT:  Okay.  I just wanted to make sure that

7    you understood.  I'm not going to do anything further in

8    this matter and I suspect that the Trustee isn't and you

9    should pursue whatever claims you have with the victim's

10   fund.

11             MR. ELLIS:  Okay.  Well, I'm very grateful to you.

12   I didn't mean to do anything other than just find out how I

13   was involved.

14             THE COURT:  Okay.  All right.  Thank you very

15   much.

16             MR. ELLIS:  Okay.  Thank you.

17             Bye, bye.

18             THE COURT:  Okay.  I'm just going to mark that

19   off.  He seems to understand now.

20             MR. CREMONA:  Understood.

21             Thank you, Your Honor.

22             THE COURT:  All right.  Sorry you had to sit here

23   all morning.  Thank you very much.

24             MR. CREMONA:  It was quite interesting.

25             THE COURT:  I wonder if I could just

1    (indiscernible - 11:25:33).  There's that.

2        (Whereupon these proceedings were concluded at

3    11:25 AM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 69

1                    C E R T I F I C A T I O N

2

3    We, Dawn South and William J. Garling, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o, ou,
                   email=digital1@veritext.com, c=US
                   Date: 2014.08.13 10:27:33 -04'00'

     _____

8    Dawn South

     AAERT Certified Electronic Transcriber CET**D-408

9

10

11   William    Digitally signed by William Garling
                DN: cn=William Garling, o, ou,
                email=digital1@veritext.com,
12   Garling    c=US
                Date: 2014.08.13 10:27:54 -04'00'

13

     Veritext

14

     330 Old Country Road

15

     Suite 300

16

     Mineola, NY 11501

17

18

     Date:  August 7, 2014

19

20

21

22

23

24

25