**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

| | |
|---|---|
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | Adv. Pro. No. 10-04749 (SMB) |

| |
|---|
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, |
| Plaintiff, |
| v. |
| PHILIP F. PALMEDO, |
| Defendant. |

**TRUSTEE'S RESPONSES AND OBJECTIONS TO DEFENDANT'S**
**COUNTERSTATEMENT OF MATERIAL FACTS**

Plaintiff Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated chapter 7 estate

of Bernard L. Madoff, respectfully submits, pursuant to Local Rule 56.1, his responses and

objections to the Counterstatement of Material Facts Submitted by Philip F. Palmedo (the

"Defendant"), in Opposition to the Trustee's Motion for Summary Judgment and in Support of

Defendant's Cross-Motion, ECF No. 112.

## Madoff's Business

1.      From the 1960s on, Madoff operated two separate business units through his sole

proprietorship called Bernard L. Madoff Investment Securities ("BLMIS"). Madoff operated a

legitimate trading business which, at times, executed trades equal to 10% of the daily volume on

the New York Stock Exchange (the "Legitimate Trading Business"). The Legitimate Trading

Business included both proprietary trading ("PT"), which traded securities for its own account,

and market-making ("MM"), which created a market in certain securities and acted as a broker-

dealer for all of the major investment firms. Declaration of Helen Davis Chaitman, executed on

October 2, 2020 ("Chaitman"), **Ex. A** [Nelson Tr.[1] 5/8/19 at 63:6:11; 63:14-1], and an investment

advisory business ("IA"). Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 63:3-4].

**RESPONSE:**  Not disputed that beginning in 1960 and until January 1, 2001, BLMIS

operated as a sole proprietorship.  Not disputed that BLMIS operated a proprietary trading business

and a market-making business as two of its three business units.  Disputed to the extent these

statements are inconsistent with the Trustee's Statement of Material Facts in Support of Motion

for Summary Judgment ("Stmt.") ¶¶ 8–18, ECF No. 101.  Disputed that the proprietary trading

business and the market-making business executed trades equal to 10% of the daily volume on the

New York Stock Exchange as immaterial and lacking evidentiary support.

---

[1] *Picard v. Carol & Stanley Nelson*, ("*Nelson*"), Adv. Pro. Nos. 10-04377 and 10-04658. The trial of this consolidated case was held on May 8 and 9, 2019 and references to the transcript of the trial appear as "Nelson Tr. [date] at [page reference]."

2.      The Legitimate Trading Business was known internally as "House 5."  Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 62:18-19].

**RESPONSE:**  Not disputed that the proprietary trading and market-making businesses were referred to within BLMIS as "House 5."  Stmt. ¶ 16.

3.      The IA business was known internally as "House 17" since it was located on the 17th floor of the Lipstick Building. Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 63:4-6].

**RESPONSE:**  Not disputed.

4.      There were approximately 172 employees who worked in the Legitimate Trading Business and only 6 to 8 people who worked in the IA business.  Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 168:14-17].

**RESPONSE:**  Disputed as immaterial.  In addition, the evidence cited by Defendant states that there were approximately 180 or so employees for the "whole operation" and eight to ten employees involved in the "Ponzi scheme."

5.      All of the banking activity of the Legitimate Trading Business was conducted at the Bank of New York ("BNY"). Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 161:5-8].

**RESPONSE:**  Disputed to the extent that the statement is not supported by admissible evidence.[2]  Not disputed that the primary banking activity of the Proprietary Trading Business was conducted at BNY.  Declaration of Bruce G. Dubinsky, dated August 28, 2020 ("Dubinsky Decl."),

---

[2] The Trustee does not dispute the admissibility of testimony by his experts.  However, Defendant routinely mischaracterizes the testimony by selectively citing to or quoting language from counsel's question rather than the actual testimony of the witness.

Attach. A (Expert Report of Bruce G. Dubinsky, dated January 16, 2019 ("Dubinsky Report")) ¶

78, ECF No. 104-1 ("In the Proprietary Trading Business, the primary operating account was the

Bank of New York ("BONY") account number 8661126621 (the "621 Account";   *see also*

Declaration of Lisa M. Collura, dated August 28, 2020 ("Collura Decl."),   Attach. A (Expert

Report of Lisa M. Collura, dated January 16, 2019 ("Collura Report")) ¶ 17 n.2, ECF No. 103-1.


6.      The PT and MM Businesses were legitimate and were not involved in an alleged

Ponzi scheme.  Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 63:2-24 ("Q. So, was the prop side [PT and

MM] of the business designed to buy and sell securities? A. Absolutely."); 64:10-14 ("Q. . . . So,

the proprietary trading side of the business bought and sold securities? A. Absolutely. Q. The

investment advisory side? A. Never."); 68:7-16 ("Q. So, the proprietary trading side of the business

had a trading platform? A. It had a trading platform and it actually traded. That's what it did.");

122:15-21 ("Q. And was the proprietary trading business actually buying stock during that period?

A. Yes. The proprietary trading business was buying stock for the proprietary trading desk and for

the market-making clients of that side of the business."); 150:18-25 ("The proprietary trading, in

fact, was investing…"); 168:8-17 (the PT and MM business were not involved in a Ponzi scheme,

"Q. So out of the whole operation of 180 or so employees, it's 8 to 10 employees who, in your

opinion, were involved in a Ponzi scheme; is that right? A. That's correct.")].

       **RESPONSE:** Disputed to the extent the statement is not supported by admissible evidence.

*See* n.2.  The proprietary trading business was engaged in pervasive fraudulent activity.  *See*

Dubinsky Decl., Attach. A (Dubinsky Report) Part IV.C.


7.      Madoff operated his entire business as a sole proprietorship until January 2001.

Adv. Pro. No. 08-01789 (SMB), ECF Nos. 10089, 10679 and 10681; *see e.g.* Complaint

("Compl.") at ¶ 19, Adv. Pro. No. 10-04749 (Bankr. S.D.N.Y. December 1, 2010), ECF No. 1.

**RESPONSE**:  Not disputed.


8.    Madoff used the trade name "Bernard L. Madoff Investment Securities" for his sole proprietorship from at least the 1970's.  Chaitman **Ex. A** [Nelson Tr. 5/8/19 172: 9:17 (Q. you're aware, are you not, that Mr. Madoff used the tradename Bernard L. Madoff Investment Securities prior to his formation of the LLC? A. Yes. I saw it on many documents, yes."]; Chaitman **Ex. B** [Confirmation Slips dating from 1979 showing the trade name Bernard L. Madoff Investment Securities [10-5420_Defendant_0002412-13]],[3] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 610 B.R. 197, 206 (Bankr. S.D.N.Y. 2019).  Even the account statement for the 703 account for December 2008, the final month of the LLC's operations, lists the account as owned by the trade name "Bernard L. Madoff Investment Securities" without any reference to the LLC. Chaitman **Ex. C** [703 Account Statement for December 2008].

**RESPONSE:**  Not disputed that "Madoff Securities frequently used the trade name 'Bernard L. Madoff Investment Securities' in the course of its business."  *Picard v. Nelson*, 610 B.R. 197, 206 (Bankr. S.D.N.Y. 2019).


9.    In January 2001, Madoff formed the LLC to which he transferred the PT and MM businesses, managed by his two sons.  Chaitman **Ex. D** [SEC Amended Form BD]; *see* Compl. at ¶ 19.

**RESPONSE:**  Not disputed that Madoff transferred the assets and liabilities of the

---

[3] Attached to the Chaitman declaration as **Ex. B** are copies of confirmation slips dating from 1979 to the Unflats, who were Madoff customers, showing credits to their account from "Bernard L. Madoff Investment Securities."

proprietary trading business and the market making business from the sole proprietorship to a single member limited liability company in January 2001. Stmt. ¶ 9. Along with "House 5," Madoff also transferred "House 17." Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206 ("BLMIS was a single enterprise that operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business.").

10.    In January 2001, Madoff notified BNY and the governmental agencies with which the Legitimate Trading Business dealt that the LLC was formed and would operate the Legitimate Trading Business. *See* the following notification letters all dated January 1, 2001: Chaitman **Ex. E** [Letter from the LLC to BNY; Letter from the LLC to the National Securities Clearing Corporation; Letter from the LLC to the Options Clearing Corporation; Letter from the LLC to the Depository Trust Company].

