**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | Adv. Pro. No. 10-04438 (CGM) |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | |
| v. | |
| ESTATE OF SEYMOUR EPSTEIN, | |
| MURIEL EPSTEIN, as beneficiary and of the Estate of Seymour Epstein and/or the Trusts created by the Last Will and Testament of Seymour Epstein, as Executor of the Estate of Seymour Epstein, and as trustee of Trusts created by the Last Will and Testament of Seymour Epstein, | |

HERBERT C. KANTOR, as trustee of Trusts created
by the Last Will and Testament of Seymour Epstein,

RANDY EPSTEIN AUSTIN, as beneficiary of the
Estate of Seymour Epstein and/or the Trusts created
by the Last Will and Testament of Seymour Epstein,

ROBERT EPSTEIN, as beneficiary of the Estate of
Seymour Epstein and/or the Trusts created by the
Last Will and Testament of Seymour Epstein,

JANE EPSTEIN, as beneficiary of the Estate of
Seymour Epstein and/or the Trusts created by the
Last Will and Testament of Seymour Epstein,

SUSAN EPSTEIN GROSS, as beneficiary of the
Estate of Seymour Epstein and/or the Trusts created
by the Last Will and Testament of Seymour Epstein,
and

SHELBURNE SHIRT COMPANY, INC.,

                    Defendants.

## TRUSTEE'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

                                                                                                    **Page**

INTRODUCTION ...............................................................................................................1

ARGUMENT ......................................................................................................................2

I.     THE TRUSTEE HAS STANDING AS THE TRANSFERS WERE AN
      INTEREST OF THE DEBTOR IN PROPERTY .......................................................2

II.    THE TRUSTEE'S MOTION RESTS ON ADMISSIBLE EVIDENCE...........................3

    A.    Expert Reports May Properly Be Considered on a Motion for Summary
          Judgment.................................................................................................................3

    B.    The Plea Allocutions Are Admissible to Prove the Existence of a Ponzi
          Scheme....................................................................................................................4

    C.    The BLMIS Books and Records Are Admissible Under the Business
          Records Exception to the Hearsay Rule...................................................................4

III.   THE TRUSTEE HAS ESTABLISHED HIS PRIMA FACIE CASE ...............................6

    A.    The Ponzi Scheme Presumption Applies.................................................................6

         1.    The Ponzi Scheme Presumption Applies Even If BLMIS Made
              Some Legitimate Trades ...........................................................................7

         2.    Even If the Ponzi Scheme Presumption Does Not Apply, Intent
              Can Be Satisfied Through "Badges of Fraud".............................................9

    B.    Bruce Dubinsky's Steadfast Opinion Is That the IA Business Did Not
          Purchase T-Bills *on Behalf of* Any Individual IA Business Customer.................10

         1.    Mr. Dubinsky Analyzed the T-Bills Across All IA Business
              Customer Accounts and Concluded That No T-Bills Were
              Purchased for IA Business Customers, Including Defendants .................10

         2.    The Purchase of T-Bills by the IA Business Was for Cash
              Management, Not Purchases Made on Behalf of Any Individual IA
              Business Customer...................................................................................12

         3.    Defendants' Speculation Regarding the T-Bills Does Not Create a
              Disputed Issue of Material Fact ...............................................................13

IV.   DEFENDANTS' AFFIRMATIVE DEFENSES HAVE BEEN REPEATEDLY
      REJECTED.............................................................................................................15

    A.    Defendants' Purported Federal and State Law Claims or BLMIS's
          Obligations Do Not Constitute "Value" Under Section 548(c)..............................15

    B.    The Trustee Is Not Seeking "Cross-Liability".......................................................16

    C.    Taxes May Not Be Considered as Part of Value Calculation.................................17

    D.    The Trustee's Treatment of Inter-Account Transfers Does Not Violate
          Federal or State Law .............................................................................................18

i

E.      The Trustee is Entitled to Prejudgment Interest .....................................................19

CONCLUSION.................................................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
No. 02-41729 (REG), 2006 WL 346418 (Bankr. S.D.N.Y. Feb. 6, 2006) ..............................5

*Alfano v. CIGNA Life Ins. Co.*,
No. 07 Civ. 9661 (GEL), 2009 WL 890626 (S.D.N.Y. Apr. 2, 2009) ..................................20

*Arista Recs. LLC v. Lime Grp. LLC*,
784 F. Supp. 2d 398 (S.D.N.Y. 2011)...................................................................................5

*Banner v. Kassow*,
104 F.3d 352 (2d Cir. 1996).................................................................................................9

*In re Barclays Bank PLC Sec. Litig.*,
756 F. App'x 41 (2d Cir. 2018) ...........................................................................................3

*In re Bernard L. Madoff*,
Adv. Pro. No. 08-01789 (SMB), 2020 WL 1488399 (Bankr. S.D.N.Y. Mar.
20, 2020) ...............................................................................................................................1

*In re Bernard L. Madoff*,
Adv. Pro. No. 10-04387 (SMB), 2018 WL 1442312 (Bankr. S.D.N.Y. Mar.
22, 2018), *adopted by,* 596 B.R. 451 (S.D.N.Y. 2019).........................................................19

*In re Bernard L. Madoff*,
592 B.R. 513 (Bankr. S.D.N.Y. 2018), *aff'd, In re BLMIS LLC*, 605 B.R. 570
(S.D.N.Y. 2019), *aff'd,* No. 19-2988-bk, 2020 WL 5902581 (2d Cir. Oct. 6,
2020) .....................................................................................................................................6

*In re BLMIS LLC*,
697 F. App'x 708 (2d Cir. 2017) ....................................................................................15, 18

*In re BLMIS LLC*,
458 B.R. 87 (Bankr. S.D.N.Y. 2011).....................................................................................7

*In re BLMIS LLC*,
No. 15 Civ. 1151 (PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016)..................................18

*In re BLMIS LLC*,
No. 19-0429, 2020 WL 5666677 (2d Cir. Sept. 24, 2020) .................................................2, 16

*In re BLMIS*,
525 B.R. 871 (Bankr. S.D.N.Y. 2015)..................................................................................17

*Cunningham v. Brown*,
  265 U.S. 1 (1924) ..................................................................................................15

*Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*,
  781 F.3d 1262 (11th Cir. 2015) ...........................................................................6

*In re Dreier LLP*,
  429 B.R. 112 (Bankr. S.D.N.Y. 2010) ..................................................................15

*In re Enron Creditors Recovery Corp.*,
  376 B.R. 442 (Bankr. S.D.N.Y. 2007) ....................................................................5

*Gowan v. Amaranth Advisors LLC (In re Dreier LLP)*,
  No. 08-15051 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014) ............6, 7

