**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (SMB) |
| | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:

BERNARD L. MADOFF,

        Debtor.

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-04438 (CGM) |
| Plaintiff, | |
| v. | |

ESTATE OF SEYMOUR EPSTEIN,

MURIEL EPSTEIN, as beneficiary and of the Estate of Seymour Epstein and/or the Trusts created by the Last Will and Testament of Seymour Epstein, as Executor of the Estate of Seymour Epstein, and as trustee of Trusts created by the Last Will and Testament of Seymour Epstein,

HERBERT C. KANTOR, as trustee of Trusts created by the Last Will and Testament of Seymour Epstein,

RANDY EPSTEIN AUSTIN, as beneficiary of the Estate of Seymour Epstein and/or the Trusts created by the Last Will and Testament of Seymour Epstein,

ROBERT EPSTEIN, as beneficiary of the Estate of Seymour Epstein and/or the Trusts created by the Last Will and Testament of Seymour Epstein,

JANE EPSTEIN, as beneficiary of the Estate of Seymour Epstein and/or the Trusts created by the Last Will and Testament of Seymour Epstein,

SUSAN EPSTEIN GROSS, as beneficiary of the Estate of Seymour Epstein and/or the Trusts created by the Last Will and Testament of Seymour Epstein, and

SHELBURNE SHIRT COMPANY, INC.,

Defendants.

## TRUSTEE'S RESPONSES AND OBJECTIONS TO DEFENDANTS' COUNTERSTATEMENT OF MATERIAL FACTS

Plaintiff Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated chapter 7 estate of Bernard L. Madoff, respectfully submits, pursuant to Local Rule 56.1, his responses and objections to the Counterstatement of Material Facts Submitted by defendants Estate of Seymour Epstein, Muriel Epstein, as executor of the Estate of Seymour Epstein and as trustee of the Trusts created by the Last Will and Testament of Seymour Epstein (the "Trusts"), Herbert C. Kantor, as Trustee of the Trusts, and Shelburne Shirt Company, Inc. ("Shelburne") (collectively, the "Defendants"),[1] in Opposition to the Trustee's Motion for Summary Judgment and in Support of Defendants' Cross-Motion, ECF No. 124.

---

[1] The subsequent transfer counts against defendants Randy Epstein Austin, Robert Epstein, Jane Epstein, and Susan Epstein Gross, as beneficiaries of the Estate of Seymour Epstein and/or the Trusts created by the Last Will and Testament of Seymour Epstein, were dismissed pursuant to the Court's July 16, 2015 Order granting in part and denying in part Defendants' motion to dismiss. *See* Order, *Picard v. Estate of Seymour Epstein*, Adv. Pro. No. 10-04438 (Bankr. S.D.N.Y. July 16, 2015), ECF No. 42. Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Estate of Seymour Epstein*, Adv. Pro. No. 10-04438 (Bankr. S.D.N.Y.).

**Madoff's Business**

1.       From the 1960s on, Madoff operated two separate business units through his sole proprietorship called Bernard L. Madoff Investment Securities ("BLMIS"). Madoff operated a legitimate trading business which, at times, executed trades equal to 10% of the daily volume on the New York Stock Exchange (the "Legitimate Trading Business"). The Legitimate Trading Business included both proprietary trading ("PT"), which traded securities for its own account, and market-making ("MM"), which created a market in certain securities and acted as a broker-dealer for all of the major investment firms.   Chaitman **Ex. B** [Nelson Tr.2 5/8/19 at 63:6:11; 63:14-1], and an investment advisory business ("IA"). Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 63:3-4].

**RESPONSE:**  Not disputed that beginning in 1960 and until January 1, 2001, BLMIS operated as a sole proprietorship.  Not disputed that BLMIS operated a proprietary trading business and a market-making business as two of its three business units.  Disputed to the extent these statements are inconsistent with the Trustee's Statement of Material Facts in Support of Motion for Summary Judgment ("Stmt.") ¶¶ 8–18, ECF No. 115.  Disputed that the proprietary trading business and the market-making business executed trades equal to 10% of the daily volume on the New York Stock Exchange as immaterial and lacking evidentiary support.


2.       The Legitimate Trading Business was known internally as "House 5."  Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 62:18-19].

**RESPONSE:**  Not disputed that the proprietary trading and market-making businesses were referred to within BLMIS as "House 5."  Stmt. ¶ 16.


3.       The IA business was known internally as "House 17" since it was located on the

17th floor of the Lipstick Building. Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 63:4-6].

    **RESPONSE:**  Not disputed.

4.      There were approximately 172 employees who worked in the Legitimate Trading Business and only 6 to 8 people who worked in the IA business.  Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 168:14-17].

    **RESPONSE:**  Disputed as immaterial.  In addition, the evidence cited by Defendant states that there were approximately 180 or so employees for the "whole operation" and eight to ten employees involved in the "Ponzi scheme."

5.      All of the banking activity of the Legitimate Trading Business was conducted at the Bank of New York ("BNY"). Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 161:5-8].

    **RESPONSE:**  Disputed to the extent that the statement is not supported by admissible evidence.[2]  Not disputed that the primary banking activity of the Proprietary Trading Business was conducted at BNY.  Bruce Dubinsky's expert report states: "In the Proprietary Trading Business, the primary operating account was the Bank of New York ("BONY") account number 8661126621 (the "621 Account")."  Declaration of Bruce G. Dubinsky, dated September 4, 2020 ("Dubinsky Decl."), Attach. A (Expert Report of Bruce G. Dubinsky, dated January 16, 2019 ("Dubinsky Report")) ¶ 78, ECF No. 118-1; *see also* Declaration of Lisa M. Collura, September 4, 2020 ("Collura Decl."), Attach. A (Expert Report of Lisa M. Collura, dated January 16, 2019 ("Collura Report")) ¶ 17 n.2, ECF No. 117-1.

---

[2] The Trustee does not dispute the admissibility of testimony by his experts.  However, Defendants routinely mischaracterize the testimony by selectively citing to or quoting language from counsel's question rather than the actual testimony of the witness.

6.      The PT and MM Businesses were legitimate and were not involved in an alleged

Ponzi scheme.  Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 63:2-24 ("Q. So, was the prop side [PT and

MM] of the business designed to buy and sell securities? A. Absolutely."); 64:10-14 ("Q. . . . So,

the proprietary trading side of the business bought and sold securities? A. Absolutely. Q. The

investment advisory side? A. Never."); 68:7-16 ("Q. So, the proprietary trading side of the business

had a trading platform? A. It had a trading platform and it actually traded. That's what it did.");

122:15-21 ("Q. And was the proprietary trading business actually buying stock during that period?

A. Yes. The proprietary trading business was buying stock for the proprietary trading desk and for

the market-making clients of that side of the business."); 150:18-25 ("The proprietary trading, in

fact, was investing…"); 168:8-17 (the PT and MM business were not involved in a Ponzi scheme,

"Q. So out of the whole operation of 180 or so employees, it's 8 to 10 employees who, in your

opinion, were involved in a Ponzi scheme; is that right? A. That's correct.")].

> **RESPONSE:** Disputed to the extent the statement is not supported by admissible evidence.
> *See* n.2.  The Proprietary Trading Business was engaged in pervasive fraudulent activity.  *See*
> Dubinsky Decl., Attach. A (Dubinsky Report) Part IV.C.

7.      Madoff operated his entire business as a sole proprietorship until January 2001.

Adv. Pro. No. 08-01789 (SMB), ECF Nos. 10089, 10679 and 10681; *see e.g.* Complaint

("Compl.") at ¶ 19, Adv. Pro. No. 10-04749 (Bankr. S.D.N.Y. December 1, 2010), ECF No. 1.

> **RESPONSE**:  Not disputed.

8.      Madoff used the trade name "Bernard L. Madoff Investment Securities" for his sole

proprietorship from at least the 1970's.  Chaitman **Ex. B** [Nelson Tr. 5/8/19 172: 9:17 (Q. you're

aware, are you not, that Mr. Madoff used the tradename Bernard L. Madoff Investment Securities prior to his formation of the LLC? A. Yes. I saw it on many documents, yes."]; Chaitman **Ex. B** [Confirmation Slips dating from 1979 showing the trade name Bernard L. Madoff Investment Securities [10-5420_Defendant_0002412-13]],[3] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 610 B.R. 197, 206 (Bankr. S.D.N.Y. 2019).  Even the account statement for the 703 account for December 2008, the final month of the LLC's operations, lists the account as owned by the trade name "Bernard L. Madoff Investment Securities" without any reference to the LLC. Chaitman **Ex. C** [703 Account Statement for December 2008].

**RESPONSE:**  Not disputed that "Madoff Securities frequently used the trade name 'Bernard L. Madoff Investment Securities' in the course of its business."  *Picard v. Nelson*, 610 B.R. 197, 206 (Bankr. S.D.N.Y. 2019).


9.      In January 2001, Madoff formed the LLC to which he transferred the PT and MM businesses, managed by his two sons.  Chaitman **Ex**. **E** [SEC Amended Form BD]; *see* Compl. at ¶ 19.

**RESPONSE:**  Not disputed that Madoff transferred the assets and liabilities of the proprietary trading business and the market making business from the sole proprietorship to a single member limited liability company in January 2001.  Stmt. ¶ 9.  Along with "House 5," Madoff also transferred "House 17."  Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206 ("BLMIS was a single enterprise that operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory

---

[3] Attached to the Chaitman declaration as **Ex. C** are copies of confirmation slips dating from 1979 to the Unflats, who were Madoff customers, showing credits to their account from "Bernard L. Madoff Investment Securities."

business.").

