# EXHIBIT 1

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Adv. Case No. 10-04377-smb

4   Adv. Case No. 10-04658-smb

5   - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

7   MADOFF INVESTMENT SECURITIES LLC,

8                 Plaintiff,

9            v.

10  NELSON et al.,

11                Defendants.

12  - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, NY  10004

17

18                May 8, 2019

19                10:22 AM

20

21  B E F O R E :

22  HON STUART M. BERNSTEIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  NAROTAM RAI

**Page 2**

1 HEARING re 10-04377-smb TRIAL

2

3 HEARING re 10-04377-smb Motion In Limine Number 1 to Admit

4 the Plea Allocutions of Bernard L. Madoff and BLMIS

5 Employees (also applies to Adv. Proc. No. 10-04658)

6

7 HEARING re 10-04377-smb Motion In Limine Number 2 to Admit

8 the Trial Testimony of Frack DiPascali (also applies to Adv.

9 Proc. No. 10-04658)

10

11 HEARING re 10-04377-smb Motion In Limine Number 3 to Exclude

12 Testimony and Exhibits Related to Defendants Asserted Tax

13 Obligations to Governmental Taxing Authorities (also applies

14 to Adv. Proc. No. 10-04658)

15

16 HEARING re 10-04658 TRIAL

17

18

19

20

21

22

23

24

25 Transcribed by: Sonya Ledanski Hyde

**Page 4**

1 CHAITMAN LLP

2     465 Park Avenue

3     New York, NY 10022

4

5 BY: HELEN DAVIS CHAITMAN

6     JENNIFER ALLIM

7

8 ALSO PRESENT TELEPHONICALLY:

9

10 SEAN DALY

11 DAVID J. SHEEHAN

12 ROBERT A. RICH

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 3**

1 A P P E A R A N C E S :

2

3 BAKER HOSTETLER LLP

4     Attorneys for the Trustee

5     45 Rockefeller Plaza

6     New York, NY 10111

7

8 BY: SEANNA R. BROWN

9     NICHOLAS J. CREMONA

10     DEAN HUNT

11     LAN HOANG

12     AMY E. VANDERWAL

13     MAXIMILLIAN S. SHIFRIN

14

15 BAKER HOSTETLER LLP

16     Attorneys for the Trustee

17     811 Main Street, Suite 1100

18     Houston, TX 77002

19

20 BY: MARIE L. CARLISLE

21

22

23

24

25

**Page 5**

1     P R O C E E D I N G S

2     CLERK: Please be seated.

3     THE COURT: Picard versus Nelson. Is the

4 Plaintiff ready?

5     MR. CREMONA: We are, Your Honor. Good morning.

6     THE COURT: Is the Defendant ready?

7     MR. HUNT: Yes.

8     THE COURT: All right. Why don't we deal with the

9 motions in limine first, which -- and objections, which I've

10 reviewed?

11     MR. CREMONA: Thank you, Your Honor. Nicholas

12 Cremona of Baker & Hostetler appearing on behalf of Irving

13 Picard as the Trustee.

14     As Your Honor indicated, we have several pretrial

15 motions that we'd like to deal with, the first of which I

16 think is one that's rather straightforward from our

17 perspective, but I understand, as Your Honor often says,

18 your perspective in this case often depends upon where you

19 sit.

20     So the motion in limine number 3 is a motion to

21 exclude the testimony of Robert Oppenheim. He is an

22 accountant that has been designated by the defendants, and

23 based on the declaration that was submitted in opposition to

24 our motion, it appears that he would testify that the

25 defendants paid roughly $5.3 million in taxes based on

2 (Pages 2 - 5)

Page 6

1 purported gains from their Madoff investments from the years

2 1985 through 2002. We object and move to have him excluded

3 because of several reasons.

4         We don't believe the testimony is relevant. We

5 don't think it's probative to any material or fact at issue.

6 And thirdly, I think when you look at the declaration on its

7 face, it's inaccurate for a couple of reasons, and we can

8 get into that.

9         But first and foremost, I don't think it's

10 relevant to admit his testimony because it will not prove or

11 dispute -- prove a material fact at issue. And secondly, as

12 we said in our papers and as Your Honor will recall, the

13 issue at the end of the day as to whether the -- what the

14 legal effect of the payment of those taxes has been decided

15 by this court at least two times.

16         As Your Honor noted in your Cohen decision, the

17 payment of taxes is not a defense. And moreover, to allow

18 the offset for payment of taxes would only come at the

19 expense of other net loser victims and limit the amount

20 recoverable by the trustee for their benefit, which is his

21 charge. And for those reasons, you noted that it's not a

22 defense. You reiterated that in your (indiscernible)

23 decision stating that the payment of taxes is not a defense.

24         When you look beyond that, Your Honor, if you look

25 at the declaration itself, it says --

Page 7

1         THE COURT: Where is the declaration?

2         MR. CREMONA: It's in -- it's in Exhibit 2, the

3 Defendant's opposition to our motion, and it actually

4 provides in it that -- if you look at Exhibit A to Mr.

5 Oppenheim's declaration, provides that the 5.3 million

6 purportedly paid in gains includes gains on these accounts

7 from the years 1985 through 1991. These accounts were not

8 opened --

9         THE COURT: To 2002.

10         MR. CREMONA: Right, but I'm focused on the 1985

11 period through 1991. These accounts --

12         THE COURT: Okay.

13         MR. CREMONA: These accounts didn't exist, and

14 that aggregates to 2.9 million purportedly in gains that the

15 taxes were paid on. Obviously, that's (indiscernible)

16 inaccurate and I would submit unreliable, and that presents

17 an independent basis to excluded it.

18         If you look then, Your Honor, to TX-24, which is

19 the Defendant's -- one of Plaintiff's Exhibit TX-24, and

20 that's --

21         THE COURT: Can you put it up on the screen? You

22 know, we have a lot of loose leaf here, and I'd appreciate

23 both sides, if you can display the exhibits on a screen.

24         MR. CREMONA: We can do that, Your Honor. And

25 just for the record, that is Carol and Stanley Nelson's

Page 8

1 amended objections and responses to Trustee's first set of

2 requests for admissions.

3         And I would direct Your Honor to Paragraph 13,

4 which starts on Page 5 of 9. And that paragraph references

5 Mr. Oppenheim, and it says that he prepared the tax return

6 for the Defendants from the period 1992 onward. That was a

7 prior admission by the Defendants which Mr. Oppenheim's

8 subsequent declaration actually contradicts, as you can see

9 if you look at the numbers. It purports to indicate that

10 $3.5 million in net taxes were paid, and the declaration

11 indicates 5.3. It also is -- there's a further discrepancy

12 that the defendants here received a tax refund from the IRS

13 in Connecticut in the amount of 1.5 million in their

14 admission and Mr. Oppenheim at --

15         THE COURT: You know what? You don't want to call

16 him as a witness, and now you're impeaching him.

17         MR. CREMONA: I'm just -- I'm just merely

18 providing independent basis that -- to demonstrate that his

19 testimony is unreliable. I think for the reasons we've

20 stated, legally I think -- based on application of Rules 401

21 and 403 and the prior determinations by Your Honor -- his

22 testimony should be excluded because it will have no

23 material effect on the outcome of the issues before the

24 Court.

25         THE COURT: What's the relevance of the taxes?

Page 9

1         MS. CHAITMAN: The relevance of the taxes is, Your

2 Honor, we believe that the Defendant should not be liable

3 for made-up gains to the extent that the reporting of those

4 gains caused them to be liable to the state and local and

5 federal taxing authorities for 50 percent, essentially, in

6 taxes.

7         And I know that Your Honor, in other cases which

8 are not consolidated with this case, you've ruled against

9 the Defendants on this issue, but it hasn't gone up on

10 appeal. And this is an issue that we are asserting, and

11 we're entitled to a ruling on it. I anticipate that your

12 ruling will be the same, but it's not a consolidated case,

13 and we have a right to that ruling.

14         THE COURT: I understand that. You've made your

15 record. I'm going to exclude the testimony for the reasons

16 I've stated in the prior decisions referred to by Mr.

17 Cremona.

18         The amount of taxes which these defendants and

19 other investors paid is irrelevant to the determination of

20 what was deposited and what was withdrawn within -- capped

21 by the two-year withdrawal. So I'll grant that motion to

22 exclude the accountant's testimony. You've made your

23 record.

24         MS. CHAITMAN: Thank you.

25         THE COURT: Okay.

3 (Pages 6 - 9)

Page 10

1      MR. CREMONA:  Thank you, Your Honor.

2      I'm going to move on to the second motion that's

3  the motion by the Trustee to quash the subpoena of Mr.

4  Picard as Trustee.

5      Your Honor may recall this issue because you

6  issued a decision on a nearly identical motion back in June

7  of 2017 in the profit withdrawal proceeding, and that's

8  referred to at ECF-16180.  I would submit that the issues

9  there were nearly identical to the issues now before you.

10  There, the Claimant sought to subpoena the Trustee and have

11  him testify at that trial on issues as to his determination

12  and the -- and his knowledge of the books and records of the

13  Debtor.

14      Your Honor noted in that decision -- you granted

15  the Trustee's motion and held that allowing the Claimant to

16  pursue that line of inquiry as to the Trustee's subjective

17  knowledge and conclusions would propel the Court and the

18  parties into a time-consuming immaterial area that will

19  prolong the trial without any corresponding benefit.

20      I would say here it's even clearer, Your Honor.

21  We have the Trustee who any personal knowledge that he would

22  -- well, he has no personal knowledge of the books and

23  records prior to his appointment.  Any personal knowledge

24  that he would have obtained would've been in consultation

25  with his counsel and through his experts.

Page 11

1      As you noted in that opinion, those experts were

2  retained nearly contemporaneously with -- his appointment

3  and anything that he would've learned from them would've --

4  would be most certainly work product and privilege, being

5  discussions with others.  And that work went on for two

6  years prior to the commencement of these voidance actions.

7  So he certainly lacks personal knowledge.  And I think more

8  importantly, Your Honor --

9      THE COURT:  But all trustees lack personal

10  knowledge of records that were maintained before he or she

11  was appointed, right?

12      MR. CREMONA:  Understood, but my -- I think the

13  more important point though is that his testimony would

14  merely be duplicative of the testimony of his expert.  The

15  lines of inquiry that have been set forth in Ms. Chaitman's

16  opposition are the Trustee's factual basis for calculating

17  clawback exposure, his factual basis for determining whether

18  they received the withdrawal, and whether any real

19  securities were purchased.

20      The Trustee's three experts that were property

21  disclosed under Rule 26 are going to testify to those very

22  same issues.  His testimony would be merely cumulative of

23  those.  And the very fact that Your Honor should consider

24  and has considered is whether this -- whether this is

25  designed to harass the Trustee.

Page 12

1      The decision that I referred to at ECF-16180 went

2  on at length to describe some of the attacks on the trustee.

3  And unfortunately, some of those attacks are maintained in

4  these papers in opposition to this motion which talked about

5  the Trustee's compensation and that he had -- and there are

6  false statements in there, candidly, Your Honor, which are

7  unfortunate.  And I hope today we can put a rest to a lot of

8  that through this trial.

9      But for those reasons, Your Honor, I would

10  respectfully request that the motion be granted because Mr.

11  Picard's testimony is not based on firsthand knowledge,

12  would be duplicative, and the design here is purely to

13  harass the Plaintiff.

14      THE COURT:  Okay.

15      MS. CHAITMAN:  Your Honor, the design is not to

16  harass.  The design is to bring out the truth about what

17  really happened here.

18      THE COURT:  But what does he have to -- what does

19  the Trustee have to say in this case?

20      MS. CHAITMAN:  He has to explain the basis on

21  which he's asserted from inception of his appointment that

22  Madoff never purchased securities with investment advisory

23  customers' money when Mr. Madoff contradicted that, and we

24  will prove that --

25      THE COURT:  I understand your case, but the

Page 13

1  Trustee didn't do any of this work.  He hired FTI to do it.

2      MS. CHAITMAN:  You know what, Judge?  I --

3      THE COURT:  All that he knows -- there's a

4  representation that he has no personal knowledge.  And I

5  know you cited the International Management case in your

6  papers, but there the trustee was the certified forensic

7  accountant who actually did the work that FTI did in this

8  case, and he called himself as the only witness in the case.

9      Mr. Picard's testimony is just going to be, you

10  know -- he won't be able to testify -- or I wouldn't let him

11  testify -- about what FTI or his lawyers told him on work

12  product and attorney-client privilege, and it'll just unduly

13  delay the trial, so I will sustain that motion to quash that

14  subpoena.

15      MR. CREMONA:  Thank you, Your Honor.  We're going

16  to -- I'm going to cede the podium to my colleague, Lan

17  Hoang, who's going to handle the remaining motions in

18  limine.

19      MS. HOANG:  Good morning, Your Honor.  Lan Hoang

20  on behalf of the Trustee.

21      THE COURT:  Okay.  Please keep your voice up.

22      MS. HOANG:  Yes.  In continuing with dealing with

23  witnesses to be presented at trial, I'd like to take the --

24  argue the motion to strike Ms. -- the Defendant's witnesses:

25  Mr. Madoff by deposition, Ms. Pitt by in person or by

4 (Pages 10 - 13)

Page 14

1  deposition, and the new disclosure, Ms. Agatha Cole as a
2  witness.
3      As to Mr. Madoff and Ms. Pitt, I think it -- the
4  issue here is not the relevance, which is the argument that
5  Defendants made in their papers.  They're relevant.  They
6  worked at BLMIS.  They perpetrated fraud.  That's not the
7  issue here.
8      The issue here is that Your Honor has ruled on.
9  We've had years of discovery, years of discovery dispute,
10 and Your Honor has already ruled that any deposition,
11 particularly the Madoff deposition that was taken after the
12 close of discovery in this case, would not -- are not --
13 that they are not permitted to participate in Madoff's
14 deposition, and that deposition would not apply in that
15 case.
16     THE COURT:  I understand that, but, you know, they
17 weren't permitted to participate in the Bonaventure trial
18 either, and I don't see the difference between your argument
19 for using DiPascali's testimony and the argument to use
20 Madoff's and -- I'm sorry, I forget the other witnesses'
21 names -- deposition testimony.  Isn't it really the same
22 issue?
23     MS. HOANG:  It's actually not, Your Honor.  Your
24 Honor has already ruled in this case as to Mr. Madoff and
25 Ms. Pitt.  As to the -- as to DiPascali, there's other

Page 15

1  grounds for the inadmissibility of his testimony, and that
2  is the judicial notice, the trustworthiness under 807.
3  There are other grounds to admit that.
4      Here we have court rulings by Your Honor that
5  state explicitly:  these witnesses will not be -- these
6  individuals will not be witnesses at this trial.  The
7  Trustee --
8      THE COURT:  I don't recall stating that.  If you
9  say I did, I did, but I recall also raising the issue that
10 even as to non-participants, how do you keep the information
11 out?
12     MS. HOANG:  Your Honor, that was actually our
13 argument at -- on the motions to open discovery to take
14 adianta -- to take the depositions of additional BLMIS
15 witnesses, and Your Honor said no.  If discovery is closed
16 --
17     THE COURT:  Right.
18     MS. HOANG:  -- those depositions would not --
19     THE COURT:  They can't --
20     MS. HOANG:  That's Ms. Pitt.
21     THE COURT:  I understand that.  They can't
22 participate, but there's a difference between not
23 participating and not being able to use trial transcript or
24 deposition transcript in accordance with the rules of
25 evidence.

Page 16

1      MS. HOANG:  Your Honor, it's -- we've proceeded
2  based on your orders that the testimony and those witnesses
3  would not -- are you -- I guess is the argument that you're
4  going to take judicial notice of those depositions?
5      THE COURT:  I mean, the judicial -- I don't know
6  what that means.
7      MS. HOANG:  Okay.
8      THE COURT:  Were the depictions taken?  Yeah.  I
9  suppose I could take judicial notice of that --
10     MS. HOANG:  Yes.
11     THE COURT:  -- but the question is the
12 truthfulness.
13     MS. CHAITMAN:  Yeah.
14     THE COURT:  Of all the depositions that are being
15 offered, really, and all the witnesses.
16     And yes, Ms. Chaitman?
17     MS. CHAITMAN:  There's a vital distinction that
18 I'd like to make, which is that the Trustee participated in
19 Madoff's deposition.
20     THE COURT:  They're not arguing that they didn't
21 have a motive to cross-examine, if that's what you're
22 getting to.
23     MS. CHAITMAN:  They had the ability to cross-
24 examine.
25     THE COURT:  Well, they also had the motive because

Page 17

1  it's the same issues.
2      MS. CHAITMAN:  Right, but they're seeking to put
3  into evidence criminal trial testimony --
4      THE COURT:  We haven't gotten to that yet, but --
5      MS. CHAITMAN:  Okay.  Okay.
6      THE COURT:  But I just --
7      MS. HOANG:  Your Honor, if I may.
8      THE COURT:  Look.  Look.  I'm going to overrule
9  any objection to the use of depositions, assuming that they
10 otherwise comply with, you know, the catchall provision that
11 you had the motive to cross-examine the witness.  When you
12 get to DiPascali, because I have more of a problem with that
13 one, so I'll overrule the objection to the use of Madoff
14 depiction and any deposition unless you can convince that
15 you didn't have a motive to cross-examine on the particular
16 issue on which the deposition is being offered.
17     MS. HOANG:  Okay, Your Honor.  What I would offer
18 is that we will have counter designations to the --
19     THE COURT:  Okay.  Fair enough.
20     MS. HOANG:  -- Ms. Chaitman's designations.  And--
21     THE COURT:  We can deal with that in post-trial
22 briefing.
23     MS. HOANG:  Yeah.
24     THE COURT:  That's not a problem.  That's not an
25 issue.

5 (Pages 14 - 17)

Page 18

1    MS. HOANG: As to Ms. Cole, Ms. Cole is an
2  attorney at Ms. Chaitman's firm. She was disclosed on May
3  1st, 2019 as -- in turning in her firm and somebody who
4  previously worked at Dow Jones. And now she is being
5  proffered, I'm not really sure for what, whether she's being
6  proffered as a fact witness, whether she's being proffered
7  as an expert witness.
8    In Ms. -- in the argument that -- in response for
9  our motion to strike, Ms. Chaitman says that Ms. Cole will
10  simply testify concerning her analysis of the documents
11  produced by the Trustee, which prove that Madoff purchased
12  securities with investor and advisory customers' money and
13  that those securities were listed on the Nelson statement.
14    That's -- Your Honor, that is expert opinion,
15  expert analysis. She is going to offer an opinion -- she is
16  going to offer her analysis of those documents produced by
17  Trustee. That's Ms. Chaitman's words.
18    THE COURT: All right. Let me --
19    MS. HOANG: So here's what --
20    THE COURT: Just a moment. Let me -- go ahead.
21  Why don't you finish?
22    MS. HOANG: Okay. So we've had years of
23  discovery. Fact discovery ended in 2016. She wasn't
24  disclosed. In -- she hasn't been disclosed in the year
25  since. We're in 2019 now. May 1st, seven days before

Page 19

1  trial, she's disclosed. So the fact that she's now
2  disclosed should preclude her from being a witness here,
3  whether as a fact witness or an expert witness. And even
4  more so as an expert witness because she hasn't provided an
5  expert report. She hasn't set forth her opinions, what she
6  relied on, her background, anything other than she works
7  with Ms. Chaitman and she worked at Dow Jones.
8    THE COURT: Okay.
9    MS. HOANG: And we have an opportunity to do that.
10  And then, if I may, Your Honor, just the last argument that
11  they raised, that Ms. Cole would be a rebuttal witness.
12  There really --
13    THE COURT: I'm not convinced of that one.
14    MS. HOANG: Yes. Okay.
15    THE COURT: It sounds like her direct case, but go
16  ahead.
17    MS. HOANG: Okay. I would just -- I'm in
18  agreement with you because if she's --
19    THE COURT: Well, you may or may not be. Let me
20  hear from Ms. Chaitman.
21    MS. CHAITMAN: Ms. Cole was simply going to walk
22  the Court through the documents.
23    THE COURT: Does she have a chart? Did she
24  prepare a chart of this?
25    MS. CHAITMAN: It's not a chart, Judge. It's just

Page 20

1  a collection of documents. And if we -- if we just admit
2  the documents into evidence, in a post-trial brief I can tie
3  everything together.
4    THE COURT: Well, that's what I thought she was
5  going to do. She can't opine.
6    MS. CHAITMAN: No, she's not. She was --
7    THE COURT: Let me -- let me just finish.
8    MS. CHAITMAN: Yeah.
9    THE COURT: She can't opine that a particular
10  purchase of treasury notes or treasury bills by BLMIS from
11  Lehman or somebody like that are the same notes that appear
12  in a customer statement. I suppose if all of the documents
13  are admitted, you know, as -- it's basically a legal
14  argument that on May 1, let's say, you know, BLMIS purchased
15  10,000 treasury bills. On May 2, the same treasury bills
16  appear in a Nelson statement. I don't really need a witness
17  for that as long as the documents are admissible. You can
18  just prepare a chart and point me to the documents in post-
19  trial briefing.
20    MS. CHAITMAN: That's fine because they're all
21  documents that were produced --
22    THE COURT: Yeah.
23    MS. CHAITMAN: -- by the Trustee.
24    THE COURT: And if she's just going to sit and go
25  through documents, you can do that in post-trial briefing.

Page 21

1    MS. CHAITMAN: That's fine. That saves us a lot
2  of time, Judge --
3    THE COURT: All right.
4    MS. CHAITMAN: Because there are a lot of
5  transactions.
6    THE COURT: So with that proviso, I guess your
7  motion is granted to exclude her.
8    MS. HOANG: Thank you.
9    Next, Your Honor, I will move to the motion to
10  admit the allocutions of Mr. Madoff.
11    THE COURT: I don't have to argument on that. I'm
12  going to admit the allocutions. I've dealt with this in
13  (indiscernible). I'll expand on it if necessary, in post-
14  trial decision to the extent that the issue is relevant.
15  But allocutions satisfy the rules for admissibility. They
16  have been admitted in numerous criminal proceedings -- or
17  numerous proceedings -- both in the Southern District and
18  elsewhere, and I will receive the allocutions.
19    MS. HOANG: Thank you, Your Honor. And now the
20  last motion we have is to admit the criminal trial
21  testimony, only certain portions, of Frank DiPascali who is
22  -- who died in 2015.
23    Mr. DiPascali was identified by the Trustee in his
24  complaint as having knowledge --
25    THE COURT: You said you weren't going to call him

6 (Pages 18 - 21)

Page 22

1 though.

2      MS. HOANG:  Yes.  We did -- we did not because at

3 the time we couldn't.  If Your Honor -- at the time, Mr.

4 DiPascali was under indictment.  He was -- he had pleaded

5 guilty and was participating in -- as a government witness

6 in the criminal trial.  Those convictions of those criminal

7 trial defendants did not become final until 2017, so we

8 could not call him even if he -- even though he was

9 available within 100 miles here.  We could not depose him.

10 Mr. DiPascali, unfortunately, died in 2015, so neither of

11 the parties here could've deposed him.

12      THE COURT:  You'll get your chance.

13      MS. HOANG:  I don't think there's an issue that

14 Mr. DiPascali's testimony is relevant.  It is.  He's telling

15 you what he did to perpetuate the fraud.  He --

16      THE COURT:  One of the arguments -- I don't

17 understand it to be a relevance argument.

18      MS. HOANG:  Okay.

19      THE COURT:  -- as much as the defense attorneys in

20 the Bonaventure trial didn't have the same motive to cross-

21 examine DiPascali, at least on some of the issues, which I

22 guess you want to use as testimony.  But for example, there

23 was really no -- there doesn't appear to be motive to cross-

24 examine him on whether or not the treasury purchases were

25 real or actually allocated.  There were various people were

Page 23

1 charged with securities fraud or conspiracy to commit

2 securities fraud.  And there was no reason to make that

3 distinction between treasure bills and equity securities as

4 there may be in this case.  So --

5      MS. HOANG:  Correct, Your Honor.  With regards to

6 the equities, Mr. DiPascali's testimony goes directly to

7 that.  There were no purchase of equities.  There was no

8 purchase of securities here.  And he tells you what he did.

9 He faked everything.  Everything was fake, and he goes

10 through how they did it.

11      On cross-examination on the eight days -- nine

12 days, excuse me -- of cross-examination, he was questioned

13 on the illegitimacy of the IA business, about -- testified

14 when did you learn that there were no trades?  He testified

15 to if you learned that there were no trades, what was the --

16 that would result in the calculation of over 30 years prior

17 to the demise of Madoff Securities, correct?  Correct.  He

18 was cross-examined at length on how they perpetuated the

19 fraud.  And including the securities, including the

20 treasury, and he talked about the backdating of the trades.

21 He talked about the rates of return.  He was all cross-

22 examined on these issues.

23      THE COURT:  Well, I guess what I'm -- I guess what

24 I'm saying is there may be some things he testified about

25 that would be -- that would come in, but there may be other

Page 24

1 things that don't come in, and I really ache to know what it

2 -- you know, what it is.

3      MS. HOANG:  Absolutely, Your Honor.

4      THE COURT:  I'm not prepared to admit as a blanket

5 matter everything he said for the reasons I've stated.

6      MS. HOANG:  Absolutely, Your Honor.  And that's

7 why at Exhibit 5 to Mr. Sheehan's declaration and the

8 Trustee's (indiscernible) papers, we set forth by page and

9 line a specific testimony that the Trustee would like to

10 move in.  It's not the entire transcript.  It's those

11 portions of the transcript that go specifically to proving

12 that BLMIS was a Ponzi scheme, which the Defendants still

13 contest here.

14      THE COURT:  All right.

15      MS. CHAITMAN:  Your Honor, at the criminal trial -

16 - which I did not attend -- nobody was convicted of

17 participating in a Ponzi scheme.

18      THE COURT:  No, but they were convicted of lying

19 about the purchase of securities for the accounts, and they

20 were convicted, among other things, about issuing

21 confirmation orders that falsely depicted purchases.

22      I understand that a "Ponzi scheme" is not a crime,

23 but the factual underpinnings of the security fraud claims

24 or the conspiracy, I guess, to commit security fraud were

25 the same facts that the Trustee is relying on to prove that

Page 25

1 there's a Ponzi scheme.  In other words --

2      MS. CHAITMAN:  Some are the same facts.  They --

3 some are not.  And clearly, the defense counsel had no

4 interest in cross-examining to elicit what I would try to

5 elicit if I were cross-examining those witnesses.

6      The other thing is, Judge, this is a complete

7 surprise to us because, as we've pointed out in our papers,

8 in the Trustee's initial disclosures, they not only didn't

9 list any of these witnesses, they expressly stated they do

10 not intend to rely on any former BLMIS employees.  And they

11 never corrected that.  They didn't do it during the period

12 of discovery.  They didn't do it until they served their --

13      THE COURT:  Did you identify Madoff and this other

14 witness --

15      MS. CHAITMAN:  Yes.

16      THE COURT:  -- that you want to use now in your

17 initial disclosures?

18      MS. CHAITMAN:  We named a couple of Madoff

19 employees, and we said --

20      THE COURT:  But you didn't name Madoff.

21      MS. CHAITMAN:  And we -- I'm sorry?

22      THE COURT:  Did you name Madoff?

23      MS. CHAITMAN:  I -- you know what?  I can't

24 remember.  I'd have to look.

25      MS. HOANG:  No, Your Honor.

7 (Pages 22 - 25)

Page 26

1    THE COURT: So, look. Let me -- let me deal with
2 DiPascali this way. I think you really have to go on a
3 subject-by-subject response to what they're purporting to
4 put in.
5    I probably agree with you that the distinction
6 between treasury trades and equity trades is not something
7 that the defense counsel had a motive to cross-examine him
8 on. On the other hand, this notion that there was a
9 conspiracy to induce investors to invest and not actually
10 invest and to continue the scheme by issuing false
11 confirmation statements and false trade confirmations and
12 false monthly statements I think is something that there was
13 a substantial motive to cross-examine him on. They may not
14 have been able to do it because the evidence was
15 overwhelming, but there was certainly a motive in the
16 criminal trial to cross-examine him on because that's what
17 they were being charged with, and that was the factual
18 underpinning of the charges.
19    MS. CHAITMAN: Yeah. You know, Judge, if I tried
20 to put in the transcript of a deposition that I took out of
21 the presence of the Trustee's counsel, you wouldn't admit
22 it.
23    THE COURT: It would depend on what you were
24 doing. It would depend on this issue of motive and whether
25 somebody had a motive to cross-examine on the same issues,

Page 27

1 but that's a hypothetical situation.
2    MS. CHAITMAN: Well, I think -- I think what I
3 would suggest then is that we deal with this in post-trial
4 briefing.
5    THE COURT: I agree with you.
6    MS. CHAITMAN: Okay.
7    THE COURT: I agree with you. There's no --
8    MS. CHAITMAN: Because I'm not --
9    THE COURT: I mean, I can read the -- I can read
10 it and you can read it at some other time. I'd like to
11 being the trial.
12    MS. CHAITMAN: Okay.
13    THE COURT: Are there any other motions that I
14 have to deal with?
15    MS. HOANG: No, Your Honor.
16    MS. CHAITMAN: Well, they're also seeking to admit
17 the testimony of (indiscernible) Pitts at the criminal
18 trial, and --
19    MS. HOANG: No. We're not.
20    THE COURT: I -- that's not my understanding.
21    MS. CHAITMAN: No?
22    MS. HOANG: No.
23    MS. CHAITMAN: So the only --
24    MS. HOANG: No, you wrote that in your papers.
25    MS. CHAITMAN: Okay. That's my misunderstanding.

Page 28

1    MS. HOANG: Okay.
2    MS. CHAITMAN: Okay.
3    THE COURT: Okay. Thank you.
4    MS. HOANG: Thank you, Your Honor.
5    THE COURT: Are there any other motions in limine
6 or pretrial objections that I have to deal with?
7    All right. Mr. Hunt, why don't you call your
8 first witness?
9    MR. HUNT: Your Honor, just a couple of
10 housekeeping matters.
11    THE COURT: Okay.
12    MR. HUNT: We'll eventually get to this.
13    THE COURT: You're going to tell me what you
14 intend to prove?
15    MR. HUNT: No, sir. I think you know what we
16 intend to prove.
17    Here today in the courtroom I have Ms. Collura,
18 Mr. Greenblatt, and Mr. Dubinsky as testifying experts. I
19 would like, if I could, to have Defendants identify which
20 witnesses they have in the courtroom, please.
21    THE COURT: What witnesses do you have in the
22 courtroom?
23    MS. CHAITMAN: We don't have any witnesses in the
24 courtroom.
25    THE COURT: Okay.

Page 29

1    MR. HUNT: Okay. Thank you, Your Honor.
2    And then just to clarify where we are on exhibits,
3 you've ruled on Exhibits 1, 2, 3, and 4, the allocutions, to
4 move those into evidence. I think you've already ruled on
5 that.
6    THE COURT: What are the disputed exhibits so we
7 don't have to go through every one?
8    MR. HUNT: So that's what I was getting ready to
9 talk about.
10    THE COURT: All right.
11    MR. HUNT: So there are a number of exhibits in
12 Volume 1 of our binder that I think, you know, we can clean
13 up pretty quickly. And the good news about that is once
14 we've cleaned it up, that binder will pretty much go away.
15    The only thing in that binder that I don't intend
16 to discuss here in the housekeeping session bar trial is the
17 last exhibit in the binder, which is Mr. Dubinsky's CV. For
18 some reason it got cut and put in the edit.
19    But just to go through the exhibits in that
20 binder, as I mentioned, Exhibits 1, 2, 3, and 4 are the
21 allocations. You've already ruled on those. Exhibit 5 is
22 the page and line designations of Mr. DiPascali, which we've
23 reserved to discuss in post-trial phase of this proceeding.
24    Exhibits 9 through 26 are the Trustee's
25 interrogatories and the Defendant's responses to those

8 (Pages 26 - 29)

Page 30

1 interrogatories, and the Defendant's responses to the
2 Trustee's request for admission.
3      We've included our interrogatories in that group
4 because the definitions are -- you have to look at the
5 definitions in order to match them up.
6      But we would like to move Trustee's Exhibits 9
7 through 26, which is the written discovery in this case,
8 into evidence.
9      THE COURT: Any objection?
10      MS. CHAITMAN: No.
11      THE COURT: Okay. So those are received.
12      (Trustee's Exhibit 9 through 26 Received into Evidence)
13      MR. HUNT: Okay. The next group that I'd like to
14 talk about are the authenticity of records, the custodian's
15 records. JP Morgan has (indiscernible) well, is an
16 important part of this case. Each party has designated JP
17 Morgan records, both BLMIS records and JP Morgan account
18 records from the Defendants. Their bank account was held at
19 JP Morgan as well.
20      Exhibit 28 -- Trustee's Exhibit 28 is the records
21 custodian affidavit for the JP Morgan-BLMIS records, and
22 Trustee's Exhibit 20 -- or 31, excuse me -- is the records
23 custodian affidavit for the Nelson's JP Morgan records.
24 We'd like to move those custodian record affidavits into
25 evidence so that they can be applied to the documents that

Page 31

1 are actually used at trial.
2      THE COURT: Any objection?
3      MS. CHAITMAN: We have no objection to any third-
4 party documents, just to cut this short, Your Honor. What
5 we do object to, we filed a written objection to Madoff's
6 internal records.
7      THE COURT: Okay. I would need testimony on that
8 as I needed testimony at the PW trial to establish the
9 trustworthiness and authenticity and deal with any hearsay
10 objections and things. I know we've dealt with a lot of
11 those issues before.
12      MR. HUNT: So just to be clear, Your Honor,
13 Trustee's Exhibits 28 and 31, are those custodian
14 affidavits.
15      THE COURT: Maybe the easier way to do this --
16      MR. HUNT: Okay.
17      THE COURT: What exhibits do you object to? I
18 know there are a lot of exhibits here, and I understand your
19 objection to the business records, which will require
20 testimony, but, you know, what's objectionable here?
21      MS. CHAITMAN: It's the -- we have the business
22 records, which are not verifiable from a third party.
23      THE COURT: I thought you had also objected to
24 some of the information in the expert reports.
25      MS. CHAITMAN: Yeah.

