**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee for the Substantively*
*Consolidated SIPA Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*

**Hearing Date:** To be
determined by Court

**Obj. Deadline:** January 11,
2021

**Reply Deadline:** February 10,
2021
**Time:** 4:00 p.m.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>   v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant, | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff,<br><br>        Plaintiff,<br>   v.<br><br>ROYAL BANK OF CANADA; GUERNROY LIMITED; ROYAL BANK OF CANADA (CHANNEL ISLANDS) LIMITED; ROYAL BANK OF CANADA TRUST COMPANY (JERSEY) LIMITED; ROYAL BANK OF CANADA (ASIA) LIMITED; ROYAL BANK OF CANADA (SUISSE) S.A.; RBC DOMINION SECURITIES INC.; and RBC ALTERNATIVE ASSETS, L.P.;<br><br>        Defendants. | Adv. Pro. No. 12-01699 (SMB) |

## MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO
## FILE AMENDED COMPLAINT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................................... 3

    I.      PROCEDURAL HISTORY ................................................................................. 3

    II.     THE PROPOSED AMENDED COMPLAINT.................................................... 4

    A.     RBC and Defendants Knew, or Subjectively Believed There Was a High
           Probability, That BLMIS's IA Business Was Fraudulent ....................................... 5

    B.     Defendants Turned a Blind Eye to Their Beliefs About Madoff ............................ 8

    C.     Fairfield Sentry Had Actual Knowledge That Madoff Was Not Trading
           Securities or, at a Minimum, Was Willfully Blind to Madoff's Fraud .................. 9

    D.     The Rye Select Funds Had Actual Knowledge That Madoff Was Not Trading
           Securities or, at a Minimum, Were Willfully Blind to Madoff's Fraud............... 14

ARGUMENT ................................................................................................................................ 17

I.     LEGAL STANDARDS GOVERNING MOTIONS TO AMEND A PLEADING .......... 17

II.    THE COURT SHOULD GRANT THE TRUSTEE'S MOTION TO AMEND IN
       LIGHT OF THE INTERVENING CHANGE IN LAW AND THE ADDITIONAL
       FACTS ALLEGED ...................................................................................................... 17

III.   NO FUTILITY, UNDUE DELAY, BAD FAITH, OR UNDUE PREJUDICE
       EXISTS.......................................................................................................................... 18

    A.     Amending the Complaint Would Not Be Futile Because the Trustee Has
           Alleged Facts Sufficient to Survive a Motion to Dismiss .................................... 18

         1.     The PAC Plausibly Pleads Defendants Knew, or Subjectively
                Believed There Was a High Probability, BLMIS's IA Business Was a
                Fraud ....................................................................................................... 21

         2.     The PAC Plausibly Pleads Defendants Consciously Disregarded What
                They Knew or Believed About BLMIS.................................................... 24

         3.     Plausibility and Incentives........................................................................ 27

         4.     The PAC Sufficiently Pleads Imputation of Actual Knowledge or
                Willful Blindness to Defendants............................................................... 28

         5.     The Initial Transfers From BLMIS to Fairfield Sentry Are Avoidable .... 30

6.    The Initial Transfers From BLMIS to the Rye Select Funds Are Avoidable ................................................................................................ 32

B.    The Trustee Did Not Act With Undue Delay or Bad Faith .................................... 33

C.    Defendants Cannot Demonstrate Undue Prejudice ................................................ 34

IV.    THE NEW TRANSFERS IN THE PAC RELATE BACK ............................................... 35

V.    THE NECESSARY CHANGES TO THE CAPTION ...................................................... 38

CONCLUSION ............................................................................................................................ 39

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
624 F. Supp. 2d 292 (S.D.N.Y. 2009) ...............................................................36, 38

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
626 F.3d 699 (2d Cir. 2010) ...............................................................34

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972) ...............................................................28

*Alexander Interactive, Inc. v. Adorama, Inc.*,
No. 12-cv-6608 (PKC) (JCF), 2014 WL 113728  (S.D.N.Y. Jan. 13, 2014) .........................17

*Anderson News, LLC v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ...............................................................19

*Anwar v. Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 372 (S.D.N.Y. 2010) .......................................................29, 30, 31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...............................................................19, 27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................19

*Block v. First Blood Assocs.*,
988 F.2d 344 (2d Cir 1993) ...............................................................34

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ...............................................................19

*Commander Oil Corp. v. Barlo Equip. Corp.*,
215 F.3d 321 (2d Cir. 2000) ...............................................................33

*Degulis v. LXR Biotechnology, Inc.*,
928 F. Supp. 1301 (S.D.N.Y. 1996) ...............................................................30

*Diebold Foundation, Inc. v. Commissioner of Internal Revenue*,
736 F.3d 172 (2d Cir. 2013) ...............................................................23

*Enron Corp. v. Granite Constr. Co. (In re Enron Corp.)*,
No. 03-93172 (AJG), 2006 WL 2400369 (Bankr. S.D.N.Y. May 11, 2006) .........................37

*Fish v. GreatBanc Tr. Co.*,
749 F.3d 671 (7th Cir. 2014) ..............................................................................21

*Foman v. Davis*,
371 U.S. 178 (1962) ...........................................................................................17

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ...........................................................................................20

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
No. 02-cv-5068 (JFK), 2008 WL 9359652 (S.D.N.Y. Mar. 17, 2008) ...................18

*HSBC Holdings PLC v. Picard*,
No. 19-277, 140 S. Ct. 2824, 2020 WL 2814770 (U.S. June 1, 2020)....................4

*In re Beacon Assocs. Litig.*,
745 F. Supp. 2d 386 (S.D.N.Y. 2010) ...............................................................25, 33

*In re Chaus Secs. Litig.*,
801 F. Supp. 1257 (S.D.N.Y. 1992) ....................................................................38

*In re Dreier LLP*,
452 B.R. 391 (Bankr. S.D.N.Y. 2011) ................................................................20

*In re Dreier LLP*,
462 B.R. 474, 487 (Bankr. S.D.N.Y. 2011) ........................................................26

*In re J.P. Jeanneret Assocs., Inc.*,
769 F. Supp. 2d 340 (S.D.N.Y. 2011) ................................................................25

*In re Madoff Sec.*,
No. 12-mc-115 (JSR) (S.D.N.Y.) ..........................................................................3

*In re Optimal U.S. Litig.*,
No. 10 Civ. 4095 (SAS), 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011)................22

*In re Parmalat Sec. Litig.*,
594 F. Supp. 2d 444 (S.D.N.Y. 2009) ................................................................29

*In re Picard*,
917 F.3d 85 (2d Cir. 2019) ...................................................................................4

*In re Picard*,
No. 17-2992, ECF 1413 (2d Cir. Apr. 8, 2019)....................................................35

*In re Picard*,
　No. 17-2992, ECF 1582-1 (2d Cir. June 1, 2020) .................................................35

*Leeming v. Dean Witter Reynolds Inc.*,
　676 F. Supp. 541 (S.D.N.Y. 1988) ......................................................................21

*Margel v. E.G.L. Gem Lab Ltd.*,
　No. 04 Civ. 1514 (PAC)(HBP), 2010 WL 445192 (S.D.N.Y. Feb. 8, 2010) .........34

*Mayle v. Felix*,
　545 U.S. 644 (2005) ............................................................................................35

*Metzeler v. Bouchard Transp. Co., Inc. (In re Metzeler)*,
　66 B.R. 977 (Bankr. S.D.N.Y. 1986). ..................................................................35

*Milanese v. Rust-Oleum Corp.*,
　244 F.3d 104 (2d Cir. 2001) ...............................................................................17

*Pagano v. Pergament*,
　No. 11-CV-2360 (SJF), 2012 WL 1828854 (E.D.N.Y. May 16, 2012) .................36

*Picard v. Alpha Prime Fund Ltd., et al.*
　Adv. Pro. No. 09-01364 (SMB), ECF 569 (Bankr. S.D.N.Y. Sept. 19, 2019).......30

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
　594 B.R. 167 (Bankr. S.D.N.Y. 2018) ....................................................2, 20, 35, 38

*Picard v. Ceretti*,
　Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug.
　11, 2015)........................................................................................................*passim*

*Picard v. Ceretti*,
　Adv. Pro. No. 09-01161 (SMB), ECF 99 (Bankr. S.D.N.Y. Mar. 17, 2014) .........18

*Picard v. Fairfield Sentry Ltd., et al.*,
　Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y.) ...............................................9

*Picard v. Katz*,
　462 B.R. 447 (Bankr. S.D.N.Y. 2011) .................................................................28

*Picard v. Legacy Capital Ltd. (In re BLMIS)*,
　548 B.R. 13 (Bankr. S.D.N.Y. 2016) .......................................................23, 25, 33

*Picard v. Mendelow (In re BLMIS)*,
　560 B.R. 208 (Bankr. S.D.N.Y. 2016) ............................................17, 18, 34, 35

*Picard v. Merkin (In re BLMIS)*,
      440 B.R. 243 (Bankr. S.D.N.Y. 2010) ................................................................30

*Picard v. Merkin (In re BLMIS)*,
      515 B.R. 117 (Bankr. S.D.N.Y. 2014) ...........................................................*passim*

*Picard v. Merkin (In re BLMIS)*,
      581 B.R. 370 (S.D.N.Y. 2012) ...........................................................................26

*Picard v. Peter Madoff (In re BLMIS)*,
      468 B.R. 620 (Bankr. S.D.N.Y. 2012) ................................................................37

*Picard v. Royal Bank of Canada*, *et al.*,
      Adv. Pro. No. 12-01699 (SMB) (Bankr. S.D.N.Y.) ..................................3, 4, 35, 37

*Picard v. Square One Fund Ltd. (In re BLMIS)*,
      Adv. Pro. No. 10-04330 (SMB), ECF 181 (Bankr. S.D.N.Y. May 30, 2019) ......25, 26, 32, 33

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*,
      46 F.3d 230 (2d Cir. 1995) .................................................................................33

*Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*,
      No. 13 Civ. 1654 (RA) (HBP), 2015 WL 4097927 (S.D.N.Y. July 6, 2015) ........34

*Rivas v. Bowling Green Assocs., L.P.*,
      No. 13-cv-7812 (PKC), 2014 WL 3694983 (S.D.N.Y. July 24, 2014) ...................20

*SEC v. Ballesteros Franco*,
      253 F. Supp. 2d 720 (S.D.N.Y. 2003) .................................................................28

*SEC v. Cooper*,
      402 F. Supp. 516 (S.D.N.Y. 1975) ......................................................................23

*SEC v. Elliott*,
      No. 09 Civ. 7594(KBF), 2012 WL 2161647 (S.D.N.Y. June 12, 2012) ...............27

*Silvercreek Management Inc. v. Citibank Inc.*,
      346 F. Supp. 3d 473 (S.D.N.Y. 2018) .................................................................21

*SIPC v. BLMIS (In re Madoff Sec.)*,
      513 B.R. 222 (S.D.N.Y. 2014) .............................................................................4

*SIPC v. BLMIS (In re Madoff Sec.)*,
      516 B.R. 18 (S.D.N.Y. 2014) ..........................................................................3, 19

*SIPC v. BLMIS (In re Madoff Sec.),*
  590 B.R. 200 (Bankr. S.D.N.Y. 2018) .................................................................38

