**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. _____ (SMB) |
| Plaintiff, | |
| v. | **COMPLAINT** |
| RAFAEL MAYER, DAVID MAYER, MONTPELLIER INTERNATIONAL LTD., PRINCE ASSETS LTD. (f/k/a PRINCE ASSETS LDC), KHRONOS GROUP LTD. (f/k/a MONTPELLIER RESOURCES LTD.), PRINCE RESOURCES LDC, MONTPELLIER USA HOLDINGS LLC, PRINCE CAPITAL PARTNERS LLC, and KHRONOS LIQUID OPPORTUNITIES FUND LTD., | |
| Defendants. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C.

§§ 78aaa-*lll* ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff

("Madoff"), by and through his undersigned counsel, for his Complaint against Rafael Mayer,

David Mayer, Montpellier International Ltd. ("Montpellier"), Prince Assets Ltd. (f/k/a Prince

Assets LDC) ("Prince"), Khronos Group Ltd. f/k/a/ Montpellier Resources Ltd. ("Khronos

Group"), Prince Resources LDC ("Prince Resources"), Montpellier USA Holdings LLC

("Montpellier USA"), Prince Capital Partners LLC ("Prince Capital"), and Khronos Liquid

Opportunities Fund Ltd. (collectively, the "Defendants"), alleges the following:

## I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property, as defined by SIPA § 78*lll*(4), stolen as part of the massive Ponzi

scheme perpetrated by Madoff and others and received by Defendants.

2.    With this Complaint, the Trustee seeks to recover approximately $49,505,850 in

subsequent transfers of BLMIS customer property (the "Subsequent Transfers") made to

Montpellier and Prince by Legacy Capital Ltd. ("Legacy Capital"), which was a single purpose

vehicle invested solely with BLMIS and organized under the laws of the British Virgin Islands.

3.    When Montpellier and Prince received the Subsequent Transfers in 2007 and

2008, Montpellier and Prince were part of a network of entities—including the other

Defendants—commonly owned and controlled by Rafael and David Mayer that ultimately

invested with BLMIS through Legacy Capital.

4.    The Trustee commenced an adversary proceeding against Legacy Capital and

other defendants which resulted in the entry of a $79,125,781 Final Judgment against Legacy

Capital avoiding fictitious profits transferred from BLMIS to or for the benefit of Legacy

Capital. *Picard v. Legacy Capital Ltd. (In re BLMIS)*, Adv. Pro. No. 10-05286 (SMB) (Bankr.

S.D.N.Y.) (the "Legacy Adversary Proceeding").

5.      After BLMIS's fraud was revealed, Rafael and David Mayer altered the corporate

structure of—and ultimately liquidated—Montpellier and Prince to conceal and prevent the

Subsequent Transfers from being returned to the BLMIS estate, and without providing notice to

creditors—chief among them, the Trustee—in the United States.  Rafael and David Mayer

exercised complete dominion and control over Montpellier and Prince for the sole purpose of

further siphoning BLMIS customer property away from the estate.  Accordingly, the Trustee also

seeks to recover the Subsequent Transfers from Rafael and David Mayer as alter egos of the

Defendants.

## II.      JURISDICTION AND VENUE

6.      This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending. The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment*

*Securities LLC et al.,* No. 08 CV 10791 and has been referred to this Court. This Court has

jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA §

78eee(b)(2)(A) and (b)(4).

7.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O).  The

Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

8.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

9.      This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3),

11 U.S.C. §§ 105(a), and 550(a), and other applicable law.

## III.    THE DEFENDANTS, RELEVANT NON-PARTIES, AND PERSONAL JURISDICTION

10.      Defendant Rafael Mayer is an individual who resides in Westchester County,

New York.  Rafael Mayer is the managing director of Khronos (as defined below), which

managed all of the entity defendants out of New York.

11.      Defendant David Mayer is an individual who resides in Santa Ana, Costa Rica.

David Mayer was a managing director of Khronos (as defined below) through February 2016.

David Mayer is a managing member of Prince Capital.  During the acts complained of herein,

David Mayer conducted business in New York and is subject to personal jurisdiction pursuant to

N.Y. CPLR 301 and 302 and Bankruptcy Rule 7004 because he purposely availed himself of the

laws and protections of the United States and the state of New York by undertaking significant

commercial activities in New York, and out of Khronos's offices in New York, including, among

other things, knowingly directing funds through Prince, Prince Resources and Montpellier to be

invested with, and then redeemed from, BLMIS through Legacy Capital.  By directing these

investments, David Mayer knowingly accepted the rights, benefits, and privileges of conducting

business and/or transactions in the United States and New York.

12.      Defendant Khronos Liquid Opportunities Fund Ltd. ("KLOF") is a company

organized under the laws of the Cayman Islands.  KLOF is subject to personal jurisdiction in

New York pursuant to N.Y. CPLR 301 and 302 and Bankruptcy Rule 7004 because it purposely

availed itself of the laws and protections of the United States and the state of New York by

undertaking significant commercial activities in New York.  KLOF is managed by Rafael Mayer

and Khronos (as defined below) in New York.  KLOF derives significant revenue from New

York and maintains minimum contacts and/or general business contacts with the United States

and New York in connection with the claims alleged herein.

