A

Privy Council

# DD Growth Premium 2X Fund (in liquidation) *v* RMF Market Neutral Strategies (Master) Ltd

[On appeal from the Court of Appeal of the Cayman Islands]

B

## [2017] UKPC 36

2017  Oct 4, 5;                                 Lord Mance DPSC, Lord Sumption,
      Nov 23                          Lord Carnwath, Lord Hodge, Lord Briggs JJSC

*Cayman Islands — Company — Distribution of capital — Shareholder exercising
right to redeem shares in Cayman Islands investment company — Shareholder
receiving payments out of share premium account — Payment out of capital for
redemption by company of its own shares subject to solvency test — Whether
redemption debts owed to shareholders to be taken into account in assessing
solvency — Whether payments for redemption of shares out of share premium
account constituting payments out of capital — Whether unlawful payments
recoverable on ground of unjust enrichment — Whether claimant liable as
constructive trustee — Cayman Islands Companies Law (2007 rev), s 37(6)*

C

D

The defendant, a Cayman Islands registered company, carried on business as a
feeder fund for the facilitation of investment in a master hedge fund. Investors in the
company were issued redeemable ordinary shares at a premium, and the proceeds of
the shares were invested in the master fund. The claimant submitted valid requests
for the redemption of its shares. By then the company was insolvent but managed to
make payments to the claimant in part satisfaction of its redemption debt. Shortly
thereafter the company went into liquidation. The company's liquidators sought to
recover the redemption payments on the ground that they had been made in breach of
section 37 of the Cayman Islands Companies Law[1], subsection (5) of which
permitted companies to make a payment in respect of the redemption of its own
shares otherwise than out of its profits or the proceeds of a fresh issue of shares but
deemed such payments to be a payment out of capital and subjected those payments
to a solvency test in subsection (6). The claimant sought a negative declaration that it
was not liable to repay the redemption payments. The liquidators cross-claimed for
recovery of the payments on the grounds, inter alia, that they constituted unjust
enrichment or were held on a constructive trust. The Grand Court held that at the
time of the redemption payments the company had not satisfied the solvency test but
the payments had been a legitimate use of the company's premium share. The Court
of Appeal upheld the judge and dismissed the liquidators' appeal.

On the liquidators' further appeal—

*Held*, advising that the appeal be allowed (Lord Mance DPSC and Lord
Hodge JSC dissenting), that "debts" for the purposes of the solvency test in
section 37(6)(a) of the Cayman Islands Companies Law included redemption debts
owed to shareholders; that the effect of subsection 37(6), read with and interpreted
by reference to subsection (5), was that a payment in respect of the redemption of
shares out of the share premium account, not being a payment out of profit or the
proceeds of a fresh issue of shares, was a deemed payment out of capital, which was
subject to the solvency test; that taking account of the redemption debts owed to
shareholders, at the time the payments were made the company could not satisfy the
solvency test; that, therefore, the redemption payments were unlawful capital
payments; that while the company had acted unlawfully in making the payments,

E

F

G

H

[1] Cayman Islands Companies Law (2007 rev), s 37: see post, para 34.

© 2018 The Incorporated Council of Law Reporting for England and Wales

A

since receipt of them discharged a valid legal entitlement to be paid for the surrender of the shares, the claimant had not been unjustly enriched; but that the claimant would be liable as a constructive trustee if it had knowledge of the facts as to the unlawfulness of the redemption payments; and that, accordingly, in the absence of findings as to the claimant's knowledge of unlawfulness, the matter would be remitted to the Grand Court (post, paras 28, 29–30, 35–36, 39, 57, 64–65, 66).

Decision of the Court of Appeal of the Cayman Islands reversed.

B

The following cases are referred to in the judgment of Lord Sumption and Lord Briggs JJSC:

*Aiken v Short* (1856) 1 H & N 210
*Barclays Bank Ltd v W J Simms Son & Cooke (Southern) Ltd* [1980] QB 677; [1980] 2 WLR 218; [1979] 3 All ER 522; [1980] 1 Lloyd's Rep 225
*Browning v Morris* (1778) 2 Cowp 790

C

*Down v Gaumont-British Picture Corpn Ltd* [1937] Ch 402; [1937] 2 All ER 609
*Fairfield Sentry Ltd v Migani* [2014] UKPC 9; [2014] 1 CLC 611, PC
*Guinness Mahon & Co Ltd v Kensington and Chelsea Royal London Borough Council* [1999] QB 215; [1998] 3 WLR 829; [1998] 2 All ER 272, CA
*Hoare & Co Ltd, In re* [1904] 2 Ch 208, CA
*Kiriri Cotton Co Ltd v Dewani* [1960] AC 192; [1960] 2 WLR 127; [1960] 1 All ER 177, PC

D

*Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349; [1998] 3 WLR 1095; [1998] 4 All ER 513, HL(E)
*Lipkin Gorman v Karpnale Ltd* [1991] 2 AC 548; [1991] 3 WLR 10; [1992] 4 All ER 512, HL(E)
*Patel v Mirza* [2016] UKSC 42; [2017] AC 467; [2016] 3 WLR 399; [2017] 1 All ER 191; [2016] 2 Lloyd's Rep 300, SC(E)

E

*Pearson v Primeo Fund* [2017] UKPC 19; [2017] BCC 552, PC
*Smith v Bromley* (1760) 2 Doug KB 696
*Trevor v Whitworth* (1887) 12 App Cas 409, HL(E)
*Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1994] 1 WLR 938; [1994] 4 All ER 890, CA; [1996] AC 669; [1996] 2 WLR 802; [1996] 2 All ER 961; 95 LGR 1, HL(E)

No additional cases were cited in argument.

F

**APPEAL** from the Court of Appeal of the Cayman Islands

The claimant investor, RMF Market Neutral Strategies (Master) Ltd, sought a negative declaration that it was not liable to repay the sum of US$ 23m paid between 12 January and 6 February 2009 by the company, DD Growth Premium 2X Fund, as delayed redemption payments. The joint official liquidators of the company, Gordon MacRae and Tammy Fu,

G

counterclaimed for the repayment of the sum. On 17 November 2014 Smellie CJ sitting in the Grand Court of the Cayman Islands granted the claim for a negative declaration and dismissed the counterclaim. On 20 November 2015 the Court of Appeal of the Cayman Islands (Mr John Martin, Sir Richard Field and Sir Alan Moses JJA) upheld the decision of the Grand Court and dismissed the liquidators' appeal.

The liquidators appealed to the Privy Council. The issue on the appeal was whether payments made for the redemption of shares were unlawful under sections 34 and 37 of the Cayman Islands Companies Law (2007 rev) and if not, whether they were recoverable.

H

The facts are stated in the judgment of Lord Sumption and Lord Briggs JJSC, post, paras 9–21.

© 2018 The Incorporated Council of Law Reporting for England and Wales

A    *Tom Smith QC* and *Adam Al Attar* (instructed by *Alan Taylor & Co*) for
the liquidators.
  *David Chivers QC* and *Paul Smith* (instructed by *Herbert Smith Freehills
llp*) for the claimant investors.

  The Board took time for consideration.

B    23 November 2017.  The following judgments were handed down.

