# Paragon Finance Plc, Thimbleby & Co (A Firm) v D. B. Thakerar & Co (A Firm), Paragon Finance Plc and another

 Positive/Neutral Judicial Consideration

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
21 July 1998

Chani 97/1275/3, CHANI 97/1560/3

Supreme Court Of Judicature in the Court of APPEAL (Civil Division) on Appeal from the High Court of Justice

**1998 WL 1044050**

Before Lord Justice Millett Lord Justice Pill Lord Justice May

Tuesday 21st July 1998

On Appeal from the Chancery Division (Mr Justice Chadwick)

On Appeal from the Chancery Division (Mr Justice Lloyd)

(Handed down transcript of Smith Bernal Reporting Limited, 180 Fleet Street London EC4A 2HD Tel: 0171 421 4040 Official Shorthand Writers to the Court)

**Representation**

Mr Christopher Parker (instructed by **Messrs Hamlin Slowe, London W1A 4SQ** ) appeared on behalf of the Paragon Finance Plc.
Mr Edward Bannister QC and MR THOMAS DUMONT (instructed by **Messrs Browne Jacobson, Nottingham** ) appeared on behalf of the two firms.

Judgment

Lord Justice Millett

These two conjoined appeals arise out of what is alleged to have been a series of mortgage frauds in relation to the purchase of flats at Vogans Mill in Docklands in the latter part of 1990. The Plaintiffs are the mortgage lenders. The Defendants are the solicitors who acted for the Plaintiffs as well as for the borrowers. In one action the Defendants are Thimbleby & Co.; in the other Thakerar & Co. Thimbleby & Co. acted in the purchase and mortgage of 7 flats; Thakerar & Co. in the purchase and mortgage of 5 flats. None of the borrowers went into occupation of the property or made any payments under their mortgages. Each of the borrowers made immediate default, following which the Plaintiffs recovered possession and eventually realised their security by resale at a substantial loss.

It was an express term of the Defendants' retainer in every case that they should advise the Plaintiffs:

   (i)  of any matters likely to affect the value of the property being purchased of which the Plaintiffs should be aware;
   (ii)  of any reduction in the purchase price for whatever reason or of a sub-sale of which the Defendants became aware; and
   (iii)  of any information suggesting that the property was not being purchased as the borrower's principal residence for the sole continuing occupation of the borrower and the borrower's family.

The vendor of each of the flats was Rosehaugh Co-Partnership Developments Ltd. ("Rosehaugh"). The Defendants' client, however, (if he or she existed at all) was not purchasing the property directly from Rosehaugh but from an intermediate third party ("the sub-vendor") by way of sub-purchase at a price far in excess of the amount payable to Rosehaugh. Moreover the amount of the mortgage advance which the Defendants' client was obtaining from the Plaintiffs was also substantially in excess of the price payable by the sub-vendor to Rosehaugh.

In each of the transactions in which Thimbleby & Co. acted, the sub-vendor was a Mr. Shefket or a company alleged to belong to or to be controlled by him; in each of the transactions in which Thakerar & Co. acted, the sub-vendor was Belgravia Estates Ltd. The Defendants were aware that their ostensible clients were sub-purchasers who had applied for mortgage advances in amounts and were purporting to buy at prices which were both significantly higher than the corresponding prices payable by the sub-vendor to Rosehaugh; yet in every case they failed to inform the Plaintiffs of these facts. Instead, they reported that there were no matters which they were required to bring to the Plaintiffs' attention.

In 1994 the Plaintiffs brought two actions, one against Thimbleby & Co. and the other against Thakerar & Co., alleging breach of contract, breach of a duty of care and breach of fiduciary duty. They alleged negligence but not dishonesty or intentional wrongdoing. Part at least of the loss which the Plaintiffs had sustained, however, was the result of the collapse of the residential property market at the end of 1990. Following the decisions of the House of Lords in *South Australia Asset Management Corporation v York Montague Ltd. [1997] AC 191* and *Smith New Court Securities Ltd. v Scrimgeour Vickers (Asset Management Ltd. [1997] AC 254* it became apparent that the Plaintiffs could not recover this part of their loss unless they established fraud. Accordingly they applied for leave to amend their pleadings in order to allege fraud, conspiracy to defraud, fraudulent breach of trust and intentional breach of fiduciary duty and sought orders for further discovery.

Unfortunately for the Plaintiffs, by this time more than six years had elapsed since the last of the relevant transactions, and *prima facie* any applicable limitation period had expired. The Plaintiffs' applications in the Thimbleby case came before Timothy Lloyd J on 25th. March 1997 when they were granted. Similar applications in the Thakerar case came before Chadwick J. on 4th. June 1997 when they were refused. Thimbleby & Co. appeal from the order of Timothy Lloyd J. and the Plaintiffs appeal from the order of Chadwick J.

Pleading a new cause of action after expiry of the limitation period

For the purposes of the Limitation Act 1980 ("the 1980 Act") any new claim made in the course of existing proceedings which involves the addition or substitution of a new cause of action is treated as a separate action commenced on the same date as the original proceedings: Section 35(1) and (2) of the 1980 Act. Where the pleadings are amended to add such a claim after an applicable limitation period has expired, the effect is to deprive the defendant of an accrued limitation defence. By the combined effect of Section 35(3)-(5) of the 1980 Act and RSC Order 20 Rule 5(2) and (5) , however, the Court may not allow such an amendment after the expiration of any relevant limitation period unless the new cause of action arises out of the same facts or substantially the same facts as a cause of action in respect of which relief has already been claimed in the action.

The proper approach to an application for leave to amend in such circumstances was considered by this Court in *Welsh Development Agency v Redpath Dorman Long Ltd. [1994] 1 WLR 1409* . The Court observed that a new claim is not made by amendment until the pleading is amended. It follows that the relevant date for the purpose of calculating the limitation period is the date at which the amendment is actually made, which by definition must be no earlier than the date at which leave to make the amendment is granted. The Court also held that leave to amend by adding a new cause of action should not be given unless the plaintiff can show that the defendant does not have a reasonably arguable case on limitation which will be prejudiced by the new claim or that the new cause of action arises out of the same or substantially the same facts as a cause of action in respect of which he has already claimed relief. By this means the injustice to the defendant of depriving him of an arguable limitation defence is avoided without denying the plaintiff the right to bring a fresh action to which, if he is correct, there is no limitation defence.

The issues

In each case the Judge had to decide (i) whether any proposed amendment introduced a new cause of action (ii) if so whether any applicable limitation period had expired by the date of the hearing before him and (iii) if so whether the new cause of action arose out of the same or substantially the same facts as a cause of action already pleaded. The pleadings and proposed amendments in the two cases are not identical, but they follow the same general lines and neither party has suggested that there is any material difference between them. For convenience we have been taken through the pleadings in the Thimbleby case only, and it has been tacitly assumed that our decision in respect of the particular amendments for which leave was sought in that case will apply with any necessary changes to the other. Furthermore, in each action the pleadings are repeated in more or less identical terms for each transaction.

