A

Privy Council

# Skandinaviska Enskilda Banken AB (Publ) *v* Conway and another

[On appeal from the Court of Appeal of the Cayman Islands]

B

## [2019] UKPC 36

2018  June 25, 26;                     Lord Reed DPSC, Lord Wilson, Lord Lloyd-Jones,
2019  July 29                              Lord Briggs JJSC, Sir Donnell Deeny

C

*Cayman Islands — Insolvency — Voidable preference — Investors in company receiving proportion of company's stated net asset value when redeeming participating shares — Company unable to meet large number of redemption requests and placed in liquidation — Company having recently met defendant bank's redemption requests in full — Liquidators seeking recovery from bank in reliance on statutory provision invalidating preferential payments made by insolvent company in favour of creditor — Judge finding company having fraudulently inflated net asset value and having intended to prefer bank — Whether net asset value binding notwithstanding fraud — Whether liquidators having statutory right of recovery to which common law restitutionary defences not available — Companies Law (2013 rev), s 145(1)*

D

*Restitution — Unjust enrichment — Voidable preferences — Defendant bank investing customers' funds in shares in investment company — Bank nominated as legal owner of shares but holding same on bare trust for customers — Company meeting bank's share redemption requests when insolvent — Liquidator's claim in restitution — Bank claiming no enrichment to itself as having been trustee passing on proceeds of redemptions to customers — Whether trustee appropriate defendant to restitutionary claim when having acted as principal rather than agent — Whether defence of change of position available to recipient of payment which constituted voidable preference — Whether liquidators entitled to recovery*

E

F

   A Swedish bank acted for two customers who wished to subscribe for a number of redeemable participating shares in a Cayman Islands open-ended investment company which traded in derivatives.  The company's articles of association provided that on redemption shareholders were to receive a proportion of the company's net asset value.  The company issued the shares to the bank "as nominee" for each of the two customers, with the bank being registered as the holder of the shares in the company's register of members.  A financial crisis having prompted a wave of redemption requests which the company could not meet, the directors of the company discovered that its principal investment manager had been fraudulently inflating the net asset value for a number of years through a series of fictitious interest rate swap transactions.  In March 2009 the company went into liquidation.  The liquidators discovered that between December 2008 and February 2009 three redemption requests by the bank had been met in full on the principal investment manager's instructions.  They commenced proceedings in the Grand Court of the Cayman Islands to recover from the bank the amount which it had received pursuant to those three redemption payments, notwithstanding that the bank had passed on the proceeds to its customers, on the ground that they had been preferential payments made to a creditor in the six months preceding the liquidation, contrary to section 145(1) of the Companies Law of the Cayman Islands[1], and that infringement

G

H

[1] Companies Law (2013 rev), s 145(1): see post, para 12.

A

of that provision gave them a statutory right of recovery.  The bank resisted the claim on, inter alia, the grounds that (i) the net asset value, being the basis on which they had received the payments, had not been binding because it had been inflated as a result of fraud, with the result that no redemptions had taken place within the articles of association and therefore no redeemers had become creditors of the company within section 145(1) ("the fraud point"); (ii) since, under its articles of association, the company had a grace period of 30 days from the redemption day to make

B

redemption payments, section 145(1) had not been satisfied in relation to the first redemption payment because at that date the company had been technically solvent on a cash-flow basis ("the 30 day point"); (iii) if, however, the three redemption payments were held to be preferences within the meaning of section 145(1), there was no statutory right of recovery thereunder and the liquidators would have to rely on a claim for restitution on the basis of unjust enrichment under the common law, in which case the bank would argue that, having done no more than receive the payments as bare trustee to pass on to its customers, it had not been enriched, and

C

that in any event it could rely on a "change of position" defence because it had received the moneys in trust and disbursed them in good faith to the beneficiaries; and (iv) the claim should have been barred on grounds of illegality or public policy.  The judge found that the company's directors had delegated actual authority to the principal investment manager so that he had become the directing mind of the company, that the company had been unable to pay its debts when the three payments to the bank had been made and that those payments had been made with a

D

view to giving the bank preference over other creditors.  Having then dismissed each of the bank's arguments in defence, he allowed the claim and made an order for repayment.  On the bank's appeal on substantially the same grounds, the Court of Appeal of the Cayman Islands upheld the judge's order.

On the bank's further appeal—

*Held*, dismissing the appeal, (1) that (per Lord Reed DPSC, Lord Lloyd-Jones and Lord Briggs JJSC) the general rule that a share redemption valuation was definitively

E

ascertained at the time of the transaction would operate where the directors of a fund had determined the redemption price by reference to a net asset value inflated without their knowledge as a result of some external fraud, but not where the fraudulent determination of the net asset value had been internal to the fund itself, which was contrary to articles of association under which the power to make the valuation arose and in breach of the duty under the contract between the company and its members to act in good faith; that it followed that, given that there had been fraud internal to the company, the redemption value could be avoided by order of the

F

court on that basis; that even on the basis that (per Lord Wilson JSC and Sir Donnell Deeny) the general rule was capable of encompassing internal frauds, that would not prevent a subsequent application to the court to void the transaction; but that neither basis would assist the bank, since it would be a condition of any order setting aside the net asset value that the bank repay the sums it had received thereunder, which it was attempting to avoid, and, moreover, any application for an order could only be brought by a party which had suffered loss in a transaction based on the net asset

G

value, and the bank was not such a party; and that, accordingly, the fraud point failed (post, paras 24, 27, 30–31, 139, 141–143, 145).

*Fairfield Sentry Ltd v Migani* [2014] 1 CLC 611, PC distinguished.

(2) That liability for the redemption of a company's shares arose as at the stated redemption date notwithstanding any provision in its articles of association providing for deferral of payment, so precluding any claim that the company had not been insolvent on the redemption date; and that, accordingly, the 30 day point failed

H

(post, paras 43–46).

*Culross Global SPC Ltd v Strategic Turnaround Master Partnership Ltd* [2010] UKPC 33, PC applied.

Dicta of James V-C in *In re European Life Assurance Society* (1869) LR 9 Eq 122, 127 considered.

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    (3) That a distinction was to be drawn between enactments which, by express wording, created a statutory cause of action for the recovery of unlawful preferences and those, like section 145 of the Companies Law of the Cayman Islands, which contained no such provision but instead rendered the relevant payment invalid and so voidable, leaving the liquidator to pursue such remedies under the general law as were available, including restitution, subject to any available defences; that where restitution was sought by the liquidator against a nominee recipient of the preference,

B    a claim by the nominee of having acted only as a trustee without having been enriched would only be available if that person had been acting as an agent as well as a trustee, since a trustee who had acted as principal was to be regarded as having been enriched by a payment received in that capacity; that, further, the fundamental principle of the law of insolvency, as found in insolvency legislation including section 145 of the Companies Law, that an insolvent company's assets should be divided equally among its ordinary creditors, had to be given priority over any detrimental impact which recovery might have upon the trustee, so precluding any

C    change of position defence based on the receipt of money in trust which had been disbursed in good faith to beneficiaries; and that, accordingly, it followed that the bank, having dealt with the company as principal, had been enriched by the payments as a preferred creditor, and had properly been subject to the restitution claim without being able to rely on change of position (see post, paras 60–61, 63, 74, 76, 80, 82, 88–89, 91, 101–107, 111, 122).

D    Dictum of Lord Walker of Gestingthorpe JSC in *Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd (Revenue and Customs Comrs intervening)* [2012] 1 AC 383, para 121, SC(E) applied.

*Lewis v Hyde* [1998] 1 WLR 94, PC and dictum of Lord Steyn in *Banque Financière de la Cité v Parc (Battersea) Ltd* [1999] 1 AC 221, 227, HL(E) considered.

(4) That the fact that the directing mind of a company was guilty of a fraud did not render illegal liquidators' attempts to recover payments made unlawfully in the lead up to the insolvency; that, on the contrary, since the liquidators were discharging

E    a legal duty to recover moneys owed properly to it and distribute those according to law among the creditors, the cause of action was not founded on an illegal act but rather to redress the unlawful acts of paying out to some creditors in preference to others; that, similarly, public policy dictated that the courts should assist the liquidators in carrying out that duty, with no public policy reason to the contrary in favour of the bank; and that, accordingly, since the illegality and public policy arguments also failed, as had all other issues pursued on the appeal, the order in

F    favour of the liquidators would stand (post, paras 124, 125).

Decision of the Court of Appeal of the Cayman Islands affirmed on partly different grounds.

The following cases are referred to in the judgments:

*Ahmed (A Debtor), In re* [2018] EWCA Civ 519; [2018] BPIR 535, CA
*Alderson v Temple* (1768) 4 Burr 2235

G    *BAT Industries plc v Sequana SA* [2016] EWHC 1686 (Ch); [2017] Bus LR 82; [2017] 1 BCLC 453
*BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc* [2013] UKSC 28; [2013] 1 WLR 1408; [2013] Bus LR 715; [2013] 3 All ER 271; [2013] 2 All ER (Comm) 531; [2013] 1 BCLC 613, SC(E)
*Banque Financière de la Cité v Parc (Battersea) Ltd* [1999] 1 AC 221; [1998] 2 WLR 475; [1998] 1 All ER 737, HL(E)

H    *Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd (Revenue and Customs Comrs intervening)* [2011] UKSC 38; [2012] 1 AC 383; [2011] 3 WLR 521; [2011] Bus LR 1266; [2012] 1 All ER 505, SC(E)
*Bilta (UK) Ltd v Nazir (No 2)* [2015] UKSC 23; [2016] AC 1; [2015] 2 WLR 1168; [2015] 2 All ER 1083; [2015] 2 All ER (Comm) 281; [2015] 2 Lloyd's Rep 61; [2015] 1 BCLC 443, SC(E)

© 2019 The Incorporated Council of Law Reporting for England and Wales

*Brisbane (Port of) Corpn v ANZ Securities Ltd* [2001] QSC 466; [2002] QCA 158; [2003] Qd R 661    **A**

*Campbell v Edwards* [1976] 1 WLR 403; [1976] 1 All ER 785; [1976] 1 Lloyd's Rep 522, CA

*Challinor v Juliet Bellis & Co* [2015] EWCA Civ 59; [2015] 2 P & CR DG3, CA

*Cherry v Boultbee* (1839) 4 My & Cr 442

*Clark v Meerson* [2018] EWHC 142 (Ch); [2018] BPIR 661

*Culross Global SPC Ltd v Strategic Turnaround Master Partnership Ltd* [2010] UKPC 33, PC    **B**

*Cutts (A Bankrupt), In re, Ex p Bognor Mutual Building Society v Trustee of T W Cutts* [1956] 1 WLR 728; [1956] 2 All ER 537, CA

*D'Eye (A Bankrupt), In re* [2016] BPIR 883

*Dextra Bank & Trust Co Ltd v Bank of Jamaica* [2002] 1 All ER (Comm) 193, PC

*Dimond v Lovell* [2002] 1 AC 384; [2000] 2 WLR 1121; [2000] 2 All ER 897, HL(E)

*European Life Assurance Society, In re* (1869) LR 9 Eq 122    **C**

*Fairfield Sentry Ltd v Migani* [2014] UKPC 9; [2014] 1 CLC 611, PC

*Fibrosa Spolka Akcyjna v Fairbairn Lawson Combe Barbour Ltd* [1943] AC 32; [1942] 2 All ER 122, HL(E)

*4Eng Ltd v Harper* [2009] EWHC 2633 (Ch); [2010] Bus LR D58; [2010] 1 BCLC 176

*HIH Casualty and General Insurance Ltd v Chase Manhattan Bank* [2003] UKHL 6; [2003] 1 All ER (Comm) 349; [2003] 2 Lloyd's Rep 61, HL(E)    **D**

*Hampshire Land Co, In re* [1896] 2 Ch 743

*Hollicourt (Contracts) Ltd v Bank of Ireland* [2001] Ch 555; [2001] 2 WLR 290; [2001] 1 All ER 289; [2001] 1 All ER (Comm) 357, CA

*Jogia (A Bankrupt), In re* [1988] 1 WLR 484; [1988] 2 All ER 328

*Jones v Sherwood Computer Services Plc* [1992] 1 WLR 277; [1992] 2 All ER 170, CA

*Kenora (Town) Hydro Electric Commission v Vacationland Dairy Co-operative Ltd* [1994] 1 SCR 80; 110 DLR (4th) 449    **E**

*King v Stewart* (1892) 66 LT 339, DC

*Kushler (M) Ltd, In re* [1943] Ch 248, CA

*Leslie (J) Engineers Co Ltd, In re* [1976] 1 WLR 292; [1976] 2 All ER 85

*Lewis v Hyde* [1998] 1 WLR 94, PC

*Lipkin Gorman v Karpnale Ltd* [1991] 2 AC 548; [1991] 3 WLR 10; [1992] 4 All ER 512, HL(E)

*Maritime Electric Co Ltd v General Dairies Ltd* [1937] AC 610; [1937] 1 All ER 748, PC    **F**

*Marks v Feldman* (1870) LR 5 QB 275

*Morant, In re* [1924] 1 Ch 79

*Moses v Macferlan* (1760) 2 Burr 1005

*Officeserve Technologies Ltd v Annabel's (Berkeley Square) Ltd* [2018] EWHC 2168 (Ch); [2019] Ch 103; [2018] 3 WLR 1568

*Orakpo v Manson Investments Ltd* [1978] AC 95; [1977] 3 WLR 229; [1977] 3 All ER 1, HL(E)    **G**

*Patrick and Lyon Ltd, In re* [1933] Ch 786

*Pearson v Primeo Fund* [2017] UKPC 19; [2017] BCC 552, PC

*Portman Building Society v Hamlyn Taylor Neck (a firm)* [1998] 4 All ER 202, CA

*Principal Group Ltd v Anderson* (1994) 29 CBR (3d) 216; (sub nom *Ernst and Young Inc v Anderson*) (1997) 147 DLR (4th) 229

*Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567; [1968] 3 WLR 1097; [1968] 3 All ER 651, HL(E)    **H**

*Rose v AIB Group (UK) plc* [2003] EWHC 1737 (Ch); [2003] 1 WLR 2791

*Rousou's Trustee v Rousou* [1955] 3 All ER 486

*Springfield Acres Ltd v Abacus (Hong Kong) Ltd* [1994] 3 NZLR 502

*Thirty-Eight Building Ltd, In re* [1999] 1 BCLC 416

© 2019 The Incorporated Council of Law Reporting for England and Wales

A  *Titan Investments Ltd Partnership, In re* [2005] ABQB 637
   *Wilson v First County Trust Ltd (No 2)* [2003] UKHL 40; [2004] 1 AC 816; [2003]
     3 WLR 568; [2003] 4 All ER 97; [2003] 2 All ER (Comm) 491, HL(E)

The following additional cases were cited in argument:

   *Barras v Aberdeen Steam Trawling and Fishing Co Ltd* [1933] AC 402, HL(Sc)
   *Cohen, In re; Ex p Trustee* [1924] 2 Ch 515, CA
B  *Compagnie Commercial Andre SA v Artibell Shipping Co Ltd* 2001 SC 653
   *Hannoun v R Ltd and Banque SYZ Co Ltd* [2009] CILR 124
   *Kratzmann Pty Ltd v Tucker (No 2)* (1968) 123 CLR 295
   *Peat v Gresham Trust Ltd* [1934] AC 252, HL(E)
   *Sharp (Official Receiver) v Jackson* [1899] AC 419, HL(E)
   *Socimer International Bank Ltd v Standard Bank London Ltd* [2008] EWCA Civ
C      116; [2008] Bus LR 1304; [2008] 1 Lloyd's Rep 558, CA
   *Star v O'Brien* (1996) 22 ACSR 434
   *Stone (Jeremy D) Consultants Ltd v National Westminster Bank plc* [2013] EWHC
    208 (Ch)

   **APPEAL** from the Court of Appeal of the Cayman Islands
     Simon Conway and David Walker, the joint official liquidators of a
company, Weavering Macro Fixed Income Fund Ltd, brought proceedings in
D  the Grand Court of the Cayman Islands (Financial Services Division) against
the bank, Skandinaviska Enskilda Banken AB (Publ) for (i) declarations that
payments of US$1,096,903·58, US$1,780,214·49 and US$5,340,643·47
("the preference sums") made by the company to the bank on 19 December
2008, 2 January 2009 and 11 February 2009 respectively were invalid as
preferences over the other creditors of the company within section 145(1) of
E  the Companies Law of the Cayman Islands (2013 rev) and (ii) repayment of
such sums to the company.  By a judgment delivered on 4 December 2015,
and subsequent order dated 5 January 2016, Clifford J granted the
declarations and made the orders sought.
     The bank appealed.  On 18 November 2016 the Court of Appeal of the
Cayman Islands (Martin, Morrison, Field JJA) dismissed the appeal.  but, on
28 February 2017, the court gave the bank permission to appeal to the
F  Judicial Committee of the Privy Council.
     The bank appealed.    The issues for the Board are stated, post,
paras 15–16.
     The facts are stated in the judgment of the Board, post, paras 2–12.

