669

A.C.                          The Mahkutai (P.C.)

A    purposes stated therein. It was common ground between the parties before
     their Lordships that, in the event of the shipowners' appeal being
     dismissed, the cross-appeal would not arise and the cargo owners should
     continue to be entitled to retain the letter of guarantee pursuant to the
     consent order. It follows that no order should be made on the cross-
     appeal, and their Lordships will humbly advise Her Majesty accordingly.

B        *Solicitors: Sinclair Roche & Temperley; Crump & Co.*

                                                              S. S.

C                              ————

                          [HOUSE OF LORDS]

D    WESTDEUTSCHE LANDESBANK GIROZENTRALE    RESPONDENT

                               AND

     ISLINGTON LONDON BOROUGH COUNCIL    .    .    APPELLANT

     1995   July 10, 11, 12, 13;      Lord Goff of Chieveley, Lord Browne-Wilkinson,
     1996   May 22                          Lord Slynn of Hadley, Lord Woolf
E                                           and Lord Lloyd of Berwick

     *Restitution—Quasi-contract—Moneys had and received—Lump sum
        paid by bank to local authority under interest rate swap agreement—
        Local authority making payments pursuant to agreement—
        Agreement ultra vires local authority—Balance of lump sum
        recovered by bank—Whether compound interest recoverable from
        date sum paid—Whether local authority holding moneys on resulting
F       trust—Whether equity to supplement bank's right to simple interest
        on common law claim*

         The parties entered into a 10-year interest rate swap agreement
     starting on 18 June 1987 based on a notional principal sum of
     £25m. Additionally, the plaintiff bank as the fixed rate payer paid
     the defendant council as the floating rate payer a lump sum of
     £2·5m. Pursuant to the agreement, the council made "interest"
G    payments in December 1987, June and December 1988 and June
     1989 to the bank totalling £1,354,474·07. On 1 November 1989
     the Divisional Court of the Queen's Bench Division held in an
     unrelated case that interest rate swap transactions by local
     authorities were ultra vires. Following that decision, the council
     made no more payments. The bank brought an action against the
     council claiming repayment of the balance of the £2·5m. amounting to
H    £1,145,525·93 plus interest from 18 June 1987. The judge gave
     judgment for the bank for the principal sum plus compound interest
     from 1 April 1990. The Court of Appeal dismissed an appeal by the
     council and allowed a cross-appeal by the bank against the judge's
     rejection of 18 June 1987 as the date from which interest should run.

670

**Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))**          **[1996]**

On appeal by the council against the award of compound     A
interest:—
*Held,* (1) that on a claim at common law for recovery of
moneys paid in pursuance of an ineffective contract the claimant
was entitled under section 35A of the Supreme Court Act 1981 to
simple interest only; that in the absence of fraud equity had never
awarded compound interest except against a trustee or other
person in a fiduciary position in respect of profits improperly
made; that the recipient of moneys under a contract subsequently     B
held void for mistake or as being ultra vires did not hold those
moneys on a resulting trust and it would be undesirable so to
develop the law of resulting trusts since to do so would give the
claimant a proprietary interest in the moneys and produce
injustice to third parties and commercial uncertainty; and that the
council was not otherwise in a fiduciary position vis-à-vis the
bank (post, pp. 690c–F, 698c–D, 700H–701A, c, 702D–E, 703E–F,     C
705A–B, 708E, 709F, 716E–F, 720G–H, 738B–C).
(2) Allowing the appeal (Lord Goff of Chieveley and Lord
Woolf dissenting), that it would be undesirable for equity to
award compound interest in aid of the bank's common law claim
for restitution having regard, inter alia, to the fact that Parliament
had twice since 1934 considered what interest should be awarded
on claims at common law and had expressly not authorised the
award of compound interest; and that, accordingly, the bank     D
should recover simple interest only as from 18 June 1987, the date
of accrual of its cause of action (post, pp. 713H–714B, 717B,
D–718B, D–E, 719A–C, 723D–E, 738A–E, 741F).
*President of India v. La Pintada Compania Navigacion S.A.*
[1985] A.C. 104, H.L.(E.) applied.
*Chase Manhattan Bank N.A. v. Israel-British Bank (London)
Ltd.* [1981] Ch. 105 considered.
*Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.) departed from.     E
Decision of the Court of Appeal [1994] 1 W.L.R. 938; [1994]
4 All E.R. 890 reversed.


The following cases are referred to in their Lordships' opinions:

*Afovos Shipping Co. S.A. v. R. Pagnan and Flli.* [1980] 2 Lloyd's Rep. 469
*Ames' Settlement, In re; Dinwiddy v. Ames* [1946] 1 Ch. 217; [1946] 1 All E.R. 689     F
*Arnott v. Redfern* (1826) 3 Bing. 353
*Attorney-General v. Alford* (1855) 4 De G.M. & G. 843
*B.P. Exploration Co. (Libya) Ltd. v. Hunt (No. 2)* [1979] 1 W.L.R. 783;
· [1982] 1 All E.R. 925
*Bankers Trust Co. v. Shapira* [1980] 1 W.L.R. 1274; [1980] 3 All E.R. 353,
C.A.
*Barnes v. Addy* (1874) L.R. 9 Ch.App. 244     G
*Birch v. Blagrave* (1755) 1 Amb. 264
*Burdick v. Garrick* (1870) L.R. 5 Ch.App. 233
*Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981]
Ch. 105; [1980] 2 W.L.R. 202; [1979] 3 All E.R. 1025
*Childers v. Childers* (1857) 1 De G. & J. 482
*Commissioner of Stamp Duties (Queensland) v. Livingston* [1965] A.C. 694;
[1964] 3 W.L.R. 963; [1964] 3 All E.R. 692, P.C.     H
*Cook, In re; Beck v. Grant* [1948] Ch. 212; [1948] 1 All E.R. 231
*De Havilland v. Bowerbank* (1807) 1 Camp. 50
*Diplock, In re; Diplock v. Wintle* [1948] Ch. 465; [1948] 2 All E.R. 318, C.A.
*Eddowes v. Hopkins* (1780) 1 Doug. 376

671

**A.C.**                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))

A
*Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C.
  32; [1942] 2 All E.R. 122, H.L.(E.)
*Gittins v. Steele* (1818) 1 Swan. 24; (1818) 1 Swan. 199
*Goldcorp Exchange Ltd., In re* [1995] 1 A.C. 74; [1994] 3 W.L.R. 199; [1994]
  2 All E.R. 806, P.C.
*Hadley v. Baxendale* (1854) 9 Exch. 341
*Hallett's Estate, In re; Knatchbull v. Hallett* (1880) 13 Ch.D. 696, C.A.

B
*Hazell v. Hammersmith and Fulham London Borough Council* [1990] 2 Q.B.
  697; [1990] 2 W.L.R. 1038; [1990] 3 All E.R. 33, C.A.; [1992] 2 A.C. 1;
  [1991] 2 W.L.R. 372; [1991] 1 All E.R. 545, H.L.(E.)
*Hungerfords v. Walker* (1989) 171 C.L.R. 125
*Johnson v. The King* [1904] A.C. 817, P.C.
*Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council* [1994]
  4 All E.R. 972

C
*Leslie (R.) Ltd. v. Sheill* [1914] 3 K.B. 607, C.A.
*Lipkin Gorman v. Karpnale Ltd.* [1987] 1 W.L.R. 987; [1992] 4 All E.R. 331;
  [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992] 4 All E.R. 512, H.L.(E.)
*London, Chatham and Dover Railway Co. v. South Eastern Railway Co.* [1893]
  A.C. 429, H.L.(E.)
*McCormick v. Grogan* (1869) L.R. 4 H.L. 82, H.L.(I.)
*Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B.
  391; [1989] 3 W.L.R. 563; [1989] 3 All E.R. 14, C.A.

D
*Montagu's Settlement Trusts, In re* [1987] Ch. 264; [1987] 2 W.L.R. 1192
*Moses v. Macferlan* (1760) 2 Burr. 1005
*Muller, In re; Cassin v. Mutual Cash Order Co. Ltd.* [1953] N.Z.L.R. 879
*Napier and Ettrick (Lord) v. Hunter* [1993] A.C. 713; [1993] 2 W.L.R. 42;
  [1993] 1 All E.R. 385, H.L.(E.)
*National Bank of Greece S.A. v. Pinios Shipping Co. No. 1* [1990] 1 A.C. 637;
  [1989] 3 W.L.R. 1330; [1990] 1 All E.R. 78, H.L.(E.)

E
*O'Sullivan v. Management Agency and Music Ltd.* [1985] Q.B. 428; [1984]
  3 W.L.R. 448; [1985] 3 All E.R. 351, C.A.
*Page v. Newman* (1829) 9 B. & C. 378
*Pavey & Matthews Pty. Ltd. v. Paul* (1987) 162 C.L.R. 221
*Practice Statement (Judicial Precedent)* [1966] 1 W.L.R. 1234; [1966] 3 All
  E.R. 77, H.L.(E.)
*President of India v. La Pintada Compania Navigacion S.A.* [1985] A.C. 104;
  [1984] 3 W.L.R. 10; [1984] 2 All E.R. 773, H.L.(E.)

F
*Quistclose Investments Ltd. v. Rolls Razor Ltd.* [1970] A.C. 567; [1968]
  3 W.L.R. 1097; [1968] 3 All E.R. 651, H.L.(E.)
*Scandinavian Trading Tanker Co. A.B. v. Flota Petrolera Ecuatoriana* [1983]
  2 A.C. 694; [1983] 3 W.L.R. 203; [1983] 2 All E.R. 763, H.L.(E.)
*Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.)
*Stocks v. Wilson* [1913] 2 K.B. 235

G
*Vandervell v. Inland Revenue Commissioners* [1967] 2 A.C. 291; [1967] 2 W.L.R.
  87; [1967] 1 All E.R. 1, H.L.(E.)
*Vandervell's Trusts (No. 2), In re* [1974] Ch. 269; [1974] 3 W.L.R. 256; [1974]
  3 All E.R. 205, C.A.
*Vinogradoff, In re; Allen v. Jackson* [1935] W.N. 68
*Wadsworth v. Lydall* [1981] 1 W.L.R. 598; [1981] 2 All E.R. 401, C.A.
*Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373; [1975] 2 W.L.R. 389; [1975]
  1 All E.R. 849, C.A.

H
*West Sussex Constabulary's Widows, Children and Benevolent (1930) Fund
  Trusts, In re* [1971] Ch. 1; [1970] 2 W.L.R. 848; [1970] 1 All E.R. 544
*Woolwich Equitable Building Society v. Inland Revenue Commissioners* [1993]
  A.C. 70; [1992] 3 W.L.R. 366; [1992] 3 All E.R. 737, H.L.(E.)

672

**Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))**                    [1996]

The following additional cases were cited in argument:                    A

*Alati v. Kruger* (1955) 94 C.L.R. 216
*Barclays Bank Ltd. v. W. J. Simms Son & Cooke (Southern) Ltd.* [1980] Q.B.
    677; [1980] 2 W.L.R. 218; [1979] 3 All E.R. 522
*Bishopsgate Investment Management Ltd. v. Homan* [1995] Ch. 211; [1994]
    3 W.L.R. 1270; [1995] 1 All E.R. 347, C.A.
*Craven-Ellis v. Canons Ltd.* [1936] 2 K.B. 403; [1936] 2 All E.R. 1066, C.A.
*Cundy v. Lindsay* (1878) 3 App.Cas. 459, H.L.(E.)                        B
*El Ajou v. Dollar Land Holdings Plc.* [1993] 3 All E.R. 717; [1994] 2 All E.R.
    685, C.A.
*General Tire & Rubber Co. v. Firestone Tyre & Rubber Co. Ltd.* [1975]
    1 W.L.R. 819; [1975] 2 All E.R. 173, H.L.(E.)
*Guardian Ocean Cargoes Ltd. v. Banco do Brasil S.A. (No. 3)* [1992] 2 Lloyd's
    Rep. 193
*International Railway Co. v. Niagara Parks Commission* [1941] A.C. 328; [1941]   C
    2 All E.R. 456, P.C.
*Mathew v. T. M. Sutton Ltd.* [1994] 1 W.L.R. 1455; [1994] 4 All E.R. 793
*Norwich Union Fire Insurance Society Ltd. v. Wm. H. Price Ltd.* [1934] A.C.
    455, P.C.
*Reg. v. Shadrokh-Cigari* [1988] Crim.L.R. 465, C.A.
*Vyse v. Foster* (1872) L.R. 8 Ch.App. 309; (1874) L.R. 7 H.L. 318, H.L.(E.)

                                                                         D
APPEAL from the Court of Appeal.
    This was an appeal by the defendant, Islington London Borough
Council, by leave of the House of Lords from the decision of the Court
of Appeal (Dillon, Leggatt and Kennedy L.JJ.) on 17 December 1993
dismissing an appeal by the council and allowing a cross-appeal by the
plaintiff bank, Westdeutsche Landesbank Girozentrale, from the order of
Hobhouse J. on 12 February 1993 giving judgment for the bank in the     E
sum of £1,145,525·93 with compound interest from 1 April 1990 totalling
£446,368·81. The bank's cross-appeal related to the date from which
compound interest should run; the Court of Appeal ordered that it should
run from 18 June 1987, thus totalling £1,358,098·57 as at the date of the
judge's judgment.
    The Court of Appeal refused the council leave to appeal from its     F
decision, but on 23 May 1994 the Appeal Committee of the House of
Lords (Lord Goff of Chieveley, Lord Browne-Wilkinson and Lord
Mustill) allowed a petition by it for leave.
    The facts are stated in their Lordships' opinions.

    *Trevor Philipson Q.C.* and *Brian Doctor* for the council. Both parties
accept that compound, as opposed to simple, interest is payable only if   G
the council received the money under the void interest rate swaps
agreement as fiduciary: see *President of India v. La Pintada Compania
Navigacion S.A.* [1985] A.C. 104, 116.
    The bank contends that where the sole legal basis on which the
property in money purportedly passed is non-existent (as where money is
paid under an ultra vires contract or by mistake) there is a separation of
the legal title in the money, which passes to the recipient, and the equitable   H
title, which remains in the original owner. That contention would apply
to the position of the revenue in *Woolwich Equitable Building Society v.
Inland Revenue Commissioners* [1993] A.C. 70, the charities in *In re*

673

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))

A   *Diplock; Diplock v. Wintle* [1948] Ch. 465, the building society in *Sinclair v. Brougham* [1914] A.C. 398 and the bank in *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105. But if the recipients were all fiduciaries simply because the legal basis for their receipt of money was non-existent there would never have been any doubt that they had to account for the money.

B   According to the analysis in *Sinclair v. Brougham* the council received the money as an innocent volunteer. If the analysis in *Sinclair v. Brougham* is not followed and/or applied to this case, the council received the money in circumstances where the bank did not retain equitable title in the money; alternatively, even if it did, the council was not constituted a "fiduciary" for the purposes of the question whether it is liable to pay compound interest. However, even if the council was in the position of a

C   fiduciary, the fact that it was justifiably ignorant of that status should preclude it from having to account for profits or pay compound interest for any period before it could reasonably have been expected to have become aware of such status. Even if that is incorrect, there is a distinction to be made between accounting for profits and paying compound interest on the one hand and the saving of expenses that the council might otherwise have incurred if it had had to borrow the money elsewhere. No

D   authority was cited in support of that extension of the obligation of a fiduciary to account by either Hobhouse J. or the Court of Appeal. The Court of Appeal relied on *Sinclair v. Brougham* for the proposition that the payment of money pursuant to an ultra vires contract made the recipient a fiduciary in respect of the money. However, in that case the building society was held to be not a fiduciary but an innocent volunteer:

E   see pp. 422–423, 445–456, 452–453 and *In re Diplock; Diplock v. Wintle*, at pp. 529–532, 544 and 547E. Like the council the building society was unaware at the time when the contracts were concluded that they were ultra vires. If, however, in *Sinclair v. Brougham* it was possible to construe the handing over of the money to the directors as being for a purpose (to invest in a lawful banking business) that failed, in the present case the bank can have had no purpose at all in handing over the money to the

F   council other than to give it completely and irrevocably to the council to do with it what it wished. A finding that the council was a fiduciary might mean that the council would have to account for any profits made with the money, despite the fact that the money was given to it out-and-out and that before it issued its writ the bank did not seek the return of the money but instead sought the further performance of the contract. The

G   bank would have been a preferred creditor in respect of the money if the council or a person in its position had become insolvent: *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105. A payer able to frame his claim in equity might be able to avoid a change of position defence and/or a defence of limitation. *Sinclair v. Brougham* is not authority for such startling propositions. Viscount Haldane L.C. does not say that the building society was in the position of a trustee. Nor does

H   the case support the bank's proposition that the separation of the legal from the equitable interest necessarily imports a trust.

[LORD GOFF OF CHIEVELEY. Their Lordships wish to hear argument as to whether *Sinclair v. Brougham* was correctly decided.]

674

If *Sinclair v. Brougham* is authority for the proposition that a person    A
who receives money under an ultra vires transaction without knowledge
of that fact does so as a fiduciary liable to pay compound interest, then it
ought to be departed from.

Complex issues arise in relation to the position of a "fiduciary" on
bankruptcy: however desirable it may be to fashion remedies in such a
situation, the complexities cannot be avoided, nor can the problems be    B
solved, by labelling the payee of money in a situation such as the present
as a "fiduciary". This was a commercial contract that envisaged that on
payment the money would become the property of the council, which
could do with it as it pleased: see *In re Goldcorp Exchange Ltd.* [1995]
1 A.C. 74, 98A–F, 100D–101E, 102G–103E and *Goff & Jones, The Law of
Restitution*, 4th ed. (1993), pp. 94–96 and 541, n. 24b. If the council was a
fiduciary, it was not in breach of its fiduciary duty by retaining and    C
spending the money. It is irrelevant whether the bank can trace the
property into the council's hands on the basis of ownership. The unwitting
use of someone else's property does not give rise to a breach of trust.

The equitable jurisdiction to award compound interest is exercisable if
money has been withheld or misapplied by a trustee or anyone else in a
fiduciary position. If the council was not in a fiduciary position on receipt    D
of the money, that removes the basis of the order for payment of
compound interest. (No one suggested that it became a fiduciary when it
failed to pay. If that were so, every overdue debtor would be a fiduciary
liable to compound interest.) However, even if the council was a fiduciary
the Court of Appeal applied the wrong test in determining whether the
circumstances were such that compound interest was appropriate. The
cases cited by Dillon L.J. [1994] 1 W.L.R. 938, 949–950 and Leggatt L.J.,    E
at pp. 953–954, show that the courts have consistently justified an award
of compound (as opposed to simple) interest not by way of punishing the
fiduciary for making use of the plaintiff's money but on the basis that it
represents the profit that the fiduciary has made or is presumed to have
made from use of the principal sum. Compound interest is given not to
compensate for loss of profit but to ensure as far as possible that the    F
defendant retains no profit for which he ought to account: see *Burdick v.
Garrick* (1870) L.R. 5 Ch.App. 233, 241 and *Wallersteiner v. Moir
(No. 2)* [1975] Q.B. 373, 406. It depends on the evidence as to what the
accounting party has done or can be presumed to have done with the
money (see *Wallersteiner v. Moir (No. 2)*, at p. 406 and *Burdick v.
Garrick*, at pp. 241 and 243–244), but if it is established that he has used    G
the money in ordinary trade the court will presume that the accounting
party has made that amount of profit that persons ordinarily do make in
trade: see *Burdick v. Garrick*, at p. 242, *Wallersteiner v. Moir (No. 2)*, at
pp. 397E–F, 398F, 406F; *O'Sullivan v. Management Agency and Music
Ltd.* [1985] Q.B. 428, 461F–G and *Guardian Ocean Cargoes Ltd. v. Banco
do Brasil S.A. (No. 3)* [1992] 2 Lloyd's Rep. 193, 198. Whether his object    H
is personal or proprietary is irrelevant. There is no evidence that the
council earned compound interest on the money or used it in a trade. The
basis of the Court of Appeal's decision was that it had had a benefit from
the money by being relieved of the obligation to pay compound interest

675

A.C.                Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))

A  on the money that it would otherwise have had to borrow. That in
accordance with the test as laid down in the authorities.

As to the date from which interest should run, the prima facie rule in
*B.P. Exploration Co. (Libya) Ltd. v. Hunt (No. 2)* [1979] 1 W.L.R. 783,
846 was plainly applied by the Court of Appeal in the context of
compound interest. The court took the view that, because the obligation
to repay ran from the date of payment, the interest too ran from that
B  date. That is unattractive. If simple interest is awarded the dictum of Lord
Wilberforce in *General Tire & Rubber Co. v. Firestone Tyre & Rubber Co.
Ltd.* [1975] 1 W.L.R. 819, 836H is of some force. Until the decision in
*Hazell v. Hammersmith and Fulham London Borough Council* [1990] 2 Q.B.
697; [1992] 2 A.C. 1, both parties considered the agreement as binding
and the bank neither demanded nor expected that it would be repaid its
C  capital sum. There is no evidence that the bank would have agreed to the
termination of the contract before the Divisional Court's decision in
*Hazell's* case, and there is evidence that it went on demanding performance
pursuant to the contract even after the House of Lords gave judgment in
that case until it issued its writ in April 1991. The time at which persons
acting honestly and reasonably would have paid is no earlier than the date
D  of the Divisional Court's judgment, alternatively 1 April 1990 (the date
chosen by Hobhouse J.), alternatively, a date just after the House of
Lords had settled the law. No other recent case has sought to expand the
old principles; they have simply been applied. [Reference was made to
*Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council*
[1994] 4 All E.R. 972.]

E  *Jonathan Sumption Q.C.* and *George Leggatt* for the bank. Any civilised
system of law is bound to provide remedies for "unjust enrichment or
unjust benefit:" see *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe
Barbour Ltd.* [1943] A.C. 32, 61 and *Woolwich Equitable Building Society
v. Inland Revenue Commissioners* [1993] A.C. 70, 197, 202. The benefit that
the council gained from the upfront payment is not limited to the net
principal sum that it failed to repay to the bank. It includes the enrichment
F  caused by having had the use of the money from the time of its receipt
until it was paid back: see *per* Hobhouse J. [1994] 4 All E.R. 890, 954C–D.
If the council had borrowed the money, it would in the commercial world
have done so at compound and not merely simple interest: see *National
Bank of Greece S.A. v. Pinios Shipping Co. No. 1* [1990] 1 A.C. 637. It
follows that to award no more than simple interest on the money received
by the council or to award interest for only part of the period for which
G  the council had the use of that money, would be to award less than full
restitution. Such a result would be inconsistent with legal principle.

Where money is paid either pursuant to a contract which is void, or
under a fundamental mistake of fact or law, the money is impressed in the
hands of the payee with a trust in favour of the payer. The payee is then
accountable to the payer not only for the principal but for the entire
H  benefit which he has obtained from his possession of the principal in the
intervening period. Compound interest may not be the measure of that
benefit in all cases, but in the present case an award of compound interest
was appropriate.

676

Where a payment is made under a contract which is void, no title to the money will pass: see *Cundy v. Lindsay* (1878) 3 App.Cas. 459. The position is the same where the contract is voidable and has been avoided ab initio: The property revests in the transferor as if it had never passed; if it cannot revest at law it will revest in equity: *Alati v. Kruger* (1955) 94 C.L.R. 216. Where, as here, the money is paid into a bank account in which it is mixed with the recipient's own money, the legal ownership of the money is lost by the payer: see *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548, 572D and *In re Hallett's Estate; Knatchbull v. Hallett* (1880) 13 Ch.D. 696, 717–718. In equity, however, it remains the property of the payer: see *Sinclair v. Brougham* [1914] A.C. 398, 418, 420, 423, 424, 441, 444 and *In re Diplock; Diplock v. Wintle* [1948] Ch. 465, 536–537.

An analogy can be drawn with the case of a payment made for a limited purpose that becomes incapable of fulfilment. The money is then held on a resulting trust for the payer: *In re Diplock*, pp. 540–541; *In re Ames' Settlement; Dinwiddy v. Ames* [1946] 1 Ch. 217 and *Quistclose Investments Ltd. v. Rolls Razor Ltd.* [1970] A.C. 567.

The separation of the legal from the equitable interest necessarily imports a trust: see *Sinclair v. Brougham*, at pp. 421, 441; *In re Diplock*, at pp. 530–531 and *Birks, An Introduction to the Law of Restitution* (1985), pp. 381–382. In the case of money paid under an ultra vires contract, this is so whether or not the money is still traceable to specific assets in accordance with the rule in *In re Hallett's Estate*. The application of this principle to a solvent defendant such as the council results in the bank recovering its property in full from the local authority's general assets. The rules of tracing were devised to work rough justice between the various victims of an insolvent fiduciary, not to enable the fiduciary himself to extinguish a claim against him in reliance on his own rearrangement of his assets: see *El Ajou v. Dollar Land Holdings Plc.* [1993] 3 All E.R. 717, 735J–736A and Hobhouse J. [1994] 4 All E.R. 890, 938F–J.

