# EXHIBIT F

Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Adv. Case No. 10-04377-smb

4  Adv. Case No. 10-04658-smb

5  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6  IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

7  MADOFF INVESTMENT SECURITIES LLC,

8           Plaintiff,

9      v.

10 NELSON et al.,

11          Defendants.

12 - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14          United States Bankruptcy Court

15          One Bowling Green

16          New York, NY  10004

17

18          May 8, 2019

19          10:22 AM

20

21 B E F O R E :

22 HON STUART M. BERNSTEIN

23 U.S. BANKRUPTCY JUDGE

24

25 ECRO:  NAROTAM RAI

Page 2

```
 1   HEARING re 10-04377-smb TRIAL

 2

 3   HEARING re 10-04377-smb Motion In Limine Number 1 to Admit

 4   the Plea Allocutions of Bernard L. Madoff and BLMIS

 5   Employees (also applies to Adv. Proc. No. 10-04658)

 6

 7   HEARING re 10-04377-smb Motion In Limine Number 2 to Admit

 8   the Trial Testimony of Frack DiPascali (also applies to Adv.

 9   Proc. No. 10-04658)

10

11   HEARING re 10-04377-smb Motion In Limine Number 3 to Exclude

12   Testimony and Exhibits Related to Defendants Asserted Tax

13   Obligations to Governmental Taxing Authorities (also applies

14   to Adv. Proc. No. 10-04658)

15

16   HEARING re 10-04658 TRIAL

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde
```

1  A P P E A R A N C E S :

2

3  BAKER HOSTETLER LLP

4      Attorneys for the Trustee

5      45 Rockefeller Plaza

6      New York, NY 10111

7

8  BY:   SEANNA R. BROWN

9        NICHOLAS J. CREMONA

10       DEAN HUNT

11       LAN HOANG

12       AMY E. VANDERWAL

13       MAXIMILLIAN S. SHIFRIN

14

15  BAKER HOSTETLER LLP

16      Attorneys for the Trustee

17      811 Main Street, Suite 1100

18      Houston, TX 77002

19

20  BY:   MARIE L. CARLISLE

21

22

23

24

25

Page 4

1   CHAITMAN LLP
2          465 Park Avenue
3          New York, NY 10022
4
5   BY:   HELEN DAVIS CHAITMAN
6         JENNIFER ALLIM
7
8   ALSO PRESENT TELEPHONICALLY:
9
10  SEAN DALY
11  DAVID J. SHEEHAN
12  ROBERT A. RICH
13
14
15
16
17
18
19
20
21
22
23
24
25

1  deposition, and the new disclosure, Ms. Agatha Cole as a
2  witness.
3           As to Mr. Madoff and Ms. Pitt, I think it -- the
4  issue here is not the relevance, which is the argument that
5  Defendants made in their papers.  They're relevant.  They
6  worked at BLMIS.  They perpetrated fraud.  That's not the
7  issue here.
8           The issue here is that Your Honor has ruled on.
9  We've had years of discovery, years of discovery dispute,
10 and Your Honor has already ruled that any deposition,
11 particularly the Madoff deposition that was taken after the
12 close of discovery in this case, would not -- are not --
13 that they are not permitted to participate in Madoff's
14 deposition, and that deposition would not apply in that
15 case.
16          THE COURT:  I understand that, but, you know, they
17 weren't permitted to participate in the Bonaventure trial
18 either, and I don't see the difference between your argument
19 for using DiPascali's testimony and the argument to use
20 Madoff's and -- I'm sorry, I forget the other witnesses'
21 names -- deposition testimony.  Isn't it really the same
22 issue?
23          MS. HOANG:  It's actually not, Your Honor.  Your
24 Honor has already ruled in this case as to Mr. Madoff and
25 Ms. Pitt.  As to the -- as to DiPascali, there's other

1   How was it structured?

2   A    So, BLMIS, Your Honor, was structured -- kind of two

3   sides of the business.  One I'll refer to as the investment

4   advisory side.  Sometimes I might slip and call it House 17

5   because it was located on the 17th floor of the Lipstick

6   Building here in Manhattan.  The other side was the

7   proprietary trading and market-making business.  And I'll

8   just refer to that throughout the trial as the prop trading

9   side of the business.  But proprietary trading is basically

10  when a broker-dealer uses its own money to trade for its own

11  account to make profits for itself.  So, somebody like

12  Goldman will have a prop trading desk and they'll try to

13  make money with their own money.

