| | |
|---|---|
| **DUFFYAMEDEO LLP**<br>275 Seventh Avenue, 7th Fl<br>New York, New York 10010.<br>Tel: (212) 729-5832<br>Todd E. Duffy<br>Douglas A. Amedeo | **Hearing Date:** January 6, 2021 @ 10:00 AM<br>**Objection Deadline:** December 23, 2020<br>**Reply Deadline:** December 30, 2020 |

*Attorneys for Alpha Prime Fund Limited*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                      Plaintiff-Applicant,<br><br>          v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                      Defendant.<br>In re:<br><br>BERNARD L. MADOFF,<br><br>                      Debtor. | No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>                      Plaintiff,<br><br>      v.<br><br>HSBC BANK PLC, et al.,<br><br>                      Defendants. | Adv. Pro. No. 09-01364 (SMB) |

## MOTION FOR THE ISSUANCE OF LETTER OF REQUEST

1.    Alpha Prime Fund Ltd. ("Alpha Prime" or "Defendant") a defendant in the above-captioned adversary proceeding, by and through its undersigned counsel, respectfully

1

submits this Motion for the Issuance of a Letter of Request for International Judicial Assistance to The Senior Master, for the attention of the Foreign Press Section, Room E16 of the Royal Courts of Justice, Strand, London WC2A 2LL, for the examination of United Kingdom resident, Mr. René Riefler.

2. This application is made pursuant to 28 U.S.C. § 1781, this Court's inherent authority, and in light of the comity between the United States and the United Kingdom. Service will be effected pursuant to the *Hague Convention of 18 March 1970 of the Taking of Evidence Abroad in Civil or Commercial Matters* (the "Hague Convention"), to which the United States and the United Kingdom are signatories.

3. This Motion is also made concurrently with the Trustee's similar application.

4. Mr. Riefler is a foreign citizen and a non-party. Thus, the Letter of Request provides the only means of compelling discovery from him.

## FACTUAL BACKGROUND

### Madoff's Ponzi Scheme and Alpha Prime's Connection to BLMIS

5. The Plaintiff herein is Irving H. Picard (the "Trustee"), trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act ("SIPA"), substantively consolidated with the Chapter 7 bankruptcy estate of Bernard L. Madoff. **The following allegations in Paragraphs 6-18 are taken from the Trustee's Second Amended Complaint and do not represent factual assertions by Alpha Prime and in many instances are affirmatively denied by Alpha Prime.**

6. Madoff, through the investment advisory business of BLMIS, conducted a decades-long Ponzi scheme of breathtaking scale. (See Second Amended Complaint filed

2

September 24, 2019 at ¶¶ 27-37 (ECF No. 567) ("Complaint")).

7. Sonja Kohn, an Austrian investment professional with personal and professional ties of Madoff, recruited new European investors to BLMIS. In 1993, Stefan Zapotocky, the head of UniCredit Bank Austria AG's ("Bank Austria") securities department, hired Kohn as an advisor and consultant. (Id. ¶¶ 39, 41, 43.)

8. Kohn introduced Zapotocky and other Bank Austria executives to Madoff. Following this introduction, Kohn and Zapotocky established Primeo Fund ("Primeo"), one of the many BLMIS feeder funds with which the two were ultimately associated. (Id. ¶ 44.)

9. Primeo was hugely successful for its founders. An outgrowth of this success was the creation of a network of additional feeder funds whose sole purpose was also to direct investments into BLMIS. Alpha Prime was one such fund. (Id. ¶ 45.)

10. Created in March 2003, Alpha Prime was another BLMIS feeder fund designed to mimic Primeo in every respect; it was designed as a "clone" of Primeo. Alpha Prime and Primeo shared not only a common broker and investment strategy, but were founded, serviced, and managed by the same individuals: Kohn, Zapotocky, Ursula Radel-Leszczynski, Nigel Fielding, and Peter Fischer (collectively, the "Directors"). (Complaint at ¶ 46.)

