**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

Hearing Date: January 20, 2021
Hearing Time: 10:00 A.M. (EST)
Objection Deadline: January 13, 2021

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |

**MOTION FOR AN ORDER APPROVING TWELFTH ALLOCATION OF PROPERTY TO THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING TWELFTH INTERIM DISTRIBUTION TO CUSTOMERS**

# TABLE OF CONTENTS

**Page**

I.    EXECUTIVE SUMMARY ..........................................................................................1

II.   THE LIQUIDATION PROCEEDING ...................................................................6

III.  ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA ............8

    A.    Allocation of Property..............................................................................8

    B.    Distributions Under SIPA .........................................................................9

    C.    Allocation Of Assets To The Customer Fund And Related Reserves ...................10

        i.    Assets in Trustee's Possession as of October 31, 2020 ...........................14

        ii.   Recoveries to the BLMIS Estate Since The Eleventh Allocation
           and Eleventh Interim Distribution .............................................15

    D.    Determination Of Allowable Net Equity Claims & Related Reserves ..................16

IV.   CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR
      TWELFTH ALLOCATION AND TWELFTH INTERIM DISTRIBUTION .................17

    A.    No Interim Distribution Of General Estate...........................................20

V.    MISCELLANEOUS .............................................................................................21

    A.    Notice...........................................................................................21

    B.    Record Date ..................................................................................21

VI.   CONCLUSION.......................................................................................................21

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, as trustee ("Trustee") for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] and the substantively consolidated Chapter 7 case of Bernard

L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this motion (the "Motion")

pursuant to SIPA §§ 78*lll*(4), 78fff(a)(1)(B), 78fff-2(b), and 78fff-2(c)(1), and Rule 9013 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking entry of an order (1)

approving the twelfth allocation of property ("Twelfth Allocation") to the fund of customer

property ("Customer Fund"); and (2) authorizing a twelfth pro rata interim distribution ("Twelfth

Interim Distribution") of at least $190,755,424.24 to customers whose claims for customer

protection under SIPA have been allowed for amounts exceeding the SIPA statutory advance limits

and which have not already been fully satisfied by the first through eleventh pro rata interim

distributions. This Court has jurisdiction over this Motion pursuant to SIPA §§ 78eee(b)(2),

78eee(b)(4), 28 U.S.C. §§ 157 and 1334, and Bankruptcy Rule 5005. This Motion is based upon

the law set forth below as well as the facts set forth in the affidavit of Vineet Sehgal ("Sehgal

Aff."), filed herewith. In support of this Motion, the Trustee represents as follows:

## I.   **EXECUTIVE SUMMARY**

1.   In order to protect customers of an insolvent broker-dealer such as BLMIS,

Congress established a statutory framework pursuant to which customers of a debtor in a SIPA

liquidation are entitled to preferential treatment in the distribution of assets from a debtor's estate.

The mechanism by which customers receive preferred treatment is through the creation of a fund

of "customer property" as defined in SIPA § 78*lll*(4), which is distinct from a debtor's general

---

[1] For convenience, subsequent references to sections of the Act shall follow the form: "SIPA § __."

estate. Customers holding allowable claims are entitled to share pro rata in the Customer Fund

based on each customer's "net equity" as of the filing date, to the exclusion of general creditors.

SIPA § 78fff-2(c).

2.      In order to make distributions from the Customer Fund, the Trustee must determine

or be able to sufficiently estimate: (a) the total value of customer property available for

distribution, or the "numerator" (including reserves for disputed recoveries), and (b) the total net

equity of all allowed claims, or the "denominator" (including reserves for disputed claims). The

Trustee calculates reserve amounts on a "worst-case" basis, such that the ultimate resolution of

disputed amounts will not adversely affect any customers' allowed or disputed net equity

distributions.

3.      In this case, for purposes of determining each customer's "net equity," the Trustee

credited the amount of cash deposited by the customer into his BLMIS account, less any amounts

already withdrawn from that BLMIS customer account (the "cash in, cash out method" or the

"Trustee's Net Investment Method"). Some claimants argued that the Trustee was required to

allow customer claims in the amounts shown on the November 30, 2008 customer statements (the

"Last Statement Method," creating the "Net Equity Dispute"). Litigation over the Net Equity

Dispute proceeded through this Court,[2] the Second Circuit,[3] and the Supreme Court of the United

States (the "Supreme Court").[4] The Trustee's Net Investment Method was upheld.

---

[2] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122
(Bankr. S.D.N.Y. 2010).

[3] *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "Net Equity Decision").

