**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (SMB) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF, | Adv. Pro. No. 10-04469 (CGM) |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | |
| v. | |
| CAROL L. KAMENSTEIN, individually and in her capacity as joint tenant, | |
| DAVID R. KAMENSTEIN, individually and in his capacity as joint tenant, | |
| SLOAN G. KAMENSTEIN, and | |
| TRACY D. KAMENSTEIN, | |
| Defendants. | |

**TRUSTEE'S MEMORANDUM OF LAW**
**IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ....................................................................................................................2

I.      The Carol Account............................................................................................3

II.     The David Account...........................................................................................4

III.    The Sloan Account...........................................................................................4

IV.    The Tracy Account...........................................................................................5

V.     The Adversary Proceeding................................................................................5

ARGUMENT ........................................................................................................................7

I.      IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT,
SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE
TRUSTEE AS A MATTER OF LAW ...................................................................7

      A.    Legal Standard ........................................................................................7

      B.    The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year
Transfers of Fictitious Profits Made by BLMIS to Defendants.............................8

            1.    BLMIS Made the Two-Year Transfers with Actual Fraudulent
Intent and in Furtherance of the Fraud.........................................................9

II.     DEFENDANTS' DEFENSES CAN BE DETERMINED AS A MATTER OF
LAW .............................................................................................................18

      A.    The Transfers Were an Interest of the Debtor in Property....................................18

      B.    SIPA And The Bankruptcy Code Authorize the Trustee to Recover
Customer Property, Wherever Held.................................................................21

            1.    SIPA and SIPC.....................................................................................22

            2.    Becoming a Member of SIPC ..................................................................24

            3.    Initiating a SIPA Liquidation...................................................................24

            4.    Customer Property Under SIPA.................................................................25

            5.    Madoff's Business .................................................................................27

6.      The Liquidation of BLMIS ...........................................................28

7.      Substantive Consolidation ..........................................................28

8.      The Trustee Can Recover Any Transfers of Customer Property ..............30

C.    Defendants' Management of Transfers From BLMIS Does Not Defeat the
      Trustee's Avoidance And Recovery Action ...........................................35

1.      The Tracy Account and Checks to Tracy .................................36

2.      The Trustee Has Satisfied His Burden to Show the Pathways of the
        Funds From BLMIS to Tracy ..................................................37

CONCLUSION.....................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
  Nos. 05 Civ. 9050(LMM), 03, MDL 1529, 2011 WL 1419617 (S.D.N.Y. Apr.
  7, 2011), *aff'd*, 748 F.3d 110 (2d Cir. 2014).............................................................8

*In re Adler Coleman Clearing Corp.*,
  195 B.R. 266 (Bankr. S.D.N.Y. 1996).............................................................23

*Alexander v. Compton (In re Bonham)*,
  229 F.3d 750 (9th Cir. 2000) .............................................................34, 35

*Armstrong v. Collins*,
  Nos. 01 Civ. 2437(PAC), 02 Civ. 2796(PAC), 02 Civ. 3620(PAC), 2010 WL
  1141158 (S.D.N.Y. Mar. 24, 2010) .............................................................12

*Bayou Accredited Fund, LLC v. Redwood Growth Partners L.P. (In re Bayou
  Grp., LLC)*,
  396 B.R. 810, 835 (Bankr. S.D.N.Y. 2008), *rev'd in part on other grounds*,
  *Bayou IV*, 439 B.R. 304 (S.D.N.Y. 2010).............................................................11, 15

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
  397 B.R. 1 (S.D.N.Y. 2007).............................................................9

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
  380 F. Supp. 2d 334 (S.D.N.Y. 2005).............................................................8

*In re Bernard L. Madoff Inv. Sec. LLC*,
  654 F.3d 229 (2d Cir. 2011).............................................................23

*In re Bevill, Bresler & Schulman, Inc.*,
  83 B.R. 880 (Bankr. D.N.J. 1988) .............................................................27

*Bonded Fin. Servs., Inc. v. European Am. Bank*,
  838 F.2d 890 (7th Cir. 1988) .............................................................38

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).............................................................7

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re
  Bayou Grp. LLC)*,
  439 B.R. 284 (S.D.N.Y. 2010).............................................................9, 12, 15

*Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*,
 97 B.R. 503 (E.D. Ark. 1987) ................................................................26

*In re Finley, Kumble*,
 130 F.3d 52 (2d Cir. 1997)......................................................................38

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
 Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774 (Bankr.
 S.D.N.Y. Jan. 3, 2014) ............................................................................12

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund)*,
 359 B.R. 510 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397 B.R. 1
 (S.D.N.Y. 2007) ......................................................................................15

*In re Lehman Bros. Holdings*,
 445 B.R. 143 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478
 B.R. 570 (S.D.N.Y. 2012).......................................................................26

*Leonhardt v. Madoff*,
 No. 09-2032 (S.D.N.Y. Mar. 5, 2009) ....................................................29

*Levey v. Cummins (In re BoxMagic Media Corp.)*
 No. 08 B 12628, 2012 WL 589652 (Bankr. N.D. Ill. Feb. 22, 2012) .....39

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986)..................................................................................7

*McHale v. Boulder Cap. (In re 1031 Tax Grp., LLC)*,
 439 B.R. 47 (S.D.N.Y. 2010)........................................................11, 12, 22

*Moran v. Goldfarb*,
 No. 09-cv-7667 (RJS), 2012 WL 2930210 (S.D.N.Y. July 16, 2012)..............11, 12

*Nisselson v. Salim (In re Big Apple Volkswagen, LLC)*,
 No. 11-11388 (JLG), 2016 WL 1069303 (Bankr. S.D.N.Y. Mar. 17, 2016)....................38, 39

*In re Old Naples Sec., Inc.*,
 223 F.3d 1296 (11th Cir. 2000) ..............................................................33

*Picard v. Avellino*,
 557 B.R. 89 (Bankr. S.D.N.Y. 2016)..................................................22, 31

*Picard v. BAM L.P.*,
 608 B.R. 165 (Bankr. S.D.N.Y. 2019).....................................................27

*Picard v. Chais*,
 445 B.R. 206 (Bankr. S.D.N.Y. 2011) ....................................................10

*Picard v. Cohen*,
  Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
  25, 2016) ..................................................................................................9, 22

*Picard v. Cohmad Sec. Corp.*,
  454 B.R. 317 (Bankr. S.D.N.Y. 2011) ...................................................................9

*Picard v. Fairfield Greenwich Ltd.*,
  762 F.3d 199 (2d Cir. 2014)...................................................................................27

*Picard v. Flinn Invs., LLC*,
  463 B.R. 280 (S.D.N.Y. 2011).................................................................................8

*Picard v. Greiff*,
  476 B.R. 715 (S.D.N.Y. 2012)........................................................................10, 15

*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011)...............................................................................10

*Picard v. Legacy Cap. Ltd.*,
  603 B.R. 682 (Bankr. S.D.N.Y. 2019) ........................................................10, 11, 12

*Picard v. Lowrey*,
  596 B.R. 451 (S.D.N.Y. 2019)...............................................................................25

*Picard v. Nelson*,
  610 B.R. 197 (Bankr. S.D.N.Y. 2019) ......................................................... *passim*

*In re Picard*,
  917 F.3d 85 (2d Cir. 2019)....................................................................................27

*In re Primeline Sec. Corp.*,
  295 F.3d 1100 (10th Cir. 2002) ............................................................................33

*Rosenman Family, LLC v. Picard*,
  395 F. App'x 766 (2d Cir. 2010) ..........................................................................23

*Sec. Inv'r Prot. Corp. v. Barbour*,
  421 U.S. 412 (1975)...............................................................................................23

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
  Madoff Inv. Sec. LLC)*,
  424 B.R. 122 (Bankr. S.D.N.Y. 2010) .............................................................10, 23

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
  Madoff)*,
  531 B.R. 439 (Bankr. S.D.N.Y. 2015) ..................................................................8, 9

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re BLMIS)*,
    522 B.R. 41 (Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL
    183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017) ......................21, 33

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    499 B.R. 416 (S.D.N.Y. 2013) ................................................................................................23

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    No. 12 MC 115(JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013), *aff'd*, 773
    F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015) ................................................6

*SEC v. F.O. Baroff Co.*,
    497 F.2d 280 (2d Cir. 1974) ....................................................................................................23

*Taunt v. Hurtado (In re Hurtado)*,
    342 F.3d 528 (6th Cir. 2003) ..................................................................................................39

*Town of Fairfield v. Madoff*,
    No. 09-5023735 (Conn. Super. Ct. Mar. 30, 2009) ................................................................29

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016) ....................................................................................................27

*In re Weis Sec., Inc.*,
    No. 73 Civil 2332, 1976 WL 820 (S.D.N.Y. Aug. 2, 1976) ....................................................23

*Ying Jing Gan v. City of New York*,
    996 F.2d 522 (2d Cir. 1993) ......................................................................................................7

**Statutes**

11 U.S.C. § 101(41) ......................................................................................................................25

11 U.S.C. § 105(a) ..........................................................................................................................5

11 U.S.C. § 109(a) ........................................................................................................................25

11 U.S.C. § 544 ................................................................................................................................5

11 U.S.C. § 548 ..............................................................................................................................21

11 U.S.C. § 548(a) ............................................................................................................................5

11 U.S.C. § 548(a)(1) ....................................................................................................................22

11 U.S.C. § 548(a)(1)(A) ................................................................................................................8

11 U.S.C. § 550(a) ............................................................................................................................5

11 U.S.C. § 550(a)(1) .................................................................................................5

11 U.S.C. § 551 .....................................................................................................5, 6

15 U.S.C. § 78ccc(a) ................................................................................................24

15 U.S.C. § 78ccc(a)(2)(A) .......................................................................................24

15 U.S.C. § 78ddd(c)(2) ...........................................................................................24

15 U.S.C. § 78eee(b)(1) ...........................................................................................32

15 U.S.C. § 78eee(b)(2)(A)(1) ..................................................................................24

15 U.S.C. § 78eee(b)(3) ...........................................................................................24

15 U.S.C. § 78eee(b)(4) ...........................................................................................24

15 U.S.C. § 78fff-2(c)(1) ..........................................................................................23

15 U.S.C. § 78fff-2(c)(3) .................................................................................... *passim*

15 U.S.C. § 78fff(a) ..................................................................................................23

15 U.S.C. § 78*lll*(4) .....................................................................................23, 26, 30

15 U.S.C. § 78*lll*(4)(D) ...........................................................................................26

15 U.S.C. § 78*lll*(5) ................................................................................................25

15 U.S.C. § 78*o*(b) ............................................................................................24, 25

**Rules**

17 C.F.R. § 240.15b1-3(b) ......................................................................................24

17 C.F.R. § 240.15c3-3 .................................................................................25, 31, 35

17 C.F.R. § 240.15c3-3(f) .........................................................................................26

17 C.F.R. § 249.501(a) .............................................................................................24

Fed. R. Bankr. P. 7056 ...........................................................................................1, 7

Fed. R. Bankr. P. 7056-1(a) ......................................................................................6

Fed. R. Civ. P. 56 .......................................................................................................1

Fed. R. Civ. P. 56(a) .................................................................................................7

Fed. R. Civ. P. 56(c)(1)..................................................................................................................7

Fed. R. Evid. 803(22)...................................................................................................................11

Fed. R. Evid. 807 .........................................................................................................................11

**Other Authorities**

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069 (2002)...........................25

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff,

respectfully submits this memorandum of law in support of the Trustee's motion (the "Motion")

under Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 for

summary judgment as to Count One of the Trustee's complaint to avoid and recover the amounts

fraudulently transferred by BLMIS to defendants Carol L. Kamenstein, individually and in her

capacity as joint tenant, David R. Kamenstein, individually, and in his capacity as joint tenant,

Sloan G. Kamenstein, and Tracy D. Kamenstein (the "Defendants"), and in opposition to

Defendants' Motion for Summary Judgment Dismissing the Complaint for Lack of Subject

Matter Jurisdiction and Motion of Defendant Tracy Kamenstein for Partial Summary Judgment

("Summary Judgment Motion").  The facts underlying this Motion are set forth in the Trustee's

Counterstatement of Material Facts Pursuant to Local Rule 7056-1 ("Stmt."), the Declaration of

Nicholas J. Cremona ("Cremona Decl."), and the Declarations of Bruce G. Dubinsky, Lisa M.

