**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (SMB) |
| | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-04469 (CGM) |
| v. | |
| CAROL L. KAMENSTEIN, individually and in her capacity as joint tenant, | |
| DAVID R. KAMENSTEIN, individually and in his capacity as joint tenant, | |
| SLOAN G. KAMENSTEIN, and | |
| TRACY D. KAMENSTEIN, | |
| Defendants. | |

**TRUSTEE'S OBJECTIONS, RESPONSES AND COUNTERSTATEMENT OF MATERIAL FACTS PURSUANT TO FED. R. CIV. P. 56, FED. R. BANKR. P. 7056 AND LOCAL RULE 7056-1 TO DEFENDANTS' STATEMENT OF MATERIAL FACTS**

Plaintiff Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated chapter 7

estate of Bernard L. Madoff ("Madoff"), submits his Objections, Responses and

Counterstatement of Material Facts Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056 and

Local Rule 7056-1 ("Counterstatement") to Defendants' Statement of Material Facts in support

of Defendants' motion for summary judgment for lack of subject matter jurisdiction, and for

partial summary judgment dismissing the Complaint, dated November 25, 2020 [ECF No. 116] [1]

(the "Defendants' Statement").

## I.     TRUSTEE'S OBJECTIONS AND RESPONSES TO DEFENDANTS' RULE 56.1 STATEMENT OF MATERIAL FACTS

**Madoff Business**

1.      From the 1960s on, Madoff operated two separate business units through his sole

proprietorship called Bernard L. Madoff Investment Securities ("BLMIS"). Madoff operated a

legitimate trading business which, at times, executed trades equal to 10% of the daily volume on

the New York Stock Exchange (the "Legitimate Trading Business"). The Legitimate Trading

Business included both proprietary trading ("PT"), which traded securities for its own account,

and market-making ("MM"), which created a market in certain securities and acted as a broker-

dealer for all of the major investment firms. *See* Chaitman **Ex. F** [Nelson Tr. [2] 5/8/19 at 63:6-11;

63:14-16], and an investment advisory business ("IA"). Chaitman **Ex. F** [Nelson Tr. 5/8/19 at

63:3-4].

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Kamenstein*, Adv. Pro. No. 10-04669 (CGM) (Bankr. S.D.N.Y.).

[2] *Picard v. Carol & Stanley Nelson*, ("*Nelson*"), Adv. Pro. Nos. 10-04377 and 10-04658. The trial of this consolidated case was held on May 8 and 9, 2019 and references to the transcript of the trial appear as "Nelson Tr. [date] at [page reference]."

**RESPONSE:** Not disputed that beginning in 1960 and until January 1, 2001, BLMIS operated as a sole proprietorship. Not disputed that BLMIS operated a proprietary trading business and a market-making business as two of its three business units along with the investment advisory business ("IA Business"). Disputed to the extent these statements are inconsistent with the Trustee's Counterstatement ¶¶ 8–18 (*see* Section II). Disputed as immaterial and lacking evidentiary support that the proprietary trading business and the market-making business executed trades equal to 10% of the daily volume on the New York Stock Exchange.

2.      All of the banking activity of the Legitimate Trading Business was conducted at the Bank of New York ("BNY"). Chaitman **Ex. F** [Nelson Tr. 5/8/19 at 161:5-8].

**RESPONSE:** Disputed to the extent that the statement is not supported by admissible evidence or the cited source.[3] Not disputed that the primary banking activity of the proprietary trading business was conducted at BNY. Bruce Dubinsky's expert report states: "In the Proprietary Trading Business, the primary operating account was the Bank of New York ("BONY") account number 8661126621 (the "621 Account")." Declaration of Bruce G. Dubinsky, dated December 16, 2020 ("Dubinsky Decl."), Attach. A (Expert Report of Bruce G. Dubinsky, dated January 16, 2019 ("Dubinsky Report")) ¶ 78; *see also* Declaration of Lisa M. Collura, dated December 16, 2020 ("Collura Decl."), Attach. A (Expert Report of Lisa M. Collura, dated January 16, 2019 ("Collura Report")) ¶ 17 n.2, ECF No. 16-1).

---

[3] The Trustee does not dispute the admissibility of testimony by his experts. However, Defendants routinely mischaracterize the testimony by selectively citing to or quoting language from counsel's question rather than the actual testimony of the witness and/or citing to or quoting only excerpts of testimony.

3.      The Legitimate Trading Business was known internally as "House 5."  Chaitman **Ex. A** [Nelson Tr. 5/8/19 at 62:18-19].

**RESPONSE:**  Not disputed that the proprietary trading and market-making businesses were referred to within BLMIS as "House 5."  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 36.

3.      The PT and MM Businesses were legitimate and were not involved in an alleged Ponzi scheme.  Chaitman **Ex. F** [Nelson Tr. 5/8/19 at 63:2-24 ("Q. So, was the prop side [PT and MM] of the business designed to buy and sell securities? A. Absolutely."); 64:10-14 ("Q. . . . So, the proprietary trading side of the business bought and sold securities? A. Absolutely. Q. The investment advisory side? A. Never."); 68:7-16 ("Q. So, the proprietary trading side of the business had a trading platform? A. It had a trading platform and it actually traded. That's what it did."); 122:15-21 ("Q. And was the proprietary trading business actually buying stock during that period? A. Yes. The proprietary trading business was buying stock for the proprietary trading desk and for the market-making clients of that side of the business."); 150:18-25 ("The proprietary trading, in fact, was investing…"); 168:8-17 (the PT and MM business were not involved in a Ponzi scheme, "Q. So out of the whole operation of 180 or so employees, it's 8 to 10 employees who, in your opinion, were involved in a Ponzi scheme; is that right? A. That's correct.")].

**RESPONSE:** Disputed to the extent the statement is not supported by admissible evidence and is not supported by the evidence cited. *See* n.2.  The proprietary trading business was engaged in pervasive fraudulent activity.  Dubinsky Decl., Attach. A (Dubinsky Report) Part IV.C.

4.      Madoff operated his entire business as a sole proprietorship until January 2001. *See* Chaitman **Ex**. **C** [Memorandum Decision Regarding Omnibus Motion to Dismiss, Adv. Pro. No. 08-01789 (SMB), ECF No. 10089]]; *see e.g.* Chaitman **Ex**. **A**, [Compl. at ¶ 22].

**RESPONSE**:  Not disputed.

5.      Madoff used the trade name "Bernard L. Madoff Investment Securities" for his sole proprietorship from at least the 1970's.  Chaitman **Ex**. **F** [Nelson Tr. 5/8/19 172: 9:17 (Q. you're aware, are you not, that Mr. Madoff used the tradename Bernard L. Madoff Investment Securities prior to his formation of the LLC? A. Yes. I saw it on many documents, yes."]; Chaitman **Ex**. **G** [Confirmation Slips dating from 1979 showing the trade name Bernard L. Madoff Investment Securities [10-5420_Defendant_0002412-13]],[4] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 610 B.R. 197, 206 (Bankr. S.D.N.Y. 2019).  Even the account statement for the 703 account (defined below at ¶ 13) at JPMorgan Chase ("JPMC") for December 2008, the final month of the LLC's operations, lists the account as owned by the trade name "Bernard L. Madoff Investment Securities" without any reference to the LLC. Chaitman **Ex. H** [703 Account Statement for December 2008].

**RESPONSE:**  Not disputed that "Madoff Securities frequently used the trade name 'Bernard L. Madoff Investment Securities' in the course of its business."  *Picard v. Nelson*, 610 B.R. 197, 206 (Bankr. S.D.N.Y. 2019).

---

[4] Attached to the Chaitman declaration as **Ex.** G are copies of confirmation slips dating from 1979 to the Unflats, who were Madoff customers, showing credits to their account from "Bernard L. Madoff Investment Securities."

6.      In January 2001, Madoff formed the LLC to which he transferred the PT and MM

businesses, managed by his two sons. *See* Chaitman **Ex**. **I** [SEC Amended Form BD]; *see*

Chaitman **Ex**. **A** [Compl. at ¶ 22].

**RESPONSE:**   Not disputed that Madoff transferred the assets and liabilities of the

proprietary trading business and the market-making business from the sole proprietorship to a

single member limited liability company in January 2001.  Declaration of Nicholas J. Cremona,

dated December 22, 2020 ("Cremona Decl."), Ex. 3 (2001 SEC Amended Form BD). Along with

the proprietary trading business and the market-making business, Madoff also transferred the IA

Business to the limited liability company.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 36,

38; *see also Nelson*, 610 B.R. at 206 ("On January 12, 2001, BLMIS amended its SEC Form BD

to reflect its change from a sole proprietorship to a single member limited liability company with

Madoff as the sole member . . . BLMIS was a single enterprise that operated three business units:

(i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory

business.");  Memorandum Decision Determining Funds Held in the Bank Accounts are

Customer Property and Awarding Prejudgment Interest at 9, *Picard v. BAM L.P.*, Adv. Pro. No.

10-04390 (Bankr. S.D.N.Y. Dec. 11, 2020), ECF No. 247 ("*BAM L.P. Decision*")[5] (finding that

"all of the assets and liabilities of the sole proprietorship, including the IA Business, were

transferred to BLMIS via the 2001 SEC Amended Form BD").


7.      In January 2001, Madoff notified BNY and the governmental agencies with which

the Legitimate Trading Business dealt that the LLC was formed and would operate the

---

[5] The *BAM L.P. Decision* is also available on Westlaw at 2020 WL 7422316 without pincites.

Legitimate Trading Business. *See* the following notification letters all dated January 1, 2001:

Chaitman **Ex. J** [Letter from the LLC to BNY; Letter from LLC to the National Securities

Clearing Corporation; Letter from the LLC to the Options Clearing Corporation; and Letter from

the LLC to the Depository Trust Company].

      **RESPONSE:**  Not disputed that Madoff notified BNY and governmental agencies of the

formation of the LLC in January 2001 but disputed that the LLC would only operate the market-

making business and proprietary trading business.  BLMIS operated as a "single enterprise."

Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206 ("On

January 12, 2001, BLMIS amended its SEC Form BD to reflect its change from a sole

proprietorship to a single member limited liability company with Madoff as the sole member . . .

BLMIS was a single enterprise that operated three business units: (i) a proprietary trading

business; (ii) a market-making business; and (iii) an investment advisory business."); *BAM L.P.*

*Decision* at 9 (finding that "all of the assets and liabilities of the sole proprietorship, including

the IA Business, were transferred to BLMIS via the 2001 SEC Amended Form BD").  The

documents speak for themselves.


      8.      Neither JPMC nor Madoff has any record of any such letter ever being sent to

JPMC. Chaitman **Ex. K** [Email dated June 12, 2018 from counsel to Trustee, Maximillian

Shifrin to Helen Davis Chaitman].

      **RESPONSE:** Not disputed that such a letter has not been located to date in BLMIS's

books and records.

9.     Madoff did not transfer the IA Business to the LLC. *See* Chaitman **Ex**. **I** [SEC

Amended Form BD at 8-10].

**RESPONSE:**  Disputed.  As of January 1, 2001, all assets of the sole proprietorship were

transferred to the LLC, including the IA Business.  Cremona Decl., Ex. 3 (2001 SEC Amended

Form BD).  In January 2001, BLMIS filed an SEC Amended Form BD to reflect the transfer of

all assets to the LLC.  *Id*.  Under "BD Successions" of the 2001 SEC Amended Form BD, it

asked:  "Briefly describe details of the succession, including any assets or liabilities not assumed

by the successor."  The response: "[e]ffective January 1, 2001, predecessor will transfer to

successor all of predecessor's assets and liabilities related to predecessor's business.  The

transfer will not result in any change in ownership or control."  *Id.* at 10–11; *see also* Question 5.

No assets or liabilities of the sole proprietorship were listed as "not assumed by the successor."

*Id.*  The SEC Amended Form BD further certified that no "accounts, funds, or securities of

customers of the *applicant* are held or maintained by such other *person*, firm, or organization."

*Id.* (2001 SEC Amended Form BD at 10) (emphasis in original).  BLMIS succeeded to the sole

proprietorship's SEC registrant number 8-8132.  Cremona Decl., Ex. 1 (1959 SEC Form BD),

Ex. 3 (2001 SEC Amended Form BD at 10).


10.     Madoff did not register with the SEC as an investment advisor until late 2006. *Id.;*

*In re Bernard L. Madoff Inv. Secs., LLC*, 424 B.R. 122, 127 (Bankr. S.D.N.Y. 2010), *aff'd* 654

F.3d 229 (2d Cir. 2011).

**RESPONSE:**  Not disputed.

**The Bank Accounts**

    **The LLC Account**

11.    As set forth above at ¶ 2, the Legitimate Trading Business maintained an account

with BNY. Chaitman **Ex. F** [Nelson Tr. 5/8/19 at 161:5-8]. In January 2001, Madoff notified

BNY that the LLC was formed and would operate the Legitimate Trading Business. Chaitman

**Ex. J** [Letter from the LLC to BNY].

    **RESPONSE:**  The Trustee's response to ¶¶ 2 and 7 are incorporated herein.  Not

disputed that the banking activity of the market-making business and proprietary trading business

was conducted at BNY.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 78 ("In the Proprietary

Trading Business, the primary operating account was the Bank of New York ("BONY") account

number 8661126621 (the "621 Account").").  Not disputed that Madoff notified Bank of New

York of the formation of the LLC in January 2001 but disputed that the LLC would only operate

the market-making business and proprietary trading business.  BLMIS operated as a "single

enterprise."  *Id.* ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206 *see also Nelson*, 610 B.R. at 206

("On January 12, 2001, BLMIS amended its SEC Form BD to reflect its change from a sole

proprietorship to a single member limited liability company with Madoff as the sole member . . .

BLMIS was a single enterprise that operated three business units: (i) a proprietary trading

business; (ii) a market-making business; and (iii) an investment advisory business."); *BAM L.P.*

*Decision* at 9 (finding that "all of the assets and liabilities of the sole proprietorship, including

the IA Business, were transferred to BLMIS via the 2001 SEC Amended Form BD").

12.     The LLC account at BNY was used to fund all of the expenses of the Legitimate

Trading Business, including the purchase of securities. Chaitman **Ex. F** [Nelson Tr. 5/8/19 at

161:14-16].

**RESPONSE:**  Disputed as irrelevant and lacking evidentiary support that "all of" the

expenses were funded out of the account at BNY for the proprietary trading business and the

market making business.  Not disputed that the BNY account was the primary operating account

for the proprietary trading business and the market making business.  Dubinsky Decl., Attach. A

(Dubinsky Report) ¶ 78.


**The 703 Account**

13.     The IA Business placed its customer deposits into an account at JPMC ending in

"703" (the "703 Account"). Chaitman **Ex. F** [Nelson Tr. 5/8/19 at 81:20-82:1]; *see e.g.* Chaitman

**Ex**. **L, M, N** and **O** [Compilation of 703 Account Statements [multiple bates nos.]].

**RESPONSE:**  Not disputed.  IA Business customers' deposits were deposited into and

commingled in the 703 Account.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura

Decl., Attach. A (Collura Report) ¶¶ 20–24.


14.     As of December 2001, almost a year after the LLC was formed, JPMC customer

statements for the 703 Account indicated that the account was held in the name of "Bernard L.

Madoff." Chaitman **Ex. F** [Nelson Tr. 5/8/19 at 14:1-23]; Chaitman **Ex. P** [703 Account

Statement for December 2001]. Thereafter, the 703 Account name was in Madoff's trade name,

Bernard L. Madoff Investment Securities. The 703 Account was never in the name of the LLC

and there is not a single document produced by JPMC which suggests that the LLC owned the

703 Account.  *See e.g.* Chaitman **Ex. K** [Email dated June 12, 2018 from counsel to Trustee,

Maximillian Shifrin to Helen Davis Chaitman]; Chaitman **Ex. Q** [Compilation of 509 Account

Statements [multiple bates nos.]]; Chaitman **Ex. R** [Compilation of 703 Account Statements

[multiple bates nos.]]; Chaitman **Ex. J** [Letter from the LLC to BNY; Letter from LLC to the

National Securities Clearing Corporation; Letter from the LLC to the Options Clearing

Corporation; Letter from the LLC to the Depository Trust Company].

