**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and for the Estate of Bernard L. Madoff,<br><br>    Plaintiff,<br><br>    v.<br><br>CAROL L. KAMENSTEIN, individually and in her capacity as joint tenant, DAVID R. KAMENSTEIN, individually and in his capacity as joint tenant, SLOAN G. KAMENSTEIN, and TRACY D. KAMENSTEIN,<br><br>    Defendants. | Adv. Pro. No. 10-04469 (CGM) |

**SECURITIES INVESTOR PROTECTION CORPORATION'S**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT**
**TRACY D. KAMENSTEIN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................................................ii

SIPC'S STANDING AS PARTY IN INTEREST AND STATUTORY INTERVENOR.................2

ARGUMENT....................................................................................................................................2

    I.    This Court Has Previously Rejected the Defendants' Arguments ..................................2

    II.    SIPA Protects "Customer Property" Entrusted to
Broker-Dealers Such as BLMIS..........................................................................................5

        A.    The history and principles underlying SIPA ..........................................................5

        B.    The broad definition of "customer property" under SIPA ...............................7

        C.    The funds in the JPMorgan accounts were customer property ………..........10

        D.    SIPA's customer property principles render irrelevant any doubts
regarding ownership of the JPMorgan bank accounts ......................................12

CONCLUSION...............................................................................................................................14

# TABLE OF AUTHORITIES

**CASES**                                                                                                                                                    **PAGE**

*In re Adler, Coleman Clearing Corp.*, 204 B.R. 99 (Bankr. S.D.N.Y. 1997)....................................7

*Ahammed v. Sec. Inv'r Prot. Corp. (In re Primeline Sec. Corp.)*, 295 F.3d 1100 (10th Cir. 2002) ...................11

*De La Pena Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255 (5th Cir. 2012) .......................................13

*Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109 (Bankr. D. Minn. 2002),
    *aff'd*, Civ No. 02-4775 RHK, 2003 WL 1824937 (D. Minn. Apr. 7, 2003),
    *aff'd*, 371 F.3d 397 (8th Cir. 2004) ............................................................................................8

*Focht v. Heebner (In re Old Naples Sec., Inc.)*, 223 F.3d 1296 (11th Cir. 2000) .........................................6, 11

*In re Hanover Square Sec.*, 55 B.R. 235 (Bankr. S.D.N.Y. 1985).................................................................6

*In re John Dawson & Assocs. Inc.*, 289 B.R. 654 (Bankr. N.D. Ill. 2003) ..................................................9

*In re Motors Liquidation Co.*, 590 B.R. 39 (S.D.N.Y. 2018), *aff'd*, No. 18-1940,
    2019 WL 6121345 (2d Cir. Nov. 19, 2019) ...............................................................................4

*In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2004) ..................................................................6

*Peloro v. United States*, 488 F.3d 163 (3d Cir. 2007) ................................................................................9

*Perez v. Terrestar Corp. (In re Terrestar Corp.)*, No. 16 Civ. 1421 (ER), 2017 WL 1040448
    (S.D.N.Y. Mar. 16, 2017), *appeal dismissed*, No. 17-1117 (2d Cir. June 7, 2017)...........................4

*Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016) ..............12

*Picard v. BAM L.P. (Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*,
    Adv. Pro. No. 10-04390, 2020 WL 7422316 (Bankr. S.D.N.Y. Dec. 11, 2020).....................3–4

*Picard v. Nelson (Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*,
    610 B.R. 197 (Bankr. S.D.N.Y. 2019)....................................................................................3–4

*Picard v. Gettinger (In re Bernard L. Madoff Inv. Sec. LLC)*, 976 F.3d 184 (2d Cir. 2020) ...........................12

*Picard v. Legacy Capital, Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    603 B.R. 682 (Bankr. S.D.N.Y. 2019) .......................................................................................4

*SEC v. F.O. Baroff Co.*, 497 F.2d 280 (2d Cir. 1974).................................................................................6

