**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| | SIPA LIQUIDATION |
| Plaintiff-Applicant, | (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

Debtor,

IRVING H. PICARD, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC,          Adv. Pro. No. 10-04469 (CGM)

Plaintiff,

v.

CAROL L. KAMENSTEIN, individually and in her
capacity as joint tenant, DAVID R. KAMENSTEIN,
individually and in his capacity as joint tenant,
SLOAN G. KAMENSTEIN, and TRACY D.
KAMENSTEIN,

Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DISMISSING THE
COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND FOR
PARTIAL SUMMARY JUDGMENT DISMISSING THE COMPLAINT AGAINST
TRACY D. KAMENSTEIN**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

The Trustee's shameless reliance on Dubinsky's perjury ........................................... 1

The money transferred to the Defendants was not the LLC's money ........................ 3

The Trustee's reliance on a 2004 LLC amended operating agreement is
misplaced ................................................................................................................... 5

Tracy Kamenstein received no Madoff funds, either directly or indirectly, after
December 11, 2006 ..................................................................................................... 5

The Trustee cannot prove the elements of a fraudulent transfer ............................... 6

FACTUAL BACKGROUND ..................................................................................... 8

The Tracy Trust Account ........................................................................................... 8

Madoff's purchase of T-bills for the Kamensteins ................................................... 8

ARGUMENT ............................................................................................................. 9

I.    THE COMPLAINT AGAINST TRACY KAMENSTEIN SHOULD
      BE DISMISSED ........................................................................................... 9

II.   THIS COURT LACKS SUBJECT MATTER JURISDICTION ............................. 15

      A.   The Trustee cannot meet his burden to prove Article III injury ............................... 16

           1.   The law of the case doctrine binds the Trustee to the holdings in
                *Avellino* .................................................................................................... 17

           2.   The holdings in *Nelson* and *BAM* are insupportable ............................ 18

           3.   Dubinsky was never qualified as an expert on whether the IA
                business was transferred to the LLC .................................................... 21

III.  SIPA DOES NOT CREATE ARTICLE III INJURY ............................................. 22

IV.   THE TRUSTEE IS NOT ENTITLED TO SUMMARY JUDGMENT .................... 25

      A.   The Trustee's Motion Rests on Inadmissible Evidence ............................................. 25

1. Dubinsky's Misstatements ................................................................. 25

2. The Expert Reports Are Not Admissible ............................................. 28

3. The allocutions and trial testimony are inadmissible ........................... 30

4. The Trustee cannot prove intent ....................................................... 32

    a. Madoff bought T-bills with IA customers' money ........................... 32

    b. The Trustee cannot prove that Madoff operated a Ponzi scheme .................... 34

        i. Defendants were creditors, not equity investors ........................... 34

        ii. The LLC was not a Ponzi scheme .............................................. 35

        iii. The IA business was profitable ................................................ 36

        iv. Madoff did not depend upon deposits of new customers ............................. 36

        v. No Ponzi scheme can last for decades ........................................ 37

5. The payments were not made "in furtherance of" a Ponzi scheme ..................... 37

V. THE TRUSTEE CANNOT PROVE HIS ALLEGED LOSSES .............................. 39

VI. THE TRUSTEE IS NOT ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST ................................................................. 40

  A. The Kamensteins Disputed the Trustee's Claims in Good Faith .............................. 43

VII. THE KAMENSTEINS PRESERVE THEIR ARGUMENT THAT 11 U.S.C. SECTION 548(C) PROVIDES A COMPLETE DEFENSE ........................ 45

CONCLUSION ...................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for Envt'l Renewal, Inc. v. Pyramid Crossgates Co.*,
　436 F.3d 82 (2d Cir. 2006) ............................................................................................. 15, 16

*Arizona v. California*,
　460 U.S. 605 (1983) .............................................................................................................. 18

*Armstrong v. Collins*,
　No.01 Civ. 2437 (PAC), 2010 WL 1141158 (S.D.N.Y. Mar 24, 2010),
　*reconsideration denied*, No. 01 Civ. 2437 (PAC), 2011 WL 308260 (S.D.N.Y.
　Jan. 31, 2011) ......................................................................................................................... 34

*In re ATM Financial Services, LLC*,
　2011 WL 2580763 (Bankr. M.D. Fla. June 24, 2011) ......................................................... 38

*Banque Worms v. BankAmerica Int'l*,
　77 N.Y.2d 362 (1991) ............................................................................................................ 39

*In re Bauman*,
　535 B.R. 289 (Bankr. C.D. Ill. 2015) .................................................................................... 24

*In re Bayou Grp., LLC ("Bayou III")*,
　396 B.R. 810 (Bankr. S.D.N.Y. 2008), *rev'd in part In re Bayou Grp., LLC*,
　439 B.R. 284 (S.D.N.Y. 2010) ............................................................................................... 38

*Bellamy v. City of New York*,
　914 F.3d 727 (2d Cir. 2019) .................................................................................................. 25

*In re Bernard L. Madoff Inv. Sec. LLC*,
　2011 WL 3568936 (2d Cir. Aug. 16, 2011) .......................................................................... 35

*In re Bernard L. Madoff Inv. Secs., LLC*,
　424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229 (2d Cir. 2011) ........................... 19

*In re Bernard L. Madoff Inv. Sec. LLC*,
　458 B.R. 87 (Bankr. S.D.N.Y. 2011) ..................................................................................... 37

*In re Bernard L. Madoff Inv. Sec. LLC*,
　654 F.3d 229 (2d Cir. 2011) .................................................................................................. 41

*In re Bernard L. Madoff Inv. Sec. LLC*,
　683 B.R. 682 (Bankr. S.D.N.Y. 2019) ................................................................................... 36

*In re Bernard L. Madoff Inv. Sec. LLC.*,
   779 F.3d 74 (2d. Cir. 2015)..................................................................................41

*In re Bernard L. Madoff Inv. Sec. LLC*,
   976 F.3d 184 (2d Cir. 2020)................................................................................45

*In re BICOM, NY, LLC*,
   619 B.R. 799 (Bankr. S.D.N.Y. 2020) ................................................................10

*In re Black & Geddes, Inc.*,
   59 B.R. 873 (Bankr. S.D.N.Y. 1986) ..................................................................13

*Blechman v. Estate of Blechman*,
   160 So. 3d 152 (Fla. Dist. Ct. App. 2015) .........................................................12

*Board of County Comm'rs of the County of Jackson v. United States*,
   308 U.S. 343 (1939).............................................................................................41

*Boger v. New York State Office of Parks, Recreation & Historic Pres.*,
   2019 WL 2766897 (N.D.N.Y. July 2, 2019) ...................................................25, 26

*Bonded Fin. Servs., Inc. v. European Am. Bank*,
   838 F.2d 890 (7th Cir. 1988) ..............................................................................14

*Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*,
   567 F.3d 1291 (11th Cir. 2009) ..........................................................................42

*In re Chowaiki & Co. Fine Art Ltd.*,
   593 B.R. 699 (Bankr. S.D.N.Y. 2018).................................................................19

*City of New York v. Venkataram*,
   2011 WL 2899092 (S.D.N.Y. July 13, 2011) ......................................................19

*Commodities Future Trading Commission v. Walsh*,
   17 N.Y.3d 162 (2011) ..........................................................................................39

*Costa v. Sears Home Imp. Products, Inc.*,
   65 F. Supp.3d 333 (W.D.N.Y. 2014) ...................................................................33

*In re DBSI, Inc.*,
   476 B.R 413 (Bankr. D. Del. 2012) ....................................................................38

*In re Deltacorp, Inc.*,
   179 B.R. 773 (Bankr. S.D.N.Y.1995)..................................................................24

*In re Dreier LLP*,
   2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014) (Bernstein, J.) ....................30, 34

*Edwards v. Onondaga Cmty. Coll.*,
  No. 5:14-CV-1329, 2016 WL 3519619 (N.D.N.Y. June 22, 2016)........................................25

*Fafel v. Dipaola*,
  399 F.3d 403 .................................................................................................................24

*Ferguson v. Garden Ridge Corp.*,
  399 B.R. 135 .................................................................................................................24

*Fernandez v. Capra*,
  916 F.3d 215 (2d Cir. 2019)...........................................................................................27

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
  130 F.3d 52 (2d Cir. 1997)..........................................................................................9, 13

*In re Foos*,
  188 B.R. 239 (Bankr. N.D. Ill. 1995) *aff'd in part, rev'd in part on other g'ds*,
  1996 WL 563503 (N.D. Ill. 1996) ...............................................................................35, 38

*GE Inv. Private Placement Partners II v. Parker*,
  247 F.3d 543 (4th Cir. 2001) ..........................................................................................37

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).......................................................................................................27

*Germinaro v. Fid. Nat. Title Ins. Co.*,
  107 F. Supp. 3d 439 (W.D. Pa. 2015)..............................................................................37

*Haimdas v. Haimdas*,
  2010 WL 652823 (E.D.N.Y. Feb. 22, 2010).......................................................................21

*Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Investments, Inc.)*,
  155 B.R. 332 (Bankr.S.D.N.Y.1993) ................................................................................13

*In re Int'l Pharmacy & Disc. II, Inc.*,
  443 F.3d 767 (11th Cir. 2005) ........................................................................................19

*JPMorgan Chase Bank, N.A. v. Yuen*,
  No. 11 Civ. 9192 (NRB), 2013 WL 2473013 (S.D.N.Y. June 3, 2013)...........................29, 30

*Kramer v. Mahia (In re Khan)*,
  14-MC-01674 (PKC), 2016 WL 6652724 (E.D.N.Y. Nov. 10, 2016) ...................................42

*Levey v. Cummins (In re BoxMagic Media Corp.)*,
  No. 08 B 12628, 2012 WL 589652 (Bankr. N.D. Ill. Feb. 22, 2012) ....................................14

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992).......................................................................................................16

*In re Lyondell Chemical Co.*,
 No. 13 Civ. 3881(RA), 2014 WL 975507 (S.D.N.Y. Mar 11, 2014) ....................................42

*In re Manhattan Inv. Fund Ltd.*,
 397 B.R. 1 (S.D.N.Y. 2007) ...........................................................................................36, 38

*McNamara v. Sher*,
 2012 WL 760531 (S.D. Cal. Mar. 8, 2012) ..............................................................................37

*Mecca v. Gibraltar Corp. of Am.*,
 746 F. Supp. 338 (S.D.N.Y. 1990) .........................................................................................42

*Mendelsohn v. Jacobowitz ("In re Jacobs")*
 394 B.R. 646 (Bankr. E.D.N.Y. 2008) ....................................................................................32

*Morales v. Walt Disney Prods.*,
 361 F.Supp. 1157 (S.D.N.Y. 1973) .......................................................................................42

*In re Murray Industries, Inc.*,
 125 B.R. 314 (Bankr. M.D. Fla. 1991) ...................................................................................24

*Nisselson v. Salim (In re Big Apple Volkswagen, LLC)*,
 No. 11-11388 (JLG), 2016 WL 1069303 (Bankr. S.D.N.Y. Mar. 17, 2016) .........................14

*Parker v. Reda*,
 327 F.3d 211 (2d Cir. 2003) ...................................................................................................29

*Perpetual Securities, Inc. v. Tang*,
 290 F.3d 132 (2d Cir. 2002) ...................................................................................................24

*Picard v. Avellino (In re Bernard L. Madoff Inv. Securities LLC)*,
 557 B.R. 89 (Bankr. S.D.N.Y. 2016), *reconsideration denied,* 2016 WL
 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) ................................................................... *passim*

*Picard v. HSBC Bank PLC*,
 454 B.R. 25 (S.D.N.Y. 2011) ("*HSBC Bank II*"), *amended sub nom. In re*
 *Bernard L. Madoff Inv. Sec. LLC*, No. 11 CIV. 763 JSR, 2011 WL 3477177
 (S.D.N.Y. Aug. 8, 2011), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec.*
 *LLC.*, 721 F.3d 54 (2d Cir. 2013), and *aff'd sub nom. In re Bernard L. Madoff*
 *Inv. Sec. LLC.*, 721 F.3d 54 (2d Cir. 2013) ...........................................................................22

*Picard v. Ida Fishman Revocable Tr.*,
 576 U.S. 1044 (2015) .............................................................................................................43

*Picard v. Mendelow*,
 560 B.R. 208 (Bankr. S.D.N.Y. 2016) ...................................................................................18

*In re Prebul Jeep, Inc.*,
  2009 WL 4581900 (Bankr. E.D. Tenn. 2009) .......................................................35

*Preuss v. Kolmar Labs., Inc.*,
  970 F. Supp. 2d 171 (S.D.N.Y. 2013).................................................................33

*Prymak v. Contemporary Fin. Sols., Inc.*,
  2007 WL 4250020 (D. Colo. Nov. 29, 2007) .........................................................37

*Redfield v. Bartels*,
  139 U.S. 694 (1891)...................................................................................43

*In re Rivas*,
  2010 WL 2265663 (Bankr. E.D. Tenn. June 3, 2010) .............................................37

