**CHAITMAN LLP**
Helen Davis Chaitman
465 Park Avenue
New York, New York 10022
Phone & Fax: 888-759-1114
hchaitman@chaitmanllp.com

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro No. 10-04469 (CGM) |
| Plaintiff, | |
| v. | |
| CAROL L. KAMENSTEIN, individually and in her capacity as joint tenant, DAVID R. KAMENSTEIN, individually and in his capacity as joint tenant, SLOAN G. KAMENSTEIN, and TRACY D. KAMENSTEIN, | |
| Defendants. | |

**DEFENDANTS' COUNTERSTATEMENT OF MATERIAL FACTS IN OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT, AND IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DISMISSING THE COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND FOR PARTIAL SUMMARY JUDGMENT DISMISSING THE COMPLAINT AGAINST TRACY D. KAMENSTEIN**

Defendants Carol L. Kamenstein ("Carol"), David R. Kamenstein, ("David"), Sloan G. Kamenstein ("Sloan"), and Tracy D. Kamenstein ("Tracy"), (collectively "Defendants" or the "Kamensteins"), submit this counterstatement of material facts in response to the Plaintiff's, Irving H. Picard (the "Trustee"), the Trustee for the Liquidation of Bernard L. Madoff Investment Securities, LLC (the "LLC"), cross motion for summary judgment, and in further support of Defendants' motion for partial summary judgment dismissing the complaint against Tracy D. Kamenstein and of Defendants' motion for summary judgment dismissing the Complaint for lack of subject matter jurisdiction, pursuant to Local Rule 56.1.

**<u>Madoff Business</u>**

1.      The LLC is the "applicant" on SEC Amended Form BD. *See* Chaitman Moving Dec[1]. **Ex. I** [SEC Amended Form BD].

2.      The LLC expressly indicated, in Amended Form BD that he filed with the SEC in 2001 when he transferred the legitimate trading business to the LLC, that he was not transferring the investment advisory business to the LLC. Madoff responded in the Form as follows:

> Q. Activities of this Partnership, Corporation or Organization:
>
> Securities Activities:
>
> A. Yes;
>
> Q. Investment Advisory Activities:
>
> A. No.

*Id*. at 8-10.

3.      Madoff did not register with the SEC as an investment advisor until late 2006. *In re Bernard L. Madoff Inv. Secs., LLC*, 424 B.R. 122, 127 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229 (2d

---

[1] References to Chaitman Moving Dec. are to the Declaration of Helen Davis Chaitman, sworn to on November 25, 2020. References to Chaitman Dec. are to the Declaration of Helen Davis Chaitman, sworn to on January 8, 2021.

Cir. 2011) ("On January 19, 1960, BLMIS registered with the SEC as a broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. section 78*o* (b), and, beginning in 2006, as an investment advisor."); *see also* Chaitman Dec. **Ex**. **A** [Form ADV Uniform Application for Investment Adviser Registration for Bernard L. Madoff Investment Securities dated August 25, 2006 at 7 [PUBLIC0003729-762] [Q: Are you, at the time of this filing, succeeding to the business of a registered investment advisor? A: No."]].

4.      According to BLMIS's Form ADV Uniform Application for Investment Adviser Registration, the LLC was handling only $ 11 billion of customer funds in the LLC's IA business. *Id.*

5.      Madoff's investment advisory business ("IA Business") was known internally as "House 17" since it was located on the 17th floor of the Lipstick Building. Chaitman Moving Dec. **Ex. F** [Nelson Tr. 5/8/19 at 63:2-7]. It was separate from the proprietary trading ("PT") and market making ("MM") businesses (collectively, the "Legitimate Trading Business" or "LTB"). *Id.*

6.      There were approximately 172 employees who worked in the Legitimate Trading Business and only 6 to 8 people who worked in the IA business. Chaitman Moving Dec. **Ex. F** [Nelson Tr. 5/8/19 at 168:14-17].

7.      All of the individual retirement accounts held by customers of the IA business were held by an independent fiduciary, FISERV. *See* Chaitman Dec. **Ex. B** [Compilation of FISERV Statements held by various IA customers].

**The Bank Accounts**

**The LLC Account**

8.      Between $700 and $800 million was transferred from the IA business to the Legitimate Trading Business just in the period from 2000 to 2008. Chaitman Moving Dec. **Ex. F** [Nelson Tr. 5/8/19 at 161:3-8 ("hundreds and hundreds of millions of dollars just since 2000 that was transferred from the 703 account [the IA business account] to the Bank of New York account"); *id.* at 161:20- (the money was "put over to the prop trading business."); *id.* at 161:21-162-:2 (Q. "[I]n the period from 2000 through

2008, how much money in total was transferred from the 703 account, which was exclusively investment advisory customers money, to the Bank of New York account, which was exclusively prop trading? A. [A]bout $700 or $800 million.")].

9.      The $700 - $800 million of transfers from the IA business' account at JPMC to the Legitimate Trading Business were used by the LLC for its business purposes. Madoff testified that transferring the money from the 703 Account to the BNY Account "allowed us to meet the margin calls of the clearing corporation. That is typical of the industry."  Chaitman Dec. **Ex. C** [Madoff Dep. Tr. 4/26/2017 at 24:6-25:13]; *see also, e.g.* Chaitman Dec. **Ex. D** [Letter dated January 24, 2011 from Stephen P. Harbeck at SIPC to Scott Garett at The U.S. House of Representatives].

