# EXHIBIT G

Page 1

1     UNITED STATES BANKRUPTCY COURT
       SOUTHERN DISTRICT OF NEW YORK
2
  ----------------------------------X
3                                    :
  In re:                             :
4                                    :
  SECURITIES INVESTOR PROTECTION     :
5  CORPORATION,                      :
                                     :
6            Plaintiff-Applicant,    :
                                     :
7         -vs-                       :  08-01789 (SMB)
                                     :
8  BERNARD L. MADOFF INVESTMENT      :
  SECURITIES, LLC,                   :
9                                    :
            Defendant.               :
10  ----------------------------------X
11                                   :
  In re:                             :
12                                   :
  BERNARD L. MADOFF,                 :
13                                   :
            Debtor.                  :
14  ----------------------------------X
15
16
17            VIDEOTAPED DEPOSITION
18                  OF
19             BERNARD L. MADOFF
20          (Taken by the Customers)
21           Butner, North Carolina
22            December 20, 2016
23
24  Reported by:  Lisa A. DeGroat, RPR
                Notary Public
25

1                    A P P E A R A N C E S
2

    For the Customers:
3

    HELEN DAVIS CHAITMAN, Esq.
4    Chaitman, L.L.P.
    465 Park Avenue
5    New York, New York   10022
    (908) 303-4568
6    hchaitman@chaitmanllp.com
7

    For the Trustee:
8

    DAVID J. SHEEHAN, Esq.
9    AMANDA E. FEIN, Esq.
    Baker & Hostetler, L.L.P.
10    45 Rockefeller Plaza
    New York, New York   10111
11    (212) 589-4616
    dsheehan@bakerlaw.com
12

13    For the Witness:
14    PETER A. GOLDMAN, Esq.
    Attorney at Law
15    12 Fairlawn Parkway
    Rye Brook, New York   10573
16    (914) 937-6857
    pagoldman45@gmail.com
17

18    The Videographer:
19    Robert Collier
20        VIDEOTAPED DEPOSITION OF BERNARD L.
21    MADOFF, taken by the Customers, at the Federal
22    Correctional Institution, Butner Medium I, Old NC
23    Highway 75, Butner, North Carolina, on the 20th day of
24    December, 2016, at 8:52 a.m., before Lisa A. DeGroat,
25    Registered Professional Reporter and Notary Public.

Page 13

1    your apartment; is that right?

2        A.    Yes.

3        Q.    And is it fair to say that you had a lot of

4    time to think about what you had done?

5        A.    Yes.

6        Q.    When you spoke to Judge Chin on March 12th,

7    2009, did you tell the truth about what you had done?

8        A.    Yes.

9        Q.    I want to read, beginning on line 12 of page

10   25, the -- the one paragraph.  Quote, "To the best of

11   my recollection, my fraud began in the early 1990s.

12   At that time the country was in a recession, and this

13   posed a problem for investments in the securities

14   markets."

15           "Nevertheless, I had received investment

16   commitments from certain institutional clients and

17   understood that those clients, like all professional

18   investors, expected to see their investments

19   outperform the market."

20           "While I never promised a specific rate of

21   return to my client, I felt compelled to satisfy my

22   clients' expectations at any cost.  I, therefore,

23   claimed that I employed an investment strategy I had

24   developed called the split-strike conversion strategy

25   to falsely give the appearance to clients that I had

Page 14

1    achieved the results I believed they expected."

2            Is that statement 100 percent true?

3       A.    Yes.  However, there's -- if I understand

4    this statement, it said that -- that -- "to falsely

5    give the appearance," implies that I had achieved the

6    results.  When I took the money and I started the

7    strategy, the strategy -- there was nothing in the

8    strategy to give a false impression.

9            In other words, I was the -- you know, I

10   intended to invest the money.  The fact that I

11   invested -- that I couldn't invest it because of

12   market conditions, but then shorted the strategy to

13   the clients, then it was -- it -- it gave the false

14   impression, but that -- it was not my intention when I

15   first developed the strategy or made the commitments

16   to the clients to -- to not invest the money at that

17   time.

18      Q.    Okay.  So, if I understand you correctly,

19   when you developed the split-strike conversion

20   strategy, your intention was to carry it out --

21      A.    Correct.

22      Q.    -- honestly?

23      A.    Correct.

24      Q.    But you didn't have the money to do that,

25   and so you --

```
                                                    Page 15

 1        A.     I didn't have the market conditions to do

 2    that.

 3        Q.     Okay.  So you started sending statements to

 4    clients which were not accurate, because they

 5    reflected purchases of securities that did not occur?

 6        A.     Yes.  That's correct.

 7        Q.     Okay.  Now, you understood that this was a

 8    fraud on your customers; right?

 9        A.     Yes.

10        Q.     And is it your testimony that you never

11    perpetrated a fraud on your customers prior to the

12    initiation of the split-strike conversion strategy?

13        A.     That's correct.

14                  MR. SHEEHAN:  Object -- object to the

15           form.

16                  THE WITNESS:  I'm sorry.  I didn't hear

17           what you just --

18                  MR. SHEEHAN:  I said I objected to the

19           form.

20                  THE WITNESS:  Oh.

21                  MR. SHEEHAN:  We have an understanding

22           that all objections are preserved, as subject to

23           objections as to form.

24                  MS. CHAITMAN:  Right, but what is your

25           objection to that form?  I just want to --
```

Page 26

1    business.

2              He was also aware that what happened in '87

3    and -- and during the crash that, you know, there was

4    some -- there was some -- there was some clients that

5    were wanting to sell out of their positions that they

6    had had because of their concern about the market.

7              And that I had, you know, objected to that,

8    telling them that this was in violation of their

9    commitments that they had made originally.  So he was

10   aware of the fact that those discussions were taking

11   place.

12             And he was also aware of the fact that I was

13   doing -- actually doing the convertible arbitrage

14   transactions prior to that.

15       Q.    Okay.  But in terms of the -- the crime that

16   he's admitting to here --

17       A.    Right.

18       Q.    -- can you shed any light on whether, in

19   fact, this began in the late '80s or the early '90s?

20       A.    Oh, it -- it began, as I said, in the '90s.

21       Q.    Okay.  All right.  And when you say in the

22   '90s, are you fairly certain it was 1992?

23       A.    That was -- yes.  That was the date -- the

24   approximate date that I said it started, because

25   that's when I really started to take in the money to

Page 54

1      A.      The past four chairmen of the SEC have all

2      been up in my office, watching us trade and meeting

3      with us, as well as all of these foreign exchanges.

4              As a matter of fact, the -- the NASD used

5      our -- during the 9/11 crisis the SEC and the NASD

6      asked us, would we allow the NASD to -- to operate

7      their backer facility out of our backer facility that

8      we had in Queens, because that's the -- everybody was

9      having problems because of the -- you know, the -- the

10     bombing out of the -- the plane crashing into the

11     buildings.

12             So the NASD for a period of, I guess it was,

13     three months used our facilities to back up their

14     trades, and also their compliance people sat in my

15     office for a period of months, operating, you know,

16     because they didn't have -- their offices were

17     destroyed.

18     Q.      Now, Mr. Madoff, I think you know that the

19     trustee has taken the position in court he has not

20     conceded that you ever did any legitimate trading.

21     Can you explain to us -- starting in 1960 and then

22     ending on December 11th, 2008 can you explain to us

23     the volume of trading that you did in various periods

24     of time and the number of employees whose job was to

25     conduct real trades?

```
                                             Page 55
 1        A.      Well, when I started my firm in 1960, it was
 2     basically myself.  And I operated at that time out of
 3     my father-in-law's accounting office, because I was in
 4     law school at the time.  So in those days it was very
 5     common for small brokerage firms to operate.
 6              As a matter of fact, I started with $500 of
 7     capital.  And that was a small amount even by the
 8     SEC's standard during that time.  So I was required to
 9     meet with the New York office of the SEC to explain
10     how I basically had the nerve to present a handwritten
11     balance sheet with $500 cash assets and no
12     liabilities.
13              And, you know, so they wanted to make sure
14     that I was real.  And I started with the $500 of -- of
15     capital, which in those days didn't require much,
16     because I was -- my plan was just to do a small retail
17     business basically with my family as clients.
18              That, you know, eventually grew from a
19     one-man operation to, I guess, you know, 200 some odd
20     people here and in -- in London in 2008.
21              I started this small retail firm.
22     Relatively unsuccessful the first couple of years,
23     because I ran into the Cuban missile crisis, and the
24     marketplace collapsed in 2000 -- in 1962.
25              Required me to borrow $30,000 from my
```

Page 56

1    father-in-law in the form of -- of municipal bonds to

2    recapitalize my firm, which I paid back, you know, a

3    year or so later.

4              And then gradually just -- and then became a

5    market-making firm in the '70s, early '70, and became

6    a market-making firm for the rest of the balance of my

7    50 years in the business.

8              At one -- we -- at the -- by the time we

9    were finished in 2008 the firm was operating -- was

10   executing a few 100,000 trades, up to 600,000 trades a

11   day at the high, but we were averaging about 300,000

12   transactions a day, and we represented ten percent of

13   the United States' volume in -- in transactions.

14        Q.    Now, we're talking about legitimate

15   transactions?

16        A.    All market-making were legitimate

17   transactions.  The -- and the firm was operating

18   basically as -- primarily most of the time as a

19   market-making and proprietary trading firm.

20              It was -- the investment advisory firm

21   really came into -- you know, into being on a gradual

22   basis, and then was my undoing basically in the early

23   '90s, because of a problem that occurred originally in

24   '80 -- as I say, the crash in '87, but perpetuated a

25   fraud that started, as I said, in the '90s, which was,

Page 83

```
 1                    THE WITNESS:  I -- I can -- I can put
 2        people to sleep.  The chairman of the London
 3        Stock Exchange fell asleep during one of my
 4        meetings with him, but he said it was jet lag.
 5        You don't have jet lag.  So --
 6                    MR. SHEEHAN:  I have no jet lag.
 7   BY MS. CHAITMAN:
 8        Q.    Mr. Madoff, I had sent you in advance of the
 9   deposition a copy of Mr. Dubinsky's report.  Have you
10   had a chance to review it?
11        A.    Yes, I have.
12        Q.    Okay.  And did you agree with his
13   conclusions?
14        A.    Some of them.
15        Q.    Okay.  Did you agree with all of them?
16        A.    No.
17        Q.    Okay.  Did you find that overall there were
18   some mistakes that Mr. Dubinsky made?
19                    MR. SHEEHAN:  Objection as to the form.
20                    THE WITNESS:  Yes.
21   BY MS. CHAITMAN:
22        Q.    Okay.  Before we go into detail with respect
23   to the report can you tell me some of the mistakes
24   that you found with Mr. Dubinsky's approach?
25        A.    Well, first of all, the majority of the
```

Page 84

1    report had to deal with the split-strike conversion

2    trades, which I was sort of at a loss for -- and this

3    report, from what I understand from -- cost a lot of

4    money to -- to produce.

5            And I had from day one acknowledged that

6    there was no split-strike trades being done and that

7    there was a fraud.  So I couldn't understand why so

8    much money was --

9            Look, let me just say that from the time

10   that I plead guilty for this -- for this fraud, I've

11   had to live with the guilt of -- of knowing what I

12   did.

13           All right.  And my decision basically to --

14   to plead guilty and to not go to trial was to be able

15   to recover as much money as possible to my -- for my

16   clients.

17           And the -- you know, rather than go to -- to

18   trial, which I knew that I was guilty of, and put my

19   family through a -- the horror of, you know, what

20   would -- what would occur with the trial, I -- I

21   decided that the best thing that I could do would be

22   to plead guilty, take my sentence and do everything

23   that I could to recover the money for the clients, who

24   I defrauded.

25       Q.    Let me just interrupt you there.

Page 91

1                And if I go to these people and -- which

2        I've already done to a certain extent anyhow -- and

3        threaten them with -- you know, with their complicity,

4        I said, I'll get the money back.  Now, nobody believed

5        that I could possibly do this.

6                        MS. CHAITMAN:  We're just running out

7            of the tape.  So we have to --

8                        THE WITNESS:  Okay.

9                        MS. CHAITMAN:  -- take a break.

10                       THE VIDEOGRAPHER:  Okay.  This ends

11           media number one in the deposition of Bernie

12           L. -- Bernard L. Madoff.  Going off the record.

13           The time is 11:12.

14                       (RECESS FROM 11:12 A.M. TO 11:27 P.M.)

15                       THE VIDEOGRAPHER:  Back on the record.

16           This begins media number two in the deposition of

17           Bernard L. Madoff.  The time is 11:27.

18       BY MS. CHAITMAN:

19           Q.    Mr. Madoff, we've been --

20           A.    Okay.  I --

21           Q.    -- discussing a few other things, but I want

22       to come back, if I may, to the Dubinsky report.

23           A.    Right.

24           Q.    And my question is:  Are there some

25       fundamental errors that you feel Mr. Dubinsky made?

Page 92

1      A.    Yes.

2      Q.    Okay.  Let's -- let's go through them one at

3   a time.

4      A.    Okay.  All right.  Basically what -- well,

5   I'd like to say is that I would -- I'm not going to

6   get involved in his -- the majority of the report that

7   deals with the split-strike conversion trades or

8   whether or not the trades were executed or not,

9   because the -- I have no objection to -- I can't find

10   fault with what he -- what his determination was,

11   because I was not executing the trades.

12          So there's no point in me, you know,

13   evaluating what he says was right or wrong.  There may

14   be errors in there, but it doesn't matter.  The fact

15   was the errors that I found were -- had to deal with

16   the beginning of the report dealing with the

17   convertible -- the trading that took place before

18   1992, which basically involved the convertible bond

19   arbitrage transactions.

20          So, first of all, let me start by saying

21   that it was quite -- I understand that his -- from his

22   CV that he has a very good CV.  All right.  In other

23   words, he seems to be -- have his references of fraud

24   reporting or -- I don't find any fault with that.  He

25   seems to have a lot of experience.

Page 93

1           That being said, it became very obvious to

2    me that his knowledge of the market-making and the

3    dealer markets and the over-the-counter trading,

4    whether it be convertibles or so on, there -- he had

5    very little experience in that.

6           And that's not a great surprise to me,

7    because it's sort of a specialized marketplace.  And

8    unless, you know, you -- you have firsthand experience

9    of how market-makers operate, how the dealer market

10   works and how the trading of convertible bonds takes

11   place, you know, that's a specialized kind of

12   marketplace.

13          And he had things that were really wrong.

14   For example, he makes the statement that Madoff sent a

15   confirmation to a client, where he -- you know, the

16   client -- he says that the client bought stock or sold

17   stock, which was opposite of what happened.

