**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA Liquidation<br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | Adv. Pro. No. 09-01239 (CGM) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br>FAIRFIELD INVESTMENT FUND LIMITED, STABLE FUND, FAIRFIELD GREENWICH LIMITED, FAIRFIELD GREENWICH (BERMUDA), LTD., FAIRFIELD GREENWICH ADVISORS LLC, FAIRFIELD INTERNATIONAL MANAGERS, INC., WALTER NOEL, JEFFREY TUCKER, ANDRES PIEDRAHITA, AMIT VIJAYVERGIYA, PHILIP TOUB, CORINA NOEL PIEDRAHITA, FAIRFIELD GREENWICH CAPITAL PARTNERS and SHARE MANAGEMENT LLC,<br><br>    Defendants. | **TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

LEGAL STANDARD APPLIED TO MOTION TO DISMISS........................................6

ARGUMENT ...................................................................................................................7

I.   THE FGG'S PARTNERS' AND AGENTS' KNOWLEDGE IS IMPUTED TO
     DEFENDANTS AND THE FAIRFIELD FUNDS ...........................................7

     A.   The Individual Defendants Were FGG Partners .......................................7

     B.   Each FGG Partner's Knowledge Is Imputed To All Other Partners, The
          FGG Entity Defendants, And The Fairfield Funds ...................................8

     C.   The Trustee's First Amended Complaint Does Not Contradict The SAC's
          Allegation That FGG Operated As A *De Facto* Partnership ................10

II.  THE TRUSTEE ALLEGES DEFENDANTS' KNOWLEDGE OF MADOFF'S
     FRAUD WITH SUFFICIENT PARTICULARITY ..........................................11

III. THE TRUSTEE'S ALLEGATIONS SUPPORT A FINDING OF
     DEFENDANTS' ACTUAL KNOWLEDGE OF MADOFF'S FRAUD, OR AT A
     MINIMUM, WILLFUL BLINDNESS TO THE FRAUD ...............................14

     A.   The FGG Partners Conspired With Madoff To Mislead The SEC .......15

     B.   The FGG Partners Were Uncommonly Close To The Otherwise Private
          Madoff....................................................................................................17

     C.   The SAC Alleges That FGG Received Numerous Warnings Of BLMIS's
          Fraud ......................................................................................................18

     D.   FGG Ignored BLMIS's Impossible Performance ..................................20

     E.   The FGG Partners Failed To Conduct Meaningful Due Diligence .......21

IV.  DEFENDANTS ASSERT DEFENSES THAT ARE UNAVAILING............22

     A.   Defendants Cannot Prove A Value Defense At The Pleading Stage....22

     B.   Defendants Cannot Take Advantage of the Safe Harbor Defense.........23

     C.   Defendants' Loss Of Their Own Investment Is Irrelevant....................24

V.      SECTION 546(e) DOES NOT PROTECT FGL AND FGBL FROM GENERAL
        PARTNER LIABILITY FOR THE DEBTS OF THEIR PARTNERSHIPS ....................26

VI.     CLAIMS TO RECOVER ADDITIONAL TRANSFERS TO FIFL AND
        STABLE FUND RELATE BACK TO THE RECOVERY CLAIMS IN THE FAC
        ........................................................................................................................28

        A.      The Additional Transfers Occurred As Part Of The Same Course Of
                Conduct As Transfers Alleged In The FAC ..........................................29

        B.      The FAC Provided Notice To Defendants That The Trustee Would Sue
                For Additional Transfers That Were Part Of The Same Course Of Conduct ........30

        C.      The Cases Defendants Rely Upon Do Not Bar Recovery Of The
                Additional Transfers ...........................................................................30

VII.    THE COURT HAS ALREADY FOUND THE SAME ALLEGATIONS
        SUFFICIENT TO EXERCISE PERSONAL JURISDICTION OVER BOTH
        PIEDRAHITA AND VIJAYVERGIYA ...........................................................32

        A.      The SAC Establishes A *Prima Facie* Case Of Specific Jurisdiction Over
                Piedrahita ...........................................................................................33

        B.      The SAC Establishes A *Prima Facie* Case Of Specific Jurisdiction Over
                Vijayvergiya .......................................................................................33

        C.      Jurisdictional Discovery Should Be Permitted, If Necessary ................34

VIII.   THE TRUSTEE SHOULD BE ALLOWED TO REPLEAD IF THE COURT
        GRANTS DEFENDANTS' MOTION TO DISMISS ......................................34

CONCLUSION ...................................................................................................35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)..................................................................................10

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
  624 F. Supp. 2d 292 (S.D.N.Y. 2009).............................................................. *passim*

*Anwar v. Fairfield Greenwich Ltd.*,
  728 F. Supp. 2d 372 (S.D.N.Y. 2010).............................................................. *passim*

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................6, 22

*Baker v. Latham Sparrowbush Assocs.*,
  72 F.3d 246 (2d Cir. 1995)................................................................................9

*Baumann v. Citizens Tr. Co. of Binghamton*,
  289 N.Y.S. 606 (3d Dep't. 1936), *modified on other grounds*, 293 N.Y.S. 45
  (3d Dept. 1937), *aff'd* 276 N.Y. 623 (1938) ..........................................................8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................6

*Bernadotte v. New York Hosp. Med. Ctr. of Queens*,
  No. 13-CV-965 (MKB), 2014 WL 808013 (E.D.N.Y. Feb. 28, 2014)....................10

*In re Boston Generating LLC*,
  617 B.R. 442 (Bankr. S.D.N.Y. 2020) ................................................................27

*In re Chaus Sec. Litig.*,
  801 F. Supp. 1257 (S.D.N.Y. 1992)....................................................................29

*Christian v. TransPerfect Glob., Inc.*,
  No. 17-cv-5554 (PKC), 2018 WL 4571674 (S.D.N.Y. Sept. 24, 2018)..................10

*Cohen v. S.A.C. Trading Corp.*,
  711 F.3d 353 (2d Cir. 2013)...............................................................................6

*Colliton v. Cravath, Swaine & Moore, L.L.P.*,
  No. 08-CV-0040 (NRB), 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008)...............11

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010)...............................................................................6

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
    822 F.2d 1242 (2d Cir. 1987)............................................................12

*Fish v. GreatBanc Tr. Co.*,
    749 F.3d 671 (7th Cir. 2014) .........................................................15

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011)........................................................................15

*Growblox Scis., Inc. v. GCM Admin. Servs., LLC*,
    No. 14 Civ. 2280 (ER), 2016 WL 1275050 (S.D.N.Y. Mar. 31, 2016)....................................8

*In re Hellas Telecommc'ns. (Luxembourg) II (SCA)*,
    524 B.R. 488 (Bankr. S.D.N.Y. 2015).............................................12

*Hill v. Oria (In re Juliet Homes, LP)*,
    Adv. No. 09-03429, 2011 WL 6817928 (Bankr. S.D. Tex. Dec. 28, 2011) .....................29, 30

*Kermanshah v. Kermanshah*,
    580 F. Supp. 2d 247 (S.D.N.Y. 2008)..............................................6

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020)...............................................................6

*Mallis v. Bankers Tr. Co.*,
    717 F.2d 683 (2d Cir. 1983).............................................................8

*Metzeler v. Bouchard Transp. Co., Inc. (In re Metzeler)*,
    66 B.R. 977 (Bankr. S.D.N.Y. 1986)..........................................30, 31

*In re Nine West LBO Sec. Litig.*,
    20 MD 2941(JSR) 2020 WL 5049621 (S.D.N.Y. Aug. 27, 2020) .........................................27

*Off. Comm. of Unsecured Creditors 360Networks (USA) Inc v. Pirelli Commc'ns Cables & Sys. USA LLC (In re 360Networks (USA) Inc.)*,
    367 B.R. 428 (Bankr. S.D.N.Y. 2007).........................................30, 31

*Off. Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
    322 F.3d 147 (2d Cir. 2003).............................................................22

*Ogier v. UPAC Ins. Fin. (In re Bauer Agency, Inc.)*,
    443 B.R. 918 (Bankr. N.D. Ga. 2011) .............................................30

*Pasternack v. Shrader*,
    863 F.3d 162 (2d Cir. 2017)............................................................34

*Pereira v. Hong Kong & Shanghai Banking Corp. (In re Kam Kuo Seafood Corp.)*,
 67 B.R. 304 (Bankr. S.D.N.Y. 1986).......................................................................30

*Picard v. BNP Paribas S.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,
 594 B.R. 167 (Bankr. S.D.N.Y. 2018)............................................................. *passim*

*Picard v. Ceretti (In re Bernard L. Madoff Inv. Sec. LLC)*,
 Adv. Pro. Nos. 08-01789 (SMB), 09-01161 (SMB), 2015 WL 4734749
 (Bankr. S.D.N.Y. Aug. 11, 2015) ..........................................................9, 14, 24, 25

*Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,
 454 B.R. 317 (Bankr. S.D.N.Y. 2011)......................................................................23

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
 Case No. 10-13164 (CGM), Adv. Pro. No. 10-03800 (CGM), 2021 WL
 1153005 (Bankr. S.D.N.Y. Mar. 25, 2021)...................................................... *passim*

*Picard v. Greiff*,
 476 B.R. 715 (S.D.N.Y. 2012)..................................................................................23

*Picard v. JABA Assoc.*,
 10 cv. 3836, 2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021) ....................................27

*Picard v. Katz*,
 462 B.R. 447 (S.D.N.Y. 2011)..........................................................14, 15, 22, 24

*Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
 548 B.R. 13 (Bankr. S.D.N.Y. 2016)..............................................................11, 14

*Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*,
 468 B.R. 620 (Bankr. S.D.N.Y. 2012)..............................................28, 29, 30, 31

*Picard v. Magnify, Inc. (In re Bernard L. Madoff Inv. Sec. LLC)*,
 583 B.R. 829 (Bankr. S.D.N.Y. 2018)......................................................................14

