Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 95-88888-cgm

4  - - - - - - - - - - - - - - - - - - - - - - - - - - x

5  In the Matter of:

6

7  THE BANKRUPTCY LINK,

8           Debtors.

9  - - - - - - - - - - - - - - - - - - - - - - - - - - x

10  Case No. 09-11893-cgm

11  - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  In the Matter of:

13

14  BERNARD L. MADOFF,

15           Debtor.

16  - - - - - - - - - - - - - - - - - - - - - - - - - - x

17  Adv. Case No. 08-01789-cgm

18  - - - - - - - - - - - - - - - - - - - - - - - - - - x

19  SECURITIES INVESTOR PROTECTION CORPORATION,

20              Plaintiff,

21        v.

22  BERNARD L. MADOFF INVESTMENT SECURITIES, LLC. et al.,

23              Defendants.

24  - - - - - - - - - - - - - - - - - - - - - - - - - - x

25

Page 2

1   Adv. Case No. 10-04889-cgm

2   - - - - - - - - - - - - - - - - - - - - - - - - - - x

3   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

4   MADOFF INVESTMENT SECURITIES LLC,

5                 Plaintiff,

6           v.

7   THE ESTATE OF ROBERT SHERVYN SAVIN et al.,

8       Defendants.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - x

10  Adv. Case No. 10-04921-cgm

11  - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

13  MADOFF INVESTMENT SECURITIES LLC,

14                Plaintiff,

15          v.

16  MILLER,

17                Defendants.

18  - - - - - - - - - - - - - - - - - - - - - - - - - - x

19

20

21

22

23

24

25



Page 3

1    Adv. Case No. 10-04486-cgm

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

4    MADOFF INVESTMENT SECURITIES LLC,

5                      Plaintiff,

6            v.

7    THE NORMA SHAPIRO REVOCABLE DECLARATION OF TRUST UNDER

8    AGREEMENT,

9                      Defendant.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12

13                   United States Bankruptcy Court

14                   355 Main Street

15                   Poughkeepsie, NY 12601

16

17                   March 17, 2021

18                   10:00 AM

19

20

21   B E F O R E :

22   HON CECELIA G. MORRIS

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

Page 4

1    HEARING re Adversary proceeding: 08-01789-cgm

2    Securities Investor Protection Corporation v. Bernard L.

3    Madoff Investment Securities, LLC. et al

4    Doc# 20318 Notice of Hearing for Status Conference filed by

5    Clerk of Court, United States Bankruptcy Court, SDNY. with

6    hearing to be held on 3/17/2021 at 10:00 AM at

7    Teleconference Line (CourtSolutions)(CGM)

8

9    HEARING re Adversary proceeding: 10-04889-cgm

10   Irving H. Picard, Trustee for the Liquidation of B v. The

11   Estate of Robert Shervyn Savin et al

12   Doc# 109 Notice of Hearing to consider the Transcript

13   regarding Hearing Held on 1/20/21 at 10:00 AM RE: Status

14   Conference re Mediations. Remote electronic access to the

15   transcript is restricted until 4/22/2021.The transcript may

16   be viewed at the Bankruptcy Court Clerks Office.

17   [Transcription Service Agency: Veritext Legal Solutions.].

18   (See the Courts Website for contact information for the

19   Transcription Service Agency.). Notice of Intent to Request

20   Redaction Deadline Due By1/29/2021. Statement of Redaction

21   Request Due By 2/12/2021. Redacted Transcript Submission Due

22   By 2/22/2021. Transcript access will be restricted through

23   4/22/2021 (related document(s)106) filed by Clerk of Court,

24   United States Bankruptcy Court, SDNY. with hearing to be

25   held on 3/17/2021 (check with court for location)

Page 5

1    HEARING re Adversary proceeding: 10-04889-cgm

2    Irving H. Picard, Trustee for the Liquidation of B v. The

3    Estate of Robert Shervyn Savin et al

4    Doc. #106 Transcript regarding Hearing Held on 1/20/21 at

5    10:00 AMRE: Status Conference re Mediations.

6    Remote electronic access to the transcript is restricted

7    until 4/22/2021.

8    The transcript may be viewed at the Bankruptcy Court Clerks

9    Office. [Transcription Service Agency: Veritext Legal

10   Solutions.]. (See the Courts Website for contact information

11   for the Transcription Service Agency.). Notice of Intent to

12   Request Redaction Deadline Due By 1/29/2021. Statement of

13   Redaction Request Due By 2/12/2021. Redacted Transcript

14   Submission Due By 2/22/2021. Transcript access will be

15   restricted through 4/22/2021. (Cales, Humberto)

16

17   HEARING re Adversary proceeding: 10-04921-cgm

18   Irving H. Picard, Trustee for the Liquidation of B v. Miller

19   Doc# 90 Notice of Hearing to consider the Letter to Hon.

20   Stuart M. Bernstein to request a pre-motion conference

21   pursuant to Rule 7056-1(a)Filed by Nicholas Cremona on

22   behalf of Irving H. Picard, Trustee for the Liquidation of

23   Bernard L. Madoff Investment Securities LLC, and Bernard L.

24   Madoff and Letter to the Honorable Stuart M. Bernstein In

25   Response and Opposition to Trustees Request for a Pre-motion

1    Conference Filed by Carole Neville on behalf of Stanley T.

2    Miller(related document(s)85, 87) filed by Clerk of Court,

3    United States Bankruptcy Court, SDNY. with hearing to be

4    held on 3/17/2021 at 10:00AM at Teleconference Line

5    (CourtSolutions) (CGM)

