**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 10-04486 (CGM) |
| NORMA SHAPIRO, individually and in her capacity as Trustee for the Norma Shapiro Revocable Declaration of Trust Under Agreement Dated 9/16/2008 and the Trust Under Will of Philip L. Shapiro; NORMA SHAPIRO DECLARATION OF TRUST UNDER AGREEMENT DATED 9/16/2008, REVOCABLE TRUST; TRUST UNDER WILL OF PHILIP SHAPIRO; and MARTIN ROSEN, in his capacity as Trustee of the Trust Under Will of Philip L. Shapiro, | |
| Defendants. | |

**TRUSTEE'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ................................................................................................2

ARGUMENT ...................................................................................................5

I.    IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT,
      SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE
      TRUSTEE AS A MATTER OF LAW ..........................................................5

      A.    Legal Standard ....................................................................5

      B.    The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year
            Transfers of Fictitious Profits Made by BLMIS to Defendants............................6

            1.    BLMIS Made the Two-Year Transfers with Actual Fraudulent
                  Intent and in Furtherance of the Fraud.........................................7

II.   DEFENDANTS' DEFENSES CAN BE DETERMINED AS A MATTER OF
      LAW ...........................................................................................17

      A.    Defendants Did Not Give Value for Fictitious Profits...........................17

      B.    Taxes May Not Be Considered as Part of Value Calculation................................18

      C.    The Trustee's Treatment of Inter-Account Transfers is Proper...........................19

      D.    The Transfers Were an Interest of the Debtor in Property.......................20

      E.    SIPA And The Bankruptcy Code Authorize the Trustee to Recover
            Customer Property, Wherever Held........................................................24

            1.    SIPA and SIPC.......................................................................25

            2.    Becoming a Member of SIPC ...............................................26

            3.    Initiating a SIPA Liquidation.............................................27

            4.    Customer Property Under SIPA............................................27

            5.    Madoff's Business ....................................................29

            6.    The Liquidation of BLMIS ................................................30

            7.    Substantive Consolidation ..............................................30

            8.    The Trustee Can Recover Any Transfers of Customer Property..............33

F.      Madoff's Purported Purchase of Securities Does Not Create a Genuine
        Issue of Material Fact..........................................................................................37

CONCLUSION........................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1031 Tax Grp., LLC*,
439 B.R. ...................................................................................................................24

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
No. 05 Civ. 9050(LMM), 2011 WL 1419617 (S.D.N.Y. Apr. 7, 2011), *aff'd*,
748 F.3d 110 (2d Cir. 2014)......................................................................................6

*In re Adler Coleman Clearing Corp.*,
195 B.R. 266 (Bankr. S.D.N.Y. 1996)......................................................................26

*Alexander v. Compton (In re Bonham)*,
229 F.3d 750 (9th Cir. 2000) ...................................................................................36

*Armstrong v. Collins*,
Nos. 01 Civ. 2437(PAC), 02 Civ. 2796 (PAC), 02 Civ. 3620(PAC), 2010 WL
1141158 (S.D.N.Y. Mar. 24, 2010) ..........................................................................10

*Bayou Accredited Fund, LLC v. Redwood Growth Partners L.P. (In re Bayou
Grp., LLC)*,
396 B.R. 810 (Bankr. S.D.N.Y. 2008), *rev'd in part on other grounds, Bayou
IV*, 439 B.R. at 304................................................................................................9, 14

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
397 B.R. 1 (S.D.N.Y. 2007)........................................................................................7

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
380 F. Supp. 2d 334 (S.D.N.Y. 2005)........................................................................6

*In re Bevill, Bresler & Schulman, Inc.*,
83 B.R. 880 (Bankr. D.N.J. 1988) ...........................................................................29

*In re BLMIS LLC*,
654 F.3d 229 (2d Cir. 2011)................................................................................19, 26

*In re BLMIS LLC*,
773 F.3d 411 (2d Cir. 2014)........................................................................................8

*In re Cassandra Grp.*,
338 B.R. 583 (Bankr. S.D.N.Y. 2006) .....................................................................15

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................................................................................................5

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp. LLC)*,
439 B.R. 284 (S.D.N.Y. 2010) ................................................................................7, 9, 13, 17

*Donell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) ................................................................................19

*Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*,
97 B.R. 503 (E.D. Ark. 1987) ................................................................................28

*In re FKF 3, LLC*,
No. 13 Civ. 3601 (JCM), 2018 WL 59292131 (S.D.N.Y. Oct. 24, 2018) ............................16

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774 (Bankr.
S.D.N.Y. Jan. 3, 2014) ................................................................................9

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund)*,
359 B.R. 510 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397 B.R. 1
(S.D.N.Y. 2007) ................................................................................13

*In re Lehman Bros. Holdings*,
445 B.R. 143 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478
B.R. 570 (S.D.N.Y. 2012) ................................................................................29

*Leonhardt v. Madoff*,
No. 09-2032 (S.D.N.Y. Mar. 5, 2009) ................................................................................31

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................................5

*McHale v. Boulder Cap. (In re 1031 Tax Grp., LLC)*,
439 B.R. 47 (S.D.N.Y. 2010) ................................................................................9, 10, 17

*Moran v. Goldfarb*,
No. 09-cv-7667 (RJS), 2012 WL 2930210 (S.D.N.Y. July 16, 2012) ................................9

*In re Motors Liquidation Co.*,
590 B.R. 39 (S.D.N.Y. 2018) ................................................................................23

*Newbro v. Freed*,
409 F. Supp. 2d 386 (S.D.N.Y. 2006) ................................................................................17

*In re Old Naples Sec., Inc.*,
223 F.3d 1296 (11th Cir. 2000) ................................................................................35

*Picard v. Avellino (In re BLMIS, LLC)*,
557 B.R. 89 (Bankr. S. D.N.Y. 2016) ................................................................................33

*Picard v. BAM L.P.*,
608 B.R. 165 (Bankr. S.D.N.Y. 2019) ..................................................................40

*Picard v. BAM L.P.*,
624 B.R. 55 (Bankr. S.D.N.Y. 2020) ............................................................. *passim*

*Picard v. Chais*,
445 B.R. 206 (Bankr. S.D.N.Y. 2011) ....................................................................7

*Picard v. Cohen*,
Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
25, 2016) ....................................................................................................7, 18, 19, 24

*Picard v. Cohmad Sec. Corp.*,
454 B.R. 317 (Bankr. S.D.N.Y. 2011) ....................................................................7

*Picard v. Estate (Succession) of Doris Igoin (In re BLMIS)*,
525 B.R. 871 (Bankr. S.D.N.Y. 2015) ..................................................................19

*Picard v. Fairfield Greenwich Ltd.*,
762 F.3d 199 (2d Cir. 2014) ..................................................................................29

*Picard v. Gettinger (In re Bernard L. Madoff Inv. Sec. LLC)*,
976 F.3d 184 (2d Cir. 2020) ..................................................................................18

*Picard v. Greiff*,
476 B.R. 715 (S.D.N.Y. 2012) ...........................................................8, 14, 17, 18

*Picard v. JABA Assocs. LP*,
No. 20 cv 3836, 2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021) ................... *passim*

*Picard v. Katz*,
462 B.R. 447 (S.D.N.Y. 2011) .......................................................................7, 17

*Picard v. Legacy Cap. Ltd.*,
603 B.R. 682 (Bankr. S.D.N.Y. 2019) ...........................................................8, 9, 23

*Picard v. Lisa Beth Nissenbaum Tr.*,
No. 20 cv. 3140, 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) ................... *passim*

*Picard v. Lowrey*,
596 B.R. 451 (S.D.N.Y. 2019) ..............................................................................27

*Picard v. Nelson*,
610 B.R. 197 (Bankr. S.D.N.Y. 2019) .......................................................... *passim*

*Picard v. RAR Entrepreneurial Fund, Ltd.*,
No. 20-cv-1029, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021) .................................21

*In re Picard*,
    917 F.3d 85 (2d Cir. 2019)................................................................................30

*In re Primeline Sec. Corp.*,
    295 F.3d 1100 (10th Cir. 2002) .......................................................................35

*Rosenman Family, LLC v. Picard*,
    395 F. App'x 766 (2d Cir. 2010) ......................................................................26

*SEC v. F.O. Baroff Co.*,
    497 F.2d 280 (2d Cir. 1974)..............................................................................25

*SIPC v. Barbour*,
    421 U.S. 412 (1975)..........................................................................................25

*SIPC v. BLMIS LLC (In re Bernard L. Madoff)*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015)...........................................................6, 7

*SIPC v. BLMIS LLC (In re BLMIS)*,
    522 B.R. 41 (Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL
    183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017)...........19, 23, 35

*SIPC v. BLMIS LLC (In re BLMIS LLC)*,
    424 B.R. 122 (Bankr. S.D.N.Y. 2010) ........................................................7, 25

*SIPC v. BLMIS LLC (In re Madoff Sec.)*,
    499 B.R. 416 (S.D.N.Y. 2013)..........................................................................26

*Stanford Square L.L.C. v. Nomura Asset Cap. Corp.*,
    232 F. Supp. 2d 289 (S.D.N.Y. 2002).............................................................15

*Town of Fairfield v. Madoff*,
    No. 09-5023735 (Conn. Super. Ct. Mar. 30, 2009) ......................................31

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016).............................................................................30

*In re Weis Sec., Inc.*,
    No. 73 Civil 2332, 1976 WL 820 (S.D.N.Y. Aug. 2, 1976)..........................26

*Ying Jing Gan v. City of New York*,
    996 F.2d 522 (2d Cir. 1993)..........................................................................5, 14

**Statutes**

11 U.S.C. § 101(41) .............................................................................................27

11 U.S.C. § 109(a) ...............................................................................................27

11 U.S.C. § 548 .................................................................................................................. 24

11 U.S.C. § 548(a) .............................................................................................................. 4

11 U.S.C. § 548(a)(1) ......................................................................................................... 25

11 U.S.C. § 548(a)(1)(A) .................................................................................................... 6

11 U.S.C. § 548(c) .............................................................................................................. 17

11 U.S.C. § 548(d)(2)(a) ..................................................................................................... 17

11 U.S.C. § 550(a)(1) ......................................................................................................... 4

11 U.S.C. § 551 .................................................................................................................. 4

15 U.S.C. § 78ccc(a) .......................................................................................................... 26

15 U.S.C. § 78ccc(a)(2)(A) ................................................................................................ 26

15 U.S.C. § 78ddd(c)(2) ..................................................................................................... 26

15 U.S.C. § 78eee ............................................................................................................... 30

15 U.S.C. § 78eee(b)(1) ...................................................................................................... 34

15 U.S.C. § 78eee(b)(2)(A)(1) ........................................................................................... 27

15 U.S.C. § 78eee(b)(3) ...................................................................................................... 27

15 U.S.C. § 78eee(b)(4) ...................................................................................................... 27

15 U.S.C. § 78fff-2(b) ........................................................................................................ 18

15 U.S.C. § 78fff-2(c)(1) ................................................................................................ 25, 26

15 U.S.C. § 78fff-2(c)(3) ................................................................................................ *passim*

15 U.S.C. § 78fff(a) ........................................................................................................... 25

15 U.S.C. § 78*lll*(4) ................................................................................................ 25, 28, 33

15 U.S.C. § 78*lll*(4)(D) .................................................................................................... 28

15 U.S.C. § 78*lll*(5) ......................................................................................................... 27

