# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

v. 10 Cr. 228 (LTS)

DANIEL BONVENTRE,
JEROME O'HARA,
GEORGE PEREZ,
ANNETTE BONGIORNO,
JOANN CRUPI,

Jury Trial

Defendants.

------------------------------x

New York, N.Y.
December 5, 2013
9:10 a.m.

Before:

HON. LAURA TAYLOR SWAIN

District Judge

APPEARANCES

PREET BHARARA
United States Attorney for the
Southern District of New York
MATTHEW L. SCHWARTZ
RANDALL W. JACKSON
JOHN T. ZACH
Assistant United States Attorneys

GORDON MEHLER
SARAH LUM
Attorneys for Defendant O'Hara

LARRY H. KRANTZ
KIMBERLY A. YUHAS
Attorneys for Defendant Perez

Case 1:10-cr-00228-LTS Document 833 Filed 04/08/14 Page 2 of 190 4857

APPEARANCES

ANDREW J. FRISCH
GARY VILLANUEVA
AMANDA BASSEN
Attorney for Defendant Bonventre

ROLAND G. RIOPELLE
Attorneys for Defendant Bongiorno

ERIC R. BRESLIN
MELISSA S. GELLER
Attorneys for Defendant Crupi

Q. And who was involved in that project to re-do the ACF statements?
A. Bernie, Annette and Jodi and, to a certain extent, myself.
Q. And how did you participate in re-doing the ACF statements?
A. I provided an array of U.S. treasury notes and researched historical pricing mechanisms and fed information to Annette.
Q. And when you say you provided treasury notes, did you go out and buy real treasuries to put in the ACF accounts?
A. No.
Q. Are you again speaking of just providing information for fake trades?
A. Correct.
Q. I'd like to show you what has -- what is in evidence as Government Exhibit 105-B17. Now, do you recognize, Mr. DiPascali, what type of document this is?
A. Yes.
Q. What is it?
A. It's a brokerage statement for the period ending January 31st, '02, for ACF services that has been crossed out.
Q. And who was managing the ACF accounts?
A. Annette.
Q. What year is this account statement from?
A. 2002.
Q. Now, I'd like, if we can, Ms. Baskin, to go to Page 121 of this document. And, Mr. DiPascali, looking at this document,

you know what you were doing was wrong?
A. Yes.
Q. And when you provided the fake treasury information, did you know that you were committing fraud?
A. Yes.
Q. Now, over the years, did Ms. Bongiorno ask you for treasury bill information?
A. Yes.
Q. How often would she have conversations with you about obtaining treasury bill information?
A. She would have conversations with either me or my staff every month.
Q. And what would -- what, if anything, would she say that she needed that treasury information for?
A. She wouldn't typically say what she needed it for.
Q. What would she say to you?
A. I need a treasury bill for this month.
Q. And how would you go about getting the treasury bill for that month?
A. I'd look at where we are on the calendar. I'd estimate about how long I wanted to be out in maturity; so if it was December of 2013, I would look at a February or March 2014 treasury bill. I'd go to Bloomberg and ascertain the price and give it to Annette.
Q. And when you would go to Bloomberg, would you look at

backdated prices?

A. Depending on the date that she asked me that she needed the bill for.

Q. And was any treasury bill ever purchased?

A. Never.

Q. I'll ask you a question. Did the market making part of Madoff Securities make a market in treasury bills?

A. No.

Q. So could you go to the market making part of the business and get a treasury bill to put in an IA account?

A. No.

Q. From time to time did you get real treasury bills?

A. Yes.

Q. And what were those real treasury bills for?

A. To invest the excess cash in the IA checking account.

Q. And when you say to invest the excess cash in the IA checking account, for what reason did you get a treasury bill to do that?

A. So as to provide safety and an enhanced yield to what the checking account interest rate was.

Q. So it would be fair to say it would be a way of getting interest on the checking account?

A. More or less, yes.

Q. And when you bought those real treasury bills to earn interest on the Madoff checking account, what did you have to

do?

A. I had to call my broker.

Q. And after you called your broker, was there a process to going out and buying the treasury bill?

A. Yeah, I would tell the broker how much dollars I wanted to commit to treasury bills and typically which one I wanted to buy, and he would take down that information and call me back and typically give me a report that I bought X amount of treasury bills at this price.

