**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>         Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>         Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated)<br><br> Adv. Pro. No. 10-04921 (CGM) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>         Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>         Plaintiff,<br><br>v.<br><br>STANLEY T. MILLER,<br><br>         Defendant. | |

**TRUSTEE'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................1

ARGUMENT .....................................................................................................................2

I.      THE TRANSFERS WERE AN INTEREST OF THE DEBTOR IN PROPERTY.............2

II.     THE IA BUSINESS DID NOT PURCHASE T-BILLS ON BEHALF OF ANY
        INDIVIDUAL IA BUSINESS CUSTOMER ....................................................................3

        A.      Dubinsky Analyzed the T-Bills Across All IA Business Customer
                Accounts and Concluded That No T-Bills Were Purchased for IA Business
                Customers, Including Defendant ............................................................................3

        B.      The Purchase of T-Bills by the IA Business Was for Cash Management,
                Not Purchases Made on Behalf of Any Individual IA Business Customer .............5

        C.      Defendant's Conjecture Regarding the T-Bills Does Not Create a Disputed
                Issue of Material Fact.............................................................................................6

III.    THE TRUSTEE'S MOTION RESTS ON ADMISSIBLE EVIDENCE............................7

        A.      Expert Reports May Properly Be Considered on a Motion for Summary
                Judgment ...............................................................................................................7

        B.      The BLMIS Books and Records Are Admissible Under the Business
                Records Exception to the Hearsay Rule..................................................................9

IV.     DEFENDANT'S AFFIRMATIVE DEFENSES HAVE BEEN REPEATEDLY
        REJECTED...................................................................................................................12

        A.      The Trustee Can Avoid Transfers From IRA Accounts .......................................12

                1.      Defendant's Cited Exemptions Are Personal To The Debtor....................12

                2.      Courts Within This Liquidation Have Previously Rejected
                        Defendant's Federal and State Law Arguments .......................................13

        B.      Defendant is the Initial Transferee and Cannot Rely on Section 550(b)'s
                Value Defense......................................................................................................16

        C.      The Trustee Properly Calculated Defendant's Principal Balance..........................17

CONCLUSION..................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  No. 02-41729 (REG), 2006 WL 346418 (Bankr. S.D.N.Y. Feb. 6, 2006) .............................10

*Arista Recs. LLC v. Lime Grp. LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011)......................................................................................9

*In re Barclays Bank PLC Sec. Litig.*,
  756 F. App'x 41 (2d Cir. 2018) ...............................................................................................7

*In re Bernard L. Madoff*,
  592 B.R. 513 (Bankr. S.D.N.Y. 2018), *aff'd, In re Bernard L. Madoff Inv. Sec.
  LLC*, 605 B.R. 570 (S.D.N.Y. 2019), *aff'd*, No. 19-2988-bk, 2020 WL
  5902581 (2d Cir. Oct. 6, 2020).........................................................................................10, 11

*In re Bernard L. Madoff Inv. Sec. LLC*,
  976 F.3d 184 (2d Cir. 2020).....................................................................................................2

*Bonded Fin. Servs., Inc. v. European Am. Bank*,
  838 F.2d 890 (7th Cir. 1988) ..................................................................................................16

*Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner,
  Heine, Underberg, Manley, Myerson & Casey)*,
  130 F.3d 52 (2d Cir. 1997), *cert. dismissed*, 524 U.S. 912 (1998) ........................................16

*Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*,
  781 F.3d 1262 (11th Cir. 2015) .........................................................................................10, 11

*In re Enron Creditors Recovery Corp.*,
  376 B.R. 442 (Bankr. S.D.N.Y. 2007)....................................................................................10

*Fox v. Smoker (In re Noblit)*,
  72 F.3d 757 (9th Cir. 1995) ....................................................................................................12

*In re Francisco*,
  204 B.R. 799 (Bankr. M.D. Fla. 1996) ...................................................................................14

*Goldberg v. Torell (In re Rundlett)*,
  149 B.R. 353 (Bankr. S.D.N.Y. 1993).................................................................................12, 13

*John T. Mather Memorial Hosp. of Port Jefferson, Inc. v. Pearl*,
  723 F.2d 193 (2nd Cir. 1983)..................................................................................................13

*In re Manhattan Investment Fund, Ltd.*,
    310 B.R. 500 (Bankr. S.D.N.Y. 2002) ................................................................5

*In re McCann. Inc.*,
    318 B.R 276 (S.D.N.Y. 2004) .........................................................................13

*Michael v. Gen. Motors Co.*,
    No. 15 Civ. 3659(CM), 2018 WL 6332883 (S.D.N.Y. Nov. 13, 2018) ....................8

*Olin Corp. v. Lamorak Ins. Co.*,
    332 F. Supp. 3d 818 (S.D.N.Y. 2018) ................................................................7

*Phoenix Assocs. III v. Stone*,
    60 F.3d 95 (2d Cir. 1995) ................................................................................9

*Picard v. BAM L.P.*,
    624 B.R. 55 (Bankr. S.D.N.Y. 2020) ...........................................................2, 18

*Picard v. Greiff*,
    476 B.R. 715 (S.D.N.Y. 2012) .................................................................14, 16

*Picard v. JABA Assocs. LP*,
    No. 20-cv-03836 (JGK), 2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021) ........2, 5, 8, 10

*Picard v. Lisa Beth Nissenbaum Tr.*,
    No. 20-cv-03140 (JGK), 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) ............. *passim*

*Picard v. Nelson*,
    610 B.R. 197 (Bankr. S.D.N.Y. 2019) ...................................................5, 10, 11, 16

*Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*,
    38 F.3d 627 (2d Cir. 1994) ................................................................................9

