Page 1

```
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No. 95-88888-cgm

 4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5   In the Matter of:

 6

 7   THE BANKRUPTCY LINK,

 8           Debtor.

 9   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adv. Case No. 08-01789-cgm

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   SECURITIES INVESTOR PROTECTION CORPORATION,

13               Plaintiff,

14           v.

15   BERNARD L. MADOFF INVESTMENT SECURITIES, LLC. et al.,

16       Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18   Adv. Case No. 09-01239-cgm

19   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20   PICARD,

21               Plaintiff,

22           v.

23   FAIRFIELD INVESTMENT FUND LIMITED, et al.,

24               Defendants.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

Page 2

1    Adv. Case No. 10-04921-cgm

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

4    MADOFF INVESTMENT SECURITIES LLC,

5                      Plaintiff,

6              v.

7    MILLER,

8                      Defendants.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11                    United States Bankruptcy Court

12                    One Bowling Green

13                    New York, NY  10004

14

15                    June 16, 2021

16                    9:55 AM

17

18

19

20

21    B E F O R E :

22    HON CECELIA G. MORRIS

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  UNKNOWN

Page 3

1    HEARING re 08-01789-cgm Doc# 20455 Notice of Adjournment of

2    Hearing RE: Letter /Letter to Judge Bernstein re Remaining

3    Chaitman LLP Adversary Proceedings Filed by Nicholas Cremona

4    on behalf of Irving H Picard Esq.; hearing held and

5    adjourned to 6/16/2021 at 10:00 AM at Videoconference

6    (ZoomGov) (CGM) .

7

8    HEARING re 08-01789-cgm Doc# 20456 Notice of Adjournment of

9    Hearing RE: Letter in Response to Trustees Letter to Judge

10   Bernstein re Remaining Chaitman LLP Adv. Pro. Listed on

11   Exhibit A Filed by Helen Davis Chaitman on behalf of Atwood

12   Management Profit Sharing Plan & Trust f/k/a Atwood Regency

13   Money Purchase Pension Plan, in its own right and as a

14   successor-in-interest to the Atwood-Regency Defined Benefit

15   Plan & Trust, Donald A. Benjamin, Benjamin T. Heller

16   Irrevocable Trust, Bernard Whitman Revocable Living Trust

17   U/A/D 8/5/86, Bernard and Judith Whitman As Partners of

18   the Whitman Partnership, Denis Castelli, Denis M. Castelli,

19   Ronald Cohen, in his capacity as a Partner of Placon2, Carol

20   DiFazio, Frank DiFazio, Elaine Dine, Dino Guiducci and Mary

21   Guiducci, ind. and in capa. as Co-Ttees of Atwood Regency

22   Profit Sharing Plan & Trust f/k/a Atwood Reg. Money Purchase

23   P&T, and former Co-Ttees of Atwood Reg. Defined Bene. P&T,

24   Doron Tavlin Trust U/A 2/4/91, Richard G. Eaton, Leslie

25   Ehrlich, Stephen Ehrlich, Elaine Dine Living Trust dated

Page 4

1    5/12/06, Estate of Allen Meisels, Estate of Boyer Palmer,

2    Estate of Boyer Palmer, Estate of Jacob M. Dick, as grantor

3    of the Jacob M. Dick Rev Living Trust Dtd 4/6/01, Estate of

4    James M. Goodman, Estate of Seymour Epstein, Estate of

5    Steven I. Harnick, Fern C. Palmer, Fern C. Palmer Revocable

6    Trust Dtd 12/31/91, as amended, Fern C. Palmer

7    Revocable Trust dated December 31, 1991 as amended, Fern C.

8    Palmer and Boyer H. Palmer, Trustees of the Palmer Revocable

9    Trust, Jennifer Gattegno, Judith Gattegno, Carla Ginsburg,

10   Edythe Gladstein, Glenhaven Limited, Andrew M. Goodman,

11   Audrey Goodman, Goodman Capital Partners L.P., Goodman

12   Charitable Foundation, in its capacity as a limited

13   partner of JABA Associates LP, Goodman Holdings, Inc., as

14   General Partner of Goodman Capital Partners L.P., Jerome

15   Goodman, Individually, as trustee for The Jerome Goodman

16   Childrens GRAT #1, as Limited Partner of Goodman Capital

17   Partners L.P., and as Beneficiary of The Jerome Goodman

18   Children, Abbey Goodman, as Beneficiary of The Jerome

19   Goodman Childrens GRAT #1 and as Limited Partner of

20   Goodman Capital Partners L.P., Kevin Goodman, as Beneficiary

21   of The Jerome Goodman Childrens GRAT #1 and as Limited

22   Partner of Goodman Capital Partners L.P., Peter Goodman, as

23   Beneficiary of The Jerome Goodman Childrens GRAT #1 and as

24   Limited Partner of Goodman Capital Partners L.P., Philip

25   Goodman, as Limited Partner of Goodman Capital Partners

1    L.P., Audrey Goodman, in her capacity as a

2    general and limited partner of JABA Associates LP, Bruce

3    Goodman, in his capacity as a general Partner of JABA

4    Associates LP, Andrew Goodman, in his capacity as a general

5    partner of JABA Associates LP, Guiducci Family Limited

6    Partnership, Mary Guiducci, individually and in

7    her capacity as a General Partner of the Guiducci Family

8    Limited Partnership, Sandra Guiducci, individually and in

9    her capacity as a General Partner of the Guiducci Family

10   Limited Partnership, Dino Guiducci, individually and in his

11   capacity as a General Partner of the Guiducci Family Limited

12   Partnership, Gary L. Harnick, Martin R Harnick, Pamela

13   Harnick, Harry Smith Revocable Living Trust, Toby

14   Harwood, Benjamin T. Heller, Diane Holmers, Heidi Holmers,

15   Irrevocable Trust FBO Ethan Siegel, in its Capacity as a

16   member of the Kuntzman Family L.L.C., Irrevocable Trust FBO

17   Jennifer Gattegno, in its capacity as a member of the

18   Kuntzman Family L.L.C., JONATHAN SCHWARTZ, AS BENEFICIARY OF

19   THE GERTRUDE E. ALPERN REVOCABLE TRUST, Jacob M. Dick

20   Revocable Living Trust Dtd 4/6/01, Individually and as

21   Tenant in Common, Carol Kamenstein, David Kamenstein, Peter

22   D. Kamenstein, Sloan G. Kamenstein, Tracy D. Kamenstein,

23   Barbara Keller, Gerald E. Keller, Eugenie Kissinger, Walter

24   B. Kissinger, Kenneth M. Kohl, Myrna Kohl, Kenneth M. Kohl,

25   as an individual and as a joint tenant, Myrna L. Kohl, as an

1    individual and as a joint tenant, Marlene Krauss, Kuntzman

2    Family LLC, LEWIS ALPERN, IN CAP. AS SUCC. TR. OF GERTRUDE

3    E. ALPERN REV. TRUST, AS BEN. OF GERTRUDE E. ALPERN REV.

4    TRUST, AS EXE. OF THE ESTATE OF GERTRUDE E. ALPERN, AND IN

5    CAP. AS TR. OF PAUL ALPERN RES. TRUST, Barbara June Lang, as

6    personal representative, as trustee, as an individual, and

7    as joint tenant, Laura Ann Smith Revocable Living Trust,

8    Laura Ann Smith in her capacity as Settlor and Trustee for

9    the Laura Ann Smith Revocable Living Trust, Felice T. Londa,

10   in her capacity as a Partner in Train Klan, Jessica Londa,

11   in her capacity as a Partner in Train Klan, Peter Londa, in

12   her capacity as a Partner in Train Klan, Pamela Marxen,

13   Allen Meisels, James M. New, Laura W. New, Russell Oasis,

14   Philip F. Palmedo, Blake Palmer, Boyer Palmer, Boyer F.

15   Palmer, Bret Palmer, Brett Palmer, Bruce Palmer, Bruce N.

16   Palmer, John W. Palmer, Karen Anderson Palmer, Kurt Palmer,

17   Oscar Palmer, Sophia Palmer, Palmer Family Trust, Palmer

18   Family Trust and its Beneficiaries, Felice J. Perlman,

19   Sanford S. Perlman, Placon2, Robert Plafsky, Plafsky Family

20   LLC Retirement Plan, Robert Plafsky, in his

21   capacity as Trustee for the Plafsky Family LLC Retirement

22   Plan, ROBERTA SCHWARTZ, AS BEN. OF THE GERTRUDE E. ALPERN

23   REV. TRUST, AS SETTLOR AND BEN. OF THE ROBERTA

24   SCHWARTZ TRUST, AND IN HER CAP. AS TRUSTEE OF THE

25   ROBERTA SCHWARTZ TRUST, Judd Robbins, Roberta Schwartz

1   Trust, Roberta Schwartz Trust, Joan Roman, Robert Roman,

2   Russell Oasis, Gloria Albert Sandler, individually as

3   grantor and beneficiary of and in her capacity as Trustee of

4   The Gloria Albert Sandler and Maurice Sandler

5   Revocable Trust, Maurice Sandler, individually as grantor

6   and beneficiary of and in his capacity as Trustee of The

7   Gloria Albert Sandler and Maurice Sandler Revocable Trust,

8   Barbara L. Savin, Robert S. Savin, Donna Schaffer, Jeffrey

9   Schaffer, Keith Schaffer, Roberta Schwartz,

10  Shelburne Shirt Company, Inc., Laura Ann Smith, Laura Ann

11  Smith, THE ESTATE OF GERTRUDE E. ALPERN, Doron A. Tavlin, as

12  Trustee and Beneficiary of the Doron Tavlin Trust U/A

13  2/4/91, Doron Tavlin, in his capacity as Trustee of the

14  Trust for the Benefit of Ryan Tavlin, Ryan Tavlin,

15  individually as beneficiary of the Trust for the Benefit of

16  Ryan Tavlin, The Gerald and Barbara Keller Family Trust, The

17  Gloria Albert Sandler and Maurice Sandler Revocable Living

18  Trust, The Harnick Brothers Partnership, Train Klan, a

19  Partnership, Trust Under Agreement Dated 12/6/99 for the

20  benefit of Walter and Eugenie Kissinger, Trust

21  dated 2/4/91 F/B/O Doron A. Tavlin, Harvey Krauss and Doron

22  A. Tavlin Trustees, Bernard Whitman, Judith Whitman, Robert

23  S. Whitman, Zieses Investment Partnership; hearing held and

24  adjourned to 6/16/2021 at 10:00 AM at Videoconference

25  (ZoomGov) (CGM).

Page 8

1    HEARING re 10-04921-cgm Doc# 92 Motion for Summary Judgment

2    /Notice of Motion for Summary Judgment filed by Nicholas

3    Cremona on behalf of Irving H. Picard, Trustee for the

4    Liquidation of Bernard L. Madoff Investment Securities

5    LLC, and Bernard L. Madoff.

6

7    HEARING re 10-04921-cgm Doc# 104 Motion for Summary Judgment

8    /Notice of Defendant's Cross- Motion for Summary Judgment

9    filed by Arthur H. Ruegger on behalf of

10   Stanley T. Miller. Responses due by 5/26/2021

11

12   HEARING re 10-04921-cgm Doc# 107 Objection /Defendant's

13   Objections, Responses and Counterstatements in Opposition to

14   the Trustee's Statement of Material Facts Pursuant to

15   Fed.R.Civ.P.56, Fed.R.Bankr. 7056 and Local Rule

16   7056-1 (related document(s)100) filed by Arthur H. Ruegger

17   on behalf of Stanley T. Miller.

18

19   HEARING re 10-04921-cgm Doc # 105 Memorandum of Law

20   /Defendant's Memorandum in Support of Defendant's Cross-

21   Motion for Summary Judgment and in Opposition to Trustee's

22   Motion for Summary Judgment (related document(s)104)

23   filed by Arthur H. Ruegger on behalf of Stanley T. Miller.

24   Objections due by 5/26/2021,

25

Page 9

1    HEARING re 10-04921-cgm Doc# 112 Memorandum of Law

2    /Defendant's Reply Memorandum of Law in Support of

3    Defendant's Cross-Motion for Summary Judgment and

4    in Opposition to Trustee's Motion for Summary Judgment and

5    the Memorandum of Law Filed by the Securities Investor

6    Protection Corporation (related document(s)104, 92, 110)

7    filed by Arthur H. Ruegger on behalf of Stanley T. Miller

8

9    HEARING re 10-04921-cgm Doc# 110 Memorandum of Law in

10   Support of the Trustee's Motion for Summary Judgment and in

11   Support of the Trustee's Opposition to Defendant's Cross-

12   Motion for Summary Judgment (related document(s)108) filed

13   by Kenneth Caputo on behalf of Securities Investor

14   Protection Corp..

15

16   HEARING re 10-04921-cgm Doc# 109 Statement /Trustees Reply

17   to Defendants Objections, Responses, and Counterstatement of

18   Material Facts filed by Nicholas Cremona on behalf of Irving

19   H. Picard, Trustee for the Liquidation of Bernard L. Madoff

20   Investment Securities LLC, and Bernard L. Madoff.

21

22   HEARING re 10-04921-cgm Doc# 108 Memorandum of Law /Trustees

23   Reply Memorandum of Law in Further Support of Trustees

24   Motion for Summary Judgment and Opposition to Defendants

25   Cross-Motion for Summary Judgment filed by Nicholas Cremona

1    on behalf of Irving H. Picard, Trustee for the Liquidation

2    of Bernard L. Madoff Investment Securities LLC, and Bernard

3    L. Madoff.

4

5    HEARING re 09-01239-cgm Doc# 305 Motion to Dismiss Adversary

6    Proceeding (Second Amended Complaint) (related

7    document(s)286) filed by Peter E. Kazanoff on behalf

8    of FAIRFIELD GREENWICH CAPITAL PARTNERS, Fairfield

9    Greenwich (Bermuda), Ltd., Fairfield Greenwich Advisors LLC,

10   Fairfield Greenwich Limited, Fairfield International

11   Managers, Inc., Fairfield Investment Fund Limited, Walter

12   Noel, Andres Piedrahita, Corina Noel Piedrahita, SHARE

13   MANAGEMENT LLC, Stable Fund, Philip Toub, Jeffrey Tucker,

14   Amit Vijayvergiya.

15

16   HEARING re 09-01239-cgm Pre Trial Conference

17

18   HEARING re 09-01239-cgm Doc# 311 Opposition Brief /Trustees

19   Memorandum Of Law In Opposition To Defendants Motion To

20   Dismiss The Second Amended Complaint (related

21   document(s)305) filed by David J. Sheehan on behalf of

22   Irving H. Picard.

23

24

25

1    HEARING re 09-01239-cgm Doc# 313 Reply to Motion to Dismiss

2    the Second Amended Complaint (related document(s)305) filed

3    by Peter E. Kazanoff on behalf of FAIRFIELD GREENWICH

4    CAPITAL PARTNERS, Fairfield Greenwich (Bermuda), Ltd.,

5    Fairfield Greenwich Advisors LLC, Fairfield Greenwich

6    Limited, Fairfield International Managers, Inc., Fairfield

7    Investment Fund Limited, Walter Noel, Andres Piedrahita,

8    Corina Noel Piedrahita, SHARE MANAGEMENT LLC, Stable Fund,

9    Philip Toub, Jeffrey Tucker, Amit Vijayvergiya.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 12

```
 1   A P P E A R A N C E S :

 2

 3   BAKER HOSTETLER LLP

 4        Attorneys for the Trustee, Irving Picard

 5        45 Rockefeller Plaza

 6        New York, NY 10111

 7

 8   BY:  NICHOLAS CREMONA

 9        CAMILLE BENT

10        ERIKA THOMAS

11

12   SIMPSON THACHER & BARTLETT LLP

13        Attorneys for Barreneche, Inc. et al.

14        425 Lexington Ave

15        New York, NY, 10017

16

17   BY:  MARK G. CUNHA

18        SARAH EICHENBERGER

19

20

21

22

23

24

25
```

Page 13

1    WOLLMUTH MAHER & DEUTSCH LLP

2         Attorneys for Fairfield Investment Fund Limited,

3         Defendant

4         500 Fifth Avenue

5         New York NY 10110

6

7    BY:  FLETCHER STRONG

8

9    ALSO PRESENT TELEPHONICALLY:

10

11   ANDREW B. KRATENSTEIN

12   KELLY A. LIBRERA

13   SCOTT BERMAN

14   MICHAEL ROBERT CARNEY

15   BERNARD V. KLEINMAN

16   DARA GILWIT HAMMERMAN

17   JONATHAN L. FLAXER

18   AMIAD KUSHNER

19   JONATHAN R. BARR

20   XOCHITL S. STROHBEHN

21   DAVID J. KANFER

22   IRA A. REID

23   JUSTIN D. MAYER

24   GREGG MASHBERG

25   ROBIN SPIGEL

```
 1   DANIEL M. GLOSBAND

 2   ERIC D. GOLDBERG

 3   SCHUYLER D. GELLER

 4   ARTHUR H. RUEGGER

 5   ROBERT ALAN ABRAMS

 6   JEFFREY T. SCOTT

 7   MARC D. POWERS

 8   VALERIE SIROTA

 9   LARRY IVAN GLICK

10   BERNARD J. GARBUTT

11   DAVID J. SHEEHAN

12   DOROTHY HEYL

13   HELEN V. CANTWELL

14   KENT A. YALOWITZ

15   PETER D. MORGENSTERN

16   KEVIN H. BELL

17   JAMES  ADDISON WRIGHT

18   MARC G. ROSENBERG

19   CHESTER B. SALOMON

20   INA BORT

21   LINDSAY WEBER

22   MARGARITA Y. GINZBURG

23   FRANKLIN SANDS

24   ROBERT S LOIGMAN

25   CATHERINE WOLTERING
```

Page 15

1   ROBERT S. GOODMAN

2   THOMAS D. GOLDBERG

3   DAVID FASTENBERG ET AL.

4   DANIEL STUART ALTER

5   ROBERT J. NELSON

6   ERIC B. LEVINE

7   BIK CHEEMA

8   EVA PASCALE BIBI

9   RICHARD J. BERNARD

10   BETH-ANN ROTH

11   EUGENE F. GETTY

12   ROBERT S FISCHLER

13   JOHN MOSCOW

14   MELANIE L. CYGANOWSKI

15   GEORGE M. CHALOS

16   HOWARD KLEINHENDLER

17   BRIAN W. HARVEY

18   KIRK L. BRETT

19   THOMAS EDWARD LYNCH

20   GREGORY W. FOX

21   SHANNON R. SELDEN

22   LINDA H. MARTIN

23   DAVID W PARHAM

24   TAMMY P. BIEBER

25   BRIAN J. BUTLER

1   LAURA K CLINTON

2   RICHARD A. KIRBY

3   KAREN E. WAGNER

4   ELLIOT MOSKOWITZ

5   VLADIMIR PAVLOVIC

6   MENACHEM O. ZELMANOVITZ

7   ROBERT H. AVAUNT

8   CARL H. LOEWENSON

9   HOWARD L. SIMON

10  JEFFREY E. BALDWIN

11  ELLIOT G SAGOR

12  GENE M. LINKMEYER

13  ROBERT A. WALLNER

14  ALAN E. GAMZA

15  RICHARD A. CIRILLO

16  TIMOTHY WEDEEN

17  MARGUERITE M. GOREK

18  JONATHAN T. KOEVARY

19  GREGORY S KINOIAN

20  PHILIPPE MARC SALOMON

21  TODD J. ROSEN

22  CHRISTOPHER H. LAROSA

23  RONALD L. ISRAEL

24  RICHARD CORBI

25  MICHAEL M. KRAUSS

Page 17

1    BRAD ROGERS

2    ANDREA FISCHER

3    LAWRENCE J. KOTLER

4    PHILIP J DICHTER

5    ADAM L. ROSEN

6    CHRISTOPHER L. GALLINARI

7    VIVIAN R. DROHAN

8    MAX FOLKENFLIK

9    BRIAN DUNEFSKY

10   STEPHEN JOHN AKERS

11   MELISSA KOSACK

12   STEVEN B. MENDELOW

13   DENNIS J. NOLAN

14   RICHARD SCHWED

15   THOMAS J. SCHELL

16   DON ABRAHAM

17   ALAN UNGER

18   STACEY ANN BELL

19   JUDITH A. ARCHER

20   EUNICE RIM HUDSON

21   JENNIFER B ZOURIGUI

22   DAVID L. BARRACK

23   JOHN D. O&#039;NEILL

24   HEATHER LAMBERG

25   ONA T. WANG

Page 18

1    LAUREN RESNICK

2    LARY S. WOLF

3    GREGORY F. HAUSER

4    LAUREN C. WATSON

5    REX LEE

6    SHAWN M. CHRISTIANSON

7    THOMAS D. GOLDBERG

8    MICHAEL S. POLLOK

9    NATHANAEL KELLEY

10   MATTHEW M. GRAHAM

11   ERIN E VALENTINE

12   MICHELLE L. GREENBERG

13   RICHARD G. HADDAD

14   MICHAEL KWON

15   ANNA CONLON AGUILAR

16   BRETT S. MOORE

17   WILLIAM R. FRIED

18   SECURITIES AND EXCHANGE COMMISSION

19   AARON FONG JAROFF

20   CARMINE BOCCUZZI

21   MEGAN P. DAVIS

22   SEANNA BROWN

23   DAVID M. GARELIK

24   MATTHEW B. LUNN

25   HELEN DAVIS CHAITMAN

1   RICHARD E. SIGNORELLI

2   CHRISTOPHER R. FENTON

3   GARY STEIN

4   JASON A NAGI

5   ANTHONY L. PACCIONE

6   BRIAN K. ESSER

7   LEE HARRINGTON

8   BARTON NACHAMIE (+)

9   MICROSOFT CORPORATION AND MICROSOFT LICENSING, GP

10  MARK MCDERMOTT

11  ALEC P. OSTROW

12  NATHAN D. ADLER

13  PETER GREGORY SCHWED

14  ERIC MARK KAY

15  ANTHONY D. BOCCANFUSO

16  PHILIP R. SCHATZ

17  STEVEN B. EICHEL

18  DEBORAH A. REPEROWITZ

19  JOSHUA COLANGELO-BRYAN

20  JOSEPH P. MOODHE

21  RICHARD M. METH

22  JULIE GORCHKOVA

23  JONATHAN ETRA

24  RENEE ROBINOW SOSKIN

25  GEORGE BRUNELLE

1    ESTERINA GIULIANI

2    WILLIAM P. WEINTRAUB

3    JOHN JOSEPH KUSTER

4    JESSICA DEBORAH MIKHAILEVICH

5    CASEY D. LAFFEY

6    MATTHEW A KUPILLAS

7    THOMAS L. LONG

8    MARTIN J. AUERBACH

9    FRED W. REINKE

10    MICHAEL T. DRISCOLL

11    LEIF T. SIMONSON

12    MARK J. HYLAND

13    ELIZABETH ROZON

14    BRUCE S. SCHAEFFER

15    SUSAN CAPOTE

16    DAVID J. MARK

17    DAVID C. MCGRAIL

18    GINNY L. GOLDMAN

19    JORDAN HARAP

20    GREGORY GOETT

21    DAVID M. BANKER

22    CHRISTIAN DE PREUX

23    GABRIELLE J. PRETTO

24    SARA RICCIARDI

25    ANGELINA E. LIM

Page 21

