**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | |
| v. | |
| THE GERALD AND BARBARA KELLER FAMILY TRUST, GERALD E. KELLER, individually and in his capacity as Trustee of the Gerald and Barbara Keller Family Trust, BARBARA KELLER, individually and in her capacity as Trustee of the Gerald and Barbara Keller Family Trust, | Adv. Pro. No. 10-04539 (CGM) |
| Defendants. | |

## TRUSTEE'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................1

BACKGROUND ..........................................................................................2

ARGUMENT ..............................................................................................4

I.      ALL OF THE ISSUES RAISED IN THIS SUMMARY JUDGMENT MOTION
        HAVE ALREADY BEEN DECIDED AND THE COURT SHOULD ADHERE
        TO THE PRIOR RULINGS AS LAW OF THE CASE ......................................4

II.     IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT,
        SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE
        TRUSTEE AS A MATTER OF LAW ...........................................................6

        A.      Legal Standard ..........................................................................6

        B.      The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year
                Transfers of Fictitious Profits Made by BLMIS to Defendants.............7

                1.      BLMIS Made the Two-Year Transfers with Actual Fraudulent
                        Intent and in Furtherance of the Fraud.........................................8

                        a.      BLMIS Was a Ponzi Scheme...........................................9

                        b.      Trustee's Experts Confirmed That BLMIS Was a Ponzi
                                Scheme........................................................................11

                        c.      The Trustee's Experts Confirmed That BLMIS Paid
                                Investor Redemptions from Customer Funds ...............13

                        d.      BLMIS's Two-Year Transfers to Defendants Were in
                                Furtherance of the Fraud...............................................15

                        e.      BLMIS Made the Transfers to Defendants Within the Two-
                                Year Period ..................................................................15

                        f.      Defendants Have Not Presented Any Countervailing
                                Evidence......................................................................16

                        g.      The Trustee is Entitled to Prejudgment Interest as a Matter
                                of Law .........................................................................16

III.    DEFENDANTS' DEFENSES CAN BE DETERMINED AS A MATTER OF
        LAW ....................................................................................................18

        A.      Defendants Did Not Give Value for Fictitious Profits...........................18

B.    Taxes May Not Be Considered as Part of Value Calculation ................................20

C.    The Transfers Were an Interest of the Debtor in Property....................................20

D.    SIPA And The Bankruptcy Code Authorize the Trustee to Recover
        Customer Property, Wherever Held........................................................................24

        1.    SIPA and SIPC..........................................................................................25

        2.    Becoming a Member of SIPC ...................................................................26

        3.    Initiating a SIPA Liquidation....................................................................26

        4.    Customer Property Under SIPA.................................................................27

        5.    Madoff's Business .....................................................................................29

        6.    The Liquidation of BLMIS ........................................................................30

        7.    Substantive Consolidation ........................................................................30

        8.    The Trustee Can Recover Any Transfers of Customer Property ..............32

E.    Madoff's Purported Purchase of Securities Does Not Create a Genuine
        Issue of Material Fact..............................................................................................37

CONCLUSION ..................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
  No. 05 Civ. 9050(LMM), 2011 WL 1419617 (S.D.N.Y. Apr. 7, 2011), *aff'd*,
  748 F.3d 110 (2d Cir. 2014)...................................................................................8

*In re Adler Coleman Clearing Corp.*,
  195 B.R. 266 (Bankr. S.D.N.Y. 1996)...................................................................25

*Alexander v. Compton (In re Bonham)*,
  229 F.3d 750 (9th Cir. 2000) ................................................................................36

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................................5

*Armstrong v. Collins*,
  Nos. 01 Civ. 2437(PAC), 02 Civ. 2796 (PAC), 02 Civ. 3620(PAC), 2010 WL
  1141158 (S.D.N.Y. Mar. 24, 2010) .......................................................................11

*Bayou Accredited Fund, LLC v. Redwood Growth Partners L.P. (In re Bayou
  Grp., LLC)*,
  396 B.R. 810 (Bankr. S.D.N.Y. 2008), *rev'd in part on other grounds*, *Bayou
  IV*, 439 B.R. 304 ...............................................................................11, 15, 16

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
  397 B.R. 1 (S.D.N.Y. 2007)....................................................................................9

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
  380 F. Supp. 2d 334 (S.D.N.Y. 2005)....................................................................7

*In re Bevill, Bresler & Schulman, Inc.*,
  83 B.R. 880 (Bankr. D.N.J. 1988) ........................................................................29

*In re BLMIS LLC*,
  773 F.3d 411 (2d Cir. 2014)....................................................................................9

*In re BLMIS LLC*,
  654 F.3d 229, 233 (2d Cir. 2011)..........................................................................25

*In re BLMIS LLC*,
  976 F.3d 184 (2d Cir. 2020)..................................................................................19

*Bourdeau Bros., Inc. v. Montagne (In re Montagne)*,
  Adv. Pro. No. 08-1024, 2010 WL 271347 (Bankr. S.D.N.Y. Jan. 22, 2010) ...........6

*Brody v. Vill. of Port Chester*,
   345 F.3d 103 (2d Cir. 2003)..................................................................5

*In re Cassandra Grp.*,
   338 B.R. 583 (Bankr. S.D.N.Y. 2006) ..................................................16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..........................................................................6, 7

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp. LLC)*,
   439 B.R. 284 (S.D.N.Y. 2010).............................................9, 11, 15, 19

*Donell v. Kowell*,
   533 F.3d 762 (9th Cir. 2008) ...............................................................20

*Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*,
   97 B.R. 503 (E.D. Ark. 1987)..............................................................28

*In re FKF 3, LLC*,
   No. 13 Civ. 3601 (JCM), 2018 WL 59292131 (S.D.N.Y. Oct. 24, 2018).......................17, 18

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund)*,
   359 B.R. 510 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397 B.R. 1 (S.D.N.Y. 2007) .................................................................15

*In re Lehman Bros. Holdings*,
   445 B.R. 143 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012)...........................................................28

*Leonhardt v. Madoff*,
   No. 09-2032 (S.D.N.Y. Mar. 5, 2009) ..................................................31

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).............................................................................7

*McHale v. Boulder Cap. (In re 1031 Tax Grp., LLC)*,
   439 B.R. 47 (S.D.N.Y. 2010).............................................11, 19, 24

*Moran v. Goldfarb*,
   No. 09-cv-7667 (RJS), 2012 WL 2930210 (S.D.N.Y. July 16, 2012)....................................11

*In re Motors Liquidation Co.*,
   590 B.R. 39 (S.D.N.Y. 2018), *aff'd*, 943 F.3d 125 (2d Cir. 2019) ...........................................4

*Newbro v. Freed*,
   409 F. Supp. 2d 386 (S.D.N.Y. 2006)..................................................18

*In re Old Naples Sec., Inc.*,
   223 F.3d 1296 (11th Cir. 2000) ...................................................................35

*In re PCH Assocs.*,
   949 F.2d 585 (2d Cir. 1991)............................................................................6

*Perez v. Terrastar Corp.* (*In re Terrastar Corp.*),
   No. 16 Civ. 1421 (ER), 2017 WL 1040448 (S.D.N.Y. Mar. 16, 2017), *appeal
   dismissed*, No. 17-1117 (2d Cir. June 29, 2017).........................................4

*Picard v. Avellino*,
   557 B.R. 89 (Bankr. S.D.N.Y. 2016) .............................................................33

*Picard v. BAM L.P.*,
   608 B.R. 165 (Bankr. S.D.N.Y. 2019) ...........................................19, 29, 40

*Picard v. BAM L.P.*,
   624 B.R. 55 (Bankr. S.D.N.Y. 2020) .................................................. *passim*

*Picard v. Chais*,
   445 B.R. 206 (Bankr. S.D.N.Y. 2011) .............................................................9

*Picard v. Cohen*,
   Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
   25, 2016) ............................................................................................9, 20, 24

*Picard v. Cohmad Sec. Corp.*,
   454 B.R. 317 (Bankr. S.D.N.Y. 2011) .............................................................9

*Picard v. Estate (Succession) of Doris Igoin (In re BLMIS)*,
   525 B.R. 871 (Bankr. S.D.N.Y. 2015) ...........................................................20

*Picard v. Fairfield Greenwich Ltd.*,
   762 F.3d 199 (2d Cir. 2014)...........................................................................29

*Picard v. Greiff*,
   476 B.R. 715 (S.D.N.Y. 2012)..........................................................9, 15, 19

*Picard v. JABA Assocs. LP*,
   No. 20 cv. 3836, 2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021) .................... *passim*

*Picard v. Katz*,
   462 B.R. 447 (S.D.N.Y. 2011)..........................................................................9

*Picard v. Legacy Cap. Ltd.*,
   603 B.R. 682 (Bankr. S.D.N.Y. 2019) ..............................................4, 10, 11, 40

*Picard v. Lisa Beth Nissenbaum Tr.*,
No. 20 cv. 3140, 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) .................................... *passim*

*Picard v. Lowrey*,
596 B.R. 451 (S.D.N.Y. 2019)...............................................................................................27

*Picard v. Miller*,
Adv. Pro. No. 10-04921 (CGM), 2021 WL 2787604 (Bankr. S.D.N.Y. July 2,
2021) ..................................................................................................................... *passim*

*Picard v. Nelson*,
610 B.R. 197 (Bankr. S.D.N.Y. 2019)........................................................................... *passim*

*Picard v. RAR Entrepreneurial Fund, Ltd.*,
No. 20-cv-1029, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021)................................................5, 6

*In re Picard*,
917 F.3d 85 (2d Cir. 2019)...................................................................................................29

*In re Pilgrim's Pride Corp.*,
442 B.R. 522 (Bankr. N.D. Tex. 2010).................................................................................5, 6

*In re Primeline Sec. Corp.*,
295 F.3d 1100 (10th Cir. 2002) ............................................................................................35

*In re Rock & Republic Enters., Inc.*,
No. 10–11728 (AJG), 2011 WL 2471000 (Bankr. S.D.N.Y. June 20, 2011)...........................5

*Rosenman Family, LLC v. Picard*,
395 F. App'x 766 (2d Cir. 2010) .........................................................................................25

*SEC v. F.O. Baroff Co.*,
497 F.2d 280 (2d Cir. 1974).............................................................................................6, 25

*SIPC v. Barbour*,
421 U.S. 412 (1975)............................................................................................................25

*SIPC v. BLMIS (In re Madoff Sec.)*,
499 B.R. 416 (S.D.N.Y. 2013).............................................................................................25

*SIPC v. BLMIS LLC (In re Bernard L. Madoff)*,
531 B.R. 439 (Bankr. S.D.N.Y. 2015)................................................................................7, 9

*SIPC v. BLMIS LLC (In re BLMIS)*,
522 B.R. 41 (Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL
183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017)....................23, 35

*SIPC v. BLMIS LLC (In re BLMIS LLC)*,
    424 B.R. 122 (Bankr. S.D.N.Y. 2010)............................................................9, 25

*Stanford Square L.L.C. v. Nomura Asset Cap. Corp.*,
    232 F. Supp. 2d 289 (S.D.N.Y. 2002).................................................................17

*Town of Fairfield v. Madoff*,
    No. 09-5023735 (Conn. Super. Ct. Mar. 30, 2009) .............................................31

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016)................................................................................29

*United States v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002)................................................................................5

