# EXHIBIT 8

98B6DIP                         Plea

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
              v.                              09 CR 764 (RJS)
4
     FRANK DIPASCALI,
5
                   Defendant.
6    ------------------------------x

7                                            New York, N.Y.
                                             August 11, 2009
8                                            3:15 p.m.

9
     Before:
10
                      HON. RICHARD J. SULLIVAN,
11
                                             District Judge
12

13                             APPEARANCES

14   LEV L. DASSIN
          United States Attorney for the
15        Southern District of New York
     MARC LITT
16   LISA BARONI
          Assistant United States Attorney
17
     BRACEWELL & GIULIANI
18        Attorneys for Defendant
     MARC L. MUKASEY
19   CRAIG S. WARKOL
     JAMIE RENNER
20   DANIEL S. CONNOLLY

21   Also Present:

22   Special Agent Keith D. Kelly
     Special Agent Julia Hanish
23   Special Agent Steven Garfinkel
     Natasha Ramesar, Pretrial Services
24

25

1              (In open court; case called)

2              THE DEPUTY CLERK:  All parties can state their

3    appearances for the record, please.

4              MR. LITT:  Good afternoon, your Honor.  Marc Litt for

5    the United States.  With me at counsel table is Lisa Baroni,

6    Keith Kelley of the FBI, Julia Hanish, and Steven Garfinkel of

7    the FBI, and Natasha Ramesar of the U.S. Pretrial Services

8    Office.

9              THE COURT:  Good afternoon to each of you.

10             For the defense.

11             MR. MUKASEY:  Good afternoon, your Honor. Marc Mukasey

12   from the law firm Bracewell & Giuliani for the defendant Frank

13   DiPascali, who is seated to my left.  With me are Dan Connolly,

14   Craig Warkol, and Jamie Renner.

15             THE COURT:  Good afternoon to each you and to Mr.

16   DiPascali.

17             Let me just get a little bit of background so it is

18   clear since this is the first appearance of anyone on this

19   case.  On Friday I received a letter from the government, Mr.

20   Litt and Ms. Baroni, advising me that the defendant, Mr.

21   DiPascali, was prepared to waive the indictment and plead

22   guilty pursuant to an information in this case.

23             The government also included a notice of intent to

24   file an information as opposed to an indictment, as well as a

25   motion pursuant to Title 18, United States Code, Section 3771

98B6DIP                         Plea

1   regarding the right of victims.  The government also provided a

2   disclosure statement setting forth a list of potential victims

3   of the criminal activity alleged in the case.  This statement

4   contained a 61-page, single-spaced list of victims which the

5   government conceded was not an exhausted or complete list but

6   was a list that they had been able to put together over the

7   course of the investigation.

8           Mr. Litt, so far so good?

9           MR. LITT:  Yes.  I believe it is only institutional

10  victims, corporate parties.

11          THE COURT:  That's right.  61 pages of institutional

12  victims.

13          In light of this fact that this case has not been

14  assigned a docket number, it will not receive a docket number

15  today after the defendant formerly waives indictment and pleads

16  here in open court.

17          The government requested that I issue an order

18  directing that its letter of August 7th be posted and the other

19  materials I mentioned be posted on the web page created by the

20  U.S. Attorney's Office for Madoff related cases.  In the

21  government's view this was the most practical and efficient way

22  to notify potential victims of today's proceeding.  So I issued

23  such an order on Friday, August 7th.

24          Late yesterday afternoon I received a copies of a

25  proposed information, a plea agreement, as well as a letter

98B6DIP                    Plea

1   from the government setting forth the bail conditions proposed

2   by the parties in this case.  I ordered that the last of these

3   be posted similarly on the and U.S. Attorney's Office web page

4   page.  The information and plea agreement will presumably be

5   posted today presuming the defendant waives indictment and

6   executes the agreement that I received a draft of yesterday.

7          To ensure at least some notice to the victims,

8   including those who may be present here today, I directed the

9   government to summarize and post on the web page the charges

10  contained in the information and the nature of the proposed

11  plea agreement between the parties.

12         So are there any other additional facts that I left

13  out, Mr. Litt?

14         MR. LITT:  I don't believe so.  No, your Honor.

15         THE COURT:  Mr. Mukasey, anything you think is

16  relevant to the record?

17         MR. MUKASEY:  No, Judge.  I think that is it.

18         THE COURT:  Mr. Mukasey, I understand that your client

19  wishes to plead guilty pursuant to the information that has

20  been drafted and provided to me, is that correct?

21         MR. MUKASEY:  That's correct, your Honor.

22         THE COURT:  Mr. DiPascali, before I accept your guilty

23  plea -- you can sit for the moment.  Before I accept your

24  guilty plea, I am going to ask you certain questions to ensure

25  first of all that you are pleading guilty because you are

1   guilty and not for some other.  And also to make sure that you

2   fully understand your rights, your Constitution and statutory

3   rights, including your right to a trial.

4        So if at any point during the course of my questioning

5   you don't understand my question or require some further

6   elaboration on my part, let me know and I will do everything to

7   clarify.  If at any point you wish to confer with Mr. Mukasey

8   or your other attorneys, that is perfectly fine.  I will give

9   you as much time as I need.  I don't want you to feel rushed

10   into a plea in this matter.

11        At this point I am going to ask Ms. Levine to

12   administer the oath.  This is an oath that I ask you to rise

13   for.  This is an oath that you will answer truthfully my

14   questions.

15        THE DEPUTY CLERK:  Please raise your right hand.

16        (Defendant sworn)

17        THE COURT:  Mr. DiPascali, having taken that oath, do

18   you understand that any false answers to my questions could

19   subject you to the penalties for perjury or for making a false

20   statement, which would carry separate penalties and be accept

21   and distinct from any of the crimes charged in the information

22   in this matter?

23        THE DEFENDANT:  I do, your Honor.

24        THE COURT:  Again, if at any point you wish to confer

25   with your attorneys before answering, that is fine.  If at any

6

98B6DIP                           Plea

1   point you would like me to clarify a question before answering,

2   that is also fine.  In fact, you should do that.  But don't

3   make any false statements because that will compound any

4   problems that you may already have.

5          THE DEFENDANT:  Understood.

6          THE COURT:  Mr. DiPascali, could you state your full

7   name for the record?

8          THE DEFENDANT:  Frank DiPascali, Jr.

9          THE COURT:  How old are you, Mr. DiPascali?

10         THE DEFENDANT:  52.

11         THE COURT:  How far you go in school?

12         THE DEFENDANT:  High school.

13         THE COURT:  Where was that?

14         THE DEFENDANT:  Archbishop Malloy High School in

15  Briarwood, Queens.

16         THE COURT:  Are you now or have you recently been

17  under the care of a doctor or a psychiatrist?

18         THE DEFENDANT:  No.

19         THE COURT:  Have you ever been treated for any type of

20  mental illness or any type of addiction, including drug or

21  alcohol addiction?

22         THE DEFENDANT:  No, sir.

23         THE COURT:  Have you taken any drugs or any medicine

24  or any pills or have you drunk any alcohol in the past 48

25  hours?

98B6DIP                              Plea                                    7

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  Tell me about that.

3              THE DEFENDANT:  I had a glass of wine at dinner the

4    night before last.

5              THE COURT:  The night before last?

6              THE DEFENDANT:  That's correct.

7              THE COURT:  No medication, no pills, no drugs of any

8    kind?

9              THE DEFENDANT:  No, sir.

10             THE COURT:  No other alcohol?

11             THE DEFENDANT:  Correct.

12             THE COURT:  Is your mind clear today?

13             THE DEFENDANT:  Crystal clear, sir.

14             THE COURT:  Do you under the nature of this proceeding

15   and what is going to take place here today?

16             THE DEFENDANT:  I do.

17             THE COURT:  Mr. Mukasey, do you have any doubt as to

18   your client's mental competence to enter an informed plea at

19   this time?

20             MR. MUKASEY:  None whatsoever.

21             THE COURT:  Let me ask Mr. Litt and Ms. Baroni if they

22   share your confidence in that regard.

23             Mr. Litt?

24             MR. LITT:  We do.  We have no reason to think

25   otherwise.

98B6DIP                        Plea

1            THE COURT:  On the basis of Mr. DiPascali's responses

2    to my questions, my observations of his demeanor, and on the

3    representations of his counsel and the prosecutors, I find that

4    Mr. DiPascali is competent to enter an information plea at this

5    time.

6            Now, Mr. DiPascali, as I understand it you wish to

7    plead guilty to an information, is that correct?

8            THE DEFENDANT:  Yes, sir.

9            THE COURT:  Have you had enough of an opportunity to

10   discuss this information and the charges contained in it with

11   your attorney, Mr. Mukasey?

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  Are you satisfied with Mr. Mukasey's

14   representation of you?

15           THE DEFENDANT:  Absolutely.

16           THE COURT:  Do you feel you need or require any

17   additional time to review the information or review any of the

18   other documents associated with this matter?

19           THE DEFENDANT:  No, sir.

20           THE COURT:  Now, have you received a copy of the

21   information that I've been referring to?

22           THE DEFENDANT:  I have.

23           THE COURT:  Have you read it yourself?

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  Have you discussed it with your attorney

98B6DIP                    Plea

1    Mr. Mukasey?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Do you waive the public reading of that

4    information, or would you like me to read it to you here in

5    open court?

6              THE DEFENDANT:  I would prefer it to be waived.

7              THE COURT:  You will waive the public reading.  That's

8    fine.

9              Now, do you have in front of you -- I don't know

10   whether you have the original in front of you -- a waiver of

11   indictment form?

12             THE DEFENDANT:  I do.

13             THE COURT:  Is that your signature on that document?

14             THE DEFENDANT:  It is.

15             THE COURT:  When did you sign that?

16             THE DEFENDANT:  About 15 minutes ago.

17             THE COURT:  Prior to signing that document had you

18   reviewed the information in this case and discussed it with

19   Mr. Mukasey?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Mr. Mukasey, is your signature on that

22   form as well?

23             MR. MUKASEY:  It is, Judge.

24             THE COURT:  And prior to signing it, did you review

25   the information and discuss it with your client?

98B6DIP                           Plea

1           MR. MUKASEY:  Extensively.

2           THE COURT:  Now, I want to make sure you understand,

3    Mr. DiPascali, that you have a right, a constitutional right,

4    to proceed by way of an indictment, which is a charging

5    instrument returned by a grand jury rather than an information,

6    which is simply a charging instrument brought by prosecutors.

7           Do you understand that?

8           THE COURT:  I do.  Under the Constitution you have a

9    right to have evidence underlying the crimes charged in the

10   information brought before the grand jury, which is a group of

11   23 citizens who would decide by majority vote whether probable

12   cause had been established to demonstrate that you had

13   committed the crimes charged in the charging instrument.

14          Do you understand that?

15          THE DEFENDANT:  Yes, I do.

16          THE COURT:  Only if the grand jury reached that

17   determination of probable cause by a majority vote with a

18   proper quorum of grand jurors present could those charges be

19   returned against you.

20          Do you understand that?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  By waiving indictment, you will be giving

23   up that right and you will be agreeing to go forward on the

24   charges contained in the information without ever having the

25   evidence brought before a grand jury.

98B6DIP                          Plea

1           Do you understand that?

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  Are you voluntarily and freely giving up

4    that right to proceed by a grand jury?

5           THE DEFENDANT:  Absolutely.

6           THE COURT:  Now, I want to explain to you your other

7    constitutional rights.  Have you had a chance to review with

8    your attorney, Mr. Mukasey, a three-page document probably

9    entitled Advice of Rights Form that should have been provided

10   to you by my chambers?

11          THE DEFENDANT:  I have.

12          THE COURT:  Is your signature on the second page of

13   that document?

14          THE DEFENDANT:  It is.

15          THE COURT:  Before you signed that document, did you

16   review it carefully with your attorney, Mr. Mukasey?

17          THE DEFENDANT:  Yes, we did.

18          THE COURT:  Did you have an opportunity discuss with

19   him any questions you may have had or any further explanation

20   of the rights described in that document?

21          THE DEFENDANT:  Thoroughly.

22          THE COURT:  Mr. Mukasey, did you sign the third page?

23          MR. MUKASEY:  I did, Judge.

24          THE COURT:  Before signing it, did you have a full and

25   extensive opportunity to discuss the rights described in that

98B6DIP                              Plea

1    document with your client?

2                MR. MUKASEY:  Yes.

3                THE COURT:  I am going to mark that as a court

4    exhibit.  I will mark it as Court Exhibit 1.  I will date it

5    and I will initial it.

6                I am also going to ask you in open court, Mr.

7    DiPascali, some questions about the rights that are contained

8    in this document.  The reason I do that is because these rights

9    are so vitally important and it is so essential that you

10   understand these rights because they are there rights that you

11   will would be waiving.  In addition to this document, I want to

12   make sure you have had an ample opportunity to consider them so

13   I will ask you questions that may seem redundant but I think is

14   it a price worth paying for rights that are this serious.

15               Mr. DiPascali, under the Constitution and laws of the

16   United States, you would be entitled to a speedy and public

17   jury trial on the charges contained in the information.

18               Do you understand that?

19               THE DEFENDANT:  Yes, sir.

20               THE COURT:  At trial you would be presumed to be

21   innocent and the government would be required to prove you

22   guilty by competent evidence beyond a reasonable doubt before

23   you could be found guilty.

24               Do you understand that?

25               THE DEFENDANT:  Yes, I do.

98B6DIP                    Plea

1           THE COURT:  Now, at trial a jury of 12 people would
2    have to agree unanimously that you were guilty before you could
3    be found guilty.

