**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 09-01239 (CGM) |
| v. | |
| FAIRFIELD INVESTMENT FUND LIMITED, STABLE FUND, FAIRFIELD GREENWICH LIMITED, FAIRFIELD GREENWICH (BERMUDA), LTD., FAIRFIELD GREENWICH ADVISORS LLC, FAIRFIELD INTERNATIONAL MANAGERS, INC., WALTER NOEL, JEFFREY TUCKER, ANDRES PIEDRAHITA, AMIT VIJAYVERGIYA, PHILIP TOUB, CORINA NOEL PIEDRAHITA, FAIRFIELD GREENWICH CAPITAL PARTNERS and SHARE MANAGEMENT LLC | |
| Defendants. | |

**MEMORANDUM DECISION DENYING MOTION TO DISMISS AS TO ALL CLAIMS EXPECT THOSE MADE AGAINST CORINA NOEL PIEDRAHITA IN HER INDIVUDAL CAPACITY**

**A P P E A R A N C E S :**

BAKER HOSTETLER LLP
Attorneys for the Plaintiff
45 Rockefeller Plaza
New York, N.Y. 10111
BY:    Erika Thomas
       Camille Bent

SIMPSON THACHER & BARTLETT LLP
Attorneys for Defendants Fairfield Greenwich Limited, Fairfield Greenwich (Bermuda) Limited,
Fairfield Greenwich Advisors LLC, Fairfield International Managers, Inc., Amit Vijayvergiya,
Philip Toub, Corina Noel Piedrahita, Fairfield Greenwich Capital Partners, and Share
Management LLC
BY:    Mark Cunha
       Sarah Eichenberger

DECHERT LLP
Attorneys for Andrés Piedrahita
BY:    Neil Steiner

WOLLMUTH MAHER & DEUTSCH LLP
Attorneys for Fairfield Investment Fund Limited and Stable Fund, L.P
BY:    Fletcher Strong

**CECELIA G. MORRIS**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the Defendants'[1] motion ("Motion to Dismiss") to dismiss the second

amended complaint ("Complaint"), filed by Irving H. Picard, Trustee for the Liquidation of

Bernard L. Madoff Investment Securities LLC ("Trustee"), on August 28, 2020.  Defendants

assert that the Complaint fails to state a claim upon which relief can be granted, pursuant to

Federal Rule of Civil Procedure ("Rule") 12(b)(6).

---

[1] Defendants in this action are Fairfield Investment Fund Limited ("FIFL"), Stable Fund, L.P. ("Stable"), Fairfield
Greenwich (Bermuda) Limited ("FG Bermuda"), Fairfield Greenwich Advisors, LLC ("FGA"), Fairfield Greenwich
Limited ("FG Limited"), Fairfield International Managers ("FIM"), Walter M. Noel, Jr., Jeffrey Tucker, Andrés
Piedrahita, Amit Vijayvergiya, Philip Toub, Corina Noel Piedrahita, Fairfield Greenwich Capital Partners
("FGCP"), and Share Management LLC (together, "Defendants").

For the reasons set forth below, the Motion to Dismiss is granted as to claims asserted against Corina Noel Piedrahita, individually, and is denied as to claims asserted against her in her capacity as a partner of Fairfield Greenwich Group ("FGG"). The Motion to Dismiss is denied on all other grounds.

## I.  Jurisdiction

This is an adversary proceeding commenced in this Court, in which the main underlying Securities Investment Protection Act ("SIPA") proceeding, No. 08-01789 (CGM), is pending. The SIPA proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H) and (O).

## II.  Background

The Complaint arises in connection with the infamous Ponzi scheme perpetrated by Bernard L Madoff through his investment company, Bernard L. Madoff Investment Securities, LLC ("BLMIS").  As recognized by the Securities Investor Protection Corporation ("SIPC"), this is not a typical SIPC proceeding in which securities or cash were on hand at the time of the failure of the brokerage house.  *Picard v. Merkin (In re BLMIS)*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010).  It was a fraud of "unparalleled magnitude" in which the only assets available to pay customer claims were "other people's money or assets derived from such funds." *In re BLMIS, LLC*, 445 B.R. 206, 215 (Bankr. S.D.N.Y. 2011).

In this Complaint, the Trustee seeks to recover over $3.5 billion in redemption payments and fees that Defendants allegedly received from Fairfield Sentry Ltd. ("Sentry"), Greenwich Sentry ("GS"), and Greenwich Sentry Partners ("GSP") (collectively, the "Fairfield Funds"). The Trustee is seeking to recover (1) redemption payments and fees allegedly transferred to Defendants in the six years prior to Madoff's arrest ("Six-Year Subsequent Transfers"); and (2) redemption payments and fees allegedly transferred to Defendants in the two years prior to Madoff's arrest ("Two-Year Subsequent Transfers"). Compl., ECF No. 286.[2] The Trustee also seeks from Fairfield Greenwich Limited ("FG Limited") and Fairfield Greenwich (Bermuda) Limited ("FG Bermuda") transfers from BLMIS to GS and GSP in the six years prior to Madoff's arrest under a theory of general partnership liability.

Defendants move to dismiss the Complaint and argue that the Trustee has failed to allege that, among other things, the Fairfield Funds had actual knowledge of the fraud at BLMIS. They also argue that none of the Defendants had this knowledge so it cannot be imputed to the Fairfield Funds through them. Thus, Defendants believe that the Trustees Six-Year Subsequent Transfer claims must be dismissed. Similarly, Defendants argue that neither the Fairfield Funds nor the Defendants were willfully blind to BLMIS's fraud, and, as such, the Two-Year Subsequent Transfer claims must be dismissed. Defendants also argue that the general partner liability claims against FG Limited and FG Bermuda are preempted by the Bankruptcy Code, the claims against Fairfield Investment Fund Limited ("FIFL") and Stable are untimely, and that the Court lacks personal jurisdiction over Vijayvergiya and Piedrahita. The Trustee opposed the motion and Defendants filed a reply.

---

[2] Unless otherwise indicated, all references to the Court's electronic docket ("ECF") may be found on the docket of adversary proceeding 09-01239-cgm.

On June 16, 2021, this Court held a hearing to consider the motion and its opposition. Hr'g Tr., ECF No. 325.

### III. Discussion

"To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The claim is facially plausible when a plaintiff pleads facts that allow the Court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). In deciding a motion to dismiss, the Court should assume the factual allegations are true and determine whether, when read together, they plausibly give rise to an entitlement of relief. *Iqbal*, 556 U.S. at 679. "And, of course, a well-pl[ed] complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint is deemed to include any written instrument attached to it as an exhibit, documents incorporated in it by reference, and other documents "integral" to the complaint.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted).  A document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous information and relied on it in framing the complaint.  *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (*citing Chambers*, 282 F.3d at 153).  However, "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *accord Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008).

