**CHAITMAN LLP**
Helen Davis Chaitman
hchaitman@chaitmanllp.com
465 Park Avenue
New York, New York 10022
Phone & Fax: 888-759-1114

*Attorneys for Defendants The Gerald and Barbara Keller Family Trust and Gerald E. Keller, in his capacity as Trustee of the Gerald and Barbara Keller Family Trust,*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>            Plaintiff-Applicant,<br><br>      v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>            Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br><br>            Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC<br><br>          Plaintiff,<br><br>      v.<br><br>THE GERALD AND BARBARA KELLER FAMILY TRUST and GERALD E. KELLER, in his capacity as Trustee of the Gerald and Barbara Keller Family Trust, Defendants. | Adv. Pro. No. 10-04539 (CGM) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION**
**TO TRUSTEE'S MOTION FOR SUMMARY JUDGMENT & IN SUPPORT OF**
**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... ii

STATEMENT OF THE CASE.................................................................................................. 3

    Gerald Keller, Trustee Never Had Possession of, and Never Cashed, a Single
    Withdrawal Check ...................................................................................................... 4

    The JPMC Accounts ................................................................................................... 5

    The Keller Trust Account ........................................................................................... 6

    The *RAR* Decision...................................................................................................... 8

    Form BD ...................................................................................................................... 9

ARGUMENT .......................................................................................................................... 10

    I.     THE TRUSTEE HAS SUED THE WRONG PARTIES............................................ 10

         A.     The Trustee Has Forfeited His Claim against Barbara Keller ....................... 10

         B.     The Keller Trust Was a Mere Conduit, Not a Transferee, and
              Cannot Be Liable to the Trustee ................................................................... 11

    II.    THE LAW OF THE CASE DOCTRINE SHOULD NOT APPLY .......................... 15

    III.    THE TRUSTEE HAS NOT PROVEN A TRANSFER OF
         PROPERTY OF THE LLC.................................................................................... 16

         A.     The JPMC Accounts Were Never Transferred to the LLC............................ 16

         B.     The Content of Form BD Is Inadmissible...................................................... 22

         C.     Even if Form BD Is Admissible, It Proves that Madoff Did Not
              Transfer the JPMC Accounts to the LLC ...................................................... 25

         D.     The Trustee's Remaining Arguments Are Hopeless ...................................... 27

    IV.    THE COURT SHOULD FOLLOW *AVELLINO* AND REJECT THE
         TRUSTEE'S "CUSTOMER PROPERTY" ARGUMENT ....................................... 27

    V.    THE TRUSTEE IS NOT ENTITLED TO PREJUDGMENT
         INTEREST.............................................................................................................. 31

CONCLUSION........................................................................................................................ 35

i

## TABLE OF AUTHORITIES

**Cases**

*In re A.W. Lawrence & Co.*,
   346 B.R. 51 (N.D.N.Y. 2006) ........................................................................13

*In re Ames Dept. Stores, Inc.*,
   274 B.R. 600 (Bankr. S.D.N.Y. 2002) ..........................................................19

*In re Bauman*,
   535 B.R. 289 (Bankr. C.D. Ill. 2015) ............................................................29

*Bellamy v. City of New York*,
   914 F.3d 727 (2d Cir. 2019)...........................................................................22

*In re Bernard L. Madoff Inv. Sec. LLC*,
   654 B.R. 229 (2d Cir. 2011).....................................................................33, 34

*In re Bernard L. Madoff Inv. Sec. LLC*,
   779 F.3d 74 (2d Cir. 2015).............................................................................34

*Board of County Comm'rs of the County of Jackson v. United States*,
   308 U.S. 343 (1939)........................................................................................32

*Bodenstein v. Univ. of N. Iowa (In re Peregrine Fin. Grp, Inc.)*,
   589 B.R. 360 (Bankr. N.D. Ill. 2018) .......................................................13, 14

*In re Bullion Res. of N. Am.*,
   922 F2d 544 (9th Cir. 1991) ..........................................................................14

*Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*,
   567 F.3d 1291 (11th Cir. 2009) .....................................................................32

*Christy v. Alexander & Alexander (In re Finley, Kumble, Wagner, Heine,
   Underberg, Manley, Myerson & Casey)*,
   130 F.3d 52 (2d Cir. 1997)........................................................................12, 13

*City of New York v. Venkataram*,
   2011 WL 2899092 (S.D.N.Y. July 13, 2011) ...............................................19

*Creator's Way Associated Labels, Inc. v. Mitchell (In re Mitchell)*,
   249 B.R. 55 (Bankr. S.D.N.Y. 2000)..............................................................21

*In re Deltacorp, Inc.*,
   179 B.R. 773 (Bankr. S.D.N.Y. 1995).............................................................30

*Grayson Consulting, Inc. v. Wachovia Securities, LLC (In re Derivium Capital
   LLC)*,
   716 F.3d 355 (4th Cir. 2013) .........................................................................12

*In re Int'l Pharmacy & Disc. II, Inc.*,
    443 F.3d 767 (11th Cir. 2005) ................................................................19

*Kopler v Jubbert*,
    986 F. 3d 147 (2d Cir. 2021).................................................................11

*Kramer v. Mahia (In re Khan)*,
    2016 WL 6652724 (E.D.N.Y. Nov. 10, 2016).........................................32

*LaBarre v. Werner Enters.*,
    2015 U.S. Dist. LEXIS 162598 (N.D.N.Y. Dec. 4, 2015).......................24

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*,
    2012 U.S. Dist. LEXIS 18503 (S.D.N.Y. Feb. 14, 2012).......................24

*Mecca v. Gibraltar Corp. of Am.*,
    746 F. Supp. 338 (S.D.N.Y. 1990)..........................................................32

*In re Murray Industries, Inc.*,
    125 B.R. 314 (Bankr. M.D. Fla. 1991) ..................................................29

*Nordberg v, Societe Generale (In re Chase & Sanborn Corp.)*,
    848 F.2d 1196 (11th Cir. 1988) ............................................................13

*Paige v. Faure*,
    229 N.Y. 114 (1920) ..............................................................................21

*Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016), *reconsideration denied*, 2016 WL
    6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) ................................... *passim*

*Picard v. Cohen (In re BLMIS)*,
    No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016) ........................34

*Picard v. HSBC Bank PLC*,
    454 B.R. 25 (S.D.N.Y. 2011)..................................................................28

*Picard v. Ida Fishman Revocable Trust (In re BLMIS)*,
    773 F.3d 411 (2d Cir. 2014), *cert. denied* 135 S. Ct. 2859 (June 22, 2015)......................7, 33

*Picard v. JABA Assoc. LP*,
    2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021) ..................................2, 9

*Picard v. Legacy Capital, Ltd.*,
    603 B.R. 682 (Bankr. S.D.N.Y. 2019) ...................................................15

*Picard v. Lowrey (In re BLMIS)*,
    Nos. 10-04387, 10-04488, 10-04350, 10-05110 (SMB), 2018 WL 1442312
    (Bankr. S.D.N.Y. Mar. 26, 2018)...........................................................34

*Picard v. Mann*,
608 B.R. 165 (Bankr. S.D.N.Y. 2019) ...................................................................................15

*Picard v. Mendelow*,
560 B.R. 208 (Bankr. S.D.N.Y 2016) ....................................................................................29

*Picard v. Nissenbaum*,
2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) ........................................................................2

*Picard v. RAR Entrepreneurial Fund, LLC*,
2021 WL 827195 (S.D.N.Y. Mar. 3, 2021) .................................................................. *passim*

*Redfield v. Bartels*,
139 U.S. 694 (1891) ..............................................................................................................33

*Sarachek v. Wahls (In re Agriprocessors, Inc.)*,
490 B.R. 374 (Bankr. N.D. Iowa 2013) ................................................................................13

*Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*,
234 B.R. 293 (Bankr. S.D.N.Y. 1999) ..................................................................................12

*Unicorn Tales Inc v Banjeree*,
138 F3d 467 (2d Cir. 1998)...................................................................................................11

*Ward v. GM LLC (In re GM LLC Ignition Switch Litig.)*,
2017 U.S. Dist. LEXIS 103890 (S.D.N.Y. July 5, 2017) ................................................19, 23

*Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,
AFL-CIO*,
955 F.2d 831 (2d Cir. 1992)............................................................................................32, 33

**Statutes**

11 U.S.C. § 546(e) .......................................................................................................................7

11 U.S.C. § 548............................................................................................................................32

11 U.S.C. § 548(a)(1)(A) .......................................................................................................16, 33

11 U.S.C. § 550............................................................................................................................32

11 U.S.C.§ 550(a)......................................................................................................................2, 12

15 U.S.C. § 78lll(4)........................................................................................................................3

15 U.S.C. § 80a–51, et seq. ........................................................................................................25

28 U.S.C. § 1961 ....................................................................................................................31, 33

Investment Company Act of 1940 ..............................................................................................25

**Other Authorities**

17 CFR § 240.15c3-3 ..................................................................................28

Fed. R. Civ. P. 25(a) ........................................................................1, 10, 11

Fed. R. Civ. P. 26 ..............................................................................19, 23

Fed. R. Civ. P. 26(a)(2)(B) ..........................................................................19

Fed. R. Civ. P. 37(c)(1) ..........................................................................19, 24

Fed. R. Civ. P. 56(c)(2)(e) ..........................................................................22

Fed. R. Civ. P. 56(g) ..................................................................................21

Fed. R. Evid. 703 ......................................................................................23

https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents
/file/sipcmemorandum121211.pdf ....................................................................28

*https://www.fincen.gov/resources/fincens-mandate-congress* ..........................................16

The Gerald and Barbara Keller Family Trust (the "Keller Trust") and Gerald Keller, in his capacity as Trustee of the Keller Family Trust ("Defendants") submit this memorandum in opposition to the motion for summary judgment filed by Plaintiff, Irving H. Picard, as trustee ("Trustee") for Bernard L. Madoff Investment Securities LLC (the "LLC"), and in support of their cross-motion for summary judgment on the Trustee's claim to avoid and recover $1,896,148 of funds in excess of principal allegedly transferred by the LLC to Defendants in the two years prior to the LLC's bankruptcy filing.  Defendants rely upon their accompanying response to the Trustee's statement of material facts ("RMF"), their counterstatement of material facts ("CMF"), the Declaration of Gerald Keller, ("Keller Decl.") and the Declaration of Helen Chaitman ("Chaitman Decl.") and the exhibits thereto.

