**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro No. 10-04539 (CGM) |
| Plaintiff, | |
| v. | |
| THE GERALD AND BARBARA KELLER FAMILY TRUST, and GERALD E. KELLER, individually and in his capacity as Trustee of the Gerald and Barbara Keller Family Trust, | |
| Defendants. | |

**DEFENDANTS' OPPOSITION AND RESPONSE TO TRUSTEE'S STATEMENT OF MATERIAL FACTS**

Gerald and Barbara Keller Family Trust and Gerald E. Keller in his capacity as Trustee of the Gerald and Barbara Keller Family Trust ("Defendants"),[1] respectfully submit this Response pursuant to Fed. R. Civ. P. 56 to object to and correct the Statement of Material Facts ("SMF") in Support of the Trustee's Motion for Summary Judgment (the "SMF"), filed by Irving H. Picard, the trustee for the liquidation of Bernard L. Madoff Investment Securities LLC (the "LLC") (ECF No. 101).

As set forth specifically in response to each numbered statement below, many of the Trustee's purportedly undisputed facts are legal arguments that belong in the Trustee's memorandum rather than in a Statement of Material Facts.  To the extent the Trustee's statements reflect "facts," those facts are often flatly contrary to the sworn testimony of the Trustee's key expert witness, Bruce Dubinsky.  In other instances, the Trustee's "facts" are either not material, incorrectly reported, or not supported by admissible evidence.  Even if a portion of the Trustee's statement, such as a quotation, may be technically accurate, Defendants do not admit to or adopt anything beyond the accuracy of the quoted language within the document, which, of course, speaks for itself.  Defendants also note that, while they may admit that certain language is quoted correctly, unless explicitly stated, Defendants' admission to the accuracy of the quoted language does not admit to the accuracy of the underlying fact or facts referred to in the quoted language.  Further, Defendants do not admit to the admissibility of, or waive objections to, the document containing the language in question.  Defendants reserve the right to make evidentiary objections

---

[1] Defendants Barbara Keller and Gerald E. Keller were dismissed as defendants by order of Judge Bernstein dated July 16, 2015, ECF 39.  Barbara Keller as Trustee is no longer a defendant because she died in June 2019 and the Trustee never took the necessary steps to amend the complaint to assert a claim against her Estate.

to the purported evidence cited in the Trustee's SMF, regardless of whether an objection is asserted herein.

## I.     Background and the Trustee

1.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced an action in the United States District Court for the Southern District of New York.  Compl., *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 11, 2008), ECF No. 1.

**RESPONSE:**  Disputed.  While Madoff was arrested on December 11, 2008, the Trustee is incorrect about the action's timing and imprecise about the nature of the fraud. Further, the case cited involves unrelated issues of the nature and conditions of Madoff's detention pending trial.

On December 11, 2008, Bernard L. Madoff was arrested on a criminal complaint alleging one count of securities fraud.  *U.S. v Madoff*, 1:08-mj-02735 UA (S.D.N.Y. Dec. 11, 2008) [ECF Nos. 1, 2].  On December 11, 2008, an action was commenced against the LLC and against Madoff by the Securities and Exchange Commission ("SEC") in the United States District Court for the Southern District of New York alleging violations of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b- 5, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940. *SEC v. Madoff*, Case 1:08-cv-10791-LLS (S.D.N.Y. Dec. 11, 2008) [ECF No. 1].  There was no charge that Madoff operated a Ponzi scheme.

On March 10, 2009, a criminal Information was filed in the District Court charging Madoff with eleven felonies including securities fraud, investment adviser fraud, mail fraud, wire fraud, three counts of money laundering, false statements, perjury, false filings with the SEC, and theft

from an employee benefit plan. *United States v. Bernard L. Madoff,* 09 Cr. 213 (DC) (S.D.N.Y Mar. 10, 2009) [ECF No. 38]. Madoff was not charged with operating a Ponzi scheme.

2.      On December 11, 2008, the United States Government initiated a criminal action against Madoff for criminal violations of federal securities laws, including, *inter alia*, securities fraud, investment advisor fraud, and mail and wire fraud. Compl., *United States v. Madoff*, No. 08-mj-02735 (S.D.N.Y. 2008), ECF No. 1.

**RESPONSE:** Undisputed.

3.      On December 15, 2008, under 15 U.S.C. § 78eee (a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Application of SIPC at 10, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 5. Thereafter, under 15 U.S.C. § 78eee(a)(4)(B), SIPC filed an application in the district court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by the Securities Investor Protection Act ("SIPA"). *Id.* at 2–3.

**RESPONSE:** Undisputed, except that the Trustee defines the LLC as "BLMIS." This is misleading because Madoff operated as a sole proprietorship from at least the 1970's under the trade name "Bernard L. Madoff Investment Securities" ("BLMIS")**.**

4.      Also, on December 15, 2008, the District Court granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    i.   appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C. § 78eee(b)(3);

    ii.  appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15 U.S.C. § 78eee(b)(3); and

    iii. removed the case to the bankruptcy court pursuant to 15 U.S.C. § 78eee(b)(4).

Order, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4 ("SIPC

Liquidation Order").

**RESPONSE:**  Undisputed except the Trustee was appointed for the liquidation of the LLC,

not for the liquidation of Madoff or his sole proprietorship, BLMIS. SIPC Liquidation Order, ECF

No. 4**.**

5.    By orders dated December 23, 2008 and February 4, 2009, respectively, the

bankruptcy court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.  Order,

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr.

S.D.N.Y. Dec. 23, 2008), ECF No. 11; Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv.*

*Sec. LLC*, Adv. Pro. No 08-01789 (SMB) (Bankr. S.D.N.Y. Feb. 4, 2009), ECF No. 69.

**RESPONSE:**  The statement is subject to clarification.  By orders dated December 23,

2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and

found that the Trustee was a disinterested person to serve and act on behalf of the estate of the

LLC only.  *See* Order, Dec. 23, 2008, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,

Adv. Pro. No. 08-01789 (SMB), ECF No. 11; Order, Feb. 4, 2009, ECF No. 69.

6.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, the bankruptcy court substantively consolidated the chapter 7 estate of Madoff

into the SIPA Proceeding.  Involuntary Petition, *In re Bernard L. Madoff*, Adv. Pro. No. 09-11893

(SMB) (Bankr. S.D.N.Y. Apr. 13, 2009), ECF No. 1; Consent Order, *Sec. Inv'r Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 9, 2009),

ECF No. 252.

**RESPONSE:**  The statement is subject to clarification.  On June 10, 2009, this Court

entered an order substantively consolidating the Chapter 7 estate of Madoff into the SIPA

liquidation. Consent Order, June 10, 2009, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec.*

*LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 08-01789, ECF No. 252. The Order

was subject to the following significant limitation and specifically preserved for Madoff's Chapter

7 trustee the power to bring avoidance actions to recover alleged property of Madoff:

> Notwithstanding the substantive consolidation of the Madoff estate into the BLMIS
> SIPA Proceeding, **the Chapter 7 Trustee shall remain Chapter 7 trustee of the**
> **Madoff estate and shall continue to have all powers, rights, claims and**
> **interests of a Chapter 7 trustee to bring claims under Chapters 5 and 7 of the**
> **Bankruptcy Code** in consultation with the SIPA Trustee and SIPC. Further, all
> powers, rights, claims and interests of the Madoff estate are expressly preserved,
> including without limitation all Chapter 5 and Chapter 7 powers, rights, claims
> and/or interests.

*Id*. at ¶4 (emphasis added).

Thus, the Consent Order specifically preserved for Madoff's Chapter 7 trustee the power

to bring avoidance actions to recover alleged property of Madoff.  *Id.*

## II.      BLMIS Operated a Ponzi Scheme Through Its Investment Advisory Business

### A.      BLMIS's Business

7.      In January 1960, Bernard L. Madoff registered as a broker-dealer with the SEC.

He was assigned registrant number 8-8132.  Through that registration, the broker-dealer became a

member of SIPC when SIPA was enacted in 1970.  SIPC Liquidation Order; Declaration of

Nicholas J. Cremona, dated July 22, 2021 ("Cremona Decl."), Ex. 1 (SEC Form BD for Bernard

L. Madoff dated Dec. 31, 1959 (PUBLIC0003607)).

**RESPONSE:** Undisputed**.**

8.      Beginning in 1960 and until January 1, 2001, BLMIS operated as a sole

proprietorship.  Declaration of Bruce G. Dubinsky, dated July 20, 2021 ("Dubinsky Decl."),

Attach. A (Expert Report of Bruce G. Dubinsky, dated January 16, 2019 ("Dubinsky Report")) ¶ 36. During its existence, it operated under the names Bernard L. Madoff and Bernard L. Madoff Investment Securities and, after 2001, as Bernard L. Madoff Investment Securities LLC. *Id.* ¶ 38.

**RESPONSE:** Disputed. The Dubinsky Report as cited does refer to the term BLMIS, but Dubinsky uses that term to connote the LLC which is seriously misleading since BLMIS was Madoff's trade name for his sole proprietorship as far back, at least, as the 1970s. *See* Chaitman Dec. **Ex. D**, SEC Amended Form BD at 8-10 ["Q. Activities of this Partnership, Corporation, or Organization: Securities Activities: A: Yes; **Investment Advisory Activities: A: No**"]. Indeed, there is no evidence that the IA business was ever contributed to the LLC. On the contrary, all the evidence proves that the IA business remained Madoff's property after the LLC was formed. *See id*.

9. Effective as of January 1, 2001, BLMIS was registered as a New York single member limited liability company. On January 12, 2001, BLMIS amended its SEC Form BD to reflect its change in corporate form from a sole proprietorship to a single member limited liability company and all the assets and liabilities of the sole proprietorship were transferred to the limited liability company. Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

**RESPONSE:** Disputed. On January 12, 2001, the LLC amended Madoff's SEC Form BD to reflect the change in corporate form for the legitimate proprietary trading ("PT") and market-making ("MM") businesses operated by Madoff's sons from a sole proprietorship to a single member limited liability company. Form BD did not effectuate a transfer of all the assets and liabilities of the sole proprietorship to the LLC. On the contrary, Form BD transferred only the PT and MM businesses. Form BD specifically stated that the LLC would not be engaged in the investment advisory business. *See* Chaitman Dec. **Ex. D,** SEC Amended Form BD at 8-10.

10.     In response to the direction in the Amended Form BD to "[b]riefly describe details

of the *succession* including any assets or liabilities not assumed by the *successor* [BLMIS],"

(emphasis in original), Madoff replied:

> EFFECTIVE JANUARY 1, 2001, PREDECESSOR WILL TRANSFER TO
> SUCCESSOR ALL OF PREDECESSOR'S ASSETS AND LIABILITIES,
> RELATED TO PREDECESSOR'S BUSINESS. THE TRANSFER WILL NOT
> RESULT IN ANY CHANGE IN OWNERSHIP OR CONTROL.

Cremona Decl., Ex. 3 (2001 SEC Amended Form BD) at Question 5 (emphasis in original).

**RESPONSE:**  Disputed. While the quoted language indeed appears on Amended Form

BD, the document expressly does not include the IA business as an operation of the LLC.  *See*

Chaitman Dec. **Ex. D**, SEC Amended Form BD at 8-10.          .

11.     Madoff further certified that no "accounts, funds, or securities of customers of the

*applicant* are held or maintained by such other *person*, firm, or organization."  *Id.* at Question 8(c)

(emphasis in original).

**RESPONSE:**  Disputed. The statement contains an incorrect predicate. Madoff did not

certify that accounts were held by the LLC. To the extent that this statement contains the Trustee's

characterization of the effect of Amended Form BD, which speaks for itself, the Court is

respectfully referred to the cited document for a true and accurate interpretation of its contents.

*See* Chaitman Dec. **Ex. D**, SEC Amended Form BD at 8-10.

12.     In 2006, BLMIS registered as an investment advisor with the SEC claiming to have

only 23 accounts and $11.7 billion in assets under management.  Dubinsky Decl., Attach. A

(Dubinsky Report) ¶ 39.

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading

because BLMIS is the trade name that Madoff used for his sole proprietorship from at least the

1970s on. The LLC registered as an investment advisor with the SEC for the first time on August

25, 2006 in order to resolve an audit by the SEC. In the registration, the LLC claimed to have 23

accounts (as opposed to the approximately 5,200 accounts in the IA business) and $11.7 billion in

assets under management (as opposed to the approximately $60 billion in assets in the IA business,

according to the IA customer statements. *See* Chaitman Dec**. Ex. BA***,* BLMIS Form ADV, Aug.

25, 2006 [PUBLIC0003729-762]. Moreover, Defendants dispute the admissibility of the document

on which the Trustee relies. This statement is not "followed by citation to evidence which would

be admissible." Local Civ. R. 56.1; *see also* Fed. R. Civ. P. 56(c).

13.     BLMIS operated three business units: (i) a proprietary trading business; (ii) a

market-making business; and (iii) an investment advisory business ("IA Business"). *Id.* ¶ 36.

**RESPONSE:**     Disputed. Defendants agree that, prior to January 2001, the sole

proprietorship, operated the three businesses set forth above. However, after January 2001, the

LLC, run by Madoff's sons, operated the PT and MM businesses of the LLC and Madoff continued

to operate the IA business as a sole proprietorship under both his own name and under his trade

name, BLMIS. *See* Responses to SMF ¶¶ 8-10. Moreover, Defendants dispute the admissibility

of the document on which the Trustee relies. *See* Response to SMF ¶ 12.

14.     The proprietary trading business traded for its own account to make money for

BLMIS. *Id.* ¶¶ 36, 46.

