**20-1333, 20-1334**
*In Re Bernard L. Madoff Inv. Sec. LLC*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term 2020

(Argued in Tandem: March 12, 2021 | Decided: August 30, 2021)

Docket Nos. 20-1333, 20-1334

IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC

_____

IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.
MADOFF INVESTMENT SECURITIES LLC,
*Plaintiff-Appellant,*

and

SECURITIES INVESTOR PROTECTION CORPORATION,
*Appellant,*

v.

CITIBANK, N.A., CITICORP NORTH AMERICA, INC.,
*Defendants-Appellees.*†

_____

IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.
MADOFF INVESTMENT SECURITIES LLC,
*Plaintiff-Appellant,*

and

_____

† The Clerk of Court is respectfully directed to amend the caption as set forth above.

SECURITIES INVESTOR PROTECTION CORPORATION,
*Appellant,*

v.

LEGACY CAPITAL LTD., KHRONOS LLC
*Defendants-Appellees.*

————————

Before:

WESLEY, SULLIVAN, MENASHI, *Circuit Judges.*

Plaintiff-Appellant Irving H. Picard was appointed as the trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") pursuant to the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.,* to recover funds for victims of Bernard Madoff's Ponzi scheme. SIPA empowers trustees to recover property transferred by the debtor where the transfers are void or voidable under Sections 548 and 550 of the Bankruptcy Code, 11 U.S.C. §§ 548, 550, to the extent those provisions are consistent with SIPA. Under Sections 548 and 550, a transferee may retain transfers it took "for value" and "in good faith." Picard brought actions against Defendants-Appellees, Citibank, N.A., Citicorp North America, Inc., Legacy Capital Ltd., and Khronos LLC, to recover payments they received either directly or indirectly from BLMIS. The district court held: (1) a lack of good faith in a SIPA liquidation requires that the defendant-transferee has acted with "willful blindness;" and (2) the trustee bears the burden of pleading the defendant-transferee's lack of good faith. Relying on the district court's legal conclusions, the bankruptcy court dismissed the actions, finding Picard did not plausibly allege Defendants-Appellees were willfully blind to the fraud at BLMIS. We disagree with both rulings of the district court. Accordingly, we **VACATE** the judgments of the bankruptcy court and **REMAND** for further proceedings consistent with this opinion. Judge Menashi concurs in the Court's opinion, and files a separate concurring opinion.

————————

ROY T. ENGLERT, JR., Robbins, Russell, Englert, Orseck, Untereiner
& Sauber LLP, Washington, D.C., *Special Counsel* (David J.

2

Sheehan, Seanna R. Brown, Amy E. Vanderwal, Matthew D. Feil, Chardaie C. Charlemagne, Baker & Hostetler LLP, New York, NY; Matthew M. Madden, Leslie C. Esbrook, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, D.C., *Special Counsel, on the brief*), *for Plaintiff-Appellant Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC*.

NATHANAEL S. KELLEY, Associate General Counsel (Kenneth J. Caputo, General Counsel, Kevin H. Bell, Senior Associate General Counsel, *on the brief*), Securities Investor Protection Corporation, Washington, D.C., *for Appellant Securities Investor Protection Corporation*.

CARMINE D. BOCCUZZI, JR. (E. Pascale Bibi, Ariel M. Fox, *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, NY, *for Defendants-Appellees Citibank N.A., Citicorp North America, Inc.*

ERIC B. FISHER (Lindsay A. Bush, *on the brief*), Binder & Schwartz LLP, New York, NY, *for Defendants-Appellees Legacy Capital Ltd., Khronos LLC*.

———————————

WESLEY, *Circuit Judge*:

These appeals are the latest installments in the long-running litigation arising from Bernard Madoff's Ponzi scheme. Madoff falsely claimed to invest money he received from customers of Bernard L. Madoff Investment Securities LLC ("BLMIS"). When customers wanted to withdraw money, BLMIS transferred funds directly to them, the *initial transferees*, some of whom then transferred the

3

funds to their own investors, the *subsequent transferees*.  Irving H. Picard, trustee

for the liquidation of BLMIS, brought actions against initial transferee Legacy

Capital Ltd. and subsequent transferees Citibank, N.A., Citicorp North America,

Inc., and Khronos LLC, seeking to avoid and recover the transfers pursuant to his

authority under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

*et seq.*  A SIPA liquidation is "conducted in accordance with" the Bankruptcy Code

"[t]o the extent consistent with" SIPA.  *Id.* § 78fff(b).  Under the Bankruptcy Code,

a transferee may retain transfers it took "for value" and "in good faith."  11 U.S.C.

§§ 548(c), 550(b).

The United States District Court for the Southern District of New York

(Rakoff, *J.*) held that in a SIPA liquidation, a lack of good faith requires a showing

of at least willful blindness to the fraud on the part of the transferee and the trustee

bears the burden of pleading the transferee's lack of good faith.  Applying that

decision, the United States Bankruptcy Court for the Southern District of New

York (Bernstein, *J.*) dismissed Picard's actions against Appellees for failure to

plead their willful blindness.  We vacate both judgments of the bankruptcy court

and hold that lack of good faith in a SIPA liquidation applies an inquiry notice,

4

not willful blindness, standard, and that a SIPA trustee does not bear the burden

of pleading the transferee's lack of good faith.

## BACKGROUND

The details of the Madoff Ponzi scheme[1] are described at length in previous

opinions of this Court and others.  *See, e.g.*, *In re BLMIS*, 654 F.3d 229, 231 (2d Cir.

2011) (collecting cases).  Madoff operated his Ponzi scheme through his investment

firm BLMIS, a securities broker-dealer.  A Ponzi scheme is "an investment fraud

that involves the payment of purported returns to existing investors from funds

contributed by new investors."  *Picard v. Gettinger (In re BLMIS)*, 976 F.3d 184, 188

n.1 (2d Cir. 2020) (citation omitted), *cert. denied*, No. 20-1382, 2021 WL 1725218 (U.S.

May 3, 2021).

Customers ranging from banks and hedge funds to individuals and charities

entrusted BLMIS with their money, expecting it to make investments on their

behalf.  A number of the customers were "feeder funds," firms that pooled money

from investors and invested directly (or indirectly) with BLMIS.  When a feeder

fund wanted to withdraw money, it received a transfer directly from BLMIS,

---

[1] The term "Ponzi scheme" is named after Charles Ponzi, who developed a "remarkable
criminal financial career" by convincing people to invest in his fake international postal
coupons business. *Cunningham v. Brown*, 265 U.S. 1, 7 (1924); *see also Gettinger*, 976 F.3d
at 188 n.1.

making it an "initial transferee."  When an investor of a feeder fund wanted to withdraw money, the feeder fund transferred money it received from BLMIS, making that investor a "subsequent transferee."  *See In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019), *cert. denied sub nom HSBC Holdings PLC v. Picard*, 140 S. Ct. 2824 (2020).

BLMIS was a sham.  It sent its customers account statements with fabricated returns; in actuality, it was making few, if any, trades.  "At bottom, the BLMIS customer statements were bogus and reflected Madoff's fantasy world of trading activity, replete with fraud and devoid of any connection to market prices, volumes, or other realities."  *Sec. Inv. Prot. Corp. v. BLMIS (In re BLMIS)*, 424 B.R. 122, 130 (Bankr. S.D.N.Y. 2010) (hereinafter "*SIPC*"), *aff'd*, 654 F.3d 229 (2d Cir. 2011).  The customers' funds were commingled in BLMIS's bank account.  When customers withdrew their "profits" or principal, BLMIS paid them from this commingled account.  As a result, each time BLMIS transferred payments to a customer, it was money stolen from other customers.  *See In re BLMIS*, 654 F.3d at 232.

Amid the global financial crisis of 2007–08, concerned customers began to withdraw their investments, leading to BLMIS's collapse as "customer requests for

6

payments exceeded the inflow of new investments." *See SIPC*, 424 B.R. at 128.

Following Madoff's arrest for securities fraud on December 11, 2008,[2] the

Securities Investor Protection Corporation ("SIPC") requested that the United

States District Court for the Southern District of New York (Stanton, *J.*) place

BLMIS into a SIPA liquidation to recover and distribute funds to BLMIS's

customers who lost their investments.[3]  The district court granted SIPC's petition,

appointed Picard as the trustee, and referred the SIPA liquidation of BLMIS to the

bankruptcy court.  In this ongoing liquidation, Picard brought actions to recover

approximately $343 million from subsequent transferees Citibank, N.A. and

Citicorp North America, Inc. (together, "Citi"), $6.6 million from subsequent

transferee Khronos LLC ("Khronos"), and $213 million from initial transferee

Legacy Capital Ltd. ("Legacy").

---

[2] Madoff pleaded guilty to eleven felony counts and was sentenced to 150 years in prison: a "symbolic" sentence for his "extraordinarily evil" crimes.  *See United States v. Madoff*, 465 F. Supp. 3d 343, 347–48 (S.D.N.Y. 2020) (citation omitted).  He died in prison on April 14, 2021.

[3] SIPC filed its request in a parallel civil action, which the Securities and Exchange Commission ("SEC") commenced against Madoff and BLMIS for securities fraud on the same day as Madoff's arrest in the criminal action.  *See SIPC*, 424 B.R. at 126.

## I. The SIPA Liquidation of BLMIS

Congress enacted SIPA in 1970 to protect customers of bankrupt broker-dealers. As we have previously explained, "[a] trustee's primary duty under SIPA is to liquidate the [failed] broker-dealer and, in so doing, satisfy claims made by or on behalf of the broker-dealer's customers for cash balances." *Marshall v. Picard (In re BLMIS)*, 740 F.3d 81, 85 (2d Cir. 2014). "In a SIPA liquidation, a fund of 'customer property,' separate from the general estate of the failed broker-dealer, is established for priority distribution exclusively among customers." *In re BLMIS*, 654 F.3d at 233. The "customer property" fund consists of "cash and securities . . . at any time received, acquired, or held by" the debtor on behalf of the customers, including "the proceeds of any such property transferred by the debtor" and "property unlawfully converted." 15 U.S.C. § 78lll(4).

Although investors of BLMIS are considered "customers" under SIPA, *see In re BLMIS*, 654 F.3d at 236, under certain circumstances, those who indirectly invested in BLMIS do not qualify as customers, *see Kruse v. Picard (In re BLMIS)*, 708 F.3d 422, 426–27 (2d Cir. 2013).[4] Only BLMIS's customers with "allowed

_____

[4] Specifically, if the investors "(1) had no direct financial relationship with BLMIS, (2) had no property interest in the assets that the [f]eeder [f]unds invested with BLMIS, (3) had no securities accounts with BLMIS, (4) lacked control over the [f]eeder [f]unds'

8

claims" are entitled to a distribution from the customer property fund. SIPA

requires customers to "share ratably in such customer property on the basis and

to the extent of their respective net equities." 15 U.S.C. § 78fff-2(c)(1)(B). We

previously approved Picard's "Net Investment Method" to calculate each

customer's "net equity," "crediting the amount of cash deposited by the customer

into his or her BLMIS account, less any amounts withdrawn from it." *See In re*

*BLMIS*, 654 F.3d at 233–34, 242. Accordingly, customers who withdrew less than

they deposited have allowed claims.[5] *See id.* at 233.

