20-1333, 20-1334
*In re Bernard L. Madoff Inv. Sec. LLC*

MENASHI, *Circuit Judge*, concurring:

The court's decision in this case might appear counterintuitive. Citibank received a repayment of a loan it made to a fund that invested with Bernard L. Madoff Investment Securities ("BLMIS"). Legacy Capital received back the principal it invested with BLMIS.[1] Yet the court holds that each party's receipt of funds it was owed amounts to a fraudulent transfer accepted in bad faith.

Normally, when a creditor receives a payment from a debtor—even if the creditor knows that the debtor is insolvent and the payment will prevent other creditors from being repaid—that payment is considered a preference, not a fraudulent transfer. *See Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 54 (2d Cir. 2005) ("A conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.") (alteration omitted) (quoting *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90-91 (N.Y. App. Div. 1st Dep't 1993)). Under these normal principles, creditors such as Citibank and Legacy would be able to retain the repayments despite knowledge of the debtor's insolvency as long as the transfers occurred outside the relatively brief period in which preferential transfers may

---

[1] Legacy has already returned the $79 million it received in net profits. *See* Special App'x 93-94.

be avoided[2] and the creditor is not participating in a fraudulent scheme by holding the funds on the debtor's behalf.[3]

I

In this case, however, we do not follow normal principles because we have applied the "Ponzi scheme presumption." Accordingly, we presume that transfers from a debtor in furtherance of a Ponzi scheme are made with fraudulent intent rather than to satisfy an antecedent debt.[4] Some courts have rejected the Ponzi

---

[2] *Compare* 11 U.S.C. § 547(b)(4)(A) (providing ninety-day period for avoiding preferential transfers), *with id.* § 548(a)(1) (providing two-year period for fraudulent transfers); *see also Picard v. Katz*, 462 B.R. 447, 451 (S.D.N.Y. 2011) (noting that because "the Bankruptcy Code also adopts for these purposes the 'applicable [state] law' … fraudulent transfers can be avoided if they occurred within 6 years" of BLMIS's bankruptcy filing), *abrogated in part by Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 437, 442 (S.D.N.Y. 2014).

[3] *See Twyne's Case*, 76 Eng. Rep. 809, 811 (Star Chamber 1601) (holding that a conveyance of goods from a debtor to a creditor was fraudulent when it was made "in satisfaction of his debt" but the debtor nevertheless "continued in possession of the said goods"); *see also Dean v. Davis*, 242 U.S. 438, 444 (1917) (noting that a "transaction may be invalid both as a preference and as a fraudulent transfer" if there exists both "the intent to prefer and the intent to defraud").

[4] *See SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) ("In this circuit, proving that [a transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."); *In re Slatkin*, 525 F.3d 805, 814 (9th Cir. 2008) ("We hold that once the existence of a Ponzi scheme is established, payments received by investors as purported profits—i.e., funds transferred to the investor that exceed that investor's initial 'investment'—are deemed to be fraudulent transfers as a matter of law."); *Klein v. Cornelius*, 786 F.3d 1310, 1320 (10th Cir. 2015) ("[B]ecause Ponzi schemes are insolvent by definition, we presume that transfers from such entities involve actual intent to defraud.").

2

scheme presumption on the ground that it improperly treats preferences as fraudulent transfers. *See, e.g., In re Unified Com. Cap., Inc.*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001) ("[T]he fraudulent conveyance statutes cannot and should not be utilized by courts as a super preference statute to effect a further reallocation and redistribution that should be specifically provided for in a statute enacted by Congress."); *Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015) (concluding that "there is no statutory justification for relieving the Receiver of its burden of proving—or for preventing the transferee from attempting to disprove—fraudulent intent" under the "Ponzi-scheme presumption" and that a creditor must "prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer").[5]

Under normal principles, fraudulent transfer law prevents pre-insolvency transfers to non-creditors or colluding creditors, not bona fide creditors; "[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them." *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987); *see also In re Sharp*, 403 F.3d at 54; *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 892 (7th Cir. 1988). It is "the preference provisions," by contrast, that serve the "policy of equality of distribution among creditors of the debtor." *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991)

---

[5] *See also Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 567 n.27 (Tex. 2016) ("Though we need not consider the validity *vel non* of the Ponzi-scheme presumptions, we note that [the Texas Uniform Fraudulent Transfer Act] provides only one express presumption: 'A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent.'") (quoting TEX BUS. & COM. CODE § 24.003(b)).

