**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 10-04539 (CGM) |
| THE GERALD AND BARBARA KELLER FAMILY TRUST, GERALD E. KELLER, individually and in his capacity as Trustee of the Gerald and Barbara Keller Family Trust, BARBARA | |

KELLER, individually and in her capacity as Trustee
of the Gerald and Barbara Keller Family Trust,

Defendants.

**TRUSTEE'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS'
<u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...............................................................................................................2

I.   THE COURT SHOULD ADHERE TO PRIOR RULINGS AS LAW OF THE
     CASE .................................................................................................................2

    A.   The Bankruptcy Court and District Court Relied on Admissible Evidence ...........3

II.  THE TRANSFERS WERE AN INTEREST OF THE DEBTOR IN PROPERTY............4

    A.   Madoff's Sleights of Hand on the Amended Form BD and Management of
    BLMIS's Bank Accounts Do Not Create a Genuine Dispute That BLMIS,
    including the IA Business, Was Transferred to the LLC ........................................6

    B.   The Expert Opinions Are Relevant to Bank Account Ownership Question..........10

    C.   The *RAR* Decision Is an Outlier.............................................................................12

III. BLMIS DID NOT PURCHASE T-BILLS ON BEHALF OF ANY INDIVIDUAL
     BLMIS CUSTOMER.......................................................................................13

    A.   Dubinsky Analyzed T-Bills Across All IA Business Customer Accounts
    and Concluded No T-Bills Were Purchased for BLMIS Customers ....................13

    B.   The Purchase of T-Bills by the IA Business Was for Cash Management,
    Not Purchases Made on Behalf of Any Individual BLMIS Customer .................15

    C.   Dubinsky's Steadfast Opinion Is That the IA Business Did Not Purchase
    T-Bills *on Behalf of* Any Individual BLMIS Customer.......................................16

    D.   Defendants' Conjecture Regarding the T-Bills Does Not Create a Disputed
    Issue of Material Fact...........................................................................................16

IV.  THE TRUSTEE'S MOTION RESTS ON ADMISSIBLE EVIDENCE..........................18

    A.   The Plea Allocutions Are Admissible to Prove the Ponzi Scheme's
    Existence ..............................................................................................................18

    B.   The BLMIS Books and Records Are Admissible Under the Business
    Records Exception to the Hearsay Rule................................................................18

V.   DEFENDANTS' AFFIRMATIVE DEFENSES HAVE BEEN REPEATEDLY
     REJECTED .......................................................................................................20

    A.   The Trustee Did Not Forfeit His Claim Against Barbara Keller ..........................20

    B.   Defendants Were Initial Transferees of the Fraudulent Transfers........................22

    C.   The Trustee is Entitled to Prejudgment Interest ..................................................25

CONCLUSION..........................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1031 Tax Grp.*,
   439 B.R. 84 (Bankr. S.D.N.Y. 2010) ................................................................ 25-26

*In re Adelphia Commc'ns Corp.*,
   No. 02-41729 (REG), 2006 WL 346418 (Bankr. S.D.N.Y. Feb. 6, 2006) ...................... 18-19

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................... 13

*In re Bernard L. Madoff Inv. Sec. LLC*,
   No. 20-1333, 2021 WL 3854761 (2d Cir. Aug. 30, 2021) ........................................ 5, 12, 26

*Blecker v. Picard (In re Bernard L. Madoff)*,
   592 B.R. 513 (Bankr. S.D.N.Y. 2018), *aff'd*, 605 B.R. 570 (S.D.N.Y. 2019),
   *aff'd*, 830 F. App'x 669 (2d Cir. 2020) .............................................................. 19, 20

*Bonded Fin. Servs., Inc. v. European Am. Bank*,
   838 F.2d 890 (7th Cir. 1988) .......................................................................... 23

*Bourdeau Bros., Inc. v. Montagne (In re Montagne)*,
   Adv. Pro. No. 08-1024, 2010 WL 271347 (Bankr. S.D.N.Y. Jan. 22, 2010) ...................... 2

*Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*,
   781 F.3d 1262 (11th Cir. 2015) ....................................................................... 18, 20

*In re Enron Creditors Recovery Corp.*,
   376 B.R. 442 (Bankr. S.D.N.Y. 2007) ................................................................ 18

*In re Finley, Kumble*,
   130 F.3d 52 (2d Cir. 1997) ............................................................................. 23

*Harkabi v. SanDisk Corp.*,
   No. 08 Civ. 8203 (WHP), 2012 WL 2574717 (S.D.N.Y. June 7, 2012) ........................... 11

*Hershel California Fruit Products Co., Inc. v. Hunt Foods, Inc.*,
   119 F. Supp. 603 (N.D. Cal. 1954) .................................................................... 22

*Jones v. UNUM Life Ins. Co. of Am.*,
   223 F.3d 130 (2d Cir. 2000) ........................................................................... 26

*Kotler v. Jubert*,
   986 F.3d 147 (2d Cir. 2021) ........................................................................... 21

*Levey v. Cummins (In re BoxMagic Media Corp.)*
    No. 08 B 12628, 2012 WL 589652 (Bankr. N.D. Ill. Feb. 22, 2012) ............................... 23-24

*Mandarino v Mandarino*,
    257 F.R.D. 394 (S.D.N.Y. 2009) ............................................................................................21

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
    643 F. Supp. 2d 471 (S.D.N.Y. 2009) ....................................................................................10

*In re Motors Liquidation Co.*,
    590 B.R. 39 (S.D.N.Y. 2018), *aff'd*, 943 F.3d 125 (2d Cir. 2019) ...........................................2

*Nisselson v. Salim (In re Big Apple Volkswagen, LLC)*,
    No. 11-11388 (JLG), 2016 WL 1069303 (Bankr. S.D.N.Y. Mar. 17, 2016).........................23

*O'Rourke v. Drunken Chicken in NY Corp.*,
    No. 19 CV 3942 (NGG)(LB), 2021 WL 1394176 (E.D.N.Y. Feb. 26, 2021) ........................21

*In re PCH Assocs.*,
    949 F.2d 585 (2d Cir. 1991).....................................................................................................2

*Picard v. Avellino*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016) ...................................................................................5, 6

*Picard v. BAM L.P.*,
    608 B.R. 165 (Bankr. S.D.N.Y. 2019) ...................................................................................19

*Picard v. BAM L.P.*,
    624 B.R. 55 (Bankr. S.D.N.Y. 2020) ............................................................................. *passim*

*Picard v. BAM L.P.*,
    Adv. Pro. No. 10-04390 (CGM) (Bankr. S.D.N.Y. Dec. 22, 2020) ......................................23

*Picard v. Est. of Seymour Epstein*,
    Adv. Pro. No. 10-04438 (CGM) (Bankr. S.D.N.Y. Jan. 27, 2021) ............................... *passim*

*Picard v. Gettinger*,
    976 F.3d 184 (2d Cir. 2020)...............................................................................................5, 12

*Picard v. JABA Assocs. LP*,
    No. 20 CV 3836, 2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021)................................... *passim*

*Picard v. Legacy Cap. Ltd.*,
    603 B.R. 682 (Bankr. S.D.N.Y. 2019)................................................................................2, 18

*Picard v. Lisa Beth Nissenbaum Tr.*,
    No. 20 CV 3140, 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021)................................... *passim*

*Picard v. Miller*,
  Adv. Pro. No. 10-04921 (CGM), 2021 WL 2787604 (Bankr. S.D.N.Y. July 2,
  2021) ........................................................................................................................ *passim*

*Picard v. Nelson*,
  610 B.R. 197 (Bankr. S.D.N.Y. 2019) ............................................................................ *passim*

*Picard v. RAR Entrepreneurial Fund LTD*,
  No. 20 CV 1029 (JMF), 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021) ........................................4

*Picard v. RAR Entrepreneurial Fund LTD*,
  No. 20 CV 1029 (JMF) (S.D.N.Y. July 14, 2021) ....................................................3, 4, 12, 13

*Scholes v. Lehmann*,
  56 F.3d 750 (7th Cir. 1995) ....................................................................................................17

