# EXHIBIT 2

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4              v.                            10 Cr. 228 (LTS)

 5   DANIEL BONVENTRE,
     JEROME O'HARA,
 6   GEORGE PEREZ,
     ANNETTE BONGIORNO,
 7   JOANN CRUPI,
                                              Jury Trial
 8                   Defendants.

 9   ------------------------------x
                                              New York, N.Y.
10                                            December 4, 2013
                                              9:00 a.m.
11
     Before:
12
             HON. LAURA TAYLOR SWAIN
13
                                              District Judge
14

15
             APPEARANCES
16

17   PREET BHARARA
          United States Attorney for the
18        Southern District of New York
     MATTHEW L. SCHWARTZ
19   RANDALL W. JACKSON
     JOHN T. ZACH
20        Assistant United States Attorneys

21

     GORDON MEHLER
22   SARAH LUM
          Attorneys for Defendant O'Hara
23

24   LARRY H. KRANTZ
     KIMBERLY A. YUHAS
25        Attorneys for Defendant Perez
```

```
 1              APPEARANCES
 2

    ANDREW J. FRISCH
 3  GARY VILLANUEVA
    AMANDA BASSEN
 4       Attorney for Defendant Bonventre

 5

    ROLAND G. RIOPELLE
 6  MAURICE H. SERCARZ
    ARIELLE PANKOWSKI
 7       Attorneys for Defendant Bongiorno

 8
    ERIC R. BRESLIN
 9  MELISSA S. GELLER
         Attorneys for Defendant Crupi
10
```

1  point of cash.  We put through tickets that would indicate the
2  purchase of a big portfolio of stock, sometimes 35, sometimes
3  50 different issues.  Then we would put an option put and an
4  option call into position, which was the hedge to the
5  portfolio.  That stayed in the customer's account for a number
6  of days, sometimes a number of weeks or months.
7        Then, on Bernie's direction, we would reverse course
8  and put through tickets that would sell all those stocks in
9  that portfolio and tickets that would take off the option
10 positions that were hedging the portfolio.  At that point we
11 would take the cash, because at that point that's all that's in
12 the customer's account, and we would put through tickets to
13 purchase treasury bills because he could not be in a cash
14 position over a certain period of time.  He instructed us to
15 buy treasury bills or put through tickets to buy treasury bills
16 whenever we were out of the market.  That's the positions that
17 you saw in the DTC report.
18       That was done many times a year, but certainly at the
19 end of every quarter.  The run we were looking at is a
20 September 30, 2005 run, which would be the end of the third
21 quarter, which is why we were in treasury bills, because we
22 were, quote, out of the market.
23 Q.  As part of this strategy, the IA business would do what was
24 referred to as going into the market and purport to buy
25 securities, is that right?

```
 1   A.  Correct.
 2   Q.  Were you really buying securities?
 3   A.  No.
 4   Q.  Was this all just on paper?
 5   A.  Yes.
 6   Q.  Then, when you got out of the market, the IA business would
 7   purport to buy treasury securities, right?
 8   A.  That's correct.
 9   Q.  Did you really buy treasury securities?
10   A.  No.
11   Q.  Were those all fake?
12   A.  Yes.
13   Q.  When that activity happened, would there be communications
14   sent to customers?
15   A.  Every time.
16   Q.  Are you familiar with the term "trade confirmation"?
17   A.  Sure.
18   Q.  Would trade confirmations be sent to customers?
19   A.  Yes.
20   Q.  Would that reflect the fake trades that you just described?
21   A.  Exactly that.
22   Q.  Would account statements that we have looked at be sent to
23   customers?
24   A.  Yes.
25   Q.  Would those account statements reflect the fake trading
```