**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |
| In re: | |
| BERNARD L. MADOFF | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. 10-04539 (CGM) |
| Plaintiff, | |
| v. | |
| THE GERALD AND BARBARA KELLER FAMILY TRUST, GERALD E. KELLER, individually and in his capacity as Trustee of the Gerald and Barbara Keller Family Trust, BARBARA KELLER, individually and in her capacity as Trustee of the Gerald and Barbara Keller Family Trust, | |
| Defendants. | |

**SECURITIES INVESTOR PROTECTION CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THE TRUSTEE'S OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

<u>**TABLE OF CONTENTS**</u>

<u>**PAGE**</u>

TABLE OF AUTHORITIES ...........................................................................ii

SIPC's Standing as Party in Interest and Statutory Intervenor .................................. 1

Preliminary Statement ..................................................................................... 1

Argument ....................................................................................................... 3

I.     SIPC Protects "Customer Property" Entrusted to Broker-Dealers
       Such as BLMIS.......................................................................................... 3

       A.  The history and principles underlying SIPA ..................................... 3

       B.  The broad definition of "customer property" under SIPA ................. 6

II.    The JPMorgan Accounts Belonged to BLMIS, and the
       Funds in the JPMorgan Accounts Were Customer Property ................. 9

III.   SIPA's Broad Protection of Customer Property Renders
       Irrelevant Any Doubts Regarding Ownership of the
       JPMorgan Accounts.............................................................................. 15

CONCLUSION................................................................................................ 19

## TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE**

*In re Adler, Coleman Clearing Corp.*,
    204 B.R. 99 (Bankr. S.D.N.Y. 1997) .................................................................. 6

*Ahammed v. Sec. Inv'r Prot. Corp. (In re Primeline Sec. Corp.)*,
    295 F.3d 1100 (10th Cir. 2002) ................................................................... 16-17

*De La Pena Stettner v. Smith (In re IFS Fin. Corp.)*,
    669 F.3d 255 (5th Cir. 2012) ........................................................................ 17

*Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*,
    286 B.R. 109 (Bankr. D. Minn. 2002), *aff'd*, Civ No. 02-4775 RHK,
    2003 WL 1824937 (D. Minn. Apr. 7, 2003),
    *aff'd*, 371 F.3d 397 (8th Cir. 2004) ............................................................. 7, 8

*Focht v. Heebner (In re Old Naples Sec., Inc.)*,
    223 F.3d 1296 (11th Cir. 2000) .................................................................. 5, 16

*Gibbs ex rel. Est. of Gibbs v. CIGNA Corp.*,
    440 F.3d 571 (2d Cir. 2006) ......................................................................... 11

*In re Bernard L. Madoff Inv. Sec. LLC*,
    424 B.R. 122 (Bankr. S.D.N.Y. 2010), aff'd, 654 F.3d 229 (2d Cir. 2011) ....... 17

*In re Bernard L. Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011) .......................................................................... 17

*In re Bernard L. Madoff Inv. Sec. LLC*,
    No. 20-1333, 2021 WL 3854761 (2d Cir. 2021) ............................................. 2, 5

*In re Hanover Square Sec.*,
    55 B.R. 235 (Bankr. S.D.N.Y. 1985) ............................................................... 4

*In re John Dawson & Assocs. Inc.*,
    289 B.R. 654 (Bankr. N.D. Ill. 2003) ............................................................... 8

*In re Motors Liquidation Co.*,
    590 B.R. 39 (S.D.N.Y. 2018), *aff'd*, 943 F.3d 125 (2d Cir. Nov. 19, 2019) ....... 14

*In re New Times Sec. Servs., Inc.*,
    371 F.3d 68 (2d Cir. 2004) ........................................................................... 4-5

## TABLE OF AUTHORITIES

**CASES** (continued)                                                                                                  **PAGE**

*Peloro v. United States*,
    488 F.3d 163 (3d Cir. 2007) ................................................................................. 8

*Perez v. Terrestar Corp. (In re Terrestar Corp.)*,
    No. 16 Civ. 1421 (ER), 2017 WL 1040448 (S.D.N.Y. Mar. 16, 2017),
    *appeal dismissed*, No. 17-1117 (2d Cir. June 7, 2017)...................................... 14

*Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016) ...................................................... 13, 16-17

*Picard v. BAM L.P. (In re Bernard L. Madoff Inv. Sec. LLC)*
    624 B.R. 55 (Bankr. S.D.N.Y. 2020) ........................................................... 13-15

*Picard v. Gettinger (In re Bernard L. Madoff Inv. Sec. LLC)*,
    976 F.3d 184 (2d Cir. 2020) ............................................................................. 17

*Picard v. JABA Assocs. LP (In re Bernard L. Madoff Inv. Sec. LLC)*,
    No. 20-cv-03836, 2021 WL 1112342 (S.D.N.Y. Mar. 24, 2021),
    *appeal docketed*, 21-872 (2d Cir.) ................................................................ 13-15

