**MANDATE**

### UNITED STATES COURT OF APPEALS
### FOR THE
### SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 24th day of September, two thousand twenty.

Before:     John M. Walker, Jr.,
            José A. Cabranes,
            Robert D. Sack,
                    *Circuit Judges.*

_____

In Re: Bernard L. Madoff Investment Securities LLC

_____

Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff,

    Plaintiff - Appellee,

v.

Emanuel Gettinger, South Ferry Building Company, Abraham Wolfson and Zev Wolfson, United Congregations Mesora, South Ferry #2 LP, Turtle Cay Partners, Coldbrook Associates Partnership, individually and in its capacity as general partner of Turtle Cay Partners, The Estate of Marianne Lowrey, James Lowrey, capacity as general partner of Turtle Cay Partners, capacity as personal rep of Estate Of Marianne Lowrey, capacity as trustee for Marianne B. Lowrey Trust, & capacity as Successor Partner Coldbrook Associates Partner, Aaron Wolfson,

    Defendants - Appellants,

Abraham Adeff, Goldie Appelgrad, Simcha Appelgrad, David G. Aviv, B.F.& W. Realty Company, Miriam Beren, Zelda Elbaum, Razel Faskowitz, Roslyn Gettinger, Morris Goldstein, Samuel Goldstein, Mr. Israel Grossman, Kalman Halpern, Zevi Harris, Joseph Katz, Bessie Kaufman, David Kaufman, A. Trust, A.N. Trust, A.O.N. Trust, AA. Trust, Aaron Trust, Abraham Trust, Abraham N. Trust, Al. Trust, Alisa Trust

**JUDGMENT**

Docket Nos. 19-429(L), 19-443(CON), 19-501(CON), 19-510(CON)

**MANDATE ISSUED ON 11/23/2020**

Defendants,

Securities Investor Protection Corporation,

Intervenor.

_____

The appeals in the above captioned case from judgments of the United States District Court for the Southern District of New York were argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgments of the district court is AFFIRMED.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

19-0429-bk(L)
*In re: Bernard L. Madoff Investment Securities LLC*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2019

(Argued:  March 31, 2020      Decided:  September 24, 2020)

Docket No. 19-0429-bk(L)

_____

In Re: Bernard L. Madoff Investment Securities LLC

_____

IRVING H. PICARD, Trustee for the liquidation of BERNARD L. MADOFF INVESTMENT
SECURITIES LLC, and BERNARD L. MADOFF,
*Plaintiff-Appellee,*

v.

EMANUEL GETTINGER, SOUTH FERRY BUILDING COMPANY, ABRAHAM WOLFSON and
ZEV WOLFSON, UNITED CONGREGATIONS MESORA, SOUTH FERRY #2 LP, TURTLE
CAY PARTNERS, COLDBROOK ASSOCIATES PARTNERSHIP, individually and in its
capacity as general partner of TURTLE CAY PARTNERS, THE ESTATE OF MARIANNE
LOWREY, JAMES LOWREY, in his capacity as general partner of TURTLE CAY
PARTNERS, personal representative of the ESTATE OF MARIANNE LOWREY, trustee
for MARIANNE B. LOWREY TRUST, and SUCCESSOR PARTNER COLDBROOK
ASSOCIATES PARTNER, AARON WOLFSON,
*Defendants-Appellants,*

ABRAHAM ADEFF, GOLDI APPELGRAD, SIMCHA APPELGRAD, DAVID G. AVIV, B.F. &
W. REALTY COMPANY, MIRIAM BEREN, ZELDA ELBAUM, RAZEL FASKOWITZ, ROSLYN
GETTINGER, MORRIS GOLDSTEIN, SAMUEL GOLDSTEIN, MR. ISRAEL GROSSMAN,
KALMAN HALPERN, ZEVI HARRIS, JOSEPH KATZ, BESSIE KAUFMAN, DAVID
KAUFMAN, A. TRUST, A.N. TRUST, A.O.N. TRUST, AA. TRUST, AARON TRUST,
ABRAHAM TRUST, ABRAHAM N. TRUST, AL. TRUST, ALISA TRUST,
*Defendants,*

*19-0429-bk(L)*
*In re: Bernard L. Madoff Investment Securities LLC*

SECURITIES INVESTOR PROTECTION CORPORATION,
*Intervenor.*

─────────────────────────

Before:        WALKER, CABRANES, and SACK, *Circuit Judges*.

After the massive Ponzi scheme perpetrated by Bernard L. Madoff

collapsed, the plaintiff-appellee, Irving H. Picard, was appointed pursuant to the

Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"), as trustee for

the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS").  The

Act established a priority system whose purpose is to make customers of failed

brokerages whole before other general creditors.  Where, as here, customer

property is insufficient to satisfy customers' claims, the trustee may recover

("claw back") property transferred by the debtor that would have been customer

property but for the transfer if and to the extent that the transfer is void or

voidable under the provisions of the Bankruptcy Code.  15 U.S.C. § 78fff–2(c)(3).

However, the provisions of the Bankruptcy Code apply only to the extent that

they are consistent with SIPA.  *Id.* § 78fff(b).  The trustee brought these four

consolidated actions against the defendants-appellants in the United States

District Court for the Southern District of New York in an attempt to recover

transfers of money that the defendants-appellants had received from BLMIS in

excess of their principal investments.  The defendants-appellants are customers

2

*19-0429-bk(L)*
*In re: Bernard L. Madoff Investment Securities LLC*

of BLMIS who were unaware of the fraud but nevertheless profited from it by

receiving what they thought were legitimate profits, when in fact the funds were

other customers' money.  The district court granted summary judgment in favor

of the trustee.  The question presented on appeal is whether the defendants-

appellants may prevent the trustee from clawing back their "profits" by invoking

an affirmative defense provided by the Bankruptcy Code.  We conclude that the

defense, as the defendants-appellants seek to apply it, would conflict with SIPA

and therefore does not apply in this SIPA liquidation.  Accordingly, the

judgment of the district court is

AFFIRMED.

SEANNA R. BROWN (David J. Sheehan, Amy
E. Vanderwal, *on the brief*), Baker &
Hostetler LLP, New York, NY, *for Plaintiff-
Appellee.*

RICHARD A. KIRBY (Beth-Ann Roth, *on the
brief*), RK Invest Law, PBC, Washington,
DC, *for Defendants-Appellants.*

HELEN DAVIS CHAITMAN, Chaitman LLP,
*for Amici Curiae good faith defendants in
similar adversary proceedings.*

KENNETH J. CAPUTO (Kevin H. Bell,
Nathanael S. Kelley, *on the brief*), Securities

3

Investor Protection Corporation,
Washington, DC, *for Intervenor*.


