**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Tracy L. Cole
Ganesh Krishna
Keith R. Murphy
Fernando A. Bohorquez
Michelle N. Tanney

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>      Plaintiff-Applicant, <br><br>   v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>      Defendant. | Adv. Pro. No. 08-01789 (CGM) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br>      Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br>      Plaintiff, <br><br>   v. <br><br> THE HEBREW UNIVERSITY OF JERUSALEM, YISSUM RESEARCH DEVELOPMENT COMPANY OF THE HEBREW UNIVERSITY OF JERUSALEM LTD., BEN-GURION UNIVERSITY OF THE NEGEV, B.G. NEGEV TECHNOLOGIES AND APPLICATIONS LTD., THE WEIZMANN INSTITUTE OF SCIENCE, and BAR ILAN UNIVERSITY, <br><br>      Defendants. | Adv. Pro. No. __-_____ (CGM) <br><br> **COMPLAINT** |

Irving H. Picard, as trustee ("Trustee" or "SIPA Trustee") for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. § 78aaa-*lll* ("SIPA"),[1] substantively consolidated with the chapter 7 estate of Bernard L.

Madoff ("Madoff"), by and through his undersigned counsel, for his Complaint against defendants

The Hebrew University of Jerusalem, Yissum Research Development Company of The Hebrew

University of Jerusalem Ltd. ("Yissum," and together with The Hebrew University of Jerusalem,

"Hebrew University"), Ben-Gurion University of the Negev, B.G. Negev Technologies and

Applications Ltd. ("B.G. Negev," and together with Ben-Gurion University of the Negev, "BGU"),

Weizmann Institute of Science ("Weizmann"), and Bar Ilan University ("Bar Ilan," and together

with Hebrew University, Yissum, BGU and Weizmann, the "Defendants"), alleges the following:

## INTRODUCTION

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Bernard Madoff ("Madoff") through BLMIS.  With the assistance of individuals both inside and

outside BLMIS, Madoff defrauded thousands of customers of BLMIS out of many billions of

dollars.

2.      The Defendants are a group of Israeli higher education and research institutions that

are among the largest and wealthiest institutions in Israel.  They collectively received tens of

millions of dollars in subsequently transferred funds from BLMIS customer accountholder

Yeshaya Horowitz Association ("YHA"), a registered Israeli non-profit association.  YHA was

founded for the purpose of providing funding to institutions like the Defendants for scientific

research in Israel.  At least one Defendant participated in the creation of YHA, and one or more

agents of each Defendant was also a member of YHA.

---

[1] Future references to SIPA will not include "15 U.S.C."

3.      YHA's BLMIS customer account ("YHA BLMIS Account") was funded by money fraudulently generated in other BLMIS customer accounts held by Magnify, Inc. ("Magnify" and "Magnify BLMIS Accounts"), and then internally transferred within BLMIS to the YHA BLMIS Account.    Through their agents, each Defendant solicited, facilitated, and received funding "grants" from YHA.

4.      The Trustee commenced an adversary proceeding to avoid and recover initial fraudulent transfers from BLMIS to Magnify, YHA, and related defendants, alleging they had actual knowledge of the BLMIS fraud.  *See Picard v. Magnify, Inc. et al.*, Adv. Pro No. 10-05279 (SMB) (Bankr. S.D.N.Y. 2017) ("Magnify/YHA Action").  The Trustee filed a second amended complaint in September 2017.  *See id.*, ECF No. 143 ("Magnify/YHA Complaint").

5.      On or about September 28, 2020 the Trustee reached a settlement in that action in which Magnify, YHA, and other defendants consented to judgments for the full amount of the transfers ("Magnify/YHA Settlement").  *See id.*, ECF Nos. 197–202.  The judgments provided that the transfers are avoided pursuant to, *inter alia*, 11 U.S.C. §§ 544, 548 (Title 11 hereinafter "Bankruptcy Code") and SIPA § 78fff-2(c)(3), and applicable state law including §§ 203(g) and 213(8) of the New York Civil Practice Law & Rules and §§ 273 through 279 of the New York Debtor and Creditor Law ("DCL"), and thus recoverable by the Trustee under §§ 550 and 551 of the Bankruptcy Code.  *See id.*, ECF Nos. 198–202.

6.      The defendants in the Magnify/YHA Action filed customer claims in this SIPA liquidation that were disallowed by the SIPA Trustee.  Under the Magnify/YHA Settlement, the defendants in the Magnify/YHA Action withdrew their objections to the Trustee's disallowance of their customer claims, and agreed they do "not contest the bases of the Trustee's determination regarding the transfers from BLMIS received by the U.S. Defendants, including that 'no securities

were ever purchased by BLMIS for [the accounts]' and that '[a]ny and all profits reported to [the U.S. Defendants] by BLMIS on account statements were fictitious'." *See id.,* ECF No. 193-2.

7.      Over the life of the YHA BLMIS Account, a nearly twenty-year period, YHA's aggregate subsequent transfers to the Defendants and others totaled approximately $120 million.

8.      With this Complaint, the Trustee seeks to recover, under Bankruptcy Code § 550(a), approximately $49.7 million in transfers of fictitious profits from BLMIS to YHA that were subsequently transferred to and received by the Defendants ("Subsequent Transfers") during the six-year period preceding Madoff's arrest on December 11, 2008 ("Applicable Period"). These fictitious profits constitute money stolen from other BLMIS customers ("customer property").

9.      Defendants received the Subsequent Transfers, which were entirely funded with inter-account transfers to the YHA BLMIS Account from the Magnify BLMIS Accounts (defined below). As detailed below, Defendants' agents participating in YHA secured a steady stream of funding from BLMIS to YHA to the Defendants, while concealing the source of YHA's funding from Israeli regulators. For the reasons described herein, the Trustee is entitled to recovery of the Subsequent Transfers.

## BACKGROUND: THE MAGNIFY SCHEME LAUNDERED STOLEN CUSTOMER PROPERTY THROUGH YHA TO DEFENDANTS

10.     Magnify was a shell company used to carry out a fraudulent scheme (the "Magnify Scheme"). As summarized below and detailed in the Magnify/YHA Complaint,[2] over a period of almost twenty years, Madoff purported to generate hundreds of millions of dollars in blatantly fictitious profits in the Magnify BLMIS Accounts. These purported gains were created through backdated and falsified trades in those accounts with only minimal deposits of real money.

---

[2] The Magnify/YHA Complaint is incorporated by reference herein.

11.    At all relevant times, Israeli Attorney Yair Green ("Green"), YHA's legal counsel and its self-proclaimed "living spirit," managed the Magnify BLMIS Accounts (defined below) and directed inter-account transfers of fictitious profits of approximately $120 million from those accounts to the YHA BLMIS Account.  YHA, Green and Defendants' other agents controlled and oversaw the withdrawal of those fictitious profits from the YHA BLMIS Account and their distribution to the Defendants in the form of grants.

12.    Magnify is a Panamanian corporation created in 1983 at the direction of Albert Igoin ("Igoin") solely to invest with BLMIS.  Magnify opened its first BLMIS customer account (hereafter "Magnify I BLMIS Account") in 1983 with a deposit of just over $3 million.  In 1990, the second Magnify BLMIS account (hereafter "Magnify II BLMIS Account," together with the Magnify I BLMIS Account, the "Magnify BLMIS Accounts") was opened with no initial deposit. Rather, the Magnify II BLMIS Account was funded by fictitious backdated trades, discussed further below, resulting in an immediate "profit" of about $100 million in the Magnify II BLMIS Account.   Virtually no other funds were ever deposited in the Magnify BLMIS Accounts. Fictitious profits generated in the Magnify BLMIS Accounts were internally transferred at BLMIS on paper to the YHA BLMIS Account.  The chart below demonstrates the flow of funds, showing transfers within BLMIS above the dotted line, and transfers out from BLMIS below the dotted line:



13.    YHA was founded in 1988 for the purpose of distributing funds from BLMIS to entities in Israel for scientific research.  YHA's founding members included Igoin, Itzhak Amir ("Amir"), the head asset manager for Hebrew University, Amnon Pazi ("Pazi"), President of Hebrew University, and Henri Atlan ("Atlan"), a Professor at Hadassah University Hospital affiliated with Hebrew University.

14.    Green and Amir encouraged Igoin to form YHA.  Within a year after YHA was founded, in 1989 Igoin transferred all of Magnify's shares to YHA, making YHA the sole shareholder and owner of Magnify.  After that, YHA had full legal control, and Green had effective control, over the disposition of the funds in the Magnify BLMIS Accounts.

15.    YHA was operated by Green and its members, many of whom simultaneously served as agents for both YHA and the Defendants.  The actions and knowledge of Green and the Defendants' other agents are imputed to the Defendants.  The agents and their roles at YHA, Magnify, and the Defendants included:

| **YHA/MAGNIFY** | **DEFENDANTS** |
|---|---|
| **Yair Green** | |
| • YHA legal counsel, controlled the flow of funds into YHA's BLMIS Account<br>• Magnify: board member, director, and investment manager | • BGU: Investment Committee board member; Executive Committee board member; Board of Governors member<br>• Weizmann Institute: Board of Governors member<br>• Hebrew University: Board of Governors member |
| **Professor Henri Atlan** | |
| • YHA: founding member; Chairman, Managing Board member<br>• Member of YHA's Center for the Study of Emerging Diseases, Member of YHA's Complexity Science Center<br>• Signatory to YHA BLMIS Account and YHA's Israeli bank accounts<br>• Signatory to Magnify's Israeli bank account | • Hadassah University Hospital affiliated with Hebrew University: Professor |
| **Hanoch Gutfreund** | |
| • YHA Managing Board member; YHA member<br>• Signatory to YHA's Israeli bank accounts | • Hebrew University: Rector, President and Professor |
| **Itzhak Amir** | |
| • YHA founding member, Manager/Director General<br>• Signatory to YHA BLMIS Account and YHA's Israeli bank accounts<br>• Signatory to Magnify's Israeli bank account | • Hebrew University: Asset Manager |

| **YHA/MAGNIFY** | **DEFENDANTS** |
|---|---|
| **Professor Ilan Chet** | |
| • YHA member | • Hebrew University: Professor; Vice President of the Research and Development Authority<br><br>• Weizmann: President |
| **Professor Bracha Rager** | |
| • YHA member<br><br>• Member of YHA's Center for the Study of Emerging Diseases<br><br>• Coordinator/Director of YHA's Israel Vaccine Research Initiative | • BGU: Professor; Founder, Department of Microbiology |
| **Professor Amnon Caspi** | |
| • YHA Audit Committee member; YHA member<br><br>• Member of YHA's Complexity Science Center | • Bar Ilan University: Deputy Head of the School of Business Administration and Economics; Head of the EMBA program at the School of Business Administration; Academic Head of Safed College; Director of the Institute for Labor Relations |
| **Professor Irun Cohen** | |
| • YHA Audit Committee member; YHA member<br><br>• Director of YHA's Center for the Study of Emerging Diseases<br><br>• Steering Committee of YHA's Israel Vaccine Research Initiative<br><br>• Member of YHA's Complexity Science Center | • Weizmann Institute: Professor; Director of Robert Koch-Minerva Center for Research in Autoimmune Diseases<br><br>• BGU: Director of the National Center for Biotechnology |
| **Professor Shimon Ullman** | |
| • YHA member | • Weizmann Institute: Professor; Department Head, Computer Science and Applied Mathematics; Director of the Weizmann AI Center |

16.     As alleged in the Magnify/YHA Complaint, Green and YHA were responsible for

Magnify after the transfer of Magnify's bearer shares to YHA in 1989 (ECF No. 143 at ¶ 56).

Green was formally responsible, at least by 1995, for setting Magnify's investment policies (*id.* at

8

¶¶ 69, 102), managing and safeguarding the funds it invested (*id.* at ¶ 102), meeting with Madoff to ensure the Magnify BLMIS Accounts would increase in value (*id.* at ¶¶ 94–96, 130), examining Magnify's earnings (*id.* at ¶ 95) and supervising the movement of funds between the Magnify BLMIS Accounts and YHA BLMIS Account (*id.* at ¶¶ 66, 130).

17.    In the world of Madoff's massive Ponzi scheme, the Magnify BLMIS Accounts were unique.  As alleged in the Magnify/YHA Complaint, by at least 1995 Madoff did not bother even pretending to trade securities in the Magnify BLMIS Accounts or to provide monthly customer statements containing fictitious transaction-level detail.  Instead, Madoff and Green personally met in New York to finalize semi-annual "Portfolio Evaluations," perfunctory snapshots of Magnify's purported holdings in the Magnify BLMIS Accounts and their value as of the document's date.  *Id.* at ¶¶ 95–97.  They contained no underlying historical information or transactional details for any security purportedly bought or sold in the Magnify BLMIS Accounts during the relevant six-month period, such as trade dates, settlement dates, trade prices or even transfers made to YHA.  *Id.* at ¶¶ 90–92.

18.    Green could dispense with the pretense of performing BLMIS account management duties, and Madoff could dispense with providing Green with monthly customer statements because of their shared knowledge that no BLMIS securities trading was funding the Magnify BLMIS Accounts.

19.    After the "profits" were generated in the Magnify BLMIS Accounts, Green periodically directed BLMIS to make inter-account transfers of funds, which were fictitious profits, or stolen customer property, from the Magnify BLMIS Accounts to the YHA BLMIS Account at BLMIS.  YHA then requested withdrawals from the YHA BLMIS Account, and BLMIS would transfer the fictitious profits from the YHA BLMIS Account in New York to YHA's

bank accounts in Israel, from which they were subsequently transferred to Defendants and others as donations or grants.

