**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-04562 (CGM) |
| v. | |
| ROBERT F. FERBER, | |
| Defendant. | |

**TRUSTEE'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .........................................................................................................................2

ARGUMENT ..............................................................................................................................3

I.     THIS COURT SHOULD ADHERE TO PRIOR RULINGS AS LAW OF THE
CASE .................................................................................................................................3

II.    IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT,
SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE
TRUSTEE AS A MATTER OF LAW .................................................................................6

     A.    Legal Standard .........................................................................................................6

     B.    The SIPA Scheme ....................................................................................................6

           1.    SIPA and SIPC..............................................................................................6

           2.    Customer Property Under SIPA.....................................................................8

     C.    The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year
Transfers of Fictitious Profits Made by BLMIS to Defendant .............................10

           1.    BLMIS Made the Two-Year Transfers with Actual Fraudulent
Intent and in Furtherance of the Fraud........................................................11

                a.    BLMIS Was a Ponzi Scheme.........................................................13

                b.    The Trustee's Experts Confirmed That BLMIS Was a
Ponzi Scheme...............................................................................15

                c.    The Trustee's Experts Confirmed That BLMIS Paid
Redemptions from Customer Funds ...............................................19

                d.    The Trustee's Evidence of "Badges of Fraud"
Independently Establishes Actual Intent to Defraud ....................20

                e.    BLMIS's Two-Year Transfers to Defendant Were in
Furtherance of the Fraud...............................................................22

           2.    BLMIS Made the Transfers to Defendant Within the Two-Year
Period .........................................................................................................22

           3.    The Transfers Were an Interest of the Debtor in Property.........................23

                a.    The Transfers are Customer Property and the Trustee Can

Recover Them ................................................................................23

b.    BLMIS Owned the JPMorgan Accounts Because the IA
Business Was Transferred to the LLC in 2001 ..............................25

c.    Because the Estates Were Consolidated, the Trustee Can
Recover Customer Property Held in The Names of Either
the LLC or Madoff ........................................................................30

d.    *Avellino* Was Wrong ....................................................................32

D.    Defendant Has Not Presented Any Countervailing Evidence ...............................36

III.    DEFENDANT'S DEFENSES CAN BE DETERMINED AS A MATTER OF
LAW ................................................................................................................36

A.    Defendant Did Not Give Value for Fictitious Profits ...........................................37

B.    Taxes May Not Be Considered as Part of Value Calculation ...............................37

IV.    THE TRUSTEE IS ENTITLED TO PREJUDGMENT INTEREST AS A
MATTER OF LAW ..........................................................................................38

CONCLUSION .............................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
    No. 05 Civ. 9050(LMM), 2011 WL 1419617 (S.D.N.Y. Apr. 7, 2011), *aff'd*,
    748 F.3d 110 (2d Cir. 2014)........................................................................................10

*Ahammed v. SIPC (In re Primeline Sec. Corp.)*,
    295 F.3d 1100 (10th Cir. 2002) ................................................................................35

*Alexander v. Compton (In re Bonham)*,
    229 F.3d 750 (9th Cir. 2000) ....................................................................................32

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)....................................................................................................5

*Armstrong v. Collins*,
    Nos. 01 Civ. 2437(PAC), 02 Civ. 2796 (PAC), 02 Civ. 3620(PAC), 2010 WL
    1141158 (S.D.N.Y. Mar. 24, 2010) ..............................................................11, 12, 15

*Banner v. Kassow*,
    104 F.3d 352 (2d Cir. 1996)......................................................................................21

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou
    Grp., LLC)*,
    396 B.R. 810 (Bankr. S.D.N.Y. 2008), *rev'd in part on other grounds*, *Bayou
    IV*, 439 B.R. at 284..............................................................................................22, 36

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
    380 F. Supp. 2d 334 (S.D.N.Y. 2005)........................................................................6

*Bourdeau Bros., Inc. v. Montagne (In re Montagne)*,
    Adv. Pro. No. 08-1024, 2010 WL 271347 (Bankr. S.D.N.Y. Jan. 22, 2010)............5

*Brody v. Vill. of Port Chester*,
    345 F.3d 103 (2d Cir. 2003)........................................................................................4

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)....................................................................................................6

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re
    Bayou Grp. LLC)*,
    439 B.R. 284 (S.D.N.Y. 2010)........................................................................ *passim*

*Donell v. Kowell*,
    533 F.3d 762 (9th Cir. 2008) ........................................................................12, 38

*Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*,
    97 B.R. 503 (E.D. Ark. 1987) ...................................................................................9

*Emerson v. Maples (In re Mark Benskin & Co., Inc.)*,
    59 F.3d 170 (6th Cir. 1995) ...................................................................................12

*Focht v. Heebner (In re Old Naples Sec., Inc.)*,
    223 F.3d 1296 (11th Cir. 2000) .............................................................................35

*Geltzer v. Artists Mktg. Corp. (In re Cassandra Grp.)*,
    338 B.R. 583 (Bankr. S.D.N.Y. 2006) ..................................................................38

*Gill v. Maddalena (In re Maddalena)*,
    176 B.R. 551 (Bankr. C.D. Cal. 1995) ..................................................................40

*Gowan v. The Patriot Grp. (In re Dreier LLP)*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011) ..................................................................12

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*,
    310 B.R. 500 (Bankr. S.D.N.Y. 2002) ..................................................................21

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund LTD.)*,
    359 B.R. 510 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397 B.R. 1
    (S.D.N.Y. 2007) .....................................................................................................22

*Hill v. Spencer Sav. & Loan Ass'n (In re Bevill, Bresler & Schulman, Inc.)*,
    83 B.R. 880 (D.N.J. 1988) .......................................................................................9

*Janvey v. Brown*,
    767 F.3d 430 (5th Cir. 2014) .................................................................................12

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
    712 F.3d 185 (5th Cir. 2013) .................................................................................12

*Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*,
    No. 12-cv-2652 (RJS), 2017 WL 82391 (S.D.N.Y. 2017) ....................................21

*Klein v. Cornelius*,
    786 F.3d 1310 (10th Cir. 2015) .............................................................................12

*In re Lehman Bros. Holdings Inc.*,
    445 B.R. 143 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478
    B.R. 570 (S.D.N.Y. 2012)........................................................................................8

*Liebersohn v. Campus Crusade for Christ, Inc.* (*In re C.F. Foods, L.P.*),
   280 B.R. 103 (Bankr. E.D. Pa. 2002) ..............................................................11, 12

*Martino v. Edison Worldwide Cap.* (*In re Randy*),
   189 B.R. 425 (Bankr. N.D. Ill. 1995) ..............................................................11, 12

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..............................................................................................6

*McHale v. Boulder Cap.* (*In re 1031 Tax Grp., LLC*),
   439 B.R. 47 (S.D.N.Y. 2010)..........................................................................15, 37

*Merrill v. Abbott* (*In re Indep. Clearing House Co.*),
   77 B.R. 843 (D. Utah 1987)..................................................................................12

*Messer v. Magee* (*In re FKF 3, LLC*),
   No. 13 Civ. 3601 (JCM), 2018 WL 5292131 (S.D.N.Y. Oct. 24, 2018)..........39, 40

*Moran v. Goldfarb*,
   No. 09-cv-7667 (RJS), 2012 WL 2930210 (S.D.N.Y. July 16, 2012)..............12, 14

*In re Motors Liquidation Co.*,
   590 B.R. 39 (S.D.N.Y. 2018), *aff'd*, 943 F.3d 125 (2d Cir. 2019) ......................3, 4

*Newbro v. Freed*,
   409 F. Supp. 2d 386 (S.D.N.Y. 2006) *aff'd*, No. 06-1722-CV, 2007 WL
   642941 (2d Cir. Feb. 27, 2007)............................................................................40

*In re PCH Assocs.*,
   949 F.2d 585 (2d Cir. 1991)....................................................................................5

*Peloro v. United States*,
   488 F.3d 163 (3d Cir. 2007)..................................................................................35

*Perez v. Terrastar Corp.* (*In re Terrastar Corp.*),
   No. 16 Civ. 1421 (ER), 2017 WL 1040448 (S.D.N.Y. Mar. 16, 2017), *appeal
   dismissed*, No. 17-1117 (2d Cir. June 29, 2017)......................................................4

*Perkins v. Haines*,
   661 F.3d 623 (11th Cir. 2011) ..............................................................................12

*Picard v. Avellino* (*In re BLMIS*),
   557 B.R. 89 (Bankr. S.D.N.Y. 2016)........................................................23, 32, 34

*Picard v. BAM L.P.*,
   608 B.R. 165 (Bankr. S.D.N.Y. 2019)...............................................................18, 37

*Picard v. BAM L.P.*,
    624 B.R. 55 (Bankr. S.D.N.Y. 2020) .............................................................. *passim*

*Picard v. Chais*,
    445 B.R. 206 (Bankr. S.D.N.Y. 2011) ...................................................................13

*Picard v. Citibank, N.A. (In re BLMIS)*,
    12 F.4th 171 (2d Cir. 2021) ........................................................................7, 24

*Picard v. Cohen*,
    Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
    25, 2016) ...............................................................................................11, 25, 37

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) ...................................................................11

*Picard v. The Est. (Succession) of Doris Igoin (In re BLMIS)*,
    525 B.R. 871 (Bankr. S.D.N.Y. 2015) ...................................................................38

*Picard v. Fairfield Greenwich Ltd.*,
    762 F.3d 199 (2d Cir. 2014) .................................................................................9

*Picard v. The Gerald and Barbara Keller Fam. Tr.*,
    Adv. Pro. No. 10-04539 (CGM), 2021 WL 4476811 (Bankr. S.D.N.Y. Sept.
    30, 2021) ..................................................................................................... *passim*

*Picard v. Gettinger (In re BLMIS)*,
    976 F.3d 184 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2603 (2021) ..........................7, 8, 13, 37

*Picard v. Greiff (In re Madoff Sec.)*,
    476 B.R. 715 (S.D.N.Y. 2012) ...................................................................13, 22

*Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*,
    773 F.3d 411 (2d Cir. 2014) ...............................................................................13

*Picard v. JABA Assocs. LP*,
    528 F. Supp. 3d 219 (S.D.N.Y. 2021) ..................................................... *passim*

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011) ...........................................................................13

*Picard v. Legacy Cap. Ltd.*,
    603 B.R. 682 (Bankr. S.D.N.Y. 2019) ..........................................................3, 15, 18

*Picard v. Lisa Beth Nissenbaum Tr.*,
    No. 20 cv. 3140, 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) ..................................... *passim*

*Picard v. Lowrey (In re Bernard L. Madoff)*,
    596 B.R. 451 (S.D.N.Y. 2019)............................................................8

*Picard v. Miller (In re Bernard L. Madoff)*,
    631 B.R. 1 (Bankr. S.D.N.Y. 2021) ........................................ *passim*

*Picard v. Nelson*,
    610 B.R. 197 (Bankr. S.D.N.Y. 2019)...................................... *passim*

*Picard v. RAR Entrepreneurial Fund, Ltd.*,
    No. 20-cv-1029, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021)..........4, 5, 15

*In re Picard*,
    917 F.3d 85 (2d Cir. 2019).............................................................24

*In re Pilgrim's Pride Corp.*,
    442 B.R. 522 (Bankr. N.D. Tex. 2010)...............................................4, 5

*Ritchie Cap. Mgmt., LLC v. Stoebner*,
    779 F.3d 857 (8th Cir. 2015) ............................................................12

*In re Rock & Republic Enters., Inc.*,
    No. 10–11728 (AJG), 2011 WL 2471000 (Bankr. S.D.N.Y. June 20, 2011)..........................4

*Rosenman Fam., LLC v. Picard*,
    395 F. App'x 766 (2d Cir. 2010) .......................................................24

*Salomon v. Kaiser (In re Kaiser)*,
    722 F.2d 1574 (2d Cir. 1983)...........................................................21

