# EXHIBIT 5



Sent to opt.

MADTSS01160350

# AMENDED AND RESTATED
# OPERATING AGREEMENT

## OF

# BERNARD L. MADOFF INVESTMENT SECURITIES LLC

On January 8, 2001 the Operating Agreement of Bernard L. Madoff Investment Securities LLC (the "**Company**") was entered into by Bernard L. Madoff, as the sole member (the "**Member**") of the Company. On this 15th day of March, 2004, the Operating Agreement of the Company has been amended and restated with the approval of the sole Member of the Company to read as follows.

1. **Name.** The name of the limited liability company formed hereby is:

    Bernard L. Madoff Investment Securities LLC

2. **Term.** The term of the Company shall continue until dissolved in accordance with the Limited Liability Company Law of the State of New York, as amended from time to time (the "**LLCL**").

3. **Purpose.** The Company is formed to receive as at January 1, 2001, all of the assets, subject to liabilities, associated with the business being conducted by Bernard L. Madoff, a sole proprietorship (the "Business") and to thereafter conduct such Business, and any further extension thereof, in such manner and form as determined by the Member in his sole discretion, to the extent permitted by the LLCL or by the laws of any jurisdiction in which the Company may do business. The Company shall also have the right if it so elects, upon receipt of required approval by the Internal Revenue Service, to serve as a non-passive nonbank trustee or custodian ("Nonbank Trustee") for individual retirement arrangements established under Section 408 of the Internal Revenue Code of 1986, as amended ("Code"). The Company shall have the authority to do all things necessary, convenient or incidental to the accomplishment of its purpose and operate its business as described in this paragraph III.

4. **Member.** The name and business address of the Member is:

    Bernard L. Madoff
    855 Third Avenue
    New York, New York 10022

5. **Powers.** (a) The Member acknowledges and agrees that the business and affairs of the Company shall be managed by the Member until the earliest of his death, disability or resignation. In the event of the Member's death, disability or resignation, the estate of the Member, the conservator of the member and/or the Member shall amend the Company's Articles of

Organization so as to provide for the management of Company by one or more managers (the "Manager"), which Manager(s) shall be designated by the Member or if applicable, his executor or conservator.

(b) The Member and each Manager, if any, shall have the power and authority to do any and all acts necessary or convenient to or in furtherance of the purposes described herein. Third parties dealing with the Company are entitled to rely conclusively upon the authority of the Member/Manager(s). Without limitation upon the generality of the foregoing, the Member/Manager(s) shall have the full and complete responsibility for managing the day-to-day business and affairs of the Company and shall make all decisions affecting the day-to-day business of the Company. In such capacity, the Member and each Manager, if any, signing singly and acting alone shall have the authority to execute agreements and expend funds on behalf of the Company.

(c) In performing his duties, the Member/Manager(s) shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, furnished to him by agents, employees, accountants or other professional advisors of the Company.

(d) The Member/Manager(s) is authorized to manage the affairs of the Company in conjunction with the Member's/Manager's other business interests and activities.

(e) The Member may engage in any other business ventures or activities which may be competitive with or in direct competition with the business of the Company.

(f) The Member/Managers have the right to delegate all or any part of his duties hereunder to one or more individuals. Such individuals shall solely have the rights specifically delegated to him by the Member/Manager.

6. **Fiduciary Conduct.** In the event the Company acts as a Nonbank Trustee, the Company and is Member, Managers and persons delegated with authority in connection with such activity ("Authorized Person") shall in all events comply with the following:

(a) The Member, Managers and Authorized Persons will be responsible for the proper exercise of fiduciary powers; including the determination of policies, the investment and disposition of property held in a fiduciary capacity, and the direction and review of the actions of all employees utilized by the Applicant in the exercise of its fiduciary powers. In discharging this responsibility, the Member and/or managers may assign to designated employees, by action duly recorded, the administration of such of the Company's fiduciary powers as may be proper to assign.

(b) A written record will be made of the acceptance and of the relinquishment or closing out of all fiduciary accounts, and of the assets held for each account.

(c) If the Company has the authority or the responsibility to render any investment advice with regard to the assets held in or for each fiduciary account, the advisability of retaining or disposing of the assets will be determined at least once during each period of 12 months.

(d) All employees taking part in the performance of fiduciary duties will be adequately bonded; and, the bonding will not be in contravention of section 412(d) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1112(d)).

(e) Legal counsel will be employed or retained and will be readily available to pass upon fiduciary matters and provide advice.

(f) In order to segregate the performance of its fiduciary duties from other business activities, the Company will maintain a separate trust and custodial division under the immediate supervision of an individual designated for that purpose. The trust and custodial division may utilize the personnel and facilities of other divisions of the Company and other divisions of the Company may utilize the personnel and facilities of the trust and custodial division, as long as the separate identity of the trust and custodial division is preserved.

