**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 10-05169 (CGM) |
| FAIRFIELD PAGMA ASSOCIATES, LP, a New York limited partnership, SEYMOUR KLEINMAN, ESTATE OF MARJORIE KLEINMAN A/K/A MARJORIE HELENE KLEINMAN, BONNIE JOYCE KANSLER, as executor, FAIRFOX, LLC, a New York limited liability company, and SEYFAIR, LLC, a New York limited liability company, | |
| Defendants. | |

**TRUSTEE'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .........................................................................................................2

ARGUMENT ..............................................................................................................4

I.     THIS COURT SHOULD ADHERE TO PRIOR RULINGS AS LAW OF THE CASE ..............................................................................................................4

II.    IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT, SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE TRUSTEE AS A MATTER OF LAW .................................................................7

     A.    Legal Standard .............................................................................................7

     B.    The SIPA Scheme .......................................................................................7

          1.    SIPA and SIPC ...............................................................................7

          2.    Customer Property Under SIPA ......................................................9

     C.    The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year Transfers of Fictitious Profits Made by BLMIS to Defendants...........................11

          1.    BLMIS Made the Two-Year Transfers with Actual Fraudulent Intent and in Furtherance of the Fraud.......................................12

               a.    BLMIS Was a Ponzi Scheme.........................................14

               b.    The Trustee's Experts Confirmed That BLMIS Was a Ponzi Scheme.............................................................16

               c.    The Trustee's Experts Confirmed That BLMIS Paid Redemptions from Customer Funds ...............................19

               d.    The Trustee's Evidence of "Badges of Fraud" Independently Establishes Actual Intent to Defraud ....................21

               e.    BLMIS's Two-Year Transfers to Defendants Were in Furtherance of the Fraud..............................................22

           2.    BLMIS Made the Transfers to Defendants Within the Two-Year Period ...................................................................................23

          3.    The Transfers Were an Interest of the Debtor in Property.........................23

i

|   |   | a. | The Transfers are Customer Property and the Trustee Can Recover Them | 24 |

|   |   | b. | BLMIS Owned the JPMorgan Accounts Because the IA Business Was Transferred to the LLC in 2001 | 25 |

|   |   | c. | Because the Estates Were Consolidated, the Trustee Can Recover Customer Property Held in The Names of Either the LLC or Madoff | 30 |

|   |   | d. | *Avellino* Was Wrong | 32 |

|   | D. | Defendants Have Not Presented Any Countervailing Evidence | 35 |

III. DEFENDANTS' DEFENSES CAN BE DETERMINED AS A MATTER OF LAW ...................................................................................................36

    A. Defendants Did Not Give Value for Fictitious Profits...........................36

    B. Taxes May Not Be Considered as Part of Value Calculation ...............36

    C. Defendants Seymour Kleinman and Marjorie Kleinman Are General Partners and Liable for the Two-Year Transfers ...................................37

IV. THE TRUSTEE IS ENTITLED TO PREJUDGMENT INTEREST AS A MATTER OF LAW....................................................................................38

CONCLUSION......................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
No. 05 Civ. 9050(LMM), 2011 WL 1419617 (S.D.N.Y. Apr. 7, 2011), *aff'd*,
748 F.3d 110 (2d Cir. 2014)................................................................................................11

*Ahammed v. SIPC*,
295 F.3d 1100 (10th Cir. 2002) .........................................................................................34

*Alexander v. Compton*,
229 F.3d 750 (9th Cir. 2000) .............................................................................................31

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................................................................6

*Armstrong v. Collins*,
No. 01 Civ. 2437(PAC), 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010) ....................12, 13, 15

*Banner v. Kassow*,
104 F.3d 352 (2d Cir. 1996)..............................................................................................21

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.*,
396 B.R. 810 (Bankr. S.D.N.Y. 2008), *rev'd in part on other grounds*, *Bayou
IV*, 439 B.R. 284 ........................................................................................................23, 35

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
380 F. Supp. 2d 334 (S.D.N.Y. 2005)..................................................................................7

*Bourdeau Bros., Inc. v. Montagne (In re Montagne)*,
Adv. Pro. No. 08-1024, 2010 WL 271347 (Bankr. S.D.N.Y. Jan. 22, 2010) ...........................6

*Brody v. Vill. of Port Chester*,
345 F.3d 103 (2d Cir. 2003)................................................................................................5

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................................................7

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re
Bayou Grp. LLC)*,
439 B.R. 284 (S.D.N.Y. 2010)..................................................................................*passim*

*Donell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) ............................................................................................13

*Douglas v. Victor Cap. Grp.*,
   No. 96 Civ. 6557 (SHS), 1997 WL 716912 (S.D.N.Y. Nov. 17, 1997) ................................38

*Dowden v. Cross Cty. Bank*,
   97 B.R. 503 (E.D. Ark. 1987) ...........................................................................................10

*Duval v. IRS*,
   Adv. Pro. No. 11-02263 (JMP), 2012 WL 1123041 (Bankr. S.D.N.Y. Apr. 3,
   2012) ...............................................................................................................................38

*Ederer v. Gursky*,
   881 N.E.2d 204 (N.Y. 2007) .............................................................................................37

*Emerson v. Maples*,
   59 F.3d 170 (6th Cir. 1995) ..............................................................................................13

*Focht v. Heebner*,
   223 F.3d 1296 (11th Cir. 2000) ........................................................................................34

*Geltzer v. Artists Mktg. Corp.*,
   338 B.R. 583 (Bankr. S.D.N.Y. 2006) ..............................................................................38

*Gill v. Maddalena*,
   176 B.R. 551 (Bankr. C.D. Cal. 1995) ..............................................................................40

*Gowan v. The Patriot Grp.*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011) ..............................................................................13

*Gredd v. Bear, Stearns Sec. Corp.*,
   310 B.R. 500 (Bankr. S.D.N.Y. 2002) ..............................................................................22

*Gredd v. Bear, Stearns Sec. Corp.*,
   359 B.R. 510 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397 B.R. 1
   (S.D.N.Y. 2007) ................................................................................................................22

*Hill v. Spencer Sav. & Loan Ass'n*,
   83 B.R. 880 (D.N.J. 1988) ................................................................................................10

*Janvey v. Brown*,
   767 F.3d 430 (5th Cir. 2014) ............................................................................................13

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
   712 F.3d 185 (5th Cir. 2013) ............................................................................................13

*Kirschner v. Fitzsimons*,
   No. 12-cv-2652 (RJS), 2017 WL 82391 (S.D.N.Y. 2017) ...............................................22

*Klein v. Cornelius*,
    786 F.3d 1310 (10th Cir. 2015) ........................................................13

*In re Lehman Bros. Holdings Inc.*,
    445 B.R. 143 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478
    B.R. 570 (S.D.N.Y. 2012).............................................................9

*Liebersohn v. Campus Crusade for Christ, Inc.* (*In re C.F. Foods, L.P.*),
    280 B.R. 103 (Bankr. E.D. Pa. 2002) .............................................12

*Martino v. Edison Worldwide Cap. (In re Randy)*,
    189 B.R. 425 (Bankr. N.D. Ill. 1995) .......................................12, 13

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)....................................................................7

*McHale v. Boulder Cap. LLC*,
    439 B.R. 47 (S.D.N.Y. 2010).......................................................15

*Merrill v. Abbott*,
    77 B.R. 843 (D. Utah 1987).........................................................13

*Messer v. Magee (In re FKF 3, LLC)*,
    No. 13 Civ. 3601 (JCM), 2018 WL 5292131 (S.D.N.Y. Oct. 24, 2018).........39, 40

*Moran v. Goldfarb*,
    No. 09-cv-7667 (RJS), 2012 WL 2930210 (S.D.N.Y. July 16, 2012).............13, 15

*In re Motors Liquidation Co.*,
    590 B.R. 39 (S.D.N.Y. 2018), *aff'd*, 943 F.3d 125 (2d Cir. 2019) ............4

*Newbro v. Freed*,
    409 F. Supp. 2d 386 (S.D.N.Y. 2006) *aff'd*, No. 06-1722-CV, 2007 WL
    642941 (2d Cir. Feb. 27, 2007)....................................................40

*Peloro v. United States*,
    488 F.3d 163 (3d Cir. 2007)..........................................................34

*Perez v. Terrastar Corp.*,
    No. 16 Civ. 1421 (ER), 2017 WL 1040448 (S.D.N.Y. Mar. 16, 2017), *appeal
    dismissed*, No. 17-1117 (2d Cir. June 29, 2017)...................................5

*Perkins v. Haines*,
    661 F.3d 623 (11th Cir. 2011) .......................................................13

*Picard v. Avellino*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016) ...............................................32

*Picard v. BAM L.P.*,
    624 B.R. 55 (Bankr. S.D.N.Y. 2020) ............................................................... *passim*

*Picard v. BAM L.P. (In re Bernard L. Madoff)*,
    608 B.R. 165 (Bankr. S.D.N.Y. 2019) ...................................................................19

*Picard v. Chais*,
    445 B.R. 206 (Bankr. S.D.N.Y. 2011) ...................................................................14

*Picard v. Citibank, N.A. (In re BLMIS)*,
    12 F.4th 171 (2d Cir. 2021) ........................................................................... 8, 25

*Picard v. Cohen*,
    Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
    25, 2016) ...................................................................................................... 12, 25

*Picard v. Cohmad Sec. Corp.*,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) ...................................................................12

*Picard v. Fairfield Greenwich Ltd.*,
    762 F.3d 199 (2d Cir. 2014) ..................................................................................10

*Picard v. The Gerald and Barbara Keller Fam. Tr.*,
    Adv. Pro. No. 10-04539 (CGM), 2021 WL 4476811 (Bankr. S.D.N.Y. Sept.
    30, 2021) ...................................................................................................... *passim*

*Picard v. Gettinger*,
    976 F.3d 184 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2603 (2021) ......................... 8, 9, 14, 36

*Picard v. Greiff*,
    476 B.R. 715 (S.D.N.Y. 2012) ...............................................................................14

*Picard v. Ida Fishman Rev. Tr.*,
    773 F.3d 411 (2d Cir. 2014) ..................................................................................14

*Picard v. JABA Assocs. LP*,
    528 F. Supp. 3d 219 (S.D.N.Y. 2021) ............................................................. *passim*

*Picard v. Legacy Cap. Ltd.*,
    603 B.R. 682 (Bankr. S.D.N.Y. 2019) ............................................................... 4, 15

*Picard v. Lisa Beth Nissenbaum Tr.*,
    No. 20 cv. 3140, 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) ................................... *passim*

*Picard v. Lowrey*,
    596 B.R. 451 (S.D.N.Y. 2019) .................................................................................9

*Picard v. Miller*,
    631 B.R. 1 (Bankr. S.D.N.Y. 2021) ............................................................. *passim*

*Picard v. Nelson*,
    610 B.R. 197 (Bankr. S.D.N.Y. 2019) ......................................................... *passim*

*Picard v. RAR Entrepreneurial Fund, Ltd.*,
    No. 20-cv-1029, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021) ..................................5

*In re Picard*,
    917 F.3d 85 (2d Cir. 2019)...........................................................................25

*In re Pilgrim's Pride Corp.*,
    442 B.R. 522 (Bankr. N.D. Tex. 2010) ...............................................................5, 6

*Ritchie Cap. Mgmt., LLC v. Stoebner*,
    779 F.3d 857 (8th Cir. 2015) .........................................................................13

*In re Rock & Republic Enters., Inc.*,
    No. 10–11728 (AJG), 2011 WL 2471000 (Bankr. S.D.N.Y. June 20, 2011)............5

*Rosenman Fam., LLC v. Picard*,
    395 F. App'x 766 (2d Cir. 2010) .....................................................................24

*Ryan v. Brophy*,
    755 F. Supp. 595 (S.D.N.Y. 1991).................................................................37

