# EXHIBIT 7

DC5PBON1                                    Trial

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   UNITED STATES OF AMERICA
4            v.                          10 Cr. 228 (LTS)
5   DANIEL BONVENTRE,
    JEROME O'HARA,
6   GEORGE PEREZ,
    ANNETTE BONGIORNO,
7   JOANN CRUPI,
                                         Jury Trial
8            Defendants.
9   ------------------------------x
                                         New York, N.Y.
10                                       December 5, 2013
                                         9:10 a.m.
11
    Before:
12
            HON. LAURA TAYLOR SWAIN
13
                                         District Judge
14

15
            APPEARANCES
16
17  PREET BHARARA
        United States Attorney for the
18      Southern District of New York
    MATTHEW L. SCHWARTZ
19  RANDALL W. JACKSON
    JOHN T. ZACH
20      Assistant United States Attorneys

21
    GORDON MEHLER
22  SARAH LUM
        Attorneys for Defendant O'Hara
23

24  LARRY H. KRANTZ
    KIMBERLY A. YUHAS
25      Attorneys for Defendant Perez
```

```
 1              APPEARANCES

 2

 3    ANDREW J. FRISCH
      GARY VILLANUEVA
      AMANDA BASSEN
 4         Attorney for Defendant Bonventre

 5

 6    ROLAND G. RIOPELLE
           Attorneys for Defendant Bongiorno

 7

 8    ERIC R. BRESLIN
      MELISSA S. GELLER
           Attorneys for Defendant Crupi

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   Q.  And who was involved in that project to re-do the ACF

2   statements?

3   A.  Bernie, Annette and Jodi and, to a certain extent, myself.

4   Q.  And how did you participate in re-doing the ACF statements?

5   A.  I provided an array of U.S. treasury notes and researched

6   historical pricing mechanisms and fed information to Annette.

7   Q.  And when you say you provided treasury notes, did you go

8   out and buy real treasuries to put in the ACF accounts?

9   A.  No.

10  Q.  Are you again speaking of just providing information for

11  fake trades?

12  A.  Correct.

13  Q.  I'd like to show you what has -- what is in evidence as

14  Government Exhibit 105-B17.  Now, do you recognize,

15  Mr. DiPascali, what type of document this is?

16  A.  Yes.

17  Q.  What is it?

18  A.  It's a brokerage statement for the period ending

19  January 31st, '02, for ACF services that has been crossed out.

20  Q.  And who was managing the ACF accounts?

21  A.  Annette.

22  Q.  What year is this account statement from?

23  A.  2002.

24  Q.  Now, I'd like, if we can, Ms. Baskin, to go to Page 121 of

25  this document.  And, Mr. DiPascali, looking at this document,

1   you know what you were doing was wrong?

2   A.  Yes.

3   Q.  And when you provided the fake treasury information, did

4   you know that you were committing fraud?

5   A.  Yes.

6   Q.  Now, over the years, did Ms. Bongiorno ask you for treasury

7   bill information?

8   A.  Yes.

9   Q.  How often would she have conversations with you about

10  obtaining treasury bill information?

11  A.  She would have conversations with either me or my staff

12  every month.

13  Q.  And what would -- what, if anything, would she say that she

14  needed that treasury information for?

15  A.  She wouldn't typically say what she needed it for.

16  Q.  What would she say to you?

17  A.  I need a treasury bill for this month.

18  Q.  And how would you go about getting the treasury bill for

19  that month?

20  A.  I'd look at where we are on the calendar.  I'd estimate

21  about how long I wanted to be out in maturity; so if it was

22  December of 2013, I would look at a February or March 2014

23  treasury bill.  I'd go to Bloomberg and ascertain the price and

24  give it to Annette.

25  Q.  And when you would go to Bloomberg, would you look at

 1  backdated prices?

 2  A.  Depending on the date that she asked me that she needed the

 3  bill for.

 4  Q.  And was any treasury bill ever purchased?

 5  A.  Never.

 6  Q.  I'll ask you a question.  Did the market making part of

 7  Madoff Securities make a market in treasury bills?

 8  A.  No.

 9  Q.  So could you go to the market making part of the business

10  and get a treasury bill to put in an IA account?

