**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Matthew B. Lunn
Michael S. Neiburg
Justin P. Duda

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | Adv. Pro. No. 10-04468 (CGM) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br><br>v.<br><br>KEN-WEN FAMILY LIMITED PARTNERSHIP; KENNETH W. BROWN, in his capacity as a General Partner of the Ken-Wen Family Limited Partnership; and | |

WENDY BROWN, in her capacity as a General Partner
of the Ken-Wen Family Limited Partnership,

                Defendants.

**TRUSTEE'S MEMORANDUM OF LAW IN SUPPORT OF (I) OPPOSITION
TO DEFENDANT KENNETH W. BROWN'S MOTION FOR SUMMARY
JUDGMENT, (II) CROSS MOTION FOR SUMMARY JUDGMENT AS TO
DEFENDANT KENNETH W. BROWN, AND (III) MOTION FOR SUMMARY
<u>JUDGMENT AS TO DEFENDANT KEN-WEN FAMILY LIMITED PARTNERSHIP</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................3

ARGUMENT .............................................................................................................5

I.      THIS COURT SHOULD ADHERE TO PRIOR RULINGS AS LAW OF THE
CASE ..................................................................................................................5

II.     IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT,
SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE
TRUSTEE AS A MATTER OF LAW ...................................................................7

     A.     Legal Standard ...........................................................................................7

     B.     The SIPA Scheme ......................................................................................7

           1.     SIPA and SIPC...............................................................................7

           2.     Customer Property Under SIPA.......................................................9

     C.     The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year
Transfers of Fictitious Profits Made by BLMIS to Defendants............................11

           1.     BLMIS Made the Two-Year Transfers with Actual Fraudulent
Intent and in Furtherance of the Fraud......................................................12

                  a.     BLMIS Was a Ponzi Scheme.........................................................14

                  b.     Trustee's Experts Confirmed That BLMIS Was a Ponzi
Scheme ........................................................................................16

                  c.     The Trustee's Experts Confirmed That BLMIS Paid
Redemptions from Customer Funds ..............................................20

                  d.     The Trustee's Evidence of "Badges of Fraud"
Independently Establishes Actual Intent to Defraud ....................22

                  e.     BLMIS's Two-Year Transfers to Defendants Were in
Furtherance of the Fraud...............................................................23

            2.     BLMIS Made the Transfers to Defendants Within the Two-Year
Period  24

           3.     The Transfers Were an Interest of the Debtor in Property........................24

a.    The Transfers are Customer Property and the Trustee Can
Recover Them ................................................................................24

b.    BLMIS Owned the JPMorgan Accounts Because the IA
Business Was Transferred to the LLC in 2001 .............................26

c.    Because the Estates Were Consolidated, the Trustee Can
Recover Customer Property Held in The Names of Either
the LLC or Madoff .........................................................................30

D.    Defendants Have Not Presented Any Countervailing Evidence ............................32

III.    MR. BROWN'S ASSERTIONS AND DEFENDANTS' OVERALL DEFENSES
CAN BE DETERMINED AS A MATTER OF LAW .......................................................33

A.    The Trustee May Recover the Fraudulent Transfers from Mr. Brown as
Ken-Wen's General Partner. .................................................................................33

1.    Mr. Brown is Liable for the First Three Fraudulent Transfers
Because He Was a General Partner of Ken-Wen.........................................34

2.    Mr. Brown Remains Liable for the November 17 Transfer Because
His Purported Disassociation Did Not Lead to the Dissolution and
Winding Up of Ken-Wen. ...........................................................................35

B.    Defendants Did Not Give Value for Fictitious Profits ...........................................36

IV.    THE TRUSTEE IS ENTITLED TO PREJUDGMENT INTEREST AS A
MATTER OF LAW ..........................................................................................................37

CONCLUSION .............................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
No. 05 Civ. 9050 (LMM), 2011 WL 1419617 (S.D.N.Y. Apr. 7, 2011), *aff'd*,
748 F.3d 110 (2d Cir. 2014)......................................................................................11

*Alexander v. Compton (In re Bonham)*,
229 F.3d 750 (9th Cir. 2000) .....................................................................................32

*Armstrong v. Collins*,
Nos. 01 Civ. 2437(PAC), 02 Civ. 2796 (PAC), 02 Civ. 3620(PAC), 2010 WL
1141158 (S.D.N.Y. Mar. 24, 2010) ...........................................................12, 13, 16

*Banner v. Kassow*,
104 F.3d 352 (2d Cir. 1996)......................................................................................22

*In re Basic Food Group, LLC*,
No. 15-1092 (JLG), Adv. No. 15-01119 (JLG), slip op., 2018 WL 5805943
(Bankr. S.D.N.Y. Oct. 31, 2018) ..............................................................................2, 3

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou
Grp., LLC)*,
396 B.R. 810 (Bankr. S.D.N.Y. 2008), *rev'd in part on other grounds*, *Bayou
IV*, 439 B.R. 284 (S.D.N.Y. 2010).........................................................................23, 33

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
380 F. Supp. 2d 334 (S.D.N.Y. 2005).........................................................................7

*Brinkley, McNerney, Morgan & Solomon v. Community Acres Assocs., Ltd.*,
602 So. 2d 685 (Fla. Dist. Ct. App. 1992) ................................................................34

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).....................................................................................................7

*Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC*,
439 B.R. 284 (S.D.N.Y. 2010).......................................................................... *passim*

*Donell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) .....................................................................................13

*Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*,
97 B.R. 503 (E.D. Ark. 1987) .....................................................................................9

*Emerson v. Maples (In re Mark Benskin & Co., Inc.)*,
    59 F.3d 170 (6th Cir. 1995) .................................................................13

*Geltzer v. Artists Mktg. Corp. (In re Cassandra Grp.)*,
    338 B.R. 583 (Bankr. S.D.N.Y. 2006) ...................................................37

*Gill v. Maddalena (In re Maddalena)*,
    176 B.R. 551 (Bankr. C.D. Cal. 1995) ...................................................39

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*,
    310 B.R. 500 (Bankr. S.D.N.Y. 2002) ...................................................22

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund LTD.)*,
    359 B.R. 510 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397 B.R. 1
    (S.D.N.Y. 2007) ....................................................................................23

*In re Grossman's*,
    607 F.3d 114 (3d Cir. 2010) ..................................................................36

*Hill v. Spencer Sav. & Loan Ass'n (In re Bevill, Bresler & Schulman, Inc.)*,
    83 B.R. 880 (D.N.J. 1988) .....................................................................10

*Inv. Protection Corp. v. Bernard L, Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013), *aff'd*,
    773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 .................1, 4

*Janvey v. Brown*,
    767 F.3d 430 (5th Cir. 2014) ..............................................................1, 13

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
    712 F.3d 185 (5th Cir. 2013) .................................................................13

*Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*,
    No. 12-cv-2652 (RJS), 2017 WL 82391 (S.D.N.Y. 2017) .....................22

*Klein v. Cornelius*,
    786 F.3d 1310 (10th Cir. 2015) .............................................................13

*In re Lehman Bros. Holdings Inc.*,
    445 B.R. 143 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478
    B.R. 570 (S.D.N.Y. 2012) ........................................................................9

*Martino v. Edison Worldwide Cap. (In re Randy)*,
    189 B.R. 425 (Bankr. N.D. Ill. 1995) ....................................................13

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .................................................................................7

*McHale v. Boulder Cap. LLC (In re The 1031 Tax Grp., LLC)*,
439 B.R. 47 (S.D.N.Y. 2010) .......................................................................................16, 37

*Merrill v. Abbott (In re Indep. Clearing House Co.)*,
77 B.R. 843 (D. Utah 1987) ...............................................................................................13

*Messer v. Magee (In re FKF 3, LLC)*,
No. 13 Civ. 3601 (JCM), 2018 WL 5292131 (S.D.N.Y. Oct. 24, 2018) ..............................40

*Moran v. Goldfarb*,
No. 09-cv-7667 (RJS), 2012 WL 2930210 (S.D.N.Y. July 16, 2012) ...........................13, 16

*Newbro v. Freed*,
409 F. Supp. 2d 386 (S.D.N.Y. 2006) *aff'd*, No. 06-1722-CV, 2007 WL
642941 (2d Cir. Feb. 27, 2007) ...........................................................................................39

*Perez v. Terrestar Corp.* (*In re Terrestar Corp.*),
No. 16 Civ. 1421 (ER), 2017 WL 1040448 (S.D.N.Y. Mar. 16, 2017), *appeal
dismissed*, No. 17-1117 (2d Cir. June 29, 2017) ..................................................................5

*Perkins v. Haines*,
661 F.3d 623 (11th Cir. 2011) ............................................................................................13

*Picard v. Avelino et al. (In re Madoff Secs.)*,
557 B.R. 89 (Bankr. S.D.N.Y. 2016) ..................................................................................34

*Picard v. BAM L.P.*,
624 B.R. 55 (Bankr. S.D.N.Y. 2020) ........................................................................ *passim*

*Picard v. BAM L.P. (In re Bernard L. Madoff)*,
608 B.R. 165 (Bankr. S.D.N.Y. 2019) ..........................................................................20, 37

*Picard v. Chais*,
445 B.R. 206 (Bankr. S.D.N.Y. 2011) ................................................................................14

*Picard v. Citibank, N.A.* (*In re BLMIS*),
12 F.4th 171 (2d Cir. 2021) ............................................................................................8, 25

*Picard v. Cohen*,
Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
25, 2016) .........................................................................................................................12, 26

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
454 B.R. 317 (Bankr. S.D.N.Y. 2011) ................................................................................12

*Picard v. Fairfield Greenwich Ltd.*,
762 F.3d 199 (2d Cir. 2014) ...............................................................................................10

vii

*Picard v. The Gerald and Barbara Keller Fam. Tr.*,
  Adv. Pro. No. 10-04539 (CGM), 2021 WL 4476811 (Bankr. S.D.N.Y. Sept.
  30, 2021) ....................................................................................................... *passim*

*Picard v. Gettinger (In re BLMIS)*,
  976 F.3d 184 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2603 (2021) ..........................8, 9, 14, 37

*Picard v. Greiff (In re Madoff Sec.)*,
  476 B.R. 715 (S.D.N.Y. 2012) .........................................................................14, 23

*Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*,
  773 F.3d 411 (2d Cir. 2014) .................................................................................14

*Picard v. JABA Assocs. LP*,
  528 F. Supp. 3d 219 (S.D.N.Y. 2021) .............................................................. *passim*

*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011) ..............................................................................14

*Picard v. Legacy Cap. Ltd.*,
  603 B.R. 682 (Bankr. S.D.N.Y. 2019) ...............................................................5, 16

*Picard v. Lisa Beth Nissenbaum Tr.*,
  No. 20 cv 3140, 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) .................................... *passim*

*Picard v. Lowrey (In re Bernard L. Madoff)*,
  596 B.R. 451 (S.D.N.Y. 2019) ...............................................................................9

*Picard v. Marilyn Bernfeld Tr.*,
  Adv. Pro. No. 10-05143 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015) .........................................11

*Picard v. Mendelow*,
  Adv. Pro. No. 10-04283 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015) .........................................11

*Picard v. Merkin et al (In Madoff Secs.)*,
  440 B.R. 243 (Bankr. S.D.N.Y. 2010) ...................................................................34

*Picard v. Miller*,
  631 B.R. 1 (Bankr. S.D.N.Y. 2021) ................................................................ *passim*

*Picard v. Nelson*,
  610 B.R. 197 (Bankr. S.D.N.Y. 2019) .............................................................. *passim*

*Picard v. RAR Entrepreneurial Fund, Ltd.*,
  No. 20-cv-1029, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021) .............................................6, 16

*In re Picard*,
  917 F.3d 85 (2d Cir. 2019) ..................................................................................25

*In re Pilgrim's Pride Corp.*,
    442 B.R. 522 (Bankr. N.D. Tex. 2010)....................................................................6

*Ritchie Cap. Mgmt., LLC v. Stoebner*,
    779 F.3d 857 (8th Cir. 2015) .........................................................................13

