**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Matthew B. Lunn
Michael S. Neiburg
Justin P. Duda

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (CGM) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF, | Adv. Pro. No. 10-04468 (CGM) |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| v. | |
| KEN-WEN FAMILY LIMITED PARTNERSHIP; KENNETH W. BROWN, in his capacity as a General Partner of the Ken-Wen Family Limited Partnership; and | |

WENDY BROWN, in her capacity as a General Partner
of the Ken-Wen Family Limited Partnership,

                    Defendants.

**TRUSTEE'S (I) OBJECTIONS, RESPONSES, AND COUNTERSTATEMENT OF
MATERIAL FACTS TO DEFENDANT KENNETH W. BROWN'S MOTION FOR
SUMMARY JUDGMENT AND (II) STATEMENT OF MATERIAL FACTS PURSUANT
TO FED. R. CIV. P. 56, FED. R. BANKR. P. 7056 AND LOCAL RULE 7056-1 IN
SUPPORT OF TRUSTEE'S (A) CROSS MOTION FOR SUMMARY JUDGMENT AS
TO DEFENDANT KENNETH W. BROWN AND (B) MOTION FOR SUMMARY
JUDGMENT AS TO DEFENDANT KEN-WEN FAMILY LIMITED PARTNERSHIP**

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff

("Madoff"), respectfully submits this opposition and response ("Response") to Defendant

Kenneth W. Brown's Motion for Summary Judgment (ECF No. 174) (the "Brown Motion")

under Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56.  In

addition to this Response, the Trustee files his (I) Cross Motion for Summary Judgment[1] as to

Defendant Kenneth W. Brown and (II) Motion for Summary Judgment as to Defendant Ken-

Wen Family Limited Partnership as to Count One of the Trustee's First Amended Complaint to

avoid and recover the amounts fraudulently transferred by BLMIS to the Ken-Wen Family

Limited Partnership ("Ken-Wen"), and Kenneth W. Brown ("Mr. Brown" and collectively with

Ken-Wen, the "Defendants") in his capacity as General Partner of Ken-Wen.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the *Trustee's Memorandum of
Law in Support of (I) Opposition to Defendant Kenneth W. Brown's Motion for Summary Judgment, (II) Cross
Motion for Summary Judgment as to Defendant Kenneth W. Brown, and (III) Motion for Summary Judgment as to
Defendant Ken-Wen Family Limited Partnership* (the "Trustee's Memorandum of Law"), filed contemporaneously
herewith.  In addition, exhibits referenced in this Response may be found attached to the Declaration of Michael S.
Neiburg, Esq., and the Declarations of Lisa M. Collura, Bruce G. Dubinsky, and Matthew G. Greenblatt, filed
contemporaneously herewith.

28784870.7

**A.    Trustee's Response to Mr. Brown's "Undisputed Facts"**

1.    Plaintiff alleges in the Complaint Defendant Brown is a General Partner of Ken-Wen Limited Family Partnership ("Ken-Wen") and Defendant Brown is being sued in his alleged capacity as a General Partner. *Complaint* at p. 1.

**RESPONSE:** Not disputed.

2.    Ken-Wen was a Florida Limited Partnership that is now inactive as its registration was revoked on September 28, 2012 for failing to file its Annual Report with the State of Florida-Division of Corporations, as set forth on Exhibit "A" attached hereto.

**RESPONSE:** Not disputed that Ken-Wen was registered as a Florida Limited Partnership. Disputed because the document attached to the Brown Motion as Exhibit A is of no moment, as each of the four Fraudulent Transfers to Ken-Wen sought to be avoided and recovered in this action took place on or before November 17, 2008.

3.    The last annual report filed by Ken-Wen with the State of Florida-Division of Corporations on April 28, 2011 does not list Defendant as a General Partner, a copy of which is attached hereto as Exhibit "B".

**RESPONSE:** Not disputed that the document attached to the Brown Motion as Exhibit B purports to show that Mr. Brown is not listed as a general partner of Ken-Wen as of April 28, 2011. Disputed because the document attached to the Brown Motion as Exhibit B is of no moment, as each of the four Fraudulent Transfers to Ken-Wen sought to be avoided and recovered in this action took place on or before November 17, 2008. As set forth more fully in the Trustee's Counter Statement of Material Facts, Ken-Wen admits that the four Fraudulent

Transfers took place as set forth on Exhibit B to the Amended Complaint. *See* Ken-Wen Answer to Am. Compl., ECF No. 89, ¶ 38.

The first of these transfers took place on June 26, 2007, in the amount of $150,000 (the "June 26 Transfer"). Mr. Brown initiated the June 26 Transfer by making a request to BLMIS, which he signed as the general partner of Ken-Wen, to wire $150,000 to the Ken-Wen account at Paradise Bank. *See* Declaration of Michael S. Neiburg, dated December 1, 2021, and filed contemporaneously herewith ("Neiburg Decl."), Ex. 15 (Mr. Brown's request for $150,000 in the June 26 Transfer); *see also* Neiburg Decl., Ex. 11 (Jan. 27, 2020 Deposition Transcript of Mr. Brown ("Brown Dep. Tr.")) at 57:15-58:22; 60:14-62:7. Mr. Brown subsequently amended this request for the funds to be transferred via check, not wire. *See* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at 60:14-62:7. Madoff forwarded check number 186272 from the 509 Account to Ken-Wen for $150,000 made payable to Ken-Wen Family LP Ltd., which was endorsed only with the Paradise Account number and deposited into the Paradise Account. *See* Neiburg Decl., Ex. 16 (Cancelled Check for $150,000 evidencing receipt of the June 26 Transfer); Declaration of Lisa M. Collura, dated December 1, 2021, and filed contemporaneously herewith ("Collura Decl."), Attach. B (Ken-Wen Expert Report of Lisa M. Collura), dated February 3, 2020 (the "Collura Ken-Wen Report"), Ex. 6; *see also* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at 57:15-58:22; 60:14-62:7.

The second transfer took place on December 31, 2007, in the amount of $500,000 (the "December 31 Transfer"). Mr. Brown initiated the December 31 Transfer by making a request to BLMIS, which he signed as the general partner of Ken-Wen, to wire transfer $500,000 to the Ken-Wen account at Paradise Bank. *See* Neiburg Decl., Ex. 17 (Mr. Brown's request for the December 31 Transfer); *see also* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at 69:5-70:1. The

BLMIS December 2007 JP Morgan account statement reflects the outgoing wire transfer to the

Paradise Account. *See* Neiburg Decl., Ex. 18 (703 Account December 2007 Statement); *see also*

Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at 63:9-64:10; 68:24-70:1. The Trustee confirmed that

the wire transfer originated from the 703 Account and was sent to the Paradise Account. *See*

Collura Decl., Attach. B (Collura Ken-Wen Report) ¶ 24, Ex. 6 (utilizing a "receiving bank

analysis" to confirm that Ken-Wen in fact received the December 31 Transfer).

The third transfer took place on January 24, 2008, in the amount of $3,000,000 (the

"January 24 Transfer"). Mr. Brown initiated the January 24 Transfer by making a request to

BLMIS, which he signed as the general partner of Ken-Wen, to liquidate $3,000,000 to the Ken-

Wen account at Paradise Bank. *See* Neiburg Decl., Ex. 19 (Mr. Brown's request to liquidate

$3,000,000 via wire in the January 24 Transfer). The BLMIS January 2008 JP Morgan account

statement reflects the outgoing wire transfer to the Paradise Account. *See* Neiburg Decl., Ex. 20

(703 Account January 2008 Statement). This JPMorgan Chase account was held in the name of

BLMIS and denotes a transfer in the amount of $3,000,000 to Ken-Wen. *See also* Neiburg

Decl., Ex. 11 (Brown Dep. Tr.) at 70:20-71:14. The Trustee confirmed that the wire transfer

originated from the 703 Account and was sent to the Paradise Account. *See* Collura Decl.,

Attach. B (Collura Ken-Wen Report) ¶ 24, Ex. 6 (utilizing a "receiving bank analysis" to confirm

that Ken-Wen in fact received the January 24 Transfer).

Finally, the fourth transfer took place on November 17, 2008, in the amount of $200,000

(the "November 17 Transfer"). Mr. Brown initiated the November 17 Transfer by making a

request to BLMIS, which he signed Kenneth W. Brown FLP, to send a check in the amount of

$200,000 made payable to Ken-Wen FLP Ltd to 405 SW Atlantic Drive, Lantana, FL 33462,

which he identified as a family address. *See* Neiburg Decl., Ex. 21 (Mr. Brown's request for

$200,000 in the November 17 Transfer); *see also* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at

29:23-30:7.  Although Mr. Brown testified he was not a general partner of Ken-Wen at the time,

he signed the request as "Kenneth Brown FLP."  *Id.*, *see also* Neiburg Decl., Ex. 11 (Brown Dep.

Tr.) at 77:20-79:18.  Madoff sent check number 201790 from the 509 Account to Ken-Wen in

the amount of $200,000 made payable to Ken-Wen Family LP LTD, which was endorsed as

"Ken-Wen Family" and deposited into the Bank of America Account.  *See* Neiburg Decl., Ex. 22

(Cancelled check for $200,000 evidencing receipt of the November 17 Transfer); s*ee also*

Neiburg Decl., Ex. 24 (Feb 25, 2020 Deposition Transcript of Ms. Werner (f/k/a Wendy Brown))

(the "Werner Dep. Tr."), at 99:7-100:23.


4.      Instead, the annual report lists Wendy Brown as the *only* General Partner of Ken-

Wen.

