# EXHIBIT 11

```
              UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF NEW YORK
                Adv. Pro. No. 08-01789(SMB)
                Adv. Pro. No. 10-04468(SMB)

SECURITIES INVESTOR PROTECTION
CORPORATION,
          Plaintiff-Applicant,
 v.
BERNARD L. MADOFF INVESTMENT
SECURITIES, LLC,
          Defendant.
- - - - - - - - - - - - - - - - - - x
In re:
BERNARD L. MADOFF,
          Debtor.
- - - - - - - - - - - - - - - - - - x
IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff
Investment Securities, LLC,
          Plaintiff,
v.
KEN-WEN FAMILY LIMITED PARTNERSHIP;
KENNETH W. BROWN, in his capacity
as a General Partner of the
Ken-Wen Family Limited Partnership;
and WENDY BROWN,
          Defendants.
- - - - - - - - - - - - - - - - - - x
                  DEPOSITION OF
                KENNETH WILLIAM BROWN
          Taken on Behalf of the Plaintiff
          DATE TAKEN:  Monday, January 27, 2020
          TIME:  10 a.m. - 12:30 p.m.
          PLACE:  Daughters Reporting, Inc.
                  101 Northeast 3rd Avenue
                  Suite 1500
                  Fort Lauderdale, Florida 33301


       Examination of the witness taken before:

             Felecia Curreri, RPR
            Daughters Reporting, Inc.
             101 Northeast 3rd Avenue
                  Suite 1500
           Fort Lauderdale, Florida 33301
```

2

```
 1    APPEARANCES:

 2    Appeared for the Plaintiff

 3         Young Conaway Stargatt & Taylor, LLP
           1000 North King Street
 4         Wilmington, DE 19801
           BY:  JACYLN C. MARASCO, ESQUIRE
 5         Tel:  302-571-6741
           Email:  jmarasco@ycst.com

 6

 7

 8    Appeared for the Defendant KENNETH W. BROWN

 9         Law Office of Mark S. Roher
           150 S. Pine Island Road
10         Suite 300
           Plantation, Florida 33324
11         BY:  MARK S. ROHER, ESQUIRE
           Tel:  954-353-2200
12         Email:  mroher@markroherlaw.com

13

14
      Appeared for the Defendant WENDY BROWN
15
           Bernfeld, DeMatteo & Bernfeld, LLP
16         600 Third Avenue
           15th Floor
17         New York, New York 10016
           BY:  DAVID B. BERNFELD, ESQUIRE
18         Tel:  212-661-1661
           Email:  davidbernfeld@bernfeld-dematteo.com
19

20

21    Also Present:

22         WENDY BROWN

23

24                          -   -   -

25
```

```
 1              (Plaintiff's Exhibit 1, Agreement, was
 2         marked for identification.)
 3    BY MS. MARASCO:
 4         Q.   Do you recognize this document?
 5         A.   Yes.
 6         Q.   What is it?
 7         A.   This is the limited partnership agreement,
 8    as it says, for Ken-Wen Family Limited Partnership.
 9         Q.   Do you see a date on that document?
10         A.   June 14, 2000.
11         Q.   If you'll turn to the last page.  Do you
12    see your signature on this document?
13         A.   Yes, that's my signature.
14         Q.   And in what capacity did you sign the
15    document?
16         A.   General partner.
17         Q.   So it's accurate to say that you were a
18    general partner of Ken-Wen?
19         A.   Yes.
20         Q.   And then on that same page to the right,
21    do you see Wendy Brown's signature?
22         A.   I do.
23         Q.   Was Wendy also a general partner?
24         A.   Yes.
25         Q.   Other than Wendy and you, were there ever
```

```
 1        Ms. Werner and Mr. Bernfeld; is that correct?
 2             MR. BERNFELD:  Correct.
 3             MS. MARASCO:  We'll just go off the record
 4        very briefly.
 5             (Discussion held off the record).
 6             MS. MARASCO:  I'm ready to go back on the
 7        record.  All set?  Okay.
 8   BY MS. MARASCO:
 9        Q.  We are back on the record.  It's
10   10:26 a.m.
11             We just completed discussions about the
12   partnership agreement.  You can put that to the
13   side for now.  I don't have anymore questions for
14   that document at this time.
15             We just discussed that Ken-Wen had an
16   investment account at BLMIS; is that correct?
17        A.  Yes.
18        Q.  And we discussed that Ken-Wen held that
19   account in the partnership name; is that correct?
20        A.  Yes.
21        Q.  Okay.  And you may have mentioned this
22   before, but do you recall the account number?
23        A.  No.
24        Q.  Okay.  Was there more than one account?
25        A.  No.
```

```
 1        Q.    Did you ever use the account in connection

 2   with the operations of the partnership?

 3        A.    No.

 4        Q.    And when I say "use the account," what do

 5   you understand that to mean?

 6        A.    The account was inactive in any other

 7   function other than for the investment account with

 8   the Madoff firm, which was passively done.  It was

 9   not operated by myself or anyone else, other than

10   Madoff had full discretion.

11            MS. MARASCO:  Okay.  I am going to hand to

12       the court reporter and ask her to mark two

13       exhibits.  One is Mr. Brown's answer to the

14       amended complaint and the other one is Wendy

15       Brown, a/k/a Wendy Werner's answer to the

16       complaint.  I'll ask them to be marked as

17       Exhibits 2 and 3, respectively.

18            (Plaintiff's Exhibit 2, Ken Brown's

19       Answer, was marked for identification.)

20            (Plaintiff's Exhibit 3, Wendy Brown's

21       Answer, was marked for identification.)

22            MR. ROHER:  Which one is two?

23            MS. MARASCO:  Two is the one on top.  It

24       is Mr. Brown's.

25   BY MS. MARASCO:
```