**RESPONSE:**  Not disputed that Madoff notified BNY and governmental agencies of the formation of the LLC in January 2001 but disputed that the LLC would only operate the market making business and proprietary trading business. BLMIS operated as a "single enterprise." Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206 ("BLMIS was a single enterprise that operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business."). The documents speak for themselves.

11.    Neither JPMC nor Madoff has any record of any such letter ever being sent to JPMC. Chaitman **Ex. F** [Email dated June 12, 2018 from counsel to Trustee, Maximillian Shifrin to Helen Davis Chaitman].

**RESPONSE:** Not disputed that such a letter has not been located to date in BLMIS's books and records.

12.     Madoff did not transfer the IA Business to the LLC.  Chaitman **Ex**. **D** [SEC Amended Form BD at 8-10].

**RESPONSE:** Disputed.  *See* Stmt. ¶¶ 9–11.

13.     Madoff did not register with the SEC as an investment advisor until late 2006. *Id.; In re Bernard L. Madoff Inv. Secs., LLC*, 424 B.R. 122, 127 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229 (2d Cir. 2011).

**RESPONSE:**  Not disputed.

**The Bank Accounts**

**The LLC Account**

14.     As set forth above at ¶¶ 5 and 10, the Legitimate Trading Business maintained an account with BNY.  Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 161:5-8] and in January 2001, Madoff notified BNY that the LLC was formed and would operate the Legitimate Trading Business. Chaitman **Ex. E** [Letter from the LLC to BNY].

**RESPONSE:**  The Trustee's response to ¶¶ 5 and 10 are incorporated herein.  Not disputed that the banking activity of the market making business and proprietary trading business was conducted at BNY.  *See* Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 78 ("In the Proprietary Trading Business, the primary operating account was the Bank of New York ("BONY") account number 8661126621 (the "621 Account").").  Not disputed that Madoff notified Bank of New York of the formation of the LLC in January 2001 but disputed that the LLC would only operate

the market making business and proprietary trading business.  BLMIS operated as a "single enterprise."  *Id.* ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206 ("BLMIS was a single enterprise that operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business.").

15.    The LLC account at BNY was used to fund all of the expenses of the Legitimate Trading Business, including the purchase of securities.  Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 161:14-16].

**RESPONSE:**  Disputed as irrelevant and lacking evidentiary support that "all of" the expenses were funded out of the account at BNY for House 5.  Not disputed that the BNY account was used for expenses.  *See* Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 78.

16.    Between $700 and $800 million was transferred from the IA business to the Legitimate Trading Business just in the period from 2000 to 2008.  Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 161:3-8 ("hundreds and hundreds of millions of dollars just since 2000 that was transferred from the 703 account [the IA business account] to the Bank of New York account"); *id.* at 161:20- (the money was "put over to the prop trading business."); *id.* at 161:21-162-:2 (Q. "[I]n the period from 2000 through 2008, how much money in total was transferred from the 703 account, which was exclusively investment advisory customers money, to the Bank of New York account, which was exclusively prop trading? A. [A]bout $700 or $800 million.")].

**RESPONSE:**  Disputed to the extent the statement is not supported by admissible evidence and is incomplete.  *See* n.2.  *But see* Declaration of Seanna R. Brown ("Brown Decl."), Ex. 1 [Nelson Tr. 5/8/19 at 160:24–162:2; 139:18–141:14]; Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 338–39 & Table 11.

17.    The $700 - $800 million of transfers from the IA business' account at JPMC to the Legitimate Trading Business were used by the LLC for its business purposes.  Madoff testified that transferring the money from the 703 Account to the BNY Account "allowed us to meet the margin calls of the clearing corporation. That is typical of the industry."  Chaitman **Ex. G** [Madoff Dep. Tr. 4/26/2017 at 24:6-25:13] *see also, e.g.* Chaitman **Ex. H** at p. 20 [Letter dated January 24, 2011 from Stephen P. Harbeck at SIPC to Scott Garett at The U.S. House of Representatives at p. 20].

**RESPONSE:**  Not disputed that funds transferred from the IA Business were used for margin calls, but Mr. Dubinsky explained that:

> [T]the Proprietary Trading Business was improperly subsidized and propped up by numerous cash infusions of IA Business Customer Money from the IA Business.  Over the ten-year period for which bank statements and corresponding data were available, over 185 separate cash infusions were made to the Proprietary Trading Business from the IA Business (directly or indirectly), totaling approximately $800 million.  (See Exhibit 34 –"Cash Infusions of IA Business Customer Money from the IA Business to the Proprietary Trading Business, July 1999 to November 30, 2008".)  Initially, cash was transferred via check or wire from the IA Business to the Proprietary Trading Business directly from the 703 Account or from an IA Business-funded brokerage account; later cash infusions were effectuated through a more complex scheme that purported to reflect securities transactions.

Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 354; *see also id.* ¶¶ 338–39.  Mr. Dubinsky further explained that:

> These cash infusions were falsely reflected as trading revenues or commissions on BLMIS's financial statements and regulatory reports. Despite what BLMIS represented on the reported financials, the Proprietary Trading Business was incurring significant net losses beginning in at least mid- 2002. Without the fraudulent infusion of cash from the IA Business, the Proprietary Trading Business would not have been able to continue as a "going concern" beyond 2002.

*Id.* at ¶ 31.

**The 703 Account**

18.     The IA Business placed its customer deposits into an account at JPMC ending in "703" (the "703 Account").  Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 81:20-82:1].

**RESPONSE:**  Not disputed.  Stmt. ¶ 70.

19.     As of December 2001, almost a year after the LLC was formed, JPMC customer statements for the 703 Account indicated that the account was held in the name of "Bernard L. Madoff."  Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 14:1-23]; Chaitman **Ex. I** [703 Account Statement for December 2001 [JPMSAB0000001-48]].  Thereafter, the 703 Account name was in Madoff's trade name, Bernard L. Madoff Investment Securities.  The 703 Account was never in the name of the LLC and there is not a single document produced by JPMC which suggests that the LLC owned the 703 Account.  *See e.g.* Chaitman **Ex. F** [Email dated June 12, 2018 from counsel to Trustee, Maximillian Shifrin to Helen Davis Chaitman]; Chaitman **Ex. J** [Compilation of 509 Account Statements]; Chaitman **Ex. K** [Compilation of 703 Account Statements]; Chaitman **Ex. E** [Letter from the LLC to BNY; Letter from LLC to the National Securities Clearing Corporation; Letter from the LLC to the Options Clearing Corporation; Letter from the LLC to the Depository Trust Company].

**RESPONSE:**  Not disputed to the extent the documents speak for themselves.  At all times, the funds in the 703 Account consisted of customer money.  *See* Stmt. ¶¶ 85–88.

20.     Moreover, through August 2002, the JPMC customer statements for the 703 account indicated that the account was held in the name of "Bernard L. Madoff."  Chaitman **Ex. L** [703 Account Statement August 1 – August 30, 2002 in the name of "Bernard L. Madoff"].  In September 2002, the 703 account statements from JPMC indicated the customer as BLMIS, the trade name for Madoff's sole proprietorship.  Chaitman **Ex. M** [703 Account Statement August 31

- September 30, 2002 in the trade name of "Bernard L. Madoff Investment Securities"].

**RESPONSE:**  Not disputed to the extent the documents speak for themselves.  At all times,

the funds in the 703 Account consisted of customer money.  *See* Stmt. ¶¶ 85–88.


21.     Through 2008, the endorsement stamp for checks deposited into the 703 Account

read "For deposit only Bernard L. Madoff." Chaitman **Ex. N** [Check dated July 16, 2008[4] paid to

"Bernard Madoff Securities" with endorsement stamp "For deposit only Bernard L. Madoff" into

the 703 Account [JPMSA10013257]].

**RESPONSE:**  Disputed as not supported by the evidence cited. Disputed further as

irrelevant because Ex. N involves a check from a different BLMIS customer.