*Greater Bright Light Home Care Servs., Inc. v. Jeffries-El*,
  58 N.Y.S.3d 68 (N.Y. App. Div. 2017) .................................................................17

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*,
  310 B.R. 500 (Bankr. S.D.N.Y. 2002) .....................................................................8

*Gust, Inc. v. Alphacap Ventures, LLC*,
  2017 WL 2875642 (S.D.N.Y. July 6, 2017), *rev'd on other grounds*, 905 F.3d
  1321 (Fed. Cir. 2018) ...........................................................................................20

*In re Hartley*,
  479 B.R. 635 (S.D.N.Y. 2012) ..............................................................................17

*In re Kaiser*,
  722 F.2d 1574 (2d Cir. 1983) .................................................................................9

*In re Livent, Inc.*,
  360 F. Supp. 2d 568 (S.D.N.Y. 2005) ...................................................................20

*In re M & L Bus. Mach. Co.*,
  84 F.3d 1330 (10th Cir. 1996) ................................................................................8

*In re Manhattan Inv. Fund Ltd.*,
  397 B.R. 1 (S.D.N.Y. 2007) ....................................................................................6

*Michael v. Gen. Motors Co.*,
  No. 15 Civ. 3659(CM), 2018 WL 6332883 (S.D.N.Y. Nov. 13, 2018) ..................4

*Moran v. Goldfarb*,
  No. 09 Civ. 7667 (RJS), 2012 WL 2930210 (S.D.N.Y. July 16, 2012) ................19

*Newbro v. Freed*,
  409 F. Supp. 2d 386 (S.D.N.Y. 2006) ...................................................................19

iv

*Olin Corp. v. Lamorak Ins. Co.*,
  332 F. Supp. 3d 818 (S.D.N.Y. 2018)....................................................................................3

*Phoenix Assocs. III v. Stone*,
  60 F.3d 95 (2d Cir. 1995) ........................................................................................................5

*Picard v. Cohen*,
  Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
  25, 2016) ..............................................................................................................................17

*Picard v. Greiff*,
  476 B.R. 715 (S.D.N.Y. 2012)...............................................................................................16

*Picard v. Legacy Cap. Ltd.*,
  603 B.R. 682 (Bankr. S.D.N.Y. 2019) ...........................................................................4, 7, 9

*Picard v. Nelson*,
  610 B.R. 197 (Bankr. S.D.N.Y. 2019)............................................................................ *passim*

*Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*,
  38 F.3d 627 (2d Cir. 1994)......................................................................................................5

*Rivera v. Home Depot USA, Inc.*,
  776 F. App'x 4 (2d Cir. 2019) .................................................................................................4

*Scholes v. Lehmann*,
  56 F.3d 750 (7th Cir. 1995) ...............................................................................................8, 14

*SEC v. Byers*,
  637 F. Supp. 2d 166 (S.D.N.Y. 2009).....................................................................................15

*SEC v. Infinity Grp. Co.*,
  226 F. App'x 217 (3d Cir. 2007) ............................................................................................15

*Stanford Square L.L.C. v. Nomura Asset Cap. Corp.*,
  232 F. Supp. 2d 289 (S.D.N.Y. 2002)....................................................................................19

*United States v. Kaiser*,
  609 F.3d 556 (2d Cir. 2010)....................................................................................................5

*United States v. Reyes*,
  157 F.3d 949 (2d Cir. 1998).....................................................................................................5

*West Virginia v. United States*,
  479 U.S. 305 (1987)................................................................................................................19

*Wing v. Layton*,
  957 F. Supp. 2d 1307 (D. Utah 2013) .....................................................................................8

**Statutes**

11 U.S.C. § 548 ............................................................................................................................1

11 U.S.C. § 548(a)(1)(A) ...........................................................................................................9

15 U.S.C. § 78fff-2(b) ..........................................................................................................14, 16

15 U.S.C. § 78fff-2(c)(3) ...........................................................................................................2

**Rules**

Fed. R. Evid. 702 ......................................................................................................................3

Fed. R. Evid. 803(6) ...............................................................................................................4, 5

Fed. R. Evid. 803(22) ...............................................................................................................4

Fed. R. Evid. 807 .................................................................................................................4, 13

**Other Authorities**

N.Y. Bus. Corp. Law § 1006(b) .............................................................................................17

## INTRODUCTION

Defendants'[1] opposition and cross-motion for summary judgment raises no genuine dispute of material fact and concedes, as it must, that the deposits and withdrawals forming the basis of the Trustee's net equity calculation are accurate, entitling the Trustee to recover the $2,622,438 of fictitious profits.  Confronted with this inexorable conclusion, Defendants resort to unscrupulous attacks on the Trustee and his experts and arguments that have already been raised and repeatedly rejected by the Bankruptcy Court, the District Court, and the Second Circuit.

Defendants repeatedly cite to cherry-picked trial testimony from *Picard v. Nelson*, 610 B.R. 197 (Bankr. S.D.N.Y. 2019) where the Bankruptcy Court reviewed all of the evidence presented, rejected the same arguments that Defendants raise here, and ruled overwhelmingly in the Trustee's favor.  Indeed, the Bankruptcy Court previously concluded that: (1) the Trustee had standing and the jurisdictional arguments to the contrary lacked merit; (2) the Trustee demonstrated that Bernard L. Madoff Investment Securities LLC's IA Business was a Ponzi scheme and he is entitled to rely on the Ponzi scheme presumption to prove intent; (3) even if the Ponzi scheme presumption did not apply, the transfers were made with the actual intent to defraud based on the existence of badges of fraud; and (4) the defendants did not give "value" under section 548 of the Bankruptcy Code.  *Nelson*, 610 B.R. at 215–18, 233–36.  The Court entered judgment in favor of the Trustee, including prejudgment interest.  *Id.* at 238.

Defendants also accuse the Trustee of failing to produce trading records from 1992 to 2000.  Not only did the Bankruptcy Court reject Defendants' argument, but counsel for Defendants has been sanctioned for repeatedly making these claims against the Trustee.  *In re*

---

[1] Defined terms shall have the same meaning prescribed in the Trustee's Memorandum of Law in Support of Motion for Summary Judgment (the "Motion").  *See Picard v. Est. of Seymour Epstein*, Adv. Pro. No. 10-04438 (Bankr. S.D.N.Y. Sept. 4 2020), ECF No. 114.

*Bernard L. Madoff*, Adv. Pro. No. 08-01789 (SMB), 2020 WL 1488399, at *19 (Bankr. S.D.N.Y.

Mar. 20, 2020) (awarding attorneys' fees and expenses against counsel personally).  Despite the

Bankruptcy Court's sanctions, counsel for Defendants continues to brazenly misrepresent the

Trustee's obligation to produce these documents.