10.    In January 2001, Madoff notified BNY and the governmental agencies with which

the Legitimate Trading Business dealt that the LLC was formed and would operate the Legitimate

Trading Business. *See* the following notification letters all dated January 1, 2001: Chaitman **Ex. F**

[Letter from the LLC to BNY; Letter from the LLC to the National Securities Clearing

Corporation; Letter from the LLC to the Options Clearing Corporation; Letter from the LLC to the

Depository Trust Company].

**RESPONSE:**  Not disputed that Madoff notified BNY and governmental agencies of the

formation of the LLC in January 2001 but disputed that the LLC would only operate the market

making business and proprietary trading business.  BLMIS operated as a "single enterprise."

Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206 ("BLMIS

was a single enterprise that operated three business units: (i) a proprietary trading business; (ii) a

market-making business; and (iii) an investment advisory business.").  The documents speak for

themselves.

11.    Neither JPMC nor Madoff has any record of any such letter ever being sent to

JPMC.  Chaitman **Ex. G** [Email dated June 12, 2018 from counsel to Trustee, Maximillian Shifrin

to Helen Davis Chaitman].

**RESPONSE:** Not disputed that such a letter has not been located to date in BLMIS's books

and records.

12.    Madoff did not transfer the IA Business to the LLC.  Chaitman **Ex**. E [SEC

Amended Form BD at 8-10].

**RESPONSE:** Disputed. *See* Stmt. ¶¶ 9–11.

13.     Madoff did not register with the SEC as an investment advisor until late 2006. *Id.; In re Bernard L. Madoff Inv. Secs., LLC*, 424 B.R. 122, 127 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229 (2d Cir. 2011).

**RESPONSE:** Not disputed.

## The Bank Accounts

### The LLC Account

14.     As set forth above at ¶¶ 5 and 10, the Legitimate Trading Business maintained an account with BNY. Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 161:5-8] and in January 2001, Madoff notified BNY that the LLC was formed and would operate the Legitimate Trading Business. Chaitman **Ex. E** [Letter from the LLC to BNY].

**RESPONSE:** The Trustee's response to ¶¶ 5 and 10 are incorporated herein. Not disputed that the banking activity of the market making business and proprietary trading business was conducted at BNY. *See* Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 78 ("In the Proprietary Trading Business, the primary operating account was the Bank of New York ("BONY") account number 8661126621 (the "621 Account")."). Not disputed that Madoff notified Bank of New York of the formation of the LLC in January 2001 but disputed that the LLC would only operate the market making business and proprietary trading business. BLMIS operated as a "single enterprise." *Id.* ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206 ("BLMIS was a single enterprise that operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business.").

15.     The LLC account at BNY was used to fund all of the expenses of the Legitimate Trading Business, including the purchase of securities.  Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 161:14-16].

**RESPONSE:**  Disputed as irrelevant and lacking evidentiary support that "all of" the expenses were funded out of the account at BNY for House 5.  Not disputed that the BNY account was used for expenses.  *See* Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 78.

16.     Between $700 and $800 million was transferred from the IA business to the Legitimate Trading Business just in the period from 2000 to 2008.  Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 161:3-8 ("hundreds and hundreds of millions of dollars just since 2000 that was transferred from the 703 account [the IA business account] to the Bank of New York account"); *id.* at 161:20- (the money was "put over to the prop trading business."); *id.* at 161:21-162-:2 (Q. "[I]n the period from 2000 through 2008, how much money in total was transferred from the 703 account, which was exclusively investment advisory customers money, to the Bank of New York account, which was exclusively prop trading? A. [A]bout $700 or $800 million.")].

**RESPONSE:**  Disputed to the extent the statement is not supported by admissible evidence and is incomplete.  *See* n.2.  *But see* Declaration of Seanna R. Brown ("Brown Decl."), Ex. 1 [Nelson Tr. 5/8/19 at 160:24–162:2, 139:18–141:14]; Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 338–39 & Table 11.

17.     The $700 - $800 million of transfers from the IA business' account at JPMC to the Legitimate Trading Business were used by the LLC for its business purposes.  Madoff testified that transferring the money from the 703 Account to the BNY Account "allowed us to meet the margin calls of the clearing corporation. That is typical of the industry."  Chaitman **Ex. H** [Madoff

Dep. Tr. 4/26/2017 at 24:6-25:13] *see also, e.g.* Chaitman **Ex. I** [Letter dated January 24, 2011 from Stephen P. Harbeck at SIPC to Scott Garett at The U.S. House of Representatives at p. 20].

**RESPONSE:**  Not disputed that funds transferred from the IA Business were used for margin calls, but Mr. Dubinsky further explained that:

> As previously detailed, the Proprietary Trading Business was improperly subsidized and propped up by numerous cash infusions of IA Business Customer Money from the IA Business.  Over the ten-year period for which bank statements and corresponding data were available, over 185 separate cash infusions were made to the Proprietary Trading Business from the IA Business (directly or indirectly), totaling approximately $800 million.  (*See* Exhibit 34 –"Cash Infusions of IA Business Customer Money from the IA Business to the Proprietary Trading Business, July 1999 to November 30, 2008".)  Initially, cash was transferred via check or wire from the IA Business to the Proprietary Trading Business directly from the 703 Account or from an IA Business-funded brokerage account; later cash infusions were effectuated through a more complex scheme that purported to reflect securities transactions.

Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 354; *see also id.* ¶¶ 338–39.

### The 703 Account

18.     The IA Business placed its customer deposits into an account at JPMC ending in "703" (the "703 Account").  Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 81:20-82:1].

**RESPONSE:**  Not disputed.  Stmt. ¶ 70.

19.     As of December 2001, almost a year after the LLC was formed, JPMC customer statements for the 703 Account indicated that the account was held in the name of "Bernard L. Madoff."  Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 14:1-23]; Chaitman **Ex. J** [703 Account Statement for December 2001 [JPMSAB0000001-48]].  Thereafter, the 703 Account name was in Madoff's trade name, Bernard L. Madoff Investment Securities.  The 703 Account was never in the name of the LLC and there is not a single document produced by JPMC which suggests that the LLC owned the 703 Account.  *See e.g.* Chaitman **Ex. G** [Email dated June 12, 2018 from counsel to Trustee,

Maximillian Shifrin to Helen Davis Chaitman]; Chaitman **Ex. K** [Compilation of 509 Account Statements]; Chaitman **Ex. L** [Compilation of 703 Account Statements]; Chaitman **Ex. F** [Letter from the LLC to BNY; Letter from LLC to the National Securities Clearing Corporation; Letter from the LLC to the Options Clearing Corporation; Letter from the LLC to the Depository Trust Company].

      **RESPONSE:**  Not disputed to the extent the documents speak for themselves.  At all times, the funds in the 703 Account consisted of customer money.  *See* Stmt. ¶¶ 85–88.

      20.     Moreover, through August 2002, the JPMC customer statements for the 703 account indicated that the account was held in the name of "Bernard L. Madoff."  Chaitman **Ex. M** [703 Account Statement August 1 – August 30, 2002 in the name of "Bernard L. Madoff"].  In September 2002, the 703 account statements from JPMC indicated the customer as BLMIS, the trade name for Madoff's sole proprietorship.  Chaitman **Ex. N** [703 Account Statement August 31 - September 30, 2002 in the trade name of "Bernard L. Madoff Investment Securities"].

      **RESPONSE:**  Not disputed to the extent the documents speak for themselves.  At all times, the funds in the 703 Account consisted of customer money.  *See* Stmt. ¶¶ 85–88.

      21.     Through 2008, the endorsement stamp for checks deposited into the 703 Account read "For deposit only Bernard L. Madoff."  Chaitman **Ex. O** [Check dated July 16, 2008[4] paid to "Bernard Madoff Securities" [JPMSA10013257]].

      **RESPONSE:**  Disputed as not supported by the evidence cited.  Disputed further as

---

[4] The deposit check referenced is merely an example, and belongs to the account of Zieses Investment Partnership, since the Trustee has not produced copies of the deposit checks made to fund Account No. 1CM005 (the "Shelburne Account") (*see* Collura Report at Ex. 6, ECF No. 117-27; *see e.g.* Compl., Ex. B) and the only deposit made to fund Account No. 1CM049 (the "Epstein Account") was an inter-account transfer (*see infra* at ¶¶ 30-31; *see also* Compl. Ex. B, Column 4*)*.

irrelevant because Ex. O involves a check from a different BLMIS customer.

22.     As late as December 2008, the statements for the 703 Account continue to list the account as owned by the sole proprietorship, BLMIS, without any reference to the LLC.  Chaitman **Ex. D** [703 Account Statement for December 2008].

**RESPONSE:**  Not disputed.

**The 509 Account**

23.     Madoff held an account at JPMC ending in "509" (the "509 Account").  Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 81:20-82:1].

**RESPONSE:**  Not disputed that BLMIS held JPMorgan account #xxxxxxxxx1509 (the "509 Account").  Stmt. ¶ 69.  The 703 and 509 Accounts were linked commercial business accounts.  *Id.* ¶ 72.  At all times, these accounts held customer money.  *See id.* ¶¶ 85–88.

24.     The 509 Account was opened and held by Madoff's sole proprietorship long before the LLC came into existence in 2001.  *See e.g.* Chaitman **Ex. P** [509 Account Statement from 1998 [MADWAA00378495-98]].