Page 32

1      THE COURT: I thought this would be easier. Maybe
2 not, but --
3      MS. CHAITMAN: Yeah, but I think that it probably
4 will be easier if we do that as they testify because I don't
5 --
6      THE COURT: Okay.
7      MS. CHAITMAN: -- know that they will use
8 everything.
9      THE COURT: So with respect to the --
10      MS. CHAITMAN: We objected to the use of the -- to
11 admission of the expert reports, per se.
12      THE COURT: Well, the expert reports are hearsay,
13 but the experts will testify, presumably.
14      MS. CHAITMAN: Exactly. To the extent they
15 testify --
16      THE COURT: Right.
17      MS. CHAITMAN: -- and use documents, I would like
18 to be able to object if I find --
19      THE COURT: Okay.
20      MS. CHAITMAN: Okay.
21      MR. HUNT: So --
22      THE COURT: Maybe that cuts it short.
23      MR. HUNT: I think it does. So there are some
24 other records custodian affidavits I just wanted to move
25 into evidence so that there's no question down the road.

Page 33

1 The would be, again, Exhibit 28 and 31 with respect to JP
2 Morgan. The Oppenheim records have been designated by both
3 parties. There's a records custodian affidavit --
4      THE COURT: That's the account's records?
5      MR. HUNT: Yes, sir. That's Exhibit 29. Fiserv
6 and PIMCO is the custodian of Mrs. Nelson's IRA, and there's
7 a records custodian for that, which is Trustee's Exhibit 30.
8 Both parties have designated records from that source, and
9 we would like to move that certification of domestic records
10 into evidence as well.
11      THE COURT: So we have 28, 29, 30, and 31. Any
12 objection?
13      MS. CHAITMAN: No, is it -- again, I have no
14 objection to third-party records.
15      THE COURT: All right.
16      MR. HUNT: Okay. One other minor housekeeping
17 matter, Your Honor.
18      THE COURT: They are received.
19      (Trustee's Exhibit 28 through 31 Received into
20 Evidence)
21      MR. HUNT: Thank you. Then we're done with Volume
22 1 of your exhibit list.
23      Sorry. Number 32 is the other designation that we
24 got from JP Morgan for the Nelson's bank record. I
25 apologize, Your Honor.

9 (Pages 30 - 33)

Page 34

1	THE COURT: All right. Any objection to 32?

2	MS. CHAITMAN: No. Again, Judge, no.

3	THE COURT: Okay.

4	(Trustee's Exhibit 32 Received into Evidence)

5	MR. HUNT: And then finally, so the record is

6	clear, Trustee's Exhibit 6 through 8, certified copies of

7	corporate records of the Debtor from the SEC, which is

8	Exhibits 6 and 7, and from the New York Secretary of State,

9	articles of incorporation, which are Exhibit 8, they're

10	properly authenticated, and they are admissible under

11	Federal Rule 9024. We move those into evidence as well.

12	THE COURT: Any objection?

13	MS. CHAITMAN: No.

14	THE COURT: Received.

15	(Trustee's Exhibit 6 through 8 Received into Evidence)

16	MR. HUNT: Thank you, Your Honor.

17	So that takes care of everything but the last

18	exhibit in Volume 1, which is Mr. Dubinsky's CV, and we'll

19	be getting rid of that one in just a minute.

20	That's all I have for pretrial matters, Your

21	Honor.

22	THE COURT: All right. I would suggest though, at

23	the end, you just make sure that we've gone through all the

24	exhibits and know what's in and what's out, okay? But for

25	the time being, as I understand it, the only things that are

Page 35

1	out right now or not received right now are BLMIS business

2	records, the expert reports -- and the expert reports

3	themselves.

4	MS. CHAITMAN: Correct. Correct.

5	THE COURT: Okay.

6	MS. CHAITMAN: And it's -- I think, just to short-

7	circuit this, I mean, to the extent that on cross-

8	examination I use third-party records, I assume they would

9	be admissible as well.

10	THE COURT: Why don't we let that just -- okay.

11	Let the events take their course.

12	MR. HUNT: That's a good point maybe, Your Honor.

13	We would propose -- I think you did this in the profit

14	withdrawal case as well, that we withhold moving records

15	into evidence until the witness's testimony is complete. We

16	can do it that way or in a posttrial submission, if you'd

17	like us to do it that way.

18	THE COURT: Well, the BLMIS records may be able to

19	be -- may -- we may be able to do that all at one, depending

20	on the testimony.

21	MR. HUNT: That's what I was thinking, either at

22	the end of the testimony, or at the end of the trial we can

23	put together a brief on that if you'd like us to.

24	THE COURT: All right.

25	Do our want to be heard, Ms. Chaitman, before we

Page 36

1	being in?

2	MS. CHAITMAN: No, thank you.

3	THE COURT: All right. You can call your first

4	witness.

5	MR. HUNT: Your Honor, we would call Bruce

6	Dubinsky to the stand, please.

7	MR. DUBINSKY: Good morning, Your Honor.

8	THE COURT: Good morning. Will you rise your

9	right hand, please?

10	Do you solemnly swear that the testimony you're

11	about to give will be the truth?

12	MR. DUBINSKY: Yes.

13	THE COURT: Okay. Please take a seat.

14	MR. HUNT: Your Honor, for ease of administration

15	of his testimony, I have a copy of his expert report and --

16	THE COURT: Are these exhibits?

17	MR. HUNT: -- two allocutions.

18	THE COURT: Thank you.

19	MR. HUNT: These are Exhibits (indiscernible).

20	MS. CHAITMAN: I'm sorry?

21	MR. HUNT: These are Exhibits (indiscernible).

22	THE COURT: I don't -- I don't need the

23	allocutions.

24	MR. HUNT: I was just (indiscernible).

25	MS. CHAITMAN: Oh, okay.

Page 37

1	MR. HUNT: (Indiscernible). That way you don't

2	have to look at a whole big one.

3	MR. DUBINSKY: Okay. Great.

4	THE COURT: And you can pull the microphone close

5	to you so you don't have to lean over.

6	Go ahead.

7	DIRECT EXAMINATION OF BRUCE DUBINSKY

8	BY MR. HUNT

9	Q	Mr. Dubinsky, could you please state your name for the

10	Court?

11	A	Bruce Gordon Dubinsky.

12	Q	Please describe your involvement in this matter.

13	A	I'm a forensic accountant. I was hired by the Trustee

14	in June of 2011 to investigate allegations of fraud and

15	whether BLMIS was insolvent and whether there was a Ponzi

16	that was perpetrated.

17	Q	Where are you currently employed?

18	A	I'm employed at an international consulting firm called

19	Duff & Phelps. It's a financial consulting firm

20	headquartered here in New York City, and I'm in the -- I'm a

21	managing director at Duff & Phelps, and I'm in the disputes

22	and investigations business division of Duff & Phelps.

23	Q	What are your duties there?

24	A	My duties are to -- I'm hired by clients such as the

25	Trustee to investigate cases of financial wrongdoing.

10 (Pages 34 - 37)

Page 38

1  That's about half of my practice, and the other half, Your
2  Honor, is on commercial cases where there's commercial
3  damages.  I either do business evaluations to assess the
4  damages or an economic calculation of damages.  So that's
5  kind of both sides of my practice.
6  Q   Mr. Dubinsky, is Duff & Phelps being paid by the
7  Trustee for your time in this case?
8  A   They are.  Yes.
9  Q   Has your compensation at Duff & Phelps changed based on
10  your appearing?
11  A   No, not at all.  It is not contingent.  As an expert
12  witness, Duff & Phelps is paid by the hour for all the
13  employees that work on the case, and it's not dependent on
14  the outcome.
15  Q   Let's talk about your qualifications an experienced
16  expert.  If you could turn to Trustee's Exhibit 33, TX-33,
17  which is a copy of your CV.  And that's actually the last
18  one in Binder 1.
19  A   Okay.  Okay.
20      MR. HUNT:  Your Honor?
21      THE COURT:  Yes.
22      MR. DUBINSKY:  Okay.
23  Q   Okay.  Yeah.  Then we'll get rid of that great big
24  book.  Is that a copy of your CV?
25  A   This is a copy of my CV, and it also has a list of

Page 39

1  rules -- the Rule 26 disclosure of testimony at trial or
2  disposition dating back to the first case that I've ever
3  testified as an expert in.
4  Q   So how many times have you testified as a forensic
5  expert regarding fraud investigations or similar matters?
6  A   Today will be the 60th trial, so I've been at 59 trials
7  before this, and I've been deposed dozens and dozens and
8  dozens of times as an expert.
9  Q   Have you testified in court on any matters other than
10  this one related to the collapse of BLMIS?
11  A   I have.  I testified, Your Honor, in the U.S. District
12  Court for the Southern District in the criminal trial,
13  what's known as the Madoff 5 criminal trial.  I was hired by
14  the U.S. Attorney's office and testified for a little over
15  three days on the stand going through and educating the jury
16  on the basic operations of BLMIS, the fraud that was
17  perpetrated at BLMIS.  I talked about the Ponzi, how that
18  was perpetrated.  I talked about a lot of issues relating to
19  how money was moved around, and then I was cross-examined in
20  that case by defense counsel, I think by all five of them.
21  Q   Other than your testimony -- I think you said it was
22  Judge Swain's court?
23  A   That was, yes.
24  Q   Other than your testimony related to the collapse of
25  BLMIS in that court, have you been qualified as an expert in

Page 40

1  any other case related to Ponzi matters?
2  A   I have, Your Honor.  In the U.S. Bankruptcy Court for
3  the District of Maryland in Greenbelt, I was qualified as an
4  expert in the first pay bankruptcy case, and it was a Ponzi
5  scheme.  It was a payroll servicing company that started out
6  in a legitimate matter, was taking money from clients, and
7  then was supposed to pay that money over to the IRS for
8  withholding for taxes.  And that spiraled into a Ponzi
9  scheme very quickly.  They just couldn't sustain the
10  operations, and then were taking -- as they were getting new
11  clients, they were taking money for tax deposits from those
12  new clients and paying the old bills at the IRS, and it just
13  eventually spiraled out of control.  I testified before -- I
14  forget the judge's name who was the chief judge at that
15  time.  Judge Mannes was the chief judge.
16  Q   Has there ever been a situation where you were
17  qualified as an expert but your testimony was excluded in
18  trial?
19  A   There was one recently, Your Honor, and the -- and the
20  only one.  The U.S. District Court in Southern Illinois, it
21  was a case involving political bribery.  There were
22  allegations that a Supreme Court judge at the state level in
23  Illinois was being bribed by State Farm Insurance company.
24  It was a big class action suit, and my testimony was about
25  the money laundering aspect.  They had brought -- the other

Page 41

1  side had brought an expert that was going to say that State
2  Farm had laundered money through political action campaign
3  committees and dark pools of money.  I was a rebuttal
4  witness.  The judge summarily rejected my testimony.  He
5  believed my testimony was based -- the underpinnings were
6  based on one American institute of certified public
7  accountant's practice aid, which it clearly was not.  There
8  was a 100-and-some-odd-page report.  And he also excluded a
9  lawyer from, I believe it was (indiscernible).  And a former
10  appellate court judge in the state of Illinois was going to
11  testify on the election rules and how it works in Illinois,
12  and all three of us in the same motion were summarily
13  excluded.  That's the only time.
14  Q   Luckily, we're here in New York today.  Where did you
15  go to college?
16  A   I went to the University of Maryland in College Park.
17  I graduated in 1983 with a bachelor's degree in accounting.
18  Q   Do you have any advanced degrees?
19  A   I do.  Subsequent to that, Your Honor, I went to
20  Georgetown University and graduated in 1986 with a master's
21  degree in taxation.  It was the corollary program to the LLM
22  program.  Being that I'm not a lawyer, I wasn't allowed to
23  take classes in that, but I was practicing as a tax
24  accountant during that time.  And so it was a similar
25  program, and I was able to obtain the master's in taxation

11 (Pages 38 - 41)

Page 42

1 and graduated with high honors in 1986. That was the end of

2 the formal education.

3 Q    So where are you -- where were you employed before you

4 started working at Duff & Phelps?

5 A    Well, to run through it briefly, Your Honor, I started

6 at one of the internal accounting firms. When I started, it

7 was called Alexander Grant and Company. It's now called

8 Grant Thornton. I was in the audit department. Spent two

9 years as an auditor going through books and records of

10 financial companies, banks. I did sports teams. I had the

11 -- when they were the Washington Bullets at that time in the

12 capitol.

13        Then I moved to the tax department, did tax

14 compliance and tax audits. To fast forward a little bit

15 from there, I had a real estate development company in

16 between, building in D.C. And then I went back to public

17 accounting -- this would've been 1990 -- and ran the tax

18 department for a regional tax firm handling IRS audit

19 matters and appellate matters for tax cases.

20        And from there, I started my own firm. Had a firm

21 with a partner for 16 years in Bethesda, Maryland just

22 outside of Washington D.C. And then in 2008, Duff & Phelps

23 wanted to expand and purchase my practice in the Washington

24 region, and I became the Washington D.C. office of Duff &

25 Phelps and have been there -- I just crossed the 11-year

Page 43

1 mark at Duff I Phelps.

2 Q    Do you have any professional licenses or special

3 training?

4 A    I do, Your Honor. The first one is I'm a certified

5 public accountant. I was licensed in 1985 and have been

6 dually licensed as a certified public accounting in the

7 state of Maryland ever since.

8        Up on the screen, I -- I'll roll through these

9 fairly quickly for Your Honor. Certified fraud examiner,

10 that's a professional designation through education and

11 proctored testing that I obtained in 1998 for the discipline

12 of conducting fraud examining, how to conduct interviews and

13 interrogations, how to take custody of documents, everything

14 that Your Honor would anticipate when one goes through and

15 does a fraud examination. I obtained a certified valuation

16 analyst in 1998. That's a credentialed body called the

17 National Association of Certified Valuators and Analysts.

18 And that, Your Honor, is again through education and a

19 proctored examination to value non-publicly traded

20 companies, so a division of a company or a whole company,

21 something where there's not a ready market price, and that's

22 the finance and theory behind that.

23        I have a master analyst in financial forensics.

24 So if Your Honor thinks about fraud examination as a

25 subcomponent of financial forensics, fraud is one piece.

Page 44

1 Financial forensics is the larger body of knowledge dealing

2 with if I'm testifying before a court, what are my roles,

3 what do I need to do to reach an opinion? So it may not

4 just be on fraud. It may be on areas of computing economic

5 damages. So that was obtained in 2008.

6        The certified in financial forensics is from the

7 American Institute of CPAs, very similar to the last one I

8 described, Your Honor. I was a commercial arbitrator for

9 two years on the American arbitrator panel for commercial

10 arbitrators. I was one of 25 selected in the county as a

11 non-lawyer. A that time, the AAA thought that litigants

12 would want a businessperson on a panel. Turned out they --

13 I found they really didn't. So for two years, I did that

14 and stopped paying the fee and let that lapse, but I went

15 through all the training and took the test and became a

16 commercial arbitrator.

17        Next to the last one, Your Honor, the registered

18 investment advisory -- advisor representative, that says

19 former. I was licensed for just about 10 years, and I

20 advised clients on buying and selling stocks, investment

21 advice. I was licensed through the state of Maryland. I

22 had my Series 65 examination and was registered with the

23 SEC. I was with two different firms in the region. Our

24 clients were basically high-net-worth individuals, many who

25 were already my clients as a CPA. Then once I got licensed,

Page 45

1 I could provide advice to them and collect a fee -- we

2 called it a wrap fee -- on assets under management. And so

3 I went through the training on that and did that.

4        And the last one, Your Honor, is a certified anti-

5 money-laundering specialist. I obtained that in 2017.

6 That, again, through a proctored examination and education

7 dealing specifically with money laundering, being able to

8 trace money, understanding how the banking system works both

9 nationally, here in the States, and internationally, and the

10 movement of money when people launder money or attempt to

11 launder money. So I think I've covered them off.

12 Q    So in addition to these professional certifications,

13 have you ever served in any capacity as a member of a

14 professional organization?

15 A    I have. So, Your Honor, I spoke a few minutes ago

16 about the Association of Certified Fraud Examiners when I

17 was the certified fraud examiner. That association is the

18 largest anti-fraud examination examining body in the world

19 with about 75,000 current members.

20        I was -- this says chairman emeritus, which I am

21 now. I was the chairman of the board for a one-year period

22 for that organization internationally, and I was on the

23 board for a year prior to that. And everything you would

24 expect, dealing with disciplinary actions of members,

25 credentialing issues, education. The whole gamut, as a

12 (Pages 42 - 45)

Page 46

1 chairman I was handling.
2 Q   So what do certify fraud examiners and certified
3 forensic financial analysts do?
4 A   We come in, and in a situation like this, try to
5 explain our work.  We conduct our work according to
6 standards, professional standards that I'm governed by.  And
7 if it's a fraud examination, there's usually a predicate of
8 fraud, that I'm hired under that predicate, and then I
9 attempt to either prove or disprove that predicate.  Was
10 there fraud or was there not fraud?  Obviously, the
11 determination of fraud is up to a trier of fact like Your
12 Honor.  It's a legal determination.
13      But I will lay out all of the steps and documents
14 and go through all of that, so whether it's Your Honor or a
15 jury, as it was in the Madoff 5 criminal trial, they can
16 make an educated determination based on my work and my
17 opinions and conclusions.
18 Q   So did you rely on your expertise as a CPA, CFA, CFFA,
19 CAMS, CVA, and master analyst to investigation BLMIS?
20 A   I did, Your Honor.  All of those have components that
21 overlap, and they're all important professional designations
22 that allow me, when I'm conducting work in this case or
23 other cases, to follow the professional standards and make
24 sure that my work is done appropriately, that my opinions
25 are stated to a reasonable degree of accounting certainty,

Page 47

1 and that others can rely on them.
2 Q   So does your expertise extend to computer forensics?
3 A   It does.  Your Honor, in the late '90s and through
4 about 2004, I was a co-owner of a computer forensics company
5 called U.S. Data Forensics, LLC.  This is when computer
6 forensics was just kind of becoming vogue.  My partner was a
7 former federal law enforcement officer out of the
8 government, one of the first to be doing computer forensics
9 work, so I was trained by him.  And I went through and
10 learned the various software.  It was fairly rudimentary at
11 that point but had been able to conduct computer forensics
12 examinations and still -- I'm involved -- I sold that
13 company off to my partner but continue to take training and
14 education courses on computers, on cybercrimes, on computer
15 offensives.
16 Q   What is computer forensics?
17 A   Computer forensics, Your Honor, is -- if you think of
18 every day you go to get your car, you turn the key, and
19 hopefully the car starts, and you can drive to court.  You
20 don't get under the hood every day, and look at the engine,
21 and see what's making the car run.  Computer forensics is
22 kind of looking under the hood in a computer down to what
23 they call binary level, zeros and ones.  And there's
24 information in there.  I can tell when documents have been
25 deleted where if you just did a random search using a

Page 48

1 browser or file explorer, you can't tell that.  So there's
2 special tools that when the computer -- software
3 manufacturers built the software, you could still look
4 underneath it as a developer or as an examiner and
5 forensically see certain things.  That's the best way to
6 explain it.
7 Q   You mentioned earlier that you have been an investment
8 advisor.
9 A   That is correct.
10 Q   Did you rely on your prior experience as an investment
11 advisor in the investigation of BLMIS?
12 A   I did.  Your Honor, when I was licensed and I had to
13 take the Series 65 examination, that went through many of
14 the items I was looking at from basics of what's a stock,
15 what is an option, what's a put, what's a pull, issues of
16 volatility.  All of those concepts are embodied in the
17 Series 65 examination.
18      I then -- when I passed it, I actually -- I had a
19 practice.  I sold it twice.  I built it up, sold it to one
20 firm, built it up again, sold another practice, so I was
21 actually advising clients, and that experience was helpful
22 in going through this investigation, understanding how
23 things work -- or how they should've worked because it's not
24 so much always what's on the page that's important.  It's
25 what's not on the page sometimes that becomes very important

Page 49

1 when you're doing an investigation.
2 Q   Have you authored any articles in your profession?
3 A   I have.  I've offered -- authored many articles, peer
4 review journal articles.  I authored an article -- I believe
5 there's a list in the CV, Your Honor.
6 Q   There is.  It's, I think, a pretty long.  And I was
7 going to ask you if they were included in that list.
8 A   Yes.  And just of note, Your Honor, there's a series of
9 -- a three-part series on Monte Carlo simulation analysis
10 that is used -- I just testified in a case two weeks ago
11 about Monte Carlo simulation in projecting stock prices.  So
12 those were peer review journals.  There's a list of
13 articles.
14      And I was also the coeditor, Your Honor, of a
15 national newsletter that went out to every -- all the CPA
16 community in the United States if they subscribe.  Back in
17 the '90s, it was a publishing company called Harcourt, Brace
18 & Company, and I was the coeditor, and I wrote half the
19 articles every month.  A little bit of an arduous task
20 writing that many articles while you're practicing, but they
21 focused on tax -- mainly on tax and business issues in that
22 publication.
23 Q   Any professional awards?
24 A   I have received professional awards.  I was awarded the
25 Certified Fraud Examiner of the Year.  I think it was in

13 (Pages 46 - 49)

Page 50

1 2005 -- I'd have to look here somewhere in the CV -- for the
2 work that I've done on cases like the Lehman Brothers case.
3 I worked on the Lehman Brothers bankruptcy for the special
4 examiner, Tony Valukas, that was appointed here in the
5 Southern District. So I worked on the Lehman Brothers case
6 as a forensic accountant. I've worked on cases where -- the
7 Washington Teachers Union case. That was union fraud, and
8 all six of those individuals went to federal prison. So a
9 combination of the work that I've done, I was awarded that
10 award. I think that is listed --
11 Q    The document will say what it says. I think you're
12 fine.
13 A    Yeah. It's somewhere in the CV.
14 Q    So was some of that work you did as a forensic
15 accountant for the U.S. government?
16 A    It is. I'm hired frequently by the U.S. Department of
17 Justice as an expert. The most notable case other than the
18 Madoff 5 case was the Wyly Brothers bankruptcy case. When
19 the Wyly Brothers had a case here in New York, the SEC went
20 after them for fraud. They then subsequently filed
21 bankruptcy in the bankruptcy court in the Northern District
22 of Dallas. I testified before the Chief Judge Barbara
23 Houser in that trial.
24        And my testimony basically centered around the
25 offshore nature -- the fraudulent offshore nature and sham

Page 51

1 nature of all the entities involved and that these
2 individuals put their money offshore to basically evade
3 taxes. And the judge agreed with me in her opinion and --
4 but that's just one of the case -- I do a lot of work for
5 the Department of Justice.
6 Q    So you gave us an overview of your assignment a few
7 minutes ago. If you could turn to Exhibit 34, which is
8 actually a small bound notebook I gave you, that's your
9 report.
10 A    Okay. Let me close this big one up for a minute.
11 Q    I think you're done with that. Could you just tell us
12 if that's the copy -- a copy of the report you prepared in
13 this case?
14 A    It is. This is a copy of my expert report, Your Honor,
15 in this case that I authored on August 20th, 2013.
16 Q    Mr. Dubinsky, the counsel and the Court both have
17 copies of that report. You should feel free to refer to it
18 if you need to during your testimony. But if you do, would
19 you just point out the line, page, something that can
20 identify it so that the record's clear and so that Judge
21 Bernstein can follow along? We'll try to do our best on
22 that.
23 A    I will.
24 Q    Okay. So what was your assignment then?
25 A    My assignment was to conduct a proper investigation of

Page 52

1 BLMIS and determine whether -- three things: whether there
2 was -- whether I found evidence of fraud, whether I found
3 evidence of a Ponzi being perpetrated, and whether at a
4 certain point in time BLMIS was insolvent using tests that
5 the bankruptcy court would -- typically looks at.
6 Q    So just briefly, because we'll get into it in more
7 detail, could you just briefly tell us the methodologies you
8 used to do that?
9 A    The methodologies in general were the investigative
10 methodologies that I'm governed by under the professional
11 standards. That is, I have to have due professional
12 competence -- professional competence to undertake an
13 investigation. If it's outside of my area of expertise, I
14 can't do it.
15        I have to have due professional care, so when I'm
16 planning the investigation, I need to properly plan it. I
17 need to have proper supervision. This being an
18 investigation of this size, I couldn't do every single
19 thing, so I had people underneath me conducting analysis
20 that then I reviewed. I had to properly plan and supervise
21 that.
22        Things like chain of custody of documents when I
23 went to, for insane, the Madoff warehouse over in Queens and
24 climbing on ladders and digging through boxes, I had to make
25 sure when I took document out and flagged them that I was

Page 53

1 interested in, I had to make sure those were tagged properly
2 so there was a trail back.
3        I had to map out the work and make sure that the
4 work was what we call QC'd or quality control tested. So if
5 an analysis was done, I would have other people then that
6 didn't do the analysis go back and test it to make sure that
7 it was accurate. All of these things are under the
8 professional standards, and that's general methodology
9 that's used. They're specific as we get into it.
10 Q    Sure.
11 A    And we go through specific testing that I did, Your
12 Honor. I'll explain exactly what I did in more detail. But
13 as a general overview, that's the basic methodology, and
14 then properly documenting what I did to render the
15 conclusions that I've rendered.
16 Q    So we're going to talk about the books and records in
17 great detail, obviously, as we get further into your
18 findings. But could you just briefly describe for the Court
19 categories of BLMIS books and records that you considered
20 and generally describe where they came from and how they
21 were relevant?
22 A    Sure. So I think the best thing, Your Honor -- if Your
23 Honor looks at Page 10 of my expert report, and I guess
24 there are some blue numbers on the bottom. I'll refer to
25 the blue numbers. I was told to --

14 (Pages 50 - 53)

Page 54

1  Q   Okay.

2  A   -- those are -- I don't know if they're TX numbers.

3  Q   No, that's just the Exhibit number.

4  A   Well, there's page numbers in blue on the bottom.

5  Q   Okay.

6  A   There's a Paragraph 13, and it runs through the bullet

7  points of the items.  And I'll run through these quickly for

8  Your Honor.

9       I looked at customer statements, trade

10 confirmations, trade blotters.  I looked at bank statements

11 where available.  I looked at trading records from what's

12 called the prop-trading business.  I'll explain the

13 different sides of the business of BLMIS in a -- in a few

14 minutes.

15      I looked at employment records.  There were issues

16 of whether people were getting paid too much, whether they

17 were profitable, whether there were ghost employees.

18 There's a section of my report about people never showing up

19 to work and getting paid.

20      I looked at the AS400 system, the computer system.

21 That was the computer system used on both sides of the

22 business, two different systems but the similar system.

23 There were backup tapes.  I think there were about 17,000

24 pieces of electronic media, backup tapes, computers,

25 cellphones, you name it in the context of electronic format

Page 55

1  that I did computer forensics on.  I restored backup takes.

2  I even went as far as securing in an identical model to the

3  AS400 computer, stripping that down clean, and then

4  restoring the exact same operating system that was being

5  used at BLMIS.  Restored that and then took backup tapes and

6  restored it so I had a working version of what the IA

7  business -- and I'll explain that side of the business in a

8  minute.

9       I restored backup tapes.  I even went as far as

10 securing an identical model to the AS400 computer, stripping

11 that down clean, and then restoring the exact same operating

12 system that was being used at BLMIS.  Restored that and then

13 took backup tapes and restored it.

14      So, I had a working version of what the IA

15 business -- and I'll explain that side of that business in a

16 minute -- was using to perpetrate the fraud.  That's the

17 general -- there were vendor files, some emails, accounting

18 records, some deposition transcripts, other sworn testimony.

19 But that's the general flavor of the documents and

20 information.  Like I said, I think I spent almost a week out

21 at the Madoff warehouse just climbing through box after box

22 -- there were just thousands of boxes of documents out there

23 dating back many, many years.  A lot of documents.

24 Q   So, are those the types of documents that forensic

25 accountants and forensic examiners, computer forensics

Page 56

1  experts rely on in your investigations?

2  A   They are, absolutely.

3  Q   What about third party records?  Did you have access to

4  some third party records?

5  A   I did.  There were third party records, what I'll all

6  third party records.  Bank statements.  Those are produced

7  by a third party.  There were records produced by the DTC

8  and the OCC.  There were agreements that I found in the --

9  in parts of BLMIS about agreements between banks.  So, there

10 were third party documents that I found.

11 Q   Were there any restrictions put on you as far as what

12 documents you could review?

13 A   Not -- none whatsoever.  In fact, if I thought I needed

14 a document, I would ask the Trustee.  If they didn't have

15 it, they'd try to go get it for me.  I had to work through

16 the Trustee.  I couldn't just go out on my own and try to

17 get documents because I had to follow the legal process.

18 But absolutely no restrictions.  I had access to a full

19 database of documents.  Unfettered access to search through.

20 So, nothing was withheld, nothing precluded from my eyes

21 from that standpoint.

22 Q   I guess it goes without saying, but did you use those

23 records in your investigation?

24 A   I didn't.  So, Your Honor, while I considered many,

25 many records, what I tried to do in the report is -- there

Page 57

1  are quite a few footnotes in the report.  So, where a

2  document directly supported a finding, I tried to footnote

3  it to make it easier for the reader.  There is an appendix

4  to the report of documents considered under Federal Rule 26.

5  I'm required to provide a list of documents considered.  So,

6  when I was searching through documents, things that I've

7  looked at, sometimes they weren't relevant.  Those are still

8  in that list.  But I would point to the body of the report

9  and the footnotes as being kind of the prime meat, if you

10 will, of those things.

11 Q   Just for the record, I believe that's Appendix B in

12 your report.  And Schedule 1 to Appendix B?

13 A   That is correct.

14 Q   Okay.  Are your conclusions based on an analysis of the

15 BLMIS books and records?

16 A   Of the BLMIS books and records, yes, plus third party

17 records, plus -- Your Honor, if I needed things from an

18 article or learned treatise, I footnoted that.  So, a

19 combination of all of that, plus my education, training and

20 experience altogether allowed me to form the basis of my

21 opinions.

22 Q   Were the records and documents that you looked at

23 sufficient to allow you to reach your conclusions?

24 A   They were.  If I'm ever in a situation where I don't

25 have enough documents, I'll tell the lawyers that and simply

15 (Pages 54 - 57)

Page 58

1 can't render the opinion. Or I'll put a qualification on
2 it. There were no qualifications put on this report.
3 Q   So, just briefly, did you reach any conclusions during
4 your investigation?
5 A   I did.
6 Q   What did you conclude?
7       THE COURT: Don't you want to qualify him first?
8       MR. HUNT: I was just going to -- I can skip that
9 and we can qualify and go to that. That's fine.
10       THE COURT: Before he tells me his opinion, don't
11 you think you should qualify him?
12 Q   So, just to make sure we have that methodology clear,
13 though. So, was your investigation of fraud -- were the
14 methodologies you used for the investigation of fraud
15 generally accepted in your profession?
16 A   Yes, they were.
17 Q   They comply with the applicable standards?
18 A   They do.
19 Q   Did you perform your work in accordance with the
20 applicable professional standards for computer forensics,
21 forensic accountants, fraud examiners, and valuation
22 analysts?
23 A   I did.
24 Q   Are your conclusions made with a reasonable degree of
25 certainty in those fields?