*SIPC v. BLMIS (In re Madoff),*
  Adv. Pro. No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016) ..........4

*Spurr v. United States,*
  174 U.S. 728 (1899) ...........................................................................................26

*State Teachers Ret. Bd. v. Fluor Corp.,*
  654 F.2d 843 (2d Cir. 1981) ...............................................................................35

*State v. United Parcel Serv., Inc.,*
  253 F. Supp. 3d 583 (S.D.N.Y. 2017) ..................................................................24

*Todd v. Exxon Corp.,*
  275 F.3d 191 (2d Cir. 2001) ...............................................................................19

*United States ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.,*
  889 F.2d 1248 (2d Cir. 1989) .............................................................................17

*United States v. A 10th Century Cambodian Sandstone Sculpture,*
  No. 12-cv-2600 (GBD), 2013 WL 1290515 (S.D.N.Y. Mar. 28, 2013) ................18

*United States v. Dambelly,*
  714 Fed. Appx. 87 (2d Cir. 2018) .......................................................................24

*United States v. Giovannetti,*
  919 F.2d 1223 (7th Cir. 1990) ............................................................................20

*United States v. Joly,*
  493 F.2d 672 (2d Cir. 1974) ...............................................................................23

*United States v. Kozeny,*
  664 F. Supp. 2d 369 (S.D.N.Y. 2009), *aff'd*, 667 F.3d 122 (2d Cir. 2011)............20

*United States v. Nektalov,*
  461 F.3d 309 (2d Cir. 2006) ...............................................................................23

*United States v. Reyes,*
  302 F.3d 48 (2d Cir. 2002) .................................................................................20

*United States v. Svoboda,*
  347 F.3d 471 (2d Cir. 2003) ...............................................................................21

*Whiteside v. United States*,
    346 F.2d 500 (8th Cir. 1965) ...................................................................................21

**Statutes**

11 U.S.C. § 550(b) ..........................................................................................................3

15 U.S.C. §§ 78aaa-*lll* ...................................................................................................1

**Rules**

Fed. R. Bankr. P. 7012 ..................................................................................................18

Fed. R. Bankr. P. 7015 ..............................................................................................1, 17

Fed. R. Civ. P. 12(b)(6) ..........................................................................................18, 19

Fed. R. Civ. P. 15 ......................................................................................................1, 17

Fed. R. Civ. P. 15(a)(2). ...............................................................................................17

**Other Authorities**

Jesse Eisinger, *Why Only One Top Banker Went to Jail for the Financial Crisis*, N.Y. TIMES
    (Apr. 30, 2014) ...........................................................................................................28

Irving H. Picard, as Trustee for the liquidation of Bernard L. Madoff Investment

Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll*,

substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"), by and

through his undersigned counsel, respectfully submits this Memorandum of Law in Support of

Trustee's Motion for Leave to File Amended Complaint under Rule 15 of the Federal Rules of

Civil Procedure and Rule 7015 of the Federal Rules of Bankruptcy Procedure (the "Motion").

With this Motion, the Trustee submits a proposed amended complaint (the "PAC") against (i)

Royal Bank of Canada; (ii) Guernroy Limited ("Guernroy"); (iii) RBC Trust Company (Jersey)

Limited ("RBC Trust"); (iv) Royal Bank of Canada Singapore Branch ("RBC Singapore"), as

successor in interest to Royal Bank of Canada (Asia) Limited ("RBC Asia"); (v) Banque SYZ

S.A. ("Banque SYZ"), as successor in interest to Royal Bank of Canada (Suisse) S.A. ("RBC

Suisse"); (vi) RBC Dominion Securities Inc. ("RBC Dominion"); and (vii) RBC Alternative

Assets, L.P. ("RBC Alternative") (collectively, "Defendants").[1]  The PAC seeks to recover at

least $77,267,644 in subsequent transfers of BLMIS customer property (the "Transfers")

Defendants received from BLMIS feeder funds Fairfield Sentry, Rye Prime Fund, Rye Broad

Market, and Rye Portfolio Limited.[2]

## PRELIMINARY STATEMENT

The Motion should be granted because there has been no undue delay, bad faith or

prejudice on the part of the Trustee in bringing the Motion and because permitting the proposed

---

[1] Allegations made herein as to activities of, or transfers received by, "Defendants" during the relevant time frame are meant to include RBC Asia, as the predecessor in interest to RBC Singapore, and RBC Suisse, as the predecessor in interest to Banque SYZ.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the PAC.

amendment would not be futile.  To the contrary, the PAC sufficiently pleads that Defendants

received the Transfers with actual knowledge of, or willful blindness to, Madoff's fraud.[3]

   In this case, the senior RBC executive whose team was responsible for due diligence on

BLMIS feeder funds freely admitted that he determined BLMIS was a fraud as early as the

1990s.  Post-fraud, this executive publicly touted his early-on conclusion that Madoff's

"guaranteed investment strategy" was not "for real," based on the impossibility of BLMIS's

trading and performance—including BLMIS's consistent positive returns, lack of correlation to

the stock index it supposedly tracked, and impossible volume of purported options trades.  Other

executives in his RBC Cap/Alt group reached similar conclusions.

   Having determined BLMIS was a fraud, RBC established a policy that it would not lend

funds to clients to leverage their BLMIS-related investments.  Yet at the same time, Defendants

continued to promote and offer their clients investment opportunities in BLMIS feeder funds.

This decision to protect oneself while still profiting from BLMIS client investments is a strategy

courts have found indicative of bad faith.

   Year after year, Defendants disregarded RBC's stringent due diligence standards.  The

RBC Cap/Alt group instead churned out perfunctory reports that simply summarized the

performance information fed to it by the BLMIS feeder funds.  These reports never mentioned

the conclusions of RBC's executives, or that RBC had, as was referred to in the industry,

"blacklisted" Madoff for certain purposes.

   By continuing to provide coveted BLMIS feeder fund investment opportunities to their

clients on a large scale, Defendants increased the profitability of their private banking and wealth

---

[3] Defendants also cannot demonstrate at the pleading stage that they gave value for the Transfers, which element
remains an affirmative defense under Bankruptcy Code § 550(b)(1).  *See, e.g., Picard v. BNP Paribas S.A. (In re
BLMIS)*, 594 B.R. 167, 206 (Bankr. S.D.N.Y. 2018) ("*BNP*").

management businesses.  In disregarding their own conclusions as to BLMIS's legitimacy as it

suited their needs, Defendants lack good faith and must return the Transfers.

**FACTUAL BACKGROUND**

## I.    PROCEDURAL HISTORY

In June 2012, the Trustee filed his complaint seeking to recover over $105 million of

subsequent transfers received by Royal Bank of Canada, Guernroy, Royal Bank of Canada

(Channel Islands) Limited ("RBC CI"), RBC Trust, RBC Asia, RBC Suisse, RBC Dominion,

and RBC Alternative (collectively, the "Original Defendants") from BLMIS feeder funds.[4]

Later that month, the Original Defendants moved to withdraw the reference on the bases

that the Trustee bears the burden of pleading lack of "good faith" under Bankruptcy Code §

550(b) (the "Good Faith Issue") and that the Trustee's claims to recover subsequent transfers are

barred by the presumption against extraterritoriality (the "Extraterritoriality Issue").[5]  The

District Court granted the motion to withdraw the reference on these issues.[6]

In April 2014, the District Court issued its decision on the Good Faith Issue and ruled

that in a SIPA proceeding, for the Trustee's claims to survive a motion to dismiss, the Trustee

has the burden of pleading that both initial and subsequent transferees either had knowledge of

fraud or willfully blinded themselves to circumstances suggesting a high probability of fraud.[7]

In July 2014, the District Court issued its decision on the Extraterritoriality Issue and concluded

that because section 550(b) does not apply extraterritorially, the Trustee must plead facts to

---

[4] Compl., *Picard v. Royal Bank of Canada*, *et al.*, Adv. Pro. No. 12-01699 (SMB) (Bankr. S.D.N.Y. Jun. 6, 2012), ECF 1.  Future references to docket entries of *Royal Bank of Canada*, *et al.*, Adv. Pro. No. 12-01699 (SMB) (Bankr. S.D.N.Y.) shall be identified as "RBC Docket."

[5] *See* Mem. of Law on Mot. to Withdraw the Reference, RBC Docket, ECF 9.

[6] *See* Order Entered May 31, 2012, *In re Madoff Sec.*, No. 12-mc-115 (JSR) (S.D.N.Y.), ECF 154; Order Entered June 7, 2012, *In re Madoff Sec.*, No. 12-mc-115 (JSR) (S.D.N.Y.), ECF 167.

[7] *SIPC v. BLMIS (In re Madoff Sec.)*, 516 B.R. 18, 22-24 (S.D.N.Y. 2014) (the "*Good Faith Decision*").

establish that the subsequent transfers he seeks to recover are "domestic" transfers.[8]  The District

Court further held that claims to recover subsequent transfers received from an entity in a foreign

liquidation proceeding should be dismissed based on principles of international comity.[9]

In December 2014, certain Original Defendants, along with other transferee defendants,

filed a motion to dismiss in this Court based on the *District Court ET Decision*.[10]  In November

2016, the Court issued its ruling on extraterritoriality[11] and subsequently dismissed the Trustee's

claims against RBC CI, RBC Jersey, RBC Asia, RBC Suisse, and RBC Dominion, as well as the

Trustee's claims against Royal Bank of Canada and Guernroy to the extent of transfers they

received from Fairfield Sentry and Kingate Global Fund, Ltd. ("Kingate Global").[12]  On appeal,

the Second Circuit held the Trustee's actions were not barred by the presumption against

extraterritoriality or by principles of international comity.[13]  After the Supreme Court denied

certiorari in June 2020,[14] this and other adversary proceedings were returned to this Court.

## II.    THE PROPOSED AMENDED COMPLAINT

The PAC sets forth how RBC determined that BLMIS's IA Business was fraudulent and

that Defendants received the Transfers from Fairfield Sentry and the Rye Select Funds with

either actual knowledge, or willful blindness to circumstances suggesting a high probability, of

fraud at BLMIS.[15]  The PAC refers to the knowledge and conduct of the RBC organization as a

---

[8] *SIPC v. BLMIS (In re Madoff Sec.)*, 513 B.R. 222, 232 n.4 (S.D.N.Y. 2014) (the "*District Court ET Decision*").

[9] *Id.* at 231-32.

[10] RBC Docket, ECF 44 (Bankr. S.D.N.Y. Dec. 31, 2014).

[11] *See SIPC v. BLMIS (In re Madoff)*, Adv. Pro. No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016) (the "*Bankruptcy Court ET Decision*").

[12] *Id.* at *15-*16, *29; *see* Stipulated Final Order, RBC Docket, ECF 70.

[13] *In re Picard,* 917 F.3d 85 (2d Cir. 2019).

[14] *HSBC Holdings PLC v. Picard*, No. 19-277, 140 S. Ct. 2824, 2020 WL 2814770 (U.S. June 1, 2020).

[15] The PAC also (1) makes conforming changes to background and other template allegations; (2) removes transfers previously sought from BLMIS feeder fund Kingate Global, in light of the scope of the Trustee's settlement with

whole and the RBC Cap/Alt group in particular, in addition to that of Defendants, because as addressed below, such knowledge and conduct is imputable to Defendants.