13.    Defendant Prince Resources is a company organized under the laws of the Cayman

Islands.  Prince Resources is subject to personal jurisdiction pursuant to N.Y. CPLR 301 and 302

and Bankruptcy Rule 7004 because it purposely availed itself of the laws and protections of the

United States and the state of New York by undertaking significant commercial activities in New

York including, among other things, knowingly directing funds to be invested with, and then

redeemed from, BLMIS through Prince and Legacy Capital.  By directing these investments,

Prince Resources knowingly accepted the rights, benefits, and privileges of conducting business

and/or transactions in the United States and New York.  Until 2016, Prince Resources was

managed by Khronos (as defined below) in New York.  Beginning in 2016, Prince Capital took

over management of Prince Resources in Florida.  Prince Resources derives significant revenue

from New York and maintains minimum contacts and/or general business contacts with the United

States and New York in connection with the claims alleged herein.

14.    Defendant Montpellier is an entity that was organized and dissolved under the

laws of Bermuda.  Montpellier was managed by Rafael Mayer and Khronos (as defined below)

in New York.  During the acts complained of herein, Montpellier conducted business in New

York and is subject to personal jurisdiction pursuant to N.Y. CPLR 301 and 302 and Bankruptcy

Rule 7004.  Montpellier knowingly directed funds to be invested with New York-based BLMIS

through Legacy Capital, and knowingly received subsequent transfers of BLMIS Customer

Property from these funds.

15.    Defendant Prince is an entity that was organized and dissolved under the laws of the

Cayman Islands.  Until 2016, Prince was managed by Khronos (as defined below) in New York.  In

4

2016, Prince Capital took over management of Prince. During the time period and in connection

with the acts complained of herein, Prince conducted business in New York and is subject to

personal jurisdiction pursuant to N.Y. CPLR 301 and 302 and Bankruptcy Rule 7004. Prince

knowingly directed funds to be invested with New York-based BLMIS through Legacy Capital, and

knowingly received subsequent transfers of BLMIS Customer Property from these funds.

16.      Defendant Khronos Group is an entity that was organized and dissolved under the

laws of Bermuda. Khronos Group was managed by Rafael Mayer and Khronos (as defined

below) in New York. During the acts complained of herein, Khronos Group conducted business

in New York and is subject to personal jurisdiction pursuant to N.Y. CPLR 301 and 302 and

Bankruptcy Rule 7004. Khronos Group knowingly directed funds to be invested with

Montpellier, which were then invested with New York-based BLMIS through Legacy Capital,

and knowingly received subsequent transfers of BLMIS Customer Property from these funds.

17.      Defendant Montpellier USA is a dissolved Delaware limited liability company

that knowingly received subsequent transfers of BLMIS Customer Property. Montpellier USA

was managed by Rafael Mayer and Khronos (as defined below) in New York.

18.      Defendant Prince Capital is a Delaware limited liability company with its

principal place of business at 20807 Biscayne Boulevard, Suite 301, Aventura, Florida 33180.

Prince Capital was a wholly owned subsidiary of Khronos (as defined below) that provided

investment advice and services to Prince and Prince Resources. During the acts complained of

herein and until the time Prince Capital took over management of Prince and Prince Resources in

2016, Prince Capital conducted business in New York and was managed by David Mayer and

Rafael Mayer out of Khronos's offices in New York. Prince Capital is subject to personal

jurisdiction pursuant to N.Y. CPLR 301 and 302 and Bankruptcy Rule 7004. Prince Capital

knowingly directed funds to be invested with Prince and Prince Resources, which were then

invested with New York-based BLMIS through Legacy Capital, and knowingly received

subsequent transfers of BLMIS Customer Property from these funds.

19.     Non-party Legacy Capital is a British Virgin Islands Corporation, with its

principal place of business in care of Hamilton Trust & Management Company Limited, Level 1,

Palm Grove House, Wickham's Cay 1, Road Town, Tortola VG1110, British Virgin Islands.  At

all times relevant to this complaint, Legacy Capital was a single purpose vehicle; it invested

solely with BLMIS through Account No. 1FR071.

20.     Non-party Khronos LLC ("Khronos") is a New York limited liability company

with its principal place of business at 51 Pondfield Road, Suite 8, Bronxville, NY 10708, and its

address for service of process by the New York Department of State is 41 Madison Avenue, 31st

Floor, New York, New York 10010.  At all times relevant to this complaint, Khronos managed

Montpellier, Khronos Group, KLOF, and Montpellier USA.  Khronos managed Prince and

Prince Resources through December 31, 2015.  At all times relevant to this complaint, Rafael

Mayer was a principal of Khronos.  Upon information and belief, David Mayer was a principal

of Khronos through February 2016.