  **LORD SUMPTION** and **LORD BRIGGS** JJSC (with whom **LORD
CARNWATH** JSC agreed)

*Introduction—the issues*

C    1    In late 2008, just after the Lehman Brothers crash, a group of
investors in a Cayman Islands open-ended investment company called DD
Growth Premium 2X Fund ("the Company") decided to cash in their
investments by exercising their right to have their shares in the Company
redeemed.  The management of the Company responded, in January 2009,
by paying some of the investors in full, and some of them nothing.  The
largest payments were made to one investor, RMF Market Neutral
D    Strategies (Master) Ltd ("RMF"), in the aggregate sum of US$23m odd, but
this was less than 40% of the amount owed to RMF by way of redemption.
The Company then ran out of money and, shortly thereafter, went into
insolvent liquidation.  The liquidator then caused the Company to claim the
US$23m back from RMF but the claim failed, both in the Grand Court and
in the Cayman Islands Court of Appeal.
E    2    The Company's appeal from the Court of Appeal raises issues about
Cayman company law, as it was between 1989 and 2011, in relation to
payments by the Company of premium due on the redemption of its shares,
on largely undisputed facts which were either agreed at the outset of the
litigation, or found by the Chief Justice of the Cayman Islands, at the trial of
preliminary issues in 2014.
F    3    The first and second issues are about the interpretation of section 37 of
the Cayman Companies Law (2007 rev) in its statutory and historical
context.  Section 37 permits a company to issue redeemable shares and
regulates the circumstances in which, and the manner in which, they may be
redeemed.  The 2007 Revision will be referred to as "the Companies Law".
The third issue is about the common law, which in this respect is not suggested
to be different as between the Cayman Islands and England, and concerns the
nature of the remedies available to the company or to its liquidator for the
G    recovery of a redemption payment rendered unlawful by section 37.
  4    Cayman law (like the law of the UK) has always contained restrictions
upon the ability of a company to reduce its capital, primarily for the
protection of its creditors.  Although originally to be found in judge-made
law, they are now almost completely statutory.  The particular restriction in
issue on this appeal consists of a form of solvency test which must be
H    satisfied by a company if it is lawfully to pay for the redemption of shares out
of capital.  It is to be found in section 37(6) of the Companies Law in the
following form:

   "(a) A payment out of capital by a company for the redemption or
purchase of its own shares is not lawful unless immediately following the

© 2018 The Incorporated Council of Law Reporting for England and Wales

A

date on which the payment out of capital is proposed to be made the company shall be able to pay its debts as they fall due in the ordinary course of business.  (b) The company and any director or manager thereof who knowingly and wilfully authorises or permits any payment out of capital to effect any redemption or purchase of any share in contravention of paragraph (a) is guilty of an offence and liable on summary conviction to a fine to fifteen thousand dollars and to imprisonment for five years."

B

5    The first issue is mainly a question of interpretation or application of the phrase "its debts as they fall due in the ordinary course of business" in section 37(6)(a).  The question is whether generally that phrase is apt to include the debts constituted by the redemption price payable to shareholders who have exercised their right to redeem ("a redemption debt").  A subsidiary question is whether in any event redemption debts were incurred by this Company in the ordinary course of its business, as the judge held.  It is common ground that, if redemption debts are generally, or are in the context of this Company's business, within section 37(6)(a), then the Company was insolvent at the material time.  There is a factual dispute whether, if not, the Company had other debts which rendered it insolvent within the meaning of section 37(6)(a).  The judge found it unnecessary to resolve that question and, for reasons which will appear, so does the Board.  This issue will be referred to as "the Solvency Issue".

C

D

6    The second, and main, issue in the appeal is whether a payment out of a company's share premium account towards the premium payable on redemption of shares (rather than towards the nominal amount of those shares) is a capital payment within the meaning of section 37(6)(a).  If it is, then a company may not use sums standing to the credit of its share premium account for payment of the premium due on redemption of shares unless it satisfies the solvency test in section 37(6)(a).

E

7    The appellant liquidators also challenged the lawfulness of the redemption payments made by the Company in this case by two alternative submissions which do not involve reliance upon section 37(6)(a).  For reasons which will become apparent the Board has not found it necessary to address those in detail.  Since all three routes of challenge question the legality of the redemption payments made, these issues will be referred to collectively as "the Illegality Issue".

F

8    The third issue, which will be called "the Remedies Issue", may be summarised in this way.  The Companies Law creates no express statutory cause of action or other civil remedy against the recipient of an unlawful redemption payment.  There is only a criminal sanction against the company, its directors and managers.  It is not in dispute that the directors of a company who procure the making of an unlawful redemption payment would be liable to the company for breach of trust, and that a recipient with knowledge of the facts as to the unlawfulness of the payment would be liable as a constructive trustee.  The question is whether a claim for the recovery of an unlawful redemption payment may be pursued by the company or its liquidator against a recipient which received the payment without knowledge of the facts giving rise to the illegality, and in settlement (or part-settlement) of the debt constituted by the Company's obligation to pay the redemption price after a valid exercise of the shareholder's right to redeem, by means of a claim in unjust enrichment, subject only to established defences, such as change of position.

G

H

© 2018 The Incorporated Council of Law Reporting for England and Wales

A    *The facts*

9    The Company is a Cayman Islands company limited by shares which, until placed in official liquidation in March 2009, carried on business as a feeder fund for the facilitation of investment in the DD Growth Premium Master Fund ("the Master Fund"). That was a hedge fund which, until the collapse of Lehman Brothers in late 2008, pursued what the judge described as a well known trading strategy of investment in correlated stocks. The mechanism whereby the Company made this facility available to investors was by the issue of redeemable ordinary shares at a premium, and by using the proceeds of the issued shares as investments in the Master Fund. Investors could realise their investments through the Company in the Master Fund by making written requests to redeem their shares on one of a regular monthly series of redemption days. Both the issue price payable by the investor and the redemption price payable by the Company was to be calculated by reference to Net Asset Value ("NAV") calculations based upon the market value, from time to time, of the Company's investment in the Master Fund on the relevant issue or redemption date.

10    The use of redeemable shares as the vehicle for investment in this way was a common business practice in the Cayman Islands, and involved both the issue and the redemption of the ordinary shares at a very substantial premium. By way of example, the NAV per US$ share of the Company's ordinary shares ranged during the period from January to June 2008 between US$106,575 and US$112·288, whereas the nominal value per share was US$0·001. Thus, an incoming investor during that period would pay for the issue of shares an amount consisting almost entirely of premium, and the payment to an outgoing investor on a redemption day during that period would be similarly constituted.

11    As a feeder fund, the Company's ordinary business consisted of the issue of shares, the transmission to the Master Fund of the proceeds of the issue, the receipt from the Master Fund of payments necessary to fund redemptions, and the payment out of redemption moneys to redeeming shareholders. The Company had no separate trading activities of its own.

12    The timetable for redemption laid down by the Company's articles may be summarised as follows: (i) A shareholder is required to give 30 days' written notice of its wish to redeem, prior to a redemption day. (ii) Redemption days were scheduled for the first business day of each month. (iii) The NAV per share was to be assessed by the administrator at the close of business on the day prior to the first business day of each month. (iv) On the redemption day redeeming shareholders redeemed their shares at a price per share based on the NAV per share of the relevant class of share. They ceased to be shareholders and became creditors of the Company for that price on that day. (v) Payment of the redemption price was to be made by the Company within 14 business days of the redemption day.

13    The conversion of the status of a redeeming investor from a shareholder to a creditor on the redemption day, in advance of payment, was expressly laid down by the articles, and the validity of that first stage in the redemption process was affirmed by the Board in *Pearson v Primeo Fund* [2017] BCC 552.

14    By August 2008 the respondent RMF Market Neutral Strategies (Master) Ltd ("RMF") was a substantial investor in the Company's US$ denominated shares. The Company operated a substantially similar Euro

© 2018 The Incorporated Council of Law Reporting for England and Wales

denominated share structure, which can be ignored for the present purposes. A
One effect of the Company's trading was that it had a substantial surplus of
share premium available for redemption of shares, although it did not
maintain a formal share premium account in its books.

15    The seismic shock to the derivatives markets which was triggered by
the collapse of Lehman Brothers in late September 2008 had a catastrophic
effect upon the investment strategy, and therefore the asset value, of the
Master Fund.  This meant that, in reality (and as later calculated by the    B
Master Fund's liquidators), the Master Fund had a net asset value of minus
US$69m odd by the end of November 2008, having lost US$76m odd in
October and US$173m odd in November.

16    The manager of the Master Fund, and of the Company, was
Dynamic Decisions Capital Management Ltd which was itself run by a
Mr Alberto Micalizzi, who was also a director of the Master Fund and of the    C
Company.  It appears that, under his supervision, the Master Fund concealed
its catastrophic losses by investments in worthless bonds (the Asseterra
bonds) which were attributed a value in the Master Fund's books sufficient
both to conceal its insolvency and to portray to the world, and in particular
to those responsible for the calculation of the NAV, a continuing state of
profitability.

17    Meanwhile, RMF and six other investors decided to redeem shares in    D
the Company, giving redemption notices effective on the 1 December 2008.
Of its 693,630.656 ordinary US$ shares, RMF gave notice to redeem
87,466.106 on 29 October and 437,330.534 on 31 October 2008, both
effective on the 1 December redemption day.  This left RMF holding
168,834.016 shares thereafter, which it unsuccessfully sought to redeem in
January 2009.    E

18    Based upon the false information provided by or on behalf of the
Master Fund, the NAV per US$ share for the December redemption date was
calculated at US$118·880.  Accordingly RMF became a creditor of the
Company on 1 December 2008 in respect of its two redemption notices in
the aggregate sum of US$62,387,824.