Accordingly, I shall consider only the proposed amendments in relation to the first of the transactions pleaded in the Thimbleby case. I shall deal with them under five headings:

(1)  Non-contentious amendments which do not introduce a new cause of action.
(2)  Amendments which the Plaintiffs contend do not introduce a new cause of action and are not objectionable on other grounds.
(3)  Amendments which introduce a new cause of action but in respect of which the Plaintiffs contend there is no applicable limitation period.
(4)  Amendments which introduce a new cause of action in respect of which the primary limitation period has expired but the Plaintiffs contend that an extended limitation period is available.
(5)  Amendments which introduce a new cause of action after the expiry of the limitation period but which the Plaintiffs contend arises out of the same or substantially the same facts as a cause of action already pleaded.

(1) Non-contentious amendments

Leave is sought for a large number of minor amendments which clearly do not introduce a new cause of action. The Defendants do not object to them. Leave to make them should be granted. They were identified in the course of argument. It is not necessary to refer to them further in this judgment.

(2) Amendments which the Plaintiffs contend do not introduce a new cause of action and are not objectionable on other grounds

The classic definition of a cause of action was given by Brett J in Cooke v Gill (1873) LR 8 CP 107 at p. 116:-

"Cause of action" has been held from the earliest times to mean every fact *which is material to be proved* to entitle the plaintiff to succeed - every fact which the defendant would have a right to traverse" (my emphasis).

In the Thakerar case Chadwick J cited the more recent definition offered by Diplock LJ in Latang v Cooper [1965] 1 QB 232 CA at pp. 242-3 and approved in Steamship Mutual Underwriting Association v Trollop & Colls [1986] 33 BLR 77 at p. 92:-

> "A cause of action is simply a factual situation the existence of which entitles one person to obtain from the court a remedy against another person"

I do not think that Diplock LJ was intending a different definition from that of Brett J. However it is formulated, only those facts which are material to be proved are to be taken into account. The pleading of unnecessary allegations or the addition of further instances or better particulars do not amount to a distinct cause of action. The selection of the material facts to define the cause of action must be made at the highest level of abstraction.

The question in Letang v Cooper was whether a claim for damages for personal injuries sustained as a result of the defendant's negligence was a claim for "damages for negligence" within the meaning of Section 2(1) of the Limitation Act 1939 ("the 1939 Act") as amended by Section 2 of the Law Reform (Limitation of Actions Act) 1954 even though the claim was expressly pleaded in trespass. Diplock LJ held that where actual damage in the form of personal injuries has been sustained by the plaintiff:

> "…every factual situation which falls within the description "trespass to the person" is, *where the trespass is unintentional* , equally aptly described as negligence" (my emphasis).

His reasoning was: (i) trespass to the person may be intentional or unintentional; (ii) intent is therefore not one of the facts which is material to be proved to constitute the cause of action; (iii) accordingly unintentional trespass may be equally aptly described as negligence.

But it is important to observe what Diplock LJ was *not* saying. He was *not* saying that trespass and negligence are the same cause of action, or that intentional trespass could equally aptly be described as negligence, or that a cause of action in which it was material to prove intent could equally well be described by the name of a cause of action in which it was not. This would make any distinction between different causes of action illusory and destroy the practical utility of the concept.

In the same case Lord Denning MR with whom Danckwerts LJ agreed said at p. 239:-

> "The truth is that the distinction between trespass and case is obsolete. We have a different sub-division altogether. Instead of dividing actions for personal injuries into *trespass* (direct damage) or *case* (consequential damage), we divide the causes of action now according as the defendant did the injury intentionally or unintentionally."

In my judgment, it is incontrovertible that an amendment to make a new allegation of intentional wrongdoing by pleading fraud, conspiracy to defraud, fraudulent breach of trust or intentional breach of fiduciary duty where previously no intentional wrongdoing has been alleged constitutes the introduction of a new cause of action.

This is sufficient to dispose of Paragraphs 10C and 15A(1) of the Statement of Claim by which the Plaintiffs seek to introduce an allegation of fraud. The Plaintiffs submit, however, that Paragraphs 10A and 15A(2) do not plead new causes of action, while they accept that Paragraph 10(B) makes a new allegation of dishonesty.

Paragraphs 10A and 15A(2) allege intentional breach of fiduciary duty. Breach of fiduciary duty was already pleaded, but in terms which did not involve any conscious impropriety. The Plaintiffs submit that the mere addition of an allegation of intent does not amount to a new cause of action. In my judgment this is contrary to the authorities already cited, which show that intentional and unintentional wrongdoing give rise to distinct causes of action. Moreover the existing pleading disclosed no cause of action for the reasons given in *Bristol & West Building Society v Mothew [1998] Ch.1* . A sufficiently pleaded allegation of breach of fiduciary duty is made for the first time by the amendment, and this to my mind unquestionably amounts to the introduction of a new cause of action.

Paragraph 10B is very curious. It alleges that the submission of the Report on Title by the Defendants constituted an implied representation that they were acting honestly in the performance of their retainer. There is no point in pleading a representation unless it is intended to plead that it was untrue. The allegation of dishonesty is contained in Paragraph 16A. The Plaintiffs submit that even if Paragraph 16A is disallowed, Paragraph 10B should remain as no more than a further instance of breach of contract. But this is far from clear. Dishonesty is not a necessary averment in a claim for breach of contract. As we have seen, a cause of action is defined by its factual ingredients, not by the name ascribed to it. As Juliet observed of the rose, its essential character is not dependent on the name by which it is called.

If Paragraph 10B makes a relevant averment at all, therefore, it must be to support a claim in deceit. The Defendants submit that leave should be refused because the Paragraph is a nonsense. I agree with this, but I think there is a stronger ground for refusing leave. If the Plaintiffs are allowed to plead dishonesty, the Paragraph is unnecessary; if they are not it is irrelevant: and if the matter is in doubt it is embarrassing.

By Paragraph 14(2) the Plaintiffs seek to add an allegation that the Defendants knew and failed to inform the Plaintiffs that the purchase price was not that stated in the Offer of Loan but the amount of the mortgage advance less expenses. By Paragraph 15 they seek to add an allegation that the Defendants failed to inform the Plaintiffs of a host of other features of the transaction of which they were aware and which were, to say the least, unusual. These cumulatively tend to show that the sub-purchase was fictitious and that the Defendants were aware of and yet failed to disclose to the Plaintiffs what must have been a conspiracy on the part of their clients and the sub-vendor to defraud them. The Plaintiffs submit that even if allegations of dishonesty and intentional wrongdoing are disallowed, these should be permitted as further instances of breach of contract and negligence. The more obvious the existence of a fraud on the part of their clients, they say, the easier it will be to establish that the Defendants were negligent in failing to disclose what they knew to the Plaintiffs. The Defendants submit that to allow these particulars to remain would be to allow a pleading of fraud "by the back door".