   *David Chivers QC* and *Ben Shaw* (instructed by *Harcus Sinclair llp*) for
the bank.
G     *David Lord QC* and *Shaun Folpp* (of the Cayman Islands Bar and
the British Virgin Islands Bar) (instructed by *Lipman Karas llp*) for the
liquidators.

   The Board took time for consideration.

H     29 July 2019. The following judgments were handed down.

   **JUDGMENT OF THE BOARD**
    1  This is the judgment of the Board, to which all its members have
contributed.  The Board is unanimous in its advice to Her Majesty with
regard to the outcome of the appeal.  It is also unanimous in its reasons for

© 2019 The Incorporated Council of Law Reporting for England and Wales

498
Skandinaviska Enskilda Banken AB v Conway (PC)                    [2019] 3 WLR

arriving at its conclusions, except to the extent that Sir Donnell Deeny (with    A
whom Lord Wilson JSC agrees) has reached his conclusion on the first issue
in the appeal, which we shall describe as the fraud point, for different
reasons from the majority of the Board. Those reasons are set out in Sir
Donnell's concurring judgment, which also expresses reservations about the
majority's reasoning concerning an aspect of another set of issues, which we
shall describe as the repayment issues, relating to a potential defence of    B
change of position.

*Introduction*

    2    This appeal from the Court of Appeal of the Cayman Islands concerns
certain share redemption payments made by Weavering Macro Fixed
Income Fund Ltd ("the company") to the appellant, Skandinaviska Enskilda
Banken AB (Publ) ("SEB"), between December 2008 and February 2009.    C
On 19 March 2009 the company went into liquidation. The central issue in
this appeal is whether these payments constituted unlawful preferences over
the other creditors of the company within the meaning of section 145(1) of
the Cayman Islands' Companies Law (2013 rev). The respondents ("the
liquidators") have brought these proceedings in their capacity as joint
official liquidators of the company.    D

    3    The company was incorporated in April 2003 as an open-ended
investment company pursuant to the law of the Cayman Islands. It traded
mainly in interest rate derivatives. Its two directors were Stefan Peterson and
Hans Ekstrom, but its investment manager was an English company known
as Weavering Capital (UK) Ltd ("WCUK"). The director of WCUK, and
also its Chief Executive Officer and Principal Investment Manager, was    E
Magnus Peterson, the brother of Stefan Peterson and the stepson of Hans
Ekstrom. As the company's investment manager, WCUK undertook the
company's trading activities. Clifford J, who heard this case at first instance,
found that: "Magnus Peterson directly, and through his company WCUK,
managed and controlled the company for all purposes relevant to these
proceedings. He controlled the investments and he made the material
decisions about redemptions." There was no appeal against that finding.    F

    4    Those who wished to invest in the company acquired redeemable
participating shares in it. SEB, a Swedish financial institution, was such an
investor. Between 2006 and 2008 SEB subscribed for shares on behalf of,
amongst others, two Swedish mutual funds, HQ Solid and Catella
Stiftelsefond ("Catella"). Between April 2006 and November 2007 SEB
subscribed for US$8·5m of participating shares on behalf of HQ Solid. In    G
March 2008 it subscribed for US$1m of participating shares on behalf of
Catella. In each case, the company issued such participating shares to "SEB
Merchant Banking as nominee for [HQ Solid/Catella]". SEB was registered
as the holder of the shares in the company's register of members.

    5    In September 2008 Lehman Brothers collapsed, and this prompted a
wave of redemption requests from some of the company's participating
shareholders, including SEB. Unfortunately, however, it ultimately    H
transpired that the company had been the subject of a significant fraud
perpetrated by Magnus Peterson. The judge found that he had been
fraudulently inflating the net asset value ("NAV") of the company by
entering into interest rate swaps which he knew to be worthless. These
swaps were concluded between the company and a BVI company called

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    Weaverking Capital Fund Ltd ("WCF") which he knew was not in a position to honour its obligations under the swaps. The swaps were simply used to give the impression of sustained growth when in reality the company was suffering large losses from on-exchange trading in futures and options. The fraud was not discovered by the directors of the company until March 2009, by which time redemption requests of over US$220m had been received. The company was unable to pay these in full.

B    6    The mechanism by which participating shares could be redeemed was set out in articles 48 to 58 of the company's articles of association and was summarised in the company's Offering Memorandum (OM) (the latest version of which was dated 24 September 2008) in the following terms:

"Redemption of Company Shares

C    "Shareholders can redeem their shares, in whole or in part, in a minimum amount of US$50,000 (subject to the discretion of the board of directors to redeem lesser amounts), on one calendar month's prior written notice (subject to the discretion of the board of directors to waive such notice), on each redemption day. To effect a redemption, a request for redemption of shares, obtained from the company must be received by the company by 5 p m Dublin time one calendar month before any redemption day, accompanied by the share certificates for shares redeemed, if any, duly endorsed and in a form for redemption acceptable to the board of directors.

D    "Redemptions are made at a price per share equal to the NAV per share of the company, as of the close of business on the relevant valuation date, rounded to the nearest whole US cent (the 'redemption price')."

"Payment of Redemptions

E    "Redemption payments are generally made within 30 calendar days after the redemption day. No interest is paid from the redemption day to the payment date. Payment is made by telegraphic transfer (with transfer charges to the account of the recipient) to the remitting bank/financial institution or to another account in the name of the shareholder."

F    As defined in the OM, "redemption day" was the first business day of each calendar month, and the "valuation day" was the business day immediately preceding the redemption day. Articles 30 to 37 of the company's articles of association provided for the determination of the NAV by the directors on the valuation day.

G    7    On 9 October 2008 SEB gave notice of redemption in accordance with these provisions for all the shares it held as nominee for Catella. On 28 October 2008 it gave the same notice in relation to the shares it held as nominee for HQ Solid. These redemption requests were processed on the 1 December 2008 redemption day, being the next redemption day following the requisite 30-day notice period, and were calculated in accordance with the company's published NAV per share. This NAV was markedly inflated as a result of Magnus Peterson's fraud. Redemption payments were expected, in accordance with the OM, "generally" to be made within 30 calendar days of the 1 December redemption day.

H    8    The company received other redemption requests from other participating shareholders in October 2008, totalling US$138,361,002·62 at the published NAV, which fell to be processed on the December 2008 redemption day (the "December redeemers"). Additional redemption

requests were also received by the company in November and December
2008 which fell to be processed on the January and February 2009
Redemption Days (the "January redeemers" and the "February redeemers").
The redemption obligations incurred by the company on these latter
redemption days were US$54·7m in January and US$30m in February.  On
17 December 2008 Magnus Peterson sent an e-mail to the company's
administrator, a company called PNC Global Investment Servicing (Europe)
Ltd ("PNC"), based in Dublin, in the following terms:

> "Hi Gillian, We have a few Swedish investors that have switched into
> our SEK based fund as at 1 December.  We need to pay them value
> tomorrow please.  On the attached spreadsheet I have highlighted those
> investors in yellow.  It is approximately US$7·6m that needs to be paid.
> SEB are sending funds today to [PNC] so there should be no problem
> executing it.  Best regards Magnus."

9    The e-mail attached a spreadsheet which identified "SEB Merchant
Banking as nominee for Catella Stiftelsefond" as one of the Swedish
redeemers due to be paid.  Accordingly, on or about 19 December 2008, SEB
received payment of US$1,096,903·58 in respect of Catella's shareholding
which it duly credited to Catella's cash account with itself.  Five other
Swedish redeemers received full payment on that date but no other
December redeemers received their redemption payments from the company
in December.  As the end of December approached, recognising that the
company did not have enough cash to pay the other December redeemers,
WCUK took legal advice on its cash-flow position.  On the same day,
29 December 2008, Magnus Peterson proposed that a letter be sent to the
unpaid December redeemers stating that a decision had been made to pay
them 25% of their redemption payment, and envisaging that the remaining
moneys would be paid by the end of January.  The judge found that Magnus
Peterson must have known by this time that the company would never be in
a position to pay all the December redeemers, let alone pay the January 2009
redemption debt which was to fall due on 2 January.  The proper course
would therefore have been to suspend the redemption payments or liquidate
the company.

10    In the end the proposed letter was not sent until 7 January, by which
time SEB had already received, on 2 January, another redemption payment
of US$1,780,214·49.  This represented 25% of the redemption proceeds due
to HQ Solid.  The company made further partial payments to some other
December redeemers (not including SEB) across January, and by the end of
the month most but not all of the December redeemers had been paid the
outstanding sums due to them.  On 11 February 2009 (by which time the
February 2009 redemption debt was also due) SEB received a further
payment of US$5,340,643·47 constituting the remaining 75% of the
redemption proceeds due to it as nominee for HQ Solid.  By this time,
however, the company had in excess of US$134m in outstanding redemption
obligations, being the balance of the December redemption debt, around
US$50m being owed to the three largest of the December redeemers, and the
entirety of the January and February redemption debt.

11    In March 2009 the directors eventually learned of the fictitious
nature of the swaps and the impact this had on the solvency of the company.
They resolved to suspend the determination of the NAV and the issue and

A   redemption of shares with immediate effect. Shareholders were informed of this by letter on 11 March 2009 and on 19 March 2009 the company was duly placed into liquidation. Subsequently, in January 2015, Magnus Peterson was sentenced to a total of 13 years' imprisonment at Southwark Crown Court for offences including making a false instrument, furnishing false information relating to accounts and carrying on business with intent to defraud creditors.

B   12   In August 2014 the liquidators issued proceedings against SEB seeking a declaration that the three redemption payments described above were invalid as preferences under section 145(1) of the Companies Law (2013 rev), and an order that the US$8,217,761·54 should be repaid plus interest. Section 145(1) reads:

C   "Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be invalid if made, incurred, taken or suffered within six months immediately preceding the commencement of a liquidation."

D   On the facts of this case, the only element of section 93 which is relevant is section 93(c), which states that a company is deemed unable to pay its debts if "it is proved to the satisfaction of the court that the company is unable to pay its debts". It is common ground between the parties that an inability to pay debts was to be judged by reference to a cash-flow test of insolvency, recently endorsed by this Board in *Culross Global SPC Ltd v Strategic Turnaround Master Partnership Ltd* [2010] UKPC 33.

E   *The issues*

13   At the time of the trial before Clifford J in October 2015 there were six main issues before the judge. The first issue was to find the controlling mind of the company. Having considered all the evidence before him over a five-day hearing he was satisfied that the two directors had delegated their powers to Magnus Peterson so that he acted as de facto director. At paras 61–62 of his judgment the judge concluded as follows:

F

"61. . . . Having carefully considered such evidence as a whole, and made due allowance for some discrepancies and those parts that are hearsay, I find that nevertheless the overwhelming weight of it is to the effect that Magnus Peterson directly, and through his company WCUK, managed and controlled the company for all purposes relevant to these proceedings. He controlled the investments and he made the material decisions about redemptions.

G

"62. Accordingly, I find that Magnus Peterson was indeed the company's controlling mind in the payment of the relevant redemptions which now I must move on to examine."

H   This finding by the judge was not challenged on appeal to the Court of Appeal in Cayman.

14   On 5 January 2016 Clifford J declared that US$8,217,761·54 in payments to SEB were invalid preferences which SEB was ordered to repay

© 2019 The Incorporated Council of Law Reporting for England and Wales

with interest to the liquidators with costs.  SEB then appealed that decision          A
to the Court of Appeal.

  15   The other issues before the judge were maintained with some
alteration in the Court of Appeal.  We propose to identify those issues which
were pursued by the parties at the hearing before the Board.

  16   The issues before us were referred to as the "fraud point", the "30
day point", the "future debts point", the "intention to prefer point", and the          B
"repayment issues".  There was also a further issue, the "amendment point",
not advanced before Clifford J.  In summary the conclusions of the courts
below on these issues were as follows:

*(1) The fraud point*

  In order to establish that the company was not insolvent at the time when          C
the payments in issue were made, and that the payments therefore fell
outside the scope of section 145(1) of the Companies Law (set out at para 12
above), SEB argued that the NAVs published by the company were not
binding as they had been inflated as a result of Magnus Peterson's fraud,
with the result that no redemptions had ever taken place in accordance with
the company's articles of association, and therefore that no redeemers had
ever become creditors of the company within the meaning of section 145.  In          D
addition, SEB argued that the company was only liable to the extent of the
real (lower) NAVs.  These arguments were rejected by the judge and the
Court of Appeal, who held that the published NAVs were binding.

*(2) The 30 day point*

  In support of its contention that the company was not insolvent at          E
the time of the first redemption payment, SEB argued that on a true
construction of the articles of association the company had a grace period of
30 days from the 1 December redemption day to make redemption
payments.  Accordingly, section 145(1) was not satisfied in relation to the
first redemption payment because at that date (19 December 2008) the
company was not yet liable to make payments to all the December
redeemers and was therefore solvent on a cash-flow basis.  This was rejected          F
by the judge and the Court of Appeal, who held that the company became
liable to pay the December redeemers on the 1 December redemption day.

*(3) The future debts point*

  This argument, also directed towards the existence of insolvency at the
time of the first redemption payment, was advanced by the liquidators on the          G
hypothesis that the judge had accepted SEB's argument in relation to the 30
Day Point i e that the December redemption debt only became due and
payable 30 days after the 1 December redemption day.  If the judge were to
have reached this conclusion, then the liquidators submitted that the future
debts falling due at that time would in any event still be relevant to the cash-
flow test of insolvency at the time of the first redemption payment.  The
court only needed to be satisfied that, as at 19 December 2008, the company          H
would not have been able to pay all of the 1 December redemption day
payments on 31 December 2008.  The judge and the Court of Appeal
accepted this argument, finding that the Cayman Islands' cash-flow test of
insolvency permitted the consideration of debts which would become

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    payable in the reasonably near future.  It was possible to infer that no finance
was available to the company to fund the December redemption payments.