Quite apart from the proprietary claim, the bank also has a personal claim in equity to require the council to account for its property: *Snell's Equity,* 29th ed. (1990), pp. 284–287.

In *Sinclair v. Brougham* it was held that there was no personal claim in equity or at law, because to allow such a claim would be indirectly to enforce an invalid borrowing contract: see pp. 414, 418. This part of the decision has been subjected to powerful and justified criticism by Lord Wright *"Sinclair v. Brougham"* (1938) 6 C.L.J. 305. But even if correct it has no application to a restitutionary claim, whether at law or in equity, arising out of a void swap contract since such restitution would not be legally or financially equivalent to enforcement of the contract itself.

Hobhouse J. gave it as an alternative ground of his decision that, even if the invalidity of the swap contract had not given rise to an obligation to repay the money in equity, the mistake under which the premium was paid to the council by the bank was capable of doing so. This is correct. Where money (or other property) is transferred under a mistake as to a matter fundamental to the transferor's intention to pass ownership, the intention to transfer ownership is vitiated and title to the money does not pass to the recipient: *Norwich Union Fire Insurance Society Ltd. v.*

677

A.C.                Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))

A  *Wm. H. Price Ltd.* [1934] A.C. 455, 462–463. As Hobhouse J. observed, at p. 432J, it would be hard to think of a more fundamental mistake than the belief of a person paying money that he was doing so pursuant to a binding agreement when there was in reality no such agreement. The result in equity is the same as it is in the case of payments under a void contract. The payer retains the equitable interest in the money: *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105;

B  *Reg. v. Shadrokh-Cigari* [1988] Crim.L.R. 465 and *In re Goldcorp Exchange Ltd.* [1995] 1 A.C. 74, 103. It follows that he has the same proprietary and personal claims arising out of that state of affairs. As the law is presently understood, it would be an answer to a claim at common law founded on mistake that the mistake was one of law. However, there is no authority that could require the House of Lords to hold that the distinction between

C  mistakes of fact and law is relevant to a claim for equitable relief, and there is no justification in the generality of cases for the continued recognition of the distinction, even at common law.

The jurisdiction to award compound interest arises from the inherent powers of a court of equity. The award of compound interest can depend only on what measure of restitution the conscience of equity requires. The award of interest, whether simple or compound, is not punitive and does

D  not depend on proof of misfeasance. The fundamental principle on which equity exercises its inherent jurisdiction to award interest is that the defendant should not profit personally from having had the use of assets to which he had no right. He is therefore accountable for the benefit that he has derived from them or may be presumed to have derived from them: see *Attorney-General v. Alford* (1855) 4 De G.M & G. 843, 851; *Burdick v.*

E  *Garrick,* L.R. 5 Ch.App. 233, 241–242; *Vyse v. Foster* (1872) L.R. 8 Ch. App. 309; (1874) L.R. 7 H.L. 318; *In re Diplock; Diplock v. Wintle* [1948] Ch. 465; *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373, 388, 397; *Guardian Ocean Cargoes Ltd. v. Banco do Brasil S.A. (No. 3)* [1992] 2 Lloyd's Rep. 193 and *Mathew v. T. M. Sutton Ltd.* [1994] 1 W.L.R. 1455, 1461.

The relationship of the parties is relevant to whether interest should be awarded in equity, but not to the measure of that interest. The relationship

F  is very much wider than that of trust or analogous relationships: see *International Railway Co. v. Niagara Parks Commission* [1941] A.C. 328, 344–345 and *Halsbury's Laws of England*, 4th ed., vol. 32 (1980), p. 55, para. 109.

Reference was also made to the Report of the Law Commission, "Law of Contract: Report on Interest" (Law Com. No. 88) (1978) (Cmnd.

G  7229), paras. 8, 10, 21 and *President of India v. La Pintada Compania Navigacion S.A.* [1985] A.C. 104.

Every statutory intervention in the common law regarding interest has been not on general principle but to remedy some perceived defect. The exclusion of compound interest in section 35A of the Supreme Court Act 1981 is not relevant here even by analogy.

*Sinclair v. Brougham* reflected the received view in 1914 about money

H  had and received. The basis of the law of restitution has changed significantly since then. The House of Lords would not imply a contract to repay; also, repayment would have been tantamount to performance. It is desirable that that part of the decision in *Sinclair v. Brougham* should

678

be brought into line with modern thinking. *Sinclair v. Brougham* would  A
today be regarded as based on obsolete reasoning.

[Reference was made to *Goff & Jones, The Law of Restitution*, p. 5;
Lord Wright, *"Sinclair v. Brougham,"* 6 C.L.J. 305, 313 et seq.; *R. Leslie
Ltd. v. Sheill* [1914] 3 K.B. 607; *Craven-Ellis v. Canons Ltd.* [1936] 2 K.B.
403; *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.*
[1943] A.C. 32; *Pavey & Matthews Pty. Ltd. v. Paul* (1987) 162 C.L.R.  B
221; *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548 and *Woolwich
Equitable Building Society v. Inland Revenue Commissioners* [1993] A.C.
70.]

In considering whether to overrule *Sinclair v. Brougham* on the equity
point, the House of Lords should take into consideration that there are
more common law remedies today. However, it cannot be an objection to
recognising an equitable remedy that there is a common law remedy for  C
the same problem. One may assimilate the remedy. A wide range of
equitable remedies serve the interests of justice: see Lord Wright, *"Sinclair
v. Brougham,"* 6 C.L.J. 305; *Cundy v. Lindsay,* 3 App.Cas. 459; *Norwich
Union Fire Insurance Society Ltd. v. Wm. H. Price Ltd.* [1934] A.C. 455
and *Alati v. Kruger*, 94 C.L.R. 216.

Professor Birks's analysis in *An Introduction to the Law of Restitution*,  D
pp. 396 et seq., is correct. The analogy with resulting trusts is helpful.
There is no reason to distinguish between cases where the purpose fails
afterwards and those where it was always non-existent. [Reference was
made to *In re Ames' Settlement, Dinwiddy v. Ames* [1946] 1 Ch. 217; *Reg.
v. Shadrokh-Cigari* [1988] Crim.L.R. 465 and *Mathew v. T. M. Sutton Ltd.*
[1994] 1 W.L.R. 1455.]

As to notice, the council says that a person cannot be a trustee where  E
he does not know that he is one, but the only thing the council was
ignorant of here was the true construction of the Local Government Act
1972; it was not ignorant of any facts. [Reference was made to Birks, "No
Consideration: Restitution after Void Contracts" (1993) 23 W.A.L.R. 195
and *El Ajou v. Dollar Land Holdings Plc.* [1993] 3 All E.R. 717.]

The case for awarding interest from the date when the sum of £2·5m.  F
was received by the council, as the Court of Appeal held, was
overwhelming. Since the principle on which equity awards interest is to
prevent the defendant from profiting from the use of money to which it
had no right, effect can be given to the principle only by awarding interest
in respect of the whole period during which the defendant had the use of
the money: *Woolwich Equitable Building Society v. Inland Revenue
Commissioners* [1993] A.C. 70, 197D. This period ran from 18 June 1987,  G
when the council received the premium. Hobhouse J. did not award
interest from that date, on two grounds: (i) that both parties were
conducting themselves at that time on the basis that their contract was
valid; and (ii) that the bank was not in fact out of pocket at that time
because it had received an equivalent sum under its swap with Morgan
Grenfell & Co. Ltd. As to the first, it cannot be material that neither  H
party was initially aware that the contract between them was void. As to
the second ground, the bank's receipt of an equivalent sum of £2·5m.
under a separate contract with Morgan Grenfell was irrelevant. The swap

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))

A with Morgan Grenfell was res inter alios acta: see *per* Hobhouse J., at p. 948J and *Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council* [1994] 4 All E.R. 972, 985D.

The relevant period for the running of interest would be the same if it were to be awarded under section 35A of the Act of 1981: see *General Tire & Rubber Co. v. Firestone Tyre & Rubber Co. Ltd.* [1975] 1 W.L.R.

B 819, 841; *B.P. Exploration Co. (Libya) Ltd. v. Hunt (No. 2)* [1979] 1 W.L.R. 783, 845. No such reason for departing from the fundamental principle exists in this case.

*Philipson Q.C.* in reply. Having heard the bank's argument on the question of the correctness of *Sinclair v. Brougham* [1914] A.C. 398, and in view of the fact that only 26 minutes remain of the time allotted for the hearing of the appeal, the council does not wish to incur the cost of a

C further day's hearing on this question and is content to allow its submissions already made to stand as its argument. It will use the time remaining to address the bank's submissions on the jurisdiction of the court to award compound interest.

As Lord Brandon of Oakbrook said in *President of India v. La Pintada Compania Navigacion S.A.* [1985] A.C. 104, 116, there is no general

D discretion to award compound interest in equity. There is no broad principle that the defendant should not benefit from assets to which he has no right. The principle underlying the equitable jurisdiction of the court is that equity will ensure that the defendant will not make a profit from having the benefit of the money: see *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373. The bank failed to show that there was some such relationship as forbade the use of the money to the council's own purpose.

E If the council was a volunteer, no claim can be made against it. There is no personal claim in equity in a case like this against a volunteer. That requires knowledge on the part of the volunteer that he has received trust property: see *Lipkin Gorman v. Karpnale Ltd.* [1987] 1 W.L.R. 987. There is no proprietary claim, because the money was paid into a bank account that became exhausted. [Reference was also made to *Bishopsgate*

F *Investment Management Ltd. v. Homan* [1995] Ch. 211.]

Alternatively, if there is some proprietary claim derived from *Sinclair v. Brougham* (a right to trace), that is no basis for an award of compound interest. (If the asset is traced and has increased in value, it may be that the increase is recoverable: see *In re Diplock; Diplock v. Wintle* [1948] Ch. 465 and *Goff & Jones, The Law of Restitution,* p. 95.) The bank has to show that the council is a trustee or fiduciary in respect of these funds. It

G says that *Sinclair v. Brougham* shows that when money is paid under a void contract the equitable title is retained in the payer. That is wrong: see *Barclays Bank Ltd. v. W. J. Simms Son & Cooke (Southern) Ltd.* [1980] Q.B. 677. It is wrong to suggest that there was no intention to pass the property. That may perhaps be so in the case of an asset, but it is not so in the case of money: see Birks, "No Consideration: Restitution after

H Void Contracts," 23 W.A.L.R. 195 and W. J. Swadling, "Restitution for No Consideration" [1994] R.L.R. 73. There was no fundamental mistake here. The part of Lord Haldane's opinion in *Sinclair v. Brougham* that refers to tracing cannot be explained as if he thought that the building

680

A

society was a trustee. If it had been, it would have had to repay the money. In Lord Haldane's eyes it was an innocent volunteer.

Their Lordships took time for consideration.

B

22 May. LORD GOFF OF CHIEVELEY. My Lords, this appeal is concerned with a transaction known as an interest rate swap. Under such a transaction, one party (the fixed rate payer) agrees to pay the other over a certain period interest at a fixed rate on a notional capital sum; and the other party (the floating rate payer) agrees to pay to the former over the same period interest on the same notional sum at a market rate determined in accordance with a certain formula. Interest rate swaps can fulfil many purposes, ranging from pure speculation to more useful purposes such as the hedging of liabilities. They are in law wagers, but they are not void as such because they are excluded from the regime of the Gaming Acts by section 63 of the Financial Services Act 1986.

C

One form of interest rate swap involves what is called an upfront payment, i.e. a capital sum paid by one party to the other, which will be balanced by an adjustment of the parties' respective liabilities. Thus, as in the present case, the fixed rate payer may make an upfront payment to the floating rate payer, and in consequence the rate of interest payable by the fixed rate payer is reduced to a rate lower than the rate which would otherwise have been payable by him. The practical effect is to achieve a form of borrowing by, in this example, the floating rate payer through the medium of the interest rate swap transaction. It appears that it was this feature which, in particular, attracted local authorities to enter into transactions of this kind, since they enabled local authorities subject to rate-capping to obtain upfront payments uninhibited by the relevant statutory controls.

D

E

At all events, local authorities began to enter into transactions of this kind soon after they came into use in the early 1980s. At that time, there was thought to be no risk involved in entering into such transactions with local authorities. Financially, they were regarded as secure; and it was assumed that such transactions were within their powers. However, as is well known, in *Hazell v. Hammersmith and Fulham London Borough Council* [1992] 2 A.C. 1 your Lordships' House, restoring the decision of the Divisional Court [1990] 2 Q.B. 697, held that such transactions were ultra vires the local authorities who had entered into them. It is unnecessary for present purposes to examine the basis of that decision; though I wish to record that it caused grave concern among financial institutions, and especially foreign banks, which had entered into such transactions with local authorities in good faith, with no idea that a rule as technical as the ultra vires doctrine might undermine what they saw as a perfectly legitimate commercial transaction. There then followed litigation in which banks and other financial institutions concerned sought to recover from the local authorities with which they had dealt the balance of the money paid by them, together with interest. Out of the many actions so commenced, two were selected as test cases. These were the present case, *Westdeutsche Landesbank Girozentrale v. Islington Borough Council*, and *Kleinwort Benson Ltd. v. Sandwell Borough Council*. Both

F

G

H

A.C.    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))    Lord Goff
of Chieveley

A   cases came on for hearing before Hobhouse J. [1994] 4 All E.R. 890. Your
Lordships are concerned only with the former case. In a powerful
judgment Hobhouse J. held that the plaintiffs ("the bank") were entitled
to recover from the defendants ("the council") the net balance outstanding
on the transaction between the parties, viz. the difference between the
upfront payment of £2·5m. paid by the bank to the council on 18 June
1987, and the total of four semi-annual interest payments totalling

B   £1,354,474·07 paid by the council to the bank between December 1987
and June 1989, leaving a net balance of £1,145,525·93 which the judge
ordered the council to pay to the bank. He held the money to be
recoverable by the bank either as money had and received by the council
to the use of the bank, or as money which in equity the bank was entitled
to trace into the hands of the council and have repaid out of the council's

C   assets. He decided that the bank's right to restitution at common law
arose from the fact that the payment made by the bank to the council was
made under a purported contract which, unknown to both parties, was
ultra vires the council and so void, no consideration having been given for
the making of the payment. The decision by the judge, which was affirmed
by the Court of Appeal [1994] 1 W.L.R. 938, raised important questions
in the law of restitution, which are of great interest to lawyers specialising

D   in this field. Yet it is an extraordinary feature of the present appeal to
your Lordships' House that the judge's decision on the substantive right
of recovery at common law does not fall for consideration by your
Lordships' House. The appeal of the council is confined to one point
only—the question of interest.

The judge ordered that the council should pay compound interest on

E   the sum awarded against them, calculated at six-monthly rests from
1 April 1990 to the date of judgment. The Court of Appeal affirmed the
judge's decision to award compound interest but, allowing a cross-appeal
by the bank, ordered that interest should run from the date of receipt of
the upfront payment. Both the judge and the Court of Appeal held that
they were entitled to invoke against the council the equitable jurisdiction
to award compound interest, on the basis that the bank was entitled to

F   succeed against the council in an equitable proprietary claim. The
foundation for the bank's equitable proprietary claim lay in the decision
of this House in Sinclair v. Brougham [1914] A.C. 398. Since that decision
has for long been controversial, the Appellate Committee invited argument
on the question whether the House should depart from the decision
despite the fact that it has stood for many years.

G
The shape of the case

Once the character of an interest swap transaction has been identified
and understood, and it is appreciated that, because the transaction was
beyond the powers of the council, it was void ab initio, the basic question
is whether the law can restore the parties to the position they were in
before they entered into the transaction. That is, of course, the function

H   of the law of restitution. I feel bound to say that, in the present case, there
ought to be no difficulty about that at all. This is because the case is
concerned solely with money. All that has to be done is to order that each
party should pay back the money it has received—or, more sensibly, to

682

Lord Goff
of Chieveley          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

strike a balance, and order that the party who has received most should    A
repay the balance; and then to make an appropriate order for interest in
respect of that balance. It should be as simple as that. And yet we find
ourselves faced with a mass of difficult problems, and struggling to
reconcile a number of difficult cases.

I must confess that, like all the judges who have been involved in these
cases, I too have found myself struggling in this way. But in the end
I have come to realise the importance of keeping my eyes on the simple    B
outline of the case which I have just described; and I have discovered that,
if one does that—if one keeps one's eyes open above the thicket of case
law in which we can so easily become enclosed—the solution of the
problem in the present case becomes much more simple. In saying this,
I do not wish in any way to criticise the judges who have been grappling
with the case at first instance and in the Court of Appeal, within the    C
confines of the doctrine of precedent by which they are bound. On the
contrary, they are entitled to our gratitude and respect. The masterly
judgment of Hobhouse J., in particular, has excited widespread admiration.
But it is the great advantage of a supreme court that, not only does it
have the great benefit of assistance from the judgments of the courts
below, but also it has a greater freedom to mould, and remould, the
authorities to ensure that practical justice is done within a framework of    D
principle. The present case provides an excellent example of a case in
which this House should take full advantage of that freedom.

*The three problems*

There are three reasons why the present case has become so
complicated. The first is that, in our law of restitution, there has developed    E
an understanding that money can only be recovered on the ground of
failure of consideration if that failure is total. The second is that because,
in particular, of the well known but controversial decision of this House
in *Sinclair v. Brougham*, it has come to be understood that a trust may be
imposed in cases such as the present where the incapacity of one of the
parties has the effect that the transaction is void. The third is that our law    F
of interest has developed in a fragmentary and unsatisfactory manner, and
in consequence insufficient attention has been given to the jurisdiction to
award compound interest.

I propose at the outset to devote a little attention to each of these
matters.

(1) *Total failure of consideration*    G

There has long been a desire among restitution lawyers to escape from
the unfortunate effects of the so-called rule that money is only recoverable
at common law on the ground of failure of consideration where the failure
is total, by reformulating the rule upon a more principled basis; and signs
that this will in due course be done are appearing in judgments throughout
the common law world, as appropriate cases arise for decision. It is    H
fortunate however that, in the present case, thanks (I have no doubt) to
the admirable researches of counsel, a line of authority was discovered
which had escaped the attention of the scholars who work in this field.

683

**A.C.**　　　Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))　　　Lord Goff
of Chieveley

A　This line of authority was concerned with contracts for annuities which
were void if certain statutory formalities were not complied with. They
were not therefore concerned with contracts void by reason of the
incapacity of one of the parties. Even so, they were concerned with cases
in which payments had been made, so to speak, both ways; and the courts
had to decide whether they could, in such circumstances, do justice by
restoring the parties to their previous positions. They did not hesitate to

B　do so, by ascertaining the balance of the account between the parties, and
ordering the repayment of the balance. Moreover the form of action by
which this was achieved was the old action for money had and received—
what we nowadays call a personal claim in restitution at common law.
With this precedent before him, Hobhouse J. felt free to make a similar
order in the present case; and in this he was self-evidently right.

C　　　The most serious problem which has remained in this connection is the
theoretical question whether recovery can here be said to rest upon the
ground of *failure* of consideration. Hobhouse J. thought not. He
considered that the true ground in these cases, where the contract is void,
is to be found in the absence, rather than the failure, of consideration;
and in this he was followed by the Court of Appeal. This had the effect
that the courts below were not troubled by the question whether there had

D　been a total failure of consideration.
　　　The approach so adopted may have found its origin in the idea, to be
derived from a well known passage in the speech of Viscount Simon L.C.
in *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.* [1943]
A.C. 32, 48, that a failure of consideration only occurs where there has
been a failure of performance by the other party of his obligation under a
contract which was initially binding. But the concept of failure of

E　consideration need not be so narrowly confined. In particular it appears
from the annuity cases themselves that the courts regarded them as cases
of failure of consideration; and concern has been expressed by a number
of restitution lawyers that the approach of Hobhouse J. is contrary to
principle and could, if accepted, lead to undesirable consequences: see
Professor Birks, "No Consideration: Restitution after Void Contracts"

F　(1993) 23 W.A.L.R. 195; Mr. W. J. Swadling, "Restitution for No
Consideration" [1994] R.L.R. 73 and Professor Burrows, "Swaps and the
Friction between Common Law and Equity" [1995] R.L.R. 15. However
since there is before your Lordships no appeal from the decision that the
bank was entitled to recover the balance of the payments so made in a
personal claim in restitution, the precise identification of the ground of

G　recovery was not explored in argument before the Appellate Committee.
It would therefore be inappropriate to express any concluded view upon
it. Even so, I think it right to record that there appears to me to be
considerable force in the criticisms which have been expressed; and I shall,
when considering the issues on this appeal, bear in mind the possibility
that it may be right to regard the ground of recovery as failure of
consideration.

H
　　　(2) *A proprietary claim in restitution*

　　　I have already stated that restitution in these cases can be achieved by
means of a personal claim in restitution. The question has however arisen

684

Lord Goff
of Chieveley        Westdeutsche Bank v. Islington L.B.C. (H.L.(E:))        [1996]

whether the bank should also have the benefit of an equitable proprietary        A
claim in the form of a resulting trust. The immediate reaction must be—
why should it? Take the present case. The parties have entered into a
commercial transaction. The transaction has, for technical reasons, been
held to be void from the beginning. Each party is entitled to recover its
money, with the result that the balance must be repaid. But why should
the plaintiff bank be given the additional benefits which flow from a
proprietary claim, for example the benefit of achieving priority in the        B
event of the defendant's insolvency? After all, it has entered into a
commercial transaction, and so taken the risk of the defendant's
insolvency, just like the defendant's other creditors who have contracted
with it, not to mention other creditors to whom the defendant may be
liable to pay damages in tort.

I feel bound to say that I would not at first sight have thought that an        C
equitable proprietary claim in the form of a trust should be made available
to the bank in the present case, but for two things. The first is the decision
of this House in *Sinclair v. Brougham* [1914] A.C. 398, which appears to
provide authority that a resulting trust may indeed arise in a case such as
the present. The second is that on the authorities there is an equitable
jurisdiction to award the plaintiff compound interest in cases where the
defendant is a trustee. It is the combination of these two factors which        D
has provided the foundation for the principal arguments advanced on
behalf of the bank in support of its submission that it was entitled to an
award of compound interest. I shall have to consider the question of
availability of an equitable proprietary claim, and the effect of *Sinclair v.
Brougham*, in some depth in a moment. But first I wish to say a few words
on the subject of interest.        E

### (3) *Interest*

One would expect to find, in any developed system of law, a
comprehensive and reasonably simple set of principles by virtue of which
the courts have power to award interest. Since there are circumstances in
which the interest awarded should take the form of compound interest,
those principles should specify the circumstances in which compound        F
interest, as well as simple interest, may be awarded; and the power to
award compound interest should be available both at law and in equity.
Nowadays, especially since it has been established (see *National Bank of
Greece S.A. v. Pinios Shipping Co. No. 1* [1990] 1 A.C. 637) that banks
may, by the custom of bankers, charge compound interest upon advances
made by them to their customers, one would expect to find that the        G
principal cases in which compound interest may be awarded would be
commercial cases.

Sadly, however, that is not the position in English law. Unfortunately,
the power to award compound interest is not available at common law.
The power is available in equity; but at present that power is, for historical
reasons, exercised only in relation to certain specific classes of claim, in
particular proceedings against trustees for an account. An important—        H
I believe the most important—question in the present case is whether that
jurisdiction should be developed to apply in a commercial context, as in
the present case.

A.C.             Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))        Lord Goff
of Chieveley

A    *Equitable proprietary claims*

I now turn to consider the question whether an equitable proprietary claim was available to the bank in the present case.

Ever since the law of restitution began, about the middle of this century, to be studied in depth, the role of equitable proprietary claims in the law of restitution has been found to be a matter of great difficulty.

B    The legitimate ambition of restitution lawyers has been to establish a coherent law of restitution, founded upon the principle of unjust enrichment; and since certain equitable institutions, notably the constructive trust and the resulting trust, have been perceived to have the function of reversing unjust enrichment, they have sought to embrace those institutions within the law of restitution, if necessary moulding them to make them fit for that purpose. Equity lawyers, on the other hand,

C    have displayed anxiety that in this process the equitable principles underlying these institutions may become illegitimately distorted; and though equity lawyers in this country are nowadays much more sympathetic than they have been in the past towards the need to develop a coherent law of restitution, and to identify the proper role of the trust within that rubric of the law, they remain concerned that the trust concept

D    should not be distorted, and also that the practical consequences of its imposition should be fully appreciated. There is therefore some tension between the aims and perceptions of these two groups of lawyers, which has manifested itself in relation to the matters under consideration in the present case.