14          The market-making side is acting as a market maker

15  in certain stocks and creating flow into the market, and

16  acting as a broker-dealer to take orders for buys and sells.

17  So, that was going on in the prop trading side of the

18  business.  And sometimes I might slip and refer to that as

19  House 5.  That's how that was known in a lot of the records.

20  So, basically, the investment advisory side and the prop

21  trading side -- two sides of BLMIS.

22  Q    So, was the prop trading side of the business designed

23  to buy and sell securities?

24  A    Absolutely.

25  Q    All right.  What about the investment advisory side of

1   the business? What was it? What was it designed to do?
2   A   Well, it was designed to purportedly trade stocks to
3   buy equities, to buy options. Under the split strike
4   conversion strategy, it would be using puts and calls. And
5   I'll explain that in more detail. And it was also
6   purportedly to -- when Mr. Madoff thought the timing was
7   right, to unwind these trades and put the money supposedly
8   in treasuries. That's what it was purported to do. The
9   problem is it never did that.
10  Q   So, I was going to ask you that. So, the proprietary
11  trading side of the business bought and sold securities?
12  A   Absolutely.
13  Q   The investment advisory side?
14  A   Never.
15  Q   Okay. To operate a securities tradings business like
16  BLMIS, do you need money?
17  A   You do need money, yes.
18  Q   Do you need computers?
19  A   You need a vast computer system. If you're going to be
20  a broker-dealer like BLMIS and do prop trading, you need
21  sophisticated computer systems.
22  Q   Let's talk about computers first.
23  A   Okay.
24  Q   You mentioned the AS400.
25  A   Yes.

1  execute anything because there were no connections to it.
2  And then it could print out statements.  So, some of the
3  same programs that were present over in the prop trading
4  side originally on the AS400 were taken, used in the IA
5  business to facilitate doing some of the same tasks, but it
6  lacked any capability to actually trade.
7  Q    So, the proprietary trading side of the business had a
8  trading platform?
9  A    It had a trading platform and it actually traded.
10 That's what it did.
11 Q    Was it set up to buy and sell stocks?
12 A    Absolutely.
13 Q    How about options?
14 A    Absolutely.
15 Q    How about treasuries?
16 A    Absolutely.
17 Q    How about the computer at the investment advisory
18 business, the AS400, was that a trading platform?
19 A    Absolutely not, Your Honor.
20 Q    Was it set up to buy and sell stocks?
21 A    It was not.
22 Q    Was it set up to buy and sell options?
23 A    It was not.
24 Q    How about treasuries?
25 A    It was not.

Page 81

1  THE COURT: Is that in the report?
2  MR. HUNT: It's in the report as well, Your Honor.
3  I think it's Page 121, Figure 39.
4  THE COURT: Okay, thank you.
5  MR. HUNT: It kind of looks like a house. I don't
6  know if we can get that up there.
7  Q   Can you identify Exhibit 37 for the record?
8  A   Exhibit 37 is my Figure 39 from Page 121 of my expert
9  report. And it is a graphic that I prepared. Basically, in
10 conducting the investigation, I wanted to see where the
11 money was coming from, kind of like follow the money, and to
12 really hone in on how the money went into the IA business
13 and how it came out. And just to give a closure to any sort
14 of thought that somehow the AI business was doing business
15 through somebody else.
16 Q   So, we'll probably be referring back to Exhibit 37 from
17 time to time. Did you review the books and records related
18 to each of the bank accounts held by BLMIS?
19 A   I did.
20 Q   Did you determine what bank account the BLMIS
21 investment advisory business deposited customer
22 (indiscernible)?
23 A   It's what I've referred to as the J.P. Morgan Chase
24 703 account. The 703 were the last three digits of the
25 account number. That was the main account where customer

Page 82

1   money was deposited in for the IA business.