11. During the six years preceding the Filing Date, BLMIS made transfers to Alpha Prime totaling at least $83,170,000. Of that amount, pursuant to a Partial Settlement Agreement, Alpha Prime returned $76,450,000 in two-year transfers. The Trustee seeks to avoid and recover $6,720,000 (the "Six-Year Transfers") under section 544 of the Bankruptcy Code and applicable provisions of the NYDCL, particularly §§ 273-277, and of SIPA, particularly § 78fff-2(c)(3). The Six-Year Transfers were, and continue to be,

customer property within the meaning of SIPA § 78lll(4) and are avoidable and recoverable under sections 548, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA. (Complaint at ¶¶ 6, 184, 186.)

12. On or about February 2, 2009, Alpha Prime filed a customer claim with the Trustee that the Trustee designated as Claim No. 001503 (the "Customer Claim"). The Customer Claim asserted that Alpha Prime is entitled to the allowance of a customer claim in an amount reflected on its BLMIS account statement for the period ending November 30, 2008. Alpha Prime subsequently agreed that its Customer Claim is limited to its net equity, $250,671,000. As part of the Partial Settlement Agreement, the Trustee allowed Alpha Prime's Customer Claim in an amount equal to 95% of Alpha Prime's net equity, or $238,137,450. The Trustee seeks to have the remaining five percent of the Customer Claim disallowed and/or equitably subordinated. (Id. ¶ 187.)

13. Kohn and Zapotocky appointed various services providers to form the enterprise that operated Primeo. (Id. ¶ 49.) They formed BA Worldwide Fund Management Limited ("BA Worldwide"), a Bank Austria affiliated company, to serve as Primeo's investment advisor, and appointed Bank Medici AG, another entity controlled by Kohn, as its sub-adviser. (Id. ¶¶ 50, 55.).

14. Radel-Leszczynski worked at BA Worldwide and served as its president from 2000-2007. (Complaint at ¶ 51.)

15. HSBC entities acted as service providers to Primeo and Alpha Prime. (Id. ¶¶ 50, 53-54, 56.) The Directors appointed HSBC Bank Bermuda ("HBOB") as Alpha Prime's administrator and custodian. (Id. ¶ 62.) By a January 2007 novation, Alpha Prime appointed HSBC Securities Services (Bermuda) Ltd. ("HSSB") its administrator and HSBC

Institutional Trust Services (Bermuda) Limited ("HITSB") its custodian. (Id.) HBOB, HSSB, and HITSB delegated their duties to HSBC Securities Services (Luxembourg) S.A. ("HSSL") which, as a result, was appointed Alpha Prime's sub-administrator and sub-custodian. (Id.) HSSL was also Primeo's custodian and sub-administrator. (Id. ¶ 57.)

16. The Directors and Alpha Prime's service providers worked together as divisions of a single organization, just as they did with Primeo. Kohn, Zapotocky, and Radel-Leszczynski recruited and interfaced with potential BLMIS investors; Fielding managed the diligence on BLMIS and acted as the gatekeeper between the HSBC service providers and the funds' directors and managers; and BA Worldwide monitored and analyzed Alpha Prime's investment portfolio and performed various other administrative services. (Id. ¶ 68.)

17. BA Worldwide performed due diligence on Primeo and Alpha Prime. This due diligence included tracking the purported securities trades shown on BLMIS customer statements and trade confirmations alongside publicly available market data. That purported trading activity consistently showed impossible trades. (Complaint at ¶¶ 79, 108.)

18. Based on its due diligence, Alpha Prime's Directors and service providers knew that, among other things:

   a. In a two-year period, 64% of the total number of options contracts purportedly traded for Primeo exceeded the total number of comparable options traded on the Chicago Board Options Exchange ("CBOE"). In one instance, the call options purportedly traded for Primeo on a particular day exceeded the number of those call options executed on the CBOE for that day by 19,700%. (Complaint at ¶ 83.) Purported options trades for Alpha Prime exceeded the total volume for options with

5

the same trade date, strike price, and expiration date as traded on the CBOE on 162 separate occasions. (*Id.* ¶ 111.)

    b.    The prices BLMIS reported for securities traded for Primeo were outside the daily range. When this occurred, BA Worldwide's report marked the BLMIS price "False" and noted whether the false price benefitted Primeo's account by marking it positive or negative. (*Id.* ¶¶ 85-88.) BA Worldwide's reports for Alpha Prime showed 395 equities trades outside of the daily range. (*Id.* ¶ 110.)