[4] Two petitions for writ of certiorari were denied by the Supreme Court of the United States on June 25, 2012. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Ryan v. Picard*, 133 S.Ct. 24 (2012); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (In re Bernard L. Madoff Inv. Sec., LLC), 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Velvel v. Picard*, 133 S.Ct. 25 (2012). A third petition for writ of certiorari was dismissed. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424

4.      Through pre-litigation and other settlements, the Trustee has successfully recovered approximately $14.368 billion through October 31, 2020 for the benefit of all BLMIS customers with allowed claims.[5]

5.      The Trustee previously filed eleven motions seeking entry of orders approving allocations of property to the Customer Fund and authorizing pro rata interim distributions of Customer Property. This Court entered orders approving those motions:

---

B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. dismissed sub nom. Sterling Equities Assocs. v. Picard*, 132 S.Ct. 2712 (2012).

[5] Over $20 billion of principal was lost in the Ponzi scheme in total. Of the $20 billion, approximately $17.5 billion of principal was lost by those who filed claims.

| No. of Distribution | Date of Distribution | Amount Allocated | Amount Distributed | Percentage Distributed | ECF No. for Motion | ECF No. for Order |
|---|---|---|---|---|---|---|
| 1 | 10/5/2011 | $2.618 billion | $884.587 million | 4.602% | 4048 | 4217 |
| 2 | 9/19/2012 | $5.501 billion | $6.431 billion | 33.556% | 4930 | 4997 |
| 3 | 3/29/2013 | $1.198 billion | $900.702 million | 4.721% | 5230 | 5271 |
| 4 | 5/5/2014 | $477.504 million | $605.916 million | 3.180% | 6024 | 6340 |
| 5 | 2/6/2015 | $756.538 million[6] | $522.180 million | 2.743% | 8860 | 9014 |
| 6 | 12/4/2015 | $345.472 million[7] | $1.567 billion | 8.262% | 9807 and 11834 | 12066 |
| 7 | 6/30/2016 | $247.013 million | $246.702 million | 1.305% | 13405 | 13512 |
| 8 | 2/2/2017 | $342.322 million | $326.360 million | 1.729% | 14662 | 14836 |
| 9 | 2/22/2018 | $1.303 billion | $716.342 million | 3.806% | 17033 | 17195 |
| 10 | 2/22/2019 | $515.974 million | $512.080 million | 2.729% | 18295 | 18398 |
| 11 | 2/28/2020 | $988.770 million | $369.258 million | 1.975% | 19226 | 19245 |

6.    The Trustee proposes to release $175 million of a general reserve of $200 million that was previously allocated to the Customer Fund and held for unknown contingencies. $25 million will continue to be held for unknown contingencies.

7.    With these and other additional funds, the Trustee stands ready to make a twelfth significant distribution to customers with allowed claims—approximately 1.022% on each allowed claim. The practical effect of this determination is to permit a twelfth interim distribution to customers whose claims have not been fully satisfied because the net equity of their respective

---

[6] The total amount allocated in the Fifth Allocation Motion was $704,395,951.58. Between the filing of that motion and the Fifth Interim Distribution date, an additional $52,142,279.87 was recovered and included in the numerator.

[7] This represents the amount allocated to the Customer Fund in the Supplemental Sixth Allocation and Sixth Interim Distribution Motion filed on October 20, 2015. The original Sixth Allocation and Sixth Interim Motion filed on April 15, 2015 did not allocate any additional recoveries to the Customer Fund; the Trustee simply re-allocated $1,448,717,625.26 of funds that had previously been allocated to the Customer Fund for the Time-Based Damages Reserve.

accounts as of the Filing Date[8] exceeded the statutory SIPA protection limit of $500,000 and were not satisfied by the First through Eleventh Interim Distributions.

8.      Thus, by way of this Motion, the Trustee seeks to distribute $190,755,424.24 (with an additional $12,045,063.41 available for distribution to certain "net loser" accounts in litigation, if the claims relating to their accounts become allowed prior to the time the distribution is made, or reserved, if not yet allowed).[9] The Twelfth Interim Distribution, when combined with the First through Eleventh Interim Distributions, will provide no less than 69.630% of each customer's allowed claim amount, plus the SIPC advance of up to $500,000. The proposed distribution will be paid on claims relating to 813 BLMIS accounts. The average payment amount to those 813 BLMIS accounts will be $234,631.52.  Eight payments will go to claimants who qualified for hardship status under the Trustee's claims Hardship Program.[10] If approved, and when combined with the SIPC payment and the amounts from the First through Eleventh Interim Distributions, 1,490 accounts (relating to 1,720 claims) will be fully satisfied (all accounts with a net equity of up to $1,645,761.48).

9.      The proposed Twelfth Allocation and Twelfth Interim Distribution are interim in nature. The Trustee anticipates recovering additional assets through litigation and settlements. Final resolution of certain disputes will permit the Trustee to reduce the reserves he is required to maintain, which will allow him to make additional distributions to customers in the future. The

---

[8] In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm. *See* SIPA § 78*lll*(7)(B).

[9] If all of these "net loser" accounts were allowed prior to the distribution, the total distribution to claimants would be approximately $202.800 million ($202,800,487.65), based on the net equity amount for deemed determined accounts.

[10] The Hardship Program was officially terminated and is no longer accepting applications.