Collura, and Matthew B. Greenblatt.

## PRELIMINARY STATEMENT

This avoidance and recovery action centers on the undisputable fact that in the two years

preceding the commencement of the SIPA liquidation (the "Two-Year Period"), Defendants

received $2,794,314 in fictitious profits from BLMIS.  For decades, BLMIS operated the largest

Ponzi scheme in history and thus, the transfers from BLMIS to Defendants were made with the

intent to hinder, delay, or defraud BLMIS's creditors and are avoidable and recoverable for the

benefit of the BLMIS customer fund.

Defendants do not dispute that they received the transfers.  Instead, they first advance the

argument that the Trustee cannot recover fraudulent transfers to Defendants because Madoff, not

BLMIS, owned the bank accounts from which they were paid. The issue, however, has been twice resolved in the Trustee's favor and constitutes the law of the case. Defendants next assert that the Trustee cannot recover transfers to Defendant Tracy Kamenstein because the withdrawals were not deposited into her bank account. This defense is not grounded in fact and can be resolved in the Trustee's favor as a matter of law because Tracy had ownership and dominion and control at all times over her BLMIS account and the withdrawals therefrom.

For these reasons, Defendants' motion for summary judgment should be denied and the Trustee's cross-motion for summary judgment should be granted.

## **BACKGROUND**

Defendants Carol L. Kamenstein and David R. Kamenstein are residents of West Palm Beach, Florida. Stmt. ¶¶ 96, 100; Ans. ¶¶ 7–8, *Picard v. Kamenstein*, Adv. Pro. No. 10-04469 (SMB) (Bankr. S.D.N.Y. Aug. 13, 2015), ECF No. 43.[1] Defendants Sloan G. Kamenstein and Tracy D. Kamenstein are residents of Palm Beach, Florida. Stmt. ¶¶ 104, 108; Ans. ¶¶ 9–10, ECF No. 43. Defendants were customers of BLMIS's investment advisory business and held four BLMIS accounts:

    i.    No. 1CM914 in the name of "Carol Kamenstein" (the "Carol Account"). Stmt. ¶ 97; Ans. ¶¶ 7, 37, ECF No. 43; *see also* Ex. B to Compl., ECF No. 1;

    ii.    No. 1CM913 in the name of "David R. Kamenstein" (the "David Account"). Stmt. ¶ 101; Ans. ¶¶ 8, 37, ECF No. 43; *see also* Ex. B to Compl., ECF No. 1;

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Kamenstein*, Adv. Pro. No. 10-04469 (CGM) (Bankr. S.D.N.Y.).

iii.    No. 1CM597 in the name of "Sloan G. Kamenstein" (the "Sloan Account").

Stmt. ¶ 104; Ans. ¶¶ 9, 37, ECF No. 43; *see also* Ex. B to Compl., ECF No. 1;

and

iv.    No. 1CM596 in the name of "Tracy D. Kamenstein" (the "Tracy Account").

Stmt. ¶ 108; Ans. ¶¶ 10, 37, ECF No. 43; *see also* Ex. B to Compl., ECF No. 1.

BLMIS's books and records show that the Sloan Account and Tracy Account were held

in the individual defendants' names, "Sloan G. Kamenstein," and "Tracy D. Kamenstein,"

respectively. Neither was opened in the name of a trust for their benefit. All BLMIS-issued

checks were made payable to Sloan or Tracy individually and not to a trust, or to a trustee for the

benefit of either Defendant.

## I.    The Carol Account

The Carol Account was opened on December 27, 2004 with an inter-account transfer

from BLMIS Account No. 1CM247 in the amount of $3,146,642, which consisted entirely of

fictitious profits. Stmt. ¶ 128. On January 31, 2005, there was a second inter-account transfer

from BLMIS Account No. 1CM247 in the amount of $686, which also consisted entirely of

fictitious profits. Stmt. ¶ 129. Between December 27, 2004 and December 11, 2008, there were

two cash deposits via check and wire in the aggregate amount of $113,600, all representing

principal. Stmt. ¶ 130. The two inter-account transfers and two cash deposits provided the Carol

Account with a total of $113,600 of principal. *Id.*

During the life of the Carol Account, Defendants made 39 cash withdrawals totaling

$2,377,040, which consisted of both principal and fictitious profits. Stmt. ¶ 131. Defendants

withdrew $2,263,440 of funds in excess of principal, representing fictitious profits over the life

of the Carol Account. Stmt. ¶ 132. Within the Two-Year Period prior to December 11, 2008,

$907,300 of fictitious profits was withdrawn from the Carol Account. Stmt. ¶ 133.

## II.    The David Account

The David Account was opened on December 27, 2004 with an inter-account transfer from BLMIS Account No. 1CM247 in the amount of $3,146,642, which consisted entirely of fictitious profits.  Stmt. ¶ 135.  On January 31, 2005, there was a second inter-account transfer from BLMIS Account No. 1CM247 in the amount of $686, which also consisted entirely of fictitious profits.  Stmt. ¶ 136.  Between December 27, 2004 and December 11, 2008, there were two cash deposits via check and wire in the aggregate amount of $113,600, all representing principal.  Stmt. ¶ 137.  The two inter-account transfers and two cash deposits provided the David Account with a total of $113,600 of principal.  *Id.*

During the life of the David Account, Defendants made 39 cash withdrawals totaling $2,377,040, which consisted of both principal and fictitious profits.  Stmt. ¶ 138.  Defendants withdrew $2,263,440 of funds in excess of principal, representing fictitious profits over the life of the David Account.  Stmt. ¶ 139.  Within the Two-Year Period prior to December 11, 2008, $907,300 of fictitious profits was withdrawn from the David Account.  Stmt. ¶ 140.

## III.    The Sloan Account

The Sloan Account was opened on September 7, 1999 with two inter-account transfers from BLMIS Account No. 1CM295 in the aggregate amount of $1,782,332—$1,457,157 of which was principal.  Stmt. ¶ 142.  On October 29, 1999, there was a third inter-account transfer from BLMIS Account No. 1CM295 in the amount of $26, which consisted entirely of fictitious profits.  Stmt. ¶ 143.  Between September 7, 1999 and December 11, 2008, there were eight cash deposits via checks and wires in the aggregate amount of $1,958,637, all representing principal.  Stmt. ¶ 144.  The three inter-account transfers and eight cash deposits provided the Sloan Account with a total of $3,415,794 of principal.  Stmt. ¶ 145.

4

During the life of the Sloan Account, Defendants made 56 cash withdrawals totaling $4,683,246, which consisted of both principal and fictitious profits. Stmt. ¶ 146. Defendants withdrew $1,267,452 of funds in excess of principal, representing fictitious profits over the life of the Sloan Account. Stmt. ¶ 148. Within the Two-Year Period prior to December 11, 2008, $527,400 of fictitious profits was withdrawn from the Sloan Account. Stmt. ¶ 149.

## IV.    The Tracy Account

The Tracy Account was also opened on September 7, 1999 with two inter-account transfers from BLMIS Account No. 1CM295 in the aggregate amount of $1,782,332—$1,457,157 of which was principal. Stmt. ¶ 152. On October 29, 1999, there was a third inter-account transfer from BLMIS Account No. 1CM295 in the amount of $26, which consisted entirely of fictitious profits. Stmt. ¶ 153. Between September 7, 1999 and December 11, 2008, there were seven cash deposits via checks and wires in the aggregate amount of $1,082,435, all representing principal. Stmt. ¶ 154. The three inter-account transfers and seven cash deposits provided the Tracy Account with a total of $2,539,593 of principal. Stmt. ¶ 155.

During the life of the Tracy Account, Defendants made 53 cash withdrawals totaling $2,991,907, which consisted of both principal and fictitious profits. Stmt. ¶ 156. Defendants withdrew $452,314 of funds in excess of principal, representing fictitious profits over the life of the Tracy Account and in the Two-Year Period. ¶¶ 158–59.

## V.    The Adversary Proceeding

In 2010, the Trustee brought this adversary proceeding against Defendants to avoid and recover fraudulent transfers of fictitious profits. Compl. ¶¶ 37–42. Under Bankruptcy Code sections 105(a), 544, 548(a), 550(a), and 551 and the New York Debtor and Creditor Law, the Trustee sought to recover $6,249,580 of fictitious profits received by Defendants from BLMIS during the six years prior to the liquidation. Compl. ¶ 39. Under sections 548(a), 550(a)(1), and

551 of the Bankruptcy Code, the Trustee also sought to avoid and recover $2,794,314 of fictitious profits received by Defendants during the Two-Year Period: $907,300 from Defendant Carol; $907,300 from Defendant David; $527,400 from Defendant Sloan; and $452,314 from Defendant Tracy.  Stmt. ¶¶ 133, 140, 149, 159; Compl. ¶ 40.  After the Trustee brought his complaint, the Second Circuit ruled that the Trustee is limited to recovery of the Two-Year Transfers.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12 MC 115(JSR), 2013 WL 1609154, at *3 (S.D.N.Y. Apr. 15, 2013), *aff'd*, 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015) ("*Section 546(e) Decision*").  On August 13, 2015, Defendants answered the Complaint.  Answer, ECF No. 43.

On June 14, 2019, the Trustee served the expert reports of Bruce G. Dubinsky, Matthew B. Greenblatt, Lisa M. Collura, and Richard Diedrich.  Defendants did not depose any of the Trustee's expert witnesses.  Expert discovery closed on December 16, 2019.