> **RESPONSE:**  Not disputed that the documents speak for themselves.  Disputed that the
LLC did not own the 703 Account.  As of January 1, 2001, all assets of the sole proprietorship
were transferred to the LLC, including the 703 Account.  Cremona Decl., Ex. 3 (2001 SEC
Amended Form BD).  The bank statements for the 703 and 509 Accounts listed the account
holder as "Bernard L. Madoff" from December 1998 to September 2002, when the name was
changed to "Bernard L. Madoff Investment Securities." Collura Decl., Attach. A (Collura
Report) ¶¶ 20 n.7, 25 n.9.  For the time period for which bank records were available (December
1998 through December 2008), the face of the bank statements for the 703 Account and 509
Account showed they were designated as "Commercial Checking" accounts, and the statements
were addressed to the attention of either Tony Tiletnick, a BLMIS employee, or Daniel
Bonventre, BLMIS's operations manager, at the BLMIS business address at 885 Third Avenue,
New York, New York.  None of the statements were addressed to Madoff personally.  Cremona
Decl., Ex. 5 (Exemplar BLMIS Bank Statements 1998-2008); Dubinsky Decl., Attach. A
(Dubinsky Report) ¶ 340, Exs. 31–32.  At all relevant times, the 703 and 509 Accounts were
used for customer deposits and withdrawals—the business of the IA Business.  Collura Decl.,
Attach. A (Collura Report) ¶¶ 20–27; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285,
Figure 52 n.286.

15.    Moreover, through August 2002, the JPMC customer statements for the 703 account indicated that the account was held in the name of "Bernard L. Madoff." Chaitman **Ex. S** [703 Account Statement August 1–August 30, 2002]. In September 2002, the 703 account statements from JPMC indicated the customer as BLMIS, the trade name for Madoff's sole proprietorship. Chaitman **Ex. T** [703 Account Statement August 31-September 30, 2002].

**RESPONSE:**  Not disputed to the extent the documents speak for themselves.  Disputed that the LLC did not own the 703 Account.  As of January 1, 2001, all assets of the sole proprietorship were transferred to the LLC, including the 703 Account.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).  The bank statements for the 703 and 509 Accounts listed the account holder as "Bernard L. Madoff" from December 1998 to September 2002, when the name was changed to "Bernard L. Madoff Investment Securities."  Collura Decl., Attach. A (Collura Report) ¶¶ 20 n.7, 25 n.9.  For the time period for which bank records were available (December 1998 through December 2008), the face of the bank statements for the 703 Account and 509 Account showed they were designated as "Commercial Checking" accounts, and the statements were addressed to the attention of either Tony Tiletnick, a BLMIS employee, or Daniel Bonventre, BLMIS's operations manager, at the BLMIS business address at 885 Third Avenue, New York, New York.  None of the statements were addressed to Madoff personally.  Cremona Decl., Ex. 5 (Exemplar BLMIS Bank Statements 1998-2008); Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340, Exs. 31, 32.  At all relevant times, the 703 and 509 Accounts were used for customer deposits and withdrawals—the business of the IA Business.  Collura Decl., Attach. A (Collura Report) ¶¶ 20–27; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure 52.

12

16.     Through 2008, the endorsement stamp for checks deposited into the 703 Account read "For deposit only Bernard L. Madoff" (Chaitman **Ex. U** [Checks dated June 11, 2007 [JPMSAI0011455-56], June 14, 2007 [JPMSAI0011482], September 26, 2005 [JPMSAI0007847]]; and *see* Chaitman **Ex. V** [Check dated July 16, 2008 [JPMSA10013257]][6]); and deposit tickets for the 703 Account bore the name of the account holder as "Bernard L. Madoff" Chaitman **Ex. W** [Deposit Tickets for the 703 Account [JPMSAI0007846; JPMSAI0009767; JPMSAI0011481; JPMSAI0011453]].

**RESPONSE:**  Disputed as not supported by the evidence cited.  Disputed further as irrelevant because Chaitman Decl., Ex. V is a check from a different BLMIS customer.

17.     As late as December 2008, the statements for the 703 Account continue to list the account as owned by the sole proprietorship, BLMIS, without any reference to the LLC. Chaitman **Ex. H** [703 Account Statement for December 2008].

**RESPONSE:**  Disputed that the sole proprietorship owned the 703 Account after 2001. As of January 1, 2001, all assets of the sole proprietorship were transferred to the LLC, including the 703 Account and any trade name.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

**The 509 Account**

18.     Madoff held an account at JPMC ending in "509" (the "509 Account"). Chaitman **Ex. F** [Nelson Tr. 5/8/19 at 81:20-82:1].

---

[6] The deposit check referenced for the year 2008 is an example, and belongs to the account of Zieses Investment Partnership, which was also a customer of Madoff, since the Trustee has not produced copies of the deposit checks made to fund the Kamenstein Accounts for 2008.

**RESPONSE:**  Not disputed that Madoff held the 509 Account until January 1, 2001.

Thereafter, all assets of the sole proprietorship were transferred to the LLC, including the 509

Account.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).


19.    The 509 Account was opened and held by Madoff's sole proprietorship long

before the LLC came into existence in 2001. *See e.g.* Chaitman **Ex. X** [509 Account Statement

from 1998].

**RESPONSE:**  Not disputed that the 509 Account was opened and held by the sole

proprietorship prior to 2001.  The 703 and 509 Accounts were linked commercial business

accounts.  The 509 Account was a controlled disbursement account that was entirely funded by

the 703 Account.  Collura Decl., Attach. A (Collura Report) ¶ 25.  An analysis of the 703

Account showed that the money in that account consisted almost entirely of customer deposits.

Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285; Collura Decl., Attach. A (Collura

Report) ¶ 27.

As of January 1, 2001, all assets of the sole proprietorship were transferred to the LLC,

including the 703 and 509 Accounts and any trade name.  Cremona Decl., Ex. 3 (2001 SEC

Amended Form BD).  The bank statements for the 703 and 509 Accounts listed the account

holder as "Bernard L. Madoff" from December 1998 to September 2002, when the name was

changed to "Bernard L. Madoff Investment Securities." Collura Decl., Attach. A (Collura

Report) ¶¶ 20 n.7, 25 n.9.  For the time period for which bank records were available (December

1998 through December 2008), the face of the bank statements for the 703 Account and 509

Account showed they were designated as "Commercial Checking" accounts, and the statements

were addressed to the attention of either Tony Tiletnick, a BLMIS employee, or Daniel

Bonventre, BLMIS's operations manager, at the BLMIS business address at 885 Third Avenue, New York, New York. None of the statements were addressed to Madoff personally. Cremona Decl., Ex. 5 (Exemplar BLMIS Bank Statements 1998-2008); Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340, Exs. 31, 32. At all relevant times, the 703 and 509 Accounts were used for customer deposits and withdrawals—the business of the IA Business. Collura Decl., Attach. A (Collura Report) ¶¶ 20–27; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure 52.

20.     There is not a shred of evidence that either the 703 or the 509 Account was ever held in the name of the LLC. On the contrary, all of the evidence indicates that these accounts were always held by Madoff individually. Chaitman **Ex. F** [Nelson Tr. 5/9/19 at 8:14-19, 9:12-10:5-21, 12:5-18:6; 26:24-29:11].

**RESPONSE:** Disputed. As of January 1, 2001, all assets of the sole proprietorship were transferred to the LLC, including the 703 and 509 Accounts and any trade name. Cremona Decl., Ex. 3 (2001 SEC Amended Form BD). The bank statements for the 703 and 509 Accounts listed the account holder as "Bernard L. Madoff" from December 1998 to September 2002, when the name was changed to "Bernard L. Madoff Investment Securities." Collura Decl., Attach. A (Collura Report) ¶¶ 20 n.7, 25 n.9. For the time period for which bank records were available (December 1998 through December 2008), the face of the bank statements for the 703 Account and 509 Account showed they were designated as "Commercial Checking" accounts, and the statements were addressed to the attention of either Tony Tiletnick, a BLMIS employee, or Daniel Bonventre, BLMIS's operations manager, at the BLMIS business address at 885 Third Avenue, New York, New York. None of the statements were addressed to Madoff personally.

Cremona Decl., Ex. 5 (Exemplar BLMIS Bank Statements 1998-2008); Dubinsky Decl., Attach.

A (Dubinsky Report) ¶ 340, Exs. 31, 32. At all relevant times, the 703 and 509 Accounts were

used for customer deposits and withdrawals—the business of the IA Business. Collura Decl.,

Attach. A (Collura Report) ¶¶ 20–27; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285,

Figure 52.

21.     The Trustee's expert witnesses, Bruce Dubinsky and Lisa Collura, have never

seen a bank statement for either the 509 Account or the 703 Account in the name of the LLC.

Chaitman **Exs. F** and **Y** [Nelson Tr. 5/8/19 at 171:23-172:8, Nelson Tr. 5/9/19 at 13:7-21; 18:3-

5].

**RESPONSE:**     Not disputed that the Trustee's expert witnesses have not seen a bank

statement for either the 509 Account or the 703 Account showing the word "LLC."

22.     The 509 account statements and checks were always in the name of Bernard L.

Madoff. *See* Chaitman **Ex. Q** [Compilation of 509 Account Statements [multiple bates nos]];

Chaitman **Exs. Z**, **AA**, **AB** and **AC** [Compilation of Checks [multiple bates nos.]].

**RESPONSE:**  Disputed because the 509 Account was held in the name of Bernard L.

Madoff until September 2002. At that point, the account holder was changed to Bernard L.

Madoff Investment Securities but BLMIS continued to use checks with "Bernard L. Madoff"

listed as the holder. Collura Decl., Attach. A (Collura Report) ¶ 25 n.9. Disputed because the

509 Account statements were also addressed to Bernard L. Madoff Investment Securities. *See*

Chaitman Decl., Ex. Q. As of January 1, 2001, all assets of the sole proprietorship were

transferred to the LLC, including the 509 Account and any trade name. These assets were owned

by the LLC.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).  The bank statements for

the 703 and 509 Accounts listed the account holder as "Bernard L. Madoff" from December

1998 to September 2002, when the name was changed to "Bernard L. Madoff Investment

Securities."  Collura Decl., Attach. A (Collura Report) ¶¶ 20 n.7, 25 n.9.  For the time period for

which bank records were available (December 1998 through December 2008), the face of the

bank statements for the 703 Account and 509 Account showed they were designated as

"Commercial Checking" accounts, and the statements were addressed to the attention of either

Tony Tiletnick, a BLMIS employee, or Daniel Bonventre, BLMIS's operations manager, at the

BLMIS business address at 885 Third Avenue, New York, New York.  None of the statements

were addressed to Madoff personally.  Cremona Decl., Ex. 5 (Exemplar BLMIS Bank Statements

1998-2008); Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340, Exs. 31, 32.  At all relevant

times, the 703 and 509 Accounts were used for customer deposits and withdrawals—the business

of the IA Business.  Collura Decl., Attach. A (Collura Report) ¶¶ 20–27; Dubinsky Decl.,

Attach. A (Dubinsky Report) ¶ 340 n.285, Figure 52.


23.    The designation "LLC" never appeared on the statements for either the 703 or the

509 Account.  *See* Chaitman **Ex. Q** [Compilation of 509 Account Statements [multiple bates

nos.]; *see* Chaitman **Ex. R** [Compilation of 703 Account Statements [multiple bates nos.]].

**RESPONSE:**  Not disputed that the Trustee's expert witnesses have not seen a bank

statement for either the 509 Account or the 703 Account showing the word "LLC."  As of

January 1, 2001, all assets of the sole proprietorship were transferred to the LLC, including the

509 Account and 703 Account.  These assets were owned by the LLC.  Cremona Decl., Ex. 3

(2001 SEC Amended Form BD).  The bank statements for the 703 and 509 Accounts listed the

account holder as "Bernard L. Madoff" from December 1998 to September 2002, when the name

was changed to "Bernard L. Madoff Investment Securities." Collura Decl., Attach. A (Collura

Report) ¶¶ 20 n.7, 25 n.9.  For the time period for which bank records were available (December

1998 through December 2008), the face of the bank statements for the 703 Account and 509

Account showed they were designated as "Commercial Checking" accounts, and the statements

were addressed to the attention of either Tony Tiletnick, a BLMIS employee, or Daniel

Bonventre, BLMIS's operations manager, at the BLMIS business address at 885 Third Avenue,

New York, New York.  None of the statements were addressed to Madoff personally.  Cremona

Decl., Ex. 5 (Exemplar BLMIS Bank Statements 1998-2008); Dubinsky Decl., Attach. A

(Dubinsky Report) ¶ 340, Exs. 31, 32.  At all relevant times, the 703 and 509 Accounts were

used for customer deposits and withdrawals—the business of the IA Business.  Collura Decl.,

Attach. A (Collura Report) ¶¶ 20–27; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285,

Figure 52.


24.    Madoff used the trade name "Bernard L. Madoff Investment Securities" for his

sole proprietorship interchangeably with the name "Bernard L. Madoff", (Chaitman **Ex. Y**

[Nelson Tr. 5/9/19 at 18:23-19:10]; Chaitman **Ex. G** [Confirmation Slips [10-

5420_Defendant_0002412-13]]; Chaitman **Ex. AD** [July 17, 1991 letterhead of Bernard L.

Madoff Investment Securities]), for years prior to the formation of the LLC. *See* Chaitman **Ex. F**

[Nelson Tr. 5/8/19 at 172:9-12].

**RESPONSE:**  Disputed as irrelevant and lacking evidentiary support.  Not disputed that

a trade name was used.  *See Nelson*, 610 B.R. at 206 ("Madoff Securities frequently used the

trade name 'Bernard L. Madoff Investment Securities' in the course of its business.").

**The Trusts**

25.    On April 11, 1984, David and Carol formed two trusts for the benefit of their

children, Tracy and Sloan. *See* Chaitman **Ex. AE** [Trust Agreement for the 1984 Tracy Dara

Kamenstein Irrevocable Trust (the "Tracy Trust"). [AMF00267661-696]]; *see* Chaitman **Ex. AF**

[Trust Agreement for the 1984 Sloan George Kamenstein Irrevocable Trust (the "Sloan

Trust")[AMF00267776-811]], (collectively, "the Trust Agreements" or "the Trusts")]. Carol is

the Trustee of the Sloan Trust and David is the Trustee of the Tracy Trust. *See* Chaitman **Ex**. **AF**

at cover, preamble and p. 34 [Sloan Trust [AMF00267776-811 at 776, 777 and 809]]; *see*

Chaitman **Ex**. **AE** at cover, preamble and p. 33 [Tracy Trust [AMF00267661-696 at 697, 662

and 694]]; *see* Declaration of Carol Kamenstein dated November 16, 2020 (the "Carol Dec."), ¶

2; *see* Declaration of David L Kamenstein dated November 16, 2020 (the "David Dec."), ¶ 2;

*and see* Declaration of Tracy D. Kamenstein dated November 16, 2020 (the "Tracy Dec."), ¶ 2.

**RESPONSE:**  Not disputed to the extent the documents speak for themselves as to the

trusts.


26.    On August 23, 1999, David and Carol opened Accounts No. 1CM597 (the "Sloan

Trust Account") and No. 1CM596 (the "Tracy Trust Account")**.** David signed the Tracy Trust

Account as Trustee , and Carol signed the Sloan Account as Trustee t. *See* Chaitman **Ex**. **AG**

[Account Opening Documents for the Tracy Trust Account [AMF00267652-60]]; and Chaitman

**Ex. AH** [Account Opening Documents for the Sloan Trust Account [AMF00267767-775]]; *see*

Carol Dec., ¶¶ 2-3; *see* David Dec., ¶¶ 5; *and see* Tracy Dec., ¶ 3.