*Sec. Inv'r Prot. Corp. v. Barbour*, 421 U.S. 412 (1975) .........................................................................6–7

*Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125 (2d Cir. 2006) ....................................7

ii

# TABLE OF AUTHORITIES

**CASES (continued)**                                                                                                                                       **PAGE**

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
      127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015)..........................................................................4

**STATUTES**

Securities Investor Protection Act, as amended, 15 U.S.C. §

78ccc(a) ............................................................................................................................10
78eee(d) .............................................................................................................................2
78fff-3 ................................................................................................................................7
78fff-2(c)(3) ................................................................................................................ 12–13
78kkk(g) ............................................................................................................................6
78*lll*(4) ....................................................................................................................... 7–8, 12
78*lll*(4)(E) ....................................................................................................................8, 10

United States Bankruptcy Code, 11 U.S.C. §

548 ...................................................................................................................................13

**OTHER AUTHORITIES:**

17 C.F.R. § 240.15c3-3 .................................................................................................................6

Exchange Act Release No. 34-9856, 37 Fed. Reg. 25,224 (1972).........................................6–7

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069 (2002) ..............................6

*Hearings Before the Subcomm. on Consumer Prot. & Fin. of the Comm. on Interstate & Foreign Commerce*,
      95th Cong., 1st Sess. on H.R. 8331, Serial No. 95-77 (Aug. 1–3, 1977).........................8

Order Granting Motion for Approval of Trustee's Investigatory & Final Reports &
      Account & For Assignment of Judgment to SIPC, *Sec. Inv'r Prot. Corp. v.
      Austin Sec., Inc.*, No. 05-1144 OEM (Bankr. E.D.N.Y. Nov. 20, 2007).........................9

*Report of the Special Study of the Securities Markets of the Securities and Exchange Commission*,
      H.R Doc. No. 95, pt. 1 (1st Sess. 1963) ............................................................................5

*Study of Unsafe and Unsound Practices of Brokers and Dealers, Report and Recommendations of the Securities and
      Exchange Commission,* H.R. Doc. No. 92-231 (1971) ...................................................5–6

Investor confidence is essential to the health and success of U.S. securities markets. The Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–78*lll* ("SIPA"),[1] and complementary Securities and Exchange Commission ("SEC") customer protection rules ensure that customers receive the maximum protection possible in the event their broker-dealer fails financially, and is liquidated. Since 1960 and until his arrest, Bernard L. Madoff ("Madoff") operated a broker-dealer registered with the SEC, first as a sole proprietorship and, since 2001, as a limited liability company, Bernard L. Madoff Investment Securities LLC ("BLMIS" or "Debtor"). Since SIPA's enactment in 1970, Madoff's broker-dealer has been a member of the Securities Investor Protection Corporation ("SIPC").

BLMIS's customers – whether they opened their accounts in 1970, 2001, or 2008 – relied on this federal scheme of customer protection when they entrusted property to BLMIS as a registered broker-dealer and SIPC member. Following Madoff's arrest in December 2008, BLMIS was placed into liquidation under SIPA for the protection of its customers. Correct allocation of "customer property" in accordance with SIPA and other applicable statutory provisions, rules, and regulations is necessary both to meet the justified expectations of BLMIS's customers, and to demonstrate that customer protection under the carefully constructed federal scheme is not just protection in theory, but protection in fact.

Irving H. Picard, as the trustee ("Trustee") for the substantively consolidated liquidation of BLMIS and Madoff, brought this action against the Defendants in order to avoid and recover fraudulent transfers of fictitious profits – customer property entrusted to BLMIS, stolen, and used in furtherance of its Ponzi scheme. The Defendants moved for summary judgment based on their assertion that the fraudulent transfers were made by Madoff, individually and from an account held in his personal name and that, consequently, the Trustee lacks standing to recover the transfers.

---

[1] For convenience, further references to SIPA shall omit "15 U.S.C."