*Roberts v. Ground Handling, Inc.*,
  499 F. Supp. 2d 340 (S.D.N.Y. 2007)................................................................25

*Ruggiero v. Warner-Lambert Co.*,
  424 F.3d 249 (2d Cir. 2005)..........................................................................27

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  513 B.R. 437 (S.D.N.Y. 2014)........................................................................18

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  610 B.R. 197 (Bankr. S.D.N.Y. 2019)......................................................... *passim*

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*
  No, 08-01789 (SMB) and Adv. Pro. No. 10-04390 (CGM), 2020 WL 7422316
  (Bankr. S.D.N.Y. Dec. 11, 2020)............................................................... *passim*

*Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*,
  234 B.R. 293 (Bankr. S.D.N.Y. 1999)..................................................................9

*SEC v. Byers*,
  637 F.Supp. 2d 166 (S.D.N.Y. 2009)..............................................................24, 42

*Siding and Insulation Co., Inc. v. Acuity Mut. Ins. Co.*,
  754 F.3d 367 (6th Cir. 2014) ........................................................................24

*Simkin v. Blank*,
  19 N.Y.3d 46 (N.Y. 2012) ............................................................................39

*In re Siskin*,
  231 B.R. 514 (Bankr. E.D.N.Y. 1999)................................................................16

*Steel Co. v. Citizens for a Better Environment*,
  523 U.S. 83 (1998)....................................................................................15

*Taunt v. Hurtado (In re Hurtado)*,
     342 F.3d 528 (6th Cir. 2003) ............................................................................14

*Taveras v. City of New York*,
     2009 WL 10701924 (E.D.N.Y. Apr. 7, 2009) ....................................................33

*Taylor v. Illinois*,
     108 S. Ct. 646 (1988)..........................................................................................33

*United States v. Blechman*,
     657 F.3d 1052 (10th Cir. 2011) .........................................................................29

*United States v. Cornielle*,
     171 F.3d 748 (2d Cir.1999)................................................................................27

*United States v. Dreer*,
     740 F.2d 18 (11th Cir. 1984) ........................................................................29, 30

*United States v. Manufacturers Trust Co.*,
     198 F.2d 366 (2d Cir. 1952)...............................................................................35

*United States v. McGaughy*,
     670 F.3d 1149 (10th Cir. 2012) .........................................................................24

*United States v. Nixon*,
     418 U.S. 683 (1974)............................................................................................33

*United States v. Ron Pair Enterprises Inc.*,
     489 U.S. 235 (1989)............................................................................................40

*United States v. Samaniego*,
     187 F.3d 1222 (10th Cir. 1999) .........................................................................29

*United States v. Strother*,
     49 F.3d 869 (2d Cir. 1995)..................................................................................29

*United States v. Tropeano*,
     252 F.3d 653 (2d Cir. 2001)...............................................................................31

*USA United Fleet, Inc. v. Ally Financial, Inc.*
     (*"In re USA United Fleet, Inc."*), 559 B.R. 41 (Bankr. E.D.N.Y. 2016)................32

*Victorinox AG v. The B & F Sys., Inc.*,
     2015 WL 9256944 (S.D.N.Y. Dec. 15, 2015), *aff'd sub nom. Victorinox AG v.
     B&F Sys., Inc.*, 709 F. App'x 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017) ........33

*Whitmore v. Arkansas*,
     495 U.S. 149 (1950)............................................................................................15

*Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,*
*AFL-CIO,*
    955 F.2d 831 (2d Cir. 1992)................................................................40, 41, 43

*Wiener v. AXA Equitable Life Ins. Co.,*
    No. 16 CIV. 04019 (ER), 2019 WL 1228074 (S.D.N.Y. Mar. 15, 2019),
    *reconsideration denied,* No. 16 CIV. 4019 (ER), 2020 WL 409785 (S.D.N.Y.
    Jan. 24, 2020)...........................................................................................21

*Wolfe v. Devon Energy Prod. Co., LP,*
    382 S.W.3d 434 (Tex. App. 2012).................................................................16

**Statutes**

5 U.S.C. § 551 *et seq.*.................................................................................28

11 U.S.C.....................................................................................................45

11 U.S.C. § 546(e)......................................................................................43

11 U.S.C. § 548...........................................................................................41

11 U.S.C. § 548(a)(1)..................................................................................43

11 U.S.C. § 548(c)......................................................................................45

11 U.S.C. § 550..............................................................................9, 10, 13, 41

15 U.S.C. § 78fff (2)(c)(3)...........................................................................23

15 U.S.C. § 78fff-3(a)(2).............................................................................39

15 U.S.C. § 78*lll* (11)(B)............................................................................39

15 U.S.C. § 78*lll*(11)(C)............................................................................39

31 U.S.C. § 9102.........................................................................................28

F.S.A. § 655.82.....................................................................................6, 8, 12

F.S.A. § 655.82(2)......................................................................................12

Securities Investor Protection Corporation (SIPC) 1970 (84 Stat. 1636)......................28

**Other Authorities**

17 C.F.R. 240.15c3-3..................................................................................22

17 C.F.R. 300.100(b)..................................................................................40

17 C.F.R. 300.103 ........................................................................................................40

17 C.F.R. 300.104(b) ..................................................................................................40

6-1006 Weinstein's Fed. Ev. § 1006.07 (2015) ........................................................29

Fed. R. Civ. P. 56(c) ..................................................................................................25

Fed. R. Evid. 801 .......................................................................................................29

Fed. R. Evid. 802 .......................................................................................................29

Fed. R. Evid. 803(6) ..................................................................................................29

Fed. R. Evid. 803(22)(C) ...........................................................................................30

Fed. R. Evid. 804 .......................................................................................................31

Fed. R. Evid. 807(a) ..................................................................................................29

https://www.everycrsreport.com/reports/RL30533.html: ...........................................28

https://www.madofftrustee.com/hardship-program-17.html .......................................42

*SEC Official Testifies on Best Method for Determining Madoff Distributions*, Sec.
Exch. Comm'n. Today 10466961, 2009 WL 10466961 (Dec. 14, 2009)..............................37

Wright & Gold, 31 Fed. Practice and Procedure § 8043 ............................................29

Defendants respectfully submit this memorandum of law in opposition to the motion for

summary judgment of Irving H. Picard, the Trustee for the Liquidation of Bernard L. Madoff

Investment Securities, LLC (the "LLC"), and in further support of the Defendants' motion for

summary judgment dismissing the Complaint as against all defendants for lack of subject matter

jurisdiction, and for partial summary judgment dismissing the Complaint as against Tracy

Kamenstein.[1]

## PRELIMINARY STATEMENT

**The Trustee's shameless reliance on Dubinsky's perjury**

In order to deny Defendants' motion to dismiss for lack of subject matter jurisdiction, the

Court must accept the perjured testimony of the Trustee's primary witness, purported expert Bruce

Dubinsky. Despite his firm having been paid over $40 million by the Trustee (or, perhaps, because

of it), Dubinsky committed numerous instances of blatant perjury during the *Nelson* trial in May

2009. *Picard v. Nelson*, Adv. Pro. Nos. 10-04377 and 10-04658 (Bankr. S.D.N.Y, May 8-9, 2019)

(the "*Nelson* trial"). It is shocking that Picard would even offer Dubinsky's testimony.

Dubinsky's perjury was elicited by the Trustee's counsel, Dean Hunt, who wanted to prove

that Madoff never purchased securities for his investment advisory ("IA") customers.

> Q. Based on your review of the BLMIS Investment Advisory books and records,
> were you able to determine if Mr. Madoff's allocation concerning treasuries was
> accurate?
>
> A. It confirmed my analysis in finding that **no treasuries were bought or traded
> for any of the investment advisory clients.**

---

[1] This memorandum of law also incorporates Defendants' reply to SIPC's opposition to the Kamensteins'
motion for summary judgment dismissing the Complaint [ECF No. 133]. All definitions in this
memorandum of law are the same as those in the Kamensteins' moving papers, which are incorporated
herein by reference.

CMF ¶ 48 [2][emphasis added].

> Q.  So, taken in conjunction with the other evidence you identified relating to treasuries, did you reach a conclusion regarding the purchase and sale of treasuries, by the BLMIS Investment Advisory business?
>
> A. **There was no evidence of treasuries being purchased for the IA business customers, plain and simple.**

*Id.* [emphasis added].

> A. [There is] no evidence [of activity in the 703 account] other than money coming in from customers and money going out to customers [and] a little bit of the sweep, the overnight sweeps . . .

CMF ¶ 49.

Dubinsky swore that there was "never any addition to the 703 Account representing trading profits." CMF ¶ 49. He testified that he scoured every bank record and didn't find any other use of customer funds other than payments to customers and bank sweeps at night at JPMC:

> A. . . . I mean, I scoured the documents to see – maybe the money came in somewhere and    somehow evaporated somewhere else. I don't know. But I looked for all of the information that would be surrounding the transmittal, and there was none of it.
>
> A. . . .  I scoured every other bank account record and every other document. I wanted to make sure I was certain.

CMF ¶  50

> Q. . . . So, the proprietary trading side of the business bought and sold securities?
>
> A. Absolutely.
>
> Q. The investment advisory side?
>
> A. Never."

CMF ¶ 48.

---

[2] References to "CMF" are to the Counterstatement of Material Facts filed herewith. References to "SMF" are to the Statement of Material Facts the Kamensteins filed in connection with their moving brief.

Remarkably, on cross-examination, when confronted with credible, third party documentary evidence, Dubinsky completely contradicted the testimony elicited by the Trustee's counsel:

> Q. But in any event, **you're now telling us that you're aware that there were approximately eight accounts at which Madoff was using investment advisory customers' money to purchase T bills. Isn't that true?**
>
> **A. That is correct, yes.**
>
> Q. Okay. And those accounts included Lehman Brothers.
>
> A. Correct.
>
> Q. Bear Sterns.
>
> A. That's correct.
>
> Q. JP Morgan Chase.
>
> A. Correct.
>
> Q. Morgan Stanley.
>
> A. There was a Morgan Stanley account, yes.

CMF ¶ 53 [emphasis added].

> Q. Well, you testified that in trying to analyze Madoff's stock and T-bill position, you went only to the DTC records.
>
> A. Correct.
>
> Q. But isn't a fact that Mr. Madoff also kept securities with financial institutions from which he bought them?
>
> A. As in the eight brokerage accounts, yes.

CMF ¶ 54.

**The money transferred to the Defendants was not the LLC's money**

In their moving papers, the Kamensteins demonstrated that this Court lacks subject matter jurisdiction of this action because the Trustee's debtor, the LLC, did not own the bank accounts

from which the transfers to the Kamensteins were made. A bank account holder has a contractual relationship with its bank that must be evidenced by a writing. There is no greater evidence that Madoff individually, and his sole proprietorship, owned the JPMC bank accounts used in the IA business than the endorsement stamps Madoff used through November 2008 to deposit checks into the 703 Account ("For deposit only, Bernard L. Madoff"), and the name printed on the checks that Madoff wrote to customers on the 509 Account ("Bernard L. Madoff"), which JPMC accepted for eight years after the LLC was formed. Obviously, JPMC would not have accepted improper endorsements on the checks Madoff deposited into the 703 account from 2001 through 2008. That course of conduct proves that Madoff individually owned the 509 and 703 accounts.

In their opposition, the Trustee and SIPC ignore all of the evidence submitted in the Kamensteins' moving papers and, instead, rely upon decisions which inexplicably accept arguments that the Bankruptcy Court had previously rejected in the well-reasoned decisions of Judge Bernstein in *Picard v. Avellino* (*In re Bernard L. Madoff Inv. Securities LLC)*, 557 B.R. 89, 109 (Bankr. S.D.N.Y. 2016) ("*Avellino*"), *reconsideration denied,* 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016). In *Avellino,* Judge Bernstein twice held that the Trustee lacks standing to sue to recover transfers by Madoff because Picard is the Trustee of the LLC only and he has standing only to sue to recover transfers by the LLC; Madoff's individual trustee had standing to sue to recover transfers made by Madoff but he chose not to do so.

The Trustee did not appeal the *Avellino* decisions. Thus, they are law of the case and the Trustee is bound by them. The dignity of this Court compels the rejection of the Trustee's shameful strategy to use Dubinsky's perjured testimony to attain holdings which are flatly contradicted by all of the credible evidence.

**The Trustee's reliance on a 2004 LLC amended operating agreement is misplaced**

In desperation, the Trustee relies upon a 2004 amended operating agreement for the LLC which allows the LLC to maintain fiduciary accounts. The Trustee argues that this document proves that the LLC operated the IA business and owned the JPMC accounts. This argument is preposterous for several reasons. First, the ownership of bank accounts is established by a contract between the depositor and the bank. There is no evidence that the amended operating agreement was ever provided to JPMC and there is not a shred of evidence that Madoff ever told JPMC he wanted to change the ownership of the 703 and 509 accounts. Surely, if Madoff had wanted to change the ownership of the accounts, he would have sent a letter to JPMC informing them to change their records and he would have changed the name on the checks and would have changed his endorsement stamp.