**Uncredited Transfers of Principal into the Kamenstein Accounts[2]**

**Account No. 1CM913 (the "David Account")**

10.      The David Account was opened on January 3, 2005 with an initial transfer in the amount of $3,146,642 from an account held by David and Carol, Account No. 1CM247 (the "David and Carol Account").  *See* Chaitman Moving Dec. **Ex. AI** [Letter dated December 23, 2004 to Jodi Crupi [AMF00250545]]; *see* Chaitman Moving Dec. **Ex. AJ** [Account Opening Documents [AMF00278590-95]]; *see* Chaitman Moving Dec. **Ex. AK** [Customer Statement dated December 31, 2004 [MDPTPP01931711]]; *see also* Chaitman Moving Dec. **Ex. A** [Compl., Ex. B, Account No. 1CM913, line 1].

11.      The David Account received an additional transfer from the David and Carol  Account dated January 31, 2005 in the amount of $686.  *See* Chaitman Moving Dec. **Ex. AL** [Customer Statement dated January 31, 2005 [MDPTPP01931716]].

---

[2] The Trustee seeks to claw back withdrawals from four accounts belonging to members of the Kamenstein Family: Account No. 1CM913 (the "David Account"), Account No. 1CM914 (the "Carol Account"), Account No. 1CM596 (the "Tracy Trust Account") and Account No. 1CM597 (the "Sloan Trust Account"), (collectively "the Kamenstein Accounts").

12.    The Trustee failed to give credit for these transfers (*see ¶¶* 10-11) claiming that the uncredited amount constitutes "fictitious profits." *See* Chaitman Moving Dec. **Ex. A** [Compl., Ex. B, Account No. 1CM913, lines 1, 3 and n.1].

### Account No. 1CM914 (the "Carol Account")

13.    The Carol Account was opened on January 3, 2005 with an initial transfer in the amount of $3,146,642 from the David and Carol Account. *See* Chaitman Moving Dec. **Ex. AI** [Letter dated December 23, 2004 to Jodi Crupi [AMF00250545]]; *see* Chaitman Moving Dec. **Ex. AO** [Account Opening Documents [AMF00278642-48]]; *see* Chaitman Moving Dec. **Ex. AP** [Customer Statement dated December 31, 2004 [MDPTPP01931998]]; *see also* Chaitman Moving Dec. **Ex. A**[Compl., Ex. B, Account No. 1CM914, line 1].

14.    The Carol Account received an additional transfer from the David and Carol Account dated January 31, 2005 in the amount of $686. *See* Chaitman Moving Dec. **Ex. AQ** [Customer Statement dated January 31, 2005 [MDPTPP01932003]].

15.    The Trustee failed to give credit for these transfers (*see ¶¶* 13-14) claiming that the uncredited amount constitutes "fictitious profits." *See* Chaitman Moving Dec. **Ex. A** [Compl., Ex. B, Account No. 1CM914, lines 1, 3 and n.1].

### Account No. 1CM597 (the "Sloan Trust Account")

16.    The Sloan Trust Account was opened on August 23, 1999 by Carol Kamenstein as Trustee, with an initial transfer in the amount of $1,782,331 from account number 1CM295, (the "Sloan and Tracy Account"), paid on September 7, 1999. *See* Chaitman Moving Dec. **Ex. AP** [Correspondence dated August 18, 1999 to Linda Schoenheimer [MADTBB01977201]]; and *see* Chaitman Moving Dec. **Ex. AH** [note dated October 18, 1999 [AMF00267768]; *see* Chaitman Moving Dec. **Ex. AS** [Customer Statement dated September 1999 [MDPTPP01693674]; *see also* Chaitman Moving Dec. **Ex. A** [Compl., Ex. B, Account No. 1CM597, line 1].

17.    Two additional transfers were made into the Sloan Trust Account from the Sloan and Tracy Account on September 7, 1999 in the amount of $1 (*see id*.) and on October 29, 1999 in the amount of $26. *See* Chaitman Moving Dec. **Ex**. **AT** [Customer Statement dated October 1999 [MDPTPP01693676]; *see also* Chaitman Moving Dec. **Ex**. **A** [Compl., Ex. B, Account No. 1CM597, lines 2 and 3].

18.    The Trustee failed to give full credit for these transfers (*see ¶¶* 16-17) and has allowed only $1,457,157 claiming that the uncredited amount constitutes "fictitious profits." *See* Chaitman Moving Dec. **Ex**. **A** [Compl., Ex. B, Account No. 1CM597, lines 1-3 and n.1].

**Account No. 1CM596 (the "Tracy Trust Account")**

19.    The Tracy Trust Account was opened on August 23, 1999 by David Kamenstein with an initial transfer in the amount of $1,782,331 from the Sloan and Tracy Account, paid on September 7, 1999. *See* Chaitman Moving Dec. **Ex**. **AR** [Correspondence dated August 18, 1999 to Linda Schoenheimer [MADTBB01977201]; and *see* Chaitman Moving Dec. **Ex**. **AG** note dated October 18, 1999 [AMF00267653]]; *see* Chaitman Moving Dec. **Ex**. **AV** [Customer Statement dated September 1999 [MDPTPP01692902]]; *see also* Chaitman Moving Dec. **Ex**. **A** [Compl., Ex. B, Account No. 1CM596, line 2].

20.    Two additional transfers were made into the Tracy Trust Account from the Sloan and Tracy Account on September 7, 1999 in the amount of $1 (*see id*.) and on October 29, 1999 in the amount of $26. *See* Chaitman Moving Dec. **Ex**. **AW** [Customer Statement dated October 1999 [MDPTPP01692904]]; *see also* Chaitman Moving Dec. **Ex**. **A** [Compl., Ex. B, Account No. 1CM596, lines 2 and 3].

21.    The Trustee failed to give full credit for these transfers (*see ¶¶* 19-20) and has allowed only $1,457,157 claiming that the uncredited amount constitutes "fictitious profits." *See* Chaitman Moving Dec. **Ex**. **A** [Compl., Ex. B, Account No. 1CM596 lines 1-3 and n.1].