18          In other words, typically when a retail

19   client gets a confirmation from Merrill Lynch, for

20   example, it states the client bought IBM at a price or

21   sold IBM at a price.

22          When a dealer sends a confirmation to a

23   client, it says, we bought, we sold.  Meaning the

24   dealer bought or sold to the client.  So, for example,

25   there's a confirmation, and I have a -- a copy of one

Page 94

1    of our confirmations.

2            Well, I don't need that.  In other words,

3    our confirmation says we bought.  That means Madoff

4    bought for the customer or from the customer or sold

5    to the customer.

6        Q.    Okay.  You know what?  I don't know if this

7    is going to help you, but --

8        A.    Here is --

9        Q.    Okay.

10       A.    Here is a confirmation.  There's a

11   confirmation --

12               MR. SHEEHAN:  Let her mark that.

13               MS. CHAITMAN:  I will.

14               THE WITNESS:  It says in the box, "We

15       sold."  All right.  Or it would say, we bought.

16       "We," referring to the firm.  Madoff.

17               Now, if we had said you bought or you

18       sold, that would be the customer bought.  You

19       know -- you know what I'm saying?

20               MR. SHEEHAN:  Uh-huh.

21               THE WITNESS:  All right.  This is a

22       standard dealer confirmation.  It also has on

23       here codes, the transaction code and a capacity

24       code.  Meaning that it has a number.

25               Meaning what is -- what -- what

Page 95

1    capacity are we operating?  Where -- on the back

2    of the confirmation it says the capacity -- the

3    transaction is transacted over the counter in

4    New York and so on.  It also has a capacity code,

5    which is trading as principal or agent and so on.

6            Dubinsky -- okay -- is used to seeing a

7    retail confirmation, which would have the

8    opposite of that.  So he makes a big point in his

9    report of saying that Madoff reflected this wrong

10   for the customer.

11           All right.  He says that, you know --

12   now, that's -- there's -- nobody that was

13   familiar with the dealer markets would make that

14   kind of a statement.  It's -- it's -- quite

15   frankly, it's an embarrassment, you know, to --

16   to put that in the report.

17           All right.  He then says that it --

18   this was in violation of his agreement with the

19   customer to act as agent.  If you look at the

20   agreements that we have with our clients, and

21   there's a whole series of when a customer opens

22   an account agreement, where there's a trading

23   authorization and so on, it says that Madoff,

24   meaning Bernard L. Madoff, the client is giving

25   Madoff -- is appointing Madoff his agent to

Page 96

1         transact business for the customer.

2                  So it says Madoff is the agent for the

3         customer.  It doesn't say that -- you know, so

4         that means that Bernard Madoff, myself, when --

5         he's authorizing me as the only person that is

6         authorized to transact the business with the

7         firm.

8                  So the firm is transacting business as

9         principal for their own account, which it clearly

10        states that on the confirmation.  He -- this

11        totally confused him for some reason.

12    BY MS. CHAITMAN:

13        Q.    Mr. Madoff, can I just stop you for a

14    second.

15                  I'm going to show you a statement, but if --

16    if a -- if a customer's statement says bought 100

17    shares of IBM --

18        A.    That means the customer bought it on the

19    statement.  The statement is showing it as the

20    customer bought.  Okay.  The statement is assuming the

21    customer -- that he's bought it from Madoff.

22                  He knows it, because Madoff is sending the

23    confirmation -- is sending the statement to the

24    customer, saying, you -- he's reflecting the

25    customer -- what the customer bought and sold.  It's

Page 97

1    not reflecting who he --

2        Q.    Okay.

3        A.    -- bought and sold it from --

4        Q.    Okay.  So you're --

5        A.    -- because we already know that.

6        Q.    You're distinguishing between the

7    confirmation and the statements?

8        A.    The statement -- yes.  The statement is --

9    was -- the statement only shows a transaction on the

10   settlement date.  All statements are operated that way

11   with every brokerage firm.  The confirmation shows

12   both the trade date and the settlement date.

13              MS. CHAITMAN:  Okay.  Let me mark as

14       Exhibit 8 the document to which you've been

15       referring.

16              (MADOFF EXHIBIT 8 WAS MARKED FOR

17       IDENTIFICATION.)

18   BY MS. CHAITMAN:

19       Q.    And if I can just summarize this, this is

20   dated -- the trade date is October 14th, 2005.  The

21   settlement date is October 19th, 2005.  And it says --

22   you've crossed out the account number, but it says,

23   "Sold" -- "we sold 42 shares" --

24       A.    To the customer.

25       Q.    -- "of Wells Fargo"?

Page 98

1      A.      To the customer.  Right.

2      Q.      Okay.  So, "we," is Bernard L. Madoff?

3      A.      Right.

4      Q.      So -- so let me just understand something.

5  So if the customer was buying 42 shares of Wells

6  Fargo, you wouldn't go into the marketplace and -- and

7  buy it for the customer?

8      A.      Well, we -- we could, but we buy it -- we'd

9  go into the marketplace and buy it for our own account

10  and then resell it to the customer.

11      Q.      Okay.

12      A.      That's how principal trades work.

13      Q.      Okay.  As a general statement with respect

14  to the investment advisory customers --

15      A.      Uh-huh.

16      Q.      Now, obviously from whenever in 1992 you

17  stopped executing split-strike trades, there weren't

18  any purchases and sales?

19      A.      That's correct.

20      Q.      So --

21              MR. SHEEHAN:  Object to the form.

22          Sorry.  What I'm going to do in the future is

23          just say form or object.

24              MS. CHAITMAN:  That's fine.  It doesn't

25          matter.

Page 99

1          MR. SHEEHAN:  I don't want to interrupt

2     the flow.

3          MS. CHAITMAN:  Yeah, that's all right.

4     BY MS. CHAITMAN:

5     Q.    I want to exclude the period after you

6     stopped executing trades that were reflected on the

7     statement.  So whenever that was.  Okay.  Whether --

8     you know, whatever month of --

9     A.    Okay.

10    Q.    -- 1992 it was.  Let me take the time before

11    that.

12    A.    Yeah.  Well, he's -- the Dubinsky report

13    that was making the statement of a trade that was a

14    convertible bond trade that was actually made.  So the

15    example he's using -- he's not talking about a

16    split-strike.

17         He's talking -- he's saying that -- on the

18    convertible bond trade didn't really exist, because

19    Madoff's confirmation is incorrect.

20    Q.    Okay.

21    A.    So --

22    Q.    So let me -- so let me just try to

23    understand something.  I want to take the period -- I

24    want to limit my questions and your answers to the

25    period when you -- before the split-strike fraud

Page 100

1    began.

2         A.    Correct.

3         Q.    Okay.  So we're going to go earlier than

4    whatever date that was in 1992, when the split-strike

5    trades were not executed.

6         A.    And the Dubinsky report that's making this

7    statement is referring to a convertible bond trade

8    that was in the period that you're talking about.

9         Q.    Okay.  So as to the convertible bond trades,

10   is it generally true that the customers were buying

11   from Madoff and selling to Madoff?

12        A.    Correct.  From Madoff's inventory that he

13   already had or that he just bought or sold.

14        Q.    Is -- is that true for everyone in the --

15   if -- if I take the convertible --

16        A.    Operating as a dealer.  Yes.

17        Q.    So with your investment advisory customers,

18   who were doing convertible arbitrage --

19        A.    Uh-huh.

20        Q.    -- their transactions always were with

21   Madoff?

22        A.    Correct.

23        Q.    So --

24        A.    All of our customers -- we always traded

25   for --

Page 101

1      Q.    From your own inventory?

2      A.    Other than theoretically in options, we

3   traded from our own inventory.

4           Now, again, a dealer operates -- you -- a

5   customer may tell the -- we may decide to sell stock

6   to a customer or buy stock from a customer.

7           Now, we may already have that stock in our

8   inventory, and we're selling it to the customer from

9   inventory or the customer may -- we may not have the

10  stock in inventory.

11          So we have to go out and buy it into -- from

12  Wall Street, from the marketplace, into our inventory

13  and then resell it to the customer.  So that might

14  happen over a period of the same day or it might

15  happen over a period of a week and so on.

16          Which brings me to the next point.  Okay?

17  That --

18     Q.    Can you -- can you remember that?  Because I

19  have a question about this.

20     A.    Okay.  Go ahead.  Then give me that then.

21     Q.    Give me a word, so I can remind you about

22  your next point.

23     A.    I'll remember.

24     Q.    You promise?

25     A.    Yes.

1      Q.    Okay.  So -- so let's say that in the

2   convertible arbitrage strategy you had a need for

3   5,000 shares of IBM, because you were going to sell

4   them to the convertible arbitrage customers.

5      A.    Right.

6      Q.    Okay.  Mr. Dubinsky was looking for the

7   purchase of 5,000 shares of IBM on a specific date in

8   the market; right?

9                MR. SHEEHAN:  Objection.

10               THE WITNESS:  Uh-huh.

11   BY MS. CHAITMAN:

12      Q.    Is that what he should have been doing?

13      A.    I'm not sure I understand your question.

14      Q.    Okay.  Well, let me start it over again.

15            Dubinsky made the point in several instances

16   that with the convertible arbitrage strategy the

17   statements all together showed more purchases of a

18   particular security than he could find records for --

19      A.    Okay.

20      Q.    -- on the New York Stock Exchange.

21      A.    Okay.  All right.  So that's a -- that's a

22   different subject, but -- all right.  He -- if

23   we're -- he -- what Dubinsky was -- was trying to

24   establish or -- was that the -- the number of bonds

25   that we -- let's say convertible bonds, because we're

1     talking about convertibles, because we're referring to

2     bonds rather than stock.

3          Q.    Okay.

4          A.    Okay?  So Dubinsky is claiming that if we

5     show on a confirmation or in a customer account that

6     we bought stock -- we sold stock to a customer or

7     bonds to -- to a customer, that he looks to try and

8     establish that there weren't enough bonds that

9     actually traded in the marketplace at the time that we

10    claim that we bought the bonds for the customer.

11               All right.  So the way he researches that is

12    he looks on the New York Stock Exchange, you know,

13    number of bonds that traded on the New York Stock

14    Exchange, and shows that that was, let's say, 100

15    bonds, and Madoff bought 200 bonds for a customer.

16               So, therefore, he couldn't have possibly

17    bought 200 bonds for a customer, because only 100

18    bonds traded on the -- on the New York Stock Exchange.

19               All right.  Now, the -- the fallacy of that

20    is that, number one, convertible bonds, which is what

21    he's researching here, do not trade on the New York

22    Stock Exchange.  They trade over the counter.

23               And to demonstrate that I happen to -- I

24    brought this.  This is a very expensive book, I was

25    told.  I happened to find it in the library here, for

Page 104

1    some strange reason.  It's the -- it's the Bible of --

2    of the bond markets.  All right.

3                    MR. GOLDMAN:  Tell us the title, so we

4        have it.

5                    THE WITNESS:  It's the, "Bond and Money

6        Markets:  Strategy, Trading, Analysis."

7    BY MS. CHAITMAN:

8        Q.    And who is the author?

9        A.    Moorad Choudhry or something of that sort.

10                   MR. SHEEHAN:  Could we have the

11       spelling of that since we won't be able to take

12       the book with us?

13                   THE WITNESS:  Moorad --

14                   MS. CHAITMAN:  Okay.  So the -- the

15       book is written by, M-o-o-r-a-d, and then his

16       last name is, C-h-o-u-d-h-r-y.  And it's

17       published by Butterworth-Heinemann Finance, and

18       it's called the, "Bond and Money Markets."

19                   MR. SHEEHAN:  What edition is it?

20       Sorry.  So I don't want to have the wrong book.

21                   MS. CHAITMAN:  You know what?  I'll let

22       you look at it.  It -- it's -- it's first

23       edition.

24                   MR. SHEEHAN:  Okay.  Fine.

25                   MS. CHAITMAN:  First edition.

Page 105

1                    THE WITNESS:  All right.  You know, I
2          happened to have made a copy of this.  It's
3          discussing the secondary market, which is
4          what's -- you know, when you -- when you buy and
5          sell stock for clients, you're buying in the
6          secondary market, as opposed to the primary
7          market.
8                    The primary market is when a company
9          goes public, they sell stock in the primary
10         market.  All right.  Then after the company sells
11         that stock to the public, it then trades -- the
12         stock trades for the rest of the -- its life in
13         the secondary market.  All right.
14                   MR. GOLDMAN:  Bernie, you keep saying,
15         "stock."  You mean bond too; right?
16                   THE WITNESS:  Same thing.
17                   MR. GOLDMAN:  Okay.
18                   THE WITNESS:  You know.  So, you know,
19         it basically is talking about -- you know, this
20         section was -- was talking about convertible
21         bonds.
22                   It says here -- it says, "Corporate
23         bonds virtually everywhere are traded on an
24         over-the-counter, OTC, basis.  That is directly
25         between counterparties over the telephone."

Page 106

1      Meaning people like Madoff.

2                "Bonds are usually listed on the

3      exchange."  I'll read what it says.  "On the New

4      York Stock Exchange a low volume of trading in

5      bonds takes place on the exchange itself, but

6      this is dwarfed by the volume of trading in the

7      bonds in the over-the-counter market."

8                In other words, what they're stating is

9      that, although, this is a bond that is listed on

10     the New York Stock Exchange, you know, most of

11     the trading takes place in that bond in the

12     over-the-counter market.

13               It's a listed bond.  So you can buy it

14     on the New York Stock Exchange, but no one does

15     that.  It's traded over the counter.  So

16     Dubinsky, you know, looks -- when he looks -- for

17     example, it would be the same thing if he looked

18     on the equity side of the market.

19               Let's say in -- in a split-strike

20     trade.  If he looked in -- because IBM trades on

21     the New York Stock Exchange, if you just looked

22     at the volume on the New York Stock Exchange to

23     try and account for that -- for the customer

24     trading, if the customer traded in the

25     over-the-counter market, which is where we trade,

Page 107

1    and where everybody else trades today, where it

2    used to be 99 percent of the market, as I said

3    earlier, traded on the floor of the exchange, now

4    ten percent trades on the floor of the exchange,

5    and the rest of it trades everywhere else.

6            And the convertible bonds have always

7    been that way.  In other words, so that Dubinsky

8    looks at the -- in order to say, well, Madoff

9    says he bought 200 bonds for a client.

10           Now, I'm looking on -- you know, in his

11   report.  He -- he looks on the New York Stock

12   Exchange, and clearly he sees that that doesn't

13   match.

14           He's ignoring the over-the-counter

15   market.  Even though in one of his examples it

16   says the bond trading on the New York, and then

17   it also says OTC market.