*Picard v. Merkin*,
 515 B.R. 117 (Bankr. S.D.N.Y. 2014)..................................................15, 22, 25

*Picard v. Merkin (In re Bernard L. Madoff Inv. Securities, LLC)*,
 440 B.R. 243 (Bankr. S.D.N.Y. 2010)......................................................................27

*In re S. Afr. Apartheid Litig.*,
 643 F. Supp. 2d 423 (S.D.N.Y. 2009).......................................................................34

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
 No. 12 MC. 115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) .......................23, 24

*Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*,
    234 B.R. 293 (Bankr. S.D.N.Y. 1999) ................................................................12

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    563 B.R. 737 (Bankr. S.D.N.Y. 2017) ..............................................................27

*Shubert v. Stranahan (In re Penn. Gear Corp.)*,
    Adv. Nos. 03-940, et al., 2008 WL 2370169 (Bankr. E.D. Pa. Apr. 22, 2008) ......................27

*Siegel v. Converters Transp., Inc.*,
    714 F.2d 213 (2d Cir. 1983) ........................................................................28, 32

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
    379 B.R. 5 (Bankr. E.D.N.Y. 2007) ..................................................................29

*Taylor v. Vermont Dep't of Educ.*,
    313 F.3d 768 (2d Cir. 2002) ..............................................................................6

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    946 F.3d 66 (2d Cir. 2019) ..............................................................................27

*West Run Student Housing Assocs., LLC v. Huntington Nat'l Bank*,
    712 F.3d 165 (3d Cir. 2013) ............................................................................10

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000) ..............................................................................12

**Statutes**

11 U.S.C. § 544 ................................................................................................26

11 U.S.C. § 546(e) ................................................................................ *passim*

11 U.S.C. § 548(a)(1)(A) ....................................................................................23

11 U.S.C. § 550 ................................................................................................27

11 U.S.C. § 550(a) ....................................................................................11, 27

11 U.S.C. § 550(b) ....................................................................................13, 14

11 U.S.C. § 550(b)(1) ......................................................................................22

**Rules**

Fed. R. Bankr. P. 7012 ........................................................................................6

Fed. R. Bankr. P. 7015 ................................................................................28, 32

Fed. R. Civ. P. 8(a) .............................................................................................11, 13

Fed. R. Civ. P. 8(a)(2) .................................................................................................6

Fed. R. Civ. P. 9(b) ..........................................................................................11, 12, 13

Fed. R. Civ. P. 12(b)(6) ...............................................................................................6

Fed. R. Civ. P. 15 ................................................................................................28, 32

Fed. R. Civ. P. 15(a) ..................................................................................................28

Fed. R. Civ. P. 15(c) ..................................................................................................29

Fed. R. Civ. P. 15(c)(1)(B) ........................................................................................28

**Other Authorities**

N.Y. Debt. & Cred. Law .............................................................................................26

N.Y. P'ship Law § 23 ...................................................................................................8

## PRELIMINARY STATEMENT

On March 25, 2021, in *Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
Case No. 10-13164 (CGM), Adv. Pro. No. 10-03800 (CGM), 2021 WL 1153005 (Bankr.
S.D.N.Y. Mar. 25, 2021)[1]—a case predicated upon substantially the same allegations of the
defendants' knowledge of Madoff's Ponzi scheme as those pleaded here—this Court found the
Trustee allegations sufficient to survive a motion to dismiss. Defendants refuse to acknowledge
the import of the *Assigned Claims Decision*. Although Defendants were offered the chance to
stipulate to the findings in the *Assigned Claims Decision*, to narrow the issues and promote
judicial economy in this avoidance action, they stubbornly adhere to their arguments that the
facts as alleged in the Trustee's Second Amended Complaint[2] fail to establish that FGG is a *de
facto* partnership and this Court has specific jurisdiction over Amit Vijayvergiya and Andres
Piedrahita.

Here, the SAC similarly details Defendants' almost two decades long relationship with
Madoff and their knowing participation in Madoff's fraudulent scheme. The SAC alleges that
FGG—including its in-house legal counsel and one of its founders, himself a former SEC
attorney—plotted with Madoff to mislead the SEC. *Anwar v. Fairfield Greenwich Ltd.*, 728 F.
Supp. 2d 372 (S.D.N.Y. 2010) covered much of the same ground. In that case, on a motion to
dismiss considering allegations less thorough than those pleaded here, Judge Marrero noted that
the complaint sufficiently alleged the FGG defendants "engaged in deliberately illegal behavior
by attempting to stymie a [SEC] investigation into Madoff's operation." *Id.* at 408. Yet

---

[1] Hereinafter referred to as the "*Assigned Claims Decision*," and the action in which it was rendered, the "*Assigned Claims Action*.*"

[2] Hereinafter referred to as "SAC." References to other terms not defined herein have the same meaning as in the SAC.

Defendants continue to portray themselves as victims of Madoff's fraud and to profess their good faith.

The SAC alleges Defendants' contemporaneous awareness of many indicia of Madoff's fraud. Madoff's strategy was predicated upon establishing options "collars," which would have necessitated BLMIS's buying and selling vast numbers of options contracts. But as the SAC alleges, Defendants knew for decades the numbers were impossible: the volume of options contracts Madoff purported to trade for FGG exceeded the volume of comparable options traded on the Chicago Board Options Exchange (the "CBOE"), the market on which Madoff purported to trade. Madoff did not trade the securities he claimed, and FGG knew it. The Trustee alleges FGG's understanding of those facts. In the early 1990s, FGG engaged consultant Gil Berman to verify the accuracy of BLMIS's purported trades, Berman raised with FGG the impossibility of Madoff's claims about options trading. Additionally, the Trustee details customers approaching FGG with concerns about this issue in the early 2000s. And it alleges the extrapolations FGG's chief risk officer, Vijayveriya, made upon the data, which confirmed in stark terms that Madoff's claims about options trading could not be true. Instead of confronting the issue, the individual Defendants agreed to suppress investor concerns, adopting Madoff's lie that he traded options over-the-counter even though the bogus trade confirmations showed only trading on the CBOE. This kind of conduct was not unusual for Defendants. As the SAC demonstrates, they made it their practice to dismiss any concerns that would inhibit their ability to profit from Madoff.

In 2001, articles in MAR/Hedge and Barron's questioned Madoff's legitimacy and scrutinized the remarkable returns of FGG, Madoff's biggest feeder fund. After these articles were published, FGG strategized with Madoff about how to respond to keep unnerved customers

in the fold.  As the SAC alleges, Jeffrey Tucker, Piedrahita, and Walter Noel signed a letter to

FGG's investors, attesting to the "uncommonly high degree of transparency" at BLMIS—a

blatant lie—and, touting FGG's due diligence practices.  The letter claimed that FGG confirmed

all of Madoff's trades—another lie.  Indeed, FGG billed itself as a sophisticated risk monitoring

outfit, priding itself on its due diligence.  In reality, FGG was anything but.

The SAC presents a legion of facts alleging instances of FGG partners stretching facts

and misdirecting or lying to clients to protect BLMIS.  FGG took the collapse of the Bayou

Hedge Fund Group as an opportunity to claim that its due diligence practices would have

detected Bayou's fraud and protected its investors.  As the SAC alleges, Defendants explained

that they would have recognized red flags such as Bayou's dual roles as custodian and broker

and its use of an unknown auditor.  Yet, as the SAC details, Citco (the Fairfield Funds'

custodian) raised with FGG the very same concerns about BLMIS and FGG chose not to

act.  Likewise, the SAC contains numerous allegations concerning FGG's clients raising similar

issues.  FGG's invariable response: to tamp down the concerns with misdirection or

dishonesty.  When an FGG investor raised concerns about Madoff's strip-mall auditor, FGG

falsely stated that PwC audited Madoff.  Also, an FGG employee wrote to Vijayvergiya with a

knowing laugh: "Does [Bayou's] 'perceived conflict of interest with the two relationships

(brokerage and auditing)' sound familiar?  Hehehe."  Defendants characterize these kinds of

allegations as "boilerplate red flags" visible only in "hindsight."  While the recognition of red

flags surrounding BLMIS may have been commonplace within FGG at the time, they are

anything but "boilerplate" or detectable only by "hindsight."

The *Anwar* court considered similar allegations when assessing whether or not the

plaintiffs established a *prima facie* case of the FGG defendants' scienter.  While less detailed

3

than the Trustee's allegations in this case, the *Anwar* court highlighted allegations that: (i) the

FGG defendants had access to information "that contradicted their public statements and that

they failed to check information they had a duty to monitor;" (ii) the FGG defendants knew they

had never heard of Friehling & Horowitz and "did next to nothing to learn more about it;" (iii)

Madoff's returns had such an "uncanny consistency and outsize implausibility that the slightest

analysis of them would have revealed they were impossible;" (iv) FGG's clients raised concerns

repeatedly, as indicia of the scam appeared on Madoff's trade confirmations; and (v) the trade

confirmations "were often fraudulent on their face because they purported to show transactions

outside of the actual trading range and trades completed on days when the markets were closed."

*Anwar*, 728 F. Supp. 2d at 408.[3]

 The SAC further alleges that Defendants misled a variety of existing and potential clients,

rating agencies and others, all to support Madoff, whom Defendants affectionately referred to as

"Uncle Bernie."  In fact, as the SAC explains, FGG even set up a foreign fund manager (FG

Bermuda) to help Madoff avoid regulatory scrutiny.  Not surprisingly, when investors inquired

whether this was to shield Madoff from SEC scrutiny, Defendants did what they did best:

concoct lies to protect Madoff, this time by spinning the creation of the "Bermuda thing" as

required for tax reasons.