6

7    HEARING re 09-11893-cgm Bernard L. Madoff

8    Doc# 40 Notice of Hearing for Status Conference filed by

9    Clerk of Court, United States Bankruptcy Court, SDNY. with

10   hearing to be held on 3/17/2021 at 10:00 AM at

11   Teleconference Line (CourtSolutions)(CGM)

12

13   HEARING re Adversary proceeding: 10-04486-cgm

14   Irving H. Picard, Trustee for the Liquidation of B v. The

15   Norma Shapiro Revocable Declaration of Trust U

16   Doc# 108 Notice of Hearing to consider the Letter to Hon.

17   Stuart M. Bernstein to request a pre-motion conference

18   pursuant to Rule 7056-1(a)Filed by Nicholas Cremona on

19   behalf of Irving H. Picard, Trustee for the Liquidation of

20   Bernard L. Madoff Investment Securities LLC, and Bernard L.

21   Madoff and Letter to the Honorable Stuart M. Bernstein In

22   Response and Opposition to Trustees Request for a Pre-motion

23   Conference Filed by Carole Neville on behalf of Norma

24   Shapiro, The Norma Shapiro Revocable Declaration of Trust

25   Under Agreement Dated9/16/08, Trust Under Will of Philip L.

1   Shapiro (related document(s)103,105) filed by Clerk of the

2   United States Bankruptcy Court, SDNY. With hearing to be

3   held on 3/17/2021 at 10:00 AM at Teleconference

4   Line(CourtSolutions) (CGM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   BAKER HOSTETLER LLP

4        Attorneys for Irving H. Picard as SIPC Trustee

5        45 Rockefeller Plaza

6        New York, NY 10111

7

8   BY:  NICHOLAS CREMONA (TELEPHONICALLY)

9

10   CHAITMAN LLP

11        Attorneys for the Estate of Robert Shervyn Savin et al.

12        465 Park Avenue

13        New York, NY 10022

14

15   BY:  HELEN DAVIS CHAITMAN (TELEPHONICALLY)

16

17   DENTONS LLP

18        Attorneys for Nora Shapiro

19        1221 Avenue of the Americas

20        New York, NY 10020

21

22   BY:  CAROLE NEVILLE (TELEPHONICALLY)

23        ART RUEGGER (TELEPHONICALLY)

24

25

1    MCDERMOTT WILL & EMERY LLP

2         Attorneys for Various Sage Entities

3         340 Madison Avenue

4         New York, NY 10173

5

6    BY:  ANDREW KRATENSTEIN (TELEPHONICALLY)

7

8    BROWN RUDNICK LLP

9         Attorneys for Fairfield Sentry Limited

10        7 Times Square

11        New York, NY 10036

12

13   BY:  DAVID MOLTON (TELEPHONICALLY)

14        MAREK P. KRZYZOWSKI (TELEPHONICALLY)

15

16   SELENDY & GAY PLLC

17        Attorneys for Ken Krys and Greig Mitchell, Joint

18        Liquidators for the Fairfield Funds

19        1290 Avenue of the Americas

20        New York, NY 10104

21

22   BY:  DAVID ELSBERG (TELEPHONICALLY)

23        YELENA KONANOVA (TELEPHONICALLY)

24        RONALD KROCK (TELEPHONICALLY)

25

Page 10

1    CLEARY GOTTLIEB STEEN & HAMILTON LLP

2         Attorneys for the HSBC & CitiBank Defendants

3         One Liberty Plaza

4         New York, NY 10006

5

6    BY:  NOWELL BAMBERGER (TELEPHONICALLY)

7         CHRISTINE JORDAN (TELEPHONICALLY)

8         DAVID SCHWARTZ (TELEPHONICALLY)

9         CARMINE BOCCUZZI (TELEPHONICALLY)

10        PASCALE BIBI (TELEPHONICALLY)

11

12   BAKER HOSTETLER LLP

13        Attorneys for Irving H. Picard, Trustee

14        45 Rockefeller Plaza

15        New York, NY 10111

16

17   BY:  SEANNA BROWN (TELEPHONICALLY)

18        TORELLO CALVANI (TELEPHONICALLY)

19        OREN WARSHAVSKY (TELEPHONICALLY)

20

21

22

23

24

25

Page 11

1    GIBSON, DUNN & CRUTCHER LLP

2         Attorneys for UBS AG, et al.

3         200 Park Avenue

4         New York, NY 10166

5

6    BY:  MARSHALL KING (TELEPHONICALLY)

7

8    HOGAN LOVELLS US LLP

9         Attorneys for Barclays Defendants

10         875 Third Avenue

11         New York, NY 10022

12

13    BY:  MARC GOTTRIDGE (TELEPHONICALLY)

14

15    WINDELS MARX

16         Special Counsel to Irving H. Picard, Trustee

17         156 West 56th Street

18         New York, NY 10019

19

20    BY:  HOWARD SIMON (TELEPHONICALLY)

21         KIM LONGO (TELEPHONICALLY)

22

23

24

25

Page 12

```
 1    WOLLMUTH MAHER & DEUTSCH LLP
 2         Attorneys for Fairfield, et al.,
 3         500 Fifth Avenue
 4         New York NY 10110
 5
 6    BY:  FLETCHER STRONG (TELEPHONICALLY)
 7
 8    YOUNG CONAWAY STARGATT & TAYLOR LLP
 9         Special Counsel for Irving H. Picard
10         1000 N. King Street
11         Wilmington, DE 19801
12
13    BY:  JUSTIN DUDA (TELEPHONICALLY)
14         MICHAEL NEIBURG (TELEPHONICALLY)
15
16    SULLIVAN CROMWELL LLP
17         Attorneys for Standard Chartered
18         125 Broad Street
19         New York, NY 10004
20
21    BY:  ANDREW FINN (TELEPHONICALLY)
22
23
24
25
```

Page 13

1   SECURITIES INVESTOR PROTECTION CORPORATION

2        1667 K Street NW

3        Washington DC, 20006

4

5   BY:   NICHOLAS HALLENBECK (TELEPHONICALLY)

6

7   ALSO PRESENT TELEPHONICALLY:

8

9   MICHAEL DRISCOLL

10  ROSA EVERGREEN

11  PATRICK MOHAN

12  JAMES BURKE

13  LAURA TAVERAS

14  VISHAKHA JOSHI

15  RANDELL MARTIN

16  DAVID PARHAM

17  MERILEN DAL RI ZIVIANI

18  ZEB LANDSMAN

19  DAVID SHEEHAN

20  JEFFREY TUCKER

21  MARK MCKEEFRY

22  LEO MUCHNIK

23  SARAH EICHENBERGER

24  JOCELYN GREER

25  ANDREW HARRIS

```
 1   THOMAS KESSLER

 2   ADAM LAVINE

 3   KEVIN KELLY

 4   KENNETH KRYS

 5   BIANCA LIN

 6   ROBERT LACK

 7   MAXWELL DILLAN

 8   ROBERT LACK

 9   ANDREW HALERN

10   RACHEL ALBANESE

11   CHERELLE GLIMP

12   JOSHUA DORCHAK

13   JONATHAN CROSS

14   HARRISON POLANS

15   BENJAMIN FLEMMING

16   ALICE O'BRIEN

17   ERIC HALPER

18   LAUREN PINCUS

19   JOHN ZULACK

20   JONATHAN COGAN

21   NICHOLAS ICKOVIC

22   DONNA XU

23   D. FARRINGTON YATES

24   DAVID SHEEHAN

25   STEPHEN M. HARNIK
```

```
 1    MARK HANCHET

 2    MARC COHEN

 3    EMILY MATHIEU

 4    STEVEN FROOT

 5    DANIEL NEGLESS

 6    BRENDA DILUIGI

 7    NATE ASHER

 8    EHUD BARAK

 9    GREGORY HAUSWER

10    JASCHA PREUSS

11    DANIEL SHAMAH

12    BILL SUSHON

13    BENJAMIN LOVELAND

14    ANDREW PROOPS

15    LAWRENCE MAY

16    JAMIE B. LEGGETT

17    ERIC WEISGERBER

18    JARED STEIN

19    JEFFREY MARGOLIN

20    CHRISTINE JORDAN

21    VICTOR MUSKIN

22    KEITH PALFIN

23    DAVID ERROLL

24    JENNIFER DELGADO

25    MARK CIANI
```

1   ANGELA HERRING

2   DAVID ELSBERG

3   ESTER MURDUKHAYEVA

4   SEAN AKCHIN

5   ANTHONY PACCIONE

6   JEFFREY FOURMAUX

7   RICHARD CIRILLO

8   MARK MAKAR

9   RAHMAN CONNELLY

10   CAROLE NEVILLE

11   NORMA SHAPIRO

12   STANLEY MILLER

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Call the calendar just by the numbers

3    because, as you know, we have sort of odd linking numbers.

4    Let's just begin by everyone on the phone introducing

5    themselves.

6            MR. CREMONA:  Good morning, Your Honor.  Nicholas

7    Cremona of Baker & Hostetler appearing on behalf of Irving

8    Picard as SIPA Trustee.

9            MS. CHAITMAN:  Good morning, Your Honor.  This is

10   Helen Davis Chaitman of Chaitman LLC on behalf of a number

11   of clawback defendants.

12           MS. NEVILLE:  Good morning, Your Honor.  Carole

13   Neville from Dentons on behalf of Stanley Miller and Norma

14   Shapiro, and with me is Art Ruegger from Dentons.

15           MR. KRATENSTEIN:  Good morning, Your Honor.

16   Andrew Kratenstein of McDermott Will & Emery on behalf of

17   the Sage defendants: Sage Associates, Sage Realty, and three

18   members of the Sage family.

19           THE COURT:  Mr. Molton, you have your hand up.

20           MR. MOLTON:  Oh, sorry, Judge.  David Molton.

21   I'll let Mr. Elsberg speak as well.  David Molton of Brown

22   Rudnick for the Liquidators of the Fairfield Funds,

23   Fairfield Sentry, Sigma and Lambda.  Mr. Elsberg.

24           MR. ELSBERG:  Hi.  Yes, Your Honor, this is David

25   Elsberg from Selendy & Gay for the Fairfield Joint

Page 18

```
 1   Liquidators.  Mr. Ken Krys, who's one of the two Joint

 2   Liquidators I represent is also on the phone with me.  And

 3   also on the phone with me are my colleagues, Lena Konanova

 4   and Ron Krock from Selendy & Gay.

 5             THE COURT:  Very good.  Anyone else wish to put

 6   their name on the record.  Yes?

 7             MR. BAMBERGER:  Good morning, Your Honor.  This is

 8   Noel Bamberger at Cleary Gottlieb, representing the HSBC

 9   defendants, and with me on the phone are Christine Jordan

10   and David Schwartz also from Cleary Gottlieb.

11             MR. KRZYZOWSKI:  Marek Krzyzowski, Brown Rudnick,

12   also for the Liquidators, Fairfield Sentry, Sigma and

13   Lambda.

14             THE COURT:  Excuse me, sir.  I didn't get the name

15   of the last person that spoke.

16             MR. KRZYZOWSKI:  Apologies, Your Honor.  This is

17   Marek Krzyzowski with Brown Rudnick, along with David Molton

18   for the Liquidators of Fairfield Sentry, Sigma and Lambda.

19             THE COURT:  Okay.

20             MS. BROWN:  Good morning, Your Honor.  This is

21   Seanna Brown on behalf of Irving Picard, Trustee, of Baker

22   Hostetler.

23             MR. KING:  Good morning, Your Honor.  It's

24   Marshall King from Gibson Dunn & Cruther, on behalf of the

25   UBS parties.
```

Page 19

1          MR. CALVANI:  Good morning, Your Honor.  Torello

2     Calvani of Baker Hostetler on behalf of the Trustee, Irving

3     Picard.

4          MR. GOTTRIDGE:  Good morning, Your Honor.  It's

5     Marc Gottridge of Hogan Lovells US, LLP, on behalf of the

6     Barclays defendants.

7          MR. WARSHAVSKY:  Good morning, Your Honor.  This

8     is Oren Warshavsky of Baker Hostetler, also for the Trustee.

9          MR. SIMON:  Good morning, Your Honor.  This is

10    Howard Simon from Windels Marx as special counsel to the

11    Trustee.

12         MS. LONGO:  Good morning, Your Honor.  This is Kim

13    Longo, also of Windels Marx, as special counsel to the

14    Trustee.

15         MR. STRONG:  Good morning, Your Honor.  This is

16    Fletcher Strong of Wollmuth Maher & Deutsch on behalf of

17    Fairfield Investment Fund, Ltd., FIF Advanced Ltd., and

18    Fairfield Investment GCI.

19         MR. DUDA:  Good morning, Your Honor.  Justin Duda

20    of Young Conaway Stargatt & Taylor on behalf of Irving

21    Picard as Trustee.

22         MR. BOCCUZZI:  Good morning, Your Honor.  Carmine

23    Boccuzzi from Cleary Gottlieb on behalf of the Citibank

24    defendants, and I'm here with my colleague, Pascale Bibi.

25         MR. NEIBURG:  Good morning, Your Honor.  Michael

Page 20

1    Neiburg from Young Conaway on behalf of the Trustee.

2              MR. FINN:  Good morning, Your Honor.  Andrew Finn

3    from Sullivan & Cromwell on behalf of the Standard Chartered

4    and Bank Safra Sarasin defendants.

5              MR. HALLENBECK:  Good morning, Your Honor.

6    Nicholas Hallenbeck on behalf of SIPC.

7              THE COURT:  Thank you.  Does anyone else wish to

8    put their name on the record?  Since there's so many of us,

9    please any time you wish to speak, make sure you give your

10   name before you speak so that the record is clear of who is

11   speaking.  Thank you.