15 U.S.C. § 78*o*(b) ...................................................................................................... 26, 27

28 U.S.C. § 1961 ................................................................................................................ 16

**Rules**

17 C.F.R. § 240.15b1-3(b) ..........................................................................................26

17 C.F.R. § 240.15b6-1(b) ..........................................................................................27

17 C.F.R. § 240.15c3-3 ...........................................................................28, 29, 33, 37

17 C.F.R. § 240.15c3-3(f) ...........................................................................................28

17 C.F.R. § 249.501(a) ...........................................................................................26, 27

Fed. R. Bankr. P. 7056 ...............................................................................................1, 5

Fed. R. Bankr. P. 7056-1(a) ...........................................................................................5

Fed. R. Civ. P. 56 ...........................................................................................................1

Fed. R. Civ. P. 56(a) ......................................................................................................5

Fed. R. Civ. P. 56(c)(1) .................................................................................................5

**Other Authorities**

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74
    (2002) ..............................................................................................................27, 28

Willis H. Riccio, Ponzi Schemes: A Man Called Charles, 58 R.I. Bank. J. 7, 8
    (July/Aug. 2009) .....................................................................................................24

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff, respectfully submits this memorandum of law in support of the Trustee's motion (the "Motion") under Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 for summary judgment as to Count One of the Trustee's amended complaint to avoid and recover the amounts fraudulently transferred by BLMIS to defendants Norma Shapiro Declaration of Trust Under Agreement Dated 9/16/2008, Revocable Trust (the "Norma Trust"), Trust Under Will of Philip Shapiro (the "Philip Trust"), Norma Shapiro, individually and in her capacity as Trustee for the Norma Trust and the Philip Trust; and Martin Rosen, in his capacity as Trustee of the Philip Trust (the "Defendants").  The facts underlying this Motion are set forth in the Trustee's Statement of Material Facts Pursuant to Local Rule 7056-1 ("Stmt."), the Declaration of Nicholas J. Cremona ("Cremona Decl."), and the Declarations of Bruce G. Dubinsky, Lisa M. Collura, and Matthew B. Greenblatt.

## PRELIMINARY STATEMENT

This avoidance and recovery action centers on the undisputable fact that in the two years preceding the commencement of the SIPA liquidation (the "Two-Year Period"), Defendants received $926,064 in fictitious profits from BLMIS.  For decades, BLMIS operated the largest Ponzi scheme in history.  In their allocutions, Madoff and BLMIS employees confirmed that BLMIS was a Ponzi scheme, starting at least in the 1970s and continuing through BLMIS's collapse in December 2008.  Thus, the Trustee has established his *prima facie* case that the transfers to Defendants were made with the intent to hinder, delay, or defraud BLMIS's creditors and, therefore, are avoidable and recoverable for the benefit of the BLMIS customer fund.

Defendants do not dispute that they received the transfers. Instead, they argue that the Trustee cannot recover the fraudulent transfers because Madoff, not BLMIS, owned the bank accounts from which they were paid. The issue, however, has been resolved in the Trustee's favor no less than five times and constitutes the law of the case. Any other defenses invoked by Defendants—including value—fail as a matter of law and do not defeat the Trustee's *prima facie* case. As there are no material facts in dispute, summary judgment should be granted in favor of the Trustee on Count One of his Amended Complaint.

## BACKGROUND

Defendants were customers of BLMIS's investment advisory business ("IA Business") and maintained three BLMIS accounts, held by or for the benefit of Defendant Norma Shapiro:

- Account No. 1S0337 held by Defendants Norma Trust and Norma Shapiro, in her capacity as Trustee for the Norma Trust, under the name "Norma Shapiro Trustee, Norma Shapiro Rev Dec Trust U/A/D 9/16/08" (the "Norma Trust Account");

- Account No. 1S0338 held by Defendants Philip Trust, Norma Shapiro, in her capacity as Trustee of the Philip Trust, and Martin Rosen, in his capacity as Trustee of the Philip Trust, under the name "Trust U/W/O Philip L Shapiro" (the "Philip Trust Account"); and

- Account No. 1S0467 held by Defendant Norma Shapiro and NTC & Co., the former custodian,[1] under the name "NTC & Co. FBO Norma Shapiro (XX1184)" (the "Norma Shapiro Account").

Stmt. ¶ 112; Answer ¶ 37, ECF No. 36.

---

[1] On May 11, 2011, NTC & Co. was dismissed as a defendant. Stipulation and Order for Voluntary Dismissal, ECF No. 12. Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Shapiro*, Adv. Pro. No. 10-04486 (CGM) (Bankr. S.D.N.Y.).

The Norma Trust Account was opened on July 10, 1997 with an inter-account transfer from BLMIS Account 1S0070 in the amount of $1,873,440, all representing fictitious profits. Stmt. ¶ 129. Between July 10, 1997 and December 11, 2008, there were seven cash deposits via check into the Norma Trust Account in the aggregate amount of $1,200,000, all representing principal. Stmt. ¶ 130. The one inter-account transfer and seven cash deposits provided the Norma Trust Account with a total of $1,200,000 of principal. Stmt. ¶ 131.

Between July 10, 1997 and December 11, 2008, the Norma Trust Account reflected 45 cash withdrawals totaling $3,654,829, which consisted of $2,454,829 of funds withdrawn in excess of principal, representing fictitious profits. Stmt. ¶¶ 132–33. Within the Two-Year Period, $748,698 of fictitious profits was withdrawn from the Norma Trust Account. Stmt. ¶ 134.

The Philip Trust Account was also opened on July 10, 1997 with an inter-account transfer from BLMIS Account 1S0072 in the amount of $948,453, all representing fictitious profits. Stmt. ¶ 136. Between July 10, 1997 and December 11, 2008, there were seven cash deposits via check into the Philip Trust Account in the aggregate amount of $350,315, all representing principal. Stmt. ¶ 137. The one inter-account transfer and seven cash deposits provided the Philip Trust Account with a total of $350,315 of principal. Stmt. ¶ 138.

Between July 10, 1997 and December 11, 2008, the Philip Trust Account reflected 50 cash withdrawals totaling $2,146,472, which consisted of $1,796,156 of funds withdrawn in excess of principal, representing fictitious profits. Stmt. ¶¶ 139–40. Within the Two-Year Period, $64,790 of fictitious profits was withdrawn from the Philip Trust Account. Stmt. ¶ 141.

The Norma Shapiro Account was opened on October 8, 2002 with an inter-account transfer from BLMIS Account 1S0327 in the amount of $1,187,673, all representing fictitious

profits. Stmt. ¶ 143. Between October 8, 2002 and December 11, 2008, there was one cash

deposit via check into the Norma Shapiro Account in the aggregate amount of $11,034, all

representing principal. Stmt. ¶ 144. The one inter-account transfer and one cash deposit

provided the Norma Shapiro Account with a total of $11,034 of principal. Stmt. ¶ 145.

Between October 8, 2002 and December 11, 2008 the Norma Shapiro Account reflected

5 cash withdrawals totaling $468,769, which consisted of $457,735 of funds withdrawn in excess

of principal, representing fictitious profits. Stmt. ¶¶ 146–47. Within the Two-Year Period,

$112,576 of fictitious profits was withdrawn from the Norma Shapiro Account. Stmt. ¶ 148.

In 2010, the Trustee brought this adversary proceeding against Defendants to avoid and

recover fraudulent transfers of fictitious profits. Stmt. ¶ 112; Compl. ¶¶ 42–47, ECF No. 1.

Under sections 548(a), 550(a)(1), and 551 of the Bankruptcy Code, the Trustee sought to avoid

and recover $926,064 of fictitious profits received by Defendants during the Two-Year Period.

Stmt. ¶¶ 135, 142, 149; Am. Compl. ¶¶ 42–44, *Picard v. The Norma Shapiro Rev. Declaration of

Tr. Under Agreement Dated 9/16/08*, No. 11-cv-07578 (S.D.N.Y. Jan. 25, 2012), ECF No. 8. On

April 16, 2014, Defendants answered the Amended Complaint. Answer, ECF No. 36.

On July 31, 2015, the Trustee served the expert reports of Bruce G. Dubinsky, Lisa M.

Collura, and Matthew B. Greenblatt. On April 15, 2019, the Trustee served supplemental expert

reports of Dubinsky and Collura. Defendants did not depose any of the Trustee's experts.

Following discovery, the case was ripe for mediation under the Order (1) Establishing

Litigation Case Management Procedures for Avoidance Actions and (2) Amending the February

16, 2010 Protective Order, *SIPC v. BLMIS LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-

01789 (SMB) (Bankr. S.D.N.Y. Nov. 10, 2010), ECF No. 3141. On January 27, 2016, the

parties entered into mediation before Deborah A. Reperowitz but were unsuccessful. *See*

Mediator's Final Report, ECF No. 102.  On February 10, 2021, the Trustee requested a Local

Rule 7056-1(a) pre-motion conference in order to file his motion for summary judgment.  *See*

Letter, ECF No. 103.  Defendants opposed the Trustee's request.  *See* Letter, ECF No. 105.

Following a pre-motion conference on March 17, 2021, this Court set a briefing schedule on the

parties' motions.  *See* Order Settling Deadlines, ECF No. 109.

## ARGUMENT

## I.      IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT, SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE TRUSTEE AS A MATTER OF LAW

### A.      Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure, applicable to bankruptcy courts

pursuant to Fed. R. Bankr. P. 7056, provides that a court must grant summary judgment when

there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986).  Factual positions are proven by either citing the record evidence—including

declarations, admissions, and interrogatory answers—or showing that an adverse party cannot

produce admissible evidence to support a fact.  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*

*Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the movant has discharged its burden, the non-movant must then "go beyond the

pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, designate specific facts showing that there is a genuine issue for trial."

*Celotex Corp.*, 477 U.S. at 324.  "[T]he nonmoving party may . . . not rely simply on conclusory

statements or on contentions that the affidavits supporting the motion are not credible."  *Ying*

*Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).  The non-moving party may not

oppose summary judgment "on the basis of an unreasonable view of the facts." *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005).

### B.    The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year Transfers of Fictitious Profits Made by BLMIS to Defendants

Under SIPA § 78fff-(2)(c)(3), the Trustee may recover any transfers by the debtor whenever customer property is insufficient to pay customer claims. To date, the Trustee has recovered $14.364 billion of $20 billion owed to customers by the estate. *See* Trustee's Twenty-Fourth Interim Report for the Period April 1, 2020 through September 30, 2020, *SIPC v. BLMIS LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2020), ECF No. 19896. Because customer property is insufficient to pay the outstanding customer claims, the Trustee is authorized to recover the transfers to Defendants. *SIPC v. BLMIS LLC (In re Bernard L. Madoff)*, 531 B.R. 439, 453–54 (Bankr. S.D.N.Y. 2015).

The Trustee seeks to avoid and recover transfers of fictitious profits made to Defendants under 11 U.S.C. § 548(a)(1)(A). The elements of this claim are: (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to hinder, delay, or defraud" a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, No. 05 Civ. 9050(LMM), 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd*, 748 F.3d 110 (2d Cir. 2014). The Bankruptcy Court has recognized that fictitious profit cases are strict liability cases. Cremona Decl., Ex. 13 (Tr. of Oral Arg. at 114:10–11, *Picard v. Marilyn Bernfeld Tr.*, Adv. Pro. No. 10-05143 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015), ECF No. 20); *see also id*. (Tr. of Oral Arg. at 100:19, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015, ECF No. 85) (holding a fictitious profit count is "almost a strict liability count")).