Q. And then that would -- you would actually get a real treasury bill?

A. Yeah.

Q. Now, for on the IA side, when you had to provide -- when you would provide the fake information, what would you do there?

A. I'd look at a pricing service of historical prices of treasury bills, ascertain the price on the date that I needed and write a ticket and put it into the AS/400.

Q. And when you would go out and buy the real treasury bills, was Ms. Crupi near you?

A. We worked in the same office.

Q. And when you were talking on the phone buying real treasury bills, was she in the vicinity where she could overhear what you were saying?

A. Yes.

Q. And would she be able to observe you, how you were on the phone and what you were doing?
A. Certainly.
Q. Now, what was your understanding of what Ms. Bongiorno would do with the treasury information that you gave to her?
A. She would put through a buy ticket that was approximately equal to the cash credit balance reflected in the account she was working on, and it would produce a confirmation and an entry on the customer statement that he was now -- owned treasuries.
Q. And as with the other trading that was on those accounts, was any of it real?
A. No.
Q. Now, did Madoff family members have accounts on the IA side of the business?
A. Some.
Q. Who were some of the Madoff family members that had accounts in the investment advisory business?
A. Peter Madoff, Marion Madoff, Ruth Madoff, Andy Madoff, Mark Madoff, Shana Madoff, Charlie Wiener. I might have missed a nephew somewhere, yeah.
Q. Who, again, was Charlie Wiener?
A. Bernie's nephew.
Q. Now, who managed the accounts for the Madoff family members?

A. Most of which were managed by Annette. Ruth Madoff's account for a time was managed by me.
Q. Now, did Ms. Bongiorno also manage IA accounts for certain Madoff Securities employees?
A. Yes.
Q. Who were some of the Madoff Securities employees who Ms. Bongiorno managed account for?
A. David Kugel, Irwin Lipkin, Dan Bonventre. I'm drawing a blank on the rest of the names.
Q. Now, from time to time, did Ms. Bongiorno ask you questions about stocks that could be used in the accounts that she was overseeing?
A. Yes.
Q. What sorts of questions would she ask you?
A. Things like, are there any stocks that you know that are up this month or that are down this month, or what did the market do this month, so she can get an understanding of where the market was vis-a-vis what she needed to do.
Q. And when you say a stock was up this month, would that be a forward-looking analysis or would that be looking at historical information from that?
A. Historically.
Q. And when you were trying to determine if a stock was up in a month, would you look forward or backward?
A. Backwards.

Bernie's feeling was that that was very risky. He was upset. He claimed he had not known that Tony had been doing this all of these months or years.

Q. Just so we are clear, we are talking about the Chase 703 account, right?

A. Correct.

Q. The Chase 703 account was the main checking account for the investment advisory business, right?

A. It was.

Q. The securities that were being purchased by Mr. Tiletnick were a way of earning interest on that checking account, right?

A. It was.

Q. These were real securities that we are talking about?

A. These CDs were issues of offshore entities of our bank.

Q. Did Mr. Madoff propose a solution for how to deal with this?

A. He either already had an account or two open or was about to open a new account or a series of them, I don't recall. He was basically giving that responsibility to me. He wanted treasury notes, treasury bills only. As the CDs would get unwound or, I don't remember, they might have unwound them immediately, I'm not sure, but in short order I managed a group of Bernard L. Madoff brokerage accounts that were held at other brokerage firms for the purpose of purchasing short-term U.S. government securities.

Q. These short-term U.S. securities were real, right?
A. Yes.
Q. This was just a way of getting interest on the real cash that was in the 703 account?
A. Yes.
Q. What were some of the firms that you now had responsibility for that had these brokerage accounts?
A. Bear Stearns, Fidelity, Bank of New York, Morgan Stanley, Lehman Brothers.
Q. We talked a little bit about this earlier, when you were buying these short-term securities, what steps would you have to take to buy these real securities on those brokerage accounts?
A. I typically picked up the phone and called the broker or the representative of each of those organizations and communicated my needs. Then he typically got or she typically got back to me and told me what I had done. Sometimes those conversations occurred in the form of faxes. Most of the time they were on the telephone.
Q. This was different than just looking at historical prices and writing something up for the fake trades, right?
A. Yes.
Q. Prior to taking on this responsibility with respect to the treasuries, had you had much involvement with the Chase 703 account?