*In re Richards*,
    92 B.R. 369 (Bankr. N.D. Ind. 1988) .................................................................13

*Rivera v. Home Depot USA, Inc.*,
    776 F. App'x 4 (2d Cir. 2019) ...........................................................................7

*Matter of Ross*,
    18 B.R. 364 (N.D.N.Y. 1982), *aff'd sub nom. Regan v. Ross*, 691 F.2d 81 (2d
    Cir. 1982) ........................................................................................................13

*Scholes, v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) ...............................................................................7

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015) .........................................................14, 15

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*,
    522 B.R. 41 (Bankr. S.D.N.Y. 2014) ...............................................................14, 18

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    499 B.R. 416 (S.D.N.Y. 2013) ......................................................................19

*In re Sherman*,
    237 B.R. 551 (Bankr. N.D.N.Y. 1999) .............................................................13

*SIPC v. Jacqueline Green Rollover Account*,
    No. 12 Civ. 1139(DLC), 2012 WL 3042986 (S.D.N.Y. Jul 25, 2012) ....................14

*Tavenner v. Smoot*,
    257 F.3d 401 (4th Cir. 2001), *cert. denied*, 534 U.S. 1116 (2002)........................12

*United States v. Kaiser*,
    609 F.3d 556 (2d Cir. 2010).............................................................................9

*United States v. Reyes*,
    157 F.3d 949 (2d Cir. 1998).............................................................................9

*In re Upright*,
    1 B.R. 694 (Bankr. N.D.N.Y. 1979) .................................................................13

*Wagner v. Eberhard (In re Vaughn Co., Realtors)*,
    Adv. Pro. No. 11-01226, 2014 WL 271632 (Bankr. D.N.M. Jan. 23, 2014) ...........16

**Statutes**

11 U.S.C. § 522.......................................................................................................13

11 U.S.C. § 522(b)...................................................................................................13

11 U.S.C. § 541.......................................................................................................13

11 U.S.C. § 548.......................................................................................................15

11 U.S.C. § 548(a)(1)(A) ..........................................................................................2

15 U.S.C. § 78fff-2(b)...............................................................................................6

15 U.S.C. § 78fff-2(c)(3) ..........................................................................................2

29 U.S.C. § 1144(d).................................................................................................14

**Rules**

29 C.F.R. § 2510.3–2(d) ..........................................................................................13

Fed. R. Civ. P. 26 .................................................................................................................8

Fed. R. Evid. 702 ................................................................................................................7

Fed. R. Evid. 803(6) ...........................................................................................................9

N.Y. C.P.L.R. § 5205 .......................................................................................................15

N.Y. C.P.L.R. § 5205(c) ...................................................................................................14

N.Y. C.P.L.R. § 5205(c)(5) ...............................................................................13, 14, 15, 16

N.Y. C.P.L.R. § 5205(d)(1) ..............................................................................................16

N.Y. Est. Pow. & Trusts L § 7-3.1(b)(4) ..........................................................................14

## INTRODUCTION

Defendant[1] is no different than any other customer who withdrew more than he deposited with BLMIS, and the Trustee is thus entitled to recover the $669,793 he received. Confronted with this inexorable conclusion, Defendant claims that his BLMIS account is *different* because it was an IRA but resorts to arguments that have already been raised and repeatedly rejected by this Court, the District Court, and the Second Circuit.

Notwithstanding the fact that this Court (and several others) have admitted BLMIS book and records into evidence, Defendant argues that certain of those records, predictably those relied upon by the Trustee, should not be admitted, while those Defendant seeks to utilize should be. Defendant cannot have it both ways. He provides no legitimate justification to exclude the Trustee's evidence of bank account ownership or other admissible records demonstrating Madoff's intent to transfer all assets and liabilities, without reservation, from the sole proprietorship to the LLC. Defendant's gamesmanship should be rejected and this Court should adhere to its prior rulings on this very issue.

Defendant also argues the Trustee should credit the full amount on the last statement he received before the IA Business was transferred to the LLC, and begin his principal balance calculation from that point. But numerous courts have held that the net investment method applies across the life of the account, and that the corporate change from a sole proprietorship to an LLC does not affect the net investment method. Defendant's proposal is also inherently contradictory—he wants credit for deposits before 2001 but no liability for withdrawals before that time. Defendant's net equity and thus avoidance liability is calculated over the life of the

---

[1] Defined terms shall have the same meaning prescribed in the Trustee's Memorandum of Law in Support of Motion for Summary Judgment (the "Motion"). *See Picard v. Miller*, Adv. Pro. No. 10-04921 (Bankr. S.D.N.Y. Apr. 15, 2021), ECF No. 99.

account and there was no change to the BLMIS customer accounts when the sole proprietorship

transferred all assets to the LLC.

The Court should grant summary judgment in the Trustee's favor.