```
 1   ANDREA J ROBINSON

 2   BRUCE M GINSBERG

 3   PHILIP BENTLEY

 4   EDWARD SMITH

 5   PATI H. GERBER

 6   PATTI H. GERBER 1997 TRUST

 7   LEONARD A. RODES

 8   WAYNE A. SILVER

 9   TERENCE WILLIAM MCCORMICK

10   EARL COLSON

11   PETER W. SMITH

12   SCOTT CAPLAN

13   MICHAEL S. FELDBERG

14   GREGORY M DEXTER

15   ALISSA M. NANN

16   BRYAN HA

17   SANFORD PHILIP ROSEN

18   BRIAN H. GERBER

19   OREN WARSHAVSKY

20   ELAINE ROSENBERG

21   DANIEL M. KUMMER

22   JOSEPH E. SHICKICH

23   JONATHAN KORTMANSKY

24   REGINA GRIFFIN

25   JOSEPH M KAY
```

Page 22

1   PAMELA MILLER

2   BRIAN H. POLOVOY

3   JAMI MILLS VIBBERT

4   ERIC R FISH

5   ANDREW JOHN FINN

6   MARIEL R. BRONEN

7   GERARD SYLVESTER CATALANELLO

8   VIRGINIA I. WEBER

9   DAVID L. MITCHELL

10   KEITH R. MURPHY

11   BRENDAN M. SCOTT

12   EDWARD P. GROSZ

13   RONALD SCOTT BEACHER

14   TIMOTHY P. HARKNESS

15   JACOB BUCHDAHL

16   CHRISTOPHER GRESH

17   CHRISTOPHER M. DESIDERIO

18   MICHAEL WEXELBAUM

19   STUART I. RICH

20   JEFFREY L. ROETHER

21   ROBERT A. RICH

22   AMY VANDERWAL

23   PFA PENSION A/S

24   LUCILLE B. BRENNAN

25   JOHN F. SAVARESE

1   GARY S. LEE

2   SUSAN F. BALASCHAK

3   THOMAS G. WALLRICH

4   TRACY L. KLESTADT

5   JACLYN M. METZINGER

6   TORELLO H. CALVANI

7   DAVID A. ROSENZWEIG

8   RICHARD B. LEVIN

9   BREON PEACE

10  JOSHUA FOWES

11  ELYSSA SUZANNE KATES

12  RICHARD J. MCCORD

13  ERIC L. LEWIS

14  JOHN J COLLINS

15  JEFFREY J RESETARITS

16  SANFORD P. DUMAIN

17  NEIL A. STEINER

18  DICHTER-MAD FAMILY PARTNERS, LLP

19  GAYTRI D. KACHROO

20  GERARDO GOMEZ GALVIS

21  YANN GERON

22  PENSION BENEFIT GUARANTY CORP.

23  JENNIFER L. YOUNG

24  J. MICHAEL MURRAY

25  RICHARD BAILEY

1   JESSICA SIMONOFF

2   GEORGE W. SHUSTER

3   SEONG H. KIM

4   ALEX R. ROVIRA

5   CHARLES COLLIER PLATT

6   CHRYSSA VILMA BETH VALLETTA

7   PETER E. SHAPIRO

8   MARISA GLASSMAN

9   MICHAEL E. PETRELLA

10   DAVID Y. LIVSHIZ

11   JOSHUA E. KELLER

12   RUSSELL M. YANKWITT

13   ELIZABETH A. SCULLY

14   MADELINE CELIA CHAIS 1992 TRUST

15   KEITH N COSTA

16   DAVID FARRINGTON YATES

17   JONATHAN M. LANDERS

18   DOUGLAS L FURTH

19   ERNEST EDWARD BADWAY

20   JOHN J. BURKE

21   JONATHAN K. COOPERMAN

22   BRIAN MADDOX

23   PAUL S. HUGEL

24   DAVID S. GOLUB

25   DOUGLAS A. KELLNER

1   WILLIAM L. CHAPMAN

2   RAYMOND V VASVARI

3   FREDERICK E. SCHMIDT

4   CAROLE NEVILLE

5   MICHAEL IRA GOLDBERG

6   MICHAEL ZEB LANDSMAN

7   CARL F. SCHOEPPL

8   FRED H. PERKINS

9   GARY F. EISENBERG

10   DOUGLAS WOLFE

11   NOWELL BAMBERGER

12   DAVID A. KOTLER

13   ROBERT MILLER

14   JOHN OLESKE

15   JAMES SERRITELLA

16   SCOTT S BALBER

17   LAWRENCE M. SHAPIRO

18   ROBERT J. KAPLAN

19   PAUL RUBIN

20   KEITH COSTA

21   MICHAEL J. RIELA

22   WILLIAM B. POLLARD

23   ANDREW J. EHRLICH

24   GEORGE V. UTLIK

25   TED A. BERKOWITZ

Page 26

```
 1   STEPHANIE WICKOUSKI

 2   THOMAS A TELESCA

 3   WILLIAM A. HABIB

 4   JESSIE MORGAN GABRIEL

 5   BETH-ANN ROTH

 6   MARK S. ROHER

 7   BRUCE BUECHLER

 8   DEBBIE LYNN LINDENBAUM

 9   MARK I SILBERBLATT

10   DAVID S. STONE

11   SHANNON ANNE SCOTT

12   MICHAEL J. RIELA

13   MARK S. LICHTENSTEIN

14   KIMBER P. SCHLADWEILER

15   PAUL T. WEINSTEIN

16   MARSHA TORN

17   DONG NI XU

18   JENNIFER A. CLARK

19   RALPH A. SICILIANO

20   MICHAEL P. BURKE

21   MARSHALL R. KING

22   LAWRENCE B. FRIEDMAN

23   ERIC FISHMAN

24   EUGENE ERNEST STEARNS

25   STEPHEN A. WEISS
```

```
 1   JORDAN W. SIEV

 2   MARK MULHOLLAND

 3   RICHARD L. BRITTAIN

 4   FREDERICK R. KESSLER

 5   BENJAMIN J.O. LEWIS

 6   EMILY J. MATHIEU

 7   BARBARA A. SCHWEIGER

 8   STEVEN FROOT

 9   JAMES J. VINCEQUERRA

10   WINDELS MARX LANE & MITTENDORF, LLP

11   ANDREW J. GOODMAN

12   MARVIN C. INGBER

13   NORMAN N KINEL

14   IRVING H. PICARD

15   ELIZABETH A. MOLINO

16   LIQUIDITY SOLUTIONS, INC.

17   PETER E. KAZANOFF

18   BRAD N. FRIEDMAN

19   GREGORY ZIMMER

20   KATHLEYA CHOTIROS

21   JOEL L. HERZ

22   HUNTER T. CARTER

23   CHRISTOPHER MATTHEW GUHIN

24   FRANK MCGINN

25   ANDREW T. SOLOMON
```

1    THOMAS B. HATCH

2    ROBINSON B. LACY

3    NICHOLAS S. DAVIS

4    JAMES L. BERNARD

5    JEFF E. BUTLER

6    KIERSTEN A. FLETCHER

7    MAXWELL DILLAN

8    KAREN DAVIS

9    ROBERT J. LACK

10   EDITH A. SCHUR

11   THOMAS J. GIBLIN

12   ABIGAIL COSTER

13   MOR WETZLER

14   WILLIAM HEUER

15   DIANE L. MCGIMSEY

16   JENNIFER OPHEIM

17   ERIC FISHER

18   JACK G. STERN

19   GUTMACHER ENTERPRISES, L.P.

20   LINDSAY A. BUSH

21   JAMES VINCENT MASELLA

22   COLUMBIA UNIVERSITY

23   STEPHEN P. SAFRANSKI

24   NORMAN A. KAPLAN

25   CARLOS J CANINO

Page 29

1    IMTIAZ A. SIDDIQUI

2    DOUGLAS E. SPELFOGEL

3    WILLIAM J. SUSHON

4    AMANDA RABOY

5    STEVEN R. SCHLESINGER

6    KATHLEEN M. AIELLO

7    MICHAEL D. SIROTA

8    ROBERT M MCCLAY

9    JAMES B. KOCH

10    STEVEN G. STORCH

11    ORTHOPAEDIC SPECIALTY GROUP P.C. PLAN PARTICIPANTS

12    IRVING J. PINTO

13    JOE R. WHATLEY

14    DANIEL B. BESIKOF

15    STEPHEN FISHBEIN

16    MARC E. HIRSCHFIELD

17    PRICE O. GIELEN

18    JOHN F. ZULACK

19    MARK MICHAEL ELLIOTT

20    JOSH KRAKOWSKY

21    MICHAEL DAVID KATZ

22    KENNETH W. LIPMAN

23    DAVID ONORATO

24    JEFFREY A. ROSENTHAL

25    TED A. BERKOWITZ

1    WILLIAM T. RUSSELL

2    NICOLE STEFANELLI

3    BRIAN NEVILLE

4    ARI MACKINNON

5    SCOTT WALTER REYNOLDS

6    RICHARD LEVY

7    DANIEL SCHIMMEL

8    SUSAN POWER-JOHNSTON

9    BARRY M. KAZAN

10   JESSICA L MARGOLIS

11   JONATHAN D. COGAN

12   LEE J. MONDSHEIN

13   SCOTT I. DAVIDSON

14   MARY GRACE WHITE METCALFE

15   THOMAS J. MOLONEY

16   ALAN NISSELSON

17   JENNIFER M. WALRATH

18   JASCHA D. PREUSS

19   ASM CAPITAL, L.P.

20   BRIAN J. LACLAIR

21   NICHOLAS G. HALLENBECK

22   JOSEPHINE WANG

23   RICHARD C. YESKOO

24   ANDREAS A. FRISCHKNECHT

25   SCHUYLER D. GELLER

1    SHAYA M. BERGER

2    JENNY LYNN FOUNTAIN

3    LARKIN M. MORTON

4    JEFFREY D. FELDER

5    MARK NELSON PARRY

6    KAREN OSTAD

7    GARY A. WOODFIELD

8    JOAQUIN M. C DE BACA

9    ROBERT WILLIAM YALEN

10   TODD E. DUFFY

11   LALIT K JAIN

12   ALLISON M. WUERTZ

13   FRANKLIN B. VELIE

14   CHAYA F. WEINBERG-BRODT

15   JAN DOUGLAS ATLAS

16   DANIEL H. TABAK

17   LAWRENCE TORN

18   KARL GEERCKEN

19   KENNETH CAPUTO

20    DAVID ELBAUM

21   JAMES L. GARRITY

22   JONATHAN M. CERRITO

23   JANICE BETH GRUBIN

24   SARAH DOWD

25   PHILIP J. GORDON

```
 1   PAUL R. DEFILIPPO

 2   DAVID J. EISEMAN

 3   CHRISTOPHER HARRIS

 4   DEBORAH A. REPEROWITZ

 5   THOMAS S. KESSLER

 6   RAFAEL MAYER

 7   M. WILLIAM MUNNO

 8   BRIAN A. SCHMIDT

 9   BENNETTE D. KRAMER

10   MARTIN A. MOONEY

11   PATRICK SIBLEY

12   BENJAMIN P. DEUTSCH

13   BRYAN R. KAPLAN

14   PETER N. WANG

15   DAVID YEGER

16   ELISE S. FREJKA

17   BLANKA K. WOLFE

18   JOHN SIEGAL

19   ERIN MARIE MEYER

20   SHELDON EISENBERGER

21   DAVID Z SCHWARTZ

22   WILLIAM A MAHER

23   DANIEL J. KORNSTEIN

24   EVAN A. DAVIS

25   JOSEPH CIOFFI
```

Page 33

1    RICHARD W. TROTTER

2    GARY S REDISH

3    MICHELE L. PAHMER

4    MEREDITH L. TURNER

5    AMY C. GROSS

6    GARY J. MENNITT

7    VERITABLE LP

8    MARSHALL W. KRAUSE

9    THOMAS E. BRETT

10   EDWARD JOHN JACOBS

11   SUSAN SALTZ DESCENDANTS TRUST

12   DENNIS C. QUINN

13   JOSEPH LUBERTAZZI

14   GEORGE R. HIRSCH

15   THOMAS F BERNDT

16   DEBORAH H. RENNER

17   THOMAS P. BATTISTONI

18   EDWARD SPIRO

19   THERESA TRZASKOMA

20   JEFFREY L. BERNFELD

21   PARVIN K. AMINOLROAYA

22   RANDY LEWIS MARTIN

23   DAVID J. SHEEHAN

24   NANCY LYNNE KOURLAND

25   PAULA J. WARMUTH

Page 34

1    MEYER MUSCHEL

2    HOWARD L. VICKERY

3    BARRY R. LAX

4    JOSHUA S. ANDROPHY

5    STEVEN H. NEWMAN

6    PATRICIA H. HEER

7    MARK G CUNHA

8    KEVIN TOOLE

9    MICHAEL R. DAL LAGO

10   JEREMY A. MELLITZ

11   DAVID NOAH GREENWALD

12   JEFFREY G. TOUGAS

13   LAWRENCE R. VELVEL

14   GERALDINE E. PONTO

15   SAMEER NITANAND ADVANI

16   JIL MAZER-MARINO

17   ERICA KLIPPER

18   NEAL S. MANN

19   MATTHEW GLUCK

20   RONALD A. HEWITT

21   JUDITH L. SPANIER

22   MARC J. KURZMAN

23   JORIAN L. ROSE

24   CANDACE NEWLOVE

25   NICHOLAS F. KAJON

Page 35

1   DEBORAH KOVSKY-APAP

2   LAURENCE MAY

3   SHIRLEY SCHUSTACK CONRAD

4   MARC J. GOTTRIDGE

5   WRENN CHAIS

6   MATTHEW J. GOLD

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  I'm calling you from my home office

3     and bells and whistles just went off, so I have no idea

4     what's going on.  So, I may have to see what's happening.

5     But it sounds like it's quieted down.

6              We will take one matter at a time and we will --

7     and do your appearances on that matter as we call it.  We

8     won't take matters in general.  So, we'll just do it that

9     way.  The first matter we have on is an update on the 08-

10    01789, SIPA v. BLMIS, and it is concerning the mediations.

11    State your name and affiliation.

12             MR. CREMONA:  Good morning, Your Honor.  Nicholas

13    Cremona of Baker and Hostetler, appearing on behalf of the

14    Trustee, Irving Picard.  As Your Honor noted, the first

15    matter on the calendar is the status conference on the

16    mediations in adversary proceedings with Defendants

17    represented by Chaitman, LLP.

18             As you may recall, Your Honor, the parties first

19    appeared before the Court in May of last year to request

20    assistance in resolving approximately 60 adversary

21    proceedings remaining where Chaitman, LLP served as counsel

22    of record by way of mediation.  At that time, the parties

23    reached agreement on protocols to conduct mediations in

24    those remaining cases consistent with the litigation

25    procedures order, which is located at ECF3141.  The parties

Page 37

1   agreed to prioritize the cases and proceed to mediation

2   before Judge Hurkin-Torres.  And the Court so ordered the

3   May 28, 2020 hearing transcript to reflect the agreed upon

4   protocols and procedures, and the parties began mediating

5   those cases as of June of last year.

6          I'm pleased to report today that overall this

7   process has been very successful.  For the most part over

8   the past year the parties have been able to adhere to their

9   commitment to mediate the cases on a weekly basis.  During

10  this process, the parties have consensually resolved 37

11  adversary proceedings.

12         I'm also pleased to report that the parties, from

13  the Trustee's perspective, have completed this process and

14  it has reached its end.  The parties have fulfilled their

15  obligation to mediate these cases.  We completed mediation

16  in all eligible cases with the exception of those cases

17  pending in the District Court, and there are three cases

18  where there are pending motions to withdraw the reference,

19  and there's another case that has a pending summary judgment

20  motion before Judge Broderick.  And the only other cases

21  where we have not mediated are cases where the Trustee has

22  already obtained the judgment in the case, one of which was

23  entered by Your Honor.

24         Mediation in all other cases, with one exception

25  which I will discuss, has been completed either by a

Page 38

1    successful settlement, a final report from the mediator, or

2    based on the expiration of more than 120 days from the day

3    the case was referred to mediation.  On that last point, I

4    would refer Your Honor to the mediation procedures that are

5    set forth in the litigation procedures order that I

6    mentioned, which was also discussed in the Trustee's status

7    report filed with the Court in March.

8            In particular, Section 5F of the avoidance actions

9    procedure set forth in Exhibit A to that order provides that

10   all mediations must be completed within 100 days from the

11   date of the mediator selection, absent mutual consent among

12   the parties and the mediator to extend that time.

13           So, as I mentioned, with the exception of one

14   case, all the remaining cases fit into one of those three

15   categories such that our obligation to mediate has been

16   completed.  The only remaining case that is subject to an

17   active mediation is the Keller case, which is Adversary

18   Proceeding Number 10-04539.  That is subject to ongoing

19   settlement negotiations.  And the 120-day deadline to

20   complete mediation in that case is set to expire on June

21   25th.  And I would submit that the parties can determine on

22   that point whether to extend the mediation or let it

23   conclude.

24           So, with that, I submit that the parties'

25   obligations to mediate these cases has been fully completed,

Page 39

1    consistent with Your Honor's authorization at the March 17

2    omnibus hearing.  The Trustee intends to bring the remaining

3    cases before this Court to a close by way of summary

4    judgment motions in a timely manner.  In that regard, as

5    Your Honor may have noticed, the Trustee filed two such

6    motions last week in cases where mediations have been

7    concluded, and they are returnable on the July 28 omnibus

8    hearing date.

9            With that, unless Your Honor has any questions,

10   that concludes the Trustee's status report on these matters.

11           THE COURT:  Okay, just give me a thumbnail right

12   now.  We've got two summary judgments pending.  How many

13   more do you think you'll be filing?  Just so I know what my

14   whole -- my whole workload is.

15           MR. CREMONA:  Sure, Your Honor.  So, as I

16   mentioned, 37 of the 57 cases were resolved, and then there

17   are --

18           THE COURT:  And in this -- and what's in this

19   Court?  Not in District.  Okay.

20           MR. CREMONA:  I would say there are another 8-10

21   motions that we would bring.  There are, as I mentioned,

22   four matters that are before the District Court.  And

23   provided it's acceptable to Your Honor, we would bring them

24   in the same fashion -- you know, a few motions per month, if

25   that's acceptable and amenable to the Court's schedule.

1      THE COURT:  That works well for me.  Does anyone

2  else wish to be heard on the status of the mediation and

3  what's going on with the protocols or anything dealing with

4  that?  Excellent.  Thank you very much.  Thank you for your

5  hard work.  Thank you for the hard work of all the attorneys

6  and the parties in this mediation process, and thank you to

7  the mediator.  I appreciate the hard work and I appreciate

8  what you all have done.

9      MR. CREMONA:  Thank you.

10      THE COURT:  I -- I always feel like you can always

11  call the mediator back.  That's my sort of feeling.  If you

12  think that would be helpful, you just reach out and make it

13  happen.

14      MR. CREMONA:  I agree, Your Honor.  And to the

15  extent -- settlement -- we are always willing to entertain

16  settlement and we'll continue to do so.

17      THE COURT:  Excellent.  Thank you much.  And thank

18  everyone involved very much.

19      MR. CREMONA:  Will do.  Thank you, Your Honor.

20      THE COURT:  Very good.  The next thing on the

21  agenda and on the calendar is 08-01789, the Securities

22  Investor Protection v. the Bernie Madoff -- which one do we

23  have on this one?  I have so many that sit out here.  I

24  believe this is the 0901239, the Securities Investor

25  Protection and Fairfield Investment Fund LTD, Stable Fund,

Page 41

1    Fairfield Greenwich LTD, Fairfield Greenwich Bermuda LTD,

2    Fairfield Greenwich Advisors, LLC, Fairfield International

3    Managers, Inc., Walter Noel, Jeffrey Tucker, Andres

4    Piedrahita, Amit Vijayvergiya, Philip Toub, Corina Noel

5    Piedrahita, Fairfield Greenwich Partners -- Capital

6    Partners, and Share Management, LLC.

7              State your name and affiliation.

8              MS. THOMAS:  Good morning, Your Honor.  Erika

9    Thomas of Baker Hostetler for Plaintiff, SIPA Trustee, Mr.

10   Irving Piccard. My colleague, Ms. Camille Bent is here with

11   me today as well.

12             We're here this morning, Your Honor, on the

13   Defendant's motion --

14             THE COURT:  Excuse me.  Let the others put their

15   name on the record, please --

16             MS. THOMAS:  Yes, Your Honor.

17             THE COURT:  -- so we have the record complete.

18   Thank you.  Defendants?  Attorneys?

19             WOMAN 1:  (indiscernible)

20             THE COURT:  Okay.

21             MR. STRONG:  Good morning, Your Honor.  Fletcher

22   Strong from Wollmuth Maher & Deutsch, LLP for Defendants

23   Fairfield Investment Fund LTD, and Stable Fund, LLP.

24             THE COURT:  Very good.

25             MR. STEINER:  Good morning, Your Honor.  Neil

Page 42

1   Steiner from Decker for Defendant Andres Piedrahita.

2          THE COURT:  Very good.  We're having an audio

3   issue I see.  Okay, we will give you a moment to see if that

4   can't be corrected.  Can someone identify him so I can call

5   him by name?  Audio is off, Ms. Thomas.  Ms. Thomas, your

6   audio's off.  There we go.  Somebody's got it.  Yes, sir?

7   Mr. Stein?  Mr. Steiner?  No, Mr. Zulack?

8          MR. ZULACK:  Yeah, I think it's lawyers from

9   Simpson Thacher, Mark Cunha and Sarah -- I think it's

10  Eisenberg.  And Mr. -- the person who argued before you on

11  February 10th, Peter Kazanoff's father is having a lung

12  transplant today so he is not going to be arguing.

13         THE COURT:  Oh, okay.

14         MR. ZULACK:  But he has sent a message to us

15  yesterday that his colleagues would be arguing on his

16  behalf.

17         THE COURT:  Very good.  Give my regards to him and

18  his father.  It seems to me 2020 was horrible with COVID,

19  and then 2021 is horrible with all other matters.  I can't

20  tell you how many times I've gotten to where I don't even

21  want to pick up the phone.  It's a family member somewhere

22  somehow, a friend somewhere somehow.  It's just been

23  ongoing, so...

24         MR. ZULACK:  Let me get the precise names from an

25  email we got yesterday.

```
 1                 THE COURT:  Thank you, thank you.

 2                 MR. CUNHA:  It's Mark Cunha, C-U-N-H-A, and Sarah

 3     Eichenberger.

 4                 MR. ZULACK:  Right.

 5                 THE COURT:  C-U-N --

 6                 MR. CUNHA:  H-A.

 7                 THE COURT:  H-A.  Mr. Cunha, can you hear us?

 8                 MR. CUNHA:  Judge, I can hear you.

 9                 THE COURT:  Okay, excellent.  We can hear you on

10     the phone.  Okay, one thing you must do, though -- you must

11     turn off the sound on your computer if you're going to use

12     the phone.

13                 MR. CUNHA:  Hi, we were muted on your Zoom call.

14     We could not unmute ourselves.  I don't know if your court

15     reporter can fix that for us?

16                 THE COURT:  We'll see if we can.  It sounded as if

17     -- we think the sound was turned off, not just mute.  I

18     mean, not -- yeah.  So --

19                 MR. CUNHA:  Our room was unmuted but we were

20     getting the message from Zoom that we were muted.  So, on

21     the Zoom side.

22                 THE COURT:  Okay, we'll see what we can do.

23                 MR. CUNHA:  Okay, in the meantime, we're on

24     speakerphone for now.