*In re Weis Sec., Inc.*,
    No. 73 Civil 2332, 1976 WL 820 (S.D.N.Y. Aug. 2, 1976)................................25

*Ying Jing Gan v. City of New York*,
    996 F.2d 522 (2d Cir. 1993)............................................................................7, 16

**Statutes**

11 U.S.C. § 101(41) ...............................................................................................27

11 U.S.C. § 109(a) .................................................................................................27

11 U.S.C. § 548 ......................................................................................................24

11 U.S.C. § 548(a) ...................................................................................................3

11 U.S.C. § 548(a)(1) .............................................................................................24

11 U.S.C. § 548(a)(1)(A) .........................................................................................7

11 U.S.C. § 548(c) .................................................................................................19

11 U.S.C. § 548(d)(2)(a) ........................................................................................19

11 U.S.C. § 550(a)(1) ...............................................................................................3

11 U.S.C. § 551 ........................................................................................................3

15 U.S.C. § 78ccc(a) ..............................................................................................26

15 U.S.C. § 78ccc(a)(2)(A) ....................................................................................26

15 U.S.C. § 78ddd(c)(2)..........................................................................................26

15 U.S.C. § 78eee(b)(1) ..............................................................................................34

15 U.S.C. § 78eee(b)(2)(A)(1) ....................................................................................26

15 U.S.C. § 78eee(b)(3) ..............................................................................................26

15 U.S.C. § 78eee(b)(4) ..............................................................................................27

15 U.S.C. § 78fff-2(b) .................................................................................................19

15 U.S.C. § 78fff-2(c)(1) .............................................................................................25

15 U.S.C. § 78fff-2(c)(3) ......................................................................................*passim*

15 U.S.C. § 78fff(a) .....................................................................................................25

15 U.S.C. § 78*lll*(4) .........................................................................................25, 28, 32

15 U.S.C. § 78*lll*(4)(D) ..............................................................................................28

15 U.S.C. § 78*lll*(5) ...................................................................................................27

15 U.S.C. § 78*o*(b) ...............................................................................................26, 27

28 U.S.C. § 1961 .........................................................................................................17

**Rules**

17 C.F.R. § 240.15b1-3(b) ..........................................................................................26

17 C.F.R. § 240.15b6-1(b) ..........................................................................................26

17 C.F.R. § 240.15c3-3 ...............................................................................27, 28, 32, 37

17 C.F.R. § 240.15c3-3(f) ...........................................................................................28

17 C.F.R. § 249.501(a) ................................................................................................26

Fed. R. Bankr. P. 7056 .............................................................................................1, 6

Fed. R. Bankr. P. 7056-1(a) .........................................................................................3

Fed. R. Civ. P. 56 .........................................................................................................1

Fed. R. Civ. P. 56(a) ....................................................................................................6

Fed. R. Civ. P. 56(c)(1) ...............................................................................................7

**Other Authorities**

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74
(2002) .................................................................................................................................27

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff,

respectfully submits this memorandum of law in support of the Trustee's motion (the "Motion")

under Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 for

summary judgment as to Count One of the Trustee's complaint to avoid and recover the amounts

fraudulently transferred by BLMIS to defendants The Gerald and Barbara Keller Family Trust

(the "Keller Family Trust"), Gerald E. Keller, in his capacity as Trustee of the Keller Family

Trust, and Barbara Keller, in her capacity as Trustee of the Keller Family Trust (the

"Defendants").  The facts underlying this Motion are set forth in the Trustee's Statement of

Material Facts Pursuant to Local Rule 7056-1 ("Stmt."), the Declaration of Nicholas J. Cremona

("Cremona Decl."), and the Declarations of Bruce G. Dubinsky, Lisa M. Collura, and Matthew

B. Greenblatt.

## PRELIMINARY STATEMENT

This avoidance and recovery action centers on the undisputable fact that in the two years

preceding the commencement of the SIPA liquidation (the "Two-Year Period"), Defendants

received $1,896,148 in fictitious profits from BLMIS.  For decades, BLMIS operated the largest

Ponzi scheme in history.  In their allocutions, Madoff and BLMIS employees confirmed that

BLMIS was a Ponzi scheme, starting at least in the 1970s and continuing through BLMIS's

collapse in December 2008.  Thus, the Trustee has established his *prima facie* case that the

transfers to Defendants were made with the intent to hinder, delay, or defraud BLMIS's creditors

and, therefore, are avoidable and recoverable for the benefit of the BLMIS customer fund.

Defendants do not dispute that they received the transfers.  Instead, they advance the

argument that the Trustee cannot recover the fraudulent transfers because Madoff, not BLMIS,

owned the bank accounts from which they were paid.  The issue, however, has been resolved in

the Trustee's favor no less than six times and constitutes the law of the case.  Any other defenses

invoked by Defendants—including value—fail as a matter of law and thus do not defeat the

Trustee's *prima facie* case.

As there are no material facts in dispute, summary judgment should be granted in favor of

the Trustee on Count One of his Complaint.

## **BACKGROUND**

Defendant Keller Family Trust is a trust that was formed under the laws of the state of

California.  Stmt. ¶ 108; Answer ¶ 7, ECF No. 40.[1]  Defendant Keller Family Trust was a

customer of BLMIS's investment advisory business ("IA Business") and held BLMIS Account

No. 1ZB314 in the name, "Gerald E. Keller, Trustee (Gerald E. Keller Separate Property) The

Gerald and Barbara Keller Family Trust U/A June 2, 1998" (the "Keller Family Trust Account").

Stmt. ¶ 109; Answer ¶ 7.  Defendant Gerald E. Keller is a resident of Rancho Mirage, California

and/or Great Neck, New York, and is a trustee and beneficiary of the Keller Family Trust.  Stmt.

¶ 110; Answer ¶ 8.  Defendant Barbara Keller is a resident of Rancho Mirage, California and/or

Great Neck, New York, and is a trustee and beneficiary of the Keller Family Trust.  Stmt. ¶ 111;

Answer ¶ 8.

The Keller Family Trust Account was opened on March 20, 1997 with a cash deposit via

check in the amount of $1,000,000, all representing principal.  Stmt. ¶ 128.  Subsequent to this

initial cash deposit, there were two additional cash deposits via checks into the Keller Family

Trust Account in the aggregate amount of $1,898,852, all representing principal.  Stmt. ¶ 129.  In

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. The Gerald and Barbara Keller Family Trust*, Adv. Pro. No. 10-04539 (CGM) (Bankr. S.D.N.Y.).

sum, these three cash deposits provided the Keller Family Trust Account with a total of $2,898,852 of principal.  Stmt. ¶ 130.  During the life of the Keller Family Trust Account, Defendants made 26 cash withdrawals totaling $4,795,000.  Stmt. ¶ 131.  Defendants withdrew $1,896,148 of funds in excess of principal, representing fictitious profits over the life of the Keller Family Trust Account and within the Two-Year Period.  Stmt. ¶¶ 132–33.

In 2010, the Trustee brought this adversary proceeding against Defendants, pursuant to sections 548(a), 550(a)(1), and 551 of the Bankruptcy Code, to avoid and recover $1,896,148 of fictitious profits received by Defendants during the Two-Year Period.[2]  Stmt. ¶¶ 109, 133; *see also* Compl. ¶ 38, ECF No. 1.  On September 17, 2015, Defendants answered the Complaint. *See* Answer, ECF No. 40.  On June 26, 2019, the Trustee served the expert reports of Bruce G. Dubinsky, Matthew B. Greenblatt, Lisa M. Collura, and Richard A. Diedrich.  Defendants did not depose any of the Trustee's expert witnesses.

Following discovery, the case was ripe for mediation under the Order (1) Establishing Litigation Case Management Procedures for Avoidance Actions and (2) Amending the February 16, 2010 Protective Order, *SIPC v. BLMIS LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Nov. 10, 2010), ECF No. 3141.  On February 25, 2021, the parties entered into mediation before the Honorable Allen Hurkin-Torres (Ret.) but were unsuccessful.  On March 17, 2021, this Court authorized the Trustee to file motions for summary judgment in any pending good faith case without a Local Rule 7056-1(a) pre-motion conference. *See SIPC v. BLMIS LLC*, Adv. Pro. No. 08-01789 (CGM) (Bankr. S.D.N.Y. Mar. 17, 2021), ECF No. 20440.

---

[2] The Trustee also brought claims against Gerald E. Keller and Barbara Keller in their individual capacities as subsequent transferees, however, those claims were dismissed.  *See* Order, ECF No. 39.

## ARGUMENT

**I.  ALL OF THE ISSUES RAISED IN THIS SUMMARY JUDGMENT MOTION HAVE ALREADY BEEN DECIDED AND THE COURT SHOULD ADHERE TO THE PRIOR RULINGS AS LAW OF THE CASE**

Each of the issues in this summary judgment motion have been previously decided by this Court and the District Court, overwhelmingly in the Trustee's favor and often in proceedings involving Defendants' same counsel. *See Picard v. Miller*, Adv. Pro. No. 10-04921 (CGM), 2021 WL 2787604 (Bankr. S.D.N.Y. July 2, 2021); *Est. of Seymour Epstein*, Adv. Pro. No. 10-04438 (CGM) (Bankr. S.D.N.Y. Jan. 27, 2021), ECF No. 155 ("*Epstein Decision*"); *Picard v. JABA Assocs. LP*, No. 20 cv. 3836 (JGK), 2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021); *Picard v. Lisa Beth Nissenbaum Tr.*, No. 20 cv. 3140 (JGK), 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021). Other than the amounts and dates of the transfers, the claims are identical and the record submitted in support is the same as the other motions for summary judgment. There is no basis to deviate from those rulings here.

Different adversary proceedings within a liquidation proceeding are considered "one case" for purposes of law of the case. *See Picard v. BAM L.P.*, 624 B.R. 55, 61 (Bankr. S.D.N.Y. 2020) (citing *Picard v. Nelson*, 610 B.R. 197, 237 (Bankr. S.D.N.Y. 2019) ("The prior decisions within this SIPA proceeding constitute law of the case.")); *Picard v. Legacy Cap. Ltd.*, 603 B.R. 682, 700 (Bankr. S.D.N.Y. 2019) (citing *In re Motors Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018) (law of the case doctrine applies across adversary proceedings within the same bankruptcy case), *aff'd*, 943 F.3d 125 (2d Cir. 2019)); *Perez v. Terrastar Corp.* (*In re Terrastar Corp.*), No. 16 Civ. 1421 (ER), 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017) (applying the law of the case doctrine because "[a]dversary proceedings filed in the same bankruptcy case do not constitute different cases"), *appeal dismissed*, No. 17-1117 (2d Cir. June 29, 2017).

The doctrine of law of the case "is not a limit on a court's power but rather a guide as to how a court should apply its discretion." *In re Pilgrim's Pride Corp.*, 442 B.R. 522, 531 (Bankr. N.D. Tex. 2010). Law of the case "expresses the general practice of refusing to reopen what has been decided." *In re Rock & Republic Enters., Inc.*, No. 10–11728 (AJG), 2011 WL 2471000, at *7 (Bankr. S.D.N.Y. June 20, 2011) (citing *Brody v. Vill. of Port Chester*, 345 F.3d 103, 110 (2d Cir. 2003). Thus, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless 'cogent' and 'compelling' reasons militate otherwise." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (citations omitted). Such cause can arise from substantially different evidence being presented at the subsequent trial, intervening contrary controlling authority or the prior decision was clearly erroneous. *In re Pilgrim's Pride Corp.*, 442 B.R. at 531.