4           Do you understand that?

5           THE DEFENDANT:  Yes, sir.

6           THE COURT:  You would not have to prove that you were
7    innocent if you went to trial.

8           Do you understand that?

9           THE DEFENDANT:  I understand.

10          THE COURT:  The jury would have to be persuaded beyond
11   a reasonable doubt and they would have to be persuaded
12   unanimously of that fact before you could be found guilty.

13          Do you understand that?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Now, at trial and at every stage of your
16   case, you would be entitled to be represented by an attorney
17   and if you couldn't afford an attorney, one would be appointed
18   for you at no cost to you.

19          Do you understand that?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  During a trial, the witnesses for the
22   government would have to come into court and testify in your
23   presence.

24          Do you understand that?

25          THE DEFENDANT:  Yes, sir.

1          THE COURT:  It is called your right to confront your

2    accusers.  It is the confrontation clause of the Constitution.

3    What that means is the witnesses would have to come and sit

4    right here or in a box like it if it were in a different

5    courtroom and you would be able to see them and hear them and

6    they would be able to see you.

7          Do you understand that?

8          THE DEFENDANT:  Yes.

9          THE COURT:  At trial your attorney Mr. Mukasey would

10   have an opportunity to cross-examine those witnesses.

11         Do you understand that?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  I have seen him do it.  He is really good

14   at it.  You would have that opportunity.

15         THE DEFENDANT:  That is why I sit next to him.

16         THE COURT:  He would also have an opportunity to

17   object to the government's evidence if he wished and if he felt

18   appropriate.

19         Do you understand that?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  At trial you would have the right to have

22   subpoenas issued, or other compulsory process used to compel

23   witnesses to testify if you wished.

24         Do you understand that?

25         THE DEFENDANT:  Yes, sir.

98B6DIP                          Plea

1           THE COURT:  If there are witnesses who you felt had

2    valuable testimony, valuable to your defense and they didn't

3    wish to testify, you could compel them to testify through

4    subpoenas.

5           Do you understand that?

6           THE DEFENDANT:  Yes, sir.

7           THE COURT:  At trial you yourself would have the right

8    to testify if you chose.

9           Do you understand that?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Would you also have the right not to

12   testify if you chose not to testify.  If you chose not to

13   testify then no one, particularly the jury, could draw any

14   negative inference or any suggestion of your guilt by virtue of

15   the fact that you chose not to testify.

16          Do you understand that?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  I would tell the jury that more than once.

19   I tell them at the beginning and I would tell them in the

20   middle and at the end that this was a fundamental right and

21   principle of bedrock proportions in our constitutional system,

22   that the criminal defendant never has any obligation to do

23   anything at a trial.  The burden also rests with the

24   government.  So if a defendant were not to testify, they could

25   not and must not draw any negative inference against that

98B6DIP                          Plea

1   witness by virtue of that nontestimony.

2           Do you understand that?

3           THE DEFENDANT:  I do.

4           THE COURT:  Now, do you understand that if you went to

5   trial and you were convicted at trial, you would then have a

6   right to appeal the jury's verdict if you wished.

7           Do you understand that?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  Now, if you plead guilty and if I accept

10  your guilty plea, you will give up your right to a trial and

11  all the other rights I have just described.

12          Do you understand that?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  The only exception to that would be your

15  right to counsel.  That right would continue through your plea,

16  through sentencing, and through appeal if you wished to appeal.

17          Do you understand that?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  But the other rights that I just described

20  and are described in the document that we talked about before,

21  Court Exhibit 1, those would be gone.  You would be waiving

22  those.

23          Do you understand that?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  Do you understand you have a right to

1    change your mind even now?

2           THE DEFENDANT:  Yes.

3           THE COURT:  There are a lot of people here, and your

4    lawyers are here, the government is here.  That is well and

5    good but if you want to go to trial, you have a right to go to

6    trial and nobody will be upset with you and annoyed at you.

7           Do you understand that?

8           THE DEFENDANT:  I understand, sir.

9           THE COURT:  Do you nevertheless wish to go forward

10   with your guilty plea at this time?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Now, do you understand that if you plead

13   guilty and if I accept your guilty plea then you will be

14   sentenced on the basis of that guilty plea among other things;

15   do you understand that?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  Do you understand that if you plead

18   guilty, there will be no appeal on the question of whether or

19   not you committed the offenses to which you pled guilty; do you

20   understand that?

21          THE DEFENDANT:  Yes, I do.

22          THE COURT:  Do you also understand if you plead

23   guilty, I am going to ask you questions about what you did.  I

24   am going to ask you basically to give up your right not to

25   incriminate yourself because I am going to need you to tell me

98B6DIP                        Plea

1     what you did that makes you guilty of these crimes before I

2     will accept the plea; do you understand that?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  I said a minute ago if you went to trial

5     you would have a right not to testify and that of course is

6     true.  No negative inference could be drawn against you or

7     considered by the jury.  If you are going to plead guilty then

8     I will need to be persuaded that you are pleading guilty

9     because you are guilty and not for some other reason.  So that

10    is why I am going to ask you questions about what you did and

11    how that makes you guilty of the offense.

12             Do you understand?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  Do you understand each and everyone of

15    these rights, Mr. DiPascali?

16             THE DEFENDANT:  I do.

17             THE COURT:  Are you waiving your rights to a trial and

18    all the other rights I just mentioned?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  Now, the information that you have

21    indicated you've read charged you in 10 separate counts.

22             Do you understand that?

23             THE DEFENDANT:  Yes.

24             THE COURT:  I am not going to go through it in detail.

25    I am not going to read it.  The first count charges you with

98B6DIP                    Plea

1   conspiracy to commit securities fraud, investment advisory

2   fraud, falsify books and records of a broker/dealer, falsify

3   books and records of an investment fund, mail fraud, wire

4   fraud, money laundering all in violation of Title 18, United

5   States Code, Section 371-72.

6            Count Two charges you with a substantive count of

7   securities fraud violation of 15, United States Code, Section

8   78j(b), 78ff.

9            The third count charges you with investment adviser

10  fraud, in violation of Title 15, United States Code, Section

11  80b-6 and 80b-17.

12           The fourth count charges you with falsifying

13  broker/dealer books and records in violation of Title 15,

14  United States Code, Sections 78q(a) and 78ff as well as the

15  regulation that is promulgated thereafter 17, C.F.R., Section

16  240.17(a)(3).

17           The fifth count charges you with falsifying investment

18  adviser books and records in violation of 15, United States

19  Code, Section 80(b)(4) and 80b-17 as well as a code section of

20  the C.F.R.

21           Count Six charges you with mail fraud in violation of

22  18, United States Code, Section 1341.

23           Count Seven charges you with wire fraud in violation

24  of Title 18, United States Code, 1343.

25           Count Eight charges you with money laundering in

1  violation of Title 18, United States Code, Section 1956(a)(2).

2         Count Nine charges you with perjury in violation of

3  Title 18, United States Code, Section 1621.

4         Count Ten charges you with income tax evasion in

5  violation of Title 26, United States Code, Section 7201.

6         So those are the 10 counts.

7         Do you understand that?

8         THE DEFENDANT:  Yes, I do.

9         THE COURT:  In addition the information contains two

10 forfeiture allegations.  The first calls for you to forfeit all

11 property and proceeds deprived from the crimes charged in

12 Counts One, Two, Six and Seven for a total amount of $170

13 billion.

14        Do you understand that?

15        THE DEFENDANT:  Yes I do.

16        THE COURT:  Billion with a "B."

17        And the second forfeiture allegation charges or

18 contains an allegation which would call for you to forfeit all

19 the property derived from the money laundering count, Count

20 Eight.  That is for a total amount of at least $250 million.

21        Do you understand that?

22        THE DEFENDANT:  Yes, sir.

23        THE COURT:  I am going to ask the government now to

24 state the elements of the offense.  These are the things that

25 the government would have to prove and the jury would have to

98B6DIP                    Plea

1    find beyond a reasonable doubt for you to be convicted on those

2    counts of the information.  These are the things that I will

3    have to find have been demonstrated before I will accept the

4    guilty plea on those counts.  So I want you to listen very

5    carefully as Mr. Litt or Ms. Baroni describes these elements.

6    It may take a while frankly.  But it is essential that you

7    understand these elements.

8            I assume you have discussed the elements of these

9    offenses with your attorney Mr. Mukasey.

10           MR. MUKASEY:  In detail.

11           THE COURT:  So, mr. Litt, do you want to go through

12   the counts in the indictment and the elements?  In the

13   information.  I think I said indictment.  Information.

14           MR. LITT:  With respect to Count One conspiracy, in

15   order to prove the crime of conspiracy the government must

16   establish each of the following elements beyond a reasonable

17   doubt:

18           First, that the conspiracy charged in the

19   information existed.  In other words, that there was in fact an

20   agreement or understanding to violate the law of the United

21   States;

22           Second, that the defendant knowingly, willingly,

23   and voluntarily became a member of the conspiracy charged;

24           Third, that any one of the co-conspirators

25   knowingly committed at least one overt act in the Southern

98B6DIP                         Plea

1    District of New York in furtherance of the conspiracy during

2    the life of the conspiracy.

3               Count Two, securities fraud.  In order to prove the

4    crime of securities fraud, the government must prove each of

5    the following beyond a reasonable doubt:

6               First, that in connection with the purchase or

7    sale of a security the defendant did any one or more of the

8    following:

9               1:   Employed a device, scheme or artifice to

10   defraud or,

11              2:   Made an untrue statement of a material fact

12   or omitted to state a material fact which made what was said

13   under the circumstances misleading or,

14              3:   Engaged in an act, practice, or course of

15   business that operated or would operate as a fraud or deceit

16   upon a purchaser or seller.

17              Second, that the defendant acted knowingly,

18   willfully, and with the intent to defraud; and,

19              Third, that the defendant knowingly used or

20   caused to be used any means or instruments of transportation or

21   communication in interstate commerce or the use of the mails in

22   furtherance of the fraudulent conduct.

23              Count Three, investment adviser fraud.  In order to

24   prove the crime of investment adviser fraud, the government

25   must prove beyond a reasonable doubt the four following

98B6DIP                        Plea

1   elements:

2              First, that the defendant was an investment

3   adviser;

4              Second, that the defendant either (A) employed a

5   device, scheme, or artifice to defraud clients and prospective

6   clients, (B) engaged in a transaction, practice, or course of

7   business which operated as a fraud and deceit upon those

8   clients and perspective clients, or (C) engaged in an act,

9   practice, and course of business that was fraudulent, deceptive

10  and manipulative;

11             Third, that the defendant devised or participated

12  in such allege device, scheme, or artifice to defraud, or

13  engaged in such alleged transaction, practice, or course of

14  business knowingly, willfully, and with the intent to defraud;

15             Fourth, that the defendant employed such alleged

16  device, scheme, or artifice to defraud or engaged in such

17  alleged transaction, practice, or course of business by use of

18  the mails or other instrumentality of interstate commerce.

19             Count Four, falsifying broker/dealer books and

20  records.  In order to prove the crime of falsifying

21  broker/dealer books and records, the government must prove

22  beyond a reasonable doubt the following elements:

23             First, that at the time of the alleged offense,

24  Bernard L. Madoff Investment Securities was a registered

25  broker/dealer;

98B6DIP                          Plea

1        Second, that that company failed to make and keep

2   certain accurate records as required under the SEC's rules and

3   regulations;

4        Third, that the defendant aided and abetted the

5   failure of that company to make and keep accurate records; and

6        Fourth, that the defendant acted knowingly and

7   willfully.

8      Count Five, falsifying books and records of an

9   investment adviser.  In order to prove this crime, the

10  government must prove beyond a reasonable doubt each of the

11  following:

12       First, that at the time of the alleged offense,

13  the Madoff firm was an investment adviser;

14       Second, that the firm failed to make and keep

15  certain accurate records as required under the SEC's rules and

16  regulations;

17       Third, that the defendant aided and abetted the

18  failure of the firm to make and keep accurate records;

19       Fourth, that the defendant acted knowingly and

20  willfully;

21       Fifth, that the offense involved the use of the

22  mails and means of instrumentalities of interstate commerce.

23     In order to prove Count Six, mail fraud, the

24  government must establish beyond a reasonable doubt each of the

25  following:

98B6DIP                          Plea

1           First, that on or about the time alleged in the

2    information, there was a scheme or artifice to defraud in order

3    to obtain money or property by false and fraudulent pretenses,

4    representations, or promises;

5           Second, that the false or fraudulent statements

6    and representations concerned material facts;

7           Third, that the defendant knowingly and willfully

8    devised or participated in the scheme or artifice to defraud

9    with knowledge of its fraudulent nature and with specific

10   intent to defraud;

11          Fourth, that the United States mails or a

12   commercial carrier were used in furtherance of the scheme

13   specified in the information.

14      In order to prove the crime of wire fraud, Count

15   Seven, the government must establish beyond a reasonable doubt

16   the following four elements:

17          First, that at or about the time alleged in the

18   information, it was a scheme or artifice to defraud in order to

19   obtain money or property by false and fraudulent pretenses,

20   representations, or promises;

21          Second, that the false or fraudulent statements

22   and representations concerned material facts;

23          Third, that the defendant knowingly and willfully

24   devised or participated in the scheme or artifice to defraud

25   with knowledge of its fraudulent nature and with specific

1   intent to defraud; and

2              Fourth, that interstate or foreign wire

3   facilities were used in furtherance of the scheme to defraud

4   and specified in the information.

5         In order to prove the crime of unlawful transportation

6   of funds or monetary instruments with the intent to promote the

7   carrying on of a specified unlawful activity --

8         THE COURT:  This is what we are referring to as the

9   money laundering count?

10        MR. LITT:  Count Eight, money laundering count, the

11  government must establish the following elements:

12             First, that the defendant transported a monetary

13  instrument or funds from a place in the United States to or

14  through a place outside the United States, or to a place in the

15  United States from or through a place outside of the United

16  States;

17             Second, that the defendant did so with the intent

18  promote the carrying on specified unlawful activity.