Counts one through seventeen in the Complaint seek recovery of subsequent transfers under 11 U.S.C. § 550(a).  Pursuant to SIPA[3] § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA pursuant to 15 U.S.C. § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).  The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 544, 547, 548, 549, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

Section 550(a) of the Bankruptcy Code states:

Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.

---

[3] SIPA may be found in title 15 of the United States Code at sections 78aaa through 78lll.

To recover a fraudulent or preferential transfer of property from a subsequent transferee,

the Trustee must show that the initial transfer of that property by the debtor is subject to

avoidance under one of the Bankruptcy Code's avoidance provisions (*e.g.*, 11 U.S.C. §§ 544,

547 & 548). *See* 11 U.S.C. § 550(a). *SIPA v. BLMIS, LLC*, 2013 WL 1609154, at *7 (S.D.N.Y.

Apr. 15, 2013).

> Nothing in the language of Section 550 requires a plaintiff in a fraudulent transfer
> adversary proceeding to avoid the transfer received by the initial transferee before
> continuing with avoidance actions down the line of transfers. Certainly, the
> plaintiff can pursue the initial transferee, but the plaintiff is not obligated to do so.
> The plaintiff is free to pursue any of the immediate or mediate transferees, and
> nothing in the statute requires a different result.

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 706-07 (11th Cir.

2005).

The Court entered consent judgments against Sentry (in the amount of $3,054,000,000[4]),

GS (in the amount of $206,038,654[5]), and GSP (in the amount of $5,985,000[6]). The consent

judgments settled claims brought pursuant to 11 U.S.C. §§ 544, 547, 548, 550, SIPA § 78fff-

(2)(c)(3) and the New York Fraudulent Conveyance Act (New York Debtor

and Creditor Law §§ 270-281).

## A. SECTION 546(e) OF THE BANKRUPTCY CODE BARS THE TRUSTEE'S SIX-YEAR SUBSEQUENT TRANSFER CLAIMS

Defendants have raised the "safe harbor" defense to the Trustee's allegations.

Section 546(e) protects a transfer that is a "settlement payment . . . made by or to (or for the

benefit of) a . . . financial institution [or] financial participant," or that is "made by or to (or for

---

[4] ECF No. 109 ("Judgment . . . is hereby entered in favor of the Trustee and against Fairfield Sentry . . . in the amount of . . . []$3,054,000,000.00[].").
[5] ECF No. 125 ("Judgment . . . is hereby entered in favor the Trustee and against Greenwich Sentry . . . in the amount of . . . []$206,038,654[].").
[6] ECF No. 126 ("Judgment . . . is hereby entered in favor the Trustee and against GSP . . . in the amount of . . . []$5,985,000[].").

the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract."  11 U.S.C. § 546(e).

Where the initial transferee fails to raise a § 546(e) defense against the Trustee's avoidance of certain transfers, as is the case here where the transferee settled with the Trustee, the subsequent transferee is nonetheless entitled to raise a § 546(e) defense against recovery of those funds. *Id.* (citing *Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 744 (Bankr. S.D.N.Y. 2008)).

Furthermore, where § 546(e) applies to the Trustee's claims, the Trustee may only proceed against a subsequent transferee insofar as he seeks to recover those subsequent transfers under § 550(a) as to which he could have avoided the initial transfer under § 548(a)(1)(A). *See Picard v. Katz ("Katz II")*, 466 B.R. 208, 214 (S.D.N.Y. 2012).  "There is one caveat to this rule: to the extent that an innocent customer transferred funds to a subsequent transferee who had actual knowledge of Madoff Securities' fraud, that subsequent transferee cannot prevail on a motion to dismiss on the basis of Section 546(e)'s safe harbor." *SIPC v. BLMIS, LLC*, 2013 WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013).  This is because a defendant is not permitted to launder what he or she knows to be fraudulently transferred funds through a nominal third party and still obtain the protections of § 546(e). *Cf. IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 707 (11th Cir. 2005) (rejecting a reading of Section 550(a) to require successive avoidance and recovery actions because it would encourage creditors to "design increasingly complex transactions, with the knowledge that more transfers decrease the likelihood of a successful avoidance action").  "In sum, if the Trustee sufficiently alleges that the transferee from whom he seeks to recover a fraudulent transfer knew of Madoff Securities' fraud, that transferee cannot claim the protections of Section 546(e)'s safe harbor." *Id.*

**i. The Trustee Has Alleged That The Fairfield Funds Had Actual Knowledge That Madoff Was Not Trading Securities**

To that end, the Defendants argue that the Trustee has failed to plead actual knowledge of the Fairfield Funds.  Sentry, GS, and GSP are not natural persons and can act only through "the instrumentality of their officers or other duly authorized agents."  *45 John Lofts, LLC v. Meridian Capital Grp., LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 743 (Bankr. S.D.N.Y. 2019).  An agent's knowledge and acts are imputed to the corporation and partnerships, unless exceptions apply which has not been argued here.  *Id.*  The Trustee has pled that Sentry was a "shell entity with no employees" that operated through its principals and agents.  Compl. ¶ 88.

Since the Trustee has pled that GS and GSP were Delaware limited partnerships and the Trustee has alleged that the agents and principals of the Fairfield Funds had actual knowledge of Madoff's fraud, the cause of action will not fail.  The Trustee has pled this knowledge in two ways: 1) that certain individuals had actual knowledge of Madoff's fraud, which is imputed to the Fairfield Funds;  and 2) that actual knowledge is imputed to the Fairfield Funds through "FGG," an alleged "de facto" partnership.

**ii. The Trustee Alleges Facts Establishing That Defendants Had Actual Knowledge That Madoff Was Not Trading Securities**

**a. Amit Vijayvergiya**

The Complaint is replete with allegations that Vijayvergiya had actual knowledge that Madoff was committing fraud, not purchasing stocks that were listed on customer statements, and that he was operating a Ponzi scheme.  The Trustee has alleged that, as early as 2003, Vijayvergiya learned that Madoff was not adhering to the spilt strike strategy (Compl. ¶¶ 283–88, ECF No. 286[7]) and that he knew Madoff was claiming to be trading options in volumes that exceeded the market volume. ¶¶ 292-97.  The Complaint contains allegations that, in 2005,

---

[7] All ¶ references herein are to the Complaint located at ECF No. 286, unless otherwise noted.