The Trustee's motion is riddled with procedural errors and substantive deficiencies. Procedurally, Gerald and Barbara Keller were dismissed in their individual capacity by Judge Bernstein in 2015.  See Order, ECF No. 39.  Barbara Keller died in June 2019; the Trustee was notified of her death on June 5, 2019; and the Trustee never amended the complaint to name Barbara Keller's estate as required by Fed. R. Civ. P. 25(a).  Thus, the Trustee's claim against Barbara Keller has been forfeited.

Further, the Trustee has sued the wrong party.  As the Trustee's own documents prove, the Keller Trust never cashed a single check from Madoff.  Instead, the Keller Trust was a mere conduit in payments that went from Madoff to Keller International Publishing Company ("Keller Publishing").  Pursuant to an agreement Gerald Keller made with Keller Publishing,  Keller withdrew funds from the Trust's Madoff account whenever Keller Publishing needed a loan. Every check from Bernard L. Madoff  was mailed to Gerald Keller at Keller Publishing and endorsed by Marianne Jannace, an employee of Keller Publishing, and deposited into the bank

account of Keller Publishing.  The Keller Trust did not even have a bank account.  Thus, "Gerald Keller, Trustee" was not a transferee within the meaning of 11 U.S.C.§ 550(a) of the Bankruptcy Code.  See Keller Decl.  Instead, Gerald Keller was a mere conduit.  The Keller Trust cannot be liable under Section 550(a).  The Trustee's recourse was against the initial transferee, Keller Publishing, which inexplicably the Trustee failed to sue.

Substantively, although the Trustee's motion covers a broad array of issues, this Court should be guided by Judge Furman's March 3, 2021 decision in *Picard v. RAR Entrepreneurial Fund, LLC*, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021) (the "*RAR* Decision").  There, on virtually identical facts, Judge Furman held that the defendant was entitled to a jury trial on the issue of whether the funds paid to the defendant were the property of the LLC, or were the property of Mr. Madoff and/or of his Sole Proprietorship, Bernard L. Madoff Investment Securities (together "Madoff"), in which event the Complaint would fail to state a claim.[1]  The issue is seminal.  As the Bankruptcy Court twice held, in decisions the Trustee did not seek to appeal, the Trustee has standing to recover transfers by the LLC but only Madoff's individual trustee has standing to recover transfers by Madoff.  *Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*, 557 B.R. 89, 110 (Bankr. S.D.N.Y. 2016) ("[o]nly the Madoff trustee, [Alan Nisselson], can recover actual transfers by the sole proprietorship") ("*Avellino*"), *reconsideration denied*, 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) ("*Avellino II*").

In two near-identical March 24, 2021 decisions, Judge Koeltl declined to follow the *RAR* Decision and granted summary judgment to the Trustee.  *Picard v. JABA Assoc. LP*, 2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021) ("*JABA*"); *Picard v. Nissenbaum*, 2021 WL 1141638

---

[1]  The jury trial in *Picard v. RAR*, S.D.N.Y Case No. 20-cv-1029 (JMF) ("*RAR*") is expected to occur in the fall of 2021.

(S.D.N.Y. Mar. 24, 2021) ("*Nissenbaum*").   Judge Koeltl's analysis and reasoning cannot withstand scrutiny.   He relied, primarily, upon a document that Judge Furman since held is inadmissible hearsay.   Moreover, the fact that, within the span of 21 days, two Southern District Court judges came to completely different determinations on identical summary judgment motions based on identical facts and law proves, at a minimum, that summary judgment was inappropriate and that both cases must be resolved by a trial.

There is one more fact the Court should be aware of at the outset: all of the 1099 tax forms sent by Madoff to the Keller Trust were in the name of Madoff individually.   Although the LLC filed 1099's for its customers, it was Madoff who filed 1099's for customers of the Sole Proprietorship.   Compare Chaitman Decl. **Ex. M** with Keller Decl. Ex. 3.   The fact that it was Madoff, not the LLC, that issued 1099's to his investment advisory customers proves that Defendants were not recipients of a transfer from the LLC.   The Trustee is estopped from arguing otherwise.

## STATEMENT OF THE CASE

For purposes of this motion, we focus on the following four arguments:

(1)  The Trustee has sued the wrong defendants.   His claim, if he had one, was against Keller Publishing only.

(2)  The Trustee lacks Article III standing to sue at all since the funds transferred to Keller Publishing belonged to Madoff and not to the LLC.

(3)  The plain language of § 78lll(4) of the Securities Investor Protection Act ("SIPA") bars the Trustee from recovering property transferred by a non-debtor.

(4)  The award to the Trustee of prejudgment interest at 4% is unjustifiable.

**Gerald Keller, Trustee Never Had Possession of, and Never Cashed,
a Single Withdrawal Check**

The transfers that the Trustee seeks to avoid were represented by checks sent by Bernard

L. Madoff to Gerald Keller at Keller Publishing, payable to "Gerald Keller, Trustee." Every single

check was endorsed by Marianne Jannace, an employee of Keller Publishing, and deposited into

the bank account of Keller Publishing. Keller Decl. ¶¶4-13. The Trustee concedes this. See

Trustee's Statement of material Facts ("SMF") ¶¶ 122-123.

The Trustee's expert Lisa Collura, claims to have traced 100% of the total amount of 13

cash withdrawals of $2,125,000 reflected on the customer statements for the Keller Family Trust

Account during the Two-Year Period to two bank accounts—one held by Keller International

Publishing LLC and one held by Keller International Publishing Corp., effectively not crediting

Keller International Publishing with all withdrawal transactions. See (Expert Report of Lisa M.

Collura, CPA, CFE, CFF, dated June 25, 2019 ("Collura Keller Family Trust Report") Exs. 5–6.

This is misleading. The correct amount of total withdrawals is $4,795,000. However, the amount

of withdrawals in excess of principal for the relevant two year period is only $1,896,148.

The checks, endorsed by Ms. Jannace and deposited in the Keller Publishing accounts,

were drawn on the "509 Account" at JPMorgan Chase Bank, N.A. ("JPMC"). The 509 Account

was owned by Madoff from the 1980's through December 2008. For the entire time period

following January 2001 – when Madoff formed the LLC to operate the legitimate trading

businesses managed by his sons – the documentary evidence is irrefutable that Madoff continued

to operate his investment advisory business (the "IA Business") through his Sole Proprietorship,

whose bank accounts remained at JPMC.

The Trustee concedes that Madoff used the trade name of the Sole Proprietorship from at

least 1970. Trustee's Memorandum of Law, ECF No. 100 ("T. Br.") at 21. Through 2000, the

Sole Proprietorship consisted of two businesses: (1) a legitimate trading business (the "LTB"), which employed approximately 180 people and consisted of proprietary trading ("PT"), *i.e.* trading securities for its own account, and market-making ("MM"), which created a market in certain securities and acted as a broker-dealer for those securities, servicing all of the world's major securities firms (CMF ¶1); and (2) the IA Business, which employed approximately five people and provided investment advisory services to its customers. The Trustee has conceded that the PT and MM Businesses were legitimate businesses. CMF ¶6. The IA Business was the business through which Madoff perpetrated his fraud. CMF ¶¶ 1-7.

In January 2001, Madoff formed the LLC and transferred to it the LTB which was managed by his sons. CMF ¶9. Madoff wrote letters to the SEC, the Depository Trust Company (the "DTC"), the Bank of New York ("BNY") which serviced the LTB, and others, that the LTB would operate through the LLC. CMF ¶10. The LTB operated on the 18th and 19th floors of the Lipstick Building in Manhattan. However, Madoff never transferred the IA Business to the LTB. Instead, he continued to operate the IA Business as his Sole Proprietorship on the 17th floor of the Lipstick Building. CMF ¶¶5, 1-7. Although the LTB maintained its bank accounts with BNY, Madoff maintained the IA Business' accounts at JPMC, whose records contain no evidence that Madoff ever transferred those accounts to the LLC or even notified JPMC of the formation of the LLC. CMF ¶¶5, 10.