**RESPONSE:**     Disputed. The term "BLMIS" as defined by the Trustee is misleading.

Defendants do not dispute that the PT business traded for its own account to make money for the

entity which held it but that entity was Madoff prior to January 2001 and the LLC after January

2001. Further, Defendants dispute the admissibility of the document on which the Trustee relies.

*See* Response to SMF ¶ 12.

15.    The market-making business made markets in certain stocks, bonds, warrants and rights. *Id.*

**RESPONSE:**  While Defendants do not dispute the statement, Defendants dispute the admissibility of the document on which the Trustee relies. *See* Response to SMF ¶ 12.

16.    The proprietary trading and market-making businesses were referred to within BLMIS as "House 5." *Id.* ¶ 36.

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading because it describes the sole proprietorship that Madoff operated at least since the 1970s. *See* Chaitman Dec. **Ex. B**, Confirmation Slips dating from 1979 showing the trade name Bernard L. Madoff Investment Securities [10-5420_Defendant_0002412-13][2]; *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 610 B.R. 197, 206 (Bankr. S.D.N.Y. 2019). "House 5" referred to the Proprietary Trading Business before the LLC was formed in 2001. *See* Chaitman Dec. **Ex. A**, Nelson Tr. 5/8/19 at 62:18-19; *see e.g.* Complaint ("Compl.") at ¶ 25, Adv. Pro. No. 10-04438 (Bankr. S.D.N.Y. November 30, 2010), ECF No. 1.[3] Defendants dispute the admissibility of the document on which the Trustee relies. *See* Response to SMF ¶ 12.

17.    The IA business was designed to purportedly trade stocks to buy equities and to buy options on behalf of its customer accounts. *Id.* ¶¶ 41-44.

**RESPONSE:**  Disputed. Defendants object to the use of the word "purportedly." The IA business existed since the 1960s. The Trustee has not produced any credible evidence that

---

[2] Attached to the Chaitman Declaration as **Ex. B** are copies of confirmation slips dating from 1979 to the Unflats, who were Madoff customers, showing credits to their account from "Bernard L. Madoff Investment Securities."

[3] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Keller, et.al,* Adv. Pro. No. 10-04549 (Bankr. S.D.N.Y.)

securities were not purchased for IA customers' accounts in the period prior to 1992-1993. Moreover, Dubinsky has admitted that Madoff used IA customers' money to purchase billions of dollars of T-bills, which Madoff credited to some of the customers' accounts. *See* Chaitman Dec. **Ex. A** Nelson Tr. 5/8/19 at 166:17-18; 90:25-91:2; 155:2-4; 154:2-9. Defendants further dispute the admissibility of the document on which the Trustee relies. *See* Response to SMF ¶ 12.

18.     The Proprietary Trading Business and the IA Business were units of BLMIS, both operated by Madoff. *Id.* ¶¶ 36, 48.

**RESPONSE:**  Disputed. They were part of the sole proprietorship prior to January 2001 but, at that time, the PT business and the MM business were transferred to the LLC.  Further, Defendants dispute the admissibility of the document on which the Trustee relies. *See* Response to SMF ¶ 12.

### B.     BLMIS Was Not Trading Securities

19.     Bruce Dubinsky, a forensic accountant with more than 30 years of experience in financial fraud investigations, was retained by the Trustee as an expert witness in this matter.  Mr. Dubinsky conducted numerous analyses from which he concluded that BLMIS did not conduct any trading on behalf of its IA Business customers. *Id.* at Section VI.A.

**RESPONSE:**  Disputed. The statement about Dubinsky's experience as a forensic accountant may well be accurate. The term "BLMIS" as defined by the Trustee is misleading because BLMIS was Madoff's sole proprietorship. Moreover, Dubinsky's flagrant and patent perjury makes him entirely incredible. *See Nelson,* Adv. Pro. No. 10-04658, ECF No. 179 at ¶168.  Defendants also dispute the admissibility of the document on which the Trustee relies. *See* Response to SMF ¶ 12.

20.     At various times, BLMIS reported to its IA Business customers that the money they

deposited with BLMIS was invested in investment strategies called the "convertible arbitrage" strategy or the "split-strike conversion" strategy. BLMIS did not execute either strategy on behalf of its IA Business customers.  *Id. at Section VI.A.*¶¶ 19- 26; *see also* ¶¶ 41–44.

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading.  The arbitrage strategy was conducted by Madoff as a sole proprietor during the 1980s.  The customers of the IA Business were not the customers of the LLC, they did not deposit money with the LLC, and the LLC did not make reports to them.  Further, *see* Responses to SMF ¶¶ 8-10, 12, 19 and 21.

21.    Mr. Dubinsky analyzed BLMIS's execution of the convertible arbitrage strategy and determined that trading never occurred dating back to at least the 1970s.  *Id.* at Section VI.A(1)(a).

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading. And Defendants dispute any analysis performed by Dubinsky based on the books and records of the sole proprietorship because they are derived from hearsay (Fed. R. Evid. 801, 802) contained in the internal records of the sole proprietorship which the Trustee himself has admitted were "permeated with fraud." *See* Adv. Pro. No. 08-01789, ECF No. 12137-1, Declaration of Bruce G. Dubinsky, November 24, 2015, Ex. 1 at 157 ("[F]raud permeated BLMIS to the extent that the company's books and records could not be relied upon by a hypothetical buyer.");  *see United States v. Casas,* 356 F.3d 104, 119 (1st Cir. 2004) ("evidence which is based on inadmissible hearsay is itself inadmissible") (citing *Martin v. Funtime, Inc.,* 963 F.2d 110, 116 (6th Cir.1992)). Moreover, Defendants dispute the admissibility of the document on which the Trustee relies. *See* Response to SMF ¶ 12.

Finally, Dubinsky's first expert report contains obviously false statements which Madoff demonstrated in his deposition. *See* Chaitman Dec. **Ex. AF,** Madoff Dep. Tr. 12/20/16 at 83:8-

84:8; 83:17-20 ["Q: . . .  Did you find that overall there were some mistakes that Mr. Dubinsky

made? . . . A. Yes."] *id.* at 91:24-92:3 ["Q. . . . Are there some fundamental errors that you feel

Mr. Dubinsky made? A. Yes. Q. Okay . . . let's go through them one at a time."]; *id.* at 92:14-19

["A. … The fact was the errors that I found were – had to deal with the beginning of the report

dealing with the convertible – the trading that took place before 1992, which basically involved

the convertible bond arbitrage transactions."]; *see id.* at 93:1-13 ["A. … [Dubinsky's] knowledge

of the market-making and the dealer markets and the over-the-counter trading, … [H]e had very

little experience in that. … [I]t's sort of a specialized marketplace. . . . And he had things that were

really wrong"]; *id.* at 95:6-16 ["A. Dubinsky . . .  is used to seeing a retail confirmation, which

would have the opposite of that. So he makes a big point in his report of saying that Madoff

reflected this wrong for the customer. . . . [F]rankly, it's an embarrassment . . .  to put that in the

report."]; *id.* at 100:17-101:3 ["Q. So with your investment advisory customers, who were doing

convertible arbitrage . . . their transactions were always with Madoff? A. Correct. . . . All of our

customers -- we always traded for – Q. From your own inventory? A. Other than theoretically in

options, we traded from our own inventory."]; *id.* at 103:4-108:8 ["A. So Dubinsky is claiming

that if we show on a confirmation or in a customer account that we bought stock – we sold stock

to a customer or bonds to – a customer, that he looks to try and establish that there weren't enough

bonds that actually traded in the marketplace at the time that we claim that we bought the bonds

for the customer . . . the way that he researches that is he looks on the New York Stock Exchange

. . .  number of bonds on the New York Stock Exchange, and shows that it was, let's say, 100

bonds, and Madoff bought 200 bonds for a customer. So therefore, he couldn't have possibly

bought 200 bonds for a customer, because only 100 bonds traded on the . . . New York Stock

Exchange . . . the fallacy of that is that . . . convertible bonds, which is what he is researching here,

so not trade on the New York Stock Exchange. They trade over the counter . . . to demonstrate that I brought . . . the Bible of – the bond markets . . ."Bond and Money Markets" [by] Moorad Choudhry. . . It's discussing the secondary market, which is . . .  when you buy and sell stock for clients, you're buying in the secondary market, as opposed to the primary market . . . it says "Corporate bonds virtually everywhere are traded on an over-the-counter, OTC, basis. That is directly between counterparties over the telephone". . . although, this is a bond that is listed on the New York Stock Exchange, . . . most of the trading takes place in that bond in the over-the-counter market. . . . He [Dubinsky] looks on the New York Stock Exchange, and clearly sees that that doesn't match. He's ignoring the over-the-counter-market. [I]t demonstrated . . . a total lack of understanding."]; *id.* at 109:6- 112:4 ["A. [Dubinsky] goes on to make another mistake when he talks about the price range . . . all of our transactions are . . . average price transactions. . . . [bought over the course of days] . . . [Dubinsky] thinks it was all bought at one price on that day . . . if he bothered to read the back of the confirmation, which he probably never did, you know, it clearly states that these are average price transactions. They're not one price."]; *id.* at 123:14-124:10 ["A. [Dubinsky] has no way of knowing that . . . . Wall Street cleared all of their transactions through basically a couple of major banks, like Citicorp, Chase and so on."]; *id.* at 191:7-10 ["A. . . . [S]o he's [Dubinsky] saying that if we – if we wrote the confirmation wrong, the trade never could have taken place, because he's [Dubinsky] - - he's not reading it properly."]; *see generally id.* at 94:21-191:10 (Madoff's testimony regarding Dubinsky's inaccuracies); *see also* Chaitman Dec. **Ex. O,** Madoff Dep. Tr. 4/26/17 at 34:19-38:10; 36:11-16 ["Q. Now, you testified last time that Mr. Dubinsky apparently lacked an understanding of that strategy? A. Well, he – must have. He must have not understood the strategy because his report failed to – failed to state that."].

22. By 1992, the IA Business changed its primary purported investment strategy to the

split-strike conversion strategy. *Id.* at Section VI.A (1)(b), specifically ¶ 155.

**RESPONSE:** Disputed. Defendants dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12 and 21.

23.     The split-strike conversion strategy, as purportedly executed by BLMIS, involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing treasury bills when the money was "out of the market." The strategy was purportedly set up by BLMIS so that the purchase of put options and the sale of call options would create a collar around the stock to reduce the volatility of BLMIS's portfolio. *Id.* ¶¶ 156-58. BLMIS did not conduct this strategy on behalf of its customers. Section VI.A (1)(b).

**RESPONSE:** Disputed. The term "BLMIS" as defined by the Trustee is misleading. *See* Responses to SMF ¶¶ 12, 19 and 21. Moreover, T-bills were the most common investment in the IA accounts and Madoff purchased T-bills with IA customers' money that did appear on the customer statements of some of the IA customers. *See, e.g.* CMF ¶¶ 75-95.

24.     Mr. Dubinsky's analysis demonstrated that BLMIS did not conduct any trading on behalf of its IA Business customers based on (a) the impossible reported volume of equity trades; (b) the impossible equity and options trades reported outside the daily price range; (c) the low volatility in its reported daily trading performance compared to the actual market behavior and the performance achieved by BLMIS in the Proprietary Trading Business unit as measured by the volume weighted average prices for its sales and purchases; (d) the consistently positive rates of returns that did not "mirror" the volatility of the markets; (e) a lack of any Depository Trust Corporation ("DTC") records to confirm the reported IA Business equity or treasury trades; and (f) a lack of Options Clearing Corporation ("OCC") records to confirm the reported IA Business

options trades.  *Id.* at Section VI.A(1)(c)(i)-(vi), A.(1)(e)(i)-(iv).

**RESPONSE:**  Disputed. Dubinsky's analysis and his testimony at the *Nelson* trial were patently dishonest.  Dubinsky was forced to admit his perjury on cross-examination when he admitted that Madoff purchased T-bills with IA customers' money, as proven by reliable third party records. *See* Chaitman Dec**. Ex. A,** Nelson Trial Tr. 5/8/19 at 166:17-18; 90:25-91:2; 155:2-4; 154:2-9; *see also* CMF ¶¶ 75-95.  Moreover, the term "BLMIS" as defined by the Trustee is misleading.  *See* Responses to SMF ¶¶ 12, 19 and 21.

### i.    Volume of Equity Trades

25.    Mr. Dubinsky analyzed equity trades that the IA Business reportedly made in the split-strike conversion strategy between January 2000 and November 2008.  His analysis compared the daily volumes for certain stocks reported as purchased or sold by the IA Business on the aggregated customer statements with the actual market volumes sold as reported by Bloomberg. *Id.* ¶¶ 159-60.

**RESPONSE:**  Disputed. Because of Dubinsky's repeated perjury during his direct examination at the Nelson trial, it is impossible to view any of his findings as being credible or reliable.  Defendants further dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19 and 21.

26.    Mr. Dubinsky found many instances where the volume that BLMIS claimed to have purchased or sold on behalf of all IA Business customers exceeded the volume of equities traded for the entire market.  *Id.*

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading because the sole proprietorship, not the LLC, owned the IA business. Moreover, because of Dubinsky's repeated perjury during his direct examination at the Nelson trial, it is impossible to

view any of his findings as being credible or reliable. Defendants further object to this statement as neither material nor necessary for the determination of this case. Finally, Defendants dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19 and 21.