Picard's goal in this liquidation is to satisfy the allowed customer claims. A

SIPA liquidation is "conducted in accordance with, and as though it were being

conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of [the

Bankruptcy Code]." 15 U.S.C. § 78fff(b). As is invariably true of Ponzi schemes,

due to BLMIS's transfers of commingled customer funds before the Ponzi scheme

unraveled, there was insufficient money in the BLMIS customer property fund for

Picard to satisfy all allowed claims. *See In re Picard*, 917 F.3d at 92. "Whenever

---

investments with BLMIS, and (5) were not identified or otherwise reflected in BLMIS's
books and records," they are not "customers" under SIPA. *Kruse*, 708 F.3d at 427–28.

[5] For the nuances of which customers are entitled to distributions from the BLMIS
customer property fund, see *SIPC*, 424 B.R. at 125.

customer property is not sufficient to pay in full the [customers'] claims . . . the

trustee may recover any property transferred by the debtor which, except for such

transfer, would have been customer property if and to the extent that such transfer

is voidable or void under the provisions of Title 11." 15 U.S.C. § 78fff-2(c)(3). As

a result, Picard initiated actions against Appellees under Sections 548 and 550 of

the Bankruptcy Code, 11 U.S.C. §§ 548, 550, to avoid and recover BLMIS's transfers

to them.

## II. The Instant Actions Under Bankruptcy Code Sections 548 and 550

Avoidance and recovery are related but distinct concepts. Section 548

governs the avoidance of actually and constructively fraudulent transfers by the

debtor. It permits a trustee to "avoid"—*i.e.*, cancel—"any transfer . . . made or

incurred on or within 2 years before the date of the filing of the [bankruptcy]

petition, if the debtor . . . made such transfer . . . with actual intent to hinder, delay,

or defraud any entity to which the debtor was or became . . . indebted." 11 U.S.C.

§ 548(a)(1)–(a)(1)(A). Section 550 authorizes a trustee to recover the property

transferred by the debtor to any transferee (initial or subsequent) "to the extent

that a transfer is avoided under [(*inter alia*)] section . . . 548 . . . of this title." 11

U.S.C. § 550(a). As a result, before Picard can recover the funds from Appellees,

he must first avoid BLMIS's transfers to Appellees.

10

Voidability under § 548(a)(1)(A) focuses on the fraudulent intent of the debtor-transferor.[6]    Under the so-called "Ponzi scheme presumption," "the existence of a Ponzi scheme demonstrates actual intent as [a] matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *Picard v. Estate (Succession) of Igoin (In re BLMIS)*, 525 B.R. 871, 892 n.21 (Bankr. S.D.N.Y. 2015) (internal quotation marks and citations omitted).    Madoff admitted in his plea allocution that "for many years up until my arrest . . . I operated a Ponzi scheme through . . . [BLMIS]," and the parties do not dispute the applicability of the Ponzi scheme presumption here.[7]    *See* Madoff Allocution at 1, *United States v. Madoff*, No. 09-cr-00213 (S.D.N.Y. Mar. 12, 2009), ECF No. 50.

---

[6] Voidability under § 548(a)(1)(B) covers constructively fraudulent transfers: if the transfer was made for "less than a reasonably equivalent value in exchange for such transfer or obligation" and the debtor was insolvent, fraud is presumed without requiring an actual intent to defraud by the debtor. 11 U.S.C. § 548(a)(1)(B).

[7] Indeed, Citi's counsel explicitly stated at oral argument they "are not challenging the application of the Ponzi scheme presumption." Oral Argument at 27:29–34, *In re BLMIS*, (Nos. 20-1333, 20-1334), https://www.ca2.uscourts.gov/oral_arguments.html.    Our concurring colleague criticizes the Ponzi scheme presumption as leading to counterintuitive results by treating what would otherwise be preferential transfers under 11 U.S.C. § 547 as fraudulent transfers under 11 U.S.C. § 548.  As he acknowledges, we have no occasion to assess—and therefore we do not address—whether the Ponzi scheme presumption is well-founded.  *See* Concurring Op. at 4, 5 n.7.  We are not in the practice of opining on issues not raised and undisputed by the parties.  *See, e.g., Cook v. Arrowsmith*

Recovery, by contrast, focuses on the transferee. As discussed above, Section 550 authorizes a trustee to recover transfers voided under Section 548 from initial and subsequent transferees. *See* 11 U.S.C. § 550(a). But those transferees may defend against such recovery under various provisions of Sections 548 and 550, depending on whether they are initial or subsequent transferees. Section 550(b)(1), applicable only to *subsequent* transferees, enables "a transferee that takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided" to retain the property transferred. 11 U.S.C. § 550(a)(2)–(b)(1). Initial transferees find recourse in § 548(c), under which a transferee "that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer." *Id.* § 548(c). The "main difference" between § 550(b)(1) and § 548(c) is that § 550(b)(1) provides "a complete defense to recovery of the property transferred," whereas under § 548(c), "the transaction is still avoided, but the transferee is given a lien to the extent value was given in good faith." 5 Collier on Bankruptcy ¶ 548.09 (16th ed. 2021).

---

*Shelburne, Inc.*, 69 F.3d 1235, 1241 n.2 (2d Cir. 1995) ("We [] do not address the issue because it has not been argued in the instant matter.").

Picard sued Appellees because, as alleged, BLMIS made fraudulent transfers to them, which are voidable under § 548, and Picard can recover those transfers under § 550 from subsequent transferees Citi and Khronos and initial transferee Legacy, unless they took the transfers for value and in good faith.

### A) Picard's Action Against Citi[8]

Citi did not receive transfers directly from BLMIS. Instead, it received at least $343 million in subsequent transfers between June 2005 and March 2008 from feeder fund Rye Select Broad Market Prime Fund, L.P. ("Prime Fund") "as repayment of funds [Citi] loaned to Prime Fund to invest with BLMIS[]." No. 20-1333 J.A. 333–34. Beginning in the spring of 2005, Citigroup Global Markets, Inc. ("CGMI"), the main Citi affiliate that conducted BLMIS-related business, uncovered facts suggesting that BLMIS was engaged in fraudulent activity. Specifically, in its diligence for deals with feeder funds, Citi was "unable to independently verify that BLMIS maintained segregated customer accounts, or even that the assets existed in any account," and it was "unable to find any evidence that BLMIS was in fact making the options trades" it was reporting to its customers. *Id.* at 335.

---

[8] These allegations are drawn from Picard's proposed amended complaint against Citi.

13

In March 2005, CGMI performed a quantitative analysis in its diligence on the deal with feeder fund Fairfield Sentry Limited ("Fairfield Sentry"). The results revealed BLMIS was not using Madoff's purported "split strike conversion" ("SSC") investment strategy[9] because BLMIS's returns outperformed the market in a manner that appeared statistically impossible. In addition, CGMI knew BLMIS lacked an independent custodian for its customers' assets, giving BLMIS sole control over customers' funds and making it more likely BLMIS could steal or misuse those funds.

Around the same time, Leon Gross, a managing director at CGMI, conducted a separate investigation of BLMIS after Harry Markopolos, a CGMI customer, asked him to analyze BLMIS's investment strategy. Gross considered possible strategies Madoff could have been using to explain BLMIS's returns. He, too, concluded that the SSC strategy was incapable of producing BLMIS's reported returns and that Madoff did not engage in any options transactions. As a result, Gross discerned that "either the returns are not the returns or the strategy is not

---

[9] Madoff falsely told customers he used the SSC investment strategy, which involved "(i) the purchase of a group or basket of equities (the 'Basket') intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P Index call options." No. 20-1333 J.A. 354.

the strategy." *Id.* at 369.  Markopolos submitted a report to the SEC detailing the evidence of fraud at BLMIS and identifying Gross as one of the experts the SEC should contact for more information.  In June 2007, Markopolos emailed Gross about BLMIS's potential downfall, asking him if he knew about "Madoff running short of new cash."  *Id.* at 374.

CGMI was unable to confirm Madoff's purported options trades.  Nor did CGMI prepare questions related to its main suspicions of fraud for a meeting it held with Madoff in November 2006, when it was planning to renew its deal with Prime Fund.  Instead, the meeting was a "check-the-box exercise where CGMI sought only basic information that amounted to a 'corporate overview' of BLMIS." *Id.* at 389.  Nevertheless, in its deal with Prime Fund, Citi "demanded a unique contractual indemnification provision related directly to fraud at BLMIS," and insisted on it before renewing the deal.  *Id.* at 374, 392.  Around the same time, CGMI rejected a separate proposed deal with Tremont Partners, Inc., Prime Fund's general partner, because it lacked such indemnification.

Picard seeks to avoid and recover $343,084,590 in subsequent transfers from Prime Fund to Citi, arguing that the Citi defendants received these transfers "at a

time when they were willfully blind to circumstances suggesting a high

probability of fraud at BLMIS." *Id.* at 413.

### B) Picard's Action Against Legacy and Khronos[10]

Legacy is a British Virgin Islands corporation that invested solely in BLMIS.

Jimmy Mayer and his son, Rafael Mayer, run Legacy.  Acting in their individual

capacities, the Mayers invested in the Meritage fund, a hedge fund managed by

Renaissance Technologies LLC ("Renaissance").  Meritage invested in BLMIS, and

Rafael was a member of the committee responsible for overseeing Meritage's

investments.

Suspicious of BLMIS's returns, Renaissance analyzed Madoff's purported

SSC investment strategy and produced a report in October 2003 presenting its

results, entitled the "Renaissance Proposal."   The Renaissance Proposal was

shared with the Meritage committee members, including Rafael.  It revealed that

the market could not support the options volume BLMIS purported to trade, that

many of BLMIS's trades were at improbable prices, and that there was no footprint

of its trades.  These findings sparked email exchanges in November 2003 between

Meritage committee members, who expressed concern about the risk of fraud at

---

[10] These allegations are drawn from Picard's amended complaint against Legacy and
Khronos.

BLMIS; Rafael was included in these emails.  When Renaissance decided to redeem Meritage's investment in BLMIS in 2004, Rafael was the only member of the Meritage committee who objected.

Rafael convinced the Meritage committee to delay redeeming half of Meritage's investment; Legacy ultimately bought that half in July 2004.  Legacy then instructed Khronos, which provided accounting services to Legacy, to investigate BLMIS.  Khronos was co-founded by Rafael and his brother, David Mayer, who were also the managing directors of Khronos.  In addition to relying on Khronos rather than an independent third party to investigate BLMIS, Rafael and David restricted the access of Khronos's employees to Legacy and its BLMIS account statements, "[c]ontrary to Khronos's standard investment monitoring process."  No. 20-1334 J.A. 102.  As a result, Rafael and David, as the managers of Khronos, were the only ones permitted to review Legacy's account details. Khronos's evaluation of BLMIS's trading data confirmed that the trades were "statistically impossible" and revealed that BLMIS lacked a capable auditor and "clearly lacked the staff necessary to conduct research on the investment opportunities."  *Id.* at 109, 115.