3

(quoting H.R. REP. NO. 95-595, at 177-78 (1977)). By treating preferential transfers to creditors as fraudulent transfers in the context of a Ponzi scheme, the Ponzi scheme presumption obscures the essential distinction between fraudulent transfers and preferences. It uses fraudulent transfer law rather than the law relating to preferences to promote an equal distribution among creditors.

This use of the fraudulent transfer statute is questionable. *See In re Unified*, 260 B.R. at 350 ("By forcing the square peg facts of a 'Ponzi' scheme into the round holes of the fraudulent conveyance statutes in order to accomplish a further reallocation and redistribution to implement a policy of equality of distribution in the name of equity, I believe that many courts have done a substantial injustice to these statutes and have made policy decisions that should be made by Congress.").[6] But as the court notes, no party to this case challenges the Ponzi scheme presumption. *See ante* at 11 ("[T]he

---

[6] *See also* Amy J. Sepinwall, *Righting Others' Wrongs: A Critical Look at Clawbacks in Madoff-Type Ponzi Schemes and Other Frauds*, 78 BROOK. L. REV. 1, 23-24 (2012) (arguing that Ponzi scheme "clawback actions" are unsupported by "the history and text of § 548" because "the purpose of the fraudulent transfer provision is to prevent the debtor from secreting away his assets, typically for his own benefit, such that they are beyond the reach of his creditors" and not "to ensure the most even distribution of assets as possible by conferring upon each creditor his pro-rata share of the recovered resources"); Melanie E. Migliaccio, Comment, *Victimized Again: The Use of an Avoidability Presumption and the Objective Standard for Good Faith to Deprive Ponzi Victims of Their Defenses*, 8 LIBERTY U.L. REV. 209, 258 (2013) (arguing that the Ponzi scheme presumption "ignores that Congress distinguishes between preferences and fraudulent transfers") (capitalization omitted).

4

parties do not dispute the applicability of the Ponzi scheme presumption here."). Therefore, we apply that presumption.[7]

By treating debt repayments as fraudulent transfers and not as preferences, the Ponzi scheme presumption assumes that creditors of a Ponzi scheme are not owed a valid contractual antecedent debt like bona fide creditors. *See Finn*, 860 N.W.2d at 651 ("[C]ourts that adopt the Ponzi-scheme presumption effectively deem a contract between the operator of a Ponzi scheme and an investor to be unenforceable as a matter of public policy."). Thus, we do not apply the normal rule that, when the transferee is a creditor, "a lack of good faith 'does not ordinarily refer to the transferee's knowledge of the source of the debtor's monies which the debtor obtained at the expense of other creditors.'" *In re Sharp*, 403 F.3d at 54 (quoting *Boston Trading*, 835 F.2d at 1512). Normally, "the law will not charge" a creditor who "may know the fraudulent purpose of the grantor" with "fraud by reason of such knowledge," even though the law assumes that an arm's-length "purchase[r] for a present consideration … enters [the transaction] for the purpose of aiding that fraudulent purpose" if the purchaser knows "the fraudulent purpose of the grantor." *English v. Brown*, 229 F. 34, 40 (3d Cir. 1916) (quoting *Atl. Refin. Co. v. Stokes*, 75 A. 445, 446-47 (N.J. Ch. 1910)). Yet the Ponzi scheme presumption necessarily treats a creditor-transferee's inquiry notice of the debtor's operation of a Ponzi scheme as indicating a lack of good faith.

---

[7] Our court has similarly applied the Ponzi scheme presumption in prior cases when its application was uncontested. *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 976 F.3d 184, 190 (2d Cir. 2020) ("It is undisputed that BLMIS made the transfers at issue with 'actual intent to hinder, delay, or defraud ... creditors.'") (quoting 11 U.S.C § 548(a)(1)(A)). We do not appear to have held directly that the presumption is well-founded.

5

That level of notice must be the same as normally required when evaluating the good faith of a transferee under the Bankruptcy Code. In this case, the district court's decision to adopt a different standard from the securities laws might have helped to avoid the counterintuitive results of treating a payment to a creditor as a fraudulent transfer. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff Sec.*), 516 B.R. 18, 22 (S.D.N.Y. 2014) ("[W]here the Bankruptcy Code and the securities laws conflict, the Bankruptcy Code must yield."). But that approach would add an additional departure from the statutory scheme. Accordingly, I concur in the court's opinion.