*Stephens v. Am. Risk Mgmt. Inc.*,
  No. 89 CIV 2999, 1995 WL 479438 (S.D.N.Y. Aug. 14, 1995) ...........................................21

*Taunt v. Hurtado (In re Hurtado)*,
  342 F.3d 528 (6th Cir. 2003) ..........................................................................................23-24

*Thompson v. Doane Pet Care Co.*,
  470 F.3d 1201 (6th Cir. 2006) ...............................................................................................10

*Unicorn Tales v. Banerjee*,
  138 F.3d 467 (2d Cir. 1998) ...................................................................................................21

*United States v. Kaiser*,
  609 F.3d 556 (2d Cir. 2010) ...................................................................................................18

*Walsh v. Chez*,
  583 F.3d 990 (7th Cir. 2009) ..................................................................................................11

*Whalen v. CSX Transp. Inc.*,
  No. 13 Civ. 3784 (LGS) (HBP), 2016 WL 5660381 (S.D.N.Y. Sept. 29, 2016) ..................10

**Statutes**

11 U.S.C. § 548(a)(1)(A) ............................................................................................................4

15 U.S.C. § 78fff-2(b) ...............................................................................................................17

15 U.S.C. § 78fff-2(c)(3) .............................................................................................................4

15 U.S.C. § 78fff(a)(1) ...............................................................................................................26

15 U.S.C. § 78fff(a)(1)(B) ..........................................................................................................26

Calif. Code Civil Procedure § 367 .............................................................................22

N.Y. C.P.L.R. § 1004 (2015) ...................................................................................22

**Rules**

Fed. R. Civ. P. 17(a) ...............................................................................................22

Fed. R. Civ. P. 25(a)(1) .......................................................................................2, 21

Fed. R. Civ. P. 25(a)(3) ...........................................................................................21

Fed. R. Civ. P. 26 ....................................................................................................10

Fed. R. Civ. P. 26(a)(2)(B) ......................................................................................10

Fed. R. Civ. P. 803(6) ...............................................................................................3

Fed. R. Evid. 703 ...................................................................................................3, 4

Fed. R. Evid. 803(6) ..................................................................................................3

Fed. R. Evid. 803(22) ..............................................................................................18

Fed. R. Evid. 807(a) ..................................................................................................4

**Other Authorities**

Moore's Federal Practice § 25.13[1] (3d. ed. 2008) ..................................................21

Moore's Federal Practice § 25.13[2][b] (3d. ed. 2008) ..............................................21

## PRELIMINARY STATEMENT

Defendants'[1] opposition and cross-motion for summary judgment raises no genuine dispute of material facts, and even concedes the accuracy of the Trustee's net equity calculation of deposits and withdrawals, entitling the Trustee to recover $1,896,148 of fictitious profits received in the Two-Year Period. Confronted with this inexorable conclusion, Defendants resort to arguments that have been repeatedly rejected by the Bankruptcy Court, the District Court, and the Second Circuit. And when that fails, they cling to one District Court ruling that deviated from the law of the case that has otherwise been overwhelmingly in favor of the Trustee.

Despite the fact that this Court (and several others) have admitted the 2001 SEC Amended Form BD (the "Amended Form BD"), Defendants insist that it is inadmissible and should not be relied upon by the Trustee to prove his *prime face* case. However, Defendants have no problem relying on the same form—the contents of which they characterize as "fraudulent"— to support their arguments as to Madoff's sole proprietorship, and ownership of the bank accounts that transferred fictitious profits to Defendants. The same is true for Defendants' objections to the admission of BLMIS books and records: they assert certain records relied upon by the Trustee should not be admitted, but records Defendants seek to utilize should be. Defendants provide no legitimate justification to exclude the Trustee's evidence of bank account ownership via the Amended Form BD or other admissible records of Madoff's intent to transfer *all* assets and liabilities of the sole proprietorship to the LLC.

The defenses invoked by Defendants fail as a matter of law and thus do not defeat the Trustee's *prima facie* case. Defendants argue that the Trustee cannot maintain his claim against

---

[1] Defined terms shall have the same meaning prescribed in the Trustee's Memorandum of Law in Support of Motion for Summary Judgment (the "Motion"). *See Picard v. The Gerald and Barbara Keller Family Tr.*, Adv. Pro. No. 10-04539 (Bankr. S.D.N.Y. July 22, 2021), ECF No. 100.

Defendant Barbara Keller, in her capacity as Trustee of the Keller Family Trust, because the

Trustee failed to timely amend the complaint to name her estate when she passed away.

However, Defendants did not provide proper notice under Fed. R. Civ. P. 25(a)(1), which

requires a formal statement noting death that is filed on the record and served on the parties.  It is

not enough that the Trustee is simply made aware of her death for the clock to start running on

any substitution.  Defendants further argue that the Trustee cannot recover the transfers because

they were not deposited into any bank accounts held by the Keller Family Trust.  This defense is

not grounded in fact and can be resolved in the Trustee's favor as a matter of law because

Defendants had ownership and dominion and control at all times over the Keller Family Trust

Account and the withdrawals therefrom.

Accordingly, as there are no material facts in dispute, summary judgment should be

granted in favor of the Trustee on Count One in his Complaint.

## **ARGUMENT**

## I.    **THE COURT SHOULD ADHERE TO PRIOR RULINGS AS LAW OF THE CASE**

Defendants ignore that their claims and defenses have already been rejected by multiple

courts within this liquidation.  The doctrine of law of the case was developed in order to

"maintain consistency and avoid reconsideration of matters once decided during the course of a

single continuing lawsuit."  *Bourdeau Bros., Inc. v. Montagne (In re Montagne)*, Adv. Pro. No.

08-1024, 2010 WL 271347, at *5 (Bankr. S.D.N.Y. Jan. 22, 2010) (quoting *In re PCH Assocs.*,

949 F.2d 585, 592 (2d Cir. 1991)).  Different adversary proceedings within a liquidation

proceeding are considered "one case" for purposes of law of the case.  *See Picard v. BAM L.P.*,

624 B.R. 55, 61 (Bankr. S.D.N.Y. 2020) (citing *Picard v. Nelson*, 610 B.R. 197, 237 (Bankr.

S.D.N.Y. 2019) ("The prior decisions within this SIPA proceeding constitute law of the case."));

*Picard v. Legacy Cap. Ltd.*, 603 B.R. 682, 700 (Bankr. S.D.N.Y. 2019) (citing *In re Motors*

*Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018) (law of the case doctrine applies across

adversary proceedings within the same bankruptcy case), *aff'd*, 943 F.3d 125 (2d Cir. 2019)).

Each issue in this summary judgment motion has been previously decided by this Court

and the District Court, overwhelmingly in the Trustee's favor and often in proceedings involving

Defendants' same counsel.  *See Picard v. JABA Assocs. LP*, No. 20 CV 3836 (JGK), 2021 WL

1112342 (S.D.N.Y. Mar. 24, 2021); *Picard v. Lisa Beth Nissenbaum Tr.*, No. 20 CV 3140 (JGK),

2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021); *Picard v. Miller*, Adv. Pro. No. 10-04921 (CGM),

2021 WL 2787604 (Bankr. S.D.N.Y. July 2, 2021); Mem. Decision, *Picard v. Est. of Seymour*

*Epstein*, Adv. Pro. No. 10-04438 (CGM) (Bankr. S.D.N.Y. Jan. 27, 2021), ECF No. 155

("*Epstein Decision*").  Other than the amounts and dates of the transfers, the claims are identical,

and the record submitted in support is the same as the other summary judgment motions.

### A.      The Bankruptcy Court and District Court Relied on Admissible Evidence

Despite the overwhelming weight of authority, Defendants insist that this Court should

not follow those rulings here because the decisions "all rest upon the courts' reliance on the

[Amended] Form BD;" a document that District Judge Jesse M. Furman determined was

inadmissible as a business record under Fed. R. Civ. P. 803(6) at an upcoming jury trial.