*Picard v. Legacy Capital, Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    603 B.R. 682 (Bankr. S.D.N.Y. 2019) ................................................................ 14

*Picard v. Lisa Beth Nissenbaum Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
    No. 20-cv-03140, 2021 WL 1141638, (S.D.N.Y. Mar. 24, 2021).................. 13-15

*Picard v. Nelson (In re Bernard L. Madoff Inv. Sec. LLC)*,
    610 B.R. 197 (Bankr. S.D.N.Y. 2019) ........................................................... 14-15

*Picard v. RAR Entrepreneurial Fund, Ltd.*,
    No. 20-cv-1029, 2021 WL 827195, (S.D.N.Y. Mar. 3, 2021)............................ 14

*Picard v. Stanley T. Miller*,
    No. 10-04921, 2021 WL 2787604, (Bankr. S.D.N.Y. July 2, 2021)............. 14-15

*Rosenman Fam., LLC v. Picard*,
    395 F. App'x 766 (2d Cir. 2010) ...................................................................... 10

*SEC v. F.O. Baroff Co.*,
    497 F.2d 280 (2d Cir. 1974) ............................................................................... 4

# TABLE OF AUTHORITIES

CASES (continued)                                                                                                PAGE

*Sec. Inv'r Prot. Corp. v. Barbour,*
    421 U.S. 412 (1975) ......................................................................................... 4, 6

*Sec. Inv'r Prot. Corp. v. Austin Sec., Inc.,*
    No. 05-1144 DEM (Bankr. E.D.N.Y. Nov. 20, 2007) ...................................... 8, 9

*Stafford v. Giddens (In re New Times Sec. Servs., Inc.),*
    463 F.3d 125 (2d Cir. 2006) .............................................................................. 6

## STATUTES

Securities Investor Protection Act, as amended, 15 U.S.C. §

78ccc(a) ................................................................................................................. 9
78eee(d) ................................................................................................................ 1
78fff-3 ................................................................................................................... 6
78fff-2(c)(3) ............................................................................................ 16, 18, 19
78kkk(g) ............................................................................................................... 5
78*lll*(4) ....................................................................................................... 6, 7, 9, 16
78*lll*(4)(E) .......................................................................................................... 7, 10

United States Bankruptcy Code, 11 U.S.C. §

548(a)(1)(A) ......................................................................................................... 19

## OTHER AUTHORITIES:

17 C.F.R. § 240.15c3-3 ......................................................................................... 6

Exchange Act Release No. 34-9856, 37 Fed. Reg. 25,224 (1972) ........................... 5, 6

*Hearings Before the Subcomm. on Consumer Prot.* & *Fin. of the
    Comm. on Interstate* & *Foreign Commerce*, 95th Cong.,
    1st Sess. on H.R. 8331, Serial No. 95-77 (Aug. 1–3, 1977) .................................. 7

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069 (2002) ...... 5-6

*Report of the Special Study of the Securities Markets of the Securities and
    Exchange Commission*, H.R. Doc. No. 95, pt. 1 (1st Sess. 1963) ...................... 3-4

## <u>TABLE OF AUTHORITIES</u>

<u>OTHER AUTHORITIES (continued)</u>                                    <u>PAGE</u>

*Study of Unsafe and Unsound Practices of Brokers and Dealers,*
    *Report and Recommendations of the Securities and*
    *Exchange Commission,* H.R. Doc. No. 92-231 (1971) ..................................... 3, 5

### SIPC's Standing as Party in Interest and Statutory Intervenor

The Securities Investor Protection Corporation ("SIPC") is a party in interest and a statutory intervenor in all liquidations under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–78*lll* ("SIPA").[1]  *See* SIPA § 78eee(d).

### Preliminary Statement

Investor confidence is essential to the health and success of U.S. securities markets.  SIPA and complementary Securities and Exchange Commission ("SEC") customer protection rules help bolster that confidence by ensuring that customers receive the maximum protection possible in the event of the failure and liquidation of their broker-dealer.  Since 1960 and until his arrest, Bernard L. Madoff ("Madoff") operated a broker-dealer registered with the SEC, first as a sole proprietorship and, since 2001, as a limited liability company, Bernard L. Madoff Investment Securities LLC ("BLMIS" or "Debtor").  Since SIPA's enactment in 1970, Madoff's broker-dealer has been a member of SIPC.

BLMIS's customers – whether they opened their accounts in 1970, 2001, or 2008 – relied on this federal scheme of customer protection when they entrusted property to BLMIS as a registered broker-dealer and SIPC member.  Following Madoff's arrest in December 2008, this Court entered an order placing BLMIS into liquidation under SIPA for the protection of those customers.  Correct allocation of "customer property" in accordance with SIPA and other applicable statutory provisions, rules, and regulations is necessary both to meet the justified

---

[1] For convenience, further references to SIPA shall omit "15 U.S.C."

expectations of BLMIS's customers, and to demonstrate that customer protection under the carefully constructed federal scheme is not just protection in theory, but protection in fact.