SACK, *Circuit Judge*:

This appeal concerns transfers of fictitious profits in a Ponzi scheme. The

defendants-appellants were customers of Bernard L. Madoff Investment

Securities LLC ("BLMIS") who, at the time BLMIS collapsed, had received funds

from the brokerage in excess of their principal investment. These funds —

unbeknownst to the defendants-appellants at the time — were, as is

characteristic of Ponzi schemes, other customers' investments, not legitimate

profits from securities trading activity.

BLMIS's bankruptcy trustee, Irving H. Picard, filed these four consolidated

actions in the United States District Court for the Southern District of New York

to recover those funds pursuant to the fraudulent transfer provisions of the

Bankruptcy Code, 11 U.S.C. § 548. Both parties moved for summary judgment.

The district court granted the trustee's motion and denied the defendants-

appellants' cross-motion.

The defendants-appellants appeal. They argue that they are entitled to

retain the transfers pursuant to the affirmative defense provided for in § 548(c),

4

which permits a transferee who takes an interest of the debtor in property "for

value and in good faith" to retain the transfer to the extent of the value given.

The defendants-appellants' good faith is not in dispute; the issue is whether the

transfers of funds to them from BLMIS were "for value."

The defendants-appellants contend that the transfers were "for value" for

two reasons. First, they assert that the transfers satisfied their purported

property rights to the fictitious profits. Second, they argue that the transfers

satisfied their contract-based claims against BLMIS. The defendants-appellants

also argue that the fraudulent transfer statute bars the trustee from recovering

because it limits a trustee's reach to only those transfers made within the two

years prior to the filing of a bankruptcy petition.

For the reasons set forth below, we conclude that, to the extent § 548(c)

applies in this liquidation under the Securities Investor Protection Act ("SIPA"),

the transfers were not "for value" for purposes of that provision, and that

recovery would not violate the two-year limitation in § 548(a)(1). We therefore

affirm the judgment of the district court.

5

# BACKGROUND

This case arises out of the infamous Ponzi scheme[1] perpetrated by Bernard

L. Madoff, which has been the subject of a wide variety of decisions of this court,

*see, e.g.*, *Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411 (2d Cir. 2014); *In re*

*BLMIS*, 721 F.3d 54 (2d Cir. 2013); *In re BLMIS*, 654 F.3d 229 (2d Cir. 2011), and

courts of the Southern District of New York.

*1. Madoff's Fraud*

Because the facts are well documented across many pages of Federal

Reporters, few require repeating here.  In brief, then, Bernard L. Madoff's BLMIS

was a securities broker-dealer that operated a fraudulent investment advisory

business for many years.  It collected funds from brokerage customers and

purported to invest those funds on behalf of the customers, but in fact never

invested the money.  Instead, it sent its customers fabricated monthly or

quarterly account statements (hereinafter "account statements") showing

---

[1] According to the U.S. Securities and Exchange Commission, "[a] Ponzi scheme is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. . . .  The schemes are named after Charles Ponzi, who duped thousands of New England residents into investing in a postage stamp speculation scheme back in the 1920s."  S.E.C. "Fast Answers," https://www.sec.gov/fast-answers/answersponzihtm.html; *see also Cunningham v. Brown*, 265 U.S. 1, 7 (1924) (describing the "remarkable criminal financial career of Charles Ponzi").

fictitious trading activity and returns that had never actually been generated.

When customers sought to withdraw money, including fictitious profits reflected

on their account statements, from their accounts, BLMIS satisfied those requests

or demands with the proceeds of other customers' investments.  The scheme

collapsed in December 2008,[2] when infusions of new capital were insufficient to

support the withdrawals that customers sought.

On December 11, 2008, Madoff was arrested on federal criminal charges

related to the scheme.  The same day, the U.S. Securities and Exchange

Commission ("SEC") filed a civil action in the United States District Court for the

Southern District of New York alleging that Madoff and BLMIS had operated an

unlawful Ponzi scheme.  The Securities Investor Protection Corporation ("SIPC")

then stepped in and filed an application for an order granting BLMIS customers

protection under SIPA.

*2. The Securities Investor Protection Act ("SIPA")*

SIPA was enacted in 1970 to protect customers of failed brokerage firms.

In a SIPA liquidation, "a fund of 'customer property,' separate from the general

---

[2] Incidentally or otherwise, at the time, the U.S. economy was in the midst of the "Great
Recession."  *See, e.g.,*
https://www.federalreservehistory.org/essays/great_recession_of_200709.

estate of the failed broker-dealer, is established for priority distribution

exclusively among customers." *In re BLMIS*, 654 F.3d at 233.  "The customer

property fund consists of cash and securities received or held by the broker-deal

on behalf of customers." *Id.*  It is distributed to customers ratably based on their

net equity.  15 U.S.C. § 78fff–2(c)(1)(B).  Net equity is, for present purposes, the

sum which would have been owed by the debtor to the customer if the debtor

had liquidated on the filing date, minus any indebtedness of the customer to the

debtor on that date.  *See id.*, § 78lll(11).

When a district court grants an application for a protective decree under

SIPA, it appoints a trustee to administer the liquidation of the failed brokerage

and removes the liquidation proceeding to bankruptcy court.  *Id.* § 78eee(b)(3),

(b)(4).  "Whenever customer property is not sufficient to pay in full [customers'

net equity claims], the trustee may recover any property transferred by the

debtor which, except for such transfer, would have been customer property if

and to the extent that such transfer is voidable or void under the provisions of

[the Bankruptcy Code]." *Id.* § 78fff–2(c)(3).  Recovered property is treated as

customer property and distributed ratably among customers based on their net

equity.  *See id.*

8

*19-0429-bk(L)*
*In re: Bernard L. Madoff Investment Securities LLC*

### 3. The BLMIS Liquidation Pursuant to SIPA

In the civil action against BLMIS and Madoff, the district court granted

SIPC's application for a protective order under SIPA.  It then followed the

procedure described above, appointing Irving H. Picard ("Picard" or the

"trustee") as trustee and removing the liquidation proceeding to bankruptcy

court.

The BLMIS customer property fund was insufficient to satisfy its

customers' net equity claims.  The trustee therefore set out to recover, under §

78fff–2(c)(3), certain funds that would have been customer property had BLMIS

not transferred them to others.  Upon recovery, the funds would be added to the

customer property fund and distributed ratably to those customers with net

equity claims.  Customers have net equity claims if, at the time that BLMIS

collapsed, they had not withdrawn any money from their accounts or had

withdrawn less than their principal.  In these circumstances, a customer's claim

equals the difference between the customer's principal and any funds received

from BLMIS.  *See id.* § 78lll(11).