20.     Prior to BLMIS's collapse, YHA withdrew more than $120 million of fictitious profits from the YHA BLMIS Account, which were sourced from inter-account transfers from the Magnify BLMIS Accounts.  In reality, those withdrawals were funded by the deposits of other BLMIS customers.  YHA never deposited any money into the YHA BLMIS Account, or any other account with BLMIS.

21.     Defendants were participants in and beneficiaries of the Magnify Scheme by effectuating the distribution of stolen customer property to themselves and others through YHA. To make these distributions, YHA employed a self-interested and conflicted grant-making process without making proper legal disclosures.  Several of Defendants' agents, while serving as YHA's members, requested millions of dollars in grants from YHA (on behalf of Defendants) and approved (as members of YHA) the same grants for the benefit of their own institutions, including for their own personal research projects, without the required disclosure by YHA of this conflict to the Israeli authorities.

22.     To the contrary, YHA falsely affirmed to the Israeli Registrar of Associations (the "Israeli Registrar") that none of its members received benefits, either directly or indirectly, through the grants that were made, nor did they receive salaries from supported institutions.

23.     Because YHA was registered with the Israeli Registrar, the source of YHA's funding required disclosure under Israeli law.  Despite this requirement, and despite years of prodding by the Israeli Registrar, YHA concealed the fact that it was solely funded by the Magnify BLMIS Accounts, which were comprised of fictitious profits reported by BLMIS.  Disclosing

Magnify as the source of funds would have opened up YHA and its members to scrutiny into the Magnify BLMIS Accounts and would have risked revealing and crumbling the Magnify Scheme.

24.     In their roles at their respective institutions and YHA, Defendants' agents acquired knowledge of YHA's finances, knowingly made or had knowledge of misrepresentations in YHA's public disclosures about the source of its funding, and participated in a self-interested and conflicted grant approval process for Defendants' benefit.  In doing so, Defendants perpetuated the Magnify Scheme.

## SUBJECT MATTER JURISDICTION AND VENUE

25.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

26.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders of judgment consistent with Article III of the U.S. Constitution.

27.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

28.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3) and Bankruptcy Code  §§ 105(a) and 550, and other applicable law.

## DEFENDANTS AND PERSONAL JURISDICTION

29.    This Court has specific personal jurisdiction over Defendants under New York Civil Practice Law and Rules §§ 301 and/or 302 (McKinney 2001) and Federal Rule of Bankruptcy Procedure 7004. Defendants knowingly accepted the rights, benefits, and privileges of conducting and profiting from business and transactions in the United States and New York and should reasonably expect to be subject to New York jurisdiction.

30.    Defendants purposely availed themselves of the laws and protections of the United States and New York State based on their direction of activities towards this forum. Specifically, Defendants submitted to New York jurisdiction through the acts of their agents to create and/or operate YHA for the purpose of obtaining funds from BLMIS in New York for distribution to the Defendants and other Israeli institutions, and/or their agents' continuous participation in the Magnify Scheme to knowingly transfer tens of millions of dollars, including the Subsequent Transfers, from the YHA BLMIS Account to the Defendants, from the creation of YHA to the collapse of BLMIS.

### A.    The Hebrew University of Jerusalem and Yissum

31.    The Hebrew University of Jerusalem is one of the largest higher education and research institutions in the State of Israel.

32.    The Hebrew University of Jerusalem conducts its commercial endeavors through its wholly-owned and controlled subsidiary Yissum. Because The Hebrew University of Jerusalem is a not-for-profit entity, it relies on Yissum to serve as its commercial arm to monetize the inventions and intellectual property generated by Hebrew University's researchers and collaborators.

33.    At all relevant times, The Hebrew University of Jerusalem and Yissum shared certain directors, officers, business operations and office space, as stated in Yissum's financial

reports: "a large part of [Yissum's] activities are carried out through the University, its employees and its facilities." Upon information and belief, The Hebrew University of Jerusalem exercises complete ownership, dominion, and control over Yissum, including control over its business, initiatives, and decision-making, and Yissum's officers are appointed by The Hebrew University of Jerusalem. Further, "[t]he University holds all the shares of [Yissum], except for 6 ordinary shares, which are held by officers of the University."

34.    Upon information and belief, Yissum's corporate obligations, responsibilities, and liabilities are to its sole owner The Hebrew University of Jerusalem, and Yissum acts as an agent for and/or solely on behalf of The Hebrew University of Jerusalem. Upon information and belief, Yissum's operational funding is provided exclusively by, and solely at the discretion of, The Hebrew University of Jerusalem. Upon information and belief, Yissum's revenue is considered to be the revenue of its parent The Hebrew University of Jerusalem, and Yissum has no other assets aside from those shared with The Hebrew University of Jerusalem.

35.    As a result, The Hebrew University of Jerusalem exercised such control over Yissum that the latter is a mere instrumentality of the Hebrew University of Jerusalem. The Hebrew University of Jerusalem and Yissum are one and the same and act as alter egos of each other. The Hebrew University of Jerusalem used its control over Yissum to cause Yissum to receive funds from YHA, or otherwise direct certain funds from YHA to Yissum. Both Defendants received funds through the Magnify Scheme and are collectively referred to as Hebrew University.

36.    Like many institutions of research and higher education, Hebrew University participates in global fundraising efforts, including through an international "Society of Friends" network covering more than 25 countries, including the United States, where it operates through a

national not-for-profit 501(c)(3) organization, the American Friends of the Hebrew University ("AFHU"), incorporated and headquartered in New York.

37.    Representatives from Hebrew University helped create, set up, and run YHA. In addition to Igoin and Green, YHA was created in 1988 by, among others, Amir, who was Hebrew University's Head Asset Manager; Pazi, who was Hebrew University's President; and Atlan, who was a professor at Hadassah University Hospital affiliated with Hebrew University's School of Medicine. Hebrew University President Hanoch Gutfreund ("Gutfreund") was also involved with YHA since at least the early 1990s. Amir, Atlan and Gutfreund all played critical roles in managing and running YHA during the relevant time period.

38.    Until his death in 1997, Amir served at various times as YHA's Chairman, Hebrew University's Asset Manager, and YHA's Managing Director. Atlan served as the Chair of YHA since its establishment in 1989. Both Amir and Atlan had signatory authority for the YHA BLMIS Account and YHA's bank accounts in Israel, as well as Magnify's bank account in Israel. Gutfreund, who was President of Hebrew University and is currently the Director of Hebrew University's Einstein Center, was appointed to YHA by at least 1995 and is still serving in this position. During this period, he participated in YHA's meetings, was granted signatory authority for YHA's Israeli bank account in 2000, and in 2001 was appointed to the YHA Managing Committee. Additionally, Ilan Chet ("Chet") served as Hebrew University's Vice President of Research and Development Authority in the 1990s, during which time he solicited grants from YHA.

39.    YHA served as a vehicle to funnel funds from the New York-based BLMIS and the YHA BLMIS Account to Israeli institutions including Hebrew University. Distributing money that YHA withdrew from the YHA BLMIS Account — considering and determining where, in

what proportion, and to whom to distribute the funds — was YHA's only function. From at least December 1989 to December 2008, YHA satisfied all grant requests from Hebrew University and the other Defendants with funds initiating from the Magnify BLMIS Accounts and inter-account transfers from these accounts to the YHA BLMIS Account. Thus, the money subsequently transferred to Hebrew University was stolen customer property originating from BLMIS in New York.

40.     The YHA BLMIS Account was opened at BLMIS at the instruction of Hebrew University's agent Amir, who contacted Madoff in February 1989 and provided Madoff with account opening and signatory instructions for the YHA BLMIS Account. As instructed by Amir, BLMIS opened the YHA BLMIS Account with Amir, Atlan, and YHA's Treasurer Ayala Nahir serving as signatories. Each withdrawal from the YHA BLMIS Account throughout the nearly 20-year relationship was submitted to BLMIS under the signatures of Amir, Atlan, Green (who were agents of Hebrew University), and/or Nahir.

41.     As signatories, on several occasions, Amir and/or Atlan requested that BLMIS transfer funds from the YHA BLMIS Account to YHA's Israeli bank account to fund grants YHA undertook to provide to, *inter alia*, Hebrew University. At all relevant times, Amir, Atlan, and/or Gutfreund knew that the funding of YHA's grants to Hebrew University came from BLMIS in New York.

42.     YHA's monthly customer account statements from BLMIS for the YHA BLMIS Account purported to list YHA's holdings in U.S. stocks and were addressed to Amir until shortly before his death. During the relevant time period, Amir, Atlan, and/or Gutfreund also reviewed and filed YHA's financial statements with the Israeli authorities, which also listed that YHA's assets were held with a "local broker in the United States." In addition, the funds YHA donated

to Hebrew University came from a U.S. bank and the vast majority of the funds YHA provided as grants to Hebrew University were in U.S. dollars, as specified by the governing agreements.

43.     Gutfreund frequently traveled to the United States, including to New York, to raise funds for Hebrew University.  On at least one of these occasions, Gutfreund also met with Madoff at BLMIS's office in New York where he received a tour of the trading room.

44.     In 2001, Green was appointed to Hebrew University's Board of Governors, which has the authority to ratify its financial and budgetary reports and to receive reports on the financial and other aspects of Hebrew University, among other responsibilities.

45.     While he served as attorney for, and *de facto* officer of YHA, Green made multiple grant requests to YHA on behalf of Hebrew University.  Green participated in the YHA meetings at which grants to Hebrew University were approved, and he drafted the contracts for the donations to Hebrew University.  Green also made requests to BLMIS to transfer the funds from the YHA BLMIS Account to YHA's Israeli bank account that would then fund the grants to Hebrew University and to other Defendants.

46.     At all relevant times, Green knew that the grants funding Hebrew University's requests came from BLMIS in New York.  Among other things, Green directed the inter-account transfers from the Magnify BLMIS Accounts to the YHA BLMIS Account.  Starting by at least 1995 and continuing every year until 2008, Green traveled to New York at least annually to personally meet with Madoff on behalf of Magnify/YHA at BLMIS offices to discuss the Magnify BLMIS Accounts and YHA BLMIS Account.

47.     Through its agents, Hebrew University solicited funds from BLMIS, which flowed through the YHA BLMIS Account, for grants.  In doing so, Hebrew University participated in the furtherance of the Magnify Scheme and is subject to personal jurisdiction in this Court through the

acts of its agents, including Gutfreund, Amir, Atlan, and Green.  Among other things, Green communicated regularly with Madoff and other BLMIS employees and made in-person visits to BLMIS headquarters in New York.

48.    As detailed further below, Hebrew University, through its agents including Green, Atlan, Amir, and Gutfreund, helped create and operate YHA for the purpose of obtaining funds from BLMIS in New York for distribution to itself and others, and continuously participated in the Magnify Scheme throughout the Applicable Period.

49.    Hebrew University was among the largest recipients of grants and funding from YHA.  From YHA's creation in 1988 to 2008, Hebrew University received approximately $34.1 million from YHA.  This money consisted of subsequent transfers originating from the YHA BLMIS Account in New York, including the $17,915,720 of Subsequent Transfers during the Applicable Period the Trustee seeks to recover from Hebrew University in this action.[3]

50.    Hebrew University accepted the benefit of each Subsequent Transfer.  As detailed below, all the Subsequent Transfers received by Hebrew University from YHA during the Applicable Period were fictitious profits generated by the Ponzi scheme and constitute stolen customer property.

### B.    Bar Ilan University

51.    Defendant Bar Ilan University is one of Israel's largest academic and research institutions.  Bar Ilan participates in global fundraising efforts through a network of international associations of "friends" located in various countries, including the United States.  In the United

---

[3] This amount includes $17.7M from YHA to The Hebrew University of Jerusalem and $202,693 from YHA to Yissum during the Applicable Period.

States, Bar Ilan fundraises through a national not-for-profit 501(c)(3) organization, the American Friends of Bar-Ilan University ("AFBIU"), with headquarters in New York.

52.     Bar Ilan was among the largest recipients of grants and funding from YHA.  From YHA's creation in 1988 to 2008, Bar Ilan received approximately $10 million from YHA, the vast majority in U.S. dollars.  This money consisted of subsequent transfers originating from the YHA BLMIS Account in New York, including the $8,787,114 of Subsequent Transfers during the Applicable Period the Trustee seeks to recover from Bar Ilan in this action.

53.     During all relevant times, Amnon Caspi ("Caspi") was a professor and researcher at Bar Ilan.  Caspi has held several leadership roles, including Director of the Institute for Labor Relations, the deputy head of Bar Ilan's School of Business Administration and Economics, head of the EMBA program at the School of Business Administration and academic head of Safed College.  In his roles at Bar Ilan, Caspi solicited funds on behalf of the University.

54.     In 1995, Caspi joined YHA.  As a YHA member, his responsibilities included deliberating and voting on the distribution of grants, and review and approval of YHA's financial statements.  Caspi requested funds from YHA on Bar Ilan's behalf by presenting grant requests to YHA, including for his own research.

55.     To fund grants, YHA requested the transfer of funds from the YHA BLMIS Account to YHA's Israeli bank accounts.  Throughout the Applicable Period, Caspi reviewed and approved YHA's annual financial statements acknowledging that 99.6% of YHA's total funds "are traded on the United States Stock Exchange through a local broker."  At YHA's direction, YHA would transfer the requested funds to Bar Ilan after the funds were deposited in YHA's Israeli bank accounts.

56.     Bar Ilan, through Caspi, solicited funds from BLMIS, which flowed through the YHA BLMIS Account, for grants.  In doing so, Bar Ilan participated in the furtherance of the Magnify Scheme and is subject to personal jurisdiction in this Court through the acts of its agent, Caspi.