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) .............................................................12

*SEC v. F.O. Baroff Co.*,
    497 F.2d 280 (2d Cir. 1974)............................................................5, 7

*SIPC v. 2427 Parent Corp. (In re BLMIS)*,
    779 F.3d 74 (2d Cir. 2015)...............................................................6

*SIPC v. BLMIS (In re Bernard L. Madoff)*,
    496 B.R. 744 (Bankr. S.D.N.Y. 2013)..................................................6

*SIPC v. BLMIS LLC (In re Bernard L. Madoff)*,
    522 B.R. 41 (Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL
    183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017)......................29, 34

*SIPC v. BLMIS LLC (In re Bernard L. Madoff)*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015).........................................10, 11, 34

*SIPC v. BLMIS LLC (In re BLMIS)*,
    424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011) ......................7, 13

*Stanford Square, L.L.C. v. Nomura Asset Cap. Corp.*,
    232 F. Supp. 2d 289 (S.D.N.Y. 2002)....................................................................................39

*Trefny v. Bear Stearns Sec. Corp.*,
    243 B.R. 300 (S.D. Tex. 1999) .............................................................................................10

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016)..................................................................................................25

*United States v. Madoff*,
    586 F. Supp. 2d 240 (S.D.N.Y. 2009) ...................................................................................30

*United States v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002)..................................................................................................4

*Ying Jing Gan v. City of New York*,
    996 F.2d 522 (2d Cir. 1993)...............................................................................................6, 37

**Statutes**

11 U.S.C. § 101(41) ....................................................................................................................34

11 U.S.C. § 109(a) ......................................................................................................................34

11 U.S.C. § 548(a) ........................................................................................................................2

11 U.S.C. § 548(a)(1)(A) ...................................................................................................... *passim*

11 U.S.C. § 548(c) ......................................................................................................................37

11 U.S.C. § 548(d)(2)(a) .............................................................................................................37

11 U.S.C. § 550(a)(1) ...................................................................................................................2

11 U.S.C. § 551 .............................................................................................................................2

15 U.S.C. § 78ccc(a) .....................................................................................................................7

15 U.S.C. § 78ccc(a)(2)(A) ...........................................................................................................7

15 U.S.C. § 78ddd(c)(2) ..............................................................................................................27

15 U.S.C. § 78fff-1(a) ...................................................................................................................9

15 U.S.C. § 78fff-2(c)(3) ...................................................................................................... *passim*

15 U.S.C. § 78fff(b) .................................................................................................7

15 U.S.C. § 78*lll*(4) ...........................................................................................7, 8, 24

15 U.S.C. § 78*lll*(5) .............................................................................................34

15 U.S.C. § 78*o*(b) .......................................................................................7, 26, 34

28 U.S.C. § 1961 ................................................................................................39

**Rules**

17 C.F.R. § 240.15b1-3(b) ...................................................................................27

17 C.F.R. § 240.15c3-3 ...................................................................................8, 9, 24

17 C.F.R. § 240.15c3-3(f) .......................................................................................8

17 C.F.R. § 249.501(a) .........................................................................................27

Fed. R. Bankr. P. 7056 ......................................................................................1, 6

Fed. R. Bankr. P. 7056-1(a) ....................................................................................3

Fed. R. Civ. P. 56 .................................................................................................1

Fed. R. Civ. P. 56(a) ..............................................................................................6

Fed. R. Civ. P. 56(c)(1) ...........................................................................................6

Fed. R. Evid. 803(22) ............................................................................................14

Fed. R. Evid. 807 ..................................................................................................14

**Other Authorities**

37 Fed. Reg. 25224 (Nov. 29, 1972)........................................................................8

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74
    (2002)..................................................................................................................8

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff,

respectfully submits this memorandum of law in support of the Trustee's motion (the "Motion")

under Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 for

summary judgment as to Count One of the Trustee's complaint to avoid and recover the amounts

fraudulently transferred by BLMIS to defendant Robert F. Ferber (the "Defendant"). The facts

underlying this Motion are set forth in the Trustee's Statement of Material Facts Pursuant to

Local Rule 7056-1 ("Stmt."), the Declaration of Nicholas J. Cremona ("Cremona Decl."), and

the Declarations of Bruce G. Dubinsky, Lisa M. Collura, and Matthew B. Greenblatt.

## PRELIMINARY STATEMENT

This avoidance and recovery action centers on the undisputable fact that in the two years

preceding the commencement of the SIPA liquidation (the "Two-Year Period"), Defendant

received $1,650,000 in fictitious profits from BLMIS. For decades, BLMIS operated the largest

Ponzi scheme in history. In their allocutions, Madoff and BLMIS employees confirmed that

BLMIS was a Ponzi scheme, starting at least in the 1970s and continuing through BLMIS's

collapse in December 2008. Thus, the Trustee has established his *prima facie* case that the

transfers to Defendant were made with the intent to hinder, delay, or defraud BLMIS's creditors

and, therefore, are avoidable and recoverable for the benefit of the BLMIS customer fund.

Defendant does not dispute that he received the transfers. Defendant's remaining

arguments and defenses, including that the Trustee cannot recover the fraudulent transfers

because Madoff, not BLMIS, owned the bank accounts from which he was paid, have been

rejected and resolved in the Trustee's favor no less than seven times. There is no reason to

depart from well-established law of the case.

As there are no material facts in dispute and Defendant cannot defeat the Trustee's *prima facie* case, summary judgment should be granted in favor of the Trustee on Count One of his Complaint.

## **BACKGROUND**

Defendant is a resident of Ruxton, Maryland. Answer ¶ 7, *Picard v. Ferber*, Adv. Pro. No. 10-04562 (CGM) (Bankr. S.D.N.Y. Aug. 13, 2015), ECF No. 40.[1] Defendant was a customer of BLMIS's investment advisory business ("IA Business") and held BLMIS Account No. 1CM524 in the name, "Robert F. Ferber," (the "Ferber Account"). Stmt. ¶ 111; Answer ¶ 7.

The Ferber Account was opened on March 17, 1998 with a cash deposit via wire in the amount of $1,250,000, all representing principal. Stmt. ¶ 128. Subsequent to this initial cash deposit, there was one additional cash deposit via wire into the Ferber Account in the amount of $600,000, all representing principal. Stmt. ¶ 129. In sum, these two cash deposits provided the Ferber Account with a total of $1,850,000 of principal. Stmt. ¶ 130. During the life of the Ferber Account, Defendant made three cash withdrawals totaling $3,500,000. Stmt. ¶ 131. Defendant withdrew $1,650,000 of funds in excess of principal, representing fictitious profits over the life of the Ferber Account and within the Two-Year Period. Stmt. ¶¶ 132–33.

In 2010, the Trustee brought this adversary proceeding against Defendant, pursuant to sections 548(a), 550(a)(1), and 551 of the Bankruptcy Code, to avoid and recover $1,650,000 of fictitious profits received by Defendant during the Two-Year Period. Stmt. ¶¶ 111, 133; *see also* Compl. ¶ 37, ECF No. 1. On August 13, 2015, Defendant answered the Complaint. *See* Answer, ECF No. 40. On June 12, 2019, the Trustee served the expert reports of Bruce G. Dubinsky,

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Ferber*, Adv. Pro. No. 10-04562 (CGM) (Bankr. S.D.N.Y.).

Matthew B. Greenblatt, and Lisa M. Collura.  Defendant did not depose any of the Trustee's

expert witnesses.

Following discovery, the parties engaged in good faith settlement negotiations but were

unable to resolve the case.  On March 17, 2021, this Court authorized the Trustee to file motions

for summary judgment in any pending good faith case without a Local Rule 7056-1(a) pre-

motion conference.  *See SIPC v. BLMIS LLC*, Adv. Pro. No. 08-01789 (CGM) (Bankr. S.D.N.Y.

Mar. 17, 2021), ECF No. 20440.

## ARGUMENT

## I.    THIS COURT SHOULD ADHERE TO PRIOR RULINGS AS LAW OF THE CASE

This Court and the District Court have granted summary judgment in the Trustee's favor

multiple times in identical cases.  *See Picard v. The Gerald and Barbara Keller Fam. Tr.*, Adv.

Pro. No. 10-04539 (CGM), 2021 WL 4476811 (Bankr. S.D.N.Y. Sept. 30, 2021); *Picard v.

Miller*, 631 B.R. 1 (Bankr. S.D.N.Y. 2021); *Est. of Seymour Epstein*, Adv. Pro. No. 10-04438

(CGM) (Bankr. S.D.N.Y. Jan. 27, 2021), ECF No. 155 ("*Epstein Decision*"); *Picard v. JABA

Assocs. LP*, 528 F. Supp. 3d 219 (S.D.N.Y. 2021); *Picard v. Lisa Beth Nissenbaum Tr.*, No. 20

cv. 3140 (JGK), 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021).  Other than the amounts and dates

of the transfers, the claims are identical and the record submitted in support is the same as the

other motions for summary judgment.  There is no basis to deviate from those rulings here.

Different adversary proceedings within a liquidation proceeding are considered "one

case" for purposes of law of the case.  *See Picard v. BAM L.P.*, 624 B.R. 55, 61 (Bankr.

S.D.N.Y. 2020) (citing *Picard v. Nelson*, 610 B.R. 197, 237 (Bankr. S.D.N.Y. 2019) ("The prior

decisions within this SIPA proceeding constitute law of the case.")); *Picard v. Legacy Cap. Ltd.*,

603 B.R. 682, 700 (Bankr. S.D.N.Y. 2019) (citing *In re Motors Liquidation Co.*, 590 B.R. 39, 62

(S.D.N.Y. 2018) (law of the case doctrine applies across adversary proceedings within the same

bankruptcy case), *aff'd*, 943 F.3d 125 (2d Cir. 2019)); *Perez v. Terrastar Corp.*, No. 16 Civ.

1421 (ER), 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017) (applying the law of the case

doctrine because "[a]dversary proceedings filed in the same bankruptcy case do not constitute

different cases"), *appeal dismissed*, No. 17-1117 (2d Cir. June 29, 2017).

The doctrine of law of the case "is not a limit on a court's power but rather a guide as to

how a court should apply its discretion." *In re Pilgrim's Pride Corp.*, 442 B.R. 522, 531 (Bankr.

N.D. Tex. 2010).  Law of the case "expresses the general practice of refusing to reopen what has

been decided." *In re Rock & Republic Enters., Inc.*, No. 10–11728 (AJG), 2011 WL 2471000, at

*7 (Bankr. S.D.N.Y. June 20, 2011) (citing *Brody v. Vill. of Port Chester*, 345 F.3d 103, 110 (2d

Cir. 2003).  Thus, "when a court has ruled on an issue, that decision should generally be adhered

to by that court in subsequent stages in the same case, unless 'cogent' and 'compelling' reasons

militate otherwise." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (citations

omitted).  Such cause can arise from substantially different evidence being presented at the

subsequent trial, intervening contrary controlling authority, or the prior decision was clearly

erroneous.  *In re Pilgrim's Pride Corp.*, 442 B.R. at 531.

There is no reason for this Court to deviate from its prior rulings in *Keller Family Trust*,

*Miller*, *Epstein*, *Nelson*, and *BAM L.P.* or the recent decisions on these issues from Judge Koeltl

in *JABA Associates* and *Nissenbaum*.  There is no substantially different evidence, intervening

contrary controlling authority, or any showing that the prior decisions were clearly erroneous.