(g) The Company will determine the value of the assets held by it in trust at least once in each calendar year and no more than 18 months after the preceding valuation. The assets will be valued at their fair market value, except that the assets of an employee pension benefit plan to which section 103(b)(3)(A) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1023(b)(3)(A)) applies will be considered to have the value stated in the most recent annual report of the plan.

(h) No fiduciary account will be accepted by the Company unless the Company's net worth (determined as of the end of the most recent taxable year) exceeds the greater of $100,000, or the sum of (i) four percent of the value of all of the assets it holds in fiduciary accounts for which it renders investment advice or make investment decisions, or directly or indirectly controls the investment activity (determined as of the most recent valuation date) and (ii) two percent of the value of all of the assets it holds in fiduciary accounts for which it does not render investment advice nor make investment decisions, and does not directly or indirectly controls the investment activity (determined as of the most recent valuation date).

(i) As long as the Company is a member of the Securities Investor Protection Corporation (SPIC) created under the Securities Investor Act of 1970 (SIPA)(15 U.S.C. sections 78aaa et seq, as amended), the amount of net worth it must exceed before it may accept new accounts is reduced by two percent of the value of assets (determined on an account-by-account basis) held for the benefit of customers (as defined in 15 U.S.C. section s 78fff-2(e)(4)) in fiduciary accounts by the nonbank trustee to the extent of the portion of each account that does not exceed the dollar limit on advances described in 15 U.S.C. sections 78fff-3(a), as amended that would apply to the assets in that account in the event of a liquidation proceeding under the SIPA.

(j) (i) The Company will take whatever lawful steps are necessary (including the relinquishment of fiduciary accounts) to insure that its net worth (determined as of the close of each taxable year) exceeds the greater of $50,000, or the sum of (A) two percent of the value of all of the assets it holds in fiduciary accounts for which it renders investment advice or make investment

decisions, or directly or indirectly controls the investment activity (determined as of the most recent valuation date) and (B) one percent of the value of all of the assets it holds in fiduciary accounts for which it does not render investment advice nor make investment decisions, and does not directly or indirectly controls the investment activity (determined as of the most recent valuation date).

(ii) As long as the Company is a member of the Securities Investor Protection Corporation (SPIC) created under the Securities Investor Act of 1970 (SIPA)(15 U.S.C. sections 78aaa et seq, as amended), the amount of net worth it must exceed in order to maintain its accounts is reduced by one percent of the value of assets (determined on an account-by-account basis) held for the benefit of customers (as defined in 15 U.S.C. section s 78fff-2(e)(4)) in fiduciary accounts by the nonbank trustee to the extent of the portion of each account that does not exceed the dollar limit on advances described in 15 U.S.C. sections 78fff-3(a), as amended that would apply to the assets in that account in the event of a liquidation proceeding under the SIPA

(k) At least once during each period of 12 months, the Company will cause detailed audits of the fiduciary books and records to be made by a qualified public accountant. At that time, the Company will ascertain whether the fiduciary accounts have been administered in accordance with law, these rules of fiduciary conduct set forth in Section 6 of this Operating Agreement, and sound fiduciary principles. The audits shall be conducted in accordance with generally accepted auditing standards, and shall involve whatever tests of the fiduciary books and records of Company as are considered necessary by the qualified public accountant.

(l) A report of the audits and examinations together with the action taken thereon, will be noted in the Company's fiduciary records.

(m) Funds held in a fiduciary capacity awaiting investment or distribution will not be held uninvested or undistributed any longer than is reasonable for the proper management of the account.

(n) No account will be pooled in a common investment fund. The investments of each account will not be commingled with any other property (except mutual funds).

(o) Assets of accounts requiring safekeeping will be deposited in an adequate vault and a permanent record will be kept of assets deposited in or withdrawn from the vault.

(p) The Company must keep it fiduciary records separate and distinct from other records. All fiduciary records must be so kept and retained for as long as the contents thereof may become material in the administration of any internal revenue law. The fiduciary records must contain full information relative to each account.

(q) The Company must keep an adequate record of all pending litigation to which it is a party in connection with the exercise of its fiduciary powers.

MADTSS01160354

(r) For purposes of this Section 6 of this Operating Agreement, the following terms shall have the definitions ascribed to each below:

(i) The term "account" or "fiduciary account" means a medical savings account established under section 220 of the Internal Revenue Code, a health savings account described in section 223, a trust described in section 401(a) (including a custodial account described in section 401(f), a custodial account described in section 403(b)(7), an individual retirement account (IRA) described in section 408 (including an account established by employers and certain association of employees described in section 408(c), a custodial account described in section 408(h), a simplified employee pension plan described in section 408(k), a simplified retirement account described in section 408(p), and a deemed IRA under a qualified employer plan described in section 408(q)), a Roth IRA described in section 408A, a Coverdell education savings accounts described in section 530 (including a custodial account described in section 530(g), and a custodial account of an eligible deferred compensation plan described in section 457(b).