*Salomon v. Kaiser (In re Kaiser)*,
    722 F.2d 1574 (2d Cir. 1983)........................................................................21

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) ..........................................................................13

*SEC v. Dynasty Fund, Ltd.*,
    121 F. App'x. 410 (2d Cir. 2005) ...................................................................38

*SEC v. F.O. Baroff Co.*,
    497 F.2d 280 (2d Cir. 1974)........................................................................6, 8

*SIPC v. 2427 Parent Corp.*,
    779 F.3d 74 (2d Cir. 2015)............................................................................7

*SIPC v. BLMIS (In re Bernard L. Madoff)*,
    496 B.R. 744 (Bankr. S.D.N.Y. 2013)..............................................................7

*SIPC v. BLMIS (In re Bernard L. Madoff)*,
    522 B.R. 41 (Bankr. S.D.N.Y. 2014), *aff'd*, 2016 WL 183492 (S.D.N.Y. Jan.
    14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017) ........................................29, 33

*SIPC v. BLMIS LLC (In re Bernard L. Madoff)*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015) ............................................................ 11, 33

*SIPC v. BLMIS LLC (In re BLMIS)*,
    424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011) .............................. 8

*Stanford Square, L.L.C. v. Nomura Asset Cap. Corp.*,
    232 F. Supp. 2d 289 (S.D.N.Y. 2002) ................................................................ 39

*Texaco A/S, S.A. v. Comm. Ins. Co. of Newark*,
    No. 90 Civ. 2722 (JFK), 1996 WL 603915 (S.D.N.Y. Oct. 21, 1996) ................................ 38

*Trefny v. Bear Stearns Sec. Corp.*,
    243 B.R. 300 (S.D. Tex. 1999) ....................................................................... 11

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016) ......................................................................... 25

*United States v. Madoff*,
    586 F. Supp. 2d 240 (S.D.N.Y. 2009) ................................................................ 30

*United States v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002) .......................................................................... 5

*Ying Jing Gan v. City of New York*,
    996 F.2d 522 (2d Cir. 1993) ...................................................................... 7, 36

**Statutes**

11 U.S.C. § 101(41) ....................................................................................... 34

11 U.S.C. § 109(a) ........................................................................................ 34

11 U.S.C. § 548(a) .......................................................................................... 3

11 U.S.C. § 548(a)(1)(A) ......................................................................... 10, 11, 23, 25

11 U.S.C. § 548(c) ........................................................................................ 36

11 U.S.C. § 548(d)(2)(a) .................................................................................. 36

11 U.S.C. § 550(a)(1) ...................................................................................... 3

11 U.S.C. § 551 ............................................................................................ 3

15 U.S.C. § 78ccc(a) ....................................................................................... 8

15 U.S.C. § 78ccc(a)(2)(A) ................................................................................. 8

15 U.S.C. § 78ddd(c)(2) ...............................................................................................26

15 U.S.C. § 78fff-1(a) ..................................................................................................10

15 U.S.C. § 78fff-2(c)(3) ........................................................................................ *passim*

15 U.S.C. § 78fff(b) .......................................................................................................8

15 U.S.C. § 78*lll*(4) ............................................................................................8, 9, 24

15 U.S.C. § 78*lll*(5) .....................................................................................................33

15 U.S.C. § 78*o*(b) .............................................................................................8, 26, 34

28 U.S.C. § 1961 ...........................................................................................................39

N.Y. P'ship Law § 26 ...................................................................................................37

## Rules

17 C.F.R. § 240.15b1-3(b) ...........................................................................................27

17 C.F.R. § 240.15c3-3 ........................................................................................9, 10, 24

17 C.F.R. § 240.15c3-3(f) ..............................................................................................9

17 C.F.R. § 249.501(a) .................................................................................................26

Fed. R. Bankr. P. 7056 ...............................................................................................1, 7

Fed. R. Bankr. P. 7056-1(a) ...........................................................................................4

Fed. R. Civ. P. 36(a)(3) ................................................................................................37

Fed. R. Civ. P. 56(a) ......................................................................................................7

Fed. R. Civ. P. 56(c)(1) ..................................................................................................7

Fed. R. Evid. 803(22) ...................................................................................................15

Fed. R. Evid. 807 .........................................................................................................15

## Other Authorities

4 Collier on Bankruptcy ¶ 548.02[5] (15th ed. 1983) ...................................................21

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74
   (2002) ........................................................................................................................9

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff,

respectfully submits this memorandum of law in support of the Trustee's motion (the "Motion")

under Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56 for summary judgment as to Count One of

the Trustee's complaint to avoid and recover the amounts fraudulently transferred by BLMIS to

defendants Fairfield Pagma Associates, LP, Seymour Kleinman, Estate of Marjorie Kleinman

a/k/a Marjorie Helene Kleinman, Bonnie Joyce Kansler, as executor of the Estate of Marjorie

Kleinman, Fairfox, LLC, and Seyfair, LLC (collectively, the "Defendants"). The facts

underlying this Motion are set forth in the Trustee's Statement of Material Facts Pursuant to

Local Rule 7056-1 ("Stmt."), the Declaration of Nicholas J. Cremona ("Cremona Decl."), and

the Declarations of Bruce G. Dubinsky, Lisa M. Collura, and Matthew B. Greenblatt.

## PRELIMINARY STATEMENT

This avoidance and recovery action centers on the undisputable fact that in the two years

preceding the commencement of the SIPA liquidation (the "Two-Year Period"), Defendants

received $1,247,929 in fictitious profits from BLMIS. For decades, BLMIS operated the largest

Ponzi scheme in history. In their allocutions, Madoff and BLMIS employees confirmed that

BLMIS was a Ponzi scheme, starting at least in the 1970s and continuing through BLMIS's

collapse in December 2008. Thus, the Trustee has established his *prima facie* case that the

transfers to Defendants were made with the intent to hinder, delay, or defraud BLMIS's creditors

and, therefore, are avoidable and recoverable for the benefit of the BLMIS customer fund.

Defendants do not dispute that they received the transfers. Defendants' remaining

arguments and defenses, including that the Trustee cannot recover the fraudulent transfers

because Madoff, not BLMIS, owned the bank accounts from which they were paid, have been

rejected and resolved in the Trustee's favor no less than seven times. There is no reason to depart from well-established law of the case.

As there are no material facts in dispute and Defendants cannot defeat the Trustee's *prima facie* case, summary judgment should be granted in favor of the Trustee on Count One of his Complaint.

## BACKGROUND

Defendant Fairfield Pagma Associates, LP ("Fairfield Pagma") is a New York limited partnership. Answer ¶ 7, ECF No. 59.[1] Defendants Fairfox, LLC and Seyfair, LLC are New York limited liability companies and general partners of Fairfield Pagma. *Id.* ¶ 9. Defendants Marjorie Kleinman and Seymour Kleinman are also general partners of Fairfield Pagma.[2] Cremona Decl., Ex. 16 (BLMIS Partnership Account Agreement); Ex. 17 (Trustee's First Set of Reqs. for Admis. to Def. Fairfield Pagma Nos. 38–39). Fairfield Pagma was a customer of BLMIS's investment advisory business and held BLMIS Account No. 1ZA994 in the name, "Fairfield Pagma Associates L.P.," (the "Fairfield Pagma Account"). Stmt. ¶ 111; Answer ¶ 7.

The Fairfield Pagma Account was opened on January 22, 1993 with two inter-account transfers from BLMIS Account 1F0067 in the amounts of $460,590 and $200,000, with $451,498 and $196,052 of these inter-account transfers representing principal, respectively. Stmt. ¶ 128. The balance of these reported two inter-account transfers comprised fictitious profits. *Id.* Subsequent to these inter-account transfers, there were 18 cash deposits via checks into the Fairfield Pagma Account in the aggregate amount of $2,852,118, all representing

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Fairfield Pagma Associates, LP*, Adv. Pro. No. 10-05169 (CGM) (Bankr. S.D.N.Y.).

[2] Defendant Marjorie Kleinman died during the pendency of this action. The Estate of Marjorie Kleinman and its executor, Bonnie J. Kansler, were substituted as defendants. Stip. for Substitution of Defs. & Order, ECF No. 40.

principal. Stmt. ¶ 129. In sum, these two inter-account transfers and 18 cash deposits provided the Fairfield Pagma Account with a total of $3,499,668 of principal. Stmt. ¶ 130. During the life of the Fairfield Pagma Account, Defendants made 25 cash withdrawals and two inter-account transfers, totaling $4,747,597 ($4,171,000 withdrawn in cash and $576,597 transferred into BLMIS Accounts 1ZB484 and 1ZB483). Stmt. ¶ 131. Defendants withdrew $1,247,929 of funds in excess of principal, representing fictitious profits over the life of the Fairfield Pagma Account and within the Two-Year Period. Stmt. ¶¶ 132–33.

In 2010, the Trustee brought this adversary proceeding against Defendants, pursuant to sections 548(a), 550(a)(1), and 551 of the Bankruptcy Code, to avoid and recover $1,247,929 of fictitious profits received by Defendants during the Two-Year Period. Stmt. ¶¶ 111, 133; *see also* Compl. ¶ 37, ECF No. 1. On September 18, 2015, Defendants answered the Complaint. Answer, ECF No. 59. On January 25, 2017, the Trustee served the following discovery requests on Defendants: (1) Trustee's First Set of Interrogatories to Defendant Fairfield Pagma; (2) Trustee's First Set of Requests for Production of Documents to Defendant Fairfield Pagma; (3) Trustee's First Set of Requests for Admission to Defendant Fairfield Pagma; and (4) Trustee's First Set of Requests for Production of Documents to Defendant Estate of Marjorie Kleinman A/K/A Marjorie Helene Kleinman, Bonnie Joyce Kansler, as Executor (collectively, the "Requests"). Defendants did not respond to the Trustee's Requests. On August 24, 2017, the Trustee served the expert reports of Bruce G. Dubinsky, Matthew B. Greenblatt, and Lisa M. Collura. Defendants did not depose any of the Trustee's expert witnesses. Discovery closed on November 14, 2017. Case Mgmt. Order, ECF No. 61.

Following discovery, the case was ripe for mediation under the Order (1) Establishing Litigation Case Management Procedures for Avoidance Actions and (2) Amending the February

16, 2010 Protective Order, *SIPC v. BLMIS (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789

(Bankr. S.D.N.Y. Nov. 10, 2010), ECF No. 3141.  On March 17, 2021, the parties entered into

mediation before Debbie A. Reperowitz but were unsuccessful.  *See* Notice of Mediation

Referral & Mediator Selection, ECF No. 88; Mediator's Final Report, ECF No. 93.  Also on

March 17, 2021, this Court authorized the Trustee to file motions for summary judgment in any

pending good faith case without a Local Rule 7056-1(a) pre-motion conference.  *See SIPC v.*

*BLMIS*, Adv. Pro. No. 08-01789 (CGM) (Bankr. S.D.N.Y. Mar. 17, 2021), ECF No. 20440.

## <u>ARGUMENT</u>

I.     **THIS COURT SHOULD ADHERE TO PRIOR RULINGS AS LAW OF THE CASE**

     This Court and the District Court have granted summary judgment in the Trustee's favor

multiple times in identical cases.  *See Picard v. The Gerald and Barbara Keller Fam. Tr.*, Adv.

Pro. No. 10-04539 (CGM), 2021 WL 4476811 (Bankr. S.D.N.Y. Sept. 30, 2021); *Picard v.*

*Miller*, 631 B.R. 1 (Bankr. S.D.N.Y. 2021); *Picard v. Est. of Seymour Epstein*, Adv. Pro. No. 10-

04438 (CGM) (Bankr. S.D.N.Y. Jan. 27, 2021), ECF No. 155 ("*Epstein Decision*"); *Picard v.*

*JABA Assocs. LP*, 528 F. Supp. 3d 219 (S.D.N.Y. 2021); *Picard v. Lisa Beth Nissenbaum Tr.*,

No. 20 cv. 3140 (JGK), 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021).  Other than the amounts

and dates of the transfers, the claims are identical and the record submitted in support is the same

as the other motions for summary judgment.  There is no basis to deviate from those rulings here.