11  A.  No.

12  Q.  From time to time did you get real treasury bills?

13  A.  Yes.

14  Q.  And what were those real treasury bills for?

15  A.  To invest the excess cash in the IA checking account.

16  Q.  And when you say to invest the excess cash in the IA

17  checking account, for what reason did you get a treasury bill

18  to do that?

19  A.  So as to provide safety and an enhanced yield to what the

20  checking account interest rate was.

21  Q.  So it would be fair to say it would be a way of getting

22  interest on the checking account?

23  A.  More or less, yes.

24  Q.  And when you bought those real treasury bills to earn

25  interest on the Madoff checking account, what did you have to

1    do?

2    A.  I had to call my broker.

3    Q.  And after you called your broker, was there a process to

4    going out and buying the treasury bill?

5    A.  Yeah, I would tell the broker how much dollars I wanted to

6    commit to treasury bills and typically which one I wanted to

7    buy, and he would take down that information and call me back

8    and typically give me a report that I bought X amount of

9    treasury bills at this price.

10   Q.  And then that would -- you would actually get a real

11   treasury bill?

12   A.  Yeah.

13   Q.  Now, for on the IA side, when you had to provide -- when

14   you would provide the fake information, what would you do

15   there?

16   A.  I'd look at a pricing service of historical prices of

17   treasury bills, ascertain the price on the date that I needed

18   and write a ticket and put it into the AS/400.

19   Q.  And when you would go out and buy the real treasury bills,

20   was Ms. Crupi near you?

21   A.  We worked in the same office.

22   Q.  And when you were talking on the phone buying real treasury

23   bills, was she in the vicinity where she could overhear what

24   you were saying?

25   A.  Yes.

1  Q.  And would she be able to observe you, how you were on the

2  phone and what you were doing?

3  A.  Certainly.

4  Q.  Now, what was your understanding of what Ms. Bongiorno

5  would do with the treasury information that you gave to her?

6  A.  She would put through a buy ticket that was approximately

7  equal to the cash credit balance reflected in the account she

8  was working on, and it would produce a confirmation and an

9  entry on the customer statement that he was now -- owned

10 treasuries.

11 Q.  And as with the other trading that was on those accounts,

12 was any of it real?

13 A.  No.

14 Q.  Now, did Madoff family members have accounts on the IA side

15 of the business?

16 A.  Some.

17 Q.  Who were some of the Madoff family members that had

18 accounts in the investment advisory business?

19 A.  Peter Madoff, Marion Madoff, Ruth Madoff, Andy Madoff, Mark

20 Madoff, Shana Madoff, Charlie Wiener.  I might have missed a

21 nephew somewhere, yeah.

22 Q.  Who, again, was Charlie Wiener?

23 A.  Bernie's nephew.

24 Q.  Now, who managed the accounts for the Madoff family

25 members?

1    A.  Most of which were managed by Annette.  Ruth Madoff's

2    account for a time was managed by me.

3    Q.  Now, did Ms. Bongiorno also manage IA accounts for certain

4    Madoff Securities employees?

5    A.  Yes.

6    Q.  Who were some of the Madoff Securities employees who

7    Ms. Bongiorno managed account for?

8    A.  David Kugel, Irwin Lipkin, Dan Bonventre.  I'm drawing a

9    blank on the rest of the names.

10   Q.  Now, from time to time, did Ms. Bongiorno ask you questions

11   about stocks that could be used in the accounts that she was

12   overseeing?

13   A.  Yes.

14   Q.  What sorts of questions would she ask you?

15   A.  Things like, are there any stocks that you know that are up

16   this month or that are down this month, or what did the market

17   do this month, so she can get an understanding of where the

18   market was vis-a-vis what she needed to do.

19   Q.  And when you say a stock was up this month, would that be a

20   forward-looking analysis or would that be looking at historical

21   information from that?

22   A.  Historically.

23   Q.  And when you were trying to determine if a stock was up in

24   a month, would you look forward or backward?