*In re Rock & Republic Enters., Inc.*,
    No. 10–11728 (AJG), 2011 WL 2471000 (Bankr. S.D.N.Y. June 20, 2011)...........................6

*Rosenman Fam., LLC v. Picard*,
    395 F. App'x 766 (2d Cir. 2010) ....................................................................24

*Salomon v. Kaiser (In re Kaiser)*,
    722 F.2d 1574 (2d Cir. 1983)...........................................................................22

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) ...........................................................................13

*SEC v. F.O. Baroff Co.*,
    497 F.2d 280 (2d Cir. 1974)....................................................................6, 8, 15

*SEC v. Madoff*,
    No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008) ..........................................30, 31

*SIPC v. 2427 Parent Corp. (In re BLMIS)*,
    779 F.3d 74 (2d Cir. 2015)......................................................................1, 7, 11

*SIPC v. BLMIS (In re Bernard L. Madoff)*,
    496 B.R. 744 (Bankr. S.D.N.Y. 2013)....................................................................7

*SIPC v. BLMIS (In re Bernard L. Madoff)*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015)...................................................................11

*SIPC v. BLMIS LLC (In re Bernard L. Madoff)*,
    522 B.R. 41 (Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL
    183492 (S.D.N.Y. Jan. 14, 2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017)............................30

*SIPC v. BLMIS LLC (In re BLMIS)*,
    424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011) .......................4, 8

*SIPC v. BLMIS*,
    No. 08-01789 (CGM) (Bankr. S.D.N.Y. May 5, 2009)..........................................31

*Trefny v. Bear Stearns Sec. Corp.*,
    243 B.R. 300 (S.D. Tex. 1999) ........................................................................10

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016)...........................................................................25

*United States v. Madoff,*
  586 F. Supp. 2d 240 (S.D.N.Y. 2009)...................................................................30

*United States v. Quintieri,*
  306 F.3d 1217 (2d Cir. 2002)...............................................................................6

*Ying Jing Gan v. City of New York,*
  996 F.2d 522 (2d Cir. 1993)...........................................................................7, 33

**STATUTES**

11 U.S.C. § 548(a)(1)(A) ............................................................................10, 11, 26

11 U.S.C. § 548(c) ...................................................................................................37

11 U.S.C. § 548(d)(2)(a) .........................................................................................37

11 U.S.C. § 550(a) ..................................................................................................34

15 U.S.C. §§ 78aaa–lll .............................................................................................1

15 U.S.C. § 78ccc(a) .................................................................................................8

15 U.S.C. § 78ccc(a)(2)(A) .......................................................................................8

15 U.S.C. § 78fff-1(a) .............................................................................................10

15 U.S.C. § 78fff-2(c)(3) ............................................................................8, 10, 11, 26

15 U.S.C. § 78fff(b) ..................................................................................................8

15 U.S.C. § 78lll(4) ..........................................................................................8, 9, 24

15 U.S.C. § 78o(b) ....................................................................................................8

28 U.S.C. § 1961 .....................................................................................................38

Fla. Stat. § 620.63(2).............................................................................................34

Fla. Stat. § 620.125(2)...........................................................................................34

Fla. Stat. § 620.1404(1).........................................................................................34

Fla. Stat. § 620.1607(1).........................................................................................35

Fla. Stat. § 620.1607(3).........................................................................................36

## RULES

Bankr. S.D.N.Y. L. R. 7056-1 ...................................................................................2

Bankr. S.D.N.Y. L. R. 7056-1(a) ...............................................................................4

Bankr. S.D.N.Y. L. R. 7056-1(b) ...............................................................................2

Bankr. S.D.N.Y. L. R. 7056-1(e) ...............................................................................2

Fed. R. Bankr. P. 7056..........................................................................................1, 7

Fed. R. Civ. P. 56 ....................................................................................................1

Fed. R. Civ. P. 56(a) ................................................................................................7

Fed. R. Civ. P. 56(c)(1)............................................................................................7

Fed. R. Evid. 803(22)..............................................................................................15

Fed. R. Evid. 807 ..............................................................................................15, 16

## OTHER AUTHORITIES

17 C.F.R. § 240.15b1-3(b)......................................................................................28

37 Fed. Reg. 25224, 25225 (Nov. 29, 1972), 17 C.F.R. § 240.15c3-3 ....................9, 25

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74
(2002).............................................................................................................9

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa–lll ("SIPA"), and the chapter 7 estate of Bernard L. Madoff

("Madoff"), respectfully submits this memorandum of law in support of the *Trustee's*

*(I) Opposition to Defendant Kenneth W. Brown's Motion for Summary Judgment, (II) Cross*

*Motion for Summary Judgment as to Defendant Kenneth W. Brown, and (III) Motion for*

*Summary Judgment as to Defendant Ken-Wen Family Limited Partnership* (collectively, the

"Trustee's Motions") under Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of

Civil Procedure 56 for summary judgment as to Count One of the Trustee's First Amended

Complaint to avoid and recover the amounts fraudulently transferred by BLMIS to the Ken-Wen

Family Limited Partnership  ("Ken-Wen"), and Kenneth W. Brown ("Mr. Brown" and

collectively with Ken-Wen, the "Defendants")[1] in his capacity as General Partner of Ken-Wen.

The facts underlying the Trustee's Motions are fully set forth in the Trustee's Counterstatement

and Statement of Material Facts Pursuant to Local Rule 7056-1 ("Counter Stmt."), incorporated

by reference as though fully set forth herein, the Declaration of Michael S. Neiburg, Esq.

("Neiburg Decl."), and the Declarations of Lisa M. Collura, Matthew B. Greenblatt, and Bruce

G. Dubinsky.

## PRELIMINARY STATEMENT

This avoidance and recovery action centers on the undisputable fact that, in the two years

preceding the commencement of the SIPA liquidation (the "Two-Year Period"), Defendants

received $3,850,000 in fictitious profits from BLMIS.  For decades, BLMIS perpetrated the

---

[1] The Trustee reached a settlement agreement with Wendy Brown, agreeing to voluntarily dismiss her from this matter with prejudice.  *See Stipulation and Order for Voluntary Dismissal of Defendant Wendy Brown with Prejudice*, ECF No. 162.

largest Ponzi scheme in history.  In their allocutions, Madoff and BLMIS employees confirmed

that BLMIS was a Ponzi scheme, starting at least in the 1970s and continuing through BLMIS's

collapse in December 2008.  Thus, the Trustee has established his *prima facie* case that the

transfers to Defendants were made with the intent to hinder, delay, or defraud BLMIS's creditors

and, therefore, are avoidable and recoverable for the benefit of the BLMIS customer fund.

Ken-Wen admits it received transfers totaling $3,850,000 in the Two-Year Period.[2]

Defendants' remaining arguments and defenses have been rejected and resolved in the Trustee's

favor on several occasions.  As there are no material facts in dispute and Defendants cannot

defeat the Trustee's *prima facie* case, the Trustee's Motions should be granted and summary

judgment should be entered in favor of the Trustee on Count One of his Amended Complaint.

Moreover, the Court should summarily deny Mr. Brown's motion for summary judgment

(the "Brown Motion") for two procedural reasons.  First, Mr. Brown fails to comply with Rule

7056-1 of the local rules of the Bankruptcy Court for the Southern District of New York (the

"Local Rules") by failing to attach a separate statement of material facts as support for the

Brown Motion.  Local Rule 7056-1(b).  "Failure to submit the statement shall constitute grounds

for denial of the motion."  *Id.*

Second, even if the Court considers the Brown Motion a statement pursuant to Local

Rule 7056-1(b), Mr. Brown fails to provide support with citations to evidence that would be

admissible at trial, as required by Local Rule 7056-1(e).  In fact, Mr. Brown (1) presented no

evidence to rebut the Trustee's proofs that BLMIS was a Ponzi scheme, (2) failed to submit

expert rebuttal reports, and (3) took no depositions of any of the Trustee's experts.  Thus, the

---

[2] *See* Neiburg Decl., Ex. 13 (Ken-Wen Responses to Trustee's First Set of Requests for Admission), at Request No. 8; *see also* Neiburg Decl., Ex. 11 (Jan, 27, 2020 Dep. Tr. of Mr. Brown ("Brown Dep. Tr.")) at 57:15-58:22; 60:14-62:7; 63:9-64:10; 68:24-70:1; 70:20-71:14, 77:20-79:18; 88:20-91:17 (acknowledging the Fraudulent Transfers).

Court should summarily deny Mr. Brown's motion.[3]

## **BACKGROUND**

Ken-Wen was a brokerage customer of BLMIS's investment advisory business and held

an account at BLMIS under the name "Ken-Wen Family LP LTD," bearing account number

1EM226 (the "Account").[4]   The Defendants opened the Account on January 4, 1993, by means

of a principal transfer of $340,000 from a different BLMIS account.[5]   Although BLMIS

statements reflect a higher transaction amount, a portion of the transferred funds consisted of

fictitious profits, which were never achieved, and thus could not be transferred.[6]   Ken-Wen made

eighteen (18) subsequent cash deposits between August 31, 1993, and February 26, 1998,

totaling approximately $938,000,[7] bringing the total principal deposited into the Account to

$1,278,000.[8]   Ken-Wen did not make any subsequent deposits to the Account after February 26,

1998.[9]   From January 4, 1993, through November 17, 2008, Ken-Wen withdrew $7,001,000

from the account, $5,723,000 of which consisted of fictitious profits.[10]   Within the Two-Year

---

[3] *See In re Basic Food Group, LLC*, No. 15-1092 (JLG), Adv. No. 15-01119 (JLG), slip op., 2018 WL 5805943, *8 (Bankr. S.D.N.Y. Oct. 31, 2018) (citing *Pavarini McGovern, LLC v. Waterscape Resort LLC (In re Waterscape Resort LLC)*, 483 B.R. 601, 610 (Bankr. S.D.N.Y. 2012) (disregarding parties' LBR 7056-1 statements because they failed to support statement with citations to any evidence submitted with the motion)).

[4] *Id.*, at 23:15-24:3; *see also* Ken-Wen Answer to Amended Complaint, ECF No. 89 ¶ 8.

[5] *See* Greenblatt Declaration, dated December 1, 2021 (the "Greenblatt Decl."), Attach. B, Ken-Wen Expert Report of Matthew G. Greenblatt, CPA/CFF, CFE, dated Feb. 3, 2020 (the "Greenblatt Ken-Wen Report") ¶¶ 7, 14, 16, 17; *see also* Neiburg Decl., Ex. 12 (BLMIS Account No. 1EM226 – Ken-Wen Family LP LTD Account Record).

[6] *See* Greenblatt Decl., Attach. B (Greenblatt Ken-Wen Report) ¶¶ 9, 14-17; Ex. 4B; *see also* Neiburg Decl., Ex. 12 (BLMIS Account No. 1EM226 – Ken-Wen Family LP LTD Account Record).

[7] *See* Greenblatt Decl., Attach. B (Greenblatt Ken-Wen Report) ¶ 19; *see also* Neiburg Decl., Ex. 12 (BLMIS Account No. 1EM226 – Ken-Wen Family LP LTD Account Record).

[8] *See* Greenblatt Decl., Attach. B (Greenblatt Ken-Wen Report) ¶ 20, Ex. 3; *see also* Neiburg Decl., Ex. 12 (BLMIS Account No. 1EM226 – Ken-Wen Family LP LTD Account Record).

[9] *Id.*

[10] *See* Greenblatt Decl., Attach. B (Greenblatt Ken-Wen Report) ¶ 22, Ex. 4B.