**RESPONSE:**  Not disputed that the document attached to the Brown Motion as Exhibit B

purports to show that only Ms. Wendy Brown is listed as a general partner of Ken-Wen as of

April 28, 2011.  Disputed because the document attached to the Brown Motion as Exhibit B is of

no moment, as each of the four Fraudulent Transfers to Ken-Wen took place on or before

November 17, 2008.  The Trustee incorporates his statements of material fact in response to

Paragraph 3 above as though fully set forth here.


5.      Moreover, attached hereto as Exhibit "C" is a Partnership Affidavit executed by

Defendant, Wendy Brown on March 5, 2012, affirming that she is the sole General Partner of

Ken-Wen.

**RESPONSE:**  Not disputed that the document attached to the Brown Motion as Exhibit C

purports to show that Ms. Brown is the sole general partner of Ken-Wen as of April 28, 2011.

Disputed because the document attached to the Brown Motion as Exhibit C is of no moment, as

each of the four Fraudulent Transfers to Ken-Wen took place on or before November 17, 2008.

Further, the document attached to the Brown Motion as Exhibit C is dated March 5, 2012—

nearly 40 months from the date of the last Fraudulent Transfer and 48 months from Mr. Brown's

purported dissociation from Ken-Wen.  The Trustee incorporates his statements of material fact

found in Paragraph 3 above as though fully set forth here.


6.      In fact, Defendant Brown dissociated himself as a general partner of Ken-Wen as

of February 29, 2008, as set forth in paragraph 2 of the Agreement of Partners of Ken-Wen

Family Limited Partnership, a copy of which is attached hereto as Exhibit "D":

> Ken hereby withdraws from the company as general partner. As of the
> Effective date, Ken's one percent (1%) general partner interest in the
> company shall be converted into one percent (1%) limited partner interest
> in the company. Wendy [Brown] shall be the sole general partner of the
> company subject to sections 3 and 4 below.

**RESPONSE:**  Disputed because even if Mr. Brown disassociated from Ken-Wen on February

29, 2008, it is undisputed that he requested three (3) of the four (4) Fraudulent Transfers as

general partner of Ken-Wen.  The Trustee incorporates his statements of material fact in

response to Paragraph 3 above as though fully set forth here.  With respect to the fourth

Fraudulent Transfer, Mr. Brown requested the funds in the same manner as the first three

Fraudulent Transfers, i.e., hand-written note to BLMIS.  *See* Neiburg Decl., Ex. 21 (Mr. Brown's

request for $200,000 in the November 17 Transfer).  The only difference is that Mr. Brown

signed the fourth request as "Kenneth W. Brown, Ken-Wen FLP."  *Id.*  Notwithstanding the

foregoing, Mr. Brown executed a collateral assignment for an insurance policy on October 8, 2008, signing as a general partner of Ken-Wen. *See* Neiburg Decl., Ex. 26 (Collateral Assignment of Life Insurance Policy, dated October 8, 2008). Mr. Brown continued to hold himself out as a general partner of Ken-Wen in April 2009, where Mr. Brown signed a modification to the aforementioned collateral assignment as general partner of Ken-Wen. *See* Neiburg Decl., Ex. 27 (Collateral Assignment of Life Insurance Policy, dated April 27, 2009). The partnership affidavit attached to the Brown Motion as Exhibit D is a self-serving document whose authenticity and/or veracity is questionable in light of the collateral assignment of life insurance policy documents referenced above—both of which are dated after Mr. Brown's purported dissociation from Ken-Wen.

7.      The *only* reference to Florida Limited Partnership law that appears in the Complaint is found in paragraph 47 where Plaintiff states:

> Defendants Kenneth Brown and Wendy Brown, as general partners of Defendant Ken-Wen, are each jointly and severally liable as a matter of Florida state law for the debts and obligations of Ken-Wen, including the fraudulent Transfers received from BLMIS. See Fla. Stat. § 620.1404(1).

**RESPONSE:** Not disputed that Paragraph 47 of the Trustee's Amended Complaint includes the above quoted language. Disputed that the Trustee does not implicate Florida partnership law elsewhere in the Amended Complaint. The Trustee's Amended Complaint (ECF No. 82), makes several references to Florida partnership law. *See e.g.* Amended Complaint ¶¶ 8-10. Disputed that the Trustee was somehow required to provide legal citations in his Amended Complaint as support for every allegation.

8.      On January 19, 2021, Plaintiff filed a Stipulation and Order for Voluntary

Dismissal of Defendant Wendy Brown With Prejudice [DE 162].

**RESPONSE:** Not disputed.

9.      The Trustee's claims against Ken-Wen and Defendant remain unresolved.

**RESPONSE:** Not disputed.

10.      This adversary proceeding has not concluded and no judgment has been entered in

this matter determining Ken-Wen's liability to Plaintiff or that Ken-Wen has any obligation to

repay any of the alleged transfers to Plaintiff pursuant to 11 U.S.C. § 550.

**RESPONSE:** Not Disputed.  By way of further response, the legal issues identified by Mr.

Brown in this Paragraph are addressed at length in the Trustee's Memorandum of Law, filed

contemporaneously herewith.

### THE TRUSTEE'S (I) COUNTERSTATEMENT OF MATERIAL FACTS TO DEFENDANT KENNETH W. BROWN'S MOTION FOR SUMMARY JUDGMENT AND (II) STATEMENT OF MATERIAL FACTS IN SUPPORT OF TRUSTEE'S (A) CROSS MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANT KENNETH W. BROWN AND (B) MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANT KEN-WEN FAMILY LIMITED PARTNERSHIP

**I.      Background and the Trustee**

1.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  *See* Compl., U.S. v. Madoff, No. 08-mj-02735 (S.D.N.Y. 2008)

(ECF No. 1); *see also* Plea Allocution of Bernard L. Madoff, at 15:23-18:3; 23:11-15, *United*

*States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (ECF No. 50).

Contemporaneously, the Securities and Exchange Commission ("SEC") commenced an action in

the United States District Court for the Southern District of New York. Compl., *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 11, 2008) (ECF No. 1).

2.      On December 11, 2008, the United States Government initiated a criminal action against Madoff for criminal violations of federal securities laws, including, *inter alia*, securities fraud, investment advisor fraud, and mail and wire fraud. Compl., *United States v. Madoff*, No. 08-mj-02735 (S.D.N.Y. 2008) (ECF No. 1).

3.      On December 15, 2008, under 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Application of SIPC at 10, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008) (ECF No. 5).  Thereafter, under 15 U.S.C. § 78eee(a)(4)(B), SIPC filed an application in the district court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by the Securities Investor Protection Act ("SIPA").  *Id.* at 2–3.

4.      Also, on December 15, 2008, the district court granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    i.      appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C. § 78eee(b)(3);

    ii.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15 U.S.C. § 78eee(b)(3); and

    iii.    removed the case to the bankruptcy court pursuant to 15 U.S.C. § 78eee(b)(4).

Order, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008) (ECF No. 4) (the "SIPC Liquidation Order").

5.      By orders dated December 23, 2008 and February 4, 2009, respectively, the bankruptcy court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789

(SMB) (Bankr. S.D.N.Y. Dec. 23, 2008) (ECF No. 11); Order, *Sec. Inv'r Prot. Corp. v. Bernard

L. Madoff Inv. Sec. LLC*, Adv. Pro. No 08-01789 (SMB) (Bankr. S.D.N.Y. Feb. 4, 2009) (ECF

No. 69).

6.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, the bankruptcy court substantively consolidated the chapter 7 estate of

Madoff into the SIPA Proceeding.  Involuntary Petition, *In re Bernard L. Madoff*, Adv. Pro. No.

09-11893 (SMB) (Bankr. S.D.N.Y. Apr. 13, 2009) (ECF No. 1); Consent Order, *Sec. Inv'r Prot.

Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y.

June 9, 2009) (ECF No. 252).

## II.     BLMIS Operated a Ponzi Scheme Through Its Investment Advisory Business

### A.     BLMIS's Business

7.      In January 1960, Bernard L. Madoff registered as a broker-dealer with the SEC.

He was assigned registrant number 8-8132.  Through that registration, the broker-dealer became

a member of SIPC when SIPA was enacted in 1970. SIPC Liquidation Order; Neiburg Decl. Ex.

1 (SEC Form BD for Bernard L. Madoff), dated Dec. 31, 1959.

8.      Beginning in 1960 and until January 1, 2001, BLMIS operated as a sole

proprietorship.  Declaration of Bruce G. Dubinsky, dated December 1, 2021, and filed

contemporaneously herewith ("Dubinsky Decl."), Attach. A (Expert Report of Bruce G.

Dubinsky), dated January 16, 2019 ("Dubinsky Report") ¶ 36.  During its existence, it operated

under the names Bernard L. Madoff and Bernard L. Madoff Investment Securities and, after

2001, as Bernard L. Madoff Investment Securities LLC. *Id.* ¶¶ 36-38.

9.      Effective as of January 1, 2001, BLMIS was registered as a New York single member limited liability company.  BLMIS's corporate documents confirmed the change in corporate form and the transfer of all assets to the limited liability company.  *See* Neiburg Decl., Ex. 28 (BLMIS Amended and Restated Operating Agreement), ¶ 3.  On January 12, 2001, BLMIS amended its SEC Form BD to reflect its change in corporate form from a sole proprietorship to a single member limited liability company.  All the assets and liabilities of the sole proprietorship were transferred to the limited liability company.  *See* Neiburg Decl., Ex. 2 (2001 SEC Amended Form BD) dated Jan. 12, 2001.  BLMIS's Amended and Restated Operating Agreement makes clear that no assets were carved out or excluded from the transfer of assets to the limited liability company.  *See* Neiburg Decl., Ex. 28 (BLMIS Amended and Restated Operating Agreement), ¶ 3.