1       A.   I see that.

2       Q.   And you said you recognized your

3  handwriting.  Do you also see your signature at the

4  bottom of the page?

5       A.   Yes, I also see Wendy Brown's signature.

6       Q.   And you see her signature right beneath

7  yours, right?

8       A.   Yes.

9       Q.   So looking at this document now, do you

10  have any understanding of what the purpose of this

11  document might be?

12       A.   I had no idea when this document was

13  signed and sent.

14       Q.   If you look at the last paragraph, it

15  says, "Bernard L. Madoff Investment Securities,

16  a/k/a BLMIS, is instructed to direct all notices or

17  communications, including demands, notices,

18  confirmations, reports and statements of account

19  for the partnership in connection with the

20  partnership account as follows."

21            Did I read that correctly?

22       A.   Yes.

23       Q.   Did you receive notices or communications

24  from BLMIS?

25       A.   Yes.  Madoff Securities would have had to

1    open the account with the Ken-Wen partnership

2    agreement.  So -- and the address in which they

3    would have sent their reports, notices and

4    statements would have been 405 Southwest Atlantic.

5        Q.   Was that a personal address or was that a

6    business address?

7        A.   That was a family address.

8        Q.   When demands, notices or confirmations or

9    reports or any of those things were sent to this

10   address, is it your testimony that you reviewed

11   those documents?

12       A.   Well, I went -- at the time I received the

13   notices and documents at the time I was living

14   there, I may have reviewed them, but it wasn't

15   anything other than just a cursory, casual review,

16   because we had no decision making power over the

17   account.

18       Q.   How long did you reside at the address 405

19   Southwest Atlantic Drive?

20       A.   I think I had left after a hurricane,

21   2005, maybe 2006.

22       Q.   Did you ever change your address with the

23   BLMIS?

24       A.   No.

25       Q.   Did you ever -- after leaving that address

1    in 2005, did you subsequently obtain a different

2    address?

3         A.   I did.

4         Q.   And did you ask BLMIS to send

5    communications to that new address?

6         A.   No, I did not.  I had no reason to.

7         Q.   You can put that document to the side.

8              I'm going to hand another document to the

9    court reporter and this will be Exhibit 5.

10             (Plaintiff's Exhibit 5, Tax Information,

11        was marked for identification.)

12   BY MS. MARASCO:

13        Q.   Here you go (handing).

14             Sir, I've handed you a document marked as

15   Exhibit 5.  At the top it says "important new tax

16   information."

17             Have you seen this document before?

18        A.   I signed it, so I must seen it, but I

19   don't know anything about it.

20        Q.   If you take a second to look at it, would

21   that help?

22        A.   No.

23        Q.   Does this document appear to be dated?

24        A.   No.

25        Q.   Looking at this document, do you have any

1    one separated earned assets from essentially the

2    inherited assets or transferred assets.

3        Q.   Why might Ken-Wen have bought insurance

4    policies?

5        A.   At the time I think we bought a

6    substantial life insurance policy on Violet Werner.

7    May have -- retirement planning or estate planning.

8    That's the only thing we were doing.  That's what

9    that money was for, retirement planning and estate

10   planning.

11       Q.   And golf courses?

12       A.   No.  I don't think so.  I said the golf

13   courses, I believe, were KBCB, but then again, you

14   know, you're helping me, reminding me of things, so

15   it's nothing intentional.

16       Q.   I'm going to hand another document to the

17   court reporter, if she'll please mark it as

18   Exhibits 10.

19            (Plaintiff's Exhibit 10, Fax, was marked

20       for identification.)

21   BY MS. MARASCO:

22       Q.   Have you seen this document before?

23       A.   I assume I did, because it's in my

24   handwriting again.