22.     As late as December 2008, the statements for the 703 Account continue to list the

account as owned by the sole proprietorship, BLMIS, without any reference to the LLC.  Chaitman

**Ex. C** [703 Account Statement for December 2008].

**RESPONSE:**  Not disputed.


**The 509 Account**

23.     Madoff held an account at JPMC ending in "509" (the "509 Account").  Chaitman

**Ex. A** [Nelson Tr. 5/8/19 at 81:20-82:1].

**RESPONSE:**  Not disputed that BLMIS held JPMorgan account #xxxxxxxxx1509 (the

"509 Account").  Stmt. ¶ 69.  The 703 and 509 Accounts were linked commercial business

---

[4] The deposit check referenced is merely an example, and belongs to the account of Zieses Investment
Partnership, since of the two deposit checks made to fund Account No. 1CM142 (the "Palmedo
Account") only a copy of the front of the deposit check dated December 20, 1995 in the amount of
$50,0000 was produced. *See* Chaitman **Ex. O** [Check dated December 16, 1995 paid to "Bernard L.
Madoff Investment Securities" in the amount of $50,000 [PALMEDO 000014]; see also Compl., Ex. B.

accounts. *Id.* ¶ 72. At all times, these accounts held customer money. *See id.* ¶¶ 85–88.

24.     The 509 Account was opened and held by Madoff's sole proprietorship long before the LLC came into existence in 2001. *See e.g.* Chaitman **Ex. P** [509 Account Statement from 1998 [MADWAA00378495-98]].

**RESPONSE:**  Not disputed that the 509 Account was opened and held by the sole proprietorship prior to 2001. The 703 and 509 Accounts were linked commercial business accounts. Stmt. ¶ 72. At all times, these accounts held customer money. *See id.* ¶¶ 85–88.

25.     There is not a shred of evidence that either the 703 or the 509 Account was ever held in the name of the LLC. On the contrary, all of the evidence indicates that these accounts were always held by Madoff individually. Chaitman **Ex. Q** [Nelson Tr. 5/9/19 at 8:14-19, 9:12-10:5-21, 12:5-18:6; 26:24-29:11].

**RESPONSE:**  Disputed. *See* Stmt. ¶¶ 85–88.

26.     The Trustee's expert witnesses, Bruce Dubinsky and Lisa Collura (whose firm was paid over $40 million by the Trustee) have never seen a bank statement for either the 509 Account or the 703 Account in the name of the LLC. Chaitman **Exs. A & Q** [Nelson Tr. 5/8/19 at 171:23-172:8, Nelson Tr. 5/9/19 at 13:7-20].

**RESPONSE:**  Disputed as the amount paid to the Trustee's expert witnesses is irrelevant. Not disputed that the Trustee's expert witnesses have not seen a bank statement for either the 509 Account or the 703 Account showing the word "LLC."

27.     The 509 account statements and checks were always in the name of Bernard L.

Madoff.  *See* Chairman **Ex. J** [Compilation of 509 Account Statements]; Chairman **Ex. R** [Compilation of Checks written from "Bernard L. Madoff" to "Philip F. Palmedo"].

    **RESPONSE:**  Disputed as the 509 Account was held in the name of Bernard L. Madoff until September 2002.  At that point, the account holder was changed to Bernard L. Madoff Investment Securities but BLMIS continued to use checks with "Bernard L. Madoff" listed as the holder.  Stmt. ¶ 86 (citing Collura Decl.,  Attach. A (Collura Report) ¶ 25 n.9).  Disputed as the 509 Account statements were also addressed to Bernard L. Madoff Investment Securities.  *See* Chairman Decl., Ex. U.  *But see* Stmt. ¶¶ 85–88.

28.    The designation "LLC" never appeared on the statements for either the 703 or the 509 Account Chairman **Ex. J** [509 Account Statements]; Chairman **Ex. K** [703 Account Statements].

    **RESPONSE:**  Not disputed.  *But see* Stmt. ¶¶ 85–88.

29.    Madoff used the trade name "Bernard L. Madoff Investment Securities" for his sole proprietorship interchangeably with the name "Bernard L. Madoff",  (Chairman **Ex. Q** [Nelson Tr. 5/9/19 at 18:23-19:10]; Chairman **Ex. B** [Confirmation slips dating from 1979 showing the trade name Bernard L. Madoff Investment Securities [10-5420_Defendant_0002412-13]]; Chairman **Ex. S** [July 17, 1991 letterhead of Bernard L. Madoff Investment Securities]), and for years prior to the formation of the LLC.  Chairman **Ex. A** [Nelson Tr. 5/8/19 at 172:9-12].

    **RESPONSE:**  Disputed as irrelevant and lacking evidentiary support.  Not disputed that a trade name was used.  *See Nelson*, 610 B.R. at 206 ("Madoff Securities frequently used the trade name 'Bernard L. Madoff Investment Securities' in the course of its business.").

**Account No. 1CM142 (the "Palmedo Account")**

30.      The Palmedo Account was opened on January 4, 1993 with an inter-account transfer in the amount of $192,271 from BLMIS account no. 1C0019-30, a C & M Trading Account (the "Transferor Account") held by Palmedo. *See* Chaitman **Ex. T** [Portfolio Management Report as of December 31, 1993 reflecting a starting equity of $192,270.99 on January 4, 1993 [PALMEDO000034]; *see also* Compl., Ex. B, line 1. However, the Trustee has failed to fully credit this transfer. *See* infra at ¶¶ 33-35.

**RESPONSE:** Disputed.  The Palmedo Account was opened on January 4, 1993 with an inter-account transfer in the amount of $150,000 of principal from BLMIS Account 1C0019.  *See* Stmt ¶ 126 (citing Declaration of Matthew B. Greenblatt, dated August 28, 2020 ("Greenblatt Decl."), Attach. B (Expert Report of Matthew B. Greenblatt, CPA/CFF, CFE dated June 19, 2019 ("Greenblatt Palmedo Report")) ¶¶ 13–15, Exs. 4A–4B, ECF Nos. 105-10, 105-14, 105-15).

**Deposits into the Palmedo Account**

31.      Subsequent deposits into the Palmedo Account were made by check paid to "Bernard L. Madoff Investment Securities". *See* Chaitman **Ex. O** [Check dated December 20, 1995 paid to "Bernard L. Madoff Investment Securities" in the amount of $50,000 [PALMEDO 000014]]; *see also* Compl., Ex. B, noting a deposit made by check dated April 1, 1993 in the amount of $25,000.

**RESPONSE:** Not disputed.

32.     The total cash deposits credited were $75,000. *See* Compl., Ex. B, Column 4. However, the Trustee has failed to fully credit the opening deposit in the amount of $192,271. See *supra* at ¶ 30 and *infra* at ¶¶ 33-35.

**RESPONSE:** Disputed as the total deposits credited were $225,000. *See* Stmt ¶ 128 (citing Greenblatt Palmedo Report ¶ 18, Ex. 3).

**The Trustee Has Failed to Properly Credit the Palmedo Account's Inter-Account Transfer**

33.     The Trustee has failed to fully credit the Palmedo Account's opening deposit, consisting of an inter-account transfer in the amount of $192,271 dated January 4, 1993. *See* Chaitman **Ex. T** [Portfolio Management Report as of December 31, 1993 reflecting a starting equity of $192,270.99 on January 4, 1993 [PALMEDO000034]]; *see also* Complaint at Ex. B, line 1.

**RESPONSE:** Disputed that the Trustee failed to properly credit the Palmedo Account for an inter-account transfer from BLMIS Account 1C0019 in the amount of $192,271.  Based on documents produced to the Trustee by the Defendant, Mr. Greenblatt confirmed that Defendant deposited only $150,000 of principal into the Palmedo Account.  *See* Greenblatt Decl., Attach B. (Greenblatt Palmedo Report) ¶ 14 (citing PALMEDO 000020, PALMEDO000022, and PALMEDO 000016).

34.     The Trustee has only credited the Palmedo Account with $150,000 of this inter-account transfer. *See* Greenblatt Report, ECF 105-10 at ¶¶ 14-15; and see Greenblatt Report. Ex. 4a, ECF No. 105-14 and 4b, ECF No. 105-15; *see* Compl., Ex. B, line 1.