With no admissible evidence to the contrary, Defendants resort to claiming the Trustee's

expert perjured himself during his testimony in *Nelson*.  But Mr. Dubinsky's testimony was

entirely consistent with his expert report.  Defendants' baseless credibility attacks are insufficient

to challenge Mr. Dubinsky's unequivocal and unimpeached conclusions.  !

The Court should grant summary judgment in the Trustee's favor.

## <u>ARGUMENT</u>

**I.     THE TRUSTEE HAS STANDING AS THE TRANSFERS WERE AN INTEREST
        OF THE DEBTOR IN PROPERTY**

SIPA § 78fff-2(c)(3) allows the Trustee to "invoke the fraudulent transfer provisions in

the Bankruptcy Code to recover customer property," transferred by the debtor.  *In re BLMIS*

*LLC*, No. 19-0429, 2020 WL 5666677, at *12 (2d Cir. Sept. 24, 2020).  Thus, the Trustee must

demonstrate that the transferred money was customer property.  The Trustee laid out at length in

his brief why the transfers to Defendants were customer property transferred by the SIPA

debtor—BLMIS.  *See* Motion at II.B., ECF No. 114.

The Trustee has standing to bring an avoidance action to recover fraudulent transfers of

customer property that he alleges depleted the BLMIS customer property estate and, if

successful, will replenish it.  *See Nelson*, 610 B.R. at 216; *see also In re BLMIS LLC*, 2020 WL

5666677, at *13 (holding BLMIS's payments to customers "were transfer of fictitious profits in

excess of principal that depleted the resources of the customer property fund").  Like the

Defendants here, the *Nelson* defendants argued that the Trustee lacked standing to avoid the

transfers because Madoff, rather than BLMIS, made the transfers. *Nelson*, 610 B.R. at 216. The

Bankruptcy Court rejected the entire premise, finding the Trustee had standing because he:

> br[ought] the avoidance actions as a representative of an insolvent
> customer property estate to avoid and recover transfers for the
> benefit of the customer property estate which was injured by the
> fraudulent transfers of customer property, and the Trustee's action
> will redress that injury by replenishing the funds in the customer
> property estate available to satisfy the customers' net equity claims
> in the SIPA proceeding.

*Id.* at 215 (citations omitted). Defendants "conflate subject matter jurisdiction with the merits of

the Trustee's claims." *Id.* at 216. The only admissible evidence before the Court demonstrates

that the Trustee can recover customer property regardless of whether that property is held in an

account with the letters "LLC" and despite whose name appears on the top of a check. *See* Stmt.

¶¶ 9–11, ECF No. 115. Defendants may contend that whether BLMIS made the transfers is

disputed, but such a dispute is not a genuine one that should defeat the Trustee's Motion.

## II.    THE TRUSTEE'S MOTION RESTS ON ADMISSIBLE EVIDENCE

### A.    Expert Reports May Properly Be Considered on a Motion for Summary Judgment

In determining whether the moving party has met its burden of establishing that no

genuine issue of material fact exists, a court may rely on expert opinions. *See Olin Corp. v.

Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 838 (S.D.N.Y. 2018) ("The summary judgment standard

requires a court to 'consider all relevant, admissible evidence,' and . . . expert opinions, as a

general matter, are admissible so long as they meet the criteria set forth in Federal Rule of

Evidence 702." (citation omitted)); *In re Barclays Bank PLC Sec. Litig.*, 756 F. App'x 41, 47 n.5

(2d Cir. 2018). Expert testimony may form the basis of summary judgment particularly "when a

party opposing summary judgment fails to present evidence sufficient to make an issue of an

expert's conclusion—such as contrary opinion evidence or evidence tending to undermine the

expert's credibility or qualifications—and when the trier of fact would not be at liberty to

disregard arbitrarily the unequivocal, uncontradicted, and unimpeached testimony of an expert."

*Rivera v. Home Depot USA, Inc.*, 776 F. App'x 4, 7–8 (2d Cir. 2019).

In attempting to rebut a moving party's expert evidence to defeat summary judgment, a

nonmoving party must do more than simply assert that the expert evidence is not credible. *See*

*Michael v. Gen. Motors Co.*, No. 15 Civ. 3659(CM), 2018 WL 6332883, at *13 (S.D.N.Y. Nov.

13, 2018) (finding plaintiff's contention that defendant's experts were not credible was

"insufficient to overcome the expert affidavits" (citation omitted)).  Defendants have not

challenged the substance of the Trustee's expert's opinions, instead resorting to selective

recitation of the trial record in *Nelson* to argue that the Trustee's expert, Mr. Dubinsky, somehow

perjured himself by offering testimony that is consistent with his report.

### B.    The Plea Allocutions Are Admissible to Prove the Existence of a Ponzi Scheme

As set forth in the Motion, guilty pleas and admissions under oath are admissible to prove

the existence of a Ponzi scheme.  *See Nelson*, 610 B.R. at 209–10 ("Criminal plea allocutions are

admissible under the exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a

judgment of a previous conviction and FED. R. EVID. 807's residual exception to hearsay.");

*Picard v. Legacy Cap. Ltd.*, 603 B.R. 682, 689 n.8 (Bankr. S.D.N.Y. 2019) ("The Court may rely

on a plea allocution as evidence to support a fact.").  These admissions support a finding that

"there is no genuine disputed issue of fact that BLMIS was a Ponzi scheme."  *Id.* at 693.  A

finding that BLMIS was a Ponzi scheme is accordingly appropriate on summary judgment.

### C.    The BLMIS Books and Records Are Admissible Under the Business Records Exception to the Hearsay Rule

Records made and kept in the ordinary course of a business are admissible pursuant to

Federal Rule of Evidence 803(6) if: (1) the statements were recorded at or near the time of the

purported transaction; (2) the record was made by or from information communicated by an individual with personal knowledge; and (3) the record was made in the regular practice of business activity. *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995).

Courts construe Rule 803(6) generously in favor of admissibility with the principal precondition to admission being the reliability of the documents. *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632–33 (2d Cir. 1994) (holding records properly admitted where they have "sufficient indicia of trustworthiness to be considered reliable"). This is "due to the general trustworthiness of regularly kept records and the need for this type of evidence in many cases." *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 421 (S.D.N.Y. 2011).

Once a *prima facie* case has been made that the records were made and kept in the ordinary course of a business, Rule 803(6) "favors the admission of evidence rather than its exclusion if it has any probative value at all." *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010). Thus, objections to a business record's accuracy or completeness go to the weight and not the admissibility of the evidence. *See United States v. Reyes*, 157 F.3d 949, 953 (2d Cir. 1998) (holding that employee's testimony "provided an adequate basis for the district court to find that the [document] was trustworthy, despite objections concerning irregularities").