**RESPONSE:**  Not disputed that the 509 Account was opened and held by the sole proprietorship prior to 2001.  The 703 and 509 Accounts were linked commercial business accounts.  Stmt. ¶ 72.  At all times, these accounts held customer money.  *See id.* ¶¶ 85–88.

25.     There is not a shred of evidence that either the 703 or the 509 Account was ever held in the name of the LLC. On the contrary, all of the evidence indicates that these accounts

were always held by Madoff individually.  Chaitman **Ex. Q** [Nelson Tr. 5/9/19 at 8:14-19, 9:12-

10:5-21, 12:5-18:6; 26:24-29:11].

  **RESPONSE:**  Disputed.  *See* Stmt. ¶¶ 85–88.

26.    The Trustee's expert witnesses, Bruce Dubinsky and Lisa Collura (whose firm was

paid over $40 million by the Trustee) have never seen a bank statement for either the 509 Account

or the 703 Account in the name of the LLC.  Chaitman **Exs. B & Q** [Nelson Tr. 5/8/19 at 171:23-

172:8, Nelson Tr. 5/9/19 at 13:7-20].

  **RESPONSE:**  Disputed as the amount paid to the Trustee's expert witnesses is irrelevant.

Not disputed that the Trustee's expert witnesses have not seen a bank statement for either the 509

Account or the 703 Account showing the word "LLC."

27.    The 509 account statements and checks were always in the name of Bernard L.

Madoff.  *See* Chaitman **Ex. K** [Compilation of 509 Account Statements]; Chaitman **Ex. R**

[Compilation of Checks written from "Bernard L. Madoff" to "Philip F. Palmedo"].

  **RESPONSE:**  Disputed as the 509 Account was held in the name of Bernard L. Madoff

until September 2002.  At that point, the account holder was changed to Bernard L. Madoff

Investment Securities but BLMIS continued to use checks with "Bernard L. Madoff" listed as the

holder.  Stmt. ¶ 86 (citing Collura Decl., Attach. A (Collura Report) ¶ 25 n.9).  Disputed as the

509 Account statements were also addressed to Bernard L. Madoff Investment Securities.  *See*

Chaitman Decl., Ex. P. *But see* Stmt. ¶¶ 85–88.

28.    The designation "LLC" never appeared on the statements for either the 703 or the

509 Account Chaitman **Ex. K** [509 Account Statements]; Chaitman **Ex. L** [703 Account

Statements].

   **RESPONSE:**  Not disputed.  *But see* Stmt. ¶¶ 85–88.


   29.    Madoff used the trade name "Bernard L. Madoff Investment Securities" for his sole

proprietorship interchangeably with the name "Bernard L. Madoff",  (Chaitman **Ex. Q** [Nelson Tr.

5/9/19 at 18:23-19:10]; Chaitman **Ex. C** [Confirmation slips dating from 1979 showing the trade

name Bernard L. Madoff Investment Securities [10-5420_Defendant_0002412-13]]; Chaitman

**Ex. S** [July 17, 1991 letterhead of Bernard L. Madoff Investment Securities]), and for years prior

to the formation of the LLC.  Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 172:9-12].

   **RESPONSE:**  Disputed as irrelevant and lacking evidentiary support.  Not disputed that a

trade name was used.  *See Nelson*, 610 B.R. at 206 ("Madoff Securities frequently used the trade

name 'Bernard L. Madoff Investment Securities' in the course of its business.").


## Account No. 1CM049 (the "Epstein Account")

   30.    The Epstein Account was opened on January 4, 1993 with a transfer in the amount

of $329,987 from BLMIS account no. 1C0061-30, a C & M Trading Account (the "Transferor

Account").  *See* Chaitman **Ex. T** [Portfolio Management Report for the Epstein Account as of

December 31, 1993 reflecting an initial investment of $329,987.05] [MF00003999]; *see* Chaitman

**Ex. U** [January 1993 Statement for the Transferor Account reflecting a transfer to the Epstein

Account in the amount of $329,987.05 on January 4, 1993 [MF00436688]]; and *see* Chaitman **Ex.

V** [Portfolio Management Reports for the Epstein Account as of March 31, 1993 and June 30, 1993

reflecting a starting equity of $329,987.05 as of January 4, 1993 [10-04438_Epstein_0000015-

16]]; *see also* Compl., Ex. B, line 1. However, the Trustee has failed to fully credit this transfer.

*See infra* at ¶¶ 33-34; *see e.g.* Greenblatt Report, Ex. 4A, ECF No. 119-15.

**RESPONSE:** Disputed. The Epstein Account was opened on January 4, 1993 with an inter-account transfer in the amount of $200,000 of principal from BLMIS Account 1C0061. *See* Stmt. ¶ 126 (citing Declaration of Matthew B. Greenblatt, dated September 4, 2020 ("Greenblatt Decl."), Attach. B (Expert Report of Matthew B. Greenblatt, CPA/CFF, CFE dated June 28, 2019 ("Greenblatt Epstein Report")) ¶¶ 13–15, Exs. 4A–4B, ECF No. 119-01).

31.    There were no subsequent cash deposits into the Epstein Account. *See* Complaint, Ex. B, Column 4.

**RESPONSE:** Not disputed.

32.    The Epstein Account was closed in April 2008 with a wire transfer from the 703 Account. *See* Chaitman **Ex. W** [Fax confirming wire transfer in the amount of $710,366 dated April 8, 2008 [AMF00242376]].

**RESPONSE:** Disputed. There was one final cash withdrawal of $172 on June 16, 2008. *See* Greenblatt Decl., Attach B. (Greenblatt Epstein Report) Ex. 4B, *see also* Compl., Ex. B.

**The Trustee Has Failed to Properly Credit the Opening Deposit into the Epstein Account**

33.    The Trustee has failed fully to credit the opening deposit into the Epstein Account in the amount of $329,987, from a Madoff account in the name of C & M Trading Account, and dated January 4, 1993. *See* Chaitman **Ex. T** [Portfolio Management Report for the Epstein Account as of December 31, 1993 reflecting an initial investment of $329,987.05 [MF00003999]]; *see* Chaitman **Ex. U** [January 1993 Statement for the Transferor Account reflecting a transfer to the

Epstein Account in the amount of $329,987.05 on January 4, 1993 [MF00436688]]; and *see*

Chaitman **Ex. V** [Portfolio Management Reports for the Epstein Account as of March 31, 1993

and June 30, 1991 reflecting a starting equity of $329,987.05 as of January 4, 1993 [10-

04438_Epstein_0000015-16]]; *see also* Compl., Ex. B, line 1; and *see e.g.* Greenblatt Report, Ex.

4A, ECF No. 119-15.

> **RESPONSE:**  Disputed that the Trustee failed to properly credit the Epstein Account for
>
> an inter-account transfer from BLMIS Account 1C0019 in the amount of $329,987.  Mr.
>
> Greenblatt determined that documents produced to the Trustee by the Defendants confirmed that
>
> only a principal amount of $200,000 was deposited by the Defendants into the Epstein Account.
>
> *See* Greenblatt Decl., Attach B. (Greenblatt Epstein Report) ¶ 14 (citing 10-
>
> 04438_Epstein_0000009–10-04438_Epstein_0000012.).

34.    The Trustee has only credited the Epstein Account with $200,000 of this transfer.

*See* Greenblatt Report, ECF No. 119-10 at ¶¶ 14-15; and see Greenblatt Report. Ex. 4A, ECF No.

119-15 and 4B, ECF No. 119-16; see Compl., Ex. B, line 1.

> **RESPONSE:**  Not disputed. The Trustee's response to ¶ 33 is incorporated herein.

35.    The Trustee claims that the uncredited amount constitutes a transfer of "fictitious

profits." *See* Compl., Ex. B, n.1.

> **RESPONSE:**  Not disputed.

**The Transferor Account (C & M Trading Account No. 1C0061-30)**

36.    Seymour Epstein made an initial deposit into the Transferor Account, (*see*

Greenblatt Report at ¶ 13, ECF No. 119-10), on October 2, 1989 in the amount of $100,000. *See*

Chaitman **Ex. X** [Account Opening Documents [10-04438_Epstein_0000444-51]; *see also*

Chaitman **Ex. Y** [Check dated October 2, 1989 in the amount of $100,000 written to "Bernard L.

Madoff" from Seymour Epstein and Muriel Epstein [10-04438_Epstein_0000008-10 at 10-

04438_Epstein_0000009]].

    **RESPONSE:** Not disputed. *See* Greenblatt Decl., Attach B. (Greenblatt Epstein Report)

¶ 14.


    37.    There were subsequent deposits into the Transferor Account totaling $100,000.

*See* Chaitman **Ex. Z** [Letters dated April 14, 1991 and October 2, 1991 from the bookkeeper for

COHMAD Securities to Epstein confirming deposits of $50,000 in each instance [10-

04438_Epstein_0000011-12]].

    **RESPONSE:** Not disputed. *See* Greenblatt Decl., Attach B. (Greenblatt Epstein Report)

¶ 14.


    38.    Seymour Epstein's total equity in the Transferor Account as of December 31,

1992 was $329,320.14. *See* Chaitman **Ex. AA** [Portfolio Management Report for the Transferor

Account as of December 31, 1992 reflecting a total equity of $329,320.14 [10-

04438_Epstein_0000432]].

    **RESPONSE:** Disputed. Mr. Greenblatt determined that documents produced to the

Trustee by Defendants confirmed that Defendants deposited only a principal amount of $200,000

into the Epstein Account. *See* Greenblatt Decl., Attach B. (Greenblatt Epstein Report) ¶ 13-15

(citing 10-04438_Epstein_0000009–10-04438_Epstein_0000012.); *see also id.* at Ex. 3A.