Page 59

1 A   They are, yes.
2 Q   Are your conclusion based on those methodologies and
3 professional standards?
4 A   They are.
5 Q   Can the results of your analysis be replicated by
6 someone with the same level of education, training, and
7 expertise as you do?
8 A   I believe they could, yes.
9 Q   Are your conclusions contained in your report?
10 A   They are, Your Honor.
11 Q   Does your report set forth the facts and data on which
12 you relied on to reach those conclusions?
13 A   It does.
14 Q   Does it include specific examples that directly support
15 your conclusions?
16 A   It does, yes.
17       MR. HUNT: Your Honor, we would proffer Mr.
18 Dubinsky to testify as an expert witness in this case. He's
19 a Certified Public Accountant, a Certified Fraud Examiner, a
20 Certified Forensic Financial Analyst, a Certified Valuation
21 Expert, a Certified Anti-Money Laundering Specialist, a
22 master analyst in financial forensics. We request that the
23 Court recognize him as being qualified to testify in the
24 areas of forensic accounting, fraud examinations, computer
25 forensics, solvency and business valuations, and investment

Page 60

1 theory and practices.
2       THE COURT: Any objection?
3       MS. CHAITMAN: No objection.
4       THE COURT: All right, he's qualified. Thank you.
5       MR. HUNT: Thank you, Your Honor.
6       MR. DUBINSKY: Thank you, Your Honor.
7       MR. HUNT: Before we get started -- do you want to
8 put some water...?
9       MR. DUBINSKY: I have it right here, thanks.
10       MR. HUNT: Okay, good. I know I've been needing
11 some.
12 Q   The Defendants in their opposition to the Trustee's
13 motion have acknowledged that fraudulent intent is not
14 disputed here. Rather, it's the nature of the fraud that is
15 issue -- is at issue. Did you examine the nature of the
16 fraud?
17 A   I did examine the nature of the fraud, yes.
18 Q   Well, let's get some background on BLMIS.
19 A   Okay.
20 Q   Just briefly, for historical context, did you review
21 the books and records to determine when Mr. Madoff began his
22 investment adviser business?
23 A   I did.
24 Q   What did you find?
25 A   It started right around 1960-'61. Early '60s.

Page 61

1 Q   Moving ahead to the '70s, what type of investment
2 trading strategy was Mr. Madoff employed in at that time?
3 A   It was purportedly a convertible arbitrage trading
4 strategy. And I should clarify, that would be for the
5 investment advisory side of the business. Mr. Madoff had
6 another side of the business and there were different
7 strategies or different trading that was occurring there.
8 But for the investment advisory side, it would've been a
9 convertible arbitrate strategy.
10 Q   Thank you for that clarification. Were you able to
11 reach any conclusions about that strategy?
12 A   I was.
13 Q   What did you find?
14 A   That that trading never occurred dating back into the
15 '70s. That based on my analysis and my conclusions that
16 since the trading never occurred, it was a fraud.
17 Q   So, the accounts at issue here were opened in December
18 of '92 and I think August of '96, is that right? What
19 trading strategy was the investment advisory side of BLMIS
20 purportedly executing on behalf of clients during that
21 period?
22 A   It was called, Your Honor, split strike conversion
23 trading strategy.
24 Q   Would that -- did that apply to these account as well?
25 A   Yes, it did.

16 (Pages 58 - 61)

Page 62

1  Q   Were you able to determine when BLMIS changed from the
2  convertible arbitrate strategy to the split strike strategy?
3  A   Right around the early '90s. This was the time period
4  after the SEC had been in to investigate the accounting firm
5  of Avellino and Bienes, who had been putting money into
6  BLMIS through taking money from their clients and posing
7  them as investor notes. And when that seemed to all
8  unravel, now, Mr. Madoff was faced with about 4,500 clients
9  -- instead of having one accounting firm to deal with and
10 one set of clients in that, now he had thousands of clients
11 to deal with because they had been potentially or
12 purportedly making a decent return and they wanted to come
13 back for more. And the convertible arbitrage at that point,
14 it was very difficult and time consuming to try to -- to try
15 to perpetrate the fraud. It took a lot of work, as you'll
16 see when I go through. And so, the split strike conversion
17 strategy was born or was utilized.
18     This was not a strategy created by Mr. Madoff.
19 The split strike conversion strategy is a legitimate trading
20 strategy that people use on Wall Street. So, this was
21 nothing genius that Mr. Madoff put in to play, but this was
22 something he put in to play to allow it to be scalable so
23 you could deal with thousands of people in that regard.
24 Q   Okay. So, during the time we're talking about here,
25 you mentioned there were two legs of the BLMIS business.

Page 63

1  How was it structured?
2  A   So, BLMIS, Your Honor, was structured -- kind of two
3  sides of the business. One I'll refer to as the investment
4  advisory side. I might slip and call it House 17
5  because it was located on the 17th floor of the Lipstick
6  Building here in Manhattan. The other side was the
7  proprietary trading and market-making business. And I'll
8  just refer to that throughout the trial as the prop trading
9  side of the business. But proprietary trading is basically
10 when a broker-dealer uses its own money to trade for its own
11 account to make profits for itself. So, somebody like
12 Goldman will have a prop trading desk and they'll try to
13 make money with their own money.
14     The market-making side is acting as a market maker
15 in certain stocks and creating flow into the market, and
16 acting as a broker-dealer to take orders for buys and sells.
17 So, that was going on in the prop trading side of the
18 business. And sometimes I might slip and refer to that as
19 House 5. That's how that was known in a lot of the records.
20 So, basically, the investment advisory side and the prop
21 trading side -- two sides of BLMIS.
22 Q   So, was the prop trading side of the business designed
23 to buy and sell securities?
24 A   Absolutely.
25 Q   All right. What about the investment advisory side of

Page 64

1  the business? What was it? What was it designed to do?
2  A   Well, it was designed to purportedly trade stocks to
3  buy equities, to buy options. Under the split strike
4  conversion strategy, it would be using puts and calls. And
5  I'll explain that in more detail. And it was also
6  purportedly to -- when Mr. Madoff thought the timing was
7  right, to unwind these trades and put the money supposedly
8  in treasuries. That's what it was purported to do. The
9  problem is it never did that.
10 Q   So, I was going to ask you that. So, the proprietary
11 trading side of the business bought and sold securities?
12 A   Absolutely.
13 Q   The investment advisory side?
14 A   Never.
15 Q   Okay. To operate a securities tradings business like
16 BLMIS, do you need money?
17 A   You do need money, yes.
18 Q   Do you need computers?
19 A   You need a vast computer system. If you're going to be
20 a broker-dealer like BLMIS and do prop trading, you need
21 sophisticated computer systems.
22 Q   Let's talk about computers first.
23 A   Okay.
24 Q   You mentioned the AS400.
25 A   Yes.

Page 65

1  Q   What is a trading platform?
2  A   Your Honor, a trading platform, if you think about --
3  it's really a collection of different computer systems that
4  will facilitate the trading process. So, from the time in,
5  the old days, when you'd pick up a phone and call a broker
6  and say I want to buy 100 shares of Exxon, that broker then
7  would initiate that purchase. They'd put it into a system,
8  that system may be the order entry system. That would go to
9  another system inside the brokerage firm, maybe it was
10 Merrill Lynch, and connect with another system. Did Merrill
11 Lynch have a seller on the other side, if they were acting
12 as an agent? If they did, that system would match it.
13     Then when your money came in, another system would
14 say Your Honor sent the money to pay for the stock or it was
15 taken out of your account. When the sale went through,
16 money has to clear back out of that brokerage firm to
17 another brokerage firm on the other side. There's pricing
18 that goes back and forth that needs to talk to the market.
19     The collection of all of those systems, be it
20 separate servers or computer programs, various programs
21 within a server constitute a trading platform. And you
22 can't trade without it unless you are -- you know, pick up
23 on the phone and call your broker, but BLMIS was a broker-
24 dealer. They were licensed as a broker-dealer, and they
25 were supposedly making a market and were, in fact, on the

17 (Pages 62 - 65)

Page 66

1 prop trading side of the business, making a market in
2 certain stocks.
3        So, all of those connections to the market --
4 Bloomberg pricing -- those things are necessary to be able
5 to execute a trade and make it happen.
6 Q    So, I was going to ask you but I think you already
7 answered this -- does a business like BLMIS need a trading
8 platform?
9 A    Absolutely.  You know, when I conducted the
10 investigation, Your Honor, one of the things I did was went
11 back and looked at the website for BLMIS.  I went back to
12 something called waybackmachine.org and it chronicles
13 historical websites.  A lot of people don't know that
14 they're maintained out there forever.  And those websites
15 talked about how sophisticated BLMIS was, the trading
16 platform, the computers, algorithms, all of the things that
17 were used to sell the public on a broker-dealer side that he
18 could execute trades and, in fact, he did.
19        And I found things inside BLMIS documents, maps of
20 the systems where the internal IT people had mapped out how
21 the systems connected to each other.  I found a lot of that
22 information at BLMIS in the documents.
23 Q    So, you testified earlier about the AS400 systems.  Did
24 you evaluate the investment advisory business side computer
25 system?

Page 67

1 A    I did.  Let me just clarify.  The AS400 system is in
2 itself a computer.  It was an IBM computer, and used
3 differently -- and I'll explain that in a minute -- on both
4 sides.  But in the prop trading side, it collected data from
5 all of these different servers and connections that the prop
6 trading business had.  It collected that data, and then was
7 used to print customer statements, was used to compute rates
8 of return.  So, the AS400 I wouldn't say was the brains of
9 the business; it was a collector of information on the prop
10 trading side from all these various systems to accumulate
11 and then facilitate further reporting, if you will.
12        In the investment advisory side, there too was
13 another AS400 computer, but the big difference over there
14 when I investigated, Your Honor, is it lacked all of the
15 other trading components that were found on the prop trading
16 side.  So, basically, all you had in the IA business was
17 this machine that was supposed to be the collector of
18 information, as it was in the prop trading side -- in the
19 investment advisory side, it was a standalone machine
20 connected to some terminals that people could enter data
21 into.
22        And I've kind of said this throughout the
23 investigation, it was like a giant typewriter.  It was like
24 a giant electronic typewriter that you could enter purported
25 trades in.  They didn't go to the market, they didn't

Page 68

1 execute anything because there were no connections to it.
2 And then it could print out statements.  So, some of the
3 same programs that were present over in the prop trading
4 side originally on the AS400 were taken, used in the IA
5 business to facilitate doing some of the same tasks, but it
6 lacked any capability to actually trade.
7 Q    So, the proprietary trading side of the business had a
8 trading platform.
9 A    It had a trading platform and it actually traded.
10 That's what it did.
11 Q    Was it set up to buy and sell stocks?
12 A    Absolutely.
13 Q    How about options?
14 A    Absolutely.
15 Q    How about treasuries?
16 A    Absolutely.
17 Q    How about the computer at the investment advisory
18 business, the AS400, was that a trading platform?
19 A    Absolutely not, Your Honor.
20 Q    Was it set up to buy and sell stocks?
21 A    It was not.
22 Q    Was it set up to buy and sell options?
23 A    It was not.
24 Q    How about treasuries?
25 A    It was not.

Page 69

1 Q    All right, so let's talk about those two computers.  I
2 want to kind of put them side by side.
3 A    Okay.
4 Q    See what they look like.  If you could take a look at
5 Exhibit 44 in your binder -- do you have that?  You will in
6 a minute.  Here it comes.
7 A    Oh, another big binder.
8 Q    You thought you were getting out of it, but no.
9 A    I won't have to go to the gym later, lifting these.
10 Exhibit 44, you said?
11 Q    Yes, sir.
12 A    Okay.
13 Q    Let me know when you've found that.
14 A    I found that, yes.
15 Q    Okay.  Did you prepare Exhibit 44?
16 A    I did.  This is contained, Your Honor, in my expert
17 report on Page 28 and 29, and 30, and actually 31.  So, it
18 carries over to four pages.  Yes, I prepared this.
19 Q    What sources of information did you use to prepare it?
20 A    A combination of sources of information.  There were
21 internal documents that I found at BLMIS, what I'll call
22 infrastructure -- IT infrastructure diagrams diagraming out
23 the systems.  There were manuals that I found at BLMIS
24 describing the different systems.  The physical examination
25 of computer software, when I went through the actual code

18 (Pages 66 - 69)

Page 70

1 and looked at the code, it would identify certain trading

2 systems. So, it was a combination of putting together a lot

3 of different information to come up with this.

4 Q   Does Exhibit 44 accurately represent your analysis of

5 the computers systems in the two legs of BLMIS?

6 A   It does.

7 Q   If you could refer to Exhibit 44 and tell us what the

8 columns and lines represent across the page, and then I want

9 to ask you about a few of the rows on that exhibit.

10 A   Okay. So, the left column, Your Honor, where it says

11 Name, that's the name of the trading either platform, system

12 or software that I was able to identify. The description is

13 a brief description of what the functionality of that

14 software was or should have been. The third column says

15 Proprietary Trading Business, and that has a column with

16 either a checkmark or a blank, depending on whether I found

17 evidence of that item being used in the prop trading

18 business or not. And the fourth column says IA Business,

19 and, similarly, there would be a checkmark or a blank to

20 denote whether, in fact, there was evidence that that

21 existed and was in use.

22 Q   I see a lot more checkmarks on Proprietary Trading

23 Business. What does that mean?

24 A   That means that those systems were present in the prop

25 trading business. If you flip through the four pages,

Page 71

1 almost every single box is checked, as one would expect to

2 find in a business that was actually trading stocks, and

3 options, and other types of investments.

4 Q   So, I want to take a look at some of those checkmarks

5 in Exhibit 44 and I want to ask you to explain what they are

6 and whether they're relevant to your opinion.

7 A   Okay.

8 Q   And let's start at Page 1, and look at the row labeled

9 ACES. Is there a checkmark in the proprietary trading

10 column of Exhibit 44?

11 A   There is.

12 Q   Is there one on the IA business side?

13 A   There is not.

14 Q   Can you tell us what the ACES system was and how it's

15 relevant to your opinion?

16 A   It's a system that routed orders between order entry

17 firms and market makers that were doing business with BLMIS.

18 So, if you were another market maker on the other side of a

19 trade, for every trade there's something called a

20 counterparty. There has to be somebody on the other side of

21 that trade. And when a buy or sell is initiated, an order

22 is initiated, that has to be tracked.

23       And so there are systems so people can communicate

24 instead of in the old days, really picking up the phone and

25 calling each other and doing it all by paper, to automate

Page 72

1 that process. And so that's what this did, the ACES system

2 did. And that was present at the prop trading business.

3 And it was not present in the IA business.

4 Q   Was it part of the trading platform prop business?

5 A   It was part of the trading platform in the proprietary

6 trading business, that's correct.

7 Q   But not the IA business?

8 A   No. I didn't find any evidence of it being at the IA

9 business.

10 Q   Let's take a look at Page 3 of Exhibit 44. I'm going

11 to move ahead a little bit. And I'd like to ask you to talk

12 to us about the row labeled MISS.

13 A   Okay. So, the MISS system was an order management

14 system and it's used for proprietary trading activities and

15 market making. It basically can handle over 400,000 trades.

16 It can go up to 1.4 million trades a day at that time. And

17 there are different -- what made up this system, there were

18 different individual software applications that made up

19 MISS.

20       But, basically, again, if you're trading on high

21 volume all throughout the day, five days a week, every week

22 of the year, you need an order management system that keeps

23 track of it all. There's just no way if you have a group of

24 traders trading that many things that you can do it by

25 paper.

Page 73

1       And so that system was present and working in the

2 prop trading business. There was software from it, there

3 were documents from it, there was architecture documents,

4 how that was hooked up, and that was in the prop trading

5 business.

6       On the IA side of the business, Your Honor, it

7 didn't exist. There's no need -- if you're not trading any

8 stocks and you're not doing anything, you don't need all

9 these systems. Systems have servers, servers take up room,

10 people can have access to it, they can see what you're

11 doing. So, in the midst of perpetrating a fraud, things you

12 don't need you don't put in the room. You leave it out.

13 And that's why these things were not present over in the IA

14 business.

15 Q   Staying on Page 3, just scroll down a little bit, I'd

16 like to talk to you about NASDAQ QIX. The NASDAQ QIX,

17 whatever that is. Can you tell us what that was? What a

18 day.

19 A   So, from the NASDAQ market, it's the -- it was a system

20 that gave you access to real time market data, and it's a

21 trading system. So, you could actually place trades through

22 that. And, interestingly enough, Mr. Madoff was involved in

23 NASDAQ. You see it on the prop trading side of the business

24 because there were stocks being executed, and buys and

25 sells, and prop trading, and market-making activities.

19 (Pages 70 - 73)

Page 74

1    Again, there's no checkmark under the IA business
2 because there's no need for it. You don't need real time
3 market quotes and trading when you're not doing trading.
4 Q   I missed one on Page 2. If you could just flip back to
5 Page 2 of Exhibit 44? What was the Fix Engine?
6 A   Oh. The Fix Engine, it's kind of like an instant
7 message communication system for trade-related messages
8 between market participants. So, there's information on --
9 going back and forth on trading, on what the pricing is.
10 It's an important component if you're actively in the
11 market, and you may have -- before you place an order, you
12 may have a large order of a million shares of Exxon, which
13 would be a larger order. You don't want to just put that
14 onto the market. It can tilt the market pretty quickly.
15    So, you may, through Fix, talk to another market
16 participant. Did they have a buyer for a piece -- you know,
17 maybe 250,000 shares? So, it's used between the market
18 participants to help form the market and efficiently create
19 the process for trading. Again, you'll see that for the
20 prop trading business. It makes sense. They're trading
21 stocks and other instruments. You don't see it for the IA
22 business. Again, you don't need it because nothing was going
23 on.
24 Q   Now, let's go back to Page 3. Sorry about that detour.
25 And if you can take a look at the Order Audit Trail System

Page 75

1 row of Exhibit 44.
2 A   Right.
3 Q   Tell Judge Bernstein what that's about.
4 A   So, Your Honor, a very important system -- even by its
5 name, the Order Audit Trail System denotes that anything
6 with the word audit in it is usually important. In the
7 trading world there are things called broken trades. A
8 trade goes through, is placed and it's never filled.
9 There's some kind of break in the trade that needs to be
10 reconciled every night. There needs to be an audit trail of
11 trades for regulators to come in, be it federal regulators
12 or state regulators.
13    So, this provided -- it tracked the orders,
14 including the origination, transmission, and cancellation or
15 execution. Basically, the history of what's going on with
16 an order. That was functioning in the prop trading
17 business. It was not present in the IA business. Again,
18 nothing was being done in the IA business with real stocks,
19 or bonds, or trading, so you don't need an audit trail when
20 you're making everything up.
21 Q   What about on Page 4, Stratus Boss? Can you tell us
22 about that and why it was one place and not the other?
23 A   So, the Stratus system is a frontend processing system
24 which maximizes the trading speed. We've heard a lot
25 certainly coming out of the financial crisis of high-

Page 76

1 frequency traders and people front-running the market by
2 being, you know, at the door quickly. So, the concept is
3 being able to execute trades very quickly. You know, if
4 things are happening very quickly, you can maybe get a
5 better price on that trade versus the next trade that you
6 place.
7    So, an important system. And you can see this
8 interface through -- one of the systems here was the MISS
9 system. It says, "To process trades place through the M2
10 and MISS system." So, when -- it's like I described earlier,
11 Your Honor. If you called up your broker, they'll put in
12 the order. That order goes to another system that then
13 takes that order and starts to process it in the big wire
14 houses like a Merrill or a Charles Schwab. The same thing
15 was being done on the prop trading side of the business.
16 There are different systems to facilitate all of this.
17 Again, present in the prop trading side of the business; not
18 present in the IA business.
19 Q   How about network connectivity? Did the investment
20 advisory business AS400 have the necessary connections to
21 the outside world to process the trades BLMIC said it was
22 processing?
23 A   No, not at all. As you can see, on the prop trading
24 business there were about 80 connections to automated
25 clearing systems that allow the process to occur. So, as

Page 77

1 you can imagine, there are phone lines and digital lines
2 connecting to different services. Order execution services
3 on the other side when you have counterparties. That was
4 all present on the prop trading side.
5    On the IA side of the business it was very
6 limited. And there's a footnote that I put there. It had a
7 basic internet connection and what was called an FTP site,
8 Your Honor, File Transfer Protocol site where basically if
9 somebody had given you a password, you could log in, go to
10 that site, and download a document, like a statement or a
11 potential trade confirm, or you could upload to that maybe a
12 copy of a document. It was not the type of site that would
13 allow trades by any stretch of the imagination, and there
14 were no other multiple connections to the internet. Having
15 one connection to the internet, it would never be able to
16 facilitate -- even if you had the systems, which weren't
17 there, the pipe wouldn't be big enough to get out to the
18 internet to facilitate this kind of trading that was being
19 purportedly done.
20 Q   Well, we've talked about what wasn't there. So, let's
21 talk about what was there.
22 A   Okay.
23 Q   Take a look at the line on Exhibit 44 or the row on
24 Exhibit 44 called Custom Software. And if you can explain
25 to the Court what you found.

20 (Pages 74 - 77)

Page 78

1  A  So, I think a few minutes ago, Your Honor, I said, when
2  I was talking about the two AS400s, one in the prop trading
3  business and one in the IA business, I said much of the
4  software that I saw when I examined it in the IA business
5  was originally derived from the prop trading business.
6       But when you're not trading stocks you don't need
7  what we call the bloat in the software, extra lines in the
8  software that do things that you would expect.  So, the
9  custom software was enabled -- enabled the programmers,
10 which went to prison, were convicted in the criminal trial
11 in the Madoff case -- but allowed those programmers to make
12 changes to the programs to facilitate whatever they were
13 trying to do.  Whether it was just entering information
14 directly in using it as a typewriter and bypassing trying to
15 go out and talk to the market because there was no market
16 connection.  Those lines of code were altered.  There was
17 software that was enabled to correct or backdate trades.
18 I'll talk about that.  There's probably another -- there's
19 another line I'll talk about that, called Statement Pro.
20      But when I talk about custom software, this was
21 taking the AS400 computer programs and there was an RPG
22 software -- report generator software that IBM put out that
23 enabled you to go in and write code and change things.  And
24 so when I examined that code -- remember, I said earlier
25 it's not sometimes what you see on the page that's

Page 79

1  important, it's what you don't see?  So, when you see code
2  that doesn't have code that talks to the market that's
3  supposed to be trading code, you say what's going on here?
4  If it was trading code and it was supposed to allow you to
5  place an order, it should have enough language in there to
6  go do that.  When that's not in there, it can't happen.
7  Q  Well, you mentioned Statement Pro.  I think that's also
8  listed on Exhibit 44.  Why don't you tell us what that is?
9  A  So, Statement Pro was custom software built in the RPG
10 programming language that I just described, Your Honor, that
11 basically allowed people at BLMIS to go in and revise and
12 print customer statements from previous months.  In a real
13 trading environment, if there was a broken trade or if there
14 was a mistake on a trade, the brokerage firm doesn't go back
15 and go... So, let's say I get my April statement from
16 Charles Schwab and I notice a mistake.  They don't go back
17 and just erase that mistake and reissue the statement.
18 They'll reissue a corrected statement and show what they've
19 corrected, and they'll do that contemporaneously.
20      This software allowed the ability to go back into
21 prior months, six-eight months -- there was no time limit,
22 you could go back years on it -- pull up a statement, type
23 into the AS400 what you wanted to change, delete what was on
24 that statement, and then reprint the statement as if that
25 was the original statement.  It never said Corrected on it,

Page 80

1  it never indicated that there was a correction.  It was just
2  the ability to go make things disappear and reappear.  Kind
3  of the magic behind the curtain, so to speak.
4  Q  I think you've answered this question but based on your
5  review of the computer systems ab BLMIS, were you able to
6  determine if any trades were being processed through the
7  investment advisory business computers?
8  A  I was able to make that determination and the answer is
9  they were not.  There was no evidence, Your Honor, of any
10 trades being executed through the IA business computer
11 systems whatsoever.
12 Q  So, in your professional opinion, can a securities
13 trading business like BLMIS investment advisory business
14 operate without a connected trading platform?
15 A  No, it can't.
16 Q  So, we've talked about computers.  Now let's talk about
17 money.  Before you can buy or sell stocks, options,
18 treasuries, do you need a source of funds?
19 A  You do.
20 Q  I want to discuss the source of funds at the BLMIS
21 investment advisory business, okay?
22 A  Okay.
23 Q  Does your report include a demonstrative aid to help us
24 explain those sources of funds?  I think it's Trial Exhibit
25 37.  And I think we have that on the board, too, don't we?

Page 81

1       THE COURT:  Is that in the report?
2       MR. HUNT:  It's in the report as well, Your Honor.
3  I think it's Page 121, Figure 39.
4       THE COURT:  Okay, thank you.
5       MR. HUNT:  It kind of looks like a house.  I don't
6  know if we can get that up there.
7  Q  Can you identify Exhibit 37 for the record?
8  A  Exhibit 37 is my Figure 39 from Page 121 of my expert
9  report.  And it is a graphic that I prepared.  Basically, in
10 conducting the investigation, I wanted to see where the
11 money was coming from, kind of like follow the money, and to
12 really hone in on how the money went into the IA business
13 and how it came out.  And just to give a closure to any sort
14 of thought that somehow the AI business was doing business
15 through somebody else.
16 Q  So, we'll probably be referring back to Exhibit 37 from
17 time to time.  Did you review the books and records related
18 to each of the bank accounts held by BLMIS?
19 A  I did.
20 Q  Did you determine what bank account the BLMIS
21 investment advisory business deposited customer
22 (indiscernible)?
23 A  It's what I've referred to as the J.P. Morgan Chase
24 703 account.  The 703 were the last three digits of the
25 account number.  That was the main account where customer

21 (Pages 78 - 81)

Page 82

1 money was deposited in for the IA business.

2 Q   What's a sweep account?

3 A   A sweep account, Your Honor, is if you have a business

4 checking account and you're maintaining a bunch of money in

5 that checking account, banks typically don't pay very much

6 interest on checking accounts. Historically, very low. And

7 so to maximize your cash efficiency, you can arrange -- if

8 the bank is large enough; usually this is with the larger

9 banks -- a situation where every night above a certain

10 amount, they may leave you with $10,000 in the bank account.

11 They will sweep out the rest of the money and put it into

12 very short-term overnight investments.

13       It could be a bankers acceptance type note, it

14 could be just a short-term treasury bill in and out. But,

15 basically, it is a way to maximize idle money sitting in an

16 account. Instead of just letting it sit in a checking

17 account, it's able to earn a little bit more that way. And

18 it goes out the night, it comes back the next morning. So,

19 that's why they call it an overnight sweep, if you're using

20 a sweep account as an overnight sweep.

21 Q   Were there any overnight sweeps associated with the 703

22 account?

23 A   There were, yes.

24 Q   If you could, Mr. Dubinsky, turn to Exhibit 38 in your

25 binder, which is also Figure 37 on Page 117 in your report.

Page 83

1 Do you have that, sir?

2 A   I do have that, yes.

3 Q   If you could describe what Exhibit 38 depicts?

4 A   So, Your Honor, I wanted to see, in order to determine

5 whether there was actual trading going on in the investment

6 advisory business, I wanted to see what cash accretions were

7 going into the 703 account. Where was the cash coming from?

8 And this shows that 97 percent of all the cash going into

9 the 703 account came from customers. Customers -- either

10 new customers putting money in or existing customers putting

11 additional money in.

12       There's a small slice for 3 percent, what I've

13 called Other Additions, and that is money that came back in

14 vis-à-vis money that was earned on the overnight sweeps over

15 the period when this was computed. So, basically, what I --

16 what this shows me is if there were trading going on in the

17 investment advisory business, and as purportedly was shown

18 on customer statements, those trades were consistently

19 earning money -- they were never losing, they were always

20 making money -- you would see another huge slice of this

21 pie, probably 80 percent of it being from trading profits.

22 Because money has to come back in to the account at some

23 point if you're going to turn it back into cash, as clients

24 want to get out, from the trading profits when they sold

25 their investments.

Page 84

1       There was never any addition to the 703 account

2 that I saw when I examined the bank accounts to show that

3 money was coming from trading profits. Again, if somebody

4 wanted to close their account or take money out -- as many

5 people took out millions and millions of dollars over the

6 years -- it had to come out of the 703 account. That was

7 the investment advisory account. There was another account

8 that money from 703 went to to wire the money out or write

9 the checks, but that was just a disbursement account. This

10 was the main account.

11       And that's a very important finding because

12 without additional money coming in from trading gains, that

13 belies the notion that there were, in fact, trading gains.

14 There weren't.

15 Q   We'll talk about those in a little bit more detail.

16 So, what sources of information did you use to prepare this

17 Exhibit 38?

18 A   These were bank statements from -- that were obtained

19 from J.P. Morgan Chase. And in addition to the bank

20 statements, there were -- there was information on customer

21 money in the computer file and that was utilized as well to

22 look at -- to match up the cash additions coming to the

23 account to try to bundle where that money was coming from.

24 In other words, to make sure that if a deposit came in, say,

25 $3 million, it wasn't traceable back to the profits from

Page 85

1 some alleged stock trade. It was all traced back to client

2 money, customer money.

3 Q   Okay, so let me see if I understand this. You're

4 saying that 97 percent of the money going into the

5 investment side, investment advisory side of BLMIS was

6 coming directly from customers. Is that what you're saying?

7 A   That's correct.

8 Q   Okay. There's 3 percent that comes from investment

9 activity, overnight sweeps, and stuff like that, right?

10 A   Correct.

11 Q   Where did the money come from to make those

12 investments, those short-term investments?

13 A   Customer money. It was taken out of the 703 account

14 and then invested overnight and then put back in the 703.

15 So, it originated from customer money just as a way to earn

16 a little bit more interest than the money sitting in the 703

17 checking account.

18 Q   So, what was the source of all of the money deposited

19 into the 703 account?

20 A   Both the 97 percent and the 3 percent were from

21 customer money. Because if you -- the 3 percent is the

22 derivative, if you will, of the earnings of those overnight

23 sweeps, it would come from customer money.

24 Q   Okay. So, looking at Exhibit 37, I guess we've

25 identified where the money came from that went into the blue

22 (Pages 82 - 85)

Page 86

1 house there. What is a cash dividend?

2 A   A cash dividend is a type of earning, Your Honor, on a

3 stock, an equity. Some companies, some of the old blue

4 chips like GE and Coca-Cola paid a cash dividend. So,

5 basically, as companies earn profits and they accumulate

6 money in their own treasury, that increases the value of the

7 company. They can either pay that money out in a dividend,

8 they can invest it, or they can hold it.

9         A lot of companies have a history of paying cash

10 dividends. And a cash dividend is a return to the investor

11 which helps boost the rate of return. So, if I spent

12 $10,000 on Apple or Exxon stock, and Exxon pays a quarterly

13 dividend, the money I'm getting back is figured into my rate

14 of return.

15        And so it's actually cash. They would write a

16 check. If you were holding it through a brokerage firm, the

17 brokerage firm collects that money and then credits your

18 account with that. The very next day when it's credited to

19 your account, you can go withdraw that cash and go spend it,

20 do with it what you want.

21 Q   Did the BLMIS investment advisory business report the

22 receipt of cash dividends to its customers on their customer

23 statements?

24 A   It did.

25 Q   If you could, sir, turn to Exhibit 39 in your binder,

Page 87

1 which I think is also Table 8 on Page 82 of your report, and

2 identify that for the Court, please.

3 A   So, this is Table 8 from Paragraph 196 on Page 81 and

4 82 of my report.

5 Q   Can I just ask you a couple questions about it? Did

6 you prepare that?

7 A   I did, yes.

8 Q   Is it an accurate representation of your analysis?

9 A   It is.

10 Q   What period did you analyze here?

11 A   1998 through 2008.

12 Q   So, what do the two columns mean in Exhibit 39?

13 A   So, the two columns -- the left column says Year. That

14 denotes the year. The right column is Dividends. And what

15 I did is I went and looked at all of the IA business

16 customers for that particular year. So, for the first year

17 of 1998, I said let me look for that entire year, let me go

18 through all of the statements. Every time it says Cash

19 Dividend, let me add it up. Let me see what it adds up to.

20 It added up, in 1998, to $137,316,449.

21        Your Honor, I did that for every single year

22 subsequent, all the way through 2008. You can see, for

23 instance, on the year 2006, it's over $839 million of

24 purported cash dividends. So, these would have been, as

25 reported on the customer statements, from the equities that

Page 88

1 were supposedly bought, a cash dividend that was paid. And

2 I aggregated them from all of the different investment

3 advisor clients and aggregated all of the different stocks.

4         So, if it was a dividend from Merck and a dividend

5 from GE, I didn't care, I just added them all up. Because

6 what I wanted to do is I wanted to go look for the money,

7 back to follow the money. I went to look in the bank

8 statements for BLMIS to see if, in fact, in 2006, for

9 instance, in the 703 account was there $839 million

10 deposited into that bank account that represented the

11 receipt of cash dividends from the payers or the transfer

12 agents. In the marketplace you have transfer agents that

13 will facilitate, instead of the company sending out checks

14 to all the broker-dealers or the brokers, the transfer agent

15 will act in that capacity to send those dividends out.