A.    **RBC and Defendants Knew, or Subjectively Believed There Was a High Probability, That BLMIS's IA Business Was Fraudulent**

Defendants were sophisticated hedge fund professionals who represented that they conducted due diligence on their clients' investments. PAC ¶¶ 91, 144. As a result of the due diligence the RBC Cap/Alt group conducted in the late 1990s in connection with Defendants' BLMIS feeder fund investments, RBC and Defendants determined BLMIS was operating a fraud. *Id.* ¶¶ 91-131.

Through 2001, Robert Picard ("RP") (no relation to the Trustee) was a Managing Director focusing on risk management in the RBC Cap/Alt group in New York and was heavily involved with BLMIS feeder fund investments and due diligence. *Id.* ¶ 94. Subsequent to the collapse of BLMIS, RP admitted that he and his then-fellow executives in the RBC Cap/Alt group had concluded early on that BLMIS's purported trading could not be real. RP's admissions were extensively quoted in Erin Arvedlund's book *Too Good to Be True: The Rise and Fall of Bernie Madoff. Id.* ¶ 95.

As told by RP, in or around 1997, he and his team performed due diligence on BLMIS and sat in "countless meetings," through which they had determined, based on various impossibilities apparent from the BLMIS feeder fund documents, that "something wasn't right." *Id.* ¶¶ 97-98.

First, RP and his team recognized that BLMIS's consistent returns bore practically no correlation to the fluctuating returns of the S&P Index, despite that the SSC Strategy should have

---

that fund in 2019; (3) adds certain transfers to Defendants from Fairfield Sentry and the Rye Select Funds, which, as set forth herein, the Trustee submits relate back for purposes of Rule 15; and (4) updates the caption, as addressed further herein.

yielded returns highly correlated to those of the S&P Index. *Id.* ¶¶ 99-103. This impossibility was specifically highlighted to RP by various BLMIS feeder funds, which funds, ironically, tried to use this lack of correlation as a selling point. *Id.* ¶¶ 103-04.

Second, RP and his team recognized that BLMIS almost never lost money—another point BLMIS feeder funds hammered home to him as a reason to invest. *Id.* ¶¶ 105-06, 108. As with the lack of correlation to the S&P Index, these unbelievably high returns with almost no volatility were apparent from the documents Defendants were reviewing, including industry-standard "Sharpe ratios" showing that the returns were impossibly good for the low level of risk purportedly being taken under the SSC Strategy. *Id.* ¶ 107. RP knew such stellar performance year after year was impossible. As Ms. Arvedlund reported, RP "didn't buy it. At RBC board of directors meetings, he had seen track records like these before"—meaning he knew from experience that such consistent, positive returns were tell-tale signs of a fraud. *Id.* ¶ 109.

Third, RP and his team understood why BLMIS's purported options trading could not have been happening, based on BLMIS's total assets under management ("AUM"), which they knew was close to $20 billion or more. *Id.* ¶¶ 110-14. As sophisticated investment professionals, they understood the limitations inherent to Madoff executing such a high volume of options trades either on the exchange or over-the-counter ("OTC"). *Id.* ¶¶ 113-14. And they knew that despite such volume, BLMIS was "never mentioned anywhere as one of the biggest hedge funds on Wall Street." *Id.* ¶ 111. Finally, they knew Madoff was intentionally understating his AUM, which no legitimate investment manager would do, but was necessary to hide the impossibility of his purported options trading. *Id.* ¶¶ 110-11.

RP and his team met with Madoff in his offices in order to, as explained by Ms. Arvedlund, "see whether his guaranteed investment strategy was for real." *Id.* ¶ 115. Upon

meeting with Madoff, RP "realized that he had logged hundreds of miles and countless meetings only to have stumbled into a fraud." *Id.* ¶ 117. With respect to questions on options, per RP, "Madoff stuttered when he tried to explain his options strategy, and right away I realized he either didn't understand it or wasn't doing what he said he was doing." *Id.* ¶ 116. RP then told others his belief that Madoff was operating a fraud. *Id.* ¶ 117. When *Too Good to Be True* was published, RP put out a statement endorsing the book, confirming that he and his colleagues had "debunked the legend" of Madoff's unrivaled trading capabilities "as early as the 1990s," and that their conclusion was the result of "deep market knowledge and in-depth due diligence." *Id.* ¶ 118.

Other high-level RBC Cap/Alt hedge fund professionals shared RP's conclusions. Loren Katzovitz, the head of the group, and Patrick Hughes, a managing director, expressed suspicions about BLMIS's purported returns to a colleague, and in December 2008, that colleague posted in an online forum that those executives had, back in 2000, "agreed [Madoff] was a fraud." *Id.* ¶ 120. Katzovitz's and Hughes's "negative opinion on Madoff" was so strong that FGG salespeople gave up trying to sell them Fairfield Sentry, after they went to a new firm. *Id.* ¶¶ 121-23.

Separately, RBC/Cap Alt group Managing Director Andrew Timpson, who specialized in hedge fund due diligence for RBC from 2000 to 2008, conceded in a post-fraud interview that he "had reviewed many Madoff feeders over the years [at RBC] and based on commonsense alone and some pretty obvious factors had identified a lot of red flags." *Id.* ¶¶ 124-25. One red flag that stood out to Timpson was the impossibly large volume of OTC options trading in which BLMIS was purportedly engaged which, as he stated in a 2007 report, "would dwarf the listed market." *Id.* ¶ 126. RBC Cap/Alt group Director Eric Aldous similarly recognized that based on

BLMIS's AUM, its purported options trades would have all alone been "moving markets." *Id.* ¶ 128. Aldous set forth in an email a litany of impossibilities related to BLMIS's purported OTC options trades and openly mocked the Harley feeder fund's willingness to explain away such impossibilities based on "the power of Madoff." *Id.* ¶¶ 127-28.

By the early 2000s if not earlier, the RBC organization had informally "blacklisted" Madoff for purposes of lending money to clients, if the loan was collateralized by the client's BLMIS account. *Id.* ¶ 129. This unwillingness to leverage BLMIS-related investments was a deviation from regular practices for RBC. As noted by a BLMIS feeder fund executive in an email, RBC was an "active player in the hedge fund space" but was unwilling to leverage Madoff due to various red flags, including his impossibly good returns and the risk of fraud. *Id.* ¶ 130.

### B.   Defendants Turned a Blind Eye to Their Beliefs About Madoff

Despite concluding early on that BLMIS was a fraud, Defendants thereafter placed tens if not hundreds of millions of dollars into multiple BLMIS feeder funds for their clients. *Id.* ¶¶ 133, 135, 138. The RBC Cap/Alt group that determined Madoff was a fraud continued to be heavily involved with these investments. *Id.* ¶¶ 136-37.

Defendants aggressively sought out BLMIS feeder fund investment opportunities. *Id.* ¶¶ 135, 138-42. For example, in 2003 and 2004, RBC bankers reached out to FGG from multiple offices about making additional investments in Fairfield Sentry, prompting an FGG executive to comment internally that RBC was "very capacity hungry." *Id.* ¶¶ 140-41.

The RBC Cap/Alt group and Defendants never again demanded answers about the impossibilities they saw and instead exempted BLMIS from RBC's strict due diligence policy as to hedge fund investments. *Id.* ¶¶ 143-51. Throughout the 2000s, the RBC Cap/Alt group's ongoing "due diligence" was a formulaic, box-checking exercise, as evidenced by the pro forma

"due diligence reports" it routinely prepared, which failed to ever mention the beliefs of the RBC

Cap/Alt group executives or the blacklisting. *Id.* ¶¶ 152-58. On the few occasions the reports

mentioned red flags as to BLMIS's trading, they did not try to provide an explanation. *Id.* ¶ 157.

The reports also just parroted conflicting assertions from different BLMIS feeder funds as to

whether BLMIS was trading options on the exchange or OTC, though the lack of available

options had been raised by several RBC Cap/Alt executives. *Id.* ¶ 158.

Beyond ignoring the impossible trading and performance it saw, the RBC Cap/Alt group

affirmatively used that information in marketing materials as a reason for clients to invest,

highlighting among other things the funds' consistent positive monthly returns, double-digit

annual rates of return, high Sharpe ratios, notably low correlation coefficients, and significant

AUMs. *Id.* ¶¶ 134, 159.

As ongoing investors in BLMIS feeder funds, Defendants for years were presented with,

but disregarded, the same trading impossibilities that RP and his group had observed. With the

passage of time, these impossibilities became even more glaring—including impossibly

consistent positive returns, almost no down months for over a decade, and an ever-increasing

AUM that by 2004, the RBC Cap/Alt group understood to be around $50 billion. *Id.* ¶¶ 160-73.

## C. Fairfield Sentry Had Actual Knowledge That Madoff Was Not Trading Securities or, at a Minimum, Was Willfully Blind to Madoff's Fraud

The PAC alleges the avoidability of the initial transfers to Fairfield Sentry because the

PAC, which incorporates the Second Amended Complaint against the FGG defendants (the

"FSAC"),[16] alleges that the Fairfield Funds, through their managers and the FGG partners, had

---

[16] In July 2010, the Trustee filed an Amended Complaint against Fairfield Sentry, Fairfield Lambda Limited, Fairfield Sigma Limited (collectively, the "Fairfield Funds"), and other defendants to avoid and recover over $3 billion of initial transfers of BLMIS customer property. *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (SMB) (Bankr. S.D.N.Y.), ECF 23. In May 2011, the Trustee settled with the Fairfield Funds, through their liquidators, *id.* ECF 69-2, and on August 28, 2020, the Trustee filed the FSAC against certain FGG partners and related FGG entities. *Id.* ECF 286.

actual knowledge that Madoff was not trading securities.  Alternatively, the PAC alleges that the

Fairfield Funds, through their managers and FGG partners, were willfully blind to Madoff's

fraud.

No investment firm in BLMIS's infamous history was more intertwined with Madoff

than FGG.  FSAC ¶ 1.  Madoff needed FGG's international connections and the billions of

dollars it collected from FGG investors to sustain the Ponzi scheme.  *Id*.  The FGG partners

needed Madoff to grow their spectacular wealth and support their extravagant lifestyles.  *Id*. ¶¶ 1,

5-6.  As one founding partner admitted, his goal was to live better than any of his clients.  *Id.* ¶ 7.

The FGG partners were paid handsomely for their efforts—receiving hundreds of million dollars

in fees.  *Id.* ¶ 333.  Thus motivated, the FGG partners worked with Madoff to hide his fraud.  *Id.*

¶¶ 151-56, 165-67, 186, 236-62.

In 1990, FGG incorporated Fairfield Sentry as its first BLMIS feeder fund.  *Id.* ¶ 88.  To

comport with Madoff's demands, Fairfield Sentry ceded control of all investment decisions to

BLMIS.  *Id.* ¶¶ 91-92.  FGG further arranged for Citco Global Custody N.V. to be listed as

Fairfield Sentry's purported custodian, with the understanding that Citco would hold that

position in name only, because all custodial duties were delegated to BLMIS.  *Id*. ¶ 91.