## IV.   BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.   BLMIS

21.     Madoff founded BLMIS in 1960 as a sole proprietorship.  In 2001, Madoff

registered BLMIS as a New York limited liability company.  At all relevant times, Madoff

controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

22.     In compliance with 15 U.S.C. § 78$o$(b)(1) and SEC Rule 15b1-3, and regardless

of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008.  Public

records obtained from the Central Registration Depository of the Financial Industry Regulatory

Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer from January 19, 1960 through December 31, 2008. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the Securities and Exchange Commission ("SEC") as a securities broker-dealer from January 19, 1960 through December 31, 2008. On December 30, 1970, BLMIS became a member of SIPC and continued its membership without any change in status until December 11, 2008 ("the Filing Date"). SIPC membership is contingent on registration of the broker-dealer with the SEC.

23.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

24.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

25.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

26.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In 2008, BLMIS had over 4,900

active customer accounts with a purported value of approximately $68 billion in AUM.  At all

times, BLMIS's Form ADVs were publicly available.

### B.    THE PONZI SCHEME

27.    In the Legacy Adversary Proceeding, the Court found that BLMIS operated as a

Ponzi scheme.

28.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using

money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had

no legitimate business operations and produced no profits or earnings.  Madoff was assisted by

several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David

Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of,

assisting Madoff in carrying out the fraud.

29.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent

activity.  It was funded, in part, by money taken from the IA Business customer deposits, but

fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial

statements and other regulatory reports filed by BLMIS.  The proprietary trading business was

incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required

fraudulent infusions of cash from the IA Business to continue operating.

30.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed

Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted

BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements

and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person

accounting firm based out of a strip mall in Rockland County, New York.  Of the three

employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was

a semi-retired accountant living in Florida.

31.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling

& Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for

Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these

fictitious annual audited financial statements prepared by Friehling & Horowitz.

### C.     MADOFF'S INVESTMENT STRATEGY

32.      BLMIS purported to execute two primary investment strategies for IA Business

customers: the convertible arbitrage strategy and the SSC strategy.  For a limited group of IA

Business customers, primarily consisting of Madoff's close friends and their families, Madoff

also purportedly purchased securities that were held for a certain time and then purportedly sold

for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any

of these strategies.

33.     All funds received from IA Business customers were commingled in a single

BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to

trade securities, but rather to make distributions to, or payments for, other customers, to benefit

Madoff and his family personally, and to prop up Madoff's proprietary trading business.

34.     The convertible arbitrage investment strategy was supposed to generate profits by

taking advantage of the pricing mismatches that can occur between the equity and bond/preferred

equity markets.  Investors were told they would gain profits from a change in the expectations for

the stock or convertible security over time.  In the 1970s this strategy represented a significant

portion of the total IA Business accounts, but by the early 1990s the strategy was purportedly used

in only a small percentage of IA Business accounts.

35.     From the early 1990s forward, Madoff began telling IA Business customers that he

employed the SSC strategy for their accounts, even though in reality BLMIS never traded any

securities for its IA Business customers.

9

36.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected impossibly consistent gains on the customers' principal investments.

37.    By 1992, the SSC strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index (the "Basket"); (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

38.    The put options were to limit the downside risk of sizeable price changes in the Basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

39.    The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform it, because in a rising market, calls would have been expected to be exercised by the counterparty.

40.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

41.    If Madoff was putting on the same basket of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and the calls sold had to equal the market value of the equities in the Basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are

no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

42.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the Madoff SSC strategy.

43.     Sophisticated or professional investors, including the Defendant, knew that Madoff could not be using the SSC strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC strategy.

*BLMIS's Fee Structure*

44.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on the AUM and profits respectively. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

*BLMIS's Market Timing*

45.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S. Treasury Bills or mutual funds invested in Treasury Bills.

46.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.  Yet this is precisely what BLMIS's customer statements reported.

47.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC strategy, which does not depend on exiting the market in a particular month.

*BLMIS Execution*

48.    BLMIS's execution as reported on its customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny, that any sophisticated or professional investor, including the Defendants, would know it was statistically impossible.

*No Evidence of BLMIS Trading*

49.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

50.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing

12

Corporation ("OCC").  The OCC has no records showing that BLMIS's IA Business cleared any

trades in any exchange-listed options.

*The Collapse of the Ponzi Scheme*

51.     The Ponzi scheme collapsed in December 2008, when BLMIS customers'

requests for redemptions overwhelmed the flow of new investments.

52.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased

none of the securities listed on the IA Business customers' fraudulent statements, and that the IA

Business operated as a Ponzi scheme.

53.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less

than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at

the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.    THE TRANSFERS

### A.    Initial Transfers from BLMIS to Legacy Capital.

54.     Legacy Capital commenced operations in September 2000 as a single-purpose

BLMIS account holder.  Legacy Capital's directors included Isaac "Jimmy" Mayer (Rafael and

David Mayer's father) and Herbert M. Selzer.  Rafael Mayer was an officer of Legacy Capital.

55.     Legacy Capital's BLMIS account, as set forth on Exhibit A, was opened with

transfers from two other BLMIS accounts owned by Mayer-related entities—HCH Management

Company Ltd. (which later changed its name to HCH Capital Limited) ("HCH") and

Montpellier.  HCH and Montpellier were Legacy Capital's only shareholders.