19    The Company had no cash of its own at that time.  None the less    F
those managing the Master Fund managed to scrape together sufficient cash,
made available first on 8 January 2009, to enable the Company to make part
payment to the investors who redeemed in December.  In summary, RMF
was paid (between 12 January and 6 February 2009) US$23m odd,
amounting to some 36.89% of what it was owed.  Of the other six investors,
the aggregate of whose redeemed shares was much less than that of RMF,
three were paid in full, but three were paid nothing.    G

20    The Company suspended its redemptions shortly thereafter and in
March 2009 was placed in official liquidation.  By these proceedings the
liquidators seek, through the Company, to recover the whole of the US$23m
odd paid in January 2009 to RMF, on the basis that those redemption
payments were rendered unlawful by section 37, or alternatively section 34,
of the Companies Law.

21    Since the Company had no assets other than its investment in the    H
Master Fund, it followed that it had in truth a negative asset value by
1 December 2008, and at all times thereafter.  It was also common ground
that, if the debts to redeeming shareholders are to be taken into account, the
Company failed the solvency test imposed by section 37(6)(a) both on

© 2018 The Incorporated Council of Law Reporting for England and Wales

A  1 December 2008, and when the part payments of the Company's
redemption debts to RMF were made.  The Company submits (and asserted
before the judge) that it also owed debts to creditors other than redeeming
shareholders which it was from December 2008 onwards unable to pay in
the ordinary course of business.  The judge found it unnecessary to reach any
conclusions about that.

B  *The proceedings*

22   RMF initiated this litigation with a claim for a negative declaration
(ie that it was not liable to repay the US$23m) in February 2011.  The
Company cross-claimed for recovery of that sum, on the alternative bases
that (1) it was the aggregate of unlawful redemption payments, recoverable
by way of unjust enrichment or constructive trust and (2) that the payments
C  constituted fraudulent preferences.

23   In his judgment handed down on 17 November 2014 (after a trial
of preliminary issues in September) Smellie CJ held that: (i) The payments
were not unlawful, being a legitimate use of the share premium account
pursuant to sections 34 and 37 of the Companies Law.  (ii) That the
Company was insolvent, both within the meaning of section 37(6)(a) and
D  generally, at the material time.  (iii) That the fraudulent preference claim
failed on the facts.

24   In the circumstances, the judge found it unnecessary to decide any
part of the remedies issue.  Indeed, the facts relevant to any claim based
in constructive trust were neither agreed nor determined as part of the
preliminary issues.

E  25   The Company's liquidators have not sought to appeal the judge's
rejection of the claim based on fraudulent preference.  Apart from that, the
Company sought to pursue its unsuccessful claims in full by way of appeal.

26   By its judgment handed down on 20 November 2015 the Court of
Appeal (Mr John Martin, Sir Richard Field and Sir Alan Moses JJA)
dismissed the Company's appeal, in substance agreeing with the judge's
interpretation of sections 34 and 37, albeit partly for different reasons.  Like
the judge, the Court of Appeal found it unnecessary to address any issues
F  about remedy.  Nor does it appear that the Court of Appeal addressed
RMF's challenge, raised by respondent's notice, to the judge's finding of
insolvency within the meaning of section 37(6)(a).

*The solvency issue*

27   It is convenient to take this issue first since, if the judge's finding that
G  the Company failed the section 37(6)(a) solvency test was unsound, this
undermines the claim for recovery based upon the alleged unlawfulness of
the redemption payments.

28   It is common ground between the parties that, if redemption debts
owed to the shareholders redeeming on the 1 December 2008 redemption
day are to be taken into account, then the Company was then unable to pay
its debts as they fell due.  This is because the payments challenged satisfied
H  only part of the December redemption debts, and the Company was
thereafter unable to pay the rest.  It is also necessary to bear in mind at the
outset that it is common ground that the December redemptions were
themselves valid in the sense that, with effect from 1 December 2008, both
RMF and the six other redeeming shareholders were converted from

© 2018 The Incorporated Council of Law Reporting for England and Wales

shareholders to creditors in respect of the shares being redeemed, and the
shares cancelled.  It is also part of that common ground that, although the
NAV of US$118·880 per share had been calculated upon false information, it
was none the less a valid NAV for the purpose of crystallising the amount of
the redeeming shareholders' debt: see *Fairfield Sentry Ltd v Migani* [2014]
1 CLC 611.

29    The insolvency test laid down by section 37(6)(a) is quoted in full at
the beginning of this judgment.  The main submission made for RMF was
that "debts" should be held, on a purposive construction, to exclude debts
due to former shareholders.  This, it was said, is because section 37(6) is part
of a statutory buttress for the maintenance of capital, and maintenance of
capital is something designed for the protection, not of contributories, but of
ordinary creditors, so that it would be perverse to read section 37(6) as
designed to ensure that former shareholders could not be paid on
redemption, merely because of a shortfall available to pay all redeeming
shareholders in full.  Accordingly, the test should address only the question
whether, after the proposed payment, the company would be able to pay its
ordinary creditors (principally trade and expense creditors), and since this
Company was not proved to have had any such creditors at the material
time, it could not be said to have failed this solvency test.

30    In the Board's judgment this submission should be rejected, for the
following reasons.  First, although there is force in the proposition that the
underlying purpose of any statutory or common law provisions or principles
for the maintenance of capital is to protect ordinary creditors rather than
shareholders or former shareholders, the protection afforded by section 37(6)
would not be effective if debts still owing to former shareholders who had
redeemed could not be paid after the proposed payment.  This is because
those creditors would, pending any liquidation, be competing for payment
with the company's "ordinary" creditors, and the existence of those
competing debts would hamper the ability of the company to pay its ordinary
creditors in full as and when their debts became due.  It is in that context
nothing to the point that section 49 of the Companies Law postpones claims
of members of a company to the claims of ordinary unsecured creditors,
precisely because it only operates in the context of a liquidation.  Until then,
former shareholders with redemption debts are as much entitled to exercise
creditors' remedies as any other creditors.

31    Secondly, there is no textual basis within section 37(6) on which this
purposive restriction can be founded.  The words "in the ordinary course of
business" in section 37(6)(a) do not operate so as to disqualify some debts
rather than others.  They are words which amplify the meaning of the phrase
"as they fall due".  The question whether a company is able "to pay its debts
as they fall due" is now a well known test for commercial rather than
balance sheet solvency, and requires that regard be had to the company's
forthcoming liabilities, and to its likely forthcoming resources with which to
discharge them.  It would be an entirely artificial exercise in the context of a
company with substantial redemption liabilities to former shareholders who
have, in respect of their redeemed shares, become creditors, to leave the
debts owed to them out of any test for commercial solvency.

32    Thirdly, as the judge found, the payment of debts owed to redeeming
creditors lay right at the heart of the ordinary business of this Company.  It is
an open-ended investment company.  Thus, even if the phrase "in the

© 2018 The Incorporated Council of Law Reporting for England and Wales

A ordinary course of business" qualified the type of debt to be taken into account, payment of redeeming shareholders fell squarely within this Company's ordinary course of business.

33   The Board therefore approaches the larger and more difficult illegality issue on the basis that the judge was right to find that the Company could not satisfy the section 37(6) solvency test when it made the payments now claimed to have been unlawful.

B

*The illegality issue*

34   It is convenient at this point to set out in full the provisions of the Companies Law which bear in any way upon this issue.  As consolidated in 2007 they represent provisions introduced in 1963, 1987 and 1989.  It cannot be doubted that their clarity suffers to a substantial extent from the piecemeal way in which they have come together over time.

C

"34(1) Where a company issues shares at a premium, whether for cash or otherwise, a sum equal to the aggregate amount of the value of the premiums on those shares shall be transferred to an account called 'the share premium account'.  Where a company issues shares without nominal or par value, the consideration received shall be paid up share capital of the company.