I accept the Plaintiffs' submissions. It is well established that fraud must be distinctly alleged and as distinctly proved, and that if the facts pleaded are consistent with innocence it is not open to the Court to find fraud. An allegation that the defendant "knew or ought to have known" is not a clear and unequivocal allegation of actual knowledge and will not support a finding of fraud even if the Court is satisfied that there was actual knowledge. An allegation that the defendant had actual knowledge of the existence of a fraud perpetrated by others and failed to disclose the fact to the victim is consistent with an inadvertent failure to make disclosure and is not a charge of fraud. It will not support a finding of fraud even if the Court is satisfied that the failure to disclose was deliberate and dishonest. Where it is expressly alleged that such failure was negligent and in breach of a contractual obligation of disclosure, but not that it was deliberate and dishonest, there is no room for treating it as an allegation of fraud.

(3) Amendments which introduce a new cause of action but in respect of which the Plaintiffs contend there is no applicable limitation period

Among the new causes of action which the Plaintiffs seek leave to introduce are (i) fraudulent breach of trust and (ii) intentional breach of fiduciary duty. They submit that no period of limitation applies to either cause of action. I shall deal with the two claims separately. Before doing so, however, I should express my opinion that the solution to the problem lies in the fact that the new claims are based on the same factual allegations as the common law claims for fraud and conspiracy to defraud. The equitable jurisdiction which the Plaintiffs invoke is thus the concurrent jurisdiction. The new claims are not different causes of action (which is historically a common law concept) but merely the equitable counterparts of the claims at common law.

Fraudulent breach of trust

Section 21 of the 1980 Act so far as material provides as follows:

> 21 Time limit for actions in respect of trust property.
>
> (1) No period of limitation prescribed by this Act shall apply to an action by a beneficiary under a trust, being an action-
>
> (a) in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy; or
>
> (b) to recover from the trustee trust property or the proceeds of trust property in the possession of the trustee, or previously received by the trustee and converted to his use.
>
> ……..
>
> (3) Subject to the preceding provisions of this section, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Act, shall not be brought after the expiration of six years from the date on which the right of action accrued."

Section 38 provides that the expressions "trust" and "trustee" have the same meanings respectively as in the Trustee Act 1925 ("the 1925 Act"). This extends the meaning of those expressions to "implied and constructive trusts": see Section 68(17) of the 1925 Act.

By Paragraphs 106 to 108 of the Statement of Claim the Plaintiffs allege that the Defendants were guilty of a fraudulent breach of trust. The Plaintiffs' case is that the Defendants obtained the mortgage advance dishonestly by statements (in the Report on Title) which they knew to be untrue and consequently held the money on a constructive trust to return it to the Plaintiffs immediately on receipt. Payment of the money to or by the direction of the borrower on completion of the sub-purchase instead of to the Plaintiffs was a breach of this constructive trust. As Counsel for the Plaintiffs acknowledged, it was not a breach of the trust which would have arisen in the ordinary way from the receipt of the advance money for payment of the amount due on completion. That trust was discharged according to its terms, but its existence assumes that the Defendants acted honestly; on the Plaintiffs' case it never came into being but was displaced *ab initio* by the constructive trust in their favour.

The Plaintiffs submit that Section 21(1)(a) of the 1980 Act taken with the extended definition of the words "trust" and "trustee" has the effect of excluding the application of any period of limitation to their claim for breach of this constructive trust. They say that it is irrelevant that the trust in question had no independent existence apart from the fraud but is rather

equity's response to the fraud. They submit that, if such a fact was ever relevant, it ceased to be so after the passing of the 1939 Act. This makes it necessary to consider the antecedent law and the effect of the 1939 Act.

Before 1890, when the Trustee Act 1888 ("the 1888 Act") came into operation, a claim against an express trustee was never barred by lapse of time. The Court of Chancery had developed the rule that, in the absence of laches or acquiescence, such a trustee was accountable without limit of time. The rule was confirmed by Section 25(3) of the Judicature Act 1873 , which provided that no claim by a *cestui que trust* against his trustee for any property held on an express trust, or in respect of any breach of such trust, should be held to be barred by any statute of limitation.

The explanation for the rule was that the possession of an express trustee is never in virtue of any right of his own but is taken from the first for and on behalf of the beneficiaries. His possession was consequently treated as the possession of the beneficiaries, with the result that time did not run in his favour against them: see the classic judgment of Lord Redesdale in Hovenden v. Lord Annesley (1806) 2 Sch. & Lef. 607 at pp. 633-4.

The rule did not depend upon the nature of the trustee's appointment, and it was applied to trustees *de son tort* and to directors and other fiduciaries who, though not strictly trustees, were in an analogous position and who abused the trust and confidence reposed in them to obtain their principal's property for themselves. Such persons are properly described as constructive trustees.

Regrettably, however, the expressions "constructive trust" and "constructive trustee" have been used by equity lawyers to describe two entirely different situations. The first covers those cases already mentioned, where the defendant, though not expressly appointed as trustee, has assumed the duties of a trustee by a lawful transaction which was independent of and preceded the breach of trust and is not impeached by the plaintiff. The second covers those cases where the trust obligation arises as a direct consequence of the unlawful transaction which is impeached by the plaintiff.

A constructive trust arises by operation of law whenever the circumstances are such that it would be unconscionable for the owner of property (usually but not necessarily the legal estate) to assert his own beneficial interest in the property and deny the beneficial interest of another. In the first class of case, however, the constructive trustee really is a trustee. He does not receive the trust property in his own right but by a transaction by which both parties intend to create a trust from the outset and which is not impugned by the plaintiff. His possession of the property is coloured from the first by the trust and confidence by means of which he obtained it, and his subsequent appropriation of the property to his own use is a breach of that trust. Well known examples of such a constructive trust are McCormick v Grogan (1869) 4 App.Cas. 82 (a case of a secret trust) and *Rochefoucald v Boustead [1897] 1 Ch. 196* (where the defendant agreed to buy property for the plaintiff but the trust was imperfectly recorded). *Pallant v Morgan [1953] Ch. 43* (where the defendant sought to keep for himself property which the plaintiff trusted him to buy for both parties) is another. In these cases the plaintiff does not impugn the transaction by which the defendant obtained control of the property. He alleges that the circumstances in which the defendant obtained control make it unconscionable for him thereafter to assert a beneficial interest in the property.