### (4) The intention to prefer point

In relation to the requirement under section 145(1) of an intention to
prefer, the liquidators submitted that Magnus Peterson's e-mail of
B    17 December relating to the Swedish redeemers was evidence of a specific
intention to prefer SEB ahead of the other redeemers in relation to the first
redemption payment.  In addition, in relation to the second and third
redemption payments, the liquidators argued that there was a specific
intention to prefer SEB over those other December redeemers and the
January and February redeemers who were not paid.  Alternatively, the
C    liquidators argued that it was possible to infer the necessary intention to
prefer from the fact that, at the time of the payments, Magnus Peterson knew
the company was unable to pay its debts in full.  In relation to this issue, both
the judge and the Court of Appeal considered that there was a specific
intention to prefer SEB (albeit for slightly different reasons) and therefore
thought it was unnecessary to decide whether the requisite intention could
be inferred only from the fact of payment in knowledge of insolvency:
D    Martin JA, at para 57.  The judge considered that there was a specific
intention, in relation to all of the redemption payments, to prefer SEB as a
member of a particular class of creditors i e the Swedish redeemers, who
Peterson claimed were intending to reinvest.  Before the Court of Appeal SEB
did not seek to challenge the judge's conclusion in relation to the first
redemption payment, but it disputed that such an intention could be in any
E    way continuing in relation to the second and third payments.  The Court of
Appeal agreed, but the court nevertheless held—by virtue of the company's
policy of paying the December redeemers 25% of the redemption payment
initially and then the balance at a later date, and the fact that this policy had
been adopted at a time when Magnus Peterson knew the company had no
prospect of paying the January or February redeemers—that these payments
F    were nevertheless made with the specific intention to prefer SEB within the
meaning of section 145(1).

### (5) The amendment point

There was a further argument relating to the intention to prefer, advanced
by SEB before the Court of Appeal by way of an amendment to its grounds of
G    appeal, on the hypothesis that the Court of Appeal held that the company
had intended to prefer SEB in relation to the first redemption payment, but
not in relation to the second or third.  In those circumstances, SEB argued
that if the second and third redemption payments had not been made with
the requisite intention then the first redemption payment should not be set
aside.  This was because, if the first redemption payment had not been made
on 19 December then it would have been paid as part of the ordinary course
H    of payments made to the December redeemers in January/February 2009
and therefore could not constitute a preference.  Given the Court of Appeal's
conclusion (referred to at para 16(d) above) that the second and third
redemption payments did involve a specific intention to prefer SEB, it did not
find it necessary to decide this point.

© 2019 The Incorporated Council of Law Reporting for England and Wales

*(6) Repayment issues*                                                                    A

In light of the conclusions set out above the judge (and, in due course, the
Court of Appeal) held that the three redemption payments to SEB were
preferences within the meaning of section 145(1).  SEB had argued,
however, that in this eventuality it was entitled to rely on the common law
defences to a claim for restitution on the basis of unjust enrichment, and that
it was specifically entitled to rely on the absence of any actual enrichment on        B
its part, and on the fact that it had changed position by remitting the
payments to HQ Solid and Catella.  SEB also argued that the liquidators'
claim was founded on illegality and contrary to public policy in that it
sought to benefit not the company, but the unpaid redeeming shareholders.
These submissions were rejected by both the judge and the Court of Appeal,
who held that the common law defences were not available to a statutory
claim under section 145 and that, in any event, they were not made out on         C
the facts.  The claim was also not barred as a result of illegality or public
policy.

17   Accordingly, the first three points all concern the question whether
the payments were made at a time when the company was insolvent, and
were therefore capable of falling within the ambit of section 145(1) of the
Companies Law, set out at para 12 above.  The first issue concerns all the         D
payments made to SEB.  The second issue, and the third issue contingent
upon it, only relate to the first payment, which SEB received as the
shareholder holding for Catella.  The second and third payments were for
HQ Solid.  The fourth and fifth issues concern the question whether the
payments were made with the intention to prefer SEB, and therefore met
another of the requirements of section 145(1).  The sixth issue concerns the
consequences of the application of section 145(1).  It is appropriate to deal      E
with these issues seriatim, although there is a measure of overlap between
them.

*(1) The fraud point*

18   The first issue was summarised at para 16(a) above.  On behalf of
SEB Mr David Chivers QC submits that Clifford J and the Court of Appeal        F
were wrong to reject SEB's submission that the published NAVs, which had
been inflated as a result of Magnus Peterson's fraud, were not valuations at
all within the meaning of the articles, alternatively were only valuations to
the extent of what would have been the true valuations.

19   The Court of Appeal rejected SEB's submission, largely on the basis
of the opinion of this Board in *Fairfield Sentry Ltd v Migani* [2014] 1 CLC        G
611.  The Court of Appeal considered that it is not permissible to reopen a
NAV retrospectively on the ground of fraud, whether or not the company
was complicit in it.  The practical reasons underlying the decision in *Fairfield
Sentry* were essential to the operation of the company and applied equally in
a situation in which the NAV was affected by fraud.  Martin JA, with whom
the other members of the Court of Appeal agreed, considered that the
redemption of shares, once acquired, is an incident of an existing contract       H
and brings it to an end according to its terms.  It is not possible to regard it as
giving rise to a new contract capable of being vitiated.  There was, moreover,
no difference between an internal and an external fraud in terms of the
binding nature of a NAV.  The whole scheme of the company's articles

© 2019 The Incorporated Council of Law Reporting for England and Wales

A   required its business to be conducted on the basis that the NAV is binding,
whether it is accurate or not: paras 29–30.

20   Mr Chivers submits that the fraudulent valuation of assets which
occurred in this case was internal to the company and that *Fairfield Sentry* is
therefore distinguishable.  He relies on the maxim that fraud unravels all.
He submits that, as a result, the redeeming shareholders never became
creditors of the company in the sums paid to them.  He accepts that, if this is
B   correct, SEB was not entitled to receive any of the redemption payments but
submits that while those payments might have been reclaimed as money had
and received such a claim would now be time-barred.  Moreover, he submits
that SEB could never be the subject of a preference claim, nor could SEB be
preferred over other persons who were not entitled to the money.

21   Under the contract between the company and its members contained
C   in the articles the directors were obliged to determine the NAV in accordance
with articles 30 to 37.  In particular, in calculating the NAV they were
obliged to apply "such generally accepted accounting principles as they may
determine" (article 32) and the company's assets were to "be valued in
accordance with such policies as the directors may determine": article 34.
Any valuations made pursuant to the articles are stated to be "binding on all
D   persons": article 34.  However, Mr Chivers submits, first, that as a matter of
public policy a fraudulent determination would not bind redeeming
shareholders.  Here he relies on *HIH Casualty and General Insurance Ltd v
Chase Manhattan Bank* [2003] 1 All ER (Comm) 349, per Lord Bingham of
Cornhill, at para 15, and Lord Hoffmann, at para 68, and *Jones v Sherwood
Computer Services plc* [1992] 1 WLR 277, 284 per Dillon LJ.  Secondly, he
submits that there is nothing in the articles which purports to permit the
E   directors to carry out a fraudulent determination of the NAV.  On the
contrary, he says, articles 32 and 34 make clear that any such assessment
must be based on an honest assessment of the value of the assets.

22   In response Mr David Lord QC for the liquidators submits that this
is essentially the same argument which was rejected by this Board in *Fairfield
Sentry* as "an impossible construction": paras 22–23.  He submits that the
whole thrust of the fund's argument in that case was that the NAV had not
F   been correctly determined and that the reasoning of the Privy Council
applies whether or not it had been or whether or not the fund itself knew it
had been.

23   In *Fairfield Sentry*, the fund invested money with Bernard L Madoff
Investment Securities LLC ("BLMIS") which was, in fact, operating a Ponzi
scheme and reporting fictitious returns to investors.  Investors participated
G   indirectly in BLMIS by subscribing for shares in the fund and redeeming
them in accordance with the fund's articles at a price dependent on the
fund's NAV.  The articles provided that any certificate as to NAV "given in
good faith by or on behalf of the directors shall be binding on all parties".  In
December 2008 the directors of the fund suspended determination of the
fund's NAV, thereby terminating the redemption of shares.  The liquidators
of the fund sought to recover payments made to members who had
H   redeemed shares prior to December 2008, on the ground that the payments
had been made on the mistaken basis that the assets were as stated by
BLMIS.  They argued that the NAV would not be "determined by the
directors" unless and until it was correctly determined using the true
information as to the assets of the fund ascertained in the light of

information which subsequently became available relating to Madoff's     A
fraud. This Board held that under the contract contained in the fund's
articles, the NAV was intended to be definitively ascertained at the time of
the transactions and could not be varied subsequently with retrospective
effect. The contrary view was untenable because on that approach the price
would not be definitively ascertained for an indefinite period after the
transaction had ostensibly been completed. As a result, payments made,
albeit under a mistake, had discharged a contractual debt and could not be     B
recovered on grounds of unjust enrichment, it not being suggested that the
mistake was such as to avoid the contract.

    **24**    The Board considers that *Fairfield Sentry* is distinguishable. It is
correct, as Mr Lord points out, that in *Fairfield Sentry* there was no
consideration of the operation of the fraud. In that case, however, the
redemption liabilities were determined by the directors in good faith, as the     C
articles required. The fraud which operated on the assessment of the NAV
was external to the fund. *Fairfield Sentry* does not address the question
whether a NAV would be considered to have been determined in accordance
with the articles if the directors themselves had fraudulently inflated the
value of the assets. By contrast, in the present case the fraud was that of
Magnus Peterson and cannot be considered external to the company. At first
instance, Clifford J. found that the two de jure directors of the company had     D
delegated authority to Magnus Peterson, para 53:

    "the evidence shows that the directors, in effect, delegated authority,
including authority in relation to redemption payments, to Magnus
Peterson which they were entitled to do pursuant to articles 144 and 145.
Even if there was not any formal delegation of authority for this purpose,
there is a compelling weight of evidence to the effect that the board     E
permitted Magnus Peterson to act as a de facto director and, in effect,
delegated their powers to him as they were entitled to pursuant to the
articles referred to. It is probably not even a question of deciding whether
this amounted to ostensible authority. In my view, it is clear that the
board allowed Magnus Peterson to act on its behalf in performing all the
functions necessary for the payment of redemptions. The necessary
implication is that Magnus Peterson had the board's actual authority for     F
this purpose. There is no requirement, in my view, that section 145 of the
Law requires express actual delegated authority. Magnus Peterson was
allowed to act on behalf of the board for relevant purposes and clearly
had authority to do so."

    **25**    The liquidators also point out, quite correctly, that it was PNC, and     G
not Magnus Peterson, which was the relevant agent for the purpose of
calculating the NAV and that there is no suggestion that PNC was complicit
in or aware of Magnus Peterson's fraud. PNC acted pursuant to the
Administration and Accountancy Services Agreement dated 30 July 2003.
The services provided by PNC included arranging for the computation of the
NAV, controlling and authorising all disbursements, maintaining the register
of shareholders, preparing and forwarding documents to shareholders and     H
notifying the adviser, the custodian and the accounting agent of all share
activity. However, PNC's role was found by Clifford J (at paras 54–62) to be
administrative only. PNC had been appointed to administer the day to day
operations and business of the company. WCUK, on the other hand, as the

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    investment adviser, was appointed "to manage the affairs of the fund":
Investment Advisory Agreement, clause 2. PNC had no part in the decision
making process in relation to the payment of redemptions. Clifford J found
(at paras 61–62) that the overwhelming weight of the evidence was to the
effect that Magnus Peterson directly, and through his company WCUK,
managed and controlled the company for all purposes relevant to these
proceedings. He controlled the investments and he made the material
B    decisions about redemptions. He was the controlling mind in the payment
of the relevant redemptions.

26    At this point it is necessary to say something about a submission on
behalf of the liquidators, on the basis of *In re Hampshire Land Co* [1896]
2 Ch 743, that Magnus Peterson's knowledge of the fraud would not be
imputed to the company that he was defrauding. It is also submitted on the
C    basis of *Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1 that Magnus Peterson's
knowledge can be attributed to the company for the purpose of making the
SEB redemption payments but not for other purposes. It seems to the Board,
however, that it is not concerned here with attributing knowledge. What
matters in this case is that valuations were prepared on a fraudulent basis by
the person to whom the directors had given actual authority to carry out the
valuations.
D    27    The Board agrees with SEB that the relevant question in this case is not
whether Magnus Peterson's fraud tainted the contractual determination of
the published NAV. As Mr Lord accepts, it clearly did. The relevant question
is, rather, whether the NAV was binding. In answering that question, it is
necessary to have regard to the fact that the fraud originated from the person
to whom the directors had delegated their powers and who was the
E    controlling mind of the company. The company was therefore in breach of its
duty under the contract to act in good faith. While the Board would accept
that, in general, it is vitally important that valuations are definitively
ascertained at the time of the transactions and are not liable to be varied
subsequently with retrospective effect, even this must yield where, as here, the
fraud is internal to the company which is seeking to rely on the contract.
F    Fraud is something apart. The Board accepts Mr Chivers's submission that
nothing in the contract constituted by the articles purported to permit the
directors of the company to carry out a fraudulent determination of the NAV
and that, even if it had, such a fraudulent determination could not bind
redeeming shareholders. The Board considers that the dishonest valuation of
assets was not made "pursuant to these articles" and therefore was not
"binding on all persons" under article 34.
G    28    Order 12, rule 2 of the Companies Winding Up Rules 2008 is relied
upon by SEB as express statutory recognition that a mis-stated NAV is not
binding by reason of fraud. It applies only in a solvent winding up and
permits rectification of the register where a company has redeemed shares at
prices based on a mis-stated net asset value which is not binding upon the
company and its members by reason of fraud or default. While this
acknowledges that there are circumstances in which rectification may take
H    place on such a ground, this does not assist SEB as the whole question here is
whether the NAV is not binding by reason of fraud.
29    Sir Donnell draws attention to the fact that the extent of any fraud
lying behind the statement of a NAV may vary enormously. He raises the
question of the consequences where a NAV has been influenced by a small or

508

**Skandinaviska Enskilda Banken AB v Conway (PC)**                    [2019] 3 WLR

minimal fraud on the part of the employee who had misstated some part of    A
the company's assets.  It is, in the Board's view, unnecessary to address this
possibility which does not arise in the present case where, as he accepts,
there was undoubtedly a massive fraud.

30    That, however, is not the end of the matter.  The Board agrees with
Sir Donnell that it would be necessary for a party who wished to have the
NAV avoided to bring proceedings to do so.  Those proceedings would be    B
brought against the liquidators of the company, but notice would also have
to be given to those who would be affected by a decision that the NAV was
voidable.  However, such proceedings would not avail SEB.  As Sir Donnell
explains in his judgment, SEB has not been defrauded but has, in fact,
received payments on behalf of its two clients substantially in excess of the
entitlement had the NAV been accurate and honest.  It would necessarily be a
condition of any order setting aside the NAV on the application of SEB that    C
SEB repay the sums it received under that NAV.

31    For this reason alone, the fraud point fails.

*(2) The 30 Day Point*

32    The second issue has been summarised at para 16(b) above.  SEB
appeals against the decision of the Court of Appeal to uphold the judge's    D
finding that the payments to the December 2008 redeemers fell due on the
1 December 2008 redemption day rather than 30 days later.