In the present case, however, it is not the function of your Lordships'

E    House to rewrite the agenda for the law of restitution, nor even to identify the role of equitable proprietary claims in that part of the law. The judicial process is neither designed for, nor properly directed towards, such objectives. The function of your Lordships' House is simply to decide the questions at issue before it in the present case; and the particular question now under consideration is whether, where money has been paid by a party to a contract which is ultra vires the other party and so void ab

F    initio, he has the benefit of an equitable proprietary claim in respect of the money so paid. Moreover the manner in which this question has arisen before this House renders it by no means easy to address. First of all, the point was not debated in any depth in the courts below, because they understood that they were bound by *Sinclair v. Brougham* [1914] A.C. 398 to hold that such a claim was here available. But second, the point has

G    arisen only indirectly in this case, since it is relevant only to the question whether the court here has power to make an award of compound interest. It is a truism that, in deciding a question of law in any particular case, the courts are much influenced by considerations of practical justice, and especially by the results which would flow from the recognition of a particular claim on the facts of the case before the court. Here, however, an award of compound interest provides no such guidance, because it is

H    no more than a consequence which is said to flow, for no more than historical reasons, from the availability of an equitable proprietary claim. It therefore provides no guidance on the question whether such a claim should here be available.

686

Lord Goff
of Chieveley                Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))              [1996]

In these circumstances I regard it as particularly desirable that your     A
Lordships should, so far as is possible, restrict the inquiry to the actual
questions at issue in this appeal, and not be tempted into formulating
general principles of a broader nature. If restitution lawyers are hoping to
find in your Lordships' speeches broad statements of principle which may
definitively establish the future shape of this part of the law, I fear that
they may be disappointed. I also regard it as important that your          B
Lordships should, in the traditional manner, pay particular regard to the
practical consequences which may flow from the decision of the House.

With these observations by way of preamble, I turn to the question of
the availability of an equitable proprietary claim in a case such as the
present. The argument advanced on behalf of the bank was that the
money paid by it under the void contract was received by the council
subject to a resulting trust. This approach was consistent with that of     C
Dillon L.J. in the Court of Appeal: see [1994] 1 W.L.R. 938, 947. It is also
consistent with the approach of Viscount Haldane L.C. (with whom Lord
Atkinson agreed) in *Sinclair v. Brougham* [1914] A.C. 398, 420–421.

I have already expressed the opinion that, at first sight, it is surprising
that an equitable proprietary claim should be available in a case such as
the present. However, before I examine the question as a matter of
principle, I propose first to consider whether *Sinclair v. Brougham* supports  D
the argument now advanced on behalf of the bank.

*Sinclair v. Brougham*

The decision of this House in *Sinclair v. Brougham* has loomed very
large in both the judgments in the courts below and in the admirable
arguments addressed to the Appellate Committee of this House. It has     E
long been regarded as a controversial decision, and has been the subject
of much consideration by scholars, especially those working in the field of
restitution. I have however reached the conclusion that it is basically
irrelevant to the decision of the present appeal.

It is first necessary to establish what the case was about. The Birkbeck
Permanent Benefit Building Society decided to set up a banking business,
known as the Birkbeck Bank. The banking business was however held to     F
be ultra vires the objects of the building society; and there followed a
spate of litigation concerned with solving the problems consequent upon
that decision. *Sinclair v. Brougham* was one of those cases.

The case has been analysed in lucid detail in the speech of my noble
and learned friend, Lord Browne-Wilkinson, which I have read (in draft)
with great respect. In its bare outline, it was concerned with the           G
distribution of the assets of the society, which was insolvent. There were
four classes of claimants. First, there were two classes of shareholders—
the A shareholders (entitled to repayment of their investment on maturity)
and the B shareholders (whose shares were permanent). Next, there was a
numerous class of people who had deposited money at the bank, under
contracts which were ultra vires and so void. Finally, there were the
ordinary trade creditors of the society. By agreement, the A shareholders   H
and the trade creditors were paid off first, leaving only the claims of the
depositors and the B shareholders. There were sufficient assets to pay off
the B shareholders, but not the depositors and certainly not both. The

687

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Goff
                                                                       of Chieveley

A   question of how to reconcile their competing claims arose for consideration
    on a summons by the liquidator for directions.

    The problem arose from the fact that the contracts under which the
    depositors deposited their money at the bank were ultra vires and so void.
    That prevented them from establishing a simple contractual right to be
    repaid, in which event they would have ranked with the ordinary trade
    creditors of the society in the liquidation. As it was, they claimed to be
B   entitled to repayment in an action for money had and received—in the
    same way as the bank claimed repayment in the case now before your
    Lordships. But the House of Lords held that they were not entitled to
    claim on this ground. This was in substance because to allow such a claim
    would permit an indirect enforcement of the contract which the policy of
    the law had decreed should be void. In those days, of course, judges still
C   spoke about the common law right to restitution in the language of
    implied contract, and so we find Lord Sumner saying in a much quoted
    passage, at p. 452:

        "To hold otherwise would be indirectly to sanction an ultra vires
        borrowing. All these causes of action are common species of the
        genus assumpsit. All now rest, and long have rested, upon a notional
D       or imputed promise to repay. The law cannot de jure impute promises
        to repay, whether for money had and received or otherwise, which, if
        made de facto, it would inexorably avoid."

    This conclusion however created a serious problem because, if the
    depositors had no claim, then, in the words of Lord Dunedin, at p. 436:

        "The appalling result in this very case would be that the society's
E       shareholders, having got proceeds of the depositors' money in the
        form of investments, so that each individual depositor is utterly
        unable to trace his money, are enriched to the extent of some 500 per
        cent."

    As a matter of practical justice, such a result was obviously unacceptable;
    and it was to achieve justice that the House had recourse to equity to
F   provide the answer. It is, I think, apparent from the reasoning of the
    members of the Appellate Committee that they regarded themselves, not
    as laying down some broad general principle, but as solving a particular
    practical problem. In this connection it is, in my opinion, significant that
    there was a considerable variation in the way in which they approached
    the problem. Viscount Haldane L.C., with whom Lord Atkinson agreed,
G   did so, at p. 421, on the basis that there arose in the circumstances "a
    resulting trust, not of an active character." Lord Dunedin based his
    decision upon a broad equity of restitution, drawn from Roman and
    French law. He asked himself the question, at p. 435: "Is English equity
    to retire defeated from the task which other systems of equity have
    conquered?"—a question which he answered in the negative. Lord Parker
    of Waddington, at pp. 441–442, attempted to reconcile his decision with
H   the established principles of equity by holding that the depositors' money
    had been received by the directors of the society as fiduciaries, with the
    effect that the depositors could thereafter follow their money in equity
    into the assets of the society. Lord Sumner, at p. 458, considered that the

688

Lord Goff
of Chieveley

Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

case should be decided on equitable principles on which there was no       A
direct authority. He regarded the question as one of administration, in
which "the most just distribution of the whole must be directed, so only
that no recognised rule of law or equity be disregarded." Setting on one
side the opinion of Lord Parker, whose approach I find very difficult to
reconcile with the facts of the case, I do not discern in the speeches of the
members of the Appellate Committee any intention to impose a trust
carrying with it the personal duties of a trustee.                           B

For present purposes, I approach this case in the following way. First,
it is clear that the problem which arose in *Sinclair v. Brougham*, viz. that
a personal remedy in restitution was excluded on grounds of public policy,
does not arise in the present case, which is not of course concerned with a
borrowing contract. Second, I regard the decision in *Sinclair v. Brougham*
as being a response to that problem in the case of ultra vires borrowing       C
contracts, and as not intended to create a principle of general application.
From this it follows, in my opinion, that *Sinclair v. Brougham* is not
relevant to the decision in the present case. In particular it cannot be
relied upon as a precedent that a trust arises on the facts of the present
case, justifying on that basis an award of compound interest against the
council.

But I wish to add this. I do not in any event think that it would be       D
right for your Lordships' House to exercise its power under the *Practice
Statement (Judicial Precedent)* [1966] 1 W.L.R. 1234 to depart from
*Sinclair v. Brougham*. I say this first because, in my opinion, any decision
to do so would not be material to the disposal of the present appeal, and
would therefore be obiter. But there is a second reason of substance why,
in my opinion, that course should not be taken. I recognise that nowadays     E
cases of incapacity are relatively rare, though the swaps litigation shows
that they can still occur. Even so, the question could still arise whether, in
the case of a borrowing contract rendered void because it was ultra vires
the borrower, it would be contrary to public policy to allow a personal
claim in restitution. Such a question has arisen in the past not only in
relation to associations such as the Birkbeck Permanent Benefit Building
Society, but also in relation to infants' contracts. Moreover there is a       F
respectable body of opinion that, if such a case arose today, it should still
be held that public policy would preclude a personal claim in restitution,
though not of course by reference to an implied contract. That was the
opinion expressed by Leggatt L.J. in the Court of Appeal in the present
case [1994] 1 W.L.R. 938, 952E–F, as it had been by Hobhouse J.; and the
same view has been expressed by Professor Birks (see *An Introduction to
the Law of Restitution* (1985), p. 374). I myself incline to the opinion that  G
a personal claim in restitution would not indirectly enforce the ultra vires
contract, for such an action would be unaffected by any of the contractual
terms governing the borrowing, and moreover would be subject (where
appropriate) to any available restitutionary defences. If my present opinion
were to prove to be correct then *Sinclair v. Brougham* will fade into
history. If not, then recourse can at least be had to *Sinclair v. Brougham*  H
as authority for the proposition that, in such circumstances, the lender
should not be without a remedy. Indeed, I cannot think that English law,
or equity, is so impoverished as to be incapable of providing relief in such

689

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Goff
                                                                                 of Chieveley

A  circumstances. Lord Wright, who wrote in strong terms ("*Sinclair v.
   Brougham*" (1938) 6 C.L.J. 305) endorsing the just result in *Sinclair v.
   Brougham*, would turn in his grave at any such suggestion. Of course, it
   may be necessary to reinterpret the decision in that case to provide a more
   satisfactory basis for it; indeed one possible suggestion has been proposed
   by Professor Birks (see *An Introduction to the Law of Restitution*, pp. 396
   et seq.). But for the present the case should in my opinion stand, though
B  confined in the manner I have indicated, as an assertion that those who
   are caught in the trap of advancing money under ultra vires borrowing
   contracts will not be denied appropriate relief.

   *The availability of an equitable proprietary claim in the present case*

       Having put *Sinclair v. Brougham* on one side as providing no authority
C  that a resulting trust should be imposed in the facts of the present case,
   I turn to the question whether, as a matter of principle, such a trust
   should be imposed, the bank's submission being that such a trust arose at
   the time when the sum of £2·5m. was received by the council from the
   bank.
       As my noble and learned friend, Lord Browne-Wilkinson, observes, it
   is plain that the present case falls within neither of the situations
D  which are traditionally regarded as giving rise to a resulting trust, viz.
   (1) voluntary payments by A to B, or for the purchase of property in the
   name of B or in his and A's joint names, where there is no presumption
   of advancement or evidence of intention to make an out-and-out gift; or
   (2) property transferred to B on an express trust which does not exhaust
   the whole beneficial interest. The question therefore arises whether
E  resulting trusts should be extended beyond such cases to apply in the
   present case, which I shall treat as a case where money has been paid for
   a consideration which fails.
       In a most interesting and challenging paper, "Restitution and Resulting
   Trusts," published in *Equity: Contemporary Legal Developments* (1992)
   (ed. Goldstein), p. 335, Professor Birks has argued for a wider role for the
   resulting trust in the field of restitution, and specifically for its availability
F  in cases of mistake and failure of consideration. His thesis is avowedly
   experimental, written to test the temperature of the water. I feel bound to
   respond that the temperature of the water must be regarded as decidedly
   cold: see, e.g., Professor Burrows, "Swaps and the Friction between
   Common Law and Equity" [1995] R.L.R. 15, and Mr. W. J. Swadling,
   "A new role for resulting trusts?" (1996) 16 Legal Studies 133.
G      In the first place, as Lord Browne-Wilkinson points out, to impose a
   resulting trust in such cases is inconsistent with the traditional principles
   of trust law. For on receipt of the money by the payee it is to be presumed
   that (as in the present case) the identity of the money is immediately lost
   by mixing with other assets of the payee, and at that time the payee has
   no knowledge of the facts giving rise to the failure of consideration. By
   the time that those facts come to light, and the conscience of the payee
H  may thereby be affected, there will therefore be no identifiable fund to
   which a trust can attach. But there are other difficulties. First, there is no
   general rule that the property in money paid under a void contract does
   not pass to the payee; and it is difficult to escape the conclusion that, as a

690

Lord Goff
of Chieveley          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

general rule, the beneficial interest in the money likewise passes to the payee.     A
This must certainly be the case where the consideration for the payment
fails after the payment is made, as in cases of frustration or breach of
contract; and there appears to be no good reason why the same should
not apply in cases where, as in the present case, the contract under which
the payment is made is void ab initio and the consideration for the
payment therefore fails at the time of payment. It is true that the doctrine
of mistake might be invoked where the mistake is fundamental in the      B
orthodox sense of that word. But that is not the position in the present
case; moreover the mistake in the present case must be classified as a
mistake of law which, as the law at present stands, creates its own special
problems. No doubt that much criticised doctrine will fall to be
reconsidered when an appropriate case occurs; but I cannot think that the
present is such a case, since not only has the point not been argued but      C
(as will appear) it is my opinion that there is any event jurisdiction to
award compound interest in the present case. For all of these reasons
I conclude, in agreement with my noble and learned friend, that there is
no basis for holding that a resulting trust arises in cases where money has
been paid under a contract which is ultra vires and therefore void ab
initio. This conclusion has the effect that all the practical problems which
would flow from the imposition of a resulting trust in a case such as the      D
present, in particular the imposition upon the recipient of the normal
duties of trustee, do not arise. The dramatic consequences which would
occur are detailed by Professor Burrows in his article on "Swaps and the
Friction between Common Law and Equity" [1995] R.L.R. 15, 27: the
duty to account for profits accruing from the trust property; the inability
of the payee to rely upon the defence of change of position; the absence      E
of any limitation period; and so on. Professor Burrows even goes so far
as to conclude that the action for money had and received would be
rendered otiose in such cases, and indeed in all cases where the payer
seeks restitution of mistaken payments. However, if no resulting trust
arises, it also follows that the payer in a case such as the present cannot
achieve priority over the payee's general creditors in the event of his
insolvency—a conclusion which appears to me to be just.      F

For all these reasons I conclude that there is no basis for imposing a
resulting trust in the present case, and I therefore reject the bank's
submission that it was here entitled to proceed by way of an equitable
proprietary claim. I need only add that, in reaching that conclusion, I do
not find it necessary to review the decision of Goulding J. in *Chase
Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105.     G

*Interest*

It is against that background that I turn to consider the question of
compound interest. Here there are three points which fall to be considered.
These are (1) whether the court had jurisdiction to award compound
interest; (2) if so, whether it should have exercised its jurisdiction to make      H
such an award in the present case; and (3) from what date should such an
award of compound interest run, if made.

It is common ground that in a case such as the present there is no
jurisdiction to award compound interest at common law or by statute.

691

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Goff
of Chieveley

A   The central question in the present case is therefore whether there is
jurisdiction in equity to do so. It was held below, on the basis that the
bank was entitled to succeed not only in a personal claim at common law
but also in a proprietary claim in equity, that there was jurisdiction in
equity to make an order that the council should pay compound interest
on the sum adjudged due. It was that jurisdiction which was exercised by
Hobhouse J., whose decision on the point was not challenged before the

B   Court of Appeal, on the basis that *Sinclair v. Brougham* [1914] A.C. 398
provided binding authority that a proprietary claim was available to the
bank in this case. However since, in my opinion, *Sinclair v. Brougham*
provides no such authority, and no proprietary claim is available to the
bank, the question now arises whether the equitable jurisdiction to award
compound interest may nevertheless be exercised on the facts of the

C   present case.

I wish however to record that Hobhouse J. was in no doubt that, if he
had jurisdiction to do so, he should award compound interest in this case.
He said [1994] 4 All E.R. 890, 955:

D       "Anyone who lends or borrows money on a commercial basis receives
or pays interest periodically and if that interest is not paid it is
compounded. . . . I see no reason why I should deny the plaintiff a
complete remedy or allow the defendant arbitrarily to retain part of
the enrichment which it has unjustly enjoyed."

With that reasoning I find myself to be in entire agreement. The council
has had the use of the bank's money over a period of years. It is plain on
the evidence that, if it had not had the use of the bank's money, it would

E   (if free to do so) have borrowed the money elsewhere at compound
interest. It has to that extent profited from the use of the bank's money.
Moreover, if the bank had not advanced the money to the council, it
would itself have employed the money on similar terms in its business.
Full restitution requires that, on the facts of the present case, compound
interest should be awarded, having regard to the commercial realities of

F   the case. As the judge said, there is no reason why the bank should be
denied a complete remedy.

It follows therefore that everything depends on the scope of the
equitable jurisdiction. It also follows, in my opinion, that if that
jurisdiction does not extend to apply in a case such as the present, English
law will be revealed as incapable of doing full justice.

G       It is right that I should record that the scope of the equitable
jurisdiction was not explored in depth in the course of argument before
the Appellate Committee, in which attention was concentrated on the
question whether a proprietary claim was available to the bank in the
circumstances of the present case. In other circumstances, it might well
have been appropriate to invite further argument on the point. However,
since it was indicated to the Committee that the council was not prepared

H   to spend further money on the appeal, whereupon it took no further part
in the proceedings, and since the relevant authorities had been cited to the
Committee, I am satisfied that it is appropriate that the point should now
be decided by your Lordships' House.

692

Lord Goff
of Chieveley    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))    [1996]

I wish also to record that I have had the opportunity of reading in A
draft the speech of my noble and learned friend, Lord Woolf, and that
I find myself to be in agreement with his reasoning and conclusion on the
point. Even so, I propose to set out in my own words my reasons for
reaching the same conclusion.

I shall begin by expressing two preliminary thoughts. The first is that,
where the jurisdiction of the court derives from common law or equity,
and is designed to do justice in cases which come before the courts, it is B
startling to be faced by an argument that the jurisdiction is so restricted
as to prevent the courts from doing justice. Jurisdiction of that kind
should as a matter of principle be as broad as possible, to enable justice
to be done wherever necessary; and the relevant limits should be found
not in the scope of the jurisdiction but in the manner of its exercise as the
principles are worked out from case to case. Second, I find it equally C
startling to find that the jurisdiction is said to be limited to certain specific
categories of case. Where jurisdiction is founded on a principle of justice,
I would expect that the categories of case where it is exercised should be
regarded not as occupying the whole field but rather as emanations of the
principle, so that the possibility of the jurisdiction being extended to other
categories of case is not foreclosed.

It is with these thoughts in mind that I turn to the equitable jurisdiction D
to award interest. In *President of India v. La Pintada Compania Navigacion
S.A.* [1985] A.C. 104 Lord Brandon of Oakbrook, delivering a speech with
which the other members of the Appellate Committee agreed, described
the equitable jurisdiction in the following words, at p. 116:

"Chancery courts had further regularly awarded interest, including
not only simple interest but also compound interest, when they E
thought that justice so demanded, that is to say in cases where money
had been obtained and retained by fraud, or where it had been
withheld or misapplied by a trustee or anyone else in a fiduciary
position."

Later however he said that Courts of Chancery only awarded compound,
as distinct from simple, interest in two special classes of case. F

With great respect I myself consider that, if the jurisdiction to award
compound interest is available where justice so demands, it cannot be so
confined as to exclude any class of case simply because that class of case
has not previously been recognised as falling within it. I prefer therefore
to read the passage quoted from Lord Brandon's speech as Mason C.J.
and Wilson J. read it in *Hungerfords v. Walker* (1989) 171 C.L.R. 125, G
148, as providing examples (i.e., not exclusive examples) of the application
of the underlying principle of justice.

Now it is true that the reported cases on the exercise of the equitable
jurisdiction, which are by no means numerous, are concerned with cases
of breach of duty by trustees and other fiduciaries. In *Attorney-General v.
Alford* (1855) 4 De G.M. & G. 843, for example, which came before Lord
Cranworth L.C., the question arose whether an executor and trustee, who H
had for several years retained in his hands trust funds which he ought to
have invested, should be chargeable with interest in excess of the ordinary
rate of simple interest. It was held that he should not be chargeable at a

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))

A    higher rate. Lord Cranworth L.C. recognised that the court might in such
a case impose interest at a higher rate, or even compound interest. But he
observed that if so the court does not impose a penalty on the trustee. He
said, at p. 851:

"What the court ought to do, I think, is to charge him only with the
interest which he has received, or which it is justly entitled to say he
B    ought to have received, or which it is so fairly to be presumed that he
did receive that he is estopped from saying that he did not receive it."

In cases of misconduct which benefits the executor, however, the court
may fairly infer that he used the money in speculation, and may, on the
principle "In odium spoliatoris omnia praesumuntur," assume that he
made a higher rate, if that was a reasonable conclusion.

C    Likewise in *Burdick v. Garrick* (1870) L.R. 5 Ch. App. 233, where a
fiduciary agent held money of his principal and simply paid it into his
bank account, it was held that he should be charged with simple interest
only. Lord Hatherley L.C., at pp. 241–242, applied the principle laid down
in *Attorney-General v. Alford*, namely that:

"the court does not proceed against an accounting party by way of
D    punishing him for making use of the plaintiff's money by directing
rests, or payment of compound interest, but proceeds upon this
principle, either that he has made, or has put himself in such a
position that he is to be presumed to have made, 5 per cent., or
compound interest, as the case may be. If the court finds . . . that the
money received has been invested in an ordinary trade, the whole
course of decision has tended to this, that the court presumes that the
E    party against whom relief is sought has made that amount of profit
which persons ordinarily do make in trade, and in those cases the
court directs rests to be made."

For a more recent case in which the equitable jurisdiction was invoked,
see *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373.

F    From these cases it can be seen that compound interest may be
awarded in cases where the defendant has wrongfully profited, or may be
presumed to have so profited, from having the use of another person's
money. The power to award compound interest is therefore available to
achieve justice in a limited area of what is now seen as the law of
restitution, viz. where the defendant has acquired a benefit through his
wrongful act (see *Goff & Jones, The Law of Restitution*, 4th ed. (1993),
G    pp. 632 et seq.; *Birks, An Introduction to the Law of Restitution*, pp. 313 et
seq.; *Burrows, The Law of Restitution* (1993), pp. 403 et seq.). The general
question arises whether the jurisdiction must be kept constrained in this
way, or whether it may be permitted to expand so that it can be exercised
to ensure that full justice can be done elsewhere in that rubric of the law.
The particular question is whether the jurisdiction can be exercised in a
case such as the present in which the council has been ordered to repay
H    the balance of the bank's money on the ground of unjust enrichment, in a
personal claim at common law.

At this stage of the argument I wish to stress two things. The first is
that it is plain that the jurisdiction may, in an appropriate case, be

694

Lord Goff
of Chieveley                Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    [1996]

exercised in the case of a personal claim in equity. In both *Alford's* case      A
and *Burdick v. Garrick*, the cases were concerned with the taking of an
account, and an order for payment of the sum found due. In each case
the accounting party was a fiduciary, who held the relevant funds on trust.
But the jurisdiction is not limited to cases in which a proprietary claim is
being made and an award of interest is sought as representing the fruits
of the property so claimed. On the contrary, the jurisdiction is in
personam, and moreover an award of interest may be made not only      B
where the trustee or fiduciary has made a profit, but also where it is held
that he ought to have made a profit and has not done so. Furthermore in
my opinion the decision of the Court of Appeal in *In re Diplock; Diplock
v. Wintle* [1948] Ch. 465 provides no authority for the proposition that
there is no *jurisdiction* to award compound interest where the claim is a
personal claim. It is true that in that case the Court of Appeal decided      C
not to award interest against a number of charities which had been held
liable, in a personal claim in equity, to repay legacies which had been paid
to them in error. But in so doing the court simply followed an old decision
of Lord Eldon L.C. in *Gittins v. Steele* (1818) 1 Swan. 199, in which his
judgment was as follows, at p. 200:

> "Where the fund out of which the legacy ought to have been paid      D
> is in the hands of the court making interest, unquestionably interest
> is due. If a legacy has been erroneously paid to a legatee who has no
> farther property in the estate, in recalling that payment I apprehend
> that the rule of the court is not to charge interest; but if the legatee is
> entitled to another fund making interest in the hands of the court,
> justice must be done out of his share."

E
The Court of Appeal in *In re Diplock* can have had no desire to make an
award of interest against the charities in the personal claim against them
in that case, and they must have been very content to follow uncritically
this old "rule of court." But it does not follow that the rule of court went
to the jurisdiction of the court. It is more likely that it represented an
established practice which, as Lord Eldon L.C.'s brief judgment indicates,
was subject to exceptions. In any event the Court of Appeal was there      F
concerned only with simple interest; and in cases of the kind there under
consideration, it seems unlikely that any question of an award of
compound interest would ever have arisen.