2   Q    What's a sweep account?

3   A    A sweep account, Your Honor, is if you have a business

4   checking account and you're maintaining a bunch of money in

5   that checking account, banks typically don't pay very much

6   interest on checking accounts.  Historically, very low.  And

7   so to maximize your cash efficiency, you can arrange -- if

8   the bank is large enough; usually this is with the larger

9   banks -- a situation where every night above a certain

10  amount, they may leave you with $10,000 in the bank account.

11  They will sweep out the rest of the money and put it into

12  very short-term overnight investments.

13        It could be a bankers acceptance type note, it

14  could be just a short-term treasury bill in and out.  But,

15  basically, it is a way to maximize idle money sitting in an

16  account.  Instead of just letting it sit in a checking

17  account, it's able to earn a little bit more that way.  And

18  it goes out the night, it comes back the next morning.  So,

19  that's why they call it an overnight sweep, if you're using

20  a sweep account as an overnight sweep.

21  Q    Were there any overnight sweeps associated with the 703

22  account?

23  A    There were, yes.

24  Q    If you could, Mr. Dubinsky, turn to Exhibit 38 in your

25  binder, which is also Figure 37 on Page 117 in your report.

08-01789-cgm   Doc 20014-6   Filed 11/25/20   Entered 11/25/20 15:53:36   Exhibit F
   Pg 12 of 19

Page 122

1  theoretically if you're doing trading?
2  A    Well that's not only theoretical, that's what actually
3  happens in the market.  If you, when you pull the data from
4  Bloomberg, for instance, it will come out at about 50-50.
5  Q    So, if you look at the high in the lower right hand
6  corner, talking about the proprietary trading business, what
7  did you find?
8  A    So, this one looks at the buys.  So, this was from
9  January 2000 through November 2008.  And the prop trading
10 business was at about 51-49, almost 50-50, where you would
11 expect to see prop traders doing the sort of buying to end
12 up, so looking at the actual data from the prop trading
13 business and running the formula that we just talked about.
14 This is what, for that time period, it ended up being.
15 Q    And was the proprietary trading business actually
16 buying stock during that period?
17 A    Yes.  The proprietary trading business was buying stock
18 for the proprietary trading desk and for the market-making
19 clients of that side of the business.  This has nothing--
20 what we're talking about now has nothing to with the IA
21 customers or IA business, at this point.
22 Q    If you look at the large pie on the left, talking about
23 the IA business buys, what does that show?
24 A    So, this shows that in the IA business, what was
25 recorded as the buys, was that the IA business was buying

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

1    when Duff & Phelps purchased my business, and so I

2    liquidated some of the stock along the way.

3    Q    What?  I'm sorry?

4    A    I had liquidated some of that stock along the way.

5    Q    But if you hadn't liquidated it, it would have gone up

6    significantly?

7    A    That's correct.

8    Q    Now, in the course of your work you became familiar

9    with the Lazard report that was prepared by the Trustee in

10   his efforts to sell the, what you refer to as the

11   proprietary trading business.

12   A    That is correct, yes.

13   Q    And did you review that report?

14   A    I did.

15   Q    And did you find any factual inaccuracies in that

16   report?

17   A    No.

18   Q    Now, you referred to the market making and proprietary

19   trading business as one business.  You call it the prop

20   trading, right?

21   A    For ease of discussion, that's what I did, yes.

22   Q    Okay.  The proprietary trading, in fact, was investing

23   on Mr. Madoff's account.  Isn't that true?

24   A    On the account of he firm, not Mr. Madoff personally,

25   but the account of the firm, as any prop trading desk would,

1    activities; isn't that true?

2    A    Correct, yes.

3    Q    And it was hundreds and hundreds of millions of dollars

4    just since 2000 that was transferred from the 703 accounts

5    to the Bank of New York account, which was used exclusively

6    for the market making and proprietary trading activities;

7    isn't that true?

8    A    Well, it went into that bank account.  I've never

9    traced to what it was used for.  It was used, presumably

10   there were salaries being paid.  Mr. Madoff's yacht was

11   being paid out of there.  There were a lot of things --

12   office rent, houses -- a lot of things the money was used

13   for.

14   Q    And all of the securities that the traders were

15   purchasing.

16   A    It could have been.  Once it's comingled, there's no

17   way to determine what it's used for at that point.

18   Q    Right.

19   A    All I know, it was taken from the 703 account

20   improperly, put over to the prop trading business.