    c.    Multiple dividend payments were purportedly made by Fidelity Spartan Fund in a calendar month (even though the fund reported only one payment) and on dates that did not correspond with published dividend payment dates. (Complaint at ¶ 91). Primeo's Dividends Detail Reports indicated that 96.1% of the dividend payments did not correspond with the published payment dates. Alpha Prime's Dividends Detail Reports indicated 128 of 133 dividend payments on the wrong date. (*Id.* ¶¶ 119-120.)

    d.    Unbalanced hedges deviated from the split-strike conversion ("SSC") strategy. Because a certain number of options are needed to hedge the equity positions in the basket, when an equity in a basket is sold without a corresponding adjustment to the options, this creates significant exposure to losses because the value of the equity basket and the options positions no longer match. (*Id.* ¶ 100.) BA Worldwide's reports reflected at least 100 such instances over the course of its relationship with BLMIS. (*Id.* ¶ 101.)

    e.    BA Worldwide's reports monitored the performance of other BLMIS feeder funds and reflected that between 2001 and 2008 there were not enough options on the entire listed market to implement the SSC strategy at any point in time. (*Id.* ¶¶

6

102-104.)

    f.    Equities were being purchased at the low and sold at the high at statistically impossible rates. (*Id.* ¶¶ 125-126.)

    g.    Speculative options trading deviated from the SSC strategy in 94 transactions. (*Id.* ¶¶ 129-133.)

    h.    Madoff always exited the market at quarter- and year-end despite his touting "market timing" as a cornerstone of the SSC strategy. (*Id.* ¶¶ 131-132.)

**The Basis for Seeking Testimony of René Riefler**

19. During the 1990s, René Riefler worked for Bank Austria and, for at least part of that time, reported to Zapotocky.

20. The Trustee alleges that his investigation has uncovered that Mr. Riefler may have personal knowledge concerning the Trustee's allegations that certain of Alpha Prime's agents knew that BLMIS's investment business was a fraud.

21. Specifically, the Trustee alleges that his investigation has uncovered that in connection with his role at Bank Austria, Mr. Riefler met with Mr. Madoff in New York in or around 1996 at the urging of Zapotocky and Kohn. The Trustee alleges that based upon that meeting, Mr. Riefler developed concerns relating to the legitimacy of Madoff's purported SSC strategy, which he subsequently reported to Zapotocky and Kohn.

22. The Trustee believes Mr. Riefler's knowledge is relevant to these proceedings because as agents of Alpha Prime, Zapotocky's and Kohn's knowledge of concerns relating to Madoff's SSC strategy may be imputed to Alpha Prime.

23. Alpha Prime believes Mr. Riefler's knowledge is relevant to these proceedings because he will likely contradict all of the allegations that the Trustee attributes

to Mr. Riefler in the Second Amended Complaint. Indeed, Alpha Prime believes that this witness will state that he did not suspect that Mr. Madoff was committing fraud or any illegal acts when he met him in the 1990s and had no idea that Mr. Madoff was conducting a Ponzi scheme until after Mr. Madoff was arrested in 2008. To the extent Mr. Riefler's testimony directly contradicts the allegations in the Second Amended Complaint, it is directly relevant to this adversary proceeding.

24. This Letter of Request is part of Alpha Prime's efforts to defend itself from the Trustee's allegations. The testimony sought is directly relevant to the issues raised by the Trustee in these proceedings. The evidence is essential for Alpha Prime to defend itself herein.

25. For the above reasons, Alpha Prime believes that the proposed Letter of Request (Exhibit 1) is just and appropriate and respectfully requests that the Court issue such Letter of Request to the indicated Judicial Authority.

Dated: New York, New York
December __, 2020

**DuffyAmedeo LLP**

/s/ Todd E. Duffy
Todd E. Duffy
Douglas A. Amedeo
275 Seventh Avenue, 7th Floor
New York, NY 10001
Tel:   (212) 729-5832
Fax:   (212) 208-2437
*Counsel to Alpha Prime Fund Ltd.*