Trustee will seek authorization for these further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.[11]

## II.     THE LIQUIDATION PROCEEDING

10.     Section 78fff(b) of SIPA provides that a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11" to the extent these provisions are consistent with SIPA.

11.     SIPA affords special protection to "customers," as defined in SIPA § 78*lll*(2), who receive preferential treatment by having their claims satisfied ahead of general creditors. *See In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) (recognizing that a "person whose claim against the debtor qualifies as a 'customer claim' is entitled to preferential treatment"); *In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment"). The amounts owed to each customer are determined by valuing his or her "net equity," defined in SIPA § 78*lll*(11), as of the Filing Date.

12.     To date, the Trustee has received 16,521 customer claims and determined 16,510 of those claims. (Sehgal Aff. ¶ 4). The remaining 11 claims are discussed in Paragraph 13 below. To date, the Trustee has allowed 2,653 claims, and SIPC has advanced $849,338,412.47 to the Trustee to pay these claims. (*Id.*). To date, the allowed claims total approximately $19.416 billion. (*Id.*). The Trustee denied 2,694 claims by customers who had accounts with BLMIS and 10,734 claims purporting to be customer claims but were in fact claims filed on behalf of claimants without an account at BLMIS. Twelve other claims were filed that asserted no claim. Another 417 claims have been withdrawn. (*Id.*).

---

[11] The Trustee seeks permission to include in the Twelfth Interim Distribution those claims that are allowed between the time an order is entered on this Motion and the date of the Twelfth Interim Distribution.

13.    Eleven claims (relating to 7 accounts) are currently categorized as "deemed determined," meaning that the Trustee has instituted litigation against those claimants. (*Id*. ¶ 5). The complaints filed by the Trustee in those litigations set forth the express grounds for disallowance of customer claims under section 502(d) of the Bankruptcy Code. Accordingly, such claims will not be allowed until the avoidance action is resolved by settlement or otherwise and any judgment rendered against the claimant in the avoidance action is satisfied.

14.    To date, the Trustee has received 428 timely and 22 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7 billion. The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms. Of these 450 claims, 95 are general creditor claims and 49 are broker-dealer claims, which together total approximately $265 million of the $1.7 billion.[12] (*Id*. ¶ 6). If the Trustee is able to fully satisfy the net equity claims of the BLMIS customers, any funds remaining will be allocated to the general estate and distributed in the order of priority established in Bankruptcy Code § 726 and SIPA § 78fff(e). All BLMIS customers who filed claims—whether their net equity customer claims were allowed or denied—may be deemed to be general creditors of the BLMIS estate. The Trustee is working diligently on behalf of all creditors and will seek to satisfy all creditor claims.

15.    1,802 docketed objections have been filed to the Trustee's claims determinations relating to 3,348 claims, which have been, and will continue to be, noticed for hearing as appropriate. (*Id*. ¶ 7). These 1,802 objections relate to 760 BLMIS accounts. (*Id*.). The objections

---

[12] The 450 secured, priority, and non-priority general claims are explicit "general creditor" claims, such as vendor and service claims. (Sehgal Aff. ¶ 6). They do not include "customer" claims, even though each "customer" claim—both those allowed and denied—has a "general creditor" component. All BLMIS creditors, including customers whose claims were allowed, customers whose claims were denied, and general creditors, may have claims as general creditors against BLMIS for misrepresentation, fraud, and breach of contract (assuming they filed claims). Customers who filed customer claims need not have specifically filed claims as general creditors to protect such rights.

raise various issues, including the proper interpretation of "net equity" (now resolved), the right to interest or time value of money (now resolved), and whether the Trustee's calculation of allowed claims amounts are correct. To date, 1,531 of the 1,802 docketed objections have been fully resolved. 271 objections are still subject to court review.

### III.   ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA

####    A.   Allocation of Property

16.   SIPA sets forth a bipartite statutory framework that gives customers priority over general creditors of the broker-dealer. Pursuant to SIPA § 78fff-2(c)(1)(B), all customers with allowed claims share ratably in the fund of customer property. Pursuant to SIPA § 78fff-2(c), general creditors and customers, to the extent of their respective unsatisfied net equities, share in any general estate. Estate property not allocable to the fund of customer property is distributed in the order of priority established in section 726 of the Bankruptcy Code. SIPA § 78fff(e). Any property allocated to the fund of customer property that is not necessary to satisfy customer and other priority claims will become part of the general estate. SIPA § 78fff-2(c).

17.   According to SIPA § 78*lll*(4), "customer property" consists of "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

18.   Among the assets that comprise "customer property" are "any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers . . ." SIPA § 78*lll*(4)(D). Under SIPA § 78*lll*(4)(D), a trustee is permitted to look to the property of the debtor to rectify the actions taken by the debtor that resulted in a shortfall in customer property. *See Ferris, Baker, Watts v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 132 (Bankr. D. Minn. 2002) ("Application of the plain

meaning of 15 U.S.C. § 78*lll*(4)(D) provides a means to rectify any actions taken by, or with respect to, the debtor, that results in such a shortfall. Thus, if the debtor failed to set aside or hold for the benefit of customers sufficient property, 15 U.S.C. § 78*lll*(4)(D) would require the trustee to correct the debtor's error.").