Following discovery, the case was ripe for mediation under the Order (1) Establishing Litigation Case Management Procedures for Avoidance Actions and (2) Amending the February 16, 2010 Protective Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Nov. 10, 2010), ECF No. 3141.  On August 20, 2020, the parties participated in an unsuccessful mediation before the Honorable Allen Hurkin-Torres (Ret.).  *See* Final Mediator's Report, ECF No. 93.  On September 4, 2020, Defendants requested a Local Rule 7056-1(a) pre-motion conference in order to file their motion for summary judgment dismissing the complaint and motion for partial summary judgment as to Defendant Tracy Kamenstein.  *See* Letter, ECF No. 97.  This Court set a briefing schedule on the parties' motions.  *See* Stipulation and Order, ECF No. 113.

Defendants filed their Summary Judgment Motion on November 25, 2020.[2]  ECF No. 115.  This

Motion follows.

## **ARGUMENT**

I.    **IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT, SUMMARY
JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE TRUSTEE AS A
MATTER OF LAW**

A.    **Legal Standard**

Rule 56(a) of the Federal Rules of Civil Procedure, applicable to bankruptcy courts

pursuant to Fed. R. Bankr. P. 7056, provides that a court must grant summary judgment when

there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986).  Factual positions are proven by either citing the record evidence—including

declarations, admissions, and interrogatory answers—or showing that an adverse party cannot

produce admissible evidence to support a fact.  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*

*Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the movant has discharged its burden, the non-movant must then "go beyond the

pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, designate specific facts showing that there is a genuine issue for trial."

*Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted).  "[T]he nonmoving party may

. . . not rely simply on conclusory statements or on contentions that the affidavits supporting the

motion are not credible."  *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).

The non-moving party may not oppose summary judgment "on the basis of an unreasonable view

---

[2] In addition to cross-motions for summary judgment, the parties are preparing for a final pre-trial conference on
January 27, 2021, including exchanging exhibits, deposition designations, and finalizing the joint pre-trial order.
*See* Order Setting Pre-Trial Deadlines And Scheduling Final Pre-Trial Conference, ECF No. 100.

of the facts." *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y.

2005).

### B.     The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year Transfers of Fictitious Profits Made by BLMIS to Defendants

Under SIPA § 78fff-(2)(c)(3), the Trustee may recover any transfers by the debtor

whenever customer property is insufficient to pay customer claims.  To date, the Trustee has

recovered $14.364 billion of $20 billion owed to customers by the estate.  *See* Trustee's Twenty-

Fourth Interim Report for the Period April 1, 2020 through September 30, 2020, *Sec. Inv'r Prot.*

*Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y.

Oct. 28, 2020), ECF No. 19896.  Because customer property is insufficient to pay the

outstanding customer claims, the Trustee is authorized to recover the transfers to Defendants.

S*ec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 531 B.R.

439, 453–54 (Bankr. S.D.N.Y. 2015) ("*Omnibus Good Faith Decision*"); *see also Picard v. Flinn*

*Invs., LLC*, 463 B.R. 280, 284 (S.D.N.Y. 2011).

The Trustee seeks to avoid and recover transfers of fictitious profits made to Defendants

under 11 U.S.C. § 548(a)(1)(A).  The elements of this claim are: (i) a transfer of an interest of the

debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to

hinder, delay, or defraud" a creditor.  *Adelphia Recovery Tr. v. Bank of Am., N.A.*, Nos. 05 Civ.

9050(LMM), 03, MDL 1529, 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd*, 748 F.3d

110 (2d Cir. 2014).  The Bankruptcy Court has recognized that fictitious profit cases are strict

liability cases.  Cremona Decl., Ex. 19 (Tr. of Oral Arg. at 114:10–11, *Picard v. Marilyn*

*Bernfeld Tr.*, Adv. Pro. No. 10-05143 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015), ECF No. 20); *see*

*also id*. (Tr. of Oral Arg. at 100:19, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (SMB) (Bankr.

S.D.N.Y. Oct. 28, 2015, ECF No. 85) (holding a fictitious profit count is "almost a strict liability

count")). This is especially true where, as here, Defendants admit receipt of the Two-Year

Transfers. Stmt. ¶¶ 98–99; *see also* Cremona Decl., Ex. 13 (Second Amended Responses and

Objections of Defendants to Trustee's First Set of Interrogatories No. 9) ("Responding Parties

admit the deposits and withdrawals reflected on Exhibit B to the complaint for the period from

December 11, 2006 through December 11, 2008."), Ex. 14 (Defendant David R. Kamenstein

Dep. Tr.) at 91:15–18.

Defendants do not dispute that the Two-Year Transfers were made within two years of

the Filing Date with actual intent to hinder, delay, or defraud a creditor. Thus, they do not

overtly challenge that BLMIS was engaged in a Ponzi scheme and that the Trustee is entitled to

rely on the Ponzi scheme presumption.

### 1. BLMIS Made the Two-Year Transfers with Actual Fraudulent Intent and in Furtherance of the Fraud

Intent to defraud can be established by showing that the debtor operated a Ponzi scheme.

*See Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp.*

*LLC)*, 439 B.R. 284, 304–05 (S.D.N.Y. 2010) ("*Bayou IV*"); *Bear, Stearns Sec. Corp. v. Gredd*

*(In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007) (citations omitted) (internal

quotation marks omitted); *see also Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL

1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) ("[T]he Trustee is entitled to rely on the Ponzi

scheme presumption pursuant to which all transfers are deemed to have been made with actual

fraudulent intent." (citing *Omnibus Good Faith Decision*, 531 B.R. at 471)); *Picard v. Cohmad*

*Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("[T]he fraudulent intent on the part of

the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi scheme

presumption.'").

### a.   BLMIS Was a Ponzi Scheme

BLMIS was engaged in a Ponzi scheme.  "The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption, particularly in light of Madoff's criminal admission."  *Picard v. Chais*, 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011); *see also Picard v. Katz*, 462 B.R. 447, 453 & n.5 (S.D.N.Y. 2011) ("[I]t is patent that all of Madoff Securities' transfers during the two-year period were made with actual intent to defraud present and future creditors.").   The existence of the scheme has been recognized by the Bankruptcy Court, the District Court, and the Second Circuit.  *See, e.g.*, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 125–33 (Bankr. S.D.N.Y. 2010); *Picard v. Greiff*, 476 B.R. 715, 718 (S.D.N.Y. 2012); *Section 546(e) Decision*, 773 F.3d at 415–16.

The existence of the BLMIS Ponzi scheme is substantiated by the allocutions of Madoff and BLMIS employees.  Stmt. ¶ 78; *see also Picard v. Nelson*, 610 B.R. 197, 208 (Bankr. S.D.N.Y. 2019) (relying on plea allocutions in finding that BLMIS was a Ponzi scheme); *Picard v. Legacy Cap. Ltd.*, 603 B.R. 682, 691 (Bankr. S.D.N.Y. 2019) ("The allocutions establish *prima facie* that Madoff ran BLMIS as a Ponzi scheme.").  Madoff admitted that he ran a Ponzi scheme through BLMIS and that he did not execute trades on behalf of his investment advisory clients.  Stmt. ¶¶ 79–86.  Frank DiPascali, Madoff's chief financial officer and co-conspirator, admitted that Madoff did not execute trades on behalf of BLMIS's investment advisory business ("IA Business") customers and that he knowingly caused false account statements to be created reflecting false transactions: "[f]rom at least the early 1990s through December of 2008 . . . [n]o purchases of [sic] sales of securities were actually taking place in [customers'] accounts."  Stmt. ¶ 87.

10

David Kugel, a manager and trader at BLMIS, admitted that he falsified trading records as far back as the early 1970s. Stmt. ¶¶ 89–90. Kugel provided historical trade information to create fake trades which, when included on the BLMIS account statements and trade confirmations of IA Business clients, gave the appearance of profitable trading when no trading had actually occurred. Stmt. ¶ 90. Irwin Lipkin, BLMIS's accountant, admitted BLMIS's revenue was falsely inflated through fraudulent bookkeeping entries and annual audited reports. Stmt. ¶ 91. Eric Lipkin, payroll clerk at BLMIS, admitted BLMIS created fake reports replicating those of the Depository Trust & Clearing Corporation in order to purportedly confirm non-existent positions in the investment advisory accounts for auditors and the Securities and Exchange Commission ("SEC"). Stmt. ¶¶ 92–93. And Enrica Cotellessa-Pitz, BLMIS accountant and comptroller, admitted investment advisory customer money was funneled to BLMIS's proprietary trading and market-making businesses to falsely inflate revenue and hide losses. Stmt. ¶¶ 94–95.

Guilty pleas and admissions under oath are admissible to prove the existence of a Ponzi scheme. *See Nelson*, 610 B.R. at 209–10 ("Criminal plea allocutions are admissible under the exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a judgment of a previous conviction and FED. R. EVID. 807's residual exception to hearsay."); *Legacy*, 603 B.R. at 689 n.8 (collecting cases) ("The Court may rely on a plea allocution as evidence to support a fact."); *Moran v. Goldfarb*, No. 09-cv-7667 (RJS), 2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012); *Bayou Accredited Fund, LLC v. Redwood Growth Partners L.P. (In re Bayou Grp., LLC)*, 396 B.R. 810, 835 (Bankr. S.D.N.Y. 2008) ("*Bayou III*"), *rev'd in part on other grounds, Bayou IV*, 439 B.R. at 304; *McHale v. Boulder Cap. (In re 1031 Tax Grp., LLC)*, 439 B.R. 47, 72 (S.D.N.Y.

2010); *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Adv. Pro. Nos. 10-03493

(SMB), 10-05447 (SMB), 2014 WL 47774, at *11 (Bankr. S.D.N.Y. Jan. 3, 2014).

Summary judgment is appropriate where the admissions support a finding that "there is

no genuine disputed issue of fact that BLMIS was a Ponzi scheme . . . ." *Legacy*, 603 B.R. at

693; *see also Moran*, 2012 WL 2930210, at *4 (granting motion for summary judgment based on

plea transcript from related Department of Justice action where perpetrator admitted under oath

to orchestrating the Ponzi scheme); *Bayou IV*, 439 B.R. at 307–08 (affirming summary judgment

on fictitious profits from Ponzi scheme based on evidence including guilty pleas of fraudsters);

*In re 1031 Tax Grp., LLC*, 439 B.R. at 72 (granting summary judgment in part and concluding

that Ponzi scheme existed with reliance on evidence including perpetrator's superseding

indictment and plea agreements); *Armstrong v. Collins*, Nos. 01 Civ. 2437(PAC), 02 Civ.

2796(PAC), 02 Civ. 3620(PAC), 2010 WL 1141158, at *24 (S.D.N.Y. Mar. 24, 2010) (granting

motion for summary judgment and finding existence of Ponzi scheme where submitted evidence

included transcripts from perpetrator's allocution and sentencing).