**RESPONSE:**  Disputed.  BLMIS Account Nos. 1CM597 and 1CM596 were held in the

individual defendants' names in BLMIS's books and records, "Sloan G. Kamenstein," and

"Tracy D. Kamenstein," respectively—not in trust names. All BLMIS-issued checks were made

payable to Sloan or Tracy, not to a trust in either Defendant's name, or to a trustee for the benefit

of either Defendant. In addition, Sloan and Tracy, individually, submitted customer claims for

their respective BLMIS accounts, which they each signed. Cremona Decl., Ex. 15 (Sloan

Kamenstein and Tracy Kamenstein Customer Claims).


**The Kamenstein Accounts**

**Account No. 1CM913 (the "David Account")**

27.    The Trustee seeks to claw back withdrawals from the David Account totaling

$907,300. *See* Chaitman **Ex. A** [Compl., Ex. B, Account No. 1CM913, Column 10]. The David

Account was opened on January 3, 2005. There was an initial transfer into the David Account of

$3,146,642 from an account held by David and Carol, Account No. 1CM247 (the "David and

Carol Account"). *See* Chaitman **Ex. AI** [Letter dated December 23, 2004 to Jodi Crupi

[AMF00250545]]; *see* Chaitman **Ex. AJ** [Account Opening Documents [AMF00278590-95]];

*see* Chaitman **Ex**. **AK** [Customer Statement dated December 31, 2004 [MDPTPP01931711]];

*see also* Chaitman **Ex**. **A** [Compl., Ex. B, Account No. 1CM913, Line 1].

**RESPONSE:** Not disputed that the Trustee seeks to avoid and recover $907,300 in

withdrawals of fictitious profits from the David Account. Not disputed that the David Account

was opened with an inter-account transfer from BLMIS Account No. 1CM247 in the amount of

$3,146,642. Disputed that 1CM913 was opened on January 5, 2005; the reported transfer of

$3,146,642 was reflected on the customer statements as occurring on December 27, 2004.

However, due to the negative principal balance in BLMIS Account No. 1CM247, there was no

principal available to be transferred and this reported inter-account transfer constituted fictitious

profits.  *See* Declaration of Matthew B. Greenblatt, dated December 16, 2020 ("Greenblatt

Decl."), Attach. B (Expert Report of Matthew B. Greenblatt, CPA/CFF, CFE dated June 14,

2019 ("Greenblatt Kamenstein Report")) ¶¶ 20–21; 66, Exs. 4A, 4F.

### Deposits into the David Account

28.     Three further deposits were made into the David Account: (1) a transfer in the

amount of $686, dated January 31, 2005, from the David and Carol Account; *see* Chaitman **Ex**.

**AL** [Customer Statement dated January 31, 2005 [MDPTPP01931716]]; (2) a check in the

amount of #13,600, dated June 11, 2007, from "Carol Kamenstein and David Kamenstein" to

"Bernard L. Madoff Investments". This check was endorsed "Bernard L. Madoff Investments",

stamped "For Deposit Only Bernard L. Madoff" and was deposited into the 703 Account; *see*

Chaitman **Ex**. **U** [Check [JPMSAI0011455]]; *see* Chaitman **Ex**. **W** [Deposit Ticket for the 703

Account [JPMSAI0011453]]; *see also* Chaitman **Ex**. **AM** [Letter dated June 11, 2007 from

David to Jodi Crupi [10-04469_KAMENSTEIN_0000108]]); and (3) a check wire transfer in the

amount of $100,000, dated November 21, 2007. *See* Chaitman **Ex**. **AN** [703 Account Statement,

November 2007 [JPMSAB0003858]]; *see also* Chaitman **Ex**. **A** [Compl., Ex. B, Account No.

1CM913].

    **RESPONSE:**  Not disputed that on January 31, 2005, there was an inter-account transfer

from BLMIS Account No. 1CM247 to the David Account in the amount of $686.   However, this

amount was not credited as principal into the David Account because this reported inter-account

transfer constituted fictitious profits.  Greenblatt Decl., Attach B. (Greenblatt Kamenstein

Report)  ¶¶ 20–21, 67, Exs 4A, 4F.  Not disputed that between December 27, 2004 and

December 11, 2008, there were two cash deposits via check and wire into the David Account in the aggregate amount of $113,600, all representing principal. *Id.* ¶ 68, Ex. 4F, Ex 3.

29.    There were no check deposits written to the LLC. Chaitman **Ex**. **U** [Check [JPMSAI0011455]]; *see e.g.* Chaitman **Ex**. **A** [Compl., Ex. B, Account No. 1CM913, Column 4].

**RESPONSE:**  Disputed.  The checks received from Defendants were deposited into the 703 Account.  After January 1, 2001, the 703 Account was owned by the LLC.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

**Withdrawals from the David Account**

30.    Throughout the life of the David Account, withdrawals were paid by checks drawn from the 509 Account paid by "Bernard L. Madoff" to "David R. Kamenstein." *See* Chaitman **Ex. AA** [Compilation of Withdrawal Checks for the David Account [multiple bates nos.]].

**RESPONSE:**  Not disputed that BLMIS sent checks from the 509 Account to Defendants.  Disputed that the account holder of the 509 Account was "Bernard L. Madoff" for all time periods.  The 509 Account was held in the name of Bernard L. Madoff until September 2002.  At that point, the account holder was changed to Bernard L. Madoff Investment Securities but BLMIS continued to use checks with "Bernard L. Madoff" listed as the holder.  Collura Decl., Attach. A (Collura Report) ¶ 25 n.9.  As of January 1, 2001, all assets of the sole proprietorship were transferred to the LLC, including the 509 Account and 703 Account.  These assets were owned by the LLC.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

31.     David never received any payments from the LLC. *See id.*

**RESPONSE:**  Disputed.  BLMIS operated as a "single enterprise."  Dubinsky Decl.,

Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206 ("BLMIS was a single

enterprise that operated three business units: (i) a proprietary trading business; (ii) a market-

making business; and (iii) an investment advisory business."); *BAM L.P. Decision* at 9 (finding

that "all of the assets and liabilities of the sole proprietorship, including the IA Business, were

transferred to BLMIS via the 2001 SEC Amended Form BD").  As of January 1, 2001, all assets

of the sole proprietorship were transferred to the LLC, including the 509 Account and 703

Account.  These assets were owned by the LLC.  Cremona Decl., Ex. 3 (2001 SEC Amended

Form BD).  Defendants received payments from BLMIS of customer money from the 703

Account for all withdrawals.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 340–350.


**Account No. 1CM914 (the "Carol Account")**

32.     The Trustee seeks to claw back withdrawals from the Carol Account totaling

$907,300. *See* Chaitman **Ex**. **A** [Compl., Ex. B, Account No. 1CM914, Column 10]. The Carol

Account was opened on January 3, 2005. There was an initial transfer into the Carol Account of

$3,146,642 from the David and Carol Account. *See* Chaitman **Ex. AI** [Letter dated December 23,

2004 to Jodi Crupi [AMF00250545]]; *see* Chaitman **Ex**. **AO** [Account Opening Documents

[AMF00278642-48]]; *see* Chaitman **Ex**. **AP** [Customer Statement dated December 31, 2004

[MDPTPP01931998]]; *see also* Chaitman **Ex**. **A** [Compl., Ex. B, Account No. 1CM914, Line 1].

**RESPONSE:**  Not disputed that the Trustee seeks to avoid and recover $907,300 in

withdrawals of fictitious profits from the Carol Account.  Not disputed that the Carol Account

was opened with an inter-account transfer from BLMIS Account No. 1CM247 in the amount of $3,146,642. Disputed that 1CM913 was opened on January 5, 2005; the reported transfer of $3,146,642 was reflected on the customer statements as occurring on December 27, 2004. However, due to the negative principal balance in BLMIS Account No. 1CM247, there was no principal available to be transferred and this reported inter-account transfer constituted fictitious profits. Greenblatt Decl., Attach. B (Greenblatt Kamenstein Report) ¶¶ 20–21, 55, Exs. 4A, 4E.

### Deposits into the Carol Account

33.      Three further deposits were made into the Carol Account: (1) a transfer in the amount of $686, dated January 31, 2005, from the David and Carol Account (*see* Chaitman **Ex**. **AQ** [Customer Statement dated January 31, 2005 [MDPTPP01932003]]; (2) a check in the amount of $13,600, dated June 11, 2007, from "Carol Kamenstein and David Kamenstein" to "Bernard L. Madoff Investments". This check was signed "Bernard L. Madoff Investments", endorsed "For Deposit Only Bernard L. Madoff" and was deposited into the 703 Account endorsed "Bernard L. Madoff Investments", stamped "For Deposit Only Bernard L. Madoff" and deposited into the 703 Account (*see* Chaitman **Ex**. **U** [Check [JPMSAI0011456]]; *see* Chaitman **Ex**. **W** [Deposit Ticket for the 703 Account [JPMSAI0011453]]; *see also* Chaitman **Ex**. **AM** [Letter dated June 11, 2007 from David to Jodi Crupi directing two deposits each in the amount of $13,600, one into the David Account and one into the Carol Account [10-04469_KAMENSTEIN_0000108]]; (3) a check wire transfer in the amount of $100,000, dated November 21, 2007. *See* Chaitman **Ex**. **AU** [703 Account Statement, November 2007 [JPMSAB0003858]]; *see also* Chaitman **Ex**. **A** [Compl., Ex. B, Account No. 1CM914].

**RESPONSE:**  Not disputed that on January 31, 2005, there was an inter-account transfer from BLMIS Account No. 1CM247 to the David Account in the amount of $686.   However, this amount was not credited as principal into the David Account because this reported inter-account transfer constituted fictitious profits.  Greenblatt Decl., Attach B. (Greenblatt Kamenstein Report)  ¶¶ 20–21, 56, Exs 4A, 4E.  Not disputed that between December 27, 2004 and December 11, 2008, there were two cash deposits via check and wire into the David Account in the aggregate amount of $113,600, all representing principal.  *Id.* ¶ 57, Ex 3.

34.    There were no check deposits written to the LLC. Chairman **Ex**. **U** [Check [JPMSAI0011456]]; *see e.g.* Chairman **Ex. A** [Compl., Ex. B, Account No. 1CM914, Column 4].

**RESPONSE:**  Disputed.  The checks received from Defendants were deposited into the 703 Account with other deposits of customer money.  After January 1, 2001, the 703 Account was owned by the LLC.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).  At all relevant times, the 703 and 509 Accounts were used for customer deposits and withdrawals—the business of the IA Business.  Collura Decl., Attach. A (Collura Report) ¶¶ 20–27; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure 52.

**Withdrawals from the Carol Account**

35.    Throughout the life of the Carol Account, withdrawals were paid by checks drawn from the 509 Account paid by "Bernard L. Madoff" to "Carol Kamenstein." *See* Chairman **Ex. Z** [Compilation of Withdrawal Checks for the Carol Account [multiple bates nos.]].

**RESPONSE:** Not disputed that BLMIS sent checks from the 509 Account to Defendants. Disputed that withdrawal checks were paid by checks drawn from the 509 Account "paid by 'Bernard L. Madoff." As of January 1, 2001, all assets of the sole proprietorship were transferred to the LLC, including the 509 Account and 703 Account. These assets were owned by the LLC. Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

36.     Carol never received any payments from the LLC. *See id.*

**RESPONSE:** Disputed. BLMIS operated as a "single enterprise." Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206 ("BLMIS was a single enterprise that operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business."); *BAM L.P. Decision* at 9 (finding that "all of the assets and liabilities of the sole proprietorship, including the IA Business, were transferred to BLMIS via the 2001 SEC Amended Form BD"). Defendants received payments from BLMIS of customer money from the 703 Account for all withdrawals. Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 340–350. As of January 1, 2001, all assets of the sole proprietorship were transferred to the LLC, including the 509 Account and 703 Account. These assets were owned by the LLC. Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

**Account No. 1CM597 (the "Sloan Trust Account")**

37.     The Trustee seeks to claw back withdrawals from the Sloan Trust Account totaling $527,400**.** *See* Chaitman **Ex**. **A** [Compl., Ex. B, Account No. 1CM597, Column 10]. The Sloan Trust Account was opened on August 23, 1999. Carol signed the account opening documents as Trustee, attaching a copy of the Trust Agreement for the Sloan Trust Chaitman

**Exs. AF** and **AH** [Account Opening Documents for the Sloan Trust Account and Trust

Agreement for the Sloan Trust [AMF00267767-811]]. There was an initial transfer into the Sloan

Trust Account of $1,782,331 from account number 1CM925, (the "Sloan and Tracy Account"),

on September 7, 1999. *See* Chaitman **Ex**. **AR** [Correspondence dated August 18, 1999 to Linda

Schoenheimer [MADTBB01977201]]; and note dated October 18, 1999 *See* Chaitman **Ex**. **AH**

[AMF00267768]]; *see* Chaitman **Ex**. **AS** [Customer Statement dated September 1999

[MDPTPP01693674]]; *see also* Chaitman **Ex**. **A** [Compl., Ex. B, Account No. 1CM597, Line 1].

    **RESPONSE:**  Disputed that Account Nos. 1CM597 was a trust account, as it was held in

the individual defendant's name— "Sloan G. Kamenstein"—in BLMIS's books and records—

not in the name of a trust.  All BLMIS-issued checks were made payable to Sloan, individually,

and none were made payable to either a trust or a trustee for the benefit of Sloan.  In addition,

Sloan, individually, signed and filed a customer claim for his BLMIS account.  Cremona Decl.,

at Ex. 15 (Sloan Kamenstein Customer Claim).  Not disputed that the Trustee seeks to avoid and

recover $527,400 in withdrawals of fictitious profits from Sloan's account.  Greenblatt Decl.,

Attach. B (Greenblatt Kamenstein Report) ¶¶ 47–48.  Not disputed that Sloan's account was

opened with an inter-account transfer from BLMIS Account No. 1CM925 in the amount of

$1,782,331 on September 7, 1999.  However, because there were a total of four inter-account

transfers from BLMIS Account 1CM295 to Sloan's and Tracy's accounts in the aggregate

amount of $3,564,663—when BLMIS Account 1CM295 had only $2,914,315[7] of principal that

could be transferred at that time— Sloan's account was only credited with $1,457,157 of

principal, representing 50% of the total available principal.  *See id.*  ¶¶ 28–29, 43, Exs 4B, 4D.

---

[7] Difference due to rounding.

**Deposits into the Sloan Trust Account**

38.     Two additional transfers were made into the Sloan Trust Account from the Sloan

and Tracy Account, the first on September 7, 1999 in the amount of $1 (*see id.*) and the second

on October 29, 1999 in the amount of $26. *See* Chaitman **Ex**. **AT** [Customer Statement dated

October 1999 [MDPTPP01693676]]; *see also* Chaitman **Ex**. **A** [Compl., Ex. B, Account No.

1CM597, Lines 2 and 3].

**RESPONSE:**  Not disputed that two additional inter-account transfers were made to

Sloan's account, but neither amount were credited as principal because the reported inter-account

transfers constituted fictitious profits.  Greenblatt Decl., Attach. B (Greenblatt Kamenstein

Report) ¶¶ 28–30, 43–44, Exs 4B, 4D.


39.     The Sloan Trust Account received additional deposits made by several check wire

transfers into the 703 Account (*see* Chaitman **Ex. N** [Compilation of 703 Account Statements

[multiple bates nos.]]; and by one check in the amount of $8,000, dated June 14, 2007, from

"Sloan Kamenstein" to "Bernard L. Madoff Investments". This check was endorsed "Bernard

Madoff Investments", stamped "For Deposit Only Bernard L. Madoff" and deposited into the

703 Account. *See* Chaitman **Ex**. **U** [Check [JPMSAI0011482]]; *see* Chaitman **Ex**. **W** [Deposit

Ticket for the 703 Account [JPMSAI0011481]]; *see* Chaitman **Ex. AU** [703 Account Statement,

June 2007 [JPMSAB0003679]]; *see also* Chaitman **Ex. A** [Compl.. Ex. B, Account No.