1

SIPC submits this Memorandum of Law in opposition to Defendants' motion for summary judgment. As explained below, SIPA goes hand-in-hand with regulations governing the custody of customer property held by a solvent broker-dealer. SIPA defines customer property broadly to include all property entrusted by customers to a broker-dealer for investment in the securities markets. It further empowers a trustee to recover fraudulent transfers of customer property in order to remediate a lapse in the broker-dealer's custodial function. This enforcement of a failed broker-dealer's custodial function builds trust in the securities markets. When Madoff formed BLMIS in 2001, he transferred all of its assets, including custody of customer property and ownership of its accounts, to the LLC. The Trustee has standing to pursue fraudulent transfers of customer property entrusted to BLMIS in order to protect BLMIS customers who have not yet received their net equity.

### SIPC'S STANDING AS PARTY IN INTEREST AND STATUTORY INTERVENOR

SIPC is a party in interest and a statutory intervenor in all liquidations under the Securities Investor Protection Act. *See* SIPA § 78eee(d). SIPC focuses here upon the Defendants' arguments that relate to SIPA.[2]

### ARGUMENT

**I.   This Court Has Previously Rejected the Defendants' Arguments**

In support of their motion for summary judgment, the Defendants argue that the Trustee lacks standing to bring the avoidance and recovery actions because the fraudulent transfers allegedly were made through bank accounts at JPMorgan Chase (the "JPMorgan accounts") held in the name of Madoff individually, not the LLC.

---

[2] Separately, Defendant Tracy D. Kamenstein seeks partial summary judgment on the assertion that she is not an initial transferee of BLMIS because the fraudulent transfers, while conveyed by checks made out to her and drawn from her BLMIS account, were deposited in her parents' bank account. For the reasons stated in the Trustee's opposition, this argument fails factually and legally. SIPC supports the Trustee's position.

2

The Defendants' arguments have been rejected twice in this liquidation. In *Picard v. Nelson (Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*, 610 B.R. 197 (Bankr. S.D.N.Y. 2019), this Court held that "[t]he Trustee has demonstrated Article III standing," *id.* at 215, and "the evidence demonstrated that BLMIS owned the [JPMorgan accounts], the source of the Two-Year Transfers." *Id.* at 216. In support of its finding, this Court found, *inter alia*, that "Madoff certified through SEC Form BD that all of [the sole proprietorship's] assets and liabilities were being transferred to BLMIS," that no other entity or person held BLMIS customer assets, and that BLMIS operated all three divisions of Madoff's business: proprietary trading, market making, and investment advisory. *Id.* at 217. Additionally, the JPMorgan accounts were used exclusively for customer property, and customer debit memos recorded transfers from BLMIS, not Madoff. *Id.* at 218.

In sum, "Madoff was not particularly attentive to the names he used in operating his Ponzi scheme but his representations made to the SEC confirm that [the sole proprietorship] ceased to operate on January 1, 2001. At that moment, all of its business and business property was transferred to BLMIS." *Id.* at 218. Accordingly, "[u]nder SIPA, the customer deposits are deemed to have been BLMIS's property for the purposes of these adversary proceedings [and] the Two-Year Transfers were made from property of BLMIS." *Id.* at 233.

Since the filing of the Defendants' motion, this Court reaffirmed, in *Picard v. BAM L.P. (Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 10-04390, 2020 WL 7422316 (Bankr. S.D.N.Y. Dec. 11, 2020), the findings in *Nelson*, holding that "the Bank Accounts are property of BLMIS and the monies paid to Defendants from those Bank Accounts must be turned over to the Trustee." *Id.* at *4. This Court found that "all of the assets and liabilities of the sole proprietorship, including the [Investment Advisory] Business, were transferred to BLMIS via the 2001 SEC Amended Form BD." *Id.* Finally, this Court concluded that the funds deposited by

3

customers and held in the JPMorgan accounts were customer property and that any transfers of fictitious profits from the accounts may be avoided and recovered by the Trustee. *Id.* at *5.