Although he had the opportunity to, the Trustee never questioned Madoff about the amended operating agreement. Indeed, the Trustee never even asked Madoff if the IA business was operated by his sole proprietorship. Moreover, while the amended operating agreement for the LLC purports to allow the LLC to handle "fiduciary" accounts, there is no evidence that the LLC ever did so. Indeed, all of the IA individual retirement accounts continued to be held by an independent fiduciary, FISERV. CMF ¶ 7.

**Tracy Kamenstein received no Madoff funds, either directly or indirectly, after December 11, 2006**

The evidence is clear that Tracy Kamenstein did not receive a single withdrawal – or any part of a withdrawal – from the Madoff account which, in fact, was never changed from the Tracy Trust Account. All the withdrawals from that account in the last two years of Madoff's operation were requested by her father, David Kamenstein, who was her Trustee; and the checks were sent by Madoff to David at his home address and deposited into the CKDK CAP account at First Union

Bank which was owned by Carol and David Kamenstein.  Although Tracy has not been sued as a subsequent transferee, she could not be because no funds from that account were transferred to Tracy during the period following December 11, 2006.  The Trustee's expert, Lisa Collura, concluded that the CKDK CAP account was owned by Tracy's parents, Carol and David Kamenstein.  Defendants voluntarily disclosed in their moving papers that Tracy's name was on the CKDK CAP account but only pursuant to Florida's Pay on Death statute, F.S.A. § 655.82.  As Tracy and her brother, Sloan, had access to the CKDK CAP account only upon the death of both Carol and David.  Neither Tracy nor Sloan had any right to access the account during their parents' life time:  they had no ability to withdraw funds, they had no debit card; they simply had the right, upon their parents' death, to access the account.  CMF ¶ 29.

**The Trustee cannot prove the elements of a fraudulent transfer**

Judge Bernstein has repeatedly held that summary judgment is not appropriate in these cases.  For example, in a similar case where the Trustee announced his intention to move for summary judgment, Judge Bernstein stated:

> [y]ou know my view on these summary judgment . . . , motions, particularly on the issues I've identified, [whether the JPMC Accounts were held by Madoff personally or by the LLC, whether the LLC was a Ponzi scheme, and if so, when it began, whether the LLC was allocating T-bills purchased by the proprietary trading arm to customers of the IA business, deposits and withdrawals] . . . I have to try it.

Hearing Tr. 12:11-15 *Picard v. Savin,* Adv. Pro. No. 10-04889.  (Bankr. S.D.N.Y, March 17, 2020) ECF No. 96.  Despite these comments, the Trustee argues that he is nonetheless entitled to summary judgment.  The Trustee is wrong. There are numerous threshold factual issues that must be determined at trial.

There are three elements to the Trustee's claim: (1) a transfer of an interest of the debtor in property; (2) made within two years of the filing date of the petition; and (3) with actual intent to hinder, delay or defraud a creditor.  The Kamensteins have demonstrated that the Trustee cannot

prove the first and third of these elements:  the Trustee cannot prove that that the LLC owned the bank accounts from which transfers were made to IA customers; and the Trustee cannot prove that Madoff operated a Ponzi scheme.  Instead, the Trustee simply relies – without credible evidence -- on the "Ponzi scheme presumption."  However, the Kamensteins will prove at trial that the LLC does not meet the requirements of a Ponzi scheme; that Madoff did, indeed, buy identifiable securities with IA customers' money.  Some of those securities appeared on the Kamensteins' statements.  CMF ¶¶ 58-91.  Madoff's own testimony proves that the IA business was not a Ponzi scheme as courts have defined that term.  For example, Madoff persistently testified that he did not require the deposits of new investors to cover redemptions CMF ¶ 38.  And, as he pointed out, Madoff never solicited new customers.  CMF ¶ 39.  Moreover, Dubinsky testified that, unlike the fraudulent IA Business, the LLC operated completely legitimately.   CMF ¶ 57.   Dubinsky acknowledged that, of a total of 180 employees, all but 8-10 of them worked in the legitimate trading business ("LTB") operated by Madoff's sons:

> Q. Now, is it your testimony that the market making part of Madoff's business was a Ponzi scheme?
>
> A. No, I did not issue that opinion.
>
> Q. Okay. And is it your testimony that the proprietary trading part of the business was a Ponzi scheme?
>
> A. No, I did not issue that opinion.
>
> Q Okay. So out of the whole operation of 180 or so 15 employees, it's 8 to 10 employees who, in your opinion, were 16 involved in a Ponzi scheme; is that right?
>
> A. That's correct.

CMF ¶ 57. Thus, the Trustee's motion for summary judgment should be denied.

## FACTUAL BACKGROUND

The Kamensteins incorporate by reference all of the facts set forth in their opening submissions.

**The Tracy Trust Account**

Madoff account number 1CM596 was opened by David Kamenstein as Trustee in the name of the Tracy D. Kamenstein Irrevocable Trust (the "Tracy Trust") on August 23, 1999. At the time the account was opened, David provided Madoff with a copy of the Tracy Trust document. SMF ¶ 43. David never changed the name of the account and operated it, throughout, as Trustee. SMF ¶ 58. The Tracy Trust was funded with a September 7, 1999 transfer of $1,782,331 from another Madoff account, the Sloan and Tracy Account. Withdrawals from the Tracy Trust Account, like the withdrawals from the other Kamenstein Accounts, were all sent to David Kamenstein at his home address at his direction. CMF ¶ 26. The withdrawals were deposited by David into a bank account held by David and Carol Kamenstein at First Union Bank referred to as the "CKDK CAP Account." SMF ¶ 57. Neither Tracy nor Sloan had any control over this account or the funds in it. They could not withdraw funds, did not have check-signing authority, and did not have debit cards on the account. CMF ¶ 29. They were named on the account solely for purposes of the Pay on Death statute, F.S.A. § 655.82.

**Madoff's purchase of T-bills for the Kamensteins**

Madoff consistently purchased and owned T-Bills which he assigned to customer accounts, including the Kamenstein accounts. For example as of December 31, 2007, the accounts of both David and Carol held T-bill positions in the amount of 2,175,000. And the Kamensteins can prove, through third party evidence, that Madoff owned those T-bills at the time they appeared on David's and Carol's customer statements. CMF ¶¶ 58-74 Similarly, as of December 31, 2007, the Tracy Trust Account held T-bill positions in the amount of 1,775,000. CMF ¶¶ 85-90. And the

Kamensteins can prove, through third party evidence, that Madoff owned those T-bills at the time

they appeared on the Tracy Trust Account customer statement.  As of December 31, 2007, the

Sloan Trust Account held T-Bill positions in the amount of 941,915.50.  CMF ¶¶ 77-82.  And the

Kamensteins can prove, through third party evidence, that Madoff owned those T-bills at the time

they appeared on the Sloan Trust Account customer statement.

Although on direct examination elicited by the Trustee, Dubinsky testified that Madoff

never purchased securities with IA customers' money, on cross-examination he admitted that

Madoff used IA customers' money, taken from the 703 Account, to purchase T-bills through

accounts Madoff held at various brokerage firms.  Dubinsky admitted:

> A.. There was money taken out of the 703 account, transferred to these
> accounts, these various accounts, and then these securities were purchased,
> yes.

CMF ¶ 52.

Much of Dubinsky's testimony on cross-examination supported Madoff's testimony at his

deposition that he used IA customers' money to purchase T-bills for them.  CMF ¶ 31.

## **ARGUMENT**

I.    **THE COMPLAINT AGAINST TRACY KAMENSTEIN SHOULD BE
      DISMISSED**

Under 11 U.S.C. § 550, a trustee may recover a transfer proven to be fraudulent from 1)

the initial transferee; 2) one for whose benefit a transfer is made; or 3) a subsequent transferee.  *In

re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 56 (2d

Cir. 1997); *Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 312 (Bankr. S.D.N.Y.

1999).  Tracy has been sued as a direct transferee only which, clearly, she is not.  She did not

receive funds from Madoff in the clawback period and she was not a beneficiary of her father's

receipt of any such funds. Thus, even if the complaint alleged that Tracy was a subsequent transferee, there is no evidence to support such a claim.

Even a joint accountholder cannot be liable for the receipt of funds that she did not know had been deposited into her account. *In re BICOM, NY, LLC,* 619 B.R. 799 (Bankr. S.D.N.Y. 2020) (granting summary judgment on a claim under 11 U.S.C. § 550). Here, Tracy cannot possibly be an initial transferee because David, as Trustee, requested withdrawals from the Tracy Trust Account; Madoff sent the checks representing withdrawals from the Tracy Trust Account to David at his home address; David deposited those checks into the CKDK CAP Account; and Tracy had no right to the funds in the CKDK Account unless and until both of her parents had died. SMF ¶¶ 57, 62; CMF ¶¶ 26, 29.

The Trustee contends that Defendants "cannot dispute" that the Tracy Trust Account was opened in Tracy's own name. Tr. Br. at 36.[3] Of course Defendants can dispute this statement because it is flatly contradicted by the account opening forms that Madoff accepted which prove that the Tracy Trust Account was opened by David as Trustee, and all of the account opening papers were signed by him, in that capacity. SMF ¶ 51. Even the Trustee's counsel has acknowledged that, although Tracy herself did not know it, the Account "was in the name of this Trust." CMF ¶ 23.

By the express terms of the Tracy Trust, Tracy had no power at any age to withdraw funds in excess of the deposits into her Trust account in the same calendar year. Thus, by definition, she

---

[3] References to "Tr. Br." are references to the Trustee's Memorandum of Law in Support of Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment, filed in this case on December 22, 2020. *Picard v. Kamenstein, et al* Adv. Pro. No. 10-04469 (Bankr. S.D.N.Y.) ECF No. 125. References to "SIPC Br." are references to Securities Investor Protection Corporation's Memorandum of Law In Opposition to Defendants' Motion for Summary Judgment and Defendant Tracy D. Kamenstein's Motion for Partial Summary Judgment, filed in this case on December 23, 2020. *Picard v. Kamenstein, et al* Adv. Pro. No. 10-04469 (Bankr. S.D.N.Y.) ECF No. 133.

could not have become, in Picard's terminology, a "net winner."  Article II, Section D, titled

"Tracy's Power to Withdraw Principal," provides as follows:

> 1.  <u>Power of Withdrawal</u>.  During each year in which any person shall transfer
> property to the Trust, including the calendar year of the execution of this
> Agreement (each such year being referred to herein as a "transfer year"),
> TRACY shall have the absolute right to withdraw from the Trust, at any time
> during such transfer year, but no later than thirty (30) days from the date of
> receipt of the notice from the Trustee as hereinafter described in subsection 3
> of this Section D, an amount of principal which, taking into account all prior
> withdrawals of principal during the transfer year by Tracy relating to transfers
> by such person, is not in excess of the lesser of (i) the exclusion amount for
> such person for such transfer year . . .  or (ii) an amount equal to all of the
> transfers (which, in the case of a transfer of property other than cash, shall be
> taken into account at its fair market value at the date of its transfer to the Trust)
> made by such person to the Trust for such transfer year.

CMF ¶ 24.

The Tracy Trust provides, in Article 2, Section E (1)(c), that the Trust will terminate when

Tracy "attains the age of thirty-six (36) years and "the Trustee shall pay over and deliver to

TRACY any then remaining principal and any accrued or undistributed income of the Trust."  In

fact, although Tracy turned 36 on November 22, 2000, David never terminated the Trust and never

paid over the remaining principal to her.  Nor did he ever notify Madoff that the name on the

account should be changed to Tracy Kamenstein.  Thus, the Trust continued.

The Trustee cannot dispute that David Kamenstein managed all of the funds in the Tracy

Trust Account.  Nor can he dispute that all funds withdrawn from the Tracy Trust Account were

deposited into the CKDK CAP account owned by David and Carol.  *E.g.* Tr. Br. at 35-39.  Madoff

sent all of the withdrawal checks to David at his home address, not to Tracy, even though Tracy

did not live in David's home. CMF ¶¶  26, 27.

There is no dispute that, as Collura concludes, all of the funds withdrawn from the Tracy

Trust Account were placed into the CKDK Account.  SMF ¶¶ 57, 62.   And Tracy had no right to

use the funds in the CKDK Account. There is nothing in the record to support the Trustee's contention that the CKDK Account was jointly owned by David, Carol, Sloan and Tracy. Tr. Br. at 37, n.7. On the contrary, neither Tracy nor Sloan ever accessed the CKDK Account. Tracy and Sloan were named on the account pursuant to a Florida statute allowing someone to be named as an account owner solely for purposes of Florida's Pay on Death statute, F.S.A. § 655.82. A Pay on Death account owner has no rights to the account whatsoever so long as the primary owner is alive. F.S.A. § 655.82(2) ("A beneficiary in an account having a pay-on-death designation has no right to sums on deposit during the lifetime of any party.").