**The Trust Accounts**

22.     The Trustee has recognized that the Sloan Trust Account was opened by Carol, and all of the account opening papers were signed by her in her capacity as Trustee of the Sloan Trust Account; and that the Tracy Trust Account was opened by David and all of the account opening papers were signed by him in his capacity as Trustee of the Tracy Trust Account. Chaitman Dec. **Ex. E** [David Dep. Tr. at 15:16-24 [Q. These two trusts were associated with the BLMIS account. And in one of them -- so for Sloan's account, Carol signed the account-opening documents as Trustee, and for Tracy's account it was you who signed the account-opening documents as Trustee. But based on your prior testimony, is it accurate to say, that regardless of these documents, you were the person who managed all of these accounts? A. Yes.]]; *see also* SMF ¶¶ 26, 43.

23.     The Trustee acknowledged that, even though Tracy did not know of the Trust Account, the Account "was in the name of this Trust." *See* Chaitman Dec. **Ex. F** [Tracy Dep. Tr. at 10:4-5].

24.     By the express terms of the Tracy Trust Agreement for the 1984 Tracy Dara Kamenstein Irrevocable Trust (the "Tracy Trust"), Tracy had no power to withdraw funds in excess of the deposits into her Trust account in the same calendar year.  *See* Chaitman Moving Dec. **Ex. AE** [Tracy Trust [AMF00267661-696 at AMF00267665].   Article II, Section D, titled "Tracy's Power to Withdraw Principal," provides as follows:

> 1. Power of Withdrawal.  During each year in which any person shall transfer property to the Trust, including the calendar year of the execution of this Agreement (each such year being referred to herein as a "transfer year"), TRACY shall have the absolute right to withdraw from the Trust, at any time during such transfer year, but no later than thirty (30) days from the date of receipt of the notice from the Trustee as hereinafter described in subsection 3 of this Section D, an amount of principal which, taking into account all prior withdrawals of principal during the transfer year by Tracy relating to transfers by such person, is not in excess of the lesser of (i) the exclusion amount for such person for such transfer year . . .  or (ii) an amount equal to all of the transfers (which, in the case of a transfer of property other than cash, shall be taken into account at its fair market value at the date of its transfer to the Trust) made by such person to the Trust for such transfer year.

*Id.*

**The CKDK CAP Account**

25.    The Trustee admits that an account ending 5822 was held First Union Bank (which later became Wachovia Bank), nicknamed the CKDK CAP Account, was owned by David and Carol. SMF ¶ 54; *see* ECF No. 128-21 [Collura Report at ¶ 28 ["Based on documents included in in BLMIS customer files, the "CKDK CAP account" is account #xxxxxx5822 at First Union Bank (which merged with Wachovia in 2001) held by defendants David and Carol Kamenstein]]. In 2008, David received a 1099 from First Union (Wachovia Bank) regarding the CKDK CAP Account. As indicated by page 3 of the 1099, which shows a summary only (the other pages of the 1099 show account detail and are not shown), neither Tracy nor Sloan is named on the Account. Declaration of David Kamenstein dated January 1, 2021 ("David Dec. 1/1/21") at ¶ 4, *and see* David Dec. 1/1/21 Ex. A.

26.    Between December 11, 2006 and December 11, 2008 (the "Clawback Period") all withdrawal checks from the Kamenstein Accounts were requested by David, sent to and received by David at his home address of 273 Tangier Avenue, Palm Beach, Florida, 33480, and the bookkeeper was instructed by David to deposit all of the checks. David Dec. 1/1/21 at ¶ 5; *see* Declaration of Tracy Kamenstein dated January 1, 2021 ("Tracy Dec. 1/1/21") at ¶ 5.

27.    Tracy did not reside with her parents from 1996 on. Tracy Dec. 1/1/21 at ¶ 7.

28.    David instructed that all of the funds from withdrawals the Clawback Period be placed into the CKDK CAP Account, with the exception of two payments to Sloan. *See* ECF Nos. 128-21 and 128-27 [Collura Report ¶ 28 and Ex. 6, "Reconciliation and Tracing Results"]; *see also* SMF ¶¶ 54, 56-57; *see also* David Dec. 1/1/21 at ¶ 5-6; Tracy Dec. 1/1/21 at ¶ 5.

29.    Neither Tracy nor Sloan had any control over or access to the CKDK CAP account or the funds in it. They could not withdraw funds, did not have check-signing authority and did not have debit cards on the account; they would only become owners after the death of Carol and David and had no right to access the account during Carol and David's lifetimes. See Tracy Dec. 1/1/21 at ¶ 3; *see also* David Dec. 1/1/21 at ¶ 2-3.

30.     Tracy did not receive the benefit of any funds withdrawn from the Tracy Trust Account during the Clawback Period. Tracy Dec. 1/1/21 at 5.

**T-Bill Purchases**

31.     Madoff testified that he consistently purchased T-Bills with IA customer funds:

> Q. So you basically took the money that went into the 703 account?
> A. Correct.
> Q. Which was the investment advisory customers' money?
> A. Correct.
> Q. And you purchased Treasury bills with that?
> A. Correct…

Chaitman Dec. **Ex. C** [Madoff Dep. Tr. 4/26/17 at 19:1-21].

> Q. . . Let's say that customer A sent you a million dollars for the split-strike program.
> A. It went into - - -
> Q. What - -
> A. - - treasury bills. . . .

Chaitman Dec. **Ex. G** [Madoff Dep. Tr. 12/20/16 at 161:12-25].

32.     Madoff testified that he purchased T-bills through accounts that he maintained at Bear Stearns, Fidelity, Lehman Brothers, JPMorgan Chase, and Morgan Stanley. *See* Chaitman Dec. **Ex. C** [Madoff Dep. Tr. 4/26/17 at 46:9-47:12].