18           But bonds -- that was the price range

19   he was trying to establish in that.  There is --

20   if you spoke to anybody that knew anything -- you

21   know, and I'm not trying to be -- I'm not trying

22   to, you know, be sarcastic with him, but if you

23   spoke to any other person, you know, that -- that

24   understood how the markets work, and you said,

25   I -- I just looked at the New York Stock

Page 108

1      Exchange, and he said, well, wait a minute.

2      Nobody trades bonds on the New York Stock

3      Exchange.  They trade them in the

4      over-the-counter market.

5             So, you know, that was to me sort of

6      surprising, that anybody would do that.  It -- it

7      demonstrated, you know, a total lack of

8      understanding.

9             Again, this is not -- I don't want to

10     be unfair to the man.  I've had 50 years of

11     experience dealing in things like this, where

12     people who, you know, understand -- I wouldn't

13     understand how lawyers operate.

14            Okay.  So if you asked me how I'm

15     supposed to give a deposition or anything else, I

16     would not know.  Of course, now I'm becoming an

17     expert on that also, but it would not be -- I

18     wouldn't -- you know, it wouldn't mean that --

19            I'm not saying Dubinsky is not a smart

20     guy.  He may be a very smart guy.  He -- his CV

21     is very good, but I've -- I've dealt with tons of

22     people that are smart people and are experienced

23     people, but, you know, it's like a brain surgeon

24     going to a dentist for -- to have a brain surgery

25     done.

Page 109

1                    All right.  So, to get back to your

2          statement, his -- his lack of understanding how a

3          confirmation in a dealer market works, which is

4          clearly a mistake, or where the volume were

5          traded is another mistake.

6                    He -- he goes on to make another

7          mistake when he talks about the price range.

8          Now, that's a little bit more complicated.  Now,

9          all of our transactions are -- are what's called

10         average price transactions.

11                   If you look on the back of my

12         confirmation -- I'm going to take this for a

13         second again -- it states, "Customer equity

14         transactions" -- because this is an equity, being

15         it says -- so it doesn't matter.  It would be the

16         same thing with bonds.

17                   It says, "As per your authorization and

18         instructions, we have executed this transaction

19         for your account."

20                   All right.  It says, "Unless stated

21         otherwise on the front of this confirmation, the

22         trade price of your transaction is an average

23         price and includes a commission equivalent of

24         four cents per share markup.  Full details of

25         this transaction on request."

Page 110

1               In other words, an average price

2        transaction is when we buy stock for a customer

3        or, you know, we buy stock.  We -- we may start

4        buying the stock on a Monday, and we may buy that

5        Monday, Tuesday, Wednesday, Thursday, Friday.  So

6        we may buy a -- 1,000 shares over a period of

7        three days, four days or five days.

8               We start on a Monday.  We may finish on

9        a Friday.  That's typically because we're buying

10       a large amount of bonds or stock for a client.

11       And we may start buying the -- let's say, the

12       bond at 98, and then we may wind up paying 100 by

13       the time Friday is, because as the market moves.

14               So we're accumulating stock, a number

15       of shares or bonds, over an average number of

16       days at an average price.

17               So if we start buying a bond, let's

18       say, at 98, and we wind up finishing buying it at

19       100, as the market moves up, we bought stock --

20       the bonds at 98, 99, 99 and a quarter and so on

21       and so forth.

22               When we report the trade for the

23       customer on Friday, which is when we're finished,

24       we may have paid 90 -- 99 and three-quarters on

25       the bond.  All right.  What Dubinsky -- you know,

Page 111

1        that was the average that we accumulated for the

2        customer.

3                Now, the 99 and three-quarters was

4        bought over a period of three days.  If -- if you

5        look at -- if he looks at the price, the range of

6        the stock, the price on the day that appears on

7        the confirmation, it may show 100, which was

8        where this -- the closing price was on that day.

9                All right.  But, you know, we may -- we

10       may sell it to the customer at 99 and

11       three-quarters, which was the average price of

12       that stock.  He -- he thinks that that's a

13       mistake.

14               How could we have bought the stock for

15       the customer at 99 and three-quarters, when it

16       shows that -- it shows that the cheapest price

17       the stock traded was 100.

18               So he's saying that Madoff is -- is

19       buying stock cheaper than he could have bought it

20       in the marketplace.  He's not accounting for the

21       fact that we started buying it, you know, three

22       days.

23               In other words, it wasn't -- he thinks

24       it was all bought at one price on that day.

25       Okay.  If he -- if he bothered to read the back

Page 112

1          of the confirmation, which he probably never did,

2          you know, it clearly states that these are

3          average price transactions.  They're not one

4          price.

5                    Okay?  We're --

6                    MR. SHEEHAN:  I just have a little

7          housekeeping.

8                    MS. CHAITMAN:  Yeah.

9                    MR. SHEEHAN:  I'd like -- he read from

10         that.  I'd like to get that marked.  That.

11                   MS. CHAITMAN:  This -- this marked.

12                   MR. GOLDMAN:  The photocopy.

13                   MR. SHEEHAN:  And his notes too.  He's

14         reading from notes.

15                   THE WITNESS:  This is just --

16                   MS. CHAITMAN:  That page.  Okay.  Good.

17         Okay.  So I'm going to mark as Exhibit 9, this is

18         a page from the volume that we've just described.

19         It's page 323.

20                   MR. SHEEHAN:  Great.  And I think he

21         had his notes that he was reading from too.

22         So --

23                   MS. CHAITMAN:  Did you have notes that

24         you were reading from?

25                   MR. SHEEHAN:  Yeah.

1                    MR. GOLDMAN:  Yeah, there was.

2                    THE WITNESS:  Where did I put them?

3                    MS. CHAITMAN:  Were there -- I did mark

4          notes before.  Are there new notes?  I didn't

5          notice.

6                    MR. SHEEHAN:  Yeah, there were notes

7          that were part of the --

8                    THE WITNESS:  Here they are.

9                    MS. CHAITMAN:  Okay.

10                   MR. GOLDMAN:  There they are.

11                   MS. CHAITMAN:  Can I mark that?

12                   THE WITNESS:  You can have it, but it's

13         my only copy.  Okay.  I am not finished with it

14         yet.  So don't -- don't take it.

15                   MS. CHAITMAN:  No.  I'm not taking it.

16                   (MADOFF EXHIBIT 9 WAS MARKED FOR

17         IDENTIFICATION.)

18                   MS. CHAITMAN:  I'm going to mark as

19         Exhibit 10 some handwritten notes that Mr. Madoff

20         has been referring to, and I'm going to give it

21         back to Mr. Madoff.

22                   (MADOFF EXHIBIT 10 WAS MARKED FOR

23         IDENTIFICATION.)

24                   MR. SHEEHAN:  For the record, there's

25         notes on the back of that page too.

Page 114

1              MS. CHAITMAN:  Yeah, yeah.

2              MR. SHEEHAN:  That'll be fine.

3              MS. CHAITMAN:  But it's all one

4      exhibit.

5              MR. SHEEHAN:  Yes.  It is one exhibit.

6              MS. CHAITMAN:  Yeah.

7              THE WITNESS:  Okay.  So --

8    BY MS. CHAITMAN:

9         Q.    So let -- just to catch up.  One mistake he

10    made was not understanding that on the trade

11    confirmations it -- Madoff -- the firm is buying -- if

12    it says, "bought," it means Madoff, the firm, bought?

13        A.    It means that -- it means -- yes.  The,

14    "we," refers to the firm, Madoff, bought from the

15    customer or sold to the customer.

16        Q.    To the customer.  Okay.  And -- and sold

17    from the firm's own inventory?

18        A.    That's correct.

19        Q.    Okay.  And then you've made the point that

20    Dubinsky looked for confirmation of the volume on the

21    New York Stock Exchange or the London Stock Exchange,

22    and, in fact, the convertible bonds were not sold on

23    the -- you didn't buy them on the --

24        A.    We traded in the over-the-counter market.

25        Q.    Right.

Page 115

1          A.      And there was not even volume reported -- in

2     the days -- the period of time he's looking for there

3     was no volume -- actually, the majority of the volume

4     was never reported in the over-the-counter market,

5     because there was no volume requirements to report

6     volume in bonds in the over-the-counter market until a

7     later date.

8          Q.      Okay.  Do you --

9          A.      It was very -- it was a very -- I don't --

10    it was very hazy, the -- the volume reporting

11    requirements on -- on bond -- in the bond market was

12    never really -- it was that way -- to this day it's

13    sort of a gray area.

14         Q.      Okay.  All right.  Now -- now you want to

15    go -- do you have another area that you want to cover?

16         A.      We've covered the confirmations and the

17    statements, and we've covered the volume, and we've

18    covered the price.  So basically what I'm saying is

19    his -- his criticism of the price of the volume and of

20    the confirmations and statements are inaccurate.

21         Q.      Now, Mr. Dubinsky says that there's no proof

22    that the bonds were converted.

23         A.      Okay.  A -- the -- the typical strategy on

24    convertible bonds is not to convert.  In other words,

25    nobody in their right mind should ever -- if a

Page 116

1    convertible bond exists, you would never buy the

2    stock, as opposed to buying the bond, if you could buy

3    the bond at a discount.

4           In other words, a convertible bond trade --

5    a convertible bond -- let's say a bond is convertible

6    into 100 shares of stock at $10 a share.  All right.

7    The -- the convertible bond always should trade at a

8    premium above what it's convertible into the price of

9    the stock at, because it has a coupon attached.  It

10   pays interest.

11          So convertible bonds typically trade at a

12   premium.  In other words, the bond theoretically would

13   be worth 100 based upon the price of the stock at ten.

14   The bond should always trade above 100.

15          It should trade at 101, 100 and a half and

16   so on, because of the fact that the convertible bond

17   is always -- is always going to be worth more than the

18   stock, you know, because of the coupon that it has to

19   it.

20          So convertible bonds sometimes trade at a

21   discount, but rarely.  Usually they trade at a

22   premium.  All right.  When you combine a bond at -- a

23   convertible bond at a -- at a discount, you could

24   theoretically buy the bond, let's say, at 98, when it

25   really should be selling at 100.

Page 117

1            All right.  Because you could buy the bond
2       at 98.  Sell the stock at ten.  Would be -- you'd make
3       a two point profit by converting it.  So ideally you
4       would say, okay.  If you -- because then you'd have no
5       risk.
6            You'd immediately buy the bond at a
7       discount, sell the common stock simultaneously at a
8       profit, and then convert one into the other.  You
9       exchange the bond by selling -- sending it to the
10      conversion agent and say, here is your bond back.  You
11      know, I want stock back.  And then you'd deliver the
12      stock out, and you'd make a profit.
13           But most bonds trade at premiums, which is
14      what they shouldn't be doing.  All right.  So the
15      typical strategy of a convertible bond trader would be
16      to -- to buy the bond either at a discount, which
17      allows you to convert it immediately and make a
18      profit, or hold the bond open and wait for the bond to
19      go to a premium, where it historically should trade
20      at, and then you sell out the bond, cover the stock
21      and un -- what's called unwinding the transaction.
22           Which Dubinsky in his report does state that
23      that is one of the -- he has that right.  That also is
24      the -- you do that kind of trading, you know, either
25      buying it and converting it or unwinding the

Page 118

1    transaction.  He acknowledges -- he has that -- that

2    part right.

3              He doesn't go into the fact that most bonds

4    should not be converted, but anybody that is familiar

5    with convertible bond trading would know that.

6              All right.  The -- so what Dubinsky then

7    does is he says that Madoff, you know, who -- who did

8    buy bonds at a discount and sell the stock, you know,

9    accordingly, it had a locked-in profit, he never

10   physically converted -- he never sent the bonds in to

11   be converted, you know, and take the profit that way,

12   which he should have -- he should have done, you know.

13             But he said, there's no evidence that he

14   ever put the bonds into conversion, because typically

15   he would have found in our records, he assumes, some

16   sort of instructions to the conversion agent to

17   convert the bonds into stock.

18             All right.  And if, in fact, we did that, he

19   would -- he would find those instructions, but our

20   strategy, as he acknowledges, as most people's

21   strategy would be, to -- to not convert.  He doesn't,

22   you know, really go into the details of that.

23             So our strategy is basically buy the bond,

24   sell the stock.  And even though we have a profit and

25   could convert it and lock in the profit, is we don't

Page 119

1    convert it.  We hold it open, and then we undo the

2    whole transaction when the premium goes back to where

3    it should be.

4           As a matter of fact, when David Kugel was

5    first hired by me his job was to track all of the

6    convertible bonds that traded in the marketplace.  And

7    we had a -- a whole spreadsheet that -- that we

8    developed for him that tracked what every bond that

9    was trading in the marketplace historically traded at.

10          So it would look and see that -- let's say

11   IBM bonds traded over this past two years always went

12   to a two point premium.  It always traded at a two

13   point premium.

14          You know, every now and then it -- it would

15   go to a -- a discount or a one point premium, and

16   then, you know, it would go back to that premium.  So

17   we would track them historically.

18          And we would always look to see when the

19   bond was -- you know, was changing its relationship.

20   And then we would go into the marketplace and buy

21   those bonds.  And that's what all convertible bonds

22   traded, but that was our specialty, was trading this

23   way.

24          All right.  But anybody that was a good

25   convertible bond trader did the same thing.  It was

Page 120

1    not unique to us.  We happened to do more of it than

2    most people.

3              All right.  So our goal was to not convert.

4    It was -- it was basically to unwind the transaction.

5    All right.  So because he -- he could never see that

6    we were actually converting, and -- and he did find

7    some that we converted, but not -- you know, but there

8    were instances -- he made the assumption that we would

9    always convert, and that -- that's totally untrue.

10             All right.  Because what we would do would

11   be when -- when the premium went to where we expected

12   it to go to, we would, what's known as, unwind it or

13   swap the transaction, which another dealer that had

14   the transaction.

15             The problem -- the customer would make -- he

16   could make more money theoretically, you know, within

17   what we -- than what he made had we actually converted

18   it.  He could make a greater profit or he could make

19   the same profit.  It didn't matter.

20             But as a dealer our goal was to keep bonds

21   out of conversion, because the more you kept the bonds

22   out of conversion, you kept them open in the

23   marketplace to trade at a -- at a future time.

24             So -- because once you convert a bond it's

25   out of existence any longer.  So the goal of all

Page 121

1    traders is to keep these bonds in circulation.  So you

2    could --

3                It would be like if a customer -- if

4    everybody took the stock that they bought, and they --

5    and they -- the company bought back more of their

6    stock, when a company, like IBM, buys back their stock

7    in the marketplace, they're taking it out of existence

8    anymore.  Nobody can trade that stock.  So everybody

9    wants to keep these bonds in circulation.