 The SAC details how the FGG defendants used BLMIS to create generational wealth for

themselves.  Judge Marrero considered similar allegations in *Anwar*, that the FGG defendants

"raked in origination fees" collecting "hundreds of millions of dollars for … shoveling money

---

[3] Defendants FIFL, Stable Fund, Fairfield International Managers, FG Capital, and Share Management were not
named in *Anwar*, and were not considered in the ruling in that action.  *See Anwar*, 728 F. Supp. 2d at 404.  FIFL,
Stable Fund, FG Capital, and Share Management are not defendants in the *Assigned Claims Action* and were not
considered in the *Assigned Claims Decision*.  The SAC alleges that all of these defendants are part of the same FGG
enterprise.  SAC ¶ 131.

into Madoff's scheme." *Id.* at 407. The Trustee alleges in the SAC that in just the five years before Madoff's collapse, the FGG Defendants made over $500 million. BLMIS was FGG's cash cow for almost two decades and despite repeated instances of crystal-clear information that BLMIS was a fraud, FGG and its partners repeatedly ignored that information and helped perpetuate the fraud, embracing the opportunity to obtain unfathomable wealth.

Finally, the Trustee has sufficiently pleaded plausible allegations that Defendant partners were a *de facto* partnership, having held themselves out for decades as a partnership. Both this Court and the *Anwar* court found that the facts alleged—detailing "a rather lengthy story of familial relations knowingly cashing in on a fraudulent scheme orchestrated by Madoff"—were sufficient to maintain a claim that FGG was a *de facto* partnership. *Assigned Claims Decision*, at *11; *see also Anwar*, 728 F. Supp. 2d at 404.

Regularly and repeatedly lying to regulators, rating agencies, and investors is not acting in good faith. Rather, doing so while being in possession of information revealing Madoff's fraud, and joking about it, shows something else altogether. The totality of the allegations in the SAC leads to the conclusion that not only did FGG know that BLMIS was a fraud, but that FGG, its founders, and partners worked diligently to perpetuate the scam. FGG was incentivized to ignore the numerous flaws and impossibilities associated with BLMIS by the prospect of hundreds of millions of dollars it could pocket for doing nothing. This Court should again reject Defendants' stubborn adherence that the factual allegations made by the Trustee fail to adequately plead their knowledge of Madoff's fraud and their lack of good faith. The Trustee has sufficiently pleaded plausible allegations of Defendants' actual knowledge of and/or willful blindness to the fraud at BLMIS. The test is plausibility and the Trustee, under the facts here, has overwhelmingly met that standard.

Defendants' Motion should be denied. [4]

## **LEGAL STANDARD APPLIED TO MOTION TO DISMISS**

To withstand a motion to dismiss under Rule 12(b)(6),[5] a complaint must contain a "short

and plain statement of the claim showing that the pleader is entitled to relief" that is "plausible

on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (quoting Fed. R. Civ. P.

8(a)(2)); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court's task is to consider the

allegations as a whole in context, *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 360 (2d Cir.

2013), and "not to assess the weight of the evidence" or identify the most plausible inference.

*Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "On a motion to dismiss, the issue is

not whether the plaintiff will prevail, but whether the plaintiff may present evidence to support

the claims. The Court must construe the factual allegations in the complaint liberally in favor of

the plaintiff." *Assigned Claims Decision*, at *3 (citation omitted).

Also, on a motion to dismiss, the court "is generally limited to . . . the four corners of the

complaint," "documents attached to the complaint," and "documents incorporated . . . by

reference." *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002); *see also*

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111–13 (2d Cir. 2010). Courts in this circuit

consider prior pleadings only where the later pleading "blatantly" and "directly contradicts" the

prior pleading. *See, e.g., Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 266 (S.D.N.Y.

2008).

---

[4] *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Second Amended Complaint, ECF No. 305-1 (hereinafter, "Motion at __").

[5] Applicable under Federal Rule of Bankruptcy Procedure 7012.

**ARGUMENT**

I.    **THE FGG'S PARTNERS' AND AGENTS' KNOWLEDGE IS IMPUTED TO DEFENDANTS AND THE FAIRFIELD FUNDS**

In the *Assigned Claims Action*, this Court found, on allegations substantially similar to those in the SAC, that the Trustee plausibly alleged Defendants formed a partnership known as FGG. "Intent to form a 'partnership' in order to earn tremendous profits while hiding behind shell corporations is well pled in the Complaint." *Assigned Claims Decision*, at *11.  This Court also found in that case allegations that Defendants lacked good faith were plausible. "Throughout the Complaint, *FGG and, by extension, all of the Defendants* are alleged to have engaged in various acts of misleading investors, deception, and fraud." *Id.* at 8 (emphasis added).  Unhappy with that result, Defendants seek to re-argue in this action whether FGG is a partnership.[6]  The allegations in the SAC and the *Assigned Claims Action* are substantially the same.  There is no reason for the Court to reach a different conclusion here.

A.    **The Individual Defendants Were FGG Partners**

As in the *Assigned Claims Action*, the Trustee here plausibly alleges a partnership.  First, the FGG partners shared, on a pro rata basis, FGG's profits and losses.  SAC ¶¶ 13, 20, 79, 99, 106, 119, 152.  Second, the FGG partners controlled and managed the FGG business, including the entity Defendants and other FGG affiliate entities.  SAC ¶¶ 11, 79, 101, 104, 105, 110, 114, 116–21, 131, 161–64.[7]  An FGG Executive Committee controlled the day-to-day management.  SAC ¶¶ 101, 107, 114, 173, 207, 303.  In addition, the founding partners—Noel, Tucker, and

---

[6] Counsel for the Trustee asked Defendants' counsel to stipulate to this Court's findings regarding the FGG partnership.  Defendants refused.

[7] *See also* SAC ¶¶ 17, 122, 322 (FIFL); 18, 126, 323 (Stable Fund); 13, 17, 99, 101, 105, 123, 130, 152, 154, 324 (FG Limited); 14, 99, 101, 106, 124, 147, 150, 151, 154, 260, 325 (FG Bermuda); 15, 17, 125, 151, 152, 326 (FG Advisors); 16, 105, 127, 152, 327 (Fairfield International Managers); 19, 128, 328 (FG Capital); 20, 129, 329, 368 (Share Management); 106, 130, 381 (non-party Safehand Investments).

Piedrahita—directed strategy and the other FGG partners acted on those directives to guide

FGG's operations, allocating responsibilities and sharing information within the partnership.

SAC ¶¶ 104, 120, 140, 162, 173.  Third, all FGG partners made pro rata capital contributions to

FGG.  SAC ¶ 119.  And fourth, the FGG partners intended to carry on as co-owners of FGG with

the common goal of earning a profit from investments with BLMIS, SAC ¶¶ 79, 118–19, 131,

and held FGG out as a partnership.  SAC ¶¶ 79, 104, 118.

Defendants are wrong that the Trustee has not adequately pled Defendants' intent to form

a partnership.  Motion at 34.  "Intent of the Defendants to form FGG is clear from the complaint,

which lays out a rather lengthy story of familial relations knowingly cashing in on a fraudulent

scheme orchestrated by Madoff."  *Assigned Claims Decision*, at *11.  Defendants are also wrong

that the SAC must name FGG as a defendant.  *See Growblox Scis., Inc. v. GCM Admin. Servs.,*

*LLC*, No. 14 Civ. 2280 (ER), 2016 WL 1275050, at *8–10 (S.D.N.Y. Mar. 31, 2016) (finding

counterclaims plausibly alleged a partnership not named as a defendant).  Whether or not FGG

was a partnership is an independent question.

### B.    Each FGG Partner's Knowledge Is Imputed To All Other Partners, The FGG Entity Defendants, And The Fairfield Funds

The SAC alleges Defendants were partners of FGG who operated in unison, allocated

responsibilities among each other and acted as agents for each other in perpetuating the FGG

enterprise.  SAC ¶¶ 117, 119, 120, 240.  On the basis of this partnership, the knowledge of each

Defendant regarding the business affairs of the partnership is imputed to the other Defendants.

*See, e.g.*, *Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 689 n.9 (2d Cir. 1983) ("It is a basic tenet of

the law of agency that the knowledge of an agent, or for that matter a partner . . . is imputed to

the principal.");  *see also* N.Y. P'SHIP LAW § 23; *Baumann v. Citizens Tr. Co. of Binghamton*,

289 N.Y.S. 606, 614–15 (3d Dep't. 1936) (holding that the partners' knowledge is chargeable to

the remaining partners), *modified on other grounds*, 293 N.Y.S. 45 (3d Dept. 1937), *aff'd* 276

N.Y. 623 (1938).

This should end the inquiry. However, if Defendants seek to relitigate the issue, their

knowledge is also imputed to the entity Defendants and the Fairfield Funds as officers and

directors, agents, and control persons. *See, e.g.*, *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d

246, 255 (2d Cir. 1995) ("The knowledge of a director, officer, sole shareholder or controlling

person of a [corporate entity] is imputable to that [entity]."); *Anwar*, 728 F. Supp. 2d at 409–10

(imputing knowledge where individuals were "principals or otherwise high-ranking officers" of

entity defendants); *Picard v. Ceretti (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. Nos. 08-

01789 (SMB), 09-01161 (SMB), 2015 WL 4734749, at *15–16 (Bankr. S.D.N.Y. Aug. 11, 2015)

("*Kingate*") (imputing knowledge based on agency).

Defendants Noel, Tucker, and Piedrahita were founding partners of FGG. SAC ¶¶ 11,

19, 79, 104. Vijayvergiya, an FGG partner, served as its Chief Risk Officer. SAC ¶¶ 11, 110,

161–64. Toub, an FGG partner, served on FGG's Executive Committee. SAC ¶¶ 11, 114.

Corina Noel Piedrahita, an FGG partner, served as its Head of Client Services and Investor

Relations. SAC ¶¶ 11, 121. In addition, Noel and Tucker acted as directors and agents of FIFL.