12             Good morning.  A lot has to do today with

13   basically just a status on many things.  I do know I have

14   things that I do have to rule on, but basically, it's a

15   status.  Let me first say there's a bit of a procedure

16   change for everyone.  I do not appreciate or want papers or

17   even agendas the day before or at 9:00 the day before I'm

18   going on the bench at 10:00 the next morning.  Please file

19   everything by Friday.  We're going to have a continual

20   Wednesday hearing.  Make sure I have the information, so I

21   have time to digest what has been filed for me to even look

22   at during a status conference.

23             First, let's begin with -- I know we have an

24   agenda.  The only agenda that's been presented to me though

25   is from the SIPA liquidation in 08-01789, and these are --

Page 21

1    the first thing is the status of the cases.  And let me just

2    begin, this is a status hearing.  I do need an update to the

3    Court as to whether this litigation stands, what causes

4    remain.  And I've seen your paperwork and I've seen Exhibit

5    A, B and C, and the timeline for moving forward.  I want you

6    to tell me what procedures we have and what's working.

7              I can tell you right now, I'm not changing those

8    procedures at this time, but I reserve the ability to

9    revisit them if I see things are not moving forward.  So you

10   can tell me things that you think are working, things that

11   you think aren't working and what we need to do about it.

12             I do have the Exhibits A, B and C.  I do have one

13   quick question before we go to A.  On B, I think there's a

14   little bit of difference.  And since I'm trying to follow

15   these precisely and this will be basically, my beginning of

16   knowing truly about all cases, in the written materials, you

17   said you had one bad faith case and 10 feeder fund.  On

18   Exhibit B, I have 10 total, not one and nine, you had one

19   and 10.

20             Would some from Baker Hostetler first like to

21   bring me up to date and give me a status on the open

22   adversaries: where are they, how many are actively

23   litigated, and from the exhibits, the breakdown of these

24   cases.  Who is going to be speaking for Baker Hostetler?

25             MR. CREMONA:  Good morning, Your Honor, again.

Page 22

1  This is Nicholas Cremona for the record appearing on behalf

2  of Irving Picard.

3         I was going to, along with my colleagues, Seanna

4  Brown, Oren Warshavsky, and Torello Calvani will walk you

5  through the report as you requested, if that's acceptable to

6  Your Honor, and to answer any questions you may have along

7  the way.

8         Just to answer your initial question with regard

9  to the exhibits and the number, there was an inadvertent

10  error there, and we can walk you through the number of

11  cases.  The bad faith and feeder fund cases is correctly

12  stated on the exhibit as 11, but there is an error in the

13  paragraph, which we will happily correct.

14         But if it's acceptable --

15         THE COURT:  Okay, wait.  I have it as 10 and

16  you're saying at 11.  If you look at the bad faith feeder

17  cases on your Exhibit B, there are only 10 cases all

18  together.  Did you have another case that you needed to add?

19         MR. CREMONA:  No, Your Honor, that is correct.  I

20  believe it was elsewhere stated incorrect within the status

21  to the Court itself.

22         THE COURT:  Thank you.  That's all I needed to

23  know because, again, I will tell you right now more than

24  likely, I'll refer back to these at times because I'm

25  expecting that this is a complete list of what we're dealing

Page 23

1    with, I mean in the future.  Okay.

2              MR. CREMONA:  It is, Your Honor.  And, you know,

3    as you saw, the status report was filed yesterday, and we

4    will certainly be mindful of filing everything the Friday in

5    advance and we apologize for that inconvenience.

6              But the report is designed to give Your Honor an

7    overview of the status of the liquidation as a whole,

8    recovery efforts, the administration of the case generally,

9    and the ongoing litigation matters, as you have seen.

10             It's designed to advise Your Honor, as you

11   mentioned, of the procedural posture of the remaining

12   avoidance actions and what the Trustee believes will be

13   coming before the Court in the coming months.

14             So with that background, I would just briefly go

15   through some of the initial sections, as I said, with my

16   colleagues to give you an overview generally of the

17   liquidation in the first instance.  And as you may have

18   seen, we started out with an overview of the Trustee's

19   recovery and distribution efforts.

20             As of the end of February, the Trustee has

21   recovered approximately $14.413 billion since the inception

22   of the liquidation proceeding.  And to date, the Trustee has

23   made 12 interim distributions to customers, aggregating more

24   than $14.16 billion, and the customers have received almost

25   70 percent of their allowed claims.

1        The Trustee is continuing to build on these

2    extraordinary efforts to prosecuting the remaining

3    identified actions in the status report and specifically,

4    the Trustee's recoveries have been comprised of the proceeds

5    of over 1100 avoidance actions commenced in the four

6    categories that we laid out in the report, namely the good-

7    faith cases, the bad faith cases, the feeder fund cases, and

8    the subsequent transferee cases.

9        My colleagues and I plan to provide an update on

10   each category, their procedural posture and how we expect

11   them to proceed before the Court in the coming months, as

12   you have requested.

13       The first section of the report on the case

14   administration and procedure is really designed to address

15   Your Honor's initial point of what we've been doing, how we

16   see the matters working, what we think works, and hopefully

17   to confirm that Your Honor agrees that these general

18   practices work and will continue to use them going forward.

19       Generally, as you may have seen, we identified the

20   overall overarching procedural orders, namely: the claims

21   procedures order, which establishes procedures whereby the

22   Trustee has been resolving pending objections to the

23   Trustee's claims determination, and we continue to do that

24   on an ongoing basis; the litigation procedures order, which

25   establishes the procedures governing the remaining good-

Page 25

1    faith actions, which we will discuss; the settlement

2    procedures order, which has worked quite well, permits the

3    Trustee to settle avoidance actions with defendants where

4    the face amount of the Complaint was less than $20 million

5    without further burdening the Court with the filing of a

6    9019 motion or further Court approval.

7            We also have pointed in the case a discovery

8    arbitrator to relieve the burden on the Court in dealing

9    with discovery disputes that the parties agree to submit to

10   former Magistrate Judge Frank Maas, with JAMS, and we have

11   detailed in the report how Judge Maas has been instrumental

12   in streamlining and resolving several key discovery

13   disputes.

14           We also briefly outline the process whereby the

15   Trustee generally on a now-annual basis files motions for

16   the allocation of customer property and interim

17   distributions to customers.  And as Your Honor may have

18   noted, most recently, the Trustee's completed the 12th

19   interim distribution from the fund, the customer fund,

20   distributing more than $231 million to eligible customers.

21           And that's a brief summary of the procedural

22   matters and how we've been moving forward.  And subject to

23   Your Honor's continued approval, you know, we certainly

24   think the process has been working and moving the cases

25   forward, and we can discuss each way that we're doing that,

Page 26

1    starting next with the claims litigation.

2            We wanted to provide you with an update there on

3    the status generally and what's going on before the Court.

4    Since the filing date, the Trustee has resolved over 4,236

5    objections to the Trustee's claims determination.  We've

6    made significant progress.  As of today, only 229 objections

7    remain.  As I mentioned, pursuant to the claims procedure

8    order, the Trustee continues to resolve pending objections

9    by way of omnibus motions.

10           Your Honor may recall seeing the Trustee's most

11   recent motion, which is the 37th omnibus motion, returnable

12   before the Court on April 21st, and that motion seeks to

13   resolve an additional eight pending objections.  We have

14   been filing omnibus motions on a monthly basis as issues in

15   the case are resolved and pave the way for determining those

16   pending objections.  And again, provided that it's

17   acceptable to Your Honor, we'll continue with that practice

18   to resolve the remaining objections.

19           THE COURT:  Okay.

20           MR. CREMONA:  Next, Your Honor, we wanted to

21   provide an update on the status of the four categories of

22   avoidance action that I mentioned earlier, starting with the

23   good-faith actions, which are those cases where the Trustee

24   acknowledges that defendants received the transfers from

25   BLMIS in good faith within the meaning of Bankruptcy Code

Page 27

1    Section 548(c), and Your Honor has some familiarity already

2    with those actions having conducted a trial in the main

3    proceeding and recently deciding the Epstein matter by way

4    of summary judgment.

5            To date, Your Honor, the Trustee has successfully

6    resolved over 935 good-faith actions, resulting in over $1.3

7    billion in recovery for the customer fund.  As of today as

8    Your Honor saw on Exhibit A to the report, there are 64

9    active good-faith cases remaining, including nine cases

10   where the parties have reached settlements in principal that

11   we expect to resolve and dismiss over the next few months.

12           With regard to where we are on the remaining 64

13   cases, we've completed discovery in 59 of them and engaged

14   in early mediation in five related cases which are ongoing.

15   We expect to resolve the remaining good-faith cases by way

16   of, for the most part, mediation pursuant to the litigation

17   procedures order to the extent that the parties agree

18   mediation would be productive, or we intend to seek leave to

19   file summary judgment motions as we have in two cases that

20   are on the calendar later today.

21           It is the Trustee's position that all the

22   remaining good-faith actions are substantially the same and

23   amenable to disposition as a matter of law pursuant to the

24   Court's recent decision that I mentioned in the Epstein

25   case, which is at Adversary Proceeding No. 10-4438, ECF No.

1   155, which Your Honor decided on January 27, 2021.

2          The Trustee expects to resolve these cases in this

3   manner before the Court over the next several months.  And

4   to the extent the cases are not resolved through mediation

5   or dispositive motion, the Trustee then would proceed to

6   trial before the Court pursuant to the litigation procedures

7   order as required in Paragraph 7.

8          THE COURT:  Let me interrupt you and ask one

9   question.  On the active good-faith cases on Exhibit A, you

10  have RAR Entrepreneurial Fund Ltd.  Is that not with

11  District Court Judge Furman?

12         MR. CREMONA:  Yes, Your Honor.  There are 11

13  matters that are pending in the District Court, and we have

14  listed them in the report as Your Honor has noted.  Seven of

15  those matters are on motions to withdraw the reference; in

16  four of the matters, the reference has been withdrawn.