There is no genuine dispute regarding BLMIS's: (1) payment of fictitious profits within the Two-Year Period to or for the benefit of Defendants; (2) interest in the transferred funds; and (3) actual intent to hinder, delay, or defraud its creditors.

      **1.**      **BLMIS Made the Two-Year Transfers with Actual Fraudulent Intent and in Furtherance of the Fraud**

Intent to defraud can be established by showing that the debtor operated a Ponzi scheme. *See Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp. LLC)*, 439 B.R. 284, 304–05 (S.D.N.Y. 2010) ("*Bayou IV*"); *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007) (citations omitted); *see also Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) ("[T]he Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent." (citing *In re Bernard L. Madoff*, 531 B.R. at 471)); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("[T]he fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi scheme presumption.'").

      **a.**      **BLMIS Was a Ponzi Scheme**

BLMIS was engaged in a Ponzi scheme. "The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption, particularly in light of Madoff's criminal admission." *Picard v. Chais*, 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011); *see also Picard v. Katz*, 462 B.R. 447, 453 & n.5 (S.D.N.Y. 2011) ("[I]t is patent that all of Madoff Securities' transfers during the two-year period were made with actual intent to defraud present and future creditors."). The existence of the scheme has been recognized by the Bankruptcy Court, the District Court, and the Second Circuit. *See, e.g.*, *SIPC v. BLMIS LLC (In*

*re BLMIS LLC)*, 424 B.R. 122, 125–33 (Bankr. S.D.N.Y. 2010); *Picard v. Greiff*, 476 B.R. 715,

718 (S.D.N.Y. 2012); *In re BLMIS LLC*, 773 F.3d 411, 415–16 (2d Cir. 2014).

The existence of the BLMIS Ponzi scheme is substantiated by the allocutions of Madoff

and BLMIS employees.  Stmt. ¶ 90; *see also Picard v. Nelson*, 610 B.R. 197, 208 (Bankr.

S.D.N.Y. 2019) (relying on plea allocutions in finding that BLMIS was a Ponzi scheme); *Picard*

*v. Legacy Cap. Ltd.*, 603 B.R. 682, 691 (Bankr. S.D.N.Y. 2019) ("The allocutions establish

*prima facie* that Madoff ran BLMIS as a Ponzi scheme.").  Madoff admitted that he ran a Ponzi

scheme through BLMIS and that he did not execute trades on behalf of his IA Business clients.

Stmt. ¶¶ 91–98.  Frank DiPascali, Madoff's chief financial officer and co-conspirator, admitted

that Madoff did not execute trades on behalf of BLMIS's IA Business customers and that he

knowingly caused false account statements to be created reflecting false transactions: "[f]rom at

least the early 1990s through December of 2008 . . . [n]o purchases of [sic] sales of securities

were actually taking place in [customers'] accounts."  Stmt. ¶ 99.  DiPascali "used hindsight to

file historical prices on stocks then [he] used those prices to post purchase of [sic] sales to

customer accounts as if they had been executed in realtime.  On a regular basis [he] added

fictitious trade data to account statements of certain clients to reflect the specific rate of earn [sic]

return that Bernie Madoff had directed for that client."  Stmt. ¶ 100.

David Kugel, a manager and trader at BLMIS, admitted that he falsified trading records

as far back as the early 1970s.  Stmt. ¶¶ 101–02.  Kugel provided historical trade data to create

fake trades which, when included on the BLMIS account statements and trade confirmations of

IA Business clients, gave the appearance of profitable trading when no trading had actually

occurred.  Stmt. ¶ 102.  Irwin Lipkin, BLMIS's accountant, admitted BLMIS's revenue was

falsely inflated through fraudulent bookkeeping entries and annual audited reports.  Stmt. ¶ 103.

Eric Lipkin, payroll clerk at BLMIS, admitted BLMIS created fake reports replicating those of the Depository Trust & Clearing Corporation in order to purportedly confirm non-existent positions in the IA Business accounts for auditors and the Securities and Exchange Commission ("SEC").  Stmt. ¶¶ 104–05.  And Enrica Cotellessa-Pitz, BLMIS accountant and comptroller, admitted IA Business customer money was funneled to BLMIS's proprietary trading and market-making businesses to falsely inflate revenue and hide losses.  Stmt. ¶¶ 106–07.

Guilty pleas and admissions under oath are admissible to prove the existence of a Ponzi scheme.  *See Nelson*, 610 B.R. at 209–10 ("Criminal plea allocutions are admissible under the exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a judgment of a previous conviction and FED. R. EVID. 807's residual exception to hearsay."); *Legacy*, 603 B.R. at 689 n.8 (collecting cases) ("The Court may rely on a plea allocution as evidence to support a fact."); *Moran v. Goldfarb*, No. 09-cv-7667 (RJS), 2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012); *Bayou Accredited Fund, LLC v. Redwood Growth Partners L.P. (In re Bayou Grp., LLC)*, 396 B.R. 810, 835 (Bankr. S.D.N.Y. 2008) ("*Bayou III*"), *rev'd in part on other grounds, Bayou IV*, 439 B.R. at 304; *McHale v. Boulder Cap. (In re 1031 Tax Grp., LLC)*, 439 B.R. 47, 72 (S.D.N.Y. 2010); *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Adv. Pro. Nos. 10-03493 (SMB), 10-05447 (SMB), 2014 WL 47774, at *11 (Bankr. S.D.N.Y. Jan. 3, 2014).

Summary judgment is appropriate where the admissions support a finding that "there is no genuine disputed issue of fact that BLMIS was a Ponzi scheme . . . ."  *Legacy*, 603 B.R. at 693; *see also Moran*, 2012 WL 2930210, at *4 (granting motion for summary judgment based on plea transcript from related Department of Justice action where perpetrator admitted under oath to orchestrating the Ponzi scheme); *Bayou IV*, 439 B.R. at 307–08 (affirming summary judgment on fictitious profits from Ponzi scheme based on evidence including guilty pleas of fraudsters);

*In re 1031 Tax Grp., LLC*, 439 B.R. at 72 (granting summary judgment in part and concluding

that Ponzi scheme existed with reliance on evidence including perpetrator's superseding

indictment and plea agreements); *Armstrong v. Collins*, Nos. 01 Civ. 2437(PAC), 02 Civ. 2796

(PAC), 02 Civ. 3620(PAC), 2010 WL 1141158, at *24 (S.D.N.Y. Mar. 24, 2010) (granting

motion for summary judgment and finding existence of Ponzi scheme where submitted evidence

included transcripts from perpetrator's allocution and sentencing).

### b. Trustee's Experts Confirmed That BLMIS Was a Ponzi Scheme

Bruce Dubinsky, a certified fraud examiner and forensic accountant, confirmed that

BLMIS was a Ponzi scheme. *See* Declaration of Bruce G. Dubinsky dated April 23, 2021

("Dubinsky Decl."), Attach. A (Dubinsky Report); *see also Nelson*, 610 B.R. at 210–14. As set

forth in Dubinsky's unrebutted report, BLMIS operated three business units: (i) a proprietary

trading business; (ii) a market-making business; and (iii) the IA Business. Stmt. ¶ 13. The

proprietary trading business traded for its own account to make money for BLMIS. The market-

making business made markets in certain stocks, bonds, warrants and rights. Stmt. ¶¶ 14–15.

The IA Business purported to purchase and sell securities on behalf of its customers. Stmt. ¶ 17.

The proprietary trading business, the market-making business, and IA Business were units of

BLMIS and operated by Madoff. Stmt. ¶ 18.

BLMIS reported to its IA Business customers, including Defendants, that the money they

deposited with BLMIS was invested in the "split-strike conversion" strategy. Stmt. ¶ 20. The

evidence establishes that BLMIS did not execute this strategy on behalf of its IA Business

customers. *Id*. Rather, Dubinsky analyzed BLMIS's trading records and determined that as far

back as the 1970s, BLMIS used historical trade information to fabricate false trades for IA

Business customers and reported those fake trades on customer statements. Stmt. ¶¶ 21–56.

Based on his investigation, Dubinsky concluded that the IA Business was a fraud and a Ponzi scheme.

The split-strike conversion strategy, as purportedly executed by BLMIS, involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. treasury bills ("T-Bills") when the money was "out of the market." Stmt. ¶ 23.  BLMIS never executed this strategy on behalf of its customers, including Defendants.  In addition to evidence of the fabricated trades across all BLMIS IA Business customer accounts, Dubinsky's analysis further confirmed the lack of any trading by BLMIS on behalf of its IA Business customers based on (a) the impossible reported volume of equity trades; (b) impossible equity and options trades reported outside the daily price range; (c) the low volatility in its reported daily trading performance compared to the actual market behavior and the performance achieved by BLMIS in the proprietary trading business unit as measured by the volume weighted average prices for its sales and purchases; (d) the consistently positive rates of returns that did not "mirror" the volatility of the markets; (e) a lack of any Depository Trust Corporation ("DTC") records to confirm the reported IA Business equity or treasury trades; and (f) a lack of Options Clearing Corporation ("OCC") records to confirm the reported IA Business options trades.  Stmt. ¶ 24.  And, Dubinsky verified that no T-Bills, purportedly part of the split-strike conversion strategy, were purchased on behalf of IA Business customers.  Stmt. ¶¶ 57–63.

### c.    The Trustee's Experts Confirmed That BLMIS Paid Investor Redemptions from Customer Funds

Lisa Collura, a forensic accountant and certified fraud examiner, analyzed the books and records of BLMIS.  *See Nelson*, 610 B.R. at 220–21.  Collura's investigation shows that during the ten-year period before its collapse on December 11, 2008, BLMIS primarily used three bank

11

accounts for the IA Business: JPMorgan Chase Bank, N.A. ("JPMorgan") account #xxxxx1703 (the "703 Account"); JPMorgan account #xxxxxxxxx1509 (the "509 Account," together with the 703 Account, the "JPMorgan Accounts")); and Bankers Trust account #xx-xx0-599 (the "BT Account"). Stmt. ¶ 69. IA Business customers' cash deposits were deposited and commingled in the 703 Account. Stmt. ¶ 70. IA Business customer withdrawals were made through the JPMorgan Accounts and the BT Account, which was a checking account entirely funded by the 703 Account during the period for which bank records are available. Stmt. ¶ 71. The JPMorgan Accounts were linked commercial business accounts. Stmt. ¶ 72. The 509 Account was a commercial controlled disbursement account that was entirely funded by the 703 Account. *Id*. The money in the 703 Account consisted almost entirely of customer deposits. Stmt. ¶¶ 72, 87. Dubinsky confirmed that customer funds were deposited and withdrawn from the JPMorgan Accounts, and that there were no inflows of money into these bank accounts as a result of trading securities or receipt of dividends on purportedly held securities. Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340.

Both Dubinsky and Collura confirmed that ninety-seven percent of all cash additions into the 703 Account came directly from IA Business customers. Stmt. ¶ 73. The other three percent of inflows into the 703 Account came from income earned from cash management activities including (1) short-term investment activity made directly from the 703 Account (including overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and T-Bills); and (2) investments of BLMIS customer funds made through bank and brokerage accounts held in the name of BLMIS or Madoff. Stmt. ¶ 74. Because the short-term investments, including overnight sweeps, were made directly out of the 703 Account, the source of the money for those investments was customer funds. Stmt. ¶ 75.