INDEX OF EXAMINATION

Examination of: Page

FRANK DIPASCALI

Direct By Mr. Zach . . . . . . . . . . . . . . .4873

GOVERNMENT EXHIBITS

Exhibit No. Received

101-57H . . . . . . . . . . . . . . . . . .5013

105-F27 . . . . . . . . . . . . . . . . . .4906

105-D28 . . . . . . . . . . . . . . . . . .4940

300-4A . . . . . . . . . . . . . . . . . .4927

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

v. 10 Cr. 228 (LTS)

DANIEL BONVENTRE,
JEROME O'HARA,
GEORGE PEREZ,
ANNETTE BONGIORNO,
JOANN CRUPI,

Defendants.

Jury Trial

------------------------------x

New York, N.Y.
December 10, 2013
9:12 a.m.

Before:

HON. LAURA TAYLOR SWAIN

District Judge

APPEARANCES

PREET BHARARA
United States Attorney for the
Southern District of New York
MATTHEW L. SCHWARTZ
RANDALL W. JACKSON
JOHN T. ZACH
Assistant United States Attorneys

GORDON MEHLER
SARAH LUM
Attorneys for Defendant O'Hara

LARRY H. KRANTZ
KIMBERLY A. YUHAS
Attorneys for Defendant Perez

APPEARANCES

ANDREW J. FRISCH
GARY VILLANUEVA
AMANDA BASSEN
Attorney for Defendant Bonventre

ROLAND G. RIOPELLE
Attorneys for Defendant Bongiorno

ERIC R. BRESLIN
MELISSA S. GELLER
Attorneys for Defendant Crupi

Q. Ms. Crupi was helping you prepare these documents for KPMG London coming back in?

A. Yes.

Q. Let's look at what is in evidence as Government Exhibit 105-C171. Can we go slowly through the three pages of this document, Ms. Baskin.

Do you see those three pages, Mr. DiPascali?

A. I do.

Q. What are we looking at?

A. The first page is something that I probably printed to get a handle on what the industry standard would be in order to collateralize an option position. I don't know what manual I took that from. It might have been from the Internet, it might have been from Bear Stearns, it might have been from any number of sources. The point of what I would be reading there would be how to margin or collateralize an option. This is the calculation. That box in the middle was the answer to my question.

Q. Whose handwriting is on this page?

A. Mine.

Q. When you say collateralize, does that mean in essence to back up or to offer some protection to your counterparty?

A. Exactly that.

Q. Now can we go to the second page of this document. What is this that we are looking at?

A. It's a spreadsheet that I created that was going to be the nuts and bolts of this exercise. It was going to do a lot of the calculation for me and allow the process to progress swiftly instead of from month to month to month and client to client to client calculate all sorts of stuff, and then have to then create another side to that.

This spreadsheet, which is an Excel-based spreadsheet, is identifying certain treasury bills across the top column. The top row is the CUSIP of treasury bills and options. The second row are the symbols of options and then a string of treasury bills.

Going on the far left column are a string of account numbers. Those are the accounts that Bernie told us he wanted to use to be the counterparties of the customer option positions. What this is doing is it's allowing me to randomly assign, once I know the total of my customer option positions, a quantity to each of those counterparties. Then, once I've randomly defined what each counterparty's position is, this is calculating what its margin or collateral requirement would be.

Once I established that, this spreadsheet allows me to randomly pick a group of treasuries that were going to represent that collateral, and then the whole total number would circle back to what I needed. It's fairly complicated, but it did all the grind work necessary to accomplish what Bernie wanted.

Q. Were any of the treasury bills that are reflected on this real?
A. No.
Q. Would it be fair to say that this essentially divvies up amongst the client accounts Mr. Madoff provided to you to collateralize the other sides of the option trading, that this document divvies up the treasuries going to each one of those accounts?
A. It first divvies up what their theoretical option position would be, and based on that it assigns an array of treasuries that would collateralize it.
Q. Let's go to the next page. Can we blow up the relevant part of this. What does this document show?
A. Those same account numbers that were in the far left column going down in a grid with a series of checks.
Q. Have you ever seen this document before?
A. Briefly.
Q. Whose handwriting is on this document?
A. Jodi's.
Q. Looking at the checks, do you understand what those reflect?
A. Not exactly, but in concept yes.
Q. What in concept does it reflect?
A. It's got something to do with how many times --
MR. BRESLIN: Objection.