## ARGUMENT

## I.   THE TRANSFERS WERE AN INTEREST OF THE DEBTOR IN PROPERTY

Pursuant to 11 U.S.C. § 548(a)(1)(A), the Trustee may avoid and recover transfers of

fictious profits where: (1) a transfer of an interest of the debtor in property; (2) was made within

two years of the bankruptcy petition date: (3) and the transfer was made with "actual intent to

hinder, delay, or defraud" a creditor.  Mem. Decision at 4, *Picard v. Est. of Seymour Epstein*,

Adv. Pro. No. 10-04438 (CGM) (Bankr. S.D.N.Y. Jan. 27, 2021), ECF No. 155 (the "*Epstein*

*Decision*"); *Picard v. JABA Assocs. LP*, No. 20-cv-03836 (JGK), 2021 WL 1112342, at *9

(S.D.N.Y. Mar. 24, 2021); *Picard v. Lisa Beth Nissenbaum Tr.*, No. 20-cv-03140 (JGK), 2021

WL 1141638, at *9 (S.D.N.Y. Mar. 24, 2021) (same).  SIPA § 78fff-2(c)(3) allows the Trustee to

"invoke the fraudulent transfer provisions in the Bankruptcy Code to recover customer

property," transferred by the debtor.  *In re Bernard L. Madoff Inv. Sec. LLC*, 976 F.3d 184, 199

(2d Cir. 2020).  Thus, the Trustee must demonstrate that the transferred money was customer

property.  The Trustee explained in his brief why the transfers to Defendant were customer

property transferred by the SIPA debtor—BLMIS.  *See* Trustee's Motion at II.C., ECF No. 99.

The admissible evidence before the Court demonstrates that the Trustee can recover

customer property regardless of whether that property is held in an account with the letters

"LLC" and despite whose name appears on the top of a check.  *See* Stmt. ¶¶ 9–11, ECF No. 100.

Defendant may contend that whether BLMIS made the transfers is disputed, but such a dispute is

not a genuine one that should defeat the Trustee's Motion.  *See, e.g.*, *JABA Assocs. LP*, 2021 WL

1112342, at *9 (citing *Picard v. BAM L.P.*, 624 B.R. 55, 61 (Bankr. S.D.N.Y. 2020) ("This Court

2

finds that all of the assets and liabilities of the sole proprietorship, including the IA Business, were transferred to BLMIS via the 2001 SEC Amended Form BD.")); *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *9 (same); *Epstein Decision* at 7 ("All monies transferred from the 509 Account or the 703 Account are "customer property" for purposes of these SIPA cases.").

## II.    THE IA BUSINESS DID NOT PURCHASE T-BILLS ON BEHALF OF ANY INDIVIDUAL IA BUSINESS CUSTOMER

Although Defendant does not overtly challenge the Trustee's expert, Bruce Dubinsky's, conclusions that BLMIS was a Ponzi scheme and never traded the securities listed on BLMIS customer statements, Defendant alleges in response to the Trustee's Statement of Material Facts that the "evidence establishes that Madoff did in fact continually purchase T-Bills with funds from the investment advisory bank accounts as reflected in the JP Morgan Chase Bank Account Statements." Defendant's Response to Trustee's Stmt. ¶ 23, ECF No. 107. But this Court has already held that the treasuries listed on defendants' customer statements were fictitious and any treasuries purchased as part of the ongoing fraud were immaterial.

### A.    Dubinsky Analyzed the T-Bills Across All IA Business Customer Accounts and Concluded That No T-Bills Were Purchased for IA Business Customers, Including Defendant

BLMIS claimed it would intermittently invest IA Business customer funds in T-Bills as part of the SSC strategy. Dubinsky, however, found no evidence of such purchases having been made on behalf of IA Business customers. Dubinsky reviewed the BLMIS books and records to identify the unique T-Bills held by the Proprietary Trading Business on December 31 from 2002 through 2007. He then compared those holdings to: (i) those T-Bill positions held at BLMIS's account at the DTC, which serves as the custodian or the clearing house for treasuries; and (ii) the T-Bills purportedly held by the IA Business. Dubinsky determined that the T-Bill CUSIPs (*i.e.*, unique security identifiers) held at the DTC under BLMIS's account matched those T-Bills

reported as being purchased and held by the Proprietary Trading Business. Conversely, none of the T-Bill CUSIPs held at the DTC under BLMIS's account matched those purportedly purchased and held on behalf of IA Business customers. Dubinsky Decl., Attach. B (Dubinsky Report) ¶¶ 224–26.

Dubinsky further compared the aggregate volume of T-Bills reported on the BLMIS customer statements as of each monthly statement to the total volume of T-Bills held in the Brokerage Accounts[2] and the Proprietary Trading Business as reported by the DTC for the same period. This analysis showed that the total volume of T-Bills purportedly held in the IA Business at year-end from 1998–2007 dwarfed the volume held in the Brokerage Accounts and the Proprietary Trading Business. *Id.* ¶ 227 & Table 5, ¶¶ 228–31 & Figure 36, Ex. 22. For example, by the end of 2007, the $80 million in treasury positions held by the Proprietary Trading Business (as recorded on the DTC records) was only 0.14 percent of the approximately $57 billion in T-Bills purportedly held by the IA Business at that time. *Id.* ¶ 227 & Table 5.

Moreover, Dubinsky's additional analysis verified that the T-Bills held in the Brokerage Accounts do not "match" the (i) trade date, (ii) volume, (iii) price, (iv) security description, and (v) maturity date for every purported treasuries position on the IA Business customer statements. *Id.* at 99 n.217, ¶¶ 232–40. Specifically, Dubinsky found that approximately 71% of the T-Bills do not have the same maturity date as any of the T-Bills held in the Brokerage Accounts, meaning 71% were never purchased by the IA Business. *Id.* ¶ 233, Ex. 23. Of the remaining 29% of the T-Bills—4,660 unique transactions—that did have the same maturity dates as those held on the Brokerage Accounts, there were only 20 unique instances in which the IA Business

---

[2] The T-Bills were held in various brokerage accounts and/or the JPMC custody account #G 13414 (collectively, the "Brokerage Accounts"). *See* Dubinsky Rpt. ¶ 228, n.213.

customer accounts purportedly purchased and sold a treasury on the same dates as the Brokerage
Accounts. *Id.* ¶¶ 234–36. In each of the 20 instances, the purported volume of the T-Bills
purchased and sold in the aggregate by the IA Business was higher than the actual volume
purchased and sold in the aggregate by the Brokerage Accounts. *Id.* ¶¶ 239–40. Thus, none of
the T-Bills identified on customer statements were the same T-Bills held in the Brokerage
Accounts.