25                 MAN 1:  We've also been kicked out of the meeting
```

Page 44

1    now.

2              MR. CUNHA:  Because of that feedback.  Because of

3    that feedback issue that we're having.

4              THE COURT:  Right, right.

5              MR. CUNHA:  I can do it, just give me a moment.  I

6    could put the call back up but give me a moment and we'll be

7    --

8              THE COURT:  Certainly, certainly.  We all

9    understand.  We've all been there.  In the -- in the -- you

10   can also do -- did you do asterisk-six, star-six on your

11   zoom call?

12             MR. CUNHA:  Star-six on the Zoom call, yes.

13             THE COURT:  Right.

14             MR. CUNHA:  Hold on for a second.

15             THE COURT:  I see you have experts there.  They're

16   better than I am at this kind of thing.  What a gorgeous day

17   and we're all inside.  But it's better we work out

18   everything.  Mr. "Cooka," can you now speak?

19             MR. CUNHA:  Judge, I'm told we're still muted on

20   your Zoom.

21             THE COURT:  Did you do asterisk-six on the

22   computer?

23             MAN 1:  Asterisk-six on the computer.

24             MR. CUNHA:  I can't because we're not on the

25   computer.  It's a videoconferencing system, so we don't have

Page 45

1   the same controls that you do from your laptop.

2           THE COURT:  Obviously, we don't either.

3           MR. CUNHA:  Yeah.  So, Judge --

4           THE COURT:  So we cannot unmute you.  So, whatever

5   you've put yourself on, we don't have any control over it

6   either.  All right, just stay on the phone then.

7           MR. CUNHA:  Judge, why don't we just proceed on

8   the phone?

9           THE COURT:  What are you going to do about the

10  echo?  You've got an echo.  Mr. "Cooka?"

11          MR. CUNHA:  Yeah.  Is there still an echo (still

12  an echo)?  Is there an echo now, Your Honor?

13          THE COURT:  It's better.  It's much better.

14          MR. CUNHA:  Can you hear me okay?

15          THE COURT:  We can hear you perfectly.

16          MR. CUNHA:  All right, so --

17          THE COURT:  Just state your name for the record,

18  right.

19          MR. CUNHA:  Your Honor, I'm Mark Cunha.  I'm

20  counsel for Fairfield Greenwich Advisors.  And I'm arguing

21  on behalf of all the Defendants for their request, as was

22  already explained to --

23          THE COURT:  I'm sorry, someone is making noise on

24  your end and we can hear it.  And it fades you out.

25          MR. CUNHA:  Okay.  Yeah.  So, as I said, I'm

Page 46

1   counsel for Fairfield Greenwich Advisors.  I'll be doing the

2   main argument for Defendants today.  As has already been

3   explained, unfortunately, Mr. Kazanoff's dad has a very

4   serious health issue.  He'll be back.  He is lead counsel.

5           I did want to tell Your Honor that I do have

6   involvement in the case.  I was lead counsel for many years

7   in this case as well as in the signed claims case, and in

8   the Anwar case.  I, unfortunately, a few years ago, reached

9   a mandatory retirement age with my firm and Pete, who's been

10  working with me on the case for many years, stepped in as

11  lead counsel.  But I have stayed involved in the case.  As I

12  said, I have very deep involvement in the case.  I am still

13  registered as a member of the Bar, Your Honor --

14          THE COURT:  Okay.  Very good.  Now, Ms. Thomas,

15  it's over to you.  Thank you.

16          MR. CUNHA:  I should also point out, Your Honor,

17  I'm sorry -- that Sarah Eichenberger is with me from Simpson

18  Thacher, and she'll be doing part of the argument.  I'll be

19  arguing the subsequent transfer counts 1-14; she'll be

20  arguing counts 15-17 having to do with general partner

21  liability, and also the requirements that claims be pled

22  with particularity against each individual Defendant.  So,

23  Sarah's here with me.

24          THE COURT:  Very good.  Very good.  Ms. Thomas?

25          MS. THOMAS:  Thank you, Your Honor.  We're here

Page 47

1    this morning on the Defendant's motion to dismiss, the

2    second amended complaint.  Your Honor may recall the factual

3    context of this compliant.  It's not new to the Court.  The

4    allegations here are substantially the same as in Picard v.

5    Fairfield Greenwich Group.  That's 10-03800 -- the motion to

6    dismiss, which Your Honor decided back in March involving

7    breach of contract and other common law claims.

8              The majority of the claims, as Mr. Cunha stated,

9    in this complaint before the Court today seek to recover

10   fraudulent transfers under the Bankruptcy Code, and there

11   are also three general partner liability claims.  The

12   Defendants here are also substantially the same as the

13   Defendants in the other action.  Here the FGG partnership is

14   not named as a Defendant.  And four additional FGG entities

15   are named as Defendants.  That's Fairfield International

16   Fund, LTD, Stable Fund, Fairfield Greenwich Capital Partners

17   and Share Management.

18             The allegations, not the individual Defendants and

19   their partners controlled all of the FGG entities and misled

20   investors and others in order to shield BLMIS from inquiry

21   and profit from the Madoff fraud also remain the same.

22             Since it's the Defendant's motion, Your Honor,

23   would you like them to start?  I assume we will go count by

24   count?

25             THE COURT:  You just gave me a background.  It is

1   their motion.  It sets me up.  Now then, Mr. Cunha, are you

2   set up now to -- it's your motion.

3            MR. CUNHA:  Thank you, Your Honor.  I'll --

4            THE COURT:  Let me just say a couple of things

5   before you begin, for everyone on the call.  This is a

6   motion to dismiss, it's not a summary judgment motion.  So,

7   I expect to stay within the parameters of what a summary

8   judgment is.

9            The other thing is try to absolutely limit what

10  you've pled in your papers.  I want you to do additions to,

11  not resay what you've already said.  Very good.  It's yours.

12           MR. CUNHA:  Okay, thank you, Your Honor.  Let me

13  just start with the point that counsel for the Trustee just

14  cave that this is the same as the Anwar case and the same as

15  the assigned claims case, in which Your Honor heard a motion

16  to dismiss earlier this year.  They're not.  Certainly not

17  for purposes of this motion.  The Anwar case, Your Honor,

18  involved alleged misdisclosures to investors.  The assigned

19  claims case, as Your Honor knows, involved alleged breach of

20  investment management agreement.

21           And, most importantly, in neither of those cases

22  on the motions to dismiss was the issue before the Court

23  that is the only issues -- two issues before the Court

24  today.  The Court need only to decide really two issues,

25  core issues on this case.  The first is has the Trustee pled

Page 49

1   with particularity facts which make it plausible if the

2   Defendant here actually knew -- that is, knew without any

3   substantial doubt -- actually knew that Madoff was not

4   trading securities.  That's first.

5          And the second point that they have to establish

6   is did they plead with particularity facts which show that -

7   - two-pronged.  That showed willful blindness, which has two

8   prongs:  One, that the Defendants each believed that it was

9   highly probably that Madoff was not trading securities and,

10  second, took action to purposely try to avoid learning that

11  truth.  Those are the issue today.  Neither of those issues

12  was before the Court on the Anwar motion or the assigned

13  claims case.  Indeed, they're not really in those cases.

14  The Court did not consider those issues on those motions.

15         And so we submit, Your Honor, that those cases do

16  not provide guidance for the Court here.  What the Courts

17  have done in these cases -- in our subsequent transfer

18  cases, which this case is -- is they have looked at the

19  pleadings before them in that case and they've gone through

20  them with a fine-toothed comb, and they have made a

21  determination as to whether facts, not conclusory

22  allegations, but facts have been plead which show either, A,

23  actual knowledge or, B, subjective belief and a high

24  probability that Madoff was not trading securities.  And

25  secondarily -- and second, that they took actions to avoid

Page 50

1    learning those facts.  So, Your Honor, this is a separate

2    case.  The issues are entirely different.  And, again, we

3    submit that Anwar and the assigned claims cases do not apply

4    here.

5           Let me, Your Honor, just jump right into an

6    analysis of the complaint -- the complaint, because that's

7    what's important.  First, a word about -- and we take very

8    seriously Your Honor's admonitions that we need to stay

9    within the rules as to what's allowed on a motion to dismiss

10   rather than a motion for summary judgment.

11          The rules in this district, Your Honor, allow, of

12   course, review of the four corners of the pleading.  In this

13   case, that's the second amended complaint.  However, they

14   also allow reference to earlier pleadings -- in this case,

15   the first amended complaint.  And they allow reference to

16   materials that are appended to pleading.  In this case,

17   there are over 100 exhibits that were attached to the first

18   amended complaint.  We're going to refer to a handful of

19   them.

20          The Trustee has tried to make the point, Your

21   Honor, that prior pleadings don't count.  They cite a Third

22   Circuit case to that proposition.  The Third Circuit case,

23   if you read it, A, it doesn't -- it doesn't stand for the

24   proposition that they cited for.  And, in any event, it says

25   that the Third Circuit rule is followed by some other

Page 51

1    circuits, and one of the circuits not mentioned is the

2    Second Circuit.

3              So, the Third Circuit case on its face doesn't

4    apply.  But in any event, Your Honor, the cases in this

5    district say that -- when there's an earlier pleading, the

6    Court is entitled to look at the earlier pleading -- indeed,

7    should -- if pointed to by counsel in the motion to dismiss;

8    and that admission -- statements therein are taken as

9    admissions in due course.

10             So, they don't necessarily overrule anything

11   that's in the second amended complaint, nor are we arguing

12   the statements in the first amended complaint or in the

13   exhibits attached to the first amended complaint -- overrule

14   anything in the second amended complaint.  Our view is that

15   it's all cumulative.  And our view is that the facts that

16   are set forth -- not the conclusory allegations -- because

17   there's a massive difference in their pleadings between the

18   allegations they make, the conclusory allegations they make,

19   and the facts that they actually plead in the complaint.

20             But our contention, Your Honor, is that the facts,

21   as plead in the second complaint, the facts as pled in the

22   first complaint and the facts as set forth in the exhibits

23   attached to the first amended complaint together all make it

24   absolutely clear that these Defendants absolutely believed

25   that Madoff was trading securities.  Everything that they

Page 52

1    did and everything that they said are premised on them

2    believing that Madoff was trading securities.

3            And why do I say that?  Well, first of all, let's

4    look at -- let's look at the facts here.  First, the

5    invested millions of dollars of their own money and family

6    money.  They alleged that Mr. Noel alone invested $9 million

7    in BLMIS.  That's the first amended complaint, paragraph 49.

8    They were planning to invest 50 million more in December

9    2008 of their own individual funds in BLMIS.  That's on the

10   eve of the collapse of Madoff Securities.

11           And this came at a time in the fall of 2008, when

12   redemptions were pouring in to Madoff and, frankly, other

13   funds because this was the financial collapse in 2008.  Any

14   sophisticated investor would know, as pointed out in one of

15   the cases we cite to Your Honor, that any Ponzi scheme would

16   be in serious trouble and would crater in those kinds of

17   conditions.

18           It is absolutely implausible that anybody who knew

19   Madoff was running a Ponzi scheme would ever invest in the

20   Ponzi scheme, but it's certainly implausible -- and even

21   more implausible that they would invest after these massive

22   redemptions in the fall of 2008 when the Ponzi scheme was

23   about to crater, which indeed it did a day or two later.

24           The Trustee's answer for this is well, they made

25   millions of dollars in fees and therefore they had an

Page 53

1    incentive.  Except they didn't.  The millions of dollars in

2    fees that were made by the Fairfield Greenwich affiliated

3    Defendants were made from the investments that their

4    investors made.  They were taking management fees, as is

5    typical in the hedge fund industry.  They were taking

6    management fees and performance fees on those investments.

7    They were going to get those fees whether they made personal

8    investments or not.  Their personal investments had nothing

9    to do with the fees they earned.

10          They made personal investments because they wanted

11   to share in the returns that were available from the

12   investment advisory business of BLMIS.  Again, and, Your

13   Honor, it's completely inconsistent that they would do that.

14   And so that's a glaring fact that stands out right at the

15   outset.

16          By the way -- yeah, no.  Second.  They hired PWC

17   to audit the Century Fund for years.  PWC, that's in the

18   second amended complaint, paragraph 140 and paragraph 200.

19   That included site visits by PWC to BLMIS.  Again, that's

20   the second amended complaint, paragraph 140; first amended

21   complaint, paragraph 396.

22          No rational fraudster would hire a Big Four

23   accounting firm to go in over multiple years and make site

24   visits to the site of the fraud.  When they were -- when PWC

25   was hired to audit the Century Fund, 95 percent of those

1    investments were with BLMIS.

2              Second.  They did ongoing diligence and analysis

3    of all BLMIS trades for Fairfield Greenwich.  That's the

4    second amended complaint, paragraphs 161, 278 and 283; first

5    amended complaint, paragraph 36.  Ongoing diligence and

6    analysis of the trade.  They spent "considerable expense" --

7    -- that's from the second amended complaint, paragraph 154 -

8    to set up an office in Bermuda, a large part of whose

9    mission was to do due diligence on Madoff and to do risk

10   modeling and risk analysis.

11             They alleged on Madoff -- that's in the second

12   amended complaint, paragraph 161; first amended complaint,

13   paragraph 232; see, also, second amended complaint,

14   paragraph 154.  So, they're alleging that the Defendants

15   here set up a separate office at considerable expense, their

16   wording, to do diligence on Madoff over years, and years,

17   and years.  Continuous diligence and risk analysis and

18   monitoring.

19             Why would anyone do that if they actually knew

20   Madoff was not trading securities?  Why would they do that

21   if they believed it was highly probable that Madoff was not

22   trading securities?  Why would they do that if their intent

23   was to stick their head in the sand and not learn the truth?

24             It's the opposite.  Due diligence, Your Honor, is

25   the opposite of trying to not to learn the truth.  Due

1   diligence is trying to learn the truth.  So, again, that's

2   completely inconsistent with what they have to prove --

3            THE COURT:  Let me interrupt you.

4            MR. CUNHA:  Sure, Your Honor.

5            THE COURT:  As you know, on a motion to dismiss --

6            MR. CUNHA:  Yes, Your Honor.

7            THE COURT:  -- the judge has to look at what's

8   most favorable to the pleadings.  And you're going off what

9   I consider to be evidence.  So, can we sort of focus back?

10           MR. CUNHA:  Yes, Your Honor.  It's actually not

11  evidence that I'm citing.  I'm actually citing the factual

12  allegations in the complaint.  So, I'm not citing any

13  evidence here.  These are -- these are their pleadings,

14  these are what they said.

15           THE COURT:  Okay.  All right.

16           MR. CUNHA:  And what the Court (indiscernible)

17  said, Your Honor, is that in this kind of -- in this kind of

18  a motion where it's a subsequent transfer and the Court has

19  to determine whether or not the subsequent transferee had

20  actual knowledge that Madoff was trading securities or not,

21  what the Court has to do is parse through the pleadings, the

22  factual allegations in the pleadings to make a determination

23  as to whether, on those factual pleadings, those factual

24  allegations, it's plausible that Madoff was trading

25  securities.

Page 56

1              THE COURT:  Okay.

2              MR. CUNHA:  So -- so, what we're doing here, Your

3      Honor, is what all of the litigants have done in the prior

4      cases and what the courts have indicated what the litigants

5      should do, which is point the Court to the factual

6      allegations in the pleadings, and then allow the Court to

7      exercise the Court's judgment, which is basically common

8      sense, as Your Honor knows from the Iqbal standard, and

9      decide on those factual allegations that have been pled --

10     not the evidence -- factual allegations that have been pled,

11     is it -- have they made a plausible case that these

12     Defendants thought Madoff was a fraud, or had actual

13     knowledge that Madoff was a fraud, was not trading?  Or

14     believed it highly probably that Madoff was not trading and

15     stuck their heads in the sand and did what they could to

16     avoid learning the truth?

17              And what we're saying, Your Honor, and the reason

18     I'm taking you through these allegations in detail is

19     because the factual allegations, when you strip away their

20     conclusory conclusions and charges, and when you look at the

21     actual facts they plead, it's completely improbable that

22     these Defendants actually knew Madoff wasn't trading

23     securities or believed it highly probable.

24              THE COURT:  Okay.

25              MR. CUNHA:  So, Your Honor, that's why I'm giving

1   you actual paragraph numbers in the second amended complaint

2   and the first amended complaint.  Because, again, this is --

3   this is exactly what courts are supposed to look at on a

4   motion to dismiss, the factual pleading.

5            THE COURT:  Okay.

6            MR. CUNHA:  So, I'm not talking about evidence,

7   Your Honor.  Well aware that this is not a summary judgment

8   motion.

9            THE COURT:  Thank you.

10            MR. CUNHA:  We could make it much stronger -- we

11   could bring in a boatload of additional evidence which would

12   support these allegations but, frankly, Your Honor, the

13   allegations in the pleading make the factual case that it's

14   completely improbable that the Defendants here thought

15   Madoff was a fraud, or thought Madoff was not trading

16   securities.

17            And, Your Honor, it's clear that that's -- that's

18   the standard, that's what they have to show.  And, by the

19   way, the majority of court who've considered these

20   subsequent transfer cases -- and there's a body of case law

21   that involves bank and involves feeder funds, financial

22   institutions that invested their investors' money in Madoff.

23   There've been a number of cases that have been brought.

24   There's a body of cases in this district where courts have

25   considered exactly the issues that are before this Court

1   today, have looked at the pleadings.  Those pleadings made

2   many, many, many of the exact same allegations that the

3   Trustee has made here.  For example, with respect to all the

4   red flags, the so-called red flags.  Those courts have

5   considered them and they've held that the red flags do not

6   amount to actual knowledge and they don't amount to willful

7   blindness.

8        Why?  Because the red flags go to what Madoff is

9   doing.  They were pretty well known in the marketplace, a

10  lot of people knew them.  By the way, the Trustee has not

11  chased most of those people.  The Trustee has not chased net

12  losers like the funds are here.  Anyway, the Courts have

13  found that the red flags do not equate to a pleading of

14  actual knowledge, they do not equate to a pleading of

15  willful blindness.

16       We point Your Honor specifically -- and these are

17  cited in our briefs -- to the Legacy case, the Merkin case,

18  the BNP Paribas case, and the ABN AMRO case -- ABN AMRO

19  Ireland case.

20       Just -- I don't want to belabor this point too

21  much, Your Honor, but this is the heart of what Your Honor

22  has to decide.  I just want to point out quickly the other

23  factual allegations in their pleadings which make it utterly

24  improbable, utterly implausible that these Defendants

25  thought Madoff was not trading securities.

1        So, not only did they set up a Bermuda office, the

2    Trustee alleges, to do diligence on an ongoing basis; they

3    also hired an outside consultant to analyze for years the

4    outside -- these trades.  That's in the second amended

5    complaint, paragraphs 143 and 145.  Mr. Kazanoff had sent in

6    with his declaration as part of our submission on this

7    motion his Exhibit 2.  And those are trading summaries that

8    Mr. Berman put together, just an example of the trading

9    summaries that he put together.  They're referred -- these

10   summaries are referred to explicitly in the second amended

11   complaint, paragraph 143, so we are allowed to refer to them

12   on a motion to dismiss.  And they show that Berman thought

13   Madoff was trading securities.  He's analyzing, in a very

14   detailed way, the trades that Madoff made.

15       If Berman thought he wasn't trading securities, he

16   would have said, Madoff's not trading securities.  There's

17   nothing to analyze here.  There's nothing to diligence.

18   But, more importantly, if Fairfield Greenwich folks thought

19   that Madoff was not trading securities, they never would

20   have hired Berman in the first place.  Why -- why do you

21   hire someone to analyze the trades, an outside consultant at

22   expense to analyze trades when you know there are no trades?

23   It makes no sense.

24       Next.  The Fairfield Funds together invested

25   billions of dollars, they allege, in BLMIS.  However, they

Page 60

1    were net losers.  At the time that BLMIS went under, the

2    Century Fund alone lost over a billion dollars.  One

3    billion.  Over a billion.  Greenwich Century lost over 100

4    million.  Greenwich Century Partners, it was much, much

5    smaller, but it also lost millions.

6            The Court in BNP Paribas made the point that even

7    to earn tens of millions of dollars apiece, which happened

8    there, as it happened here, but to risk billions of dollars

9    in something you know is a Ponzi scheme and is going to go

10   under by sophisticated investment professionals whose job it

11   is, whose entire career it is to be investment professionals

12   -- to put billions of dollars in to something you now is a

13   Ponzi scheme and is bound to fail at some point is,

14   "nonsensical boarding on the absurd."

15           What else did they do?  Well, they -- there were

16   internal communications, Your Honor, which are attached --

17   which are attached to the first amended complaint.  These

18   are exhibits to the first amended complaint.  And I'm not

19   going to belabor this, Your Honor.  It's very fast.  I'm

20   just going to very quickly give you a smattering that show

21   that the internal communication of Fairfield Greenwich

22   people, one to another, were all premised, all of them, in

23   all of the exhibits that they submitted -- were all premised

24   on the understanding and belief of the Fairfield Greenwich

25   people that Madoff was not trading securities.

1           And this is very important, Your Honor, because

2    what the Trustee has said is, oh, all this due diligence

3    that they did and hiring Mr. Berman and hiring

4    PriceWaterhouse, we can explain that.  Fairfield Greenwich

5    was trying to create an elaborate façade so they could tell

6    investors they were doing this and therefore attract the

7    investors and people to invest the investors' money and make

8    these all fit.

9           I think that's not only improbable that anybody

10   would go to these lengths -- actually spend the money, do

11   things like hire Mr. Berman, which is not something that

12   they disclosed to the shareholders, in order to have this

13   elaborate rouse to attract investors.  Completely not

14   plausible.

15          But in any event, Your Honor, the very -- the

16   internal documents -- so, either the conversation from one

17   Fairfield Greenwich person to another, or conversations

18   between a Fairfield Greenwich person and Mr. Madoff were all

19   premised -- and you'll see it, because I'm just going to

20   give you a quick smattering -- were all premised on the

21   belief that Madoff was trading securities.

22          So, if we look at Exhibit 39.  This is a

23   transcript of a call between Mr. Vijayvergiya, who's a

24   Defendant here, and Mr. Madoff.  And they claim there was

25   something untoward and they quote from the notes of this

Page 62

1    call, which -- by the way, which they have characterized in

2    the first amended complaint as a transcript of the call.  So

3    Your Honor can take it as accurate.  But if you actually

4    read -- if you actually read it -- and, Your Honor, this is

5    a theme.  They make charges in conclusory statements, and

6    then when you look at the facts, the facts do not support

7    the conclusory statement.

8            So, here we see at page 40, 66, and 84, Mr.

9    Vijayvergiya asking detailed questions of Mr. Madoff about

10   his operation, about his trading.  Mr. Vijayvergiya, you

11   remember, was hired, they allege, to do diligence on Madoff,

12   and what we see in this transcript is Mr. Vijayvergiya doing

13   his job and trying to learn more about Mr. Madoff's trading.

14           Completely implausible that if Mr. Vijayvergiya

15   had actual knowledge that Madoff was not trading securities

16   or believed it highly probable that Madoff was not trading

17   securities, that Mr. Vijayvergiya would have asked these

18   questions.  You don't ask due diligence questions about

19   trades that you know are nonexistent.

20           It also showed -- it also showed that far from

21   sticking their heads in the sand, Mr. Vijayvergiya was

22   trying to learn the truth, which is -- so that he asked

23   detailed questions -- again, detailed questions about

24   Madoff's trading operation.

25           Next paragraph -- Exhibit 41.  We have an email

Page 63

1   from Mr. Vijayvergiya to Mr. Murphy in 2008, August of 2008

2   again, attached to their complaint -- their first amended

3   complaint.  And in it, Mr. Vijayvergiya says, well, we're

4   preparing 12 pages of outstanding operational due diligence

5   questions for BLM.  Why would you ask -- why would have 12

6   pages of operational due diligence questions if you know

7   there are no trades?  There's nothing to diligence.  Also,

8   the opposite of sticking your head in the sand.  A due

9   diligence questionnaire is detailed, trying to find out more

10  about the operation.

11          The flipside of that refers to Mr. Tucker, who's

12  the Jeffrey.  Verify the existence and the segregation of

13  assets in the past by tracing stocks from a trade blotter to

14  the stock record, to the DTC and back to client account.  We

15  plan to repeat this check during our upcoming due diligence.

16          And this is an area, Your Honor, where they've

17  made a charge which is completely undercut by the facts that

18  they plead and by the facts that are set forth in the

19  exhibits that they attach to their amended -- excuse me, to

20  their first amended complaint.  You remember, Your Honor --

21  you may remember from the pleading, Your Honor, that they

22  alleged that there were some articles that were published --

23  one was in Barron's, one was in MARHedge -- in 2001, which

24  raised questions about Madoff, complained about his secrecy,

25  raised other questions about Madoff's operations.

1           And the allegation in the second amended complaint

2    is that Fairfield Greenwich did nothing about that.  The

3    truth in the facts that they actually plead is, as indicated

4    in their own exhibit, Mr. Tucker actually paid a visit -- he

5    paid a visit to Madoff offices and he made them show him the

6    books and records.  He made them show him the trade -- that

7    trade blotter, and he traced that to a screen which had DTC

8    on it.  They showed him a DTC screen.  They asked Mr. Tucker

9    to pick two securities positions that Fairfield had with

10   BLMIS.  Mr. Tucker did that.  Then they showed him how those

11   positions existed on their books and existed on the DTC

12   screen.  And Mr. Tucker recalled from his own understanding

13   of Fairfield positions that they tied out.

14           So, again, they say one thing but they -- but

15   their exhibits -- they say one thing in their conclusory

16   charge, but the exhibits are completely to the contrary.

17   And, Your Honor, that's -- that's not the only evidence of -

18   - that's not the only evidence of -- of that meeting, of

19   that visit by Mr. Tucker.  It's also set forth in their

20   exhibit -- their Exhibit 85, in Mr. Tucker's sworn testimony

21   where he lays out in detail what happened in that meeting.

22           Yeah, so just a few more things, Your Honor, not

23   to belabor this.  But, again, Your Honor, this is the heart

24   of what Your Honor has to decide and I just think it's

25   terribly important that Your Honor understands just how

1    different the actual facts that they have pled and

2    incorporated through their exhibits -- how different the

3    facts are from their charges in their second amended

4    complaint.  And, Your Honor, you yourself said on page 6 of

5    your recent decision on the other case, the assigned claims

6    case, that conclusory allegations are to be disregarded.

7    And you go right -- you pare it down to look at the facts.

8    And we look at the actual facts pled.  They just don't hold

9    up.  In fact, they actually prove the opposite, that the

10   Fairfield people thought Madoff was trading securities.

11           Just a few others.  Page 40 -- excuse me, Exhibit

12   47 from Mr. Blum of Fairfield to Mr. Tucker of Fairfield.

13   This is in 2003.  Mr. Blum says, I'd like you to check.  It

14   seems like Madoff was starting to liquidate a day or two

15   earlier than usual.  Is this driven by the fact that he's

16   become so large that liquidating requires more lead time?

17           Again, liquidating what?  Obviously premised on

18   the thought that Madoff was trading securities and asking

19   about his liquidation strategy.  Again, an internal

20   communication.  This isn't some phonied-up -- there's no

21   possibility that this is some phonied-up communication for

22   investors.  Internal communication between FGG people,

23   premised on Madoff trading securities.

24           Exhibit 61.  Madoff may have $20 billion invested

25   in the AUM -- in assets under management, in the strategy.

1    Mr. Lipton, Fairfield Greenwich:  That could be right.  He's

2    been doing this for 40 years.  Exhibit 65.  Phone

3    conversation between Mr. Vijayvergiya and Mr. Madoff in June

4    of 2008.  Again, what it shows is Mr. Vijayvergiya asking

5    detailed questions of Mr. Madoff, in this case, about the

6    option strategy and the counterparties to the option

7    strategy.  Asking, what are the exposure limits?  At what

8    point are the puts trading?  Does BLM have to post

9    performance assurance?  These are all detailed questions

10   about trading premised on his understanding that Madoff was

11   trading.  It's completely implausible that he would be

12   asking Madoff these questions if he actually knew Madoff

13   wasn't trading.  There's -- there would be no puts or

14   options to analyze, or to have exposure limits on.

15          68 from Mr. Della Schiava, again, Fairfield

16   Greenwich, to Mr. Vijayvergiya and back and forth between

17   them.  And they're talking about Mr. Madoff's strategy of

18   remaining in cash at the end of certain years.  Again,

19   premised on trading, number 76.  Options activity,

20   discussing Madoff options activity.  Again -- and this is

21   Vijayvergiya -- and, again, this is Mr. Vijayvergiya.  This