There is no reason to deviate from this Court's decisions in *Miller*, *Epstein*, *Nelson*, and *BAM L.P.* or the recent decisions on these issues from Judge Koeltl in *JABA Associates* and *Nissenbaum*. There is no substantially different evidence, intervening contrary controlling authority, or any showing that the prior decisions were clearly erroneous. Although a contrary decision was issued by Judge Furman in *Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-1029, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021), this Court need not follow that decision. As Judge Koeltl noted in exercising his discretion to not follow the *RAR* decision, "there is no genuine issue of material fact that the transfers in this case were in fact made by the LLC." *JABA Assocs. LP*, 2021 WL 1112342, at *n.4 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.")). The consistent decisions in *Nelson*, *BAM*

*L.P.*, *Epstein*, *Miller*, *JABA Associates*, and *Nissenbaum*, as opposed to the *RAR* decision,

properly guide this Court in reaching its decision.[3]

Adhering to the prior decisions entered on these issues ensures defrauded customers are

treated in the same manner across adversary proceedings within this liquidation. The doctrine of

law of the case was developed in order to "maintain consistency and avoid reconsideration of

matters once decided during the course of a single continuing lawsuit." *Bourdeau Bros., Inc. v.*

*Montagne (In re Montagne)*, Adv. Pro. No. 08-1024, 2010 WL 271347, at *5 (Bankr. S.D.N.Y.

Jan. 22, 2010) (quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)). Doing so here—

in this hybrid proceeding under SIPA and the Bankruptcy Code—ensures that the goals of

Congress in enacting bankruptcy legislation and the SIPA statute are met: that claimants holding

similar claims receive similar treatment. *In re Pilgrim's Pride Corp.*, 442 B.R. at 531; *see also*

*SEC v. F.O. Baroff Co.*, 497 F.2d 280, 283 (2d Cir. 1974) (holding that the purpose of SIPA is

protection and equal treatment of public customers of broker-dealers).

## II.    IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT, SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE TRUSTEE AS A MATTER OF LAW

### A.    Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure, applicable to bankruptcy courts

pursuant to Fed. R. Bankr. P. 7056, provides that a court must grant summary judgment when

there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986). Factual positions are proven by either citing the record evidence—including

---

[3] Defendants may argue that this Court is required to follow *RAR* because it was issued before Judge Koeltl's decisions, pointing to a theory that the earliest decision controls when there is an intra-Circuit split of authority. But this is not a definitive rule in the Second Circuit, and even if it was, this Court would follow its 2017 decision in *Nelson*.

declarations, admissions, and interrogatory answers—or showing that an adverse party cannot produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1); *see also Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the movant has discharged its burden, the non-movant must then "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324. "[T]he nonmoving party may . . . not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993). The non-moving party may not oppose summary judgment "on the basis of an unreasonable view of the facts." *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005).

### B.    The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year Transfers of Fictitious Profits Made by BLMIS to Defendants

Under SIPA § 78fff-(2)(c)(3), the Trustee may recover any transfers by the debtor whenever customer property is insufficient to pay customer claims. To date, the Trustee has recovered $14.418 billion of $20 billion owed to customers by the estate. *See* Trustee's Twenty-Fifth Interim Report for the Period October 1, 2020 through March 31, 2021, *SIPC v. BLMIS LLC*, Adv. Pro. No. 08-01789 (CGM) (Bankr. S.D.N.Y. Apr. 30, 2021), ECF No. 20480. Because customer property is insufficient to pay the outstanding customer claims, the Trustee is authorized to recover the transfers to Defendants. *SIPC v. BLMIS LLC (In re Bernard L. Madoff)*, 531 B.R. 439, 453–54 (Bankr. S.D.N.Y. 2015).

The Trustee seeks to avoid and recover transfers of fictitious profits made to Defendants under 11 U.S.C. § 548(a)(1)(A). The elements of this claim are: (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to

hinder, delay, or defraud" a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, No. 05 Civ. 9050(LMM), 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd*, 748 F.3d 110 (2d Cir. 2014). The Bankruptcy Court has recognized that fictitious profit cases are strict liability cases. Cremona Decl., Ex. 15 (Tr. of Oral Arg. at 114:10–11, *Picard v. Marilyn Bernfeld Tr.*, Adv. Pro. No. 10-05143 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015), ECF No. 20); *see also id.* (Tr. of Oral Arg. at 100:19, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015, ECF No. 85) (holding a fictitious profit count is "almost a strict liability count")). This is especially true where, as here, Defendants admitted receipt of the Two-Year Transfers. Stmt. ¶ 110; *see also* Cremona Decl., Ex. 13 (Responses and Objections of Defendant Keller Family Trust to Trustee's First Request for Production of Documents No. 5) ("Responding Party does not dispute the deposits and withdrawals reflected on Exhibit B to the complaint for the period of December 11, 2006 on."); (Responses and Objections of Defendant Gerald E. Keller to Trustee's First Request for Production of Documents No. 5) (same); (Responses and Objections of Defendant Barbara Keller to Trustee's First Request for Production of Documents No. 5) (same); Ex. 14 (Responses and Objections of Defendant Keller Family Trust to Trustee's First Set of Interrogatories No. 9) (same); (Responses and Objections of Defendant Gerald E. Keller to Trustee's First Set of Interrogatories No. 9) (same); (Responses and Objections of Defendant Barbara Keller to Trustee's First Set of Interrogatories No. 9) (same).

There is no genuine dispute regarding BLMIS's: (1) payment of fictitious profits within the Two-Year Period to or for the benefit of Defendants; (2) interest in the transferred funds; and (3) actual intent to hinder, delay, or defraud its creditors.

      **1.**       **BLMIS Made the Two-Year Transfers with Actual Fraudulent Intent and in Furtherance of the Fraud**

Intent to defraud can be established by showing that the debtor operated a Ponzi scheme.

*See Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp. LLC)*, 439 B.R. 284, 304–05 (S.D.N.Y. 2010) ("*Bayou IV*"); *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007) (citations omitted); *see also Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) ("[T]he Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent." (citing *In re Bernard L. Madoff*, 531 B.R. at 471)); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("[T]he fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi scheme presumption.'").

### a.   BLMIS Was a Ponzi Scheme

BLMIS was engaged in a Ponzi scheme.  *See Miller*, 2021 WL 2787604, at *4 ("That BLMIS operated as a Ponzi scheme is well-established and . . . the Trustee has met its burden of proof for summary judgment on this issue."); *Epstein Decision* at 5 ("Intent to defraud is established as debtor operated a *Ponzi* scheme.").  "The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption, particularly in light of Madoff's criminal admission."  *Picard v. Chais*, 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011); *see also Picard v. Katz*, 462 B.R. 447, 453 & n.5 (S.D.N.Y. 2011) ("[I]t is patent that all of Madoff Securities' transfers during the two-year period were made with actual intent to defraud present and future creditors.").  The existence of the scheme has been recognized by the Bankruptcy Court, the District Court, and the Second Circuit.  *See, e.g.*, *In re BLMIS LLC*, 773 F.3d 411, 415–16 (2d Cir. 2014); *Picard v. Greiff*, 476 B.R. 715, 718 (S.D.N.Y. 2012); *SIPC v. BLMIS LLC (In re BLMIS LLC)*, 424 B.R. 122, 125–33 (Bankr. S.D.N.Y. 2010).

The existence of the BLMIS Ponzi scheme is substantiated by the allocutions of Madoff

9

and BLMIS employees. Stmt. ¶ 90; *see also Nelson*, 610 B.R. at 208 (relying on plea allocutions in finding that BLMIS was a Ponzi scheme); *Legacy*, 603 B.R. at 691 ("The allocutions establish *prima facie* that Madoff ran BLMIS as a Ponzi scheme."). Madoff admitted that he ran a Ponzi scheme through BLMIS and that he did not execute trades on behalf of his IA Business clients. Stmt. ¶¶ 91–98. Frank DiPascali, Madoff's chief financial officer and co-conspirator, admitted: "[f]rom at least the early 1990s through December of 2008 . . . [n]o purchases of [sic] sales of securities were actually taking place in [customers'] accounts." Stmt. ¶ 99. DiPascali "used hindsight to file historical prices on stocks then [he] used those prices to post purchase of [sic] sales to customer accounts as if they had been executed in realtime. On a regular basis [he] added fictitious trade data to account statements of certain clients to reflect the specific rate of earn [sic] return that Bernie Madoff had directed for that client." Stmt. ¶ 100.

David Kugel, a manager and trader at BLMIS, admitted that he falsified trading records as far back as the early 1970s. Stmt. ¶¶ 101–02. Kugel provided historical trade data to create fake trades which, when included on the BLMIS account statements and trade confirmations of IA Business clients, gave the appearance of profitable trading when no trading had actually occurred. Stmt. ¶ 102. Irwin Lipkin, BLMIS's accountant, admitted BLMIS's revenue was falsely inflated through fraudulent bookkeeping entries and annual audited reports. Stmt. ¶ 103. Eric Lipkin, payroll clerk at BLMIS, admitted BLMIS created fake reports replicating those of the Depository Trust & Clearing Corporation in order to purportedly confirm non-existent positions in the IA Business accounts for auditors and the Securities and Exchange Commission ("SEC"). Stmt. ¶¶ 104–05. And Enrica Cotellessa-Pitz, BLMIS accountant and comptroller, admitted IA Business customer money was funneled to BLMIS's proprietary trading and market-making businesses to falsely inflate revenue and hide losses. Stmt. ¶¶ 106–07.

10

Guilty pleas and admissions under oath are admissible to prove the existence of a Ponzi

scheme.  *See Nelson*, 610 B.R. at 209–10 ("Criminal plea allocutions are admissible under the

exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a judgment of a previous

conviction and FED. R. EVID. 807's residual exception to hearsay."); *Legacy*, 603 B.R. at 689 n.8

("The Court may rely on a plea allocution as evidence to support a fact."); *Moran v. Goldfarb*,

No. 09-cv-7667 (RJS), 2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012); *Bayou Accredited*

*Fund, LLC v. Redwood Growth Partners L.P. (In re Bayou Grp., LLC)*, 396 B.R. 810, 835

(Bankr. S.D.N.Y. 2008) ("*Bayou III*"), *rev'd in part on other grounds, Bayou IV*, 439 B.R. at

304; *McHale v. Boulder Cap. (In re 1031 Tax Grp., LLC)*, 439 B.R. 47, 72 (S.D.N.Y. 2010).

Summary judgment is appropriate where the admissions support a finding that "there is

no genuine disputed issue of fact that BLMIS was a Ponzi scheme . . . ." *Legacy*, 603 B.R. at

693; *see also Moran*, 2012 WL 2930210, at *4 (granting motion for summary judgment based on

plea transcript from related Department of Justice action where perpetrator admitted under oath

to orchestrating the Ponzi scheme); *Bayou IV*, 439 B.R. at 307–08 (affirming summary judgment

on fictitious profits from Ponzi scheme based on evidence including guilty pleas of fraudsters);

*In re 1031 Tax Grp., LLC*, 439 B.R. at 72 (granting summary judgment in part and concluding

that Ponzi scheme existed with reliance on evidence including perpetrator's superseding

indictment and plea agreements); *Armstrong v. Collins*, Nos. 01 Civ. 2437(PAC), 02 Civ. 2796

(PAC), 02 Civ. 3620(PAC), 2010 WL 1141158, at *24 (S.D.N.Y. Mar. 24, 2010) (granting

motion for summary judgment and finding existence of Ponzi scheme where submitted evidence

included transcripts from perpetrator's allocution and sentencing).