19        In order to prove Count Nine, perjury, the government

20  must prove beyond a reasonable doubt each of the following

21  elements:

22             First, that the defendant took an oath to testify

23  truly before the Securities and Exchange Commission, a body

24  authored by law to administer oaths;

25             Second, that the defendant made false statements

1  as to matters about which the defendant testified under oath

2  and set forth in the information;

3              Third, that the matters as to which it is charged

4  that the defendant made false statements were material to the

5  issues under inquiry by the Securities and Exchange Commission;

6  and

7              Fourth, that such false statements were willfully

8  made.

9         To prove the offense of the attempting to evade or

10  defeat a tax or the payment thereof, which is Count Ten, the

11  government must prove the following elements:

12             First, that the defendant attempted to evade or

13  defeat a tax;

14             Second, that additional taxes were due and owing

15  by the defendant;

16             Third, that the defendant acted knowingly and

17  willfully.

18         I should point out that there are aiding and abetting

19  charges as well with respect to the substantive counts set

20  forth in Counts Two through Eight.  So if the defendant caused

21  or aided and abetted another in committing any of those crimes,

22  he would be guilty as if a principal.

23             THE COURT:  I think I may have neglected to mention

24  the aiding and abetting counts.

25             You understand, Mr. DiPascali, in addition to the

98B6DIP                          Plea

 1   substantive crimes charged after the conspiracy count, Counts

 2   Two through 10, some of those, most of those also charge aiding

 3   and abetting so that even if you didn't commit the crime, it is

 4   alleged that you aided and abetted others to commit the crime

 5   and so each of the elements would have to be met for aiding and

 6   abetting; all right?

 7           THE DEFENDANT:  Yes, sir.

 8           THE COURT:  Do you understand those are the elements

 9   of the offenses?

10           THE DEFENDANT:  I do.

11           THE COURT:  It took a long time but is that consistent

12   with what you discussed with your attorney?

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  Mr. Mukasey, do you agree those are the

15   elements to the offenses in the information?

16           MR. MUKASEY:  I do, Judge.

17           THE COURT:  I want to go over with you, Mr. DiPascali,

18   the maximum penalties you face for each of these offenses.

19   Count One, the conspiracy count, carries a maximum term of

20   imprisonment of five years, a maximum term of supervised

21   release of three years, a maximum fine of the greatest of

22   either $250,000, or twice the gross pecuniary or financial loss

23   to persons, other than yourself, resulting from the offense, or

24   twice the gross pecuniary gain derived from the offense,

25   whichever is greatest of those three alternatives is the

98B6DIP                    Plea

1   maximum fine.  In addition as part of your sentence, I can

2   order restitution be paid to any victims and I can also order

3   that you forfeit the proceeds or least -- Count One carries at

4   least part of the forfeiture allegation, right?

5           MR. LITT:  Yes.

6           THE COURT:  In addition, Count One carries a mandatory

7   special assessment of $100.  That is in addition to any fine or

8   forfeiture or restitution.

9           Count Two, which is the securities fraud count,

10  carries a maximum term of imprisonment of 20 years, a maximum

11  term of supervised release of three years, a maximum fine of

12  the greatest of $5 million, or twice the gross gain or twice

13  the gross loss as I previously described those things so

14  whichever is greatest of those three, as well as restitution

15  and forfeiture and $100 special assessment.  The 100-dollar

16  special assessment would be mandatory.

17          Count Three, which is the investment adviser fraud

18  count, carries a maximum term of imprisonment of five years, a

19  maximum term of supervised release of three years, a maximum

20  fine of the greatest of either $250,000, or twice the gross

21  pecuniary gain deprived from the offense or twice the gross

22  pecuniary loss to persons, other than yourself, as well as

23  restitution to any persons injured by this conduct, and a

24  mandatory special assessment of $100.

25          Count Four, which is falsifying books and records of a

98B6DIP                          Plea

1   broker/dealer carries a maximum term of imprisonment of 20

2   years, a maximum term of supervised release of three years, a

3   maximum fine again of the greatest $5 million, or twice the

4   gross gain or twice the gross loss to persons, other than

5   yourself, from the offense, as well as restitution, and again a

6   mandatory special assessment of $100.

7          Counts Five, which is falsifying books and records of

8   an investment adviser carries a maximum term of imprisonment of

9   five years, a maximum term of supervised release of three

10  years, a maximum fine of the greatest of $10,000, or twice the

11  gross gain derived from the offense, or twice gross pecuniary

12  loss to persons, other than yourself, resulting from offense,

13  as well as restitution and again a $100 special assessment.

14         Count Six is the mail fraud count.  It carries a

15  maximum term of imprisonment of 20 years, a maximum term of

16  supervised release of three years, a maximum fine of $250,000,

17  or twice the gross gain or twice the gross loss, as well as

18  restitution, and a mandatory special assessment of $100.

19         County Seven, wire fraud, carries similar penalties.

20  Again, a 20-year maximum term of imprisonment, a three-year

21  term of supervised release, a maximum fine of the greatest of

22  250,000, or twice the gross gain or twice the gross loss to

23  persons, other than yourself, as well as a potential for

24  restitution to any victims, and a $100 special assessment.

25         Count Eight, which is a money laundering count,

1   carries a maximum term of imprisonment of five years, a maximum

2   term of supervised release of three years, a maximum fine of

3   the greatest of $500,000, or twice the gross gain or twice the

4   gloss loss resulting from the offense, as well as restitution

5   to any victims, and a mandatory special assessment of $100.

6           Count Nine carries a maximum term of imprisonment of

7   five years, the perjury count, a maximum term of supervised

8   release of three years, a maximum fine of the greatest of

9   $250,000, or twice the gross gain or twice the gross loss, and

10  a mandatory special assessment of $100.

11          Count Ten, which is the tax evasion count, carries a

12  maximum term of imprisonment five years, a maximum term of

13  supervised of three years, a maximum fine of the greatest of

14  $250,000, or twice the gross gain or twice the gross loss,

15  whichever is the greatest, as well as restitution, and a

16  mandatory special assessment of $100.

17          Do you understand those are the maximum penalties?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  Mr. Litt, something you wanted to add?

20  Did I misstate something?

21          MR. LITT:  Your Honor, with respect to Count Six,

22  Seven, and Eight, mail fraud, wire fraud, and money laundering,

23  forfeiture is also a possible penalty.

24          THE COURT:  Yes.  I was going to mention the

25  forfeiture.  I thought I did with respect to the individual

98B6DIP                          Plea

1   counts.  Understand for those counts for which the forfeiture

2   allegation as been set forth in the information, in addition to

3   any fine, in addition to any restitution, in addition to any

4   mandatory special assessment you could also be ordered to

5   forfeit any of the proceeds from the offense.

6           Do you understand that?

7           THE DEFENDANT:  I do.

8           THE COURT:  The maximum possible penalties combined

9   would be a maximum term of imprisonment of 125 years.

10          Do you understand that?

11          THE DEFENDANT:  Yes.

12          THE COURT:  The maximum special assessment, when you

13  collectively add up would be $1,000, as well as the fines and

14  everything else I mentioned.

15          Do you understand that?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  Are you a United States citizen, Mr.

18  DiPascali?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  Do you understand as a result of your

21  conviction, you could lose certain valuable civil rights,

22  including your right to hold public office, your right to serve

23  on a jury, your right to vote, and your right to possess any

24  kind of firearm; do you understand that?

25          THE DEFENDANT:  I do.

98B6DIP                         Plea

1           THE COURT:  Now, are you serving any other sentences

2     to day, state, federal or local at this time?

3           THE DEFENDANT:  No, sir.

4           THE COURT:  Now, with respect to supervised release,

5     you should be aware that there are terms and conditions

6     associated with supervised release.  If you were to violate the

7     terms of your supervised release, you then could be returned to

8     prison for the full period of your supervised release and you

9     would not get any credit for the good time on which you are on

10    supervised release.

11          Do you understand that?

12          THE DEFENDANT:  I do.

13          THE COURT:  I will give an illustration because it is

14    not always clear.  If I sentenced you to a term of imprisonment

15    and then sentenced you to five years of supervised -- three

16    years of supervised release, we will say, three years.  What

17    that means is after you have finished your prison sentence, you

18    will be released and you would be supervised by the Probation

19    Department.  There will be conditions associated with your

20    supervision including, among other things, that you not commit

21    any further crimes, you not possess a firearm, you not use or

22    possess any kinds of drugs, among other things.

23          Well, if for 35 months you were perfect, you did

24    everything you were asked to do and then in the 36th month, the

25    last month of supervised release you committed another crime,

98B6DIP                         Plea

1    or you possessed a firearm illegally, well, then I could

2    violate your supervised release and I could return you to

3    prison for three full years, the full term of supervised

4    release even though for 35 out of 36 months you were perfect.

5              Do you understand that?

6              THE DEFENDANT:  I do.

7              THE COURT:  Do you understand that parole has been

8    abolished so you would not be released from prison any earlier

9    as a result of parole?

10             THE DEFENDANT:  I do.

11             THE COURT:  Parole doesn't exist in the federal

12   system.  It exists in certain state systems, including New York

13   State.  It used to exist in the federal system and what that

14   meant typically is a judge would impose a sentence usually of

15   an indeterminate nature, five to 10 years, and someone else, a

16   parole board typically, would determine when would be the

17   appropriate time for the defendant to be released depending on

18   whether or not they had been rehabilitated or are ready to

19   resume life in the community.  That is not a part of this

20   federal system.  So whatever sentence I impose is the sentence

21   you will serve.

22             Do you understand that?

23             THE DEFENDANT:  I do.

24             THE COURT:  The only exception to that is that you

25   could receive up to 15 percent off for good behavior.  That

1    would be a determination made by Bureau of Prisons and it would

2    be no more than 15 percent of the sentence imposed.

3           Do you understand that?

4           THE DEFENDANT:  I do.

5           THE COURT:  I want to go over a few other things with

6    sentencing.  First of all, in terming what your sentence will

7    be, that is a decision for me to make.

8           Do you understand that?

9           THE DEFENDANT:  I do.

10          THE COURT:  For the Court and no one else.

11          So whatever your attorneys may have told you, whatever

12   the government may have told you, whatever any one else may

13   have told you, that is not binding on me.

14          Do you understand that?

15          THE DEFENDANT:  I do.

16          THE COURT:  I will determine what is the appropriate

17   sentence after reviewing the presentence report, after

18   reviewing submissions made by you if you wish, made by the

19   government, made by the victims of the offenses.

20          Do you understand that?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Only then will I decide what is the

23   appropriate sentence.

24          Now, I also want to go over with you the current state

25   of the law.  Under the law I am required to consider certain

1    factors before imposing sentence.  I will tell you quite

2    candidly even if I weren't required to consider these things, I

3    would consider them.  These are the factors that I think any

4    civilized society would take into account in imposing a

5    sentence on another human being.

6            Those things include, among other things, your own

7    personal history and background.  It also includes obviously

8    the nature and circumstances of the offenses to which you have

9    offered to plea guilty.  It includes the need for me to impose

10   a sentence that reflects the seriousness of the offenses and

11   the need to promote respect for the law.

12           Another objective for sentencing is deterrence, that

13   is both general and specific deterrence.  I would be obliged to

14   fashion a sentence that prevents you from committing crimes of

15   this sort or any other sort in the future and that also would

16   have the effect of deterring others who might consider engaging

17   in this kind of criminal conduct to think twice, general

18   deterrence.

19           I would consider your own needs, your own

20   rehabilitative needs, your own medical needs, your own

21   educational needs, those things.  For you and for any defendant

22   who comes before me I would consider those things before

23   imposing a sentence.

24           I would also consider the needs of the victims of

25   these crimes to receive restitution.  That is obviously an

1    important factor that would have to be considered in imposing a

2    sentence.

3            I would also consider the United States Sentencing

4    Guidelines. Are you familiar with the Sentencing Guidelines,

5    Mr. DiPascali?

6            THE DEFENDANT: I am.

7            THE COURT: You have discussed those with your

8    attorney?

9            THE DEFENDANT: In detail.

10           THE COURT: I am not going to go over them in great

11   detail. The United States Sentencing Guidelines are a big

12   book. A new edition comes out each year. This year's version

13   is about 600 pages long. I am not going to go into it in any

14   kind of detail. What these guidelines attempt to do is provide

15   objectives and transparent criteria by which an individual and

16   the criminal conduct that an individual engaged in can be

17   evaluated.

18           These guidelines are advisory. They are not binding

19   on me. I am not required to follow them. I am required to

20   consider them and I will consider them. What they essentially

21   do is that for each crime or type of crime, they provide a

22   framework to assess the seriousness of that crime. There are

23   two calculations that are done. First, is a offense level

24   calculation. For financial frauds, for example, the

25   calculation would focus on the amount of loss involved, the

98B6DIP                          Plea

1    number of victims, the nature of the offense.  And for each of

2    those factors, it would be numerical value ascribed.  And so in

3    calculating these things, the Court would basically do math and

4    come up with a number, which would be the offense level.

5          In addition there is a separate calculation for

6    criminal history category and so not surprisingly a person

7    engaged in other criminal conduct who has prior convictions and

8    prior sentences would be treated more seriously and would get

9    more criminal history points than someone who has no criminal

10   history.  On the basis of those two calculations, offense level

11   on the one hand and criminal history category on the other, the

12   guidelines comes up with a range in terms of months which in

13   the view of the Commission that prepares these guidelines would

14   be appropriate in the ordinary case.

15         So as I said I will consider those calculations, I

16   will make calculations, and I will certainly consider the range

17   that is provided for and proposed by these guidelines.  At the

18   end of the day, ultimately I don't have to follow them and I am

19   free to go higher or lower as I see fit.