Vijayvergiya lied to the SEC to assist Madoff in covering up his fraud. ¶¶ 165; 236–62. The

Complaint also alleges that Vijayvergiya knew that BLMIS was being audited by an uncertified

accounting firm incapable of performing the work that would have been necessary if Madoff

were trading actual securities. ¶¶ 188–212. Most damningly, the Trustee alleges that

Vijayvergiya joked in an email with a colleague about how Madoff was running a Ponzi scheme

similar to that of Bayou's. ¶ 198. These are only a few examples of Vijayvergiya's actual

knowledge that has been pled by the Trustee in the 106-page Complaint, including his attempt to

liquidate his personal investment in Fairfield Sentry as Madoff's scheme was unraveling in 2008.

¶ 313.

b. **Jeffrey Tucker**

The Trustee alleges that Tucker had actual knowledge that BLMIS was operating a Ponzi

scheme since, at least as early as May 2001, when articles were published in MAR/Hedge and

Barron's insinuating that Madoff was operating a Ponzi scheme. ¶ 132. Tucker was quoted in

the article, which allegedly contained a quote from another investor that to take Madoff "at face

value is a bit naïve." ¶ 134. After the articles, the Trustee asserts that Tucker, Noel, and

Piedrahita intentionally mislead clients about the safety of the Fairfield Funds. ¶ 136. Tucker

allegedly expressed concern over "whether the assets were" held by BLMIS. ¶ 141. Citgo

Global Custody N.V. ("Citgo")[8] also expressed its concern about being the "custodian" of the $3

billion of Fairfield Sentry's invested that was "sub-custodied" at BLMIS. ¶ 138. The Trustee

alleges that, in December 2002, in an attempt to verify whether Fairfield Sentry's assets existed,

---

[8] It is alleged that "Noel and Tucker arranged for Citco Global Custody N.V. to be listed as Fairfield Sentry's custodian with the understanding that Citco would hold that position in name only, as custodial duties were contractually delegated to BLMIS." ¶ 91.

Daniel Lipton[9] and personnel of Citgo visited BLMIS's offices. At the site visit, they were unable to verify the existence of Fairfield Sentry's assets. ¶ 140. The Complaint contains allegations that, at least as early as October 2003, Tucker was aware that Madoff did not follow the split strike conversion strategy, as he claimed. ¶ 283. The Trustee alleges in the Complaint that, in January 2006, Tucker lied to the SEC to protect Madoff during the SEC's investigation into BLMIS. ¶ 259.

Finally, and most damningly, is the Trustee's allegation that Tucker knew Madoff was operating a Ponzi scheme and purposefully withheld information from clients about how similar BLMIS was to Bayou after Bayou's Ponzi scheme was exposed. ¶ 196. Once Tucker suspected that BLMIS was a Ponzi scheme, he and his colleagues continued to investigate and found more evidence that BLMIS's accounting firm could not perform the audits that would have been necessary if BLMIS was actually investing in the markets—a sign Tucker knew meant that BLMIS was committing fraud (¶¶ 188–205) and lied about that information to clients in order to protect the Ponzi scheme (¶ 201). This type of behavior allegedly continued until December 2008, when the Ponzi scheme unraveled. ¶¶ 210–11.

### c. Walter Noel

The Trustee asserts allegations against Noel similar to those he asserts against the other Defendants. In the Complaint, he alleges that Noel had knowledge of the Ponzi scheme and attempted to "mollify" clients after the Barron's/MAR Hedge article. ¶ 136. The Complaint alleges that Tucker and Noel conspired with Madoff to avoid SEC scrutiny by creating a Bermuda corporation rather than a U.S. based one. ¶ 151. And that Noel and Tucker arranged for a Citgo to be a "straw" custodian delegating full custody and advisory control over

---

[9] Lipton was allegedly a partner in FGG; FGG's Chief Financial Officer; and an agent of FG Limited, FG Bermuda, and FG Advisors.

investments to BLMIS. ¶¶ 91-92. It is alleged that Noel was aware that BLMIS may be doing something illegal as early as December 2003. ¶ 184.

### d. Philip Toub

The Trustee alleges that, at least as early as 2003, Toub had knowledge that BLMIS was not employing Madoff's split strike conversion strategy and that Madoff could not be making legitimate investments with the amount of assets he had under his management. ¶¶ 181-82. In 2003, Toub assisted his colleges in covering up this fraud by lying to investors. ¶¶ 153-55. This behavior was not a one-off. It continued through 2008 when Toub stated that FGG needed to work on "branding" instead of addressing any fraud risk at BLMIS, indicating he was already aware of the fraud and focused on covering it up. ¶¶ 210, 234.

### e. Andrés Piedrahita

The Trustee alleges that Piedrahita had a close, personal relationship with Madoff and, with Tucker and Noel, was responsible for creating a corporate structure meant to funnel money into the principals' and directors' pockets. ¶¶ 108, 116, 130, 170. As early as 2001, Piedrahita was allegedly lying to clients to in order to cover up the fraudulent activity exposed by the Barron's and MAR/Hedge articles. ¶¶ 136, 173. This behavior allegedly continued until 2008. ¶¶ 111, 176. The Trustee alleges that, in 2003, Piedrahita was again made aware of the fraud taking place at BLMIS and possibly also within FGG. ¶ 184. In 2007, Piedrahita allegedly admits that he has "always been concerned" about what was happing at BLMIS and acknowledges that "there is absolutely nothing we can do about it," indicating his willingness to continue investing in the fraudulent scheme. ¶ 233. The Trustee also alleges that Piedrahita knew that Fairfield Sentry lied to investors about who had custody of their assets, lied to the SEC

to assist Madoff in covering up his fraud, and tried to quell fears about BLMIS in 2008 when

BLMIS's profits remained unaffected by the global recession.  ¶¶ 111, 234, 259.

### f.  Corina Noel Piedrahita

The Trustee has failed to plead individualized factual allegations demonstrating that

Corina Noel Piedrahita had independent actual knowledge of the BLMIS fraud.  She is alleged to

have been FGG's Head of Client Services and Investor Relations.  ¶ 121.  The Trustee has

alleged that FGG had actual knowledge of BLMIS' fraud.  ¶¶ 9-10

> ("It is inescapable that FGG partners knew BLMIS was not trading securities.
> They knew BLMIS's returns could not be the result of the split strike conversion
> strategy (the "SSC Strategy"). They knew BLMIS's equities and options trading
> volumes were impossible. They knew that BLMIS reported impossible, out-of-
> range trades, which almost always were in Madoff's favor. They knew Madoff's
> auditor was not certified and lacked the ability to audit BLMIS. They knew
> BLMIS did not use an independent broker or custodian. They knew Madoff
> refused to identify any of BLMIS's options counterparties. They knew their
> clients and potential clients raised numerous due diligence questions they would
> not and could not satisfactorily answer. They knew Madoff would refuse to
> provide them with honest answers to due diligence questions because it would
> confirm the details of his fraud. They knew Madoff lied about whether he traded
> options over the counter or through the exchange. They knew they lied to clients
> about BLMIS's practices in order to keep the money flowing and their fees
> growing. And they knowingly misled the SEC at Madoff's direction. Every step
> the FGG partners took was a calculated effort to maintain the viability of the
> BLMIS Ponzi scheme despite knowing Madoff was not engaged in the trading of
> securities.").