## The JPMC Accounts

The funds of all IA customers were deposited into the JPMC "703 Account" and all checks written to customers of the IA Business were written from the JPMC "509 Account" (together, the "JPMC Accounts") CMF ¶ 18, 37. Through August 2002, the 703 Account statements indicated that the account was held in the name of "Bernard L. Madoff." CMF ¶ 22. From September 2002 on, the 703 Account statements indicated the customer as Bernard L. Madoff Investment

Securities, the trade name Madoff had used for his Sole Proprietorship since the 1970's. *Id.* All customer deposits were placed into the 703 Account and, until the date Madoff confessed, the endorsement stamp for the 703 Account read: "For deposit only; Bernard L. Madoff." CMF ¶23. There is not a single JPMC document indicating that the 703 Account was ever owned by the LLC.

Similarly, the name on the 509 Account was changed in September 2002, from Madoff individually to Bernard L. Madoff Investment Securities, without the LLC designation, although the checks drawn on that account simply bore the name of Bernard L. Madoff. CMF ¶29, 30. All checks written to the Keller Trust had "Bernard L. Madoff" printed on the top. CMF ¶38. Defendants never received funds from an account owned by the LLC. CMF ¶38.

The Trustee admits that he has no documentary evidence that the 509 Account was ever owned by the LLC. CMF ¶11. There is incontrovertible evidence that both the 509 Account and the 703 Account were always owned by Madoff individually. *See e.g.* CMF ¶¶20-31. The Trustee's experts admitted they never saw a bank statement for either of the JPMC Accounts in the name of the LLC. CMF ¶28.

### The Keller Trust Account

Gerald Keller opened an investment account with Bernard L. Madoff on January 21, 1997. Keller signed an agreement for Madoff to be his investment adviser. He never signed an agreement with the LLC, which, of course, was not formed until January 2001. Keller Decl. ¶ 1. In August 1999 he asked that the account name be changed to:

> Gerald E. Keller, Trustee
> (Gerald E. Keller Separate Property)
> The Gerald and Barbara Keller Family Trust U/A June 2, 1998

*Id.* ¶ 2.

The Keller Trust never had a bank account. *Id.* ¶ 13. All withdrawal checks from Madoff were deposited into the bank account of Keller Publishing. The Madoff account was used only to

fund the business operations of Keller Publishing.  *Id.* ¶¶ 10-13.  Pursuant to an oral agreement

with the Chief Financial Officer of Keller Publishing, Irwin Levine, Mr. Keller would only request

withdrawals from the Madoff account when Keller Publishing needed working capital.  Every

single request for a withdrawal was sent by Gerald, not as Trustee but as an individual, with the

address of Keller Publishing.  *Id.*  The withdrawal checks were sent to:

> Gerald Keller
> Keller International Publishing Corp.
> 150 Great Neck Road, Room 400
> Great Neck, NY 11021.

*Id.* ¶¶ 4 - 10.

The checks were payable to Gerald Keller, Trustee, endorsed "Gerald Keller" by Marianne

Jannace, an employee of Keller Publishing, and deposited into the bank account of Keller

Publishing.  They were never used for the benefit of the Trust, only for Keller Publishing.  *Id.* ¶¶

7 – 10.

The Keller Trust was listed by the Trustee as a good faith customer of Madoff.  See ECF

No. 71 at 16 n.48; ECF No. 71-1 at 2 (#48).  The Second Circuit limited the Trustee's claims

against good faith customers to those seeking to recover withdrawals in the last two years before

Madoff's confession,  pursuant to 11 U.S.C. § 546(e).  *See Picard v. Ida Fishman Revocable Trust

(In re BLMIS)*, 773 F.3d 411, 423 (2d Cir. 2014), *cert. denied* 135 S. Ct. 2859 (June 22, 2015).

The Complaint seeks recovery of $1,896,148 in withdrawals that the Keller Trust allegedly

received in the two-year period prior to Madoff's confession.  However, the Keller Trust received

no payments from the LLC for the entire life of the account.

Barbara Keller died in June 2019.  Notice of her death was given to the Trustee on June 5,

2019. See Chaitman Dec. Ex AF.  The Trustee never amended the complaint to name Mrs. Keller's

estate as a defendant.

**The *RAR* Decision**

In the *RAR* Decision, Judge Furman, denied the Trustee's motion for summary judgment on the issue of whether the LLC or the Sole Proprietorship owned the JPMC Accounts from which funds were transferred to defendant and set the matter down for a jury trial. Reviewing the same evidence, law, and claims as are present in this case, Judge Furman held that summary judgment was inappropriate and the issue had to be resolved by a jury.

Judge Furman held that a rational jury could find that Madoff did not transfer the JPMC Accounts to the LLC after the LLC was formed in 2001, based, *inter alia*, on the following evidence – all of which is before this Court:

(a) Madoff did **not** indicate on Form BD (defined below) filed with the SEC in 2001, that the LLC was going to be engaged in the business of "investment advisory services."

(b) The IA Business received customers' deposits in the 703 Account, and customer withdrawals were made from the 509 Account both held by Madoff.

(c) Through 2008 – seven years after the LLC was formed – the endorsement stamp on all customer checks deposited into the 703 Account read "For deposit only Bernard L. Madoff," again without reference to the LLC.

(d) Checks sent to IA customers from the 509 Account listed "Bernard L. Madoff" as the account holder;

(e) The monthly statements for the 509 Account and the 703 Account showed the customer to be "Bernard L. Madoff Investment Securities" through the date Madoff confessed; the designation "LLC" never appeared on the statements for either of the JPMC Accounts.

(f) While Madoff sent letters to the Bank of New York — where the accounts for the PT and MM businesses were maintained — as well as several governmental agencies, notifying them

of the formation of the LLC, there is no evidence of any such letter being sent to JPMC.  *RAR*, 2021 WL 827195 at *11.

In the month of January 2001, approximately $5 billion passed through the 703 Account. See Chaitman Decl. **Ex Q**.  Yet, the Trustee claims that the 703 account was transferred to the LLC, despite the fact that there is no evidence of any instruction by Madoff to JPMC to change the name on the accounts from Madoff or the Sole Proprietorship to the LLC.

## **Form BD**

The Trustee relies heavily on the argument that, by an unsigned form filed with the SEC by Madoff in 2001, Madoff transferred ownership of the JPMC Accounts to the LLC.  T. Br. at 20-22; 32-33; Declaration of Nicholas Cremona ("Cremona Decl.), ECF No. 102, Ex. 3 (SEC Amended Form BD), ECF No. 102-3 ("Form BD").  There is no assertion that this document went to JPMC, and none of the Trustee's experts opines on Form BD in their reports.  On July 14, 2021, after *JABA* and the other the decisions the Trustee relies upon, Judge Furman ruled that the contents of Form BD are unreliable and inadmissible hearsay, explaining that, "in light of . . . Madoff's demonstrated history of falsifying information in SEC filings, 'the source of the information [on the form] plainly 'indicates a lack of trustworthiness'"  Chaitman Decl. **Ex. BE**, *Picard v. RAR*, S.D.N.Y Case No. 20-CV-1029 (JMF), 7/14/2021 Mem. Op. and Order at 2. (ECF No. 90) ("*RAR In Limine* Order") (quoting Fed. R. Evid. 803(6)(E).

Since both Madoff and his brother, Peter Madoff, confessed to submitting false documents to the SEC, *see* RAR In Limine Order at 2, we should not be surprised by Judge Furman's ruling. Indeed, the Trustee's reliance on the document is absurd.  The Trustee's experts, from inception, have claimed that Madoff's records are "permeated with fraud."  Expert Report of Bruce G. Dubinsky (*In re Bernard L. Madoff*, S.D.N.Y. Adv. Pro. No. 08-1789 (SMB) ("company's books and records could not be relied upon" because "fraud permeated [the LLC") Chaitman Decl. **Ex.**

**BF**, [2015 Expert Report of Bruce G. Dubinsky at 12-26]; (referring to fraudulent and "fictitious" notations in the customer statements that "were irreconcilable with any trading records" and warning against giving "undue credence to fictitious amounts engineered by Madoff"); *see* Chaitman Decl. **Ex. BG**, Trustee's Supplemental Memorandum of Law in Support of Trustee's Motion Affirming Treatment of Profit Withdrawal Transactions, *SIPC v. BLMIS,* 08- 01789 (CGM), filed August 12, 2016, ECF No. 13876. It is, therefore, preposterous for the Trustee to ask this Court to accept for its truth an unsigned document submitted by Madoff to the SEC in January 2001. But that is what the Trustee does.

## ARGUMENT

## I.    THE TRUSTEE HAS SUED THE WRONG PARTIES

### A.    The Trustee Has Forfeited His Claim against Barbara Keller

Barbara Keller was dismissed as an individual defendant by order of the Bankruptcy Court in 2015. *See* Order, ECF No. 39. The Trustee maintained a claim against her as co-trustee of the Keller Trust but Barbara Keller died in June 2019; the Trustee was notified of her death on June 5, 2019 (CMF ¶39); and the Trustee never amended the complaint to name Barbara Keller's estate as a defendant, as required by Fed. R. Civ. P. 25(a). Rule 25(a)(1) provides:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. **If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.** (Emphasis added.)