27.    For example, on July 14, 2000, the aggregated IA Business customer statements reported purchases of 2,822,680 shares of AIG (as reflected in the column titled "IA Business Purported Value"), but the total market volume that traded that day for all of AIG shares in the market was only 1,692,800 (as reflected in the column titled "Actual Market Value"). Similarly, the IA Business reported trading 17,709,440 shares of GE on September 13, 2000, but the total market volume that traded all day for GE shares in the market was only 7,604,800. *Id.* ¶ 159, Ex. 11 to Dubinsky Report ("Split-Strike Conversion IA Business Equity Volume Analysis, Analyzed Time Period"); *see also* Ex. 12 to Dubinsky Report ("Split-Strike Conversion IA Business Options Volume Analysis, Analyzed Time Period").

**RESPONSE:**  Disputed. Defendants object to this statement as neither material nor necessary for the determination of this case. Defendants further dispute the admissibility of the document on which the Trustee relies. Finally, Madoff admitted that he didn't purchase the Fortune 100 company stocks shown on the IA customers' statements (although he testified that he did purchase T-bills). *See* Chaitman Dec. **Ex. O,** Madoff Dep. Tr. 4/26/17 19:22-20:1*; see also* Responses to SMF ¶¶ 12, 19 and 21.

28.    Mr. Dubinsky concluded that BLMIS's trading in excess of market volumes demonstrated that the IA Business did not trade on behalf of its customers. *Id.* at Section VI. A.(1)(c), ¶¶ 159-60, Exs. 11-12 to Dubinsky Report.

**RESPONSE:** Disputed. The term "BLMIS" as defined by the Trustee is misleading. After giving knowingly false testimony on direct examination at the Nelson trial, Dubinsky admitted that, in fact, he knew that Madoff used IA customers' money to purchase huge positions of T-bills. *See* Chaitman Dec. **Ex. A,** Nelson Trial Tr. 5/8/19 at 166:17-18; 90:25-91:2; 155:2-4; 154:2-9; *see also* CMF ¶¶ 75-95. Defendants dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19 and 21.

### ii.    Equity and Options Trades Priced Outside Daily Price Range

29.    For the analyzed period of 2000-2008, Mr. Dubinsky determined that there were 99,972 equity transactions executed outside the daily market traded price range. The purported prices for these transactions exceeded the daily high price by as much as $8.96 and were below the daily low by as much as $105.04. There was no evidence in the BLMIS books and records that the almost 100,000 transactions were mistakes, and there were no DTC records evidencing that the trades were actually executed. Mr. Dubinsky opined that equity trades that were reported as having been executed outside the daily price range of the entire U.S. equities market could not have occurred. *Id.* ¶¶ 161-62, Ex. 13 to Dubinsky Report ("Split-Strike Conversion IA Business Equity Price Analysis, Analyzed Time Period").

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading. Defendants object to this statement as neither material nor necessary for the determination of this case because Madoff conceded that he didn't buy the equities shown on the IA customers' statements after 1992-93. However, Madoff did testify that he purchased T-bills with IA customers' money and these T-bills did appear on some customers' statements. *See* Chaitman Dec. **Ex. O,** Madoff Dep. Tr. 4/26/17 at 19:1-21; 19:22-20:1; 46:9-47:12; Chaitman Dec. **Ex. AF,** Madoff Dep. Tr. 12/20/16 at 161:12-25. Given Dubinsky's outright perjury at the Nelson trial, it

is impossible to believe any of his testimony except where Madoff conceded the point. Defendants

further dispute the admissibility of the document on which the Trustee relies. *See* Responses to

SMF ¶¶ 12, 19 and 21.

30.    Mr. Dubinsky performed the same analysis on options trades for the same time

period and identified 34,501 options transactions traded outside of the daily price range.  He found

that the options traded above the daily high price by as much as $15.25 higher and by as much as

$6.05 below the daily low price.  Mr. Dubinsky opined, as with the equity trades, that the reported

options trades purportedly executed outside the daily price range could not have occurred.  *Id.* ¶¶

164-66, Ex. 14 to Dubinsky Report ("Split-Strike Conversion IA Business Options Price Analysis,

Analyzed Time Period").

**RESPONSE:** Disputed. Defendants object to this statement as neither material nor

necessary for the determination of this case. Defendants further dispute the admissibility of the

document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19, 21, 28 and 29.

### iii.    Volume Weighted Average Price Analysis

31.    The absence of actual trading was also reflected in the prices at which the IA

Business purportedly bought and sold shares using the split-strike conversion strategy.  Mr.

Dubinsky conducted a Volume Weighted Average Price ("VWAP") analysis of the daily purchases

and sales reported by the IA Business and the Proprietary Trading Business.  *Id.* ¶¶ 168-72.

**RESPONSE:** Disputed. Defendants object to this statement as neither material nor

necessary for the determination of this case. Dubinsky has destroyed his own credibility by lying

on direct examination at the Nelson trial.  Defendants further dispute the admissibility of the

document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19, 21, 28 and 29.

32.    VWAP is a trading benchmark that gives the average price a security has traded

throughout the day, based on both volume and price.  The VWAP is a widely used industry benchmark that allows a firm to see how well its traders are doing compared to the rest of the market. *Id.* ¶¶ 168-69.

**RESPONSE:**  While the statement itself may be true, Defendants dispute the admissibility of the document on which the Trustee relies. *See* Response to SMF ¶ 12.

33.    Based on Mr. Dubinsky's analysis, he determined that the IA Business purportedly executed 83% of the daily buy transactions by share volume *below* the VWAP, and 72% of the daily sell transactions by share volume *above* the VWAP.  In other words, BLMIS had the uncanny ability to buy low and sell high at a remarkable rate compared to the rest of the market. *Id.* ¶ 170.

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading. Defendants object to this statement as neither material nor necessary for the determination of this case. Defendants further dispute the admissibility of the document on which the Trustee relies and states that nothing Dubinsky says can be relied upon because of his blatant perjury on direct examination at the Nelson trial. *See* Responses to SMF ¶¶ 12, 19, 21, 28 and 29.

34.    Mr. Dubinsky further compared the IA Business's purchase and sale of the same stock actually traded by the Proprietary Trading Business on the same days.  The Proprietary Trading Business matched average VWAP of traders.  The IA Business, however, consistently outperformed VWAP by such wide margins that it evidenced the fictitious nature of the trades. *Id.* ¶¶ 171-72.

**RESPONSE:**  Disputed. Defendants object to this statement as neither material nor necessary for the determination of this case.  Defendants further dispute the admissibility of the document on which the Trustee relies. Dubinsky ignores Madoff's testimony that he acted as principal for his IA customers, meaning that he purchased positions in certain securities over a

period of days and charged his customers an average price, not the trading day's market price. *See* Chaitman Dec. **Ex. AF,** Madoff Dep. Tr. 12/20/16 at 109:6-112:4; *id.* at 111:23-112:4 ["A. . . . [H]e [Dubinsky] thinks it was all bought at one price on that day . . . if he bothered to read the back of the confirmation, which he probably never did, you know, it clearly states that these are average price transactions. They're not one price."]. *See* Responses to SMF ¶¶ 12, 21, 28 and 29.

35.    Mr. Dubinsky concluded that the unrealistic VWAP results demonstrated that the IA Business did not trade on behalf of its customers. *Id.* ¶¶ 170-72.

**RESPONSE:** Disputed. *See* Response to SMF ¶ 34. Further, *see* Responses to SMF ¶¶ 12, 19, 21, 28 and 29.

### iv.    Annual Rates of Return

36.    To further test whether the IA Business engaged in trading, Mr. Dubinsky analyzed the volatility of the IA Business's reported average annual rate of return for the split-strike conversion strategy as compared with the volatility of the annual rate of return as reported by Bloomberg for the two major market indices, the S&P 100 Index and the Dow Jones Industrial Average (the "Dow Jones") from December 31, 1996 through December 11, 2008. *Id.* ¶¶ 177-78.

**RESPONSE:**  Disputed. *See* Response to SMF ¶ 34.

37.    Because the IA Business's split-strike conversion strategy was supposedly engineered around the S&P 100, with a basket of stocks in the S&P 100 and using S&P index options, the IA Business's returns should have performed similarly to the S&P 100 Index.  In other words, if the market goes down, the returns should have gone down and vice versa. *Id.* ¶ 177.

**RESPONSE:** Disputed. *See* Response to SMF ¶ 34.

38.    Mr. Dubinsky's analysis showed, however, that the volatility in the IA Business rates of return did not mirror the volatility of the rates of returns of the major indices.  The IA

Business rates of return stayed within a small range, generally between 10-12% for most years and

going up to 20% for the year of 1999. *Id.* ¶¶ 178, 180. The returns for the major market indices

ranged from a high of 31% to a low of -37% (specifically, the S&P 100 swinging widely from a

high of 31% to a low of - 37%, and the Dow Jones from a high of 25% to a low of -34%). *Id.*

¶ 179.

**RESPONSE:** Disputed. *See* Response to SMF ¶ 34.

39.     While the returns available in the major indices went up and down, representing the

volatility in the market, the IA Business returns stayed steady for the twelve-year period examined,

never having a negative year or month (even throughout 2008). *Id.* ¶¶ 180-81.

**RESPONSE:** Disputed. *See* Response to SMF ¶ 34.

40.     Mr. Dubinsky concluded that the lack of volatility in the IA Business demonstrated

that the IA Business was not engaged in trading. *Id.* ¶ 181.

**RESPONSE:** Disputed. *See* Response to SMF ¶ 34.

> **v.     Securities Listed on the IA Business Customer Statements Did Not
> Reconcile with DTC Records**

41.     Mr. Dubinsky compared the trades purportedly executed for the customer accounts

in the IA Business with the records maintained by the DTC, an organization in the United States

that clears and settles equity transactions in the U.S. market. *Id.* at Section VI.A.(1)(e).

**RESPONSE:** Disputed. Defendants dispute the admissibility of the document on which

the Trustee relies. Further, given Dubinsky's perjury at the Nelson trial, his testimony is entitled

to no credibility. Moreover, Madoff testified that the brokerage firms through which he purchased

T-bills retained custody of those T-bills, so they would not have been placed with the DTC. *See*

Chaitman Dec. **Ex. BB,** Madoff Dep. Tr. 6/15/2016 at 52:22-25; Chaitman Dec. **Ex. O**, Madoff

Dep. Tr. 4/26/2017 at 40:24-41:15; 78:1-25.  Madoff testified that when he was dealing as principal

there was no counterparty since he was on both sides of the trade.  Chaitman Dec. **Ex. AF,** Madoff

Dep. Tr. 12/20/16 at 128:7-12.  *See* Responses to SMF ¶¶ 12, 19, 21, 28 and 29.

42.    When equity trades are recorded at the DTC it creates the official record of where

that stock is held.   The ownership of the stock can be confirmed with the DTC.  *Id.* ¶¶ 194-95.

**RESPONSE:**  The Trustee's statement requires clarification. There are other methods of

creating an official record of where the stock is held, and to the extent this statement implies that

this is the *only* official record, it is false. For example, Madoff maintained numerous custodial

accounts which held securities which were not recorded at the DTC.  Similarly, Madoff held T-

bills at the firms from which he purchased them.  *See* Chaitman Dec. **Ex. BB,** Madoff Dep. Tr.

6/15/2016 at 52:22-25; Chaitman Dec. **Ex. O,** Tr. 4/26/2017 at 40:24-41:15; 78:1-25; Chaitman

Dec. **Ex. AF,** Madoff Dep. Tr. 12/20/16 at 128:7-12.  Defendants further dispute the admissibility

of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 21, 28 and 29.

43.    BLMIS had a single account with the DTC, the "646 account."  All equity trades

made by BLMIS should have been reflected in the DTC records pertaining to its account. *Id.* ¶

209.

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading.

Presumably, here, the Trustee is referring to the LLC's account with the DTC which held securities

purchased by the LLC and not securities purchased by the IA business through other brokerage

firms. Defendants further dispute the admissibility of the document on which the Trustee relies.

*See* Responses to SMF ¶¶ 12, 21, 28, 29, 41 and 42.

44.    Mr. Dubinsky's analysis confirmed that the securities that were cleared through

BLMIS's DTC account, the 646 account, were traded by the Proprietary Trading business.  No IA

Business trades were cleared through BLMIS's DTC account.  *Id.* ¶¶ 209-13.

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading.  *See* Response to ¶ 42.  Defendants object to this statement as neither material nor necessary for the determination of this case.  Defendants further dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 21, 28, 29 and 41.

45.    The Proprietary Trading Business shares reflected in the DTC records matched the BLMIS records evidencing those trades.  *Id.* ¶¶ 209, 211, 213.

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading. Here, the Trustee is referring to the PT business as operated by the LLC because he only has the DTC's records going back to 2001, when the LLC was formed. Further, Defendants dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 21, 28, 29, 41 and 42.

46.    Mr. Dubinsky concluded that the Proprietary Trading Business actually executed those trades in the marketplace, as confirmed by the DTC records.  For the IA Business, however, Mr. Dubinsky could not account for the stock purportedly traded for the customers in the IA Business in any DTC records.  *Id.* ¶ 209.

**RESPONSE:**  Disputed. While the Proprietary Trading Business conducted legitimate trades, Defendants object to this statement as neither material nor necessary for the determination of this case. Defendants further dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 21, 28, 29, 41 and 42.

47.    Based on his analysis, Mr. Dubinsky concluded that the IA Business did not execute the equity trades reflected on the customer statements.  *Id.* ¶ 212.

**RESPONSE:** Disputed. The IA Business traded in T-bills for various specific IA customers, which were accurately reflected on the customer statements. CMF ¶¶ 75-95. Further, Defendants dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19 and 21.

48.    Because there were no records from the DTC showing that BLMIS owned the securities listed on the IA Business customer statements, BLMIS created fake DTC records for the IA Business.    Mr. Dubinsky discovered dozens of fake DTC screen inquiries to document purported trading activity of the IA Business.    *Id.* ¶¶ 199-208.