Picard seeks to avoid and recover $213,180,068 that Legacy received from BLMIS in initial transfers, and $6,601,079 that Khronos received "as investment management and accounting services fees" in subsequent transfers, arguing both defendants received these transfers with "willful blindness to circumstances suggesting a high probability of fraud at BLMIS." *Id.* at 91, 124–25.[11]

### III. The Decisions Below

Appellees moved to withdraw their cases from the bankruptcy court to the district court to decide "whether SIPA and other securities laws alter the standard the [t]rustee must meet in order to show that a defendant did not receive transfers in 'good faith' under either 11 U.S.C. § 548(c) or 11 U.S.C. § 550(b)." *SIPC v. BLMIS*, 516 B.R. 18, 20 (S.D.N.Y. 2014) (the *"Good Faith Decision"*) (citation omitted). The district court granted their motion.[12]

The district court made two rulings on the "good faith" defense. First, the court concluded that a lack of good faith in a SIPA liquidation requires "a showing

---

[11] The relief sought from Khronos is pleaded in the alternative, to the extent that any of the $6.6 million in fees paid to Khronos included funds that were initially transferred to Legacy.

[12] The district court has the authority to withdraw, on its own or upon the motion of a party, any case referred to the bankruptcy court. *See* 28 U.S.C. § 157(d). The court must, "on timely motion of a party," withdraw the reference if it "determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." *Id.*

that the defendant acted with *willful blindness* to the truth, that is, he intentionally

chose to blind himself to the red flags that suggest a high probability of fraud." *Id.*

at 21 (internal quotation marks, alteration, and citation omitted) (emphasis added).

It rejected applying an *inquiry notice* standard, "under which a transferee may be

found to lack good faith when the information the transferee learned would have

caused a reasonable person in the transferee's position to investigate the matter

further." *Id.* (internal quotation marks and citation omitted).

Second, the court set the pleading burden for the good faith defense, finding

that good faith is an *affirmative defense* and acknowledging that "in the context of

an ordinary bankruptcy proceeding," the defendant bears the burden of pleading

this affirmative defense under both Section 548(c) and Section 550(b)(1). *Id.* at 24.

The district court nevertheless concluded that "SIPA . . . affects the burden of

pleading good faith or its absence" and alters the traditional framework such that,

in a SIPA liquidation, the trustee bears the burden of pleading the defendant's lack

of good faith. *Id.*

The district court returned the cases to the bankruptcy court, which applied

the standard articulated by the district court and dismissed both actions. The

bankruptcy court denied Picard leave to amend his complaint against Citi, finding

19

it would be futile because his proposed amended complaint does not plausibly allege willful blindness. It also dismissed Picard's amended complaint against Legacy and Khronos for failing to plausibly allege their willful blindness to the fraud committed by BLMIS.[13] Picard and SIPC appeal both judgments of the bankruptcy court.

## DISCUSSION

There are two[14] issues before us: (1) the definition of "good faith" in the context of a SIPA liquidation; and (2) which party bears the burden of pleading good faith or the lack thereof.

### I. Defining "Good Faith" in a SIPA Liquidation

As recounted above, the district court rejected the *inquiry notice* standard, "under which a transferee may be found to lack good faith when the information the transferee learned would have caused a reasonable person in the transferee's position to investigate the matter further." *Good Faith Decision*, 516 B.R. at 21

---

[13] The bankruptcy court dismissed Picard's action against Legacy in all respects "except as to the portion . . . seeking to avoid and recover fictitious profits transferred to Legacy," payments it received in excess of its principal. *See Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 17 (Bankr. S.D.N.Y. 2016).

[14] The parties also briefed a third issue: whether Picard's proposed amended complaint against Citi and amended complaint against Legacy and Khronos plausibly allege Appellees were willfully blind to fraud at BLMIS. Because we vacate the bankruptcy court's judgments based on the first two issues, we do not address this third issue.

(internal quotation marks and citation omitted).    Instead, it decided the appropriate standard is *willful blindness*, under which the defendant lacks good faith if it "intentionally [chose] to blind [itself] to the red flags that suggest a high probability of fraud." *Id.* (internal quotation marks and citation omitted).

Inquiry notice is distinct from willful blindness both in degree and intent. "[A] willfully blind defendant is one who takes *deliberate* actions to avoid confirming a *high probability* of wrongdoing and *who can almost be said to have actually known the critical facts*." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (emphasis added).    Inquiry notice requires knowledge of suspicious facts that need not suggest a "high probability" of wrongdoing but are nonetheless sufficient to induce a reasonable person to investigate.    *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 650–51 (2010) (collecting cases).    Willful blindness also imputes a heightened sense of culpability, whereas a defendant on inquiry notice who fails to investigate does not necessarily do so with the purpose of avoiding confirming the truth.

The district court reasoned that because (1) SIPA is part of the securities laws, (2) a lack of good faith under the securities laws requires fraudulent intent, and (3) SIPA "expressly provides that the Bankruptcy Code applies only '[t]o the

extent consistent with the provisions of this chapter [of the federal securities laws],'" the inquiry notice standard for good faith applicable under the Bankruptcy Code "must yield" to the willful blindness standard for good faith required under the securities laws. *Good Faith Decision*, 516 B.R. at 21–22 (quoting 15 U.S.C. § 78fff(b)) (alterations in original). It also determined "in the context of securities transactions such as those protected by SIPA, the inquiry notice standard . . . would be both unfair and unworkable" because it "would impose a burden of investigation on investors totally at odds with the investor confidence and securities market stability that SIPA is designed to enhance." *Id.* at 22.

On appeal, Citi mounts an alternative defense of the district court's ruling. It argues that the ordinary meaning of good faith in the Bankruptcy Code applies a willful blindness standard to establish lack of good faith. Legacy and Khronos primarily defend the district court's "securities-law theory," arguing that because SIPA is housed within the federal securities laws, the willful blindness standard for lack of good faith in the securities context applies here. We review interpretations of a statute *de novo*, *In re BLMIS*, 654 F.3d at 234, and conclude that inquiry notice, rather than willful blindness, is the appropriate standard for

determining lack of good faith in a SIPA liquidation, just as it is in an ordinary

bankruptcy proceeding.

### A) A Lack of Good Faith Under Sections 548(c) and 550(b) of the Bankruptcy Code Does Not Require Willful Blindness

Section 550(b) of the Bankruptcy Code, which applies to Citi and Khronos

as subsequent transferees, provides that "[t]he trustee may not recover . . . from . . .

a transferee that takes for value, . . . *in good faith*, and without knowledge of the

voidability of the transfer avoided."[15]   11 U.S.C. § 550(b)–(b)(1) (emphasis added).

Similarly, § 548(c), which applies to initial transferee Legacy, permits a transferee

that "takes for value and *in good faith* . . . [to] retain any interest transferred."  *Id.*

§ 548(c) (emphasis added).  Appellees do not contend that the definition of good

faith differs between the sections.[16]  They offer "no reason to depart from the

normal rule of statutory construction that words repeated in different parts of the

same statute generally have the same meaning."  *Law v. Siegel*, 571 U.S. 415, 422

(2014) (internal quotation marks and citation omitted).

---

[15] The "for value" defense is not at issue in this appeal.  The district court assumed for the purpose of its decision that the transfers were made "for value," *see Good Faith Decision*, 516 B.R. at 20, n.1, and we do the same.

[16] Although Citi notes in passing that Picard relies on cases that do not "deal with Section 550," such as an Eighth Circuit decision applying the inquiry notice standard for lack of good faith under § 548, *see* Citi's Br. at 33, it does not otherwise explain or argue that good faith under § 548 takes on a different meaning from that under § 550.

The Bankruptcy Code does not define "good faith." "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). "To assess ordinary meaning, we consider the commonly understood meaning of the statute's words at the time Congress enacted the statute, and with a view to their place in the overall statutory scheme." *New York v. Nat'l Highway Traffic Safety Admin.*, 974 F.3d 87, 95 (2d Cir. 2020) (internal quotation marks and citations omitted).

Dictionary definitions and case law predating the Bankruptcy Code of 1978, "usual source[s] that might shed light on the statue's ordinary meaning," *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019), demonstrate that "good faith" encompasses inquiry notice. At the time of the Bankruptcy Code's drafting, Black's Law Dictionary defined good faith as "[h]onesty of intention, and freedom from *knowledge of circumstances which ought to put [a party] upon inquiry*," as well as "[a]n honest intention to abstain from taking any unconscientious advantage of another, even through technicalities of law, together with absence of all information, *notice*, or benefit or belief of facts which render [a] transaction unconscientious." Black's Law Dictionary 822 (rev. 4th ed. 1968) (emphases added); *see also* Black's Law Dictionary 623 (5th ed. 1979) (same); *id.* at 624

24

(defining "good faith purchasers" as "[t]hose who buy without notice of circumstances which would put a person of ordinary prudence on inquiry as to the title of the seller"). Ballantine's Law Dictionary similarly defined good faith as "[f]airness and equity[,] [t]he antithesis of fraud and deceit[,] and [a]cting in the absence of circumstances placing a man of ordinary prudence *on inquiry*." Ballentine's Law Dictionary 528 (3d ed. 1969) (emphasis added). And the Oxford English Dictionary, "one of the most authoritative on the English language," *Taniguchi*, 566 U.S. at 569, explained that "[t]he Eng[lish] uses [of good faith] closely follow those of [the Latin phrase *bona fides*]," "in which the primary notion seems to have been the *objective aspect* of confidence well . . . bestowed" and defined "good faith" as "honesty of intention in entering into engagements, sincerity in professions." Oxford English Dictionary 460 (1961) (emphasis added).

Aside from dictionary definitions, "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012) (explaining that because "[m]ost common English words have a number of dictionary definitions" and "[m]any words have more than one ordinary

25

meaning," "[o]ne should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise").  Here, the context is Sections 548 and 550 of the Bankruptcy Code, which deal with the trustee's ability to avoid and recover fraudulent transfers, and these provisions derive from the law of fraudulent conveyances.[17]  *See* 5 Collier on Bankruptcy ¶ 548.01 (16th ed. 2021). The concept of "good faith" as historically used in fraudulent conveyance law therefore informs our construction of the phrase in Sections 548 and 550.

Early fraudulent conveyances cases exemplify the principle that transferees of a fraudulent transfer did not act in good faith when they had inquiry notice of the debtor-transferor's fraud.  *See, e.g.*, *Bentley v. Young*, 210 F. 202, 205 (S.D.N.Y. 1914) (Learned Hand, *J.*) ("It must be remembered that [the transferee's] *personal* good faith is not enough; the question is, not what he individually believed, but whether the circumstances would have put a reasonable man in his situation upon inquiry, and whether that inquiry would have led to sufficient knowledge of the facts to prevent the sale.") (emphasis added), *aff'd* 223 F. 536 (2d Cir. 1915); *Johnson*

---

[17] "Originally, the body of law was known as fraudulent conveyance law, and was limited . . . to fraudulent conveyances of real property. Current fraudulent transfer law has expanded to include transfers of personal property, and the incurring of obligations." 5 Collier on Bankruptcy ¶ 548.01 n.3 (16th ed. 2021).  The law of fraudulent conveyances traces its roots to the Elizabethan statutes of 1571.  *See id.* ¶ 548.01.

*v. Dismukes*, 204 F. 382, 382 (5th Cir. 1913) (affirming district court's avoidance of

fraudulent transfer under the Bankruptcy Act of 1898 where "the facts and

circumstances accompanying the transaction were calculated to put [the

transferee] upon inquiry"); *see also Harrell v. Beall*, 84 U.S. 590, 591 (1873) (noting

that the transferee not only "intentionally shut his eyes to the truth" but also "had

such notice and information as made it his duty to inquire further, and that the

slightest effort by him in that direction would have discovered the whole fraud").