## II

Some courts have suggested that repayments such as those Citibank and Legacy Capital received "occur as part of the fraud" and therefore do not qualify as "repayment of a debt that was antecedent to the company's fraud." *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 11 (S.D.N.Y. 2007). In other words, there was no valid antecedent debt. Yet here, even the Trustee refers to the Madoff victims as "creditors," *see, e.g.*, Trustee's Br. 4, and indeed the purpose of SIPA is to treat each "customer" as a "creditor," *In re Bernard L. Madoff Inv. Sec. LLC*, 440 B.R. 243, 272 (Bankr. S.D.N.Y. 2010) (quoting 15 U.S.C. § 78fff-2(c)(3)). In our "net equity" decision, we described BLMIS profits as fictitious but treated the investments of principal, as are at issue in this case, as valid contractual antecedent debts. *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233, 242 (2d Cir. 2011) (approving the "Net Investment Method," which "credit[s] the amount of cash deposited by the customer into his or her BLMIS account [i.e. the investment of principal], less any amounts withdrawn from it"); *see also id.* at 235 ("[A]ny dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested.") (quoting *Sec.*

*Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 141 (Bankr. S.D.N.Y. 2010)).

Other courts have suggested that these sorts of "redemption payments … were necessarily made with intent to 'hinder, delay or defraud' present and future creditors" because those payments "constituted an integral and essential component of the fraudulent Ponzi scheme." *In re Bayou Grp., LLC*, 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007).[8] But it is unclear that the statutory phrase "intent to hinder, delay, or defraud" would by itself include repayments to creditors simply because such repayments are a critical part of the Ponzi scheme. Preferences generally "hinder" payments to other creditors yet are not for that reason considered fraudulent transfers. *See Richardson v. Germania Bank*, 263 F. 320, 325 (2d Cir. 1919) ("A very plain desire to prefer, and thereby incidentally to hinder creditors, is (1) not as a matter of law an intent obnoxious to [the fraudulent transfer provision]; and (2) is not persuasive in point of fact that such intent, evil in itself, ever existed."). A contrary argument would "obliterate" the preferential transfer provision "from the statute." *Irving Trust Co. v. Chase Nat'l Bank*, 65 F.2d 409, 411 (2d Cir. 1933). Moreover, when a statutory phrase—here, "hinder, delay, or defraud"—has a "well-established common-law meaning," we generally respect that meaning. *Moskal v. United States*, 498 U.S. 103, 126 (1990) (Scalia, J., dissenting). This phrase dates to the Statute of 13 Elizabeth, enacted by Parliament in 1571. *See* Fraudulent Conveyances Act of 1571, 13 Eliz. ch. 5, §§ I, V (Eng.) (prohibiting transfers made to "delaye hynder or defraude" creditors except for

---

[8] *See also Katz*, 462 B.R. at 453 ("[I]t is patent that all of Madoff Securities' transfers during the two-year period were made with actual intent to defraud present and future creditors, *i.e.*, those left holding the bag when the scheme was uncovered.").

7

transfers in exchange for "good Consyderation, & bona fide"); *In re Goldberg*, 277 B.R. 251, 291-92 (Bankr. M.D. La. 2002). The Statute of 13 Elizabeth prevented debtors from shortchanging creditors by squirreling away assets out of their creditors' reach.[9] The phrase refers to keeping assets away from all creditors rather than preferences among creditors, and courts presumably ought to follow "the specialized legal meaning that the term … has long possessed." *Moskal*, 498 U.S. at 121 (Scalia, J., dissenting).

It may be that there are better arguments for the Ponzi scheme presumption, but consideration of that issue must await an appropriately contested case.[10] Because the parties do not raise the issue here, I concur.

---

[9] *See* Douglas G. Baird & Thomas H. Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 VAND. L REV. 829, 829 (1985) ("[T]he Statute of 13 Elizabeth … was intended to curb what was thought to be a widespread abuse. Until the seventeenth century, England had certain sanctuaries into which the King's writ could not enter. A sanctuary was not merely the interior of a church, but certain precincts defined by custom or royal grant. Debtors could take sanctuary in one of these precincts, live in relative comfort, and be immune from execution by their creditors. It was thought that debtors usually removed themselves to one of these precincts only after selling their property to friends and relatives for a nominal sum with the tacit understanding that the debtors would reclaim their property after their creditors gave up or compromised their claims. The Statute of 13 Elizabeth limited this practice.") (footnote omitted).

[10] We generally do not address arguments not raised by the parties. *See, e.g.*, *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 435 n.53 (2d Cir. 2004). Yet we commonly identify issues that merit further consideration. *See, e.g.*, *United States v. Ingram*, 721 F.3d 35, 38 (2d Cir. 2013) (Calabresi, J., concurring) (calling "attention to a procedural challenge that has been strangely absent from this case").

8