Defendants' Opp. at 2, 9 (citing Mem. Opinion and Order at 2, *Picard v. RAR Entrepreneurial*

*Fund LTD*, No. 20 CV 1029 (JMF) (S.D.N.Y. July 14, 2021), ECF No. 90 (the "RAR MIL

Order")).  Defendants assert that the prior courts' reliance on the Amended Form BD

necessitates a complete deviation from the law of the case.

However, Defendants misrepresent Judge Furman's *RAR* decision.  Judge Furman ruled

the Amended Form BD was not a business record under Fed. R. Evid. 803(6), but expressly

permitted the Trustee to lay a foundation under Fed. R. Evid. 703 for admissibility of the

Amended Form BD at trial: "the Court reserves judgment to trial on whether the contents of the

3

[Amended] Form [BD] can be admitted under Rule 703, as that will depend on whether [the

Trustee]'s expert can and does lay a proper foundation for admission under the Rule."  RAR

MIL Order at 2.  Judge Furman also did not determine whether the Amended Form BD could be

admitted pursuant to Fed. R. Evid. 807(a) under the residual hearsay exception.  Thus, contrary

to Defendants' assertions, the Amended Form BD may still be admissible at the *RAR* trial.[2]

Defendants also ignore that Judge Furman considered the Amended Form BD in his

opinion granting the Trustee partial summary judgment.  *See Picard v. RAR Entrepreneurial*

*Fund LTD*, No. 20 CV 1029 (JMF), 2021 WL 827195, at *1 (S.D.N.Y. Mar. 3, 2021).  Judge

Furman found the Amended Form BD "provide[d] compelling evidence that the accounts were

transferred to BLMIS LLC."  *Id.* at *11.

Defendants cannot have it both ways.  They cannot argue the Amended Form BD is

inadmissible when the Trustee relies upon it to support his *prima facie* case, while also relying

upon it to support their arguments.  Defendants' Response to Trustee's Stmt. ¶¶ 8–11, 85;

Counterstatement of Material Facts ("CMF") ¶¶ 9, 12 (citing Chaitman Decl. Ex. D (Amended

Form BD at 8–10)).  The Amended Form BD, like BLMIS's other books and records, remains

admissible.

## II.    THE TRANSFERS WERE AN INTEREST OF THE DEBTOR IN PROPERTY

Pursuant to 11 U.S.C. § 548(a)(1)(A), the Trustee may avoid and recover transfers of

fictious profits where: (1) a transfer of an interest of the debtor in property; (2) was made within

two years of the bankruptcy petition date: (3) and the transfer was made with "actual intent to

hinder, delay, or defraud" a creditor.  *Miller*, 2021 WL 2787604, at *4; *see also JABA Assocs.*

---

[2] In addition, the Bankruptcy Court has twice admitted the Amended Form BD in prior trials, one involving
Defendants' counsel.  *See Nelson*, 610 B.R. at 206, 218; *BAM L.P.*, 624 B.R. at 59–61.

*LP*, 2021 WL 1112342, at *9; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *9.  SIPA §

78fff-2(c)(3) allows the Trustee to "invoke the fraudulent transfer provisions in the Bankruptcy

Code to recover customer property," transferred by the debtor.  *Picard v. Gettinger*, 976 F.3d

184, 199 (2d Cir. 2020).  Thus, the Trustee must demonstrate that the transferred money was

customer property.  The Trustee explained in his brief why the transfers to Defendants were

customer property transferred by the SIPA debtor—BLMIS.  *See* Trustee's Motion at III.D., ECF

No. 100.

> The admissible evidence before the Court demonstrates that the Trustee can recover

customer property regardless of whether that property is held in an account with the letters

"LLC" and despite whose name appears on the top of a check.  Stmt. ¶¶ 9–11, ECF No. 101.

Defendants may contend that whether BLMIS made the transfers is disputed, but such a dispute

is not a genuine one.  *See Miller*, 2021 WL 2787604, at *4 ("The Defendant's argument that the

JPMorgan Accounts were the property of Madoff, not BLMIS is without merit. The transfers the

Trustee seeks to avoid are customer property."); *Epstein Decision* at 7 ("All monies transferred

from the 509 Account or the 703 Account are "customer property" for purposes of these SIPA

cases."); *see also In re Bernard L. Madoff Inv. Sec. LLC*, No. 20-1333, 2021 WL 3854761, at *6

(2d Cir. Aug. 30, 2021) (noting that "each time BLMIS transferred payments to a customer, it

was money stolen from other customers," because "the customers' funds were commingled in

BLMIS's bank account").

> As Defendants' counsel previously argued before this Court and the District Court,

Defendants' contrary view stems from an interlocutory bankruptcy court decision in another

adversary proceeding, *Picard v. Avellino*, in which the court dismissed the Trustee's claims to

recover fraudulent transfers before 2001.  557 B.R. 89 (Bankr. S.D.N.Y. 2016).[3]  But any

reliance on *Avellino* is misplaced because the Trustee only seeks to avoid transfers made between

2006 and 2008, well after 2001 when the LLC succeeded the sole proprietorship.  *See JABA*

*Assocs. LP*, 2021 WL 1112342, at *9; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *9;

*Epstein Decision* at 6–7.

### A.    Madoff's Sleights of Hand on the Amended Form BD and Management of BLMIS's Bank Accounts Do Not Create a Genuine Dispute That BLMIS, including the IA Business, Was Transferred to the LLC

There is no dispute that, prior to January 1, 2001, Madoff's sole proprietorship held the

JPMorgan Accounts used by the IA Business.  There is also no dispute that Madoff converted his

business to an LLC in 2001.  As discussed in the Trustee's Motion, when Madoff changed the

form of his business from a sole proprietorship to an LLC in 2001, he did not file a new

application for SEC registration.  *See* Trustee's Motion at III.C, ECF No. 100 (citing Cremona

Decl., Ex. 3 (Amended Form BD)).  Instead, he filed an Amended Form BD to reflect that

change, retaining the same SEC registration number he had since January of 1960.  *Id.*  With the

same SEC registration number following the transfer to the LLC, the sole proprietorship ceased

to exist as a broker-dealer or in any other capacity.

Yet Defendants argue that Madoff's sole proprietorship continued to run the IA Business,

while the other two business units operated under the newly-formed LLC.  *See* Defendants' Opp.

at 5, 21.  But the Amended Form BD explicitly stated the "predecessor" or the sole

proprietorship, would transfer to its successor, the LLC, "*all* of predecessor's assets and

liabilities related to predecessor's business," including the IA Business and the JPMorgan

---

[3] The *Avellino* decision has not yet been appealed because it is not a final judgment. The case is still ongoing in the Bankruptcy Court.

Accounts.  Cremona Decl., Ex. 3 (Amended Form BD at 10–11, *see also* Question 5) (emphasis

added).  Contrary to Defendants' assertions otherwise, the Amended Form BD listed no assets or

liabilities as "not assumed by the successor."  *Id.*  The Amended Form BD also stated no

"accounts, funds, or securities of customers of the applicant are held by or maintained by [any]

other person, firm, or organization."  *Id.* (Amended Form BD at 5); *see also JABA Assocs. LP*,

2021 WL 1112342, at *9 (citing *BAM L.P.*, 624 B.R. at 61 ("This Court finds that all of the

assets and liabilities of the sole proprietorship, including the IA Business, were transferred to

BLMIS via the 2001 SEC Amended Form BD.")); *Lisa Beth Nissenbaum Tr.*, 2021 WL

1141638, at *9 (same); *Miller*, 2021 WL 2787604, at *11 (same); *Epstein Decision* at 7 (same).

In support of their theory that the sole proprietorship continued its business after the LLC

was formed, Defendants point to an unchecked box on the Amended Form BD regarding

investment advisory services and ask, given that Madoff had never registered his IA Business,

"[w]hy, then, would he transfer the IA Business to the LLC, run by his sons?"  Defendants' Opp.

at 25.  But Defendants point to no admissible evidence that the unchecked box supports their

speculation.  Rather, the admissible evidence demonstrates that Madoff transferred all the sole

proprietorship's assets, including the bank accounts used for the IA Business, to the LLC, and

operated the IA Business with the proprietary trading and market-making businesses as a single

firm.  Indeed, Madoff did not register the IA Business until August 2006, and when he did so, he

did it *not* as a sole proprietor but as the LLC.  Chaitman Decl. Ex. BA (Form ADV dated Aug.