Irving H. Picard, as the trustee ("Trustee") for the substantively consolidated liquidation of BLMIS and Madoff, brought this action against the Defendants in order to avoid and recover fraudulent transfers of fictitious profits, that is, customer property entrusted to BLMIS that was stolen and used in furtherance of its Ponzi scheme ("stolen customer property").[2] As explained below, SIPA defines customer property broadly to include all property entrusted by customers to a broker-dealer for investment in the securities markets. SIPA further empowers a trustee to recover fraudulent transfers of customer property in order to remediate a lapse in the broker-dealer's custodial function. This enforcement of a failed broker-dealer's custodial function builds trust in the securities markets.

When Madoff formed the LLC in 2001, he transferred all of BLMIS's assets, including custody of customer property, ownership of its accounts, and the customer relationships themselves, to the LLC. For purposes of SIPA, the SIPC member BLMIS, which had been a sole proprietorship, became an LLC. Further, the August 25, 2006 Form ADV confirms that the investment advisory business was registered as the LLC prior to the two-year transfers at issue in this case. Thus, the Trustee has standing to pursue fraudulent transfers of customer property entrusted to

---

[2] *In re Bernard L. Madoff Inv. Sec. LLC*, No. 20-1333, 2021 WL 3854761, at *2 (2d Cir. Aug. 30, 2021) ("The customers funds were commingled in BLMIS's bank account. When customers withdrew their 'profits' or principal, BLMIS paid them from this commingled account. As a result, each time BLMIS transferred payments to a customer, it was money stolen from other customers.") (internal citation omitted).

BLMIS in order to protect BLMIS customers who have not yet received their net equity, or their "stolen customer property."

**ARGUMENT**

## I.    SIPA Protects "Customer Property" Entrusted to Broker-Dealers Such as BLMIS

The Defendants argue that the property they entrusted to BLMIS for investment in the securities markets should not fall under the scope of SIPA's protections.  They seek this outcome even though they received more customer property than they were entitled to receive.  In other words, the Defendants received other customers' funds or "stolen customer property", but argue that SIPA does not empower the Trustee to recover that "stolen customer property."  However, as explained below, this argument fails as a matter of law, undermines faith in the securities markets, and is contrary to the purpose and scope of SIPA.

### A.    The history and principles underlying SIPA

As described in the *Study of Unsafe and Unsound Practices of Brokers and Dealers, Report and Recommendations of the Securities and Exchange Commission*, H.R. Doc. No. 92-231, at 11–12 (1971) ("*SEC Study*"), in the years leading to the enactment of SIPA, the securities industry paid little attention to the creation of brokerage back-office systems and appropriate staffing of back-offices necessary for maintaining accurate records in real time.  As a consequence, broker-dealers suffered from "an absence of control of securities traffic to provide assurance for prompt deliveries of securities and remittances of payments."  *Id.* at 11.  Furthermore, until the enactment of SIPA, broker-dealers could use without

3

restraint credit balances of customers, including free credit balances to which the customer was entitled upon demand. *Id.* at 16 (citing to *Report of the Special Study of the Securities Markets of the Securities and Exchange Commission*, H.R. Doc. No. 95, pt. 1, at 393–98 (1st Sess. 1963)). Broker-dealers increasingly used their customer business to leverage their proprietary business, putting customer property at risk for their own gain. *Id.* at 51–53.

Because an undue portion of the industry's assets was invested in securities, broker-dealers themselves were vulnerable to market downturn. *Id.* at 18. By the late 1960s, these circumstances and changes in market conditions converged, resulting in a breakdown in many firms of the control over the possession, custody, location, and delivery of securities, and the payment of money obligations to customers. *Id.* at 11–12.

The subsequent collapse of multiple broker-dealers led to the enactment of SIPA in 1970, which was designed to, *inter alia,* "restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers." *Sec. Inv'r Prot. Corp. v. Barbour*, 421 U.S. 412, 415 (1975). Congress sought to insulate public customers, and the financial markets, from the adverse effects of the failure of a broker-dealer. *See In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985); *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 281 (2d Cir. 1974) ("The object of [SIPA], and the function of [SIPC], is to protect the public customers of securities dealers from suffering the consequences of financial instability in the brokerage industry"); *In re New Times Sec. Servs., Inc.*, 371 F.3d

68, 84 (2d Cir. 2004) (identifying SIPA's "statutory goals" as "promoting investor confidence and providing protection to investors . . . ," and noting that "remedial legislation should be construed broadly to effectuate its purposes" (internal citation omitted)); *Focht v. Heebner (In re Old Naples Sec., Inc.)*, 223 F.3d 1296, 1300 (11th Cir. 2000) ("Congress passed SIPA in 1970 . . . to protect investors when their brokerages fail. The statute established the SIPC to maintain a fund for investor protection, oversee the liquidation of brokerages in a manner similar to bankruptcy proceedings, and, under certain circumstances, reimburse customers of a failed brokerage."); *In re Bernard L. Madoff Inv. Sec. LLC*, No. 20-1333, 2021 WL 3854761, at *2 (2d Cir. Aug. 30, 2021) ("Congress enacted SIPA in 1970 to protect customers of bankrupt broker-dealers.").