Other customers have no net equity claims, or net equity claims of zero.

These customers, at the time that BLMIS collapsed, had withdrawn more money

9

from their accounts than they had deposited. Because BLMIS never actually invested customers' money or generated legitimate profits, these customers had received not only a return of their principal investment but also fictitious "profits" that were in fact other customers' money. The defendants-appellants are several customers who received such fictitious profits.

### 4. The Instant Action

In 2010, Picard, the plaintiff-appellee, commenced these four consolidated actions against the defendants-appellants in the United States District Court for the Southern District of New York, seeking to claw-back transfers of money that the defendants-appellants had received from BLMIS in excess of their principal investments. The trustee sought to recover these funds under two provisions of the Bankruptcy Code: 11 U.S.C. § 548(a)(1)(A), often referred to as the "actual fraud" provision, and 11 U.S.C. § 548(a)(1)(B), or the "constructive fraud" provision. Together, the provisions are often referred to as the "fraudulent transfer provisions."

Section 548(a)(1)(A) authorizes a trustee to claw back "any transfer of an interest of the debtor in property" made "with actual intent to hinder, delay, or defraud" creditors. Section 548(a)(1)(B) authorizes a trustee to recover transfers if

the debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer and the debtor received less than "a reasonably equivalent value in exchange for such transfer." These authorizations apply to transfers made within the two years prior to the date on which the bankruptcy petition was filed. 11 U.S.C. § 548(a)(1).

If a trustee establishes a *prima facie* case under the fraudulent transfer provisions, then he or she is entitled to recovery unless the transferee can establish an affirmative defense. One affirmative defense applies whether a trustee seeks to recover under § 548(a)(1)(A) or (a)(1)(B). It permits a transferee who "takes for value and in good faith"[3] to retain the transfer to the extent of the value given. 11 U.S.C. § 548(c). "Value" is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor." *Id.* §§ 548(d)(2)(A). Another defense applies to actions under the constructive fraud provision, § 548(a)(1)(B), but not the actual fraud provision. It establishes a safe harbor that shields from recovery, *inter alia*, transfers "made in connection with a securities contract" and "settlement payment[s]." *Id.* § 546(e).

---

[3] It is undisputed that the defendants-appellants here acted in good faith and had no knowledge of Madoff's fraud.

*5. The Defendants-Appellants' Affirmative Defenses*

It is undisputed that BLMIS made the transfers at issue with "actual intent to hinder, delay, or defraud . . . creditors." *Id.* § 548(a)(1)(A). The defendants-appellants contended that the trustee nevertheless failed to state a claim.[4] They argued that the trustee could not recover the transfers because the funds: (1) were "settlement payment[s]" or "transfer[s] made . . . in connection with a securities contract," *id.* § 546(e), and (2) had been received in exchange for "value," *see id.* § 548(c).

The district court (Jed S. Rakoff, *Judge*) had considered these issues previously in a separate proceeding to which the defendants-appellants were not parties. *See In re BLMIS*, 476 B.R. 715 (S.D.N.Y. 2012) (hereinafter "*Greiff*"). *Greiff* underlies much of the procedural history and the substantive issues in this case. It therefore warrants explication here.

*6. The* Greiff *Decision*

In *Greiff*, as here, the trustee sought to recover under §§ 548(a)(1)(A) and

---

[4] The defendants-appellants first raised this argument in a motion to withdraw the reference to the bankruptcy court. *See, e.g.,* South Ferry Building Co., et al. Appellants' Memorandum of Law in Support of Motion to Withdraw the Reference, 11-cv-9447, DE 1 (Dec. 22, 2011). The defendants-appellants later moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). In our discussion here, we attempt to streamline these events for the sake of clarity.

548(a)(1)(B) transfers from BLMIS to the defendants — customers who had

received "profits," which of course were fictitious, in addition to their principal.

The defendants, as here, asserted that the trustee had failed to state a claim.

First, they argued that the transfers were "made in connection with a

securities contract" or were "settlement payment[s]" under § 546(e) and thus

could not be recovered under the constructive fraud provision. *See Greiff*, 476

B.R. at 718–19. The court agreed. It explained that a securities contract is, among

other things, "a master agreement" that provides for "the purchase, sale, or loan

of a security." *Id.* at 720 (quoting 11 U.S.C. § 741(7)). The agreements that each

BLMIS customer signed in order to open an account with BLMIS, the court

observed, did just that. *Id.* (stating that the agreements "authorize[d] Bernard L.

Madoff . . . to buy, sell and trade in stocks"). The agreements, the court

concluded, "clearly qualify as securities contracts," and the transfers were "made

in connection with [those contracts]." *Id.*

The court agreed also that the transfers were "settlement payments" under

§ 546(e). It explained that the Second Circuit's "extremely broad" definition of a

settlement payment includes a "transfer of cash or securities made to complete a

securities transaction." *Greiff*, 476 B.R. at 721 (brackets omitted) (quoting *Enron*

13

*Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011)).

This definition, the court reasoned, includes the transfers because the defendants

had contracted to invest money in return for access to an investment strategy and

the fruits that it bore; the transfers, from the defendants' perspective, were those

fruits and thus "completed securities transactions." *Id.* That BLMIS never

invested in securities and the transfers did not actually complete securities

transactions did not alter the court's conclusion because it determined that

§ 546(e) protects "the legitimate expectations of customers . . . even when the

stockbroker is engaged in fraud." *Id.* at 722. Accordingly, the court concluded

that the trustee had failed to state a claim under § 548(a)(1)(B), leaving only the

trustee's claims under the actual fraud provision, § 548(a)(1)(A).

Second, the defendants argued that the trustee's claims fared no better

under the actual fraud provision because they took the transfers "for value." *Id.*

at 723–24. As noted above, under § 548(d)(2)(A), "value" is defined as property

or the securing or satisfaction of a debt. "Debt" is defined as "liability on a claim."

11 U.S.C. § 101(12). And the term "claim" means the "right to payment," or the

"right to an equitable remedy for breach of performance if such breach gives rise

to a right to payment." *Id.* § 101(5).

14

The defendants argued that the account statements and the fictitious

positions therein evidenced "securities entitlements" or a right to payment that

was satisfied by the transfers.  *See Greiff*, 476 B.R. at 724.  The argument hinges on

the New York Uniform Commercial Code ("NYUCC"), which states in relevant

part that "a person acquires a security entitlement if a securities intermediary . . .

indicates by book entry that a financial asset has been credited to the person's

securities account."  *See id.* (quoting NYUCC § 8–501(b)(1)).  Alternatively, the

defendants argued that they had a "claim for benefit-of-the-bargain damages."