57.     As detailed further below, Bar Ilan, through Caspi, continuously participated in the Magnify Scheme throughout the Applicable Period for the purpose of obtaining funds from the YHA BLMIS Account in New York for distribution to itself and others.

58.     Bar Ilan accepted the benefit of each Subsequent Transfer.  As detailed below, all the Subsequent Transfers received by Bar Ilan from YHA during the Applicable Period were fictitious profits generated by the Ponzi scheme and constitute stolen customer property.

**C.     Weizmann Institute of Science**

59.     Defendant Weizmann is an advanced higher education and research institution in the State of Israel.  Weizmann participates in global fundraising efforts through a network of international "committees" located in various countries including the United States.  In the United States it operates through a New York-based not-for-profit 501(c)(3) organization, the American Committee for the Weizmann Institute of Science ("ACWIS").

60.     From YHA's creation in 1988 to 2008, Weizmann received approximately $10.83 million from YHA, the vast majority in U.S. dollars.  This money consisted of subsequent transfers originating from the YHA BLMIS Account in New York, including the $6,148,927 of Subsequent Transfers the Trustee seeks to recover from Weizmann in this action.

61.     During the Applicable Period, Irun Cohen ("Cohen") was a professor and/or administrator at Weizmann.  At Weizmann, he held several senior and leadership positions, including Senior Scientist of the Department of Cell Biology, the Mauerberger Professor of Immunology, and Director of the Robert Koch-Minerva Center for Research in Autoimmune

Diseases.  As a professor and program director at Weizmann, Cohen actively participated in YHA

meetings where grants were discussed and approved to Weizmann.

62.    In 1996, Cohen joined YHA.  As a YHA member, his responsibilities included

deliberating and voting on the distribution of grants and reviewing and approving YHA's financial

statements.  Cohen solicited and accepted YHA funds on behalf of Weizmann through a YHA

created entity called the Center for the Study of Emerging Diseases ("CSED"), of which Cohen

served as Director.  The CSED was never incorporated as a legal entity but was another vehicle

through which YHA provided additional grants to Weizmann and others.  CSED was funded by

YHA.  Cohen requested funds from YHA and then further distributed those funds through CSED.

63.    To fund grants to Weizmann, YHA requested transfers of funds from the YHA

BLMIS Account to YHA's Israeli bank accounts.  At all relevant times, Cohen reviewed and

approved YHA's annual financial statements acknowledging that substantially all of YHA's

assets, and therefore the funding for Weizmann's grant requests, came from a local U.S. broker.

64.    YHA satisfied grant requests from Weizmann and the other Defendants with

inter-account transfers of funds from the Magnify BLMIS Accounts to the YHA BLMIS Account.

65.    In March 2004, Shimon Ullman ("Ullman"), another Weizmann professor, joined

YHA.  At Weizmann, Ullman was both a professor and the head of the Applied Mathematics and

Computer Science Department.  Ullman actively solicited funds or grants from YHA.  As a YHA

member, Ullman's duties included deliberating and voting on grants and reviewing and approving

YHA's annual financial statements.  From the time he joined YHA, he acted as an agent on behalf

of both Weizmann and YHA to deliberate on and then approve funding for grants.

66.    Green was appointed to Weizmann's Board of Governors in 2007, a body that is

responsible for controlling the business of Weizmann.

67.    Through its agents, Weizmann solicited funds from BLMIS, which flowed through the YHA BLMIS Account, for grants.  In doing so, Weizmann participated in the furtherance of the Magnify Scheme and is subject to personal jurisdiction in this Court through the acts of its agents, Cohen, Ullman and Green.  Among other things, Green communicated regularly with Madoff and other BLMIS employees and made in-person visits to BLMIS's headquarters in New York for the purposes of securing funds for Defendants and others, including Weizmann.

68.    Weizmann's agents, particularly Cohen, requested and granted funds from YHA and CSED for the benefit of Weizmann.  As detailed further below, Cohen, Ullman and Green continuously participated in the Magnify Scheme to knowingly transfer from New York several million dollars, including the Subsequent Transfers, to Weizmann for its benefit.

69.    Weizmann accepted the benefit of each Subsequent Transfer.  As detailed below, all the Subsequent Transfers received by Weizmann from YHA were fictitious profits generated by the Ponzi scheme and constitute stolen customer property.

### D.    Ben-Gurion University of the Negev and B.G. Negev Technologies and Applications Ltd.

70.    Defendant Ben-Gurion University of the Negev is an Israeli higher education and research institution.  Ben-Gurion University of the Negev conducts its commercial endeavors through its wholly-owned and controlled subsidiary B.G. Negev.  Because Ben-Gurion University of the Negev is a not-for-profit entity, it relies on B.G. Negev to serve as its commercial arm to monetize inventions and intellectual property of Ben-Gurion University of the Negev's researchers.

71.    At all relevant times, Ben-Gurion University of the Negev and B.G. Negev shared certain directors, officers, personnel, and business operations.  Upon information and belief, Ben-Gurion University of the Negev exercises complete ownership, dominion, and control over

B.G. Negev, including control over its business and initiatives and decision making, and B.G. Negev's officers are appointed by Ben-Gurion University of the Negev.

72.    Upon information and belief, B.G. Negev's corporate obligations, responsibilities, and liabilities are to its sole owner, Ben-Gurion University of the Negev, and it acts as an agent for and/or solely on behalf of Ben-Gurion University of the Negev. Upon information and belief, B.G. Negev's operational funding is provided exclusively by, and solely at the discretion of, Ben-Gurion University of the Negev. Upon information and belief, the revenues of B.G. Negev are considered to be the revenues of its parent Ben-Gurion University of the Negev and B.G. Negev has no other assets aside from those shared with Ben-Gurion University of the Negev.

73.    As a result, Ben-Gurion University of the Negev exercised such control over B.G. Negev that the latter is a mere instrumentality of Ben-Gurion University of the Negev. Ben-Gurion University and B.G. Negev are one and the same and act as alter egos of each other. Ben-Gurion University of the Negev used its control over B.G. Negev to cause B.G. Negev to receive funds from YHA, or otherwise direct certain funds from YHA to B.G. Negev. Both Defendants received funds through the Magnify Scheme and are collectively referred to as BGU.

74.    BGU participates in global fundraising efforts through a network of "Associates" or "Friends" located in various countries, including the United States. In the United States, BGU operates through a national not-for-profit 501(c)(3) organization, American Associates of Ben-Gurion University of Negev, with headquarters in New York.

75.    From YHA's creation in 1988 to 2008, BGU received approximately $18.16 million from the YHA BLMIS Account, the vast majority in U.S. dollars. This money consisted

of subsequent transfers originating from BLMIS in New York, including the $16,866,170 of Subsequent Transfers that the Trustee seeks to recover in this action.[4]

76.    Bracha Rager ("Rager") was a Professor in the Department of Microbiology and Immunology at BGU. As a professor at BGU, Rager actively solicited funds or grants on behalf of and for the benefit of the University.

77.    In 1997, Rager joined and participated in CSED's activities.

78.    In September 2005, Rager formally became a YHA member. To fund each grant to BGU, members of YHA requested transfers of funds from the YHA BLMIS Account to YHA's Israeli bank accounts. From at least September 2005, Rager reviewed and approved YHA's annual financial statements acknowledging that the funding for BGU's grant requests came from a local U.S. broker.

79.    Cohen, in addition to his roles at Weizmann, was the Associate Dean of BGU's Medical School from 1973 to 1974. During the relevant period, Cohen served as the Director of the National Center for Biotechnology in the Negev at BGU from 2004–2006. As an administrator at BGU, Cohen actively solicited funds or grants on behalf of and for the benefit of BGU. As a YHA member throughout the relevant period, Cohen's responsibilities included deliberating and voting on the distribution of grants and reviewing and approving YHA's financial statements.

80.    YHA satisfied all the grant requests from BGU and the other Defendants with inter-account transfers of funds from the Magnify BLMIS Accounts to the YHA BLMIS Account.

81.    In 2002, Green was appointed to the Board of Governors of BGU. According to BGU's Constitution and Statutes, the Board of Governors "is the supreme authority of BGU, and

---

[4] This amount includes $15.3M from YHA to Ben-Gurion University of the Negev and $1.55M from YHA to B.G. Negev during the Applicable Period.

it oversees its affairs, management and assets." It approves BGU's financial reports, and ratifies its annual budget and financial policy. The Board of Governors is also tasked with raising funds for BGU.

82.     While on the BGU Board of Governors, Green served on the Investments Committee and Executive Committee. In these roles, Green was responsible for making decisions concerning the finances of BGU and fundraising efforts undertaken by BGU.

83.     Green, on behalf of BGU, obtained funds from BLMIS deposited into the YHA BLMIS Account for grants in furtherance of the Magnify Scheme. Among other things, Green communicated regularly with Madoff and other BLMIS employees and made in-person visits to BLMIS's headquarters in New York for the purposes of securing funds for Defendants and others, including BGU.

84.     As detailed further below, BGU, through Green, Rager, and Cohen, helped create and operate YHA for the purpose of obtaining funds from the YHA BLMIS Account in New York for distribution to itself and others, and continuously participated in the Magnify Scheme throughout the Applicable Period.

85.     BGU accepted the benefit of each Subsequent Transfer. As detailed below, all of the Subsequent Transfers received by BGU from YHA during the Applicable Period were fictitious profits generated by the Ponzi scheme and constitute stolen customer property.

**BACKGROUND, THE TRUSTEE AND STANDING**

86.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

87.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due, and its customers needed the protections afforded by SIPA.

88.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    i.      appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    ii.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

    iii.    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

89.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

90.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

91.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

92.     At a plea hearing on August 11, 2009, in the case captioned *United States v.*
*DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali ("DiPascali"), a former BLMIS employee,
pleaded guilty to a ten-count criminal information charging him with participating in and
conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of
securities took place in connection with BLMIS customer accounts, and that the Ponzi scheme had
been ongoing at BLMIS since at least the 1980s.

93.     At a plea hearing on November 21, 2011, in the case captioned *United States v.*
*Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded
guilty to a six-count criminal information charging him with securities fraud, falsifying the records
of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades
in BLMIS customer accounts beginning in the early 1970s.

94.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George
Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their
participation in the Ponzi scheme as employees of BLMIS.

95.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims,
recovering, and distributing customer property to BLMIS's customers holding allowed customer
claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.
The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover
payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to
the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.
Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described
in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

96.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

97.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.     BLMIS

98.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered as a broker dealer with the United State Securities and Exchange Commission.  In 2001, Madoff changed the corporate form of BLMIS from a sole-proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

99.     In compliance with 15 U.S.C. § 78$o$(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning in January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was

created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

100.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business.

101.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

102.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

103.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**B.    The Ponzi Scheme**

104.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by

several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David

Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of,

assisting Madoff in carrying out the fraud.

105.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent

activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but

fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial

statements and other regulatory reports filed by BLMIS.  The proprietary trading business was

incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required

fraudulent infusions of cash from the IA Business to continue operating.

106.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling

& Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's

fraudulently reported trading revenues and/or commissions on its financial statements and other

regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm

based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one

was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant

living in Florida.

107.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling &

Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns

for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these

fictitious annual audited financial statements prepared by Friehling & Horowitz.

### Madoff's Investment Strategy

108.    In general, BLMIS purported to execute two primary investment strategies for

BLMIS customers: the convertible arbitrage strategy and the split strike conversion strategy ("SSC

Strategy").  For a limited group of BLMIS customers, primarily consisting of Madoff's close

friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

109.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

110.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

111.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

112.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

### BLMIS's Fee Structure

113.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a

commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### BLMIS's Market Timing

114.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

115.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

116.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### BLMIS's Execution

117.    BLMIS's execution, as reported on its BLMIS customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### No Evidence of BLMIS Trading

118.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

119.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

### The Collapse of the Ponzi Scheme

120.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

121.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA side of the business operated as a Ponzi scheme.

122.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

### DEFENDANTS' PARTICIPATION IN THE MAGNIFY SCHEME

123.    YHA was formed as a non-profit association registered with the Israeli Registrar and during the course of its existence distributed tens of millions of dollars in fictitious profits to Israeli academic and scientific institutions, including the Defendants.  Following Igoin's death in 1995, Green and Defendants' other agents steadily increased the amount of the yearly grants made

to the Defendants. Green and the Defendants' other agents took active steps to conceal information regarding the source of YHA's funding while reaping the benefits of withdrawals of fictitious profits. Based on the Defendants' conduct described herein, the Subsequent Transfers are recoverable by the Trustee under Bankruptcy Code §550.

### A.    YHA was a Critical Piece of the Fraudulent Magnify Scheme

124.    YHA was created by Amir, Green, and Igoin for the purpose of extending grants to Hebrew University and other Israeli institutions.

125.    Green incorporated YHA and filed its registration papers with the Israeli Registrar in May 1988. As set forth in its Articles of Association, YHA's stated purpose was to promote scientific research in Israel, which it achieved through grants initially to Hebrew University and Hadassah and later to others, including the other Defendants and their agents. YHA's Articles of Association state, among other things, that its income would be derived from "special donations secured through Mr. Albert Igoin — hereinafter referred to as 'THE DONOR'." As detailed below, YHA's description of its funding would continually change to avoid any reference to Magnify, effectively avoiding additional potential scrutiny by the Israeli Registrar.

126.    Hebrew University's Amir opened the YHA BLMIS Account at BLMIS, which was funded by an inter-account transfer of $2.8 million of principal and a purported $183,339 of fictitious profits from the Magnify I BLMIS Account to the YHA BLMIS Account on March 17, 1989. Although Igoin was identified as "the donor" to YHA, he never actually deposited any money into the YHA BLMIS Account, to which the only deposit of principal was the inter-account transfer from the Magnify I BLMIS Account.