Judge Furman issued an opinion in *Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-1029,

2021 WL 827195 (S.D.N.Y. Mar. 3, 2021), reserving a single issue for trial—whether the

transfers were made by the debtor—but otherwise disposed of all other issues on summary

judgment in the Trustee's favor.  As Judge Koeltl noted in exercising his discretion to not follow

the *RAR* decision, "there is no genuine issue of material fact that the transfers in this case were in

fact made by the LLC." *JABA Assocs. LP*, 528 F. Supp. 3d at *n.4 (citing *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact.")).  The consistent

decisions in *Nelson*, *BAM L.P.*, *Epstein*, *Miller*, *Keller Family Trust*, *JABA Associates*, and

*Nissenbaum*, as opposed to the *RAR* decision, properly guide this Court in reaching its decision.[2]

Adhering to the prior decisions entered on these issues ensures defrauded customers are

treated in the same manner across adversary proceedings within this liquidation.  The doctrine of

law of the case was developed in order to "maintain consistency and avoid reconsideration of

matters once decided during the course of a single continuing lawsuit." *Bourdeau Bros., Inc. v.

Montagne*, Adv. Pro. No. 08-1024, 2010 WL 271347, at *5 (Bankr. S.D.N.Y. Jan. 22, 2010)

(quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)).  Doing so here—in this hybrid

proceeding under SIPA and the Bankruptcy Code—ensures that the goals of Congress in

enacting bankruptcy legislation and the SIPA statute are met: that claimants holding similar

claims receive similar treatment. *In re Pilgrim's Pride Corp.*, 442 B.R. at 531; *see also SEC v.

F.O. Baroff Co.*, 497 F.2d 280, 283 (2d Cir. 1974) (holding that the purpose of SIPA is

protection and equal treatment of public customers of broker-dealers).

---

[2] Defendant may argue that this Court is required to follow *RAR* because it was issued before Judge Koeltl's
decisions, pointing to a theory that the earliest decision controls when there is an intra-Circuit split of authority.  But
this is not a definitive rule in the Second Circuit, and even if it was, this Court would follow the 2017 *Nelson*
decision.

II.    **IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT, SUMMARY
JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE TRUSTEE AS A
MATTER OF LAW**

A.    **Legal Standard**

Rule 56(a) of the Federal Rules of Civil Procedure, applicable to bankruptcy courts

pursuant to Fed. R. Bankr. P. 7056, provides that a court must grant summary judgment when

there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986).  Factual positions are proven by either citing the record evidence—including

declarations, admissions, and interrogatory answers—or showing that an adverse party cannot

produce admissible evidence to support a fact.  Fed. R. Civ. P. 56(c)(1); *see also Matsushita

Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the movant has discharged its burden, the non-movant must then "go beyond the

pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

*Celotex Corp.*, 477 U.S. at 324.  "[T]he nonmoving party may . . . not rely simply on conclusory

statements or on contentions that the affidavits supporting the motion are not credible."  *Ying

Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).  The non-moving party may not

oppose summary judgment "on the basis of an unreasonable view of the facts."  *Berk v. St.

Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005).

B.    **The SIPA Scheme**

1.    **SIPA and SIPC**

Congress enacted SIPA in 1970 to protect customers of failed broker-dealers by

"expedit[ing] the return of customer property."  *SIPC v. 2427 Parent Corp.*, 779 F.3d 74, 80 (2d

Cir. 2015); *SIPC v. BLMIS (In re Bernard L. Madoff)*, 496 B.R. 744, 748–49 (Bankr. S.D.N.Y.

2013).  The program included the creation of SIPC, a nonprofit, private membership corporation

to which registered broker-dealers belong.  The "members" of SIPC include "all persons

registered as broker-dealers" with the SEC under section 78*o*(b) of Title 15.  SIPA §

78ccc(a)(2)(A).  SIPC membership, and thus SIPA protection, arises from a broker-dealer's

registration with the SEC, without regard to the corporate form of the broker-dealer.  SIPA §

78ccc(a).

When one of its members fails, SIPC initiates a SIPA liquidation, a distinct liquidation

proceeding applicable only to SIPC member firms.  *See SEC v. F.O. Baroff Co., Inc.*, 497 F.2d

280, 281 (2d Cir. 1974) (object of SIPA and SIPC is to protect customers in brokerage industry).

SIPC specifies a trustee to liquidate the business and any assets of the member-broker and

recover customer property wrongfully transferred or unlawfully converted by the broker.  SIPA

§§ 78*lll*(4), 78fff-2(c)(3).

Although a SIPA liquidation is similar to a bankruptcy and incorporates certain

provisions of the Bankruptcy Code, it is "tailored to achieve SIPA's objectives."  *SIPC v. BLMIS*

*LLC (In re BLMIS)*, 424 B.R. 122, 133 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir.

2011); *see also Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171, 180 (2d Cir. 2021).  As the

Second Circuit recently explained:

> SIPA thus incorporates the Bankruptcy Code to effectuate its
> priority scheme, but it does so selectively.  Section 78fff(b) makes
> clear that the Bankruptcy Code applies only to the extent that it is
> "consistent" with the provisions of SIPA.  15 U.S.C. § 78fff(b).  This
> selective incorporation of the bankruptcy provisions ensures that,
> when fit together, the individual pieces of SIPA produce a system
> that functions as intended.

*Picard v. Gettinger*, 976 F.3d 184, 199 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2603 (2021);

*see also* SIPA § 78fff(b) (SIPA liquidation proceeding shall proceed as if conducted under

Chapter 7 of Bankruptcy Code to extent consistent with SIPA).

### 2.    Customer Property Under SIPA

Customer property is a term of art in the securities industry, and means property held by a broker-dealer but that belongs to customers. *See* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74 (2002); *Gettinger*, 976 F.3d at 189–90; *Picard v. Lowrey (In re Bernard L. Madoff)*, 596 B.R. 451, 469–70 (S.D.N.Y. 2019); *Keller Fam. Tr.*, 2021 WL 4476811, at *4. When customers invest their cash and securities with a broker, they transfer possession, but not title, of their money to the broker. The broker never owns that money, but rather is legally bound to hold that money in reserve for its customers. *See Lowrey*, 596 B.R. at 469–70 (noting that "customer property" in securities industry refers to property held by broker-dealer but belongs to its customers); *Nelson*, 610 B.R. at 232–33. Where and how that property is held in reserve is the subject of customer protection rules, promulgated by the SEC, known as Rule 15c3-3. Exchange Act Release No. 34-9856, Adoption of Rule 15c3-3, 37 Fed. Reg. 25224, 25225 (Nov. 29, 1972), 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3"). Once a broker-dealer goes into liquidation under SIPA, the Rule 15c3-3 reserve forms the corpus of the firm's estate for distribution to customers. The SIPA designation of customer property is the seamless continuation of Rule 15c3-3. *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 191–92 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012).

Under SIPA, customer property includes securities and cash held for customers under Rule 15c3-3 and assets derived from or traceable to customer property. SIPA § 78*lll*(4). Once property is entrusted by a customer to a broker-dealer for the purpose of purchasing securities, it remains customer property until it is returned to its rightful owner, regardless of how many hands it passes through. SIPA § 78*lll*(4) (including in the definition of customer property "the proceeds of any such property transferred by the debtor, including property *unlawfully converted*" (emphasis added)); Rule 15c3-3(f) (Rule 15c3-3 account cannot be subject to bank lien because

it consists of customer property); *Dowden v. Cross Cty. Bank*, 97 B.R. 503, 508 (E.D. Ark. 1987) (Rule 15c3-3 deposit is not subject to bank's setoff claim because it is customer property). SIPA's broad definition of customer property recognizes customers' enduring rights to the property they gave to their broker for safekeeping.

Because customer property is not the broker's property, when a broker goes into liquidation, it is also not "debtor" property. *See BAM L.P.*, 624 B.R. at 61–62 ("[M]oney held by a broker on behalf of its customers is not the broker's property under state law."). This means that a SIPA trustee's avoidance and recovery action does not neatly fit into the Bankruptcy Code, which allows trustees to recover a transfer of "an interest in *property of the debtor*." 11 U.S.C. § 548(a)(1)(A) (emphasis added). SIPA corrects this through § 78fff-2(c)(3), which provides that "the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property" to the extent that the transfer "is voidable or void" under the Bankruptcy Code, and "[s]uch recovered property shall be treated as customer property" and is "deemed to have been the property of the debtor." SIPA § 78fff-2(c)(3); *see also JABA Assocs. LP*, 528 F. Supp. 3d at 236; *Nissenbaum Tr.*, 2021 WL 1141638, at *10; *Picard v. Fairfield Greenwich Ltd*., 762 F.3d 199, 213 (2d Cir. 2014).

This tailored definition of "property of the debtor" in SIPA is "an intended fiction" by Congress to provide SIPA trustees with expansive authority to marshal assets, wherever located, for the benefit of customers when assets are missing, such as when property is missing from Rule 15c3-3 custodial accounts. SIPA § 78fff-1(a); *Hill v. Spencer Sav. & Loan Ass'n*, 83 B.R. 880, 894 (D.N.J. 1988). Section 78fff-2(c)(3) is designed "to recover securities that would have been part of the fund of customer property but for a prior transfer to a customer." *Id*. at 893. The purpose of SIPA § 78fff-2(c)(3) is "to prevent one or more customers from depriving other

9

customers of assets by keeping these assets out of the 'pool' available for distribution to customers on a ratable basis." *Trefny v. Bear Stearns Sec. Corp.*, 243 B.R. 300, 322 (S.D. Tex. 1999).

### C. The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year Transfers of Fictitious Profits Made by BLMIS to Defendant

Under SIPA § 78fff-(2)(c)(3), the Trustee may recover any transfers by the debtor whenever customer property is insufficient to pay customer claims. To date, the Trustee has recovered $14.493 billion of approximately $20 billion owed to customers by the estate. *See* Trustee's Twenty-Sixth Interim Report for the Period April 1, 2021 through September 30, 2021, *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (CGM) (Bankr. S.D.N.Y. Oct. 29, 2021), ECF No. 20821. Because customer property is insufficient to pay the outstanding customer claims, the Trustee is authorized to recover the transfers to Defendant. *SIPC v. BLMIS (In re Bernard L. Madoff)*, 531 B.R. 439, 453–54 (Bankr. S.D.N.Y. 2015).

The Trustee seeks to avoid and recover transfers of fictitious profits made to Defendant under 11 U.S.C. § 548(a)(1)(A). The elements of this claim are: (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to hinder, delay, or defraud" a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, No. 05 Civ. 9050(LMM), 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd*, 748 F.3d 110 (2d Cir. 2014). This Court has recognized that fictitious profit cases are strict liability cases. Cremona Decl., Ex. 19 (Tr. of Oral Arg. at 114:10–11, *Picard v. Marilyn Bernfeld Tr.*, Adv. Pro. No. 10-05143 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015), ECF No. 20); (Tr. of Oral Arg. at 100:19, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015, ECF No. 85) (holding fictitious profit count is "almost a strict liability count")). This is especially true where, as here, Defendant admitted receipt of the Two-Year Transfers. Stmt. ¶ 112; *see also* Cremona

Decl., Ex. 18 (June 20, 2017 Deposition of Robert F. Ferber) at 45:6–14.

There is no genuine dispute regarding any of the three elements of the Trustee's claim under section 548(a)(1)(A).

### 1. BLMIS Made the Two-Year Transfers with Actual Fraudulent Intent and in Furtherance of the Fraud

Intent to defraud can be established by either showing that the debtor operated a Ponzi scheme or through a badges of fraud analysis. *See JABA Assocs. LP*, 528 F. Supp. 3d at 236–41; *Nissenbaum Tr.*, 2021 WL 1141638, at *11–15; *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) ("[T]he Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent." (citing *In re Bernard L. Madoff*, 531 B.R. at 471)); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("[T]he fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi scheme presumption.'").