(ii) The term "plan administrator" means an administrator as defined in Treasury regulation section 1.414(g)-1.

(iii) The term "common investment fund" means a trust that satisfies the following requirements:

(1) The trust consists of all or part of the assets of several accounts that have been established with the Company, and

(2) The trust is described in section 401(a) of the Code and is exempt from tax under section 501(a) of the Code, or is a trust that is created for the purpose of providing a satisfactory diversification of investments or reduction of administrative expenses for the participating accounts and that satisfies the requirements of section 408(c) of the Code.

(iv) The term "fiduciary records" means all matters which are written, transcribed, recorded, received or otherwise come into the possession of the Company and are necessary to preserve information concerning the acts and events relevant to the fiduciary activities of the Company.

(v) The term "qualified public accountant" means a qualified public accountant, as defined in section 103(a)(3)(D) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1023(a)(3)(D), who is independent of the Company.

(vi) The term "net worth" means the amount of the Company's assets less the amount of its liabilities, as determined in accordance with generally accepted accounting principles.

MADTSS01160355

7. **Capital Contributions.** (a) As at January 1, 2001, the Member shall be credited with a capital contribution in an amount equal to the fair market value of the assets, subject to liabilities, comprising the Business and shall acquire his interest in the Company.

(b) A capital account ("**Capital Account**") shall be established for the Member and the balance therein shall equal the capital contribution made by the Member pursuant to Section 6(a) above, plus any allocations of Profits made to the Member pursuant to Section 8 below minus all cash and the value of assets distributed to the Member (net of any liabilities actually assumed by the Member and liabilities to which such distributed property is subject) and minus any allocation of Losses made to the Member pursuant to Section 9 below.

(c) A person who is substituted as a Member shall be deemed to have made the capital contribution attributable to the interest in the Company he is acquiring and shall succeed to the Capital Account of his transferor to the extent of such interest.

8. **Additional Contributions; Loans; Return of Capital.** (a) The Member is not required to make any additional capital contribution or loans to, or entitled to receive any return of capital from, the Company.

(b) Member may lend funds to the Company. Any loan made by a Member shall be upon such terms and conditions as the Member/Manager(s) shall determine. In the event a Member makes a loan pursuant hereto, except as may be otherwise be agreed by the Member making the loan, all principal and interest payments that have become due and payable with respect to such loan shall be made prior to any distributions based on membership interests.

9. **Allocation of Profits and Losses.** The aggregate profits and losses of the Company shall be allocated to the Member.

10. **Distributions.** Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member/Manager(s).

11. **Liability of Member.** The Member shall have no liability for the obligations or liabilities of the Company.

12. **Exculpation and Indemnification of Member and Manager(s).** Neither the Member nor any Manager shall be liable for any acts or omissions, except acts or omissions based on his fraud, bad faith or willful misconduct. Furthermore, neither the Member nor any Manager shall be liable for any debts, obligations or liabilities of the Company or to each other, whether arising in tort, contract, or otherwise, solely by reason of serving in such a capacity or participating (as an employee, consultant, contractor or otherwise) in the conduct of the business of the Company. The Company shall indemnify the Member and each Manager to the fullest extent permitted by Section 420 of the LLCL, as amended, modified or supplemented from time to time, or any successor section thereto.

13.     **Formation.** The Member hereby acknowledge that Bernard L. Madoff, as organizer, filed the Articles of Organization of the Company on December 4, 2000 in the Office of the Secretary of State of New York, effective January 1, 2001.

14.     **Governing Law.** This Agreement shall be governed by, and construed under, the laws of the State of New York, all rights and remedies being governed by said laws.

15.     **Sole and Absolute Discretion.** All actions which the Member and any Manager may take and all determinations or similar exercises of judgment which the Member and any Manager may make pursuant to this Agreement may be made at the sole and absolute discretion of the Member or Manager, subject to performance by the Member/Manager in accordance with their fiduciary obligations.

16.     **Entire Agreement.** This Agreement sets forth the entire agreement of the Member. This Agreement shall not be modified or amended except in a writing signed by the Member or his successor and assign.

17.     **Third Party Beneficiaries.** Except as provided in Section 11 above, there are no third party beneficiaries of or in this Agreement, or of any of the terms or provisions hereof or of any of the rights, privileges, duties, liabilities or obligations created hereby.

IN WITNESS WHEREOF, the undersigned has duly executed this Amended and Restated Operating Agreement this 14th day of April 2004.

*[Signature]*
Bernard L. Madoff