     Different adversary proceedings within a liquidation proceeding are considered "one

case" for purposes of law of the case.  *See Picard v. BAM L.P.*, 624 B.R. 55, 61 (Bankr.

S.D.N.Y. 2020) (citing *Picard v. Nelson*, 610 B.R. 197, 237 (Bankr. S.D.N.Y. 2019) ("The prior

decisions within this SIPA proceeding constitute law of the case.")); *Picard v. Legacy Cap. Ltd*.,

603 B.R. 682, 700 (Bankr. S.D.N.Y. 2019) (citing *In re Motors Liquidation Co.*, 590 B.R. 39, 62

(S.D.N.Y. 2018) (law of the case doctrine applies across adversary proceedings within the same

bankruptcy case), *aff'd*, 943 F.3d 125 (2d Cir. 2019)); *Perez v. Terrastar Corp.*, No. 16 Civ.

1421 (ER), 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017) (applying the law of the case

doctrine because "[a]dversary proceedings filed in the same bankruptcy case do not constitute

different cases"), *appeal dismissed*, No. 17-1117 (2d Cir. June 29, 2017).

      The doctrine of law of the case "is not a limit on a court's power but rather a guide as to

how a court should apply its discretion." *In re Pilgrim's Pride Corp.*, 442 B.R. 522, 531 (Bankr.

N.D. Tex. 2010). Law of the case "expresses the general practice of refusing to reopen what has

been decided." *In re Rock & Republic Enters., Inc.*, No. 10–11728 (AJG), 2011 WL 2471000, at

*7 (Bankr. S.D.N.Y. June 20, 2011) (citing *Brody v. Vill. of Port Chester*, 345 F.3d 103, 110 (2d

Cir. 2003). Thus, "when a court has ruled on an issue, that decision should generally be adhered

to by that court in subsequent stages in the same case, unless 'cogent' and 'compelling' reasons

militate otherwise." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (citations

omitted). Such cause can arise from substantially different evidence being presented at the

subsequent trial, intervening contrary controlling authority, or the prior decision was clearly

erroneous. *In re Pilgrim's Pride Corp.*, 442 B.R. at 531.

      There is no reason for this Court to deviate from its prior rulings in *Keller Family Trust*,

*Miller*, *Epstein*, *Nelson*, and *BAM L.P.* or the recent decisions on these issues from Judge Koeltl

in *JABA Associates* and *Nissenbaum*. There is no substantially different evidence, intervening

contrary controlling authority, or any showing that the prior decisions were clearly erroneous.

Judge Furman issued an opinion in *Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-1029,

2021 WL 827195 (S.D.N.Y. Mar. 3, 2021), reserving a single issue for trial—whether the

transfers were made by the debtor—but otherwise disposed of all other issues on summary

judgment in the Trustee's favor.  As Judge Koeltl noted in exercising his discretion to not follow

the *RAR* decision, "there is no genuine issue of material fact that the transfers in this case were in

fact made by the LLC." *JABA Assocs. LP*, 528 F. Supp. 3d at *n.4 (citing *Anderson v. Liberty*

*Lobby, Inc*., 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact.")).  The consistent

decisions in *Nelson*, *BAM L.P.*, *Epstein*, *Miller*, *Keller Family Trust*, *JABA Associates*, and

*Nissenbaum*, as opposed to the *RAR* decision, properly guide this Court in reaching its decision.[3]

Adhering to the prior decisions entered on these issues ensures defrauded customers are

treated in the same manner across adversary proceedings within this liquidation.  The doctrine of

law of the case was developed in order to "maintain consistency and avoid reconsideration of

matters once decided during the course of a single continuing lawsuit." *Bourdeau Bros., Inc. v.*

*Montagne*, Adv. Pro. No. 08-1024, 2010 WL 271347, at *5 (Bankr. S.D.N.Y. Jan. 22, 2010)

(quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)).  Doing so here—in this hybrid

proceeding under SIPA and the Bankruptcy Code—ensures that the goals of Congress in

enacting bankruptcy legislation and the SIPA statute are met: that claimants holding similar

claims receive similar treatment. *In re Pilgrim's Pride Corp*., 442 B.R. at 531; *see also SEC v.*

*F.O. Baroff Co*., 497 F.2d 280, 283 (2d Cir. 1974) (holding that the purpose of SIPA is

protection and equal treatment of public customers of broker-dealers).

---

[3] Defendants may argue that this Court is required to follow *RAR* because it was issued before Judge Koeltl's decisions, pointing to a theory that the earliest decision controls when there is an intra-Circuit split of authority.  But this is not a definitive rule in the Second Circuit, and even if it was, this Court would follow the 2017 *Nelson* decision.

## II.    IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT, SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE TRUSTEE AS A MATTER OF LAW

### A.    Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure, applicable to bankruptcy courts

pursuant to Fed. R. Bankr. P. 7056, provides that a court must grant summary judgment when

there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986).  Factual positions are proven by either citing the record evidence—including

declarations, admissions, and interrogatory answers—or showing that an adverse party cannot

produce admissible evidence to support a fact.  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*

*Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the movant has discharged its burden, the non-movant must then "go beyond the

pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

*Celotex Corp.*, 477 U.S. at 324.  "[T]he nonmoving party may . . . not rely simply on conclusory

statements or on contentions that the affidavits supporting the motion are not credible."  *Ying*

*Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).  The non-moving party may not

oppose summary judgment "on the basis of an unreasonable view of the facts."  *Berk v. St.*

*Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005).

### B.    The SIPA Scheme

#### 1.    SIPA and SIPC

Congress enacted SIPA in 1970 to protect customers of failed broker-dealers by

"expedit[ing] the return of customer property."  *SIPC v. 2427 Parent Corp.*, 779 F.3d 74, 80 (2d

Cir. 2015); *SIPC v. BLMIS (In re Bernard L. Madoff)*, 496 B.R. 744, 748–49 (Bankr. S.D.N.Y.

2013). The program included the creation of SIPC, a nonprofit, private membership corporation

to which registered broker-dealers belong. The "members" of SIPC include "all persons

registered as broker-dealers" with the SEC under section 78*o*(b) of Title 15. SIPA §

78ccc(a)(2)(A). SIPC membership, and thus SIPA protection, arises from a broker-dealer's

registration with the SEC, without regard to the corporate form of the broker-dealer. SIPA §

78ccc(a).

When one of its members fails, SIPC initiates a SIPA liquidation, applicable only to SIPC

member firms. *See SEC v. F.O. Baroff Co., Inc.*, 497 F.2d 280, 281 (2d Cir. 1974) (object of

SIPA and SIPC is to protect customers in brokerage industry). SIPC specifies a trustee to

liquidate the business and any assets of the member-broker and recover customer property

wrongfully transferred or unlawfully converted by the broker. SIPA §§ 78*lll*(4), 78fff-2(c)(3).

Although a SIPA liquidation is similar to a bankruptcy and incorporates certain

provisions of the Bankruptcy Code, it is "tailored to achieve SIPA's objectives." *SIPC v. BLMIS*

*LLC (In re BLMIS)*, 424 B.R. 122, 133 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir.

2011); *see also Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 180 (2d Cir. 2021). As the

Second Circuit recently explained:

> SIPA thus incorporates the Bankruptcy Code to effectuate its
> priority scheme, but it does so selectively. Section 78fff(b) makes
> clear that the Bankruptcy Code applies only to the extent that it is
> "consistent" with the provisions of SIPA. 15 U.S.C. § 78fff(b). This
> selective incorporation of the bankruptcy provisions ensures that,
> when fit together, the individual pieces of SIPA produce a system
> that functions as intended.

*Picard v. Gettinger*, 976 F.3d 184, 199 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2603 (2021);

*see also* SIPA § 78fff(b) (SIPA liquidation proceeding shall proceed as if conducted under

Chapter 7 of Bankruptcy Code to extent consistent with SIPA).

## 2. Customer Property Under SIPA

Customer property is a term of art in the securities industry, and means property held by a broker-dealer but that belongs to customers. *See* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74 (2002); *Gettinger*, 976 F.3d at 189–90; *Picard v. Lowrey*, 596 B.R. 451, 469–70 (S.D.N.Y. 2019); *Keller Fam. Tr.*, 2021 WL 4476811, at *4. When customers invest their cash and securities with a broker, they transfer possession, but not title, of their money to the broker. The broker never owns that money, but rather is legally bound to hold that money in reserve for its customers. *See Lowrey*, 596 B.R. at 469–70 (noting that "customer property" in securities industry refers to property held by broker-dealer but belongs to its customers); *Nelson*, 610 B.R. at 232–33. Where and how that property is held in reserve is the subject of customer protection rules, promulgated by the SEC, known as Rule 15c3-3. Exchange Act Release No. 34-9856, Adoption of Rule 15c3-3, 37 Fed. Reg. 25224, 25225 (Nov. 29, 1972), 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3"). Once a broker-dealer goes into liquidation under SIPA, the Rule 15c3-3 reserve forms the corpus of the firm's estate for distribution to customers. The SIPA designation of customer property is the seamless continuation of Rule 15c3-3. *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 191–92 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012).

Under SIPA, customer property includes securities and cash held for customers under Rule 15c3-3 and assets derived from or traceable to customer property. SIPA § 78*lll*(4). Once property is entrusted by a customer to a broker-dealer for the purpose of purchasing securities, it remains customer property until it is returned to its rightful owner, regardless of how many hands it passes through. SIPA § 78*lll*(4) (including in the definition of customer property "the proceeds of any such property transferred by the debtor, including property *unlawfully converted*" (emphasis added)); Rule 15c3-3(f) (Rule 15c3-3 account cannot be subject to bank lien because

it consists of customer property); *Dowden v. Cross Cty. Bank*, 97 B.R. 503, 508 (E.D. Ark. 1987) (Rule 15c3-3 deposit is not subject to bank's setoff claim because it is customer property). SIPA's broad definition of customer property recognizes customers' enduring rights to the property they gave to their broker for safekeeping.

Because customer property is not the broker's property, when a broker goes into liquidation, it is also not "debtor" property. *See BAM L.P.*, 624 B.R. at 61–62 ("[M]oney held by a broker on behalf of its customers is not the broker's property under state law."). This means that a SIPA trustee's avoidance and recovery action does not neatly fit into the Bankruptcy Code, which allows trustees to recover a transfer of "an interest in *property of the debtor*." 11 U.S.C. § 548(a)(1)(A) (emphasis added). SIPA corrects this through § 78fff-2(c)(3), which provides that "the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property" to the extent that the transfer "is voidable or void" under the Bankruptcy Code, and "[s]uch recovered property shall be treated as customer property" and is "deemed to have been the property of the debtor." SIPA § 78fff-2(c)(3); *see also JABA Assocs. LP*, 528 F. Supp. 3d at 236; *Nissenbaum Tr.*, 2021 WL 1141638, at *10; *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014).

This tailored definition of "property of the debtor" in SIPA is "an intended fiction" by Congress to provide SIPA trustees with expansive authority to marshal assets, wherever located, for the benefit of customers when assets are missing, such as when property is missing from Rule 15c3-3 custodial accounts. SIPA § 78fff-1(a); *Hill v. Spencer Sav. & Loan Ass'n*, 83 B.R. 880, 894 (D.N.J. 1988). Section 78fff-2(c)(3) is designed "to recover securities that would have been part of the fund of customer property but for a prior transfer to a customer." *Id*. at 893. The purpose of SIPA § 78fff-2(c)(3) is "to prevent one or more customers from depriving other

customers of assets by keeping these assets out of the 'pool' available for distribution to customers on a ratable basis." *Trefny v. Bear Stearns Sec. Corp.*, 243 B.R. 300, 322 (S.D. Tex. 1999).