25   A.  Backwards.

1   Bernie's feeling was that that was very risky.  He was upset.

2   He claimed he had not known that Tony had been doing this all

3   of these months or years.

4   Q.  Just so we are clear, we are talking about the Chase 703

5   account, right?

6   A.  Correct.

7   Q.  The Chase 703 account was the main checking account for the

8   investment advisory business, right?

9   A.  It was.

10  Q.  The securities that were being purchased by Mr. Tiletnick

11  were a way of earning interest on that checking account, right?

12  A.  It was.

13  Q.  These were real securities that we are talking about?

14  A.  These CDs were issues of offshore entities of our bank.

15  Q.  Did Mr. Madoff propose a solution for how to deal with

16  this?

17  A.  He either already had an account or two open or was about

18  to open a new account or a series of them, I don't recall.  He

19  was basically giving that responsibility to me.  He wanted

20  treasury notes, treasury bills only.  As the CDs would get

21  unwound or, I don't remember, they might have unwound them

22  immediately, I'm not sure, but in short order I managed a group

23  of Bernard L. Madoff brokerage accounts that were held at other

24  brokerage firms for the purpose of purchasing short-term U.S.

25  government securities.

1    Q.   These short-term U.S. securities were real, right?

2    A.   Yes.

3    Q.   This was just a way of getting interest on the real cash

4    that was in the 703 account?

5    A.   Yes.

6    Q.   What were some of the firms that you now had responsibility

7    for that had these brokerage accounts?

8    A.   Bear Stearns, Fidelity, Bank of New York, Morgan Stanley,

9    Lehman Brothers.

10   Q.   We talked a little bit about this earlier, when you were

11   buying these short-term securities, what steps would you have

12   to take to buy these real securities on those brokerage

13   accounts?

14   A.   I typically picked up the phone and called the broker or

15   the representative of each of those organizations and

16   communicated my needs.  Then he typically got or she typically

17   got back to me and told me what I had done.  Sometimes those

18   conversations occurred in the form of faxes.  Most of the time

19   they were on the telephone.

20   Q.   This was different than just looking at historical prices

21   and writing something up for the fake trades, right?

22   A.   Yes.

23   Q.   Prior to taking on this responsibility with respect to the

24   treasuries, had you had much involvement with the Chase 703

25   account?

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    FRANK DIPASCALI

 4    Direct By Mr. Zach . . . . . . . . . . . . . .4873

 5                      GOVERNMENT EXHIBITS

 6    Exhibit No.                               Received

 7     101-57H    . . . . . . . . . . . . . . . . .5013

 8     105-F27    . . . . . . . . . . . . . . . . .4906

 9     105-D28    . . . . . . . . . . . . . . . . .4940

10     300-4A     . . . . . . . . . . . . . . . . .4927

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DCAPBON1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4           v.                          10 Cr. 228 (LTS)

 5   DANIEL BONVENTRE,
     JEROME O'HARA,
 6   GEORGE PEREZ,
     ANNETTE BONGIORNO,
 7   JOANN CRUPI,
                                         Jury Trial
 8              Defendants.

 9   ------------------------------x
                                         New York, N.Y.
10                                       December 10, 2013
                                         9:12 a.m.
11
     Before:
12
             HON. LAURA TAYLOR SWAIN
13
                                         District Judge
14

15
             APPEARANCES
16

17   PREET BHARARA
          United States Attorney for the
18        Southern District of New York
     MATTHEW L. SCHWARTZ
19   RANDALL W. JACKSON
     JOHN T. ZACH
20        Assistant United States Attorneys