Period, Ken-Wen made four (4) withdrawals from the Account, totaling $3,850,000 of fictitious profits.[11]

The Trustee commenced this adversary action to avoid and recover at least $5,723,000 of fictitious profits received by Defendants from BLMIS during the six-year period before the liquidation.[12]  The United States Court of Appeals for the Second Circuit subsequently ruled that the Trustee is limited to recovery only of the transfers made within the Two-Year Period.  *See Inv. Protection Corp. v. Bernard L, Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12 MC 115 (JSR), 2013 WL 1609154, at **2-3 (S.D.N.Y. Apr. 15, 2013), *aff'd*, 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (the "Section 546(e) Decision").  The Trustee amended his Complaint, seeking only to recover four (4) transfers totaling $3,850,000 of fictitious profits made in the Two-Year Period (the "Fraudulent Transfers").[13]

On February 3, 2020, the Trustee served on Defendants the Ken-Wen-specific expert reports of Matthew B. Greenblatt and Lisa M. Collura, along with the general case expert reports of Bruce G. Dubinsky, Rich A. Diedrich, Lisa M. Collura, and Matthew B. Greenblatt.[14] Defendants did not seek to depose the Trustee's expert witnesses.  The Trustee took the depositions of Mr. Brown and Wendy Werner (f/k/a Wendy Brown) ("Ms. Werner") on January 27 and February 25, 2020, respectively.  Following discovery, the parties engaged in good faith settlement negotiations but were unable to resolve the case.  On March 17, 2021, this Court authorized the Trustee to file motions for summary judgment in any pending good faith case

---

[11] *Id.*, *see also* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at 88:9-91:2.

[12] Compl., ECF No. 1, ¶¶ 2, 3, 39 and 40.  Counts One, Two, Three, Four, Five, Six, and Seven.

[13] Am. Compl. ECF No. 82, Count One.

[14] *See* Neiburg Decl., Ex. 14 (Feb. 3, 2020 letter from Trustee's counsel to counsel for Mr. Brown, enclosing six (6) expert reports and a production of expert-related documents).  *See also Picard v. Miller*, 631 B.R. 1, 6–7 (Bankr. S.D.N.Y. 2021) ("This Court and the District Court have repeatedly admitted these expert reports to resolve prior trials and summary judgment motions.").

without a Local Rule 7056-1(a) pre-motion conference. *See SIPC v. BLMIS LLC*, Adv. Pro. No.

08-01789 (CGM) (Bankr. S.D.N.Y. Mar. 17, 2021), ECF No. 20440.  Mr. Brown filed his

motion for summary judgment on November 5, 2021.  *See* Brown Motion, ECF No. 174.  The

Court set a briefing schedule on the Trustee's and Mr. Brown's motions.  *See* Stipulation and

Order, ECF No. 175.

## ARGUMENT

## I.    THIS COURT SHOULD ADHERE TO PRIOR RULINGS AS LAW OF THE CASE

This Court and the District Court have granted summary judgment in the Trustee's favor

multiple times in nearly identical cases.  *See Picard v. The Gerald and Barbara Keller Fam. Tr.*,

Adv. Pro. No. 10-04539 (CGM), 2021 WL 4476811 (Bankr. S.D.N.Y. Sept. 30, 2021); *Picard v.*

*Miller (In re Bernard L. Madoff)*, 631 B.R. 1 (Bankr. S.D.N.Y. 2021); *Est. of Seymour Epstein*,

Adv. Pro. No. 10-04438 (CGM) (Bankr. S.D.N.Y. Jan. 27, 2021), ECF No. 155 (the "Epstein

Decision"); *Picard v. JABA Assocs. LP*, 528 F. Supp. 3d 219 (S.D.N.Y. 2021); *Picard v. Lisa*

*Beth Nissenbaum Tr.*, No. 20 cv. 3140 (JGK), 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021).

Other than the amounts and dates of the transfers, the claims are identical and the record

submitted in support of the Trustee's Motions is the same as the other motions for summary

judgment.  There is no basis to deviate from those rulings here.

Different adversary proceedings within a liquidation proceeding are considered "one

case" for purposes of law of the case.  *See Picard v. BAM L.P.*, 624 B.R. 55, 61 (Bankr.

S.D.N.Y. 2020) (citing *Picard v. Nelson*, 610 B.R. 197, 237 (Bankr. S.D.N.Y. 2019) ("The prior

decisions within this SIPA proceeding constitute law of the case.")); *Picard v. Legacy Cap. Ltd.*,

603 B.R. 682, 700 (Bankr. S.D.N.Y. 2019) (citing *In re Motors Liquidation Co.*, 590 B.R. 39, 62

(S.D.N.Y. 2018) (law of the case doctrine applies across adversary proceedings within the same

bankruptcy case), *aff'd*, 943 F.3d 125 (2d Cir. 2019)); *Perez v. Terrestar Corp.* (*In re Terrestar Corp.*), No. 16 Civ. 1421 (ER), 2017 WL 1040448, at \*4 (S.D.N.Y. Mar. 16, 2017) (applying the law of the case doctrine because "[a]dversary proceedings filed in the same bankruptcy case do not constitute different cases"), *appeal dismissed*, No. 17-1117 (2d Cir. June 29, 2017).

The doctrine of law of the case "is not a limit on a court's power but rather a guide as to how a court should apply its discretion." *In re Pilgrim's Pride Corp.*, 442 B.R. 522, 531 (Bankr. N.D. Tex. 2010). Law of the case "expresses the general practice of refusing to reopen what has been decided." *In re Rock & Republic Enters., Inc.*, No. 10–11728 (AJG), 2011 WL 2471000, at \*7 (Bankr. S.D.N.Y. June 20, 2011) (citing *Brody v. Vill. of Port Chester*, 345 F.3d 103, 110 (2d Cir. 2003). Thus, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless 'cogent' and 'compelling' reasons militate otherwise." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (citations omitted).

There is no reason for this Court to deviate from its prior rulings in the above-referenced actions or the recent decisions from Judge Koeltl in *JABA Associates* and *Nissenbaum*. Although the Hon. Jesse M. Furman reserved one issue for trial—whether the transfers were made by the debtor—he disposed of all other issues on summary judgment in favor of the Trustee. *See Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-cv-1029, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021). Adhering to the prior decisions entered on these issues ensures defrauded customers are treated in the same manner across adversary proceedings within this liquidation. Doing so here ensures that claimants holding similar claims receive similar treatment. *In re Pilgrim's Pride Corp.*, 442 B.R. at 531; *see also SEC v. F.O. Baroff Co.*, 497 F.2d 280, 283 (2d Cir. 1974) (holding that the purpose of SIPA is protection and equal treatment of public customers of

broker-dealers).

## II.    IN THE ABSENCE OF DISPUTED ISSUES OF MATERIAL FACT, SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE TRUSTEE AS A MATTER OF LAW

### A.    Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure, applicable to bankruptcy courts

pursuant to Fed. R. Bankr. P. 7056, provides that a court must grant summary judgment when

there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986).  Factual positions are proven by either citing the record evidence—including

declarations, admissions, and interrogatory answers—or showing that an adverse party cannot

produce admissible evidence to support a fact.  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*

*Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the movant has discharged its burden, the non-movant must then "go beyond the

pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

*Celotex Corp.*, 477 U.S. at 324.  "[T]he nonmoving party may . . . not rely simply on conclusory

statements or on contentions that the affidavits supporting the motion are not credible."  *Ying*

*Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).  The non-moving party may not

oppose summary judgment "on the basis of an unreasonable view of the facts."  *Berk v. St.*

*Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005).

### B.    The SIPA Scheme

#### 1.    SIPA and SIPC

Congress enacted SIPA in 1970 to protect customers of failed broker-dealers by

"expedit[ing] the return of customer property."  *SIPC v. 2427 Parent Corp. (In re BLMIS)*, 779

F.3d 74, 80 (2d Cir. 2015); *SIPC v. BLMIS (In re Bernard L. Madoff)*, 496 B.R. 744, 748–49

(Bankr. S.D.N.Y. 2013).  The program included the creation of SIPC, a nonprofit, private

membership corporation to which registered broker-dealers belong.  The "members" of SIPC

include "all persons registered as broker-dealers" with the SEC under section 78*o*(b) of Title 15.

SIPA § 78ccc(a)(2)(A).  SIPC membership, and thus SIPA protection, arises from a broker-

dealer's registration with the SEC, without regard to the corporate form of the broker-dealer.

SIPA § 78ccc(a).

When one of its members fails, SIPC initiates a SIPA liquidation, a distinct liquidation

proceeding applicable only to SIPC member firms.  *See SEC v. F.O. Baroff Co., Inc.*, 497 F.2d

280, 281 (2d Cir. 1974).  SIPC specifies a trustee to liquidate the business and any assets of the

member-broker and recover customer property wrongfully transferred or unlawfully converted

by the broker.  SIPA §§ 78*lll*(4), 78fff-2(c)(3).

Although a SIPA liquidation is similar to a bankruptcy and incorporates certain

provisions of the Bankruptcy Code, it is "tailored to achieve SIPA's objectives."  *SIPC v. BLMIS

LLC (In re BLMIS)*, 424 B.R. 122, 133 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir.

2011) (the "Net Equity Decision"); *see also Picard v. Citibank, N.A.* (*In re BLMIS)*, 12 F.4th

171, 180 (2d Cir. 2021).  As the Second Circuit recently explained:

> SIPA thus incorporates the Bankruptcy Code to effectuate its
> priority scheme, but it does so selectively.  Section 78fff(b) makes
> clear that the Bankruptcy Code applies only to the extent that it is
> "consistent" with the provisions of SIPA.  15 U.S.C. § 78fff(b).  This
> selective incorporation of the bankruptcy provisions ensures that,
> when fit together, the individual pieces of SIPA produce a system
> that functions as intended.

*Picard v. Gettinger (In re BLMIS)*, 976 F.3d 184, 199 (2d Cir. 2020), *cert. denied*, 141 S.

Ct. 2603 (2021); *see also* SIPA § 78fff(b) (SIPA liquidation proceeding shall proceed as if

conducted under Chapter 7 of Bankruptcy Code to extent consistent with SIPA).

### 2.    Customer Property Under SIPA

Customer property is a term of art in the securities industry, and means property held by a broker-dealer but that belongs to customers. *See* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071–74 (2002); *Gettinger*, 976 F.3d at 189–90; *Picard v. Lowrey (In re Bernard L. Madoff)*, 596 B.R. 451, 469–70 (S.D.N.Y. 2019); *Keller Fam. Tr.*, 2021 WL 4476811, at *4. When customers invest their cash and securities with a broker, they transfer possession, but not title, of their money to the broker, who is legally bound to hold that money in reserve for its customers. *See Lowrey*, 596 B.R. at 469–70 (noting that "customer property" in securities industry refers to property held by broker-dealer but belongs to its customers); *Nelson*, 610 B.R. at 232–33. Where and how that property is held in reserve is the subject of customer protection rules, promulgated by the SEC, known as Rule 15c3-3. Exchange Act Release No. 34-9856, Adoption of Rule 15c3-3, 37 Fed. Reg. 25224, 25225 (Nov. 29, 1972), 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3"). Once a broker-dealer goes into liquidation under SIPA, the Rule 15c3-3 reserve forms the corpus of the firm's estate for distribution to customers. The SIPA designation of customer property is the seamless continuation of Rule 15c3-3. *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 191–92 (Bankr. S.D.N.Y. 2011), *rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012).

Once property is entrusted to a broker-dealer for the purpose of purchasing securities, it remains customer property until returned to its rightful owner, regardless of how many hands it passes through. SIPA § 78*lll*(4) (including in the definition of customer property "the proceeds of any such property transferred by the debtor, including property *unlawfully converted*" (emphasis added)); Rule 15c3-3(f) (Rule 15c3-3 account cannot be subject to bank lien because it consists of customer property); *Dowden v. Cross Cty. Bank (In re Brittenum & Assocs., Inc.)*, 97 B.R. 503, 508 (E.D. Ark. 1987) (Rule 15c3-3 deposit is not subject to bank's setoff claim

9

because it is customer property). SIPA's broad definition of customer property recognizes customers' enduring rights to the property they gave to their broker for safekeeping.