10.      In response to the direction in the 2001 SEC Amended Form BD to "[b]riefly describe details of the succession including any assets or liabilities not assumed by the successor [BLMIS]," (emphasis in original), Madoff replied:

> EFFECTIVE JANUARY 1, 2001, PREDECESSOR WILL TRANSFER TO SUCCESSOR ALL OF PREDECESSOR'S ASSETS AND LIABILITIES, RELATED TO PREDECESSOR'S BUSINESS.  THE TRANSFER WILL NOT RESULT IN ANY CHANGE IN OWNERSHIP OR CONTROL.

Neiburg Decl., Ex. 2 (2001 SEC Amended Form BD) pp. 9-10 (emphasis in the original).  No assets or liabilities of the sole proprietorship were listed as "not assumed by the successor."

11.      Madoff further certified that no "accounts, funds, or securities of customers of the *applicant* are held or maintained by such other person, firm, or organization."  *Id.* at Question 8(C) (emphasis in original).

12.     In 2006, BLMIS registered as an investment advisor with the SEC claiming to have only 23 accounts and $11.7 billion in assets under management.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 39.

13.     BLMIS operated three business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business ("IA Business").  *Id.* ¶ 36.

14.     The proprietary trading business traded for its own account to make money for BLMIS.  *Id.* ¶¶ 36, 46.

15.     The market-making business made markets in certain stocks, bonds, warrants and rights.  *Id.* ¶ 46.

16.     The proprietary trading and market-making businesses were referred to within BLMIS as "House 5." and are collectively referred to as the "Proprietary Trading Business."  *Id.* ¶ 36.

17.     The IA Business was designed to purportedly trade stocks to buy equities and to buy options on behalf of its customer accounts.  *Id.* ¶¶ 41–44.

18.     The Proprietary Trading Business and the IA Business were units of BLMIS, both operated by Madoff.  *Id.* ¶¶ 36, 48.

**B.      BLMIS Was Not Trading Securities**

19.     The Trustee retained Bruce Dubinsky, a forensic accountant with more than 30 years of experience in financial fraud investigations, as an expert witness in this matter. Mr. Dubinsky conducted numerous analyses from which he concluded that BLMIS did not conduct any trading on behalf of its IA Business customers.  *Id.* Section VI.A.

20.     At various times, BLMIS reported to its IA Business customers that the money they deposited with BLMIS was invested in investment strategies called the "convertible

arbitrage" strategy or the "split-strike conversion" strategy.  BLMIS did not execute either

strategy on behalf of its IA Business customers.  *Id.* ¶¶ 19–26; 41–44.

21.     Mr. Dubinsky analyzed BLMIS's execution of the convertible arbitrage strategy

and determined that trading never occurred dating back to at least the 1970s.  *Id.* Section

VI.A.(1)(a).

22.     By 1992, the IA Business changed its primary purported investment strategy to

the split-strike conversion strategy.  *Id.* Section VI.A.(1)(b), specifically ¶ 155.

23.     The split-strike conversion strategy, as purportedly executed by BLMIS, involved

(a) investing in a basket of common stocks from the Standard & Poor's 100 Index, (b) buying put

options and selling call options to hedge against price changes in the underlying basket of stocks,

and (c) purchasing U.S. treasury bills ("<u>T-Bills</u>") when the money was "out of the market."  The

strategy was purportedly set up by BLMIS so that the purchase of put options and the sale of call

options would create a collar around the stock to reduce the volatility of BLMIS's portfolio.  *Id.*

¶¶ 156–58.  BLMIS did not conduct this strategy on behalf of its customers.  *Id.* Section

VI.A(1)(b).

24.     Mr. Dubinsky's analysis demonstrated that BLMIS did not conduct any trading on

behalf of its IA Business customers based on (a) the impossible reported volume of equity trades;

(b) the impossible equity and options trades reported outside the daily price range; (c) the low

volatility in its reported daily trading performance compared to the actual market behavior and

the performance achieved by BLMIS in the Proprietary Trading Business unit as measured by

the volume weighted average prices for its sales and purchases; (d) the consistently positive rates

of returns that did not "mirror" the volatility of the markets; (e) a lack of any Depository Trust

Corporation ("<u>DTC</u>") records to confirm the reported IA Business equity or treasury trades; and

(f) a lack of Options Clearing Corporation ("OCC") records to confirm the reported IA Business

options trades. *Id.* Section VI.A.(1)(c)(i)-(vi), A.(1)(e)(i)-(iv).

### i.    Volume of Equity Trades

25.    Mr. Dubinsky analyzed equity trades that the IA Business reportedly made in the

split-strike conversion strategy between January 2000 and November 2008.  His analysis

compared the daily volumes for certain stocks reported as purchased or sold by the IA Business

on the aggregated customer statements with the actual market volumes sold as reported by

Bloomberg. *Id.* ¶¶ 159–60.

26.    Mr. Dubinsky found many instances where the volume that BLMIS claimed to

have purchased or sold on behalf of all IA Business customers exceeded the volume of equities

traded for the entire market. *Id.*

27.    For example, on July 14, 2000, the aggregated IA Business customer statements

reported purchases of 2,822,680 shares of AIG (as reflected in the column titled "IA Business

Purported Value"), but the total market volume that traded that day for all of AIG shares in the

market was only 1,692,800 (as reflected in the column titled "Actual Market Value").  Similarly,

the IA Business reported trading 17,709,440 shares of GE on September 13, 2000, but the total

market volume that traded all day for GE shares in the market was only 7,604,800. *Id.* ¶ 159, Ex.

11 to Dubinsky Report ("Split-Strike Conversion IA Business Equity Volume Analysis,

Analyzed Time Period"); *see also* Ex. 12 to Dubinsky Report ("Split-Strike Conversion IA

Business Options Volume Analysis, Analyzed Time Period")

28.    Mr. Dubinsky concluded that BLMIS's trading in excess of market volumes

demonstrated that the IA Business did not trade on behalf of its customers. *Id.* Section

VI.A.(1)(c), ¶¶ 159–60, Exs. 11–12 to Dubinsky Report.

### ii.    Equity and Options Trades Priced Outside Daily Price Range

29.    For the analyzed period of 2000-2008, Mr. Dubinsky determined that there were 99,972 equity transactions executed outside the daily market traded price range. *Id.* ¶ 161. The purported prices for these transactions exceeded the daily high price by as much as $8.96 and were below the daily low by as much as $105.04. *Id.* There was no evidence in the BLMIS books and records that the almost 100,000 transactions were mistakes, and there were no DTC records evidencing that the trades were actually executed. Mr. Dubinsky opined that equity trades that were reported as having been executed outside the daily price range of the entire U.S. equities market could not have occurred. *Id.* ¶¶ 161–62, Ex. 13 to Dubinsky Report ("Split-Strike Conversion IA Business Equity Price Analysis, Analyzed Time Period").

30.    Mr. Dubinsky performed the same analysis on options trades for the same time period and identified 34,501 options transactions traded outside of the daily price range. *Id.* ¶ 164. He found that the options traded above the daily high price by as much as $15.25 higher and by as much as $6.05 below the daily low price. *Id.* ¶ 165. Mr. Dubinsky opined, as with the equity trades, that the reported options trades purportedly executed outside the daily price range could not have occurred. *Id.* ¶¶ 164–66, Ex. 14 to Dubinsky Report ("Split-Strike Conversion IA Business Options Price Analysis, Analyzed Time Period").

### iii.    Volume Weighted Average Price Analysis

31.    The absence of actual trading was also reflected in the prices at which the IA Business purportedly bought and sold shares using the split-strike conversion strategy. Mr. Dubinsky conducted a Volume Weighted Average Price ("VWAP") analysis of the daily purchases and sales reported by the IA Business and the Proprietary Trading Business. *Id.* ¶¶ 168–72.

32.     VWAP is a trading benchmark that gives the average price a security has traded throughout the day, based on both volume and price.  The VWAP is a widely used industry benchmark that allows a firm to see how well its traders are doing compared to the rest of the market.  *Id.* ¶¶ 168–69.

33.     Based on Mr. Dubinsky's analysis, he determined that the IA Business purportedly executed 83% of the daily buy transactions by share volume below the VWAP, and 72% of the daily sell transactions by share volume above the VWAP.  *Id.* ¶ 170.  In other words, BLMIS had the uncanny ability to buy low and sell high at a remarkable rate compared to the rest of the market.  *Id.* ¶ 170.

34.     Mr. Dubinsky further compared the IA Business's purchase and sale of the same stock actually traded by the Proprietary Trading Business on the same days.  The Proprietary Trading Business matched average VWAP of traders.  The IA Business, however, consistently outperformed VWAP by such wide margins that it evidenced the fictitious nature of the trades.  *Id.* ¶¶ 171–72.

35.     Mr. Dubinsky concluded that the unrealistic VWAP results demonstrated that the IA Business did not trade on behalf of its customers.  *Id.* ¶¶ 170–72.

### iv.    Annual Rates of Return

36.     To further test whether the IA Business engaged in trading, Mr. Dubinsky analyzed the volatility of the IA Business's reported average annual rate of return for the split-strike conversion strategy as compared with the volatility of the annual rate of return as reported by Bloomberg for the two major market indices, the S&P 100 Index and the Dow Jones Industrial Average (the "Dow Jones") from December 31, 1996 through December 11, 2008.  *Id.* ¶¶ 177–78.