25       Q.   Okay.  And did you sign this document?

```
 1        A.   I did.

 2        Q.   And you signed it in your capacity as a

 3   GP, correct?

 4        A.   Right.  I don't see any date on it,

 5   though.

 6        Q.   Do you see the fax number at the top of

 7   the page?

 8        A.   Yes.

 9        Q.   And to whom is this fax addressed?

10        A.   Frank at Madoff Securities.

11        Q.   And do you see the account number there?

12        A.   I do.

13        Q.   What account number is that?

14        A.   1EM226-3- -- it looks like zero.

15        Q.   And this is a request to wire 150,000 and

16   it looks like there was a request that it be sent

17   to Paradise Bank?

18        A.   Yes.

19        Q.   And that appears to be crossed out; is

20   that correct?

21        A.   There's an X through it.  Why, I don't

22   know.  There's other writing here.  It says, "spoke

23   to client, no wire."

24        Q.   And what's the -- you see 6-21 written

25   after that?
```

```
 1        A.   Yeah, it's not in my handwriting.  I don't
 2   know what that is.
 3        Q.   Did Ken-Wen ever switch from using RBC
 4   Santora to Paradise Bank?
 5        A.   We may have switched or we may just had
 6   the accounts setup simultaneously.  Like I said, we
 7   had different banks that we worked with and this, I
 8   think, was business practices, different.
 9        Q.   And if they were in existence
10   simultaneously, why might the request be for
11   deposit into Paradise Bank instead of RBC?
12        A.   For whatever reason it was at the time, I
13   don't know.  It's, like I said, it's been a while,
14   so I don't know.
15        Q.   To your recollection, was the Paradise
16   Bank account also held by the Ken-Wen partnership?
17        A.   I believe so, because he has an account
18   number there.
19        Q.   And then it -- the deposit request, it
20   says, "To Ken-Wen Family Limited Partnership," is
21   that correct?
22        A.   Yes.
23        Q.   Okay.  Who may have had access to the
24   Paradise Bank account?
25        A.   Wendy Brown and Ken Brown.
```

1    Q.    Would anyone else have had access to the

2  Paradise Bank account?

3    A.    No.

4    Q.    Do you recall whether you received

5  contemporaneous account statements from Paradise

6  Bank?

7    A.    We got statements, sure, regularly.

8    Q.    And you do at least a cursory review of

9  them, to your recollection?

10   A.    Probably, yes.

11   Q.    Do you recall whether you executed a new

12  account control agreement?

13   A.    I don't know what you mean by that.

14   Q.    We discussed earlier that Ken-Wen had

15  pledged the account to RBC Santora; do you recall

16  that?

17   A.    I don't know if the whole account was

18  pledged or a portion of the account.  Yes, there

19  was a pledge agreement with RBC Bank, but they had

20  no influence over the account, other than there may

21  have been a securities interest at the time.  Maybe

22  the $600,000 paid them off, I don't know.

23   Q.    To your recollection, did Paradise Bank

24  ever have a security interest in the account?

25   A.    No.  Then again, I don't remember.  I'm

1    sorry, I don't remember.

2        Q.   So you mentioned earlier that this has a

3    notation that says "spoke to client, no wire," and

4    there's an X through it.

5            Do you recall speaking to someone at BLMIS

6    about this request?

7        A.   No, I don't.

8        Q.   Do you know why the funds would not be

9    wired?

10       A.   No.

11       Q.   Do you recall receiving the funds by

12   another means?

13       A.   No.

14       Q.   Okay.  I'm going to hand another document

15   to the court reporter to mark as Exhibit 11.

16           (Plaintiff's Exhibit 11, Check, was marked

17       for identification.)

18   BY MS. MARASCO:

19       Q.   Have you seen this document before?

20       A.   No.

21       Q.   Can you tell me what it is?

22       A.   It's a check.

23       Q.   From whom?

24       A.   B. L. Madoff.

25       Q.   And to whom is it addressed?

```
 1       A.    Ken-Wen Family Limited Partnership.

 2       Q.    And what is the date of the check?

 3       A.    6-26-2007.

 4       Q.    Okay.  And what is the amount of the

 5   check?

 6       A.    $150,000.

 7       Q.    Do you see a reference number in the

 8   bottom left-hand corner of the check?

 9       A.    Yes, 1EM226-3.

10       Q.    And then if you turn to the second page,

11   do you see the endorsement there?

12       A.    Yes.

13       Q.    And which bank does it appear to have been

14   deposited in?

15       A.    It looks like it's stamped Paradise Bank.

16       Q.    Why might Mr. Madoff be writing a check

17   for $150,000 to the Ken-Wen Family Limited

18   Partnership?

19       A.    Probably a distribution.

20       Q.    So when we talked about -- when we talked

21   about Exhibit 10 before, that was the fax with the

22   request for $150,000?

23       A.    Right.

24       Q.    And there was the notation that says "no

25   wire/6/21," right?
```

1        A.    Yes.

2        Q.    And here we have a check dated 6/26/2007

3    for $150,000 to Paradise Bank account.  Suggests to

4    me that the funds were sent by check instead of

5    wire; does that sound like --

6        A.    I have no reason to dispute that, sure.

7    It looks like the money was sent by check, yes.

8        Q.    Do you know why the money would be sent by

9    check as opposed to wire?