**RESPONSE:** Not disputed. The Trustee's response to ¶ 33 is incorporated herein.

35.    The Trustee claims that the uncredited amount constitutes a transfer of "fictitious profits." *See* Compl., Ex. B, n.1.

**RESPONSE:**  Not disputed.

**The Transferor Account (C & M Trading Account No. 1C0019-30)**

36.    The Transferor Account was opened in June 1991 with an initial deposit of $100,000. *See* Chaitman **Ex. V** [Account Agreement and Letter from Palmedo to Cohn dated June 18, 1991 requesting to open an account with a deposit in the amount of $100,000; and Letter from Cohn to Palmedo dated June 19, 1991 acknowledging deposit [PALMEDO000020-22]].

**RESPONSE:**  Disputed.  Account No. 1C0019, was a pooled account in which Madoff commingled the funds of certain investors into one BLMIS customer account.  *See* Greenblatt Decl., Attach B. (Greenblatt Palmedo Report) ¶ 13.  Account No. 1C0019 was opened in April 1991.  *See id.*, Ex. 4A.  Not disputed that Palmedo made two deposits of $100,000 and $50,000 into 1C0019, totaling a principal amount of $150,000.  *See id.* ¶ 14 (citing PALMEDO 000020, PALMEDO000022, and PALMEDO 000016).

37.    A subsequent deposit was made in December 1991 by check in the amount of $50,000. *See* Chaitman **Ex. W** [Letter from Cohn to Palmedo dated December 9, 1991 acknowledging a subsequent check deposit in the amount of $50,000 [PALMEDO000016]].

**RESPONSE:**  Not disputed that Palmedo made two deposits of $100,000 and $50,000 into 1C0019, totaling a principal amount of $150,000.  *See id.* ¶ 14 (citing PALMEDO 000020, PALMEDO000022, and PALMEDO 000016).

38.     The total equity in the Transferor Account as of December 31, 1992 was

$191,960.18. *See* Chaitman **Ex. U** [Portfolio Management Report as of December 31, 1992

reflecting a total equity of $191,960.18 [PALMEDO000015]].

**RESPONSE:** Disputed.  The Trustee's response to ¶ 36 is incorporated herein.


**Withdrawals from the Palmedo Account**

39.     Throughout the life of the Palmedo Account, withdrawals were paid by checks

drawn from the 509 Account paid by "Bernard L. Madoff" to "Philip F. Palmedo". *See* Chaitman

**Ex. R** [Compilation of Withdrawal Checks [MADWAA00048660; MADWAA00073133;

MADWAA0222573; MADWAA00293605]. The Trustee is missing third-party evidence of an

alleged withdrawal in the amount of $60,000 dated October 21, 1998. *See* Collura Report at Ex.

3, ECF No. 103-24; *see e.g.* Compl., Ex. B.

**RESPONSE:**  Not disputed that BLMIS sent checks from the 509 Account to Defendant.

Disputed that the account holder of the 509 Account was "Bernard L. Madoff" for all time

periods.  The 509 Account was held in the name of Bernard L. Madoff until September 2002.  At

that point, the account holder was changed to Bernard L. Madoff Investment Securities but

BLMIS continued to use checks with "Bernard L. Madoff" listed as the holder.  Stmt. ¶ 86

(citing Collura Decl., Attach. A (Collura Report) ¶ 25 n.9).  Not disputed that BLMIS bank

records are unavailable for the period prior to December 1998.  *See* Collura Decl., Attach B

(Expert Report of Lisa M. Collura, CPA, CFE, CFF, dated June 19, 2019 ("Collura Palmedo

Report")) ¶ 13, ECF No. 103-21 ("I reconciled all but one of the seven cash transactions

reflected on the customer statements for the Palmedo Account to available BLMIS bank records,

documentation contained in BLMIS customer files, and/or documents produced to the Trustee related to the Palmedo Account.").

40.    Defendant never received any payments from the LLC. *See id.*

**RESPONSE:**  Disputed. BLMIS operated as a "single enterprise." Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Picard v. Nelson*, 610 B.R. 197, 206 (Bankr. S.D.N.Y. 2019) ("BLMIS was a single enterprise that operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business."). Defendant received payments from BLMIS of customer money from the 703 Account for all withdrawals. Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 340–350.

**T-Bill Purchases**

41. Madoff testified that he consistently purchased T-Bills with IA customer funds:

> Q. So you basically took the money that went into the 703 account?
> A. Correct.
> Q. Which was the investment advisory customers' money?
> A. Correct.
> Q. And you purchased Treasury bills with that?
> A. Correct…

Chaitman **Ex. G** [Madoff Dep. Tr. 4/26/17 at 19:1-21].

> Q. . . . Let's say that customer A sent you a million dollars for the split-strike program.
> A. It went into - - -
> Q. What - -
> A. - - treasury bills." . . .

Chaitman **Ex. X** [Madoff Dep. Tr. 12/20/16 at 161:12-25].

**RESPONSE:**  Not disputed that Madoff so testified but disputed as incomplete.  Chaitman Decl., Ex. X at 161:17–22 ("Q. It went into U.S. treasury bills? A. Well, some of it went into

treasury bills.  Some of it went back to customers when they withdrew profits – Q. Okay. A. –that didn't exist."). *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

42.     Madoff testified that he purchased T-bills through accounts that he maintained at Bear Stearns, Fidelity, Lehman Brothers, JPMorgan Chase, and Morgan Stanley.  *See* Chaitman **Ex. G** [Madoff Dep. Tr. 4/26/17 at 46:9-47:12].

**RESPONSE:**  Not disputed that Madoff so testified.  *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

43.     Madoff's testimony concerning his investment of customer funds in T-bills is validated by the third party records in the Trustee's possession. *See* Chaitman **Ex. Y** [Compilation of Bear Stearns Statements and 703 Account Statements].

**RESPONSE:**  Not disputed that Madoff so testified. *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

44.     Madoff explained that these bore an interest rate of approximately 3%-4%, which was money earned with the IA customers' funds. Chaitman **Ex. G** [Madoff Dep. Tr. 4/26/17 at 19:1-21].

**RESPONSE:**  Not disputed that Madoff so testified.  *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business

money was for BLMIS's cash management and were not purchased for any customer account.").

45.     While Madoff acknowledged that the IA customer statements often reflected the ownership of Fortune 100 company securities that had not been bought in connection with the purported split-strike conversion strategy, the account statements also reflected the ownership of T-bills that he actually did purchase. *Id. at* 19:22-20:1.

**RESPONSE:**  Not disputed that Madoff so testified. *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

46.     Madoff testified that "by the time we were finished in 2008 . . . we [the LLC] represented ten percent of the United States' volume in – in [legitimate, market-making] transactions." Chaitman **Ex. X** [Madoff Dep. Tr. 12/20/16 at 54:21-56:29, quote at 56:8-17].

**RESPONSE:**  Disputed as incomplete and an inaccurate modification of Madoff's testimony, which speaks for itself.

47.     The Trustee's witnesses testified to having seen "anecdotal evidence" that Madoff [the LLC] conducted trades equal to approximately 10 percent of the daily volume of the New York Stock Exchange as a whole.  Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 162:7-11].

**RESPONSE:**  Not disputed that Mr. Dubinsky so testified as to the market making business and proprietary trading business but disputed to the extent it is incomplete.  Mr. Dubinsky testified that he "d[id]n't know for a fact" about the daily volume traded by the market making business and proprietary trading business.  Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 162:7–11]. Disputed as irrelevant.

48.     Madoff testified that he never required the deposits of other customers to pay out existing customers, and until the market was collapsing when no one ever requested it. *See* Chaitman **Ex. G** [Madoff Dep. Tr. 4/26/17 at 30:10-22; 31:2-25].

**RESPONSE:**  Not disputed that Madoff so testified.  *But see* Stmt. ¶¶ 72–82 ("The only source of cash available for the IA Business to pay purported investment profits as well as redemption requests from its customers was from cash that other IA Business customers deposited in the 703 Account.")