Defendants argue that the BLMIS books and records are not trustworthy because they are "permeated with fraud." But business records of an entity engaged in fraud are routinely admitted into evidence. *See Kaiser*, 609 F.3d at 575–76 & n.6 (finding fraudulent activity did not preclude admissibility under business records exception); *In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 454–58 (Bankr. S.D.N.Y. 2007) (admitting debtor's records under business records exception even though Enron was engaged in fraudulent financial transactions); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2006 WL 346418, at *1 (Bankr. S.D.N.Y. Feb.

5

6, 2006) (admitting debtors' books and records even though principals engaged in bank fraud, securities fraud, and conspiracy through debtor).  In *In re Int'l Mgmt. Assocs., LLC*, the Eleventh Circuit upheld the admission of records under the business records exception even though the bankruptcy court found that the business was a Ponzi scheme that "was not set up to, and did not, conduct any legitimate business at all."  781 F.3d 1262, 1267–69 (11th Cir. 2015).  Indeed, the BLMIS books and records have been admitted into evidence and relied upon multiple times in this liquidation.  *See Nelson*, 610 B.R. at 223–24; *In re Bernard L. Madoff*, 592 B.R. 513, 527–29 (Bankr. S.D.N.Y. 2018), *aff'd, In re BLMIS LLC*, 605 B.R. 570, 584–87 (S.D.N.Y. 2019), *aff'd,* No. 19-2988-bk, 2020 WL 5902581 (2d Cir. Oct. 6, 2020).

## III.    THE TRUSTEE HAS ESTABLISHED HIS PRIMA FACIE CASE

### A.    The Ponzi Scheme Presumption Applies

Defendants argue that the Trustee has failed to demonstrate that Madoff's Ponzi scheme meets the four-factor test articulated in *In re Dreier LLP*, No. 08-15051 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014).  But *Dreier* explained that:

> [s]ome courts have discussed a four-factor test . . . [while o]thers have identified badges that weigh in favor of finding a Ponzi scheme, including the absence of any legitimate business connected to the investment program, the unrealistic promises of low risk and high returns, commingling investor money, the use of agents and brokers paid high commissions to perpetuate the scheme, misuse of investor funds, the "payment" of excessively large fees to the perpetrator and the use of false financial statements.

*Id.* at *9.  These badges are merely characteristics of Ponzi schemes "but a Ponzi scheme can exist without them.  At bottom, the label Ponzi scheme applies 'to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud.'"  *Id.* (citing *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 12 (S.D.N.Y. 2007)).

6

*Dreier* cited *In re BLMIS LLC*, 458 B.R. 87, 104 (Bankr. S.D.N.Y. 2011) for the proposition that "[t]he breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of this case, particularly in light of Madoff's criminal admission." 2014 WL 47774, at *12. Marc Dreier did not admit to running a Ponzi scheme, *id.* at *11, and the *Dreier* Court found no evidence comparable to the magnitude and global renown of Madoff's scheme warranting the Ponzi scheme presumption.

The Trustee relies on allocutions of Madoff, Frank DiPascali, David Kugel, Irwin Lipkin, Enrica Cotellessa-Pitz, and Eric Lipkin, all of whom were associated with, and pleaded guilty in connection with Madoff's scheme. These employees testified that Madoff ran a Ponzi scheme through his IA Business, including that: (1) although investors were told their money was invested, no such investments occurred, Stmt. ¶¶ 92–94, 98; (2) investors' money was deposited into a single Chase bank account, *id.* ¶¶ 92, 99; (3) when investors sought to redeem their purported profits, they received their or other investors' money being held in the Chase account, *id.* ¶ 92; and (4) BLMIS issued false account statements to cover up the fact that it made no trades, *id*. ¶¶ 95, 99, 101. "The allocutions establish *prima facie* that Madoff ran BLMIS as a Ponzi scheme." *Legacy*, 603 B.R. at 691; *see also Nelson*, 610 B.R. at 208.

Mr. Dubinsky also confirmed that BLMIS never executed Madoff's purported split-strike conversion strategy ("SSC strategy"), or any other trading, on behalf of its customers, including Defendants. Stmt. ¶¶ 19–24. In the face of the allocutions and Mr. Dubinsky's testimony, Defendants provided no evidence to rebut the conclusion that BLMIS was a Ponzi scheme.

### 1. The Ponzi Scheme Presumption Applies Even If BLMIS Made Some Legitimate Trades

Despite overwhelming evidence to the contrary, Defendants argue that the IA Business was profitable, and that parts of Madoff's business engaged in legitimate trading. But even if

some profits trickled into the IA Business, it is insufficient to rebut the Ponzi scheme

presumption.  Courts regularly apply the Ponzi scheme presumption where a debtor ran a

legitimate business alongside a Ponzi scheme.  For example, in *In re Manhattan Inv. Fund Ltd.*,

Bear Stearns unsuccessfully argued that the Ponzi presumption: (i) only applies when the

payments sought to be avoided are made to early investors and (ii) is inapplicable if the transfers

were part of a legitimate business transaction.  310 B.R. 500, 506 (Bankr. S.D.N.Y. 2002).

Although the perpetrator was operating a Ponzi scheme, Bear Stearns argued that he legitimately

short sold technology stocks separate from the Ponzi scheme.  The court rejected that argument:

> When a debtor operating a Ponzi scheme makes a payment with
> the knowledge that future creditors will not be paid, that payment
> is presumed to have been made with actual intent to hinder, delay
> or defraud other creditors—regardless of whether the payments
> were made to early investors, or whether the debtor was engaged in
> a strictly classic Ponzi scheme.

*Id.* at 509.  The court concluded that the argument that "fraudulent intent cannot be presumed . . .

because the . . . payments at issue were made in connection with a legitimate business outside of

the Ponzi scheme . . . is ludicrous."  *Id.* at 509–11 (collecting cases); *see also Wing v. Layton*,

957 F. Supp. 2d 1307, 1315 (D. Utah 2013) ("Ponzi schemes sometimes use legitimate

operations to attract investors, but this does not insulate those operations from the taint of the

Ponzi scheme."); *In re M & L Bus. Mach. Co.*, 84 F.3d 1330, 1332 (10th Cir. 1996) (Ponzi

scheme existed where company's legitimate computer sales and leasing operations were a front);

*Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) ("It is no answer that some or for that

matter all of Phillip's profit may have come from 'legitimate' trades made by the corporations.

They were not legitimate. The money used for the trades came from investors gulled by

fraudulent representations.").  Here, the existence of some legitimate trades—even if Defendants

could prove they existed, which they cannot—will not affect the Ponzi scheme presumption.