39.     On January 4, 1993 $329,987.05 was transferred from the Transferor Account to
the Epstein Account. *See* Chaitman **Ex. U** [January 1993 Statement for the Transferor Account
reflecting a transfer to the Epstein Account in the amount of $329,987.05 on January 4, 1993
[MF00436688]]; see also Compl., Ex. B, Line 1.

**RESPONSE:**  Not disputed that the January 1993 customer statement for the Epstein
Account reflected an inter-account transfer from 1C0061 in the amount of $329,987.  *See*
Greenblatt Decl., Attach B. (Greenblatt Epstein Report) ¶ 13; *see also id.* at Ex. 4B.  Disputed
that this inter-account transfer was made up of principal.  Based on documents produced to the
Trustee by the Defendants, Mr. Greenblatt confirmed that Defendants deposited only $200,000
of principal into the Epstein Account.  *See* Greenblatt Decl., Attach B. (Greenblatt Epstein
Report) ¶ 13-15 (citing 10-04438_Epstein_0000009–10-04438_Epstein_0000012.); *see also id.*
at Ex. 3A.

**Withdrawals from the Epstein Account**

40.     Throughout the life of the Epstein Account, withdrawals were paid by checks
drawn from the 509 Account paid by "Bernard L. Madoff" to "Seymour Epstein" (see Chaitman
**Ex. R** [Compilation of Withdrawal Checks for the Epstein Account]). The Epstein Account was
closed on April 9, 2008. *See* Chaitman **Ex. AB** [703 Account Statement dated April 2008
reflecting a transfer in the amount of $710,366 [JPMSAB0003974]; and *see* Chaitman **Ex. AC**
[Check dated June 16, 2008 reflecting a payment of the balance in the Epstein Account in the
amount of $171.68 [JPMSAF0068008]; *see also* Compl., Ex. B.

**RESPONSE:**  Disputed that all withdrawals were paid by checks to Defendants, but not
disputed that BLMIS did send checks from the 509 Account to Defendants.  Disputed that the
account holder of the 509 Account was "Bernard L. Madoff" for all time periods.  The 509

Account was held in the name of Bernard L. Madoff until September 2002.  At that point, the

account holder was changed to Bernard L. Madoff Investment Securities but BLMIS continued

to use checks with "Bernard L. Madoff" listed as the holder.  Stmt. ¶ 86 (citing Collura Decl.,

Attach. A (Collura Report) ¶ 25 n.9).

41.    Epstein died on December 19, 2008. Answer at ¶ 7, Adv. Pro. No. 10-04438,

ECF. No. 43; *see also* Chaitman Ex. A [Order Appointing Successor Trustees, New York County

Surrogate Court File No. 2009-0423 [PUBLIC0627879-82 at PUBLIC0627879]].

**RESPONSE:**  Not disputed.

42.    Epstein never received any payments from the LLC. *See id.*

**RESPONSE:**  Disputed.  BLMIS operated as a "single enterprise."  Dubinsky Decl.,

Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Picard v. Nelson*, 610 B.R. 197, 206 (Bankr.

S.D.N.Y. 2019) ("BLMIS was a single enterprise that operated three business units: (i) a

proprietary trading business; (ii) a market-making business; and (iii) an investment advisory

business.").  Defendants received payments from BLMIS of customer money from the 703

Account for all withdrawals.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 340–350.

43.    The Trustee is missing third-party evidence of alleged withdrawals from the

Epstein Account in the amounts of $25,000 dated July 1, 1994; and $100,000 dated July 17, 1997

listed on Ex. B to the Complaint. See Collura Report at Ex. 6, ECF No. 117-27; see e.g. Compl.,

Ex. B.

**RESPONSE:**  Not disputed that BLMIS bank records are unavailable for the period prior

to December 1998.  *See* Collura Decl., Attach B (Expert Report of Lisa M. Collura, CPA, CFE,

CFF, dated June 19, 2019 ("Collura Epstein Report")) ¶ 13, ECF No. 117-21 ("I reconciled all but two (approximately 91%) of the 23 cash transactions reflected on the customer statements for the Epstein Accounts to available BLMIS bank records, documentation contained in BLMIS customer files, and/or documents produced to the Trustee related to the Epstein Accounts.").

**Account No. 1CM005 (the "Shelburne Account")**

44.    Shelburne Shirt Company Inc. ("Shelburne") is a corporation formed under the laws of the state of New York. *See* Chaitman **Ex**. **AD** [Account Opening Documents [AMF00240582-86]]; *see* Answer at ¶ 13.

**RESPONSE:**  Not disputed.

45.    On December 17, 1992, it opened an account with Madoff (the "Shelburne Account"). *Id.* The Shelburne Account received a check in the amount of $100,000 on January 4, 1993. *See* Compl., Ex. B, Line 1

**RESPONSE:**  Not disputed to the extent that the "Shelburne Account" refers to BLMIS account number 1CM005 in the name of "Shelburne Shirt C/O Seymour Epstein" which reflects an initial deposit of $100,000 on January 4, 1993.  Disputed as to the remainder of paragraph 45.

46.    The Shelburne Account received two subsequent deposits by checks dated December 27, 1993 in the amount of $150,000 and January 3, 1995 in the amount of $50,000. *See* Compl., Ex. B, Column 4.

**RESPONSE:**  Not disputed.

20

47.      The Shelburne Account was closed on October 23, 2007. *See* Chaitman **Ex**. **AE**
[Correspondence from Seymour Epstein to Frank DiPascali dated October 23, 2007
[AMF00240545]].

**RESPONSE:**  Not disputed.


48.      Shelburne was dissolved on December 28, 2009. *See* Chaitman **Ex**. **AF** [NYS
Department of State Division of Corporations Entity Information].

**RESPONSE:**  Not disputed.


**Withdrawals from the Shelburne Account**

49.      Throughout the life of the Shelburne Account, withdrawals were paid by checks
drawn from the 509 Account paid by "Bernard L. Madoff" to "Shelburne Shirt." *See* Chaitman
**Ex. R** [Compilation of Withdrawal Checks for the Shelburne Account].

**RESPONSE:**  Not disputed.


50.      Shelburne never received any payments from the LLC. *See id.*

**RESPONSE:**  Disputed. BLMIS operated as a "single enterprise."  Dubinsky Decl.,
Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Picard v. Nelson*, 610 B.R. 197, 206 (Bankr.
S.D.N.Y. 2019) ("BLMIS was a single enterprise that operated three business units: (i) a
proprietary trading business; (ii) a market-making business; and (iii) an investment advisory
business.").  Defendants received payments from BLMIS of customer money from the 703
Account for all withdrawals.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 340–350.

**T-Bill Purchases**

51. Madoff testified that he consistently purchased T-Bills with IA customer funds:

> Q. So you basically took the money that went into the 703 account?
> A. Correct.
> Q. Which was the investment advisory customers' money?
> A. Correct.
> Q. And you purchased Treasury bills with that?
> A. Correct…

Chaitman **Ex. H** [Madoff Dep. Tr. 4/26/17 at 19:1-21].

> Q. . . . Let's say that customer A sent you a million dollars for the split-strike program.
> A. It went into - - -
> Q. What - -
> A. - - treasury bills." . . .

Chaitman **Ex. AG** [Madoff Dep. Tr. 12/20/16 at 161:12-25].

**RESPONSE:** Not disputed that Madoff so testified but disputed as incomplete. Chaitman Decl., **Ex. AG** at 161:17–22 ("Q. It went into U.S. treasury bills? A. Well, some of it went into treasury bills. Some of it went back to customers when they withdrew profits – Q. Okay. A. –that didn't exist."). *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

52. Madoff testified that he purchased T-bills through accounts that he maintained at Bear Stearns, Fidelity, Lehman Brothers, JPMorgan Chase, and Morgan Stanley. *See* Chaitman **Ex. H** [Madoff Dep. Tr. 4/26/17 at 46:9-47:12].

**RESPONSE:** Not disputed that Madoff so testified. *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

53.    Madoff's testimony concerning his investment of customer funds in T-bills is validated by the third party records in the Trustee's possession. *See* Chaitman **Ex. Y** [Compilation of Bear Stearns Statements and 703 Account Statements].

**RESPONSE:**  Not disputed that Madoff so testified. *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

54.    Madoff explained that these bore an interest rate of approximately 3%-4%, which was money earned with the IA customers' funds. Chaitman **Ex. H** [Madoff Dep. Tr. 4/26/17 at 19:1-21].

**RESPONSE:**  Not disputed that Madoff so testified.  *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

55.    While Madoff acknowledged that the IA customer statements often reflected the ownership of Fortune 100 company securities that had not been bought in connection with the purported split-strike conversion strategy, the account statements also reflected the ownership of T-bills that he actually did purchase. *Id. at* 19:22-20:1.

**RESPONSE:**  Not disputed that Madoff so testified.  *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

56.    Madoff testified that "by the time we were finished in 2008 . . . we [the LLC]
represented ten percent of the United States' volume in – in [legitimate, market-making]
transactions." Chaitman **Ex. AG** [Madoff Dep. Tr. 12/20/16 at 54:21-56:29, quote at 56:8-17].

**RESPONSE:**  Disputed as incomplete and an inaccurate modification of Madoff's
testimony, which speaks for itself.


57.    The Trustee's witnesses testified to having seen "anecdotal evidence" that Madoff
[the LLC] conducted trades equal to approximately 10 percent of the daily volume of the New
York Stock Exchange as a whole.  Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 162:7-11].