16        So, I did that for every year. In total, Your

17 Honor can see the total is over $4.3 billion -- $4.3 billion

18 of supposed cash dividends from 1998 to 2008. There was no

19 record whatsoever of any of that cash ever being received by

20 the IA business. Which, again, if there were legitimate

21 trades, if the stock had actually been purchased, these

22 dividends were declared -- I checked them in the public

23 market to find out yes, in fact, they were declared. For

24 real holders of stock, you would've seen the money coming

25 in. That's a tremendous amount of money. That money did

Page 89

1 not exist. Never came in.

2 Q   Let's make sure we're crystal clear about this. Was

3 there any evidence in the BLMIS books and records on the

4 investment advisory side that showed any of the reported

5 more than $4 billion in cash dividends was received by the

6 investment advisory customers over that ten-year period

7 beginning in 1998 until Mr. Madoff was arrested?

8 A   None. No evidence.

9 Q   Would those dividends have shown up in the BLMIS

10 investment advisory bank records as being paid to BLMIS for

11 distribution to investment advisory customers?

12 A   Absolutely.

13 Q   Which account?

14 A   It should've gone into the 703 account because that is

15 the account that was maintained for the IA business. It was

16 basically the only account other than the disbursement

17 account. And if a customer wanted their money, they had to

18 go to BLMIS, ask for a redemption or a cash out. The money

19 would've come from the 703 account to the 509 account --

20 that was the control disbursement account -- and ultimately

21 to the investor.

22 Q   Is that why you put a red X on the dividend arrow going

23 into the IA business?

24 A   Oh, so we're back to -- what was that exhibit?

25 Q   Which is Exhibit 37, which I think is also on the chart

23 (Pages 86 - 89)

Page 90

1 up there.

2 A   Yeah, so --

3     THE COURT:  Which page?  I'm sorry, which page is

4 that in the report?  Oh, I have it.  Page 121.

5     MR. HUNT:  Okay.  Sorry.

6 A   So, yes.  Under -- there's a box underneath the blue

7 box that says IA Business, or there's a line with an arrow

8 that says Dividends.  And I have an X there.  That was one

9 of the things that I eliminated by doing this analysis.

10 That the dividends were never received.

11     I also should say I looked for documentation from

12 the transfer agents saying, well, here's a transmittal, it's

13 going to be wired to the account.  Here's, you know, $20

14 million for a particular dividend payment.  I looked for why

15 are remittances...?  I mean, I scoured the documents to see

16 -- maybe the money came in somewhere and somehow evaporated

17 somewhere else.  I don't know.  But I looked for all of the

18 information that would be surrounding the transmittal, and

19 there was none of it.

20 Q   In fact, in your review of the BLMIS books and records,

21 did you identify any other income-producing activities for

22 the investment advisory business, other than the short-term

23 sweeps and the BLMIS interest-bearing accounts that were

24 funded by 703 customer deposits, what you just discussed?

25 A   No.  There were several brokerage accounts, that money

Page 91

1 was taken from the 703 account and put into, that purchased

2 some treasuries.  But other than -- and those weren't

3 purchased in connection with any split strike conversion

4 strategy.  But, no, other than that, there was absolutely no

5 evidence of any trading whatsoever going on in the IA

6 business.

7 Q   How about any third party financing the investment

8 advisory arm was receiving?  Did you find any of that?

9 A   Other than about $145 million worth of loans, I think

10 it was either 2005 or '06, Your Honor, there was somewhat of

11 a liquidity crush.  You know, again, when you're running a

12 Ponzi scheme like this, the big fear is kind of the run on

13 the bank.  If everybody shows up to cash out, you don't have

14 the money to pay everybody and that's when these things

15 collapse.

16     And so there was a liquidity crunch in the mid-

17 2000s, and there was so loan -- two loans obtained from a

18 bank that were very short term.  I think within six months,

19 the loans were paid off.  I think it was about $145 million.

20 It's in the report.  Other than that -- and that would be --

21 that was not enough to sustain -- that was a short-term kind

22 of bridge loan.

23     But back to your original question, that was the

24 only third party financing I saw.  There was no other

25 legitimate business within the IA business, and no sort of

Page 92

1 use of the money in a legitimate way to create any sort of

2 other profits for the IA business.

3 Q   Where would all that money have shown up?

4 A   In the 703 account.  That was the account that was used

5 for the IA business.

6 Q   Is that why you have the big red Xes on all of those

7 possible incoming sources of funds?

8 A   It is.  I was trying again to see where the money was

9 coming in, how it was being earned, was there -- you know,

10 maybe Mr. Madoff said he was going to trade stocks but he,

11 you know, just invested in gold bars somewhere.  And while

12 that would've have been right, maybe there was an investment

13 somewhere else, and then he was selling those gold bars and

14 producing some income.  So, that's the other income

15 producing box in the upper right.

16     There was no evidence other than money coming in

17 from customers and money going out to customers.  A little

18 bit of the sweep, the overnight sweeps to kind of create

19 more money for the Ponzi to enable it to go a little bit

20 longer, in other words.  And that's why I have Xes on all of

21 those.

22 Q   So, based on your review of the books and records of

23 BLMIS, did you reach a conclusion about the source of funds

24 for the 703 account?

25 A   I did.

Page 93

1 Q   I probably asked and answered that one but I'll ask it

2 again.

3 A   It came from the IA business customers.

4 Q   Was J.P. Morgan Chase formerly known as Chase

5 Manhattan Bank?  Do you remember that?

6 A   It was.

7 Q   Did Mr. Madoff testify in his allocution about how he

8 used that bank account?

9 A   I recall he did, yes.

10 Q   If you could turn to the Trustee's Exhibit 1 in your

11 binder.  It's the small binder, I think.  You're going to be

12 happy about that.

13     THE COURT:  Do you have that allocution?

14     MR. HUNT:  Yes, sir, it's --

15     THE COURT:  You had had it separate from --

16     MR. HUNT:  Oh, yeah, we do.  We have it in a small

17 bound copy.

18     THE COURT:  Well, give it to me, rather than...

19 (indiscernible)

20     MR. HUNT:  Do you have...?

21     MR. DUBINSKY:  I have a small binder that says

22 Regarding Madoff Allocation.

23     THE COURT:  Right.  I have a copy of it from...

24     MR. HUNT:  Sorry, I apologize.  I thought I'd

25 provided it.

24 (Pages 90 - 93)

Page 94

1    THE COURT:  I think I turned it away because I
2  said I didn't need it.
3    MR. HUNT:  It's Trustee's Exhibit 1.
4    THE COURT:  I have it.
5    MR. HUNT:  Okay, thank you.
6  Q   If you could please read Mr. Madoff's allocution
7  starting at the end of Line 15 on Page 24.  On Page 24.
8  A   So, Page 24 starting at the end --
9  Q   At the end of Line 15 through the end of the first
10  sentence on Line 22.
11  A   Okay.  "Up until I was arrested on December 11, 2008, I
12  never invested these funds in the securities as I had
13  promised.  Instead, those funds were deposited in a bank
14  account at Chase Manhattan Bank.  When clients wished to
15  receive the profits they believed they had earned with me or
16  to redeem their principal, I used money in the Chase
17  Manhattan Bank account that belonged to them or other
18  clients to pay the requested funds."
19  Q   Did your investigation confirm if Mr. Madoff's
20  allocution accurately reflected how the Chase accounts were
21  used to pay redemptions?
22  A   It did.  And it does accurately reflect what my
23  investigation concluded, that that's how it was used.
24  Q   Just going back to the dividends we talked about to
25  clean up the point.  Were there any records showing that any

Page 95

1  of these $4 billion of cash dividends were deposited into
2  any other bank account?
3  A   No.  I scoured every other bank account record and
4  every other document.  I wanted to make sure that I was
5  certain.
6  Q   So, to wrap up this issue, please summarize your
7  conclusions concerning the source of funds flowing out of
8  the investment advisory business to customers.  Where was
9  that money coming from?
10  A   Customer money.  Just other customers' money.
11  Q   Did your conclusion that the BLMIS investment advisory
12  business did not have a connected trading platform have
13  anything to do with your conclusion that the investment
14  advisory business was being operated as a Ponzi scheme?
15  A   Absolutely.
16  Q   Why?
17  A   Because without the ability to actually connect to the
18  market and trade and no evidence of those trades ever
19  occurring, coupled with what I just testified about, that
20  the only money I saw was customer money in and customer
21  money out, no accretion to that 703 account from any sort of
22  trading profit dividends -- that's the classic example of a
23  Ponzi.  There's nothing going on.  You're taking money from
24  people, you're promising that you're going to do something
25  with it, and then you pay them back as if you're fulfilling

Page 96

1  your promise.
2  Q   So, in addition to the not-connected trading platform,
3  did your conclusion that the customer deposits were used to
4  pay customer redemptions have any bearing on your conclusion
5  that the investment advisory business was being operated as
6  a Ponzi scheme?
7  A   It did.  As I just said, the lack of other funds from
8  trading profits, from dividends, from real results of actual
9  trading -- the lack of that played into the conclusion that
10  this was simply a Ponzi.  Just taking money in and paying it
11  back.
12  Q   Okay.  So, we talked about the trading platform.
13  A   Yes.
14  Q   We talked about the money.
15  A   Correct.
16  Q   Now I want to talk about the investment strategy that
17  BLMIS was marketing to its customers, okay?
18  A   Okay.
19  Q   What was that?
20  A   During the time period for this case?
21  Q   Yes.
22  A   It was called a split strike conversion strategy, Your
23  Honor, and it's a strategy, as I said during my
24  qualification phase, that is a real trading strategy.  And
25  the way it was purportedly set up by BLMIS was to buy some

Page 97

1  of the stocks in the S&P 100 Index.  So, the Standard &
2  Poor's 100 Index has the largest 100 stocks in that.  And in
3  order to get the equivalent of the index without just buying
4  the index itself, you can pick a basket of stocks that are
5  representative of the 100.  So, maybe you pick 10, 20.
6    And so you buy that.  And then it uses options
7  around that purchase.  And what it uses is a call option and
8  a put option.  So, these are options.  A call option in this
9  case was being sold, and a call option -- if you bought
10  Exxon at 100, the call option might be for expiration in six
11  months at 120.  So, if Exxon goes up to past 120, the holder
12  of that call option can call you up, BLMIS, and say, okay,
13  make good on that option.  I'm going to want that stock.  Or
14  they can cash settle the option.  And let's say Exxon went
15  up to 140.  You as the holder of Exxon have given up the
16  upside past 120.
17    So, you've sold the call option.  Somebody can
18  take it from you at 120 and above.  They can't exercise it
19  below.  And in exchange for giving them the right to do
20  that, you earn a premium.  So, that premium falls into part
21  of the profit of the strategy.  When you sell something at a
22  profit, part of the profit.
23    The downside is buying a put option.  So, it's
24  like Your Honor buying an insurance policy.  If Exxon,
25  instead of going up starts to crater and fall, you may have

25 (Pages 94 - 97)

Page 98

1 a six-month put option for Exxon at 80. So, if 80 -- so, if
2 Exxon all of a sudden has a one-day bad announcement and
3 goes from 100 to 50, you're limited once it gets to 80
4 because you have the ability to put that stock -- it's your
5 option to force somebody else to buy it from you at 80, and
6 now you've protected yourself on the downside.
7       In order to buy that insurance, just like if you
8 buy fire insurance or car insurance, you have to pay a
9 premium, and that premium that you pay offsets the premium
10 you receive when you sold the call. So, that nets that
11 profit down. And it creates what's called a collar around
12 the stock. So, basically, it limits the upside, gives you
13 some upside but limits it, and protects you on the downside.
14      In addition -- so, that's the typical split strike
15 conversion strategy. What BLMIS added a little twist to it
16 was clients were told or it was marketed that when Mr.
17 Madoff or anybody at BLMIS could kind of foresee the market
18 and knew when to get out of the market, and they would
19 unwind this trade and put the money into treasuries.
20 Because treasuries, as we all know, are safer investments
21 with less risk than market. Markets have volatility.
22 Stocks go up and down. Yesterday, I think it was, the
23 market was down, I don't know, 490 points based on the trade
24 threat of tariffs. So, there's volatility. Treasuries have
25 much less volatility.

Page 99

1       So, this is what it was marketed as, and so that
2 whole strategy I've kind of called the BLMIS Split Strike
3 Conversion, which included the sale of a call, the purchase
4 long of a stock, buying actual stock, buying the put, and
5 then when the market timing, so to speak, BLMIS would roll
6 out of that and purportedly put the money in treasuries.
7 One of --
8 Q   Let me ask you this. Was that strategy reflected on
9 the customer statements included in the BLMIS books and
10 records during the period of 1992 until the time Mr. Madoff
11 was arrested?
12 A   It was, yes.
13 Q   Did you investigate that strategy?
14 A   I did.
15 Q   Did BLMIS's investment advisory leg employ that
16 strategy?
17 A   Purportedly but not -- not real, no. It was -- it was
18 basically a series of fake trades that were put into the
19 AS400, used as a giant typewriter, produced customer
20 statements, produced one side of a confirmation, and then --
21 that's all it did. It didn't execute anything. No trades.
22 Q   Did Mr. Madoff testify about the split strike strategy
23 in his allocution?
24 A   He did.
25 Q   And if you could turn back to Exhibit 1 again? Let me

Page 100

1 know when you have that.
2 A   Okay.
3 Q   And I'd like you to read the end of Line 20 on Page 25
4 through Line 18 on Page 26.
5 A   Okay. "Through the split-strike conversion strategy, I
6 promised to clients and prospective clients that client
7 funds would be invested in  common stocks within the
8 Standard & Poor's 100 Index, a collection of the 100 largest
9 publicly traded companies in terms of their market
10 capitalization. I promised that I would select a basket of
11 stocks that would closely mimic the price movements of the
12 Standard and Poor's 100 Index. I promised that I would
13 opportunistically time those purchases and would be out of
14 the market intermittently, investing client funds during
15 these periods in United States Government-issued securities
16 such as United States Treasury bills. In addition, I
17 promised that as part of the split-strike conversion
18 strategy, I would hedge the investments I made in the basket
19 of common stocks by using client funds to buy and sell
20 option contracts related to those stocks, thereby limiting
21 potential client losses caused by unpredictable changes in
22 stock prices. In fact, I never made those investments I
23 promised clients, who believed they were invested with me in
24 the split-strike conversion strategy."
25 Q   Did your investigation confirm if Mr. Madoff's

Page 101

1 allocution accurately reflected how the split-strike
2 strategy was being implemented in his Investment Advisory
3 business?
4 A   It did. It was not being implemented. It was --
5 nothing was happening. It was -- he's allocating here that
6 it never happened, and it was a fraud.
7 Q   Thank you for that clarification. If you could also
8 turn to Trustee's Exhibit 2, which is Mr. DiPascali's
9 allocution? And when you have that, let me know.
10 A   I have that.
11 Q   Do you recall if Mr. DiPascali's allocution factored
12 into your opinion in any way?
13 A   The only way it factored into my opinion is it
14 confirmed my findings. I didn't rely on either Mr. Madoff's
15 allocution, Mr. DiPascali's allocution, or anybody else's
16 allocution or depositions in reliance for my opinion. I
17 used it, once I did my work and analysis, to see if it
18 confirmed it or if it was being -- if it said something
19 else. But that's how I used them.
20 Q   Okay. So, if you could turn to Page 46 of Exhibit 2,
21 Mr. DiPascali's allocution, and read the allocution
22 beginning on Line 21 and ending on Line 25?
23 A   "From our office in Manhattan, at Bernie Madoff's
24 direction, and together with others, I represented to
25 hundreds, if not thousands, of clients that security trades

26 (Pages 98 - 101)

Page 102

1 were being placed in their accounts when in fact no trades

2 were taking

3 place at all."

4 Q    From your review of the BLMIS books and records, were

5 you able to determine if Mr. DiPascali's allocation about

6 securities trades was accurate?

7 A    Yes.  The results of my analysis and my investigation

8 confirmed what he said in that regard in the allocation was

9 accurate.

10 Q    Okay.  Let's break this down a little bit.  I want to

11 talk to you first about that first element of the split-

12 strike strategy that you mentioned, which was the purchase

13 and sale of stocks.

14 A    Okay.

15 Q    And as a starting point, I want to discuss DTC records.

16 A    Okay.

17 Q    What is a DTC?

18 A    The DTCC, the Depository Trust Corporation -- sometimes

19 goes by DTC -- is the organization in the United States that

20 clears all equity trades.  So, they clear and settle the

21 trades.  They act as custodian for stock.

22      So, in the old days here on Wall Street, before

23 that time if you owned stock you would have a safe and you'd

24 have the actual stock certificates, paper certificates.  And

25 there were runners.  And if you sold the stock, you had to

Page 103

1 have a runner run the stock to somebody else, and that

2 broker took it and took possession on your behalf as a

3 client.

4      All of that antiquated system changed, and it

5 became computerized, and those stocks are held at a central

6 depository by book entry.  And that's what the DTC does.  It

7 acts as -- it clears all of the equities, records them, and

8 makes sure that in fact if they're custodianing those

9 securities, that they actually exist.

10      Kind of like if you have a bank account at Bank of

11 America.  You get a statement from them every month.

12 They're your custodian of your money, you see it on the

13 statement, and that's what they represent to you.

14 Q    So, you may have already answered this, but how do DTC

15 records relate to legitimate trading?

16 A    Well, every legitimate trade gets recorded at the DTC,

17 and ultimately there are custodian records at the DTC

18 saying, Charles Schwab, you own on this date 10 million

19 shares of Exxon stock.  And if anybody wanted to check that,

20 there is a procedure.  You can do a confirmation with the

21 DTC.

22      But basically, that is the official record of

23 where that stock sits.  So, stock's not flying around in

24 people's hands anymore and sitting in safes, and that sort

25 of stuff.

Page 104

1 Q    Were you able to obtain DTC records evidencing the

2 purchase and sale of stock at BLMIS?

3 A    I was.

4 Q    If you could turn to Exhibit 45 in your binder.  I will

5 ask you if you prepared it and what information you used to

6 prepare it.

7      THE COURT:  Is that in the report?

8      MR. HUNT:  Yes, Sir.  It is Figure 16 in his

9 report.  And I apologize I don't have a page number for you.

10      MR. DUBINSKY:  It is on Page 68, Your Honor.

11 A    So, this was --

12      THE COURT:  So, did you prepare that?

13      MR. DUBINSKY:  I did prepare that.  The underlying

14 analysis and the chart, yes.

15 Q    What information did you use?

16 A    So, I used DTC documentation from October 2002 through

17 October 2008.  And what I attempted to do here, and what I

18 was able to do, is I wanted to look at the equity trades,

19 both in the trading side of the business and the purported

20 trades in the IE business, to see where their custodian

21 evidencing all of these stock trades.  Okay?

22 Q    What do the X and Y axis represent on this exhibit --

23 A    So, along the left is the dollar value of total equity.

24 It's the amount -- I'm sorry, not dollar value -- the amount

25 of actual shares held.  And then along the bottom axis is

Page 105

1 the date.  So, why don't we focus on the middle where it

2 says October 31, 2005?

3      So, what I did here, Your Honor, was the left bar

4 that's been highlighted on the screen in dark blue, I went

5 and found records at the Prop Trading business, trading

6 records showing that 53,770 shares of stock in total, on

7 October 31, 2005, were supposedly held by the Prop Trading

8 business.

9      I then obtained records from the Debtors for that

10 same date, October 31, 2005, and found evidence to the exact

11 share number, that 353,770 shares.  DTC had records that

12 showed stock for BLMIS was custodied at DTC.

13      It's important, Your Honor, to understand that at

14 DTC, BLMIS had one account.  It was called the 646 account,

15 and that was their participant number when they agreed to

16 participate with DTC.  Recall, as a broker dealer, when

17 you're clearing equities, you have to have a DTC account.

18 And so, the Prop Trading business did have an account, 646.

19      So, with that one account, I obtained the records.

20 We also -- I asked the Trustee when these records were

21 subpoenaed from DTC to ask the DTC for any other potential

22 Madoff accounts, and the DTC responded this was the account.

23 This was the only records they had.  There was only one

24 account, the 646.

25      So, in the middle -- back to the middle, Your

27 (Pages 102 - 105)

Page 106

1 Honor -- I now have accounted for all of the Prop Trading
2 shares, but I needed to account for the middle column, the
3 lighter blue, which was the IA business, that represented on
4 December 31 across all of the customer accounts, there was
5 over one billion -- us, it was 1,175,593,585 shares taken
6 from the trading records and the customer statements.
7     And I said, okay, where are the custodian records
8 evidencing over a billion shares?  I've got the custodian
9 records to tie out the 353,000 on the Prop Trading side, and
10 there were no records from DTC in that account, the 646
11 account.  That's the only account DTC had for BLMIS
12 evidencing any of that stock.
13     So, to state simply, that stock -- and that
14 confirmed my suspicions in the investigation that those
15 stocks were never traded -- if they were traded, there would
16 be equity results from DTC records showing that those
17 equities were sitting at DTC.
18 Q   Did you find the same performance across the board
19 during the entire period from 2002 to 2008?
20 A   I did.  You can see there's a couple of years the Prop
21 Trading had a few less shares than DTC, like a hundred less
22 shares or 20 less shares.
23     By and large, I was able to reconcile almost every
24 share on the Prop Trading share, and in every single year on
25 this analysis from 2002 through 2008, there wasn't a single

Page 107

1 document, a single real document, from DTC evidencing any of
2 these blue bars.  I mean, billions of dollars -- billions of
3 shares, which represented billions and billions and billions
4 of dollar value of purported trades.
5 Q   So, what's that squiggly line in the middle of this
6 exhibit?
7 A   Hmm.  That's a good question.  The squiggly line, Your
8 Honor, is if I scaled this chart to actual scale, it would -
9 - those blue bars would be off the chart.  So, I'm basically
10 just denoting to the reader that I've broken up the scaling.
11 And so, graphically, it's not a proportion, but I put the
12 nominal numbers, the real numbers, on so the reader can
13 understand that.  And that's what that squiggly gray line
14 means.
15 Q   So, based on your review of the DTC records, what did
16 you conclude about the equity shares that BLMIS was saying
17 it held?
18 A   Didn't hold them.  Never traded them; didn't hold them.
19 Q   Okay.  Is this exhibit --
20 A   And let me just clarify, in the IA business.
21 Q   Was the --
22 A   In the Prop Trading business, I was able to tie down
23 and confirm, Your Honor, that those actually did trade and
24 were sitting at the DTC on those dates.
25 Q   Is this Exhibit 45 an accurate summary of your review

Page 108

1 of all of the DTC records that you were able to obtain for
2 BLMIS?
3 A   It is, yes.
4 Q   Business performance consistent with legitimate
5 Investment Advisory business activity?
6 A   No, not at all.  When I had my investment advisory
7 business and a client asked me to buy stocks, we bought the
8 stocks, placed a trade, got a confirmation, the stock was
9 purchased.  We produced statements for them.  That's what
10 investment advisors do.
11     And there's documentation that if the SEC -- the
12 SEC can do a surprise audit.  When I had the investment
13 advisory when I worked with the firm, the SEC can show up on
14 your doorstep and knock on the door and want to see records.
15     And so, a real investment advisory business buys
16 stocks, sells them when the client says to sell them, and
17 has records to support that and prove it.
18 Q   Let's wrap up this DTC discussion.  I want to ask you
19 what metadata is?
20 A   So, metadata -- the easiest way to describe it in
21 computer terms is if Your Honor is writing an opinion and
22 using Microsoft Word, you can see the words on the page, and
23 if you underline it you can see the underline, and if you
24 bold it you can see that.
25     There's still code embedded in the document

Page 109

1 underneath the document that Your Honor can't see, such as
2 how many keystrokes were in the document, the time the
3 document -- you started working on it -- time that you last
4 saved it.  A variety of those types of characteristics are
5 maintained in a computer file.
6     Now, you can't go find that, and you can't, or I
7 can't, without the use of forensic software.  Forensic
8 software kind of goes underneath the layer that you and I
9 can see normally and looks at what's embedded in the file.
10 Q   So, did you find some documents internally of the
11 Investment Advisory business that talked about the DTC?
12 A   I did.
13 Q   Okay.  If you could take a look at Exhibits 47 and 48
14 in your binder?  And I want to put those on the screen
15 together.  I think those are Figures 17 and 18 on Pages 72
16 and 73 of the report.  I just want to talk about those --
17 A   That is correct.
18 Q   Is this an example of the metadata review that you
19 conducted of those internal records you found?
20 A   It is.  So, Figure 17, Your Honor, this is just one
21 example -- I found multiple documents, dozens of these -- on
22 its face appears to be a what's called a security position
23 inquiry from the Depository Trust Company.
24     In other words, if you have your account -- and
25 remember, Your Honor, I talked about the 646.  You can see

Page 110

1 it's in a couple places, but right underneath the double
2 line, you'll see it says participant -- P-A-R-T -- that's
3 Participant 0646, Madoff LLC.
4        This would allow the participant with a DTC
5 terminal, which the Prop Trading business had, the IA
6 business did not, to go in and at any time -- let's say a
7 regulator came in or you wanted to look up what your
8 position in a certain stock was, how much did you actually
9 own, you go into the DTC terminal, you sign in and you do an
10 inquiry.
11        This inquiry was looking up the CUSIP for AT&T,
12 Incorporated. What's important about this -- and it shows
13 $8.5 million as a participant position. Okay. If Your
14 Honor looks at what's been highlighted up in the upper right
15 corner, it says, date 11/30/2006, time 1600 -- this is in
16 military time -- 1600 hours, 13 minutes and 35 seconds, so
17 4:13 -- no -- yeah --
18 Q    6:13
19 A    6 --
20 Q    (indiscernible)
21 A    Yes, right. If we look at Figure 18, this is the mega
22 data that I pulled out of this document. So, this was a
23 Microsoft Word document, and I said I found a bunch of
24 these. It shows you that the date this document was created
25 was on December 19th, 2006 at 11:16 AM.

Page 111

1        So, this is two and a half weeks after Figure 17
2 was purportedly printed. So, Figure 17, if you go in and do
3 the look-up and it documents the date, and you were to
4 either do a screen capture or a print-out, that's what you
5 would see of Figure 17. But underneath it, it shows that
6 this document wasn't even created until after the fact.
7        So, somebody went in -- and it says here, the
8 author was Eric Lipkin. I can't tell you without
9 interviewing him whether he actually did it or somebody had
10 access to his computer. But the software was registered to
11 Eric Lipkin. Microsoft Word, date created 12/19/2006, after
12 the fact. So, somebody was going in -- and it says, last
13 saved by Eric Lipkin, says the word count, page count.
14        But this document, the metadata proves that this
15 document was created after the fact. There would be no
16 reason, if you had a legitimate DTC terminal and could sit
17 down and type in and see what positions you owned, that you
18 would ever need to make and backdate a screenshot like this.
19 Q    So, just so our record's clear, I think the Figure 17
20 you've been referring to is Trustee's Exhibit 47, and Figure
21 --
22 A    Correct.
23 Q    -- 18 that you've referred to is Trustee's Exhibit 48?
24 A    That is correct.
25 Q    Did you find other examples of fake DTC records

Page 112

1 internally at BLMIS?
2 A    I did.
3 Q    Based on your review of the Investment Advisory
4 computer, and the available DTC external records, and the
5 internal documents that you found, did you reach a
6 conclusion about the stock trading of the Investment
7 Advisory business?
8 A    I did. Your Honor, I found, in addition to these
9 documents, software on the AS/400 in the Investment Advisory
10 side of the business, that recreated official-looking DTC
11 reports.
12        Again, there would be no reason, if you were doing
13 legitimate trading and you owned the stocks, to go into your
14 own computer system and write code that used form-printing
15 software to print out a report that mimicked what the DTC
16 puts out, because you would have the real DTC report.
17        So, when you -- again, looking at the fake DTC
18 ones that we just talked about, the computer software -- and
19 I was able to get it to run and produce what it was
20 producing -- the fake DTC reports, led me to conclude that,
21 again, no trading occurred.
22        You start to pile this on and say, well, no money
23 ever went into the 703, DTC doesn't have records of it. Now
24 there's fake DTC reports being created. You layer all this
25 on and it's easier and easier as we go to conclude there's

Page 113

1 no trading. If there was trading, you would be doing this.
2 Q    Okay. Let's add another layer, then. I want to stick
3 with stocks.
4        THE COURT: Is this a good time --
5        MR. DEAN: Yes, it is, Your Honor.
6        THE COURT: -- to take a lunch break?
7        MR. DEAN: (indiscernible)
8        THE COURT: All right. Why don't we take a lunch
9 break and we'll reconvene at a quarter to 2:00?
10        WOMAN: That's all right.
11        THE COURT: We'll lock the courtroom so you can
12 leave your stuff here.
13        MR. DEAN: Thank you very much, Your Honor. We
14 appreciate it.
15        (Recess)
16        THE COURT: Please be seated. Let's continue.
17        DIRECT EXAMINATION OF BRUCE DUBINSKY
18 BY MR. HUNT:
19 Q    So, Mr. Dubinsky, when we broke for lunch, we were
20 talking about the stock trading. Do you recall that?
21 A    I do.
22 Q    So, I want to keep talking about that a little bit and
23 ask you if you could turn to Exhibit 49 in your binder,
24 which I think is Exhibit 11 to your report.
25 A    Okay, I have that.

29 (Pages 110 - 113)

Page 114

1  THE COURT: Is that in the report?

2  MR. HUNT: It's in the report, Exhibit 11, in the

3  report. I think it's actually in the appendices, Your

4  Honor, which is why you probably don't see, that's that big

5  letter.

6  THE COURT: That's correct.

7  MR. HUNT: But we've got it on the screen here, if

8  that's okay.

9  Q  Did you prepare Exhibit 49.

10 A  I did.

11 Q  Is that an accurate representation of your analyses?

12 A  It is.

13 Q  If you could, just start by describing each of the

14 columns in Exhibit 49, and tell us what those mean.

15 A  Okay. So, this is an analysis of the time period for

16 the split strike conversion stock between January 2000 and

17 November 2008. The left column is the trade date, the

18 actual -- or the date that the purported trade occurred.

19 The second column is the ticker. In other words, the ticker

20 symbol for the stock, so you can see the third one down,

21 AIG, GE, etc. The third column that says IA Business

22 Purported Volume is the sum for that particular day, so, on

23 the first line, March 9, 2000, for all of the stock for WMT

24 Ticker. I went and added up across all of the customer

25 statements and the trading records, in the supposed trading

Page 115

1  records. And that's what that column represents, that the

2  purported, that's why I say purported volume. The fourth

3  column says IA Business Purported Value. That's the number

4  of shares times the actual price on that day. The fifth

5  column says actual market volume. That's the actual market

6  volume that was reported to Bloomberg. And I went to

7  Bloomberg. This was one of the third-party sources of

8  information, Your Honor, that I testified earlier that I

9  obtained to complete the analysis. So, I went to Bloomberg

10 and obtained actual market data for this trading period.

11 And the last column is what I've called magnitude exceeded.

12 So, this was an analysis where I wanted to look at, day by

13 day, for a particular -- for stocks, to see if the volume

14 that BLMIS indicated it traded for all of its IA business

15 actually exceeded the entire market. In other words, the

16 entire market of equities that were traded. And so, it's

17 easy to look, for instance, if we go down seven lines

18 to July 14, 2000, Your Honor ... and we'll highlight this on

19 the screen. It's the one ...

20 Q  AIG?

21 A  It's AIG, it's not on the screen. We'll continue on

22 while he's looking for that on the screen. But on the face

23 of the exhibit AIG purported volume in IA business 2,822,680

24 shares. If you jump two columns to the right and look at the

25 total market volume that traded that day for all of AIG

Page 116

1  shares in the market, 1,692,800 shares. So, what BLMIS was

2  purportedly showing is, somehow magically, it was able to

3  trade more than the entire market traded for that day. In

4  other words, the magnitude exceeded, it traded to the volume

5  of 166, almost 167 percent of the market, which is well in

6  excess of the entire market. You can look down, halfway

7  down, on September 13, for GE. GE, in the IA business,

8  purported volume, 17,709,440 shares. The actual market

9  volume, as reported by Bloomberg in the market, was

10 7,604,800 shares. So, again, the purported volume exceeded

11 the purported volume in the IA business, exceeded the entire

12 market by over two times. And so, this whole exhibit goes

13 through many, many, many days throughout the entire period

14 where these trades exceeded the market. What's important to

15 point out, during this analysis too, there were many that I

16 did not put on this, that while they didn't exceed the

17 entire market, they were 90 percent of the whole market, 95

18 percent of the whole market. So, this is just, what you're

19 seeing here, is everything that exceeded the market that

20 couldn't be. You can't exceed the entire market, but there

21 are quite a few that aren't even on here, where it was

22 approaching 95, 90 percent of the entire market, which too,

23 while that's not an impossibility, it's highly unlikely,

24 let's put it that way.

25 Q  So, this 24-page Exhibit 49, does it include both

Page 117

1  instances where the BLMIS investment advisory business

2  exceeded purchases that were reported as well as sales?

3  A  It does. It starts to flip to the sales on page 12 of

4  24. And you'll see, when they shift around in the, to

5  brackets, those are the sales, the IA business purported

6  volume. So, those are the sales that I then just compared

7  to the total market. So, it was both on the purported buy

8  and the purported sale of these equities.