Over the course of Fairfield Sentry's investments with BLMIS, FGG reviewed customer

statements, trade tickets, and other information from BLMIS that reflected obvious trading

impossibilities and other indications of BLMIS's fraud.  *Id.* ¶¶ 137, 142-45, 271, 287, 296, 307.

In 1990, FGG hired Gil Berman, a former options trader, as an independent contractor to analyze

BLMIS's trading activity.  *Id.* ¶ 143.  Beginning in the mid-1990s, Berman recognized trading

impossibilities on Fairfield Sentry's account statements.  *Id.* ¶¶ 144, 285-87.  Berman informed

FGG that prices BLMIS reported were above the highest trading prices reported for the day,

which was impossible. *Id.* ¶ 145. Over the years, Berman informed FGG that BLMIS's reported options trades were "unusual and difficult to explain" and inconsistent with the SSC Strategy. *Id.* ¶ 285. By 2008, Berman was pleading with FGG to investigate BLMIS's purported options trades. *Id.* ¶ 283. Berman even discussed with Amit Vijayvergiya, FGG's partner and Chief Risk Officer, that Madoff could be backdating trade confirmations. *Id.* ¶ 287.

FGG's knowledge that BLMIS purported to trade securities outside their reported price ranges was further confirmed by a prominent investment consultant. *Id.* ¶¶ 308-12. In May 2005, Vijayvergiya received a report authored by Prime Buchholz & Associates analyzing trades BLMIS purportedly made on April 6, 2004. *Id.* ¶ 309. The report noted that "in 27 out of 38 trades placed on April 6, 2004, Madoff Securities posted purchases below the reported lowest price available on the exchange that day." *Id.* ¶ 310. Vijayvergiya ignored BLMIS's inexplicable pricing, writing to a co-worker, "feel free to file this under 'completely useless' …" *Id.* ¶ 312.

In 2001 *Mar/Hedge* and *Barron's* published articles that openly questioned BLMIS's legitimacy. *Id.* ¶¶ 132-34. Following publication, Citco, FGG's agent and custodian, acknowledged grave doubts about Madoff and feared that its risk exposure was approximately $3 billion, which was the full amount of Fairfield Sentry's investments with BLMIS. *Id.* ¶¶ 138-39. In response, FGG arranged a site visit to BLMIS with procedures agreed upon in advance to confirm the existence of Fairfield Sentry's assets. *Id.* ¶ 140. But when the visit finally took place, the agreed upon procedures were ignored. *Id.* Citco was forbidden to review BLMIS's back office, interview certain BLMIS employees, or perform other basic procedures. *Id.* Nor was Citco given "evidence about the existence of the US T bills (e.g., stock record reconciliation / clearing confirmation)," as they had requested. *Id.* In short, Citco was unable to verify the

existence of Fairfield Sentry's assets, which it purportedly held as Fairfield Sentry's custodian. *Id.* ¶ 140-41.  According to Citco, the site visit was a failure.  *Id.* ¶ 140.  Over the next six years, FGG never took any steps to confirm the existence of Fairfield Sentry's assets with BLMIS.  *Id.* ¶¶ 148, 167, 213, 226, 229-34.

In an example of FGG's complicity in Madoff's Ponzi scheme, FGG lied to the SEC about BLMIS to protect Madoff from scrutiny.  *Id.* ¶¶ 233-62.  In 2005, FGG became aware of an SEC investigation into the trading practices of certain BLMIS feeder funds for potential violations of federal securities laws.  *Id.* ¶ 238.  After the SEC contacted FGG to schedule a meeting, Madoff spoke with Vijayvergiya and Mark McKeefry, FGG's Chief Legal Officer, to plan what they would tell the SEC.  *Id.* ¶¶ 238-41.  Madoff began by stating: "Obviously, first of all, this conversation never took place."  *Id.* ¶ 242.  Madoff then coached Vijayvergiya and McKeefry how to obfuscate BLMIS's role with regard to the Fairfield Funds.  *Id.* ¶¶ 243-53.  For example, Madoff told them to tell the SEC that BLMIS was merely the Fairfield Funds' executing broker that took orders from FGG.  *Id.* ¶¶ 245-47.  This was false.  Madoff also reviewed the notes FGG had drafted for the SEC meeting and edited the remarks FGG planned to deliver.  *Id.* ¶ 252.  The SEC meeting occurred in December 2005, and Vijayvergiya and McKeefry performed as instructed, telling the SEC that an FGG affiliate—not BLMIS—made investment decisions for the Fairfield Funds.  *Id.* ¶¶ 254-56.  They said nothing about Madoff's extensive coaching prior to the meeting.  *Id.* ¶ 258.  And when asked by the SEC whether they had spoken to Madoff in advance, they lied and said that their conversation had been "mostly in regards to reproducing binders."  *Id.* ¶ 257.

Another example of FGG's complicity concerns Friehling & Horowitz.  *Id.* ¶¶ 188-213. FGG knew that Friehling & Horowitz was not certified to perform audits by the American

Institute of Certified Public Accountants. *Id.* ¶ 189. Nevertheless, FGG represented to clients

that Friehling & Horowitz audited BLMIS, an impossibility. *Id.* When pressed, FGG told at

least one investor that PricewaterhouseCoopers audited BLMIS's returns (while acknowledging

internally that this was a lie). *Id.* ¶ 193. FGG told other investors—as Madoff had instructed—

that Friehling & Horowitz was a large, reputable firm with hundreds of clients. *Id.* ¶¶ 192, 201.

FGG knew this too was a lie. *Id.* ¶ 201. FGG's founding partner, Jeffrey Tucker, had a Dun &

Bradstreet report, which FGG had requested, that showed Friehling & Horowitz had only one

employee, receipts of a mere $180,000, and operated out of Mr. Friehling's home. *Id.* ¶ 204.

FGG touted its sophisticated due diligence practices, but by its own admission, FGG did

not apply them to BLMIS. *Id.* ¶¶ 142, 148-49, 157. For example, although FGG claimed its due

diligence practices would have uncovered the Bayou Ponzi scheme, FGG declined to apply those

standards to BLMIS—even as FGG recognized the similarities between BLMIS and Bayou in

that both used an obscure and unqualified auditor, had a fee structure contrary to industry

standard, and lacked independent service providers. *Id.* ¶¶ 196-200, 207-10, 214-19. After

dismissing investor concerns about BLMIS and Bayou, an FGG employee joked with

Vijayvergiya about the obvious similarities between the two frauds. *Id.* ¶ 199. For FGG,

concerns about BLMIS were a branding, as opposed to a diligence, issue. *Id.* ¶¶ 145, 156, 168,

210.

In sum, and as further alleged in the FSAC, the Fairfield Funds knew that BLMIS was

not trading securities. They knew BLMIS's returns could not be the result of the SSC Strategy.

*Id.* ¶¶ 9, 281-89. They knew BLMIS's equities and options trading volumes were impossible.

*Id.* ¶¶ 278-80, 290-97. They knew that BLMIS reported impossible, out-of-range trades, which

always were in Madoff's favor. *Id.* ¶¶ 145, 307-13. They knew Madoff's auditor was not

certified and lacked the ability to audit BLMIS. *Id.* ¶¶ 188-213. They knew BLMIS did not use

an independent broker or custodian. *Id.* ¶¶ 220-35. They knew Madoff refused to identify any

of BLMIS's options counterparties. *Id.* ¶¶ 165, 264-65, 288, 298-300. They knew Madoff lied

about whether he traded options over the counter or through an exchange. *Id.* ¶¶ 303-06. They

knew their clients and potential clients raised numerous due diligence questions they would not

and could not answer. *Id.* ¶¶ 156, 165-69, 175-83, 186-87, 190, 200-03, 223-26, 229-30, 233.

They knew Madoff refused to provide them with honest answers to due diligence questions

because it would have confirmed the details of his fraud. *Id.* ¶¶ 192, 265, 298-299, 303-05.

### D.   The Rye Select Funds Had Actual Knowledge That Madoff Was Not Trading Securities or, at a Minimum, Were Willfully Blind to Madoff's Fraud

The Trustee filed the Tremont Complaint against Tremont and the Tremont Feeder Funds

(including the Rye Select Funds) in 2010 for avoidance and recovery of $2.1 billion of initial

transfers from BLMIS. PAC ¶ 189. In 2011, this Court approved a settlement between the

Trustee and Tremont in which the parties deemed the initial transfers avoided. *Id.* ¶ 191.

The PAC incorporates the Tremont Complaint (cited herein as "TC") and supplements

the allegations therein. *Id.* ¶ 189. The PAC plausibly pleads that the Tremont Feeder Funds,

through their Tremont managers, had actual knowledge that BLMIS was not trading securities.

Alternatively, the PAC sufficiently pleads that the Tremont Feeder Funds, through their

managers, were willfully blind to BLMIS's fraud.

Tremont was utterly dependent on BLMIS's fraud. Tremont managed one of the largest

groups of BLMIS feeder funds, with billions invested at the time of Madoff's arrest, and it co-

managed Kingate Global. TC ¶¶ 1-2, 5; PAC ¶¶ 190, 244, 246. Various Tremont executives

observed that BLMIS accounted for "all of the profits of the firm," that the Tremont Feeder

Funds' "only reason for being" was as feeders into BLMIS, and that BLMIS was Tremont's

"crack addiction business." PAC ¶ 246. Tremont's parent company similarly concluded that "the economics of Tremont's business [was] Madoff." *Id.* ¶ 247. This business yielded Tremont hundreds of millions of dollars in fees, and millions of dollars in compensation to its executives. *Id.* ¶¶ 245-47; TC ¶¶ 14, 31, 58-59, 82, 103-10. Its chief executives had longstanding, unusually close relationships with Madoff for almost two decades, which Tremont touted in its marketing materials to investors. PAC ¶¶ 192-94.

Tremont was continually confronted with warnings from investors and potential investors indicating that BLMIS was a fraud. *Id.* ¶¶ 195-206. For instance, in April 2001, one investor wrote to Schulman: "I know you are sick of answering this but man is it hot out here with the Bernie fraud rumors." *Id.* ¶ 195. Another client questioned "the legitimacy of the whole Bernie thing." TC ¶ 197. At least two other potential investors specifically raised the prospect that BLMIS was a Ponzi scheme. PAC ¶¶ 203, 206. Over the years, third parties repeatedly highlighted to Tremont, among other things, BLMIS's impossibly stable returns; its use of a small auditor with no other clients; its lack of a third-party custodian; its unknown counterparties; its failure to charge a management fee; its utter lack of transparency; and the inability to verify assets. *Id.* ¶¶ 195, 197, 199, 202; TC ¶158, 194-95, 215. Tremont's executives knew these warnings evidenced fraud, as revealed by their practice of internally sharing the *Barron's and Mar/Hedge* articles questioning Madoff's legitimacy after receiving such warnings. PAC ¶¶ 196, 205-06.

Tremont was also continually confronted with information that BLMIS's trading and performance was neither legitimate nor possible. *Id.* ¶¶ 207-09. Based on information it received from BLMIS, Tremont knew that daily securities positions and prices BLMIS reported differed from those reported by Bloomberg, and there was insufficient volume for BLMIS to complete its

purported securities trades.  *Id.* ¶¶ 208-09; TC ¶¶ 170-74.  Tremont also knew BLMIS had a

history of impossibly consistent positive returns given the SSC Strategy Madoff purported to

employ.  TC ¶¶ 160-64.  Tremont used BLMIS's impossible trading and performance regularly for

years as the centerpiece for its own reports and marketing materials.  PAC ¶ 207-08.