56.     On January 1, 2005, HCH sold its Legacy Capital shares to Prince.

57.     On December 6, 2010, the Trustee commenced the Legacy Adversary Proceeding.

58.     On July 2, 2015, the Trustee filed an amended complaint in the Legacy Adversary

Proceeding seeking to avoid and recover initial transfers of Customer Property from BLMIS to

13

Legacy Capital in the amount of approximately $213,180,068 (the "Amended Complaint"). On April 12, 2016, the Court dismissed Khronos from the Legacy Adversary Proceeding and dismissed all claims against Legacy Capital, except those seeking to avoid and recover $86,505,850 in fictitious profits transferred to or for the benefit of Legacy Capital within two years of the Filing Date ("Legacy Initial Transfers"). A chart setting forth the transfers BLMIS made to Legacy Capital is attached as Exhibit B. The Trustee incorporates by reference the allegations contained in the Amended Complaint as if fully set forth herein.

59.    On November 12, 2019, the Court entered a Stipulation and Order for Entry of Final Judgment ("Stipulated Order"), ECF No. 230 that included, among other things: (i) the Parties' consent to the Bankruptcy Court's entry of a final order and judgment in connection with the Trustee's avoidance claim, and (ii) entry of the final order and judgment against Legacy Capital in the amount of $79,125,781.00. The Stipulated Order further provided that "the Legacy Transfers are avoidable and avoided under § 548(a)(1)(A) and recoverable from Legacy Capital under § 550(a) of the Bankruptcy Code." Legacy Adversary Proceeding, ECF No. 230. On November 12, 2019, the Court entered the Final Judgment and Order ("Final Judgment"), ECF No. 231.

### B.    Subsequent Transfers from Legacy Capital to Montpellier and Prince

60.    Prior to the Filing Date, a portion of the Legacy Initial Transfers was subsequently transferred to Defendants Montpellier and Prince (the "Legacy Subsequent Transfers").

61.    Montpellier and Prince received the Legacy Subsequent Transfers as follows: Montpellier received $50,000,000 on September 4, 2007—which, based on records currently available to the Trustee, included up to approximately $12,505,850 of fictitious profits—and $27,000,000, consisting entirely of fictitious profits, on October 4, 2007. Prince received $10,000,000, consisting entirely of fictitious profits, on June 6, 2008. A chart setting forth the

known Legacy Subsequent Transfers to Montpellier is attached as Exhibit C.  A chart setting

forth the known Legacy Subsequent Transfers to Prince is attached as Exhibit F.

62.     The Legacy Subsequent Transfers are recoverable from Defendants pursuant to

section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-

2(c)(3).

### C.     Subsequent Transfers from Montpellier International to Montpellier Resources

63.     On September 7, 2007, October 5, 2007, December 6, 2007, January 9, 2008,

February 6, 2008, March 6, 2008, April 8, 2008, July 15, 2008, August 7, 2008, and October 10,

2008, Montpellier transferred the Legacy Subsequent Transfers, totaling $39,505,850, it received

to Montpellier Resources Limited, which later changed its name to Khronos Group (the

"Montpellier Subsequent Transfers").  A chart setting forth the known Montpellier Subsequent

Transfers is attached as Exhibit D.

64.     Khronos Group then transferred at least a portion of Montpellier Subsequent

Transfers to Montpellier USA on October 5, 2007, November 2, 2007, January 9, 2008, May 7,

2008, June 5, 2008, July 15, 2008, August 7, 2008, and December 30, 2008.  A chart setting

forth the known transfers from Khronos Group to Montpellier USA is attached as Exhibit E.

65.     Khronos Group also transferred at least a portion of Montpellier Subsequent

Transfers to Prince on July 11, 2008, October 16, 2008, and February 6, 2009, as set forth on

Exhibit F.

### D.     Subsequent Transfers from Prince to Prince Resources

66.     On June 13, 2008, July 18, 2008, September 4, 2008, November 25, 2008,

December 19, 2008, January 13, 2009, February 18, 2009, March 5, 2009, March 12, 2009, and

March 19, 2009 Prince transferred the Legacy Subsequent Transfers, totaling $10,000,000, it

received to Prince Resources LDC ("Prince Resources") (the "Prince Subsequent Transfers").  A

chart setting forth the known Prince Subsequent Transfers is attached as Exhibit G.

### E.    Subsequent Transfers from Prince Resources to Prince Capital

67.    On July 11, 2008, August 8, 2008, August 15, 2008, September 17, 2008,

November 28, 2008, March 5, 2009, and March 20, 2009, Prince Resources transferred a portion

of the Legacy Subsequent Transfers, totaling $7,250,220, it received to Prince Capital (the

"Prince Capital Subsequent Transfers").  A chart setting forth the known Prince Capital

Subsequent Transfers is attached as Exhibit H.

### F.    The Mayers Are the Alter Egos of Montpellier and Prince

68.    Montpellier served as a holding company in a larger investment fund complex that

operated as a fund-of-funds (the "Montpellier Group").  The Montpellier Group comprised numerous

entities incorporated in different jurisdictions that were, in one way or another, connected to

Montpellier Resources (later Khronos Group), a Bermuda entity that acted as the master fund.