D

"(2) The share premium account may be applied by the company subject to the provisions, if any, of its memorandum or articles of association in such manner as the company may, from time to time, determine including, but without limitation— (a) paying distributions or dividends to members; (b) paying up unissued shares of the company to be issued to members as fully paid bonus shares; (c) in the manner provided in section 37; (d) writing off the preliminary expenses of the company; (e) writing off the expenses of, or the Commission paid or discount allowed on, any issue of shares or debentures of the company; and (f) providing for the premium payable on redemption or purchase of any shares or debentures of the company: Provided that no distribution or dividend may be paid to members out of the share premium account unless, immediately following the date on which the distribution or dividend is proposed to be paid, the company shall be able to pay its debts as they fall due in the ordinary course of business; and the company and any director or manager thereof who knowingly and wilfully authorises or permits any distribution or dividend to be paid in contravention of the foregoing provision is guilty of an offence and liable on summary conviction to a fine of fifteen thousand dollars and to imprisonment for five years."

E

F

G

"37(1) Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if authorised to do so by its articles of association, issue shares which are to be redeemed or are liable to be redeemed at the option of the company or the shareholder.

"(2) Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if authorised to do so by its articles of association, purchase its own shares, including any redeemable shares.

H

"(3)(a) No share may be redeemed or purchased unless it is fully paid. (b) A company may not redeem or purchase any of its shares if, as a result of the redemption or purchase, there would no longer be any other

© 2018 The Incorporated Council of Law Reporting for England and Wales

1604
DD Growth Premium 2X Fund v RMF Market Neutral Strategies (PC)   [2018] Bus LR
Lord Sumption and Lord Briggs JJSC

member of the company holding shares.  (c) Redemption of shares may be
effected in such manner as may be authorised by or pursuant to the
company's articles of association.  (d) If the articles of association do not
authorise the manner of purchase, a company shall not purchase any of its
own shares unless the manner of purchase has first been authorised by
a resolution of the company.  (e) The premium, if any, payable on
redemption or purchase must have been provided for out of the profits of
the company or out of the company's share premium account before or at
the time the shares are redeemed or purchased or in the manner provided
for in subsection (5).  (f) Shares may only be redeemed or purchased out
of profits of the company or out of the proceeds of a fresh issue of shares
made for the purposes of the redemption or purchase or in the manner
provided for in subsection (5).  (g) Shares redeemed or purchased under
this section shall be treated as cancelled on redemption or purchase, and
the amount of the company's issued share capital shall be diminished by
the nominal value of those shares accordingly; but the redemption or
purchase of shares by a company is not to be taken as reducing the
amount of the company's authorised share capital.  (h) Without prejudice
to paragraph (g), where a company is about to redeem or purchase shares,
it has power to issue shares up to the nominal value of the shares to be
redeemed or purchased as if those shares had never been issued: Provided
that where new shares are issued before the redemption or purchase of the
old shares the new shares shall not, so far as relates to fees payable on or
accompanying the filing of any return or list, be deemed to have been
issued in pursuance of this subsection if the old shares are redeemed or
purchased within one month after the issue of the new shares.

"(4)(a) Where, under this section, shares of a company are redeemed or
purchased wholly out of the company's profits, the amount by which the
company's issued share capital is diminished in accordance with
paragraph (g) of subsection (3) on cancellation of the shares redeemed or
purchased shall be transferred to a reserve called 'the capital redemption
reserve'.  (b) If the shares are redeemed or purchased wholly or partly out
of the proceeds of a fresh issue and the aggregate amount of those
proceeds is less than the aggregate nominal value of the shares redeemed
or purchased, the amount of the difference shall be transferred to the
capital redemption reserve.  (c) Paragraph (b) does not apply if the
proceeds of the fresh issue are applied by the company in making a
redemption or purchase of its own shares in addition to a payment out of
capital under subsection (5).  (d) The provisions of this Law relating to the
reduction of a company's share capital apply as if the capital redemption
reserve were paid-up share capital of the company, except that the reserve
may be applied by the company in paying up its unissued shares to be
allotted to members of the company as fully paid bonus shares.

"(5)(a) Subject to this section, a company limited by shares or limited
by guarantee and having a share capital may, if so authorised by its
articles of association, make a payment in respect of the redemption or
purchase of its own shares otherwise than out of its profits or the proceeds
of a fresh issue of shares.  (b) References in subsections (6) to (9) to
payment out of capital are, subject to paragraph (f), references to any
payment so made, whether or not it would be regarded apart from this
subsection as a payment out of capital.  (c) The amount of any payment

© 2018 The Incorporated Council of Law Reporting for England and Wales

A  which may be made by a company out of capital in respect of the
redemption or purchase of its own shares is such an amount as, taken
together with— (i) any available profits of the company are being applied
for purposes of the redemption or purchase; and (ii) the proceeds of any
fresh issue of shares made for the purpose of the redemption or purchase,
is equal to the price of redemption or purchase, is equal to the price of
redemption or purchase, and the payment out of capital permitted under
B  this paragraph is referred to in subsections (6) to (9) as the capital
payment for the shares.  Nothing in this paragraph shall be taken to imply
that a company shall be obliged to exhaust any available profits before
making any capital payment.  (d) Subject to paragraph (f), if the capital
payment for shares redeemed or purchased and cancelled is less than their
nominal amount, the amount of the difference shall be transferred to the
company's capital redemption reserve.  (e) Subject to paragraph (f), if
C  the capital payment is greater than the nominal amount of the shares
redeemed or purchased and cancelled, the amount of any capital
redemption reserve, share premium account or fully paid share capital of
the company may be reduced by a sum not exceeding, or by sums not in
the aggregate exceeding, the amount by which the capital payment
exceeds the nominal amount of the shares.  (f) Where the proceeds of a
D  fresh issue are applied by a company in making any redemption or
purchase of its own shares in addition to a payment out of capital under
this subsection, the references in paragraphs (d) and (e) to the capital
payment are to be read as referring to the aggregate of that payment and
those proceeds.

"(6)(a) A payment out of capital by a company for the redemption or
purchase of its own shares is not lawful unless immediately following the
E  date on which the payment out of capital is proposed to be made the
company shall be able to pay its debts as they fall due in the ordinary
course of business.  (b) The company and any director or manager thereof
who knowingly and wilfully authorises or permits any payment out of
capital to effect any redemption or purchase of any share in contravention
of paragraph (a) is guilty of an offence and liable on summary conviction
F  to a fine of fifteen thousand dollars and to imprisonment for five years."

35   Beginning again with section 37(6), and leaving aside the issue about
the meaning of "debts as they fall due in the ordinary course of business",
there is nothing difficult or uncertain about its purpose and effect, which is to
subject any payment out of capital for the redemption or purchase by a
company of its own shares to the solvency test as a condition for its
G  lawfulness.  But it immediately begs the question what is "a payment out of
capital".  That question is answered in terms by section 37(5)(b), which is
expressed to apply in the context of subsections (6) to (9).  It is "any payment
so made, whether or not it would be regarded apart from this subsection as a
payment out of capital".  It is common ground, and clearly correct, that the
phrase "any payment so made" means any payment referred to in
section 37(5)(a); i e "a payment in respect of the redemption or purchase of
H  its own shares otherwise than out of its profits or the proceeds of a fresh issue
of shares".  Since a payment out of share premium account is plainly not a
payment out of profits or out of the proceeds of a fresh issue of shares, it is
deemed to be a payment out of capital, provided only that it is made "in
respect of" the redemption or purchase of the company's own shares.  It was

© 2018 The Incorporated Council of Law Reporting for England and Wales

common ground, and plainly correct, that the phrase "in respect of" is wide
enough to include a payment of the premium due on the redemption of
shares.

36    In the Board's judgment that is the end of the matter. Section 37(6)
is, on its face, a free-standing condition for the lawfulness of a particular
type of payment for the redemption or purchase of shares, namely payment
out of capital. Section 37(5)(a) and (b) operate, expressly, as a form of
definition of the meaning of "payment out of capital" and do so for the
purpose of deeming that to be capital whether it would or would not
otherwise be so regarded. The conclusion that, therefore, a payment in
respect of the redemption of shares out of share premium account is a
deemed payment out of capital subject to the section 37(6) solvency test is a
straightforward application of clear statutory language, the displacement of
which would require very strong pointers to the contrary.

37    The main arguments that there are sufficient pointers to the contrary,
advanced for RMF, have thus far persuaded both the courts below. They
may conveniently be divided into three classes, namely: (i) arguments based
on section 37(3)(e); (ii) arguments based on section 34; and (iii) arguments
based on the legislative history behind these provisions, both in the UK and
in the Cayman Islands.