The second class of case is different. It arises when the defendant is implicated in a fraud. Equity has always given relief against fraud by making any person sufficiently implicated in the fraud accountable in equity. In such a case he is traditionally though I think unfortunately described as a constructive trustee and said to be "liable to account as constructive trustee." Such a person is not in fact a trustee at all, even though he may be liable to account as if he were. He never assumes the position of a trustee, and if he receives the trust property at all it is adversely to the plaintiff by an unlawful transaction which is impugned by the plaintiff. In such a case the expressions "constructive trust" and "constructive trustee" are misleading, for there is no trust and usually no possibility of a proprietary remedy; they are "nothing more than a formula for equitable relief": *Selangor United Rubber Estates Ltd. v Cradock [1968] 1 WLR 1555* at p. 1582 *per* Ungoed-Thomas J.

The constructive trust on which the Plaintiffs seek to rely is of the second kind. The Defendants were fiduciaries, and held the Plaintiffs' money on a resulting trust for them pending completion of the sub-purchase. But the Plaintiffs cannot establish and do not rely upon a breach of this trust. They allege that the money which was obtained from them and which would otherwise have been subject to it was obtained by fraud and they seek to raise a constructive trust in their own favour in its place.

The importance of the distinction between the two categories of constructive trust lies in the application of the Statutes of Limitation. Before 1890 constructive trusts of the first kind were treated in the same way as express trusts and were often confusingly described as such; claims against the trustee were not barred by the passage of time. Constructive trusts of the second kind however were treated differently. They were not in reality trusts at all, but merely a remedial mechanism by which equity gave relief for fraud. The Court of Chancery, which applied the Statutes of Limitation by analogy, was not misled by its own terminology; it gave effect to the reality of the situation by applying the Statute to the fraud which gave rise to the defendant's liability: see *Soar v Ashwell [1893] 2 QB 390* at p. 393 *per* Lord Esher:

> "If the breach of the legal relation relied on….in the view of the Court of Equity treats the defendant as trustee for the Plaintiff, the Court of Equity treats the defendant as a trustee by construction, and the breach is called a constructive trust; and against the breach by which by construction creates the trust the Court of Equity allows Statutes of Limitation to be vouched."

Lord Esher's reference to the breach of the legal relation shows that while the first kind of constructive trust was a creature of equity's exclusive jurisdiction the second arose in the exercise of its concurrent jurisdiction. That is why the Statute was applied by analogy. For a fuller discussion of the distinction between the two categories of constructive trust, see Hovenden v Lord Annesley ( *supra* ) at pp 632-3; Soar v Ashwell ( *supra* ); *Taylor v Davies [1920] AC 636* ; *Clarkson v Davies [1923] AC 100* ; Selangor United Estates Ltd. v Cradock ( *supra* ); *Competitive Insurance Co. Ltd. v Davies Investments Ltd. [1975] 1 WLR 1240* .

It was evidently considered unduly harsh that trustees should remain liable indefinitely for innocent breaches of trust when even common law actions for fraud were barred after six years, and Section 8 of the 1888 Act introduced a period of limitation (effectively six years) for such claims. Its purpose was to provide protection for trustees who would otherwise be liable without limitation of time (laches and acquiescence apart) where the breach of trust was committed innocently: see *Re Richardson [1920] 1 Ch. 423* at p. 440. It excepted two cases from its provisions: (i) where the claim was founded upon any fraud or fraudulent breach of trust to which the trustee was party or privy and (ii) where the proceeds were still retained by the trustee or had previously been received by the trustee and converted to his use. The same scheme was adopted by Section 19 of the 1939 Act and Section 21 of the 1980 Act.

Section 1(3) of the 1888 Act defined "trustee" as follows:

> "(3) For the purposes of this Act the expression "trustee" shall be deemed to include an executor or administrator and a trustee whose trust arises by construction or implication of law as well as an express trustee…."

Read literally and without regard to its evident purpose the 1888 Act might be thought to have replaced the former scheme in its entirety and to have abolished the distinction between the two categories of constructive trust. This, however, was not the case. In Taylor v Davies ( *supra* ) the Privy Council sitting on a Canadian appeal had to consider Section 47 of the (Ontario) Limitations Act 1914 . The Canadian Act was closely modelled on the 1888 Act and contained a definition of "trustee" in similar terms. The Privy Council held that constructive trustees of the second kind were not within the terms of the Act and

could still rely on the Statutes of Limitation by analogy, as otherwise a section which was passed for the relief of trustees would seriously alter for the worse the position of constructive trustees. Viscount Cave said at p. 653:

> "It does not appear that the section has this effect. The expressions "trust property" and "retained by the trustee" properly apply, not to a case where a person having taken possession of the property on his own behalf is liable to be declared a trustee by the Court; but rather to a case where he originally took possession upon trust or on behalf of others. In other words they refer to cases where a trust arose before the occurrence of the transaction. The exception no doubt applies, not only to an express trustee named in the instrument of trust, but also to those persons who under the rule explained in Soar v Ashwell and other cases are treated as being in like position; but in their Lordships' opinion it does not apply to a mere constructive trust of the character described in the judgment of Sir William Grant" (in Beckford v Wade (1805) 17 Ves. Jun. 87 , 97 ie. a constructive trust of the second kind).

The Privy Council revisited the question in *Clarkson v Davies [1923] AC 100* . Unlike Taylor v Davies this was a case of fraud. It was held that this was not a valid distinction. Referring to Taylor v Davies the Privy Council stated:

> "…it was there laid down that there is a distinction between a trust which arises before the occurrence of the transaction impeached and cases which arises only by reason of that transaction."

The same conclusion was reached in Piwinski v Corporate Trustees of the Diocese of Armidale [1971] 1 NSWLR 266 and Queensland Mines v Hudson [1976] ACLC 28,658 . In each of those cases the New South Wales Supreme Court had to consider the limitation provisions of the Trustee Act 1925 of New South Wales which were also modelled on those of the 1888 Act.

Had the present case occurred before 1940, therefore, the Defendants could have pleaded a limitation defence to the claim based on constructive trust. The question is whether the distinction between the two kinds of constructive trust survived the passing of the 1939 Act, Section 19 of which was in the virtually the same terms as Section 21 of the 1980 Act, and both of which adopted the definition of "trust" and "trustee" in 1925 Act.

The 1939 Act was enacted in response to the Fifth Interim Report of the Law Revision Committee in 1936. This included a recommendation in the following terms:

> "It is perhaps too late now to suggest that [the 1888 Act] was intended to do away with the distinction between express and constructive trusts for the purpose of the limitation of actions, though the definition of "trustee" in Section 1(3) seems to point to that conclusion. At any rate we consider that the distinction should now be abolished, and we recommend that the exception in Section 8 of [the 1888 Act] should expressly be made to extend to trustees whether holding on express or constructive trusts, including personal representatives."