33    Mr Chivers relied on the terms of the articles of association as set out
at para 6 above in this sentence: "Redemption payments are generally made
within 30 calendar days after the redemption day."  He therefore submitted
that, as the redemption day for the shares held by SEB as nominee for Catella    E
was 1 December, the obligation to make the redemption payment, ie the
debt, had not fallen due when that and the other December payments were
made on 19 December.  Therefore, in regard to the first payment only, the
company was not insolvent at that time.

34    The first observation to make is that the use of the word "generally"
with regard to redemption payments is indicative of the description of the
practice of the company rather than of the definition of legal rights.    F

35    The frailty of the argument is further increased by article 36 of the
company's articles which provides: "The price to be paid for participating
shares which are to be redeemed shall be deemed to be a liability of the
company from the valuation point on the redemption day until the price is
paid."

36    It is common case that the redemption day for the first payment to    G
SEB was 1 December 2008.  So the articles clearly say that it was a liability of
the company from then and therefore SEB was a creditor to that extent from
1 December.

37    One also notes article 55 of the company's articles, which provides
that the company should remit redemption proceeds "within such period as
the directors shall determine".

38    SEB nevertheless argues that the December redemption payments    H
were not due by December 19 and therefore the company was not insolvent
at that time.

39    In support of that SEB relies on the judgment of James V-C in *In re
European Life Assurance Society* (1869) LR 9 Eq 122.  In considering a

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    petition to wind up that company the Vice-Chancellor at p 127 said the
following:

> "I think that the petitioners have not made out a case at all in any sense
> of inability to pay debts within the meaning of the Act of Parliament.
> I apprehend that Mr Glasse is right in his construction, that inability to
> pay debts must refer to debts absolutely due—that is to say, debts for
B    > which a creditor may go at once to the company's office and demand
> payment."

40    This decision has been a leading authority for nearly 150 years,
submits counsel.  It has not escaped criticism.  In *BNY Corporate Trustee
Services Ltd v Eurosail-UK 2007-3BL plc* [2013] 1 WLR 1408, para 28
C    Lord Walker of Gestingthorpe JSC noted that it was an extempore judgment
"with very little reasoning".  "He did not refer to any of the authorities that
had been cited.  It may be unfortunate that his judgment has come to be
regarded as a leading case."

41    Counsel sought to argue that, whatever the position in England,
where in any event there had been statutory intervention twice over the
years, it was still good law in the Cayman Islands.  There are two clear
D    answers to that.  First of all the Court of Appeal in the Cayman Islands was
entitled not to follow this judgment at first instance by the Vice-Chancellor.
They set out their reasons clearly at paras 31–35 of the judgment of Martin
JA in this case for not doing so.

42    Secondly, for our part we consider that reliance may be placed on the
decision of the Board in *Culross Global SPC Ltd v Strategic Turnaround
Master Partnership Ltd* [2010] UKPC 33.  In his judgment on behalf of the
E    Board Lord Mance JSC identified the issue:

> "1.  This appeal arises from the respondent's application to strike out
> as an abuse of the process a petition to wind up the respondent, Strategic
> Turnaround Master Partnership Ltd, issued by the appellant, Culross
> Global SPC Ltd, on 10 June 2008.  Whether the petition was an abuse of
> the process depends upon whether, at the date of its issue, the appellant
F    > was a current creditor, with standing to issue it, or at best only a
> prospective creditor, in which case it would have no such standing."

43    At para 9 of his judgment one finds the relevant definition of the
redemption date:

G    > "Redemption date means generally the last business day of each
> calendar quarter or such other day as may be determined from time to
> time by the board of directors in its discretion."

There is a section dealing with the redemption of shares including para 38 to
the effect that the company would remit redemption proceeds "within
such period as the directors shall determine".  Under "Payments upon
Redemption" one finds the following:
H

> "Payment of the redemption price will be made as soon as practicable
> but, except in cases otherwise described herein, a shareholder who is
> making a redemption will receive at least 90% of the redemption price no
> later than 30 days following the date of redemption."

© 2019 The Incorporated Council of Law Reporting for England and Wales

510
**Skandinaviska Enskilda Banken AB v Conway (PC)**                    [2019] 3 WLR

Lord Mance JSC's analysis of the matter commences at para 15, and at    A
para 20 he says:

> "The focus of these provisions is on the redemption date by reference
> to which the redemption price payable is crystallised and from which the
> price is deemed to be a liability of the respondent; the remittance of the
> 'redemption proceeds' is treated as a matter of supplementary procedure,
> although it may be refused on, in particular, money laundering grounds.    B
> Both stages may be said to be part of a continuing process, but it does not
> follow that 'redemption' within the meaning of articles 55 and 32 only
> occurs at the conclusion of that whole process."

**44**    We agree with the view taken by the Board in that case. Applying
that approach to the circumstances of the present case, the redemption price
became a liability of the company on 1 December 2008. As the company    C
was then unable to pay all of those shareholders who had served notices of
redemption taking effect on that date, it was unable to pay its debts for
insolvency purposes at the time the selective payments were made to SEB
and certain other Swedish institutions, as the judge at first instance found.
The reference to payments made generally within 30 days is part of a
"supplementary procedure".    D

**45**    Further support for the liquidators' case is to be found in a further
judgment of Lord Mance JSC in *Pearson v Primeo Fund* [2017] BCC 552.
This is a case dealing with redemption funds following the exposure of
Bernard Madoff and his giant Ponzi scheme. At para 13 Lord Mance JSC
said the following:

> "In the Board's opinion, payment is, as a matter of general principle,    E
> clearly not an inherent element of the redemption or purchase by the
> company of its own shares. The provision in the articles for its deferral
> for a short time was, no doubt, a convenience to the company. The
> essence of redemption is, however, the surrender of the status of
> shareholder, with all attendant rights, just as the essence of purchase is
> the transfer of property. If this occurs the deferral of payment of the price
> is no more than a grant of a short period of credit to the company,    F
> without any reservation of property or interest."

**46**    In this case we conclude that the moneys due by the company to the
redeeming shareholders from 1 December were indeed debts which had
fallen due. Proceedings could have been issued for that debt even if
summary judgment might not immediately have been granted. We therefore
find against SEB on that point.    G

*(3) The future debts point*

**47**    This point is summarised at para 16(c) above. It was expressly
contingent on SEB succeeding on the 30 day point. As it has not succeeded
on that point it is not necessary to deal with it further.

H

*(4) The intention to prefer point*

**48**    This point is summarised at para 16(d) above. SEB contends that the
payments which it received as nominee for HQ Solid were not made with a
view to preferring that company. The first of those payments was made on

© 2019 The Incorporated Council of Law Reporting for England and Wales

A 2 January 2009 in the sum of $1,780,214·49. The second was made on 11 February 2009 in the sum of $5,340,643·47.

49 SEB acknowledges that there was a clear intention to make the full payment to SEB as nominee for Catella on 19 December 2008 with a view to preferring that redeemer.

50 Section 145(1) of the Companies Law, set out in full at para 12 above, provides inter alia that:

B
"Every conveyance or transfer of property . . . made . . . by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 *with a view* to giving such creditor a preference over the other creditors shall be invalid . . ." (Emphasis added.)

C It is accepted that on the authorities "with a view" requires a "dominant intention to prefer". SEB disputes that there was such an intention here, maintaining that the second and third payments were on foot of a lawful policy of paying the December redeemers 25% on 2 January (if they had not already been paid on 19 December) with a further 75% to come. The obvious major flaw in that argument appears from the schedule of payments found as an appendix to the statement of facts and issues. The two payments to SEB Merchant Banking as nominee for HQ Solid of 2 January and 11 February fully discharge the claim for redemption in the sum of $7,120,857·96. But not all the December redeemers were paid 100% as SEB was for HQ Solid. Banque Privée Edmond Rothschild Europe received $23,166,331·79 whereas it was owed $52,665,327·15. Both HSB Private Bank (Suisse) and Somers Dublin A/C Signet received only 25% of the sums to which they were entitled on foot of the NAV. These were the three largest creditors. SEB was the fourth largest creditor, but was paid in full. This was hardly accidental and demonstrates an intention to prefer. If there was a 25% / 75% policy it was not carried into effect—some redeemers were preferred.

51 The matter was dealt with very fully by the Court of Appeal from para 41 on. At para 44 the court records the following passage from Clifford J at first instance at para 179 of his judgment:

"I find on the evidence that there was an intention to pay the Swedish redeemers on the basis that they were investors, or potential investors, in the Swedish fund. The fact that there may have been a mistake about this matters not. What does matter is the subjective intention of Magnus Peterson in acting, as I have found, as the company's controlling mind. The intention appears to have been a principal or dominant intention to prefer a particular class of creditors. This resulted in a preference in fact of a particular creditor."

The court also recorded, at para 44, that despite Magnus Peterson's e-mail to PNC of 17 December saying that a few Swedish investors "have switched into our SEK based fund" "it appears that in fact SEB never subscribed for, or expressed an interest in subscribing for, shares in the Swedish fund on behalf of Catella, HQ Solid or anyone else".

52 We observe that Magnus Peterson is a convicted fraudster so the e-mail to PNC of 17 December may just have been intended to give a plausible but entirely untruthful reason for PNC paying those creditors

© 2019 The Incorporated Council of Law Reporting for England and Wales

512
**Skandinaviska Enskilda Banken AB v Conway (PC)**                    **[2019] 3 WLR**

A

ahead of other creditors.  Indeed that is the likely inference, partly for the
reason mentioned by the Court of Appeal, i e there is no evidence that SEB
had any such interest in reinvesting.  This reference to Swedish investors
reinvesting was also to be found in an e-mail from Peterson to PNC of
20 January 2009.

53    The Court of Appeal concluded in the light of two decisions of
the English Court of Appeal, *In re Cutts (A Bankrupt), Ex p Bognor Mutual
Building Society v Trustee of T W Cutts* [1956] 1 WLR 728 and *In re
M Kushler Ltd* [1943] Ch 248, 252 that the necessary intention could be
inferred by the court in accordance with general principles of inference from
the available evidence.

54    SEB sought to rely on the following passage from the judgment of
Lord Greene MR at p 252 of *Kushler* above:

C

   "It must, however, be remembered that the inference to be drawn is of
   something which has about it, at the, at least, a taint of dishonesty, and, in
   extreme cases, much more than a mere taint of dishonesty.  The court is
   not in the habit of drawing inferences which involve dishonesty or
   something approaching dishonesty unless there are solid grounds for
   drawing them."

D

Several things are to be observed about this.  The judgment of Lord
Greene MR was ex tempore.  The facts of the case of *Kushler* did involve
dishonesty to a degree.  The sole director in the 13 days before insolvency
chose to pay off an overdraft to the bank for the first time rather than to pay
trade creditors.  He was in fact a personal guarantor of the banking account.
He concealed that fact from the creditor's meeting.  That was the factual
matrix of the observations above.

E

55    In its written argument SEB says that commercial impropriety is at
least required.

56    At para 55 the Court of Appeal concluded that there was insufficient
material to enable the judge to infer a dominant intention throughout to
prefer SEB on the grounds that it intended to invest in the Swedish fund.
Martin JA, however, proceeded as follows:

F

   "56. The matter does not, however, end there.  The judge did not rely
   only on an intention to prefer Swedish redeemers: he said (again at
   para 187) that 'the intention in this regard appears to have been
   reinforced by particular decision making in relation to the payments'.  He
   was referring to the policy set out in the letter dated 31 December 2008 of
   paying the December redeemers 25% initially and the balance later, and
   that set out in the board minutes dated 22 February 2009 of giving
   priority to redemptions that were not 'large redemptions'.  Although the
   judge regarded these merely as reinforcing his view that the payments to
   SEB were made pursuant to a policy of giving preference to investors in
   the Swedish fund, it seems to me that the letter dated 31 December 2008
   at least has a significance of its own.  By the time the second SEB
   redemption payment, representing 25% of the amount outstanding, was
   made on 2 January 2009 the sums due to the January redeemers had
   already fallen due and notice of redemption had been given by the
   February redeemers.  The judge found that Magnus Peterson knew that
   the company had no prospect of paying the January redeemers and the

G

H

513
[2019] 3 WLR                    Skandinaviska Enskilda Banken AB v Conway (PC)

A    February redeemers in full. The proper course would have been to
     suspend redemptions (if that were by then possible) or liquidate the
     company. He nevertheless caused the company to adopt a policy
     designed to allow the December redeemers to be paid before other
     redeemers. The second SEB redemption payment and the third SEB
     redemption payment were made pursuant to this policy, and had the
     intended effect of preferring SEB (as one of the class of December
B    redeemers) over the body of January redeemers. SEB says that it was not
     preferred in the application of the policy, but that does not answer the
     point. Although the policy may have been applied consistently in relation
     to the December redeemers, so that SEB gained no advantage over them,
     it did give SEB an advantage over the January redeemers and (in the case
     of the third SEB redemption payment) over the February redeemers, all of
C    whom were to the knowledge of Magnus Peterson unlikely to be paid.
     That is in my opinion sufficient to justify the judge's conclusion of a
     specific intention to prefer. As the judge recorded at para 78, SEB did not
     put pressure on the company to pay, or even request payment after giving
     notice of redemption, so there was nothing to displace the inference that
     SEB was paid pursuant to that intention. Accordingly, although for
     slightly different reasons from those expressed by the judge, I would hold
D    that the 'Continuing Intention Point' fails.
         "57. That conclusion deals to some extent with the respondent's
     notice, which made specific reference to the letter dated 31 December
     2008 and the February 2009 board minutes. I do not, however, find it
     necessary to address the more general question raised by the respondent's
     notice, namely whether the fact of payment in knowledge of insolvency is
     sufficient without more to found an inference of intention to prefer. In
E    light of the letter from Maples and Calder to which I have referred, I also
     think it would be undesirable to do so."

     That last reference is to the fact that there was other litigation pending.

     57    It appears that, as well as the evidence from the e-mails and the
     board minutes and the witness on behalf of the liquidators, Peterson was
F    himself a former employee of SEB, a further possible reason for him to prefer
     SEB. The Board concludes that the Court of Appeal was entitled to reach
     the conclusion that it did and that SEB fails on this point also.

     *(5) The amendment point*

     58    This point was summarised in para 16(e) above. It only arose if the
G    Board was with SEB on the previous issue, as to the intention behind the
     second and third payments. As that is not the case it is neither necessary nor
     appropriate to address this.

     *(6) Repayment issues*

     59    The repayment issues were summarised in para 16(f) above. To
     recap, SEB argued that, in the event that the payments were held to be
H    voidable under section 145(1) of the Companies Law, the liquidators' claim
     to restitution arose under the common law and was based on unjust
     enrichment. SEB was, it argued, therefore entitled to defend the claim on the
     basis that (1) it had not been enriched, since it had received the payments as
     the nominee of Catella and HQ Solid, and (2) it had changed its position on

© 2019 The Incorporated Council of Law Reporting for England and Wales

514
Skandinaviska Enskilda Banken AB v Conway (PC)                    [2019] 3 WLR

the faith of the payments, by remitting them to those funds, and would suffer                    A
an unjust detriment if it were now required to repay them.  The judge and the
Court of Appeal rejected those contentions, holding that the liquidators'
right to repayment arose under statute and not at common law, and that in
any event the defence of change of position was not made out on the facts.
SEB also argued that the liquidators' claim was in any event founded on
illegality and was contrary to public policy.  Those contentions also were                    B
rejected by the judge and the Court of Appeal.