I must confess that I find the reasoning which would restrict the
equitable jurisdiction to award compound interest to cases where the claim
is proprietary in nature to be both technical and unrealistic. This is shown
by the reasoning and conclusion of Hobhouse J. in *Kleinwort Benson Ltd.      G
v. South Tyneside Metropolitan Borough Council* [1994] 4 All E.R. 972,
another swap transaction case, in which the plaintiff bank had no
proprietary claim. The judge upheld the submission of the defendant
council that, although they were under a personal liability to make
restitution both at law and in equity, nevertheless the court had no
jurisdiction to award compound interest on the sum adjudged due. He      H
said, at p. 994:

> "If . . . the plaintiff is only entitled to a personal remedy which will
> be the case where, although there was initially a fiduciary relationship

A
and the payer was entitled in equity to treat the sum received by the
payee as his, the payer's, money and to trace it, but because of
subsequent developments he is no longer able to trace the sum in the
hands of the payee, then there is no subject matter to which the
rationale on which compound interest is awarded can be applied. The
payee cannot be shown to have a fund belonging to the payer or to
have used it to make profits for himself."

B

This reasoning is logical, assuming the restricted nature of the equitable
jurisdiction to award compound interest. But if, as Lord Brandon in
*President of India v. La Pintada Compania Navigacion S.A.* [1985] A.C.
104, 116 stated, the jurisdiction is founded upon the demands of justice, it
is difficult to see the sense of the distinction which Hobhouse J. felt
compelled to draw. It seems strange indeed that, just because the power

C
to trace property has ceased, the court's jurisdiction to award compound
interest should also come to an end. For where the claim is based upon
the unjust enrichment of the defendant, it may be necessary to have power
to award compound interest to achieve full restitution, i.e. to do full
justice, as much where the plaintiff's claim is personal as where his claim
is proprietary in nature. Furthermore, I know of no authority which

D
compelled Hobhouse J. to hold that he had no jurisdiction to award
compound interest in respect of the personal claim in equity in the case
before him.

For these reasons I am satisfied that there is jurisdiction in equity to
award compound interest in the case of personal claims as well as
proprietary claims.

E
I turn next to the question whether the equitable jurisdiction can be
exercised in aid of common law remedies such as, for example, a personal
remedy in restitution, to repair the deficiencies of the common law. Here
I turn at once to *Snell's Equity*, 29th ed. (1990), p. 28, where the first
maxim of equity is stated to be that "Equity will not suffer a wrong to be
without a remedy." The commentary on this maxim in the text reads:

F
"The idea expressed in this maxim is that no wrong should be allowed
to go unredressed if it is capable of being remedied by courts of
justice, and this really underlies the whole jurisdiction of equity. As
already explained, the common law courts failed to remedy many
undoubted wrongs, and this failure led to the establishment of the
Court of Chancery. But is must not be supposed that every *moral*
wrong was redressed by the Court of Chancery. The maxim must be

G
taken as referring to rights which are suitable for judicial enforcement,
but were not enforced at common law owing to some technical
defect."

To this maxim is attributed the auxiliary jurisdiction of equity. The
commentary reads:

H
"Again, to this maxim may be traced the origin of the auxiliary
jurisdiction of the Court of Chancery, by virtue of which suitors at
law were aided in the enforcement of their legal rights. Without such
aid these rights would often have been 'wrongs without remedies.'
For instance, it was often necessary for a plaintiff in a common law

696
**Lord Goff
of Chieveley**        Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))        [1996]

action to obtain discovery of facts resting in the knowledge of the    A
defendant, or of deeds, writings or other things in his possession or
power. The common law courts, however, had no power to order
such discovery, and recourse was therefore had to the Court of
Chancery, which assumed jurisdiction to order the defendant to make
discovery on his oath."

The question which arises in the present case is whether, in the exercise of    B
equity's auxiliary jurisdiction, the equitable jurisdiction to award
compound interest may be exercised to enable a plaintiff to obtain full
justice in a personal action of restitution at common law.

I start with the position that the common law remedy is, in a case such
as the present, plainly inadequate, in that there is no power to award
compound interest at common law and that without that power the
common law remedy is incomplete. The situation is therefore no different    C
from that in which, in the absence of jurisdiction at common law to order
discovery, equity stepped in to enable justice to be done in common law
actions by ordering the defendant to make discovery on oath. The only
difference between the two cases is that, whereas the equitable jurisdiction
to order discovery in aid of common law actions was recognised many
years ago, the possibility of the equitable jurisdiction to award compound    D
interest being exercised in aid of common law actions was not addressed
until the present case. Fortunately, however, judges of equity have always
been ready to address new problems, and to create new doctrines, where
justice so requires. As Sir George Jessel M.R. said, in a famous passage
in his judgment in *In re Hallett's Estate; Knatchbull v. Hallett* (1880)
13 Ch.D. 696, 710:

"I intentionally say modern rules, because it must not be forgotten    E
that the rules of courts of equity are not, like the rules of the common
law, supposed to have been established from time immemorial. It is
perfectly well known that they have been established from time to
time—altered, improved, and refined from time to time. In many
cases we know the names of the Chancellors who invented them. No
doubt they were invented for the purpose of securing the better    F
administration of justice, but still they were invented."

I therefore ask myself whether there is any reason why the equitable
jurisdiction to award compound interest should not be exercised in a case
such as the present. I can see none. Take, for example, the case of fraud.
It is well established that the equitable jurisdiction may be exercised in
cases of fraud. Indeed it is plain that, on the same facts, there may be a    G
remedy both at law and in equity to recover money obtained by fraud: see
*Johnson v. The King* [1904] A.C. 817, 822, *per* Lord Macnaghten. Is it to
be said that, if the plaintiff decides to proceed in equity, compound
interest may be awarded; but that if he chooses to proceed in an action at
law, no such auxiliary relief will be available to him? I find it difficult to
believe that, at the end of the 20th century, our law should be so
hidebound by forms of action as to be compelled to reach such a    H
conclusion.

For these reasons I conclude that the equitable jurisdiction to award
compound interest may be exercised in the case of personal claims at

697

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))        Lord Goff
of Chieveley

A    common law, as it is in equity. Furthermore I am satisfied that, in
particular, the equitable jurisdiction may, where appropriate, be exercised
in the case of a personal claim in restitution. In reaching that conclusion,
I am of the opinion that the decision of Hobhouse J. in *Kleinwort Benson
Ltd. v. South Tyneside Metropolitan Borough Council* [1994] 4 All E.R. 972
that the court had no such jurisdiction should not be allowed to stand.

B        I recognise that, in so holding, the courts would be breaking new
ground, and would be extending the equitable jurisdiction to a field where
it has not hitherto been exercised. But that cannot of itself be enough to
prevent what I see to be a thoroughly desirable extension of the
jurisdiction, consistent with its underlying basis that it exists to meet the
demands of justice. An action of restitution appears to me to provide an
almost classic case in which the jurisdiction should be available to enable

C    the courts to do full justice. Claims in restitution are founded upon a
principle of justice, being designed to prevent the unjust enrichment of the
defendant: see *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548. Long ago,
in *Moses v. Macferlan* (1760) 2 Burr. 1005, 1012, Lord Mansfield C.J.
said that the gist of the action for money had and received is that "the
defendant, upon the circumstances of the case, is obliged by the ties of
natural justice and equity to refund the money." It would be strange

D    indeed if the courts lacked jurisdiction in such a case to ensure that justice
could be fully achieved by means of an award of compound interest,
where it is appropriate to make such an award, despite the fact that the
jurisdiction to award such interest is itself said to rest upon the demands
of justice. I am glad not to be forced to hold that English law is so
inadequate as to be incapable of achieving such a result. In my opinion

E    the jurisdiction should now be made available, as justice requires, in cases
of restitution, to ensure that full justice can be done. The seed is there,
but the growth has hitherto been confined within a small area. That
growth should now be permitted to spread naturally elsewhere within this
newly recognised branch of the law. No genetic engineering is required,
only that the warm sun of judicial creativity should exercise its benign
influence rather than remain hidden behind the dark clouds of legal

F    history.
        I wish to add that I for my part do not consider that the statutory
power to award interest, either under section 3 of the Law Reform
(Miscellaneous Provisions) Act 1934 or under section 35A of the Supreme
Court Act 1981 (which, pursuant to section 15 of the Administration of
Justice Act 1982, superseded section 3 of the Act of 1934), inhibits the

G    course of action which I now propose. It is true that section 3(1) of the
Act of 1934, when empowering courts of record to award interest in
proceedings for the recovery of any debt or damages, did not authorise
the giving of interest upon interest. But I cannot see that it would be
inconsistent with the intention then expressed by Parliament later to
extend the existing equitable jurisdiction to award compound interest to
enable courts to ensure that full restitution is achieved in personal actions

H    of restitution at common law. It is of course common knowledge that,
until the latter part of this century, the existence of a systematic law of
restitution, founded upon the principle of unjust enrichment, had not been
recognised in English law. The question whether there should be a power

Lord Goff
of Chieveley
Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    [1996]

to award compound interest in such cases, in order to achieve full    A
restitution, simply did not arise in 1934 and cannot therefore have been
considered by Parliament in that year. To hold that, because Parliament
did not then authorise an award of compound interest in proceedings the
nature of which was not then recognised, the courts should now be
precluded from exercising the ordinary judicial power to develop the law
by extending an existing jurisdiction to meet a newly recognised need
appears to me to constitute an unnecessary and undesirable fetter upon    B
the judicial development of the law. It is not to be forgotten that there is
jurisdiction in equity, as well as at common law, to order restitution on
the ground of unjust enrichment; and I cannot see that section 3(1) of the
1934 Act would have precluded any extension of the existing equitable
jurisdiction to award compound interest to enable full restitution to be
achieved in such a case. Accordingly neither would section 3(1), which    C
applied to all courts of record, have precluded a similar extension of the
jurisdiction to enable full restitution to be achieved in actions at common
law. Section 35A of the Act of 1981 no doubt perpetuated the position as
established by section 3(1) of the Act of 1934, in that it, too, did not
confer a power on the courts to award compound interest; but I cannot
see that this affects the position. In so far as it is relevant to refer to the
Report of the Law Commission "Law of Contract: Report on Interest"    D
(Law Com. No. 88) (Cmnd. 7229) of 7 April 1978 which preceded that
enactment, it appears from the Report that it was generally opposed to
the introduction of any general power to award compound interest; but
there was no intention of interfering with the equitable jurisdiction, and
the problem which has arisen in the present case was not addressed. I wish
to add that such an extension of the equitable jurisdiction as I propose    E
would, in my opinion, be a case of equity acting in aid of the common
law. There is in my opinion no need, and indeed no basis, for outlawing
such a development as a case of equity acting in aid of the legislature
simply because the legislature, in conferring upon courts the power to
award simple interest, did not authorise the giving of compound interest.

It remains for me to say that I am satisfied, for the reasons given by
Hobhouse J., that this is a case in which it was appropriate that compound    F
interest should be awarded. In particular, since the council had the free
use of the bank's money in circumstances in which, if it had borrowed the
money from some other financial institution, it would have had to pay
compound interest for it, the council can properly be said to have profited
from the bank's money so as to make an award of compound interest
appropriate. However, for the reasons given by Dillon L.J. [1994]    G
1 W.L.R. 938, 947–949, I agree with the Court of Appeal that the interest
should run from the date of receipt of the money.

*Conclusion*

For these reasons I would dismiss the appeal.

LORD BROWNE-WILKINSON. My Lords, in the last decade many local    H
authorities entered into interest rate swap agreements with banks and
other finance houses. In *Hazell v. Hammersmith and Fulham London
Borough Council* [1992] 2 A.C. 1 your Lordships held that such contracts

699

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))        Lord Browne-Wilkinson

A were ultra vires local authorities and therefore void. Your Lordships left open the question whether payments made pursuant to such swap agreements were recoverable or not. The action which is the subject matter of this appeal is one of a number in which the court has had to consider the extent to which moneys paid under such an agreement are recoverable.

An interest rate swap agreement is an agreement between two parties
B by which each agrees to pay the other on a specified date or dates an amount calculated by reference to the interest which would have accrued over a given period on a notional principal sum. The rate of interest payable by each party (on the same notional sum) is different. One rate of interest is usually fixed and does not change (and the payer is called "the fixed rate payer"); the other rate is a variable or floating rate based on a fluctuating interest rate such as the six-month London Inter-bank
C Offered Rate ("LIBOR") and the payer is known as "the floating rate payer." Normally the parties do not make the actual payments they have contracted for but the party owing the higher amount pays to the other party the difference between the two amounts.

In the present case the swap contract was concluded between the respondent bank, Westdeutsche Landesbank Girozentrale ("the bank"), and the appellant, the council of the London Borough of Islington ("the
D local authority"), on 16 June 1987. The arrangement was to run for 10 years starting on 18 June 1987. The interest sums were to be calculated on a notional principal sum of £25m. and were to be payable half-yearly. The bank was to be the fixed rate payer at a rate of 7·5 per cent. per annum and the local authority was to be the floating rate payer at the domestic sterling LIBOR rate. In addition, the bank was to pay to the local
E authority on 18 June 1987 a sum of £2·5m. ("the upfront payment") which payment was made. As a result of the provision of the upfront payment the rate of interest payable by the bank as the fixed rate payer was agreed to be lower than what would have been appropriate (9·43 per cent.) if the upfront payment had not been made.

Pursuant to the terms of the agreement, the following payments were made:
F

| Date | Payment by bank to council | Payment by council to bank |
| --- | --- | --- |
| 18.06.87 | £2,500,000 | |
| 18.12.87 | | £   172,345·89 |
| 20.06.88 | | £   229,666·09 |
| 19.12.88 | | £   259,054·56 |
| 19.06.89 | | £   693,407·53 |
| Total | £2,500,000 | £1,354,474·07 |

H Therefore the payments made by the bank to the local authority exceed those made by the local authority to the bank to the extent of £1,145,525·93.

On 1 November 1989 the Divisional Court gave judgment in *Hazell's* case declaring void swap transactions entered into by local authorities.

700

Lord Browne-
Wilkinson          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

The decision applied to the contract between the parties in the present     A
case.

As will appear it is of central importance to note the way in which the
local authority dealt with the upfront payment of £2·5m. made to it on
18 June 1987. The money was credited to a bank account of the local
authority in which there were other moneys of the local authority, i.e. into
a mixed account. That account itself became overdrawn overnight on
several dates in June and July 1987. There was an overall debit balance     B
on the account on 16 November 1987. The moneys in the mixed account
were used by the local authority for its general expenditure. If the upfront
payment had not been received, the local authority would have had to
borrow more money if it could. The local authority had been, and was
likely to be in the future, rate-capped and one of the attractions to the
local authority in the swap agreement was that it obtained the upfront      C
payment in a form which did not attract statutory controls.

The bank in this action sought recovery of the amounts paid by it
under the void agreement together with interest. On 12 February 1993
Hobhouse J. [1994] 4 All E.R. 890 gave judgment in the Commercial
Court for the bank ordering payment by the local authority to the bank
of the balance together with compound interest on the balance as from
1 April 1990 with six-monthly rests.                                        D

The council appealed to the Court of Appeal against that order and
the bank cross-appealed contending that compound interest should have
been ordered as from the date of receipt of the principal sum, i.e. 18 June
1987.

On 17 December 1993 the Court of Appeal (Dillon, Leggatt and
Kennedy L.JJ.) [1994] 1 W.L.R. 938 dismissed the local authority's appeal   E
and allowed the cross-appeal by the bank. It held that the bank was
entitled to recover the balance at law as money had and received
(Dillon L.J., at p. 946; Leggatt L.J., at p. 953E–F). It also held that the bank
was entitled to recover the balance in equity on the ground that the
local authority held the upfront payment on a resulting trust and was there-
fore personally liable, as trustee, to repay the bank (Dillon L.J., at
p. 947A–E; Leggatt L.J., at p. 953G–H). The Court of Appeal further held   F
the local authority liable to pay compound interest on the balance from
time to time outstanding as from the date of receipt of the upfront
payment. The ability of the court to award compound, as opposed to
simple, interest was founded on the equitable jurisdiction to award
compound interest as against a trustee or other person owing fiduciary
duties who is personally accountable and who has made use of the
plaintiff's money: Dillon L.J., at pp. 949–951; Leggatt L.J., at pp. 953–   G
955.

The local authority now accepts that it is personally liable to repay the
balance to the bank. The local authority appeals to your Lordships only
against the award of compound interest. But, as will appear,
notwithstanding the narrow scope of the appeal it raises profound
questions for decision by your Lordships.                                   H

*Compound interest in equity*

It is common ground that in the absence of agreement or custom the
court has no jurisdiction to award compound interest either at law or

701

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Browne-
                                                                        Wilkinson

A   under section 35A of the Supreme Court Act 1981. It is also common
    ground that in certain limited circumstances courts of equity can award
    compound interest. Mr. Philipson, for the local authority, contends that
    compound interest can only be ordered on a claim against a trustee or
    other person owing fiduciary duties who in breach of such duty has used
    trust moneys in his own trade. He contends that compound interest cannot
    be awarded in this case since (a) the local authority never held the upfront
B   payment as a trustee or in a fiduciary capacity and (b) in any event the
    local authority did not use the upfront payment in its trade. Mr. Sumption,
    for the bank, contends that compound interest can be awarded in equity
    whenever the defendant is liable to disgorge a benefit received whether or
    not he is a trustee or a fiduciary. Alternatively, Mr. Sumption contends
    that the local authority did receive the upfront payment as a trustee and
C   as such is in equity accountable for the benefits it has received, including
    the benefit of not having to borrow £2·5m. on the market at compound
    interest.
        In the absence of fraud courts of equity have never awarded compound
    interest except against a trustee or other person owing fiduciary duties
    who is accountable for profits made from his position. Equity awarded
    simple interest at a time when courts of law had no right under common
D   law or statute to award any interest. The award of compound interest was
    restricted to cases where the award was in lieu of an account of profits
    improperly made by the trustee. We were not referred to any case where
    compound interest had been awarded in the absence of fiduciary
    accountability for a profit. The principle is clearly stated by Lord
    Hatherley L.C. in *Burdick v. Garrick*, L.R. 5 Ch.App. 233, 241:

E       "the court does not proceed against an accounting party by way of
        punishing him for making use of the plaintiff's money by directing
        rests, or payment of compound interest, but proceeds upon this
        principle, either that he has made, or has put himself into such a
        position as that he is to be presumed to have made, 5 per cent., or
        compound interest, as the case may be."

F       The principle was more fully stated by Buckley L.J. in *Wallersteiner v.
    Moir (No. 2)* [1975] Q.B. 373, 397:

        "Where a trustee has retained trust money in his own hands, he will
        be accountable for the profit which he has made or which he is
        assumed to have made from the use of the money. In *Attorney-
        General v. Alford*, 4 De G.M. & G. 843, 851 Lord Cranworth L.C.
G       said: 'What the court ought to do, I think, is to charge him only with
        the interest which he has received, or which it is justly entitled to say
        he ought to have received, or which it is so fairly to be presumed that
        he did receive that he is estopped from saying that he did not receive
        it.' This is an application of the doctrine that the court will not allow
        a trustee to make any profit from his trust. The defaulting trustee is
        normally charged with simple interest only, but if it is established that
H       he has used the money in trade he may be charged compound interest.
        . . . The justification for charging compound interest normally lies in
        the fact that profits earned in trade would be likely to be used as
        working capital for earning further profits. Precisely similar equitable

702

Lord Browne-
Wilkinson

Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    [1996]

principles apply to an agent who has retained moneys of his principal    A
in his hands and used them for his own purposes: *Burdick v. Garrick*."

In *President of India v. La Pintada Compania Navigacion S.A.* [1985]
A.C. 104, 116 Lord Brandon of Oakbrook (with whose speech the rest of
their Lordships agreed) considered the law as to the award of interest as
at that date in four separate areas. His third area was equity, as to which
he said:                                                                  B

"Thirdly, the area of equity. The Chancery courts, again differing
from the common law courts, had regularly awarded simple interest
as ancillary relief in respect of equitable remedies, such as specific
performance, rescission and the taking of an account. Chancery
courts had further regularly awarded interest, including not only
simple interest but also compound interest, when they thought that    C
justice so demanded, that is to say in cases where money had been
obtained and retained by fraud, or where it had been withheld or
misapplied by a trustee or anyone else in a fiduciary position. . . .
Courts of Chancery only in two special classes of case, awarded
compound, as distinct from simple, interest."

These authorities establish that in the absence of fraud equity only awards    D
compound (as opposed to simple) interest against a defendant who is a
trustee or otherwise in a fiduciary position by way of recouping from such
a defendant an improper profit made by him. It is unnecessary to decide
whether in such a case compound interest can only be paid where the
defendant has used trust moneys in his own trade or (as I tend to think)
extends to all cases where a fiduciary has improperly profited from his
trust. Unless the local authority owed fiduciary duties to the bank in    E
relation to the upfront payment, compound interest cannot be awarded.

*Was there a trust? The argument for the bank in outline*

The bank submitted that, since the contract was void, title did not pass
at the date of payment either at law or in equity. The legal title of the
bank was extinguished as soon as the money was paid into the mixed    F
account, whereupon the legal title became vested in the local authority.
But, it was argued, this did not affect the equitable interest, which
remained vested in the bank ("the retention of title point"). It was
submitted that whenever the legal interest in property is vested in one
person and the equitable interest in another, the owner of the legal interest
holds it on trust for the owner of the equitable title: "the separation of the    G
legal from the equitable interest necessarily imports a trust." For this
latter proposition ("the separation of title point") the bank, of course,
relies on *Sinclair v. Brougham* [1914] A.C. 398 and *Chase Manhattan Bank
N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105.

The generality of these submissions was narrowed by submitting that
the trust which arose in this case was a resulting trust "not of an active
character:" see *per* Viscount Haldane L.C. in *Sinclair v. Brougham* [1914]    H
A.C. 398, 421. This submission was reinforced, after completion of the
oral argument, by sending to your Lordships Professor Peter Birks's paper
"Restitution and Resulting Trusts:" see *Equity: Contemporary Legal*

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))    

A *Developments*, p. 335. Unfortunately your Lordships have not had the advantage of any submissions from the local authority on this paper, but an article by William Swadling "A new role for resulting trusts?" 16 Legal Studies 133 puts forward counter-arguments which I have found persuasive.

B It is to be noted that the bank did not found any argument on the basis that the local authority was liable to repay either as a constructive trustee or under the in personam liability of the wrongful recipient of the estate of a deceased person established by *In re Diplock; Diplock v. Wintle* [1948] Ch. 465. I therefore do not further consider those points.

*The breadth of the submission*

C Although the actual question in issue on the appeal is a narrow one, on the arguments presented it is necessary to consider fundamental principles of trust law. Does the recipient of money under a contract subsequently found to be void for mistake or as being ultra vires hold the moneys received on trust even where he had no knowledge at any relevant time that the contract was void? If he does hold on trust, such trust must arise at the date of receipt or, at the latest, at the date the legal title of the D payer is extinguished by mixing moneys in a bank account: in the present case it does not matter at which of those dates the legal title was extinguished. If there is a trust two consequences follow: (a) the recipient will be personally liable, regardless of fault, for any subsequent payment away of the moneys to third parties even though, at the date of such payment, the "trustee" was still ignorant of the existence of any trust: see Burrows, "Swaps and the Friction between Common Law and Equity" E [1995] R.L.R. 15; (b) as from the date of the establishment of the trust (i.e. receipt or mixing of the moneys by the "trustee") the original payer will have an equitable proprietary interest in the moneys so long as they are traceable into whomsoever's hands they come other than a purchaser for value of the legal interest without notice. Therefore, although in the present case the only question directly in issue is the personal liability of F the local authority as a trustee, it is not possible to hold the local authority liable without imposing a trust which, in other cases, will create property rights affecting third parties because moneys received under a void contract are "trust property."

*The practical consequences of the bank's argument*

G Before considering the legal merits of the submission, it is important to appreciate the practical consequences which ensue if the bank's arguments are correct. Those who suggest that a resulting trust should arise in these circumstances accept that the creation of an equitable proprietary interest under the trust can have unfortunate, and adverse, effects if the original recipient of the moneys becomes insolvent: the moneys, if traceable in the hands of the recipient, are trust moneys and H not available for the creditors of the recipient. However, the creation of an equitable proprietary interest in moneys received under a void contract is capable of having adverse effects quite apart from insolvency. The proprietary interest under the unknown trust will, quite apart from

704
Lord Browne-
Wilkinson          **Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))**          [1996]

insolvency, be enforceable against any recipient of the property other than the purchaser for value of a legal interest without notice.

Take the following example. T (the transferor) has entered into a commercial contract with R1 (the first recipient). Both parties believe the contract to be valid but it is in fact void. Pursuant to that contract: (i) T pays £1m. to R1 who pays it into a mixed bank account; (ii) T transfers 100 shares in X company to R1, who is registered as a shareholder. Thereafter R1 deals with the money and shares as follows: (iii) R1 pays £50,000 out of the mixed account to R2 otherwise than for value; R2 then becomes insolvent, having trade creditors who have paid for goods not delivered at the time of the insolvency; (iv) R1 charges the shares in X company to R3 by way of equitable security for a loan from R3.

If the bank's arguments are correct, R1 holds the £1m. on trust for T once the money has become mixed in R1's bank account. Similarly R1 becomes the legal owner of the shares in X company as from the date of his registration as a shareholder but holds such shares on a resulting trust for T. T therefore has an equitable proprietary interest in the mixed account and in the shares.