21   Q    Right.  And how much money in total just from -- in the

22   period from 2000 through 2008, how much money in total was

23   transferred from the 703 account, which was exclusively

24   investment advisory customers money, to the Bank of New York

25   account, which was exclusively prop trading?

1              MS. CHAITMAN:  Okay.

2              THE COURT:  Okay.

3    Q    Isn't it a fact that if a customer was credited with a

4    T-bill which appreciated during the period of the customer's

5    ownership, that the customer is entitled to that

6    appreciation?

7    A    I disagree with you.

8    Q    Now, is it your testimony that the market making part

9    of Madoff's business was a Ponzi scheme?

10   A    No, I did not issue that opinion.

11   Q    Okay.  And is it your testimony that the proprietary

12   trading part of the business was a Ponzi scheme?

13   A    No, I did not issue that opinion.

14   Q    Okay.  So out of the whole operation of 180 or so

15   employees, it's 8 to 10 employees who, in your opinion, were

16   involved in a Ponzi scheme; is that right?

17   A    That's correct.

18   Q    Okay.  Now, are you aware that the Nelsons never sent a

19   check payable to Bernard L. Madoff Investment Securities,

20   LLC?

21   A    I don't know one way or the other.

22   Q    Okay.  And are you aware that every check that the

23   Nelsons received was from an account in the name of Bernard

24   L. Madoff, that they never received a check from the LLC?

25             MR. HUNT:  Objection, Your Honor.  That

1  earlier just said Bernard L. Madoff.  Now this one says
2  Bernard L. Madoff Investment Securities.
3  Q     Okay.
4           MS. CHAITMAN:  Can you go to the next year?
5  Q     Okay.  This is December 2005.  It doesn't say LLC on
6  the account, does it?
7  A     I agree with you it does not.
8  Q     Okay.
9           MS. CHAITMAN:  Can you go to 2006?
10 Q     Doesn't say LLC on December 2006, does it?
11 A     It does not.
12 Q     Okay.
13          MS. CHAITMAN:  Can you go to 2007?
14 Q     It doesn't say LLC on 2007, does it, December 2007?
15 A     I would agree with you, yes, does not.
16 Q     Okay.
17          MS. CHAITMAN:  Can you go to any statements we
18 have in 2008?
19 Q     Okay.  This is December -- November 29th to December
20 31, 2008.  Do you see it says Bernard L. Madoff Investment
21 Securities?
22 A     I see that.
23 Q     Okay.  So in the entire period applicable to the case
24 against the Nelsons, J.P. Morgan Chase never issued a
25 statement in the name of the LLC; isn't that true?

1  A    Well, you showed me a statement that first started as
2  Bernard L. Madoff when it was a sole proprietor.  Then we
3  both agreed that it became an LLC in January of 2001.
4  There's then a name change on the J.P. Morgan Chase
5  statements that then says Bernard L. Madoff Investment
6  Securities; that certainly wouldn't be an individual.  But I
7  agree with you it does not say the letters LLC on any of
8  these.
9  Q    You're aware, are you not, that Mr. Madoff used the
10 trade name Bernard L. Madoff Investment Securities prior to
11 his formation of the LLC?
12 A    Yes.  I saw it on many documents, yes.
13 Q    Okay.  And, in fact, we just pulled up something, DX-X,
14 which is dated December 19th, 1996.  And do you see that
15 even as far back as December 1996, he was using Bernard L.
16 Madoff Investment Securities?
17 A    I see that, yes.
18 Q    So that was really just a trade name that he used,
19 right?
20          MR. HUNT:  Objection, Your Honor.  This witness is
21 not qualified to talk about trade names, corporate
22 structure.
23 Q    You know the difference between a trade name and an
24 LLC, don't you?
25          THE COURT:  Well, there's an objection.  Do you

Page 232

1               **I N D E X**

2

3                            **RULINGS**

4                                              **Page**      **Line**

5

6   Motion to Exclude the Robert Oppenheim's

7   Testimony Granted                            9           21

8

9   Motion by the Trustee to quash the subpoena

10  of Mr. Picard as Trustee Sustained           13          13

11

12  Mr. Madoff Allocations Admitted              21          12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 233

1         C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  May 10, 2019