19.     Thus, if a trustee determines that there is a shortfall in assets such that customer property is insufficient to satisfy net equity claims, then he may look to other assets of the debtor and allocate property to the fund of customer property.

20.     SIPA liquidations generally take a broad and inclusive customer-related approach to the allocation of property. For example, in *In re Park South Securities, LLC*, 99% of the debtor's estate was allocated to customer property. *See* Order, No. 03-08024A (Bankr. S.D.N.Y. Oct. 30, 2008) (ECF No. 201).[13] Consistent with prior liquidations, the Trustee expects to allocate the vast majority of the BLMIS estate to the Customer Fund, inasmuch as here, recovered property either belonged to customers or was derived from the misuse of customer property.

### B.    Distributions Under SIPA

21.     The SIPA distribution scheme, while complex, can be distilled to a simple equation. Each customer is entitled to his or her pro rata share of customer property. To determine the percentage that each allowed customer will receive from the fund of customer property in an

---

[13] *Accord SIPC v. Lehman Brothers, Inc.*, Adv. Pro. No. 08-01420, Motion for Order Approving Allocation of Property of the Estate at 27-28, n.33 (Bankr. S.D.N.Y. Oct. 5, 2009) (ECF No. 1866) (allocating "most" of debtor's assets to customer property); *In re Vision Inv. Grp., Inc.*, Adv. Pro. No. 97-1035B, Order Approving Third and Final Report and Final Accounting of the Securities Investor Protection Corporation (Bankr. W.D.N.Y. Dec. 13, 2005) (allocating 95% of debtor's estate to customer property); *In re Klein Maus & Shire, Inc.*, Adv. Pro. No. 00-8193A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors (Bankr. S.D.N.Y. Dec. 15, 2004) (allocating 99% of debtor's estate to customer property); *In re MJK Clearing*, 286 B.R. at 132 (allocating 100% the debtor's assets as customer property); *In re A.R. Baron & Co., Inc.*, Order Approving Final Report and Account and Related Relief, Adv. Pro. No. 96-8831A (Bankr. S.D.N.Y. Feb. 10, 2004) (allocating 99% of the debtor's assets to customer property); *In re Hanover, Sterling & Co.*, Adv. Pro. No. 96-8396A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of the Fund of Customer Property (Bankr. S.D.N.Y. Aug. 21, 2002) (allocating 75% of debtor's estate to customer property).

interim distribution, the aggregate amount collected to date by the Trustee and allocated to customer property is divided by the aggregate amount of net equity claims allowable by the Trustee. The percentage result is then to be applied to each net equity claim to determine a customer's pro rata share. The equation is as follows:

Fund of Customer Property ("Numerator")_____  = Customer Pro Rata Share
Allowable Customer Net Equity Claims ("Denominator")

22.     SIPA § 78fff-2(c)(1) establishes the order of distribution of customer property. The second and third priorities of distribution are relevant here. The second priority is to distribute customer property among customers based on their filing date net equities. SIPA § 78fff-2(c)(1)(B). The third priority is to distribute customer property to SIPC as subrogee. SIPA § 78fff-2(c)(1)(C). Thereafter, any customer property remaining becomes part of the general estate.

23.     The amount advanced by SIPC to the Trustee in full or partial satisfaction of a customer claim is based on the difference between the customer's net equity and his share of customer property, subject to the $500,000 limit of SIPA's statutory protection. The SIPC advance does not reduce the customer's net equity or his claim against customer property. If the sum of the amount of a customer's SIPC advance and any subsequent distribution of customer property exceeds the customer's net equity, SIPC has the right to recoup its advance from the excess. In effect, SIPC becomes subrogated to the claims of customers to the extent it has made advances but cannot seek recovery from customer property as to any individual customer until the customer has been fully satisfied. SIPA §§ 78fff-3(a), 78fff-2(c)(1).

### C.     Allocation Of Assets To The Customer Fund And Related Reserves

24.     As the Court previously found in its Net Equity Decision, and as numerous courts in civil and criminal proceedings have also found, Madoff did not engage in securities trading on behalf of BLMIS customers. Madoff used customer funds to support operations and fulfill

requests for redemptions to perpetuate a Ponzi scheme. Thus, payment of "profits" to any one customer in fact came from another customer's deposit of funds. In essence, all of the funds withdrawn by BLMIS customers were simply other people's money.

25.    BLMIS had an obligation to set aside sufficient assets to cover its statutory obligations to customers. *See* Securities Exchange Act Rule 15c3-3, 17 C.F.R. § 240.15c3-3.[14] At this time, the assets of BLMIS and Madoff are insufficient to cover those obligations.