### b.    Trustee's Experts Confirmed That BLMIS Was a Ponzi Scheme

Bruce Dubinsky, a certified fraud examiner and forensic accountant, confirmed that

BLMIS was a Ponzi scheme. *See* Declaration of Bruce G. Dubinsky dated December 16, 2020

("Dubinsky Decl."), Attach. A (Dubinsky Expert Report); *see also Nelson*, 610 B.R. at 210–14.

As set forth in Dubinsky's unrebutted report, BLMIS operated three business units: (i) a

proprietary trading business; (ii) a market-making business; and (iii) the IA Business. Stmt. ¶

13. The proprietary trading business traded for its own account to make money for BLMIS. The

market-making business made markets in certain stocks, bonds, warrants and rights. Stmt. ¶¶

14–15. The IA Business purported to purchase and sell securities on behalf of its customers.

12

Stmt. ¶ 17. The proprietary trading business, the market-making business, and IA Business were units of BLMIS and operated by Madoff. Stmt. ¶ 18.

BLMIS reported to its IA Business customers, including Defendants, that the money they deposited with BLMIS was invested in the "split-strike conversion" strategy. Stmt. ¶ 20. The evidence establishes that BLMIS did not execute this strategy on behalf of its IA Business customers. *Id*. Rather, Dubinsky determined that as far back as the 1970s, BLMIS used historical trade information to fabricate false trades for IA Business customers and reported those fake trades on customer statements. Stmt. ¶ 21. Based on his investigation, Dubinsky concluded that the IA Business was a fraud and a Ponzi scheme.

### c.    The Trustee's Experts Confirmed That BLMIS Paid Investor Redemptions from Customer Funds

Lisa Collura, a forensic accountant and certified fraud examiner, analyzed the books and records of BLMIS. *See Nelson*, 610 B.R. at 220–21. Collura's investigation shows that during the ten-year period before its collapse on December 11, 2008, BLMIS primarily used three bank accounts for the IA Business: JPMorgan Chase Bank, N.A. ("JPMorgan") account #xxxxx1703 (the "703 Account"); JPMorgan account #xxxxxxxxx1509 (the "509 Account," together with the 703 Account, the "JPMorgan Accounts")); and Bankers Trust account #xx-xx0-599 (the "BT Account"). Stmt. ¶ 57. IA Business customers' cash deposits were deposited and commingled in the 703 Account. Stmt. ¶ 58. IA Business customer withdrawals were made through the JPMorgan Accounts and the BT Account, which was a checking account entirely funded by the 703 Account during the period for which bank records are available. Stmt. ¶ 59. The JPMorgan Accounts were linked commercial business accounts. Stmt. ¶ 60. The 509 Account was a commercial controlled disbursement account that was entirely funded by the 703 Account. *Id*. The money in the 703 Account consisted almost entirely of customer deposits. Stmt. ¶¶ 60, 75.

Dubinsky confirmed that customer funds were deposited and withdrawn from the JPMorgan Accounts, and that there were no inflows of money into these bank accounts as a result of trading securities or receipt of dividends on purportedly held securities. Dubinsky Decl., Attach. A (Dubinsky Expert Report) ¶ 340.

Both Dubinsky and Collura confirmed that ninety-seven percent of all cash additions into the 703 Account came directly from IA Business customers. Stmt. ¶ 61. The other three percent of inflows into the 703 Account came from income earned from cash management activities including (1) short-term investment activity made directly from the 703 Account (including overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and T-Bills); and (2) investments of BLMIS customer funds made through bank and brokerage accounts held in the name of BLMIS or Madoff. Stmt. ¶ 62. Because the short-term investments, including overnight sweeps, were made directly out of the 703 Account, the source of the money for those investments was customer funds. Stmt. ¶ 63.

The IA Business did not have any legitimate income-producing activities. The only source of cash available for the IA Business to pay purported investment profits as well as redemption requests was from cash that other IA Business customers deposited in the 703 Account. Stmt. ¶ 70. These transactions rendered BLMIS insolvent. By no later than December 2002, BLMIS's assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion. Stmt. ¶ 71. By December 2008, the customer property on hand at BLMIS was grossly insufficient to pay the claims of its customers. Stmt. ¶ 72.

Defendants did not serve a rebuttal to the Trustee's experts' opinions that the funds in the 703 Account consisted of customer money, that the IA Business had no source of funds other than customer money, or that customer redemptions were paid with funds from the 703 Account.

Nor did Defendants depose the Trustee's experts or identify any evidence—admissible or

otherwise—to rebut the substantial evidence demonstrating that Madoff was operating a Ponzi

scheme through BLMIS's IA Business and that the transfers of fictitious profits Defendants

received comprised other customers' deposits. Accordingly, the undisputed evidence is that the

transfers were made with the intent to hinder, delay, or defraud BLMIS's creditors.

### d.    BLMIS's Two-Year Transfers to Defendants Were in Furtherance of the Fraud

In a Ponzi scheme, the Trustee need not prove that the debtor intended to hinder, delay,

or defraud a *particular* creditor, but rather he must only establish that the transfers made to the

transferee were in furtherance of a fraudulent scheme. *See Bayou IV*, 439 B.R. at 304; *Bayou III*,

396 B.R. at 826.

"Every payment made by the debtor to keep the scheme on-going was made with the

actual intent to hinder, delay or defraud creditors, primarily the new investors." *Gredd v. Bear,*

*Stearns Sec. Corp. (In re Manhattan Inv. Fund)*, 359 B.R. 510, 518 (Bankr. S.D.N.Y.), *rev'd in*

*part on other grounds*, 397 B.R. 1 (S.D.N.Y. 2007) (citation omitted). This is predicated on the

reality that a debtor's failure to honor an investor's withdrawal request "would promptly have

resulted in demand, investigation, the filing of a claim and disclosure of the fraud." *Bayou III*,

396 B.R. at 843; *see also Greiff*, 476 B.R. at 723. Every redemption payment "in and of itself

constituted an intentional misrepresentation of fact" of the investor's rights to their falsely

inflated account statement and "an integral and essential part" of the fraud. *Bayou III*, 396 B.R.

at 843 (emphasis in original). Thus, the transfers to Defendants were in furtherance of the

fraudulent Ponzi scheme.

**e.    BLMIS Made the Transfers to Defendants Within the Two-Year Period**

BLMIS transferred fictitious profits to or for the benefit of Defendants between

December 11, 2006 and December 11, 2008.  The Trustee's evidence is uncontroverted as to

Defendants David, Carol, and Sloan, who admit the date, receipt, and amount of the transfers the

Trustee seeks to avoid and recover.  Stmt. ¶¶ 98–99.  Defendants admit the date and the amount

of the transfers from the Tracy Account but dispute Tracy's liability for fraudulent transfers

because the BLMIS checks payable to Tracy were not deposited into her individual bank

account.  This argument lacks merit and is addressed below in Section II.C.

**f.    The Trustee is Entitled to Prejudgment Interest as a Matter of Law**

The Trustee is also entitled to an award of prejudgment interest from the date the Trustee

filed his complaint against Defendants on November 30, 2010 because "[f]ull compensation to

the estate for the avoided transfer[s] normally requires prejudgment interest to compensate for

the value over time of the amount recovered."  *In re Cassandra Grp.*, 338 B.R. 583, 599 (Bankr.

S.D.N.Y. 2006) (awarding prejudgment interest from date of filed complaint "[t]o fully and

fairly compensate [debtor's] creditors for their loss—not only of [the amount] that was

fraudulently conveyed . . . but of the use of that money since the date of the demand"); *see also*

*Picard v. Lowrey (In re Bernard L. Madoff)*, Adv. Pro. Nos. 10-04387 (SMB), 10-04488 (SMB),

10-04350 (SMB), 10-05110 (SMB), 2018 WL 1442312, at *15 (Bankr. S.D.N.Y. Mar. 22,

2018); *Picard v. Goldenberg*, Adv. Pro. No. 10-04946 (SMB), 2018 WL 3078149, at *6 (Bankr.

S.D.N.Y. June 19, 2018).

In *BAM L.P.*, this Court awarded prejudgment interest finding that the "net losers" of

BLMIS's Ponzi scheme "are the real victims of Defendants' dilatory litigation tactics" and after

ten years of litigation "an award of prejudgment interest is essential to the [Trustee's] collection

of customer property."  Memorandum Decision Determining Funds Held in the Bank Accounts

are Customer Property and Awarding Pre Judgment Interest at 14, *Picard v. BAM L.P.*, Adv. Pro.

No. 10-04390 (CGM) (Bankr. S.D.N.Y. Dec. 11, 2020), ECF No. 247 ("*BAM L.P. Decision*")[3]

(citing *Stanford Square L.L.C. v. Nomura Asset Cap. Corp.*, 232 F. Supp. 2d 289, 293 (S.D.N.Y.

2002) ("Awarding prejudgment interest is based upon the premise that the party to whom the

money is owed has been deprived of the use of the funds and can be made whole only by the

award of interest. Conversely, the party owing the money has had the use of the funds he was

obligated to have paid and should be required to pay compensation by way of interest.")).

Having determined that prejudgment interest should be awarded, this Court found that the federal

rate should be used where the Trustee's claims arise only from federal law.  *Id.* at 16.  However,

"[w]here the interest rate codified in 28 U.S.C. § 1961 is too low to compensate the plaintiff,

courts can opt to apply the prime rate of interest," which was 4% on the Filing Date.  *Id.* at 17

(quoting *In re FKF 3, LLC*, No. 13 Civ. 3601 (JCM), 2018 WL 59292131, at *13 (S.D.N.Y. Oct.

24, 2018)); *see also Nelson*, 610 B.R. at 238 ("The Trustee is directed to settle a separate

judgment in each adversary proceeding together with a statement of judgment setting forth his

*calculation of interest* and costs." (emphasis added)).

Here, Defendants are represented by the same counsel as defendants in *Nelson*, yet they

refuse to acknowledge the law of the case.  Instead, Defendants' counsel has continued to engage

in dilatory litigation practices that warrant prejudgment interest in the same way this Court

applied it in *BAM L.P.*  The "net losers" are the real victims of Defendants' litigation tactics

while "Defendants are 'net winners' (having withdrew more money than they invested) and, by

definition, have been withholding the net losers' principal investments for many years."  *BAM*

---

[3] The *BAM L.P. Decision* is also available on Westlaw at 2020 WL 7422316 without pincites.