1CM597].

**RESPONSE:**  Not disputed that between September 7, 1999 and December 11, 2008,

Sloan's account reflected eight cash deposits via check and wires totaling $1,958,637 of

principal.  Greenblatt Decl., Attach. B (Greenblatt Kamenstein Report) ¶ 45.

40.      There were no check deposits written to the LLC. Chaitman **Ex**. **U** [Check

[JPMSAI0011482]]; *see e.g.* Chaitman **Ex**. **A** [Compl.. Ex. B, Account No. 1CM597, Column

4].

**RESPONSE:**  Disputed.  The checks received from Defendants were deposited into the

703 Account.  After January 1, 2001, the 703 Account was owned by the LLC.  Cremona Decl.,

Ex. 3 (2001 SEC Amended Form BD).  At all relevant times, the 703 and 509 Accounts were

used for customer deposits and withdrawals—the business of the IA Business.  Collura Decl.,

Attach. A (Collura Report) ¶¶ 20–27; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285,

Figure 52.

### Withdrawals from the Sloan Trust Account

41.      Throughout the life of the Sloan Trust Account, withdrawals were paid by checks

drawn on the 509 Account paid by "Bernard L. Madoff" to "Sloan G. Kamenstein." *See*

Chaitman **Ex. AB** [Compilation of Withdrawal Checks for the Sloan Trust Account [multiple

bates nos.]].

**RESPONSE:**  Not disputed that BLMIS sent checks from the 509 Account to

Defendants.  Disputed that withdrawal checks were paid by checks drawn from the 509 Account

"paid by 'Bernard L. Madoff."  As of January 1, 2001, all assets of the sole proprietorship were

transferred to the LLC, including the 509 Account and 703 Account.  These assets were owned

by the LLC.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

42.      Sloan never received any payments from the LLC. *See id*.

**RESPONSE:** Disputed.  Defendants received payments from BLMIS of customer money from the 703 Account for all withdrawals.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 340–350.  As of January 1, 2001, all assets of the sole proprietorship were transferred to the LLC, including the 509 Account and 703 Account.  These assets were owned by the LLC. Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

### Account No. 1CM596 (the "Tracy Trust Account")

43.     The Trustee seeks to claw back withdrawals from the Tracy Trust Account totaling $452,314**.** *See* Chaitman **Ex. A** [Compl., Ex. B, Account No. 1CM596, Column 10]. The Tracy Trust Account was opened on August 23, 1999. David signed the account opening documents as Trustee, attaching a copy of the Trust Agreement for the Tracy Trust. Chaitman **Exs. AE** and **AG** [Account Opening Documents for the Tracy Trust Account and Trust Agreement for the Tracy Trust [AMF00267661-696]]. There was an initial transfer into the Tracy Trust Account of $1,782,331 from the Sloan and Tracy Account, on September 7, 1999. *See* Chaitman **Ex. AR** [Correspondence dated August 18, 1999 to Linda Schoenheimer [MADTBB01977201]; and *see* Chaitman **Ex**. **AG** note dated October 18, 1999 [AMF00267653]]; *see* Chaitman **Ex. AV** [Customer Statement dated September 1999 [MDPTPP01692902]]; *see also* Chaitman **Ex**. **A** [Compl., Ex. B, Account No. 1CM596, Line 2].

**RESPONSE:** Disputed that Account No. 1CM596 was a trust account, as it was held in the individual defendant's name—"Tracy D. Kamenstein"—in BLMIS's books and records, not in the name of a trust.  All BLMIS-issued checks were made payable to Tracy, individually, and none were made payable to either a trust or to a trustee for the benefit of Tracy.  In addition, Tracy, individually, signed and filed a customer claim for her BLMIS account.  Cremona Decl.,

Ex. 15 (Tracy Kamenstein Customer Claim).  Not disputed that the Trustee seeks to avoid and

recover $452,314 in withdrawals of fictitious profits from Tracy's BLMIS account.  Greenblatt

Decl., Attach. B (Greenblatt Kamenstein Report)  ¶¶35–36.  Not disputed that Tracy's account

was opened with an inter-account transfer from BLMIS Account No. 1CM295 in the amount of

$1,782,331 on September 7, 1999.  However, because there were a total of four inter-account

transfers from BLMIS Account 1CM295 to Sloan's and Tracy's accounts in the aggregate

amount of $3,564,663—when BLMIS Account 1CM295 had only $2,914,315[8] of principal that

could be transferred at that time—Tracy's account was only credited with $1,457,157 of

principal, representing 50% of the total available principal.  *See id.* ¶¶ 28–29, 31, Exs 4B, 4C.

### Deposits into the Tracy Trust Account

44.      Two additional transfers were made into the Tracy Trust Account from the Sloan

and Tracy Account, the first on September 7, 1999 in the amount of $1 (*see id*.) and the second

on October 29, 1999 in the amount of $26. *See* Chaitman **Ex**. **AW** [Customer Statement dated

October 1999 [MDPTPP01692904]]; *see also* Chaitman **Ex**. **A** [Compl., Ex. B, Account No.

1CM596, Lines 1 and 3].

**RESPONSE:** Not disputed that two additional inter-account transfers the amounts of $1

and $26 were made to Tracy's account, but these amounts were not credited as principal because

the reported inter-account transfers constituted fictitious profits.  Greenblatt Decl., Attach. B

(Greenblatt Kamenstein Report) ¶¶ 28, 30, 32, Exs 4B, 4C.

---

[8] Difference due to rounding.

45.     The Tracy Trust Account received additional deposits made by several check wire

transfers into the 703 Account (*see* Chaitman Ex. **O** [Compilation of 703 Account Statements

[multiple bates nos.]]; and by two checks: (1) a check in the amount of $20,600, dated September

26, 2005 from Tracy Dara Kamenstein to Bernard Madoff. This check was endorsed by "Bernard

Madoff", stamped "For Deposit Only Bernard L. Madoff" and deposited into the 703 Account

(s*ee* Chaitman **Ex**. **U** [Check [JPMSAI0007847]]; *see* Chaitman **Ex**. **W** [Deposit Ticket for the

703 Account bearing the account holder Bernard L. Madoff reflecting check in the amount of

$20,600 [JPMSAI0007846]]; *see also* Chaitman **Ex. A** [Compl., Ex. B, Account No. 1CM596]);

and (2) a check in the amount of $87,747, dated June 15, 2006, and deposited into the 703

Account. *See* Chaitman **Ex**. **W** [Deposit Ticket for the 703 Account [ JPMSAI0009767]]; s*ee*

Chaitman **Ex**. **AX** [703 Account Statement, June 2006 [JPMSAB0002995]; *see* Chaitman **Ex**.

**AW** [Customer Statement, June 2006 [MDPTPP01693384]]; *see also* Chaitman **Ex. A** [Compl.,

Ex. B, Account No. 1CM596].

**RESPONSE:** Not disputed to the extent that the documents speak for themselves.

Between September 7, 1999 and December 11, 2008, Tracy's account reflected seven cash

deposits via checks and wires totaling $1,082,435 of principal.  Greenblatt Decl., Attach. B

(Greenblatt Kamenstein Report) ¶ 33.


46.     There were no check deposits written to the LLC. Chaitman **Ex**. **U** [Check

[JPMSAI0007847]]; *see* Chaitman **Ex**. **W** [Deposit Ticket [JPMSAI0009767]; *see e.g.* Chaitman

**Ex**. **A** [Compl., Ex. B, Account No. 1CM597, Column 4].

**RESPONSE:**  Disputed.  The checks received from Defendants were deposited into the

703 Account.  After January 1, 2001, the 703 Account was owned by the LLC.  Cremona Decl.,

Ex. 3 (2001 SEC Amended Form BD).  At all relevant times, the JPMorgan Accounts were used for customer deposits and withdrawals—the business of the IA Business.  Collura Decl., Attach. A (Collura Report) ¶¶ 20–27; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure 52.

### **Withdrawals from the Tracy Trust Account**

47.    Throughout the life of the Tracy Trust Account, withdrawals were paid by checks drawn from the 509 Account paid by "Bernard L. Madoff" to "Tracy D. Kamenstein." *See* Chaitman **Ex. AC** [Compilation of Withdrawal Checks for the Tracy Trust Account [multiple bates nos.]].

**RESPONSE:**  Not disputed that BLMIS sent checks from the 509 Account were made payable to "Tracy D. Kamenstein."  Disputed that the account holder of the 509 Account was "Bernard L. Madoff" for all time periods.  After January 1, 2001, the 703 Account was owned by the LLC.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).  At all relevant times, the 703 and 509 Accounts were used for customer deposits and withdrawals—the business of the IA Business.  Collura Decl., Attach. A (Collura Report) ¶¶ 20–27; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure 52.

48.    Tracy never received any payments from the LLC. *See id.*

**RESPONSE:**  Disputed.  BLMIS operated as a "single enterprise."  Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 36, 38; *see also Nelson*, 610 B.R. at 206 ("BLMIS was a single enterprise that operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business."); *BAM L.P. Decision* at 9 (finding

that "all of the assets and liabilities of the sole proprietorship, including the IA Business, were

transferred to BLMIS via the 2001 SEC Amended Form BD").  Defendants received payments

from BLMIS of customer money from the 703 Account for all withdrawals.  Dubinsky Decl.,

Attach. A (Dubinsky Report) ¶¶ 340–350.  As of January 1, 2001, all assets of the sole

proprietorship were transferred to the LLC, including the 509 Account and 703 Account.  These

assets were owned by the LLC.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).


**Management of the Kamenstein Accounts**

49.     Management of all of the Kamenstein Accounts was handled by David. *See*

Chaitman **Ex. AZ** [Compilation of Withdrawal Requests [multiple bates nos.]]; *see* Carol Dec.,

¶¶ 2, 4, 5; *see* David Dec., ¶¶ 6-12; *and see* Tracy Dec., ¶ 3.

**RESPONSE:**  Not disputed to the extent the documents speak for themselves.


50.     All communications on behalf of the Kamensteins with Madoff were from David.

*See* Chaitman **Ex. AZ** [Compilation of Withdrawal Requests [multiple bates nos.]]; *see* Carol

Dec., ¶¶ 2; *see* David Dec., ¶¶ 2, 3; *and see* Tracy Dec., ¶ 3, 4.

**RESPONSE:**  Disputed.  Tracy, as the BLMIS accountholder, made and signed a change

of address request for Account No. 1CM596 on March 21, 2005.  Cremona Decl., Ex. 16 (Tracy

Kamenstein Verification of Address Change).


51.     All requests for withdrawals from the Kamenstein Accounts were made by David.

*See* Chaitman **Ex. AZ** [Compilation of Withdrawal Requests [multiple bates nos.]]; *see* Carol

Dec., ¶¶ 2, 5; *see* David Dec., ¶¶ 2, 3, 6; *and see* Tracy Dec., ¶ 3, 4, 5, 8.

**RESPONSE:**  Not disputed to the extent the documents speak for the themselves.


52.      All instructions for depositing the funds from the withdrawals from the

Kamenstein Accounts were made by David. *See* Chaitman **Ex. AZ** [Compilation of Withdrawal

Requests [multiple bates nos.]]; *see* David Dec., ¶¶ 2, 3, 6-8.

**RESPONSE:**  Not disputed to the extent the documents speak for themselves.  All

checks from BLMIS representing a withdrawal from the Kamenstein Accounts were made

payable to the named accountholder.  For example, each of the 53 checks from BLMIS

representing a withdrawal from Tracy's account were made payable to "Tracy D. Kamenstein."

Collura Decl., Attach. B (Collura Kamenstein Report), Ex. 6; Cremona Decl., Ex. 17 (Jan. 6,

2000 BLMIS Check to Tracy Kamenstein).


53.      Typically, David would send correspondence to Madoff's office requesting four

withdrawals at a time; one from each of the Kamenstein Accounts. This correspondence would

include instructions to his book keeper for deposit of the withdrawal checks. *See* Chaitman **Ex.**

**AZ** [Compilation of Withdrawal Requests [multiple bates nos.]]; *see* David Dec., ¶¶ 6-8.

**RESPONSE:**  Not disputed to the extent the documents speak for themselves.  All

checks from BLMIS representing a withdrawal from the Kamenstein Accounts were made

payable to the named accountholder.  For example, each of the 53 checks from BLMIS

representing a withdrawal from Tracy's account were made payable to "Tracy D. Kamenstein."

Collura Decl., Attach. B (Collura Kamenstein Report), Ex. 6; Cremona Decl., Ex. 17 (Jan. 6,

2000 BLMIS Check to Tracy Kamenstein).

54.     David and Carol held a bank account at First Union Bank, which later became
Wachovia Bank, ending in 822. This account was nicknamed the "CKDK CAP Account." *See*
Chaitman **Ex. AZ** [Compilation of Withdrawal Requests [multiple bates nos.]]; *see* David Dec.,
¶¶ 10; *see* Chaitman **Ex. BA** [Letter dated November 13, 2001 to Jodi Crupi defining the account
ending in 822 as the David and Carol Kamenstein "CAP" account [AMF00250573]]; *see*
Chaitman **Ex. BB** [Report of Trustee's Expert, Lisa Collura ("Collura Report"): "Reconciliation
and Tracing Results" – Kamenstein Accounts, Ex. 6, fn. 6].

**RESPONSE:**  Not disputed.

55.     David and Carol included Sloan and Tracy's names on their bank accounts for
estate planning purposes only. Sloan and Tracy never accessed David and Carol's accounts. *See*
David Dec., ¶ 9; *and see* Tracy Dec., ¶ 6.

**RESPONSE:**  Not disputed that Tracy was a named owner of the CKDK CAP Account.
Disputed that Sloan and Tracy never had access to the CKDK CAP Account as they were joint
owners of the account.

56.     Over the course of time, withdrawal checks from all Kamenstein Accounts would
mainly be deposited into the CKDK CAP Account. *See* Chaitman **Exs. Z, AA, AB** and **AC**
[Withdrawal Checks dated January 5, 2004 from the David and Carol Account
[JPMSAF0019840-41]; from the Sloan Trust Account [JPMSAF0019848-49]; and from the
Tracy Trust Account [JPMSAF0019846-47]]; *see* David Dec., ¶ 7.

**RESPONSE:**  Not disputed that correspondence related to the cash withdrawals from the
Kamenstein Accounts during the Two-Year Period instructed that all or a portion of the cash

withdrawals be deposited into the CKDK CAP account.  Collura Decl., Attach. B (Expert Report

of Lisa M. Collura, CPA, CFE, CFF, dated June 14, 2019 ("Collura Kamenstein Report")) ¶¶

28–29.  All BLMIS-issued checks representing a withdrawal from Tracy's account were made

payable to "Tracy D. Kamenstein."  Collura Decl., Attach. B (Collura Kamenstein Report), Ex.

6; Cremona Decl., Ex. 17 (Jan. 6, 2000 BLMIS Check to Tracy Kamenstein).  All BLMIS-issued

checks representing a withdrawal from Sloan's account were made payable to "Sloan G.

Kamenstein."   Collura Decl., Attach. B (Collura Kamenstein Report), Ex. 6; Cremona Decl. Ex.

18 (Nov. 14, 2001 BLMIS Check to Sloan Kamenstein).


57.      As the Trustee has admitted, during the Clawback Period, all of the deposits were

put into the CKDK CAP Account. *See* Chaitman **Ex. AZ** [Compilation of Withdrawal Requests

[multiple bates nos.]]; *see* David Dec., ¶¶ 11-12; *see e.g.* Carol Dec., ¶¶ 7; *see* Chaitman **Ex. BB**

[Collura Report, Ex. 6].