The Defendants' efforts to negate the holdings of *Nelson*, and now *BAM*, are without merit. For example, they emphasize that, on the 2001 SEC Form BD, Madoff did not check the box stating that BLMIS would engage in investment advisory services. But the investment advisory business was not registered until 2006. And significantly, when Madoff *did* register as an investment advisor, he did so through the LLC, not as a sole proprietor.³ Accordingly, even if there was a doubt in 2001 whether the LLC succeeded to the investment advisory business (despite the 2001 SEC Form BD and the Trustee's expert testimony to the contrary), the investment advisory business was clearly registered under the LLC by the time the two-year transfers at issue here were made.

Thus, the Defendants' effort to revisit the conclusions in *Nelson* and *BAM* fails to overturn the law of the case. *See Nelson*, 610 B.R. at 237 ("The prior decisions within this SIPA proceeding constitute law of the case . . . .") (citing *Picard v. Legacy Capital, Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*, 603 B.R. 682, 700 (Bankr. S.D.N.Y. 2019)); *In re Motors Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018) (finding that the law of the case doctrine applies across adversary proceedings within the same bankruptcy case), *aff'd*, 943 F.3d 125 (2d Cir. 2019); *Perez v. Terrastar Corp. (In re Terrestar Corp.)*, No. 16 Civ. 1421 (ER), 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017) (applying the law of the case doctrine because "[a]dversary proceedings filed in the same bankruptcy case do not constitute different cases"), *appeal dismissed*, No. 17-1117 (2d Cir. June 7, 2017).

---

³ *See Investment Advisory Firm Summary for Bernard L. Madoff Investment Securities LLC*, INVESTMENT ADVISOR PUBLIC DISCLOSURE, https://adviserinfo.sec.gov/firm/summary/2625 (last accessed Dec. 22, 2020). *Cf. Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (stating that "[c]ourts routinely take judicial notice of . . . governmental records," including, for example, records in an SEC database).

4

**II.    SIPA Protects "Customer Property" Entrusted to Broker-Dealers Such as BLMIS**

The decisions in *Nelson* and *BAM* correctly upheld the Trustee's efforts under SIPA to recover customer property entrusted to a broker-dealer. But here, the Defendants argue that the property they entrusted to BLMIS should not fall under the scope of SIPA's protections. They seek this outcome solely because they received more customer property than they were entitled to receive – in other words, they received other customer's funds, and they do not want SIPA to protect that property. However, as explained below, such an argument undermines faith in the securities markets, and is contrary to applicable law.

**A.    The history and principles underlying SIPA**

As described in the *Study of Unsafe and Unsound Practices of Brokers and Dealers, Report and Recommendations of the Securities and Exchange Commission,* H.R. Doc. No. 92-231, at 11-12 (1971) ("*SEC Study*"), in the years leading to the enactment of SIPA, little attention was paid to the creation of brokerage back-office systems and appropriate staffing of back-offices in order to ensure the maintenance of accurate records in real time. As a consequence, there developed "an absence of control of securities traffic to provide assurance for prompt deliveries of securities and remittances of payments." *Id.* at 11. Furthermore, until the enactment of SIPA, broker-dealers could use without restraint credit balances of customers, including free credit balances. These credit balances are sums from a customer account to which the customer was entitled upon demand. *SEC Study* at 16 (citing to *Report of the Special Study of the Securities Markets of the Securities and Exchange Commission*, H.R Doc. No. 95, pt. 1, at 393-98 (1st Sess. 1963)). Broker-dealers increasingly used their customer business to leverage their proprietary business, which put customer property at risk. *SEC Study* at 51–53.