Florida courts have recognized that a Pay on Death Account is one of a number of mechanisms that is frequently used as an estate-planning tool and allows an asset to transfer outside of the probate process. *Blechman v. Estate of Blechman,* 160 So. 3d 152, 157 (Fla. Dist. Ct. App. 2015), *citing* Nathaniel W. Schwickerath, *Public Policy and the Probate Pariah: Confusion in the Law of Will Substitutes,* 48 Drake L.Rev. 769, 798 (2000) (interpreting an LLC agreement under New Jersey law to recognize a non-testamentary transfer of a decedent's share in an LLC to his children rather than as part of his estate).

Here, all the evidence shows that Tracy did not and could not use any of the funds in the CKDK Account. As the Trustee has admitted in the Collura Report, the CKDK Account was owned by David and Carol. SMF ¶ 54; CMF ¶ 25 ("Based on documents included in BLMIS customer files, the "CKDK CAP account" is . . . held by defendants David and Carol Kamenstein.") Tracy did not have the right to withdraw funds. CMF ¶ 29. She did not have check signing authority, or a debit card on the CKDK Account and she had no checks, and could not simply walk into the bank and take money out. *Id.*

The Trustee argues that, because Tracy was named as the payee on all 53 checks from Madoff representing a withdrawal from the Tracy Trust Account, she is automatically liable. Tr. Br. at 36. However, this is not correct. David Kamenstein opened the account in the name of the Tracy Trust and he provided Madoff with a copy of the Trust document. SMF ¶ 43. The ownership of the account was never changed from the Trust's ownership. All of the checks on which the Trustee sues Tracy were requested by David and were sent to David's home, not Tracy's home. None of the checks on which the Trustee sues Tracy was endorsed by Tracy and deposited into an account she owned. On the contrary, the checks were deposited into the CKDK CAP account which was owned by Carol and David. SMF ¶¶ 57, 62; CMF ¶¶ 25, 28.

Thus, there is no basis for finding that Tracy was the initial transferee of the checks. And, although the Trustee has not sued Tracy as a subsequent transferee, the Trustee could not do so because, as is clear from David's instructions to his bookkeeper, he did not request that any of the withdrawn funds be transferred to Tracy. As the Second Circuit made clear in *In re Finley, Kumble*, 130 F.3d at 57, in order to establish initial transferee status, the defendant must have had possession and entitlement to the money. Here, Tracy was not the initial transferee and she never had possession or entitlement to the money.

Even in cases where a defendant is the initial recipient of a check, the defendant cannot be liable if the initial transferee lacked "dominion and control" over the funds. In such a case, the initial transferee is considered a "mere conduit" and is not liable under 11 U.S.C. § 550. *Finley Kumble,* 130 F.3d at 57; *Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Investments, Inc.),* 155 B.R. 332, 337 (Bankr.S.D.N.Y.1993) ("Parties that act as conduits and simply facilitate the transfer of funds or property from the debtor to a third party generally are not deemed initial transferees for purposes of" section 550); *In re Black & Geddes, Inc.,* 59 B.R. 873, 875 (Bankr. S.D.N.Y.

1986) ("an entity that acts as a mere conduit of funds is not an "initial transferee" within the ambit of section 550 and no recovery may be had from the entity").  As the Seventh Circuit held, in order to have dominion and control over the funds, the party must be "free to invest the whole [amount] in lottery tickets or uranium stocks." *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988).

The Trustee cites no authority to the contrary.  He cites *Nisselson v. Salim (In re Big Apple Volkswagen, LLC)*, No. 11-11388 (JLG), 2016 WL 1069303, at *17 (Bankr. S.D.N.Y. Mar. 17, 2016), to argue that Tracy had the right to use the funds in the CKDK CAP account, even if she chose not to do so.  In *In re Big Apple Volkswagen,* the court held that the evidence showed that the defendant had chosen to "cede[ ] her control" over the funds to her children but still had control over the funds had she chosen to assert it, so she was technically liable for fraudulent transfers. Here, however, Tracy never had control of the funds: the account was opened by David as Trustee of the Tracy Trust; all communications concerning the account were always between David and Madoff; Madoff always sent checks representing withdrawals from the Tracy Trust Account to David at his home address, and those funds were deposited into the CKDK CAP account, to which Tracy had no access. CMF ¶¶ 25, 28, 29

The Trustee also relies on *Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528 (6th Cir. 2003), where a mother had knowingly accepted the transfer of funds as a way to conceal them from creditors.  These facts are entirely irrelevant here.  The Trustee has conceded that all of the Kamensteins are entirely innocent of any wrongdoing and that they are good faith recipients of withdrawals from the various Madoff accounts.  Finally, the Trustee relies upon *Levey v. Cummins (In re BoxMagic Media Corp.)*, No. 08 B 12628, 2012 WL 589652, (Bankr. N.D. Ill. Feb. 22, 2012), for no apparent reason.  That case involved a preference claim where the defendant asserted

the affirmative defense that the preference was paid in the ordinary course of business but failed to adduce any evidence supporting that defense.

There is no basis to hold Tracy liable for David's withdrawal of funds from the Tracy Trust Account and the Court should grant summary judgment dismissing the Trustee's claim against Tracy.

## II.    THIS COURT LACKS SUBJECT MATTER JURISDICTION

A federal court cannot exercise jurisdiction where the plaintiff lacks Article III injury. *See Whitmore v. Arkansas,* 495 U.S. 149, 161 (1950). As the Supreme Court held in *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 101 (1998), a district court must establish jurisdiction, including a determination that the plaintiff has Article III standing, before deciding the merits. Courts may not simply resort to a theory of "hypothetical jurisdiction" without first determining that the court has subject matter jurisdiction. *Id.* at 94. As the Supreme Court explained:

> Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle,* 7 Wall. 506, 514, 19 L.Ed. 264 (1868).

*Steel*, 523 U.S. at 94. For a federal court "to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act *ultra vires.*" *Id.* at 101. That a plaintiff may offer to make good use of the money he hopes to recover is not a basis to exercise jurisdiction when the plaintiff never owned the stolen property.

In *Alliance for Envt'l Renewal, Inc. v. Pyramid Crossgates Co.,* 436 F.3d 82, 86 (2d Cir. 2006), the Second Circuit, citing *Steel,* explicitly held that standing must be resolved before the merits. The issue in *Steel* was whether Article III standing or "statutory standing" should be decided first. As the court observed, "*Steel Co.* is clear enough that merits issues may not be

decided first, but leaves us uncertain as to the circumstances under which statutory standing may

be decided (and rejected) before Article III standing is established." *Alliance,* 436 F.3d at 86.  Thus,

*Alliance* in no way suggests that the court defer consideration of standing until after conducting a

trial on the merits.  Courts nationwide agree that subject matter jurisdiction is separate from

whether the plaintiff has stated a claim. "Standing is not an element of a claim. It is a jurisdictional

underpinning of a suit and can be challenged at any time." *Wolfe v. Devon Energy Prod. Co., LP,*

382 S.W.3d 434, 464 (Tex. App. 2012); *see also In re Siskin*, 231 B.R. 514, n.3 (Bankr. E.D.N.Y.

1999).  The Trustee has failed to prove he has subject matter jurisdiction and the Kamensteins are

entitled to summary judgment dismissing the Complaint against them.

The indisputable documentary record proves that the money the Trustee seeks to recover

was transferred by Madoff, not the LLC. Picard is the Trustee for the LLC, not Madoff

individually, and he has no standing to assert a claim that, by statute and court order, could only

have been asserted by Madoff's individual Trustee.

### A.    The Trustee cannot meet his burden to prove Article III injury

The burden is on the Trustee to establish that he has suffered Article III injury. *See Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The Trustee must carry that burden "in the

same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner

and degree of evidence required at successive stages of the litigation." *Id.*at 561.  The Trustee does

not challenge any of the evidence set forth in the Kamenstein's moving papers which proves that

Madoff owned the bank accounts through which the Kamensteins were paid. Instead, he simply

ignores it.

- The Trustee ignores the letters Madoff sent in January 2001 to the entities with which the LLC did business informing them that the Legitimate Trading Business (the "LTB") had been transferred to the LLC.  SMF ¶ 7.  Madoff sent no such letter to JPMC. SMF ¶ 8.

- The Trustee ignores the name printed on every check sent to the Kamensteins from the 509 Account: "Bernard L. Madoff." SMF ¶¶ 30, 35, 41, 47

- The Trustee ignores the endorsement stamp on every check that Madoff received from an IA customer through November 2008: "For deposit only: Bernard L. Madoff." SMF ¶ 16.

- The Trustee ignores the bank statements for the 703 and 509 Accounts, all of which show that the accounts were never owned by the LLC; instead the 703 account was owned by BLMIS, Madoff's sole proprietorship since the 1970's and the 509 account was owned by Madoff individually. SMF ¶¶ 14, 15.

- The Trustee ignores the admissions of his own experts that they had never seen even a single document relating to the JPMC accounts in the name of the LLC. SMF ¶ 21.

- The Trustee ignores Dubinsky's admission that the LLC was a legitimate business and it was only the investment advisory business that was fraudulent. SMF ¶ 57.

Since the 509 and 703 Accounts were not owned by the LLC, the funds in those accounts were not the property of the LLC and are not recoverable by the Trustee. Ignoring all of this irrefutable evidence, the Trustee argues that the transfers to the Kamensteins were an "interest of the debtor in property," relying on *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 610 B.R. 197, 216 (Bankr. S.D.N.Y. 2019) ("*Nelson*") and on *Sec. Inv'r Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC* No, 08-01789 (SMB) and Adv. Pro. No. 10-04390 (CGM), 2020 WL 7422316 (Bankr. S.D.N.Y. Dec. 11, 2020) ("*BAM"*). These decisions are irreconcilable with the well-reasoned decisions in *Avellino.* They are also irreconcilable with the evidence.

1. **The law of the case doctrine binds the Trustee to the holdings in *Avellino***

The Trustee and SIPC both argue that all decisions within the SIPA proceeding [except the *Avellino* decisions] constitute law of the case and should not be revisited. *E.g.* Tr. Br. at 2, SIPC Br. at 4. This is untrue. The clawback cases were not substantively consolidated and the Kamensteins do not have standing to appeal this Court's rulings in *Nelson* or in any other proceeding to which they were not a party. But even if they did, the law of the case is "a

discretionary rule of practice and generally does not limit a court's power to reconsider an issue."
*Sec. Inv'r Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 437, 441 (S.D.N.Y. 2014). Certainly, the District Court retains the power to review and reverse all decisions of the Bankruptcy Court, and the doctrine of law of the case does not even limit a court's power to reconsider its own decisions prior to final judgment. *Arizona v. California*, 460 U.S. 605 (1983).

The Trustee contends that the "law of the case" doctrine binds the Kamensteins but, apparently, does not similarly bind him. This contention is insupportable. Law of the case binds the parties to a case, not third parties who had no standing to appeal a decision in another case. Thus, it is the Trustee who is bound by the law of the case in this Court's two decisions in *Avellino*, holding that only Madoff's Trustee can seek to avoid transfers made by Madoff individually. The Trustee does not explain why he should be able to relitigate a ruling which he did not appeal yet the Kamensteins should be bound by decisions to which they were not parties.

## 2. The holdings in *Nelson* and *BAM* are insupportable

The holdings in *Nelson* and in *BAM* are clear error. Judge Bernstein twice held that Picard had no standing to sue to recover transfers by Madoff. *See Avellino*, 557 B.R. at 109 ("Only the Madoff trustee can recover actual transfers by the sole proprietorship."); *Picard v. Mendelow*, 560 B.R. 208, 227 (Bankr. S.D.N.Y. 2016) (same). Notwithstanding these rulings, in *Nelson,* Judge Bernstein ignored *Avellino* and held that the Trustee has standing to recover any property that will be used to enrich the LLC's customers. By that reasoning, the Trustee would have a right to rob a bank, so long as he put the money in the customer property estate. Article III injury cannot be so casually created. Judge Bernstein had it right in *Avellino*: the LLC's "customer property estate" cannot include property that belonged to Madoff, just as Madoff's estate cannot include property that belonged to the LLC.

There is not a single document to indicate that Madoff ever changed the ownership of the JPMC accounts from him and his sole proprietorship to the LLC.  Indeed, the Trustee has admitted there is no such document.  SMF ¶ 8.  And since the two JPMC accounts used by Madoff for his IA Business were not owned by the LLC, they were not the property of the LLC.  *In re Chowaiki & Co. Fine Art Ltd.*, 593 B.R. 699, 713 (Bankr. S.D.N.Y. 2018) ("New York law presumes that 'once funds are deposited in a bank account, the account holder has title to and control over those funds.'"); *City of New York v. Venkataram*, 2011 WL 2899092, at *5, n.6 (S.D.N.Y. July 13, 2011) ("'Under New York law, the party who possesses property is presumed to be the party who owns it.'"); *see also In re Int'l Pharmacy & Disc. II, Inc.,* 443 F.3d 767, 771 (11th Cir. 2005) ("In most states, the name or title to a bank account creates a presumption of ownership in the titleholder.")