33.     Madoff's testimony concerning his investment of customer funds in T-bills is validated by the third-party records in the Trustee's possession. *See* Chaitman Dec. **Ex. H** [Compilation of Bear Stearns Statements and 703 Account Statements].

34.     Madoff explained that the T-Bills bore an interest rate of approximately 3%-4%, which was money earned with the IA customers' funds. Chaitman Dec. **Ex. C** [Madoff Dep. Tr. 4/26/17 at 19:1-21].

35.     While Madoff acknowledged that the IA customer statements often reflected the ownership of Fortune 100 company securities that had not been bought in connection with the purported split-strike conversion strategy, the account statements also reflected the ownership of T-bills that he actually did purchase. *Id. at* 19:22-20:1.

36.     Madoff testified that "by the time we were finished in 2008 . . . we [the LLC] represented ten percent of the United States' volume in – in [legitimate, market-making] transactions." Chaitman Dec. **Ex. G** [Madoff Dep. Tr. 12/20/16 at 54:21-56:25, quote at 56:8-17].

37.     The Trustee's witnesses testified to having seen "anecdotal evidence" that Madoff [the LLC] conducted trades equal to approximately 10 percent of the daily volume of the New York Stock Exchange as a whole. Chaitman Dec. **Ex. I** [Nelson Tr. 5/8/19 at 162:7-11].

38.     Madoff testified that he never required the deposits of other customers to pay out existing customers, until the market was collapsing, when no one ever requested it. *See* Chaitman Dec. **Ex**. **C** [Madoff Dep. Tr. 4/26/17 at 30:10-31:25; 108:1-4]; *see also* Chaitman Dec. **Ex. J** [Madoff Dep. Tr. 11/9/17 at 517:10-16 [Q: Did you ever need to take in a new customer's money in order to pay money to an existing customer? A: No. Q: In the entire time you were in business? A: Up until the collapse of the financial market.]]; *see also* Chaitman Dec. **Ex. C** [Madoff Dep. Tr. 4/26/17 at 108:1-4].

39.     Madoff testified that he never solicited new investment advisory customers. Chaitman **Ex**. **C** [Madoff Dep. Tr. 4/26/17 at 31:17-25 [Q: Did you actively solicit new investment advisory customers? A. No. Q: Why not? A: Because the firm was in a position that we were always turning away investors. We never – never solicited, you know, monies coming in. . . . ]].

40.     Madoff testified that his fraud began post-1992, likely 1993. *Id.* at 11:10-12:4.

41.     Madoff testified that Frank DiPascali purchased T-Bills with IA customers' money. *Id.* at 29:10-30:1; *see e.g. id. at* 28:4-30:1.

42.     The receipts from the sale or redemption of T-bills were paid into the 703 Account by the brokerage houses, including Bear Stearns and JPMC. Chaitman Dec. **Ex**. **H** [Bear Stearns March 2005 Statement, *see* Deposits and Withdrawals entry for March 30, 2005; Bear Stearns September 2005 Statement, *see* Deposits and Withdrawals entry for September 30, 2005; Bear Stearns December 2005 Statement, *see* Deposits and Withdrawals entry for December 21, 2005; June 2008 703 Account Statement, *see* first of four entries for 6/26].

43.    Joann Crupi, a Madoff employee who worked on the 17th floor of the Lipstick Building, testified that Frank DiPascali used to tell her when he was about to buy T-Bills and would then tell her to whom to allocate them. Chaitman Dec. **Ex**. **K**  [Crupi Tr. 165:6-22].

44.    Frank DiPascali testified that Madoff told him to which accounts the T-Bills should be credited. *See* Chaitman Dec. **Ex**. **L** [DiPascali Tr. 5344:9-5346:2; 5345:7-25].

45.    DiPascali also testified that a spreadsheet bore the account numbers "that Bernie told us he wanted to use to be the counterparties of the customer option positions" and that "this spreadsheet allows me to randomly pick a group of treasuries that were going to represent that collateral." Chaitman Dec. **Ex**. **L** [DiPascali Trial Testimony, 12/10/13 at 5345:7-25]; and Chaitman Dec. **Ex**. **M** [the spreadsheet to which DiPascali referred, Government Exhibit 105-c171].

46.    Madoff testified that, as with other entities in the industry, he maintained records for only six years, so there would not always be trade confirmations in their records. Chaitman Dec. **Ex**. **G** [Madoff Dep. Tr. 12/20/16 at 133:12-134:2]. Madoff testified that, during the 1980's, there would not always be third party confirmations because there were clearing houses that issued continuous net settlement printouts. *Id.* at 130:20-23; 132:12-24.

47.    Madoff testified that when he was dealing as principal there was no counterparty since he was on both sides of the trade. *Id*. at 128:7-12.

### Dubinsky's Testimony[3]

48.    On direct examination at the *Nelson* trial, Dubinsky repeatedly testified that no securities were ever purchased with IA customers' money.

> Q. . . . **So, the proprietary trading side of the business bought and sold securities**?
> A. **Absolutely**.
> Q. **The investment advisory side**?
> A. **Never**.

---

[3] *See e.g.* Chaitman Dec. **Ex**. **N** [Chart illustrating quotes of inconsistent testimony by Bruce Dubinsky as proven by his retractions on cross examination at the Nelson trial, *Picard v. Nelson*, Adv. Pro. Nos. 10-04377 and 10-04658 (Bankr. S.D.N.Y, May 8-9, 2019) (SMB)].

Chaitman Dec. **Ex. I** [Nelson Tr. 5/8/19 at 64:10-14, *see also* Nelson Tr. 5/8/19 at 73:6-14; 74:1-3; 74:19-

23; 75:17-20] (emphasis added).