10               All right.  Now, another mistake that he

11   makes is if, in fact, we did convert -- you know, he

12   makes the assumption that we would physically put the

13   bonds ourselves into conversion, which, you know, I

14   can understand him thinking that we would do that.

15               All right.  But he makes the assumption that

16   because he didn't see any instructions from Madoff to

17   the conversion agent, that we didn't convert.

18               What he seems to not understand, which I can

19   understand him not understanding, is we had -- he

20   thinks our only bank was J.P. Morgan and Bank of

21   New York, which -- in the 2000's those were our main

22   banks.

23               J.P. Morgan was our primary bank when we

24   were dealing with customers in split-strike, and our

25   operating bank when we were dealing with our

Page 122

1    market-making and dealer in -- in general, doing

2    hundreds of thousands of trades, were handled through

3    Bank of New York, which was our operating bank.

4            All right.  In the period that he's looking

5    at the convertible bonds in the '70s and the '80s, we

6    had -- our banks were Chase Manhattan Bank,

7    Continental Bank, Commercial Bank of North America,

8    Meadowbrook National Bank, Marine Midland Bank.

9            You know, we also had clearing arrangements

10   with -- with Barclays, with Carlo LaBorde (PHONETIC) &

11   Company, Edwards & Hanley (PHONETIC) and others.  In

12   other words --

13       Q.    Bear Stearns?

14       A.    Huh?

15       Q.    Bear Stearns?

16       A.    Bear Stearns.  So he like -- he doesn't see

17   any of that, because he wouldn't.  He's looking at --

18   you know, in the -- in the more recent period those

19   banks have already been merged out or don't exist any

20   longer.

21           You know, when we -- when we did convert

22   bonds -- and we did convert bonds, you know.  We

23   didn't -- you know, the -- the majority of what we

24   unwound, but we looked -- when we did convert a bond,

25   we would convert the bond through one of those agents,

Page 123

1   like Commercial Bank of North America, because if the

2   bank's conversion agent was in Chicago, and we wanted

3   to convert it, we would have -- we would have had

4   to either send somebody out to Chicago or a messenger

5   to convert the bond or mail it and hope that the

6   mail -- the bonds actually got there.

7           You would never do that.  You would -- you

8   would give it to a bank, you know, and the bank would

9   convert it for you.  So we would give it to the

10  Commercial Bank of North America.

11          They had -- they were a large clearing bank,

12  and they would physically convert it with arrangements

13  through whoever the conversion agent was doing that.

14          All right.  He doesn't -- he has no way of

15  knowing that, because those banks weren't -- he

16  doesn't even know those banks existed when they were

17  there.  So the banks themselves, which we would

18  convert, would -- would draft out.

19          It was the same thing like when we would

20  deliver -- before we formed the clearing corporation

21  on equities, if you sold stock to a brokerage firm in

22  Chicago, in order to get paid for that you would have

23  to mail that stock to Chicago and hope that they sent

24  you a check while the bank -- you know, when they

25  finally got it.

Page 124

1          All right.  As opposed to when we developed

2     a clearing corporation, meaning the National

3     Securities Clearing -- Clearing Corporation, NTTC, you

4     know, we would -- they would clear the whole

5     transaction.

6          So it would -- you know, of course, the

7     industry -- another thing I got blamed for was

8     founding the clearing corporation, because Wall Street

9     cleared all of their transactions through basically a

10    couple of major banks, like Citicorp, Chase and so on.

11         Nobody -- they handled -- they -- brokerage

12    firms themselves didn't all have the facilities --

13    back office facility.  So a bank used to clear those

14    trades for them.  The banks -- that was a great

15    business for banks.

16         So the industry, because of the paperwork

17    crisis, decided they had to have a -- they had to have

18    a clearing corporation developed to clear the trades

19    for the industry.

20         The major banks in the United States went

21    crazy with that concept, because they wanted to keep

22    all of the business themselves.  They wanted brokerage

23    firms to be required to -- to use the banks to clear

24    the transactions rather than have a clearing

25    corporation.

Page 125

1           But finally we -- you know, the SEC put

2    enough pressure on people to develop a clearing

3    corporation.  So we formed the National Securities

4    Clearing Corporation, which I became the chairman of.

5           And then we merged also Depository Trust

6    into that.  So that brokerage firms would send their

7    deliveries of stocks rather than through the mail,

8    where you have to use the bank to do that, to use a

9    clearing corporation, which settled all of the trades

10   for the whole industry.

11          So what -- what happens today -- I'm telling

12   you more than you probably are interested or wanting

13   to know, but if I -- I may buy stock -- you know, sell

14   10,000 shares to Merrill Lynch and 10,000 shares to

15   someone else and so on and so forth.

16          And buy and sell all day long with -- you

17   know, like we did hundreds of thousands of

18   transactions as -- as the report points out.  The

19   clearing corporation nets all of these transactions,

20   you know, among the Wall Street brokerage firms.

21          And at the end of the day they net out -- I

22   may have bought and sold a million shares during the

23   day, but the net comes out to 500 shares between all

24   my buys and sells.

25          They send me a bill at the end of the day

Page 126

1     that I either have to pay on the 500 shares or get a

2     check for the 500 shares of stock.  And all of the

3     banks went out of the clearing business, and now it's

4     all handled by the National Securities Clearing

5     Corporation Depository Trust.

6          Q.    Okay.  I want to go back, because that's one

7     of the things that Dubinsky talks about, that he can't

8     find trade confirmations.  Now, we're dealing with --

9          A.    So --

10         Q.    -- the convertible arbitrage strategy --

11    strategy in the 1980s.

12                    THE COURT REPORTER:  Can I ask for a

13         break?

14                    MS. CHAITMAN:  Of course.  Of course.

15                    THE VIDEOGRAPHER:  Going off the

16         record.  The time is 12:09.

17                    (RECESS FROM 12:09 P.M. TO 12:16 P.M.)

18                    THE VIDEOGRAPHER:  Back on the record.

19         The time is 12:16.

20                    THE WITNESS:  Okay.  So I think we were

21         at the -- the clearing of -- oh, so that his

22         inability to find instructions to convert bonds,

23         you know, all the time was that he was not aware

24         of the fact that if we did convert bonds we had

25         the ability and did convert bonds through other

Page 127

1         clearing -- other clearing banks.

2     BY MS. CHAITMAN:

3         Q.    So that you wouldn't have the records for

4     that?

5         A.    Wouldn't -- they would not exist, because

6     there would be no way that we would put the bonds

7     physically for the most part -- we did some -- some of

8     them, depending upon what the year it was and what he

9     was looking for, but, as I say, the idea was not to --

10    to actually convert, but --

11        Q.    Right.

12        A.    -- to arrange a swap arrangement --

13        Q.    Right.

14        A.    -- or a clearing arrangement.

15        Q.    Okay.  Now, he also makes the point that he

16    couldn't find trade confirmations.

17        A.    Okay.  That -- when -- one of the times

18    that -- when you first came down, if you still

19    remember --

20        Q.    And when you say, "you," are you --

21        A.    Meaning David Sheehan --

22        Q.    Sheehan.

23        A.    -- and his staff of attorneys came down

24    here.  I think it was at that time that they mentioned

25    to me that they could not find confirmations --

Page 128

1    counterparty confirmations on transactions.

2              So -- and we were buying and selling stock

3    through other brokerage firms for clients.  They

4    expected us to -- they saw that we had confirmations

5    selling and buying stocks from the customer, but they

6    did not find any confirmations to the broker.

7              All right.  Now, number one, if we were

8    dealing as principal, which clearly our confirmations

9    stated, and we always did it as principal, we would --

10   there wouldn't be a counterparty on the other side of

11   the trade, because we were the counterparty on the

12   other side of the trade.

13             But when we did go out into the street to

14   buy the stock, you know, there would be a

15   counterparty, you know, on the other side of the

16   trade.  He couldn't find the confirmation.  So he saw

17   thousands of confirmations with clients, but he never

18   saw any broker confirmations, period.

19             So he said to the -- you weren't buying and

20   selling stock from anywhere.  You know, there were no

21   confirmations.  And I looked at him, and I said, well,

22   no.  You know, I was sort of -- didn't understand the

23   question, because I didn't understand why he expected

24   there to find confirmations.

25        Q.    When you say, "him," to whom are you

Page 129

1    referring?

2        A.    The trustee.

3        Q.    Okay.

4        A.    And -- so it was that -- you know, I then

5    realized that, you know, he expected to find -- you

6    know, just as he found a broker confirmation, he

7    assumed that every time we went and sold or bought

8    stock from a customer we bought it from another

9    broker, which sometimes we did.

10            Sometimes we bought it out of inventory.  If

11   it was bought out of inventory, there wouldn't be --

12   there would be a customer confirmation at an earlier

13   date that -- that we put it into our inventory, but --

14            All right.  But, I said, there -- there are

15   no confirmations.  And that sort of went on deaf ears.

16   Now, number one, I said, first of all, you're looking

17   at -- we don't -- we don't keep any records of

18   customer confirmations from the past six years.

19            I said, the record retention period for the

20   industry is six years.  So after six years everybody

21   gets rid of all of their records.  You can imagine, we

22   do hundreds of thousands of trades everyday.

23            If we -- if we kept paperwork for all of

24   those transactions, you know, it would be impossible.

25   I said, so we keep customer confirmations for, you

Page 130

1    know, a longer period of time, because customers need

2    that for tax purposes, audits and so on and so forth.

3              But a general policy, we don't keep records

4    for more than six years, because that's what the

5    record retention period does.  Even though we did have

6    records, because -- and I used to always yell at my

7    people.

8              I used to say, after six years, get rid of

9    everything, because I'm paying for storage on this

10   stuff.  But I said, wait a minute.  I said, you

11   won't -- you won't find confirmations for any of my

12   trades.

13             I said, I do hundreds of thousands of

14   shares -- of trades everyday.  I said, you don't

15   find -- you can't find any of those confirmations.  I

16   said, so are you now assuming because you can't find a

17   confirmation when my market-makers or proprietary

18   traders bought hundreds of thousands of trades

19   everyday that those trades didn't take place either?

20             And there was no answer.  I said, first of

21   all, are you aware of the fact that brokers stopped

22   issuing confirmations years ago?

23        Q.    How --

24        A.    Because of the clearing corporation.

25        Q.    How many years ago?

Page 131

1        A.      Well, there's what's called a continuous net

2    settlement, which I started to say.  In other words,

3    when we buy and sell stock all day long, anybody buys

4    and sell stocks when they're long, they don't issue a

5    counterparty confirmation to Merrill Lynch, because

6    those trades are reported automatically through the

7    clearinghouse, and you get -- you don't get

8    confirmations.

9            Customers get -- confirmations get mailed

10   out back and forth, but the industry does not issue

11   confirmations to each other, you know, as a general

12   rule.  You can, if you want, but nobody would do that.

13           So I said, so making your supposition that

14   you can't find a confirmation from a brokerage firm on

15   the other side of a customer trade, and you can't

16   find -- you won't find a confirmation on the other

17   side of a - of a non-customer trade either, because

18   they don't -- I don't have any customer confirmations

19   in my records.

20           I said, how can you not understand that?

21   Now, maybe -- like my lawyers -- you can't expect him

22   to understand.  They're lawyers.  They're not

23   brokerage firms.

24           I said, all right, but you're asking me

25   questions -- you know, they're asking me questions

                                          Page 132

1    that they have to get somebody that explains that.

2              Now, certainly Dubinsky would know that, but

3    he doesn't even mention -- in fairness to Dubinsky, he

4    doesn't -- he doesn't mention anything about this

5    confirmation issue, because he clearly knows that

6    much.

7              This was the trustee, Irving Picard, and his

8    attorneys, or, I guess, and David's partners or

9    whatever.  And maybe they had no reason to know that

10   either, because the average person would not know

11   that.

12        Q.    When did the continuous net settlement

13   system come into place?  Was it in place in the '80s?

14        A.    Yes.  Probably in the '80s.

15        Q.    Okay.

16        A.    So --

17        Q.    So how -- how does that work?  At the end of

18   the day you just get a computerized printout --

19        A.    Right.

20        Q.    -- with -- with the net amount that you have

21   to sell --

22        A.    Right.

23        Q.    -- or receive?

24        A.    Right.

25        Q.    Okay.  Okay.  And if you were doing

Page 133

1    over-the-counter purchases and sales of subordinated

2    bonds, convertible bonds --

3        A.    Yeah.

4        Q.    -- was that done on a continuous net

5    settlement basis also?

6        A.    No.

7        Q.    How was that done?

8        A.    It was just -- it was -- you wouldn't issue

9    a confirmation.  It was -- well, it depends -- you

10   want to know about a convertible bond for a -- for a

11   claim?

12       Q.    When you were doing the investment -- I'm

13   focusing on the 1980s.

14       A.    Right.

15       Q.    The convertible arbitrage transactions.

16       A.    Uh-huh.  We wouldn't have -- there wouldn't

17   be -- it -- we would issue, you know, a -- we would

18   issue a confirmation there, but we wouldn't have those

19   in our records in the '80s, because we don't hold the

20   confirmations after six years.

21       Q.    Right.  And the -- if you were -- you were

22   selling to the customer, you had a confirmation, but

23   when you were buying it --

24       A.    There wouldn't be a confirmation.

25       Q.    -- for inventory, there wouldn't be a

Page 134

1    confirmation?

2         A.    No.  Not -- not after six years.

3         Q.    Okay.  Okay.  So we're -- we're going -- we

4    started out listing the mistakes that you felt --

5         A.    Right.

6         Q.    -- Dubinsky made.  Did he make a mistake

7    with respect to using the trade date versus the

8    settlement date; is that what you covered already?

9         A.    The average price.  Yes.

10        Q.    Okay.

11        A.    On the ranges?

12        Q.    Yeah.

13        A.    Well, it's -- if you look at the range on --

14   you wouldn't have -- there wouldn't be a -- there

15   wouldn't be a record of the ranges.

16             Well, first of all, you can't even use the

17   ranges, because you'd have to -- well, he -- in order

18   to -- in order -- in other words, if the SEC was doing

19   an audit, which they did all of the time as to, you

20   know, best -- what's called best execution, they would

21   actually look and see, you know, what dates you bought

22   this stock.

23             Okay.  You know, if it was an average price

24   transaction, they would have to go back and look at

25   all of the days, you know, that you accumulated the

                                                    Page 135

1    stock, not just use the last day that you reported the

2    trade to the customer, because they understand what an

3    average price is.

4              Now, the only ones -- typically if you call

5    up a broker, and you tell him, buy me, you know, 50

6    shares of IBM or 200 shares of IBM, they would

7    actually -- they wouldn't do that over the course of a

8    day.