SAC ¶¶ 17, 122, 322. Noel, Tucker, Piedrahita, Lipton, McKeefry, Blum, and Toub variously

acted as agents, officers, and directors of FG Limited ("FGL"). SAC ¶¶ 123, 324. Noel, Tucker,

Piedrahita, Lipton, McKeefry, Blum, Vijayvergiya, McKenzie, and Smith variously acted as

agents, officers, and directors of FG Bermuda ("FGBL"). SAC ¶¶ 124, 325. Noel, Tucker,

Piedrahita, Lipton, McKeefry, Blum, Vijayvergiya, McKenzie, and Bowes variously acted as

agents, officers, and directors of FG Advisors. SAC ¶¶ 125, 326. Tucker was a managing

member of Stable Fund. SAC ¶¶ 126, 323. Noel and Tucker were owners of Fairfield

International Managers and FG Capital. SAC ¶¶ 127–28, 327–28. Corina Noel Piedrahita was

Share Management's agent and alter ego. SAC ¶¶ 129, 329. Finally, the FGG partners

controlled and managed the Fairfield Funds. SAC ¶¶ 79–80, 119, 320–21.

### C. The Trustee's First Amended Complaint Does Not Contradict The SAC's Allegation That FGG Operated As A *De Facto* Partnership

Defendants dispute the Trustee's allegations in the SAC by fabricating "conflicts" with

the Trustee's First Amended Complaint ("FAC").[8] For example, Defendants argue that FGG

cannot be a partnership because the FAC referred to FGG as a trade name, Motion at 4, 33, but

the two are not mutually exclusive.

Moreover, the Court should not entertain the competing inferences Defendants derive

from supposedly contradictory allegations. The FAC has been superseded by the SAC, and its

allegations do not bind the Trustee at the motion to dismiss stage, where the court confines itself

to the four corners of the amended complaint. *West Run Student Housing Assocs., LLC v.

Huntington Nat'l Bank*, 712 F.3d 165, 172–73 (3d Cir. 2013). Prior pleadings are given weight

only if the new allegations are directly contradictory and material to the court's adjudication.

*Christian v. TransPerfect Glob., Inc.*, No. 17-cv-5554 (PKC), 2018 WL 4571674, at *2–3

(S.D.N.Y. Sept. 24, 2018). That is not the case here. Furthermore, given the changes to the

applicable legal standards since the FAC was filed in 2010, the allegations in the SAC are

appropriate. *See, e.g.*, *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d

Cir. 2012) (permitting amendment to meet changed legal standards). The SAC's allegations are

entitled to deference. *See Bernadotte v. New York Hosp. Med. Ctr. of Queens*, No. 13-CV-965

---

[8] ECF No. 23.

(MKB), 2014 WL 808013, at *6 (E.D.N.Y. Feb. 28, 2014) (finding no direct contradiction, the

court was not "moved to abandon the usual deference afforded to an Amended Complaint").[9]

## II.    THE TRUSTEE ALLEGES DEFENDANTS' KNOWLEDGE OF MADOFF'S FRAUD WITH SUFFICIENT PARTICULARITY

Defendants here challenge claims which seek the recovery of customer property

fraudulently transferred by BLMIS to the Fairfield Funds and subsequently transferred to

Defendants pursuant to Section 550(a) of the Bankruptcy Code. Defendants argue that the

Trustee's claims should be dismissed because the Trustee alleged each Defendant's state of

mind—actual knowledge of or willful blindness to Madoff's fraudulent scheme—with an

insufficient degree of particularity, and thus they should be allowed to retain such customer

property. Motion at 2, 11, 12, 32, 33 n.23. Defendants' arguments should be rejected.

The Court must consider whether the transfers that are the subject of the Trustee's claims

are both avoidable and recoverable. Voidability of the initial transfers and recovery of the

subsequent transfers are governed by different pleading standards. Federal Rule of Civil

Procedure 8(a) "governs the portion of a claim to recover the subsequent transfer." *See, e.g.*,

*Picard v. Legacy Capital Ltd.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 548 B.R. 13, 35, 36

(Bankr. S.D.N.Y. 2016) ("*Legacy*"). Federal Rule of Civil Procedure Rule 9(b) "governs the

portion of a claim to avoid an initial intentional fraudulent transfer." *Id.* While Rule 9(b)

requires particularized allegations as to "the circumstances constituting fraud," it relaxes the

requirement for pleading the "[m]alice, intent, knowledge, and other conditions of a person's

---

[9] Defendants rely upon *Colliton v. Cravath, Swaine & Moore, L.L.P.*, No. 08-CV-0040 (NRB), 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008) to argue that the Court should disregard the partnership allegations in the SAC. Motion at 33. *Colliton* is distinguishable because it presented "special circumstances" involving an employment dispute in which the defendant, a convicted felon, filed an amended complaint that lacked any evidentiary basis and directly contradicted prior allegations in order to plead around controlling law. *Colliton*, 2008 WL 4386764, at *6.

mind," which a plaintiff may allege "generally." Fed. R. Civ. P. 9(b). As the Second Circuit has

recognized, while the underlying fraud must be alleged with particularity, the perpetrator's intent

need not be: "a plaintiff realistically cannot be expected to plead a defendant's actual state of

mind." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000). "Greater liberality in the

pleading of fraud is particularly appropriate in bankruptcy cases" where it is the task of the

trustee—"a third party outsider to the fraudulent transaction"—to "plead the fraud on

secondhand knowledge for the benefit of the estate and all of its creditors." *Sec. Inv. Prot. Corp.

v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999). Such is the case here, and

the Trustee should be permitted greater latitude in alleging Defendants' state of mind. *See id.* at

311. Yet, disregarding that established law, Defendants assail the Trustee's allegations as to

their state of mind, contending that "the SAC makes no allegations whatsoever as to what certain

individual Defendants supposedly knew." Motion at 2.

Defendants also claim that the Trustee used impermissible "group pleading" to

circumvent Rule 9(b)'s requirements. Motion at 2, 4, 10, 14, 32–33, 33 n.23. However, courts

permit grouping defendants when, as here, there are allegations that the defendants are insiders.

*See, e.g.*, *In re Hellas Telecommc'ns. (Luxembourg) II (SCA)*, 524 B.R. 488, 534 (Bankr.

S.D.N.Y. 2015) (denying motion to dismiss predicated on "group pleading" arguments because

the complaint plausibly alleged that defendants were insiders exerting control through their

affiliates). The SAC specifically alleges Defendants' status as insiders of the FGG enterprise

and their roles within FGG. SAC ¶¶ 11, 19, 79, 101, 104, 110, 114, 116–21, 131, 161–64; *see

also infra* § I.A. *Compare DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247,

1249 (2d Cir. 1987) (finding that a complaint against multiple defendants was insufficient where

it was "framed almost entirely upon information and belief," "with little or no specification as to

12

individual roles," and allegations did not describe defendants as insiders or affiliates), *with Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 315–17 (S.D.N.Y. 2009) (permitting grouping of insider and affiliate defendants together).

Accepting Defendants' arguments concerning "group pleading" here would also contravene the *Assigned Claims Decision*, which found that "throughout the Complaint" in that action, the Trustee sufficiently alleged that "FGG and, by extension, all of the Defendants are alleged to have engaged in various acts of misleading investors, deception, and fraud." *Assigned Claims Decision*, at *8. The SAC's allegations of *de facto* partnership and the grounds for imputing the FGG partners' knowledge are substantially the same as those in the *Assigned Claims Action* and they easily satisfy the requirements of both Rule 8(a) and Rule 9(b). The SAC has alleged with particularity each individual Defendant's conduct and/or roles within FGG showing knowledge of Madoff's fraud.[10] SAC ¶¶ 240–62. The SAC therefore provides each Defendant with notice of the claims against them.

Defendants' misconceptions concerning pleading requirements extend to the defenses they assert under Sections 550(b) and 546(e) of the Bankruptcy Code, which are inapplicable in light of Defendants' actual knowledge of or willful blindness to Madoff's fraud. Both of those defenses are addressed in greater detail below.

---

[10] *See infra* pp. 15–21; *see also*, *e.g.*, allegations related to Noel, SAC ¶¶ 79, 91, 93, 110, 136–37, 151–52, 170, 173, 184, 212, 259, 276; Tucker, *id.* ¶¶ 79, 82, 91, 93, 109–10, 135–36, 151–53, 155–56, 168, 170, 173, 176–77, 179–80, 184, 186, 191, 196–97, 201–07, 210–12, 224, 226, 232, 234, 238, 240, 259, 283; Noel Piedrahita, *id.* ¶¶ 11, 121, 129; Piedrahita, *id.* ¶¶ 103, 107, 111, 170, 173, 176, 184, 233–34; Vijayvergiya, *id.* ¶¶ 110, 148–49, 153, 155, 157–69, 174–75, 179, 186–87, 192–94, 196, 198–201, 207, 210, 212–13, 218, 224–27, 229–31, 233–34, 237, 240–58, 266–68, 272, 274–75, 283–86, 292–95, 297, 303–04, 306, 309, 312–13; Toub, *id.* ¶¶ 153, 155, 181–82, 210, 234.

### III. THE TRUSTEE'S ALLEGATIONS SUPPORT A FINDING OF DEFENDANTS' ACTUAL KNOWLEDGE OF MADOFF'S FRAUD, OR AT A MINIMUM, WILLFUL BLINDNESS TO THE FRAUD

Neither one fact nor one allegation alone demonstrates Defendants' actual knowledge of or willful blindness to Madoff's fraud. The Trustee's allegations, in their totality, paint an unmistakable picture of individuals and entities working in concert to enrich themselves by perpetuating a known fraud at their clients' expense. The facts alleged in the SAC illustrate Defendants' lack of good faith,[11] thereby establishing the voidability of the transfers—whether the applicable standard is actual knowledge of the fraud at BLMIS or willful blindness to circumstances indicating its high probability,[12] *Picard v. Magnify, Inc. (In re Bernard L. Madoff Inv. Sec. LLC)*, 583 B.R. 829, 841 (Bankr. S.D.N.Y. 2018) (collecting cases); *Picard v. Katz*, 462 B.R. 447, 455 (S.D.N.Y. 2011).