17         And in one of those cases as Your Honor noted, is

18  the RAR decision and Judge Furman has recently issued a

19  decision granting in part the Trustee's motion for summary

20  judgment, and that matter is actually scheduled for a

21  conference before Judge Furman tomorrow afternoon.  And we

22  can discuss this in the status conference later on the

23  pending mediations, but I intend to report to Your Honor

24  that we intend to mediate that case on a parallel track as

25  it proceeds before Judge Furman, again, to the extent that's

1   acceptable to the Court.

2          THE COURT:  That's absolutely acceptable.  If you

3   would do me a favor on your next report, not necessarily

4   this one, is just put a little asterisk for the things that

5   we're waiting on District Court or they're at District

6   Court, so that I honestly don't clutter my brain.  How's

7   that?

8          MR. CREMONA:  Absolutely, Your Honor.  There is a

9   paragraph dedicated to the matters pending in the District

10  Court, and I apologize.  I know you didn't have sufficient

11  time to review the report in detail, but we did itemize

12  those 11 matters for Your Honor's convenience as stated in

13  the report.

14         THE COURT:  I did, and I did read it.  The problem

15  is absorbing it enough to then look at Exhibit A and put

16  them together.  I mean, the RAR one was easy, and it stood

17  out because, of course, I have read that decision, so that

18  was all.  I'm just trying to make them go together so that I

19  can understand the full picture of everything.  Thank you.

20         MR. CREMONA:  Understood, thank you, Your Honor.

21  And unless Your Honor has any other questions regarding the

22  good-faith cases or the other matters I've addressed, I will

23  cede the virtual podium, if you will, to my colleague Seanna

24  Brown to address the status of the appeal of the good-faith

25  standard under 548(c) and 550(b) and how it affects the

1    remaining bad faith, feeder fund, and subsequent transferee

2    cases.

3              THE COURT:  Thank you.  I appreciate that.  Thank

4    you.

5              MR. CREMONA:  Thank you, Your Honor.  Miss Brown.

6              MS. BROWN:  Yes, good morning, Your Honor.  Seanna

7    Brown on behalf of Irving Picard.

8              As Mr. Cremona just said, I'd like to discuss the

9    appeals on the good-faith standard.  Last Friday was a very

10   big day in the case that we've, the Trustee, and probably

11   all of the parties have been waiting for for almost seven

12   years, which is to have the Circuit review the standard that

13   Judge Rakoff imposed back in 2014 on good faith and whose

14   burden it is to plead.

15             So I'd like to discuss that appeal today and give

16   you some background on that.  But before I do, I thought it

17   might be helpful for me to run through the categories of

18   cases that could be implicated by the Second Circuit's

19   ruling.

20             THE COURT:  Okay.

21             MS. BROWN:  So we three subgroups of cases where

22   we allege that the defendants took the transfers without --

23   with a lack of good faith.  We have what we call the bad-

24   faith cases; those were cases that were brought in 2010.  We

25   brought about 30 of them against Madoff's friends, family

1    members, employees and other insiders.  We've resolved or

2    settled all of those cases with the exception of Picard v.

3    Avellino; that case is in active discovery.

4           We brought about 30 actions against Madoff's

5    feeder funds; those are cases like the Fairfield case, which

6    I know Your Honor is familiar with.  Those are Madoff

7    customers that aggregated the investments of other

8    investors.  We brought 30 of those actions back in 2010.

9    We've resolved or settled 21 of them and there are nine

10   still pending, which is indicated on the Exhibit B to the

11   report.

12          And we can fix, if Your Honor would find that

13   helpful, Paragraph 20 of the report, which has the

14   discrepancy that you noted at the beginning of the hearing.

15          THE COURT:  Just so long as it's noted on the

16   record; that's all I need because I'm probably going to

17   refer myself back to Exhibit A, B and C throughout this

18   case.

19          MS. BROWN:  Okay.  So Exhibit B has the one bad

20   faith and the nine feeder fund cases that are still pending,

21   so that we have a total of 10 cases in that category.

22          And I just want to pause to note that the Trustee

23   has had enormous success in these cases.  We've recovered

24   over $11.6 billion from defendants in these cases, and that

25   has allowed the Trustee to make significant distributions of

1    customer property to Madoff customers in this proceeding.

2           Our last category of bad-faith cases are the

3    subsequent transfer cases.

4           THE COURT:  Slow down for just a moment.  The ones

5    that are in front of me though of this 11, these are

6    Avellino and then the feeder fund cases.  These are the ones

7    that are still outstanding.

8           MS. BROWN:  Correct, Your Honor.

9           THE COURT:  Okay, that's all I needed to know.  I

10   just wanted to be clear about that because you jumped to the

11   recovery, but the recovery is not from any one of these

12   cases; these are what's still left.  Thanks.

13          MS. BROWN:  Sure.  And just not to correct the

14   record, so we have 10 cases in the bad faith and feeder fund

15   categories.  Your Honor, I just said 11.  I just want to

16   make sure the record is clear, so it doesn't get confusing.

17   We have 10, as indicated on Exhibit B.

18          THE COURT:  Thank you.

19          MS. BROWN:  You're welcome.  So our last category

20   of cases in the bad-faith world is the subsequent transfer

21   cases, and those are defendant cases where defendants

22   received transfers of property from Madoff feeder funds, and

23   we have 83 of those cases pending, currently pending before

24   Your Honor.

25          So all of these cases, because --

1          THE COURT:  Excuse me, let me interrupt again.  In

2   every one of these, no reference has been withdrawn, there

3   is no other court involved in these 83.  I have 83.

4          MS. BROWN:  There's 83, 83 is the correct number.

5   That is correct, with the exception of three cases: the

6   first would be Citibank, that's one case that's subject to

7   the Second Circuit's appeal.

8          THE COURT:  Certainly.

9          MS. BROWN:  And there are two cases that are

10  pending before the District Court; they're actually stayed.

11  It's the ABN AMRO case, which is Docket No., the Bankruptcy

12  Court Docket No. is 10-05354; that's also known as the RBS

13  case.  The second case at the District Court is Picard v.

14  ABN AMRO Bank Ireland, Ltd., which is Adversary Proceeding

15  No. 10-05355.

16          In those two cases that are at the District Court,

17  Judge Bernstein also ruled that the Trustee did not

18  sufficiently plead the defendants' willful blindness.  Those

19  cases resulted in a final judgment that was appealed to the

20  District Court.  The defendants in those actions did try to

21  join the Second Circuit appeals in the Legacy and Citibank

22  matters, and the Second Circuit did not allow them to join

23  as parties; it allowed those defendants to file amicus

24  briefs in the Second Circuit appeal.

25          So the posture of those cases is that the District

Page 34

1   Court, they are pending in the District Court but they are

2   stayed pending the outcome of the Second Circuit appeal.

3           THE COURT:  Okay.

4           MS. BROWN:  With the exception of those three

5   cases that are listed on Exhibit C to the report, every -- I

6   believe, and perhaps one of my colleagues, Oren Warshavsky

7   or Torello Calvani when they speak later, could correct me

8   if I'm wrong.  But I believe with the exception of those

9   three, every single one of the other cases listed on Exhibit

10  C is pending before Your Honor in the Bankruptcy Court.

11          THE COURT:  Okay.

12          MS. BROWN:  So I think it would, you know,

13  hopefully, it would be helpful --

14          THE COURT:  I have one question.  I just have one

15  question to ask.  The District Court, ABN AMBRO NV and ABN

16  AMBRO Bank of Ireland, 05354 and 05355, you also have on 12-

17  01697 ABN AMBRO Fund Services, Isle of Man.  Is that in the

18  same category?

19          MS. BROWN:  I don't believe so, Your Honor.  I

20  believe that's a separate --

21          THE COURT:  Okay, that's all I needed to know.

22  Thank you.

23          MS. BROWN:  Of course.  So with Your Honor's

24  indulgence, I'd like to maybe spend just a couple of minutes

25  talking about the history of the good-faith appeal because

1    it's long, and I promise to be very brief, but I think it

2    helps explain why we're still at the pleadings stage in many

3    of the cases that are currently pending before Your Honor.

4              So in 2010 when the Trustee brought his

5    Complaints, both the good-faith cases and the bad-faith

6    cases, it was the standard for good faith under 548(c) and

7    550(b) was inquiry notice, and it was the defendants' burden

8    to plead their affirmative defense.

9              Judge Lifland denied several motions between 2009

10   and 2011 by various defendants who sought to dismiss the

11   Trustee's Complaint because he found that the Trustee had no

12   burden to negate a defense in his Complaint.

13             In 2011, in the Picard v. Katz matter, that was

14   one of the first matters that Judge Rakoff withdrew the

15   reference on, and he began issuing various decisions in that

16   matter.  Following that event, hundreds of defendants began

17   withdrawing the reference to Judge Rakoff, and he granted

18   those motions and withdrew on a number of common issues that

19   we've listed in the status report, and he directed the

20   parties to undertake common briefing.

21             The two issues that are most relevant to the

22   umbrella of bad-faith cases were the extraterritoriality

23   decision, as well as the decision on 548(c) and 550(b)'s

24   good-faith defense.

25             So Judge Rakoff issued his decisions in 2014 on

1   both of the ET and the good-faith issues.  And in the good

2   faith, with regard to good faith, he held that it's no

3   longer inquiry notice, but a willful blindness standard to

4   show a lack of good faith, and that's no longer the

5   defendants' burden to plead that but the Trustee's.

6           So because this was a new standard being imposed

7   upon the Trustee, we immediately sought an interlocutory

8   appeal from Judge Rakoff, which he denied in 2014, and he

9   held that the Circuit should only review that ruling after

10  the Bankruptcy Court has applied it to the facts of a

11  particular case.