The IA Business did not have any legitimate income-producing activities. The only source of cash available for the IA Business to pay purported investment profits as well as redemption requests was from cash that other IA Business customers deposited in the 703 Account. Stmt. ¶ 82. These transactions rendered BLMIS insolvent. By no later than December 2002, BLMIS's assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion. Stmt. ¶ 83. By December 2008, the customer property on hand at BLMIS was grossly insufficient to pay the claims of its customers. Stmt. ¶ 84.

Defendants did not serve a rebuttal to the Trustee's experts' opinions that the funds in the 703 Account consisted of customer money, that the IA Business had no source of funds other than customer money, or that customer redemptions were paid with funds from the 703 Account. Nor did Defendants depose the Trustee's experts or identify any evidence—admissible or otherwise—to rebut the substantial evidence demonstrating that Madoff was operating a Ponzi scheme through BLMIS's IA Business and that the transfers of fictitious profits Defendants received comprised other customers' deposits. Accordingly, the undisputed evidence is that the transfers were made with the intent to hinder, delay, or defraud BLMIS's creditors.

### d.    BLMIS's Two-Year Transfers to Defendants Were in Furtherance of the Fraud

In a Ponzi scheme, the Trustee need not prove that the debtor intended to hinder, delay, or defraud a *particular* creditor, but rather he must only establish that the transfers made to the transferee were in furtherance of a fraudulent scheme. *See Bayou IV*, 439 B.R. at 304.

"Every payment made by the debtor to keep the scheme on-going was made with the actual intent to hinder, delay or defraud creditors, primarily the new investors." *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund)*, 359 B.R. 510, 518 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397 B.R. 1 (S.D.N.Y. 2007) (citation omitted). This is predicated on the

reality that a debtor's failure to honor an investor's withdrawal request "would promptly have

resulted in demand, investigation, the filing of a claim and disclosure of the fraud." *Bayou III*,

396 B.R. at 843; *see also Greiff*, 476 B.R. at 723. Every redemption payment "in and of itself

constituted an intentional misrepresentation of fact" of the investor's rights to their falsely

inflated account statement and "an integral and essential part" of the fraud. *Bayou III*, 396 B.R.

at 843. Thus, the transfers to Defendants were in furtherance of the fraudulent Ponzi scheme.

### e.   BLMIS Made the Transfers to Defendant Within the Two-Year Period

BLMIS transferred fictitious profits to or for the benefit of Defendants between

December 11, 2006 and December 11, 2008. The Trustee's evidence is uncontroverted as to the

date, receipt, and amount of the transfers the Trustee seeks to avoid and recover.

### f.   Defendants Have Not Presented Any Countervailing Evidence

Defendants have not and cannot come forward with evidence to rebut the Trustee's *prima*

*facie* case. During discovery, Defendants failed to present any evidence, fact or expert, to rebut

the Trustee's proofs that BLMIS was a Ponzi scheme. Defendants did not serve rebuttal reports

disputing the existence of a Ponzi scheme and took no depositions of any of the Trustee's expert

witnesses. Absent such evidence, any attempt by Defendants to offer vague assertions,

unfounded credibility attacks, or proffers of evidence they would elicit on cross-examination of

the Trustee's expert witnesses is unavailing and does not present a genuine dispute of material

fact to withstand summary judgment. *See Ying Jing Gan*, 996 F.2d at 532 (explaining that the

nonmoving party "may not rely simply on conclusory statements or on contentions that the

affidavits supporting the motion are not credible"); *see also Bayou III*, 396 B.R. at 825

(explaining that conjecture, surmise, or "metaphysical doubt," as well as self-serving conclusory

statements will not defeat summary judgment).

g.    **The Trustee is Entitled to Prejudgment Interest as a Matter of Law**

The Trustee is also entitled to an award of prejudgment interest from December 11, 2008

(the "Filing Date") because "[f]ull compensation to the estate for the avoided transfer[s]

normally requires prejudgment interest to compensate for the value over time of the amount

recovered." *In re Cassandra Grp.*, 338 B.R. 583, 599 (Bankr. S.D.N.Y. 2006) (awarding

prejudgment interest "[t]o fully and fairly compensate [debtor's] creditors for their loss—not

only of [the amount] that was fraudulently conveyed . . . but of the use of that money since the

date of the demand").

In *BAM L.P.*, this Court awarded prejudgment interest finding that the "net losers" of

BLMIS's Ponzi scheme "are the real victims of Defendants' dilatory litigation tactics" and after

ten years of litigation "an award of prejudgment interest is essential to the [Trustee's] collection

of customer property." *Picard v. BAM L.P.*, 624 B.R. 55, 64 (Bankr. S.D.N.Y. 2020) (citing

*Stanford Square L.L.C. v. Nomura Asset Cap. Corp.*, 232 F. Supp. 2d 289, 293 (S.D.N.Y. 2002)

("Awarding prejudgment interest is based upon the premise that the party to whom the money is

owed has been deprived of the use of the funds and can be made whole only by the award of

interest. Conversely, the party owing the money has had the use of the funds he was obligated to

have paid and should be required to pay compensation by way of interest.")).  Likewise, in

*Epstein*, this Court awarded prejudgment interest against "Defendants, like these, who litigate

issues that have already been decided by the Court in this case." *Picard v. Est. of Seymour

Epstein*, Adv. Pro. No. 10-04438 (CGM) (Bankr. S.D.N.Y. Jan. 27, 2021), ECF No. 155

("*Epstein Decision*") (finding the Trustee "has spent approximately ten years prosecuting this

case and cannot be made whole without an award of prejudgment interest"); *see also Picard v.

JABA Assocs. LP*, No. 20 cv. 3836 (JGK), 2021 WL 1112342, at *19 (S.D.N.Y. Mar. 24, 2021)

15

("The 4% rate compensates the Trustee for the loss of the use of the Two-Year Transfers for the years that this litigation has lasted, and reduces the profits to the defendants from having withheld the funds."); *Picard v. Lisa Beth Nissenbaum Tr.*, No. 20 cv. 3140 (JGK), 2021 WL 1141638, at *17–18 (S.D.N.Y. Mar. 24, 2021) (same).

Having determined that prejudgment interest should be awarded, this Court found that the federal rate should be used where the Trustee's claims arise only from federal law. *BAM L.P.*, 624 B.R. at 64. However, "[w]here the interest rate codified in 28 U.S.C. § 1961 is too low to compensate the plaintiff, courts can opt to apply the prime rate of interest," which was 4% on the Filing Date. *Id.* at 65 (quoting *In re FKF 3, LLC*, No. 13 Civ. 3601 (JCM), 2018 WL 59292131, at *13 (S.D.N.Y. Oct. 24, 2018)); *see also Epstein Decision* at 11 ("Interest is awarded in the amount of 4%"). Further, this Court found "the accrual date for prejudgment interest is the Filing Date, as the claims asserted by the Trustee arose only upon the filing of the SIPA liquidation." *BAM L.P.*, 624 B.R. at 65–66 (citing *In re FKF 3, LLC*, 2018 WL 59292131, at *14); *see also Epstein Decision* at 10–11 (finding "the Trustee is entitled to interest from the date that the SIPA action was commenced [sic]").

Here, Defendants are represented by the same counsel as defendants in *BAM L.P.*,[2] yet they refuse to acknowledge the law of the case. Instead, Defendants' counsel continues to engage in dilatory litigation practices that warrant prejudgment interest in the same way this Court applied it in *BAM L.P.* The "net losers" are the real victims of Defendants' litigation tactics while "Defendants are 'net winners' (having withdrew more money than they invested)

---

[2] Following this Court's judgment entered against defendants in *BAM L.P.*, defendants filed an appeal to the District Court. *See Picard v. BAM L.P.*, No. 21-cv-0395 (PGG) (S.D.N.Y. Jan. 15, 2021), ECF No. 1. Subsequently, the appeal was voluntarily dismissed, defendants paid the judgment in full, in addition to post-judgment interest, and the Trustee filed a satisfaction of judgment with this Court. *See SIPC v. BLMIS LLC*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Apr. 8, 2021), ECF No. 20415.

and, by definition, have been withholding the net losers' principal investments for many years."
*Id.* at 64. As this Court stated, the Trustee has "incurred costs litigating against Defendants who
have resisted the law of the case." *Id.* (citing *Newbro v. Freed*, 409 F. Supp. 2d 386, 402
(S.D.N.Y. 2006) ("An important rationale for the prejudgment interest rule is that the party
against whom the claim is asserted could have stopped the running of interest by paying what
was owed.")). Indeed, this rationale applies and this Court should apply the prime rate on the
Filing Date, which was 4%, just as it did in *BAM L.P.* and *Epstein*, from the Filing Date through
the date of entry of judgment in favor of the Trustee.

## II.    DEFENDANTS' DEFENSES CAN BE DETERMINED AS A MATTER OF LAW

Defendants raise certain legal defenses, many of which have already been addressed and
rejected by this Court in prior opinions in this liquidation. Defendants cannot meet their burden
of establishing a triable issue of fact to defeat the Trustee's Motion.

### A.    Defendants Did Not Give Value for Fictitious Profits

Having established that BLMIS transferred at least $926,064 in fictitious profits within
the Two-Year Period to Defendants with actual fraudulent intent, the Trustee is entitled to avoid
and recover the Two-Year Transfers. To defeat the avoidance of a transfer on summary
judgment, Defendants must offer evidence sufficient to create a material issue of fact as to
whether they took (1) "for value . . . to the extent that [they] gave value to the debtor in exchange
for such transfer" and (2) "in good faith." *Bayou IV*, 439 B.R. at 308 (placing burden of proving
affirmative defense on transferee); 11 U.S.C. § 548(c); *In re 1031 Tax Grp., LLC*, 439 B.R. at 73.
Fictitious profits "may be recovered regardless of the customers' good faith." *Katz*, 462 B.R. at
453; *see also Greiff*, 476 B.R. at 722–24.

"Value" includes satisfaction of an antecedent debt of the debtor. *See* 11 U.S.C.
§ 548(d)(2)(a). However, as a matter of law, Defendants cannot establish that they took the

transfers of fictitious profits "for value" because such false profits were not on account of a valid antecedent debt. *Cohen*, 2016 WL 1695296, at *11. The Second Circuit recently held that BLMIS customers, like Defendants, "cannot invoke the 'for value' defense here in the same way in which they could if this were an ordinary bankruptcy because the defense operates differently in a SIPA liquidation." *In re BLMIS LLC*, 976 F.3d 184, 199–200 (2d Cir. 2020); *see also JABA Assocs.*, 2021 WL 1112342, at *15–17; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *15–16. Even if Defendants have enforceable claims under federal or state law, "a conclusion that satisfaction of those claims gave 'value' to [BLMIS] would conflict with SIPA." *Greiff*, 476 B.R. at 727. This is because SIPA "differs from general bankruptcy law because it 'choose[s] among creditors' and prioritizes customers." *In re BLMIS LLC*, 976 F.3d at 192 (citing *Greiff*, 476 B.R. at 727). Customers like Defendants, who have no net equity claims, may have valid claims and payment on those claims could discharge an antecedent debt, but:

> [t]he types of claims that a customer may make against a customer property fund are those 'relating to, or net equity claims based upon, securities or cash, . . . insofar as such obligations are ascertainable from the books and records of the debtor or otherwise established to the satisfaction of the trustee.' 15 U.S.C. § 78fff-2(b). In the case at bar, the only such claims are those for a return of principal or net equity.