Case 1:10-cr-00228-LTS Document 882 Filed 04/03/14 Page 211 of 211

INDEX OF EXAMINATION

Examination of: Page

FRANK DIPASCALI

Direct By Mr. Zach . . . . . . . . . 5233 continued)

GOVERNMENT EXHIBITS

Exhibit No. Received

600-67 and 600-68 . . . . . . . . . . . . . .5236

101-114 and 101-12 . . . . . . . . . . . . . .5253

3501-33 . . . . . . . . . . . . . . . . . .5243

Case 1:10-cr-00228-LTS Document 884 Filed 04/04/14 Page 1 of 151 6919

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

v. 10 Cr. 228 (LTS)

DANIEL BONVENTRE,
JEROME O'HARA,
GEORGE PEREZ,
ANNETTE BONGIORNO,
JOANN CRUPI,

Jury Trial

Defendants.

------------------------------x

New York, N.Y.
January 13, 2014
9:15 a.m.

Before:

HON. LAURA TAYLOR SWAIN

District Judge

APPEARANCES

PREET BHARARA
United States Attorney for the
Southern District of New York
MATTHEW L. SCHWARTZ
RANDALL W. JACKSON
JOHN T. ZACH
Assistant United States Attorneys

GORDON MEHLER
SARAH LUM
Attorneys for Defendant O'Hara

LARRY H. KRANTZ
KIMBERLY A. YUHAS
Attorneys for Defendant Perez

Case 1:10-cr-00228-LTS Document 884 Filed 04/04/14 Page 2 of 151 

APPEARANCES

ANDREW J. FRISCH
GARY VILLANUEVA
AMANDA BASSEN
Attorney for Defendant Bonventre

ROLAND G. RIOPELLE
Attorneys for Defendant Bongiorno

ERIC R. BRESLIN
MELISSA S. GELLER
Attorneys for Defendant Crupi

you said, I need to understand the capacity code. What is the capacity code here?
A. Again, it is agent.
Q. That is the number 1 up there, right?
A. Correct.
Q. This is a fake trade, right?
A. Oh, yes.
Q. The way it is being typed up, could this be coming from Madoff's inventory?
A. I'm sorry. I didn't hear the rest of that question.
Q. The way it is being typed up, would this be a trade that would be coming out of inventory?
A. No.
Q. We can take that down. Did Madoff Securities on the 18th floor make a market in options?
A. No.
Q. Could any options trades be coming out of inventory from upstairs?
A. Possibly as principal. But the reality was the trading room upstairs had insignificant options inventory.
Q. Nothing like 20 percent of the market?
A. Nothing like 20 contracts much less 20 percent.
Q. It was a very, very small bit?
A. It was insignificant.
Q. How about treasuries?

A. What about them?
Q. Did they make a market in treasuries?
A. No.
Q. Could you be buying treasuries out of the inventory upstairs, or did they have inventory -- strike that question. Did they have inventory to be placing into the account of treasuries upstairs that was equivalent to the amount that was on the statements?
A. No.
Q. I would like to switch topics once again, very briefly. I would like to show you what is in evidence as O'Hara Exhibit 9. Can we activate the ELMO. We talked a bit, Mr. DiPascali, on Thursday about the meeting between Mr. O'Hara and Mr. Perez, yourself, and Bernie Madoff. Do you recall that?
A. Yes.
Q. After that meeting in the IA business, did you continue to need DTC type information?
A. I did.
Q. On cross-examination by Mr. Mehler, he showed you this document, right? Do you recall that?
A. I recall seeing the document. I don't exactly remember when.
Q. This document says "API bal," do you see that?
A. I do.
Q. What is your understanding what "API bal" stands for?

Case 1:10-cr-00228-LTS Document 884 Filed 04/04/14 Page 151 of 151

INDEX OF EXAMINATION

Examination of: Page

FRANK DIPASCALI

Redirect By Mr. Zach . . . . . . . . . . . . . . .6937

Recross By Mr. Krantz . . . . . . . . . . . . . .6997

Recross By Mr. Riopelle . . . . . . . . . . 7044 by

Recross By Mr. Mehler . . . . . . . . . . . . . .7062

PLAINTIFF EXHIBITS

Exhibit No. Received

101-57I . . . . . . . . . . . . . . . . . . . . .6944

DEFENDANT EXHIBITS

Exhibit No. Received

AB20A, 20B and 20C . . . . . . . . . . . . . . .7056

AB19 . . . . . . . . . . . . . . . . . . . . .7046