This Court held as much when it found: "While some T-Bills were purchased as part of
the ongoing fraud, the treasuries on Defendants' customer statements were fictitious. *Epstein
Decision* at 7; *see also Picard v. Nelson*, 610 B.R. 197, 214 (Bankr. S.D.N.Y. 2019)
("[A]lthough the Proprietary Trading Business purchased T-Bills, the volume of T-Bills that
appeared on the customer statements dwarfed the aggregate volume of T-Bills actually purchased
and held by BLMIS."); *see also JABA Assocs. LP*, 2021 WL 1112342, at *13 (finding "there is
no dispute of material fact that the IA Business did not conduct legitimate business by
purchasing T-Bills on behalf of its customers"); *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638,
at *13 (same); *In re Manhattan Investment Fund, Ltd.*, 310 B.R. 500, 511 (Bankr. S.D.N.Y.
2002) ("using . . . manipulative and deceptive devices and employing schemes and artifices to
defraud, and engaging in acts and courses of business that operated and would operate as a fraud
and deceit upon persons" are classic hallmarks of Ponzi schemes). Defendant offers no counter-
evidence or reason to depart from this Court's prior rulings on the same issue.

### B.    The Purchase of T-Bills by the IA Business Was for Cash Management, Not Purchases Made on Behalf of Any Individual IA Business Customer

Dubinsky's report is clear that BLMIS's limited purchases of T-Bills with funds from the
703 Account were not for any individual IA Business customer account, but rather were for the
purpose of investing BLMIS's excess cash—*i.e.*, cash management. Dubinsky Rpt. ¶ 228.

5

Frank DiPascali's criminal trial testimony confirmed the same.  DiPascali stated that the

Brokerage Accounts were used to purchase T-Bills for BLMIS's cash management purposes and

not for IA Business customers.  Cremona Decl., Ex. 6, (DiPascali Testimony) at 4921:7–12,

4930:6–4931:5, 4931:12–4933:13, 4961:15–4962:22 (Dec. 5, 2013); 5344:24–5346:3 (Dec. 10,

2013); 6950:25–6951:9 (Jan. 13, 2014), ECF No. 95-7.

### C.    Defendant's Conjecture Regarding the T-Bills Does Not Create a Disputed Issue of Material Fact

Defendant provides no evidence to counter Dubinsky's analysis or DiPascali's testimony.

Instead, Defendant simply alleges, without evidence or context, in his responses to the Trustee's

Statement of Material Facts that "Madoff traded in short term securities, derivatives and T-Bills

in connection with the investment advisory accounts."  As set forth above, Dubinsky's analysis

shows, and DiPascali's testimony confirms, that none of the T-Bills purchased by the IA

Business are the same T-Bills reported on customer statements, including Defendant's.

DiPascali described a complicated spreadsheet he created to calculate duration and volume of T-

Bills that were not owned but were reported on all customer statements.  Cremona Decl., Ex. 6

(DiPascali Testimony) at 5344:24–5346:3 (Dec. 10, 2013); 4930:18–4931:5 (Dec. 5, 2013);

Brown Decl., Ex. 2 (DiPascali Testimony) at 4803:23–4804:21 (Dec. 4, 2013).  Defendant

presents no admissible evidence to support his responses.

Even if Defendant was able to rebut Dubinsky's analysis or DiPascali's testimony, which

he cannot, he has no claim to credit for T-Bills purchased by BLMIS as a cash management tool.

SIPA only covers net equity claims for cash and securities "for the account of such customer."

SIPA § 78fff-2(b).  In addition, because BLMIS operated a Ponzi scheme, there are no transfers

of "real profit" to be credited.  So called "legitimate profits" cannot be separated from tainted

funds when the money used for "legitimate" trades came from other customers who were

6

defrauded by BLMIS.  *See Scholes*, *v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) ("It is no answer that some or for that matter all of Phillip's profit may have come from "legitimate" trades made by the corporations.  They were not legitimate. The money used for the trades came from investors gulled by fraudulent representations.").

Thus, even if Defendant was somehow able to show that BLMIS purchased a T-Bill, allocated the T-Bill to his account, and that the sale of the T-Bill resulted in a profit for his account—something Defendant did not and cannot show—Defendant is still not entitled to a credit for any such hypothetical transaction under the case law.

## III.    THE TRUSTEE'S MOTION RESTS ON ADMISSIBLE EVIDENCE

### A.    Expert Reports May Properly Be Considered on a Motion for Summary Judgment

In determining whether the moving party has met its burden of establishing that no genuine issue of material fact exists, a court may rely on expert opinions.  *See Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 838 (S.D.N.Y. 2018) ("The summary judgment standard requires a court to 'consider all relevant, admissible evidence,' and . . . expert opinions, as a general matter, are admissible so long as they meet the criteria set forth in Federal Rule of Evidence 702." (citation omitted)); *In re Barclays Bank PLC Sec. Litig.*, 756 F. App'x 41, 47 n.5 (2d Cir. 2018).  Expert testimony may form the basis of summary judgment particularly "when a party opposing summary judgment fails to present evidence sufficient to make an issue of an expert's conclusion—such as contrary opinion evidence or evidence tending to undermine the expert's credibility or qualifications—and when the trier of fact would not be at liberty to disregard arbitrarily the unequivocal, uncontradicted, and unimpeached testimony of an expert." *Rivera v. Home Depot USA, Inc.*, 776 F. App'x 4, 7–8 (2d Cir. 2019).