22   is between Mr. Vijayvergiya and Mr. Berman.  So, again,

23   based on a mutual understanding that Madoff was trading

24   securities and trying to understand more about how he was

25   doing it.

Page 67

2      That's enough, Your Honor, you get the idea.  But

3   the point is this.  Every single one of these document is

4   premised on a belief that Madoff was trading securities.

5   None of these documents -- and we submit, Your Honor, none

6   of the exhibits to the first amended complaint, and none of

7   the actual factual allegation in either the first amended

8   complaint or the second amended complaint actually show if

9   any Fairfield Greenwich Defendant here or any person

10  associated with Fairfield Greenwich had any knowledge

11  whatsoever that Madoff was not trading securities or any

12  believe whatsoever that Madoff might not be trading

13  securities.

14      They all show the opposite.  That everything that

15  they were communicating to each other, everything that they

16  did was premised on them believing Madoff was trading

17  securities.

18      Let's look at -- let's look at the facts which

19  they... By the way, they don't tell, Your Honor, what facts

20  they think show actual knowledge or willful blindness.  I

21  guess they leave it to Your Honor to try to figure that out

22  on your own, even though that's what you have to decide on

23  this motion.  And they admit in their brief in opposition --

24  they flat out admit, Your Honor, there is no fact.  There is

25  no fact which shows actual knowledge or willful blindness.

Page 68

1    None.

2           So, then they ask Your Honor -- they say, but look

3    at the totality of the facts.  Somehow or other this

4    collection of facts, none of which show actual knowledge and

5    none of which show willful blindness, are supposed to add up

6    in their totality to a showing of actual knowledge and a

7    showing of willful blindness.  Well, they don't.  There's no

8    facts.  And Your Honor can ask them.  Point me to the

9    paragraph numbers, where the facts are alleged which show

10   actual knowledge.

11          And if you look at the cases that we referenced to

12   Your Honor, all those cases focus on specific allegations

13   that either do, in the Court's opinion, or do not, in the

14   Court's opinion, show actual knowledge that were pointed to

15   by the Trustee.  The Trustee doesn't even try to point to a

16   specific fact here.  He just says, somehow, Your Honor, from

17   the penumbra of facts, Your Honor is to try to -- should

18   reach the conclusion that there was actual knowledge or

19   willful blindness here.  And it's baloney.  Because the

20   specific facts -- and we've pointed Your Honor to the

21   specific facts -- the specific facts that are pled and the

22   specific facts that are in the exhibits to the first amended

23   complaint show the opposite.  They show that the Fairfield

24   Greenwich operators, the Fairfield Greenwich Defendants all

25   thought Madoff was trading securities.

Page 69

1          So, take a look at some of the things they do.

2     They do point to some facts, so these are the ones we assume

3     they think that altogether add up to actual knowledge.

4     Well, let's look at them.  They say that Madoff was close

5     friends -- close friends with the Fairfield Greenwich

6     Defendants.  They were close friends.  They don't say which

7     ones but they say, Fairfield Greenwich Defendants were close

8     friends with Madoff.  And what do they point -- and that's

9     what they say.

10          But what do they say -- what do they actually say

11    about the relationship?  The actual facts.  So, first, there

12    is a -- and I'm going to assume this is an error, Judge.

13    I'm going to assume it was not a willful attempt to mislead

14    the Court.  But they say in the second amended complaint at

15    paragraph 110 that there were many, many contacts -- 44

16    contacts between Tucker and -- I'm sorry, they say in their

17    brief, in their opposition brief at page 17, that there are

18    many, many contacts between Tucker and Noel, FG Defendants,

19    with Madoff in the period 1997 and '98.  44 by Tucker and 10

20    by Noel.  '97 to '98.  And they reference for that second

21    amended complaint, paragraph 110.

22          When we actually look at the second amended

23    complaint, they don't allege that it was one year, which

24    they do in their brief -- they allege that that was over 12

25    years.  That's a massive difference, Your Honor.  So, what

Page 70

1    they actually allege, the facts that they actually allege is

2    that Mr. Noel visited with Mr. Tucker less than one time per

3    year and that Mr. Tucker visited with Mr. Noel less than

4    four times per year.  They also allege that Mr. Vijayvergiya

5    visited with Mr. Noel one or two times per year.

6           Again, Your Honor, Century had billions of dollars

7    invested with BLMIS, 95 percent of Century's assets were

8    invested with BLMIS.  Less than one time a year, less than

9    four times a year, and one or two times per year between

10   principals -- Mr. Tucker was in charge of the Madoff

11   relationship, they allege, and Mr. Vijayvergiya was in

12   charge of doing due diligence on the Madoff trades.  That

13   doesn't look like close personal friends, Your Honor.  That

14   looks like sort of the minimal that you would expect for in-

15   person contact with probably your most important business

16   contact.  And, again, they completely -- they completely

17   misrepresent that in their brief.

18          What else?  Oh, the SEC.  They claim that there

19   was an effort by Fairfield Greenwich people, specifically

20   Mr. Vijayvergiya, to mislead the SEC when it investigated

21   Madoff in 2005 and 2006 to make a determination as to

22   whether Mr. Madoff should register as an investment advisor

23   because of the -- his activity on the investment advisory

24   business at BLMIS.

25          First, they don't say how even if that happened,

Page 71

1   which it did not, and if you look at the documents that they

2   quote from and attach as exhibits, there was no effort to

3   mislead the SEC.  But even if there was, that doesn't mean

4   there was actual knowledge that Madoff was not trading

5   securities.  It also doesn't mean that they believed it

6   highly probably that Madoff was not trading securities.

7           And, in any event, Your Honor, if you look -- if

8   you actually look at the SEC, the transcript of the call,

9   the notes of the call, the Trustee's conclusory allegation

10  that they were trying to mislead the SEC are belied by the

11  actual notes of the conversation, which... And we refer Your

12  Honor to the first amended complaint, paragraph 358, and to

13  Exhibit 3, which is attached to the Kazanoff declaration,

14  which was also an exhibit to the first amended complaint.

15  And we also point Your Honor to the second amended

16  complaint, paragraphs 254-259, which quote from the notes.

17  There's nothing misleading about what Mr. Vijayvergiya told

18  the SEC.

19          We've already mentioned to Your Honor that the

20  notes, which they call as accurate as a transcript, and

21  that's in the FAC first amended complaint, paragraph 39, a

22  true and accurate transcript -- we've already mentioned that

23  those notes show Mr. Vijayvergiya asking Mr. Madoff detailed

24  diligence questions about Madoff's trading operations.  So,

25  again, the notes of that call, far from going to show actual

1    knowledge or willful blindness, show the opposite.  They

2    show Vijayvergiya believing Madoff traded and they show

3    Vijayvergiya doing diligence, trying to learn more about the

4    trading operation, the opposite of head in the sand, which a

5    finding of willful blindness requires.

6            I've already mentioned, you know, Berman, the

7    outside consultant that was hired by Fairfield Greenwich to

8    diligence Madoff trades on an ongoing basis, to analyze

9    them, and the document that's referred to in the second

10   amended complaint, paragraph 143.  It's also attached to Mr.

11   Kazanoff's declaration as Exhibit 2, which shows Mr. Berman

12   thought Madoff was trading.

13           And it also shows -- if you look at their second

14   amended complaint, paragraph 143 -- that Mr. Berman's

15   concern wasn't that Madoff wasn't trading.  He never said to

16   Mr. Vijayvergiya or anybody else, I'm concerned that

17   Madoff's not trading securities.  I -- you know -- what he

18   said is, I'm concerned that some of these trades -- and they

19   point to a handful of instances over many years -- that many

20   of these trades are outside the strategy.

21           Well, outside the strategy, he has to be executing

22   the strategy.  There has to be trades.  So, again, the

23   opposite of actual knowledge, Your Honor.  And, by the way,

24   courts have said that trades outside the strategy over a

25   period of many years are not even a red flag.  At best,

Page 73

1   they're a pale pink, to quote one of the Courts.

2        What else?  They point to a meeting with Madoff in

3   October of 2008 with the Fairfield Greenwich people at which

4   the Fairfield Greenwich people ask Madoff for additional

5   information on option county parties.  That's reactive

6   diligence, Your Honor.  That's first amended complaint

7   paragraph 430.  Again, the opposite of willful blindness and

8   the opposite of actual knowledge.

9        Finally, they point to comments by third parties.

10  I think what's most important about those comments is --

11  none of those comments was anybody coming to Fairfield

12  Greenwich and saying, hey, Fairfield Greenwich, this guy's a

13  fraud.  That's not what they -- that's not what they say.

14  What they do is they come to -- if you look, they come to

15  Fairfield Greenwich and they point out one aspect of

16  Madoff's operations or another that they don't like, and

17  that they're not going to trade with Madoff because of that.

18       Again, these are the red flag aspects of Madoff's

19  operation, which the courts have unanimously rejected as

20  sufficient to show actual knowledge of willful blindness.

21  One court said -- and this is the BNP Paribas court -- that

22  these comments from third parties don't establish anything

23  about the actual knowledge or subjective believe of the

24  Defendants receiving the comments, and it's just, "pleading

25  by innuendo" and rejected them as a reason for finding

1    actual knowledge or willful blindness.

2         Then they -- then they end by saying, well, there

3    are aspects of BLMIS's operation that remained unclear to

4    Mr. Vijayvergiya in late August of 2008, and that's the

5    second amended complaint, paragraph 169.  Well, again,

6    that's exactly the opposite of actual knowledge.  If

7    operations are unclear to Vijayvergiya, there had to be

8    operations.  If Vijayvergiya had actual knowledge Madoff was

9    not trading, it would be crystal clear to him what Madoff's

10   operation was.  There was no operation.

11        Your Honor, What's not pled -- what's not pled is

12   also very telling.  The second amended complaint plea in

13   paragraph 75, that close friends of Mr. Madoff got targeted

14   returns.  So, these were people who came to Madoff and said,

15   Bernie, I would like, you know, a 20 percent return this

16   year, and Bernie gave it to them.

17        What's important about that is Fairfield Greenwich

18   is not listed among those friends.  No Fairfield Greenwich

19   person.  No Fairfield Greenwich fund is listed among a

20   friend of Madoff that got targeted returns.

21        See also paragraph 34 of the second amended

22   complaint.  Fairfield Greenwich people are not listed among

23   the close friends that are referred to in paragraph 34 of

24   the second amended complaint.  Paragraph 33 and 69

25   (indiscernible) of the second amended complaint plead by

Page 75

1    name, eight others besides Madoff who were in on the

2    conspiracy.  Again, no Defendant is listed here.

3          What else isn't in there?  None of the -- none of

4    these eight conspirators who pleaded guilty, some of them

5    pleaded guilty, and they gave allocations -- excuse me, I

6    may have mispronounced that, Judge -- to the Court.  Not one

7    of these people has charged that Fairfield Greenwich was in

8    on the fraud, or any person at Fairfield Greenwich was in on

9    the fraud.  So, not surprisingly, there are no such

10   allegations.

11         Second.  Now federal authority and no New York

12   State or New York City authority has charged anyone

13   associated with Fairfield Greenwich or any entity associated

14   with Fairfield Greenwich with any even civil -- certainly no

15   criminal charges -- there are no civil charges.  The New

16   York AG's Office investigated and brought no charges.  The

17   Department of Justice brought no charges.  The District

18   Attorney's Office in New York City brought no charges.  And

19   they investigated.  And, by the way, we understand that the

20   Trustee has access to the investigatory records, including

21   productions by Fairfield Greenwich to those government

22   authorities, has access to (indiscernible).

23         So, again, there's no allegation there that the

24   government had charged Fairfield Greenwich with anything,

25   and there's no allegation because it didn't happen.

1       Your Honor, my colleague, Ms. Eichenberger, will

2    talk a little bit more about the necessity that Your Honor

3    go on a defendant-by-defendant basis, and that the

4    requirement in the law is that actual knowledge of willful

5    blindness be established with respect to each individual

6    Defendant; and to the extent that it's not, with respect to

7    an individual Defendant, Your Honor must dismiss.

8       But in that regard, I will just make the point

9    that there are no allegations whatsoever with respect to

10   Defendant Corina Piedrahita, there are no allegations

11   whatsoever with respect to Mr. Philip Toub.  There are

12   virtually no allegations whatsoever with respect to Andres

13   Piedrahita.  Virtually no allegations whatsoever with

14   respect to Mr. Noel.  All those four Defendants should be

15   just dismissed out of hand because they don't even attempt

16   to meet their obligation to plead facts that show actual

17   knowledge or willful blindness on the part of any of those

18   four.

19       What they try to do is impute knowledge up from

20   other Fairfield Greenwich people to this partnership that

21   they claim exist in Fairfield Greenwich group.  And then

22   impute down from Fairfield Greenwich group to those four, as

23   if everything the Fairfield Greenwich group somehow knew

24   from other people, these folks knew.  And the point will be

25   made by Ms. Eichenberger --

1          THE COURT:  Why don't we let her make the point?

2     Why don't we let her make the point?  There's no reason to

3     be repetitive.  There's no reason to be repetitive.

4          MR. CUNHA:  Yes, thank you, Your Honor.  I'll do

5     that.  And, finally, Your Honor, there's no allegation in --

6     Century settled.  Century Fund was originally a Defendant in

7     this case.  The funds were originally a Defendant.  And some

8     time ago, the Century Fund, which is the big one, settled

9     with the Trustee and there was a settlement agreement that

10    was entered into and a judgment.

11         Interestingly enough, in that settlement

12    agreement, there's no allegation and no statement that the

13    transfers to Century are voidable or void.  They had the

14    opportunity to do it and they didn't do it.

15         Your Honor, I'm cognizant that you're being very

16    generous with your time, and I'll try to skip ahead to the

17    stuff that's just new.  So, let's skip ahead to the two-year

18    transfer.  Under section -- and there are two sets of

19    transfer tiers that Your Honor has to focus on:  six-year

20    transfers and two-year transfers.  The six-year transfers

21    are all the transfers -- the subsequent transfers to the

22    Defendants here that arose out of initial transfers from the

23    fund in the six years before the filing of the bankruptcy

24    case.

25         So, what's being chased here are payments from

1    BLMIS to the fund -- that's the initial transfer -- and then

2    transfers from the fund to the managers, who are the

3    Defendants here, which was a subsequent transfer.  And what

4    the cases say is that the Court can void -- that the Trustee

5    can have voided and recover six years of transfers only if

6    they establish actual knowledge, actual knowledge that

7    Madoff was not trading.  And they plead that in a conclusory

8    way, and they're seeking those six-year transfers on that

9    basis.

10          They alternatively argue, Your Honor, that if

11   actual knowledge hasn't been pled by them, that they've pled

12   willful blindness.  And the two-year transfers -- so for two

13   years of transfers from the funds and then from the funds to

14   the subsequent transferees, they don't need to show actual

15   knowledge, they need to show willful blindness.  This is

16   under section 550(b) of the -- of the Bankruptcy Code, and

17   it's also under section 548 (a)(1)(a) and 548(c) of the

18   Bankruptcy Code.

19          To step back for a minute, the reason why you have

20   to have actual knowledge is that under 546(e) of the

21   Bankruptcy Code there's a safe harbor.  It exempts

22   securities transactions.  It's been held definitively by the

23   Second Circuit in the Fishman case that the Madoff transfers

24   to its customers -- so exactly the initial transfers we're

25   talking about here; the transfers from Madoff to his

Page 79

1    customers, Century Greenwich, Century Greenwich, Century

2    Partners -- that those transfers absolutely are subject to

3    the safe harbor provision in 546(e), which exempt securities

4    transactions, settlement payments, which exempts them from

5    the ability of a Trustee to void -- to avoid and recover

6    those transfers.  546(e).

7              So, that's what governs here.  There is an

8    exception to 546(e) which is for actual knowledge, and

9    that's why they have to prove actual knowledge for the six-

10   year transfer.  If they can't prove actual knowledge, then -

11   - and prove is wrong -- if they can't state it by

12   particularized facts in the pleadings, and that's what we're

13   talking about, they could try to state with particularized

14   facts willful blindness.  That's under Section 548(a)(1)(a),

15   because 546(e) doesn't apply to fraudsters.  It doesn't

16   apply to people with actual knowledge.  And 546(e) does not

17   apply to transfers that are referenced in Section

18   548(a)(1)(a).  And (a)(1)(a) -- 548(a)(1)(a) allows recovery

19   of two-year transfers, two years of transfer, except under

20   548(c).  And 548(c) says the Trustee cannot avoid and

21   recover if the transfers were taken by the transferees, and

22   this applies to subsequent transferees as well, either for

23   value and in good faith.  Value and in good faith.  That's

24   the same thing that's said in Section 550(b), Your Honor,

25   and it's under 550 to the only Bankruptcy Code cited in the

Page 80

1    second amended complaint that they're trying to recover.

2           So, what does value mean in good faith?  They have

3    to establish value and they have to establish good faith.

4    Well, the courts have held that value is only what's

5    necessary to make a contract.  It doesn't have to be

6    sufficient value, it doesn't have to be adequate value --

7    it's what we all learned, I think, in day one of contracts,

8    the Peppercorn.

9           And here, the courts have held that -- that on a

10   motion to dismiss, the judge can divine value from the facts

11   pled in the complaint.  And here those facts establish it,

12   again, under the authorities we've cited.  The redemptions

13   here -- these transfers here at issue, the initial transfers

14   from BLMIS to the fund were for redemption.  The funds were

15   saying, we've got investors who want to take some of their

16   investment out.  And so the BLMIS sent those redemptions to

17   the funds which, in turn, were sent to the manages, and the

18   courts have held, well, those redemptions, they're for value

19   because investors were giving up equity in order to get

20   those redemptions.

21          So, value was given.  And the Trustee has argued

22   in other cases, well, that's not value because the equity

23   was worthless.  And the courts have said, no, the equity's

24   not worthless at all.  These folks have claims against the

25   estate.  And, in fact, they've recovered millions and

Page 81

1   millions of dollars from the estate as a result of those

2   claims.  So, they add value.  So value is found there in the

3   equity given up for the redemption.

4          The courts have also said -- and I refer Your

5   Honor to the Legacy case, which we cite in our complaint.

6   Legacy.  That value is given by managers for services

7   performed by the Defendants.  And here, the Trustee pleads

8   many -- you know, pleads the usual range of services that

9   funds give in return for the fees they earn.  They manage

10  the investment, they go out and find investors, they manage

11  the flow of investments back and forth, they do diligence,

12  they analyze the trades, etc., etc.

13         The Trustee's complaint is they don't -- they

14  think the diligence wasn't good enough, that they don't

15  think that the Fairfield managers did a very good job, but

16  they don't dispute that the Fairfield managers did, in fact,

17  manage these funds.  And that is sufficient, the courts have

18  held, to satisfy the value prong of what an investor has to

19  show to be exempt under 550(b) and under 548(c) to not allow

20  voidability.  So, that's value.

21         Second, good faith.  Judge Rakoff has held that

22  the burden is on -- is on the Trustee to plead facts which

23  show good faith.  Good faith, the words themselves could be

24  a little bit misleading.  It's not generalized good faith.

25  What the courts have held clearly, plainly and unanimously

Page 82

1   is that good faith, in this context of seeking subsequent

2   transfer, is a subjective belief in a high probability that

3   there were no trades.  Each Defendant has to have had a

4   person subjective believe there was a high probability that

5   Madoff was making no trades.  And, second, have had to take

6   active steps to avoid learning the truth.

7         Your Honor, the Trustee agrees that this is their

8   burden, that this is the standard they cited in their brief

9   in opposition.  So, there's no real disagreement between the

10  Trustee and us that the burden on -- that the burden that

11  the Trustee must -- must meet is to plead facts with

12  particularity, and Rule 9(b) does apply because it's fraud -

13  - plead facts with particularity, which establish that there

14  was actual knowledge that Madoff was not trading for the

15  six-year claim, and that they must plead facts which

16  establish -- for the two-year transfers, plead facts which

17  establish each Defendant had a subjective believe in a high

18  probability that there were no trades, and took active steps

19  to avoid learning the truth.

20        I won't go through the list of facts again with

21  Your Honor that we went through earlier, but all of those

22  facts that are pled in their complaint and that -- and that

23  are in the exhibits to the first amended complaint, all of

24  those facts that show that the Fairfield -- that show that

25  the Fairfield Greenwich Defendants here believed Madoff was

Page 83

1   trading securities, they negate actual knowledge.  Of

2   course, they also negate willful blindness.  Because they

3   thought Madoff was trading securities, so obviously they did

4   not have a subjective belief in a high probability that

5   Madoff was not trading.

6           On the second prong, taking steps to avoid

7   learning the truth.  Here again, the facts are to the -- are

8   the opposite.  Not only did they not take steps to avoid

9   learning the truth.  The steps that they took were to try to

10  learn the truth.  Again, we referred Your Honor to the

11  pleadings and the exhibits showing Mr. Tucker's visit to

12  Madoff to physically inspect the books and look at a DTC

13  screen, which was phony, by the way, but he didn't know that

14  -- to look at a DTC screen to actually ascertain and to

15  prove to himself that the trading was going on.

16          They say that -- they point to Friehling &

17  Horowitz.  Friehling and Horowitz was a small auditor that

18  was used by Madoff, based in a strip mall, only three

19  employees.  They say, ha, that's too small of an auditor,

20  too small and obscure of an auditor for an operation like

21  the investment advisory business at BMLIS.  Fraud.  They

22  must've known there was a fraud.  And then they say in a

23  conclusory way, they did nothing -- they did nothing to

24  investigate Friehling & Horowitz.  However, the facts they

25  plead are exactly the opposite of that.  And, again, this is

Page 84

1    a pattern.  They make a charge in a conclusory way, and then

2    you look at the fact that they point to, and the fact points

3    to the exact opposite of what they want Your Honor to

4    conclude.

5           They looked into -- the facts that they plead is

6    that they looked into Friehling & Horowitz.  There were

7    calls made from Mr. Madoff.  They made a call to Mr. Madoff.

8    They called Mr. DiPascali twice.  They did research on

9    Friehling & Horowitz and they alleged that in October 2008,

10   there was a due diligence visit in which... Withdrawn.

11          So, anyway, they say they did nothing to

12   investigate Friehling & Horowitz, but then the facts they

13   plead show that they, in fact, did investigate Friehling &

14   Horowitz.  Again, this is the opposite of sticking your head

15   in the sand.  It's the opposite of taking steps to avoid

16   learning the truth.  They took steps to learn the truth.

17          The case as availed, Your Honor, is doing due

18   diligence is the opposite of willful blindness.  And we

19   would point Your Honor to the Legacy case, the BNP Paribas

20   case, the Elendow case, the ABN AMRO Ireland case.

21          So, Your Honor, this brings me to the end of my

22   presentation.  We would ask that Your Honor dismiss the

23   subsequent transfer counts, counts 1-14 in the complaint for

24   failure to plead facts with particularly which show that any

25   Defendant had actual knowledge that Madoff was trading -- to

1    trading securities; for failing to plead facts which show

2    that the Defendants had a subjective belief in a high

3    probability that Madoff was not trading securities; for

4    failure to plead facts which show Defendants sticking their

5    head in the sand and trying to avoid learning the truth.  We

6    submit that the facts show -- all of them together, all

7    facts and altogether in totality show that the Defendants

8    very much believed Madoff was trading securities.  So, no

9    actual knowledge is pled, no willful blindness is pled.  We

10   submit it would be futile to re-plead given the factual

11   picture that emerges so clearly from the facts they've

12   already pled.

13           And, Your Honor, they've had three tries at this.

14   This is their third -- this is there second amended

15   complaint.  So, there's the complaint, first amended, second

16   amended.  It's been more than 12 years that this

17   litigation's been proceeding, more than 12 years.  The

18   Trustees have had massive discovery already in that period.

19   They've had access to all of Madoff's documents, all of

20   them.  And so they've seen all of the communications from

21   Madoff's side.  They've also had hundreds of litigations in

22   which they've gotten a massive amount of discovery from

23   other -- from other participants in the BLMIS Investment

24   Advisory business, and they've had access and given

25   documents specifically about Fairfield Greenwich Defendants

Page 86

1    from government investigations.

2           There were more than 100 exhibits attached to the

3    first amended complaint.  So, these complaints have been

4    made by the Trustee on a very, very, very substantial

5    factual record.  Enough is enough.  He's had more than

6    enough time, he's had had more than enough discovery, he's

7    had more than enough cracks at it.  The facts overwhelmingly

8    show that the Fairfield Greenwich Defendant thought Madoff

9    was trading securities and Your Honor should not allow an

10   amend.

11          That brings my argument to a halt, Your Honor.

12   With Your Honor's permission, I'll turn it over now to Sarah

13   Eichenberger, who has a much briefer argument with respect

14   to the matters that I mentioned.

15          THE COURT:  Please.  Thank you.

16          MR. CUNHA:  Thank you, Your Honor.

17          MS. EICHENBERGER:  Good morning, Your Honor.

18   Sarah Eichenberger from Simpson Thacher & Bartlett on behalf

19   of Defendants.  Can you hear me okay?

20          THE COURT:  Perfectly.  Thank you.

21          MS. EICHENBERGER:  Okay, great.  So, as my

22   colleague, Mr. Cunha, just explained, the Trustee was

23   required to include specific facts establishing that each

24   individual Defendant had actual knowledge, or that they

25   subjectively believe that BLMIS was no trading securities. I

Page 87

1    fact, those parties here agree that Rule 90 governs at least

2    a portion of the claims dealing with the six-year transfers.

3    And, further, that Rule 90 generally requires particularized

4    allegations on a defendant-by-defendant basis.

5           So, what the Trustee here has a burden of alleging

6    with facts specifying each individual Defendant's alleged

7    contribution to the purported (indiscernible) and

8    identifying each individual responsible for each purported

9    act.  And the Trustee argues that the standard here should

10   be relaxed because the bankruptcy Trustee is an outsider to

11   the fraudulent transactions.  But as Mr. Cunha discussed,

12   this particular Trustee knows a great deal about BLMIS and

13   its affairs.  And in any event, courts are very clear that

14   even if the standard is relaxed, it's not an elimination of

15   the particularity requirement.

16          And the complaint here has not pled facts on a

17   defendant-by-defendant basis showing that any individual

18   subjectively believed or actually knew that BLMIS was not

19   trading securities.  And also, take for example, Defendant

20   Corina Noel Piedrahita.  So, as Mr. Cunha supplied, the

21   complaint contained virtually no allegations as to Corina

22   Piedrahita.  In fact, with respect of her state of mind, it

23   only alleges a mere two things.  One is that she controlled

24   an entity called Share management, and that's in paragraph

25   129 of the complaint; and, two, that her knowledge is

Page 88

1    imputed to Share Management, and that's at paragraph 129 and

2    329.

3            But what's missing from the complaint are any

4    specific allegations as to what Ms. Piedrahita knew and why.

5    And the same is true with the other Defendants, including

6    Mr. Philip Toub and Mr. Andres Piedrahita.  The complaint

7    contains virtually no allegation as to their subjective

8    state of mind.

9            In fact, as my colleague Mr. Cunha just explained

10   at length, the facts pled as to the individual Defendants

11   show that collectively they believed that BMLIS was a

12   legitimate operation and that it was, in fact, trading

13   securities.

14           So, what the Trustee here does in lieu of

15   particularized pleadings is to prevail on two different

16   theories of imputation.  First he claims that there is an

17   inside exception that applies and allows him to impute

18   knowledge to all Defendants.  But as we make clear in our

19   papers, Your Honor, the insider exception that the Trustee

20   is invoking is actually unique to the security context.  It

21   only applies when there's a question as to the authorship of

22   a challenged document, and that's not the case here.

23           The Trustee's second tactic is to rely on a

24   purported de facto SGG partnership.  But, as we have

25   previously stated in our papers, Defendant contends that no

Page 89

1    such partnership ever existed.  And even if such a

2    partnership did exist, it still doesn't solve the Trustee's

3    pleading problem and there are two reasons for this.  One,

4    there are no facts establishing actual knowledge or willful

5    blindness of any single Defendant.  And, second, using SGG

6    as a pleading device is contrary to (indiscernible) law.

7         The case law is clear that knowledge can only be

8    imputed in one direction, and that's from an individual to a

9    partnership entity.  It cannot be imputed from the