      **b.**     **Trustee's Experts Confirmed That BLMIS Was a Ponzi Scheme**

Bruce Dubinsky, a certified fraud examiner and forensic accountant, confirmed that

BLMIS was a Ponzi scheme. *See* Declaration of Bruce G. Dubinsky dated July 20, 2021

("Dubinsky Decl."), Attach. A (Dubinsky Report); *see also Nelson*, 610 B.R. at 210–14. As set

forth in Dubinsky's unrebutted report, BLMIS operated three business units: (i) a proprietary

trading business; (ii) a market-making business; and (iii) the IA Business. Stmt. ¶ 13. The

proprietary trading business traded for its own account to make money for BLMIS. The market-

making business made markets in certain stocks, bonds, warrants and rights. Stmt. ¶¶ 14–15.

The IA Business purported to purchase and sell securities on behalf of its customers. Stmt. ¶ 17.

The proprietary trading business, the market-making business, and IA Business were units of

BLMIS and operated by Madoff. Stmt. ¶ 18.

      BLMIS reported to its IA Business customers, including Defendants, that the money they

deposited with BLMIS was invested in the "split-strike conversion" strategy. Stmt. ¶ 20. The

evidence establishes that BLMIS did not execute this strategy on behalf of its IA Business

customers. *Id*. Rather, Dubinsky analyzed BLMIS's trading records and determined that as far

back as the 1970s, BLMIS used historical trade information to fabricate false trades for IA

Business customers and reported those fake trades on customer statements. Stmt. ¶¶ 21–56.

Based on his investigation, Dubinsky concluded that the IA Business was a fraud and a Ponzi

scheme.

      The split-strike conversion strategy, as purportedly executed by BLMIS, involved (a)

investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put

options and selling call options to hedge against price changes in the underlying basket of stocks,

and (c) purchasing U.S. treasury bills ("T-Bills") when the money was "out of the market."

Stmt. ¶ 23. BLMIS never executed this strategy on behalf of its customers, including

Defendants. In addition to evidence of the fabricated trades across all BLMIS IA Business

customer accounts, Dubinsky's analysis further confirmed the lack of any trading by BLMIS on behalf of its IA Business customers based on (a) the impossible reported volume of equity trades; (b) impossible equity and options trades reported outside the daily price range; (c) the low volatility in its reported daily trading performance compared to the actual market behavior and the performance achieved by BLMIS in the proprietary trading business unit as measured by the volume weighted average prices for its sales and purchases; (d) the consistently positive rates of returns that did not "mirror" the volatility of the markets; (e) a lack of any Depository Trust Corporation ("DTC") records to confirm the reported IA Business equity or treasury trades; and (f) a lack of Options Clearing Corporation ("OCC") records to confirm the reported IA Business options trades. Stmt. ¶ 24. And, Dubinsky verified that no T-Bills, purportedly part of the split-strike conversion strategy, were purchased on behalf of IA Business customers. Stmt. ¶¶ 57–63.

> ### c.    The Trustee's Experts Confirmed That BLMIS Paid Investor Redemptions from Customer Funds

Lisa Collura, a forensic accountant and certified fraud examiner, analyzed the books and records of BLMIS. *See Nelson*, 610 B.R. at 220–21. Collura's investigation shows that during the ten-year period before its collapse on December 11, 2008, BLMIS primarily used three bank accounts for the IA Business: JPMorgan Chase Bank, N.A. ("JPMorgan") account #xxxxx1703 (the "703 Account"); JPMorgan account #xxxxxxxxx1509 (the "509 Account," together with the 703 Account, the "JPMorgan Accounts")); and Bankers Trust account #xx-xx0-599 (the "BT Account"). Stmt. ¶ 69. IA Business customers' cash deposits were deposited and commingled in the 703 Account. Stmt. ¶ 70. IA Business customer withdrawals were made through the JPMorgan Accounts and the BT Account, which was a checking account entirely funded by the 703 Account during the period for which bank records are available. Stmt. ¶ 71. The JPMorgan Accounts were linked commercial business accounts. Stmt. ¶ 72. The 509 Account was a

commercial controlled disbursement account that was entirely funded by the 703 Account. *Id*.

The money in the 703 Account consisted almost entirely of customer deposits. Stmt. ¶¶ 72, 87.

Dubinsky confirmed that customer funds were deposited and withdrawn from the JPMorgan

Accounts, and that there were no inflows of money as a result of trading securities or receipt of

dividends on purportedly held securities. Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340.

Both Dubinsky and Collura confirmed that ninety-seven percent of all cash additions into

the 703 Account came directly from IA Business customers. Stmt. ¶ 73. The other three percent

of inflows into the 703 Account came from income earned from cash management activities

including (1) short-term investment activity made directly from the 703 Account (including

overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and T-Bills);

and (2) investments of BLMIS customer funds made through bank and brokerage accounts held

in the name of BLMIS or Madoff. Stmt. ¶ 74. Because the short-term investments, including

overnight sweeps, were made directly out of the 703 Account, the source of the money for those

investments was customer funds. Stmt. ¶ 75.

The IA Business did not have any legitimate income-producing activities. The only

source of cash available for the IA Business to pay purported investment profits as well as

redemption requests was from cash that other IA Business customers deposited in the 703

Account. Stmt. ¶ 82. These transactions rendered BLMIS insolvent. By no later than December

2002, BLMIS's assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion.

Stmt. ¶ 83. By December 2008, the customer property on hand at BLMIS was grossly

insufficient to pay the claims of its customers. Stmt. ¶ 84.

Defendants did not serve a rebuttal to the Trustee's experts' opinions that the funds in the

703 Account consisted of customer money, that the IA Business had no source of funds other

than customer money, or that customer redemptions were paid with funds from the 703 Account.

Nor did Defendants depose the Trustee's experts or identify any evidence—admissible or

otherwise—to rebut the substantial evidence demonstrating that Madoff was operating a Ponzi

scheme through BLMIS's IA Business and that the transfers of fictitious profits Defendants

received comprised other customers' deposits.  Accordingly, the undisputed evidence is that the

transfers were made with the intent to hinder, delay, or defraud BLMIS's creditors.

### d.      BLMIS's Two-Year Transfers to Defendants Were in Furtherance of the Fraud

In a Ponzi scheme, the Trustee need not prove that the debtor intended to hinder, delay,

or defraud a *particular* creditor, but rather he must only establish that the transfers made to the

transferee were in furtherance of a fraudulent scheme.  *See Bayou IV*, 439 B.R. at 304.

"Every payment made by the debtor to keep the scheme on-going was made with the

actual intent to hinder, delay or defraud creditors, primarily the new investors."  *Gredd v. Bear,*

*Stearns Sec. Corp. (In re Manhattan Inv. Fund)*, 359 B.R. 510, 518 (Bankr. S.D.N.Y.), *rev'd in*

*part on other grounds*, 397 B.R. 1 (S.D.N.Y. 2007) (citation omitted).  This is predicated on the

reality that a debtor's failure to honor an investor's withdrawal request "would promptly have

resulted in demand, investigation, the filing of a claim and disclosure of the fraud."  *Bayou III*,

396 B.R. at 843; *see also Greiff*, 476 B.R. at 723.  Every redemption payment "in and of itself

constituted an intentional misrepresentation of fact" of the investor's rights to their falsely

inflated account statement and "an integral and essential part" of the fraud.  *Bayou III*, 396 B.R.

at 843.  Thus, the transfers to Defendants were in furtherance of the fraudulent Ponzi scheme.

### e.      BLMIS Made the Transfers to Defendants Within the Two-Year Period

BLMIS transferred fictitious profits to or for the benefit of Defendants between

December 11, 2006 and December 11, 2008.  The Trustee's evidence is uncontroverted as to the

date, receipt, and amount of the transfers the Trustee seeks to avoid and recover.

### f.    Defendants Have Not Presented Any Countervailing Evidence

Defendants have not and cannot come forward with evidence to rebut the Trustee's *prima facie* case. During discovery, Defendants failed to present any evidence, fact or expert, to rebut the Trustee's proofs that BLMIS was a Ponzi scheme. Defendants did not serve rebuttal reports and took no depositions of any of the Trustee's experts. Absent such evidence, any attempt by Defendants to offer vague assertions, unfounded credibility attacks, or proffers of evidence they would elicit on cross-examination of the Trustee's expert witnesses is unavailing and does not present a genuine dispute of material fact to withstand summary judgment. *See Ying Jing Gan*, 996 F.2d at 532 (explaining that the nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"); *see also Bayou III*, 396 B.R. at 825 (explaining that conjecture, surmise, or "metaphysical doubt," as well as self-serving conclusory statements will not defeat summary judgment).

### g.    The Trustee is Entitled to Prejudgment Interest as a Matter of Law

The Trustee is also entitled to an award of prejudgment interest from December 11, 2008 (the "Filing Date") because "[f]ull compensation to the estate for the avoided transfer[s] normally requires prejudgment interest to compensate for the value over time of the amount recovered." *In re Cassandra Grp.*, 338 B.R. 583, 599 (Bankr. S.D.N.Y. 2006) (awarding prejudgment interest "[t]o fully and fairly compensate [debtor's] creditors for their loss—not only of [the amount] that was fraudulently conveyed . . . but of the use of that money").

In *BAM L.P.*, this Court awarded prejudgment interest finding that the "net losers" of BLMIS's Ponzi scheme "are the real victims of Defendants' dilatory litigation tactics" and after ten years of litigation "an award of prejudgment interest is essential to the [Trustee's] collection

of customer property." *BAM L.P.*, 624 B.R. at 64 (citing *Stanford Square L.L.C. v. Nomura Asset Cap. Corp.*, 232 F. Supp. 2d 289, 293 (S.D.N.Y. 2002) ("Awarding prejudgment interest is based upon the premise that the party to whom the money is owed has been deprived of the use of the funds and can be made whole only by the award of interest. Conversely, the party owing the money has had the use of the funds he was obligated to have paid and should be required to pay compensation by way of interest.")). Likewise, in *Epstein*, this Court awarded prejudgment interest against "Defendants, like these, who litigate issues that have already been decided by the Court in this case." *Epstein Decision* at 10 (finding the Trustee "has spent approximately ten years prosecuting this case and cannot be made whole without an award of prejudgment interest"); *see also JABA Assocs. LP*, 2021 WL 1112342, at *19 ("The 4% rate compensates the Trustee for the loss of the use of the Two-Year Transfers for the years that this litigation has lasted, and reduces the profits to the defendants from having withheld the funds."); *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *17–18 (same).