20         Do you understand that?

21         THE DEFENDANT:  I do.

22         THE COURT:  Finally, I want to make sure that you

23   understand whatever sentence I impose no matter how unhappy you

24   may be with it, you will not be entitled to withdraw your

25   guilty plea at that point and go forward with the trial.

98B6DIP                    Plea

1           Do you understand that?

2           THE DEFENDANT:  I do.

3           THE COURT:  You will be entitled to your opinion that

4    I got it wrong or I was too harsh, but you would not be able to

5    say I would like to turn the clock back to August 11th and go

6    to trial now because that option will have gone.

7           Do you understand that?

8           THE DEFENDANT:  I do.

9           THE COURT:  I understand there is a plea agreement in

10   this case, is that correct?

11          MR. MUKASEY:  That's correct.

12          MR. LITT:  Yes.

13          THE COURT:  Is the original with you, Mr. Mukasey?

14          MR. MUKASEY:  It is, your Honor.

15          THE COURT:  You can keep that there for the moment.  I

16   received a draft.  I have not received an executed or signed

17   copy.  Let me make sure it is the same as what you have.  Bear

18   with me for a second.

19          (Pause)

20          It is an August 11th letter.  It is a seven-paged,

21   single-spaced letter.  It is from the government, Ms. Baroni

22   and Mr. Litt, to Mr. Mukasey, your attorney.

23          Do you have a copy of this in front you, or the

24   original in front of you?

25          THE DEFENDANT:  I have the original.

98B6DIP                          Plea

1              THE COURT:  Is your signature on the last page?

2              THE DEFENDANT:  It is.

3              THE COURT:  When did you sign it?

4              THE DEFENDANT:  35 minutes ago.

5              THE COURT:  Before you signed it, did you have an

6       opportunity to read this agreement?

7              THE DEFENDANT:  In detail.

8              THE COURT:  Did you have an opportunity discuss it

9       with Mr. Mukasey in detail?

10             THE DEFENDANT:  We have.

11             THE COURT:  Do you require any additional time to

12      review this agreement?

13             THE DEFENDANT:  No, sir.

14             THE COURT:  Mr. Mukasey, is that your signature on the

15      last page as well?

16             MR. MUKASEY:  It is, Judge.

17             THE COURT:  Before you signed it, did you review this

18      agreement in detail with your client?

19             MR. MUKASEY:  Yes, we did.

20             THE COURT:  Now, Mr. DiPascali, I am not going to go

21      over this in tremendous detail because as I said it is a

22      seven-paged, single-spaced letter.  I want to make sure you

23      understand the nature of this agreement.  This agreement is

24      what is known as cooperation agreement.

25             Is that your understanding?

98B6DIP                              Plea

1          THE DEFENDANT:  Yes, it is.

2          THE COURT:  By this agreement you have agreed to

3     cooperate with the government and to take on certain

4     obligations that are set forth in this agreement.

5          Is that correct?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  The government has agreed if you provide

8     substantial assistance, well, they will make a motion to the

9     Court to apprise me of that assistance, which would then allow

10    me for sentence you below the Sentencing Guidelines.  So that

11    is essence what the agreement is.

12         Is that your understanding?

13         THE DEFENDANT:  Exactly, sir.

14         THE COURT:  Is there any other agreement that you have

15    besides this one, besides this August 11th agreement?

16         THE DEFENDANT:  No, sir.

17         THE COURT:  Is there any other oral agreement or any

18    side agreement that exists beyond the confines of these seven

19    pages?

20         THE DEFENDANT:  No, sir.

21         THE COURT:  Has anybody attempted to threaten you or

22    induce you or otherwise persuade you to plead guilty to the

23    charges contained in the information or to accept and sign this

24    plea agreement?

25         THE DEFENDANT:  No, sir.

98B6DIP                          Plea

1              THE COURT:  You signed it of your own free will and

2       voluntarily?

3              THE DEFENDANT:  I have.

4              THE COURT:  Now, I want to make sure you understand if

5       the government decides that you provided substantial

6       assistance -- as I say they can make this motion -- I am not

7       required to follow it and I will still ultimately decide what

8       is the proper sentence.

9              Do you understand that?

10             THE DEFENDANT:  I do.

11             THE COURT:  Now, if the government decides that you

12      did not provide substantial assistance, then that may limit my

13      ability to sentence you below the guidelines.  As I said the

14      guidelines are just advisory so it ultimately wouldn't bar me

15      from doing so.  There was a time when it would have, but it

16      wouldn't today.  Certainly the government has the exclusive

17      right to decide whether or not you provided substantial

18      assistance under this agreement.

19             Do you understand that?

20             THE DEFENDANT:  I do.

21             THE COURT:  Mr. Mukasey, are you aware of any of valid

22      defense that would apply as a matter of law or any other reason

23      why your client should not be allowed to enter a plea at this

24      time?

25             MR. MUKASEY:  No, Judge.

98B6DIP                          Plea

1           THE COURT:  Now, at this point I am going to ask you

2    to stand, Mr. DiPascali.  I want you to tell me in your own

3    words what it is that you did that makes you guilty of the

4    offense -- excuse me -- the offenses charged in the

5    information.  So since there are 10 counts, this may take a

6    while.  I am not sure if you discussed with your lawyer how is

7    the best way to do this, either count by count or groups of

8    counts.

9           Mr. Mukasey, do you have a view?

10          MR. MUKASEY:  Judge, we have we have worked together

11   to prepare a statement that I think covers all the counts.  I

12   think we can have Mr. DiPascali read it if that is okay with

13   the Court.  I think that he will hit all the elements of all

14   the counts.  If you would like he can advise the Court of the

15   counts that he is about to discuss if that is helps focus the

16   Court.

17          THE COURT:  Whatever you think is most appropriate.

18   There is nothing wrong with reading a statement, Mr. DiPascali,

19   as long as they are really your words.  It is not usual a

20   defendant in your position would work with their attorney to

21   prepare a statement that would be their allocution to crimes

22   charged in the information.  But it is important that they be

23   your words and that is something you are just reciting or

24   reading.

25          I may ask you some questions or interrupt along the

98B6DIP                        Plea

1   way.  If you have a statement, why don't we start with that and

2   we will see if it is necessary to follow up in certain areas.

3            MR. MUKASEY:  May I have one moment?

4            THE COURT:  Yes.

5            While you are conferring if you could hand to

6   Ms. Levine the plea agreement, I will mark that as a court

7   exhibit.  I will mark that as Court Exhibit 2.  I will initial

8   and date it as well.

9            (Pause)

10           THE COURT:  Mr. DiPascali, are you ready?

11           THE DEFENDANT:  Yes, I am.

12           THE COURT:  Let me ask you to read slowly so the court

13  reporter can get it down.  We have very good court reporters,

14  probably the best in the world, but there are limits to what 10

15  fingers can do.  I frequently speak too quickly and they are

16  too polite to remind me, but I will remind you.

17           THE DEFENDANT:  Thank you, your Honor.

18           I am standing here today to say that from the early

19  1990s until December of 2008 I helped Bernie Madoff, and other

20  people, carry out the fraud that hurt thousands of people.  I

21  am guilty and I want to explain a little bit about what I did

22  and how I want everybody everyone to know that I take

23  responsibility for my conduct.

24           Judge, I started working for Bernard Madoff Investment

25  Securities in 1975 right after a graduated from high school.  I

98B6DIP                    Plea

1    was a kid from Queens.  I didn't have a college degree.  I

2    didn't know anything about Wall Street.  I ended up spending

3    the next 30 years working for Bernie Madoff and his firm until

4    December 11th, 2008.

5          Over the first 15 or so years at the Madoff firm, I

6    had a bunch of different jobs.  I worked a research analyst,

7    and options trader, and a guy who basically did whatever I was

8    told to do around the office.

9          In 1987 I helped move our firm from the office at 110

10   Wall Street to our new office at 885 Third Avenue.  Eventually

11   Bernie Madoff's investment advisory business, which managed

12   client accounts, took space on the 17th floor of 885 Third

13   Avenue and I became sort of a supervisor of that floor.

14         During that first 15 or so years, I watched Bernie

15   Madoff and other people at the firm.  I learned how the

16   securities industry worked, or at least how it worked in the

17   Madoff universe.  I thought I worked for a prestigious and

18   successful securities firm.

19         By 1990 or so Bernie Madoff was a mentor to me and a

20   lot more.  I was loyal to him.  I ended up being loyal to a

21   terrible, terrible fault.  By the early 1990s Bernie Madoff had

22   stable clients whose accounts he managed as an investment

23   adviser.  He attracted a lot of these clients by telling them

24   that the firm would apply a hedged investment strategy to their

25   money.  The clients were told that the strategy involved

98B6DIP                          Plea

1    purchasing what we call basket of blue chip common stocks.

2    Hedging those investments by buying and selling option

3    contracts, getting in and out of the market at opportune times

4    and investing in government securities at other times.

5           By 2008 Bernie Madoff had thousands of clients who

6    believed their funds were being invested this way.  For years I

7    was a main point of contact for many of those clients when they

8    had questions about their account.

9           From at least the early 1990s through December of

10   2008, there was one simple fact that Bernie Madoff knew, that I

11   knew, and that other people knew but that we never told the

12   clients nor did we tell the regulators like the SEC.  No

13   purchases of sales of securities were actually taking place in

14   their accounts.  It was all fake.  It was all fictitious.  It

15   was wrong and I knew it was wrong at the time, sir.

16           THE COURT:  When did you realize that?

17           THE DEFENDANT:  In the late '80s or early '90s.

18           I would like to address some of the counts in the

19   information.  Regarding Count One, conspiracy; Count Two,

20   securities fraud; and Count Three, investment adviser fraud.

21           From our office in Manhattan at Bernie Madoff's

22   direction, and together with others, I represented to hundreds,

23   if not thousands, of clients that security trades were being

24   placed in their accounts when in fact no trades were taking

25   place at all.

1          THE COURT:  How did you do that?  Through documents or

2     through oral communications?

3          THE DEFENDANT:  Both.

4          THE COURT:  Both.

5          THE DEFENDANT:  Most of the time the clients' money

6     just simply went into a bank account in New York that Bernie

7     Madoff controlled.  Between the early '90s and December '08 at

8     Bernie Madoff's direction, and together with others, I did

9     follow things:  On a regular basis I told clients over the

10    phones and using wires that transactions on national securities

11    exchanges were taking place in their account when I knew that

12    no such transactions were indeed taking place.  I also took

13    steps to conceal from clients, from the SEC, and from auditors

14    the fact that no actual security trades were taking place and

15    to perpetuate the illusion that they actually were.

16          On a regular basis I used hindsight to file historical

17    prices on stocks then I used those prices to post purchase of

18    sales to customer accounts as if they had been executed in

19    realtime.  On a regular basis I added fictitious trade data to

20    account statements of certain clients to reflect the specific

21    rate of earn return that Bernie Madoff had directed for that

22    client.

23          Regarding Count Six, mail fraud, on a regular basis I

24    caused the U.S. mail to be used to send fraudulent account

25    statements to clients from our office in Manhattan.  The

98B6DIP                    Plea

1    account statements listed security transactions that had

2    supposedly taken place in the client accounts, although I knew

3    that no such transactions had indeed taken place.  For example,

4    in December of 2008, I caused fake accounts statements to be

5    mailed from the Madoff firm to a client in Manhattan.

6            Regarding the wire fraud, or Count Seven, on a regular

7    basis I caused money to be wired from bank accounts in that New

8    York to bank accounts in London, and other places abroad.  For

9    example, in March of '07 I caused about $14 million to be sent

10   by wire from a bank account in London to a bank account in New

11   York in furtherance of this fraudulent scheme.

12           THE COURT:  How did it further this scheme?

13           THE DEFENDANT:  Bernie Madoff was trying to present

14   the scenario, Judge, to regulators and others that he was

15   earning commission income on these fictitious trades in order

16   to substantiate the ruse.  He had me wire funds -- excuse me.

17   He had our London office wire funds to New York that

18   represented the theoretical amount of those commissioned

19   incomes, had the regulators come in and added up all the

20   tickets, if you will, to see our customer commissions.  And in

21   the example I cited in that particular instance, we would have

22   had we actually done those trades earned $14 million in

23   commission income.  So he had the London office wire to the New

24   York office a figure of about $14 million.

25           THE COURT:  What was your role in connection with

1    those wire transfers?

2            THE DEFENDANT:  I calculated the theoretical

3    commissions and advised the London office where to send the

4    money.

5            On Count Eight, sir, international money laundering,

6    between 2002 and 2008, I caused money to be wired from a Madoff

7    firm bank account in New York to a Madoff account in London,

8    which again was used to continue this fraud.  I participated in

9    falsifying documents that were required to be made and kept

10   accurately under the SEC rules and regulations, including

11   ledgers, trade blotters, customer statements, and trade

12   confirmations.

13           On Count Four and five, falsifying broker/dealer books

14   and records and falsifying investment adviser books and

15   records, between 2004 and 2008 the firm was a registered

16   broker/dealer.  Between September '06 and December '08 when the

17   firm was also a registered as an investment adviser, it was

18   required to make accurate books and records under the SEC

19   rules.  In January of '06, together with others, I used data

20   from the Internet to create fake trade blotters that were made

21   and kept and produced for the SEC.

22           In April of '08, together with others, I caused fake

23   trade blotters, ledgers, and other books and records to be made

24   and kept by the firm.

25           In order to discuss Count Nine, which is perjury, on

98B6DIP                          Plea

1   January 26, 2006, at Bernie Madoff's direction I lied to the

2   SEC during testimony I gave under oath in Manhattan about the

3   activities of the Madoff firm.  My false testimony is set out

4   in Paragraph 61 of the information.

5          I did all of these fraudulent activities, your Honor,

6   in Manhattan.