To the extent that the Trustee's allegations demonstrate the existence of FGG as a *de

facto* partnership and the imputation of FGG's knowledge to her, this cause of action may

survive.  Discussion of FGG and its effect on individualized pleading is *infra*.

Defendants argue that the fact that the Fairfield Funds invested in BLMIS is proof that

they had no actual knowledge of the fraud.  This argument belies the allegation that Sentry was a

"shell entity" with no employees.  And that it and the other two Fairfield Funds were created as

conduits for Defendants to reap the benefits of Madoff's fraud.  ¶¶ 80, 88, 98-110.  It can be

reasonably inferred from the allegations in the Complaint, that any money "lost" by the Fairfield

Funds or by the Defendants was part of an orchestrated scheme to shield the partners of FGG

from liability on the money they personally received.  Whether such allegations are true will be

decided at a later stage of litigation.

## B. SECTION 550(B) OF THE BANKRUPTCY CODE DOES NOT BAR THE TRUSTEE'S TWO-YEAR SUBSEQUENT TRANSFER CLAIMS

Defendants argue that the Trustee has failed to meet his pleading burden under § 550(b).

Section 550(b) provides an exception to liability under § 550(a).  Section 550(b) states:

> The trustee may not recover under section (a)(2) of this section from—
> (1) a transferee that takes for value, including satisfaction or securing of a present
> or antecedent debt, in good faith, and without knowledge of the voidability of the
> transfer avoided; or
> (2) any immediate or mediate good faith transferee of such transferee.

In order to prevail on a motion to dismiss,

> the Trustee must plead that (1) the initial transfer is avoidable, and either (2) the
> subsequent transferee lacked good faith or (3) received the subsequent transfer
> with knowledge that the initial transfer was avoidable. But even if the subsequent
> transferee received the transfer in good faith and without knowledge of the
> avoidability of the initial transfer (and assuming a prior transferee did not take for
> value), the subsequent transferee must still take for value to prevail on its defense.

*SIPC v. BLMIS*, 594 B.R. 167, 196 (Bankr. S.D.N.Y. 2018).  The first prong of this test is not in

dispute.  The Trustee has pleaded that the initial transfer is avoidable and that the funds at issue

"originated with" BLMIS.  *Id.*; Compl. ¶¶ 314–18, 333.  The Trustee must also plead the "who,

when, and how much" but does not have the burden of pleading a "dollar-for-dollar accounting

of the exact funds at issue" at this stage.  *Id.*

### A.  Good Faith

Defendants are raising the affirmative defense of "good faith purchase for value" in their

motion to dismiss.  In the *Good Faith Decision*, the district court placed the burden of pleading

"good faith" on the plaintiff. *SIPC v. BLMIS, LLC*, 516 B.R. 18, at 24 n.4 (S.D.N.Y. 2014) ("*Good Faith Decision*"); *see also SIPC v. BLMIS*, *LLC*, 590 B.R. at 200, 205–06 (Bankr. S.D.N.Y. 2018) (discussing District Court *BLMIS* rulings). "Value" remains Defendants' burden to plead and prove. *SIPC v. BLMIS, LLC*, 594 B.R. 167, 198 (Bankr. S.D.N.Y. 2018).

To prove "good faith," the Trustee must plead that "the transferee neither had actual knowledge of the Madoff Securities fraud []or willfully blinded himself to circumstances indicating a high probability of such fraud." *SIPC v. BLMIS, LLC*, 590 B.R. 200, 205 (Bankr. S.D.N.Y. 2018) (quoting the *Good Faith Decision*). The Court has already concluded that the Trustee has pled actual knowledge with regard to all Defendants except Corina Noel Piedrahita.

Thus, the Court will only address willful blindness here. Willful blindness consists of two elements: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *SIPC v. BLMIS, LLC*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (internal quotation omitted)). Pleading that Defendants intentionally blinded themselves to the "red flags" that suggested a high probability of fraud is sufficient to plead "willful blindness" and "lack of good faith." *Picard v. Katz*, 462 B.R. 447, 455 (S.D.N.Y. 2011), *abrogated on other grounds by SIPC v. BLMIS, (In re BLMIS )*, 513 B.R. 437 (S.D.N.Y. 2014). "Thus, willful blindness connotes strong suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate failure to acquire actual knowledge of its existence." *SIPC v. BLMIS, LLC*, 594 B.R. 167, 198 (Bankr. S.D.N.Y. 2018) (emphasis in original) (citation omitted).

Based on the same allegations that allows this Court to find actual knowledge, the Court now finds that the Trustee has successfully pled willful blindness as to those Defendants. And

for the same reasons as is set forth above, the Trustee has failed to plead any allegations regarding the willful blindness of Corina Noel Piedrahita—except to whatever extent she is found to have knowledge as a partner of FGG.  ¶ 8

> ("[T]he questions about BLMIS's suspicious operations were frequent and numerous. Clients raised them. Potential clients raised them. Most importantly, independent consultants investigating or working for FGG raised them. These consultants brought signs of fraud at BLMIS to the FGG partners' attention, but the partners ignored the warnings, protected BLMIS from inquiry, and continued to reap vast wealth from the BLMIS fraud.").

Defendants rely on a line of decisions, which stand for the proposition that a financial professional would never knowingly invest in a Ponzi scheme. *In re Bernard L. Madoff Inv. Sec. LLC*, 548 B.R. 13, 32 (Bankr. S.D.N.Y. 2016) (the "*Legacy Capital*" case) ("While greed may cloud judgment, it is not plausible that the average financial professional owing fiduciary duties to its own clients and investors would knowingly invest their money in a Ponzi scheme that is doomed to collapse."); *see also Picard v. BNP Paribas S.A. (In re Bernard L. Madoff)*, 594 B.R. 197, 204 (Bankr. S.D.N.Y. 2018) (finding it "implausible" that defendants would invest "if they subjectively believed that there was a high probability that BLMIS was not actually trading securities"); *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re Fabrikant & Sons, Inc.)*, 480 B.R. 480 (S.D.N.Y. 2012) (dismissing allegations that banks would knowingly invest in a debtor they knew was "shuffling money around to meet short term obligations"), *aff'd*, 541 F. App'x 55 (2d Cir. 2013); *Picard v. ABN AMRO Bank (Ireland) Ltd. (In re BLMIS)*, Adv. Pro No. 10-05355 (SMB), 2020 WL 401822 (Bankr. S.D.N.Y. Jan. 23, 2020).  This is circular reasoning.  The Court cannot know what Defendants knew or how they might react to a situation without seeing what facts are borne out by the evidence.