Under the plain language of the Rule, any claim against the estate of Mrs. Keller was forfeited by the Trustee. The Trustee's counsel was given notice of the death by email on June 5, 2019, triggering the 90 day period for substitution. Nothing further was required. A "party is given 90 days from the time when it learns from compliance with Rule 25(a)(1) of the death of an

opposing party to take appropriate action." *Unicorn Tales Inc v Banjeree*, 138 F3d 467, 470, (2d Cir. 1998). The Second Circuit has been resolute in not permitting additional requirements to be engrafted upon the plain language of the Rule. *See e.g., Kopler v Jubbert*, 986 F. 3d 147, 155 (2d Cir. 2021) ("But even if we were writing on a clean slate, we see nothing in the language of Rule 25 that imposes a service or identification requirement beyond the requirement that 'the statement of death be served on the involved parties.'"). If the Trustee chose to sit on his hands after he received that notice, as he did, he forfeited his claim against Barbara Keller. She should be dismissed with prejudice.

### B.    The Keller Trust Was a Mere Conduit, Not a Transferee, and Cannot Be Liable to the Trustee

The Trustee's motion should be denied and Defendants' cross-motion for summary judgment dismissing the Complaint should be granted because the Trustee has sued the wrong party. As set forth above, and in the Keller Declaration, pursuant to an agreement with Keller Publishing, a totally different entity, Gerald Keller asked for withdrawals from its Madoff account only when requested by Keller Publishing. None of the Keller Trust withdrawal checks was deposited into a Keller Trust bank account. Indeed, the Keller Trust never even had a bank account. All of the Madoff withdrawal checks were payable to "Gerald E Keller TSTEE," mailed to Mr. Keller at Keller Publishing's office, endorsed by an employee of Keller Publishing, Marianne Jannace, and deposited into a checking account for Keller Publishing. Keller Decl. ¶¶ 4 - 13. Pursuant to the agreement between Mr. Keller and Keller Publishing, Defendants exercised no dominion or control over the checks drawn on the 509 Account. Keller Publishing was the first entity to do that. In other words, the Keller Trust was a mere conduit for the transmission of the funds from Madoff to Keller Publishing.

The "mere conduit" defense is a judicially created equitable doctrine developed to avoid possible unfairness caused by a literal application of Section 550(a) of the Bankruptcy Code. *See Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 313 (Bankr. S.D.N.Y. 1999) (citing, *inter alia*, *Christy v. Alexander & Alexander (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 56 (2d Cir. 1997) ("*Finley, Kumble*") In *Stratton Oakmont*, Chief Bankruptcy Judge Brozman observed:

> Every Circuit that has encountered the "initial transferee" question has adopted the "dominion and control" test set forth by the Seventh Circuit in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir.1988), where Judge Easterbrook held:
>
>> We think the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the "initial transferee"; the agent may be disregarded. … "Transferee" is not a self-defining term; it must mean something different from "possessor" or "holder" or "agent".

*Stratton Oakmont*, 234 B.R. at 312-13 (quoting *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 893 (7th Cir.1988), and citing, *inter alia*, *Finley, Kumble*, 130 F.3d at 57-58). "[I]t would be inequitable to impose the strict liability reserved for an initial transferee on a conduit simply because he or she was the first to physically hold the money or property despite the fact that he or she was powerless to 'put the money to [his or her] own purposes.'" *Stratton Oakmont*, 234 B.R. at 314 (quoting *Finley, Kumble*, 130 F.3d at 57 (discussing unintended consequences that would ensue were courts to equate initial transferees with conduits). Under the dominion and control test, an initial transferee must (1) have legal dominion and control over the property—*e.g.*, the right to use the property for its own purpose— and (2) actually exercise this legal dominion and control. *Grayson Consulting, Inc. v. Wachovia Securities, LLC (In re Derivium Capital LLC),* 716 F.3d 355 (4th Cir. 2013)

In determining whether the mere conduit test is met, courts will consider the totality of the transactions involved.  *See Finley, Kumble,* 130 F.3d at 55 (holding defendant was mere conduit after making detailed findings concerning flow of funds for entirety of transaction); *Nordberg v, Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199-200 (11th Cir. 1988) (holding that courts must "evaluate a transaction in its entirety" and determine whether defendant is initial transferee by evaluating "defendant's status in light of the entire transaction"); *In re A.W. Lawrence & Co*., 346 B.R. 51 (N.D.N.Y. 2006).   Where a contractual obligation, or even an informal arrangement, requires that the recipient of the funds will turn them over to a third party, the predicate for the mere conduit rule is satisfied.  *See Sarachek v. Wahls (In re Agriprocessors, Inc*.), 490 B.R. 374 (Bankr. N.D. Iowa 2013) (informal understanding sufficient); *Bodenstein v. Univ. of N. Iowa (In re Peregrine Fin. Grp, Inc.)*, 589 B.R. 360, 377-78 (Bankr. N.D. Ill. 2018) (contractual obligation); *see also A.W. Lawrence & Co., Inc. v. Burstein, (In re A.W. Lawrence & Co.),* 346 B.R. at  57-59 (debtor never held an interest in a check payable to the debtor that was endorsed over and never passed through its bank account in light of all the circumstances of the case).

The court in *Peregrine* described the arrangement in *Sarachek* as follows:

> The court held that a minister and the church he worked for were mere conduits for funds that were owed to workers for work they performed on property of the debtor. The minister had assisted Agriprocessors, Inc. and families in their town by recommending individuals to Agriproceesors for employment. In an informal arrangement, Agriprocessors would send checks to the minister–some payable to him and some payable to his church–with instructions on how much to pay each worker. The minister cashed the checks at his personal bank and distributed the money to the workers in accordance with the instructions. When Agriprocessors filed for bankruptcy, the trustee sought to avoid the transfers to the minister and the church. Applying the *Bonded* test, the court found that neither the minister nor the church was liable as an initial transferee of the money; both were mere conduits. The minister had

no right to put the money to his own use. The court rejected the
argument that he minister or the church could have used the money
for themselves merely because the checks were payable to them.

*Peregrine,* 589 B.R. at 377-78.

This is an even stronger case because Gerald Keller never cashed the checks; the checks

were all received by and endorsed by Marianne Jannace, an employee of Keller Publishing, who

affixed Mr. Keller's signature and deposited the checks into the bank account of Keller Publishing.

Keller Decl. ¶¶ 10-13.

The Ninth Circuit's decision in *In re Bullion Res. of N. Am.*, 922 F2d 544 (9th Cir. 1991),

is also instructive.  There, the chapter 7 trustee sought to recover "loan" proceeds from one of the

directors of CBC ("Miller") as the "entity for whose benefit such transfer was made."  The Ninth

Circuit applied the "dominion or control'' test and held that Miller was not a transferee, relying on

the fact that Miller was under a contractual obligation to pledge the CBC stock immediately to the

debtor's president as part of  a loan agreement.  *Id.* at 549.  The court concluded that Miller did

not have dominion or control over the money in that he could not ''put the money to [his] own

purposes." *Id.*  The Ninth Circuit further reasoned that Miller ''would not become a transferee

unless and until he gained the beneficial interest in the stock.  *Id.*

Similarly, here, the Defendants did not exercise dominion or control over the funds

transferred to "Gerald Keller, Trustee."  Keller was contractually obligated to turn the funds over

to Keller Publishing and derived no benefit from the withdrawals.  The fact that the checks were

all directly deposited into the bank account of Keller Publishing was apparent, not just from the

endorsements on the checks in the Trustee's possession, but also from an interrogatory answer

directed to the Trustee in 2017.  *See* Keller Decl. ¶¶ 14-15.  Nor can the Trustee show that Keller

Trust acted other than in good faith.  Accordingly, the Keller Trust was a "mere conduit" and cannot be liable.

## II.       THE LAW OF THE CASE DOCTRINE SHOULD NOT APPLY

While acknowledging that the law of the case doctrine is not mandatory, the Trustee argues the Court should follow the decisions of other courts which are in his favor, while ignoring the decisions which are adverse to his interests.  T. Br. at 4-6.  But the decisions which the Trustee asks this Court to follow all rest upon the courts' reliance on Form BD – a document which is clearly fraudulent and, as Judge Furman held, inadmissible.

Further, there are decisions by which the Trustee is bound, and those the Court cannot ignore.  For example, the Trustee is bound by the law of the case in the two *Avellino* decisions that he has not sought to appeal.  *Avellino* holds that only Madoff's trustee, Alan Nisselson, not Mr. Picard, can seek to avoid transfers made by Madoff individually.  *Avellino*, 557 B.R. at 110.  As demonstrated in Point III, *infra*, Madoff, not the LLC, owned the 509 Account from which the Keller Trust received withdrawals.  Mr. Picard has no standing to seek to avoid those transfers.