**RESPONSE:** Disputed. The term "BLMIS" as defined by the Trustee is misleading. Further, given Dubinsky's perjury at the Nelson trial, it is impossible to credit any of his testimony. Moreover, Dubinsky admitted on cross-examination that Madoff maintained numerous brokerage accounts through which he purchased T-bills with IA customers' money, which were credited to some IA customers' statements. *See* Chaitman Dec. **Ex. A,** Nelson Trial Tr. 5/8/19 at 166:17-18; 90:25-91:2; 155:2-4; 154:2-9; *see also* CMF ¶¶ 75-95.  Defendants dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19, 21, 28, 41 and 42.

49.    BLMIS installed software on the IA Business computer system that recreated fake DTC reports that were meant to look like official reports.  *Id.* ¶¶ 206-07.

**RESPONSE:** Disputed. While software may have been installed on certain computer systems, the term "BLMIS" as defined by the Trustee is misleading. Further, given Dubinsky's perjury at the Nelson trial, it is impossible to credit any of his testimony.  Defendants dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19, 21, 28, 41 and 42.

50.    Mr. Dubinsky explained that there would be no reason, if one were doing legitimate

trading and had owned the stocks, to go into a computer system and write code that used form-printing software to print out a report that mimicked what the DTC puts out, because there would instead be a real DTC report. *Id.* ¶ 208. Mr. Dubinsky made this determination by examining the metadata of the fake DTC screens, the code embedded in the document to record characteristics of the document, including when it was created. *Id.* ¶¶ 199-205.

**RESPONSE:** Disputed. Defendants object to this statement as neither material nor necessary for the determination of this case. Further, given Dubinsky's perjury at the Nelson trial, it is impossible to credit any of his testimony. Defendants dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19, 21, 28, 41 and 42.

51.    Based on Mr. Dubinsky's analysis of the DTC records, Mr. Dubinsky concluded that BLMIS was not trading equities for its IA Business customers. *Id.* ¶ 208.

**RESPONSE:** Disputed. The term "BLMIS" as defined by the Trustee is misleading. While Dubinsky may have made certain "conclusions," the IA business in fact traded in T-bills on behalf of some of its customers whose statements accurately reflected those trades. CMF ¶¶ 75-95. Moreover, given Dubinsky's perjury at the Nelson trial, it is impossible to credit any of his testimony. Further, *see* Responses to SMF ¶¶ 12, 19, 21, 28, 41 and 42.

### vi.    Reported Options Trades Could Not be Reconciled to OCC Records

52.    The options purportedly executed for the customer accounts in the IA Business could not be reconciled with the records of the OCC, an organization that clears and settles options transactions in the U.S. market. *Id.* ¶¶ 196-98.

**RESPONSE:** Disputed. Defendants object to this statement as neither material nor necessary for the determination of this case. Moreover, Dubinsky's pervasive perjury at the *Nelson*

trial makes all of his testimony incredible. Defendants further dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19, and 21.

53.     Mr. Dubinsky explained that BLMIS had a single account with the OCC, and the IA Business purportedly traded S&P Index options ("OEX"), which are "proprietary options" traded exclusively on the Chicago Board of Option Exchange ("CBOE"). These proprietary options can only be traded on the CBOE, but there would be a record of them both from the CBOE and the OCC. *Id.* ¶¶ 166, 219.

**RESPONSE:** Disputed. The term "BLMIS" as defined by the Trustee is misleading. Defendants object to this statement as neither material nor necessary for the determination of this case. Further, given Dubinsky's perjury at the Nelson trial, it is impossible to credit any of his testimony. Defendants dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19, 21, 28, 41 and 42.

54.     Mr. Dubinsky reviewed the OCC records for the BLMIS account from October 31, 2002 through October 31, 2008. Based on his review of those records, Mr. Dubinsky was able to reconcile and confirm the options that were traded by the Proprietary Trading Business but could not account for the options purportedly traded for the customers in the IA Business. *Id.* ¶¶ 220-21. Mr. Dubinsky found that the options purportedly traded on behalf of the IA Business customers, as recorded in the IA Business trading records, were not shown on OCC records and were not cleared through the OCC. *Id.* ¶ 222.

**RESPONSE:** Disputed. The term "BLMIS" as defined by the Trustee is misleading. The IA business traded in T-bills on behalf of some of its customers and accurately reflected those trades on the customers' statements. *See, e.g.* CMF ¶¶ 75-95. Further, given Dubinsky's perjury at the Nelson trial, it is impossible to credit any of his testimony. Defendants also dispute the

admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19, 21, 28, 41 and 42. Finally, Defendants dispute the admissibility of opinions based on customer statements which the Trustee has refused to produce.

55.    For example, on October 31, 2005, records for the Proprietary Trading Business and the OCC indicate that 20 options described as "S&P 100 INDEX November 590 Call" were purchased and held by BLMIS. The aggregate number of "S&P 100 INDEX NOVEMBER 590 CALL" options reported on IA Business customer statements for the same date totaled 658,342. *Id.* ¶ 223.

**RESPONSE:** Disputed. *See* Response to SMF ¶ 54. *See also* Responses to SMF ¶¶ 12, 19, 21, 28, 41 and 42.

56.    Based on his analyses, Mr. Dubinsky concluded that BLMIS did not conduct any options trading on behalf of its IA Business customers. *Id.* ¶ 222.

**RESPONSE:** Disputed. The term "BLMIS" as defined by the Trustee is misleading. The IA business traded in T- bills on behalf of some of its customers and accurately reflected those trades on the customers' statements. *See, e.g.* CMF ¶¶ 75-95. Defendants object to this statement as neither material nor necessary for the determination of this case. Defendants further dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19 and 21. Finally, Defendants dispute the admissibility of opinions or other material based on customer statements, which the Trustee has refused to produce.

C.    **The IA Business Did Not Purchase Treasuries for IA Business Customer Accounts**

57.    In addition to purchasing stocks and options collars, BLMIS claimed it would intermittently invest IA Business customer funds in T-Bill as part of the split-strike conversion

strategy.  *Id.* ¶ 44.

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading. The IA business traded in T- bills on behalf of some of its customers and accurately reflected those trades on the customers' statements. *See, e.g.*  CMF ¶¶ 75-95. Further, given Dubinsky's perjury at the Nelson trial, it is impossible to credit any of his testimony. Defendants dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19, 21, and 28.

58.    Mr. Dubinsky found no evidence of such purchases having been made on behalf of IA Business customers. While BLMIS purchased T-Bills with customer funds, these purchases did not match the allocation of T-Bill transactions that appeared on customer statements.  *Id.* ¶¶ 224, 218.

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading. Madoff did, in fact, purchase huge volumes of T-bills which, in some instances, were credited to the Defendants' accounts. CMF ¶¶ 75-95. Further, given Dubinsky's perjury at the Nelson trial, it is impossible to credit any of his testimony.  Defendants dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19, 21, and 28. Finally, Defendants dispute the admissibility of opinions or other material based on customer statements which the Trustee has refused to produce.

59.    For the period of 2002 through 2007, Mr. Dubinsky reviewed the BLMIS books and records to identify the unique treasury bills held by the Proprietary Trading Business on December 31 of each of those years.  He then compared those holdings to (i) those T-Bill positions held at BLMIS's account at the DTC, which serves as the custodian or the clearing house for treasuries, and (ii) the T-Bill purportedly held by the IA Business for its customers.  *Id.* ¶¶ 225-27.

**RESPONSE:**  Disputed. Dubinsky's exercise was irrelevant because he did not look at the T-bills that Madoff owned through various brokerage accounts, which T-bills he had purchased with IA customers' money and which he credited to some customers' accounts.  *See* Response to SMF ¶ 58.

60.    Mr. Dubinsky prepared a summary chart of his review of these voluminous records, which accurately represents his comparison of the T-Bill positions in the Proprietary Trading Business and the positions purportedly purchased by the IA Business for its customers:

Table 5
Comparison of Year-End US Treasury Positions: Proprietary Trading Business vs. IA Business

| Year-End | Proprietary Trading Business | IA Business | Proprietary Trading Business positions as a percent of IA Business positions |
|---|---|---|---|
| 2002 | $84,000,000 | $30,975,765,000 | 0.27% |
| 2003 | $70,000,000 | $33,643,020,000 | 0.21% |
| 2004 | $70,000,000 | $37,935,258,000 | 0.18% |
| 2005 | $75,000,000 | $40,913,910,000 | 0.18% |
| 2006 | $70,000,000 | $48,342,420,000 | 0.14% |
| 2007 | $80,000,000 | $56,990,055,000 | 0.14% |

*Id.* ¶ 227, Table 5.

**RESPONSE:**  Disputed. Dubinsky's analysis is irrelevant to the fact – which he admitted on cross-examination at the *Nelson* trial – that Madoff purchased T-bills with IA customers' money, which were credited to some customers' accounts. *See* Chaitman Dec**. Ex. A,** Nelson Trial Tr. 5/8/19 at 166:17-18; 90:25-91:2; 155:2-4; 154:2-9; *see also* CMF ¶¶ 75-95. *See* Response to SMF ¶ 58.

61.    The amount of T-Bill held by the Proprietary Trading Business was negligible compared to those purportedly held on behalf of customers of the IA Business.  For example, by the end of 2007, the $80 million in treasury positions held by the Proprietary Trading Business (as

recorded on the DTC records) was only 0.14 percent of the approximately $57 billion in treasury positions purportedly held by the IA Business. *Id.*

**RESPONSE:** Disputed. *See* Response to SMF ¶ 58; *see also* Responses to SMF ¶¶ 41 and 42. As further set forth in Response to SMF ¶ 42, DTC was not the only source of records for where given securities were located. *See* Chaitman Dec. **Ex. BB,** Madoff Dep. Tr. 6/15/2016 at 52:22-25; **Ex. O,** Madoff Dep. Tr. Tr. 4/26/2017 at 40:24-41:15; 78:1-25. Finally, Defendants dispute the admissibility of opinions or other material based on customer statements which the Trustee has refused to produce.

62.    Mr. Dubinsky further analyzed whether T-Bills purportedly purchased for IA Business customers matched those T-Bills reported as being purchased and held by BLMIS's brokerage accounts. Mr. Dubinsky determined that 100% of the treasuries held by the brokerage accounts were not the same treasuries as purportedly held by the IA Business accounts because of different maturity dates, different purchase and sale dates, and/or they had a different reported volume. *Id.* ¶¶ 232-40.

**RESPONSE:** Disputed. The term "BLMIS" as defined by the Trustee is misleading. On cross-examination at the *Nelson* trial, Dubinsky admitted that Madoff used IA customers' money to purchase T-bills through various brokerage accounts that he maintained for this purpose. *See also* Chaitman Dec. **Ex. A,** Nelson Trial Tr. 5/8/19 at 166:17-18; 90:25-91:2; 155:2-4; 154:2-9. Madoff purchased T-bills which, in some instances, were credited to the Defendants' accounts. CMF ¶¶ 75-95. Further, given Dubinsky's perjury at the Nelson trial, it is impossible to credit any of his testimony. Defendants dispute the admissibility of the document on which the Trustee relies. *See* Responses to SMF ¶¶ 12, 19, 21 and 28. Finally, Defendants dispute the admissibility of opinions or other material based on customer statements which the Trustee has refused to produce.

63.    Mr. Dubinsky additionally determined that, even if one were to add up all of the treasuries in those eight brokerage accounts and the Proprietary Trading Business, they would be short of what was reported on the IA Business customer statements. *Id.* ¶¶ 230-31 and Figure 36; *see also* Ex. 22 to Dubinsky Report ("Purported IA Business Treasuries versus Actual Treasuries Held by BLMIS").

**RESPONSE:**  Disputed. *See* Response to SMF ¶ 62.

64.    Frank DiPascali, a former BLMIS employee, now deceased, gave certain testimony at the multi-day criminal trial held in *United States v. Bonventre*, 10-CR-228 (LTS) (S.D.N.Y.) ("DiPascali Testimony"), ECF Nos. 858, 862, 884 (attached as Exhibit 3 to Cremona Decl.)  In his criminal trial testimony, DiPascali confirmed that the T-Bills purchased with the IA Business money were for BLMIS's cash management and were not purchased for any customer account:

> **Q.** From time to time did you get real treasury bills?
> **A.** Yes.
> **Q.** And what were those real treasury bills for?
> **A.** To invest the excess cash in the IA checking account.
> **Q.** And when you say to invest the excess cash in the IA checking account, for what reason did you get a treasury bill to do that?
> **A.** So as to provide safety and an enhanced yield to what the checking account interest rate was.
> **Q.** So it would be fair to say it would be a way of getting interest on the checking account?
> **A.** More or less, yes.

Cremona Decl., Ex. 6 (DiPascali Testimony) at 4931:12-23 (Dec. 5, 2013); *see also id.* at 4921:7–12, 4930:6–4931:5, 4934:3-25; *id.* at 5345:1–5346:3 (Dec. 10, 2013).

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading. Madoff purchased T-bills which, in some instances, were credited to the Defendants' accounts. CMF ¶¶ 75-95. The T-bill purchases are documented in reliable third party records.  DiPascali's testimony as to Madoff's intent in purchasing T-bills is inadmissible and obviously self-serving.

There is no room in the securities business for a *post facto* explanation by a criminal defendant as to why a securities dealer purchased specific securities that were credited to a customer's account. The securities markets could not function if such evidence could be used to disallow securities positions reflected on customer statements.