In 1918, the National Conference of Commissioners on Uniform State Laws

approved and recommended the Uniform Fraudulent Conveyance Act ("UFCA")

in an attempt to end the then-existing confusion caused by a lack of uniformity

between different states' fraudulent conveyances laws. *See* Nat'l Conf. of Comm'rs

on Unif. State L., *Prefatory Note to* Unif. Fraudulent Conveyance Act (1918),

*reprinted in* Peter A. Alces, Law of Fraudulent Transactions, App. A (2020). Several

states adopted the UFCA, which provided for the transferee's lack of "good faith"

as a basis for voiding fraudulent transfers. *See id*. § 9; *id*. § 3 (defining "fair

consideration" to require "good faith"). Interpreting New York's version of the

UFCA in a more recent case, we concluded that the transferee lacked good faith

where she had "information sufficient to alert" her that the debtor-transferor

27

"might improperly funnel to third parties the money she was advancing" and should have, but did not, "ma[ke] reasonably diligent inquiries," s*ee HBE Leasing Corp. v. Frank*, 48 F.3d 623, 637 (2d Cir. 1995)—in other words, inquiry notice. *See also Davis v. Hudson Tr. Co.*, 28 F.2d 740, 743 (3d Cir. 1928) (interpreting "good faith" under New Jersey's Uniform Fraudulent Conveyance Act as imposing an inquiry notice standard).

The Bankruptcy Act of 1938 (the "1938 Act"), predecessor of the Bankruptcy Code of 1978, built upon this established inquiry notice standard for good faith. Portions of the 1938 Act were a "federal codification" of the UFCA. *Cohen v. Sutherland*, 257 F.2d 737, 741 (2d Cir. 1958). Section 67d(6) of the 1938 Act permitted "bona-fide" transferees of fraudulent transfers to retain those transfers. S*ee* Pub. L. No. 75-696, 52 Stat. 840, 878 (1938). Courts and scholars accepted "bona-fide" as synonymous with good faith, *see Cohen*, 257 F.2d at 743 n.4, and concluded that—as with good faith under the UFCA—"the presence of any circumstances placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith," *Steel Structures, Inc. v. Star Mfg. Co.*, 466 F.2d 207, 215–16 (6th Cir. 1972) (quoting 4 Collier on Bankruptcy § 67.41, at 589–90 (14th ed.)); *see also* Paul J. Hartman, *A*

28

*Survey of the Fraudulent Conveyance in Bankruptcy*, 17 Vand. L. Rev. 381, 409 (1964) ("'Good faith' on the part of the transferee, so as to be protected under section 67d(6) of the [1938] Act, seems to presuppose lack of knowledge of such facts as would put a reasonably prudent person on inquiry.").

In light of this background understanding of the term good faith in early American fraudulent conveyance law, the 1938 Act, and typical legal usage at the time of the enactment of the Bankruptcy Code, the plain meaning of good faith in Sections 548 and 550 of the Bankruptcy Code embraces an inquiry notice standard. We therefore need not consider other tools of statutory interpretation. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) (finding that "we may seek guidance in the legislative history and purpose of the statute" only when there is ambiguity). However, even if we found the statute to be ambiguous, the legislative history supports our conclusion. In 1970, Congress established the Commission on the Bankruptcy Laws of the United States (the "Bankruptcy Law Commission") to analyze and recommend changes to federal bankruptcy law in a "comprehensive report." *See* Pub. L. No. 91-354, 84 Stat. 468, 468 (1970). In Part II of the report containing a draft bill implementing its recommendations, the Bankruptcy Law Commission proposed: "[t]he trustee may not recover property

. . . from a subsequent transferee . . . who purchases for value in good faith without

knowledge of the voidability of the initial transfer." Rep. of Comm'n on Bankr. L.

of U.S., H.R. Doc. No. 93-137, Pt. II at 179 (1973). It then explained that "no attempt

ha[d] been made to define" good faith because "[i]t was felt best to leave this to

the courts on a case-by-case construction," but that "good faith clearly would not

be present if the transferee knew facts that would lead a reasonable person to

believe that the property was recoverable." *Id.* at 180.[18] This accords with inquiry

notice, as it includes the "knowledge of facts" and "reasonable person" elements.[19]

Moreover, our sister circuits that have addressed the issue unanimously

accept an inquiry notice standard. In *In re Nieves*, 648 F.3d 232 (4th Cir. 2011), the

court held that, "[i]n determining good faith for the purposes of a § 550(b)(1)

defense, . . . a transferee does not act in good faith when he has sufficient [actual]

---

[18] The report also acknowledged that this proposed section governing liability of transferees was "derived from [(*inter alia*)] . . . [§] 67d(6)" of the 1938 Act, H.R. Doc. No. 93-137, Pt. II at 179. As discussed above, courts had interpreted a "bona-fide" transferee under § 67d(6) of the 1938 Act to encompass a transferee so long as the transferee was not on inquiry notice of a debtor-transferor's fraud. *See, e.g., Steel Structures, Inc.*, 466 F.2d at 215–16 (citing 4 Collier on Bankruptcy § 67.41, at 588–90 (14th ed.)).

[19] By contrast, willful blindness requires more than knowing facts that would lead a reasonable person to infer fraud: the defendant must "subjectively believe that there is a high probability that a fact exists" and "take deliberate actions to avoid learning of that fact." *Glob.-Tech Appliances*, 563 U.S. at 769. Nothing in the legislative history suggests the Bankruptcy Law Commission or Congress aimed to set such a high bar.

knowledge to place him on inquiry notice of the debtor's possible insolvency." *Id.*

at 238 (citation omitted).   "In so holding, [the court] arrive[d] at the same

conclusion as . . . three other circuit courts [(the Seventh, Eighth, and Ninth

Circuits)] that have addressed the issue." *Id.* (citing *In re Sherman*, 67 F.3d 1348,

1355 (8th Cir. 1995); *In re Agric. Rsch. & Tech. Grp., Inc.*, 916 F.2d 528, 535–36 (9th

Cir. 1990); *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 897–98 (7th Cir.

1988)).[20]   The Fifth and Tenth Circuits agree.   *See In re Am. Hous. Found.*, 785 F.3d

143, 164 (5th Cir. 2015), *revised* (June 8, 2015); *In re M & L Bus. Mach. Co., Inc.*, 84

F.3d 1330, 1334–38 (10th Cir. 1996).

In a prior BLMIS-liquidation opinion, we too expressed that "[t]he presence

of good faith [under § 548(c)] depends upon, *inter alia*, whether the transferee had

information that put it on inquiry notice that the transferor was insolvent or that

the transfer might be made with a fraudulent purpose." *Marshall*, 740 F.3d at 91

n.11 (2d Cir. 2014) (internal quotation marks and citation omitted).   And while the

district court dismissed this language as *dictum*, *see Good Faith Decision*, 516 B.R. at

---

[20] By cherry-picking certain language from the Seventh Circuit's opinion, Citi argues that
*Bonded* actually adopted a higher standard than inquiry notice for good faith.  But the
Seventh Circuit disagrees.  *See In re Equip. Acquisition Res., Inc.*, 803 F.3d 835, 840 (7th Cir.
2015) ("The *Bonded* Court found that § 550(b)(1) codified an imputed knowledge or
inquiry notice standard.").

22 n.2, even before *Marshall*, we expressed that "[a] transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency." *Banner v. Kassow*, 104 F.3d 352 (2d Cir. 1996) (unpublished opinion) (quoting *In re Sherman*, 67 F.3d at 1355).[21]

The then-current dictionary definitions when the Bankruptcy Code was enacted and early case law fail to establish that the common understanding of lack of good faith in the fraudulent conveyances context was, at a minimum, willful blindness. In many of the early cases on which Citi relies, willful blindness was *sufficient*, but not *necessary*, to establish a lack of good faith. *See, e.g., Dean v. Davis*, 242 U.S. 438, 445 (1917); *Wilson v. Robinson*, 83 F.2d 397, 398 (2d Cir. 1936). The few cases where the Supreme Court expressed a standard for good faith closer to willful blindness concerned the title of a holder of negotiable instruments, far removed from this context.[22] *See Goodman v. Simonds*, 61 U.S. (20 How.) 343, 363–65 (1857); *Murray v. Lardner*, 69 U.S. (2 Wall.) 110, 121–22 (1864).

---

[21] This "unpublished opinion" appears in the Federal Reporter because it was decided before the introduction of the Federal Appendix in 2001, where unpublished opinions ("summary orders") of this Circuit usually appear.

[22] Appellees also rely on the Uniform Commercial Code ("UCC"), which—at the time the Bankruptcy Code was enacted—defined good faith for merchants as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade," and for nonmerchants as "honesty in fact in the conduct or transaction concerned." U.C.C. §§ 2-

Citi also fails to appreciate the distinction between *preferential* transfers, where the debtor makes payments to certain creditors and not others, and (actually) *fraudulent* transfers, where, as discussed above, the debtor possesses an intent to defraud and reduces the assets available to all creditors. *See Van Iderstine v. Nat'l Disc. Co.*, 227 U.S. 575, 582 (1913). Citi contends that the district court's willful blindness standard is supported by this Court's decision in *In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005), which held that a transferee did not act in bad faith under New York's UFCA where the transferee was alleged to have at least inquiry notice that the debtor had made certain preferential transfers to the defendant. *See id.* at 48, 54–55. But *In re Sharp* and the cases upon which it relies, *see id.* at 54–55 (citing, *inter alia*, *Bos. Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1512 (1st Cir. 1987)), do not affect the meaning of good faith here, much less support the district court's willful blindness standard. Rather, *In re Sharp* stands for the principle that a transfer is not voidable on the ground that it is constructively fraudulent under the UFCA (which requires showing a transferee's

---

103(1)(b), 1-201(19) (1978). Their reliance is misplaced. First, "honesty in fact" is not limited to lacking fraudulent intent. Second, because "identical language may convey varying content when used in different statutes," *Yates v. United States*, 574 U.S. 528, 537 (2015), and given the well-established use of inquiry notice under the Bankruptcy Code and the statutory schemes upon which it was directly modeled, the UCC is of limited import here.

bad faith) where the transferee is aware "that the transferor is preferring him to other creditors." *Id.* at 54–55 (internal quotation marks omitted).  Given the Ponzi scheme presumption establishing that BLMIS's transfers were fraudulent, the absence of an inquiry notice standard in the preferential transfers context simply has no bearing on the meaning of good faith here.   Indeed, *In re Sharp* acknowledged that this Court had previously adopted an inquiry notice standard for good faith under the UFCA in *HBE Leasing*, 48 F.3d 623, but distinguished that case because it involved a fraudulent transfer, whereas *In re Sharp* concerned a preferential transfer.  *See id.* at 55.[23]

---

[23] Citi's argument regarding the "without knowledge" prong of § 550(b) in determining the meaning of "good faith" is equally unavailing.  *See* 11 U.S.C. § 550(b)(1) ("The trustee may not recover . . . from . . . a [subsequent] transferee that takes for value, . . . in good faith, and *without knowledge of the voidability of the transfer avoided*.") (emphasis added). Citi contends good faith could not mean inquiry notice because some courts have interpreted "without knowledge" as "an example of good faith" and "'without knowledge' is a standard different than notice."  Citi's Br. at 24 n.7.  However, Citi fails to cite to any case where a court has held that both good faith and without knowledge apply a willful blindness standard.  Although we do not endorse this view, we note solely for the purpose of dismissing Citi's argument that courts that have found "good faith" and "without knowledge" to be synonymous have concluded inquiry notice applies to both, not that both require willful blindness.  *See, e.g., In re Nieves*, 648 F.3d at 240 (noting that *Mixon*, a previous Fourth Circuit case, "discusse[d] only the knowledge prong of § 550(b)(1), not good faith," but that *Mixon* "ask[ed] if the transferee possesse[d] actual knowledge of facts that would lead a reasonable person to believe that the transferred property was voidable").