25, 2006) (providing "Bernard L. Madoff Investment Securities LLC" as the "Primary Business

Name," "full legal name," and "Name under which you primarily conduct your advisory

business").  And even if there was a doubt in 2001 whether the LLC succeeded the IA Business,

the IA Business was clearly registered under the LLC by the time the transfers at issue here were

made within the Two-Year Period. *See Miller*, 2021 WL 2787604, at *11 ("all of the assets and
liabilities of the sole proprietorship, including the IA Business, were transferred to BLMIS via
the 2001 SEC Amended Form BD" (citing *BAM L.P.*, 624 B.R. at 61); *JABA Assocs. LP*, 2021
WL 1112342, at *9 (same); *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *9 (same); *Epstein
Decision* at 7 (same).

In further support of their improbable theory, Defendants claim that the Amended Form
BD is missing "Schedule D," which Madoff was required to complete if it was his intention for
the LLC to succeed the IA Business. However, Defendants ignore that all of the information
required to be included in "Schedule D" in fact appears in the Amended Form BD. For example,
Question 1.C.(2) requires the applicant to "List on Schedule D. . . *Other Business Names* any
other name by which the firm conducts business and where it is used." Cremona Decl., Ex. 3
(Amended Form BD at 1) (emphasis added). Eight pages later, just below the heading "BD
Schedule C – Amendments to Schedules A&B," reads "BD – *Other Business Names*" which is
followed by "No Information Filed." *Id.* at 9 (emphasis added). Below "BD Schedule C," is a
heading "BD – *Successions*" under which Madoff lists "Bernard L. Madoff" as the predecessor
entity and states that "*all* of predecessor's assets and liabilities" are to be assumed by the
successor. *Id.* at 9–10 (emphasis added). Questions 7, 8, and 9 under the heading "BD –
Arrangements" requires the applicant to "complete appropriate items on Schedule D . . .
Arrangement Details" if applicant indicates "yes" to any of those questions. *Id*. at 4. The
choices selected for questions 7, 8, and 9 are "No," thus under the heading "BD – Arrangements
/ Control Persons / Financing" following Schedule C, is "No Information Filed." *Id.* at 10.
Questions 10(A) and 10(B) require additional detail regarding any business "Affiliates" of the
applicant if "yes" is selected. *Id.* at 5. A section titled "BD – *Affiliates*," also after Schedule C,

includes details of the applicant's affiliation with "Madoff Securities International LTD." *Id.*
(emphasis added).  Likewise, Questions 12(Z) and 13(B) under the heading "BD – Types of
Business" requires details of other types of businesses engaged in by applicant on Schedule D.
*Id.* at 7.  A corresponding heading of "BD – Other Business" with instructions to "Briefly
describe any other business (Item 12Z)" and "Briefly describe any other non-securities business
(Item 13B)" appears after Schedule C and includes the explanation that "Bernard L. Madoff is a
member of the Cincinnati Stock Exchange" for 12(Z) and is blank for 13(B) consistent with the
applicant's responses to those questions.  *Id.* at 9 (emphasis added).  Thus, all of the information
to be included in Schedule D appears on the Amended Form BD.

Finally, Defendants' argument that the JPMorgan Account statements did not list the
word "LLC" after "Bernard L. Madoff Investment Securities" and the checks or Form 1099s
Madoff sent to Defendants post-2001 listed "Bernard L. Madoff" rather than "Bernard L. Madoff
Investment Securities LLC" on the top left corner is insufficient to make ownership of the IA
Business a genuine factual dispute.  *See* Defendants' Opp. at 8, 12, 17.  The name on the
JPMorgan Account statements changed after the LLC was formed, from "Bernard L. Madoff" to
"Bernard L. Madoff Investment Securities," although the name on the checks did not change.
Stmt. ¶ 86 (citing Collura Decl., Attach. A (Collura Report) ¶¶ 20 n.7, 25 n. 9, ECF No. 103-1).
Furthermore, Defendant Gerald Keller sent 26 letter requests for withdrawals to "Bernard L.
Madoff Investment Securities LLC" from 2004 through 2008.  *See* Keller Decl., Ex. 4
(AMF00053897-53), ECF No. 114-4.

But whether a fraudster ensures that his checkbook reflects the most up-to-date corporate
name of his business before sending out stolen money does not answer the legal question of
whether the transfers of customer property are recoverable by a SIPA trustee.  As both this Court

and the District Court held, "forms filled out improperly [and] business names used interchangeably on bank accounts and checks[ ]are the sleights of hand that one would expect to see when exhuming the remnants of a Ponzi scheme." *JABA Assocs. LP*, 2021 WL 1112342, at *9 (citing *BAM L.P.*, 624 B.R. at 60); *see also Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *9 (same).

Because the JPMorgan Accounts were transferred to the LLC when it was created in 2001 and were the accounts used to make the transfers to Defendants during the Two-Year Period, the transfers here are an "interest of the debtor in property," and the Trustee has met the first element of his avoidance claim.

### B.    The Expert Opinions Are Relevant to Bank Account Ownership Question

Defendants further assert that this Court should not consider the Trustee's expert reports because they are not relevant to the ownership of the JPMorgan Accounts issue.  *See* Defendants' Opp. at 19.  Defendants state that "[n]one of the experts purported to opine on this issue and they are barred, under Fed. R. Civ. P. 26(a)(2)(B), from doing so now."  *Id.*  This argument is not supported by Fed. R. Civ. P. 26 or case law.

Rule 26 requires that an expert report "provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions.  It must explain factually why and how the witness has reached them" but *does not* require that an expert report "replicate every word that the expert might say on the stand."  *Whalen v. CSX Transp. Inc.*, No. 13 Civ. 3784 (LGS) (HBP), 2016 WL 5660381, at *4 (S.D.N.Y. Sept. 29, 2016); *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006); *accord In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009).  The report's purpose "is instead to convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary."  *Walsh v. Chez*, 583 F.3d 990, 994 (7th

Cir. 2009); *accord Harkabi v. SanDisk Corp.*, No. 08 Civ. 8203 (WHP), 2012 WL 2574717, at

*4 (S.D.N.Y. June 7, 2012). To that end, the Trustee made the experts available for cross-

examination and their reports available for inspection, but Defendants failed to depose any of the

Trustee's experts and failed to proffer their own experts in rebuttal.

As part of Dubinsky's investigation as to the solvency of BLMIS, he analyzed the corporate

structure and related bank accounts of BLMIS. Through his investigation, he confirmed that "[i]n

1960, Madoff founded BLMIS as a sole proprietorship. BLMIS . . . operated three business units."

Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 36, ECF No. 104-1. Then, "[i]n 2001, BLMIS

was reorganized as a single-member LLC with Madoff as the sole member." *Id*. ¶ 38.

Subsequently, "[i]n August 2006, BLMIS registered as an investment adviser with the SEC." *Id*.

¶ 39. He further analyzed the bank accounts as part of his solvency and proof of fraud analysis,

finding that "the pervasive fraud in BLMIS was conducted through its main bank accounts." *Id*. ¶

77. Dubinsky identified the main bank accounts as the JPMorgan Accounts for the IA Business

activities, and the Bank of New York 621 Account for the Proprietary Trading and Market Making

businesses. *Id*. ¶ 78. Dubinsky further found, as part of his investigation of BLMIS as a Ponzi

scheme, that no monies were deposited in the JPMorgan Accounts from the sale of securities, or

the receipt of dividends.

Likewise, Collura testified that she analyzed all available BLMIS bank records and through

that work "confirmed the accuracy and reliability of the cash transactions on the customer

statements by reconciling those transactions reported on the BLMIS customer statements to

available third-party bank records." *Nelson*, 610 B.R. at 220 (citing Tr. (5/8) at 194:23–197:1; Tr.