SIPA's statutory scheme is "necessary to a comprehensive program of investor protection consistent not only with express congressional intent but with the high standards of financial responsibility which must prevail in the brokerage community." *See* Exchange Act Release No. 34-9856, 37 Fed. Reg. 25,224 at 25,225 (1972). SIPA required the SEC to compile a list of unsafe and unsound practices in the securities industry, along with recommendations to eliminate them. *See SEC Study* at 27–30, 42; SIPA § 78kkk(g). One Rule adopted pursuant to this mandate was SEC Rule 15c3-3, also known as the "Customer Protection Rule,"[3] which required the segregation of certain customer property. *See SEC Study* at 30; *see also* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1070

---

[3] Exchange Act Release No. 34-9856, 37 Fed. Reg. 25,224 (1972).

(2002) ("The rule, which can be loosely described as a 'segregation rule,' divides the customer and proprietary activities of the firm."); 17 C.F.R. § 240.15c3-3.

Thus, a primary objective of SIPA, and one of the principal responsibilities of a SIPA trustee, is to protect customers of a failed broker-dealer in a SIPA liquidation proceeding. *See Barbour*, 421 U.S. at 421; *In re Adler, Coleman Clearing Corp.*, 204 B.R. 99, 105–06 (Bankr. S.D.N.Y. 1997). SIPA advances this purpose "by according those claimants in a SIPA liquidation proceeding who qualify as 'customers' of the debtor priority over the distribution of 'customer property.' Each customer shares ratably in this fund of assets to the extent of the customer's net equity at the time of filing." *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006) (internal citations omitted). In the event the fund of customer property proves insufficient to make the customers whole, SIPC provides protection – subject to statutory limitations – from the SIPC Fund. SIPA § 78fff-3.

Together, SIPA and SEC Rule 15c3-3 serve the objective of SIPA "that customer funds and securities not be exposed to risk of loss through broker-dealer insolvency." *See* 37 Fed. Reg. 25,224 at 25,225.

## B.    The broad definition of "customer property" under SIPA

The definition of customer property in SIPA § 78*lll*(4)[4] is expansive and mirrors the customer protection rules that govern broker-dealer operations. Indeed,

---

[4] SIPA § 78*lll*(4) provides, in pertinent part,

> The term "customer property" means cash and securities (except customer name securities delivered to the customer) at any time

Congress amended § 78*lll*(4) in 1978 to add subpart (E) (originally subpart (D)), to create protections where property had not been properly segregated, or cash deposits had not been made by the broker-dealer as required by applicable laws, rules, and regulations – specifically SEC Rule 15c3-3. *See Hearings Before the Subcomm. on Consumer Prot. & Fin. of the Comm. on Interstate & Foreign Commerce*, 95th Cong., 1st Sess. on H.R. 8331, Serial No. 95-77, at 113–14 (Aug. 1–3, 1977) (Report to the Board of Directors of the Securities Investor Protection Corporation of the Special Task Force to Consider Possible Amendments to the Securities Investor Protection Act of 1970).

Accordingly, courts interpret "customer property" broadly. For example, in the SIPA liquidation proceeding of MJK Clearing, Inc., all of the cash in the possession of the debtor on the filing date, including money derived from stock loan transactions with a plaintiff-creditor, constituted customer property under SIPA § 78*lll*(4)(E). *See Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 129–32 (Bankr. D. Minn. 2002), *aff'd*, Civ No. 02-4775 RHK, 2003 WL 1824937 (D. Minn. Apr. 7, 2003), *aff'd*, 371 F.3d 397 (8th Cir. 2004). In

---

received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted. The term "customer property" includes –

* * *

(E)    any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers, unless the trustee determines that including such property within the meaning of such term would not significantly increase customer property.

that case, because there was a shortfall in the fund of customer property, the court

applied what it characterized as the "plain meaning" of the customer property

definition as:

> [A] means to rectify any actions taken by, or with respect to, the debtor, that results in a shortfall. *This clearly entails looking to the debtor's other, non-customer accounts such as banking accounts containing funds . . . to remedy the shortfall for the protection of customers.*

*Id.* at 132 (emphasis added).