*Greiff*, 476 B.R. at 724.  They argued that, as a result of the fraud, they had a claim

against BLMIS for the amounts reflected in the account statements.   *Id.* at 725.

BLMIS discharged that liability, the defendants argued, when it made the

transfers.  *Id.*

    The court disagreed.  It explained that the "for value" defense applies

when there is "commensurability of consideration," that is, where payments to

the investor resisting claw back are "offset by an equivalent benefit to the estate."

*Id.* (quoting *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995)).  The defendants'

receipt of fictitious profits, the court stated, does not meet that test.  The court

observed that "every circuit court to address this issue has concluded that an

*19-0429-bk(L)*
*In re: Bernard L. Madoff Investment Securities LLC*

investor's profits from a Ponzi scheme, whether paper profits or actual transfers, are not 'for value.'"  *Id.*

The defendants argued that, notwithstanding this general rule, they were entitled to retain the transfers because they were creditors, not equity investors. *See id.* at 726.  The district court was unpersuaded.  It stated that "it [wa]s a distinction without a difference" because the defendants had "faced the same risks as equity investors," and, "[l]ike equity investors, rather than contracting for a definite return on their investment, defendants contracted for another to use its best efforts to try to generate a profit."  *Id.*  The court therefore concluded that "the general rule that investors in a Ponzi scheme d[o] not receive their profits 'for value,'" also applies to "this unusual kind of 'creditor,' whose claims to profits depend upon enforcing fraudulent representations."  *Id.* at 726–27.

Finally, the court determined that "even if the defendants had enforceable claims for the amounts reported on their brokerage statements, a conclusion that satisfaction of those [debts] gave 'value' to [BLMIS] would conflict with SIPA." *Id.* at 727.  SIPA, the court explained, differs from general bankruptcy law because it "choose[s] among creditors" and prioritizes customers.  *Id.*  The court reasoned that:

16

> To allow defendants, who have no net equity claims, to
> retain profits paid out of customer property on the
> ground that their withdrawals satisfied creditor claims
> under state law would conflict with the priority system
> established under SIPA by equating net equity and
> general creditor claims.  Indeed, . . . courts typically find
> that satisfaction of antecedent debt provides value to the
> debtor because the fraudulent transfer provisions [§§
> 548(a)(1)(A) and (a)(1)(B)] do not try "to choose among"
> a debtor's creditors.  SIPA, however, prioritizes net
> equity claims over general creditor claims.  Moreover,
> SIPA specifically connects its priority system to its
> incorporation of the fraudulent transfer provisions [§§
> 548(a)(1)(A) and (a)(1)(B)], empowering a trustee to
> invoke those provisions "whenever customer property is
> not sufficient to pay in full" the priority claims.  A
> presumption that the fraudulent transfer provisions [§§
> 548(a)(1)(A) and (a)(1)(B)] do not choose between
> creditors should not and logically cannot apply to
> frustrate the Trustee's efforts to satisfy priority claims.

*Id.* at 727–28 (citations omitted).  Thus, the court concluded, even if the account

statements did evidence antecedent debts or liabilities on claims, the transfers

still were not "for value" because such a conclusion would conflict with the

priority system established by SIPA.

### 7. Dismissal of the § 548(a)(1)(B) Claims

The district court, in the case before us, largely adopted the rulings and

reasoning in *Greiff.  See In re BLMIS*, 499 B.R. 416, 418 n.1, 421 n.4 (S.D.N.Y. 2013).

Thus, it dismissed the trustee's claims under the constructive fraud provision,

§ 548(a)(1)(B), on the grounds that the § 546(e) exception for transfers "made in connection with a securities contract" or "settlement payment[s]" applied. *Id.* at 418 n.1. And the court allowed the trustee's claims under the actual fraud provision, § 548(a)(1)(A), to proceed because it had concluded that the transfers were not "for value" under § 548(c). *Id.* at 430. In allowing the § 548(a)(1)(A) claims to go forward, the court also rejected an argument that § 548(a)(1) prohibited the trustee from considering transfers made more than two years prior to the filing of the petition when calculating the amount of money subject to recovery. *See id.*

Following the district court's decision, the defendants-appellants moved for an interlocutory appeal. The district court denied the motion and returned the proceeding to the bankruptcy court.

*8. The Motions for Summary Judgment*

Back in the bankruptcy court, the parties stipulated to material facts and each moved for summary judgment. On March 22, 2018, the bankruptcy court issued a report and recommendation that the district court grant the trustee's motion for summary judgment and deny the defendants-appellants' cross-motion. The case was assigned to United States District Court Judge Paul A.

Engelmayer.

The defendants-appellants filed timely objections to the report and recommendation. They argued that they were entitled to summary judgment because they had received the transfers "for value" under § 548(c). They argued also that recovery was barred by § 548(a)(1), which limits a trustee's avoidance and recovery powers to those transfers made within the two years prior to the filing of a bankruptcy petition.

The trustee responded that the district court already had decided these issues in its decision dismissing the § 548(a)(1)(B) claims and allowing the § 548(a)(1)(A) claims to proceed. That decision, the trustee argued, was law of the case and precluded the defendants-appellants from relitigating the issues when there had been no intervening change of controlling law.

The defendants-appellants argued that the law indeed had changed. Specifically, they contended that this court's intervening decision in *Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411, 418 (2d Cir. 2014) (hereinafter "*Ida Fishman*") compelled the conclusion that the transfers were "for value." And they argued that the Supreme Court's decision in *California Public Employees' Retirement System v. ANZ Securities, Inc.*, 137 S. Ct. 2042 (2017) (hereinafter

19

19-0429-bk(L)
In re: Bernard L. Madoff Investment Securities LLC

"*CalPERS*") made clear that allowing the trustee to recover the transfers would

violate the two-year limitation in § 548(a)(1).

    *a.*    Ida Fishman *and the "For Value" Defense*

    In *Ida Fishman*, we affirmed the judgment of the Southern District of New

York (Jed S. Rakoff, *Judge*) dismissing the trustee's claims under the constructive

fraud provision, § 548(a)(1)(B), on the grounds that the transfers at issue were

"made in connection with a securities contract" or "settlement payment[s]" and

thus "shielded by § 546(e) from clawback."  *Ida Fishman*, 773 F.3d at 414–15.  We

concluded that the district court had not erred, and we therefore affirmed its

judgment.  The decision did not apply to the defendants-appellants because they

were not parties to the proceeding that reached us on appeal.[5]

    In affirming the dismissal, we agreed with the district court that the

account documents customers executed to open an account with BLMIS fell

within the Bankruptcy Code's broad definition of a securities contract.  *Id.* at 418–

19.  And, but for those contracts, there would be no basis for a customer to make

deposits or withdrawals and therefore no basis for the transfers.  *Id.* at 418–19.