127.    YHA's registration documents named seven founders, including Amir, Atlan, Igoin, Pazi and Igoin's niece, Ayala Nahir. Over the years, additional academics and professors were invited to join YHA, including Gutfreund, Rager, Chet, Caspi, Cohen, and Ullman. Through

this group, alongside Green, in control of YHA's funding, YHA funneled millions in stolen BLMIS customer property to the Defendants.

128.    Around the time the YHA BLMIS Account was opened, minutes from a YHA meeting held in Paris on March 9, 1989 noted that YHA's founding members expected significant gains on the BLMIS investments.  Specifically, the founding members had the "expect[ation] that the $3,000,000 invested with the New York broker [BLMIS] will reach $4,000,000 by the end of 1989" — an expectation of a 33% return over a period of just nine months that would be available to fund grants.  This anticipated level of return was an early indication that the gains purportedly generated in the Magnify BLMIS Accounts were implausible.

### B.    Magnify, the Fraudulent Source of YHA's Grant Funds

129.    In December 1989, Magnify executed an unconditional Assignment of Transfer of its shares to YHA, and Magnify's bearer shares were delivered to Green in connection with the transfer.  YHA thereafter owned and controlled Magnify.

130.    Following the transfer of Magnify to YHA, the Magnify II BLMIS Account with BLMIS was opened without any initial deposit of principal.  Instead, to record an initial deposit into the Magnify II BLMIS Account, BLMIS created backdated trades resulting in a profit of more than $100 million in the Magnify II BLMIS Account.  Specifically, according to BLMIS's September 1990 customer ledger, MCI Inc. shares in the Magnify II BLMIS Account were "sold" in May 1990 for a profit of more than $100 million; these shares were shown in BLMIS trade confirmations as being "bought" in October 1986.  There was no deposit or growth in the Magnify II BLMIS Account, however, that could have been used to buy those shares.  Despite the fact that no principal was ever deposited in the Magnify II BLMIS Account, its September 1990 statement reflected a fictitious balance in excess of $100 million, which, along with additional fictitious

growth in the Magnify BLMIS Accounts, was the continuing source of funding for transfers to the YHA BLMIS Account.

131.    During the Applicable Period, YHA's grants to Defendants and other Israeli institutions were funded exclusively by inter-account transfers of fictitious profits from the Magnify BLMIS Accounts to the YHA BLMIS Account, which were then withdrawn by YHA in Israel and subsequently transferred to the Defendants and others.

132.    Green controlled these transfers and when needed, instructed BLMIS to transfer funds from the Magnify BLMIS Accounts to satisfy YHA's funding.    As alleged in the Magnify/YHA Complaint, BLMIS generated semi-annual "draft" Portfolio Evaluations in preparation for visits from Green.    *See* Magnify/YHA Action, ECF No. 143 at ¶¶ 90, 95-97.    These Portfolio Evaluations contained no underlying historical information or transactional details for any security purportedly bought or sold during the relevant six-month period, such as trade dates, settlement dates, or trade prices.    Nor did they reflect withdrawals or inter-account transfers from the Magnify BLMIS Accounts to the YHA BLMIS Account.    Instead, the Portfolio Evaluations reflected a snapshot of purported holdings as of the date of the Portfolio Evaluation.

133.    Green, Madoff and Frank DiPascali then met behind closed doors at BLMIS and emerged from these meetings with changes to certain Portfolio Evaluations that modified investment results and balances.    *See id.* at ¶¶ 97-101.    Green therefore knew that the funds he had transferred from the Magnify BLMIS Accounts to the YHA BLMIS Account were fictitious profits based on non-existent trading.    Green's knowledge is imputed[5] to YHA and the Defendants.

---

[5] *See, e.g., Picard v. Magnify, Inc. et al*, Adv. Pro. No. 10-05279 (SMB) (Bankr. S.D.N.Y.) (ECF No. 166) ("Magnify Motion to Dismiss Decision") at p. 18 (finding that Green's knowledge is imputed to YHA and Magnify).

134.    The transfer of ownership of Magnify to YHA in 1989 gave Green and the YHA

members control of the underlying source of funding and ensured that YHA's grants to Defendants

would continue to perpetuate the Magnify Scheme.

**C.    After Igoin's Death, YHA Accelerated Its Inter-Account Transfers from the Magnify BLMIS Accounts to the YHA BLMIS Account to Fund Grants to Defendants**

135.    After Igoin's death in 1995, the grant money requested of YHA and transferred to

Defendants began to increase in size and scope.

136.    Beginning in the late 1990s, YHA, including Green and Defendants' other agents,

began increasing redemptions from the YHA BLMIS Account for grants to Defendants and others,

as shown in the chart below:



137.    In 1996, YHA's annual redemptions from the YHA BLMIS Account for grants

exceeded $2 million; in 1998, they had more than doubled to over $4 million annually.  From 1998

to 2002, YHA's annual redemptions from the YHA BLMIS Account for grants ranged from between $4 million to $9 million. The annual redemptions continued to escalate, and each year from 2003 to 2008, YHA's redemptions from the YHA BLMIS Account exceeded $10 million per year, from which grants were ultimately distributed to the Defendants, among others, through their agents at YHA.

**D.    YHA Conceals the True Source of Funding for Defendants' Grants**

138.    YHA was obligated by Israeli Associations Law to publicly disclose the extent of YHA's assets by submitting annual reports to the Israeli Registrar. From December 1996 forward, however, Green and YHA's members, which at various times included Defendants' agents Atlan, Gutfreund, Amir, Chet, Rager, Caspi, Cohen, and Ullman, effectively concealed the facts surrounding YHA's sole ownership of and control over Magnify and the Magnify BLMIS Accounts, from which YHA received all of its funding. Only after Madoff's fraud was revealed to the world did YHA indicate that the source of its grants was a foreign company. However, even then, YHA revealed neither Magnify's name nor YHA's sole ownership and control over Magnify and the Magnify BLMIS Accounts.

139.    Since at least 1996, all registered non-profit associations in Israel have been required to disclose their sources of funding to the Israeli Registrar, including the identity of donors. Since 2002, such disclosures have been required as to those contributing sums above NIS 20,000 (approx. $5,847 USD) annually. If, as in the case of YHA, the source of funding is an entity it owns or controls (Magnify), proper disclosures would include the consolidated annual financial statements of the relevant entity.

140.    In 1999, the Israeli Registrar instituted a procedure by which a registered association may acquire a Certificate of Proper Management from the Israeli Registrar to show the association is operating in good standing. The certificate attests that the association has complied

with all the applicable legal requirements and has used the association's funds and assets solely for the purposes specified in its charter. To receive a certificate, an Association must submit two consecutive years of proper disclosures and documentation to the Registrar.

141. A Certificate of Proper Management further serves to assure potential recipients of an association's financial support, such as the Defendants, that the sources of the funds it will receive are not in any way legally tainted. Certification of a non-profit association provides an objective indicator of the propriety of the funds being granted. A donor providing grants of significant magnitude to several of the most prominent institutions in Israel would be expected to obtain a Certificate of Proper Management.

142. Many associations in Israel seek to obtain a Certificate of Proper Management in order to qualify for the receipt of public funding and tax-exempt status. In 2001, the Israeli Registrar began considering YHA for such a certificate at its own volition. Israeli Registrar records indicate that around this period it began reviewing the financial statements for YHA and inquiring about YHA's management and reporting. As a result, YHA was supposed to disclose the source of its funding to the Israeli Registrar.

143. Following its review, the Israeli Registrar repeatedly concluded that YHA was not properly disclosing the financial information of its underlying donor. The result was that the Israeli Registrar issued multiple violations to YHA for not reporting the identity of a donor who had contributed grants hundreds of times greater than the NIS 20,000 (approx. $5,847 USD) threshold.

144. When challenged by the Israeli Registrar regarding these violations, in 2001, 2003, 2004 and 2007, YHA repeatedly communicated with the Israeli Registrar regarding the source of its funds, including direct communications from members Gutfreund and Atlan, and from Green. In none of those communications did YHA disclose the existence of Magnify, its ownership or

control of Magnify, or that all of its funds during this time originated from inter-account transfers of fictitious profits from the Magnify BLMIS Accounts to the YHA BLMIS Account. Nor did YHA state, as it subsequently claimed in litigation relating to the Magnify/YHA Complaint, that Igoin left funds in a trust for which YHA was the trustee, or, alternatively, that YHA was holding funds for the benefit of Igoin's heirs.

145. After Igoin's death, YHA gave conflicting reports as to its funding. In its March 1996 meeting minutes, filed with the Israeli Registrar, YHA reported that Green had spoken with Igoin's widow and "it was agreed that the 'donations' would continue in the future in amounts of the order similar to those contributed during the lifetime of her late husband," although Green had also stated that she should not be addressed for new fund allocation requests. In other statements to the Israeli Registrar, as discussed below, YHA maintained that its funding was coming from a donor who wished to remain anonymous, a statement YHA continued to repeat for years after Igoin's death.

146. However, there is no evidence that Igoin's widow, who passed away in 2005, ever acted in the Magnify BLMIS Accounts or the YHA BLMIS Account, and no trust agreement exists to establish any control by the Igoin family over Magnify or YHA. Igoin's surviving heirs maintain they were unaware of Magnify or YHA until after the collapse of BLMIS.

147. An accurate disclosure to the Israeli Registrar that YHA owned and controlled Magnify would have revealed that the Magnify BLMIS Accounts (and the inter-account transfers from the Magnify BLMIS Accounts to the YHA BLMIS Account) were the sole source of YHA's funding. The disclosure that YHA was funded by a foreign entity it owned or controlled would have invited the Israeli Registrar to inquire further into the Magnify Scheme. For example, if YHA disclosed that the money was actually being sourced from the Magnify BLMIS Accounts, the

Israeli Registrar would have requested, at a minimum, consolidated financial statements from Magnify showing its ownership, assets, balance sheet, and income. Alternatively, if YHA asserted that its funds were sourced from Igoin or Magnify in trust, proper disclosure would have included any trust instrument and documentation, and ultimately would have led back to the Magnify BLMIS Accounts where the assets were being held. If Magnify actually were held "in trust," truthful disclosures likely would have resulted in the Israeli Registrar determining YHA to be a Public Trust. Under Israeli law, there are limitations on foreign investments that may be held by Public Trusts as well as requirements for additional disclosures.

148.   Instead of truthfully disclosing that the source of its funding was the Magnify BLMIS Accounts, YHA represented to the Israeli Registrar over a period of years that it could not disclose the donor's identity because the donor insisted on remaining anonymous. In 2001, for example, the Israeli Registrar requested that YHA verify the source of its income. YHA replied that it "is financed by a sole foreign donor, who requested that his anonymity be preserved." Igoin had passed away six years earlier in 1995. This obfuscation remained the practice as late as 2007, not only by Green, but also separately in representations from Gutfreund, Atlan and Nahir. In 2004, Green represented to the Registrar for the first time that "the donor" had died and claimed that he—Green—was the trustee for the donor.

149.   The Israeli Registrar in correspondence to YHA pointed out the inconsistency between YHA's claim of the donor's desire for anonymity with the fact that YHA previously identified Igoin as YHA's donor in its publicly filed Registrar File. As Green knew, any statement by YHA after 1995 that Igoin himself was a continuing donor would have been demonstrably — and provably — false. By referring instead to an "anonymous donor," YHA obfuscated that the true source of its funds was not an individual but an entity, Magnify, which YHA owned and

controlled and whose legitimacy could not have survived scrutiny.  By foregoing compliance with the Israeli Registrar regarding its Certificate of Proper Management, YHA avoided further potential investigation.

150.    YHA's October 2008 revised bylaws with the Israeli Registrar stated that the "Income of the Association" would be "[t]hrough special donations that will be transferred via Mr. Albert Igoin," and that Igoin, who by then had been dead for 13 years, would remain on the Board of Directors.  Once again, the explanation concealed that the Magnify BLMIS Accounts were the true source of YHA's funding.

151.    YHA hid from the Israeli authorities not only the source but also the amount of its funding.  YHA members were under a duty to inspect and accurately report YHA's financial activity, including information concerning its financial situation and its financial sources.  YHA's members, including at various times Atlan, Gutfreund, Amir, Chet, Rager, Caspi, Cohen and Ullman, reviewed and approved YHA's financial statements, and Cohen and Caspi served on YHA's Audit Committee.

152.    YHA's 2002 financial statement, publicly filed with the Israeli Registrar, shows that the grants made that year exceeded the amount of its available assets to fund the grants.  This indicated that YHA was insolvent, and, as Green pointed out in a letter to Madoff, this "gap" between the amount YHA had pledged and the funds in its YHA BLMIS Account would "create a problem for our accountant when he draws up the 2002 balance sheet."  When the Israeli Registrar questioned the deficit, YHA responded by stating that it intended to reduce its deficit — which constituted about 25% of its total assets for the year — by "raising donations abroad."  In fact, there was no reason to raise money and no real money was ever "raised." YHA's cash needs

were satisfied by inter-account transfers of fictitious profits from the Magnify BLMIS Accounts

to the YHA BLMIS Account, which YHA continued to conceal.

153.    For each of the years 1999, 2000, 2001, 2002 and 2003, YHA's financial statements

showed that YHA was insolvent, because its pledged amounts exceeded its reported assets for each

year by between $1.8 and $10.2 million dollars.   The deficits were covered by inter-account

transfers from the Magnify Accounts to the YHA BLMIS Account, but neither these transfers nor

the Magnify BLMIS Accounts were reflected on YHA's financial statements or otherwise

disclosed.