The Ponzi scheme presumption has been embraced by appellate and district courts across the country. It stems from the very nature of a Ponzi scheme, which "'cannot work forever.'" *Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC*, 439 B.R. 284, n.19 (S.D.N.Y. 2010) ("*Bayou IV*") (quoting *Martino v. Edison Worldwide Cap. (In re Randy)*, 189 B.R. 425, 438 (Bankr. N.D. Ill. 1995)). A Ponzi scheme's operator knows, from the outset, that "[t]he investor pool is a limited resource and will eventually run dry." *Armstrong v. Collins*, Nos. 01 Civ. 2437(PAC), 02 Civ. 2796 (PAC), 02 Civ. 3620(PAC), 2010 WL 1141158, at *20–21 (S.D.N.Y. Mar. 24, 2010) (quoting *Liebersohn v. Campus Crusade for Christ, Inc.* (*In re C.F. Foods, L.P.*), 280 B.R. 103, 110 (Bankr. E.D. Pa. 2002)). When it does, the operator knows, "the scheme will collapse and that those still invested in the enterprise will lose their money." *Bayou*

*IV*, 439 B.R. at 294 n.19.  One thus "can infer an intent to defraud future undertakers [investors]

from the mere fact that a debtor was running a Ponzi scheme." *Armstrong*, 2010 WL 1141158, at

\*21 (quoting *In re C.F. Foods, L.P.*, 280 B.R. at 110).[3]

Multiple courts of appeals have adopted that presumption.  *See Janvey v. Brown*, 767

F.3d 430, 438–39 (5th Cir. 2014); *Emerson v. Maples*, 59 F.3d 170 (6th Cir. 1995); *Scholes v.

Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995); *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008);

*Klein v. Cornelius*, 786 F.3d 1310, 1320 (10th Cir. 2015); *Perkins v. Haines*, 661 F.3d 623, 626

(11th Cir. 2011).  And no court of appeals has rejected the presumption.  *Cf. Ritchie Cap. Mgmt.,

LLC v. Stoebner*, 779 F.3d 857, 862 (8th Cir. 2015) (declining to address the presumption).

Courts adopting the presumption have repeatedly explained that it reflects a logical

inference from a debtor's decision to perpetrate a scheme that is "insolvent by definition."  *Klein*,

786 F.3d at 1320; *see also Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d

185, 196 (5th Cir. 2013) ("[T]ransfers from a Ponzi scheme are presumptively made with intent

to defraud, because a Ponzi scheme is, 'as a matter of law, insolvent from its inception.'"

(citation omitted)); *Bayou IV*, 439 B.R. at 294 ("'Knowledge to a substantial certainty constitutes

intent in the eyes of the law,' and awareness that some investors will not be paid is sufficient to

establish actual intent to defraud." (citation omitted)); *In re Randy*, 189 B.R. at 439 ("[Fraudster]

necessarily knew all along that most investors, certainly the latest among them, would lose their

money if they invested in his scheme.  Without a doubt on this record, [fraudster] had actual

intent to defraud his creditors when he paid brokers from investors' funds."); *Merrill v. Abbott*,

77 B.R. 843, 860 (D. Utah 1987) ("[A] debtor's knowledge that future investors will not be paid

---

[3] Indeed, "no other reasonable inference is possible."  *Armstrong*, 2010 WL 1141158, at \*21; *see also Moran*, 2012 WL 2930210, at \*4 (transactions or transfers "made in the course of a Ponzi scheme" could "have been made for no purpose other than to hinder, delay[,] or defraud creditors" (quoting *Gowan v. The Patriot Grp. (In re Dreier LLP)*, 452 B.R. 391, 424 (Bankr. S.D.N.Y. 2011))).

is sufficient to establish his actual intent to defraud them.").

Under either the Ponzi scheme presumption or the badges of fraud analysis, there is no dispute that BLMIS made the transfers with the intent to hinder, delay, or defraud.

### a.    BLMIS Was a Ponzi Scheme

BLMIS was engaged in a Ponzi scheme.  *See Gettinger*, 976 F.3d at 188; *Miller*, 631 B.R. at 9 ("That BLMIS operated as a *Ponzi* scheme is well-established and . . . the Trustee has met its burden of proof for summary judgment on this issue." (citation omitted)); *Epstein Decision* at 5 ("Intent to defraud is established as debtor operated a *Ponzi* scheme.").  "The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption . . . , particularly in light of Madoff's criminal admission." *Picard v. Chais*, 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011); *see also Picard v. Katz*, 462 B.R. 447, 453 & n.5 (S.D.N.Y. 2011) (same).  The existence of the scheme has been recognized by the Bankruptcy Court, the District Court, and the Second Circuit.  *See, e.g.*, *Picard v. Ida Fishman Rev. Tr.*, 773 F.3d 411, 415–16 (2d Cir. 2014); *Picard v. Greiff*, 476 B.R. 715, 718 (S.D.N.Y. 2012); *In re BLMIS*, 424 B.R. at 125–33.

The existence of the BLMIS Ponzi scheme is substantiated by the allocutions of Madoff and BLMIS employees.  Stmt. ¶ 92.  Madoff admitted that he ran a Ponzi scheme through BLMIS and that he did not execute trades on behalf of his IA Business clients.  Stmt. ¶¶ 93–100. Frank DiPascali, Madoff's chief financial officer and co-conspirator, admitted: "[f]rom at least the early 1990s through December of 2008 . . . [n]o purchases of [sic] sales of securities were actually taking place in [customers'] accounts."  Stmt. ¶ 101.  DiPascali "used hindsight to file historical prices on stocks then [he] used those prices to post purchase of [sic] sales to customer accounts as if they had been executed in realtime.  On a regular basis [he] added fictitious trade data to account statements of certain clients to reflect the specific rate of earn [sic] return that

13

Bernie Madoff had directed for that client."  Stmt. ¶ 102.

David Kugel, a manager and trader at BLMIS, admitted that he falsified trading records as far back as the early 1970s.  Stmt. ¶¶ 103–04.  Kugel provided historical trade data to create fake trades which, when included on the BLMIS account statements and trade confirmations of IA Business clients, gave the appearance of profitable trading when no trading had actually occurred.  Stmt. ¶ 104.  Irwin Lipkin, BLMIS's accountant, admitted BLMIS's revenue was falsely inflated through fraudulent bookkeeping entries and annual audited reports.  Stmt. ¶ 105.  Eric Lipkin, payroll clerk at BLMIS, admitted BLMIS created fake reports replicating those of the Depository Trust & Clearing Corporation in order to purportedly confirm non-existent positions in the IA Business accounts for auditors and the Securities and Exchange Commission ("SEC").  Stmt. ¶¶ 106–07.  And Enrica Cotellessa-Pitz, BLMIS accountant and comptroller, admitted IA Business customer money was funneled to BLMIS's proprietary trading and market-making businesses to falsely inflate revenue and hide losses.  Stmt. ¶¶ 108–09.

Guilty pleas and admissions under oath are admissible to prove the existence of a Ponzi scheme, and courts routinely rely on them in granting summary judgment.  *See JABA Assocs. LP*, 528 F. Supp. 3d at 233–34 ("The various plea allocutions are admissible under Federal Rules of Evidence 803(22) and 807, as several courts considering this issue in similar contexts have held."); *Nelson*, 610 B.R. at 209–10 ("Criminal plea allocutions are admissible under the exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a judgment of a previous conviction and FED. R. EVID. 807's residual exception to hearsay."); *Moran v. Goldfarb*, No. 09-cv-7667 (RJS), 2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012) (granting motion for summary judgment based on plea transcript from related Department of Justice action where perpetrator admitted under oath to orchestrating the Ponzi scheme); *Bayou IV*, 439 B.R. at 307–

08 (affirming summary judgment on fictitious profits from Ponzi scheme based on evidence including guilty pleas of fraudsters); *McHale v. Boulder Cap. LLC (In re The 1031 Tax Grp., LLC)*, 439 B.R. 47, 72 (S.D.N.Y. 2010) (granting summary judgment in part and concluding that Ponzi scheme existed with reliance on evidence including perpetrator's superseding indictment and plea agreements); *Armstrong*, 2010 WL 1141158, at *24 (granting motion for summary judgment and finding existence of Ponzi scheme where submitted evidence included transcripts from perpetrator's allocution and sentencing).

The plea allocutions of Madoff and former BLMIS employees show "there is no genuine disputed issue of fact that BLMIS was a Ponzi scheme . . . ." *Legacy Cap. Ltd.*, 603 B.R. at 693 (granting summary judgment and finding BLMIS operated Ponzi scheme on basis of allocutions); *JABA Assocs. LP*, 528 F. Supp. 3d at 237; *Nissenbaum Tr.*, 2021 WL 1141638, at *11 (same); *RAR Entrepreneurial Fund, Ltd.*, 2021 WL 827195, at *7.

### b.    The Trustee's Experts Confirmed That BLMIS Was a Ponzi Scheme

Bruce Dubinsky, a certified fraud examiner and forensic accountant, confirmed that BLMIS was a Ponzi scheme. *See* Decl. of Bruce G. Dubinsky, dated Nov. 12, 2021 ("Dubinsky Decl."), Attach. A (Dubinsky Report); *see also Nelson*, 610 B.R. at 210–14. As set forth in Dubinsky's unrebutted report, BLMIS operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) the IA Business. Stmt. ¶ 15. The proprietary trading business traded for its own account. The market-making business made markets in certain stocks, bonds, warrants and rights. Stmt. ¶¶ 16–18. The IA Business purported to purchase and sell securities on behalf of its customers. Stmt. ¶ 19. The proprietary trading business, the market-making business, and IA Business were units of BLMIS and operated by Madoff. Stmt. ¶ 20. Based on his investigation, Dubinsky concluded that the IA Business was a

fraud and a Ponzi scheme.

BLMIS reported to its IA Business customers, including Defendant, that the money they deposited with BLMIS was invested in the "split-strike conversion" strategy which involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. treasury bills when the money was "out of the market." Stmt. ¶¶ 22, 25; Cremona Decl., Ex. 8 (Plea Allocution of Bernard L. Madoff) at 25:25–26:18. Dubinsky concluded that BLMIS did not execute this strategy on behalf of its IA Business customers, including for Defendant. Stmt. ¶¶ 22, 25.

Dubinsky analyzed BLMIS's trading records and determined that as far back as the 1970s, BLMIS used historical trade information to fabricate false trades for IA Business customers and reported those fake trades on customer statements. Stmt. ¶¶ 23–58. Dubinsky's analysis further confirmed the lack of any trading by BLMIS on behalf of its IA Business customers based on (a) the impossible reported volume of equity trades; (b) impossible equity and options trades reported outside the daily price range; (c) the low volatility in its reported daily trading performance compared to the actual market behavior and the performance achieved by BLMIS in the proprietary trading business unit as measured by the volume weighted average prices for its sales and purchases; (d) the consistently positive rates of returns that did not "mirror" the volatility of the markets; (e) a lack of any Depository Trust Corporation ("DTC") records to confirm the reported IA Business equity or treasury trades; and (f) a lack of Options Clearing Corporation ("OCC") records to confirm the reported IA Business options trades. Stmt. ¶ 26. Dubinsky further verified that no treasuries, purportedly part of the split-strike conversion strategy, were purchased on behalf of IA Business customers. Stmt. ¶¶ 59–65.

16

Dubinsky found many instances where the volume that BLMIS claimed to have
purchased or sold on behalf of all IA Business customers exceeded the volume of equities traded
for the entire market. Stmt. ¶¶ 27–30. Dubinsky also analyzed the equity and options trades that
were priced outside the daily price range. Stmt. ¶¶ 31–32. For the period of 2000-2008,
Dubinsky determined that there were 99,972 equity transactions executed outside the daily
market traded price range, and 34,501 options transactions traded outside of the daily price
range. *Id*. The absence of actual trading was also reflected in the prices at which the IA
Business purportedly bought and sold shares using the split-strike conversion strategy. Stmt. ¶¶
33–37. Dubinsky also analyzed the volatility of the IA Business's reported average annual rate
of return for the split-strike conversion strategy as compared with the volatility of the annual rate
of return for the two major market indices—the S&P 100 Index and the Dow Jones Industrial
Average. Stmt. ¶ 38. Because the IA Business's split-strike conversion strategy was supposedly
engineered around the S & P 100, the IA Business's returns should have performed similarly to
the S&P 100 Index. Stmt. ¶ 39. This analysis showed that the volatility in the IA Business rates
of return did not mirror the volatility of the rates of return of the major indices. Stmt. ¶¶ 40–42.