### C.    The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year Transfers of Fictitious Profits Made by BLMIS to Defendants

Under SIPA § 78fff-(2)(c)(3), the Trustee may recover any transfers by the debtor whenever customer property is insufficient to pay customer claims. To date, the Trustee has recovered $14.493 billion of approximately $20 billion owed to customers by the estate. *See* Trustee's Twenty-Sixth Interim Report, *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (CGM) (Bankr. S.D.N.Y. Oct. 29, 2021), ECF No. 20821. Because customer property is insufficient to pay the outstanding customer claims, the Trustee is authorized to recover the transfers to Defendants. *SIPC v. BLMIS (In re Bernard L. Madoff)*, 531 B.R. 439, 453–54 (Bankr. S.D.N.Y. 2015).

The Trustee seeks to avoid and recover transfers of fictitious profits made to Defendants under 11 U.S.C. § 548(a)(1)(A). The elements of this claim are: (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to hinder, delay, or defraud" a creditor. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, No. 05 Civ. 9050(LMM), 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd*, 748 F.3d 110 (2d Cir. 2014). This Court has recognized that fictitious profit cases are strict liability cases. Cremona Decl., Ex. 18 (Tr. at 114:10–11, *Picard v. Marilyn Bernfeld Tr.*, Adv. Pro. No. 10-05143 (Bankr. S.D.N.Y. Oct. 28, 2015), ECF No. 20); (Tr. at 100:19, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (Bankr. S.D.N.Y. Oct. 28, 2015), ECF No. 85). This is especially true where, as here, Defendants admitted receipt of the Two-Year Transfers. Stmt. ¶ 112.

There is no genuine dispute regarding any of the three elements of the Trustee's claim under section 548(a)(1)(A).

### 1. BLMIS Made the Two-Year Transfers with Actual Fraudulent Intent and in Furtherance of the Fraud

Intent to defraud can be established by either showing that the debtor operated a Ponzi scheme or through a badges of fraud analysis. *See JABA Assocs. LP*, 528 F. Supp. 3d at 236–41; *Nissenbaum Tr.*, 2021 WL 1141638, at \*11–15; *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at \*5 (Bankr. S.D.N.Y. Apr. 25, 2016) ("[T]he Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent." (citation omitted); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("[T]he fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi scheme presumption.'").

The Ponzi scheme presumption has been embraced by appellate and district courts across the country. It stems from the very nature of a Ponzi scheme, which "'cannot work forever.'" *Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC*, 439 B.R. 284, n.19 (S.D.N.Y. 2010) ("*Bayou IV*") (quoting *Martino v. Edison Worldwide Cap. (In re Randy)*, 189 B.R. 425, 438 (Bankr. N.D. Ill. 1995)). A Ponzi scheme's operator knows, from the outset, that "[t]he investor pool is a limited resource and will eventually run dry." *Armstrong v. Collins*, No. 01 Civ. 2437(PAC), 2010 WL 1141158, at \*20–21 (S.D.N.Y. Mar. 24, 2010) (quoting *Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.)*, 280 B.R. 103, 110 (Bankr. E.D. Pa. 2002)). When it does, the operator knows, "the scheme will collapse and that those still invested in the enterprise will lose their money." *Bayou IV*, 439 B.R. at 294 n.19. One thus "can infer an intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme." *Armstrong*, 2010 WL 1141158, at \*21 (quoting *In re C.F.*

*Foods, L.P.*, 280 B.R. at 110).[4]

Multiple courts of appeals have adopted that presumption. *See Janvey v. Brown*, 767 F.3d 430, 438–39 (5th Cir. 2014); *Emerson v. Maples*, 59 F.3d 170 (6th Cir. 1995); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995); *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008); *Klein v. Cornelius*, 786 F.3d 1310, 1320 (10th Cir. 2015); *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011). And no court of appeals has rejected the presumption. *Cf. Ritchie Cap. Mgmt., LLC v. Stoebner*, 779 F.3d 857, 862 (8th Cir. 2015) (declining to address the presumption).

Courts adopting the presumption have repeatedly explained that it reflects a logical inference from a debtor's decision to perpetrate a scheme that is "insolvent by definition." *Klein*, 786 F.3d at 1320; *see also Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013) ("[T]ransfers from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, 'as a matter of law, insolvent from its inception.'" (citation omitted)); *Bayou IV*, 439 B.R. at 294 ("'Knowledge to a substantial certainty constitutes intent in the eyes of the law,' and awareness that some investors will not be paid is sufficient to establish actual intent to defraud." (citation omitted)); *In re Randy*, 189 B.R. at 439 ("[Fraudster] necessarily knew all along that most investors, certainly the latest among them, would lose their money if they invested in his scheme. Without a doubt on this record, [fraudster] had actual intent to defraud his creditors when he paid brokers from investors' funds."); *Merrill v. Abbott*, 77 B.R. 843, 860 (D. Utah 1987) ("[A] debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.").

---

[4] Indeed, "no other reasonable inference is possible." *Armstrong*, 2010 WL 1141158, at *21; *see also Moran*, 2012 WL 2930210, at *4 (transactions or transfers "made in the course of a Ponzi scheme" could "have been made for no purpose other than to hinder, delay[,] or defraud creditors" (quoting *Gowan v. The Patriot Grp.*, 452 B.R. 391, 424 (Bankr. S.D.N.Y. 2011))).

Under either the Ponzi scheme presumption or the badges of fraud analysis, there is no dispute that BLMIS made the transfers with the intent to hinder, delay, or defraud.

### a.    BLMIS Was a Ponzi Scheme

BLMIS was engaged in a Ponzi scheme. *See Gettinger*, 976 F.3d at 188; *Miller*, 631 B.R. at 9; *Epstein Decision* at 5. "The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption . . . , particularly in light of Madoff's criminal admission." *Picard v. Chais*, 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011). The existence of the scheme has been recognized by the Bankruptcy Court, the District Court, and the Second Circuit. *See, e.g.*, *Picard v. Ida Fishman Rev. Tr.*, 773 F.3d 411, 415–16 (2d Cir. 2014); *Picard v. Greiff*, 476 B.R. 715, 718 (S.D.N.Y. 2012); *In re BLMIS*, 424 B.R. at 125–33.

The existence of the BLMIS Ponzi scheme is substantiated by the allocutions of Madoff and BLMIS employees. Stmt. ¶ 90. Madoff admitted that he ran a Ponzi scheme through BLMIS and that he did not execute trades on behalf of his investment advisory business ("IA Business") clients. Stmt. ¶¶ 91–98. Frank DiPascali, Madoff's chief financial officer and co-conspirator, admitted: "[f]rom at least the early 1990s through December of 2008 . . . [n]o purchases of [sic] sales of securities were actually taking place in [customers'] accounts." Stmt. ¶ 99. DiPascali "used hindsight to file historical prices on stocks then [he] used those prices to post purchase of [sic] sales to customer accounts as if they had been executed in realtime. On a regular basis [he] added fictitious trade data to account statements of certain clients to reflect the specific rate of earn [sic] return that Bernie Madoff had directed for that client." Stmt. ¶ 100.

David Kugel, a manager and trader at BLMIS, admitted that he falsified trading records as far back as the early 1970s. Stmt. ¶¶ 101–02. Kugel provided historical trade data to create fake trades which, when included on the BLMIS account statements and trade confirmations of IA Business clients, gave the appearance of profitable trading when no trading had actually

14

occurred.  Stmt. ¶ 102.  Irwin Lipkin, BLMIS's accountant, admitted BLMIS's revenue was

falsely inflated through fraudulent bookkeeping entries and annual audited reports.  Stmt. ¶ 103.

Eric Lipkin, payroll clerk at BLMIS, admitted BLMIS created fake reports replicating those of

the Depository Trust & Clearing Corporation in order to purportedly confirm non-existent

positions in the IA Business accounts for auditors and the Securities and Exchange Commission

("SEC").  Stmt. ¶¶ 104–05.  And Enrica Cotellessa-Pitz, BLMIS accountant and comptroller,

admitted IA Business customer money was funneled to BLMIS's proprietary trading and market-

making businesses to falsely inflate revenue and hide losses.  Stmt. ¶¶ 106–07.

      Guilty pleas and admissions under oath are admissible to prove the existence of a Ponzi

scheme, and courts routinely rely on them in granting summary judgment.  *See JABA Assocs. LP*,

528 F. Supp. 3d at 233–34 ("The various plea allocutions are admissible under Federal Rules of

Evidence 803(22) and 807, as several courts considering this issue in similar contexts have

held."); *Nelson*, 610 B.R. at 209–10 ("Criminal plea allocutions are admissible under the

exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a judgment of a previous

conviction and FED. R. EVID. 807's residual exception to hearsay."); *Moran v. Goldfarb*, No. 09-

cv-7667 (RJS), 2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012) (granting motion for

summary judgment based on plea transcript from related Department of Justice action where

perpetrator admitted under oath to orchestrating the Ponzi scheme); *Bayou IV*, 439 B.R. at 307–

08 (same); *McHale v. Boulder Cap. LLC*, 439 B.R. 47, 72 (S.D.N.Y. 2010); *Armstrong*, 2010

WL 1141158, at *24.

      The plea allocutions of Madoff and former BLMIS employees show "there is no genuine

disputed issue of fact that BLMIS was a Ponzi scheme . . . ."  *Legacy Cap. Ltd.*, 603 B.R. at 693;

*JABA Assocs. LP*, 528 F. Supp. 3d at 237; *Nissenbaum Tr.*, 2021 WL 1141638, at *11 (same).

### b.    The Trustee's Experts Confirmed That BLMIS Was a Ponzi Scheme

Bruce Dubinsky, a certified fraud examiner and forensic accountant, confirmed that BLMIS was a Ponzi scheme. *See* Decl. of Bruce G. Dubinsky, dated Nov. 12, 2021 ("Dubinsky Decl."), Attach. A (Dubinsky Report); *see also Nelson*, 610 B.R. at 210–14. As set forth in Dubinsky's unrebutted report, BLMIS operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) the IA Business. Stmt. ¶ 15. The proprietary trading business traded for its own account. The market-making business made markets in certain stocks, bonds, warrants and rights. Stmt. ¶¶ 16–17. The IA Business purported to purchase and sell securities on behalf of its customers. Stmt. ¶ 19. The proprietary trading business, the market-making business, and IA Business were units of BLMIS and operated by Madoff. Stmt. ¶ 20. Based on his investigation, Dubinsky concluded that the IA Business was a fraud and a Ponzi scheme.

BLMIS reported to its IA Business customers, including Defendants, that the money they deposited with BLMIS was invested in the "split-strike conversion" strategy which involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. treasury bills when the money was "out of the market." Stmt. ¶¶ 22, 25; Cremona Decl., Ex. 8 (Plea Allocution of Bernard L. Madoff) at 25:25–26:18. Dubinsky concluded that BLMIS did not execute this strategy on behalf of its IA Business customers, including for Defendants. Stmt. ¶¶ 22, 25.

Dubinsky analyzed BLMIS's trading records and determined that as far back as the 1970s, BLMIS used historical trade information to fabricate false trades for IA Business customers and reported those fake trades on customer statements. Stmt. ¶¶ 23–58. Dubinsky's

analysis further confirmed the lack of any trading by BLMIS on behalf of its IA Business customers based on (a) the impossible reported volume of equity trades; (b) impossible equity and options trades reported outside the daily price range; (c) the low volatility in its reported daily trading performance compared to the actual market behavior and the performance achieved by BLMIS in the proprietary trading business unit as measured by the volume weighted average prices for its sales and purchases; (d) the consistently positive rates of returns that did not "mirror" the volatility of the markets; (e) a lack of any Depository Trust Corporation ("DTC") records to confirm the reported IA Business equity or treasury trades; and (f) a lack of Options Clearing Corporation ("OCC") records to confirm the reported IA Business options trades.  Stmt. ¶ 26.  Dubinsky further verified that no treasuries, purportedly part of the split-strike conversion strategy, were purchased on behalf of IA Business customers.  Stmt. ¶¶ 59–63.