21

22   GORDON MEHLER
     SARAH LUM
          Attorneys for Defendant O'Hara
23

24   LARRY H. KRANTZ
     KIMBERLY A. YUHAS
25        Attorneys for Defendant Perez
```

DCAPBON1

1                   APPEARANCES

2

ANDREW J. FRISCH
3 GARY VILLANUEVA
AMANDA BASSEN
4       Attorney for Defendant Bonventre

5

ROLAND G. RIOPELLE
6       Attorneys for Defendant Bongiorno

7

ERIC R. BRESLIN
8 MELISSA S. GELLER
       Attorneys for Defendant Crupi

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Ms. Crupi was helping you prepare these documents for KPMG

2   London coming back in?

3   A.  Yes.

4   Q.  Let's look at what is in evidence as Government Exhibit

5   105-C171.  Can we go slowly through the three pages of this

6   document, Ms. Baskin.

7          Do you see those three pages, Mr. DiPascali?

8   A.  I do.

9   Q.  What are we looking at?

10  A.  The first page is something that I probably printed to get

11  a handle on what the industry standard would be in order to

12  collateralize an option position.  I don't know what manual I

13  took that from.  It might have been from the Internet, it might

14  have been from Bear Stearns, it might have been from any number

15  of sources.  The point of what I would be reading there would

16  be how to margin or collateralize an option.  This is the

17  calculation.  That box in the middle was the answer to my

18  question.

19  Q.  Whose handwriting is on this page?

20  A.  Mine.

21  Q.  When you say collateralize, does that mean in essence to

22  back up or to offer some protection to your counterparty?

23  A.  Exactly that.

24  Q.  Now can we go to the second page of this document.  What is

25  this that we are looking at?

A.   It's a spreadsheet that I created that was going to be the

nuts and bolts of this exercise.  It was going to do a lot of

the calculation for me and allow the process to progress

swiftly instead of from month to month to month and client to

client to client calculate all sorts of stuff, and then have to

then create another side to that.

            This spreadsheet, which is an Excel-based spreadsheet,

is identifying certain treasury bills across the top column.

The top row is the CUSIP of treasury bills and options.  The

second row are the symbols of options and then a string of

treasury bills.

            Going on the far left column are a string of account

numbers.  Those are the accounts that Bernie told us he wanted

to use to be the counterparties of the customer option

positions.  What this is doing is it's allowing me to randomly

assign, once I know the total of my customer option positions,

a quantity to each of those counterparties.  Then, once I've

randomly defined what each counterparty's position is, this is

calculating what its margin or collateral requirement would be.

            Once I established that, this spreadsheet allows me to

randomly pick a group of treasuries that were going to

represent that collateral, and then the whole total number

would circle back to what I needed.  It's fairly complicated,

but it did all the grind work necessary to accomplish what

Bernie wanted.

 1  Q.  Were any of the treasury bills that are reflected on this

 2  real?

 3  A.  No.

 4  Q.  Would it be fair to say that this essentially divvies up

 5  amongst the client accounts Mr. Madoff provided to you to

 6  collateralize the other sides of the option trading, that this

 7  document divvies up the treasuries going to each one of those

 8  accounts?

 9  A.  It first divvies up what their theoretical option position

10  would be, and based on that it assigns an array of treasuries

11  that would collateralize it.

12  Q.  Let's go to the next page.  Can we blow up the relevant

13  part of this.  What does this document show?

14  A.  Those same account numbers that were in the far left column

15  going down in a grid with a series of checks.

16  Q.  Have you ever seen this document before?

17  A.  Briefly.

18  Q.  Whose handwriting is on this document?

19  A.  Jodi's.

20  Q.  Looking at the checks, do you understand what those

21  reflect?

22  A.  Not exactly, but in concept yes.

23  Q.  What in concept does it reflect?

24  A.  It's got something to do with how many times --

25          MR. BRESLIN:  Objection.

```
1                          INDEX OF EXAMINATION

2   Examination of:                              Page

3   FRANK DIPASCALI

4   Direct By Mr. Zach . . . . . . . . 5233 continued)

5                        GOVERNMENT EXHIBITS

6   Exhibit No.                                Received

7    600-67 and 600-68   . . . . . . . . . . . .5236

8    101-114 and 101-12  . . . . . . . . . . . .5253

9    3501-33   . . . . . . . . . . . . . . . . .5243

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

E1DPBON1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4           v.                        10 Cr. 228 (LTS)

 5   DANIEL BONVENTRE,
     JEROME O'HARA,
 6   GEORGE PEREZ,
     ANNETTE BONGIORNO,
 7   JOANN CRUPI,
                                       Jury Trial
 8            Defendants.