Because customer property is not the broker's property, when a broker goes into liquidation, it is also not "debtor" property. *See BAM L.P.*, 624 B.R. at 61–62 ("[M]oney held by a broker on behalf of its customers is not the broker's property under state law."). This means that a SIPA trustee's avoidance and recovery action does not neatly fit into the Bankruptcy Code, which allows trustees to recover a transfer of "an interest in *property of the debtor*." 11 U.S.C. § 548(a)(1)(A) (emphasis added). SIPA corrects this through § 78fff-2(c)(3), which provides that "the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property" to the extent that the transfer "is voidable or void" under the Bankruptcy Code, and "[s]uch recovered property shall be treated as customer property" and is "deemed to have been the property of the debtor." SIPA § 78fff-2(c)(3); *see also JABA Assocs. LP*, 528 F. Supp. 3d at 236; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *10; *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014).

This tailored definition of "property of the debtor" in SIPA is "an intended fiction" by Congress to provide SIPA trustees with expansive authority to marshal assets, wherever located, for the benefit of customers when assets are missing. SIPA § 78fff-1(a); *Hill v. Spencer Sav. & Loan Ass'n (In re Bevill, Bresler & Schulman, Inc.)*, 83 B.R. 880, 894 (D.N.J. 1988). Section 78fff-2(c)(3) is designed "to recover securities that would have been part of the fund of customer property but for a prior transfer to a customer." *Id.* at 893. The purpose of SIPA § 78fff-2(c)(3) is "to prevent one or more customers from depriving other customers of assets by keeping these assets out of the 'pool' available for distribution to customers on a ratable basis." *Trefny v. Bear Stearns Sec. Corp.*, 243 B.R. 300, 322 (S.D. Tex. 1999).

### C.    The Trustee Is Entitled to Summary Judgment Avoiding the Two-Year Transfers of Fictitious Profits Made by BLMIS to Defendants.

Under SIPA § 78fff-(2)(c)(3), the Trustee may recover any transfers by the debtor whenever customer property is insufficient to pay customer claims.  To date, the Trustee has recovered $14.493 billion of approximately $20 billion owed to customers by the estate.  *See* Trustee's Twenty-Sixth Interim Report for the Period April 1, 2021, through September 30, 2021, *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (CGM) (Bankr. S.D.N.Y. Oct. 29, 2021), ECF No. 20821.  Because customer property is insufficient to pay the outstanding customer claims, the Trustee is authorized to recover the transfers made to Defendants.  *SIPC v. BLMIS (In re Bernard L. Madoff)*, 531 B.R. 439, 453–54 (Bankr. S.D.N.Y. 2015).

The Trustee seeks to avoid and recover transfers of fictitious profits made to Defendants under 11 U.S.C. § 548(a)(1)(A).  The elements of this claim are:  (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to hinder, delay, or defraud" a creditor.  *Adelphia Recovery Tr. v. Bank of Am., N.A.*, No. 05 Civ. 9050(LMM), 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), *aff'd*, 748 F.3d 110 (2d Cir. 2014).  This Court has recognized that fictitious profit cases are strict liability cases.  *See* Neiburg Decl., Ex. 23 (Tr. of Oral Arg. at 114:10–11, *Picard v. Marilyn Bernfeld Tr.*, Adv. Pro. No. 10-05143 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015) (ECF No. 20); (Tr. of Oral Arg. at 100:19, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015 (ECF No. 85) (holding fictitious profit count is "almost a strict liability count")).  There is no genuine dispute regarding any of the three elements of the Trustee's claim under section 548(a)(1)(A).

### 1.    BLMIS Made the Two-Year Transfers with Actual Fraudulent Intent and in Furtherance of the Fraud

Intent to defraud can be established by either showing that the debtor operated a Ponzi scheme or through a badges of fraud analysis. *See JABA Assocs. LP*, 528 F. Supp. 3d at 236–41; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at \*11–15; *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at \*5 (Bankr. S.D.N.Y. Apr. 25, 2016) ("[T]he Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent." (citing *In re Bernard L. Madoff*, 531 B.R. at 471)); *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("[T]he fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi scheme presumption.'").

The Ponzi scheme presumption has been embraced by appellate and district courts across the country. It stems from the very nature of a Ponzi scheme, which "'cannot work forever.'" *Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC*, 439 B.R. 284, n.19 (S.D.N.Y. 2010) ("*Bayou IV*") (quoting *Martino v. Edison Worldwide Cap. (In re Randy)*, 189 B.R. 425, 438 (Bankr. N.D. Ill. 1995)). A Ponzi scheme's operator knows, from the outset, that "[t]he investor pool is a limited resource and will eventually run dry." *Armstrong v. Collins*, Nos. 01 Civ. 2437(PAC), 02 Civ. 2796 (PAC), 02 Civ. 3620(PAC), 2010 WL 1141158, at \*20–21 (S.D.N.Y. Mar. 24, 2010) (quoting *Liebersohn v. Campus Crusade for Christ, Inc.* (*In re C.F. Foods, L.P.)*, 280 B.R. 103, 110 (Bankr. E.D. Pa. 2002)). When it does, the operator knows, "the scheme will collapse and that those still invested in the enterprise will lose their money." *Bayou IV*, 439 B.R. at 294 n.19. One thus "can infer an intent to defraud future undertakers [investors]

from the mere fact that a debtor was running a Ponzi scheme." *Armstrong*, 2010 WL 1141158, at *21 (quoting *In re C.F. Foods, L.P.*, 280 B.R. at 110).[15]

Multiple courts of appeals have adopted that presumption. *See Janvey v. Brown*, 767 F.3d 430, 438–39 (5th Cir. 2014); *Emerson v. Maples (In re Mark Benskin & Co., Inc.)*, 59 F.3d 170 (6th Cir. 1995); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995); *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008); *Klein v. Cornelius*, 786 F.3d 1310, 1320 (10th Cir. 2015); *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011). And no court of appeals has rejected the presumption. *Cf. Ritchie Cap. Mgmt., LLC v. Stoebner*, 779 F.3d 857, 862 (8th Cir. 2015) (declining to address the presumption).

Courts have repeatedly explained that the presumption reflects a logical inference from a debtor's decision to perpetrate a scheme that is "insolvent by definition." *Klein*, 786 F.3d at 1320; *see also Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013) ("[T]ransfers from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, 'as a matter of law, insolvent from its inception.'" (citation omitted)); *Bayou IV*, 439 B.R. at 294 ("'Knowledge to a substantial certainty constitutes intent in the eyes of the law,' and awareness that some investors will not be paid is sufficient to establish actual intent to defraud." (citation omitted)); *In re Randy*, 189 B.R. at 439 ("[Fraudster] necessarily knew all along that most investors, certainly the latest among them, would lose their money if they invested in his scheme. Without a doubt on this record, [fraudster] had actual intent to defraud his creditors when he paid brokers from investors' funds."); *Merrill v. Abbott*

---

[15] Indeed, "no other reasonable inference is possible." *Armstrong*, 2010 WL 1141158, at *21; *see also Moran*, 2012 WL 2930210, at *4 (transactions or transfers "made in the course of a Ponzi scheme" could "have been made for no purpose other than to hinder, delay[,] or defraud creditors" (quoting *Gowan v. The Patriot Grp. (In re Dreier LLP)*, 452 B.R. 391, 424 (Bankr. S.D.N.Y. 2011))).

*(In re Indep. Clearing House Co.)*, 77 B.R. 843, 860 (D. Utah 1987) ("[A] debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.").

Under either the Ponzi scheme presumption or the badges of fraud analysis, there is no dispute that BLMIS made the transfers with the intent to hinder, delay, or defraud.

### a.    BLMIS Was a Ponzi Scheme

BLMIS was engaged in a Ponzi scheme. *See Gettinger*, 976 F.3d at 188; *Miller*, 631 B.R. at 9 ("That BLMIS operated as a *Ponzi* scheme is well-established and . . . the Trustee has met its burden of proof for summary judgment on this issue." (citation omitted)); *Epstein Decision* at 5 ("Intent to defraud is established as debtor operated a *Ponzi* scheme."). "The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption . . . , particularly in light of Madoff's criminal admission." *Picard v. Chais*, 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011); *see also Picard v. Katz*, 462 B.R. 447, 453 & n.5 (S.D.N.Y. 2011) ("[I]t is patent that all of Madoff Securities' transfers during the two-year period were made with actual intent to defraud present and future creditors."). The existence of the scheme has been recognized by the Bankruptcy Court, the District Court, and the Second Circuit. *See, e.g.*, *Picard v. Ida Fishman Rev. Tr. (In re BLMIS)*, 773 F.3d 411, 415–16 (2d Cir. 2014); *Picard v. Greiff (In re Madoff Sec.)*, 476 B.R. 715, 718 (S.D.N.Y. 2012); *In re BLMIS*, 424 B.R. at 125–33.

The existence of the BLMIS Ponzi scheme is substantiated by the allocutions of Madoff and BLMIS employees. Counter Stmt. ¶ 90. Madoff admitted that he ran a Ponzi scheme through BLMIS and that he did not execute trades on behalf of his IA Business clients. Counter Stmt. ¶¶ 91–98. Frank DiPascali, Madoff's chief financial officer and co-conspirator, admitted: "[f]rom at least the early 1990s through December of 2008 . . . [n]o purchases of [sic] sales of securities were actually taking place in [customers'] accounts." Counter Stmt. ¶ 99. DiPascali

14

"used hindsight to file historical prices on stocks then [he] used those prices to post purchase of

[sic] sales to customer accounts as if they had been executed in realtime.  On a regular basis [he]

added fictitious trade data to account statements of certain clients to reflect the specific rate of

earn [sic] return that Bernie Madoff had directed for that client."  Counter Stmt. ¶ 100.

      David Kugel, a manager and trader at BLMIS, admitted that he falsified trading records

as far back as the early 1970's.  Counter Stmt. ¶ 102.  Kugel provided historical trade data to

create fake trades which, when included on the BLMIS account statements and trade

confirmations of IA Business clients, gave the appearance of profitable trading when no trading

had actually occurred.  *Id.*  Irwin Lipkin, BLMIS's accountant, admitted BLMIS's revenue was

falsely inflated through fraudulent bookkeeping entries and annual audited reports.  Counter

Stmt. ¶ 103.  Eric Lipkin, payroll clerk at BLMIS, admitted BLMIS created fake reports

replicating those of the Depository Trust & Clearing Corporation to purportedly confirm non-

existent positions in the IA Business accounts for auditors and the Securities and Exchange

Commission ("SEC").  Counter Stmt. ¶¶ 104–05.  And Enrica Cotellessa-Pitz, BLMIS

accountant and comptroller, admitted IA Business customer money was funneled to BLMIS's

proprietary trading and market-making businesses to falsely inflate revenue and hide losses.

Counter Stmt. ¶¶ 106–07.

      Guilty pleas and admissions under oath are admissible to prove the existence of a Ponzi

scheme, and courts routinely rely on them in granting summary judgment.  *See JABA Assocs. LP*,

528 F. Supp. 3d at 233–34 ("The various plea allocutions are admissible under Federal Rules of

Evidence 803(22) and 807, as several courts considering this issue in similar contexts have

held."); *Nelson*, 610 B.R. at 209–10 ("Criminal plea allocutions are admissible under the

exceptions to the hearsay rule set forth in FED. R. EVID. 803(22) for a judgment of a previous

conviction and FED. R. EVID. 807's residual exception to hearsay."); *Moran v. Goldfarb*, No. 09-cv-7667 (RJS), 2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012) (granting motion for summary judgment based on plea transcript from related Department of Justice action where perpetrator admitted under oath to orchestrating the Ponzi scheme); *Bayou IV*, 439 B.R. at 307–08 (affirming summary judgment on fictitious profits from Ponzi scheme based on evidence including guilty pleas of fraudsters); *McHale v. Boulder Cap. LLC (In re The 1031 Tax Grp., LLC)*, 439 B.R. 47, 72 (S.D.N.Y. 2010) (granting summary judgment in part and concluding that Ponzi scheme existed with reliance on evidence including perpetrator's superseding indictment and plea agreements); *Armstrong*, 2010 WL 1141158, at *24 (granting motion for summary judgment and finding existence of Ponzi scheme where submitted evidence included transcripts from perpetrator's allocution and sentencing).