37.     Because the IA Business's split-strike conversion strategy was supposedly engineered around the S&P 100, with a basket of stocks in the S&P 100 and using S&P index options, the IA Business's returns should have performed similarly to the S&P 100 Index.  In other words, if the market goes down, the returns should have gone down and vice versa.  *Id.* ¶ 177.

38.     Mr. Dubinsky's analysis showed, however, that the volatility in the IA Business rates of return did not mirror the volatility of the rates of returns of the major indices.  The IA Business rates of return stayed within a small range, generally between 10-12% for most years and going up to 20% for the year of 1999.  *Id.* ¶¶ 178, 180.  The returns for the major market indices ranged from a high of 31% to a low of -37% (specifically, the S&P 100 swinging widely from a high of 31% to a low of -37%, and the Dow Jones from a high of 25% to a low of -34%).  *Id.* ¶ 179.

39.     While the returns available in the major indices went up and down, representing the volatility in the market, the IA Business returns stayed steady for the twelve-year period examined, never having a negative year or month (even throughout 2008).  *Id.* ¶¶ 180–81.

40.     Mr. Dubinsky concluded that the lack of volatility in the IA Business demonstrated that the IA Business was not engaged in trading.  *Id.* ¶ 181.

> **v.    Securities Listed on the IA Business Customer Statements Did Not Reconcile with DTC Records**

41.     Mr. Dubinsky compared the trades purportedly executed for the customer accounts in the IA Business with the records maintained by the DTC, an organization in the United States that clears and settles equity transactions in the U.S. market.  *Id.* Section VI.A.(1)(e).

42.      When equity trades are recorded at the DTC it creates the official record of where that stock is held.  The ownership of the stock can be confirmed with the DTC.  *Id.* ¶¶ 194–95.

43.      BLMIS had a single account with the DTC, the "646 account."  All equity trades made by BLMIS should have been reflected in the DTC records pertaining to its account.  *Id.* ¶ 209.

44.      Mr. Dubinsky's analysis confirmed that the securities that were cleared through BLMIS's DTC account, the 646 account, were traded by the Proprietary Trading business.  No IA Business trades were cleared through BLMIS's DTC account.  *Id.* ¶¶ 209–13.

45.      The Proprietary Trading Business shares reflected in the DTC records matched the BLMIS records evidencing those trades.  *Id.* ¶¶ 209, 211, 213.

46.      Mr. Dubinsky concluded that the Proprietary Trading Business actually executed those trades in the marketplace, as confirmed by the DTC records.  For the IA Business, however, Mr. Dubinsky could not account for the stock purportedly traded for the customers in the IA Business in any DTC records.  *Id.* ¶ 209.

47.      Based on his analysis, Mr. Dubinsky concluded that the IA Business did not execute the equity trades reflected on the customer statements.  *Id.* ¶ 212.

48.      Because there were no records from the DTC showing that BLMIS owned the securities listed on the IA Business customer statements, BLMIS created fake DTC records for the IA Business.  Mr. Dubinsky discovered dozens of fake DTC screen inquiries to document purported trading activity of the IA Business.  *Id.* ¶¶ 199–208.

49.      BLMIS installed software on the IA Business computer system that recreated fake DTC reports that were meant to look like official reports.  *Id.* ¶¶ 206–07.

50.    Mr. Dubinsky explained that there would be no reason, if one were doing legitimate trading and had owned the stocks, to go into a computer system and write code that used form-printing software to print out a report that mimicked what the DTC puts out, because there would instead be a real DTC report.  *Id.* ¶ 208.  Mr. Dubinsky made this determination by examining the metadata of the fake DTC screens, the code embedded in the document to record characteristics of the document, including when it was created.  *Id.* ¶¶ 199–205.

51.    Based on Mr. Dubinsky's analysis of the DTC records, Mr. Dubinsky concluded that BLMIS was not trading equities for its IA Business customers.  *Id.* ¶ 208.

### vi.    Reported Options Trades Could Not be Reconciled to OCC Records

52.    The options purportedly executed for the customer accounts in the IA Business could not be reconciled with the records of the OCC, an organization that clears and settles options transactions in the U.S. market.  *Id.* ¶¶ 196–98.

53.    Mr. Dubinsky explained that BLMIS had a single account with the OCC, and the IA Business purportedly traded S&P Index options,  which are "proprietary options" traded exclusively on the Chicago Board of Option Exchange ("CBOE").  These proprietary options can only be traded on the CBOE, but there would be a record of them both from the CBOE and the OCC.  *Id.* ¶¶ 166, 219.

54.    Mr. Dubinsky reviewed the OCC records for the BLMIS account from October 31, 2002, through October 31, 2008.  Based on his review of those records, Mr. Dubinsky was able to reconcile and confirm the options that were traded by the Proprietary Trading Business but could not account for the options purportedly traded for the customers in the IA Business.  *Id.* ¶¶ 220–21.  Mr. Dubinsky found that the options purportedly traded on behalf of the IA Business customers, as recorded in the IA Business trading records, were not shown on OCC records and were not cleared through the OCC.  *Id.* ¶ 222.

55.     For example, on October 31, 2005, records for the Proprietary Trading Business and the OCC indicate that 20 options described as "S&P 100 INDEX November 590 Call" were purchased and held by BLMIS.  *Id.* ¶ 223.  The aggregate number of "S&P 100 INDEX NOVEMBER 590 CALL" options reported on IA Business customer statements for the same date totaled 658,342.  *Id.*

56.     Based on his analyses, Mr. Dubinsky concluded that BLMIS did not conduct any options trading on behalf of its IA Business customers.  *Id.* ¶ 222.

**C.      The IA Business Did Not Purchase Treasuries for IA Business Customer Accounts**

57.     In addition to purchasing stocks and options collars, BLMIS claimed it would intermittently invest IA Business customer funds in U.S. T-Bills as part of the split-strike conversion strategy.  *Id.* ¶¶ 44, 228.

58.     Mr. Dubinsky found no evidence of such purchases having been made on behalf of IA Business customers.  *Id.* ¶ 224.  While BLMIS purchased U.S. T-Bills with customer funds, these purchases did not match the allocation of U.S. T-Bill transactions that appeared on customer statements.  *Id.* ¶¶ 224, 218.

59.     For the period of 2002 through 2007, Mr. Dubinsky reviewed the BLMIS books and records to identify the unique U.S. T-Bills held by the Proprietary Trading Business on December 31 of each of those years.  *Id.* ¶ 225.  He then compared those holdings to (i) those U.S. T-Bill positions held at BLMIS's account at the DTC, which serves as the custodian or the clearing house for treasuries, and (ii) the U.S. T-Bills purportedly held by the IA Business for its customers.  *Id.* ¶¶ 225–27.

60.     Mr. Dubinsky prepared a summary chart of his review of these voluminous records, which accurately represents his comparison of the U.S. T-Bill positions in the

Proprietary Trading Business and the positions purportedly purchased by the IA Business for its

customers:

Table 5

Comparison of Year-End US Treasury Positions: Proprietary Trading Business vs. IA Business

| Year-End | Proprietary Trading Business | IA Business | Proprietary Trading Business positions as a percent of IA Business positions |
|---|---|---|---|
| 2002 | $84,000,000 | $30,975,765,000 | 0.27% |
| 2003 | $70,000,000 | $33,643,020,000 | 0.21% |
| 2004 | $70,000,000 | $37,935,258,000 | 0.18% |
| 2005 | $75,000,000 | $40,913,910,000 | 0.18% |
| 2006 | $70,000,000 | $48,342,420,000 | 0.14% |
| 2007 | $80,000,000 | $56,990,055,000 | 0.14% |

*Id.* ¶ 227, Table 5.

61.    The amount of U.S. T-Bills held by the Proprietary Trading Business was

negligible compared to those purportedly held on behalf of customers of the IA Business.  *Id.*

For example, by the end of 2007, the $80 million in treasury positions held by the Proprietary

Trading Business (as recorded on the DTC records) was only 0.14 percent of the approximately

$57 billion in treasury positions purportedly held by the IA Business.  *Id.*

62.    Mr. Dubinsky further analyzed whether U.S. T-Bills purportedly purchased for IA

Business customers matched those U.S. T-Bills reported as being purchased and held by

BLMIS's brokerage accounts.  Mr. Dubinsky determined that 100% of the treasuries held by the

brokerage accounts were not the same treasuries as purportedly held by the IA Business accounts

because of different maturity dates, different purchase and sale dates, and/or they had a different

reported volume.  *Id.* ¶¶ 232–40.

63.     Mr. Dubinsky additionally determined that even if one were to add up all of the treasuries in those eight brokerage accounts and the Proprietary Trading Business, they would be short of what was reported on the IA Business customer statements. *Id.* ¶¶ 230–31 and Figure 36; *see also* Ex. 22 to Dubinsky Report ("Purported IA Business Treasuries versus Actual Treasuries Held by BLMIS").

64.     Frank DiPascali, a former BLMIS employee, now deceased, gave certain testimony at the multi-day criminal trial held in *United States v. Bonventre*, 10-CR-228 (LTS) (S.D.N.Y.) ("DiPascali Testimony") (ECF Nos. 858, 862, 884) (attached to the Neiburg Decl. as Ex. 3).  In his criminal trial testimony, DiPascali confirmed that the U.S. T-Bills purchased with the IA Business money were for BLMIS's cash management and were not purchased for any customer account:

> **Q.** From time to time did you get real treasury bills?
>
> **A.** Yes.
>
> **Q.** And what were those real treasury bills for?
>
> **A**. To invest the excess cash in the IA checking account.
>
> **Q**. And when you say to invest the excess cash in the IA checking account, for what reason did you get a treasury bill to do that?
>
> **A.** So as to provide safety and an enhanced yield to what the checking account interest rate was.
>
> **Q.** So it would be fair to say it would be a way of getting interest on the checking account?
>
> **A.** More or less, yes.