10       A.    No.

11       Q.    So when you spoke to someone at BLMIS in

12   connection with this request that we marked as

13   Exhibit 10, it says "spoke to client, no wire."

14   Did they inform you that they would not be sending

15   a wire?

16       A.    I don't know.  I don't recall any of it,

17   but, for whatever reason, the document speaks for

18   itself.  That's apparently what happened.

19       Q.    Okay.  I'm going to hand another document

20   to the court reporter.  This will be Exhibit 12.

21            (Plaintiff's Exhibit 12, Bank Statement,

22       was marked for identification.)

23            MR. ROHER:  Can we go off the record?

24            (Discussion held off the record).

25   BY MS. MARASCO:

1       Q.   Are you all right to continue, sir?

2       A.   I'm exhausted.  I'm really tired.  I

3  really want to go home and go to sleep.

4       Q.   I hear you.

5       A.   Okay.

6       Q.   Let me know if you need a break.

7       A.   No, I'm fine.

8       Q.   Thank you.

9            So this has been marked as Exhibit 12.

10  This is another account statement for BLMIS at

11  JPMorgan Chase.  The account number is 140081703.

12            Is that consistent with what you see in

13  front of you?

14       A.   It is consistent with what I see, yes.

15       Q.   What is the date on this statement that

16  you have in front of you?

17       A.   It looks like month end statement of

18  December 31st, 2007.

19       Q.   If we'll turn to Page 51, it's just about

20  the last page.

21       A.   Got it.

22       Q.   So you actually have the highlighted

23  version.  It is the $500,000 transfer.  It's in the

24  middle there.

25            Do you see where it says "12-31 fed wire

```
 1    debit via Paradise Bank AC Ken-Wen Family Limited
 2    Partnership"?
 3        A.   Right.
 4        Q.   And that's a $500,000 debit; is that
 5    correct?
 6        A.   Yes.
 7        Q.   So it's fair to say, based on this, that
 8    it looks like $500,000 was wired from BLMIS to the
 9    Paradise Bank account held by Ken-Wen?
10        A.   That's what the document says.
11        Q.   Do you recall requesting a $500,000 wire
12    in December 2007?
13        A.   No, I don't, but I just generally recall
14    that at the time of 2007 I wanted to be getting out
15    of the stock market.  I didn't like the market
16    conditions.  That's what my business was
17    forecasting, so that was probably a liquidation
18    effort to get out of the stock market.
19        Q.   When you made these requests, did you know
20    how much was left in the account?
21        A.   I had a fair idea.
22        Q.   Based on what?
23        A.   The statement.
24        Q.   So the statement that was sent to you from
25    BLMIS would reflect the balance of funds in the
```

67

1   fairly well-informed as to the value levels of the

2   account.

3       Q.   By whom would you be informed?

4       A.   Ms. Brown.  We talked.

5       Q.   Did you receive account statements as

6   well?

7       A.   Or I would go to the house and review them

8   from time to time, but the address was always 405.

9   I wasn't trying to be ignorant of them, no.  We

10  just had no decision making over them, other than

11  we could make withdrawals.  That's the only

12  decisions we could make.

13      Q.   So when you would have made a request in

14  December 2007 to withdraw $500,000 from the

15  account, would you have conferred with Ms. Brown?

16      A.   Yes.

17      Q.   Would you need her consent to make that

18  request?

19      A.   I think so.  Yes, I think, because we were

20  both general partners at the time.  Certainly if

21  there was a disagreement, then I think that there

22  would have been a disagreement, but it didn't

23  happen, so --

24      Q.   For example, what might have happened, if

25  you know, if you had made a request for a

1    withdrawal that exceeded the amount in the account?

2         A.   It would not have happened.  First of all,

3    Madoff would not have sent a withdrawal greater

4    than the amount that's in the account.  It's just

5    not going to happen in the securities business.

6         Q.   Would that have been discussed?  Would you

7    have made a phone call to determine how much was

8    left in the account?

9         A.   Probably.

10        Q.   I'm going to hand another document to the

11   court reporter to mark as Exhibit 13.

12             (Plaintiff's Exhibit 13, Fax Request, was

13        marked for identification.)

14   BY MS. MARASCO:

15        Q.   So this is going to be a little bit out of

16   order.  Put that to the side for now.  This is

17   going to be Exhibit 14.

18             (Plaintiff's Exhibit 14, Request for

19        Transfer, was marked for identification.)

20   BY MS. MARASCO:

21        Q.   So now you have what's in front of you as

22   Exhibit 14.  We'll talk about Exhibit 13 in just a

23   minute.