49.     Madoff testified that his fraud began post-1992, likely 1993. *Id.* at 11:10-12:4.

**RESPONSE:**  Not disputed that Madoff so testified but disputed as irrelevant.

50.     Madoff testified that Frank DiPascali purchased T-Bills with IA customers' money. *Id.* at 29:10-30:1; *see e.g. id. at* 28:4-30:1.

**RESPONSE:**  Not disputed that Madoff so testified.  *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

51.     The receipts from the sale or redemption of T-bills were paid into the 703 Account by the brokerage houses, including Bear Stearns and JPMC. Chaitman **Ex. Y** [Bear Stearns March 2005 Statement, *see* Deposits and Withdrawals entry for March 30, 2005; Bear Stearns September 2005 Statement, *see* Deposits and Withdrawals entry for September 30, 2005; Bear Stearns December 2005 Statement, *see* Deposits and Withdrawals entry for December 21, 2005; June 2008 703 Account Statement, *see* first of four entries for 6/26].

**RESPONSE:**  Not disputed that the eight brokerage accounts were used by BLMIS for cash management purposes, received funds solely from the 703 Account, invested those funds primarily in money market funds, T-Bills, and other low-risk, U.S. government securities and then transferred funds back to the 703 Account.  Collura Decl., Attach. A (Collura Report) ¶ 57; *see also* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

52.    Joann Crupi, a Madoff employee who worked on the 17th floor of the Lipstick Building, testified that Frank DiPascali used to tell her when he was about to buy T-Bills and would then tell her to whom to allocate them. Chaitman **Ex. Z** [Crupi Tr. 165:6-22].

**RESPONSE:** Not disputed that Crupi so testified.  *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

53.    Frank DiPascali testified that Madoff told him to which accounts the T-Bills should be credited. *See generally,* Chaitman **Ex. AA** [DiPascali Tr. 5344:9-5346:2; 5345:7-25].

**RESPONSE:** Not disputed that DiPascali so testified.  *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

54.    DiPascali further testified that a spreadsheet bore the account numbers "that Bernie told us he wanted to use to be the counterparties of the customer option positions" and that "this spreadsheet allows me to randomly pick a group of treasuries that were going to represent that

collateral." Chairman **Ex. AA** [DiPascali Trial Testimony, 12/10/13 at 5345:7-25]; and Chairman

**Ex. AB** [the spreadsheet to which DiPascali referred, Government Exhibit 105-c171].

    **RESPONSE:** Not disputed that DiPascali so testified.


55.    Madoff testified that, as with other entities in the industry, he maintained records

for only six years, so there would not always be trade confirmations in their records. (Chairman

**Ex. X** [Madoff Dep. Tr. 12/20/16 at 133:12-134:2]). Madoff testified that, during the 1980's, there

would not always be third party confirmations because there were clearing houses that issued

continuous net settlement printouts. *Id.* at 130:20-23; 132:12-24.

    **RESPONSE:** Not disputed that Madoff so testified.  *See* Stmt. Part II (BLMIS Operated a

Ponzi Scheme Through Its Investment Advisory ("IA") Business.).


56.    Madoff testified that when he was dealing as principal there was no counterparty

since he was on both sides of the trade. *Id*. at 128:7-12.

    **RESPONSE:** Not disputed that Madoff so testified.  *See* Stmt. Part II (BLMIS Operated a

Ponzi Scheme Through Its Investment Advisory ("IA") Business.).


**Dubinsky's Testimony**

57.    On direct examination at the Nelson trial, Dubinsky repeatedly testified that no

securities were ever purchased with IA customers' money.

> Q. . . . So, the proprietary trading side of the business bought and sold securities?
> A. Absolutely.
> Q. The investment advisory side?
> A. Never.

Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 64:10-14, *see also* Nelson Tr. 5/8/19 at 73:6-14;

74:1-3; 74:19-23; 75:17-20].

> Q. I think you've answered this question but based on your review of the computer
> systems at BLMIS, were you able to determine if any trades were being processed
> through the investment advisory business computers?
> A. I was able to make that determination and the answer is they were not. There
> was no evidence, Your Honor, of any trades being executed through the IA business
> computer systems whatsoever.

*Id.* at 80:4-15.

> Q. So, to wrap up this issue, please summarize your conclusions concerning the
> source of funds flowing out of the investment advisory business to customers.
> Where was that money coming from?
> A. Customer money. Just other customers' money.
> Q. Did your conclusion that the BLMIS investment advisory business did not have
> a connected trading platform have anything to do with your conclusion that the
> investment advisory business was being operated as a Ponzi scheme?
> A. Absolutely.
> Q. Why?
> A. Because without the ability to actually connect to the market and trade and no
> evidence of those trades ever occurring, coupled with what I just testified about,
> that the only money I saw was customer money in and customer money out, no
> accretion to that 703 account from any sort of trading profit dividends -- that's the
> classic example of a Ponzi. There's nothing going on. You're taking money from
> people, you're promising that you're going to do something with it, and then you
> pay them back as if you're fulfilling your promise.
> Q. So, in addition to the not-connected trading platform, did your conclusion that
> the customer deposits were used to pay customer redemptions have any bearing on
> your conclusion that the investment advisory business was being operated as a
> Ponzi scheme?
> A. It did. As I just said, the lack of other funds from trading profits, from dividends,
> from real results of actual trading -- the lack of that played into the conclusion that
> this was simply a Ponzi. Just taking money in and paying it back.

*Id.* at 94:6 – 95:11.

> Q. Were you able to obtain DTC treasury records for BLMIS?
> A. I was. For the period of 2002 through 2007, I was able to obtain those records,
> and then I performed an analysis, identified the -- first I went and identified the
> unique treasury bills held by the prop trading business on December 31 of every
> year. I compared those holdings to the holdings at DTC, and I also compared those
> holdings to the IA business. And what I found, similar to the equities, is that the
> prop trading that the -- and the treasury bills weren't a big part of the prop trading,
> but the treasury bills that were held by the prop trading matched to the DTC records,

and that was based on the treasury CUSIP, and in contrast none of the CUSIPs held at the DTC matched those that were supposed to have been bought for the IA customers. So, again, it was a process of elimination. Once I matched everything to the prop trading, to the DTC -- were there any other DTC records left? No. Now I'm left with this tranche of purported treasuries for the IA business that have no support, no evidence of ever being purchased.

*Id*. at 128:19 – 129:12.

Q. . . .please summarize your conclusions concerning the source of funds flowing out of the investment advisory business to customers. Where was that money coming from?
A. Customer money. Just other customers' money."

*Id*. at 92:16-93:3.

Q. Based on your review of the BLMIS Investment Advisory books and records, were you able to determine if Mr. Madoff's allocation concerning treasuries was accurate?
A. It confirmed my analysis in finding that no treasuries were bought or traded for any of the investment advisory clients.

*Id*. at 129:9-14.

A. There was no evidence of treasuries being purchased for the IA business customers, plain and simple.

*Id*. at 132:9-14.

**RESPONSE:**  Not disputed that Mr. Dubinsky so testified but disputed to the extent the cited testimony is incomplete.  *See* Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 64:10–14; 72:10–75:20; 80:4–15; 95:6–96:11; 129:19–130:12; 95:6–10; 129:9–14; 132:9–14]; *see also* Stmt. ¶¶ 64–68.

58.    Dubinsky testified on direct examination that there is "no evidence [of activity in the 703 account] other than money coming in from customers and money going out to customers," *id*. at 92:16-17, and a minimal amount (3% of the total monies in the 703 Account) from overnight sweeps, *id*. at 83:3-15; 85:3-21.  He swore that there was "never any addition to the 703 Account

that [he] saw when [he] examined the bank accounts to show that money was coming from trading profits." *Id.* at 84:1-3.

**RESPONSE:** Disputed as misrepresenting the testimony; statements are not supported by the evidence. Mr. Dubinsky testified:

> Q Is that why you have the big red Xes on all of those possible incoming sources of funds?
>
> A It is. I was trying again to see where the money was coming in, how it was being earned, was there -- you know, maybe Mr. Madoff said he was going to trade stocks but he, you know, just invested in gold bars somewhere. And while that would've have been right, maybe there was an investment somewhere else, and then he was selling those gold bars and producing some income. So, that's the other income producing box in the upper right.
>
> There was no evidence other than money coming in from customers and money going out to customers. A little bit of the sweep, the overnight sweeps to kind of create more money for the Ponzi to enable it to go a little bit longer, in other words. And that's why I have Xes on all of those.

Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 92:6–21].

59.     Dubinsky testified that he "scoured every bank record and didn't find any other use of customer funds other than payments to customers and bank sweeps at night at JPMC." *Id*. at 153:14-16.

**RESPONSE:** Disputed as misrepresenting the testimony. Mr. Dubinsky testified:

> Q Now, I typed word verbatim what you said this morning on direct examination, and you said that you, quote, "Scoured every bank record and didn't find any other use of customer funds other than payments to customers and bank sweeps at night at JPMC." That was your testimony this morning.
>
> A If that's what you typed down. I think I also testified this morning that three [sic] was money for other treasuries and brokerage accounts.

Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 153:12–20].

60.    On cross examination, however, Dubinsky admitted that reliable third party records show that the IA business did, in fact, buy T-bills with money from the 703 Account and that the T-bills paid interest. *Id.* at 166:17-18 ("Q. And those T-bills paid interest, right? A. Those T-bills paid interest.").

**RESPONSE:**  Not disputed that Mr. Dubinsky so testified but disputed to the extent the cited testimony is incomplete.  Mr. Dubinsky testified:

> Q Now, you testified that you saw no evidence of any income earned on investment advisory customers money. But now you've acknowledged that you were aware that money was taken from the 703 accounts and invested in T-bills, right?

> A Well, let me correct that, the two things. I've always been aware that money left the 703 to be invested. I think what I testified to is no money was made in the investment advisory customer accounts on the purported trades that were promised to them.

> Q So you're not -- you weren't -- you didn't seek to convince Judge Bernstein that money hadn't been made on the investment advisory customers money to the extent that it was invested in T-bills.

> A I'm not sure I understand your question.

> Q Isn't it a fact, Mr. Dubinsky, that the T-bill investments that Mr. Madoff made with investment advisory customers money earned interest?

> A Are you talking about the overnight sweeps?

> Q No, I'm not. I'm talking about the eight or nine firms that you've acknowledged that Madoff purchased T-bills through with investment advisory customers money.

> A So --

> Q And those T-bills paid interest, right?

> A Those T-bills paid interest. I don't know when you said whether they made money, I don't know. I didn't analyze that because, depending on when you buy them at par or below par and the interest that you collect with accrued interest. And then when you sell them, you may make money, you may not. I did acknowledge, and I said during my direct, money was used from the 703 for the overnight sweep. I said that earned interest. That was a way to kind of keep enough money in the Ponzi to add more to the pot. And I acknowledged that money was taken from the 703 to be used where Mr. Madoff purchased or somebody in BLMIS purchased additional treasuries.

Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 165:20–167:4].

61.     Dubinsky admitted that he knew that Madoff maintained several brokerage accounts through which he purchased T-bills using money taken from the 703 Account. *Id.* at 90:25-91:2 ("A. No. There were several brokerage accounts, that money was taken from the 703 account and put into, that purchased some treasuries."); 155:2-4 ("A. There was money taken out of the 703 account, transferred to these accounts, these various accounts, and then these securities were purchased, yes.").

**RESPONSE:** Not disputed that Mr. Dubinsky so testified but disputed to the extent the cited testimony is incomplete.  Mr. Dubinsky testified:

> Q In fact, in your review of the BLMIS books and records, did you identify any other income-producing activities for the investment advisory business, other than the short-term sweeps and the BLMIS interest-bearing accounts that were funded by 703 customer deposits, what you just discussed?
>
> A No. There were several brokerage accounts, that money was taken from the 703 account and put into, that purchased some treasuries. But other than -- and those weren't purchased in connection with any split strike conversion strategy. But, no, other than that, there was absolutely no evidence of any trading whatsoever going on in the IA business.

Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 90:20–91:6].

> Q Okay. And you recall that these were investments of securities that were made with investment advisory customers' money, right?
>
> A There was money taken out of the 703 account, transferred to these accounts, these various accounts, and then these securities were purchased, yes.

*Id.* at 154:24–155:4.

62.     Dubinsky named the following firms that held these accounts: Lehman Brothers, Bear Stearns, JPMorgan Chase and Morgan Stanley and he acknowledged that "those T-bills paid interest." *Id.* at 154:2-9; 166:17-18.

Q. But in any event, you're now telling us that you're aware that there were approximately eight accounts at which Madoff was using investment advisory customers' money to purchase T bills. Isn't that true?

A. That is correct, yes.

Q. Okay. And those accounts included Lehman Brothers.

A. Correct.

Q. Bear Sterns.

A. That's correct.

Q. JP Morgan Chase.

A. Correct.

Q. Morgan Stanley.

A. There was a Morgan Stanley account, yes.

*Id.* at 154:2-9.

**RESPONSE:**  Not disputed that Mr. Dubinsky so testified but disputed to the extent the cited testimony is incomplete.  *See* Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 153:21–154:9].  Mr. Dubinsky testified:

Q Isn't it a fact, Mr. Dubinsky, that the T-bill investments that Mr. Madoff made with investment advisory customers money earned interest?

A Are you talking about the overnight sweeps?

Q No, I'm not. I'm talking about the eight or nine firms that you've acknowledged that Madoff purchased T-bills through with investment advisory customers money.

A So --

Q And those T-bills paid interest, right?

A Those T-bills paid interest. I don't know when you said whether they made money, I don't know. I didn't analyze that because, depending on when you buy them at par or below par and the interest that you collect with accrued interest. And then when you sell them, you may make money, you may not. I did acknowledge, and I said during my direct, money was used from the 703 for the overnight sweep.  I said that earned interest. That was a way to kind of keep enough money in the Ponzi to add more to the pot. And I acknowledged that money was taken from the 703 to be used where Mr. Madoff purchased or somebody in BLMIS purchased additional treasuries.

*Id.* at 166:9–167:4.

63.    While, on direct examination, Dubinsky testified that he found no evidence of IA

customer T-bills in the DTC records, he admitted on cross-examination that Madoff kept securities

with the financial institutions from which he had purchased them:

> Q. Well, you testified that in trying to analyze Madoff's stock and T-bill position, you went only to the DTC records.
> A. Correct.
> Q. But isn't a fact that Mr. Madoff also kept securities with financial institutions from which he bought them?
> A. As in the eight brokerage accounts, yes.

*Id.* at 177:16-18-21.

**RESPONSE:**  Not disputed that Mr. Dubinsky so testified but disputed to the extent the

cited testimony is incomplete.  Mr. Dubinsky testified:

> Q Yes. And you didn't -- you didn't calculate the securities that he had in those brokerage accounts; isn't that true?
>
> A The securities in those brokerage accounts were for the prop trading business. And those were accounted for in the DTC because those records, even if somebody -- the DTC records the trade of the equity. And so they would have been there as I went through on the prop trading, whether he held them, in custody of them, or they were with somebody else, they would have been recorded. On the IA business, those records didn't exist. We've talked about the eight brokerage accounts, but as I said, even if you add up all the treasuries in those eight brokerage accounts, they're woefully short of what Mr. Madoff or BLMIS was showing on a customer statements for a particular day for all of the treasuries.

Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 177:22–178:12].

64.    Additionally, while another analysis allegedly performed by Dubinsky addresses

the T-bills held by the Brokerage Firms, Dubinsky did not add up all those T-bills. *See e.g. See*

*e.g.* Dubinsky Report ¶ 227, Table 5; and ¶¶ 232-240, ECF No. 104-1.

**RESPONSE:**  Disputed as not supported by the evidence cited and vague.  Mr. Dubinsky's

analysis confirmed that (i) IA Business T-Bills were not held at the DTC (Dubinsky Decl., Attach.