The Trustee has established there were no legitimate trades on behalf of any IA Business

customer and thus, the Ponzi scheme presumption applies.  *Legacy*, 603 B.R. at 693.

### 2.    Even If the Ponzi Scheme Presumption Does Not Apply, Intent Can Be Satisfied Through "Badges of Fraud"

As an alternative to the Ponzi scheme presumption, a trustee may show certain "badges

of fraud" to prove actual intent under section 548(a)(1)(A).  *Banner v. Kassow*, 104 F.3d 352, at

*2 (2d Cir. 1996).  The Second Circuit has recognized the following badges of fraud:

> (1) the lack or inadequacy of consideration; (2) the family,
> friendship, or close associate relationship between the parties; (3)
> the retention of possession, benefit, or use of the property in
> question; (4) the financial condition of the party sought to be
> charged both before and after the transaction in question; (5) the
> existence or cumulative effect of a pattern or series of transactions
> or course of conduct after the incurring of debt, onset of financial
> difficulties, or pendency or threat of suits by creditors; and (6) the
> general chronology of the event and transactions under inquiry.

*In re Kaiser*, 722 F.2d 1574, 1582–83 (2d Cir. 1983).  In addition, "[c]oncealment of facts and

false pretenses by the transferor" may also be a badge of fraud.  *Id.* (citation omitted).

The Trustee's proofs establish that the IA Business did not conduct trading on behalf of

its customers: (i) the plea allocutions of Madoff and BLMIS employees, Stmt. ¶¶ 89–106; (ii) the

IA Business computer system was not able to trade securities, Dubinsky Rpt. ¶¶ 273–89, ECF

No. 118-1; (iii) the BLMIS books and records and other documents show that BLMIS was not

trading securities, Stmt. ¶¶ 19–56; (iv) BLMIS's limited T-Bill purchases were not on behalf of

IA Business customers, *id.* ¶¶ 57–68; and (v) the IA Business had no other significant sources of

funds, *id.* ¶¶ 69–84.  In *Nelson*, the Bankruptcy Court found that this evidence, as a matter of

law, demonstrated that the Two-Year Transfers at issue bore at least three of the "badges of

fraud": "(i) '[c]oncealment of facts and false pretenses by the transferor,' (ii) BLMIS's

insolvency at the time of the Two-Year Transfers and (iii) the lack of consideration for the

fictitious transfers."  610 B.R. at 235 ("[T]he existence of the badges of fraud supply a separate

basis to conclude that the Two-Year Transfers were made with the actual intent to defraud.").

### B. Bruce Dubinsky's Steadfast Opinion Is That the IA Business Did Not Purchase T-Bills *on Behalf of* Any Individual IA Business Customer

Defendants' scurrilous accusation that Mr. Dubinsky perjured himself is based on

rhetoric, not fact.  Mr. Dubinsky's report makes clear that he never hid the fact that BLMIS used

IA Business customer money to purchase T-Bills.  Dubinsky Rpt. ¶¶ 228, 340, Fig. 52.  Mr.

Dubinsky's report is also quite clear that "US Treasuries purchased using money from the 703

Account were not purchased *for* the IA Business Customers" but rather were purchased by the

IA Business to earn additional interest on the cash it received from customers.  *Id.* ¶ 228

(emphasis added).  Mr. Dubinsky's testimony during the *Nelson* trial was entirely consistent with

his report, and even where selectively quoted by Defendants, confirms that "[t]here was no

evidence of treasuries being purchased *for* the IA business customers, plain and simple."

Counterstatement of Material Facts ("CMF") ¶ 67, ECF No. 124 (emphasis added) (quoting

Chaitman Ex. B [Nelson Tr. 5/8/19 at 132:9–14]); Dubinsky Rpt. ¶¶ 224–40; Declaration of

Seanna R. Brown ("Brown Decl."), Ex. 1 (Trial Testimony of Bruce G. Dubinsky in *Picard v.

Nelson* dated May 8, 2019 ("*Nelson* Tr.")) at 92:6–21, 128:5–19, 129:9–132:14, 177:16–178:12.

#### 1. Mr. Dubinsky Analyzed the T-Bills Across All IA Business Customer Accounts and Concluded That No T-Bills Were Purchased for IA Business Customers, Including Defendants

BLMIS claimed it would intermittently invest IA Business customer funds in T-Bills as

part of the SSC strategy.  Mr. Dubinsky, however, found no evidence of such purchases having

been made on behalf of IA Business customers.  Mr. Dubinsky reviewed the BLMIS books and

records to identify the unique T-Bills held by the Proprietary Trading Business on December 31

from 2002 through 2007.  He then compared those holdings to: (i) those T-Bill positions held at

BLMIS's account at the DTC, which serves as the custodian or the clearing house for treasuries; and (ii) the T-Bills purportedly held by the IA Business.  Mr. Dubinsky determined that the T-Bill CUSIPs (*i.e.*, unique security identifiers) held at the DTC under BLMIS's account matched those T-Bills reported as being purchased and held by the Proprietary Trading Business. Conversely, none of the T-Bill CUSIPs held at the DTC under BLMIS's account matched those purportedly purchased and held on behalf of IA Business customers.  Dubinsky Rpt. ¶¶ 224–26.

Mr. Dubinsky further compared the aggregate volume of T-Bills reported on the BLMIS customer statements as of each monthly statement to the total volume of T-Bills held in the Brokerage Accounts[2] and the Proprietary Trading Business as reported by the DTC for the same period.  This analysis showed that the total volume of T-Bills purportedly held in the IA Business at year-end from 1998–2007 dwarfed the volume held in the Brokerage Accounts and the Proprietary Trading Business.  *Id.* ¶ 227 & Table 5, ¶¶ 228–31 & Figure 36, Ex. 22.  For example, by the end of 2007, the $80 million in treasury positions held by the Proprietary Trading Business (as recorded on the DTC records) was only 0.14 percent of the approximately $57 billion in T-Bills purportedly held by the IA Business at that time.  *Id.* ¶ 227 & Table 5. During the *Nelson* trial, consistent with his report, Mr. Dubinsky testified that if the T-Bills held in the Brokerage Accounts were added up, the total would be "woefully short" of what appeared on BLMIS customer statements.  Brown Decl., Ex. 1 (*Nelson* Tr.) at 177:19–178:12.