**RESPONSE:**  Not disputed that Mr. Dubinsky so testified as to the market making
business and proprietary trading business but disputed to the extent it is incomplete.  Mr. Dubinsky
testified that he "d[id]n't know for a fact" about the daily volume traded by the market making
business and proprietary trading business.  Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 162:7–11].
Disputed as irrelevant.


58.    Madoff testified that he never required the deposits of other customers to pay out
existing customers, and until the market was collapsing when no one ever requested it. *See*
Chaitman **Ex. H** [Madoff Dep. Tr. 4/26/17 at 30:10-22; 31:2-25].

**RESPONSE:**  Not disputed that Madoff so testified.  *But see* Stmt. ¶¶ 72–82 ("The only
source of cash available for the IA Business to pay purported investment profits as well as
redemption requests from its customers was from cash that other IA Business customers deposited
in the 703 Account.")


59.    Madoff testified that his fraud began post-1992, likely 1993. *Id.* at 11:10-12:4.

**RESPONSE:** Not disputed that Madoff so testified but disputed as irrelevant.

60.     Madoff testified that Frank DiPascali purchased T-Bills with IA customers' money. *Id.* at 29:10-30:1; *see e.g. id. at* 28:4-30:1.

**RESPONSE:** Not disputed that Madoff so testified. *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

61.     The receipts from the sale or redemption of T-bills were paid into the 703 Account by the brokerage houses, including Bear Stearns and JPMC. Chaitman **Ex. AH** [Bear Stearns March 2005 Statement, *see* Deposits and Withdrawals entry for March 30, 2005; Bear Stearns September 2005 Statement, *see* Deposits and Withdrawals entry for September 30, 2005; Bear Stearns December 2005 Statement, *see* Deposits and Withdrawals entry for December 21, 2005; June 2008 703 Account Statement, *see* first of four entries for 6/26].

**RESPONSE:** Not disputed that the eight brokerage accounts were used by BLMIS for cash management purposes, received funds solely from the 703 Account, invested those funds primarily in money market funds, T-Bills, and other low-risk, U.S. government securities and then transferred funds back to the 703 Account. Collura Decl., Attach. A (Collura Report) ¶ 57; *see also* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

25

62.    Joann Crupi, a Madoff employee who worked on the 17th floor of the Lipstick Building, testified that Frank DiPascali used to tell her when he was about to buy T-Bills and would then tell her to whom to allocate them. Chaitman **Ex. AI** [Crupi Tr. 165:6-22].

**RESPONSE:** Not disputed that Crupi so testified.  *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

63.    Frank DiPascali testified that Madoff told him to which accounts the T-Bills should be credited. *See generally,* Chaitman **Ex. AJ** [DiPascali Tr. 5344:9-5346:2; 5345:7-25].

**RESPONSE:** Not disputed that DiPascali so testified.  *But see* Stmt. ¶¶ 64–68 ("In his criminal trial testimony, DiPascali confirmed that the treasury bills purchased with the IA Business money was for BLMIS's cash management and were not purchased for any customer account.").

64.    DiPascali further testified that a spreadsheet bore the account numbers "that Bernie told us he wanted to use to be the counterparties of the customer option positions" and that "this spreadsheet allows me to randomly pick a group of treasuries that were going to represent that collateral." Chaitman **Ex. AJ** [DiPascali Trial Testimony, 12/10/13 at 5345:7-25]; and Chaitman **Ex. AK** [the spreadsheet to which DiPascali referred, Government Exhibit 105-c171].

**RESPONSE:** Not disputed that DiPascali so testified.

65.    Madoff testified that, as with other entities in the industry, he maintained records for only six years, so there would not always be trade confirmations in their records. (Chaitman **Ex. AG** [Madoff Dep. Tr. 12/20/16 at 133:12-134:2]). Madoff testified that, during the 1980's,

there would not always be third party confirmations because there were clearing houses that issued

continuous net settlement printouts. *Id.* at 130:20-23; 132:12-24.

**RESPONSE:** Not disputed that Madoff so testified. *See* Stmt. Part II (BLMIS Operated a

Ponzi Scheme Through Its Investment Advisory ("IA") Business.).


66.     Madoff testified that when he was dealing as principal there was no counterparty

since he was on both sides of the trade. *Id*. at 128:7-12.

**RESPONSE:** Not disputed that Madoff so testified. *See* Stmt. Part II (BLMIS Operated a

Ponzi Scheme Through Its Investment Advisory ("IA") Business.).


## Dubinsky's Testimony

67.     On direct examination at the Nelson trial, Dubinsky repeatedly testified that no

securities were ever purchased with IA customers' money.

> Q. . . . So, the proprietary trading side of the business bought and sold securities?
> A. Absolutely.
> Q. The investment advisory side?
> A. Never.

Chaitman **Ex. B** [Nelson Tr. 5/8/19 at 64:10-14, *see also* Nelson Tr. 5/8/19 at 73:6-14;

74:1-3; 74:19-23; 75:17-20].

> Q. I think you've answered this question but based on your review of the computer
> systems at BLMIS, were you able to determine if any trades were being processed
> through the investment advisory business computers?
> A. I was able to make that determination and the answer is they were not. There
> was no evidence, Your Honor, of any trades being executed through the IA business
> computer systems whatsoever.

*Id*. at 80:4-15.

> Q. So, to wrap up this issue, please summarize your conclusions concerning the
> source of funds flowing out of the investment advisory business to customers.
> Where was that money coming from?

A. Customer money. Just other customers' money.

Q. Did your conclusion that the BLMIS investment advisory business did not have a connected trading platform have anything to do with your conclusion that the investment advisory business was being operated as a Ponzi scheme?

A. Absolutely.

Q. Why?

A. Because without the ability to actually connect to the market and trade and no evidence of those trades ever occurring, coupled with what I just testified about, that the only money I saw was customer money in and customer money out, no accretion to that 703 account from any sort of trading profit dividends -- that's the classic example of a Ponzi. There's nothing going on. You're taking money from people, you're promising that you're going to do something with it, and then you pay them back as if you're fulfilling your promise.

Q. So, in addition to the not-connected trading platform, did your conclusion that the customer deposits were used to pay customer redemptions have any bearing on your conclusion that the investment advisory business was being operated as a Ponzi scheme?

A. It did. As I just said, the lack of other funds from trading profits, from dividends, from real results of actual trading -- the lack of that played into the conclusion that this was simply a Ponzi. Just taking money in and paying it back.

*Id*. at 94:6 – 95:11.

Q. Were you able to obtain DTC treasury records for BLMIS?

A. I was. For the period of 2002 through 2007, I was able to obtain those records, and then I performed an analysis, identified the -- first I went and identified the unique treasury bills held by the prop trading business on December 31 of every year. I compared those holdings to the holdings at DTC, and I also compared those holdings to the IA business. And what I found, similar to the equities, is that the prop trading that the -- and the treasury bills weren't a big part of the prop trading, but the treasury bills that were held by the prop trading matched to the DTC records, and that was based on the treasury CUSIP, and in contrast none of the CUSIPs held at the DTC matched those that were supposed to have been bought for the IA customers. So, again, it was a process of elimination. Once I matched everything to the prop trading, to the DTC -- were there any other DTC records left? No. Now I'm left with this tranche of purported treasuries for the IA business that have no support, no evidence of ever being purchased.

*Id*. at 128:19 – 129:12.

Q. . . .please summarize your conclusions concerning the source of funds flowing out of the investment advisory business to customers. Where was that money coming from?

A. Customer money. Just other customers' money."

*Id*. at 92:16-93:3.

Q. Based on your review of the BLMIS Investment Advisory books and records, were you able to determine if Mr. Madoff's allocation concerning treasuries was accurate?

A. It confirmed my analysis in finding that no treasuries were bought or traded for any of the investment advisory clients.

*Id*. at 129:9-14.

A. There was no evidence of treasuries being purchased for the IA business customers, plain and simple.

*Id*. at 132:9-14.

**RESPONSE:**  Not disputed that Mr. Dubinsky so testified but disputed to the extent the cited testimony is incomplete.  *See* Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 64:10–14, 72:10–75:20, 80:4–15, 95:6–96:11, 129:19–130:12, 95:6–10, 129:9–14, 132:9–14]; *see also* Stmt. ¶¶ 64–68.

68.     Dubinsky testified on direct examination that there is "no evidence [of activity in the 703 account] other than money coming in from customers and money going out to customers," *id*. at 92:16-17, and a minimal amount (3% of the total monies in the 703 Account) from overnight sweeps, *id*. at 83:3-15; 85:3-21.  He swore that there was "never any addition to the 703 Account that [he] saw when [he] examined the bank accounts to show that money was coming from trading profits." *Id.* at 84:1-3.

**RESPONSE:**  Disputed as misrepresenting the testimony; statements are not supported by the evidence.  Mr. Dubinsky testified:

Q Is that why you have the big red Xes on all of those possible incoming sources of funds?

A It is. I was trying again to see where the money was coming in, how it was being earned, was there -- you know, maybe Mr. Madoff said he was going to trade stocks but he, you know, just invested in gold bars somewhere. And while that would've have been right, maybe there was an investment

somewhere else, and then he was selling those gold bars and producing some
income. So, that's the other income producing box in the upper right.

There was no evidence other than money coming in from customers and
money going out to customers. A little bit of the sweep, the overnight sweeps
to kind of create more money for the Ponzi to enable it to go a little bit longer,
in other words. And that's why I have Xes on all of those.

Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 92:6–21].

69.    Dubinsky testified that he "scoured every bank record and didn't find any other use

of customer funds other than payments to customers and bank sweeps at night at JPMC." *Id*. at

153:14-16.

**RESPONSE:** Disputed as misrepresenting the testimony.  Mr. Dubinsky testified:

Q Now, I typed word verbatim what you said this morning on direct
examination, and you said that you, quote, "Scoured every bank record and
didn't find any other use of customer funds other than payments to customers
and bank sweeps at night at JPMC." That was your testimony this morning.

A If that's what you typed down. I think I also testified this morning that three
[sic] was money for other treasuries and brokerage accounts.

Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 153:12–20].

70.    On cross examination, however, Dubinsky admitted that reliable third party records

show that the IA business did, in fact, buy T-bills with money from the 703 Account and that the

T-bills paid interest. *Id.* at 166:17-18 ("Q. And those T-bills paid interest, right? A. Those T-bills

paid interest.").

**RESPONSE:**  Not disputed that Mr. Dubinsky so testified but disputed to the extent the

cited testimony is incomplete.  Mr. Dubinsky testified:

Q Now, you testified that you saw no evidence of any income earned on
investment advisory customers money. But now you've acknowledged that you
were aware that money was taken from the 703 accounts and invested in T-bills,
right?

A Well, let me correct that, the two things. I've always been aware that money left the 703 to be invested. I think what I testified to is no money was made in the investment advisory customer accounts on the purported trades that were promised to them.

Q So you're not -- you weren't -- you didn't seek to convince Judge Bernstein that money hadn't been made on the investment advisory customers money to the extent that it was invested in T-bills.

A I'm not sure I understand your question.

Q Isn't it a fact, Mr. Dubinsky, that the T-bill investments that Mr. Madoff made with investment advisory customers money earned interest?

A Are you talking about the overnight sweeps?

Q No, I'm not. I'm talking about the eight or nine firms that you've acknowledged that Madoff purchased T-bills through with investment advisory customers money.

A So --

Q And those T-bills paid interest, right?

A Those T-bills paid interest. I don't know when you said whether they made money, I don't know. I didn't analyze that because, depending on when you buy them at par or below par and the interest that you collect with accrued interest. And then when you sell them, you may make money, you may not. I did acknowledge, and I said during my direct, money was used from the 703 for the overnight sweep. I said that earned interest. That was a way to kind of keep enough money in the Ponzi to add more to the pot. And I acknowledged that money was taken from the 703 to be used where Mr. Madoff purchased or somebody in BLMIS purchased additional treasuries.

Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 165:20–167:4].


71.     Dubinsky admitted that he knew that Madoff maintained several brokerage accounts through which he purchased T-bills using money taken from the 703 Account. *Id.* at 90:25-91:2 ("A. No. There were several brokerage accounts, that money was taken from the 703 account and put into, that purchased some treasuries."); 155:2-4 ("A. There was money taken out of the 703 account, transferred to these accounts, these various accounts, and then these securities were purchased, yes.").

**RESPONSE:** Not disputed that Mr. Dubinsky so testified but disputed to the extent the

cited testimony is incomplete.  Mr. Dubinsky testified:

> Q In fact, in your review of the BLMIS books and records, did you identify any
> other income-producing activities for the investment advisory business, other
> than the short-term sweeps and the BLMIS interest-bearing accounts that were
> funded by 703 customer deposits, what you just discussed?
>
> A No. There were several brokerage accounts, that money was taken from the
> 703 account and put into, that purchased some treasuries. But other than -- and
> those weren't purchased in connection with any split strike conversion strategy.
> But, no, other than that, there was absolutely no evidence of any trading
> whatsoever going on in the IA business.

Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 90:20–91:6].

> Q Okay. And you recall that these were investments of securities that were made
> with investment advisory customers' money, right?
>
> A There was money taken out of the 703 account, transferred to these accounts,
> these various accounts, and then these securities were purchased, yes.

*Id.* at 154:24–155:4.


72.     Dubinsky named the following firms that held these accounts: Lehman Brothers,

Bear Stearns, JPMorgan Chase and Morgan Stanley and he acknowledged that "those T-bills paid

interest."  *Id.* at 154:2-9; 166:17-18.

> Q. But in any event, you're now telling us that you're aware that there were
> approximately eight accounts at which Madoff was using investment advisory
> customers' money to purchase T bills. Isn't that true?
> A. That is correct, yes.
> Q. Okay. And those accounts included Lehman Brothers.
> A. Correct.
> Q. Bear Sterns.
> A. That's correct.
> Q. JP Morgan Chase.
> A. Correct.
> Q. Morgan Stanley.
> A. There was a Morgan Stanley account, yes.

*Id.* at 154:2-9.

**RESPONSE:**  Not disputed that Mr. Dubinsky so testified but disputed to the extent the

cited testimony is incomplete.  *See* Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 153:21–154:9].  Mr.

Dubinsky testified:

> Q Isn't it a fact, Mr. Dubinsky, that the T-bill investments that Mr. Madoff made
> with investment advisory customers money earned interest?
>
> A Are you talking about the overnight sweeps?
>
> Q No, I'm not. I'm talking about the eight or nine firms that you've
> acknowledged that Madoff purchased T-bills through with investment advisory
> customers money.
>
> A So --
>
> Q And those T-bills paid interest, right?
>
> A Those T-bills paid interest. I don't know when you said whether they made
> money, I don't know. I didn't analyze that because, depending on when you buy
> them at par or below par and the interest that you collect with accrued interest.
> And then when you sell them, you may make money, you may not. I did
> acknowledge, and I said during my direct, money was used from the 703 for the
> overnight sweep.  I said that earned interest. That was a way to kind of keep
> enough money in the Ponzi to add more to the pot. And I acknowledged that
> money was taken from the 703 to be used where Mr. Madoff purchased or
> somebody in BLMIS purchased additional treasuries.

*Id.* at 166:9–167:4.

73.    While, on direct examination, Dubinsky testified that he found no evidence of IA

customer T-bills in the DTC records, he admitted on cross-examination that Madoff kept securities

with the financial institutions from which he had purchased them:

> Q. Well, you testified that in trying to analyze Madoff's stock and T-bill position,
> you went only to the DTC records.
> A. Correct.
> Q. But isn't a fact that Mr. Madoff also kept securities with financial institutions
> from which he bought them?
> A. As in the eight brokerage accounts, yes.

*Id.* at 177:16-18-21.

**RESPONSE:**  Not disputed that Mr. Dubinsky so testified but disputed to the extent the

cited testimony is incomplete.  Mr. Dubinsky testified:

> Q Yes. And you didn't -- you didn't calculate the securities that he had in those
> brokerage accounts; isn't that true?
>
> A The securities in those brokerage accounts were for the prop trading business.
> And those were accounted for in the DTC because those records, even if
> somebody -- the DTC records the trade of the equity. And so they would have
> been there as I went through on the prop trading, whether he held them, in
> custody of them, or they were with somebody else, they would have been
> recorded. On the IA business, those records didn't exist. We've talked about the
> eight brokerage accounts, but as I said, even if you add up all the treasuries in
> those eight brokerage accounts, they're woefully short of what Mr. Madoff or
> BLMIS was showing on a customer statements for a particular day for all of the
> treasuries.

Brown Decl., Ex. 1 [Nelson Tr. 5/8/19 at 177:22–178:12].


74.    Additionally, while another analysis allegedly performed by Dubinsky addresses

the T-bills held by the Brokerage Firms, Dubinsky did not add up all those T-bills. *See e.g.*

Dubinsky Report ¶ 227, Table 5; and ¶¶ 232-240, ECF No. 118-1.

**RESPONSE:**  Disputed as not supported by the evidence cited and vague.  Mr. Dubinsky's

analysis confirmed that (i) IA Business T-Bills were not held at the DTC (Dubinsky Decl., Attach.

A (Dubinsky Report) ¶¶ 224–27); (ii) T-Bills purchased using money from the 703 Account were

not purchased for the IA Business Customers (*id.* ¶¶ 228–29); (iii) the aggregate volume of

purported IA Business T-Bills as reported on the customer statements far exceeds the volume of

T-Bills in the Brokerage Accounts and the Proprietary Trading Business (*id.* ¶¶ 230–31); and (iv)

the T-Bills held in the Brokerage Accounts do not match the T-Bills reported on the IA Business

customer account statements (*id.* ¶¶ 232–40).

**T-Bill Purchases for the Epstein Account**

75. Madoff purchased significant amounts of T-Bills for the Epstein Account and

held them throughout the time they were credited to the Epstein Account, for example:

**RESPONSE:**    Disputed that T-Bills were purchased by BLMIS on behalf of any IA

Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of

such [T-Bill] purchases having been made on behalf of IA Business customers. While BLMIS

purchased treasury bills with customer funds, these purchases did not match the allocation of

treasury bill transactions that appeared on customer statements.").

**T-Bills (due 2/3/2005) CUSIP No. 912795RY9**

76.    On December 9, 2004, Madoff purchased $100,000,000 of a T-Bill (due 2/3/2005)

(CUSIP No. 912795RY9[5]) from Morgan Stanley. Chaitman **Ex. AL** [Chart, MSYSAD0000225].