9  Q  Is that something you would see in a legitimate trading

10 situation?

11 A  No. You can't trade more than the whole market. It's,

12 you know, the analogy, if you go to the local Ford dealer

13 and they have 100 cars on the lot, you can't buy 120 cars.

14 They don't have them.

15 Q  Does the Bloomberg data you relied on in Column Five of

16 Exhibit 49 include over-the-counter trades?

17 A  It does. So, OTC, or over-the-counter trades,

18 Bloomberg collects that data for market participants. It's

19 reported from equities and all of that's funneled into the

20 Bloomberg data.

21 Q  Is it possible that the trades we discussed were made

22 over the counter somewhere else?

23 A  No. I looked at that. I looked at the Frankfurt and

24 London -- this is in footnote 156 on page 58 of my report.

25 I also performed the analysis on the Frankfurt and London

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Page 118

1 Stock Exchanges, added up that; first looked at those, did
2 he same analysis, then I said, okay, let's just add them all
3 together and see what it is. And even if you do that, he's
4 still, these purported trades exceed all of that.
5 Q   So, if the investment advisory business, BLMIS, had
6 been conducting over-the-counter tradings, would the AS400
7 have been connected to some sort of outside trading platform
8 for that?
9 A   Absolutely.
10 Q   So, I want to talk a little bit about how the split
11 strike strategy was supposed to be achieving its results.
12 A   Okay.
13 Q   Are you familiar with the term 'volume weighted average
14 price' in the financial industry?
15 A   I am. It's known as VWAP in the industry, but yes.
16 Q   What is that?
17 A   It's a formula that basically, if you are time slicing
18 purchases, in other words, if you're buying stock over the
19 period of a day at different intervals, you want to look at
20 what the average price is for each last sale and then
21 average those for the entire day. And it gives you a gauge
22 on how well you're doing compared to the open market. It
23 would be a wonderful world if we could always buy low and
24 sell high, but we know that's not the reality, that doesn't
25 work. If I could do that, I wouldn't be in this court

Page 119

1 testifying, but it's not the reality.
2 Q   Let's look at that equation you're talking about. I
3 think it's Exhibit 41 for the trial, and it's also shown on
4 page 60 of your report. Can you just walk us through all of
5 these fancy symbols on this VWAP equation?
6 A   Sure. On the top, you're just summing all of the
7 trades for that particular day at the price of each trade
8 times the quantity of each trade, divided by the sum of all
9 the trades and the quantity. So, basically, it's giving you
10 a volume-weighted average price of everything that you
11 bought during the day. And it's important because if a
12 client came to me or any trader and said, "Buy me 100,000
13 shares of Exxon," you could put that in as one order, and
14 maybe you put it in at ten o'clock, and at one o'clock some
15 piece of news comes out about Exxon that lowers the value,
16 you just ended up buying at a high price that day, you cost
17 your client money. So, by time slicing, which is what the
18 trading business was doing, and putting in that trade in
19 time intervals over the course of the day, and then
20 measuring your VWAP, you can see how well you're doing
21 compared to the market. And at the end of the day, you
22 should be pretty close to the VWAP that the volume weighted
23 average price of all the trades in the market, as a measure
24 of how well you executed your trades.
25 Q   Is the VWAP the benchmark that financial analysts use

Page 120

1 to evaluate the timing of sales?
2 A   It is. When you're doing programmatic trading and
3 looking at trying to maximize or minimize your risk of
4 pricing swings during the day, VWAP is a benchmark that's
5 widely used in the industry.
6 Q   Did you conduct a VWAP analysis on the information that
7 you found in the BLMIS books and records?
8 A   I did.
9 Q   Did you analyze the VWAP for trades documented on the
10 BLMIS Investment Advisory side?
11 A   Both on the Investment Advisory side and the prop
12 trading business. And that was using information that I
13 found at BLMIS. I also purchased from Bloomberg data,
14 third-party market data, that records VWAP for the entire
15 market for that day. So, that's the, kind of the benchmark
16 that you compare that to, to see how good is your trader
17 doing against the rest of the market.
18 Q   So, why did you do this? Why did you do it?
19 A   I wanted to, again, in the quest to be able to see if
20 there was any trading, I wanted to go look at the trades
21 because I noticed when I was going through the statements,
22 it always seemed that the trades were always making money.
23 And again, that's not the reality of the market. I mean,
24 just nobody can always make money on trading. And so, when
25 I've looked at that, I said, this is another indication to

Page 121

1 me that something's not right, kind of, you know, a red flag
2 in my mind, so to speak. And then by looking and doing an
3 analysis, that's what drove me to do this analysis.
4 Q   Did you prepare a demonstrative to kind of summarize
5 what you found?
6 A   I did. I think there were several, yes.
7 Q   I think that's the Trustee's Demonstrative Exhibit One.
8 I'm not sure if that's in one of those binders up there, but
9 it's on the screen. Do you have that there?
10 A   I do have that.
11 Q   If you could, just tell us, first of all, if that's the
12 demonstrative you prepared?
13 A   Yes, this is.
14 Q   Okay. Can you identify what is going on in the small
15 pie in the upper right hand corner?
16 A   So, in the blue label, where it say "Typical market
17 maker prop trader," upper right corner, in the marketplace,
18 if you're executing this type of strategy where you're
19 trying to time slice your trades, the typical market maker
20 prop trader will buy, on average, 50 percent of the time
21 below the average, 50 percent above. But it converges at
22 about 50-50. Again, sometimes you can buy at a good price,
23 sometimes you're buying above what other paid and it's not
24 such a good deal.
25 Q   Is that sort of theoretical, what you would see

31 (Pages 118 - 121)

Page 122

1 theoretically if you're doing trading?

2 A   Well that's not only theoretical, that's what actually

3 happens in the market. If you, when you pull the data from

4 Bloomberg, for instance, it will come out at about 50-50.

5 Q   So, if you look at the high in the lower right hand

6 corner, talking about the proprietary trading business, what

7 did you find?

8 A   So, this one looks at the buys. So, this was from

9 January 2000 through November 2008. And the prop trading

10 business was at about 51-49, almost 50-50, where you would

11 expect to see prop traders doing the sort of buying to end

12 up, so looking at the actual data from the prop trading

13 business and running the formula that we just talked about.

14 This is what, for that time period, it end up being.

15 Q   And was the proprietary trading business actually

16 buying stock during that period?

17 A   Yes. The proprietary trading business was buying stock

18 for the proprietary trading desk and for the market-making

19 clients of that side of the business. This has nothing--

20 what we're talking about now has nothing to with the IA

21 customers or IA business, at this point.

22 Q   If you look at the large pie on the left, talking about

23 the IA business buys, what does that show?

24 A   So, this shows that in the IA business, what was

25 recorded as the buys, was that the IA business was buying

Page 123

1 below the average price 83 percent of the time. In other

2 words, in the industry, they're hitting home runs,

3 supposedly, 83 percent of the time. You can see it's way

4 off kilter with what you would expect to see and if people

5 could really buy below the average price of 83 percent of

6 the time, again, it would be a wonderful world, but that's

7 not the reality.

8 Q   So, how does that investment advisory business VWAP for

9 reported stock purchases compared to proprietary trading

10 business?

11 A   It's off the chart. It signals that these trades never

12 occurred. To me that's what it signals.

13 Q   Let's talk about stock sales.

14 A   Okay.

15 Q   I think that's Trustee's Demonstrative Exhibit Two,

16 which should be popping up on the screen right now. If you

17 could take a look, again, at the pie on the right, top, what

18 do you find?

19 A   So, that's the one under the blue line that says

20 "Typical Market Maker Prop Trader," using the Bloomberg

21 data, that's about 50-50, measuring, and using the actual

22 Bloomberg data in the Madoff proprietary to test that. It

23 came out that the proprietary trading business was selling

24 above average about 48 percent of the time. Right about,

25 you know, 50 percent, 50 to 48. You go to the left, under

Page 124

1 the red banner, the IA business, was selling above the

2 average price 72 percent of the time. Again, how convenient

3 if you can always, you know, for the vast majority of the

4 time, buy low and sell high; in the real world that doesn't

5 work. That's how it's almost, you're guaranteed to make

6 money if you could do this, but the real world doesn't work

7 that way. So, again, this was an indication to me something

8 was off. And coupled with the other analysis that I did,

9 proved to me that this trading just didn't occur.

10 Q   So, the proprietary trading business and the investment

11 advisory business, were both operated by the same person,

12 weren't they?

13 A   Yeah, Bernard L. Madoff.

14 Q   Did you reach any conclusion about the discrepancy in

15 the performance between the proprietary trading business and

16 the investment advisory business?

17 A   I did. Think of it this way: If there was some sort

18 of magical algorithm that Madoff had to be able to buy low

19 and sell high all the time, that would have been employed in

20 the prop trading desk. I mean prop trading is his own money

21 for his own firm. He would have employed that. The fact

22 that you don't see that, and you see the reality that they

23 were at 52-48 and close to 50 percent on the buys, tells you

24 there is no magical wand that can be waived. Average

25 traders doing this hit the average. That's what they're

Page 125

1 expected to do. That's how they're measured. And it shows

2 that the IA business just couldn't have executed these at

3 that rate.

4 Q   Does your conclusion have any bearing on your

5 conclusion that the BLMIS investment advisory business was

6 being operated as a Ponzi scheme?

7 A   It does, because again, going back to the chart across

8 the way there with the IA business in the middle, without

9 any sort of legitimate trading going on for the IA

10 customers, the strategy that was being promised, and no

11 other source of business, this plays in that the trades

12 didn't occur. Again, that's the classic of a Ponzi. All

13 you're doing is taking customer money and using that money

14 to pay back customers. Nothing else is happening with it.

15 Q   So, based on your review of the books and records of

16 BLMIS, was BLMIS buying and selling stocks for its

17 investment advisory customers?

18 A   Not for the IA business customers. I've seen no

19 evidence of that.

20 Q   So, if we can talk about the second part of the split

21 strategy options --

22 A   Okay.

23 Q   Could you again briefly describe -- and briefly this

24 time -- how the options work with that strategy?

25 A   They're just a paired set of options. They were,

32 (Pages 122 - 125)

Page 126

1 because the strategy was supposed to be buying a basket of
2 stocks around the S&P 100, BLMIS was purportedly using
3 what's called OEX options, or S&P Index options, on the 100
4 index. And there was a sale of a call and a purchase of a
5 put that created the collar around the stock. And that was
6 part of the overall strategy that was being touted, that it
7 would prevent downside, you know, downside risk protection,
8 but at the same time limiting the upside so you're probably
9 not going to hit a home run, but you'll be getting singles
10 and doubles all the time.
11 Q    So, where are options trades recorded?
12 A    Well option trades are reported through the OCC, the
13 Option Clearing Corporation. First of all, they should be
14 recorded in your own broker dealer accounts in the books and
15 records, if they're actually going on. But to clear those
16 options, the OCC was established, and that's kind of the
17 clearing house of the options. These options that were
18 purportedly being used were OEX options, and those are our
19 proprietary options of the Chicago Board of Option Exchange.
20 And so they are exchange-traded options and licensed by the
21 CBOE, that's the only way they can be traded. But there
22 would be a record of those both from the CBOE and the OCC,
23 the Option Clearing Corporation, just like we talked about
24 with the DTC earlier this morning.
25 Q    Were you able to obtain OCC clearing records for BLMIS?

Page 127

1 A    I was.
2 Q    Did you perform an exercise like your DTC exercise for
3 these OCC records?
4 A    I did.
5 Q    And I think you talked about that on page 76 of the
6 report. What period did you analyze?
7 A    This was October 31, 2002 through 2008. And similar,
8 Your Honor, to the chart we had earlier, where I went
9 through and said let's look at the proprietary trading for
10 the equities, I said let's look at the proprietary trading
11 for options to see if any of the similar options were traded
12 that appeared on customer statements. So, I had those on
13 the prop trading side. I had the ones that were purportedly
14 traded for the IA business, and then I had the OCC records.
15 And none of those, in paragraph 188 I conclude the options
16 purportedly traded on behalf of the IA customers were not
17 shown on any OCC records and were not cleared through the
18 OCC. So, I was able to match up the options on the prop
19 trading to the OCC records, which one would expect to see.
20 There were options that were traded in the prop trading and
21 market making side of the business. But on the IA side,
22 those records were not matched because those trades never
23 happened.
24 Q    So, based on your review of the BLMIS books and
25 records, did you reach a conclusion as to whether or not

Page 128

1 BLMIS was trading options for its investment advisory
2 clients?
3 A    I reached the conclusion that no options were ever
4 traded on behalf of the IA business customers.
5 Q    So, let's talk about the third element of the split
6 strike strategy, which I think you said was treasuries.
7 A    Correct.
8 Q    I think you did an analysis of that and it's on page 70
9 of the report. Based on your review of the books and
10 records, did you determine how treasuries factored into this
11 split strike strategy the BLMIS was marketing to is
12 customers?
13 A    I did. They were supposed to be used, Your Honor, when
14 either Mr. Madoff or somebody at BMLIS determined it was
15 time to, quote, get out of the market, and the purported
16 equity and option trades were unwound and then money was
17 used to purchase treasuries, in other words, to go into kind
18 of a parking situation during that time period. That's how
19 it was supposed to work.
20 Q    If you could turn to Exhibit One, which is Mr. Madoff's
21 allocution, and starting in the middle of line 7, on page
22 26, through line 11, and read that into the record please.
23 A    What was the line number to start on?
24 Q    It's line 7 through 11 on page 26.
25 A    "I promised that I would opportunistically time those

Page 129

1 purchases would be out of the market intermittently
2 investing client funds during these periods in United States
3 government-issued securities such as United States Treasury
4 bills."
5 Q    And then read line 16 through 18 on that same page.
6 A    "In fact, I never made those investments I promised
7 clients who believed they were invested with me in the split
8 strike conversion strategy."
9 Q    Based on your review of the BLMIS Investment Advisory
10 books and records, were you able to determine if Mr.
11 Madoff's allocation concerning treasuries was accurate?
12 A    It confirmed my analysis in finding that no treasuries
13 were bought or traded for any of the investment advisory
14 clients.
15 Q    Does the DTC also get involved in documenting the
16 purchase of treasuries?
17 A    It does. It acts as the clearing house for treasuries,
18 just like it does for equities.
19 Q    Were you able to obtain DTC treasury records for BLMIS?
20 A    I was. For the period of 2002 through 2007, I was able
21 to obtain those records, and then I performed an analysis,
22 identified the -- first I went and identified the unique
23 treasury bills held by the prop trading business on December
24 31 of every year. I compared those holdings to the holdings
25 at DTC, and I also compared those holdings to the IA

33 (Pages 126 - 129)

Page 130

1  business.  And what I found, similar to the equities, is
2  that the prop trading that the -- and the treasury bills
3  weren't a big part of the prop trading, but the treasury
4  bills that were held by the prop trading matched to the DTC
5  records, and that was based on the treasury CUSIP, and in
6  contrast none of the CUSIPs held at the DTC matched those
7  that were supposed to have been bought for the IA customers.
8  So, again, it was a process of elimination.  Once I matched
9  everything to the prop trading, to the DTC -- were there any
10  other DTC records left?  Now I'm left with this tranche
11  of purported treasuries for the IA business that have no
12  support, no evidence of ever being purchased.
13  Q   If you could turn to Exhibit 50 in your binder, which
14  is Table Five on page 71 of your report, and identify that
15  for the record?
16  A   This is Table Five from my report on page 71 of my
17  report.  And this was a part of this analysis.  And what I
18  did for each year end, so, starting with 2002, you can see -
19  - that's the first column; the second column says
20  Proprietary Trading Business; third column, IA Business, and
21  the fourth column says Proprietary Trading Business
22  Positions as a Percent of IA Business Positions.  So, in
23  looking at year end, I went to the IA business, added up
24  from all of the records and customer statements, the total
25  dollar amount of treasuries.  And you'll see in that first

Page 131

1  row for 2002, it's $30,975,765 worth of treasuries.  So,
2  just under $31 billion worth of treasuries.  The prop
3  trading, when I added those all up for that same time
4  period, there was $84 million.  So, as a percentage, if one
5  were to somehow try to attribute the treasuries in the prop
6  trading as somehow being attributable to IA business
7  customers, that's .27, two-sevenths of one percent.  And so,
8  in essence, you'd be left with over $30 billion of
9  treasuries that couldn't be allocated to anybody because
10  they didn't exist, if somebody even took that approach.  And
11  I went through the same analysis for every year here and you
12  can see, like in 2007, 80 million of treasuries in the prop
13  trading, the IA business at that point was now just shy of
14  $57 billion of treasuries, so .14 percent.  So, again, it
15  just shows that the treasuries didn't match, they're not the
16  same.  They're not part -- the prop trading treasuries are
17  not part of the trading cycle, if you will, in the IA
18  business, part of the split strike conversion strategy.  And
19  even if you argued somehow that you could attribute these,
20  you're woefully short on the IA business because there's not
21  enough in the prop trading to cover everybody.  So, it just
22  doesn't make sense.
23  Q   So, looking at the DTC records that you were able to
24  recover, how far short were we in 2007?
25  A   Almost $57 billion.  If you take the $56,990,000 minus

Page 132

1  $80 million, that's $56,910,000.  I mean $56 billion of
2  missing treasuries.  It's ...
3  Q   How many were missing in 2006?
4  A   Over 48,300,000, or 270 million.
5  Q   For the period 2002 through 2007, is it your testimony
6  that there are quite a few missing?
7  A   That would be an understatement, quite a few --
8  billions and billions and billions of dollars were missing.
9  Q   So, taken in conjunction with the other evidence you
10  identified with relating to treasuries, did you reach a
11  conclusion regarding the purchase and sale of treasuries, by
12  the BLMIS Investment Advisory business?
13  A   There was no evidence of treasuries being purchased for
14  the IA business customers, plain and simple.
15  Q   So, switching back to Mr. DiPascali, do you recall him
16  testifying about the nature of the split strike hedging
17  strategy?
18  A   I do.
19  Q   If you could turn to Exhibit Two in your binder, Mr.
20  DiPascali's allocutions, and read the allocution starting on
21  page 45, line 23 through 46, line 17.
22  A   "He attracted a lot of these clients by telling them
23  that the firm would apply a hedged investment strategy to
24  their money.  The clients were told that the strategy
25  involved purchasing what we call basket or blue chip common

Page 133

1  stocks.  Hedging those investments by buying and selling
2  option contracts, getting in and out of the market at
3  opportune times, and investing in government securities at
4  other times.  By 2008, Bernie Madoff had thousands of
5  clients who believed their funds were being invested this
6  way.  For years, I was a main point of contact for many of
7  those clients when they had questions about their account.
8  From at least the early 1990s, through December of 2008,
9  there was one simple fact that Bernie Madoff knew that I
10  knew, and that other people knew, but that we never told the
11  clients, nor did we tell the regulators like the SEC: no
12  purchases of sales of securities were actually taking place
13  in their accounts.  It was all fake.  It was all fictitious.
14  It was wrong and I knew it was wrong at the time, sir."
15  Q   Did the investigation of the BLMIS books and records
16  that you conducted confirm Mr. DiPascali's allocution,
17  accurately summarize the true nature of the split strike
18  strategy?
19  A   It did.  It confirmed my findings.
20  Q   So, moving from the split strike strategy, I want to
21  talk a little bit about a rate of return, specifically the
22  rate of return, the BLMIS, was reporting to its investment
23  advisory customers.
24  A   Okay.
25  Q   And if you can stick with Mr. DiPascali's allocution

34 (Pages 130 - 133)

Page 134

1 for a minute, Exhibit Two, and turn again to page 47, and
2 read the allocution beginning on line 16 and ending on line
3 22.
4 A    "On a regular basis, I used hindsight to file
5 historical prices on stocks, then I used those prices to
6 post purchase of sales to customer accounts as if they had
7 been executed in real time.  On a regular basis, I added
8 fictitious trade data to account statements of certain
9 clients to reflect the specific rate of earn return that
10 Bernie Madoff had directed for that client."
11 Q    In your review of the books and records of BLMIS, were
12 you able to analyze the rate of return Mr. DiPascali was
13 talking about?
14 A    I did.  In analyzing the rate of return, and he's also
15 talking about a process called shtupping that was going on
16 for certain clients, adding a little bit extra rate of
17 return for those clients.  That's in my report as well.
18 Q    If you could turn to Exhibit 40, which is Figure 15 on
19 page 64 of your report?
20 A    I'm sorry, Exhibit 40?
21 Q    Forty, yes, sir.  Do you have that binder there?
22 A    I do.  And it was on page ...?
23 A    It's also on page 64 of your report.
24 A    Okay.
25 Q    Is this an exhibit you prepared?

Page 135

1 A    It is.
2 Q    Is it an accurate graphical representation of your
3 analysis?
4 A    It is.
5 Q    Could you identify the sources for this information?
6 A    The source of the information was information from the
7 S&P, from the actual market, through December 11, 2008, from
8 December 1996.  There was also information taken from the
9 Dow Jones Industrial Average on the market.  This
10 information was obtained from Bloomberg.  And those two,
11 what I did here was plotted out the rate of return for those
12 actual indexes for those period of time, so, what did the
13 markets actually do.  And that's in the, both the blue line,
14 Your Honor, and the green line.  And then I plotted the red
15 line, is the IA business average annual rate of return
16 through December 11, 2008.  That's the red line that kind of
17 goes straight across.  And what I wanted to see was, again,
18 in looking at, to answer the question, were there any real
19 trades, were these trades that were being reported on the
20 customer statements, were they real?  I wanted to look at
21 the performance.  And what you can see, recall the split
22 strike conversion strategy, was based on a basket of stocks
23 in the S&P 100, and using S&P index options.  So, that
24 strategy could have come close to mirroring the returns on
25 the S&P, albeit not exactly because you got options, you've

Page 136

1 got a collar situation that tamps that down a little bit.
2 But it should look pretty similar.  And what we see is it's
3 anything but similar.  The red line for the average annual
4 IA business rate of return goes from about, looks like 12
5 percent in the end of '96, close to 20 percent in '99, then
6 it dips down to 10 percent in '04, and in '08 it's about 10
7 percent when the music stopped, when Mr. Madoff went and
8 confessed.  In contrast, Your Honor, you'll see the blue and
9 green line going up and down.  So, for instance, in 2001,
10 when the markets really took a dive, you could see both the
11 S&P 100 was at negative ... the S&P was negative, looks like
12 23, 24 percent.  The Dow was probably negative 18 percent.
13 Yet the Madoff purported returns were about 11 or 12
14 percent.  And you could see in times when the S&P goes up,
15 that's, you know, going up and down that's called volatility
16 in the market, that happens, as we saw yesterday.  But this
17 kind of straight line, red line of average returns, really
18 told more the story that these trades couldn't have
19 occurred.  You can't have that kind of -- when this strategy
20 was built around the S&P 100 index, and a basket of those
21 stocks, it should have behaved similarly, and it didn't.
22 Q    Could the collar have accounted for this abnormally
23 high level of consistently positive returns?
24 A    So, the collar, as it was done, would have taken off
25 the very top peaks and bottom peaks of the returns on the

Page 137

1 S&P and the Dow, but still would have had volatility.  And
2 that didn't happen.  So, no, it wouldn't have allowed it to
3 look like this.
4 Q    Does the finding you've summarized in Exhibit 40 relate
5 to your opinion that the rates of return BLMIS was reporting
6 to its investment advisory customers was an element of a
7 Ponzi scheme?
8 A    Yes.  Again, you know, the goal of a Ponzi scheme is to
9 keep it going and get more money and you keep it going and
10 you have to tell clients you're doing something for them.
11 If you tell them you're just taking their money and not
12 doing anything with it, obviously, the suspicious arises.
13 So, this is part of keeping it going.
14 Q    So, let's wrap up our discussion on trading and rates
15 of return.  And I'd like to do that by having you turn again
16 to Exhibit One, Mr. Madoff's allocution, and read page 27,
17 line 9, ending on line 16.
18 A    "To further cover up the fact that I had not executed
19 trades on behalf of my investment advisory clients, I
20 knowingly caused false trading confirmations and client
21 account statements that reflected the bogus transactions and
22 positions to be created and sent to clients purportedly
23 involved in the split strike conversion strategy, as well as
24 other individual clients I defrauded who believed they had
25 invested in securities through me."

35 (Pages 134 - 137)

Page 138

1  Q    And then, if you could, just turn to Exhibit Two, Mr.
2  DiPascali's allocution, and read what he allocated on page
3  51, line 18 through 21.
4  A:  "Judge, thousands of clients, institutions,
5  individuals, funds, charities, were all mislead about the
6  status of their accounts, what was being done with their
7  money and what their accounts were worth."
8  Q    Based on your review of the books and records of BLMIS,
9  are Mr. Madoff's and Mr. DiPascali's allocutions consistent
10  with your finding on the trading and rates of return?
11  A    They are.
12  Q    So, we're here in bankruptcy court.  Solvency is a
13  topic that comes up once in a while.  Did you take a look at
14  that?
15  A    I did.  I was asked to prepare a solvency analysis of
16  BLMIS.
17  Q    Did you reach a conclusion regarding the solvency of
18  BLMIS?
19  A    I did.
20  Q    What test did you use to do that?
21  A    I applied the balance sheet test, Your Honor.  I also
22  looked at the capital adequacy test and the ability to pay
23  test, ultimately relying on the balance sheet test to
24  determine the insolvency, the deep insolvency, of BLMIS, in
25  December 2002 all the way through December 2008.

Page 139

1  Q    So, what is the balance sheet test?
2  A    Well, the balance sheet test, you want to look, if a
3  company is solvent, its assets, it has to have positive
4  equity.  So, it's assets would exceed its liabilities and
5  you'd be left with equity.  In other words, it has the
6  ability to stay in business and continue.  And that's one
7  test.  You can have a company that has negative equity but
8  it gets from somebody and can continue for a little bit, but
9  basically, if it's in a negative position, the ability to
10  continue becomes a going concern issue.  And so, you look at
11  the balance sheet, add up all the assets, add up all the
12  liabilities and subtract those, and look at what position
13  its in.  And that's what I did.  I, again, because BLMIS is
14  one entity, there were two sides, two legs if you will:  the
15  investment advisory side and the prop trading side.  I
16  looked at the assets of both and the liabilities of both,
17  and then ran my computations and analysis from that.
18  Q    If you could turn to Exhibit 35 in your binder and tell
19  us what that is?  And this is Exhibit 27 to his report, Your
20  Honor.
21  A    So, Exhibit 35 is a series of recast balance sheets for
22  BLMIS from December 11, 2002 and then each subsequent
23  December 11 through 2008.  And what I did is, in the -- it's
24  a basic balance sheet I set forth.  And I wanted to look at
25  what the total assets and total liabilities.  So, for the IA

Page 140

1  business, I knew there was some cash left when -- this is at
2  2002, so I knew what the cash balance was in 2002.  There
3  were some inter-company receivables.  And basically, this
4  relates, Your Honor, to money that was funneled from the IA
5  business over the years, to the prop trading business to
6  technically prop up the prop trading business.  I hate to
7  sound redundant there but basically, there was a scheme that
8  money was taken from the IA business, funneled into the prop
9  trading business.  It was made to look like it was
10  additional profits for the prop trading business, through
11  commission revenue and other revenue, added to their
12  financials.  And so, to account for that, on the balance
13  sheet I put it on as a receivable to the IA business,
14  because it really was the IA business money, put it on as a
15  payable from the prop trading.  But because it's one entity,
16  it gets eliminated.  It's, you know, right hand, left hand,
17  right pocket, left pocket.  I then looked at the net trading
18  positions for the prop trading.  It had some cash.  This is
19  in the second column.  It had some net trading positions,
20  some fixed assets.  These numbers are all in millions.  And
21  when you add it all up, all the way across for BLMIS,
22  because again, two legs but one company, there was 1.8
23  billion in assets at December 11, 2002 and 11.9 billion in
24  liabilities.  The biggest chunk of those liabilities were
25  the liabilities owed back to the IA business customers.

Page 141

1  Because looking at the situation with no trading going on,
2  but money was taken in on a cash-in, cash-out basis, the
3  business technically would owe those customers back their
4  money, on a net basis.  So, that's the number I used was he
5  net calculation for customer liabilities.  And if you --
6  this doesn't show it on this one, it's shown on my report.
7  Let me find it in my report, because I think that's helpful
8  to look at.  If Your Honor turns to page 1, first 161,
9  you'll see what we're looking at in Exhibit 35 replicated on
10  page 161 in my report.  Right below that, all I do is a
11  simple math and take the total assets, subtract liabilities
12  from above and come up with the, what I call the insolvent
13  number of $10 billion.  So, as of December 11, 2002, BLMIS
14  was insolvent to the tune of $10 billion.
15  Q    I think that may be Exhibit 36 in your binder, if you
16  take a look at that and tell me if you're looking at the
17  same thing?
18  A    Well, we were looking at a piece of Exhibit 36, yes.
19  Q    Getting back to Exhibit 35, what records did you use?
20  Are they accurately reflected at the bottom of the exhibit
21  there?
22  A    They are.  So, there were reports from ... information
23  from focus reports for the prop trading business, there was
24  calculations for the customer liabilities, that's referenced
25  there.  And then you'll see a footnote that I put, the

Page 142

1 receivables and payables based on analysis of cash infusions
2 from the IA business to the prop trading business. And that
3 was the same for each of the subsequent years. It was the
4 same balance sheet test analysis, Your Honor, using similar
5 data for the next year.
6 Q    Look at Exhibit 36 and tell me what that is.
7 A    So, Exhibit 36 is set forth on my table 13 in my report
8 on page 162. And all this is, is the summary, if you will,
9 of each of the years where I take the total assets, subtract
10 the total liabilities and come up with the determination of
11 whether it was solvent or insolent. In this case, every
12 single year is insolvent. And you can see, Your Honor, the
13 insolvency deepens to its deepest point in 2007 at about
14 $21.5 billion. And in 2008, on December 11, when Mr. Madoff
15 went into the, turned himself in to the authorities, it was
16 over $19 billion insolvent. So, in every year here, I use
17 the term deeply insolvent, grossly insolvent, but insolvent.
18 Q    So, insolvent from the 2002 to 2008 at least?
19 A    At least.
20 Q    So, just to summarize, Mr. Dubinsky, did your
21 investigation allow you to reach a conclusion regarding the
22 Trustees contention in this case that BLMIS's investment
23 advisory business was committing long-term fraud on its
24 customers?
25 A    Yes.

Page 143

1 Q    What did you conclude?
2 A    That, in fact, the fraud had been going on for, for
3 decades. It was -- there's certainly evidence for a court
4 to find that there was a fraud that was committed and that
5 without any trading going on, there was no substantive
6 activities other than operating a Ponzi.
7 Q    If you could turn to Exhibit One, Mr. Madoff's
8 allocution, in our binder, and read the allocution starting
9 on page 24 through the end of the sentence on line 15?
10 A    What was the line to start on?
11 Q    Line 9 through 15.
12 A    Okay. "The essence of my scheme was that I represented
13 to clients and perspective clients who wished to open
14 investment advisory, in individual trading accounts with me,
15 that I would invest their money in shares of common stock,
16 options and other securities of large well-known
17 corporations, and upon request would return to their
18 profits and principal. Those representations were false for
19 any years."
20 Q    Based on your review of the BLMIS books and records,
21 was Mr. Madoff's allocution concerning the nature of the
22 fraud consistent with your findings?
23 A    It was, yes.
24 Q    Did your investigation allow you to reach a conclusion
25 regarding the Trustee's contention in this case that the

Page 144

1 fraud being perpetrated by BLMIS and its investment advisory
2 business was a Ponzi scheme?
3 A    Yes.
4 Q    What did you conclude?
5 A    That, in fact, it was a Ponzi scheme. It operated as a
6 Ponzi scheme, has all the classic hallmarks of operating as
7 Ponzi scheme, as we've gone through during my direct. And I
8 concluded it was a Ponzi.
9 Q    If you could turn to page 23 of Exhibit One, Mr.
10 Madoff's allocution, and read lines 14 through the end of
11 the sentence on line 18.
12 A    "Your Honor, for many years up until my arrest on
13 December 11, 2008, I operated a Ponzi scheme through the
14 investment advisory side of my business, Bernard L. Madoff
15 Securities LLC, which was located here in Manhattan, New
16 York at 885 Third Avenue.
17 Q    Based on your review of the BLMIS books and records, is
18 Mr. Madoff's allocution concerning the Ponzi scheme
19 consistent with your findings?
20 A    It is, yes.
21 Q    Based on your review of the books and records of BLMIS,
22 for the periods we just discussed, did you see any evidence
23 of legitimate trading in any of the three split-strike
24 elements of the investment advisory customer accounts?
25 A    No, I did not.