 Tremont also knew that BLMIS had no ISDA agreements in place for its purported OTC

options trades, though such agreements were required, and that Madoff had never given Tremont a

single counterparty name, though Tremont bore the risk of a counterparty default and those names

should have been on every trade confirmation.   *Id.* ¶¶ 227-28, 231-33; TC ¶ 185.  Tremont

understood BLMIS's options trading was a fiction, as illustrated by its total lack of concern as to

counterparty exposure when Lehman Brothers collapsed in 2008.  PAC ¶¶ 239-43.

 By helping conceal it, Tremont was an active and knowing facilitator of the fraud.

Tremont consistently excluded Madoff from its own due diligence requirements.  *Id.* ¶¶ 210-15.

Tremont employees knew three things "ya don't ask" about BLMIS were its AUM, how it

generated its purported returns, and its auditors.  *Id.* ¶ 212.  As stated by one employee, Tremont

had "no manager due dili[gence] process" for BLMIS.  *Id.* ¶ 215.  Though BLMIS should have

been rejected based on Tremont's policy against self-custody and self-clearing alone, it got a

pass.  *Id.* ¶¶ 216-21.  Schulman also strictly prohibited anyone other than himself from contacting

BLMIS, despite its significance to Tremont's existence.  *Id.* ¶ 213.

 Tremont similarly prevented investors and even its own auditors from having contact with

BLMIS, and it hindered the due diligence efforts of third parties through obstruction and

misleading statements.  *Id.* ¶¶ 222-25.  Among the tales Tremont wove were (i) that Friehling &

Horowitz audited other broker-dealers, (ii) that Tremont had verified the existence of BLMIS's

assets, and (iii) various fabrications regarding BLMIS's purported options trading, including

claiming to have spoken with, and providing actual names and descriptions of non-existent

counterparties. *Id.* ¶¶ 225-43.

## ARGUMENT

## I.    LEGAL STANDARDS GOVERNING MOTIONS TO AMEND A PLEADING

Federal Rule of Civil Procedure 15, made applicable here by Federal Rule of Bankruptcy

Procedure 7015, provides that when a party requires leave of court to amend its pleading, "[t]he

court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Leave "should

not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-

movant, or futility."  *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing

*Foman v. Davis*, 371 U.S. 178, 182 (1962)).  As this Court has explained, "amendments are

favored because they 'tend to facilitate a proper decision on the merits.'"  *Picard v. Mendelow*

*(In re BLMIS)*, 560 B.R. 208, 221 (Bankr. S.D.N.Y. 2016) (citation omitted).  The burden is on

the party opposing leave to amend to demonstrate that one or more of the grounds supporting

denial exists.  *See, e.g.*, *Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12-cv-6608 (PKC)

(JCF), 2014 WL 113728, at *3 (S.D.N.Y. Jan. 13, 2014) (discussing futility and undue

prejudice).

## II.    THE COURT SHOULD GRANT THE TRUSTEE'S MOTION TO AMEND IN LIGHT OF THE INTERVENING CHANGE IN LAW AND THE ADDITIONAL FACTS ALLEGED

Beyond the general standard for seeking leave to amend, "[a]n intervening change in

pleading standards may justify leave to amend."  *Mendelow*, 560 B.R. at 221; *see United States*

*ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 889 F.2d 1248, 1255 (2d Cir.

1989).  Here, the Trustee seeks leave to amend his complaint on the well-accepted grounds of an

intervening change in pleading standards.

This Court has recognized that there was good cause in granting motions brought on similar grounds to the instant motion. *See, e.g.*, *Mendelow*, 560 B.R. at 224; *see also* Order, *Picard v. Ceretti*, Adv. Pro. No. 09-01161 (SMB), ECF 99 (Bankr. S.D.N.Y. Mar. 17, 2014). In particular, as here, where the original complaint has grown "stale due to the unusually drawn out procedural history" of a case, the Trustee should be permitted to add new facts and allegations. *See Grand River Enters. Six Nations, Ltd. v. Pryor*, No. 02-cv-5068 (JFK), 2008 WL 9359652, at *3 (S.D.N.Y. Mar. 17, 2008) (granting leave to add allegations related to extant claims). Moreover, leave to amend should be permitted because this would be the Trustee's first amendment in this action. *See United States v. A 10th Century Cambodian Sandstone Sculpture*, No. 12-cv-2600 (GBD), 2013 WL 1290515, at *10 (S.D.N.Y. Mar. 28, 2013) (granting leave where it was "the Government's first request to amend its complaint with facts collected pursuant to its ongoing investigation").

## III.    NO FUTILITY, UNDUE DELAY, BAD FAITH, OR UNDUE PREJUDICE EXISTS

### A.    Amending the Complaint Would Not Be Futile Because the Trustee Has Alleged Facts Sufficient to Survive a Motion to Dismiss

Leave to amend should be granted here because the PAC sets forth facts that would permit this Court to reasonably infer that Defendants were bad-faith subsequent transferees of avoidable initial transfers.[17]

When evaluating for futility on a motion for leave to amend, a court must determine whether the amended pleading could survive a Rule 12(b)(6) motion to dismiss. The motion to dismiss standard under Rule 12(b)(6), made applicable here by Federal Rule of Bankruptcy Procedure 7012, is well settled: the court must "constru[e] the complaint liberally, accepting all

---

[17] By seeking to file an amended pleading, the Trustee does not concede that the District Court's decisions regarding the pleading burden and standards for Defendants' good faith are correct. The Trustee is currently appealing these decisions at the Second Circuit.

factual allegations in the complaint as true, and drawing all reasonable inferences in the

plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citation

omitted).  At this stage, "the issue is not whether a plaintiff will ultimately prevail but whether

the [plaintiff] is entitled to offer evidence to support the claims." *Todd v. Exxon Corp.*, 275 F.3d

191, 198 (2d Cir. 2001) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.' . . .  A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While the

plausibility test "asks for more than a sheer possibility that a defendant has acted unlawfully," it

"is not akin to a 'probability requirement.'" *Id.*; *accord Twombly*, 550 U.S. at 556.  "Because

plausibility is a standard lower than probability, a given set of actions may well be subject to

diverging interpretations, each of which is plausible," and, for that reason, "[t]he choice between

two plausible inferences that may be drawn from factual allegations is not a choice to be made

by the court on a Rule 12(b)(6) motion." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162,

184-85 (2d Cir. 2012).

To plead a lack of good faith, the Trustee must either allege that each Defendant had

actual knowledge of fraud at BLMIS or that each Defendant "willfully blinded [itself] to

circumstances indicating a high probability of such fraud." *Good Faith Decision*, 516 B.R. at 23.

Actual knowledge requires the Trustee to plead that Defendants had "a high level of certainty

and absence of any substantial doubt regarding the existence of a fact." *Picard v. Ceretti (In re

BLMIS)*, Adv. Pro. No. 09-1161 (SMB), 2015 WL 4734749, at *13 (Bankr. S.D.N.Y. Aug. 11,

2015) ("*Kingate*") (quoting *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 139 (Bankr. S.D.N.Y.

2014) ("*Merkin II*").  Actual knowledge may be proven by circumstantial evidence.  *Rivas v.*

*Bowling Green Assocs., L.P.*, No. 13-cv-7812 (PKC), 2014 WL 3694983, at *2 (S.D.N.Y. July

24, 2014).

    Willful blindness, also known as deliberate ignorance or conscious avoidance, is a

doctrine that comes from criminal law.  *United States v. Reyes*, 302 F.3d 48, 54 (2d Cir. 2002);

*accord Merkin II*, 515 B.R. at 139 n.15 ("Willful blindness is equivalent to the criminal law

concept of 'conscious avoidance.'" (citation omitted)).  Willful blindness requires the Trustee to

plead that Defendants: (1) subjectively believed there was a high probability that a fact existed;

and (2) took deliberate actions to avoid learning of that fact.  *BNP*, 594 B.R. at 197 (citing

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)).  This "ostrich instruction is

designed for cases in which there is evidence that the defendant, knowing or strongly suspecting

that he is involved in shady dealings, takes steps to make sure that he does not acquire full or

exact knowledge of the nature and extent of those dealings."  *United States v. Giovannetti*, 919

F.2d 1223, 1228 (7th Cir. 1990); *see also United States v. Kozeny*, 664 F. Supp. 2d 369, 388

(S.D.N.Y. 2009), *aff'd*, 667 F.3d 122 (2d Cir. 2011); *In re Dreier LLP*, 452 B.R. 391, 450

(Bankr. S.D.N.Y. 2011).  As this Court has described it, "willful blindness connotes strong

suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate

failure to acquire actual knowledge of its existence."  *Merkin II,* 515 B.R. at 140 (emphasis in

original).

    As noted by this Court, the line between "actual knowledge" and "willful blindness" is

difficult to draw.  *Merkin II*, 515 B.R. at 139.  Given the similarity of the standards, the same

evidence may support a finding of either actual knowledge or willful blindness. *See United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003).

Actual knowledge and willful blindness are difficult to determine as a matter of law. *See Leeming v. Dean Witter Reynolds Inc.*, 676 F. Supp. 541, 545 (S.D.N.Y. 1988) (acknowledging that "subjective factual issues" as to actual knowledge were "ill-suited for resolution on a motion to dismiss"); *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 685 (7th Cir. 2014) ("[F]inding the line between 'willful blindness' and 'reason to know' may be like finding the horizon over Lake Michigan in a snowstorm. . . . In other words, only rarely could that line be drawn as a matter of law.") (citations omitted).

1.    The PAC Plausibly Pleads Defendants Knew, or Subjectively Believed There Was a High Probability, BLMIS's IA Business Was a Fraud

RP's and his RBC Cap/Alt group's belief that BLMIS was a fraud is now public knowledge. RP freely acknowledged that belief in a detailed, post-fraud interview for a high-profile publication by a respected author in the financial industry. He then endorsed the book, further touting how he and his colleagues "debunked the 'legend' of Madoff as early as the 1990s." There is perhaps no stronger evidence of one's knowledge than that person's own admissions. *See, e.g.*, *Silvercreek Management Inc. v. Citibank Inc.*, 346 F. Supp. 3d 473, 487-90 (S.D.N.Y. 2018) (allegations of actual knowledge by Credit Suisse sufficient to survive summary judgment where employees made statements acknowledging their awareness of the fraud); *Whiteside v. United States*, 346 F.2d 500, 504 (8th Cir. 1965) (finding that defendant's "after-the-fact trustworthy admissions show beyond doubt that he had actual knowledge of" the fact that a check was illegally altered).

The belief RP and his RBC Cap/Alt group formed was a result of the numerous impossibilities they saw and appreciated in the late 1990s, including: (i) BLMIS's consistently

positive returns, which RP knew was an indicator of fraud; (ii) the lack of correlation to the S&P

Index and unexplainably high Sharpe ratios; (iii) that Madoff was hiding BLMIS's true AUM,

and that the volume of options needed to execute the SSC Strategy on its AUM was impossibly

high; and (iv) the complete lack of discussion on Wall Street about BLMIS as a hedge fund

despite that if its trades were real, it would have been "moving markets."  As a result, RBC and

Defendants, at a minimum, knew the BLMIS feeder funds' reported activity could not be the

result of legitimate securities trading by BLMIS.  This is sufficient to support a finding of actual

knowledge.  *See, e.g., Kingate*, 2015 WL 4734749, at *13-*14 (actual knowledge adequately

alleged based on defendants' awareness of numerous trading impossibilities, including equity

and options trades that could not have taken place).