69.    Montpellier Resources invested through three entities of which it was the majority

owner and over which it had voting and dispositive power: Montpellier, Montpellier USA,[1] and

Montpellier Investments LP.  Khronos was the investment manager for Montpellier Resources

and, consequently, for each of the entities comprising the Montpellier Group.

70.    According to SEC filings, Montpellier Resources, Khronos, and Rafael Mayer were

deemed to be beneficial owners of shares held by the entities comprising the Montpellier Group.

71.    Despite this labyrinthine structure, publicly available documents indicate that the

Montpellier Group was comprised of private investment vehicles primarily owned by Rafael

---

[1] Montpellier USA also appears to be a subsidiary of both Montpellier USA Holdings Ltd., a Bermuda entity that was dissolved in January 2017 after voluntary liquidation by Rafael Mayer, and Montpellier USA LLC, a Delaware entity that was also dissolved in 2017 and which, upon information and belief, had an ownership interest in Montpellier Investments LP.

Mayer and David Mayer (collectively, the "Mayers"), their family members and close associates. Investment in these entities was limited to the same group. The Mayers were the decisionmakers for the Montpellier Group.

72.     Upon information and belief, beginning in or around August 2010, Khronos and the Mayers began dismantling the Montpellier Group and replacing it with a structure centered around KLOF.

73.     Upon information and belief, the directors, officers, and beneficial owners of the Montpellier Group and KLOF included the Mayers, and their associates, the Mayers' father, Isaac "Jimmy" Mayer, Piero DiCapua, Herbert Selzer, and Edmundo Esquenazi (DiCapua, Selzer, and Esquenazi collectively, the "Associates").

74.     Prince also served as a holding company within a larger investment structure and was operated by the Mayers and their Associates in a similar fashion to Montpellier, with Prince Resources acting as the master fund, and Prince Capital, through the Mayers, acting as investment adviser. The Mayers were the decisionmakers for the entities in the Prince master fund structure.

75.     Montpellier and Prince shared the same beneficial owners. The directors and officers of the Prince-related entities included the Mayers and their Associates.

76.     The Mayers dominated, influenced, and controlled Defendants, through their overlapping investment and financial services management roles with Legacy Capital and Khronos, such that no corporate veil should be maintained between the entities.

77.     After BLMIS's fraud was revealed and Legacy Capital's and the Defendants' liability to the Trustee arose, the Mayers systematically dismantled the structure of the entities they formed and controlled and misused the corporate form to avoid repaying customer property to the BLMIS estate.

78.    Then, with knowledge of Defendants' liability to the Trustee, the Mayers dissolved Montpellier, Prince and Khronos Group after voluntary liquidation—in which they served as liquidators—to, at least in part, prevent the recovery of BLMIS customer property by the estate.

79.    The Mayers wrongly used their complete control over Legacy Capital, Khronos, and Defendants as mere instrumentalities prior to and throughout the duration of the Legacy Adversary Proceeding, to further their own interests and to profit from the BLMIS fraud, to the detriment of the BLMIS customer estate.

### 1.    The Mayers Misused the Corporate Form by Sharing Personnel and Business Functions

80.    At all relevant times, the entities comprising the Montpellier Group, the Prince master fund structure, and the KLOF master fund structure shared directors, officers, beneficial ownership, shareholders, business operations, and offices.  As a result, the Mayers and Defendants are one and the same, act as the alter egos of each other, and acted in concert.

81.    As summarized in the chart below, the same individuals worked in the same capacities at the Mayer-controlled entities.

| Entity | Directors | Officers | Shareholders | Investment Manager | Address |
|---|---|---|---|---|---|
| Legacy Capital | Jimmy Mayer, Selzer | Rafael Mayer | Montpellier Prince | Khronos (via Montpellier and Prince) | c/o Khronos |
| Montpellier | Rafael Mayer, DiCapua, Selzer | Rafael Mayer | Khronos Group | Khronos | c/o Khronos |
| Khronos Group | Rafael Mayer, DiCapua, Selzer | | | Khronos | c/o Khronos |
| Montpellier USA Holdings Ltd. | Rafael Mayer, DiCapua, Selzer | | Khronos Group | Khronos | c/o Khronos |

18

| KLOF | Rafael Mayer, DiCapua, Selzer, David Mayer | David Mayer | | Khronos | c/o Khronos |
|---|---|---|---|---|---|
| Prince | David Mayer | | Prince Resources | Khronos | c/o Khronos |
| Prince Resources | David Mayer, DiCapua, Selzer | | | Khronos, Prince Capital Partners | c/o Khronos |
| HCH | Jimmy Mayer, DiCapua, Selzer, Edmundo Esquenazi | DiCapua | | | |

## 2.    The Mayers Misused the Corporate Form by Commingling Entity Assets

82.     As stated above, Prince was part of a master fund structure that was, as the Mayers would have the world believe, separate and apart from the Montpellier Group.

83.     In reality, the boundaries between the various entities were more porous.  For example, on July 11, 2008, Montpellier Resources transferred $15 million to Prince.  Similarly, on August 19, 2009, Montpellier Resources transferred $28,652,693.18 to Prince.  Additionally, holdings of Legacy shares moved across the entities, as on October 15, 2008, when $22.8 million in Legacy shares were transferred to Montpellier International from Prince, as set forth on Exhibit F.