38    Section 37(3)(e) provides for three permitted ways or "gateways"
whereby the premium payable on redemption for purchase of shares may be
provided for, namely: (1) out of profits; (2) out of share premium account; or
(3) "in the manner provided for in subsection (5)". RMF submitted that
section 37(3)(e) permits the use of share premium account to pay premium on
redemption, regardless of the restriction in section 37(6), which only applies
if the third gateway, namely the manner provided for in subsection (5), has to
be employed for the purpose. The submission therefore treats section 37(6)
as if it is purely parasitic upon section 37(5).

39    While attractively argued by David Chivers QC for RMF, the Board
has not been persuaded that this analysis is correct. Neither on its own nor
when aggregated with the other arguments to which reference will be made
below is it sufficient to displace the clear meaning and effect of subsection (6),
read with and interpreted by reference to subsection (5)(a) and (b). The
reasons follow.

40    First, section 37(3)(e) is silent as to whether the use of share premium
account for the payment of premium on redemption is, or is not, subject to
the solvency test. The answer to that question lies elsewhere. Secondly,
subsections (5) and (6) are both expressly concerned with conditions for
payment of redemption amounts whereas subsection (3)(e) is, by its terms,
concerned with the making of provision in advance of, or at the time of,
redemption.

41    Thirdly, the third gateway in subsection (5)(e), namely "the manner
provided for in subsection (5)" could, had this been intended, easily have
referred also to subsection (6), or subsection (6) could itself have been
framed so as to be expressly confined to payments sought to be achieved by
using the subsection (5) gateway. In short, subsection (6) could have been,
but is not, expressed to be parasitic upon subsection (5). It is only if that
parasitic relationship between the two subsections is assumed, rather than
treated as the issue to be determined, that the alternative construction,
advanced by RMF and favoured by Lord Hodge JSC, gains strength.

© 2018 The Incorporated Council of Law Reporting for England and Wales

A    42    Fourthly, this argument pays insufficient attention to what appears
to be the main purpose of subsection (3)(e), read in the context of its sister,
subsection (3)(f).  Subsection (3)(f) is designed to identify the legitimate
resources for payment of the nominal amount due on redeemed shares,
whereas subsection (3)(e) is about resources for the payment of premium.
Reading the two together, they both permit the use of profits and the manner
provided for in subsection (5), but they prohibit the use of share premium
B    account for the payment of the nominal amount due, and they prohibit the
use of a fresh issue of shares for payment of the premium amount.  That
purpose is unrelated to the question whether any of the permitted methods,
and in particular the use of share premium account, amounts to a deemed
capital payment, thereby triggering the solvency test in subsection (6).

43    Finally, if the legislature had intended to exclude share premium
C    account from the reach of the deeming effect of subsections (5)(a) and (b),
this could so easily have been expressly stated in subsection (5)(a), by adding
a reference to share premium account in the words following "otherwise
than".  This is incidentally just what the legislature did do in 2011, although
that is irrelevant for the purposes of construction.

44    Turning to section 34, the argument is that, when subsection (2) is
read as a whole, it appears to contemplate and indeed authorise the use of
D    share premium account for providing for the premium payable on
redemption or purchase of shares without any solvency requirement.  This is
because the provision on redemption is given in subsection (2)(f), whereas the
proviso, which contains an identical solvency test to that in section 37(6)(a),
is expressed to apply only to distributions or dividends which are authorised
by subsection (2)(a).  Again, this is an attractive argument, and one which
E    strongly influenced the judge and the Court of Appeal.

45    The Board has not been persuaded by this argument, for two main
reasons.  The first is that the provision for a solvency test in relation to
distributions or dividends in section 34 does not mean or imply that there is
not some other solvency test applicable to one or more of the other permitted
uses of share premium account, such as that in section 37(6).  Section 34 is
the only place in the Companies Law in which the use of share premium
F    account for distribution or dividends is dealt with.  By contrast the use of
share premium account for redemption for purchase is just mentioned in the
non-exclusive list in section 34(2), but dealt with in detail in section 37.

46    The second reason derives from the history of the piecemeal
introduction of these provisions, and reinforces the first.  The provisions for
the use of share premium account on redemption of shares, including earlier
G    versions of what are now sections 37(3)(e) and (f), and section 37(5) and (6),
were introduced in 1987, as parts of what were then section 34.  At that
stage section 32 (which was the earlier version of what is now section 34)
made no mention of the use of share premium account for distribution or
dividends, made no reference to any solvency test and merely noted that it
could be used in providing for the premium payable on redemption of any
shares or any debentures of the company.  The permission to use share
H    premium account for distribution or dividends was introduced, side by side
with the solvency proviso now in section 34(2), in 1989.  If the provisions
newly introduced in 1987 subjected the use of share premium account to the
solvency test, it could not sensibly be suggested that the 1989 addition of
distribution and dividends, side by side with its own solvency test, was

© 2018 The Incorporated Council of Law Reporting for England and Wales

1608
DD Growth Premium 2X Fund v RMF Market Neutral Strategies (PC)   [2018] Bus LR
Lord Sumption and Lord Briggs JJSC

intended by a side-wind to release the use of share premium account for
redemption from a solvency requirement.                                                   A

47   Turning to the wider legislative history, counsel for both parties
travelled at length through the history of the common law and statutory
provision for the maintenance of capital, beginning with *Trevor v
Whitworth* (1887) 12 App Cas 409 and continuing through the UK
Companies Acts from 1929 onwards into the Cayman Islands legislation       B
which, in its original form in 1963, mirrored that to be found in the UK
Companies Act 1948.  Thereafter the two legislative schemes diverged.

48   The argument for RMF was that, in the context of a progressive
liberalisation of the regime for the maintenance of capital, share premium
account had, from 1948 in the UK and from 1963 in the Cayman Islands,
been available for the payment of a premium on redemption of shares
without any requirement for commercial solvency.  For completeness, it was   C
pointed out that this has clearly been the position from 2011, when share
premium account was, by further amendment of section 37(5)(a), clearly
excluded from the definition of capital payments.   Why, it was asked
rhetorically, should there have been a blip in that process of liberalisation
which applied a solvency test to the use of share premium account for this
purpose, which had previously been absent?                                                D

49   The answer in the Board's judgment is that, prior to 1987, Cayman
law permitted only the issue and redemption of preference shares, rather
than equity shares, following in that respect the precedent set by the
Companies Act 1948.  In sharp contrast with shares of the type in issue in
these proceedings, where the premium may exceed the nominal amount by
several orders of magnitude, the premium likely to be payable upon the
redemption of preference shares would typically be modest, limited to some   E
capitalisation of coupon, unpaid on early redemption.  The propensity for
permitting the premium payable on redemption of equity shares to
undermine capital maintenance, by comparison with preference shares, was
perceptively analysed by Professor Gower in 1980 in his consultative report
"The Purchase by a Company of its Own Shares" (Cmnd 7944).  At para 22,
after pointing out that section 58 of the Companies Act 1948 permitted a     F
premium payable on redemption to be provided for out of share premium
account, he continued:

    "This anomaly may not matter much in the case of preference shares in
    the strict sense, where the premiums are likely to be small.  But in relation
    to redeemable equity shares the premiums might well be many times the
    nominal value, resulting in a substantial reduction of capital on
    redemption.  It is therefore suggested that sections 56 and 58 should be   G
    amended so as to prevent redeemable shares from being redeemed
    otherwise than out of profits or an issue of new capital without any use of
    share premium account which would be left intact."

50   In due course, the UK Parliament followed that advice and
prohibited the use of share premium account for the payment of premium on
redemption of shares, when extending the ability of a company to issue and   H
redeem shares from preference shares to equity shares.  This was done in the
Companies Act 1981.  By contrast, in 1987 the Cayman Islands adopted a
more nuanced approach.  The ability to issue and redeem shares was
extended from preference shares to equity shares, and share premium

© 2018 The Incorporated Council of Law Reporting for England and Wales

A account was permitted to be used for funding the premium payable on redemption.  It is not surprising in that context that the Cayman Islands legislature took the more modest step of imposing a solvency test from the use of share premium account for that purpose rather than, as in the UK, prohibiting it altogether.  It may well be that this was done specifically to permit or encourage the use of shares and share premium as an investment vehicle in the way commonly used by open-ended investment companies as

B illustrated by the facts of this appeal.  There was no time before 2011 at which, in the Cayman Islands, redeemable equity shares could be issued, or redeemed, when there was also an uncontrolled right to fund premium payable on redemption out of share premium account.  If the solvency test was imposed in 1987, as the Board considers that it was, it cannot in the light of the legislative history sensibly be described as some unaccountable

C blip in an otherwise seamless liberalisation of the capital maintenance regime.