In his book on Canadian law "The Constructive Trust" Professor Donovan Waters has written at p. 1020:

> "However, in England, without the benefit of later trust developments, the Limitation Act was intended to bury this issue, and by almost unanimous consent bury the issue it did."

In a recent and so far unreported decision Barlow Clowes International Ltd. v Eurotrust International Ltd. in which judgment was delivered this year the Court of Appeal of the Isle of Man considered the provisions of Section 21 of the (Manx) Limitation Act 1984 , which is in identical terms to Section 21 of the 1980 Act. The plaintiffs alleged that the defendants had knowingly assisted in the commission of a fraudulent breach of trust and were accordingly "liable to account as constructive trustees". The Court held that on the facts pleaded the trust arose before the occurrence of the transactions impeached (ie. that the constructive trust was of the first kind), with the result that present question did not arise. But affirming the decision of the First Deemster reported at (1998/9) 2 O.F.L.R. 42 it also held that (i) that the rule in Taylor v Davies had no application to a person who knowingly assists in a fraudulent breach of a pre-existing trust and (ii) that the former distinction between the two categories of constructive trust had been abrogated by the 1939 Act and therefore by the Manx Act .

The first of these propositions is not relevant to anything which we have to decide, since despite the flexibility of the concept of the constructive trustee it cannot be stretched so far that it encompasses the borrowers in the cases before us. The Plaintiffs do not charge the Defendants with "knowing assistance". They do not allege that the Defendants are strangers who were implicated in a breach of trust committed by trustees or others in a fiduciary position. They allege the converse; that despite their fiduciary position the Defendants allowed themselves to be implicated in a fraud committed by others.

The second proposition is, however, of direct relevance to the present case. The Court of Appeal held that, by incorporating for the first time the definition of "trust" and "trustee" contained in Section 68(17) of the 1925 Act, Section 19 of the 1939 Act had the effect of abrogating the former distinction between the two kinds of constructive trust. In reaching this conclusion the Court relied on the recommendation of the Law Revision Committee and what the Court described as the preponderance of academic writing.

In my judgment there are formidable arguments in favour of the contrary view, some based on textual analysis and others on policy considerations. They include the following:

(1) If the 1939 Act was intended to abrogate the former distinction between the two kinds of constructive trust, it is difficult to see how it achieved its object. It can hardly have done so by merely by adopting the definitions of "trust" and "trustee" in the Trustee Act 1925 , since these are not materially different from those in the 1888 Act. If anything the use of the definitions in the 1925 Act points in the opposite direction, for that Act is concerned exclusively with the powers and duties of trustees properly so called. It is not concerned with persons whose trusteeship is merely a formula for giving restitutionary relief. Such persons have no trust powers or duties; they cannot invest, sell or deal with the trust property; they cannot retire or appoint new trustees; they have no trust property in their possession or under their control, since they became accountable as constructive trustees only by parting with the trust property. They are in reality neither trustees nor fiduciaries, but merely wrongdoers.

(2) The Law Reform Committee was concerned with a different problem. By a process of reasoning which, like the Committee, I find difficult to understand, the Courts had applied the extended definition of "trustee" to Section 8 of the 1888 Act but not to the exceptions, with the result that an executor could plead the statute even though he retained the property. This anomaly was corrected by the new definitions, which were materially different in relation to personal representatives.

(3) The actual recommendation of the Law Reform Committee went wider than the mischief to which it drew attention, and it is an open question whether Parliament intended to adopt the wider recommendation or merely to put an end to the mischief. If it had intended the former, however, it is difficult to believe that it would have chosen to do so by the means which it adopted. It would surely have used language like that to be found in Section 11 of the (New South Wales) Limitation Act 1969 .

(4) As a matter of statutory construction the question turns on the meaning of the opening words of Section 21(1) of the 1980 Act (re-enacting in similar terms the opening words of Section 19(1) of the 1939 Act). As Harpum noted in his influential article in 102 LQR 266 at p. 288, these are not apt to cover constructive trusts of the second kind. This is because they refer to

"…an action by a beneficiary under a trust…to which the trustee…"

As Harpum observed, these words would appear to be *prima facie* applicable only to those whose trusteeship precedes the occurrence which is the subject of the claim against them and not those whose trusteeship arises only by reason of that occurrence.

(5) One of the distinctions between express trusts and other trusts under the former law was that express trusts were evidenced in writing and other trusts were not. This distinction has clearly been abolished (probably by the 1888 Act) and there is no occasion to regret its passing. In expressing the opinion that the rule in Taylor v Davies was abolished by the 1939 Act, however, most commentators have concentrated on the inappropriateness of distinguishing for limitation purposes between trusts by reference to the modes of their creation. This is not, however, the distinction between the two kinds of constructive trusts which was drawn in that case. That was the distinction between an institutional trust and a remedial formula - between a trust and a catch phrase. In my opinion, those academic writers whose opinions were relied on by the Manx Court of Appeal were not primarily concerned with the issue now under consideration.

(6) If the views of trust and restitution lawyers are also taken into account, the opinions of academic writers are more tentative than the Manx Court of Appeal allowed. The Consultation Paper on Limitation of Actions (No. 151) issued by the Law Commission deals with the problem at pp.74-6 in terms which do not support the view that the distinction between the two kinds of constructive trust is plainly obsolete.

(7) The Manx Court of Appeal appears to have misunderstood the relevance of Shephard v Cartwright [1955] AC 728 . In that case the defendants pleaded the 1939 Act. At p. 450 Viscount Simonds adopted the answer given by Denning LJ at [1953] Ch. 756. This was that if the father had taken the money on behalf of his children, as he ought to have done, and had since converted it to his own use, then no period of limitation would run; but if he had taken the money fraudulently and adversely to the children, the period of limitation would not start to run until the children discovered the fraud. This was consistent only with the survival of the old law. Denning LJ must have considered that the distinction between the two kinds of constructive trustee was still relevant after the passing of the 1939 Act, or he would not have drawn the distinction he did.

(8) Although at first sight the distinction drawn in Taylor v Davies appears to be merely chronological, it marks a real difference between trustees (whether or not expressly appointed as such) who commit a breach of trust (however created) and persons who are not trustees at all but who are described as trustees for the purpose of enabling equitable relief to be granted against them. Actions founded on tort are barred after six years, and there is no exception for actions founded on fraud, though the start of the limitation period may be deferred in such cases. There is no logical basis for distinguishing between an action for damages for fraud at common law and the corresponding claim in equity for "an account as constructive trustee" founded on the same fraud. Section 21 of the 1980 Act can sensibly be limited to wrongs cognisable by equity in the exercise of its exclusive jurisdiction. It makes no sense to extend it to the exercise of its concurrent jurisdiction.