### The effect of section 145

60    It may be helpful to begin by repeating the terms of section 145(1):

"Every conveyance or transfer of property, or charge thereon, and
every payment obligation and judicial proceeding, made, incurred, taken                    C
or suffered by any company in favour of any creditor at a time when the
company is unable to pay its debts within the meaning of section 93 with
a view to giving such creditor a preference over the other creditors shall be
invalid if made, incurred, taken or suffered within six months
immediately preceding the commencement of a liquidation."

The side note to section 145 is "voidable preference", and it is common                    D
ground between the parties that the effect of the section is to render a
conveyance or payment falling within its scope voidable, rather than void ab
initio.  We shall proceed on that basis.  It accords with the views of most of
the academic commentators on similar provisions for the avoidance of
preferences, and with *Marks v Feldman* (1870) LR 5 QB 275, 281 per Kelly
CB.  We do not consider that the description of a fraudulent preference as
"void" by Lord Mansfield CJ in *Alderson v Temple* (1768) 4 Burr 2235,                    E
2241 was intended by him to distinguish between its being void and
voidable.

61    So understood, section 145 is consistent with the treatment of
voidable preferences (or fraudulent preferences, as they have also been
described) under the common law and more recently statute law.  It was
established by the time of Lord Mansfield CJ that transactions by which a                    F
bankrupt discharges his debts to one or more creditors with the intention of
preferring those creditors over other creditors were subject to avoidance in
appropriate circumstances under the common law.  That is because such
transactions defeat the intention of Parliament, established in relation to
bankrupt individuals since the Statute of Bankrupts Act 1542 (34 & 35 Hen
8, c 4), and subsequently applied also in relation to companies, that there
should be a collective procedure for the collection and realisation of an                    G
insolvent debtor's estate, so as to ensure its distribution in accordance with a
statutory scheme providing for an equal or "pari passu" distribution among
the ordinary unsecured creditors.  As Lord Mansfield CJ said in relation to a
fraudulent preference in *Alderson v Temple* at p 2240, "it is defeating the
equality that is introduced by the Statutes of Bankruptcy".

62    Two other features of voidable preferences are worth noting at                    H
this stage.  First, since the law governing preferences necessarily applies
retrospectively, a transaction which is held to have been a voidable
preference will have been valid and effective at the time when it took place.
Secondly, the preference need not involve any moral blame on the part of the
recipient: *In re Patrick and Lyon Ltd* [1933] Ch 786, 790.

© 2019 The Incorporated Council of Law Reporting for England and Wales

[2019] 3 WLR                    Skandinaviska Enskilda Banken AB v Conway (PC)

A    63   Section 145 invalidates any conveyance or payment which falls
within its scope, but is silent as to the consequences of that invalidation.  It
can be contrasted with a provision such as section 239 of the United
Kingdom Insolvency Act 1986, which also deals with preferences, but
requires the court, on an application by the relevant office-holder, to "make
such order as it thinks fit for restoring the position to what it would have
been if the company had not given that preference".  Section 241 then lists
B    seven types of order which may be made, without prejudice to the generality
of section 239.  By contrast, since section 145(1) of the Cayman Companies
Law is silent as to the consequences of the invalidation, those consequences
must therefore be regulated by the general law which applies in the situation
resulting from the avoidance of the transfer or payment in question: that is to
say, by any other statutory provisions which may be applicable, or in their
C    absence by the common law.  Depending on the circumstances, there may be
a variety of remedies available, personal or proprietary, at common law or
in equity.  They will usually include a right to proprietary or personal
restitution of the property or money transferred, subject to any defences
which may be available.
    64   That conclusion is supported by a substantial body of authority.  As
D    we have explained, before preferences were rendered voidable under
statutory provisions such as section 145, they were voidable at common law,
as being incompatible with the scheme of distribution to which creditors
were entitled under statute.  An action then lay to recover the property or
money which had been transferred.  The point is illustrated by the case of
*Alderson v Temple* 4 Burr 2235, where the preference took the form of the
delivery of promissory notes to the defendant.  On the avoidance of the
E    transaction, the notes were held to be recoverable in an action of trover.  In
*Marks v Feldman* LR 5 QB 275, where the goods which were the subject of
the preference had been converted into money, the appropriate remedy was
held to be an action for money had and received.  Kelly CB explained,
at p 279, that the basis of the claim for recovery was that the preferential
payment offended against the spirit, although not the letter, of the statutory
F    bankruptcy code.
    65   That approach continued to be followed when statutory provision
was first made for the avoidance of the transaction, but no provision was
made for the granting of a remedy.  The point is illustrated by the case of
*Rousou's Trustee v Rousou* [1955] 3 All ER 486, where Danckwerts J had to
decide whether the right to recover money which had been paid under a
settlement which was either void under section 42(1) of the Bankruptcy Act
G    1914, or voidable as a fraudulent conveyance under section 172 of the Law
of Property Act 1925, was a statutory right arising by implication: an
analogous question to that raised in the present case.  Section 42(1) of the
1914 Act provided:

    "Any settlement of property, not being a settlement made before and
    in consideration of marriage, or made in favour of a purchaser or
H    incumbrancer in good faith and for valuable consideration, or a
    settlement made on or for the wife or children of the settlor of property
    which has accrued to the settlor after marriage in right of his wife, shall, if
    the settlor becomes bankrupt within two years after the date of the
    settlement, be void against the trustee in the bankruptcy, and shall, if the

© 2019 The Incorporated Council of Law Reporting for England and Wales

516
Skandinaviska Enskilda Banken AB v Conway (PC)                    [2019] 3 WLR

A

settlor becomes bankrupt at any subsequent time within ten years after
the date of the settlement, be void against the trustee in the bankruptcy,
unless the parties claiming under the settlement can prove that the settlor
was, at the time of making the settlement, able to pay all his debts without
the aid of the property comprised in the settlement, and that the interest
of the settlor in such property passed to the trustee of such settlement on
the execution thereof."

B

Section 172 of the 1925 Act provided:

"(1) Save as provided in this section, every conveyance of property,
made whether before or after the commencement of this Act, with intent
to defraud creditors, shall be voidable, at the instance of any person
thereby prejudiced . . .

C

"(3) This section does not extend to any estate or interest in property
conveyed for valuable consideration and in good faith or upon good
consideration and in good faith to any person not having, at the time of
the conveyance, notice of the intent to defraud creditors."

66    Danckwerts J held that, on the avoidance of the settlement under
either of these provisions, a right to restitution arose under the common law,
based on the principle established in *Moses v Macferlan* (1760) 2 Burr 1005.

D

He said, at p 491:

"It is clear that there is no provision in any of the sections on which the
trustee relies for re-transfer of the property or repayment of the money
with regard to a void transaction . . . [I]t is true, when the setting aside of
a transaction is obtainable under a statute, that it is by reason of that

E

result that an obligation is imposed by the law on the man, who
improperly has property or money, to re-transfer it or repay it to the
successful party in the action. It seems to me that that is the true view. It
was unnecessary for the statute in those cases to create any right of action
for recovery of the money, because, once the transaction had been set
aside, the property or money was wrongfully in the hands of the person
who had it and, therefore, by operation of law, as stated by Lord

F

Wright MR in *Brook's Wharf & Bull Wharf Ltd v Goodman Bros* [1937]
1 KB 534, 545 became re-transferable or repayable to the successful
party. Therefore, it seems to me that the right to the recovery of the
money is not a statutory right in a case like the present. It is a right
imposed by the law which Lord Mansfield CJ in *Moses v Macferlan*
(1760) 2 Burr 1005 called a quasi-contractual right . . ."

G

67    Another aspect of Danckwerts J's decision in that case, concerned with
a question in private international law as to the law governing the recovery of
the payment, was questioned by Sir Nicolas Browne-Wilkinson V-C in *In re
Jogia (A Bankrupt)* [1988] 1 WLR 484, 495, but no doubt was expressed as to
the correctness of the decision on the point now in issue.

68    The same conclusion as in *Rousou's Trustee* was reached by Oliver J
in *In re J Leslie Engineers Co Ltd* [1976] 1 WLR 292. That case concerned

H

section 227 of the Companies Act 1948, which provided:

"In a winding up by the court, any disposition of the property of the
company, including things in action, and any transfer of shares, or
alteration in the status of members of the company, made after the

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    commencement of the winding up, shall, unless the court otherwise orders, be void.”

Oliver J observed, at p 298:

B    “Now, it must be remembered that the invalidation of a disposition of the company's property, and the recovery of the property disposed of, are two logically distinct matters. Section 227 says nothing about recovery; it merely avoids dispositions . . . What is the appropriate remedy in respect of the invalidated disposition is a matter not regulated by the statute and that has to be determined by the general law.”

He added, at p 299, that section 227 did not mean that the company had some special remedy which enabled it to proceed with a claim in circumstances where, had the disposition been invalid on some other ground than the section, no such remedy would have lain.

C    69    That decision was followed by the Court of Appeal in *Hollicourt (Contracts) Ltd v Bank of Ireland* [2001] Ch 555, which concerned section 127 of the Insolvency Act 1986. That section is in very similar terms to section 227 of the 1948 Act, and provides:

D    “In a winding up by the court, any disposition of the company's property, and any transfer of shares, or alteration in the status of the company's members, made after the commencement of the winding up is, unless the court otherwise orders, void.”

Mummery LJ, giving the judgment of the court, said, at para 22:

E    “As Oliver J pointed out in *In re J Leslie Engineers Co Ltd* [1976] 1 WLR 292, 298 the invalidating provisions (then to be found in section 227 of the Companies Act 1948) do not spell out the appropriate remedy of the company when the disposition is avoided. The right of recovery of the company's property which has been disposed of is determined by the general law. It is common ground in these proceedings that that right of recovery, whether invoked against the payees or against the bank, is restitutionary.”

F    That decision has been followed in numerous subsequent proceedings under section 127: see, for example, *Rose v AIB Group (UK) plc* [2003] 1 WLR 2791, and *Officeserve Technologies Ltd v Annabel's (Berkeley Square) Ltd* [2019] Ch 103.

70    In *In re Ahmed (A Debtor)* [2018] BPIR 535 the Court of Appeal considered an argument that a statutory right of action was created by section 284(1) of the Insolvency Act 1986, which provides:

G    “Where a person is adjudged bankrupt, any disposition of property made by that person in the period to which this section applies is void except to the extent that it is or was made with the consent of the court, or is or was subsequently ratified by the court . . .”

H    The argument was rejected. Gloster LJ, with whom Patten and David Richards LJJ agreed, stated at para 29:

“In my judgment section 284 only operates to *avoid* relevant dispositions. The section is silent as to the remedy available to the bankruptcy estate when a disposition has been avoided, and the

© 2019 The Incorporated Council of Law Reporting for England and Wales

appropriate remedy is, accordingly, governed by the general law." *A*
(Emphasis in original.)

71   It is unfortunate that none of the authorities we have mentioned
appears to have been cited to the Grand Court or the Court of Appeal in the
present case.  Accepting the liquidators' submission that the cause of action
arose under section 145 itself, and their further submission that a defence of
change of position was therefore not available to SEB, the Grand Court *B*
referred to Professor Sir Roy Goode's article, "The Avoidance of
Transactions in Insolvency Proceedings and Restitutionary Defences", in
*Mapping the Law: Essays in Memory of Peter Birks* (2006), p 299.  The
Board has also been assisted by Sir Roy's *Principles of Corporate Insolvency
Law,* 5th ed (2018).  These contain valuable discussions of issues arising in
connection with voidable preferences, but we cannot discern in them any *C*
support for the proposition that a provision in the form of section 145
creates a statutory right of recovery.  On the contrary, both in his article and
in his book Sir Roy carefully distinguishes between statutory provisions
which make express provision for orders reversing the effect of a disposition,
such as section 239 of the Insolvency Act 1986 (quoted at para 63 above),
and those which contain no such provision, such as section 127 (quoted at *D*
para 69).  In the article, he states at p 304 that in cases falling within
provisions of the latter kind, "the consequences of invalidity are not spelled
out and are left to rules of the common law".  That point is repeated at p 310
("section 127 . . . says nothing about the consequences of invalidity, leaving
these to be determined by the common law"), at p 311 ("These [viz remedies
consequent upon avoidance under section 127] are left to the common law *E*
and typically take the form . . . where money was paid over and has been
spent, [of] an order for repayment in a claim for money had and received"),
and again at p 318 ("section 127 says nothing about the consequences of the
invalidity of a disposition . . . These are left to the common law.").

72   Upholding the conclusion of the Grand Court, the Court of Appeal
also cited a passage in the judgment of the Board, delivered by Lord Browne-
Wilkinson, in *Lewis v Hyde* [1998] 1 WLR 94.  That case was concerned *F*
with section 309 of the New Zealand Companies Act 1955, which provided:

"Every conveyance or transfer of property, every security or charge
given over any property, every obligation incurred, every execution under
any judicial proceedings suffered, and every payment made (including any
payment made in pursuance of a judgment or order of a court), by any
company unable to pay its debts as they become due from its own money, *G*
shall be voidable as against the liquidator, if— (a) It is in favour of any
creditor or any person in trust for any creditor with a view to giving that
creditor or any surety or guarantor for the debt due to that creditor a
preference over the other creditors; and (b) The making, suffering,
paying, or incurring of the same occurs within two years before the
commencement of the winding up of the company."
*H*

In the course of his judgment, Lord Browne-Wilkinson stated, at p 98:

"The effect of the section, if applied, is to require the preferred creditor
to repay what he has received, the moneys recovered being applicable pari
passu between the creditors in the liquidation.  The underlying purpose is

© 2019 The Incorporated Council of Law Reporting for England and Wales

A     to ensure compliance with the basic principle of insolvency law viz pari passu distribution of the insolvent estate."

73   Read in isolation, that dictum appears to support the Court of Appeal's conclusion. However, we do not believe that it can bear the weight which the Court of Appeal placed upon it. The case was not concerned with the question whether the statutory provision there in issue created a statutory cause of action. Lord Browne-Wilkinson was not referred to any of the authorities which we have cited. His observation as to the "effect" of the section appears in a paragraph concerned with an entirely different question. Read in its context, it should not in the Board's opinion be treated as the expression of a considered view that the section created a statutory cause of action. When Lord Browne-Wilkinson referred to the "effect" of the section, he may have been referring to the ultimate consequence of the section's application, that is to say, the common law obligation of the preferred creditor, following the avoidance of the payment, to repay the money.

74   The Board concludes, therefore, that section 145 does not create a statutory right to recover the property or payment which were the subject of the preference, but merely renders the relevant transfer or payment voidable. In the present case, the effect of the order made under section 145 is therefore to avoid the company's payment to SEB of the amount due to it on the redemption of its shares.

*The basis of the right to restitution of the proceeds of the redemption*

75   Proceeding then on the basis that the consequences of the avoidance of a fraudulent preference under section 145 depend on the general law, it is apparent that they will vary according to the circumstances. A conveyance or payment which is voidable has full effect in law and equity until it is avoided. Dealings by the recipient with the property or money in question during the intervening period are legally effective, and can therefore limit the consequences of avoidance. The effect of statutory provisions (e g as to registration of title) may also need to be considered. In principle, however, where property has been transferred and remains in the hands of the transferee, the consequence of the avoidance is to deprive the transferee of his title. The liquidator therefore has a claim to recover the property on the basis of the company's title. If the property has passed into the hands of third parties, the liquidator may be able to trace into their hands at common law or in equity. As was mentioned earlier, that proprietorial approach was followed, in the context of personal bankruptcy, in *Alderson v Temple* 4 Burr 2235.