T's equitable interest will enjoy absolute priority as against the creditors in the insolvency of R2 (who was not a purchaser for value) provided that the £50,000 can be traced in the assets of R2 at the date of its insolvency. Moreover, if the separation of title argument is correct, since the equitable interest is in T and the legal interest is vested in R2, R2 also holds as trustee for T. In tracing the £50,000 in the bank account of R2, R2 as trustee will be treated as having drawn out "his own" moneys first, thereby benefiting T at the expense of the secured and unsecured creditors of R2. Therefore in practice one may well reach the position where the moneys in the bank account of R2 in reality reflect the price paid by creditors for goods not delivered by R2: yet, under the tracing rules, those moneys are to be treated as belonging in equity to T.

So far as the shares in the X company are concerned, T can trace his equitable interest into the shares and will take in priority to R3, whose equitable charge to secure his loan even though granted for value will pro tanto be defeated.

All this will have occurred when no one was aware, or could have been aware, of the supposed trust because no one knew that the contract was void.

I can see no moral or legal justification for giving such priority to the right of T to obtain restitution over third parties who have themselves not been enriched, in any real sense, at T's expense and indeed have had no dealings with T. T paid over his money and transferred the shares under a supposed valid contract. If the contract had been valid, he would have had purely personal rights against R1. Why should he be better off because the contract is void?

My Lords, wise judges have often warned against the wholesale importation into commercial law of equitable principles inconsistent with the certainty and speed which are essential requirements for the orderly conduct of business affairs: see *Barnes v. Addy* (1874) L.R. 9 Ch.App. 244, 251 and 255; *Scandinavian Trading Tanker Co. A.B. v. Flota Petrolera Ecuatoriana* [1983] 2 A.C. 694, 703–704. If the bank's arguments are

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Browne-
                                                                        Wilkinson

A   correct, a businessman who has entered into transactions relating to or
    dependent upon property rights could find that assets which apparently
    belong to one person in fact belong to another; that there are "off balance
    sheet" liabilities of which he cannot be aware; that these property rights
    and liabilities arise from circumstances unknown not only to himself but
    also to anyone else who has been involved in the transactions. A new area
    of unmanageable risk will be introduced into commercial dealings. If the
B   due application of equitable principles forced a conclusion leading to these
    results, your Lordships would be presented with a formidable task in
    reconciling legal principle with commercial common sense. But in my
    judgment no such conflict occurs. The resulting trust for which the bank
    contends is inconsistent not only with the law as it stands but with any
    principled development of it.

C
    *The relevant principles of trust law*

        (i) Equity operates on the conscience of the owner of the legal interest.
    In the case of a trust, the conscience of the legal owner requires him to
    carry out the purposes for which the property was vested in him (express
    or implied trust) or which the law imposes on him by reason of his
D   unconscionable conduct (constructive trust).
        (ii) Since the equitable jurisdiction to enforce trusts depends upon the
    conscience of the holder of the legal interest being affected, he cannot be
    a trustee of the property if and so long as he is ignorant of the facts
    alleged to affect his conscience, i.e. until he is aware that he is intended to
    hold the property for the benefit of others in the case of an express or
    implied trust, or, in the case of a constructive trust, of the factors which
E   are alleged to affect his conscience.
        (iii) In order to establish a trust there must be identifiable trust
    property. The only apparent exception to this rule is a constructive trust
    imposed on a person who dishonestly assists in a breach of trust who may
    come under fiduciary duties even if he does not receive identifiable trust
    property.
        (iv) Once a trust is established, as from the date of its establishment
F   the beneficiary has, in equity, a proprietary interest in the trust property,
    which proprietary interest will be enforceable in equity against any
    subsequent holder of the property (whether the original property or
    substituted property into which it can be traced) other than a purchaser
    for value of the legal interest without notice.
        These propositions are fundamental to the law of trusts and I would
G   have thought uncontroversial. However, proposition (ii) may call for some
    expansion. There are cases where property has been put into the name of
    X without X's knowledge but in circumstances where no gift to X was
    intended. It has been held that such property is recoverable under a
    resulting trust: *Birch v. Blagrave* (1755) 1 Amb. 264; *Childers v. Childers*
    (1857) 1 De G. & J. 482; *In re Vinogradoff; Allen v. Jackson* [1935] W.N.
    68; *In re Muller; Cassin v. Mutual Cash Order Co. Ltd.* [1953] N.Z.L.R.
H   879. These cases are explicable on the ground that, by the time action was
    brought, X or his successors in title have become aware of the facts which
    gave rise to a resulting trust; his conscience was affected as from the time
    of such discovery and thereafter he held on a resulting trust under which

706
Lord Browne-
Wilkinson                Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                [1996]

the property was recovered from him. There is, so far as I am aware, no    A
authority which decides that X was a trustee, and therefore accountable
for his deeds, at any time before he was aware of the circumstances which
gave rise to a resulting trust.

Those basic principles are inconsistent with the case being advanced
by the bank. The latest time at which there was any possibility of
identifying the "trust property" was the date on which the moneys in the
mixed bank account of the local authority ceased to be traceable when the    B
local authority's account went into overdraft in June 1987. At that date,
the local authority had no knowledge of the invalidity of the contract but
regarded the moneys as its own to spend as it thought fit. There was
therefore never a time at which both (a) there was defined trust property
and (b) the conscience of the local authority in relation to such defined
trust property was affected. The basic requirements of a trust were never    C
satisfied.

I turn then to consider the bank's arguments in detail. They were
based primarily on principle rather than on authority. I will deal first with
the bank's argument from principle and then turn to the main authorities
relied upon by the bank, *Sinclair v. Brougham* [1914] A.C. 398 and *Chase
Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105.    D

*The retention of title point*

It is said that, since the bank only intended to part with its beneficial
ownership of the moneys in performance of a valid contract, neither the
legal nor the equitable title passed to the local authority at the date of
payment. The legal title vested in the local authority by operation of law
when the moneys became mixed in the bank account but, it is said, the    E
bank "retained" its equitable title.

I think this argument is fallacious. A person solely entitled to the full
beneficial ownership of money or property, both at law and in equity,
does not enjoy an equitable interest in that property. The legal title carries
with it all rights. Unless and until there is a separation of the legal and
equitable estates, there is no separate equitable title. Therefore to talk    F
about the bank "retaining" its equitable interest is meaningless. The only
question is whether the circumstances under which the money was paid
were such as, in equity, to impose a trust on the local authority. If so, an
equitable interest arose for the first time under that trust.

This proposition is supported by *In re Cook; Beck v. Grant* [1948] Ch.
212; *Vandervell v. Inland Revenue Commissioners* [1967] 2 A.C. 291, 311G,
*per* Lord Upjohn, and 317F, *per* Lord Donovan; *Commissioner of Stamp    G
Duties (Queensland) v. Livingston* [1965] A.C. 694, 712B–E; *Underhill and
Hayton, Law of Trusts and Trustees*, 15th ed. (1995), p. 866.

*The separation of title point*

The bank's submission, at its widest, is that if the legal title is in A but
the equitable interest in B, A holds as trustee for B.                        H

Again I think this argument is fallacious. There are many cases where
B enjoys rights which, in equity, are enforceable against the legal owner,
A, without A being a trustee, e.g. an equitable right to redeem a mortgage,

08-01789-cgm    Doc 20008-5    Filed 11/25/20    Entered 11/25/20 14:46:21    Attachment
5    Pg 39 of 73

707

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Browne-Wilkinson

A  equitable easements, restrictive covenants, the right to rectification, an insurer's right by subrogation to receive damages subsequently recovered by the assured: *Lord Napier and Ettrick v. Hunter* [1993] A.C. 713. Even in cases where the whole beneficial interest is vested in B and the bare legal interest is in A, A is not necessarily a trustee, e.g. where title to land is acquired by estoppel as against the legal owner; a mortgagee who has fully discharged his indebtedness enforces his right to recover the
B  mortgaged property in a redemption action, not an action for breach of trust.

The bank contended that where, *under a pre-existing trust,* B is entitled to an equitable interest in trust property, if the trust property comes into the hands of a third party, X (not being a purchaser for value of the legal interest without notice), B is entitled to enforce his equitable interest against the property in the hands of X because X is a trustee for B. In my
C  view the third party, X, is not necessarily a trustee for B: B's equitable right is enforceable against the property in just the same way as any other specifically enforceable equitable right can be enforced against a third party. Even if the third party, X, is not aware that what he has received is trust property B is entitled to assert his title in that property. If X has the necessary degree of knowledge, X may himself become a constructive
D  trustee for B on the basis of knowing receipt. But unless he has the requisite degree of knowledge he is not personally liable to account as trustee: *In re Diplock; Diplock v. Wintle* [1948] Ch. 465, 478; *In re Montagu's Settlement Trusts* [1987] Ch. 264. Therefore, innocent receipt of property by X subject to an existing equitable interest does not by itself make X a trustee despite the severance of the legal and equitable titles.
E  *Underhill and Hayton, Law of Trusts and Trustees,* pp. 369–370, whilst accepting that X is under no personal liability to account unless and until he becomes aware of B's rights, does describe X as being a constructive trustee. This may only be a question of semantics: on either footing, in the present case the local authority could not have become accountable for profits until it knew that the contract was void.

F  *Resulting trust*

This is not a case where the bank had any equitable interest which pre-dated receipt by the local authority of the upfront payment. Therefore, in order to show that the local authority became a trustee, the bank must demonstrate circumstances which raised a trust for the first time either at
G  the date on which the local authority received the money or at the date on which payment into the mixed account was made. Counsel for the bank specifically disavowed any claim based on a constructive trust. This was plainly right because the local authority had no relevant knowledge sufficient to raise a constructive trust at any time before the moneys, upon the bank account going into overdraft, became untraceable. Once there ceased to be an identifiable trust fund, the local authority could not
H  become a trustee: *In re Goldcorp Exchange Ltd.* [1995] 1 A.C. 74. Therefore, as the argument for the bank recognised, the only possible trust which could be established was a resulting trust arising from the circumstances in which the local authority received the upfront payment.

708
Lord Browne-
Wilkinson                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    [1996]

Under existing law a resulting trust arises in two sets of circumstances:    A
(A) where A makes a voluntary payment to B or pays (wholly or in part)
for the purchase of property which is vested either in B alone or in the
joint names of A and B, there is a presumption that A did not intend to
make a gift to B: the money or property is held on trust for A (if he is the
sole provider of the money) or in the case of a joint purchase by A and B
in shares proportionate to their contributions. It is important to stress
that this is only a *presumption*, which presumption is easily rebutted either    B
by the counter-presumption of advancement or by direct evidence of A's
intention to make an outright transfer: see *Underhill and Hayton, Law of
Trusts and Trustees,* pp. 317 et seq.; *Vandervell v. Inland Revenue
Commissioners* [1967] 2 A.C. 291, 312 et seq.; *In re Vandervell's Trusts
(No. 2)* [1974] Ch. 269, 288 et seq. (B) Where A transfers property to B
*on express trusts,* but the trusts declared do not exhaust the whole    C
beneficial interest: ibid. and *Quistclose Investments Ltd. v. Rolls Razor Ltd
(In Liquidation)* [1970] A.C. 567. Both types of resulting trust are
traditionally regarded as examples of trusts giving effect to the common
intention of the parties. A resulting trust is not imposed by law against
the intentions of the trustee (as is a constructive trust) but gives effect to
his presumed intention. Megarry J. in *In re Vandervell's Trusts (No. 2)*
suggests that a resulting trust of type (B) does not depend on intention    D
but operates automatically. I am not convinced that this is right. If the
settlor has expressly, or by necessary implication, abandoned any beneficial
interest in the trust property, there is in my view no resulting trust: the
undisposed-of equitable interest vests in the Crown as bona vacantia: see
*In re West Sussex Constabulary's Widows, Children and Benevolent (1930)
Fund Trusts* [1971] Ch. 1.    E

Applying these conventional principles of resulting trust to the present
case, the bank's claim must fail. There was no transfer of money to the
local authority on express trusts: therefore a resulting trust of type
(B) above could not arise. As to type (A) above, any presumption of
resulting trust is rebutted since it is demonstrated that the bank paid, and
the local authority received, the upfront payment with the intention that
the moneys so paid should become the absolute property of the local    F
authority. It is true that the parties were under a misapprehension that the
payment was made in pursuance of a valid contract. But that does not
alter the actual intentions of the parties at the date the payment was made
or the moneys were mixed in the bank account. As the article by William
Swadling, "A new role for resulting trusts?" 16 Legal Studies 133
demonstrates the presumption of resulting trust is rebutted by evidence of    G
any intention inconsistent with such a trust, not only by evidence of an
intention to make a gift.

Professor Birks, "Restitution and Resulting Trusts" (see *Equity:
Contemporary Legal Developments,* p. 335, at p. 360), whilst accepting that
the principles I have stated represent "a very conservative form" of
definition of a resulting trust, argues from restitutionary principles that
the definition should be extended so as to cover a perceived gap in the law    H
of "subtractive unjust enrichment" (at p. 368) so as to give a plaintiff a
proprietary remedy when he has transferred value under a mistake or
under a contract the consideration for which wholly fails. He suggests that

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))

A    a resulting trust should arise wherever the money is paid under a mistake
     (because such mistake vitiates the actual intention) or when money is paid
     on a condition which is not subsequently satisfied.

         As one would expect, the argument is tightly reasoned but I am not
     persuaded. The search for a perceived need to strengthen the remedies of
     a plaintiff claiming in restitution involves, to my mind, a distortion of
     trust principles. First, the argument elides rights in property (which is the
B    only proper subject matter of a trust) into rights in "the value transferred:"
     see p. 361. A trust can only arise where there is defined trust property: it
     is therefore not consistent with trust principles to say that a person is a
     trustee of property which cannot be defined. Second, Professor Birks's
     approach appears to assume (for example in the case of a transfer of value
     made under a contract the consideration for which subsequently fails) that
C    the recipient will be deemed to have been a trustee from the date of his
     original receipt of money, i.e. the trust arises at a time when the "trustee"
     does not, and cannot, know that there is going to be a total failure of
     consideration. This result is incompatible with the basic premise on which
     all trust law is built, viz. that the conscience of the trustee is affected.
     Unless and until the trustee is aware of the factors which give rise to the
     supposed trust, there is nothing which can affect his conscience. Thus
D    neither in the case of a subsequent failure of consideration nor in the case
     of a payment under a contract subsequently found to be void for mistake
     or failure of condition will there be circumstances, at the date of receipt,
     which can impinge on the conscience of the recipient, thereby making him
     a trustee. Thirdly, Professor Birks has to impose on his wider view an
     arbitrary and admittedly unprincipled modification so as to ensure that a
     resulting trust does not arise when there has only been a failure to perform
E    a contract, as opposed to total failure of consideration: see pp. 356–359
     and 362. Such arbitrary exclusion is designed to preserve the rights of
     creditors in the insolvency of the recipient. The fact that it is necessary to
     exclude artificially one type of case which would logically fall within the
     wider concept casts doubt on the validity of the concept.

         If adopted, Professor Birks's wider concepts would give rise to all the
F    practical consequences and injustices to which I have referred. I do not
     think it right to make an unprincipled alteration to the law of property
     (i.e. the law of trusts) so as to produce in the law of unjust enrichment
     the injustices to third parties which I have mentioned and the consequential
     commercial uncertainty which any extension of proprietary interests in
     personal property is bound to produce.

G
     *The authorities*

         Three cases were principally relied upon in direct support of the
     proposition that a resulting trust arises where a payment is made under a
     void contract.

H    (A) *Sinclair v. Brougham [1914] A.C. 398*

         The case concerned the distribution of the assets of the Birkbeck
     Permanent Benefit Building Society, an unincorporated body which was
     insolvent. The society had for many years been carrying on business as a

710

Lord Browne-
Wilkinson

Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    [1996]

bank which, it was held, was ultra vires its objects. The bank had accepted    A
deposits in the course of its ultra vires banking business and it was held
that the debts owed to such depositors were themselves void as being ultra
vires. In addition to the banking depositors, there were ordinary trade
creditors. The society had two classes of members, the A shareholders
who were entitled to repayment of their investment on maturity and the B
shareholders whose shares were permanent. By agreement, the claims of
the ordinary trade creditors and of the A shareholders had been settled.    B
Therefore the only claimants to the assets of the society before the court
were the ultra vires depositors and the B shareholders, the latter of which
could take no greater interest than the society itself.

The issues for decision arose on a summons taken out by the liquidator
for directions as to how he should distribute the assets in the liquidation.
In the judgments, it is not always clear whether this House was laying    C
down general propositions of law or merely giving directions as to the
proper mode in which the assets in that liquidation should be distributed.
The depositors claimed, first, in quasi-contract for money had and
received. They claimed secondly, as the result of an argument suggested
for the first time in the course of argument in the House of Lords (at
p. 404), to trace their deposits into the assets of the society.

D

*Money had and received*

The House of Lords was unanimous in rejecting the claim by the ultra
vires depositors to recover in quasi-contract on the basis of moneys had
and received. In their view, the claim in quasi-contract was based on an
implied contract. To imply a contract to repay would be to imply a
contract to exactly the same effect as the express ultra vires contract of    E
loan. Any such implied contract would itself be void as being ultra vires.

Subsequent developments in the law of restitution demonstrate that
this reasoning is no longer sound. The common law restitutionary claim is
based not on implied contract but on unjust enrichment: in the
circumstances the law imposes an obligation to repay rather than implying
an entirely fictitious agreement to repay: *Fibrosa Spolka Akcyjna v.
Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32, 63–64, *per* Lord    F
Wright; *Pavey & Matthews Pty. Ltd. v. Paul* (1987) 162 C.L.R. 221, 227,
255; *Lipkin Gorman v. Karpnale Ltd* [1991] 2 A.C. 548, 578c; *Woolwich
Equitable Building Society v. Inland Revenue Commissioners* [1993] A.C.
70. In my judgment, your Lordships should now unequivocally and finally
reject the concept that the claim for moneys had and received is based
on an implied contract. I would overrule *Sinclair v. Brougham* on this    G
point.

It follows that in *Sinclair v. Brougham* the depositors should have had
a personal claim to recover the moneys at law based on a total failure of
consideration. The failure of consideration was *not* partial: the depositors
had paid over their money in consideration of a promise to repay. That
promise was ultra vires and void; therefore the consideration for the
payment of the money wholly failed. So in the present swaps case (though    H
the point is not one under appeal) I think the Court of Appeal were right
to hold that the swap moneys were paid on a consideration that wholly
failed. The essence of the swap agreement is that, over the whole term of

711

A.C.                 Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                 Lord Browne-
Wilkinson

A   the agreement, each party thinks he will come out best: the consideration
for one party making a payment is an obligation on the other party to
make counter-payments over the whole term of the agreement.

If in *Sinclair v. Brougham* the depositors had been held entitled to
recover at law, their personal claim would have ranked pari passu with
other ordinary unsecured creditors, in priority to the members of the
society who could take nothing in the liquidation until all creditors had
B   been paid.

*The claim in rem*

The House of Lords held that, the ordinary trade creditors having
been paid in full by agreement, the assets remaining were to be divided
between the ultra vires depositors and the members of the society pro rata
according to their respective payments to the society. The difficulty is to
C   identify any single ratio decidendi for that decision. Viscount Haldane L.C.
(with whom Lord Atkinson agreed) and Lord Parker of Waddington gave
fully reasoned judgments (considered below). Lord Dunedin apparently
based himself on some "super-eminent" equity (not a technical equity) in
accordance with which the court could distribute the remaining assets of
the society: see pp. 434 and 436. The members (by which presumably he
D   means the society) were not in a fiduciary relationship with the depositors:
it was the directors not the society which had mixed the moneys: p. 438.
This indicates that he was adopting the approach of Lord Parker: yet he
concurred in the judgment of Lord Haldane L.C.: p. 438. I can only
understand his judgment as being based on some super-eminent jurisdiction
in the court to do justice as between the remaining claimants in the course
E   of a liquidation.

Lord Sumner plainly regarded the case as a matter of doing justice in
administering the remaining assets in the liquidation, all other claims
having been eliminated: p. 459. He said, at p. 458:

"The question is one of administration. The liquidator, an officer
of the court, who has to discharge himself of the assets that have
come to his hands, asks for directions, and, after hearing all parties
F   concerned, the court has the right and the duty to direct him how to
distribute all the assets. . . . In my opinion, if precedent fails, the
most just distribution of the whole must be directed, so only that no
recognised rule of law or equity be disregarded."

Lord Haldane L.C. treated the case as a tracing claim: could the
depositors follow and recover property with which, in equity, they had
G   "never really parted:" p. 418. After holding that the parties could not
trace at law (pp. 418–420) he said that the moneys could be traced in
equity "based upon trust:" p. 420. The only passage in which he identifies
the trust is at p. 421:

"The property was never converted into a debt, in equity at all events,
and there has been throughout a resulting trust, not of an active
H   character, but sufficient, in my opinion, to bring the transaction
within the general principle."

He treats the society itself (as opposed to its directors) as having mixed
the depositors' money with its own money, but says, at pp. 422–423, that

712

Lord Browne-
Wilkinson                Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))              [1996]

such mixing was not a breach of fiduciary duty by the society but        A
authorised by the depositors: it was intended that "the society should be
entitled to deal with [the depositors' money] freely as its own." On that
ground he distinguished *In re Hallett's Estate*, 13 Ch.D. 696 (a trustee is
taken to have drawn his own money first) and held that the mixed moneys
therefore belonged to the depositors and members pro rata.

Like others before me, I find Lord Haldane L.C.'s reasoning difficult,     B
if not impossible, to follow. The only equitable right which he identifies
arises under "a resulting trust, not of an active character" which, as
I understand it, existed from the moment when the society received the
money. Applying the conventional approach, the resulting trust could only
have arisen because either the depositors were treated as contributors to a
fund (a resulting trust of type (A) above) or because the "trust" on which
the moneys were paid to the society had failed (a resulting trust of type    C
(B)). Yet the finding that the society was not in breach of fiduciary duty
because it was the intention of the parties that the society should be free
to deal with the money as its own (p. 423) is inconsistent with either type
of resulting trust. Such an intention would rebut the *presumption* of
resulting trust of type (A) and is inconsistent with a payment on express
trusts which fail, i.e. with a type (B) resulting trust. Therefore the inactive
resulting trust which Lord Haldane L.C. was referring to was, as Professor    D
Birks points out ("Restitution and Resulting Trusts," *Equity: Contemporary
Legal Developments,* at pp. 359–362), not a conventional one: indeed there
is no trace of any such trust in earlier or later authority. The question is
whether the recognition of such a trust accords with principle and the
demands of certainty in commercial dealings.

As to the latter, Lord Haldane L.C.'s theory, if correct, gives rise to    E
all the difficulties which I have noted above. Nor does the theory accord
with principle. First, it postulates that the society became a trustee at a
time when it was wholly ignorant of the circumstances giving rise to the
trust. Second, since the depositors' money was *intended* to be mixed with
that of the society, there was never any intention that there should be a
separate identifiable trust fund, an essential feature of any trust. Third,
and most important, if Lord Haldane L.C.'s approach were to be       F
applicable in an ordinary liquidation it is quite incapable of accommodating
the rights of ordinary creditors. Lord Haldane L.C.'s inactive resulting
trust, if generally applicable, would give the depositors (and possibly the
members) rights having priority not only to those of ordinary trade
creditors but also to those of some secured creditors, e.g. the common
form security for bank lending, a floating charge on the company's assets.    G
The moneys of both depositors and members are, apparently, trust moneys
and therefore form no part of the company's assets available to pay
creditors, whether secured or unsecured. This seems to be an impossible
conclusion. Lord Haldane L.C. appreciated the difficulty, but did not
express any view as to what the position would be if there had been trade
creditors in competition: see pp. 421–422 and 425–426.

Lord Parker analysed the matter differently. He held that the depositors    H
had paid their money not to the society itself but to the directors, who
apparently held the moneys on some form of *Quistclose* trust (*Quistclose
Investments Ltd. v. Rolls Razor Ltd. (In Liquidation)* [1970] A.C. 567): the

A   money had been paid by the depositors to the directors to be applied by
them in making valid deposits with the society and, since such deposit was
impossible, the directors held the moneys on a trust for the depositors: see
pp. 441–442, 444. It is to be noted that Lord Parker does not at any time
spell out the nature of the trust. However, he held that the directors owed
fiduciary duties both to the depositors and to the members of the society.
Therefore it was not a case in which a trustee had mixed trust moneys

B   with his own moneys (to which *In re Hallett's Estate* would apply) but of
trustees (the directors) mixing the moneys of two innocent parties to both
of whom they owed fiduciary duties: the depositors and members therefore
ranked pari passu: p. 442.