26.    For these reasons, and because it is not uncommon for almost all property available to a broker-dealer to be deemed "customer property," the Trustee seeks the Court's approval to allocate to the Customer Fund virtually all cash and cash equivalents currently in his possession that was not previously allocated -- $74,324,876.19. ECF Nos. 4217, 4997, 5271, 6340, 9014, 12066, 13512, 14836, 17195 and 18398; *see also First Fed. Sav. & Loan Assoc. of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 362-66 (D.N.J. 1986) (describing and approving SIPA allocation and distribution scheme similar to that proposed by Trustee).

---

[14] SIPA's definitional paragraphs were amended in 1978 to incorporate in the "customer property" definition any other property of the debtor's estate which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers. Thus, to the extent that prior to the Filing Date BLMIS failed to maintain cash and securities in compliance with the Net Capital Rule issued by the SEC (Rule 15c3-1), as affected by the Customer Protection Rule (Rule 15c3-3) (both issued pursuant to the Exchange Act, 15 U.S.C. § 78*o*(c)(3)(A)), the Trustee is required to allocate property as necessary to remedy such non-compliance. The Customer Protection Rule effectively requires that a broker-dealer maintain control of all property that would have to be delivered to customers in the event of a liquidation: either the securities themselves or their value in the form of cash (or equivalents), and cash sufficient to pay net cash obligations to customers.

27.    The Trustee previously sought and obtained approval to allocate the following amounts to the Customer Fund:

| No. of Allocation | Amount Allocated | Percentage Distributed | ECF No. for Motion | ECF No. for Order |
|---|---|---|---|---|
| 1 | $2.618 billion | 4.602% | 4048 | 4217 |
| 2 | $5.501 billion | 33.556% | 4930 | 4997 |
| 3 | $1.198 billion | 4.721% | 5230 | 5271 |
| 4 | $477.504 million | 3.180% | 6024 | 6340 |
| 5 | $756.538 million[15] | 2.743% | 8860 | 9014 |
| 6 | $345.472 million[16] | 8.262% | 9807 and 11834 | 12066 |
| 7 | $247.013 million | 1.305% | 13405 | 13512 |
| 8 | $342.322 million | 1.729% | 14662 | 14836 |
| 9 | $1.303 billion | 3.806% | 17033 | 17195 |
| 10 | $515.974 million | 2.729% | 18295 | 18398 |
| 11 | $988.770 million | 1.975% | 19226 | 19245 |

[15] The total amount allocated in the Fifth Allocation Motion was $704,395,951.58. Between the filing of that motion and the Fifth Interim Distribution date, an additional $52,142,279.87 was recovered and included in the numerator.

[16] This represents the amount allocated to the Customer Fund in the Supplemental Sixth Allocation and Sixth Interim Distribution Motion filed on October 20, 2015. The original Sixth Allocation and Sixth Interim Motion filed on April 15, 2015 did not allocate any additional recoveries to the Customer Fund; the Trustee simply re-allocated $1,448,717,625.26 of funds that had previously been allocated to the Customer Fund for the Time-Based Damages Reserve.

28.    The amounts previously distributed as outlined in each of the First through Eleventh

Allocation Motions change as additional accounts are determined. Below is a summary of the

amounts allocated and distributed:

| No. | Amount Allocated | Reserve From Previous Allocations[17] | Funds Received After Eighth and Tenth Interim Distribution Used for Springing Claims | Amount Available for Distribution | Allocation for Allowed Claims[18] | Allocation for Deemed Determined Claims[19] | SIPC Subrogation | Other Reserves[20] |
|---|---|---|---|---|---|---|---|---|
| 1 | $2.618 billion | N/A | $85.078 million | $2.703 billion | $884.587 million | $54.248 million | $8.917 million | $1.755 billion |
| 2 | $5.501 billion | $1.755 billion | $620.353 million | $7.877 billion | $6.431 billion | $395.552 million | $83.665 million | $966.393 million |
| 3 | $1.198 billion | $966.393 million | $87.278 million | $2.252 billion | $900.702 million | $55.650 million | $15.906 million | $1.279 billion |
| 4 | $477.504 million | $1.279 billion | $58.789 million | $1.816 billion | $605.916 million | $37.485 million | $11.499 million | $1.161 billion |
| 5 | $756.538 million[21] | $1.161 billion | $50.710 million | $1.968 billion | $522.180 million | $32.334 million | $10.389 million | $1.403 billion |
| 6 | $345.472 million[22] | $1.403 billion | $152.740 million | $1.901 billion | $1.567 billion | $97.391 million | $37.568 million | $199.925 million |
| 7 | $247.013 million | $199.925 million | $24.126 million | $471.064 million | $246.702 million | $15.383 million | $6.671 million | $202.308 million |
| 8 | $342.322 million | $202.308 million | $31.964 million | $576.594 million | $326.360 million | $20.381 million | $9.335 million | $220.518 million |
| 9 | $1.303 billion | $220.518 million | $33.150 million | $1.557 billion | $716.342 million | $44.864 million | $22.614 million | $772.713 million |
| 10 | $515.974 million | $772.713 million | $23.769 million | $1.312 billion | $512.080 million | $32.169 million | $17.770 million | $750.437 million |
| 11 | $988.770 million | $750.437 million | $0 million | $571.250 million | $369.258 million | $23.281 million | $14.200 million | $164.511 million |

[17] Reserve from Previous Allocations represents amounts that were reserved in prior allocations.