*L.P. Decision* at 14.  As this Court stated, the Trustee has "incurred costs litigating against

Defendants who have resisted the law of the case," having been put on notice of the Ponzi

scheme at least as early as the Trustee's complaint was filed against them.  *Id.* at 15 (citing

*Newbro v. Freed*, 409 F. Supp. 2d 386, 402 (S.D.N.Y. 2006) ("An important rationale for the

prejudgment interest rule is that the party against whom the claim is asserted could have stopped

the running of interest by paying what was owed.")).  Indeed, this rationale applies here where

Defendants' counsel also attempted to withdraw their claims.  Notice of Withdrawal of

Objection, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789

(Bankr. S.D.NY. June 27, 2018), ECF No. 17842.  Thus, this Court should apply the prime rate

on the Filing Date, which was 4%, just as it did in *BAM L.P.*, from November 30, 2010, the date

of the filing of the complaint, through the date of entry of judgment in favor of the Trustee.

## II.    DEFENDANTS' DEFENSES CAN BE DETERMINED AS A MATTER OF LAW

### A.    The Transfers Were an Interest of the Debtor in Property

Defendants argue that the Trustee, who stands in the shoes of BLMIS, has not suffered

injury in fact and thus, does not have standing to recover the Two-Year Transfers because the

JPMorgan Accounts were the property of Madoff, not BLMIS.  Defendants' argument has been

twice rejected by the Bankruptcy Court in this liquidation proceeding.  In *Nelson*, the court held:

> Defendants conflate subject matter jurisdiction with the merits of the
> Trustee's claims. The Trustee certainly has standing to argue that
> BLMIS made the Two-Year Transfers. . . . In any event, the
> Defendants' jurisdictional argument lacks merit because the
> evidence demonstrate[s] that BLMIS owned the [JPMorgan] Chase
> Accounts, the source of the Two-Year Transfers.

*Nelson*, 610 B.R. at 216.  More recently, in *BAM L.P.*, this Court held:

> [A]ll of the assets and liabilities of the sole proprietorship, including
> the IA Business, were transferred to BLMIS via the 2001 SEC
> Amended Form BD.  As such, the Defendants' customer accounts
> and the Bank Accounts are property of BLMIS and the monies paid

> to Defendants from those Bank Accounts must be turned over to the
> Trustee.

*BAM L.P. Decision* at 10 (noting that this finding is consistent with law of the case) (citing

*Nelson*, 610 B.R. at 237 ("The prior decisions within this SIPA proceeding constitute law of the

case.")).

BLMIS was the owner of the JPMorgan Accounts at the time of the transfers to

Defendants.  Madoff began operating as a sole proprietorship in the early 1960's under the

names of Bernard L. Madoff and Bernard L. Madoff Investment Securities.  *BAM L.P. Decision*

at 6.  The sole proprietorship filed with the Securities & Exchange Commission a Form BD

under file number 8-8132 in January of 1960.  Cremona Decl., Ex. 1 (1959 SEC Form BD); *see

also BAM L.P. Decision* at 6.  Through that registration, the broker-dealer became a member of

SIPC when SIPA was enacted in 1970.  There is no dispute that prior to 2001, the JPMorgan

Accounts were held by Madoff's sole proprietorship.

Effective January 1, 2001, Madoff changed the corporate form of his broker-dealer

business to an LLC.  BLMIS was incorporated as an LLC.  Cremona Decl., Ex. 2 (Articles of

Organization); *see also BAM L.P. Decision* at 6.  With this change in corporate form, BLMIS

also filed an Amended Form BD with the SEC in January 2001 to reflect that change using the

same SEC registrant number 8-8132; BLMIS did not file a new application for registration.

Cremona Decl., Ex. 3 (2001 SEC Amended Form BD); *see also BAM L.P. Decision* at 6–7.

Under "BD Successions" of the 2001 SEC Amended Form BD, it asked:  "Briefly describe

details of the succession, including any assets or liabilities not assumed by the successor."  The

response was:

> Effective January 1, 2001, predecessor will transfer to successor all
> of predecessor's assets and liabilities related to predecessor's
> business.  The transfer will not result in any change in ownership or
> control.

Cremona Decl., Ex. 3 (2001 SEC Amended Form BD at 10–11, *see also* Question 5). No assets

or liabilities of the sole proprietorship were listed as "not assumed by the successor." *Id.* The

SEC Amended Form BD further certified that no "accounts, funds, or securities of customers of

the *applicant* are held or maintained by such other *person*, firm, or organization." *Id.* (2001 SEC

Amended Form BD at 5) (emphasis in original). BLMIS succeeded to the sole proprietorship's

SEC registrant number 8-8132. Cremona Decl., Ex. 1 (1959 SEC Form BD), Ex. 3 (2001 SEC

Amended Form BD at 10).

Upon the filing of the 2001 SEC Amended Form BD, the sole proprietorship no longer

operated as a broker-dealer or in any other capacity. Cremona Decl., Ex. 3 (2001 SEC Amended

Form BD at 10–11); *see also BAM L.P. Decision* at 7 ("The predecessor identified on the 2001

SEC Amended Form BD is "Bernard L. Madoff" and the successor is identified as BLMIS.").

Indeed, this Court noted "that this succession provision meant that, without exception, all of the

assets and liabilities of the sole proprietorship were transferred to BLMIS and the sole

proprietorship ceased to exist." *BAM L.P. Decision* at 7.

BLMIS's corporate documents confirmed the change in corporate form and the transfer

of all assets. In its Amended and Restated Operating Agreement, BLMIS plainly sets forth

Madoff's intent to transfer all assets—including bank accounts—held by the sole proprietorship

to the LLC, effective January 1, 2001:

> 3. **Purpose.** The Company is formed to receive as at January 1,
> 2001, all of the assets, subject to liabilities, associated with the
> business being conducted by Bernard L. Madoff, as sole
> proprietorship (the "Business") and to thereafter conduct such
> Business, and any further extension therefor, in such manner and
> form as determined by the Member in his sole discretion, to the
> extent permitted by the [Limited Liability Company Law of the
> State of New York] or by the laws of any jurisdiction which the
> Company may do business.

Cremona Decl., Ex. 4 (Amended and Restated Operating Agreement).  Consistent with the 2001

Amended Form BD filed with the SEC, the Amended and Restated Operating Agreement makes

clear that no assets were carved out or excluded from the transfer of assets to the LLC, and

confirmed that all assets of the sole proprietorship—the three business units and their bank

accounts—were transferred to the LLC as of January 1, 2001.  Madoff transferred ownership of

all of the assets of the sole proprietorship to the LLC, thereby stripping any ownership interest of

the sole proprietorship in any assets, including the bank accounts of the IA Business.  *See Sec.*

*Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re BLMIS)*, 522 B.R. 41, 60 (Bankr.

S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*,

697 F. App'x 708 (2d Cir. 2017) (all Madoff Securities' assets and liabilities were transferred to

BLMIS upon the reorganization to a single member limited liability company).

Defendants nonetheless argue that various BLMIS and JPMorgan documents indicate

Madoff intended to keep the IA Business separate under his trade name "Bernard L. Madoff

Investment Securities."  Summary Judgment Motion at 4.  But any "discrepancies Defendants

have demonstrated to exist—forms filled out improperly, business names used interchangeably

on bank accounts and checks—are the sleights of hand that one would expect to see when

exhuming the remnants of a Ponzi scheme." *BAM L.P. Decision* at 8 (citing Willis H. Riccio,

Ponzi Schemes: A Man Called Charles, 58 R.I. Bank. J. 7, 8 (July/Aug. 2009)).

**B.**      **SIPA And The Bankruptcy Code Authorize the Trustee to Recover Customer Property, Wherever Held**

For purposes of avoidance and recovery, BLMIS is deemed under SIPA to have an

interest in the transferred property; thus, the transfers here are avoidable under section 548 of the

Bankruptcy Code.  As this Court previously held, pursuant to SIPA § 78fff-2(c)(3):

> The trustee may recover any property transferred by the debtor
> which, except for such transfer, would have been customer property

> if and to the extent that such transfer is voidable or void under the
> provisions of Title 11. Such recovered property shall be treated as
> customer property. For purposes of such recovery, ***the property so
> transferred shall be deemed to have been the property of the debtor***
> and, if such transfer was made to a customer or for his benefit, such
> customer shall be deemed to have been a creditor, the laws of any
> State to the contrary notwithstanding.

*BAM L.P. Decision* at 8–11 (emphasis added); *see also* 15 U.S.C. § 78fff-2(c)(3) (finding

transferred customer property is "deemed to have been the property of the debtor"); *Cohen*, 2016

WL 1695296, at *5 ("BLMIS transferred customer property to [defendant], and under SIPA §

78fff-2(c)(3) such property is 'deemed to have been property of the debtor'"); *In re 1031 Tax*

*Grp., LLC*, 439 B.R. at 68–70 (in a Ponzi scheme, money reflected in bank account statements

"in the name of a debtor is presumed to be property of the bankruptcy estate" for purposes of 11

U.S.C. § 548(a)(1)).

Defendants challenge whether the transfers were "an interest of the debtor in property"

and rely on *Picard v. Avellino*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016), which held that the Trustee

could not recover transfers prior to 2001, when BLMIS was converted from a sole proprietorship

to an LLC. But unlike the Trustee's case in *Avellino*, in which he sought to recover transfers

prior to 2001, here, the Trustee only seeks to avoid transfers of fictitious profits within the Two-

Year Period. Moreover, where the transfers are customer property, the Trustee is entitled to

avoid and recover the Two-Year Transfers, regardless of the change in the Debtor's corporate

form from a sole proprietorship to a limited liability company. *BAM L.P. Decision* at 9–10;

*Nelson*, 610 B.R. at 215–18.

## 1.    SIPA and SIPC

In enacting SIPA, Congress fashioned a program for protecting customer property—that

is, property placed with a broker-dealer for the purchase of securities where title to such property

always remained with the customer. This program included the creation of SIPC, a nonprofit,

private membership corporation to which most registered broker-dealers are required to belong.

When one of its members fails, SIPC protects those customers by initiating a SIPA liquidation, a

form of liquidation proceeding applicable only to SIPC member firms. *See SEC v. F.O. Baroff*

*Co.*, 497 F.2d 280, 281 (2d Cir. 1974) (holding that the object of SIPA and SIPC is to protect

customers in the brokerage industry). Although a SIPA liquidation is similar to a bankruptcy and

incorporates certain provisions of the Bankruptcy Code, it is "tailored to achieve SIPA's

objectives," *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 133, one of which is the prompt

return of customer property to customers. SIPA § 78fff(a); *see also Sec. Inv'r Prot. Corp. v.*

*Barbour*, 421 U.S. 412, 416 (1975).

To do so, SIPC specifies a trustee to liquidate the business and any assets of the member-

broker and recover customer property wrongfully transferred or unlawfully converted by the

broker. SIPA §§ 78*lll*(4), 78fff-2(c)(3). These funds form the corpus of the customer property

estate, from which the trustee makes distributions to customers of their ratable share of customer

property. SIPA § 78fff-2(c)(1). SIPA prioritizes this customer property estate, which is distinct

from the general bankruptcy estate for the broker-dealer member firm. SIPA § 78fff-2(c)(1); *see*

*In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011); *Rosenman Family,*

*LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010); *In re Weis Sec., Inc.*, No. 73 Civil 2332,

1976 WL 820, at *6−7 (S.D.N.Y. Aug. 2, 1976); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv.*

*Sec. LLC (In re Madoff Sec.)*, 499 B.R. 416, 420 (S.D.N.Y. 2013). The customer property estate

is composed of customer property, including recovered assets, which are earmarked to satisfy

customers' net equity claims. By contrast, the general estate is made up of the broker-dealer's

assets available to satisfy the claims of general creditors. *See In re Adler Coleman Clearing*

*Corp.*, 195 B.R. 266, 270 (Bankr. S.D.N.Y. 1996).