**RESPONSE:**  Disputed.  Of the $2,987,100 in total cash withdrawals reflected on the

customer statements for the Kamenstein Accounts during the Two-Year Period, $2,876,300 went

to the CKDK CAP Account and $30,000 went to a bank account held by Sloan.  The remaining

$80,800 relating to four cash withdrawals from the Kamenstein Accounts dated July 2, 2008

could not be traced to any account number or account holder because of the absence of

Defendants' bank records.  Collura Decl., Attach. B (Collura Kamenstein Report) ¶ 30, n.14, and

Ex. 5.


58.      Even though, under the Trust Agreements, Tracy and Sloan were each to receive

the principal and income of the Trusts by age 36, *See* Chaitman **Ex**. **AE** at 7, Section E.1(c)


37

(Tracy Trust [AMF00267661-696 at 668]); *see* Chaitman **Ex**. **AF** at 8, Section E.1(c) (Sloan

Trust [AMF00267776-811 at 783]), David continued to manage each Trust and each Trust

Account as he always had previously. *See* David Dec., ¶ 3. The distributions were not made. *See*

David Dec., ¶¶ 3; *and see* Tracy Dec., ¶ 4; *see e.g.* Chaitman **Ex. A** [Compl., Ex. B, Account

Nos. 1CM596 and 1CM597]; *see* Chaitman **Ex. BB** [Collura Report, Ex. 6].

**RESPONSE:**  Not disputed that Tracy and Sloan did not receive the principal and

income of the Trusts by age 36, but this is immaterial to the Trustee's avoidance action.

Disputed that Account Nos. 1CM597 and 1CM596 were trust accounts, as they were held in the

individual defendants' names in BLMIS's books and records, "Sloan G. Kamenstein," and

"Tracy D. Kamenstein," respectively—not by trusts for their benefit.  All BLMIS-issued checks

were made payable to Sloan or Tracy, individually, and neither to a trust, nor a trustee for the

benefit of either Defendant.  In addition, Sloan and Tracy, individually, submitted customer

claims for their respective BLMIS accounts, which they each signed.   Cremona Decl., Ex. 15

(Sloan Kamenstein and Tracy Kamenstein Customer Claims).

### Tracy and the Tracy Trust Account

59.    Tracy had no involvement in the Tracy Trust Account nor did she receive the

benefit of any of the withdrawals from the Tracy Trust Account during the Clawback Period. *See*

Tracy Dec., ¶¶ 1, 4, 5, 8, 9; *see* David Dec., ¶¶ 6-8; 10-12.

**RESPONSE:**  Disputed.  Tracy was a customer of the IA Business and held BLMIS

Account No. 1CM596 in the name of "Tracy D. Kamenstein."  Ans. ¶¶ 10, 37, *Picard v.*

*Kamenstein*, Adv. Pro. No. 10-04669 (SMB) (Bankr. S.D.N.Y. Aug. 13, 2015), ECF No. 43;

Cremona Decl., Ex. 15 (Tracy Kamenstein Customer Claim).  The BLMIS account was held by

Tracy individually, with no reference to any trust.  *Id.*  Over the life of the account, the account

name never changed.  *Id.*  The only change requested was a change of address request signed and

submitted by Tracy on March 21, 2005.  Cremona Decl., Ex. 16 (Tracy Kamenstein Verification

of Address Change).  Each of the 53 checks from BLMIS representing a withdrawal from

Tracy's account were made payable to "Tracy D. Kamenstein."  Collura Decl., Attach. B

(Collura Kamenstein Report), Ex. 6; Cremona Decl., Ex. 17 (Jan. 6, 2000 BLMIS Check to

Tracy Kamenstein).  In conjunction with her ownership of the BLMIS account, Tracy executed

and filed customer claim number 000189 attempting to recover the balance on her last BLMIS

customer statement, listing herself as the accountholder for Account 1CM596.  Cremona Decl.,

Ex. 15 (Tracy Kamenstein Customer Claim).


60.     The withdrawal requests from David do not contain any instructions to deposit

any of the funds from the withdrawals from the Tracy Trust Account into any of Tracy's bank

accounts or to transfer any of the funds for the benefit of Tracy. *See* Chaitman **Ex. AZ**

[Compilation of Withdrawal Requests [multiple bates nos.]]; *see supra* at ¶¶ 56-57.

**RESPONSE:**  Disputed that David did not direct withdrawals to Tracy's bank accounts.

Defendants admit that the disputed transfers from Tracy's account in the Two-Year Period were

deposited in the CKDK CAP account held jointly by all four Defendants, including Tracy.

David Dec. ¶ 9 ("For estate planning purposes, all of our bank accounts bore all four of our

names, including those of our children. Carol and I always included Tracy and Sloan as owners

of our bank accounts so that, in the event of our death, they would have immediate access to our

funds."); Tracy Dec. ¶ 6 (same).  The Collura Kamenstein Report is not inconsistent with this

admission.  Bank records for this joint account were not produced by Defendants so Ms. Collura

relied on Defendants' customer files at BLMIS to identify the bank accountholders. Defendants'

admissions that Tracy was a joint accountholder confirm what the bank records would have

disclosed had Defendants not failed to produce them. Collura Decl., Attach. B (Collura

Kamenstein Report), ¶ 28, n.9, Ex. 6 n.6. Disputed that the withdrawals from the BLMIS

account held in Tracy's name were not for her benefit. Each of the 53 checks from BLMIS

representing a withdrawal from Tracy's account were made payable to "Tracy D. Kamenstein."

Collura Decl., Attach. B (Collura Kamenstein Report), Ex. 6; Cremona Decl., Ex. 17 (Jan. 6,

2000 BLMIS Check to Tracy Kamenstein). In conjunction with her ownership of the BLMIS

account, Tracy filed and signed customer claim number 000189 attempting to recover the

balance on her last BLMIS customer statement, listing herself as the accountholder for Account

1CM596. Cremona Decl., Ex. 15 (Tracy Kamenstein Customer Claim).


61.    The Trustee admits that none of the withdrawal checks from the Tracy Trust

Account were deposited into any of Tracy's bank accounts. *See* Chaitman **Ex. BB** [Collura

Report, at Ex. 6].

**RESPONSE:** Disputed. Defendants admit that the disputed transfers from Tracy's

account in the Two-Year Period were deposited in the CKDK CAP account held jointly by all

four Defendants, including Tracy. David Dec. ¶ 9 ("For estate planning purposes, all of our bank

accounts bore all four of our names, including those of our children. Carol and I always included

Tracy and Sloan as owners of our bank accounts so that, in the event of our death, they would

have immediate access to our funds."); Tracy Dec. ¶ 6 (same). The Collura Kamenstein Report

is not inconsistent with this admission. Bank records for this joint account were not produced by

Defendants so Ms. Collura relied on Defendants' customer files at BLMIS to identify the bank

accountholders.  Defendants' admissions that Tracy was a joint accountholder confirm what the

bank records would have disclosed had Defendants not failed to produce them.  Collura Decl.,

Attach. B (Collura Kamenstein Report), ¶ 28, n.9, Ex. 6 n.6.  In addition, each of the 53 checks

from BLMIS representing a withdrawal from Tracy's account were made payable to "Tracy D.

Kamenstein."  *Id.*; Cremona Decl., Ex. 17 (Jan. 6, 2000 BLMIS Check to Tracy Kamenstein).


62.    The Collura Report indicates that all of the withdrawals from the Kamenstein

Accounts during the Clawback Period were deposited into the CKDK CAP Account. *Id.* Collura

was unable to trace any of the withdrawals to Tracy. *Id.* The Trustee has no third-party records to

show that withdrawals from the Tracy Trust Account were received by Tracy during the

Clawback Period. *Id.*

**RESPONSE:**  Disputed that all of the withdrawals from the Kamenstein Accounts during

the Clawback Period were deposited into the CKDK CAP Account.  Disputed further that there

are no records to show withdrawals from Tracy's account were received by Tracy as all checks

for withdrawals were made payable to Tracy, individually, and Defendants admit that the

disputed transfers from Tracy's account in the Two-Year Period were deposited in the CKDK

CAP account held jointly by all four Defendants, including Tracy.  David Dec. ¶ 9 ("For estate

planning purposes, all of our bank accounts bore all four of our names, including those of our

children. Carol and I always included Tracy and Sloan as owners of our bank accounts so that, in

the event of our death, they would have immediate access to our funds."); Tracy Dec. ¶ 6 (same).

This is consistent with the Collura Kamenstein Report, in which Ms. Collura notes that bank

account records from the CKDK CAP account were not produced by Defendants and that she

could only identify the accountholders from the Defendants' customer files at BLMIS.  Collura

Decl., Attach. B (Collura Kamenstein Report), ¶ 28, n.9, Ex. 6 n.6.  In addition, each of the 53

checks from BLMIS representing a withdrawal from Tracy's account were made payable to

"Tracy D. Kamenstein."  *Id.*; Cremona Decl., Ex. 17 (Jan. 6, 2000 BLMIS Check to Tracy

Kamenstein).

## THE TRUSTEE'S COUNTERSTATEMENT OF MATERIAL FACTS

### I.      Background and the Trustee

1.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced an action in the United States District Court for the Southern District of New York.  Compl., *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 11, 2008), ECF No. 1.

2.      On December 11, 2008, the United States Government initiated a criminal action against Madoff for criminal violations of federal securities laws, including, *inter alia*, securities fraud, investment advisor fraud, and mail and wire fraud.  Compl., *United States v. Madoff*, No. 08-mj-02735 (S.D.N.Y. 2008), ECF No. 1.

3.      On December 15, 2008, under 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Application of SIPC at 10, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 5.  Thereafter, under 15 U.S.C. § 78eee(a)(4)(B), SIPC filed an application in the district court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by the Securities Investor Protection Act ("SIPA").  *Id.* at 2–3.

4.      Also, on December 15, 2008, the district court granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

> i.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C. § 78eee(b)(3);

      ii.  appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15
U.S.C. § 78eee(b)(3); and

      iii.  removed the case to the bankruptcy court pursuant to 15 U.S.C. § 78eee(b)(4).

Order, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4 ("SIPC

Liquidation Order").

5.      By orders dated December 23, 2008 and February 4, 2009, respectively, the

bankruptcy court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789

(SMB) (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 11; Order, *Sec. Inv'r Prot. Corp. v. Bernard

L. Madoff Inv. Sec. LLC*, Adv. Pro. No 08-01789 (SMB) (Bankr. S.D.N.Y. Feb. 4, 2009), ECF

No. 69.

6.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, the bankruptcy court substantively consolidated the chapter 7 estate of

Madoff into the SIPA Proceeding.  Involuntary Petition, *In re Bernard L. Madoff*, Adv. Pro. No.

09-11893 (SMB) (Bankr. S.D.N.Y. Apr. 13, 2009), ECF No. 1; Consent Order, *Sec. Inv'r Prot.

Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y.

June 9, 2009), ECF No. 252.

## II.    BLMIS Operated a Ponzi Scheme Through Its Investment Advisory Business

### A.    BLMIS's Business

7.      In January 1960, Bernard L. Madoff registered as a broker-dealer with the SEC.

He was assigned registrant number 8-8132.  Through that registration, the broker-dealer became

a member of SIPC when SIPA was enacted in 1970.  SIPC Liquidation Order; Cremona Decl.,

Ex. 1 (1959 SEC Form BD for Bernard L. Madoff dated Dec. 31, 1959 (PUBLIC0003607)).

8.       Beginning in 1960 and until January 1, 2001, BLMIS operated as a sole proprietorship.  Dubinsky Decl., Attach. A (Dubinsky Report)) ¶ 36.  During its existence, it operated under the names Bernard L. Madoff and Bernard L. Madoff Investment Securities and, after 2001, as Bernard L. Madoff Investment Securities LLC.  *Id.* ¶ 38.

9.       Effective as of January 1, 2001, BLMIS was registered as a New York single member limited liability company.  On January 12, 2001, BLMIS amended its SEC Form BD to reflect its change in corporate form from a sole proprietorship to a single member limited liability company and all the assets and liabilities of the sole proprietorship were transferred to the limited liability company.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

10.       In response to the direction in the SEC Amended Form BD to "[b]riefly describe details of the *succession* including any assets or liabilities not assumed by the *successor* [BLMIS]," (emphasis in original), Madoff replied:

> EFFECTIVE JANUARY 1, 2001, PREDECESSOR WILL TRANSFER TO SUCCESSOR ALL OF PREDECESSOR'S ASSETS AND LIABILITIES, RELATED TO PREDECESSOR'S BUSINESS. THE TRANSFER WILL NOT RESULT IN ANY CHANGE IN OWNERSHIP OR CONTROL.

Cremona Decl., Ex. 3 (2001 SEC Amended Form BD) at Question 5 (emphasis in original).  No assets or liabilities of the sole proprietorship were listed as "not assumed by the successor."  *Id.*

11.       Madoff further certified that no "accounts, funds, or securities of customers of the *applicant* are held or maintained by such other *person*, firm, or organization."  *Id.* at Question 8(c) (emphasis in original).

12.       In 2006, BLMIS registered as an investment advisor with the SEC claiming to have only 23 accounts and $11.7 billion in assets under management.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 39.

13.     BLMIS operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) the IA Business.  *Id.* ¶ 36.

14.     The proprietary trading business traded for its own account to make money for BLMIS.  *Id.* ¶¶ 36, 46.

15.     The market-making business made markets in certain stocks, bonds, warrants and rights.  *Id.*

16.     The proprietary trading and market-making businesses were referred to within BLMIS as "House 5." *Id.* ¶ 36.

17.     The IA Business was designed to purportedly trade stocks to buy equities and to buy options on behalf of its customer accounts.  *Id.* ¶¶ 41–44.

18.     The proprietary trading business, the market-making business, and the IA Business were units of BLMIS operated by Madoff.  *Id.* ¶¶ 36, 48.

**B.      BLMIS Was Not Trading Securities**

19.     Bruce Dubinsky, a forensic accountant with more than 30 years of experience in financial fraud investigations, was retained by the Trustee as an expert witness in this matter. Mr. Dubinsky conducted numerous analyses from which he concluded that BLMIS did not conduct any trading on behalf of its IA Business customers.  *Id.* at Section VI.A.

20.     At various times, BLMIS reported to its IA Business customers that the money they deposited with BLMIS was invested in investment strategies called the "convertible arbitrage" strategy or the "split-strike conversion" strategy.   BLMIS did not execute either strategy on behalf of its IA Business customers.  *Id.* ¶¶ 19–26; *see also* ¶¶ 41–44.

21.     Mr. Dubinsky analyzed BLMIS's execution of the convertible arbitrage strategy and determined that trading never occurred dating back to at least the 1970s.  *Id.* at Section VI.A.

(1)(a).

22.     By 1992, the IA Business changed its primary purported investment strategy to the split-strike conversion strategy.  *Id.* at Section VI.A.(1)(b), specifically ¶ 155.

23.     The split-strike conversion strategy, as purportedly executed by BLMIS, involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing treasury bills when the money was "out of the market."  The strategy was purportedly set up by BLMIS so that the purchase of put options and the sale of call options would create a collar around the stock to reduce the volatility of BLMIS's portfolio.  *Id.* ¶¶ 156–58.  BLMIS did not conduct this strategy on behalf of its customers.  *Id.* at Section VI.A.(1)(b).

24.     Mr. Dubinsky's analysis demonstrated that BLMIS did not conduct any trading on behalf of its IA Business customers based on (a) the impossible reported volume of equity trades; (b) the impossible equity and options trades reported outside the daily price range; (c) the low volatility in its reported daily trading performance compared to the actual market behavior and the performance achieved by BLMIS in the proprietary trading business unit as measured by the volume weighted average prices for its sales and purchases; (d) the consistently positive rates of returns that did not "mirror" the volatility of the markets; (e) a lack of any Depository Trust Corporation ("DTC") records to confirm the reported IA Business equity or treasury trades; and (f) a lack of Options Clearing Corporation ("OCC") records to confirm the reported IA Business options trades.  *Id.* at Section VI.A.(1)(c)(i)-(vi), A.(1)(e)(i)-(iv).