Because an undue portion of the industry's assets was invested in securities, broker-dealers themselves were vulnerable to market downturn. *SEC Study* at 18. By the late 1960s, these

5

circumstances and changes in market conditions converged to result in a virtual breakdown in many firms of the control over the possession, custody, location, and delivery of securities, and the payment of money obligations to customers. *Id* at 11–12. There followed a collapse of broker-dealers which led to the enactment of SIPA in 1970, and to a directive in SIPA that the SEC compile a list of unsafe and unsound practices in the securities industry, and recommendations to eliminate them. *See SEC Study* at 27–30, 42; SIPA § 78kkk(g). One Rule adopted pursuant to this mandate was SEC Rule 15c3-3, also known as the "Customer Protection Rule,"[4] which required the segregation of certain customer property. *See SEC Study* at 30; *see also* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1070 (2002) ("The rule, which can be loosely described as a 'segregation rule,' divides the customer and proprietary activities of the firm."); 17 C.F.R. § 240.15c3-3.

SIPA was enacted, *inter alia,* to "restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers." *Sec. Inv'r Prot. Corp. v. Barbour*, 421 U.S. 412, 415 (1975). Congress sought to insulate public customers, and the financial markets, from the adverse effects of the failure of a broker-dealer. *See In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985); *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 281 (2d Cir. 1974) ("The object of [SIPA], and the function of [SIPC], is to protect the public customers of securities dealers from suffering the consequences of financial instability in the brokerage industry"); *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 84 (2d Cir. 2004) (identifying SIPA's "statutory goals" as "promoting investor confidence and providing protection to investors . . . ," and noting that "remedial legislation should be construed broadly to effectuate its purposes" (internal citation omitted)); *Focht v. Heebner (In re Old Naples Sec., Inc.)*, 223 F.3d 1296, 1300 (11th Cir. 2000) ("Congress passed SIPA in 1970 . . . to protect investors when their brokerages fail. The statute established

---

[4] Exchange Act Release No. 34-9856, 37 Fed. Reg. 25,224 (1972).

SIPC to maintain a fund for investor protection, oversee the liquidation of brokerages in a manner similar to bankruptcy proceedings, and, under certain circumstances, reimburse customers of a failed brokerage.").

SIPA's statutory scheme is "necessary to a comprehensive program of investor protection consistent not only with express congressional intent but with the high standards of financial responsibility which must prevail in the brokerage community." *See* Exchange Act Release No. 34-9856, 37 Fed. Reg. 25,224 at 25,225 (1972). Together, SIPA and SEC Rule 15c3-3 serve the objective of SIPA "that customer funds and securities not be exposed to risk of loss through broker-dealer insolvency." *Id.*

In accordance with this objective, the primary operation of SIPA, and one of the principal responsibilities of a SIPA trustee, is to protect customers of a broker-dealer in a SIPA liquidation proceeding. *See Barbour*, 421 U.S. at 417; *In re Adler, Coleman Clearing Corp.*, 204 B.R. 99, 105–06 (Bankr. S.D.N.Y. 1997). SIPA advances this purpose "by according those claimants in a SIPA liquidation proceeding who qualify as 'customers' of the debtor priority over the distribution of 'customer property.' Each customer shares ratably in this fund of assets to the extent of the customer's net equity at the time of filing." *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006) (internal citations omitted). In the event the fund of customer property proves insufficient to make the customers whole, SIPC provides protection – subject to statutory limitations – from the SIPC Fund. SIPA § 78fff-3.

B.    **The broad definition of "customer property" under SIPA**

The definition of customer property in SIPA § 78*lll*(4)[5] is expansive and mirrors the

---

[5] SIPA § 78*lll*(4) provides, in pertinent part,

> The term "customer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the

7

customer protection rules that govern the pre-liquidation operation of the broker-dealer. By amending § 78*lll*(4) in 1978 to add subpart (E) (originally subpart (D)), Congress explicitly created protections where property had not been properly segregated, or cash deposits had not been made by the broker-dealer as required by applicable laws, rules, and regulations – specifically SEC Rule 15c3-3. *See Hearings Before the Subcomm. on Consumer Prot. & Fin. of the Comm. on Interstate & Foreign Commerce*, 95th Cong., 1st Sess. on H.R. 8331, Serial No. 95-77, at 113–14 (Aug. 1–3, 1977) (Report to the Board of Directors of the Securities Investor Protection Corporation of the Special Task Force to Consider Possible Amendments to the Securities Investor Protection Act of 1970).