Instead, all the evidence proves that the bank accounts remained Madoff's property after the LLC was formed.  Madoff did not register with the SEC as an investment advisor until August 25, 2006.  *In re Bernard L. Madoff Inv. Secs., LLC*, 424 B.R. 122, 127 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229 (2d Cir. 2011) ("On January 19, 1960, BLMIS registered with the SEC as a broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. section 78*o* (b), and, beginning in 2006, as an investment advisor."); *see* Chaitman **Ex**. **A**, Form ADV Uniform Application for Investment Adviser Registration for Bernard L. Madoff Investment Securities dated August 25, 2006 at 7 [PUBLIC0003729-762] [Q: Are you, at the time of this filing, succeeding to the business of a registered investment advisor? A: No."].  Even after August 25, 2006 there was no change in Madoff's relationship with JPMC and no change in the ownership of the JPMC accounts used for the IA business.  Moreover, according to Madoff's August 25, 2006 filing with the SEC, the LLC was handling only $ 11 billion of customer funds in the LLC's IA

business.  CMF ¶ 4.  This represents a very small portion of the business handled by Madoff personally through the 703 and 509 accounts.

Thus, there is not a shred of evidence to establish that the Trustee has suffered Article III injury.  In *Nelson,* Judge Bernstein held, in addition to his conclusion that the Trustee could recover anything that was "customer property," that the "evidence demonstrated that BLMIS owned the Chase Accounts" *Nelson,* 610 B.R. at 216.  But this is clearly erroneous.  As this Court did in *BAM,* Judge Bernstein pointed to SEC Amended Form BD as "consistent with" the Trustee's argument that the LLC owned the bank accounts.  Judge Bernstein stated that Madoff represented, on SEC Amended Form BD, that he would transfer "all of predecessor's assets and liabilities related to predecessor's business" and that no "accounts, funds, or securities of customers of the *applicant* are held or maintained by such other *person*, firm or organization".  *Nelson,* 610 B.R. at 216.  However, Judge Bernstein committed clear error:  the LLC, **not Madoff**, is clearly noted as the "applicant" on Amended Form BD.   CMF ¶ 1.  Moreover, this Court failed to address the fact that the LLC expressly confirmed that the only "business" of the LLC was market making and proprietary trading, and the LLC represented that it did not engage in "investment advisory services" at all.  CMF ¶ 2.  Finally, of course, no filing by the LLC with the SEC can change Madoff's contractual relationship with JPMC.

Judge Bernstein's reference to the JPMC bank statements as Commercial Checking Accounts, in *Nelson,* 610 B.R. at 217, certainly does not indicate who owned the bank accounts. And, based on JPMC's records, Madoff owned the accounts, not the LLC. Indeed, it is preposterous to suppose that, for seven years, JPMC would have accepted for deposit checks that Madoff endorsed "For deposit only Bernard L. Madoff" if, in fact, Madoff did not own the 703 account. Judge Bernstein also appeared to rely upon the fact that the JPMC bank statements were

sent to Anthony Tiletnick or Daniel Bonventre, and not to Madoff personally.  But there is nothing

in the law which suggests that an account holder can change the ownership of an account, not by

notifying the bank in writing, but rather by simply designating an employee to receive the bank

statements. Finally, in *Nelson* Judge Bernstein cited admissions in the Defendants' answers that

they received transfers from the LLC, as well as debit memoranda that contained the name of the

LLC.  *Nelson* 610 B.R. at 216.  Obviously, the answers were filed in *Nelson* before defense counsel

was able to obtain the indisputable evidence that the Trustee misrepresented the ownership of the

JPMC accounts.  But, surely, the Trustee should not be rewarded for his dishonesty so that he can

succeed in defrauding Madoff's former customers.  In any event, the Kamensteins made no such

admissions in their answer.

### 3.  Dubinsky was never qualified as an expert on whether the IA business was transferred to the LLC

In *BAM* and *Nelson,* the Court relied upon the purported expert testimony of Dubinsky.

But, putting aside for a moment Dubinsky's flagrant perjury, Dubinsky's testimony on the

ownership of the JPMC bank accounts, and whether the IA Business was transferred to the LLC,

is not admissible because he has no expertise on the issue of how ownership of a bank account is

documented by a commercial bank or how a sole proprietorship is converted to an LLC.  Indeed,

Dubinsky's expert reports are devoid of any opinions on these subjects.  The Trustee never even

sought to qualify Dubinsky as an expert on the subject of whether the IA Business was transferred

to the LLC and he did not opine on this subject in his expert report.  *See e.g.* Expert Report of

Bruce Dubinsky, *Picard v. Kamenstein, et al.* Adv. Pro. No. 10-04469 (Bankr. S.D.N.Y.) ECF No.

129-1.  *See Wiener v. AXA Equitable Life Ins. Co.,* No. 16 CIV. 04019 (ER), 2019 WL 1228074,

at *4 (S.D.N.Y. Mar. 15, 2019), *reconsideration denied,* No. 16 CIV. 4019 (ER), 2020 WL 409785

(S.D.N.Y. Jan. 24, 2020) ("an expert who is qualified in one field cannot offer an opinion about

aspects of the case in another field for which she is not qualified"); *Haimdas v. Haimdas*, 2010 WL 652823, at *2 (E.D.N.Y. Feb. 22, 2010) (disqualifying expert because "the witness's background only qualifies him or her to testify about the "issues or subject matter[s] within his or her area of expertise") and citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)).

III.    **SIPA DOES NOT CREATE ARTICLE III INJURY**

The Trustee and SIPC make numerous arguments that Judge Bernstein properly rejected in *Avellino*. For example, they argue that the Securities Investor Protection Act ("SIPA") somehow authorizes the Trustee to sue to recover a transfer made by Madoff, not the LLC, based on a broad definition of "customer property" under SIPA and, by implication, Rule 15c3-3 of the Securities Exchange Act of 1934. *See* 17 C.F.R. 240.15c3-3; Tr. Br. at 35; SIPC Br. at 6.  However, this strained attempt to alter the statute is doomed to fail. As Judge Rakoff held, SIPA does not confer a "vast power on such a trustee to commence lawsuits he could not otherwise bring" and Rule 15c3-3 is "undisputedly not a part of SIPA" and does not "grant the Trustee additional standing." *Picard v. HSBC Bank PLC*, 454 B.R. 25, 29-31 (S.D.N.Y. 2011) ("*HSBC Bank II"), amended sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, No. 11 CIV. 763 JSR, 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54 (2d Cir. 2013), and *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54 (2d Cir. 2013).

The Trustee argues that the scope of the Protective Decree, by which Picard was appointed SIPA Trustee, should be construed to include both Madoff and the LLC. *E.g.* Tr. Br. at 32. But this precise argument was considered and rejected in *Avellino*. *See Avellino reconsideration decision* at *3. Moreover, the Protective Decree states in ¶ I that the customers of the LLC are in need of the protections of SIPA, not the customers of Madoff individually. Similarly, in ¶ II, the Protective Decree notes that the Trustee was appointed as the "trustee for the liquidation of the Defendant," referring to the LLC and with no mention whatsoever of Madoff individually.

The argument that the Trustee was appointed for the *business* of the broker-dealer, rather than for the liquidation of the LLC doesn't help the Trustee *See, e.g.* Tr. Br. at 32. The business of the broker-dealer was the legitimate trading business. Although the Trustee argues that the LLC took over the business of the sole proprietorship, *id.,* there is simply no evidence to support this statement. On the contrary, not a single employee of the legitimate trading business had any role in the operation of the IA business. The businesses were operated completely separately and on different floors of the Lipstick Building:  the LLC operated on the 18th and 19th floors; the IA business operated on the 17th floor. CMF ¶ 5. The LLC used Bank of New York for all its banking needs; the IA business used JPMC. SMF ¶¶ 11, 13.

The Trustee argues that "as long as a trustee can show that the property [he seeks to recover] was customer property received by the broker-dealer, he has the authority to recover it, wherever it lies." Tr. Br. at 33; SIPA § 78fff (2)(c)(3). But that is precisely what the Trustee cannot prove. The evidence is indisputable that the Kamensteins' property was never received by the broker-dealer. The Trustee argues that, even if Madoff operated a sole proprietorship before the Trustee was appointed, the Trustee still has the right to recover funds paid by Madoff individually. But this precise argument was rejected by Judge Bernstein, twice, in *Avellin*o.

The Substantive Consolidation Order entered by the District Court on July 9, 2009, expressly provides that Madoff's own trustee has standing to void transfers by Madoff and Picard has standing to void transfers by the LLC. Yet, the Trustee argues that this is just a "belt and suspenders" order to ensure that none of Madoff's assets slipped through the cracks since various entities were pursuing them, and the reservations in the order were necessary because, unless they were expressly preserved, the substantive consolidation of the two estates could extinguish both trustees' avoidance powers altogether. Tr. Br. at 34. Judge Bernstein flatly rejected this argument,

and for good reason. *See Avellino reconsideration decision at *2-3.* Moreover, any reliance on the substantive consolidation of the LLC's estate and Madoff's estate is constrained both by the limitations of the substantive consolidation doctrine and the Court's order authorizing the consolidation, which does not expand it. Substantive consolidation does not merge the debtors or retroactively transform property of someone other than the debtor into property of the debtor. *See, e,g, In re Bauman*, 535 B.R. 289, 301 (Bankr. C.D. Ill. 2015); *In re Murray Industries, Inc.*, 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991); *Ferguson v. Garden Ridge Corp.*, 399 B.R. 135. 140 (D. Del. 2008); *In re Deltacorp, Inc.*, 179 B.R. 773 (Bankr. S.D.N.Y.1995).

Thus, the Consolidation Order could not create subject matter jurisdiction where none exists because subject matter jurisdiction cannot be expanded by judicial fiat, the consent of the parties, or by any other artifice. *See, e.g. Perpetual Securities, Inc. v. Tang*, 290 F.3d 132, 136 (2d Cir. 2002); *Siding and Insulation Co., Inc. v. Acuity Mut. Ins. Co.*, 754 F.3d 367, 373-374 (6th Cir. 2014); *Fafel v. Dipaola*, 399 F.3d 403, 410 (1st Cir. 2005. Subject matter jurisdiction cannot be conferred or waived by consent, estoppel, or failure to raise the issue early in the proceedings. Indeed, lack of subject matter jurisdiction can be raised at any time. *United States v. McGaughy*, 670 F.3d 1149, 1155 (10th Cir. 2012).

Finally, the Trustee argues that, if Defendants are correct, there is no one that can recover the withdrawals and that this is not the intention of SIPA. Tr. Br. at 31. This is not the case at all and it has nothing to do with SIPA. As this Court held, Madoff's individual trustee, Alan Nisselson, could have asserted a claim to recover the transfers, but he simply chose not to do so. *See Avellino*, 557 B.R. at 110 ("Only the Madoff trustee can recover actual transfers by the sole proprietorship."). Perhaps Nisselson recognized, as did Judge Chin, that clawing back funds from

innocent customers is "cruel." *SEC v. Byers,* 637 F.Supp. 2d 166, 182 (S.D.N.Y. 2009). The fact that Nisselson failed to sue Defendants does not give the Trustee Article III standing to sue them.

## IV.    THE TRUSTEE IS NOT ENTITLED TO SUMMARY JUDGMENT

Ignoring Judge Bernstein's repeated admonition that summary judgment is inappropriate, the Trustee nonetheless maintains he is entitled to it.  He is not.  The Trustee's motion rests on inadmissible evidence, and as we have demonstrated, the Trustee cannot prove a "transfer of an interest of the debtor in property" because the Trustee's "debtor," the LLC, never owned the funds in the 703 and 509 Accounts.  In addition, the Trustee cannot prove intent because he cannot prove the existence of a Ponzi scheme and, thus, cannot rely on the Ponzi scheme presumption to establish fraud.

### A.    The Trustee's Motion Rests on Inadmissible Evidence

The evidence submitted on a motion for summary judgment must be admissible. *Bellamy v. City of New York,* 914 F.3d 727, 750 (2d Cir. 2019); *Edwards v. Onondaga Cmty. Coll.*, No. 5:14-CV-1329, 2016 WL 3519619, at *4 (N.D.N.Y. June 22, 2016); *Boger v. New York State Office of Parks, Recreation & Historic Pres.*, 2019 WL 2766897, at *6 (N.D.N.Y. July 2, 2019); *Roberts v. Ground Handling, Inc.*, 499 F. Supp. 2d 340, 360 (S.D.N.Y. 2007). *See also* Fed. R. Civ. P. 56(c). The evidence on which the Trustee relies is inadmissible.

#### 1.    Dubinsky's Misstatements

Underlying all of the Trustee's arguments is the single premise that Madoff never purchased any securities with IA customers' money. Confronted with the third party documentary evidence at the *Nelson* Trial, however, Dubinsky admitted that Madoff *did* purchase T-bills with IA customers' money.