> Q. I think you've answered this question but based on your review of the computer systems at BLMIS, were you able to determine if any trades were being processed through the investment advisory business computers?
> A. I was able to make that determination and the answer is they were not. **There was no evidence, Your Honor, of any trades being executed through the IA business computer systems whatsoever.**

*Id*. at 80:4-11 (emphasis added).

> A. . . . I scoured every other bank account record and every other document. I wanted to make sure I was certain.
> Q. So, to wrap up this issue, please summarize your conclusions concerning the source of funds flowing out of the investment advisory business to customers. Where was that money coming from?
> A. **Customer money. Just other customers' money.**
>
> Q. Did your conclusion that the BLMIS investment advisory business did not have a connected trading platform have anything to do with your conclusion that the investment advisory business was being operated as a Ponzi scheme?
> A. Absolutely.
> Q. Why?
> A. Because without the ability to actually connect to the market and trade and no evidence of those trades ever occurring, coupled with what I just testified about, that the only money I saw was customer money in and customer money out, no accretion to that 703 account from any sort of trading profit dividends -- that's the classic example of a Ponzi. There's nothing going on. You're taking money from people, you're promising that you're going to do something with it, and then you pay them back as if you're fulfilling your promise.
> Q. So, in addition to the not-connected trading platform, did your conclusion that the customer deposits were used to pay customer redemptions have any bearing on your conclusion that the investment advisory business was being operated as a Ponzi scheme?
> A. It did. As I just said, the lack of other funds from trading profits, from dividends, from real results of actual trading -- the lack of that played into the conclusion that this was simply a Ponzi. Just taking money in and paying it back.

*Id*. at 95:3 – 96:11.

> Q. Were you able to obtain DTC treasury records for BLMIS?
> A. I was. For the period of 2002 through 2007, I was able to obtain those records, and then I performed an analysis, identified the -- first I went and identified the unique treasury bills held by the prop trading business on December 31 of every year. I compared those holdings to the holdings at DTC, and I also compared those holdings to the IA business. And what I found, similar to the equities, is that the prop trading that the -- and the treasury bills weren't a big part of the prop trading, but the treasury bills that were held by the prop trading matched to the DTC records, and that was based on the treasury CUSIP, and in

contrast none of the CUSIPs held at the DTC matched those that were supposed to have been bought for the IA customers. So, again, it was a process of elimination. Once I matched everything to the prop trading, to the DTC -- were there any other DTC records left? No. Now I'm left with this tranche of purported treasuries for the IA business that have no support, no evidence of ever being purchased.

*Id.* at 129:19 – 130:12.

> A. **There was no evidence other than money coming in from customers and money going out to customers.** A little bit of the sweep, the overnight sweeps to kind of create more money for the Ponzi to enable it to go a little bit longer, in other words. And that's why I have Xes on all of those.
> Q.  So, based on your review of the books and records of BLMIS, did you reach a conclusion about the source of funds for the 703 account?
> A.  I did.
> Q.  I probably asked and answered that one but I'll ask it again.
> A.  It came from the IA business customers.

*Id.* at 92:16-93:3 (emphasis added).

> Q. Based on your review of the BLMIS Investment Advisory books and records, were you able to determine if Mr. Madoff's allocation concerning treasuries was accurate?
> A. It confirmed my analysis in finding that **no treasuries were bought or traded for any of the investment advisory clients.**

*Id.* at 129:9-14 (emphasis added).

> Q. So, taken in conjunction with the other evidence you identified with relating to treasuries, did you reach a conclusion regarding the purchase and sale of treasuries, by the BLMIS Investment Advisory business?
> A. **There was no evidence of treasuries being purchased for the IA business customers, plain and simple.**

*Id.* at 132:9-14 (emphasis added).

> A.  On the IA side of the business, Your Honor, it [a computer system for trading securities] didn't exist. There's no need -- if you're not trading any stocks and you're not doing anything, you don't need all these systems. Systems have servers, servers take up room, people can have access to it, they can see what you're doing. So, in the midst of perpetrating a fraud, things you don't need you don't put in the room. You leave it out. And that's why these things were not present over in the IA business.

*Id.*  at 73:6-14

> A. Again, there's no checkmark under the IA business because there's no need for it. **You don't need real time market quotes and trading when you're not doing trading.**

*Id.* at 74:1-3 (emphasis added).

  **A. Again, you'll see that for the prop trading business. It makes sense. They're trading stocks and other instruments. You don't see it for the IA business. Again, you don't need it because nothing is going on.**

*Id.* at 74:19-23 (emphasis added).

  A. Again, **nothing was being done in the IA business with real stocks, or bonds, or trading, so you don't need an audit trail when you're making everything up.**

*Id.* at 75:17-20 (emphasis added).

  49. Dubinsky testified on direct examination that there is "**no evidence [of activity in the 703 account] other than money coming in from customers and money going out to customers**," *id.* at 92:16-18 (emphasis added), and a minimal amount (3% of the total monies in the 703 Account) from overnight sweeps. *Id.*; *see also id.* at 83:3-15; 85:3-21. He swore that there was "**never any addition to the 703 Account that [he] saw when [he] examined the bank accounts to show that money was coming from trading profits**." *Id.* at 84:1-3 (emphasis added).

  50. Dubinsky testified that he scoured every bank record and didn't find any other use of customer funds other than payments to customers and bank sweeps at night at JPMC. *Id.* at 153:14-16; *see id.* at 90:15-19 (A. . . . I mean, I scoured the documents to see – maybe the money came in somewhere and somehow evaporated somewhere else. I don't know. But I looked for all of the information that would be surrounding the transmittal, and there was none of it.); *see id.* at 95:3-5 (A. . . .  I scoured every other bank account record and every other document. I wanted to make sure I was certain.).