9              All right.  Because that -- you know, they

10   would just buy -- it's a small amount of a lot, but if

11   you're dealing with -- with discretionary accounts or

12   you're accumulating a larger -- with a -- a portfolio

13   of accounts, the way we always traded, you would

14   always do an average price transaction.

15             So they -- what they would have to do is go

16   back, which they would do, and see what was your real

17   average price.  They would verify what the average

18   price was, not just look at the last day, because they

19   would realize that you would never be able to find

20   a -- you would rarely be able to find a match, because

21   you'd --

22        Q.    Right.

23        A.    -- have done it, you know, at different

24   periods of time.

25        Q.    Right, right.  Are there other general

Page 136

1    mistakes that you can recall from --

2        A.    Well, we -- he mentions that David -- well,

3    he talks about David Kugel as -- you know, he mentions

4    in the report that David Kugel -- in other words, he

5    acknowledges that they don't have records going back

6    to the time that David -- he's talking about David

7    Kugel, because we don't -- there are no records.

8            So he's -- he points out as a footnote that

9    he's using David Kugel's information to plea bargain

10   that he created fictitious trades.  Now, as I stated

11   before, that makes no sense to me at all.

12           And I think that David Kugel -- I'm not

13   even -- I'm not saying that he's lying.  I'm saying

14   that he misinterpreted -- what he said when he created

15   a trade, he's misinterpreting what he's saying.

16           In other words, if -- if -- if I -- if I

17   give instructions to -- you know, if I wanted -- if I

18   decide I want to sell stock to a customer out of my

19   inventory, I -- I could say to someone like David

20   Kugel, you know, I want to sell stock to -- I want to

21   sell, you know, IBM to the client.

22           So we have 100 bonds in -- 100 convertible

23   bonds in the account.  I want to sell to Carl Shapiro,

24   you know, 20 bonds.  You know, I want to do a

25   convertible trade for him.

Page 137

1              Give instructions, you know, to Annette to

2      buy, you know, convertible bond, you know, for -- for

3      Carl Shapiro, and, you know, just tell her what --

4      tell them what the formula -- what the formula is, so

5      she knows how many bonds -- how to set the trade up.

6              He -- you know, he would write these

7      instruction sheet -- this -- this convertible bond,

8      you've got to -- if you're going to do 50 bonds, you

9      know, this is -- this is how many bonds, and this is

10     how much stock you sell.

11             And it gives her like -- she then looks at

12     my inventory record and sees, okay.  He -- he has X

13     number of bonds he can convert.  Takes it out of --

14     out of the investment account or the firm's trading

15     account into this customer account.

16             So David Kugel has no idea, nor has any

17     other trader, what the -- what the firm's net

18     inventory.  We could have -- we could have -- we have

19     five different traders trading IBM convert.  They're

20     all competing with each other.

21             They don't want to -- they never want David

22     to know what his position is, because he -- you know,

23     they're competing with him.  That's part of the

24     strategy of the firm, all market-making firms.

25             So he -- if -- if -- if someone says, well,

Page 138

1    give them instructions, he'll give -- he'll give

2    Annette or Jodi instructions of how many bonds to --

3    to buy and sell for this customer.

4           He has no idea after that where that --

5    where it's coming from.  He doesn't know whether it's

6    coming from the firm's inventory, from his inventory

7    or someone else's inventory.  He would not know that.

8           So if -- if he says to somebody, which is a

9    very -- I'm going back to like when I told in my

10   proffer agreement that I short stock to a customer.

11   And they said, you sold stock to a customer?  How can

12   you short stock a customer?  You're selling them stock

13   that you don't own.

14          And I say, yeah, market-makers do that all

15   day long.  That's part of our business.  We're

16   shorting stock to a customer.  And he -- and an alarm

17   bell goes off and says, well, how can you sell stock

18   to a customer you don't own?

19   Q.    Okay.  Well, that --

20   A.    You know --

21   Q.    Let me ask you that.

22   A.    Okay.

23   Q.    Was that illegal, for you to be selling

24   stock to a customer that you didn't own?

25   A.    No.  I'll -- I'll -- I'll explain that too,

                                        Page 139

1    because that's -- that's another issue, but let me

2    just finish this thing.

3             So that if, in fact, David Kugel or anybody

4    is -- is giving instructions to the operations side of

5    the business, meaning Annette or Jodi, of -- of how to

6    do a trade, that doesn't mean that's a fictitious

7    trade.

8             He -- you know, he has no idea.  He's just

9    telling her how to do the allocation of the trade.

10   Not -- he doesn't know if -- you know, whether or not

11   the firm has it in inventory or doesn't have it in

12   inventory.

13            But even if I wanted to short it to the

14   customer, let's say I didn't have it in inventory,

15   there's nothing wrong with that.  I am allowed to

16   short stock to a customer.

17            Theoretically I could have shorted all of

18   these split-strike trades to the customer forever.  My

19   violation was not going short.  It was not recording

20   the short on my financial records as a liability,

21   which I guarantee you, nobody understands that.

22            To this day if I called up the prosecutor,

23   Litt, and I said to him, you know, I don't have --

24   there's nothing wrong with me shorting stock.  He

25   would look at me and say, that's not true.  You can't

Page 140

1     short to a customer.

2              And I can prove that to you, because I don't

3     know how many times, you know, I had to -- I had to

4     argue this case in front of the SEC and with the

5     issuing companies, like Apple computer and everything

6     at -- when we were at board meetings with the IBM.

7              Average company does not want you to ever

8     short stock.  In other words, every company that

9     trades on an exchange does not want a brokerage firm

10    to sell stock that he doesn't own.

11             They think that short selling is illegal, is

12    immoral and should never be done.  All right.  That's

13    what they want.  They don't want ever -- they don't

14    want anybody to be able to short stock.

15             Just like nobody wanted, you know, George

16    Soros to short Sterling and make a billion dollars

17    shorting -- you know, breaking the market on -- on

18    shorting.

19             But what they don't understand is that

20    shorting is a very -- you know, a very, you know,

21    legitimate market, you know, thing to do in the

22    marketplace, and it's required, because it keeps

23    stocks from going to artificially high prices.

24             All right.  And the -- it certainly happens

25    that as I was -- when I was looking for -- reading

Page 141

1    another book, one of the things I do here is I tutor

2    people on finance and the marketplace.

3           Of course, the Bureau of Prisons only big

4    concern is that I'm teaching them a fraud.  All right.

5    So originally I was told, no, you can't tutor or teach

6    anybody here, you know, but I said, listen, I said,

7    they -- you have outside people coming in here,

8    professors, to -- to lecture, you know, as part of,

9    you know, the justice department, and they're all

10   asking, can Bernie Madoff -- you have Bernie Madoff

11   sitting here.  Let him lecture people.

12          And the Bureau of Prisons says, the

13   newspapers are going to say that Bernie Madoff is --

14   is perpetuating a fraud.  Just like when they put me

15   in charge -- when I first got here, my first job was

16   in the engraving department.

17          I was engraving signs, you know, that they

18   hung on walls here.  So the -- the Wall Street Journal

19   said, Bernie's first job is engraving, you know.  So

20   they said, take him away from the engraving

21   department.

22          And they -- I had seven jobs in seven days,

23   because no matter what I was doing, including I was in

24   charge of cleaning the computers, you know, can't do

25   that, you know, because you're reprogramming the

Page 142

1    computer.

2              I couldn't reprogram my telephone number.

3    You know, that's not my -- not my strengths here.  So

4    I'm now -- my job is now cleaning the laundry room.

5    That's my job here.

6              The -- I'll -- I'll -- there's a book that

7    was written by someone like Dubinsky.  He has a very

8    big -- and he talks about --

9                   MR. GOLDMAN:  Tell us the name of the

10        book and the author, Bernie.

11                  THE WITNESS:  I don't even know what

12        it --

13                  MS. CHAITMAN:  May I mark that whole

14        thing as --

15                  THE WITNESS:  "Secret Weapon."

16                  MS. CHAITMAN:  -- the next exhibit?

17                  MR. SHEEHAN:  Could you just mark it as

18        an exhibit?

19                  MS. CHAITMAN:  Yeah.  Let me just mark

20        it.

21                  Can I mark this whole thing?

22                  THE WITNESS:  Yeah.

23                  MS. CHAITMAN:  Is it all connected?

24                  THE WITNESS:  Yeah.

25                  MS. CHAITMAN:  Is it all one --

Page 143

1               THE WITNESS:  Yeah, yeah.

2               MS. CHAITMAN:  Okay.

3               THE WITNESS:  Anyhow --

4               MS. CHAITMAN:  So I'm marking as

5        Exhibit 11 --

6               (MADOFF EXHIBIT 11 WAS MARKED FOR

7        IDENTIFICATION.)

8     BY MS. CHAITMAN:

9        Q.    -- a -- it says the author is Kevin Freeman,

10    and the title is, "Secret Weapon."  And it's pages --

11    I don't know what the first page is, but the --

12              MR. SHEEHAN:  It's the inside cover.

13       Q.    The inside cover is 78.  78 to 83, and then

14    123 and 124.

15       A.    He's talking about how the markets work.  He

16    talks about bear runs, and he talks about naked short

17    selling, and he talks about the Madoff exemption.

18       Q.    Is that a term that's in the industry?

19       A.    Naked -- yeah, naked --

20       Q.    No, but the Madoff exemption?

21       A.    Yes.  In other words, he goes on to state,

22    "Long before he was convicted of defrauding the

23    American public of some 50 billion through a Ponzi

24    scheme, Bernie Madoff was chairman of the National

25    Association of Securities Dealers, NASD.  In that

Page 144

1    capacity he appeared regularly at the SEC and served

2    on agency panels."

3         And then he quotes them as saying, "When it

4    came to Bernie, people paid more attention, said

5    Georgetown University law school professor, Donald

6    Langevoort, who worked on an SEC panel with Madoff."

7         He quoted -- then goes on to quote, saying,

8    "This was a guy who really knew how markets worked.

9    He was the grownup in the room.  If there was a

10   confession" -- "if there was confusion or a question

11   or two people on opposite sides going at each other,

12   Bernie would speak up and explain what the deal was.

13   I'm sure in some ways that may have thrown even the

14   commission off their guard."

15        "One of Madoff's key accomplishments at the

16   SEC was to get a rule approved, the so-called Madoff

17   exemption, that allowed market-makers to naked short

18   sell.  Market-makers are broker-dealer firms that gain

19   fees by holding shares of securities in order to help

20   grease the wheels of trading."

21        "If someone buys stock in a company, it is

22   the market-maker who sells the stock and then finds an

23   offsetting order.  This keeps the markets flowing

24   smoothly."

25        "In the case of short selling if the

Page 145

1    market-maker has no inventory of the shares sold, the

2    firm is allowed to create an IOU for the shares.  This

3    is a form of naked short selling legalized by the

4    Madoff market exemption."

5            Basically what he's stating, this is the --

6    he's quoting this law professor at Georgetown, who

7    served on a panel with me, that says that I could sell

8    stock short.

9            So selling stock short, not only is it

10   something that is to the benefit of the marketplace,

11   market-makers are required to sell stock short.  So

12   theoretically I don't ever have to, you know, buy

13   stock for a customer.

14           I'm responsible for producing that stock if

15   the customer ever wants it.  And any profit that the

16   customer makes in the trade I'm responsible for.

17           So in theory, which my attorney said to me,

18   Bernie, you know, you can -- you're not doing anything

19   wrong with being short these split-strike trades to

20   the client, you know.  You know, I can short all day

21   long, and I do short stock at times.  Every brokerage

22   firm short stocks to a customer.

23           My violation was not showing the IOU, the

24   liability, you know, on my balance sheet.  That's what

25   the violation was.  I would have also been out of

1   ratio, you know, by not -- if I did show that.  So --

2       Q.    So you mean that there was -- do you -- if

3   you sell short, do you have an obligation -- is it

4   your understanding that you have an obligation to the

5   customer?

6       A.    To produce that stock if the customer wants

7   it.

8       Q.    Right, but do you have an obligation -- and

9   we're talking about the investment advisory customer.

10      A.    Yes.

11      Q.    Did you have an obligation to tell the

12  customer, your statement shows 30 shares of IBM, but

13  I'm actually short that --

14      A.    No.

15      Q.    -- position?

16      A.    No.

17      Q.    So it was --

18      A.    No.  You don't -- you're not --

19      Q.    So if -- if a customer is -- if a securities

20  customer is dealing with a market-maker --

21      A.    Or anybody.

22      Q.    Well, only the market-makers have the

23  exemption.

24      A.    No, no.  That's -- that's wrong.  The

25  market -- the -- the -- anybody can sell stock short

Page 147

1    to a customer, you know.  The -- it's -- they always

2    can sell stock through shorting, but he --

3              You know, what he's talking about is -- you

4    know, is that, you know, I was the one that argued for

5    the short stock selling, because what he -- he

6    confuses the situation, because there are certain

7    requirements that a market -- if a market-maker is

8    shorting stock to a customer or to anybody, he has

9    to -- his records have to show that he shorted the

10   stock.

11              MR. SHEEHAN:  Who is, "he"?

12              THE WITNESS:  Meaning the brokerage

13       firm.

14              MR. SHEEHAN:  Okay.

15   BY MS. CHAITMAN:

16   Q.   Okay.  So the brokerage -- so let's just

17   take the split-strike.  Okay?

18              MR. GOLDMAN:  Wait.  Before -- before

19       you ask the question, I think he said -- and the

20       transcript will speak for itself, obviously, but

21       I think he said that the -- the market-maker was

22       required to sell short.  Did you mean permitted

23       to sell short?

24              THE WITNESS:  Well, you -- you're

25       required to make a two-sided market.  So if, in

Page 148

1          fact, you -- you're not required to sell stock to

2          the customer short.  You're allowed to sell stock

3          to a customer short.

4                    MR. GOLDMAN:  That's --

5                    THE WITNESS:  If -- in other words,

6          that's the difference.  You have to be -- you

7          have to sell it at a price that's related to the

8          marketplace, you know.

9                    And you have to -- you -- you -- you

10         would put it on your records that you're selling

11         short on the original order ticket.  You have to

12         mark it, because it's what they call an uptake

13         rule and so on, which means you have to -- it's

14         not important.  It's confusing.

15     BY MS. CHAITMAN:

16         Q.    Okay.  So -- so basically if you take John

17     Smith.  He's a split-strike customer.  His statement

18     shows that he owns a portfolio of securities, and, in

19     fact, you don't at that time own them.

20         A.    No.

21         Q.    Are you saying that there's nothing

22     fraudulent about issuing a statement to an IA

23     customer --

24         A.    Uh-huh.

25         Q.    -- an investment advisory customer, showing

Page 149

1      securities as having been purchased for the customer,

2      when, in fact, they haven't been purchased?