According to this Court, knowledge of the voidability of the transfer and good faith are two distinct, but overlapping, elements under Section 550(b) of the Bankruptcy Code. *Picard v. BNP Paribas S.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 594 B.R. 167, 198 (Bankr. S.D.N.Y. 2018) ("*BNP Paribas*"); *Legacy*, 548 B.R. at 38–39. To plead such knowledge, the Trustee must allege that Defendants "possessed knowledge of facts that suggest a transfer may be fraudulent." *BNP Paribas*, 594 B.R. at 198. Alternatively, to plead a lack of good faith, the Trustee must "allege that each Defendant willfully blinded itself to facts suggesting a high probability of fraud at BLMIS." *Id.* at 197 (citation omitted). Willful blindness requires the Trustee to plead that

---

[11] *See id.*

[12] The Court need not reach the issue of Defendants' willful blindness if it determines that the SAC plausibly alleges Defendants' actual knowledge. *See, e.g., Kingate*, at *16 (having decided that the Trustee plausibly alleged Defendants' actual knowledge of the BLMIS fraud, the bankruptcy court declined to reach the issue of willful blindness).

Defendants: (1) subjectively believed there was a high probability that a fact existed, and (2) took deliberate actions to avoid learning of that fact. *Id.* (citing *Glob.-Tech Appliances*, *Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)). Willful blindness "connotes [a] strong suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate failure to acquire knowledge of its existence." *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 140 (Bankr. S.D.N.Y. 2014). If a person who is not under an independent duty to investigate "nonetheless, intentionally chooses to blind himself to the 'red flags' that suggest a high probability of fraud, his 'willful blindness' to the truth is tantamount to a lack of good faith." *Katz*, 462 B.R. at 455; *accord Merkin*, 515 B.R. at 139.

Given the fact-intensive inquiry required, willful blindness can rarely be determined as a matter of law. *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 685 (7th Cir. 2014) ("Consistent with these observations, we have said that finding the line between 'willful blindness' and 'reason to know' may be like finding the horizon over Lake Michigan in a snowstorm . . . In other words, only rarely could that line be drawn as a matter of law.") (internal quotation marks and citations omitted).

## A.    The FGG Partners Conspired With Madoff To Mislead The SEC

In late 2005, as part of its investigation of Madoff's trading practices, the SEC requested an interview with FGG personnel. FGG chose Vijayvergiya, its Chief Risk Officer, and McKeefry, its Chief Legal Officer and Chief Operating Officer, to handle the interview. FGG immediately recognized that the interview had grave implications for its Madoff-related business—any misstep by FGG might subject Madoff to further SEC scrutiny and damage FGG's relationship with Madoff and Defendants' stream of fees. Flouting the SEC's designation of the interview as confidential, McKeefry and Vijayvergiya reached out to Madoff—they wanted to be able to peddle Madoff's approved narrative to the SEC. During the prep session,

15

Madoff immediately dispelled any notion that it might be conducted in good faith, stating to McKeefry: "Obviously, first of all, this conversation never took place, Mark, okay?" McKeefry and Vijayvergiya happily obliged. Madoff was no stranger to SEC probes, and that experience enabled him to impart his tactics for throwing the SEC off the trail to McKeefry and Vijayvergiya. He instructed them to describe BLMIS not as the Fairfield Funds' investment manager, but only as the executing broker. He coached them to tell the SEC investigators that FGG approved built-in trading parameters that Madoff followed, and that FGG directed Madoff by phone if there were to be any adjustments to those parameters. And he instructed them to never admit to having written documents because doing so would ensure that the SEC would demand they be produced. He directed them to give inexact answers, and suggested they "act casual," lest they inadvertently tip the SEC investigators off to a damaging fact. SAC ¶¶ 236–53.[13]

During the SEC interview, Vijayvergiya and McKeefry followed Madoff's orders to the letter, spinning a false narrative of Madoff's minimal authority over the Fairfield Funds, featuring misrepresentations about FGBL's role as investment manager and Madoff's adherence to guidelines set by FGG in executing the SSC strategy. SAC ¶¶ 254–58.

The contemporaneous words and actions of its partners make FGG's state of mind clear: their focus was to further the fraudulent scheme orchestrated by Madoff. The facts concerning McKeefry's and Vijayvergiya's prep session with Madoff (drawn from a transcript of the call) and their interview with the SEC are detailed in the SAC. SAC ¶¶ 236–62. It is irrelevant that

---

[13] In *Anwar*, Judge Marrero considered plausible comparable allegations that Defendants "engaged in deliberately illegal behavior by attempting to stymie a [SEC] investigation into Madoff's operation," and with one exception found this weighed in favor of finding defendants' scienter was sufficiently pled in that case. *Anwar*, 728 F. Supp. 2d at 408.

the SEC investigation was not focused on whether Madoff was trading securities. *See* Motion at 22–23. Defendants (i) actively concealed BLMIS's role as the Fairfield Funds' investment adviser by scrubbing all references to BLMIS from their written materials in the months preceding the SEC's investigation, SAC ¶¶ 236–37; (ii) solicited Madoff to strategize with them about how to respond to the SEC's questioning and then acquiesced to his instructions to misstate his role with the Fairfield Funds, SAC ¶¶ 240–53; and (iii) colluded with Madoff, by submitting a script containing misstatements to him before the interview for his review, and then accepting his edited approach as to how FGG should respond. SAC ¶ 252. Defendants knew Madoff was not legitimately trading securities, and they intended to mislead the SEC to keep BLMIS in business so that FGG could continue to reap the rewards.

## B.    The FGG Partners Were Uncommonly Close To The Otherwise Private Madoff

The SAC details the unique insight into BLMIS's operations that Defendants obtained through their business and personal relationships with Madoff. Defendants' response to these allegations is only to complain that each, taken in isolation, does not independently demonstrate that Defendants "actually knew that Madoff was not trading securities." Motion at 3. The allegations, however, show the close relationship Defendants had with Madoff and their comfortable place within his fraudulent scheme. They met and spoke with Madoff frequently, socialized with him, and eventually came to inhabit the same social circles. For example, between 1997 and 1998, Tucker met with Madoff at least 44 times and Noel met with Madoff at least 10 times. SAC ¶ 110. Vijayvergiya spoke to Madoff and BLMIS employees, including Madoff's chief lieutenant, DiPascali, hundreds of times and visited BLMIS's offices at least once or twice a year. SAC ¶¶ 110, 162. Piedrahita hosted Madoff on his yacht. SAC ¶ 108. Madoff

even kept the contact information for Tucker, Noel, and key FGG personnel in his personal diary, alongside that of other friends and key Madoff insiders.  SAC ¶ 110.

### C.    The SAC Alleges That FGG Received Numerous Warnings Of BLMIS's Fraud

The SAC allegations concerning the FGG partners' activities in the wake of the May 2001 Barron's and MAR/Hedge articles exemplify their conduct whenever Madoff's legitimacy came into question.  The articles reported widespread industry suspicion about the mismatch between the SSC Strategy's expected return profile and the returns Madoff (and Fairfield Sentry) achieved.  SAC ¶¶ 132–35.  FGG's reaction was not to investigate or move the Fairfield Funds' investments away from Madoff, but to embrace Madoff and pacify investors.  Madoff was rattled by the prospect of investor redemptions and he inquired with FGG about its clients' reactions to the articles.  FGG knew that the best way to cement its relationship with Madoff was to keep investors on board.  FGG sent a letter to its clients—to mislead the investing public that was unnerved by the Barron's and MAR/Hedge articles and to tout FGG's "uncommonly high degree of transparency" with Madoff.  SAC ¶¶ 136–37.  These allegations typify FGG's use of its access to Madoff to mollify investors and further Madoff's fraudulent scheme.

FGG also came to learn through its own independent research that BLMIS's supposed auditor, Friehling & Horowitz ("F&H"), was not only unqualified to audit BLMIS's purported multi-billion dollar investment advisory business, but was not certified to perform audits altogether.  SAC ¶¶ 188, 191–92, 202, 204–05.  FGG, nevertheless, repeatedly lied to its clients, confirming that F&H audited BLMIS while embellishing F&H's credentials.  SAC ¶¶ 189, 194, 201.  In another instance, FGG falsely told a client that PwC audited Madoff's returns.  SAC ¶ 193.

Defendants ignore these damning allegations and attempt to shift the Court's focus to an

inapposite ruling in *BNP Paribas*. *See* Motion at 29, n.21 (citing *BNP Paribas*, 594 B.R. at 205

n.20). In *BNP Paribas*, the court determined that the Trustee did not allege any independent

review of F&H's qualifications to perform audits. *BNP Paribas*, 594 B.R. at 205 n.20. And the

*BNP Paribas* defendants communicated directly with F&H in an attempt to verify the assets in

their BLMIS accounts. *Id.* Conversely, in the SAC, the Trustee alleges that FGG independently

researched F&H. SAC ¶¶ 191, 204. And when Madoff made representations that directly

contradicted FGG's research, FGG falsely reported to clients that BLMIS used a reputable,

qualified auditor, even though, internally, they questioned the legitimacy of Madoff's

accountant. SAC ¶¶ 192, 194. Even after Defendants confirmed that the information they had

provided to their clients was false, they took no steps to correct their prior misstatements. SAC

¶¶ 201, 204.