12          Two months after his good-faith ruling, Judge

13  Rakoff issued his extraterritoriality ruling, and he found

14  that because Section 550(b) does not apply

15  extraterritorially, the Trustee must plead facts to

16  establish that the subsequent transfers were domestic.  So a

17  number of the subsequent transferee defendants, I mean, as

18  well as we're, you know, around the world, so that ruling

19  did have an impact on the Trustee's cases.

20          So the cases were then returned to Judge

21  Bernstein.  And because of the new pleading standards that

22  were imposed, in the Summer of 2014 following Judge Rakoff's

23  ruling, the Trustee moved before Judge Bernstein for leave

24  to amend his Complaints to plead additional allegations with

25  regard to extraterritoriality, as well as good faith, and

Page 37

1    the Trustee also sought leave to take additional discovery

2    so that he could meet this new pleading standard of willful

3    blindness.

4            And Judge Bernstein then ruled that he wanted to

5    address the extraterritoriality issues first before he

6    addressed any issues with regard to the good-faith defense

7    or any discovery requests.  And so, the parties then

8    embarked on, I guess almost a six-year process to litigate

9    the extraterritoriality ruling.

10           Judge Bernstein came down with his ruling in 2016,

11   so that's two years after Judge Rakoff's ruling.  The

12   Trustee appealed that to the Second Circuit, which reversed

13   in 2019, which reinstated the Trustee's claims against the

14   subsequent transferee defendants, and in June 2020, the

15   Supreme Court denied cert, so that's the ET ruling.

16           We had cases and claims and defendants that were

17   not dismissed by Judge Bernstein's extraterritoriality

18   ruling.  And as soon as we got Judge Bernstein's ruling on

19   ET, while the ET appeal was pending, the Trustee moved

20   before Judge Bernstein to take -- he renewed his motion for

21   the limited discovery on the good-faith issues because under

22   the way Judge Bernstein had segregated the cases, those

23   issues were now ripe for disposition.

24           So in the cases that weren't dismissed by

25   extraterritoriality, we sought additional discovery, which

Page 38

1    Judge Bernstein denied in 2018.  So at that point, the

2    Trustee, you know, moved forward with his cases based on the

3    record that he had, and he brought forth various cases where

4    he believed that the pleadings were sufficient to meet the

5    willful blindness standard without the benefit of any

6    additional discovery.

7             One of those cases was the Citibank matter.  The

8    Trustee brought a motion for leave to amend, which Judge

9    Bernstein denied.  He found that the Trustee did not plead

10   the defendants' willful blinding, and that was the first

11   case that resulted in a final judgment that encapsulated the

12   standard on good faith, so that was really the first

13   opportunity in 2019 that we had to appeal that ruling of

14   Judge Rakoff.

15            Around the same time that the Citibank judgment

16   became final, there was a final judgment also entered in the

17   Legacy case.  That case, likewise, Judge Bernstein ruled

18   that the Trustee did not plead the defendants' willful

19   blindness.

20            So we finally had two final judgments in hand five

21   years after Judge Rakoff's rulings.  We asked for a direct

22   appeal to the Second Circuit which was granted.  We finished

23   briefing and, as I mentioned, we had argument last Friday

24   before the Circuit on those appeals.  So the appeal --

25            THE COURT:  Let me interrupt.  Excuse me, I just

1   need to interrupt for one thing.  I'm again looking at

2   Exhibit C and I remember your narrative about Legacy.  Am I

3   missing Legacy or I'm not finding it in your Exhibit C?

4          MS. BROWN:  Legacy is listed on Exhibit B, Your

5   Honor.

6          THE COURT:  Oh, it's B, I apologize.  There, I see

7   it, okay.  Thank you.

8          MS. BROWN:  Of course.

9          THE COURT:  Never mind, thank you.  Okay, go

10  ahead.

11         MS. BROWN:  So just turning to the appeal for a

12  second, there are -- so there's two appeals that present,

13  there's two common issues amongst the appeals in each of the

14  Citibank and Legacy cases, and then each case has an

15  individual issue.

16         The common issue is, of course, what's the proper

17  standard for good faith under 548(c) or 550(b): is it

18  inquiry notice, willful blindness, or I guess potentially

19  something else that the Circuit might impose, and the second

20  common issue is whose burden it is to plead that good-faith

21  defense.

22         In each appeal, there's a separate issue of

23  whether Judge Bernstein correctly applied the willful

24  blindness standard to the Trustee's allegations.  And I

25  guess I would say it would be kind of foolish of me to try

Page 40

1    to predict exactly what the Circuit would do.  I certainly

2    have my views on what they should do.  But even as an

3    advocate, I concede that there's a lot of different possible

4    outcomes.

5             And so, just to kind of walk Your Honor a couple

6    that pop out at me is I think if the Circuit were to rule on

7    the two common issues, it might not reach the individual

8    issues because it might not need to, and I think the

9    opposite is also true.

10            So it's really hard to predict exactly the path

11   that the remaining cases will take without that clear

12   guidance from the Second Circuit on the standard that

13   governs this defense that's present in every single one of

14   these cases.

15            I did take a look at the prior appeals that we've

16   had to the Second Circuit to get a sense of timing.  And I

17   think based on our prior appeals with sort of similar issues

18   that affected a broad number of cases, I think we can expect

19   a ruling sometime in the next three to nine months.  Our

20   extraterritoriality ruling was really the quickest ruling we

21   had, which was also the most recent.  We've had other

22   appeals where the rulings took, you know, nine months to a

23   year.

24            But what I would say to Your Honor is that the

25   Trustee is very, very eager to litigate these cases and get

Page 41

1    into discovery.  We've been seeking discovery for almost

2    seven years to get these cases to a place where we can

3    prosecute our claims and recover the customer property

4    that's outstanding.

5            And so, assuming the Circuit rules in the

6    Trustee's favor on some or all of the issues, the Trustee

7    wants to get into discovery as quickly as possible.  Some of

8    the events in the Complaint took lace 15, 16, 17 years ago

9    at this point and so, I would assure you that we're going to

10   do everything that we can as soon as we have the Circuit's

11   ruling in hand to move these cases forward as quickly as we

12   can.

13           My colleagues, Oren Warshavsky and Torello Calvani

14   are also on the line.  They can speak to some of the

15   specifics of either the feeder fund or the subsequent

16   transferee cases if Your Honor would like to hear more

17   details on those, or I can answer any questions that you

18   might have.

19           THE COURT:  Okay.  Let me just for -- time is not

20   really my issue, but I think timing is my thought.  If we

21   are still waiting on the Circuit, I don't know that we need

22   any more information about the subsequent transferee cases.

23   Am I hearing what you said?  Basically, that you're not

24   really looking for an opinion or thinking that you'll be

25   seeing an opinion until around October/November.

1           MS. BROWN:  I think that's right, Your Honor, for

2    the subsequent transfer cases that are awaiting that

3    decision.  There are some cases that are in active discovery

4    that maybe we should address today.  But I think the

5    remaining subsequent transferee cases, they will be impacted

6    by the ruling, so I don't think it makes -- I don't think we

7    would be asking for anything from Your Honor until then.

8           THE COURT:  Okay.  The one thing I would like to

9    ask is, I remember reading in your summary that you sent me

10   that you all had doing some discovery by agreement; is that

11   in any of these cases?

12          MS. BROWN:  Yes, and Mr. Warshavsky is available

13   to discuss those cases.

14          THE COURT:  Okay, all right.

15          MS. BROWN:  Thank you, Your Honor.

16          THE COURT:  As you can just understand, I'm trying

17   to get a full picture of everything that's going on.  Okay,

18   Mr. Warshavsky.

19          MR. WARSHAVSKY:  Good morning, Your Honor.

20          THE COURT:  Good morning.

21          MR. WARSHAVSKY:  Thank you.  I think if we go to

22   Exhibit B maybe, that would be the place to start.  One of

23   the challenges, of course, is that you already had a very

24   long discussion.  I think it was very thorough, so I think

25   maybe it's best to explain maybe one or two of the actions.

Page 43

1    There are two here which are in discovery, and that is the

2    fourth one down, Your Honor, 10-4285, UBS AG et al, and the

3    third one down, I'm sorry, which is 09-01364, which is HSBC

4    Bank et al.

5            And in the HSBC action, there is still an initial

6    transferee, Alpha Prime, and the Trustee is in Alpha Prime,

7    are in active litigation and there is active discovery, and

8    that is proceeding, and Judge Maas is the discovery

9    arbitrator there.

10           THE COURT:  Okay.

11           MR. WARSHAVSKY:  The parties, a lot of the

12   discovery is overseas.  Right now, the Trustee is taking

13   active discovery -- well, trying to take active discovery.

14   Given the challenges of the Hague request, number one, and

15   obviously the pandemic, number two, so timing has been a bit

16   of a challenge, but we are taking discovery in Luxembourg,

17   Austria, and England in that case right now.

18           THE COURT:  And I think I recall that Judge

19   Bernstein had allowed for the Hague service; is that in this

20   case?

21           MR. WARSHAVSKY:  That's going to be in the next

22   case I discuss.

23           THE COURT:  Okay.

24           MR. WARSHAVSKY:  That'll be in the one right below

25   it, UBS.  So in the HSBC case, there had been various

Page 44

1   motions for letters of request under the Hague Convention,

2   and some of those have been disputed or negotiated, so he

3   did have to issue orders in some of those.

4           Generally speaking, we have tried to work it out

5   with other parties ahead of time so as not to have a

6   discovery dispute on these requests, but they tend to have a

7   lot of detail and they tend to have some conflict of laws

8   issues, so we do the best we can.  All the parties try to do

9   the best they can and take it to the judge only when they

10  really can't reach an agreement.