*Id.* at 200. This Court should not depart from the well-established precedent that limits value to the principal invested by good faith defendants.

### B.    Taxes May Not Be Considered as Part of Value Calculation

The Bankruptcy Court and District Court have also already considered and rejected any defense involving Defendants' ability to offset their avoidance liability by the amount of taxes paid on the fraudulent transfers received from BLMIS. *See JABA Assocs.*, 2021 WL 1112342, at *19 ("Beyond the complex problems of proof and tracing, the offset would come at the expense of other customers, and SIPA prioritizes repayment of customers."); *Nelson*, 610 B.R. at 236–37

(citing *Cohen*, 2016 WL 1695296, at \*15 (stating "the offset would introduce complex problems of proof and tracing and reduce the [Trustee's] ability to recover assets" and would only "come at the expense of the other victims." (citation omitted))); *Picard v. Estate (Succession) of Doris Igoin (In re BLMIS)*, 525 B.R. 871, 893 (Bankr. S.D.N.Y. 2015) ("[T]he withdrawal of the money to pay taxes the [d]efendants never should have had to pay is not a defense to the fraudulent transfer claims." (citing *Donell v. Kowell*, 533 F.3d 762, 778–79 (9th Cir. 2008)).

### C.    The Trustee's Treatment of Inter-Account Transfers is Proper

Defendants may argue that the Trustee failed to credit Defendants with the full amounts transferred to their BLMIS accounts.  In effect, Defendants would be rearguing the Second Circuit's decision affirming the Trustee's use of the "Inter-Account Transfer Method," which applies the Net Investment Method to all accounts, including those that received one or more inter-account transfers (i.e., the purported transfer of funds from one BLMIS account to another BLMIS account).  *In re BLMIS LLC*, 697 F. App'x at 708.

The Second Circuit rejected arguments that the Inter-Account Transfer Method violates federal securities laws and New York law.  *Id.* at 712–713.  Further, the Court held that the Trustee's use of the Inter-Account Transfer Method "does not . . . treat the transferor account and transferee account as one account in violation of SIPA.  The Inter-Account [Transfer] Method treats the two accounts as separate for purposes of determining 'net equity' based on cash deposits and cash withdrawals, the only relevant data points under [the Second Circuit's] *Net Equity Decision*."  *Id.* at 711 (citing *In re BLMIS LLC*, 654 F.3d 229, 238 (2d Cir. 2011)).

As described in his expert reports, Greenblatt applied the Inter-Account Transfer Method to the Norma Trust Account, Philip Trust Account, and Norma Shapiro Account as part of each account's principal balance calculation, including citation to the BLMIS books and records supporting each inter-account transfer, all of which were produced to Defendants.  *See*

19

Declaration of Matthew B. Greenblatt, dated April 28, 2021, Attach. A (Greenblatt Report), n.6,

¶¶ 18, 27–28; Attach. B (Greenblatt Shapiro Report) ¶¶ 7–87; Exs. 4A–6C.

### D.     The Transfers Were an Interest of the Debtor in Property

The Trustee anticipates that Defendants will dispute whether the transfers were "an

interest of the debtor in property" because Defendants argue the JPMorgan Accounts were the

property of Madoff, not BLMIS.  Defendants' argument has been rejected by the Bankruptcy

Court and District Court no less than *five times* in this liquidation.  In *Nelson*, the court held:

> Defendants conflate subject matter jurisdiction with the merits of the
> Trustee's claims. The Trustee certainly has standing to argue that
> BLMIS made the Two-Year Transfers. . . . In any event, the
> Defendants' jurisdictional argument lacks merit because the
> evidence demonstrate[s] that BLMIS owned the [JPMorgan] Chase
> Accounts, the source of the Two-Year Transfers.

*Nelson*, 610 B.R. at 216.  In *BAM L.P.*, this Court held:

> [A]ll of the assets and liabilities of the sole proprietorship, including
> the IA Business, were transferred to BLMIS via the 2001 SEC
> Amended Form BD.  As such, the Defendants' customer accounts
> and the Bank Accounts are property of BLMIS and the monies paid
> to Defendants from those Bank Accounts must be turned over to the
> Trustee.

*BAM L.P.*, 624 B.R. at 61 (noting that this finding is consistent with law of the case) (citing

*Nelson*, 610 B.R. at); *see also Epstein Decision* at 7 ("This Court has already determined that all

of Madoff's customers were transferred to BLMIS.").

In *JABA Associates* and *Nissenbaum*, the District Court held:

> Madoff was using the accounts at issue in his capacity as a sole
> proprietor until he reorganized his business as an LLC. When
> Madoff changed the form of his business from a sole proprietorship
> to an LLC, the business retained the same SEC registration number.
> When submitting the Amended Form BD, Madoff noted that the
> [sole proprietorship] [sic] 'will transfer to successor all of
> predecessor's assets and liabilities related to predecessor's business.
> The transfer will not result in any change in ownership or control.' .
> . . And there were no assets or liabilities of the sole proprietorship

> listed as 'not assumed by the successor.' . . . The form also indicated
> that no 'accounts, funds, or securities of customers of the applicant
> are held by or maintained by [any] other person, firm, or
> organization.'

*JABA Assocs.*, 2021 WL 1112342, at *9; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *9.[3]

BLMIS was the owner of the JPMorgan Accounts at the time of the transfers to

Defendants. Madoff began operating as a sole proprietorship in the early 1960's under the

names of Bernard L. Madoff and Bernard L. Madoff Investment Securities. *BAM L.P.*, 624 B.R.

at 59. The sole proprietorship filed with the Securities & Exchange Commission a Form BD

under file number 8-8132 in January of 1960. Cremona Decl., Ex. 1 (1959 SEC Form BD); *see*

*also BAM L.P.*, 624 B.R. at 59. Through that registration, the broker-dealer became a member of

SIPC when SIPA was enacted in 1970. There is no dispute that prior to 2001, the JPMorgan

Accounts were held by Madoff's sole proprietorship.

Effective January 1, 2001, Madoff changed the corporate form of his broker-dealer

business when he incorporated BLMIS as an LLC. Cremona Decl., Ex. 2 (Articles of

Organization); *see also BAM L.P.*, 624 B.R. at 59. With this change in corporate form, BLMIS

also filed an Amended Form BD with the SEC in January 2001 to reflect that change using the

same SEC registrant number 8-8132; BLMIS did not file a new application for registration.

Cremona Decl., Ex. 3 (2001 SEC Amended Form BD); *see also BAM L.P.*, 624 B.R. at 59–60.

---

[3] *JABA Associates* and *Nissenbaum* also address and resolve the "disputed facts" that prevented the grant of summary judgment in *Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-1029, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021). In *RAR Entrepreneurial Fund*, Judge Jesse M. Furman held that there were issues of fact on whether the transfers were made by the LLC or Madoff personally, despite finding that the Trustee had standing to pursue the Two-Year Transfers, had established the elements of his claim, and that "RAR faces an uphill battle and that the Trustee is ultimately likely to prevail on its claim." *RAR Entrepreneurial Fund*, 2021 WL 827195, at *10. But for the reasons explained in *JABA Associates* and *Nissenbaum*, there is no genuine issue of material fact that the transfers were made by the LLC, which, as Judge John G. Koeltl observed, is consistent with this Court's ruling in *Epstein*. *JABA Assocs.*, 2021 WL 1112342, at *n.4; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *n.5 (citation omitted). Judge Koeltl further noted that any "contrary decision would be in tension with the finding that the Trustee has standing to recover the transfers as property of BLMIS." *JABA Assocs.*, 2021 WL 1112342, at *n.4; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *n.5.

Under "BD Successions" of the Amended Form BD, it asked: "Briefly describe details of the

succession, including any assets or liabilities not assumed by the successor." The response was:

> Effective January 1, 2001, predecessor will transfer to successor all of predecessor's assets and liabilities related to predecessor's business. The transfer will not result in any change in ownership or control.

Cremona Decl., Ex. 3 (2001 SEC Amended Form BD at 10–11, *see also* Question 5). No assets

or liabilities of the sole proprietorship were listed as "not assumed by the successor." *Id.* The

Amended Form BD further certified that no "accounts, funds, or securities of customers of the

*applicant* are held or maintained by such other *person*, firm, or organization." *Id.* (2001 SEC

Amended Form BD at 5). BLMIS succeeded to the sole proprietorship's SEC registrant number

8-8132. Cremona Decl., Ex. 1 (1959 SEC Form BD), Ex. 3 (2001 SEC Amended Form BD).

Upon the filing of the 2001 SEC Amended Form BD, the sole proprietorship no longer

operated as a broker-dealer or in any other capacity. Cremona Decl., Ex. 3 (2001 SEC Amended

Form BD at 10–11); *see also BAM L.P.*, 624 B.R. at 60 ("The predecessor identified on the 2001

SEC Amended Form BD is "Bernard L. Madoff" and the successor is identified as BLMIS.").

Indeed, this Court noted "that this succession provision meant that, without exception, all of the

assets and liabilities of the sole proprietorship were transferred to BLMIS and the sole

proprietorship ceased to exist." *BAM L.P.*, 624 B.R. at 60.

BLMIS's corporate documents confirmed the change in corporate form and the transfer

of all assets. In its Amended and Restated Operating Agreement, BLMIS plainly sets forth

Madoff's intent to transfer all assets—including bank accounts—held by the sole proprietorship

to the LLC, effective January 1, 2001:

> 3. **Purpose.** The Company is formed to receive as at January 1, 2001, all of the assets, subject to liabilities, associated with the business being conducted by Bernard L. Madoff, as sole proprietorship (the "Business") and to thereafter conduct such

> Business, and any further extension therefor, in such manner and
> form as determined by the Member in his sole discretion, to the
> extent permitted by the [Limited Liability Company Law of the
> State of New York] or by the laws of any jurisdiction which the
> Company may do business.

Cremona Decl., Ex. 4 (Amended and Restated Operating Agreement).  Consistent with the 2001

Amended Form BD filed with the SEC, the Amended and Restated Operating Agreement makes

clear that no assets were carved out or excluded from the transfer of assets to the LLC, and

confirmed that all assets of the sole proprietorship—the three business units and their bank

accounts—were transferred to the LLC as of January 1, 2001.  Madoff transferred ownership of

all of the assets of the sole proprietorship to the LLC, thereby stripping any ownership interest of

the sole proprietorship in any assets, including the bank accounts of the IA Business.  *See SIPC*

*v. BLMIS LLC (In re BLMIS)*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151

(PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017)

(finding all Madoff Securities' assets and liabilities were transferred to BLMIS upon the

reorganization to a single member limited liability company).

The District Court's decisions in *JABA Associates* and *Nissenbaum* are consistent with

the prior decisions of this Court on the exact same issues in this liquidation, and should likewise

constitute law of the case.  *See Epstein Decision* at 10 ("All of Defendants' legal arguments in

opposition to this summary judgment motion were previously decided and law of the case.");

*BAM L.P.*, 624 B.R. at 61 ("This finding is also consistent with the law of the case."); *Nelson*,

610 B.R. at 237 (Bankr. S.D.N.Y. 2019) ("The prior decisions within this SIPA proceeding

constitute law of the case and Defendants offer no reason or evidence to allow this Court to

revisit them here."); *Picard v. Legacy Capital Ltd.*, 603 B.R. 682, 700 (Bankr. S.D.N.Y. 2019)

("These rulings constitute law of the case . . . .") (citing *In re Motors Liquidation Co.*, 590 B.R.