In attempting to rebut a moving party's expert evidence to defeat summary judgment, a nonmoving party must do more than simply assert that the expert evidence is not credible. *See Michael v. Gen. Motors Co.*, No. 15 Civ. 3659(CM), 2018 WL 6332883, at \*13 (S.D.N.Y. Nov. 13, 2018) (finding plaintiff's contention that defendant's experts were not credible was "insufficient to overcome the expert affidavits" (citation omitted)).  Defendant argues that Bruce Dubinsky acts "simply as a narrator of the facts."  Defendant's Opposition at 23.  Defendant's argument is not only a mischaracterization of the record before the Court, but demonstrates ignorance of the requirements of Fed. R. Civ. P. 26 and the foundation for expert opinions. Dubinsky, a forensic accountant and certified fraud examiner, among other certifications, was tasked with the investigation of the 40-year fraud at BLMIS.  Dubinsky set forth the findings of his investigation and the opinions therefrom as required by Fed. R. Civ. P. 26, which, in relevant part, requires a complete statement of all opinions and the basis and reason for them, and the facts or data considered by the witness in forming the opinions.  *See* Fed. R. Civ. P. 26. Dubinsky's explanation of the facts, reasons, and basis for his opinions is in compliance with Rule 26.  Moreover, this Court has already held that the Trustee's experts' reports are admissible and have been relied upon resolving prior summary judgment motions.  *Epstein Decision* at 7 ("This evidence is not just theoretically admissible; it has been admitted by this Court in prior trials."); *see also JABA Assocs.*, 2021 WL 1112342, at \*6 (finding "it is plain that the reports help the trier of fact to understand the evidence, are based on sufficient data, are based on reliable principles and methods, and that the experts have reliably applied the principles and methods to the facts of the case."); *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at \*7 (same).

Further, Defendant never deposed, challenged, or otherwise objected to the Trustee's expert reports on any basis at any time prior.  Defendant offers no rebuttal expert witness or

contrary evidence besides to disagree with the Trustee's expert's conclusions regarding the

transfer of all assets and liabilities of the sole proprietorship to the LLC.

**B.      The BLMIS Books and Records Are Admissible Under the Business Records Exception to the Hearsay Rule**

Records made and kept in the ordinary course of a business are admissible pursuant to

Federal Rule of Evidence 803(6) if: (1) the statements were recorded at or near the time of the

purported transaction; (2) the record was made by or from information communicated by an

individual with personal knowledge; and (3) the record was made in the regular practice of

business activity. *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995).

Courts construe Rule 803(6) generously in favor of admissibility with the principal

precondition to admission being the reliability of the documents. *Potamkin Cadillac Corp. v.*

*B.R.I. Coverage Corp.*, 38 F.3d 627, 632–33 (2d Cir. 1994) (holding records properly admitted

where they have "sufficient indicia of trustworthiness to be considered reliable"). This is "due to

the general trustworthiness of regularly kept records and the need for this type of evidence in

many cases." *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 421 (S.D.N.Y. 2011).

Once a *prima facie* case has been made that the records were made and kept in the

ordinary course of a business, Rule 803(6) "favors the admission of evidence rather than its

exclusion if it has any probative value at all." *United States v. Kaiser*, 609 F.3d 556, 574 (2d

Cir. 2010). Thus, objections to a business record's accuracy or completeness go to the weight

and not the admissibility of the evidence. *See United States v. Reyes*, 157 F.3d 949, 953 (2d Cir.

1998) (holding that employee's testimony "provided an adequate basis for the district court to

find that the [document] was trustworthy, despite objections concerning irregularities").

Defendant argues that the BLMIS books and records are "unreliable." But business

records of an entity engaged in fraud are routinely admitted into evidence. *See Kaiser*, 609 F.3d

9

at 575–76 & n.6 (finding fraudulent activity did not preclude admissibility under business

records exception); *In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 454–58 (Bankr.

S.D.N.Y. 2007) (admitting debtor's records under business records exception even though Enron

was engaged in fraudulent financial transactions); *In re Adelphia Commc'ns Corp.*, No. 02-

41729 (REG), 2006 WL 346418, at *1 (Bankr. S.D.N.Y. Feb. 6, 2006) (admitting debtors' books

and records even though principals engaged in bank fraud, securities fraud, and conspiracy

through debtor).  In *In re Int'l Mgmt. Assocs., LLC*, the Eleventh Circuit upheld the admission of

records under the business records exception even though the bankruptcy court found that the

business was a Ponzi scheme that "was not set up to, and did not, conduct any legitimate

business at all."  781 F.3d 1262, 1267–69 (11th Cir. 2015).

When considering this exact issue in a nearly identical adversary proceeding, the District

Court stated:

> If the defendants' argument were true, a case involving fraud
> would never benefit from expert testimony about the alleged fraud
> because the records at issue were fraudulent.  But a discerning
> review of the records, particularly when supported by bank
> statements, can show the details of money that was received by an
> enterprise and money that was distributed, even if aspects of the
> records—such as securities that were listed but not purchased—
> were false.

*JABA Assocs. LP.*, 2021 WL 1112342, at *7; *see also Lisa Beth Nissenbaum Tr.*, 2021 WL

1141638, at *6 (same).  Indeed, the BLMIS books and records have been admitted into evidence

and relied upon multiple times in this liquidation.  *See Epstein Decision* at 7; Hr'g Tr. at 203:12–

204:7, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (Bankr. S.D.N.Y. Sept. 14, 2020), ECF No.

225; *Nelson*, 610 B.R. at 223–24; *In re Bernard L. Madoff*, 592 B.R. 513, 527–29 (Bankr.