10   partnership entity down to the individual.  And there's a

11   good reason for this.  You can't impute a subjective state

12   of mind from one individual to another, because imputed

13   knowledge is at its core constructive knowledge.  It's akin

14   to saying that even if an individual didn't actually know a

15   fact, he should have known a fact.  And so the imputation

16   standard that the Trustee is advancing here is really just

17   an attempt to do away with the subjective pleading

18   requirement and to impose an objective standard that courts

19   in this circuit have rejected.

20        And, Your Honor, I submit that even Anwar, which

21   the Trustee relied upon in his papers and which held that

22   the Plaintiff in that action has sufficiently pled the

23   existence of a de facto SGG partnership -- even there, the

24   Court refused to engage in the type of institution that the

25   Trustee is urging here.  You know, in that action, the Court

1   held that the Plaintiff had not pled (indiscernible) in Mr.

2   Piedrahita, who was one of the alleged members of the de

3   facto SGG partnership, and who also happens to be a

4   Defendant in this action.

5            So, Anwar therefore rejected this idea of group

6   pleading and refused to impute the subjective state of mind

7   from other individual alleged partners to the remaining

8   partners.

9            And, Your Honor, therefore, for all of the reasons

10  Mr. Cunha and I have discussed, the Trustee has not pled

11  actual knowledge or willful blindness as to any individual

12  Defendant and he should not be allowed to prevail on

13  (indiscernible).  And unless Your Honor has additional

14  questions on that, I can shift gears and move to our

15  defenses to counts 15-17 of the (indiscernible).

16            THE COURT:  Very good. If you all don't mind,

17  we're going to take a ten-minute break.  So, we'll be in

18  recess for ten minutes.

19            (Recess)

20            THE COURT:  We're back on the record.  Ms.

21  Eichenberger, you're back on the record.

22            MS. EICHENBERGER:  Thank you, Your Honor.  I can

23  continue with the general partnership claims.

24            THE COURT:  Would you do me one big favor?  You

25  need to speak louder.  You're not being picked up clearly on

Page 91

1    the record.

2            MS. EICHENBERGER:  Understood, Your Honor.  I will

3    do that.  Is this a little bit better?

4            THE COURT:  That's perfect.  Much better, thank

5    you.

6            MS. EICHENBERGER:  Great.  So, continuing on, Your

7    Honor, to count 15-17 of the second amended complaint.  So,

8    the second amended complaint alleges that Defendant

9    Fairfield Greenwich, LTD and Fairfield Greenwich Bermuda,

10   LTD are liable for satisfying the six-year initial transfer

11   claims against two of the funds, Greenwich Century and

12   Greenwich Century Partners.  But as we discussed in our

13   papers, Your Honor, that claim is preempted by the Federal

14   Bankruptcy Code and by Section 546(e) in particular.

15           Just to take a step back, the Trustee is trying to

16   frame his claims against Fairfield Greenwich, LTD and

17   Fairfield Greenwich Bermuda, LTD, as general partnership

18   liabilities.  But what the Second Circuit held in the

19   Tribune case is that the Court needs to look not at the way

20   the Trustee has labeled his claim, but at the nature of the

21   underlying claim.  And if those underlying claims conflict

22   with federal law or congressional intent, they are

23   preempted.

24           So, here, the claims for which the Trustee is

25   seeking to hold FGO and FGB liable are the avoidance claims

Page 92

1    that he has made against Greenwich Century and Greenwich

2    Century Partners.  And those underlying avoidance claims

3    against the funds are either governed by or preempted by the

4    Federal Bankruptcy Code.  More specifically, the claims

5    against the two funds fall within two different statutory

6    reviews.  The first is the Securities Investor Protection

7    Act, which expressly imports the Federal Bankruptcy Code

8    and, by extension, the Section 546(e) safe harbor.

9          And the second framework that the Trustee is using

10   to avoid the claims against the fund is the New York State

11   Fraudulent Transfer Law, the New York Debtor & Creditor Law.

12   And as the Second Circuit made clear in Tribune, the Federal

13   Bankruptcy Code is designed to create a comprehensive system

14   of preemptive federal regulations in this area.  In fact,

15   what the Second Circuit says is that the bankruptcy

16   constitutes a wholesale preemption of state laws regarding

17   creditors' rights.

18         And the reason is because the safe harbor in

19   Section 546(e) was expressly designed by Congress to protect

20   the finality of transfers like the ones here that were taken

21   in good faith.  And if the Trustee is allowed to claw back

22   those transfers by simply affixing the language of general

23   partnership to those claims, it would frustrate Congress's

24   intent.

25         So, Your Honor, for that reason, we submit that

Page 93

1    Congress plainly intended to preclude the Trustee from using

2    general partnership liability as a workaround for other

3    state law concepts and, therefore, for those reasons we

4    submit that counts 15-17 of the complaint should be

5    dismissed.

6           And unless Your Honor has any questions, I'll turn

7    it over to my colleague, Mr. Fletcher Strong to discuss --

8           THE COURT:  Please.  I have no questions.  Thank

9    you.

10          MR. STRONG:  Morning, Your Honor.  Fletcher Strong

11   from Wollmuth Maher & Deutsch, counsel for Defendants

12   Fairfield Investment Fund, LTD, which I'll refer to as FIFL,

13   and Stable Fund, LP.  I'll be presenting this morning on my

14   client's Statute of Limitations defense that's unique to my

15   two clients.

16          As Your Honor knows, Bankruptcy Code Section

17   550(f) requires all subsequent transfer actions to be

18   brought within one year after the avoidance of the initial

19   transfer.

20          Here the BLMIS trustee settlements with the

21   Fairfield feeder funds occurred, at the latest, in July

22   2011, thus mandating that any subsequent transfer claims had

23   to be brought on or before July 2012.

24          The operative second amended complaint in this

25   action was filed on August 28th, 2020, which is more than

Page 94

1    eight years after the applicable July 2012 deadline.

2    Accordingly, the $62 million in new subsequent transfer

3    claims that are alleged in the second amended complaint

4    should be dismissed as time barred.

5            Now, the Trustee does not dispute this fact but

6    argues instead that the untimely new claims relate back to

7    the timely-filed first amended complaint filed in 2010.

8            To relate back under Federal Rule 15, the new

9    claim must arise out of the same common core of operative

10   facts alleged in the original complaint.  Within the context

11   of BLMIS claw back action, specifically Judge Bernstein held

12   in the BNP case that subsequent transfer claims can only

13   relate back if defendants were "at the center of a common

14   scheme to strip assets from BLMIS."

15           The Trustee argues that this test is satisfied

16   because the new claims against my clients purportedly

17   revolved around Defendant's efforts to profit from fraud by

18   charging the Fairfield funds management and performance

19   fees.

20           This is simply false.  It is actually undisputed

21   that both FIFL and Stable never received a dime in

22   performance or management fees.  To the contrary, they

23   actually paid out millions of dollars of fees every year to

24   the Fairfield management entities that oversaw the BLMIS

25   investments.  Indeed, the Trustee's own reply brief

1    correctly refers to FIFL and Stable as funds of funds that

2    merely invested in BLMIS through the Fairfield feeder funds.

3              The Trustee then argues, well, the untimely new

4    claims should be allowed because they are part of the same

5    underlying transactions alleged in the first amended

6    complaint.

7              This argument should also fail.  For avoidance

8    actions, the general rule is that each transfer should be

9    treated separately and distinctly for relation back

10   purposes.  Thus in the BNP case, even a reservation of

11   rights to add additional subsequent transfer claims in the

12   future was deemed not sufficient for Rule 15.

13             However, where the new transfers follow a similar

14   pattern and generally the same amount and same time period,

15   whether sent on a weekly or monthly basis or whatever it may

16   be, those untimely new claw back claims could potentially be

17   deemed timely and relate back.

18             Here, however, even a cursory review of Appendix A

19   that was submitted with Defendant's motion moving papers

20   shows that there is no discernible pattern whatsoever as to

21   the timing or amount of the Trustee's new transfer claims,

22   alleged FIFL and Stable that actually range in amounts from

23   $91 on the low end all the way up to $15 million on the high

24   end.  Therefore, these claims cannot relate back to the 2010

25   first amended complaint.

1         For these reasons and the reasons set forth in our

2    moving papers, we respectfully request that the Court

3    dismiss the $62 million in untimely new claims alleged

4    against FIFL and Stable.

5         With that, that's all I have, Your Honor, unless -

6    - if there are any questions, I'd be happy to address them.

7         THE COURT:  I have no questions.  Thank you.

8         MR. STRONG:  Thank you, Your Honor.

9         THE COURT:  Anyone else in the motion to dismiss

10   wish to be heard?

11        THE COURT:  Very good.  Ms. Thomas?

12        MS. THOMAS:  Thank you, Your Honor.

13        I will start with the standard on this motion to

14   dismiss because I think that we've gotten a bit far afield

15   in terms of the facts that Defendant's attorney, Mr. Cunha

16   has cherry-picked from the first amended complaint and from

17   apparently other complaints that are not at issue in this

18   action.

19        But again, this is a motion to dismiss.  Viewing

20   the second amended complaint in the light most favorable to

21   the Trustee, the allegations establish a plausible claim

22   that the Defendants shared knowledge and information and

23   acted in concert, that they created numerous entities that

24   they operated and controlled to generate over $1 billion in

25   fees by funneling assets to BLMIS; that the Defendants were

Page 97

1    aware of numerous warnings and indicia of fraud, including

2    from a consultant that they hired; that the Defendants lied

3    to investors and regulators to shield Madoff from inquiry,

4    and that they did so with actual knowledge of the Ponzi

5    scheme at BLMIS.

6         The Defendants allege due diligence as an element

7    that shows they were not aware.  The Trustee's allegations

8    are very clear that the Defendants conducted due diligence

9    as a performative action, merely to help create a veneer of

10   legitimacy for BLMIS.  And there are specific examples

11   alleged in the complaint to support this conclusion.

12        What the Defendants did is they hired a

13   consultant, Gil Berman, to summarize BLMIS's trades, but

14   then they ignored concerns that Mr. Berman raised about

15   indicia of fraud as early as 1996.  He later made specific

16   recommendations that they verify the assets were there, that

17   they request trade confirms on the date the trades

18   supposedly took place, not days later, and that they request

19   information on options counterparties.  The Defendants did

20   none of those things.

21        The second amended complaint also alleges that the

22   Defendants applied different standards to BLMIS than they

23   did to other entities.  That's in -- at Paragraph 149.

24        Investors raised concerns that Defendants lied and

25   purported -- used their purported due diligence as a shield

1   for BLMIS.  Again, there are many examples to support that

2   this conclusion and these allegations.  On the topic of

3   dodging questions from investors, lying to investors,

4   several paragraphs for good reference are 224, 228, and 229.

5           Mr. Piedrahita -- I think Mr. Cunha said something

6   about internal correspondence, which indicated, you know,

7   the Defendant's (indiscernible).  Again, the Trustee is an

8   outsider to the Defendant's scheme, so the Trustee is

9   limited to alleging facts which show indicia and demonstrate

10  indicia that the Defendants had actual knowledge.

11          Internal correspondence with the Defendants where

12  a salesperson points out that a bank director says FGG is

13  going to end up in jail if they don't clean up their act.

14  These are the types of internal correspondence alleged in

15  the second amended complaint.

16          We allege also after the Bayou hedge fund Ponzi

17  scheme was discovered, again relying on their meaningless

18  due diligence, the Defendants said to investors that their

19  sophisticated due diligence would have caught the Bayou

20  fraud, but then internally the conversations are joking.

21  And I believe that's Paragraph 199 of the complaint.

22          The paragraphs -- the salespeople are joking about

23  the similarities between the unqualified auditor in the

24  Bayou case and BLMIS's auditor.

25          Mr. Cunha also mentioned this concept of the

Page 99

1    auditor and that there was some due diligence performed with

2    respect to the auditor.  Again, what the Defendants did was

3    they recognized that the auditor was not only not qualified

4    but not certified to conduct audits.  And instead of doing

5    any legitimate follow-up, what they did was continue to lie

6    to investors, and they did this to shield BLMIS from further

7    inquiry.

8            Another example of the Defendants shielding BLMIS

9    are the meetings with the SEC that are alleged in the

10   complaint.  The Defendants, Mr. Vijayvergiya and Mr.

11   McKeefry, were tasked by the partnership with conducting

12   those meetings with the SEC.  And what they did was

13   purposely lie to the SEC to downplay Madoff's role, and to

14   make it seem that he didn't have unfettered discretion with

15   respect to Century's assets.  They tried to play up their

16   own role to make it seem as if they were actually performing

17   work for which they ultimately received almost $1 billion in

18   fees.

19           The categories of allegations that are in the

20   complaint -- and to be clear, this is not a red flag

21   complaint against the FGG defendants.  The Defendants took

22   specific action, and it's alleged that they particularly

23   tried to help BLMIS, enabled BLMIS to continue because the

24   more assets under management with BLMIS, the more fees could

25   be generated by the Defendant entities.

1          And Your Honor, the second amended complaint

2    alleges that all of the individual defendants and their FGG

3    partners controlled all of the FGG entities, including the

4    Fairfield funds.

5          So to Mr. Strong's point about the payment of

6    fees, FIFL and Stable were immediate transferees to assist

7    the Defendants in getting the fees to themselves.

8          There were no third parties here.  The money would

9    go from BLMIS to the Fairfield funds, and then to various

10   entities created by the Defendants to generate fees.  FG

11   Limited, and FG Bermuda, and sometimes other entities.

12   There are exhibits attached to the second (indiscernible) to

13   show that the Defendants, the individual defendants, owned,

14   operated, and controlled the various FGG entities, and they

15   ultimately received the fees that were generated by these

16   entities.

17          The fact that the fee -- that money may have gone

18   to FIFL before it went to Walter Noel or to FIFL or to --

19   before it went to another entity and then to other

20   defendants doesn't change the fact that the Defendants used

21   these entities to generate the fees for themselves.

22          Sorry, Your Honor.  I'm just going through notes

23   trying to catch the points that Mr. Cunha raised.  I think I

24   could move to the specific allegations.

25          So there's been comments that the Trustee has not

Page 101

1    made specific allegations with respect to the individual

2    defendants, and that is simply not the case, Your Honor.

3    The Trustee is not group pleading or grouping the

4    Defendants.

5              The second amended complaint outlines very

6    specific allegations about each Defendant's status as an FGG

7    insider and their specific roles within FGG.  That's at Page

8    12 to 13 of our opposition brief and Footnote 10 of the

9    Trustee's opposition brief.

10             The interesting thing about the Defendant's

11   argument in this regard is that they created and controlled

12   over a dozen entities all for the sole purpose of generating

13   fees and distributing money to themselves, and now they seek

14   to hide behind the entities that they created.  The Trustee

15   didn't create this context of multiple individual defendants

16   acting in overlapping roles as agents, officers, directors,

17   and even alter egos of so many entities.  The Defendants

18   created this context, and now they seek to hide behind it.

19             That being said, Your Honor, it is outlined in the

20   Trustee's opposition brief, specific allegations with

21   specific cites to the second amended complaint with

22   particularity to give each defendant notice of the claims

23   against them.

24             With respect to the first amended complaint, we

25   really should not be talking about the first amended

Page 102

1    complaint because it's been superseded -- sorry, Your Honor.

2    My video is going out.  It's been superseded by the second

3    amended complaint.  And the first amended complaint does not

4    conflict with the second amended complaint.  It alleges the

5    same scheme by the Defendants using the entities that they

6    created and control to generate over $1 billion in fees.

7            In fact, even the allegation -- or the argument

8    that Defendants have raised that the allegation that FGG was

9    used as a tradename does not conflict with the first amended

10   complaint because in the same paragraph where the Trustee

11   pointed out that FGG was used as a tradename, the Trustee

12   also alleged that the profits were distributed to the

13   individual defendant partnership percentages.  So it was

14   clear throughout the first amended complaint that FGG was

15   considered to be an actual de facto partnership.

16           With respect to the relation back argument, the --

17   I think I've covered that, Your Honor, and it is covered in

18   our brief.  But the fact remains that where FIFL received

19   transfers from Fairfield Century, it then paid fees to FGA

20   to FG Limited, Walter Noel, and Jeffrey Tucker, so it's

21   clear that the Defendants used these various entities to pay

22   fees to themselves.  And that is the common core of

23   operative facts is the Defendant's use of these entities to

24   benefit from and continue to enable the BLMIS scheme.

25           We could turn to the imputation allegations, Your

Page 103

1    Honor.  I don't know if you would like to hear that.  We --

2    the Defendants spoke about the imputation of knowledge.  The

3    Trustee's imputation allegations are not as complicated as

4    the Defendants purport them to be.

5         The second amended complaint alleges throughout

6    that the Defendants acted in concert, that they shared --

7    they shared BLMIS-related information, they acted as agents

8    for FGG and for each other, their interests were not adverse

9    to each other, they acted as a cohesive unit.

10        And so the imputation among the Defendants of

11   knowledge is not based on the existence of a partnership

12   entity.  There's no imputation up and then back down.  The

13   Defendants are alleged to have shared this information among

14   each other in connection with operating FGG as an

15   enterprise, that -- and they acted as agents.

16        So all of those arguments concerning imputation

17   down from a partner to an individual, that's really not

18   what's alleged.  There's an agency theory.  There's an

19   officer-director theory, and there's a theory that as

20   partners operating the enterprise, the Defendant's knowledge

21   is imputed to (indiscernible) information with each other.

22        I think Ms. Bent could address now the general

23   partnership -- the general partnership lability claims.

24        THE COURT:  Please.

25        MS. BENT:  Good afternoon.  Almost good afternoon.

Page 104

1    Good afternoon, Your Honor.  My name is Camille Bent.  I'm

2    at Baker Hostetler representing the Trustee (indiscernible)

3    in this matter.  With regard --

4              THE COURT:  Let me stop you.  Let me stop you.

5              MS. BENT:  Sure.

6              THE COURT:  Your -- whatever your audio is, it's

7    quivering.

8              MS. BENT:  My audio?  Is it better now?

9              THE COURT:  Uh-huh.  Not yet.

10             MS. BENT:  Okay.  My audio is quivering.  Okay.

11             THE COURT:  Still.  Still.  Still quivering.

12             MS. BENT:  Okay.  Hang on one second for me.

13             THE COURT:  Thank you.

14             MS. BENT:  Okay.

15             THE COURT:  That's it.  That's perfect.

16             MS. BENT:  Is that better?

17             MS. THOMAS:  Maybe take out your headphones?

18             MS. BENT:  Okay.  Let me take off the headphones.

19    I thought that would be --

20             THE COURT:  Yeah, because I think your hair is

21    rubbing.  Okay.

22             MS. BENT:  Oh, my hair.  Okay.

23             THE COURT:  See if that worked.  Pull it back and

24    see if that works.

25             MS. BENT:  Is that better?

Page 105

1          THE COURT:  No.  It wasn't your hair.

2          MS. BENT:  Okay.  So then let me switch to the

3    head -- the computer audio.

4          THE COURT:  Thank you.

5          MS. BENT:  Give me one second please.  Thank you.

6    Figure out how to switch back.  Oh, I'll just turn this off.

7          THE COURT:  You're now mute.  You need to unmute

8    yourself.  Asterisk 6.

9          MS. BENT:  Can you hear?

10         THE COURT:  Perfect.  We hear you now.

11         MS. BENT:  Judge Morris, can you hear me now?

12         THE COURT:  Perfect, and that's much better.

13    Thank you.

14         MS. BENT:  I can't hear her though.

15         THE COURT:  Oh.  I can keep talking.  I'll keep

16    talking.  Your background looks great.  I'm trying to talk

17    so that you can hear.  I -- say something to me when you

18    think you can hear me.  Okay.

19         MS. BENT:  Oh, can you hear me now?

20         THE COURT:  Perfectly.

21         MS. BENT:  Yes.  Okay.  Mission 1 accomplished.

22         THE COURT:  Okay.  Yeah.  Can you hear me?  Can

23    you hear me?

24         MS. BENT:  Yes.  Mission two.

25         THE COURT:  Perfect.  We're really good.  We're

Page 106

1    good.  We're good to go.

2           MS. BENT:  Okay.  So today I wanted to talk to you

3    about general partner liability.  And as you know, general

4    partners are liable for the debts -- the debts of the -- the

5    debts of the partnership.  And the Trustee in this case has

6    sufficiently alleged facts to show that FG Bermuda and FG

7    Limited were general partners of Greenwich Century and

8    Greenwich Century Partners.

9           For Count 15 through 17, the Trustee must prove

10   that when each of the six-year transfers were made, the

11   respective defendant served as a general partner of the

12   partnership, that the partnership was insolvent, and that

13   their assets were insufficient to satisfy any judgment

14   against them for the claims asserted.

15          And that's from In re LJM2 Co-Investment Limited

16   Partnership.  Okay.  It's a Delaware Court of Chancellery

17   case 2004.  And the Trustee has alleged facts in the

18   complaint to show each element.

19          The Trustee has alleged that Greenwich Century and

20   Greenwich Century Partners were Delaware limited

21   partnerships in part -- in Paragraphs 98 and 100

22   respectively.

23          And then for Count 15, we've alleged that FG

24   Limited is a general partner of Greenwich Century.  In 397,

25   we allege that Greenwich Century was insolvent and its

Page 107

1    assets were insufficient to satisfy any judgments.  And in

2    397, we also allege that FG Limited is liable to satisfy any

3    judgment against Greenwich Century.

4            We allege similar allegations for Count 16 in

5    Paragraphs 400 and 401, and for Count 17 in Paragraphs 404

6    and 405.

7            We reference at this -- the Defendants argue that

8    these counts are based on state fraudulent transfer law, and

9    that's not the case.  The applicable Delaware law that we're

10   referring to in these counts is Section 17-403 of the

11   Delaware code, which holds that -- which states that general

12   partners are liable for the debts of the partnership.  It

13   specifically outlines the general partner -- general powers

14   and liabilities of general partners, and it provides that a

15   general partner of a limited liability -- limited

16   partnership has the liabilities of a partner in a

17   partnership that's governed by the Delaware Uniform

18   Partnership Law, the persons other than the partnership and

19   other partners.

20           All of that being said, the Defendant's argument

21   that the bankruptcy code precludes the Trustee from bringing

22   these claims is incorrect, and that's because it's not

23   relying on state fraudulent transfer claims.  What we're

24   merely trying to do here is obtain declaratory judgment that

25   the general partners are liable under Delaware law.

1          This is something that -- this support -- the

2     decisions in Merkin and JABA Associates support this

3     conclusion that Section 550 does not preclude a state law

4     partnership theory of liability.  Judge Lifland held that in

5     Merkin in 2010, and as recently as March of this year, Judge

6     Knodell reached the same result.

7          So the other thing that I'll add, Your Honor, is

8     that we're not seeking double recovery.  There's no

9     disagreements about the Defendant's position in their papers

10    that the single satisfaction rule applies.  The Trustee

11    however is entitled to recover against the general partners

12    to the extent that he cannot recover from the partnerships

13    themselves.

14         So in conclusion, that's what we're -- that's what

15    the Trustee alleges in terms of general partnerships, and we

16    request that the Court deny the motion to dismiss as to

17    these counts, Your Honor.

18         THE COURT:  Very good.

19         MS. BENT:  Your Honor, if I may, I would also like

20    to address the Safe Harbor issues that the Defendants

21    raised.

22         THE COURT:  Please.

23         MS. BENT:  Thank you.

24         The Safe Harbor defense doesn't apply here because

25    it does not protect initial transferees who have actual

Page 109

1   knowledge.  The parties actually agree that where the

2   Trustee pleads that the initial transferees or the

3   subsequent transfers had actual knowledge that BLMIS was not

4   trading securities, they cannot -- they cannot receive the

5   benefit of the Safe Harbor defense.

6           The actual -- what we call the actual knowledge

7   decision in our brief is instructive because it stands for

8   that exact proposition.  Here in our case, the Trustee

9   plausibly alleged that the initial transferees, the

10  Fairfield funds, had actual knowledge that BLMIS was not

11  trading securities.  We allege this in Paragraphs 9, 10,

12  (indiscernible), 320, and 321 of the complaint, of the

13  second amended complaint.

14          Aside from that, we also allege that knowledge of

15  a number of individual and entity defendants was imputed to

16  each of the Fairfield funds.  For example, for Fairfield

17  Century, we allege in Paragraph 320 that Fairfield

18  International Managers as manager, Fairfield Limited as

19  investment manager of Fairfield Century, Fairfield Bermuda

20  as investment manager of Fairfield Century, Noel as founder

21  and director of Fairfield Century, and Tucker as founder of

22  Fairfield Century all had knowledge that was imputed to

23  Fairfield Century, actual knowledge.

24          In Paragraph 21 -- excuse me.  In Paragraph 321,

25  we do the same for Greenwich Century.  We allege Noel,

Page 110

1    Tucker, and FG Limited each as general partner of Greenwich

2    Century had knowledge that was imputed to General Century.

3              We also allege that FG Bermuda as investment

4    manager and FG advisors who provided administrative services

5    to Greenwich Century each acknowledge that was imputed to

6    Greenwich Century.

7              Last, for Greenwich Century partners, we allege

8    that FG Bermuda as general partner, and FG advisors who

9    provided administrative services again to Greenwich Century

10   partners in this case had knowledge that was imputed to that

11   partnership.

12             So we get very specific and particularized with

13   the allegations of knowledge that was imputed to each of the

14   Fairfield funds, and we also -- on top of that, we allege

15   that the principles and the control persons for the

16   Fairfield funds were Walter Noel and Jeffrey Tucker.  We

17   allege that in Paragraph 80.  And then we allege that the

18   agents for the Fairfield funds were FG Limited in Paragraph

19   152, FG advisors in Paragraph 151, and FG Bermuda in

20   Paragraph 153.

21             I also want to call Your Honor's attention to the

22   Kingate case that we reference in the -- in our opposition

23   brief on Page 24.  I want to mention that case because it's

24   particularly instructive here as well.  And it's because the

25   founders -- in that case, you had the same thing we have

1   here.  You had founders who were sophisticated financial

2   professionals who had close relations -- relationships with

3   Madoff, and they knowingly shielded Madoff and BLMIS from

4   outside scrutiny from investors and regulators alike to

5   protect the profits they shared.

6         On those facts in that case, the Court found that

7   the Kingsgate funds "knew that Madoff was not engaging in

8   the securities transactions he reported and that many of the

9   entries in the statements and trade confirmations depicted -

10  - depicted trades that could not have taken place."

11        Because of that knowledge, the Court held that the

12  initial transferees were not innocent legitimate

13  participants and that the -- that the Safe Harbor was meant

14  to protect, and the same is true here.  Again, you have

15  sophisticated financial individuals.  You have individuals

16  that had close relationships with Madoff that were a part of

17  Madoff's inner circle.  We allege these for -- these

18  allegations, for example, in Paragraphs 4 and 108, and in

19  other places as well.

20        We also allege that our -- not our -- the

21  individual defendants knowingly shielded Madoff and BLMIS

22  from outside scrutiny, and we extensively make those

23  allegations.  My colleague, Ms. Thomas, went through a lot

24  of those as it relates to Friehling & Horowitz as well as

25  the knowledge that they had in real time with the Bayou

Page 112

1    fraud as well as the information that they withheld from the

2    SEC.  And those are alleged at length in Paragraphs 170 to

3    187 and then also 188 to 218.

4             So in Kingate, the Court concluded that the

5    totality of the allegations in that complaint painted a

6    picture of individuals who knew Madoff was reporting

7    fictitious transactions, and we believe that the same

8    analysis applies here and that the Court should find that

9    the SE -- that the second amended complaint has alleged

10   facts that conclude that -- that are plausible, excuse me,

11   that demonstrate that, you know, we have a familial

12   relations between the Defendants who knowingly cashed in on

13   a fraudulent scheme that was orchestrated by Madoff.

14            Thank you, Your Honor.

15            THE COURT:  Thank you.  Ms. Thomas?

16            MS. THOMAS:  Thank you, Your Honor.  Wow.

17            Is this better?

18            THE COURT:  Much better.

19            MS. THOMAS:  Can you hear me?

20            THE COURT:  We thought you were -- yeah.  We

21   thought you were in the Grand Canyon for a minute.

22            MS. THOMAS:  No.  Maybe turn yours up.

23            THE COURT:  Now speak to us and see.  Can you hear

24   me, Ms. Thomas?

25            MS. THOMAS:  Can you hear me now?

Page 113