Having determined that prejudgment interest should be awarded, this Court found that the federal rate should be used where the Trustee's claims arise only from federal law. *BAM L.P.*, 624 B.R. at 64. However, "[w]here the interest rate codified in 28 U.S.C. § 1961 is too low to compensate the plaintiff, courts can opt to apply the prime rate of interest," which was 4% on the Filing Date. *Id.* at 65 (quoting *In re FKF 3, LLC*, No. 13 Civ. 3601 (JCM), 2018 WL 59292131, at *13 (S.D.N.Y. Oct. 24, 2018)); *see also Miller*, 2021 WL 2787604, at *12 ("Consistent with other decisions that have awarded prejudgment interest, the Court holds that interest is awarded in the amount of 4%."); *Epstein Decision* at 11 ("Interest is awarded in the amount of 4%."). Further, this Court found "the accrual date for prejudgment interest is the Filing Date, as the claims asserted by the Trustee arose only upon the filing of the SIPA liquidation." *BAM L.P.*,

624 B.R. at 65–66 (citing *In re FKF 3, LLC*, 2018 WL 59292131, at *14); *see also Epstein Decision* at 10–11 (finding "the Trustee is entitled to interest from the date that the SIPA action was commenced [sic]"); *Miller*, 2021 WL 2787604, at *12, n.13 ("The Court would be willing to consider awarding interest from the date of the SIPA action where the facts warrant it.").

Here, Defendants are represented by the same counsel as defendants in *Nelson* and *Epstein*, yet they refuse to acknowledge the law of the case. Instead, Defendants' counsel continues to engage in dilatory litigation practices that warrant prejudgment interest in the same way this Court applied it in *Epstein*. The "net losers" are the real victims of Defendants' litigation tactics while "Defendants are 'net winners' (having withdrew more money than it invested) and, by definition, have been withholding the net losers' principal investments for many years." *BAM L.P.*, 624 B.R. at 64. As this Court stated, the Trustee has "incurred costs litigating against Defendants who have resisted the law of the case." *Id.* (citing *Newbro v. Freed*, 409 F. Supp. 2d 386, 402 (S.D.N.Y. 2006) ("An important rationale for the prejudgment interest rule is that the party against whom the claim is asserted could have stopped the running of interest by paying what was owed.")). Indeed, this rationale applies and this Court should apply the prime rate on the Filing Date, which was 4%, just as it did in *BAM L.P.*, *Epstein*, and *Miller*, from the Filing Date through the date of entry of judgment in favor of the Trustee.

## III.    DEFENDANTS' DEFENSES CAN BE DETERMINED AS A MATTER OF LAW

Defendants will likely raise certain legal defenses, all of which have already been addressed and rejected by this Court in many prior opinions in this liquidation. Defendants cannot meet their burden of establishing a triable issue of fact to defeat the Trustee's Motion.

### A.    Defendants Did Not Give Value for Fictitious Profits

Having established that BLMIS transferred at least $1,896,148 in fictitious profits within the Two-Year Period to Defendants with actual fraudulent intent, the Trustee is entitled to avoid

and recover the Two-Year Transfers. To defeat the avoidance of a transfer on summary judgment, Defendants must offer evidence sufficient to create a material issue of fact as to whether they took (1) "for value . . . to the extent that [he] gave value to the debtor in exchange for such transfer" and (2) "in good faith." *Bayou IV*, 439 B.R. at 308 (placing burden of proving affirmative defense on transferee); 11 U.S.C. § 548(c); *In re 1031 Tax Grp., LLC*, 439 B.R. at 73.

"Value" includes satisfaction of an antecedent debt of the debtor. *See* 11 U.S.C. § 548(d)(2)(a). However, as a matter of law, Defendants cannot establish that they took the transfers of fictitious profits "for value" because such false profits were not on account of a valid antecedent debt. *See Picard v. BAM L.P.*, 608 B.R. 165, 180–81 (Bankr. S.D.N.Y. 2019). The Second Circuit held that BLMIS customers, like Defendants, "cannot invoke the 'for value' defense here in the same way in which they could if this were an ordinary bankruptcy because the defense operates differently in a SIPA liquidation." *In re BLMIS LLC*, 976 F.3d 184, 199–200 (2d Cir. 2020); *see also JABA Assocs.*, 2021 WL 1112342, at *15–17; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *15–16. Even if Defendants had enforceable claims under federal or state law, "a conclusion that satisfaction of those claims gave 'value' to [BLMIS] would conflict with SIPA." *Greiff*, 476 B.R. at 727. This is because SIPA "differs from general bankruptcy law because it 'choose[s] among creditors' and prioritizes customers." *In re BLMIS LLC*, 976 F.3d at 192 (citing *Greiff*, 476 B.R. at 727). Customers like Defendants, who have no net equity claims, may have valid claims and payment on those claims could discharge an antecedent debt, but:

> [t]he types of claims that a customer may make against a customer property fund are those 'relating to, or net equity claims based upon, securities or cash, . . . insofar as such obligations are ascertainable from the books and records of the debtor or otherwise established to the satisfaction of the trustee.' 15 U.S.C. § 78fff-2(b). In the case at bar, the only such claims are those for a return of principal or net equity.

*Id.* at 200. This Court should not depart from the well-established precedent that limits value to

the principal invested by good faith defendants.

**B.      Taxes May Not Be Considered as Part of Value Calculation**

The Bankruptcy Court and District Court have also already considered and rejected any

defense involving Defendants' ability to offset their avoidance liability by the amount of taxes

paid on the fraudulent transfers received from BLMIS.  *See JABA Assocs.*, 2021 WL 1112342, at

*19 ("Beyond the complex problems of proof and tracing, the offset would come at the expense

of other customers, and SIPA prioritizes repayment of customers."); *Nelson*, 610 B.R. at 236–37

(citing *Cohen*, 2016 WL 1695296, at *15 (stating "the offset would introduce complex problems

of proof and tracing and reduce the [Trustee's] ability to recover assets" and would only "come

at the expense of the other victims." (citation omitted))); *Picard v. Estate (Succession) of Doris

Igoin (In re BLMIS)*, 525 B.R. 871, 893 (Bankr. S.D.N.Y. 2015) ("[T]he withdrawal of the

money to pay taxes the [d]efendants never should have had to pay is not a defense to the

fraudulent transfer claims." (citing *Donell v. Kowell*, 533 F.3d 762, 778–79 (9th Cir. 2008)).

**C.      The Transfers Were an Interest of the Debtor in Property**

The Trustee anticipates that Defendants will dispute whether the transfers were "an

interest of the debtor in property" because Defendants argue the JPMorgan Accounts were the

property of Madoff, not BLMIS.  Defendants' argument has been rejected by the Bankruptcy

Court and District Court no less than *six times* in this liquidation.  In *Nelson*, the court held:

> Defendants conflate subject matter jurisdiction with the merits of the
> Trustee's claims. The Trustee certainly has standing to argue that
> BLMIS made the Two-Year Transfers. . . . In any event, the
> Defendants' jurisdictional argument lacks merit because the
> evidence demonstrate[s] that BLMIS owned the [JPMorgan] Chase
> Accounts, the source of the Two-Year Transfers.

*Nelson*, 610 B.R. at 216.  In *BAM L.P.*, this Court held:

> [A]ll of the assets and liabilities of the sole proprietorship, including
> the IA Business, were transferred to BLMIS via the 2001 SEC

Amended Form BD.  As such, the Defendants' customer accounts
and the Bank Accounts are property of BLMIS and the monies paid
to Defendants from those Bank Accounts must be turned over to the
Trustee.

*BAM L.P.*, 624 B.R. at 61; *see also Miller*, 2021 WL 2787604, at *11 (finding "the Defendants

customer accounts and the Bank Accounts are property of BLMIS"); *Epstein Decision* at 7

("This Court has already determined that all of Madoff's customers were transferred to

BLMIS.").

In *JABA Associates* and *Nissenbaum*, the District Court held:

Madoff was using the accounts at issue in his capacity as a sole
proprietor until he reorganized his business as an LLC. When
Madoff changed the form of his business from a sole proprietorship
to an LLC, the business retained the same SEC registration number.
When submitting the Amended Form BD, Madoff noted that the
[sole proprietorship] [sic] 'will transfer to successor all of
predecessor's assets and liabilities related to predecessor's business.
The transfer will not result in any change in ownership or control.' .
. . And there were no assets or liabilities of the sole proprietorship
listed as 'not assumed by the successor.' . . . The form also indicated
that no 'accounts, funds, or securities of customers of the applicant
are held by or maintained by [any] other person, firm, or
organization.'

*JABA Assocs.*, 2021 WL 1112342, at *9; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *9.

BLMIS owned the JPMorgan Accounts at the time of the transfers to Defendants.

Madoff began operating as a sole proprietorship in the early 1960's under the names of Bernard

L. Madoff and Bernard L. Madoff Investment Securities.  *BAM L.P.*, 624 B.R. at 59.  In January

1960, the sole proprietorship filed with the SEC a Form BD under registrant number 8-8132.

Cremona Decl., Ex. 1 (1959 SEC Form BD).  Through that registration, the broker-dealer

became a member of SIPC when SIPA was enacted in 1970.  There is no dispute that prior to

2001, the JPMorgan Accounts were held by Madoff's sole proprietorship.

Effective January 1, 2001, Madoff changed the corporate form of his broker-dealer

business when he incorporated as an LLC.  Cremona Decl., Ex. 2 (Articles of Organization); *see also BAM L.P.*, 624 B.R. at 59.  With this change in corporate form, BLMIS also filed an Amended Form BD with the SEC in January 2001 to reflect that change using the same SEC registrant number 8-8132; BLMIS did not file a new application for registration.  Cremona Decl., Ex. 3 (Amended Form BD); *see also BAM L.P.*, 624 B.R. at 59–60.  Under "BD Successions" of the Amended Form BD, it asked:  "Briefly describe details of the succession, including any assets or liabilities not assumed by the successor."  The response was:

> Effective January 1, 2001, predecessor will transfer to successor all of predecessor's assets and liabilities related to predecessor's business.  The transfer will not result in any change in ownership or control.

Cremona Decl., Ex. 3 (Amended Form BD at 10–11, *see also* Question 5).  No assets or liabilities of the sole proprietorship were listed as "not assumed by the successor."  *Id.*  The Amended Form BD further certified that no "accounts, funds, or securities of customers of the *applicant* are held or maintained by such other *person*, firm, or organization."  *Id.* (Amended Form BD at 5).  BLMIS succeeded to the sole proprietorship's SEC registrant number 8-8132.  Cremona Decl., Ex. 1 (1959 SEC Form BD), Ex. 3 (Amended Form BD at 10).

Upon the filing of the Amended Form BD, the sole proprietorship no longer operated as a broker-dealer or in any other capacity.  Cremona Decl., Ex. 3 (Amended Form BD at 10–11); *see also BAM L.P.*, 624 B.R. at 60 ("The predecessor identified on the 2001 SEC Amended Form BD is "Bernard L. Madoff" and the successor is identified as BLMIS.").  Indeed, this Court noted "that this succession provision meant that, without exception, all of the assets and liabilities of the sole proprietorship were transferred to BLMIS and the sole proprietorship ceased to exist."  *BAM L.P.*, 624 B.R. at 60.

BLMIS's corporate documents confirmed the change in corporate form and the transfer

of all assets.  In its Amended and Restated Operating Agreement, BLMIS plainly sets forth

Madoff's intent to transfer all assets—including bank accounts—held by the sole proprietorship

to the LLC, effective January 1, 2001:

> 3. **Purpose.**  The Company is formed to receive as at January 1, 2001, all of the assets, subject to liabilities, associated with the business being conducted by Bernard L. Madoff, as sole proprietorship (the "Business") and to thereafter conduct such Business, and any further extension therefor, in such manner and form as determined by the Member in his sole discretion, to the extent permitted by the [Limited Liability Company Law of the State of New York] or by the laws of any jurisdiction which the Company may do business.