7          THE COURT:  Let me ask you about the perjury count.

8   There is a number of specifications of false statements, eight,

9   in particular with an underlying portions which I gather are

10  the false or allegedly false statements.  Is your statement

11  here today that the underlying portions set forth in pages 41

12  through 43 were in fact false statements?

13         THE DEFENDANT:  Yes, your Honor.

14         THE COURT:  At the time you uttered these

15  statements -- this is a transcript of your testimony, is that

16  correct?

17         THE DEFENDANT:  It is indeed a transcript describing

18  the Madoff trading operation, which I knew at time when I was

19  describing it was entirely fraudulent.

20         THE COURT:  So you anticipated my next question.  You

21  knew at the time you made these statements that portions of the

22  statements, in particular the underlying portions, were false?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  You did this to mislead the SEC?

25         THE DEFENDANT:  Yes, sir.

98B6DIP                          Plea

1             THE COURT:  For what purpose?

2             THE DEFENDANT:  To throw them off their tracks, sir.

3             THE COURT:  Did you have a sense they were on the

4    track?

5             THE DEFENDANT:  Yes, sir.

6             THE COURT:  At that point?

7             THE DEFENDANT:  Yes, sir.

8             THE COURT:  These statements were made all on one

9    occasion, January 26, 2006?

10            THE DEFENDANT:  Yes, sir.

11            THE COURT:  And where was that?

12            THE DEFENDANT:  Down at the SEC offices in the World

13   Trade Center.

14            THE COURT:  World Financial Center?

15            THE DEFENDANT:  Correct.

16            THE COURT:  I interrupted you.  I think you were

17   proceeding on to another count.

18            THE DEFENDANT:  Judge, thousands of clients,

19   institutions, individuals, funds, charities were all misled

20   about the status of their accounts, what was being done with

21   their money, and what their accounts were worth.

22            In order to discuss Count Ten, which is tax evasion,

23   let me say that in the years 2002, 5, 6 and 7, I evaded federal

24   taxes that I owed by putting some of my income in the name of a

25   corporation I controlled and that I didn't fully and truthfully

98B6DIP                          Plea

1    report my income on my federal income tax returns.

2              Your Honor, while this was going on, I knew no trades

3    were happening.  I knew I was participating in a fraudulent

4    scheme.  I knew what was happening was criminal and I did it

5    anyway.

6              I thought for a long time that Bernie Madoff had other

7    assets that he could liquidate if the clients requested the

8    return of their money.  That is not an excuse.  There is no

9    excuse.  I knew everything that I did was wrong and it was

10   criminal and I did it knowingly and willfully.  I regret

11   everything that I did.  I accept complete responsibility for my

12   conduct.  I don't know how I went from an 18-year-old kid

13   happening to have a job to before someone standing before the

14   Court today.  I can only say I never wanted to hurt anyone.  I

15   apologize to every victim of this catastrophe and to my family

16   and to the government.  I am very, very sorry.

17             THE COURT:  Thank you, Mr. DiPascali.

18             Let me ask you a couple questions about the tax fraud

19   count.

20             This is the years between 2002 and 2007.  It sound

21   like it is 2002, 2005, 2006, and 2007; is that correct?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  And when you made the false statements to

24   the IRS, where were you when you did that?  This was in your

25   tax returns you made these false statements?

98B6DIP                      Plea

1           THE DEFENDANT:  In those years, sir, I did not file

2    tax returns.

3           THE COURT:  But at the time you either filed false tax

4    returns or didn't file tax returns, you understood that you

5    were liable for additional taxes, that you had hidden income so

6    to speak through this company that you controlled?

7           THE DEFENDANT:  Yes, sir.

8           THE COURT:  Did any of the fraud associated with the

9    tax evasion take place in New York?

10          MR. MUKASEY:  May I have one moment, your Honor?

11          THE COURT:  Certainly.

12          (Pause)

13          MR. MUKASEY:  Your Honor, with respect to the venue on

14   Count Ten, I think it is fair to say that the evidence would

15   show that the income that was evaded was earned in New York and

16   the money was transferred into this corporation from an account

17   in New York.  To the extent that that establishes venue, we

18   offer that for venue.  If not, Judge, we are willing to waive

19   venue as to Count Ten.

20          He is a resident of New Jersey.  A lot of his personal

21   accounting actions take place in New Jersey.  So it is a

22   movement of the money into this account that he controlled in

23   the Southern District of New York.  If it is not enough to

24   establish venue, we will waive venue on Count Ten.

25          THE COURT:  Mr. DiPascali, do you understand what

98B6DIP                    Plea

1    Mr. Mukasey just said?

2              THE DEFENDANT:  I do, sir.

3              THE COURT:  We didn't talk really about venue when we

4    were going through the elements of the offense.  These are the

5    10 elements that Mr. Litt described and these were things that

6    would have to be demonstrated and proven beyond a reasonable

7    doubt if you went to trial.

8              Each of the counts of the information also have a

9    requirement that venue be established.  The standard of proof

10   for venue is lesser.  It is by a preponderance.  It means a

11   little more than halfway basically.  So what Mr. Mukasey has

12   said is he thinks there is such basis for venue to be

13   established on the tax evasion case; but if there weren't that

14   you would you be prepared to waive venue, which you can do.

15             Is that your understanding?  Is that what you wish to

16   do?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  Give me a minute.  There are 10 counts

19   here so I want to take a quick look to make sure we covered the

20   elements.

21             While I am doing that, Mr. Litt, to your mind is that

22   a sufficient allocution with respect to each of the 10 Counts

23   of the information?

24             MR. LITT:  Yes, your Honor.

25             THE COURT:  Mr. Mukasey, do you agree?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98B6DIP                          Plea

1         MR. MUKASEY:  I do, your Honor.

2         Mr. DiPascali, has one or two more sentences.

3         THE COURT:  I am sorry.  I didn't mean to cut you off,

4    Mr. DiPascali.

5         THE DEFENDANT:  I wanted to make it very, very clear I

6    know my apology means almost nothing but I hope my actions

7    going forward with the government will mean something and I

8    promise to dedicate all my energy to try to explain to others

9    how this happened.  I hope my help will bring some small

10   measure of comfort to those who have been harmed.

11        THE COURT:  Thank you.

12        THE DEFENDANT:  Thank you.

13        (Pause)

14        THE COURT:  Mr. Litt, let me ask you to summarize the

15   government's evidence if it were to go to trial.

16        Mr. DiPascali, let me ask you to listen carefully to

17   Mr. Litt as he summarizes the evidence and also as he

18   summarizes your role in these offenses.  Because after he is

19   done, I am going to ask you if you take issue with or dispute

20   anything he just said.  So I want you to pay close attention.

21        MR. LITT:  Yes, your Honor.  If this case were to have

22   proceeded to trial, the government would have proven through

23   testimony and evidence beyond a reasonable doubt the facts set

24   forth in the information.  In summary, the government would

25   have proven that beginning at least as early as the 1980s, a

98B6DIP                    Plea

 1    conspiracy existed between Mr. DiPascali, Mr. Madoff, and

 2    others, to commit securities fraud, investment adviser fraud,

 3    falsifying books and records of a broker/dealer and of an

 4    investment adviser, mail fraud, wire fraud, and money

 5    laundering.

 6          Mr. Madoff's firm, Bernard L. Madoff Investment

 7    Securities, LLC., was a registered broker/dealer throughout the

 8    period and was a registered investment adviser between about

 9    September 2006 and December 11th of 2008.

10          Mr. DiPascali worked at the firm in New York, New

11    York, where the firm was located beginning in 1975.  By the

12    early 1990s, Mr. DiPascali was responsible under the direction

13    of Mr. Madoff for a major part of the firm's investment

14    advisory business.  That part of the business purported to

15    invest client funds in the basket of stocks from the S & P 100

16    hedged by options transactions.  In fact, the evidence would

17    demonstrate that Mr. DiPascali, Mr. Madoff, and others knew

18    that no stocks or options were being purchased as had been

19    promised to investors.

20          Mr. Madoff, Mr. DiPascali, and other co-conspirators

21    made it appear as though clients' investments with the firm

22    were profitable by sending those clients literally millions of

23    pages of false account statements and trade confirmations

24    through the U.S. mails.  Those account statements and trade

25    confirmations reported or purported to report transactions that

98B6DIP                    Plea

1    had been made up using historical price data and with the

2    benefit of hindsight.  None of the reported transactions were

3    real.

4          In later years when revenues from other parties of

5    Mr. Madoff's business declined, Mr. Madoff and Mr. DiPascali

6    wired hundreds of millions of dollars of invested funds to a

7    bank account in London and sent some of that money back to New

8    York, New York to an operating account that funded other

9    parties of Mr. Madoff's business.  Among the uses of interstate

10   wires -- I should say Mr. DiPascali used interstate wires in

11   connection with the fraud both in speaking with investors

12   located outside New York as well as to transfer money to and

13   from bank accounts in New York, New York.

14         The government also would have proven that to conceal

15   the fraud and to deceive the SEC under the direction of

16   Mr. Madoff, Mr. DiPascali and other co-conspirators created

17   false books and records, records that were required to be kept

18   and maintained by the firm and were required by SEC regulation

19   to contain true data.

20         THE COURT:  Can I ask -- perhaps I should have asked

21   Mr. DiPascali this -- is Mr. DiPascali an advisement adviser or

22   broker/dealer licensed to do these things, or the firm does and

23   he worked with the firm?

24         MR. LITT:  He is not.  He worked for the firm.  And

25   the aiding and abetting charges in the information cover that.

1          THE COURT:  Thank you.

2          MR. LITT:  As I was saying for the books and records,

3   SEC rules and regulations require the firm to keep various

4   books and records both in its capacity as a broker/dealer and

5   as an investment adviser and Mr. Madoff, Mr. DiPascali, and

6   others caused false and fraudulent records to be created, some

7   of which were presented to the SEC as well.  They did that to

8   conceal the fraud and conceal some of the activities that the

9   firm was engaged in.

10          At Mr. Madoff's direction Mr. DiPascali also committed

11   perjury in sworn testimony from the SEC in New York.  There are

12   several instances of that set forth under the indictment.

13          THE COURT:  Information.

14          MR. LITT:  Sorry.

15          THE COURT:  I did it before, too.

16          MR. LITT:  In sum that false testimony disguised the

17   nature and scale of the investment advisory business that the

18   firm was engaged in.

19          Finally, the defendant attempted to evade federal

20   income taxes by taking income through a nominee LLC, limited

21   liability corporation, in which he controlled in failing to

22   declare and pay taxes on that income.

23          THE COURT:  Do you have a view with respect to venue

24   on that count, Count Ten?

25          MR. LITT:  I think the transfer of the money from New

98B6DIP                          Plea

1   York, New York probably is sufficient; but I think out of an

2   abundance of caution I think a waiver of venue is appropriate

3   and covers venue.

4           THE COURT:  Is a waiver of venue contained in the

5   agreement between the parties on Count Ten?

6           MR. LITT:  It is not.

7           THE COURT:  So that would be something that Mr.

8   DiPascali has agreed to waive venue on Count Ten but it is not

9   contained in the agreement?

10          MR. LITT:  Yes.

11          THE COURT:  Mr. DiPascali, did you hear what Mr. Litt

12  just said.

13          THE DEFENDANT:  I have.

14          THE COURT:  Do you disagree or take issue with any of

15  his characterization of the facts or the evidence in this case?

16          THE DEFENDANT:  No, sir, I don't.

17          THE COURT:  Have a seat.

18          At this time I had put out a couple sign-in sheets

19  before to provide for victims if they wish to be heard on the

20  issue of whether or not the plea should be accepted and the

21  plea agreement should be accepted, and if they wish to speak

22  later on the issue of bail and remand.  I had one victim sign

23  the sheet to be heard as to whether or not the plea and plea

24  agreement should be accepted.  That is Miriam seed man.

25          Is Ms. Seed man here?

98B6DIP                          Plea

1              Ms. Seed man, would you still like to be heard on this

2       issue.

3              MS. SIEGMAN:  I would.

4              THE COURT:  Come up and use the lecturn if you don't

5       mind.  While I am here, if there is any other victim who wishes

6       to be heard on this issue, and this issue only, who did not get

7       a chance to sign, perhaps you can raise your hand now and I can

8       send the sheet your way.

9              Is there anyone?

10             Let the record reflect that there is no other person

11      here in the courtroom has signified that they wish to speak as

12      a victim with respect to the issue of whether or not the Court

13      should accept the plea and the plea agreement.

14             Ms. Siegman, identify yourself for the record, speak

15      slowly, spell your name too, and then I am happy to hear you.

16             MS. SIEGMAN:  Thank you, Judge Sullivan.

17             Can you hear me?

18             THE COURT:  I can.

19             MS. SIEGMAN:  My name is Miriam Siegman.  M-i-r-i-a-m,

20      last name, S-i-e-g-m-a-n.

21             THE COURT:  I probably mispronounced your name.  I

22      apologize.

23             MS. SIEGMAN:  That's fine.

24             I am a 65-year-old Madoff victim now penniless and

25      facing homelessness.  I stand before you, Judge Sullivan, to

98B6DIP                        Plea

1    ask that you consider rejecting this deal.

2         Criminal defendants in the Madoff case central to this

3    murderous fraud want to cut deals by swapping information,

4    naming names in exchange for lighter sentences.  That, of

5    course, is their right.  To some victims, not all, but to some

6    this behind-closed-doors bargaining seems to depend heavily on

7    the quality and connectedness of the defendants' lawyers and a

8    quest for expediency.

9         I ask, and others as well:  Should these factors trump

10   the victims and the public's need for the truth, the full truth

11   that could come of a trial or the chance for victims to hear in

12   open court evidence, witnesses' questioned, and cross-examined,

13   or the chance to have brought before the mighty power of the

14   Bench even the most exalted, the most highly placed, including

15   government officials, and elected officials?