The idea that a financial institution would never knowingly risk its own investments in a Ponzi scheme is belied by the fact that this case is before the Court.  At the time of Madoff's

arrest, BLMIS managed approximately $65 billion (mostly fictitious) funds.  *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 125 (Bankr. S.D.N.Y. 2014).  It would not have been disputed, in November 2008—prior to Madoff's admission that he was running a Ponzi scheme—that BLMIS was considered an "average financial professional owing fiduciary duties to its own clients and investors."  And yet, "[o]n March 12, 2009, Madoff pled guilty to an 11–count criminal indictment filed against him and admitted that he operated a Ponzi scheme through the investment advisory side of BLMIS."  *SIPC v. BLMIS (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 126 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011).  Things are not always as they seem.  And as such, this Court will not presume what some financial institution might do when it learned it was participating in a Ponzi scheme.  Nor will it presume that Defendants operated an "average financial institution."

The Court has read and considered the allegations made against these Defendants in this Complaint—and, based solely on the allegations contained therein, finds it plausible that the Defendants knowingly invested their money in a Ponzi scheme in order to enrich themselves, through fees and other means, at the expense of their investors.

## B.  Value

Whether the Defendants gave value is a question of fact to be resolved either at the summary judgment stage or at trial.  The "value" that a subsequent transferee must provide is "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value." *Legacy Capital*, 548 B.R. at 37 (citation omitted); *accord Enron Corp. v. Ave. Special Situations Fund II, L.P. (In re Enron Corp.)*, 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005). In addition, the "value" element under § 550(b)(1) looks to what the transferee gave up rather than what the transferor received.

The Defendants argue that they gave "value" by providing "investment management services for the Fairfield Funds" and/or for surrendering corresponding shares in the Fairfield Funds. What the Defendants did or did not do is not the concern of the Court at the motion to dismiss phase. This Court may only dismiss for failure to state a claim when an affirmative defense is apparent on the face of the complaint. *See BLMIS*, 594 B.R. at 206. That Defendants gave value is not apparent on the face of the Complaint. When read as a whole, the Complaint lays out a corporate organization completely devoid of any management and investment services. The Trustee asserts that the Defendants deferred to Madoff in all major decision making, including whether to form a U.S. based entity and what lies should be told to the SEC. ¶¶ 2, 9, 151 ("Madoff strongly influenced FG Bermuda's formation. Noel and Tucker initially planned for a U.S.-based FGG entity to serve in that role. Madoff objected because he feared that employing a U.S.-based entity would expose him to greater SEC scrutiny. Noel and Tucker capitulated and formed FG Bermuda to serve as investment adviser."), ¶ 241 ("FGG arranged a pre-call with Madoff . . . to ensure that Vijayvergiya and McKeefry would deliver a Madoff-sanctioned story.").

The Complaint states that "Fairfield Sentry ceded control of . . . its investment decisions . . . to BLMIS . . . with the understanding that [Sentry's custodian] would hold that position in name only, as custodial duties were contractually delegated to BLMIS." ¶ 91; *see also* ¶ 92 ("Responsibility for Fairfield Sentry's investment decisions was, likewise, delegated to BLMIS. Even so, Fairfield International Managers was listed as Fairfield Sentry's investment adviser, for which it was paid a 20% performance fee."). It is also alleged that a "sub-custodian agreement . . . authorized BLMIS to be in custody of all of Fairfield Sentry's BLMIS assets." ¶ 228.

As to whether the Defendants "gave value" in the form of surrendering shares in the Fairfield Funds, such a determination cannot be made as a matter of law or fact at this stage.

## C. DE FACTO PARTNERSHIP THEORY CURES THE LACK OF INDIVIDUALIZED PLEADING

Defendants argue that the Trustee should not be permitted to use a "de facto" partnership to cure a lack of individualized pleading. The Court has found the pleadings sufficient against all Defendants on an individualized basis except for Corina Noel Piedrahita.

The Trustee alleges that "FGG" was "founded in 1983 and is a de facto partnership or partnership by estoppel" with a principal place of business in New York. ¶ 11. FGG is allegedly comprised of all the named individual Defendants, among others. ¶ 11. The Trustee alleges that FGG maintained an office at 919 Third Avenue, New York, New York 10022. ¶ 11.

"Adequately alleging a partnership requires showing four elements: (1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners." *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403-04 (S.D.N.Y. 2010) (citing *Kidz Cloz, Inc. v. Officially for Kids. Inc*., 320 F. Supp. 2d 164, 171 (S.D.N.Y.2004)).

While federal courts refer to "elements" when determining whether a partnership exists, the New York Appellate Division, Second Department, has stated that a court should consider "a series of *factors*" to determine whether or not a partnership exists, including, but not limited to, "(1) sharing of profits, (2) sharing of losses, (3) ownership of partnership assets, (4) joint management and control, (5) joint liability to creditors, (6) intention of the parties, (7) compensation, (8) contribution of capital, and (9) loans to the organization." *Brodsky v. Stadlen*, 138 A.D.2d 662, 663 (N.Y. App. Div. 2d Dep't 1988) (emphasis added); *see also DeCristofaro*

*v. Nest Seekers E. End, LLC*, No. 35876–11, 2017 WL 350803, at *6 (N.Y. Sup Ct. Jan. 11,

2017) (same); *Hammond v. Smith*, No. 2008/02441, 2016 WL 1708522, at *3 (N.Y. Sup. Ct.

Apr. 22, 2016) ("No one factor is determinative; it is necessary to examine the parties'

relationship as a whole.") (quoting *Kyle v. Brenton*, 184 A.D.2d 1036, 1036 (N.Y. App. Div. 4th

Dep't 1992) (citing *Martin v. Peyton*, 246 N.Y. 213 (N.Y. Ct. App. 1927) (stating that to

determine if a partnership exists, facts should be weighed "in connection with all the rest"))).