Likewise, the Trustee cannot explain why the Court should not rule, consistent with Judge Bernstein's repeated holdings, that these cases could not be disposed of on summary judgment as to the principal defenses but, instead, require a trial.  *See e.g. Picard v. Legacy Capital, Ltd.*, 603 B.R. 682 (Bankr. S.D.N.Y. 2019); *Picard v. Mann*, 608 B.R. 165 (Bankr. S.D.N.Y. 2019); Chaitman Decl. **Ex. BH**, *Picard v. Savin*, Adv. Pr. No. 10-04889 ("[y]ou know my view on these summary judgment . . . , motions, particularly on the issues I've identified, [whether the JPMC Accounts] were held by Madoff personally or by the LLC, whether the LLC was a Ponzi scheme, and if so, when it began, and whether the LLC was allocating T-bills purchased by the proprietary trading arm to customers of the IA business.] . . . I have to try it.").

Finally, Judge Furman's *RAR* Decision and the RAR *In Limine* Order, are better guides to the proper result here than the decisions the Trustee relies upon. Neither of those decisions bars this Court from finding in favor of the Keller Trust based on Judge's Furman's sound reasoning.

## III. THE TRUSTEE HAS NOT PROVEN A TRANSFER OF PROPERTY OF THE LLC

Assuming the Trustee has sued the correct parties, the first element of the Trustee's claim pursuant to 11 U.S.C. § 548(a)(1)(A) would be a transfer of an interest of the debtor in property. The Trustee's debtor is the LLC. The property at issue is the money transferred from the 509 Account which, the Trustee has conceded, was never in the name of the LLC. CMF ¶ 11.

### A. The JPMC Accounts Were Never Transferred to the LLC

The evidence shows that the LLC did not own the JPMC Accounts and the IA Business was not transferred from the Sole Proprietorship to the LLC. Hence, the Trustee failed to establish an essential element of his claim because he seeks to avoid and recover property in which his debtor, the LLC, had no interest. At a minimum, there are material issues of fact sufficient to compel denial of the Trustee's summary judgment motion.

First, obviously, a bank account cannot be transferred without the knowledge and consent of the bank. No bank could comply with its "know your customer" obligations if the owner of a bank account could transfer it without the knowledge and consent of the bank. *See, e.g.,* Customer Due Diligence Rule (CDD) Final Rule.[2]

> The CDD Rule, which amends Bank Secrecy Act regulations, aims to improve financial transparency and prevent criminals and terrorists from misusing companies to disguise their illicit activities and launder their ill-gotten gains. The CDD Rule clarifies and strengthens customer due diligence requirements for U.S. banks, mutual funds, brokers or dealers in securities, futures commission merchants, and introducing brokers in commodities. The CDD Rule

---

[2] CDD Rule is posted at Financial Crimes Enforcement Network ("FinCEN") website: *https://www.fincen.gov/resources/fincens-mandate-congress*, last visited Aug. 13, 2021. FinCEN is a bureau of the U.S. Department of the Treasury.

requires these covered financial institutions to identify and verify the identity of the natural persons (known as beneficial owners) of legal entity customers who own, control, and profit from companies when those companies open accounts.

The CDD Rule has four core requirements. It requires covered financial institutions to establish and maintain written policies and procedures that are reasonably designed to:

1. identify and verify the identity of customers
2. identify and verify the identity of the beneficial owners of companies opening accounts
3. understand the nature and purpose of customer relationships to develop customer risk profiles
4. conduct ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information

With respect to the requirement to obtain beneficial ownership information, financial institutions will have to identify and verify the identity of any individual who owns 25 percent or more of a legal entity, and an individual who controls the legal entity.

There is no evidence that JPMC was ever asked, or ever consented, to change the ownership of the JPMC Accounts. Indeed, there is unrefuted evidence to the contrary.

While the LLC was formed in January 2001 and the Trustee claims that the JPMC Accounts were transferred to the LLC in January 2001, Madoff changed the names on the JPMC Accounts in September 2002, from his own name to the Sole Proprietorship. The endorsement stamp on the 703 Account checks remained "For deposit only Bernard L. Madoff" (CMF ¶23) and the 509 Account checks continued to bear Madoff's personal name until the day he confessed (CMF ¶¶25-31). Madoff made no reference to the LLC when he changed the name on the JPMC Accounts in 2002. All checks paid to Gerald E. Keller, Trustee, indicated the account was owned by "Bernard L. Madoff." CMF ¶29. Defendants never received funds from an account owned by the LLC. CMF ¶29. There is no evidence that the LLC ever owned the 703 or 509 Account. CMF ¶27.

Indeed, it is preposterous to suggest that the JPMC Accounts could have been transferred without any document signed by Madoff and by JPMC. The 703 Account had approximately $5 billion of deposits in January 2001. Chaitman Decl. Ex. Q at 1. Any argument that ownership of a bank account containing $5 billion could be transferred without the exchange of any document to or from the bank is absurd.

The absence of any such documentation is readily explainable. When Madoff formed the LLC to own the LTB operated by his sons, he made clear that he was transferring only the LTB to the LLC. He wrote letters only to entities that did business with the LTB to inform them of the transfer. Madoff sent a letter to BNY, the bank that had been servicing the LTB; he wrote to the DTC; he wrote to the NSCC, and others. CMF ¶10. Madoff's letter to BNY stated that the LLC had been formed and that ownership of Madoff's BNY accounts should be re-titled in the name of the LLC. However, Madoff wrote no such letter to JPMC, or to anyone else who did business with the IA Business. Madoff continued to use the JPMC Accounts for the IA Business and he never re-titled the JPMC Accounts from Madoff to the LLC. CMF ¶¶25-31. To the contrary, some 18 months after the LLC was formed, Madoff changed the name on the JPMC Accounts from his personal name to the trade name for the Sole Proprietorship. CMF ¶ 31.

Against all this evidence, the Trustee cannot produce a single document from JPMC's records indicating that the account holder of the JPMC Accounts was ever the LLC; and the Trustee's experts have admitted that they never saw a JPMC bank statement in the name of the LLC. Indeed, the Trustee conceded "We have not identified any specific document requesting a change in the ownership of the "509 Account.") CMF ¶11; Chaitman **Ex. K** [Email dated June 12, 2018 from counsel to Trustee, Maximillian Shifrin to Helen Davis Chaitman].

The undisputed facts prove that the LLC never owned the JPMC Accounts and that the money the Trustee seeks to recover was transferred from the 509 Account to Gerald Keller, Trustee by Madoff, not by the LLC.

The Trustee repeatedly mentions that Defendants did not depose his experts and did not serve rebuttal expert reports. *See, e.g.*, T. Br. at 3, 14-15, 26. But nothing in the Trustee's expert reports is relevant to the issue of ownership of the JPMC Accounts. None of the experts purported to opine on this issue and they are barred, under Fed. R. Civ. P. 26(a)(2)(B), from doing so now. *See,*. Dubinsky Report January 16, 2019, ECF No. 104-1. *See, e.g., Ward v. GM LLC (In re GM LLC Ignition Switch Litig*.), 2017 U.S. Dist. LEXIS 103890, at *338-48 (S.D.N.Y. July 5, 2017) (granting *in limine* motion and holding that failure to make prompt disclosure under Rule 26 warranted preclusion under Rule 37(c)(1)).

Further, the issue of ownership of a bank account is not appropriate for expert testimony because it is totally within the experience of the average juror. "[O]nce funds are deposited in a bank account, the account holder has title to and control over those funds." *In re Ames Dept. Stores, Inc.*, 274 B.R. 600, 617 (Bankr. S.D.N.Y. 2002); *accord City of New York v. Venkataram*, 2011 WL 2899092, at *5 n.6 (S.D.N.Y. July 13, 2011) (holding that party who possesses property is presumed to be owner); *see also In re Int'l Pharmacy & Disc. II, Inc.*, 443 F.3d 767, 771 (11th Cir. 2005) ("In most states, the name or title to a bank account creates a presumption of ownership in the title-holder.").

In the *RAR* Decision, Judge Furman held that the defendant was entitled to a jury trial on the issue of whether the money it received belonged to the LLC or to Madoff, in which event the Trustee lacks standing to recover the funds. As here, the Trustee's claim in *RAR* was that the Sole Proprietorship had transferred all of its assets and lines of business to the LLC in 2001, including

the IA Business through which Madoff operated his fraud.  In *RAR*, the defendant asserted, with

the same documentary support that the Defendants presented here, that the IA Business was not

transferred to the LLC and that the Sole Proprietorship retained that business and the bank accounts

at JPMC from which the monies paid to defendant came.  Judge Furman carefully catalogued the

evidence, all applicable here, that showed the Trustee had not proven as a matter of law that the

LLC owned the JPMC Accounts:

> For instance, on Section 12 of the [S.E.C.] Form,[BD] which asks
> the applicant to "[c]heck types of business engaged in (or to be
> engaged in . . . ) by applicant," the boxes for "Broker or dealer
> making inter-dealer markets in corporate securities over-the-
> counter," "[t]rading securities for own account" and "[o]ther" were
> checked — but not the box for "[i]nvestment advisory services."
> Additionally, the investment advisory business received customers'
> cash deposits in the 703 Account maintained at JPMorgan. . . , and
> all withdrawals from the RAR Account were made by transfers from
> the 509 Account or 703 Account[.]  The name listed on the customer
> statements for those Accounts for the duration of the relevant period
> did not include "LLC"; it was either "Bernard L. Madoff" or
> "Bernard L. Madoff Investment Securities" — *i.e.*, the trade name
> of the sole proprietorship.  And through 2008, the endorsement
> stamp for checks deposited into the 703 Account read "For deposit
> only Bernard L. Madoff."  Similarly, checks sent to RAR from the
> 509 Account listed "Bernard L. Madoff" as the account holder.
> Indeed, even when "Bernard L. Madoff Investment Securities" was
> listed, the designation "LLC" never appeared on the statements for
> either the 703 or the 509 Account.  And while Madoff sent letters to
> the Bank of New York — where the accounts for the proprietary
> trading and market-making businesses were maintained — as well
> as several governmental agencies notifying them of the formation of
> the LLC, there is no evidence of any such letter being sent to
> JPMorgan, where the accounts for the investment advisory business
> were maintained.  In light of this evidence, and drawing all
> inferences in favor of RAR, the Court cannot say that no reasonable
> factfinder could conclude that either Madoff himself or the sole
> proprietorship retained ownership over the 703 and 509 Accounts
> even after the LLC's formation in 2001.