Further, Defendants object to the admissibility of the plea allocutions of Madoff and former BLMIS employees. The allocutions would only be admissible if the facts contained therein are "essential to the judgment." *See* FRE 803(22)(C); *In re Dreier LLP*, 2014 WL 47774, at *11 (Bankr. S.D.N.Y. Jan. 3, 2014) (Bernstein, J.) ("A prior judgment of conviction may be used as prima facie evidence in a subsequent civil suit only with respect to matters of fact or law 'necessarily decided by the conviction and the verdict on which it was based.'"). Here, the Trustee seeks to admit the allocutions on the question of whether a Ponzi scheme presumption may apply. Whether a Ponzi scheme presumption may apply depends upon a showing of the following: (1) little or no legitimate underlying business; (2) the promise of exorbitant returns; (3) early scheduled payment of such returns to early (or "top") investors; (4) the need to attract new money in order to pay the existing top investors. *See Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.),* 309 F.3d 1325, 1327 n.2 (11th Cir. 2002); *Balaber-Strauss v. Lawrence,* 264 B.R. 303, 305-06 (S.D.N.Y. 2001). Here, the statements are not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed. R. Civ. P. 56(c).

Moreover, Defendants object to the Trustee's statement as a general and overbroad conclusion. There is nothing in the testimony above that supports the Trustee's general conclusion that T-bills were not purchased for any customer account, let alone for Defendants' accounts which is the account at issue here. The securities markets could not function if customer statements were not credited with securities positions reflected therein. And, Defendants dispute the admissibility

of opinions or other material based on customer statements, which the Trustee has refused to

produce.

65.    DiPascali differentiated between the T-Bills actually purchased for cash

management purposes and those fabricated for customers of the IA Business:

> **Q.** And when you bought those real treasury bills to earn interest on
> the Madoff checking account, what did you have to do?
> **A.** I had to call my broker.
> **Q.** And after you called your broker, was there a process to going
> out and buying the treasury bill?
> **A.** Yeah, I would tell the broker how much dollars I wanted to
> commit to treasury bills and typically which one I wanted to buy,
> and he would take down that information and call me back and
> typically give me a report that I bought X amount of treasury bills
> at this price.
> **Q.** And then that would – you would actually get a real treasury bill?
> **A.** Yeah.
> **Q.** Now, for on the IA side, when you had to provide – when you
> would provide the fake information, what would you do there?
> **A.** I'd look at a pricing service of historical prices of treasury bills,
> ascertain the price on the date that I needed and write a ticket and
> put it into the AS/400.
>
> <center>***</center>
>
> **Q.** Now, what was your understanding of what Ms. Bongiorno
> would do with the treasury information that you gave to her?
> **A.** She would put through a buy ticket that was approximately equal
> to the cash credit balance reflected in the account she was working
> on, and it would produce a confirmation and an entry on the
> customer statement that he was now – owned treasuries.
> **Q.** And as with the other trading that was on those accounts, was
> any of it real?
> **A.** No.

*Id.* at 4931:24–4934:13 (Dec. 5, 2013).

    **RESPONSE:**  Disputed. *See* Response to SMF ¶ 64.

66.    DiPascali further testified that the T-Bill purchases in the eight brokerage accounts

(held at Bank of New York, Bear Stearns, Fidelity, Lehman, and Morgan Stanley) were made at

the direction of Mr. Madoff to earn interest on the cash held in JP Morgan Chase Bank, N.A.

("JPMorgan") account #xxxxx1703 (the "703 Account") (further discussed below in ¶ 69):

> **Q.** Did Mr. Madoff propose a solution for how to deal with this?
> **A.** He either already had an account or two open or was about to open a new account or a series of them, I don't recall. He was basically giving that responsibility to me. He wanted treasury notes, treasury bills only. As the CDs would get unwound or, I don't remember, they might have unwound them immediately, I'm not sure, but in short order I managed a group of Bernard L. Madoff brokerage accounts that were held at other brokerage firms for the purpose of purchasing short-term U.S. government securities.
> **Q.** These short-term U.S. securities were real, right?
> **A.** Yes.
> **Q.** This was just a way of getting interest on the real cash that was in the 703 account?
> **A.** Yes.
> **Q.** What were some of the firms that you now had responsibility for that had these brokerage accounts?
> **A.** Bear Stearns, Fidelity, Bank of New York, Morgan Stanley, Lehman Brothers.
> **Q.** We talked a little bit about this earlier, when you were buying these short-term securities, what steps would you have to take to buy these real securities on those brokerage accounts?
> **A.** I typically picked up the phone and called the broker or the representative of each of those organizations and communicated my needs. Then he typically got or she typically got back to me and told me what I had done. Sometimes those conversations occurred in the form of faxes. Most of the time they were on the telephone.
> **Q.** This was different than just looking at historical prices and writing something up for the fake trades, right?
> **A.** Yes.

*Id.* at 4961:15–4962:22 (Dec. 5, 2013).

**RESPONSE:** Disputed. *See* Response to SMF ¶ 64. DiPascali's testimony is patently incredible because it was given in consideration of the Government allowing DiPascali to stay out of prison. Madoff's testimony, on the other hand, was given when he was serving a 150-year prison sentence and had no incentive to lie.

67.      DiPascali explained the nuts and bolts of his process that resulted in T-Bill transactions showing up on the IA Business customer statements, and further confirmed that they

were all fake:

> **Q.** Now can we go to the second page of this document. What is this that we are looking at?
>
> **A.** It's a spreadsheet that I created that was going to be the nuts and bolts of this exercise. It was going to do a lot of the calculation for me and allow the process to progress swiftly instead of from month to month to month and client to client to client calculate all sorts of stuff, and then have to then create another side to that. This spreadsheet, which is an Excel-based spreadsheet, is identifying certain treasury bills across the top column. The top row is the CUSIP of treasury bills and options. The second row are the symbols of options and then a string of treasury bills. Going on the far left column are a string of account numbers. Those are the accounts that Bernie told us he wanted to use to be the counterparties of the customer option positions. What this is doing is it's allowing me to randomly assign, once I know the total of my customer option positions, a quantity to each of those counterparties. Then, once I've randomly defined what each counterparty's position is, this is calculating what its margin or collateral requirement would be. Once I established that, this spreadsheet allows me to randomly pick a group of treasuries that were going to represent that collateral, and then the whole total number would circle back to what I needed. It's fairly complicated, but it did all the grind work necessary to accomplish what Bernie wanted.
>
> **Q.** Were any of the treasury bills that are reflected on this real?
>
> **A.** No.

*Id.* at 5344:24–5346:3 (Dec. 10, 2013).

**RESPONSE:** Disputed. The IA business in fact traded in T- bills, on behalf of numerous IA customers including Defendants, and accurately reflected those trades on the customer statements. CMF ¶¶ 75-95. DiPascali did not testify that the T-bills appearing on Defendants' statements were "randomly assigned." This is a statement that was not confirmed by Madoff; nor was it confirmed by Joann Crupi, who testified that DiPascali instructed her specifically as to which IA customers should be credited with specific T-bill positions. CMF ¶ 62. *See generally,* Chaitman Dec. **Ex. O,** Madoff Dep. Tr. 4/26/17. Further, Defendants dispute the admissibility of DiPascali's testimony. *See* Response to SMF ¶ 64.

68.     DiPascali also confirmed that the Proprietary Trading Business did not have an

inventory of T-Bills "that was equivalent to the amount that was on the statements" for IA Business

customers. *Id.* at 6950:25–6951:9 (Jan. 13, 2014).

**RESPONSE:** Disputed and irrelevant because the Trustee refused to produce to

Defendants the statements of all IA customers. *See* Response to SMF ¶ 64.

### D. The IA Business Had No Other Sources of Funds

69.    During at least the ten-year period before its collapse on December 11, 2008,

BLMIS primarily used three bank accounts for the IA Business:  the 703 Account; JPMorgan

account # xxxxxxxx1509 (the "509 Account", together with the 703 Account, the "JPMorgan

Accounts"); and Bankers Trust account #xx-xx0-599 (the "BT Account").   Dubinsky Decl.,

Attach. A (Dubinsky Report) ¶ 340 n.285; Declaration of Lisa M. Collura, dated August 28, 2020

("Collura Decl."), Attach. A (Expert Report of Lisa M. Collura, CPA, CFE, CFF, dated January

16, 2019 ("Collura Report")) ¶ 17.

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading.

Defendants dispute the admissibility of the documents on which the Trustee relies. This statement

is not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also*

Fed. R. Civ. P. 56(c). *See* Responses to SMF ¶¶ 12, 19 and 21.

70.    IA Business customers' cash deposits were deposited (and commingled) into the

703 Account.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura Decl., Attach. A

(Collura Report) ¶¶ 20–24.

**RESPONSE**:  Disputed. Defendants dispute the use of the term "commingled" to the

extent the Trustee means anything other than IA business customer funds were held together with

other IA business customer funds in the same account. Further, Defendants dispute the

admissibility of the documents on which the Trustee relies.  This statement is not "followed by

citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed. R. Civ. P. 56(c). *See* Responses to SMF ¶¶ 12, 19 and 21.

71.    IA Business customer withdrawals were made through the JPMorgan Accounts and the BT Account, which was a checking account entirely funded by the 703 Account during the period for which bank records are available.  Collura Decl., Attach. A (Collura Report) ¶¶ 25–30.

**RESPONSE:**  Disputed. Defendants dispute the admissibility of the documents on which the Trustee relies.  This statement is not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed. R. Civ. P. 56(c). Further, *see* Responses to SMF ¶¶ 12, 19 and 21.

72.    The JPMorgan Accounts were linked commercial business accounts.  The 509 Account was a controlled disbursement account that was entirely funded by the 703 Account.  *Id.* ¶ 25.  An analysis of the 703 Account showed that the money in that account consisted almost entirely of customer deposits.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285; Collura Decl., Attach. A (Collura Report) ¶ 27.

**RESPONSE:**  Disputed, and subject to clarification. Defendants dispute the admissibility of the documents on which the Trustee relies.  This statement is not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed. R. Civ. P. 56(c). The IA business in fact traded in T-bills on behalf of some of its customers and accurately reflected those trades on customer statements. CMF ¶¶ 75-95.  The profits on T-bills were deposited into the 703 Account. CMF ¶ 61.   Further, *see* Responses to SMF ¶¶ 12, 19 and 21.

73.    Ninety-seven percent of all cash additions into the 703 Account came directly from IA Business customers. Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure 52; Collura Decl., Attach. A (Collura Report) ¶ 24, Figure 1.

**RESPONSE:**  Disputed. While Defendants do not dispute that Madoff used the 703 Account for his IA business, and deposited customer funds therein, Defendants dispute the admissibility of the documents on which the Trustee relies.  This statement is not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed. R. Civ. P. 56(c). Further, the IA business in fact traded in T-bills. CMF ¶¶ 75-95.  The profits on such transactions were deposited into the 703 Account. CMF ¶ 61. *See also* Responses to SMF ¶¶ 12 and 21; *see e.g.* Responses to SMF ¶¶ 28 and 29.

74.    The other three percent of inflows into the 703 Account came from income earned on (1) short-term investment activity made directly from the 703 Account (including overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and T-Bills); and (2) investments of BLMIS customer funds made through bank and brokerage accounts held in the name of BLMIS or Madoff.  Collura Decl., Attach. A (Collura Report) ¶¶ 45–62; Dubinsky Decl., Attach. A (Dubinsky Report) Figure 52 & n.286.

**RESPONSE:**  Disputed. Defendants dispute the admissibility of the documents on which the Trustee relies.  This statement is not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed. R. Civ. P. 56(c). Further, the IA business traded in T-bills on behalf of some of its customers, including Defendants, and accurately reflected those trades on the customer statements. CMF ¶¶ 75-95.  The profits on these investments were deposited into the 703 Account. CMF ¶ 61. *See also* Responses to SMF ¶¶ 12 and 21; *see e.g.* Responses to SMF ¶¶ 28 and 29.

75.    Because the short-term investments, including overnight sweeps, were made directly out of the 703 Account, the source of the money for those investments was customer funds. Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura Decl., Attach. A (Collura Report)

¶¶ 24, 46–47.

**RESPONSE:** Defendants dispute the admissibility of the documents on which the Trustee relies. This statement is not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed. R. Civ. P. 56(c). This statement is inappropriate argument, rather than a "fact." Further, *see* Responses to SMF ¶¶ 12 and 21; *see e.g.* Responses to SMF ¶¶ 28 and 29.

76.    There were no inflows into the 703 Account from sales of securities for customer accounts. Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura Decl., Attach. A (Collura Report) ¶¶ 24, 32.

**RESPONSE**: Disputed. The IA business traded in T-bills on behalf of various customers including Defendants, and accurately reflected those trades on its customer statements. CMF ¶¶ 75-95. The profits were deposited into the 703 Account. CMF ¶ 61. Further, Defendants dispute the admissibility of the documents on which the Trustee relies. This statement is not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed.R.Civ.P. 56(c). *See also* Responses to SMF ¶¶12, 21, 28 and 29.

77.    There were no outflows from the 703 Account to purchase securities for customer accounts. Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 350; Collura Decl., Attach. A (Collura Report) ¶ 32.

**RESPONSE:** Disputed. The IA business traded in T-bills on behalf of various customers including Defendants, and accurately reflected those trades on its customer statements. CMF ¶¶ 75-95. Dubinsky admitted at the *Nelson* trial that the T-bill purchases were funded with customers' funds taken from the 703 Account. *See* Chaitman Dec. **Ex. A**, Nelson Tr. 5/8/19 at 166:17-18; 90:25-91:2; 155:2-4; 154:2-9; *see* Responses to SMF ¶¶ 75 and 76; *see also* Responses to SMF ¶¶ 12 and 21; *see e.g.* Responses to SMF ¶¶ 28 and 29.