Lastly, Appellees' contention that lack of good faith requires willful blindness is premised in part on the misconception that inquiry notice is *purely objective*.  Their argument goes: (1) "'[g]ood faith,' as it is plainly understood, refers to one's *subjective* intentions," Citi's Br. at 25; (2) inquiry notice is *purely objective*: what the investor knew or "should have known" about BLMIS "based on a theory of fraud by hindsight," akin to a negligence standard, *id.* at 20; (3) willful blindness, by contrast, is subjective; (4) as a result, we should reject inquiry notice in favor of willful blindness.  Even assuming that premises (1) and (3) are correct, the error in premise (2) renders the conclusion invalid.

Inquiry notice is not purely objective, nor is it a negligence standard. Although some courts have characterized inquiry notice as an "objective test," under which "courts look to what the transferee objectively 'knew or should have known' in questions of good faith," *In re Bayou Grp., LLC*, 439 B.R. 284, 313 (S.D.N.Y. 2010) (citation omitted), "what the transferee *should have known* depends on what it *actually knew*, and not what it was charged with knowing on a theory of constructive notice." *In re Nieves*, 648 F.3d at 238 (emphases added).  As a result, even courts that use the phrase "should have known" acknowledge that the first step in the inquiry notice analysis looks to what facts the defendant *knew*.  *See, e.g.*,

*In re Sherman*, 67 F.3d at 1355; *In re Bayou Grp., LLC*, 439 B.R. at 310 ("The first question typically posed is whether the transferee *had information* that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose.") (emphasis added). Our view of inquiry notice incorporates both objective and subjective components. Inquiry notice "signifies actual awareness of suspicious facts that would have led a reasonable [transferee], acting diligently, to investigate further and by doing so discover" a debtor-transferor's fraud. *In re Sentinel Mgmt. Grp., Inc.*, 809 F.3d 958, 961 (7th Cir. 2016).[24]

Thus, the good faith defense under Sections 548(c) and 550(b)(1) should be approached in a three-step inquiry. First, a court must examine what facts the defendant knew; this is a subjective inquiry and not "a theory of constructive notice." *In re Nieves*, 648 F.3d at 238. Second, a court determines whether these facts put the transferee on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a

---

[24] Citi argues that "the Supreme Court has rejected a good faith test that combines both subjective and objective elements as 'not entirely reconcilable.'" Citi's Br. at 13 (citing *Goodman*, 61 U.S. at 363 and *Murray* 69 U.S. at 121–22). *Goodman* and *Murray*, as explained above, concern inapposite contexts and do not wholesale reject a definition of good faith that incorporates subjective and objective elements. Indeed, the extensive case law referenced above demonstrates that courts have been successfully applying the inquiry notice standard under Sections 548 and 550 as we articulate without any perceivable difficulty.

36

reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud. *See In re Bayou Grp., LLC*, 439 B.R. at 310. Third, once the court has determined that a transferee had been put on inquiry notice, the court must inquire whether "diligent inquiry [by the transferee] would have discovered the fraudulent purpose" of the transfer. *Id.* (quoting *In re Agric. Rsch. & Tech. Grp.*, 916 F.2d at 536) (emphasis omitted); *see also In re M & L Bus. Mach. Co.*, 84 F.3d at 1338. An objective "reasonable person" standard applies in the second and third steps, namely, in assessing whether (1) the suspicious facts were such that they would have put a reasonable person in the transferee's position on inquiry notice; and (2) the transferee conducted a reasonably diligent investigation after being put on inquiry notice. *See In re Bayou Grp., LLC*, 439 B.R. at 313 (collecting cases).

In sum, we join all of our sister circuits that have addressed the issue in holding that a lack of good faith under Sections 548 and 550 of the Bankruptcy Code encompasses an inquiry notice standard. The historical usage of the phrase "good faith" (particularly as used in the context of fraudulent conveyance law), this Court's prior case law, and the legislative history of the Bankruptcy Code all

37

lead us to reject the heightened willful blindness standard that Citi argues should

be applied even in ordinary bankruptcy proceedings.

### B) The Securities Laws Do Not Impose a Willful Blindness Standard for Lack of Good Faith in a SIPA Liquidation

Even accepting that good faith under the Bankruptcy Code uses inquiry

notice, Legacy, Khronos, and to a lesser extent Citi argue that willful blindness is

required here *because SIPA is different.*  They defend the district court's theory,

which no court of appeals has ever adopted,[25] that because SIPA "is part of the

securities laws and expressly provides that the Bankruptcy Code applies only [t]o

the extent consistent with the provisions of this chapter [of the federal securities

laws]," and because "good faith in the securities context implies a lack of

fraudulent intent," lack of good faith in a SIPA liquidation requires willful

blindness.  *Good Faith Decision*, 516 B.R. at 22 (internal quotation marks and citation

omitted) (alterations in original).  The cornerstone of the district court's theory is

that SIPA prohibits the trustee from utilizing the inquiry notice standard under

the Bankruptcy Code because it is inconsistent with the willful blindness standard

---

[25] The district court relied solely on its own earlier precedent.  It first articulated its securities-law theory in a prior BLMIS-liquidation case, *Picard v. Katz*, 462 B.R. 447, 455–56 (S.D.N.Y. 2011), and reaffirmed the theory in *Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012), neither of which were appealed.

38

under federal securities laws.  It reached this view through an analysis of the text

and policy considerations underlying SIPA and federal securities laws.

Section 78fff of SIPA provides "[t]o the extent consistent with the provisions

of *this chapter*, a liquidation proceeding shall be conducted in accordance with, and

as though it were being conducted under[, the Bankruptcy Code]."  15 U.S.C.

§ 78fff (emphasis added).[26]  While the district court interpreted "this chapter" to

mean "this chapter [of the federal securities laws]," *Good Faith Decision*, 516 B.R. at

22—*i.e.*, Title 15—"this chapter" actually refers to *SIPA itself*—*i.e.*, Chapter 2B-1 of

Title 15.  *See id.* § 78aaa ("*This chapter* may be cited as the 'Securities Investor

Protection Act of 1970.'") (emphasis added).  Nevertheless, SIPA also provides that

"[e]xcept as otherwise provided in [SIPA], *the provisions of the Securities Exchange*

---

[26] As explained above, SIPA specifies in a later section "[w]henever customer property is not sufficient to pay in full the [customers'] claims . . . the trustee may recover any property transferred . . . if and to the extent that such transfer is voidable or void under the provisions of Title 11," which includes Sections 548 and 550.  *Id.* § 78fff-2.  This provision, unlike the one on which the district court relied, is not cribbed by the "[t]o the extent consistent with the provisions of this chapter" clause.  By stating that a SIPA trustee may recover "*to the extent* that such transfer is voidable or void under [the Bankruptcy Code]," this section therefore indicates that a SIPA trustee's power to avoid and recover transfers under Sections 548 and 550 should be coextensive with that of an ordinary bankruptcy trustee.  *Id.* (emphasis added).  The district court's *Good Faith Decision*, by contrast, necessarily puts SIPA trustees at a disadvantage compared to their ordinary bankruptcy counterparts by setting a higher bar for a transferee's lack of good faith.

*Act of 1934* (hereinafter referred to as the "1934 Act") *apply as if [SIPA] constituted an amendment to, and was included as a section of, such Act*." *Id.* § 78bbb (emphasis added). SIPA is therefore part of the 1934 Act.

Despite this incorporation of SIPA into the 1934 Act, the securities-law theory does not hold up. By making SIPA an *amendment* to the 1934 Act, Congress intended for *SIPA* to apply if the 1934 Act is inapplicable or inconsistent with SIPA. It is a "well established canon of statutory interpretation" that "the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted). Moreover, when "the scope of the earlier statute is broad but the subsequent statute[] more specifically address[es] the topic at hand," there is even greater reason to assume the later statute controls. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000). As a result, where SIPA speaks and the 1934 Act is silent, SIPA governs.

Nothing in the 1934 Act (minus SIPA) concerns liquidation proceedings of insolvent securities broker-dealers. "The 1934 Act was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets, and to impose regular reporting requirements on companies whose stock is listed on

40

national securities exchanges." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976).

Its overall goal is "to protect investors against false and deceptive practices that

might injure them." *Id.* at 198. Over time, Congress enacted statutes such as SIPA

to address specific aspects of the securities industry.

However, unlike the 1934 Act, SIPA does not regulate fraud on securities

markets. Instead, its "primary purpose . . . is to provide protection for investors if

the broker-dealer with whom they are doing business encounters financial

troubles." H.R. Rep. No. 91-1613, at 1 (1970), *as reprinted in* 1970 U.S.C.C.A.N. 5254,

5254. Indeed, we have previously explained that "SIPA's supposed purpose was

to remedy broker-dealer insolvencies—not necessarily broker-dealer fraud." *SIPC*

*v. 2427 Parent Corp. (In re BLMIS)*, 779 F.3d 74, 79 (2d Cir. 2015).

Accordingly, the *general* "fraudulent intent" requirement in the 1934 Act is

irrelevant to the *specific* context of a SIPA liquidation.[27] The district court derived

---

[27] Legacy and Khronos argue that our ruling in *Gettinger*, 976 F.3d 184, supports the securities-law theory. *Gettinger* concluded that recognizing the "for value" defense of the defendants-appellants, who received fictitious profits from BLMIS, "would conflict with SIPA" even though it would be permissible under the Bankruptcy Code. *See id.* at 199–200. However, *Gettinger* recognized that the for value defense "would place the defendants-appellants, who have no net equity and thus are not entitled to share in the customer property fund, ahead of customers who have net equity claims," which "SIPA does not permit." *Id.* at 199. Nowhere did *Gettinger* invoke "the securities laws," generally. *See id.* And, if anything, a willful blindness standard would hinder, rather

the fraudulent intent requirement from Section 10(b) of the 1934 Act.  *See Good Faith Decision*, 516 B.R. at 22 (citing *Ernst & Ernst*, 425 U.S. at 206).  Section 10(b) regulates "deceptive conduct in connection with the purchase or sale of [specific] securit[ies]."  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010) (internal quotation marks and citation omitted).  It would be odd indeed to assume that, just because § 10(b) requires investors bringing damages actions to prove the fraudulent intent of the defendant in purchase-and-sale transactions, the same intent is necessarily required of transferees from whom a SIPA trustee seeks to recover fraudulent transfers by a broker-dealer in its liquidation.  A § 10(b) action for securities fraud is meaningfully different from a SIPA liquidation.