(5/9) at 44:15–45:19.). This analysis was the basis for Collura's opinion that the activity in the

JPMorgan Accounts did not change after the transition to the LLC—receiving and distributing the deposits and withdrawals of the IA Business. *Id.*

Both this Court and the District Court have relied upon the unrebutted expert reports of Dubinsky and Collura to find that the JPMorgan Accounts containing customer deposits were transferred from the sole proprietorship to the LLC in January 2001. *See, e.g.*, *Miller*, 2021 WL 2787604, at *3; *JABA Assocs. LP*, 2021 WL 1112342, at *3, *9 (citing *BAM L.P.*, 624 B.R. at 59–61); *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *3, *9.

### C.     The *RAR* Decision Is an Outlier

The Trustee disagrees with Judge Furman's *RAR* decision to the extent he found a genuine issue of material fact exists for trial.  But whether Madoff transferred the IA Business to the LLC is a question that courts have decided in favor of the Trustee six times, including on summary judgment and after bench trials.  *See, e.g.*, *Miller*, 2021 WL 2787604, at *4; *JABA Assocs. LP*, 2021 WL 1112342, at *9–10; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *9–10; *Epstein Decision* at *7; *BAM L.P.*, 624 B.R. at 59–61; *Nelson*, 610 B.R. at 216–18.  Against this weight of authority, Judge Furman's decision to send that question to a jury for the first time is an anomaly,[4] and the District Court has twice declined to follow *RAR* as District Judge John G.

---

[4] Notably, Judge Furman also denied defendant's motion *in limine* to exclude the Trustee's expert witness testimony concerning whether the monies in the JPMorgan Accounts constitute "customer property" under SIPA.  *See* RAR MIL Order ¶ 1, ECF No. 90.  Even so, this Court, the District Court, and the Second Circuit have already determined that the funds in the JPMorgan Accounts were customer property.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 2021 WL 3854761, at *3 ("As is invariably true of Ponzi schemes, due to BLMIS's transfers of commingled customer funds before the Ponzi scheme unraveled, there was insufficient money in the BLMIS customer property fund for Picard to satisfy all allowed claims."); *Miller*, 2021 WL 2787604, at *4 ("All monies transferred from the 509 Account or the 703 Account are "customer property" for purposes of these SIPA cases."); *JABA Assocs.*, 2021 WL 1112342, at *3 ("Customer property was deposited into the same JPMorgan Accounts when BLMIS operated an LLC as happened when BLMIS operated as a sole proprietorship."); *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *3 (same); *Gettinger*, 976 F.3d at 200 ("The transfers at issue, however, were not returns of principal; they were transfers of fictitious profits in excess of principal that depleted the resources of the customer property fund without an offsetting satisfaction of a debt or liability of that fund."); *Epstein Decision* at 5–6 ("All monies transferred from the 509 Account or the 703 Account are "customer property" for purposes of these SIPA cases."); *BAM L.P.*, 624 B.R. at 61 ("The funds held in the Bank Accounts were meant to be invested legitimately through BLMIS but never were. Thus, they were 'customer property.'").

Koeltl held "there is no genuine issue of material fact that the transfers in this case were in fact made by the LLC." *JABA Assocs. LP*, 2021 WL 1112342, at *10, n.4 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of some alleged factual dispute . . . will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.")); *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *10, n.4 (same). This singular district court opinion with the opposite conclusion does not mandate a jury trial. Indeed, Judge Koeltl's *JABA Assocs. LP* and *Lisa Beth Nissenbaum Tr.* decisions were entered *after* Judge Furman's *RAR* decision, and Judge Koeltl expressly considered and rejected Judge Furman's reasoning. This Court should do the same.

## III. BLMIS DID NOT PURCHASE T-BILLS ON BEHALF OF ANY INDIVIDUAL BLMIS CUSTOMER

Although Defendants do not overtly challenge Dubinsky's conclusions that BLMIS was a Ponzi scheme and never traded the securities listed on BLMIS customer statements, Defendants allege, with no evidentiary basis, that "Madoff purchased significant amounts of T-Bills for the Keller Trust Account and held them throughout the time they were credited to the [Keller Family Trust] Account." CMF ¶ 89, ECF No. 113. But this Court has already held the treasuries listed on customer statements were fictitious and any treasuries purchased as part of the ongoing fraud were immaterial.

### A. Dubinsky Analyzed T-Bills Across All IA Business Customer Accounts and Concluded No T-Bills Were Purchased for BLMIS Customers

BLMIS claimed it would intermittently invest BLMIS customer funds in T-Bills as part of the SSC strategy, but Dubinsky found no evidence of such purchases having been made for IA Business customers. Dubinsky reviewed the BLMIS books and records to identify the unique T-Bills held by the Proprietary Trading Business on December 31 from 2002 through 2007. He then compared those holdings to: (i) those T-Bill positions held at BLMIS's account at the DTC,

13

which serves as the custodian or the clearing house for treasuries; and (ii) the T-Bills purportedly held by the IA Business. Dubinsky determined that the T-Bill CUSIPs (*i.e.*, unique security identifiers) held at the DTC under BLMIS's account matched those T-Bills reported as being purchased and held by the Proprietary Trading Business. Conversely, none of the T-Bill CUSIPs held at the DTC under BLMIS's account matched those purportedly purchased and held on behalf of IA Business customers. Dubinsky Decl., Attach. B (Dubinsky Report) ¶¶ 224–26.

Dubinsky further compared the aggregate volume of T-Bills reported on the BLMIS customer statements as of each monthly statement to the total volume of T-Bills held in the Brokerage Accounts[5] and the Proprietary Trading Business as reported by the DTC for the same period. This analysis showed that the total volume of T-Bills purportedly held in the IA Business at year-end from 1998–2007 dwarfed the volume held in the Brokerage Accounts and the Proprietary Trading Business. *Id.* ¶ 227 & Table 5, ¶¶ 228–31 & Figure 36, Ex. 22. For example, by the end of 2007, the $80 million in treasury positions held by the Proprietary Trading Business (as recorded on the DTC records) was only 0.14 percent of the approximately $57 billion in T-Bills purportedly held by the IA Business at that time. *Id.* ¶ 227 & Table 5.

Moreover, Dubinsky's additional analysis verified that the T-Bills held in the Brokerage Accounts do not "match" the (i) trade date, (ii) volume, (iii) price, (iv) security description, and (v) maturity date for every purported treasury position on the IA Business customer statements. *Id.* at 99 n.217, ¶¶ 232–40. Specifically, Dubinsky found that 71% of the T-Bills do not have the same maturity date as any of the T-Bills held in the Brokerage Accounts, meaning 71% were never purchased by the IA Business. *Id.* ¶ 233, Ex. 23. Of the remaining 29% of the T-Bills—

---

[5] The T-Bills were held in various brokerage accounts and/or the JPMC custody account #G 13414 (collectively, the "Brokerage Accounts"). Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 228, n.213.

4,660 unique transactions—that did have the same maturity dates as those held on the Brokerage

Accounts, there were only 20 unique instances in which the IA Business customer accounts

purportedly purchased and sold a treasury on the same dates as the Brokerage Accounts. *Id.* ¶¶

234–36.  In each of the 20 instances, the purported volume of the T-Bills purchased and sold in

the aggregate by the IA Business was higher than the actual volume purchased and sold in the

aggregate by the Brokerage Accounts. *Id.* ¶¶ 239–40.  Thus, none of the T-Bills identified on

customer statements were the same T-Bills held in the Brokerage Accounts.

This Court held as much when it found: "While some T-Bills were purchased as part of

the ongoing fraud, the treasuries on Defendants' customer statements were fictitious." *Epstein*

*Decision* at 7; *see also Nelson*, 610 B.R. at 214 ("[A]lthough the Proprietary Trading Business

purchased T-Bills, the volume of T-Bills that appeared on the customer statements dwarfed the

aggregate volume of T-Bills actually purchased and held by BLMIS."); *see also JABA Assocs.*

*LP*, 2021 WL 1112342, at *13 (finding "there is no dispute of material fact that the IA Business

did not conduct legitimate business by purchasing T-Bills on behalf of its customers"); *Lisa Beth*

*Nissenbaum Tr.*, 2021 WL 1141638, at *13 (same).  Defendants offer no countervailing evidence

or reason to depart from this Court's prior rulings on the same issue.