Similarly, in *Peloro v. United States*, 488 F.3d 163 (3d Cir. 2007), bearer

bonds held by a debtor broker-dealer for an investor's account that had been seized

by the FBI prior to being deposited into the account were deemed customer

property, because, under SIPA, customer property includes not only securities

actually allocated to customer accounts but "any cash and securities at any time

received, acquired, or held" for the securities accounts of a customer. *Id.* at 170,

173–74 (quotation marks and alterations in original omitted).

In *In re John Dawson & Assocs. Inc.*, 289 B.R. 654 (Bankr. N.D. Ill. 2003), the

Court held that an investor could share in the fund of customer property where

losses resulted from the broker-dealer's unauthorized trading of cash or securities

from the investor's account, because customer property includes "the proceeds of

any such property transferred by the debtor, including property unlawfully

converted." *Id.* at 662.

In *Sec. Inv'r Prot. Corp. v. Austin Sec., Inc.*, No. 05-1144 DEM (Bankr.

E.D.N.Y. 2007), the Court approved the trustee's allocation of the following to the

fund of customer property: (a) assets in brokerage accounts of a former principal who had engaged in unauthorized trading; (b) proceeds from the sale of the former principal's luxury watches and of his wife's jewelry; (c) proceeds from sale of the principal's television set; and (d) the debtor's proprietary brokerage accounts and clearing deposit. With the exception of proceeds realized from the surrender of the life insurance policies owned by the debtor and trail commissions owed to the debtor and received by the trustee after commencement of the liquidation, all property recovered by the trustee from the debtor and third parties was determined to "constitute property which was, or should have been, held by the Debtor for the account of its customers; the proceeds of such property; or substitutes therefor."[5]

## II.   The JPMorgan Accounts Belonged to BLMIS, and the Funds in the JPMorgan Accounts Were Customer Property

SIPC membership, and thus SIPC protection, arises from a broker-dealer's registration with the SEC, without regard to the corporate form of the broker-dealer. SIPA § 78ccc(a). Likewise, SIPC protection covers customer property entrusted to that SIPC member, regardless of whether the SIPC member maintains custody of the customer property in accordance with federal law, and even if such property is unlawfully converted. SIPA § 78*lll*(4).

The evidence in this case demonstrates that Madoff registered BLMIS as a broker-dealer with the SEC in January 1960, first as a sole proprietorship and then,

---

[5] Trustee's Investigatory & Final Reports and Account at 10–18, *Sec. Inv'r Prot. Corp. v. Austin Sec., Inc.*, No. 05-1144 DEM (Bankr. E.D.N.Y. Oct. 22, 2007) (ECF No. 90); *accord,* Order Granting Motion for Approval of Trustee's Investigatory & Final Reports & Account & For Assignment of Judgment to SIPC, at 1–2, *Austin Sec., Inc.*, No. 05-1144 DEM (Bankr. E.D.N.Y. Nov. 20, 2007) (ECF No. 89).

beginning in January 2001, as an LLC. *See* Dubinsky Report, ECF No. 104-1 at ¶¶ 36-40.[6] BLMIS accepted cash for the securities accounts of customers and pooled these funds in the JPMorgan accounts for use in the Ponzi scheme. *See Id.* at ¶¶ 340-41. Thus the funds in the JPMorgan accounts constituted customer property precisely because BLMIS received, acquired, and took possession and control of property entrusted by customers to the firm for investing in the securities markets, and then deposited the entrusted funds in the JPMorgan accounts. *See Rosenman Fam., LLC v. Picard*, 395 F. App'x 766, 769 (2d Cir. 2010) (holding that investor "funds are subject to SIPA" when the investor "intend[ed] to invest in the investment advisory fund of Bernard L. Madoff Investment Securities LLC ('BLMIS')" and the funds were "deposit[ed] in BLMIS' JPMorgan Chase Bank account... for that purpose."). Under SIPA § 78*lll*(4)(E), the JPMorgan account funds are customer property even if BLMIS failed to segregate them in compliance with federal law and regulations.

When Madoff converted his business from a sole proprietorship to an LLC, the LLC filed an "SEC Form BD" document to inform the SEC (and SIPC, through the SEC) of the nominal change in corporate structure. SEC Form BD, ECF No. 102-3. The brokerage firm's SEC registration number (8-8132) - used to identify brokerage firms in the SEC's records, and which has been assigned to the firm since its registration with the SEC in January 1960 - remained the same. The SEC Form

---

[6] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. The Gerald and Barbara Keller Family Trust*, Adv. Pro. No. 10-04539 (CGM) (Bankr. S.D.N.Y).

BD affirmed that all assets and liabilities related to the sole proprietorship were transferred to the limited liability company. *See Id.* at pages 11-12. In other words, the customer property entrusted to the sole proprietorship and held in the JPMorgan accounts, became entrusted to BLMIS as an LLC. The existence of the SIPC member Madoff used to operate his ongoing Ponzi scheme continued throughout, but ultimately under the veil of the LLC.