---

[5] *Ida Fishman* reached this court after the district court dismissed the trustee's
constructive fraud claims in dozens of suits and certified the dismissals as final
judgments.  773 F.3d at 417.

The transfers thus were made in connection with a securities contract. *Id.* at 421.

We also agreed that the transfers fit within the Bankruptcy Code's broad

definition of a "settlement payment" and thus were shielded from claw back by

§ 546(e). *Id.* at 422–23.

In objecting to the bankruptcy court's report and recommendation, the

defendants-appellants argued that our analysis in *Ida Fishman* established a new

rule: that courts must rely on the Bankruptcy Code — and only the Bankruptcy

Code — to determine whether transfers are shielded from recovery by an

affirmative defense.  They asserted that because we relied only on the

Bankruptcy Code to determine whether the transfers in *Ida Fishman* were

shielded by § 546(e), the district court also was required to consider only the

Bankruptcy Code to determine whether the transfers at issue here were "for

value" under § 548(c).  According to the argument, the district court therefore

could not consider the priority system established by SIPA that protects

customers before general creditors when determining whether the transfers were

"for value" under § 548(c).

On *de novo* review, the district court was unpersuaded.  It said that the

defendants-appellants' argument "overreads" the *Ida Fishman* decision because

*19-0429-bk(L)*
*In re: Bernard L. Madoff Investment Securities LLC*

the issues of whether a transfer is a "settlement payment" under § 546(e) and

whether a transfer is "for value" under § 548(c) are "distinct matters of statutory

construction, and very different."  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv.*

*Sec. LLC*, 596 B.R. 451, 467 (S.D.N.Y. 2019).  "That BLMIS's transfers were

'settlement payments' . . . does not logically suggest that defendants gave 'value'

within the meaning of a separate statutory provision. . . ."  *Id.*  Accordingly, the

court decided that *Ida Fishman* was not a basis for reconsidering the district

court's prior decision that the transfers were not "for value" under § 548(c).

> b.   CalPERS *and the 11 U.S.C. § 548(a)(1) Two-Year Limitation*

The defendants-appellants also argued that the two-year limitation in the

fraudulent transfer statute, § 548(a)(1), barred recovery.  The statute authorizes

trustees to recover fraudulent transfers "made or incurred on or within 2 years

before the date of the filing of the [bankruptcy] petition."  11 U.S.C. § 548(a)(1).

The defendants-appellants contended that the trustee's claims violated the two-

year limitation because, in calculating the amount of money subject to recovery,

the trustee had considered transfers that the defendants-appellants had received

more than two years prior to the filing of the petition.

The defendants-appellants' exposure under the fraudulent transfer

22

provisions was calculated as follows:

> First, amounts transferred by [BLMIS] to a given
> defendant at any time are netted against the amounts
> invested by that defendant in [BLMIS] at any time.
> Second, if the amount transferred to the defendant
> exceeds the amount invested, the Trustee may recover
> these net profits from that defendant to the extent that
> such monies were transferred to that defendant in the
> two years prior to [BLMIS] filing for bankruptcy.  Any
> net profits in excess of the amount transferred during the
> two-year period are protected from recovery by the
> Bankruptcy code's statute of limitations.  *See* 11 U.S.C.
> § 548(a)(1).

*Greiff*, 476 B.R. at 729 (adopting the Ninth Circuit's two-step approach in *Donell v.*

*Kowell*, 533 F.3d 762, 771–72 (9th Cir. 2008)).

The defendants-appellants, the district court observed, had made the same

argument before "without success."  596 B.R. at 470.   In an earlier decision, the

court had explained:

> It is true that section 548(a)(1) allows the Trustee to avoid
> only those transfers made by the debtor "on or within 2
> years before the date of the filing of the [bankruptcy]
> petition." 11 U.S.C. § 548(a)(1)(A).  Yet there is no similar
> limitation in section 548(c) with respect to whether a
> given transfer is "for value."  The concept of harm or
> benefit to the estate is separate from the concept of the
> reach-back period, which merely serves to allow finality
> to ancient transactions. . . .  Thus, there is no reason why
> a line should be drawn at the beginning of the reach-back
> period in determining whether a transfer was for value.

*Id.* at 471 (quoting *In re BLMIS*, 499 B.R. 416, 427 (S.D.N.Y. 2013)).

The defendants-appellants argued that this reasoning was no longer sound. They contended that *CalPERS* had changed the law and compelled the conclusion that the two-year limitation in fact did establish a bright line that could not be crossed.

In *CalPERS*, the Supreme Court determined that a statutory provision limiting claims under section 11 of the Securities Act of 1933 to those brought within three years of the securities offering is a statute of repose, not a statute of limitations.[6] 137 S. Ct. at 2055. As a result, the three-year period cannot be equitably tolled. *Id.*

*CalPERS*, the district court concluded, is inapposite because it concerns

---

[6]     In the ordinary course, a statute of limitations creates "a time limit for suing in a civil case, based on the date when the claim accrued." Black's Law Dictionary 1546 (9th ed. 2009) (Black's). . . . Measured by this standard, a claim accrues in a personal-injury or property-damage action "when the injury occurred or was discovered." Black's 1546.

A statute of repose, on the other hand, puts an outer limit on the right to bring a civil action. . . . A statute of repose "bar[s] any suit that is brought after a specified time since the defendant acted . . . , even if this period ends before the plaintiff has suffered a resulting injury."

*CTS Corp. v. Waldburger*, 573 U.S. 1, 7-8 (2014) (citation omitted).

equitable tolling.  By contrast, the district court's earlier decision approving the

trustee's calculation "did not turn on whether § 548(a) was a statute of repose or a

statute of limitation," and contained "no discussion of equitable tolling."  596 B.R.

at 472.  The court thus concluded that *CalPERS* did not require it to revisit its

earlier conclusion that the trustee's claims did not violate the two-year limitation

in § 548(a)(1).  *Id.*

   Having considered the issues *de novo* and finding the defendants-

appellants' arguments to be without merit, the district court adopted the

bankruptcy court's recommendation in full.  *Id.*  The district court thus granted

the trustee's motion for summary judgment and denied the defendants-

appellants' cross-motion for summary judgment.  *Id*.  The defendants-appellants

appeal.