154.    YHA and the Defendants' agents, therefore, not only directly controlled the flow

of money into the YHA BLMIS Account, but they also concealed the source of YHA's funding,

which precluded potential discovery of the Magnify BLMIS Accounts.

### E.    YHA's Meetings Reflect No Discussion of Its Budget, Scope or Source of Ever-Increasing Funding, or Financial Oversight of Suspect Transfers from Magnify

155.    In spite of Igoin's death in 1995, which was reported to the members of YHA no

later than the general meeting of June 28, 1995, funding continued to flow into YHA in amounts

that increased from year to year.

156.    As YHA continued to undertake to fund research at various institutions in sums

totaling millions of dollars every year, including undertakings in advance to provide funding over

a number of years, there is no record of any discussion at any YHA meeting of basic questions

regarding its financial position, its sources of funding or its ability to meet its commitments.

Instead, YHA agreed to provide funding for ambitious multimillion-dollar and multi-year projects

without anyone ever disclosing where the money would come from to fund the undertakings YHA

assumed.   Other than approval of the financial statements, and minimal discrete references to

conversations with Igoin's widow, minutes of YHA's meetings reflect no discussion of the amount

of funds forecast to be available for the coming year, the source of any such funds, or how these funds were expected to be obtained, regardless of the size of the deficit reported on YHA's financial statements. The members essentially behaved as though YHA was an unlimited ATM machine.

157. By recording in its financial reports that its funding was from "donations received" instead of from the Magnify BLMIS Accounts, YHA, including its members Atlan, Gutfreund, Chet, Rager, Caspi, Cohen, and Ullman, not only avoided disclosure of Magnify's existence but also avoided disclosure of various suspect transfers. For example, Green approved transfers to himself, Nahir and her family, and to Amir's widow. In 1998, Magnify formed a subsidiary, Strand International Investments, Ltd. ("Strand"), through which Magnify funneled approximately $10 million to Green, his family and others. YHA's meeting minutes and records reflect no discussion of this subsidiary or any transfers to or from it.

### F.    Conflicts Permeated YHA's Grant Process

158. YHA and Defendants established and participated in a conflicted grant approval process that enabled them to approve millions of dollars to themselves. This structure of presenting and approving grants to themselves, without disclosing their dual roles, violated Israeli law. In Israel, non-profits are governed by a "non-distribution constraint," which restricts individuals who control a non-profit association from benefiting themselves — directly or indirectly — from the distribution of funds. Non-profits are generally limited to only paying their directors, officers, and members a reasonable compensation for labor, services or capital provided to the organization.

159. As part of its investigation into YHA over the years, the Israeli Registrar, in addition to inquiring about the disclosure of YHA's donor, also requested that YHA certify that it was acting within the scope of the non-distribution constraint.

160.    In its letter dated September 6, 2007, for example, an accounting firm acting on behalf of the Israeli Registrar requested that YHA certify that "the members of the board and/or members of the audit committee and/or their family members are not among the recipients of wages/grants/support in the Association or in entities supported by the Association."

161.    Instead of truthfully disclosing that the YHA members and/or Audit Committee members did in fact solicit and receive grants from YHA and receive salaries from institutions receiving those grants, YHA responded by letter dated September 24, 2007, declaring that "there are no members of the board and/or members of the auditing committee … among the recipients of salaries/scholarships/support in the Association or at the entities supported by the Association." This was false because nearly all of YHA's members — including the two professors who sent and signed the letter, Atlan and Gutfreund —— received a salary or pension from their respective institutions, which were receiving grants from YHA.  By failing to report these conflicts to the Registrar, the members effectively helped YHA evade further investigation into its finances and operation.

162.    Israeli law further requires that Associations have an Audit Committee.  YHA formed its committee only in 2000, staffing it with YHA members including Defendants' agents, Caspi and Cohen.  Pursuant to Israeli Law, the Audit Committee was obligated to confirm the propriety of the Association's funding, operations, and activities and that of its officers and management.  YHA's Audit Committee shirked its obligations, and the lack of any genuine oversight by YHA and the Defendants' agents contributed to and enabled the Magnify Scheme.

**DEFENDANTS TREATED YHA AS A CAPTIVE DONOR FOR THEIR PROJECTS**

### A.    Yair Green, as Agent of Defendants

163.    As alleged by the Trustee in the Magnify/YHA Action, over a nearly twenty-year period, YHA received more than $120 million in fictitious profits, or stolen BLMIS customer

property, which were purportedly generated from just over $3 million deposited in the Magnify

BLMIS Accounts.  The Magnify BLMIS Accounts were the sole source of money for YHA.

Moreover, following the public revelation of the fraud and collapse of BLMIS, in 2009 defendants

named in the Magnify/YHA Complaint, including YHA, filed net equity claims with the SIPA

Trustee as customers of BLMIS for approximately $839 million that they asserted was still owed.

The SIPA Trustee denied these claims.  Coupled with the $120 million YHA had previously

received, the purported growth in the BLMIS accounts related to Magnify/YHA aggregated to

almost $1 billion, an increase the Bankruptcy Court described as "mind-boggling."

164.    In denying a motion to dismiss the Magnify/YHA Complaint, the Bankruptcy Court

held that the Trustee's allegations in the Magnify/YHA Action plausibly alleged that Green had

subjective actual knowledge at all relevant times that the money in the Magnify BLMIS Accounts

could not have resulted from trading securities based on, among other things, the allegations of

"clearly fictitious transactions" in the Magnify BLMIS Accounts.  Moreover, the Bankruptcy

Court held the Trustee had plausibly alleged Green's actual knowledge based on facts surrounding

the implausible growth in the Magnify BLMIS Accounts, and the replacement of monthly account

statements for the Magnify BLMIS Accounts with fictitious Portfolio Evaluations finalized in

personal meetings with Green.

165.    Based on the Trustee's allegations in the Magnify/YHA Complaint and the

Bankruptcy Court's determinations, "the Court conclude[d] that the Complaint adequately alleges

that Defendants Magnify [and] YHA … had actual knowledge, through Green, that BLMIS was

not trading securities."

166.    As the Bankruptcy Court stated, "the [Magnify/YHA Complaint] sufficiently

alleges that Green acted with actual knowledge that BLMIS was not engaged in trading securities.

He nevertheless continued to withdraw the funds as part of his fraudulent scheme depleting the customer property estate by over $150 million."

167.    Green served on the respective Boards of Governors and/or Trustees of Defendants Hebrew University, Weizmann, and BGU, and his knowledge is imputed to those Defendants.

168.    The Trustee further incorporates by reference the allegations contained in the Magnify/YHA Complaint, including paragraphs 9-10; 43; and 99-145, alleging facts supporting Green's actual knowledge of the BLMIS fraud, as if fully set forth herein.

## B.    Hebrew University and Yissum

### 1.    Hebrew University Solicited and Received Funds from BLMIS Through Its Agents Amir, Atlan, Gutfreund, Green, and Chet

169.    Over the course of the Magnify Scheme, YHA transferred approximately $34.1 million to Hebrew University.  Of this amount, The Hebrew University of Jerusalem received approximately $17.7 million and Yissum received approximately $202,693 of Subsequent Transfers during the Applicable Period that the Trustee seeks to recover.

170.    The Subsequent Transfers to Hebrew University were solicited by Hebrew University's agents Amir, Atlan, Gutfreund, Green and Chet, each of whom wore two hats, one as an agent of the donee Hebrew University, and another as a key member of the donor YHA.

#### a.    Itzhak Amir

171.    From at least 1988, Amir served as an agent of both Hebrew University and YHA, acting on each entity's behalf, with their consent, and for their benefit.

172.    Amir, who was Asset Manager of Hebrew University until his death in 1997, was one of the founding members of YHA and served as its Manager, a position that included serving as the donor's representative.  While he was working at Hebrew University, Amir received a salary from YHA.  Among other things, a May 1990 fiduciary agreement executed by Amir on behalf of

YHA supports Amir's awareness of Magnify, its link with YHA, and that it was the source of financing for YHA's activities.

173.     As Head Asset Manager/Head of Investments and Funds Authority for Hebrew University, Amir presumably was responsible for, among other things, developing and monitoring the University's funding resources, including its grants and endowments, in consideration of the University's budgets.  Amir's involvement in Hebrew University's fundraising efforts made his affiliation with YHA an immense benefit to the University.  In fact, until Igoin's death, Hebrew University was one of only two institutions that received funding from YHA.

174.     As YHA's Manager, Amir took part in directing YHA's funding activity and until his death, served as an integral point person for YHA's operations, specifically: (i) Amir opened the YHA BLMIS Account; (ii) Amir's home address in Jerusalem served as YHA's official address; (iii) YHA held meetings at Amir's home until his death; (iv) beginning in at least 1992, Amir chaired numerous YHA meetings and signed meeting minutes for those meetings; and (v) Amir reviewed the YHA BLMIS Account customer statements, which BLMIS mailed to Amir's attention.  Additionally, for his services as a signatory on the YHA BLMIS Account and as YHA's Director General, Amir received a monthly salary from YHA.

175.     Through his tenure with YHA, Amir also solicited millions of dollars from YHA for the benefit of Hebrew University.

176.     After Amir's death and following a request from Green, an agreement was signed by YHA and Hebrew University to set up a fund in memory of Amir, "who worked at the University for many years and headed the University's authority for funds and investments." Pursuant to the agreement, YHA donated $100,000 to establish a permanent trust fund to distribute

scholarships to doctoral students.  At an awards ceremony for one such scholarship, Green gave a tribute to Amir stating that "without [Amir's] vision, [YHA] would not have been founded."

177.    Amir's actions managing YHA and approving grants to Hebrew University were within the scope of his duties and agency for YHA.

178.    Amir's solicitation and acceptance of funds on Hebrew University's behalf were within the scope of his duties and agency for Hebrew University.  Moreover, Hebrew University ratified Amir's actions by retaining the benefit of these funds.

179.    In carrying out his respective responsibilities for YHA and Hebrew University, Amir functioned as an agent for both, and his knowledge and actions are imputed to Hebrew University.

b.    Henri Atlan

180.    Atlan was one of YHA's founding members, served as its first Chairman, and served on YHA's Managing Board.  Contemporaneously with his service at YHA, including as Chairman, Atlan served as a Professor at Hadassah University Hospital affiliated with Hebrew University's School of Medicine.  As such, Atlan actively solicited grants on behalf of and for their benefit.

181.    Atlan had signatory authority for YHA's Israeli bank account and the YHA BLMIS Account.  When YHA needed money to be transferred from BLMIS to its Israeli bank account, Atlan signed letters to BLMIS requesting those withdrawals from the YHA BLMIS Account.  Atlan signed nearly every letter sent to BLMIS with these requests.

182.    During Atlan's tenure at YHA, Hebrew University received $17.7 million in the Applicable Period in grants from YHA.  Over this time, Atlan participated in YHA's decisions to award grants to Hebrew University, never recusing himself due to a potential conflict of interest.

183.    Atlan, alongside Green and others, helped YHA avoid scrutiny from authorities by opting to conceal Magnify, the true source of its funding.  Atlan and the YHA members also hid from the Israeli Registrar the fact they were benefitting from YHA's grants, both directly through their own research projects as well as indirectly through grants given to their affiliate institutions. This allowed YHA to continue to draw out millions of dollars of stolen customer property from BLMIS for Hebrew University.  In doing so, Atlan effectively perpetuated and enabled the Magnify Scheme.

c.    Hanoch Gutfreund

184.    From at least 1995, Gutfreund served as an agent of both Hebrew University and YHA, acting on each entity's behalf, with their consent, and for their benefit.

185.    Gutfreund served as President of Hebrew University from 1992–1997.  He knew Igoin personally and understood that YHA was founded in part to donate funds to Hebrew University.  By at least 1995, Gutfreund joined YHA.  As President of and a professor at Hebrew University, Gutfreund solicited funds or grants on behalf of and for the benefit of the University.

186.    In his capacity as a YHA member, Gutfreund actively participated in YHA's operations and grantmaking process and solicited grants from YHA on behalf of Hebrew University.  According to YHA's records, Gutfreund attended virtually every YHA meeting between 1995 and 2008 and served as its Chairman at several meetings in Atlan's absence beginning in 1998.

187.    Gutfreund held numerous leadership roles and responsibilities at YHA.  For example, in 2000, along with Nahir and Atlan, Gutfreund was given signatory authority for YHA's bank account in Israel, and since 2001, along with Atlan, Gutfreund served on YHA's Managing Board.

188.    Gutfreund actively drafted, solicited, and presented to YHA grant proposals on behalf of Hebrew University beginning in the year 1997.  From these solicitations, Gutfreund secured over $13 million in funding from YHA for the benefit of Hebrew University.

189.    During the Applicable Period, Gutfreund participated in YHA's meetings awarding grants to Hebrew University.

190.    During Gutfreund's tenure at YHA, Hebrew University received $17.9 million in grants from YHA during the Applicable Period.

191.    Gutfreund, alongside Green and others, helped YHA avoid scrutiny from authorities effectively concealing Magnify, the true source of its funding.  Gutfreund and other YHA members also failed to disclose to the Israeli Registrar the fact they were benefitting from YHA through grants given to their respective universities, including in Gutfreund's correspondence with the Israeli Registrar.  This allowed YHA the ability to continue to solicit and receive millions of dollars for Hebrew University.  In doing so, Gutfreund effectively perpetuated and enabled the Magnify Scheme.

192.    Gutfreund's actions managing YHA and approving grants to Hebrew University were within the scope of his duties and agency for YHA.