Additionally, all equity trades made by BLMIS should have been reflected in the DTC
records pertaining to BLMIS's account with the DTC—an organization that clears and settles
equity transactions in the U.S. market. Stmt. ¶ 43. Dubinsky's analysis confirmed that the
equity securities that were cleared through BLMIS's DTC account were traded by the proprietary
trading business; no IA Business trades were cleared through BLMIS's DTC account. Stmt. ¶¶
44–48. He concluded that the IA Business did not execute the equity trades reflected on the
customer statements. Similarly, the options purportedly executed for the customer accounts in
the IA Business could not be reconciled with the records of the OCC, an organization that clears

and settles options transactions in the U.S. market.  Stmt. ¶¶ 54–57.  Based on Dubinsky's

analysis of these records, he concluded that BLMIS did not executed the equity trades or conduct

any options trading on behalf of its IA Business customers.  Stmt. ¶¶ 49–53, 58.

Nor did BLMIS purchase the treasuries it reported to customers.  Stmt. ¶¶ 59–60.  While

BLMIS did purchase treasuries with customer funds, it did so as a way to obtain interest on the

customer cash it was holding.  Stmt. ¶ 76.  The purchases did not match the allocation of T-Bill

transactions that appeared on customer statements.  Stmt. ¶ 60.  Dubinsky's analysis also

confirmed that the volume of treasuries that appeared on the customer statements dwarfed the

aggregate volume of treasuries actually purchased and held by BLMIS.  Stmt. ¶¶ 61–65; *see also*

*Nelson*, 610 B.R. at 214, 234 n.37 ("Dubinsky's analysis demonstrated that the T-Bill

transactions that appeared in the customer statements were fictitious and bore no relationship to

the actual treasuries purchased by BLMIS and documented in the DTC records.").  Frank

DiPascali, Madoff's right-hand employee, testified that treasuries purchased by the IA Business

were solely as a cash management tool, that the treasuries were not purchased for IA Business

customers, and that the treasuries that appeared on customer statements were fictitious.  Stmt. ¶¶

66–70; *see also Nelson*, 610 B.R. at 226, 234 n.37.  For these reasons, this Court has already held

that any treasuries purchased were "part of the ongoing fraud," *Epstein Decision* at 7, and that

"the purchase of treasuries was part of the cash management system used by BLMIS to sustain

the Ponzi scheme and 'did not transform BLMIS into a legitimate enterprise or prohibit the

Trustee's reliance on the Ponzi scheme presumption.'"  *BAM L.P*., 608 B.R. at 175 n.15 (quoting

*Legacy*, 603 B.R. at 691).

Finally, BLMIS falsely reported paying or crediting customers with $4.3 billion in cash

dividends between 1998 and 2008.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 253.

Dubinsky confirmed that BLMIS neither received any monies as a result of trading securities nor received any dividends on purportedly held securities.  *Id.* ¶ 340.

### c. The Trustee's Experts Confirmed That BLMIS Paid Redemptions from Customer Funds

Lisa Collura, a forensic accountant and certified fraud examiner, analyzed the books and records of BLMIS.  *See Nelson*, 610 B.R. at 220–21.  Collura's investigation shows that during the ten-year period before its collapse on December 11, 2008, BLMIS primarily used three bank accounts for the IA Business: JPMorgan Chase Bank, N.A. ("JPMorgan") account #xxxxx1703 (the "703 Account"); JPMorgan account #xxxxxxxxx1509 (the "509 Account," together with the 703 Account, the "JPMorgan Accounts")); and Bankers Trust account #xx-xx0-599 (the "BT Account").  Stmt. ¶ 71.  The JPMorgan Accounts were linked commercial business accounts. Stmt. ¶ 74.  IA Business customers' cash deposits were deposited and commingled in the 703 Account.  Stmt. ¶ 72.  IA Business customer withdrawals were made through the JPMorgan Accounts and the BT Account, which was a checking account entirely funded by the 703 Account.  Stmt. ¶ 73.  The 509 Account was a commercial controlled disbursement account that was entirely funded by the 703 Account.  *Id*.  The money in the 703 Account consisted almost entirely of customer deposits.  Stmt. ¶¶ 74, 89.  Dubinsky confirmed that customer funds were deposited and withdrawn from the JPMorgan Accounts, and that there were no inflows of money as a result of trading securities or receipt of dividends on purportedly held securities.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340.

Both Dubinsky and Collura confirmed that ninety-seven percent of all cash additions into the 703 Account came directly from IA Business customers.  Stmt. ¶ 75.  The other three percent of inflows into the 703 Account came from income earned from cash management activities including (1) short-term investment activity made directly from the 703 Account (including

overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and treasuries);

and (2) investments of BLMIS customer funds made through bank and brokerage accounts held

in the name of BLMIS or Madoff.  Stmt. ¶ 76.  Because the short-term investments, including

overnight sweeps, were made directly out of the 703 Account, the source of the money for those

investments was customer funds.  Stmt. ¶ 77.

The IA Business did not have any legitimate income-producing activities.  The only

source of cash available for the IA Business to pay purported profits as well as redemption

requests was from cash that other IA Business customers deposited in the 703 Account.  Stmt. ¶

84.  These transactions rendered BLMIS insolvent.  By no later than December 2002, BLMIS's

assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion.  Stmt. ¶ 85.  By

December 2008, the customer property on hand at BLMIS was grossly insufficient to pay the

claims of its customers.  Stmt. ¶ 86.

Defendant did not serve a rebuttal to the Trustee's experts' opinions that the funds in the

703 Account consisted of customer money, that customer redemptions were paid with funds

from the 703 Account, or that the IA Business had no source of funds other than customer

money.  Nor did Defendant depose the Trustee's experts or identify any evidence—admissible or

otherwise—to rebut the substantial evidence demonstrating that Madoff was operating a Ponzi

scheme through BLMIS's IA Business and that the transfers of fictitious profits Defendant

received comprised other customers' deposits.  Accordingly, the undisputed evidence is that the

transfers were made with the intent to hinder, delay, or defraud BLMIS's creditors.

  **d.**  **The Trustee's Evidence of "Badges of Fraud" Independently**
     **Establishes Actual Intent to Defraud**

Independent of the Ponzi presumption, courts in this liquidation proceeding have found

that BLMIS made the transfers with the requisite intent to defraud under the "badges of fraud"

analysis. *See JABA Assocs. LP*, 528 F. Supp. 3d at 240–41; *Nissenbaum Tr.*, 2021 WL 1141638,

at *14–15; *Nelson*, 610 B.R. at 235. The Second Circuit has recognized the following badges of

fraud: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate

relationship between the parties; (3) the retention of possession, benefit or use of the property in

question; (4) the financial condition of the party sought to be charged both before and after the

transaction in question; (5) the existence or cumulative effect of a pattern or series of

transactions or course of conduct after the incurring of debt, onset of financial difficulties, or

pendency or threat of suits by creditors; (6) the general chronology of the event and transactions

under inquiry. *See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983);

*Banner v. Kassow*, 104 F.3d 352, 352 (2d Cir. 1996). The Second Circuit has also recognized

that "[c]oncealment of facts and false pretenses by the transferor" may be a badge of fraud. *In re

Kaiser*, 722 F.2d at 1582; *see also* 4 Collier on Bankruptcy ¶ 548.02[5] at 548–34 to 38 (15th ed.

1983). The existence of several badges can "constitute conclusive evidence of an actual intent to

defraud . . . ." *Kirschner v. Fitzsimons*, No. 12-cv-2652 (RJS), 2017 WL 82391, at *13

(S.D.N.Y. 2017) (noting that the existence of badges of fraud "focus the inquiry on the

circumstances that suggest a conveyance was made with fraudulent intent" (citation omitted));

*see also Gredd v. Bear, Stearns Sec. Corp.*, 310 B.R. 500, 505, n.3 (Bankr. S.D.N.Y. 2002)

(noting that "[b]adges of fraud are circumstances that so commonly accompany fraudulent

transfers that their presence gives rise to an inference of intent to defraud").

The evidence adduced by the Trustee and set forth above, which has not been

controverted by Defendant, establishes at least three of the badges of fraud, including the

concealment of facts by BLMIS, BLMIS's insolvency at the relevant time, and the lack of

consideration proved for fictious transfers to customers. *See JABA Assocs. LP*, 528 F. Supp. 3d

at 241 (citing *Nelson*, 610 B.R. at 235 ("[T]he existence of the badges of fraud supply a separate

basis to conclude that the Two-Year Transfers were made with the actual intent to defraud."));

*Nissenbaum Tr.*, 2021 WL 1141638, at *15 (same).  The Trustee seeks an independent finding

that the Trustee established BLMIS's actual intent under the the badges of fraud analysis.

### e.    BLMIS's Two-Year Transfers to Defendant Were in Furtherance of the Fraud

In a Ponzi scheme, the Trustee need not prove that the debtor intended to hinder, delay,

or defraud a *particular* creditor, but rather he must only establish that the transfers made to the

transferee were in furtherance of a fraudulent scheme.  *See Bayou IV*, 439 B.R. at 304.

"Every payment made by the debtor to keep the scheme on-going was made with the

actual intent to hinder, delay or defraud creditors, primarily the new investors."  *Gredd v. Bear,

Stearns Sec. Corp.*, 359 B.R. 510, 518 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397

B.R. 1 (S.D.N.Y. 2007) (citation omitted).  This is predicated on the reality that a debtor's failure

to honor an investor's withdrawal request "would promptly have resulted in demand,

investigation, the filing of a claim and disclosure of the fraud."  *Bayou Accredited Fund, LLC v.

Redwood Growth Partners, L.P.*, 396 B.R. 810, 843 (Bankr. S.D.N.Y. 2008) ("*Bayou III*"), *rev'd

in part on other grounds*, *Bayou IV*, 439 B.R. at 284; *see also Greiff*, 476 B.R. at 723.  Every

redemption payment "*in and of itself* constituted an intentional misrepresentation of fact" of the

investor's rights to their falsely inflated account statement and "an integral and essential part of

the [] fraud."  *Bayou III*, 396 B.R. at 843.  Thus, the transfers to Defendant were in furtherance

of the fraudulent Ponzi scheme.

### 2.    BLMIS Made the Transfers to Defendant Within the Two-Year Period

BLMIS transferred fictitious profits to or for the benefit of Defendant between December

11, 2006 and December 11, 2008.  The Trustee's evidence is uncontroverted as to the date,

receipt, and amount of the transfers the Trustee seeks to avoid and recover.

### 3.    The Transfers Were an Interest of the Debtor in Property

The Trustee has met the first element of section 548(a)(1)(A)—that the transfers were an interest of the debtor in property—in three ways.  First, he has shown that the transfers at issue comprise customer property which he is authorized to recover under SIPA and the Bankruptcy Code.  Second, he has shown that the JPMorgan Accounts were owned by BLMIS at the time of the transfers to Defendant.  Third, because the BLMIS liquidation and Madoff's chapter 7 estate were substantively consolidated, the Trustee can recover customer property whether held in the name of BLMIS or Madoff.

Defendant may argue that the Trustee has not met the first element of section 548(a)(1)(A) because: (1) the IA Business, including the JPMorgan Accounts from which the fraudulent transfers were made, were not transferred to the LLC in 2001 when Madoff changed the corporate form of his business and (2) *Avellino* says that the Trustee can only recover transfers made by the LLC, notwithstanding substantive consolidation.  Defendant's arguments are wrong as a matter of undisputed fact and law.