Dubinsky found many instances where the volume that BLMIS claimed to have purchased or sold on behalf of all IA Business customers exceeded the volume of equities traded for the entire market.  Stmt. ¶¶ 27–30.  Dubinsky also analyzed the equity and options trades that were priced outside the daily price range.  Stmt. ¶¶ 31–32.  For the period of 2000-2008, Dubinsky determined that there were 99,972 equity transactions executed outside the daily market traded price range, and 34,501 options transactions traded outside of the daily price range.  *Id*.  The absence of actual trading was also reflected in the prices at which the IA Business purportedly bought and sold shares using the split-strike conversion strategy.  Stmt. ¶¶ 33–37.  Dubinsky also analyzed the volatility of the IA Business's reported average annual rate of return for the split-strike conversion strategy as compared with the volatility of the annual rate of return for the two major market indices—the S&P 100 Index and the Dow Jones Industrial Average.  Stmt. ¶ 38.  Because the IA Business's split-strike conversion strategy was supposedly

engineered around the S & P 100, the IA Business's returns should have performed similarly to the S&P 100 Index. Stmt. ¶ 39. This analysis showed that the volatility in the IA Business rates of return did not mirror the volatility of the rates of return of the major indices. Stmt. ¶¶ 40–42.

Additionally, all equity trades made by BLMIS should have been reflected in the DTC records pertaining to BLMIS's account with the DTC—an organization that clears and settles equity transactions in the U.S. market. Stmt. ¶ 43. Dubinsky's analysis confirmed that the equity securities that were cleared through BLMIS's DTC account were traded by the proprietary trading business; no IA Business trades were cleared through BLMIS's DTC account. Stmt. ¶¶ 44–48. He concluded that the IA Business did not execute the equity trades reflected on the customer statements. Similarly, the options purportedly executed for the customer accounts in the IA Business could not be reconciled with the records of the OCC, an organization that clears and settles options transactions in the U.S. market. Stmt. ¶¶ 54–57. Based on Dubinsky's analysis of these records, he concluded that BLMIS did not executed the equity trades or conduct any options trading on behalf of its IA Business customers. Stmt. ¶¶ 49–53, 58.

Nor did BLMIS purchase the treasuries it reported to customers. Stmt. ¶¶ 59–60. While BLMIS did purchase treasuries with customer funds, it did so as a way to obtain interest on the customer cash it was holding. Stmt. ¶ 74. The purchases did not match the allocation of T-Bill transactions that appeared on customer statements. Stmt. ¶ 60. Dubinsky's analysis also confirmed that the volume of treasuries that appeared on the customer statements dwarfed the aggregate volume of treasuries actually purchased and held by BLMIS. Stmt. ¶¶ 61–63; *see also Nelson*, 610 B.R. at 214, 234 n.37 ("Dubinsky's analysis demonstrated that the T-Bill transactions that appeared in the customer statements were fictitious and bore no relationship to the actual treasuries purchased by BLMIS and documented in the DTC records."). DiPascali,

Madoff's right-hand employee, testified that treasuries purchased by the IA Business were solely

as a cash management tool, that the treasuries were not purchased for IA Business customers,

and that the treasuries that appeared on customer statements were fictitious.  Stmt. ¶¶ 64–68; *see*

*also Nelson*, 610 B.R. at 226, 234 n.37.  For these reasons, this Court has already held that any

treasuries purchased were "part of the ongoing fraud," *Epstein Decision* at 7, and that "the

purchase of treasuries was part of the cash management system used by BLMIS to sustain the

Ponzi scheme and 'did not transform BLMIS into a legitimate enterprise or prohibit the Trustee's

reliance on the Ponzi scheme presumption.'"  *Picard v. BAM L.P. (In re Bernard L. Madoff)*, 608

B.R. 165, 175 n.15 (Bankr. S.D.N.Y. 2019) (citation omitted).

Finally, BLMIS falsely reported paying or crediting customers with $4.3 billion in cash

dividends between 1998 and 2008.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 190–98.

Dubinsky confirmed that BLMIS neither received any monies as a result of trading securities nor

received any dividends on purportedly held securities.  *Id.* ¶ 279.

### c.    The Trustee's Experts Confirmed That BLMIS Paid Redemptions from Customer Funds

Lisa Collura, a forensic accountant and certified fraud examiner, analyzed the books and

records of BLMIS.  *See Nelson*, 610 B.R. at 220–21.  Collura's investigation shows that during

the ten-year period before its collapse on December 11, 2008, BLMIS primarily used three bank

accounts for the IA Business: JPMorgan Chase Bank, N.A. ("JPMorgan") account #xxxxx1703

(the "703 Account"); JPMorgan account #xxxxxxxxx1509 (the "509 Account," together with the

703 Account, the "JPMorgan Accounts")); and Bankers Trust account #xx-xx0-599 (the "BT

Account").  Stmt. ¶ 69.  The JPMorgan Accounts were linked commercial business accounts.

Stmt. ¶ 72.  IA Business customers' cash deposits were deposited and commingled in the 703

Account.  Stmt. ¶ 70.  IA Business customer withdrawals were made through the JPMorgan

Accounts and the BT Account, which was a checking account entirely funded by the 703 Account. Stmt. ¶ 71. The 509 Account was a commercial controlled disbursement account that was entirely funded by the 703 Account. *Id*. The money in the 703 Account consisted almost entirely of customer deposits. Stmt. ¶¶ 72, 87. Dubinsky confirmed that customer funds were deposited and withdrawn from the JPMorgan Accounts, and that there were no inflows of money as a result of trading securities or receipt of dividends on purportedly held securities. Stmt. ¶ 76.

Both Dubinsky and Collura confirmed that ninety-seven percent of all cash additions into the 703 Account came directly from IA Business customers. Stmt. ¶ 73. The other three percent of inflows into the 703 Account came from income earned from cash management activities including (1) short-term investment activity made directly from the 703 Account (including overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and treasuries); and (2) investments of BLMIS customer funds made through bank and brokerage accounts held in the name of BLMIS or Madoff. Stmt. ¶ 74. Because the short-term investments, including overnight sweeps, were made directly out of the 703 Account, the source of the money for those investments was customer funds. Stmt. ¶ 75.

The IA Business did not have any legitimate income-producing activities. The only source of cash available for the IA Business to pay purported profits as well as redemption requests was from cash that other IA Business customers deposited in the 703 Account. Stmt. ¶ 82. These transactions rendered BLMIS insolvent. By no later than December 2002, BLMIS's assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion. Stmt. ¶ 83. By December 2008, the customer property on hand at BLMIS was grossly insufficient to pay the claims of its customers. Stmt. ¶ 84.

Defendants did not serve a rebuttal to the Trustee's experts' opinions that the funds in the

703 Account consisted of customer money, that customer redemptions were paid with funds

from the 703 Account, or that the IA Business had no source of funds other than customer

money.  Nor did Defendants depose the Trustee's experts or identify any evidence—admissible

or otherwise—to rebut the substantial evidence demonstrating that Madoff was operating a Ponzi

scheme through BLMIS's IA Business and that the transfers of fictitious profits Defendants

received comprised other customers' deposits.  Accordingly, the undisputed evidence is that the

transfers were made with the intent to hinder, delay, or defraud BLMIS's creditors.

> **d.      The Trustee's Evidence of "Badges of Fraud" Independently Establishes Actual Intent to Defraud**

Independent of the Ponzi presumption, courts in this liquidation proceeding have found

that BLMIS made the transfers with the requisite intent to defraud under the "badges of fraud"

analysis.  *See JABA Assocs. LP*, 528 F. Supp. 3d at 240–41; *Nissenbaum Tr.*, 2021 WL 1141638,

at *14–15; *Nelson*, 610 B.R. at 235.  The Second Circuit has recognized the following badges of

fraud: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate

relationship between the parties; (3) the retention of possession, benefit or use of the property in

question; (4) the financial condition of the party sought to be charged both before and after the

transaction in question; (5) the existence or cumulative effect of a pattern or series of

transactions or course of conduct after the incurring of debt, onset of financial difficulties, or

pendency or threat of suits by creditors; (6) the general chronology of the event and transactions

under inquiry.  *See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983);

*Banner v. Kassow*, 104 F.3d 352, 352 (2d Cir. 1996).  The Second Circuit has also recognized

that "[c]oncealment of facts and false pretenses by the transferor" may be a badge of fraud.  *In re*

*Kaiser*, 722 F.2d at 1582; *see also* 4 Collier on Bankruptcy ¶ 548.02[5] at 548–34 to 38 (15th ed.

1983).  The existence of several badges can "constitute conclusive evidence of an actual intent to

defraud . . . ."  *Kirschner v. Fitzsimons*, No. 12-cv-2652 (RJS), 2017 WL 82391, at *13

(S.D.N.Y. 2017) (noting that the existence of badges of fraud "focus the inquiry on the

circumstances that suggest a conveyance was made with fraudulent intent" (citation omitted));

*see also Gredd v. Bear, Stearns Sec. Corp.*, 310 B.R. 500, 505, n.3 (Bankr. S.D.N.Y. 2002)

(noting that "[b]adges of fraud are circumstances that so commonly accompany fraudulent

transfers that their presence gives rise to an inference of intent to defraud").

The evidence adduced by the Trustee and set forth above, which has not been

controverted by Defendants, establishes at least three of the badges of fraud, including the

concealment of facts by BLMIS, BLMIS's insolvency at the relevant time, and the lack of

consideration proved for fictious transfers to customers.  *See JABA Assocs. LP*, 528 F. Supp. 3d

at 241 (citing *Nelson*, 610 B.R. at 235 ("[T]he existence of the badges of fraud supply a separate

basis to conclude that the Two-Year Transfers were made with the actual intent to defraud."));

*Nissenbaum Tr.*, 2021 WL 1141638, at *15 (same).  The Trustee seeks an independent finding

that the Trustee established BLMIS's actual intent under the the badges of fraud analysis.

### e.    BLMIS's Two-Year Transfers to Defendants Were in Furtherance of the Fraud

In a Ponzi scheme, the Trustee need not prove that the debtor intended to hinder, delay,

or defraud a *particular* creditor, but rather he must only establish that the transfers made to the

transferee were in furtherance of a fraudulent scheme.  *See Bayou IV*, 439 B.R. at 304.

"Every payment made by the debtor to keep the scheme on-going was made with the

actual intent to hinder, delay or defraud creditors, primarily the new investors."  *Gredd v. Bear,*

*Stearns Sec. Corp.*, 359 B.R. 510, 518 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397

B.R. 1 (S.D.N.Y. 2007).  This is predicated on the reality that a debtor's failure to honor an

investor's withdrawal request "would promptly have resulted in demand, investigation, the filing

of a claim and disclosure of the fraud." *Bayou Accredited Fund, LLC v. Redwood Growth

Partners, L.P.*, 396 B.R. 810, 843 (Bankr. S.D.N.Y. 2008) ("*Bayou III*"), *rev'd in part on other

grounds*, *Bayou IV*, 439 B.R. at 284.  Every redemption payment "*in and of itself* constituted an

intentional misrepresentation of fact" of the investor's falsely inflated account statement and "an

integral and essential part of the [] fraud." *Id.* at 843.  Thus, the transfers to Defendants were in

furtherance of the fraudulent Ponzi scheme.

### 2.    BLMIS Made the Transfers to Defendants Within the Two-Year Period

BLMIS transferred fictitious profits to or for the benefit of Defendants between

December 11, 2006 and December 11, 2008.  The Trustee's evidence is uncontroverted as to the

date, receipt, and amount of the transfers the Trustee seeks to avoid and recover.