 9   ------------------------------x
                                       New York, N.Y.
10                                     January 13, 2014
                                       9:15 a.m.
11
     Before:
12
             HON. LAURA TAYLOR SWAIN
13
                                       District Judge
14

15
             APPEARANCES
16

17   PREET BHARARA
          United States Attorney for the
18        Southern District of New York
     MATTHEW L. SCHWARTZ
19   RANDALL W. JACKSON
     JOHN T. ZACH
20        Assistant United States Attorneys

21
     GORDON MEHLER
22   SARAH LUM
          Attorneys for Defendant O'Hara
23

24   LARRY H. KRANTZ
     KIMBERLY A. YUHAS
25        Attorneys for Defendant Perez
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1                    APPEARANCES

2

  ANDREW J. FRISCH
3 GARY VILLANUEVA
  AMANDA BASSEN
4      Attorney for Defendant Bonventre

5

  ROLAND G. RIOPELLE
6      Attorneys for Defendant Bongiorno

7

  ERIC R. BRESLIN
8 MELISSA S. GELLER
       Attorneys for Defendant Crupi

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  you said, I need to understand the capacity code.  What is the

2  capacity code here?

3  A.  Again, it is agent.

4  Q.  That is the number 1 up there, right?

5  A.  Correct.

6  Q.  This is a fake trade, right?

7  A.  Oh, yes.

8  Q.  The way it is being typed up, could this be coming from

9  Madoff's inventory?

10 A.  I'm sorry.  I didn't hear the rest of that question.

11 Q.  The way it is being typed up, would this be a trade that

12 would be coming out of inventory?

13 A.  No.

14 Q.  We can take that down.  Did Madoff Securities on the 18th

15 floor make a market in options?

16 A.  No.

17 Q.  Could any options trades be coming out of inventory from

18 upstairs?

19 A.  Possibly as principal.  But the reality was the trading

20 room upstairs had insignificant options inventory.

21 Q.  Nothing like 20 percent of the market?

22 A.  Nothing like 20 contracts much less 20 percent.

23 Q.  It was a very, very small bit?

24 A.  It was insignificant.

25 Q.  How about treasuries?

E1drbon2                    DiPascali - redirect

```
 1  | A.  What about them?
 2  | Q.  Did they make a market in treasuries?
 3  | A.  No.
 4  | Q.  Could you be buying treasuries out of the inventory
 5  | upstairs, or did they have inventory -- strike that question.
 6  | Did they have inventory to be placing into the account of
 7  | treasuries upstairs that was equivalent to the amount that was
 8  | on the statements?
 9  | A.  No.
10  | Q.  I would like to switch topics once again, very briefly.  I
11  | would like to show you what is in evidence as O'Hara Exhibit 9.
12  | Can we activate the ELMO.  We talked a bit, Mr. DiPascali, on
13  | Thursday about the meeting between Mr. O'Hara and Mr. Perez,
14  | yourself, and Bernie Madoff.  Do you recall that?
15  | A.  Yes.
16  | Q.  After that meeting in the IA business, did you continue to
17  | need DTC type information?
18  | A.  I did.
19  | Q.  On cross-examination by Mr. Mehler, he showed you this
20  | document, right?  Do you recall that?
21  | A.  I recall seeing the document.  I don't exactly remember
22  | when.
23  | Q.  This document says "API bal," do you see that?
24  | A.  I do.
25  | Q.  What is your understanding what "API bal" stands for?
```

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    FRANK DIPASCALI

 4    Redirect By Mr. Zach . . . . . . . . . . . . .6937

 5    Recross By Mr. Krantz  . . . . . . . . . . .6997

 6    Recross By Mr. Riopelle  . . . . . . . . 7044 by

 7    Recross By Mr. Mehler  . . . . . . . . . . .7062

 8                      PLAINTIFF EXHIBITS

 9    Exhibit No.                            Received

10     101-57I   . . . . . . . . . . . . . . . . .6944

11                      DEFENDANT EXHIBITS

12    Exhibit No.                            Received

13     AB20A, 20B and 20C  . . . . . . . . . . . .7056

14     AB19    . . . . . . . . . . . . . . . . . .7046

15

16

17

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300