The plea allocutions of Madoff and former BLMIS employees show "there is no genuine disputed issue of fact that BLMIS was a Ponzi scheme . . . ." *Legacy Cap. Ltd.*, 603 B.R. at 693 (granting summary judgment and finding BLMIS operated Ponzi scheme on basis of allocutions); *JABA Assocs. LP*, 528 F. Supp. 3d at 237; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *11 (same); *RAR Entrepreneurial Fund, Ltd.*, 2021 WL 827195, at *7.  The allocutions also show, despite Defendants' assertions to the contrary, that Madoff never executed legitimate security trades on behalf of his customers.  Counter Stmt. ¶¶ 91–98.

### b.    Trustee's Experts Confirmed That BLMIS Was a Ponzi Scheme

Bruce Dubinsky, a certified fraud examiner and forensic accountant, confirmed that BLMIS was a Ponzi scheme.  *See* Decl. of Bruce G. Dubinsky, dated Dec. 1, 2021 ("Dubinsky Decl."), Attach. A Expert Report of Bruce G. Dubinsky, dated January 16, 2019 (the "Dubinsky Report") ¶¶ 18, 29; *see also Nelson*, 610 B.R. at 210–14.  As set forth in Dubinsky's unrebutted

report, BLMIS operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) the IA Business.  Counter Stmt. ¶ 13.  The proprietary trading business traded for its own account.  Counter Stmt. ¶ 14.  The market-making business made markets in certain stocks, bonds, warrants and rights.  Counter Stmt. ¶ 15.  The IA Business purported to purchase and sell securities on behalf of its customers.  Counter Stmt. ¶ 17.  The proprietary trading business, the market-making business, and IA Business were units of BLMIS and operated by Madoff.  Counter Stmt. ¶ 18.  Based on his investigation, Dubinsky concluded that the IA Business was a fraud and a Ponzi scheme.  Counter Stmt. ¶¶ 21–56.

BLMIS reported to its IA Business customers, including Defendants, that the money they deposited with BLMIS was invested in the "split-strike conversion" strategy which involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. treasury bills when the money was "out of the market."  Counter Stmt. ¶¶ 20, 23; Neiburg Decl., Ex. 5 (Plea Allocution of Bernard L. Madoff) at 25:25–26:18. Dubinsky concluded that BLMIS did not execute this strategy on behalf of its IA Business customers, including for Defendants.  Counter Stmt. ¶¶ 20, 23.

Dubinsky analyzed BLMIS's trading records and determined that as far back as the 1970s, BLMIS used historical trade information to fabricate false trades for IA Business customers and reported those fake trades on customer statements.  Counter Stmt. ¶¶ 21–56. Dubinsky's analysis further confirmed the lack of any trading by BLMIS on behalf of its IA Business customers based on (a) the impossible reported volume of equity trades; (b) impossible equity and options trades reported outside the daily price range; (c) the low volatility in its reported daily trading performance compared to the actual market behavior and the performance

achieved by BLMIS in the proprietary trading business unit as measured by the volume weighted
average prices for its sales and purchases; (d) the consistently positive rates of returns that did
not "mirror" the volatility of the markets; (e) a lack of any Depository Trust Corporation
("DTC") records to confirm the reported IA Business equity or treasury trades; and (f) a lack of
Options Clearing Corporation ("OCC") records to confirm the reported IA Business options
trades. Counter Stmt. ¶ 24. Dubinsky further verified that no treasuries, purportedly part of the
split-strike conversion strategy, were purchased on behalf of IA Business customers. Counter
Stmt. ¶¶ 57–63.

Dubinsky found many instances where the volume that BLMIS claimed to have
purchased or sold on behalf of all IA Business customers exceeded the volume of equities traded
for the entire market. Counter Stmt. ¶¶ 25–28. Dubinsky also analyzed the equity and options
trades that were priced outside the daily price range. Counter Stmt. ¶¶ 29–30. For the period of
2000-2008, Dubinsky determined that there were 99,972 equity transactions executed outside the
daily market traded price range, and 34,501 options transactions traded outside of the daily price
range. *Id*. The absence of actual trading was also reflected in the prices at which the IA
Business purportedly bought and sold shares using the split-strike conversion strategy. Counter
Stmt. ¶¶ 31–35. Dubinsky also analyzed the volatility of the IA Business's reported average
annual rate of return for the split-strike conversion strategy as compared with the volatility of the
annual rate of return for the two major market indices—the S&P 100 Index and the Dow Jones
Industrial Average. Counter Stmt. ¶ 36. Because the IA Business's split-strike conversion
strategy was supposedly engineered around the S&P 100, the IA Business's returns should have
performed similarly to the S&P 100 Index. Counter Stmt. ¶ 37. This analysis showed that the
volatility in the IA Business rates of return did not mirror the volatility of the rates of return of

the major indices.  Counter Stmt. ¶¶ 38–40.

Additionally, all equity trades made by BLMIS should have been reflected in the DTC records pertaining to BLMIS's account with the DTC—an organization that clears and settles equity transactions in the U.S. market.  Counter Stmt. ¶ 41.  Dubinsky's analysis confirmed that the equity securities that were cleared through BLMIS's DTC account were traded by the proprietary trading business; no IA Business trades were cleared through BLMIS's DTC account.  Counter Stmt. ¶¶ 42–46.  He concluded that the IA Business did not execute the equity trades reflected on the customer statements.  Counter Stmt. ¶ 46.  Similarly, the options purportedly executed for the customer accounts in the IA Business could not be reconciled with the records of the OCC, an organization that clears and settles options transactions in the U.S. market.  Counter Stmt. ¶¶ 52–55.  Based on Dubinsky's analysis of these records, he concluded that BLMIS did not execute the equity trades or conduct any options trading on behalf of its IA Business customers.  Counter Stmt. ¶¶ 47–51, 56.

Nor did BLMIS purchase the treasuries it reported to customers.  Counter Stmt. ¶¶ 57–58.  While BLMIS did purchase treasuries with customer funds, it did so as a way to obtain interest on the customer cash it was holding.  Counter Stmt. ¶ 74.  The purchases did not match the allocation of T-Bill transactions that appeared on customer statements.  Counter Stmt. ¶ 58.  Dubinsky's analysis also confirmed that the volume of treasuries that appeared on the customer statements dwarfed the aggregate volume of treasuries actually purchased and held by BLMIS.  Counter Stmt. ¶¶ 59–63; *see also Nelson*, 610 B.R. at 214, 234 n.37 ("Dubinsky's analysis demonstrated that the T-Bill transactions that appeared in the customer statements were fictitious and bore no relationship to the actual treasuries purchased by BLMIS and documented in the DTC records.").  Frank DiPascali, Madoff's right-hand employee, testified that treasuries

purchased by the IA Business were solely as a cash management tool, that the treasuries were not purchased for IA Business customers, and that the treasuries that appeared on customer statements were fictitious.  Counter Stmt. ¶¶ 64–68; *see also Nelson*, 610 B.R. at 226, 234 n.37. For these reasons, this Court has already held that any treasuries purchased were "part of the ongoing fraud," *Epstein Decision* at 7, and that "the purchase of treasuries was part of the cash management system used by BLMIS to sustain the Ponzi scheme and 'did not transform BLMIS into a legitimate enterprise or prohibit the Trustee's reliance on the Ponzi scheme presumption.'" *BAM L.P.*, 608 B.R. at 175 n.15 (quoting *Legacy*, 603 B.R. at 691).

Finally, BLMIS falsely reported paying or crediting customers with $4.3 billion in cash dividends between 1998 and 2008.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 253. Dubinsky confirmed that BLMIS neither received any monies as a result of trading securities nor received any dividends on purportedly held securities.  *Id.* ¶ 340.

### c.  The Trustee's Experts Confirmed That BLMIS Paid Redemptions from Customer Funds

Lisa Collura, a forensic accountant and certified fraud examiner, analyzed the books and records of BLMIS.  *See Nelson*, 610 B.R. at 220–21.  Collura's investigation shows that during the ten-year period before its collapse on December 11, 2008, BLMIS primarily used three bank accounts for the IA Business: JPMorgan Chase Bank, N.A. ("JPMorgan") account #xxxxx1703 (the "703 Account"); JPMorgan account #xxxxxxxxx1509 (the "509 Account," together with the 703 Account, the "JPMorgan Accounts")); and Bankers Trust account #xx-xx0-599 (the "BT Account").  Counter Stmt. ¶ 69.  The JPMorgan Accounts were linked commercial business accounts.  Counter Stmt. ¶ 72.  IA Business customers' cash deposits were deposited and commingled in the 703 Account.  Counter Stmt. ¶ 70.  IA Business customer withdrawals were made through the JPMorgan Accounts and the BT Account, which was a checking account

entirely funded by the 703 Account.  Counter Stmt. ¶ 71.  The 509 Account was a commercial

controlled disbursement account that was entirely funded by the 703 Account.  *Id*.  The money in

the 703 Account consisted almost entirely of customer deposits.  Counter Stmt. ¶¶ 72, 87.

Dubinsky confirmed that customer funds were deposited and withdrawn from the JPMorgan

Accounts, and that there were no inflows of money as a result of trading securities or receipt of

dividends on purportedly held securities.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340.

      Both Dubinsky and Collura confirmed that ninety-seven percent of all cash additions into

the 703 Account came directly from IA Business customers.  Counter Stmt. ¶ 73.  The other

three percent of inflows into the 703 Account came from income earned from cash management

activities including (1) short-term investment activity made directly from the 703 Account

(including overnight sweeps, overnight deposits, commercial paper, Certificates of Deposit and

treasuries); and (2) investments of BLMIS customer funds made through bank and brokerage

accounts held in the name of BLMIS or Madoff.  Counter Stmt. ¶ 74.  Because the short-term

investments, and including overnight sweeps were made directly out of the 703 Account, the

source of the money for those investments was customer funds.  Counter Stmt. ¶ 75.

      The IA Business did not have any legitimate income-producing activities.  Counter Stmt.

¶ 82.  The only source of cash available for the IA Business to pay purported profits as well as

redemption requests was from cash that other IA Business customers deposited in the 703

Account.  *Id*.  These transactions rendered BLMIS insolvent.  Counter Stmt. ¶ 83.  By no later

than December 2002, BLMIS's assets totaled approximately $1.82 billion and its liabilities

totaled $11.9 billion.  *Id*.  By December 2008, the customer property on hand at BLMIS was

grossly insufficient to pay the claims of its customers.  Counter Stmt. ¶ 84.  As detailed below, at

no point did Defendants produce evidence to dispute these facts.

      **d.**      **The Trustee's Evidence of "Badges of Fraud" Independently
Establishes Actual Intent to Defraud**

Independent of the Ponzi presumption, courts in this liquidation proceeding have found

that BLMIS made the transfers with the requisite intent to defraud under the "badges of fraud"

analysis. *See JABA Assocs. LP*, 528 F. Supp. 3d at 240–41; *Nissenbaum*, 2021 WL 1141638, at

*14–15; *Nelson*, 610 B.R. at 235. The Second Circuit has recognized the following badges of

fraud: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate

relationship between the parties; (3) the retention of possession, benefit or use of the property in

question; (4) the financial condition of the party sought to be charged both before and after the

transaction in question; (5) the existence or cumulative effect of a pattern or series of

transactions or course of conduct after the incurring of debt, onset of financial difficulties, or

pendency or threat of suits by creditors; (6) the general chronology of the event and transactions

under inquiry. *See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983);

*Banner v. Kassow*, 104 F.3d 352, 352 (2d Cir. 1996). The Second Circuit has also recognized

that "[c]oncealment of facts and false pretenses by the transferor" may be a badge of fraud. *In re

Kaiser*, 722 F.2d at 1582; *see also* 4 Collier on Bankruptcy ¶ 548.02[5] at 548–34 to 38 (15th ed.