Neiburg Decl., Ex. 3 (DiPascali Testimony) at 4931:12–23 (Dec. 5, 2013); *see also id.* at 4921:7–12, 4930:6–4931:5, 4934:3–25; *id.* at 5345:1–5346:3 (Dec. 10, 2013).

65.     DiPascali differentiated between the U.S. T-Bills actually purchased for cash management purposes and those fabricated for customers of the IA Business:

**Q.** And when you bought those real treasury bills to earn interest on the Madoff checking account, what did you have to do?

**A.** I had to call my broker.

**Q.** And after you called your broker, was there a process to going out and buying the treasury bill?

**A.** Yeah, I would tell the broker how much dollars I wanted to commit to treasury bills and typically which one I wanted to buy, and he would take down that information and call me back and typically give me a report that I bought X amount of treasury bills at this price.

**Q.** And then that would – you would actually get a real treasury bill?

**A.** Yeah.

**Q.** Now, for on the IA side, when you had to provide – when you would provide the fake information, what would you do there?

**A.** I'd look at a pricing service of historical prices of treasury bills, ascertain the price on the date that I needed and write a ticket and put it into the AS/400.

***

**Q.** Now, what was your understanding of what Ms. Bongiorno would do with the treasury information that you gave to her?

**A.** She would put through a buy ticket that was approximately equal to the cash credit balance reflected in the account she was working on, and it would produce a confirmation and an entry on the customer statement that he was now – owned treasuries.

**Q.** And as with the other trading that was on those accounts, was any of it real?

**A.** No.

*Id.* at 4931:24–4933:13 (Dec. 5, 2013).

66.    DiPascali further testified that the U.S. T-Bill purchases in the eight brokerage accounts (held at Bank of New York, Bear Stearns, Fidelity, Lehman, and Morgan Stanley) were made at the direction of Mr. Madoff to earn interest on the cash held in JP Morgan Chase Bank, N.A. ("JPMorgan") account #xxxxx1703 (the "703 Account") (further discussed below in ¶ 69):

**Q.** Did Mr. Madoff propose a solution for how to deal with this?

**A.** He either already had an account or two open or was about to open a new account or a series of them, I don't recall. He was basically giving that responsibility to me. He wanted treasury notes, treasury bills only. As the CDs would get unwound or, I don't remember, they might have unwound them immediately, I'm not sure, but in short order I managed a group of Bernard L. Madoff brokerage accounts that were held at other brokerage firms for the purpose of purchasing short-term U.S. government securities.

**Q.** These short-term U.S. securities were real, right?

**A.** Yes.

**Q.** This was just a way of getting interest on the real cash that was in the 703 account?

**A.** Yes.

**Q.** What were some of the firms that you now had responsibility for that had these brokerage accounts?

**A.** Bear Stearns, Fidelity, Bank of New York, Morgan Stanley, Lehman Brothers.

**Q.** We talked a little bit about this earlier, when you were buying these short-term securities, what steps would you have to take to buy these real securities on those brokerage accounts?

**A.** I typically picked up the phone and called the broker or the representative of each of those organizations and communicated my needs. Then he typically got or she typically got back to me and told me what I had done. Sometimes those conversations occurred in the form of faxes. Most of the time they were on the telephone.

**Q.** This was different than just looking at historical prices and writing something up for the fake trades, right?

**A.** Yes.

*Id.* at 4961:15–4962:22 (Dec. 5, 2013).

67.    DiPascali explained the nuts and bolts of his process that resulted in U.S. T-Bill transactions showing up on the IA Business customer statements, and further confirmed that they were all fake:

**Q.** Now can we go to the second page of this document. What is this that we are looking at?

**A.** It's a spreadsheet that I created that was going to be the nuts and bolts of this exercise. It was going to do a lot of the calculation for me and allow the process to progress swiftly instead of from month to month to month and client to client to client calculate all sorts of stuff, and then have to then create another side to that. This spreadsheet, which is an Excel-based spreadsheet, is identifying certain treasury bills across the top column. The top row is the CUSIP of treasury bills and options. The second row are the symbols of options and then a string of treasury bills. Going on the far left column are a string of account numbers. Those are the accounts that Bernie told us he wanted to use to be the counterparties of the customer option positions. What this is doing is it's allowing me to randomly assign, once I know the total of my customer option positions, a quantity to each of those counterparties. Then, once I've randomly defined what each counterparty's position is, this is calculating what its margin or collateral requirement would be. Once I established that, this spreadsheet allows me to randomly pick a group of treasuries that were going to represent that collateral, and then the whole total number would circle back to what I needed. It's fairly complicated, but it did all the grind work necessary to accomplish what Bernie wanted.

**Q.** Were any of the treasury bills that are reflected on this real?

**A.** No.

*Id.* at 5344:24–5346:3 (Dec. 10, 2013).

68.    DiPascali also confirmed that the Proprietary Trading Business did not have an inventory of U.S. T-Bills "that was equivalent to the amount that was on the statements" for IA Business customers. *Id.* at 6950:25–6951:9 (Jan. 13, 2014).

### D.    The IA Business Had No Other Sources of Funds

69.    During at least the ten-year period before its collapse on December 11, 2008, BLMIS primarily used three bank accounts for the IA Business: the 703 Account; JPMorgan account #xxxxxxxxx1509 (the "509 Account", together with the 703 Account, the "JPMorgan Accounts"); and Bankers Trust account #xx-xx0-599 (the "BT Account"). Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285; Collura Decl., Attach. A (Expert Report of Lisa M. Collura, CPA, CFE, CFF), dated January 16, 2019 ("Collura Report")) ¶ 17.

70.     IA Business customers' cash deposits were deposited (and commingled) into the

703 Account.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura Decl., Attach. A

(Collura Report) ¶¶ 20–24.

71.     IA Business customer withdrawals were made through the JPMorgan Accounts

and the BT Account, which was a checking account entirely funded by the 703 Account during

the period for which bank records are available.  Collura Decl., Attach. A (Collura Report)

¶¶ 25–30.

72.     The JP Morgan Accounts were linked commercial business accounts.  The 509

Account was a controlled disbursement account that was entirely funded by the 703 Account.  *Id.*

¶ 25.  An analysis of the 703 Account showed that the money in that account consisted almost

entirely of customer deposits.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285;

Collura Decl., Attach. A (Collura Report) ¶ 27.

73.     Ninety-seven percent of all cash additions into the 703 Account came directly

from IA Business customers.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure

52; Collura Decl., Attach. A (Collura Report) ¶ 24, Figure 1.

74.     The other three percent of inflows into the 703 Account came from income earned

on (1) short-term investment activity made directly from the 703 Account (including overnight

sweeps, overnight deposits, commercial paper, Certificates of Deposit and U.S. T-Bills); and (2)

investments of BLMIS customer funds made through bank and brokerage accounts held in the

name of BLMIS or Madoff.  Collura Decl., Attach. A (Collura Report) ¶¶ 45–62; Dubinsky

Decl., Attach. A (Dubinsky Report), ¶ 340, Figure 52 & n.286.

75.     Because the short-term investments, including overnight sweeps, were made

directly out of the 703 Account, the source of the money for those investments was customer

funds.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura Decl., Attach. A (Collura Report) ¶¶ 24, 46–47.

76.    There were no inflows into the 703 Account from sales of securities for customer accounts.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340; Collura Decl., Attach. A (Collura Report) ¶¶ 24, 32.

77.    There were no outflows from the 703 Account to purchase securities for customer accounts.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 350; Collura Decl., Attach. A (Collura Report) ¶ 32.

78.    Apart from two short-term loans BLMIS received from JPMorgan totaling $145 million in November 2005 and January 2006—both of which were repaid by June 2006—the IA Business did not obtain loans from third parties or from the Proprietary Trading Business sufficient to pay the IA Business customer withdrawals.  Dubinsky Decl., Attach. A (Dubinsky Report) ¶¶ 341–44.

79.    The IA Business also did not receive payments of any cash dividends.  According to the customer statements, the IA Business reported that it received cash dividends related to purported trading and paid or credited them to the accountholders.  Between 1998 and 2008, BLMIS reported that it had paid or credited its customers $4.3 billion in cash dividends.  *Id.* ¶¶ 247–55.

80.    Of the more than 8,300 IA Business dividend transactions identified on the customer account statements from 1998 to 2008, not one purported dividend payment matched to a cash addition to the 703 Account.  *Id.* ¶¶ 253–54.

81.    There is no record of any dividends being received by the IA business. *Id.* ¶ 248.

82.    The IA Business did not have any legitimate income-producing activities.  The only source of cash available for the IA Business to pay purported investment profits as well as redemption requests from its customers was from cash that other IA Business customers deposited in the 703 Account.  *Id.* ¶¶ 330–37.

83.    These transactions rendered BLMIS insolvent.  By no later than December 2002, its assets totaled approximately $1.82 billion and its liabilities totaled $11.9 billion.  *Id.* Section VII., ¶¶ 432–33, Table 13.

84.    In December 2008, BLMIS's capital had dwindled to the point where customer redemptions or withdrawal requests grossly exceeded the amounts it had on hand.  The customer property on hand at BLMIS as of December 11, 2008, was not sufficient to pay the claims of its customers.  *Id.* ¶¶ 40, 440–41.