24             Do you recognize this document?

25        A.   Which exhibit am I on?

69

```
 1      Q.   This is 14.

 2      A.   You want me to talk about that one?

 3      Q.   Yes.

 4      A.   Okay.

 5      Q.   Do you recognize this document?

 6      A.   It's in my handwriting.

 7      Q.   Okay.  And what does it appear to be?

 8      A.   A transfer of $500,000.

 9      Q.   It's a request for a transfer of 500,000;

10  is that right?

11      A.   "Please wire transfer 500,000 to Ken-Wen

12  Family Limited Partnership."

13      Q.   Do you see the address there?

14      A.   I do.

15      Q.   And is that the address we were just

16  discussing before?

17      A.   Yes.

18      Q.   That's 405 Southwest Atlantic Drive?

19      A.   Yes.

20      Q.   To what account is the request seeking a

21  deposit?

22      A.   Ken-Wen Family Limited Partnership at

23  Paradise Bank.

24      Q.   Okay.  And you signed this document in

25  your capacity as GP; is that right?
```

```
 1        A.   I did.

 2        Q.   And then at the top in the bottom -- I'm

 3   sorry, at the top left-hand corner there's a note

 4   that says "free hand," do you see that?

 5        A.   I do.

 6        Q.   What does that mean?

 7        A.   I don't know.

 8        Q.   Is that your handwriting as well?

 9        A.   No.

10        Q.   And then in the right-hand side in that

11   big blank space there it says "3.6 million," do you

12   see that?

13        A.   I do.

14        Q.   Does that sound like that may have been

15   the balance?

16        A.   I think so.

17        Q.   And then you see the bottom, it looks like

18   a little symbol there, and it says "12/31"?

19        A.   Yes.

20        Q.   Now, I will turn to what was previously

21   marked as Exhibit 13 that everyone should have.

22   And this appears to be another fax request; is that

23   correct?

24        A.   Yes, it is.

25        Q.   And is this your handwriting?
```

```
 1        A.    Yes, it is.

 2        Q.    And to whom is the fax addressed?

 3        A.    Frank at Madoff.

 4        Q.    Do you see the reference number there?

 5        A.    Yes.

 6        Q.    What account is that?

 7        A.    Ken-Wen Family Limited Partnership.

 8        Q.    And the account number?

 9        A.    1EM226-3-0.

10        Q.    And then what does it say just beneath

11   that?

12        A.    "Please liquidate $3 million from the

13   account and wire transfer proceeds to Ken-Wen

14   Family Limited Partnership, Paradise Bank."

15        Q.    Do you recall why you made a request to

16   liquidate the account?

17        A.    Yes.

18        Q.    Why?

19        A.    I was troubled by the stock market.  I

20   wanted to get liquidity as quickly as possible and

21   at the time we decided we wanted to have greater

22   control over our moneys, rather than have a

23   discretionary account, which we had no control

24   over, if we were looking at hard times coming in

25   the marketplace, which eventually did.  It was
```

1  called the financial crisis of 2008, 2009, 2010,

2  2011, 2012.  That's why we got out of the

3  marketplace.

4      Q.   And you said you were troubled by the

5  market.  What caused you to be troubled?

6      A.   The policy at the fed and the misstated

7  conditions of our banking system.  Something called

8  subprime loans.  I can go on and on.  Our

9  disappointments over trade and the way we were not

10  being able to accomplish anything in Congress to do

11  anything about stimulating growth.

12      Q.   And you were in tune with this.  Was that

13  in connection with your business?

14      A.   Yes, yes, religiously.

15      Q.   And K. W. Brown Investments and 21st

16  Century were still operating?

17      A.   Yes.

18      Q.   Okay.  Did you tell me when they stopped

19  operating?

20      A.   March of 2008.

21      Q.   So with the request to liquidate the 3

22  million, was it your understanding that that

23  withdrawal would wipe out the account?

24      A.   I think that -- if I may proceed ahead of

25  you.  It says 3.1 down at the bottom.  I thought a

1  small residual would be there to keep the account

2  open, in case we wanted to come back.

3      Q.   And do you recall receiving the funds, the

4  $3 million in funds?

5      A.   Yes.

6      Q.   Do you recall where they were deposited?

7      A.   At Paradise Bank.

8      Q.   And what did you do with those funds?

9      A.   We had established some sophisticated

10 financial planning and estate planning by creating

11 an offshore trust so that we could trade in foreign

12 currencies.  With the U.S. dollar at any of the

13 relationship of what the banking system was telling

14 me, the Australian dollar was at $0.55 to the

15 dollar.  The Canadian dollar was at $0.62 to the

16 dollar and I could see our dollar falling the same,

17 so I wanted to get out of U.S. currency for a

18 safety feature.

19     Q.   Was the full 3 million invested into the

20 offshore?

21     A.   I think 3.8 million was.

22     Q.   Where did the other .8 come from?

23     A.   I don't know now.  It's a long time, but

24 the other statements I think show that somewhere

25 along the line.