A (Dubinsky Report) ¶¶ 224–27); (ii) T-Bills purchased using money from the 703 Account were

not purchased for the IA Business Customers (*id.* ¶¶ 228–29); (iii) the aggregate volume of
purported IA Business T-Bills as reported on the customer statements far exceeds the volume of
T-Bills in the Brokerage Accounts and the Proprietary Trading Business (*id.* ¶¶ 230–31); and (iv)
the T-Bills held in the Brokerage Accounts do not match the T-Bills reported on the IA Business
customer account statements (*id.* ¶¶ 232–40)

## T-Bill Purchases for the Palmedo Account

65.    Madoff purchased significant amounts of T-Bills for the Palmedo Account and
held them throughout the time they were credited to the Palmedo Account, for example:

**RESPONSE:**    Disputed that T-Bills were purchased by BLMIS on behalf of any IA
Business customer, including Defendant.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of
such [T-Bill] purchases having been made on behalf of IA Business customers. While BLMIS
purchased treasury bills with customer funds, these purchases did not match the allocation of
treasury bill transactions that appeared on customer statements.").

### T-Bills (due 4/3/08) CUSIP No. 912795D65

66.    On December 13, 2007, Madoff purchased $300,000,000 of a T-Bill (due 4/3/2008)
(CUSIP No. 912795D65[5]) from JPMorgan. Chaitman **Ex. AC** [Chart, JPMSAA0020018].

**RESPONSE:**    Not disputed.  The Trustee objects to Chaitman Decl., Ex. AC as

---

[5] The CUSIP numbers listed herein may not all appear on the customer statements. The maturity dates of
the t-bills, however, have been matched to the CUSIP numbers available on https://www.treasurydirect.
gov/instit/annceresult/annceresult_query.htm**,** which appears as Chaitman **Ex. AN.** This Court may take
judicial notice of this pursuant to Fed. R. Evid. 201(b)(2) (The court may judicially notice a fact that is
not subject to reasonable dispute because it can be accurately and readily determined from sources whose
accuracy cannot reasonably be questioned.). *See Abely v. Aeterna Zentaris Inc.,* 2013 WL 2399869, at
*21 (S.D.N.Y. May 29, 2013) (documents on a government website "are published by government
sources from which the Court may appropriately take judicial notice."); *see also Lilakos v. New York City,*
2020 WL 1696118, at *4, n.4 (2d Cir. Apr. 8, 2020) (taking judicial notice of a form available online at

inadmissible on the grounds that Defendant has not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendant's contentions that treasuries were in fact purchased on his behalf, to the exclusion of all other BLMIS customers.

67.    On December 31, 2008, Madoff credited $1,175,000 of those T-Bills to the Palmedo Account, with a value of $1,165,000.75. Chaitman **Ex. AC** [Chart, MDPTPP00816225].

**RESPONSE:**    Disputed to the extent that the evidence cited does not support the statement.[6]  Disputed further that the Palmedo Account was credited with a value of $1,165,000.75 because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendant.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").   The Trustee objects to Chaitman Decl., Ex. AC as inadmissible on the grounds that Defendant has not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendant's contentions that treasuries were in fact purchased on his behalf, to the exclusion of all other BLMIS customers.

---

nyc.gov website); *Apotex Inc. v. Acorda Therapeutics, Inc.,* 823 F.3d 51, 60, n.3 (2d Cir. 2016) (taking judicial notice of a document published on regulations.gov, a government website, "because the Guidance is publicly available and its accuracy cannot reasonably be questioned."); *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.,* 638 F. App'x 43, 47, n.2 (2d Cir. 2016) (taking judicial notice of public records contained on the Georgia Secretary of State's website).

[6] The Trustee' notes that the date of the statement cited is December 31, 2007.

68.    On March 19, 2008, Madoff sold all $1,175,000 of those T-Bills and credited the Palmedo Account with $ 1,174,459.50. Chaitman Ex. AC [Chart, MDPTPP00816233].

**RESPONSE:** Disputed as lacking evidentiary support and to the extent that the evidence cited does not support the statement. Disputed further that the Palmedo Account was credited with a value of $1,174,459.50 because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendant. Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers. While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements."). The Trustee objects to Chaitman Decl., Ex. AC as inadmissible on the grounds that Defendant has not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendant's contentions that treasuries were in fact purchased on his behalf, to the exclusion of all other BLMIS customers.

69.    On the maturity date of April 3, 2008, Madoff redeemed all $300,000,000 of those T-Bills at face value. Chaitman **Ex. AC** [Chart, JPMSAB0003961].

**RESPONSE:**    Not disputed.    The Trustee objects to Chaitman Decl., Ex. AC as inadmissible on the grounds that Defendant has not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendant's contentions that treasuries were in fact purchased on his behalf, to the exclusion of all other BLMIS customers.

70.    Third-party records show that Madoff held these T-Bills throughout the period during which they appeared on the Palmedo Account customer statement, buying $300,000,000 of

them on December 13, 2007 for a total of $297,312,000, and redeeming them on the maturity date

of April 3, 2008 at face value of $300,000,000. Chaitman **Ex. AC** [Chart, JPMSAB0003961].

**RESPONSE:**  Disputed as lacking evidentiary support and to the extent that the evidence

cited does not support the statement.  Disputed further because BLMIS did not purchase any T-

Bills on behalf of any IA Business customer, including Defendant.  Stmt. ¶¶ 57–68 ("Mr.

Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA

Business customers.  While BLMIS purchased treasury bills with customer funds, these

purchases did not match the allocation of treasury bill transactions that appeared on customer

statements.").  The Trustee objects to Chaitman Decl., Ex. AC as inadmissible on the grounds

that Defendant has not identified a percipient witness or expert witness in accordance with Fed.

R. Civ. P. 26 who can testify to support Defendant's contentions that treasuries were in fact

purchased on his behalf, to the exclusion of all other BLMIS customers.


71.    These T-Bills (CUSIP No. 912795D65) were not held by our other clients at the

same time: Chaitman **Ex. AD** [December 2007 customer statements for Lisa B. Nissenbaum,

Doron Tavlin, Boyer Palmer, and Harry Smith.]

**RESPONSE:** Disputed as irrelevant and not based on admissible evidence.  This statement

incorrectly excludes thousands of other BLMIS accounts and the other treasury cited by Defendant

in paragraph 72.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases

having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills

with customer funds, these purchases did not match the allocation of treasury bill transactions that

appeared on customer statements.").


**T-Bills (due 8/9/07) CUSIP No. 912795ZU8**

72.    On May 9, 2007, Madoff purchased $300,000,000 of a T-Bill (due 8/9/07) (CUSIP No. 912795ZU8) from JPMorgan. Chaitman **Ex. AC** [Chart, JPMSAA0015295].

**RESPON/SE:**    Not disputed.   The Trustee objects to Chaitman Decl., Ex. AC as inadmissible on the grounds that Defendant has not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendant's contentions that treasuries were in fact purchased on his behalf, to the exclusion of all other BLMIS customers.

73.    On June 26, 2007, Madoff credited $1,075,000 of those T-Bills to the Palmedo Account, with a value of $1,069,205.75. Chaitman **Ex. AC** [Chart, MDPTPP00816196].

**RESPONSE:**    Disputed that the Palmedo Account was credited with a value of $1,069,205.75 because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendant.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").  The Trustee objects to Chaitman Decl., Ex. AC as inadmissible on the grounds that Defendant has not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendant's contentions that treasuries were in fact purchased on his behalf, to the exclusion of all other BLMIS customers.

74.    On July 31, 2007, Madoff sold all $1,075,000 of those T-Bills and credited the Palmedo Account with $1,073,688.50 Chaitman **Ex. AC** [Chart, MDPTPP00816200].

**RESPONSE:**  Disputed as lacking evidentiary support and to the extent that the evidence cited does not support the statement.  Disputed further that the Palmedo Account was credited with a value of $1,073,688.50 because BLMIS did not purchase any T-Bills on behalf of any IA

Business customer, including Defendant.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").  The Trustee objects to Chaitman Decl., Ex. AC as inadmissible on the grounds that Defendant has not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendant's contentions that treasuries were in fact purchased on his behalf, to the exclusion of all other BLMIS customers.

75.     Third-party records show that Madoff held these T-Bills throughout the period during which they appeared on the Palmedo Account customer statement, buying $300,000,000 of them on May 9, 2007 for a total of $296,373,666.66, and redeeming them on the maturity date of August 9, 2007 at face value of $300,000,000. Chaitman **Ex. AC** [Chart, JPMSAB0003373].