Moreover, Mr. Dubinsky's additional analysis verified that the T-Bills held in the Brokerage Accounts do not "match" the (i) trade date, (ii) volume, (iii) price, (iv) security description, and (v) maturity date for every purported treasuries position on the IA Business

---

[2] The T-Bills were held in various brokerage accounts and/or the JPMC custody account #G 13414 (collectively, the "Brokerage Accounts").  *See* Dubinsky Rpt. ¶ 228, n.213.

customer statements. Dubinsky Rpt. at 99 n.217, ¶¶ 232–40. Specifically, Mr. Dubinsky found

that approximately 71% of the T-Bills do not have the same maturity date as any of the T-Bills

held in the Brokerage Accounts, meaning 71% were never purchased by the IA Business. *Id.* ¶

233, Ex. 23. Of the remaining 29% of the T-Bills—4,660 unique transactions—that did have the

same maturity dates as those held on the Brokerage Accounts, there were only 20 unique

instances in which the IA Business customer accounts purportedly purchased and sold a treasury

on the same dates as the Brokerage Accounts. *Id.* ¶¶ 234–36. In each of the 20 instances, the

purported volume of the T-Bills purchased and sold in the aggregate by the IA Business was

higher than the actual volume purchased and sold in the aggregate by the Brokerage Accounts.

*Id.* ¶¶ 239–40. Thus, none of the T-Bills identified on customer statements, including those

identified by Defendants' counsel, were the same T-Bills held in the Brokerage Accounts.

### 2. The Purchase of T-Bills by the IA Business Was for Cash Management, Not Purchases Made on Behalf of Any Individual IA Business Customer

Mr. Dubinsky's report is clear that BLMIS's limited purchases of T-Bills with funds from

the 703 Account were not for any individual IA Business customer account, but rather were for

the purpose of investing BLMIS's excess cash—*i.e.*, cash management—and he testified

accordingly. Dubinsky Rpt. ¶ 228; Brown Decl., Ex. 1 (*Nelson* Tr.) at 82:2–84:14, 85:3–23,

90:20–91:6, 152:22–153:11, 166:9–167:9. Frank DiPascali's criminal trial testimony confirmed

the same. DiPascali stated that the Brokerage Accounts were used to purchase T-Bills for

BLMIS's cash management purposes and not for IA Business customers. Cremona Decl., Ex. 3,

(DiPascali Testimony) at 4921:7–12, 4930:6–4931:5, 4931:12–4933:13, 4961:15–4962:22 (Dec.

5, 2013); 5344:24–5346:3 (Dec. 10, 2013); 6950:25–6951:9 (Jan. 13, 2014), ECF No. 116-4; *see

also* Brown Decl., Ex. 2 (DiPascali Testimony) at 4803:23–4804:21 (Dec. 4, 2013).

The Court previously rejected Defendants' current objections to the admissibility of DiPascali's testimony when it previously admitted DiPascali's testimony under Federal Rule of Evidence 807 because it was both relevant and trustworthy. *Nelson*, 610 B.R. at 229. DiPascali purchased the T-Bills held by the Brokerage Accounts *and* generated the fictitious holdings of T-Bills reported on the customer statements. "DiPascali's direct testimony established that the T-Bill trades appearing on the customer statements were fabricated and bore no relationship to BLMIS's use of funds in the 703 Account to purchase T-Bills as a cash management tool. In other words, the actual T-Bill purchases were never allocated to the IA Business customers." *Id.* at 228–29. DiPascali's testimony was "obviously relevant" to how BLMIS managed its cash— "the material issue raised by the Defendants and is the most probative on that issue." *Id.* at 229.

To the question of trustworthiness, DiPascali testified in *United States v. Bonventre* after he had already pleaded guilty but had yet to be sentenced. Thus, "[h]e had an interest in continuing to cooperate with the Government in the hope of a favorable sentencing recommendation. Conversely, he gave his testimony (for sixteen days) under oath in open Court and was subject to cross-examination in connection with anything he said." *Id.* The Bankruptcy Court found that DiPascali had no motive to lie and defendants had not identified "any inconsistencies between his allocution and his trial testimony, he never recanted his testimony, and his unavailability was due to his death rather than to any attempt to absent himself." *Id.*

### 3.    Defendants' Speculation Regarding the T-Bills Does Not Create a Disputed Issue of Material Fact

Defendants provide no evidence to counter Mr. Dubinsky's analysis or DiPascali's testimony. Instead, Defendants speculate that the T-Bills held in the Brokerage Accounts were purchased for and should be credited to their accounts, over the thousands of other BLMIS accounts where the same T-Bills were also reported. As set forth above, Mr. Dubinsky's

analysis shows, and DiPascali's testimony confirms, that none of the T-Bills purchased by the IA

Business are the same T-Bills reported on customer statements, including Defendants'.

DiPascali described a complicated spreadsheet he created to calculate duration and volume of T-

Bills that were not owned but were reported on all customer statements. Cremona Decl., Ex. 3

(DiPascali Testimony) at 5344:24–5346:3 (Dec. 10, 2013); 4930:18–4931:5 (Dec. 5, 2013);

Brown Decl., Ex. 2 (DiPascali Testimony) at 4803:23–4804:21 (Dec. 4, 2013). Defendants

present no admissible evidence to support their claim that their customer statements are in any

way different than the thousands of other accounts.

Even if Defendants were able to rebut Mr. Dubinsky's analysis or DiPascali's testimony,

which they cannot, they have no claim to an individual credit for T-Bills purchased by BLMIS as

a cash management tool. SIPA only covers net equity claims for cash and securities "for the

account of such customer." SIPA § 78fff-2(b). There is no mechanism within SIPA or the

Bankruptcy Code for any one customer to increase their net equity claim—or here, reduce their

avoidance liability—because BLMIS earned interest on various short-term investments,

including T-Bills. To the extent such property existed on the Filing Date, this property has

already been allocated to the fund of customer property and distributed pro rata to customers

with allowed claims. *See* Order, *In re Bernard L. Madoff*, Adv. Pro. No. 08-01789 (SMB)

(Bankr. S.D.N.Y. July 12, 2011), ECF No. 4217 (approving allocation).

In addition, because BLMIS operated a Ponzi scheme, there are no transfers of "real

profit" to be credited. So called "legitimate profits" cannot be separated from tainted funds when

the money used for "legitimate" trades came from other customers who were defrauded by

BLMIS. *See Scholes*, 56 F.3d at 757 ("It is no answer that some or for that matter all of Phillip's

profit may have come from "legitimate" trades made by the corporations. They were not

legitimate. The money used for the trades came from investors gulled by fraudulent representations."). Defendants state they can "trace" their "legitimate" profits to a real trade and therefore they are entitled to recoup that profit. In the context of Ponzi schemes, however, tracing theories are almost universally rejected by courts as inequitable. *See SEC v. Byers*, 637 F. Supp. 2d 166, 177 (S.D.N.Y. 2009) (collecting cases); *SEC v. Infinity Grp. Co.*, 226 F. App'x 217, 218 (3d Cir. 2007) ("In the original Ponzi scheme case, *Cunningham v. Brown*, 265 U.S. 1 (1924), the Supreme Court held that 'tracing' fictions should not be used to pursue individual recoveries when a fraud ensnares multiple victims whose funds are commingled.").