**RESPONSE:**    Not disputed.   The Trustee objects to Chaitman Decl., Ex. AL as

inadmissible on the grounds that Defendants have not identified a percipient witness or expert

witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions

---

[5] The CUSIP numbers listed herein may not all appear on the customer statements. The maturity dates of
the T-bills, however, have been matched to the CUSIP numbers available on
https://www.treasurydirect.gov/instit/annceresult/annceresult_query.htm**.** This Court may take judicial
notice of this pursuant to Fed. R. Evid. 201(b)(2) (The court may judicially notice a fact that is not subject
to reasonable dispute because it can be accurately and readily determined from sources whose accuracy
cannot reasonably be questioned.). *See Abely v. Aeterna Zentaris Inc.,* 2013 WL 2399869, at *21
(S.D.N.Y. May 29, 2013) (documents on a government website "are published by government sources
from which the Court may appropriately take judicial notice."); *see also Lilakos v. New York City,* 2020
WL 1696118, at *4, n.4 (2d Cir. Apr. 8, 2020) (taking judicial notice of a form available online at nyc.gov
website); *Apotex Inc. v. Acorda Therapeutics, Inc.,* 823 F.3d 51, 60, n.3 (2d Cir. 2016) (taking judicial
notice of a document published on regulations.gov, a government website, "because the Guidance is
publicly available and its accuracy cannot reasonably be questioned."); *Reed Const. Data Inc. v.
McGraw-Hill Companies, Inc*., 638 F. App'x 43, 47, n.2 (2d Cir. 2016) (taking judicial notice of public
records contained on the Georgia Secretary of State's website).

that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

77.    On December 10, 2004, Madoff credited $475,000 of those T-Bills to the Epstein Account, with a value of $ 473,499. Chaitman **Ex. AL** [Chart, MDPTPP00665912].

**RESPONSE:**  Disputed that the Epstein Account was credited with a value of $473,499 because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").   The Trustee objects to Chaitman Decl., Ex. AL as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

78.    On December 31, 2004, Madoff sold those T-Bills and credited the Epstein Account with $ 474,259. Chaitman **Ex. AL** [Chart, MDPTPP00665912

**RESPONSE:**  Disputed as lacking evidentiary support and to the extent that the evidence cited does not support the statement.  Disputed further that the Epstein Account was credited with a value of $474,259 because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill

transactions that appeared on customer statements."). The Trustee objects to Chaitman Decl., Ex. AL as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

79.     Third-party records show that Madoff held these T-Bills throughout the period during which they appeared on the Epstein Account customer statement, buying $100,000,000 of them on December 9, 2004 from Morgan Stanley for a total of $99,688,905, and redeeming them on their maturity date of February 3, 2005 for face value of $100,000,000. Chaitman **Ex. AL** [Chart, MSYSAB0000297]. These T-Bills (CUSIP No. 912795RV9) were not held by our other clients at the same time. *See* Chaitman **Ex. AM** [December 2004 customer statements for Stephen and Leslie Ehrlich, Jacob Dick Trust and Doron Tavlin].

**RESPONSE:** Disputed as lacking evidentiary support and to the extent that the evidence cited does not support the statement. Disputed further because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendants. Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers. While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements."). Disputed further because the statement that these T-Bills "were not held by other clients at the same time" incorrectly excludes thousands of other BLMIS accounts and the other treasuries cited by Defendants in paragraphs 80, 86, and 90. *Id.* The Trustee objects to Chaitman Decl., Ex. AL as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to

support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

## T-Bills (due 12/16/2004) CUSIP No. 912795RR4

80.     On September 2, 2004, Madoff purchased $75,000,000 of a T-Bill (due 12/16/2004) (CUSIP No. 912795RR4) from Morgan Stanley. Chaitman **Ex. AL** [Chart, MSYSAD0000215].

**RESPONSE:**     Not disputed.   The Trustee objects to Chaitman Decl., Ex. AL as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

81.     On September 22, 2004, Madoff credited $500,000 of those T-Bills to the Epstein Account, with a value of $ 498,065. Chaitman **Ex. AL** [Chart, MDPTPP00665896].

**RESPONSE:**  Disputed that the Epstein Account was credited with a value of $498,065 because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").  The Trustee objects to Chaitman Decl., Ex. AL as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions

38

that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

82.   On November 8, 2004, Madoff sold those T-Bills and credited the Epstein Account with $ 499,030. Chaitman **Ex. AL** [Chart, MDPTP00665904].

**<u>RESPONSE</u>:**  Disputed as lacking evidentiary support and to the extent that the evidence cited does not support the statement.[6]  Disputed further that the Epstein Account was credited with a value of $499,030 because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").  The Trustee objects to Chaitman Decl., Ex. AL as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

83.   Third-party records show that Madoff held these T-Bills throughout the period during which they appeared on the Epstein Account customer statement, buying $75,000,000 of them on September 2, 2004 from Morgan Stanley for $74,666,405, and redeeming them on their maturity date of December 16, 2008 at face value of $75,000,000. Chaitman **Ex. AL** [Chart, JPMSAB0003373].

---

[6] The Trustee notes that the November 2004 BLMIS customer statement for the Epstein Account is found at MDPTPP00665904.

**RESPONSE:**  Disputed as lacking evidentiary support and to the extent that the evidence cited does not support the statement.  Disputed further because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").  The Trustee objects to Chaitman Decl., Ex. AL as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

84.    The Epstein Account held securities in the amount of $996,384.80 two years prior to Madoff's confession on December 11, 2008. Chaitman **Ex. AN** [Customer Statement dated 11/30/06 [MDPTPP00666050-54 at MDPTPP00666053]].

**RESPONSE:**  Not disputed that the November 2006 customer statement for the Epstein Account reflected a market value of securities of $996,384.80.  Disputed that any securities were purchased by BLMIS on behalf of any IA Business customer, including Defendants. Stmt. ¶¶ 19–56 ("Mr. Dubinsky's analysis demonstrated that BLMIS did not conduct any trading on behalf of its IA Business customers."). Disputed that T-Bills were purchased by BLMIS on behalf of any IA Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.").

**T-Bill Purchases for the Shelburne Account**

85.    Madoff purchased significant amounts of T-Bills for the Shelburne Account and held them throughout the time they were credited to the Epstein Account, for example:

**RESPONSE:**  Disputed that T-Bills were purchased by BLMIS on behalf of any IA Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers. While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").


**T-Bills (due 12/16/2004) CUSIP No. 912795RR4**

86.    On May 9, 2007, Madoff purchased $300,000,000 of a T-Bill (due 8/9/2007) (CUSIP No. 912795ZU8) from JPMorgan. Chaitman **Ex. AO** [Chart, JPMSAA0015295].

**RESPONSE:**  Not disputed.[7]  The Trustee objects to Chaitman Decl., Ex. AO as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.


87.    On June 26, 2007, Madoff credited $1,425,000 of those T-Bills to the Shelburne Account, with a value of $1,417,319.25. Chaitman **Ex. AO** [Chart, MDPTPP00585246.

**RESPONSE:**  Disputed that the Shelburne Account was credited with a value of $1,417,319.25 because BLMIS did not purchase any T-Bills on behalf of any IA Business

---

[7] The Trustee notes that the subtitle preceding paragraph 86 refers to a different treasury with a maturity date of 12/16/2004 and with CUSIP No. 912795RR4.

customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").  The Trustee objects to Chaitman Decl., Ex. AO as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

88.    On July 3, 2007, Madoff sold those T-Bills and credited the Shelburne Account with $ 1,418,160. Chaitman **Ex. AO** [Chart, MDPTPP0058525].

**RESPONSE:**  Disputed as lacking evidentiary support and to the extent that the evidence cited does not support the statement.  Disputed further that the Shelburne Account was credited with a value of $1,418,160 because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").  The Trustee objects to Chaitman Decl., Ex. AO as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

89.     Third-party records show that Madoff held these T-Bills throughout the period

during which they appeared on the Shelburne Account customer statement, buying $300,000,000

of them on May 9, 2007 from JPMorgan for a total of $296,373,666.66, and redeeming them on

their maturity date of August 9, 2007 for face value of $300,000,000. Chaitman **Ex. AO** [Chart,

JPMSAB0003373].

**RESPONSE:**  Disputed as lacking evidentiary support and to the extent that the evidence

cited does not support the statement.  Disputed further because BLMIS did not purchase any T-

Bills on behalf of any IA Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr.

Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA

Business customers.  While BLMIS purchased treasury bills with customer funds, these

purchases did not match the allocation of treasury bill transactions that appeared on customer

statements.").  The Trustee objects to Chaitman Decl., Ex. AO as inadmissible on the grounds

that Defendants have not identified a percipient witness or expert witness in accordance with

Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact

purchased on their behalf, to the exclusion of all other BLMIS customers.


### T-Bills (due 2/3/2005) CUSIP No. 912795RY9

90.     On December 9, 2004, Madoff purchased $100,000,000 of a T-Bill (due

2/3/2004) (CUSIP No. 912795RY9) from Morgan Stanley. Chaitman **Ex. AO** [Chart,

MSYSAD0000225].

**RESPONSE:**  Not disputed.[8]  The Trustee objects to Chaitman Decl., Ex. AO as

inadmissible on the grounds that Defendants have not identified a percipient witness or expert

---

[8] The Trustee notes that the treasury with CUSIP No. 912795RY9 had a maturity date of 2/3/2005, not
2/3/2004.

witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

91.     On December 10, 2004, Madoff credited $525,000 of those T-Bills to the Shelburne Account, with a value of $523,341. Chaitman **Ex. AO** [Chart, MDPTPP00585064].