Page 145

1 Q    Any stock trades?
2 A    None.
3 Q    Any options trades?
4 A    None.
5 Q    Any treasuries trades?
6 A    None.
7 Q    Any profits being generated by the investment advisory
8 business?
9 A    Not for the IA business customer, none.
10 Q    Based on your review of the books and records, what was
11 the source of funds that the BLMIS investment advisory
12 business used to pay customer redemptions?
13 A    Customer money.
14 Q    Is that the only source of funding for the IA business?
15 A    Yes.
16 Q    How much money did the BLMIS investment advisory
17 customer statements say that BLMIS owed is customers in
18 December of 2008?
19 A    The statements indicated about $65 billion.
20 Q    Sixty-five billion dollars?
21 A    Sixty-five billion with B.
22 Q    How much money did BLMIS have in the bank?
23 A    Not anywhere near that amount. I think it was, in
24 2008, just under $1 billion.
25 Q    What would have happened if all of the investment

37 (Pages 142 - 145)

Page 146

1 advisory customers had sought to redeem their statement

2 balances?

3 A   There was no money to pay people back.  No one would

4 have gotten their money back.

5 Q   The system would have collapsed?

6 A   System would have collapsed.  It's a classic, Your

7 Honor, run on the bank.

8 Q   Is that what happened.

9 A   Exactly what happened.

10 Q   Are your conclusions regarding the BLMIS computer

11 systems based on recognized computer forensic methodologies?

12 A   They are.

13 Q   Are your conclusions regarding the solvency of BLMIS

14 based on recognized methodologies used by forensic

15 accountants and valuation professionals?

16 A   They are.

17 Q   Are your conclusions concerning the trading and funding

18 practices of BLMIS based on recognized methodologies used by

19 forensic accountants, fraud examiners and valuation

20 professionals?

21 A   They are.

22 Q   Are your conclusions made with a reasonable degree of

23 certainty in those fields?

24 A   They were, yes, they are.

25 Q   Can the results of your analysis be replicated by

Page 147

1 someone with the same level of education, training and

2 experience as you have?

3 A   I believe they would be able to, yes.

4 Q   Thank you for your time, Mr. Dubinsky.  I have no

5 further questions.

6 A   Thank you.

7        THE COURT:  Cross Examination?

8        CROSS EXAMINATION OF BRUCE DUBINSKY

9 BY MS. CHAITMAN:

10 Q   Mr. Dubinsky, how much has your firm been paid to date

11 by Mr. Picard?

12 A   I believe, it's roughly about $39 million, maybe close

13 to $40 million.

14 Q   Okay.  And of that amount, how much has been paid to

15 you personally?

16 A   I don't know.  I get a salary, so I'm not on any sort

17 of contingency if that's what you're asking.

18 Q   Has your salary increased since you've been retained by

19 Mr. Picard?

20 A   My salary has increased, yes, since that time, yes.

21 Q   What was your salary at the time you were retained by

22 Mr. Picard?

23 A   I would defer to, Your Honor, to not answer that.

24 That's personal information.

25        THE COURT:  Well, it's relevant to bias.  You can

Page 148

1 answer it.

2 A   My salary was, at that time, $500,000 a year.

3 Q   And what was it last year?

4 A   Last year it was $650,000.

5 Q   And when did it go up from 500 to 650?

6 A   It's gone up over the time period.

7        THE COURT:  You have to speak up and into the

8 microphone Ms. Chaitman, because we're not picking you up.

9        MS. CHAITMAN:  Oh, I'm sorry.

10        THE COURT:  Can you stand at the podium?

11        MS. CHAITMAN:  At the podium?  Sure.

12        THE COURT:  Thank you.

13 Q   And in addition to your salary, do you get other

14 benefits?

15 A   I do, yes.

16 Q   What are those?

17 A   There's life insurance, there's disability insurance,

18 there are stock options for being a partner in the firm;

19 those types of benefits.

20 Q   And have your stock options increased in the time

21 you've been an expert in this case?

22 A   Generally, not only mine but the whole firm's has, yes.

23 Q   Okay.  And what is the, what was the value of your

24 stock options when you were first retained by Mr. Picard?

25        MR. HUNT:  Your Honor, that is getting a little

Page 149

1 personal, I think.

2        THE COURT:  Well, I think you've made your point

3 that he gets paid by the firm that does the work.

4        MS. CHAITMAN:  Right, but if he's getting, you

5 know, a million dollars in stock options I think that's

6 relevant.

7        THE COURT:  Do you know the value of your stock

8 options?

9        MR. DUBINSKY:  I don't, sitting here today.  They

10 fluctuate and the firm's been through different acquisitions

11 of private equity firms over the years, so, I don't.

12 Q   You own stock in the firm at this point, right?

13 A   I'm sorry, I couldn't hear you.

14        THE COURT:  Could you keep your voice up, Ms.

15 Chaitman?

16 Q   You own stock in your firm, right?

17 A   Yes, that's correct.

18 Q   And how many shares of stock do you own at the present

19 time?

20 A   I believe it's 1,300 shares.

21 Q   And how many shares did you own at the time that Mr.

22 Picard retained you?

23 A   I don't recall.

24 Q   Has it increased significantly?

25 A   No, I think it's actually decreased.  I was given stock

38 (Pages 146 - 149)

Page 150

1 when Duff & Phelps purchased my business, and so I
2 liquidated some of the stock along the way.
3 Q   What? I'm sorry?
4 A   I had liquidated some of that stock along the way.
5 Q   But if you hadn't liquidated it, it would have gone up
6 significantly?
7 A   That's correct.
8 Q   Now, in the course of your work you became familiar
9 with the Lazard report that was prepared by the Trustee in
10 his efforts to sell the, what you refer to as the
11 proprietary trading business.
12 A   That is correct, yes.
13 Q   And did you review that report?
14 A   I did.
15 Q   And did you find any factual inaccuracies in that
16 report?
17 A   No.
18 Q   Now, you referred to the market making and proprietary
19 trading business as one business.  You call it the prop
20 trading, right?
21 A   For ease of discussion, that's what I did, yes.
22 Q   Okay.  The proprietary trading, in fact, was investing
23 on Mr. Madoff's account.  Isn't that true?
24 A   On the account of he firm, not Mr. Madoff personally,
25 but the account of the firm, as any prop trading desk would,

Page 151

1 yes.
2 Q   Okay.  And how many traders were involved in
3 proprietary trading?
4 A   It varied over the years that I looked at.  I think --
5 I'd have to go to back.  I think at one point there were
6 maybe six or eight on the prop trading desk.
7 Q   Six or eight?
8 A   Six or eight.
9 Q   And how many traders were there in the market making?
10 A   I think at one point maybe 20, 22.  I'd have to go back
11 and refresh my memory.
12 Q   Okay.  And all together, Madoff employed how people, as
13 of, say, 2007?  Do you remember?
14 A   I don't recall.
15 Q   Approximately?
16 A   I don't recall.  It wasn't in the hundreds, but I don't
17 recall.
18 Q   It was about 180, wasn't it?
19 A   That sounds about right.
20 Q   And of the 180, how many were involved in the IA
21 business?
22 A   There were approximately, I think eight to ten people.
23 Q   Eight to ten people.
24 A   Correct.
25 Q   So, of the 180, 170 were involved in the, what you call

Page 152

1 the prop trading, right?
2 A   I would agree with you, yes.
3 Q   Either traders or support personnel.
4 A   Correct.
5 Q   And is it your testimony that there was anything
6 illegal about the prop trading business?
7 A   Well, I'm not here to give a legal opinion on what was
8 illegal or not but certainly the funneling of money from the
9 IA business into the prop trading business, and then
10 falsifying reports to regulators based on that, it certainly
11 would be wrong and probably would rise to somebody
12 determining it was illegal.
13 Q   Now, you testified that the only use of the investment
14 advisory customer's money, according to your analysis, was
15 that it was used to pay customers who were asking for
16 withdrawals.
17 A   Correct.
18 Q   And then I think your testimony was that that was all
19 it was used for.  It was either used to invest in overnight
20 funds at JP Morgan Chase, right?
21 A   Correct.
22 Q   Or it was used to fund withdrawals, right?
23 A   No.  I think my testimony also said it was used to fund
24 purchases of certain treasuries in brokerage accounts in the
25 IA business, side of the business.  I think I talked about

Page 153

1 all three of those.
2 Q   Well, when you say in brokerage accounts, what
3 brokerage accounts are you referring to?
4 A   There were six or eight other brokerage accounts
5 that were located during this time period, the 2000 to 2008
6 time period, where there were certain treasuries that were
7 being purchased.  Money was being taken out of the 703
8 account, Your Honor, over to those brokerage accounts.
9 These are at other wire houses.  And treasuries were
10 purchased in those accounts and then liquidated at various
11 times.
12 Q   Now, I typed word verbatim what you said this morning
13 on direct examination, and you said that you, quote,
14 "Scoured every bank record and didn't find any other use of
15 customer funds other than payments to customers and bank
16 sweeps at night at JPMC."  That was your testimony this
17 morning.
18 A   If that's what you typed down.  I think I also
19 testified this morning that three was money for other
20 treasuries and brokerage accounts.
21 Q   Well, I think the record will show that that isn't what
22 you testified.  But in any event, you're now telling us that
23 you're aware that there were approximately eight accounts at
24 which Madoff was using investment advisory customers' money
25 to purchase T bills.  Isn't that true?

39 (Pages 150 - 153)

Page 154

1 A   That is correct, yes.

2 Q   Okay.  And those accounts included Lehman Brothers.

3 A   Correct.

4 Q   Bear Sterns.

5 A   That's correct.

6 Q   JP Morgan Chase.

7 A   Correct.

8 Q   Morgan Stanley.

9 A   There was a Morgan Stanley account, yes.

10 Q   Right.  Now, a lot of those precise T bills were listed

11 on the Nelson statements.  You know that, don't you?

12 A   I don't know that.  I've never done that analysis to

13 see if those were listed on the Nelson statements.  The

14 analysis that I have done looked in total across client

15 statements.

16 Q   Okay.  You know, there are three accounts at issue

17 here, right, for the Nelsons?

18 A   Yes, that's my understanding.

19 Q   Okay.  Roy, can you pull up, please, Exhibit DX-EG.

20 And can you go to page two, please?  Did you look at

21 documents like this?  Did you review, for example, the

22 Lehman account statements?

23 A   I've seen these documents, yes.

24 Q   Okay.  And you recall that these were investments of

25 securities that were made with investment advisory

Page 155

1 customers' money, right?

2 A   There was money taken out of the 703 account,

3 transferred to these accounts, these various accounts, and

4 then these securities were purchased, yes.

5 Q   Okay.  So, this shows that this is dated ... just one

6 second ... you know what, I've confused myself on this.

7      THE COURT:  It's July 2002 according to the

8 exhibit.

9      MS. CHAITMAN:  Right.  Right.  Hold on one second.

10 I just have to find that document.  Hold on one second.  I'm

11 sorry.  You know what, I'm going to start with a different

12 one -- I'm sorry -- because I can't find the other documents

13 with respect to that.  Would you please, Roy, pull up

14 Exhibit DX-BJ; is that the one I just asked you for?  Okay.

15 How about -- oh, you know what, here's the problem.  Can you

16 go to Bates No. 2000 -- 20042-43 in that document?

17      MR. HUNT:  Sorry.  I was just going to say, while

18 she's looking for that record where she indicated a minute

19 ago that she is reading verbatim from the transcript about

20 (indiscernible).  I just wanted to point out that was -- her

21 reading was not correct.

22      THE COURT:  Well, the record will speak for

23 itself.

24      MR. HUNT:  I agree.

25      MS. CHAITMAN:  Okay.

Page 156

1      THE COURT:  This is BGO-51 you put on the screen

2 there in the upper left-hand corner?

3      MS. CHAITMAN:  DX-BG, and then DXBG is a

4 collection of documents.  This is Bates numbered JPMSAA-

5 0020042-43.

6      THE COURT:  This is what was an exhibit, though.

7      MS. CHAITMAN:  Yes.

8      THE COURT:  What exhibit is this?

9      MS. CHAITMAN:  It's Exhibit DX-BG, which is a

10 collection of these documents.

11      THE COURT:  Okay, but that's your marking for the

12 DX-BG?

13      MS. CHAITMAN:  Yes, DX-BG.

14 Q   Okay.  So can you see on this that on June 12th,

15 there's a trade date at the very top which says, UST Bills.

16 Do you see that?

17 A   There are mult- -- oh, right there?  Yes, I see that.

18 Q   Yeah.  Do you see there's a purchase of $50 million?

19 There are a bunch of them; do you see that?

20 A   I do.

21 Q   It's six $50 million purchases of T-bills?

22 A   I see that.

23 Q   Okay.  And that's a T-bill maturing on September 11th,

24 2008; do you see that?

25 A   That's correct.

Page 157

1 Q   Okay.

2      MS. CHAITMAN:  And now if you'd be good enough,

3 Roy, to pull up Exhibit DG -- DX-GX, G as in George --

4 excuse me -- DX-GZ, and then the Bates no. ends in 98099.

5 Okay, that's it.

6 Q   This is the --

7      MS. CHAITMAN:  Oh, excuse me.  I'm sorry, Judge.

8 I'm driving everybody crazy.  I have to go back, Roy, it'll

9 kill me.  In the same exhibit, I need Bates No. 2003-A.

10 Q   Okay.  So this shows that on May 12th, do you see where

11 it says May 12th for the trade date?

12 A   I see one category, yes.

13 Q   Okay.  And then underneath there -- one, two,

14 three, four, five -- six entries of $50 million purchases of

15 the T-bill maturing September 18th, 2008?

16 A   I see that, yes.

17 Q   Okay.  And now can you go back to that account

18 statement, which was -- it's in DX-GZ and it ends 598099.

19 Okay.  And do you see that this shows on May 27th -- so the

20 purchase was on May 12th, this is on May 27th.  Do you see

21 that there's a credit to the Nelson's account no. 265-3-0?

22 A   Yes.

23 Q   And it's for $894,645?

24 A   Yes.

25 Q   Okay.  So this is Madoff's purchase using 703 account

40 (Pages 154 - 157)

Page 158

1 money of a T -- of a huge position of T-bills, and this is
2 credited to the Nelson's account.  Do you see that?
3 A  I disagree with you.  I see what you're saying, but I
4 disagree with what you're saying.
5 Q  Okay.  In the course of the years of your involvement
6 in this case, did any Madoff employee explain to you why the
7 exact T-bill, which Madoff indisputably purchased with
8 investment advisor customer's money, showed up on --
9     MR. HUNT:  Your Honor, I object to her
10 mischaracterization of that.
11     THE COURT:  Why don't you just ask the question.
12 Q  Shows up on the Nelson's statement.
13     THE COURT:  Rephrase the question because there
14 was an objection.
15     MS. CHAITMAN:  Okay.
16     THE COURT:  Without the introduction.
17 Q  In the years of your investigation in this case, did
18 any Madoff former employee ever explain to you how it
19 happened that that specific T-bill was listed as an asset on
20 the Nelson's statement 265-3-0 as of May 31, 2008?
21 A  So first of all, I've never spoken to any Madoff
22 employee.
23 Q  Okay, then that's the -- that's -- you've answered my
24 question.
25 A  Okay.

Page 159

1     MS. CHAITMAN:  Judge, I  have a huge volume of
2 these.  I can go through them with the witness.  It's going
3 to be the same question.  We're going to get smoother about
4 presenting them, but do you --
5     THE COURT:  I don't know the best way to do it.
6 Did you ever compare BLMIS's purchases of T-bills from one
7 of these brokerage firms with the entries on customer
8 statements to see if it purported to show that the T-bill
9 was allocated to that customer?
10     MR. DUBINSKY:  In the report that I issued that we
11 have in front of us, I did not.  There was a subsequent
12 report that was issued in January 2019 where I did that
13 analysis and concluded that they did not match up.  I've
14 gone through all of the brokerage accounts in that report.
15     THE COURT:  Is that because you -- well, okay.
16     MS. CHAITMAN:  Well, I would object to that, Your
17 Honor.  Even though you elicited the answer, we don't have
18 the benefit in this case of an expert report that was done a
19 few months ago.
20     THE COURT:  That's true.
21     MS. CHAITMAN:  So, and I haven't had an
22 opportunity to analyze it.  I'm prepared to go through
23 about, I think it's about 50 or more transactions where I
24 can match up a statement --
25     MR. HUNT:  Your Honor, counsel's testifying.

Page 160

1     THE COURT:  Well, I guess maybe the simple -- he's
2 not going to testify to any allocation.  And I think we
3 discussed this at the beginning and maybe the simplest way,
4 so there is no dispute regarding business records, is you
5 show a J.P. Morgan brokerage purchase of T-bills and a
6 corresponding entry in a Nelson account statement and you
7 argue, I guess, that that was an actual allocation of that,
8 a portion of that purchase there.
9     MS. CHAITMAN:  Okay.
10     THE COURT:  And you can do it with a chart.
11     MS. CHAITMAN:  Okay.
12     THE COURT:  And just, if you do it with a chart,
13 just identify the exhibits so they can be checked.
14     MS. CHAITMAN:  Okay.  All right, I'll do it that
15 way.
16     THE COURT:  All right.  Unless you think that
17 there's some benefit to taking this witness through your 50
18 examples.
19     MS. CHAITMAN:  I think he's given us his knowledge
20 on this subject.
21     THE COURT:  Your case to try.
22     MS. CHAITMAN:  We'll be submitting all that
23 information with our post-trial brief, Your Honor.
24 Q  Now, you've testified this afternoon that 703 account
25 money was used to fund the, what you call the prop trading

Page 161

1 activities; isn't that true?
2 A  Correct, yes.
3 Q  And it was hundreds and hundreds of millions of dollars
4 just since 2000 that was transferred from the 703 accounts
5 to the Bank of New York account, which was used exclusively
6 for the market making and proprietary trading activities;
7 isn't that true?
8 A  Well, it went into that bank account.  I've never
9 traced to what it was used for.  It was used, presumably
10 there were salaries being paid.  Mr. Madoff's yacht was
11 being paid out of there.  There were a lot of things --
12 office rent, houses -- a lot of things the money was used
13 for.
14 Q  And all of the securities that the traders were
15 purchasing.
16 A  It could have been.  Once it's comingled, there's no
17 way to determine what it's used for at that point.
18 Q  Right.
19 A  All I know, it was taken from the 703 account
20 improperly, put over to the prop trading business.
21 Q  Right.  And how much money in total just from -- in the
22 period from 2000 through 2008, how much money in total was
23 transferred from the 703 account, which was exclusively
24 investment advisory customers money, to the Bank of New York
25 account, which was exclusively prop trading?

41 (Pages 158 - 161)

Page 162

1  A   I'd have to check the numbers, about $700 or $800
2  million.
3  Q   Right.  Now, the -- what you call the prop trading
4  business, the market making business was a huge, huge
5  business, wasn't it?
6  A   At one point, it was, yes.
7  Q   Okay.  And at one point, you know that Madoff conducted
8  trades equal to approximately 10 percent of the daily volume
9  on the New York Stock Exchange.
10 A   I've seen anecdotal evidence to that, but I don't know
11 for a fact.
12 Q   Okay.  You never did an analysis, say, for example, in
13 2000 or any time between 2000 and 2008, so you never did an
14 analysis of the prop trading, the volume of prop trading as
15 compared to other firms?
16 A   No, I didn't.
17 Q   Okay.  But did you ever investigate who the customers
18 of the market making unit were?
19 A   I didn't investigate.  There were documents with
20 customer names, institutional clients, other banks, other
21 customers.  But beyond that, I didn't do an in-depth
22 investigation into that side of the business for that
23 purpose.
24 Q   But it's fair to say, is it not, that the market making
25 unit did business with all of the major financial firms in

Page 163

1  the United States?
2  A   I don't know about all of them.  It did business with
3  quite a few major financial firms at that time period.
4        MS. CHAITMAN:  Now if your computer person would
5  be good enough to pull up Exhibit 37 that you used this
6  morning.
7        MR. HUNT:  We're not connected.
8        MS. CHAITMAN:  We're not connected.
9        MR. HUNT:  I guess disconnected us.
10       MS. CHAITMAN:  Do you have the Trustee's exhibits,
11 Your Honor?  No.  Can I have your copy of Exhibit 37?
12       THE COURT:  Some of the exhibits are in the report
13 where the charts are in the report.
14       MS. CHAITMAN:  Yeah, let me just find that.  So
15 Exhibit 37, do you know what page it's on?
16       MR. HUNT:  It's Figure 39 in his report.
17       THE COURT:  What page is that?
18       MS. CHAITMAN:  Oh, okay.  Let me do it the old-
19 fashioned way.
20 Q   Can you see this?
21 A   Yes, I can see that.
22       THE COURT:  What page is that in the report?
23       MR. HUNT:  It's on Figure --
24       MR. DUBINSKY:  Page 121, Your Honor.
25       THE COURT:  Thank you.

Page 164

1  Q   Okay.  So this is what you were testifying about what
2  the use of investment advisor customers money was, right?
3  A   Correct.
4  Q   Okay.  And where on this chart did you indicate that
5  $700 or $800 million was transferred to the BNY account for
6  the purchase of -- for the general use of the prop trading,
7  as you call it?
8  A   That's not on there.  This chart was showing that the
9  source of incoming funds, as an output, I was looking at
10 what -- where the customer money came from.  So I tried to
11 isolate the incoming inbound money into the IA business to
12 eliminate potential other sources of financing, other
13 sources of business, so it wasn't focused on how the IA
14 business spent their money.
15       MS. CHAITMAN:  Now, do you have a chart for 39,
16 Exhibit 39?  Where is that in here, can you tell me?  Is
17 this it?
18       MR. HUNT:  No.
19       MS. CHAITMAN:  Oh, can you show me?
20       MR. HUNT:  What are you looking for?
21       MS. CHAITMAN:  Figure 39.
22       THE COURT:  You know, it's on Page 82.
23       MS. CHAITMAN:  Okay, thank you.
24 Q   Now in your experience with respect to Ponzi schemes,
25 putting aside the Madoff case, what was the longest existing

Page 165

1  Ponzi scheme that you were paid to understand?
2  A   It would either be a case called DBSI -- was hired by
3  the Department of Justice, it was a real estate Ponzi out of
4  Idaho -- or the First Pay case.  The First Pay case, I
5  think, went for 10 years and the DBSI may have been 10 or 12
6  years, but in that range.
7  Q   Okay.  In your experience, have you ever been involved
8  in analyzing a Ponzi scheme that went on from -- maybe
9  50 years?
10 A   No, I have not.
11 Q   Okay.
12 A   This is pretty unique in that regard.
13 Q   Okay.  In fact, the whole concept of a Ponzi scheme is
14 that it can't last -- it can't survive for a long time
15 because it doesn't have the economic viability; isn't that
16 true?
17 A   Well, at some point, there's going to be a choke point
18 where it goes out of business or a run on the bank, but they
19 can go for a while.
20 Q   Now, you testified that you saw no evidence of any
21 income earned on investment advisory customers money.  But
22 now you've acknowledged that you were aware that money was
23 taken from the 703 accounts and invested in T-bills, right?
24 A   Well, let me correct that, the two things.  I've always
25 been aware that money left the 703 to be invested.  I think

42 (Pages 162 - 165)

Page 166

1 what I testified to is no money was made in the investment
2 advisory customer accounts on the purported trades that were
3 promised to them.
4 Q    So you're not -- you weren't -- you didn't seek to
5 convince Judge Bernstein that money hadn't been made on the
6 investment advisory customers money to the extent that it
7 was invested in T-bills.
8 A    I'm not sure I understand your question.
9 Q    Isn't it a fact, Mr. Dubinsky, that the T-bill
10 investments that Mr. Madoff made with investment advisory
11 customers money earned interest?
12 A    Are you talking about the overnight sweeps?
13 Q    No, I'm not.  I'm talking about the eight or nine firms
14 that you've acknowledged that Madoff purchased T-bills
15 through with investment advisory customers money.
16 A    So --
17 Q    And those T-bills paid interest, right?
18 A    Those T-bills paid interest.  I don't know when you
19 said whether they made money, I don't know.  I didn't
20 analyze that because, depending on when you buy them at par
21 or below par and the interest that you collect with accrued
22 interest.  And then when you sell them, you may make money,
23 you may not.  I did acknowledge, and I said during my
24 direct, money was used from the 703 for the overnight sweep.
25 I said that earned interest.  That was a way to kind of keep

Page 167

1 enough money in the Ponzi to add more to the pot.  And I
2 acknowledged that money was taken from the 703 to be used
3 where Mr. Madoff purchased or somebody in BLMIS purchased
4 additional treasuries.
5 Q    Okay.  And those treasuries paid interest, right, and
6 they also could have appreciated in value depending on what
7 happened with interest rates during the period that Mr.
8 Madoff held them.
9 A    Or conversely, gone down in value, yes.
10 Q    Right.  And to the extent that those treasuries were
11 allocated to the Nelsons and they appreciated in value, that
12 was --
13     MR. HUNT:  Objection, Your Honor.  He's already
14 testified he didn't do that exercise.  She just said she's
15 going to --
16     THE COURT:  Well, she just -- overruled, she can
17 ask him the question.  Go ahead.
18     MR. HUNT:  She said she's going to do that by
19 paper.
20     THE COURT:  Overruled.
21 Q    To the extent that the Nelson's accounts were credited
22 with T-bills that we can prove that Mr. Madoff owned at the
23 time they were credited --
24     THE COURT:  Ms. Chaitman, just ask him a question.
25 Don't load it with all that.

Page 168

1     MS. CHAITMAN:  Okay.
2     THE COURT:  Okay.
3 Q    Isn't it a fact that if a customer was credited with a
4 T-bill which appreciated during the period of the customer's
5 ownership, that the customer is entitled to that
6 appreciation?
7 A    I disagree with you.
8 Q    Now, is it your testimony that the market making part
9 of Madoff's business was a Ponzi scheme?
10 A    No, I did not issue that opinion.
11 Q    Okay.  And is it your testimony that the proprietary
12 trading part of the business was a Ponzi scheme?
13 A    No, I did not issue that opinion.
14 Q    Okay.  So out of the whole operation of 180 or so
15 employees, it's 8 to 10 employees who, in your opinion, were
16 involved in a Ponzi scheme; is that right?
17 A    That's correct.
18 Q    Okay.  Now, are you aware that the Nelsons never sent a
19 check payable to Bernard L. Madoff Investment Securities,
20 LLC?
21 A    I don't know one way or the other.
22 Q    Okay.  And are you aware that every check that the
23 Nelsons received was from an account in the name of Bernard
24 L. Madoff, that they never received a check from the LLC?
25     MR. HUNT:  Objection, Your Honor.  That

Page 169

1 mischaracterizes the document.
2     THE COURT:  Well, yeah, I think there's an
3 assumption in there, which is an issue in another one of
4 these cases.  If you want to ask him, is he aware that they
5 received a check that had Bernard Madoff's name on it, you
6 can ask him that.  Whose account it was, though, is a
7 different issue.  Was the 703 account, if you know, an
8 account in the name held by Bernard Madoff individually or
9 in the name of BLMIS?
10     MR. DUBINSKY:  BLMIS, Your Honor.
11 Q    It was in the name of Bernard L. Madoff Investment
12 Securities, but it was never -- was it ever in the name of
13 the LLC?
14 A    Are you talking about the actual check or the account
15 itself?
16 Q    Let's take them one at a time.
17 A    Okay.
18 Q    Do you agree that the checks from the 703 account was -
19 - well, excuse me, they weren't checks.
20     MR. HUNT:  Your Honor, there were no checks coming
21 from the 703 account.
22     MS. CHAITMAN:  I do.  I'm correcting that.
23 Q    The BLMIS account statements did not list the LLC.
24 A    You mean the word LLC, the three letters?
25 Q    Yes, yes.

43 (Pages 166 - 169)

Page 170

1  A    I'd have to look at one.  I don't recall.

2  Q    Okay.  And are you aware that no one from Madoff's

3  offices ever notified J.P. Morgan Chase to change the name

4  of the 703 account when the LLC was formed in 2001?

5  A    I don't know one way or the other.

6  Q    Okay.

7         MS. CHAITMAN:  Can you, Roy, pull up DXD and DXE?

8  You know what?  Just go to DXE, that's going to be too hard

9  to look at.

10  Q    Okay.  This is a statement dated December 1, 2000, and

11  you can see this was before Madoff formed BLMIS LLC, right?

12  A    That's correct.  It was turned into an LLC I believe in

13  January 2001.

14  Q    Okay.

15         MS. CHAITMAN:  Can you scroll through and get to a

16  page which has a January 2001 or a February 2001 statement,

17  please?  Okay, well, you know what?  Go back to that.

18  Q    This is December 2004; do you see this?

19  A    I see this.

20  Q    And can you read to the Judge what the name of the

21  account is?

22  A    It now says Bernard L. Madoff Investment Securities.

23  Q    It doesn't say LLC, does it?

24  A    No, it does not have the word LLC on there or the

25  letters LLC.  It's changed because the one you showed me

Page 171

1  earlier just said Bernard L. Madoff.  Now this one says

2  Bernard L. Madoff Investment Securities.

3  Q    Okay.

4         MS. CHAITMAN:  Can you go to the next year?

5  Q    Okay.  This is December 2005.  It doesn't say LLC on

6  the account, does it?

7  A    I agree with you it does not.

8  Q    Okay.

9         MS. CHAITMAN:  Can you go to 2006?

10  Q    Doesn't say LLC on December 2006, does it?

11  A    It does not.

12  Q    Okay.

13         MS. CHAITMAN:  Can you go to 2007?

14  Q    It doesn't say LLC on 2007, does it, December 2007?

15  A    I would agree with you, yes, does not.

16  Q    Okay.

17         MS. CHAITMAN:  Can you go to any statements we

18  have in 2008?

19  Q    Okay.  This is December -- November 29th to December

20  31, 2008.  Do you see it says Bernard L. Madoff Investment

21  Securities?

22  A    I see that.

23  Q    Okay.  So in the entire period applicable to the case

24  against the Nelsons, J.P. Morgan Chase never issued a

25  statement in the name of the LLC; isn't that true?

Page 172

1  A    Well, you showed me a statement that first started as

2  Bernard L. Madoff when it was a sole proprietor.  Then we

3  both agreed that it became an LLC in January of 2001.

4  There's then a name change on the J.P. Morgan Chase

5  statements that then says Bernard L. Madoff Investment

6  Securities; that certainly wouldn't be an individual.  But I

7  agree with you it does not say the letters LLC on any of

8  these.

9  Q    You're aware, are you not, that Mr. Madoff used the

10  trade name Bernard L. Madoff Investment Securities prior to

11  his formation of the LLC?

12  A    Yes.  I saw it on many documents, yes.

13  Q    Okay.  And, in fact, we just pulled up something, DX-X,

14  which is dated December 19th, 1996.  And do you see that

15  even as far back as December 1996, he was using Bernard L.

16  Madoff Investment Securities?

17  A    I see that, yes.

18  Q    So that was really just a trade name that he used,

19  right?

20         MR. HUNT:  Objection, Your Honor.  This witness is

21  not qualified to talk about trade names, corporate

22  structure.

23  Q    You know the difference between a trade name and an

24  LLC, don't you?

25         THE COURT:  Well, there's an objection.  Do you

Page 173

1  know how Madoff used Bernard L. Madoff Securities before it

2  became an LLC?

3         MR. DUBINSKY:  It was on documents before it

4  became an LLC.  I don't know beyond what intent he used it

5  for, anything beyond that.  It was on documents.

6  Q    Okay.  Can you -- well, in fact, this is the top of a

7  check.  See, it says CW check?

8  A    Yes.

9         THE COURT:  Doesn't it say what it says?  It's in

10  evidence, I take it.

11         MS. CHAITMAN:  Yeah.

12         THE COURT:  You can argue that --

13         MS. CHAITMAN:  Okay.  And if you can just scroll--

14         THE COURT:  But that's the name that was used.

15         MS. CHAITMAN:  I'm sorry, Judge.  If you can just

16  scroll through the other pages of this document, Roy.  Thank

17  you.

18  Q    In the course of your work, Mr. Dubinsky, you came

19  across a lot of documents like this, which had the trade

20  name, but not the LLC name.  And it was on the checks, the

21  top part of the checks, wasn't it?

22  A    What was, the trade name?

23  Q    The trade name.

24  A    As you're depicting it, yes, it was.

25  Q    Okay.  And are you able to tell the Judge whether

44 (Pages 170 - 173)

Page 174

1  you've ever seen a check made out to the Nelsons which was
2  from the LLC, which actually said Bernard L. Madoff
3  Investment Securities, LLC?
4  A    I didn't.  I didn't drill down into the specific Nelson
5  account.  My work was overall across all of the accounts,
6  Your Honor, so I didn't specifically look at those checks.
7  Q    We've put up DX-HW, and this is a deposit.  This is
8  dated March 2002 after the LLC was formed; but, in fact, the
9  Nelsons sent the money to Bernard Madoff Securities.  Do you
10  see that; it was a $300,000 check?
11  A    That's what the check is made out to, yes, for 300,000,
12  yes.
13  Q    Okay.
14        MR. HUNT:  Your Honor, just Mr. Dubinsky has
15  testified he hasn't looked at any of the individual
16  accounts.
17        THE COURT:  Yeah, I'll sustain.  I think that
18  these questions may be better directed to Miss Collura or
19  Mr. Greenblatt.  He didn't drill down into the individual
20  accounts.
21        MS. CHAITMAN:  Okay.
22        THE COURT:  And they say what they say, you know?
23  Your clients made them out however they made them out.
24  Q    Now, you know, don't you, that Frank DiPascali had a
25  Bloomberg terminal on his desk?