RP admitted that he and the other RBC Cap/Alt group executives connected the dots in

real time and concluded that BLMIS was a fraud, and then confronted Madoff, who had no

answers.  As in *In re Optimal U.S. Litig.*, No. 10 Civ. 4095 (SAS), 2011 WL 4908745, at *7-*8

(S.D.N.Y. Oct. 14, 2011) (finding scienter adequately pled), the PAC alleges that the RBC

Cap/Alt group raised "critical questions" about risk at BLMIS, "failed to obtain [from Madoff]

any answers to its questions," and believed that BLMIS was likely a fraud.

As in *Merkin II*, the RBC Cap/Alt group was aware that the entire options market could

not have accommodated Madoff's enormous AUM.  *See Merkin II*, 515 B.R. at 141 (noting that

Merkin "saw and appreciated" quantitative facts including that BLMIS's purported options

trading volume was impossible).  RP and his team knew by the 1990s that such options trading

could not be happening, even at $20 billion.  Numerous RBC Cap/Alt group executives

thereafter pointed out the same impossibilities, observing for instance, as Timpson did, that "[i]f

estimates of total Madoff AUM of $25-$50bn are accurate" such OTC contracts "would dwarf

the listed market." This belief in real time that BLMIS's purported options trading could not have happened is alone sufficient for alleging the first prong of willful blindness. *See Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 35 (Bankr. S.D.N.Y. 2016) ("*Legacy*") (strong suspicion that BLMIS's options trades were not real is sufficient for pleading willful blindness prong one).[18]

An international financial entity comprised of sophisticated financial professionals, RBC appreciated that the foregoing impossibilities indicated BLMIS was not engaged in real securities trading and was a fraud. RP acknowledged that his and his team's beliefs that they had "stumbled into a fraud" were based on "deep market knowledge and in-depth due diligence." *See, e.g., SEC v. Cooper,* 402 F. Supp. 516, 521 (S.D.N.Y. 1975) ("As a sophisticated, experienced and knowledgeable broker, [defendant] would have had to have been blind not to have seen what was going on[.]"); *Diebold Foundation, Inc. v. Commissioner of Internal Revenue*, 736 F.3d 172, 188-89 (2d Cir. 2013) (sophistication plus intimate knowledge indicated that defendant knew or was willfully blind to illegitimate tax scheme). Here the RBC Cap/Alt group and Defendants had a deep understanding of BLMIS's purported strategy, trading activity, and performance results, enabling them to recognize that BLMIS was operating a fraud.

Like Merkin, RP and the other RBC Cap/Alt group executives who performed due diligence on Madoff owed duties to their clients to be on the lookout for fraud, and the RBC Cap/Alt group even stressed in marketing materials that it conducted strict due diligence on investments, whether client-selected or discretionary. PAC ¶ 145. As such, they were able to

---

[18] Although here the Trustee asserts that Defendants subjectively believed BLMIS's trading could not have been real, Defendants' belief as to fraud generally is sufficient for the PAC to survive a motion to dismiss. The Second Circuit does not require a willfully blind defendant to know the specific wrongdoing committed. *See United States v. Nektalov*, 461 F.3d 309, 315 (2d Cir. 2006) ("The culpability of the willfully blind defendant lies in his averting his eyes to what he thinks he sees, not in the objective accuracy of his vision."); *see also United States v. Joly*, 493 F.2d 672, 674 (2d Cir. 1974) (affirming convictions for importation and possession of cocaine despite no direct evidence that defendant knew he was carrying cocaine because defendant "admitted that 'he thought he was doing something wrong but he really didn't know what it was'").

recognize the numerous "red flags" at BLMIS as indicia of fraud, such as Timpson, for example, who acknowledged understanding and appreciating such evidence. *See Merkin II*, 515 B.R. at 145 ("[T]he fact that the Government and other investors missed the same red flags does not mean that Merkin did too. . . . Merkin was not a mere investor . . . [rather] he owed a separate duty of care in selecting [his funds'] outside money-managers and their investments. He even touted [the diligence his funds performed]. In short, the visibility of 'red flags' depends on who is standing sentry, and Merkin agreed to keep a sharp lookout for fraud.").

Thus, this is not a case where Defendants were fooled by a fraud that was only visible to them in hindsight.

2. The PAC Plausibly Pleads Defendants Consciously Disregarded What They Knew or Believed About BLMIS

The PAC alleges facts sufficient to satisfy the second prong of willful blindness—that Defendants ignored what they knew or believed about BLMIS's fraud.[19] "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *State v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 667 (S.D.N.Y. 2017) (citation omitted). "[T]he standard does not require proof of an identifiable 'affirmative act'" and merely refers to a requisite state of mind. *Id.* at 667 (citation omitted); *see also United States v. Dambelly*, 714 Fed. Appx. 87, 88-89 (2d Cir. 2018) (holding willful blindness may be established "even when the defendant has taken no active measures" to avoid knowledge).

Here, the stark contrast between RBC's blacklisting of BLMIS-based leverage transactions and its investing for clients in BLMIS feeder funds cuts to the heart of Defendants' willful avoidance. After recognizing Madoff's fraud in real time, an organization-wide informal

---

[19] By definition this conscious avoidance prong has relevance only to willful blindness but not actual knowledge.

blacklist was implemented to protect RBC, yet Defendants continued to actively seek out and

place tens of millions of dollars for clients into BLMIS feeder funds.  This is factually similar to

cases involving BLMIS feeder fund manager Ivy Asset Management, LLC ("Ivy").  *See In re*

*J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011); *In re Beacon Assocs. Litig.*,

745 F. Supp. 2d 386 (S.D.N.Y. 2010).  There, Ivy diminished its own proprietary investments in

BLMIS because its principals suspected Madoff might be a fraud, while at the same time

continuing to put client funds into BLMIS and failing to advise clients to get out.  *See J.P.*

*Jeanneret Assocs.*, 769 F. Supp. 2d at 368 (finding sufficient the allegations that Ivy was (i)

"protecting its own flank" by divesting its proprietary BLMIS investments in response to its

belief in a high probability of fraud, while (ii) "accreting its purse with money earned by

exposing others" to BLMIS investments and inflating its AUM); *Beacon Assocs.*, 745 F. Supp.

2d 386 at 405-06 (same).

Also, in *Square One*, this Court found willful blindness where Square One's principal

withdrew his own funds and was thus "no longer at personal risk" yet continued to earn fees for

"turning over Square One investors' moneys to Madoff."  *See Picard v. Square One Fund Ltd.*

*(In re BLMIS)*, Adv. Pro. No. 10-04330 (SMB), ECF 181, at 43:19-23 (Bankr. S.D.N.Y. May 30,

2019) (citing *Legacy*, 548 B.R. 13) ("*Square One* Tr.").

Defendants not only failed to protect their clients from BLMIS's fraud, they actively

marketed BLMIS feeder fund investments to their clients, highlighting BLMIS's impossible

trading and performance as a reason to invest.  *See Beacon Assocs.*, 745 F. Supp. 2d at 405

(scienter found where defendants made public statements in support of BLMIS investments

while knowing facts or having access to information suggesting that such public statements were

not accurate).

Moreover, Defendants could have demanded answers from the BLMIS feeder funds during their numerous interactions over the years, but they instead deliberately stopped conducting any meaningful due diligence once their beliefs about Madoff were formed. This Court has previously held that a refusal to conduct further diligence constitutes turning away. *See Square One* Tr. at 43:12-13 ("As to the second prong, Estenne did not bother to conduct any further due diligence regarding BLMIS."); *see also Merkin II*, 515 B.R. at 141 (holding complaint adequately alleged Merkin "took deliberate actions to avoid learning the truth about BLMIS" by, for example, "not press[ing]" Madoff to answer questions).

Defendants' failure to confront the likelihood of fraud at BLMIS was also contrary to the duty they recognized they owed their clients to always investigate the investments they were making. *See, e.g., Spurr v. United States*, 174 U.S. 728, 733-34 (1899) (gross indifference to duty to investigate facts strengthens the conclusion that a failure to investigate was a willful choice); *Picard v. Merkin (In re BLMIS)*, 581 B.R. 370, 381 (S.D.N.Y. 2012) ("It is important to know what [fund managers] like Merkin should have done, because if he did not respond appropriately to specific indications that Madoff was a fraud, it may support an inference that Merkin consciously turned away from those facts and any further investigation."); *In re Dreier LLP*, 462 B.R. 474, 493 (Bankr. S.D.N.Y. 2011) (willful blindness allegations survived a motion to dismiss in part based on "circumstantial evidence of the type of investigation a fund manager performs in connection with its pre-existing duty to its own investors, and hence, what [defendant] should have done").

Like in *Merkin II* and *Kingate*, Defendants ignored RBC's strict due diligence policies and procedures when it came to Madoff. *See Merkin II*, 515 B.R. at 141; *Kingate*, 2015 WL 4734749 at *14. If anything, Defendants should have heightened their scrutiny of BLMIS and its

feeder funds.  Instead, Defendants made their own peace with Madoff by implementing a self-

protection policy prohibiting leverage investments, and thereafter, their ongoing due diligence

was merely a formulaic exercise.  In such circumstances, a finding of willful blindness is

appropriate.  *See SEC v. Elliott,* No. 09 Civ. 7594(KBF), 2012 WL 2161647, at *5-7 (S.D.N.Y.

June 12, 2012) (defendants, who had "decades of training and experience in the securities

industry," acted with willful blindness by completely disregarding their normal due diligence and

as a result selling restricted shares of a company without a legitimate exception).

### 3.   Plausibility and Incentives

"A claim has facial plausibility when the pleaded factual content allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009).  Here, plausibility is easily shown because Defendants' actual

knowledge or willful blindness is demonstrated by RP's admissions as well as the statements of

other RBC Cap/Alt executives.  Beyond the admissions, Defendants' conduct is plausible

because the PAC alleges they limited their risk by foregoing leverage transactions and because

they were incentivized to continue investing for clients on a large scale in BLMIS feeder funds.

PAC ¶¶ 129-31, 174-82.

In so doing, Defendants (i) effectively capitalized on BLMIS's impossibly consistent

positive returns by providing their clients with coveted BLMIS feeder fund investment

opportunities, (ii) favorably competed with other banks offering access to BLMIS by cultivating

relationships with numerous BLMIS feeder funds, (iii) earned fees from their hedge fund clients,

and (iv) earned "retrocession" fees from various BLMIS feeder funds, which the funds were able

to offer at a generous level on account of BLMIS's inexplicable refusal to charge management or

performance fees itself.  *Id.* ¶¶ 174-82.  In this way, Defendants were able to grow and increase

the profitability of their private banking and wealth management businesses.  *See Kingate,* 2015

WL 4734749, at *16 ("As discussed in *Merkin*, a corporation benefits from an aura of profitability that enables it to attract more investors.").