84.     In this intertwined structure, one entity's costs and expenses were regularly paid for by other Mayer-controlled entities.  For example, on March 14, 2008, Prince Resources paid for expenses incurred by Montpellier Resources.  Prince Resources similarly transferred money on June 27, 2008 to Montpellier Investments LP to cover its expenses.

85.     Beginning in May 2010, Montpellier transferred significant sums of money to

19

Khronos for the payments of costs and expenses, including legal fees related to the BLMIS

liquidation, incurred by other entities, including Khronos itself.  For example, on October 19,

2011, Montpellier paid Khronos for the retainer fee for Legacy Capital's counsel.  In May 2014,

Khronos received four separate payments from Montpellier for legal costs incurred by other

entities in the Mayer structure.  There were at least 110 such payments, totaling over two million

dollars.  Prince Resources has also transferred significant sums of money to Khronos to cover

legal fees incurred by other entities.

86.     Similarly, Prince Resources transferred well over one million dollars to Khronos

for the payments of costs and expenses, including legal fees related to the BLMIS liquidation,

incurred by other entities.  There were at least 110 such payments.

87.     Additionally, Montpellier paid Legacy Capital's attorneys.

88.     On September 17, 2010, Montpellier and Prince Resources paid attorneys for

responding to the Trustee's Rule 2004 subpoenas directed to the Mayers.

89.     The Mayers have represented to the Trustee that Legacy Capital is impecunious.

Montpellier and Prince Resources therefore paid Legacy's legal fees for the purpose of

protecting the Legacy transfers from collection by the Trustee.

90.     Although the Mayers have represented to the Trustee that Legacy Capital was

owned by BNP Paribas as of December 2008, Khronos and the Mayers continued to control and

operate Legacy Capital after this date.  Rafael Mayer remains an officer of Legacy Capital even

after the ownership change.  On September 30, 2011, Legacy Capital entered into a promissory

note with Khronos under which Khronos lent Legacy Capital $250,000.  The promissory note

was secured by a pledge of Legacy Capital's rights under an investment adviser insurance policy

dated December 22, 2008 and issued to HCH.  The promissory note was signed by Selzer on

20

behalf of Legacy Capital and Rafael Mayer on behalf of Khronos.  Khronos was also reimbursed

by Montpellier for paying the retainer fee for Legacy Capital's counsel in October 2011.

### 3.      KLOF Is the Continuation of Montpellier Resources/Khronos Group

91.     On March 11, 2009, Montpellier Resources registered in Bermuda as a

Segregated Accounts Company.  After this date, Montpellier Resources conducted its investment

activities through two classes of shares that were linked to segregated accounts: the Distribution

Class and the Continuing Class.

92.     Upon information and belief, after Montpellier Resources changed its name to

Khronos Group, the Continuing Class became the Liquid Opportunities Fund Segregated Account.

93.     Upon information and belief, after KLOF was registered in 2011, the Liquid

Opportunities Fund Segregated Account and the Continuing Class assets were transferred to

KLOF.  Upon information and belief, beginning on July 26, 2011, KGL transferred

$109,253,099 to KLOF.  Ledger entries note that these payments were in connection with the

"Continuing Fund."

94.     Upon information and belief, after this date, KLOF succeeded and took over for

Khronos Group.

95.     The Montpellier Subsequent Transfers received by Khronos Group are therefore

recoverable from KLOF.

### 4.      The Mayers Misused the Corporate Form After Liability to the Trustee Arose

96.     Montpellier and Prince received transfers of customer property from Legacy

Capital on September 4, 2007, October 4, 2007, and June 6, 2008.

97.     The Mayers knew that the Legacy Subsequent Transfers originated from BLMIS.

98.     The Mayers knew of Montpellier's and Prince's liability as subsequent transferees

21

of BLMIS customer property as evidenced by their October 6, 2010 production of documents

from Khronos's files in response to the Trustee's Rule 2004 Subpoena, dated July 7, 2010.

Among the documents produced were Legacy Capital share registries indicating the dates and

amounts of Montpellier's and Prince's redemptions of their respective shares in Legacy Capital

on dates corresponding with the Legacy Transfers.

99.    Despite the known liability to the Trustee, upon information and belief, beginning

in or around August 2010, Khronos and the Mayers began dismantling the Montpellier Group

and replaced it with a structure centered around KLOF.  The funds comprising the KLOF

structure are "wholly owned and controlled by Khronos."

100.    On August 18, 2010, Montpellier Resources changed its name to Khronos Group.

Its directors were Rafael Mayer, Selzer, and DiCapua. Upon information and belief, David

Mayer served as a director between December 2011 and December 2015.

101.    On October 1, 2010, an offering memorandum for KLOF, "a segregated account

of Khronos Group," was issued.  Khronos served as KLOF's investment manager.

102.    Also beginning in August 2010, various entities that were originally incorporated

as Montpellier entities changed their names to Khronos entities, including Khronos Group LLC

(f/k/a Montpellier LLC), Khronos LOF Holdings LLC (f/k/a Montpellier USA Redemption

Holdings LLC), and Khronos LOF Investments LP (f/k/a Montpellier Investments LP).  Upon

information and belief, Khronos and/or the Mayers were the managing members or partners of

each of these entities.