51   Lord Hodge JSC criticises this analysis, in particular the reference to Professor Gower's report, as a misuse of UK legislative history and policy for the interpretation of the undoubtedly different provisions of the Cayman Company Law.  But when Professor Gower reported in 1980 the statutory

D provisions regulating the issue and redemption of shares were substantially the same in both jurisdictions, and the risks arising from the extension of the redemption of shares from preference to equity shares were therefore also the same.  Professor Gower was doing no more than point out the logical consequences of providing for the redemption of equity shares upon the maintenance of capital.

E 52   Lord Hodge JSC draws support from a detailed textual analysis of the progressive development of the Cayman regime regulating the issue and redemption of shares from 1963, through 1987 and 1989 to 2007, for a conclusion that the solvency test now in section 37(6) was never intended to apply to the use of share premium account for the payment of premium on redemption.  In the Board's view the question turns primarily upon the construction of the 2007 Revision.  If the 1987 Revision had clearly not

F applied the solvency test, then this might have been a sufficient contra-indication to displace the apparently clear meaning of section 37(6) read with the definition of payment out of capital in subsection (5), in the 2007 Revision.  But the Board's view is that the broadly equivalent provisions of the 1987 Revision do not lead to any different conclusion, construed on their own, and the modest textual changes to what is now section 37 introduced

G in 1989 make no significant difference.

53   The judge was clearly influenced in his approach to the construction of sections 34 and 37 by a perception that to subject the lawfulness of a payment of redemption premium out of share premium account to a solvency test would expose investors in companies of this kind to unacceptable risks of uncertainty because of the risk of claw-back claims, sometimes long after redemption, arising from facts internal to the issuing

H company, unknown to the investor but affecting the commercial solvency of the company.  If those claw-back claims could indeed be made against innocent investors (i e without knowledge of the facts about the company's solvency giving rise to the illegality) then the judge's concerns would be understandable.  None the less, as will shortly appear, the Board considers

© 2018 The Incorporated Council of Law Reporting for England and Wales

that the answer to those concerns lies in the limited nature of the remedy, rather than in adopting a strained construction of sections 34 and 37.

54    The conclusion that the solvency test in section 37(6) applies to the use of share premium account for payment of premium on redemption means that it is unnecessary to address in detail either of the other grounds upon which the Company argued that the payments in issue were unlawful. For completeness there follows a brief explanation why the Board found neither of them persuasive.

55    The first was that, separately from section 37(6), and although only applicable to payment of the nominal amount due on the redemption of shares, section 37(3)(f) was none the less itself a cumulative condition which would render the use of share premium account for payment of the premium under section 37(3)(e) unlawful, if the nominal amount was not to be funded out of proceeds of a fresh issue or in the manner provided for in subsection (5). Although generally the conditions for redemption are cumulative in section 37, subsections 3(e) and (f) deal with quite different aspects of the manner in which redemption is to be funded. Once a valid redemption has occurred (as is common ground in these proceedings) then the company owes a debt to the redeeming shareholder equivalent to what will always be the aggregate of the nominal amount and any relevant premium. It does not follow, merely because the nominal amount is not provided for or paid in a manner which renders the payment lawful, that this necessarily affects the lawfulness of the payment of the premium amount.

56    The second alternative submission was that, in the context of the payment of premium on redemption, where there was no lawful payment of the nominal amount, the payment of the premium would be a distribution or divided, separately subjected to a solvency test by section 34(2). Again, the concession that there was a valid redemption, sufficient to convert the redeeming shareholders into creditors and to bring to an end their rights as shareholders, necessarily means that a payment then or thereafter made to them is neither a dividend nor a distribution. Accordingly, it is not subject to the solvency test in section 34(2).

57    For the reasons already given, the Board has concluded that the payments in issue in these proceedings were unlawful payments, because they were capital payments which triggered the solvency test in section 37(6), with which the Company was at the time unable to comply.

*The remedy issue*

58    If, as the Board concludes, payment of the redemption proceeds was unlawful by virtue of section 37(6)(a) of the Companies Law, the next question is whether they are recoverable by the Company. The liquidators' primary case is that they are recoverable at common law on the ground of unjust enrichment. Alternatively they submit that they are recoverable in equity on the ground that the redeeming shareholder is accountable as a constructive trustee on the footing of knowing receipt. Conceptually these two proposed bases of recovery are very different. A common law liability in restitution depends on the defendant having been unjustly enriched by the receipt. The liability of a constructive trustee is essentially a custodial liability comparable to that of an express trustee, which is imposed on him because he has sufficient knowledge to affect his conscience. The difference is of some practical importance in the present case. If the payments are

© 2018 The Incorporated Council of Law Reporting for England and Wales

A    recoverable only on the footing of knowing receipt, the company must
establish that the redeeming shareholder had sufficient knowledge of the
facts which made the payment unlawful.  But knowledge of the facts giving
rise to a right of restitution is generally irrelevant.

59    A number of uncontroversial points should be made by way of
introduction.  First, section 37(6)(a) of the Companies Law prohibits a
payment out of capital of the redemption proceeds, but does not prohibit
B    the redemption itself.  It is, as the Board has observed, common ground that
the redemption itself was lawful and effective.  It follows that on the
relevant redemption days the transaction was executed.  The redeemed
shares were thereupon cancelled and the Company's issued share capital was
reduced by their nominal value: see the Companies Law, section 37(3)(g).
Secondly, there is nothing in the Companies Law to prevent the redemption
C    proceeds from being payable at some time after the Redemption Day.  Under
the terms of the Offering Memorandum for the shares in question, the
redemption proceeds were payable within 14 days.  It follows, as the parties
agree, that on the Redemption Day, the Company came under a liability to
pay the redemption proceeds by the due date.  The debt was incurred by the
Company in consideration of the cancellation of the shares, and the payment
was in consideration of the discharge of that debt.  Thirdly, the prohibition
D    in section 37(6)(a) is directed at the Company, i e at the directors by whom it
acts.  Fulfilment of the conditions imposed by section 37(6)(a) is a matter of
internal administration.  It is a breach of trust on the part of the directors to
authorise the payment of the redemption proceeds if the conditions in
section 37(6)(a) are not satisfied.

60    In principle, money paid under an ineffective (e g a void) transaction is
E    recoverable: *Westdeutsche Landesbank Girozentrale v Islington London
Borough Council* [1994] 1 WLR 938, per Hobhouse J, approved (obiter) on
appeal to the House of Lords [1996] AC 669, 681–682, per Lord Goff of
Chieveley, p 714, per Lord Browne-Wilkinson, p 723 per Lord Woolf;
*Guinness Mahon & Co Ltd v Kensington and Chelsea Royal London
Borough Council* [1999] QB 215. As the editors of *Goff & Jones*, *The Law of
Unjust Enrichment*, 9th ed (2016), Chapter 13, explain, the ground of
F    recovery in these cases is failure of basis.  The transfer was not intended to be
gratuitous, but the ineffectiveness of the transaction means that there never
was any consideration for it.  The same is in principle true if the reason why
the transaction is ineffective is that it is illegal, although in this case the
position is complicated by the public policy against the recovery of money
paid for an illegal purpose: *Smith v Bromley* (1760) 2 Doug KB 696; *Patel v
G    Mirza* [2017] AC 467, paras 146–148, per Lord Neuberger of
Abbotsbury PSC, paras 194–197, per Lord Mance JSC, paras 251–252, per
Lord Sumption JSC.

61    The present case is, however, rather different.  The basis for the
payment of the redemption proceeds is that the shares have been redeemed
and cancelled and a valid debt is owed by the Company.  That basis has not
failed.  On the contrary, the redemption was lawful.  The shares have been
H    duly cancelled and the nominal share capital of the company adjusted
accordingly.  The Company's payment of part of the proceeds discharged
pro tanto the lawful debt that arose in consequence.  It is accepted by the
liquidators that if it had not been paid, it could have been proved as a debt in
the liquidation of the company.  It follows that although the Company acted

© 2018 The Incorporated Council of Law Reporting for England and Wales

illegally in making the payment, upon receipt it discharged a valid legal
entitlement of the redeeming shareholder.