(9) Although the 1939 and 1980 Acts are perhaps not wholly consistent in this respect, any principled system of limitation should be based on the cause of action and not the remedy. There is a case for treating fraudulent breach of trust differently from other frauds, but only if what is involved really is a breach of trust. There is no case for distinguishing between an action for damages for fraud at common law and its counterpart in equity based on the same facts merely because equity employs the formula of constructive trust to justify the exercise of the equitable jurisdiction.

(10) A principled system of limitation would also treat a claim against an accessory as barred when the claim against the principal was barred and not before. There is, therefore, a case for treating a claim against a person who has assisted a trustee in committing a breach of trust as subject to the same limitation regime as the claim against the trustee: see J.W. Brunyate, Limitation of Actions in Equity (1932) Ch. 1. But the borrowers, who obtained the money by deceit and were the principal wrongdoers, were neither trustees nor fiduciaries. If guilty of fraud, they can plead the statute. It would be extraordinary if the Defendants were liable in equity as accessories or co-conspirators without limit of time when the claim against the principal wrongdoers was barred.

We do not have to decide this question, because it is sufficient that the Plaintiffs cannot show that the Defendants have no reasonably arguable limitation defence. In my judgment we should treat the Defendants as having an arguable limitation defence of which they should not be deprived by amendment.

But I would offer a more vigorous response. I question whether so many different remedies should continue to be available for the same misapplication of property. They make proceedings of the present kind unnecessarily complex. But whatever the answer to this question, the present problem is a semantic one. The Defendants cannot sensibly be described as constructive trustees at all. The expression is used in its remedial sense, though not in the sense in which it is used in the United States

and Canada, where it is the basis of a discretionary proprietary remedy; in cases of the present case a plaintiff is necessarily confined to a personal remedy. Before the Judicature Act the expression was a catch phrase which was employed by the Court of Chancery to justify the exercise of equity's concurrent jurisdiction in cases of fraud. 125 years later it is surely time to discard it. If we cannot bring ourselves to discard it, at least we can resolve not to take it literally.

Breach of fiduciary duty

In my judgment the application for leave to amend to plead breach of fiduciary duty fails for a similar reason. It is clear from the authorities already cited that the Court of Chancery drew the same distinction between those whose fiduciary obligations preceded the acts complained of and those whose liability in equity was occasioned by the acts of which complaint was made. In pleading breach of fiduciary duty the Plaintiffs concentrate on the information which the Defendants possessed but concealed from them rather than on the money, but the position is essentially the same. On the Plaintiffs' case the Defendants did not obtain the information from the Plaintiffs or by reason of their fiduciary relationship; they obtained it from the borrowers and because of their complicity in the fraud. The fraud was committed when the borrowers submitted their fictitious application forms to the Plaintiffs, and this must have been before the Plaintiffs retained the Defendants as their solicitors. On the Plaintiffs' case the Defendants did not take advantage of their fiduciary relationship to misappropriate moneys entrusted to them; the borrowers obtained the money by fraud and procured it to be channelled to them through the Defendants' client account. It would be absurd if the borrowers were deprived of the protection of the Limitation Act because of the route by which the money reached them; and equally absurd if they were entitled to it and the Defendants were not. The Defendants' fiduciary relationship only came into being in the course of the fraud and was incidental to the means by which the fraud was perpetrated. The Plaintiffs' case cannot sensibly be described as based on breach of fiduciary duty. Their case is that they were swindled.

*Nelson v Rye*

The Plaintiffs, however, submit that a claim for an account in respect of a breach of fiduciary duty is outside the scope of the 1980 Act and is accordingly not subject to any period of limitation. For these propositions they rely on *Nelson v Rye [1996] 1 WLR 1378* . In my judgment that case is not in point, but since the Plaintiffs place great reliance on it I must explain why I regard it as irrelevant as well as wrongly decided.

In Nelson v Rye the plaintiff was a solo musician who appointed the defendant his manager on terms that he would collect the fees and royalties which were due to him and pay his expenses and account to him annually for his net income after deducting his own commission. When the relationship came to an end the plaintiff claimed an account, and the question was whether the account should be limited to the six years before the issue of the writ or whether it should extend over the whole period of the relationship. Actions for an account are dealt with by Section 23 of the 1980 Act. The time limit for such an action is dependent on the nature of the claim which is the basis of the duty to account.

The Judge recognised that the defendant's obligation to account was contractual and held that a claim to enforce the contractual right to an account would have been barred after six years by Sections 5 and 23 of the 1980 Act. But he held that this was irrelevant because the plaintiff had chosen to sue for breach of fiduciary duty and not for breach of contract. He observed that not all fiduciary relationships give rise to constructive trusts, but held that this one did. After stating that it was a fallacy to suppose that breach of fiduciary duty and breach of constructive trust were different causes of action, he held that the defendant's failure to account was either a breach of fiduciary duty which fell outside the 1980 Act altogether or a breach of a constructive trust which fell within Section 21(1)(b) of the Act.

The law on this subject has been settled for more than a hundred years. An action for an account brought by a principal against his agent is barred by the Statutes of Limitation unless the agent is more than a mere agent but is a trustee of the money which he received: see Burdick v Garrett (1870) 5 Ch.App. 233 ; Knox v Gye (1872) 5 App.Cas. 656 ; Re Sharpe [1892]1 Ch.D. 154 . A claim for an account in equity, absent any trust, has no equitable element; it is based on legal, not equitable rights: see *How v Earl Winterton [1896] 2 Ch. 617* at p. 639 *per* Lindley LJ. Where the agent's liability to account was contractual equity acted in obedience to the statute: see Hovenden v Lord Annesley (1806) 2 Sch. & Lef. 607 at p. 631 *per* Lord Redesdale. Where, as in Knox v Gye , there was no contractual relationship between the parties, so that the liability was exclusively equitable, the Court acted by analogy with the statute. Its power to do so is implicitly preserved by Section

36 of the 1980 Act (re-enacting in simpler terms the tortuous provisions of Section 2(2) and (7) which were subjected to critical analysis by Sir Robert Megarry V.-C. in Tito v Waddell (No. 2) [1977] Ch. 106 at pp. 250-252).

Accordingly, the defendant's liability to account for more than six years before the issue of the writ in Nelson v Rye depended on whether he was, not merely a fiduciary (for every agent owes fiduciary duties to his principal), but a trustee, that is to say, on whether he owed fiduciary duties *in relation to the money.*

Whether he was in fact a trustee of the money may be open to doubt. Unless I have misunderstood the facts or they were very unusual it would appear that the defendant was entitled to pay receipts into his own account, mix them with his own money, use them for his own cash-flow, deduct his own commission, and account for the balance to the plaintiff only at the end of the year. It is fundamental to the existence of a trust that the trustee is bound to keep the trust property separate from his own and apply it exclusively for the benefit of his beneficiary. Any right on the part of the defendant to mix the money which he received with his own and use it for his own cash flow would be inconsistent with the existence of a trust. So would a liability to account annually, for a trustee is obliged to account to his beneficiary and pay over the trust property on demand. The fact that the defendant was a fiduciary was irrelevant if he had no fiduciary or trust obligations in regard to the money. If this was the position, then the defendant was a fiduciary and subject to an equitable duty to account, but he was not a constructive trustee. His liability arose from his failure to account, not from his retention and use of the money for his own benefit, for this was something which he was entitled to do.