76   In the present case, however, no claim is advanced on a proprietary basis. It is not suggested that the avoidance of the payment has affected the title to any property in SEB's possession, and no attempt has been made to trace the money into the hands of the funds to which SEB transferred it, or their fundholders. Instead, the liquidators have based their claim to repayment on a statutory entitlement impliedly created by section 145. For the reasons we have explained, we do not accept that a claim lies on that basis. It is however accepted on behalf of SEB that, subject to its argument that it was not enriched by the payment, and its defence of change of position, the liquidators are in principle entitled to restitution of a payment

© 2019 The Incorporated Council of Law Reporting for England and Wales

which is avoided under section 145 at common law on the ground of unjust enrichment.

77   As counsel submitted, the law has long recognised that a claim to restitution can be brought in such circumstances by those responsible for the administration of the insolvent's estate.  Historically, the relevant form of action was indebitatus assumpsit, on a count for money had and received.  In *Moses v Macferlan* 2 Burr 1005 Lord Mansfield CJ explained the basis of such claims in terms derived from equity and Roman law, stating at p 1009:

> "If the defendant be under an obligation, from the ties of natural justice, to refund; the law implies a debt, and gives this action, founded in the equity of the plaintiff's case, as it were upon a contract ('quasi ex contractu', as the Roman law expresses it).  This species of assumpsit, ('for money had and received to the plaintiff's use,') lies in numberless instances . . ."

Although the claim proceeded upon the fiction of an implied contractual obligation, Lord Mansfield CJ made clear at p 1012 that it was founded on essentially equitable considerations (in a non-technical sense):

> "This kind of equitable action, to recover back money, which ought not in justice to be kept, is very beneficial, and therefore much encouraged.  It lies only for money which, ex aequo et bono, the defendant ought to refund . . . In one word, the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money."

78   Consistently with that approach, in *Marks v Feldman* LR 5 QB 275, as mentioned earlier, the appropriate remedy was held to be an action for money had and received.  Kelly CB stated at p 281 that:

> "if originally the fraudulent preference had consisted in the payment of a sum of money into the hands of the defendant, it can hardly be disputed, unless indeed we at once abrogate the law as to fraudulent preferences, that an action for money had and received could have been maintained against the favoured creditor".

79   Following the abolition of the forms of action, the basis of such a claim was usually described as quasi-contract.  Thus in *Rousou's Trustee v Rousou* [1955] 3 All ER 486, in the passage cited at para 66 above, Danckwerts J explained that the right to re-transfer or repayment arose from the fact that, once the transaction had been set aside, the property or money was wrongfully in the hands of the person who had it and therefore became re-transferable or repayable to the successful party.  As authority for this "quasi-contractual right", as he described it, he cited *Moses v Macferlan*.  The claim in *In re Leslie Engineers Co Ltd* [1976] 1 WLR 292 was also for money had and received: see at p 299.  In more recent times, following the lead given by Lord Wright in *Fibrosa Spolka Akcyjna v Fairbairn Lawson Combe Barbour Ltd* [1932] AC 32, the basis of this type of claim to restitution has been described as unjust enrichment; but the legal substance of the claim remains as it was.

80   It may not be immediately obvious how the claim for restitution in a case such as the present fits the academic model of unjust enrichment which was adopted by Lord Steyn in *Banque Financière de la Cité v Parc*

© 2019 The Incorporated Council of Law Reporting for England and Wales

A  *(Battersea) Ltd* [1999] 1 AC 221, 227: a model which may not, however, readily accommodate all the situations where personal claims lie for restitution, and should not become a Procrustean bed.  The reason why the law requires the repayment of the money to the liquidators (subject to possible defences) is the injustice of SEB's benefiting from the avoided payment at the expense of the company's creditors.  In Lord Mansfield CJ's words, it is money which ought not in justice to be kept.  The injustice lies

B  not between the company and SEB, since the company received in full the quid pro quo for which the payment was made, namely the redemption of SEB's shares, and that is not undone by the avoidance of the payment.  Nor would restitution benefit the company, since in the winding up it has no beneficial interest in its assets, which the office holder holds on trust for the creditors in accordance with the statutory insolvency scheme.  But

C  restitution of the money to the assets available for distribution by the liquidators among the company's creditors is necessary to complete the process of undoing the unfair advantage which SEB obtained at their expense.  The common law therefore imposes an obligation on SEB to repay the money, with a corresponding right to rank as a creditor for the amount owed to it, but only upon repayment: see *Cherry v Boultbee* (1839) 4 My & Cr 442.

D  81    Counsel for SEB resisted this conclusion on the ground that SEB had not been enriched by the payment.  Alternatively, they argued that SEB had a defence to the claim to restitution on the ground of change of position.  It is necessary to consider each of these contentions in turn.

        *Enrichment*

E  82    On a count for money had and received, it was necessary to establish that the defendant had received the money in question.  But there can be situations in which the receipt of the money is not in itself sufficient to establish that the law requires the defendant to repay it in the event that a mistake or a failure of consideration (or some other relevant factor) becomes apparent.  The defendant may, for example, have received the money merely

F  as an agent, and remitted it to his principal in accordance with his instructions.  The term "enrichment" has been employed in recent times in order to refine the analysis.

        83    SEB's argument that it was not enriched is based upon the fact that, as the judge found, it held the redeemable shares as a bare trustee for two Swedish mutual funds, namely Catella and HQ Solid.  The shares were issued to it expressly as the nominee of those funds, but it was (and was

G  entered in the company's register of members as) the legal owner of the shares.  As a trustee, SEB did not have any beneficial interest in the shares.  Accordingly, it is argued, SEB received the proceeds of the redemption of the shares as a bare trustee, and had no beneficial interest in them.  In these circumstances, it is argued, SEB was not enriched by the receipt of the money.

H  84    The principal authority cited in support of this contention is a dictum of Millett LJ in *Portman Building Society v Hamlyn Taylor Neck (a firm)* [1998] 4 All ER 202.  The defendants in that case were a firm of solicitors who had acted on behalf of the plaintiff building society.  In that capacity, they received a mortgage advance from the society and paid it initially into their client account, and then, in accordance with their

© 2019 The Incorporated Council of Law Reporting for England and Wales

instructions, to the vendor of the property being purchased by the building society's customer.  The building society subsequently brought a claim against the solicitors for restitution of the mortgage advance, on the ground that it had been paid to the solicitors under a mistake of fact.  The claim was struck out, and an appeal against that decision was dismissed.  As Millett LJ explained at p 208, the solicitors were the agents of the building society. They received the payment from their principal, held it to the order of their principal, applied it in accordance with their principal's instructions, and thereby obtained a good discharge.

85    SEB rely on Millett LJ's statement at p 206:

"In the present case the firm was not enriched by the receipt of the £92,100.  The money was trust money, which belonged in equity to the society, and was properly paid by the firm into its client account.  The firm never made any claim to the money.  It acknowledged that it was the society's money, held to the order of the society and it was applied in accordance with the society's instructions in exchange for a mortgage in favour of the society.  The firm did not receive the money for its own use and benefit, but to the society's use."

Those observations, it was submitted, apply equally to SEB's receipt of the redemption proceeds.  Since it received the money as a trustee, and had no beneficial interest in it, it was therefore not enriched by the receipt.

86    There are however some fundamental differences between that case and the present.  As has been explained, that was a case in which the defendant received the payment as an agent, and dealt with it in accordance with its principal's instructions, which created a trust of the kind recognised in *Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567.  Even if the defendant had been the agent of a third party to which it had remitted the money, rather than the agent of the plaintiff, any claim in restitution would have lain against its principal.  In that regard, Millett LJ stated, at p 207:

"The true rule is that where the plaintiff has paid money under (for example) a mistake to the agent of a third party, he may sue the principal whether or not the agent has accounted to him, for in contemplation of law the payment is made to the principal and not to his agent.  If the agent still retains the money, however, the plaintiff may elect to sue either the principal or the agent, and the agent remains liable if he pays the money over to his principal after notice of the claim.  If he wishes to protect himself, he should interplead.  But once the agent has paid the money to his principal or to his order without notice of the claim, the plaintiff must sue the principal."

87    That point is also illustrated by the case of *Challinor v Juliet Bellis & Co* [2015] EWCA Civ 59; [2015] 2 P & CR DG3, where the Court of Appeal considered that no claim in restitution lay against solicitors who had received a payment into their client trust account (again, a *Quistclose* type of trust) as an immediate loan to their client, and had then disbursed the money to or for the account of their client.  They had received the payment as agents, not principals, and had not been enriched by its receipt.  Agents may or may not act as trustees of moneys held for their principals, but they are not in either event enriched by payments made to them for the account of their principals.

© 2019 The Incorporated Council of Law Reporting for England and Wales

A   88   SEB, on the other hand, was not the agent of Catella or HQ Solid,
but was itself a registered shareholder in the company.  As the registered
holder of redeemable shares, SEB, not Catella or HQ Solid, was the person
entitled to be paid the proceeds of the redemption of the shares, and it was
the person to whom, in law, the payment was made.  It dealt with the
company as principal.  The fact that the company may be taken to have
known that SEB was a nominee for the funds is neither here nor there.  The
B   company was entitled and obliged, under the articles of association which
formed its contract with SEB, to deal with SEB as the legal owner of its
shares, and had no dealings with the underlying funds (which in any event
lacked legal personality, as explained below) or with the investors in them.

89   The question whether the recipient of a voidable preference is
enriched by the receipt does not therefore depend upon whether the recipient
C   receives the money as a trustee for someone else, or upon the terms of the
trust.  Although a bare trustee has a functional resemblance to an agent,
there are nevertheless material legal differences between a trustee and an
agent, which apply to bare trustees just as to other trustees.  A trustee who is
not also acting as an agent acts as a principal in transactions with third
parties, including the company in the present case.  It was, for example, SEB
D   which was owed the redemption moneys.  A trustee who is not acting as an
agent is enriched at common law by the payments which he receives, since
the common law ignores the equitable interest of the beneficiaries.  He can
accordingly be an appropriate defendant in an action for the restitution of
money paid to him as trustee.

90   These points are illustrated by the case of *In re Morant* [1924] 1 Ch
79, in which a trustee in bankruptcy sought to recover a preference avoided
E   under section 44(1) of the Bankruptcy Act 1914, which provided:

"Every conveyance or transfer of property, or charge thereon made,
every payment made, every obligation incurred, and every judicial
proceeding taken or suffered by any person unable to pay his debts as they
become due from his own money in favour of any creditor, or of any
person in trust for any creditor, with a view of giving such creditor, or any
F   surety or guarantor for the debt due to such creditor, a preference over the
other creditors, shall, if the person making, taking, paying or suffering the
same is adjudged bankrupt on a bankruptcy petition presented within
three months after the date of making, taking, paying or suffering the
same, be deemed fraudulent and void as against the trustee in the
bankruptcy."

G
The money in question had been paid to the agents of the creditor.  A claim
to repayment which was brought against them was rejected by
P O Lawrence J.  He observed at pp 86–87 that "the payment of a debt to an
authorized agent for the use of the creditor operates in law as a payment to
the creditor, and such a payment is, in my judgment, covered by the words in
section 44(1): 'every payment made . . . in favour of any creditor.' " Payment
H   to an agent was not payment to "any person in trust for any creditor": those
words, in the judge's view, had in contemplation the situation where a
"payment might be made to a trustee (either created ad hoc or existing under
some instrument) in such circumstances as would support the contention
that no payment had been made to the creditor himself": p 87.

© 2019 The Incorporated Council of Law Reporting for England and Wales

524
Skandinaviska Enskilda Banken AB v Conway (PC)                    [2019] 3 WLR

91    There are practical reasons, as well as the reasons of legal principle
which we have explained, why a trustee who acts as principal should be
regarded as being enriched by a payment which he receives in that capacity.
The alternative is to join the beneficiaries as defendants to the claim to
repayment; but that may often be inconvenient and expensive, if the
beneficiaries are numerous or difficult to trace.  It may even be impossible, if
for example the beneficiaries cannot be ascertained (as, for example, where
the trust confers wide discretionary powers, or where the beneficiaries are
ascertainable only on the occurrence of some future event).

92    The conclusion that a trustee is enriched by the receipt of money in
that capacity is consistent with the decision of the Divisional Court in *King v
Stewart* (1892) 66 LT 339, where money had been paid to the defendant
trustee in the mistaken belief that it was due under a contract between him
and the plaintiff.  The trustee was held to be the appropriate defendant,
although the money had been remitted by him to the cestui que trust.
A more recent illustration is *In re Thirty-Eight Building Ltd* [1999] 1 BCLC
416, a case brought under section 239 of the Insolvency Act 1986, where the
trustees of a pension fund, rather than the beneficiaries of the scheme, were
held to be the appropriate defendants.

93    There is also an analogy with the decision of the High Court of New
Zealand in *Springfield Acres Ltd v Abacus (Hong Kong) Ltd* [1994] 3 NZLR
502, where it was argued that a trustee could not be liable for the knowing
receipt of funds transferred in breach of a fiduciary duty, since it did not
receive the funds for its own benefit.  The contention was rejected.  Henry J
observed at p 511 that the trustee "was not merely an agent . . . and the fact
that it had fiduciary obligations itself to others in accounting for its use of the
funds is beside the point".  Another illustration is the case of *Port of Brisbane
Corpn v ANZ Securities Ltd* [2001] QSC 466; [2003] Qd R 661, in which
the defendant received money as a bare trustee before remitting it in
accordance with its instructions.  An argument that it had not been enriched
by the receipt of the money was advanced at first instance but rejected, and
authorities concerned with the position of agents were distinguished.  The
argument was not renewed on appeal, where the focus was on the defence of
change of position.

*Change of position: The relevant principles*

94    There remains the question whether a defence of change of position
is available.  The expression "change of position" has been employed in
recent times to describe one type of situation in which it may be unjust,
and therefore inappropriate in an action founded on essentially equitable
considerations, to allow a claim to restitution on the basis of unjust
enrichment.  This idea can be traced back to *Moses v Macferlan* 2 Burr 1005,
where after explaining that the action was equitable in nature, Lord
Mansfield CJ stated, at p 1011:

"This is equally beneficial to the defendant.  It is the most favourable
way in which he can be sued: he can be liable no further than the money
he has received; and against that, may go into every equitable defence,
upon the general issue; he may claim every equitable allowance; he may
prove a release without pleading it; in short, he may defend himself by

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    every thing which shows that the plaintiff, ex aequo et bono, is not entitled to the whole of his demand, or to any part of it."

95    Despite that broad statement, however, the defence of change of position has received only partial recognition in English law, as Lord Goff of Chieveley acknowledged in *Lipkin Gorman v Karpnale Ltd* [1991] 2 AC 548, 578. Lord Goff explained the general nature of the defence at p 580:

B
"At present I do not wish to state the principle any less broadly than this: that the defence is available to a person whose position has so changed that it would be inequitable in all the circumstances to require him to make restitution, or alternatively to make restitution in full."

C    Lord Goff was careful not to suggest that the defence was necessarily available in all cases of restitution, stating (ibid) that "it is not however appropriate in the present case to attempt to identify all those actions in restitution to which change of position may be a defence".