I find the approach of Lord Parker much more intelligible than that of
Lord Haldane L.C.: it avoids finding that the society held the money on a

C   resulting trust at the same time as being authorised to mix the depositors'
money with its own. In *In re Diplock; Diplock v. Wintle* [1948] Ch. 465
the Court of Appeal found the ratio of *Sinclair v. Brougham* to lie in Lord
Parker's analysis. But, quite apart from the fact that no other member of
the House founded himself on Lord Parker's analysis, it is in some
respects very unsatisfactory. First, the finding that the depositors' moneys
were received by the directors, as opposed to the society itself, is artificial.

D   Although it was ultra vires the society to enter into a contract to repay
the moneys, it was not ultra vires the society to receive moneys. Second,
Lord Parker's approach gives depositors and members alike the same
priority over trade creditors as does that of Lord Haldane L.C. The fact
is that any analysis which confers an equitable proprietary interest as a
result of a payment under a void contract necessarily gives priority in an

E   insolvency to the recovery of the ultra vires payment. Lord Parker too
was aware of this problem: but he left the problem to be solved in a case
where the claims of trade creditors were still outstanding. Indeed he went
further than Lord Haldane L.C. He appears to have thought that the
court had power in some cases to postpone trade creditors to ultra vires
depositors and in other cases to give the trade creditors priority: which
course was appropriate he held depended on the facts of each individual

F   case: pp. 444 and 445. There is much to be said for the view that Lord
Parker, like Lord Haldane L.C. and Lord Sumner, was dealing only with
the question of the due administration of assets of a company in
liquidation. Thus he says, at p. 449:

"nor, indeed, am I satisfied that the equity to which effect is being
given in this case is necessarily confined to a liquidation. It is,

G   however, unnecessary for your Lordships to decide these points."

This makes it clear that he was not purporting to do more than decide
how the assets of that society in that liquidation were to be dealt with.

As has been pointed out frequently over the 80 years since it was
decided, *Sinclair v. Brougham* is a bewildering authority: no single ratio
decidendi can be detected; all the reasoning is open to serious objection; it

H   was only intended to deal with cases where there were no trade creditors
in competition and the reasoning is incapable of application where there
are such creditors. In my view the decision as to rights in rem in *Sinclair
v. Brougham* should also be overruled. Although the case is one where

714

Lord Browne-
Wilkinson

Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

property rights are involved, such overruling should not in practice disturb    A
long-settled titles. However, your Lordships should not be taken to be
casting any doubt on the principles of tracing as established in *In re
Diplock*.

If *Sinclair v. Brougham*, in both its aspects, is overruled the law can be
established in accordance with principle and commercial common sense: a
claimant for restitution of moneys paid under an ultra vires, and therefore
void, contract has a personal action at law to recover the moneys paid as    B
on a total failure of consideration; he will not have an equitable
proprietary claim which gives him either rights against third parties or
priority in an insolvency; nor will he have a personal claim in equity, since
the recipient is not a trustee.

(B) *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.*    C
    *[1981] Ch. 105*

In that case Chase Manhattan, a New York bank, had by mistake
paid the same sum twice to the credit of the defendant, a London bank.
Shortly thereafter, the defendant bank went into insolvent liquidation. The
question was whether Chase Manhattan had a claim in rem against the
assets of the defendant bank to recover the second payment.    D

Goulding J. was asked to assume that the moneys paid under a mistake
were capable of being traced in the assets of the recipient bank: he was
only concerned with the question whether there was a proprietary base on
which the tracing remedy could be founded: p. 116B. He held that, where
money was paid under a mistake, the receipt of such money without more
constituted the recipient a trustee: he said that the payer "retains an
equitable property in it and the conscience of [the recipient] is subjected    E
to a fiduciary duty to respect his proprietary right:" p. 119.

It will be apparent from what I have already said that I cannot agree
with this reasoning. First, it is based on a concept of retaining an equitable
property in money where, prior to the payment to the recipient bank,
there was no existing equitable interest. Further, I cannot understand how
the recipient's "conscience" can be affected at a time when he is not aware    F
of any mistake. Finally, the judge found that the law of England and that
of New York were in substance the same. I find this a surprising
conclusion since the New York law of constructive trusts has for a long
time been influenced by the concept of a *remedial* constructive trust,
whereas hitherto English law has for the most part only recognised an
institutional constructive trust: see *Metall und Rohstoff A.G. v. Donaldson
Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391, 478–480. In the present context,    G
that distinction is of fundamental importance. Under an institutional
constructive trust, the trust arises by operation of law as from the date of
the circumstances which give rise to it: the function of the court is merely
to declare that such trust has arisen in the past. The consequences that
flow from such trust having arisen (including the possibly unfair
consequences to third parties who in the interim have received the trust
property) are also determined by rules of law, not under a discretion.    H
A remedial constructive trust, as I understand it, is different. It is a judicial
remedy giving rise to an enforceable equitable obligation: the extent to
which it operates retrospectively to the prejudice of third parties lies in the

A    discretion of the court. Thus for the law of New York to hold that there
is a remedial constructive trust where a payment has been made under a
void contract gives rise to different consequences from holding that an
institutional constructive trust arises in English law.

     However, although I do not accept the reasoning of Goulding J.,
*Chase Manhattan* may well have been rightly decided. The defendant bank
knew of the mistake made by the paying bank within two days of the
B    receipt of the moneys: see at p. 115A. The judge treated this fact as
irrelevant (p. 114F) but in my judgment it may well provide a proper
foundation for the decision. Although the mere receipt of the moneys, in
ignorance of the mistake, gives rise to no trust, the retention of the
moneys after the recipient bank learned of the mistake may well have
given rise to a constructive trust: see *Snell's Equity*, p. 193; *Pettit, Equity*
C    *and the Law of Trusts*, 7th ed. (1993) p. 168; *Metall und Rohstoff A.G. v.
Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391, 473–474.

### (C) *In re Ames' Settlement; Dinwiddy v. Ames* [1946] Ch. 217

     In this case the father of the intended husband, in consideration of the
son's intended marriage with Miss H., made a marriage settlement under
D    which the income was payable to the husband for life and after his death
to the wife for life or until her remarriage, with remainder to the issue
of the intended marriage. There was an ultimate trust, introduced by the
words "If there should not be any child of the said intended marriage who
attains a vested interest . . ." for an artificial class of the husband's next
of kin. The marriage took place. Many years later a decree of nullity on
the grounds of non-consummation had the effect of rendering the marriage
E    void ab initio. The income was paid to the husband until his death which
occurred 19 years after the decree of nullity. The question was whether
the trust capital was held under the ultimate trust for the husband's next-
of-kin or was payable to the settlor's estate. It was held that the settlor's
estate was entitled.

     The judgment is very confused. It is not clear whether the judge was
F    holding (as I think correctly) that in any event the ultimate trust failed
because it was only expressed to take effect in the event of the failure of
the issue of a non-existent marriage (an impossible condition precedent)
or whether he held that all the trusts of the settlement failed because the
beneficial interests were conferred in consideration of the intended
marriage and that there had been a total failure of consideration. In either
event, the decision has no bearing on the present case. On either view, the
G    fund was vested in trustees on trusts which had failed. Therefore the
moneys were held on a resulting trust of type (B) above. The decision
casts no light on the question whether, there being no express trust,
moneys paid on a consideration which wholly fails are held on a resulting
trust.

H    *The stolen bag of coins*

     The argument for a resulting trust was said to be supported by the
case of a thief who steals a bag of coins. At law those coins remain
traceable only so long as they are kept separate: as soon as they are mixed

716
Lord Browne-
Wilkinson                Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                [1996]

with other coins or paid into a mixed bank account they cease to be     A
traceable at law. Can it really be the case, it is asked, that in such
circumstances the thief cannot be required to disgorge the property which,
in equity, represents the stolen coins? Moneys can only be traced in equity
if there has been at some stage a breach of fiduciary duty, i.e. if either
before the theft there was an equitable proprietary interest (e.g. the coins
were stolen trust moneys) or such interest arises under a resulting trust at    B
the time of the theft or the mixing of the moneys. Therefore, it is said, a
resulting trust must arise either at the time of the theft or when the
moneys are subsequently mixed. Unless this is the law, there will be no
right to recover the assets representing the stolen moneys once the moneys
have become mixed.

I agree that the stolen moneys are traceable in equity. But the
proprietary interest which equity is enforcing in such circumstances arises    C
under a constructive, not a resulting, trust. Although it is difficult to find
clear authority for the proposition, when property is obtained by fraud
equity imposes a constructive trust on the fraudulent recipient: the
property is recoverable and traceable in equity. Thus, an infant who has
obtained property by fraud is bound in equity to restore it: *Stocks v.
Wilson* [1913] 2 K.B. 235, 244; *R. Leslie Ltd. v. Sheill* [1914] 3 K.B. 607.
Moneys stolen from a bank account can be traced in equity: *Bankers     D
Trust Co. v. Shapira* [1980] 1 W.L.R. 1274, 1282C–E: see also *McCormick
v. Grogan* (1869) L.R. 4 H.L. 82, 97.

*Restitution and equitable rights*

Those concerned with developing the law of restitution are anxious to    E
ensure that, in certain circumstances, the plaintiff should have the right to
recover property which he has unjustly lost. For that purpose they have
sought to develop the law of resulting trusts so as to give the plaintiff a
proprietary interest. For the reasons that I have given in my view such
development is not based on sound principle and in the name of unjust
enrichment is capable of producing most unjust results. The law of
resulting trusts would confer on the plaintiff a right to recover property    F
from, or at the expense of, those who have not been unjustly enriched at
his expense at all, e.g. the lender whose debt is secured by a floating
charge and all other third parties who have purchased an equitable interest
only, albeit in all innocence and for value.

Although the resulting trust is an unsuitable basis for developing
proprietary restitutionary remedies, the remedial constructive trust, if    G
introduced into English law, may provide a more satisfactory road
forward. The court by way of remedy might impose a constructive trust
on a defendant who knowingly retains property of which the plaintiff has
been unjustly deprived. Since the remedy can be tailored to the
circumstances of the particular case, innocent third parties would not be
prejudiced and restitutionary defences, such as change of position, are
capable of being given effect. However, whether English law should follow    H
the United States and Canada by adopting the remedial constructive trust
will have to be decided in some future case when the point is directly in
issue.

717

A.C.    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))    Lord Browne-Wilkinson

A    *The date from which interest is payable*

The Court of Appeal held that compound interest was payable by the local authority on the balance for the time being outstanding, such interest to start from the date of the receipt by the local authority of the upfront payment of £2·5m. on 18 June 1987. Although, for the reasons I have given, I do not think the court should award compound interest in this

B    case, I can see no reason why interest should not start to run as from the date of payment of the upfront payment. I agree with the judgment of Leggatt L.J. in the Court of Appeal [1994] 1 W.L.R. 938, 955 that there is no good ground for departing from the general rule that interest is payable as from the date of the accrual of the cause of action.

*Equity acting in aid of the common law*

C    Since drafting this speech I have seen, in draft, the speeches of my noble and learned friends, Lord Goff of Chieveley and Lord Woolf. Both consider that compound interest should be awarded in this case on the grounds that equity can act in aid of the common law and should exercise its jurisdiction to order compound interest in aid of the common law right to recover moneys paid under an ultra vires contract.

D    I fully appreciate the strength of the moral claim of the bank in this case to receive full restitution, including compound interest. But I am unable to accept that it would be right in the circumstances of this case for your Lordships to develop the law in the manner proposed. I take this view for two reasons.

First, Parliament has twice since 1934 considered what interest should be awarded on claims at common law. Both the Act of 1934, section 3(1),

E    and its successor, section 35A of the Act of 1981, make it clear that the Act does not authorise the award of compound interest. However both Acts equally make it clear that they do not impinge on the award of interest in equity. At the time those Acts were passed, and indeed at all times down to the present day, equity has only awarded compound interest in the limited circumstances which I have mentioned. In my judgment, your Lordships would be usurping the function of Parliament if, by

F    expanding the equitable rules for the award of compound interest, this House were now to hold that the court exercising its equitable jurisdiction in aid of the common law can award compound interest which the statutes have expressly not authorised the court to award in exercise of its common law jurisdiction.

Secondly, the arguments relied upon by my noble and learned friends were not advanced by the bank at the hearing. The local authority would

G    have a legitimate ground to feel aggrieved if the case were decided against them on a point which they had had no opportunity to address. Moreover, in my view it would be imprudent to introduce such an important change in the law without this House first having heard full argument upon it. Although I express no concluded view on the points raised, the proposed development of the law bristles with unresolved questions. For example,

H    given that the right to interest is not a right which existed at common law but is solely the creation of statute, would equity in fact be acting in aid of the common law or would it be acting in aid of the legislature? Does the principle that equity acts in aid of the common law apply where there

718

is no concurrent right of action in equity? If not, in the absence of any    A
trust or fiduciary relationship what is the equitable cause of action in this
case? What were the policy reasons which led Parliament to provide
expressly that only the award of simple interest was authorised? In what
circumstances should compound interest be awarded under the proposed
expansion of the equitable rules? In the absence of argument on these
points it would in my view be imprudent to change the law. Rather, the
whole question of the award of compound interest should be looked at    B
again by Parliament so that it can make such changes, if any, as are
appropriate.

For these reasons, which are in substance the same as those advanced
by my noble and learned friend, Lord Lloyd of Berwick, I am unable to
agree with the views of Lord Goff of Chieveley and Lord Woolf.

C

*Conclusion*

I would allow the appeal and vary the judgment of the Court of
Appeal so as to order the payment of simple interest only as from 18 June
1987 on the balance from time to time between the sums paid by the bank
to the local authority and the sums paid by the local authority to the
bank.    D


LORD SLYNN OF HADLEY. My Lords, for the reasons given by my
noble and learned friend, Lord Browne-Wilkinson, I agree that *Sinclair v.
Brougham* [1914] A.C. 398 should be departed from and that it should be
held that in this case the local authority was neither a trustee of, nor in a
fiduciary position in relation to, the moneys which it had received from    E
the bank, nor had it improperly profited from the use of those moneys.
For the reasons which he gives no resulting trust could arise on the
present facts.

It follows that if, as I think, Lord Brandon of Oakbrook in *President
of India v. La Pintada Compania Navigacion S.A.* [1985] A.C. 104, 116,
was right to say that in the Court of Chancery the award of compound
interest was limited to situations "where money had been obtained and    F
retained by fraud, or where it had been withheld or misapplied by a
trustee or anyone else in a fiduciary position," Courts of Chancery would
not have awarded compound interest in a case like the present.

It is common ground that compound interest could not have been
awarded at common law as presently formulated nor under the statutory
provisions in section 3 of the Law Reform (Miscellaneous Provisions) Act    G
1934 nor under section 35A of the Supreme Court Act 1981 as inserted by
the Administration of Justice Act 1982.

But for the legislation I would have accepted that it was open to your
lordships to hold that, in the light of the development of the law of
restitution, the courts could award compound interest, either by modifying
the common law rule or by resorting to equity to act in aid of the common
law right to recover moneys paid under a void transaction. As to whether    H
it would have been right to do so in general terms, or whether it would
have been right to limit the cases in which compound interest should be
awarded, or whether compound interest should be awarded at all I am

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Slynn
of Hadley

A   not, on the restricted arguments advanced in this case, prepared to
comment.

I do not, however, consider that it would be right on this appeal to
enlarge the cases in which compound interest can be awarded when
Parliament has twice in relatively recent times limited statutory interest to
simple interest. This is a matter which should be considered by Parliament
when the merits or disadvantages of giving the courts power to award
B   compound interest could be examined in a context wider than the present
case.

Accordingly in agreement with my noble and learned friends, Lord
Browne-Wilkinson and Lord Lloyd of Berwick, and despite the forceful
reasoning of my noble and learned friends, Lord Goff of Chieveley and
Lord Woolf, I would allow the appeal and vary the judgment of the Court
C   of Appeal so as to award simple interest from 18 June 1987.

LORD WOOLF.   My Lords, this appeal raises directly only one issue of
law. It is whether the courts have jurisdiction to make an order for the
payment of compound interest ancillary to an order for restitution when
a contract is ultra vires. All the judges in the courts below concluded that
there was jurisdiction to do so.
D
In this case an order was made in favour of the respondent bank as
against the appellant local authority which was the recipient of the ultra
vires payment. There is no dispute that there was jurisdiction to make an
order for the payment of *simple* interest. The dispute is limited to the
order for compound interest.

It is accepted that if there is jurisdiction to make the order this is a
E   case in which this achieves a just result. There is only one other issue
raised by the appeal and that is as to the date from which the interest
should be paid.

The transaction was a commercial transaction. The local authority in
calculating the balance which it had to repay the bank was given credit
for the sums which it had paid by way of notional interest under the
contract prior to it being appreciated that the contract might be ultra
F   vires. If the transaction had not taken place the local authority would
have had to borrow (if it could find a way of lawfully doing so) the sum
paid to it by the bank on terms which would be likely to involve
compound interest being recoverable in proceedings for default. (Here see
*National Bank of Greece S.A. v. Pinios Shipping Co. No. 1* [1990] 1 A.C.
637 as to commercial transactions with banks.) The bank could have lent
G   that sum on the same basis.

Hobhouse J., the judge at first instance, reflected the commercial
justice of the situation in the passage in his judgment in which he set out
succinctly why he considered compound interest was payable [1994] 4 All
E.R. 890, 955:

"[The local authority] has kept that sum and has not made any
restitution. In this situation I see no reason why I should not exercise
H   my equitable jurisdiction to award compound interest. Simple interest
does not reflect the actual value of money. Anyone who lends or
borrows money on a commercial basis receives or pays interest
periodically and if that interest is not paid it is compounded

720

Lord Woolf          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

(e.g. *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373 and *National Bank
of Greece S.A. v. Pinios Shipping Co. No. 1, The Maira* [1990] 1 A.C.
637). I see no reason why I should deny the plaintiff a complete
remedy or allow the defendant arbitrarily to retain part of the
enrichment which it has unjustly enjoyed. There are no special factors
which have to be taken into account. No question of insolvency is
involved nor is there any basis for any persuasive argument to the
contrary."

This being the situation I am relieved that I am of the opinion that the
judges in the courts below were correct in concluding that in the
circumstances of this case they were entitled to award compound interest.
Any other decision would be inconsistent with the court's ability to grant
full restitution. It would be a further unhappy aspect, from a commercial
standpoint, of the history of this case in particular and the swaps litigation
as a whole. This commenced with the decision, to which I was a party at
first instance, of *Hazell v. Hammersmith and Fulham London Borough
Council* [1992] 2 A.C. 1. It is no secret that the decision at first instance in
that case, which was approved by this House, caused dismay among some
of those concerned with the standing abroad of the commercial law of this
country. That concern is likely to be increased if the outcome of this
litigation is that this appeal has to be allowed by this House because the
courts have no jurisdiction to grant compound interest.

The position is not improved by the fact that such is the confused state
of English law as to the extent of its jurisdiction to award interest that the
hearing before their Lordships involved four days of argument. Argument
that could have lasted even longer but for counsel for the local authority
courteously informing their Lordships that because of the costs which the
local authority was incurring on the appeal he was required by his clients
to curtail his argument.

The argument had been extended by their Lordships themselves raising
the issue as to the correctness of a decision of this House of some 80 years
standing (*Sinclair v. Brougham* [1914] A.C. 398). That case does not
directly involve the courts' equitable jurisdiction to award interest. Yet the
issue as to whether the case was correctly decided still needed to be raised
because the reasoning in that case was inconsistent with the submissions
of the local authority. The fact that counsel was required to take the
course of seeking to limit his argument does put in question whether the
way appeals are managed before the House and the resources available to
their Lordships are ideal for meeting both the contemporary needs of
litigants and their Lordships' responsibilities for the proper development
of the law.

I have had the considerable advantage of being able to read in draft
the admirably reasoned speeches of Lord Goff of Chieveley and Lord
Browne-Wilkinson. That reasoning convinces me that the bank is not
entitled to proceed by way of an equitable proprietary claim and that the
recipient of a sum of money paid under an ultra vires contract should not
be regarded as owing the duty of a trustee or a fiduciary to the payer of
that sum. Further than that it is not necessary for me to go. This avoids
the dangers which Lord Browne-Wilkinson suggests could result from the

A.C.         Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))         Lord Woolf

A    wholesale importation into commercial law of equitable principles. I am also in agreement with Lord Goff's reasoning as to compound interest being able to be awarded where one party is under a duty to make restitution to another, as a consequence of the development of the law of restitution.

B    *The significance of the difference between equitable principles and remedies*

Such a wholesale importation is not necessarily the consequence of a finding that the courts have the equitable jurisdiction to make an order for the payment of compound interest in conjunction with the grant of a remedy of restitution. We are concerned here primarily not with equitable principles of substantive law but with the possible existence of an equitable remedy. Compound interest, if it is recoverable, will be recoverable in the
C    circumstances of this case in equity because of the absence of any statutory or common law remedy which will prevent the local authority being unjustly enriched at the expense of the bank if compound interest is not payable.

The situation is one in which compound interest would be awarded because it would be unconscionable to allow the local authority to make a profit out of a contract which was void because it had exceeded its own
D    powers. This is very much an analogous situation to those where equity has traditionally provided remedies. Perhaps the best example is provided by specific performance. It is unnecessary to inquire whether the right which is being enforced by an order of specific performance is one recognised by the common law or equity. What does matter is whether it is equitable to grant the remedy and whether an award of damages in lieu
E    would be an adequate remedy.

In addition, if the contract had not been void and the local authority had failed to make the payments required the bank might well, as I will seek to show, have been fully protected by its remedy in damages at common law. Because there is no contract damages are not available. Here the situation is very much in accord with those where equity traditionally mitigates the inadequacy of a common law remedy without
F    having to invoke substantive equitable law principles. This situation is described in *Snell's Equity*, p. 26:

"Between them, equitable interests, mere equities, floating equities and the great doctrines of equity cover most of the field of equity; and they are all concerned to a greater or lesser degree with the rights of property. Yet although the existence of such rights has long been
G    an important factor in deciding whether equity will intervene, it is not essential. Equitable remedies, though often used in aid of property rights, are also often used in other cases. The underlying principle is the inadequacy of the common law remedy of damages. Thus the equitable remedies of rescission and injunction may be employed in relation to contracts for personal services; and injunctions are
H    sometimes granted in cases of tort which involve no rights of property. In this sense there may be equities unrelated to property."

In the same way there may be equities unrelated to a breach of trust or fiduciary duty. I would add that equity does not only come to the aid

722
**Lord Woolf**          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

of a claimant where damages are an inadequate remedy. It can also do so
when one of the other common law remedies is inadequate. I would take
as an example the remedy of an account. The advantages of the equitable
remedy over the common law remedy have resulted in the latter remedy
being supplanted by the former. It may well be that the editors of *Snell's
Equity* did not have in mind the power to award interest when writing the
paragraph I have set out. The paragraph is nonetheless of general
application and there is no reason why it should not apply to the equitable
remedy of awarding interest in the same way as it applies to
other equitable remedies. The award of interest is only distinct from other
remedies in that it is usually awarded as an ancillary to some other
remedy.

I therefore accept Mr. Sumption's submission on behalf of the bank
that where there is a duty to make restitution equity can achieve full
restitution by granting, when it is appropriate to do so, simple or
compound interest in addition to requiring repayment of the principal
sum. For this to be the position the defendant must have made an actual
or presumed profit, a profit which he is presumed to have derived from
his having been the recipient of a principal sum which he has not repaid.
The compound interest will not be payable as of right. The remedy of
awarding interest, like other equitable remedies, will be discretionary.
Interest will only be awarded when it accords with equitable principles to
make the award.

I appreciate that Mr. Sumption did not advance the argument in
favour of the grant of compound interest on the basis that I have put
forward. However, he came before your Lordships' House not expecting
*Sinclair v. Brougham* [1914] A.C. 398 to be challenged. He had no reason
in his printed case to do other than base his argument on the fact that the
local authority was a fiduciary. Before your Lordships he made clear that
while he was arguing that the local authority was a fiduciary he was also
contending that, if there was power to order restitution, equity could, as
I have already indicated, achieve full restitution. This is also clear from
the statements in the bank's case to which I will refer shortly.

*The absence of previous authority*

There may be no clear previous authority to support this conclusion
but this is not surprising where the relatively new jurisdiction of ordering
restitution is involved. What is more important than the absence of clear
support in the authorities for the grant of compound interest is the
absence from the existing authorities of any statement of principle
preventing the natural development of a salutary equitable jurisdiction
enabling compound interest to be awarded. The jurisdiction is clearly
desirable if full restitution in some cases is to be achieved. It is relevant
here to repeat what is stated at the outset in the bank's case under the
heading "The Position in Principle:"

    "1. ' . . . any civilised system of law is bound to provide remedies
    for cases of what has been called unjust enrichment or unjust benefit,
    that is to prevent a man from retaining the money of or some benefit
    derived from another which it is against conscience that he should
    keep:' *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour*

723

A.C.        Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))        Lord Woolf

A        *Ltd.* [1943] A.C. 32, 61 (Lord Wright), approved in *Woolwich Equitable Building Society v. Inland Revenue Commissioners* [1993] A.C. 70, 197, 202."