[18] Allocation for Allowed Claims represents the amount allocated for claims that have been allowed.

[19] Allocation for Deemed Determined Claims represents amounts allocated and reserved for claims that are currently in litigation with the Trustee.

[20] Other Reserves represents all monies that are reserved for various issues.

[21] The total amount allocated in the Fifth Allocation Motion was $704,395,951.58. Between the filing of that motion and the Fifth Interim Distribution date, an additional $52,142,279.87 was recovered and included in the numerator.

[22] This represents the amount allocated to the Customer Fund in the Supplemental Sixth Allocation and Sixth Interim Distribution Motion filed on October 20, 2015. The original Sixth Allocation and Sixth Interim Motion filed on April 15, 2015 did not allocate any additional recoveries to the Customer Fund; the Trustee simply re-allocated $1,448,717,625.26 of funds that had previously been allocated to the Customer Fund for the Time-Based Damages Reserve.

29.     As reflected in the table above, the amount reserved through the Eleventh Interim

Distribution is $164,511,336.62. This previously reserved amount, plus the $74,324,876.19 that

the Trustee seeks to allocate in this Motion, constitutes the total amount available for distribution.

Therefore, the total amount available for the Twelfth Interim Distribution will be

$238,836,212.81. Of this amount, $3,170,109.13 must be held in reserve for non-liquid asset

recoveries related to certain settlements, leaving a total of $235,666,103.68 available for

distribution.

30.     The Trustee will maintain a general reserve of $25,000,000.00, bringing the amount

available for the Twelfth Interim Distribution to $210,666,103.68.

31.     Of the $210,666,103.68 numerator, $190,755,424.24 will be distributed as part of

the Twelfth Interim Distribution to allowed accounts, and SIPC subrogation[23] for allowed

accounts in the amount of $7,667,541.17[24] will be released to SIPC. For deemed determined

accounts, $12,047,158.51 will be reserved. (Sehgal Aff. ¶ 14).

32.     The Trustee does not seek to allocate any funds to the General Estate at this time.

     **i.**       **Assets in Trustee's Possession as of October 31, 2020**

33.     The Form SIPC 17 completed by the Trustee each month lists all of the recoveries

and assets in the Trustee's possession. In the Trustee's Form SIPC 17 for the period ending on

October 31, 2020 ("October 31 SIPC 17 Form"), attached hereto as Exhibit A, the Trustee reports

that he has recovered $14,368,201,417.43.[25] These funds were primarily derived from the

---

[23] According to the provisions of SIPA, SIPC is reimbursed for its advances to customers once each respective customer claim is fully satisfied.

[24] An additional $4,036.90 of SIPC subrogation associated with the Twelfth Interim Distribution for an account that has not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

[25] In addition, the Trustee has in his possession a *de minimis* amount of unliquidated assets.

following sources: (a) the transfer of BLMIS bank accounts to the BLMIS estate; (b) the results of pre-litigation and litigation settlements; (c) customer preference recoveries; (d) the sale of assets; (e) refunds; and (f) earnings on the Trustee's investment and money market accounts.

34.     To the extent additional settlements are reached and/or become final prior to the entry of an order on this Motion, the Trustee will allocate and distribute those recoveries in accordance with the formula set forth herein.

       ii.       **Recoveries to the BLMIS Estate Since The Eleventh Allocation and Eleventh Interim Distribution**

35.     In the Motion on the Eleventh Allocation and Eleventh Interim Distribution, the Trustee reported total recoveries of $988,770,171.17 that were not previously allocated. When combined with recoveries of $515,974,099.72 reported in the Tenth Allocation and Tenth Interim Distribution, recoveries of $1,302,865,670.54 reported in the Ninth Allocation and Ninth Interim Distribution, recoveries of $342,321,897.89 reported in the Eighth Allocation and Eighth Interim Distribution, recoveries of $247,012,857.10 reported in the Seventh Allocation and Seventh Interim Distribution, recoveries of $345,472,293.08 reported in the Sixth Allocation and Sixth Interim Distribution, recoveries of $756,538,231.45 reported in the Fifth Allocation and Fifth Interim Distribution, recoveries of $477,503,824.33 reported in the Fourth Allocation and Fourth Interim Distribution, recoveries of $1,198,067,071.04 reported in the Third Allocation and Third Interim Distribution, recoveries of $5,501,375,994.66 reported in the Second Allocation and Second Interim Distribution, and recoveries of $2,617,974,430.26 reported in the First Allocation and First Interim Distribution, the total recoveries as of the Eleventh Allocation and Eleventh Interim Distribution were $14,293,876,541.24. The Trustee has recovered additional funds for the estate from multiple parties and sources since that time.