23

### 2.      Becoming a Member of SIPC

The "members" of SIPC include "all persons registered as broker-dealers" with the SEC

under section 78*o*(b) of Title 15.  SIPA § 78ccc(a)(2)(A).  SIPC membership, and thus SIPA

protection, arises from a broker-dealer's registration with the SEC, without regard to the

corporate form of the broker-dealer.  SIPA § 78ccc(a).

Under section 78*o*(b), a broker-dealer applies for registration with the SEC on SEC Form

BD (the uniform form for broker-dealer registrations).  *See* 17 C.F.R. § 249.501(a).  Once

registered with the SEC, the broker-dealer is assigned a registrant number, becomes a member of

SIPC, and is required to pay into the SIPC fund by annual assessments.  SIPA § 78ddd(c)(2).

If an entity succeeds to and continues the business of a broker-dealer previously

registered with the SEC, and the succession is based on a change in the predecessor's form of

organization, it files a Form BD Amendment.  SEC Rule 15b1-3(b), 17 C.F.R. § 240.15b1-3(b).

The successor entity continues the business and SIPC membership of its predecessor.  When a

firm ceases to do business as a broker-dealer, it withdraws from registration with the SEC by

filing an SEC BDW form (the uniform request form for broker-dealer withdrawal) through the

Central Registration Depository.  17 C.F.R. §§ 249.501(a), 240.15b6-1(b).  Once it is de-

registered, the former broker-dealer ceases being a SIPC member.

### 3.      Initiating a SIPA Liquidation

If SIPC determines that one of its members has failed or is in danger of failing to meet its

obligations to customers, it applies for a customer protective decree in district court.  The district

court acquires jurisdiction over the broker-dealer and its property wherever located.  SIPA

§ 78eee(b)(2)(A)(1).  The decree places the firm in liquidation and appoints a trustee specified by

SIPC to liquidate the business of the debtor-broker.  SIPA § 78eee(b)(3).  The liquidation is then

removed to the bankruptcy court.  *Id*. § 78eee(b)(4).

The term "debtor" has a special definition under SIPA: "a *member* of SIPC with respect
to whom an application for a protective decree has been filed under section 78eee(a)(3) of this
title."  SIPA § 78*lll*(5) (emphasis added).  This differs from the Bankruptcy Code, where a
"debtor" is an individual, partnership, or corporation.  11 U.S.C. §§ 109(a), 101(41).  Because
SIPC membership tracks SEC registration, SIPC names the SEC-registered broker-dealer that is
at risk of failing as the "debtor" in the application for the protective decree.  Thus, registration
under 15 U.S.C. § 78*o*(b) is the key to who the SIPC member is, and, if the member is placed
into liquidation, who the debtor is.

### 4.        Customer Property Under SIPA

Customer property is a term of art in the securities industry, and means property held by a
broker-dealer but that belongs to customers.  *See* Michael P. Jamroz, *The Customer Protection
Rule*, 57 Bus. Law. 1069, 1071–74 (2002); *see, e.g.*, *Picard v. Lowrey*, 596 B.R. 451, 469–70
(S.D.N.Y. 2019).  When customers invest their cash and securities with a broker, they transfer
possession, but not title, of their money to the broker.  The broker never owns that money, but
rather is legally bound to hold that money in reserve for its customers.  *See Lowrey*, 596 B.R. at
469–70 (noting that "customer property" in securities industry refers to property held by broker-
dealer but belongs to its customers).

Customer protection rules, promulgated by the SEC as required by SIPA, require broker-
dealers to safeguard customers' securities and cash in a reserve fund.  This reserve would form
the corpus of the firm's estate for distribution to customers if the firm went into liquidation under
SIPA.  Exchange Act Release No. 34-9856, Adoption of Rule 15c3-3, 37 Fed. Reg. 25224,
25225 (Nov. 29, 1972), 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3"); *see also* Jamroz, 57 Bus. Law.
at 1071–74.

Customer property includes securities and cash held for customers under Rule 15c3-3;

assets derived from or traceable to customer property; and, under SIPA § 78*lll*(4)(D), other

debtor property that a trustee must allocate to the fund of customer property as necessary to

remedy the debtor's non-compliance with the segregation requirements of Rule 15c3-3.

Customer property retains its nature and special protections under SIPA, even if the broker

transfers that property to others.  SIPA § 78*lll*(4) (including in the definition of customer

property "the proceeds of any such property transferred by the debtor, including property

*unlawfully converted*" (emphasis added)); *see also BAM L.P. Decision* at 10 ("When the

Defendants invested their money into the IA Business, the deposits were placed into the Bank

Accounts and commingled with all of the Ponzi scheme victims' deposits. The funds held in the

Bank Accounts were meant to be invested legitimately through BLMIS but never were. Thus,

they were 'customer property.'"); *Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*,

97 B.R. 503, 508 (E.D. Ark. 1987) (Rule 15c3-3 deposit is not subject to bank's setoff claim

because it is customer property); Rule 15c3-3(f) (Rule 15c3-3 account cannot be subject to bank

lien because it consists of customer property).  This broad definition recognizes customers'

enduring rights to the property they gave to their broker for safekeeping.  Indeed, once a broker-

dealer goes into liquidation under SIPA, the SIPA designation of customer property is the

seamless continuation of Rule 15c3-3, taking effect the moment the broker-dealer fails.  *In re*

*Lehman Bros. Holdings*, 445 B.R. 143, 191–92 (Bankr. S.D.N.Y. 2011), *rev'd in part on other*

*grounds*, 478 B.R. 570 (S.D.N.Y. 2012).

Because customer property is not the broker's property, when a broker goes into

liquidation, it is also not "debtor" property, which places it outside the reach of Bankruptcy Code

provisions for avoidance and recovery of transfers.  *BAM L.P. Decision* at 10 ("Money held by a

broker on behalf of its customers is not the broker's property under state law." (quoting *Nelson*, 610 B.R. at 232–233)). SIPA § 78fff-2(c)(3) circumvents this prohibition by creating a legal fiction that confers standing on SIPA trustees to recover customer property by treating such property as though it were "property of the debtor" in an ordinary bankruptcy. *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014). SIPA § 78fff-2(c)(3) allows a trustee to "recover any property transferred by the debtor which, except for such transfer, would have been customer property." This provision is designed "to recover securities that would have been part of the fund of customer property but for a prior transfer to a customer." *In re Bevill, Bresler & Schulman, Inc*., 83 B.R. 880, 893 (Bankr. D.N.J. 1988). "The inquiry in an avoidance action, therefore, is: if the transfer did not occur, would the securities have been part of the fund of customer property?" *Id*. If the answer is yes, then that cash or securities are customer property subject to recovery by SIPA trustees.

### 5.    Madoff's Business

When IA Business customers sent BLMIS money to purchase securities, Madoff converted and commingled that customer money in the 703 Account. Dubinsky Decl., Attach. A. (Dubinsky Report) ¶ 340; *BAM L.P. Decision* at 11 ("When the Defendants invested their money into the IA Business, the deposits were placed into the Bank Accounts and commingled with all of the Ponzi scheme victims' deposits."). This pool of commingled funds was used to pay customer redemptions. Dubinsky Decl., Attach. A. (Dubinsky Report) ¶ 341; *see also BAM L.P.*, 608 B.R. at 174–75; *In re Picard*, 917 F.3d 85, 92 (2d Cir. 2019) (noting that Madoff commingled funds into JPMorgan checking account and sent customers redemptions from commingled account); *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 564 (2d Cir. 2016) ("BLMIS deposited customer investments into a single commingled checking account and . . . [w]hen customers sought to withdraw money from their accounts,

including withdrawals of the fictitious profits that BLMIS had attributed to them, BLMIS sent

them cash from the commingled checking account.").

### 6.    The Liquidation of BLMIS

In December 2008, SIPC sought a protective decree under SIPA § 78eee that the

customers of a member broker-dealer needed protection under SIPA.  Application of SIPC ¶ 2,

*SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 5 ("SIPC

Application").  The SIPC Application named the member broker-dealer that was registered with

the SEC as of December 2008 under Registrant Number 8-8132: Bernard L. Madoff Investment

Securities LLC.  *See id*.  The district court entered the decree and appointed the Trustee "for the

liquidation of the *business of the Defendant* with all the duties and powers of a trustee as

prescribed in SIPA."  Order ¶ 2, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15,

2008), ECF No. 4 ("Protective Decree") (emphasis added).

### 7.    Substantive Consolidation

In the days and months immediately following the revelation of Madoff's Ponzi scheme,

an SEC receiver was appointed for BLMIS,[4] the SIPA Trustee was appointed for BLMIS, a Joint

Provisional Liquidator was appointed for Madoff's London entity, and the United States

Government instituted a criminal proceeding against Madoff.  Stmt. ¶¶ 1–6.  By March 15, 2009,

the Government indicated its intent to forfeit certain of Madoff's personal assets.  *See*

Government's Notice of Intent to Seek Forfeiture of Certain Assets, *United States v. Madoff*, No.

09-cr-213 (DC) (S.D.N.Y. Mar. 15, 2009), ECF No. 59.  But as of April 2009, no chapter 7 case

had been initiated against Madoff personally.  Creditors sued him in various jurisdictions outside

---

[4] The receivership was terminated upon the appointment of a SIPA Trustee.  *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4.

the bankruptcy court.  *See, e.g.*, *Leonhardt v. Madoff*, No. 09-2032 (S.D.N.Y. Mar. 5, 2009);

*Town of Fairfield v. Madoff*, No. 09-5023735 (Conn. Super. Ct. Mar. 30, 2009).

In response, certain creditors filed an involuntary bankruptcy petition against Madoff,

citing the need for his personal estate to be marshaled and distributed in a coordinated,

consistent, and efficient manner alongside the liquidation of his company.  These creditors were

concerned with the "specter of overlapping asset administrations which could delay or prejudice

distributions to creditors," in light of the Government's forfeiture of assets and the SEC seeking

disgorgement and civil penalties of Madoff and his firm.  Pet. at 7, *SEC v. Madoff*, No. 08-cv-

10791 (LLS) (S.D.N.Y. Apr. 1, 2009), ECF No. 37.  The district court agreed that the

appointment of a chapter 7 trustee for Madoff would stem the proliferation of lawsuits against

Madoff and enable an orderly and equitable administration of his personal estate.  Order at 3–4,

*SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Apr. 10, 2009), ECF No. 47.  In allowing the

creditors to commence the involuntary case against Madoff, the district court specifically

referenced that they should be able to target "that portion of Mr. Madoff's property that is neither

forfeitable criminally nor subject to the liquidation of BLMIS under SIPA."  *Id*. at 4.