### i.     Volume of Equity Trades

25.     Mr. Dubinsky analyzed equity trades that the IA Business reportedly made in the split-strike conversion strategy between January 2000 and November 2008.  His analysis

compared the daily volumes for certain stocks reported as purchased or sold by the IA Business

on the aggregated customer statements with the actual market volumes sold as reported by

Bloomberg.  *Id.* ¶¶ 159–60.

26.    Mr. Dubinsky found many instances where the volume that BLMIS claimed to

have purchased or sold on behalf of all IA Business customers exceeded the volume of equities

traded for the entire market.  *Id.*

27.    For example, on July 14, 2000, the aggregated IA Business customer statements

reported purchases of 2,822,680 shares of AIG (as reflected in the column titled "IA Business

Purported Value"), but the total market volume that traded that day for all of AIG shares in the

market was only 1,692,800 (as reflected in the column titled "Actual Market Value").  Similarly,

the IA Business reported trading 17,709,440 shares of GE on September 13, 2000, but the total

market volume that traded all day for GE shares in the market was only 7,604,800.  *Id.* ¶ 159, Ex.

11 to Dubinsky Report ("Split-Strike Conversion IA Business Equity Volume Analysis,

Analyzed Time Period"); *see also* Ex. 12 to Dubinsky Report ("Split-Strike Conversion IA

Business Options Volume Analysis, Analyzed Time Period").

28.    Mr. Dubinsky concluded that BLMIS's trading in excess of market volumes

demonstrated that the IA Business did not trade on behalf of its customers.  *Id.* at Section

VI.A.(1)(c), ¶¶ 159–60, Exs. 11–12 to Dubinsky Report.

### ii.    Equity and Options Trades Priced Outside Daily Price Range

29.    For the analyzed period of 2000-2008, Mr. Dubinsky determined that there were

99,972 equity transactions executed outside the daily market traded price range.  The purported

prices for these transactions exceeded the daily high price by as much as $8.96 and were below

the daily low by as much as $105.04.  There was no evidence in the BLMIS books and records

that the almost 100,000 transactions were mistakes, and there were no DTC records evidencing

48

that the trades were actually executed. Mr. Dubinsky opined that equity trades that were reported as having been executed outside the daily price range of the entire U.S. equities market could not have occurred. *Id.* ¶¶ 161–62, Ex. 13 to Dubinsky Report ("Split-Strike Conversion IA Business Equity Price Analysis, Analyzed Time Period").

30.     Mr. Dubinsky performed the same analysis on options trades for the same time period and identified 34,501 options transactions traded outside of the daily price range. He found that the options traded above the daily high price by as much as $15.25 higher and by as much as $6.05 below the daily low price. Mr. Dubinsky opined, as with the equity trades, that the reported options trades purportedly executed outside the daily price range could not have occurred. *Id.* ¶¶ 164–66, Ex. 14 to Dubinsky Report ("Split-Strike Conversion IA Business Options Price Analysis, Analyzed Time Period").

### iii.    Volume Weighted Average Price Analysis

31.     The absence of actual trading was also reflected in the prices at which the IA Business purportedly bought and sold shares using the split-strike conversion strategy. Mr. Dubinsky conducted a Volume Weighted Average Price ("VWAP") analysis of the daily purchases and sales reported by the IA Business and the proprietary trading business. *Id.* ¶¶ 168–72.

32.     VWAP is a trading benchmark that gives the average price a security has traded throughout the day, based on both volume and price. The VWAP is a widely used industry benchmark that allows a firm to see how well its traders are doing compared to the rest of the market. *Id.* ¶¶ 168–69.

33.     Based on Mr. Dubinsky's analysis, he determined that the IA Business purportedly executed 83% of the daily buy transactions by share volume *below* the VWAP, and 72% of the daily sell transactions by share volume *above* the VWAP. In other words, BLMIS

had the uncanny ability to buy low and sell high at a remarkable rate compared to the rest of the market.  *Id.* ¶ 170.

34.    Mr. Dubinsky further compared the IA Business's purchase and sale of the same stock actually traded by the proprietary trading business on the same days.  The proprietary trading business matched average VWAP of traders.  The IA Business, however, consistently outperformed VWAP by such wide margins that it evidenced the fictitious nature of the trades. *Id.* ¶¶ 171–72.

35.    Mr. Dubinsky concluded that the unrealistic VWAP results demonstrated that the IA Business did not trade on behalf of its customers.  *Id.* ¶¶ 170–72.

### iv.    Annual Rates of Return

36.    To further test whether the IA Business engaged in trading, Mr. Dubinsky analyzed the volatility of the IA Business's reported average annual rate of return for the split-strike conversion strategy as compared with the volatility of the annual rate of return as reported by Bloomberg for the two major market indices, the S&P 100 Index and the Dow Jones Industrial Average (the "Dow Jones") from December 31, 1996 through December 11, 2008.  *Id.* ¶¶ 177–78.

37.    Because the IA Business's split-strike conversion strategy was supposedly engineered around the S&P 100, with a basket of stocks in the S&P 100 and using S&P index options, the IA Business's returns should have performed similarly to the S&P 100 Index.  In other words, if the market goes down, the returns should have gone down and vice versa.  *Id.* ¶ 177.

38.    Mr. Dubinsky's analysis showed, however, that the volatility in the IA Business rates of return did not mirror the volatility of the rates of returns of the major indices.  The IA Business rates of return stayed within a small range, generally between 10-12% for most years

and going up to 20% for the year of 1999.  *Id.* ¶¶ 178, 180.  The returns for the major market

indices ranged from a high of 31% to a low of -37% (specifically, the S&P 100 swinging widely

from a high of 31% to a low of -37%, and the Dow Jones from a high of 25% to a low of -34%).

*Id.* ¶ 179.

39.     While the returns available in the major indices went up and down, representing

the volatility in the market, the IA Business returns stayed steady for the twelve-year period

examined, never having a negative year or month (even throughout 2008).  *Id.* ¶¶ 180–81.

40.     Mr. Dubinsky concluded that the lack of volatility in the IA Business

demonstrated that the IA Business was not engaged in trading.  *Id.* ¶ 181.

> **v.      Securities Listed on the IA Business Customer Statements Did Not Reconcile with DTC Records**

41.     Mr. Dubinsky compared the trades purportedly executed for the customer

accounts in the IA Business with the records maintained by the DTC, an organization in the

United States that clears and settles equity transactions in the U.S. market.  *Id.* at Section

VI.A.(1)(e).

42.     When equity trades are recorded at the DTC it creates the official record of where

that stock is held.   The ownership of the stock can be confirmed with the DTC.  *Id.* ¶¶ 194–95.

43.     BLMIS had a single account with the DTC, the "646 account."    All equity trades

made by BLMIS should have been reflected in the DTC records pertaining to its account.  *Id.* ¶

209.

44.     Mr. Dubinsky's analysis confirmed that the securities that were cleared through

BLMIS's DTC account, the 646 account, were traded by the proprietary trading business.  No IA

Business trades were cleared through BLMIS's DTC account.  *Id.* ¶¶ 209–13.

45.     The proprietary trading business shares reflected in the DTC records matched the

BLMIS records evidencing those trades.  *Id.* ¶¶ 209, 211, 213.

46.     Mr. Dubinsky concluded that the proprietary trading business actually executed those trades in the marketplace, as confirmed by the DTC records.  For the IA Business, however, Mr. Dubinsky could not account for the stock purportedly traded for the customers in the IA Business in any DTC records.  *Id.* ¶ 209.

47.     Based on his analysis, Mr. Dubinsky concluded that the IA Business did not execute the equity trades reflected on the customer statements.  *Id.* ¶ 212.

48.     Because there were no records from the DTC showing that BLMIS owned the securities listed on the IA Business customer statements, BLMIS created fake DTC records for the IA Business.  Mr. Dubinsky discovered dozens of fake DTC screen inquiries to document purported trading activity of the IA Business.  *Id.* ¶¶ 199–208.

49.     BLMIS installed software on the IA Business computer system that recreated fake DTC reports that were meant to look like official reports.  *Id.* ¶¶ 206–07.

50.     Mr. Dubinsky explained that there would be no reason, if one were doing legitimate trading and had owned the stocks, to go into a computer system and write code that used form-printing software to print out a report that mimicked what the DTC puts out, because there would instead be a real DTC report.  *Id.* ¶ 208.  Mr. Dubinsky made this determination by examining the metadata of the fake DTC screens, the code embedded in the document to record characteristics of the document, including when it was created.  *Id.* ¶¶ 199–205.

51.     Based on Mr. Dubinsky's analysis of the DTC records, Mr. Dubinsky concluded that BLMIS was not trading equities for its IA Business customers.  *Id.* ¶ 208.

### vi.     Reported Options Trades Could Not be Reconciled to OCC Records

52.     The options purportedly executed for the customer accounts in the IA Business could not be reconciled with the records of the OCC, an organization that clears and settles

options transactions in the U.S. market. *Id.* ¶¶ 196–98.

53.     Mr. Dubinsky explained that BLMIS had a single account with the OCC, and the

IA Business purportedly traded S&P Index options ("OEX"), which are "proprietary options"

traded exclusively on the Chicago Board of Option Exchange ("CBOE").  These proprietary

options can only be traded on the CBOE, but there would be a record of them both from the

CBOE and the OCC. *Id.* ¶¶ 166, 219.

54.     Mr. Dubinsky reviewed the OCC records for the BLMIS account from October

31, 2002 through October 31, 2008.  Based on his review of those records, Mr. Dubinsky was

able to reconcile and confirm the options that were traded by the proprietary trading business but

could not account for the options purportedly traded for the customers in the IA Business. *Id.* ¶¶

220–21.  Mr. Dubinsky found that the options purportedly traded on behalf of the IA Business

customers, as recorded in the IA Business trading records, were not shown on OCC records and

were not cleared through the OCC. *Id.* ¶ 222.

55.     For example, on October 31, 2005, records for the proprietary trading business

and the OCC indicate that 20 options described as "S&P 100 INDEX November 590 Call" were

purchased and held by BLMIS.  The aggregate number of "S&P 100 INDEX NOVEMBER 590

CALL" options reported on IA Business customer statements for the same date totaled 658,342.

*Id.* ¶ 223.

56.     Based on his analyses, Mr. Dubinsky concluded that BLMIS did not conduct any

options trading on behalf of its IA Business customers. *Id.* ¶ 222.

### C.     The IA Business Had No Other Sources of Funds

57.     During at least the ten-year period before its collapse on December 11, 2008,

BLMIS primarily used three bank accounts for the IA Business: the 703 Account; JPMorgan

account #xxxxxxxxx1509 (the "509 Account", together with the 703 Account, the "JPMorgan

Accounts"); and Bankers Trust account #xx-xx0-599 (the "BT Account").  Dubinsky Decl.,

Attach. A (Dubinsky Report) ¶ 340 n.285; Declaration of Lisa M. Collura, dated August 28,

2020 ("Collura Decl."), Attach. A (Expert Report of Lisa M. Collura, CPA, CFE, CFF, dated

January 16, 2019 ("Collura Report")) ¶ 17.

58.    IA Business customers' cash deposits were deposited (and commingled) into the

703 Account.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura Decl., Attach. A

(Collura Report) ¶¶ 20–24.

59.    IA Business customer withdrawals were made through the JPMorgan Accounts

and the BT Account, which was a checking account entirely funded by the 703 Account during

the period for which bank records are available.  Collura Decl., Attach. A (Collura Report)

¶¶ 25–30.

60.    The JPMorgan Accounts were linked commercial business accounts.  The 509

Account was a controlled disbursement account that was entirely funded by the 703 Account.  *Id.*

¶ 25.  An analysis of the 703 Account showed that the money in that account consisted almost

entirely of customer deposits.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285;

Collura Decl., Attach. A (Collura Report) ¶ 27.

61.    Ninety-seven percent of all cash additions into the 703 Account came directly

from IA Business customers.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure

52; Collura Decl., Attach. A (Collura Report) ¶ 24, Figure 1.

62.    The other three percent of inflows into the 703 Account came from income earned

on (1) short-term investment activity made directly from the 703 Account (including overnight

sweeps, overnight deposits, commercial paper, Certificates of Deposit and Treasury Bills); and

(2) investments of BLMIS customer funds made through bank and brokerage accounts held in

the name of BLMIS or Madoff.  Collura Decl., Attach. A (Collura Report) ¶¶ 45–62; Dubinsky

Decl., Attach. A (Dubinsky Report) Figure 52 & n.286.

63.     Because the short-term investments, including overnight sweeps, were made

directly out of the 703 Account, the source of the money for those investments was customer

funds.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura Decl., Attach. A (Collura

Report) ¶¶ 24, 46–47.

64.     There were no inflows into the 703 Account from sales of securities for customer

accounts.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura Decl., Attach. A

(Collura Report) ¶¶ 24, 32.

65.     There were no outflows from the 703 Account to purchase securities for customer

accounts.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 350; Collura Decl., Attach. A

(Collura Report) ¶ 32.

66.     Apart from two short-term loans BLMIS received from JPMorgan totaling $145

million in November 2005 and January 2006—both of which were repaid by June 2006—the IA

Business did not obtain loans from third parties or from the proprietary trading and market-

making businesses sufficient to pay the IA Business customer withdrawals.  Dubinsky Decl.,

Attach. A (Dubinsky Report) ¶¶ 341–44.

67.     The IA Business also did not receive payments of any cash dividends.  According

to the customer statements, the IA Business reported that it received cash dividends related to

purported trading and paid or credited them to the accountholders.  Between 1998 and 2008,

BLMIS reported that it had paid or credited its customers $4.3 billion in cash dividends.  *Id.*

¶¶ 247–55.

68.     Of the more than 8,300 IA Business dividend transactions identified on the

customer account statements from 1998 to 2008, not one purported dividend payment matched to a cash addition to the 703 Account. *Id. ¶¶* 253–54.

69.     There is no record of any dividends being received by the IA business. *Id. ¶* 248.

70.     The IA Business did not have any legitimate income-producing activities. The only source of cash available for the IA Business to pay purported investment profits as well as redemption requests from its customers was from cash that other IA Business customers deposited in the 703 Account. *Id. ¶¶* 330–37.

71.     These transactions rendered BLMIS insolvent. By no later than December 2002, its assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion. *Id.* at Section VII., *¶¶* 432–33, Table 13.

72.     In December 2008, BLMIS's capital had dwindled to the point where customer redemptions or withdrawal requests grossly exceeded the amounts it had on hand. The customer property on hand at BLMIS as of December 11, 2008 was not sufficient to pay the claims of its customers. *Id. ¶¶* 40, 440–41.

> ### i.      The Transfers Were Made by Bernard L. Madoff Investment Securities LLC

73.     BLMIS operated as a sole proprietorship prior to 2001. In January 2001, the sole proprietorship was converted to a single member LLC, using the same SEC registrant number, 8-8132. Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

74.     The bank statements for the JPMorgan Accounts listed the account holder as "Bernard L. Madoff" from December 1998 to September 2002, when the name was changed to "Bernard L. Madoff Investment Securities." Collura Decl., Attach. A (Collura Report) ¶¶ 20 n.7, 25 n.9.

75.     For the time period for which bank records were available (December 1998

through December 2008), the JPMorgan Accounts were used for customer deposits and

withdrawals—the business of the IA Business.  Collura Decl., Attach. A (Collura Report) ¶¶ 20–

27; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure 52.

76.     For the time period for which bank records were available, the face of the bank

statements for the JPMorgan Accounts showed they were designated as "Commercial Checking"

accounts.  The statements were addressed to the attention of either Tony Tiletnick, a BLMIS

employee, or Daniel Bonventre, BLMIS's operations manager, at the BLMIS business address at

885 Third Avenue, New York, New York.  None of the statements were addressed to Madoff

personally.  Cremona Decl., Ex. 5 (Exemplar BLMIS Bank Statements 1998-2008); Dubinsky

Decl., Attach. A (Dubinsky Report) ¶ 340, Exs. 31–32.