Courts interpret "customer property" broadly. For example, in the SIPA liquidation proceeding of MJK Clearing, Inc., all of the cash in the possession of the debtor on the filing date, including money derived from stock loan transactions with a plaintiff-creditor, constituted customer property under SIPA § 78*lll*(4)(E). *See Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 129–32 (Bankr. D. Minn. 2002), *aff'd.*, Civ No. 02-4775 RHK, 2003 WL 1824937 (D. Minn. Apr. 7, 2003), *aff'd.*, 371 F.3d 397 (8th Cir. 2004). In that case, because there was a shortfall in the fund of customer property, the court applied what it characterized as the "plain meaning" of the customer property definition as:

> [A] means to rectify any actions taken by, or with respect to, the debtor, that results in a shortfall. *This clearly entails looking to the debtor's other, non-customer accounts such as banking accounts containing funds . . . to remedy the shortfall for the protection of customers.*

*Id.* at 132 (emphasis added).

---

> proceeds of any such property transferred by the debtor, including property unlawfully converted. The term "customer property" includes –
> 
> * * *
> 
> (E)  any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers, unless the trustee determines that including such property within the meaning of such term would not significantly increase customer property.

8

Similarly, in *Peloro v. United States*, 488 F.3d 163 (3d Cir. 2007), bearer bonds held by a debtor broker-dealer for an investor's account that had been seized by the FBI prior to being deposited into the account were deemed customer property, because, under SIPA, customer property includes not only securities actually allocated to customer accounts but "any cash and securities at any time received, acquired, or held" for the securities accounts of a customer. *Id.* at 170, 173–74 (quotation marks and alterations in original omitted).

In *In re John Dawson & Assocs. Inc.*, 289 B.R. 654 (Bankr. N.D. Ill. 2003), the Court held that an investor could share in the fund of customer property where losses resulted from the broker-dealer's unauthorized trading of cash or securities from the investor's account, because customer property includes "the proceeds of any such property transferred by the debtor, including property unlawfully converted." *Id.* at 662.

In *Sec. Inv'r Prot. Corp. v. Austin Sec., Inc.*, No. 05-1144 DEM (Bankr. E.D.N.Y. 2007), the Court approved the trustee's allocation of the following to the fund of customer property: (a) assets in brokerage accounts of a former principal who had engaged in unauthorized trading; (b) proceeds from the sale of the former principal's luxury watches and of his wife's jewelry; (c) proceeds from sale of the principal's television set; and (d) the debtor's proprietary brokerage accounts and clearing deposit. With the exception of proceeds realized from the surrender of the life insurance policies owned by the debtor and trail commissions owed to the debtor and received by the trustee after commencement of the liquidation, all property recovered by the trustee from the debtor and third parties was determined to "constitute property which was, or should have been, held by the Debtor for the account of its customers; the proceeds of such property; or substitutes therefor."[6]

---

[6] Trustee's Investigatory & Final Reports and Account at 10–18, *Sec. Inv'r Prot. Corp. v. Austin Sec., Inc.*, No. 05-1144 DEM (Bankr. E.D.N.Y. Oct. 22, 2007); *accord*, Order Granting Motion for Approval of Trustee's Investigatory & Final Reports & Account & For Assignment of Judgment to SIPC, at 1–2, *Austin Sec., Inc.*, No. 05-1144 OEM (Bankr. E.D.N.Y. Nov. 20, 2007).

C.     **The funds in the JPMorgan accounts were customer property**

SIPC membership, and thus SIPC protection, arises from a broker-dealer's registration with the SEC, without regard to the corporate form of the broker-dealer. SIPA § 78ccc(a). Likewise, SIPC protection covers customer property entrusted to that SIPC member, regardless of whether the SIPC member maintains custody of the customer property in accordance with federal law. A SIPC member's non-compliance with laws and regulations does not remove customer property from SIPA's protective scheme. If it were otherwise, any Madoff-like fraudster could shield his stolen customer property from a SIPA Trustee simply by running the scheme through a bank account held in a different name, or transferring the customer property to a new, separate and distinct legal entity.