Although, in cross-examination at the *Nelson* Trial, Dubinsky abandoned his perjured testimony on direct examination by the Trustee's counsel, the Trustee nevertheless relies on

Dubinsky's perjured direct testimony to argue, here, that the Trustee is entitled to summary judgment. Indeed, on his summary judgment motion, the Trustee relies almost entirely upon the perjured testimony of Dubinsky, elicited by the Trustee's counsel, Dean Hunt, that Madoff never used IA customers' funds to purchase securities even though, on cross-examination, Dubinsky admitted that Madoff had used IA customers' money to purchase T-bills. CMF ¶ 55. When questioned by Dean Hunt, Dubinsky testified that there is "no evidence [of activity in the 703 account] other than money coming in from customers and money going out to customers," *id*. at 92:16-17, and a minimal amount (3% of the total monies in the 703 Account) from overnight sweeps. CMF ¶ 48. Dubinsky swore that there was "never any addition to the 703 Account . . . [representing] trading profits." CMF ¶ 49. He testified that he scoured every bank record and didn't find any other use of customer funds other than payments to customers and bank sweeps at night at JPMC. CMF ¶ 50. It is truly remarkable that the Trustee would continue to rely upon Dubinsky's testimony on direct examination at the *Nelson* trial when Dubinsky completely recanted that testimony on cross.

When questioned by the Nelsons' counsel, Dubinsky admitted that Madoff used IA customers' money, taken from the 703 Account, to purchase T-bills through accounts Madoff held at the various brokerage firms and that the T-bills paid interest. Dubinsky testified:

> Q. But in any event, you're now telling us that you're aware that there were approximately eight accounts at which Madoff was using investment advisory customers' money to purchase T bills. Isn't that true?
>
> **A.** That is correct, yes.

CMF ¶ 53. He further testified:

> A.. There was money taken out of the 703 account, transferred to these accounts, these various accounts, and then these securities were purchased, yes.

CMF ¶ 55.

"No legal system can long remain viable if lying under oath is treated as no more than a

social solecism. Swearing to tell the truth is a solemn oath, the breach of which should have serious

consequences." *United States v. Cornielle*, 171 F.3d 748, 753 (2d Cir.1999).   Thus, it is the

obligation of the trial court to exclude evidence which is clearly not credible. For example, in a

case where the trial court found that the expert's theory of causation did not rise above "subjective

belief or unsupported speculation," the Supreme Court found that "it was within the District Court's

discretion to conclude that the studies upon which the experts relied were not sufficient, whether

individually or in combination, to support their conclusions that [plaintiff's] exposure to PCB's

contributed to his cancer." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146-147 (1997).  Similarly, the

Second Circuit upheld the preclusion of a medical expert who sought to testify that the plaintiff's

cirrhosis of the liver was caused by the drug Rezulin. *See Ruggiero v. Warner-Lambert Co.,* 424

F.3d 249, 254 (2d Cir. 2005). There was no error in the district court's exclusion of the testimony

on the grounds that the expert "was unable to point to any studies or, for that matter, anything else

that suggested that cirrhosis could be caused or exacerbated by Rezulin" and the technique of

differential diagnoses under the circumstances was not sufficiently reliable. *Id.* at 254. Of course,

the standard is even stricter where a party knowingly adduces perjured testimony.  Thus, in

*Fernandez v. Capra*, 916 F.3d 215, 230 (2d Cir. 2019), *quoting United States v. Wallach*, 935 F.2d

445, 456 (2d Cir. 1991), the Second Circuit wrote that, "if it is established that the government

knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'"[4]

---

[4] Judge Bernstein rejected the Trustee's attempt in *Nelson* to fabricate evidence purportedly proving that the JPMC accounts were owned by the LLC through the use of a fraudulent records custodian affidavit. *See Nelson*, 610 B.R. at 231; *see* Trustee's Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction, *Picard v. Nelson,* Adv. Pro. No. 10-04658 (Bankr. S.D.N.Y. Sept 18, 2019) ECF No. 183, at 20; Defendants' Memorandum of Law in Support of Motion to Dismiss for Lack of Subject-Matter Jurisdiction, *Picard v. Nelson,* Adv. Pro. No. 10-04658 (Bankr. S.D.N.Y. August 8, 2019), ECF No. 170 at 7-9; 11-15; *and see* Defendants' Proposed Findings of Fact and Conclusions of Law, *Picard v. Nelson,* Adv. Pro. No. 10-04658 (Bankr. S.D.N.Y. Sept. 5, 2019), ECF No.

Although Picard is not functioning as a government officer, he is a trustee appointed by SIPC which is a "quasi governmental entity." [5] Thus, the same standard should apply to Picard: Dubinsky's testimony should be stricken in its entirety and, to preserve the integrity of this SIPA proceeding, Picard and his counsel, as well as Dubinsky, should be severely sanctioned.

### 2. The Expert Reports Are Not Admissible

Aside from the fact that Dubinsky's testimony should be barred by virtue of his flagrant perjury, his testimony is inadmissible because it is based, in large part, on Madoff's books and records which, according to Dubinsky, are "permeated with fraud." *See, e.g.,* Expert Report of Bruce G. Dubinsky (*In re Bernard L. Madoff,* Adv. Pro. No. 08-1789 (SMB), ECF Doc. No. 12137-1) ("[F]raud permeated BLMIS to the extent that the company's books and records could not be relied upon by a hypothetical buyer."); Trustee's Supp. Br. (Aug. 12, 2016) (ECF Doc. No.

---

179 at 18-19, ¶¶ 43-49.  These tactics by the Trustee and his counsel are, unfortunately, consistent with his misrepresentations, throughout these proceedings, that Madoff never purchased securities with IA customers' money – a contention that Dubinsky's cross-examination in *Nelson* proves is false. CMF n. 2; CMF ¶ 93.

[5] According to  https://www.everycrsreport.com/reports/RL30533.html:

Congress established the Securities Investor Protection Corporation (SIPC) in 1970 (84 Stat. 1636) to assure that cash and securities held in brokerage firms are protected from loss caused by securities firms' failures. The SIPC is a nonprofit corporation under the District of Columbia Nonprofit Act, which provides that it "shall not be an agency or establishment of the United States Government." Of the seven-member board of directors, one is appointed by the Secretary of the Treasury from among the department's officers and employees; one is appointed by members of the Federal Reserve Board from among its officers and employees; five directors are appointed by the President subject to the advice and consent of the Senate. The President designates the chairman, who is also the corporation's chief executive officer.

Although the SIPC is a nonprofit corporation under the D.C. law, it is effectively a subsidiary of the SEC. The corporation's bylaws are subject to the SEC's adoption, amendment, or rejection. The hybrid nature of the SIPC is revealed by various legal characteristics. The SIPC is not under any of the general management laws, including the Government Corporation Control Act (31 U.S.C. 9102). However, to the extent that the bylaws and rules of the SIPC are approved or disapproved by the SEC, they are subject to the Administrative Procedure Act (5 U.S.C. 551 *et seq.*). The corporation also has borrowing authority and a line of credit from the Treasury.

13876) at 5, 6 and 63; Dubinsky Report Jan 2019 Appendix B, citing "SQL Compilation of BLMIS

Data", and "AS/400 Tapes," *Picard v. JABA et. al,* Case No. 1:20-cv-03836-JGK, ECF No. 15-4.

Where the source of information is inadmissible because it is permeated with fraud, any

analyses or testimony based on the fraudulent records is also inadmissible. *See, e.g.*, 6-1006

Weinstein's Fed. Ev. § 1006.07 (2015); *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th

Cir. 1999) (summary evidence cannot be admitted if the underlying materials are inadmissible);

Fed. R. Evid. 801 and 802. Even where only portions of the underlying source material constitute

improper hearsay, those defects may be imputed to the summary or demonstrative exhibit as a

whole. *See* Wright & Gold, 31 Fed. Practice and Procedure § 8043, at 527.

Madoff's books and records are not admissible as business records under Fed. R. Evid.

803(6) or under the residual exception to the rule against hearsay, Fed. R. Evid. 807(a). Courts

applying Rule 803(6) have stressed that the "trustworthiness" of the information is the "principal

precondition to admissibility." *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995) (internal

quotation marks omitted); *JPMorgan Chase Bank, N.A. v. Yuen*, No. 11 Civ. 9192 (NRB), 2013

WL 2473013, at *6 (S.D.N.Y. June 3, 2013). While some courts have found, in specific instances,

that particular documents satisfy this trustworthiness requirement even though the proponent could

not identify the author or date of the entry, courts have always required other indicia of reliability

and trustworthiness for admission. *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003).

Here, there are no indicia of reliability. According to the Trustee, there was an "incentive

to falsify or alter" the records, making them absolutely inadmissible. *See Yuen*, 2013 WL 2473013,

at *7; *see also United States  v. Blechman*, 657 F.3d 1052, 1066 (10th Cir. 2011) ("an essential

link in the trustworthiness chain fails" when the supplier of the information was not acting in the

regular course of business). When considering whether a document was prepared by an

untrustworthy source, courts examine whether the party providing the information had an incentive

to misrepresent. In *United States v. Dreer*, the court held business records inadmissible because

other records in the business were falsified. 740 F.2d 18 (11th Cir. 1984). The court explained that,

"[a]lthough the proponent of the records did not admit that the records were falsified, there was an

extremely strong inference arising from evidence of numerous other forged financial documents

that the proffered evidence was not genuine." *Id*. at 20. Here, the Trustee himself has asserted,

when it furthered his interests, that Madoff's records are "permeated with fraud." Yet, he wants

this Court to grant judgment against the Kamensteins based upon the same fraudulent records.

### 3.  The allocutions and trial testimony are inadmissible

The Trustee relies on the plea allocutions of various Madoff employees and the criminal

trial testimony of Frank DiPascali**.**  *E.g.* Tr. Br. at 10. DiPascali ran the IA Business for Madoff,

who testified that DiPascali purchased T-bills with IA customers' money. CMF ¶ 41. Reliable third

party documentary evidence demonstrates that the receipts from the sale or redemption of T-bills

were paid directly into the 703 Account. CMF ¶ 42. And Joann Crupi, one of the Madoff employees

that reported to DiPascali, testified that DiPascali would tell him to which of Madoff's IA

customers specific T-bill transactions should be credited. CMF ¶ 43. DiPascali died before the

Kamensteins had the opportunity to depose him.

Moreover, DiPascali's testimony is inadmissible against the Kamensteins. In order to be

admissible, the facts contained therein must be "essential to the judgment." FRE 803(22)(C); *In re

Dreier LLP*, 2014 WL 47774 at * 11 (Bankr. S.D.N.Y. Jan. 3, 2014) (Bernstein, J.) ("A prior

judgment of conviction may be used as prima facie evidence in a subsequent civil suit only with

respect to matters of fact or law 'necessarily decided by the conviction and the verdict on which it

was based.'"). Here, the Trustee seeks to admit the allocutions, at a minimum, on the question of

whether a Ponzi scheme presumption may apply. *See, e.g.* Tr. Br. at 11. Yet, in the criminal trial,

none of the defendants was charged with operating a Ponzi scheme. Although Madoff used the term "Ponzi scheme" in his allocution, he did not testify to his understanding of what a Ponzi scheme is. And, indeed, in his deposition testimony, he negated virtually all of the elements of a Ponzi scheme. For example, he testified that, until the fall of 2008, when Lehman Brothers filed in bankruptcy and the global economy had collapsed, he had never had difficulty funding customer redemptions. CMF ¶ 38. He testified concerning his investment of customer funds in T-bills. CMF ¶ 31. And his testimony is validated by the third party records in the Trustee's possession. CMF ¶¶ 58-91.

Under Fed. R. Evid. 804, a plea statement is admissible as an exception to the hearsay rule if, when made, it would expose the declarant to criminal liability or, if supported by corroborating circumstances that clearly indicate its trustworthiness, it is offered in a criminal case as one that tends to expose the declarant to criminal liability. However, here, DiPascali was trying to curry favor with the government in order to avoid imprisonment. Statements made to shift the blame or curry favor are not sufficiently self-incriminatory to be admissible. *United States v. Tropeano,* 252 F.3d 653 (2d Cir. 2001).

There is reliable third party documentary evidence proving the falsity of the Trustee's contentions and of DiPascali's testimony. While the Kamensteins have not been able to cross-examine DiPascali, their counsel did cross-examine Dubinsky who admitted his perjury at the *Nelson* trial and admitted that Madoff purchased T-bills through various brokerage firms, using IA customers' money. None of this evidence was put before the jury in the criminal trial. Nor did the government or the criminal defendants introduce the records that T-Bills were purchased and appear on the Kamensteins' account statements (although DiPascali did testify that Madoff told

him to which customer accounts the T-bills should be credited). Obviously, the government had

no interest in proving that Madoff conducted legitimate trading for any of his IA customers.

And Joann Crupi testified that DiPascali told her when he was about to buy T-bills and to

whom the T-bills should be allocated. CMF ¶ 43.  This refutes DiPascali's testimony that he

purchased T-bills as a cash management tool only and that the T-bills that were allocated to

customers were from a spreadsheet and none of them were "real." *E.g.* SMF ¶¶ 44-45.

### 4.    The Trustee cannot prove intent

Ignoring his lack of standing to sue on behalf of Madoff or the sole proprietorship, the

Trustee depends entirely on the "Ponzi scheme presumption" to satisfy the third element of his

claim, intent. *E.g.* Tr. Br. at 9.  However, he has no evidence to support a finding of intent as a

matter of law. And, since the Kamensteins can show, through reliable third-party records, that

Madoff did buy T-bills for their accounts, the Trustee cannot prove that Madoff operated a Ponzi

scheme.