  51. On cross examination, however, Dubinsky admitted that reliable third-party records show that the IA business did, in fact, buy T-bills with money from the 703 Account and that the T-bills paid interest. *Id.* at 166:17-18 ("Q. And those T-bills paid interest, right? A. **Those T-bills paid interest**.") (emphasis added).

  52. Dubinsky admitted that he knew that Madoff maintained several brokerage accounts through which he purchased T-bills using money taken from the 703 Account. *Id.* at 90:25-91:2 ("A. No. **There were several brokerage accounts, that money was taken from the 703 account and put into,**

that purchased some treasuries.") (emphasis added); 153:4-11 ("A. **There were about six or eight**

**other brokerage accounts that were located during this time period, the 2000 to 2008 time period,**

**where there were certain treasuries that were being purchased. Money was being taken out of the**

**703 account, Your Honor, over to those brokerage accounts**. These are at other wire houses. **And**

**treasuries were purchased in those accounts and then liquidated at various times**.") (emphasis

added); 155:2-4 ("A. **There was money taken out of the 703 account, transferred to these accounts,**

**these various accounts, and then these securities were purchased, yes.**") (emphasis added).

53.    Dubinsky named the following firms that held these accounts: Lehman Brothers, Bear

Stearns, JPMorgan Chase and Morgan Stanley and he acknowledged that "those T-bills paid interest."

Chaitman Moving Dec. **Ex F** at 154:2-9; Chaitman Dec. **Ex. I** at 166:17-18.

> Q. But in any event, **you're now telling us that you're aware that there were**
> **approximately eight accounts at which Madoff was using investment advisory**
> **customers' money to purchase T bills. Isn't that true?**
> **A. That is correct, yes.**
> Q. Okay. And those accounts included Lehman Brothers.
> A. Correct.
> Q. Bear Sterns.
> A. That's correct.
> Q. JP Morgan Chase.
> A. Correct.
> Q. Morgan Stanley.
> A. There was a Morgan Stanley account, yes.

*Id.* at 152:22-154:9 (emphasis added).

54.    While, on direct examination, Dubinsky testified that he found no evidence of IA customer

T-bills in the DTC records, he admitted on cross-examination that Madoff kept securities with the financial

institutions from which he had purchased them:

> Q. Well, you testified that in trying to analyze Madoff's stock and T-bill position, you went
> only to the DTC records.
> A. Correct.
> Q. **But isn't a fact that Mr. Madoff also kept securities with financial institutions from**
> **which he bought them?**
> A. **As in the eight brokerage accounts, yes.**

*Id.* at 177:16-21 (emphasis added).

55.    And further, on cross examination, Dubinsky testified that these securities were purchased

with investment advisory customers' money and that those T-bills earned interest:

> Q. … And you recall that these were investments of securities that were made with
> investment advisory customers' money, right?
> A. **There was money taken out of the 703 account, transferred to these accounts, these
> various accounts, and then these securities were purchased, yes.**

Chaitman Moving Dec. **Ex. F**. at 154:24-155:4 (emphasis added).

> Q.  Isn't it a fact, Mr. Dubinsky, that the T-bill investments that Mr. Madoff made with
> investment advisory customers money earned interest?
> A.  Are you talking about the overnight sweeps?
> Q.  No, I'm not. I'm talking about the eight or nine firms that you've acknowledged that
> Madoff purchased T-bills through with investment advisory customers' money.
> A. So --
> Q. And those T-bills paid interest, right?
> A. **Those T-bills paid interest**.

Chaitman Dec. **Ex. I**. at 166:9-18 (emphasis added).

56.    Additionally, while another analysis allegedly performed by Dubinsky addresses the T-

bills held by the Brokerage Firms, Dubinsky did not add up all those T-bills. *See e.g.* Dubinsky Report ¶

227, Table 5; and ¶¶ 232-240, ECF No. 129-1.

57.    Dubinsky conceded in cross-examination at the Nelsons' trial that the LLC did not operate

a Ponzi scheme and that it was a legitimate business:

> Q. Now, is it your testimony that the market making part of Madoff's business was a Ponzi
> scheme?
> A. No, I did not issue that opinion.
> Q. Okay. And is it your testimony that the proprietary trading part of the business was a
> Ponzi scheme?
> A. No, I did not issue that opinion.
> Q Okay. So out of the whole operation of 180 or so 15 employees, it's 8 to 10 employees
> who, in your opinion, were involved in a Ponzi scheme; is that right?
> A. That's correct.

Chaitman Moving Dec. **Ex. F** [Nelson Tr. 5/8/19 at 168:8-17].

**T-Bill Purchases for the Kamenstein Accounts**

**T-Bill Purchases for the David Account**

58.     Madoff purchased significant amounts of T-Bills for the David Account and held them

throughout the time they were credited to the David Account, for example[4]:

59.     On December 13, 2007, Madoff purchased 300,000,000 of a T-Bill (CUSIP no 912795D65,

due 4/3/08) from JP Morgan. Chaitman Dec. **Ex**. **O** [Chart, JPMSAA0020018].

60.     On December 31, 2007, Madoff credited 2,175,000 of those T-Bills to the David Account,

with a value of $2,156,490.75.  Chaitman Dec. **Ex**. **O** [Chart, MDPTPP01931925].

61.     On January 3, 2008, Madoff sold 25,000 of those T-Bills and credited the David Account

with $24,800.25 Chaitman Dec. **Ex. O** [Chart, [MDPTPP01931928]]

62.     On February 7, 2008 Madoff sold a further 50,000 of those T-Bills and credited the David

Account with $49,840.50 Chaitman Dec. **Ex. O** [Chart, [MDPTPP01931931].

63.     On March 4, 2008 Madoff sold a further 50,000 of those T-Bills and credited the David

Account with $49,917 Chaitman Dec. **Ex. O** [Chart, [MDPTPP01931933].