3          A.    That's correct.

4                MR. SHEEHAN:  Object.

5                THE WITNESS:  You don't have to --

6          you're not required.  It's not the customer's

7          business whether or not you're selling the stock

8          from long or whether you're selling it short.

9      BY MS. CHAITMAN:

10         Q.    Okay.  So what you're saying is that the

11     fact that the split-strike conversion strategy was

12     carried out from sometime in 1992 until December of

13     2008 without your actually owning the securities that

14     showed up on the statements, that was not a fraud, but

15     the fraud was that you didn't disclose to the SEC on

16     your focus reports --

17         A.    That's correct.

18         Q.    -- that you had that debt?

19         A.    Right.

20                MR. SHEEHAN:  Objection.  Objection,

21         but go ahead.

22                THE WITNESS:  That's correct.

23     BY MS. CHAITMAN:

24         Q.    Okay.  Can you put this in your own words,

25     so we don't have any confusion about it?  I just want

Page 150

1      it to be very clear on the record.

2          A.      That there is nothing wrong with selling

3      stock to a customer out of a short position.  In other

4      words, you do not have -- that is not a violation.

5      The violation -- and it is typical for a brokerage

6      firm to at times sell stock to a customer short.  That

7      is not a violation itself.

8                  And the customer doesn't care whether the

9      stock that you are selling him is stock that you

10     actually are long or short.  You know, the customer

11     assumes, as -- and, rightfully so, that if he wants --

12     if wants delivery of those securities, or he wants the

13     profit made from the transaction, that you're still

14     obligated to do that.

15                 So had I reported this transaction on my

16     financial records as a liability, that would be --

17     that would be all right, but because I didn't, that's

18     where the violation was.

19                 Now, obviously, I couldn't do that, because

20     my -- my liabilities would have been too great.  Which

21     brings me to another error, you know, that I find in

22     the Dubinsky report.  See if I can remember where it

23     was.  Related to that.  The -- well --

24         Q.      Do you -- do you want -- do you want her to

25     read back your last comment?  Maybe it'll prompt you

Page 151

1    to --

2        A.    No.

3        Q.    -- to recall.

4        A.    No.  I'll think of it.  First of all, here

5    is this.  This is yours, and this is yours, I think.

6    I have too much paperwork here.

7        Q.    I just want to go back -- back to this.

8    Forgive me, but it intrigues me.

9            So the entire portfolio that was purportedly

10   owned by the investment advisory customers from 19 --

11   from whenever it was in 1992 that you stopped buying

12   the securities that showed up on the statements until

13   2008, you had always honored withdrawals?

14       A.    Right.

15       Q.    You never defaulted in any of your

16   obligations to the customers?

17       A.    Not until, you know, I went out of business.

18       Q.    Right.  Okay.  So the only violation of law

19   that you understand you committed was not disclosing

20   on your focus reports that you had sold short; is that

21   right?

22       A.    Not that I had sold short.  That I didn't --

23   I did not reflect my liabilities.  That was because of

24   the short position.

25       Q.    Right.

Page 152

1   A.   The short position would have reflected a
2   liability to the customer.
3   Q.   To purchase the shares?
4   A.   I did not show that.
5   Q.   Okay.  Okay.  And I just want to ask you one
6   other thing, which is not related, except it came into
7   my mind.
8   A.   Okay.  Before you do that --
9   Q.   Oh, okay.
10   A.   -- I remembered what I was going to say.
11   Q.   Go ahead.
12   A.   Dubinsky states that -- well, he -- he -- he
13   acknowledges that he -- he doesn't have records to
14   prove this, but he infers in some language that
15   because I did not on my focus reports --
16          One of the -- one of the things that he --
17   points he makes to demonstrate that I was -- he was
18   trying to establish his theory, obviously, initiated
19   by the trustee, that my fraud went back almost to the
20   beginning of time.
21          All right.  That I didn't do any business,
22   because I did not reflect any customer business on my
23   financials -- on my focus reports.  Customers that
24   were -- you know, activity, long and shorts.
25          So -- because he says that, you know, I

Page 153

1    mean, he -- he's saying he could have been doing

2    business in -- for customers in the '80s or '70s or

3    '60s, the '70s even, because my focus reports, which

4    he doesn't have, by the way, because he doesn't -- he

5    can't get that, but he's assuming that there was no

6    customer, you know, business -- no customer positions

7    shown on my focus reports.

8              All right.  But this is a common error made

9    in -- by customers in general.  I used to get calls

10   from people that would say, listen, Merrill Lynch

11   doesn't show, you know, my assets on a position.

12             He's doing all of this business with -- with

13   me or with all of these customers, and it doesn't show

14   on Merrill Lynch's financial statements, you know, any

15   of this business.

16             I said, well, are you talking about his

17   balance sheet?  He says, yeah.  I said, brokerage

18   firms do not show customer assets fully paid for

19   securities on their balance sheets.  Otherwise,

20   Merrill Lynch would have trillions and trillions of

21   dollars.

22             I said, you know, when a brokerage firm

23   files a focus report or any balance sheet, when they

24   send you, you know, they do not -- they do not show or

25   record customers' fully paid for securities.

Page 154

1          So if a customer had a margin account or

2    a -- you know, a liability, he would have to show a

3    payable or a receivable from a customer.

4          But if a customer buys IBM, pays for the

5    IBM, and the brokerage firm has that IBM in his -- you

6    know, in his box or at the clearing corporation, that

7    doesn't appear on his records anywhere.  So, you know,

8    as long -- if I was -- if I had a -- a liability, and

9    not from a short sale, because, you know, the short

10   sale -- the short sale, if it's a liability, would

11   appear on it, but if he was long and short, the

12   same -- it's another thing.

13         When you're trading in convertible

14   securities, you're -- you're allowed to net the -- the

15   receivable and payable for the same customer against

16   each other.  So that stuff does not appear on a focus

17   report.

18         Now, that's a basic accounting.  Anybody

19   that's a -- anybody that's familiar with any brokerage

20   firm accounting would know that question.  So why he

21   would think there would be a -- that would be on my --

22   on my balance sheet, it's not certain.

23         What would be on my balance sheet would be

24   if the customer owed me money, which is another thing.

25   There's a -- there's a major flaw.  And this I have to

Page 155

1      address, even though you didn't ask me about it.

2              The trustee somehow or other when I read the

3      GAO report -- and I actually spoke to the treasury

4      secretary -- the inspector general of the treasury

5      department about this.

6              In the -- in the -- in the GAO report,

7      issued by the government, which is a report that he

8      issues from the general accounting -- accountability

9      office, based upon the trustee's report, there's a --

10             I have a -- this is something that -- David,

11     you might ask Irving Picard how he had managed to get

12     this thing slipped through.

13             Jeffry Picower --

14             MR. GOLDMAN:  Tell us what you're

15         looking at, Bernie.

16             THE WITNESS:  Oh, this is the GA -- a

17         copy -- part of the G -- the SIPC report, the GAO

18         report, which is -- took seven years to -- to

19         finally get, which my attorneys assured me was

20         going to be done immediately.  It took seven

21         years to finally get them to do the results of --

22         of the trustee's report.

23             There's a 6.3 billion dollar liability

24         to the debit balance in Jeffrey Picower's

25         account, which was a -- a major issue was one of

Page 156

1          the things that created my whole problem.  This
2          relates to them -- them not honoring their
3          commitments with me when -- and --
4                    Okay.  This is on -- and I can't give
5          you -- this is my only copy, but you can find it.
6          It's on page 37 of the -- of the GAO report.
7                    And I'm quoting now the General
8          Account -- Accounting Office.  It says, "As part
9          of our review of the records provided by the
10         trustee, we noted some customer accounts having a
11         negative balance."
12                   "For example, in the Picower case the
13         records showed a negative balance of 6.3 billion
14         dollars.  In theory this reflected some kind of
15         margin account or debit balance."
16                   "The trustee told us even though such
17         an account would not be in keeping with the
18         standard industry practice, such negative
19         balances raised the question of whether the
20         reported amounts represent a debt owed by the
21         customers to the Madoff firm."
22                   Now, that clearly is a debt.  All
23         right.  Jeffry Picower owed me 6.3 billion
24         dollars.  All right.  The trustee -- I mean, the
25         GAO -- thank God.  He questioned the trustee,

Page 157

1          what about the 6.3 billion dollars?

2                    And for some reason the trustee

3          claimed, well, we can ignore that, you know.

4          That's not typical.

5                    All right.  Now, if you look at my

6          records or any brokerage firm's records or

7          account agreements with customers, it clearly

8          states that, you know, they're responsible for

9          any debit balances or margin accounts that they

10         have with the firm.

11                   It says here on my trading

12         authorization, which clients sign, it says, "The

13         undersigned hereby agrees to indemnify and hold

14         you harmless from and to pay you promptly on

15         demand any and all losses arising thereof or

16         debit balance due hereon."

17                   In other words, every customer that

18         opens a margin account or has any debt with a

19         brokerage firm owes them that money.  All right.

20                   MS. CHAITMAN:  Okay.  Can I just

21         mark -- okay.  I'm going to mark as Exhibit 12 --

22         can I take that?  Is that one document, the one

23         you just read from?

24                   THE WITNESS:  Yeah.

25                   MS. CHAITMAN:  Okay.  So I'm marking as

Page 158

1          Exhibit 12 -- this is a trading authorization.

2                    THE WITNESS:  Here, what -- use this

3          one, because this one is -- this copy is better.

4          It's the same type of thing.

5                    MS. CHAITMAN:  Okay.  So I'm -- you

6          know what?  Can I mark them both?  Because you

7          read this one.  So --

8                    THE WITNESS:  It's the same -- it says

9          the same thing.

10                    MS. CHAITMAN:  Okay.  All right.  So

11          I'm marking as Exhibit 12 the one you read.

12                    (MADOFF EXHIBIT 12 WAS MARKED FOR

13          IDENTIFICATION.)

14                    MS. CHAITMAN:  And I'm going to mark as

15          Exhibit 13 something called, "Trading

16          authorization limited to purchases and sales."

17                    (MADOFF EXHIBIT 13 WAS MARKED FOR

18          IDENTIFICATION.)

19     BY MS. CHAITMAN:

20          Q.    And can you just read in whatever the

21     language is that you want?

22          A.    Uh-huh.  All right.  So for some reason, you

23     know, the trustee convinced the GAO -- I don't --

24     maybe they didn't care that much about it -- that this

25     six -- that this debit balance was not typical at a

Page 159

1    brokerage firm or that they weren't.  Now --

2        Q.    Wait.  I just want to go back to this.  I

3    don't want to lose track of it.

4                MR. SHEEHAN:  Sure.

5    BY MS. CHAITMAN:

6        Q.    You -- you said that this has better

7    language on the points.

8        A.    It doesn't -- it just shows the customer --

9    every customer agreement always has that customers are

10   responsible for any debit balance --

11       Q.    Okay.

12       A.    -- they owe the brokerage firm.

13       Q.    Okay.  Okay.

14     (The following pages were redacted pp. 159:14-160:18)

15

16

17

18

19

20

21

22

23

24

25

Page 160

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19        Q.     Okay.

20        A.     All right.

21        Q.     So I want to go back to one other question.

22   When you stopped buying securities on the split-strike

23   customer accounts, and you said you did that for a

24   short period of time, and then you stopped.

25        A.     It wasn't a short period of time.  It was

Page 161

1    from 1992 to 2008.

2         Q.    Right, but I understood your testimony to be

3    that when you initiated that program you actually were

4    buying.

5         A.    Oh.

6         Q.    Am I correct about that?

7         A.    Yes, but that was prior to that.  That was

8    before the hedge funds.  That was prior to '92.

9         Q.    Oh, okay.  Okay.  Okay.  I'm glad you

10   clarified that.

11            So what -- what were you doing with the

12   money?  Let's say that Customer A sent you a million

13   dollars for the split-strike program.

14        A.    It went into --

15        Q.    What --

16        A.    -- treasury bills.

17        Q.    It went into U.S. treasury bills?

18        A.    Well, some of it went into treasury bills.

19   Some of it went back to customers when they withdrew

20   profits --

21        Q.    Okay.

22        A.    -- that didn't exist.

23        Q.    The -- the portion that went into treasury

24   bills, were those interest-paying treasury bills?

25        A.    Yeah.

Page 162

1        Q.    And do you remember in 1992 what the

2    interest rate was -- was on the treasury bills?

3        A.    Probably like two percent, something like

4    that, on -- you know, one and a half, two percent.

5        Q.    Okay.  And is it fair to say that for the

6    whole period up until 2008 that the money that wasn't

7    used to redeem customer accounts was in treasury

8    bills?

9        A.    Probably, yeah.

10       Q.    And that would have been interest-earning

11   treasury bills?

12       A.    Yeah.

13       Q.    Whatever the current interest rate was; is

14   that right?

15       A.    Uh-huh, uh-huh.

16       Q.    Were these longer-term treasury bills --

17       A.    No.

18       Q.    -- or shorter term?

19       A.    No.  They were short term.  They were

20   T-bills, you know.  You know, the short term.  One to

21   two years.

22       Q.    Okay.  So the customers' money was earning

23   some percentage?

24       A.    Yeah.

25       Q.    Whatever the treasury bill rate was?

Page 163

1      A.    Yeah, but there wasn't enough treasury bills
2    to cover all of the liabilities.
3                   MS. CHAITMAN:  Okay.  Does everybody --
4         do you want to take a break, and then we'll go
5         through until --
6                   MR. SHEEHAN:  Sure.  As a --
7                   MS. CHAITMAN:  Because I'm about to --
8         to go through the Dubinsky report, which is going
9         to be tedious.  Why don't we take --
10                  MR. SHEEHAN:  Whatever.
11                  MS. CHAITMAN:  -- five minutes.
12                  MR. SHEEHAN:  Five minutes?
13                  MS. CHAITMAN:  Yeah.
14                  MR. SHEEHAN:  That's good.
15                  THE VIDEOGRAPHER:  Going off the
16        record.  The time is 13:01.
17                  (RECESS FROM 1:01 P.M. TO 1:18 P.M.)
18                  (MADOFF EXHIBIT 14 WAS MARKED FOR
19        IDENTIFICATION.)
20                  THE VIDEOGRAPHER:  Back on the record.
21        This begins media number three in the deposition
22        of Bernard L. Madoff.  The time is 13:18.
23    BY MS. CHAITMAN:
24      Q.    Mr. Madoff, I've just given you what had
25    previously been marked in your -- in a -- your

Page 164

1    deposition in June, but I've renumbered it as Madoff

2    Exhibit 14.

3              This is a statement for one of my clients,

4    Arthur Blecker.  It's dated June 30th, 1986.  And what

5    is the trading strategy on this statement?

6        A.    It looks like a convertible bond, buying

7    convertible bonds and selling the -- the related

8    stock.