When FGG clients raised ominous similarities between BLMIS and the Bayou Hedge

Fund, a Ponzi scheme that had collapsed spectacularly, FGG worked to dismiss investor

concerns. FGG partners shut down all attempts to provide written responses to client inquiries,

SAC ¶¶ 196–98, 210–11; consulted Madoff about how he wanted to address the problem, SAC ¶

212; deliberately dodged an actual question that had been posed, SAC ¶ 200; and joked about the

parallels between Bayou and BLMIS. SAC ¶ 199. As the SAC alleges, FGG knew that many

features of BLMIS's operation bore a striking resemblance to Bayou: (i) BLMIS utilized an

atypical fee structure, which meant that Madoff was walking away from billions of dollars; (ii)

BLMIS provided no electronic access to trading information; (iii) BLMIS mailed trading tickets

three days after trades were made; and (iv) Madoff employed an obscure auditor and gave

inconsistent answers about the auditor and BLMIS's trading practices. SAC ¶¶ 214–19. FGG,

19

nevertheless, touted its diligence, asserting that its practices never would have allowed for an investment with a fund like Bayou.  SAC ¶¶ 207–08, 214.

The SAC also alleges that FGG's independent consultant, Gil Berman, repeatedly reported to the FGG partners strong indications of fraud.  Despite Berman's discovery of impossibilities and inconsistencies with the SSC Strategy, such as trading prices above the daily highs all in BLMIS's favor and speculative options trades that would have exposed investors to significant, unanticipated risk, the FGG partners took no action.  SAC ¶¶ 143–45, 283–87.

### D.    FGG Ignored BLMIS's Impossible Performance

The SAC is replete with particularized allegations demonstrating that Defendants possessed contemporaneous information reflecting the SSC Strategy's impossible returns.  *See, e.g.*, SAC ¶¶ 273, 278–79, 283, 292, 307.  Defendants regularly analyzed the Fairfield Funds' statements and trade confirmations and reported the performance to their clients.  Their own analysis confirmed that Madoff was not engaging in the securities transactions he reported and that many of the trades could not have occurred as reported.  *See, e.g.*, SAC ¶¶ 273–75, 294–95, 303.  For example, Defendants recognized and ignored: (i) impossibly consistent positive returns over two decades of investment with BLMIS, even during times of economic crisis; (ii) uncanny market timing; (iii) the purchase and sale of equities outside the daily price range all in BLMIS's favor; (iv) options trading volume that exceeded the total market volume of those trades; (v) over-the-counter options trades that contradictorily included CUSIP numbers (which are associated only with securities traded on public markets); (vi) options trading that violated industry standards; and (vii) BLMIS's billions of dollars of equity and options trading without leaving any market footprint.  SAC ¶¶ 271–80, 283–87, 292–97, 302–06, 309–10.  As the facts alleged in the SAC make clear, these were not "red flags" visible only in hindsight; they were contemporaneously known to FGG and its partners based on their own analysis.

FGG deflected clients' concerns regarding BLMIS's custody of assets and the risks resulting from BLMIS's overlapping roles as custodian, prime broker, and investment adviser. Rather than provide direct answers, FGG partners told sales personnel not to put anything in writing, and instead to invite clients to come to FGG's office, knowing that few, if any, clients would take them up on the offer—a tactic that created the illusion of transparency. SAC ¶¶ 156, 170–87, 220–35.

### E.    The FGG Partners Failed To Conduct Meaningful Due Diligence

The SAC alleges that FGG knew that it did not apply its standard due diligence practices to BLMIS. SAC ¶¶ 142–69. In fact, Vijayvergiya asked an FGG partner whether FGG "specifically monitor[ed BLMIS's] adherence to operating guidelines" to gauge whether BLMIS was performing according to the SSC Strategy. The answer was a resounding "No." SAC ¶ 157. Vijayvergiya further admitted after BLMIS's collapse that as FGG's risk manager, he did not confirm BLMIS's trades with the DTCC, nor was he aware of anyone within FGG who had. SAC ¶ 148. When Gil Berman reported his due diligence findings to Defendants, they ignored the results, SAC ¶¶ 283–88. When FGG joined Citco on a site visit to BLMIS to verify the existence of Fairfield Sentry's assets and the mission resulted in failure, FGG asked no questions. SAC ¶¶ 140–41. When clients and third parties asked about FGG's risk management capabilities, Vijayvergiya gave vague, evasive answers and thwarted direct communication with Madoff. SAC ¶¶ 142–69. When FGG performed minimal due diligence and obtained information that should have caused them to act, they did not act and continued to mislead their clients. *See, e.g.*, SAC ¶¶ 207, 267–68, 311–12.

Like the Trustee's complaint in the *Assigned Claims Action*, the SAC alleges the "various acts of misleading investors, deception, and fraud" in which FGG and Defendants engaged, demonstrating their "knowingly cashing in on a fraudulent scheme orchestrated by Madoff."

*Assigned Claims Decision*, at *11.  Taken together, the SAC's allegations provide ample "factual

content" from which to infer Defendants' actual knowledge and, in the alternative, their willful

blindness.  *Iqbal*, 556 U.S. at 678.  Defendants stood to earn, and did in fact earn, hundreds of

millions of dollars in fees by turning a blind eye to BLMIS's fraud.  *See Anwar*, 728 F. Supp. 2d

at 410 (stating these same Defendants waved off "two decades" of "red flags" about Madoff's

fraud because their "finer faculties were overcome by the fees they earned and . . . they turned a

blind eye to obvious signs of fraud."); *see also Katz*, 462 B.R. at 454–55 (holding the complaint

plausibly alleged that defendants had invested while willfully blind to Madoff's fraud "because

they felt they could realize substantial short-term profits while protecting themselves against the

long-term risk."); *Merkin*, 515 B.R. at 143 (holding defendants' "substantial management and

incentive fees . . . can explain why they would turn a blind eye to a fraud.").  The totality of these

allegations in the SAC show, at a minimum, Defendants and, by imputation, the Fairfield Funds

willfully blinded themselves to BLMIS's fraud.

## IV.    DEFENDANTS ASSERT DEFENSES THAT ARE UNAVAILING

### A.    Defendants Cannot Prove A Value Defense At The Pleading Stage

Under Section 550(b)(1) of the Bankruptcy Code, defendants have the burden of pleading

and proving they gave value to the Fairfield Funds.  *BNP Paribas*, 594 B.R. at 206.  Only if "the

defense is apparent on the face of the complaint," may a court dismiss the underlying claim.  *Id.*

(citing *Off. Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,

322 F.3d 147, 158 (2d Cir. 2003)).  The question of whether value has been exchanged for a

subsequent transfer is a fact-intensive question and typically inappropriate at the motion to

dismiss stage.  *See, e.g.*, *BNP Paribas*, 594 B.R. at 206–07 (holding that the court must

determine on a transfer-by-transfer basis whether defendants gave value based on their

redemption of BLMIS feeder fund shares, which could not be made from the four corners of the

complaint or the documents incorporated by reference); *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 341 (Bankr. S.D.N.Y. 2011) (declining to reach the defendants' value arguments, which were affirmative defenses to be raised at summary judgment or trial).

Moreover, the Trustee disputes Defendants' claim that the FGG management companies and their agents provided value that inured to the benefit of Fairfield Sentry and its clients. In fact, the SAC alleges that Defendants collected management fees for abdicating all responsibility for custody of the Fairfield Funds' assets and investment decision-making. SAC ¶¶ 91, 255–56. Defendants performed enough self-serving due diligence on their assets under management with BLMIS to track the calculation of their 20% performance and management fees, SAC ¶¶ 18, 92, 99, but when signs of BLMIS's fraudulent operation arose, they withheld that information from their clients. SAC ¶¶ 181–82, 290, 294–95, 297, 304–06.

### B.    Defendants Cannot Take Advantage of the Safe Harbor Defense

The "safe harbor" of Section 546(e) of the Bankruptcy Code is a defense to the avoidance of an initial transfer. It provides that "the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a  . . . stockbroker, . . . or that is a transfer made by or to (or for the benefit of) a . . . stockbroker, . . . in connection with a securities contract, . . . except under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(e). Subsequent transferees, like Defendants, may receive incidental protection from Section 546(e), but only to the extent the safe harbor insulates the initial transfers from avoidance. *See BNP Paribas*, 594 B.R. at 197.

In *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC. 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ("*Actual Knowledge Decision*"), the District Court explained that the safe harbor's purpose is to protect the securities markets and "the reasonable expectations of legitimate participants in these markets." *Id.* at *4*; *see also Picard v. Greiff*, 476

B.R. 715, 721 (S.D.N.Y. 2012). The safe harbor does not protect transferees who lack such expectations. *Actual Knowledge Decision*, at *3. Such is the case here. Defendants knew that the transfers from BLMIS were not "settlement payments." Defendants also knew that the transfers could not have been made in connection with a legitimate "securities contract," because there was no account agreement that led to the purchase of securities. The District Court held that Section 546(e) does not apply to initial transfers received by customers who participated in BLMIS's fraud and "those who had actual knowledge of its workings (and thereby effectively participated in it by taking advantage of its workings)." *Id.* at *4 (citing *Katz*, 462 B.R. at 452).

The SAC alleges that through the individual Defendants who acted as the Fairfield Funds' agents and control persons, the Fairfield Funds acquired actual knowledge that BLMIS was not engaging in legitimate securities transactions. *See Kingate*, 2015 WL 4734749, at *13 (holding the Trustee plausibly alleged the Kingate Funds "knew that Madoff was not engaging in the securities transactions he reported, and that many of the entries in the statements and trade confirmations depicted trades that could not have taken place."). The totality of the SAC's allegations[14] demonstrate Defendants' actual knowledge.