11          Turning to the UBS case, the second one, there's

12  two cases which UBS is the first party; that's just because

13  of the Convention of how UBS happened to be a custodian for

14  those funds.  But I'd focus on the first one, the one I

15  called out before, 4285, we would call that the LuxAlpha

16  case.  LuxAlpha and Groupement Financier -- I hope I

17  pronounced that right -- are the two initial transferees.

18          And when the Trustee brought the claim, the

19  Trustee brought the claim both against the funds themselves,

20  as well as the service providers of those funds, which were

21  the UBS entities and in LuxAlpha, it was also a group of

22  entities called Access.

23          I think Miss Brown talked a little bit about the

24  effect of the appeals.  In this case in particular, this was

25  a foreign feeder fund, it's a foreign feeder fund in

Page 45

1    liquidation, LuxAlpha is.  And when the cases were returned

2    in 2014, LuxAlpha was one of the cases that was part of the

3    omnibus extraterritoriality proceedings and the subsequent

4    transferees were dismissed from -- or most of them were

5    dismissed from the case in the Bankruptcy Court's

6    extraterritoriality ruling.

7            In the meantime, while the extraterritoriality

8    briefing was occurring, I think what you're referring to is

9    the parties -- the Trustee tried to start discovery and the

10   parties ultimately -- he ultimately -- the parties couldn't

11   agree.  And Judge Bernstein ruled that the Trustee could

12   take discovery under the Hague Convention against the

13   parties, almost as if they were a third party, not do

14   federal rules discovery, and I think maybe that's what Your

15   Honor is referring to.

16           THE COURT:  That is exactly.  I am because I

17   remember it being said, it's under the Hague rules, not

18   under the civil procedure rules.  Okay.

19           MR. WARSHAVSKY:  That's right.  And so, the

20   parties had that agreement, and some discovery has been

21   served, and I think maybe in 2017 or 2018 -- I don't have

22   that date, Your Honor, when it was actually served -- and

23   then discovery, the production began in 2020 in response to

24   that out of Luxembourg.

25           At the same time, the Trustee tried -- in one of

1    the initial transferees, LuxAlpha, entered into mediation.

2    We did it with Judge Conrad, former Judge Conrad, who was a

3    bankruptcy judge in Vermont; ultimately, the mediation was

4    unsuccessful.  And so the Trustee amended his Complaint in

5    March, or made a motion to amend in March of 2020 before the

6    mandate had been returned as to the subsequent transferees.

7             So the Complaint was only against the initial

8    transferees, which were LuxAlpha and Groupement.  And it was

9    in connection with that case and the Trustee's motion to

10   amend where Judge Bernstein indicated that he did not want

11   to further delve into the issue because any ruling -- if the

12   Second Circuit changed the standard in any respect, the

13   parties would be right back in front of him on a motion to

14   amend or a motion to dismiss.

15            And so, he adjourned that action sine die 'til

16   after the Second Circuit's decision.  And as such, a few

17   months later, the Trustee and LuxAlpha at least agreed to

18   try to start discovery under the federal rules.  Again, we

19   went to Judge Maas -- we appointed Judge Maas as the

20   discovery arbitrator, and he has issued one order in the

21   case and we're trying to take discovery in that case now to

22   the extent possible.

23            THE COURT:  Okay.  And on this one, since we've

24   got it sine die, we just want to make sure it never falls

25   off the radar.

1          MR. WARSHAVSKY:  Right.

2          THE COURT:  And I think all of us are in agreement

3     with that.

4          MR. WARSHAVSKY:  We absolutely are, Your Honor.

5          THE COURT:  Well, and since we see what's going

6     on, this is -- I probably will ask for another status.  So,

7     of course, we'll be informed around October or November,

8     we'll take another look at that.  Okay.

9          But going forward and any time you can reach

10    agreements, of course, that's wonderful, and I do have to

11    admit I really appreciate Judge Maas' work on this.  If

12    you're around any judge, discovery disputes are often the

13    bane of our existence, so thank you.

14         MR. WARSHAVSKY:  Your Honor, I think the only case

15    which is active, you know, there's the Avellino case, which

16    is more of a different -- it's not a feeder fund case; that

17    case is active and in expert discovery.

18         THE COURT:  Okay.

19         MR. WARSHAVSKY:  And then there's the Fairfield

20    case, which I know Your Honor has become well aware of, and

21    that case is proceeding on a motion to dismiss.  There's the

22    assigned claims, which Your Honor already heard, and then

23    there's the claim against the subsequent transferors, and I

24    think, which is really the management --

25         THE COURT:  Okay, hold on.  Just stop for me for

Page 48

1    just a minute, Mr. Warshavsky.

2              MR. WARSHAVSKY:  Sure.

3              THE COURT:  And the Fairfield case you're talking

4    about is the 09-01239, Fairfield Investment Fund?

5              MR. WARSHAVSKY:  Correct, Your Honor.

6              THE COURT:  Okay.  So that's in, again, Exhibit B,

7    and the Avellino and the Fairfield and there's -- okay, all

8    right.

9              MR. WARSHAVSKY:  I'm sorry, Your Honor.

10             THE COURT:  I'm sorry to interrupt.  I just want

11   to be clear.

12             MR. WARSHAVSKY:  Yes, my apologies.

13             THE COURT:  So I just want to be clear.

14             MR. WARSHAVSKY:  I had it moved from the exhibit.

15   Yes, I was referring to the first Avellino, that's the first

16   captioned case on Exhibit B.

17             And then the Fairfield case, which is the second

18   captioned case where the Trustee settled with the fund, the

19   initial transferees, but the claims against some of the

20   management defendants continues.  And that there is motion

21   practice, which briefing is currently before Your Honor and

22   I guess we're hopeful that the briefing will end and the

23   Second Circuit's decision will coincide.

24             And with that, I think --

25             THE COURT:  I believe -- Mr. Warshavsky, just let

1    me -- if I'm recalling correctly, I think we have a hearing

2    on this in June.

3              MR. WARSHAVSKY:  That's correct, Your Honor.

4              THE COURT:  Okay, all right.

5              MR. WARSHAVSKY:  And, Your Honor, as most of the

6    subsequent transfer cases do stem out of Fairfield, I think

7    maybe I will turn it over to Mr. Calvani just to discuss

8    them if you'd want to.  The only comment I would make to the

9    colloquy you had with Miss Brown before, is the very last

10   action on Exhibit C, which is captioned 20-01316,

11   Montpelier, et al.

12             THE COURT:  Uh huh.

13             MR. WARSHAVSKY:  That is actually a subsequent

14   transfer case where briefing -- that is a subsequent

15   transfer case that comes out of Legacy and is all fictitious

16   profits.  So at least the Trustee's position is that intent

17   or good faith or lack of good faith wouldn't matter, so that

18   is also currently being briefed.  A motion to dismiss was

19   filed two weeks ago and the Trustee's response is due --

20   opposition is due on May 4th.

21             THE COURT:  Okay.  So that, you've alerted me to

22   something.  Do you expect any more cases to be filed similar

23   to the Montpelier case?

24             MR. WARSHAVSKY:  There might be one that I'm

25   aware, but Mr. Calvani might be -- is probably better to

Page 50

1    supplement my answer to this, but there is a tolling

2    agreement from one other subsequent transferee out of Legacy

3    that the Trustee is trying to negotiate with, but that is

4    yet to be filed.

5              THE COURT:  Okay.

6              MR. WARSHAVSKY:  But I think Mr. Calvani can

7    answer these questions better than I can.

8              THE COURT:  And Mr. Warshavsky, did we give you a

9    hearing date on your motion to dismiss?

10             MR. WARSHAVSKY:  Your Honor, I apologize, I don't

11   know.  I'm sorry?

12             THE COURT:  I said I apologize.  It was -- it's

13   not your motion to dismiss, it is someone else, but I don't

14   know if there's a hearing date.  Okay.

15             MR. WARSHAVSKY:  I know we have a stipulated

16   schedule, Your Honor.

17             THE COURT:  Okay.

18             MR. WARSHAVSKY:  And I don't know -- I believe

19   that it might have been filed before the cases were

20   transferred over.  I believe the parties had stipulated to

21   June 16th, but I don't know if that was in consultation with

22   chambers.  I'm sorry, I don't have that information in front

23   of me.

24             THE COURT:  Okay, we'll take care of that.  We

25   just need to be in touch with chambers, okay.  All right.

Page 51

1    And now that you all have the schedules, you don't -- we

2    have some omnibus dates.  So everyone, you don't necessarily

3    have to totally consult chambers.  I believe that one was

4    set for June 9th, but our omnibus is June 16th, but that's

5    also something I have to talk with chambers about with

6    staff, but it sounds like we're beginning to get on the same

7    page, everyone.  Thank you.

8            MR. WARSHAVSKY:  Thank you, Your Honor.

9            THE COURT:  Now we're moving into -- you wanted to

10   move into the...

11           I have the Trustee's agenda, but the Trustee's

12   agenda has two other -- I believe there's two other matters.

13   First, let me ask a question before we move into something

14   else, because I just want to simply call for the record the

15   09-11893, which is the Bernie Madoff Chapter 7.  And I'm

16   just calling it to make sure that I understand, first, who's

17   the Trustee in the Chapter 7 -- and correct me if I'm wrong

18   -- that there's no litigation.  This is simply -- I don't

19   want to say a placeholder but is there anything that remains

20   outstanding and a timeline for moving forward with this.

21           MS. LONGO:  Good morning, Your Honor.  This is Kim

22   Longo of Windels Marx.  I can speak to that if it's

23   acceptable.  Windels Marx, Alan Nisselson was appointed the

24   Trustee in 2009 for the Bernie Madoff individual case.  That

25   case was substantively consolidated with the main BLMIS case

Page 52

1    in June 2009, and there's been no activity in that case

2    since that time.