39, 62 (S.D.N.Y. 2018) (confirming law of the case doctrine applies across adversary

proceedings within the same bankruptcy case)).

Defendants may nonetheless argue that various BLMIS and JPMorgan documents

indicate Madoff intended to keep the IA Business separate under the name "Bernard L. Madoff

Investment Securities." But any "discrepancies Defendants have demonstrated to exist—forms

filled out improperly, business names used interchangeably on bank accounts and checks—are

the sleights of hand that one would expect to see when exhuming the remnants of a Ponzi

scheme." *BAM L.P.*, 624 B.R. at 60 (citing Willis H. Riccio, Ponzi Schemes: A Man Called

Charles, 58 R.I. Bank. J. 7, 8 (July/Aug. 2009)).

### E.    SIPA And The Bankruptcy Code Authorize the Trustee to Recover Customer Property, Wherever Held

For purposes of avoidance and recovery, BLMIS is deemed under SIPA to have an

interest in the transferred property; thus, the transfers here are avoidable under section 548 of the

Bankruptcy Code. As this Court previously held, pursuant to SIPA § 78fff-2(c)(3):

> The trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11. Such recovered property shall be treated as customer property. For purposes of such recovery, ***the property so transferred shall be deemed to have been the property of the debtor*** and, if such transfer was made to a customer or for his benefit, such customer shall be deemed to have been a creditor, the laws of any State to the contrary notwithstanding.

*Id.* at 62 (emphasis added); *see also* SIPA § 78fff-2(c)(3) (finding transferred customer property

is "deemed to have been the property of the debtor"); *Cohen*, 2016 WL 1695296, at *5 ("BLMIS

transferred customer property to [defendant], and under SIPA § 78fff-2(c)(3) such property is

'deemed to have been property of the debtor'"); *In re 1031 Tax Grp., LLC*, 439 B.R. at 68–70

(holding that in a Ponzi scheme, money reflected in bank account statements "in the name of a

debtor is presumed to be property of the bankruptcy estate" for purposes of 11 U.S.C. § 548(a)(1)).

Where the transfers are customer property, the Trustee is entitled to avoid and recover the Two-Year Transfers, regardless of the change in the Debtor's corporate form from a sole proprietorship to a limited liability company. *Epstein Decision* at 5–6; *BAM L.P.*, 624 B.R. at 62; *Nelson*, 610 B.R. at 215–18; *see also JABA Assocs.*, 2021 WL 1112342, at *10; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *10.

### 1.    SIPA and SIPC

In enacting SIPA, Congress fashioned a program for protecting customer property—that is, property placed with a broker-dealer for the purchase of securities where title to such property always remained with the customer. This program included the creation of SIPC, a nonprofit, private membership corporation to which most registered broker-dealers are required to belong. When one of its members fails, SIPC protects those customers by initiating a SIPA liquidation, a form of liquidation proceeding applicable only to SIPC member firms. *See SEC v. F.O. Baroff Co.*, 497 F.2d 280, 281 (2d Cir. 1974) (holding that the object of SIPA and SIPC is to protect customers in the brokerage industry). Although a SIPA liquidation is similar to a bankruptcy and incorporates certain provisions of the Bankruptcy Code, it is "tailored to achieve SIPA's objectives," *In re BLMIS LLC*, 424 B.R. at 133, one of which is the prompt return of customer property to customers. SIPA § 78fff(a); *see also SIPC v. Barbour*, 421 U.S. 412, 416 (1975).

To do so, SIPC specifies a trustee to liquidate the business and any assets of the member-broker and recover customer property wrongfully transferred or unlawfully converted by the broker. SIPA §§ 78*lll*(4), 78fff-2(c)(3). These funds form the corpus of the customer property estate, from which the trustee makes distributions to customers of their ratable share of customer property. SIPA § 78fff-2(c)(1). SIPA prioritizes this customer property estate, which is distinct

from the general bankruptcy estate for the broker-dealer member firm.  SIPA § 78fff-2(c)(1); *see*

*In re BLMIS LLC*, 654 F.3d at 233; *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768 (2d

Cir. 2010); *In re Weis Sec., Inc.*, No. 73 Civil 2332, 1976 WL 820, at *6−7 (S.D.N.Y. Aug. 2,

1976); *SIPC v. BLMIS LLC (In re Madoff Sec.)*, 499 B.R. 416, 420 (S.D.N.Y. 2013).  The

customer property estate is composed of customer property, including recovered assets, which

are earmarked to satisfy customers' net equity claims.  By contrast, the general estate is made up

of the broker-dealer's assets available to satisfy the claims of general creditors.  *See In re Adler

Coleman Clearing Corp.*, 195 B.R. 266, 270 (Bankr. S.D.N.Y. 1996).

### 2.    Becoming a Member of SIPC

The "members" of SIPC include "all persons registered as broker-dealers" with the SEC

under section 78*o*(b) of Title 15.  SIPA § 78ccc(a)(2)(A).  SIPC membership, and thus SIPA

protection, arises from a broker-dealer's registration with the SEC, without regard to the

corporate form of the broker-dealer.  SIPA § 78ccc(a).

Under section 78*o*(b), a broker-dealer applies for registration with the SEC on SEC Form

BD (the uniform form for broker-dealer registrations).  *See* 17 C.F.R. § 249.501(a).  Once

registered with the SEC, the broker-dealer is assigned a registrant number, becomes a member of

SIPC, and is required to pay into the SIPC fund by annual assessments.  SIPA § 78ddd(c)(2).

If an entity succeeds to and continues the business of a broker-dealer previously

registered with the SEC, and the succession is based on a change in the predecessor's form of

organization, it files a Form BD Amendment.  SEC Rule 15b1-3(b), 17 C.F.R. § 240.15b1-3(b).

The successor entity continues the business and SIPC membership of its predecessor.  When a

firm ceases to do business as a broker-dealer, it withdraws from registration with the SEC by

filing an SEC BDW form (the uniform request form for broker-dealer withdrawal) through the

Central Registration Depository.  17 C.F.R. §§ 249.501(a), 240.15b6-1(b).  Once it is de-

registered, the former broker-dealer ceases being a SIPC member.

### 3.      Initiating a SIPA Liquidation

If SIPC determines that one of its members has failed or is in danger of failing to meet its

obligations to customers, it applies for a customer protective decree in district court.  The district

court acquires jurisdiction over the broker-dealer and its property wherever located.  SIPA

§ 78eee(b)(2)(A)(1).  The decree places the firm in liquidation and appoints a trustee specified by

SIPC to liquidate the business of the debtor-broker.  SIPA § 78eee(b)(3).  The liquidation is then

removed to the bankruptcy court.  *Id*. § 78eee(b)(4).

The term "debtor" has a special definition under SIPA: "a *member* of SIPC with respect

to whom an application for a protective decree has been filed under section 78eee(a)(3) of this

title."  SIPA § 78*lll*(5) (emphasis added).  This differs from the Bankruptcy Code, where a

"debtor" is an individual, partnership, or corporation.  11 U.S.C. §§ 109(a), 101(41).  Because

SIPC membership tracks SEC registration, SIPC names the SEC-registered broker-dealer that is

at risk of failing as the "debtor" in the application for the protective decree.  Thus, registration

under SIPA § 78*o*(b) is the key to who the SIPC member is, and, if the member is placed into

liquidation, who the debtor is.

### 4.      Customer Property Under SIPA

Customer property is a term of art in the securities industry, and means property held by a

broker-dealer but that belongs to customers.  *See* Michael P. Jamroz, *The Customer Protection

Rule*, 57 Bus. Law. 1069, 1071–74 (2002); *see, e.g.*, *Picard v. Lowrey*, 596 B.R. 451, 469–70

(S.D.N.Y. 2019).  When customers invest their cash and securities with a broker, they transfer

possession, but not title, of their money to the broker.  The broker never owns that money, but

rather is legally bound to hold that money in reserve for its customers.  *See Lowrey*, 596 B.R. at

469–70 (noting that "customer property" in securities industry refers to property held by broker-dealer but belongs to its customers).

Customer protection rules, promulgated by the SEC as required by SIPA, require broker-dealers to safeguard customers' securities and cash in a reserve fund. This reserve would form the corpus of the firm's estate for distribution to customers if the firm went into liquidation under SIPA. Exchange Act Release No. 34-9856, Adoption of Rule 15c3-3, 37 Fed. Reg. 25224, 25225 (Nov. 29, 1972), 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3"); *see also* Jamroz, 57 Bus. Law. at 1071–74.

Customer property includes securities and cash held for customers under Rule 15c3-3; assets derived from or traceable to customer property; and, under SIPA § 78*lll*(4)(D), other debtor property that a trustee must allocate to the fund of customer property as necessary to remedy the debtor's non-compliance with the segregation requirements of Rule 15c3-3. Customer property retains its nature and special protections under SIPA, even if the broker transfers that property to others. SIPA § 78*lll*(4) (including in the definition of customer property "the proceeds of any such property transferred by the debtor, including property *unlawfully converted*" (emphasis added)); *see also BAM L.P.*, 624 B.R. at 62 ("When the Defendants invested their money into the IA Business, the deposits were placed into the Bank Accounts and commingled with all of the Ponzi scheme victims' deposits. . . . Thus, they were 'customer property.'"); *Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*, 97 B.R. 503, 508 (E.D. Ark. 1987) (Rule 15c3-3 deposit is not subject to bank's setoff claim because it is customer property); Rule 15c3-3(f) (Rule 15c3-3 account cannot be subject to bank lien because it consists of customer property). This broad definition recognizes customers' enduring rights to the property they gave to their broker for safekeeping. Indeed, once a broker-dealer goes into

liquidation under SIPA, the SIPA designation of customer property is the seamless continuation

of Rule 15c3-3, taking effect the moment the broker-dealer fails. *In re Lehman Bros. Holdings*,

445 B.R. 143, 191–92 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478 B.R. 570

(S.D.N.Y. 2012).

Because customer property is not the broker's property, when a broker goes into

liquidation, it is also not "debtor" property, which places it outside the reach of Bankruptcy Code

provisions for avoidance and recovery of transfers. *BAM L.P.*, 624 B.R. at 61–62 ("Money held

by a broker on behalf of its customers is not the broker's property under state law." (quoting

*Nelson*, 610 B.R. at 232–233)). SIPA § 78fff-2(c)(3) circumvents this prohibition by creating a

legal fiction that confers standing on SIPA trustees to recover customer property by treating such

property as though it were "property of the debtor" in an ordinary bankruptcy. *See JABA*

*Assocs.*, 2021 WL 1112342, at *10; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *10;

*Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014). SIPA § 78fff-2(c)(3)

allows a trustee to "recover any property transferred by the debtor which, except for such

transfer, would have been customer property." This provision is designed "to recover securities

that would have been part of the fund of customer property but for a prior transfer to a

customer." *In re Bevill, Bresler & Schulman, Inc.*, 83 B.R. 880, 893 (Bankr. D.N.J. 1988). "The

inquiry in an avoidance action, therefore, is: if the transfer did not occur, would the securities

have been part of the fund of customer property?" *Id*. If the answer is yes, then that cash or

securities are customer property subject to recovery by SIPA trustees.