S.D.N.Y. 2018), *aff'd, In re Bernard L. Madoff Inv. Sec. LLC*, 605 B.R. 570, 584–87 (S.D.N.Y.

2019), *aff'd*, No. 19-2988-bk, 2020 WL 5902581 (2d Cir. Oct. 6, 2020).

Despite Defendant's concerns about the reliability of certain BLMIS books and records, he has no problem arguing that the checks he received from BLMIS, which listed "Bernard L. Madoff," are admissible and dispositive of bank account ownership. *See also Nelson*, 610 B.R. at 223 ("The Defendants have not objected to certain BLMIS books and records (i.e., their own BLMIS customer statements or BLMIS checks produced by third parties) and have themselves sought to admit certain of these documents into evidence, even when not produced by third parties."). Just like in *Nelson*, Defendant cannot have it both ways here. Through the reconstruction of BLMIS's fraud described in their expert reports, the experts reconciled the BLMIS books and records to other internal BLMIS documents and documents from third parties. *See Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*, 781 F.3d 1262 (in Ponzi scheme involving trustee's efforts to recover fictitious profits, court found that expert reconciled all of the underlying documents from the debtor's offices and the information in those documents substantially matched the records kept by the financial institutions and clients with which the debtor had transacted). For example, the experts confirmed the date and amount of the Two-Year Transfers across various BLMIS documents. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 592 B.R. 513, 536 (Bankr. S.D.N.Y. 2018) (finding "the Trustee confirmed [the records'] accuracy through the same methods employed by the trustee in *Int'l Mgmt*. He obtained BLMIS' bank records, cross-checked them against BLMIS' cash transaction records and records provided by other customers."). Defendant provides no evidence of why this Court should consider some BLMIS books and records—and Defendant's interpretation of them—rather than the totality of all the records reviewed by the experts.

## IV.    DEFENDANT'S AFFIRMATIVE DEFENSES HAVE BEEN REPEATEDLY REJECTED

### A.    The Trustee Can Avoid Transfers From IRA Accounts

Defendant argues that federal and state law exempts withdrawals from IRA accounts and trusts from the reach of the Trustee because such accounts are included among the categories of personal property specifically protected from judgment creditors' claims.  These defenses, if applicable at all, would only impact the Trustee's ability to *collect* on a judgment against Defendant, not his ability to avoid and recover the Two-Year Transfers under SIPA.

### 1.    Defendant's Cited Exemptions Are Personal To The Debtor

First, Defendant relies upon various out-of-circuit decisions to assert the principle that the Trustee may not avoid a transfer of property under certain federal and state law because "the creditors or entities to which the defendant was or becomes liable could have had no interest in the property."  Defendant's Opposition at 10.  In other words, Defendant argues "no harm, no foul."  This argument, known as the "diminution of the estate" doctrine, had some historical application, but the majority of courts have since rejected it in favor of the principle that "the opportunity to claim exemptions is personal to the debtor and is not available to a creditor as a defense to a preference action."  *Goldberg v. Torell (In re Rundlett)*, 149 B.R. 353, 358 (Bankr. S.D.N.Y. 1993); *see also Tavenner v. Smoot*, 257 F.3d 401, 406 (4th Cir. 2001) (noting that a majority of courts have rejected the "no harm, no foul" approach for avoiding fraudulent transfers), *cert. denied*, 534 U.S. 1116 (2002); *Fox v. Smoker (In re Noblit)*, 72 F.3d 757 (9th Cir. 1995) (stating that the majority of recent cases has rejected the "diminution of the estate" doctrine).  That is to say, an exemption is provided only for the benefit of the debtor, here being BLMIS, and if the exempt property was transferred, the debtor has in essence waived the exemption, and the transferee, here being Defendant, cannot avail himself of the exemption in a

subsequent avoidance action. *In re Rundlett*, 149 B.R. at 358 (citing *In re Richards*, 92 B.R.

369, 372 (Bankr. N.D. Ind. 1988)).[3]

The Bankruptcy Code further clarifies that exemptible property is property of the estate

within the meaning of Section 541 until the *individual debtor* asserts successfully the right to

the exemption. *See, e.g.*, *In re Upright*, 1 B.R. 694, 702 (Bankr. N.D.N.Y. 1979) (citing 11

U.S.C. §§ 522(b), 541) (noting all property of the debtor is property of the estate upon the filing

of the petition for relief); *In re Sherman*, 237 B.R. 551, 554 (Bankr. N.D.N.Y. 1999) (citing *John*

*T. Mather Memorial Hosp. of Port Jefferson, Inc. v. Pearl*, 723 F.2d 193 (2nd Cir. 1983)

(explaining that it is the individual debtor that may exempt property that is either personal or

realty under N.Y. C.P.L.R. §§ 5205–06); *Matter of Ross*, 18 B.R. 364, 369 (N.D.N.Y.

1982), *aff'd sub nom. Regan v. Ross*, 691 F.2d 81 (2d Cir. 1982) (rejecting arguments that

pension benefits are exempt under 11 U.S.C. § 522 since "such an exemption is personal to the

debtor").