```
 1              THE COURT:  Yes, I can.

 2              MS. THOMAS:  Fantastic.  There were only two

 3    points that I wanted to just cover, Your Honor.  This was

 4    specific cites in reference to arguments that Mr. Cunha

 5    raised.

 6              One, he mentioned again in the context of due

 7    diligence, a trustee's theory of the case is that this was

 8    just intended to create an air of legitimacy for BLMIS to

 9    help shield from inquiry.  He mentioned FG Bermuda --

10    they're Fairfield Greenwich Bermuda.  The trustee alleges at

11    paragraph 154 of the second amended complaint, that this

12    entity was specifically created outside of the United States

13    to help BLMIS avoid scrutiny of U.S. regulators.

14              Also with respect to the visit by PWC to BLMIS,

15    the trustee alleges in paragraph 140 of the complaint what

16    actually happened at that visit is that it was declared a

17    failed mission because they were unable to verify anything

18    concerning assets or even complete the purpose of the due

19    diligence visit.

20              Your Honor, to the extent there are any other

21    points that we didn't cover, we believe that they're covered

22    in our opposition brief.

23              THE COURT:  Very good.  Mr. Cunha?

24              MR. CUNHA:  Yeah, we think --

25              THE COURT:  (indiscernible)
```

Page 114

1          MR. CUNHA:  -- (indiscernible) recognize a name,

2     Your Honor.  We say Mr. Qna like the letter "Q" -- Qna.

3          THE COURT:  (indiscernible) Oh, like the letter

4     "Q"?

5          MR. CUNHA:  Yeah, like the letter "Q."  Like "Q"

6     and then "na," N-A.  Qna.

7          THE COURT:  Thank you.  Thank you.

8          MR. CUNHA:  Thank you, Judge.  Your Honor, what's,

9     I think, most striking about the arguments by Ms. Strong and

10    Ms. Bent is, we challenge them in my argument to point to

11    specific factual allegations in the second amended complaint

12    which show actual knowledge on the part of FG defendants

13    that Madoff was not trading securities or would show willful

14    blindness and specifically a subjective belief that Madoff -

15    - was a high probability Madoff was not trading securities

16    and showing instances -- and show actions by them --

17    specific backed actions by them to avoid learning the truth,

18    and they didn't point to a single factual allegation in the

19    complaint -- in the second amended complaint -- which shows

20    actual knowledge or which shows willful blindness.  Not one.

21          Ms. Bent tried.  She pointed Your Honor to the

22    second amended complaint, paragraphs 9, 10, 206, 320, and

23    321.  Well, I just reread those paragraphs, Your Honor.

24    Paragraph 9 is completely conclusory.  Paragraph 10 --

25    completely conclusory.  Paragraph 320 -- completely

1    conclusory.  Paragraph 321 -- completely conclusory.  Only

2    one of those paragraphs has anything in it that actually

3    cites the -- states the facts and that fact that's state is

4    this.  When Fairfield Greenwich did its diligence with

5    respect to F&H -- Friehling and Horowitz, the auditor -- and

6    they called Mr. DiPascali -- at a certain point -- they

7    called him twice -- at a certain point, Mr. DiPascali said

8    he could not provide any additional information on F&H.

9            So nothing about this points to actual knowledge

10   on the part of anyone at Fairfield Greenwich.  What it

11   points to is Fairfield Greenwich doing diligence and at a

12   certain point they've learned all that they could because

13   Mr. DiPascali who is the guy at Madoff that they contacted -

14   - the insider at BLMIS that they contacted -- couldn't tell

15   them anymore.  So again, nothing.  They utterly failed --

16   utterly failed.  I challenged to point to actual factual

17   allegations in the complaint which show actual knowledge or

18   would show willful blindness.

19           You know, they claim again -- and I told you --

20   this to Your Honor.  I made this point to Your Honor in my

21   initial presentation.  All of this elaborate due diligence

22   that was done by the Fairfield Greenwich entities -- which

23   they admit -- both internal and external, that this is

24   performative, that this was just a show for the investors.

25   First we say that's completely improbable.  But second, it

Page 116

1    does not address, and they do not even try to address, the

2    internal communications at FG and the communications between

3    Mr. Vijayvergiya in particular at Fairfield Greenwich and

4    Mr. Madoff which show that the Fairfield Greenwich people

5    thought Madoff was trading securities.  Nothing performative

6    about those communications for the investors.  Not disclosed

7    to the investors.  It couldn't help them attract other

8    investors.  These are internal communications or

9    communications with Madoff.  They had no answers to that

10   whatsoever.  And those communications show, Your Honor, that

11   the Fairfield Greenwich people thought Madoff was trading

12   securities.

13           Interestingly enough, the exhibits to the first

14   amended complaint are completely dropped from the second

15   amended complaint.  Second, interestingly enough, they

16   actually continue to quote from those exhibits in the second

17   amended complaint, but they don't reference what documents

18   they're quoting from and they no longer attach the exhibits.

19   Hmm.  Why is that?  It's very obvious why it is.  When you

20   look at the exhibits, they overwhelmingly show that the

21   Fairfield Greenwich defendants thought Madoff was trading

22   securities, hence they dropped them from the second amended

23   complaint in an effort to, frankly, pull the wool over the

24   eyes of the Court in an effort to meet a pleading burden

25   because they knew that their own exhibits that they pulled -

Page 117

1    - that they think are important to this case -- important

2    enough to attach to and incorporate by reference into their

3    first amended complaint -- their own exhibits prove that the

4    -- establish -- that the Fairfield Greenwich defendants, by

5    their own exhibits, did not have actual knowledge that

6    Madoff was not trading securities, but in fact, they thought

7    Madoff was trading securities throughout the exhibits.

8            They make a reference to this jail comment that

9    someone made to Fairfield.  If you actually look at the

10   allegation, there's no context for it.  The individual who

11   made that comment, he doesn't say why he thinks this would

12   happen.  He doesn't say anything about Madoff being a fraud.

13   He seems to be commenting on some aspect of something that

14   was going on at Fairfield Greenwich.  Not that Madoff was a

15   fraud, not that they knew that Madoff was a fraud, not that

16   they believed that Madoff was a fraud and there's no

17   reference to that whatsoever.  Frankly, it's mudslinging,

18   Your Honor.  It has nothing to do with the standard here.

19           By the way, we are gratified that Ms. Bent agrees

20   that the safe harbor is in play here -- 546(e).  We're

21   gratified that Ms. Bent has agreed and conceded that actual

22   knowledge must be established by the factual allegations in

23   the pleading and we say that they have utterly failed to do

24   that.

25           They say that the first amended complaint has been

Page 118

1    superseded.  Yes, it has.  There's a second amended

2    complaint, but the authorities that we point Your Honor to

3    indicate that prior pleading can and should be taken into

4    account in deciding a motion to dismiss because statements

5    in prior pleadings and exhibits to them -- documents

6    incorporated by reference -- count as admissions in due

7    course.  They have no answer for that.

8             By the way, Your Honor, we're here on a motion to

9    dismiss the second amended complaint.  We could just as

10   easily be here on a motion by the trustee for leave to file

11   the second amended complaint, and in that event, of course

12   the operative pleading would be the first amended complaint

13   and that's the -- and we would be focusing on that.  We're

14   only here on a motion to dismiss because it seems cleaner to

15   the trustee and to us to proceed on a motion to allow them

16   to file the second amended complaint and then make a motion

17   to file the second amended complaint, rather than say, "No,

18   you can't file the second amended complaint.  You've got to

19   -- we're going to say it's futile because you don't state a

20   claim for actual knowledge or for willful blindness."  And

21   so it can't be because of this procedural difference in how

22   we decided to proceed, but, Your Honor, it's forbidden from

23   looking at a prior pleading and forbidden from looking at

24   the exhibits to that prior pleading.  In any event, Your

25   Honor, the main point here is that the authorities we have

1    cited to Your Honor -- and they're clear -- have said you do

2    look at prior pleadings and they're treated as admissions in

3    due course.

4           They mentioned the Kingate case, Your Honor.

5    Kingate is a case that we think is helpful and the reason is

6    this.  In Kingate, the court found -- this court, Judge

7    Bernstein -- found, hmm, the plaintiff has met -- the

8    trustee has met its pleading burden of at least pleading

9    facts which could at least be claimed to show actual

10   knowledge that Madoff wasn't trading securities, that Madoff

11   was a fraud.  Why?  Why does the Court find that?  Well, the

12   main reason is it finds it is because the head of

13   operational due diligence at Kingate reported to his

14   superior -- so this is their Amit Vijayvergiya, if you will

15   -- reported to his superiors that BLMIS was a scam.  So they

16   had actual knowledge from their guy responsible for

17   investigating Madoff that Madoff was a scam, that he was a

18   fraud.

19          There's nothing like that in this record here.

20   Nothing like that whatsoever.  Mr. Vijayvergiya never makes

21   that conclusion.  There's no allegation he makes that

22   conclusion.  There's no allegation that he makes any such

23   report to anybody at Fairfield Greenwich.  To the contrary,

24   all of his reports go to operational matters at Madoff,

25   basically, based on his view -- his understanding -- that

Page 120

1   Madoff was trading securities.  So that is a massive,

2   massive difference between the Kingate case and this case.

3           Second massive difference.  And that's, in this

4   case, Grosso, one of the senior people at Kingate -- he met

5   with Madoff on the 17th floor.  The 17th floor is where

6   Madoff conducted the investment advisory business of BLMIS.

7   He did not admit many people at all -- hardly anyone -- to

8   the 17th floor and some of the cases we've cited to Your

9   Honor make this point.  So to be admitted to the 17th floor

10  is to be admitted into Madoff's inner sanctum because that's

11  where the fraud was taking place.

12          There is no allegation in the complaint here, Your

13  Honor, that anybody at Fairfield Greenwich, any defendant

14  here or anybody associated with a Fairfield Greenwich

15  entity, was admitted to the 17th floor or allowed onto the

16  17th floor.  And it seems trivial, Your Honor, but it's

17  actually rather -- the courts have found it important and it

18  is important because, again, Madoff had legitimate trading

19  operations going on on other floors.  Madoff was a major

20  market maker on Wall Street.  He had legitimate businesses

21  that he was running on other floors.  The investment

22  advisory business was on the 17th floor and Kingate people

23  were given access to that floor where all the fraud was

24  taking place.  No allegations that FG was.  So those are two

25  very, very crucial -- crucial differences between that case

Page 121

1    and this case.

2          I put the Court to the Merkin case also.  Merkin -

3    - again, feeder funds that invested in BLMIS on behalf of

4    its investors -- and there the court found that the trustee

5    had not stated a case for actual knowledge, that he hadn't

6    stated facts which made it plausible that the Merkin fund

7    had actual knowledge that Madoff was a fraud.  But they did

8    find that they'd stated -- just enough -- that they'd stated

9    enough to say to state a willful blindness case, that they

10   thought a high probability Madoff's not trading.

11         But why?  Why did they find willful blindness but

12   they didn't actual knowledge?  And the reason is because one

13   of the portfolio managers for Merkin -- so one of their

14   folks who actually, you know, ran a book -- a portfolio book

15   for investors at Merkin -- actually told Mr. Merkin, the

16   head of Merkin, that he thought Madoff could be a Ponzi

17   scheme.  So here's Merkin with actual -- here's Merkin being

18   told Madoff could be a Ponzi scheme.  We've got nothing like

19   that here.  We have nothing on the record here with any

20   internal person at Fairfield Greenwich reporting to anybody

21   else at Fairfield Greenwich that they thought Madoff could

22   be a Ponzi scheme.  Zero.  And they've had massive

23   discovery, Your Honor.  It just doesn't exist.

24         So -- but the Court says, "Hm.  Could be a Ponzi

25   scheme."  Well, that's not actual knowledge.  It's not

                                                        Page 122

1      enough for actual knowledge.  Even being told, "Hey, Madoff

2      could be a Ponzi scheme."  That's not enough for actual

3      knowledge but it is enough for willful blindness.  But we

4      don't have that here.  So here, we don't even have -- we

5      don't have willful blindness either.

6              They also have an investor summarizing a meeting

7      with Merkin and the investor -- what the investor took away

8      from his meeting with Merkin is, there seems to be some

9      probability in (indiscernible) mind that this -- meaning

10     BLMIS -- could be a fraud.  So the Court said, "Look, well,

11     looking at that, okay.  Fine.  They've pled enough for

12     subjective belief in a probability -- high probability --

13     that Madoff could be a fraud on the part of Merkin, but not

14     enough to say he actually knew beyond a doubt.  So no actual

15     knowledge but there is willful blindness."  But again, we --

16     there's nothing like that in our records.  There's nothing

17     whatsoever that they plead which shows that anybody at

18     Fairfield Greenwich thought in their mind that Madoff could

19     be a Ponzi scheme, that Madoff could be a fraud, or that

20     Madoff wasn't trading securities.  Nothing at all in the

21     record.

22              Your Honor, I'll just -- I'll end there.  I think

23     that's enough.  The main point is -- I think, Your Honor,

24     the main takeaway is, we challenged them to point to

25     specific allegations of fact that show actual knowledge or

1    belief that a high probability that Madoff was not trading

2    securities.  They've utterly failed to do so and that's

3    because they've utterly failed to do so in their pleadings.

4    They agree that the actual knowledge standard applies.  They

5    agree that the willful blindness standard applies.  Their

6    pleadings have not established it, have not even come close

7    to establishing it.  Their pleadings have actually done the

8    opposite and show -- you know, beyond doubt -- show beyond

9    doubt in all of them, consistent to all the documents, that

10   the folks at Fairfield Greenwich thought Madoff was trading

11   securities.  And for that reason, Your Honor, you must

12   dismiss all of the subsequent transfer claims under the

13   standards that they themselves conceded apply here.  Thank

14   you, Your Honor.

15              THE COURT:  Does anyone else wish to be heard?

16   Yes.

17              MS. BENT:  Your Honor, may I make on more quick

18   point?

19              THE COURT:  Yes.

20              MS. BENT:  Thank you, Your Honor.  Very quickly, I

21   just wanted to point you to page 13 of our opposition brief

22   -- in footnote 10 and that's in section 2 of our opposition

23   brief.  Footnote 10, we extensively point to specific

24   allegations and have broken down by defendants as to what

25   they knew in our brief.

1          The other very quick point I want to make is that

2     the dispute that you heard about in the allegations -- the

3     varying stories that you've heard about whether the

4     defendants had knowledge that BLMIS is trading securities is

5     exactly why we are entitled to discovery.  It's an issue of

6     fact and it's not appropriate to weigh one theory of what

7     happened over the other.  The complaint on its face states a

8     plausible claim that the defendants actually knew that BLMIS

9     was trading securities and any issue of fact entitles us to

10    discovery.  Thank you, Your Honor.

11          THE COURT:  Very good.

12          MR. CUNHA:  Your Honor, just one counter to that.

13    Again, we're not asking Your Honor to make findings of fact

14    here.  We're not -- it's not an evidentiary case.  It's on

15    the pleadings, but we will say that Ms. Bent is completely

16    wrong about what the burden is here and what the Court needs

17    to do.  The cases are very, very clear that what decides

18    these motions and what the Court is required to do on these

19    motions is look at the well-pled factual allegations and

20    make a determination whether in the Court's judgment, using

21    the Court's common sense, whether those allegations

22    establish that the plaintiffs actually knew that there was

23    no trading at Madoff or believed in a high probability that

24    there was no trading at Madoff.

25          We're not asking for a factual finding here, Your

Page 125

1    Honor.  We're asking for -- whether the facts as pled make a

2    plausible case for actual knowledge of willful blindness.

3    That's what required under the Iqbal Twombley standard and

4    it is not something that goes to discovery.  It not

5    something that goes to summary judgment.  It goes at the

6    motion to dismiss stage which is what Iqbal and Twombley

7    were concerned with and if you look at every single case

8    that we've cited and that they've cited, that's what the

9    courts do.  They look at the factual allegations in the

10   complaint -- not the conclusory claims, not the conclusory

11   charges -- the factual allegations in the complaint and the

12   courts make a decision, are those facts sufficient to make a

13   plausible case that there was actual knowledge -- they had

14   actual knowledge that -- actual knowledge -- subjective

15   knowledge -- that Madoff was not trading or a belief in high

16   probability that Madoff was not trading.

17        And so, respectfully, Ms. Bent is wrong and it's

18   exactly what the Court is required to do on this motion is

19   to look at those factual allegations and the -- and in the

20   material attached to the complaint and to see whether they

21   have met that burden of pleading a plausible case of actual

22   knowledge or willful blindness.  We submit, Your Honor, that

23   the factual allegations -- and we've pointed them out in

24   great detail -- the factual allegations amount to a clear

25   picture -- a clear understanding -- that whatever else they

1    understood, the Madoff defendants clearly believed that

2    Madoff was trading securities, and therefore, these claims

3    must fail.  Thank you, Your Honor.

4            THE COURT:  Thank you.  Yes.  Anyone else?

5            MR. STRONG:  Yes.  Your Honor, Fletcher Strong

6    from Wollmuth Maher & Deutsch.  I'd like to respond briefly

7    to trustee's counsel's response to my statute of limitations

8    argument.  I found Ms. Thomas and Ms. Bent's presentation

9    very interesting in that it did clarify the entire basis for

10   their relation back argument is that the payment of

11   performance and management fees satisfies the underlying

12   standard.

13           This argument clearly fails here in the rule 15

14   analysis because taking a step back, rule 15 requires

15   adequate notice of both facts surrounding the claims as well

16   the parties to support overturning a statute of limitations.

17   Remember, rule 15 allows litigants that fail to properly

18   file claims in accordance with the applicable statute of

19   limitations in time.  So because of that, I think they are

20   conflating somewhat.  It appears that they're conflating the

21   potential imputation arguments that are relevant for the

22   knowledge analysis with the relation back analysis for

23   purposes of rule 15.

24           But even if their argument was correct that the

25   payment of performance and management fees were relevant,

Page 127