Cremona Decl., Ex. 4 (Amended and Restated Operating Agreement).  Consistent with the

Amended Form BD filed with the SEC, the Amended and Restated Operating Agreement makes

clear that no assets were carved out or excluded from the transfer of assets to the LLC, and

confirmed that all assets of the sole proprietorship—the three business units and their bank

accounts—were transferred to the LLC as of January 1, 2001.  Madoff transferred ownership of

all of the assets of the sole proprietorship to the LLC, thereby stripping any ownership interest of

the sole proprietorship in any assets, including the bank accounts of the IA Business.  *See SIPC*

*v. BLMIS LLC (In re BLMIS)*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151

(PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017)

(finding all Madoff Securities' assets and liabilities were transferred to BLMIS upon the

reorganization to a single member limited liability company).

Defendants may nonetheless argue that various BLMIS and JPMorgan documents

indicate Madoff intended to keep the IA Business separate under the name "Bernard L. Madoff

Investment Securities."  But any "discrepancies Defendants have demonstrated to exist—forms

filled out improperly, business names used interchangeably on bank accounts and checks—are

the sleights of hand that one would expect to see when exhuming the remnants of a Ponzi

23

scheme." *BAM L.P.*, 624 B.R. at 60 (citation omitted); *JABA Assocs.*, 2021 WL 1112342, at *9

(same); *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *9 (same).

>       **D.      SIPA And The Bankruptcy Code Authorize the Trustee to Recover
>               Customer Property, Wherever Held**

For purposes of avoidance and recovery, BLMIS is deemed under SIPA to have an

interest in the transferred property; thus, the transfers here are avoidable under section 548 of the

Bankruptcy Code.  As this Court previously held, pursuant to SIPA § 78fff-2(c)(3):

> The trustee may recover any property transferred by the debtor
> which, except for such transfer, would have been customer property
> if and to the extent that such transfer is voidable or void under the
> provisions of Title 11. Such recovered property shall be treated as
> customer property. For purposes of such recovery, ***the property so
> transferred shall be deemed to have been the property of the debtor***
> and, if such transfer was made to a customer or for his benefit, such
> customer shall be deemed to have been a creditor, the laws of any
> State to the contrary notwithstanding.

*Id.* at 62 (emphasis added); *see also* SIPA § 78fff-2(c)(3) (finding transferred customer property

is "deemed to have been the property of the debtor"); *Cohen*, 2016 WL 1695296, at *5 ("BLMIS

transferred customer property to [defendant], and under SIPA § 78fff-2(c)(3) such property is

'deemed to have been property of the debtor'"); *In re 1031 Tax Grp., LLC*, 439 B.R. at 68–70

(holding that money reflected in bank account statements "in the name of a debtor is presumed to

be property of the bankruptcy estate" for purposes of 11 U.S.C. § 548(a)(1) in a Ponzi scheme).

Where the transfers are customer property, the Trustee is entitled to avoid and recover the

Two-Year Transfers, regardless of the change in the Debtor's corporate form from a sole

proprietorship to a limited liability company.  *Epstein Decision* at 5–6; *BAM L.P.*, 624 B.R. at

62; *Nelson*, 610 B.R. at 215–18; *see also JABA Assocs.*, 2021 WL 1112342, at *10; *Lisa Beth

Nissenbaum Tr.*, 2021 WL 1141638, at *10.

### 1.    SIPA and SIPC

In enacting SIPA, Congress fashioned a program for protecting customer property—that is, property placed with a broker-dealer for the purchase of securities where title to such property always remained with the customer. This program included the creation of SIPC, a nonprofit, private membership corporation to which most registered broker-dealers are required to belong. When one of its members fails, SIPC protects those customers by initiating a SIPA liquidation, a form of liquidation proceeding applicable only to SIPC member firms. *See SEC v. F.O. Baroff Co.*, 497 F.2d 280, 281 (2d Cir. 1974) (holding that the object of SIPA and SIPC is to protect customers in the brokerage industry). Although a SIPA liquidation is similar to a bankruptcy and incorporates certain provisions of the Bankruptcy Code, it is "tailored to achieve SIPA's objectives," *In re BLMIS LLC*, 424 B.R. at 133, one of which is the prompt return of customer property to customers. SIPA § 78fff(a); *see also SIPC v. Barbour*, 421 U.S. 412, 416 (1975).

To do so, SIPC specifies a trustee to liquidate the business and any assets of the member-broker and recover customer property wrongfully transferred or unlawfully converted by the broker. SIPA §§ 78*lll*(4), 78fff-2(c)(3). These funds form the corpus of the customer property estate, from which the trustee makes distributions to customers of their ratable share of customer property. SIPA § 78fff-2(c)(1). SIPA prioritizes this customer property estate, which is distinct from the general bankruptcy estate for the broker-dealer member firm. SIPA § 78fff-2(c)(1); *see In re BLMIS LLC*, 654 F.3d 229, 233 (2d Cir. 2011); *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010); *In re Weis Sec., Inc.*, No. 73 Civil 2332, 1976 WL 820, at *6−7 (S.D.N.Y. Aug. 2, 1976); *SIPC v. BLMIS LLC (In re Madoff Sec.)*, 499 B.R. 416, 420 (S.D.N.Y. 2013). The customer property estate is composed of customer property, including recovered assets, which are earmarked to satisfy customers' net equity claims. By contrast, the general estate is made up of the broker-dealer's assets available to satisfy the claims of general creditors.

*See In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 270 (Bankr. S.D.N.Y. 1996).

### 2.    Becoming a Member of SIPC

The "members" of SIPC include "all persons registered as broker-dealers" with the SEC

under section 78*o*(b) of Title 15.  SIPA § 78ccc(a)(2)(A).  SIPC membership, and thus SIPA

protection, arises from a broker-dealer's registration with the SEC, without regard to the

corporate form of the broker-dealer.  SIPA § 78ccc(a).

Under section 78*o*(b), a broker-dealer applies for registration with the SEC on SEC Form

BD (the uniform form for broker-dealer registrations).  *See* 17 C.F.R. § 249.501(a).  Once

registered with the SEC, the broker-dealer is assigned a registrant number, becomes a member of

SIPC, and is required to pay into the SIPC fund by annual assessments.  SIPA § 78ddd(c)(2).

If an entity succeeds to and continues the business of a broker-dealer previously

registered with the SEC, and the succession is based on a change in the predecessor's form of

organization, it files a Form BD Amendment.  SEC Rule 15b1-3(b), 17 C.F.R. § 240.15b1-3(b).

The successor entity continues the business and SIPC membership of its predecessor.  When a

firm ceases to do business as a broker-dealer, it withdraws from registration with the SEC by

filing an SEC BDW form (the uniform request form for broker-dealer withdrawal) through the

Central Registration Depository.  17 C.F.R. §§ 249.501(a), 240.15b6-1(b).  Once it is de-

registered, the former broker-dealer ceases being a SIPC member.

### 3.    Initiating a SIPA Liquidation

If SIPC determines that one of its members has failed or is in danger of failing to meet its

obligations to customers, it applies for a customer protective decree in district court.  The district

court acquires jurisdiction over the broker-dealer and its property wherever located.  SIPA

§ 78eee(b)(2)(A)(1).  The decree places the firm in liquidation and appoints a trustee specified by

SIPC to liquidate the business of the debtor-broker.  SIPA § 78eee(b)(3).  The liquidation is then

removed to the bankruptcy court. *Id*. § 78eee(b)(4).

The term "debtor" has a special definition under SIPA: "a *member* of SIPC with respect to whom an application for a protective decree has been filed under section 78eee(a)(3) of this title." SIPA § 78*lll*(5) (emphasis added). This differs from the Bankruptcy Code, where a "debtor" is an individual, partnership, or corporation. 11 U.S.C. §§ 109(a), 101(41). Because SIPC membership tracks SEC registration, SIPC names the SEC-registered broker-dealer that is at risk of failing as the "debtor" in the application for the protective decree. Thus, registration under SIPA § 78*o*(b) is the key to who the SIPC member is, and, if the member is placed into liquidation, who the debtor is.

### 4.    Customer Property Under SIPA

Customer property is a term of art in the securities industry, and means property held by a broker-dealer but that belongs to customers. *See* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74 (2002); *see, e.g.*, *Picard v. Lowrey*, 596 B.R. 451, 469–70 (S.D.N.Y. 2019). When customers invest their cash and securities with a broker, they transfer possession, but not title, of their money to the broker. The broker never owns that money, but rather is legally bound to hold that money in reserve for its customers. *See Lowrey*, 596 B.R. at 469–70 (noting that "customer property" in securities industry refers to property held by broker-dealer but belongs to its customers).

Customer protection rules, promulgated by the SEC as required by SIPA, require broker-dealers to safeguard customers' securities and cash in a reserve fund. This reserve would form the corpus of the firm's estate for distribution to customers if the firm went into liquidation under SIPA. Exchange Act Release No. 34-9856, Adoption of Rule 15c3-3, 37 Fed. Reg. 25224, 25225 (Nov. 29, 1972), 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3"); *see also* Jamroz, 57 Bus. Law. at 1071–74.

Customer property includes securities and cash held for customers under Rule 15c3-3; assets derived from or traceable to customer property; and, under SIPA § 78*lll*(4)(D), other debtor property that a trustee must allocate to the fund of customer property as necessary to remedy the debtor's non-compliance with the segregation requirements of Rule 15c3-3. Customer property retains its nature and special protections under SIPA, even if the broker transfers that property to others.  SIPA § 78*lll*(4) (including in the definition of customer property "the proceeds of any such property transferred by the debtor, including property *unlawfully converted*" (emphasis added)); *see also BAM L.P.*, 624 B.R. at 62 ("When the Defendants invested their money into the IA Business, the deposits were placed into the Bank Accounts and commingled with all of the Ponzi scheme victims' deposits. The funds held in the Bank Accounts were meant to be invested legitimately through BLMIS but never were. Thus, they were 'customer property.'"); *Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*, 97 B.R. 503, 508 (E.D. Ark. 1987) (Rule 15c3-3 deposit is not subject to bank's setoff claim because it is customer property); Rule 15c3-3(f) (Rule 15c3-3 account cannot be subject to bank lien because it consists of customer property).  This broad definition recognizes customers' enduring rights to the property they gave to their broker for safekeeping.  Indeed, once a broker-dealer goes into liquidation under SIPA, the SIPA designation of customer property is the seamless continuation of Rule 15c3-3, taking effect the moment the broker-dealer fails.  *In re Lehman Bros. Holdings*, 445 B.R. 143, 191–92 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012).

Because customer property is not the broker's property, when a broker goes into liquidation, it is also not "debtor" property, which places it outside the reach of Bankruptcy Code provisions for avoidance and recovery of transfers.  *BAM L.P.*, 624 B.R. at 61–62 ("Money held

by a broker on behalf of its customers is not the broker's property under state law." (quoting

*Nelson*, 610 B.R. at 232–233)).  SIPA § 78fff-2(c)(3) circumvents this prohibition by creating a

legal fiction that confers standing on SIPA trustees to recover customer property by treating such

property as though it were "property of the debtor" in an ordinary bankruptcy.  *See JABA*

*Assocs.*, 2021 WL 1112342, at *10; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *10;

*Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014).  SIPA § 78fff-2(c)(3)

allows a trustee to "recover any property transferred by the debtor which, except for such

transfer, would have been customer property."  This provision is designed "to recover securities

that would have been part of the fund of customer property but for a prior transfer to a

customer."  *In re Bevill, Bresler & Schulman, Inc.*, 83 B.R. 880, 893 (Bankr. D.N.J. 1988).  "The

inquiry in an avoidance action, therefore, is: if the transfer did not occur, would the securities

have been part of the fund of customer property?"  *Id*.  If the answer is yes, then that cash or

securities are customer property subject to recovery by SIPA trustees.