16        Has it been decided somewhere that a trial is too

17   great a luxury, too much of an expense for the public quest for

18   truth, too time consuming and bothersome or politically

19   unpleasant?

20        Why, Judge Sullivan, am I asking you to consider my

21   request to reject a deal?  The crimes allegedly committed by

22   Mr. DiPascali and already admitted to by Mr. Madoff, Mr.

23   DiPascali's boss of 30 years, are enormous in scope.  These

24   crimes have affected thousands of men, women, and children,

25   whole generations of families have been decimated, children,

98B6DIP                     Plea

1    parents, dependents who are ill.  None of these victims knows

2    how or why this has happened to them.  The defendants won't say

3    a word until today, even then very little, and the prosecutors

4    have said very little to victims.

5           The alleged crimes were vast and systematic, executed

6    with great attention to detail.  The result total:  Total

7    destruction of normal daily life now and likely forever for

8    thousands of us, certainly for me.  Dazed, we are told that we

9    have no need to know how the crimes against us were carried

10   out.  Today, a few tasty tidbits were thrown out into the court

11   and I could see every snap to attention with a genuine interest

12   in hearing those details and the need to know them.

13          Then there is the astonishing duration of the crime.

14   Mr. DiPascali was an employee of Madoff for 30 -- well over 30

15   years or around 30 years.  The criminal enterprise went and on.

16   He, of course, had ample opportunity to do the right thing.

17   Victims have no idea how this could have been possible, this

18   long duration.  Though, there are hints of horrendous

19   dereliction of duty within and outside of government and in the

20   street.  One sentence about lying to the SEC doesn't tell the

21   story.

22          There is also the corrupting ripple effect of Mr.

23   DiPascali's alleged activities, activities which in the view of

24   many victims encouraged and enabled criminal activity on the

25   part of others, but we have learned nothing about how or why

98B6DIP                        Plea

1    and likely we will learn nothing about how or why.

2            And Finally, and perhaps the most troubling of all for

3    me, the possible purchase of influence with the goal of

4    protecting Madoff from investigation and legislation.  Victims,

5    and as importantly the American public, the little guy with a

6    401K or pension desperately need light to shine on this

7    process.  Victims want more than confirmation.  They need

8    information and knowledge.  We want the kind of justice that

9    allows the truth to be spoken out loud in a courtroom and we

10   want to know that prosecutors will not conveniently pass over

11   the too highly placed.

12           The crimes committed against me and others are

13   life-shattering and they are forever.  I want no others to

14   suffer in this way.  Judge Sullivan, you have the power to show

15   the American people that justice works for victims and society

16   as a whole as well as for defendants.  Take the process out

17   from behind closed doors and reject this plea deal.

18           In closing, if in the end you cannot, will you or

19   someone help me and others victims understand why and how a

20   plea deal will help them and the American public and allow men

21   and women who run our public institutions to learn from this

22   tragedy.

23           Thank you.

24           THE COURT:  Thank you, Mr. Siegman.  I appreciate the

25   time and attention you obviously put into preparing those

98B6DIP                        Plea

1    remarks.

2              Is there any other victim that wishes to be heard?

3              Let me ask Mr. Litt or Mr. Mukasey if they wish to

4    respond to anything that Ms. Siegman just said?

5              MR. LITT:  Not at this time, your Honor, no.

6              THE COURT:  Mr. Mukasey.

7              MR. MUKASEY:  Simply that I think the allocution was

8    sufficient for acceptance by the Court, Judge.

9              THE COURT:  Ms. Siegman, I am certainly sensitive to

10   the points you've made, but I think there is a difference

11   between a criminal trial and a truth commission, which each may

12   have their benefits to be sure.  But I think a criminal trail

13   is less ambitious than a truth commission.

14             Mr. Mukasey I think is correct in saying that the

15   allocution that Mr. DiPascali gave is sufficient under the law

16   and so the issue for me is there something manifestly unjust

17   about the plea agreement or the plea that has been offered

18   here.  I don't believe that the request for the truth ends

19   today.  Certainly sentencing will not take place for several

20   months.  But before imposing sentence, I would expect to have

21   more information than what I've heard today and what you've

22   heard today.  So I expect there will be more information and

23   the Court will sentence on the basis of additional information.

24   I assume that to be the case.

25             So in light of those remarks I will, I believe, accept

98B6DIP                    Plea

1    the plea.  I have a few other things I would like to take up

2    with Mr. DiPascali.  I am certainly sensitive to your concerns,

3    which I think are probably the concerns of many other people as

4    well.  Thank you for your time.

5            Let's me ask you now to rise again, Mr. DiPascali.

6            How do you now plead to Counts One through Ten of the

7    information, guilty or not guilty?

8            THE DEFENDANT:  Guilty, your Honor.

9            THE COURT:  Did you do the things you are charged with

10   doing in the information?

11           THE DEFENDANT:  Indeed I did.

12           THE COURT:  Are you pleading guilty because you are

13   guilty?

14           THE DEFENDANT:  Yes, sir.

15           THE COURT:  Are you pleading guilty voluntarily and of

16   your own free will?

17           THE DEFENDANT:  Yes, sir.

18           THE COURT:  Mr. DiPascali, because you acknowledge

19   that you are guilty as charged in Counts One through Ten of the

20   information, because you know your rights and are waiving those

21   rights, because your plea is entered knowingly and voluntarily

22   and is supported by an independent basis in fact for each of

23   the elements of the offenses charged in the information, I

24   accept your guilty plea and I adjudge you guilty on Counts One

25   through Ten of the information.

98B6DIP                        Plea

1           You may have a seat.

2           Mr. Litt.

3           MR. LITT:  I would ask if the Court could inquire

4    about whether the defendant Mr. DiPascali admits to the

5    forfeiture allegations.

6           THE COURT:  Fair enough.

7           Mr. DiPascali, let me also ask you about the

8    forfeiture allegations.  There are two forfeiture allegations

9    in the information.

10          You indicated you have read them both, is that

11   correct?

12          THE DEFENDANT:  That's correct.

13          THE COURT:  Do you admit the facts that are contained

14   in each of the allegations?

15          THE DEFENDANT:  Yes, I do.

16          THE COURT:  Is that sufficient, Mr. Litt?

17          MR. LITT:  Yes, it is.

18          THE COURT:  Thank you.

19          Let's talk about sentencing now.  The parties

20   requested the sentencing be put over for a number of months in

21   light of Mr. DiPascali's cooperation and had requested that I

22   set a control date in May of 2010.

23          Is that still the position of the parties?

24          MR. LITT:  It is of the government, your Honor.

25          THE COURT:  Mr. Mukasey.

98B6DIP                          Plea

1          MR. MUKASEY:  It is the position of the defense,

2     Judge.

3          THE COURT:  Tell me what exactly it is that you have

4     in mind?  So by that date I would get another submission or

5     letter from the parties, or by that date we would have

6     presumably a sentencing unless I adjourned it?

7          MR. LITT:  Well, I think you would get a letter from

8     the parties, your Honor.

9          THE COURT:  On that date or a date before that date?

10         MR. LITT:  On that date.

11         THE COURT:  On that date.  You expect that the

12    cooperation will be going for at least that long?

13         MR. LITT:  Yes, your Honor.

14         THE COURT:  Or approximately that long?

15         MR. LITT:  I would say at least.

16         THE COURT:  Mr. Mukasey, that is your position as

17    well?

18         MR. MUKASEY:  Yes, Judge.

19         THE COURT:  May 15th.  I will expect a letter from the

20    government apprising the Court as to whether or not it is

21    prepared to go forward with sentencing, and if not proposing

22    another control date.  Obviously Mr. Mukasey should be CC'd on

23    any correspondence.

24         Let's talk about bail pending sentencing.  Title 18,

25    Section 3143(a) provides that a defendant shall be detained

98B6DIP                              Plea

1    following a plea or conviction, unless the judicial officer

2    finds by clear and convincing evidence that the person is not

3    likely to flee.  This is for the period between a jury's

4    verdict or in the case of today a guilty plea and the

5    sentencing.

6              So I had also had sign-in sheet to hear from any

7    victims who wish to be heard on this sheet.  No one has signed

8    that sheet.

9              Does anyone wish to be heard with respect to bail or

10   remand?

11             The parties have submitted a letter, which I

12   referenced earlier.  Bear with me while I am looking for it.  I

13   remember it well.  It provided for a bond of $400,000 -- excuse

14   me, $2.5 million to be secured by three financially responsible

15   persons, to be secured with property of $400,000 which would in

16   essence be the equity value in the home of Mr. DiPascali's

17   sister, surrender of all travel documents with no new

18   applications permitted, and travel restricted to the Southern

19   District of New York, Eastern District of New York, and here it

20   says the District of Pennsylvania but Pennsylvania has more

21   than one district, as well as regular pretrial supervision.

22             Is that the position of the parties?

23             MR. LITT:  We meant to say the Eastern District of

24   Pennsylvania and the District of New Jersey, which is where the

25   defendant lives.

98B6DIP                          Plea

1          MR. MUKASEY:  That's right.

2          THE COURT:  I see.  Anything else that the parties

3    wish to say on this?

4          MR. LITT:  No, your Honor.

5          MR. MUKASEY:  Yes, your Honor.

6          THE COURT:  Mr. Mukasey.

7          MR. MUKASEY:  By agreement with Mr. Litt, subject to

8    approval of the Court, we would ask for one week from today

9    until August 18th to satisfy those bail conditions if they are

10   acceptable to your Honor.

11         THE COURT:  I am not sure they are.  I should state

12   that up front.  Following a jury's verdict or following a

13   guilty plea there is a presumption that the defendant will be

14   detained, remanded pending sentencing.  That is for a variety

15   of reasons.  That is the Bail Reform Act of 1984.  I think

16   everyone at the front two tables understands that.

17         So I want to explore that.  It seems to me that this

18   defendant has ample incentive to flee.  I understand he is

19   cooperating with the government, but the defendant is 52 years

20   old.  He is facing a maximum term of imprisonment of 125 years.

21   Although the plea agreement has no guidelines calculation, I

22   certainly have done an admittedly quick and dirty guidelines

23   calculation.  But based on just the fraud counts, it seems to

24   me that the guidelines calculation comes out at a fairly

25   astronomical place based on the amount of the loss involved,

98B6DIP                    Plea

1    based on the abuse of trust that was involved in the course of

2    the schemes to which Mr. DiPascali admitted.

3              So it seems to me under the guidelines, even with the

4    acceptance the guidelines would call for a range of mandatory

5    life.  Now, because the maximum sentence is not life but 125

6    years, under the guidelines before considering cooperation,

7    before considering the Section 3553(a) factors, the guidelines

8    would be recommending a life term.  So that is certainly

9    serious, serious consequences facing Mr. DiPascali.

10             Now, the bail package proposed here by normal

11   standards would seem pretty considerable.  There is 2.5 million

12   dollar bond that would have three financially responsible

13   persons and property that is valued -- at least the equity

14   value is $400,000.  So by most standards that would be a pretty

15   large package.  But that amount is completely dwarfed by the

16   amount of restitution and forfeiture in this case.  $170

17   billion is what the plea agreement provides for Mr. DiPascali

18   to forfeit.  So it would seem to me that a 2.5 million dollar

19   bond thrown on top of that mountain doesn't count for much.

20             Now, the next argument would be that the financially

21   responsible persons, the co-signers and Mr. DiPascali's sister

22   would have some moral suasion over him, that he would be

23   disinclined to flee or do anything that might put them at risk,

24   and only that might be persuasive.  But in this case there are

25   thousands of victims who many of them lost more than $2.5

98B6DIP                      Plea

1    million.  So the fact that three more victims might be thrown

2    on top of a long list of victims doesn't strike me as a

3    terribly compelling basis to believe that Mr. DiPascali would

4    be deterred from engaging in conduct that would constitute a

5    violation of the terms of his bail or flight.

6           Now, the penalties for bail jumping are by most human

7    standards considerable.  It is five years' imprisonment,

8    maximum, with a two-level enhancement for obstruction of

9    justice on top of the guidelines calculation in this case.  But

10   here it would be again virtually meaningless.  It would expand

11   the maximum penalty from 125 years to 130 years.  It would

12   expand the guidelines calculation from what I think looks like

13   a level 46 to a level 48.  And for those of you unfamiliar with

14   the guidelines level 43 is life.  So you can't do much more

15   than that.

16          So in light of this, the package strikes me as fairly

17   symbolic and not terribly onerous in light of the other facts

18   in this case.  So it seems to me that it is really we are on an

19   honor system.  I am being asked to believe that Mr. DiPascali

20   is not going to run away because he has turned his life around

21   and that I should credit his statements here today that he is

22   sorry for what he has done and he is committed to making amends

23   to the best of his ability, which I can understand the

24   sentiment.  But the fact of the matter is the defendant's

25   conduct which is admitted today doesn't give me great

98B6DIP                     Plea

1   confidence on that store.

2         Mr. DiPascali has admitted to a 20-year period of

3   fraud in which he committed perjury to the SEC under oath.  He

4   maintained and manufactured false books and records that were

5   designed to mislead regulators and auditors.  He issued by his

6   own account and the government's account literally thousands or

7   even millions of statements to investors that were designed to

8   mislead them and lull them into maintaining investments they

9   had made or increasing the investments that they had made.  The

10  money laundering that is set forth in one of the accounts

11  describes a fairly massive-scale scheme that continued as

12  recently as December of 2008.

13        So I think all of that suggests to me that Mr.

14  DiPascali is not a good bet.  I think the argument that I

15  anticipate is that, Well, Mr. DiPascali understands that if he

16  violates the terms of his bail then his cooperation agreement

17  will be ripped up and any hope he would have for a sentence

18  below the guidelines would be greatly diminished.  I understand

19  that as well.  But I don't think it would be irrational for a

20  defendant faced with the kind of sentence that Mr. DiPascali is

21  facing to decide that maybe cooperation is not going to do it.