"No one characteristic of a business relationship is determinative in finding the existence of a

partnership in fact." *Brodsky v. Stadlen*, 138 A.D.2d 662, 663 (N.Y. App. Div. 2d Dep't 1988).

The use of the term "factors," rather than "elements," by New York courts implies that a party

can prove the existence of a *de facto* partnership without meeting each of the "elements" and

underscores the need for the Court to allow this cause of action to proceed to discovery.

Similarly, a partnership by estoppel can be established by the showing that (1) there is "a

representation that the partnership exists" and (2) "that the injured party relied on this

representation to his or her detriment." *Ads Plus Advert., Inc. v. Ault*, 928 F. Supp. 2d 683, 692-

93 (W.D.N.Y. 2013) (cleaned up). "Partnership by estoppel should not be lightly invoked and

generally presents issues of fact." *First Am. Corp. v. Price Waterhouse LLP*, 988 F. Supp. 353,

358 (S.D.N.Y. 1997).

The Complaint plainly states:

The FGG partners: (i) shared, on a pro rata basis, the profits and losses realized by
the FGG entities; (ii) made pro rata contributions to the capital of FGG entities;
(iii) intended to carry on as co-owners of FGG with the common goal of earning a
profit; and (iv) participated in the management of entities within the FGG
enterprise. FGG's compensation structure was consolidated and its profits passed
through FG Bermuda and FG Limited before being distributed to the partners. As
a de facto partnership, the knowledge of all its members (i.e., the FGG partners
and FGG entities) is imputed among each other through the partnership itself, as
are the liabilities each FGG partner and entity incurred.

¶ 119. These allegations are not merely conclusory. The Complaint contains numerous allegations regarding the formation and operation of FGG. ¶¶ 11-20, 79-132. Noel and Tucker founded FGG and were allegedly members of "the Executive Committee in charge of FGG's day-to-day management." ¶ 101. They grew FGG by including family members and giving them a "stake" in the partnership. Piedrahita, a son-in-law to Noel, was allegedly named as the "third founding partner" of FGG and given a 33.3% share in FG Limited. ¶ 105. In exchange, Piedrahita courted new clients for FGG and maintained the current ones with dinners and events in New York. ¶ 107. He, along with Tucker, and Noel, managed and supervised FGG's efforts in Europe and Latin America. ¶ 108. FGG capitalized on Piedrahita's business and investment contacts and Piedrahita received a share of FGG's profits through his stake in FGG's business entities. ¶ 112.

Another of Noel's sons-in law, Toub, allegedly joined FGG in 1997 and "focused his business development activities on Brazil and the Middle East. He was an FGG partner and served on FGG's Executive Committee." ¶ 114.

Vijayvergiya was allegedly FGG's Chief Risk Officer and was provided a stake in FG Bermuda for his sales and the perception that he was monitoring the risk of the Fairfield investments. ¶ 147-149.

Corina Noel Piedrahita was allegedly FGG's Head of Client Services and Investor Relations. ¶ 121. She allegedly received her partnership distributions through Share Management, LLC, a company she established and operated as if it were her alter ego. ¶ 20.

Whether a *de facto* partnership or partnership by estoppel has been formed is a fact intensive inquiry requiring discovery. These allegations, along with those contained in the Complaint, are sufficient to survive a motion to dismiss.

Defendants argue that Federal Rule of Civil Procedure 9(b) does not permit "group pleading." While this is generally true, Defendants' argument fails for two reasons. The Trustee has set forth specific allegations against each Defendant, including Corina Noel Piedrahita. *See In re Drier LLP*, 452 B.R. 391, 408 (Bankr. S.D.N.Y. 2011) ("[G]roup pleading is generally forbidden because each defendant is entitled to know what he is accused of doing.") (citation omitted). Group pleading is permissible where, like here, the Complaint "informs each defendant of the nature of his or her alleged participation in the fraud." *Id.* (cleaned up). Even though the Complaint does not contain individualized allegations of Corina's actual knowledge or willful blindness, it sufficiently lays out her role in FGG and its alleged scheme to siphon fees from BLMIS's and FGG's clients via her corporate entity. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.").

In addition, "no specific connection" between the fraudulent behavior and particular defendants is necessary "where, as here, defendants are insiders or affiliates." *Id.* The Trustee has alleged that the individual Defendants were all insiders of FGG.

## D. THE GENERAL PARTNER LIABILITY CLAIMS AGAINST FG LIMITED AND FG BERMUDA ARE NOT PREEMPTED BY THE BANKRUPTCY CODE

Under counts fifteen, sixteen, and seventeen of the Complaint, the Trustee asserts general partner liability against FG Limited and FG Bermuda to hold them jointly and severally liable for GS's and GSP's obligations to the Trustee.[10] ¶ 395-406. Defendants argue that these claims are preempted by § 546(e) of the Bankruptcy Code. The Trustee disputes this and argues that the

---

[10] On April 17, 2012, the Bankruptcy Court entered consent judgments in favor of the Trustee against both GS and GSP in the respective amounts of $206,038,654 and $5,985,000. GS and GSP are insolvent and cannot satisfy their obligations to the Trustee.

claims are independent of the direct claims asserted against FG Limited and FG Bermuda, which arise under § 550(a)(2) of the Bankruptcy Code.

Absent express language in the statute, a federal law may preempt state law where the federal interest is "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" or a state law may be "preempted to the extent that it actually conflicts with federal law." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Deve. Comm'n*, 461 U.S. 190, 204 (1983). There is no conflict of law here and no preemption. Bankruptcy courts routinely hold general partners personally liable for avoidable transfers made to a partnership. *In re BLMIS, LLC*, 440 B.R. 243, 268-69 (Bankr. S.D.N.Y. 2010) (J. Lifland); *SIPC v. BLMIS, LLC*, 563 B.R. 737, 754 (Bankr. S.D.N.Y. 2017) (J. Bernstein) (holding same); *see also SIPC v. BLMIS, LLC*, __ F. Supp. 3d __, 2021 WL 1112342, at *18 (S.D.N.Y. Mar. 24, 2021) (collecting cases holding same).

In their reply brief, the Defendants argue that the Trustee is seeking a double recovery by seeking a judgment against FG Limited and FG Bermuda for the same transfers that he has already recovered from GS and GSP. "The Trustee may recover avoided transfers from an initial transferee or a subsequent transferee and need not seek recovery first from the initial transferee." *SIPC v. BLMIS, LLC*, 563 B.R. 737, 753 (Bankr. S.D.N.Y. 2017). And the Trustee is limited by § 550(d) to "only a single satisfaction" of an avoided transfer. 11 U.S.C. § 550(d). Whether the Trustee has been fully satisfied is an issue to be determined at a later stage of this litigation.