*RAR* Decision at *11 (internal cites and footnote omitted).

Thus, Judge Furman denied the Trustee's summary judgment motion, holding that the Trustee did not prove an essential element of his prima facie case, i.e. a transfer of property in which the debtor, the LLC, had an interest. *Id*. at *12 ("In sum, pursuant to Rule 56(g), the Trustee's motion for summary judgment is . . . DENIED with respect to the final element [of his claim] (namely, whether the transfer consisted of an interest of the debtor in property).")  The record before this Court requires the same result.

Moreover, there is compelling evidence here beyond what was before Judge Furman in *RA*R.  As set forth above, for every year through 2007, the Keller Trust was issued its Form 1099 for tax purposes by Bernard L. Madoff.  CMF ¶35.  It was never issued a 1099 by the LLC.  CMF ¶35.  This was not accidental.  Customers of the LLC received their Form 1099s directly from the LLC, not from Bernard L. Madoff.  CMF ¶15.

Additionally, pursuant to SEC requirements, Madoff filed monthly "FOCUS" Reports with FINRA through 2008.  Every one of these reports indicates that the LLC received no revenue from investment advisory business services.  In each year, the revenue line is blank although investment services were being rendered by Madoff to the Keller Trust.  CMF ¶14 [2007 – 2008 FOCUS reports]

In addition, the Keller Trust's contract for investment advisory services was with Madoff personally.  CMF ¶32.  The Keller Trust never had a contract with the LLC.  Nor, under New York law, could Madoff assign the contract to the LLC without the Keller Trust's consent, which consent was never sought or obtained.  *See Paige v. Faure*, 229 N.Y. 114, 118 (1920) ("No bilateral contract for personal services can be assigned by either party to it, without the consent of the other."); *Creator's Way Associated Labels, Inc. v. Mitchell (In re Mitchell)*, 249 B.R. 55, 57-58 (Bankr. S.D.N.Y. 2000) (holding that personal service contract "could not be assigned under New

York law without the other party's consent"). Thus, the Keller Trust was never a customer of the LLC.

Against this avalanche of evidence, the Trustee relies, almost entirely, on Form BD, a document the Trustee contends Madoff submitted to the SEC in January 2001, when the Trustee alleges Madoff transferred the IA Business to the LLC. T. Br. at 22. Aside from the fact that Madoff pled guilty to filing false documents with the SEC, it is undisputed that the document is incomplete, is unsigned, and references schedules that are not attached. It is undisputed that Madoff did not list, as a line of business the LLC would engage in, the IA Business. Cremona Decl. Ex. 3 (Form BD) at §12 (S). It is also undisputed that the SEC did nothing to verify the contents of Form BD. Apparently, the SEC did not even require that Madoff sign the form.

The Trustee points to other decisions in which Form BD was accepted by other courts. T. Br. at 20-22. But the fact that other courts have made obvious errors does not mean that this Court should join in those errors. Judge Furman initially relied upon Form BD but, when he learned more, he held that Form BD is not admissible for the truth of the matters asserted. It is pathetic that the Trustee is forced to rely upon a document which is facially insufficient by virtue of being unsigned and prepared by Madoff and Peter Madoff, both of whom pled guilty to filing false documents with the SEC.

## B. The Content of Form BD Is Inadmissible

"[I]t is axiomatic that, when reviewing a summary judgment determination, [a court] may only consider admissible evidence." *Bellamy v. City of New York*, 914 F.3d 727, 750 (2d Cir. 2019); see also Fed. R. Civ. P. 56(c)(2)(e). The Trustee cannot rely on Form BD to prove that Madoff transferred the JPMC Accounts from the Sole Proprietorship to the LLC in 2001 because the content of Form BD is inadmissible hearsay. Its content, provided by Madoff, does not fall within the business records exception because the SEC did nothing to verify the information that

Madoff put on the form, including his statement that the assets of the Sole Proprietorship would

be transferred to the LLC.  Indeed, the submission to the SEC was patently ineffective because

Madoff did not even sign it.

In the July 14, 2021 *RAR In Limine* Order – subsequent to the decisions the Trustee relies

upon – Judge Furman granted defendant's motion barring the admission of the content of Form

BD, subject to the Trustee's being able to lay a proper foundation at trial under the expert testimony

provisions of Fed. R. Evid. 703.  Chaitman Decl. **Ex. BE,** *RAR In Limine* Order at 2.  Judge

Furman's order was based on Madoff's "demonstrated history of falsifying information in SEC

filings . . . which plainly 'indicate[s] a lack of trustworthiness.'"  *Id.* (quoting Fed. R. Evid.

803(6)(E)).  Judge Furman also made clear that even if an expert laid a proper foundation for

admissibility under Fed. R. Evid. 703, the form could not be admitted for the truth of the matter

asserted:

> "[A] party cannot call an expert simply as a conduit for introducing
> hearsay." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d
> Cir. 2013) (internal quotation marks omitted); *accord United States
> v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). Moreover, Plaintiff
> cannot rely on hearsay admitted under Rule 703 as substantive
> evidence of the facts underlying the expert's opinion. *See, e.g.,
> United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007) (noting
> that where an expert witness "form[s] an opinion by applying her
> expertise to otherwise inadmissible evidence . . . , the evidence is
> not being presented for the truth of the matter asserted"); accord Fed.
> R. Evid. 703 advisory committee's note to 2000 amendments.

Chaitman Decl. **Ex. BE**, *RAR In Limine* Order at 2, ¶ 2.

Further, this document cannot come in under Fed. R. Evid. 703 because it was not the

subject of an expert report timely served by the Trustee.  *See, e.g., Ward v. GM LLC (In re GM

LLC Ignition Switch Litig.)*, 2017 U.S. Dist. LEXIS 103890, at *338-48 (S.D.N.Y. July 5, 2017)

(granting *in limine* motion and holding that failure to make prompt disclosure under Rule 26

warranted preclusion under Rule 37(c)(1)); *LaBarre v. Werner Enters.*, 2015 U.S. Dist. LEXIS 162598, at *1-9 (N.D.N.Y. Dec. 4, 2015) (granting *in limine* motion precluding expert from testifying as to information, conclusions, and opinions that were not contained within his expert report); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.,* 2012 U.S. Dist. LEXIS 18503, at *24-26 (S.D.N.Y. Feb. 14, 2012) (granting motion *in limine* and holding that "expert's report operates to limit the scope of the testimony that can be elicited from the expert. Opinions that are not disclosed in the expert's report cannot be offered.").

It would be clear error to rely on incomplete, unsigned documents prepared by a notorious fraudster who was convicted of lying to the SEC and whose books were permeated with fraud. As such, the Trustee tries to bolster his reliance on Form BD by referencing an LLC Operating Agreement which he says evidences Madoff's intent to transfer all the business and the assets of the Sole Proprietorship to the LLC as of January 1, 2001. T. Br. at 23.

But Madoff was a fraudster. He had concealed the IA Business from the SEC for 30 years as of January 2001. He certainly wasn't going to go to the trouble of forming an LLC, operated by his sons, to continue the illegal IA business through the LLC. Moreover, whatever Madoff's intent might have been, the document suffers from many of the same deficiencies as Form BD. There is no foundation, it is hearsay when offered against the Defendants, and the information in it apparently came from Madoff, which destroys any semblance of reliability. Accordingly, neither Form BD nor the Operating Agreement should be considered on this motion for the truth of the matters asserted.

Finally, there is third party documentary evidence proving that Madoff continued to operate the IA Business because he continued, for many years after 2001, to invest IA customers' funds in T-bills that he purchased through various investment firms. See CMF ¶¶ 71-121.

### C.    Even if Form BD Is Admissible, It Proves that Madoff Did Not Transfer the JPMC Accounts to the LLC

If Form BD is admissible to prove anything, it shows that the LLC did **not** acquire the IA Business; that stayed with the Sole Proprietorship.  For example, Question No. 12 on the form lists various forms of businesses in which the applicant may engage.  Madoff checked the boxes for market making and proprietary trading (C) and (V); he did not check the box for investment advisory services (S).  Cremona Decl. Ex. 3 (Form BD) §12 (S).  Since the Investment Company Act of 1940 requires registration by an investment advisor, this omission could not be inadvertent.  *See*  15 U.S. Code § 80a–51, et seq.  Not checking the "S" box proves that the LLC was not acquiring the IA Business.