78.     Apart from two short-term loans BLMIS received from JPMorgan totaling $145 million in November 2005 and January 2006—both of which were repaid by June 2006—the IA Business did not obtain loans from third parties or from the Proprietary Trading Business sufficient to pay the IA Business customer withdrawals. Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 342-44.

**RESPONSE:**    Disputed. The term "BLMIS" as defined by the Trustee is misleading. While Defendants do not dispute the statement that the IA Business did not obtain loans from third parties apart from two short term loans totaling $145 million, and received from JPMC, Defendants dispute the admissibility of the documents on which the Trustee relies. This statement is not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed. R. Civ. P. 56(c). Further, *see* Responses to SMF ¶¶ 12 and 21; *see e.g.* Responses to SMF ¶¶ 28 and 29.

79.     The IA Business also did not receive payments of any cash dividends.  According to the customer statements, the IA Business reported that it received cash dividends related to purported trading and paid or credited them to the accountholders.  Between 1998 and 2008, BLMIS reported that it had paid or credited its customers $4.3 billion in cash dividends.  *Id.* ¶¶ 247-55.

**RESPONSE:**    Disputed. The term "BLMIS" as defined by the Trustee is misleading. Moreover, Defendants dispute the admissibility of the documents on which the Trustee relies.  This statement is not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed. R. Civ. P. 56(c). Further, *see* Responses to SMF ¶¶ 12, 19 and 21.

80.    Of the more than 8,300 IA Business dividend transactions identified on the customer account statements from 1998 to 2008, not one purported dividend payment matched to a cash addition to the 703 Account. *Id.* ¶¶ 253-54.

**RESPONSE:** Disputed. The IA business in fact traded in T- bills on behalf of some of its customers, including Defendants, and accurately reflected those trades on customer statements. CMF ¶¶ 75-95. Moreover, Defendants dispute the admissibility of the documents on which the Trustee relies. This statement is not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed. R. Civ. P. 56(c). Further, Defendants dispute the admissibility of opinions or other material based on customer statements, which the Trustee has refused to produce. *see* Responses to SMF ¶¶12, 19 and 21; *see e.g.* Responses to SMF ¶¶ 28 and 29.

81.    There is no record of any dividends being received by the IA business. *Id.* ¶ 248.

**RESPONSE:** Disputed. *See* Response to SMF ¶ 80.

82.    The IA Business did not have any legitimate income-producing activities. The only source of cash available for the IA Business to pay purported investment profits as well as redemption requests from its customers was from cash that other IA Business customers deposited in the 703 Account. *Id.* ¶¶ 330-37.

**RESPONSE:** Disputed. In fact, the IA business was able to transfer between $700 and $800 million to the LLC during the period from 2001 – 2008. CMF ¶¶ 16-17. *See* Response to SMF ¶ 80.

83.    These transactions rendered BLMIS insolvent. By no later than December 2002, its assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion. *Id.* at Section VII., ¶¶ 432-33, Table 13.

**RESPONSE:** Disputed. *See* Response to SMF ¶ 79. Further, *see* Responses to SMF ¶¶ 12, 19 and 21; *see e.g.* Responses to SMF ¶¶ 28 and 29. And given Dubinsky's flagrant perjury, it is impossible to credit any of his conclusions.

84.     In December 2008, BLMIS's capital had dwindled to the point where customer redemptions or withdrawal requests grossly exceeded the amounts it had on hand. The customer property on hand at BLMIS as of December 11, 2008 was not sufficient to pay the claims of its customers. *Id.* ¶¶ 40, 440-41.

**RESPONSE:** Disputed. *See* Response to SMF ¶ 83.

### i.      The Transfers Were Made by Bernard L. Madoff Investment Securities LLC

85.     BLMIS operated as a sole proprietorship prior to 2001. In January 2001, the sole proprietorship was converted to a single member LLC, using the same SEC registrant number, 8-8132. Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

**RESPONSE:** Disputed. *See* Response to SMF ¶ 83. The IA business was never transferred to the LLC. Moreover, the statement is unsupported by the document on which the Trustee relies. This sentence contains an incorrect predicate that SEC registration effectuates a conversion of a business form. Amended Form BD expressly indicates that Madoff did not transfer the IA business to the LLC. *See* Chaitman Dec**. Ex. D**, Amended Form BD.

86.     The bank statements for the 703 and 509 Accounts listed the account holder as "Bernard L. Madoff" from December 1998 to September 2002, when the name was changed to "Bernard L. Madoff Investment Securities." Collura Decl., Attach. A (Collura Report)   ¶¶ 20 n.7, 25 n.9.

**RESPONSE:** Undisputed.

87.     For the time period for which bank records were available (December 1998 through December 2008), the 703 and 509 Accounts were used for customer deposits and withdrawals— the business of the IA Business.  *Id.* ¶¶ 24-30; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure 52.

**RESPONSE**:  Disputed.  For the period for which bank records were available, the 703 and 509 Accounts were used for customer deposits and withdrawals, for overnight investments, and to fund purchases of T-bills which were credited to certain customers' accounts, including Defendants'.  CMF ¶¶ 75-95. Moreover, Defendants dispute the admissibility of some of the documents on which the Trustee relies.  This statement is not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed. R. Civ. P. 56(c). Further, *see* Responses to SMF ¶¶ 12, 19 and 21; *see e.g.* Responses to SMF ¶¶ 28 and 29.

88.     For the time period for which bank records were available, the face of the bank statements for the JPMorgan Accounts showed they were designated as "Commercial Checking" accounts.  The statements were addressed to the attention of either Tony Tiletnick, a BLMIS employee, or Daniel Bonventre, BLMIS's operations manager, at the BLMIS business address at 885 Third Avenue, New York, New York.  None of the statements were addressed to Madoff personally.  Cremona Decl., Ex. 5 (Exemplar BLMIS Bank Statements 1998-2008); Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340, Exs. 31, 32.

**RESPONSE**:  Disputed. The term "BLMIS" as defined by the Trustee is misleading. *See* Response to SMF ¶¶ 12, 19 and 21; and *see e.g.* Responses to SMF ¶¶ 28 and 29.

89.     At all times after January 1, 2001, the JPMorgan Accounts were owned by BLMIS. Cremona Decl., Ex. 3 (2001 SEC Amended Form BD).

**RESPONSE:**  Disputed. The term "BLMIS" as defined by the Trustee is misleading. *See* Response to SMF ¶¶ 12, 19 and 21; and *see e.g.* Responses to SMF ¶¶ 28 and 29.

      **E.**      **The Plea Allocutions**

90.     The plea allocutions of Madoff and BLMIS employees Frank DiPascali, David Kugel, Irwin Lipkin, and Eric Lipkin, attached as Exhibits 7-12 to the Cremona Decl., further establish that BLMIS did not conduct legitimate operations from its IA Business.

**RESPONSE:**  Disputed. Defendants dispute the admissibility of the plea allocutions, which do not contain facts "essential to the judgment." *See* FRE 803(22)(C); *In re Dreier LLP*, 2014 WL 47774, at *11 (Bankr. S.D.N.Y. Jan. 3, 2014) (Bernstein, J.). *See* Response to SMF ¶ 64. Defendants never had the opportunity to depose any of these people.

**Bernard L. Madoff**

91.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal action filed against him by the United States Attorney for the Southern District of New York. Plea Allocution of Bernard L. Madoff, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (the "Madoff Allocution"), ECF No. 57 (attached as Exhibit 7 to Cremona Decl.).

**RESPONSE:**  Undisputed, except that Defendants object to the admissibility of the plea allocutions of Madoff and former BLMIS employees which do not contain facts "essential to the judgment." *See* Responses to SMF ¶¶ 64 and 90.

92.     At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Cremona Decl., Ex. 7 (Madoff Allocution) at 23:14-23; 31:25-32:1.

**RESPONSE:**  The term "BLMIS" as defined by the Trustee is misleading. Defendants

object to the Trustee's interpretation of Madoff's statement. While Madoff admitted to operating

a "Ponzi scheme" from 1992-93 on, he did not explain his understanding of what a "Ponzi scheme"

is.  Moreover, Madoff testified credibly that he used IA customers' money to purchase T-bills

which were credited to specific customers' accounts. *See* CMF ¶¶ 51-66; *see also* CMF ¶¶ 75-95.

Further, Defendants object to the admissibility of the plea allocutions of Madoff and former BLMIS

employees which do not contain facts "essential to the judgment."  *See* Responses to SMF ¶¶ 64

and 90.

93.     Madoff further testified at the plea hearing that he never invested his clients' funds

in securities, that he used funds on hand in the JP Morgan account to pay customer redemptions,

and that he created false trading confirmations and client account statements to cover up the fact

that he had not executed trades on behalf of BLMIS investment advisory clients.  Madoff stated:

> The essence of my scheme was that I represented to clients and prospective
> clients who wished to open investment advisory and individual trading
> accounts with me that I would invest their money in shares of common stock,
> options, and other securities of large well-known corporations, and upon
> request, would return to them their profits and principal. Those
> representations were false for many years up and until I was arrested on
> December 11, 2008, I never invested these funds in the securities, as I had
> promised. Instead, those funds were deposited in a bank account at Chase
> Manhattan Bank. When clients wished to receive the profits they believed
> they had earned with me or to redeem their principal, I used the money in
> the Chase Manhattan bank account that belonged to them or other clients to
> pay the requested funds. The victims of my scheme included individuals,
> charitable organizations, trusts, pension funds, and hedge funds.

*Id.* at 24:9-24.

**RESPONSE:**  Defendants object to the Trustee's interpretation of Madoff's statement and

to the admissibility of the plea allocutions on which the Trustee relies.  *See* Responses to SMF ¶¶

64, 90 and 92. Further, although Madoff testified that he did not execute the split strike conversion

strategy that he promised customers, he actively traded in T-bills as well as other investments. The

proceeds of securities, interest earned on investments and cash deposits enabled him to meet the

customer withdrawal requests. Indeed, Madoff testified that, in the entire period from 1960 until

mid-2008 (during the global financial collapse), he had never needed new customers' investments

in order to fund customer redemptions.  *See* Chaitman Dec. **Ex**. **O,** Madoff Dep. Tr. 4/26/17 at

30:10-22; 31:2-25. On the contrary, during the period from 2001 – 2008, he had transferred $700

to $800 million from the IA business to the LLC. CMF ¶ 16-17; *See* Chaitman Dec. **Ex.  A,** Nelson

Tr. 5/8/19 at 161:21-162-:2**;** *see also* Chaitman Dec. **Ex. AF,** Madoff Dep. Tr. 12/20/16 at 161:11-

162:24**.**

94.     Beginning in the early 1990s, Madoff represented to IA Business customers that

he was using a split strike conversion strategy based on blue-chip securities. *Id.* at 25:18–24.

**RESPONSE:** Undisputed.

95.     Madoff further detailed his strategy as follows:

> Through the split strike conversion strategy I promised to clients and
> prospective clients that client funds would be invested in a basket of
> common stocks within the Standard & Poors 100 index, a collection of the
> 100 largest publicly-traded companies in terms of their market
> capitalization. I promised that I would select a basket of stocks that would
> closely mimic the price movements of the Standard & Poors 100 index. I
> promised that I would opportunistically time those purchases and would be
> out of the market intermittently, investing client funds during these periods
> in United States Government-issued securities, such as United States
> Treasury bills. In addition, I promised that as part of the split strike
> conversion strategy, I would hedge the investments I made in the basket of
> common stocks by using client funds to buy and sell option contracts related
> to those stocks, thereby limiting the potential client losses caused by
> unpredictable changes in stock prices. In fact, I never made those
> investments I promised clients, who believed they were invested with me in
> the split strike conversion strategy.

*Id.* at 25:25-26:18.

**RESPONSE**: Disputed. As Madoff testified, he did not purchase the Fortune 100 company stocks he purported to purchase for his IA customers.  However, he did use IA customers' money to purchase billions of dollars of T-bills which he credited to specific IA customers' accounts. *See* CMF ¶¶ 51-66. After committing flagrant perjury at the *Nelson* trial, Dubinsky admitted this.  *See* Chaitman Dec. **Ex. A**, Nelson Tr. 5/8/19 at 166:17-18; 90:25-91:2; 155:2-4; 154:2-9; *see also* CMF ¶¶ 75 95; *see also* Responses to SMF ¶¶ 29, 64, 90 and 92.

96.    BLMIS investment advisory customers received account statements from BLMIS that purported to reflect securities transactions and investment returns that appeared as though their investments with BLMIS were profitable.  Madoff explained:

> To further cover up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me.

*Id.* at 27:9-16.

**RESPONSE**:  Disputed. *See* Responses to SMF ¶¶ 64, 90 and 92.  Madoff admitted that he didn't purchase the Fortune 100 company stocks shown on the IA customers' statements. However, he did, indisputably, purchase T-bills with IA customers' money and these were the most common investments on the IA customers' statements.  CMF ¶¶ 51-66; *see also* CMF ¶¶ 75-95.

97.    Madoff stated that the proprietary trading and market making businesses were engaged in legitimate trading.  *Id.* at 25:6-11.

**RESPONSE**:  Undisputed, however Defendants object to the admissibility of the plea allocutions on which the Trustee relies.  *See* Responses to SMF ¶¶ 64, 90 and 92. Madoff also stated

that funds from his investment advisory business were transferred to the proprietary trading and market making businesses, via his affiliated London entity. *See* Chaitman Dec. **Ex. BC,** Madoff Allocution at 29:12-22.

98.    Madoff also stated that funds from his investment advisory business were transferred to the proprietary trading and market making businesses, via his affiliated London entity. *Id.* at 29:12-22.

**RESPONSE**: Undisputed that Madoff generated enough income in the IA business that, during the period from 2001 – 2008 he was able to transfer between $700 and 800 million to the LLC.  CMF ¶¶ 16-17.