But even if we accept for argument's sake that "this chapter" in § 78fff includes the 1934 Act, there is nothing in the 1934 Act that actually requires *willful blindness* in this context.  Although the Supreme Court has never held that reckless disregard suffices for § 10(b) liability, "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by

_____

than advance, SIPA's purpose by making it more difficult to recover customer property. *See* 6 Collier on Bankruptcy ¶ 749.02 (16th ed. 2021) (explaining that "[t]he overall purpose of [SIPA's transfer recovery provision, 15 U.S.C. § 78fff-2(c)(3),] is to prevent one or more customers from depriving other customers of assets by keeping these assets out of the pool available for distribution to customers on a ratable basis") (internal quotation marks and citation omitted).

42

showing that the defendant acted intentionally or recklessly, though the [c]ircuits

differ on the degree of recklessness required." *Tellabs, Inc. v. Makor Issues & Rts.,*

*Ltd.*, 551 U.S. 308, 319 n.3 (2007); *see, e.g., S. Cherry St., LLC v. Hennessee Grp. LLC,*

573 F.3d 98, 109 (2d Cir. 2009) ("This Court has . . . long held that the scienter

element can be satisfied by a strong showing of reckless disregard for the truth.").

Yet because "willful blindness . . . surpasses recklessness," *Glob.-Tech Appliances*,

563 U.S. at 769, the former may well be too stringent a standard under the 1934

Act. There is no need to resolve this debate. For our purpose, it suffices that the

1934 Act does not prescribe a uniform willful blindness requirement, further

undermining the theory that willful blindness applies here because SIPA is part of

the 1934 Act.[28]

SIPA's legislative history bolsters our conclusion. The House Report on

SIPA explains the interplay between SIPA and the 1934 Act. *See* H.R. Rep. No. 91-

1613, *as reprinted in* 1970 U.S.C.C.A.N. 5254. For example, it notes that certain

sections of the 1934 Act "set forth current provisions of law dealing with the

---

[28] To the extent Appellees rely on the "securities laws" generally—for which there is no
textual basis in SIPA—claims under §§ 11, 12(a)(2), 17(a)(2), and 17(a)(3) of the Securities
Act of 1933 do not have any scienter requirement. *See Rombach v. Chang*, 355 F.3d 164, 169
n.4 (2d Cir. 2004); *Aaron v. SEC*, 446 U.S. 680, 696–97 (1980).

43

financial responsibility of broker-dealers," *id.* at 5266, and that "section 7(D) [of

SIPA] would amend section 15(c)(3) of the [1934 Act]," *id.* at 5276.  In its discussion

of *SIPA liquidation proceedings*, the Report declares "[t]he bill uses certain terms

defined in [the Bankruptcy Act] with the meanings there established, except as

further defined in the reported bill."  *Id.* at 5262.  The only reference to the 1934

Act is that the trustee's reports to the court should "hav[e] regard to the

recordkeeping requirements under the [1934 Act]."  *Id.* at 5264.  Absent from the

extensive Report is *any* suggestion that Congress intended the 1934 Act's general

fraudulent intent requirement to displace the Bankruptcy Code's definition for

good faith.  Accordingly, the federal securities laws do not supply the definition

of good faith in a SIPA liquidation; the Bankruptcy Code does.

Finally, by clarifying that inquiry notice is not a negligence standard, *see*

Section I.A., *supra*, we also reject the district court's and Appellees' contentions

that the inquiry notice standard is "unworkable" and contrary to SIPA's goals.  *See*

Citi's Br. at 30; Legacy and Khronos's Br. at 24, 42–43.  Inquiry notice does not

universally impose an affirmative duty to investigate.  As discussed above, the

duty to conduct a diligent investigation arises *only* when a transferee is actually

aware of suspicious facts that would lead a reasonable investor to inquire further

into a debtor-transferor's potential fraud.  *See In re M & L Bus. Mach. Co., Inc.*, 84 F.3d at 1338; *In re Agric. Rsch. & Tech. Grp.*, 916 F.2d at 536.  The inquiry notice standard for good faith under SIPA is therefore not overly burdensome on the customers and indirect investors of broker-dealers.

The district court criticized inquiry notice as impracticable, questioning "how could [an investor investigate his broker's internal practices] anyway?" *Good Faith Decision*, 516 B.R. at 21 (citation omitted).  We cannot provide an answer for every case.  The adequacy of an investigation is, of course, a fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently-situated transferees.  Courts routinely conduct that inquiry seemingly without a hitch.  *See, e.g., Janvey v. GMAG, L.L.C.*, 977 F.3d 422, 428 (5th Cir. 2020) (concluding that, in analyzing the good faith defense under the Texas Uniform Fraudulent Transfer Act, the record evidence did not show that the defendants-appellees "diligently investigated" the debtor-transferor's Ponzi scheme after being put on inquiry notice).

The text of SIPA and the 1934 Act, the underlying goals of SIPA, and the practical implications of an inquiry notice standard provide no reason to depart from the meaning of the good faith defense under Sections 548 and 550 as it is

45

applied in an ordinary bankruptcy proceeding.  Lack of good faith in a SIPA

liquidation therefore applies an inquiry notice, not willful blindness, standard.

## II. Burden of Pleading Good Faith, or the Lack Thereof

The district court found that good faith is an affirmative defense under

Sections 548 and 550 of the Bankruptcy Code and acknowledged that in ordinary

circumstances, the initial or subsequent transferee bears the burden of pleading

good faith.  *See Good Faith Decision*, 516 B.R. at 24.  Indeed, Federal Rule of Civil

Procedure 8(c) places the burden of pleading an affirmative defense on the

defendant.  *See Perry v. Merit Sys. Prot. Bd.*, 137 S. Ct. 1975, 1987 n.9 (2017) ("[A]n

affirmative defense to a plaintiff's claim for relief[] [is] not something the plaintiff

must anticipate and negate in her pleading.") (citing Fed. R. Civ. P. 8(c)(1)).

However, the district court determined that the trustee bears the burden of

pleading lack of good faith in a SIPA liquidation because of the policy goals of

SIPA.  *See Good Faith Decision*, 516 B.R. at 24.  Like their arguments concerning the

meaning of "good faith," Legacy and Khronos primarily appear to defend the

district court's reasoning, while Citi raises an additional, alternative argument for

affirming the district court's conclusion.  Specifically, Citi disputes that good faith

is an affirmative defense under § 550, even in an ordinary bankruptcy proceeding.

We reject both the district court's reasoning and Citi's alternative argument on

46

appeal.   Because we conclude that good faith is an affirmative defense under Sections 548 and 550 and that SIPA does not compel departing from the well-established burden-of-pleading rules, the trustee is not required to plead a transferee's lack of good faith.

### A) Good Faith is an Affirmative Defense Under Sections 548 and 550 of the Bankruptcy Code

As with the definition of good faith, Sections 548 and 550 are silent on the pleading burden.   However, we and other courts have held good faith is an affirmative defense under these sections.   With regard to § 548, there is little credible debate.   Section 548(a)(1)(A) of the Bankruptcy Code allows a trustee to "avoid any transfer" made within two years of the debtor's filing of a bankruptcy petition, if the debtor "made such transfer . . . with actual intent to . . . defraud any entity to which the debtor was . . . indebted."   11 U.S.C. § 548(a)(1)–(a)(1)(A). Section 548(c) creates a defense, allowing transferees to "retain any interest transferred" if the transferee "takes for value and in good faith."   *Id.* § 548(c).   As we have previously explained:

> If a trustee establishes a *prima facie* case under the fraudulent transfer provisions, then he or she is entitled to recovery unless the transferee can establish an *affirmative defense.*   One affirmative defense applies whether a trustee seeks to recover under § 548(a)(1)(A) . . . .   It permits a transferee who 'takes for value and *in good faith*' to retain the transfer to the extent of the value given.

47

*Gettinger*, 976 F.3d at 190 (emphases added) (quoting 11 U.S.C. § 548(c)).  As a

defendant asserting an affirmative defense, the transferee bears the burden of

establishing its good faith under § 548(c).  Our sister circuits that have addressed

this question uniformly agree.  *See In re Taneja*, 743 F.3d 423, 429 (4th Cir. 2014)

(explaining that § 548(c) establishes "an affirmative defense" that "a defendant has

. . . [the] burden of proving"); *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011)

("[Section] 548(c) provides a transferee with an affirmative defense where the

transferee acts in good faith."); *In re Hannover Corp.*, 310 F.3d 796, 799 (5th Cir.

2002) ("The burden of proof is on the defendant transferee."); *In re M & L Bus.*

*Mach. Co.*, 84 F.3d at 1338 (same); *In re Agric. Rsch. And Tech. Grp., Inc.*, 916 F.2d at

535 (same).

Citi contends that, in contrast to good faith under § 548(c), good faith is not

an affirmative defense under § 550(b), which applies only to subsequent

transferees.[29]  Section 550(a) states "*[e]xcept as otherwise provided in this section*, to

---

[29] Citi also argues that "under the [1934] Act—of which SIPA is a part—a plaintiff suing
under Section 20(a), which imposes liability on a control person for those she controls"
bears the burden of pleading lack of good faith.  Citi's Br. at 53.  The 1934 Act is plainly
irrelevant here; nothing in SIPA purports to incorporate the pleading burden in unrelated
contexts under the 1934 Act.

the extent that a transfer is avoided under [(*inter alia*)] section . . . 548 . . . , the

trustee may recover, for the benefit of the estate, the property transferred . . . from

[an initial or subsequent transferee]." 11 U.S.C. § 550(a) (emphasis added). Section

550(b) states "*[t]he trustee may not recover*" from a subsequent transferee "that takes

for value, . . . in good faith, and without knowledge of the voidability of the

transfer avoided." *Id.* § 550(b)–(b)(1). Although § 550(b) is written differently and

affects a different class of transferees than § 548(c), the statutory structure, case

law, and legislative history make clear that good faith under § 550(b) is an

affirmative defense.

Section 550(a) sets out the elements a trustee must satisfy to recover

transferred property: that the transfer was avoided, and that the defendant is an

initial or subsequent transferee. *See* 5 Collier on Bankruptcy ¶ 550.02 (16th ed.

2021). Section 550(b) provides an exception to the trustee's general power of

recovery under § 550(a). "When a proviso . . . carves an exception out of the body

of a statute . . . those who set up such exception must prove it." *Meacham v. Knolls*

*Atomic Power Lab'y*, 554 U.S. 84, 91 (2008) (alteration and citation omitted).

Although *Meacham* concerned exemptions to prohibited conduct under the Age

Discrimination in Employment Act, it affirms the overarching principle that when

49

there is an exception to the general rule, the party claiming the benefit of the exception bears the burden of pleading it. *See N.Y. Univ. Med. Ctr. v. N.L.R.B.*, 156 F.3d 405, 413 (2d Cir. 1998) (citing *FTC v. Morton Salt Co.*, 334 U.S. 37, 44–45 (1948)). Because taking a transfer in good faith under § 550(b) is an exception to the general rule permitting the trustee to recover the transfer under § 550(a), it is an affirmative defense.