**B.    The Purchase of T-Bills by the IA Business Was for Cash Management, Not
        Purchases Made on Behalf of Any Individual BLMIS Customer**

Dubinsky's report is clear that BLMIS's limited purchases of T-Bills with funds from the

703 Account were not for any individual BLMIS customer account, but rather were for the

purpose of investing BLMIS's excess cash—*i.e.*, cash management.  Dubinsky Decl., Attach. A

(Dubinsky Report) ¶ 228; Collura Decl., Attach. A (Collura Report) ¶ 52.  Frank DiPascali's

criminal trial testimony confirmed the same.  DiPascali stated that the Brokerage Accounts were

used to purchase T-Bills for BLMIS's cash management purposes and not for BLMIS customers.

Cremona Decl., Ex. 6, (DiPascali Testimony) at 4921:7–12, 4930:6–4931:5, 4931:12–4933:13,

4961:15–4962:22 (Dec. 5, 2013); 5344:24–5346:3 (Dec. 10, 2013); 6950:25–6951:9 (Jan. 13,

2014), ECF No. 102-6.

### C.   Dubinsky's Steadfast Opinion Is That the IA Business Did Not Purchase T-Bills *on Behalf of* Any Individual BLMIS Customer

Defendants' scurrilous accusation that Dubinsky perjured himself is based on rhetoric,

not fact. Defendants' Response to Trustee's Stmt. ¶ 19. Dubinsky's report makes clear that he

never hid the fact that BLMIS used IA Business customer money to purchase T-Bills. Dubinsky

Decl., Attach. A (Dubinsky Report) ¶¶ 228, 340, Fig. 52. Dubinsky's report is also quite clear

that "US Treasuries purchased using money from the 703 Account were not purchased *for* the IA

Business Customers" but rather were purchased by the IA Business to earn additional interest on

the cash it received from customers. *Id.* ¶ 228 (emphasis added). Dubinsky's testimony during

the *Nelson* trial was entirely consistent with his report, and even where selectively quoted by

Defendants, confirms that "[t]here was no evidence of treasuries being purchased *for* the IA

business customers, plain and simple." CMF ¶ 62, ECF No. 113 (emphasis added) (quoting

Chaitman Decl. Ex. A (Nelson Tr. 5/8/19 at 132:9–14)); Dubinsky Decl., Attach. A (Dubinsky

Report) ¶¶ 224–40; Brown Decl., Ex. 1 (Trial Testimony of Bruce G. Dubinsky in *Picard v.

Nelson* dated May 8, 2019) at 92:6–21, 128:5–19, 129:9–132:14, 177:16–178:12.

### D.   Defendants' Conjecture Regarding the T-Bills Does Not Create a Disputed Issue of Material Fact

Defendants provide no evidence or expert opinions to counter Dubinsky's analysis or

DiPascali's testimony. Instead, Defendants repeatedly allege that "Madoff purchased T-bills

which, in some instances, were credited to the Defendants' accounts." Defendants' Response to

Trustee's Stmt. ¶¶ 62, 64, ECF No. 112 (citing CMF ¶¶ 75–95).

As set forth above, Dubinsky's analysis shows, and DiPascali's testimony confirms, that

16

none of the T-Bills purchased by the IA Business are the same T-Bills reported on customer statements, including Defendants'. DiPascali described a complicated spreadsheet he created to calculate duration and volume of T-Bills that were not owned but were reported on all customer statements. Cremona Decl., Ex. 6 (DiPascali Testimony) at 5344:24–5346:3 (Dec. 10, 2013); 4930:18–4931:5 (Dec. 5, 2013); Brown Decl., Ex. 2 (DiPascali Testimony) at 4803:23–4804:21 (Dec. 4, 2013). Defendants present no admissible evidence to support their responses.

Even if Defendants were able to rebut Dubinsky's analysis or DiPascali's testimony, which they cannot, they have no claim to credit for T-Bills purchased by BLMIS as a cash management tool. SIPA only covers net equity claims for cash and securities "for the account of such customer." SIPA § 78fff-2(b). In addition, because BLMIS operated a Ponzi scheme, there are no transfers of "real profit" to be credited. So called "legitimate profits" cannot be separated from tainted funds when the money used for "legitimate" trades came from other customers who were defrauded by BLMIS. *See Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) ("It is no answer that some or for that matter all of Phillip's profit may have come from "legitimate" trades made by the corporations. They were not legitimate. The money used for the trades came from investors gulled by fraudulent representations.").

Thus, even if Defendants were somehow able to show that BLMIS purchased a T-Bill, allocated the T-Bill to the Keller Family Trust Account, and that the sale of the T-Bill resulted in a profit for the Keller Family Trust Account—something Defendants did not and cannot show—Defendants are still not entitled to a credit for any such hypothetical transaction under the case law.

17

## IV.    THE TRUSTEE'S MOTION RESTS ON ADMISSIBLE EVIDENCE

### A.    The Plea Allocutions Are Admissible to Prove the Ponzi Scheme's Existence

As set forth in the Motion, guilty pleas and admissions under oath are admissible to prove

the existence of a Ponzi scheme.  *See Nelson*, 610 B.R. at 209–10 ("Criminal plea allocutions are

admissible under the exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a

judgment of a previous conviction and FED. R. EVID. 807's residual exception to hearsay.");

*Legacy*, 603 B.R. at 689 n.8 ("The Court may rely on a plea allocution as evidence to support a

fact").  These admissions support a finding that "there is no genuine disputed issue of fact that

BLMIS was a Ponzi scheme."  *Id.* at 693.  A finding that BLMIS was a Ponzi scheme is

accordingly appropriate on summary judgment and Defendants' objections otherwise have been

overruled numerous times.  *See, e.g.*, *Miller*, 2021 WL 2787604, at *3; *JABA Assocs. LP*, 2021

WL 1112342, at *7; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *8.

### B.    The BLMIS Books and Records Are Admissible Under the Business Records Exception to the Hearsay Rule

Defendants argue that the BLMIS books and records were "permeated with fraud."

Defendants' Response to Trustee's Stmt. ¶ 21.  But business records of an entity engaged in

fraud are routinely admitted into evidence.  In *Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*,

the Eleventh Circuit upheld the admission of records under the business records exception

although the lower court found the business was a Ponzi scheme "not set up to, and did not,

conduct any legitimate business at all."  781 F.3d 1262, 1267–69 (11th Cir. 2015); *see also*

*Kaiser*, 609 F.3d at 575–76 & n.6 (finding fraudulent activity did not preclude admissibility

under business records exception); *In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 454–58

(Bankr. S.D.N.Y. 2007) (admitting debtor's records under business records exception although

Enron was engaged in fraudulent activity); *In re Adelphia Commc'ns Corp.*, No. 02-41729

(REG), 2006 WL 346418, at *1 (Bankr. S.D.N.Y. Feb. 6, 2006) (admitting debtors' books and

records although principals engaged in bank and securities fraud through debtor).  When

considering this exact issue in a nearly identical action, the District Court stated:

> If the defendants' argument were true, a case involving fraud would
> never benefit from expert testimony about the alleged fraud because
> the records at issue were fraudulent.  But a discerning review of the
> records, particularly when supported by bank statements, can show
> the details of money that was received by an enterprise and money
> that was distributed, even if aspects of the records—such as
> securities that were listed but not purchased—were false.

*JABA Assocs. LP.*, 2021 WL 1112342, at *7.  Indeed, the BLMIS books and records have been

admitted into evidence and relied upon multiple times in this liquidation.  *See, e.g.*, *Miller*, 2021

WL 2787604, at *3; *JABA Assocs. LP*, 2021 WL 1112342, at *7; *Lisa Beth Nissenbaum Tr.*,

2021 WL 1141638, at *8; *Epstein Decision* at 7; *Nelson*, 610 B.R. at 223–24; *Picard v. BAM*

*L.P.*, 608 B.R. 165, 172 & n.12, 174–75 (Bankr. S.D.N.Y. 2019); *Blecker v. Picard (In re*

*Bernard L. Madoff)*, 592 B.R. 513, 527–29 (Bankr. S.D.N.Y. 2018), *aff'd,* 605 B.R. 570, 584–87

(S.D.N.Y. 2019), *aff'd*, 830 F. App'x 669 (2d Cir. 2020).