The Defendants seek to evade these facts, and the legal conclusions to be drawn from them. For example, the Defendants presently assert that "[t]he term 'BLMIS' as defined by the Trustee is misleading." Defendants' Opposition and Response to Trustee's Statement of Material Facts, ECF No. 112. But the Defendants are bound by the admission in their Answer that they had an account with the LLC. *See* Answer, ECF No. 40 at introductory paragraph (defining "BLMIS" as "Bernard L. Madoff Investment Securities LLC"); ¶7 (admission that "Defendant Trust holds a BLMIS account…"); ¶¶ 20 and 36 (Defendants note that "… BLMIS was not formed until 2001…").[7] And, Gerald Keller certainly was not misled, as he sent 26 letters to "Bernard L. Madoff Investment Securities LLC" from 2004 – 2008. *See* Keller Decl., Ex. 4, ECF No. 114-4, at AMF00058397-423.

The Defendants also argue that Madoff's fraudulent investment advisory business - including the Defendants' account and the JPMorgan accounts through which the fraud ran - was never transferred to the LLC. They mistakenly rely on

---

[7] *See Gibbs ex rel. Est. of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout this litigation.").

the assertion that on the 2001 SEC Form BD, Madoff did not check the box stating that BLMIS would engage in investment advisory services. *See, e.g.*, Defendants' Memorandum of Law, ECF No. 111 at Page 25. But in 2001, Madoff had no registered investment advisory business to report to the regulators -- the investment advisory business was not registered until August 25, 2006. *See* BLMIS Form ADV dated August 25, 2006, Chaitman Dec. Ex. BA, ECF No. 115-53, [PUBLIC0003729-762]. And when Madoff *did* register his investment advisory services, *he did so as the LLC*, not as a sole proprietor. *Id.* at PUBLIC0003729 (providing "Bernard L. Madoff Investment Securities LLC" as the "Primary Business Name," "full legal name," and "Name under which you primarily conduct your advisory business"); PUBLIC0003733 (identifying "Form of Organization" as "Limited Liability Company (LLC)"); PUBLIC0003738 (listing "broker-dealer" as "Other Business Activity"); PUBLIC0003751 (identifying Bernard Lawrence Madoff as "Sole Member/Principal" since January 2001, and Peter Barnett Madoff as "Director of Trading/Chief Compliance Officer" since June 1969); PUBLIC0003753 (filing no information under "Other Business Names"); and PUBLIC0003756-59 (providing information regarding a NASD censure and fine on the regulatory action disclosure reporting page).

Accordingly, even if there was a doubt in 2001 whether the LLC succeeded to the investment advisory business, the investment advisory business was indisputably registered as the LLC on August 25, 2006 – *several months before* the two-year transfers at issue here were made.

The Defendants cite *Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016), to assert that the Trustee does not have standing here. However, the Bankruptcy Court in *Avellino* specifically rejected the same argument -- namely that the "[defendants'] investments in BLMIS never became customer property because they invested with BLMIS in its capacity as an investment advisor rather than as a broker-dealer." *Id.* at 110. Noting that "SIPA authorizes the trustee to avoid and recover transfers of customer property," the Bankruptcy Court held that "[t]he funds that the Defendants voluntarily deposited with BLMIS became customer property subject to SIPA." *Id.* Accordingly, it allowed the Trustee to proceed with claims to avoid transfers of customer property made after the change in corporate structure in 2001. *Id.* at 95.

Similarly, the Defendants' arguments regarding ownership of the JPMorgan accounts have been rejected repeatedly in this liquidation. *See Picard v. JABA Assocs. LP (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 20-cv-03836, 2021 WL 1112342, at *9–10 (S.D.N.Y. Mar. 24, 2021) ("[T]he Trustee has standing to bring this avoidance and recovery action because the IA Business and the JPMorgan Accounts were property of the LLC."), *appeal docketed*, 21-872 (2d Cir.); *Picard v. Lisa Beth Nissenbaum Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 20-cv-03140, 2021 WL 1141638, at *9–10 (S.D.N.Y. Mar. 24, 2021) (same); *Picard v. BAM L.P. (In re Bernard L. Madoff Inv. Sec.)*, 624 B.R. 55. 61 (Bankr. S.D.N.Y. 2020) (holding that "the [JPMorgan accounts] are property of BLMIS," funds in the accounts are customer property, and "the monies paid to Defendants from those

13

[JPMorgan accounts] must be turned over to the Trustee"); *Picard v. Nelson (In re Bernard L. Madoff Inv. Sec. LLC)*, 610 B.R. 197, 215–16 (Bankr. S.D.N.Y. 2019) (holding that "[t]he Trustee has demonstrated Article III standing," and "the evidence demonstrated that BLMIS owned the [JPMorgan accounts], the source of the Two-Year Transfers"); *Picard v. Stanley T. Miller (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 10-04921, 2021 WL 2787604 (Bankr. S.D.N.Y. July 2, 2021); *but see Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-1029, 2021 WL 827195, at \*12 (S.D.N.Y. Mar. 3, 2021) (denying summary judgment on the issue of "whether the transfer consisted of an interest of the debtor in property").