## DISCUSSION

   On appeal, the defendants-appellants argue that the district court erred in

granting the trustee's motion for summary judgment and denying their cross-

motion for two reasons.  First, they contend that they are entitled to retain the

transfers under 11 U.S.C. § 548(c) because they received the transfers "for value"

and in good faith.  They argue that they had "enforceable securities entitlements,"

or claims against BLMIS, based on the account statements that were satisfied by

the transfers.  Second, the defendants-appellants argue that the trustee is barred

from recovering the transfers by § 548(a)(1)'s two-year limitation.  They assert

that the transfers fall outside the permissible window for recovery because their

alleged rights to the transfers arose more than two years prior to the filing of the

petition.  They also contend that the trustee's method of calculating their

exposure under the fraudulent transfer statute impermissibly takes into account

transfers that occurred prior to the two-year period.

We conclude, largely for the reasons adopted by the district court, that the

defendants-appellants' arguments are without merit.  We therefore affirm the

judgment of the district court.

## I.    Standard of Review

We review the district court's grant of summary judgment *de novo*.  *See*

*Latham v. Commodore Cruise Line, Ltd.*, 173 F.3d 845 (2d Cir. 1999) (reviewing the

grant of summary judgment *de novo* where the district court had applied the law

of the case doctrine).  "Summary judgment is proper 'if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law.'" *Process, America, Inc. v. Cynergy Holdings, LLC*, 839

F.3d 125, 133 (2d Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

## II.    Analysis

*1. The "For Value" Defense*

On appeal, the defendants-appellants argue that they have the right to

retain the transfers under § 548(c) because they received the funds in good faith

and in exchange "for value."  It is undisputed that the defendants-appellants

received the transfers in good faith; the issue is whether they received the

transfers "for value."

The Bankruptcy Code defines "value" as property or the securing or

satisfaction of a debt.  "Debt" is defined as "liability on a claim."  11 U.S.C.

§ 101(12).  And "claim" is defined as the "right to payment," or the "right to an

equitable remedy for breach of performance if such breach gives rise to a right to

payment." *Id.* § 101(5).

The defendants-appellants argue that the transfers were for value on two

independent bases.  First, they argue that the transfers satisfied a property right

to payment of "profits" that was created when BLMIS fabricated account

statements to make it appear as though BLMIS had traded in securities and

profited from those trades on the defendants-appellants' behalf.  Second, they

contend that the transfers discharged BLMIS's liability on claims based on the

defendants-appellants' contract rights.

    *a.    The Defendants-Appellants' Property Rights Theory*

    The defendants-appellants argue that, in *Ida Fishman*, we recognized that

they had property rights arising out of the account statements.  Appellants' Br. at

28–30.  They assert that this court "looked to state law and found that — as a

result of the [account opening documents signed by BLMIS customers] — each

subsequent account statement issued by Madoff created an 'enforceable

securities entitlement' regardless of whether the contents of the statements were

truthful."  Appellants' Br. at 30 (quoting *Ida Fishman*, 773 F.3d at 422).  They

further assert that this court "held that the securities entitlements were

enforceable against the broker/debtor and that the [defendants-appellants] were

entitled to take withdrawals from their brokerage accounts."  *Id.* (citing *Ida

Fishman*, 773 F.3d at 422).

    The defendants-appellants' argument misreads our use of the phrase

"enforceable securities entitlement," and mischaracterizes the context in which

we used it.  In *Ida Fishman*, the phrase "enforceable securities entitlement"

28

appears in the section of the opinion analyzing whether the transfers were

"settlement payments" within the safe harbor of § 546(e).  There, we rejected the

trustee's argument that the transfers could not be settlement payments because

BLMIS had never traded in securities.  We stated that:

> the statutory definition [of a "settlement payment"]
> should be broadly construed to apply to "the transfer of
> cash or securities made to complete a securities
> transaction."  *Enron*, 651 F.3d at 334 (citations omitted).
> That is what the BLMIS clients received.  Each time a
> customer requested a withdrawal from BLMIS, he or she
> intended that BLMIS dispose of securities and remit
> payment to the customer.  *See* **N.Y.U.C.C. § 8–501(b)(1)
> & cmt. 2 (broker's written crediting of securities to a
> customer's account creates an enforceable securities
> entitlement).**  The statutory definition and *Enron* compel
> the conclusion that, for example, if I instruct my broker
> to sell my shares of ABC Corporation and remit the cash,
> that payment is a "settlement" even if the broker may
> have failed to execute the trade and sent me cash stolen
> from another client.  As the district court correctly
> concluded, because the customer granted BLMIS
> discretion to liquidate securities in their account to the
> extent necessary to implement their sell orders or
> withdrawal requests, each transfer in respect of a such an
> order or request constituted a settlement payment.

*Ida Fishman*, 773 F.3d at 422–23 (emphasis added).  Our citation to the NYUCC

thus provided a background principle that helped explain what customers

thought BLMIS would do and intended BLMIS to do in order to satisfy their

*19-0429-bk(L)*
*In re: Bernard L. Madoff Investment Securities LLC*

withdrawal demands.  We did not decide, as the defendants-appellants contend,

that the account statements created securities entitlements.

In fact, even if the account statements created such entitlements, they did

not give the defendants-appellants property rights to the fictitious "profits" from

fictitious trading at issue here.  The NYUCC provides that a person acquires a

securities entitlement if a securities intermediary such as a broker "indicates by

book entry that a financial asset has been credited to the person's securities

account."  NYUCC § 8–501(b)(1).  Once a securities intermediary makes such an

entry, the customer "has a security entitlement even [if] the securities

intermediary does not itself hold the financial asset."[7]  *Id.* § 8–501(c).

However, as the official comment shows, this rule serves chiefly to clarify

and secure customers' rights amid the delays and disconnects that may attend

authentic trading activity — there is no indication that it contemplates fraud.

The comment explains that the rule may come into play because, for example,

"[t]he person from whom the securities intermediary bought the security might

---

[7] This does not mean "that the intermediary is free to create security entitlements
without itself holding sufficient financial assets to satisfy its entitlement holders."
NYUCC § 8–501 cmt. 3.  The official comment explains that the purpose of subsection
(c) is "to make it clear the question whether a person has acquired a security entitlement
does not depend on whether the intermediary has complied with that duty."  *Id.*

30

*19-0429-bk(L)*
*In re: Bernard L. Madoff Investment Securities LLC*

have failed to deliver and it might have taken some time to clear up the problem,

or there may have been an operational gap in time between the crediting of a

customer's account and the receipt of securities from another securities

intermediary."  NYUCC § 8–501 cmt. 3.