193.    Gutfreund's solicitation and acceptance of funds on Hebrew University's behalf were within the scope of his duties and agency for Hebrew University.  Moreover, Hebrew University ratified Gutfreund's conduct by retaining the benefit of these funds.

194.    In carrying out his respective leadership responsibilities for YHA and Hebrew University, Gutfreund functioned as an agent for both, and his knowledge and actions are imputed to Hebrew University.

d.    Yair Green

195.    Green served as an agent of both Hebrew University and YHA, acting on each entity's behalf, with their consent, and for their benefit.

196.    As the Bankruptcy Court held in the Magnify/YHA Action, the Trustee adequately alleged that Green knew that Madoff falsified the amounts reported in the Magnify BLMIS Accounts.  Green knew that if he called upon Madoff to transfer funds from the Magnify BLMIS Accounts to YHA's BLMIS Account, regardless of the balance in the Magnify BLMIS Accounts, Madoff would agree, and the funds would be transferred.  As part of the Magnify Scheme, Green and YHA, including Hebrew University's representative agents, ensured that YHA had virtually unlimited funds for grants to the Defendants.

197.    Green was a chief architect of the Magnify Scheme.  The scheme both enabled YHA to funnel millions of dollars in fraudulent transfers to the Defendants and gave Green the opportunity to elevate his profile throughout Israel under the guise of acting as a philanthropist.

198.    In or around 2001, Green was named to Hebrew University's Board of Governors. The Board of Governors is "the supreme Authority of the University" with the power to "supervise the management, affairs, concerns and property of the University . . . [and to] consider and authorize the annual budget of the University and approve its financial policy."

199.    The Board of Governors has the authority to ratify Hebrew University's financials and budgetary reports and receive reports on the financial and other aspects of Hebrew University, among other responsibilities.

200.    Green actively solicited YHA for grant money, was a member of Hebrew University's Board of Governors, and also simultaneously served as YHA's counsel, drafting, and signing grant contracts on behalf of YHA.  Green played a significant role in funneling millions

of dollars in grants from YHA to Hebrew University, all the while remaining an active participant in Madoff's fraud.

201.    Green's actions with respect to approving and facilitating grants to Hebrew University were within the scope of his duties and agency for YHA.  Further, Green's service on Hebrew University's Board of Governors and his solicitation of funds on Hebrew University's behalf were within the scope of his agency for Hebrew University.  Hebrew University ratified Green's conduct by accepting the benefit of the funds.

e.    Ilan Chet

202.    Chet served as an agent of both Hebrew University and YHA, acting on each entity's behalf, with their consent, and for their benefit.

203.    Professor Chet served as Hebrew University's Vice President for Research and Development Authority from 1991 to 2001.  Upon information and belief, he returned to Hebrew University in 2006 as a professor.  As a professor at Hebrew University, Chet actively solicited funds or grants on behalf of and for the benefit of Hebrew University.

204.    According to Chet's publicly posted resume, he served as President of Defendant Weizmann during the intervening period between 2001 – 2006.

205.    Prior to joining YHA, while serving as an agent of Hebrew University, Chet actively drafted, solicited, and presented on grant proposals to YHA.

206.    In or around March 2007, Chet joined YHA.  In that role he attended several meetings, including meetings at which the members reviewed, discussed, and approved YHA's annual financial statements, in which YHA acknowledged that its funds were sourced with a broker in the United States.

207.    During his tenure at YHA Chet approved grants to Hebrew University.  In total, Hebrew University benefitted from the receipt of approximately $3 million in grants from YHA while Chet served as a member.

208.    Chet's actions within YHA approving grants to Hebrew University were within the scope of his duties and agency for YHA.

209.    Chet's acceptance of funds on Hebrew University's behalf were within the scope of his duties and agency for Hebrew University.  Moreover, Hebrew University ratified Chet's conduct by accepting the benefit of the funds.

210.    In carrying out his respective responsibilities for YHA and Hebrew University, Chet acted as an agent of both, and his knowledge and actions are imputed to Hebrew University.

2.    **Based on the Conduct of Its Agents, the Subsequent Transfers to Hebrew University are Recoverable**

211.    Amir, Gutfreund, Atlan, and Chet held prominent positions at premier academic institutions.  In addition, Amir and Gutfreund were, at various times, responsible for Hebrew University's financial affairs, which entailed managing an endowment in the hundreds of millions of dollars.

212.    Amir, Gutfreund, Atlan, and Chet worked with Green for years to obtain grants from YHA for the Hebrew University and others, while failing to accurately disclose to Israeli authorities the source of YHA's funding.

213.    Gutfreund and Atlan knew that YHA did not have sufficient funds in its bank accounts to cover the pledged grants to Hebrew University and the other Defendants.  This was expressly clear for at least the years 1999 to 2003, when the annual financial statements reflected that YHA's liabilities, including pledged grants, exceeded its assets by amounts ranging from $1.8

million to $10.2 million.  Gutfreund and Atlan did nothing to address the deficit but willingly accepted YHA's seemingly endless pool of funds.

214.    As discussed above, Green knew about the fraud at BLMIS.  Amir, Gutfreund, Atlan and Chet, among other things: (1) accepted the Magnify BLMIS Accounts' unexplained ability to fund YHA's pledges on demand even during periods of YHA's reported insolvency; (2) effectively concealed from the public and Israeli regulators, in contravention of Israeli regulations, that the Magnify BLMIS Accounts were YHA's funding source; and (3) solicited, approved and received YHA's grants while acting under an undisclosed conflict of interest, all of which helped preserve a seemingly endless supply of grant money to their institution.

215.    Hebrew University ratified the conduct of Amir, Atlan, Gutfreund, Chet, and Green by accepting the Subsequent Transfers.

216.    Over the course of the Magnify Scheme, Hebrew University received $34.1 million in total, of which the Trustee seeks $17.9 million as Subsequent Transfers during the Applicable Period.

### C.    Ben-Gurion University of the Negev and B.G. Negev

#### 1.    BGU Solicited and Received Funds from BLMIS Through Its Agents Rager, Cohen and Green

217.    Over the course of the Magnify Scheme, YHA transferred approximately $18.16 million to BGU.  Of this amount, Ben-Gurion University of the Negev received $15.3 million, and B.G. Negev received $1.55 million of Subsequent Transfers during the Applicable Period that the Trustee seeks to recover.  BGU received funds from YHA at least as early as 1998 and produced direct correspondence from YHA to the CEO of B.G. Negev and from the President of BGU to Green.

a.    Bracha Rager

218.    Rager served as an agent of both BGU and YHA, acting on each entity's behalf, with their consent, and for their benefit.

219.    Rager was one of the founders of the Department of Microbiology and Immunology at BGU, having joined BGU in or around 1976.  Rager's duties for BGU included raising funds to conduct scientific research.  As a professor at BGU, Rager solicited funds or grants on behalf of and for the benefit of the University.

220.    In addition, in or around January 1997, YHA announced the formation of the CSED.  The CSED was never incorporated as a legal entity but was merely a vehicle YHA used to distribute grant money.  Despite having no formal existence through which to conduct business, certain of YHA's members also assumed the title of members of the CSED, including Atlan and Rager, with Cohen assuming the title of the Director of the CSED.  Ultimately, the CSED functioned as an alter ego of YHA and constituted yet another avenue to funnel fictitious profits to Defendants.

221.    In July 1997, Rager assumed a title as a CSED member.  In that role, she purported to be responsible for guiding the CSED's activities, including providing funding to BGU, where she worked as a professor.

222.    Beginning in July 1997, Rager solicited and accepted YHA funds on behalf of BGU under the name of the CSED, as donor.  In an agreement dated 1998, Green, assuming authority to act on the CSED's behalf, promised BGU a grant of $90,000 to fund research led by Rager, and four more grants of $90,000 each during the period 1999–2002 to further support Rager's work. Rager also solicited and accepted YHA funds on behalf of BGU for additional research that was led by her.  In an agreement dated 2003, Green promised BGU another grant of $90,000 in

connection with Rager's work, which was followed with a 2004 agreement promising $50,000. Additional grants totaling at least $50,000 were promised in 2005.

223.    In September 2005, Rager formally became a YHA member.  In that capacity, Rager participated in YHA's grant making decisions beyond the CSED, and approved YHA's annual financial statements for the years ending 2005, 2006 and 2007.  After Rager joined YHA, funding continued to BGU.  For example, in 2006 YHA approved an additional $627,000 to fund six projects being conducted at BGU.

224.    Also in 2006, Rager spearheaded another YHA "research center" called the Israel Vaccine Research Initiative ("IVRI"), under which YHA could expand its grants to Defendants. The IVRI was meant to be the successor of the CSED.  Like the CSED, the IVRI was not incorporated as a legal entity.  Following the same model as the CSED, at the time of BLMIS's collapse, IVRI was in the process of becoming an additional avenue under which YHA would distribute grants to Defendants.

225.    Despite operating under the control of YHA and having no separate legal identity, the IVRI was publicly held out as a BGU "affiliate," with Rager serving as the lead director.  In a letter dated January 2006, written on BGU letterhead, and addressed to YHA, Rager reported that there was "a need for long-term financial support" for the IVRI, and she expressed her "backing for the application for support" from YHA.  On April 3, 2008, Rager participated in a YHA meeting and approved increasing the IVRI's budget by $1.8 million in research funds to be allotted to BGU.  BLMIS's collapse intervened and prevented YHA's transfer of that research grant to BGU.

226.    Rager served as a member of YHA, as an employee/agent of BGU, as a director of IVRI, and as a member of CSED, simultaneously soliciting, approving and receiving grants for BGU.

227.    Rager's actions within YHA and approving grants to BGU were within the scope of her duties and agency for YHA.

228.    Rager's solicitation and acceptance of funds on BGU's behalf were within the scope of her duties and agency for BGU.  Moreover, BGU ratified Rager's actions by accepting the benefit of the funds.

229.    In carrying out her respective responsibilities for YHA and BGU, Rager functioned as an agent for both, and her knowledge and actions are imputed to BGU.

b.    Irun Cohen

230.    Cohen served as an agent of both BGU and YHA, acting on each entity's behalf, with their consent, and for their benefit.

231.    Cohen served as the Director of the National Center for Biotechnology at BGU from 2004–2006.

232.    In addition to BGU, Cohen served as an agent for Weizmann and YHA, as detailed further below.  Among his other roles at YHA, Cohen was a YHA member throughout the Applicable Period.  In that capacity his responsibilities included deliberating and voting on the distribution of grants and reviewing and approving YHA's financial statements.

233.    Cohen was also appointed to YHA's Audit Committee in 2001 and his responsibilities included confirming the propriety of the activities of the officers and of YHA.  Instead of carrying out these legal obligations on behalf of the Audit Committee, Cohen appears to have simply rubber stamped that he "examined the final conduct of [YHA] and found it to be in order."

234.    Alongside Green and others, Cohen helped YHA avoid scrutiny from authorities by failing to disclose Magnify, the true source of YHA's funding, in YHA's financial statements. For example, Cohen approved financial statements that reported YHA's securities, which comprised 99.6% of YHA's total funds, "are traded on the United States Stock Exchange via a local broker." Cohen did not, however, disclose Magnify or BLMIS, despite repeated inquiries from the Israeli Registrar.

235.    During Cohen's tenure on the Audit Committee, YHA failed to disclose to the Israeli Registrar — as required by law — that YHA's members, YHA's Managing Board members and YHA's Audit Committee members, like Cohen, were recipients of YHA grants and personally benefitting both from the grants themselves as well as receiving salaries from their respective institutions.

236.    Cohen's actions within YHA and approving grants to BGU were within the scope of his duties and agency for YHA.

237.    Cohen's solicitation and acceptance of funds on BGU's behalf were within the scope of his duties and agency for BGU. Moreover, BGU ratified Cohen's actions by accepting the benefit of the funds.

238.    In carrying out his respective responsibilities for YHA and BGU, Cohen functioned as an agent for both, and his knowledge and actions are imputed to BGU.

c.    Yair Green

239.    Green served as an agent of both BGU and YHA, acting on each entity's behalf, with their consent, and for their benefit.

240.    As part of the Magnify Scheme, Green and YHA, including BGU's other agents, ensured that YHA had seemingly unlimited funds for grants to the Defendants.

241.    Green served on BGU's Board of Governors from 2002 – 2012, its Executive Committee since at least 2002, and on its Investment Committee from 2003 – 2012.  He was elected Chairman of BGU's Board of Directors in 2010.  Upon information and belief, these appointments were in acknowledgement of the millions of dollars in grants that he orchestrated to be funneled to BGU through YHA, which were fictious profits.

242.    According to BGU's Constitution and Statutes, the Board of Governors is "the supreme authority of BGU, and it oversees its affairs, management and assets."  It approves BGU's financial reports, ratifies its annual budget and its financial policy.  The Board of Governors is also tasked with raising funds for BGU.

243.    While on the BGU Board of Governors, Green served on the Investment Committee and Executive Committee.  Following his formal appointment to the BGU Board of Governors, millions of dollars flowed from YHA to BGU.

244.    Upon information and belief, as a result of the grants to BGU that Green facilitated, the University also presented him with an honorary doctorate in 2006.

245.    Green's actions with respect to approving and providing funds to BGU were within the scope of his duties and agency for YHA.  Green's actions with respect to soliciting and accepting grants on BGU's behalf were within the scope of his duties and agency for BGU as a member of its Board of Governors.  Moreover, BGU ratified his conduct by accepting the benefit of the funds.  In carrying out his respective responsibilities for YHA and BGU, Green served as an agent for both, and his knowledge and actions are imputed to BGU.