### a.    The Transfers are Customer Property and the Trustee Can Recover Them

Where the transfers are customer property, the Trustee is entitled to avoid and recover the Two-Year Transfers, regardless of the change in the corporate form of Madoff's business from a sole proprietorship to an LLC.  *Keller Fam. Tr.*, 2021 WL 4476811, at *3–4; *Epstein Decision* at 5–6; *BAM L.P.*, 624 B.R. at 62; *Nelson*, 610 B.R. at 215–18.

When IA Business customers sent money to BLMIS for the purpose of purchasing securities, it became "customer property" under SIPA.  SIPA § 78*lll*(4); *Rosenman Fam., LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010) (funds given to BLMIS for the purpose of

purchasing securities and deposited in the JPMorgan Account are subject to SIPA); *see also*

*BAM L.P.*, 624 B.R. at 62. Whether operated as a sole proprietorship or as an LLC, BLMIS's

assets were composed primarily of customer property and its liabilities were composed primarily

of amounts owed to customers. The transfers were made from the JPMorgan Accounts that were

functionally used by BLMIS as its Rule 15c3-3 account, which forms the corpus of the fund of

customer property under SIPA. Stmt. ¶¶ 71–79, 89–91; 17 C.F.R. § 240.15c3-3.

  For at least the ten-year period prior to the liquidation, BLMIS bank records show that

the JPMorgan Accounts were used as an instrumentality of the fraud for customer deposits and

withdrawals—for at least three years while the firm was a sole proprietorship, and for the seven

years after it became an LLC. Dubinsky Decl., Attach. A. (Dubinsky Report) ¶¶ 340, 341; *BAM*

*L.P.*, 624 B.R. at 62 ("When the Defendants invested their money into the IA Business, the

deposits were placed into the Bank Accounts and commingled with all of the Ponzi scheme

victims' deposits."); Decl. of Lisa M. Collura, dated Nov. 17, 2021 ("Collura Decl."), Attach. A

(Collura Report) ¶ 17; *see also Citibank*, 12 F.4th at 179 ("The customers' funds were

commingled in BLMIS's bank account. When customers withdrew their "profits" or principal,

BLMIS paid them from this commingled account. As a result, each time BLMIS transferred

payments to a customer, it was money stolen from other customers."); *In re Picard*, 917 F.3d 85,

92 (2d Cir. 2019) (noting that Madoff commingled funds into JPMorgan checking account and

sent customers redemptions from commingled account); *Trs. of Upstate N.Y. Eng'rs Pension*

*Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 564 (2d Cir. 2016) (finding BLMIS deposited customer

investments into a single commingled checking account and sent cash withdrawals from the

commingled checking account).

  The undisputed facts demonstrate the transfers here are "property transferred by the

debtor which, except for such transfer, would have been customer property" and therefore are

recoverable under SIPA § 78fff-2(c)(3).  Because the funds are indisputably customer property,

BLMIS is deemed under SIPA to have an interest in the transferred customer property, making

the transfers here avoidable under § 548(a)(1)(A) of the Bankruptcy Code.  Stmt. ¶ 91; *Miller*,

631 B.R. at 8; *Keller Fam. Tr.*, 2021 WL 4476811, at *4; *Cohen*, 2016 WL 1695296, at *5

("BLMIS transferred customer property to [defendant], and under SIPA § 78fff-2(c)(3) such

property is 'deemed to have been property of the debtor'.").  Where, as here, there is no dispute

that the Trustee is seeking to recover transfers comprising customer property, the form of the

broker-dealer at the time of transfer is irrelevant.

### b.    BLMIS Owned the JPMorgan Accounts Because the IA Business Was Transferred to the LLC in 2001

This Court has held numerous times that the transfers made by BLMIS in other prior

identical cases—like the Two Year Transfers here—were "an interest of the debtor in property"

because the JPMorgan Accounts were the property of BLMIS, not Madoff.  *See Keller Fam. Tr.*,

2021 WL 4476811, at *4; *Miller*, 631 B.R. at 8; *Epstein Decision* at 7; *BAM L.P.*, 624 B.R. at 61;

*Nelson*, 610 B.R. at 216; *JABA Assocs. LP*, 528 F. Supp. 3d at 234–36; *Nissenbaum Tr.*, 2021

WL 1141638, at *9.  Any contrary argument from Defendant should be rejected based on the

*seven prior decisions* in this liquidation that so hold.  In *Nelson*, the court held:

> Defendants conflate subject matter jurisdiction with the merits of the
> Trustee's claims. The Trustee certainly has standing to argue that
> BLMIS made the Two-Year Transfers. . . . In any event, the
> Defendants' jurisdictional argument lacks merit because the
> evidence demonstrate[s] that BLMIS owned the [JPMorgan] Chase
> Accounts, the source of the Two-Year Transfers.

*Nelson*, 610 B.R. at 216.  In *BAM L.P.*, this Court held:

> [A]ll of the assets and liabilities of the sole proprietorship, including
> the IA Business, were transferred to BLMIS via the 2001 SEC
> Amended Form BD.  As such, the Defendants' customer accounts

and the Bank Accounts are property of BLMIS and the monies paid
to Defendants from those Bank Accounts must be turned over to the
Trustee.

*BAM L.P.*, 624 B.R. at 61; *see also Miller*, 631 B.R. at 16 (finding "the Defendants customer

accounts and the Bank Accounts are property of BLMIS"); *Epstein Decision* at 7 ("This Court

has already determined that all of Madoff's customers were transferred to BLMIS.").

In *JABA Associates* and *Nissenbaum*, the District Court held:

Madoff was using the accounts at issue in his capacity as a sole
proprietor until he reorganized his business as an LLC. When
Madoff changed the form of his business from a sole proprietorship
to an LLC, the business retained the same SEC registration number.
When submitting the Amended Form BD, Madoff noted that the
[sole proprietorship] [sic] 'will transfer to successor all of
predecessor's assets and liabilities related to predecessor's business.
The transfer will not result in any change in ownership or control.' .
. . And there were no assets or liabilities of the sole proprietorship
listed as 'not assumed by the successor.' . . . The form also indicated
that no 'accounts, funds, or securities of customers of the applicant
are held by or maintained by [any] other person, firm, or
organization.'

*JABA Assocs. LP*, 528 F. Supp. 3d at 234–35; *Nissenbaum Tr.*, 2021 WL 1141638, at *9.

BLMIS owned the JPMorgan Accounts at the time of the transfers to Defendant. Madoff

began operating as a sole proprietorship in the early 1960s under the names of Bernard L.

Madoff and Bernard L. Madoff Investment Securities. *BAM L.P.*, 624 B.R. at 59. Under section

78*o*(b), a broker-dealer applies for registration with the SEC on SEC Form BD (the uniform form

for broker-dealer registrations). *See* 17 C.F.R. § 249.501(a). Once registered with the SEC, the

broker-dealer is assigned a registrant number, becomes a member of SIPC, and is required to pay

into the SIPC fund by annual assessments. SIPA § 78ddd(c)(2). In January 1960, the sole

proprietorship filed with the SEC a Form BD under registrant number 8-8132. Cremona Decl.,

Ex. 1 (1959 SEC Form BD). Through that registration, the broker-dealer became a member of

SIPC when SIPA was enacted in 1970. There is no dispute that prior to 2001, the JPMorgan

Accounts were held by Madoff's sole proprietorship.

Effective January 1, 2001, Madoff changed the corporate form of his broker-dealer business when he incorporated as an LLC. Cremona Decl., Ex. 2 (Articles of Organization); *see also BAM L.P.*, 624 B.R. at 59. If an entity succeeds to and continues the business of a broker-dealer previously registered with the SEC, and the succession is based on a change in the predecessor's form of organization, it files a Form BD Amendment. SEC Rule 15b1-3(b), 17 C.F.R. § 240.15b1-3(b). The successor entity continues the business and SIPC membership of its predecessor. Thus, with this change in corporate form, BLMIS filed an Amended Form BD with the SEC in January 2001 to reflect that change using the same SEC registrant number 8-8132; BLMIS did not file a new application for registration. Cremona Decl., Ex. 3 (2001 Amended Form BD); *see also BAM L.P.*, 624 B.R. at 59–60.

Under "BD Successions" of the 2001 Amended Form BD, it asked: "Briefly describe details of the succession, including any assets or liabilities not assumed by the successor." Cremona Decl., Ex. 3 (2001 Amended Form BD at 10–11, *see also* Question 5). The response was: "Effective January 1, 2001, predecessor will transfer to successor all of predecessor's assets and liabilities related to predecessor's business. The transfer will not result in any change in ownership or control." *Id.* No assets or liabilities of the sole proprietorship were listed as "not assumed by the successor." *Id.* The 2001 Amended Form BD further certified that no "accounts, funds, or securities of customers of the *applicant* are held or maintained by such other *person*, firm, or organization." *Id.* (2001 Amended Form BD at 5). BLMIS succeeded to the sole proprietorship's SEC registrant number 8-8132. Cremona Decl., Ex. 1 (1959 SEC Form BD); Ex. 3 (2001 Amended Form BD at 10).

Upon the filing of the Amended Form BD, the sole proprietorship no longer operated as a

broker-dealer or in any other capacity.  Cremona Decl., Ex. 3 (2001 Amended Form BD at 10–

11); *see also BAM L.P.*, 624 B.R. at 60 ("The predecessor identified on the 2001 SEC Amended

Form BD is "Bernard L. Madoff" and the successor is identified as BLMIS.").  Indeed, this

Court noted "that this succession provision meant that, without exception, all of the assets and

liabilities of the sole proprietorship were transferred to BLMIS and the sole proprietorship

ceased to exist."  *BAM L.P.*, 624 B.R. at 60.

BLMIS's corporate documents confirmed the change in corporate form and the transfer

of all assets.  In its Amended and Restated Operating Agreement, BLMIS sets forth Madoff's

intent to transfer all assets—including bank accounts—held by the sole proprietorship to the

LLC, effective January 1, 2001:

> 3.  **Purpose.**  The Company is formed to receive as at January 1,
> 2001, all of the assets, subject to liabilities, associated with the
> business being conducted by Bernard L. Madoff, as sole
> proprietorship (the "Business") and to thereafter conduct such
> Business, and any further extension therefor, in such manner and
> form as determined by the Member in his sole discretion, to the
> extent permitted by the [Limited Liability Company Law of the
> State of New York] or by the laws of any jurisdiction which the
> Company may do business.

Cremona Decl., Ex. 5 (Amended and Restated Operating Agreement).  Consistent with the 2001

Amended Form BD filed with the SEC, the Amended and Restated Operating Agreement makes

clear that no assets were carved out or excluded from the transfer of assets to the LLC, and

confirmed that all assets of the sole proprietorship—the three business units and their bank

accounts—were transferred to the LLC as of January 1, 2001.

The change in corporate form of the IA Business was reflected in Defendant's customer

statements which, after 2001, reflected the name of the LLC on the top left corner.  *Compare*

Cremona Decl., Ex. 14 (Nov. 30, 1998 BLMIS Customer Statement) *with* Cremona Decl., Ex. 15

(Jan. 31, 2001 BLMIS Customer Statement) (both produced by Defendant).  Madoff also made

various financial institutions aware of the change in corporate form and referred to the LCC in

correspondence with JPMorgan regarding the 703 and 509 Accounts.  Cremona Decl., Ex. 20

(Letters to Financial Institutions).  In addition, by virtue of the transfer, existing BLMIS

customers of the IA Business as of 2001—like Defendant—became customers of the LLC in

accordance with their customer agreements that expressly inured to the benefit of "any successor

organization."  Cremona Decl., Ex. 16 (1998 Customer Agreement).  In fact, at some point after

the change to the LLC, the Defendant executed a revised customer agreement with the LLC

which also reflected the name of the LLC on the top left corner.  Cremona Decl., Ex. 17 (Revised

Customer Agreement).  And the JPMorgan Accounts continued to be used in the same way both

prior to and after 2001—to receive customer deposits and to satisfy customer withdrawal

requests.  Collura Decl., Ex. A (Collura Report) ¶ 17.