### 3.    The Transfers Were an Interest of the Debtor in Property

The Trustee has met the first element of section 548(a)(1)(A)—that the transfers were an

interest of the debtor in property—in three ways.  First, he has shown that the transfers at issue

comprise customer property which he is authorized to recover under SIPA and the Bankruptcy

Code.  Second, he has shown that the JPMorgan Accounts were owned by BLMIS at the time of

the transfers to Defendants.  Third, because the BLMIS liquidation and Madoff's chapter 7 estate

were substantively consolidated, the Trustee can recover customer property whether held in the

name of BLMIS or Madoff.

Defendants may argue that the Trustee has not met the first element of section

548(a)(1)(A) because: (1) the IA Business, including the JPMorgan Accounts from which the

fraudulent transfers were made, were not transferred to the LLC in 2001 when Madoff changed

the corporate form of his business and (2) *Avellino* says that the Trustee can only recover

transfers made by the LLC, notwithstanding substantive consolidation.  Defendants' arguments are wrong as a matter of undisputed fact and law.

> ### a.      The Transfers are Customer Property and the Trustee Can Recover Them

Where the transfers are customer property, the Trustee is entitled to avoid and recover the Two-Year Transfers, regardless of the change in the corporate form of Madoff's business from a sole proprietorship to an LLC.  *Keller Fam. Tr.*, 2021 WL 4476811, at *3–4; *Epstein Decision* at 5–6; *BAM L.P.*, 624 B.R. at 62; *Nelson*, 610 B.R. at 215–18.

When IA Business customers sent money to BLMIS for the purpose of purchasing securities, it became "customer property" under SIPA.  SIPA § 78*lll*(4); *Rosenman Fam., LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010) (funds given to BLMIS for the purpose of purchasing securities and deposited in the JPMorgan Account are subject to SIPA); *see also BAM L.P.*, 624 B.R. at 62.  Whether operated as a sole proprietorship or as an LLC, BLMIS's assets were composed primarily of customer property and its liabilities were composed primarily of amounts owed to customers.  The transfers were made from the JPMorgan Accounts that were functionally used by BLMIS as its Rule 15c3-3 account, which forms the corpus of the fund of customer property under SIPA.  Stmt. ¶¶ 69–77, 87–89; 17 C.F.R. § 240.15c3-3.

For at least the ten-year period prior to the liquidation, BLMIS bank records show that the JPMorgan Accounts were used as an instrumentality of the fraud for customer deposits and withdrawals—for at least three years while the firm was a sole proprietorship, and for the seven years after it became an LLC.  Dubinsky Decl., Attach. A. (Dubinsky Report) ¶ 279; *BAM L.P.*, 624 B.R. at 62 ("When the Defendants invested their money into the IA Business, the deposits were placed into the Bank Accounts and commingled with all of the Ponzi scheme victims' deposits."); Decl. of Lisa M. Collura, dated Nov. 17, 2021 ("Collura Decl."), Attach. A (Collura

Report) ¶¶ 20–27; *see also Citibank*, 12 F.4th at 179 ("The customers' funds were commingled in BLMIS's bank account. When customers withdrew their "profits" or principal, BLMIS paid them from this commingled account. As a result, each time BLMIS transferred payments to a customer, it was money stolen from other customers."); *In re Picard*, 917 F.3d 85, 92 (2d Cir. 2019) (noting that Madoff commingled funds into JPMorgan checking account and sent customers redemptions from commingled account); *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 564 (2d Cir. 2016) (same).

The undisputed facts demonstrate the transfers here are "property transferred by the debtor which, except for such transfer, would have been customer property" and therefore are recoverable under SIPA § 78fff-2(c)(3). Because the funds are indisputably customer property, BLMIS is deemed under SIPA to have an interest in the transferred customer property, making the transfers here avoidable under § 548(a)(1)(A) of the Bankruptcy Code. Stmt. ¶ 89; *Miller*, 631 B.R. at 8; *Keller Fam. Tr.*, 2021 WL 4476811, at *4; *Cohen*, 2016 WL 1695296, at *5. Where, as here, there is no dispute that the Trustee is seeking to recover transfers comprising customer property, the form of the broker-dealer at the time of transfer is irrelevant.

### b.    BLMIS Owned the JPMorgan Accounts Because the IA Business Was Transferred to the LLC in 2001

This Court has held numerous times that the transfers made by BLMIS in other prior identical cases—like the Two Year Transfers here—were "an interest of the debtor in property" because the JPMorgan Accounts were the property of BLMIS, not Madoff. *See Keller Fam. Tr.*, 2021 WL 4476811, at *4; *Miller*, 631 B.R. at 8; *Epstein Decision* at 7; *BAM L.P.*, 624 B.R. at 61; *Nelson*, 610 B.R. at 216; *JABA Assocs. LP*, 528 F. Supp. 3d at 234–36; *Nissenbaum Tr.*, 2021 WL 1141638, at *9. Any contrary argument from Defendants should be rejected based on the *seven prior decisions* in this liquidation that so hold. In *BAM L.P.*, this Court held:

> [A]ll of the assets and liabilities of the sole proprietorship, including
> the IA Business, were transferred to BLMIS via the 2001 SEC
> Amended Form BD. As such, the Defendants' customer accounts
> and the Bank Accounts are property of BLMIS and the monies paid
> to Defendants from those Bank Accounts must be turned over to the
> Trustee.

*BAM L.P.*, 624 B.R. at 61; *see also Miller*, 631 B.R. at 16 (same); *Epstein Decision* at 7 (same).

In *JABA Associates* and *Nissenbaum*, the District Court held:

> Madoff was using the accounts at issue in his capacity as a sole
> proprietor until he reorganized his business as an LLC. When
> Madoff changed the form of his business from a sole proprietorship
> to an LLC, the business retained the same SEC registration number.
> When submitting the Amended Form BD, Madoff noted that the
> [sole proprietorship] [sic] 'will transfer to successor all of
> predecessor's assets and liabilities related to predecessor's business.
> The transfer will not result in any change in ownership or control.' .
> . . And there were no assets or liabilities of the sole proprietorship
> listed as 'not assumed by the successor.' . . . The form also indicated
> that no 'accounts, funds, or securities of customers of the applicant
> are held by or maintained by [any] other person, firm, or
> organization.'

*JABA Assocs. LP*, 528 F. Supp. 3d at 234–35; *Nissenbaum Tr.*, 2021 WL 1141638, at *9.

BLMIS owned the JPMorgan Accounts at the time of the transfers to Defendants.

Madoff began operating as a sole proprietorship in the early 1960s under the names of Bernard

L. Madoff and Bernard L. Madoff Investment Securities. *BAM L.P.*, 624 B.R. at 59. Under

section 78*o*(b), a broker-dealer applies for registration with the SEC on SEC Form BD (the

uniform form for broker-dealer registrations). *See* 17 C.F.R. § 249.501(a). Once registered with

the SEC, the broker-dealer is assigned a registrant number, becomes a member of SIPC, and is

required to pay into the SIPC fund by annual assessments. SIPA § 78ddd(c)(2). In January

1960, the sole proprietorship filed with the SEC a Form BD under registrant number 8-8132.

Cremona Decl., Ex. 1 (1959 SEC Form BD). Through that registration, the broker-dealer

became a member of SIPC when SIPA was enacted in 1970. There is no dispute that prior to

2001, the JPMorgan Accounts were held by Madoff's sole proprietorship.

Effective January 1, 2001, Madoff changed the corporate form of his broker-dealer business when he incorporated as an LLC.  Cremona Decl., Ex. 2 (Articles of Organization); *see also BAM L.P.*, 624 B.R. at 59.  If an entity succeeds to and continues the business of a broker-dealer previously registered with the SEC, and the succession is based on a change in the predecessor's form of organization, it files a Form BD Amendment.  SEC Rule 15b1-3(b), 17 C.F.R. § 240.15b1-3(b).  The successor entity continues the business and SIPC membership of its predecessor.  Thus, with this change in corporate form, BLMIS filed an Amended Form BD with the SEC in January 2001 to reflect that change using the same SEC registrant number 8-8132; BLMIS did not file a new application for registration.  Cremona Decl., Ex. 3 (Amended Form BD); *see also BAM L.P.*, 624 B.R. at 59–60.

Under "BD Successions" of the 2001 Amended Form BD, it asked:  "Briefly describe details of the succession, including any assets or liabilities not assumed by the successor."  Cremona Decl., Ex. 3 (Amended Form BD at 10–11, *see also* Question 5).  The response was:  "Effective January 1, 2001, predecessor will transfer to successor all of predecessor's assets and liabilities related to predecessor's business.  The transfer will not result in any change in ownership or control."  *Id.*  No assets or liabilities of the sole proprietorship were listed as "not assumed by the successor."  *Id.*  The 2001 Amended Form BD further certified that no "accounts, funds, or securities of customers of the *applicant* are held or maintained by such other *person*, firm, or organization."  *Id.* (Amended Form BD at 5).  BLMIS succeeded to the sole proprietorship's SEC registrant number 8-8132.  Cremona Decl., Ex. 1 (1959 SEC Form BD); Ex. 3 (Amended Form BD at 10).

27

Upon the filing of the Amended Form BD, the sole proprietorship no longer operated as a

broker-dealer or in any other capacity.  Cremona Decl., Ex. 3 (Amended Form BD at 10–11); *see*

*also BAM L.P.*, 624 B.R. at 60.  Indeed, this Court noted "that this succession provision meant

that, without exception, all of the assets and liabilities of the sole proprietorship were transferred

to BLMIS and the sole proprietorship ceased to exist."  *BAM L.P.*, 624 B.R. at 60.

BLMIS's corporate documents confirmed the change in corporate form and the transfer

of all assets.  In its Amended and Restated Operating Agreement, BLMIS sets forth Madoff's

intent to transfer all assets—including bank accounts—held by the sole proprietorship to the

LLC, effective January 1, 2001:

> 3.  **Purpose.**  The Company is formed to receive as at January 1,
> 2001, all of the assets, subject to liabilities, associated with the
> business being conducted by Bernard L. Madoff, as sole
> proprietorship (the "Business") and to thereafter conduct such
> Business, and any further extension therefor, in such manner and
> form as determined by the Member in his sole discretion, to the
> extent permitted by the [Limited Liability Company Law of the
> State of New York] or by the laws of any jurisdiction which the
> Company may do business.

Cremona Decl., Ex. 5 (Amended and Restated Operating Agreement).  Consistent with the 2001

Amended Form BD filed with the SEC, the Amended and Restated Operating Agreement makes

clear that no assets were carved out or excluded from the transfer of assets to the LLC, and

confirmed that all assets of the sole proprietorship—the three business units and their bank

accounts—were transferred to the LLC as of January 1, 2001.

The change in corporate form of the IA Business was reflected on BLMIS customer

statements which, after 2001, reflected the name of the LLC on the top left corner.  *Compare*

Dubinsky Decl., Attach. A (Dubinsky Report) Figure 7 (Dec. 30, 2000 BLMIS Customer

Statement) *with* Cremona Decl., Ex. 14 (Oct. 31, 2008 BLMIS Customer Statement).  Madoff

also made various financial institutions aware of the change in corporate form and referred to the

LCC in correspondence with JPMorgan regarding the 703 and 509 Accounts.  Cremona Decl.,

Ex. 19 (Letters to Financial Institutions).  In addition, existing BLMIS customers of the IA

Business as of 2001—like Defendants—became customers of the LLC in accordance with their

customer agreements that expressly inured to the benefit of "any successor organization."

Cremona Decl., Ex. 15 (BLMIS Customer Agreement).  And the JPMorgan Accounts continued

to be used in the same way both prior to and after 2001—to receive customer deposits and to

satisfy customer withdrawal requests.  Collura Decl., Ex. A (Collura Report) ¶¶ 20–27.