1983). The existence of several badges can "constitute conclusive evidence of an actual intent to

defraud . . . ." *Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*,

No. 12-cv-2652 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. 2017) (noting that the existence of

badges of fraud "focus the inquiry on the circumstances that suggest a conveyance was made

with fraudulent intent" (citation omitted)); *see also Gredd v. Bear, Stearns Sec. Corp. (In re

Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 505, n.3 (Bankr. S.D.N.Y. 2002) (noting that

"[b]adges of fraud are circumstances that so commonly accompany fraudulent transfers that their

presence gives rise to an inference of intent to defraud").

The evidence adduced by the Trustee and set forth above, which has not been controverted by Defendants, establishes the concealment of facts by BLMIS, BLMIS's insolvency at the relevant time, and the lack of consideration proved for fictitious transfers to customers. *See JABA Assocs. LP*, 528 F. Supp. 3d at 241 (citing *Nelson*, 610 B.R. at 235 ("[T]he existence of the badges of fraud supply a separate basis to conclude that the Two-Year Transfers were made with the actual intent to defraud.")); *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *15 (same). The Trustee seeks an independent finding that the Trustee established BLMIS's actual intent under the badges of fraud analysis.

### e. BLMIS's Two-Year Transfers to Defendants Were in Furtherance of the Fraud

In a Ponzi scheme, the Trustee need not prove that the debtor intended to hinder, delay, or defraud a *particular* creditor, but rather he must only establish that the transfers made to the transferee were in furtherance of a fraudulent scheme. *See Bayou IV*, 439 B.R. at 304.

"Every payment made by the debtor to keep the scheme on-going was made with the actual intent to hinder, delay or defraud creditors, primarily the new investors." *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund LTD.)*, 359 B.R. 510, 518 (Bankr. S.D.N.Y.), *rev'd in part on other grounds*, 397 B.R. 1 (S.D.N.Y. 2007) (citation omitted). This is predicated on the reality that a debtor's failure to honor an investor's withdrawal request "would promptly have resulted in demand, investigation, the filing of a claim and disclosure of the fraud." *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Grp., LLC)*, 396 B.R. 810, 843 (Bankr. S.D.N.Y. 2008) ("*Bayou III*"), *rev'd in part on other grounds*, *Bayou IV*, 439 B.R. at 284; *see also Greiff*, 476 B.R. at 723. Every redemption payment "*in and of itself* constituted an intentional misrepresentation of fact" of the investor's rights to their falsely inflated account statement and "an integral and essential part of the [] fraud." *Bayou III*, 396

23

B.R. at 843 (emphasis in original).  Thus, the transfers to Defendants were in furtherance of the

fraudulent Ponzi scheme.

### 2.    BLMIS Made the Transfers to Defendants Within the Two-Year Period

BLMIS transferred fictitious profits to or for the benefit of Defendants between

December 11, 2006 and December 11, 2008.  The Trustee's evidence is uncontroverted as to the

date, receipt, and amount of the transfers the Trustee seeks to avoid and recover.[16]

### 3.    The Transfers Were an Interest of the Debtor in Property

The Trustee established that the Fraudulent Transfers were an interest of the debtor in

property in three ways.  First, the Trustee has shown that the transfers at issue comprise customer

property, which he is authorized to recover under SIPA and the Bankruptcy Code.  Second, he

has shown that the JPMorgan Accounts were owned by BLMIS at the time of the transfers to

Defendants.  Third, because the BLMIS liquidation and Madoff's chapter 7 estate were

substantively consolidated, the Trustee can recover customer property whether held in the name

of BLMIS or Madoff.

### a.    The Transfers are Customer Property and the Trustee Can Recover Them

Where the transfers are customer property, the Trustee is entitled to avoid and recover the

Two-Year Transfers, regardless of the change in the corporate form of Madoff's business from a

sole proprietorship to an LLC.  *Keller Fam. Tr.*, 2021 WL 4476811, at *3–4; *Epstein Decision* at

5–6; *BAM L.P.*, 624 B.R. at 62; *Nelson*, 610 B.R. at 215–18.

When IA Business customers sent money to BLMIS for the purpose of purchasing

securities, it became "customer property" under SIPA.  SIPA § 78*lll*(4); *Rosenman Fam., LLC v.*

---

[16] *See* Ken-Wen Answer to Am. Compl. ECF No. 89 ¶¶ 38, 43; *see also* Am. Compl., ECF No. 82, at Exhibit B.

*Picard*, 395 F. App'x 766, 768 (2d Cir. 2010) (funds given to BLMIS for the purpose of purchasing securities and deposited in the JPMorgan Account are subject to SIPA); *see also BAM L.P.*, 624 B.R. at 62.  Whether operated as a sole proprietorship or as an LLC, BLMIS's assets were composed primarily of customer property and its liabilities were composed primarily of amounts owed to customers.  The transfers were made from the JPMorgan Accounts that were functionally used by BLMIS as its Rule 15c3-3 account, which forms the corpus of the fund of customer property under SIPA.  Counter Stmt. ¶¶ 69–77, 87–89; 17 C.F.R. § 240.15c3-3.

For at least the ten-year period prior to the liquidation, BLMIS bank records show that the JPMorgan Accounts were used as an instrumentality of the fraud for customer deposits and withdrawals—for at least three years while the firm was a sole proprietorship, and for the seven years after it became an LLC.  Dubinsky Decl., Attach. A. (Dubinsky Report) ¶¶ 340, 341; *BAM L.P.*, 624 B.R. at 62 ("When the Defendants invested their money into the IA Business, the deposits were placed into the Bank Accounts and commingled with all of the Ponzi scheme victims' deposits."); Decl. of Lisa M. Collura, dated Dec. 1, 2021 ("Collura Decl."), Attach. A Expert Report of Lisa M. Collura, dated January 16, 2019 (the "Collura Report") ¶ 17; *see also Citibank*, 12 F.4th at 179 ("The customers' funds were commingled in BLMIS's bank account. When customers withdrew their "profits" or principal, BLMIS paid them from this commingled account.  As a result, each time BLMIS transferred payments to a customer, it was money stolen from other customers."); *In re Picard*, 917 F.3d 85, 92 (2d Cir. 2019) (noting that Madoff commingled funds into JPMorgan checking account and sent customers redemptions from commingled account); *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 564 (2d Cir. 2016) (finding BLMIS deposited customer investments into a single commingled checking account and sent cash withdrawals from the commingled checking

account).

The undisputed facts demonstrate the Fraudulent Transfers are "property transferred by the debtor which, except for such transfer, would have been customer property" and therefore are recoverable under SIPA § 78fff-2(c)(3). Because the funds are indisputably customer property, BLMIS is deemed under SIPA to have an interest in the transferred customer property, making the Fraudulent Transfers avoidable under § 548(a)(1)(A) of the Bankruptcy Code. Counter Stmt. ¶ 89; *Miller*, 631 B.R. at 8; *Keller Fam. Tr.*, 2021 WL 4476811, at *4; *Cohen*, 2016 WL 1695296, at *5 ("BLMIS transferred customer property to [defendant], and under SIPA § 78fff-2(c)(3) such property is 'deemed to have been property of the debtor'."). Where, as here, there is no dispute that the Trustee is seeking to recover transfers comprising customer property, the form of the broker-dealer at the time of transfer is irrelevant.

> **b.** **BLMIS Owned the JPMorgan Accounts Because the IA Business Was Transferred to the LLC in 2001**

This Court has held numerous times that the transfers made by BLMIS in other prior identical cases—like the Two Year Transfers here—were "an interest of the debtor in property" because the JPMorgan Accounts were the property of BLMIS, not Madoff. *See Keller Fam. Tr.*, 2021 WL 4476811, at *4; *Miller*, 631 B.R. at 8; *Epstein Decision* at 7; *BAM L.P.*, 624 B.R. at 61; *Nelson*, 610 B.R. at 216; *JABA Assocs. LP*, 528 F. Supp. 3d at 234–36; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *9. Any contrary argument from Defendants should be rejected based on the *seven prior decisions* in this liquidation that so hold. In *Nelson*, the court held:

> Defendants conflate subject matter jurisdiction with the merits of the Trustee's claims. The Trustee certainly has standing to argue that BLMIS made the Two-Year Transfers. . . . In any event, the Defendants' jurisdictional argument lacks merit because the evidence demonstrate[s] that BLMIS owned the [JPMorgan] Chase Accounts, the source of the Two-Year Transfers.

*Nelson*, 610 B.R. at 216. In *BAM L.P.*, this Court held:

26

> [A]ll of the assets and liabilities of the sole proprietorship, including
> the IA Business, were transferred to BLMIS via the 2001 SEC
> Amended Form BD.  As such, the Defendants' customer accounts
> and the Bank Accounts are property of BLMIS and the monies paid
> to Defendants from those Bank Accounts must be turned over to the
> Trustee.

*BAM L.P.*, 624 B.R. at 61; *see also Miller*, 631 B.R. at 16 (finding "the Defendants customer

accounts and the Bank Accounts are property of BLMIS"); *Epstein Decision* at 7 ("This Court

has already determined that all of Madoff's customers were transferred to BLMIS.").

In *JABA Associates* and *Nissenbaum*, the District Court held:

> Madoff was using the accounts at issue in his capacity as a sole
> proprietor until he reorganized his business as an LLC.  When
> Madoff changed the form of his business from a sole proprietorship
> to an LLC, the business retained the same SEC registration number.
> When submitting the Amended Form BD, Madoff noted that the
> [sole proprietorship] [sic] 'will transfer to successor all of
> predecessor's assets and liabilities related to predecessor's business.
> The transfer will not result in any change in ownership or control.' .
> . .  And there were no assets or liabilities of the sole proprietorship
> listed as 'not assumed by the successor.' . . .  The form also indicated
> that no 'accounts, funds, or securities of customers of the applicant
> are held by or maintained by [any] other person, firm, or
> organization.'

*JABA Assocs. LP*, 528 F. Supp. 3d at 234–35; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at

*9 (same).

BLMIS owned the JPMorgan Accounts at the time of the transfers to Defendants.

Madoff began operating as a sole proprietorship in the early 1960s under the names of Bernard

L. Madoff and Bernard L. Madoff Investment Securities.  *BAM L.P.*, 624 B.R. at 59.  As

explained above, once registered with the SEC, the broker-dealer is assigned a registrant number,

becomes a member of SIPC, and is required to pay into the SIPC fund by annual assessments.

SIPA § 78ddd(c)(2).  In January 1960, the sole proprietorship filed with the SEC a Form BD

under registrant number 8-8132.  Neiburg Decl., Ex. 1 (1959 SEC Form BD).  Through that

27

registration, the broker-dealer became a member of SIPC when SIPA was enacted in 1970.

There is no dispute that prior to 2001, the JPMorgan Accounts were held by the proprietorship.

Effective January 1, 2001, Madoff changed the corporate form of his broker-dealer

business when he incorporated as an LLC. Neiburg Decl., Ex. 29 (BLMIS Articles of

Organization); *see also BAM L.P.*, 624 B.R. at 59. If an entity succeeds to and continues the

business of a broker-dealer previously registered with the SEC, and the succession is based on a

change in the predecessor's form of organization, it files a Form BD Amendment. SEC Rule

15b1-3(b), 17 C.F.R. § 240.15b1-3(b). The successor entity continues the business and SIPC

membership of its predecessor. BLMIS filed an Amended Form BD with the SEC in January

2001, reflecting the change in corporate form using the same SEC registrant number 8-8132;

BLMIS did not file a new application for registration. Neiburg Decl., Ex. 2 (2001 Amended

Form BD); *see also BAM L.P.*, 624 B.R. at 59–60.

Under "BD Successions" of the 2001 Amended Form BD, it asked: "Briefly describe

details of the succession, including any assets or liabilities not assumed by the successor."