> **i.    The Transfers Were Made by Bernard L. Madoff Investment Securities LLC**

85.    BLMIS operated as a sole proprietorship prior to 2001.  In January 2001, the sole proprietorship was converted to a single member LLC, using the same SEC registrant number, 8-8132.  Neiburg Decl., Ex. 2 (2001 SEC Amended Form BD).

86.    The bank statements for the 703 and 509 Accounts listed the account holder as "Bernard L. Madoff" from December 1998 to September 2002, when the name was changed to "Bernard L. Madoff Investment Securities."  Collura Decl., Attach. A (Collura Report) ¶¶ 20 n.7, 25 n.9.

87.    For the time period for which bank records were available (December 1998 through December 2008), the JP Morgan Accounts were used for customer deposits and withdrawals—the business of the IA Business.  *Id.* ¶¶ 24–30; Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340 n.285, Figure 52.

88.     For the period for which bank records were available, the face of the bank statements for the JP Morgan Accounts showed they were designated as "Commercial Checking" accounts.  The statements were addressed to the attention of either Tony Tiletnick, a BLMIS employee, or Daniel Bonventre, BLMIS's operations manager, at the BLMIS business address at 885 Third Avenue, New York, New York.  None of the statements were addressed to Madoff personally.  *See* Neiburg Decl., Ex. 4 (Exemplar BLMIS Bank Statements 1998-2008); Dubinsky Decl., Attach. A (Dubinsky Report) ¶ 340, Exs. 31–32.

89.     At all times after January 1, 2001, the JP Morgan Accounts were owned by BLMIS.  Neiburg Decl., Ex. 2 (2001 SEC Amended Form BD).

### E.      The Plea Allocutions

90.     The plea allocutions of Madoff and BLMIS employees Frank DiPascali, David Kugel, Irwin Lipkin, Eric Lipkin, and Enrica Cotellessa-Pitz (attached to the Neiburg Decl. as Exhibits 5–10) further establish that BLMIS did not conduct legitimate operations from its IA Business.

### Bernard L. Madoff

91.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal action filed against him by the United States Attorney for the Southern District of New York.  *See* Neiburg Decl., Ex. 5 (Plea Allocution of Bernard L. Madoff, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (the "Madoff Allocution") (ECF No. 57)).

92.     At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  *Id.* at 23:14–23.

93.     Madoff further testified at the plea hearing that he never invested his clients' funds in securities, that he used funds on hand in the JP Morgan account to pay customer

redemptions, and that he created false trading confirmations and client account statements to

cover up the fact that he had not executed trades on behalf of BLMIS investment advisory

clients.  Madoff stated:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options, and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false for many years.  Up until I was arrested on December 11, 2008, I never invested these funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.  The victims of my scheme included individuals, charitable organizations, trusts, pension funds, and hedge funds.

*Id.* at 24:9–24.

94.     Beginning in the early 1990s, Madoff represented to IA Business customers that

he was using a split strike conversion strategy based on blue-chip securities.  *Id.* at 25:18–24.

95.     Madoff further detailed his strategy as follows:

> Through the split strike conversion strategy I promised to clients and prospective clients that client funds would be invested in a basket of common stocks within the Standard & Poors 100 index, a collection of the 100 largest publicly-traded companies in terms of their market capitalization.  I promised that I would select a basket of stocks that would closely mimic the price movements of the Standard & Poors 100 index.  I promised that I would opportunistically time those purchases and would be out of the market intermittently, investing client funds during these periods in United States Government-issued securities, such as United States Treasury bills.  In addition, I promised that as part of the split strike conversion strategy, I would hedge the investments I made in the basket of common stocks by using client funds to buy and sell option contracts related to those stocks, thereby limiting the potential client losses caused by unpredictable changes in stock prices.  In fact, I never made those investments I promised clients, who believed they were invested with me in the split strike conversion strategy.

*Id.* at 25:25–26:18.

96.     BLMIS investment advisory customers received account statements from BLMIS

that purported to reflect securities transactions and investment returns that appeared as though

their investments with BLMIS were profitable.  Madoff explained:

> To further cover up the fact that I had not executed trades on behalf of my
> investment advisory clients, I knowingly caused false trading confirmations and
> client account statements that reflected the bogus transactions and positions to be
> created and sent to clients purportedly involved in the split strike conversion
> strategy, as well as other individual clients I defrauded who believed they had
> invested in securities through me.

*Id.* at 27:9–16.

97.     Madoff stated that the proprietary trading and market making businesses were

engaged in legitimate trading.  *Id.* at 25:6–11.

98.     Madoff also stated that funds from his investment advisory business were

transferred to the proprietary trading and market making businesses, via his affiliated London

entity.  *Id.* at 29:12–22.

**Frank DiPascali**

99.     At a plea hearing on August 11, 2009, in the case captioned *United States v.

DiPascali*, No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to

a ten-count criminal action charging him with, *inter alia*, participating in and conspiring to

perpetuate the Ponzi scheme.  *See* Neiburg Decl., Ex. 6 (Plea Allocution of Frank DiPascali, Jr.,

*United States v. DiPascali*, No. 09-CR- 764 (RJS) (S.D.N.Y. Aug. 11, 2009) (the "DiPascali

Allocution") (ECF No. 12)).  Mr. DiPascali confirmed Madoff's explanation of the split-strike

conversion strategy and that BLMIS never engaged in the strategy or executed the purported

trades reported on customer statements.  DiPascali stated:

> By the early 1990s Bernie Madoff had stable clients whose accounts he managed
> as an investment adviser.  He attracted a lot of these clients by telling them that
> the firm would apply a hedged investment strategy to their money.  The clients
> were told that the strategy involved purchasing what we call basket of blue chip

common stocks.  Hedging those investments by buying and selling option
contracts, getting in and out of the market at opportune times and investing in
government securities at other times…. From at least the early 1990s through
December of 2008, there was one simple fact that Bernie Madoff knew, that I
knew, and that other people knew but that we never told the clients nor did we tell
the regulators like the SEC.  No purchases of [sic] sales of securities were actually
taking place in their accounts.  It was all fake.  It was all fictitious.  It was wrong
and I knew it was wrong at the time, sir.

Neiburg Decl. Ex. 6 (DiPascali Allocution) at 45:21–46:15.

100.    At the plea hearing, DiPascali testified that he had been instructed to falsely

represent to clients that security trading was occurring in their investment accounts when in fact,

no trades were being made.  DiPascali explained:

From our office in Manhattan at Bernie Madoff's direction, and together with
others, I represented to hundreds, if not thousands, of clients that security trades
were being placed in their accounts when in fact no trades were taking place at all.

Id. at 46:21–25.

Most of the time the clients' money just simply went into a bank account in New
York that Bernie Madoff controlled.  Between the early '90s and December '08 at
Bernie Madoff's direction, and together with others, I did [the] follow[ing] things:
On a regular basis I told clients over the phones and using wires that transactions
on national securities exchanges were taking place in their account when I knew
that no such transactions were indeed taking place.  I also took steps to conceal
from clients, from the SEC, and from auditors the fact that no actual security
trades were taking place and to perpetuate the illusion that they actually were.  On
a regular basis I used hindsight to file historical prices on stocks then I used those
prices to post purchase of sales to customer accounts as if they had been executed
in realtime.  On a regular basis I added fictitious trade data to account statements
of certain clients to reflect the specific rate of earn return that Bernie Madoff had
directed for that client.

Id. at 47:5–22.

***… I knew no trades were happening. I knew I was participating in a
fraudulent scheme. I knew what was happening was criminal and I did it anyway.

Id. at 52:2–5.

**David Kugel**

101.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal action charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  *See* Neiburg Decl., Ex. 7 (Plea Allocution of David L. Kugel, *United States v. Kugel*, No. 10- CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011) (the "Kugel Allocution") (ECF No. 188)).

102.    As far as back as the 1970s, there is no evidence that the purported investment transactions reflected in the customer statements of BLMIS's IA Business customers ever occurred, and in fact the evidence reveals that those transactions did not and could not have occurred.  *See* Neiburg Decl., Ex. 7 (Kugel Allocution) at 32:4–12 ("Specifically, beginning the early '70s, until the collapse of BLMIS in December 2008, I helped create fake, backdated trades.  I provided historical trade information . . . to create fake trades that, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred.").

**Irwin Lipkin**

103.    At a plea hearing on November 8, 2012, in the case captioned *United States v. Irwin Lipkin*, No. 10-CR-228 (LTS), Irwin Lipkin, a former BLMIS accountant, pleaded guilty to a two-count criminal action charging him with securities fraud, falsifying the records of BLMIS, and making false statements in relation to documents required by ERISA.  *See* Neiburg Decl., Ex. 8 (Plea Allocution of Irwin Lipkin, *United States v. Irwin Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 8, 2012) (the "Irwin Lipkin Allocution") (ECF No. 288)).  Mr. Lipkin admitted that BLMIS's revenue was falsely inflated through fraudulent bookkeeping entries and annual audited reports.  *Id.* at 30:23–31:3, 31:10–18, 31:24–32:5.

**Eric S. Lipkin**

104.    At a plea hearing on June 6, 2011, in the case captioned *United States v. Eric S.*
*Lipkin*, No. 10-CR-228 (LTS), Eric Lipkin, a former BLMIS payroll clerk, pleaded guilty to a
six-count criminal action charging him with bank fraud, falsifying the records of BLMIS,
conspiracy, and making false statements to facilitate a theft concerning ERISA.  *See* Neiburg
Decl., Ex. 9 (Plea Allocation of Eric S. Lipkin, *United States v. Eric S. Lipkin*, No. 10-CR-228
(LTS) (S.D.N.Y. June 6, 2011) (the "Eric Lipkin Allocution") (ECF No. 148)).