1      Q.   And you said it was a trust?

2      A.   Yes.

3      Q.   What was the name of the trust?

4      A.   South Pack.

5      Q.   Just to close the loop on that, I'm going

6   to hand to the court reporter to mark as

7   Exhibit 15.

8           (Plaintiff's Exhibit 15, Bank Statement,

9       was marked for identification.)

10  BY MS. MARASCO:

11     Q.   If you'll turn to Page 47 of 63.

12          Are you there?

13     A.   Yes.

14     Q.   Do you see in the middle of the page

15  there's an entry -- sorry.  Just to take a step

16  back.

17          Do you recognize this document?

18     A.   I don't recognize the document.

19     Q.   What do you understand it to be?

20     A.   I understand it to be Madoff's Baton Rouge

21  statement at Chase Bank, Chase Morgan.

22     Q.   And what is the date on this statement?

23     A.   Ending date is January 31st, 2008.

24     Q.   And then the account number is 140081703;

25  is that correct?

1      A.   Yes, same as the previous one.

2      Q.   So turning back to Page 47 of 63, now that

3   we've established what it is.  I'm looking at the

4   middle of the page, entry on January 24th, 2008.

5           Do you see "fed wire debit via Paradise

6   Bank AC Ken-Wen Family Limited Partnership transfer

7   for ref Ken-Wen for $3 million"?

8      A.   Yes.

9      Q.   And is that consistent with the request

10   that you made to liquidate the account that we just

11   discussed in Exhibit 13?

12      A.   Yes.

13      Q.   Okay.  So it's accurate to say that the

14   funds would have been transferred from BLMIS to the

15   Paradise Bank account?

16      A.   Yes.

17      Q.   This will be Exhibit 16.

18           (Plaintiff's Exhibit 16, Check, was marked

19      for identification.)

20   BY MS. MARASCO:

21      Q.   Do you recognize this document?

22      A.   No.

23      Q.   Looking at it now, can you tell me what it

24   is?

25      A.   It's a check from B. L. Madoff to Ken-Wen

 1   Family Limited Partnership.

 2       Q.   And what's the date on the check?

 3       A.   11-17-2003 or is that 2008?  I can't make

 4   it out.

 5       Q.   Actually, if you look on the left-hand

 6   side under the star 031, there's a date there

 7   that's a little more clear.

 8       A.   11-25-2008.

 9       Q.   Okay.  And do you see the account number

10   referenced in the bottom left-hand corner?

11       A.   I do.

12       Q.   And what is the account number?

13       A.   1EM226-3.

14       Q.   And then on the back page, do you see

15   whether or not -- can you tell me whether this

16   check was endorsed?

17       A.   It was.

18       Q.   By whom?

19       A.   It would appear to be Ms. Brown's

20   handwriting to Paradise Bank.

21       Q.   But it says Ken-Wen Family; is that right?

22       A.   Yes.

23       Q.   We discussed earlier you made a request to

24   liquidate the account for 3 million and I said,

25   "Did that wipe out the account?"  And you said,

1    "You would guess that, because the bottom of the

2    page said 3.1, that there would be 100,000 left in

3    the account to keep it open," do you recall that?

4        A.   I do recall that.

5        Q.   Okay.  This check appears to be in the

6    amount of 200,000; is that correct?

7        A.   Yeah, it's 200,000.

8        Q.   Why might this check exceed the balance

9    that you believe to be in the account?

10       A.   Well, whatever was -- I don't know if this

11   is the last check or the liquidating check.

12   Further, we left a small balance in the account.  I

13   don't remember what the residual was because the

14   3.1 was not my handwriting.  So I wanted to

15   liquidate the account and just leave the vestige of

16   the money there and my wife also agreed with that.

17       Q.   Do you recall requesting $200,000?

18       A.   No.  I was no longer a general partner

19   then.

20       Q.   This will be Exhibit 17.

21            (Plaintiff's Exhibit 17, Bank Statement,

22       was marked for identification.)

23   BY MS. MARASCO:

24       Q.   Do you recognize this document?

25       A.   Yes.

```
 1        Q.    Can you tell me what it is?

 2        A.    It's a handwritten document by me for

 3   200,000.  I don't know what the date is.

 4        Q.    Do you see the account number there?

 5        A.    I do.

 6        Q.    What account number is that?

 7        A.    Same as always, EM226-3.

 8        Q.    It says, "Please mail check to Ken-Wen FLP

 9   Limited for 200,000 as requested."  Am I reading

10   that correctly?

11        A.    Yes.

12        Q.    And to whom is this request addressed?

13        A.    Irwin at Madoff.

14        Q.    I'm reading that as Aaron.

15        A.    Aaron?  Okay.  At Madoff, yes.

16        Q.    Do you recall speaking with Aaron?

17        A.    No.

18        Q.    How did you know to send the request to

19   Aaron?

20        A.    Most likely by discussing it.

21        Q.    And did you sign this document?

22        A.    I did.

23        Q.    And how did you sign this document?

24        A.    Kenneth Brown FLP.

25        Q.    And we just discussed the $200,000 check
```

1    and I asked you if you had requested it and you

2    said you don't recall, but you weren't a general

3    partner at that time.