**RESPONSE:**  Disputed as lacking evidentiary support and to the extent that the evidence cited does not support the statement.  Disputed further because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendant.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").  The Trustee objects to Chaitman Decl., Ex. AC as inadmissible on the grounds that Defendant has not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendant's contentions that treasuries were in fact purchased on his behalf, to the exclusion of all other BLMIS customers.

76.    The Palmedo Account held securities in the amount of $1,033,504.12 two years prior to Madoff's confession on December 11, 2008. Chaitman Ex. AE [Customer Statement dated 11/30/06 [MDPTPP00816154-158 at MDPTPP00816156]].

**RESPONSE:**  Not disputed that the November 30, 2006 customer statement reflected a market value of securities of $1,033,504.12. Disputed that any securities were purchased by BLMIS on behalf of any IA Business customer, including Defendants. Stmt. ¶¶ 19–56 ("Mr. Dubinsky's analysis demonstrated that BLMIS did not conduct any trading on behalf of its IA Business customers."). Disputed further that T-Bills were purchased by BLMIS on behalf of any IA Business customer, including Defendant.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.").

**Defendant Paid Taxes on Alleged Fictitious Profits in the Palmedo Account**

77.    In the years from 1993 through 2007, Palmedo paid taxes totaling $587,607 and received a refund in the amount of $143,609 for the years 2003 through 2007 pursuant to Internal Revenue Service ruling pursuant to 26 CFR 6-1.105. Accordingly, Palmedo paid un-refunded taxes based on the allegedly fictitious profits of $443,998. *See* Chaitman **Ex. AF** [Declaration of Steven Albanese, C.P.A. dated May 22, 2017 at ¶ 8 and Ex. A].

**RESPONSE:**  Disputed as irrelevant and not based on admissible evidence.

**The Trustee's Misrepresentations**

78.    The Trustee has consistently represented, from 2008 to the present, that Madoff never purchased any securities with IA customers' money. Declaration of Helen Davis Chaitman dated 5/6/2019, *Picard v. Nelson*, Adv. Pro. No. 10-04377, ECF No. 156-1, Ex. A.

**RESPONSE:**  Disputed.  Counsel has already been sanctioned by this Court for these

spurious accusations.  In another matter in this liquidation, counsel for defendant made a third

motion to compel the production of trading records on the premise that the Trustee hid the records

because they would prove that BLMIS used customer funds to purchase securities and allocated

those purchases (and the profits from subsequent sales) to customers.  *Sec. Inv'r Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (SMB), 2020

WL 1488399, at *1 (Bankr. S.D.N.Y. Mar. 20, 2020).  After the Discovery Arbitrator denied the

motion to compel and this Court affirmed, the Trustee sought reimbursement of his attorneys' fees

and the Discovery Arbitrator's fees under Federal Rule of Civil Procedure 37(a)(5)(B).  *Id.*  This

Court described that counsel for the defendants' "entire approach" to the dispute for the trading

records is based on the "false narrative that the Trustee is a liar who hid the fact" that BLMIS used

the funds deposited with BLMIS by IA Business customers to purchase securities and allocated

those purchases to customers.  *Id.* at *2; *see also id.* at *10 ("[T]o justify placing the burden on the

Trustee, she falsely accused him of deliberately concealing the use of IA customer funds to

purchase securities when she knew, had she read it, that the Dubinsky Report disclosed that precise

fact.").  This Court determined that an award of attorneys' fees and expenses was justified against

counsel personally as "[s]he perpetuated the myth that the Trustee hid BLMIS's use of IA customer

money to buy securities, when, in fact, this was fully disclosed in the Dubinsky Report, and then

tried to leverage the Trustee's perceived dishonesty plus his greater resources to force the Trustee

to review 30 million documents in the BLMIS Database and the contents of 13,000 boxes without

regard to any notion of proportionality."  *Id.* at *19.  Despite this Court's strong language and

award of monetary sanctions, counsel for Defendant continues to brazenly misrepresent the

Trustee's obligation to produce these documents.

79.     The Trustee has refused to produce trading records and all of the customers'
account statements. Declaration of Helen Davis Chaitman dated 4/11/2018, *Picard v. Nelson*, Adv.
Pro. No. 10-04377, ECF No. 86-1; s*ee also* Trustee Response to Defendants' Document Demands
and Interrogatories served in Adv. Pro. No. 10-04995 (SMB) and dated April 8, 2016, [Response
to Request No. 2], *Picard v. Wilenitz*, Adv. Pro. No. 10-04995 ECF No. 70-2].

**RESPONSE:**  Disputed.  Counsel has already been sanctioned by this Court for these
spurious accusations.  *See* Response to ¶ 78; *In re Bernard L. Madoff*, 2020 WL 1488399, at *19.


**The Bankruptcy Court's View That Summary Judgment is Not Appropriate**

80.     This Court has held that summary judgment is not appropriate in the claw back
cases, *see e.g. Picard v. Legacy Capital, Ltd.,* 603 B.R. 682 (Bankr. S.D.N.Y. 2019); *Picard v.
Mann,* 608 B.R. 165 (Bankr. S.D.N.Y. 2019).

**RESPONSE:**  Disputed as immaterial and not a factual statement.  It is also an inaccurate
statement as this Court did consider and resolved certain issues on summary judgment.  *See, e.g.*,
*Legacy*, 603 B.R. at 695–98 (finding summary judgment to be appropriate on all but (i) the start
date of the BLMIS Ponzi scheme; and (ii) whether the profits reported on the defendant's BLMIS
account statements arising from BLMIS's purported U.S. Treasury Bill trades were real and
resulted from BLMIS's purchase of those U.S. Treasury Bills for the defendant's benefit); *Mann*,
608 B.R. at 176 (narrowing the scope of the trial to determine whether the Two-Year Transfers
were transfers by the debtor within the meaning of SIPA § 78fff-2(c)(3) and Bankruptcy Code §
548(a)(1)(A)).


81.     This Court expressed the same concerns at a recent hearing regarding the Trustee's
announced intention to move for summary judgment in another, similar case, *Picard v. Savin,* Adv.

Pro. No. 10-04889. *See* March 17, 2020 Hearing Tr. 9:23-10:15; 12:11-15, *id.* at ECF No. 96

("[y]ou know my view on these summary judgment . . . , motions, particularly on the issues

I've identified, [whether the JPMC Accounts were held by Madoff personally or by the LLC,

whether the LLC was a Ponzi scheme, and if so, when it began, whether the LLC was allocating

T-bills purchased by the proprietary trading arm to customers of the IA business, deposits and

withdrawals] . . . I have to try it.").

> **RESPONSE:**  Disputed as immaterial and not a factual statement.  *See also Picard v.*
>
> *Philip F. Palmedo*, No. 20-cv-01926 (PGG) (S.D.N.Y. July 8, 2020), ECF No. 5 (district court
>
> denied motion to withdraw the reference as "premature," finding the case not to be "trial-ready"
>
> given the Trustee's forthcoming motion for summary judgment, and referred the case back to the
>
> bankruptcy court for proposed findings of fact and conclusions of law on the motion); *Picard v.*
>
> *Estate of Allen Meisels*, No. 20-cv-01278 (GHW) (S.D.N.Y. June 8, 2020), ECF No. 17 (same).

Dated: October 23, 2020
   New York, New York

> */s/ Nicholas J. Cremona*
> BAKER & HOSTETLER LLP
> 45 Rockefeller Plaza
> New York, New York 10111
> Telephone: (212) 589-4200
> Facsimile: (212) 589-4201
> Nicholas J. Cremona
> ncremona@bakerlaw.com
> Seanna R. Brown
> Email: sbrown@bakerlaw.com
> Maximillian S. Shifrin
> Email: mshifrin@bakerlaw.com
>
> *Attorneys for Irving H. Picard, Trustee*
> *for the Substantively Consolidated SIPA*
> *Liquidation of Bernard L. Madoff Investment*
> *Securities LLC and the Chapter 7 Estate of*
> *Bernard L. Madoff*