In *In re Dreier LLP*, the Bankruptcy Court noted "reluctance to allow tracing and impose a constructive trust in bankruptcy is particularly compelling when it involves the commingled proceeds of a Ponzi scheme." 429 B.R. 112, 137 (Bankr. S.D.N.Y. 2010). Here, the funds used to purchase the T-Bills came from the commingled funds in the 703 Account. Accordingly, allowing some defendants to cherry pick "profits"—at a time when the company was insolvent and owed billions of dollars to customers—would be to allow them to benefit at the expense of other, similarly-situated claimants. *In re BLMIS LLC*, 697 F. App'x 708, 711 (2d Cir. 2017).

Thus, even if Defendants were somehow able to show that BLMIS purchased a T-Bill, allocated the T-Bill to their accounts, and that the sale of the T-Bill resulted in a profit for their accounts—something Defendants cannot show—Defendants are still not entitled to a credit for any such hypothetical transaction under the case law.

## IV. DEFENDANTS' AFFIRMATIVE DEFENSES HAVE BEEN REPEATEDLY REJECTED

### A. Defendants' Purported Federal and State Law Claims or BLMIS's Obligations Do Not Constitute "Value" Under Section 548(c)

As Defendants acknowledge, the Second Circuit recently held that BLMIS customers, like Defendants, "cannot invoke the 'for value' defense here in the same way in which they

could if this were an ordinary bankruptcy because the defense operates differently in a SIPA

liquidation." *In re BLMIS LLC*, 2020 WL 5666677, at *12. Even if Defendants had enforceable

claims under federal or state law, "a conclusion that satisfaction of those claims gave 'value' to

[BLMIS] would conflict with SIPA." *Picard v. Greiff*, 476 B.R. 715, 727 (S.D.N.Y. 2012). This

is because SIPA "differs from general bankruptcy law because it 'choose[s] among creditors'

and prioritizes customers." *In re BLMIS LLC*, 2020 WL 5666677, at *5 (citing *Greiff*, 476 B.R.

at 727). Customers like Defendants, who have no net equity claims, may have valid claims and

payment on those claims could discharge an antecedent debt, but:

> [t]he types of claims that a customer may make against a customer
> property fund are those 'relating to, or net equity claims based
> upon, securities or cash, . . . insofar as such obligations are
> ascertainable from the books and records of the debtor or otherwise
> established to the satisfaction of the trustee.' 15 U.S.C. § 78fff-
> 2(b). In the case at bar, the only such claims are those for a return
> of principal or net equity.

*Id.* at *12–13. This Court should not depart from the well-established precedent that limits value

to the principal invested by good faith defendants.

### B.    The Trustee Is Not Seeking "Cross-Liability"

Defendants fundamentally misunderstand the Trustee's claims against them. The Trustee

is seeking to avoid and recover $1,110,538 from Defendants Estate of Seymour Epstein and

Muriel Epstein, as executrix of the Estate of Seymour Epstein and as trustee of Trusts created by

the Last Will and Testament of Seymour Epstein (the "Trusts"), representing the Two-Year

Transfers from the Seymour Account. Defendants argue that the Trustee has failed to name the

Trusts as defendants and the claims he asserts against Muriel Epstein individually and as trustee

are subsequent transferee claims. Upon his death, Seymour Epstein's assets, including the Two-

Year Transfers, became part of his estate and some or all of the assets in the estate are held by

the trustee pursuant to the Trusts created by operation of Seymour Epstein's Last Will and

Testament.  The Trustee has properly named Muriel Epstein as executor of Seymour Epstein's

estate and trustee of the Trusts, where she holds title to the Two-Year Transfers.[3]

The Trustee is also seeking $1,511,900 from Defendant Shelburne Shirt Company, Inc.,

representing the Two-Year Transfers from the Shelburne Account.  Defendant Shelburne Shirt

Company, Inc. was dissolved a year before the Trustee filed his complaint, however, under New

York law, "[t]he dissolution of a corporation shall not affect any remedy available to or against

such corporation, its directors, officers or shareholders for any right or claim existing or any

liability incurred before such dissolution." *In re Hartley*, 479 B.R. 635, 640 (S.D.N.Y. 2012)

(citing N.Y. Bus. Corp. Law § 1006(b)); *see also Greater Bright Light Home Care Servs., Inc. v.

Jeffries-El*, 58 N.Y.S.3d 68, 73 (N.Y. App. Div. 2017).  Nowhere in his Complaint does the

Trustee seek to hold Defendants "liable for any damages awarded against the others."[4]

### C.    Taxes May Not Be Considered as Part of Value Calculation

The Bankruptcy Court and the District Court have already considered and rejected any

defense allowing Defendants to offset their avoidance liability by the amount of taxes paid on the

fraudulent transfers received from BLMIS.  *See Nelson*, 610 B.R. at 236–37 (citing *Picard v.

Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *15 (Bankr. S.D.N.Y. Apr. 25,

2016) (stating "the offset would introduce complex problems of proof and tracing and reduce the

[Trustee's] ability to recover assets . . . at the expense of the other victims")); *In re BLMIS*, 525

B.R. 871, 893 (Bankr. S.D.N.Y. 2015) ("[T]he withdrawal of the money to pay taxes the

[d]efendants never should have had to pay is not a defense to the fraudulent transfer claims."

---

[3] The Trustee's subsequent transfer claims against the *beneficiaries* of the Trusts were dismissed.  Motion at n.4.

[4] Likewise, the Complaint asserts no claims against Defendant Estate of Seymour Epstein for the Two-Year Transfers from the Shelburne Account, although the Trustee reserves his right to pursue subsequent transferee claims if this Court enters judgment in his favor against Defendant Shelburne Shirt Company, Inc.

(citation omitted)).  "The prior decisions within this SIPA proceeding constitute law of the case

and Defendants offer no reason or evidence . . . to revisit them here."  *Nelson*, 610 B.R. at 237.

> ### D.    The Trustee's Treatment of Inter-Account Transfers Does Not Violate Federal or State Law

Finally, Defendants argue that "the Epstein Account received only partial credit in the

amount of $150,000 for an 'inter-account' transfer of $329,987 made on January 4, 1993," in

contravention of federal and state law.[5]  Opp'n at 30.  Defendants attempt to reargue the

Trustee's use of the "Inter-Account Transfer Method," which applies the Net Investment Method

to all accounts, including those that received one or more inter-account transfers.  *In re BLMIS*

*LLC*, 697 F. App'x at 708.  The Second Circuit rejected Defendants' arguments that the Inter-

Account Transfer Method violates federal securities laws and New York law.  *Id.* at 712–713.