**RESPONSE:**  Disputed that the Shelburne Account was credited with a value of $523,341 because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").  The Trustee objects to Chaitman Decl., Ex. AO as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

92.     On December 31, 2004, Madoff sold those T-Bills and credited the Shelburne Account with $ 524,181. Chaitman **Ex. AO** [Chart, MDPTPP00585064].

**RESPONSE:**  Disputed as lacking evidentiary support and to the extent that the evidence cited does not support the statement.  Disputed further that the Shelburne Account was credited with a value of $524,181 because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS

purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements."). The Trustee objects to Chaitman Decl., Ex. AO as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

93.     Third-party records show that Madoff held these T-Bills throughout the period during which they appeared on the Shelburne Account customer statement, buying $100,000,000 of them on December 9, 2004 from Morgan Stanley for a total of $99,688,905, and redeeming them on their maturity date of February 3, 2005 for face value of $100,000,000. Chaitman **Ex. AO** [Chart, MSYSAB0000297].

**RESPONSE:** Disputed as lacking evidentiary support and to the extent that the evidence cited does not support the statement. Disputed further because BLMIS did not purchase any T-Bills on behalf of any IA Business customer, including Defendants. Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers. While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements."). The Trustee objects to Chaitman Decl., Ex. AO as inadmissible on the grounds that Defendants have not identified a percipient witness or expert witness in accordance with Fed. R. Civ. P. 26 who can testify to support Defendants' contentions that treasuries were in fact purchased on their behalf, to the exclusion of all other BLMIS customers.

94.    These T-Bills (CUSIP No. 912795RV9) were not held by our other clients at the same time. *See* Chaitman **Ex. AM** [December 2004 customer statements for Stephen and Leslie Ehrlich, Jacob Dick Trust and Doron Tavlin].

**RESPONSE:** Disputed as irrelevant and not based on admissible evidence.  To the extent paragraph 94 refers to the treasury with CUSIP No. 912795RY9, not 912795RV9, this statement incorrectly excludes thousands of other BLMIS accounts and the other treasury cited by Defendants in paragraphs 76 and 86. Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.  While BLMIS purchased treasury bills with customer funds, these purchases did not match the allocation of treasury bill transactions that appeared on customer statements.").

95.    The Shelburne Account held securities in the amount of $ 1,372,648.72 two years prior to Madoff's confession on December 11, 2008. Chaitman **Ex. AP** [Customer Statement dated 11/30/06 [MDPTPP00585202-06 at MDPTPP00585205]].

**RESPONSE:**  Not disputed that the November 2006 BLMIS customer statement for the Shelburne Account reflected a market value of securities of $1,372,648.72.  Disputed that any securities were purchased by BLMIS on behalf of any IA Business customer, including Defendants. Stmt. ¶¶ 19–56 ("Mr. Dubinsky's analysis demonstrated that BLMIS did not conduct any trading on behalf of its IA Business customers."). Disputed that T-Bills were purchased by BLMIS on behalf of any IA Business customer, including Defendants.  Stmt. ¶¶ 57–68 ("Mr. Dubinsky found no evidence of such [T-Bill] purchases having been made on behalf of IA Business customers.").

**Defendants Paid Taxes on Alleged Fictitious Profits in the Epstein and Shelburne Accounts**

96.    In the years from 1993 through 2002, Defendants paid taxes totaling $870,483 on

the investment income from the Epstein and Shelburne Accounts combined.  *See* Chaitman **Ex.**

**AQ** [Declaration of Jeffrey J. Cronin, C.P.A. dated December 27, 2017 at ¶¶ 8-9 and Ex. A].

**RESPONSE:**  Disputed as irrelevant and not based on admissible evidence.


97.    For these years, Defendants paid $463,854 in unrefunded taxes on gains in the

Epstein Account and $406,629 in unrefunded taxes on gains in the Shelburne Account.  *See id.* at

Ex. A.

**RESPONSE:**  Disputed as irrelevant and not based on admissible evidence.


**The Trustee's Misrepresentations**

98.    The Trustee has consistently represented, from 2008 to the present, that Madoff

never purchased any securities with IA customers' money. Declaration of Helen Davis Chaitman

dated 5/6/2019, *Picard v. Nelson*, Adv. Pro. No. 10-04377, ECF No. 156-1, Ex. A.

**RESPONSE:**  Disputed.  Counsel has already been sanctioned by the Bankruptcy Court

for these spurious accusations.  In another matter in this liquidation, counsel made a third motion

to compel the production of trading records on the premise that the Trustee hid the records

because they would prove that BLMIS used customer funds to purchase securities and allocated

those purchases (and the profits from subsequent sales) to customers.  *Sec. Inv'r Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (SMB),

2020 WL 1488399, at *1 (Bankr. S.D.N.Y. Mar. 20, 2020).  After the Discovery Arbitrator

denied the motion to compel and the Bankruptcy Court affirmed, the Trustee sought

reimbursement of his attorneys' fees and the Discovery Arbitrator's fees under Federal Rule of

Civil Procedure 37(a)(5)(B). *Id.* The Bankruptcy Court described that counsel for the defendants' "entire approach" to the dispute for the trading records is based on the "false narrative that the Trustee is a liar who hid the fact" that BLMIS used the funds deposited with BLMIS by IA Business customers to purchase securities and allocated those purchases to customers. *Id.* at *2; *see also id.* at *10 ("[T]o justify placing the burden on the Trustee, she falsely accused him of deliberately concealing the use of IA customer funds to purchase securities when she knew, had she read it, that the Dubinsky Report disclosed that precise fact."). The Bankruptcy Court determined that an award of attorneys' fees and expenses was justified against counsel personally as "[s]he perpetuated the myth that the Trustee hid BLMIS's use of IA customer money to buy securities, when, in fact, this was fully disclosed in the Dubinsky Report, and then tried to leverage the Trustee's perceived dishonesty plus his greater resources to force the Trustee to review 30 million documents in the BLMIS Database and the contents of 13,000 boxes without regard to any notion of proportionality." *Id.* at *19. Despite the Bankruptcy Court's strong language and award of monetary sanctions, counsel for Defendants continues to brazenly misrepresent the Trustee's obligation to produce these documents.

99.    The Trustee has refused to produce trading records and all of the customers' account statements. Declaration of Helen Davis Chaitman dated 4/11/2018, *Picard v. Nelson*, Adv. Pro. No. 10-04377, ECF No. 86-1; s*ee also* Trustee Response to Defendants' Document Demands and Interrogatories served in Adv. Pro. No. 10-04995 (SMB) and dated April 8, 2016, [Response to Request No. 2], *Picard v. Wilenitz*, Adv. Pro. No. 10-04995 ECF No. 70-2].

**RESPONSE:** Disputed. Counsel has already been sanctioned by the Bankruptcy Court for these spurious accusations. *See* Response to ¶ 98; *In re Bernard L. Madoff*, 2020 WL 1488399, at *19.

Pg 49 of 50

**The Bankruptcy Court's View That Summary Judgment is Not Appropriate**

100.    This Court has held that summary judgment is not appropriate in the claw back

cases, *see e.g. Picard v. Legacy Capital, Ltd.,* 603 B.R. 682 (Bankr. S.D.N.Y. 2019); *Picard v.*

*Mann,* 608 B.R. 165 (Bankr. S.D.N.Y. 2019).

**RESPONSE:**  Disputed as immaterial and not a factual statement.  It is also an

inaccurate statement as the Bankruptcy Court did consider and resolved certain issues on

summary judgment.  *See, e.g.*, *Legacy*, 603 B.R. at 695–98 (finding summary judgment to be

appropriate on all but (i) the start date of the BLMIS Ponzi scheme; and (ii) whether the profits

reported on the Defendants' BLMIS account statements arising from BLMIS's purported U.S.

Treasury Bill trades were real and resulted from BLMIS's purchase of those U.S. Treasury Bills

for the Defendants' benefit); *Mann*, 608 B.R. at 176 (narrowing the scope of the trial to

determine whether the Two-Year Transfers were transfers by the debtor within the meaning of

SIPA § 78fff-2(c)(3) and Bankruptcy Code § 548(a)(1)(A)).


101.    This Court expressed the same concerns at a recent hearing regarding the Trustee's

announced intention to move for summary judgment in another, similar case, *Picard v. Savin,* Adv.

Pro. No. 10-04889. *See* March 17, 2020 Hearing Tr. 9:23-10:15; 12:11-15, *id.* at ECF No. 96

("[y]ou know my view on these summary judgment . . . , motions, particularly on the issues I've

identified, [whether the JPMC Accounts were held by Madoff personally or by the LLC, whether

the LLC was a Ponzi scheme, and if so, when it began, whether the LLC was allocating T-bills

purchased by the proprietary trading arm to customers of the IA business, deposits and

withdrawals] . . . I have to try it.").

**RESPONSE:**  Disputed as immaterial and not a factual statement.  *See also Picard v.*

*Palmedo*, No. 20-cv-01926 (PGG) (S.D.N.Y. July 8, 2020), ECF No. 5 (district court denied motion to withdraw the reference as "premature," finding the case not to be "trial-ready" given the Trustee's forthcoming motion for summary judgment, and referred the case back to the bankruptcy court for proposed findings of fact and conclusions of law on the motion); *Picard v. Estate of Allen Meisels*, No. 20-cv-01278 (GHW) (S.D.N.Y. June 8, 2020), ECF No. 17 (same).

Dated:  October 30, 2020
        New York, New York

*/s/ Nicholas J. Cremona*
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Nicholas J. Cremona
ncremona@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Maximillian S. Shifrin
Email: mshifrin@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*