Page 175

1  A    Yes.
2  Q    And he used it, right?
3  A    To look up prices, yes, that's my understanding.
4  Q    Well, he used it to trade, didn't he?
5  A    It's not my understanding, no.  It was used to look up
6  prices, to back date trades, purported trades, to obtain
7  historical information, post-facto information.
8  Q    Okay.  And who was it, to your understanding, that
9  handled the purchases of T-bills at the seven or eight
10  accounts that you've acknowledged purchased T-bills from
11  Madoff?
12  A    I don't know for a fact.  I recall that Mr. DiPascali
13  testified he would call the brokers and place a trade
14  through the brokers, I think to those brokerage accounts.  I
15  don't know if he did it all the time or if others were
16  involved, but I recall in the criminal case, he testified to
17  that.
18  Q    Okay.  Now, you opined in your report that the
19  convertible bond arbitrage trading was not accurately
20  reflected by the statements; isn't that true?
21  A    I testified it didn't happen.  But I don't think they
22  were in -- in the time period we're talking about in this
23  case for your client, I don't believe there was any
24  convertible arbitrage; it was all splits strike conversion.
25  Q    Right, right.  But you, in fact, analyzed the

Page 176

1  convertible bond trading by going to the New York Stock
2  Exchange records --
3  A    Correct.
4  Q    -- didn't you?  And you concluded that one of the
5  reasons you felt that the statements were fraudulent was
6  that the volume of trades, according to the New York Stock
7  Exchange, was less than the volume of the same -- of trades
8  in those securities, right?
9  A    Correct.
10  Q    And then  you changed that opinion in your later report
11  because Mr. Madoff pointed out that the trading wasn't done
12  through the New York Stock Exchange; isn't that true?
13  A    No, I didn't change the opinion.
14        THE COURT:  Are you asking you questions about
15  what his later report says?
16        MS. CHAITMAN:  I'm asking --
17        THE COURT:  Because you've objected to what --
18        MS. CHAITMAN:  Right, but I'm asking him, he made
19  several errors in his report, and I want to bring that
20  evidence out.
21        THE COURT:  Which shouldn't he be entitled to
22  testify about that report then?  I don't have the report
23  before me.
24        MS. CHAITMAN:  We don't need to go to the report.
25  We can do it a different way.

Page 177

1        MR. HUNT:  Your Honor, I would concur that she's
2  asking about the report that has been issued that's not part
3  of this case.
4        THE COURT:  We can deal with it on redirect.
5  Q    Isn't it a fact that you now know that most convertible
6  bond trading was done on -- was done in New York by the
7  counter market?
8  A    I knew at the time as well when I issued this report;
9  there's a footnote in the report that explains that.  And
10  there was additional analysis done post-facto because either
11  you or somebody had raised the criticism of that.
12  Q    Right.  Now, did you look to see what accounts Madoff
13  had safekeeping arrangements with, what banks he had
14  safekeeping arrangements with?
15        THE COURT:  What do you mean by that?
16  Q    Well, you testified that in trying to analyze Madoff's
17  stock and T-bill position, you went only to the DTC records.
18  A    Correct.
19  Q    But isn't a fact that Mr. Madoff also kept securities
20  with financial institutions from which he bought them?
21  A    As in the eight brokerage accounts, yes.
22  Q    Yes.  And you didn't -- you didn't calculate the
23  securities that he had in those brokerage accounts; isn't
24  that true?
25  A    The securities in those brokerage accounts were for the

45 (Pages 174 - 177)

Page 178

1 prop trading business. And those were accounted for in the
2 DTC because those records, even if somebody -- the DTC
3 records the trade of the equity. And so they would have
4 been there as I went through on the prop trading, whether he
5 held them, in custody of them, or they were with somebody
6 else, they would have been recorded. On the IA business,
7 those records didn't exist. We've talked about the eight
8 brokerage accounts, but as I said, even if you add up all
9 the treasuries in those eight brokerage accounts, they're
10 woefully short of what Mr. Madoff or BLMIS was showing on a
11 customer statements for a particular day for all of the
12 treasuries.
13 Q   Right. But you're aware, are you not, that in this
14 case -- and, in fact, in other cases -- the Trustee has
15 refused to produce the documents he made available to you;
16 that is, we have not been permitted to see account
17 statements of non-clients.
18     MR. HUNT: Objection.
19 Q   You're testifying to something.
20     MR. HUNT: She's testifying about discovery.
21     THE COURT: Sustained. Just as the question.
22 Q   Now, are you familiar with the term Madoff exemption?
23 A   Yes.
24 Q   What does it mean?
25 A   It was an exemption with the SEC for what's called

Page 179

1 naked short shelling.
2 Q   Okay. And you know that a market making, under that
3 exemption, had the right to sell unlimited shorts.
4 A   And then had to close them out within 13 days, that's
5 correct.
6 Q   Okay.
7     MS. CHAITMAN: I have no further questions, Your
8 Honor.
9     THE COURT: Redirect?
10     MR. HUNT: No redirect, Your Honor.
11     THE COURT: You can step down. Thank you very
12 much.
13     MR. DUBINSKY: Thank you, Your Honor.
14     THE COURT: Call your next witness, please.
15     MR. HUNT: And would it be possible to get a 10-
16 minute break?
17     THE COURT: Okay. We can only go until about 5:00
18 today.
19     MR. HUNT: We can put on Miss Collura next.
20     THE COURT: Just to talk about the schedule. I
21 can continue tomorrow afternoon and then all of Friday.
22     MR. HUNT: Okay.
23     THE COURT: All right? 10 minutes.
24     MS. CHAITMAN: And tomorrow afternoon starting at
25 2:00?

Page 180

1     THE COURT: 2:00, and then we can go as long as we
2 want.
3     (Recess)
4     CLERK: Please be seated.
5     THE COURT: Could you raise your right hand,
6 please? Do you solemnly swear that the testimony you're
7 about to give will be the truth?
8     MS. COLLURA: I do.
9     THE COURT: Okay. Please state your name. I
10 don't know if it was stated.
11     MS. COLLURA: Lisa Collura.
12     THE COURT: Thank you.
13 [WITNESS LILSA COLLURA SWORN IN]
14     MR. HUNT: Your Honor, I have a binder of exhibits
15 that are demonstrative exhibits for counsel.
16     THE COURT: Thank you. Do you have an extra one
17 for my clerk? If not, he'll tough it out.
18     MR. HUNT: Okay. I guess just to clarify, and it
19 seems like we're making good time here, you want to just
20 move all exhibits in?
21     THE COURT: I think that probably makes sense.
22     MS. CHAITMAN: And just to, if I may, just on that
23 issue, Your Honor. We have a lot of exhibits, some of which
24 we started with where we have a hundred of the same document
25 but a different time period.

Page 181

1     THE COURT: Is there a dispute regarding the
2 authenticity or the admissibility of the documents? I don't
3 know what they are.
4     MR. HUNT: I don't have a dispute on the
5 authenticity of the Debtors' books and records, Your Honor.
6     THE COURT: Are there any DTC records or anything
7 like that?
8     MR. HUNT: As far as I know, we've got he Debtors'
9 books and records, the third-party bank records, which we
10 got from their accountant.
11     THE COURT: I just want to make sure that after
12 the evidence is closed, we don't have a problem with
13 authentication or something like that, for which we would
14 need a witness.
15     MS. CHAITMAN: All right. I mean, what I have,
16 for example, are like the checks that were sent out by
17 Madoff.
18     THE COURT: If they're checks on the Madoff
19 account, I don't know if there's any disputes at issue.
20     MS. CHAITMAN: Right, right, okay.
21     MR. HUNT: But there are, you know, there are a
22 lot of books and records that we've reviewed that Mr.
23 Dubinsky testified about.
24     THE COURT: Why don't we complete the evidence.
25 It doesn't sound like there's going to be a dispute. If you

46 (Pages 178 - 181)

Page 182

1 think there's going to be an issue regarding authentication
2 or hearsay -- the business records, for example -- you'll
3 have to do it through the witnesses.
4        MR. HUNT:  I would also ask if we could go ahead
5 and qualify Ms. Collura as an expert on forensic accounting?
6        THE COURT:  Any objection to her qualifications as
7 a forensic accountant?
8        MS. CHAITMAN:  No.
9        THE COURT:  She's qualified.  Go ahead.
10       MR. HUNT:  Thank you, Your Honor.
11          DIRECT EXAMINATION OF LISA COLLURA
12 BY MR. HUNT:
13 Q   Good afternoon.
14 A   Hello.
15 Q   Let me ask you what your job was for the BLMIS
16 engagement; what did you do?
17 A   So my job was specifically to focus on looking at the
18 cash transactions that appeared on the customer statements
19 of the BLMIS IA business customers and reconcile those cash
20 transactions to available records.  In addition to
21 reconciliation, part of my responsivity was to trace
22 transactions from BLMIS to other bank accounts, bank
23 accounts held by the defendants or other account holders.
24 Q   If you could turn to Exhibit 3 in your demonstrative
25 binder.  I'll ask you if you can use that to help explain

Page 183

1 those concepts for us a bit.
2 A   This isn't -- the one in here, 3?
3 Q   Yes.
4 A   This one, this one is 4, while 3 is here.  Okay.  Then
5 4 is missing, okay.
6 Q   We've got the tab situation taken care of for a moment,
7 please.
8 A   Great.
9 Q   If you could look at Exhibit 3 and specifically turning
10 to the reconciliation portion of your work, could you
11 explain to us what you mean when you say reconciliation?
12 A   For reconciliation, it's when I match customer cash
13 transactions that were reflected on customer statements to
14 other evidence, and that other evidence included BLMIS bank
15 records, correspondence in BLMIS customer files, or
16 documents that were either produced to or received by the
17 Trustee.
18 Q   Did you reconcile to third-party records for each of
19 the customer accounts in the investment advisor business?
20 A   For all of the customer, BLMIS customer accounts, I
21 reconciled to third-party bank records that were available
22 to me.
23 Q   And did you do that for the Nelson accounts?
24 A   I did.
25 Q   You also say you traced the flow of funds.  Looking at

Page 184

1 Exhibit 3, can you help us walk through that concept?
2 A   So by traced, I mean when I'm following the flow of
3 funds from BLMIS to another bank account.  And so, for
4 purposes of this matter, I traced the cash withdrawals
5 during the two-year period.
6 Q   And you performed that for the Nelson accounts?
7 A   I did.
8 Q   What categories of BLMIS books and records did you
9 review to conduct the reconciliation and tracing analysis of
10 the BLMIS investment advisory accounts?
11 A   BLMIS bank records that were secured by the Trustee,
12 both in the Trustee's -- I'm sorry -- BLMIS' records, as
13 well as received by J.P. Morgan.  I also reviewed
14 correspondence that was included in BLMIS customer files,
15 the files that were maintained at BLMIS for each -- or many
16 of the BLMIS customers of the IA business.  And then lastly,
17 any documents that were produced to the Trustee in this
18 matter or were received by the Trustee related to the Nelson
19 accounts.
20 Q   Did you rely on any specific data that was documents on
21 the BLMIS investment advisory customer statements?
22 A   The cash transactions on those statements.
23 Q   Did FTI compile the information for you to complete
24 that analysis?
25 A   FTI did, yes.

Page 185

1 Q   How did you all do that?
2 A   So the cash transactions reflected on the customer
3 statements were noted by specific transaction types, and
4 they often had the word check or check wire, and those were
5 all accumulated in a chronological listing of cash
6 transactions for all BLMIS customers.
7 Q   How many transactions are we talking about for these
8 customer statements that you reconciled?
9 A   For the ones that I reconciled, there were over 227,000
10 cash transactions, either -- including both cash deposits
11 and cash withdrawals reflected on the customer statements
12 for the period that I performed my reconciliation analysis.
13 Q   Is that the type of record relied on in the ordinary
14 course by forensic accountants like yourself?
15 A   Bank records?
16 Q   Yes.
17 A   Yes, it is.
18 Q   What about the customer statements?
19 A   Yes.
20 Q   Based on your review of the BLMIS books and records,
21 did you find the investment advisory customer statements to
22 be reliable?
23 A   The cash transactions on those customer statements,
24 yes, were reliable.
25 Q   Do you have all of the customer statements for the

47 (Pages 182 - 185)

Page 186

1 three Nelson accounts?

2 A    Yes, I do.

3 Q    And you reviewed all of those.

4 A    I did.

5 Q    Let's turn now to another source of data that you

6 identified, third-party bank records with BLMIS.  Are third-

7 party bank records the type of information relied on by

8 forensic accountants while reconciling and tracing funds?

9 A    Yes, they are.

10 Q    Please explain what bank records you analyzed.

11 A    The bank records that I analyzed were related to the

12 bank accounts that were used by the IA business for cash

13 deposits and withdrawals to and from customers.  There were

14 three primary bank accounts that were used in the 10-year

15 period for which I had available bank records; two of those

16 accounts were at J.P. Morgan, and one of those accounts was

17 at Bankers Trust.

18 Q    Was one of the accounts the 703 account?

19 A    Yes, it was.

20 Q    What records did you review for the 703 account?

21 A    For the 703 account, I had available to me monthly bank

22 statements.  I had deposited checks that were deposited into

23 that account, along with many of the related deposit slips,

24 as well as any checks that were written off of the 703

25 account.  And the 703 account also had wire transfers, and

Page 187

1 there was a detailed file received by the Trustee that

2 included all of the information about the wire transfers for

3 a period of time, not the full 10-year period, but a period

4 of that time within the 10-year period.

5 Q    I was going to ask you what period you looked at.

6 A    We had available to us records from December 1998 to

7 December 2008; and, therefore, that's why I refer to it as

8 the 10-year period.

9 Q    Okay.  How about the BLMIS 509 account; did you review

10 bank records for that?

11 A    I did.

12 Q    What records did you look at for the 509 account?

13 A    For the 509 account, there were also monthly bank

14 statements for that account.  The primary record that I

15 reviewed for that account was the cancelled checks that were

16 written from the 509 account.

17 Q    What period did you analyze?

18 A    Again, December 1998 to December 2008.

19 Q    What BLMIS bank records did you review for the Bankers

20 Trust account?

21 A    For the Bankers Trust account, there were monthly bank

22 statements, some checks, although there weren't a lot of

23 checks written from that account.  But I think for Bankers

24 Trust, it was primarily the monthly bank statements.

25 Q    Was the Bankers Trust account involved in any of the

Page 188

1 transfers we're talking about here today?

2 A    No, it was not.

3 Q    If you could turn to Exhibit 4 in your binder, which --

4 A    It's here, it's here.

5 Q    Okay.  And describe for us, first of all, if you

6 prepared that exhibit.

7 A    I did.

8 Q    What records did you use to prepare it?

9 A    The bank statements and other bank records that I just

10 described.

11 Q    Okay.  Using Exhibit 4, demonstrative Exhibit 4 as a

12 guide, I want you to discuss how you -- what you concluded

13 about the flow of BLMIS customer funds.

14 A    So the cash deposits from BLMIS customers were

15 deposited into the 703 account, which is the first account

16 listed there in the middle in the blue boxes.  From the 703

17 account, there were wire transfers, as well as check --

18 excuse me, as well as checks that were sent to BLMIS

19 customers for -- to pay cash withdrawals.

20        The 703 account also funded a hundred percent the

21 509 account, which is another account at J.P. Morgan, which

22 is the middle one there in the blue boxes.  It, the 703

23 account also a hundred percent funded the Bankers Trust

24 account.  And the -- from both the 509 account and the

25 Bankers Trust account, there were checks that were sent to

Page 189

1 pay customers for their withdrawals that they took on their

2 customer accounts.

3 Q    Were there any wires or checks written to the Nelson

4 parties from the 703 account?

5 A    None from the 703 account, no.

6 Q    Okay.  Why is that?

7 A    The withdrawals taken by the Nelsons on their accounts

8 were in the form of checks that were sent from the 509

9 account, which again was a hundred percent funded by the 703

10 account.

11 Q    Where'd the money come for the 703 account again,

12 where'd it come from?

13 A    The customer deposits came into the 703 account.

14 Q    Anywhere else?

15 A    I'm sorry?

16 Q    Did it come from anywhere else into the 703 account?

17 A    Customer deposits?

18 Q    Yeah.

19 A    No, they only went into the 703 account.

20 Q    Okay.

21        THE COURT:  I think he was asking whether the 703

22 account received deposits from any source other than

23 customer funds.  Was that your question?

24        MR. HUNT:  Yes.

25        MS. COLLURA:  Oh, I'm sorry.

48 (Pages 186 - 189)

Page 190

1  A   Yes. So the majority of the funds into the 703 account

2  for that 10-year time period was direct -- from BLMIS

3  customers, directly from customers, about 97 percent. There

4  was 3 percent that weren't directly from customers, but it

5  was related to transactions with brokerage accounts that

6  were in the name of either BLMIS or Bernard L. Madoff; there

7  were transfers back and forth with those accounts. And the

8  3 percent is also comprised of interest that was earned on

9  the short-term investments that were made -- the overnight

10  sweeps, the CDs, commercial paper, and other short-term

11  investments that were made directly from the 703 account.

12  Q   What is a bank statement?

13  A   A bank statement is typically monthly. It's a monthly

14  statement that identifies the transactions in a particular

15  bank account on a daily basis.

16  Q   Did you review the bank statements for the 703 and 509

17  account?

18  A   I did.

19  Q   Do the bank statements for the 703 account and the 509

20  account show the interaction between the two accounts you

21  just described?

22  A   Yes, they do.

23  Q   If you could turn to demonstrative 5, please, and

24  identify the document on the left.

25  A   The document on the left is a monthly statement for the

Page 191

1  703 account for the month of November 2008.

2  Q   What's the source of that record?

3  A   That record was from J.P. Morgan.

4  Q   Now identify the record on the right, please.

5       MS. CHAITMAN: Could you bring those closer so we

6  can see them, so I can see them?

7       THE COURT: Don't you have at least the -- Miss

8  Chaitman, do you have at least the binder because they're

9  easier to see in the binder. Is this exhibit in the binder?

10      MR. HUNT: Yes.

11      THE COURT: Which number is it?

12      MR. HUNT: It's Exhibit 5 demonstrative. No, he's

13  got the wrong one up there.

14      MS. CHAITMAN: I have it in this.

15      MR. HUNT: It's demonstrative Exhibit 5.

16      THE COURT: That's not 5 that's just put up on the

17  -- you had it before.

18      MS. CHAITMAN: I don't have the one that's on the

19  screen.

20      THE COURT: That's fine. You have the wrong

21  exhibit on the screen, or at least it's not Exhibit 5.

22  That's Exhibit 5, all right, that's the correct one. Do you

23  have what you need?

24      MS. CHAITMAN: Now I do, thank you.

25      THE COURT: Okay.

Page 192

1  Q   If you could identify the document on the right,

2  please.

3  A   The document on the right is the monthly statement for

4  the 509 account for November 2008.

5  Q   Do these records relate to your analysis of the flow of

6  funds in the investment advisor business we just discussed?

7  A   Yes.

8  Q   Explain how, please.

9  A   So this -- these two statements show an example of, on

10  one day, particularly November 25th, 2008, where there was a

11  funding transfer from the 703 account to the 509 account.

12  On the left-hand side, you see the transaction dated

13  November 25th with the description, funding xfer or transfer

14  to lots of numbers and then it ends in 509, so that's the

15  509 account for $8,944,621.13.

16      On the right-hand side in the 509 account

17  statement, you see the corresponding receipt of that

18  transfer from the 703 account on the same date in the same

19  amount.

20  Q   Are you familiar with the term holder as it relates to

21  bank accounts?

22  A   I am.

23  Q   How is the term holder defined in the banking world?

24  A   The holder of the -- in a bank account is typically the

25  name that appears on the monthly statements.

Page 193

1  Q   If you could turn to Exhibit 6 in your binder and

2  identify the two documents on the left, please.

3  A   The documents on the left are two different bank

4  account monthly bank statements for the 703 account for the

5  month of August 2002 and then the month of September 2002.

6  Q   What's the source of these records?

7  A   These are from J.P. Morgan.

8  Q   How do you know these are account statements for the

9  703 account?

10  A   The 703 account number is the last three digits of the

11  account number that appears on the statement.

12  Q   Do the statements identify the holder of the account?

13  A   Yes. The name on the account for the August 2002

14  statement is Bernard L. Madoff.

15  Q   For both, for both accounts?

16  A   For both accounts. The statements on the right-hand

17  side are the same months, August 2002 and September 2002,

18  just for the 509 account.

19  Q   The documents below those are what?

20  A   Those are the statements for both the 703 account and

21  the 509 account for September 2002 for, again, the 703

22  account and the 509 account.

23  Q   Do these statements identify the holder?

24  A   Yes. In September of 2002, the holder of the account

25  became Bernard L. Madoff Investment Securities for both the

49 (Pages 190 - 193)

Page 194

1 703 account and the 509 account.

2 Q    Did you include that opinion in your report?

3 A    Yes.

4 Q    Where did it come up, where is it in your report?

5 A    It was in Exhibit 3 to my report.

6 Q    From the period September 2002 to the time that Mr.

7 Madoff was arrested, it was what entity was the holder of

8 the 703 account?

9 A    Bernard L. Madoff Investment Securities.

10 Q    For the period September 2002 through December 2008

11 when Mr. Madoff was arrested, what was the holder of the 509

12 account?

13 A    Bernard L. Madoff Investment Securities.

14 Q    With the name change in the corporate entity between

15 August and September 2002, did you see any differences in

16 the handling of the transactions reflected in the 703 or 509

17 accounts?

18 A    No.  The transactions in both of those accounts were

19 consistent, meaning they were cash in from customers and

20 withdrawals to customers, for the whole time period that I

21 had statements available to me, which was from back from

22 December 1998.

23 Q    Okay.  Let's go back and talk about reconciliation.

24 You said you did a global reconciliation.  And just refresh

25 my recollection what you did to do that.

Page 195

1 A    So the global reconciliation was when I took the cash

2 transactions that were reflected on the customer statements

3 for all customer accounts and reconciled those cash

4 transactions to the available BLMIS bank records, again,

5 that were available to me from December 1998 to December

6 2008.

7 Q    Why did you perform this, quote/unquote, global

8 reconciliation of the customer statements and bank records

9 for the BLMIS 703 and 509 accounts?

10 A    This was done to help determine whether or not the cash

11 transactions on the customer statements were accurately

12 reflected as cash transactions -- cash deposits or cash

13 withdrawals.

14 Q    How many transactions did you review?

15 A    On the customer statements, there was over 225,000 cash

16 transactions.  And on the bank records, I reviewed over

17 150,000 transactions on those bank records.

18 Q    How did you keep track of those transactions?

19 A    So we kept track of them, we assigned a unique

20 identifier to each of the cash transactions on the customer

21 statements.  We assigned a different unique identifying

22 number to all the transactions in the bank records.  And we

23 would match those when we reconciled one transaction on the

24 customer statements to one transaction on the bank records;

25 and, therefore, that avoided matching the same transaction

Page 196

1 twice.

2 Q    Is that a methodology that forensic accounts typically

3 use in this reconciliation process?

4 A    Yes, I would say so.

5 Q    If you could turn to Exhibit 7 in your binder and

6 identify that for the Court.

7 A    Exhibit 7 is a summary of these -- of what I just

8 described was my overall reconciliation results of the

9 227,795, to be exact, cash transactions that were reflected

10 on the BLMIS customer statements from December 1998 to

11 December 2008.

12 Q    Records you relied on in that exhibit are the ones we

13 just talked about.

14 A    Yes, correct.

15 Q    Okay.  Is that an accurate summary of your analysis?

16 A    Yes, and this shows the results of my reconciliation.

17 And those results are that I reconciled 99.01 percent of

18 those cash transactions to the available BLMIS records.

19 Q    What does Exhibit 7 tell us about the reconciliation of

20 the investment advisory business customer statements in the

21 703 and 509 accounts?

22 A    That the cash transactions that appeared on the

23 customer statements were accurately reflected.

24 Q    Is that your opinion with respect to all of those cash

25 transactions?

Page 197

1 A    Yes.

2 Q    Now we discussed the global reconciliation.  Did you

3 also reconcile the cash deposits and withdrawals recorded in

4 the BLMIS investment advisory customer statements for the

5 Carol and Stanley Nelson account in the two accounts that

6 were held by or for the benefit of Mrs. Nelson?

7 A    Yes, I did.

8 Q    Let's look at the Carol and Stanley joint account,

9 which is account no. 1ZA284, and I want to talk to you about

10 your reconciliation of that account.  If you could turn to

11 Exhibit 8 in your binder and identify that for the Court.

12 A    Exhibit 8 is an example of a reconciliation of a cash

13 deposit that appeared on the customer statement for 1ZA284

14 and how I reconciled that cash deposit to BLMIS bank

15 records.

16 Q    Okay.  Let's start with the document on the left.  Can

17 you identify that document and its source, please?

18 A    The document on the left is a customer ledger for the

19 BLMIS' customer account 1ZA284, and this was for the month

20 of -- this was a page from the month of January 2008 for

21 1ZA284, which is an account held by Carol Nelson and Stanley

22 Nelson.  This example shows a check, a cash addition

23 transaction in the form of a check on January 17th, 2008 for

24 $500,000.

25 Q    What's the document in the middle?

Page 198

1 A    The document in the middle is the copy of the deposited

2 check and deposit slip that was found in BLMIS bank records.

3 I think these were from J.P. Morgan, related to the deposit

4 into the 703 account.

5 Q    Who sent that check?

6 A    The check was sent from Dr. Stanley Nelson and Carol

7 Nelson.  The check was dated January 15th, 2008.  The check

8 was made out to Bernard Madoff Securities for $500,000, and

9 in the memo is reference to an account number 1ZA284.

10 Q    And the document on the bottom, the deposit slip?

11 A    So the deposit slip shows that this $500,000 check from

12 the Nelsons was included in a larger deposit that was made

13 into the 703 account on January 17th, 2008.  The total

14 deposit on that day into the 703 account was $2,583,500.

15 Q    What about the document on the right?

16 A    So the document on the right is the 703 account

17 statement for January 2008.  And this document reflects that

18 the deposit I just mentioned, the total deposit on

19 January 17th, 2008 for $2,583,500, which includes the

20 $500,000 from the Nelsons.

21 Q    So I assume you used these records in your

22 reconciliation, didn't you?

23 A    I did.

24 Q    How did you do that?

25 A    So this reconciliation using these records helped to

Page 199

1 determine that this particular cash deposit was accurately

2 reflected on the Nelson's customer statement.

3 Q    Did you perform a similar reconciliation of the 1ZA284

4 customer statements to available records for each deposit

5 into the 1ZA284 Carol and Stanley Nelson account?

6 A    I did.

7 Q    Are those results summarized in your report?

8 A    Yes, they are.

9 Q    Let's talk about withdrawals from the 1ZA284.  And if

10 you could turn to Exhibit 9 in your binder and identify that

11 for the Court, please.

12 A    Exhibit 9 is an example of how I reconciled a cash

13 withdrawal on the customer statement for 1ZA284.

14 Q    What is the document on the left?

15 A    The document on the left is the customer ledger for

16 1ZA284 for the month of November 2008 for the Carol and

17 Stanley Nelson account.

18 Q    What does it show?

19 A    This shows a cash withdrawal transaction, dated

20 November 24th, 2008 for $100,000.

21 Q    What's the document in the middle?

22 A    The document in the middle is a copy of the cancelled

23 check from the 509 account, and this came from J.P. Morgan.

24 And this check was dated the same date that we just saw on

25 the customer statement, November 24th, 2008 for the same

Page 200

1 amount, which was $100,000.  The payee of the check was

2 Carol Nelson and Stanley Nelson.  There is a reference to

3 the check in the memo field for the account number, which is

4 1ZA284, and this was a check written from the 509 account.

5 Q    What is the document on the right?

6 A    The document on the right is a copy of correspondence

7 that was found in the BLMIS customer file for 1ZA284.  This

8 is a letter from the Nelsons, from Stanley Nelson and Carol

9 Nelson, dated November 21st, 2008, requesting the withdrawal

10 of $100,000 from their account 1ZA284.

11 Q    How did you use these records in your reconciliation of

12 the withdrawal from the account?

13 A    So these records reconciled to the cash withdrawal that

14 appeared on the customer statement and supported my

15 determination that the cash transactions on the customer

16 statements were accurately reflected.

17 Q    Did you perform a similar reconciliation of the 1ZA284

18 customer statements to available records for each of the

19 withdrawals in the 1ZA284 Carol and Stanley Nelson account?

20 A    Yes, I did.

21 Q    Did you reach any conclusions about the customer

22 statements?

23 A    I was able to reconcile a hundred percent of all the

24 cash transactions on the customer statements for 1ZA284 to

25 available bank records, to correspondence in customer files

Page 201

1 for that account, or other documents received by the

2 Trustee.

3 Q    Are those results in your report?

4 A    Yes, they are.

5 Q    Where?

6 A    In my Exhibits 7 and 10 reflect -- Exhibit 7 reflects

7 the reconciliation to those three sources of information --

8 the BLMIS bank records, the documents in the customer file,

9 and as well as any documents that were received by the

10 Trustee.  Exhibit 10 also includes the specific Bates

11 numbers for the bank records that I reconciled to.

12 Q    If you could look at Exhibit 59 in your big binders

13 over there, I'd like to ask you a couple of questions about

14 that.

15 A    59?

16 Q    Yes, ma'am.  Can you identify Exhibit 59?

17 A    Exhibit 59 is a summary exhibit that summarizes those

18 two exhibits that were attached to my report that I just

19 mentioned, Exhibit 7 and Exhibit 10.  This summary exhibit

20 was just, I created to make it easier to put it all in one

21 place, instead of having to look at two separate exhibits

22 that were attached to my report.

23 Q    If you could look across the top of Exhibit 59 and tell

24 us what each of the columns represents.

25 A    The first column is what we refer to as CMID, which is

51 (Pages 198 - 201)

Page 202

1 just the unique identifier that I mentioned before that we
2 assigned to each one of the cash transactions that appeared
3 on the customer statements. The next column is the
4 transaction date; next is the amount of the transaction,
5 transaction type, and then the transaction description. All
6 of those columns, the information in those columns came from
7 the information on the customer statements.
8 Q    Okay.
9 A    The next three columns that are under the banner of
10 called reconciliation results identify the results of my
11 reconciliation to the three sources of information; BLMIS
12 bank records, BLMIS customer files, documents received by
13 the Trustee. There's either a yes in those columns or an
14 n/a: yes refers to when I was able to reconcile; n/a is
15 where I didn't have an available record to complete my
16 reconciliation.
17        The last set of columns is references to specific
18 Bates numbers. And so, for every instance that there's a
19 yes in one of the middle columns, there will be a
20 corresponding Bates number in one of the last three columns.
21 Q    What does Exhibit 59 tell us about the accuracy of the
22 customer statements for this account?
23 A    Exhibit 9 supports that I reconciliation a hundred
24 percent of the cash transactions on the customer account for
25 1ZA284 to one of those -- one or more of those three sources

Page 203

1 of information.
2 Q    Is Trustee's Exhibit 59 a fair and accurate summary of
3 the relevant information you used regarding the cash
4 deposits and withdrawals from the BLMIS customer statements
5 for 1ZA284 account and the records you used to reconcile
6 those cash transactions to the customer statements?
7 A    Yes, it is.
8 Q    Again, just to be clear, based on the analysis you just
9 described, did you reach any conclusions concerning the
10 accuracy of the customer statements for the 1ZA284 account?
11 A    That the cash transactions on the customer statements
12 were accurately reported.
13 Q    Okay. Let's turn now to the next account that's
14 involved with this trial, the 1ZA283 account held by Carol
15 Nelson individually. Mrs. Nelson has confirmed that a $1
16 million deposit was the only deposit into that account. Did
17 you reconcile that deposit for the 1ZA283 to a customer
18 statement?
19 A    That deposit would have appeared on the customer
20 statement for 1ZA283.
21 Q    Is Mrs. Nelson's admission that the $1 million deposit
22 was the only deposit into 1ZA283 accurate?
23 A    Could I look at my summary exhibit for 1ZA283?
24 Q    Yes, that's fine. It's --
25        THE COURT: Exhibit 58.