Defendants' decision to "willfully blind themselves to the fact that they had invested in a fraudulent enterprise" is therefore particularly plausible given that Defendants found a way to "realize substantial short-term profits while protecting themselves against the long-term risk." *Picard v. Katz*, 462 B.R. 447, 454 (Bankr. S.D.N.Y. 2011) (finding such allegations in complaint sufficient to survive a motion to dismiss).

Moreover, in organizations like RBC, the individual bankers involved with investment decisions receive immediate financial compensation based on the size and performance of their clients' investments, yet they are typically shielded from personal liability if an investment subsequently blows up because of fraud. Notably, only a single banker went to jail in the wake of the financial crisis.[20] Such bankers are thus incentivized to take large, immediate-term risks without consideration for the longer-term implications.

4.    The PAC Sufficiently Pleads Imputation of Actual Knowledge or Willful Blindness to Defendants

The PAC sufficiently pleads that the knowledge and conduct of RBC's executives is imputable to each of the Defendants.[21] PAC ¶¶ 88-90, 183-88.

To start, imputation of the RBC Cap/Alt group's knowledge and conduct to Defendants Royal Bank of Canada and RBC Alternative is a given, because their executives and other personnel were one and the same, and the RBC Cap/Alt group directly managed and controlled these Defendants' BLMIS feeder fund investments. *Id.* ¶ 89, 184.

---

[20] Jesse Eisinger, *Why Only One Top Banker Went to Jail for the Financial Crisis*, N.Y. TIMES (Apr. 30, 2014), *available at* https://www.nytimes.com/2014/05/04/magazine/only-one-top-banker-jail-financial-crisis.html.

[21] It is a self-evident proposition that the actions and knowledge of corporate entities emanate from their agents. *See SEC v. Ballesteros Franco*, 253 F. Supp. 2d 720, 729 (S.D.N.Y. 2003) ("[A] corporation can act only through the actions of natural persons and . . . the actions of its agents, acting within the scope of their agency, are attributed to the corporation.") (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154 (1972)).

The knowledge and conduct of the RBC Cap/Alt group executives is imputed to the remaining Defendants because the RBC Cap/Alt group (and its predecessors) was a global business unit responsible for risk management and due diligence for BLMIS feeder fund investments on an enterprise-wide basis, and it acted as agent for all Defendants with respect to their BLMIS feeder fund investments.[22]  *See, e.g., Merkin II*, 515 B.R. at 146 ("Under well-established principles of agency law, 'the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals.'").  This global approach was reflected in the enterprise-wide blacklisting of BLMIS for leverage purposes.  *Id.* ¶¶ 129-31.

Such knowledge and conduct is moreover imputed to all Defendants based on RBC's policy that entities and groups operate under a centralized management and due diligence structure, which encouraged and facilitated the sharing of knowledge and information among such entities.[23]  *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 406 (S.D.N.Y. 2010) (holding group pleading of alleged misstatements and omissions against diverse array of hedge fund operators, subsidiaries, executives, administrators, custodians and other insiders at "multiple interrelated entities" appropriate due to the "tight weave of connections" between defendants).  To this end, Defendants functioned as a global, integrated enterprise as to hedge fund and alternative investments, operating generally under the same master brand name "RBC."[24]  *See In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 447, 452-53 (S.D.N.Y. 2009) (denying summary judgment based on question of fact whether member was an agent for the

---

[22] *Id.* ¶¶ 88, 185, 188.

[23] *Id.* ¶¶ 185-88.

[24] *Id.* ¶ 186.

global entity, noting *inter alia* that member firms used the company name "in order to project the image of a cohesive international organization").

In any event, given their highly fact-specific nature, questions of imputation are not generally decided as a matter of law prior to discovery. *See, e.g.*, *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1312 (S.D.N.Y. 1996) (holding imputation of director's knowledge to company "a matter of fact that cannot be determined on a motion to dismiss"); *see also Picard v. Merkin (In re BLMIS)*, 440 B.R. 243, 260 (Bankr. S.D.N.Y. 2010).

5.    The Initial Transfers From BLMIS to Fairfield Sentry Are Avoidable

The PAC alleges the avoidability of the initial transfers from BLMIS to Fairfield Sentry because the FSAC, which is incorporated by reference into the PAC, alleges facts showing that the Fairfield Funds (including Fairfield Sentry) knew that BLMIS was not trading securities. In *Kingate*, the Court found defendants had actual knowledge of Madoff's fraud where they deliberately prevented access to Madoff, deflected investors' inquiries, and ignored warnings of fraud brought by their own agents. 2015 WL 4734749, at *14; *see also id.* at *5 (finding actual knowledge based on defendants' statements about BLMIS that were "plainly made up, intended to soothe shareholder anxieties, and did not result from any investigation or inquiry"). Like *Kingate*, FGG blatantly lied to third parties—including the SEC—to prevent further inquiry into Madoff. FSAC ¶¶ 155, 158-59, 165-67, 175, 186, 189, 193-94, 201, 212, 224, 228, 230, 242, 255-58, 266, 268, 297; *see also Picard v. Alpha Prime Fund Ltd., et al.*, Adv. Pro. No. 09-01364 (SMB), ECF 569, at 55:20-23 (Bankr. S.D.N.Y. Sept. 19, 2019) (finding directors and service providers "deflected inquiries and provided false information" to mitigate concerns about BLMIS); *Anwar*, 728 F. Supp. 2d at 407 (finding FGG defendants "engaged in deliberately illegal behavior by attempting to stymie a [SEC] investigation into Madoff's operation"). FGG also ignored its own diligence and warnings from its own agents that Madoff's trades were

impossible.  FSAC ¶¶ 137, 142-45, 271, 274-75, 278-79, 283-88, 292-96, 303.  As in *Kingate*, the FSAC pleads actual knowledge because the allegations in the FSAC "paint a picture of sophisticated financial professionals who knew that Madoff was reporting fictitious transactions, and took steps to prevent any inquiry."  2015 WL 4734749, at *15.

Alternatively, the FSAC plausibly alleges that the Fairfield Funds were willfully blind to BLMIS's fraud.  As in *Merkin II*, FGG saw various warning signs indicating that BLMIS was a fraud, which this Court has held is sufficient to allege the first prong of willful blindness.  515 B.R. at 141.  For example, the Trustee alleges that FGG appreciated the impossibilities of BLMIS's purported trading activities.  FSAC ¶¶ 137, 142-45, 271, 287, 296, 307.  FGG knew that the volume of trades reported by BLMIS were impossible.  *Id*. ¶¶ 278-86, 290-97.  And, FGG knew it was impossible for Friehling & Horowitz to audit BLMIS.  *Id.* ¶¶ 188-213.

The FSAC also plausibly alleges the second prong of willful blindness.  *See Anwar*, 728 F. Supp. 2d at 411 ("Defendants' 'fraud alert' should have been flashing red.  A fair inference that flows from the facts alleged is that if they failed to see the perceptible signs of fraud, it may have been because they chose to wear blinders.").  The FGG partners had a close relationship and special access to Madoff and BLMIS.  FSAC ¶¶ 1-3.  They referred to Madoff as "Uncle Bernie" and attended birthdays, anniversaries, retirements, holidays, yacht trips, and vacations in exotic locales with him.  *Id*.  Despite their close relationships, as in *Merkin II*, the FGG partners refused to ask Madoff hard questions that might confirm and expose the fraud, and instead focused on appeasing Madoff, finding more investors, and earning more fees.  *Merkin II*, 515 B.R. at 128; FSAC ¶¶ 192, 265, 289-90, 303-05.  Not only did the FGG partners deliberately take steps to avoid exposing the truth about BLMIS, they prevented others from doing so as well,

including the SEC.  FSAC ¶¶ 155, 158-59, 165-67, 175, 186, 189, 193-94, 201, 212, 224, 228,

230, 242, 255-58, 266, 268, 297.

In summary, the initial transfers from BLMIS to the Fairfield Funds are avoidable.

6.    The Initial Transfers From BLMIS to the Rye Select Funds Are Avoidable

The PAC alleges the avoidability of the initial transfers from BLMIS to the Rye Select

Funds because it alleges facts showing that the Tremont Feeder Funds—including the Rye Select

Funds—knew BLMIS was not trading securities and that Tremont actively facilitated the fraud.

The facts pled as to Tremont's actual knowledge closely mirror those against Kingate, as

detailed in *Kingate*, 2015 WL 4734749, at *14-15.  In finding that the Trustee plausibly alleged

defendants' actual knowledge in *Kingate*, this Court cited allegations that defendants knew of

others' concerns about BLMIS's self-clearing, self-custody, and lack of transparency.  *See*

*Kingate*, 2015 WL 4734749, at *14.  Here, the Trustee alleges Tremont was warned not only

about these issues, but also that BLMIS might be or was a fraud—including specifically that it

could be a Ponzi scheme.  The Trustee also alleges that Tremont analyzed and reported on

BLMIS's trading information, which reflected quantitative impossibilities demonstrating those

trades could not have taken place.  *Id.* at *14.  And like *Kingate*, Tremont simply exempted

BLMIS from its otherwise rigorous due diligence requirements.  *Id.* at *13.  Lastly, as in

*Kingate*, Tremont aggressively attempted to impede its own agents' and third parties' attempts at

conducting due diligence on BLMIS, and fabricated stories designed to assuage their legitimate

concerns, including as to the existence and identity of options counterparties as well as the

existence of the assets themselves.  *Id.* at *8, 14.

Tremont engaged in this misdirection despite being particularly well-positioned to

facilitate due diligence due to its unusually close relationship with, and access to, Madoff.

*Square One* Tr. at 40:8-12 ("Generally actual knowledge or at least willful blindness will be

inferred where the defendant has access to the usually secretive Madoff and his business . . . and shielded Madoff from third-party inquiries" (citations omitted)).  As in *Kingate*, Tremont was motivated by its dependence on Madoff's fraud and its fear that others' due diligence might reveal that fraud.  *See Kingate*, 2015 WL 4734749, at *14.

Alternatively, the PAC plausibly alleges the Tremont Feeder Funds were willfully blind to Madoff's fraud.  At the very least, the PAC plausibly alleges that Tremont subjectively believed there was a high probability that the IA Business was not engaged in actual securities trading.  As in *Merkin II*, Tremont was confronted with various warning signs indicating that BLMIS was a fraud and appreciated the implications of those facts in real time.  *See Merkin II*, 515 B.R. at 141; *Legacy*, 548 B.R. at 33-34.

The PAC also plausibly alleges the second prong of willful blindness, *i.e.*, that Tremont turned a blind eye to its beliefs about the fraud.  As in *Merkin II*, Tremont's management demanded no answers from Madoff despite their close connections—including Schulman, who claimed to have taught Madoff options trading—and instead exempted BLMIS from Tremont's due diligence process.  *Merkin II*, 515 B.R. at 128; *see also Square One* Tr. at 43:12-13.  Rather than confirm its beliefs, Tremont was interested only in perpetuating the fraud on which its existence depended.  *See Beacon Assocs.*, 745 F. Supp. 2d at 406 (investment manager defendants "benefitted concretely and personally" from limiting the extent to which they communicated their suspicions about BLMIS, in order to keep the company's AUM high).