### 5.    The Mayers Used Their Complete Control over Montpellier, Prince and Khronos Group to Dissolve and Liquidate Subsequent Transferees of BLMIS Estate Property

103.    On January 16, 2017, the Bermuda Registrar of Companies recorded the

voluntary winding up of Montpellier.  Rafael Mayer, as Liquidator, dissolved Montpellier.

Rafael Mayer served as a director of Montpellier at the time of dissolution.  The date of

dissolution was recorded just after fact discovery closed in the Legacy Adversary Proceeding.

Despite knowledge of Montpellier's receipt of the Legacy Subsequent Transfers, and his active

participation in the Legacy Adversary Proceeding, Rafael Mayer did not provide notice of the

dissolution of Montpellier International to the Trustee.

104.    On September 6, 2017, Khronos Group was dissolved after voluntary liquidation.

Rafael Mayer served as the liquidator.  The Trustee was not provided with notice of the

dissolution or liquidation.

105.    On April 15, 2019, David Mayer, as liquidator, oversaw the dissolution after

voluntary liquidation of Prince.  Despite knowledge of Prince's receipt of the Legacy Subsequent

Transfers, David Mayer did not provide notice of the dissolution of Prince to the Trustee.  The

Trustee was not provided with notice of the dissolution or liquidation.

106.    As liquidators of Montpellier, Prince and Khronos Group, before dissolving the

entities the Mayers were required to assess and compromise all known creditor claims and all

claims about which they reasonably should have known.  Additionally, the Mayers were required

to provide notice to all creditors, including contingent creditors, appearing in the entities' books

and records in all jurisdictions where the entities did business.  Because Montpellier, Prince and

Khronos Group were letterbox entities and their decisions to invest primarily in United States

funds and securities for United States investors were made in New York, Montpellier, Prince and

Khronos Group did business in the United States.  Upon information and belief, the Mayers did

not provide notice to creditors in the United States.  The Mayers did not provide notice to the

Trustee.  By virtue of these actions, the Mayers breached their duty to the Trustee, as a creditor

of Montpellier, Prince and Khronos Group.

23

107.    Upon information and belief, the Mayers did not disclose that Montpellier, Prince and Khronos Group had significant debts, and that those debts could become significantly greater, depending on the outcome of an appeal from the Legacy Adversary Proceeding.  By claiming the entities were solvent, the Mayers could liquidate them without supervision of the court.  By naming themselves as liquidators, the Mayers are personally liable for any improper liquidation of these funds.

108.    Only the Mayers had authority to act for Montpellier, Prince and Khronos Group with respect to the BLMIS investments with Legacy Capital, and the related financial services provided by Khronos.  As alleged in the Legacy Adversary Proceeding, contrary to Khronos's standard investment monitoring process, only the Mayers were permitted to review Legacy's BLMIS account information.  Similarly, the Mayers had ultimate authority with respect to Montpellier's, Prince's and Khronos Group's investment decisions and the provision of financial and accounting services from Khronos.  The Mayers also exhibited complete and total authority with respect to the decision to voluntarily dissolve and liquidate Montpellier, Prince and Khronos Group, and to serve as the only liquidators in the process.

    **6.    Rafael Mayer Authorized Entry of a Final Judgment Against Legacy Capital Knowing It Lacked Funds to Satisfy the Judgment While Planning with David Mayer to Dissolve the Subsequent Transferees**

109.    On November 12, 2019, the Bankruptcy Court entered Final Judgment against Legacy Capital in the amount of $79,125,781.00 in connection with Count One of the Amended Complaint in the Legacy Adversary Proceeding.  The Bankruptcy Court further entered the Stipulated Order which provided "the Legacy Transfers are avoidable and avoided under § 548(a)(1)(A) and recoverable from Legacy [Capital] under § 550(a) of the Bankruptcy Code."  Upon information and belief, Rafael Mayer, as an officer of Legacy Capital and Khronos, provided Legacy Capital's legal counsel in New York with authority to enter into the Stipulated

24

Order and Final Judgment on Legacy Capital's behalf. Through its responses to the Trustee's

post-judgment discovery and collection efforts, Legacy Capital has represented that it was

impecunious and did not possess assets to satisfy the Final Judgment. Rafael Mayer, on behalf

of Legacy Capital, signed a verified statement concerning its responses provided in connection

with the Trustee's post-judgment interrogatories.

110.    As Legacy Capital's sole purpose was to serve as a BLMIS account holder, the

Mayers knew on December 11, 2008 that Legacy Capital did not have assets to satisfy a

judgment against it. The Mayers also knew on that date that Montpellier and Prince had liability

as subsequent transferees. Nevertheless, the Mayers executed their total dominion and authority

over Montpellier and Prince, including as liquidators of Montpellier and Prince, and even

commenced foreign dissolution proceedings in Bermuda and the Cayman Islands in order to, at

least in part, frustrate and prevent the recovery of BLMIS customer property by the estate.