62    It is fundamental that a payment cannot amount to enrichment if it
was made for full consideration; and that it cannot be unjust to receive or
retain it if it was made in satisfaction of a legal right.  As Professor Burrows
has put it in his *Restatement of the English Law of Unjust Enrichment*
(2012), para 3(6), "in general, an enrichment is not unjust if the benefit was
owed to the defendant by the claimant under a valid contractual, statutory
or other legal obligation".  The proposition is supported by more than a
century and a half of authority: see, in particular, *Aiken v Short* (1856)
1 H & N 210, 215, *Barclays Bank Ltd v W J Simms Son & Cooke (Southern)
Ltd* [1980] QB 677, *Lipkin Gorman v Karpnale Ltd* [1991] 2 AC 548,
574–577, 580–581, *Kleinwort Benson Ltd v Lincoln City Council* [1999]
2 AC 349, 408, per Lord Hope of Craighead, *Fairfield Sentry Ltd v Migani*
[2014] 1 CLC 611, para 18.

63    The liquidators submitted that, subject to any change of position
defence, there was a right to restitution because the purpose of
section 37(6)(a) was the protection of the company's assets for the benefit of
its creditors.  In support of this submission, they cited *Smith v Bromley*
2 Doug KB 696, *Browning v Morris* (1778) 2 Cowp 790, and *Kiriri Cotton
Co Ltd v Dewani* [1960] AC 192.  These are all decisions about the rule of
public policy against the recovery of money paid for an illegal purpose.
They are authority for the proposition that although in principle money paid
for an illegal purpose is not recoverable, there is an exception for cases
where the parties to the illegal transaction were not in pari delicto.  One
circumstance in which they will not be in pari delicto is that the illegality
consisted in the breach of an obligation laid upon the defendant for the
protection of the very class of persons to which the claimant belonged.  Thus
in the *Kiriri Cotton Co Ltd* case a tenant was entitled to restitution of an
illegal premium which he had paid by agreement to the landlord, because the
duty not to charge it was laid by statute on landlords for the protection of
tenants.  This line of cases needs to be revisited in the light of the decision
of the Supreme Court in *Patel v Mirza* [2017] AC 467, in which every member
of the court (albeit for different reasons) recognised a more general right to
restitution of money paid under an illegal transaction.  But this does not
matter, for these cases have no bearing on facts like those presently before
the Board.  They assume a prima facie right to restitution and address the
circumstances in which the illegality of the underlying transaction may
afford a defence, whereas in the present case there is no prima facie right to
restitution to call for such a defence.  They go on to assume (as was in fact
the case in all of them) that the party seeking restitution was party to the
illegality, whereas in the present case the redeeming shareholder simply
received payments which were due to him under lawful transactions.  The
purpose of the rule which made the transaction illegal may be relevant to
defeat reliance on the principle of public policy ex turpi causa non oritur
actio.  But it cannot create a right of restitution which would not otherwise
exist.

64    The Board concludes that the Company is not entitled to recover the
payments at common law on the ground of unjust enrichment.  The reality of
the present case is that a payment has been received from a company for
lawful consideration but it has been authorised by its directors in breach of

© 2018 The Incorporated Council of Law Reporting for England and Wales

A   their duties to the Company. This is the proper domain of the law of
constructive trusts. Not even in return for good consideration can a person
retain assets which he knows to have been paid to him in breach of the
statutory duties of the directors. But knowledge, especially in relation to
apparently routine transactions where lawfulness depends on the internal
affairs of the Company, may be hard to prove.

B   65   The Board will humbly advise Her Majesty that this appeal must be
allowed, and a declaration made that the payments of redemption proceeds
pursuant to the respondents' redemption requests dated 29 and 31 October
2008 were unlawful by virtue of section 37(6)(a) of the Companies Law.
The courts below did not deal with the right of recovery because they
considered that the payments were lawful. Accordingly, there are no

C   findings of fact to found the claim to make the redeeming shareholder
accountable on the footing of knowing receipt. The matter must therefore
be remitted to the Grand Court to determine whether the respondent is
accountable for those payments as a constructive trustee.

**LORD HODGE JSC** (dissenting) (with whom **LORD MANCE DPSC**
agreed)

D   66   I agree with the judgment of Lord Sumption and Lord Briggs JJSC on
the solvency issue and also on the remedy issue if the repayment of the
premium on the redeemed shares were illegal. I am not however persuaded
that the Chief Justice and the Court of Appeal of the Cayman Islands erred in
their conclusions on the illegality issue.

67   The relevant provisions of the 2007 Companies Law are the
consolidation of provisions introduced in 1963, 1987 and 1989. The

E   legislative history of the current provisions, which have been set out in
para 33 above, differs markedly from the way in which companies
legislation in the United Kingdom has regulated the share premium account.
The policies behind the legislation in the United Kingdom do not, in my
view, provide a reliable guide as to the meaning of the 2007 Companies Law.

68   The 1963 Companies Law, in section 32, treated the share premium
account as a species of capital by applying the provisions of the 1963 Law

F   relating to the reduction of share capital to the share premium account "as if
the share premium account were paid-up share capital". But that deeming
provision was qualified in subsection (1) by the words "except as provided in
this section". It was therefore subject to exceptions in subsection (2), of
which the relevant one was that the share premium account could be applied
"in providing for the premium payable on redemption of any redeemable
preference shares or of any debenture of the company". Section 34 of the

G   1963 Law, which empowered a company, if authorised by its articles, to
issue redeemable preference shares, drew a distinction between the
redemption of shares and the repayment of the premium on those shares. It
provided (i) that the shares were to be redeemed out of profits otherwise
available for dividend or out of the proceeds of a fresh issue of shares made
for the purposes of the redemption (section 34(1)(a)) and (ii) that any

H   premium payable on redemption must have been provided for out of
profits or the share premium account before the shares are redeemed
(section 34(1)(c)). The 1963 Law reflected the relevant provisions (sections
56 and 58) of the United Kingdom's Companies Act 1948. No other
provision was needed to authorise the use of funds in the share premium
account in paying the premium on redemption of the preference shares.

© 2018 The Incorporated Council of Law Reporting for England and Wales

69    At that time, the only redeemable shares which a company was
authorised to issue were preference shares, which would normally have only
a modest premium payable on redemption.  But in 1987 company law in the
Cayman Islands was altered radically when companies were empowered to
issue redeemable equity shares.  The 1987 Law substituted a new section 32
which did not alter the basic rule which treated the share premium account
as if it were capital but, by extending the exception of the provisions of that
section from that deeming provision, allowed the use of that account to
provide for the premium payable on the redemption of any shares or of
any debenture of the company.  The substituted section 34, providing for
the redemption and purchase of shares, preserved the substance of
section 34(1)(c) of the 1963 Law by providing (in subsection (2)(e)):

"The premium (if any) payable on redemption or purchase must have
been provided for out of the profits of the company or out of the
company's shares [sic] premium account before or at the time the shares
are redeemed or purchased."

The section retained the distinction between the use of the share premium
account to pay the premium on redemption or purchase and the repayment
of the nominal value of the shares on redemption or purchase by providing
(in subsection 34(3)(f)):

"*Subject to the provisions of subsection (5)*, shares may only be
redeemed or purchased out of profits of the company or out of the
proceeds of a fresh issue of shares made for the purposes of the redemption
or purchase." (Emphasis added.)

But, as the emphasised words show, the repayment of the nominal value of
the shares was subjected to a new regime, which is in substance that which is
now contained in section 37(5) and (6) of the 2007 Act.  That regime allows
the company to make a payment in respect of the redemption or purchase of
its own shares otherwise than out of its profits or the proceeds of a fresh issue
of shares but deems such payments to be a payment out of capital and
subjects those payments to the solvency test in subsection (6).

70    The 1989 Law by repealing subsections (1) and (2) of section 32
removed the provision that the share premium account was to be subjected
to the rules relating to the reduction of capital as if it were paid up share
capital, except as provided in that section.  It replaced those subsections with
the provisions which are now found in section 34 of the 2007 Law and are
set out in para 33 above.  Those amendments preserved the share premium
account but no longer deemed the share premium account to be capital for
any purpose.  The new subsection (2) provided that the share premium
account may be applied in such manner as the company may determine.  The
enumerated uses of the account were stated not to limit that discretion.
Those uses included the paying of distributions or dividend to members,
which use alone was subjected to the solvency test in what is now the proviso
to section 34(2) of the 2007 Act.  The uses which were not so subjected
included and include the application of the share premium account
"(f) providing for the premium payable on redemption or purchase of any
shares or debentures of the company".