Unless the defendant was a trustee of the money which he received, however, the claim for an account was barred after six years. The fact that the defendant was a fiduciary did not make his failure to account a breach of fiduciary duty or make him liable to pay equitable compensation. His liability to account arose from his receipt of money in circumstances which made him an accounting party. It did not arise from any breach of duty, fiduciary or otherwise. The defendant was merely an accounting party who had failed to render an account.

Accordingly, insofar as it decided that the defendant was liable to account without limit of time even if the money was not trust money, Nelson v Rye was in my opinion wrongly decided. But it is not in point in the present case. The Defendants were, of course, accounting parties in respect of the moneys advanced by the Plaintiffs; but unless and until the underlying transactions are set aside the Defendants have duly accounted for the money. They laid it out in accordance with their instructions on completion of each of the transactions in question: see Bristol & West Building Society v Mothew ( *supra*) . The Plaintiffs do not claim an account on the ground that the receipt of the money by the Defendants made them accounting parties. They claim equitable compensation for breach of fiduciary duty, and they seek all necessary accounts to enable the compensation to be quantified. For the reasons I have already given, such a claim could be met by a limitation defence before 1939 and is at least arguably subject to such a defence today.

(4) Amendments which introduce a new cause of action in respect of which the Plaintiffs contend that an extended limitation period is available

Section 32 of the 1980 Act provides as follows:

> "32  Postponement of limitation period in case of fraud, concealment or mistake.
>
> (1)  Subject to [subsections (3) and (4A)] below, where in the case of any action for which a period of limitation is prescribed by this Act, either-
>
> (a)  the action is based upon the fraud of the defendant;
>
> ........
>
> the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it."

In the Thakerar case Chadwick J was not satisfied that the Plaintiffs could not with reasonable diligence have discovered the fraud before 4th. June 1991, that being six years before the date of the hearing of the application to amend. The Plaintiffs accept that this was a conclusion to which he was entitled to come on the evidence before him, and do not appeal from this

part of his decision. In the Thimbleby case, however, Lloyd J found that the Plaintiffs could not with reasonable diligence have discovered the fraud before 25th. March 1991, that being the relevant date in that case, and the Defendants appeal from his decision.

As early as 17th. July 1990 the First Plaintiffs had received an audit valuation which expressed the opinion that a flat at Vogan's Mill was worth £165,000, not the ostensible purchase price of £270,000. An internal memorandum of these Plaintiffs in August 1990 was warning of prospective losses if advances were made against valuations by the valuers concerned in the transactions in question. Two of the transactions were completed after this. In December 1990 the police paid a visit to the First Plaintiffs and explained the *modus operandi* of the mortgage frauds at Vogans Mill. Between December 1990 and January 1991 the Plaintiffs carried out a review of the transactions at Vogans Mill and elsewhere. As a result, solicitors were instructed to investigate the *bona fides* of the borrowers, and the Defendants were placed on a referral list.

In February 1991 the First Plaintiffs received the documents of title to two of the flats. These showed an 82% uplift in the purchase price. By this time an internal memorandum of the First Plaintiffs indicates that they had cause for grave suspicion of the *bona fides* and even of the existence of the borrowers. Ten of the eleven cases currently in arrears (905) were not on the electoral register. Nine of the eleven (81%) had no existing mortgage. Most of them described themselves as company directors or self-employed (so providing no references from their employer) with annual incomes of £50,000 or more, yet eight of the eleven (72%) had opted for non-MIRAS mortgages, indicating that they were not taxpayers. The First Plaintiffs were clearly alive to the likelihood of fraud on the part of the borrowers, though possibly not of the Defendants' complicity.

The First Plaintiffs concentrated in the first instance on bringing proceedings for repossession. They also instructed solicitors to make preliminary investigations into the *bona fides* of the borrowers. On 4th. October 1991 they instructed their present solicitors to investigate the involvement of the brokers, solicitors accountants and valuers in the case of 69 transactions. They obtained the files and reviewed them. Within a week of instruction they made a preliminary report. This has not been disclosed, but the Writ was issued on 3rd. November 1994. It did not allege fraud, but it is far from clear that it could not have done so.

The First Plaintiffs have deposed that while they may have been alerted much earlier to the fraudulent nature of the mortgage applications, they did not in fact discover that the Defendants were implicated in the fraud until they obtained the completion documents in the course of discovery in the Action. These showed that while the whole of the mortgage advance was paid to or to the direction of the subvendor, the balance of the purchase price ostensibly payable by the borrower was never received by the Defendants from their clients as one would normally expect. This suggests that they were either aware that it was not paid at all or dishonestly shut their eyes to the possibility that this was the case. The question is whether the First Plaintiffs could not with reasonable diligence have discovered these facts much earlier.

The Second Plaintiffs have filed no evidence on this question at all. It is difficult to see how they can have discharged the burden of showing that they come within the Section.

The First Plaintiffs submit that they acted reasonably throughout. They cannot be criticised for their decision to concentrate on the repossession actions in the first instance, nor for their delay in instructing their present solicitors until October 1991. Their was no need for urgency; they had almost six years in which to bring proceedings.

In my judgment this reasoning is misconceived. The question is not whether the Plaintiffs *should* have discovered the fraud sooner; but whether they *could* with reasonable diligence have done so. The burden of proof is on them. They must establish that they *could not* have discovered the fraud without exceptional measures which they could not reasonably have been

expected to take. In this context the length of the applicable period of limitation is irrelevant. In the course of argument May LJ observed that reasonable diligence must be measured against some standard, but that the six year limitation period did not provide the relevant standard. He suggested that the test was how a person carrying on a business of the relevant kind would act if he had adequate but not unlimited staff and resources and were motivated by a reasonable but not excessive sense of urgency. I respectfully agree.

As Chadwick J observed in the Thackeray case, it is not easy to believe that a solicitor acting for the borrower in this kind of mortgage fraud can be ignorant of the fraudulent nature of the mortgage application. It is very difficult to believe when he has acted for several such borrowers. In my judgment Lloyd J should not have been satisfied on the material before him, in summary proceedings in the absence of discovery and without the benefit of cross-examination, that the Plaintiffs could not with reasonable diligence have discovered the fraud before the relevant date. This is not to say that he should have reached a concluded view. He should have refused leave to amend and left all to play for in fresh proceedings.