96    The counterpart of finding that it would be inequitable to require the defendant to repay the money which he received is that it would be inequitable for the plaintiff to pursue a claim for its recovery. That way of considering the matter has been adopted in a number of the authorities: see,
D    for example, the judgment of the Board in *Dextra Bank & Trust Co Ltd v Bank of Jamaica* [2002] 1 All ER (Comm) 193, para 38.

97    The potential importance of a defence of change of position is particularly evident in relation to claims to recover voidable payments long after they were received. In such a situation, the recipient may in good faith have parted irretrievably with the money, without notice of the risk of
E    avoidance. In such a case, it is possible that an order for restitution against the recipient would not in reality restore the position to what it was before the voidable payment was made, but would effectively leave the recipient worse off than if he had never received the money in the first place. Consistently with Lord Goff's explanation of the defence of change of position, one would therefore expect that a trustee, like any other innocent
F    recipient of money paid on a basis which has failed, might be excused from the obligation to repay it in such circumstances.

98    That general proposition gains support from the case of *Challinor v Juliet Bellis & Co* [2015] 2 P & CR DG3, where the Court of Appeal accepted that, if a claim in restitution had otherwise lain against an agent who had received moneys in trust and disbursed them in good faith to the beneficiary, a defence of change of position would have been available. The
G    availability of the defence was also accepted in the Australian case of *Port of Brisbane Corpn v ANZ Securities Ltd* [2001] QSC 466; [2003] Qd R 661, where the trustee recipient was found to have acted in good faith and to its detriment (if it was required to make restitution) in paying out the money in accordance with its instructions.

99    The question which arises, therefore, is whether the defence is
H    available to the recipient of a payment which constituted a voidable preference. In that regard, the primary argument of the liquidators is that section 145 creates a statutory entitlement to repayment which is unqualified, and that the common law relating to restitution is simply irrelevant. We have rejected that argument for the reasons explained earlier.

© 2019 The Incorporated Council of Law Reporting for England and Wales

100    Their alternative argument is that a defence of change of position is
inconsistent with the statutory aim of section 145, since it would subvert the
fundamental principle of pari passu distribution of an insolvent company's
assets. In support of this argument, they cite the article by Professor Sir Roy
Goode which was mentioned earlier (para 71 above). In that article, Sir Roy
accepted at p 303 that claims under sections 238 (transactions at an
undervalue), 239 (preferences) and 423 (transactions defrauding creditors)
of the Insolvency Act 1986 are based on unjust enrichment, but argued (as
he does also in his *Principles of Corporate Insolvency Law* (op cit),
para 13-144), that to allow a defence of change of position would be
inconsistent with the policy underlying those provisions, namely the
restoration of value to the company for the benefit of its creditors.

101    As we have explained, preferences were struck down by the courts
long before legislation was enacted to deal with them. The courts avoided
preferences, exercising common law powers, on the basis that the
preferential payment of one or more creditors would otherwise defeat the
intention of Parliament in enacting a statutory scheme for the distribution of
a bankrupt's assets, under which his ordinary creditors received equal
treatment. In doing so, the courts gave effect to a principle of public policy
which also underlies what has become known as the anti-deprivation rule
(that a person cannot effectively provide for his property to cease to form
part of his estate upon his bankruptcy), and what has become known as
the pari passu rule (that a party cannot effectively contract out of the
distribution of his estate in accordance with insolvency legislation). The
relevant principle was described by Lord Walker of Gestingthorpe JSC in
*Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd
(Revenue and Customs Comrs intervening)*) [2012] 1 AC 383, para 121, as
"a general principle of public policy which (in the traditional phrase)
prevents a fraud on the insolvency statutes". In other words, the common
law supports insolvency legislation by refusing to give effect to arrangements
which would defeat its operation.

102    Insolvency legislation itself now contains anti-avoidance provisions
designed to prevent the circumvention of the statutory scheme of
distribution of an insolvent individual's or company's estate among its
creditors. Sections 238, 239 and 423 of the Insolvency Act 1986 are
examples, which contain their own claw-back provisions, subject to
provisions for the protection of third parties in particular situations which
Parliament has specified. Section 145 of the Companies Law is another
example of an anti-avoidance provision. As has been explained, however, it
does not contain a claw-back provision, and therefore requires the
liquidator to rely on a common law right to recover the property or money
transferred to the preferred creditor, following the avoidance of the transfer
or payment.

103    The question which therefore arises in this case is whether, in the
context of a claim by a liquidator for the restitution of money paid to a
preferred creditor following the avoidance of the payment under
section 145, the common law gives priority to the operation of the statutory
scheme of distribution over the detrimental impact which recovery may have
upon the creditor against whom the claim is made.

104    The Board answers that question in the affirmative. As a matter of
principle, the well-established principle of public policy which is applied by

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    the courts so as to deny effect to arrangements in fraudem legis does not, of
its nature, pick and choose according to the detriment which may be suffered
by the defendant as a consequence of its operation.  As a matter of practice,
the court has not been referred to any judicial decision in which a change of
position has been held to be available as a defence to a claim brought at
common law for the recovery of a preference (our own researches have
disclosed one dictum, in *In re Morant* [1924] 1 Ch 79, 87, which does not
B    appear to have been cited in any subsequent English case).  It would be
remarkable if such a defence were in principle available, without its having
an established basis in centuries' worth of case law on insolvency.

105    That view derives support, in the first place, from the decision of
the Supreme Court in *Wilson v First County Trust Ltd (No 2)* [2004] 1 AC
816.  The case concerned a consumer credit agreement which had not been
C    executed in accordance with the relevant legislation.  The consequence,
under the legislation, was that the creditor could not recover the money
advanced.  An argument that the creditor was entitled to recover the money
at common law, on the ground of unjust enrichment, was rejected, since such
a result would defeat the intention of Parliament.    Lord Nicholls of
Birkenhead stated, at para 49:

D        "True, the Consumer Credit Act 1974 does not expressly negative any
    other remedy available to the lender, nor does it render an improperly
    executed agreement unlawful.  But when legislation renders the entire
    agreement inoperative, to use a neutral word, for failure to comply with
    prescribed formalities the legislation itself is the primary source of
    guidance on what are the legal consequences."

E    106    As Lord Nicholls noted at para 50, that result was consistent with
the approach adopted by the House of Lords in the earlier cases of *Orakpo v
Manson Investments Ltd* [1978] AC 95 and *Dimond v Lovell* [2002] 1 AC
384, which arose in similar circumstances, and where claims based on unjust
enrichment were likewise rejected.    In the latter case, Lord Hoffmann
observed at pp 397-398 that Parliament contemplated that a debtor might be
enriched consequential upon non-enforcement of an agreement pursuant to
F    the statutory provisions.  It was not open to the court to say this consequence
was unjust and should be reversed by a remedy at common law.    In the
present case also, given the absence of any trace of a defence of change of
position in centuries' worth of case law on the recovery of preferences, and
the absence from section 145 itself of any provision for the protection of
preferred creditors, we do not consider that it is open to the Board to
G    conclude that the legislature did not contemplate that the effect of
section 145 might be to enable preferential payments to be recovered from
their recipients, notwithstanding detrimental consequences.  Once that point
is reached, the position is clear: the Board cannot override the intention of
the legislature by providing a common law defence.

107    Further support for that conclusion can be derived from a number
of Canadian authorities.  They all display, in broad harmony with the views
H    of the courts below, a deep-seated disinclination to allow a change of
position defence to undermine recovery of voidable preferences for the
benefit of the general creditors.

108    In *Principal Group Ltd v Anderson* (1994) 29 CBR (3d) 216,
Cairns J rejected change of position as a defence to a voidable preference

claim under section 95 of the Bankruptcy and Insolvency Act 1985.  That    A
provided that payments made within three months prior to bankruptcy with
a view to preferring a creditor were to be "deemed fraudulent and void as
against the trustee in the bankruptcy".  The judge held first that it would be
contrary to public policy to permit that defence to succeed in relation to a
payment motivated by fraud, even though the recipients were innocent.
Secondly he held that, para 182:                                            B

> "To relieve the recipients of an obligation to repay these wrongfully
> received moneys would result in an unequal distribution of assets of a
> bankrupt among creditors with similar rank, and that, in turn, would be
> incompatible and inconsistent [with] the specific intent and purpose of the
> Bankruptcy and Insolvency Act".

109    On an appeal from that decision specifically concerning the    C
availability of change of position as a defence, sub nom *Ernst and Young Inc v
Anderson* (1997) 147 DLR (4th) 229, the Alberta Court of Appeal held that a
change of position defence could not be maintained where a statute placed a
public duty upon an office holder to make the relevant recoveries.  In so
holding, the court relied on the decision of the Board in *Maritime Electric Co
Ltd v General Dairies Ltd* [1937] AC 610, that an equitable estoppel could    D
not be pleaded as a bar to the performance of a statutory duty, and the
decision of the Supreme Court of Canada in *Kenora (Town) Hydro Electric
Commission v Vacationland Dairy Co-operative Ltd* 110 DLR (4th) 449
holding that the same approach should be applied to a defence of change of
position where it was incompatible with the performance of a statutory duty.
The court said, at p 233:                                                    E

> "In the present case, it cannot be doubted that the Act imposes in the
> clearest and most express and elaborate terms duties upon a trustee in
> bankruptcy of treating all the creditors equally and seeing that they are all
> paid pro rata.  All the provisions of that Act interlock closely.  Section 95
> and similar anti-avoidance sections are very detailed backstops to that
> scheme."

110    In the *Ernst and Young* case, the Alberta Court of Appeal also    F
identified at p 234 an additional reason why a defence of change of position
is inapt:

> "The whole idea of the defence of change of position is that the equity
> lies with the payee and not with the payor who wants to get back his
> payment.  But where a trustee in bankruptcy carries out a duty to sue to
> undo a fraudulent payment, it is difficult to say that change of position    G
> makes the trustee's suit inequitable."

That point was also emphasised in another Albertan case, *In re Titan
Investments Ltd Partnership* [2005] ABQB 637.  The case concerned
voidable preferences following the collapse of a Ponzi scheme.  The relevant
legislation, the Fraudulent Preferences Act 2000, provided that payments
with intent to prefer were to be void as against the creditor or creditors    H
injured, delayed, prejudiced or postponed, and afforded an individual
creditor the right to bring a class claim for recovery on behalf of all creditors.
The payments were not described as fraudulent.  The Bankruptcy and
Insolvency Act was still in force, but no trustee had been appointed by the

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    time of trial. Following Cairns J in the *Anderson* case, Hawco J said that it
would be contrary to public policy to allow the defence of change of position
to prevail where there had been fraud. He added at para 47 that any
consideration of equity with respect to the recipients of the preferences
would also have to include a consideration of equity with respect to the
underpaid creditors.

B    111    In these cases, a defence of change of position was denied partly on
the basis that the moneys received under a fraudulent preference were the
proceeds of fraud. We do not consider that that reasoning is in accordance
with modern English law about the nature of a voidable preference, or the
law of the Cayman Islands. But in both cases concern was also expressed
that to allow a change of position defence to a claim for the recovery of a
preferential payment would run counter to the statutory scheme for the
C    division of the insolvent company's property among its creditors, since in
the cases where it applied the anti-avoidance provision, under which
preferential payments are voidable, would be deprived of practical effect.
The reasoning also acknowledged that a claim designed to restore to a
company in liquidation the assets which ought to be available for
distribution among its creditors is different in nature from a conventional
claim to restitution of a benefit transferred from one individual to another by
D    a defective transaction. In the latter situation, it is the private interests of the
two parties which are mainly in issue, and the equitable considerations
requiring the benefit to be returned to the plaintiff can be cancelled out by
equitable considerations arising from a change of position on the part of the
defendant. In the former situation, on the other hand, the liquidator's claim
is brought in order to give effect to a statutory scheme which has been
E    enacted by the legislature mainly in the public interest for the protection of
creditors as a class.

112    In answer to those points, counsel for SEB have referred to some
recent decisions of English courts in which the considerations relevant to a
change of position defence have been treated as relevant also to the
application of provisions of the Insolvency Act 1986.

F    113    The case of *4Eng Ltd v Harper* [2010] 1 BCLC 176 concerned a
claim under section 423 of the Insolvency Act 1986, which deals with
transactions at an undervalue and gives the court a discretionary power to
make such order as it thinks fit for restoring the position to what it would
have been if the transaction had not been entered into. A change of position
was treated as being relevant to the exercise of that discretion. No change of
position was however established on the facts, as it was not proved that the
G    recipient of the money had used it for any purpose for which she would not
otherwise have used her own funds. In the later case of *BAT Industries plc v
Sequana SA* [2017] Bus LR 82, para 523, Rose J stated that the matters
referred to in *4Eng* were "relevant to the question of what is the appropriate
relief to be granted and do not provide a complete defence to the claim under
section 423".

H    114    The case of *Rose v AIB Group (UK) plc* [2003] 1 WLR 2791 was
concerned with section 127 of the Insolvency Act 1986 (quoted in para 69
above), which gives the court a discretionary power to validate dispositions
which would otherwise be avoided. Where a disposition is avoided, the
section is silent as to recovery of the property or payment in question, as was
explained earlier, and leaves it to the general law. In that context, it was

© 2019 The Incorporated Council of Law Reporting for England and Wales

accepted in *Rose* that a personal claim to restitution could be met by a    A
defence of change of position. Mr Nicholas Warren QC, sitting as a deputy
High Court judge, stated at para 41 that he did not know why the defence
should not be available in cases where, for instance, a creditor did not know
and could not have known of the existence of a winding up petition. He
observed that "in other cases where payments can be treated as void or ultra
vires, it is commonplace that restitution is available subject to restitutionary    B
defences". He contrasted section 127 with sections 238 and 239 (dealing
respectively with transactions at an undervalue and preferences), noting at
para 42 that, in contrast to the latter sections, no remedy was provided for
recovery under section 127 and the matter was left to the general law.
However, the defence failed on the facts, as the creditor was aware at the
time when it received the payment of the risk of its being invalidated under
section 127.    C

115    That approach has been followed in some other cases concerned
with restitution following avoidance under section 127: see, for example,
*Clark v Meerson* [2018] BPIR 661, para 47, and *Officeserve Technologies*
[2019] Ch 103, para 41. In the latter case Judge Paul Matthews, sitting as a
High Court judge, thought that there would have to be "some good policy
reason" why a change of position defence should not apply. In every case,    D
the defence has failed on the facts. A different approach was adopted, in
relation to section 284, in *In re D'Eye (A Bankrupt)* [2016] BPIR 883, where
the registrar commented at para 49 that "we are not in *Goff and Jones*
territory because we are not dealing with unjust enrichment generally but a
particular statutory regime".

116    The judgments in *4Eng Ltd v Harper* [2010] 1 BCLC 176 and *Rose
v AIB Group (UK) Ltd* [2003] 1 WLR 2791 have been criticised, for    E
example by Professor Sir Roy Goode in his *Principles of Corporate
Insolvency Law* (op cit), para 13-144. In his article "*4Eng v Harper*:
Restitution and Insolvency" (2011) 24 Insolvency Intelligence 91, Simon
Davenport QC argues that the wholesale recognition of a change of position
defence to recovery claims arising from statute and made in support of the
pari passu principle would be wrong in principle. He concludes that the fact
that rejection of such a defence "may lead sometime to 'harsh results' in the    F
language of Lord Goff is in the nature of the regime: the interests of the
general body of creditors are put above those of the individual recipient":
p 95.