Restitution is an area of the law which is still in the process of being evolved by the courts. In relation to restitution there are still questions remaining to be authoritatively decided. One question, which was still

B    undecided until the decision on this appeal, is whether its legitimacy is derived from the common law or equity or both. In order to decide whether compound interest is payable in this case I do not consider it is necessary to decide which is the correct answer to that question, but I am content to assume that the cause of action is one at common law. If the principal sum is repayable as money had and received rather than under

C    some trust or because of the existence of a fiduciary duty it is still unconscionable for the local authority to retain the benefit it made from having received payment under a contract it purported to make which was outside its powers. The fact that, until the law was clarified by the decision in this case, the local authority may reasonably not have appreciated that it should make restitution is not critical. What is critical is that the

D    payment of compound interest is required to achieve restitution. A defendant may perfectly reasonably not regard himself as having been a trustee until the court so decides but this does not effect the remedies which the court has jurisdiction to grant. The jurisdiction of the court to grant remedies has to be judged in the light of what the court decides.

As to the date from which the interest should run I am in agreement with Lord Browne-Wilkinson that the decision of the Court of Appeal

E    should not be disturbed.


*Unjust enrichment creates the required relationship*

There are a great many situations where interest as an equitable remedy has been awarded. Examples are conveniently set out in *Halsbury's Laws of England*, 4th ed., vol. 32 (1980), p. 55, para. 109. The principle

F    which connects those examples is stated in the first sentence of the paragraph. It is the existence of a "particular relationship . . . between the creditor and debtor." The "particular relationship" in this case arises out of the right of the bank to restitution and the fact that the local authority would be unjustly enriched if it retained what it had received. That made

G    the local authority an accounting party. The bank had to give credit for the sums it had received and the local authority had to pay the balance which was still due of what it had received. What it had received included the use of the money. The approach is precisely that indicated in the passage in the judgment of Lord Hatherley L.C. in *Burdick v. Garrick*, L.R. 5 Ch.App. 233, 241 already cited by Lord Browne-Wilkinson. It is the making of the award not as a punishment but to disgorge a profit

H    made or presumed to have been made out of the payment of a sum of money which should not have been made. Here this was because the contract was void as being ultra vires. There would be no difference of principle if the contract was void for mistake.

724
Lord Woolf          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

*No distinction in principle between simple and compound interest*          A

If the case is one where there is jurisdiction to award equitable interest
then whether compound or simple interest is recoverable depends on the
facts of the particular case. If it is not a situation where the defendant
would have earned compound interest then as in *Burdick v. Garrick* there
would be no profit of compound interest so it will not be awarded. Simple
interest will awarded instead.          B

*The Law Commission's approach*

In Law of Contract: Report on Interest (Law Com. No. 88) (1978)
(Cmnd. 7229), the Law Commission decided not to make any
recommendations for change as to the equitable jurisdiction. It is, however,
interesting to note the following paragraphs of the report:          C

"10. Thirdly, there is the equitable jurisdiction. Interest may be
awarded as ancillary relief in respect of equitable remedies such as
specific performance, rescission or the taking of an account.
Furthermore, the payment of interest may be ordered where money
has been obtained and retained by fraud, or where it has been
withheld or misapplied by an executor or a trustee or anyone else in
a fiduciary position. . . ."          D

"*(a) The equitable jurisdiction*
"21. The equitable jurisdiction to award interest and to fix the
rate at which it should be paid is extensive. It includes, for example,
the power to order the payment of interest where money has been
obtained or withheld by fraud or where it has been misapplied by
someone in a fiduciary position. In such cases the court has an          E
inherent power to order the payment of interest at whatever rate is
equitable in the circumstances and may direct that such interest be
compounded at appropriate intervals. Our view is that it would not
be appropriate to impose statutory controls upon the exercise of the
equitable jurisdiction to award interest, beyond those controls that
are already in existence. We invited criticisms of this view in our          F
working paper but no one disagreed with us. Accordingly, we make
no recommendations for change in relation to the equitable
jurisdiction."

From what I have said already it is clear that I agree with the
statements in those paragraphs in so far as the equitable jurisdiction to
award interest is regarded as "ancillary relief" but not in so far as they          G
suggest that it is only equitable remedies in relation to which there can be
the ancillary jurisdiction to award interest. The paragraphs are perfectly
satisfactory as long as they are not regarded as exhaustive. It has to be
remembered that the Law Commission were not intending to make any
recommendations as to equitable interest.
The fact that the paragraphs accept that compound interest is payable          H
in the case of fraud perhaps suggests that it is not intended to limit the
relief to situations which only give an entitlement to an equitable remedy.
In many cases of fraud the appropriate remedy will be common law
damages. It is true in the first of the only two cases referred to by the Law

A  Commission, *Johnson v. The King* [1904] A.C. 817, 821, the Privy Council appeared to think that interest was not payable in the case of an overpayment by mistake. However the authority relied on for this conclusion was *London, Chatham and Dover Railway Co. v. South Eastern Railway Co.* [1893] A.C. 429. Lord Macnaghten, at p. 821, regarded "the law as settled by the judgment" of this House in that case. It is a case to which I will refer later but it was not concerned with the equitable

B  jurisdiction to grant interest, only the common law jurisdiction. What is of interest is what Lord Macnaghten said as to the power to award interest if there had been fraud. He said, at p. 822:

C  "In order to guard against any possible misapprehension of their Lordships' views, they desire to say that, in their opinion, there is no doubt whatever that money obtained by fraud and retained by fraud can be recovered with interest, whether *the proceedings be taken in a court of equity or in a court of law*, or in a court which has a jurisdiction both equitable and legal, as the Supreme Court of Sierra Leone possesses under the Ordinance of November 10, 1881." (Emphasis added.)

D  Lord Macnaghten did not consider that it mattered whether the proceedings were based on a common law or equitable cause of action.

The other case referred to in the Report is *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373. That case is a clear authority for the existence of an equitable jurisdiction and that it can be exercised where there is breach of a fiduciary duty but the court was not concerned with extent of that jurisdiction. It was accepted by all the members of the Court of Appeal

E  that the jurisdiction was frequently exercised in the case of breach of trust and of a fiduciary duty but there is nothing in the judgments to suggest that the jurisdiction is limited to those situations. Indeed Lord Denning M.R. clearly did not regard it as being so limited. He said, at p. 388:

F  "The reason is because a person in a fiduciary position is not allowed to make a profit out of his trust: and, if he does, he is liable to account for that profit or interest in lieu thereof. In addition, in equity interest is awarded whenever a wrongdoer deprives a company of money which it needs for use in its business. It is plain that the company should be compensated for the loss thereby occasioned to it. Mere replacement of the money—years later—is by no means adequate compensation, especially in days of inflation. The company

G  should be compensated by the award of interest. That was done by Sir William Page Wood V.-C. (afterwards Lord Hatherley) in one of the leading cases on the subject, *Atwool v. Merryweather* (1867) L.R. 5 Eq. 464n., 468–469. But the question arises: should it be simple interest or compound interest? On general principles I think it should be presumed that the company (had it not been deprived of the money) would have made the most beneficial use open to it: cf.

H  *Armory v. Delamirie* (1723) 1 Stra. 505. It may be that the company would have used it in its own trading operations; or that it would have used it to help its subsidiaries. Alternatively, it should be presumed that the wrongdoer made the most beneficial use of it. But,

726

A

whichever it is, in order to give adequate compensation, the money should be replaced at interest with yearly rests, i.e. compound interest."

This was a broader approach than that adopted by Buckley L.J. or Scarman L.J.

B

There remains a further case to which I should make reference before leaving the authorities as to the equitable jurisdiction. It is *President of India v. La Pintada Compania Navigacion S.A.* [1985] A.C. 104. This is the leading case as to the common law and statutory jurisdictions to which I will return later. I refer to it for the leading speech of Lord Brandon of Oakbrook with which the other members of the House agreed. Lord Brandon reviewed the different jurisdictions to award interest. While doing so he made the following dicta about the equitable jurisdiction, at p. 116 (Lord Brandon also referred to the equitable jurisdiction, at pp. 118–121, but he was then dealing with the position as to interest in the Admiralty Court and I do not consider those references are of any help here):

C

"Thirdly, the area of equity. The Chancery courts, again differing from the common law courts, had regularly awarded simple interest as ancillary relief in respect of equitable remedies, such as specific performance, rescission and the taking of an account. Chancery courts had further regularly awarded interest, including not only simple interest but also compound interest, when they thought that justice so demanded, that is to say in cases where money had been obtained and retained by fraud, or where it had been withheld or misapplied by a trustee or anyone else in a fiduciary position. . . . The first point is that neither the Admiralty Court, nor Courts of Chancery, awarded interest, except in respect of moneys for which they were giving judgment. The second point is that the Admiralty Court never, and Courts of Chancery only in two special classes of case, awarded compound, as distinct from simple, interest."

D

E

The House had been referred in the course of argument to the report of the Law Commission and I suspect that Lord Brandon restricted the jurisdiction of the courts to award interest to equitable remedies following what was stated in that report. Likewise as to the distinction which he drew between the jurisdictions to award simple and compound interest. According to the report of argument, counsel did not address the House on the limits of the equitable jurisdiction. Therefore although any statement of Lord Brandon is entitled to the greatest respect I do not regard these two dicta as indicating that Lord Brandon held a considered opinion inconsistent with my views, which I have set out above. It may well be that he was doing no more than describing the situations where in the past the equitable jurisdiction had been exercised.

F

G

*The position where the claim is based on a personal equity*

H

Lord Browne-Wilkinson, in his speech, points out that two arguments were not advanced on behalf of the bank. The first is that the local authority should be liable to make the repayments as a constructive trustee. There is no need for me to make any comment about this

A     argument. The second argument which was not advanced is that the bank
was entitled to repayment because of the existence of a personal equity
based on the decision in *In re Diplock; Diplock v. Wintle* [1948] Ch. 465.
This is a point which it is necessary for me to consider because of the
decision of Hobhouse J. in *Kleinwort Benson Ltd. v. South Tyneside
Metropolitan Borough Council* [1994] 4 All E.R. 972, although the decision
in *In re Diplock* dealt with very different circumstances from those which

B     exist here. The court in *In re Diplock* was concerned with the personal
equitable liability of a legatee to repay the executors of an estate of a
deceased person a sum which was wrongly paid to them out of the estate.
In the *Kleinwort Benson* case, Hobhouse J. decided that the existence of a
personal equitable cause of action did not create a power to award
compound interest. This conclusion is inconsistent with the view which

C     I have expressed that there is a power to award compound interest in the
circumstances of this case.

     Personal equitable rights are not confined to the situation considered
in *In re Diplock*. For example, a personal equitable right to contribution
can exist between co-sureties. This is regarded as being an application of
an equitable approach to restitution to a situation where the remedy at
law is not normally satisfactory. It exists without there having to be any

D     proprietary right which could give rise to the difficulties to which Lord
Browne-Wilkinson has referred.

     The *Kleinwort Benson* case also involved a local authority which had
entered into a swap transaction which was void. Hobhouse J. distinguished
the *Kleinwort Benson* case from the present case because in that case there
was no reliance on an equitable proprietary claim for repayment of the

E     sum which had been paid under the void swap contract. In the *Kleinwort
Benson* case, the local authority accepted that prima facie they were under
a personal liability to make restitution in law and in equity to the bank
but argued it was not open to a court to award compound interest where
only remedies in personam were established.

     Hobhouse J. decided that the local authority's submissions were
correct. He said, at pp. 994–995:

F

       "The position is therefore that if a plaintiff is entitled to a
proprietary remedy against a defendant who has been unjustly
enriched, the court may but is not bound to order the repayment of
the sum with compound interest. If on the other hand the plaintiff is
only entitled to a personal remedy which will be the case where,
although there was initially a fiduciary relationship and the payer was

G        entitled in equity to treat the sum received by the payee as his, the
payer's, money and to trace it, but because of subsequent
developments he is no longer able to trace the sum in the hands of
the payee, then there is no subject matter to which the rationale on
which compound interest is awarded can be applied. The payee
cannot be shown to have a fund belonging to the payer or to have
used it to make profits for himself. The legal analysis which is the

H        basis of the award of compound interest is not applicable. (It is
possible that in some cases there might be an intermediate position
where it could be demonstrated that the fiduciary had, over part of
the period, profited from holding a fund as a fiduciary even though

he no longer held the fund at the date of trial and that in such a case    A
the court might make some order equivalent to requiring him to
account for those profits; but that is not the situation which I am
asked to consider in the present case.) Although the original equitable
right in both situations is the same at the outset, that is to say at the
time when the payment was made and received, the two situations do
not continue to be the same and are not the same at the time of trial    B
when the remedy comes to be given. The payee no longer has property
of the payer. The payer is confined to personal rights and remedies
analogous to those recognised by the common law in the action for
money had and received. In such a situation only simple interest can
be awarded even though the plaintiff is relying upon a restitutionary
remedy. Simple interest was awarded in *Woolwich Equitable Building
Society v. Inland Revenue Commissioners* [1993] A.C. 70 and in *B.P.*    C
*Exploration Co. (Libya) Ltd. v. Hunt (No. 2)* [1979] 1 W.L.R. 783
and both those cases involved an application of restitutionary
principles which carried with them remedies in personam (see also
*O'Sullivan v. Management Agency and Music Ltd.* [1985] Q.B. 428.)."

  The three cases cited by the judge to support his proposition that    D
simple interest only could be awarded do not in fact assist to determine
the question of principle which is at stake here. In both the *Woolwich* and
the *B.P. Exploration* cases, the claim which was advanced was limited to
statutory interest. The position as to compound interest was not
considered. In the *O'Sullivan* case, it was conceded that in relation to part
of the claim compound interest was payable and, in fact, it was awarded.
Only simple interest was paid in relation to the balance of the claim, but    E
this was not because of any lack of jurisdiction; it was because it was only
appropriate to award simple interest in the circumstances of that case.

  If Hobhouse J.'s reasoning is correct, then even if there had been an
equitable claim in rem which would justify the award of compound
interest, that would cease to be the situation if the right to trace were lost.
That this would create an unsatisfactory state of affairs is demonstrated    F
by the contrasting decisions to which the judge came in this case and in
the *Kleinwort Benson* case. The power of the court to award compound
interest would depend upon circumstances over which the claimant would
have no control. This is inconsistent with the commercial realities to which
the judge referred in the passage which I have cited from his judgment in
this case.

  Contrary to the view expressed by Hobhouse J., the rationale on which    G
compound interest is awarded is independent of whether or not there is
any property capable of being traced still in the payee's hands. The critical
issue is whether, as has happened in this case, the authority was able to
make a profit (which would include making a saving in the interest which
it had to pay) from the fact it had received a sum of money to which it
was not entitled. Even in the case of a claim in rem, the profit is distinct    H
from the traceable property. If this were not the position the payee by
returning the property to the payer prior to the proceedings could defeat
the right which a claimant would otherwise have to compound interest.

08-01789-cgm    Doc 20008-5    Filed 11/25/20    Entered 11/25/20 14:46:21    Attachment
5    Pg 61 of 73

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Woolf

A   Hobhouse J. refers, at p. 994, to *In re Diplock; Diplock v. Wintle* [1948]
Ch. 465 in order to identify the distinction between personal and
proprietary equitable remedies. He cites a passage from the very long
judgment of the Court of Appeal in that case, at p. 521. However,
although this is not clear, I would regard that passage as dealing only
with equitable *proprietary* remedies. He also refers to a further passage in
the judgment in *In re Diplock*, at p. 517, which he does not cite. He
B   presumably refers to the sentence in the judgment which indicates the view
of the Court of Appeal that:

> "upon their personal claims the appellants [plaintiffs] are not entitled
> to any interest. The same may not however be true as regards the
> claims in rem, at least where the appellants are able to 'trace' their
> proprietary interest into some specific investment."

C
It is therefore probable that Hobhouse J. was influenced in coming to his
decision by the judgment of the Court of Appeal in *In re Diplock.*
However, that judgment provides a shaky foundation for Hobhouse J.'s
decision. The passage to which he refers can, and should, in my judgment,
be regarded as doing no more than indicating the decision on the merits
of the situation which the Court of Appeal was considering in *In re
D   Diplock*, a situation which is very different from that which exists here.
There was no commercial relationship between the parties. The overpaid
legatees' liability was secondary and they were charities. In those
circumstances if they had actually made a profit from the overpayment
which could be traced it would have been reasonable to award interest but
if they had not it would not have been reasonable to do so. I would draw
attention here to the following passage of the judgment of the Court of
E   Appeal in *In re Diplock*, at p. 503, which indicates the Court of Appeal's
general approach:

> "Since the original wrong payment was attributable to the blunder of
> the personal representatives, the right of the unpaid beneficiary is in
> the first instance against the wrongdoing executor or administrator:
> and the beneficiary's direct claim in equity against those overpaid or
F   > wrongly paid should be limited to the amount which he cannot
> recover from the party responsible. In some cases the amount will be
> the whole amount of the payment wrongly made . . ."

I would also draw attention to the only passage in the Court of
Appeal's judgment which gives any reason for their conclusion as to
interest which is in these terms, at pp. 506–507:
G
> "We should add that . . . in our judgment the respondents are
> liable under this head of their claim for the principal claimed only
> and not for any interest. This last result appears to follow from the
> case of *Gittins v. Steele* (1818) 1 Swan. 199, cited in *Roper on
> Legacies*, 4th ed. (1847), p. 461, where the language of Lord Eldon
> L.C. in the case, at p. 200, is cited: 'If a legacy has been erroneously
H   > paid to a legatee who has no farther property in the estate, in recalling
> that payment, I apprehend that the rule of the court is not to charge
> interest; but if the legatee is entitled to another fund making interest
> in the hands of the court, justice must be done out of his share.' "

The judgment of Lord Eldon L.C., at p. 200, in this case is extremely    A
short. The Court of Appeal has cited the whole of the judgment except
the opening sentence which reads: "Where the fund out of which the
legacy ought to have been paid is in the hands of the court making
interest, unquestionably interest is due."

In fact, interest was therefore ordered to be paid in that case at 4 per
cent. The short judgment of Lord Eldon L.C. was in proceedings which
followed an earlier judgment (1818) 1 Swan. 24. Having examined the    B
case in both reports, I find they provide no support for a general
proposition that equity could not in an appropriate case award interest in
support of a personal equitable claim. The case supports the contrary
view. In the circumstances which Lord Eldon L.C. is considering, the
legatee had as far as one can tell benefited financially from the early
payment and, that being so, the decision is merely an example of the fact    C
that if a payee has benefited financially from his being unjustly enriched,
an order for interest will be made. It is relevant that as interest had been
earned (in the hands of the court), interest was payable.

Before leaving *In re Diplock* it is important to note that *In re Diplock*
was not concerned with whether compound interest was payable; it was
concerned with whether any interest, simple or compound, was payable.
The view that no interest, not even simple, was payable was understandable    D
on the facts but not otherwise.

While, therefore, it is not necessary on my approach to decide whether
the sums paid by the bank are recoverable from the local authority in
equity or in common law, it is necessary for me to indicate that
Hobhouse J. was wrong in his judgment in *Kleinwort Benson Ltd. v. South
Tyneside Metropolitan Borough Council* [1994] 4 All E.R. 972 in deciding    E
that he would have no power to award compound interest if, as he
thought was the case, the bank was entitled to a personal equitable remedy
which would enable it to obtain judgment for the sums which had been
paid.

There is one more aspect of Hobhouse J.'s judgment to which I should
refer. In his review of the authorities, Hobhouse J. drew attention to two
lines of authority, one where simple interest is being awarded, and the    F
second where compound interest being awarded. In the former situation,
the court, according to Hobhouse J., is concerned to compensate the party
for what he has lost in consequence of not receiving the money to which
he was entitled. In the latter situation the court is concerned with the
benefit which the payee has derived as a result of the payment having
been made. The distinction is a valid one if what is being considered is the
right to interest on the one hand under the statute or common law and on    G
the other in equity. The distinction is not valid if a different position is
being considered, namely, whether simple or compound interest should be
awarded in equity. Equity, in the case of both simple and compound
interest, will look at the benefit which the payee has derived. If it is
equitable so to do, the payee will be ordered to pay simple or compound
interest depending upon the benefit which has resulted from the payment.    H

*The position at common law and by statute*

I should now deal shortly with the situation as to interest at common
law and by statute. At common law the power to award interest was

731

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Woolf

A linked to the power to award damages. While the equitable jurisdiction was concerned to prevent profit by the recipient of funds to which he was not entitled, the common law was concerned with the loss suffered by the payer of the funds. The statutory jurisdiction differed from the common law because initially there had to be a judgment for the payment of a debt or damages before interest could be awarded and the legislator was dealing with the generality of those situations.

B As to the common law position a convenient starting-point is provided by the decision of this House in *London, Chatham and Dover Railway Co. v. South Eastern Railway Co.* [1893] A.C. 429 which I have already cited. In that case the Lord Chancellor, Lord Herschell, and the other members of this House, came to the conclusion with considerable reluctance that at common law where there was no agreement or statutory provision which

C permitted the payment of interest a court had no power to award interest, whether simple or compound, by way of damages for the late payment of a debt. The view of the House was rather surprising because the members reluctantly followed a decision of Lord Tenterden C.J. in *Page v. Newman* (1829) 9 B. & C. 378 which was based on convenience in preference to an earlier and more "liberal" line of authorities including a decision of Lord Mansfield C.J. in *Eddowes v. Hopkins* (1780) 1 Doug. 376 and Lord

D Ellenborough C.J. in *De Havilland v. Bowerbank* (1807) 1 Camp. 50. Lord Mansfield C.J. stated the position in these terms:

"that though by the common law, book debts do not of course carry interest, it may be payable in consequence of the usage of particular branches of trade; or of a special agreement; . . ."

E (which of course is beyond question) or, in cases of long delay under vexatious and oppressive circumstances, if a jury in their discretion shall think fit to allow it. Lord Ellenborough C.J. included among four categories of situations where interest was payable that where the money had been actually used and interest made on it.

After the decision in the *London, Chatham and Dover Railway Co.* case

F it was generally accepted that at common law, apart from statute and some limited exceptions, there was no power to award simple or compound interest for the late payment of a sum of money.

This situation which was regarded as unsatisfactory by this House in 1893 was ameliorated in 1934 by the intervention of the legislature. Section 3(1) of the Law Reform (Miscellaneous Provisions) Act 1934 considerably extended the power which was contained in Lord Tenterden's

G Act, the Civil Procedure Act 1833 (3 & 4 Will. 4, c. 42). The Act of 1934 so far as relevant provided:

"3(1) In any proceedings tried in any court of record for the recovery of any debt or damages, the court may, if it thinks fit, order that there shall be included in the sum for which judgment is given interest at such rate as it thinks fit on the whole or any part of the

H debt or damages for the whole or any part of the period between the date when the cause of action arose and the date of the judgment: Provided that nothing in this section—(*a*) shall authorise the giving of interest upon interest; or (*b*) shall apply in relation to any debt

732
Lord Woolf        Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))        [1996]

upon which interest is payable as of right whether by virtue of any  A
agreement or otherwise; . . ."

It is to be noted that section 3 of the Act of 1934 makes it abundantly
clear that it does not authorise the giving of compound interest and that
it confines the power to award interest to situations where there is a "sum
for which judgment is given." The latter point was a cause of considerable
injustice. It enabled a debtor to prevent a court exercising the power under  B
section 3 of the Act of 1934 by making a late payment but a payment
prior to any judgment being given. To remedy that situation, the Supreme
Court Act 1981 was amended by the Administration of Justice Act 1982
by adding a new section, section 35A. Section 35A is still the current
relevant statutory provision. It makes clear: (a) that it is still only simple
interest which is payable, that it only applies to the recovery of a debt or  C
damages and that interest is to be paid at "such rate as the court thinks
fit or as rules of court may provide" (subsection (1)); (b) that the section
does not apply when for whatever reason interest on a debt already runs
(subsection (4)); (c) that the section applies to payments made up to the
date of the judgment (subsection (1)(a)).