36.     The Trustee has recovered approximately $74,324,876.19 since the Eleventh Allocation and Eleventh Interim Distribution as a result of litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries. (Sehgal Aff. ¶ 10). Therefore, the Trustee seeks approval to allocate the full amount of these recoveries to the Customer Fund.

### D.     Determination Of Allowable Net Equity Claims & Related Reserves

37.     For distribution purposes, the Customer Fund numerator is only one half of the equation. In order to calculate each customer's pro rata share of customer property, the Trustee also needs to establish the denominator, or the amount of allowable net equity claims.

38.     If the Trustee had determined all customer claims and his determinations were final either through the passage of time or judicial determination, the denominator would simply equal the aggregate amount of allowed claims. Because the Trustee seeks to make a Twelfth Interim Distribution prior to a final determination of all customer claims and certain disputes are pending, the Trustee cannot use as a denominator equal to the amount of allowed claims as of this date. Doing so could result in an uneven distribution to customers, in violation of SIPA and the Bankruptcy Code, because there could be insufficient funds to distribute to claimants whose claims are allowed in the future. Instead, the Trustee must project as to the amount of all allowable net equity claims and establish sufficient reserves to ensure that all possibly eligible claimants receive a pro rata distribution, should their claims be allowed. In order to do so, he must maintain sufficient reserves.

39.     Certain accountholders decided against filing a claim in this proceeding, even though they may have had allowable net equity claims. The statutory bar date to file claims was July 2, 2009. SIPA § 78fff-2(a)(3). Thus, a failure to file a claim by that date means that there is no distribution that can be made to these accounts. No reserves are maintained for these accounts.

40.    Further, certain accountholders have entered into final settlements not contingent on the Net Equity Dispute. No reserves are maintained for these accounts.

## IV.    CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR TWELFTH ALLOCATION AND TWELFTH INTERIM DISTRIBUTION

41.    SIPA § 78fff-2(c)(1) establishes, in pertinent part, that a customer is to receive his ratable share from the fund of customer property. To the extent the customer's share has been fully satisfied through an advance of funds by SIPC, SIPC steps into the shoes of the customer as subrogee and receives that customer's share of customer property. In that manner, a customer does not receive a double recovery on his claim that was already fully satisfied by the SIPC advance.

42.    As set forth above and in the Sehgal Affidavit, the Trustee proposes to allocate $74,324,876.19 to the Customer Fund at this time and release $190,755,424.24 for distribution.

43.    Of the $210,666,103.68 numerator, $190,755,424.24 will be distributed as part of the Twelfth Interim Distribution to allowed accounts and SIPC subrogation for allowed accounts in the amount of $7,667,541.17[26] will be released to SIPC. For deemed determined accounts, $12,047,158.51 will be reserved. (Sehgal Aff. ¶ 14).

44.    The Denominator is $20,594,340,605.45. (Sehgal Aff. ¶ 17). To determine the percentage of each allowed customer net equity claim that can be satisfied from the Customer Fund, the Net Customer Fund is divided by the Denominator, resulting in the following percentage:

$$\frac{\$210,666,103.68}{\$20,594,340,605.45} = 1.022\%$$

---

[26] An additional $4,036.90 of SIPC subrogation associated with the Twelfth Interim Distribution for an account that has not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

45.     Under this scenario, a total of 813 accounts will receive a distribution up to 1.022%

of their net equity claims. (Sehgal Aff. ¶ 18). Of these 813 accounts (relating to 950 claims), 16

accounts (relating to 17 claims) will become fully satisfied, bringing the total of fully satisfied

account holders to 1,490 (all accounts with an allowed claim amount of up to $1,645,761.48). 797

accounts will remain partially satisfied and will be entitled to participate in future distributions.

(*Id.*).

46.     An additional seven accounts (relating to 11 claims) that are currently "deemed

determined" could receive a distribution if and when the status of their claims moves from

"deemed determined" to allowed. (*Id.* ¶ 19). One of the seven accounts would be fully satisfied

by the SIPC advance. The remaining six accounts would receive both a SIPC advance and a

distribution in accordance with the Trustee's Motion and the Twelfth Allocation and Twelfth

Interim Distribution. (*Id.*). None of the remaining six accounts would be fully satisfied by the

First through Twelfth Interim Distributions. (*Id.*).