The bankruptcy court subsequently appointed Alan Nisselson as Chapter 7 Trustee for

Madoff.  Notice of Appointment of Trustee Alan Nisselson, *In re Bernard L. Madoff*, No. 09-

11893 (SMB) (Bankr. S.D.N.Y. Apr. 21, 2009), ECF No. 13.  Thereafter, the SIPA Trustee

moved to substantively consolidate the SIPA liquidation and the chapter 7 bankruptcy because

BLMIS and Madoff were the alter ego of the other, Madoff used BLMIS as his "personal piggy

bank," and Madoff did not have any other significant source of income other than that derived

from his broker-dealer subject to liquidation under SIPA.  Memorandum of Law in Support of

Joint Motion for Entry of Order Substantively Consolidating the Estate of Bernard L. Madoff

into the SIPA Proceeding of Bernard L. Madoff Investment Securities, *Sec. Inv'r Prot. Corp. v.*
*Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 5,
2009), ECF No. 196.

The Chapter 7 Trustee consented to the relief sought and the two trustees established a
protocol that was embodied in the bankruptcy court's order substantively consolidating the
BLMIS and the Bernard L. Madoff estates. *See* Consent Order Substantively Consolidating the
Estate of Bernard L. Madoff into the SIPA Proceeding of Bernard L. Madoff Investment
Securities LLC and Expressly Preserving All Rights, Claims and Powers of Both Estates, *Sec.*
*Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr.
S.D.N.Y. June 10, 2009), ECF No. 252 (the "Substantive Consolidation Order"). The
Substantive Consolidation Order merged the chapter 7 estate of Bernard L. Madoff into the
BLMIS SIPA proceeding *nunc pro tunc*, and all assets and liabilities of the two estates were
deemed consolidated as of the date of the filing of the liquidation proceedings. The Substantive
Consolidation Order expressly preserved the SIPA Trustee's powers to avoid and recover
fraudulent transfers of customer property and the Chapter 7 Trustee's powers to pursue recovery
of Madoff's non-customer property. *Id.* ¶¶ 4, 7 ("the SIPA Trustee is authorized to pursue
claims on behalf of the consolidated estate as representative of and fiduciary for the BLMIS
SIPA Proceeding and as subrogee and assignee of creditors' claims for, among other things, the
avoidance and recovery of transferred property").

## 8.    The Trustee Can Recover Any Transfers of Customer Property

When IA Business customers sent money to BLMIS for the purpose of purchasing
securities, it became "customer property" under SIPA. SIPA § 78*lll*(4); *see also BAM L.P.*
*Decision* at 11. BLMIS used the JPMorgan Accounts as the firm's Rule 15c3-3 account. Stmt.
¶¶ 57–65, 75–76; 17 C.F.R. § 240.15c3-3. Whether operated as a sole proprietorship or as an

30

LLC, BLMIS's assets were composed primarily of customer property and its liabilities were

composed primarily of amounts owed to customers. As indicated in the 2001 SEC Amended

Form BD, all assets and liabilities were transferred from the sole proprietorship to the LLC in

January 2001. *See* Stmt. ¶¶ 9–11 (citing Cremona Decl., Ex. 3 (2001 SEC Amended Form BD));

*BAM L.P. Decision* at 7.

The protections provided by SIPA mandate that the Trustee can recover transfers of

customer property by the SIPC member, regardless of its corporate form. Despite this,

Defendants argue that *Avellino* supports their argument that the Trustee cannot recover the

transfers made to Defendants between 2006-2008 because the drawer of those checks listed

Bernard L. Madoff rather than Bernard L. Madoff Investment Securities LLC and the SIPA

Trustee can only recover transfers made by the LLC. *See Avellino*, 557 B.R. at 110.[5]   The

result of *Avellino* is that customer property transferred by the sole proprietor cannot be

recovered, which cannot be the intention of SIPA which seeks to protect customer property, or

this SIPA liquidation which authorizes the Trustee to recover customer property. As this Court

recognized in *BAM L.P.*:

> At first blush, this may seem like a distinction without a difference
> because Madoff's chapter 7 case has been substantially consolidated
> with the SIPA liquidation of BLMIS. Thus, one would think that
> even if Madoff operated his Ponzi scheme under his sole
> proprietorship, rather than BLMIS, the Trustee would still be
> entitled to recover these funds as fraudulent transfers. However, in
> *Picard v. Avellino (In re BLMIS, LLC)*, 557 B.R. 89, 110 (Bankr. S.
> D.N.Y. 2016), the Court held that "only the Madoff [chapter 7]
> trustee can recover actual transfers by the sole proprietorship."
> There is a possibility that even if such actions were commenced by
> him, they would not be recoverable. *Id.* at 109 ("The [SIPA] Trustee
> can recover the transfers of customer property by BLMIS, but

---

[5] In *Avellino*, unlike the instant case, the Trustee alleged that the defendants lacked good faith when they received
the transfers. On that basis, the Trustee sought to recover all transfers made to those defendants during the life of
their BLMIS accounts, which dated back to 1978. Here, the Trustee is only seeking to recover transfers made
between 2006-2008 when BLMIS was an LLC.

> Madoff's [chapter 7] bankruptcy trustee cannot recover the transfers of customer property made by Madoff individually" because "[t]he substantive consolidation of the BLMIS and Madoff estates did not empower Madoff's chapter 7 trustee to exercise the powers of a SIPA trustee, nor could it.").

*BAM L.P. Decision* at n.4.  While there is practicality in establishing a finite date for discerning the debtor's property, that rule does not apply to customer property recoverable under SIPA by a SIPA trustee wherever held.

Further, there was no error in naming only the LLC in the Protective Decree.  SIPA requires a protective decree when a SIPC-member broker-dealer fails.  SIPA § 78eee(b)(1).  The *only* SIPC *member* at the time of failure was the LLC, as the sole proprietorship had ceased to operate almost eight years prior, and thus the LLC was the only entity that *could have been* named in the Protective Decree.

Second, when the Trustee was appointed, it was for the liquidation of the *business* of the broker-dealer.  There are numerous undisputed facts that show that the sole proprietorship and the LLC continued uninterrupted as a single business dealing with customer property since Madoff registered as a broker-dealer with the SEC in 1960, including:

- Customer property was deposited into the same JPMorgan commercial banking account when BLMIS operated as a sole proprietorship and as an LLC.  Stmt. ¶¶ 57–65, 75–76.

- The customers of the sole proprietorship became the customers of the LLC when it changed corporate form.  Stmt. ¶¶ 9–11; *see also BAM L.P. Decision* at 7–8 ("Defendants agreed to be liable to any successors when they signed their customer agreements.").

- When Madoff converted the sole proprietorship to an LLC, he expressly identified it to the SEC as an amendment to an existing broker-dealer's registration—not a new application of a separate broker-dealer seeking to register with the SEC.  Stmt. ¶¶ 9–11.

- The SEC registration number of BLMIS has always remained 8-8132 throughout the entire course of its business.  Stmt. ¶¶ 7–11; *BAM L.P. Decision* at 7 ("The same SEC file number, 8-8132, that appeared in the 1959 SEC Form BD appeared on the 2001 SEC Amended Form BD.").

32

- Madoff reported to the SEC that he transferred all assets and liabilities, which by definition includes bank accounts, from the sole proprietorship to the LLC. Stmt. ¶¶ 9–11.

Indeed, the Bankruptcy Court recognized as much, stating that Madoff has always been a member of SIPC, and "the incorporation of BLMIS as a limited liability company continued his business without change . . . . Thus, nothing has changed since 1960 except for the business form that Madoff used to conduct his Ponzi scheme." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014); *BAM L.P. Decision* at 6–7. Because the Trustee is appointed for the liquidation *of the business* of the debtor, such liquidation necessarily entails the liquidation of any predecessor conducting the same business, using the same SEC registrant number, on behalf of its customers with their customer property.

Third, SIPA makes clear that a SIPA trustee is authorized to recover customer property wherever it lies. *BAM L.P. Decision* at 11. SIPA protection focuses on "whether there was actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation." *In re Old Naples Sec., Inc.*, 223 F.3d 1296, 1302 (11th Cir. 2000) (internal quotation marks omitted); *see also In re Primeline Sec. Corp.*, 295 F.3d 1100, 1107 (10th Cir. 2002) ("Whether a claimant deposited funds 'with the debtor' does not depend simply on to whom claimants made their checks payable . . . [t]he relevant inquiry is whether the brokerage firm actually received, acquired or possessed claimants property."). Thus, as long as a trustee can show that the property in question was customer property received by the broker-dealer, he has the authority to recover it, wherever it lies. SIPA § 78fff-2(c)(3); *BAM L.P. Decision* at 11 ("The funds held in the Bank Accounts were meant to be invested legitimately through BLMIS but never were. Thus, they were "customer property." . . . The Defendants' fictitious profits must be turned over to the Trustee.").

The fact that a broker-dealer may have operated under a different legal form many years prior to the SIPA liquidation does not change a SIPA trustee's rights and powers to recover that customer property for the benefit of its owners—the customers.  Focusing on the name on a check or the corporate from of the broker-dealer at a particular time shifts the focus away from SIPA's customer property regime and instead allows the fraudster to determine the circumstances under which customer property can be recovered.  *See BAM L.P. Decision* at 8 (finding that "[t]he discrepancies . . . —forms filled out improperly, business names used interchangeably on bank accounts and checks—are the sleights of hand that one would expect to see when exhuming the remnants of a Ponzi scheme.")  Where, as here, there is no dispute that the Trustee is seeking to recover transfers comprising customer property, the form of the broker-dealer at the time of transfer is irrelevant.

Fourth, the Substantive Consolidation Order changed nothing about the SIPA Trustee's rights to customer property.  If anything, it was a "belt and suspenders" order to ensure that none of Madoff's assets slipped through the cracks given that the Government was pursuing forfeiture, the SIPA Trustee was pursuing customer property, and the Joint Provisional Liquidators were marshaling the assets of Madoff's London entity.  The order expressly states that the SIPA Trustee will retain his powers to recover customer property notwithstanding the consolidation of the estates.  Such reservations did not in any way change the rights and powers that were conferred on the SIPA Trustee as a result of the commencement of the SIPA liquidation.  Instead, those reservations in the order were necessary because absent express preservation, the substantive consolidation of two debtors' estates could have extinguished both trustees' avoidance powers altogether.  *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 768–69 (9th

Cir. 2000) ("Absent express preservation of the trustee's avoidance power, an order of substantive consolidation would ordinarily eliminate that power.").