77.     At all times after January 1, 2001, the JPMorgan Accounts were owned by

BLMIS.  Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

### D.     The Plea Allocutions

78.     The plea allocutions of Madoff and BLMIS employees Frank DiPascali, David

Kugel, Irwin Lipkin, and Eric Lipkin, attached as Exhibits 7–12 to the Cremona Decl., further

establish that BLMIS did not conduct legitimate operations from its IA Business.

**Bernard L. Madoff**

79.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*,

No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal action filed against him by

the United States Attorney for the Southern District of New York.  Plea Allocution of Bernard L.

Madoff, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (the "Madoff

Allocution"), ECF No. 57 (attached as Exhibit 7 to Cremona Decl.).

80.     At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the

investment advisory side of [BLMIS]."  Cremona Decl., Ex. 7 (Madoff Allocution) at 23:14–23;

31:25–32:1.

81.    Madoff further testified at the plea hearing that he never invested his clients' funds

in securities, that he used funds on hand in the JP Morgan account to pay customer redemptions,

and that he created false trading confirmations and client account statements to cover up the fact

that he had not executed trades on behalf of BLMIS investment advisory clients.  Madoff stated:

> The essence of my scheme was that I represented to clients and prospective clients
> who wished to open investment advisory and individual trading accounts with me
> that I would invest their money in shares of common stock, options, and other
> securities of large well-known corporations, and upon request, would return to them
> their profits and principal.  Those representations were false for many years.  Up
> until I was arrested on December 11, 2008, I never invested these funds in the
> securities, as I had promised.  Instead, those funds were deposited in a bank account
> at Chase Manhattan Bank.  When clients wished to receive the profits they believed
> they had earned with me or to redeem their principal, I used the money in the Chase
> Manhattan bank account that belonged to them or other clients to pay the requested
> funds.  The victims of my scheme included individuals, charitable organizations,
> trusts, pension funds, and hedge funds.

*Id.* at 24:9–24.

82.    Beginning in the early 1990s, Madoff represented to IA Business customers that he

was using a split strike conversion strategy based on blue-chip securities.  *Id.* at 25:18–24.

83.    Madoff further detailed his strategy as follows:

> Through the split strike conversion strategy I promised to clients and prospective
> clients that client funds would be invested in a basket of common stocks within the
> Standard & Poors 100 index, a collection of the 100 largest publicly-traded
> companies in terms of their market capitalization.  I promised that I would select a
> basket of stocks that would closely mimic the price movements of the Standard &
> Poors 100 index. I promised that I would opportunistically time those purchases
> and would be out of the market intermittently, investing client funds during these
> periods in United States Government-issued securities, such as United States
> Treasury bills.  In addition, I promised that as part of the split strike conversion
> strategy, I would hedge the investments I made in the basket of common stocks by
> using client funds to buy and sell option contracts related to those stocks, thereby
> limiting the potential client losses caused by unpredictable changes in stock prices.
> In fact, I never made those investments I promised clients, who believed they were
> invested with me in the split strike conversion strategy.

*Id.* at 25:25–26:18.

84.    BLMIS investment advisory customers received account statements from BLMIS

that purported to reflect securities transactions and investment returns that appeared as though their

investments with BLMIS were profitable.  Madoff explained:

> To further cover up the fact that I had not executed trades on behalf of my
> investment advisory clients, I knowingly caused false trading confirmations and
> client account statements that reflected the bogus transactions and positions to be
> created and sent to clients purportedly involved in the split strike conversion
> strategy, as well as other individual clients I defrauded who believed they had
> invested in securities through me.

*Id.* at 27:9–16.

85.    Madoff stated that the proprietary trading and market-making businesses were

engaged in legitimate trading.  *Id.* at 25:6–11.

86.    Madoff also stated that funds from his investment advisory business were

transferred to the proprietary trading and market-making businesses, via his affiliated London

entity.  *Id.* at 29:12–22.

**Frank DiPascali**

87.    At a plea hearing on August 11, 2009, in the case captioned *United States v.
DiPascali*, No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to

a ten-count criminal action charging him with participating in and conspiring to perpetuate the

Ponzi scheme.  Plea Allocution of Frank DiPascali, Jr., *United States v. DiPascali*, No. 09-CR-

764 (RJS) (S.D.N.Y. Aug. 11, 2009) (the "DiPascali Allocution"), ECF No. 12 (attached as

Exhibit 8 to Cremona Decl.).  Mr. DiPascali confirmed Madoff's explanation of the split-strike

conversion strategy and that BLMIS never engaged in the strategy or executed the purported

trades reported on customer statements.  DiPascali stated:

> By the early 1990s Bernie Madoff had stable clients whose accounts he managed
> as an investment adviser.  He attracted a lot of these clients by telling them that the
> firm would apply a hedged investment strategy to their money.  The clients were
> told that the strategy involved purchasing what we call basket of blue chip common

stocks. Hedging those investments by buying and selling option contracts, getting in and out of the market at opportune times and investing in government securities at other times. . . . From at least the early 1990s through December of 2008, there was one simple fact that Bernie Madoff knew, that I knew, and that other people knew but that we never told the clients nor did we tell the regulators like the SEC. No purchases of [sic] sales of securities were actually taking place in their accounts. It was all fake. It was all fictitious. It was wrong and I knew it was wrong at the time, sir.

Cremona Decl., Ex. 8 (DiPascali Allocution) at 45:21–46:15.

88.    At the plea hearing, DiPascali testified that he had been instructed to falsely

represent to clients that security trading was occurring in their investment accounts when in fact,

no trades were being made. DiPascali explained:

> From our office in Manhattan at Bernie Madoff's direction, and together with others, I represented to hundreds, if not thousands, of clients that security trades were being placed in their accounts when in fact no trades were taking place at all.

*Id.* at 46:21–25.

> ***Most of the time the clients' money just simply went into a bank account in New York that Bernie Madoff controlled. Between the early '90s and December '08 at Bernie Madoff's direction, and together with others, I did [the] follow[ing] things: On a regular basis I told clients over the phones and using wires that transactions on national securities exchanges were taking place in their account when I knew that no such transactions were indeed taking place. I also took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place and to perpetuate the illusion that they actually were. On a regular basis I used hindsight to file historical prices on stocks then I used those prices to post purchase of sales to customer accounts as if they had been executed in realtime. On a regular basis I added fictitious trade data to account statements of certain clients to reflect the specific rate of earn return that Bernie Madoff had directed for that client.

*Id.* at 47:5–22.

> ***… I knew no trades were happening. I knew I was participating in a fraudulent scheme. I knew what was happening was criminal and I did it anyway.

*Id.* at 52:2–5.

**David Kugel**

89.    At a plea hearing on November 21, 2011, in the case captioned *United States v.*

*Kugel*, No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal action charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Plea Allocution of David L. Kugel, *United States v. Kugel*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011) (the "Kugel Allocution"), ECF No. 188 (attached as Exhibit 9 to Cremona Decl.).

90.     As far as back as the 1970s, there is no evidence that the purported investment transactions reflected in the customer statements of BLMIS's IA Business customers  ever occurred, and in fact the evidence reveals that those transactions did not and could not have occurred.  Cremona Decl., Ex. 9 (Kugel Allocution) at 32:4–12 ("Specifically, beginning the early '70s, until the collapse of BLMIS in December 2008, I helped create fake, backdated trades. I provided historical trade information . . . to create fake trades that, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred.").

**Irwin Lipkin**

91.     At a plea hearing on November 8, 2012, in the case captioned *United States v. Irwin Lipkin*, No. 10-CR-228 (LTS), Irwin Lipkin, a former BLMIS accountant, pleaded guilty to a two-count criminal action charging him with securities fraud, falsifying the records of BLMIS, and making false statements in relation to documents required by ERISA.  Plea Allocution of Irwin Lipkin, *United States v. Irwin Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 8, 2012) (the "Irwin Lipkin Allocution"), ECF No. 288 (attached as Exhibit 10 to Cremona Decl.).  Mr. Lipkin admitted that BLMIS's revenue was falsely inflated through fraudulent bookkeeping entries and annual audited reports.  Cremona Decl., Ex. 10 (Irwin Lipkin Allocution) at 30:23–31:3, 31:10–18, 31:24–32:5.

**Eric S. Lipkin**

92.     At a plea hearing on June 6, 2011, in the case captioned *United States v. Eric S. Lipkin*, No. 10-CR-228 (LTS), Eric Lipkin, a former BLMIS payroll clerk, pleaded guilty to a six-count criminal action charging him with bank fraud, falsifying the records of BLMIS, conspiracy, and making false statements to facilitate a theft concerning ERISA.  Plea Allocution of Eric S. Lipkin, *United States v. Eric S. Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. June 6, 2011) (the "Eric Lipkin Allocution"), ECF No. 148 (attached as Exhibit 11 to Cremona Decl.).

93.     Mr. Eric Lipkin admitted that BLMIS created fake reports that replicated those of the DTC, which provides clearance for nearly all equity, bond, government securities, mortgage-backed securities, money market instruments, and over-the-counter derivative transactions in the U.S. Market.  The purpose of these fake DTC reports was to purportedly confirm non-existent positions in the IA accounts, and the fake reports were given to auditors and the SEC to mislead them.  Cremona Decl., Ex. 11 (Eric Lipkin Allocution) at 32:4–10, 33:22–34:8.

**Enrica Cotellessa-Pitz**

94.     At a plea hearing on December 19, 2011, in the case captioned *United States v. Cotellessa-Pitz,* No. 10-CR-228 (LTS), Enrica Cotellessa-Pitz, a former BLMIS accountant and comptroller, pleaded guilty to a four-count criminal action charging her with conspiracy to falsify the records of BLMIS, conspiracy to obstruct the IRS in the collection of income taxes, and conspiracy to make false filings with the SEC.  Plea Allocution of Enrica Cotellessa-Pitz, *United States v. Cotellessa-Pitz*, No. 10-CR-228 (LTS) (S.D.N.Y. Dec. 19, 2011) (the "Cotellessa-Pitz Allocution"), ECF No. 1512 (attached as Exhibit 12 to Cremona Decl.).

95.     Ms. Cotellessa-Pitz admitted that IA Business customer money was funneled to BLMIS's proprietary trading and market-making businesses to falsely inflate their revenue and

hide their losses.  Cremona Decl., Ex. 12 (Cotellessa-Pitz Allocution) at 31:12–32:12.

## III.    The Kamenstein Accounts[9]

### A.    The Carol Account

96.    Defendant Carol L. Kamenstein ("Carol") is a resident of West Palm Beach,

Florida.  Ans. ¶ 7, *Picard v. Kamenstein*, Adv. Pro. No. 10-04469 (SMB) (Bankr. S.D.N.Y. Aug.

13, 2015), ECF No. 43.[10]

97.    Carol was a customer of the IA Business and held BLMIS Account No. 1CM914

(the "Carol Account") in the name of "Carol Kamenstein" *Id.* ¶¶ 7, 37; *see also* Ex. B to Compl.,

ECF No. 1.

98.    Carol does not dispute the deposits and withdrawals as reflected on Exhibit B to

the Complaint from December 11, 2006 to December 11, 2008.  Cremona Decl., Ex. 13 (Second

Amended Responses and Objections of Defendants Carol L. Kamenstein, David R. Kamenstein,

Sloan G. Kamenstein, and Tracy D. Kamenstein to Trustee's First Set of Interrogatories dated

May 18, 2017 No. 9); *see also* Ex. B to Compl., ECF No. 1.

99.    On February 22, 2017, David testified that the withdrawals from BLMIS for the

Carol Account between December 27, 2004 to December 2, 2008 (the date of the last

withdrawal) are accurately reflected on Exhibit B to the Complaint.  Cremona Decl., Ex. 14

(Defendant David R. Kamenstein Dep. Tr.) at 91:15–18.

### B.    The David Account

100.    Defendant David R. Kamenstein ("David") is a resident of West Palm Beach,

---

[9] The Kamenstein Accounts refer to four BLMIS accounts held by Defendants: Carol Account (No. 1CM914), David Account (No. 1CM913), Sloan Account (No. 1CM597), and the Tracy Account (No. 1CM596).  A fifth BLMIS account (No. 1CM247) in the name "David R. Kamenstein & Carol Kamenstein J/T WROS" was excluded as there were no cash withdrawals within the Two-Year Period.  *See* Ex. B to Compl., ECF No. 1.

[10] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Kamenstein*, Adv. Pro. No. 10-04469 (CGM) (Bankr. S.D.N.Y.).

Florida.  Ans. ¶ 8, ECF No. 43.

101.    David was a customer of the IA Business and held BLMIS Account No. 1CM913 (the "David Account") in the name of "David R. Kamenstein."  *Id.* ¶¶ 8, 37; *see also* Ex. B to Compl., ECF No. 1.

102.    David does not dispute the deposits and withdrawals as reflected on Exhibit B to the Complaint from December 11, 2006 to December 11, 2008.  Cremona Decl., Ex. 13 (Second Amended Responses and Objections of Defendants Carol L. Kamenstein, David R. Kamenstein, Sloan G. Kamenstein, and Tracy D. Kamenstein to Trustee's First Set of Interrogatories dated May 18, 2017 No. 9); *see also* Ex. B to Compl.

103.    On February 22, 2017, David testified that the withdrawals from BLMIS for the David Account between December 27, 2004 to December 2, 2008 (the date of the last withdrawal) are accurately reflected on Exhibit B to the Complaint.  Cremona Decl., Ex. 14 (Defendant David R. Kamenstein Dep. Tr.) at 91:15–18.

C.    **The Sloan Account**

104.    Defendant Sloan G. Kamenstein ("Sloan") is a resident of Palm Beach, Florida. Ans. ¶ 9, ECF No. 43.

105.    Sloan was a customer of the IA Business and held BLMIS Account No. 1CM597 (the "Sloan Account") in the name of "Sloan G. Kamenstein."  *Id.* ¶¶ 9, 37; *see also* Ex. B to Compl., ECF No. 1.

106.    Sloan does not dispute the deposits and withdrawals as reflected on Exhibit B to the Complaint from December 11, 2006 to December 11, 2008.  Cremona Decl., Ex. 13 (Second Amended Responses and Objections of Defendants Carol L. Kamenstein, David R. Kamenstein, Sloan G. Kamenstein, and Tracy D. Kamenstein to Trustee's First Set of Interrogatories dated May 18, 2017 No. 9); *see also* Ex. B to Compl.

107.    On February 22, 2017, David testified that the withdrawals from BLMIS for the

Sloan Account between September 7, 1999 and December 2, 2008 (the date of the last

withdrawal) are accurately reflected on Exhibit B to the Complaint.  Cremona Decl., Ex. 14

(Defendant David R. Kamenstein Dep. Tr.) at 91:15–18.

### D.    The Tracy Account

108.    Defendant Tracy D. Kamenstein ("Tracy") is a resident of Palm Beach, Florida.

Ans. ¶ 10, ECF No. 43.

109.    Tracy was a customer of the IA Business and held BLMIS Account No. 1CM596

(the "Tracy Account") in the name of "Tracy D. Kamenstein."  *Id.* ¶¶ 10, 37; *see also* Ex. B to

Compl., ECF No. 1.

110.    On March 21, 2005, Tracy signed and submitted to BLMIS a change of address

request for "future mailings, account statements, checks" from BLMIS.  Cremona Decl., Ex. 16

(Tracy Kamenstein Verification of Address Change).

111.    Tracy does not dispute the deposits and withdrawals as reflected on Exhibit B to

the Complaint from December 11, 2006 to December 11, 2008.  Cremona Decl., Ex. 13

(Second Amended Responses and Objections of Defendants Carol L. Kamenstein, David R.