Here, the funds in the JPMorgan accounts constituted customer property precisely because BLMIS received, acquired and took possession and control of property entrusted by customers to the firm, and then deposited the entrusted funds in the JPMorgan accounts. Under SIPA § 78*lll*(4)(E), the JPMorgan account funds are customer property even if BLMIS failed to set them aside in compliance with federal law and regulations.

The manner in which BLMIS maintained custody of the customer property, and the fraudulent pathway through which it transferred the funds to the Defendants in furtherance of its Ponzi scheme, is irrelevant. Indeed, the evidence proves that any transfer from the commingled pool of assets was a transfer of customer property recoverable by the Trustee.

Specifically, the evidence in this case demonstrates that Madoff registered BLMIS as a broker-dealer with the SEC in January 1960, first as a sole proprietorship and then, beginning in January 2001, as an LLC. Madoff accepted cash for the securities accounts of customers and pooled these funds in the JPMorgan accounts for use in his Ponzi scheme. When Madoff converted his business from a sole proprietorship into an LLC, the LLC filed an "SEC Form BD" document to inform the SEC (and SIPC, through the SEC) of the nominal change in corporate structure. The

10

brokerage firm's SEC registrant number (8-8132) used to identify brokerage firms in the SEC's records, and which has been assigned to the firm since its registration with the SEC in January 1960, remained the same. The SEC Form BD affirmed that all assets and liabilities related to the sole proprietor business were transferred to the limited liability company.

In other words, the customer property entrusted to the sole proprietorship and held in the JPMorgan accounts became entrusted to BLMIS. Madoff continued the same ongoing Ponzi scheme under the veil of an LLC. Indeed, from the outset of this liquidation, the Defendants themselves believed that BLMIS had custody of their customer property. The Defendants filed claims with the Trustee for customer property that they entrusted to BLMIS – and filed objections to the Trustee's denials of their claims – admitting that they had accounts with the LLC and seeking SIPA protection for the property in those accounts. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 08-01789-smb (Bankr. S.D.N.Y.), ECF Nos. 550, 551, 552, and 1065.

Once the Defendants entrusted their property for investment purposes, it became "customer property," and Madoff's machinations could not change that legal designation. SIPA protection applied and continues to apply until the property is returned to the customer – from wherever the property is located, and by or through whomever was the custodian of the customer property. *See, e.g., Ahammed v. Sec. Inv'r Prot. Corp. (In re Primeline Sec. Corp.)*, 295 F.3d 1100, 1107 (10th Cir. 2002) ("Whether a claimant deposited funds 'with the debtor' does not depend simply on to whom claimants made their checks payable . . . [t]he relevant inquiry is whether the brokerage firm actually received, acquired or possessed Claimants' property." (citing *In re Old Naples Sec.*, 223 F.3d at 1302)); *In re Old Naples Sec., Inc.* 223 F.3d at 1302 (stating that SIPA protection focuses not solely on "[w]hether a claimant deposited cash with the debtor," but also on "whether there was actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation" (internal quotes and citations omitted)).

11

### D. SIPA's customer property principles render irrelevant any doubts regarding ownership of the JPMorgan bank accounts

The accounts held customer property that was entrusted to the sole proprietorship, and then entrusted to BLMIS. There was a nominal change in the broker-dealer's corporate structure, but no change in custody of customer property. As stated in BLMIS's 2001 SEC Form BD, and as held in *Nelson* and *BAM*, ownership of the JPMorgan accounts was transferred to the LLC, and BLMIS was the holder of the JPMorgan accounts throughout the relevant time period.