The Trustee must demonstrate actual intent to defraud by clear and convincing evidence.

*See, e.g. Mendelsohn v. Jacobowitz ("In re Jacobs")* 394 B.R. 646, 661 (Bankr. E.D.N.Y. 2008)

("The trustee has the burden of showing that the challenged transfer was made with actual intent

to hinder, delay, or defraud, and he or she must do so under the clear and convincing standard.");

*USA United Fleet, Inc. v. Ally Financial, Inc. ("In re USA United Fleet, Inc.")*, 559 B.R. 41, 57

(Bankr. E.D.N.Y. 2016) (same). Here, the Trustee has not shown actual intent, either by clear and

convincing evidence or by any other standard. Thus, his motion for summary judgment must fail.

### a.    Madoff bought T-bills with IA customers' money

The Kamensteins can prove that Madoff used IA customers' funds to purchase T-bills,

some of which were credited to their accounts. CMF ¶¶ 58-91.  The Trustee cannot argue that

Madoff did not own enough T-bills to cover the more than 5,000 customer accounts he held in the

IA business because he refused to produce the account statements of all of Madoff's IA customers in response to Defendant's document demand, thus making it impossible for Defendant to test the veracity of the Trustee's contention. *See Picard v. Wilenitz*, Adv. Pro. No. 10-04995 ECF No. 70-2. Indeed, the Trustee refused to provide the Kamensteins with "direct access" to a database "because it contains documents relating to thousands of customers, many of which are not relevant to this proceeding." *See id.* at § 1. The Trustee would not produce, or even log, documents that were received that he deemed not relevant. *See id.* at § 1.

A party that refuses to produce evidence requested in discovery is precluded from using such evidence at trial. In *United States v. Nixon,* 418 U.S. 683 (1974), the Court wrote that the "very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence." *See also, Taylor v. Illinois*, 108 S. Ct. 646 (1988)(affirming an order precluding testimony where a witness had not been identified in pretrial discovery); *Victorinox AG v. The B & F Sys., Inc*., 2015 WL 9256944, at *2, n.2 (S.D.N.Y. Dec. 15, 2015), *aff'd sub nom. Victorinox AG v. B&F Sys., Inc*., 709 F. App'x 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017) (refusing to consider cost data estimates because they were not produced during discovery); *Taveras v. City of New York*, 2009 WL 10701924, at *7 (E.D.N.Y. Apr. 7, 2009) (precluding defendants from relying on charts that were not produced during discovery); *cf. Costa v. Sears Home Imp. Products, Inc.,* 65 F. Supp.3d 333, 346 (W.D.N.Y. 2014) (holding on summary judgment that a party could not rely on an affidavit the other party did not know about); *Preuss v. Kolmar Labs., Inc.,* 970 F. Supp. 2d 171, 178-79 (S.D.N.Y. 2013) (striking affirmation for failure to disclose).

Moreover, there is no evidence to suggest that every IA customer had precisely the same T-bills in his account. In fact, we know the opposite is true. This firm represents the defendants in

many different clawback actions. From our review of the Trustee's records, each of the Kamenstein Accounts held T-bills that were not held simultaneously by all of our other clients. CMF ¶¶ 66, 75, 83, 92.

The listing of a security on a brokerage account statement is evidence that the brokerage firm has credited that security to the customer's account.  No customer has any other proof.  The Kamensteins have presented reliable third party evidence that the T-bills on the account statements were owned by Madoff at the time they appeared on the statements related to each of the Kamenstein Accounts.  The Trustee cannot claim that these particular T-bills either somehow did not exist, or were bought only for "cash management" purposes rather than "for" the Kamensteins. That is plainly disproven by the T-Bills' undeniable existence on the Kamensteins' customer statements and on the records of the third parties that held the T-bills for Madoff.

### b.    The Trustee cannot prove that Madoff operated a Ponzi scheme

Courts apply a four-factor test to determine the existence of a Ponzi scheme: (1) deposits were made by investors, (2) the debtor conducted little or no legitimate business, (3) the purported business operation of the debtor produced little or no profits or earnings, and (4) the source of payments to investors was from cash infused by new investors. *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Case No. 08-15051, 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 3, 2014); *Armstrong v. Collins*, No.01 Civ. 2437 (PAC), 2010 WL 1141158 at * 22 (S.D.N.Y. Mar 24, 2010), *reconsideration denied*, No. 01 Civ. 2437 (PAC), 2011 WL 308260 (S.D.N.Y. Jan. 31, 2011). The Trustee cannot meet any of these criteria.

### i.    Defendants were creditors, not equity investors

While fraudulent transfer actions against **equity** investors in a Ponzi scheme are justified because those investors are owners of the business who received dividends when there was no source of revenue for the business and its creditors were unpaid, such actions are not justified

against creditors of the debtor, who simply received the money to which they were contractually and legally entitled. *See, e.g. United States v. Manufacturers Trust Co.*, 198 F.2d 366, 367 (2d Cir. 1952). The Second Circuit has recognized that customers such as Defendant are creditors, not owners. *In re Bernard L. Madoff Inv. Securities LLC*, 2011 WL 3568936, 6 (2d Cir. Aug. 16, 2011)

Madoff held the Kamensteins' funds as a custodian and fiduciary, to purchase securities in the Kamensteins' name. And the Trustee has acknowledged that all "BLMIS customers who filed claims—whether their net equity customer claims were allowed or denied—are general creditors of the BLMIS estate." Trustee's Fifth Interim Report ¶ 76, *In re Madoff*, No. 08-01789, ECF No. 4072 (Bankr. S.D.N.Y. May 16, 2011).

### ii.   The LLC was not a Ponzi scheme

Dubinsky conceded in cross-examination at the Nelsons' trial that the LLC did not operate a Ponzi scheme and that it was a legitimate business. CMF ¶ 57.  It is clear that Madoff formed the LLC in 2001 to insulate the LTB operated by his sons from the fraudulent IA business which he operated. But even if the LLC operated the IA Business, the fraudulent part of Madoff's entire operation was very small compared to the legitimate trading done by the LLC. The LLC conducted a massive legitimate trading business. Madoff testified that "by the time we were finished in 2008 . . . we represented ten percent of the United States' volume in – in [legitimate, market-making] transactions." CMF ¶ 36. The Trustee's witnesses admitted to having seen "anecdotal evidence" that Madoff conducted trades equal to approximately 10% of the daily volume of the New York Stock Exchange as a whole. CMF ¶ 37. Over 96% of the staff employed by Madoff worked in the LTB. The Trustee admitted that only "six to eight people" worked in the IA Business and the remaining 172 people worked in the LTB. CMF ¶ 57.

Where the Ponzi scheme constitutes "a small part of a larger, legitimate business" the Ponzi scheme presumption is inappropriate. *In re Prebul Jeep, Inc.*, 2009 WL 4581900 (Bankr. E.D.

Tenn. 2009); *In re Foos*, 188 B.R. 239 (Bankr. N.D. Ill. 1995) *aff'd in part, rev'd in part on other g'ds*, 1996 WL 563503 (N.D. Ill. 1996). In *In re Manhattan Inv. Fund Ltd*, 359 Bankr. 510 (S.D.N.Y. 2007), *affirmed in part, rev'd in part, In re Manhattan Inv. Fund Ltd.* 397 Bankr. 1 (S.D.N.Y. 2007), the court cited its earlier ruling that the Ponzi scheme presumption may still be applied where there is also legitimate business; "[w]hen a debtor operating a Ponzi scheme makes a payment with the knowledge that future creditors will not be paid, that payment is presumed to have been made with actual intent . . . regardless of whether the payments were made to early investors, or whether the debtor was engaged in a strictly classic Ponzi scheme." However, this holding is inapplicable here because the Trustee has no evidence to show that Madoff made any payments to Defendants knowing that any other customers would not be paid. Indeed, Madoff testified that he never had difficulty funding a withdrawal until the financial crisis. CMF ¶ 38.

### iii.    **The IA business was profitable**

The Trustee has also failed to prove that the IA Business was not profitable. On the contrary, Dubinsky has admitted that it transferred between $700 and $800 million to the Bank of New York account servicing the LLC following its formation in 2001. CMF ¶ 8.  We have not found a single Ponzi scheme case where a Ponzi scheme funded a legitimate affiliate to the tune of $700-$800 million.

### iv.    **Madoff did not depend upon deposits of new customers**

The Trustee has not shown that the LLC relied on "after-acquired investment funds to pay off previous investors" to "forestall disclosure of the fraud." *See In re Bernard L. Madoff Inv. Sec. LLC,* 683 B.R. 682, 689 (Bankr. S.D.N.Y. 2019) ("Legacy"), (in addition to the four factor test, the "Ponzi scheme label applies 'to any sort of inherently fraudulent arrangement under which the debtor transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud'") (*quoting In re Manhattan Inv. Fund Ltd.*, 397 Bankr. 1, 12

(S.D.N.Y. 2007). The Trustee cannot refute Madoff's testimony that he did not require the deposits

of other customers to pay out existing customers. CMF ¶ 38.

v.    <strong>No Ponzi scheme can last for decades</strong>

Courts nationwide recognize that a classic Ponzi scheme is short-lived.

"[M]ost Ponzi schemes are of relatively short duration." *SEC Official Testifies on Best Method for*

*Determining Madoff Distributions*, Sec. Exch. Comm'n. Today 10466961, 2009 WL 10466961

(Dec. 14, 2009); *Prymak v. Contemporary Fin. Sols., Inc.,* 2007 WL 4250020, at \*2 (D. Colo. Nov.

29, 2007) (a Ponzi scheme "is a fraudulent scheme that can be profitable for only a short period of

time [.]"); *see e.g., McNamara v. Sher*, 2012 WL 760531, at \*1 (S.D. Cal. Mar. 8, 2012) (Ponzi

scheme lasting two years); *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549-

50 (4th Cir. 2001) (Ponzi scheme lasting 17 months); *Germinaro v. Fid. Nat. Title Ins. Co.,* 107 F.

Supp. 3d 439, 450 (W.D. Pa. 2015) (Ponzi scheme lasting nine months); *In re Rivas*, 2010 WL

2265663, at \*1 (Bankr. E.D. Tenn. June 3, 2010) (Ponzi scheme lasting 14 months).

Although the Trustee has claimed (incredibly) that Madoff operated a Ponzi scheme from

the early 1960s on, Madoff has testified that his fraud began post-1992, likely 1993. CMF ¶ 40.

Even if Madoff's fraud began in 1993, however, that would mean it lasted for 15 years. We have

not found a single case where a court found the existence of a Ponzi scheme that spanned 15 years.

5.    <strong>The payments were not made "in furtherance of" a Ponzi scheme</strong>

The requirement that, to be clawed back, a payment must have been made "in furtherance

of" a Ponzi scheme reflects the fact that even an entity running a Ponzi scheme can engage in

legitimate transactions. *In re Bernard L. Madoff Inv. Securities, LLC,* 458 B.R. 87, 105 (Bankr.

S.D.N.Y. 2011) ("it is conceivable that certain transfers may be so unrelated to a Ponzi scheme

that the presumption should not apply"). The "in furtherance" element is *in addition to* the first

requirement that the debtor operate as a Ponzi scheme, which supplies the basis for finding intent.

Accordingly, it restricts the operation of the Ponzi scheme presumption to transfers that are both made by a Ponzi schemer *and* needed to continue that scheme. *In re DBSI*, *Inc.,* 476 B.R 413, 422 (Bankr. D. Del. 2012); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1 at 13 (S.D.N.Y. 2007); *Foos*, 188 B.R. at 244; *In re ATM Financial Services, LLC*, 2011 WL 2580763, *5 (Bankr. M.D. Fla. June 24, 2011) ("The Ponzi presumption must have some limitations, lest it swallow every transfer made by a debtor, whether or not such transfer has anything to do with the debtor's Ponzi scheme").

Rather than establish that there was a Ponzi scheme and then show that the payments to the Kamensteins were made in furtherance of it, the Trustee contends that every payment must have been made to keep a Ponzi scheme going because any failure to honor a withdrawal request would inevitably have revealed it.  This conclusory statement relies exclusively upon the Trustee's "proof" that Madoff conducted a Ponzi scheme and an assumption that payments made to the Kamensteins must constitute payments "in furtherance of" it, relying on cases that apparently cannot find "any other explanation" for the payments.  *In re Bayou Grp., LLC ("Bayou III"),* 396 B.R. 810, 843 (Bankr. S.D.N.Y. 2008), *rev'd in part In re Bayou Grp., LLC*, 439 B.R. 284 (S.D.N.Y. 2010); Tr. Br. at 15. The Trustee's reasoning is insupportable. Defendants had written contracts with Madoff pursuant to which they had a right to make withdrawals. Madoff was simply fulfilling his contractual obligations to the Kamensteins when he honored his requests to withdraw funds. If he failed to honor a redemption request, the Kamensteins could have quickly obtained a court order compelling Madoff to comply. Compliance with a legal contractual obligation cannot possibly be the basis for a Ponzi scheme finding.  Further, Madoff has testified that he did not have any difficulty meeting redemptions, CMF ¶ 38, and, indeed, he never failed to honor a customer's request withdrawal until after Lehman Brothers collapsed in the fall of 2008.