64.     On March 19, 2008 Madoff sold a further 2,050,000 of those T-Bills and credited the David

Account with $2,049,057 for a total transfer of 2,175,000 at a credit of $2,173,614.75 Chaitman Dec. **Ex.**

**O** [Chart, [MDPTPP01931933].

65.     Third-party records show that Madoff held these T-Bills throughout the period during

---

[4] The CUSIP numbers listed herein may not all appear on the customer statements. The maturity dates of the T-bills, however, have been matched to the CUSIP numbers available on https://www.treasurydirect.gov/instit/annceresult/annceresult_query.htm**.**  This Court may take judicial notice of this pursuant to Fed. R. Evid. 201(b)(2) (The court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.). *See Abely v. Aeterna Zentaris Inc.,* 2013 WL 2399869, at *21 (S.D.N.Y. May 29, 2013) (documents on a government website "are published by government sources from which the Court may appropriately take judicial notice."); *see also Lilakos v. New York City,* 2020 WL 1696118, at *4, n.4 (2d Cir. Apr. 8, 2020) (taking judicial notice of a form available online at nyc.gov website); *Apotex Inc. v. Acorda Therapeutics, Inc.,* 823 F.3d 51, 60, n.3 (2d Cir. 2016) (taking judicial notice of a document published on regulations.gov, a government website,  "because the Guidance is publicly available and its accuracy cannot reasonably be questioned."); *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.,* 638 F. App'x 43, 47, n.2 (2d Cir. 2016) (taking judicial notice of public records contained on the Georgia Secretary of State's website).

which they appeared on the David Account customer statement, buying $300,000,000 of them on December 13, 2007 for a total of $ 297,312,000, and redeeming them on the maturity date of April 3, 2008 at face value of $300,000,000. Chaitman Dec. **Ex. O** [Chart, JPMSAB0003961].

66.     The David Account held T-bills that were not held simultaneously by our other clients. Chaitman Dec. **Ex**. **P** [December 2007-March 2008 customer statements for Lisa B. Nissenbaum, Doron Tavlin, Boyer Palmer and Harry Smith].

### **T-Bill Purchases for the Carol Account**

67.     Madoff purchased significant amounts of T-Bills for the Carol Account and held them throughout the time they were credited to the Carol Account, for example:

68.     On December 13, 2007, Madoff purchased 300,000,000 of a T-Bill (CUSIP no 912795D65, due 4/3/08) from JP Morgan. Chaitman Dec. **Ex. Q** [Chart, JPMSAA0020018].

69.     On December 31, 2007, Madoff credited 2,175,000 of those T-Bills to the Carol Account, with a value of $2,156,490.75.  Chaitman Dec. **Ex. Q** [Chart, MDPTPP01932212].

70.     On January 3, 2008, Madoff sold 25,000 of those T-Bills and credited the Carol Account with $24,800.25 Chaitman Dec. **Ex. Q** [Chart, [MDPTPP01932215]]

71.     On February 7, 2008 Madoff sold a further 50,000 of those T-Bills and credited the Carol Account with $49,840.50 Chaitman Dec. **Ex. Q** [Chart, [MDPTPP01932218]].

72.     On March 4, 2008 Madoff sold a further 50,000 of those T-Bills and credited the Carol Account with $49,917 Chaitman Dec. **Ex. Q** [Chart, [MDPTPP01932220].

73.     On March 19, 2008 Madoff sold a further 2,050,000 of those T-Bills and credited the Carol Account with $2,049,057, for a total transfer of 2,175,000 at a credit of $2,173,614.75 Chaitman Dec. **Ex. Q** [Chart, MDPTPP01932220]

74.     Third-party records show that Madoff held these T-Bills throughout the period during which they appeared on the Carol Account customer statement, buying $300,000,000 of them on

December 13, 2007 for a total of $ 297,312,000, and redeeming them on the maturity date of April 3, 2008 at face value of $300,000,000. Chaitman Dec. **Ex. Q** [Chart, JPMSAB0003961].

75.    The Carol Account held T-bills that were not held simultaneously by our other clients. Chaitman Dec. **Ex. P** [December 2007-March 2008  customer statements for Lisa B. Nissenbaum, Doron Tavlin, Boyer Palmer and Harry Smith]

### **T-Bill Purchases for the Sloan Trust Account**

76.     Madoff purchased significant amounts of T-Bills for the Sloan Trust Account and held them throughout the time they were credited to the  Sloan Trust Account, for example:

77.    On December 13, 2007, Madoff purchased 300,000,000 of a T-Bill (CUSIP no 912795D65, due 4/3/08) from JP Morgan. Chaitman Dec. **Ex. R** [Chart, JPMSAA0020018].

78.    On December 31, 2007, Madoff credited 950,000 of those T-Bills to the Sloan Trust Account, with a value of $2,156,490.75.  Chaitman Dec. **Ex. R** [Chart, MDPTPP01694261].

79.    On January 3, 2008, Madoff sold 25,000 of those T-Bills and credited the Sloan Trust Account with $24,800.25 Chaitman Dec. **Ex. R** [Chart, MDPTPP01694265]

80.    On February 7, 2008 Madoff sold a further 25,000 of those T-Bills and credited the Sloan Trust Account with $24,920.25 Chaitman Dec. **Ex. R** [Chart, [MDPTPP01694268].

81.    On March 19, 2008 Madoff sold a further 900,000 of those T-Bills and credited the Sloan Trust Account with $899,586.00, for a total transfer of 950.000 at a credit of $949,306.50 Chaitman Dec. **Ex. R** [Chart, MDPTPP01694270]

82.    Third-party records show that Madoff held these T-Bills throughout the period during which they appeared on the Sloan Trust Account customer statement, buying $300,000,000 of them on December 13, 2007 for a total of $ 297,312,000, and redeeming them on the maturity date of April 3, 2008 at face value of $300,000,000. Chaitman Dec. **Ex. R** [Chart, JPMSAB0003961].