9        Q.    Okay.  And where it says long --

10       A.    Uh-huh.

11       Q.    On this statement, which was sent to the

12   customer, long means that the customer owns it; right?

13       A.    Correct.

14       Q.    Whereas, on the confirmation, the actual

15   trade confirmation, it would be the opposite; right?

16   It would show --

17       A.    That -- that Madoff sold it to the customer.

18   "We sold," it would say.

19       Q.    It would say the firm --

20       A.    The firm sold it to the customer.

21       Q.    -- sold to the customer.

22             Okay.  And, conversely, where it says,

23   "Short, Interco, Inc." --

24       A.    It would show we bought from the customer.

25       Q.    Okay.  And am I correct that your testimony

Page 165

1    is that all of the long positions reflected on the

2    arbitrage strategy statements were actual positions

3    that you held?

4         A.    That's correct.

5         Q.    Okay.  So, if you can, I want you to take a

6    look in the Dubinsky report, which we've marked as

7    Exhibit --

8              MS. CHAITMAN:  What did we mark it as?

9              MS. FEIN:  7.

10             MS. CHAITMAN:  Dubinsky --

11             MS. FEIN:  7.

12             MR. SHEEHAN:  7.

13   BY MS. CHAITMAN:

14        Q.    7.  As Exhibit 7.  If you could, look at

15   page 16.

16        A.    Okay.

17        Q.    In paragraph 35, this is the beginning of

18   Dubinsky's factual background, and it says, "BLMIS."

19   "In 1960 Madoff founded BLMIS as a sole

20   proprietorship.  BLMIS" --

21             MS. CHAITMAN:  Page 16.

22             MR. GOLDMAN:  Okay.

23   BY MS. CHAITMAN:

24        Q.    -- "a market-making business in

25   over-the-counter stocks was registered as a

Page 166

1      broker-dealer with the Securities and Exchange

2      Commission as of January 19th, 1960 and operated three

3      business units."

4                "One, a market-making business, two, a

5      proprietary trading business, and then," parentheses,

6      "together with the market-making business, known

7      inside BLMIS as House Five," end paren, "and, three,

8      an investment advisory business," paren, "known inside

9      BLMIS as House 17."

10          A.    Right.

11          Q.    Now, did people at your firm use the phrase

12     House 17?

13          A.    In the firm?

14          Q.    Yes.

15          A.    Yes.

16          Q.    And during what period of time?  From 1960

17     on?

18          A.    No.  Because the 17th floor wasn't in

19     existence in 1960.  It only came into existence, you

20     know, in the '80s.  It was -- House 17 just refers

21     to -- that was the business that operated out of the

22     17th floor.

23          Q.    Okay.  But -- and that was the business that

24     was --

25          A.    The IA business.  It was basically just

Page 167

1    split-strike business, because that was -- that did --

2    I think the 17th floor came into existence after 19 --

3    in -- after '92.

4        Q.    Right.  So isn't -- isn't it a fact that

5    when you -- when you started doing the -- we'll call

6    it, the fraudulent investment advisory business, that

7    you moved the people who did that down to a separate

8    floor?

9        A.    That's correct.

10        Q.    And was your idea to separate them from

11    everyone else, so that there wouldn't be --

12        A.    Well, what happened was when we closed the

13    Avellino & Bienes' accounts in '92, the -- when we --

14    when -- I decided to take the -- those clients back

15    directly into the account.

16            So the -- in other words, after I -- I

17    returned the money to Avellino & Bienes' accounts,

18    there was an uproar from those accounts, as well as my

19    father-in-law, because they were all basically -- most

20    of them were -- were his accounting clients, and

21    they -- you know, they all wanted to continue to do

22    business.

23            The SEC had told me at the time, they said,

24    look, you -- you want to -- you want to still do

25    business with these people.  That's fine, because

Page 168

1     there's nothing wrong with you doing business with

2     these people.

3            As a matter of fact, they said, if you want

4     to do business with the Avellino & Bienes' people,

5     that's -- that's fine too.  They just have to register

6     as an -- as a registered investment company, you know.

7            I said, no.  I said, I'm -- I was furious

8     with -- with them at the time, because they had never

9     told me that they had changed their mode of operation,

10    where they were now paying them, you know, interest

11    on -- on a loan.

12           That was not something that was ever agreed

13    upon with me.  So I said, I'm -- you know, I decided

14    I'm sending the money back, closing those accounts,

15    but, of course, I started getting, you know, a lot of

16    pressure from these people, who were relying upon that

17    money, you know, to live on, you know.

18           They said, no.  Why -- why can't we open a

19    direct account with you, you know?  I said, well,

20    because I'm not really equipped to handle all of these

21    individual accounts, you know.  I -- they had like 500

22    customers, you know, clients, you know.

23           So I said, look, you know, I don't want to

24    do that.  But then it was Frank DiPascali basically

25    who said -- because he was, you know, handling that

Page 169

1    stuff at the time.  He said to me, look, let's -- you

2    know, let's take these -- these new clients.

3              And I said, well, you know, it's like, you

4    know -- it's -- who the hell is going to handle all of

5    that stuff?  And he was the one that said, well, you

6    know, we'll just computerize the trading, and, you

7    know, I -- I can handle all of that stuff.

8              So I operated -- I said, all right.  You

9    want to start doing that, we'll -- we'll start doing

10   that.  And that's when I -- I needed more space and

11   operated and put them on the 17th floor.

12        Q.    Okay.  So House 17 was only a term used

13   after 1992?

14        A.    Pretty much.  It's -- to my recollection,

15   yes.

16        Q.    Okay.

17        A.    Because it didn't exist, the 17th floor --

18        Q.    Okay.

19        A.    -- before then.

20        Q.    Okay.  And is it fair to say that it was

21   only after House 17 was formed, by that is you moved

22   people downstairs, that it was only after that that

23   you first began the investment advisory fraud?

24        A.    Correct.

25              MR. SHEEHAN:  Objection.  Go ahead.

Page 170

1    BY MS. CHAITMAN:

2        Q.    Let me ask that in a way that Mr. Sheehan

3    won't object.

4             Was there any investment advisory fraud done

5    by your firm prior to the formation of House 17?

6        A.    No.  I mean, I'm not exactly sure how you're

7    using House 17, like in what reference, you know.

8        Q.    Well, the -- when you moved people down to

9    the 17th floor --

10       A.    Uh-huh.

11       Q.    -- it was Frank DiPascali, Jodi Crupi,

12   Annette Bongiorno?

13       A.    Yes.  And then the -- the whole -- the

14   mailroom was down there and the -- you know, part of

15   the computer operation was down there.  Anything

16   that -- anybody that was going to be related to all of

17   these accounts basically.

18       Q.    Okay.  And -- but that was -- that was done

19   sometime in 1992 --

20       A.    Right.

21       Q.    -- or '93?

22             Well, do you remember when?

23       A.    No.  I don't remember.  It was like -- I --

24   you know, I'd have to look at the leases, but

25   basically it was -- it all started basically after

Page 171

1    the -- I know it was '92, because that was when the

2    Avellino & Bienes thing blew up.

3        Q.    Okay.  Okay.

4        A.    It was the summer of '92, was when the

5    Avellino & Bienes started.  So it would have to be

6    sometime after that.

7        Q.    Okay.  Now, during the period prior to 1992

8    was the investment advisory operation handled

9    separately from the market-making and proprietary

10   trading?

11       A.    Yes.  Yeah, it always was.

12       Q.    It was always handled separately?

13       A.    (WITNESS NODS HEAD UP AND DOWN.)

14       Q.    But --

15               MR. SHEEHAN:  The witness nodded yes.

16               THE WITNESS:  Huh?

17               MR. SHEEHAN:  You nodded yes.

18               MR. GOLDMAN:  You have to verbalize

19       your answer.

20               THE WITNESS:  Oh.

21               MR. GOLDMAN:  You seemed to indicate

22       while you're nodding your head.

23               THE WITNESS:  Yes.

24               MR. SHEEHAN:  Thank you.

25   BY MS. CHAITMAN:

Page 172

1        Q.    During the 1980s who was responsible for the

2    investment advisory accounts, like we just looked at

3    the -- the Blecker statement, June 30th?

4        A.    Me.

5        Q.    You handled that?

6        A.    Right.

7        Q.    Okay.  Did you have traders who were in the

8    market-making or proprietary trading groups that

9    actually did the trading for the investment advisory

10   customers in the '80s?

11       A.    No.  The only one that handled the -- that

12   spoke to the clients and that made the decision of

13   what to buy and sell for the clients was myself.

14       Q.    Okay.

15       A.    Not -- none of the market-makers.  I mean,

16   market-makers might have bought stock into the

17   firm's -- into the firm's inventory, but I was the one

18   that actually made the decision as to put the -- put

19   the trade through to a client account.

20       Q.    Okay.  And since you were buying from

21   inventory, you could just look at the inventory and

22   decide what --

23       A.    Yeah.

24       Q.    -- to sell to the --

25       A.    Or if I went out and -- you know, or if it

Page 173

1    went -- or if the market-maker bought it from the

2    street into -- into his account, and then I would make

3    the decision --

4        Q.    Okay.

5        A.    -- to put it into a client account.

6        Q.    Okay.  If you'd be good enough to look at

7    paragraph 119 of Dubinsky's report.

8                    MR. GOLDMAN:  One -- one --

9                    MS. CHAITMAN:  It's paragraph 119.

10                   MR. SHEEHAN:  Paragraph 119.  Okay.

11                   THE WITNESS:  Where the hell is

12       paragraph 119?

13                   MS. CHAITMAN:  The --

14                   MR. GOLDMAN:  Page 51.

15                   THE WITNESS:  What page?

16                   MR. GOLDMAN:  51.

17                   THE WITNESS:  Okay.  Uh-huh.

18   BY MS. CHAITMAN:

19       Q.    If you could, just read paragraphs 185

20   through 190.  I just want to ask you some questions

21   about --

22       A.    Paragraph one --

23       Q.    185.

24                   MR. SHEEHAN:  Okay.  So we're --

25                   MS. CHAITMAN:  You know what?  Oh,

Page 174

1            we're looking at different --

2                    THE WITNESS:  I'm not with you.

3                    MS. CHAITMAN:  You know what?  I've got

4        different versions of the Dubinsky report.

5        Let -- let me do it differently.  Hold on one

6        second.

7    BY MS. CHAITMAN:

8        Q.    Okay.  If you'd be good enough to turn to

9    page 35.  So Mr. Dubinsky's -- the heading on

10   subparagraph two is that, "Purported convertible

11   security trades exceeded the entire reported market

12   volume for certain days."

13       A.    Uh-huh.

14       Q.    Do you see that heading?

15       A.    Right.

16       Q.    Okay.  And then he explains that he looked

17   at reported records on the New York Stock Exchange,

18   the daily stock price record, the --

19       A.    Uh-huh.

20       Q.    -- American Stock Exchange and the daily

21   price record from the New York Stock Exchange; do you

22   see that?

23       A.    Right.

24       Q.    And he reached the conclusion that these had

25   to be fraudulent trades, because there weren't that

Page 175

1    many trades done on those days?

2        A.    Right.

3        Q.    And I believe you've already explained, but

4    can you just explain again why this conclusion is not

5    correct?

6        A.    Well, he's -- he's making -- he's

7    referencing in his footnote that the data was

8    collected from the daily stock price record from the

9    New York Stock Exchange, from the daily stock record

10   price and the American Stock Exchange, which provided

11   the month and short position of the data.

12           These trades were not executed.  There's no

13   relevance to looking at the New York Stock Exchange or

14   the American Stock Exchange, because they wouldn't

15   be -- stock would never have been transacted on

16   those -- on those exchanges anyhow.

17       Q.    Okay.  And is that a fact that's generally

18   known or -- I mean --

19       A.    Well --

20       Q.    If you --

21              MR. SHEEHAN:  Object to the form.

22              THE WITNESS:  Anybody that knew

23       Madoff's business -- I mean, anybody, including

24       the clients, it would be hard -- I mean, we were

25       relatively famous for, you know, trading off the

Page 176

1          floor of the exchanges.

2                    So, I mean, with -- anybody that was a

3          client of ours or that was a regulator or that

4          was in the industry would know that our business

5          was not transacted on the floor of the New York

6          Stock Exchange.

7     BY MS. CHAITMAN:

8          Q.    Okay.  Now, looking at page 36.

9          A.    Uh-huh.

10         Q.    Dubinsky has a chart showing that most of

11    the trades that -- you know, 41 percent, there were no

12    trades occurred in the market that -- that exceeded

13    one to two times the number of trades on the account

14    statements.

15                   Is that again because he's not looking at

16    the right place, he doesn't have the records to show

17    the trades?

18                    MR. SHEEHAN:  Object.

19                    THE WITNESS:  Yes.

20    BY MS. CHAITMAN:

21         Q.    Okay.  Now, on page 37 Mr. Dubinsky is

22    saying that the transactions reported on the

23    Avellino & Bienes' statements were -- were not

24    possible because of the volume in the market.

25                   Did you make up the trades for the

Page 177

1    Avellino & Bienes' clients, or were those actual

2    trades?

3        A.    You talk -- what period of time are you

4    talking about?

5        Q.    Well, the Avellino & Bienes' clients during

6    the 1980s on the convertible --

7        A.    Right.

8        Q.    -- arbitrage, were those actual trades or

9    were those made-up trades?

10       A.    Those were actual trades.

11       Q.    Okay.  If you look on page 38.

12       A.    Uh-huh.  All right.

13       Q.    Mr. Dubinsky opines that the -- the purchase

14   prices of the convertible securities did not represent

15   market prices?

16       A.    Right.

17       Q.    I think you've spoken to this, but can you

18   just briefly summarize your position on this.

19       A.    He's -- he -- he's -- he's referencing the

20   New York Stock Exchange bonds, and none of these

21   trades would have -- you know, were executed on the

22   New York Stock Exchange.

23       Q.    Okay.  Would it be possible for someone to

24   actually check the prices?  Are there records that

25   exist or that even existed as of 2008 which would have

Page 178

1    shown what the trade prices were on the

2    over-the-counter market in the 1980s?

3        A.    Would there be --

4        Q.    Is there anyplace that one could have looked

5    for that?

6        A.    On a -- if it was a convertible bond?

7        Q.    Yes.

8        A.    Probably not, because -- well, certainly you

9    wouldn't reference the New York Stock Exchange.  The

10   trade didn't take place on that.  As to -- there

11   were --

12           It depends upon -- I'm not sure when -- when

13   there was any records kept as to over-the-counter bond

14   transactions.  That was always sort of a sketchy area.