## C.    Defendants' Loss Of Their Own Investment Is Irrelevant

As alleged in the SAC, any personal BLMIS investment by Defendants pales in comparison to the exorbitant profits they gained through management and performance fees "earned" by their affiliate entities. SAC ¶¶ 9, 13, 15, 79, 92, 94, 99,102, 142, 152, 219. The fees

---

[14] This Court should reject Defendants' misguided invitation to consider the SAC's allegations in isolation. *See* Motion at 18–24. The SAC must be assessed in its totality. Despite Defendants' attempt to cherry-pick and minimize certain allegations in the SAC, all of the allegations should be read as a whole. *See Kingate*, 2015 WL 4734749, at *13 ("The totality of the allegations in the FAC paint a picture of sophisticated financial professionals who knew that Madoff was reporting fictitious transactions, and took steps to prevent any inquiry."). *See also Assigned Claims Decision*, at *11 (finding allegations of partnership by estoppel sufficient to overcome a motion to dismiss "[w]hen the Complaint is read as one cohesive document").

they received were anything but "incremental"—they were at least six times the amount of their

claimed investments—and those fees provided more than ample financial motivation for them to

knowingly lie to protect Madoff from scrutiny. *See Merkin*, 515 B.R. at 143 (noting that

substantial management and incentive fees earned by defendants, which tied to the net asset

value of fictitious profits generated by BLMIS, explain why they would turn a blind eye to the

fraud). Indeed, in *Anwar*, the District Court recognized that FGG's receipt of exorbitant fees

from BLMIS was important background for analyzing defendants' motive to commit fraud

against their clients. *See Anwar*, 728 F. Supp. 2d at 407.

The SAC plausibly alleges that FGG's founders carefully structured the Fairfield Funds

and other Fairfield entities to reap hundreds of millions of dollars of performance and

management fees from BLMIS. SAC ¶¶ 79–93. By forming multiple investment vehicles, they

funneled billions of dollars of investor money into BLMIS's Ponzi scheme. SAC ¶¶ 94–101.

And by forming multiple layers of companies that purportedly serviced the investment vehicles,

they were able to collect fees at every layer. SAC ¶¶ 92, 94, 99, 152. The FGG partners had a

powerful incentive to keep the fraud secret because the money invested with BLMIS was largely

not FGG's to lose, and their personal financial success depended entirely on the continued

operation of Madoff and BLMIS. In their own words, Defendants did whatever was necessary to

avoid "piss[ing] Bernie off." SAC ¶ 171. Whether the Fairfield Funds were deemed "net losers"

under the Trustee's calculation of net equity has no bearing on the actual knowledge analysis.

Motion at 13; *see, e.g.*, *Kingate*, at *2 (the court determined that the Trustee had plausibly

alleged the Kingate Funds' actual knowledge of BLMIS's fraud even though their deposits

exceeded their withdrawals by nearly $800 million). As alleged in the SAC, Defendants clearly

came out as winners from Madoff's fraud.

## V.    SECTION 546(e) DOES NOT PROTECT FGL AND FGBL FROM GENERAL PARTNER LIABILITY FOR THE DEBTS OF THEIR PARTNERSHIPS

The Trustee has alleged general partnership liability claims against FGL and FGBL under Delaware law.  SAC ¶¶ 395–406 (the "General Partner Claims").  As general partners of Delaware partnerships unable to satisfy their debts and liabilities, FGL and FGBL are jointly and severally liable for the partnerships' obligations.  SAC ¶¶ 317, 395–406.  The claims are not, as Defendants contend, preempted by Section 546(e) of the Bankruptcy Code.

As the Trustee has alleged, FGBL was a general partner of Greenwich Sentry ("GS"), a Delaware partnership, from July 2003 to December 31, 2004, and from January 1, 2006 until November 19, 2010, when GS filed for Chapter 11 bankruptcy protection.  SAC ¶ 318.  FGBL was a general partner of Greenwich Sentry Partners ("GSP") from its inception in 2006 until November 19, 2010, when GSP filed for Chapter 11 protection.  SAC ¶¶ 100, 318.

GS and GSP each had an investment account with BLMIS, and the Trustee sought to avoid and recover from GS and GSP withdrawals they made from their BLMIS accounts within six years before the SIPA proceedings commenced.  On April 17, 2012, the Bankruptcy Court entered Consent Judgments in favor of the Trustee against both GS and GSP in the respective amounts of $206,038,654 and $5,985,000.  SAC ¶ 314–15.  GS and GSP are insolvent and cannot satisfy their obligations to the Trustee.  SAC ¶¶ 397, 401, 405.  The SAC alleges the transfers GS and GSP received from BLMIS are voidable under Section 544 of the Bankruptcy Code, New York Debtor & Creditor Law and SIPA.  SAC ¶ 315.

The General Partner Claims seek a judgment pursuant to Delaware law against Defendants FGL and FGBL as the respective general partners of GS and GSP, holding them jointly and severally liable for GS's and GSP's obligations to the Trustee.  SAC ¶¶ 317–18, 395–406.  The claims are independent of the Trustee's recovery claims against FGL and FGBL,

26

which arise under section 550(a)(2) of the Bankruptcy Code.  They do not circumvent Section

546(e).  *See Picard v. Merkin (In re Bernard L. Madoff Inv. Securities, LLC)* (*"Merkin I"*), 440

B.R. 243, 268–69 (Bankr. S.D.N.Y. 2010) (citing *Shubert v. Stranahan (In re Penn. Gear Corp.)*,

Adv. Nos. 03-940, et al., 2008 WL 2370169, at *9 (Bankr. E.D. Pa. Apr. 22, 2008)) (defendant's

liability under both state partnership law and Bankruptcy Code section 550 lies in his status as a

partner).  In *Merkin I*, on a motion to dismiss, Judge Lifland held that Section 550 does not

preclude a state law partnership theory of liability:

> Specifically in the bankruptcy context, general partners can be held
> personally liable under state law for avoidable transfers made to
> the partnership.  A trustee is empowered under section 550(a) of
> the Code to recover avoided transfers from a partnership as initial
> transferee, or from the general partner of the partnership under
> applicable state partnership law.

*Merkin I,* at 268–69.  *See also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 563

B.R. 737, 754 (Bankr. S.D.N.Y. 2017) (denying defendants' motion for summary judgment on

general partner liability claims for the same reasons).  These and other courts in these SIPA

avoidance and recovery proceedings have concluded that general partners are liable under state

law for the fraudulent transfers their partnerships received.  *See Picard v. JABA Assoc.*, 10 cv.

3836 (JGK), 2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021) (collecting cases).

None of the cases Defendants cited absolve them of liability as general partners.  Motion

at 36 (citing *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 97 (2d Cir. 2019); *In

re Nine West LBO Sec. Litig.*, 20 MD 2941(JSR) 2020 WL 5049621, at *12, 15 (S.D.N.Y. Aug.

27, 2020); *In re Boston Generating LLC*, 617 B.R. 442, 478 (Bankr. S.D.N.Y. 2020)).  Those

cases involve state law fraudulent transfer or unjust enrichment claims that seek to recover the

same transfers under the same theories as the avoidance claims under the Bankruptcy Code and

are misapplied.  The General Partner Claims should not be dismissed.

27

## VI.    CLAIMS TO RECOVER ADDITIONAL TRANSFERS TO FIFL AND STABLE FUND RELATE BACK TO THE RECOVERY CLAIMS IN THE FAC

The Trustee's claims to recover additional subsequent transfers made to FIFL and Stable Fund identified in the SAC (the "Additional Transfers") are timely because they relate back to claims asserted in the FAC.[15]  Federal Rule of Civil Procedure 15, made applicable by Bankruptcy Rule 7015, states that when the claim or defense asserted in the amended pleading "arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading" the amendment relates back to the date of the original pleading.  Fed. R. Civ. P. 15(c)(1)(B).  "The text of Rule 15 makes explicit Congress's intent that leave to amend a complaint shall be freely given when justice so requires."  *Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir. 1983) (citing Fed. R. Civ. P. 15(a)).  This is because "[t]he purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities."  *Id.* (cleaned up).

"The principal inquiry . . . is whether the general fact situation alleged in the original pleading provides adequate notice to the opposing party of the matters raised in the amended pleading."  *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 468 B.R. 620, 633 (Bankr. S.D.N.Y. 2012) ("*Peter Madoff*") (cleaned up).  The addition of fraudulent transfer claims against existing defendants will relate back to the original pleading where the new transfers occurred as part of the "same course of conduct" as the transfers alleged in the original pleading. *See Adelphia*, 624 F. Supp. 2d at 334.  In addition, explicitly preserving the right to amend and add new transfers may suffice to provide adequate notice.  *Peter Madoff*, 468 B.R. at 634.

---

[15] As alleged in the FAC, FGG operated FIFL as a fund of funds that received subsequent transfers of customer property from Fairfield Sentry, and FGG operated Stable Fund as a fund of funds that received subsequent transfers of customer property from Greenwich Sentry.  FAC ¶¶ 79–80 (FIFL); FAC ¶¶ 112, 114 (Stable Fund).

### A.    The Additional Transfers Occurred As Part Of The Same Course Of Conduct As Transfers Alleged In The FAC

"Rule 15(c) does not set a high bar for relation back, so long as the claims attempted to be asserted in the new complaint share a reasonable measure of common ground with the allegations of the original pleading." *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 27 (Bankr. E.D.N.Y. 2007).  Here, the conduct in question concerns Defendants' efforts to profit from fraud by charging the Fairfield Funds management and performance fees for doing nothing more than feeding money into Madoff's Ponzi scheme.  FAC ¶¶ 4, 23–24, 80, 114, 120, 125, 137–38, 482, 484.  "The fraudulent transfers alleged in the original complaint, along with the new transfers alleged in the Second Amended Complaint, are alleged to have been part of this overall Ponzi scheme.  Both the original and the newly alleged fraudulent transfers therefore arose as part of the same course of alleged conduct." *Hill v. Oria (In re Juliet Homes, LP)*, Adv. No. 09-03429, 2011 WL 6817928, at *7 (Bankr. S.D. Tex. Dec. 28, 2011).

Relation back is permitted because in the FAC and the SAC the Trustee has alleged an underlying common scheme or course of conduct involving Defendants' profiting from Madoff's fraud.  *See Adelphia*, 624 F. Supp. 2d at 333–34 (permitting relation back where new transfers related to the same fraudulent loan transactions alleged in the original pleading); *see also Peter Madoff*, 468 B.R. at 634 (permitting relation back where the original and amended complaints alleged that defendants used BLMIS as a piggy bank); *In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1264 (S.D.N.Y. 1992) (holding allegations of accounts receivable manipulations in an amended complaint related back even though the events were distinct from those alleged in the original complaint, because they were part of the same basic scheme to defraud investors alleged in the original complaint).