3              THE COURT:  So all we need to do is just make sure

4    on this that it just doesn't fall off, that we have it -- I

5    guess are you saying to me, Ms. Longo, we don't really need

6    to call it again?

7              MS. LONGO:  Yes, Your Honor, it's generally not

8    involved.  Occasionally, something's entered on the docket

9    that relates to the main case, but there's, you know,

10   nothing happening in that case and the case doesn't

11   currently, you know, engage in anything involved with the

12   BLMIS Trustee.

13             THE COURT:  Okay.  So this one, okay, so we're

14   only going to be dealing with this if we end up at almost

15   the end of the case, but Mr. Nisselson is the Trustee and

16   you are representing him.  Okay, thank you.

17             MS. LONGO:  Yes, Your Honor.  We also represent,

18   just for clarity, Irving Picard as the Trustee on BLMIS as

19   special counsel and conflicts counsel, but that's separate

20   and independent from our representation of Alan Nisselson

21   and that is sitting inactive, for lack of a better way to

22   say it.

23             THE COURT:  Okay, thank you.  That's what I -- and

24   before we turn to the Fairfield Sentry, let's sort of clean

25   up the docket on the administration of -- I have two things

Page 53

1    on my docket.  I have --

2            MR. CREMONA:  Good morning again.

3            THE COURT:  Yes, please, what else do I have on

4    the SIPA?  Oh, the mediations, thank you.  Go ahead, okay.

5            MR. CREMONA:  Sorry to interrupt, Your Honor.  I

6    was just trying to help keep us moving forward on the

7    agenda.  Again, this is Nicholas Cremona on behalf of Baker

8    Hostetler and the Trustee.

9            We have two remaining items, as Your Honor noted.

10   Next on the agenda this morning is the status conference on

11   the mediations with the Chaitman LLP firm.  And just to give

12   Your Honor some background, the parties first appeared

13   before the Court in May of last year to request assistance

14   in resolving over 60 adversary proceedings remaining where

15   Chaitman LLP served as counsel of record by way of

16   mediation.

17           So at that time, the parties reach agreement on

18   protocols to conduct mediations in those 60 or so remaining

19   cases, consistent with the litigation procedures order.  The

20   parties agreed to prioritize the cases and proceed to

21   mediation before former Judge Hurkin-Torres to the extent

22   that his schedule permitted.  Judge Bernstein so ordered the

23   May 28 hearing transcript to reflect the agreed-upon

24   protocols and procedures and the parties began mediating

25   those cases in June of 2020.

Page 54

1          You know, as we sit here today, overall, this

2    process has been very successful.  For the most part, the

3    parties have been able to adhere to their commitment to

4    mediate the cases on a weekly basis.  Since the beginning of

5    the process, the parties have consensually resolved over 30

6    -- actually, 33 adversary proceedings exactly.

7          And in addition, we've reached agreement and have

8    settlements in principle in two other adversary proceedings.

9    As we detailed in the status report, one as recent as last

10   Thursday, which is the Sylvan case, and that's Adversary

11   Proceeding No. 10-04961.  We have ongoing mediations in 11

12   additional cases and have commitment among the parties to

13   have follow-up sessions in two cases tomorrow, namely the

14   Peter Kamenstein case, which is Adversary Proceeding No. 10-

15   04648, and the Keller cases, which is Adversary Proceeding

16   No. 10-04539.

17         The parties have also reached agreement to mediate

18   the following four cases over the next four Thursdays on

19   March 25, April 1, April 8, and April 15th, respectively,

20   subject to assigning the particular dates based on the

21   defendants'' schedules.  The four cases I'm referring to are

22   as follows: the Fern Palmer, Adversary Proceeding No. 10-

23   04397; Boyer Palmer, 10-04826; the Estate of Jerome Goodman,

24   10-04545; and as we discussed earlier, the RAR Entertainment

25   Fund, which is 10-04352.

1        And unless Your Honor has any questions, I would

2    ask that Miss Chaitman confirm the defendants' agreement to

3    the schedule of prospective mediations as I've stated.

4        THE COURT:  Yes, please Ms. Chaitman.

5        MS. CHAITMAN:  Thank you, Your Honor.  Yes, we've

6    agreed to schedule the four mediations.  I'm just now

7    confirming the availability of clients, so I haven't

8    finalized which dates each will appear, but I'll give the

9    Trustee that information within the next 24 hours.

10       THE COURT:  Excellent.  Sounds like this is moving

11   forward.  I probably will need another -- what is the best

12   way to be updated on these?

13       MR. CREMONA:  With that, Your Honor, I would

14   suggest, as we have in the past, that this matter be carried

15   to the next omnibus hearing date, which I believe is April

16   21, so the parties can report back at that point any

17   progress and any issues that should arise if that's

18   acceptable to the Court.

19       THE COURT:  Certainly, because given what I've

20   just heard from you all, it seems to me that that will just

21   be a quick note on the calendar, but I do like to be

22   apprised of what's happening, so I appreciate that.  And I

23   know that seems a little soon, but it seems to me as I hear

24   what you all have to say, you all are working well together

25   and making this happen.  Thank you.

1          MR. CREMONA:  Thank you, Your Honor.  Then the

2    final item on the Trustee's agenda, unless there are any

3    questions, I would move forward to that.

4          THE COURT:  Okay, please do.  I have no more.

5          MR. CREMONA:  Sorry, Your Honor.  The final item

6    on the Trustee's agenda then is the Trustee's request for

7    leave of Court to file summary judgments in two identical

8    good-faith actions, except for the fact that they have

9    different amounts of fictitious profits at issue. One is --

10   the first is Picard v. Norma Shapiro, which is Adversary 10-

11   04486, which has $926,064 in fictitious profits at issue;

12   and the other is Adversary Proceeding No. 10-04921, Picard

13   v. Stanley Miller, and that case has $669,793 in fictitious

14   profits at issue.

15         Your Honor, as the Trustee noted in his request,

16   which was the same in both cases because they are in the

17   identical procedural posture and are similarly situated in

18   all respects, both cases have completed discovery many years

19   ago and have been through mediation and negotiations that

20   span several years.

21         Unfortunately, the parties weren't able to

22   consensually resolve the cases and the mediator issued final

23   reports concluding the mediations on February 8th earlier

24   this year, so that the cases could proceed before Your Honor

25   in accordance with the litigation procedures order.

1          During the course of the cases, the Trustee served

2     expert reports and allocutions establishing his prima facie

3     case.   The defendants in both cases conducted no discovery

4     and provided no rebuttal experts.   In the meantime, the law

5     of the case has become even more clear, if possible, that

6     fictitious profits received through this Ponzi scheme must

7     be returned, and now as Your Honor has awarded, with

8     interest.

9          So based on Your Honor's recent decision as I

10    mentioned earlier in the Epstein case, which I know you're

11    intimately familiar, we believe that these remaining cases

12    are amenable to disposition on summary judgment because Your

13    Honor noted, among other things, that all of the legal

14    arguments and defenses were previously decided and are law

15    of the case and awarded judgment in favor of the Trustee,

16    plus prejudgment interest in the rate of 4 percent from the

17    date of the Complaint to the date of the judgment.

18          So on this basis, the Trustee submits that summary

19    judgment is appropriate because there are no issues of

20    material fact precluding Your Honor from entering judgment

21    finding that BLMIS made the transfers to the defendants in

22    these actions with the actual intent -- actual fraudulent

23    intent in the course of and in furtherance of the Ponzi

24    scheme.

25          Accordingly, the Trustee seeks leave here to date

Page 58

1   to file motions in both cases, and provided its acceptable

2   to the Court, we are prepared to present a schedule to do so

3   that would be consistent with what we have done in prior

4   motions before Your Honor in the Epstein case and the

5   Palmedo case.

6            THE COURT:  Very good.  And I believe, is it Ms.

7   Neville that's on the other side of these cases; who's your

8   opposing counsel?

9            MS. NEVILLE:  Good morning, Your Honor.  It's

10  Carole Neville from Dentons.

11           THE COURT:  Yes, Ms. Neville, hi.  I thought so,

12  all right.

13           MS. NEVILLE:  Yes, I'm here.

14           THE COURT:  State your name for the record.

15           MS. NEVILLE:  Carole Neville from Dentons US, LLP,

16  and I'm here with Art Ruegger.

17           THE COURT:  Thank you.

18           MS. NEVILLE:  We represent both Stanley Miller and

19  Norma Shapiro, and we've opposed the Trustee's proposed

20  proceeding on practical grounds and basically, humane

21  grounds.  Both of these cases are good-faith cases.  Both

22  involve very elderly defendants.

23           Mr. Miller is 89 and in poor health.  He doesn't

24  have assets to litigate with the Trustee or to satisfy the

25  judgment.  He has a wife who's nine years younger, and all

1    of the property that he holds is exempt from the execution

2    under Florida law; it's held either by tenants-in-the

3    entirety, protected by the homestead laws, or also protected

4    by laws governing proceeds of individual retirement

5    accounts.

6            So proceeding to summary judgment to obtain a

7    judgment, which has no chance of execution, makes no sense

8    to me and seems quite heartless.  I have in a culpa letter

9    that I sent to Your Honor laid out the law in this

10   jurisdiction, which says that if the property transferred

11   came from an exempt asset, which the individual retirement

12   account is, there is no cause of fraudulent transfer, and

13   so, there's a legal issue here that has not been addressed

14   by Your Honor in any other case.

15           But unfortunately, this defendant has no assets to

16   pursue litigation with.  He and his wife had maybe a million

17   dollars in total in cash for the rest of their lives and

18   can't satisfy this judgment and litigate and conduct the

19   rest of their lives, so that's the Millers.

20           I think that those cases, twice Mr. Miller sent

21   hardship applications and twice they were denied.  I think

22   this case should be dismissed on hardship grounds.