### 5.    Madoff's Business

When IA Business customers sent BLMIS money to purchase securities, Madoff

commingled that customer money in the 703 Account. Dubinsky Decl., Attach. A. (Dubinsky

Report) ¶ 340; *BAM L.P.*, 624 B.R. at 62 ("When the Defendants invested their money into the

IA Business, the deposits were placed into the Bank Accounts and commingled with all of the

Ponzi scheme victims' deposits."). This pool of commingled funds was used to pay customer

redemptions. Dubinsky Decl., Attach. A. (Dubinsky Report) ¶ 341; *see also In re Picard*, 917

F.3d 85, 92 (2d Cir. 2019) (noting that Madoff commingled funds in bank accounts and sent

customers redemptions from commingled account); *Trs. of Upstate N.Y. Eng'rs Pension Fund v.

Ivy Asset Mgmt.*, 843 F.3d 561, 564 (2d Cir. 2016) ("BLMIS deposited customer investments

into a single commingled checking account and . . . [w]hen customers sought to withdraw money

from their accounts, including withdrawals of the fictitious profits that BLMIS had attributed to

them, BLMIS sent them cash from the commingled checking account.").

### 6.    The Liquidation of BLMIS

In December 2008, SIPC sought a protective decree under SIPA § 78eee that the

customers of a member broker-dealer needed protection under SIPA. Application of SIPC ¶ 2,

*SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 5 ("SIPC

Application"). The SIPC Application named the member broker-dealer that was registered with

the SEC as of December 2008 under Registrant Number 8-8132: Bernard L. Madoff Investment

Securities LLC. *See id*. The district court entered the decree and appointed the Trustee "for the

liquidation of the *business of the Defendant* with all the duties and powers of a trustee as

prescribed in SIPA." Order ¶ 2, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15,

2008), ECF No. 4 ("Protective Decree") (emphasis added).

### 7.    Substantive Consolidation

In the days and months immediately following the revelation of Madoff's Ponzi scheme,

an SEC receiver was appointed for BLMIS,[4] the SIPA Trustee was appointed for BLMIS, a Joint

---

[4] The receivership was terminated upon the appointment of a SIPA Trustee. *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4.

Provisional Liquidator was appointed for Madoff's London entity, and the United States

Government instituted a criminal proceeding against Madoff. Stmt. ¶¶ 1–6. By March 15, 2009,

the Government indicated its intent to forfeit certain of Madoff's personal assets. *See*

Government's Notice of Intent to Seek Forfeiture of Certain Assets, *United States v. Madoff*, No.

09-cr-213 (DC) (S.D.N.Y. Mar. 15, 2009), ECF No. 59. But as of April 2009, no chapter 7 case

had been initiated against Madoff personally. Creditors sued him in various jurisdictions outside

the bankruptcy court. *See, e.g.*, *Leonhardt v. Madoff*, No. 09-2032 (S.D.N.Y. Mar. 5, 2009);

*Town of Fairfield v. Madoff*, No. 09-5023735 (Conn. Super. Ct. Mar. 30, 2009).

  In response, certain creditors filed an involuntary bankruptcy petition against Madoff,

citing the need for his personal estate to be marshaled and distributed in a coordinated,

consistent, and efficient manner alongside the liquidation of his company. These creditors were

concerned with the "specter of overlapping asset administrations which could delay or prejudice

distributions to creditors," in light of the Government's forfeiture of assets and the SEC seeking

disgorgement and civil penalties of Madoff and his firm. Pet. at 7, *SEC v. Madoff*, No. 08-cv-

10791 (LLS) (S.D.N.Y. Apr. 1, 2009), ECF No. 37. The district court agreed that the

appointment of a chapter 7 trustee for Madoff would stem the proliferation of lawsuits against

Madoff and enable an orderly and equitable administration of his personal estate. Order at 3–4,

*SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Apr. 10, 2009), ECF No. 47. In allowing the

creditors to commence the involuntary case against Madoff, the district court specifically

referenced that they should be able to target "that portion of Mr. Madoff's property that is neither

forfeitable criminally nor subject to the liquidation of BLMIS under SIPA." *Id*. at 4.

  The bankruptcy court subsequently appointed Alan Nisselson as Chapter 7 Trustee for

Madoff. Notice of Appointment of Trustee Alan Nisselson, *In re Bernard L. Madoff*, No. 09-

11893 (SMB) (Bankr. S.D.N.Y. Apr. 21, 2009), ECF No. 13.  Thereafter, the SIPA Trustee

moved to substantively consolidate the SIPA liquidation and the chapter 7 bankruptcy because

BLMIS and Madoff were the alter ego of the other, Madoff used BLMIS as his "personal piggy

bank," and Madoff did not have any other significant source of income other than that derived

from his broker-dealer subject to liquidation under SIPA.  Memorandum of Law in Support of

Joint Motion for Entry of Order Substantively Consolidating the Estate of Bernard L. Madoff

into the SIPA Proceeding of Bernard L. Madoff Investment Securities, *SIPC v. BLMIS LLC*,

Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 5, 2009), ECF No. 196.

The Chapter 7 Trustee consented to the relief sought and the two trustees established a

protocol that was embodied in the bankruptcy court's order substantively consolidating the

BLMIS and the Bernard L. Madoff estates.  *See* Consent Order Substantively Consolidating the

Estate of Bernard L. Madoff into the SIPA Proceeding of Bernard L. Madoff Investment

Securities LLC and Expressly Preserving All Rights, Claims and Powers of Both Estates, *SIPC

v. BLMIS LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 10, 2009), ECF No. 252

(the "Substantive Consolidation Order").  The Substantive Consolidation Order merged the

chapter 7 estate of Bernard L. Madoff into the BLMIS SIPA proceeding *nunc pro tunc*, and all

assets and liabilities of the two estates were deemed consolidated as of the date of the filing of

the liquidation proceedings.  The Substantive Consolidation Order expressly preserved the SIPA

Trustee's powers to avoid and recover fraudulent transfers of customer property and the Chapter

7 Trustee's powers to pursue recovery of Madoff's non-customer property.  *Id*. ¶¶ 4, 7 ("the

SIPA Trustee is authorized to pursue claims on behalf of the consolidated estate as representative

of and fiduciary for the BLMIS SIPA Proceeding and as subrogee and assignee of creditors'

claims for, among other things, the avoidance and recovery of transferred property").

32

## 8.    The Trustee Can Recover Any Transfers of Customer Property

When IA Business customers sent money to BLMIS for the purpose of purchasing

securities, it became "customer property" under SIPA.  SIPA § 78*lll*(4); *see also BAM L.P.*, 624

B.R. at 62.  BLMIS used the JPMorgan Accounts as the firm's Rule 15c3-3 account.  Stmt. ¶¶

69–77, 87–89; 17 C.F.R. § 240.15c3-3.  Whether operated as a sole proprietorship or as an LLC,

BLMIS's assets were composed primarily of customer property and its liabilities were composed

primarily of amounts owed to customers.  As indicated in the Amended Form BD, all assets and

liabilities were transferred from the sole proprietorship to the LLC in January 2001.  *See* Stmt. ¶¶

9–11 (citing Cremona Decl., Ex. 3 (2001 SEC Amended Form BD)); *BAM L.P.*, 624 B.R. at 60;

*JABA Assocs.*, 2021 WL 1112342, at *9; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *9.

The protections provided by SIPA mandate that the Trustee can recover transfers of

customer property by the SIPC member, regardless of its corporate form.  Despite this,

Defendants may argue that *Picard v. Avellino*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016) supports

their argument that the Trustee cannot recover the transfers made to Defendants between 2006-

2008 because the drawer of those checks listed Bernard L. Madoff rather than Bernard L. Madoff

Investment Securities LLC and the SIPA Trustee can only recover transfers made by the LLC.

*See Avellino*, 557 B.R. at 110.  The result of *Avellino* is that customer property transferred by the

sole proprietor cannot be recovered, which cannot be the intention of SIPA which seeks to

protect customer property, or this SIPA liquidation which authorizes the Trustee to recover

customer property.  As this Court recognized in *BAM L.P.*:

> At first blush, this may seem like a distinction without a difference
> because Madoff's chapter 7 case has been substantially consolidated
> with the SIPA liquidation of BLMIS.  Thus, one would think that
> even if Madoff operated his Ponzi scheme under his sole
> proprietorship, rather than BLMIS, the Trustee would still be
> entitled to recover these funds as fraudulent transfers.  However, in
> *Picard v. Avellino (In re BLMIS, LLC)*, 557 B.R. 89, 110 (Bankr. S.

33

> D.N.Y. 2016), the Court held that "only the Madoff [chapter 7]
> trustee can recover actual transfers by the sole proprietorship."
> There is a possibility that even if such actions were commenced by
> him, they would not be recoverable.

*BAM L.P.*, 624 B.R. at n.4 (citation omitted).  While there is practicality in establishing a finite

date for discerning the debtor's property, that rule does not apply to customer property

recoverable under SIPA by a SIPA trustee wherever held.

Further, there was no error in naming only the LLC in the Protective Decree.  SIPA

requires a protective decree when a SIPC-member broker-dealer fails.  SIPA § 78eee(b)(1).  The

*only* SIPC *member* at the time of failure was the LLC, as the sole proprietorship had ceased to

operate almost eight years prior, and thus the LLC was the only entity that *could have been*

named in the Protective Decree.

Second, when the Trustee was appointed, it was for the liquidation of the *business* of the

broker-dealer.  There are numerous undisputed facts that show that the sole proprietorship and

the LLC continued uninterrupted as a single business dealing with customer property since

Madoff registered as a broker-dealer with the SEC in 1960, including:

- Customer property was deposited into the same JPMorgan Accounts when BLMIS operated as a sole proprietorship and as an LLC.  Stmt. ¶¶ 69–77, 87–89.

- The customers of the sole proprietorship became the customers of the LLC when it changed corporate form.  Stmt. ¶¶ 9–11; *see also BAM L.P.*, 624 B.R. at 60 ("Defendants agreed to be liable to any successors when they signed their customer agreements.").

- When Madoff converted the sole proprietorship to an LLC, he expressly identified it to the SEC as an amendment to an existing broker-dealer's registration—not a new application of a separate broker-dealer seeking to register with the SEC.  Stmt. ¶¶ 9–11.

- The SEC registration number of BLMIS has always remained 8-8132 throughout the entire course of its business.  Stmt. ¶¶ 7–11; *BAM L.P.*, 624 B.R. at 59 ("The same SEC file number, 8-8132, that appeared in the 1959 SEC Form BD appeared on the 2001 SEC Amended Form BD.").

- Madoff reported to the SEC that he transferred all assets and liabilities, which includes bank accounts, from the sole proprietorship to the LLC.  Stmt. ¶¶ 9–11.

Indeed, the Bankruptcy Court recognized as much, stating that Madoff has always been a member of SIPC, and "the incorporation of BLMIS as a limited liability company continued his business without change . . . . Thus, nothing has changed since 1960 except for the business form that Madoff used to conduct his Ponzi scheme."  *SIPC v. BLMIS LLC (In re Bernard L. Madoff)*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014); *BAM L.P.*, 624 B.R. at 59.  Because the Trustee is appointed for the liquidation *of the business* of the debtor, such liquidation necessarily entails the liquidation of any predecessor conducting the same business, using the same SEC registrant number, on behalf of its customers with their customer property.