## 2.    Courts Within This Liquidation Have Previously Rejected Defendant's Federal and State Law Arguments

Second, this Court has previously rejected Defendant's arguments based on ERISA and

N.Y. C.P.L.R. § 5205(c)(5).  In this Court's inter-account transfer decision, it held:

> Initially, except as described in 29 C.F.R. § 2510.3–2(d), ERISA
> does not generally apply to IRA accounts, including those that were
> rolled-over from ERISA-regulated plans. . . . Furthermore, ERISA
> contains an express provision subordinating ERISA to other federal
> statutes. . . . These claimants have not explained how ERISA's anti-
> alienation provision trumps SIPA's net equity calculation or
> distribution procedures other than to say it does. In short, SIPA's net
> equity calculation as approved in the Second Circuit's Net Equity

---

[3] Defendant cites to only one case within this circuit, *In re McCann. Inc.*, 318 B.R 276 (S.D.N.Y. 2004) in support, but it is inapposite; the Bankruptcy Court declined to let the Chapter 11 Trustee seek to recover trust funds because those funds were never part of the bankruptcy estate to begin with, whereas here the Trustee seeks transfers of funds that belonged to other BLMIS customers.

Decision trumps any affect ERISA might have on the net equity calculation.

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 522 B.R. 41, 59 (Bankr. S.D.N.Y. 2014) (citing *In re Francisco*, 204 B.R. 799, 801 (Bankr. M.D. Fla. 1996) ("There is nothing in the Congressional Record or in the language of the legislation dealing with ERISA, to indicate that ERISA was designed to include IRAs within the definition of "employee benefit program or a plan."); 29 U.S.C. § 1144(d) ("Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States. . . . "); *SIPC v. Jacqueline Green Rollover Account*, No. 12 Civ. 1139(DLC), 2012 WL 3042986, at *8 n. 4 (S.D.N.Y. Jul 25, 2012) (noting ERISA's subordination provision)); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 479 (Bankr. S.D.N.Y. 2015) ("Although the Inter–Account Transfer Decision dealt with the computation of net equity under SIPA and the Trustee is seeking in these adversary proceedings to recover fictitious profits, I reject these arguments for the same reasons.").

Likewise, Defendant's argument that N.Y. C.P.L.R. § 5205(c)(5)'s and N.Y. Est. Pow. & Trusts L § 7-3.1(b)(4)'s nearly identical exemptions do not apply to "[a]dditions to" the trusts that are "fraudulent conveyances," has already been rejected by this Court and the District Court. The District Court previously found that the N.Y. C.P.L.R. "provides [defendants] no support. While N.Y. C.P.L.R. § 5205(c) exempts money in certain trusts, including IRAs, from 'application to the satisfaction of a money judgment,' § 5205(c)(5) and N.Y. Est. Pow. & Trusts L § 7-3.1(b)(4) specifically provide that the exemption does not apply to '[a]dditions to' the trust that are 'fraudulent conveyances.'" *Picard v. Greiff*, 476 B.R. 715, 728 n.13 (S.D.N.Y. 2012). "[W]here Madoff Securities fraudulently transferred profits into [defendants'] IRAs, distributions of those profits are not protected by § 5205(d)(1)." *Id.*

14

Similarly, on a motion to dismiss from similarly-situated defendants, this Court previously held:

> CPLR § 5205 exempts certain trust property from judgment execution, but the defendants have not cited any authority in support of their argument that it invalidates the plaintiff's cause of action. Second, the exemption does not apply to all trusts. Third, CPLR § 5205 addresses the situation where the judgment debtor and the trust are different entities, and the plaintiff seeks to satisfy its judgment against the judgment debtor from the trust property or income. Here, the trust or retirement account received the fraudulent transfer. Fourth, even if the principal is exempt, the income earned by the trust may not be fully exempt from execution by a judgment creditor.

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 531 B.R. 439. 483 (Bankr. S.D.N.Y. 2015).

The fact that the District Court ruled that the Trustee may not pursue state law claims in his avoidance actions has no bearing on the Trustee's authority to avoid or recover BLMIS property as expressly provided by the Bankruptcy Code under Section 548. At most, the IRA account issue would be relevant to the Trustee's recovery of an avoided transfer, but even then the fraudulent transfer exception operates to deny the protection that Defendant seeks. In fact, Defendant cites numerous New York state cases applying N.Y. CPLR § 5205(c)(5) exception, all of which involve a party's attempt to enforce a judgment.

To avoid the operation of the fraudulent transfer exception, Defendant alleges that it applies only to "additions" to the account, and that such "additions" could only be made by the customer. However, Defendant ignores the basis of the Trustee's litigation—all "additions" beyond the Defendant's principal investment were "fraudulent conveyances" made by BLMIS using money that was stolen from other customers. The money "added" by BLMIS was the very

fictitious profits that the Defendant thereafter withdrew.  These transfers are not protected from

avoidance by the Trustee.

To rebut this, Defendant insists that "withdrawals" as opposed to "additions" by the

customer are purportedly not covered by N.Y. C.P.L.R. § 5205(c)(5) exception, and therefore

cannot be avoided by the Trustee.  This argument ignores the fact that section 5205(d)(1)

exempts withdrawals from trusts only where "the principal . . . is exempt under subdivision (c)."

*Greiff*, 476 B.R. at 728, n.13.  All withdrawals beyond the Defendant's principal investment are

"fraudulent conveyances" that are subject to avoidance and recovery by the Trustee.

## B.  Defendant is the Initial Transferee and Cannot Rely on Section 550(b)'s Value Defense

Defendant contends that the IRA custodian, NTC & Co., rather than he is the initial

transferee of the transfers to his BLMIS Account No. 1ZR284.  However, in a similar adversary

proceeding, this Court already held that the IRA custodian is a mere conduit and the Trustee may

recover the Two-Year Transfers from defendants as initial transferees.  In *Nelson*, the Court

found:

> This argument lacks merit. In the first place, an IRA is not a
> separate legal entity from its owner. . . . [Defendant] owned her
> IRA account.  In the second place, the IRA custodian is a mere
> conduit. The initial transferee is the one who first acquires
> dominion and control over the transferred asset, . . . , and in the
> words of Judge Easterbrook, can invest the funds in lottery tickets
> or uranium stock..  [Defendant]'s IRA custodian was not free to
> invest her money in lottery tickets or uranium stock.