```
 1    the BNP case by Judge Bernstein has held that for subsequent

 2    transfers the relevant inquiry is whether the conduct of the

 3    defendant led to the stripping of assets from BLMIS.  Here,

 4    the payment of performance and management fees did not strip

 5    BLMIS of any assets.  The fees were specifically paid from,

 6    as alleged in the complaint, from the assets of

 7    (indiscernible), so even if -- taking them at face value

 8    that the payment of fees is relevant, it doesn't satisfy the

 9    requirement that payment of fees strip BMLIS itself of

10    assets.

11              THE COURT:  Very good.

12              MR. STRONG:  Thank you, Your Honor.

13              MS. EICHENBERGER:  Your Honor, if I may take a

14    moment to respond to the trustee's points regarding

15    imputation and general partnership.  I will make it very

16    short.

17              THE COURT:  Thank you.

18              MS. EICHENBERGER:  So we heard from the trustee's

19    counsel that they believe that -- what they've alleged is

20    that there was shared knowledge because all of the

21    defendants were officers, directors, and (indiscernible)

22    partners of the shared ecosystem.  Not only is this an

23    oversimplification but their reliance on shared knowledge

24    is, at its core, just another way of saying that they can

25    rely on constructive knowledge.
```

Page 128

1          But that's not the standard here.  We all agree

2     that there is an obligation on the trustee to plead direct

3     and clear knowledge that BLMIS was not trading securities,

4     and you can't rely on concepts of shared knowledge or

5     imputed knowledge to meet that high burden.

6          Second, with respect to the trustee's general

7     partnership argument, the trustees continue to ignore the

8     second circuit's analysis in Tribune and reiterates their

9     framing of their claims in count 15 through 17 as general

10    partnership claims.  But Tribune instructs that you need to

11    look at the underlying nature of the claims alleged.  And

12    here, the trustee's general partnership claims are really

13    just avoidance claims masquerading as general partnership

14    claims, and those claims, as we have said, are preempted by

15    the federal bankruptcy code.  And the trustee's reliance on

16    the Merkin and Jabba Associates cases doesn't change the

17    analysis.  Merkin was decided many years ago and certainly

18    well before the second circuit's decision in Tribune and

19    doesn't engage in any substantial analysis of the preemption

20    arguments that we have made.  Jabba Associates merely cites

21    Merkin, and again, does not engage with Tribune or with any

22    of the substantial preemption arguments they have made

23    today.  And therefore, we submit that those cases are not

24    findings on this Court.

25          So unless Your Honor has any questions, I will

1    yield the floor.

2                THE COURT:  I do not.  Ms. Thomas, you wish to add

3    anything?  Ms. Bent, you wish to add anything?

4                MS. STRONG:  No, Your Honor.  Thank you.

5                THE COURT:  Ms. Bent?

6                MS. BENT:  No.

7                THE COURT:  Very good.  I will issue a written

8    opinion.

9                MS. BENT:  Thank you, Your Honor.

10               THE COURT:  Thank you very much.  Thank you for

11   your time.  Thank you for your well-articulated arguments.

12               MS. STONG:  Your Honor, I have one administrative

13   question.  We're actually on the calendar, I believe, for a

14   pre-trial conference.  I don't know if that was in error.

15   In other words, in addition to the hearing.

16               THE COURT:  On -- for today on the pre-trial

17   conference on this matter?

18               MS. STRONG:  Right.  I think it was an error.

19               THE COURT:  It's an error.  We will do that at a

20   later date.

21               MS. STRONG:  Thank you, Your Honor.

22               MR. CUNHA:  Your Honor, I'd just like to thank you

23   for giving us so much --

24               THE COURT:  It's not -- excuse me -- it's not an

25   error.  It's just that we will do it at a later date after I

Page 130

1    do the opinion.  Yes, sir, Mr. Cunha.

2            MR. CUNHA:  Your Honor, I'd just like to -- on

3    behalf of my clients, Your Honor, I'd just like to thank you

4    for listening so carefully and giving us so much time today.

5    After 12 years, I'm sure they're gratified to have an

6    opportunity to get before Your Honor and see how much care

7    and attention Your Honor's giving so thank you.  Thank the

8    Court.

9            THE COURT:  Thank you. I can tell you I also

10   credit my staff and all we've done to really pay attention

11   to this matter.  We've spent quite a bit of time getting

12   ourselves up to date on everything in this case.  So it's

13   wonderful.

14           MR. CUNHA:  Thanks again, Your Honor.  We -- all

15   of us here at -- certainly my colleagues at Simpson

16   Thatcher, my colleagues on the defense side, certainly my

17   clients deeply appreciate it.

18           THE COURT:  Very good.  Thank you.  Now then

19   moving on to the next matter and everyone has been very,

20   very patient and I have learned a lesson today.  We will

21   only set these up separately so we can have a break in

22   between.  This is a lot of summary judgment argument in one

23   day when we've started at the hour we started at.

24           Let me ask the parties that are dealing with this

25   right now if we think we should take another break before we

Page 131

1    begin argument on -- I will just say the Miller matter so

2    that everyone knows where we are.

3              MS. TURNER:  Your Honor, Tara Turner of Baker

4    Hostettler on behalf of the trustee Irving Picard.  I defer

5    to you if you feel that we should take a break, but I'm

6    ready to proceed as soon as possible.

7              THE COURT:  Well, let me ask everyone else because

8    everyone else is in the same position I've been in and that

9    is sitting here listening with water.  That's what I've had,

10   water.  Or do we need to take just a break to give everybody

11   a chance to do what they need to do after they've sat for a

12   long period of time and have maybe a snack?  Let me hear

13   from others then.  You're on mute.

14             WOMAN 1:  Can you hear me now?

15             THE COURT:  Perfectly.  Thank you.

16             WOMAN 1:  I would love a break.

17             THE COURT:  Okay.  You've said it.  That's it.

18   All we needed was one person to say it and if one person

19   says it, we're going to do it.  So we will take -- let's

20   take a 25-minutes break.  That gives everybody a chance to

21   go do what they need to do -- or 30 minutes.  We'll make it

22   an even 30 minutes.

23             WOMAN 1:  Thank you.

24             THE COURT:  And then we'll come back at 5 after

25   1:00.

Page 132

1          WOMAN 1:  Thank you.

2          (A short break was taken)

3          THE COURT:  Great.  We are now on the adversary

4  proceeding 10-04921 in the matter of the Securities

5  Investment Protection Corporation versus Stanley T. Miller.

6  And it's Irving Picard trustee for the substantially

7  consolidated SIPC liquidation of Bernie L. Madoff Investment

8  Security, LLC, and Bernie L. Madoff.  Very good.  State your

9  name and affiliation.

10          MS. TURNER:  Good afternoon, Your Honor.  Tara

11  Turner of Baker Hostettler on behalf of the trustee Irving

12  Picard.

13          MS. NEVILLE:  Carol Neville from Dentons on behalf

14  of Stanley Miller and with me on the phone is Art Ruegger.

15          MR. HALLENBECK:  Good afternoon, Your Honor.

16  Nicolas Hallenbeck on behalf of the Securities Investor

17  Protection Corporation.

18          THE COURT:  Excellent.  Anyone else wants to put

19  their name on the record?

20          MR. CREMONA:  Good afternoon, Your Honor.

21  Nicholas Cremona also of Baker Hostettler on behalf of the

22  trustee.

23          THE COURT:  I believe this is a -- this one is a

24  summary judgment.  Correct?

25          MS. TURNER:  That's correct, Your Honor.

Page 133

1              THE COURT:  And I believe it's cross summary

2      judgments.  Correct?

3              MS. NEVILLE:  That's correct, Your Honor.

4              THE COURT:  Ms. Turner, I believe you are arguing

5      for the trustee.

6              MS. TURNER:  Correct.  Thank you, Your Honor.

7              THE COURT:  Very good.

8              MS. TURNER:  We are here today on the trustee's

9      motion for summary judgment and defendant's cross motion for

10     summary judgment.  Despite defendant's best efforts to

11     ignore the prior decisions in this liquidation, the simple

12     fact is that there are no remaining issues of fact in

13     dispute in this adversary proceeding.

14             Defendant's arguments have been rejected by this

15     court and the district court no less than five times.  Your

16     Honor is well versed in the elements of the trustee's claims

17     so I'm going to move through those quickly.  First, there's

18     no dispute that defendant received the two-year transfers of

19     fictitious profits within two years of the petition date.

20     Second, this court has already held that the trustee can

21     rely on the Ponzi scheme presumption, most recently in Your

22     Honor's Epstein opinion, therefore, it is law of the case in

23     this liquidation.  Even if it weren't, the trustee's experts

24     confirm that BLMIS was a Ponzi scheme and that BLMIS

25     employees substantiated those findings through their plea

1    allocutions and testimony.  Defendant offers no evidence or

2    expert testimony to rebut the trustee's proofs.

3              As to the trustee's final element -- whether the

4    transfers were of an interest of the debtor in property --

5    this Court and the district court have sounded rejected

6    defendant's argument that the IA business was held by Madoff

7    personally or as part of his sole proprietorship.  Based on

8    the same documents that were presented in the trustee's

9    motion for summary judgment in Epstein, including the Form

10   BDs and that BLMIS articles of incorporation, this Court

11   found that BLMIS was the owner of the JPMorgan accounts

12   because Madoff transferred ownership of all assets of the

13   sole proprietorship, including the IA business in the Chase

14   accounts to the LLC, as of January 1, 2001.

15             Despite these five decisions in the Trustee's

16   favor on this issue, Defendant refashions the same arguments

17   already rejected by this Court, including that certain BLMIS

18   records are inadmissible and unreliable, that the Trustee's

19   expert, Mr. Dubinsky, is unqualified, and that the name on

20   the BLMIS checks is dispositive of the bank account

21   ownership issue.  But again, this Court has already found

22   that the BLMIS books and records are admissible and

23   trustworthy, and that Mr. Dubinsky is qualified as an expert

24   on this issue.  The Court relied on both in Epstein, when it

25   found that all assets were transferred from the sole

1    proprietorship to BLMIS.  Again, Defendant has presented no

2    admissible evidence to rebut Mr. Dubinsky, nor did Defendant

3    depose Mr. Dubinsky.

4            In addition to the elements of the Trustee's

5    claim, the Trustee is also entitled to pre-judgement

6    interest, consistent with the law of the case in this

7    liquidation.  Pre-judgement interest is necessary to

8    compensate fully the BLMIS estate for the loss of customer

9    property while it was in Defendant's hands for over 12

10   years.  This Court awarded pre-judgement interest at a rate

11   of 4 percent in Epstein and Mann.  Interest is similarly

12   appropriate here, because Defendant is represented by the

13   same Counsel as Defendant in Mann, yet refuses to

14   acknowledge law of the case.  Instead, he's continued to

15   delay judgement, including prolonging discovery and

16   mediation.

17           Further, this Court previously stated that the

18   accrual date for pre-judgement interest is the filing date,

19   as the claims asserted by the Trustee arose only upon the

20   filing of the SIPA liquidation.  So the Trustee submits that

21   interest should be applied in this case from the filing

22   date, until the date judgement is entered.

23           Finally, Defendant argues that he has affirmative

24   defenses that overcome the Trustee's claims, including that

25   federal and New York law exempt his assets from judgement.

Page 136

1    But these exemptions, if they apply at all -- which the

2    Trustee believes they do not -- apply to collection of a

3    judgement, not the Trustee's avoidance claims.  This Court

4    and the District Court previously rejected these same

5    arguments based on ERISA in New York law, finding that

6    neither overcomes the Trustee's avoidance claims.  In any

7    event, fraudulent transfers made as additions to Defendant's

8    IRA would fall in New York's statute exception to the

9    exemption.  Despite Defendant's arguments that a judgement

10   here would strip Defendant of his retirement benefits

11   protected under New York law, Defendant ignores that the

12   fictitious profits transferred to him were actually other

13   customers' money in the first instance.

14           Defendant also argues that he is a subsequent

15   transferee, and his IRA custodian is the initial transferee.

16   However, Defendants in Nelson raised the same issue before

17   Judge Bernstein, and he held as a matter of law that the IRA

18   custodian is a mere conduit.  He found that the initial

19   transferee, here the Defendant, is the first to acquire

20   dominion and control over the assets.  The IRA custodian in

21   Nelson is the same here.  Further, the Trustee's expert

22   analyzed the IRA account statements and confirmed that the

23   transfers were IRA or same-day distributions.  As such,

24   Defendant is the initial transferee and cannot rely on

25   Section 550(b)'s value defense.

1          Finally, in his opposition, Defendant argues that

2     if the IA business and JPMorgan accounts were transferred to

3     the LLC in 2001, then the Trustee improperly calculated

4     Defendant's avoidance liability.  Defendant effectively asks

5     for credit for the fictitious securities listed in his

6     account as of December 31, 2000, in addition to deposits

7     made between January 1, 2001 and BLMIS's collapse, while

8     deducting withdrawals made during the same period, ignoring

9     that Defendant improperly credits himself for fictitious

10    profits on the customer statement.  If the Trustee only gave

11    credit to Defendant's deposit and withdrawals after the LLC

12    was created, Defendant's avoidance liability would increase

13    to over $4 million.  In any event, this Court has already

14    determined that the change to the LLC has no impact on the

15    Trustee's net investment method.

16         For the foregoing reasons, the Trustee's motion

17    should be granted, and Defendant's cross-motion should be

18    denied in its entirety.  Thank you.

19         THE COURT:  Very good.  Does anyone wish to add to

20    the Trustee's argument for the summary judgment?

21         MR. HALLENBECK:  Just briefly, Your Honor.

22    Nicholas Hallenbeck on behalf of Securities Investor

23    Protection Corporation.  I just wanted to point out one

24    factor that may not be readily apparent from the briefs

25    filed in this case but is on the record.

1              If you look at the Statement of Material Fact

2      Number 12, it indicates that the -- and this goes to the

3      Defendant's argument that the SEC public records -- or that

4      the -- I'm sorry.  This goes to the Defendant's argument

5      that the 2001 SEC form, by not checking the box for the

6      independent advisory services box, that the IA firm

7      continued on a separate path, along with the sole

8      proprietorship.  But, Your Honor, that's not necessarily the

9      case, because in 2001, Madoff did not have a registered

10     investment advisory business to report to the SEC.  Madoff

11     did not register the investment advisory business until

12     August of 2006, and that's in Statement of Fact -- Statement

13     of Material Fact Number 12.

14             The Trustee stated in 2006, BLMS registered as an

15     investment advisor.  And then, although the Defendants say

16     that they disputed that fact, in the reply -- in the text of

17     the reply they said, in August 2006, Madoff registered the

18     IA business with the SEC.

19             So, Your Honor, that fact is important because it

20     indicates that this occurred before the two-year transfers

21     at issue here.  They were from approximately December 2006

22     to December 2008, and so just wanted to point that out for

23     Your Honor.

24             THE COURT:  Very good.  Anyone else in support?

25     Very good.  Ms. Neville, then, I -- if you would please

Page 139

1    rebut first the Trustee's summary judgment, and then launch

2    into your counter summary judgment.

3              MS. NEVILLE:  Fine, Your Honor.  Can you hear me?

4    I'm always --

5              THE COURT:  Perfectly.

6              MS. NEVILLE:  -- confused about whether I'm muting

7    or unmuting.

8              THE COURT:  Truly, I relate.  Okay, go ahead.

9              MS. NEVILLE:  I know that these cases have been

10   argued again and again.  However, I would like to point out

11   that the Trustee does not have a single expert on the issue

12   of banking, banking practices, corporate matters, or

13   securities matters.  They have three experts, all of which

14   are forensic accountants.  And through those experts, the

15   Trustee is trying to put in the evidence that there was a

16   corporate transaction.

17             I'm confused about Mr. Hallenbeck's last argument.

18   Is he implying that there was no investment advisory

19   business before 2006?  That would be nonsense.  Clearly,

20   there was an investment advisory business when Madoff

21   registered the other two businesses in 2001, and he did not

22   check the investment advisory business.

23             I think it's pretty clear from the actual -- the

24   actual operation of the investment advisory business that it

25   was kept completely separate from the proprietary trading

Page 140

1      business and the market making business.  It had different

2      employees, it had different customers, it had different bank

3      accounts, it had different sources of funds.  If you rely on

4      the BD report from 2001 to say that all assets were

5      transferred, you're relying on the SEC filing, which was

6      patently false.  In fact, both Peter and Bernie Madoff were

7      convicted of false statements on their securities filings,

8      and those are the main pieces of evidence on which the

9      Trustee relies.

10           I truly don't think that this is the issue for

11     this case.  Your Honor has made a decision about the

12     language of SIPC as bringing in customer money applying to

13     any money that was held in the 703 and 509 accounts.  I

14     don't think that they ever belonged to the Debtor.  I don't

15     think the customers ever belonged to the Debtor.  But I

16     think my cross-motion really obviates the needs to have a

17     fight about this again.

18           I'd like to make two points.  In Epstein, Your

19     Honor actually ordered pre-judgement interest from the date

20     of the filing of the Epstein adversary.  In Mann, it was

21     ordered from the date of the BLMIS adversary.  Those are two

22     different dates, and it makes a big difference in the

23     calculation of interest.

24           I do have an argument about pre-judgement interest

25     in this case, which I think is really important.  This is a

Page 141

1    man who is 89 years old and has Alzheimer's.  He has no

2    funds to meet the judgement, let alone the judgement with

3    interest, so I'm very curious to know why both SIPC, whose

4    interest is in protecting customers, and the Trustee are so

5    adamant about pursuing pre-judgement interest against this

6    man, let alone the judgement.  I mean, this is a case where

7    it shouldn't have gone forward in the first place.  I'm

8    basically doing it on a pro bono basis because I find it so

9    offensive that this man is being pursued.  His assets are

10   exempt, he doesn't have much assets, and he's sick.

11           Mr. Cremona read out 386 other possible Defendants

12   under a hardship case.  No one was prosecuted who had less

13   than $500,000 in a transfer.  There are lots of other

14   examples of people being let out, so the prosecution of this

15   particular Defendant is really offensive.

16           I'd like to address the cross-motion now, because

17   I think it's really important.  A lot of my arguments have

18   been totally misrepresented.

19           THE COURT:  Okay.

20           MS. NEVILLE:  It is a absolute principle in New

21   York that there is a connection between the inability of a

22   Trustee to collect on assets because of legal protection or

23   exemption and the right to avoid a transfer.  I cited three

24   or four cases in my brief, the first of which being the Bear

25   Stearns versus Gredd case, which relies on a U.S. Supreme

Page 142

1    Court Begier versus IRS.  Mr. Cremona and Ms. Turner, now,

2    have ignored the fact that this is a principle in New York.

3    It may be a minority view, but it is an absolute principle.

4    If you can't collect on the asset, you can't bring an

5    avoidance action.  My brief has three or four cases, all of

6    which show that in that instance, the Trustee was barred by

7    the defense of a legal protection or exemption from pursuing

8    the action.

9          Now the question comes, is this asset exempt?

10   There is no question, under New York law, that this asset,

11   which was an individual retirement account, is exempt.

12   There's not one statute, there are two statutes.  One is the

13   CPLR, but even before that is the trust and estates, the

14   EPTL 7-3.1, which defines an individual retirement account

15   as a spendthrift account.  It changes the notion of what

16   that account is from a self-settled trust to a -- almost an

17   irrevocable trust set up by a third party.  Absolutely,

18   that's what it does.

19         The same language appears in the CPLR 5205, which

20   is an execution statute, and both have an exemption.  The

21   way the statute works is the asset and the distributions

22   from it, in two parts, are exempt from the claims of

23   creditors, except for the time when the settler of that

24   trust, or IRA, puts money into the account to conceal it

25   from their own creditors.  Every single case that has

Page 143

1    interpreted these two statutes has interpreted it that way.

2    The idea that a third party could come in and say the money

3    that went into that trust was a fraudulent transfer

4    undermines the entire protection, which is set up by the

5    statute.

6            Ms. Turner points out that there is an exclusion,

7    and that exclusion is for a fraudulent transfer.  And as I

8    just pointed out, the language there is not 100 percent

9    clear, but it certainly doesn't apply to transfers from

10   BLMIS.  First of all, it only applies in cases under Article

11   10 of the DCL.  The Trustee does not have a claim under the

12   DCL.

13           Earlier in the same statute, when the -- when the

14   legislator wanted to refer to the Bankruptcy Code, it

15   expressly did.  Let me pull this up so I can cite it for you

16   exactly.  I think it's in (c)(3) of the CPLR 5205.  It says

17   that all trusts and the assets from there shall be

18   conclusively presumed to be spendthrift trust under this

19   section, under the common law of the state of New York for

20   all purposes, including but not limited to all cases arising

21   in cases under Section 100 -- 113 of Title 11 of the United