### 5.    Madoff's Business

When IA Business customers sent BLMIS money to purchase securities, Madoff

converted and commingled that customer money in the 703 Account.  Dubinsky Decl., Attach.

A. (Dubinsky Report) ¶ 340; *BAM L.P.*, 624 B.R. at 62 ("When the Defendants invested their

money into the IA Business, the deposits were placed into the Bank Accounts and commingled

with all of the Ponzi scheme victims' deposits.").  This pool of commingled funds was used to

pay customer redemptions.  Dubinsky Decl., Attach. A. (Dubinsky Report) ¶ 341; *see also*

*Picard v. BAM L.P.*, 608 B.R. 165 at 174–75 (Bankr. S.D.N.Y. 2019); *In re Picard*, 917 F.3d 85,

92 (2d Cir. 2019) (noting that Madoff commingled funds into JPMorgan checking account and

sent customers redemptions from commingled account); *Trs. of Upstate N.Y. Eng'rs Pension*

*Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 564 (2d Cir. 2016) ("BLMIS deposited customer

investments into a single commingled checking account and . . . [w]hen customers sought to

withdraw money from their accounts, including withdrawals of the fictitious profits that BLMIS

had attributed to them, BLMIS sent them cash from the commingled checking account.").

### 6.      The Liquidation of BLMIS

In December 2008, SIPC sought a protective decree under SIPA § 78eee that the

customers of a member broker-dealer needed protection under SIPA.  Application of SIPC ¶ 2,

*SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 5 ("SIPC

Application").  The SIPC Application named the member broker-dealer that was registered with

the SEC as of December 2008 under Registrant Number 8-8132: Bernard L. Madoff Investment

Securities LLC.  *See id*.  The district court entered the decree and appointed the Trustee "for the

liquidation of the *business of the Defendant* with all the duties and powers of a trustee as

prescribed in SIPA."  Order ¶ 2, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15,

2008), ECF No. 4 ("Protective Decree") (emphasis added).

### 7.      Substantive Consolidation

In the days and months immediately following the revelation of Madoff's Ponzi scheme,

an SEC receiver was appointed for BLMIS,[4] the SIPA Trustee was appointed for BLMIS, a Joint

Provisional Liquidator was appointed for Madoff's London entity, and the United States

Government instituted a criminal proceeding against Madoff.  Stmt. ¶¶ 1–6.  By March 15, 2009,

the Government indicated its intent to forfeit certain of Madoff's personal assets.  *See*

Government's Notice of Intent to Seek Forfeiture of Certain Assets, *United States v. Madoff*, No.

09-cr-213 (DC) (S.D.N.Y. Mar. 15, 2009), ECF No. 59.  But as of April 2009, no chapter 7 case

had been initiated against Madoff personally.  Creditors sued him in various jurisdictions outside

---

[4] The receivership was terminated upon the appointment of a SIPA Trustee.  *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4.

the bankruptcy court.  *See, e.g.*, *Leonhardt v. Madoff*, No. 09-2032 (S.D.N.Y. Mar. 5, 2009);

*Town of Fairfield v. Madoff*, No. 09-5023735 (Conn. Super. Ct. Mar. 30, 2009).

In response, certain creditors filed an involuntary bankruptcy petition against Madoff,

citing the need for his personal estate to be marshaled and distributed in a coordinated,

consistent, and efficient manner alongside the liquidation of his company.  These creditors were

concerned with the "specter of overlapping asset administrations which could delay or prejudice

distributions to creditors," in light of the Government's forfeiture of assets and the SEC seeking

disgorgement and civil penalties of Madoff and his firm.  Pet. at 7, *SEC v. Madoff*, No. 08-cv-

10791 (LLS) (S.D.N.Y. Apr. 1, 2009), ECF No. 37.  The district court agreed that the

appointment of a chapter 7 trustee for Madoff would stem the proliferation of lawsuits against

Madoff and enable an orderly and equitable administration of his personal estate.  Order at 3–4,

*SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Apr. 10, 2009), ECF No. 47.  In allowing the

creditors to commence the involuntary case against Madoff, the district court specifically

referenced that they should be able to target "that portion of Mr. Madoff's property that is neither

forfeitable criminally nor subject to the liquidation of BLMIS under SIPA."  *Id*. at 4.

The bankruptcy court subsequently appointed Alan Nisselson as Chapter 7 Trustee for

Madoff.  Notice of Appointment of Trustee Alan Nisselson, *In re Bernard L. Madoff*, No. 09-

11893 (SMB) (Bankr. S.D.N.Y. Apr. 21, 2009), ECF No. 13.  Thereafter, the SIPA Trustee

moved to substantively consolidate the SIPA liquidation and the chapter 7 bankruptcy because

BLMIS and Madoff were the alter ego of the other, Madoff used BLMIS as his "personal piggy

bank," and Madoff did not have any other significant source of income other than that derived

from his broker-dealer subject to liquidation under SIPA.  Memorandum of Law in Support of

Joint Motion for Entry of Order Substantively Consolidating the Estate of Bernard L. Madoff

into the SIPA Proceeding of Bernard L. Madoff Investment Securities, *SIPC v. BLMIS LLC*,

Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 5, 2009), ECF No. 196.

The Chapter 7 Trustee consented to the relief sought and the two trustees established a

protocol that was embodied in the bankruptcy court's order substantively consolidating the

BLMIS and the Bernard L. Madoff estates.  *See* Consent Order Substantively Consolidating the

Estate of Bernard L. Madoff into the SIPA Proceeding of Bernard L. Madoff Investment

Securities LLC and Expressly Preserving All Rights, Claims and Powers of Both Estates, *SIPC

v. BLMIS LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 10, 2009), ECF No. 252

(the "Substantive Consolidation Order").  The Substantive Consolidation Order merged the

chapter 7 estate of Bernard L. Madoff into the BLMIS SIPA proceeding *nunc pro tunc*, and all

assets and liabilities of the two estates were deemed consolidated as of the date of the filing of

the liquidation proceedings.  The Substantive Consolidation Order expressly preserved the SIPA

Trustee's powers to avoid and recover fraudulent transfers of customer property and the Chapter

7 Trustee's powers to pursue recovery of Madoff's non-customer property.  *Id*. ¶¶ 4, 7 ("the

SIPA Trustee is authorized to pursue claims on behalf of the consolidated estate as representative

of and fiduciary for the BLMIS SIPA Proceeding and as subrogee and assignee of creditors'

claims for, among other things, the avoidance and recovery of transferred property").

### 8.    The Trustee Can Recover Any Transfers of Customer Property

When IA Business customers sent money to BLMIS for the purpose of purchasing

securities, it became "customer property" under SIPA.  SIPA § 78*lll*(4); *see also BAM L.P.*, 624

B.R. at 62.  BLMIS used the JPMorgan Accounts as the firm's Rule 15c3-3 account.  Stmt. ¶¶

69–77, 87–89; 17 C.F.R. § 240.15c3-3.  Whether operated as a sole proprietorship or as an LLC,

BLMIS's assets were composed primarily of customer property and its liabilities were composed

primarily of amounts owed to customers.  As indicated in the Amended Form BD, all assets and

32

liabilities were transferred from the sole proprietorship to the LLC in January 2001. *See* Stmt. ¶¶ 9–11 (citing Cremona Decl., Ex. 3 (Amended Form BD)); *BAM L.P.*, 624 B.R. at 60; *JABA Assocs.*, 2021 WL 1112342, at *9; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *9.

The protections provided by SIPA mandate that the Trustee can recover transfers of customer property by the SIPC member, regardless of its corporate form. Despite this, Defendants may argue that *Picard v. Avellino*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016) supports their argument that the Trustee cannot recover the transfers made to Defendants between 2006-2008 because the drawer of those checks listed Bernard L. Madoff rather than Bernard L. Madoff Investment Securities LLC and the SIPA Trustee can only recover transfers made by the LLC. *See Avellino*, 557 B.R. at 110.[5] The result of *Avellino* is that customer property transferred by the sole proprietor cannot be recovered, which cannot be the intention of SIPA which seeks to protect customer property, or this SIPA liquidation which authorizes the Trustee to recover customer property. As this Court recognized in *BAM L.P.*:

> At first blush, this may seem like a distinction without a difference because Madoff's chapter 7 case has been substantially consolidated with the SIPA liquidation of BLMIS. Thus, one would think that even if Madoff operated his Ponzi scheme under his sole proprietorship, rather than BLMIS, the Trustee would still be entitled to recover these funds as fraudulent transfers. However, in *Picard v. Avellino (In re BLMIS, LLC)*, 557 B.R. 89, 110 (Bankr. S. D.N.Y. 2016), the Court held that 'only the Madoff [chapter 7] trustee can recover actual transfers by the sole proprietorship.' There is a possibility that even if such actions were commenced by him, they would not be recoverable.

*BAM L.P.*, 624 B.R. at n.4. While there is practicality in establishing a finite date for discerning the debtor's property, that rule does not apply to customer property recoverable under SIPA by a

---

[5] In *Avellino*, unlike the instant case, the Trustee alleged that the defendants lacked good faith when they received the transfers. On that basis, the Trustee sought to recover all transfers made to those defendants during the life of their BLMIS accounts, which dated back to 1978. Here, the Trustee is only seeking to recover transfers made between 2006-2008 when BLMIS was an LLC.

SIPA trustee wherever held.

Further, there was no error in naming only the LLC in the Protective Decree. SIPA requires a protective decree when a SIPC-member broker-dealer fails. SIPA § 78eee(b)(1). The *only* SIPC *member* at the time of failure was the LLC, as the sole proprietorship had ceased to operate almost eight years prior, and thus the LLC was the only entity that *could have been* named in the Protective Decree.

Second, when the Trustee was appointed, it was for the liquidation of the *business* of the broker-dealer. There are numerous undisputed facts that show that the sole proprietorship and the LLC continued uninterrupted as a single business dealing with customer property since Madoff registered as a broker-dealer with the SEC in 1960, including:

- Customer property was deposited into the same 703 Account when BLMIS operated as a sole proprietorship and as an LLC. Stmt. ¶¶ 69–77, 87–89.

- The customers of the sole proprietorship became the customers of the LLC when it changed corporate form. Stmt. ¶¶ 9–11; *see also BAM L.P.*, 624 B.R. at 60 ("Defendants agreed to be liable to any successors when they signed their customer agreements.").

- When Madoff converted the sole proprietorship to an LLC, he expressly identified it to the SEC as an amendment to an existing broker-dealer's registration—not a new application of a separate broker-dealer seeking to register with the SEC. Stmt. ¶¶ 9–11.

- The SEC registration number of BLMIS has always remained 8-8132 throughout the entire course of its business. Stmt. ¶¶ 7–11; *BAM L.P.*, 624 B.R. at 59 ("The same SEC file number, 8-8132, that appeared in the 1959 SEC Form BD appeared on the 2001 SEC Amended Form BD.").

- Madoff reported to the SEC that he transferred all assets and liabilities, which by definition includes bank accounts, from the sole proprietorship to the LLC. Stmt. ¶¶ 9–11.