22        So all of this basically leads me to the statute, back

23  to the statute which is that I need to be persuaded as the

24  judicial officer that there is clearing and convincing evidence

25  that he is not going to flee and at this point I am not really

98B6DIP                        Plea

1    there.

2            So let me hear from counsel if they want to be heard

3    on this.  Mr. Mukasey.

4            MR. MUKASEY:  Thirty seconds, Judge, to confer?

5            THE COURT:  Certainly.

6            (Pause)

7            MR. MUKASEY:  Judge, if I could be heard on the issue.

8            THE COURT:  Certainly.

9            MR. MUKASEY:  Mr. DiPascali, your Honor, has known

10   that he has been under investigation that could put him in jail

11   for the rest of his life since December 11th, 2008.  At that

12   time he was served with a grand jury subpoena.  He has known

13   that this day was coming for probably eight months.

14           THE COURT:  Can I interrupt you?

15           Because it seems to me that based on what has been

16   described to me is that Mr. DiPascali must have known that this

17   house of cards was going to come crashing down for years but it

18   didn't prevent him from doing what he did up until December of

19   2008.

20           MR. MUKASEY:  As Mr. DiPascali mentioned, Judge, I

21   think that he always thought that there would be a safe landing

22   for many investors and it wasn't until really the end that he

23   learned the full truth of this.

24           I would like to address my comments really to his ties

25   to the community and why I think notwithstanding your guideline

98B6DIP                          Plea

1    analysis, which is pretty darn accurate, and notwithstanding

2    the really cataclysmic nature of the fraud here, I think Mr.

3    DiPascali is a clear and convincing bet to return to court.

4          He has known he has been under investigation for the

5    better part of nine months.  He has been speaking with the U.S.

6    Attorney's Office.  He has been following the guidance by the

7    FBI.  I am not shy to say that I believe he has established a

8    relationship with the agents of trust.  He is where he is

9    supposed to be when they ask him to be there.  He has been at

10   every proffer, at every meeting, and every location that he is

11   supposed to be at.  He understands that he has but one way to

12   ever see the light of day and that is to satisfy the government

13   that he is trustworthy person.

14         I think the government is signing him up to the

15   cooperation agreement says something about their trust in him.

16   He understands that he has got miles to go in terms of

17   providing substantial assistance.  He is here today and he has

18   known he was going to be here today to try to reach that goal.

19   He understands that he is working his way down from probably a

20   life sentence.  I anticipate Mr. DiPascali, and I think the

21   government would back me up on this, to be a cooperator in a

22   white-collared case in a historic nature, somebody who can pull

23   the curtain back on a fraud and answer a lot of questions that

24   Ms. Siegman wants to be answered and the whole world wants to

25   be answered.

1           We would not have gone through what was really a

2    grueling process to convince the government that he was a

3    person worthy of its trust if we didn't want to see this

4    through to the end.  Mr. DiPascali does want to see it through

5    to the end and that is why he came here and admitted in open

6    court a fraud of 30 years or the better part of 20 or 30 years.

7           Let me talk a little bit, Judge, about Mr. DiPascali's

8    background.  He has in Bridgewater, New Jersey, four children.

9    He comes from an extremely close family.  In fact, this is the

10   first time I have ever seen him discuss the fraud without

11   breaking down and crying.  He is an emotional person.  He is

12   not a person that would ever do anything to harm his family.  I

13   think that really in the back of his mind he wasn't convinced

14   that investors would be hurt here.  Of course they could have

15   been.  I am not sure he was convinced that they would have been

16   had Mr. Madoff actually had assets to back this up.

17          Let me tell you a little bit about each of Mr.

18   DiPascali's kids and the relationship he has with them as well

19   has his siblings.  He has a daughter today who is starting

20   Brooklyn Law School.  Yesterday he went with her to move her

21   in.  He is incredibly close with her.

22          He has three sons -- Frank, Jr., Greg, and Mike.  The

23   two young ones live at home.  Mr. DiPascali is their world and

24   he is their world.  He supports his mother who is 77 years old

25   and also lives in Bridgewater with one of his sisters.  Then he

1   has the other sister who is willing to post her house to show

2   her confidence in Mr. DiPascali.

3           I think that if the amount of the bond were raised and

4   perhaps if we could somehow find additional security that that

5   could be thrown on to the pile as well.  There is not a bail

6   package in the universe that is not without some risk, but I

7   think this is a bail package that can be fashioned into a bail

8   package that gives the Court comfort, like the government has

9   comfort in Mr. DiPascali.

10          It is worth pointing out that since January Mr.

11  DiPascali has been operating under, to use your term, the honor

12  system with the government.  They have never frozen his assets.

13  They never seized his bank accounts.  He voluntarily turned

14  over to the U.S. Marshal some of his property.  He is prepared

15  to turn over his property.  He has been operating since January

16  on really a letter agreement with the government regarding his

17  spending knowing that he would be ultimately subject to a

18  forfeiture order.  He has not violated the government's trust

19  once.

20          Every month we report to the government the amount of

21  money he is spending.  They are keeping him on a tight leash

22  and he is abiding by that.  He has almost no assets that are

23  not forfeitable.  So as soon as the government moves to freeze

24  the bank accounts and seize the bank accounts, he is not going

25  to have disposable income.  He doesn't have an ability to flee.

98B6DIP                          Plea

1   He doesn't have anywhere to go frankly.  We turned over his

2   passport.  My office has kept the passport for months.

3          To the extent it is worth knowing, he has put hundreds

4   of hours into preparing to proffer with the government,

5   learning about what it means to be a government witness,

6   learning what it means to accept responsibility and hopefully

7   get a 5K1 letter because he wants it not because he wants to

8   take off.  He takes care of his mother.  The Pretrial Services

9   officer asked this morning, Do you speak to your mother and

10  your sisters on a weekly basis?  And he said, No, much more

11  than that.  He speaks to them not on a daily basis but

12  sometimes on a multiple-times-in-a-day basis.

13         It sounds maybe odd stacked up against this fraud, but

14  he is a family person.  He doesn't travel.  He doesn't go on

15  lavish vacations.  He is a homebody.  He wants to cause no more

16  pain to his kids.  He sat in our office a couple nights ago

17  explaining to his family the possibilities and the

18  consequences.  He has been straight up with them, he has been

19  straight up with us, and he has been straight up with the

20  government.

21         You can take this bet, Judge, Mr. DiPascali is here to

22  do the right thing.  He wants the 5K letter.  It would be inane

23  for him to flee and leave his family with nothing as it is.

24  They are going to have to endure very, very rough times.  I

25  don't think he thinks about it in terms of, Well, I am facing

98B6DIP                    Plea

1    life in prison, what is another two years if I get a bail

2    jumping charge.  He thinks of it in the opposite way, which is

3    I am facing life in prison and I better show up every darn day

4    if I am to avoid anything but that.

5              That is why we entered into the cooperation agreement.

6    That is why we hope Mr. DiPascali can satisfy the Miriam

7    Siegmans of the world and the government and this Court.  I

8    don't want to put anybody on the spot.  I think the FBI agents

9    would speak to diligence and his compliance and his ability to

10   be trusted to continue to work with them.  I think they would

11   establish a very good relationship with him, professional and

12   arm's length but very trusting.  You can imagine the hill that

13   the government faced in offering him a cooperation agreement.

14   They I think came at this perhaps at the beginning with the

15   same scepticism that your Honor does and he won them over.  If

16   your Honor releases him on an appropriate bail package, he will

17   win your Honor over with trust and with compliance.

18              May I have one moment, Judge?

19              THE COURT:  Certainly.

20              (Pause)

21              MR. MUKASEY:  Thank you for hearing me, Judge.

22              THE COURT:  Mr. Litt, anything you want to add?

23              MR. LITT:  I would ask a couple of points that I think

24   your Honor anticipated in the arguments.  Mr. Mukasey hit on

25   some of them.

98B6DIP                        Plea

1          Mr. DiPascali, we do believe has known since very
2     early on -- December 11th, 12th -- that he was a key player in
3     this and he was under investigation and has not fled.  He has
4     always cooperated with the government to date and appeared when
5     called upon to do so.  He showed up today knowing what the
6     consequences of his actions today would be and certainly
7     deserves credit for that.

8          He does appear to be close to his family and he does
9     have significant ties to the community.  The plea agreement
10    that he has entered into gives him every incentive to appear
11    and to try to fulfill the terms of that agreement because to do
12    otherwise would likely confine him to the rest of his life in
13    jail.

14          THE COURT:  If he flees and you were able to get him
15    back.

16          MR. LITT:  Yes.  That's right, your Honor.

17          With respect to the bail package and amount, the
18    reason why there is less securities than there is in some other
19    cases there might have been is related to the forfeiture issue
20    and the fact that most of Mr. DiPascali's assets are subject to
21    forfeiture.  And over the coming weeks we expect to be
22    presenting preliminary orders or forfeiture to your Honor which
23    may be submitted any time prior to sentencing to start the
24    process of accomplishing that.  We have already to date
25    confiscated some of Mr. DiPascali's assets.

98B6DIP                    Plea

 1            Finally, the government believes that the assistance,

 2    if we did not believe that he could provide substantial

 3    assistance to the government, we wouldn't have entered into

 4    this agreement.  We do believe that he can provide substantial

 5    assistance and we believe that his ability to do so would be

 6    hampered were he to be detained.

 7            THE COURT:  Why is that?

 8            MR. LITT:  This is a very documented intensive

 9    investigation, among other things.  There are literally

10    millions of pages of documents and data and computer equipment

11    and the like that it will be very beneficial were he to be able

12    to have access to provide the substantial assistance that we

13    expect he will be able to do.

14            I think some of the concerns that your Honor has can

15    be addressed in part through electronic monitoring and home

16    detention if your Honor thinks that would add such an

17    additional layer of surety about flight.  There are flaws with

18    that as your Honor well knows.  There is no substitute in terms

19    of assuring somebody's presence in court other than

20    incarceration, but the government certainly believes that given

21    his connections to the community, again his record with the

22    government to date, the fact that he has not fled in the last

23    eight months, the fact that he showed up today and admitted his

24    guilt, exposed himself to 125 years of incarceration, that he

25    has three family members who would be tremendously harmed were

98B6DIP                           Plea

1    he to flee if they were approved as cosigners on the package,

2    that those things even without home detention and electronic

3    monitoring in the government's view provide clear and

4    convincing evidence in this case, and every case must be viewed

5    on its own facts, to reasonably assure clear and convincing

6    evidence that Mr. DiPascali would appear when required.

7    Certainly those factors when necessary combined with home

8    detention and electronic monitoring would do that.

9              THE COURT:  Mr. Litt, I am looking at a submission you

10   made to me in another case, which you reminded me that the Bail

11   Reform Act of 1984 creates no general expectation of post

12   verdict liberty.  To the contrary, it establishes as a

13   presumption in favor of detention.  You then went on to remind

14   me that "the interest in detaining defendants who have been

15   found guilty beyond a reasonable doubt of such crimes also

16   includes the need to encourage general respect for the law by

17   signaling that a guilty person will not be able to avoid or

18   delay imposition and service of the sentence prescribed by

19   law."

20             So, look, let me say this:  I have great respect for

21   the lawyers in this room.  I know them.  I think they are good

22   at what they do and I have great respect for them.  Clearly

23   they have taken the positions they take because they believe

24   them and I don't disregard that lightly.  On the other hand, I

25   think everybody recognizes that each of us has an independent

1    role to play in this process.

2           Mr. Litt and Mr. Mukasey have focused on what Mr.

3    DiPascali has done since December of 2008.  I keep focusing on

4    what he did for 20 or 30 years before that.  I keep thinking of

5    how many people put their trust in Mr. DiPascali and have lived

6    to regret it deeply and I am frankly reluctant to put my trust

7    in Mr. DiPascali.  I don't see why he would anymore respect the

8    oath he would take on a bail package than he would respect the

9    oath he took in front of the SEC, another arm of the

10   government.  So I think we may have disagreement on this one.

11          I am not persuaded.  Maybe I haven't heard enough

12   about how remand would affect his ability to cooperate with the

13   government.  I think there are lots of individuals who are in

14   custody who can still cooperate very effectively and work with

15   law enforcement agents very effectively.  On this record, in

16   the length of time that this conspiracy went on, again the

17   amount and nature of the misrepresentations to clients, to

18   government entities, to auditors, I just cannot find by clear

19   and convincing evidence that Mr. DiPascali does not pose a risk

20   of flight.  I just can't do it.

21          MR. MUKASEY:  Judge, if I could add some facts to the

22   record that might help persuade you that he is a trustworthy

23   defendant.  In terms of your concern about how he would be

24   hampered from cooperating were he detained, not only he is

25   going to cooperate with the U.S. Attorney's Office and with the

98B6DIP                    Plea

1   FBI, I can tell you from having been in these proffers, it is

2   an extremely onerous process involving computers and documents

3   and account statements and it requires the sort of 8-hour,

4   10-hour, 12-hour sessions that you just cannot have when you

5   are remanded.

6           He is also going to be cooperating with the SEC, with

7   the IRS, with any agency that wishes to speak with him, and we

8   hope and we believe there will be a number of agencies both

9   inside New York and outside New York that wish to speak with

10  him.  We've discussed among ourselves the Massachusetts

11  Attorney General has been very, very active in this case.

12          Obviously he is a U.S. Attorney's Office cooperator,

13  but I would hope that when the Madoff cases are going to spring

14  up all over the country, Mr. DiPascali will be at least a very

15  valuable witness to debrief to understand the operations and he

16  is not a testifying witness.  There are civil lawsuits that he

17  may be able to help people out.  I think he is going to be

18  working chiefly with the FBI and SEC here in New York, but he

19  can and is ready, willing and able to work with these other

20  agencies.