## E. THE SAC'S NEW CLAIMS AGAINST FIFL AND STABLE RELATE BACK

On August 20, 2020, Defendants move to dismiss, as time barred under § 550(f), the Trustee's subsequent transfer claims against Fairfield Investment Fund Limited[11] ("Fairfield

---

[11] Count one.

Investment Fund") and Stable Fund L.P.[12] ("Stable Fund"), in the total amount of $62 million,

which were not pled in the first amended complaint.  The Court granted an order permitting the

Trustee to file this (second amended) Complaint on August 20, 2020.  Under Rule 15 of the

Federal Rules of Civil Procedure, "an amendment to a pleading relates back to the date of the

original pleading when the amendment asserts a claim or defense that arose out of the conduct,

transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R.

Civ. P. 15(c)(1)(B).  "The purpose of Rule 15 is to provide maximum opportunity for each claim

to be decided on its merits rather than on procedural technicalities."  *Siegel v. Converters

Transp., Inc.*, 714 F.2d 213, 217 (2d Cir. 1983) (cleaned up).  To the extent that the Trustee's

claims relate back to the original pleading, it is not time barred.

      The primary consideration in determining whether the proposed amendment to the

Complaint should relate back is whether the Complaint put the defendant on notice that

additional transfers may be pursued at a later date.  *In re 360networks (USA) Inc.*, 367 B.R. 428,

433 (Bankr. S.D.N.Y. 2007).  This is an objective standard.  The Court of Appeals for the

Second Circuit has stated that "the central inquiry is whether adequate notice of the matters

raised in the amended pleading has been given to the opposing party within the statute of

limitations by the general fact situation alleged in the original pleading."  *Id.*

      Fairfield Investment Fund and the Stable Fund were named as Defendants in the

Amended Complaint, which was filed with the Court on August 12, 2010 ("2010 Complaint.").

ECF No., 23.  Each was defined as an "FGG Affiliate." 2010 Compl. ¶ 79, ¶ 112.  The 2010

Complaint states

> The money transferred from BLMIS to the Feeder Funds was subsequently
> transferred by the Feeder Funds to the FGG Affiliates . . . . These payments from
> the Feeder Funds constitute subsequent transfers of the Initial Transfers from

---

[12] Count two.

> BLMIS to the Feeder Funds. Because the FGG Affiliates . . . did not take the
> funds in good faith or without knowledge of the voidability of the initial transfers,
> all transfers from BLMIS to the Feeder Funds, which the Feeder Funds
> subsequently transferred, either directly or indirectly, to the FGG Affiliates . . .
> (the "Subsequent Transfers"), were and remain Customer Property subject to
> turnover to the Trustee and/or are avoidable and recoverable by the Trustee.

2010 Compl. ¶ 543.  The 2010 Complaint asserts counts one, four, seven, ten, thirteen,

nineteen, twenty-two, twenty-five, and twenty-seven against the Fairfield Investment Fund and

the Stable Fund.  2010 Compl. at ¶¶ 160, 164, 168, 172, 177, 183, 187, 191, 194.

The 2010 Complaint was filed before the entry of a consent judgments against GS, GSP,

and Sentry, which were all entered in 2011.  Since the statute of limitations set forth in § 550 had

not begun to run when the 2010 Complaint was filed, the causes of action in that pleading are

timely.  *See SIPC v. BLMIS*, 501 B.R. 26, 37 (S.D.N.Y. 2013) (citing and quoting *In re Maxim

Truck Co., Inc.*, 415 B.R. 346, 353 (Bankr. S.D. Ind. 2009) for the premise that a trustee is

permitted "to add a defendant as a subsequent transferee when the period of time to initiate an

action under § 550 for recovery of an avoided transfer has not yet even been triggered, let alone

expired, against any of the Defendants.").

Defendants had over 10 years notice that they would be asked to account for these

transfers.  As has previously been stated by this Court,

> the Trustee is an outsider to these transactions and will need discovery to identify
> the specific subsequent transfers by date, amount and the manner in which they
> were effected.  The Moving Defendants are a group of interrelated individuals and
> entities . . . .  Whether they additionally received Subsequent Transfers of BLMIS
> funds from one another is a question to which they, and they alone, have the
> requisite information to respond.

*In re BLMIS, LLC*, 445 B.R. 206, 236 (Bankr. S.D.N.Y. 2011).  The Defendants were adequately

appraised that the Trustee intended to collect "all" subsequent transfers that they received.

Counts one and two "relate back" and are properly brought.

## F. THE COURT HAS PERSONAL JURISDICTION OVER MESSRS. VIJAYVERGIYA AND PIEDRAHITA

To survive a motion to dismiss for lack of personal jurisdiction, the burden is on the plaintiff to show a *prima facie* case that personal jurisdiction exists.[13] *Dorchester Fin. Sec., v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). The due process analysis is a two-step inquiry that focuses on (1) minimum contacts and (2) whether jurisdiction will be reasonable. *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945).

There are two way to satisfy minimum contacts. One can prove either specific jurisdiction or general jurisdiction.[14] *Cromer Fin. v. Berger*, 137 F. Supp. 2d 452, 473 (S.D.N.Y. 2001). Specific jurisdiction exists when the defendant "purposefully direct[s] his activities at residents of the forum" and the underlying cause of action "arises out of or relates to those activities." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73, (1985)). The "purposeful availment" prong is satisfied when the defendant's contacts with the forum state "proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum state." *Burger King*, 471 U.S. at 475. This ensures that the defendant will not be subject to jurisdiction due to "random, fortuitous, or attenuated contacts." *Id.* The "arises out of or relates to those activities" prong may be satisfied when "defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019).

---

[13] This Court has previously held that it has personal jurisdiction over Vijayvergiya and Piedrahita based on the same conduct alleged in this Complaint. *See In re Fairfield Sentry Ltd.*, 627 B.R. 546, 565 (Bankr. S.D.N.Y. 2021).

[14] General jurisdiction "is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." Here, the Trustee's suit is related to the contacts Defendants allegedly have with the forum; the assertion of general jurisdiction is not necessary here. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d. 1996).

After the "minimum contacts" analysis, courts determine whether those contacts "may be

considered in light of other factors to determine whether the assertion of personal jurisdiction

would comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471

U.S. 462, 476 (1985) (internal quotation marks omitted). The "reasonableness" factors include

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2)
> the interests of the forum state in adjudicating the case; (3) the plaintiff's interest
> in obtaining convenient and effective relief; (4) the interstate judicial system's
> interest in obtaining the most efficient resolution of the controversy; and (5) the
> shared interest of the states in furthering substantive social policies.