Madoff had been conducting the IA Business since the 1960's and he had never registered as an investment advisor.  The reason, undoubtedly, is because he did not want SEC auditors examining the records of the IA Business.  Why, then, would he transfer the IA Business to the LLC, run by his sons?  Cremona Decl. Ex. 3 (Form BD) §12 (C), §12 (V) (compare Form BD Items 12 (C) and (V) with item 12(S)).  Form BD indicates that he did not do so:

> 5.      Is applicant at the time of this filing succeeding to the business of a currently registered broker/dealer?
>
> * * * *
>
> If "Yes," contact CRD prior to submitting form; **complete appropriate items on Schedule D, Page 1, Section III.**

*Id.* (Form BD) at §5 (emphasis added).

Since Madoff was a registered broker/dealer, he clearly was obligated to "complete appropriate items on Schedule D, Page 1, Section III if it was his intention for the LLC to succeed to or acquire the interests of the IA Business, which at the time was indisputably operated through the Sole Proprietorship.  Yet, the Form BD that the Trustee relies on contains no Schedule D.

Form BD also requires disclosure of common control:

10 (a).   Directly or indirectly, does applicant control, is applicant controlled by, or is applicant under common control with, any partnership, corporation, or other organization **that is engaged in the securities or investment advisory business**?

If "Yes" to Item 10A, **complete appropriate items on Schedule D, Page 2, Section V, Firm Affiliates.**

*Id.* (Form BD) at §4.  Again, Madoff was obligated to disclose, on Schedule D, whether he had a

control relationship with an investment advisory business.  And again, the Form BD contains no

Schedule D.

These specific answers to specific questions over-ride the general statement upon which

the Trustee relies – that Madoff was transferring all of his businesses to the LLC.  Madoff was

transferring all of the businesses the SEC knew about; that is, his two legitimate businesses that

were run by his sons.  He did not transfer the illegitimate IA Business in which his sons were not

involved.

The explanations required on the missing Schedule D would particularize any relationship

between the IA Business, on the one hand, and the LLC on the other, and eliminate any alleged

ambiguity in respect of this critical issue.  But there is no Schedule D and no explanation as to its

absence.  And, without Schedule D, the incomplete Form BD should not serve as the linchpin for

the Trustee's argument that, as a matter of law, the IA Business, along with the JPMC Accounts,

were acquired by the LLC in 2001.

Despite the missing Schedule D, without which Form BD lacks any probative value, the

Trustee argues that Madoff's failure to describe assets or liabilities that were **not** assumed by the

LLC on Question 5 of Form BD is proof that the JPMC Accounts were transferred to the LLC.  T.

Br. at 21-22.  The Trustee's argument is illogical and assumes against the evidence that Madoff

transferred the IA Business to the LLC (which Form BD does not indicate) along with the lines of

business that Madoff did explicitly state were being transferred to and succeeded by the LLC, *i.e.,* the PT and the MM. The fact that Madoff did not describe assets not transferred to the LLC proves that the IA Business and the JPMC Accounts were not transferred.

In sum, if Form BD is admissible to prove anything, it proves that the IA Business was never transferred to the LLC.

### D. The Trustee's Remaining Arguments Are Hopeless

Unable to meet Defendants' showing, the Trustee resorts to palpably untenable factual assertions. For example, he says that the transfer of all assets and business lines including the IA Business is shown by the fact that the Sole Proprietorship stopped operating in any capacity after January 1, 2001. T. Br. at 22. This statement is facially false. The IA Business continued to operate, as it had from the 1970's, through the 509 and 703 Accounts and Madoff continued to invest IA customers' funds in T-bills that he purchased through Bear Stearns, Fidelity, Morgan Stanley, et al. See CMF ¶¶ 71-121.

Moreover, the contract with the Keller Trust was never changed; the checks to the Keller Trust continued to come from an account owned by Madoff; the 1099's that the Keller Trust received continued to come from Madoff. Even the Trustee admits that, after January 2001, nothing changed with respect to the IA Business. T. Br. at 32.

### IV. THE COURT SHOULD FOLLOW *AVELLINO* AND REJECT THE TRUSTEE'S "CUSTOMER PROPERTY" ARGUMENT

Faced with the overwhelming evidence that the Sole Proprietorship continued the IA Business even after the LLC was formed in 2001, the Trustee tries a different tack. He says it does not matter whether the JPMC Accounts were owned by the LLC or Madoff; the monies in the JPMC Accounts constitute "customer property" and the Trustee has standing to pursue customer property wherever it may be. T. Br. at 24, *et seq.*

If the Trustee were correct, he would have standing to sue customers of Lehman Brothers because Lehman Brothers was a SIPA debtor which also had "customer property." However, as SIPC has readily acknowledged, "customer property" is specific to each SIPA debtor:

> "the Fund of Customer Property consists of all cash and securities that qualify as "customer property" within the mean of SIPA. The statute generally defines "customer property" as the cash and securities "at any time received, acquired, or held by or for" the Debtor "from or for the securities accounts of a customer." See SIPA § 78lll(4). In turn, SIPA generally defines the term "customer" to include a claimant with a claim against the Debtor on account of such property, including cash on deposit with the Debtor for the purposes of purchasing securities. See SIPA § 78lll(2).

https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/sipcmemorandum121211.pdf.

Obviously, the Trustee is grossly over-reaching, reminiscent of similar attempts in other cases. *See, e.g., Picard v. HSBC Bank PLC*, 454 B.R. 25, 29-31 (S.D.N.Y. 2011) (holding that SIPA does not confer "vast power on such a trustee to commence lawsuits he could not otherwise bring" and Rule 15c3-3 is "undisputedly not a part of SIPA" and does not "grant the Trustee additional standing").

Mr. Picard is the Trustee for the LLC and his avoidance powers extend only to recovery of the LLC's "customer property." That is precisely what Judge Bernstein held in *Avellino* and *Avellino II*, the two carefully reasoned decisions that the Trustee did not seek to appeal. As Judge Bernstein explained:

> While the pre–2001 inter-account transfers are relevant to the computation of net equity, and in the fraudulent transfer context to whether the defendant withdrew principal or fictitious profits, **it does not follow that the Trustee can recover the actual withdrawals of cash by customers of the sole proprietorship. Only the Madoff trustee [and not Picard] can recover actual transfers by the sole proprietorship**, but the customer property withdrawn prior to January 1, 2001 was not property of the Madoff sole proprietorship and cannot be avoided by the Madoff trustee or

> one exercising his powers pursuant to the Substantive Consolidation
> Order.

*Avellino*, 557 B.R. at 110 (emphasis added); *accord Picard v. Mendelow*, 560 B.R. 208, 227

(Bankr. S.D.N.Y 2016) (holding that claims to avoid transfers from the Sole Proprietorship are

futile for the reasons stated in *Avellino*). The *Avellino* decisions are binding on the Trustee under

preclusion principles such as *res judicata* and collateral estoppel. Accordingly, Mr. Picard lacks

standing to sue to recover property transferred by Madoff; he can only sue to recover property

transferred by the LLC.

The Trustee argues that the Substantive Consolidation Order entered by the District Court

on July 9, 2009, which expressly orders that Madoff's own trustee has standing to void transfers

by Madoff and that Picard has standing to void transfers by the LLC, is just a "belt and suspenders"

order to ensure that none of Madoff's assets slipped through the cracks since various entities were

pursuing them, and the reservations in the order were necessary because, unless they were

expressly preserved, the substantive consolidation of the two estates could extinguish both

trustees' avoidance powers altogether. T. Br. at 36. The court in *Avellino* flatly rejected this

argument. *See Avellino II* at **2-3.

Moreover, any reliance by the Trustee on the substantive consolidation of the LLC's estate

and Madoff's estate is misplaced. Substantive consolidation does not merge the debtors or

retroactively transform property of someone other than the debtor into property of the debtor. *See,*

*e.g., In re Bauman*, 535 B.R. 289, 301 (Bankr. C.D. Ill. 2015) ("Most significantly, substantive

consolidation should not be deemed to have a retroactive effect of transforming property owned

by an entity separate from a debtor into property of that debtor as of the prepetition date of the

challenged transfer . . . The facts of property ownership as they existed prepetition remains

unchanged, as do the elements of proof under sections 548 and 544."); *In re Murray Industries,*

*Inc.,* 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991) ("[S]ubstantive consolidation of several estates means one thing and one thing only—that all assets of the several entities are pooled and all creditors of the several entities are entitled to share in the pooled assets in accord with their respective rights.  It would certainly be a violation of due process if the order of substantive consolidation would operate to destroy defenses and rights which existed prior to the entry of the order of substantive consolidation."); *In re Deltacorp, Inc.*, 179 B.R. 773 (Bankr. S.D.N.Y. 1995) ("[E]states are merged for the purposes of bankruptcy administration, but the consolidation alone does not effect a corporate merger.")