**Frank DiPascali**

99.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal action charging him with participating in and conspiring to perpetuate the Ponzi scheme.  Plea Allocution of Frank DiPascali, Jr., *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (the "DiPascali Allocution"), ECF No. 12 (attached as Exhibit 8 to Cremona Decl.)  Mr. DiPascali confirmed Madoff's explanation of the split-strike conversion strategy and that BLMIS never engaged in the strategy or executed the purported trades reported on customer statements.  DiPascali stated:

> By the early 1990s Bernie Madoff had stable clients whose accounts he managed as an investment adviser.  He attracted a lot of these clients by telling them that the firm would apply a hedged investment strategy to their money. The clients were told that the strategy involved purchasing what we call basket of blue chip common stocks. Hedging those investments by buying and selling option contracts, getting in and out of the market at opportune times and investing in government securities at other times. . . . From at least the early 1990s through December of 2008, there was one simple fact that Bernie Madoff knew, that I knew, and that other people

> knew but that we never told the clients nor did we tell the regulators like the SEC. No purchases of [sic] sales of securities were actually taking place in their accounts. It was all fake. It was all fictitious. It was wrong and I knew it was wrong at the time, sir.

Cremona Decl., Ex. 8 (DiPascali Allocution) at 45:21-46:15.

**RESPONSE**: Disputed. The term "BLMIS" as defined by the Trustee is misleading.

Defendants further dispute the admissibility of the plea allocutions on which the Trustee relies.

*See* Responses to SMF ¶¶ 64, 90 and 92. Moreover, DiPascali was not charged with "participating

in and conspiring to perpetuate the Ponzi scheme". He was charged with conspiracy to commit

securities fraud and investment advisory fraud, among other federal crimes.

100.    At the plea hearing, DiPascali testified that he had been instructed to falsely

represent to clients that security trading was occurring in their investment accounts when in fact,

no trades were being made.  DiPascali explained:

> From our office in Manhattan at Bernie Madoff's direction, and together with others, I represented to hundreds, if not thousands, of clients that security trades were being placed in their accounts when in fact no trades were taking place at all.

*Id.* at 46:21-25.

> ***Most of the time the clients' money just simply went into a bank account in New York that Bernie Madoff controlled. Between the early '90s and December '08 at Bernie Madoff's direction, and together with others, I did [the] follow[ing] things: On a regular basis I told clients over the phones and using wires that transactions on national securities exchanges were taking place in their account when I knew that no such transactions were indeed taking place. I also took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place and to perpetuate the illusion that they actually were. On a regular basis I used hindsight to file historical prices on stocks then I used those prices to post purchase of sales to customer accounts as if they had been executed in realtime. On a regular basis I added fictitious trade data to account statements of certain clients to reflect the specific rate of return that Bernie Madoff had directed for that client.

*Id.* at 47:5-22.

> ***... I knew no trades were happening. I knew I was participating in a fraudulent scheme. I knew what was happening was criminal and I did it anyway.

*Id.* at 52:2-5.

**RESPONSE**:  Disputed. Defendants object to the Trustee's interpretation of DiPascali's statement. Further, Defendants dispute the admissibility of the plea allocutions on which the Trustee relies. *See* Responses to SMF ¶¶ 64, 90 and 92. Moreover, the Trustee relies on that part of the plea where DiPascali, as the first cooperating witness, points the finger at others and makes the kind of exculpatory comments that are inadmissible hearsay. *See* Fed. R. Evid. 804 and Response to SMF ¶ 99.

**David Kugel**

101.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel,* No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal action charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Plea Allocution of David L. Kugel, *United States v. Kugel,* No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011) (the "Kugel Allocution"), ECF No. 188 (attached as Exhibit 9 to Cremona Decl.).

**RESPONSE**:  The term "BLMIS" as defined by the Trustee is misleading.  Defendants dispute the admissibility of the plea allocutions on which the Trustee relies. *See* Responses to SMF ¶¶ 64, 90 and 92.

On or about November 11, a Superseding Information was filed against David Kugel. *United States v. Kugel*, No. 10- CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011), ECF No. 188. At his plea hearing on that date, Kugel admitted to six charges, none of which involved an alleged Ponzi scheme.  Kugel required him to testify that he was engaged in a Ponzi scheme or that BLMIS used

other peoples' money to satisfy redemptions, nor did he so testify, and did not plead guilty to participating in a Ponzi scheme. As a result of his assistance in providing evidence against other employees, he served no jail time. Kugel Allocution at 14-16.

102.    As far as back as the 1970s, there is no evidence that the purported investment transactions reflected in the customer statements of BLMIS's IA Business customers  ever occurred, and in fact the evidence reveals that those transactions did not and could not have occurred.  Cremona Decl., Ex. 9 (Kugel Allocution) at 32:4-12 ("Specifically, beginning the early '70s, until the collapse of BLMIS in December 2008, I helped create fake, backdated trades.  I provided historical trade information . . . to create fake trades that, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred.").

**RESPONSE**: Disputed. The term "BLMIS" as defined by the Trustee is misleading. Defendants dispute the admissibility of the plea allocutions on which the Trustee relies. *See* Responses to SMF ¶¶ 64, 90 and 92.  Kugel's testimony is disputed by the testimony of Madoff and DiPascali, both of whom testified that Madoff's fraud began in the 1990s.  Chaitman Dec**. Ex. AF,** Madoff Dep. Tr. 12/20/2016 at 13:10-14:3; 14:22-15:9; 26:20; 56:24-25; Chaitman Dec. **Ex. AJ**, DiPascali Allocution at 5344:18-20; *see also* Cremona Decl. Ex. 6 at 47:7-22, DiPascali Allocution.   Moreover, Kugel's testimony is contradicted by Dubinsky's admissions on cross-examination at the Nelson trial that Madoff used IA customers' funds to purchase T-bills, which were credited to some customers' accounts. *See* Chaitman Dec. **Ex. A**, Nelson Tr. 5/8/19 at 166:17-18; 90:25-91:2; 155:2-4; 154:2-9. Further, Defendants dispute the admissibility of opinions or other material based on customer statements, which the Trustee has refused to produce.

**Irwin Lipkin**

103.    At a plea hearing on November 8, 2012, in the case captioned *United States v. Lipkin,* No. 10-CR-228 (LTS), Irwin Lipkin, a former BLMIS accountant, pleaded guilty to a two-count criminal action charging him with securities fraud, falsifying the records of BLMIS, and making false statements in relation to documents required by ERISA.  Plea Allocution of Irwin Lipkin, *United States v. Irwin Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 8, 2012) (the "Irwin Lipkin Allocution"), ECF No. 288 (attached as Exhibit 10 to Cremona Decl.).  Mr. Lipkin admitted that BLMIS's revenue was falsely inflated through fraudulent bookkeeping entries and annual audited reports.  Cremona Decl., Ex. 10 (Irwin Lipkin Allocution) at 30:23-31:3, 31:10-18, 31:24-32:5.

**RESPONSE**: Disputed. The term "BLMIS" as defined by the Trustee is misleading. Defendants dispute the admissibility of the plea allocution on which the Trustee relies. *See* Responses to SMF ¶¶ 64, 90 and 92.  Moreover, the revenue in question was never characterized as "BLMIS" revenue. Also, Lipkin was not charged with and did not plead guilty to participating in a Ponzi scheme. Defendants had no opportunity to depose Lipkin.  The testimony referred to herein is not "essential".  *See* FRE 803(2)(C).

**Eric S. Lipkin**

104.    At a plea hearing on June 6, 2011, in the case captioned *United States v. Eric S. Lipkin,* No. 10-CR-228 (LTS), Eric Lipkin, a former BLMIS payroll clerk, pleaded guilty to a six-count criminal action charging him with bank fraud, falsifying the records of BLMIS, conspiracy, and making false statements to facilitate a theft concerning ERISA.  Plea Allocution of Eric S. Lipkin, *United States v. Eric S. Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. June 6, 2011) (the "Eric Lipkin Allocution"), ECF No. 148 (attached as Exhibit 11 to Cremona Decl.).

**RESPONSE**:  Subject to clarification.  The term "BLMIS" as defined by the Trustee is misleading. Further, Defendants dispute the admissibility of the plea allocutions on which the Trustee relies. *See* Responses to SMF ¶¶ 64, 90 and 92.

On June 6, 2011, a Superseding Information was filed against Eric Lipkin. *United States v. Eric S. Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. June 6, 2011) ECF No. 148. On that date, Lipkin pleaded guilty to six charges Eric Lipkin Allocution at 15-19: none of which required him to testify that Madoff conducted a Ponzi scheme, or that early redeeming investors were paid with later investors' money or that redemptions were made with other people's money and he did not so testify. Lipkin also agreed to cooperate with the Government. *Id.* at 27. He was not charged with conspiracy to perpetuate a Ponzi scheme. *See also* Response to SMF ¶ 99. Defendants had no opportunity to depose Lipkin.

105.    Mr. Eric Lipkin admitted that BLMIS created fake reports that replicated those of the DTC, which provides clearance for nearly all equity, bond, government securities, mortgage-backed securities, money market instruments, and over-the-counter derivative transactions in the U.S. Market.  The purpose of these fake DTC reports was to purportedly confirm non-existent positions in the IA accounts, and the fake reports were given to auditors and the SEC to mislead them.  Cremona Decl., Ex. 11 (Eric Lipkin Allocution) at 32:4-10, 33:22-34:8.

**RESPONSE**:  Disputed. The term "BLMIS" as defined by the Trustee is misleading. Defendants dispute the admissibility of the plea allocutions on which the Trustee relies. *See* Responses to SMF ¶¶ 64, 90 and 92.

**Enrica Cotellessa-Pitz**

106.    At a plea hearing on December 19, 2011, in the case captioned *United States v. Cotellessa-Pitz,* No. 10-CR-228 (LTS), Enrica Cotellessa-Pitz, a former BLMIS accountant and

comptroller, pleaded guilty to a four-count criminal action charging her with conspiracy to falsify the records of BLMIS, conspiracy to obstruct the IRS in the collection of income taxes, and conspiracy to make false filings with the SEC.  Plea Allocution of Enrica Cotellessa-Pitz, *United States v. Cotellessa-Pitz*, No. 10-CR-228 (LTS) (S.D.N.Y. Dec. 19, 2011) (the "Cotellessa-Pitz Allocution"), ECF No. 1512 (attached as Exhibit 12 to Cremona Decl.).

**RESPONSE**: Disputed, insofar as the statement above does not properly reflect the charges against Ms. Cotellessa-Pitz.  The term "BLMIS" as defined by the Trustee is misleading. Defendants dispute the admissibility of the plea allocutions on which the Trustee relies. *See* Responses to SMF ¶¶ 64, 90 and 92.

On December 19, 2011, an Information was filed against Ms. Cotellessa-Pitz. *United States v. Enrica Cotellessa-Pitz, S5 10 Cr. 288 (LTS)*. She pleaded guilty to four charges, none of which required her to admit or testify that BLMIS was a Ponzi scheme, that early redeeming investors were paid with later investors' money or that redemptions to customers were made with other peoples' money and she did not so admit Chaitman Dec. **Ex. BD** at 14-17. Cotellessa-Pitz agreed to cooperate with the Government (Chaitman Dec. **Ex. BD** at 23) and as a result of her cooperation and testimony about Madoff and others, she was not given a jail sentence. Even if Cotellessa-Pitz's testimony is admissible, she was not charged with perpetrating a Ponzi scheme. .

107.    Ms. Cotellessa-Pitz admitted that IA Business customer money was funneled to BLMIS's proprietary trading and market making businesses to falsely inflate their revenue and hide their losses.  Cremona Decl., Ex. 12 (Cotellessa-Pitz Allocution) at 31:12-32:12.

**RESPONSE**: Undisputed, however the term "BLMIS" as defined by the Trustee is misleading, and Defendants dispute the admissibility of the plea allocution on which the Trustee relies. *See* Responses to SMF ¶¶ 64, 90 and 92.  Notably, however, the testimony of Cotellessa-

Pitz establishes that the IA Business was never short of cash and, in fact, the IA Business had sufficient excess cash that it transferred $700 - $800 million to the LLC in the period following 2000. *See* Chaitman Dec. **Ex**. **BD**.

### III.   The Family Trust Account BLMIS Transactions

108.   Defendant Keller Family Trust is a trust that was formed under the laws of the state of California. Answer ¶ 7, ECF No. 40[4]

**RESPONSE**:   Undisputed.

109.   Defendant Keller Family Trust was a customer of the IA Business and held BLMIS Account No. 1ZB314 in the name, "Gerald E. Keller, Trustee (Gerald E. Keller Separate Property) The Gerald and Barbara Keller Family Trust U/A June 2, 1998." Answer ¶ 7; see also Ex. B to Compl., ECF No. 1.

**RESPONSE**:   Undisputed to the extent that Keller Family Trust was a customer of the IA Business and held the Keller Family Trust Account.

110.   Defendant Gerald E. Keller is a resident of Rancho Mirage, California and/or Great Neck, New York, and is a trustee and beneficiary of the Keller Family Trust. Answer ¶ 8.

**RESPONSE**:   Undisputed.

111.   Defendant Barbara Keller is a resident of Rancho Mirage, California and/or Great Neck, New York, and is a trustee and beneficiary of the Keller Family Trust. *Id.* ¶ 13.

**RESPONSE**:   Disputed. Barbara Keller died in June 2019; the Trustee was notified of her death on June 5, 2019; and the Trustee never amended the complaint to name Barbara Keller's estate as required by Fed. R. Civ. P. 25(a).  Thus, the Trustee's claim against Barbara Keller has

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. The Gerald and Barbara Keller Family Trust*, Adv. Pro. No. 10-04539 (CGM) (Bankr. S.D.N.Y.).

been forfeited; see Chaitman Decl. **Ex. AE** [Email correspondence dated June 5, 2019].