Citi contends that the "[e]xcept as otherwise provided" clause in § 550(a) requires the trustee to "negate that 'exception' [in § 550(b)] in his pleadings to state a claim." Citi's Br. at 47. It relies on *United States v. Cook*, 84 U.S. 168 (1872), in which the Supreme Court held that "[w]here a statute defining an offen[s]e contains an exception, in the enacting clause of the statute, which is so incorporated with the language defining the offen[s]e that the ingredients of the offen[s]e cannot be accurately and clearly described if the exception is omitted, the rules of good pleading require that an indictment founded upon the statute must allege enough to show that the accused is not within the exception." *Id.* at 173. *Cook* is inapposite; it is grounded in the interpretation of a criminal statute, and the "except as otherwise provided" language does not make § 550(b) "so incorporated with the language defining" the trustee's right to recovery under § 550(a) "that the

50

ingredients of the [claim] cannot be accurately and clearly described" without it. *Id.*

Moreover, although § 550(b) states "[t]he trustee may not recover," while § 548(c) states "a transferee . . . may retain," Citi does not point to any authority that supports a conclusion that this difference is indicative of good faith being an element of the trustee's claim under § 550. Indeed, a more persuasive explanation for the difference is that, as stated earlier, § 550(b)(1) provides subsequent transferees a complete defense against recovery, whereas § 548(c) grants transferees "a lien to the extent value was given in good faith." 5 Collier on Bankruptcy ¶ 548.09 (16th ed. 2021).

Our reading of § 550 is consistent with precedents of this Court and others. We have declared subsequent transferees "may *assert* a good faith defense" under § 550(b). *In re Red Dot Scenic, Inc.*, 351 F.3d 57, 58 (2d Cir. 2003) (emphasis added); *see also Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 209 & n.8 (2d Cir. 2014). And the other circuits that have addressed the issue have uniformly concluded that "§ 550(b) offers an affirmative defense." *See In re Smith*, 811 F.3d 228, 246 (7th Cir. 2016); *see also In re Mortg. Store, Inc.*, 773 F.3d 990, 994 (9th Cir. 2014); *In re Nieves*, 648 F.3d at 237. For example, in *In re Nordic Vill., Inc.*, 915 F.2d 1049 (6th Cir. 1990),

51

*rev'd on other grounds sub nom. United States v. Nordic Vill., Inc.*, 503 U.S. 30 (1992),

the majority determined that "[t]he language of [§ 550(b)] clearly places the burden

of showing value, good faith, and lack of knowledge, on the transferee as a

defense." *Id.* at 1055. The dissent sought to differentiate between initial transferees

under § 549, which concerns post-petition transactions and explicitly places the

burden of proof on the transferee, and subsequent transferees under § 550. *See id.*

at 1063–64. It argued that because "subsequent transferees are much more likely

to be innocent third parties," "[a]bsent an express rule placing the burden of proof

on subsequent transferees, . . . the burden should rest on the party seeking to

recover the property, at least as to the issues of the subsequent transferee's good

faith and knowledge." *Id.* at 1063–64. However, as the majority explained, "[t]he

way [§ 550(a)] is worded makes it clear that the trustee's right to recover is broad,

by giving rights against not only the transferee, but also against transferees of the

initial transferee," and "to prevent innocent third parties from being hurt by this

broadly delineated right of recovery, the law gives them a defense if they show

that they took for value, in good faith, and without knowledge of the voidability

of the transfer." *Id.* at 1055–56. In other words, the good faith defense under

§ 550(b)(1)—like the good faith defense under § 548(c)—is an act of legislative

grace *because* subsequent transferees might be "innocent third parties." *Id.* at 1056. But the mere possibility of a subsequent transferee's blamelessness does not suggest that the trustee must bear the burden of pleading the transferee's lack of good faith.

The legislative history further substantiates our view. The Senate Report accompanying the modern Bankruptcy Code notes that "[i]n order for the transferee to be *excepted* from liability under [§ 550(b),] he himself must be a good faith transferee." S. Rep. No. 95-989, at 90 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5876 (emphasis added). The Report also confirms that § 550(a) "permits the trustee to recover from" *any* transferee: "the initial transferee of an avoided transfer or from any immediate or mediate transferee of the initial transferee." *Id.* Its explanation accords with the concept that good faith is a defense that permits the transferee "to be excepted" from the trustee's general recovery power. *See id.* Citi's reliance on the Bankruptcy Law Commission's report explaining its proposed draft bill is misplaced. Although the report recommended removing a sentence that explicitly placed the burden of proof of establishing good faith on post-petition transferees of personal property, that context does not concern

53

subsequent transferees of pre-petition fraudulent conveyances. *See* Rep. of Comm'n on Bankr. L. of U.S., H.R. Doc. No. 93-137, Pt. II at 164.

The legislative history also demonstrates that Congress did not intend to create a different pleading burden with respect to subsequent transferees compared to initial transferees. As expressed in the Senate Report accompanying the Bankruptcy Code, "[t]he phrase 'good faith' [under § 550] . . . is intended to prevent a transferee from whom the trustee could recover from transferring the recoverable property *to an innocent transferee*, and *receiving a retransfer from him*, that is *'washing'* the transaction through an innocent third party." S. Rep. No. 95-989, at 90, *as reprinted in* 1978 U.S.C.C.A.N. at 5876 (emphasis added). Congress's concern about potential "washing" through subsequent transferees supports the conclusion that voidable subsequent transfers are presumed recoverable and that it did not intend to release subsequent transferees of the pleading burden.

Finally, the Trustee's access to discovery before filing the complaint under Rule 2004 of the Federal Rules of Bankruptcy Procedure does not affect our analysis. Rule 2004 has never been interpreted to permit shifting the pleading burden. Indeed, the fact that "good faith" concerns the transferee's knowledge of suspicious facts and other information "peculiarly within the knowledge and

54

control of the defendant" supports the allocation of the pleading burden on the defendant-transferee. *See Gomez v. Toledo*, 446 U.S. 635, 640–41 (1980); *see also Nat'l Commc'ns Ass'n Inc. v. AT&T Corp.*, 238 F.3d 124, 130–31 (2d Cir. 2001) (explaining that "all else being equal, the burden [of proving an issue] is better placed on the party with easier access to relevant information" and that "courts should avoid requiring a party to shoulder the more difficult task of proving a negative").

The structural similarity of § 550 to § 548, the case law, and the legislative history compel us to concur with a leading treatise on bankruptcy law that "once the trustee has avoided a transfer and established that the property has been transferred to an immediate or mediate transferee, the transferee has the burden to show that it took (1) for value, (2) in good faith[,] and (3) without knowledge of the voidability of the transfer."  5 Collier on Bankruptcy ¶ 550.03 (16th ed. 2021).

## B) SIPA Does Not Require the Trustee to Plead an Affirmative Defense

Federal Rule of Civil Procedure 8(c)(1) provides that, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense," placing the burden to plead on the defendant.   Notwithstanding this clear language, the district court held that even though good faith is an affirmative defense, SIPA "affects the burden of pleading good faith or its absence" and that

55

"[i]t would totally undercut SIPA's twin goals of maintaining marketplace stability and encouraging investor confidence if a trustee could seek to recover the investors' investments while alleging no more than that they withdrew proceeds from their facially innocent securities accounts." *Good Faith Decision*, 516 B.R. at 24.

The district court's policy-based justifications for departing from Rule 8(c)(1) fail on two grounds. First, the Supreme Court has held "courts should generally not depart from the usual practice under the Federal Rules on the basis of perceived policy concerns." *See Jones v. Bock*, 549 U.S. 199, 212–13 (2007). In that case, the Court reversed the Sixth Circuit for applying policy-based reasons to place the burden of negating an affirmative defense on the plaintiff to establish his Prison Litigation Reform Act claims. *See id.* at 213–14. As a result, *even if* the district court had legitimate policy concerns in allocating the pleading burden to the transferee, it should not have used those concerns to shift the traditional pleading burden.

Second, placing the burden to plead good faith on the initial and subsequent transferees does not contradict the goals of SIPA. As explained in the House Report, "[SIPA] would provide for the establishment of a fund to be used to make

56

it possible for the public customers in the event of the financial insolvency of their broker, to recover that to which they are entitled." H.R. Rep. No. 91-1613, at 1, *as reprinted in* 1970 U.S.C.C.A.N. at 5255. "The purposes of a liquidation proceeding under [SIPA]" include "to distribute customer property and . . . otherwise satisfy net equity claims of customers" "as promptly as possible after the appointment of a trustee in such liquidation proceeding." 15 U.S.C. § 78fff(a)(1), (a)(1)(B).

A transferee's burden to plead the affirmative defense of good faith does not "undercut" SIPA's purpose of "encouraging investor confidence" by permitting the trustee to recover from investors "while alleging no more than that they withdrew proceeds from their facially innocent securities accounts." *Good Faith Decision*, 516 B.R. at 24. Indeed, requiring the trustee to plead the transferee's *lack* of good faith would do more to hinder SIPA's goal of distributing customer property "as promptly as possible after the appointment of a trustee" by delaying the trustee's actions to recover the property. *See* 15 U.S.C. § 78fff(a)(1). And, regardless, perceived policy concerns related to SIPA do not permit us to reconfigure bankruptcy law.

Nothing in SIPA compels departure from the well-established rule that the defendant bears the burden of pleading an affirmative defense. Accordingly, the

57

district court erred by holding that the trustee bears the burden of pleading a lack

of good faith under Sections 548(c) and 550(b)(1).

## CONCLUSION

We **VACATE** the judgments of the bankruptcy court and **REMAND** for

further proceedings consistent with this opinion.

20-1333, 20-1334
*In re Bernard L. Madoff Inv. Sec. LLC*

MENASHI, *Circuit Judge*, concurring:

The court's decision in this case might appear counterintuitive. Citibank received a repayment of a loan it made to a fund that invested with Bernard L. Madoff Investment Securities ("BLMIS"). Legacy Capital received back the principal it invested with BLMIS.[1] Yet the court holds that each party's receipt of funds it was owed amounts to a fraudulent transfer accepted in bad faith.

Normally, when a creditor receives a payment from a debtor—even if the creditor knows that the debtor is insolvent and the payment will prevent other creditors from being repaid—that payment is considered a preference, not a fraudulent transfer. *See Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 54 (2d Cir. 2005) ("A conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.") (alteration omitted) (quoting *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90-91 (N.Y. App. Div. 1st Dep't 1993)). Under these normal principles, creditors such as Citibank and Legacy would be able to retain the repayments despite knowledge of the debtor's insolvency as long as the transfers occurred outside the relatively brief period in which preferential transfers may

---

[1] Legacy has already returned the $79 million it received in net profits. *See* Special App'x 93-94.

be avoided[2] and the creditor is not participating in a fraudulent scheme by holding the funds on the debtor's behalf.[3]

## I

In this case, however, we do not follow normal principles because we have applied the "Ponzi scheme presumption." Accordingly, we presume that transfers from a debtor in furtherance of a Ponzi scheme are made with fraudulent intent rather than to satisfy an antecedent debt.[4] Some courts have rejected the Ponzi

---

[2] *Compare* 11 U.S.C. § 547(b)(4)(A) (providing ninety-day period for avoiding preferential transfers), *with id.* § 548(a)(1) (providing two-year period for fraudulent transfers); *see also Picard v. Katz*, 462 B.R. 447, 451 (S.D.N.Y. 2011) (noting that because "the Bankruptcy Code also adopts for these purposes the 'applicable [state] law' … fraudulent transfers can be avoided if they occurred within 6 years" of BLMIS's bankruptcy filing), *abrogated in part by Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 437, 442 (S.D.N.Y. 2014).