Despite Defendants' concerns about the reliability of certain BLMIS books and records,

they have no problem arguing that the checks and Form 1099s received from BLMIS, which

listed "Bernard L. Madoff," are admissible and dispositive of bank account ownership.[6]  This

Court has previously found similar objections to be wholly "disingenuous."  *Miller*, 2021 WL

2787604, at *3 (stating "It appears the Defendant advocates for admissibility when it suits his

position, and inadmissibility when it does not."); *see also Nelson*, 610 B.R. at 223 ("The

Defendants have not objected to certain BLMIS books and records (i.e., their own BLMIS

---

[6] *See also* Chaitman Decl. Ex. AZ (Declaration of Theresa Pissi, C.P.A. dated January 2, 2018), which is supported
by certain BLMIS books and records as well.

customer statements or BLMIS checks produced by third parties) and have themselves sought to

admit certain of these documents into evidence, even when not produced by third parties.").

Through the reconstruction of BLMIS's fraud described in their expert reports, the experts

reconciled the BLMIS books and records to other internal BLMIS documents and documents

from third parties.  *See In re Int'l Mgmt. Assocs., LLC*, 781 F.3d at 1267–69 (in Ponzi scheme

involving trustee's efforts to recover fictitious profits, court found that the trustee reconciled all

of the underlying documents from the debtor's offices and the information in those documents

substantially matched the records kept by the financial institutions and clients with which the

debtor had transacted).  For example, the experts confirmed the fictitious profits within the Two-

Year Period across various BLMIS documents.  *See Blecker*, 592 B.R. at 536 (finding "the

Trustee confirmed [the records'] accuracy" when "[h]e obtained BLMIS' bank records, cross-

checked them against BLMIS' cash transaction records and records provided by other

customers").

Defendants provide no explanation for why this Court should consider some BLMIS

books and records—and Defendants' interpretation of them—rather than the totality of all the

records reviewed by the experts.

## V.    DEFENDANTS' AFFIRMATIVE DEFENSES HAVE BEEN REPEATEDLY REJECTED

### A.    The Trustee Did Not Forfeit His Claim Against Barbara Keller

Defendants argue that the Trustee cannot maintain his claim against Defendant Barbara

Keller in her capacity as co-Trustee of the Keller Family Trust because she died in June 2019,

and the Trustee did not amend the complaint to substitute her estate although he was notified of

her death via email on June 5, 2019.[7]  However, an email is not sufficient notice under Fed. R.

---

[7] Defendants incorrectly state that Barbara Keller died on June 5, 2019.  She died on April 15, 2019.  *See, e.g.,*

Civ. P. 25(a)(1), which requires a "statement noting death" of a party to be filed and "served on the parties as provided in Rule 5 and on nonparties as provided in Rule 4." Fed. R. Civ. P. 25(a)(3); *see also* Moore's Federal Practice § 25.13[1], [2][b] (3d. ed. 2008) (Fed. R. Civ. P. 25 "implies that the statement noting the death of a party . . . must be a formal, written document that is both served on the appropriate persons and filed with the court").

Indeed, "[t]his requirement of a formal suggestion of death is absolutely necessary to trigger the running of the ninety days. Actual knowledge of the party's death is not sufficient, nor is mention of the death in court proceedings or pleadings." *Stephens v. Am. Risk Mgmt. Inc.*, No. 89 CIV 2999, 1995 WL 479438, at *2 (S.D.N.Y. Aug. 14, 1995) (informal notice by attorney did not trigger the 90–day period, which "can only be triggered by formal service of a suggestion of death" made on the record); *see also Kotler v. Jubert*, 986 F.3d 147, 154 (2d Cir. 2021) (citing *Unicorn Tales v. Banerjee*, 138 F.3d 467, 469 (2d Cir. 1998) (holding that the 90-day limit began running only when properly served with a formal statement of death on the record); *O'Rourke v. Drunken Chicken in NY Corp.,* No. 19 CV 3942 (NGG)(LB), 2021 WL 1394176, at *3 (E.D.N.Y. Feb. 26, 2021) (same, stating that "[a] formal suggestion of death, for the purposes of Rule 25(a), is more than a simple statement that a party has died. . . . Knowledge of the death or a mention of it in a filing is insufficient."); *Mandarino v Mandarino*, 257 F.R.D. 394, 395–96 (S.D.N.Y. 2009) (letter to the court advising it of plaintiff's death was not a properly served statement of death sufficient to trigger the 90-day period).

No formal notice was provided, and the mere mention of her death to counsel relied upon in Defendants' briefing is not sufficient. Defendants' Opp. at 10–11; CMF ¶ 36. Even so, the

---

https://www.legacy.com/us/obituaries/thedesertsun/name/barbara-keller-obituary?pid=192577813, last visited September 1, 2021.

Trustee's claim against the Keller Family Trust remains viable because he also named Defendant

Gerald Keller, as Trustee of the Keller Family Trust.  Under the Federal Rules of Civil Procedure

and California and New York state law, the trustee, rather than the trust itself, is the proper party

to a legal action.  *See* Fed. R. Civ. P. 17(a); *Hershel California Fruit Products Co., Inc. v. Hunt

Foods, Inc.*, 119 F. Supp. 603, 607 (N.D. Cal. 1954); Calif. Code Civil Procedure §§ 367, 369;

N.Y. C.P.L.R. § 1004 (2015).  It is enough that the Trustee named Defendant Gerald Keller as

Trustee of the Keller Family Trust, especially considering that the Keller Family Trust provided

that: "If BARBARA KELLER is unable or unwilling to serve or to continue to serve as Trustee

or as co-Trustee of any portion of the trust estate, GERALD E. KELLER shall serve as sole

Trustee of said portion."  Chaitman Decl. Ex. AD (Declaration of Trust, Article Five, ¶ 1.(a)).

### B.    Defendants Were Initial Transferees of the Fraudulent Transfers

Defendants argue that while the BLMIS checks were made payable to "Gerald Keller,

Trustee," they were never deposited in any bank accounts held by Defendants, but a bank

account held by the Keller International Publishing Company ("Keller Publishing"),[8] which

Defendants argue renders Keller Publishing the initial transferee of the Keller Family Trust

Account transfers.  Defendants' Opp. at 11.  Defendants further assert that pursuant to an oral

agreement with Keller Publishing, Gerald Keller was a "mere conduit" for the transmission of

funds received by Keller Publishing and "exercised no dominion or control" over the

withdrawals made from the BLMIS account in his name.  *Id.* (citing Declaration of Gerald Keller

("Keller Decl.") ¶ 5, ECF No. 114).  However, both Gerald Keller's declaration and deposition

---

[8] Based on available bank records from BLMIS, Collura traced the 13 cash withdrawals of $2,125,000 reflected on the customer statements for the Keller Family Trust Account during the Two-Year Period to two bank accounts— one held by Keller International Publishing LLC and one held by Keller International Publishing Corp.  Stmt. ¶ 123 (citing Collura Decl., Attach. B (Collura Keller Family Trust Report) ¶ 28, Exs. 5–6), ECF Nos. 103-2, 103-6, 103-7.

testimony under oath on September 13, 2017 do not support this conclusion.

The Bankruptcy Code does not define "transferee" or "initial transferee," but many courts, including the Second Circuit, use the "dominion and control" test to define transferee as one having "the right to put the money to one's own purpose," and has "legal dominion over the money [when] it is free to invest that money in lottery tickets or uranium stocks." *In re Finley, Kumble*, 130 F.3d 52, 57 (2d Cir. 1997) (citing *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 891–894 (7th Cir. 1988)); *see also* Order, *Picard v. BAM L.P.*, Adv. Pro. No. 10-04390 (CGM) (Bankr. S.D.N.Y. Dec. 22, 2020), ECF No. 253 ("The initial transferee, in this instance, is the party named on the checks.").