Defendants have proffered no evidence, or reason, to revisit the determination of this issue by the Courts in the *Nelson*, *BAM L.P.*, *JABA*, *Nissenbaum* and *Miller* cases. *See Nelson,* 610 B.R. at 237 ("The prior decisions within this SIPA proceeding constitute law of the case . . . .") (citing *Picard v. Legacy Capital, Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*, 603 B.R. 682, 700 (Bankr. S.D.N.Y. 2019)); *In re Motors Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018) (stating that the law of the case doctrine applies across adversary proceedings within the same bankruptcy case), *aff'd*, 943 F.3d 125 (2d Cir. 2019); *Perez v. Terrestar Corp. (In re Terrestar Corp.)*, No. 16 Civ. 1421 (ER), 2017 WL 1040448, at \*4 (S.D.N.Y. Mar. 16, 2017) (applying the law of the case doctrine because "[a]dversary proceedings filed in the same bankruptcy case do not constitute different cases"), *appeal dismissed*, No. 17-1117 (2d Cir. June 7, 2017).

III.     **SIPA's Broad Protection of Customer Property Renders Irrelevant Any Doubts Regarding Ownership of the JPMorgan Accounts**

The JPMorgan accounts held customer property that was entrusted to a sole proprietorship, and then entrusted to an LLC.  There was a nominal change in the broker-dealer's corporate structure, but no change in *custody* of customer property. As stated in BLMIS's 2001 SEC Form BD, and as held in *JABA*, *Nissenbaum*, *Nelson*, *BAM* and *Miller*, ownership of the JPMorgan accounts was transferred to the LLC, and BLMIS was the holder of the JPMorgan accounts throughout the relevant time period.  Further, the August 25, 2006 Form ADV confirms this fact. When Madoff finally registered the investment advisory business with the SEC, he did so as the LLC.  And again, he did so at least several months before the two-year transfers were made in this case.  *See* BLMIS Form ADV, Chaitman Dec. Ex. BA, ECF No. 115-53 at PUBLIC0003729-762.

Even if this Court had doubts regarding account ownership, however, SIPA and the securities laws would still govern ownership of, and dominion over, the account funds.  A SIPC member's non-compliance with laws and regulations does not remove customer property from SIPA's protective scheme.  If it were otherwise, any fraudster could shield his "stolen customer property" from a SIPA Trustee simply by running the scheme through a bank account held in a different name, or transferring the "stolen customer property" to a new, separate and distinct legal entity.

Once the Defendants entrusted their property to a SIPC-member broker-dealer for investment purposes, it became "customer property," and Madoff's

machinations could not change that legal designation.  SIPA protection applied and continues to apply until the "stolen customer property" is recovered, pooled, and distributed to customers on a pro rata basis – from wherever the "stolen customer property" is located, and by or through whomever was the custodian of the "stolen customer property."  *See, e.g.*, *Ahammed v. Sec. Inv'r Prot. Corp. (In re Primeline Sec. Corp.)*, 295 F.3d 1100, 1107 (10th Cir. 2002) ("Whether a claimant deposited funds 'with the debtor' does not depend simply on to whom claimants made their checks payable.  The relevant inquiry is whether the brokerage firm actually received, acquired or possessed Claimants' property." (citing *In re Old Naples Sec.*, 223 F.3d at 1302)); *In re Old Naples Sec., Inc.* 223 F.3d at 1302 (stating that SIPA protection focuses not solely on "[w]hether a claimant deposited cash with the debtor," but also on "whether there was actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation" (internal quotes and citations omitted)).

By defining "customer property" broadly in SIPA § 78*lll*(4), and by explicitly authorizing the recovery of misappropriated or "stolen customer property" in SIPA § 78fff-2(c)(3), SIPA effectively renders the issue of account ownership irrelevant to the final analysis.  In other words, the central issue becomes not account ownership but rather property rights – specifically whether the property in the accounts was customer property.  *Cf. Avellino*, 557 B.R. at 108–09 (stating that while "[t]he customer property invested with BLMIS never became property of Madoff or BLMIS

16

under applicable non-bankruptcy law . . . ," under SIPA "the Trustee can recover the transfers of customer property by BLMIS . . . ").