    The comment further makes clear that an entitlement holder only has

rights to actual securities held by a securities intermediary:

> Suppose that Customer A holds 1000 shares of XYZ Co.
> stock in an account with her broker, Able & Co.  Able in
> turn holds 1000 shares of XYZ Co. through its account
> with Clearing Corporation, but has no other positions in
> XYZ Co. shares, either for other customers or for its own
> proprietary account.  Customer B places an order with
> Able for the purchase of 1000 shares of XYZ Co. stock,
> and pays the purchase price.  Able credits B's account
> with a 1000 share position in XYZ Co. stock, but Able
> does not itself buy any additional XYZ Co. shares.  Able
> fails, having only 1000 shares to satisfy the claims of A
> and B.  Unless other insolvency law establishes a
> different distributional rule, A and B would share the
> 1000 shares held by Able pro rata, without regard to the
> time that their respective entitlements were
> established. . . .  In this case, . . . the entitlements are not
> worth what [A and B] thought. . . .

*Id.* § 8–502 cmt. 4.  It follows that regardless of whether the defendants-appellants

had securities entitlements as a result of the account statements, they did not

have property rights to the values in excess of principal reflected there.

31

Accordingly, when BLMIS transferred those full values to the defendants-appellants, the transfers were not in satisfaction of property rights and therefore were not "for value."

> b.    *The Defendants-Appellants' Contract Rights Theory*

The defendants-appellants' second theory of "value" is grounded in contract rights.  They argue that they are entitled to retain the transfers under section 29(b) of the Exchange Act of 1934, which allows an innocent party to a securities contract procured by fraud to choose to void or enforce the contract.  Appellants' Br. at 35 (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387–88 (1970)).  As innocent parties here, the defendants-appellants contend that they may choose to enforce their alleged contract rights to the purported "profits" reflected in the account statements.  Taken to its logical conclusion, the argument posits that the transfers were "for value" because they discharged BLMIS's liability on § 29(b) claims or any other claims sounding in contract.  We are unpersuaded.  We agree with the SIPC, the trustee, and the district court that a conclusion that the transfers were "for value" would conflict with SIPA's legally binding priority system.

32

SIPA prioritizes customers over general creditors. It is made up of several

interlocking pieces, each of which furthers this priority scheme. For example,

SIPA provides for a fund of customer property, separate from the general estate,

that is distributed ratably among customers based on their respective net

equities. *See In re BLMIS*, 654 F.3d at 233. If the customer property fund is

insufficient to satisfy customers' net equity claims, the customers then may

participate in the distribution of the general estate. *See* 15 U.S.C. § 78fff–

2(c)(1)(d). Separately, if customer property is insufficient to pay customers' net

equity claims, the trustee may recover property "transferred by the debtor

which . . . would have been customer property if and to the extent that such

transfer is voidable or void under the provisions of Title 11." *Id.* § 78fff–2(c)(3);

*see also id.* § 78fff–1(a) ("A trustee shall be vested with the same powers and title

with respect to the debtor and the property of the debtor, including the same

rights to avoid preferences, as a trustee in a case under title 11.").

SIPA thus incorporates the Bankruptcy Code to effectuate its priority

scheme, but it does so selectively. Section 78fff(b) makes clear that the

Bankruptcy Code applies only to the extent that it is "consistent" with the

provisions of SIPA.[8]  15 U.S.C. § 78fff(b).  This selective incorporation of the

bankruptcy provisions ensures that, when fit together, the individual pieces of

SIPA produce a system that functions as intended.

A trustee therefore can invoke the fraudulent transfer provisions in the

Bankruptcy Code to recover customer property.[9]  But whether a transferee can

invoke the "for value" defense — exactly as that defense applies in bankruptcy,

i.e., to transfers that satisfy a debt or discharge liability on a claim — depends

upon whether the defense would operate in a manner consistent with SIPA and

its priority system.  *See In re BLMIS*, 499 B.R. at 423–24.

In the case at bar, recognizing the defendants-appellants' "for value"

defense would conflict with SIPA.  The defendants-appellants then would retain

funds that otherwise would be customer property distributed ratably to

---

[8] Section 78fff(b) states:

> To the extent consistent with the provisions of this chapter, a
> liquidation proceeding shall be conducted in accordance
> with, and as though it were being conducted under chapters
> 1, 3, and 5 and subchapters I and II of chapter 7 of title 11.  For
> the purposes of applying such title in carrying out this section,
> a reference in such title to the date of the filing of the petition
> shall be deemed to be a reference to the filing date under this
> chapter.

[9] Deciding otherwise would reduce a SIPA trustee's authority to something less than a
bankruptcy trustee's authority, which the statute does not contemplate.

customers based on their net equity claims.  That result would place the

defendants-appellants, who have no net equity and thus are not entitled to share

in the customer property fund, ahead of customers who have net equity claims.

SIPA does not permit it.

As the district court observed,

> In a SIPA bankruptcy, it is often the case that the universe
> of funds available consists primarily of customer
> investments of principal, which, at the point of entering
> into bankruptcy, are no longer sufficient to reimburse all
> customers.  In these situations, it is also likely that each
> and every customer has a claim against the debtor for
> fraud, breach of fiduciary duty, or the like.  SIPA makes
> the policy decision that the best way to proceed in these
> circumstances is to attempt to treat each investor
> equitably by providing for recovery of customer
> property and pro rata distributions based on each
> customer's net-equity claim, rather than merely letting
> those who came out ahead to retain the amounts
> obtained.  *Cf. Donell*, 533 F.3d at 776 ("[C]ourts have long
> held that it is more equitable to attempt to distribute all
> recoverable assets among the defrauded investors who
> did not recover their initial investments rather than to
> allow the losses to rest where they fell.").  While courts
> have recognized this principal in the context of any
> fraud, it is all the more true in a SIPA bankruptcy, where
> it would significantly undo the SIPA scheme to allow
> customers to recast amounts received as something other
> than what they were—fictitious profits—and treat them
> as a claim for antecedent debts beyond the customer's net
> equity.

*In re BLMIS*, 499 B.R. at 425.

Moreover, the defendants-appellants cannot invoke the "for value" defense here in the same way in which they could if this were an ordinary bankruptcy because the defense operates differently in a SIPA liquidation.  In an ordinary bankruptcy, the "for value" defense applies to any transfer that was made in exchange for value.  Value is defined as property that increases the assets of the general estate, or satisfaction of an antecedent debt that decreases the liabilities of the general estate.  Regardless of whether a transferee took funds in exchange for other property or as satisfaction of a debt, the result is the same: the net assets or resources available to the general estate after the transfer is equal to that value before the transfer.  Thus, the "for value" defense applies to the extent that the resources available to satisfy creditors remain the same.