2.      **Based on the Conduct of Its Agents, the Subsequent Transfers to BGU are Recoverable.**

246.    Rager and Cohen worked with Green for years, including throughout the Applicable Period, to solicit and obtain grants from YHA for Defendant BGU, while failing to disclose the source of YHA's funding to the Israeli authorities.

247.    As a member of YHA, and of its Audit Committee, Cohen participated in YHA's obfuscation of the fact that the Magnify BLMIS Accounts were YHA's funding source.

248.    As a member of YHA's CSED and managing agent of IVRI, Rager participated in the approval process for YHA's grants whether made under the name of CSED or IVRI.  CSED and IVRI served as additional avenues for funneling money to BGU and other Defendants, with Rager's knowledge and support.

249.    As discussed above, Green knew of the fraud at BLMIS.  Cohen and Rager, among other things: (1) accepted YHA's unexplained ability to pay multimillion-dollar and multi-year pledges on demand even during periods of reported insolvency; (2) effectively concealed from the public and Israeli regulators, in contravention of Israeli regulations, that the Magnify BLMIS Accounts were YHA's funding source; and (3) solicited, approved and received YHA's grants while acting under an undisclosed conflict of interest, all of which helped preserve a seemingly endless supply of grant money to their institution.

250.    BGU ratified the conduct of Rager, Cohen and Green by accepting the Subsequent Transfers.

D.      **Weizmann**

1.      **Weizmann Solicited and Received Funds from BLMIS Through Its Agents Cohen, Ullman and Green**

251.    Throughout the Magnify Scheme, YHA transferred approximately $10.83 million to Weizmann.  Of this amount, Weizmann received approximately $6.15 million of Subsequent

Transfers during the Applicable Period that the Trustee seeks to recover (the "Weizmann Subsequent Transfers").

a.    Irun Cohen

252.    From at least 1996, Cohen acted as an agent on behalf of both Weizmann and YHA, acting on each entity's behalf, with their consent, and for their benefit.

253.    In addition to his position at co-Defendant BGU from 2004-2006, Cohen was a professor/administrator at Weizmann and held multiple senior positions, including Senior Scientist of the Department of Cell Biology, the Mauerberger Professor of Immunology, and Director of the Robert Koch-Minerva Center for Research in Autoimmune Diseases.  As a professor/administrator at Weizmann, Cohen solicited funds or grants on behalf of and for the benefit of Weizmann.

254.    Cohen became a member of YHA in 1996.  In 1997 Cohen, along with Atlan, played a key role in creating the CSED, as another name under which YHA provided grants to Defendants.

255.    Cohen wore multiple hats: the Director of the CSED, YHA member, YHA Audit Committee member and also a professor/director at Weizmann.  Cohen used these positions of authority to obtain grants for Weizmann as well as his individual studies.

256.    According to YHA's records, Cohen and others used their discretion when disbursing YHA's funds.  Acting as the CSED's Director, Cohen had particular influence over the disbursement of YHA's funds through the CSED.  That enabled him to approve distributions in the name of the CSED for Cohen's own research projects at Weizmann and for the projects and studies of other YHA individual members, as well as other Weizmann researchers.

257.    Cohen sent letters to Green and Nahir about CSED grant requests for his personal research at Weizmann.  Cohen also sent letters on CSED letterhead to himself as director of the CSED "informing" himself that the grant requests that he had made for his own research or other

research projects conducted at Weizmann were approved. For example, in July 2000, Cohen sent

a letter in his capacity as Director of the CSED to himself in his capacity as professor at Weizmann,

providing that a prior grant was renewed in the amount of $90,000 per year for a period of three

years.

258. In Cohen's first year as the CSED's Director, YHA approved grants totaling

$270,000 through the CSED, including for Cohen's own research at Weizmann.

259. In the ensuing years, Cohen not only continued to request and approve funds from

YHA and the CSED to Weizmann, but he significantly increased the amounts. For example, in

1998 Cohen requested that YHA increase previously approved funding of $3 million for CSED,

seeking and receiving approval for an additional $500,000 per year for a period of three years.

260. Cohen was also appointed to YHA's Audit Committee from 2001 and his

responsibilities included confirming the propriety of the activities of the officers and of the

Association. There is no documentation showing that Cohen or any of the Audit Committee

members carried out these legal obligations; rather Cohen appears to have simply rubber stamped

that he "examined the final conduct of [YHA] and found it to be in order." YHA's financial reports

also indicated that YHA, at times, operated at a deficit. Cohen did not question how YHA could

address the deficit or continue to fund the grants he solicited and obtained on behalf of Weizmann.

261. As described above, alongside Green and others, Cohen failed to disclose Magnify,

the true source of YHA's funding, in YHA's financial statements. As with BGU, this enabled

YHA to continue to transfer millions of dollars to Weizmann and ultimately perpetuated the

Magnify Scheme.

262. YHA failed to disclose to the Israeli Registrar, as required under Israeli law, that

its own members, like Cohen, were benefitting from YHA's distribution of funds.

263.    Cohen's actions within YHA, including managing CSED and approving grants to Weizmann, were within the scope of his duties and agency for YHA.

264.    Cohen's solicitation and acceptance of funds on Weizmann's behalf were within the scope of his duties and agency for Weizmann.  Moreover, Weizmann ratified his conduct by accepting the benefit of the funds.

265.    In carrying out his respective responsibilities for YHA and Weizmann, Cohen functioned as an agent for both, and his knowledge and actions are imputed to Weizmann.

     b.  <u>Shimon Ullman</u>

266.    Shimon Ullman acted as an agent on behalf of both Weizmann and YHA, acting on each entity's behalf, with their consent, and for their benefit.

267.    In March 2004, Weizmann professor Ullman joined YHA, further strengthening the bond between YHA and Weizmann.  Acting as an agent for both YHA and Weizmann, Ullman furthered the practice of approving grants, which were comprised of stolen customer property, to Weizmann.

268.    Both Cohen and Ullman participated in numerous YHA meetings where they discussed and approved YHA's annual financial reports.  Documents do not show that either Cohen or Ullman questioned how YHA could fund the millions of dollars they solicited and obtained from YHA on behalf of Weizmann.

269.    Ullman's actions within YHA, including approving grants to Weizmann, were within the scope of his duties and agency for YHA.

270.    Ullman's solicitation and acceptance of funds on Weizmann's behalf were within the scope of his duties and agency for Weizmann.  Moreover, Weizmann ratified his conduct by retaining the benefit of the funds.

271.    In carrying out his respective responsibilities for YHA and Weizmann, Ullman functioned as an agent for both, and his knowledge and actions are imputed to Weizmann.

c.    <u>Yair Green</u>

272.    Green served as an agent of both Weizmann and YHA, acting on each entity's behalf, with their consent, and for their benefit.

273.    As part of the Magnify Scheme, Green and the YHA members, including Weizmann's other representative agents, ensured that YHA had seemingly unlimited funds for grants to the Defendants.

274.    Green was appointed to Weizmann's Board of Governors in 2007.    Upon information and belief, this appointment was an acknowledgement of the millions of dollars in grants that Green helped to funnel to Weizmann through YHA, which were fictious profits.

275.    In that role, Green was responsible for making decisions concerning the finances of Weizmann and played a role in Weizmann's fundraising efforts for itself and its employees.

276.    Green's actions within YHA relating to grants to Weizmann were within the scope of his duties and agency for YHA.

277.    Green's acceptance of funds on Weizmann's behalf was within the scope of his duties and agency for Weizmann.    Moreover, Weizmann ratified his conduct by retaining the benefit of the funds.

278.    As a member of Weizmann's Board of Governors, Green's knowledge of the fraudulent source of YHA's funding is imputed to Weizmann.

2.    **Based on the Conduct of its Agents, the Subsequent Transfers to Weizmann are Recoverable**

279.    As detailed above, Green, Cohen and Ullman served as agents both for YHA and Weizmann, and in those roles solicited and received grants from YHA on Weizmann's behalf.

While at Weizmann, Cohen held positions of authority within the CSED and YHA, while continuing to solicit and approve grants to Weizmann.

280.    As CSED Director, Cohen knew that CSED did not function independently from YHA.  Cohen also knew that the YHA BLMIS Account did not have sufficient funds to cover the grants to Weizmann and the other Defendants.  This was expressly clear for at least the years 1999 to 2003, when the annual financial statements reflected that YHA's liabilities, including pledged grants, exceeded its assets by amounts ranging from $1.8 million to $10.2 million.  Cohen did nothing to address the deficit but willingly accepted YHA's seemingly endless pool of funds.

281.    Ullman knew, as Cohen did, that YHA's financial reports disclosed that its assets "are traded on the United States Stock Exchange via a local broker."  As members of YHA, Cohen and Ullman approved financial statements referencing only the modest amounts in YHA's Israeli bank account and the YHA BLMIS Account.  Based upon YHA's financial statements, it was impossible for YHA to fund millions of dollars in pledges to Weizmann, including for Cohen's personal projects.

282.    As discussed above, Green was aware of the fraud at BLMIS.  Cohen and Ullman, among other things: (1) accepted YHA's unexplained ability to pay multimillion-dollar and multi-year pledges on demand even during periods of reported insolvency; (2) concealed from the public and Israeli regulators, in contravention of Israeli regulations, that the Magnify BLMIS Accounts were YHA's funding source; and (3) solicited, approved and received YHA's grants while acting under an undisclosed conflict of interest, all of which helped preserve a seemingly endless supply of grant money to their institution.

283.    Weizmann ratified the conduct of Cohen, Ullman and Green by accepting the Weizmann Subsequent Transfers.

E.    **Bar Ilan**

1.    **Bar Ilan Solicited and Received Funds from BLMIS Through Its Agent Caspi**

284.    Throughout the Magnify Scheme, YHA transferred approximately $10 million to Bar Ilan.  Of this amount, Bar Ilan received approximately $8.8 million of Subsequent Transfers during the Applicable Period (the "Bar Ilan Subsequent Transfers").

285.    Caspi served as an agent of both Bar Ilan and YHA, acting on each entity's behalf, with their consent, and for their benefit.

286.    Caspi joined YHA in 1995, was appointed a member of YHA's Audit Committee at least since 2000 and appears to have served in that position at least until 2013.

287.    At the same time, Caspi was a lecturer and researcher at Bar Ilan, at least between 1995 and 2004.  He also served as the Director and principal investigator of Bar Ilan's "Cranet" research laboratory in the field of human resources and labor relations, which was established by YHA.  According to Bar Ilan, Caspi served as Director of the Institute for Labor Relations, as the Director of the EMBA program within its School of Business Administration, and the head of Bar Ilan Affiliate Safed College from 2003 – 2006.  As of 2021, Caspi is on Bar Ilan's website as part of its faculty.  As a professor and administrator at Bar Ilan, Caspi actively solicited funds or grants on behalf of and for the benefit of the University.

288.    In 1995, Caspi joined YHA and subsequently began directly soliciting and approving grants from YHA on behalf of Bar Ilan, including for his own projects.

289.    Caspi personally benefited from the grants that were solicited and received by Bar Ilan.  For example, he requested and YHA approved a salary "addition" of $1,000 per month to Caspi as part of one of the Bar Ilan approved grants.

290.    Minutes of a YHA meeting from 2000 show that Caspi, then a member of YHA, asked to increase the contribution to the Cranet project, for which he was the director and principal investigator, and an additional $540,000 was accordingly approved.

291.    During Caspi's tenure at YHA, Bar Ilan received at least $660,000 for his research. Documents surrounding the grants show that Bar Ilan was aware that Caspi was seeking funding from YHA on its behalf.

292.    In 2000, Caspi was elected to YHA's Audit Committee.  Caspi's responsibilities on the Audit Committee included confirming the propriety of the activities of the officers and of the Association.  Instead of carrying out these responsibilities to YHA, Caspi appears to have rubber stamped that he "examined the final conduct of [YHA] and found it to be in order."

293.    As described above, Caspi, alongside Green and others concealed that Magnify was the true source of YHA's funding in its financial statements.  This enabled YHA to continue to make grants of millions of dollars to Bar Ilan and perpetuated the Magnify Scheme.

294.    Presumably as a result of the grants to Bar Ilan, Green received an honorary doctorate in 2008.

2.    **Based on the Conduct of its Agent, the Subsequent Transfers to Bar Ilan are Recoverable**

295.    Caspi served as an agent both for YHA and Bar Ilan and in those roles solicited grants from YHA on Bar Ilan's behalf.  Caspi's knowledge and actions are imputed to Bar Ilan.

296.    Caspi's solicitation and acceptance of funds for Bar Ilan, particularly for the Cranet project, were within the scope of his duties and agency for Bar Ilan.  Moreover, Bar Ilan ratified his conduct by retaining the benefit of the funds.

297.    As a YHA member and Audit Committee member who approved financial statements, Caspi was aware that YHA's purported assets were insufficient to cover its grant pledges.  Despite this knowledge, Caspi solicited grants from YHA on Bar Ilan's behalf.

298.    In his role on the Audit Committee, Caspi acquired additional information about YHA's financial condition.  Caspi knew that YHA did not report sufficient funds to cover the grants to Bar Ilan and the other Defendants.  This was expressly clear for at least the years 1999 to 2003, when the annual financial statements reflected that YHA's liabilities, including pledged grants, exceeded its assets by amounts ranging from $1.8 million to $10.2 million.  Instead of questioning YHA's financial condition and investigating how it was possible for YHA to fund the grants to Bar Ilan, over the time period that Caspi acted for YHA, he did nothing to address the deficit but willingly accepted YHA's seemingly endless pool of funds.