The sole proprietorship thus had no corporate existence, no SEC registration, no assets,

and no customers after 2001.  *See SIPC v. BLMIS (In re Bernard L. Madoff)*, 522 B.R. 41, 60

(Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016),

*aff'd*, 697 F. App'x 708 (2d Cir. 2017) (finding all Madoff Securities' assets and liabilities were

transferred to BLMIS upon the reorganization to a single member limited liability company).

Moreover, when Madoff did finally register his investment advisory business in 2006, he did so

not as a sole proprietor but rather through the LLC, using the same SEC Registrant Number and

signing the form on behalf of "Bernard L. Madoff Investment Securities LLC."  Cremona Decl.,

Ex. 4 (2006 Form ADV).  Thus, if any doubt remained in 2001 as to whether the LLC succeeded

to the IA Business, it was resolved when the IA Business was registered under the LLC in

2006—before the fraudulent transfers were made.

Defendant may nonetheless argue that various BLMIS and JPMorgan documents indicate

Madoff intended to keep the IA Business separate under the name "Bernard L. Madoff

Investment Securities." But any "discrepancies Defendants have demonstrated to exist—forms

filled out improperly, business names used interchangeably on bank accounts and checks—are

the sleights of hand that one would expect to see when exhuming the remnants of a Ponzi

scheme." *BAM L.P.*, 624 B.R. at 60 (citation omitted); *JABA Assocs. LP*, 528 F. Supp. 3d at 235

(same); *Nissenbaum Tr.*, 2021 WL 1141638, at \*9 (same); *see also* Cremona Decl., Ex. 8 (Plea

Allocution of Bernard L. Madoff) at 23:14–17 (stating at plea hearing that "for many years up

until my arrest on December 11, 2008, I operated a Ponzi scheme through the *investment*

*advisory side of my business*, Bernard L. Madoff Securities *LLC*." (emphasis added)). Any

ministerial oversights in BLMIS's recordkeeping are insufficient to create a *genuine* factual

dispute as to the ownership of the IA Business, as numerous courts have so held.

### c.    Because the Estates Were Consolidated, the Trustee Can Recover Customer Property Held in The Names of Either the LLC or Madoff

After Madoff confessed in December 2008, the Government brought criminal charges

and the SEC filed a civil complaint against Madoff and BLMIS alleging that they were operating

a Ponzi scheme through BLMIS's IA Business. *United States v. Madoff*, 586 F. Supp. 2d 240

(S.D.N.Y. 2009); Complaint, *SEC v. Madoff*, 08-cv-10791 (LLS) (S.D.N.Y. Dec. 11, 2008), ECF

No. 1. Because BLMIS was a registered broker-dealer, SIPC obtained a protective decree

finding its customers needed the protections of SIPA, placed BLMIS into liquidation, appointed

the Trustee "for the liquidation of the business of the Defendant with all the duties and powers of

a trustee as prescribed in SIPA," and removed the case to the bankruptcy court. Order ¶ 2, *SEC*

*v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4 ("Protective Decree");

SIPC Application ¶ 2, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF

No. 5.

Shortly after the Trustee's appointment, certain creditors filed an involuntary bankruptcy petition against Madoff, concerned that they would be prejudiced if Madoff's personal estate was not liquidated alongside the liquidation of the broker-dealer by the SIPA Trustee. Pet. at 7, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Apr. 1, 2009), ECF No. 37. The district court allowed the chapter 7 case to go forward, to target "that portion of Mr. Madoff's property that is neither forfeitable criminally nor subject to the liquidation of BLMIS under SIPA." Order at 4, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Apr. 10, 2009), ECF No. 47. Alan Nisselson was subsequently appointed chapter 7 Trustee for Madoff. *See* Notice of Appointment, *In re Bernard L. Madoff*, No. 09-011893 (CGM) (Bankr. S.D.N.Y. Apr. 21, 2009), ECF No. 13.

Because Madoff used BLMIS as his personal piggy bank and alter ego, and his only significant source of income was his draw from BLMIS, which itself came from stolen customer money, there was no way to separate Madoff's assets from those of the business. *See* Mem. of Law, *SIPC v. BLMIS*, No. 08-01789 (CGM) (Bankr. S.D.N.Y. May 5, 2009), ECF No. 196. Upon motion by the Trustee, the bankruptcy court substantively consolidated the SIPA liquidation and the chapter 7 bankruptcy, merging Madoff's chapter 7 estate into the SIPA proceeding *nunc pro tunc*. All assets and liabilities of the two estates were deemed consolidated as of December 10, 2008. *See* Order, *SIPC v. BLMIS*, No. 08-01789 (CGM) (Bankr. S.D.N.Y. June 10, 2009), ECF No. 252 (the "Consolidation Order"). The SIPA Trustee was authorized to avoid and recover fraudulent transfers of customer property under SIPA *on behalf of the consolidated estate*. *Id.* ¶ 7 (emphasis added) (stating "the SIPA Trustee is authorized to pursue claims on behalf of the consolidated estate . . . for, among other things, the avoidance and recovery of transferred property"). The chapter 7 Trustee had the powers of an ordinary bankruptcy trustee. *Id.* ¶ 4. The Consolidation Order unified interests in the separate estates,

31

ensuring that all assets, whether technically Madoff assets or BLMIS assets, flowed into the

consolidated estate to be returned to customers. The Order further provided that, like those of

the SIPA Trustee, the fees and expenses of the chapter 7 Trustee would be paid by SIPC as

opposed to coming out of the estate, thereby maximizing the recoveries for customers and

creditors. *Id.* ¶ 5.

The Consolidation Order supports the right of the Trustee to recover customer property

transferred from any bank account held by BLMIS or Madoff. The Order preserves the

respective avoidance powers of both the SIPA Trustee and the chapter 7 Trustee, a provision

included in light of caselaw holding that "[a]bsent express preservation of the trustee's avoidance

power, an order of substantive consolidation would ordinarily eliminate that power." *Alexander

v. Compton*, 229 F.3d 750, 768 (9th Cir. 2000). But the preservation of each trustee's respective

powers is not a limit on those powers. The Consolidation Order does not state that the SIPA

Trustee can only recover customer property when held by the LLC; to the contrary, the effect of

the Order is that when the SIPA Trustee exercises that power, he does so on behalf of the

consolidated estate and can recover any customer property held by Madoff *or* the LLC. *Cf. BAM

L.P.*, 624 B.R. at 61 & n.4 (noting that because the chapter 7 case was substantively consolidated

with the SIPA proceeding, the SIPA Trustee should be able to recover fraudulent transfers made

by Madoff's sole proprietorship).

### d.    *Avellino* **Was Wrong**

The *Avellino* decision entered by Judge Bernstein was centered around the fact that the

SIPC Application that commenced the BLMIS liquidation named the member broker-dealer that

was registered with the SEC as of December 2008 under Registrant Number 8-8132: Bernard L.

Madoff Investment Securities LLC. *Picard v. Avellino*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016). In

*Avellino*, the bankruptcy court reasoned that because the SIPC Application and the Protective

Decree named only the LLC (rather than the LLC *and* the defunct predecessor sole

proprietorship), the only "debtor" for purposes of the avoidance and recovery provisions of SIPA

and the Bankruptcy Code was the LLC. *Id.* at 108–09. The bankruptcy court also ruled that the

Consolidation Order did not give the SIPA Trustee the power to recover property held in

Madoff's name, nor did the chapter 7 Trustee have the power to recover customer property. *Id.*

at 109–10. Taken together, the bankruptcy court's holdings meant that there was no fiduciary

that could recover customer property transferred by the broker-dealer prior to 2001. *Id.* at 108–

10.

This interpretation of the Protective Decree and the Consolidation Order is unmoored

from the text of SIPA. First, because the sole proprietorship had ceased to exist some eight years

prior to the collapse, the only SIPC member that *could have been* named in the Protective Decree

was the LLC. There is no SIPA requirement that a protective decree identify every prior name or

form of organization under which the broker-dealer member of SIPC formerly operated (nor

would imposing such a requirement extra-statutorily be consistent with SIPA's protective

purpose). The Protective Decree here named the SIPC member and subjected all customer

property wherever and whenever held to the special protections of SIPA for the benefit of the

broker-dealer's customers.

Second, the Trustee was appointed for the liquidation of the *business* of the broker-

dealer. The facts show that Madoff's business was a continued, uninterrupted one from its

inception in 1960, funneling customer property in the same way through the same bank accounts.

Collura Decl., Ex. A (Collura Report) ¶ 17; *see also In re Bernard L. Madoff*, 522 B.R. at 60

("[T]he incorporation of BLMIS as a limited liability company continued his business without

change. . . . Thus, nothing has changed since 1960 except for the business form that Madoff used

to conduct his Ponzi scheme."); *JABA Assocs. LP*, 528 F. Supp. 3d at 227 ("While BLMIS changed from a sole proprietorship to an LLC, many aspects of the business remained the same."); *Nissenbaum Tr.*, 2021 WL 1141638, at *3 (same); *In re Bernard L. Madoff*, 531 B.R. at 485 (finding that "nothing changed" when BLMIS changed to an LLC).   Because the Trustee is appointed for the liquidation *of the business* of the debtor, such liquidation necessarily entails the liquidation of any predecessor conducting the same business, using the same SEC registrant number, on behalf of its customers with their customer property.

Moreover, where the same broker-dealer is continuously registered with the SEC under the same Registrant Number, its SIPC membership is also continuous.   The term "debtor" has a special definition under SIPA, which controls here: "a *member* of SIPC with respect to whom an application for a protective decree has been filed under section 78eee(a)(3) of this title."   SIPA § 78*lll*(5) (emphasis added); SIPA 78fff(b) (Code applies only to the extent that it is "consistent" with the provisions of SIPA).   This differs from the Bankruptcy Code, where a "debtor" is an individual, partnership, or corporation.   11 U.S.C. §§ 109(a), 101(41).   Because SIPC membership tracks SEC registration, SIPC names the SEC-registered broker-dealer that is at risk of failing as the "debtor" in the application for the protective decree.   Thus, registration under SIPA § 78*o*(b) is the key to who the SIPC member is, and, if the member is placed into liquidation, who the debtor is.   Whether a change in corporate form would or would not change the "person" who was the debtor in an ordinary bankruptcy proceeding, the debtor in this SIPA Proceeding is "the member of SIPC" as to which the Protective Decree was brought.   And since SIPA was enacted in 1970, the relevant member of SIPC here has been BLMIS, whether organized as a sole proprietorship or an LLC.

Additionally, *Avellino*'s holding that the transfers must emanate from a bank account in

the name of the debtor is not consistent with SIPA and its case law. SIPA protection is not

conditioned on bank accounts being in the name of the debtor. For example, it does not matter to

"whom claimants made their checks payable" when they deposited funds "with the debtor."

*Ahammed v. SIPC*, 295 F.3d 1100, 1107 (10th Cir. 2002). And SIPA protection follows where

"there was 'actual receipt, acquisition or possession of the property of a claimant by the

brokerage firm under liquidation.'" *Focht v. Heebner*, 223 F.3d 1296, 1302 (11th Cir. 2000)

(citation omitted). Courts have construed customer property broadly to include, for example,

funds or assets held in non-debtor bank accounts. *See Peloro v. United States*, 488 F.3d 163,

170, 173–74 (3d Cir. 2007) (bearer bonds held by broker-dealer for investor's account that were

seized by FBI prior to deposit in investor account were customer property); Order, *SIPC v.*

*Austin Sec., Inc.*, Adv. No. 05-1144 DEM (Bankr. E.D.N.Y. Nov. 20, 2007), ECF No. 89

(allocating to fund of customer property principals' brokerage accounts and proceeds from sales

of jewelry belonging to principal and his wife).