The sole proprietorship thus had no corporate existence, no SEC registration, no assets,

and no customers after 2001.  *See SIPC v. BLMIS (In re Bernard L. Madoff)*, 522 B.R. 41, 60

(Bankr. S.D.N.Y. 2014), *aff'd*, 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x

708 (2d Cir. 2017) (finding all Madoff Securities' assets and liabilities were transferred to

BLMIS upon the reorganization to a single member LLC).  Moreover, when Madoff did finally

register his IA Business in 2006, he did so not as a sole proprietor but rather through the LLC,

using the same SEC registrant number and signing the form on behalf of "Bernard L. Madoff

Investment Securities LLC."  Cremona Decl., Ex. 4 (2006 Form ADV).  Thus, if any doubt

remained in 2001 as to whether the LLC succeeded to the IA Business, it was resolved when the

IA Business was registered under the LLC in 2006—before the fraudulent transfers were made.

Defendants may nonetheless argue that various BLMIS and JPMorgan documents

indicate Madoff intended to keep the IA Business separate under the name "Bernard L. Madoff

Investment Securities."  But any "discrepancies Defendants have demonstrated to exist—forms

filled out improperly, business names used interchangeably on bank accounts and checks—are

the sleights of hand that one would expect to see when exhuming the remnants of a Ponzi

scheme."  *BAM L.P.*, 624 B.R. at 60 (citation omitted); *JABA Assocs. LP*, 528 F. Supp. 3d at 235

(same); *Nissenbaum Tr.*, 2021 WL 1141638, at *9 (same). Any ministerial oversights in

BLMIS's recordkeeping are insufficient to create a *genuine* factual dispute as to the ownership of

the IA Business, as numerous courts have so held.

> **c.     Because the Estates Were Consolidated, the Trustee Can Recover Customer Property Held in The Names of Either the LLC or Madoff**

After Madoff confessed in December 2008, the Government brought criminal charges

and the SEC filed a civil complaint against Madoff and BLMIS alleging that they were operating

a Ponzi scheme through BLMIS's IA Business. *United States v. Madoff*, 586 F. Supp. 2d 240

(S.D.N.Y. 2009); Compl., *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 11, 2008),

ECF No. 1. Because BLMIS was a registered broker-dealer, SIPC obtained a protective decree

finding its customers needed the protections of SIPA, placed BLMIS into liquidation, appointed

the Trustee "for the liquidation of the business of the Defendant with all the duties and powers of

a trustee as prescribed in SIPA," and removed the case to the bankruptcy court. Order ¶ 2,

*Madoff*, No. 08-cv-10791 (S.D.N.Y. Dec. 15, 2008), ECF No. 4 ("Protective Decree"); SIPC

Application ¶ 2, *id.*, ECF No. 5.

Shortly after the Trustee's appointment, certain creditors filed an involuntary bankruptcy

petition against Madoff, concerned that they would be prejudiced if Madoff's personal estate was

not liquidated alongside the liquidation of the broker-dealer by the SIPA Trustee. Pet. at 7,

*Madoff*, No. 08-cv-10791 (S.D.N.Y. Apr. 1, 2009), ECF No. 37. The district court allowed the

chapter 7 case to go forward, to target "that portion of Mr. Madoff's property that is neither

forfeitable criminally nor subject to the liquidation of BLMIS under SIPA." Order at 4, *Madoff*,

No. 08-cv-10791 (S.D.N.Y. Apr. 10, 2009), ECF No. 47. Alan Nisselson was subsequently

appointed chapter 7 Trustee for Madoff. *See* Notice of Appointment, *In re Bernard L. Madoff*,

No. 09-11893 (CGM) (Bankr. S.D.N.Y. Apr. 21, 2009), ECF No. 13.

Because Madoff used BLMIS as his personal piggy bank and alter ego, and his only significant source of income was his draw from BLMIS, which itself came from stolen customer money, there was no way to separate Madoff's assets from those of the business. *See* Mem. of Law, *SIPC v. BLMIS*, No. 08-01789 (CGM) (Bankr. S.D.N.Y. May 5, 2009), ECF No. 196. Upon motion by the Trustee, the bankruptcy court substantively consolidated the SIPA liquidation and the chapter 7 bankruptcy, merging Madoff's chapter 7 estate into the SIPA proceeding *nunc pro tunc*. All assets and liabilities of the two estates were deemed consolidated as of December 10, 2008. *See* Order, *SIPC v. BLMIS*, No. 08-01789 (CGM) (Bankr. S.D.N.Y. June 10, 2009), ECF No. 252 (the "Consolidation Order"). The SIPA Trustee was authorized to avoid and recover fraudulent transfers of customer property under SIPA *on behalf of the consolidated estate*. *Id*. ¶ 7 (emphasis added) (stating "the SIPA Trustee is authorized to pursue claims on behalf of the consolidated estate . . . for, among other things, the avoidance and recovery of transferred property"). The chapter 7 Trustee had the powers of an ordinary bankruptcy trustee. *Id*. ¶ 4. The Consolidation Order unified interests in the separate estates, ensuring that all assets, whether technically Madoff assets or BLMIS assets, flowed into the consolidated estate to be returned to customers. The Order further provided that, like those of the SIPA Trustee, the fees and expenses of the chapter 7 Trustee would be paid by SIPC as opposed to coming out of the estate, thereby maximizing the recoveries for customers. *Id*. ¶ 5.

The Consolidation Order supports the right of the Trustee to recover customer property transferred from any bank account held by BLMIS or Madoff. The Order preserves the respective avoidance powers of both the SIPA Trustee and the chapter 7 Trustee, a provision included in light of caselaw holding that "[a]bsent express preservation of the trustee's avoidance power, an order of substantive consolidation would ordinarily eliminate that power." *Alexander*

*v. Compton*, 229 F.3d 750, 768 (9th Cir. 2000). But the preservation of each trustee's respective

powers is not a limit on those powers. The Consolidation Order does not state that the SIPA

Trustee can only recover customer property when held by the LLC; to the contrary, the effect of

the Order is that when the SIPA Trustee exercises that power, he does so on behalf of the

consolidated estate and can recover any customer property held by Madoff *or* the LLC. *Cf. BAM*

*L.P.*, 624 B.R. at 61 & n.4 (noting that because the chapter 7 case was substantively consolidated

with the SIPA proceeding, the SIPA Trustee should be able to recover fraudulent transfers made

by Madoff's sole proprietorship).

### d.    *Avellino* **Was Wrong**

The *Avellino* decision entered by Judge Bernstein was centered around the fact that the

SIPC Application that commenced the BLMIS liquidation named the member broker-dealer that

was registered with the SEC as of December 2008 under registrant number 8-8132: Bernard L.

Madoff Investment Securities LLC. *Picard v. Avellino*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016). In

*Avellino*, Judge Bernstein reasoned that because the SIPC Application and the Protective Decree

named only the LLC (rather than the LLC *and* the defunct predecessor sole proprietorship), the

only "debtor" for purposes of the avoidance and recovery provisions of SIPA and the Bankruptcy

Code was the LLC. *Id.* at 108–09. Judge Bernstein also ruled that the Consolidation Order did

not give the SIPA Trustee the power to recover property held in Madoff's name, nor did the

chapter 7 Trustee have the power to recover customer property. *Id.* at 109–10. Taken together,

the holdings meant that there was no fiduciary that could recover customer property transferred

by the broker-dealer prior to 2001. *Id.* at 108–10.

This interpretation of the Protective Decree and the Consolidation Order is unmoored

from the text of SIPA. First, because the sole proprietorship ceased to exist some eight years

prior to the collapse, the only SIPC member that *could have been* named in the Protective Decree

was the LLC.  There is no SIPA requirement that a protective decree identify every prior name or

form of organization under which the broker-dealer formerly operated (nor would imposing such

a requirement extra-statutorily be consistent with SIPA's protective purpose).  The Protective

Decree here named the SIPC member and subjected all customer property wherever and

whenever held to the special protections of SIPA for the benefit of the broker-dealer's customers.

Second, the Trustee was appointed for the liquidation of the *business* of the broker-

dealer.  The facts show that Madoff's business was a continued, uninterrupted one from its

inception in 1960, funneling customer property in the same way through the same bank accounts.

Collura Decl., Ex. A (Collura Report) ¶¶ 20–27; *see also In re Bernard L. Madoff*, 522 B.R. at 60

("[T]he incorporation of BLMIS as a limited liability company continued his business without

change. . . . Thus, nothing has changed since 1960 except for the business form that Madoff used

to conduct his Ponzi scheme."); *JABA Assocs. LP*, 528 F. Supp. 3d at 227 ("While BLMIS

changed from a sole proprietorship to an LLC, many aspects of the business remained the

same."); *Nissenbaum Tr.*, 2021 WL 1141638, at *3 (same); *In re Bernard L. Madoff*, 531 B.R. at

485 (finding that "nothing changed" when BLMIS changed to an LLC).   Because the Trustee is

appointed for the liquidation *of the business* of the debtor, such liquidation necessarily entails the

liquidation of any predecessor conducting the same business, using the same SEC registrant

number, on behalf of its customers with their customer property.

Moreover, where the same broker-dealer is continuously registered with the SEC under

the same registrant number, its SIPC membership is also continuous.  The term "debtor" has a

special definition under SIPA, which controls here: "a *member* of SIPC with respect to whom an

application for a protective decree has been filed under section 78eee(a)(3) of this title."  SIPA §

78*lll*(5) (emphasis added); SIPA 78fff(b) (Code applies only to the extent that it is "consistent"

with the provisions of SIPA). This differs from the Bankruptcy Code, where a "debtor" is an individual, partnership, or corporation. 11 U.S.C. §§ 109(a), 101(41). Because SIPC membership tracks SEC registration, SIPC names the SEC-registered broker-dealer that is at risk of failing as the "debtor" in the application for the protective decree. Thus, registration under SIPA § 78*o*(b) is the key to who the SIPC member is, and, if the member is placed into liquidation, who the debtor is. Whether a change in corporate form would or would not change the "person" who was the debtor in an ordinary bankruptcy proceeding, the debtor in this SIPA Proceeding is "the member of SIPC" as to which the Protective Decree was brought. And since SIPA was enacted in 1970, the relevant member of SIPC here has been BLMIS, whether organized as a sole proprietorship or an LLC.

Additionally, *Avellino*'s holding that the transfers must emanate from a bank account in the name of the debtor is not consistent with SIPA and its case law. SIPA protection is not conditioned on bank accounts being in the name of the debtor. For example, it does not matter to "whom claimants made their checks payable" when they deposited funds "with the debtor." *Ahammed v. SIPC*, 295 F.3d 1100, 1107 (10th Cir. 2002). And SIPA protection follows where "there was 'actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation.'" *Focht v. Heebner*, 223 F.3d 1296, 1302 (11th Cir. 2000) (citation omitted). Courts have construed customer property broadly to include funds or assets held in non-debtor bank accounts. *See Peloro v. United States*, 488 F.3d 163, 170, 173–74 (3d Cir. 2007) (bearer bonds held by broker-dealer for investor's account that were seized by FBI prior to deposit in investor account were customer property); Order, *SIPC v. Austin Sec., Inc.*, Adv. Pro. No. 05-1144 (Bankr. E.D.N.Y. Nov. 20, 2007), ECF No. 89 (allocating to fund of customer property principals' brokerage accounts and proceeds from sales of jewelry).

As long as a SIPA trustee can show that the property in question was customer property received by the broker-dealer firm that is a member of SIPC, the trustee has the authority to recover it, wherever it lies. SIPA § 78fff-2(c)(3). Such property never belonged to Madoff, the sole proprietorship, or the LLC, regardless of whose name was on the bank account. Whatever particular bank account a fraudster chooses to park customer property in or however that particular bank account is denominated cannot change the nature of customer property or the Trustee's duty to recover that property and return it to its rightful owners. Taken to its logical conclusion, because BLMIS's only assets were funds in the JPMorgan Accounts, a contrary finding would mean that there is no customer property in the SIPA liquidation and there is no estate representative who can recover the funds transferred out of JPMorgan Accounts. *See BAM L.P.*, 624 B.R. at n.4. Such an outcome would leave a vast amount of customer property outside the reach of the SIPA liquidation, something SIPA does not intend. This result cannot be reconciled with the order appointing the Trustee, the Consolidation Order, prior precedent in this case, nor with the plain language of SIPA.