Neiburg Decl., Ex. 2 (2001 Amended Form BD at pp, 10–11, *see also* Question 5). The response

was: "Effective January 1, 2001, predecessor will transfer to successor all of predecessor's assets

and liabilities related to predecessor's business. The transfer will not result in any change in

ownership or control." *Id*. No assets or liabilities of the sole proprietorship were listed as "not

assumed by the successor." *Id.* The 2001 Amended Form BD further certified that no

"accounts, funds, or securities of customers of the *applicant* are held or maintained by such other

*person*, firm, or organization." *Id.* (2001 Amended Form BD at 5). BLMIS succeeded to the

sole proprietorship's SEC registrant number 8-8132. Neiburg Decl., Ex. 1 (1959 SEC Form

BD); Ex. 2 (2001 Amended Form BD at 10). Indeed, this Court noted "that this succession

28

provision meant that, without exception, all of the assets and liabilities of the sole proprietorship

were transferred to BLMIS and the sole proprietorship ceased to exist." *BAM L.P.*, 624 B.R. at

60. ("The predecessor identified on the 2001 SEC Amended Form BD is "Bernard L. Madoff"

and the successor is identified as BLMIS.").

BLMIS's corporate documents confirmed the change in corporate form and the transfer

of all assets. In its Amended and Restated Operating Agreement, BLMIS sets forth Madoff's

intent to transfer all assets—including bank accounts—held by the sole proprietorship to the

LLC, effective January 1, 2001:

> 3. **Purpose.** The Company is formed to receive as at January 1,
> 2001, all of the assets, subject to liabilities, associated with the
> business being conducted by Bernard L. Madoff, as sole
> proprietorship (the "Business") and to thereafter conduct such
> Business, and any further extension therefor, in such manner and
> form as determined by the Member in his sole discretion, to the
> extent permitted by the [Limited Liability Company Law of the
> State of New York] or by the laws of any jurisdiction which the
> Company may do business.

Neiburg Decl., Ex. 28 (BLMIS Amended and Restated Operating Agreement), ¶ 3. Consistent

with the 2001 Amended Form BD filed with the SEC, the Amended and Restated Operating

Agreement makes clear that no assets were carved out or excluded from the transfer of assets to

the LLC, and confirmed that all assets of the sole proprietorship—the three business units and

their bank accounts—were transferred to the LLC as of January 1, 2001. Madoff also made

various financial institutions aware of the change in corporate form. S*ee* Neiburg Decl., Ex. 31

(Letters to Financial Institutions). In addition, by virtue of the transfer, existing BLMIS

customers of the IA Business as of 2001—like Defendants—became customers of the LLC in

accordance with their customer agreements that expressly inured to the benefit of "any successor

organization." *See, e.g.*, Neiburg Decl., Ex. 32 (BLMIS Customer Agreement), ¶ 17. The

JPMorgan Accounts continued to be used in the same way both prior to and after 2001—to

receive customer deposits and to satisfy customer withdrawal requests.  Collura Decl., Attach. A
(Collura Report) ¶ 17.

The sole proprietorship thus had no corporate existence, no SEC registration, no assets,
and no customers after 2001.  *See SIPC v. BLMIS LLC (In re Bernard L. Madoff)*, 522 B.R. 41,
60 (Bankr. S.D.N.Y. 2014), *aff'd*, 15 Civ. 1151 (PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14,
2016), *aff'd*, 697 F. App'x 708 (2d Cir. 2017) (finding all Madoff Securities' assets and
liabilities were transferred to BLMIS upon the reorganization to a single member limited liability
company).  Moreover, when Madoff did finally register his investment advisory business in
August 2006, he did so not as a sole proprietor but rather through the LLC, using the same SEC
Registrant Number and signing the form on behalf of "Bernard L. Madoff Investment Securities
LLC."  *See* Neiburg Decl., Ex. 30 (August 2006 Form ADV).  Thus, if any doubt remained in
2001 as to whether the LLC succeeded to the IA Business, it was resolved when the IA Business
was registered under the LLC in 2006—before the fraudulent transfers were made.

> **c.     Because the Estates Were Consolidated, the Trustee Can
> Recover Customer Property Held in The Names of Either the
> LLC or Madoff**

In December 2008, the Government brought criminal charges and the SEC filed a civil
complaint against Madoff and BLMIS alleging that they were operating a Ponzi scheme through
BLMIS's IA Business.  *United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. 2009);
Complaint, *SEC v. Madoff*, 08-cv-10791 (LLS) (S.D.N.Y. Dec. 11, 2008), ECF No. 1.  Because
BLMIS was a registered broker-dealer, SIPC obtained a protective decree finding its customers
needed the protections of SIPA, placed BLMIS into liquidation, appointed the Trustee "for the
liquidation of the business of the Defendant with all the duties and powers of a trustee as
prescribed in SIPA," and removed the case to the bankruptcy court.  Order ¶ 2, *SEC v. Madoff*,

No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4; SIPC Application ¶ 2, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 5.

Shortly after the Trustee's appointment, certain creditors filed an involuntary bankruptcy petition against Madoff.  Pet. at 7, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Apr. 1, 2009), ECF No. 37.  The district court allowed the chapter 7 case to go forward, to target "that portion of Mr. Madoff's property that is neither forfeitable criminally nor subject to the liquidation of BLMIS under SIPA."  Order at 4, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Apr. 10, 2009), ECF No. 47.

Because Madoff used BLMIS as his personal piggy bank and alter ego, and his only significant source of income was his draw from BLMIS, which itself came from stolen customer money, there was no way to separate Madoff's assets from those of the business.  *See* Mem. of Law, *SIPC v. BLMIS*, No. 08-01789 (CGM) (Bankr. S.D.N.Y. May 5, 2009), ECF No. 196.  Upon motion by the Trustee, the bankruptcy court substantively consolidated the SIPA liquidation and the chapter 7 bankruptcy, merging Madoff's chapter 7 estate into the SIPA proceeding *nunc pro tunc*, consolidating all assets and liabilities of the two estates as of December 10, 2008.  *See* Order, *SIPC v. BLMIS*, No. 08-01789 (CGM) (Bankr. S.D.N.Y. June 10, 2009), ECF No. 252 (the "Consolidation Order").  The SIPA Trustee was authorized to avoid and recover fraudulent transfers of customer property under SIPA *on behalf of the consolidated estate*.  *Id*. ¶ 7 (emphasis added) (stating "the SIPA Trustee is authorized to pursue claims on behalf of the consolidated estate . . . for, among other things, the avoidance and recovery of transferred property").  The Consolidation Order unified interests in the separate estates, ensuring that all assets, whether technically Madoff assets or BLMIS assets, flowed into the consolidated estate to be returned to customers.  The Consolidation Order further provided that

31

the fees and expenses of both trustees would be paid by SIPC as opposed to coming out of the estate, thereby maximizing recoveries for customers and creditors.  *Id*. ¶ 5.

The Consolidation Order supports the right of the Trustee to recover customer property transferred from any bank account held by BLMIS or Madoff.  The Consolidation Order preserves the respective avoidance powers of both the SIPA Trustee and the chapter 7 Trustee, a provision included in light of caselaw holding that "[a]bsent express preservation of the trustee's avoidance power, an order of substantive consolidation would ordinarily eliminate that power." *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 768 (9th Cir. 2000).  The Consolidation Order does not state that the SIPA Trustee can only recover customer property when held by the LLC; to the contrary, the effect of the Consolidation Order is that when the SIPA Trustee exercises that power, he does so on behalf of the consolidated estate and can recover any customer property held by Madoff *or* the LLC.  *Cf. BAM L.P.*, 624 B.R. at 61 & n.4 (noting that because the chapter 7 case was substantively consolidated with the SIPA proceeding, the SIPA Trustee should be able to recover fraudulent transfers made by Madoff's sole proprietorship).

### D.      Defendants Have Not Presented Any Countervailing Evidence

Defendants have not and cannot come forward with evidence to rebut the Trustee's *prima facie* case nor any evidence to support an argument that Madoff used money from his IA Business customers to purchase securities, including treasuries, which appeared on Defendants' customer statements.  Further, Defendants offered no witnesses—fact or expert—to (1) establish the necessary support for summary judgment in their favor (for Mr. Brown or otherwise) or (2) rebut the Trustee's case or support this argument.  The evidence and opinions of the Trustee's expert witnesses and DiPascali's testimony unequivocally demonstrate that BLMIS made the transfers with the intent to defraud, and that no securities (including treasuries) were purchased by BLMIS for its IA Business customers, including Defendants.  Defendants offer vague

32

assertions, which are insufficient to withstand summary judgment. *See Bayou III*, 396 B.R. at

825 (explaining that conjecture, surmise, or "metaphysical doubt," as well as self-serving

conclusory statements will not defeat summary judgment). Defendants cannot create an issue of

material fact where none exists simply because they disagree. *See Ying Jing Gan v. City of N.Y.*,

996 F.2d 522, 532 (2d Cir. 1993) (nonmoving party "may not rely simply on conclusory

statements or on contentions that the affidavits supporting the motion are not credible").

## III.     MR. BROWN'S ASSERTIONS AND DEFENDANTS' OVERALL DEFENSES CAN BE DETERMINED AS A MATTER OF LAW

Mr. Brown's sole argument in support of his motion for summary judgment is that he

purportedly disassociated from Ken-Wen on February 29, 2008. *See* Brown Motion, ECF

No. 174 ¶¶ 16–18. As detailed below, this Court has already held that general partners can be

held personally liable under state law for avoidable transfers made to the partnership. The

balance of Defendants' purported legal defenses are inapposite as the Court has already

addressed and rejected them in many prior opinions in this liquidation. Mr. Brown has failed to

put forth any evidence in support of his motion; and thus cannot meet his burden for summary

judgment. Defendants likewise cannot meet their burden of establishing a triable issue of fact to

defeat the Trustee's Motions.

### A.     The Trustee May Recover the Fraudulent Transfers from Mr. Brown as Ken-Wen's General Partner.

The Trustee may recover the Fraudulent Transfers from Mr. Brown because

(1) Mr. Brown served as the general partner of Ken-Wen at the time three of the four Fraudulent

Transfers were made and (2) Mr. Brown's purported disassociation on or about February 29,

2008 (a) did not lead to the dissolution and winding up of Ken-Wen, (b) took place less than two

years before the fourth Fraudulent Transfer was made on November 17, 2008, and (c) was not

made known to BLMIS.

### 1. Mr. Brown is Liable for the First Three Fraudulent Transfers Because He Was a General Partner of Ken-Wen.

It is well settled that a general partner of a limited partnership is jointly and severally liable for all of the debts and obligations of the partnership. *See Picard v. Merkin et al (In Madoff Secs.)*, 440 B.R. 243, 268 (Bankr. S.D.N.Y. 2010) (citing *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 391 (D. Del. 2000); *In re LJM2 Co-Investment, L.P.*, 866 A.2d 762, 772 (Del. Ch. 2004) (internal quotations omitted)). Moreover, this Court held that "general partners can be held personally liable under state law for avoidable transfers made to the partnership." *See Merkin*, 440 B.R. at 268-69 (holding that a trustee is empowered under § 550(a) of the Bankruptcy Code to recover avoided transfers from a partnership as initial transferee, or from the general partner of the partnership under applicable state partnership law). As stated above, Ken-Wen is a Florida limited partnership.[17] Florida law provides that general partners are jointly and severally liable for the debts of a general partnership or a limited partnership. *See Picard v. Avelino et al. (In re Madoff Secs.)*, 557 B.R. 89, 128 nn. 35, 36 (Bankr. S.D.N.Y. 2016) (citing FLA. STAT. § 620.8306(1) and § 620.1404(1) (2016), respectively); *Brinkley, McNerney, Morgan & Solomon v. Community Acres Assocs., Ltd.*, 602 So. 2d 685, 686-87 (Fla. Dist. Ct. App. 1992) (noting that § 620.1404(1) (2016) did not modify existing Florida law holding that general partners are liable for the partnership's debts); *see also* FLA. STAT. § 620.63(2) and § 620.125(2) repealed.

It is undisputed that Mr. Brown was the general partner of Ken-Wen for three of the four Fraudulent Transfers, totaling $3,650,000. Mr. Brown confirmed this fact during his deposition, testifying that he made the requests for the first three transfers at issue as the general partner of

---

[17] Am. Compl., ECF No. 82 ¶ 8; Ken-Wen Answer to Am. Compl., ECF No. 89 ¶ 8.