105.    Mr. Eric Lipkin admitted that BLMIS created fake reports that replicated those of
the DTC, which provides clearance for nearly all equity, bond, government securities, mortgage-
backed securities, money market instruments, and over-the-counter derivative transactions in the
U.S. Market.  The purpose of these fake DTC reports was to purportedly confirm non-existent
positions in the IA accounts, and the fake reports were given to auditors and the SEC to mislead
them.  *Id.* at 32:4–10, 33:22–34:8.

**Enrica Cotellessa-Pitz**

106.    At a plea hearing on December 19, 2011, in the case captioned *United States v.*
*Cotellessa-Pitz*, No. 10-CR-228 (LTS), Enrica Cotellessa-Pitz, a former BLMIS accountant and
comptroller, pleaded guilty to a four-count criminal action charging her with conspiracy to
falsify the records of BLMIS, conspiracy to obstruct the IRS in the collection of income taxes,
and conspiracy to make false filings with the SEC.  *See* Neiburg Decl.. Ex. 10 (Plea Allocation
of Enrica Cotellessa-Pitz, *United States v. Cotellessa-Pitz*, No. 10-CR-228 (LTS) (S.D.N.Y. Dec.
19, 2011) (the "Cotellessa-Pitz Allocution") (ECF No. 1512)).

107.    Ms. Cotellessa-Pitz admitted that IA Business customer money was funneled to
BLMIS's proprietary trading and market making businesses to falsely inflate their revenue and
hide their losses.  Neiburg Decl., Ex. 10 (Cotellessa-Pitz Allocution) at 31:12–32:12.

### III.    The BLMIS Transactions in the Account

108.    Ken-Wen was a brokerage customer of BLMIS's investment advisory business and held an account at BLMIS under the name "Ken-Wen Family LP LTD," bearing account number 1EM226 (the "Account"). *See* Ken-Wen Answer to Am. Compl., ECF No. 89, ¶ 8; *see also* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at 23:15-24:3.  The Defendants opened the Account on January 4, 1993, by means of a principal transfer of $340,000.  *See* Neiburg Decl., Ex. 12 (BLMIS Account No. 1EM226 – Ken-Wen Family LP LTD Account Record).

109.    Ken-Wen was a limited partnership formed under the laws of the state of Florida. Its principal place of business is located at 270 South County Road, Palm Beach, Florida 33480. Ken-Wen Answer to Am. Compl., ECF No. 89, ¶ 8.

110.    Defendant Kenneth W. Brown was a general partner of Defendant Ken-Wen and maintains his residence in Lantana, Florida.  *Id.* ¶ 9; *see also* Neiburg Decl., Ex. 11 (Brown Dep. Tr.), at 15:17-19.

111.    Although BLMIS statements reflect a higher transaction amount, a portion of the transferred funds consisted of unavailable principal, and thus could not be transferred.  *See* Declaration of Matthew B. Greenblatt, dated December 1, 2021, and filed contemporaneously herewith ("Greenblatt Decl."), Attach. B (Ken-Wen Expert Report of Matthew B. Greenblatt) (the "Greenblatt Ken-Wen Report"), ¶¶ 9, 14–17; Greenblatt Ken-Wen Report at Ex. 4B; *see also* Neiburg Decl., Ex. 12 (BLMIS Account No. 1EM226 – Ken-Wen Family LP LTD Account Record).  Ken-Wen made eighteen (18) subsequent cash deposits between August 31, 1993, and February 26, 1998, totaling $938,000.  *See* Greenblatt Decl., Attach B. (Greenblatt Ken-Wen Report), ¶ 19; *see also* Neiburg Decl., Ex. 12 (BLMIS Account No. 1EM226 – Ken-Wen Family LP LTD Account Record).  The initial transfer of approximately $340,000 and the eighteen (18) subsequent cash deposits, equaling $1,278,000, represents the only principal deposited into the

Account between January 4, 1993, and December 11, 2008. *See* Greenblatt Decl., Attach B. (Greenblatt Ken-Wen Report), ¶ 20, Ex. 3; *see also* Neiburg Decl., Ex. 12 (BLMIS Account No. 1EM226 – Ken-Wen Family LP LTD Account Record). Ken-Wen did not make any subsequent deposits to the Account after February 26, 1998. *Id.* From January 4, 1993, through November 17, 2008, Ken-Wen withdrew $7,001,000 from the account, $5,723,000 of which consisted of fictitious profits. *See* Greenblatt Decl., Attach B. (Greenblatt Ken-Wen Report), ¶ 22, Ex. 4B. Within the two year period before the liquidation (the "Two-Year Period"), Ken-Wen made four (4) withdrawals of fictitious profits from the Account, totaling $3,850,000 (the "Fraudulent Transfers"). *Id.*, *see also* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at 88:9-91:2.

112.    Three of the Fraudulent Transfers were made from the Ken-Wen Account at BLMIS to a bank account that Ken-Wen held at Paradise Bank (the "Paradise Account"). *See* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at 88:20-91:17. The only persons with access to the Paradise Bank account were Mr. Brown and Ms. Werner (f/k/a Wendy Brown). *Id.* at 91:10-17. The fourth transfer was made from the Ken-Wen Account at BLMIS to a bank account that Ken-Wen held at Bank of America (the "Bank of America Account"). *See* Neiburg Decl., Ex. 24 (Werner Dep. Tr.) at 99:4-100:23. One hundred percent (100%) of the monies transferred by each of the four (4) transfers were traced to the Paradise Account and the Bank of America Account. *See* Collura Decl., Attach. B (Collura Ken-Wen Report) ¶ 13, Ex. 6.

113.    The first of these transfers was the June 26 Transfer. Mr. Brown initiated the June 26 Transfer by making a request to BLMIS, which he signed as the general partner of Ken-Wen, to wire $150,000 to the Ken-Wen account at Paradise Bank. *See* Neiburg Decl., Ex. 15 (Mr. Brown's request for $150,000 in the June 26 Transfer); *see also* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at 57:15-58:22; 60:14-62:7. Mr. Brown subsequently amended this request for

the funds to be transferred via check, not wire. *See* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at

60:14-62:7. Madoff forwarded check number 186272 from the 509 Account to Ken-Wen for

$150,000 made payable to Ken-Wen Family LP Ltd., which was endorsed only with the Paradise

Account number and deposited into the Paradise Account. *See* Neiburg Decl., Ex. 16 (Cancelled

Check for $150,000 evidencing receipt of the June 26 Transfer); *see* Collura Decl., Attach. B

(Collura Ken-Wen Report), Ex. 6; *see also* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at 57:15-

58:22; 60:14-62:7.

114.    The second transfer was the December 31 Transfer. Mr. Brown initiated the

December 31 Transfer by making a request to BLMIS, which he signed as the general partner of

Ken-Wen, to wire transfer $500,000 to the Ken-Wen account at Paradise Bank. *See* Neiburg

Decl., Ex. 17 (Mr. Brown's request for the December 31 Transfer); *see also* Neiburg Decl., Ex.

11 (Brown Dep. Tr.) at 69:5-70:1. The BLMIS December 2007 JP Morgan account statement

reflects the outgoing wire transfer to the Paradise Account. *See* Neiburg Decl., Ex. 18 (703

Account December 2007 Statement), at JPMSAB0003455; *see also* Neiburg Decl., Ex. 11

(Brown Dep. Tr.) at 63:9-64:10; 68:24-70:1. The Trustee confirmed that the wire transfer

originated from the 703 Account and was sent to the Paradise Account. *See* Collura Decl.,

Attach. B (Collura Ken-Wen Report) ¶ 24, Ex. 6 (utilizing a "receiving bank analysis" to confirm

that Ken-Wen in fact received the December 31 Transfer).

115.    The third transfer was the January 24 Transfer. Mr. Brown initiated the January

24 Transfer by making a request to BLMIS, which he signed as the general partner of Ken-Wen,

to liquidate $3,000,000 to the Ken-Wen account at Paradise Bank. *See* Neiburg Decl., Ex. 19

(Mr. Brown's request to liquidate $3,000,000 via wire in the January 24 Transfer). The BLMIS

January 2008 JP Morgan account statement reflects the outgoing wire transfer to the Paradise

Account. *See* Neiburg Decl., Ex. 20 (703 Account January 2008 Statement) at

JPMSAB0004178. This JPMorgan Chase account was held in the name of BLMIS and denotes a

transfer in the amount of $3,000,000 to Ken-Wen. *See also* Neiburg Decl., Ex. 11 (Brown Dep.

Tr.) at 70:20-71:14. The Trustee confirmed that the wire transfer originated from the 703

Account and was sent to the Paradise Account. *See* Collura Decl., Attach. B (Collura Ken-Wen

Report) ¶ 24, Ex. 6 (utilizing a "receiving bank analysis" to confirm that Ken-Wen in fact

received the January 24 Transfer).

116.    Finally, the fourth transfer was the November 17 Transfer. Mr. Brown initiated

the November 17 Transfer by making a request to BLMIS, which he signed Kenneth W. Brown

FLP, to send a check in the amount of $200,000 made payable to Ken-Wen FLP Ltd to 405 SW

Atlantic Drive, Lantana, FL 33462, which he identified as a family address. *See* Neiburg Decl.,

Ex. 21 (Mr. Brown's request for $200,000 in the November 17 Transfer). Although Mr. Brown

testified he was not a general partner of Ken-Wen at the time, he initiated the request in the same

manner as the previous three Fraudulent Transfers—hand written note to BLMIS—and he signed

the request as "Kenneth Brown FLP." *Id.*, *see also* Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at

77:20-79:18. Madoff sent check number 201790 from the 509 Account to Ken-Wen in the

amount of $200,000 made payable to Ken-Wen Family LP LTD, which was endorsed as "Ken-

Wen Family" and deposited into the Bank of America Account. *See* Neiburg Decl., Ex. 22

(Cancelled check for $200,000 evidencing receipt of the November 17 Transfer); *see also*

Neiburg Decl., Ex. 24 (Werner Dep. Tr.) at 99:7-100:23.