4        A.   That's right.

5        Q.   Is that still correct?

6        A.   Yes.

7        Q.   Do you see the handwritten notation at the

8    bottom left-hand corner, the 11/17?

9        A.   Yes.

10       Q.   Looking now at Exhibit 16, can you just

11   tell me again the date on the check?

12       A.   11-17-2008.

13       Q.   Okay.  So is it likely that that check was

14   a result of this request?

15       A.   Yes.

16       Q.   Okay.  But it's your testimony that you

17   were not a general partner at that time?

18       A.   That's right.

19       Q.   And so why did you make a request for a

20   $200,000 withdrawal?

21       A.   Probably to facilitate a transfer of the

22   money out of the account.

23       Q.   And how did you know that there was

24   $200,000 left in the account?

25       A.   I don't recall, but it went to 405

 1    Southwest Atlantic where I wasn't living at the

 2    time.

 3        Q.    Do you recall conferring with Ms. Werner

 4    with respect to this request?

 5        A.    I'm sure we would have discussed it.

 6        Q.    And then at the bottom corner of the

 7    account, do you see handwriting there?

 8        A.    I do.

 9        Q.    And that's not your handwriting; is that

10    correct?

11        A.    No, it's not.

12        Q.    Can you tell me what it says?

13        A.    "Asterisk will be refunding account with

14    brackets three million in."

15        Q.    Okay.  And did you ever refund the

16    account?

17        A.    No.

18        Q.    We discussed earlier that it was -- you

19    were troubled by the market and that you wanted to

20    get out of the market; do you recall that?

21        A.    Yes, absolutely.  That's exactly right.

22        Q.    Why might this notation indicate that you

23    would be refunding the account?

24        A.    Well, market conditions improved.  Right

25    now, my philosophy was to be more aggressive with

```
 1          MR. ROHER:  So I object to this whole line
 2     of questioning.
 3          Do you realize who filed this?
 4          MS. MARASCO:  I do.
 5          MR. ROHER:  Just so I'm -- just so I'm on
 6     the same page with you --
 7          MS. MARASCO:  This is not a deposition of
 8     me.
 9          MR. ROHER:  Okay, but I don't know why you
10     are asking him questions about this.  It's not
11     his answers to the admissions.  You are asking
12     the wrong party.
13          MS. MARASCO:  He was a general partner
14     but --
15          MR. ROHER:  Honestly, this is making no
16     sense to me.  He was a general partner as of
17     2008.  This isn't even --
18          MS. MARASCO:  I'm going to note for the
19     record that counsel is making a very lengthy
20     speaking objection and I would just ask that
21     we could have this discussion off the record.
22          MR. ROHER:  That's fine.  We can go off
23     the record.  I never refuse to go off the
24     record.
25          MS. MARASCO:  I'm going to ask you then
```

```
 1        questions using Exhibit 19, which is the --
 2        which is this Exhibit B here, this chart.
 3        This is a complaint that was filed against the
 4        Ken-Wen Limited Partnership and names
 5        Mr. Brown as general partner and a defendant,
 6        so I'm going to proceed with using this
 7        document.
 8   BY MS. MARASCO:
 9        Q.   When we are looking at this document,
10   column five identifies certain withdrawals; do you
11   see that?
12        A.   Yes.
13        Q.   And these are withdrawals that were made
14   from the account.  If you see at the top, BLMIS
15   account 1EM226, Ken-Wen Family Limited Partnership
16   Limited.  Do you see that?
17        A.   Yes.
18             MR. ROHER:  Object to form.
19   BY MS. MARASCO:
20        Q.   Okay.  So at the bottom, let's start from
21   the very bottom.  Do you see that there is a date
22   11-17-2008, a check for $200,000, and do you see
23   that amount as a withdrawal?
24        A.   Yes.
25             MR. ROHER:  Object to form.
```

```
 1   BY MS. MARASCO:
 2       Q.   And so that was the $200,000 check that we
 3   just discussed from Mr. Madoff?
 4            MR. ROHER:  Object to form.
 5            THE WITNESS:  It's the same date, yes.
 6   BY MS. MARASCO:
 7       Q.   Okay.  And then going one above to the
 8   January 24th, 2008 check wire and you see that
 9   $3 million withdrawal?
10       A.   Yes.
11       Q.   And we discussed that was the request to
12   liquidate the account?
13            MR. ROHER:  Object to form.
14            THE WITNESS:  Yes.
15   BY MS. MARASCO:
16       Q.   Okay.  And then one above, 12-31-2007
17   check wire, $500,000 withdrawal.  Do you see that
18   as well?
19       A.   Yes.
20       Q.   And do you recall us discussing that as a
21   wire into the Paradise Bank account?
22       A.   Yes.
23            MR. ROHER:  Object to form.
24            MS. MARASCO:  I would just ask that you
25       not interrupt your client when he's answering.
```

```
 1              MS. ROHER:  So let me object.

 2              THE WITNESS:  I will.

 3              MR. ROHER:  Ken, let me object.

 4              THE WITNESS:  I understand.  I understand

 5      now.

 6   BY MS. MARASCO:

 7      Q.   And then just one further up, 6-26-2007,

 8   check, $150,000.  Do you recall discussing that

 9   check from Mr. Madoff?

10              MR. ROHER:  Object to form.

11              THE WITNESS:  I recall, yes.

12   BY MS. MARASCO:

13      Q.   Okay.  So is it accurate to say, at least

14   with respect to those four transfers, that this

15   chart accurately reflects withdrawals from the

16   account?

17              MR. ROHER:  Object to form.

18              THE WITNESS:  It comports with what we

19      discussed today, yes.

20   BY MS. MARASCO:

21      Q.   Okay.  And we discussed that when those

22   withdrawals were made, they were deposited into an

23   account held by the Ken-Wen Family Partnership; is

24   that correct?

25      A.   Those three deposits, yes.
```