"[T]he recognition of transfers from one BLMIS account to another must, too, be limited

by the net principal in the transferring account at the time of transfer."  *In re BLMIS LLC*, No. 15

Civ. 1151 (PAE), 2016 WL 183492, at *9 (S.D.N.Y. Jan. 14, 2016).  Defendants' approach

"would necessarily result in treating certain fictitious gains in the recipient account (the amount

by which the transfer exceeded the net equity in the transferring account) as if they were real."

*Id.*  Mr. Greenblatt applied the Inter-Account Transfer Method to the Seymour Account as part

of the principal balance calculation, including citation to the BLMIS books and records

supporting each transfer.  *See* Greenblatt Decl., Attach. A (Methodology for the Principal

Balance Calculation, dated November 15, 2012, at n.6, ¶¶ 18, 27–28, ECF No. 119-1; Attach. B

(Greenblatt Epstein Report) ¶¶ 7–17; Exs. 4A–B, ECF Nos. 119-10, 119-15, 119-16.

---

[5] In fact, the Trustee's expert Mr. Greenblatt credited the Seymour Account with $200,000 of principal from the inter-account transfer on January 4, 1993.  *See* Declaration of Matthew B. Greenblatt, dated September 4, 2020 ("Greenblatt Decl."), Attach. B (Expert Report of Matthew B. Greenblatt, CPA/CFF, CFE dated June 28, 2019 ("Greenblatt Epstein Report")) ¶¶ 13–15, ECF No. 119-10.

### E.    The Trustee is Entitled to Prejudgment Interest

Defendants argue prejudgment interest is inappropriate because they "did nothing wrong" but that is not the relevant inquiry.[6]  This Court has discretion in granting prejudgment interest and setting the interest rate, "and absent a sound reason to deny it, it should be awarded." *In re Bernard L. Madoff*, Adv. Pro. No. 10-04387 (SMB), 2018 WL 1442312, at *15 (Bankr. S.D.N.Y. Mar. 22, 2018), *adopted by,* 596 B.R. 451 (S.D.N.Y. 2019).  While Defendants may have unwittingly invested in the Ponzi scheme, they "still received money that was never in fact [theirs] to spend."  *Moran v. Goldfarb*, No. 09 Civ. 7667 (RJS), 2012 WL 2930210, at *9 (S.D.N.Y. July 16, 2012).  At the very latest, Defendants knew they were "net winners," or possessed funds BLMIS took from other customers, when the Trustee filed this avoidance action in November 2010.  Despite this knowledge, Defendants have benefitted—and continue to benefit—from the fraudulent transfers in their possession, to the detriment of the other victims.

Prejudgment interest is appropriate to compensate the victims who have suffered due to the Ponzi scheme, and to avoid Defendants' unjust enrichment.  As the District Court stated:

> Awarding prejudgment interest is based upon the premise that the party to whom the money is owed has been deprived of the use of the funds and can be made whole only by the award of interest. Conversely, the party owing the money has had the use of the funds he was obligated to have paid and should be required to pay compensation by way of interest.

*Stanford Square L.L.C. v. Nomura Asset Cap. Corp.*, 232 F. Supp. 2d 289, 293 (S.D.N.Y. 2002); *see also West Virginia v. United States*, 479 U.S. 305, 310  n.2 (1987) (prejudgment interest is "[t]o compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered."); *Newbro v. Freed*, 409 F. Supp. 2d 386, 402 (S.D.N.Y. 2006) ("An

---

[6] The Trustee reserves his right to fully brief the applicability of prejudgment interest and the appropriate interest rate if this Court enters judgment against Defendants for the Two-Year Transfers.

important rationale for the prejudgment interest rule is that the party against whom the claim is asserted could have stopped the running of interest by paying what was owed . . . .").

Further, this Court should look to New York's statutory prejudgment interest rate to award interest on a judgment where, as here, it accurately reflects the loss resulting from Defendants withholding the return of fictitious profits. In *Gust, Inc. v. Alphacap Ventures, LLC*, the District Court awarded prejudgment interest at New York's interest rate of nine percent, noting that "while [the plaintiff's] claims arise out of federal law . . . there is no reason to think that the [federal] rate more accurately captures the true loss to [the plaintiff]." No. 15CV6192 (DLC), 2017 WL 2875642, at \*7 (S.D.N.Y. July 6, 2017), *rev'd on other grounds*, 905 F.3d 1321 (Fed. Cir. 2018); *see also Alfano v. CIGNA Life Ins. Co.*, No. 07 Civ. 9661 (GEL), 2009 WL 890626, at \*7 (S.D.N.Y. Apr. 2, 2009) (for federal claims under ERISA, the court determined New York's rate of 9% better reflected "the true loss to plaintiff"); *In re Livent, Inc.*, 360 F. Supp. 2d 568, 572 (S.D.N.Y. 2005) (holding that noteholders who brought federal securities claims were entitled to the forum state rate of 9% to fully compensate for investment losses). Thus, the Trustee is entitled to prejudgment interest on the Two-Year Transfers.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant summary judgment on Count One of the Trustee's Complaint and enter an order avoiding the transfers of fictitious profits made by BLMIS to Defendants within the Two-Year Period ($1,110,538 to Defendants Estate of Seymour Epstein and Muriel Epstein, as executrix of the Estate of Seymour Epstein and as trustee of the Trusts, and $1,511,900 to Defendant Shelburne Shirt Company, Inc. from the Shelburne Account), and requiring Defendants to return such transfers or the value thereof to the Trustee.

Dated: October 30, 2020
      New York, New York

                  /s/ Nicholas J. Cremona

                  **BAKER & HOSTETLER LLP**
                  45 Rockefeller Plaza
                  New York, New York 10111
                  Telephone: (212) 589-4200
                  Facsimile: (212) 589-4201
                  David J. Sheehan
                  Email: dsheehan@bakerlaw.com
                  Nicholas J. Cremona
                  Email: ncremona@bakerlaw.com
                  Seanna R. Brown
                  Email: sbrown@bakerlaw.com
                  Maximillian S. Shifrin
                  Email: mshifrin@bakerlaw.com

                  *Attorneys for Irving H. Picard, Trustee*
                  *for the Substantively Consolidated SIPA*
                  *Liquidation of Bernard L. Madoff Investment*
                  *Securities LLC and the Chapter 7 Estate of*
                  *Bernard L. Madoff*