Page 204

1        MR. HUNT: -- Exhibit 58. Thank you, Your Honor.
2 A    Yes, that is the only cash addition into that account.
3 Q    Let's talk about the cash withdrawals. Please turn to
4 Exhibit 10 in your binder.
5 A    Okay.
6 Q    Starting with the record on the left, can you tell us
7 what that is, please?
8 A    The record on the left is the BLMIS customer ledger for
9 1ZA283 for the month of November 2008.
10 Q    What about the document in the middle?
11 A    The document in the middle is a copy of a check from
12 the 509 account related to a cash withdrawal that appeared
13 on the customer ledger for November 2008.
14 Q    And finally, identify for the record the document on
15 the far right.
16 A    That is a page -- or a document from the BLMIS customer
17 file related to 1ZA283.
18 Q    Is this a document that came from what we commonly
19 refer to as the account maintenance file?
20 A    Yes.
21 Q    If you could please, tell us how you reconciled the
22 withdrawal for this particular transaction.
23 A    So the cash withdrawal transaction that appeared on the
24 customer statement for November 2008 for 1ZA283 was a
25 $25,000 withdrawal dated November 18th.

Page 205

1 Q    And this, the 1ZA283 is in the name of Carol Nelson.
2 Q    From the customer statement?
3 Q    On the customer statement, yes.
4 A    The middle document, which is again the 509 check, is
5 the check that I reconciled to this cash withdrawal
6 transaction is also dated November 18th, 2008 for $25,000,
7 made out to Carol Nelson. There is reference in the memo
8 line to 1ZA283, and this was a check written from the 509
9 account.
10 Q    Does the information on the back of the check have any
11 meaning for this particular one?
12 A    Not for my reconciliation purposes. I will -- that
13 will become very relevant for my tracing analysis.
14 Q    Okay. How about the document on the right?
15 A    The document on the right is a letter that was found in
16 the BLMIS customer file for 1ZA283, and this was a letter
17 from Carol Nelson dated November 17th, 2008 requesting to
18 withdrawn $25,000 from her account 1ZA283.
19 Q    Okay. Based on your review of these records, did you
20 reach a conclusion about the withdrawal that's shown on
21 Exhibit 152 -- sorry, Exhibit 10?
22 A    Based on my reconciliation results and this specific
23 document shown on Exhibit 10, I was able to reconcile the
24 $25,000 cash withdrawal in November of 2008; and, therefore,
25 I conclude that that withdrawal was accurately reflected on

52 (Pages 202 - 205)

Page 206

1 the customer statements for this account.

2 Q   Did you perform a similar reconciliation of 1ZA283

3 customer statements to available records for each withdrawn

4 from the Carol Nelson account?

5 A   Yes.

6 Q   Did you reach any conclusions about the customer

7 statements as they pertain to that account?

8 A   I was able to reconcile 100 percent of the cash

9 transactions on the customer statements for 1ZA283, and

10 therefore conclude that the cash transactions were

11 accurately reflected.

12 Q   Are those results reflected your, in your report for

13 this account?

14 A   Yes, they are.

15 Q   Did you prepare a summary exhibit of that

16 reconciliation?

17 A   Yes, I did.

18 Q   If you can turn back to the big binder.  It's Trustee's

19 Exhibit 58, as we just mentioned.  Did you prepare that

20 exhibit?

21 A   I did.

22 Q   What's the source of information for that exhibit?

23 A   So this, the source is the BLMIS customer statements

24 for 1ZA283, BLMIS bank records, BLMIS customer files for

25 this account, 1ZA283, and any documents that were received

Page 207

1 by the trustee related to these transactions.

2 Q   One more time, if you could just go across the columns

3 real quick, tell us what they are and how you used them?

4 A   The very first column is an ID number, CMID, which is a

5 unique identifier assigned to every one of the cash

6 transactions on the customer statements.

7       The next four columns are information that were --

8 that was obtained from the customer statements:  the

9 transaction date, the amount, the transaction type, and the

10 description.  he middle set of columns under the

11 reconciliation results identify either a yes or an N/A to

12 indicate if I reconciled to each of, any of those three

13 sources of information, BLMIS bank records, customer files,

14 or documents received by the trustee.

15       For every time there's a yes in that column, there

16 will be a corresponding Bates number in one of the last

17 three columns, to identify the specific document that I

18 reconciled to.

19 Q   Does Trustee's Exhibit 58 tell us anything about the

20 1ZA283 account customer statements?

21 A   That I reconciled 100 percent of the cash transactions

22 on the customer statements, and therefore the cash

23 transactions on those customer statements for 1ZA283 were

24 accurately reflected on the customer statements.

25 Q   Is Exhibit 58 a fair and accurate summary of the

Page 208

1 relevant information that you reviewed and used regarding

2 the cash deposits and withdrawals from the 1ZA283 account?

3 A   Yes, it is.

4 Q   Finally, turning to your reconciliation of cash

5 deposits and withdrawals for the Carol Nelson IRA account,

6 1ZR265, did you reconcile the deposits into the 1ZR265 IRA

7 account?

8 A   Yes, I did.

9 Q   Did your methodology compare -- how did your

10 methodology compare to the methodologies you used for the

11 283 and the 284 accounts?

12 A   The same methodology.

13 Q   Did you perform similar reconciliation for the customer

14 statements for each withdrawal from the 1ZR265 Carol Nelson

15 IRA account?

16 A   Yes, I did.

17 Q   If you could turn to the trustee's demonstrative

18 Exhibit 11 in your binder.  Starting with the record on the

19 left, could you identify the document and its source?

20 A   That's a BLMIS customer ledger from, related to 1ZA265

21 from BLMIS records for the month of January 2006.

22 Q   What about the document in the middle?

23 A   That's a copy of the check for, written from the 509

24 account related to a cash withdrawal that was reflected on

25 the customer statement for 1ZR265.

Page 209

1 Q   Now could you tell us what the documents on the far

2 right are?

3 A   The documents on the far right are documents that were

4 reproduced to the trustee by Fiserv, which is the custodian

5 of an IRA held by Carol Nelson.  And these records were

6 related to the cash withdrawal from 1ZR265 in January of

7 2006.

8 Q   How did you use these records in reconciling

9 account 1ZR265 customer statements?

10 A   So there is cash withdrawal reflected on the 1ZR265

11 account statement for January 2006.  On, dated January 5th,

12 there's a cash withdrawal transaction for $200,000.  The

13 name on the account, 1ZR265 is Retirement Accounts, Inc.,

14 customer IRA for the benefit of Carol Nelson.  And there's

15 an account number there in parentheses, which is (47003),

16 which is highlighted here because that will become relevant

17 as we look at various documents related to this IRA account.

18       This, I reconciled this cash withdrawal

19 transaction to first the copy of the 509 check that was

20 written to Retirement Accounts, Inc. for the benefit of

21 Carol Nelson. It has that same account number, the 47003.

22 The check is dated 1/5, or January 5th, 2006.  It's made out

23 for $200,000.  There's a reference in the memo line to

24 1ZR265, and this is a check written from the 509 account.

25 Q   Same name, date, amount, and account?

53 (Pages 206 - 209)

Page 210

1  A    Correct.

2  Q    Okay.  What are the documents on the right?

3  A    The documents on the right are documents produced to

4  the trustee by Fiserv, which again is the custodian for the

5  individual retirement account held for the benefit of Carol

6  Nelson.  The first document there is a letter requesting the

7  $200,000 withdrawal, or it's referred to as a partial

8  liquidation from the IRA account held for the benefit of

9  Carol Nelson.  You'll see there, on the top of that document

10  on the right-hand side, there's the same reference to that

11  account number, 47003, which indicates that we're talking

12  about the same account.

13        The set of documents to the far right are month,

14  quarterly account statements that were issued by Fiserv to

15  the account holder that would reflect the, any cash

16  transactions or other transactions that occurred in the IRA

17  account during the month, or I'm sorry, during the quarter.

18  These were quarterly statements.  The relevant information

19  on these statements were, are blown up at the bottom there,

20  which is the cash in from BLMIS, and then, which is the

21  first line on January 6th, 2006, you'll see an increase in

22  the cash column of $200,000, that's the cash withdrawal

23  coming from BLMIS.

24        Three days later, on January 9th, 2006, there is a

25  transaction called, with the description same-day

Page 211

1  distribution for Tax Year 2006, and that's also for

2  $200,000, reflecting the distribution to Carol Nelson.

3  Q    Do you need some water?

4  A    Yes, thank you.

5  Q    So based on your review of these records, did you reach

6  a conclusion about the withdrawal from the 1ZA, ZR265

7  account that's shown on the customer statement here on

8  Demonstrative Exhibit 11?

9  A    Yes, I conclude that that cash withdrawal transaction

10  is accurately reflected on the customer statement.

11  Q    Did you perform a similar reconciliation of the 1ZR265

12  customer statements to available bank records for each of

13  the withdrawals of the 1ZR265 Carol Nelson IRA?

14  A    Yes, I did.

15  Q    Did you reach any conclusions about the customer

16  statements for the 1ZR265 account?

17  A    Based on my reconciliation rate of 100 percent of those

18  cash transactions, I conclude that they were accurately

19  reported on the customer statements.

20  Q    Are those results in your report?

21  A    Yes, they are.

22  Q    Did you prepare a summary of that analysis?

23  A    Yes, I did.

24  Q    If you can turn to Exhibit 60 in your binder, I'll ask

25  you if you prepared that.

Page 212

1  A    Yes, I did.

2  Q    What's the source of information for Trustee's Exhibit

3  60?

4  A    The source includes the customer statements for 1ZR265,

5  the available BLMIS bank records, the BLMIS customer files

6  that were in BLMIS's records, as well as the documents that

7  were produced to the trustee by Fiserv.

8  Q    Did you use the same information from Exhibits 7 and 10

9  in your report to prepare this summary exhibit?

10  A    Yes, I did.

11  Q    Do the columns have the same meaning and source

12  documents that you discussed in your explanation for the

13  summary exhibits for the 283 and 284 accounts?

14  A    Yes, the same columns appear here on this summary

15  exhibit.

16  Q    Does Trustee's Exhibit 60 tell us anything about the

17  1ZR265 customer statements?

18  A    The cash transactions on those customer statements were

19  reconciled to one of those sources of information that

20  appears on my summary exhibit, and therefore the cash

21  transactions are accurately reflected on the customer

22  statements.

23  Q    Is Trustee's Exhibit 60 a fair and accurate summary of

24  relevant information regarding the cash deposits and

25  withdrawals from the BLMIS customer statements for 1ZR265,

Page 213

1  and the records that you used to reconcile the cash

2  transactions shown on the customer statements?

3  A    Yes, it is.

4  Q    Just to be clear, based on your analysis, did you reach

5  conclusion regarding the accuracy of the customer statements

6  for this account?

7  A    Yes, that the cash transactions that appeared on the

8  customer statements were accurately reported.

9  Q    So just to wrap up the reconciliation portion of the

10  program this afternoon, have you prepared a summary of your

11  findings for these three accounts?

12  A    Yes, I have.

13  Q    If you could turn to Trustee's Demonstrative Exhibit 12

14  in your binder?  Did you prepare that exhibit?

15  A    I did.

16  Q    What is it showing?

17  A    This is a summary of my reconciliation results for the

18  three accounts that were held by the Nelsons, and that this

19  reflects that I reconciled 100 percent of the cash

20  transactions that appeared on the customer statement for

21  those three accounts to the available records that I

22  reviewed.

23  Q    Okay, so you reconciled 96 transactions for the 1ZA283,

24  hundred percent?

25  A    Yes.

54 (Pages 210 - 213)

Page 214

1 Q  48 transactions for the 1ZA283, a hundred percent.

2 A  Correct.

3 Q  12 transactions for the 1ZR265, a hundred percent?

4 A  Correct.

5 Q  Are you confident in the results of your reconciliation

6 analyses, as summarized on Trustee's Exhibits 58, 59, 60,

7 and this Demonstrative 12?

8 A  Yes.

9 Q  To a reasonable degree of accounting certainty?

10 A  Yes.

11 Q  Okay.  Let's talk about tracing.  Can you just tell us

12 again what you mean by tracing?  Because those two things

13 confuse me sometimes.

14 A  Tracing is when I follow the flow of funds from BLMIS

15 to a bank account held by the defendants, or the account

16 holder.  For this case I've reviewed and traced the cash

17 withdrawals during the two-year period prior to the

18 bankruptcy.

19 Q  Why did you do that?  Why did you trace those funds?

20 A  To confirm that the -- who was in receipt of the funds

21 from BLMIS.

22 Q  What period did you trace the flow of funds for, from

23 each of the three Nelson accounts?

24 A  The two-year period.

25 Q  Before we get into the details, if you could turn to

Page 215

1 Trustee's Demonstrative Exhibit 13 in your binder?  And I'll

2 ask you if you prepared that.

3 A  Yes, I did.

4 Q  Just looking at the summary of your work, what did you

5 conclude about the 1ZA284 account with respect to the

6 tracing analysis?

7 A  For 1ZA284, for all of the cash withdrawals in the two-

8 year period, those withdrawals were sent from BLMIS to an

9 account held by Stanley Nelson and Carol Nelson.  The total

10 cash withdrawals during the two-year period was $2,610,000.

11 Q  What did you learn about the 1ZA283 account?

12 A  For the 1ZA283 account, there was a total of $255,000

13 in withdrawals in the two-year period.  A hundred percent of

14 that was received into two different bank accounts, one that

15 was held by Stanley and Carol, and one that was only held by

16 Carol Nelson.

17 Q  Okay, and what were the amounts of those two splits?

18 A  The 120,000 went into the account held by both Stanley

19 and Carol, and 135,000 went into an account held just by

20 Carol.

21 Q  Turning now to the 1ZR265 account, what did you learn

22 about that?

23 A  My tracing for the 1ZR265 showed that in the two-year

24 period, there was cash withdrawals from that account of

25 $200,000 and -- $200,077.  That money first went to NTC, or

Page 216

1 Fiserv, and then was further distributed to Carol Nelson,

2 and a small portion of that amount was kept by NTC for fees

3 that were charged.

4 Q  I think you said 1ZA265, it's ZR265.

5 A  Okay, I apologized.  Yes, 1ZR265.

6 Q  So let's go back to the 1ZA284 account, and look at the

7 details.  And if you could turn to Trustee's Demonstrative

8 Exhibit 14 in your binder and review -- and identify that

9 for the Court, please?

10 A  This is an example of how I traced a cash withdrawal

11 from 1ZA284 in November 2008 using a cancelled check from

12 the 509 account?

13 Q  Can you walk us through that analysis?

14 A  So there is a -- there was a cash withdrawal, which I

15 think we saw in earlier demonstratives, for $100,000, dated

16 November 24th, 2008, from 1ZA284, held in the name of Carol

17 Nelson and Stanley Nelson.

18    The top portion there is the front of the canceled

19 check, which reflects all that same information.  What was

20 relevant, most relevant to me for my tracing was the

21 information that appeared on the back of the cancelled

22 check, which is shown on the bottom portion of this

23 demonstrative.  The back of the cancelled check was endorsed

24 for deposit only to account ending in 1884, in the name of

25 Dr. Stanley Nelson and Carol Nelson.  The other blue

Page 217

1 highlight there shows that it went to an account held at JP

2 Morgan Chase.

3 Q  Based on your review of a canceled check, did you reach

4 a conclusion about the November 24, 2008 withdrawal from the

5 1ZA284 account?

6 A  Yes, I conclude that this cash withdrawal went from

7 BLMIS to a bank account at JP Morgan, held by Dr. Stanley

8 Nelson and Carol Nelson, with Account Number ending in 1884.

9 Q  I think you indicated that there was another

10 methodology you used beyond just the review of the cancelled

11 checks for your tracing.  If you could to Exhibit 15 in your

12 binder, and identify that for the record?

13 A  So I don't, I don't know if I would characterize it as

14 another methodology, but this was definitely something else

15 that I looked at when available, and these were the records

16 that were produced, related to the defendant's bank

17 accounts.  So these were records by JP Morgan related to the

18 account that we just talked about, which was ending in 1884,

19 held by Stanley Nelson and Carol Nelson.

20 Q  Okay, and what did you find?

21 A  So, these records further support the receipt of the

22 $100,000 cash withdrawal from BLMIS in November of 2008, as

23 reflected there with the transaction, the deposit

24 transaction dated November 24th, 2008 for $100,000 into this

25 joint bank account at JP Morgan.

55 (Pages 214 - 217)

Page 218

1  Q   Based on your review of the defendant's bank records,

2  did you reach a conclusion about the November 24, 2008

3  withdrawal from the 1ZA284 account that you also used to

4  trace the BLMIS cancelled check?

5  A   Yes, that this -- their records further support the

6  receipt of the $100,000 from BLMIS.

7  Q   Did you perform similar tracing analyses for each of

8  the withdrawals from the 1ZA284 Carol and Stanley Nelson

9  account?

10 A   In the two-year period, yes.

11 Q   Are the results of that tracing included in your

12 report?

13 A   Yes, they are.

14 Q   Where?

15 A   In my report, it would be in Exhibit 9 and 10.

16 Q   Okay, if -- have you prepared a summary of that work?

17 A   Yes.

18 Q   Okay. Take a look at Exhibit -- Trustee's Exhibit 56

19 in the big binder there in front of you. Does Exhibit 56

20 tell us that about the 1ZA284 account?

21 A   Yes, this exhibit supports the tracing of all of the

22 withdrawals in the two-year period from 1ZA284 to the joint

23 account held by Stanley Nelson and Carol Nelson, with the

24 number ending 1884. Now, the account was held at JP Morgan.

25 Q   Could you walk us through what each of the columns are

Page 219

1  in this exhibit?

2  A   So the first set of columns is similar to what we saw

3  in the reconciliation summary exhibits. That was the CMID

4  that's assigned to each of the cash transactions,

5  transaction date amount, transaction type and transaction

6  description. What's populated in those columns comes from

7  the customer statement, from 1ZA284.

8       The next set of columns is information relevant to

9  the BLMIS bank account that I reconciled those transactions,

10 too, and also with the Bates reference of the check that I

11 would have used or did use for my tracing analysis. The

12 next set of columns under the banner Tracing Results per

13 BLMIS records, that -- those columns reflect the banking

14 institution, the bank account number, and the potential bank

15 account holder that's based just by looking at the canceled

16 checks from BLMIS records, the 509 canceled checks.

17      And then finally the last set of columns are the

18 tracing rules, based on my review of the defendant's bank

19 records, when available. You can see that they were not

20 available up until January 2008. And then from then on, I

21 have information populated in those columns that reflect

22 information that was included in those records for the

23 defendant's bank accounts.

24 Q   Were you able to trace each of the withdrawals from the

25 1ZA284 account shown on the customer statements during the

Page 220

1  two-year period between and including December 11th, 2006

2  and December 11, 2008?

3  A   Yes, I was.

4  Q   Is that analysis reflected on Exhibit 56?

5  A   Yes, it is.

6  Q   (indiscernible) looking at. Is that a fair and

7  accurate summary regarding the relevant information

8  regarding the withdrawals from the BLMIS statement for the

9  1ZA284 account, and the records that you used to trace that

10 information?

11 A   Yes, it is.

12 Q   Just to be clear, based on your analysis, were you able

13 to trace all of the withdrawals from this account during the

14 two-year period?

15 A   Yes, I was.

16 Q   And lets' turn now to the 1ZA283 account, the Carol

17 Nelson individual account, and if you can turn to Trustee's

18 Demonstrative Exhibit 16 in your binder, I'd like to ask you

19 about your tracing analysis for that. Can you identify the

20 records we're looking at in Trustee's Demonstrative Exhibit

21 16, and tell us how you used them?

22 A   So this demonstrative is a copy of a cancelled check

23 from BLMIS records related to a withdrawal from Carol

24 Nelson's account 1ZA283. The withdrawal was dated November

25 18th, 2008 for $25,000. The first -- the front page, which

Page 221

1  is at the top there, is the check -- the front of the check

2  from the 509 account.

3       Again, what's most relevant to my tracing analysis

4  on these cancelled checks is the back of the canceled check.

5  And this case, the endorsement was for deposit only to

6  Account Number ending in 6140 in the name of Carol Nelson.

7  And just like we did before, was there some supporting work

8  you did with respect to this transfer as well?

9  A   Yes, there was available records from the defendant's

10 bank records related to this transaction.

11 Q   If you could turn to Trustee's Demonstrative Exhibit 18

12 in your binder, I want to ask you about those records.

13 Starting with the record on the left, moving to the right.

14 A   The record on the left is a copy of the monthly bank

15 statement for the account ending in 6140 in the name of

16 Carol Nelson, and this statement reflects a deposit on

17 November 20th, 2008 for $25,000. On the right is the

18 corresponding deposit slip that reflects the same $25,000.

19 The deposit slip is also dated November 20th, 2008, into

20 account ending in 6140, in the name of Carol Nelson.

21 Q   Based on you review of these records, did you reach a

22 conclusion about the November 18, 2008 withdrawal in the

23 1ZA283 account?

24 A   Yes, these documents further confirm the receipt of

25 money into Carol Nelson's bank account for $25,000 from

56 (Pages 218 - 221)

Page 222

1 BLMIS?

2 Q  If you could turn now to Trustee's Demonstrative

3 Exhibit 17, when you looked at the tracing via check, are

4 you showing us another example here, just to double-check?

5 A  This is another example.  This is another example of

6 tracing a withdrawal from 1ZA283 using a cancelled check

7 from the 509 account.  This example is dated in May of 2007,

8 and that was before the time period that I had available

9 records to me from the defendant's bank records.  But even

10 without those records, I was able to use the information

11 from the 509 account, cancelled check, and specifically the

12 information on the back of the cancelled check to tell me

13 where the money went when it left BLMIS.

14       And in this case, it was a $40,000 withdrawal.

15 The check is made out to Carol Nelson for $40,000.  The back

16 of the canceled check is endorsed for deposit only to

17 account ending in 1884, in the name, of Dr. Stanley Nelson

18 and Carol Nelson, and the stamp reflects that it went to a

19 bank account held at JP Morgan --

20 Q  Is that reflecting of the branch, and the distributions

21 that we see on the demonstrative that you showed us earlier?

22 A  Yes, it's included in the $120,000 that's traced to

23 account ending in 1884.

24 Q  Did you sue the cancelled checks to trace the other

25 withdrawals from this account?

Page 223

1 A  Yes, I did.

2 Q  Are the results of your analyses reflected in your

3 report for the 1ZA283 and 265 accounts?  I think it's a

4 combined exhibit.

5 A  Yes, it is.

6 Q  If you could turn to Trustee's Exhibit 55 in your

7 binder?  Did you prepare Exhibit 55?

8 A  Yes, I did.

9 Q  What did you do to prepare it?

10 A  This exhibit is similar to the one we just saw for

11 1ZA284.  This one reflects the two-year withdrawals -- the

12 withdrawals in the two-year period from 1ZA283.  It includes

13 the information from the customer statement related to those

14 withdrawals, and it contains the results of my tracing

15 analysis.

16 Q  Are each of the columns the same as they were in the

17 prior example?

18 A  Yes, they are.

19 Q  What does Trustee's Exhibit 55 tell us about the 1ZA283

20 account?

21 A  This exhibit supports that I traced 100 percent of the

22 cash withdrawals from 1ZA283 in the two-year period to two

23 different bank accounts, one held by both Stanley Nelson and

24 Carol Nelson, and one held just by Carol Nelson.

25 Q  Is Trustee's Exhibit 55 a fair and accurate summary of

Page 224

1 relevant information regarding the withdrawals from the

2 BLMIS Account 1ZA283, and the records you used to trace

3 those withdrawals during that two-year period?

4 A  Yes, it is.

5 Q  Just to be clear, what did you find that two-year

6 period?

7 A  In the two-year period, there was a total of $255,000

8 in withdrawals from 1ZA283.  I traced 100 percent of those

9 withdrawals to two different bank accounts.  $120,000 went

10 to a bank account held by Stanley and Carol Nelson, and

11 135,000 went to a bank account held by Carol Nelson.

12 Q  Okay.  Let's turn finally to the IRA account, Mrs.

13 Nelson's IRA account, 1ZR265.  And I want to start with a

14 little background information about that account.  If you

15 could turn to Trustee's Demonstrative Exhibit 19, and

16 identify that for the Court.

17 A  Exhibit 19 is the application for the self-directed

18 IRA, or individual retirement account held by Carol Nelson

19 at Retirement Accounts, Inc., also referred to as NTC, or

20 Fiserv, these are all different names of the entity that

21 held -- that was the custodian for the IRA held for the

22 benefit of Carol Nelson.  This IRA application refers to the

23 account number that we saw a few demonstratives ago for

24 7003, which is an identifying account number related to this

25 IRA account, and this application was signed by Carol

Page 225

1 Nelson.

2 Q  Please tell the Court what you used, and why you used

3 it, with respect to this document.

4 A  This document wasn't related to any specific cash

5 transaction in the BLMIS account, but this, this application

6 informed me of the account that was held at Retirement

7 Accounts, Inc., as custodian for the IRA held for the

8 benefit of Carol Nelson, and that was related to the BLMIS

9 account?

10 Q  If you could turn to Trustee's Demonstrative Exhibit 20

11 in your binder, and identify that for the Court, please?

12 A  These are additional documents that relate to the

13 individual retirement account held for the benefit of Carol

14 Nelson.  The documents on the left-hand side is an IRA

15 distribution request.  You'll see at the top there it says

16 Fiserv, which again is another name that we've seen on a

17 number of these documents related to this same account.  The

18 account number, again, references 47003.  This is a request

19 from -- for $200,000, signed by Carol Nelson, on December

20 28th, 2005.

21       The document on the right is a letter -- a

22 handwritten letter from Carol Nelson, received by Retirement

23 Accounts, Inc., which again is the same entity as Fiserv and

24 NTC.  And the, I will just read this, because it indicates

25 how the distributions were requested from Carol Nelson.  So

57 (Pages 222 - 225)

Page 226

1 it was, again, this was a self-directed IRA. Carol Nelson
2 writes, I wish to withdraw $200,000 from Account Number
3 47003. Please distribute the funds on January 3rd, but not
4 before. Please have Bernard Madoff overnight funds to you,
5 and overnight them to me at my home address.
6 Q    Based on your review of the books and records, BLMIS,
7 were you able to determine if Mrs. Nelson in fact self-
8 directed these withdrawals?
9 A    Yes, she did.
10 Q    How many withdrawals were there from the 1ZR265
11 account? And I think you'll probably need to look at
12 Exhibit 162, I think. Or, no --
13 A    And it's actually Exhibit 60.
14 Q    Okay, thank you.
15 A    Which is the summary exhibit for my reconciliation
16 results, because that has all of the cash transactions. So
17 there were -- I'm sorry, your question was how many cash
18 withdrawals?
19 Q    How many cash withdrawals were there?
20 A    Eight cash withdrawals.
21 Q    How many were there within the two-year period?
22 A    Three.
23 Q    Were there BLMIS 509 account checks for each of those
24 withdrawals?
25 A    Yes.

Page 227

1 Q    Were the amounts consistent with the IRA distribution
2 request?
3 A    Yes, they were.
4 Q    Were you able to track the flow of funds for each of
5 the checks?
6 A    Yes, I was.
7 Q    Where did they go?
8 A    So the checks were deposited into an account held by
9 NTC or Fiserv, and that's reflected on the quarterly account
10 statement. The 509 checks reflect that those -- the money
11 went into an account held at JP Morgan. But it's further
12 supported by the quarterly account statements from Fiserv
13 related to her IRA that shows the inflow of money from
14 Bernard L. Madoff, or BLMIS.
15 Q    So finally, with respect to the withdrawals from the
16 1ZR265 account, were you able to determine if the withdrawn
17 funds fever left Mrs. Nelson's custodial account?
18 A    Yes, they did. Within a few days, they were
19 distributed to Mrs. Nelson, in the form of a distribution.
20 Q    Okay, if you could turn to Trustee's Demonstrative 21,
21 please, and identify that for the record.
22 A    So Demonstrative 21 is an example of my tracing
23 analysis related to the cash withdrawal in January 2007 from
24 1ZR265.
25 Q    What's the document on the left?

Page 228

1 A    That is the check from BLMIS, and it is for $100,000.
2 It's from, related to a cash withdrawal on 1ZR265.
3 Q    Okay. How about the documents in the middle?
4 A    These are the quarterly account statements that I
5 talked about before, where these reflect the activity in the
6 IRA account held for Mrs. Nelson during this, during the
7 quarter. This one in particular was the first quarter of
8 2007, which included transactions in January of 2007.
9        The there's a section in these quarterly account
10 statements that are, is called account transactions, and it
11 reflects cash inflows or outflows in and out of the IRA.
12 And what was relevant here was the transactions dated in
13 January of 2007. On January 9th, 2007, there was an inflow
14 of cash of $100,000 with the description Bernard L. Madoff
15 Brokerage Account, and this indicates the withdrawal from
16 BLMIS on -- in January 2009 from 1ZR265.
17        And then you'll see six days later, on January
18 15th, there's a transaction with the description same-day
19 distribution for Tax Year 2007. It's for the same amount,
20 less $10 of a -- for a check fee, and that was the
21 distribution to Carol Nelson.
22 Q    Okay, what about the document on the right, how does
23 that play into your flow of funds?
24 A    So the document on the right is an IRS form, a tax form
25 of 1099, and this identifies distributions made on IRA

Page 229

1 accounts, made from IRA accounts. And this was relevant to
2 me because it confirmed the distribution to Carol Nelson.
3 The 1099 shows that the payer is Fiserv, and that the
4 recipient is Carol Nelson.
5        The same account number that we keep seeing over
6 and over on these documents, the 47003, is reflected on this
7 IRA 1099 form, and it shows a gross distribution of $99,990,
8 which is the same amount that we saw on the quarterly amount
9 statement, as the distribution for tax year 2007.
10 Q    Did you perform a similar analysis for both of the two-
11 year withdrawals for the 1ZR265 account?
12 A    Yes, I did.
13 Q    What was the timeframe that you saw from the funds
14 going from BLMIS to the IRA, and ultimately to Mrs. Nelson?
15 A    Very short time period. Within, within a week.
16 Q    Were there any other withdrawals from the IRA to Mrs.
17 Nelson, other than those from BLMIS?
18 A    There was one other small withdrawal that was for fees,
19 paid to NTC.
20 Q    Is that reflected on the demonstrative that we've been
21 looking at here?
22 A    Yes.
23 Q    What was the total amount of fees we're talking about.
24 A    The total amount of fees in the two-year period was
25 $87.

58 (Pages 226 - 229)

Page 230

1  Q   If you could tell me if we've now traced all of the
2  funds within the two-year period for the 1ZR265 account?
3  A   Yes, I have.
4  Q   Did you rely on your forensic accounting skills during
5  your reconstruction of the BLMIS books and records to reach
6  conclusions concerning your global reconciliation, your
7  reconciliation of your three accounts at issue, and the
8  tracing of the flow of funds from those accounts during the
9  two-year period?
10 A   Yes, I did.
11 Q   Can the results of your reconstruction of the records
12 and reconciliation, and tracing analysis of these accounts
13 be reconstructed or replicated by someone with your same
14 expertise and training?
15 A   Yes, I believe that they can.
16 Q   Are your methodologies generally accepted in your
17 profession?
18 A   Yes.
19 Q   And are your conclusions based on those methodologies?
20 A   Yes, they are.
21 Q   Thank you for your time.  I have no further questions
22 right now.
23       THE COURT:  All right, we'll pick up at 2:00
24 tomorrow.  All right, thank you.
25       MS. CHAITMAN:  Judge, can we leave things in the

Page 231

1  courtroom or not?
2       THE COURT:  It's not a good idea.  I have a
3  calendar tomorrow, so you should move them down to your
4  respective rooms, okay?
5       MS. CHAITMAN:  Okay.
6       THE COURT:  You can come back earlier tomorrow,
7  and move them back up, but they should be moved out of here
8  tonight, and locked up, I would think.
9       MS. CHAITMAN:  Okay, so what time should we come
10 to bring everything in.  Because you have court in the
11 morning, so --
12       THE COURT:  Yeah, but I mean, you can come at
13 1:00.  How long do you think --
14       MS. CHAITMAN:  1:00?
15       THE COURT:  Yeah.
16       MS. CHAITMAN:  Okay, thank you.
17       THE COURT:  I assume it's not going to take more
18 than an hour to bring everything back up.
19       MS. CHAITMAN:  No.
20       THE COURT:  Okay.
21       (Whereupon these proceedings were concluded at 4:56 PM)
22
23
24
25

Page 232

1          I N D E X
2
3          RULINGS
4                  Page    Line
5
6  Motion to Exclude the Robert Oppenheim's
7  Testimony Granted              9      21
8
9  Motion by the Trustee to quash the subpoena
10 of Mr. Picard as Trustee Sustained      13      13
11
12 Mr. Madoff Allocations Admitted         21      12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 233

1          C E R T I F I C A T I O N
2
3     I, Sonya Ledanski Hyde, certified that the foregoing
4  transcript is a true and accurate record of the proceedings.
5
6
7
8  Sonya Ledanski Hyde
9
10
11
12
13
14
15
16
17
18
19
20 Veritext Legal Solutions
21 330 Old Country Road
22 Suite 300
23 Mineola, NY 11501
24
25 Date:  May 10, 2019

59 (Pages 230 - 233)