### B.    The Trustee Did Not Act With Undue Delay or Bad Faith

The mere passage of time, in the absence of bad faith, does not warrant a denial of leave to amend.  *See*, *e.g.*, *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 333 (2d Cir. 2000); *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234-35 (2d Cir. 1995); *Block v. First Blood Assocs.*, 988 F.2d 344, 350-51 (2d Cir 1993); *Margel v. E.G.L. Gem Lab Ltd.*, No. 04

Civ. 1514 (PAC)(HBP), 2010 WL 445192, at *10-11 (S.D.N.Y. Feb. 8, 2010). This factor

largely turns on whether the party acted in good faith during the delay, rather than the length of

the delay. *Commander Oil Corp.*, 215 F.3d at 333. "Delay is rarely fatal to a Rule 15 motion if

it can be explained." *Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*, No. 13 Civ. 1654 (RA) (HBP),

2015 WL 4097927, at *7 (S.D.N.Y. July 6, 2015).

The Trustee has acted in good faith and has not delayed in seeking leave to amend.

Between the time the complaint was filed and now, the Trustee has actively litigated case-wide

issues of law pertaining to this proceeding, including the Good Faith Issue and the

Extraterritoriality Issue. The timing of this request merely reflects the complex procedural

history of this proceeding as well as other proceedings in which the Trustee seeks to recover

from subsequent transferees, which began shortly after the Trustee filed his complaint and before

Defendants filed any responsive pleading. This Court found in *Mendelow* that the dramatic

change in the legal landscape, spanning several years, "explains the delay in moving for leave to

amend." *Mendelow*, 560 B.R. at 223.

### C.    Defendants Cannot Demonstrate Undue Prejudice

The party opposing amendment has the burden of proving that leave to amend would

result in "actual prejudice, not the possibility of prejudice." *Mendelow*, 560 B.R. at 224.

Prejudice turns on whether an amendment "would require the opponent to expend significant

additional resources to conduct discovery and prepare for trial or significantly delay the

resolution of the dispute." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d

699, 725-26 (2d Cir. 2010) (internal quotation marks and citation omitted). Defendants here face

no prejudice, because due to this proceeding's complex procedural history, discovery has not

commenced and the proceeding is still in the pleading stage. *See, e.g.*, *State Teachers Ret. Bd. v.

Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (finding no prejudice where no trial date had been

set, no motion for summary judgment had been filed, and amendment would not involve much additional discovery).

Moreover, since the initial complaint was filed, this litigation was effectively stayed by agreement of all parties following the withdrawals of the reference on the Good Faith Issue and the Extraterritoriality Issue. During this time, the parties agreed to thirteen stipulations extending Defendants' time to respond to the complaint.[25] Defendants' only response to date was a motion to dismiss on the Extraterritoriality Issue.[26] And after the *Bankruptcy Court ET Decision* was reversed by the Second Circuit, Defendants successfully moved to stay the issuance of the mandate,[27] which as a result did not occur until June 1, 2020.[28] Now that the Extraterritoriality Issue has been resolved and the mandate has issued, the Trustee should be granted leave to amend his complaint to meet the pleading burden and legal standard imposed by the *Good Faith Decision*, in order to "facilitate a proper decision on the merits." *Mendelow*, 560 B.R. at 221.

## IV.   THE NEW TRANSFERS IN THE PAC RELATE BACK

The PAC includes $30,712,988 of additional subsequent transfers to Defendants that should be permitted because they are not "separate and distinct," and as such they relate back to the original complaint.[29]

As stated in *Mayle v. Felix*, 545 U.S. 644, 646 (2005), "relation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims." The additional transfers here were made pursuant to the same feeder fund agreements pursuant to

---

[25] *See, e.g.*, RBC Docket, ECF 12 (Bankr. S.D.N.Y. Sep. 14, 2012); *id.*, ECF 34 (Bankr. S.D.N.Y. Oct. 24, 2014).

[26] *Id.*, ECF 44 (Bankr. S.D.N.Y. Dec. 31, 2014).

[27] *In re Picard*, No. 17-2992, ECF 1413 (2d Cir. Apr. 8, 2019).

[28] *In re Picard*, No. 17-2992, ECF 1582-1 (2d Cir. June 1, 2020).

[29] *Compare BNP*, 594 B.R. at 210-11; *Metzeler v. Bouchard Transp. Co., Inc. (In re Metzeler)*, 66 B.R. 977, 984 (Bankr. S.D.N.Y. 1986).

which the previously identified Fairfield Sentry and Rye Select Fund transfers were made, and

thus arise out of the same "common core of operative facts." *Adelphia Recovery Trust v. Bank of*

*Am., N.A.*, 624 F. Supp. 2d 292, 333-34 (S.D.N.Y. 2009) (new transfers relate back because they

were margin loan payments arising out of certain co-borrowing facility transactions, and

occurred during same time period as original transfers); *Pagano v. Pergament*, No. 11-CV-2360

(SJF), 2012 WL 1828854, at *7 (E.D.N.Y. May 16, 2012) (new transfers relate back because

they were payments on the same loan, from the same sale proceeds, and "arise from the same

basic facts and conduct as alleged in the Trustee's complaint"). Where new transfers are in

connection with a specific agreement or group of transactions alleged in an original complaint,

defendants are put "on notice of what must be defended against in the amended pleadings" and

such transfers relate back. *Adelphia*, 624 F. Supp. 2d at 333-34 (citation omitted).

Here, the newly discovered transfers consist solely of transfers to each Defendant from

the same BLMIS feeder funds as set forth in the original complaint. Each such Defendant's

relationship with its applicable feeder fund(s) was governed by one or more subscription

agreements, which agreements formed the basis for the Defendant's ownership interests in those

funds. Pursuant to such agreements, Defendants consented to all provisions of the fund's PPM,

prospectus, partnership agreement and/or articles of association, including those governing

subscriptions and redemptions. Thus, both the newly discovered and previously identified

redemptions by each Defendant from its applicable feeder fund(s) arose out of the same

ownership documents.

Defendants were on notice from the original complaint that the Trustee was ultimately

seeking any and all transfers made to Defendants pursuant to each of their applicable feeder fund

investment relationships and the related subscription agreements. The Trustee's original

complaint (i) set forth Defendants' and the feeder funds' investment relationship, (ii) identified

the subscription agreements as the documents governing those investments, and (iii) indicated

that the Trustee was seeking recovery of Defendants' redemptions from such investments. *See,*

*e.g.*, Original Compl. ¶¶ 26-30, RBC Docket, ECF 1.

The original complaint moreover makes clear that the Trustee may in the future seek to

add more like-kind transfers, by stating that the subsequent transfers being sought are those

"presently known" and "[b]ased on the Trustee's investigation to date" and that the Trustee is

seeking "at least" the amounts alleged therein. *See id*. ¶¶ 23-25, 28-29. The complaint also

indicates that "the Trustee's investigation is ongoing, and he reserves the right to: (i) supplement

the information on the [Fairfield Sentry and Rye Select Fund] Initial Transfers and [Fairfield

Sentry and Rye Select Fund] Subsequent Transfers; and (ii) seek recovery of any additional

transfers." *Id*. ¶¶ 70, 98. This language was sufficient to give Defendants notice that new

transfers would likely be added. *See, e.g., Picard v. Peter Madoff (In re BLMIS)*, 468 B.R. 620,

633-34 (Bankr. S.D.N.Y. 2012) (similar allegations in the Trustee's original complaint gave

sufficient notice of the Trustee's intent to seek recovery of additional transfers).

Defendants were at all times in possession of their own, complete set of records setting

forth each redemption out of Fairfield Sentry or a Rye Select Fund for the duration of that

investment relationship. On notice that the Trustee was seeking all known subsequent transfers

made to Defendants from these funds, Defendants at all times knew the full amount of possible

recoveries the Trustee might seek. *See, e.g.*, *Enron Corp. v. Granite Constr. Co. (In re Enron*

*Corp.)*, No. 03-93172 (AJG), 2006 WL 2400369, at *12 (Bankr. S.D.N.Y. May 11, 2006)

(finding relation back of amended complaint enlarging amount of fraudulent transfer because

defendant was on notice that the particular transfer was being sought, and knew or should have known from its own records the correct amount).

Beyond the parties' contractual relationship, both the previously identified and newly discovered subsequent transfers also arise out of the same "common core of operative facts" because such transfers were received by Defendants in bad faith and with knowledge of or willful blindness to Madoff's fraudulent scheme. *See Adelphia*, 624 F. Supp. 2d at 334 (finding relation back of new fraudulent transfers, noting that fraudulent transfer actions "often involve a common scheme to defraud which provides a nexus for relation back" (citation omitted)); *In re Chaus Secs. Litig.*, 801 F. Supp. 1257, 1264 (S.D.N.Y. 1992) (finding accounts receivable manipulations alleged in amended complaint related back even though the events were distinct from those alleged in the original complaint, because they were a "natural offshoot" of the same "basic scheme" to defraud investors as was alleged in the original complaint (citation omitted)).

Defendants here are alleged to be more than just innocent investors "looking to payments from third parties," but rather a part of the "common scheme to strip assets from BLMIS." *BNP*, 594 B.R. at 212. As this Court has stated, "the defendant's good faith has been an issue in every case from the start." *SIPC v. BLMIS (In re Madoff Sec.)*, 590 B.R 200, 209 (Bankr. S.D.N.Y. 2018).

For all these reasons, these new transfers relate back.

## V.    THE NECESSARY CHANGES TO THE CAPTION

The PAC's caption reflects the following changes, which the Trustee seeks to make on the following grounds:

- Original Defendant RBC CI, previously sued in the alternative for the same transfers as Defendant Guernroy, is no longer being sued, as the Trustee has determined that Guernroy is the transferee.

- Defendant RBC Trust's name has been changed from "Royal Bank of Canada Trust Company (Jersey) Limited" to "RBC Trust Company (Jersey) Limited" in order to conform with the Corporate Disclosure Statement filed by Defendants.  PAC ¶ 83.

- Defendant RBC Singapore is being sued in place of and as successor in interest to Original Defendant RBC Asia, which was in the process of winding down as of July 2018 and pursuant to court order was replaced by RBC Singapore in the Extraterritoriality Issue appellate proceedings.  *Id.* ¶ 84.  In its motion, RBC Singapore "agreed that it shall have and be bound by all liabilities of RBC Asia in connection with the claims pending in this case or otherwise arising out of or relating to any investments in or redemptions of shares of Fairfield Sentry Limited and Fairfield Sigma Limited."  *Id.*

- Defendant Banque SYZ is being sued in place of and as successor in interest to Original Defendant RBC Suisse, which merged into Banque SYZ in December 2015, as reflected in the Corporate Disclosure Statement filed by Banque SYZ.  *Id.* ¶ 85.

## <u>CONCLUSION</u>

For the foregoing reasons, the Trustee respectfully requests that the Court grant the

Trustee's request for an order allowing him to amend the complaint, and any and all other relief

the Court deems just and proper.

Dated: New York, New York
       November 10, 2020

By: /s/ Howard L. Simon
Howard L. Simon (hsimon@windelsmarx.com)
Kim M. Longo (klongo@windelsmarx.com)
Alan D. Lawn (alawn@windelsmarx.com)
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, New York 10019
Tel:  (212) 237-1000
Fax: (212) 262-1215

*Special Counsel for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*