**7.    The Mayers Obstructed the Trustee's Legitimate Discovery Efforts
Concerning Montpellier and Prince and their Transfers of BLMIS
Customer Property**

111.    On July 13, 2020, the Trustee issued a Rule 2004 Subpoena directed to Khronos

(the "Khronos Subpoena"). The Khronos Subpoena, *inter alia*, included document requests

concerning the Legacy Subsequent Transfers received by Montpellier and Prince, and any further

subsequent transfers from Montpellier and Prince. Khronos vigorously objected to the Khronos

Subpoena and, without attempting to negotiate, brought a motion to quash the Khronos

Subpoena, arguing, among other things, that Khronos did not have possession, custody or control

of documents concerning Prince as it stopped providing services to Prince on December 31, 2015.

Khronos's position was that the Trustee should not, and should not be permitted to, bring claims

to recover this money. Khronos also contended that, based on its books and records, it would be

impossible for the Trustee to trace the assets Khronos helped transfer. The motion to quash was

denied and the Bankruptcy Court entered an Order requiring the production of documents sought by the Trustee as well as disclosure of the name of the entity that purportedly replaced Khronos as Prince's service provider.  The Bankruptcy Court noted that the name of the new service provider should have been provided to the Trustee before any motion to quash was made.

112.    When Khronos finally disclosed the name of the entity that replaced it—no earlier than on the deadline set by the Bankruptcy Court—the reason for Khronos's obfuscation became clear.  The new service provider was Prince Capital, an entity affiliated with Khronos, and, of course, the Mayers.

113.    Publicly available documents indicate that Prince Capital was formerly a "wholly-owned subsidiary of Khronos," whose principals include David Mayer and Daniel Levy, both of whom are former managing partners of Khronos.  Prince Capital also formerly shared its address with Khronos and was managed by David Mayer.

114.    Khronos's Form ADV, dated August 10, 2020, moreover, lists Prince Capital as a "location at which [Khronos] keep[s] [its] books and records."

115.    Given the positions taken by Khronos, upon information and belief, the Mayers' goal was to obstruct discovery because the Trustee's subsequent transfer claims implicate them personally.

116.    As the alter egos of Montpellier and Prince, and as liquidators of Montpellier and Prince, the Mayers are personally liable for the debts and obligations of those entities, including the Legacy Subsequent Transfers they received from Legacy Capital.  Likewise, under theories of equitable collapsing, the Mayers should be responsible for the Legacy Subsequent Transfers Montpellier and Prince received from Legacy Capital.

## COUNT ONE
## RECOVERY OF SUBSEQUENT TRANSFERS – ALL DEFENDANTS
## 11 U.S.C. § 550 AND SIPA § 78fff-2(c)(3)

117.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

118.     Defendant Montpellier received the Legacy Subsequent Transfers, totaling approximately $39,505,850.  Of that amount, Defendants Khronos Group, Montpellier USA, and Prince received further transfers of the Legacy Subsequent Transfers as set forth on Exhibits D, E, and F.

119.     Defendant Prince received the Legacy Subsequent Transfers, totaling approximately $10,000,000.  Of that amount, Defendants Prince Resources and Prince Capital received further transfers of the Legacy Subsequent Transfers as set forth on Exhibits G and H.

120.     Each of the Legacy Subsequent Transfers is recoverable from Rafael Mayer and David Mayer as alter egos of Montpellier and Prince under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

121.     Each of the Legacy Subsequent Transfers was made directly or indirectly to Montpellier or Prince.

122.     Montpellier, Prince, Khronos Group, Montpellier USA, and Prince Resources are immediate or mediate transferees of the Legacy Subsequent Transfers.

123.     As a result of the foregoing, pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants Montpellier, Prince, Khronos Group, Montpellier USA, Prince Resources, and Prince Capital, and the Mayers as their alter egos, recovering the Legacy Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendants Rafael Mayer, David Mayer, Montpellier, Prince, Khronos Group, Montpellier USA, Prince Resources, Prince Capital, and KLOF as follows:

(a)     On the Count One, recovering the Legacy Subsequent Transfers, or the value thereof, from Rafael Mayer, David Mayer, Montpellier, Prince, Khronos Group, Montpellier USA, Prince Resources, Prince Capital, and/or KLOF for the benefit of the estate of BLMIS;

(b)     Awarding the Trustee all applicable fees, interest, costs, and disbursements of this action;

(c)     Awarding the Trustee prejudgment interest from the date on which Montpellier and Prince received the Legacy Subsequent Transfers; and

(d)     Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: November 11, 2020           */s/ David J. Sheehan*
       New York, New York          **Baker & Hostetler LLP**
                                   45 Rockefeller Plaza
                                   New York, New York 10111
                                   Telephone:  (212) 589-4200
                                   Facsimile:  (212) 589-4201
                                   David J. Sheehan
                                   Oren J. Warshavsky
                                   Jason S. Oliver
                                   Tatiana Markel
                                   Carrie A. Longstaff
                                   Peter B. Shapiro

                                   *Attorneys for Irving H. Picard, Trustee*
                                   *for the Substantively Consolidated SIPA*
                                   *Liquidation of Bernard L. Madoff Investment*
                                   *Securities LLC and the chapter 7 estate of*
                                   *Bernard L. Madoff*