71    Another use which was not subjected to the solvency test in
section 34(2) of the 1963 Law as amended in 1989 is the application of the

© 2018 The Incorporated Council of Law Reporting for England and Wales

A   share premium account "(c) in the manner provided in section 34" (now section 37 of the 2007 Law).  This would allow the funds in the share premium account to be used to redeem the nominal value of shares, but such application would fall under what under the 2007 Law is the section 37(5) regime and thus the section 37(6) solvency test.

72   The 1989 Law amended section 34(3)(e) of the 1963 Law to read:

B        "The premium (if any) payable on redemption or purchase must have been provided for out of the profits of the company or out of the company's share premium account before or at the time the shares are redeemed or purchased *or in the manner provided for in subsection (5)*." (Emphasis added.)

C   This provision as amended thus provided an additional source of the funds, deemed capital under subsection (5), which a company could use to pay the premium payable on redemption or purchase.  The 1989 Law also amended section 34(3)(f) by deleting the opening words emphasised in para 69 above and by adding the words emphasised below so as to read:

        "Shares may only be redeemed or purchased out of profits of the company or out of the proceeds of a fresh issue of shares made for the purposes of the redemption or purchase *or in the manner provided for in subsection (5)*." (Emphasis added.)
D

Thus the nominal value of redeemed or purchased shares could be paid for out of profit, out of the proceeds of a fresh issue of shares made for that purpose or out of deemed capital as provided in subsection (5).  Changes were also made by the 1989 Law to section 34(5) (now section 37(5) of the 2007 Law) but they are not relevant.

E

73   From this legislative history the following conclusions can be drawn.  First, the legislation has throughout authorised the application of the share premium account to pay the premium on the redemption of redeemable shares.  Secondly, when redeemable equity shares were introduced, the 1987 Law preserved a distinction between the repayment of the premium on redeemable shares (now including redeemable equity shares) and the repayment of the nominal value of those shares by subjecting only the latter to the provisions of subsections (5) and (6) in the opening words of section 34(3)(f) (para 69 above).  Thirdly, this distinction is preserved by the amendments introduced by the 1989 Law which expressly provide for an additional optional source of payment in both section 37(3)(e) and section 37(3)(f) of the 2007 Law.  Thus the premium on redemption of shares may be paid out of (a) profits or (b) the share premium account or (c) as provided for in subsection (5) (ie a deemed capital payment subject to a solvency test).  The nominal value of the shares on the other hand may be paid (a) out of profits or (b) out of the proceeds of a fresh issue of shares or (c) as provided for in subsection (5) (ie a deemed capital payment subject to the solvency test).  The use of the disjunctive "or" in section 37(3)(e) means that the payment of the premium on redemption or purchase out of the share premium account is not subjected to the regime under subsections (5) and (6).  This is consistent with section 34 of the 2007 Law, which does not impose a solvency test on the use of the share premium account when it is used to provide the premium payable on the redemption or purchase of shares.

F

G

H

© 2018 The Incorporated Council of Law Reporting for England and Wales

A

74   Lord Sumption and Lord Briggs JJSC start their analysis with
section 37(6) of the 2007 Law, and thereby bypass the restrictions on the
scope of section 37(5) on which subsection (6) is parasitic.  Subsection (6) is
parasitic on subsection (5) because the solvency test imposed by that
subsection is applied only to the payments out of capital or out of that which
subsection (5) deems to be capital when used to make a payment in respect
of the redemption or purchase of the company's own shares.  But, as I have
shown, under the 1963 Law and the 1987 Law the share premium account
was not treated "as if [it] were paid up capital" when it was used to pay the
premium on the redemption of shares because such use was exempted from
the deeming provision.  In the 1989 Law the share premium account ceased
to be subject to the provisions of the Law relating to the reduction of share
capital.  Thus, under the 2007 Law the share premium account is not capital
and therefore is not caught by section 37(6) unless subsection (5) applies to
make it so.  But section 37(5)(a), which introduces the regime for payment in
respect of the redemption or purchase of shares out of deemed capital, is
stated to be "Subject to this section", which requires reference to the other
provisions of section 37, including subsection (3)(e), in order to determine
the scope of subsection (5).

B

C

75   Lord Sumption and Lord Briggs JJSC in paras 40 and 42 above
interpret section 37(3)(e) and (f) of the 2007 Law as being concerned
only with "the making of provision" or being "to identify the legitimate
resources" for the payment of the premium and the nominal amount of the
redeemed shares, while they construe section 37(5) as providing the
authorisation for payment subject to the subsection (6) solvency test
(paras 35 and 36 above).  On their approach, section 37(3), when read with
section 34(2), does not authorise the use of those funds.  I respectfully
disagree.  Section 37(3)(e) of the 2007 Law performs a purpose which can be
traced back to section 34(1)(c) of the 1963 Law: para 68 above.  It identifies
the sources of the payment of the premium on redemption and one source is
the share premium account, which under section 34(2) of the 2007 Law (and
formerly section 32(2) of the 1963 Law both as originally enacted and as
amended in 1987 and 1989) can be applied in providing for the premium
payable on redemption.  Under the 1963 Law, and the 1948 UK Act on
which it was modelled, no other authorisation for the payment was required.
The amendments to section 34(3)(f) of the 1963 Law in 1987 (para 69
above) and to both section 34(3)(e) and (f) of that Law in 1989 (para 71
above) preserved this position.  Against this legislative background, I am not
persuaded that the introduction of what is now section 37(5) of the 2007
Law overrode the authorisation given by the combination of section 34(2)
and section 37(3)(e) of that Law.

D

E

F

G

76   This view of the scope of the deeming provisions in section 37(5)(a)
and (b) of the 2007 Law does not empty those provisions of content.  The
deeming provisions would cover liquid assets of the company, such as cash
obtained by borrowing, if they were to be used in respect of the redemption
or purchase of the company's shares.  Further, the conclusion that the share
premium account is available for the payment of premium on the
redemption of redeemable shares is consistent with the altered status of that
account which ceased to be deemed in any circumstances to be capital for the
purpose of the provisions of the Law relating to reduction of capital in 1989.
But for the imposition of the solvency test in relation to the use of the share

H

© 2018 The Incorporated Council of Law Reporting for England and Wales

A    premium account in paying distributions and dividends to members (now by section 34(2) of the 2007 Law) the share premium account would have reverted to its pre-1963 status in Jamaican (and Cayman) law in the Jamaican Companies Act 1864 (as amended) as profits available for distribution: *In re Hoare & Co Ltd* [1904] 2 Ch 208; *Down v Gaumont-British Picture Corpn Ltd* [1937] Ch 402. In this regard the amendments made to the Law in 1989 confirm my view that the legislature in 1987 by

B    making only section 34(3)(f) subject to section 34(5) did not include the use of the share premium account to pay the premium on the redemption or purchase of shares within the section 34(6) solvency test.

77    It is undoubtedly correct that the legislation could have been more clearly drafted as Lord Sumption and Lord Briggs JJSC have stated. But the legislative history which I have set out does not suggest that the legislature

C    altered the substance of the 2007 Law when in 2011 it amended section 37(5) expressly to exclude payments out of the share premium account from the extended definition of capital and thus from the solvency test. In short, the legislature of the Cayman Islands in 1987 adopted a radically different approach to the use of the share premium account from that which Professor Gower recommended to the UK Government and which the UK Parliament adopted in the Companies Act 1981. The 1987

D    Law extended the authorised use of the share premium account in payment of the premium on the redemption of shares, which previously had been limited to redeemable preference shares, to provide for the payment of the premium on the redemption of equity shares, notwithstanding that the premium commanded by such shares would often be much larger. In so doing, it did not impose on such use of the share premium account the solvency test now contained in section 37(6).

E    78    I agree with the conclusion of Lord Sumption and Lord Briggs JJSC that the Company's other submissions, namely (i) that there were cumulative conditions in section 37(3)(f) and (e) of the 2007 Law and (ii) that the payment of the premium to a former shareholder would be a distribution subject to the solvency test in the proviso to section 34(2) of the 2007 Law, fall to be rejected for the reasons which they have stated in paras 51 and 52

F    of the judgment.

*Conclusion*

79    I would therefore have dismissed the appeal.

*Appeal allowed.*

G    Shiranikha Herbert, *Barrister*

H

© 2018 The Incorporated Council of Law Reporting for England and Wales