(5) Amendments which introduce a new cause of action after the expiry of the limitation period but which the Plaintiffs contend arises out of the same or substantially the same facts as a cause of action already pleaded

Whether one cause of action arises out of the same or substantially the same facts as another was held by this Court in Welsh Development Agency v Redpath Dorman Long Ltd. ( *supra* ) to be essentially a matter of impression. In borderline cases this may be so. In others it must be a question of analysis. In the Thakerar case Chadwick J observed that it would be "contrary to common sense" to hold that a claim based on allegations of negligence and incompetence on the part of a solicitor involved substantially the same facts as a claim based on allegations of fraud and dishonesty. I respectfully agree. In all our jurisprudence there is no sharper dividing line than that which separates cases of fraud and dishonesty from cases of negligence and incompetence.

Conclusion

Save to the limited extent already described I would refuse the Plaintiffs leave to amend. In particular, I would refuse them leave to introduce by amendment any allegations of fraud, dishonesty, fraudulent breach of trust or breach of fiduciary duty.

The orders for discovery made by Lloyd J were consequent on the grant of leave to amend. Chadwick J, having refused leave to amend, refused to order further discovery. The Plaintiffs submit this result need not follow. The question has not been fully argued, and I would refuse discovery but without prejudice to the Plaintiffs' right to renew their applications on the basis of the pleadings as they will stand after effect is given to this judgment.

Save to the limited extent already mentioned the appeal in Thimbleby will be allowed and that in Thakerar will be dismissed.

LORD JUSTICE PILL: I agree and in deference to the submissions of counsel add something upon issue (5) identified by Millett LJ.

Section 35(4) of the Limitation Act 1980 provides that:

"Rules of Court may provide for allowing a new claim . . . to be made . . . but only if the conditions specified in sub-section (5) below are satisfied, and subject to any further restrictions the rules may impose."

Sub-section (5) provides:

"The conditions referred to in sub-section (4) above are the following —

(a) in the case of a claim involving a new cause of action, if the new cause of action arises out of the same facts or substantially the same facts as are already in issue on any claim previously made in the original action;

(b) . . ."

R.S.C. Order 20, rule 5 provides so far as is material:

"

(1) Subject to . . . the following provisions of this rule, the court may at any stage of the proceedings allow the plaintiff to amend his writ, or any party to amend his pleading, on such terms as to costs or otherwise as may be just and in such manner (if any) as it may direct.

(2) Where an application to the court for leave to make the amendment mentioned in paragraph . . . (5) is made after any relevant period of limitation current at the date of issue of the writ has expired, the court may nevertheless grant leave in the circumstances mentioned in that paragraph if it thinks it just to do so.

(5) An amendment may be allowed under paragraph (2) notwithstanding that the effect of the amendment may be to add or substitute a new cause of action if the new cause of action arises out of the same facts or substantially the same facts as a cause of action in respect of which relief has already been claimed in the action by the party applying for leave to make the amendment."

While discretions exist in the application of O 20 r 5, they can be exercised only if the "overriding condition" in section 35(5)(a) is satisfied ( Balfour Beatty Construction Ltd v Parsons Brown & Newton Ltd [1990] Con LJ 205 per Nourse LJ at 212). I agree with the view of Millett LJ, expressed when considering issue (2), that an amendment to make a new allegation of intentional wrongdoing by pleading fraud, conspiracy to defraud, fraudulent breach of trust or intentional breach of fiduciary duty where previously no intentional wrongdoing had been alleged constitutes the introduction of a new cause of action.

The power conferred by section 35(4) of the 1980 Act could now be exercised in a situation such as that in *Sterman v EW and WJ Moore [1970] 1 QB 596* . Lord Denning MR stated, at p 604:

"I think we should give full effect to the wide words of Ord 20 r 5(1). We should not cut them down by reference to subrules (2), (3), (4) and (5). I adhere to the view I expressed in *Chatsworth Investments Ltd v Cussins (Contractors) Ltd [1969] 1 WLR 1* , 5:

'Since the new rule, I think we should discard the strict rule of practice in *Weldon v Neal (1887) 19 QBD 394* . The courts should give Ord 20 r 5(1) its full width. They should allow an amendment whenever it is just so to do, even though it may deprive the defendant of a defence under the Statute of Limitations.'

I withdraw not one whit of those words: and I think we should apply them here. Here was a plaintiff who issued his writ and served it on the defendants well within the period of limitation. They knew perfectly well that the plaintiff was claiming damages for his fall from the trestle because it was their fault. Yet they seek to bar him on the most technical

consideration — just because he omitted the words 'for negligence and breach of statutory duty'. I do not think we should allow this technical objection to prevail. We should apply the wise words of Holroyd Pearce LJ in *Pontin v Wood [1962] 1 QB 594* , 609 when he said that the court would give its aid 'to regularising the procedure of a known genuine case commenced before the time limit expired but containing technical defects'. Applying those words, we should allow the plaintiff to amend the writ so as to state in terms that his claim is for damages 'for negligence and breach of statutory duty'. I see no harm in adding the further claim for damages for 'breach of agreement'."

Where it is sought to add allegations of wrongdoing which is intentional, the position is in my judgment different. The change cannot be categorised as a technicality. I accept the submission made on behalf of the plaintiffs that the critical question is the extent to which the facts on which the new cause of action is based depart from those already pleaded (and not the seriousness of the new allegation). However, to allege that an injury is caused intentionally is to add a new allegation of fact which gives the allegations of fact as a whole a substantially different character. In *Letang v Cooper [1965] 1 QB 232* , this Court recognised the division in actions for personal injuries "according as the defendant did the injury intentionally or unintentionally" (Lord Denning MR (with whom Danckwerts LJ agreed) at p 239). Moreover as Bowen LJ stated in Edgington v Fitzmaurice (1885) 29 Ch 459 at 483, "the state of a man's mind is as much a fact as the state of his digestion. . . . It is as much a fact as anything else". The addition of allegations of intentional wrongdoing take these cases beyond the power conferred by section 35(4) because the claims do not arise "out of the same facts or substantially the same facts".

Upon the section as enacted, the reasoning is in a sense self-justifying because it is the allegation of intentional wrongdoing which makes the cause of action new for the purposes of section 35(5)(a) and it is the allegation of intentional wrongdoing which also prevents the claim arising out of the same or substantially the same facts for the purposes of the section. Upon analysis, however, reinforced by the common sense referred to by Chadwick J, the power in section 35(4) cannot be exercised in the plaintiffs' favour in these cases.

LORD JUSTICE MAY: I also agree.

Order: Appeal in <u>Thakerar</u> dismissed with costs in the appeal;

appeal in <u>Thimbleby</u> allowed with costs here and below;

application for leave to appeal to the House of Lords refused.

Crown copyright