117    This is not the occasion on which to decide whether or not the
reasoning in those cases was correct. They were not concerned with
voidable preferences, and the statutory provisions in question were    G
materially different from section 145 of the Companies Law. There is
however nothing in them which would lead the Board to doubt the
correctness of the conclusion which it has reached as a matter of principle in
the light of authorities such as *Wilson v First County Trust* [2004] 1 AC 816,
and which is supported by the Canadian authorities it has cited.

*The present case*    H

118    Given that conclusion, it is not strictly necessary for the Board to
consider whether a defence of change of position might otherwise have been
made out on the facts of the present case. It is however appropriate to make
some brief observations about the reasoning of the courts below on this

© 2019 The Incorporated Council of Law Reporting for England and Wales

531
[2019] 3 WLR                          Skandinaviska Enskilda Banken AB v Conway (PC)

A    point, particularly since concerns about that reasoning prompted the Board
to consider in such detail whether the defence was in principle available.

119    It is not suggested that SEB had the rights of indemnity against
beneficiaries which are available to a bare trustee under the common law.
SEB nevertheless had the supposed benefit of contractual indemnities from
the two Swedish funds, which were on their face designed to protect it from
claims by third parties, including the present claim by the liquidators.
B    Having heard expert evidence of Swedish law, the judge held that those
indemnities had from the outset been worthless, mainly because the two
funds lacked legal personality.  A main reason why the judge held (obiter)
that a change of position defence, if it had been available, would have failed,
and the sole reason why the Court of Appeal reached the same conclusion,
was that the effective cause of SEB being out of pocket if it had to repay
C    the liquidators was the ineffectiveness of its indemnities, rather than the
payment of the redemption proceeds to the two funds.  Martin JA, with
whom Morrison and Field JJA agreed, stated, at para 65:

> "It [i e SEB] claims to have changed its position by paying the proceeds
> to Catella and HQ Solid in circumstances where it now has no ability to
> recover them; but the position in fact was that it paid them over on
D    > terms that included contractual indemnities.  The deterioration in SEB's
> position stems not from its payment of the proceeds but from the fact that
> the indemnities have, according to the evidence, always been worthless.
> SEB's failure to procure a valuable indemnity or otherwise protect its
> position cannot be said to amount to a change of position sufficient to
> afford a defence to the preference claim."

E    The majority of the Board have serious reservations whether this is a correct
application of the principles which underlie the defence of change of
position.  It could be said, to the contrary, that the very fact that SEB paid
away the redemption proceeds without the protection of an effective
indemnity was the basis of its change of position.

F    120    The judge also gave as reasons for his conclusion that a change of
position defence would have failed the fact that SEB was, as trustee, obliged
to account to its beneficiaries in respect of redemption proceeds, and that, as
registered owner of the shares, it rather than its beneficiaries was the person
liable to repay a voidable preference.  Again the majority of the Board doubt
whether these points truly impact upon a change of position defence.  The
G    first wrongly assumes that a change of position must be voluntary, while the
second goes to the question whether SEB was enriched, as the Board has
already explained.

121    For the reasons we have explained, however, we consider that a
defence of change of position is in any event unavailable.

*Conclusion on change of position*

H    122    For the foregoing reasons, the Board has concluded that a claim to
restitution of the amount paid by the company to SEB cannot be met by a
defence of change of position.  As a consequence, the liquidators are in its
opinion entitled to recover from SEB the amount which they received and
remitted to the funds on whose behalf they were acting.

© 2019 The Incorporated Council of Law Reporting for England and Wales

532
Skandinaviska Enskilda Banken AB v Conway (PC)                    [2019] 3 WLR

*Postscript*                                                                    A

**123**   The Board should not depart from this case without acknowledging
that the rejection of a defence of change of position may be capable of
leading to harsh results.  That possibility has been recognised in recent times
in a number of jurisdictions.  In England and Wales, for example, the
provisions of the Insolvency Act 1986 dealing with transactions at an
undervalue, preferences and transactions defrauding creditors provide a      B
defence of bona fide purchase in order to protect third parties dealing with
the person who obtained property from the company: see sections 241(2)
and 425(2).  In New Zealand, section 296 of the Companies Act 1993 also
provides protection to the bona fide purchaser from the company's
transferee, and in addition provides the transferee himself with what
amounts to a statutory defence of change of position.  Whether it would be
desirable to provide a measure of protection under the law of the Cayman     C
Islands, either to creditors of the company or to third parties dealing with
such creditors, may be a question worthy of consideration, but is not a
matter for the Board.

*Illegality and public policy*

**124**   Although pleaded Mr Chivers did not press the Board with regard    D
to the contentions that his client should succeed because of illegality and
public policy.  The fact that the directing mind of the company was guilty of
a fraud does not render illegal the liquidators' attempts to recover payments
made unlawfully in the lead up to the insolvency.  On the contrary they are
discharging a legal duty to recover moneys owed properly to the company
and distribute these according to law among the creditors.  The cause of
action here of the liquidators is not founded on an illegal act but rather to   E
redress the unlawful acts of paying out to some creditors in preference to
others.  Similarly public policy dictates that the courts should assist the
liquidators in doing this.  There is no public policy reason to the contrary in
favour of SEB.

*Conclusion*                                                                   F

**125**   For all of the above reasons the Board will humbly advise Her
Majesty that this appeal should be dismissed.
**126**   The Board is obliged to counsel for their learned oral and written
arguments and to the solicitors for the careful and professional preparation
of the papers relating to the case.

SIR DONNELL DEENY (with whom LORD WILSON JSC agreed)                       G

**127**   I have expressed my own views in the judgment of the Board on the
issues on which we are agreed.  I acknowledge that the repayment issues
required considerable analysis and elucidation.  We are all agreed that the
appellant ("SEB") is not entitled in law to avail of a defence of change of
position to the claim by the liquidators, who, in any event, I do not consider
to be unjustly enriching themselves as they are seeking to recover funds      H
unlawfully dispersed and redistribute them to the creditors according to law.
I observe that SEB never sought to argue for delay on the part of the
liquidator as a defence.  I do not agree, with respect, with the "serious
reservations" of the majority as to the correctness of the findings of the

© 2019 The Incorporated Council of Law Reporting for England and Wales

A    Grand Court and Court of Appeal on this issue, as set out at paras 119–123 of the judgment of the Board.

128    SEB contends that in paying away the money to their clients they changed their position to their detriment. But they received the money on foot of their contractual relationship with their clients. They were registered shareholders in Weavering Macro Fixed Income Fund Ltd ("the company")

B    as part of that relationship. On foot of instructions from the clients they redeemed the shares and paid the money received into the accounts of their clients. I incline to the view that the Court of Appeal in Cayman were correct in holding that there was no change of position in that seamless process.

129    SEB will now be at a loss not due to a change of position but for a different reason. It believed that it had effective indemnities from its clients.

C    It called an expert in the relevant law, that of Sweden, Mr Alf-Peter Svensson, at the trial at first instance before Clifford J. But as he sets out in his judgment at paras 219 to 229 this witness gave evidence in cross-examination that, for reasons that the judge set out and accepted, these indemnities were "worthless". The judge found at para 223 that SEB "never had the ability" to recover on the indemnities. Neither client was a mark for

D    recovery by the time of the trial. But that was not the case in March 2009 when the company went into liquidation, yet no steps were taken by SEB to protect its position e g by freezing the moneys in the accounts of their client received from the company. This would be relevant if a defence existed as to the exercise of the court's discretion in relation to any such defence. The failure of SEB to take effective steps to protect itself would render it more equitable to let it bear the loss, rather than the shareholders in the company,

E    of which, in any event it was one.

130    The judge, at para 229, found that even if a defence of change of position was available to SEB it had not been established on the facts. The Court of Appeal agreed. I consider they were entitled to do so.

131    We are also agreed on the outcome of the issue regarding fraud but I arrive there by a slightly different route which I set out in this judgment.

F    My caveat reflects the approach to the issue of fraud tainting the net asset valuation ("NAV") of the company on the basis of which SEB received share redemption payments between December 2008 and February 2009 as set out in our main judgment.

132    SEB contends that the liquidators cannot recover against them because the payments were made to them on foot of a fraudulent assessment of the net asset value of the shares in December 2008. Its counsel relied on a

G    dictum of Lord Denning MR in *Campbell v Edwards* [1976] 1 WLR 403, 407, a contract case. "Fraud or collusion unravels everything."

133    The respondents point out that the assessment of the NAV was in fact carried out by PNC, not by Magnus Peterson. No criticism is made of PNC. Nor is there any allegation of fraud against the two directors of the company. But the matter does not end there.

H    134    PNC arrived at their NAV on the basis of information provided by Magnus Peterson. As found at first instance he was the controlling mind of the company. He had arranged an elaborate fraud with a related company to give the appearance of assets in the company which did not exist. The reality therefore is that the NAV was indeed tainted with fraud as it was

© 2019 The Incorporated Council of Law Reporting for England and Wales

based on calculations and claims which were fraudulent and provided by           A
Magnus Peterson.

135    What flows from fraud of this nature?  Does it render the NAV and
the payments to redeeming shareholders that were based on that NAV void
ab initio or voidable on application to the court?  Firstly, one notes that
article 34 of the articles of association expressly says that the NAV is binding
on all parties.  "The assets of the company shall be valued in accordance with           B
such policies as the directors may determine.  Any valuations made pursuant
to these articles shall be binding on all persons."

136    Secondly, the decision of the Board in *Fairfield Sentry Ltd v Migani*
[2014] 1 CLC 611 is of considerable assistance.  The Privy Council there was
concerned with a similar clause.  The company concerned had invested very
heavily in the funds run by Bernie Madoff.  It transpired that Madoff was
running a huge Ponzi scheme.  Mr Chivers QC points out that in that case           C
there was no finding of fact that the company was a party to Madoff's fraud.
It is to be contrasted with the situation here where the controlling mind was
a fraudster who largely, although not completely, guided the actions of the
administrator, as the judge at first instance found.  However the judgment of
Lord Sumption JSC in that case nevertheless has considerable relevance to
the facts before us.                                                              D

"3. It is inherent in a Ponzi scheme that those who withdraw their
funds before the scheme collapses escape without loss, and quite possibly
with substantial fictitious profits.  The loss falls entirely on those investors
whose funds are still invested when the money runs out and the
scheme fails.  Members of the fund who redeemed their shares before
18 December 2008 recovered the NAV which the directors determined to           E
be attributable to their shares on the basis of fictitious reports from
BLMIS.  The loss will in principle be borne entirely by those who were
still members of the fund at that date . . .

"22. The fund's case is that when article 10(2) defines the redemption
price as the NAV per share 'determined in accordance with article 11', it
means the NAV correctly determined by dividing the NAV of the fund by
the number of shares in issue in accordance with articles 11(1)[b], 11(2)           F
and 11(3).  If this is right, the same must be true of article 9(1)(c), which
fixes the subscription price by reference to the same provisions of
article 11.  The directors' determination of the NAV per share as at the
valuation day, under article 11, was not definitive according to this
analysis unless a certificate was issued pursuant to article 11(1)[c], and
that would happen only if the directors chose to issue one.                        G

"23. In the Board's opinion, this is an impossible construction.  If it
were correct, an essential term of both the subscription for shares and
their redemption, namely the price, would not be definitively ascertained
at the time when the transaction took effect, nor at the time when the
price fell to be paid.  Indeed, it would not be definitively ascertained for an
indefinite period after the transaction had ostensibly been completed,
because unless a certificate was issued it would always be possible to vary           H
the determination of the NAV per share made by the directors at the time
and substitute a different one based on information acquired long
afterwards about the existence or value of the assets.  This would not only
expose members who had redeemed their shares to an open-ended

© 2019 The Incorporated Council of Law Reporting for England and Wales

A  liability to repay part of the price received if it subsequently appeared that the assets were worth less than was thought at the time.  It would confer on them an open-ended right to recover more (at the expense of other members) if it later appeared that they were worth more.  Corresponding problems would arise out of the retrospective variation of the subscription price long after the shares had been allotted.  Indeed, it is
B  difficult to see how the directors could perform their duty under article 9(1)(b) not to allot or issue a share at less than the subscription price if the latter might depend on information coming to light after the allotment had been made."

137    I agree with the Board in the *Fairfield* case that a situation where a NAV, stated in the articles to be binding, was in fact to be retrospectively
C  fixed or altered would tend to render the operation of the company and its share dealing unworkable.  Even in a situation where there was fraud on the part of the company, that consideration would point against an automatic invalidity on the part of the transaction based on the false NAV, but would not prohibit a subsequent application to void the transaction.  While the *Fairfield* case is distinguishable on the facts the principles set out therein are
D  against the appellant.

138    Thirdly, it must be borne in mind that the extent of any fraud lying behind the statement of a NAV might vary enormously.  Here there was undoubtedly a major fraud but it is nevertheless apparent that the company had sufficient assets or credit to make payments to redeeming shareholders of some US$90m.  A NAV might have been influenced by a small or minimal fraud on the part of the employee who had misstated some part of the
E  company's assets.  It would be quite wrong that such a marginal factor should render all transactions based on that NAV void ab initio.

139    In my view the NAV was and is binding on all parties until and unless successful proceedings are brought before the Grand Court *by a party which has suffered loss* to have the NAV in a transaction based upon it avoided for fraud.

F  140    This approach would be consistent with Order 12, rule 2 of the Companies Winding Up Rules.  Martin JA at para 29 of the judgment of the Court of Appeal points out that section 112 of the Law applies only in the case of a solvent winding up but it does give a remedy for rectification of the register between members.  It does not assist SEB on the facts here.

141    It would be necessary for a party who wished to have the NAV declared void to bring proceedings to do so.  Those proceedings would be
G  against the persons responsible at that time for a company.  In this case that would be the joint liquidators.  But it would have to be on notice to those who would be impacted by a decision of the court to conclude that the NAV was properly voidable.  All the other persons who had sold on the basis of the allegedly fraudulent NAV would be entitled to be heard as a finding may adversely affect them.  Such persons are not before this court and were not
H  before the courts below.

142    On the facts of this case the conclusion that the NAV is voidable for fraud does not assist SEB.  They have not been defrauded.  On the contrary they received far more on behalf of their two clients than they were entitled to if an honest and accurate NAV had been stated at that time.  If SEB

536
**Skandinaviska Enskilda Banken AB v Conway (PC)**                    [2019] 3 WLR
**Sir Donnell Deeny**

brought proceedings and the NAV was set aside it would follow that the    A
payments made under that NAV to SEB would be ordered to be repaid.

143    The view that fraud unravels everything reflects in particular the
need for a court not to act as an engine of fraud assisting the fraudster
against his victim.  The courts will strive to compensate those who have
suffered loss as a result of fraud and to recover compensation from the
fraudster.  But that is not the situation here.  SEB received an inflated amount    B
for its shares.  It then chose to pass that money on without further ado to its
clients.  It was not defrauded.

144    On the other hand the liquidators are seeking to recover the
moneys from SEB and, we were told, some 24 other redeeming shareholders
in other proceedings, in order to distribute it in a lawful fashion amongst
all the shareholders who sought to redeem prior to 19 March 2009.
Presumably the shareholders who invested in the last months of the    C
company or chose not to redeem their shares will be left with nothing.

145    The Board is agreed that the fraud point does not assist SEB.

*Appeal dismissed.*

C_{OLIN} B_{ERESFORD}, *Barrister*
                                                                    D

────────
                                                                    E

                                                                    F

                                                                    G

                                                                    H

© 2019 The Incorporated Council of Law Reporting for England and Wales