The Act of 1982 followed the Report on Interest by the Law
Commission (Law Com. No. 88) (Cmnd. 7229) of 7 April 1978 to which  D
I have already referred. Parliament did not implement by the Act of 1982
all the recommendations of the Law Commission as to changes which
should be made. In particular, it did not accede to the suggestion of the
Law Commission that there should be a statutory standard rate of interest
for reasons of administrative convenience. Instead, it retained the court's
existing wide statutory discretion.  E

There are two more cases to which I need to refer. The first is
*Wadsworth v. Lydall* [1981] 1 W.L.R. 598 and the second is *President of
India v. La Pintada Compania Navigacion S.A.* [1985] A.C. 104, to which
I have already referred. The decision in *Wadsworth v. Lydall* received
express approval in *La Pintada.* I refer to *Wadsworth v. Lydall* for three
reasons. The first is that it brings out clearly that despite the decision of
this House in *London, Chatham and Dover Railway Co. v. South Eastern*  F
*Railway Co.* [1893] A.C. 429, there is no inherent common law bias against
the award of compound interest at common law. What is required for
compound interest to be payable is that the contract either expressly or
impliedly provides for the payment of compound interest or there is a
breach of the contract and the breach is such that compound interest will
be regarded as flowing from the breach in accordance with the second  G
limb of the principle laid down in *Hadley v. Baxendale* (1854) 9 Exch.
341. The second reason is that while prior to the decision in *Wadsworth v.
Lydall* it could legitimately be thought that the situations where compound
interest would be awarded at common law were necessarily of a
commercial nature, this is not an essential requirement. The situations
where it was clearly established that compound interest was recoverable
(as, for example, in the case of bills of exchange or banking transactions)  H
should be regarded not so much as independent exceptions to a general
rule but as examples of the application of a general rule where in
accordance with ordinary contractual principles compound interest should

A   be recoverable. The third reason why I refer to *Wadsworth v. Lydall* is that it clearly demonstrates that notwithstanding the period which has elapsed since the decision in the *London, Chatham and Dover Railway Co.* case, in 1893, the courts will be prepared to limit the application of that decision where this can be done in accordance with principle and it is appropriate to do so.

B   *Wadsworth v. Lydall* was a decision of the Court of Appeal. The facts were straightforward. The defendant and the plaintiff had an informal partnership agreement under which the partnership held an agricultural tenancy of a farm and the plaintiff lived in the farmhouse. When the partnership was dissolved the plaintiff and the defendant agreed that the plaintiff would give up possession of the farm by a specified date when he would receive £10,000 from the defendant. On the strength of that

C   agreement the plaintiff entered into a further agreement with a third party to purchase another property on terms which required him to pay the £10,000, which by then he should have received from the defendant, to the third party. Only part of the £10,000 was paid by the defendant to the plaintiff prior to his completing his transaction with the third party. The plaintiff therefore had to take out a mortgage from the third party for the balance. In an action which he brought against the defendant the

D   plaintiff claimed as special damages the interest and costs he incurred due to his having to obtain the mortgage.

The trial judge disallowed those two items of special damage but the plaintiff succeeded in recovering them as a result of the decision of the Court of Appeal. In relation to the argument that the Court of Appeal were bound to conclude that the appeal failed because of the combined

E   effect of the decision in the *London, Chatham and Dover Railway Co.* case and because of the provisions of the Law Reform (Miscellaneous) Provisions Act 1934, Brightman L.J. said, at p. 603:

"In my view the court is not so constrained by the decision of the House of Lords. In *London, Chatham and Dover Railway Co. v. South Eastern Railway Co.* [1893] A.C. 429 the House of Lords was not concerned with a claim for special damages. The action was an action

F   for an account. The House was concerned only with a claim for interest by way of general damages. If a plaintiff pleads and can prove that he has suffered special damage as a result of the defendant's failure to perform his obligation under a contract, and such damage is not too remote on the principle of *Hadley v. Baxendale* (1854) 9 Exch. 341, I can see no logical reason why such special

G   damage should be irrecoverable merely because an obligation on which the defendant defaulted was an obligation to pay money and not some other type of obligation."

The facts of *President of India v. La Pintada Compania Navigacion S.A.* [1985] A.C. 104 are not important. Its significance is that the approach of this House was that Parliament had chosen to remedy some of the

H   injustices caused by the common law rule as laid down in the decision in the *London, Chatham and Dover Railway Co.* case, and the restrictive language of section 3(1) of the Act of 1934. Due deference to the intention of Parliament therefore prevented any further departure from the House's

734
**Lord Woolf**          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

earlier decision in relation to interest. So the earlier decision would still     A
apply to general damages.

In his speech, Lord Brandon of Oakbrook identified, at p. 122, "three
cases in which the absence of any common law remedy for damage or loss
caused by the late payment of a debt may arise . . ." For convenience he
described these cases as case 1, case 2 and case 3. Case 1 is where a debt
is paid late, before any proceedings for its recovery have been begun.     B
Case 2 is where a debt is paid late, after proceedings for its recovery have
begun, but before they have been concluded. Case 3 is where a debt
remains unpaid until, as a result of proceedings for its recovery being
brought and prosecuted to a conclusion, a money judgment is given in
which the original debt becomes merged.

Having examined the history and origins of the common law rule and
the interventions by the legislature, Lord Brandon described qualification     C
of the common law rule made in *Wadsworth v. Lydall* as being important,
and set out his conclusions as follows, at p. 129:

> "First, an ideal system of justice would ensure that a creditor should
> be able to recover interest both on unpaid debts in case 1, and also
> in respect of debts paid late or remaining unpaid in cases 2 and 3.
> Secondly, if the legislature had not intervened twice in this field since     D
> the *London, Chatham and Dover Railway Co.* case, first by the Act of
> 1934 and more recently by the Act of 1982, and if the Court of
> Appeal had not limited the scope of that case by its decision in
> *Wadsworth v. Lydall* [1981] 1 W.L.R. 598, I should have thought that
> a strong, if not an overwhelming, case would have been made out for
> your Lordships' House, in order to do justice to creditors in all three     E
> cases 1, 2 and 3, to depart from the decision in the *London, Chatham
> and Dover Railway* case [1893] A.C. 429. But, thirdly, since the
> legislature has made the two interventions in this field to which I have
> referred, and since the scope of the *London, Chatham and Dover
> Railway* case has been qualified to a significant extent by *Wadsworth
> v. Lydall* [1981] 1 W.L.R. 598, I am of the opinion, for three main
> reasons, that the departure sought by the respondents would not now     F
> be justified."

The first of the reasons Lord Brandon gave for his conclusion was that
the greater part of the injustice had already been remedied by the
intervention of the legislature and judicial qualification of the scope of the
decision in *London, Chatham and Dover Railway Co. v. South Eastern
Railway Co.* [1893] A.C. 429. The second was that Parliament had given     G
effect in legislation to some of the recommendations of the Law
Commission (Law of Contract: Report on Interest (Law Com. No. 88)
(1978) (Cmnd. 7229)) but had not given effect to further recommendations
which meant that for the House to intervene would be to intervene in a
manner which would conflict with the policy indicated by Parliament. The
third reason was that the intervention would create for creditors a remedy     H
as of right rather than a discretionary remedy which would be again
contrary to the policy of Parliament as indicated in the Acts of 1934 and
1982.

735

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))            Lord Woolf

A    *The reasoning in President of India v. La Pintada Compania Navigacion S.A. does not apply to equitable interest*

In relation to that reasoning [1985] A.C. 104 it is important to note that none of the three reasons directly apply to the issue at present before their Lordships. The first reason does not directly apply to the present case because neither the legislation nor the decision in *Wadsworth v.*

B    *Lydall* [1981] 1 W.L.R. 598 addresses the injustice demonstrated by the facts of this case. The injustice arises because, contrary to the intention of the parties, there is no contract. The inroads which have been made on the decision in the *London, Chatham and Dover Railway Co.* case by *Wadsworth v. Lydall* can only apply where there is a contract under which either interest is expressly payable or the situation is one where the second limb of the rule in *Hadley v. Baxendale*, 9 Exch. 341 applies to a breach

C    of contract. The second reason given by Lord Brandon, at p. 129, does not apply because the Law Commission made no recommendation as to the equitable remedy of interest. The third reason does not apply because if the court has jurisdiction to award interest in equity, like other equitable remedies, the remedy will be discretionary.

I therefore do not find anything in Lord Brandon's reasoning which makes it inappropriate to extend the right in equity so that it extends to

D    the recovery of compound interest ancillary to a restitutionary remedy. In this case this is particularly true because if there had been a contract and non-payment of the sums due under the contract by the local authority the bank may well, if proceedings resulted, have received compound interest as special damages.

E    *The desirability of the equitable jurisdiction being extended*

A decision in favour of the bank in this case will mark a further improvement in the powers of the English courts, an improvement the need for which has so frequently been recognised. While the improvement is consistent with the decision of this House in *La Pintada*, it should be noted that that decision has not been free from criticism. In a typically

F    closely reasoned article, "On Interest, Compound Interest and Damages" (1985) 101 L.Q.R. 30 the late Dr. F. A. Mann was not impressed by the reasoning of the House. Dr. Mann, at p. 34, found it difficult to understand, if interest, including compound interest, was recoverable under the second limb under the rule in *Hadley v. Baxendale*:

G    "why it should not also be recoverable under the first limb, where damages are such 'as may fairly and reasonably be considered arising naturally, i.e. according to the usual course of things' from the breach?"

As Dr. Mann pointed out, at pp. 34–35, to say that interest considered as damages is too remote is an argument which at the present time is no longer realistic or persuasive and which can only be described as an

H    "empty phrase." The modern test should be whether the debtor could reasonably foresee that in the ordinary course of things the loss was likely to occur or was on the cards. Who would refuse to impute such knowledge to a debtor? Who would venture to suggest that a defaulting debtor could

736
Lord Woolf          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

not reasonably foresee interest as the creditor's loss flowing from the
failure to pay?

A

Dr. Mann did not distinguish between simple and compound interest.
However, if what he said with regard to simple interest is true then
adopting the same approach it must equally apply to compound interest.
Dr. Mann's final comment was, at p. 47:

> "The history of interest, particularly in the field of Admiralty, displays
> a lack of legal analysis and a degree of positivism and inflexibility
> which show the common law of England at its worst."

B

In my judgment, their Lordships should avoid leaving the equitable
jurisdiction of the English courts open to the same criticism.

Lord Browne-Wilkinson and Lord Lloyd of Berwick (whose speech I
have also had the advantage of reading in draft) do not regard this as a
case in which it would be appropriate to extend the law in the way
I would wish. Their arguments, which are based on the legislative history
as to interest and, in the case of Lord Lloyd, also based on *La Pintada,*
I have dealt with already. However, as to the suggestion of usurpation of
the role of Parliament I do remind myself of the approach of Lord
Brandon of Oakbrook in the passage in his speech in *La Pintada*, at
p. 129, which I have previously cited. Both Lord Browne-Wilkinson and
Lord Lloyd also make the additional point that the local authority could
feel aggrieved if this appeal were to be decided on the approach which
Lord Goff and I would adopt. Here I take a different view. If their
Lordships had not raised the issue of the correctness and scope of the
decision in *Sinclair v. Brougham* [1914] A.C. 398, the bank would have
succeeded. The local authority were only prepared to argue this point with
reluctance. As I have indicated, the local authority also wanted the
argument curtailed. In these circumstances they can hardly complain if
they lacked the opportunity of dealing with the detail of your Lordships'
reasoning.

C

D

E

In my recollection of his argument Mr. Sumption made it clear that
his argument was not totally dependent on establishing that the local
authority was a fiduciary. I have already set out how his case described
the position in principle. I would also refer to paragraph 13 of his case
and the footnote thereto, where he said:

F

> "Quite apart from the proprietary claim, the bank also has a
> *pérsonal* claim in equity to require the council to account for its
> property: *Snell's Equity,* 29th ed., pp. 284–287.[1]" (Emphasis added.)
>
> "[1] In *Sinclair v. Brougham* it was held that there was no personal
> claim in equity or at law, because to allow such a claim would be
> indirectly to enforce an invalid borrowing contract: see, in particular,
> pp. 414, 418 (Viscount Haldane L.C.). This part of the decision has
> been subjected to powerful and justified criticism by Lord Wright
> (1938) 6 C.L.J. 805. But even if correct *it has no application to a
> restitutionary claim, whether at law or in equity,* arising out of a void
> swap contract since such restitution would not be legally or financially
> equivalent to enforcement of the contract itself." (Emphasis added.)

G

H

The passage in *Snell's Equity* refers to a personal claim in equity where
their is a breach of trust. However, the footnote makes reasonably clear

737
A.C.              Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))           Lord Woolf

A   that Mr. Sumption was applying the same approach as I would to a
restitutionary claim "whether at law or in equity."
    For these reasons I would dismiss the appeal.

    LORD LLOYD OF BERWICK.   My Lords, it was common ground before
your Lordships that the bank is entitled to recover the principal sum of
£1,145,526 in a common law action for money had and received. Judgment
B   for that sum would carry simple interest at the appropriate rate under
section 35A of the Supreme Court Act 1981. Hobhouse J. [1994] 4 All
E.R. 890 and the Court of Appeal [1994] 1 W.L.R. 938 have held (albeit
for different reasons) that the bank has an alternative claim to recover the
principal sum in equity, and that the equitable cause of action entitles the
bank to claim a discretionary award of compound interest, depending on
C   the facts of the particular case. The issue in the appeal as it came before
your Lordships was whether the courts below were right in this respect.
Thus the bank's argument is stated succinctly in paragraph 11 of its
printed case as follows:

        "The bank's submission in summary is that where money is paid
    either (i) pursuant to a contract which is void, or (ii) under a
D       fundamental mistake of fact or law, the money is impressed in the
    hands of the payee with a trust in favour of the payer. The payee is
    then accountable to the payer not only for the principal but for the
    entire benefit which he has obtained from his possession of the
    principal in the intervening period."

    A little later it is said, in paragraph 12(5): "The separation of the legal
E   from the equitable interest necessarily imports a trust." In support of his
argument Mr. Sumption relied, as he had in the courts below, on *Sinclair
v. Brougham* [1914] A.C. 398. He also relied on the speech of Lord
Brandon of Oakbrook in *President of India v. La Pintada Compania
Navigacion S.A.* [1985] A.C. 104, 116. It was not suggested in the bank's
printed case that Lord Brandon's formulation of the equitable jurisdiction
to award compound interest was incomplete, or insufficient for the bank's
F   purposes. Nor was it suggested that the decision of Hobhouse J. in the
parallel decision of *Kleinwort Benson Ltd. v. South Tyneside Metropolitan
Borough Council* [1994] 4 All E.R. 972 (in which he declined to make an
award of compound interest in favour of the bank, on the ground that the
bank was in that case confined to its common law action for money had
and received) was wrongly decided.
G       The local authority, in paragraph 5.1 of its case, stated the issue for
decision in similar terms:

        "Both parties accept that compound, as opposed to simple, interest
    is payable only if the council received the money under the void
    interest rate swaps agreement as fiduciary: *President of India v. La
    Pintada Compania Navigacion S.A.* [1985] A.C. 104, 116."

H       The whole thrust of the local authority's case was directed to showing
that it was not a fiduciary when it received the money and did not become
a fiduciary thereafter. *Sinclair v. Brougham* could be distinguished. It had
never been suggested that the mere failure to pay back the principal sum

738

Lord Lloyd
of Berwick        **Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))**        [1996]

rendered the local authority a fiduciary, otherwise "every overdue debtor    A
would be a fiduciary liable to compound interest" (paragraph 6.12).

Both parties, therefore, came before your Lordships on the basis that
*Sinclair v. Brougham* was correctly decided, for whatever it did decide. But
in the course of the argument your Lordships indicated that the House
would be willing to reconsider the correctness of that decision. For the
reasons given by my noble and learned friend, Lord Browne-Wilkinson,    B
I agree that *Sinclair v. Brougham* was wrongly decided on both the points
discussed in his speech, and should be overruled. I understand that all
your Lordships are agreed that the bank has failed to make good its claim
that it has an equitable cause of action against the local authority for
breach of duty as trustee or fiduciary. It follows that the ground on which
the courts below awarded compound interest cannot be supported. The
local authority has succeeded on the only issue on which the parties came    C
before your Lordships. Accordingly, I would be content to allow the
appeal, and leave it at that.

But my noble and learned friend, Lord Woolf, is of the view that, even
though the bank has failed to prove any breach of trust or fiduciary duty,
it may nevertheless be entitled to claim compound interest by way of a
general equitable remedy ancillary to its common law claim for money    D
had and received; and his views receive the powerful support of my noble
and learned friend, Lord Goff of Chieveley.

I have naturally considered these views with the greatest care; for there
is much force in the argument that the local authority ought, in justice, to
pay compound interest, if it would have had to pay compound interest (as
no doubt it would) on sums borrowed by way of more orthodox bank
lending. But I regret that in my opinion the House cannot, or at any rate    E
should not, hold that there is any such power in equity to make good the
supposed defects of the common law remedy. I have come to that
conclusion for three main reasons.

In the first place the point in question, which is one of great general
importance, was scarcely argued. This was not the fault of counsel. The
point only emerged from the background once it became apparent that    F
*Sinclair v. Brougham* might fall to be reconsidered. By then there was no
time to develop the argument. Thus the decision of Hobhouse J. in the
*Kleinwort Benson* case, which would have to be overruled if the point is
good, was only mentioned by Mr. Philipson at the very end of his
argument, and then only in connection with the date from which interest
should run. The decision was never mentioned by Mr. Sumption in oral    G
argument at all.

Nor did Mr. Sumption seek to question the reasoning or conclusion of
the House in *President of India v. La Pintada Compania Navigacion S.A.*
[1985] A.C. 104. On the contrary, he relied on Lord Brandon's speech as
an accurate summary of the equitable jurisdiction to award compound
interest in the two special classes of case to which Lord Brandon referred.
I may be wrong, but I do not recall any reference to the comments    H
expressed by Mason C.J. and Wilson J. in *Hungerfords v. Walker,* 171
C.L.R. 125. It is accepted that to decide the compound interest point in
favour of the bank would mean breaking new ground, and would be

739

A.C.                 Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Lloyd
                                                                              of Berwick

A   extending the equitable jurisdiction to a field where it has never before
    been exercised. I do not think it right to take so momentous a course
    involving such widespread ramifications, on the back of such inadequate
    argument. Above all I cannot regard it as fair to decide the case against
    the local authority on the alternative argument when through no fault of
    their own they have not had a proper opportunity to deal with the
    argument.

B       Secondly, I have difficulty in reconciling an award of compound
    interest as an equitable remedy available in support of the common law
    claim for money had and received with the ratio decidendi of the House
    in *La Pintada*. The facts of that case were that the charterers were between
    two and six years late in paying sums due to the owners by way of freight
    and demurrage. The owners claimed interest in respect of the late payment.

C   The question was referred to arbitration, and the umpire awarded
    compound interest in favour of the owners for the whole period of the
    delay. One of the questions of law for the court was whether the umpire
    had jurisdiction to award interest in respect of the late payment.
    Mr. Saville Q.C. launched a frontal attack on *London, Chatham and Dover
    Railway Co. v. South Eastern Railway Co.* [1893] A.C. 429, in which it was
    held that a claim for interest by way of general damages will not lie at

D   common law for late payment of a debt, in the absence of some custom
    binding on the parties, or some express or implied agreement. In giving
    the leading speech, Lord Brandon said, at p. 129, that other things being
    equal there was "a strong, if not an overwhelming, case" for departing
    from the decision in the *London, Chatham and Dover Railway Co.* case in
    order to do justice to creditors. But with regret he felt unable to take that

E   course. I return to his reasons later. All the other noble Lords shared
    Lord Brandon's regret. Lord Roskill said, at p. 111:

        "It has long been recognised that *London, Chatham and Dover Railway
        Co. v. South Eastern Railway Co.* left creditors with a legitimate sense
        of grievance and an obvious injustice without remedy. I think the
        House in 1893 recognised those consequences of the decision, but

F       then felt compelled for historical reasons to leave that injustice
        uncorrected."

    Like Lord Brandon, he felt unable to depart from the *London, Chatham
    and Dover Railway* case, and called for the injustice to be remedied by
    further legislation.
        I quote these passages in order to make the point that if Mr. Saville,

G   for the owners, could have detected some way of supporting the umpire's
    award of compound interest, he would have found a ready ear. He pointed
    out in the course of his argument that the equitable jurisdiction to award
    compound interest had survived the passing of the Act of 1934, as had the
    Admiralty jurisdiction, and he argued that these "exceptional" jurisdictions
    should be regarded as the rule, and not vice versa. But this argument did
    not prevail. When Lord Brandon said, at p. 116, that "the Admiralty

H   Court never, and Courts of Chancery *only in two special classes of case*"
    awarded compound, as distinct from simple, interest (my emphasis), he
    meant, I think, exactly what he said. Moreover, he regarded it as a point
    of importance. I cannot, therefore, agree that he was only giving examples

of the application of a more general equitable jurisdiction to grant   A
ancillary relief by way of compound interest. To my mind the immediate
context, and the shape of the case as a whole, make quite clear that that
was not his meaning.

It may be said that in *President of India v. La Pintada Compania
Navigacion S.A.* [1985] A.C. 104 the claim was for payment of a debt due
under a contract, whereas in the present case the claim is for money had   B
and received. But why should that make any difference? It is true that the
common law action for money had and received can be given a
restitutionary label; and that "restitution" may be said to be incomplete
unless compound interest is included in the award. But the label cannot
change the underlying reality. The cause of action remains a common law
action for the return of money paid in pursuance of an ineffective contract.
If compound interest cannot be recovered in a claim for debt due under a   C
contract (in the absence of custom, or some express or implied agreement
to that effect) I cannot see any reason in principle, or logic, why it should
be recoverable in the case of money paid under a contract which turns out
to be ineffective.

It is said, nevertheless, that the reasoning which led Lord Brandon to
reject the owners' claim for compound interest does not apply to the
different facts of the present case. Lord Brandon identified three main   D
reasons for his conclusion. It is to the second reason, at p. 130, that
I would draw attention. I will quote the reason in full:

> "My second main reason is that, when Parliament has given effect by
> legislation to some recommendations of the Law Commission in a
> particular field, but has taken what appears to be a policy decision
> not to give effect to a further such recommendation, any decision of   E
> your Lordships' House which would have the result of giving effect,
> by another route, to the very recommendation which Parliament
> appears to have taken that policy decision to reject, could well be
> regarded as an unjustifiable usurpation by your Lordships' House of
> the functions which belong properly to Parliament, rather than as a
> judicial exercise in departing from an earlier decision on the ground   F
> that it has become obsolete and could still, in a limited class of cases,
> continue to cause some degree of injustice."

It is true that the Law Commission (Law of Contract: Report on Interest
(Law Com. No. 88) (1978) (Cmnd. 7229)) made no recommendation for
changing the equitable jurisdiction to award interest, and so Parliament
cannot be said to have taken a policy decision to reject any such   G
recommendation. But the underlying objection remains. Parliament has
on two occasions, first in 1934, and then in 1981, remedied injustices
which had long been apparent in the power to award interest at common
law. On the latter occasion it did so in the light of the view expressed by
the Law Commission that the equitable jurisdiction to award interest was
working satisfactorily, and called for no change. To extend the equitable
jurisdiction for the first time to cover a residual injustice at common law,   H
which Parliament chose not to remedy, would, I think, be as great a
usurpation of the role of the legislature, and as clear an example of
judicial law-making, as it would have been in *La Pintada.* If it is thought

741

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Lloyd
of Berwick

A  desirable that the courts should have a power to award compound interest
in common law claims for money had and received, then such a result can
now only be brought about by Parliament.

My third reason for rejecting the bank's claim for compound interest
is that I am by no means certain that the policy considerations all point
in favour of change. It is presumably in commercial transactions that the
discretionary power to award compound interest would most frequently
B  be used, on the ground that the money received by the payee would
otherwise have had to be borrowed at compound interest. But it is in just
such transactions that the need for certainty is paramount. Disputes which
would otherwise be settled on the basis of simple interest would be fought
in the hope of persuading the court that an award of compound interest
was appropriate. It is interesting to note that it was on this very ground
C  that Lord Tenterden C.J. rejected the solution proposed by Best C.J. in
*Arnott v. Redfern* (1826) 3 Bing. 353. In *Page v. Newman* (1829) 9 B. & C.
378, Lord Tenterden said, at pp. 380–381:

"If we were to adopt as a general rule that which some of the
expressions attributed to the Lord Chief Justice of the Common Pleas
in *Arnott v. Redfern* which it seemed to warrant, viz. that interest is
D      due wherever the debt has been wrongfully withheld after the plaintiff
has endeavoured to obtain payment of it, it might frequently be made
a question at nisi prius whether the proper means had been used to
obtain payment of the debt, and such as the party ought to have
used. That would be productive of great inconvenience."

As one who has in the past attempted to keep open the availability of
E  equitable remedies in commercial disputes, I am now conscious of the
strength of the arguments the other way: see *Scandinavian Trading Tanker
Co. A.B. v. Flota Petrolera Ecuatoriana* [1983] 2 A.C. 694, disapproving
dicta of Lloyd J. in *Afovos Shipping Co. S.A. v. R. Pagnan and Flli.* [1980]
2 Lloyd's Rep. 469. It is, of course, true that even an award of simple
interest lies in the discretion of the court, as does the rate of interest. But
in the great majority of cases it is not difficult to predict the amount of
F  simple interest which is likely to be awarded. Compound interest, on the
other hand, is not so predictable. It presents wider room for disagreement.
Disputes would be likely to end up in court, and this would, in the words
of Lord Tenterden, "be productive of great inconvenience." Despite the
weight which must attach to the views of my noble and learned friends,
Lord Goff of Chieveley and Lord Woolf, I would allow the appeal.

G

*Appeal allowed with costs.*

*Solicitors: Nabarro Nathanson; Travers Smith Braithwaite.*

M. G.

H