47.     SIPC is entitled to receive repayment as to any given customer to the extent the

customer's claim was fully repaid by a combination of the SIPC advance and the Trustee's

distributions. *See In re Bell & Beckwith*, 104 B.R. 842, 852-55 (Bankr. N. D. Ohio 1989), *aff'd*,

937 F.2d 1104 (6th Cir. 1991). SIPC, as subrogee, is entitled to receive partial repayment of its

cash advances to the Trustee pursuant to SIPA § 78fff-3(a)(1). A SIPC subrogation payment was

made on March 29, 2013 in the amount of $102,805,012.23, on May 5, 2014 in the amount of

$11,299,366.89, on February 6, 2015 in the amount of $11,226,253.72, on January 6, 2016 in the

amount of $38,193,864.82, on June 30, 2016 in the amount of $7,309,329.92, on February 2, 2017

in the amount of $10,335,452.50, on February 22, 2018 in the amount of $23,781,437.74, on

February 22, 2019 in the amount of $17,917,594.09, and on February 28, 2020 in the amount of

$14,633,402.60, for a total of $237,501,714.51 in subrogation payments to SIPC. Based on the

18

"net loser" accounts that have been allowed and have returned a signed Partial Assignment and Release (PAR) through this Twelfth Interim Distribution, SIPC's subrogation claim is $8,429,576.40. The $8,429,576.40 is comprised of $7,667,541.17[27] of SIPC subrogation from the Twelfth Interim Distribution and $762,035.23[28] of SIPC subrogation associated with the First through Eleventh Interim Distributions (this $762,035.23 represents SIPC subrogation for accounts determined after the February 28, 2020 payment was made). This amount will be released to SIPC.

48.    Unless otherwise noted, the numbers contained herein are based on recoveries and claims allowed as of October 31, 2020. To the extent additional claims are allowed, the Trustee will distribute funds consistent with the formulas set forth in this Motion.

---

[27] An additional $4,036.90 of SIPC subrogation associated with the Twelfth Interim Distribution for an account that has not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

[28] An additional $271,001.60 of SIPC subrogation associated with the First through Eleventh Interim Distribution for an account that has not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

## A.    No Interim Distribution Of General Estate

49.    Under SIPA § 78fff(e), funds from the general estate satisfy the administrative costs and expenses of a Debtor's estate and a liquidation proceeding. To the extent the general estate is insufficient, SIPC makes advances to the Trustee for the payment of such costs and expenses. SIPA § 78fff-3(b)(2). All administrative advances made by SIPC are recoverable from the general estate under section 507(a)(2) of the Bankruptcy Code. SIPA §§ 78eee(b)(5)(E), 78fff(e). The general estate is distributed in accordance with section 726 of the Bankruptcy Code, with section 507(a)(2) expenses receiving second priority.[29] SIPA § 78fff(e).

50.    As noted previously, the Trustee has received 428 timely and 22 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7 billion. The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms. Of these 450 claims, 95 are general creditor claims and 49 are broker-dealer claims which together total approximately $265.4 million of the $1.7 billion. Inasmuch as the Trustee proposes to allocate no assets to the General Estate, there are no funds in the General Estate from which to make a distribution to general creditors at this time. Accordingly, "[no] purpose would be served" by the examination of or the institution of actions seeking to disallow such claims. *See* 11 U.S.C. § 704(5). If the Trustee is able to fully satisfy the net equity claims of the BLMIS customers, any funds remaining will be allocated to the general estate and distributed in the order of priority established in Bankruptcy Code § 726 and SIPA § 78fff(e). All BLMIS customers who filed claims—whether their net equity customer claims were allowed or denied—may be deemed to be general creditors of the BLMIS estate. The Trustee is working diligently on behalf of all creditors and will seek to satisfy all creditor claims.

---

[29] There are no § 507(a)(1) expenses in this liquidation proceeding.

## V.   MISCELLANEOUS

### A.   Notice

51.     Pursuant to Bankruptcy Rules 2002(a)(6), 2002(f)(8), and 2002(h), the Trustee has given notice of the hearing on the Trustee's Motion by first class mail, postage prepaid, to all claimants that filed a claim. Pursuant to the Order Establishing Notice Procedures (ECF No. 4650), the Trustee has given notice of the hearing on the Trustee's Motion via email and/or U.S. Mail to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; and (v) all persons who have filed notices of appearance in the BLMIS proceeding. The Trustee believes that no further notice need be given of this or any further matter in the proceeding.

### B.   Record Date

52.     The Twelfth Interim Distribution will be made to all record holders as of January 20, 2021.

## VI.   CONCLUSION

53.     This Motion and the relief requested by the Trustee are consistent with the policy and purposes underlying SIPA and are in the best interests of the customers of BLMIS, the Estate, and its creditors.

54.     No prior application for the relief sought herein has been made to this or any other Court.

21

**WHEREFORE,** the Trustee respectfully requests that this Court enter an order (a) approving (i) the proposed Twelfth Allocation of Property to the Customer Fund and to the General Estate and (ii) the proposed Twelfth Interim Distribution of the Customer Fund; and (b) granting such other and further relief as may be deemed just and proper.

Dated: December 9, 2020
      New York, New York

Respectfully submitted,

*/s/ David J. Sheehan*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*