Finally, taken to its logical conclusion, because BLMIS's only assets were funds in the JPMorgan Accounts, Defendants' argument means that there is no customer property in the SIPA liquidation and there is no estate representative who can recover the funds transferred out of that bank account. *See BAM L.P. Decision* at n.4. Such an outcome would leave a vast amount of customer property outside the reach of the SIPA liquidation, something SIPA does not intend. This result cannot be reconciled with the order appointing the Trustee, the Substantive Consolidation Order, prior precedent in this case, nor with the plain language of SIPA.

In sum, as long as the SIPA Trustee can show that the property he is seeking to recover is customer property, he has the power to recover it, whether that property is held in an account with the letters "LLC" or not. Such property never belonged to Madoff, the sole proprietorship, or the LLC, regardless of whose name was on the bank account. *BAM L.P. Decision* at 11. That is what SEC Rule 15c3-3 (promulgated at the direction of SIPA) means. Whatever particular bank account a fraudster chooses to park customer property in or however that particular bank account is denominated cannot change the nature of customer property or the Trustee's duty to recover that property and return it to its rightful owners. That is what SIPA and SEC Rule 15c3-3 intend.

### C.   Defendants' Management of Transfers From BLMIS Does Not Defeat the Trustee's Avoidance And Recovery Action

Defendants submit several declarations, explaining how they set up trusts, the intent of the trusts, and what they did with money transferred from BLMIS. In particular, Defendants aver that the money withdrawn from the Tracy Account was taken by her parents, Defendants

David and Carol, and therefore, the Trustee cannot recover those funds from Tracy.[6]  But

Defendants cannot dispute that the Tracy Account was opened in her name individually and not

as a trust for her benefit, BLMIS checks in the requested amounts were made payable to Tracy,

and that Tracy executed and submitted a customer claim for the Tracy Account.  Defendants also

admit that Tracy was an owner of the bank account into which the checks made out to Tracy

were deposited.  Declaration of Tracy D. Kamenstein ¶ 6, ECF No. 120; Declaration of David R.

Kamenstein ¶ 9, ECF No. 118.  Tracy had dominion and control over her BLMIS account and

the withdrawals therefrom.  As such, even if Defendants' declarations were taken as true, the fact

that Tracy gifted the checks to her parents or her parents took the checks for their own benefit is

neither relevant nor bars the Trustee's right to recover those transfers from Tracy.

### 1.    The Tracy Account and Checks to Tracy

Account 1CM596 was opened on September 7, 1999 in the name of "Tracy D.

Kamenstein."  Stmt. ¶ 108; Ans. ¶¶ 10, 37; *see also* Ex. B to Compl., ECF No. 1.  The Tracy

Account was held by Tracy D. Kamenstein individually, with no reference to any trust.  Ans. ¶¶

10, 37; Cremona Decl., Ex. 15 (Tracy Kamenstein Customer Claim).  Over the life of the Tracy

Account, the account name never changed.  Ans. ¶¶ 10, 37.  The only change request was a

change of address request made by Tracy.  Cremona Decl., Ex. 16 (Tracy Kamenstein

Verification of Address Change).  All 53 checks from BLMIS representing a withdrawal from

the Tracy Account were made payable to Tracy D. Kamenstein.  Collura Decl., Attach. B

---

[6] Although Defendants did not move for partial summary judgment for the transfers to Defendant Sloan G.
Kamenstein, they suggest that the Sloan Account and the Tracy Account were treated the same.  Defendants are
correct that the two accounts were similar—account 1CM597 was held in Sloan's name individually, checks written
from the Sloan Account were made payable to Sloan, and Sloan executed and submitted a customer claim for the
Sloan Account.  *See* Cremona Decl., Ex. 18 (Nov. 14, 2001 BLMIS Check to Sloan Kamenstein), Ex. 15 (Sloan
Kamenstein Customer Claim).  Further, the Trustee's expert was able to trace withdrawals from the Sloan Account
to a bank account held solely in Sloan's name.  Declaration of Lisa M. Collura, dated December 16, 2020 ("Collura
Decl."), Attach. B (Collura Kamenstein Report), ¶ 29, Ex. 6.  Sloan was also an owner of the CKDK Cap Account.
Like Tracy, Sloan had ownership and dominion and control over his BLMIS account.

(Collura Kamenstein Report), Ex. 6; Cremona Decl., Ex. 17 (Jan. 6, 2000 BLMIS Check to

Tracy Kamenstein).  And, in conjunction with her ownership of the BLMIS account, Tracy filed

customer claim number 000189 attempting to recover the balance on her last BLMIS customer

statement, listing herself as the accountholder for Account 1CM596.  Cremona Decl., Ex. 15

(Tracy Kamenstein Customer Claim).

> **2.      The Trustee Has Satisfied His Burden to Show the Pathways of the Funds From BLMIS to Tracy**

Defendants argue that while the BLMIS checks were made payable to Tracy, they were

actually deposited in a bank account held by her parents, David and Carol, which, according to

Defendants, renders David and Carol the initial transferees, despite the fact that Tracy was an

owner of that bank account.  The Defendants' self-serving declarations do not support this

conclusion.

Defendants admit that the disputed transfers from the Tracy Account in the Two-Year

Period were deposited in an account held in the joint names of David, Carol, Sloan, and Tracy

Kamenstein.  Declaration of Tracy D. Kamenstein ¶ 6, ECF No. 120 ("For estate planning

purposes, my parents always included me and my brother Sloan as owners of their bank accounts

so that, in the event of their death or incapacitation, we would have immediate access to their

funds."); Declaration of David R. Kamenstein ¶ 9, ECF No. 118 ("For estate planning purposes,

all of our bank accounts bore all four of our names, including those of our children. Carol and I

always included Tracy and Sloan as owners of our bank accounts so that, in the event of our

death, they would have immediate access to our funds.").[7]  As an owner of the joint bank

---

[7] Ms. Collura's report is not inconsistent with this admission.  Bank records for this joint account were not produced by Defendants so Ms. Collura relied on Defendants' customer files at BLMIS to identify the bank accountholders. Defendants' admissions make clear that Tracy was a joint accountholder, which the bank records would have disclosed had Defendants not failed to produce them.

account, Tracy had "the legal right to put the assets to [her] own use," even if she "cho[se] not to

exercise it." *Nisselson v. Salim (In re Big Apple Volkswagen, LLC)*, No. 11-11388 (JLG), 2016

WL 1069303, at *17 (Bankr. S.D.N.Y. Mar. 17, 2016).

The Bankruptcy Code does not define "transferee" or "initial transferee," but many

courts, including the Second Circuit, use the "dominion and control" test to define transferee as

follows:

> The minimum requirement of status as a 'transferee' is dominion
> over the money or other asset, the right to put the money to one's
> own purpose. . . . An entity does not have legal dominion over the
> money until it is free to invest that money in lottery tickets or
> uranium stocks.

*In re Finley, Kumble*, 130 F.3d 52, 57 (2d Cir. 1997) (citing *Bonded Fin. Servs., Inc. v. European

Am. Bank*, 838 F.2d 890, 891–894 (7th Cir. 1988)); *see also* Order, *Picard v. BAM L.P.*, Adv.

Pro. No. 10-04390 (CGM) (Bankr. S.D.N.Y. Dec. 22, 2020), ECF No. 253 ("The initial

transferee, in this instance, is the party named on the checks.").

In *In re Big Apple Volkswagen, LLC*, a trustee asserted fraudulent transfer claims against

a defendant who argued that she had no knowledge of the transfers and did not control the bank

account where the funds were ultimately deposited.  2016 WL 1069303, at *15.  The defendant

also argued that she lacked "dominion and control" over the funds and was a "mere conduit" of

the transfers.  *Id.*  The Court rejected those arguments, finding: (1) the debtor did not transfer the

funds to the defendant for the benefit of a third party, but for her benefit directly, (2) the

defendant had the "absolute right to utilize the [t]ransfers in her discretion," and (3) the debtor

did not condition or otherwise limit the defendant's rights to use the transferred funds as she

pleased.  *Id.* at *17.  The Court explained that the defendant had "unfettered control" over the

transferred funds, and the fact that she allegedly chose to "cede[] her control" to her children

"does not insulate her from liability."  *Id.*  Further, a transferee's "knowledge or lack thereof is

38

simply not probative of [] initial transferee status." *Id.*; *see also Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 535 (6th Cir. 2003) (finding that mother of debtors was initial transferee where she "had legal authority to do what she liked with the [transferred] funds" and there was "no evidence of some formal contractual arrangement that required her to obey the debtors' commands").

Likewise, in *Levey v. Cummins (In re BoxMagic Media Corp.)*, a debtor made a preference transfer by check addressed to the defendant but the check was ultimately deposited into a bank account held by another party, after the defendant endorsed the check. No. 08 B 12628, 2012 WL 589652, at *1 (Bankr. N.D. Ill. Feb. 22, 2012). The court granted summary judgment on the Trustee's preference claim under section 547 of the Bankruptcy Code to avoid the transfer initially because the defendant had initial control over the funds before endorsing it. *Id.*

Tracy was the only person legally authorized to receive funds from her BLMIS account, which is why each check was addressed to her personally. Tracy had the absolute right to use the customer property in her discretion and BLMIS placed no limits on her account or the withdrawal of funds. Tracy's choice to have the funds deposited into an account she held with her brother and parents instead of to her individual bank account does not absolve her of initial transferee liability for the fraudulent transfers.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court deny Defendants' Summary Judgment Motion, grant summary judgment in the Trustee's favor on Count One of the Trustee's Complaint, and enter an order avoiding the transfers of fictitious profits that BLMIS made to Defendants within the Two-Year Period ($907,300 from Defendant Carol; $907,300 from Defendant David; $527,400 from Defendant Sloan; and $452,314 from

Defendant Tracy), and requiring Defendants to return such transfers or the value thereof to the

Trustee.

Dated:  December 22, 2020
        New York, New York

                                   /s/ Nicholas J. Cremona
                                   Baker & Hostetler LLP
                                   45 Rockefeller Plaza
                                   New York, New York 10111
                                   Telephone: (212) 589-4200
                                   Facsimile: (212) 589-4201
                                   David J. Sheehan
                                   Email: dsheehan@bakerlaw.com
                                   Nicholas J. Cremona
                                   Email: ncremona@bakerlaw.com
                                   Seanna R. Brown
                                   Email: sbrown@bakerlaw.com
                                   Lan Hoang
                                   Email: lhoang@bakerlaw.com
                                   Amy E. Vanderwal
                                   Email: avanderwal@bakerlaw.com
                                   Tatiana Markel
                                   Email: tmarkel@bakerlaw.com

                                   *Attorneys for Irving H. Picard, Trustee*
                                   *for the Substantively Consolidated SIPA*
                                   *Liquidation of Bernard L. Madoff Investment*
                                   *Securities LLC and the Chapter 7 Estate of*
                                   *Bernard L. Madoff*