Kamenstein, Sloan G. Kamenstein, and Tracy D. Kamenstein to Trustee's First Set of

Interrogatories dated May 18, 2017  No. 9); *see also* Ex. B to Compl.

112.    On February 22, 2017, David testified that the withdrawals from BLMIS for the

Tracy Account between September 7, 1999 and December 2, 2008 (the date of the last

withdrawal) are accurately reflected on Exhibit B to the Complaint.  Cremona Decl., Ex. 14

(Defendant David R. Kamenstein Dep. Tr.) at 91:15–18.

## IV.    Analysis of the Kamenstein Accounts

113.    Lisa Collura was retained by the Trustee to reconcile the cash transactions

reflected on the statements of all BLMIS customer accounts with available records and trace the flow of those funds for the Kamenstein Defendants. Collura Decl., Attach. A (Collura Report) ¶ 7; Collura Decl., Attach. B (Expert Report of Lisa M. Collura, CPA, CFE, CFF, dated June 14, 2019 ("Collura Kamenstein Report")) ¶ 6.

114.    For both reconciliation and tracing analyses, Ms. Collura reviewed available third-party bank records. These bank records include hundreds of thousands of pages of BLMIS bank statements, wire transfer data, cancelled checks, and deposit slips. Collura Decl., Attach. A (Collura Report) ¶ 10.

115.    The reconciliation of the customer statements and bank records was conducted to determine whether the cash transactions on the BLMIS customer statements were accurately reflected as cash transactions—cash deposits or cash withdrawals. *Id.* ¶¶ 10, 15, 31.

116.    Ms. Collura confirmed that the deposit and withdrawal transactions identified on the BLMIS customer statements corresponded to transactions on the available third-party bank records in the same amount, on or around the same date, and to or for the benefit of the same customer. *Id.* ¶ 22; Collura Decl., Attach. B (Collura Kamenstein Report) ¶ 13.

117.    Ms. Collura reviewed over 225,000 transactions on the customer statements, and over 150,000 transactions on the bank records. Collura Decl., Attach. A (Collura Report) ¶¶ 10, 15. She kept track of these transactions by assigning a unique identifier to each of the cash transactions on the customer statements and a different unique identifying number to all of the transactions in the bank records. *Id.* ¶¶ 10, 23.

118.    Of the over 225,000 transactions reflected on BLMIS customer statements from December 1998 to December 2008, Ms. Collura was able to reconcile 99.01% of these cash transactions to BLMIS bank records. *Id.* ¶¶ 15, 31.

119.    For Ms. Collura's reconciliation analysis with respect to Defendants, she analyzed the cash transactions in the Kamenstein Accounts from September 1999 to December 2008. During this time period, the customer statements for the Kamenstein Account reflected 206 cash deposit and withdrawal transactions.  Collura Decl., Attach. B (Collura Kamenstein Report) ¶¶ 14.

120.    She reconciled all 206 cash transactions reflected on the customer statements for the Kamenstein Accounts to available BLMIS bank records, documentation contained in BLMIS customer files, and/or documents produced to the Trustee related to the Kamenstein Accounts. *Id*. ¶¶ 14–21; *see also* Ex. B. to Compl.

121.    Based on her review of documents contained in the customer files maintained at BLMIS for the Kamenstein Accounts, Ms. Collura did not find any instance of the Defendants communicating to BLMIS any disagreement with respect to the accuracy of any cash transaction reflected on the customer statements for the Kamenstein Accounts.  Collura Decl., Attach. B (Collura Kamenstein Report) ¶¶ 13, 22.

122.    For Ms. Collura's tracing analysis with respect to the Defendants, she analyzed 84 cash withdrawals from the Kamenstein Accounts during the two years prior to December 11, 2008 (the "Two-Year Period") totaling $2,987,100.   *Id*. ¶¶ 23–26, Exs. 5–6.

123.    Based on available bank records from BLMIS, bank records produced to the Trustee by Wells Fargo Bank, and correspondence related to the cash withdrawals from the Kamenstein Accounts produced to the Trustee by Defendants, Collura concluded that of the $2,987,100, the total amount of cash withdrawals reflected on the customer statements for the Kamenstein Accounts during the Two-Year Period, $2,876,300 went to a bank account held jointly by all four Defendants, and $30,000 went to a bank account held solely by Sloan.  The

remaining $80,800 relating to four cash withdrawals from the Kamenstein Accounts dated July

2, 2008 could not be traced to any account number or account holder.  *Id.*  ¶¶ 28–30, and Exs. 5–

6.

124.    Matthew Greenblatt oversaw the task of reconstructing BLMIS's books and

records and calculating the principal balance for each BLMIS account (the "Principal Balance

Calculation").  Mr. Greenblatt calculated the ending principal balance by applying the Net

Investment Method (the Trustee's cash in/cash out net equity methodology), which takes into

account all of the customer deposits as additions to principal and all of the customer withdrawals

or inter-account transfers as reductions to principal.  Declaration of Matthew B. Greenblatt, dated

August 28, 2020 ("Greenblatt Decl."), Attach. A (Expert Report of Matthew G. Greenblatt,

CPA/CFF, CFE dated November 15, 2012 ("Greenblatt Report")) ¶¶ 4–5, 13–19; *see also Sec.*

*Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec.)*, 424

B.R. 122 (Bankr. S.D.N.Y. 2010).

125.    Mr. Greenblatt prepared a chronological listing of cash and principal transactions

reflected in the BLMIS customer statements.  Greenblatt Decl., Attach. A (Greenblatt Report)

¶¶ 13–15.  Mr. Greenblatt relied on the customer statements because they are the most

comprehensive and complete accounting of the debtor's books and records with respect to

transaction-by-transaction line item detail of the cash and principal transactions and because the

customer statements were sent to customers, giving customers the opportunity to correct errors

on the statements.  Greenblatt Decl., Attach. A (Greenblatt Report) ¶¶ 40–43, Exs. 3–4.

126.    The first monthly customer statement which reported dollar amounts for any

securities allegedly held at month end was March of 1981.  Therefore, the full period in which

the Principal Balance Calculation could be performed covered the 27-year period for which

customer statements were available in the BLMIS books and records—the time period from

April 1, 1981 through December 11, 2008.  *Id.* ¶ 5 n.1.

127.    For Mr. Greenblatt's analysis with respect to Defendants, his Principal Balance

Calculation covered the period from the Kamenstein Accounts opening through December 11,

2008.  Greenblatt Decl., Attach. B (Expert Report of Matthew B. Greenblatt, CPA/CFF, CFE

dated June 14, 2019 ("Greenblatt Kamenstein Report")) ¶¶ 1–4.

### A.    The Carol Account

128.    Mr. Greenblatt determined that on December 27, 2004, the Carol Account (No.

1CM914) was opened with an inter-account transfer from BLMIS Account No. 1CM247 in the

amount of $3,146,642.  However, due to the negative principal balance in BLMIS Account No.

1CM247, this reported inter-account transfer constituted fictitious profits.  *Id.* ¶¶ 20–21, 55, Exs.

4A, 4E.

129.    Subsequent to this initial inter-account transfer, on January 31, 2005, there was an

inter-account transfer from BLMIS Account No. 1CM247 to the Carol Account in the amount of

$686.  However, this amount was not credited as principal into the Carol Account because this

reported inter-account transfer constituted fictitious profits.  *Id.* ¶¶ 20–21, 56, Exs. 4A, 4E.

130.    Additionally, between December 27, 2004 and December 11, 2008, there were

two cash deposits via check and wire into the Carol Account in the aggregate amount of

$113,600, all representing principal.  *Id.* ¶ 57, Ex 3.  In sum, these two inter-account transfers

and two cash deposits provided the Carol Account with a total of $113,600 of principal.  *Id.*, Ex.

3.

131.    Between December 27, 2004 and December 11, 2008, the Carol Account reflected

a total of 39 cash withdrawals totaling $2,377,040.  *Id.* ¶ 58.

132.    The Principal Balance Calculation for the Carol Account demonstrated that

between December 27, 2004 and December 11, 2008, $2,377,040 was withdrawn from BLMIS, which consisted of $113,600 of principal and an additional $2,263,440 of funds withdrawn in excess of principal, representing fictitious profits withdrawn over the life of the Carol Account. *Id.* ¶ 59, Ex. 4E.

133.    Within the Two-Year Period prior to December 11, 2008, $907,300 of fictitious profits was withdrawn from the Carol Account.  *Id.*

134.    It is therefore undisputed that, during the Two-Year Period, Carol withdrew $907,300 in excess of principal deposited in the Carol Account.  *Id.*

### B.    The David Account

135.    Mr. Greenblatt determined that on December 27, 2004, the David Account (No. 1CM913) was opened with an inter-account transfer from BLMIS Account No. 1CM247 in the amount of $3,146,642.  However, due to the negative principal balance in BLMIS Account No. 1CM247, this reported inter-account transfer constituted fictitious profits.  *Id.* ¶¶ 20–21, 66, Exs. 4A, 4F.

136.    Subsequent to this initial inter-account transfer, on January 31, 2005, there was an inter-account transfer from BLMIS Account No. 1CM247 to the David Account in the amount of $686.  However, this amount was not credited as principal into the David Account because this reported inter-account transfer constituted fictitious profits.  *Id.* ¶¶ 20–21, 67, Exs. 4A, 4F.

137.    Additionally, between December 27, 2004 and December 11, 2008, there were two cash deposits via check and wire into the David Account in the aggregate amount of $113,600, all representing principal.  *Id.* ¶ 68, Ex. 3. In sum, these two inter-account transfers and two cash deposits provided the David Account with a total of $113,600 of principal.  *Id.*, Ex. 3.

138.    Between December 27, 2004 and December 11, 2008, the David Account

reflected a total of 39 cash withdrawals totaling $2,377,040. *Id.* ¶ 69.

139.    The Principal Balance Calculation for the David Account demonstrated that between December 27, 2004 and December 11, 2008, $2,377,040 was withdrawn from BLMIS, which consisted of $113,600 of principal and an additional $2,263,440 of funds withdrawn in excess of principal, representing fictitious profits withdrawn over the life of the David Account. *Id.* ¶ 70, Ex. 4F.

140.    Within the Two-Year Period prior to December 11, 2008, $907,300 of fictitious profits was withdrawn from the David Account. *Id.*

141.    It is therefore undisputed that, during the Two-Year Period, David withdrew $907,300 in excess of principal deposited in the David Account. *Id.*

**C.    The Sloan Account**

142.    Mr. Greenblatt determined that on September 7, 1999, the Sloan Account (No. 1CM597) was opened with two inter-account transfers from BLMIS Account No. 1CM295 in the aggregate amount of $1,782,332. However, the Sloan Account was only credited with $1,457,157 of principal because the remaining balance of this reported inter-account transfer constituted fictitious profits. *Id.* ¶¶ 28–29, 43, Exs. 4B, 4D.

143.    Subsequent to this initial inter-account transfer, on October 29, 1999, there was an inter-account transfer from BLMIS Account No. 1CM295 to the Sloan Account in the amount of $26. However, this amount was not credited as principal into the Sloan Account because this reported inter-account transfer constituted fictitious profits. *Id.* ¶ 30, 44, Exs. 4B, 4D.

144.    Additionally, between September 7, 1999 and December 11, 2008, there were eight cash deposits via check and wire into the Sloan Account in the aggregate amount of $1,958,637, all representing principal. *Id.* ¶ 45.

145.    In sum, these three inter-account transfers and eight cash deposits provided the

Sloan Account with a total of $3,415,794 of principal.  *Id.* ¶ 46, Ex. 3.

146.    Between September 7, 1999 and December 11, 2008, the Sloan Account reflected a total of 56 cash withdrawals totaling $4,683,246.  *Id.*  ¶ 47.

147.    All 56 checks from BLMIS representing a withdrawal from the Sloan Account were made payable to "Sloan G. Kamenstein."  Collura Decl., Attach. B (Collura Kamenstein Report), Ex. 6; Cremona Decl., Ex. 18 (Nov. 14, 2001 BLMIS Check to Sloan Kamenstein).

148.    The Principal Balance Calculation for the Sloan Account demonstrated that between September 7, 1999 and December 11, 2008, $4,683,246 was withdrawn from BLMIS, which consisted of $3,415,794 of principal and an additional $1,267,452 of funds withdrawn in excess of principal, representing fictitious profits withdrawn over the life of the Sloan Account. Greenblatt Decl., Attach. B (Greenblatt Kamenstein Report) ¶ 48, Ex. 4D.

149.    Within the Two-Year Period prior to December 11, 2008, $527,400 of fictitious profits was withdrawn from the Sloan Account.  *Id.*

150.    It is therefore undisputed that, during the Two-Year Period, Sloan withdrew $527,400 in excess of principal deposited in the Sloan Account.  *Id.*

151.    On January 12, 2009, Sloan filed and signed customer claim number 000177 attempting to recover the balance on his last BLMIS customer statement, listing himself as the accountholder for the Sloan Account.  Cremona Decl., Ex. 15 (Sloan Kamenstein Customer Claim).

### D.    The Tracy Account

152.    Mr. Greenblatt determined that on September 7, 1999, the Tracy Account (No. 1CM596) was opened with two inter-account transfers from BLMIS Account No. 1CM295 in the aggregate amount of $1,782,332.  However, the Tracy Account was only credited with $1,457,157 of principal because the remaining balance of this reported inter-account transfer

constituted fictitious profits.  Greenblatt Decl., Attach. B (Greenblatt Kamenstein Report) ¶¶ 28–29, 31, Exs. 4B, 4C.

153.    Subsequent to this initial inter-account transfer, on October 29, 1999, there was an inter-account transfer from BLMIS Account No. 1CM295 to the Tracy Account in the amount of $26.   However, this amount was not credited as principal into the Tracy Account because this reported inter-account transfer constituted fictitious profits.  *Id.* ¶ 30, 32, Exs. 4B, 4C.

154.    Additionally, between September 7, 1999 and December 11, 2008, there were seven cash deposits via checks and wires into the Tracy Account in the aggregate amount of $1,082,435, all representing principal.  *Id.* ¶ 33.

155.    In sum, these three inter-account transfers and seven cash deposits provided the Tracy Account with a total of $2,539,593 of principal.  *Id.* ¶ 34, Ex. 3.

156.    Between September 7, 1999 and December 11, 2008, the Tracy Account reflected a total of 53 cash withdrawals totaling $2,991,907.  *Id.* ¶ 35.

157.    Each of the 53 checks from BLMIS representing a withdrawal from the Tracy Account were made payable to "Tracy D. Kamenstein."  Collura Decl., Attach. B (Collura Kamenstein Report), Ex. 6; Cremona Decl., Ex. 17 (Jan. 6, 2000 BLMIS Check to Tracy Kamenstein).

158.    The Principal Balance Calculation for the Tracy Account demonstrated that between September 7, 1999 and December 11, 2008, $2,991,907 was withdrawn from BLMIS, which consisted of $2,539,593 of principal and an additional $452,314 of funds withdrawn in excess of principal, representing fictitious profits withdrawn over the life of the Tracy Account. Greenblatt Decl., Attach. B (Greenblatt Kamenstein Report) ¶ 36, Ex. 4C.

159.    Within the Two-Year Period prior to December 11, 2008, $452,314 of fictitious

profits was withdrawn from the Tracy Account.  *Id.*

160.    It is therefore undisputed that, during the Two-Year Period, Tracy withdrew $452,314 in excess of principal deposited in the Tracy Account.  *Id.*

161.    On January 12, 2009, Tracy executed and submitted customer claim number 000189 attempting to recover the balance on her last BLMIS customer statement, listing herself as the accountholder for the Tracy Account.  Cremona Decl., Ex. 15 (Tracy Kamenstein Customer Claim).

Dated: December 22, 2020
      New York, New York

*/s/ Nicholas J. Cremona*
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Nicholas J. Cremona
ncremona@bakerlaw.com
Lan Hoang
lhoang@bakerlaw.com
Amy E. Vanderwal
avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*