Even if this Court had doubts regarding account ownership, SIPA and the securities laws would still govern ownership of, and dominion over, the account funds. By defining "customer property" broadly in SIPA § 78*lll*(4), and by explicitly authorizing the recovery of misappropriated customer property in SIPA § 78fff-2(c)(3), SIPA effectively renders the issue of account ownership irrelevant to the final analysis. In other words, the central issue becomes not account ownership but rather property rights – specifically whether the property in the accounts was customer property. *Cf. Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*, 557 B.R. 89, 108 (Bankr. S.D.N.Y. 2016) (stating that while "[t]he customer property invested with BLMIS never became property of Madoff or BLMIS under applicable non-bankruptcy law . . .", under SIPA "the Trustee can recover the transfers of customer property by BLMIS . . ."). Indeed, the Second Circuit's recent analysis of transfers of customer property focused upon the transferee's property rights in the funds held by BLMIS. *Picard v. Gettinger (In re Bernard L. Madoff Inv. Sec. LLC)*, 976 F.3d 184, 198 (2d Cir. 2020) ("It follows that regardless of whether the defendants-appellants had securities entitlements as a result of the account statements, they did not have property rights to the values in excess of principal reflected there"); *id.* at 201 ("BLMIS never traded in securities and, as a result, never generated any legitimate profits. The defendants-appellants therefore had no rights to the transfers . . . .").

The focus on customer property rights is all the more important when a fraudster is involved. A court that focuses on a fraudster's shell game only gives the fraudster a chance to

12

determine the final outcome of his fraudulent scheme. On the other hand, a court that focuses on the identification and return of customer property effectively neutralizes the fraudster's scheming, obfuscation, and redirection. BLMIS controlled these funds and made the transfers at issue in this case. *See De La Pena Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255, 262–64 (5th Cir. 2012) ("[R]egardless of its legal title, [the debtor] had the ultimate power to transfer funds to others, who included the [defendants]. That it obscured its power to transfer in an intentionally complicated corporate structure suggests that control is decisive, and that legal title is irrelevant where, as here, a debtor organization has taken care to mask its activities through fictional divisions.").

Madoff's misuse of customer property, whether placing it in a personal account or under his mattress, should not hinder the Trustee's goal of recovering customer property, and maximizing protection for all victims of the scheme. If the good faith recipients of other customers' money had no "property rights" to the money they received, and a fraudster created a fictional story to justify those fraudulent transfers in the first place, then the law requires the return of the misappropriated funds. Indeed, the entire purpose of this litigation is to effectuate that fundamental goal of SIPA: protection of the custodial function of an insolvent broker-dealer by securing the return of customer property entrusted to the broker-dealer. SIPA promotes that outcome by: (1) defining customer property in broad terms, *supra* Section II(B), and (2) creating a broad recovery mechanism that maximizes customer estate recoveries, notwithstanding state law. SIPA § 78fff-2(c)(3).

Accordingly, SIPA displaces or overrides, to the extent necessary, any inconsistent federal or state law that would undermine or limit the SIPA trustee's ability to bring about the return of the stolen property to the customers who hold valid claims for the return of their stolen property. The two years transfers were, indeed, transfers of customer property by a SIPA debtor within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548 (a)(1)(A), and should be avoided and promptly recovered for the benefit of customers with valid claims.

## **CONCLUSION**

For the reasons set forth above, SIPC respectfully requests that the Court deny the Defendants' motion for summary judgment.

Dated:  December 23, 2020
        Washington, D.C.

Respectfully submitted,

*/s/ Kenneth J. Caputo*
KENNETH J. CAPUTO
General Counsel

KEVIN H. BELL
Senior Associate General Counsel

NATHANAEL S. KELLEY
Associate General Counsel

NICHOLAS G. HALLENBECK
Assistant General Counsel
(admitted *pro hac vice*)

SECURITIES INVESTOR PROTECTION
CORPORATION
1667 K St., NW, Suite 1000
Washington, D.C. 20006
Telephone: (202) 371-8300
Email: kcaputo@sipc.org
Email: kbell@sipc.org
Email: nkelley@sipc.org
Email: nhallenbeck@sipc.org

14