## V.    THE TRUSTEE CANNOT PROVE HIS ALLEGED LOSSES

The Trustee has afforded the Kamenstein Accounts only partial credit for certain transfers. For example, a transfer of $1,782,331 from the Sloan and Tracy Account was paid into the Tracy Trust Account on September 7, 1999.  The Trustee has not given full credit for this transfer. Instead, he has allowed only $1,457,157, claiming that it is an "inter-account transfer" that consisted partially of "fictitious profits."  CMF ¶ 21.   On the same date, the Sloan Trust Account received a transfer of $1,882,331 from the Sloan and Tracy Account. The Trustee has not given full credit for this transfer. Instead, he has allowed only $1,457,157.  CMF ¶ 18.  Similarly, on December 27, 2004, each of the Carol Account and the David Account received a transfer from the Carol & David Account in the amount of $3,146,642, for which the Trustee has given no credit, contending that the transfers constitute "inter-account transfers" that consisted entirely of "fictitious profits."  CMF ¶¶ 10, 12, 13, 15.

Disallowing transactions made years before Madoff's fraud was uncovered violates not only the Bankruptcy Code but also New York State law. *See, e.g., Simkin v. Blank*, 19 N.Y.3d 46 (N.Y. 2012) (court declined to reform property settlement incorporated into a divorce decree, even though spouse who received Madoff account ultimately received nothing). *See also Commodities Future Trading Commission v. Walsh*, 17 N.Y.3d 162, 173 (2011) (rejecting clawback in divorce, and holding that "[a]t its core, our rule favoring innocent transferees of stolen funds over defrauded owners is rooted in New York's "concern for finality in business transactions."); *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362 (1991) (holding on certification that, even if the source is questionable, absent fraud by the recipient, the funds cannot be clawed back). .

Separate treatment of accounts is a basic concept of SIPA. "[A] customer who holds accounts with the debtor in separate capacities shall be deemed to be a different customer in each capacity" for purposes of distribution. 15 U.S.C. § 78fff-3(a)(2); *see also* 15 U.S.C. § 78*lll*(11)(C)

("In determining net equity . . ., accounts held by a customer in separate capacities shall be deemed

to be accounts of separate customers.") 15 U.S.C. § 78*lll* (11)(B) (a customer's net equity is based

on the amounts owed to "customer," the securities positions of "such customer," and any

indebtedness of "such customer"). Under the SIPA Rules, "[a]ccounts held by a customer in

different capacities, as specified by these rules, shall be deemed to be accounts of 'separate'

customers." 17 C.F.R. 300.100(b). Thus, accounts held by partnerships and corporations are

treated as separate from the partners or owners of the entity. *Id.* at 300.103. Trust accounts are

distinct from their trustee, settlor or beneficiary. *Id.* at 300.104(b). By charging customers with the

withdrawals made by transferor account holders, the Trustee is violating the plain language of

SIPA. *See e.g. United States v. Ron Pair Enterprises Inc*., 489 U.S. 235, 241 (1989) ("[W]here, as

here, the statute's language is plain, 'the sole function of the court is to enforce it according to its

terms'").

While it would certainly be convenient for the Trustee, no court has held that he is relieved

of putting in credible evidence to establish to a trier of fact that a transfer is a transfer of "fictitious

profits."  Even assuming *arguendo* that the Trustee could prove that the LLC transferred profits

that were fictitious in 2006, which he cannot, that still does not mean that the amounts transferred

to the Kamenstein Accounts from other Madoff accounts in 1999 or 2004 were "fictitious."  The

Kamensteins are entitled to the presumption that all of the monies that were reflected in an account

are legitimate unless and until the Trustee can prove that they were not.

VI.    **THE TRUSTEE IS NOT ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST**

In *Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992), the Court held that, although discretionary awards of

prejudgment interest are permissible under federal law in certain circumstances, the award should

be a function of (1) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other principles as are deemed relevant by the court.

The Second Circuit explained that prejudgment interest should not result in over-compensation of the plaintiff, such as when the statute, as here, fixes damages deemed fully compensatory. *Id.* This principle is particularly relevant here because the Trustee's position through these cases is that no Madoff customer is entitled to any interest or appreciation <u>since 1980</u>. The Second Circuit has approved the Trustee's position. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011).  Consistent with that view, although the Trustee allowed some claims in 2009, the Trustee has refused to pay any interest to claimants on their allowed claims although customers have had to wait ten years for full payment of those claims. Thus, in the Trustee's view, allowed claimants who invested in 1980 are entitled to receive, by 2020 (40 years later), only their net investment. Indeed, when customers sought allowance of appreciation, since 1980, in the form of an inflation adjustment, the Trustee successfully opposed that relief. *In re Bernard L. Madoff Inv. Sec. LLC.,* 779 F.3d 74 (2d. Cir. 2015).

If innocent victims of Madoff's fraud are not entitled to any appreciation since 1980, why would the Trustee be entitled to prejudgment interest?  The Trustee sues the Kamensteins under 11 U.S.C. § 548 which does not provide for an award of interest. Section 550 prescribes the remedy for the avoidance of a fraudulent transfer: the statute limits the recovery to the property transferred or the value of that property. The plain language of the provision does not include an award of interest.  Surely, if Congress had intended that the plaintiff be awarded interest, Congress would have so mandated.

Prejudgment interest is inappropriate when the defendants, like the Kamensteins, did nothing wrong. *Wickham*, 955 F.2d at 834; *see also Board of County Comm'rs of the County of Jackson v. United States,* 308 U.S. 343, 352 (1939) ("interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable"); *Mecca v. Gibraltar Corp. of Am.,* 746 F. Supp. 338, 349 (S.D.N.Y. 1990) (same); *Morales v. Walt Disney Prods.,* 361 F.Supp. 1157, 1158 (S.D.N.Y. 1973); *In re Lyondell Chemical Co.*, No. 13 Civ. 3881(RA), 2014 WL 975507, at *10 (S.D.N.Y. Mar 11, 2014) (affirming award of administrative expense but declining to impose prejudgment interest). *See also Kramer v. Mahia (In re Khan)*, 14-MC-01674 (PKC), 2016 WL 6652724 at *2-3 (E.D.N.Y. Nov. 10, 2016)(declining to impose prejudgment interest in a case where the transferee had not made the transfer with actual intent to hinder, delay, or defraud his creditors or wrongfully retained or secreted away the transferred funds); *Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*, 567 F.3d 1291, 1300 (11th Cir. 2009)(affirming the bankruptcy court's denial of prejudgment interest where the defendant's position was reasonable, the parties' dispute was genuine, and there was no evidence that either party was responsible for delaying the dispute's resolution.)

As Judge Chin recognized in approving a receiver's decision not to claw back funds from innocent investors, clawback actions could be "cruel." *SEC v. Byers,* 637 F. Supp.2d 166 (S.D.N.Y. 2009) ("[m]any of the investors may not have the money, and litigation to collect it would be expensive, time-consuming and, in some instances, cruel.") Here, the Trustee made the "cruel" decision to seek to claw back withdrawals taken by innocent Madoff customers who, in many instances, lost their life's savings. In the process, the Trustee has enriched himself and his law firm to an unprecedented extent. Remarkably, the Trustee has even been so callous as recently

to terminate the "hardship" program he instituted in 2009. *See.*
https://www.madofftrustee.com/hardship-program-17.html.

## A.    The Kamensteins Disputed the Trustee's Claims in Good Faith

The Kamensteins will prove at trial that prejudgment interest should not be imposed where, as here, there is a good-faith dispute regarding whether a defendant is liable, or where it is the plaintiff who is responsible for any delay. *Wickham,* 955 F.2d at 834. *See also Redfield v. Bartels,* 139 U.S. 694 (1891) (suit to recover duties wrongfully imposed; interest denied since plaintiff neglected to bring suit for years). Here, the Trustee brought suit against the Kamensteins alleging six different claims under both state and federal law, and seeking to claw back withdrawals taken over the last six years of Madoff's operations. The Trustee's complaint clearly violated 11 U.S.C. Section 546(e), forcing the Defendants to challenge the complaint. They did so successfully, in the District Court and the Second Circuit, but that litigation was not resolved until the Supreme Court denied the Trustee's cert petition on June 22, 2015. *Picard v. Ida Fishman Revocable Tr.,* 576 U.S. 1044 (2015). As a result of the litigation the Kamensteins were forced to undertake, the complaint was limited to one claim, under 11 U.S.C. Section 548(a)(1). Surely, the Kamensteins should not be charged with interest because the Trustee so grossly over-reached. On the contrary, the Trustee should be required to pay the Kamensteins' legal fees in preventing the Trustee from suing them in violation of clear provisions of the Bankruptcy Code.

The Trustee also sued "subsequent transferees" with no justification and his complaint was dismissed against all subsequent transferees by order of Judge Bernstein dated June 2, 2015 and July 16, 2015. Adv. Pro. No. 10-01789, ECF Nos. 10089, 10679 and 10681. Clearly, the Kamensteins are not responsible for the fact that the Trustee grossly over-reached in his complaint. Similarly, there were other delays in the litigation, after 2015, for which the Defendants cannot possibly be blamed. These will be attested to at trial but include, for example, that the Trustee was

solely responsible for inordinate delays in discovery. Due in large part to objections by the Trustee and the Trustee's totally unjustifiable concealment of material evidence relating to Jeffry Picower's role in Madoff's fraud, it took over two years to depose Bernard Madoff. This firm first moved to depose Madoff on March 9, 2016. Madoff's deposition was not completed until November 9, 2017. Similarly, on the request of the Trustee, Judge Bernstein delayed this firm's enforcement of subpoenae served on various former Madoff employees from March 2017 to May 2019.

Finally, this Court in *BAM,* held that the Trustee was entitled to prejudgment interest running from the date of filing the Complaint because the Mann defendants had "failed to demonstrate that the equities of this case fall in their favor." *BAM,* 2020 WL 7422316, at *7. The Kamensteins will prove, at trial, that the equities do fall in their favor. Unlike the Kamensteins, this Court held that the Manns had "chose[n] gamesmanship" because they had withdrawn their customer claims "in order to strip this Court of equitable jurisdiction . . . and delay a prior scheduled trial." *Id.* Here, as the Kamensteins will prove at trial, it was Judge Bernstein who suggested to counsel for *BAM* that it withdraw its proof of claim and, based on Judge Bernstein's suggestion, the Kamensteins followed suit. The Kamensteins' trial had not, at that time, been scheduled. Moreover, the Kamensteins admitted that the amounts shown on Exhibit B to the Complaint are accurate as to the last two years' withdrawals, but did not admit as to earlier years because the Trustee's proof was inadequate.

Here, unlike in *BAM,* the Court did not have before it a situation where the Trustee needlessly increased the Defendants' legal costs by causing them to respond to a summary judgment motion that this Court has already held cannot be granted. And, as discussed *supra, BAM* wrongly relied on the purportedly expert testimony of Dubinsky, when Dubinsky was not

qualified to testify on the ownership of the JPMC Accounts, and it is incontrovertible that Dubinsky committed perjury when he testified that Madoff never bought securities for his IA customers.

At the very most, if prejudgment interest is awarded, it should be awarded at the same interest rate that the Trustee earned on funds that he invested – the short term T-bill rate. While the Court used the prime rate in *BAM*, that rate has no relevance to the Trustee. He is not a bank and had no ability to lend excess funds and earn the prime rate. On the contrary, since he chose to invest funds he was holding at the short term T-bill rate, that is the only rate which tracks his actual purported damages. Any other rate would be unjustifiably punitive.

## VII.    THE KAMENSTEINS PRESERVE THEIR ARGUMENT THAT 11 U.S.C. SECTION 548(C) PROVIDES A COMPLETE DEFENSE

In *In re Bernard L. Madoff Inv. Sec. LLC,* 976 F.3d 184 (2d Cir. 2020) ("*Gettinger*"), the Second Circuit held that 11 U.S.C. Section 548(c) does not provide a complete defense to the Trustee's claims. The Kamensteins have contended, throughout these proceedings, that Section 548(c) does provide a complete defense. They were not parties to *Gettinger* and, until the Supreme Court speaks on the issue, they respectfully preserve their argument that Section 548(c) should be enforced in accordance with its terms.

## <u>CONCLUSION</u>

For all the foregoing reasons, this Court should (a) grant the motion of Tracy Kamenstein

to dismiss the complaint as against her; (b) grant the Kamensteins' motion to dismiss the complaint

for lack of subject matter jurisdiction; and (c) deny the Trustee's motion for summary judgment.

January 8, 2021                                        **CHAITMAN LLP**

                                  By:    */s/ Helen Davis Chaitman*
                                         Helen Davis Chaitman
                                         465 Park Avenue
                                         New York, New York 10022
                                         Phone & Fax: 888-759-1114
                                         hchaitman@chaitmanllp.com

                                         *Attorneys for Defendants*