83.    The Sloan Trust Account held T-bills that were not held simultaneously by our other clients. Chaitman Dec. **Ex. P** [December 2007-March 2008  customer statements for Lisa B. Nissenbaum, Doron Tavlin, Boyer Palmer and Harry Smith]

### T-Bill Purchases for the Tracy Trust Account

84.    Madoff purchased significant amounts of T-Bills for the Tracy Trust Account and held them throughout the time they were credited to the Tracy Trust Account, for example:

85.    On December 13, 2007, Madoff purchased 300,000,000 of a T-Bill (CUSIP no 912795D65, due 4/3/08) from JP Morgan. Chaitman Dec. **Ex. S** [Chart, JPMSAA0020018].

86.    On December 31, 2007, Madoff credited 1,775,000 of those T-Bills to the Tracy Trust Account, with a value of $1,759,894.75.  Chaitman Dec. **Ex. S** [Chart, MDPTPP01693489].

87.    On January 3, 2008, Madoff sold 25,000 of those T-Bills and credited the Tracy Trust Account with $24,800.25 Chaitman Dec. **Ex. S** [Chart, MDPTPP01693493]

88.    On February 7, 2008 Madoff sold a further 25,000 of those T-Bills and credited the Tracy Trust Account with $24,958.50 Chaitman Dec. **Ex. S** [Chart, MDPTPP01693496].

89.    On March 4, 2008 Madoff sold a further 25,000 of those T-Bills and credited the Tracy Trust Account with $49,917 Chaitman Dec. **Ex. S** [Chart, MDPTPP01693498].

90.    On March 19, 2008 Madoff sold a further 1,700,000 of those T-Bills and credited the Tracy Trust Account with $ 1,699,218.00, for a total transfer of 1,775,000 at a credit of $1,773,897 Chaitman Dec. **Ex. S** [Chart, MDPTPP01693498]

91.    Third-party records show that Madoff held these T-Bills throughout the period during which they appeared on the Tracy Trust Account customer statement, buying $300,000,000 of them on December 13, 2007 for a total of $ 297,312,000, and redeeming them on the maturity date of April 3, 2008 at face value of $300,000,000. Chaitman Dec. **Ex. S** [Chart, JPMSAB0003961].

92.    The Tracy Trust Account held T-bills that were not held simultaneously by our other clients. Chaitman Dec. **Ex**. **P** [December 2007-March 2008  customer statements for Lisa B. Nissenbaum, Doron Tavlin, Boyer Palmer and Harry Smith].

## The Trustee's Misrepresentations

93.    The Trustee has consistently represented, from 2008 to the present, that Madoff never purchased any securities with IA customers' money.  Declaration of Helen Davis Chaitman dated 5/6/2019, *Picard v. Nelson*, Adv. Pro. No. 10-04377, ECF No. 156-1, Ex. A.

94.    The Trustee has refused to produce trading records and all of the customers' account statements.  Declaration of Helen Davis Chaitman dated 4/11/2018, *Picard v. Nelson*, Adv. Pro. No. 10-04377, ECF No. 86-1; s*ee also* Trustee Response to Defendants' Document Demands and Interrogatories served in Adv. Pro. No. 10-04995 and dated April 8, 2016, [Response to Request No. 2], *Picard v. Wilenitz*, Adv. Pro. No. 10-04995 ECF No. 70-2].

95.    The Trustee has proffered fabricated evidence purportedly proving that the JPMC Accounts were owned by the LLC through the use of various versions of custodian affidavits which was rejected by this Court. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 610 B.R. 197, 231 (Bankr. S.D.N.Y. 2019) ("The Trustee cannot, however, use the Coribello declarations to prove a material fact because '[i]t is the records, *not* the certification, that are introduced as substantive evidence.'"); *see Picard v. Nelson,* Adv. Pro. No. 10-04658 Trustee's Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction, ECF No. 183, at 20; *see* Defendants' Memorandum of Law in Support of Motion to Dismiss for Lack of Subject-Matter Jurisdiction, ECF No. 170 at 7-9; 11-15; *and see* Defendants' Proposed Findings of Fact and Conclusions of Law, *Picard v. Nelson,* Adv. Pro. No. 10-04658 (Bankr. S.D.N.Y. Sept. 5, 2019), ECF No. 179 at 18-19, ¶¶ 43-49.

**This Court's View That Summary Judgment is Not Appropriate**

96.     This Court has held that summary judgment is not appropriate in the claw back cases, *see e.g. Picard v. Legacy Capital, Ltd.,* 603 B.R. 682 (Bankr. S.D.N.Y. 2019); *Picard v. Mann,* 608 B.R. 165 (Bankr. S.D.N.Y. 2019).

97.     Judge Bernstein, again, expressed the same concerns at a hearing regarding the Trustee's announced intention to move for summary judgment in another, similar case, *Picard v. Savin,* Adv. Pro. No. 10-04889.  *See* March 17, 2020 Hearing Tr. 9:23-10:15; 12:11-15, *id.* at ECF No. 96 ("[y]ou know my view on these summary judgment . . . , motions, particularly on the issues I've identified, [whether the JPMC Accounts were held by Madoff personally or by the LLC, whether the LLC was a Ponzi scheme, and if so, when it began, whether the LLC was allocating T-bills purchased by the proprietary trading arm to customers of the IA business, deposits and withdrawals] . . . I have to try it.").

Dated: January 8, 2021
       New York, New York

CHAITMAN LLP
By: */s/ Helen Davis Chaitman*
Helen Davis Chaitman
hchaitman@chaitmanllp.com
465 Park Avenue
New York, New York 10022
Phone & Fax: 888-759-1114
*Attorney for Defendants*