15           There was confusion in the industry whether

16   bonds that trades -- the bonds that were traded over

17   the counter were reported or not reported.  The -- I'm

18   not sure about what date that was.

19           And, then again, it depended upon how they

20   were reported, because if the bonds were done after

21   hours, they wouldn't be reported to any facility.

22           Sometimes you would have to call up the --

23   for awhile the NASD put a system in where you would

24   call them up and report them over the phone, you know,

25   after the close of the day, but there was always sort

Page 179

1    of confusion about that.

2         Q.    Did the trustee or any attorney working for

3    the trustee ever ask you whether you purchased the

4    convertible bonds --

5         A.    Not to my recollection.

6         Q.    -- through the New York Stock Exchange?

7         A.    No.

8         Q.    Did they ever ask you anything about how you

9    acquired the bonds?

10        A.    I don't think so.

11        Q.    Did they ever talk to you about how the

12   bonds were priced?

13        A.    No.

14        Q.    Now, on page 40 Mr. Dubinsky states at the

15   top of the page that, "Convertible securities were

16   purportedly traded by the IA business even after they

17   were called for conversion."

18        A.    Correct.

19        Q.    Do you have any comment on that conclusion?

20        A.    No, because, you know, I don't -- I don't

21   remember this particular trade.  You know, I wouldn't

22   have -- it was so long ago that I wouldn't have

23   record.

24             And, again, I'm not sure that you -- I'm not

25   sure of whether or not you are able to trade a bond

Page 180

1    after the fact that it was converted, called for

2    conversion.  I mean, you weren't forced to convert, to

3    my knowledge.

4        Q.    Okay.  Well, he only gives one example, and

5    it's McMillan.  And he writes in paragraph 100, "The

6    IA business purportedly closed out its position on

7    March 14th, 1985.  However, this" -- "the subordinated

8    debentures were converted into 1.6 million shares of

9    common stock in January 1985."

10       A.    He said it was -- it was -- it was -- what?

11   It was converted -- it was --

12       Q.    Look at paragraph 100.

13       A.    Uh-huh.  Is he saying they were called or

14   converted?

15       Q.    He's saying that the subordinated debentures

16   were converted.

17       A.    Oh, he's saying called, I think.  He said

18   they were -- they were called.  Right.  He -- he --

19   what he's pointing out to is these bonds were -- were

20   called, but it was closed out on the customer account

21   in March.

22             Now, that, to me, looks like that this bond

23   was -- was -- was unwound or swapped, and it may have

24   not been closed out.  And the customer -- looking at

25   the customer account, it just says, "Received and

```
                                            Page 181

 1    delivered."

 2              It doesn't say converted, which -- which is

 3    the way it would always appear, because when we

 4    were -- it means that we were unwinding the customer

 5    position from -- into the firm's trading account.  It

 6    was an internalized trade.

 7              So, as far as -- you know, they may have

 8    called the bonds, you know, then, but he was -- but he

 9    was basically pointing out that we would have had to

10    physically convert it, you know, transfers, if, in

11    fact -- you know, obviously, you couldn't physically

12    convert it after the bond was called, because --

13        Q.    Right.

14        A.    -- they wouldn't do that.

15        Q.    Right.

16        A.    So that -- that points out to me that that

17    was a trade that was unwound internally.  That we were

18    just closing out the trade and the customer account

19    transaction.

20        Q.    Okay.

21        A.    It wasn't a bond that was issued to me.  You

22    know, it wasn't -- wasn't turned into the company

23    itself.

24        Q.    Okay.

25        A.    Like a conversion.
```

Page 182

1      Q.     Okay.  In the heading above paragraph 101,

2   he wrote, "The IA business did not account for

3   dividend payments or accrued interest on the

4   convertible securities."

5      A.     Uh-huh.

6      Q.     "Thereby evidencing the fictitious" --

7   "fictitious nature of the underlying transactions."

8      A.     It depends upon whether the bond -- you

9   know, there are instances where a bond is -- is

10  bought, you know, what they call traded flat.  It

11  means traded without -- without interest.

12          It's like that with dividends also.  You can

13  trade a stock flat X dividend.  You buy it at a lower

14  price, because you're buying it without the dividend.

15          It's -- it's a transaction that you would --

16  you know, typically it would be done between dealers

17  and professionals, not for the average customer,

18  because these -- these instruments are bought to

19  trade.

20          They're not interested -- they're not bought

21  as an investment purpose to be held, which is the

22  way -- you know, which is -- if you were doing that as

23  typically an investment type of account, then,

24  obviously, you would want to, you know, get the

25  dividend for income and so on and so forth.

Page 183

1           But professionals will trade what they call

2      flat -- or just like you could buy a zero coupon bond.

3      Most customers don't buy zero coupon bonds, but -- but

4      dealers, traders, like ourselves, typically will

5      trade, you know -- you know, zero coupon bonds are

6      flat, because what you're really doing is you're

7      not --

8           The idea of the trade is not to cash the

9      dividend or the interest, but basically to use the

10     instrument as a trading vehicle, but you -- when you

11     do that, obviously, you account for the dividend in

12     the price of the stock.

13          So you're -- you adjust the price of the

14     stock to the client based upon the fact that you're

15     not getting a dividend.

16     Q.    So --

17     A.    And, also, one of the things Dubinsky

18     doesn't seem to account for is that brokerage firms

19     trade what they call due bills.

20          In other words, most -- when you buy stock

21     frequently, you're not getting the -- the dividend

22     from the company, because you're buying the stock --

23     it's coming -- it's being transacted in what's known

24     as street name, which is -- it's not in -- registered

25     in -- in the client's name and so on.

Page 184

1          So you -- a lot of times -- very frequently

2     you'll buy stock from a customer that pays a dividend

3     or declared a dividend, and you won't get the

4     dividend.  The company is going to pay the dividend to

5     whoever the stock's name is registered in.

6          And most stocks are not registered in

7     clients' names anymore.  They're -- they're registered

8     in a street name.  So the brokerage firms will issue

9     due bills to each other to get the monies, and then

10    you just journal it into a client account.

11         He doesn't go into any of that, which is --

12    I can understand, you know.  I'm not faulting him for

13    that.  It's not that the customer didn't -- didn't get

14    the price.

15         So our customer -- if they weren't getting

16    the dividend, they were -- they were getting a lower

17    price on the stock, you know, to account for that,

18    because the firm is going to get the dividend.

19         So you have to make the customer whole some

20    way.  When you're internalizing trades as principal,

21    that's a common way of doing business.

22    Q.    Did Mr. Dubinsky ever talk to you?

23    A.    No.  I never knew he existed until I saw the

24    report.

25    Q.    Okay.  Did anyone from the trustee's side,

Page 185

1    any expert, ever question you about any of the --

2        A.    To my recollection --

3        Q.    Let me just finish the question.

4              -- any of the convertible arbitrage trade?

5        A.    No.  I never had any conversation with the

6    trustees regarding any of this trading, other than

7    when they came down here to speak to me, but I don't

8    think they ever really got into -- into the trading.

9        Q.    Okay.  Mr. Dubinsky reaches the conclusion

10   on page 41, just above paragraph 105, that there's no

11   evidence that the IA business converted the

12   convertible securities into common shares; do you see

13   that?

14       A.    Yeah.

15       Q.    And then he says, "Companies that have

16   publicly-traded securities typically use third-party

17   institutions, known as transfer agents, to keep track

18   of the individuals and entities that own their stocks

19   and bonds."

20             "Most transfer agents are banks or trust

21   companies.  Although, companies sometimes act as its

22   own transfer agent.  The transfer agent maintains

23   records of the shareholder information."

24             And then in paragraph 109, he says, "In

25   order to have converted preferred convertible stock

Page 186

1    and convertible debt into common stock, the IA

2    business would have needed documentation regarding the

3    conversion of the securities."

4         A.    Uh-huh.

5         Q.    Now, did you have that documentation, or did

6    you --

7         A.    No.  As I stated earlier, if -- if we

8    converted -- when we converted stock, we typically

9    would have one of our clearing facilities convert the

10   stock.

11             Meaning, Commercial Bank of North America,

12   Bankers Trust, Irving, any one of those people.

13   Marine Midland that -- that provided that facility for

14   us.

15             So we would not, except under rare

16   occasions, physically convert the stock ourselves.

17   Doesn't mean the stock wasn't converted.

18        Q.    Okay.

19        A.    And, as far as him relating to the transfer

20   agents, the stock trades in street name.  So --

21   meaning it's -- it's traded as a negotiable

22   instrument.  It's not -- it's very rarely put in a

23   customer's name, unless the customer is going to

24   request delivery of the securities.

25             So if a customer wants to hold the

Page 187

1    securities themselves, which now doesn't exist -- as a

2    matter of fact, they're eventually going to -- that's

3    never going to happen, because nobody wants to go

4    through transfer agents.

5             So I don't even know why that's in the

6    report, because very few brokerage firms put stock in

7    a customer's name.  Customers don't want to hold it.

8             If the brokerage firm is holding their

9    security, they always -- they never hold it in a

10   customer's name.  They hold it in -- in the street

11   name.  And the dividends don't -- do not go to the

12   customer directly from the -- from the company --

13        Q.    Right.

14        A.    -- transfers.  They get paid to the broker,

15   and then the broker would make the customer whole.

16        Q.    And that would have been true for the 1980s?

17        A.    Yes.

18        Q.    Okay.  Now, in paragraph 115 Dubinsky wrote,

19   "Trade confirmations fabricated by the IA business to

20   support the convertible arbitrage trades were actually

21   prepared backwards, as though BLMIS was trading as a

22   principal, rather than an agent."

23        A.    Oh, that's true.  I mean, we always trade as

24   principal, as I said before.  Doesn't mean they were

25   created backwards.

Page 188

1      Q.    Right.

2      A.    I mean, it says right on the customer

3  confirmation that we're trading as principal.

4      Q.    Right.

5      A.    And that's not -- that has nothing to do

6  with whether you're trading it backwards or not.

7      Q.    Right.

8      A.    He's almost insinuating that -- from that

9  statement that trading as a principal, there was

10  something wrong with it.  That would be great news to

11  the industry.

12      Q.    I want to just interject some questions on

13  another subject.  Can you describe for us what kinds

14  of trading you did with Bear Stearns?

15      A.    Mostly market-making, proprietary trading or

16  for Bear Stearns' customers.  There's -- our trades

17  with Bear Stearns were typical of what we traded with

18  everybody.

19          It was -- we were trading basically for Bear

20  Stearns' own account or for their customers' accounts.

21  If Bear Stearns got -- wanted to buy and sell stock

22  for -- for one of their clients, they had to go to a

23  market-maker, like myself, unless Bear Stearns traded

24  the stock himself.  Then he would internalize the

25  stock himself, just as I'm doing.

                                                      Page 189

1        Q.    Okay.  So Bear -- but Bear Stearns was a
2    market-maker; right?
3        A.    Some -- in some of the securities.  Yeah.
4        Q.    Okay.  And they were doing convertible bond
5    trades in the 1980s?
6        A.    Yes.
7        Q.    Okay.  So why would they need you?
8        A.    Well, because they may have not been making
9    a market in the convertible bond that we were making
10   the market in.  In other words, they -- you know,
11   there are times when we were a market-maker in a
12   convertible bond, and we bought it from somebody else
13   as well.
14            If -- if we didn't -- if we didn't have the
15   stock in inventory, and we didn't want to short it to
16   a client, we might go to Bear Stearns, and they might
17   do the same thing to us.
18            But Bear Stearns was a competitor at times,
19   and they were not a competitor, you know, at times.
20   But Bear Stearns was -- was one of our big clients.
21       Q.    Did they buy securities for you and hold --
22   and hold those securities?
23       A.    Did Bear Stearns?  We had accounts at Bear
24   Stearns.  Yes.
25       Q.    So there would have been times when you

Page 190

1    purchased securities through them, and they would hold
2    those securities?
3        A.    Bear Stearns?
4        Q.    Yeah.
5        A.    Probably not.  You know, usually they would,
6    you know -- it depends upon what -- what kind of stock
7    it was and whether it was a stock that went through
8    the clearinghouse or not.
9        Q.    Or convertible bonds, would they sometimes
10   be holding some of your inventory?
11       A.    No.  They wouldn't typically be holding
12   convertible bonds for us.
13       Q.    Would you be holding convertible bonds for
14   them?
15       A.    Probably not.
16       Q.    Okay.  I'd -- I'd like to look at pages 48
17   and 49 of the report.
18       A.    Uh-huh.
19       Q.    This is -- in paragraph 117, if you can just
20   read it to yourself, and then I'll ask you some
21   questions.
22       A.    This -- this was an example that I pointed
23   to earlier where he fails to understand he's reading
24   the confirmations wrong.  He's reversing -- he's
25   confusing the we -- we to -- to you.

Page 191

1          Q.    Okay.   Okay.   And he's -- he's concluding

2     that this is -- this is evidence of your fraud; right?

3          A.    Yeah.   He's -- right.   I mean, it's --

4     clearly he's -- he's not understanding that when we

5     say, "We bought," it's we bought from the customer or

6     we sold to the customer.

7               Not as he's -- so he's saying that if we --

8     if we wrote the confirmation wrong, the trade never

9     could have taken place, because he's -- he's not

10    reading it properly.

11         Q.    Right.   Can you describe for us the kinds of

12    transactions you did for Carl Shapiro's various

13    accounts that you felt uncomfortable about doing?

14                    MR. SHEEHAN:   Object.

15                    THE WITNESS:   Okay.   Well, I -- it

16         would be easier for me to explain the strategies

17         that I initiated for the big four accounts, which

18         Carl Shapiro would be included in that.

19                    The -- we have to go back to -- this is

20         going to take a little bit of time.   How much

21         time do we have?

22                    MR. SHEEHAN:   The rest of the

23         afternoon.

24                    THE WITNESS:   Oh, okay.   That's fine

25         with me.   Unfortunately, I have nowhere to go.

Page 226

1    STATE OF NORTH CAROLINA

2    COUNTY OF PERSON

3

4                    CERTIFICATE OF TRANSCRIPT

5

6            I, Lisa A. DeGroat, a Court Reporter and

7    Notary Public in and for the aforesaid county and

8    state, do hereby certify that the foregoing deposition

9    of BERNARD L. MADOFF, was taken by me and reduced to

10   typewriting under my direction; and the transcript is

11   a true record of the testimony given by the witness.

12           I further certify that I am neither attorney

13   or counsel for, nor related to or employed by any

14   attorney or counsel employed by the parties hereto or

15   financially interested in the action.

16           This the 3rd day of January, 2017.

17

18

19

20

21

22   LISA A. DeGROAT

     Registered Professional Reporter

23   Notary Public #19952760001

     Expiration Date:  December 8, 2020

24   1-888-656-DEPO

25