**B.      The FAC Provided Notice To Defendants That The Trustee Would Sue For Additional Transfers That Were Part Of The Same Course Of Conduct**

"[I]f the original complaint indicates an intention to pursue all transactions, the adding of such transactions will relate back." *Pereira v. Hong Kong & Shanghai Banking Corp. (In re Kam Kuo Seafood Corp.)*, 67 B.R. 304, 306 (Bankr. S.D.N.Y. 1986).  The FAC stated: "The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information on the Initial Transfers, Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers."  FAC ¶ 548.  In *Peter Madoff*, this Court found that similar language in the Trustee's original pleading provided reasonable notice.  468 B.R. at 633–34; *see also Ogier v. UPAC Ins. Fin. (In re Bauer Agency, Inc.)*, 443 B.R. 918, 922 (Bankr. N.D. Ga. 2011) (holding, in part, that sufficient notice was provided because "[t]he complaint expressly states that the Trustee intends to avoid all transfers that [defendant] received" from the Ponzi scheme "during the relevant time periods"); *In re Juliet Homes, LP*, 2011 WL 6817928, at *7 (finding the defendants were on notice that the Trustees would likely view any transfers from debtors—including partnership distributions, consulting fees, sales proceeds, lease payments, and similar transfers—as potentially fraudulent in light of the allegations concerning the Ponzi scheme); *Adelphia*, 624 F. Supp. 2d at 333 (permitting relation back where original pleading sought *all* payments from margin loans).

**C.      The Cases Defendants Rely Upon Do Not Bar Recovery Of The Additional Transfers**

The Bankruptcy Court decisions in *BNP Paribas*, *Metzeler v. Bouchard Transp. Co., Inc. (In re Metzeler)*, 66 B.R. 977 (Bankr. S.D.N.Y. 1986), and *Off. Comm. of Unsecured Creditors 360Networks (USA) Inc v. Pirelli Commc'ns Cables & Sys. USA LLC (In re 360Networks (USA)*

*Inc.)*, 367 B.R. 428 (Bankr. S.D.N.Y. 2007) ("*360Networks*"), do not bar recovery of the Additional Transfers.  Motion at 37–38.

In *BNP Paribas*, the Court found that the Trustee's proposed subsequent transfer claims did not relate back to the original complaint because the "old and new [transfers] were not part of the common fraudulent scheme or pattern present in *Adelphia* and *Peter Madoff*."  594 B.R. at 211–12.  The Court also held the old and new transfers related to different leverage transactions at different times and therefore "the facts and circumstances surrounding the value given in exchange for the transfer differ[ed]."  *Id*. at 211.  Here, where the Trustee has plausibly alleged that Defendants received the old and new transfers during the same period of time as part of a common enterprise created to profit from Madoff's fraud, Defendants' reliance on *BNP Paribas* is misplaced.

In *Metzeler*, the Court noted that the trustee sought to amend to add new transfers without any "allegations implying an overall scheme" to defraud.  *In re Metzeler*, 66 B.R. at 979 ("All that is pleaded with respect to these transfers is that they were made in payment of invoices sent to [the debtor].").  The Court also noted that the proof required to avoid and recover the new and old transfers would be different.  *Id*. at 984 ("The proof offered for one transaction is not governing as to another.").  Because the FAC and the SAC share a common core of operative facts concerning an overall scheme to profit from Madoff's fraud, *Metzeler* is not analogous.

Similarly, *360networks* is distinguishable.  The Court in *360Networks* addressed an initial complaint that failed to allege the debtor's relationship with the defendant, failed to describe the nature of the allegedly preferential transfers, and did not put the defendant on notice that the committee would pursue recovery of further transfers.  *In re 360Networks (USA)*, 367 B.R. at

434. That is not the case here. *See e.g.*, FAC ¶¶ 79–80, 112, 114, 548. None of the cases
Defendants rely on bar the Trustee's claims to recover the Additional Transfers.

Finally, Defendants argue each transfer must be viewed as a separate and distinct
transaction that can never relate back to transfers in an original pleading. Motion at 37. If
accepted, Defendants' argument would strike Rule 7015 from the Rules of Bankruptcy
Procedure in any fraudulent transfer litigation. Defendants' argument is also wrong because it
ignores that Rule 15 focuses on *conduct* as well as transactions. Newly alleged transactions from
a series of transactions relate back when they are part of the same overarching course of conduct.
*See Adelphia*, 624 F. Supp. 2d at 334 (rejecting defendants' argument that "each transfer is a
separate and distinct event" that cannot relate back under Rule 15); *see also Siegel*, 714 F.2d at
216 (holding newly alleged transactions were part of the same course of conduct and related
back because"[t]he gist of both the original suit and the amended complaint was the unlawful
agreement to pay lower freight charges and commissions, and its continuing performance, not a
series of agreements as to unrelated shipments.").

## VII.    THE COURT HAS ALREADY FOUND THE SAME ALLEGATIONS SUFFICIENT TO EXERCISE PERSONAL JURISDICTION OVER BOTH PIEDRAHITA AND VIJAYVERGIYA

In the *Assigned Claims Decision*, this Court ruled that the same facts alleged in the
instant SAC are sufficient at this stage of the litigation to support the Court's exercise of
jurisdiction over Piedrahita and Vijayvergiya. *See Assigned Claims Decision*, at *13–16. The
same analysis applies here.[16]  While the causes of action here – avoidance and recovery claims –
differ, the jurisdictional analysis should not. As the Court noted in assessing virtually identical

---

[16] The Trustee's counsel asked Defendants' counsel to stipulate to this Court's findings regarding personal
jurisdiction. Defendants refused.

facts, the allegations of Defendants' ongoing activities both in the United States and New York

establish a *prima facie* case that they purposefully availed themselves of the benefits of the

forum and also that the contacts alleged in the SAC satisfy the "arising out of" prong of specific

personal jurisdiction. *See id.* at *14–15. Any jurisdictional burden imposed on Piedrahita or

Vijayvergiya is "substantially outweighed by the forum state's interest in adjudicating the case

and the plaintiff's interest in obtaining convenient and effective relief." *Id.* at *16.

A.   **The SAC Establishes A *Prima Facie* Case Of Specific Jurisdiction Over
     Piedrahita**

Piedrahita was a founding partner of FGG and consistently worked in concert with the

other Defendants to market FGG, grow the enterprise, and recruit investment capital for Fairfield

Sentry.

SAC ¶¶ 103–04, 107, 109. In return, Piedrahita received millions of dollars in

distributions from FGG's New York-centered activities, including distributions from the

investment managers of Fairfield Sentry. SAC ¶¶ 105–06. Piedrahita conducted business in

New York. SAC ¶ 23. He maintained an office in FGG's New York headquarters, regularly met

with Madoff at BLMIS's New York headquarters, hosted dinners and client events in New York,

signed client communications using a New York address block, and attended FGG Executive

Committee and Board of Directors meetings in New York. SAC ¶ 107. Together with Corina

Noel Piedrahita, Piedrahita also maintained residences in New York, Connecticut, and Florida.

SAC ¶ 112.

B.   **The SAC Establishes A *Prima Facie* Case Of Specific Jurisdiction Over
     Vijayvergiya**

This Court analyzed the same factual allegations in the *Assigned Claims Decision* with

respect to Vijayvergiya and should conduct the same analysis and reach the same result here.

*See Assigned Claims Decision* at 14 (finding the complaint successfully alleged that Vijayvergiya purposely availed himself of New York and the United States). Vijayvergiya conducted business in New York, headed the Risk Management Division of FGG's New York-based Investment Group as FGG's Chief Risk Officer, and reported directly to FGG personnel based in New York. SAC ¶¶ 14, 24, 164. He was one of four individuals at FGG permitted to authorize the movement of cash into and out of the FGG feeder funds' investment accounts with BLMIS, SAC ¶ 163; he had hundreds of conversations with BLMIS personnel in New York, including conversations with Frank DiPascali and Madoff himself, SAC ¶¶ 162, 241–43; and he acted as an agent of FGG and FGBL, preparing responses to clients' concerns about Madoff. SAC ¶¶ 161, 164. Vijayvergiya also used an FGG U.S. email account in connection with investor communications. SAC ¶ 161.

### C.    Jurisdictional Discovery Should Be Permitted, If Necessary

If this Court finds that the Trustee has not made a *prima facie* showing of jurisdiction over Piedrahita, the Court should permit jurisdictional discovery. *See In re S. Afr. Apartheid Litig.*, 643 F. Supp. 2d 423, 431 (S.D.N.Y. 2009); *see also Assigned Claims Decision*, at *13 n.14 (permitting the Trustee to conduct jurisdictional discovery to determine whether general jurisdiction exists over Piedrahita).

## VIII.    THE TRUSTEE SHOULD BE ALLOWED TO REPLEAD IF THE COURT GRANTS DEFENDANTS' MOTION TO DISMISS

Should this Court find the Trustee's allegations insufficient to withstand Defendants' motion to dismiss, the Trustee should be allowed leave to amend. Defendants argue a "prolonged burden" but do not claim any prejudice or bad faith. Without such a showing, the rule in this circuit is to allow a party to amend its pleadings. *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017).

## <u>CONCLUSION</u>

For all the foregoing reasons, the Court should deny Defendants' Motion.

Dated:  April 15, 2021
      New York, New York

<u>*/s/ David J. Sheehan*</u>
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4200
David J. Sheehan
dsheehan@bakerlaw.com

*Attorneys for Irving H. Picard,*
*Trustee for the Substantively Consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the Chapter 7*
*Estate of Bernard L. Madoff*