23           THE COURT:  Let's not go to Miss Shapiro until we

24   discuss Miller.

25           MS. NEVILLE:  Okay.

1           THE COURT:  Mr. Cremona.

2           MR. CREMONA:  Yes, Your Honor, thank you.  Your

3    Honor, I think it's important to say that none of what we

4    just heard from Miss Neville articulates a viable defense to

5    an avoidance action.  She has raised purported issues in

6    connection with the Trustee's ability to collect on his

7    eventual judgment in these cases, and I think she's all but

8    conceded the liability based on the law of the case.

9           But just quickly, I'd like to respond to one issue

10   she raised on the IRA, claiming that it has not been

11   litigated with regard to the Miller defendants, and that's

12   the IRA issue as defined in the letter; that's just not

13   correct.  That issue was decided twice previously in these

14   cases: first, it was decided by the District Court in the

15   Picard v. Greiff matter, which is at 476 B.R. 715 at p. 729;

16   that case is cited in our status report.

17          And the District Court made clear that the

18   Internal Revenue Code does not require a dismissal of these

19   actions based on withdrawals from an IRA account.  And the

20   Court also rejected the claim that an IRA account is exempt

21   by state law of the trust, as Miss Neville I think

22   articulated in her letter.

23          And again, this Court in its omnibus decision at

24   531 B.R. 439 rejected -- and by the way, the Miller

25   defendants participated in the briefings on the omnibus

Page 61

1    good-faith motion to dismiss, which was covered by the

2    decision that I just quoted, raising the exact same argument

3    in his motion to dismiss the amended complaint, as filed in

4    his motion to dismiss on March 22nd, 2013, which is ECF No.

5    25.  So I think just as a legal matter, the issue has been

6    heard and rejected.

7              And on the issue that it's an issue of compassion

8    or that the case should be dismissed based on a hardship.

9    You know, unfortunately for these defendants, Miss Neville's

10   judgment cannot supplant that of Mr. Picard as the Court-

11   appointed SIPA Trustee charged with recovering customer

12   property that is wrongfully being withheld by these

13   defendants for over 10 years.

14             And while the defendants in both cases are of

15   advanced age at this point in time, they could have resolved

16   these cases consensually years ago, and we've been involved

17   in mediation for multiple years, but instead they chose to

18   vigorously litigate these cases in the face of clear

19   precedent, which is binding.

20             So the Trustee must prosecute these actions to

21   conclusion in discharge of his fiduciary duty.  Outright

22   dismissal, as the defendants suggest, would be in derogation

23   of the Trustee's duty, providing an unjust outcome by

24   providing disparate treatment to similarly situated

25   creditors, as Ms. Neville is urging.  He cannot, just based

Page 62

1    on her urging, provide better or different treatment to

2    these defendants who are withholding stolen funds.

3            And accordingly, the Trustee that to expeditiously

4    resolve these cases, we should be permitted to move forward

5    by way of summary judgment, which we believe is the most

6    efficient and expeditious way to conclude the cases,

7    especially in consideration of Your Honor's decision in

8    Epstein and to return the stolen money to the -- the stolen

9    customer property to the net loser victims.

10           MS. NEVILLE:  Your Honor, may I?

11           THE COURT:  Ms. Neville, you had your hand up.

12   Yes, of course, you may rebut certainly.

13           MS. NEVILLE:  Well, first of all, the two

14   decisions cited by Mr. Cremona on the motion -- on our

15   motions to dismiss and the issue of whether or not proceeds

16   of an IRA under Florida law or under New York law can be

17   subject to execution or fraudulent transfer law is still, in

18   my book, not finally resolved.

19           Second of all --

20           THE COURT:  But that's past -- but Miss Neville,

21   that's past summary judgment and getting a decision; that's

22   on collection.  Tell me why we should move --

23           MS. NEVILLE:  Not entirely, Your Honor.

24           THE COURT:  Yes, it is.  This is very sad, and it

25   is absolutely heartbreaking, and we understand that, but...

1          MS. NEVILLE:  Your Honor, in this case, all of the

2     property is exempt under Florida law.

3          THE COURT:  Once we get through summary judgment

4     and anything like that, that is collection; that is not part

5     of getting -- we got it, you got to get to that stage first.

6          MS. NEVILLE:  He has no assets to pursue summary

7     judgment and he has no assets to fight collection.  So right

8     now, we know that the assets are protected by tenants-in-the

9     entirety and the homestead act, so why are we holding a

10    judgment over this man's head; that's the question, Your

11    Honor.

12         THE COURT:  Miss Neville, I hear you.  I'm ruling

13    against you.  I'm going to permit the Trustee to move

14    forward with summary judgment.  If the defendant is judgment

15    proof, then the Trustee will have no ability to collect.

16    Now then, let's move on.

17         MS. NEVILLE:  And he will hold the judgment over

18    an 89-year-old man and his wife; that's really -- that's the

19    outcome there.

20         THE COURT:  Thank you, Miss Neville.

21         MS. NEVILLE:  The second one, Your Honor, is Mrs.

22    Shapiro is 102.  She has one asset left, which is some funds

23    which would just cover the judgment now.  She's willing to

24    let the Trustee have a judgment which he can collect when

25    she dies, but she wants to keep her money until she dies to

Page 64

1    maintain her independence and security.  She's in fairly

2    good health.  She doesn't intend to go traveling anywhere,

3    she can't because of the pandemic and because of her age.

4            This is just a matter of how you settle.  And,

5    frankly, to take the money from this woman now is heartless.

6    This is all she has, and it is her independence.  Now, the

7    Trustee can talk about his fiduciary duty.  He can have a

8    judgment; it's just a question of when he gets to execute on

9    it.

10           THE COURT:  Very good.  Mr. Cremona.

11           MR. CREMONA:  Your Honor, again, I think similar

12   to the Miller action, we have not heard a defense to an

13   avoidance action and, instead, have heard, you know, an

14   emotional ploy, and I did not want to get into the

15   confidential settlement discussions and/or mediation and

16   what assets or available or not.

17           You know, as I've explained to Ms. Neville in the

18   context of the mediation, the Trustee certainly views all of

19   these persons as victims and acknowledge that we are in a

20   most unfortunate circumstance, but there are different

21   levels of victims, and there are net winners and there are

22   net losers that have not recovered their principal.

23           And the fact remains that Ms. Shapiro has retained

24   almost a million dollars in stolen funds for over 10 years.

25   And again, I realize she's of advanced age now, but she

Page 65

1    could have settled this case years ago.  We engaged in

2    mediation for over three years, and we were unable to

3    resolve the case.

4            The Trustee has determined that we should move

5    forward for summary judgment.  As I mentioned, I'm prepared

6    to propose schedules to resolve both on a timely schedule

7    consistent with the matters and the way we've treated others

8    in the same cases.

9            THE COURT:  Ms. Neville.

10           MS. NEVILLE:  Your Honor, if she has to go forward

11   with a summary judgment motion, she's actually spending the

12   money that the Trustee could have if he would just let her

13   keep the money until she dies.

14           THE COURT:  You're asking me, again, there's

15   something else that you've said that I agree with Mr.

16   Cremona.  You all have had settlement discussions.  You have

17   even talked to me about settlement discussions.  That is not

18   in front of me.  This is a legal matter in front of me.

19           MS. NEVILLE:  Yes, Your Honor.

20           THE COURT:  So Mr. Cremona, I am going to give you

21   permission to move forward with summary judgment.  I don't

22   know about your scheduling, but why don't we set the summary

23   judgment hearing for June 16th.

24           MS. NEVILLE:  Your Honor --

25           THE COURT:  That way, you two can work -- yes,

1     ma'am?

2              MS. NEVILLE:  I would like permission to move,

3     cross-move for summary judgment in the Miller case.

4              THE COURT:  Of course.

5              MR. CREMONA:  And, Your Honor, just that is

6     contemplated in the schedule that I had sort of mapped out,

7     consistent with, as I said, in what we did in Epstein and

8     Palmedo and the matters that are before the District Court.

9              If it's helpful, I mean, we can reduce it to a

10    scheduling order, but I had the matters in both cases

11    staggered and fully briefed by June 9, which would work well

12    with an argument on June 16 as Your Honor suggested.

13             THE COURT:  That's perfect, thank you.  So we'll

14    adjourn both.  Mr. Cremona, given the circumstances in both

15    of these cases, if you have -- if it's a good-faith case and

16    discovery is completed and mediation is without success and

17    you have these similar fact patterns, I give you permission

18    to bring summary judgments in any cases that fit like this.

19             MR. CREMONA:  Thank you, Your Honor.

20             THE COURT:  That will avoid having a court

21    hearing.

22             MR. CREMONA:  Thank you, Your Honor.

23             THE COURT:  And honestly save the defendants some

24    money on having to have someone appear in court.

25             MR. CREMONA:  As Your Honor may have noted, we had

1    contemplated that approach in the status report, so I

2    appreciate that we've confirmed that now on the record.

3                    THE COURT:  Thank you.  Very good, thank you.  And

4    thank you, Ms. Neville.  Mr. Cremona is correct, there is a

5    general understanding of the elderly and it is hard for all

6    of us.  And all I'm doing is I didn't mean to adjourn the

7    cases; I just meant the letter for permission for summary

8    judgment, we'll just do away with that.  Very good.  Okay,

9    thank you, everyone.

10                   Now then, I believe Mr. Cremona, did we address

11   everything in your agenda and all the matters with Mr.

12   Picard and the BLMIS and the Bernie Madoff cases?

13                   MR. CREMONA:  Yes, we have, Your Honor.

14                   THE COURT:  Very good.

15                   (Whereupon these proceedings were concluded at

16   11:16 AM)

17

18

19

20

21

22

23

24

25

Page 68

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 19, 2021