Third, SIPA makes clear that a SIPA trustee is authorized to recover customer property wherever it lies.  *BAM L.P.*, 624 B.R. at 62.  SIPA protection focuses on "whether there was 'actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation.'"  *In re Old Naples Sec., Inc*., 223 F.3d 1296, 1302 (11th Cir. 2000) (citation omitted); *see also In re Primeline Sec. Corp*., 295 F.3d 1100, 1107 (10th Cir. 2002) ("Whether a claimant deposited funds 'with the debtor' does not depend simply on to whom claimants made their checks payable . . . [t]he relevant inquiry is whether the brokerage firm actually received, acquired or possessed claimants property.").  Thus, as long as a trustee can show that the property in question was customer property received by the broker-dealer, he has the authority to recover it, wherever it lies.  SIPA § 78fff-2(c)(3); *BAM L.P.*, 624 B.R. at 62 ("The funds held in the Bank Accounts were meant to be invested legitimately through BLMIS but never were. Thus, they were "customer property" . . . [and] must be turned over to the Trustee.").

The fact that a broker-dealer may have operated under a different legal form many years prior to the SIPA liquidation does not change a SIPA trustee's rights and powers to recover that

customer property for the benefit of its owners—the customers.  Focusing on the name on a
check or the corporate from of the broker-dealer at a particular time shifts the focus away from
SIPA's customer property regime and instead allows the fraudster to determine the
circumstances under which customer property can be recovered.  *See BAM L.P.*, 624 B.R. at 60
(finding that "[t]he discrepancies . . .—forms filled out improperly, business names used
interchangeably on bank accounts and checks—are the sleights of hand that one would expect to
see when exhuming the remnants of a Ponzi scheme")  Where, as here, there is no dispute that
the Trustee is seeking to recover transfers comprising customer property, the form of the broker-
dealer at the time of transfer is irrelevant.

Fourth, the Substantive Consolidation Order changed nothing about the SIPA Trustee's
rights to customer property.  If anything, it was a "belt and suspenders" order to ensure that none
of Madoff's assets slipped through the cracks given that the Government was pursuing forfeiture,
the SIPA Trustee was pursuing customer property, and the Joint Provisional Liquidators were
marshaling the assets of Madoff's London entity.  The order expressly states that the SIPA
Trustee will retain his powers to recover customer property notwithstanding the consolidation of
the estates.  Such reservations did not in any way change the rights and powers that were
conferred on the SIPA Trustee as a result of the commencement of the SIPA liquidation.
Instead, those reservations in the order were necessary because absent express preservation, the
substantive consolidation of two debtors' estates could have extinguished both trustees'
avoidance powers altogether.  *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 768–69 (9th
Cir. 2000) ("Absent express preservation of the trustee's avoidance power, an order of
substantive consolidation would ordinarily eliminate that power.").

Finally, taken to its logical conclusion, because BLMIS's only assets were funds in the

JPMorgan Accounts, Defendants' argument means that there is no customer property in the SIPA liquidation and there is no estate representative who can recover the funds transferred out of that bank account.  *See BAM L.P.*, 624 B.R. at n.4.  Such an outcome would leave a vast amount of customer property outside the reach of the SIPA liquidation, something SIPA does not intend. This result cannot be reconciled with the order appointing the Trustee, the Substantive Consolidation Order, prior precedent in this case, nor with the plain language of SIPA.

In sum, as long as the SIPA Trustee can show that the property he is seeking to recover is customer property, he has the power to recover it, whether that property is held in an account with the letters "LLC" or not.  Such property never belonged to Madoff, the sole proprietorship, or the LLC, regardless of whose name was on the bank account.  *BAM L.P.*, 624 B.R. at 62.  That is what Rule 15c3-3 (promulgated at the direction of SIPA) means.  Whatever particular bank account a fraudster chooses to park customer property in or however that particular bank account is denominated cannot change the nature of customer property or the Trustee's duty to recover that property and return it to its rightful owners.  That is what SIPA and Rule 15c3-3 intend.

### F.    Madoff's Purported Purchase of Securities Does Not Create a Genuine Issue of Material Fact

Finally, the Trustee anticipates that Defendants will argue that Madoff used money from his IA Business customers to purchase securities, which appeared on Defendants' BLMIS customer statements.  Defendants have offered no witnesses—fact or expert—to support this argument.  In contrast, the Trustee's expert witness, Dubinsky—a certified fraud examiner and forensic accountant with more than thirty years of experience in financial fraud investigations— conducted several analyses upon which he concluded that BLMIS did not conduct any trading on behalf of its IA Business customers.  Stmt. ¶¶ 19–24.

Dubinsky found many instances where the volume that BLMIS claimed to have

purchased or sold on behalf of all IA Business customers exceeded the volume of equities traded

for the entire market. Stmt. ¶¶ 25–28. Dubinsky also analyzed the equity and options trades for

the period of 2000-2008 and determined that there were 99,972 equity transactions executed

outside the daily market traded price range, and 34,501 options transactions traded outside of the

daily price range. Stmt. ¶¶ 29–30. The absence of actual trading was also reflected in the prices

at which the IA Business purportedly bought and sold shares using the split-strike conversion

strategy. Stmt. ¶¶ 31–35. Dubinsky also analyzed the volatility of the IA Business's reported

average annual rate of return for the split-strike conversion strategy as compared with the

volatility of the annual rate of return reported by Bloomberg for the two major market indices—

the S&P 100 Index and the Dow Jones Industrial Average. Stmt. ¶ 36. Because the IA

Business's split-strike conversion strategy was supposedly engineered around the S&P 100, the

IA Business's returns should have performed similarly to the S&P 100 Index. Stmt. ¶ 37. This

analysis showed that the volatility in the IA Business rates of return did not mirror the volatility

of the rates of return of the major indices. Stmt. ¶¶ 38–40.

Additionally, all equity trades made by BLMIS should have been reflected in the DTC

records pertaining to BLMIS's single account with the DTC—an organization in the United

States that clears and settles equity transactions in the U.S. market. Stmt. ¶ 41. Dubinsky's

analysis confirmed that the equity securities that were cleared through BLMIS's DTC account

were traded by the proprietary trading business; no IA Business trades were cleared through

BLMIS's DTC account. Stmt. ¶¶ 42–46. Similarly, the options purportedly executed for the

customer accounts in the IA Business could not be reconciled with the records of the OCC, an

organization that clears and settles options transactions in the U.S. market. Stmt. ¶¶ 52–55.

Based on Dubinsky's analysis of these records, he concluded that BLMIS did not conduct any equities or options trading on behalf of its IA Business customers. Stmt. ¶¶ 47–51, 56.

Besides purchasing equity securities and options, BLMIS also claimed it would intermittently invest IA Business customer funds in T-Bills as part of the split-strike conversion strategy. Stmt. ¶ 57. While BLMIS purchased T-Bills with customer funds as a way to obtain interest on all the customer cash it was holding, these purchases did not match the allocation of T-Bill transactions that appeared on customer statements. Stmt. ¶ 58. Dubinsky's analysis confirmed that although BLMIS purchased T-Bills for cash management purposes, the volume of T-Bills that appeared on the customer statements dwarfed the aggregate volume of T-Bills actually purchased and held by BLMIS. Dubinsky prepared a summary chart of his review of these voluminous records, which accurately represents his comparison of the T-Bill positions:

Table 5
Comparison of Year-End US Treasury Positions: Proprietary Trading Business vs. IA Business

| Year-End | Proprietary Trading Business | IA Business | Proprietary Trading Business positions as a percent of IA Business positions |
|----------|------------------------------|-------------|------------------------------------------------------------------------------|
| 2002 | $84,000,000 | $30,975,765,000 | 0.27% |
| 2003 | $70,000,000 | $33,643,020,000 | 0.21% |
| 2004 | $70,000,000 | $37,935,258,000 | 0.18% |
| 2005 | $75,000,000 | $40,913,910,000 | 0.18% |
| 2006 | $70,000,000 | $48,342,420,000 | 0.14% |
| 2007 | $80,000,000 | $56,990,055,000 | 0.14% |

Stmt. ¶¶ 59–63. Accordingly, the T-Bill positions that appeared on the customer statements were fictitious. *Id.*; *see also Nelson*, 610 B.R. at 214, 234 n.37 ("Dubinsky's analysis demonstrated that the T-Bill transactions that appeared in the customer statements were fictitious and bore no relationship to the actual T-Bills purchased by BLMIS and documented in the DTC records.").

DiPascali testified that the IA Business used funds in the 703 Account to purchase T-Bills

as a cash management tool but the T-Bills were not purchased for IA Business customers, and he and other BLMIS employees created fictitious T-Bill positions on customer statements. Stmt. ¶¶ 64–68; *see also Nelson*, 610 B.R. at 226, 234 n.37. "[T]he purchase of T-Bills was part of the cash management system used by BLMIS to sustain the Ponzi scheme and 'did not transform BLMIS into a legitimate enterprise or prohibit the Trustee's reliance on the Ponzi scheme presumption.'" *BAM L.P.*, 608 B.R. at 175 n.15 (citation omitted). The operators of Ponzi schemes "often engage in some legitimate transactions. If the legitimate transactions further the scheme or are funded by the scheme they are part of the scheme and do not insulate the legitimate transactions from the taint of the scheme." *Nelson*, 610 B.R. at 234 (citation omitted).

The evidence and opinions of the Trustee's expert witness and DiPascali's testimony unequivocally demonstrate that no securities or T-Bills were purchased by BLMIS for its IA Business customers, including Defendants. Absent expert opinion, Defendants cannot create an issue of material fact where none exists simply because they disagree. Accordingly, this anticipated defense fails as a matter of law.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant summary judgment in the Trustee's favor on Count One of the Trustee's Amended Complaint and enter an order: (1) avoiding the transfers of fictitious profits that BLMIS made to Defendants within the Two-Year Period ($748,698 from Defendants Norma Trust and Norma Shapiro, in her capacity as Trustee of the Norma Trust, $64,790 from Defendants Philip Trust, Norma Shapiro, in her capacity as Trustee of the Philip Trust, and Martin Rosen, in his capacity as Trustee of the Philip Trust, and $112,576 from Defendant Norma Shapiro, individually); (2) awarding the Trustee prejudgment interest from the Filing Date through the date of entry of judgment at the rate of 4%; and (3) requiring Defendants to return such transfers or the value thereof to the Trustee.

Dated:  April 28, 2021
      New York, New York

                    */s/ Nicholas J. Cremona*
                    Baker & Hostetler LLP
                    45 Rockefeller Plaza
                    New York, New York 10111
                    Telephone: (212) 589-4200
                    Facsimile: (212) 589-4201
                    David J. Sheehan
                    Email: dsheehan@bakerlaw.com
                    Nicholas J. Cremona
                    Email: ncremona@bakerlaw.com
                    Seanna R. Brown
                    Email: sbrown@bakerlaw.com
                    Lan Hoang
                    Email: lhoang@bakerlaw.com
                    Amy E. Vanderwal
                    Email: avanderwal@bakerlaw.com

                    *Attorneys for Irving H. Picard, Trustee*
                    *for the Substantively Consolidated SIPA*
                    *Liquidation of Bernard L. Madoff Investment*
                    *Securities LLC and the Chapter 7 Estate of*
                    *Bernard L. Madoff*