*Nelson*, 610 B.R. at 238 (citing *Wagner v. Eberhard (In re Vaughn Co., Realtors)*, Adv. Pro. No.

11-01226, 2014 WL 271632, at *3 (Bankr. D.N.M. Jan. 23, 2014) (collecting cases); *Christy v.*

*Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley,*

*Myerson & Casey)*, 130 F.3d 52, 57 (2d Cir. 1997), *cert. dismissed*, 524 U.S. 912, (1998);

*Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988)).

Further, the Trustee's expert, Lisa M. Collura, analyzed the pattern of cash withdrawals reflected on the customer statements for the Miller Account during the Two-Year Period. Collura Decl., Attach. B (Collura Miller Report) ¶ 50.  Based on Collura's review and analysis, $2,000,000 of the total cash withdrawals reflected on the BLMIS customer statements for the Miller Account during the Two-Year Period first went from BLMIS to NTC, as custodian for the IRA held by the Defendant.  *Id.* ¶ 51.  Collura determined that the NTC quarterly account statements also reflect that shortly after the inflow of cash from BLMIS, there was an outflow of the same amount described as an "IRA" or "Same Day" distribution to Defendant.  *Id.* ¶ 52.  This flow of funds pattern occurred for 14 of the 15 cash withdrawal transactions reflected on the customer statements for the Miller Account during the Two-Year Period, totaling $1,000,000. *Id.*  For the remaining cash withdrawal transaction on March 30, 2007, the NTC quarterly account statements and other correspondence reflect that on the same day as the inflow of $1,000,000 from BLMIS, there was an outflow of the same amount described as a "Purchase" that was used to purchase shares in an Austin Capital Safe Harbor Offshore Fund on behalf of the Defendant.  *Id.* ¶ 53.  The evidence demonstrates that NTC merely acted as IRA custodian and that the Defendant was the first to have dominion and control over the customer property.

### C.    The Trustee Properly Calculated Defendant's Principal Balance

Finally, Defendant argues that the net investment method should only be used from January 2001 when BLMIS became an LLC, rather than from the opening of the account in 1998.  *See* Defendant's Opposition at 28.  Specifically, Defendant wants credit for the fictitious securities listed on the December 2000 statement, and that the net investment method should apply from January 2001 to the Filing Date to reach his avoidance liability amount.   Ignoring that Defendant improperly credits himself for fictitious profits on his December 31, 2000 customer statement, if the Trustee only gave credit to Defendant's deposits and withdrawals after

17

January 2001, Defendant's negative net equity and avoidance liability would increase to over \$4 million.  This is because Defendant made one deposit of \$10,280 after January 2001 via check on August 5, 2002 and 63 cash withdrawals after totaling \$4,610,063.

In any event, this argument has already been rejected by this Court.  In the litigation on whether the net investment method applied to transfers between BLMIS accounts, Judge Bernstein held that the 2001 corporate form change date had no impact on the applicability of the net investment method from prior to the 2001 date.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014) (finding "the fictitious profits that comprised [defendants'] accounts when Madoff operated as a sole proprietorship were still fictitious profits in their accounts when Madoff operated as BLMIS LLC"); *see also BAM L.P.*, 624 B.R. at 59.  The Court found that Madoff has always been a member of SIPC, and "the incorporation of BLMIS as a limited liability company continued his business without change . . . . Thus, nothing has changed since 1960 except for the business form that Madoff used to conduct his Ponzi scheme."  *In re Bernard L. Madoff*, 522 B.R. at 60.  In essence, Defendant is arguing that the changeover from a sole proprietorship to an LLC changes fictitious profits before 2001 into principal.  But as aptly noted by Judge Bernstein, "Madoff's incorporation did not transmute those fictitious profits into principal."  *Id.*

The Trustee's expert, Matthew B. Greenblatt, calculates Defendant's ending principal balance by applying the Net Investment Method (the cash in/cash out methodology), which treats customer deposits as additions to principal and customer withdrawals or inter-account transfers as deductions from principal (the "Net Investment Method").  Stmt. ¶¶ 122–31.  If the customer's ending principal balance is negative (meaning they received fictitious profits), they are liable for any amounts withdrawn within the Two-Year Period preceding the Filing Date.

18

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 499 B.R. 416,

426–27, 430 (S.D.N.Y. 2013) (endorsing the Net Investment Method underlying the Trustee's

avoidance liability calculations); *see also* Declaration of Matthew B. Greenblatt, dated April 14,

2020 ("Greenblatt Decl."), Attach. B (Greenblatt Miller Report) at II.A., ECF No. 98-10.  Thus,

the Miller Account reflected $669,793 of funds withdrawn in excess of principal, representing

fictitious profits within the Two-Year Period prior to December 11, 2008.  *See* Greenblatt Decl.,

Attach. B. (Greenblatt Miller Report) Ex. 4, ECF No. 98-15.

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court grant summary

judgment on Count One of the Trustee's Amended Complaint and enter an order: (1) avoiding

the transfers of fictitious profits that BLMIS made to Defendant within the Two-Year Period

($669,793); (2) awarding the Trustee prejudgment interest from the Filing Date through the date

of entry of judgment at the rate of 4%; and (3) requiring Defendant to return such transfers or the

value thereof to the Trustee.

Dated: May 26, 2021
New York, New York

/s/ Nicholas J. Cremona
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Maximillian S. Shifrin
Email: mshifrin@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*