22   States (indiscernible) Code, as amended.  That's one

23   provision, one subsection of the exclusion that refers only

24   to DCL.  So the exemption, on its face, doesn't apply to an

25   avoidance under 548(a)(1)(a), which is all the Trustee has

Page 144

1    here.

2              In addition, that particular section refers only

3    to additions.  And it is quite clear in all of the case law

4    addressing that exemption that it only applies to actual

5    exemptions, i.e., deposits.  It doesn't apply to income.

6    Because what you have in the following section, in D, is

7    distributions which are income, or profits, and that's a

8    completely different section.  So additions means only

9    additions.  The only actual additions to that account are

10   Mr. Millers' $4 million-plus of deposits into that account.

11             What is not discussed is D, which is the income

12   exemptions, and it says that property from that individual

13   retirement account is exempt from execution by creditors, or

14   any kind of recovery from creditors, if the principal is

15   exempt.  Well, the principal of that account is Mr. Miller's

16   deposits, and those are exempt from fraudulent transfer

17   actions.  And in this case, it's 100 percent --

18             THE COURT:  Excuse me.  Just let me get -- let me

19   get a fact clear in my own mind, Ms. Neville, just one fact

20   I want to be clear on.  Has he not received all the

21   principal back?

22             MS. NEVILLE:  Yes.  Yes, Your Honor, he has.

23             THE COURT:  Okay.  Okay.  That's all.  I just

24   wanted to be clear on that.  I thought that's what I'd read.

25             MS. NEVILLE:  Yes.  No, of course, he has.  But

Page 145

1    the question I have is whether or not the transfers which

2    were made, which includes some of those principals, are

3    avoidable, and the answer is, no, because they are exempt.

4            I want to get to the cases that have discussed

5    this.  The first one --

6            THE COURT:  Well, just so -- I want to be clear.

7    I want you discussing the Bernstein opinion and the Rakoff

8    opinion.

9            MS. NEVILLE:  Exactly.

10           THE COURT:  Okay.

11           MS. NEVILLE:  I think Judge Rakoff's opinion came

12   first.  It was on a motion to dismiss, and the argument

13   there, which I actually was one of the people making the

14   argument, was that because people had to take out money from

15   their individual retirement accounts, it shouldn't be

16   counted as a fraudulent transfer, and Judge Rakoff denied

17   that.  And in a footnote, he tried to address the question

18   of whether or not the exemption applied.

19           There was no factual or legal discussion in the

20   briefing on that particular matter.  And he actually -- he

21   actually tosses away the Section D exemption for income

22   distributions and says, basically, that it wouldn't apply

23   here.  But on its face, it applies because it's from a

24   trust, the principal of which is exempt.  And the principal

25   is, as the Trustee says in his actual statement of facts, is

Page 146

1    exempt because the principal is the money that was put in by

2    Mr. Miller.

3            Judge Bernstein then, also on a motion to dismiss,

4    raised four separate issues.  I'll address them one at a

5    time.  The first one was, we didn't tie the fact that you

6    couldn't execute on the asset to the viability of a

7    fraudulent transfer.  And what I've just said earlier is

8    that that's the principle under New York law which says that

9    if you can't get it, then you can't avoid it.  So, on the

10   first point, the answer to that is, there is a connection

11   between the ability to collect and the ability to avoid.

12           The second is, he said, the exemption doesn't

13   apply to all trusts, which was true, because this was a

14   motion to dismiss that had 50 or 80 participants, and not

15   everybody had an individual retirement account.  There is no

16   dispute that it absolutely does apply to individual

17   retirement accounts.

18           The third thing he says is that CPLR 5205

19   addresses the situation where the Debtor and the Trust are

20   different entities, and the Plaintiff seeks to satisfy its

21   judgement against the judgement Debtor from the trust.

22   Here, the trust of the retirement received the fraudulent

23   transfer.  We agree.  It went first to a trust, which had a

24   spendthrift trust.

25           Fourth, even if the principal is exempt, the

Page 147

1   income earned may not be fully exempt.  Well, under

2   5205(d)(1), the 90 percent qualification on the exemption is

3   inapplicable to individual retirement accounts.  So all of

4   the issues that are raised by Judge Bernstein I think I can

5   address, or I have addressed, at great length in the briefs.

6          Then we get to the question of whether or not

7   there's a subsequent transferee, and Ms. Turner said, well,

8   look at Nelson.  Well, I don't have the factual development

9   in Nelson that I have laid out for you in this case.  What

10  Fiserv did -- now, you remember, Fiserv was the appointed

11  agent, custodian trustee for all of Madoff's individual

12  retirement accounts.  There must have been 100 or more.  And

13  early on in the case, many people brought an action against

14  Fiserv Retirement Accounts.  It had 20 different names, but

15  they were all the same entity.

16         Their agreement about law suits on a fraudulent

17  case like this is pretty air tight.  It would have been

18  hard, at the early stages of this case, to bring Fiserv into

19  the picture, and it was dismissed, even by the Trustee,

20  without prejudice early on.

21         But what I have seen in this case and in several

22  of the others that I have, because I had other individual

23  retirement accounts, is that Fiserv held onto the money for

24  an extremely lengthy period of time.  And one of my other

25  clients pointed this out, that he got very frustrated

Page 148

1    because he would make a request to Fiserv for a withdrawal

2    and it would take weeks to get it.  And then, when I would

3    look at the dates on the checks, you would see that the

4    checks went earlier to Fiserv.

5          So what I have shown, and what I can continue to

6    show, is that Fiserv would make a request to -- well, the

7    beneficiary would make a request to Fiserv for money.

8    Fiserv would make a request to BLMIS or Madoff Securities,

9    whoever.  Mostly, they're addressed to Bernie Madoff,

10   exactly.  All of the requests are addressed to Bernie

11   Madoff, as a matter of fact.  And then, the money would come

12   to retirement accounts.  Every check in this case went to

13   retirement accounts, every single check.  There's no check

14   to Mr. Miller, and the Trustee doesn't have a single check

15   to Mr. Miller, because they all went from retirement

16   accounts to Mr. Miller.

17         But the dates on the check, which are the dates in

18   the Trustee's complaint, are all the dates that the checks

19   were sent to Fiserv.  They're not the dates that then Fiserv

20   passed them on.  So Fiserv held on to those checks for a

21   week, 10 days, two weeks.  And it's a very tedious process

22   to figure this out.  You have to take the date of the check.

23   You have to take the quarterly reports that Fiserv sent.

24   You have to show when Fiserv reports that it got the check.

25   Then you have to see when the check was sent out or the

Page 149

1    distribution was made to Mr. Miller.  And for many years,

2    the dates were a week to 10 days, two weeks later.  So

3    Fiserv had the money to float, not only on this account, but

4    on 100 accounts.

5              There were anomalies here.  First of all, 2006 was

6    a year when there was only one distribution made, and it was

7    made on the same day.  I don't know why.  I mean, I didn't

8    have -- you can't ask Mr. Miller any of this stuff about the

9    account.  Two thousand seven was an anomaly as well.  First

10   of all, $1 million came out and went to another Madoff fund-

11   of-funds investment, Austin Capital.  And there were other

12   distributions of an extraordinary size, $300,000, whatever.

13   Those were made on the same day, so they're hard to compare

14   to the process that Fiserv used throughout the entire

15   account.  But not a single request was ever made by Mr.

16   Miller directly to Bernie Madoff.  Not a single check was

17   ever paid directly to Mr. Miller from BLMIS, Madoff

18   Securities, Bernie Madoff, or anybody.  They all came from

19   Fiserv throughout the entire history of this account.

20             We get to the question, then, of whether -- oh, I

21   want to point out one more thing.

22             THE COURT:  Let me just ask one -- let me

23   interrupt and ask one question.  The record shows that

24   between $50,000 to $60,000 a month was taken out.  Did that

25   go to Mr. Miller?

Page 150

1          MS. NEVILLE:  After it went to retirement

2     accounts, it did.

3          THE COURT:  I understand, but you're saying

4     Mr. Miller didn't have the $1 million, Mr. Miller didn't

5     have the other amount, but he did have the $50,000 to

6     $60,000 a month.

7          MS. NEVILLE:  Yeah.  I'm not making a point,

8     though, Your Honor, about necessarily where the --

9          THE COURT:  That's a point I want made.

10          MS. NEVILLE:  Okay.  Okay.  For me, it was the

11     timing, because the --

12          THE COURT:  Answer my question first.

13          MS. NEVILLE:  Oh, I --

14          THE COURT:  Then you can put timing in all you

15     want to.  But I want to know if this ended up in Mr.

16     Miller's account.

17          MS. NEVILLE:  The $60,000 did end up in Mr.

18     Miller's account.  I mean, I don't have the checks to show

19     you that, but I assume it did.

20          Now, I would like to point out that there were --

21          THE COURT:  I know you're arguing the subsequent

22     initial transfer.

23          MS. NEVILLE:  Yes.

24          THE COURT:  But you haven't looked at your

25     client's bank accounts to see that these came in to him?

Page 151

1              MS. NEVILLE:  Your Honor, there are several things

2    about that.  It's 12 years since these cases were started.

3              THE COURT:  Okay.

4              MS. NEVILLE:  By the time they were actually

5    started -- I have 35 clients.  Many of my clients did not

6    retain the documentation that you would -- we would all have

7    loved to have.  I mean, even the Fiserv documents that we

8    got on discovery in 2015 were incomplete.  There was not, in

9    most clients' cases, a retention of documents like bank

10   checks.

11             THE COURT:  Okay.  I was just -- that's fine.

12   That's all.

13             MS. NEVILLE:  Unfortunately, that's the case.

14             THE COURT:  Okay.

15             MS. NEVILLE:  The second thing is that one cannot

16   ask Mr. Miller a question now and get an answer that makes

17   any sense.

18             THE COURT:  Okay.  Okay.  I don't know that that's

19   in dispute.  I was just curious because of what you said.

20   All right.

21             MS. NEVILLE:  I'm even taking the fact that he

22   must have received the money.

23             THE COURT:  Okay.

24             MS. NEVILLE:  Because there are a couple of

25   instances where there was a check returned or a check

Page 152

1    misplaced, and that shows up both in the Trustee's chart and

2    in the Fiserv thing, but I think that's largely irrelevant.

3           THE COURT:   Okay, thank you.

4           MS. NEVILLE:   I think what's really important here

5    is the fact that Fiserv held onto that money.  And during

6    the period, particularly from 2007 on, Fiserv was taking

7    huge amounts of fees out.  It took out a fee for the

8    administration of the Austin Capital money as an

9    extraordinary investment.  That's what I think they called

10   it, the extraordinary investment fee, which was taken out

11   every month for monitoring the reports that were sent to

12   retirement accounts from Citco regarding the Austin Capital

13   account.  So even that money went through -- went through

14   Fiserv first.

15          I think the point that I was trying to make about

16   the subsequent transferee and the timing here is that I

17   don't -- I don't know if that was made a point in Nelson.  I

18   don't think it was, because I think I'm the one who spent

19   most of her time tracing these ridiculous transfers from

20   check to quarterly statement to client.  But I do see that

21   there was a period of time where Fiserv had the float on a

22   good deal of money over a long period of time.  And I think

23   the case law in New York -- and again, it's another Bear

24   Stearns versus Gredd case, but not the same one that I cited

25   earlier, this is 397 B.R. 1 -- talks about the fact that

Page 153

1    dominion and control doesn't mean you're free to buy uranium

2    stocks and play the lottery.  It's an exercise of any

3    control.  It's just not a mere pass-through of money from

4    one entity to another.

5              And in this case, what we have is a huge entity

6    holding on to lots and lots of money being transferred from

7    BLMIS, Madoff Securities, Bernie Madoff, whoever, to these

8    holders of these individual retirement accounts.  They were

9    able to take fees out of it, and did take fees out of it.

10   They were indemnified, and had they actually been held

11   liable for not adequately warning the customers of the

12   fraud, they would have been indemnified and been able to

13   take money again out of any accounts that remained.

14             That is enough to, I think, constitute dominion

15   and control, and I think it turns Mr. Miller from being an

16   initial transferee into being a subsequent transferee.  And

17   I think you got some of the subsequent transferee law from

18   Mr. Cunha this morning, but there is more of it in our

19   brief.  Once you are a subsequent transferee, 550(b)(1)

20   kicks in.  It's very clear Mr. Miller had no knowledge of

21   the fraud, and it's clear here that the value that was given

22   was the value that is given to Fiserv.  And they had a

23   contract, so it fits within the Enron case for the question

24   of meeting the value prong of 550(b)(1).  There was value;

25   there was no knowledge.  There is a defense.

1              I would -- I think I've addressed the issue of

2     interest.  There was another aspect of the Nelson case.

3     Judge Bernstein handed -- signed an order that said -- that

4     relies on Wagner v. Eberhard, which is a Nevada case, and

5     the Trustee has cited it again.  But that is a case under

6     Nevada law and turns on the fact that the trust, the IRA

7     trust, is viewed as a separate entity.  It's like a self-

8     settled trust.  But New York law blows that assumption away.

9     So Eberhard and all the cases collected in there, which look

10    at the difference between an individual retirement account

11    and a self-settled trust, you know, are irrelevant.  Wagner

12    v. Eberhard is inapposite.

13             That's it, unless you have any more questions, and

14    unless they have something I'd like to respond to.

15             THE COURT:  I don't.  I don't.  Ms. Turner?

16             MS. TURNER:  Thank you, Your Honor.  Just a few

17    points, and please bear with me as I kind of organize my

18    thoughts here.

19             So, first, on Defendant's point regarding pre-

20    judgement interest, because the Trustee has requested pre-

21    judgement interest from the filing date through the date of

22    entry of judgement.  Defendant is correct that the Trustee

23    asked for pre-judgement interest from the date of the

24    complaint in Mann and Epstein.  However, in both of those

25    decisions, Your Honor cited -- and let me pull up the

Page 155

1   case --

2           THE COURT:  And you've taken me up on appeal on

3   it, so...

4           MS. TURNER:  Correct.  Your Honor cited, I believe

5   it's FKF 3, which held that Trustee is -- a SIPA Trustee is

6   entitled to pre-judgement interest from the date of the

7   filing date, and that is the basis for the Trustee's request

8   in this case.

9           Second, regarding --

10          THE COURT:  Just to be clear, that wasn't a SIPA

11  Trustee.  That was just a regular Chapter 11 Trustee, so...

12          MS. TURNER:  Okay.  Thank you, Your Honor, for the

13  clarification.  Sorry if I misunderstood.

14          THE COURT:  No, you didn't.  I'm just clarifying

15  it for everybody's sake.

16          MS. TURNER:  Regarding Defendant's argument about

17  Mr. Miller's financial state, the Trustee is sympathetic to

18  Mr. Miller's plight, but the Trustee has a fiduciary duty to

19  recover the fictitious profits for the benefit of the

20  Customer Property Fund, and Mr. Miller has held on to these

21  profits for over 12 years.

22          And next, I just want to address, Defendant --

23  Counsel for Defendant spent a significant amount of time

24  explaining why the New York law exemption applies.  But the

25  Trustee submits that the Defendant has failed to show that

1    this exemption operates to defeat the Trustee's avoidance

2    claims.  And I'm just going to run through some of

3    Defendant's cited cases.

4            First, the Bear Stearns case; this involved

5    fraudulent transfers of billions in short-ship sales, which

6    are heavily regulated under federal law, that requires these

7    assets to be frozen until the seller covers the short sale.

8    In this case, there was no dispute that the transfers were

9    short sales and could not have been used to satisfy other

10   creditors.  But here, in Miller, the Defendant argues that

11   state law, not federal, would exempt his IRA assets.  But

12   the fictitious profits he received were comprised of

13   customer property.  Further, this no-harm-no-foul rule the

14   Defendant suggests has been rejected in favor of finding

15   that any exemption is the Debtors', here BLMIS, to assert.

16           And the other case Defendant relies on is Ehrlich

17   v. Commercial Factors of Atlanta.  In that case, CFA had a

18   valid perfected security interest in the cash transferred to

19   it in an effort to pay down the Debtor's debt.  This wide-

20   ranging security interest in its property and assets as

21   collateral would encourage a CFA.  HTG was transferring the

22   property that was already secured by the transferee; thus,

23   it never really belonged to the Debtor.  Whereas here, the

24   transfers to Defendant were always property of the Debtor,

25   and anything beyond Defendant's deposits with BLMIS were

Page 157

1    other customers' money and must be returned.

2           And then, I believe this is my last point, Your

3    Honor.  Counsel gave us a long history of the IRA custodian

4    and made some general statements about delay that some of

5    her other clients have experienced.  But the Trustee would

6    ask the Court to review his expert, Ms. Lisa Collura's

7    Exhibit 11 to her expert report.  It shows that almost all

8    of the transfers were inflows to the custodian on the same

9    day that they were outflows to the Defendant.

10          For example, I am looking at Exhibit 11 right now.

11   On January 8, 2008, there was a transfer of $60,000 that was

12   settled with the IRA custodian on January 8th.  That same

13   day, it was transferred to Defendant.  Again, on February

14   19, 2008, another $60,000 was settled with the IRA

15   custodian, and that same day, it was transferred to

16   Defendant.  Again, April 8, 2008, $100,000 was transferred

17   to the IRA custodian and was settled that same day and sent

18   to the Defendant.  And most of these transfers occur -- most

19   of the inflows and outflows occur on the same day, some one

20   or two days apart.

21          And, I lied; I have one more point.  With regards

22   to Nelson, Counsel argued that this case differs factually.

23   The Trustee submits it doesn't.  There are no different

24   facts here.  But even if there were, Judge Bernstein held as

25   a matter of law that the IRA custodian was a mere conduit,

Page 158

1    so that doesn't matter in this case.

2            Your Honor, if you have any other questions, I'm

3    happy to answer them.  Otherwise, thank you for giving me

4    the chance to argue.  This was my first oral argument.

5            THE COURT:  Ah, congratulations.

6            MS. TURNER:  Thank you.

7            THE COURT:  Welcome to the Court.

8            MS. NEVILLE:  Your Honor?

9            THE COURT:  Yes, ma'am, sure?

10           MS. NEVILLE:  I'd like to answer some of the

11   things Ms. Turner said.  That first transfer in January of

12   2008 was requested from Bernie Madoff in -- December 24th of

13   2007, so there was a delay there in that particular one.

14   The other transfers in 2008 were mostly anomalies, $300,000,

15   which Mr. Miller requested for whatever reason he did.

16           And I am not saying that every single transfer

17   throughout the entire 11 years that Mr. Miller had was

18   delayed.  But there are significant delays, and I have

19   pointed them out in their brief.  Virtually every single one

20   in 2005 was delayed 10 days or a week.  So there were

21   certainly anomalies in the last couple of years.  As I

22   pointed out, 2006 had only one distribution; 2007 had that

23   $1 million.  There were definite anomalies, but throughout

24   the entire time, retirement accounts had the ability to ask

25   for the money, did ask for the money, took its fees out of

Page 159

1    the money, and then transferred it to Mr. Miller.

2            So, there's no such thing as a matter of law that

3    the custodian is a conduit.  It's a factual matter.  And

4    what I'm arguing here is that there are facts that I have

5    presented to you, which I don't think were presented in

6    Nelson, that for 11 years, retirement accounts controlled

7    this account and controlled the money -- controlled the

8    ability to take the money out for its fees, and for whatever

9    else it needed.

10           On the issue of fiduciary duty, I think I did

11   address that there were exceptions made for other people in

12   this particular instance where the Defendant showed that he

13   had no money.  And there were other exceptions, 386 to be

14   exact.  And I'd also like to point out that this may be the

15   only case where SIPC actually went after innocent recipients

16   of a fraudulent transfer.  Virtually all the other cases

17   prior to Madoff, it was only those who were complicit in the

18   fraud or who profited from the fraud deliberately, not

19   innocent customers.  I mean, that's basically -- I

20   understand fiduciary duty.  At the moment, I believe that

21   all of the people who lost principal are close to getting

22   all of their principal back, both from the Madoff Trustee

23   and from the Trustees --

24           THE COURT:  That's irrelevant.  That part's

25   irrelevant.

Page 160

1          MS. NEVILLE:  Well, okay.

2          THE COURT:  All right.  Anyone else wish to add

3     anything?  You two will be receiving a written decision in

4     this matter.

5          MS. NEVILLE:  Thank you, Your Honor, and thank you

6     for the break.  I needed it.  I needed an aspirin.

7          THE COURT:  Thanks, everyone, and Ms. Turner,

8     congratulations.  It's always good to see the younger

9     lawyers coming up to the Court.

10          MS. TURNER:  Thank you, Your Honor.

11          THE COURT:  And, as Ms. Neville and I know, we're

12     probably the older lawyers.

13          MS. NEVILLE:  A retiree, Your Honor.

14          THE COURT:  Oh.  Haven't made it there yet.  On my

15     way.  Good luck, everyone.  Thank you very much.

16          MAN 1:  Thank you, Your Honor.

17          MAN 2:  Thank you, Your Honor.

18          THE COURT:  Thank you.

19          (Whereupon these proceedings were concluded at

20     0:00 PM)

21

22

23

24

25

Page 161

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  June 17, 2021