Indeed, the Bankruptcy Court recognized as much, stating that Madoff has always been a member of SIPC, and "the incorporation of BLMIS as a limited liability company continued his business without change . . . . Thus, nothing has changed since 1960 except for the business form

that Madoff used to conduct his Ponzi scheme." *SIPC v. BLMIS LLC (In re Bernard L. Madoff)*, 522 B.R. 41, 60 (Bankr. S.D.N.Y. 2014); *BAM L.P.*, 624 B.R. at 59.  Because the Trustee is appointed for the liquidation *of the business* of the debtor, such liquidation necessarily entails the liquidation of any predecessor conducting the same business, using the same SEC registrant number, on behalf of its customers with their customer property.

Third, SIPA makes clear that a SIPA trustee is authorized to recover customer property wherever it lies.  *BAM L.P.*, 624 B.R. at 62.  SIPA protection focuses on "whether there was actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation."  *In re Old Naples Sec., Inc*., 223 F.3d 1296, 1302 (11th Cir. 2000) (internal quotation marks omitted); *see also In re Primeline Sec. Corp*., 295 F.3d 1100, 1107 (10th Cir. 2002) ("Whether a claimant deposited funds 'with the debtor' does not depend simply on to whom claimants made their checks payable . . . [t]he relevant inquiry is whether the brokerage firm actually received, acquired or possessed claimants property.").  Thus, as long as a trustee can show that the property in question was customer property received by the broker-dealer, he has the authority to recover it, wherever it lies.  SIPA § 78fff-2(c)(3); *BAM L.P.*, 624 B.R. at 62 ("The funds held in the Bank Accounts were meant to be invested legitimately through BLMIS but never were. Thus, they were "customer property." . . . The Defendants' fictitious profits must be turned over to the Trustee.").

The fact that a broker-dealer may have operated under a different legal form many years prior to the SIPA liquidation does not change a SIPA trustee's rights and powers to recover that customer property for the benefit of its owners—the customers.  Focusing on the name on a check or the corporate from of the broker-dealer at a particular time shifts the focus away from SIPA's customer property regime and instead allows the fraudster to determine the

circumstances under which customer property can be recovered.  *See BAM L.P.*, 624 B.R. at 60

(finding that "[t]he discrepancies . . . —forms filled out improperly, business names used

interchangeably on bank accounts and checks—are the sleights of hand that one would expect to

see when exhuming the remnants of a Ponzi scheme.")  Where, as here, there is no dispute that

the Trustee is seeking to recover transfers comprising customer property, the form of the broker-

dealer at the time of transfer is irrelevant.

Fourth, the Substantive Consolidation Order changed nothing about the SIPA Trustee's

rights to customer property.  If anything, it was a "belt and suspenders" order to ensure that none

of Madoff's assets slipped through the cracks given that the Government was pursuing forfeiture,

the SIPA Trustee was pursuing customer property, and the Joint Provisional Liquidators were

marshaling the assets of Madoff's London entity.  The order expressly states that the SIPA

Trustee will retain his powers to recover customer property notwithstanding the consolidation of

the estates.  Such reservations did not in any way change the rights and powers that were

conferred on the SIPA Trustee as a result of the commencement of the SIPA liquidation.

Instead, those reservations in the order were necessary because absent express preservation, the

substantive consolidation of two debtors' estates could have extinguished both trustees'

avoidance powers altogether.  *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 768–69 (9th

Cir. 2000) ("Absent express preservation of the trustee's avoidance power, an order of

substantive consolidation would ordinarily eliminate that power.").

Finally, taken to its logical conclusion, because BLMIS's only assets were funds in the

JPMorgan Accounts, Defendants' argument means that there is no customer property in the SIPA

liquidation and there is no estate representative who can recover the funds transferred out of that

bank account.  *See BAM L.P.*, 624 B.R. at n.4.  Such an outcome would leave a vast amount of

36

customer property outside the reach of the SIPA liquidation, something SIPA does not intend.
This result cannot be reconciled with the order appointing the Trustee, the Substantive
Consolidation Order, prior precedent in this case, nor with the plain language of SIPA.

In sum, as long as the SIPA Trustee can show that the property he is seeking to recover is
customer property, he has the power to recover it, whether that property is held in an account
with the letters "LLC" or not. Such property never belonged to Madoff, the sole proprietorship,
or the LLC, regardless of whose name was on the bank account. *Id.* at 62. That is what SEC
Rule 15c3-3 (promulgated at the direction of SIPA) means. Whatever particular bank account a
fraudster chooses to park customer property in or however that particular bank account is
denominated cannot change the nature of customer property or the Trustee's duty to recover that
property and return it to its rightful owners. That is what SIPA and SEC Rule 15c3-3 intend.

### E. Madoff's Purported Purchase of Securities Does Not Create a Genuine Issue of Material Fact

The Trustee also anticipates that Defendants will argue that Madoff used money from his
IA Business customers to purchase securities, which appeared on Defendants' BLMIS
statements. Defendants have offered no witnesses—fact or expert—to support this argument. In
contrast, the Trustee's expert witness, Dubinsky—a certified fraud examiner and forensic
accountant—conducted several analyses upon which he concluded that BLMIS did not conduct
any trading on behalf of its IA Business customers. Stmt. ¶¶ 19–24.

Dubinsky found many instances where the volume that BLMIS claimed to have
purchased or sold on behalf of all IA Business customers exceeded the volume of equities traded
for the entire market. Stmt. ¶¶ 25–28. Dubinsky also analyzed the equity and options trades that
were priced outside the daily price range. Stmt. ¶¶ 29–30. For the period of 2000-2008,
Dubinsky determined that there were 99,972 equity transactions executed outside the daily

market traded price range, and 34,501 options transactions traded outside of the daily price

range.  *Id*.  The absence of actual trading was also reflected in the prices at which the IA

Business purportedly bought and sold shares using the split-strike conversion strategy.  Stmt. ¶¶

31–35.  Dubinsky also analyzed the volatility of the IA Business's reported average annual rate

of return for the split-strike conversion strategy as compared with the volatility of the annual rate

of return for the two major market indices—the S&P 100 Index and the Dow Jones Industrial

Average.  Stmt. ¶ 36.  Because the IA Business's split-strike conversion strategy was supposedly

engineered around the S & P 100, the IA Business's returns should have performed similarly to

the S&P 100 Index.  Stmt. ¶ 37.  This analysis showed that the volatility in the IA Business rates

of return did not mirror the volatility of the rates of return of the major indices.  Stmt. ¶¶ 38–40.

Additionally, all equity trades made by BLMIS should have been reflected in the DTC

records pertaining to BLMIS's single account with the DTC—an organization that clears and

settles equity transactions in the U.S. market.  Stmt. ¶ 41.  Dubinsky's analysis confirmed that

the equity securities that were cleared through BLMIS's DTC account were traded by the

proprietary trading business; no IA Business trades were cleared through BLMIS's DTC

account.  Stmt. ¶¶ 42–46.  He concluded that the IA Business did not execute the equity trades

reflected on the customer statements.  Stmt. ¶ 47; *see also* Stmt. ¶¶ 48–51.  Similarly, the options

purportedly executed for the customer accounts in the IA Business could not be reconciled with

the records of the OCC, an organization that clears and settles options transactions in the U.S.

market.  Stmt. ¶¶ 52–55.  Based on Dubinsky's analysis of these records, he concluded that

BLMIS did not conduct any options trading on behalf of its IA Business customers.  Stmt. ¶ 56.

Besides purchasing equity securities and options, BLMIS also claimed it would

intermittently invest IA Business customer funds in T-Bills as part of the split-strike conversion

38

strategy.  Stmt. ¶ 57.  While BLMIS purchased T-Bills with customer funds as a way to obtain

interest on all the customer cash it was holding, these purchases did not match the allocation of

T-Bill transactions that appeared on customer statements.  Stmt. ¶ 58.  Dubinsky's analysis

confirmed that although BLMIS purchased T-Bills for cash management purposes, the volume of

T-Bills that appeared on the customer statements dwarfed the aggregate volume of T-Bills

actually purchased and held by BLMIS.  Dubinsky prepared a summary chart of his review of

these voluminous records, which accurately represents his comparison of the T-Bill positions:

Table 5

Comparison of Year-End US Treasury Positions: Proprietary Trading Business vs. IA
Business

| Year-End | Proprietary Trading Business | IA Business | Proprietary Trading Business positions as a percent of IA Business positions |
|----------|------------------------------|-------------|------------------------------------------------------------------------------|
| 2002 | $84,000,000 | $30,975,765,000 | 0.27% |
| 2003 | $70,000,000 | $33,643,020,000 | 0.21% |
| 2004 | $70,000,000 | $37,935,258,000 | 0.18% |
| 2005 | $75,000,000 | $40,913,910,000 | 0.18% |
| 2006 | $70,000,000 | $48,342,420,000 | 0.14% |
| 2007 | $80,000,000 | $56,990,055,000 | 0.14% |

Stmt. ¶¶ 59–63.  Accordingly, the T-Bill positions that appeared on the customer statements were

fictitious.  *Id*.; *see also Nelson*, 610 B.R. at 214, 234 n.37 ("Dubinsky's analysis demonstrated

that the T-Bill transactions that appeared in the customer statements were fictitious and bore no

relationship to the actual T-Bills purchased by BLMIS and documented in the DTC records.").

Further, this Court has already held any T-Bills purchased were "part of the ongoing fraud" and

immaterial.  *Epstein Decision* at 7.

39

Frank DiPascali, Madoff's right-hand employee, testified that the IA Business used funds in the 703 Account to purchase T-Bills as a cash management tool but the T-Bills were not purchased for IA Business customers, and he and other BLMIS employees created fictitious T-Bill positions in customer statements. Stmt. ¶¶ 64–68; *see also Nelson*, 610 B.R. at 226, 234 n.37. "[T]he purchase of T-Bills was part of the cash management system used by BLMIS to sustain the Ponzi scheme and 'did not transform BLMIS into a legitimate enterprise or prohibit the Trustee's reliance on the Ponzi scheme presumption.'" *BAM L.P.*, 608 B.R. at 175 n.15 (quoting *Legacy*, 603 B.R. at 691). The operators of Ponzi schemes "often engage in some legitimate transactions. If the legitimate transactions further the scheme or are funded by the scheme they are part of the scheme and do not insulate the legitimate transactions from the taint of the scheme." *Nelson*, 610 B.R. at 234 (citing *Legacy*, 603 B.R. at 691–93).

The evidence and opinions of the Trustee's expert witness and DiPascali's testimony unequivocally demonstrate that no securities or T-Bills were purchased by BLMIS for its IA Business customers, including Defendants. Absent expert opinion, Defendants cannot create an issue of material fact where none exists simply because they disagree. Accordingly, this anticipated defense fails as a matter of law.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant summary judgment in the Trustee's favor on Count One of the Trustee's Complaint, and enter an order: (1) avoiding $1,896,148 in transfers of fictitious profits that BLMIS made to Defendants within the Two-Year Period; (2) awarding the Trustee prejudgment interest from the Filing Date through the date of entry of judgment at the rate of 4%; and (3) requiring Defendants to return such transfers or the value thereof.

Dated: July 22, 2021
     New York, New York

*/s/ Nicholas J. Cremona*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Lan Hoang
Email: lhoang@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*