21          The SEC of course have their limitations on where they

22  can do and when they can go and when Mr. DiPascali can go if he

23  were detained.  I think it would seriously hinder his ability

24  to work with the SEC.  Part of what the world wants to know

25  here is how did the SEC fail to catch this for lack of a better

1   phrase and just to use the terms of discussion of the day.   I

2   don't know the case that your Honor read back Mr. Litt's

3   language to him but I would ask the Court consider whether that

4   was a case of cooperation.

5            THE COURT:  It was not.

6            MR. MUKASEY:  And you make a good point obviously

7   about --

8            THE COURT:  You have to say that, Mr. Mukasey.

9            MR. MUKASEY:  I am not saying I agree with everything.

10  You make a good point about how do trust a guy who basically

11  has been a fraudster for 25 years.  Here is the answer:  He

12  lived in a universe for 25 years that he doesn't live in

13  anymore.  On December 11th he exited that universe.  Once he

14  got out of that universe -- by the way that universe was

15  twisted and it was perverted, and it was almost impossible for

16  somebody who wasn't living in that universe to understand.  It

17  was an alternative reality.  It was not the kind of conspiracy

18  where a bunch of people are down in the dungeon plotting how to

19  rip off innocent old ladies.  It wasn't like that.

20           Mr. DiPascali started with Mr. Madoff when he was 18

21  or 19 years old.  He didn't know the way things run at Goldman

22  Sachs.  He didn't know the way things run at Morgan Stanley.

23  So sat and watched and he learned and listened and at some

24  point after several years I think a light went off, I think he

25  said to himself, This is kind of a bizarre universe but this is

98B6DIP                      Plea

1    my universe.  This is what Bernie tells me to do and this is

2    what I am doing.  By the way no one is going to get hurt at the

3    end because Bernie Madoff has been telling me he has assets

4    abroad and in real estate and in commodities that are going to

5    make sure that all the clients' money will be able to be

6    returned.

7            So he wasn't out there sort of ripping and robbing and

8    stealing as you might think of it.  He is guilty?  1,000

9    percent.  No question about it.  There is no way we could have

10   a trial in this matter.  He is absolutely guilty.  He was

11   living in a universe creating fake trade tickets and creating

12   fake trade blotters.  It is the way you did things.  It was

13   okay because Bernie was going to take care of it.  Don't worry,

14   Bernie will take care of it.  That is how he went to sleep at

15   night.  That was the universe he was living in for 25 years, 20

16   years.

17           On December 11th he came to my office shaking, crying

18   out of that universe.  He stepped out of that universe and

19   stepped into the real kind of world, the world that Ms. Siegman

20   lives in, I live in, you live in.  The world where you cannot

21   create a fake trade ticket and say, Don't worry it is okay

22   because no one is going to get hurt here.  He realizes now, he

23   is out of that universe.  He is in a universe with laws and

24   rules and regulations and oaths and promises and trusts.

25           I am happy to tell you that we had to knock hard on

98B6DIP                    Plea

1    the door of the U.S. Attorney's Office to get Mr. DiPascali in

2    there because they originally have the same -- I don't want to

3    speak for them.  I would imagine prosecutors in the real world

4    have the same degree of scepticism.  The guy was a fraudster

5    for 25 years.  How could I trust him?  How can I put him on the

6    witness stand?  Well, you know what?  He earned their trust.

7    He now I think has their trust.  Because he stepped out of the

8    universe, the one that you are focusing on, the one that said

9    you have wanton disregard for these victims and you have a

10   20-year history of fraud.

11        He is in a new world where he talks to the FBI agents

12   almost every day.  They were at his house yesterday.  He goes

13   to the U.S. Attorney's Office at his job.  It is going be his

14   full-time job.  Never has never missed an appearance.  He comes

15   early.  He stays late.  He goes outside to smoke and gets a

16   class of water.  Otherwise he is in there looking at records,

17   explaining history.

18        So you are right there was a world that he is going

19   get punished for.  He doesn't live in that world anymore.  Now

20   he is in this world.  Now he is in the world where he has got

21   to live up to what he says and he has to tell the truth or he

22   is going to go right back to that world where the only other

23   inhabitant is Bernie Madoff spending 150 years in prison.

24        THE COURT:  I understand the arguments and the

25   sincerity of what you are saying and what Mr. Litt is saying

1   that you have each reached a conclusion that Mr. DiPascali

2   would do that.  Perhaps you know him better than I.  I don't

3   think I can overlook the conduct that he admitted to today,

4   which I think coupled with the seriousness of the penalties

5   that he is looking at I think provides ample incentive to flee

6   if cooperation doesn't look like it is going to pan out the way

7   he thought, or as he gets closer to the day of sentencing that

8   the harsh realities of a sentence for this conduct starts

9   staring him in the face.  I think in light of all facts and all

10  the conduct in this case and in light that Mr. DiPascali has

11  made false statements to the SEC and to others and in light of

12  the fact for decades he made false statements to people that

13  entrusted him with their life savings -- I am not going to

14  trust him with his life savings.  I am just hoping he shows up

15  to court.  People entrusted him with the life savings.  I am

16  unpersuaded respectfully.

17          MR. MUKASEY:  Perhaps if we can add some heft to the

18  bail package, something such as home detention.

19          THE COURT:  Well, look, I don't rule out the

20  possibility of the parties to make another motion.  Based on

21  what is before me today and based on the proposal that has been

22  made jointly by the parties for bail, I am going to deny that

23  request.  I am going to remand Mr. DiPascali.  It not designed

24  to be punitive.  Time for sentencing is later.  It is designed

25  really I think to meet the objectives of the statute in light

98B6DIP                          Plea

1    of the facts as I understand them.

2         Mr. DiPascali, it may not be what you wanted or

3    expected today but --

4         MR. MUKASEY:  May I have one moment to discuss one

5    matter with the government?

6         THE COURT:  Certainly.

7         (Pause)

8         MR. LITT:  Your Honor, if I could at the risk of

9    trotting over ground that we've covered, first with respect to

10   the brief that your Honor mentioned that, as your Honor knows,

11   was in a case following three and a half years of intense

12   litigation and a nine-week trial, not a cooperator.

13        THE COURT:  A man whose fraud, total fraud was tiny in

14   comparison to this defendant's, right.

15        MR. LITT:  Yes.  Absolutely, your Honor.

16        THE COURT:  I don't want anyone to be in the dark

17   here.  I am referring to Mr. Litt's submission in the case of

18   *United States v. Alberto Villar*, 05 CR 621.

19        MR. LITT:  That's right.  I guess what I am having

20   difficulty articulating is it is essential I think is that we

21   believe that Mr. DiPascali's cooperation, what he wants to do,

22   what he says he wants to do will be hampered if we --

23        THE COURT:  You have to take him out in order to bring

24   him to the FBI.  Look, we are all experienced with cooperators.

25   We all know there are many cooperators who are in custody who

98B6DIP                       Plea

1   are able to cooperate and meet with law enforcement officials

2   and engage in cooperation.  He is not doing anything activity.

3   He is not wearing a wire and going out.  I am not sure I am

4   persuaded that he needs to be out to be able to effectively

5   cooperate.

6           MR. LITT:  The documents involved in this case fill a

7   half a floor of a New York office building and about 6,000

8   boxes in a warehouse and a computer server that was dedicated

9   in large part to the investment advisory activities, a computer

10  that Mr. DiPascali has a certain amount of specialized

11  knowledge about, a server that has proprietary software, that

12  is ancient by modern standards in terms of technology and the

13  operating system and the like.  The records and the unraveling

14  of what happened in this case over decades requires looking

15  through exactly what I just described, a half of a floor of an

16  office building.

17          In going through this process, and I will just speak

18  in hypotheticals, to present a document to a witness that

19  triggers a recollection of something else.  It is one thing to

20  be able to walk across the room or pull a file and present that

21  file in realtime and through that process get to the bottom of

22  what happened and a very small piece of what happened in this

23  case then it would be to do that process through the cumbersome

24  circumstance of Mr. DiPascali's being incarcerated.

25          I think it will just be a lot more efficient, the

98B6DIP                        Plea

1   government will be able to get Mr. DiPascali's cooperation much

2   more fully, completely, efficiently, and quicker if he is out.

3   I would just urge the Court --

4          THE COURT: Let's me interrupt you, though.  That is

5   not really the consideration of 3143.  It doesn't say or if the

6   government thinks it would be more convenient to have a person

7   out.  So clearly the government has reached a conclusion.  And

8   I don't mean this disrespectfully.  Clearly you reached a

9   determination that bail is appropriate.  I understand that.  I

10  am not persuaded by clear and convincing evidence that Mr.

11  DiPascali is going to be here at the time of sentencing given

12  the monumental sentence he is facing and given the amount of

13  cooperation that is going to be needed to put a dent into that

14  sentence.

15         So, look, I don't think there is much more that you

16  folks can say today that is going to persuade me.  If you want

17  to make another submission, I will consider it.  But on the

18  basis of the facts as I have laid them out, I am not prepared

19  to agree to the bail package that you have all proposed.

20         MR. MUKASEY: Understood that the current bail package

21  on the table needs to be withdrawn and obviously I am told

22  needs some more energy and some more heft.  Judge, we were

23  obviously surprised by your Honor's take on this and what I

24  would propose is to allow us to brief this issue and or -- I

25  guess the law is pretty clear.  I am not sure how much briefing

1    there is going to be, but Mr. DiPascali's family is completely

2    unprepared for this.  He is completely unprepared for this.  He

3    is the financial provider to his family.  I frankly didn't

4    recognize --

5              THE COURT:  Is he working, though?

6              MR. MUKASEY:  No.  But I think he is certainly taking

7    care of his family, the four kids and the girl in law school

8    and the boys that are home for the summer.  I think that we can

9    probably work out a package if your Honor were to give us 48

10   hours, 72 hours that was strict, that satisfied your Honor of

11   his ties to the community.

12             I agree that cooperation is not one of the 3142, 43

13   prongs.  However, I think it bears some thinking about really

14   how he will be able to cooperator or not cooperate if he is

15   remanded, and probably satisfy your Honor with a package that

16   includes home detention, strict Pretrial Services reporting,

17   perhaps less travel, and a lot more for those he loves to lose.

18             THE COURT:  I am reacting to what I have in front of

19   me now.  The statute is pretty clear that unless I make the

20   finding that I am not prepared to make, Mr. DiPascali is

21   remanded.  So I am going to order his remand without prejudice

22   to renewing a motion whenever you see fit with whatever

23   submissions you think appropriate.

24             Mr. DiPascali, we have not set a sentencing date for

25   you.  That is because it has been represented to me that your

98B6DIP                      Plea

1   cooperation will continue for some time. We have a control

2   date in May. Then perhaps we will have more information as to

3   when we will go forward with sentencing. I want to make sure

4   you understand about sentencing, however. As I said before,

5   the Probation Department will prepare a report, a presentence

6   report, that will be quite extensive. They will interview a

7   number of people, including the government to get more

8   information about the offenses that are in the information, and

9   also interview you, among others. So I would ask that you be

10  cooperative with the Probation Department as they prepare that

11  report.

12          Mr. Mukasey, I assume you wish to be present for any

13  interview?

14          MR. MUKASEY: Yes, Judge.

15          THE COURT: I will direct that no interview is to take

16  place unless Mr. Mukasey is present. So if they show up to

17  interview you and Mr. Mukasey is not there, you remind them

18  that I told you not to go forward. If Mr. Mukasey directs you

19  not for answer certain questions, listen to him, but don't make

20  any false statements to the Probation Department. If you were

21  to do that, it could be a separate offense or an enhancement

22  for obstruction of justice. So I think that would serve no

23  one's interest. Be as cooperative as you can be.

24          Mr. Mukasey.

25          MR. MUKASEY: I am going to back to the bail issue. I

98B6DIP                      Plea

1    think that it might persuade your Honor what Mr. DiPascali is

2    looking forward to in terms of his cooperation and the ties

3    that he has to his family and the community and the cooperation

4    that he has already given to the government is perhaps if I

5    were allowed to ask the FBI Agent Keith Kelley some questions

6    that --

7              THE COURT:  Asking here in open court, you mean?

8              MR. MUKASEY:  Yeah.  I don't want to do anything that

9    will put anybody on the spot, but I think there is a

10   relationship of trust here that can be considered a tie to the

11   community, in addition with the FBI and the government, which I

12   think Special Agent Kelley would shed some light on, in

13   addition to the very, very close ties Mr. DiPascali has with

14   his family.

15             THE COURT:  I am not sure what you are asking me.  Are

16   you asking me to put Mr. Kelley on the stand and let you

17   examine him?

18             (Pause)

19             THE COURT:  Counsel.

20             Mr. Mukasey.

21             MR. MUKASEY:  I am going to withdraw that application.

22             THE COURT:  If you folks want to renew the

23   application, you can do so.  I think I've explained what my

24   concerns are and what the burden is.

25             Is there anything else we need to cover today,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98B6DIP                          Plea

1    Mr. Litt?

2              MR. LITT:  No, your Honor.

3              THE COURT:  Mr. Mukasey?

4              MR. MUKASEY:  If I can have just one moment?

5              (Pause)

6              MR. MUKASEY:  Nothing further, Judge.

7              THE COURT:  Thank you all.  I will hear from you May

8    15th if not before then.  I appreciate all your time.  Thank

9    you to the court reporter, the marshals, and all the victims

10   who came as well.

11                            o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25



I (We) hereby certify that the foregoing is a true and correct transcript, to the best of my (our) ability, of the above proceeding. (our)

Official Court Reporter
U.S. District Court