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). When

purposeful availment has been satisfied, the burden shifts to the defendant to present a

"compelling case" that jurisdiction would be unreasonable under the circumstances. *Burger*

*King Corp., v. Rudzewicz*, 471 U.S. 462, 472-73 (1985).

**i. The Court Has Personal Jurisdiction Over Vijayvergiya**

Vijayvergiya is a citizen of Canada who conducts business in New York. ¶ 24. He is

alleged to have been the Vice President and Risk Manager of FG Bermuda. ¶ 147. FG Bermuda

was wholly owned by the New York based FG Limited. ¶ 150. Its financial transactions had to

be approved by FGG's New York based executives and all FG Bermuda employees reported

directly to FGG personnel in New York. ¶ 150. FG Bermuda's files were maintained in New

York. ¶ 150. FG Bermuda registered as an investment advisor under the Investment Advisors

Act of 1940. ¶ 260.

Vijayvergiya is alleged to be an agent of FG Advisors, a Delaware limited–liability

company that is registered to do business in New York and has its principal place of business in

New York. ¶¶ 15, 125. He is also alleged to be a partner of FGG, a New York based *de facto*

partnership, and FGG's Chief Risk Officer. ¶ 149.

Vijayvergiya allegedly visited BLMIS's New York offices once or twice a year.  ¶ 110.

He allegedly lied to the SEC during its investigation of Madoff.  ¶ 153.  He allegedly used a

".com" FGG email account, which referenced "U.S.".[15]  ¶ 161.  He was an alleged conduit

between FGG and BLMIS.  ¶ 162.  As part of his employment, he moved cash into and out of

investment accounts at BLMIS.  ¶ 163.

As was addressed earlier, the Complaint is replete with allegations that Vijayvergiya

mislead investors about the safety of their investment in BLMIS,[16] assisted BLMIS in covering

up its fraud, and profited from the fraud.  ¶ 333.  The Trustee has satisfied his *prima facie* burden

of demonstrating that personal jurisdiction exists over Vijayvergiya.

Exercising this jurisdiction is reasonable.  The forum has a substantial interest in applying

the subsequent transfer provisions of the Bankruptcy Code which are incorporated through SIPA.

*Maxam*, 460 B.R. at 119; *Cohmad*, 418 B.R. at 81.  BLMIS was a broker dealer.  SIPA reflects

an overriding federal policy "to protect investors against financial losses arising from their

broker's insolvency and protect the securities markets as a whole."  *Sec. Inv'r Prot. Corp. v.*

*BLMIS (In re BLMIS)*, 522 B.R. 41, 50 (Bankr. S.D.N.Y.2014) (citing *In re BLMIS*, 654 F.3d at

235, 239).

The Trustee has a significant interest in litigating in this Court.  The Trustee has

commenced roughly 1,000 other adversary proceedings in this Court.  *See Picard v. Maxam*, 460

B.R. at 119 (citation omitted).  This Court, the District Court and the Second Circuit Court of

Appeals have issued numerous decisions establishing the legal framework for deciding this and

similar adversary proceedings.  Litigating this adversary proceeding in this Court will result in

the "the most efficient resolution" of this dispute, and ultimately, the SIPA liquidation, and

---

[15] amit@fggus.com

[16] BLMIS is a New York limited–liability company with a principal place of business in New York City. ¶ 27.

promote consistency in the resolution of the many similar disputes pending in this Court.  *Picard v. Estate of Igoin, (In re Bernard L. Madoff Inv. Sec. LLC)*, 525 B.R. 871, 890 (Bankr. S.D.N.Y. 2015) ("[T]he Trustee's choice of forum is entitled to substantial deference.  He sued in his 'home court' where the BLMIS SIPA proceeding is pending, where he was appointed, where he and his counsel work and where he has commenced roughly 1,000 similar adversary proceedings.  His selection of this forum did not involve forum shopping; it reflected business as usual.").

## ii. The Court Has Personal Jurisdiction Over Piedrahita

The Trustee has alleged that Piedrahita is a partner in FGG.  ¶ 102.  Prior to joining FGG, Piedrahita ran a New York based investment management firm, which he allegedly combined with FGG upon joining.  ¶¶ 103-04.  He owned 66.7% of FG Limited, a company registered to do business in New York with its executive offices in New York.  ¶ 105.  Piedrahita was the director and chief executive officer of FG Bermuda.  He allegedly maintained an office in FGG's New York headquarters. ¶ 106.  He met regularly with Madoff and hosted clients in New York. ¶ 107.  He signed client communications using a New York address block.  ¶ 107.  He maintained residences with his wife in New York.  ¶ 112.

As is addressed above, the Complaint is replete with allegations of Piedrahita's knowledge of and participation in BLMIS's fraud in order to personally gain.  ¶ 333.  The Trustee has met his *prima facia* burden of establishing personal jurisdiction over Piedrahita and for the reasons expressed above, the exercise of this jurisdiction is reasonable.

## G. THE TRUSTEE IS PERMITTED TO MAKE A MOTION TO AMEND

The Defendants argue that the Trustee should not be permitted to re-plead in order to meet his pleading burden.  The Court sees no reason to allow the Trustee to amend his Complaint

to add details regarding Corina Noel Piedrahita's actual knowledge or willful blindness at this time.  However, the Court will not bar the Trustee from his right to bring a motion to amend the Complaint in the future.  Rule 15 places no time bar on making motions to amend pleadings and permits the amending of pleadings "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Amendments are also permitted during and after trial in certain circumstances.  Fed. R. Civ. P. 15(b)(1) ("If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended."); (b)(2) ("A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.").

The Court finds that the Complaint is sufficient on its face as to every cause of action, except for the individual claims asserted against Corina Noel Piedrahita.  All causes of action against Corina Noel Piedrahita, individually, are dismissed, without prejudice.  The Trustee may proceed against her as a partner of FGG.  The Trustee is also free to make a motion to amend the Complaint, pursuant to Rule 15, if he so chooses.

## IV. Conclusion

For the foregoing reasons, the motion to dismiss is denied except as to individual claims asserted against Corina Noel Piedrahita.  The Trustee shall submit a proposed order within fourteen days of the issuance of this decision, directly to chambers (via E-Orders), upon not less than two days' notice to all parties, as required by Local Bankruptcy Rule 9074-1(a).



**Dated: August 6, 2021**
**Poughkeepsie, New York**

/s/ Cecelia G. Morris
_____
**Hon. Cecelia G. Morris**
**Chief U.S. Bankruptcy Judge**
Page **30** of **30**