In *RAR* Judge Furman correctly rejected the Trustee's "customer property" argument, citing *Avellino*:

> Contending that the Bankruptcy Court's opinion in *Picard v. Avellino* . . . , was wrongly decided, [the Trustee] maintains: "[A]s long as the SIPA Trustee can show that the property he is seeking to recover is customer property, he has the power to recover it whether that property is held in an account with the letters 'LLC' or not." . . . But *Avellino*, which held that the Trustee could not recover transfers made by the sole proprietorship or Madoff individually prior to the formation of the LLC, presumed, as all parties apparently did, that the sole proprietorship had transferred all assets to the LLC. [*Avellino*] at 108 & n.14, 110.  Here, by contrast, RAR's theory is that the sole proprietorship never transferred the investment advisory business (and, by extension, ownership of the relevant accounts) to the LLC in the first place, but rather continued operating independently alongside the LLC in order to "insulate" the proprietary trading and market-making businesses from the investment advisory business's fraudulent activities. . . . **Thus, even if the Trustee were correct that — *contra Avellino* — SIPA empowers him to recover transfers of customer property made by the sole proprietorship prior to the formation of the LLC, assuming that the sole proprietorship transferred all assets to the LLC, it does not follow that the Trustee may recover transfers of assets to which BLMIS LLC never succeeded**.
>
> Accordingly, the question of whether the Two-Year Transfers were transfers made by the debtor . . . cannot be resolved here and, as in *BAM* and *Nelson*, requires trial.

*RAR* Decision at *11 (internal citations omitted) (emphasis added).

Despite all of the Trustee's ramblings, SIPA limits his avoidance powers to transfers made by the SIPA debtor. *See, e.g.*, T. Br. at 7 (SIPA "Trustee may recover any transfers <u>by the debtor</u>"); *Id.* at 24, 29, (quoting SIPA § 78fff-2(c)(3))  There is no dispute that the SIPA debtor is the LLC here.  The caption confirms this.  SIPC did not institute a SIPA liquidation of Madoff or the Sole Proprietorship.  Hence, under *Avellino*, transfers made by the Sole Proprietorship cannot be recovered by the Trustee.

As Judge Furman held in *RAR*, the Trustee cannot avoid transfers from the Sole Proprietorship and there is an abundance of evidence that the JPMC Accounts were never transferred to the LLC.  At a minimum, the Court should hold, as did Judge Furman, that Defendants are entitled to a trial on this issue.

## V.    THE TRUSTEE IS NOT ENTITLED TO PREJUDGMENT INTEREST

The Trustee seeks 4% prejudgment interest from December 2008.  This is 400% more than the statutory post-judgment interest rate to which the Trustee is entitled under 28 U.S.C. § 1961.  Yet, the Trustee has not shown any basis for treating innocent victims of Madoff's fraud so punitively, particularly when he has not recognized a right to any appreciation or cost-of-living adjustment for any Madoff customer from 1980 through today.  *See* 28 U.S.C. §1961.

Defendants are innocent victims of Madoff's fraud and the SEC's incompetence.  Awarding any prejudgment interest only compounds their injury for doing nothing wrong besides assuming the SEC was competent to regulate Madoff.  Further, if an award of interest were appropriate, the Court should not award 4% interest based on the prime interest rate on December 15, 2008 – the date of the bankruptcy filing.  T. Br. at 17-18.  Nor should the Court award interest

for a period before the Defendants were served with the complaint.  And then, at most, the Court should award the federal statutory interest rate from July 2015.

There are many reasons why interest should not be awarded at all, let alone at a 4% rate. First, there is no statutory basis for an award of interest here.  The Trustee sued Defendants under 11 U.S.C. § 548 which does not provide for an award of interest.  Bankruptcy Code § 550 prescribes the remedy for the avoidance of a fraudulent transfer: the statute limits the recovery to the property transferred or the value of that property.  The plain language of the provision does not include an award of interest.  Surely, if Congress had intended that the plaintiff be awarded interest, Congress would have so mandated.

Second, prejudgment interest is plainly inappropriate where the Defendants did nothing wrong and there is a good faith basis for contesting liability.  *See Wickham Contracting Co. Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO,*, 955 F.2d 831, 834 (2d Cir. 1992); *see also Board of County Comm'rs of the County of Jackson v. United States*, 308 U.S. 343, 352 (1939) ("[I]nterest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness.  It is denied when its exaction would be inequitable"); *Mecca v. Gibraltar Corp. of Am.*, 746 F. Supp. 338, 349 (S.D.N.Y. 1990) (same); *see also Kramer v. Mahia (In re Khan),* 2016 WL 6652724 at *2-3 (E.D.N.Y. Nov. 10, 2016) (declining to impose prejudgment interest in a case where the transferee was innocent of any fraudulent intent); *Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*, 567 F.3d 1291, 1300 (11th Cir. 2009) (affirming bankruptcy court's denial of prejudgment interest where defendant's position was reasonable, parties' dispute was genuine, and there was no evidence that either party was responsible for delaying dispute's resolution.).

Third, prejudgment interest should not be imposed where it is the plaintiff who is responsible for any delay. *Wickham Contracting*, 955 F.2d at 834; *see also Redfield v. Bartels*, 139 U.S. 694 (1891) (suit to recover duties wrongfully imposed; interest denied since plaintiff neglected to bring suit for years). Here, Judge Rakoff dismissed six of the seven claims the Trustee asserted in his complaint and the Second Circuit affirmed. The Trustee filed suit against Defendants in December 2010, but it was not until June 2015, that the Supreme Court denied the Trustee's cert. petition seeking review of the Second Circuit's decision dismissing all of the Trustee's claims under New York law and under provisions of the Bankruptcy Code other than 11 U.S.C. § 548(a)(1)(A). *See Picard v. Ida Fishman Revocable Trust (In re BLMIS),* 773 F.3d 411, 423 (2d Cir. 2014), *cert. denied* 135 S. Ct. 2859 (June 22, 2015). Thus, five years were wasted because the Trustee grossly over-reached in drafting the complaint; and during this time period the Trustee repeatedly moved to extend Defendants' time to answer the complaint. ECF Nos. 13-23 (stipulations extending Defendants' time to answer).

After issue was joined in September 2015, (ECF. No. 40) the Trustee also delayed discovery unconscionably by engaging in a protracted effort to avoid disclosing the material evidence that Madoff (not the LLC) owned the JPMC accounts from which Defendants were paid and that Madoff actually purchased securities with IA customers' money. Even running interest from July 2015 would reduce by half the prejudgment interest imposed.

Fourth, even assuming interest could be awarded at all, a rate of 4% is excessive and punitive. At most, the rate should be consistent with 28 U.S.C. § 1961. Four percent gives the Trustee a windfall that is not the purpose of interest in this context. Prejudgment interest should not result in overcompensation of the plaintiff, such as when the statute, as here, fixes damages deemed fully compensatory. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011).

This principle is particularly relevant here because the Trustee's position throughout these cases is that no Madoff customer is entitled to any interest or appreciation since 1980, and the Second Circuit has approved the Trustee's position. *Id.* Consistent with that view, although the Trustee allowed some claims in 2009, the Trustee has refused to credit any allowed claimant with any appreciation or cost-of-living adjustment since 1980. Thus, in the Trustee's view, allowed claimants who invested in 1980 are entitled to receive, by 2020 (40 years later), only their net investment. Indeed, when customers sought allowance of appreciation, since 1980, in the form of an inflation adjustment, the Trustee successfully opposed that relief. *In re Bernard L. Madoff Inv. Sec. LLC*, 779 F.3d 74 (2d Cir. 2015).

In each year, Defendants paid state and federal taxes on the purported short term gains in their accounts at the highest tax rate. It would be inequitable and punitive to add prejudgment interest on top of the loss of the investment proceeds which they believed they had fairly earned and, furthermore, on top of the full taxes paid on those proceeds. Moreover, Judge Bernstein, who had these cases for ten years, never imposed prejudgment interest. *See Picard v. Cohen (In re BLMIS),* No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016) ("*Cohen*"), *adopted by,* No. 16 CV 5513 (LTS), slip op. (S.D.N.Y. Feb. 24, 2017) (judgment in the amount of two-year liability without interest); *Picard v. Lowrey (In re BLMIS),* Nos. 10-04387, 10-04488, 10-04350, 10-05110 (SMB), 2018 WL 1442312 (Bankr. S.D.N.Y. Mar. 26, 2018) (report and recommendation) ("*Lowrey*") (same). Thus, the award of prejudgment interest should be vacated.

## CONCLUSION

For the foregoing reasons, the Trustee's motion for summary judgment should be denied in its entirety, and the Defendants' cross-motion for summary judgment should be granted in its entirety, together with such other and further relief as the Court deems appropriate.

Dated:   New York, New York
         August 17, 2021

**CHAITMAN LLP**

By:   */s/ Helen Davis Chaitman*
      Helen Davis Chaitman
      hchaitman@chaitmanllp.com
      465 Park Avenue
      New York, New York 10022
      Phone & Fax: 888-759-1114

      *Attorneys for Defendants The Gerald and Barbara Keller Family Trust and Gerald E. Keller, in his capacity as Trustee of the Gerald and Barbara Keller Family Trust*