112.    Defendants do not dispute the deposits and withdrawals as reflected on Exhibit B
to the Complaint from December 11, 2006 to December 11, 2008. Cremona Decl., Ex. 13
(Responses and Objections of Defendant Gerald E. Keller to Trustee's First Request for Production
of Documents No. 5); (Responses and Objections of Defendant Barbara Keller to Trustee's First
Request for Production of Documents No. 5); Ex. 14 (Responses and Objections of Defendant
Keller Family Trust to Trustee's First Set of Interrogatories No. 9); (Responses and Objections of
Defendant Gerald E. Keller to Trustee's First Set of Interrogatories No. 9); (Responses and
Objections of Defendant Barbara Keller to Trustee's First Set of Interrogatories No. 9Defendants
Estate of Seymour Epstein and Muriel Epstein to Trustee's First Set of Interrogatories No. 9).

**RESPONSE**:  Undisputed.

**A.      Analysis of the Keller Family Trust Account**

113.    Lisa Collura was retained by the Trustee to reconcile the cash transactions reflected
on the statements of the BLMIS customer accounts with available records and trace the flow of
those funds.  Collura Decl., Attach. A (Collura Report) ¶ 7; Collura Decl., Attach. B (Expert Report
of Lisa M. Collura, CPA, CFE, CFF, dated June 28, 2019 ("Collura Epstein Report")) ¶ 6.

**RESPONSE**:    The term "BLMIS" as defined by the Trustee is misleading. Defendants
dispute the admissibility of the documents on which the above statement is based. It is not
"followed by citation to evidence which would be admissible." Local Civ. R. 56.1; *see also* Fed.
R. Civ. P. 56(c). Defendants also object to any analysis based on the statements of the customer
accounts because they are derived from hearsay (Fed. R. Evid. 801, 802) contained in Madoff's
internal records which, the Trustee's own expert admitted, were "permeated with fraud." *See e.g.*
Response to SMF ¶ 21. Additionally, Collura biased her conclusions by including different kinds

of transactions together.

114.    For both reconciliation and tracing analyses, Ms. Collura reviewed available third-party bank records.  These bank records include hundreds of thousands of pages of BLMIS bank statements, wire transfer data, cancelled checks, and deposit slips. Collura Decl., Attach. A (Collura Report) ¶ 10.

**RESPONSE**:    Undisputed only insofar as this statement recites the tasks Collura performed. However, the term "BLMIS" as defined by the Trustee is misleading. Further, *see* Response to SMF ¶ 113.

115.    The reconciliation of the customer statements and bank records was conducted to determine whether the cash transactions on the BLMIS customer statements were accurately reflected as cash transactions—cash deposits or cash withdrawals.  *Id. ¶¶* 15, 31.

**RESPONSE**: The term "BLMIS" as defined by the Trustee is misleading and *See* Response to SMF ¶ 113.

116.    Ms. Collura confirmed that the deposit and withdrawal transactions identified on the BLMIS customer statements corresponded to transactions on the available third-party bank records in the same amount, on or around the same date, and to or for the benefit of the same customer.  *Id. ¶* 22, Collura Decl., Attach. B (Collura Keller Family Trust Report) ¶¶ 10–11.

**RESPONSE**:    The term "BLMIS" as defined by the Trustee is misleading and *see* Response to SMF ¶ 113.

117.    Ms. Collura reviewed over 225,000 transactions on the customer statements, and over 150,000 transactions on the bank records.  She kept track of these transactions by assigning a unique identifier to each of the cash transactions on the customer statements and a different unique identifying number to all of the transactions in the bank records.  Collura Decl., Attach. A

(Collura Report) ¶¶ 10, 23.

**RESPONSE**: *See* Response to SMF ¶ 113.

118.    Of the over 225,000 transactions reflected on BLMIS customer statements from December 1998 to December 2008, Ms. Collura was able to reconcile 99.01% of these cash transactions to BLMIS bank records. *Id.* ¶¶ 15, 31.

**RESPONSE**: The term "BLMIS" as defined by the Trustee is misleading. *See* Response to SMF ¶ 113.

119.    For Ms. Collura's reconciliation analysis with respect to Defendants, she analyzed the cash transactions in the Keller Family Trust Account from March 1997 to December 2008. During this time period, the customer statements for the Keller Family Trust Account reflected 29 cash deposit and withdrawal transactions Twenty-eight cash transactions reflected on the customer statements for the Keller Family Trust Account occurred in the ten-year period, December 1998 to December 2008, for which there were available BLMIS bank records. Collura Decl., Attach. B (Collura Keller Family Trust Report) ¶¶ 13–15, Exs. 3, 6.

**RESPONSE**:    *See* Response to SMF ¶ 113. Additionally, Defendants object to the Trustee's Principal Balance Calculations on the grounds that the Trustee lacks third-party evidence to support its conclusions.

120.    Collura reconciled 29 cash transactions reflected on the customer statements for the Keller Family Trust Account to available BLMIS bank records, documentation contained in BLMIS customer files, and/or documents produced to the Trustee related to the Keller Family Trust Account. *Id.* ¶¶ 13–15, 17–20, Exs. 3–4, 6.

**RESPONSE**: Disputed. The term "BLMIS" as defined by the Trustee is misleading. Additionally, *see* Responses to SMF ¶¶ 113 and 119.

121.     Based on her review of documents contained in the customer files maintained at BLMIS for the Keller Family Trust Account, Ms. Collura did not find any instance of Defendants communicating to BLMIS any disagreement with respect to the accuracy of any cash transaction reflected on the customer statements for the Keller Family Trust Account. *Id.* ¶¶ 20, 23.

**RESPONSE**:   Disputed. The term "BLMIS" as defined by the Trustee is misleading. Additionally, *see* Response to SMF ¶ 113.

122.     For Collura's tracing analysis with respect to Defendants, she analyzed the 13 cash withdrawals from the Keller Family Trust Account during the two years prior to December 11, 2008 (the "Two-Year Period"), totaling $2,125,000. *Id.* ¶¶ 25, 28, Ex. 5.

**RESPONSE**:   Undisputed only insofar as it recites the tasks Collura performed. Disputed as to the remainder. *See* Responses to SMF ¶¶ 113 and 119. Further, the allegation is misleading.  The correct amount of total withdrawals is $4,795,000. However, the amount of withdrawals in excess of principal for the relevant two year period is only $1,896,148.

123.     Based on available bank records from BLMIS, she traced 100% of the total amount of 13 cash withdrawals of $2,125,000 reflected on the customer statements for the Keller Family Trust Account during the Two-Year Period to two bank accounts—one held by Keller International Publishing LLC and one held by Keller International Publishing Corp. *Id.* ¶ 28, Exs. 5–6.

**RESPONSE**:   Requires clarification. The Defendants acted as mere conduits for the Keller International Publishing entities. The Keller Trust did not have a bank account.   As the Collura Keller Family Trust Report confirms, all withdrawals by the Trust were deposited into a Keller International Publishing Account. See Keller Declaration. The Report also confirms the Trustee was on notice of this from 2009 based on the records in his possession. He should have sued the Keller International Publishing entities, not these Defendants. The allegation is

misleading in terms of the amount of withdrawals. The correct amount of total withdrawals is $4,795,000. However, the amount of withdrawals in excess of principal for the relevant two year period is only $1,896,148. Finally, the term "BLMIS" as defined by the Trustee is misleading. *See also* Responses to SMF ¶¶ 113 and 119.

124.    Matthew Greenblatt oversaw the task of reconstructing BLMIS's books and records and calculating the principal balance for each BLMIS account (the "Principal Balance Calculation"). Mr. Greenblatt calculated the ending principal balance by applying the Net Investment Method (the Trustee's cash in/cash out net equity methodology), which takes into account all of the customer deposits as additions to principal and all of the customer withdrawals or inter-account transfers as reductions to principal. Declaration of Matthew B. Greenblatt, dated July 21, 2021 ("Greenblatt Decl."), Attach. A (Expert Report of Matthew G. Greenblatt, CPA/CFF, CFE dated November 15, 2012 ("Greenblatt Report")) ¶¶ 4–5; *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec.),* 424 B.R. 122 (Bankr. S.D.N.Y. 2010).

**RESPONSE**:    Undisputed insofar as it recites the tasks that Greenblatt performed. However, Defendants dispute the admissibility of the documents on which the statement is based. It is not "followed by citation to evidence which would be admissible." Local Civ. R. 56.1; Fed. R. Civ. P. 56(c). Defendants also object to the Trustee's Principal Balance Calculations. They are derived from hearsay (Fed. R. Evid. 801, 802). BLMIS's books and records were "permeated with fraud." *See* Response to SMF ¶21. Summaries derived from inadmissible hearsay cannot constitute a Rule 1006 summary. *Hackett v Hous. Auth. of City of San Antonio*, 750 F2d 1308, 1312 (5th Cir. 1985) (citing *Soden v. Freightliner Corp.,* 714 F.2d 498, 506 (5th Cir. 1983). Defendants object to the Trustee's Principal Balance Calculations to the extent there is no third-party evidence to

support its conclusions.

125.    Greenblatt prepared a chronological listing of cash and principal transactions reflected in the BLMIS customer statements.  Greenblatt relied on the customer statements because they are the most comprehensive and complete accounting of the debtor's books and records with respect to transaction-by-transaction line item detail of the cash and principal transactions and because the customer statements were sent to customers, giving customers the opportunity to correct errors on the statements. Greenblatt Decl., Attach. A (Greenblatt Report) ¶¶ 10–12, 40–43.

**RESPONSE**:  *See* Response to SMF ¶ 124.

126.    The first monthly customer statement which reported dollar amounts for any securities allegedly held at month end was March of 1981.  Therefore, the full period in which the Principal Balance Calculation could be performed covered the time period from April 1, 1981 through December 11, 2008. *Id. ¶* 5 n.1.

**RESPONSE**:  *See* Response to SMF ¶ 124.

127.    Greenblatt's analysis Principal Balance Calculation covered the period from the Keller Family Trust Account opening through December 11, 2008. Greenblatt Decl., Attach. B (Expert Report of Matthew B. Greenblatt, CPA/CFF, CFE dated June 25, 2019 ("Greenblatt Keller Family Trust Report")) ¶¶ 4, 7–15.

**RESPONSE**:  *See* Response to SMF ¶ 124.

128.    Greenblatt determined that on March 20, 1997, the Keller Family Trust Account was opened with a cash deposit via check in the amount of $1,000,000 all representing principal. *Id.* ¶ 11.

**RESPONSE:**  Undisputed.

129.    Subsequent to this initial cash deposit, there were two additional cash deposits via checks into the Keller Family Trust Account in the aggregate amount of $1,898,852, all representing principal. *Id.* ¶ 12.

**RESPONSE:**  Undisputed.

130.    In sum, these three cash deposits provided the Keller Family Trust Account with a total of $2,898,852 of principal. *Id.* ¶ 13, Ex. 3.

**RESPONSE:**  Undisputed.

131.    Between March 20, 1997 and December 11, 2008, the Keller Family Trust Account reflected a total of 26 cash withdrawals totaling $4,795,000.  *Id.* ¶ 14.

**RESPONSE:**  Disputed. See also Response to SMF ¶123.

132.    The Principal Balance Calculation for the Keller Family Trust Account demonstrated that between March 20, 1997 and December 11, 2008, $4,795,000 was withdrawn from BLMIS, which consisted of $2,898,852 of principal and an additional $1,896,148 of funds withdrawn in excess of principal, representing fictitious profits over the life of the Keller Family Trust Account.  *Id.* ¶ 15, Ex. 4. 26.

**RESPONSE:**  Disputed. *See* Responses to SMF ¶¶ 113, 123 and 124. Further, the terms "fictitious profits" and BLMIS as defined by the Trustee are misleading.

133.    Within the Two-Year Period prior to December 11, 2008, $ 1,896,148 of fictitious profits was withdrawn from the Keller Family Trust Account. *Id.*

**RESPONSE:**  Disputed. *See* Responses to SMF ¶¶ 113, 123 and 124. Further, the term "fictitious profits" as defined by the Trustee is misleading.

134.    It is therefore undisputed that, during the Two-Year Period, Defendants withdrew $ 1,896,148 in excess of principal deposited in the Keller Family Trust Account. *Id.*

**RESPONSE:**    Disputed. *See* Responses to SMF ¶¶ 113, 119, 123, 124, 128, 129 and 130. Further, Defendants object to the Trustee's Principal Balance Calculations. They are derived from hearsay (Fed. R. Evid. 801, 802). As the Trustee's own expert admitted, BLMIS's books and records were "permeated with fraud." *See* Response to SMF ¶ 21. Summaries derived from inadmissible hearsay cannot constitute a Rule 1006 summary. *Hackett v Hous. Auth. of City of San Antonio*, 750 F2d 1308, 1312 (5th Cir. 1985) (citing *Soden v. Freightliner Corp.,* 714 F.2d 498, 506 (5th Cir. 1983). Additionally, Defendants object to the Trustee's Principal Balance Calculations to the extent the Trustee has no third-party evidence to support its conclusions.

Dated: August 17, 2021
         New York, New York

<div style="margin-left:50%">

**CHAITMAN LLP**
By:  */s/ Helen Davis Chaitman*
Helen Davis Chaitman
hchaitman@chaitmanllp.com
465 Park Avenue
New York, New York 10022
Phone & Fax: 888-759-1114

*Attorney for Defendants*

</div>