[3] *See Twyne's Case*, 76 Eng. Rep. 809, 811 (Star Chamber 1601) (holding that a conveyance of goods from a debtor to a creditor was fraudulent when it was made "in satisfaction of his debt" but the debtor nevertheless "continued in possession of the said goods"); *see also Dean v. Davis*, 242 U.S. 438, 444 (1917) (noting that a "transaction may be invalid both as a preference and as a fraudulent transfer" if there exists both "the intent to prefer and the intent to defraud").

[4] *See SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) ("In this circuit, proving that [a transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."); *In re Slatkin*, 525 F.3d 805, 814 (9th Cir. 2008) ("We hold that once the existence of a Ponzi scheme is established, payments received by investors as purported profits—i.e., funds transferred to the investor that exceed that investor's initial 'investment'—are deemed to be fraudulent transfers as a matter of law."); *Klein v. Cornelius*, 786 F.3d 1310, 1320 (10th Cir. 2015) ("[B]ecause Ponzi schemes are insolvent by definition, we presume that transfers from such entities involve actual intent to defraud.").

scheme presumption on the ground that it improperly treats preferences as fraudulent transfers. *See, e.g., In re Unified Com. Cap., Inc.*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001) ("[T]he fraudulent conveyance statutes cannot and should not be utilized by courts as a super preference statute to effect a further reallocation and redistribution that should be specifically provided for in a statute enacted by Congress."); *Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015) (concluding that "there is no statutory justification for relieving the Receiver of its burden of proving—or for preventing the transferee from attempting to disprove—fraudulent intent" under the "Ponzi-scheme presumption" and that a creditor must "prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer").[5]

Under normal principles, fraudulent transfer law prevents pre-insolvency transfers to non-creditors or colluding creditors, not bona fide creditors; "[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them." *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987); *see also In re Sharp*, 403 F.3d at 54; *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 892 (7th Cir. 1988). It is "the preference provisions," by contrast, that serve the "policy of equality of distribution among creditors of the debtor." *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991)

---

[5] *See also Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 567 n.27 (Tex. 2016) ("Though we need not consider the validity *vel non* of the Ponzi-scheme presumptions, we note that [the Texas Uniform Fraudulent Transfer Act] provides only one express presumption: 'A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent.'") (quoting TEX BUS. & COM. CODE § 24.003(b)).

3

(quoting H.R. REP. NO. 95-595, at 177-78 (1977)). By treating preferential transfers to creditors as fraudulent transfers in the context of a Ponzi scheme, the Ponzi scheme presumption obscures the essential distinction between fraudulent transfers and preferences. It uses fraudulent transfer law rather than the law relating to preferences to promote an equal distribution among creditors.

This use of the fraudulent transfer statute is questionable. *See In re Unified*, 260 B.R. at 350 ("By forcing the square peg facts of a 'Ponzi' scheme into the round holes of the fraudulent conveyance statutes in order to accomplish a further reallocation and redistribution to implement a policy of equality of distribution in the name of equity, I believe that many courts have done a substantial injustice to these statutes and have made policy decisions that should be made by Congress.").[6] But as the court notes, no party to this case challenges the Ponzi scheme presumption. *See ante* at 11 ("[T]he

---

[6] *See also* Amy J. Sepinwall, *Righting Others' Wrongs: A Critical Look at Clawbacks in Madoff-Type Ponzi Schemes and Other Frauds*, 78 BROOK. L. REV. 1, 23-24 (2012) (arguing that Ponzi scheme "clawback actions" are unsupported by "the history and text of § 548" because "the purpose of the fraudulent transfer provision is to prevent the debtor from secreting away his assets, typically for his own benefit, such that they are beyond the reach of his creditors" and not "to ensure the most even distribution of assets as possible by conferring upon each creditor his pro-rata share of the recovered resources"); Melanie E. Migliaccio, Comment, *Victimized Again: The Use of an Avoidability Presumption and the Objective Standard for Good Faith to Deprive Ponzi Victims of Their Defenses*, 8 LIBERTY U.L. REV. 209, 258 (2013) (arguing that the Ponzi scheme presumption "ignores that Congress distinguishes between preferences and fraudulent transfers") (capitalization omitted).

4

parties do not dispute the applicability of the Ponzi scheme presumption here."). Therefore, we apply that presumption.[7]

By treating debt repayments as fraudulent transfers and not as preferences, the Ponzi scheme presumption assumes that creditors of a Ponzi scheme are not owed a valid contractual antecedent debt like bona fide creditors. *See Finn*, 860 N.W.2d at 651 ("[C]ourts that adopt the Ponzi-scheme presumption effectively deem a contract between the operator of a Ponzi scheme and an investor to be unenforceable as a matter of public policy."). Thus, we do not apply the normal rule that, when the transferee is a creditor, "a lack of good faith 'does not ordinarily refer to the transferee's knowledge of the source of the debtor's monies which the debtor obtained at the expense of other creditors.'" *In re Sharp*, 403 F.3d at 54 (quoting *Boston Trading*, 835 F.2d at 1512). Normally, "the law will not charge" a creditor who "may know the fraudulent purpose of the grantor" with "fraud by reason of such knowledge," even though the law assumes that an arm's-length "purchase[r] for a present consideration … enters [the transaction] for the purpose of aiding that fraudulent purpose" if the purchaser knows "the fraudulent purpose of the grantor." *English v. Brown*, 229 F. 34, 40 (3d Cir. 1916) (quoting *Atl. Refin. Co. v. Stokes*, 75 A. 445, 446-47 (N.J. Ch. 1910)). Yet the Ponzi scheme presumption necessarily treats a creditor-transferee's inquiry notice of the debtor's operation of a Ponzi scheme as indicating a lack of good faith.

---

[7] Our court has similarly applied the Ponzi scheme presumption in prior cases when its application was uncontested. *See, e.g., In re Bernard L. Madoff Inv. Sec. LLC*, 976 F.3d 184, 190 (2d Cir. 2020) ("It is undisputed that BLMIS made the transfers at issue with 'actual intent to hinder, delay, or defraud … creditors.'") (quoting 11 U.S.C § 548(a)(1)(A)). We do not appear to have held directly that the presumption is well-founded.

5

That level of notice must be the same as normally required when evaluating the good faith of a transferee under the Bankruptcy Code. In this case, the district court's decision to adopt a different standard from the securities laws might have helped to avoid the counterintuitive results of treating a payment to a creditor as a fraudulent transfer. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff Sec.*), 516 B.R. 18, 22 (S.D.N.Y. 2014) ("[W]here the Bankruptcy Code and the securities laws conflict, the Bankruptcy Code must yield."). But that approach would add an additional departure from the statutory scheme. Accordingly, I concur in the court's opinion.

## II

Some courts have suggested that repayments such as those Citibank and Legacy Capital received "occur as part of the fraud" and therefore do not qualify as "repayment of a debt that was antecedent to the company's fraud." *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 11 (S.D.N.Y. 2007). In other words, there was no valid antecedent debt. Yet here, even the Trustee refers to the Madoff victims as "creditors," *see, e.g.*, Trustee's Br. 4, and indeed the purpose of SIPA is to treat each "customer" as a "creditor," *In re Bernard L. Madoff Inv. Sec. LLC*, 440 B.R. 243, 272 (Bankr. S.D.N.Y. 2010) (quoting 15 U.S.C. § 78fff-2(c)(3)). In our "net equity" decision, we described BLMIS profits as fictitious but treated the investments of principal, as are at issue in this case, as valid contractual antecedent debts. *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233, 242 (2d Cir. 2011) (approving the "Net Investment Method," which "credit[s] the amount of cash deposited by the customer into his or her BLMIS account [i.e. the investment of principal], less any amounts withdrawn from it"); *see also id.* at 235 ("[A]ny dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested.") (quoting *Sec.*

6

*Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 141 (Bankr. S.D.N.Y. 2010)).

Other courts have suggested that these sorts of "redemption payments … were necessarily made with intent to 'hinder, delay or defraud' present and future creditors" because those payments "constituted an integral and essential component of the fraudulent Ponzi scheme." *In re Bayou Grp., LLC*, 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007).[8] But it is unclear that the statutory phrase "intent to hinder, delay, or defraud" would by itself include repayments to creditors simply because such repayments are a critical part of the Ponzi scheme. Preferences generally "hinder" payments to other creditors yet are not for that reason considered fraudulent transfers. *See Richardson v. Germania Bank*, 263 F. 320, 325 (2d Cir. 1919) ("A very plain desire to prefer, and thereby incidentally to hinder creditors, is (1) not as a matter of law an intent obnoxious to [the fraudulent transfer provision]; and (2) is not persuasive in point of fact that such intent, evil in itself, ever existed."). A contrary argument would "obliterate" the preferential transfer provision "from the statute." *Irving Trust Co. v. Chase Nat'l Bank*, 65 F.2d 409, 411 (2d Cir. 1933). Moreover, when a statutory phrase—here, "hinder, delay, or defraud"—has a "well-established common-law meaning," we generally respect that meaning. *Moskal v. United States*, 498 U.S. 103, 126 (1990) (Scalia, J., dissenting). This phrase dates to the Statute of 13 Elizabeth, enacted by Parliament in 1571. *See* Fraudulent Conveyances Act of 1571, 13 Eliz. ch. 5, §§ I, V (Eng.) (prohibiting transfers made to "delaye hynder or defraude" creditors except for

---

[8] *See also Katz*, 462 B.R. at 453 ("[I]t is patent that all of Madoff Securities' transfers during the two-year period were made with actual intent to defraud present and future creditors, *i.e.*, those left holding the bag when the scheme was uncovered.").

7

transfers in exchange for "good Consyderation, & bona fide"); *In re Goldberg*, 277 B.R. 251, 291-92 (Bankr. M.D. La. 2002). The Statute of 13 Elizabeth prevented debtors from shortchanging creditors by squirreling away assets out of their creditors' reach.[9] The phrase refers to keeping assets away from all creditors rather than preferences among creditors, and courts presumably ought to follow "the specialized legal meaning that the term … has long possessed." *Moskal*, 498 U.S. at 121 (Scalia, J., dissenting).

It may be that there are better arguments for the Ponzi scheme presumption, but consideration of that issue must await an appropriately contested case.[10] Because the parties do not raise the issue here, I concur.

---

[9] *See* Douglas G. Baird & Thomas H. Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 VAND. L REV. 829, 829 (1985) ("[T]he Statute of 13 Elizabeth … was intended to curb what was thought to be a widespread abuse. Until the seventeenth century, England had certain sanctuaries into which the King's writ could not enter. A sanctuary was not merely the interior of a church, but certain precincts defined by custom or royal grant. Debtors could take sanctuary in one of these precincts, live in relative comfort, and be immune from execution by their creditors. It was thought that debtors usually removed themselves to one of these precincts only after selling their property to friends and relatives for a nominal sum with the tacit understanding that the debtors would reclaim their property after their creditors gave up or compromised their claims. The Statute of 13 Elizabeth limited this practice.") (footnote omitted).

[10] We generally do not address arguments not raised by the parties. *See, e.g.*, *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 435 n.53 (2d Cir. 2004). Yet we commonly identify issues that merit further consideration. *See, e.g.*, *United States v. Ingram*, 721 F.3d 35, 38 (2d Cir. 2013) (Calabresi, J., concurring) (calling "attention to a procedural challenge that has been strangely absent from this case").