In *Nisselson v. Salim (In re Big Apple Volkswagen, LLC)*, a trustee asserted fraudulent transfer claims against a defendant who argued that she did not control the bank account where the funds were ultimately deposited.  No. 11-11388 (JLG), 2016 WL 1069303, at *15 (Bankr. S.D.N.Y. Mar. 17, 2016).  The defendant also argued she lacked "dominion and control" over the funds and was a "mere conduit" of the transfers.  *Id.*  The Court rejected those arguments, finding: (1) the debtor did not transfer the funds to the defendant for the benefit of a third party, but for her benefit directly, (2) the defendant had the "absolute right to utilize the [t]ransfers in her discretion," and (3) the debtor did not condition or otherwise limit the defendant's rights to use the transferred funds as she pleased.  *Id.* at *17.  The Court explained that the defendant had "unfettered control" over the transferred funds, and the fact that she allegedly chose to "cede[] her control" to her children "does not insulate her from liability."  *Id.*; *see also Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 535 (6th Cir. 2003) (finding that debtors' mother was initial transferee where she "had legal authority to do what she liked with the [transferred] funds" and there was "no evidence of some formal contractual arrangement that required her to obey the

debtors' commands"); *Levey v. Cummins (In re BoxMagic Media Corp.)* No. 08 B 12628, 2012
WL 589652, at *1 (Bankr. N.D. Ill. Feb. 22, 2012) (granting summary judgment against
defendant who had initial control over the funds before endorsing it and choosing to have it
deposited into a bank account held by another party).

Defendants Gerald Keller and until recently, Barbara Keller, as co-Trustees of the Keller
Family Trust were the only individuals legally authorized to receive funds from the Keller
Family Trust Account, which is why each check was addressed to "Gerald Keller, Trustee."
Defendants had "the legal right to put the assets to [their] own use," even if they "cho[se] not to
exercise it." *In re Big Apple Volkswagen, LLC*, 2016 WL 1069303, at *17. In fact, Gerald
Keller admitted during his deposition that only he—neither his financial director, Irvin Levine
nor anyone else at Keller Publishing—made the decisions as to whether to make withdrawals
from BLMIS.[9] Brown Decl., Ex. 3 (Sept. 13, 2017 Deposition of Gerald Keller) ("Keller Dep.
Tr.") at 26:4–6. When asked, "In making a decision to make a withdrawal, was that made by
you?" Gerald Keller answered affirmatively, "Yes." *Id.* Gerald Keller also stated that while
Levine held the BLMIS records for the Keller Family Trust Account, he spent the money in the
manner *he* decided to spend it, testifying that "My job to spend the money; [Levine's] job to
make it work for me." *Id.* at 41:15. In addition, contrary to his declaration, Gerald Keller
testified that he—not his employee, Marianne Jannace—personally endorsed the BLMIS letter
requests and checks. *See id.* at 24:12–17 ("Well, anytime a check would come in, I would
countersign it and deposit it in Keller Publishing."); 25:20–26:2 ("I might be also involved in
sending in a request. I'd have to sign for it, but then he would send it in."); 41:4–15 (answering

---

[9] This briefing is the very first mention of any purported agreement—oral or otherwise—with Keller Publishing
regarding the Keller Family Trust Account. During his deposition, Gerald Keller did not mention this agreement
with Levine, who not only handled Keller Publishing's finances but also some of Gerald Keller's personal finances.
Brown Decl., Ex. 3 (Keller Dep. Tr.) at 22:17–23:8.

affirmatively that he "received the checks" and "signed the checks"). Even in his misleading

declaration, Gerald Keller stated that Jannace could not sign the letter requests for withdrawals

or endorse any BLMIS checks without his explicit permission. Keller Decl. ¶ 5, ECF No. 114.

She could not act alone.

Thus, Gerald Keller had "dominion and control" over the Keller Family Trust Account;

he had the absolute right to use the customer property in his discretion and BLMIS placed no

limits on the Keller Family Trust Account or the withdrawal of funds. Gerald Keller made the

final decisions as to whether to withdraw funds from the Keller Family Trust Account, to draft

and request funds directly from BLMIS, and finally to endorse checks received from BLMIS

over to his own publishing company. His choice not to have the funds deposited in any personal

account, or an account held in the name of the Keller Family Trust, does not absolve him of

initial transferee liability for the fraudulent transfers.[10]

### C.    The Trustee is Entitled to Prejudgment Interest

Defendants argue prejudgment interest is inappropriate because they "did nothing

wrong." Defendants' Opp. at 32. But that is not the relevant inquiry. As this Court previously

stated when similarly situated defendants made the same argument: "Although it may be true that

Defendants were not responsible for BLMIS' fraud, the purpose of prejudgment interest is to

make the Plaintiff whole rather than to punish Defendants or to provide Plaintiff with a

windfall." *BAM L.P.*, 624 B.R. at 63 (citing *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130,

139 (2d Cir. 2000)). This Court has discretion in granting prejudgment interest and setting the

---

[10] For a BLMIS account that Defendants claim they received no personal benefit from, Defendants Gerald and
Barbara Keller provided an affidavit from their accountant stating that they, and not Keller Publishing, paid
$1,051,767 in taxes on reported gains, interest, and dividend income from the Keller Family Trust Account from
1997 through 2002. CMF ¶¶ 122–123 (citing Chaitman Decl. Ex. AZ (Declaration of Theresa Pissi, C.P.A., dated
January 2, 2018, ¶ 5 & Ex. A).

interest rate, "and absent a sound reason to deny prejudgment interest, such interest should be awarded." *Epstein Decision* at 10 (citing *In re 1031 Tax Grp.*, 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010)); *see also BAM L.P.*, 624 B.R. at 63.

Defendants have done nothing to distinguish themselves from the defendants whose cases have come before them where this Court awarded prejudgment interest. *See Miller*, 2021 WL 2787604, at *12 (awarding prejudgment interest from the date of the complaint where defendant "recovered his principal investment" from his IRA when "[o]ther victims have not been so fortunate"); *JABA Assocs. LP*, 2021 WL 1112342, at *19 (awarding prejudgment interest from the date of the complaint to "compensate[] the Trustee for the loss of the use of the Two-Year Transfers for the years that this litigation has lasted, and [to] reduce[] the profits to the defendants from having withheld the funds); *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *18 (same); *Epstein Decision* at 10 (awarding prejudgment interest from the date of the complaint where "[a]ll of Defendants' legal arguments in opposition to this summary judgment motion were previously decided and law of the case"); *BAM L.P.*, 624 B.R. at 63 (awarding prejudgment interest from the date of the complaint where defendants went to trial on an issue that was previously resolved by this Court in *Nelson*). The same factors that militated in favor of prejudgment interest there are present here; perhaps even more so since these Defendants continued to litigate in the face of clearly binding precedent. Further, "[t]he purposes of a liquidation proceeding under [SIPA] include to distribute customer property and . . . otherwise satisfy net equity claims of customers *as promptly as possible after the appointment of a trustee in such liquidation proceeding*." *In re Bernard L. Madoff Inv. Sec. LLC*, 2021 WL 3854761, at *18 (citing 15 U.S.C. § 78fff(a)(1), (a)(1)(B)) (internal quotation marks omitted) (emphasis

added).  Defendants have held onto other customers' property for over a decade and it must be

returned in addition to prejudgment interest.

## <u>CONCLUSION</u>

For the foregoing reasons, the Trustee respectfully requests that the Court grant summary

judgment on Count One of the Trustee's Complaint and enter an order: (1) avoiding the fictitious

profits that BLMIS transferred to Defendants within the Two-Year Period ($1,896,148); (2)

awarding the Trustee prejudgment interest from the Filing Date through the date of entry of

judgment at the rate of 4%; and (3) requiring Defendants to return such transfers or the value

thereof to the Trustee.


Dated: September 1, 2021
      New York, New York

*/s/ Nicholas J. Cremona*
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*