Indeed, the Second Circuit's recent analysis of transfers of customer property focused upon the transferee's property rights in the funds entrusted to BLMIS. *Picard v. Gettinger (In re Bernard L. Madoff Inv. Sec. LLC)*, 976 F.3d 184, 198 (2d Cir. 2020) ("It follows that regardless of whether the defendants-appellants had securities entitlements as a result of the account statements, they did not have property rights to the values in excess of principal reflected there"); *id.* at 201 ("BLMIS never traded in securities and, as a result, never generated any legitimate profits. The defendants-appellants therefore had no rights to the transfers . . . .").

The focus on customer property rights is all the more important when a fraudster is involved. A court that focuses on a fraudster's shell game only gives the fraudster a chance to determine the final outcome of his fraudulent scheme. *Cf. In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 238 (2d Cir. 2011) (reasoning that the Trustee's Net Investment Method of calculating a customer's net equity entitlement to property "refuses to permit Madoff to arbitrarily decide who wins and who loses" (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 140 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011)).

On the other hand, a court that focuses on the identification and return of customer property effectively neutralizes the fraudster's scheming, obfuscation, and redirection. *See De La Pena Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255, 262–64 (5th Cir. 2012) ("[R]egardless of its legal title, [the debtor] had the ultimate

power to transfer funds to others, who included the [defendants].  That it obscured

its power to transfer in an intentionally complicated corporate structure suggests

that control is decisive, and that legal title is irrelevant where, as here, a debtor

organization has taken care to mask its activities through fictional divisions.").

BLMIS controlled these funds and made the transfers at issue in this case.

Madoff's misuse of customer property, whether placing it in a personal account or

under his mattress, should not hinder the Trustee's goal of recovering "stolen

customer property" and maximizing protection for all victims of the scheme.  If the

good faith recipients of other customers' money had no "property rights" to the

money they received, and a fraudster created a fictional story to justify those

fraudulent transfers in the first place, then the law requires the return of the

misappropriated funds.

Indeed, the entire purpose of this litigation is to effectuate that fundamental

goal of SIPA: protection of the custodial function of an insolvent broker-dealer by

securing the return of "stolen customer property" entrusted to the broker-dealer.

SIPA promotes that outcome by: (1) defining customer property in broad terms,

*supra* Section I(B), and (2) creating a broad recovery mechanism that maximizes

customer estate recoveries, notwithstanding state law. SIPA § 78fff-2(c)(3).

Finally, to the extent the Defendants assert that Madoff perpetrated the

fraud as sole proprietor, even after creating an LLC, the express language of SIPA,

the Protective Decree and the Bankruptcy Code all make clear that the District

Court properly entered an order substantively consolidating the non-debtors into

18

the debtor's bankruptcy estate.  More importantly, the Court's orders did not create or assign any powers to recover "customer property" that the SIPA Trustee did not already possess by Federal statute.  The SIPA Trustee had, pursuant to the Protective Decree and SIPA, the power to pursue customer property fraudulently conveyed by BLMIS.  The Substantive Consolidation Order merely specified that the SIPA Trustee should exercise those statutory powers to recover customer property upon substantive consolidation of the Madoff estate into the SIPA liquidation proceeding.  The SIPA Trustee's authority to pursue customer property conveyed by BLMIS and Madoff flows from the Protective Decree entered by the District Court – which created a SIPA liquidation proceeding and appointed Mr. Picard as SIPA trustee for the "business" operated by Madoff as the broker-dealer member of SIPC – regardless of the form that business may have taken.

Accordingly, the two year transfers in furtherance of the Ponzi scheme run through BLMIS were transfers of customer property by a SIPA debtor within the meaning of SIPA § 78fff-2(c)(3) and 11 U.S.C. § 548 (a)(1)(A), and the Trustee has standing to avoid and recover such transfers for the benefit of customers with valid claims.

## CONCLUSION

For the reasons set forth above, and in the Trustee's Motion for Summary Judgment, Reply and Opposition to the Defendants' Cross-Motion for Summary Judgment, SIPC respectfully requests that the Court enter a Judgment in favor of the Trustee, on behalf of the consolidated estate of BLMIS and Madoff, in the full

amount of the Avoidable Transfers, plus prejudgment interest from December 11,

2008 to the date of entry of such judgment, and for the Trustee's costs.

Dated: September 1, 2021                    Respectfully submitted,
        Washington, D.C.

                                            */s/ Kenneth J. Caputo*
                                            KENNETH J. CAPUTO
                                            General Counsel

KEVIN H. BELL
Senior Associate General Counsel

NATHANAEL S. KELLEY
Associate General Counsel

NICHOLAS G. HALLENBECK
Assistant General Counsel

SECURITIES INVESTOR
PROTECTION CORPORATION
1667 K St., NW, Suite 1000
Washington, D.C. 20006
Telephone: (202) 371-8300
Email: kcaputo@sipc.org
Email: kbell@sipc.org
Email: nkelley@sipc.org
Email: nhallenbeck@sipc.org