In a SIPA liquidation, the trustee is charged with recovering and distributing a fund of customer property separate from the general estate.  A receipt of property would increase the assets of the customer property fund just as it would the general estate.  But the same is not true of satisfaction of a debt or claim.  There are only a small number of claims that customers can make against a customer property fund and, accordingly, only a small number of liabilities

*19-0429-bk(L)*
*In re: Bernard L. Madoff Investment Securities LLC*

that could be discharged by satisfaction of a claim.  The types of claims that a

customer may make against a customer property fund are those "relating to, or

net equity claims based upon, securities or cash, . . . insofar as such obligations

are ascertainable from the books and records of the debtor or otherwise

established to the satisfaction of the trustee."  15 U.S.C. § 78fff–2(b).

In the case at bar, the only such claims are those for a return of principal or

net equity as calculated using the method described in *Greiff*.  The transfers at

issue, however, were not returns of principal; they were transfers of fictitious

profits in excess of principal that depleted the resources of the customer property

fund without an offsetting satisfaction of a debt or liability of that fund.  As the

district court explained,

> To the extent that defendants' state and federal law claims allow them to withhold funds beyond their net-equity share of customer property, those defendants are, in effect, making those damages claims against the customer property estate.  Because their damages claims are not net-equity claims (or any other payments that are permitted to be made in SIPA's priority scheme), allowing such claims to be drawn out of the customer property estate would violate SIPA.

*In re BLMIS*, 499 B.R. at 424.  We agree and conclude that the transfers were not

"for value" for purposes of § 548(c) as that provision applies in this SIPA

37

liquidation.

*Sharp International Corp. v. State Street Bank & Trust Co.*, 403 F.3d 43 (2d Cir.

2005), does not affect our conclusion.  The defendants-appellants urge us to

equate the transfers here to those in *Sharp* and rule in their favor on that basis.

But there exists no such equivalency because *Sharp* involved a bankruptcy

liquidation, not a SIPA liquidation.  In *Sharp*, we determined that a payment to a

bank in satisfaction of an obligation was for value notwithstanding the fact that

the debtor engaged in fraud to obtain the funds used to pay the bank.  We

explained that

> Even the preferential repayment of pre-existing debts to
> some creditors does not constitute a fraudulent
> conveyance, whether or not it prejudices other creditors,
> because the basic object of fraudulent conveyance law is
> to see that the debtor uses his limited assets to satisfy
> some of his creditors; it normally does not try to choose
> among them.

*Sharp*, 403 F.3d at 54 (internal quotation marks omitted).  The defendants-

appellants' reliance on *Sharp* is misplaced because the case at bar involves a SIPA

liquidation in which we *do* "choose among" creditors.

The transfers therefore were not "for value" for purposes of § 548(c) as that

provision applies in this SIPA liquidation.  Concluding otherwise would violate

SIPA by permitting a conflicting provision of the Bankruptcy Code to apply and

ignoring SIPA's mandate that customers with net equity claims receive priority

over general creditors.

2. *The Time-Barred Defense*

The defendants-appellants' second argument on appeal is based on the

two-year limitation in § 548(a)(1).  It has two parts.

First, the defendants-appellants argue that the trustee cannot recover the

transfers because the supposed "underlying obligation" that gave rise to the

transfers arose more than two years prior to the filing of the petition.  *See*

Appellants' Br. at 43–46.  The argument lacks merit.  When the defendants-

appellants and BLMIS entered into a securities contract, no right to the transfers

at issue arose.  The defendants-appellants had contracted for access to BLMIS's

purported trading strategy and any profits that resulted from that strategy.  But

BLMIS never traded in securities and, as a result, never generated any legitimate

profits.  The defendants-appellants therefore had no rights to the transfers let

alone rights that arose prior to the two-year limitation period.[10]

_____

[10] For the same reason, we disagree with the defendants-appellants argument that the
trustee first must avoid BLMIS's "obligation" to pay the defendants-appellants the
fictitious profits reflected on the account statements before the trustee can recover those

39

Second, the defendants-appellants, joined by the *amici curiae*, argue that "not only are [fraudulent transfer] claims limited" to the those transfers that occurred within the two years prior to the filing of the petition, but "the Trustee's legal authority to compute amounts claimed are likewise bound by those same dates." Appellants' Br. at 47; *see also Amici Curiae* Br. at 8–10. It follows, they argue, that the trustee's calculations, "reaching back" to dates prior to the beginning of the two-year period and "netting claims resulted in an overstepping of his authority." *Id.* We disagree.

There is no such limitation on a trustee's "legal authority" to compute exposure under the fraudulent transfer provisions. In *Greiff*, the district court explained:

> It is true that section 548(a)(1) allows the Trustee to avoid only those transfers made by the debtor "on or within 2 years before the date of the filing of the petition." 11 U.S.C. § 548(a)(1)(A). Yet there is no similar limitation in section 548(c) with respect to whether a given transfer is "for value." The concept of harm or benefit to the estate is separate from the concept of the reach-back period, which merely serves to allow finality to ancient transactions. . . . Thus, there is no reason why a line should be drawn at the beginning of the reach-back period in determining whether a transfer was for value.

---

transfers. *See* Appellants' Br. at 46. The argument is meritless because no obligation exists for the trustee to avoid.

*In Re BLMIS*, 499 B.R. at 427 (*quoted at Sec. Investor Prot. Corp. v. Bernard L. Madoff*

*Inv. Sec. LLC*, 596 B.R. 451, 471 (S.D.N.Y. 2019)).  We agree.

The trustee seeks to recover only "fictitious profits" from the defendants-

appellants.  He does not seek to recover any principal from them.  His claims

thus respect a line between those transfers that were received "for value" and

those that were not.  The trustee determined on which side of that line a transfer

falls by netting the amounts the defendants-appellants had received from BLMIS

against the amounts they had invested in BLMIS over time.  If the amount that

the defendants-appellants had received exceeded the total amount they had

invested, then the trustee determined that those "profits" were recoverable so

long as "such monies were transferred to [the defendants-appellants] in the two

years prior to [BLMIS] filing for bankruptcy."  *Id.* (quoting *Greiff*, 476 B.R. at 729).

This method abides § 548(a)(1)'s protection of transfers made more than two

years prior to the filing of the bankruptcy petition while appropriately

calculating "harm or benefit to the estate," which is unrelated to a line drawn at a

certain point in time for purposes of granting "finality to ancient transactions."

*Id.* (quoting *In re BLMIS*, 499 B.R. at 427).

41

We conclude that the trustee's claims under the actual fraud provision do

not violate the statutory provision limiting recovery to transfers made within the

two years prior to the filing of the petition.  Thus, the district court did not err in

granting the trustee's motion for summary judgment and denying the

defendants-appellants' cross-motion for summary judgment.

## CONCLUSION

We have considered the defendants-appellants' remaining arguments on

appeal and conclude that they are without merit.  We therefore AFFIRM the

judgment of the district court.