299.    Among other things, Caspi: (1) accepted YHA's unexplained ability to pay multimillion-dollar and multi-year pledges on demand even during periods of reported insolvency; (2) obscured, in contravention of Israeli regulations, that the Magnify BLMIS Accounts were YHA's funding source; and (3) solicited, approved, and received YHA's grants while acting under an undisclosed conflict of interest, all of which helped preserve a seemingly endless supply of grant money to Bar Ilan.

300.    Bar Ilan ratified the conduct of Caspi by accepting the Bar Ilan Subsequent Transfers.

## THE TRANSFERS

### A.    The Initial Transfers from BLMIS to YHA

301.    According to BLMIS's records, from March 1989 through October 2008, YHA withdrew from its YHA BLMIS Account the amount of $126,489,846 (the "Initial Transfers").  Of this amount, $123,673,185 constituted fictitious profits and $2,816,661 constituted the return

of principal.  *See* Exhibit B to the Magnify/YHA Complaint, ECF No. 143-2.  The Initial Transfers

were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

### 1.    The Six-Year Initial Transfers

302.    During the six years prior to the Filing Date, BLMIS made Transfers to YHA

totaling $77,580,000, all of which represented Fictitious Profits from the Madoff Ponzi scheme

(the "Six-Year Initial Transfers").  *See* Exhibit B to the Magnify/YHA Complaint, ECF No. 143-

2, Column 11.

### 2.    The Two-Year Initial Transfers

303.    During the two years prior to the Filing Date, BLMIS made Transfers to YHA

totaling $24,000,000, all of which represented Fictitious Profits from the Madoff Ponzi scheme

(the "Two-Year Initial Transfers").  *See* Exhibit B to the Magnify/YHA Complaint, ECF No. 143-

2, Column 10.

### B.    The Initial Transfers Have Been Avoided

304.    The Trustee reached a settlement with YHA, which was approved by the

Bankruptcy Court on September 28, 2020.  Pursuant to the settlement, the Initial Transfers were

avoided under*, inter alia*, Bankruptcy Code §§ 544, 548, SIPA §78fff-2(c)(3) and applicable state

law, including as set forth in the consent judgment entered by the Bankruptcy Court on October

22, 2020.  *See* Magnify/YHA Action ECF Nos. 197, 199.  The Trustee now seeks to recover the

Subsequent Transfers of those Initial Transfers.

### C.    The Subsequent Transfers

### 1.    Subsequent Transfers from YHA to The Hebrew University of Jerusalem

305.    Prior to the Filing Date, YHA transferred a portion of the Initial Transfers to The

Hebrew University of Jerusalem ("The Hebrew University of Jerusalem Subsequent Transfers").

Based on the Trustee's investigation to date, The Hebrew University of Jerusalem Subsequent Transfers during the Applicable Period total approximately $17.7 million. A chart setting forth the presently-known Subsequent Transfers to The Hebrew University of Jerusalem is attached as Exhibit A.

306.    In the Trustee's settlement in the Magnify/YHA Action, YHA affirmed that it transferred no less than $36 million of Subsequent Transfers to Hebrew University (including Yissum).

307.    The Hebrew University of Jerusalem Subsequent Transfers are recoverable from The Hebrew University of Jerusalem under Bankruptcy Code § 550(a) and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

### 2.    Subsequent Transfers from YHA to Yissum

308.    Prior to the Filing Date, YHA transferred a portion of the Initial Transfers to Yissum (the "Yissum Subsequent Transfers"). Based on the Trustee's investigation to date, the Yissum Subsequent Transfers during the Applicable Period total approximately $202,693. A chart setting forth the presently-known Yissum Subsequent Transfers is attached as Exhibit B.

309.    In the Trustee's settlement in the Magnify/YHA Action, YHA affirmed that it transferred no less than $36 million of Subsequent Transfers to Hebrew University (including Yissum).

310.    The Yissum Subsequent Transfers are recoverable from Yissum under Bankruptcy Code § 550(a) and applicable provisions of SIPA, including § 78fff-2(c)(3).

### 3.    Subsequent Transfers from YHA to Ben-Gurion University of the Negev

311.    Prior to the Filing Date, YHA transferred a portion of the Initial Transfers to Ben-Gurion University of the Negev ("Ben-Gurion University of the Negev Subsequent Transfers").

Based on the Trustee's investigation to date, the Ben-Gurion University of the Negev Subsequent Transfers during the Applicable Period total approximately $15.31 million. A chart setting forth the presently known Ben-Gurion University of the Negev Subsequent Transfers is attached as Exhibit C.

312.    In the Trustee's settlement in the Magnify/YHA Action, YHA affirmed that it transferred no less than $18.38 million of Subsequent Transfers to BGU (including B.G. Negev).

313.    The Ben-Gurion University of the Negev Subsequent Transfers are recoverable from Ben-Gurion University of the Negev under Bankruptcy Code § 550(a) and applicable provisions of SIPA, including § 78fff-2(c)(3).

### 4.    Subsequent Transfers from YHA to B.G. Negev

314.    Prior to the Filing Date, YHA transferred a portion of the Initial Transfers to B.G. Negev (the "B.G. Negev Subsequent Transfers"). Based on the Trustee's investigation to date, the B.G. Negev Subsequent Transfers during the Applicable Period total approximately $1.55 million. A chart setting forth the presently known B.G. Negev Subsequent Transfers is attached as Exhibit D.

315.    In the Trustee's settlement in the Magnify/YHA Action, YHA affirmed that it transferred no less than $18.38 million of Subsequent Transfers to BGU (including B.G. Negev).

316.    The B.G. Negev Subsequent Transfers are recoverable from B.G. Negev under Bankruptcy Code § 550(a) and applicable provisions of SIPA, including § 78fff-2(c)(3).

### 5.    Subsequent Transfers from YHA to Weizmann

317.    Prior to the Filing Date, YHA transferred a portion of the Initial Transfers to Weizmann. Based on the Trustee's investigation to date, the Weizmann Subsequent Transfers during the Applicable Period total approximately $6.15 million. A chart setting forth the presently known Weizmann Subsequent Transfers is attached as Exhibit E.

318.    In the Trustee's settlement in the Magnify/YHA Action, YHA affirmed that it transferred no less than $13.5 million of Subsequent Transfers to Weizmann.

319.    The Weizmann Subsequent Transfers are recoverable from Weizmann under Bankruptcy Code § 550(a) and applicable provisions of SIPA, including § 78fff-2(c)(3).

6.    **Subsequent Transfers from YHA to Bar Ilan**

320.    Prior to the Filing Date, YHA transferred a portion of the Initial Transfers to Bar Ilan.  Based on the Trustee's investigation to date, the Bar Ilan Subsequent Transfers during the Applicable Period total approximately $8.8 million.  A chart setting forth the presently known Bar Ilan Subsequent Transfers is attached as Exhibit F.

321.    In the Trustee's settlement in the Magnify/YHA Action, YHA affirmed that it transferred no less than $10.03 million of Subsequent Transfers to Bar Ilan.

322.    The Bar Ilan Subsequent Transfers are recoverable from Bar Ilan under Bankruptcy Code § 550(a) and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

323.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

## COUNT ONE

## RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 105(a) and 550(a)

### *(Against The Hebrew University of Jerusalem)*

324.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

325.    Based on the conduct described herein, The Hebrew University of Jerusalem Subsequent Transfers are recoverable under Bankruptcy Code § 550 and SIPA § 78fff-2(c)(3).

326.    The Hebrew University of Jerusalem is an immediate or mediate transferee of the Initial Transfers from YHA.

327.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 105(a) and 550(a) and SIPA §§ 78fff-2(c)(3), the Trustee is entitled to a judgment against The Hebrew University of Jerusalem: (a) recovering The Hebrew University of Jerusalem Subsequent Transfers, or the value thereof, from The Hebrew University of Jerusalem for the benefit of the BLMIS estate; and (b) awarding any other relief as the Court deems appropriate.

## COUNT TWO

## RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 105(a) and 550(a)

### *(Against Yissum)*

328.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

329.    Based on the conduct described herein, the Yissum Subsequent Transfers are recoverable from Yissum under Bankruptcy Code § 550 and SIPA § 78fff-2(c)(3).

330.    Yissum is an immediate or mediate transferee of the Initial Transfers from YHA.

331.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 105(a) and 550(a) and SIPA §§ 78fff-2(c)(3), the Trustee is entitled to a judgment against Yissum: (a) recovering the Yissum Subsequent Transfers, or the value thereof, from Yissum for the benefit of the BLMIS estate; and (b) awarding any other relief as the Court deems appropriate.

## COUNT THREE

## RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 105(a) and 550(a)

### *(Against Ben-Gurion University of the Negev)*

332.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

333.     Based on the conduct described herein, the Ben-Gurion University of the Negev Subsequent Transfers are recoverable from Ben-Gurion University of the Negev under Bankruptcy Code § 550 and SIPA § 78fff-2(c)(3).

334.     Ben-Gurion University of the Negev is an immediate or mediate transferee of the Initial Transfers from YHA.

335.     As a result of the foregoing, pursuant to Bankruptcy Code §§ 105(a) and 550(a) and SIPA §§ 78fff-2(c)(3), the Trustee is entitled to a judgment against Ben-Gurion University of the Negev: (a) recovering the Ben-Gurion University of the Negev Subsequent Transfers, or the value thereof, from Ben-Gurion University of the Negev for the benefit of the BLMIS estate; and (b) awarding any other relief as the Court deems appropriate.

## COUNT FOUR

## RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 105(a) and 550(a)

### *(Against B.G. Negev)*

336.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

337.     Based on the conduct described herein, the B.G. Negev Subsequent Transfers are recoverable from B.G. Negev under Bankruptcy Code § 550 and SIPA § 78fff-2(c)(3).

338.    B.G. Negev is an immediate or mediate transferee of the Initial Transfers from YHA.

339.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 105(a) and 550(a) and SIPA §§ 78fff-2(c)(3), the Trustee is entitled to a judgment against B.G. Negev: (a) recovering the B.G. Negev Subsequent Transfers, or the value thereof, from B.G. Negev for the benefit of the BLMIS estate; and (b) awarding any other relief as the Court deems appropriate.

## COUNT FIVE

## RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 105(a) and 550(a)

### *(Against Weizmann)*

340.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

341.    Based on the conduct described herein, the Weizmann Subsequent Transfers are recoverable from Weizmann under Bankruptcy Code § 550 and SIPA § 78fff-2(c)(3).

342.    Weizmann is an immediate or mediate transferee of the Initial Transfers from YHA.

343.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 105(a) and 550(a) and SIPA §§ 78fff-2(c)(3), the Trustee is entitled to a judgment against Weizmann: (a) recovering the Weizmann Subsequent Transfers, or the value thereof, from Weizmann for the benefit of the BLMIS estate; and (b) awarding any other relief as the Court deems appropriate.

## COUNT SIX

## RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 105(a) and 550(a)

### *(Against Bar Ilan)*

344.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

345.    Based on the conduct described herein, the Bar Ilan Subsequent Transfers are recoverable from Bar Ilan under Bankruptcy Code § 550 and SIPA § 78fff-2(c)(3).

346.    Bar Ilan is an immediate or mediate transferee of the Initial Transfers from YHA.

347.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 105(a) and 550(a) and SIPA §§ 78fff-2(c)(3), the Trustee is entitled to a judgment against Bar Ilan: (a) recovering the Bar Ilan Subsequent Transfers, or the value thereof, from Bar Ilan for the benefit of the BLMIS estate; and (b) awarding any other relief as the Court deems appropriate.

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

a)    On the First Count, under Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3), the Trustee is entitled to judgment against The Hebrew University of Jerusalem recovering The Hebrew University of Jerusalem Subsequent Transfers, or the value thereof, from Hebrew University for the benefit of the estate;

b)    On the Second Count, under Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3), the Trustee is entitled to judgment against Yissum recovering the Yissum Subsequent Transfers, or the value thereof, from Yissum for the benefit of the estate;

c)    On the Third Count, under Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3), the Trustee is entitled to judgment against Ben-Gurion University of the Negev recovering the Ben-Gurion University of the Negev Subsequent Transfers, or the value thereof, from Ben-Gurion University of the Negev for the benefit of the estate;

d)    On the Fourth Count, under Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3), the Trustee is entitled to judgment against B.G. Negev recovering the B.G. Negev Subsequent Transfers, or the value thereof, from B.G. Negev for the benefit of the estate;

e) On the Fifth Count, under Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3), the Trustee is entitled to judgment against Weizmann recovering the Weizmann Subsequent Transfers, or the value thereof, from Weizmann for the benefit of the estate;

f) On the Sixth Count, under Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3), the Trustee is entitled to judgment against Bar Ilan recovering the Bar Ilan Subsequent Transfers, or the value thereof, from Bar Ilan for the benefit of the estate;

g) If any Defendant challenges the avoidability of the Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Initial Transfers are avoidable pursuant to SIPA § 78fff(b) and 78fff-2(c)(3), Bankruptcy Code §§ 105(a), 544(b), 547(b), 548(a), and 551, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. Law §§ 270 *et seq.* (McKinney 2001)), and other applicable law;

h) On all Counts, awarding the Trustee prejudgment interest from the date on which the Subsequent Transfers were received by each Defendant;

i) Awarding the Trustee attorneys' fees, to the extent applicable, and all applicable interest, costs, and disbursements of this proceeding;

j)      Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.

Date:    September 27, 2021
         New York, New York

By:  */s/ David J. Sheehan*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Tracy L. Cole
Email: tcole@bakerlaw.com
Ganesh Krishna
Email: gkrishna@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Fernando A. Bohorquez
Email: fbohorquez@bakerlaw.com
Michelle N. Tanney
Email: mtanney@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC, and the Chapter 7 Estate of Bernard L.*
*Madoff*