As long as a SIPA trustee can show that the property in question was customer property

received by the broker-dealer firm that is a member of SIPC, the trustee has the authority to

recover it, wherever it lies. SIPA § 78fff-2(c)(3). Such property never belonged to Madoff, the

sole proprietorship, or the LLC, regardless of whose name was on the bank account. Whatever

particular bank account a fraudster chooses to park customer property in or however that

particular bank account is denominated cannot change the nature of customer property or the

Trustee's duty to recover that property and return it to its rightful owners. Taken to its logical

conclusion, because BLMIS's only assets were funds in the JPMorgan Accounts, a contrary

finding would mean that there is no customer property in the SIPA liquidation and there is no

estate representative who can recover the funds transferred out of JPMorgan Accounts. *See BAM*

*L.P.*, 624 B.R. at n.4.  Such an outcome would leave a vast amount of customer property outside

the reach of the SIPA liquidation, something SIPA does not intend.  This result cannot be

reconciled with the order appointing the Trustee, the Consolidation Order, prior precedent in this

case, nor with the plain language of SIPA.

> ### D.    Defendant Has Not Presented Any Countervailing Evidence

Defendant has not and cannot come forward with evidence to rebut the Trustee's *prima*

*facie* case nor any evidence to support an argument that Madoff used money from his IA

Business customers to purchase securities, including treasuries, which appeared on Defendant's

customer statements.  But Defendant offered no witnesses—fact or expert—to rebut the

Trustee's case or support this argument.  The evidence and opinions of the Trustee's expert

witness and DiPascali's testimony unequivocally demonstrate that BLMIS made the transfers

with the intent to defraud (whether because was a Ponzi scheme or under the badges of fraud

analysis), and that no securities (including treasuries) were purchased by BLMIS for its IA

Business customers, including Defendant.  All Defendant offers are vague assertions or proffers

of evidence he would elicit on cross-examination of the Trustee's expert witnesses, which is not

sufficient to withstand summary judgment.  *See Bayou III*, 396 B.R. at 825 (explaining that

conjecture, surmise, or "metaphysical doubt," as well as self-serving conclusory statements will

not defeat summary judgment).  Defendant cannot create an issue of material fact where none

exists simply because he disagrees.  *See Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 532 (2d

Cir. 1993) (nonmoving party "may not rely simply on conclusory statements or on contentions

that the affidavits supporting the motion are not credible").

## III.    DEFENDANT'S DEFENSES CAN BE DETERMINED AS A MATTER OF LAW

Defendant will likely raise certain legal defenses, all of which have already been

addressed and rejected by this Court in many prior opinions in this liquidation.  Defendant

cannot meet his burden of establishing a triable issue of fact to defeat the Trustee's Motion.

### A.      Defendant Did Not Give Value for Fictitious Profits

Having established that BLMIS transferred at least $1,650,000 in fictitious profits within

the Two-Year Period to Defendant with actual fraudulent intent, the Trustee is entitled to avoid

and recover the Two-Year Transfers.  To defeat the avoidance of a transfer on summary

judgment, Defendant must offer evidence sufficient to create a material issue of fact as to

whether he took (1) "for value . . . to the extent that [he] gave value to the debtor in exchange for

such transfer" and (2) "in good faith."  *Bayou IV*, 439 B.R. at 308 (placing burden of proving

affirmative defense on transferee); 11 U.S.C. § 548(c); *In re 1031 Tax Grp., LLC*, 439 B.R. at 73.

"Value" includes satisfaction of an antecedent debt of the debtor.  *See* 11 U.S.C.

§ 548(d)(2)(a).  The Second Circuit has ruled that as a matter of law, Defendant cannot establish

that he took the transfers of fictitious profits "for value" because such false profits were not on

account of a valid antecedent debt.  *Gettinger*, 976 F.3d at199–200; *see also JABA Assocs. LP*,

528 F. Supp. 3d at 241–43; *Nissenbaum Tr.*, 2021 WL 1141638, at *15–16 (same); *Picard v.*

*BAM L.P.*, 608 B.R. 165, 180–81 (Bankr. S.D.N.Y. 2019).  That ruling is law of the case,

requiring dismissal of Defendant's value defense.

### B.      Taxes May Not Be Considered as Part of Value Calculation

The Bankruptcy Court and District Court have also already considered and rejected any

defense involving Defendant's ability to offset their avoidance liability by the amount of taxes

paid on the fraudulent transfers received from BLMIS.  *See JABA Assocs. LP*, 528 F. Supp. 3d at

245 ("Beyond the complex problems of proof and tracing, the offset would come at the expense

of other customers, and SIPA prioritizes repayment of customers."); *Nelson*, 610 B.R. at 236–37

(citing *Cohen*, 2016 WL 1695296, at *15 (stating "the offset would introduce complex problems

of proof and tracing and reduce the [Trustee's] ability to recover assets" and would only "come

37

at the expense of the other victims" (citation omitted))); *Picard v. The Est. (Succession) of Doris Igoin*, 525 B.R. 871, 893 (Bankr. S.D.N.Y. 2015) ("[T]he withdrawal of the money to pay taxes the [d]efendants never should have had to pay is not a defense to the fraudulent transfer claims." (citing *Donell*, 533 F.3d at 778–79)).

## IV.    THE TRUSTEE IS ENTITLED TO PREJUDGMENT INTEREST AS A MATTER OF LAW

The Trustee is also entitled to an award of prejudgment interest from December 11, 2008 (the "Filing Date") because "[f]ull compensation to the estate for the avoided transfer[s] normally requires prejudgment interest to compensate for the value over time of the amount recovered." *Geltzer v. Artists Mktg. Corp.*, 338 B.R. 583, 599 (Bankr. S.D.N.Y. 2006) (awarding prejudgment interest "[t]o fully and fairly compensate [debtor's] creditors for their loss—not only of [the amount] that was fraudulently conveyed . . . but of the use of that money"). Prejudgment interest properly "compensates the Trustee for the loss of the use of the Two-Year Transfers for the years that this litigation has lasted and reduces the profits to [Defendant] from having withheld the funds." *JABA Assocs. LP*, 528 F. Supp. 3d at 246; *Nissenbaum Tr.*, 2021 WL1141638, at *18 (same); *see also BAM L.P.*, 624 B.R. at 63–66.

In *BAM L.P.*, this Court awarded prejudgment interest finding that the "net losers" of BLMIS's Ponzi scheme "are the real victims of Defendants' dilatory litigation tactics" and after ten years of litigation "an award of prejudgment interest is essential to the [Trustee's] collection of customer property." *BAM L.P.*, 624 B.R. at 64 (citing *Stanford Square, L.L.C. v. Nomura Asset Cap. Corp.*, 232 F. Supp. 2d 289, 293 (S.D.N.Y. 2002) ("Awarding prejudgment interest is based upon the premise that the party to whom the money is owed has been deprived of the use of the funds and can be made whole only by the award of interest. Conversely, the party owing the money has had the use of the funds he was obligated to have paid, and should be required to

pay compensation by way of interest.")).  Likewise, in *Epstein*, this Court awarded prejudgment

interest against "Defendants, like these, who litigate issues that have already been decided by the

Court."  *Epstein Decision* at 10 (finding the Trustee "has spent approximately ten years

prosecuting this case and cannot be made whole without an award of prejudgment interest").

Having determined that prejudgment interest should be awarded, this Court found that the

federal rate should be used where the Trustee's claims arise only from federal law.  *BAM L.P.*,

624 B.R. at 64.  However, "[w]here the interest rate codified in 28 U.S.C. § 1961 is too low to

compensate the plaintiff, courts can opt to apply the prime rate of interest," which was 4% on the

Filing Date.  *Id.* at 65 (quoting *Messer v. Magee (In re FKF 3, LLC)*, No. 13 Civ. 3601 (JCM),

2018 WL 5292131, at *13 (S.D.N.Y. Oct. 24, 2018)); *see also Miller*, 631 B.R. at 17–18

("Consistent with other decisions that have awarded prejudgment interest, the Court holds that

interest is awarded in the amount of 4%."); *Epstein Decision* at 11 ("Interest is awarded in the

amount of 4%); *JABA Assocs. LP*, 528 F. Supp. 3d at 246 ("The 4% rate compensates the

Trustee for the loss of the use of the Two-Year Transfers for the years that this litigation has

lasted, and reduces the profits to the defendants from having withheld the funds."); *Nissenbaum

Tr.*, 2021 WL 1141638, at *17–18 (same).

Further, this Court found "the accrual date for prejudgment interest is the Filing Date, as

the claims asserted by the Trustee arose only upon the filing of the SIPA liquidation."  *BAM

L.P.*, 624 B.R. at 65–66 (citing *In re FKF 3, LLC*, 2018 WL 5292131, at *14); *see also Epstein

Decision* at 10–11 (finding "the Trustee is entitled to interest from the date that the SIPA action

was commenced [sic]"); *Miller*, 631 B.R. at 18, n.13 ("The Court would be willing to consider

awarding interest from the date of the SIPA action where the facts warrant it.").  Here, Defendant

refuses to acknowledge the law of the case.  By doing so, Defendant "assumed the consequences

associated with [their] failure to compensate the bankruptcy estate for its loss occasioned by the fraudulent conveyance[s] . . . ." *Gill v. Maddalena*, 176 B.R. 551, 557–58 (Bankr. C.D. Cal. 1995). "An important rationale for the prejudgment interest rule is that the party against whom the claim is asserted could have stopped the running of interest by paying what was owed." *Newbro v. Freed*, 409 F. Supp. 2d 386, 402 (S.D.N.Y. 2006) *aff'd*, No. 06-1722-CV, 2007 WL 642941 (2d Cir. Feb. 27, 2007). As this Court stated, the Trustee has "incurred costs litigating against Defendants who have resisted the law of the case." *Id.* (citing *Newbro v. Freed*, 409 F. Supp. 2d 386, 402 (S.D.N.Y. 2006) ("An important rationale for the prejudgment interest rule is that the party against whom the claim is asserted could have stopped the running of interest by paying what was owed.")). As a result, prejudgment interest is warranted here, *see JABA Assocs. LP*, 2021 WL 1112342, at *19–20 (granting request for prejudgment interest from date of complaint); *Nissenbaum Tr.*, 2021 WL 1141638, at *18 (same); *Epstein Decision* at 9–10 (same); *BAM L.P.*, 624 B.R. at 65 (same), and the proper accrual date is the Filing Date because there are no mitigating factors. *Keller Fam. Tr.*, 2021 WL 4476811, at *9 (Trustee requested from date of Filing Date); *Miller*, 631 B.R. at 17–18 (same); *see also In re FKF 3, LLC*, 2018 WL 5292131, at *14 (appropriate accrual date for prejudgment interest for fraudulent transfer claims is date of bankruptcy petition).

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant summary judgment in the Trustee's favor on Count One of the Trustee's Complaint, and enter an order: (1) avoiding $1,650,000 in transfers of fictitious profits that BLMIS made to Defendant within the Two-Year Period; (2) awarding the Trustee prejudgment interest from the Filing Date through the date of entry of judgment at the rate of 4%; and (3) requiring Defendant to return such transfers or the value thereof.

Dated: November 17, 2021
      New York, New York

          /s/ Nicholas J. Cremona
          Baker & Hostetler LLP
          45 Rockefeller Plaza
          New York, New York 10111
          Telephone: (212) 589-4200
          Facsimile: (212) 589-4201
          David J. Sheehan
          Email: dsheehan@bakerlaw.com
          Nicholas J. Cremona
          Email: ncremona@bakerlaw.com
          Seanna R. Brown
          Email: sbrown@bakerlaw.com
          Lan Hoang
          Email: lhoang@bakerlaw.com
          Amy E. Vanderwal
          Email: avanderwal@bakerlaw.com

          *Attorneys for Irving H. Picard, Trustee*
          *for the Substantively Consolidated SIPA*
          *Liquidation of Bernard L. Madoff Investment*
          *Securities LLC and the Chapter 7 Estate of*
          *Bernard L. Madoff*