### D.    Defendants Have Not Presented Any Countervailing Evidence

Defendants cannot come forward with evidence or witnesses to rebut the Trustee's *prima facie* case. The evidence and opinions of the Trustee's expert witness and DiPascali's testimony unequivocally demonstrate that BLMIS made the transfers with the intent to defraud (whether because BLMIS was a Ponzi scheme or under the badges of fraud analysis). All Defendants can offer are vague assertions or proffers of evidence they would elicit on cross-examination of the Trustee's expert witnesses, which is not sufficient to withstand summary judgment. *See Bayou III*, 396 B.R. at 825 (explaining that conjecture, surmise, or "metaphysical doubt," and self-serving conclusory statements will not defeat summary judgment). Defendants cannot create an issue of material fact where none exists simply because they disagree. *See Ying Jing Gan v. City*

*of N.Y.*, 996 F.2d 522, 532 (2d Cir. 1993) (nonmoving party "may not rely simply on conclusory

statements or on contentions that the affidavits supporting the motion are not credible").

## III.   DEFENDANTS' DEFENSES CAN BE DETERMINED AS A MATTER OF LAW

Defendants will likely raise certain legal defenses, all of which have been rejected by this

Court.  Defendants cannot establish a triable issue of fact to defeat the Trustee's Motion.

### A.   Defendants Did Not Give Value for Fictitious Profits

Having established that BLMIS transferred at least $1,247,929 in fictitious profits within

the Two-Year Period to Defendants with actual fraudulent intent, the Trustee is entitled to avoid

and recover the Two-Year Transfers.  To defeat the avoidance of a transfer on summary

judgment, Defendants must offer evidence sufficient to create a material issue of fact as to

whether they took (1) "for value . . . to the extent that [he] gave value to the debtor in exchange

for such transfer" and (2) "in good faith."  11 U.S.C. § 548(c); *Bayou IV*, 439 B.R. at 308.

"Value" includes satisfaction of an antecedent debt of the debtor.  *See* 11 U.S.C.

§ 548(d)(2)(a).  The Second Circuit has ruled that as a matter of law, Defendants cannot establish

that they took the transfers of fictitious profits "for value" because such false profits were not on

account of a valid antecedent debt.  *Gettinger*, 976 F.3d at 199–200; *see also JABA Assocs. LP*,

528 F. Supp. 3d at 241–43; *Nissenbaum Tr.*, 2021 WL 1141638, at *15–16; *BAM L.P.*, 608 B.R.

at 180–81.  That ruling is law of the case, requiring dismissal of Defendants' value defense.

### B.   Taxes May Not Be Considered as Part of Value Calculation

The Bankruptcy Court and District Court have also already considered and rejected any

defense involving Defendants' ability to offset their avoidance liability by the amount of taxes

paid on the fraudulent transfers received from BLMIS.  *See JABA Assocs. LP*, 528 F. Supp. 3d at

245 ("Beyond the complex problems of proof and tracing, the offset would come at the expense

of other customers, and SIPA prioritizes repayment of customers."); *Nelson*, 610 B.R. at 236–37.

36

**C.    Defendants Seymour Kleinman and Marjorie Kleinman Are General Partners and Liable for the Two-Year Transfers**

Defendant Fairfield Pagma is a New York limited partnership. Answer ¶ 7, ECF No. 59. Defendants Fairfox, LLC, Seyfair, LLC, Marjorie Kleinman, and Seymour Kleinman are general partners of Fairfield Pagma. *Id.* ¶ 9. In New York, partners are jointly and severally liable for tort claims against the partnership. *See Ryan v. Brophy*, 755 F. Supp. 595, 597 (S.D.N.Y. 1991) (citing N.Y. P'ship Law § 26); *Ederer v. Gursky*, 881 N.E.2d 204, 209 (N.Y. 2007) ("[G]eneral partners are jointly and severally liable to nonpartner creditors for all wrongful acts and breaches of trust committed by their partners in carrying out the partnership's business, and jointly liable for all other debts to third parties."). Thus, Defendants are liable for the Two-Year Transfers.

Defendants Seymour Kleinman and Marjorie Kleinman may argue that they ceased being general partners of Fairfield Pagma before Defendants received the Two-Year Transfers, and thus, they cannot be liable. However, the Partnership Account Agreement for the Fairfield Pagma Account lists defendants Seymour and Marjorie as general partners. Cremona Decl., Ex. 16 (BLMIS Partnership Account Agreement). Further, Defendants failed to respond to the Trustee's Requests, including the Trustee's First Set of Requests for Admission to Defendant Fairfield Pagma, meaning those requests are deemed admitted. Fed. R. Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney."); *SEC v. Dynasty Fund, Ltd.*, 121 F. App'x. 410, 411–412 (2d Cir. 2005) (finding lower court properly deemed requests for admission as admitted following 6 month late responses); *Duval v. IRS*, Adv. Pro. No. 11–02263 (JMP), 2012 WL 1123041, at *2 (Bankr. S.D.N.Y. Apr. 3, 2012). The Trustee's Requests asked:

- Request No. 38: Admit that Defendant Seymour Kleinman was a general partner of Fairfield Pagma Associates, LP from December 11, 2006 to December, 11 2008.

- Request No. 39: Admit that Marjorie Kleinman was a general partner of Fairfield Pagma Associates, LP from December 11, 2006 to December 11, 2008.

Cremona Decl., Ex. 17 (Trustee's First Set of Reqs. for Admis. to Def. Fairfield Pagma Nos. 38–39). Defendants also failed to produce any documents in response to the Trustee's Requests. Any attempt by Defendants to now introduce evidence four years after the close of discovery must fail. *Douglas v. Victor Cap. Grp.*, No. 96 Civ. 6557 (SHS), 1997 WL 716912, at *2 (S.D.N.Y. Nov. 17, 1997) (plaintiff precluded from using document requested but not produced in discovery on the summary judgment motion or at trial."); *Texaco A/S, S.A. v. Comm. Ins. Co. of Newark*, No. 90 Civ. 2722 (JFK), 1996 WL 603915, at *1 (S.D.N.Y. Oct. 21, 1996) (same).

## IV.    THE TRUSTEE IS ENTITLED TO PREJUDGMENT INTEREST AS A MATTER OF LAW

The Trustee is also entitled to an award of prejudgment interest from December 11, 2008 (the "Filing Date") because "[f]ull compensation to the estate for the avoided transfer[s] normally requires prejudgment interest to compensate for the value over time of the amount recovered." *Geltzer v. Artists Mktg. Corp.*, 338 B.R. 583, 599 (Bankr. S.D.N.Y. 2006) (awarding prejudgment interest "[t]o fully and fairly compensate [debtor's] creditors for their loss—not only of [the amount] that was fraudulently conveyed . . . but of the use of that money"). Prejudgment interest properly "compensates the Trustee for the loss of the use of the Two-Year Transfers for the years that this litigation has lasted and reduces the profits to [Defendants] from having withheld the funds." *JABA Assocs. LP*, 528 F. Supp. 3d at 246; *Nissenbaum Tr.*, 2021 WL1141638, at *18 (same); *see also BAM L.P.*, 624 B.R. at 63–66.

In *BAM L.P.*, this Court awarded prejudgment interest finding that the "net losers" of

BLMIS's Ponzi scheme "are the real victims of Defendants' dilatory litigation tactics" and "an award of prejudgment interest is essential to the [Trustee's] collection of customer property." 624 B.R. at 64 (citing *Stanford Square, L.L.C. v. Nomura Asset Cap. Corp.*, 232 F. Supp. 2d 289, 293 (S.D.N.Y. 2002) ("Awarding prejudgment interest is based upon the premise that the party to whom the money is owed has been deprived of the use of the funds and can be made whole only by the award of interest. Conversely, the party owing the money has had the use of the funds he was obligated to have paid, and should be required to pay compensation by way of interest.")). Likewise, in *Epstein*, this Court awarded prejudgment interest against defendants "who litigate issues that have already been decided by the Court." *Epstein Decision* at 10.

Having determined that prejudgment interest should be awarded, this Court found that the federal rate should be used where the Trustee's claims arise only from federal law. *BAM L.P.*, 624 B.R. at 64. However, "[w]here the interest rate codified in 28 U.S.C. § 1961 is too low to compensate the plaintiff, courts can opt to apply the prime rate of interest," which was 4% on the Filing Date. *Id.* at 65 (quoting *Messer v. Magee (In re FKF 3, LLC)*, No. 13 Civ. 3601 (JCM), 2018 WL 5292131, at *13 (S.D.N.Y. Oct. 24, 2018)); *see also Miller*, 631 B.R. at 17–18 ("[T]he Court holds that interest is awarded in the amount of 4%."); *Epstein Decision* at 11 ("Interest is awarded in the amount of 4%); *JABA Assocs. LP*, 528 F. Supp. 3d at 246 ("The 4% rate compensates the Trustee for the loss of the use of the Two-Year Transfers for the years that this litigation has lasted."); *Nissenbaum Tr.*, 2021 WL 1141638, at *17–18 (same).

Further, this Court found "the accrual date for prejudgment interest is the Filing Date, as the claims asserted by the Trustee arose only upon the filing of the SIPA liquidation." *BAM L.P.*, 624 B.R. at 65–66 (citing *In re FKF 3, LLC*, 2018 WL 5292131, at *14); *see also Epstein Decision* at 10–11 (finding "the Trustee is entitled to interest from the date that the SIPA action

was commenced [sic]"); *Miller*, 631 B.R. at 18, n.13 ("The Court would be willing to consider awarding interest from the date of the SIPA action where the facts warrant it."). Here, Defendants refuse to acknowledge the law of the case. By doing so, Defendants "assumed the consequences associated with [their] failure to compensate the bankruptcy estate for its loss occasioned by the fraudulent conveyance[s] . . . ." *Gill v. Maddalena*, 176 B.R. 551, 557–58 (Bankr. C.D. Cal. 1995). "An important rationale for the prejudgment interest rule is that the party against whom the claim is asserted could have stopped the running of interest by paying what was owed." *Newbro v. Freed*, 409 F. Supp. 2d 386, 402 (S.D.N.Y. 2006) *aff'd*, No. 06-1722-CV, 2007 WL 642941 (2d Cir. Feb. 27, 2007). As this Court stated, the Trustee has "incurred costs litigating against Defendants who have resisted the law of the case." *BAM L.P.*, 624 B.R. at 64. As a result, prejudgment interest is warranted here, *see JABA Assocs. LP*, 2021 WL 1112342, at *19–20 (prejudgment interest from date of complaint); *Nissenbaum Tr.*, 2021 WL 1141638, at *18 (same); *Epstein Decision* at 9–10 (same); *BAM L.P.*, 624 B.R. at 65 (same), and the proper accrual date is the Filing Date because there are no mitigating factors. *Keller Fam. Tr.*, 2021 WL 4476811, at *9 (Trustee requested from Filing Date); *Miller*, 631 B.R. at 17–18 (same); *see also In re FKF 3, LLC*, 2018 WL 5292131, at *14 (appropriate accrual date for prejudgment interest for fraudulent transfer claims is date of bankruptcy petition).

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant summary judgment in the Trustee's favor on Count One of the Trustee's Complaint, and enter an order: (1) avoiding $1,247,929 in transfers of fictitious profits that BLMIS made to Defendants within the Two-Year Period; (2) awarding the Trustee prejudgment interest from the Filing Date through the date of entry of judgment at the rate of 4%; and (3) requiring Defendants to return such transfers or the value thereof.

Dated: November 17, 2021
        New York, New York

/s/ Nicholas J. Cremona
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Lan Hoang
Email: lhoang@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*