Ken-Wen.  *See* Counter Stmt. ¶¶ 113–115.  Thus, Mr. Brown is liable for the first three of the

Fraudulent Transfers.

> ## 2. Mr. Brown Remains Liable for the November 17 Transfer Because His Purported Disassociation Did Not Lead to the Dissolution and Winding Up of Ken-Wen.

Mr. Brown is also liable for the November 17 Transfer because his purported

disassociation did not result in the dissolution and winding up of Ken-Wen.  Mr. Brown cites to

Fla. Stat. § 620.1607(1), purportedly for the proposition that a general partner is not liable for a

limited partnership's obligation incurred after disassociation.  *Id.*, p. 4.  Mr. Brown, however,

fails to acknowledge the statutory exception to this general provision.  *See generally* Brown

Motion, ECF No. 174.  Section 620.1607(3) provides:

> a person that disassociated as a general partner but whose dissociation ***did not result in a dissolution and winding up of the limited partnership's activities is liable on a transaction entered into by the limited partnership after the dissociation*** only if:  (a) ***a general partner would be liable on the transaction***; (b) at the time the other party enters into the transaction, (1) ***less than two years have passed since the disassociation*** and (2) the other party does not have notice of the disassociation and reasonably believes that the person is a general partner.

(emphasis added).  The exception applies here.

Mr. Brown requested the final November 17 Transfer, signing the request as Kenneth

Brown FLP.  *See* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at 78:8-24.  Even if Mr. Brown

disassociated from Ken-Wen on February 29, 2008, his disassociation did not result in the

dissolution and winding up of Ken-Wen, evidenced by the subsequent November 17 Transfer

and Mr. Brown's assertions in his motion for summary judgment.  The Trustee has established

that general partners can be personally liable under state law for avoidable transfers made to the

partnership.  The November 17 Transfer took place less than two years from the purported

disassociation, and Mr. Brown produced no evidence showing that BLMIS had notice that

Mr. Brown was no longer a general partner. In fact, Mr. Brown requested the November 17

Transfer in the same manner as every other request—a handwritten note to BLMIS.[18]

Moreover, Mr. Brown continued to hold himself out to the world as a general partner of

Ken-Wen after the purported disassociation. By way of example, Mr. Brown executed a

document titled Collateral Assignment of Life Insurance Policy on October 8, 2008, signing as a

general partner of Ken-Wen. *See* Neiburg Decl., Ex. 26 (Collateral Assignment of Life

Insurance Policy, dated October 8, 2008). In April 2009, Mr. Brown executed a modified

version of the Collateral Assignment of Life Insurance Policy, again signing as general partner of

Ken-Wen. *See* Neiburg Decl., Ex. 27 (Collateral Assignment of Life Insurance Policy, dated

April 27, 2009).

Mr. Brown's citation to the Missouri Supreme Court decision is likewise unavailing

because the "obligation" discussed by that court deals solely with the issue of when the

obligation to pay rent arises under a partnership's real estate lease with a landlord—it has no

relevance to fraudulent transfer law. *See* Brown Motion, ¶ 14. It is black letter law that a

fraudulent transfer claim arises "when an individual is exposed prepetition to conduct giving rise

to an injury, which underlies a right to payment under the Bankruptcy Code." *In re Grossman's*,

607 F.3d 114, 125 (3d Cir. 2010).

For these reasons, under the law of the case and Florida's partnership law, Mr. Brown

remains liable as a general partner for the November 17 Transfer. *See* Fla. Stat. § 620.1607(3).

### B.    Defendants Did Not Give Value for Fictitious Profits

Having established that BLMIS transferred at least $3,850,000 in fictitious profits within

---

[18] *Compare* Neiburg Decl., Ex. 21 (Mr. Brown's request for $200,000 in the November 17 Transfer), *with* Neiburg Decl., Ex. 15 (Mr. Brown's request for $150,000 in the June 26 Transfer), Ex. 17 (Mr. Brown's request for $500,000 in the December 31 Transfer), and Ex. 19 (Mr. Brown's request to liquidate $3,000,000 in the January 24 Transfer).

the Two-Year Period to Defendants with actual fraudulent intent, the Trustee is entitled to avoid

and recover the Two-Year Transfers.  To defeat the avoidance of a transfer on summary

judgment, Defendants must offer evidence sufficient to create a material issue of fact as to

whether he took (1) "for value . . . to the extent that [he] gave value to the debtor in exchange for

such transfer" and (2) "in good faith."  *Bayou IV*, 439 B.R. at 308 (placing burden of proving

affirmative defense on transferee); 11 U.S.C. § 548(c); *In re 1031 Tax Grp., LLC*, 439 B.R. at 73.

"Value" includes satisfaction of an antecedent debt of the debtor.  *See* 11 U.S.C.

§ 548(d)(2)(a).  The Second Circuit has ruled that as a matter of law, Defendants cannot establish

that they took the transfers of fictitious profits "for value" because such false profits were not on

account of a valid antecedent debt.  *Gettinger*, 976 F.3d at 199–200; *see also JABA Assocs. LP*,

528 F. Supp. 3d at 241–43; *Lisa Beth Nissenbaum Tr.*, 2021 WL 1141638, at *15–16 (same);

*Picard v. BAM L.P. (In re Bernard L. Madoff)*, 608 B.R. 165, 180–81 (Bankr. S.D.N.Y. 2019).

That ruling is law of the case, requiring dismissal of Defendants' value defense.

## IV.    THE TRUSTEE IS ENTITLED TO PREJUDGMENT INTEREST AS A MATTER OF LAW

The Trustee is also entitled to an award of prejudgment interest from December 11, 2008

(the "Filing Date") because "[f]ull compensation to the estate for the avoided transfer[s]

normally requires prejudgment interest to compensate for the value over time of the amount

recovered."  *Geltzer v. Artists Mktg. Corp. (In re Cassandra Grp.)*, 338 B.R. 583, 599 (Bankr.

S.D.N.Y. 2006) (awarding prejudgment interest "[t]o fully and fairly compensate [debtor's]

creditors for their loss—not only of [the amount] that was fraudulently conveyed . . . but of the

use of that money").  Prejudgment interest properly "compensates the Trustee for the loss of the

use of the Two-Year Transfers for the years that this litigation has lasted and reduces the profits

to [Defendants] from having withheld the funds."  *JABA Assocs. LP*, 528 F. Supp. 3d at 246;

*Lisa Beth Nissenbaum Tr.*, 2021 WL1141638, at \*18 (same); *see also BAM L.P.*, 624 B.R. at 63–66.

In *BAM L.P.*, this Court awarded prejudgment interest finding that the "net losers" of BLMIS's Ponzi scheme "are the real victims of Defendants' dilatory litigation tactics" and after ten years of litigation "an award of prejudgment interest is essential to the [Trustee's] collection of customer property." *BAM L.P.*, 624 B.R. at 64 (citing *Stanford Square, L.L.C. v. Nomura Asset Cap. Corp.*, 232 F. Supp. 2d 289, 293 (S.D.N.Y. 2002) ("Awarding prejudgment interest is based upon the premise that the party to whom the money is owed has been deprived of the use of the funds and can be made whole only by the award of interest. Conversely, the party owing the money has had the use of the funds he was obligated to have paid, and should be required to pay compensation by way of interest.")).  Likewise, in *Epstein*, this Court awarded prejudgment interest against "Defendants, like these, who litigate issues that have already been decided by the Court." *Epstein Decision* at 10 (finding the Trustee "has spent approximately ten years prosecuting this case and cannot be made whole without an award of prejudgment interest").

Having determined that prejudgment interest should be awarded, this Court found that the federal rate should be used where the Trustee's claims arise only from federal law. *BAM L.P.*, 624 B.R. at 64.  However, "[w]here the interest rate codified in 28 U.S.C. § 1961 is too low to compensate the plaintiff, courts can opt to apply the prime rate of interest," which was 4% on the Filing Date. *Id.* at 65 (quoting *Messer v. Magee (In re FKF 3, LLC)*, No. 13 Civ. 3601 (JCM), 2018 WL 5292131, at \*13 (S.D.N.Y. Oct. 24, 2018)); *see also Miller*, 631 B.R. at 17–18 ("Consistent with other decisions that have awarded prejudgment interest, the Court holds that interest is awarded in the amount of 4%."); *Epstein Decision* at 11 ("Interest is awarded in the amount of 4%); *JABA Assocs. LP*, 528 F. Supp. 3d at 246 ("The 4% rate compensates the

Trustee for the loss of the use of the Two-Year Transfers for the years that this litigation has

lasted, and reduces the profits to the defendants from having withheld the funds."); *Lisa Beth*

*Nissenbaum Tr.*, 2021 WL 1141638, at *17–18 (same).

Further, this Court found "the accrual date for prejudgment interest is the Filing Date, as

the claims asserted by the Trustee arose only upon the filing of the SIPA liquidation." *BAM*

*L.P.*, 624 B.R. at 65–66 (citing *In re FKF 3, LLC*, 2018 WL 5292131, at *14); *see also Epstein*

*Decision* at 10–11 (finding "the Trustee is entitled to interest from the date that the SIPA action

was commenced [sic]"); *Miller*, 631 B.R. at 18, n.13 ("The Court would be willing to consider

awarding interest from the date of the SIPA action where the facts warrant it."). Here,

Defendants refuse to acknowledge the law of the case. By doing so, Defendants "assumed the

consequences associated with [their] failure to compensate the bankruptcy estate for its loss

occasioned by the fraudulent conveyance[s] . . . ." *Gill v. Maddalena (In re Maddalena)*, 176

B.R. 551, 557–58 (Bankr. C.D. Cal. 1995). "An important rationale for the prejudgment interest

rule is that the party against whom the claim is asserted could have stopped the running of

interest by paying what was owed." *Newbro v. Freed*, 409 F. Supp. 2d 386, 402 (S.D.N.Y.

2006) *aff'd*, No. 06-1722-CV, 2007 WL 642941 (2d Cir. Feb. 27, 2007). As this Court stated,

the Trustee has "incurred costs litigating against Defendants who have resisted the law of the

case." *Id.* (citing *Newbro v. Freed*, 409 F. Supp. 2d 386, 402 (S.D.N.Y. 2006). As a result,

prejudgment interest is warranted here, *see JABA Assocs. LP*, 2021 WL 1112342, at *19–20

(granting request for prejudgment interest from date of complaint); *Lisa Beth Nissenbaum Tr.*,

2021 WL 1141638, at *18 (same); *Epstein Decision* at 9–10 (same); *BAM L.P.*, 624 B.R. at 65

(same), and the proper accrual date is the Filing Date because there are no mitigating factors.

*Keller Fam. Tr.*, 2021 WL 4476811, at *9 (Trustee requested from date of Filing Date); *Miller*,

631 B.R. at 17–18 (same); *see also In re FKF 3, LLC*, 2018 WL 5292131, at *14 (appropriate

accrual date for prejudgment interest for fraudulent transfer claims is date of bankruptcy

petition).

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court (I) deny the

Brown Motion, (II) grant summary judgment in the Trustee's favor on Count One of the

Trustee's Amended Complaint, and enter an order: (1) avoiding $3,850,000 in transfers of

fictitious profits that BLMIS made to Defendants within the Two-Year Period; (2) awarding the

Trustee prejudgment interest from the Filing Date through the date of entry of judgment at the

rate of 4%; and (3) requiring Defendants to return such transfers or the value thereof to the

Trustee.

Dated:  December 1, 2021
        New York, New York

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Michael S. Neiburg*
Matthew B. Lunn
Michael S. Neiburg (admitted *pro hac vice*)
Justin P. Duda
Rockefeller Center
1270 Avenue of the Americas, Suite 2210
New York, New York 10020
Telephone:  (212) 332-8840
Facsimile: (212) 332-8855
Email:  *mlunn@ycst.com*
        *mneiburg@ycst.com*
        *jduda@ycst.com*

*Attorneys for Plaintiff Irving H. Picard,*
*Trustee for the Liquidation of Bernard L.*
*Madoff Investment Securities LLC*