117.    Mr. Brown testified that these funds, totaling $3.8 million, were subsequently

transferred to an offshore trust account titled "South Pack [sic]." *See* Neiburg Decl., Ex. 11

(Brown Dep. Tr.) at 73:8-74:4. From the Southpac account, the funds were then transferred back

to an attorney in the United States to be held in escrow.  *See* Neiburg Decl., Ex. 24 (Werner Dep.

Tr.) at 88:9-90:11.  Ms. Werner testified that the purpose of the transfer was to repay a loan that

Mr. Brown owed to the Harvey Werner Marital Trust 2 in connection with the satisfaction of a

$6.2 million United States Securities and Exchange Commission judgment against Mr. Brown

that was scheduled to become due in March 2008.  *Id.* at 90:12-94:25.

118.    Defendants do not dispute the date, receipt, or amount of the Fraudulent

Transfers.  Ken-Wen Answer to Am. Compl., ECF No. 89, ¶¶ 38, 43 (citing Ex. B to Am.

Compl.); Neiburg Decl., Ex. 13 (Ken-Wen Response to Trustee's Requests for Admission),

Answer to Admission No. 4; Neiburg Decl., Ex. 11 (Brown Dep. Tr.) at 57:15-58:22; 60:14-

62:7; 63:9-64:10; 68:24-70:1; 70:20-71:14, 77:20-79:15 (acknowledging the Fraudulent

Transfers).

### A.    Analysis of the Account

119.    Lisa Collura was retained by the Trustee to reconcile the cash transactions

reflected on the statements of the BLMIS customer accounts with available records and trace the

flow of those funds.  *See* Collura Decl., Attach. A (Collura Report) ¶ 7; Collura Decl., Attach. B

(Collura Ken-Wen Report) ¶ 6.

120.    For both reconciliation and tracing analyses, Ms. Collura reviewed available

third-party bank records.  These bank records include hundreds of thousands of pages of BLMIS

bank statements, wire transfer data, cancelled checks, and deposit slips.  Collura Decl., Attach. A

(Collura Report) ¶ 10.

121.    The reconciliation of the customer statements and bank records was conducted to

determine whether the cash transactions on the BLMIS customer statements were accurately

reflected as cash transactions—cash deposits or cash withdrawals.  *Id.* ¶¶ 15, 31.

122.    Ms. Collura confirmed that the deposit and withdrawal transactions identified on

the BLMIS customer statements corresponded to transactions on the available third-party bank

records in the same amount, on or around the same date, and to or for the benefit of the same

customer.  *Id.* ¶ 22; Collura Decl., Attach. B (Collura Ken-Wen Report) ¶ 13.

123.    Ms. Collura reviewed over 225,000 transactions on the customer statements, and

over 150,000 transactions on the bank records.  She kept track of these transactions by assigning

a unique identifier to each of the cash transactions on the customer statements and a different

unique identifying number to all of the transactions in the bank records.  Collura Decl., Attach. A

(Collura Report) ¶¶ 10, 23.

124.    Of the over 225,000 transactions reflected on BLMIS customer statements from

December 1998 to December 2008, Ms. Collura was able to reconcile 99.01% of these cash

transactions to BLMIS bank records.  *Id.* ¶¶ 15, 31.

125.    For Ms. Collura's reconciliation analysis with respect to Defendants, she analyzed

the cash transactions in the Account from January 1993 to December 2008.  During this time

period, the customer statements for the Account reflected 31 cash deposit and withdrawal

transactions, thirteen of which occurred in the ten-year period, December 1998 to December

2008, for which there were available BLMIS records.  Collura Decl., Attach. B (Collura Ken-

Wen Report) ¶¶ 14–16.

126.    Ms. Collura reconciled both cash transactions reflected on the customer

statements for the Account to available BLMIS bank records, documentation contained in

BLMIS customer files, and/or documents produced to the Trustee related to the Account.  *Id.*

¶¶ 14–21, Ex. 6; *see also* Ex. B. to Am. Compl.

127.    Based on her review of documents contained in the customer files maintained at

BLMIS for the Account, Ms. Collura did not find any instance of Defendants communicating to

BLMIS any disagreement with respect to the accuracy of any cash transaction reflected on the

customer statements for the Account.  Collura Decl., Attach. B (Collura Ken-Wen Report) ¶¶ 20,

23.

128.    For Ms. Collura's tracing analysis with respect to Defendants, she analyzed the

four cash withdrawals from the Account during the Two-Year Period, totaling $3,850,000.  *Id.*

¶¶ 25–29, Collura Decl., Attach. B (Collura Ken-Wen Report), Ex. 5.

129.    Based on available bank records from BLMIS, she traced 100% of the total

amount of cash withdrawals reflected on the customer statements for the Account during the

Two-Year Period to bank accounts held by or for the benefit of Defendants.  *Id.*

130.    Matthew Greenblatt oversaw the task of reconstructing BLMIS's books and

records and calculating the principal balance for each BLMIS account (the "Principal Balance

Calculation").  Mr. Greenblatt calculated the ending principal balance by applying the Net

Investment Method (the Trustee's cash in/cash out net equity methodology), which takes into

account all of the customer deposits as additions to principal and all of the customer withdrawals

or inter-account transfers as reductions to principal.  *See* Greenblatt Decl., Attach. A (Expert

Report of Matthew G. Greenblatt, CPA/CFF, CFE dated November 15, 2012 ("Greenblatt

Report")) ¶¶ 4–5; *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re

Bernard L. Madoff Inv. Sec.)*, 424 B.R. 122, 124 (Bankr. S.D.N.Y. 2010) (endorsing Trustee's

use of the Net Investment Method) *aff'd* by 654 F.3d 229 (2d Cir. 2011).

131.    Mr. Greenblatt prepared a chronological listing of cash and principal transactions

reflected in the BLMIS customer statements.  Mr. Greenblatt relied on the customer statements

because they are the most comprehensive and complete accounting of the debtor's books and records with respect to transaction-by-transaction line item detail of the cash and principal transactions and because the customer statements were sent to customers, giving customers the opportunity to correct errors on the statements.  Greenblatt Decl., Attach. A (Greenblatt Report) ¶¶ 10–12, 40–43.

132.    Mr. Greenblatt explained that the Principal Balance Calculation covers the time period from April 1, 1981 through December 11, 2008, an approximately 27-year period for which Mr. Greenblatt had BLMIS's books and records.  *Id.* ¶ 5.  The first monthly customer statement which reported dollar amounts for any securities allegedly held at month end was March of 1981.  Therefore, the full period in which the Principal Balance Calculation could be performed covered the time period from April 1, 1981 through December 11, 2008.  *Id.* ¶ 5 n.1.

133.    For Mr. Greenblatt's analysis with respect to Defendants, his Principal Balance Calculation covered the period from the Account opening through November 2008.  *See* Greenblatt Decl., Attach B. (Greenblatt Ken-Wen Report), ¶¶ 7–12.

    **i.    *Principal Balance Calculation for the Account***

134.    Mr. Greenblatt determined that on January 4, 1993, the Account was opened with an inter-account transfer of $535,163, of which $340,000 was principal from BLMIS Account 1E0002.  *Id.* ¶¶ 13–17, Exs. 3A, 4A, 4B.

135.    In sum, this one inter-account transfer provided the Account with its only transfer of principal in the amount of $340,000.  Subsequent to the initial inter-account transfer, Ken-Wen made eighteen (18) subsequent cash deposits into the Account, totaling $938,000.  The total amount of principal transferred and deposited into the Account equaled $1,278,000.  *Id.* ¶¶ 18, 19, 20.

136.    Between January 4, 1993 and December 11, 2008, the Account reflected a total of 13 cash withdrawals totaling $7,001,000, which consisted of both principal and fictitious profits. *Id.* ¶¶ 21–22.

137.    The Principal Balance Calculation for the Account demonstrated that between January 4, 1993 and December 11, 2008, $7,001,000 was withdrawn from BLMIS, which consisted of $1,278,000 of principal and an additional $5,723,000 of funds withdrawn in excess of principal, representing fictitious profits over the life of the Account. *Id.* ¶ 22.

138.    Within the Two-Year Period prior to December 11, 2008, $3,850,000 of fictitious profits were withdrawn from the Ken-Wen Account. *Id.*, Ex. 4B.


Dated:  December 1, 2021           YOUNG CONAWAY STARGATT &
New York, New York                 TAYLOR, LLP

                                   */s/ Michael S. Neiburg*
                                   Matthew B. Lunn
                                   Michael S. Neiburg (admitted *pro hac vice*)
                                   Justin P. Duda
                                   Rockefeller Center
                                   1270 Avenue of the Americas, Suite 2210
                                   New York, New York 10020
                                   Telephone:  (212) 332-8840
                                   Facsimile: (212) 332-8855
                                   Email:  *mlunn@ycst.com*
                                           *mneiburg@ycst.com*
                                           *jduda@ycst.com*

                                   *Attorneys for Plaintiff Irving H. Picard,*
                                   *Trustee for the Liquidation of Bernard L.*
                                   *Madoff Investment Securities LLC*