1        Q.    The four?

2        A.    Four deposits, yes.

3        Q.    Okay.  We discussed earlier that the

4    accounts at either RBC or Paradise Bank was held in

5    the name of the partnership; is that right?

6        A.    Yes.

7        Q.    We discussed that only you or Wendy had

8    access to the RBC Bank; is that correct?

9        A.    That's my understanding, yes.

10       Q.    Only you and Wendy had access to the

11   Paradise Bank account; is that correct?

12       A.    That would be my understanding, yes.

13       Q.    Do you have any reason to believe that

14   anyone else would have accessed or would have had

15   access to the four withdrawals that we just

16   discussed?

17       A.    No.

18       Q.    Okay.  We discussed earlier that you

19   called BLMIS and spoke with someone on the phone

20   when you wanted to make a withdrawal; is that

21   correct?

22       A.    I think so, yes.

23       Q.    Did you ever meet with anyone at BLMIS in

24   person?

25       A.    No, never did.

1      Q.   Never?

2      A.   I wanted to meet with Madoff, but it never

3   happened.

4      Q.   Did you ever meet Mr. Pascali?

5      A.   No.

6      Q.   And so how do you know who to call when

7   you wanted to make a withdrawal?

8      A.   They would answer the phone.

9      Q.   So it was just a general line and you were

10   directed to whomever answered the phone?

11     A.   Yes, and I would say "I want to do a

12   transfer."

13     Q.   There were no extensions or anything like

14   that?

15     A.   No, it seemed like a very small firm at

16   the time.

17     Q.   Okay.

18     A.   Which made it seem personal.

19     Q.   And then when you spoke to someone on the

20   phone, they would give you instruction about how to

21   make the withdrawal request; is that correct?

22     A.   Precisely.

23     Q.   Did BLMIS send written correspondence to

24   your recollection?

25     A.   No.

```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA

 4    COUNTY OF BROWARD

 5

 6              I, the undersigned authority, certify

 7    that the witness, KENNETH WILLIAM BROWN, personally

 8    appeared before me on the 27th day of January,

 9    2020, and was duly sworn.

10

11    Signed this 30th of January, 2020.

12

13

14
                    FELECIA CURRERI, RPR
15                  Notary Public - State of Florida
                    My Commission Expires:  12-19-2023
16                  Commission No. GG 933850

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA

 4   COUNTY OF BROWARD

 5

 6           I, FELECIA CURRERI, Registered
     Professional Reporter, State of Florida at Large,
 7   do hereby certify that the aforementioned witness
     was by me first duly sworn or affirmed to testify
 8   to the whole truth; that I was authorized to and
     did report said deposition in stenotype; and that
 9   the foregoing pages, numbered from 5 to 104,
     inclusive, are a true and correct transcription of
10   my shorthand notes of said deposition.
             I further certify that said
11   deposition was taken at the time and place
     hereinabove set forth and that the taking of said
12   deposition was commenced and completed as
     hereinabove set out.
13           I further certify that I am not an
     attorney or counsel of any of the parties, nor am I
14   a relative or employee of any attorney or counsel
     of any party connected with the action, nor am I
15   financially interested in the action.
             The foregoing certification of this
16   transcript does not apply to any reproduction of
     the same by any means unless under the direct
17   control and/or direction of the certifying
     reporter.
18
             IN WITNESS WHEREOF, I have hereunto
19   set my hand this 30th day of December, 2020.

20

21

22
             Felecia Curreri, RPR
23           Notary Public - State of Florida
             My Commission Expires:  12-19-2023
24           Commission No. GG 933850

25
```