Robert J. Lack (rlack@fklaw.com)
Jeffrey C. Fourmaux (jfourmaux@fklaw.com)
Dielai Yang (dyang@fklaw.com)
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, NY 10036-6516
Telephone: (212) 833-1100
Facsimile: (212) 833-1250

*Attorneys for Defendant Multi-Strategy Fund Limited*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | No. 08-01789 (CGM) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff, <br><br> Plaintiff, <br><br> v. <br><br> MULTI-STRATEGY FUND LIMITED and CDP CAPITAL TACTICAL ALTERNATIVE INVESTMENTS, <br><br> Defendants. | Adv. Pro. No. 12-01205 (CGM) |

## DEFENDANT MULTI-STRATEGY FUND LIMITED'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT ........................................................... 1

WHAT DISTINGUISHES THIS CASE ................................................ 2

ARGUMENT ....................................................................................... 4

I.    THE TRUSTEE'S CLAIM IS BARRED BY 11 U.S.C. § 546(e) ..................... 4

    A.    The Alleged Initial Transfer Was Made by or to a Covered Entity ....................... 6

        1.    The alleged initial transfer was made by a stockbroker .............................. 6

        2.    The alleged initial transfer was made to a financial institution ................. 7

    B.    The Alleged Initial Transfer Was a Settlement Payment
and Made in Connection with a Securities Contract ............................................. 10

II.   THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT
MULTI-STRATEGY RECEIVED BLMIS CUSTOMER PROPERTY ......... 16

III.  THE COURT LACKS PERSONAL JURISDICTION
OVER MULTI-STRATEGY ........................................................................... 24

    A.    Relevant Jurisdictional Facts ................................................................ 24

    B.    Multi-Strategy Did Not Consent to Jurisdiction, and
Is Not Subject to General Jurisdiction, in New York ........................................... 25

    C.    Multi-Strategy Is Not Subject to Specific Jurisdiction in New York ................. 26

        1.    Applicable law ......................................................................................... 26

        2.    The Trustee's claim does not arise out of or relate to any
purposeful conduct of Multi-Strategy in the United States ..................... 27

CONCLUSION .................................................................................... 40

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*5-Star Mgmt., Inc. v. Rogers*,
940 F. Supp. 512 (E.D.N.Y. 1996) ...................................................................8

*Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*,
409 B.R. 737 (Bankr. E.D.N.C. 2009) ...........................................................17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................17

*Beacon Enters., Inc. v. Menzies*,
715 F.2d 757 (2d Cir. 1983)...........................................................................38

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................17

*Best Van Lines, Inc. v. Walker*,
490 F.3d 239 (2d Cir. 2007)...........................................................................27

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ...........................................................................26, 28, 30

*Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011)...........................................................................14

*Ctr. for Reprod. Law & Policy v. Bush*,
304 F.3d 183 (2d Cir. 2002).............................................................................3

*Daimler AG v. Bauman*,
517 U.S. 117 (2014).......................................................................................26

*Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*,
323 B.R. 857 (Bankr. S.D.N.Y. 2005).........................................................7, 14

*Fairfield Sentry Ltd. v. Migani*,
[2014] UKPC 9 .........................................................................................10, 25

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ......................................25, 26

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020)................................7, 8, 9, 10

*Ferrante Equip. Co. v. Lasker-Goldman Corp.*,
    26 N.Y.2d 280 (1970) .................................................................30

*Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.*,
    2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020) ...............................21

*Giuliano v. Barch*,
    2017 WL 1234042 (S.D.N.Y. Mar. 31, 2017) ..............................29

*Hanson v. Denckla*,
    357 U.S. 235 (1958)......................................................................26

*Harris v. N.Y. State Dep't of Health*,
    202 F. Supp. 2d 143 (S.D.N.Y. 2002).............................................8

*Hau Yin To v. HSBC Holdings PLC*,
    2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), *aff'd*,
    700 F. App'x 66 (2d Cir. 2017) .......................................32, 33, 37

*Heinert v. Bank of Am. N.A.*,
    835 F. App'x 627 (2d Cir. 2020) ..................................................12

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984)................................................................26, 28

*In re Roco Corp.*,
    701 F.2d 978 (1st Cir. 1983).........................................................15

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    946 F.3d 66 (2d Cir. 2019)..........................................5, 7, 8, 11

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    10 F.4th 147 (2d Cir. 2021), *petition for cert. filed sub nom.*
    *Kirschner v. FitzSimons*, 2022 WL 161692 (U.S. Jan. 5, 2022)........................9, 11

*Int'l Customs Assocs. v. Ford Motor Co.*,
    893 F. Supp. 1251 (S.D.N.Y. 1995), *aff'd*, 201 F.3d 431 (2d Cir. 1999) .........30, 38

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
    140 S. Ct. 768 (2020).....................................................................12

*J.E.T. Advertising Assocs., Inc. v. Lawn King, Inc.*,
    84 A.D2d 744, 745 (2d Dep't 1981) ..............................................29

*Jackson v. Broadcast Music, Inc.*,
    2006 WL 250524 (S.D.N.Y. Feb. 1, 2006)......................................8

iii

*Jonas v. Estate of Leven*,
 116 F. Supp. 3d 314 (S.D.N.Y. 2015).............................................................27, 29

*Kimco Exch. Place Corp. v. Thomas Benz, Inc.*,
 34 A.D.3d 433 (2d Dep't 2006) .........................................................................34

*Law v. Siegel*,
 571 U.S. 415 (2014).............................................................................................15

*Letom Mgmt. Inc. v. Centaur Gaming, LLC*,
 2017 WL 4877426 (S.D.N.Y. Oct. 27, 2017) ...................................................36

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
 732 F.3d 161 (2d Cir. 2013)...............................................................................35

*Maranga v. Vira*,
 386 F. Supp. 2d 299 (S.D.N.Y. 2005).................................................................38

*McKee Elec. Co. v. Rauland-Borg Corp.*,
 20 N.Y.2d 377 (1967) .........................................................................................37

*Merit Mgmt. Grp., LP v. FTI Consulting Inc.*,
 138 S. Ct. 883 (2018)..........................................................................................15

*Met. Air Serv., Inc. v. Penberthy Aircraft Leasing Co.*,
 648 F. Supp. 1153 (S.D.N.Y. 1986)...................................................................29

*Metals Alliance Corp. v. Beshay*,
 1998 WL 811788 (S.D.N.Y. Nov. 19, 1998) .....................................................38

*Mortg. Funding Corp. v. Boyer Lake Pointe, LC*,
 379 F. Supp. 2d 282 (E.D.N.Y. 2005) ...............................................................30

*Nastasi & Assocs. v. Bloomberg, L.P.*,
 2021 WL 3541153 (S.D.N.Y. Aug. 11, 2021).....................................................8

*New Hampshire v. Maine*,
 532 U.S. 742 (2001).............................................................................................10

*Norton v. Mathews*,
 427 U.S. 524 (1976)...............................................................................................3

*O'Connor v. DL-DW Holdings, L.L.C. (In re Extended Stay, Inc.)*,
 2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020) .......................................18

*Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
 549 B.R. 56 (S.D.N.Y. 2016)..............................................................................35

*Parke-Bernet Galleries, Inc. v. Franklyn*,
    26 N.Y.2d 13 (1970) ...................................................................................38

*Picard v. BNP Paribas S.A. (In re Madoff)*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018) ...............................................30, 31

*Picard v. Bureau of Labor Insurance (In re Madoff)*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) ...............................................30, 31

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    12 F.4th 171 (2d Cir. 2021) ..............................................................15

*Picard v. Fairfield Inv. Fund Ltd. (SIPC v. Bernard L. Madoff Inv. Sec. LLC)*,
    2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ................5, 6, 12, 14

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
    773 F.3d 411 (2d Cir. 2014) ....................................................... *passim*

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ...............................................12, 18

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*,
    542 B.R. 100 (Bankr. S.D.N.Y. 2015) ...............................................17

*RBC Cap. Mkts., LLC v. Garcia Hamilton & Assocs., LP*,
    2021 WL 230194 (S.D.N.Y. Jan. 22, 2021) .......................................38

*Roper Starch Worldwide, Inc. v. Reymer & Assocs.*,
    2 F. Supp. 2d 470 (S.D.N.Y. 1998) ...................................................29, 32

*Rosenblatt v. Coutts & Co. AG*,
    2017 WL 3493245 (S.D.N.Y. Aug. 14, 2017) ....................................32

*Rosner v. Bank of China*,
    349 F. App'x 637 (2d Cir. 2009) .......................................................12

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)................................................................8

*Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) .......................................................................35

*Ryan v. Hunton & Williams*,
    2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ..................................12

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*,
    337 B.R. 791 (Bankr. S.D.N.Y. 2005) ...............................................15

3642052.1

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
   476 B.R. 715 (S.D.N.Y. 2012), *aff'd sub nom. Picard v. Ida Fishman
   Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411 (2d
   Cir. 2014) ...................................................................................................................6

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
   2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) .....................................11, 12, 13, 14

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
   490 B.R. 46 (S.D.N.Y. 2013) ...................................................................................2

*SPV Osus Ltd. v. UBS AG*,
   114 F. Supp. 3d 161 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) ...........37

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018) ......................................................................................3

*Steinberg v. A Analyst Ltd.*,
   2009 WL 806780 (S.D. Fla. Mar. 26, 2009) ...........................................................35

*SunLight Gen. Cap. LLC v. CJS Invs. Inc.*,
   114 A.D.3d 521 (1st Dep't 2014) ...........................................................................29

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ..................................................................................................9

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
   477 F. Supp. 3d 241 (S.D.N.Y. 2020), *appeal withdrawn*, 2021 WL 4190722
   (2d Cir. Apr. 14, 2021) ...........................................................................................37

*Walden v. Fiore*,
   571 U.S. 277 (2014) .....................................................................................28, 29, 31

*Waldman v. Palestine Liberation Org.*,
   835 F.2d 317 (2d Cir. 2016) ...................................................................................26

**Statutes and Rules**

11 U.S.C. § 101(22) .......................................................................................................7

11 U.S.C. § 101(22)(A)................................................................................................7, 8

11 U.S.C. § 101(53A) ....................................................................................................6

11 U.S.C. § 544..............................................................................................................1

11 U.S.C. § 544(b) .........................................................................................................1

11 U.S.C. § 546(e) ............................................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) ................................................................................ *passim*

11 U.S.C. § 550 ........................................................................................................1

11 U.S.C. § 550(a) ...............................................................................................4, 18

11 U.S.C. § 550(a)(1) ................................................................................................1

11 U.S.C. § 551 ........................................................................................................1

11 U.S.C. § 741(7)(A)(i) .........................................................................................11

11 U.S.C. § 741(7)(A)(vii) ......................................................................................11

11 U.S.C. § 741(8) ..................................................................................................15

15 U.S.C. § 78fff-2(c)(3) .........................................................................................16

Fed. R. Bankr. P. 7004 ............................................................................................27

Fed. R. Bankr. P. 7004(f) ........................................................................................27

Fed. R. Civ. P. 4 ......................................................................................................27

Fed. R. Civ. P. 12(b)(2) .......................................................................................1, 27

Fed. R. Civ. P. 12(b)(6) ............................................................................................1

CPLR § 213 ...............................................................................................................2

CPLR § 302 ............................................................................................................27

CPLR § 302(a) ........................................................................................................27

CPLR § 302(a)(1) ........................................................................................27, 35, 37

3642052.1

Defendant Multi-Strategy Fund Limited ("Multi-Strategy") respectfully submits this memorandum of law, together with the accompanying Declarations of Robert J. Lack and Mario A. Therrien ("Lack Decl." and "Therrien Decl."), in support of its motion pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) to dismiss the complaint (the "Complaint" or "Compl.," No. 12-1205 ECF 1) filed by plaintiff Irving H. Picard, Trustee (the "Trustee") for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the Estate of Bernard L. Madoff.

## PRELIMINARY STATEMENT

The sole remaining count in the Complaint alleges that Multi-Strategy, a foreign investment fund, received a transfer of $25,763,374 from Fairfield Sentry Limited ("Sentry") on March 15, 2005, more than three years before BLMIS filed for bankruptcy. *See* Compl. ¶¶ 50, 58 & Ex. F.[1] The Trustee seeks to recover this transfer under 11 U.S.C. § 550 as a subsequent transfer of an alleged fraudulent conveyance of funds from BLMIS to Sentry. *See id.* However, because the alleged initial transfer from BLMIS occurred more than two years before BLMIS's December 11, 2008 bankruptcy petition, the Trustee cannot seek to avoid the transfer under 11 U.S.C. § 548(a)(1)(A), but instead seeks to do so under New York state law pursuant to 11 U.S.C. § 544(b).[2] As a result, the initial transfer falls outside the exception to the safe harbor

---

[1] The Complaint originally asserted claims against Multi-Strategy and its investment manager, CDP Capital Tactical Alternative Investments ("CDP"), for recovery of subsequent transfers received from Kingate Global Fund Ltd. ("Kingate") (Count 1) as well as from Sentry (Count 2). By Stipulation and Order dated December 28, 2021 (ECF 88), Count 1 was dismissed based on the Trustee's settlement with Kingate, and Count 2 was dismissed as to CDP based on a representation that Multi-Strategy, and not CDP, received the challenged transfer from Sentry.

[2] *See* Compl. ¶ 44, incorporating by reference the allegations in Amended Complaint, *Picard v. Fairfield Sentry Ltd.*, No. 09-1239 (Bankr. S.D.N.Y. July 20, 2010), ECF 23 (the "Fairfield Amended Complaint"). Paragraph 536 and Counts 11, 14, 17, and 20 of that pleading, each titled "Fraudulent Transfer (Initial Transferee) – New York Debtor and Creditor Law . . . and 11

in Section 546(e) of the Bankruptcy Code, which applies to trustee actions seeking to avoid

certain types of transfers, "except under section 548(a)(1)(A) of this title."  11 U.S.C. § 546(e).

Under this Circuit's controlling law, the Complaint's allegations establish that the

alleged initial transfer from BLMIS to Sentry is covered by Section 546(e) because it was made

by or to a stockbroker or financial institution and was a settlement payment or transfer in

connection with a securities contract.  Accordingly, the Trustee cannot recover the alleged

subsequent transfer from Sentry to Multi-Strategy, and the Complaint should be dismissed.

The Complaint also should be dismissed on additional grounds.  The Trustee is

limited to recovering BLMIS customer property.  In light of the allegations the Trustee has made

in the Complaint and in the series of other complaints he has filed in these consolidated

proceedings, he cannot plausibly allege that the money Multi-Strategy received from Sentry

actually constituted BLMIS customer property, as opposed to subscription money Sentry had

received from its other investors.  The Complaint also fails to allege facts sufficient to support

personal jurisdiction over Multi-Strategy, a Cayman Islands fund operating from Canada, based

on its redemption from Sentry, a fund organized in the British Virgin Islands, which sent the

redemption from its bank in Dublin to Multi-Strategy's bank in Montreal.[3]

## **WHAT DISTINGUISHES THIS CASE**

This case has two distinguishing characteristics that make this motion to dismiss

easier for this Court to decide—and easier for this Court to dismiss the Complaint in its

entirety—compared to most motions to dismiss the Trustee's subsequent transfer claims that are

---

U.S.C. §§ 544, 550(a)(1), and 551 – Against the Feeder Funds," apply to the "Six Year Initial
Transfers" from BLMIS to Sentry.  *See* CPLR § 213 (six-year statute of limitations).

[3] By making this motion, Multi-Strategy is not waiving its right to have an Article III court enter
a final judgment in this matter.  *See SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff
Sec.)*, 490 B.R. 46, 58 (S.D.N.Y. 2013).

or will be pending before the Court.  First, the case involves a single transfer made in March

2005, more than two years before BLMIS's bankruptcy.  Accordingly, as shown in Point I

below, the entire case can be dismissed based on the Section 546(e) safe harbor.  Second, as

shown in Point II, none of the amount transferred to Multi-Strategy by Sentry could plausibly

have constituted BLMIS customer property, and the case likewise can be dismissed on that basis.

Multi-Strategy does share a characteristic in common with many of the other

moving defendants in that it is a foreign entity that contests this Court's personal jurisdiction

over it.  To the extent that there are other subsequent transferee cases pending before the Court

that present the Section 546(e) and/or customer property issues and do not present a

jurisdictional challenge, this Court has the discretion to decide those issues in those cases and

apply its rulings to this one without having to reach Multi-Strategy's jurisdictional defense.[4]

Furthermore, because the Trustee contends that personal jurisdiction over Multi-Strategy exists

because it "knowingly received subsequent transfers from BLMIS," Compl. ¶ 6, the

determination of jurisdiction depends on the customer property issue.  For these reasons, we have

briefed the Section 546(e) and customer property issues first, before addressing personal

jurisdiction.

---

[4] *See Norton v. Mathews*, 427 U.S. 524, 528-31 (1976) (avoiding a jurisdictional question, and instead dismissing on the merits, because Court had already decided the merits question in a companion case); *Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 194 (2d Cir. 2002) (allowing courts to assume jurisdiction "in those peculiar circumstances where the outcome on the merits has been foreordained by another case such that the jurisdictional question could have no effect on the outcome") (internal quotation marks omitted); *see also SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 347 (2d Cir. 2018) (Calabresi, J., concurring).  We note that this approach is in effect the one taken by Judge Rakoff and Judge Bernstein in addressing common issues like extraterritoriality earlier in these proceedings, which has conserved judicial resources by deferring issues whose decision might prove unnecessary.

3

## **ARGUMENT**

I.    **THE TRUSTEE'S CLAIM IS BARRED BY 11 U.S.C. § 546(e)**

Section 550(a) of the Bankruptcy Code provides that to the extent a transfer is avoided under certain sections of the Code, the trustee may recover the property transferred, or its value, from the initial transferee or any subsequent transferee.  Section 546(e), however, bars a trustee from avoiding a transfer (other than under Section 548(a)(1)(A), which has only a two-year lookback period) if the transfer, *inter alia*, (1) was made by or to a covered entity such as a stockbroker, financial institution, or financial participant; and (2) was either a settlement payment or a transfer in connection with a securities contract:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

The Second Circuit has instructed that courts should enforce Section 546(e)'s safe harbor whenever it applies by its terms, specifically including in actions brought by the Trustee here.  In construing Section 546(e) in the context of avoidance actions by the Trustee, the Second Circuit has explained that, "in enacting the Bankruptcy Code, Congress struck careful balances between the need for an equitable result for the debtor and its creditors, and the need for finality." *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 423 (2d Cir. 2014) (citation omitted).  In particular, "by enacting § 546(e), Congress provided that, for a very broad range of securities-related transfers, the interest in finality is

4

sufficiently important that they cannot be avoided by a bankruptcy trustee at all, except as actual

fraudulent transfers under § 548(a)(1)(A)." *Id*. "Unwinding settled securities transactions . . .

would seriously undermine . . . markets in which certainty, speed, finality, and stability are

necessary to attract capital." *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 90

(2d Cir. 2019) ("*Tribune I*"). "Permitting the clawback of millions, if not billions, of dollars

from BLMIS clients—many of whom are institutional investors and feeder funds—would likely

cause the very 'displacement' that Congress hoped to minimize in enacting § 546(e)." *Fishman*,

773 F.3d at 420 (citation omitted).

When such a clawback action is brought against a subsequent transferee of a

BLMIS client, the subsequent transferee can assert any defenses against the Trustee that the

initial transferee could have asserted, including Section 546(e). This includes the situation

where, as here, the alleged initial transferee, Sentry, settled with the Trustee and agreed to a

consent judgment.[5]  *See Picard v. Fairfield Inv. Fund Ltd. (SIPC v. Bernard L. Madoff Inv. Sec.

LLC*), 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021) (Morris, C.J.) ("Where the

initial transferee fails to raise a § 546(e) defense against the Trustee's avoidance of certain

transfers, as is the case here . . . , the subsequent transferee is nonetheless entitled to raise a

§ 546(e) defense against recovery of those funds."). Accordingly, because the Trustee is seeking

to recover from Multi-Strategy as a subsequent transferee of a BLMIS transfer to Sentry, his

---

[5] On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield Settlement
Agreement") with the Liquidators of Sentry and the other Fairfield funds. *Picard v. Fairfield
Sentry Ltd.*, No. 09-1239 (Bankr. S.D.N.Y. May 9, 2011), ECF 69-2. This Court approved the
Fairfield Settlement Agreement on June 7, 2011, *id*. ECF 92, and it was incorporated into the
Consent Judgment entered against Sentry on July 13, 2011 (the "Consent Judgment"), *id*. ECF
109, ¶ 2; Compl. ¶ 49.

3642052.1

Complaint must be dismissed if BLMIS's transfer to Sentry was protected by Section 546(e).[6]

As shown below, it was.

## A.   The Alleged Initial Transfer Was Made by or to a Covered Entity

Here, the alleged initial transfer was made by or to an entity covered by

Section 546(e) both because the alleged initial transfer was made by a stockbroker and because it

was made to a financial institution, though either of those facts alone would be sufficient.[7]

### 1.   The alleged initial transfer was made by a stockbroker

The Code defines "stockbroker" to include entities that "engage[ ] in the business

of effecting transactions in securities."  11 U.S.C. § 101(53A).  As the District Court has noted:

> Overall, Madoff Securities, which was registered as a stockbroker with the SEC, clearly engaged in securities transactions. . . .  [E]ven assuming the truth of the allegation that Madoff Securities' investment advisory division never traded securities on behalf of clients, Madoff Securities nonetheless qualifies as a stockbroker by virtue of the trading conducted by its market making and proprietary trading divisions.

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012) (citation omitted),

*aff'd sub nom. Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,

773 F.3d 411 (2d Cir. 2014).  As the Second Circuit noted in the ensuing appeal, "It is not

disputed [by the Trustee] that BLMIS was a 'stockbroker' for the purposes of § 546(e)."  773

F.3d at 417; *see* Br. for Plaintiff-Appellant Irving H. Picard, *In re Bernard L. Madoff Inv. Sec.

LLC*, No. 12-2557 (2d Cir. May 15, 2013), ECF 145, at i-ii, 5 (not challenging stockbroker

finding on appeal).

---

[6] Although Section 546(e) is an affirmative defense, a court can dismiss based on Section 546(e) if its applicability is established on the face of the complaint or documents incorporated by reference into or integral to the complaint.  *See Fairfield Inv. Fund*, 2021 WL 3477479, at *2.

[7] Multi-Strategy reserves for later consideration, if necessary, the question whether the transfer also was "made by or to (or for the benefit of) a . . . financial participant."  11 U.S.C. § 546(e).

2.      **The alleged initial transfer was made to a financial institution**

Section 101(22) of the Code defines "financial institution" to include not only "an entity that is a commercial or savings bank," but also the customer of such a bank "when [the bank] is acting as agent or custodian for a customer . . . in connection with a securities contract." 11 U.S.C. § 101(22)(A).  In *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*"), this Court held that Sentry and its affiliated funds Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda") were "financial institutions" because they were customers of Citco Bank Nederland N.V. Dublin Branch ("Citco Bank"), which acted as their agent in connection with the securities contracts pursuant to which the redemption payments were made.  *Id*. at *7.

Citco Bank is a bank regulated by the Central Bank of the Netherlands and registered with the Central Bank of Ireland.  *Fairfield III*, 2020 WL 7345988, at *6 & n.11.[8]  In a document filed with this Court proffering additional allegations pertaining to Multi-Strategy ("Proffer," ECF 57), the Trustee alleged that Walter Noel and Jeffrey Tucker, the founders of Fairfield Greenwich Group ("FGG"), which organized Sentry, "contracted Citco Global Custody N.V. . . . to nominally serve as the custodian of the Fairfield Sentry assets" and "opened bank

---

[8] *See* De Nederlandsche Bank, *Information Detail: Citco Bank Nederland N.V.*, https://www.dnb.nl/en/public-register/information-detail/?registerCode=WFTDG&relationNumber=B0275 (last visited Jan. 25, 2022) (identifying Citco Bank Nederland N.V. as "[c]arrying on the business of a bank," including "[a]cceptance of deposits and other repayable funds"); Central Bank of Ireland, *Financial Service Provider Profile: Citco Bank Nederland NV Dublin Branch*, http://registers.centralbank.ie/FirmDataPage.aspx?firmReferenceNumber=C27278 (last visited Jan. 25, 2022) (classifying Citco Bank as a "credit institution . . . whose business is to receive deposits or other repayable funds from the public and to grant credits for its own account").  This Court can take judicial notice of information from such public registries.  *See Tribune I*, 946 F.3d at 78; *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 869 (Bankr. S.D.N.Y. 2005).

7

accounts at Citco Bank Nederland, N.V. Dublin Branch." Proffer ¶ 37.[9]  Sentry thus was a

customer of Citco Bank.  *See Tribune I*, 946 F.3d at 78-79 (for purposes of Section 101(22)(A),

"customer" must be given its "ordinary meaning," which includes "someone who buys goods or

services" and "a person . . . for whom a bank has agreed to collect items") (citations omitted);

*Fairfield III*, 2020 WL 7345988, at *7.

In *Tribune I*, the Second Circuit applied the common-law meaning of "agency"

for purposes of Section 101(22)(A) and Section 546(e):

> Agency is the fiduciary relationship that arises when one person (a "principal")
> manifests assent to another person (an "agent") that the agent shall act on the
> principal's behalf and subject to the principal's control, and the agent manifests
> assent or otherwise consents so to act. . . .  Establishment of an agency
> relationship requires facts sufficient to show (1) the principal's manifestation of
> intent to grant authority to the agent, and (2) agreement by the agent.  In addition,
> the principal must maintain control over key aspects of the undertaking.

946 F.3d at 79 (cleaned up).

In this case, the Trustee alleges that the initial transfers from BLMIS to Sentry

were made from BLMIS accounts entitled "Citco Global Custody N.V. FBO Fairfield Sentry

Ltd." (account numbers 1FN012 and 1FN045).  Compl. Exs. D, E.  In the Proffer, in addition to

acknowledging Citco Global Custody N.V.'s service as custodian for Sentry and the related

opening of bank accounts by Sentry at Citco Bank, the Trustee alleges that FGG personnel "had

final control of the Fairfield Sentry bank accounts and controlled all of Fairfield Sentry's

relationships with the various Citco entities," Proffer ¶ 37, and "controlled and approved all

---

[9] This Court may take judicial notice of admissions in documents in the public record filed by the
Trustee, particularly where the Trustee does not dispute their accuracy.  *See Rothman v. Gregor*,
220 F.3d 81, 92 (2d Cir. 2000); *Nastasi & Assocs. v. Bloomberg, L.P.*, 2021 WL 3541153, at *4-
5 (S.D.N.Y. Aug. 11, 2021); *Jackson v. Broadcast Music, Inc.*, 2006 WL 250524, at *7
(S.D.N.Y. Feb. 1, 2006); *Harris v. N.Y. State Dep't of Health*, 202 F. Supp. 2d 143, 173 n.13
(S.D.N.Y. 2002); *5-Star Mgmt., Inc. v. Rogers*, 940 F. Supp. 512, 518-19 (E.D.N.Y. 1996).

subscriptions into and redemptions from the fund," *id.* ¶ 39.  These allegations are sufficient to

establish that Citco Bank was Sentry's agent in connection with the redemptions at issue.  To

paraphrase the Second Circuit in *In re Tribune Co. Fraudulent Conveyance Litig.*, 10 F.4th 147

(2d Cir. 2021) ("*Tribune II*"), *petition for cert. filed sub nom. Kirschner v. FitzSimons*, 2022 WL

161692 (U.S. Jan. 5, 2022) (No. 21-1006), "Here, [Sentry] entered into an agreement with [Citco

Bank] whereby [Citco Bank] was hired to be a steward of [Sentry]'s money . . . .  It was clearly

acting on behalf of [Sentry], which is enough to satisfy § 546(e)."  *Id.* at 176.

This Court came to the same conclusion in *Fairfield III*:

> [T]he [Fairfield] Liquidators' admission that redemptions were paid by Citco
> Bank establishes the necessary agency.  It is implausible to infer that Citco Bank
> made the redemption payments to specific redeemers in specific amounts absent
> the [Fairfield] Funds' directions to do so.  Moreover, Citco Bank accepted those
> directions by executing the redemption payments.  Based on the foregoing, the
> Funds were customers of Citco Bank who acted as their agents in connection with
> the securities contracts pursuant to which the redemption payments were made,
> and the Funds were, therefore "financial institutions" within the meaning of
> 11 U.S.C. § 546(e).

2020 WL 7345988, at *7 (footnote omitted).  This Court's holding in *Fairfield III* is binding on

the Trustee because he was in privity with the Fairfield Liquidators who were litigating the

consolidated Fairfield redeemer actions partly for the Trustee's benefit.[10]

---

[10] Pursuant to the Fairfield Settlement Agreement that was incorporated into the Consent
Judgment on which the Trustee relies, *see* Compl. ¶ 49 & note 5 *supra*, the Fairfield Liquidators
will pay the Trustee 15% of their net recoveries from all claims the Liquidators assert against
redeemers from the Fairfield funds (included in the definition of "Sharing Claims") until the
Trustee has been paid $1.924 billion.  Fairfield Settlement Agreement, No. 09-1239 ECF 69-2,
¶¶ 1, 4, 11.  The Fairfield Settlement Agreement states that "[t]he Trustee and the Liquidators
agree and stipulate that a joint interest exists between them with respect to the Sharing Claims."
*Id.* ¶ 14.  The Trustee and the Liquidators' agreed joint interest in any such recovered BLMIS
customer property constitutes a "preexisting 'substantive legal relationship,'" focused on a
successive or concurrent interest in property, of the kind recognized by the Supreme Court to
give rise to nonparty issue preclusion in *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008).  Because
the Trustee is in privity with the Liquidators in actions to recover alleged BLMIS customer
property, such as the actions at issue in *Fairfield III*, and because the issue of Sentry's "financial

B.    **The Alleged Initial Transfer Was a Settlement Payment
and Made in Connection with a Securities Contract**

In *Fishman*, the Second Circuit held that Section 546(e) shielded transfers from

BLMIS to its account holders from the Trustee's avoidance powers.  773 F.3d at 417.  The Court

of Appeals concluded that the documents governing BLMIS customers' accounts constituted

securities contracts, and that the payments BLMIS made to those customers were made "in

connection with" those contracts, and also constituted "settlement payments," *id*. at 418-23—

though either of those findings would have sufficed to invoke the safe harbor.  The Court

rejected the Trustee's argument that the safe harbor did not apply because Madoff did not

actually carry out the promised securities transactions.  *Id*. at 419-20.

The same reasoning and result doubly apply to the transfer that the Trustee alleges

BLMIS made to Sentry for the purpose of funding Multi-Strategy's redemption request.  That

alleged transfer from BLMIS to Sentry was clearly *both* "in connection with" the securities

contracts Sentry had entered into with BLMIS, as in *Fishman*, *and* "in connection with" the

allegedly related securities contract Multi-Strategy had with Sentry through Sentry's Articles of

Association,[11] pursuant to which Multi-Strategy made its redemption.  *See Fairfield Sentry Ltd.*

*v. Migani*, [2014] UKPC 9, ¶ 10, https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf

---

institution" status was "actually litigated" and "essential" to the final judgments dismissing
numerous such actions on ground of the Section 546(e) safe harbor, this Court's finding in
*Fairfield III* that Sentry was a "financial institution" in connection with redemption payments
from Sentry to its subscribers is binding on the Trustee.  *See New Hampshire v. Maine*, 532 U.S.
742, 748-49 (2001) (stating requirements for issue preclusion).

[11] *See Fairfield Sentry Ltd. v. Multi-Strategy Fund Ltd.*, No. 11-1576 (Bankr. S.D.N.Y. Oct. 27,
2016), ECF 14-6, excerpt attached as Lack Decl. Ex. A.

10

("the terms of the subscriber's membership of the Fund, which govern the redemption of its shares . . . are to be found in the Articles of Association of the Fund").[12]

The definition of "securities contract" includes "a contract for the purchase, sale, or loan of a security," 11 U.S.C. § 741(7)(A)(i), and "[t]he term 'redemption,' in the securities context, means 'repurchase,'" *Tribune I*, 946 F.3d at 80. The definition of "securities contract" also includes "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph." 11 U.S.C. § 741(7)(A)(vii). Accordingly, "the definition of a securities contract . . . includes . . . redemption requests." *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 2013 WL 1609154, at *8 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"). Furthermore, all Section 546(e) requires is that the transfer be "in connection with *a* securities contract," not in connection with the securities contract between the transferor and initial transferee. *See Fishman*, 773 F.3d at 422 (holding that "Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided" and that "a transfer can be connected to, and can be made in relation to, multiple documents or purposes simultaneously"); *Cohmad*, 2013 WL 1609154, at *9 (explaining that a transfer from a debtor to an initial transferee may qualify as having been made "in connection with a securities contract" between the initial transferee and a subsequent transferee, and thus be covered by the safe harbor on that basis).

Implicit in the Trustee's subsequent transfer claim is the allegation that the funds Multi-Strategy received were transferred from BLMIS to Sentry in order that Sentry could then satisfy Multi-Strategy's redemption request. Although, as demonstrated in Point II *infra*, this

---

[12] This Court may consider the Articles of Association in connection with this motion because, as the basis for the challenged redemption, they are integral to the Complaint. *See Tribune II*, 10 F.4th at 176 ("Here, the documents the district court relied on were the contracts that set forth the relationship between Tribune and CTC, and they were therefore integral to the complaint.").

3642052.1

allegation lacks plausible support, its assertion necessarily involves the allegation of a

connection between the initial transfer from BLMIS to Sentry and Multi-Strategy's contract with

Sentry that authorized the redemption. Accordingly, the Section 546(e) safe harbor applies to the

initial transfer, and thus also bars recovery of the subsequent transfer.

        The Trustee may argue that the safe harbor does not apply here because the initial

transferee, Sentry, allegedly knew of Madoff's fraud, and thus knew that there was no actual

"settlement payment" or "securities contract" between BLMIS and Sentry. In *Fairfield*

*Investment Fund*, this Court accepted that Sentry's knowledge had been adequately pleaded in a

later version of the *Fairfield* complaint than the one that was incorporated by reference into the

instant Complaint. *See* 2021 WL 3477479, at *4-5 (citing Second Amended Complaint, No. 09-

1239, ECF 286).[13] It then quoted Judge Rakoff's statement that "'if the Trustee sufficiently

alleges that the transferee from whom he seeks to recover a fraudulent transfer knew of Madoff

Securities' fraud, that transferee cannot claim the protections of Section 546(e)'s safe harbor.'"

*Fairfield Inv. Fund*, 2021 WL 3477479, at *4 (quoting *Cohmad*, 2013 WL 1609154, at *7).

        That argument does not defeat the application of the safe harbor here for several

reasons. *First*, as noted above, even if Sentry's alleged knowledge that BLMIS was not actually

---

[13] Multi-Strategy respectfully disagrees with that conclusion and reserves for a later stage of this
action or appeal all arguments that the Trustee has not adequately pleaded Sentry's actual
knowledge of Madoff's fraud either in Second Amended Complaint or the earlier pleadings in
*Fairfield Investment Fund* and/or that Sentry did not in fact have such actual knowledge. *See*
*Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 776-77 (2020) (holding that "to have
'actual knowledge' of a piece of information, one must in fact be aware of it" and distinguishing
between actual knowledge and constructive knowledge); *Heinert v. Bank of Am. N.A.*, 835 F.
App'x 627, 631 (2d Cir. 2020) ("allegations [of actual knowledge of misrepresentations] do not
suffice to show that [the bank] had actual knowledge of the [account holders'] Ponzi scheme, the
fraud on which the [plaintiffs'] claim relies"); *Rosner v. Bank of China*, 349 F. App'x 637, 639
(2d Cir. 2009) (similar); *Ryan v. Hunton & Williams*, 2000 WL 1375265, at *9 (E.D.N.Y. Sept.
20, 2000) (similar); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 140
(Bankr. S.D.N.Y. 2014) (refusing to equate "strong suspicion" with "actual knowledge").

trading securities meant that Sentry knew there was no actual "securities contract" between

BLMIS and Sentry and would preclude Sentry from invoking Section 546(e), that would not

affect the separate securities contracts between Sentry and its investors, including Multi-

Strategy.  Nor would Sentry's alleged knowledge of the BLMIS fraud preclude applying Section

546(e) for the benefit of a Sentry investor if the initial transfer was "in connection with" Sentry's

agreement with a Sentry investor.  In *Cohmad*, Judge Rakoff agreed that securities contracts

other than the initial transferee's securities contract with BLMIS could independently satisfy

Section 546(e)'s requirement that the initial transfer be in connection with a securities contract.

2013 WL 1609154, at *8-9.  Judge Rakoff ruled that so long as the initial transferee withdrew

funds from BLMIS to make a payment under a securities contract between the initial transferee

and a subsequent transferee, then the withdrawal from BLMIS would be a transfer made in

connection with a securities contract—namely, the contract between the initial transferee and the

subsequent transferee—and would not be avoidable on a subsequent transferee claim:

> Take, for example, a hypothetical situation in which the Trustee alleges that a
> withdrawal of funds by an investment fund from its Madoff Securities customer
> account occurred because an investor in that fund sought redemption of its
> investment under the terms of its investment contract.  Assuming that either the
> investment fund or the investor qualifies as a financial institution or financial
> participant, and barring other circumstances that may appear on the facts of a
> given case, that situation appears to fit within the plain terms of Section 546(e):
> an initial transfer that was "made by or to (or for the benefit of) a . . . financial
> institution [or] financial participant . . . in connection with a securities contract."

*Id*. at *9 (footnote omitted).[14]  As applied to the facts here, the investment fund was

Sentry (which was a financial institution as shown above) and the investor was Multi-

Strategy (or some other Sentry investor).

---

[14] Judge Rakoff also observed that "[t]o the extent that, for example, an initial transfer from
Madoff [S]ecurities to an investment fund customer and the subsequent transfer from the
investment fund to its redeeming investors may together comprise a 'settlement payment' under

*Second*, the Trustee has not pleaded that Multi-Strategy actually knew of Madoff's fraud. Since the applicability of Section 546(e) is clear on the face of the Complaint and documents integral to it, if the Trustee advances a theory of transferee actual knowledge as an exception to the safe harbor, it is incumbent on him to plead such actual knowledge. But nothing in the Complaint even suggests that Multi-Strategy had actual knowledge of Madoff's fraud.[15] And "actual knowledge," *id*. at *1—not "mere suspicion," *id*. at *3, or inquiry notice— is what Judge Rakoff repeatedly stated was necessary to defeat the safe harbor. *See, e.g., id.* at *4 ("the Trustee must show, at a minimum, that the transferee had actual knowledge that there were no actual securities transactions being conducted") (footnote omitted); *id*. at *1, 3, 6, 7, 10. Furthermore, there is no allegation that Multi-Strategy actually knew of any fraud at Sentry either. Because the initial transfer was made in connection with the securities contract between Sentry and Multi-Strategy and Multi-Strategy is not alleged to have had actual knowledge of the Madoff fraud, the Court can and should, on those grounds alone, dismiss the Complaint based on the safe harbor in Section 546(e).

*Finally*, Section 546(e) also applies here for a separate and independently sufficient reason. While we recognize that this Court and the District Court have previously ruled that Section 546(e) cannot be invoked by a transferee with actual knowledge of Madoff's

---

*Enron* [*Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 339 (2d Cir. 2011)], that transfer may fall within the purview of Section 546(e), assuming it meets the statute's other requirements." *Cohmad*, 2013 WL 1609154, at *9 n.5.

[15] Thus, this case is unlike *Fairfield Investment Fund*, in which this Court found that the allegations against most of the subsequent transferee defendants were sufficient to show they actually knew about Madoff's fraud. *See* 2021 WL 3477479, at *5-6. Furthermore, many of the subsequent transfers in that case were not in connection with securities contracts, but rather management contracts. *See, e.g.*, Fairfield Am. Compl. ¶ 138 (Fairfield Greenwich Limited received $3,844,000 in management fees and $83,591,000 in performance fees from Sentry in 2002); *Picard v. Fairfield Sentry Ltd.*, No. 09-1239 ECF 286-12, at 5 (showing these same amounts as subsequent transfers from Sentry).

14

fraud, and while, for the reasons discussed above, this Court does not need to reject that ruling in

order to give Multi-Strategy the benefit of the safe harbor, we note that nothing in Section 546(e)

supports making its applicability turn on the knowledge of the transferee, as opposed to the

debtor-transferor.[16]   That section provides for only one exception to the safe harbor:  namely, for

a claim under Section 548(a)(1)(A), which requires the Trustee to allege and prove intentional

fraud by the *transferor*.  *See Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,

12 F.4th 171, 181 (2d Cir. 2021) ("Voidability under § 548(a)(1)(A) focuses on the fraudulent

intent of the debtor-transferor.") (footnote omitted); *Silverman v. Actrade Cap., Inc. (In re*

*Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) (under § 548(a)(1)(A) "it is

the intent of the transferor and not the transferee that is relevant") (citations omitted).  Nor does

transferee knowledge play any role in the definitions of "settlement payment," 11 U.S.C.

§ 741(8), or "securities contract," *id*. § 741(7).

    To hold that transferee knowledge defeats the safe harbor is thus inconsistent with

Section 546(e)'s language.  Where the Code creates an exemption or safe harbor, and specifies

exceptions, a court is not free to create additional exceptions even when doing so is motivated by

a party's alleged wrongdoing.  *See Law v. Siegel*, 571 U.S. 415, 424-25 (2014).  The courts must,

instead, adhere to "the plain meaning of the language" of the statute.  *Merit Mgmt. Grp., LP v.*

*FTI Consulting Inc.*, 138 S. Ct. 883, 897 (2018).  Considering the Second Circuit's admonitions

---

[16] This is an open question at the Circuit level, and Multi-Strategy expressly preserves it.
Although the Second Circuit in *Fishman* noted that the defendants there had "every reason to
believe that BLMIS was actually engaged in the business of effecting securities transactions,"
773 F.3d at 420, it did not state that the result would have been different had that not been the
case.  The only circumstances in which the knowledge of the transferee would be relevant would
be if it could be imputed to the transferor, such as where the transferee, "as the [transferor]'s
president, director, and sole shareholder, . . . was in a position to control the disposition of [the
transferor's] property," *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983) (citation omitted).

3642052.1

in *Fishman* that, in enacting Section 546(e) and its single exception for claims under Section 548(a)(1)(A), Congress struck a balance favoring the securities markets' interest in finality over creditors' interests in recovery, and that the courts "are obliged to respect the balance Congress struck among these complex competing considerations," 773 F.3d at 423, the safe harbor should apply here according to its plain language regardless of the initial transferee Sentry's alleged knowledge.  Accordingly, the Complaint should be dismissed on that ground as well.

## II.     THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT MULTI-STRATEGY RECEIVED BLMIS CUSTOMER PROPERTY

In order to state a claim against Multi-Strategy under SIPA, the Trustee must plausibly allege that the $25.8 million Multi-Strategy received from Sentry on March 15, 2005 was a subsequent transfer of BLMIS customer property fraudulently transferred from BLMIS to Sentry.  *See* 15 U.S.C. § 78fff-2(c)(3) ("the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11").

The Complaint fails to do this.  All it alleges is that during the six years preceding the petition date, BLMIS transferred approximately $3 billion to Sentry, and that "[a] portion of [those transfers] was subsequently transferred either directly or indirectly to, or for the benefit of," Multi-Strategy.  Compl. ¶¶ 45, 50.  Although one of the Complaint's exhibits contains 75 pages of small type listing thousands of transactions recorded in Sentry's accounts at BLMIS, *id*. Ex. E, it fails to identify which, if any, of these transactions constituted initial transfers of BLMIS customer property that were allegedly subsequently transferred to Multi-Strategy. Essentially, the Trustee is asking the Court to infer that because BLMIS transferred a large amount of money to Sentry over a long period of time, to the extent Sentry transferred money during that time to Multi-Strategy, *all* of that money *must* have come from BLMIS.

16

As the Supreme Court has made clear, the Federal Rules of Civil Procedure do not permit such speculative and conclusory pleading. To survive a motion to dismiss, a claim must not merely be possible, but must be plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57, 570 (2007). As this Court stated in *Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*, 542 B.R. 100 (Bankr. S.D.N.Y. 2015), barebones allegations that customer funds were transferred to the subsequent transferee do not suffice to make the claim plausible:

> The Trustee must allege facts that support the inference that the funds at issue originated with . . . BLMIS, and contain the "necessary vital statistics"—the "who, when, and how much" of the transfers to establish that an entity was a subsequent transferee of the funds. At the pleading stage, the Trustee is not required to provide a "dollar-for-dollar accounting" of the exact funds at issue. However, barebones allegations that the funds at issue were transferred to the Subsequent Transferees, without more detail, are insufficient.

*Id*. at 119. In *Shapiro*, the Court dismissed a conclusory subsequent transferee claim, noting that the complaint "does not tie any initial transfer to any subsequent transfer or Subsequent Transferee." *Id*. The same is true for the instant Complaint, which does not tie the Multi-Strategy transfer to any particular transfer from BLMIS to Sentry. *Compare* Second Am. Compl. ¶¶ 108, 110, 162-66 in *Picard v. Shapiro*, No. 10-5383, ECF 33 (Bankr. S.D.N.Y. July 8, 2014) *with* Compl. ¶¶ 45, 48, 50, 58-61 (Lack Decl. Ex. B); *see also Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*, 409 B.R. 737, 750-51 (Bankr. E.D.N.C. 2009).

The Trustee's failure to tie the Multi-Strategy transfer to any particular transfer from BLMIS to Sentry cannot be excused on the ground that the Trustee lacks access to sufficient information, since the Trustee, by virtue of the document-sharing provisions of the Fairfield Settlement Agreement, had access to Sentry's records at the time he filed the Complaint and for nearly a decade since. *See* Fairfield Settlement Agreement, No. 09-1239 ECF 69-2, ¶ 14

17

(Trustee and Liquidators "each agree to provide reasonable access to the other's documents, data, and other information relating to, or beneficial to the pursuit of, the Sharing Claims").[17]

The Complaint's conclusory allegation that Multi-Strategy's redemption from Sentry consisted of BLMIS customer property is, moreover, not plausible. When one sums all the transfers from BLMIS to Sentry from the earliest transfer within the six-year period before the petition date[18] through the date of Multi-Strategy's redemption (i.e., from December 11, 2002 through March 15, 2005), and compares that amount to the sum of redemptions from Sentry alleged in the Trustee's subsequent transferee complaints during the same period, it appears that *Sentry distributed approximately $570 million more than it received from BLMIS* during that time. *See* Lack Decl. ¶¶ 7-16 & Exs. C-E.[19] Specifically, BLMIS made $120,000,000 of

---

[17] Thus, this case is unlike *Merkin*, where this Court allowed the Trustee "greater latitude" in pleading the required tie because the subsequent transfer claims there had to "be proved through the books and records of the defendants," 515 B.R. at 151 (internal quotation marks omitted).

[18] Since the statute of limitations under New York's Debtor and Creditor Law for fraudulent conveyances is six years, the Trustee could not recover transfers from BLMIS to Sentry that occurred before December 11, 2002 as initial transfers even if Section 546(e) did not apply. Thus, he cannot recover any subsequent transfers of those transfers under Section 550(a). The only subsequent transfers the Trustee can even potentially recover under Section 550(a) are subsequent transfers of customer property that was initially transferred after December 11, 2002. So, the Court may only consider alleged initial transfers after December 11, 2002 (the first of which was on May 9, 2003) in determining whether an alleged subsequent transfer was a transfer of recoverable customer property; any earlier initial transfers alleged in Complaint Exhibit E must be excluded from consideration. The Trustee recognized this when in other cases he dismissed claims for subsequent transfers that occurred before May 9, 2003. *See* Stipulation & Order at 3, *Picard v. Banco Itaú Europa Lux. S.A.*, No. 12-1019 (Bankr. S.D.N.Y. Jan. 26, 2022), ECF 113; Stipulation & Order ¶ 2, *Picard v. Pub. Inst. for Soc. Sec.*, No. 12-1002 (Bankr. S.D.N.Y. Dec. 21, 2021), ECF 111; Compl. Ex. E & Notice of Voluntary Dismissal, *Picard v. Lighthouse Inv. Partners LLC*, No. 11-2762 (Bankr. S.D.N.Y. Nov. 17, 2021), ECF 1-5 & 97.

[19] These exhibits consist of the Trustee's pleadings in other proceedings in this Court; the Court can take judicial notice of their contents. *See* note 9, *supra*; *O'Connor v. DL-DW Holdings, L.L.C. (In re Extended Stay, Inc.)*, 2020 WL 10762310, at *5 (Bankr. S.D.N.Y. Aug. 8, 2020) ("In the context of bankruptcy litigation, the public records of which the court may take judicial notice include documents filed in a related bankruptcy proceeding, an adversary proceeding and the underlying bankruptcy case.") (citations omitted).

18

transfers into Sentry during that period, *id*. ¶¶ 8, 11, 13, while Sentry made $691,783,262 of transfers out as redemptions to its investors and to its related funds Sigma, Lambda, Fairfield Investment Fund Limited, Fairfield Investment Trust, and FIF Advanced, Ltd. ("collectively, the Fairfield Affiliated Funds"), *id*. ¶¶ 9-10, 12, 14-16. Because the amount of money Sentry paid out dwarfed the amount it took in from BLMIS, and the funds it received from BLMIS had long run out before Sentry made its transfers to Multi-Strategy, Sentry's transfers to Multi-Strategy could not have been BLMIS customer property.

How could Sentry have paid out more than it received from BLMIS? Sentry has stated that "[f]rom time to time, to make Redemption Payments, Sentry . . . utilized subscription monies of other investors on hand that were directed for investment in BLMIS." First Am. Compl. ¶ 63, *Fairfield Sentry Ltd. v. Citco Global Custody NV*, No. 19-1122 (Bankr. S.D.N.Y. Nov. 26, 2019), ECF 19. This procedure made perfect sense during a period when investor subscriptions into Sentry exceeded investor redemptions; there would have been no point in sending money to BLMIS while simultaneously withdrawing a lesser amount. Indeed, Exhibit E to the Complaint shows that during the period December 11, 2002 to March 15, 2005, Sentry transferred hundreds of millions of dollars more cash into BLMIS than it withdrew.

| Date | Description | Account No. | Cash Deposits from Sentry to BLMIS | Cash Withdrawals from BLMIS to Sentry | Source |
|---|---|---|---|---|---|
| 5/9/2003 | CHECK WIRE | 1FN012 | | ($40,000,000) | Compl. Ex. E, at 19 |
| 7/11/2003 | CHECK WIRE | 1FN012 | | (55,000,000) | Compl. Ex. E, at 20 |
| 7/22/2003 | CHECK WIRE | 1FN012 | | (25,000,000) | Compl. Ex. E, at 20 |
| 10/23/2003 | CHECK WIRE | 1FN045 | $20,000,000 | | Compl. Ex. E, at 51 |
| 11/14/2003 | CHECK WIRE | 1FN045 | 50,000,000 | | Compl. Ex. E, at 52 |
| 1/21/2004 | CHECK WIRE | 1FN012 | 50,000,000 | | Compl. Ex. E, at 21 |
| 3/10/2004 | CHECK WIRE | 1FN012 | 50,000,000 | | Compl. Ex. E, at 21 |
| 8/31/2004 | CHECK WIRE | 1FN012 | 100,000,000 | | Compl. Ex. E, at 22 |
| 12/28/2004 | CHECK WIRE | 1FN045 | 100,000,000 | | Compl. Ex. E, at 54 |
| **Totals** | | | **$370,000,000** | **($120,000,000)** | |

19

As shown below, the transaction details the Trustee has provided to this Court in his numerous complaints lead to the inescapable conclusion that, in the case of Multi-Strategy and many other investors, Sentry paid redemptions to its investors with subscription money it received from Sentry's other investors, not with money it received from BLMIS.

As alleged by the Trustee, at the time Multi-Strategy redeemed, BLMIS had not transferred funds to Sentry for almost two years. Prior redemptions from Sentry exceeded the total of all potentially recoverable transfers from BLMIS to Sentry alleged by the Trustee. Thus, all potentially recoverable initial transfers from BLMIS to Sentry had already been exhausted in making redemptions to other investors before Sentry paid Multi-Strategy.

Specifically, as demonstrated in paragraphs 7-16 of the Lack Declaration and its Exhibits C-E, the Trustee's complaints show the following transaction history:

- On May 9, 2003, BLMIS transferred $40 million to Sentry. That is the earliest initial transfer alleged by the Trustee after the six-year statute of limitations cutoff date (December 11, 2002), and thus the earliest transferred customer property that could even potentially be recovered by the Trustee.

- From May 14 to May 20, 2003, Sentry paid out $51.7 million, $11.7 million more than it had received from BLMIS, thus more than exhausting the funds it had received from BLMIS on May 9, 2003.

- On June 16 and June 18, 2003, Sentry paid out an additional $10.5 million in redemptions.

- On July 11, 2003, BLMIS transferred $55 million to Sentry.

- On July 16, 2003, Sentry paid out $81.8 million, $26.8 million more than it had received from BLMIS, thus more than exhausting the July 11, 2003 transfer from BLMIS.

- On July 22, 2003, BLMIS transferred $25 million to Sentry.

- On August 15 and September 17, 2003, Sentry paid out $53.1 million, $28.1 million more than it had received from BLMIS, thus more than exhausting the July 22, 2003 transfer from BLMIS.

- From September 18, 2003 to March 14, 2005, Sentry paid out $406.4 million, without receiving any more money from BLMIS.

- On March 15, 2005, Sentry paid out $25.8 million to Multi-Strategy, as well as $62.5 million to others, again without receiving any more money from BLMIS.

Accordingly, the Trustee's conclusory allegation that the money sent by Sentry to Multi-Strategy came from BLMIS is implausible in light of the Trustee's own detailed, specific allegations of cash flows into and out of Sentry, and cannot be credited on a motion to dismiss. Put another way, because "[t]here is an obvious alternative explanation" for the source of Multi-Strategy's redemption, "that explanation renders [the Trustee's] competing explanation conceivable but not plausible." *Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.*, 2020 WL 6323462, at *5 (S.D.N.Y. Oct. 28, 2020) (cleaned up).

While the preceding analysis considers data drawn from all the Trustee's complaints in Sentry subsequent transferee actions, the Court also can conclude that the Trustee's allegation that Multi-Strategy received BLMIS customer property is implausible, based solely on documents attached to or incorporated by reference into the Complaint in this case.

In particular, pages 19-20 of Exhibit E to the Complaint (Lack Decl. Ex. C, at 19-20) show that the three cash withdrawals (labeled "Check Wire") from Sentry's BLMIS accounts that occurred both within the six-year statute of limitations period and before Multi-Strategy's March 15, 2005 redemption—namely, the withdrawals that occurred on May 9, July 11, and July 22, 2003—totaled $120 million. But between those dates and the day before the Multi-Strategy redemption, more than $124 million was transferred from Sentry just to the Fairfield Affiliated Funds, without even considering the hundreds of millions of dollars transferred to other investors that redeemed in the interim as alleged in other Trustee complaints. The more than $124 million sent to the Fairfield Affiliated Funds can be seen in exhibits to the Amended Complaint in

21

*Picard v. Fairfield Sentry Ltd.* (09-1239 ECF 23-1) (Lack Decl. Ex. E) that are expressly

incorporated by reference in paragraph 44 of the Complaint against Multi-Strategy:[20]

| Date | Recipient | Amount | Source | Ex. E Page |
|------|-----------|--------|--------|------------|
| 5/14/2003 | Fairfield Investment Fund | ($3,200,000) | 09-1239 ECF 23-1 Ex. 15 | 42 |
| 5/14/2003 | Fairfield Investment Fund | (6,525,000) | 09-1239 ECF 23-1 Ex. 15 | 43 |
| 5/14/2003 | Fairfield Investment Trust | (2,110,788) | 09-1239 ECF 23-1 Ex. 17 | 59 |
| 5/14/2003 | Fairfield Lambda | (1,100,000) | 09-1239 ECF 23-1 Ex. 9 | 25 |
| 5/14/2003 | Fairfield Sigma | (1,800,000) | 09-1239 ECF 23-1 Ex. 8 | 8 |
| 6/16/2003 | Fairfield Investment Trust | (50,000) | 09-1239 ECF 23-1 Ex. 16 | 54 |
| 7/16/2003 | Fairfield Investment Trust | (200,000) | 09-1239 ECF 23-1 Ex. 17 | 60 |
| 7/16/2003 | Fairfield Lambda | (250,000) | 09-1239 ECF 23-1 Ex. 9 | 26 |
| 7/16/2003 | Fairfield Sigma | (3,000,000) | 09-1239 ECF 23-1 Ex. 8 | 9 |
| 8/15/2003 | Fairfield Investment Fund | (1,100,000) | 09-1239 ECF 23-1 Ex. 15 | 44 |
| 8/15/2003 | Fairfield Lambda | (1,700,000) | 09-1239 ECF 23-1 Ex. 9 | 27 |
| 8/15/2003 | Fairfield Sigma | (700,000) | 09-1239 ECF 23-1 Ex. 8 | 10 |
| 9/17/2003 | Fairfield Investment Fund | (800,000) | 09-1239 ECF 23-1 Ex. 15 | 45 |
| 9/17/2003 | Fairfield Lambda | (1,300,000) | 09-1239 ECF 23-1 Ex. 9 | 28 |
| 9/17/2003 | Fairfield Lambda | (2,100,000) | 09-1239 ECF 23-1 Ex. 9 | 29 |
| 9/17/2003 | Fairfield Sigma | (2,600,000) | 09-1239 ECF 23-1 Ex. 8 | 11 |
| 9/17/2003 | Fairfield Sigma | (10,500,000) | 09-1239 ECF 23-1 Ex. 8 | 12 |
| 10/14/2003 | Fairfield Investment Fund | (1,900,000) | 09-1239 ECF 23-1 Ex. 15 | 46 |
| 10/14/2003 | Fairfield Investment Fund | (4,000,000) | 09-1239 ECF 23-1 Ex. 15 | 47 |
| 10/14/2003 | Fairfield Investment Trust | (50,000) | 09-1239 ECF 23-1 Ex. 16 | 55 |
| 10/14/2003 | Fairfield Lambda | (250,000) | 09-1239 ECF 23-1 Ex. 9 | 30 |
| 10/14/2003 | Fairfield Sigma | (600,000) | 09-1239 ECF 23-1 Ex. 8 | 13 |
| 11/19/2003 | Fairfield Investment Fund | (800,000) | 09-1239 ECF 23-1 Ex. 15 | 48 |
| 11/19/2003 | Fairfield Sigma | (2,150,000) | 09-1239 ECF 23-1 Ex. 8 | 14 |
| 12/18/2003 | Fairfield Investment Fund | (1,000,000) | 09-1239 ECF 23-1 Ex. 15 | 49 |
| 12/18/2003 | Fairfield Lambda | (175,000) | 09-1239 ECF 23-1 Ex. 9 | 31 |
| 1/21/2004 | Fairfield Lambda | (275,000) | 09-1239 ECF 23-1 Ex. 9 | 32 |
| 1/21/2004 | Fairfield Sigma | (8,650,000) | 09-1239 ECF 23-1 Ex. 8 | 15 |
| 2/18/2004 | Fairfield Lambda | (100,000) | 09-1239 ECF 23-1 Ex. 9 | 33 |
| 2/18/2004 | Fairfield Sigma | (2,150,000) | 09-1239 ECF 23-1 Ex. 8 | 16 |
| 3/18/2004 | Fairfield Lambda | (750,000) | 09-1239 ECF 23-1 Ex. 9 | 34 |
| 3/24/2004 | Fairfield Sigma | (7,350,000) | 09-1239 ECF 23-1 Ex. 8 | 17 |
| 4/20/2004 | Fairfield Lambda | (3,170,000) | 09-1239 ECF 23-1 Ex. 9 | 35 |
| 4/20/2004 | Fairfield Sigma | (4,700,000) | 09-1239 ECF 23-1 Ex. 8 | 18 |
| 4/20/2004 | Fairfield Sigma | (8,400,000) | 09-1239 ECF 23-1 Ex. 8 | 19 |
| 4/21/2004 | FIF Advanced | (700,000) | 09-1239 ECF 23-1 Ex. 18 | 65 |
| 5/17/2004 | Fairfield Investment Fund | (1,700,000) | 09-1239 ECF 23-1 Ex. 15 | 50 |

---

[20] *See* Compl. ¶ 44 ("The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein."). Substantially the same transfers are also included in exhibits to the Second Amended Complaint in *Picard v. Fairfield Sentry Ltd.*, No. 09-1239 ECF 286-5, 286-6, 286-8, 286-10.

3642052.1

| Date | Recipient | Amount | Source | Ex. E Page |
|---|---|---|---|---|
| 5/17/2004 | Fairfield Lambda | (4,700,000) | 09-1239 ECF 23-1 Ex. 9 | 36 |
| 5/17/2004 | Fairfield Sigma | (7,700,000) | 09-1239 ECF 23-1 Ex. 8 | 20 |
| 6/17/2004 | Fairfield Investment Fund | (1,000,000) | 09-1239 ECF 23-1 Ex. 15 | 51 |
| 6/17/2004 | Fairfield Lambda | (850,000) | 09-1239 ECF 23-1 Ex. 9 | 37 |
| 6/17/2004 | Fairfield Sigma | (2,500,000) | 09-1239 ECF 23-1 Ex. 8 | 21 |
| 6/17/2004 | FIF Advanced | (1,000,000) | 09-1239 ECF 23-1 Ex. 18 | 66 |
| 7/16/2004 | Fairfield Investment Trust | (150,000) | 09-1239 ECF 23-1 Ex. 17 | 61 |
| 7/16/2004 | Fairfield Investment Trust | (1,110,000) | 09-1239 ECF 23-1 Ex. 16 | 56 |
| 8/13/2004 | Fairfield Lambda | (900,000) | 09-1239 ECF 23-1 Ex. 9 | 38 |
| 8/13/2004 | Fairfield Sigma | (3,200,000) | 09-1239 ECF 23-1 Ex. 8 | 22 |
| 9/15/2004 | Fairfield Investment Fund | (2,000,000) | 09-1239 ECF 23-1 Ex. 15 | 52 |
| 9/15/2004 | Fairfield Investment Trust | (50,000) | 09-1239 ECF 23-1 Ex. 16 | 57 |
| 9/15/2004 | Fairfield Investment Trust | (75,000) | 09-1239 ECF 23-1 Ex. 17 | 62 |
| 9/15/2004 | Fairfield Lambda | (115,000) | 09-1239 ECF 23-1 Ex. 9 | 39 |
| 9/15/2004 | Fairfield Sigma | (850,000) | 09-1239 ECF 23-1 Ex. 8 | 23 |
| 9/15/2004 | FIF Advanced | (2,400,000) | 09-1239 ECF 23-1 Ex. 18 | 67 |
| 10/19/2004 | Fairfield Investment Trust | (450,000) | 09-1239 ECF 23-1 Ex. 17 | 63 |
| 10/19/2004 | FIF Advanced | (500,000) | 09-1239 ECF 23-1 Ex. 18 | 68 |
| 12/13/2004 | FIF Advanced | (880,000) | 09-1239 ECF 23-1 Ex. 18 | 69 |
| 2/16/2005 | Fairfield Lambda | (1,400,000) | 09-1239 ECF 23-1 Ex. 9 | 40 |
| 2/16/2005 | FIF Advanced | (200,000) | 09-1239 ECF 23-1 Ex. 18 | 70 |
| 2/16/2005 | FIF Advanced | (4,580,000) | 09-1239 ECF 23-1 Ex. 18 | 71 |
| | **Total** | **($124,515,788)** | | |

The transfers listed above are sufficient to show the implausibility of the Trustee's allegation that Multi-Strategy's $25.8 million redemption was BLMIS customer property, because the prior BLMIS transfers into Sentry were more than exhausted before that redemption, even when one considers only the intervening transfers from Sentry to the Fairfield Affiliated Funds, and without even considering the money transferred to others. Thus, whether the Court considers all the complaints the Trustee has filed, or just the Complaint against Multi-Strategy, it is plain that *none* of the money Multi-Strategy received from Sentry came from BLMIS. The Trustee's customer property allegations concerning Multi-Strategy do not meet the *Iqbal-Twombly* plausibility standard and must be dismissed.

3642052.1

### III.   THE COURT LACKS PERSONAL JURISDICTION OVER MULTI-STRATEGY

In this case, the Trustee seeks to recover a payment made by a BVI company (Sentry) from its bank account in Ireland to the Canadian bank account of a Cayman Islands company run from Canada (Multi-Strategy).  None of the recognized bases for personal jurisdiction—consent, general jurisdiction, or specific jurisdiction—exists here with respect to Multi-Strategy.

### A.   Relevant Jurisdictional Facts

Multi-Strategy is an investment fund organized as an exempted company under the laws of the Cayman Islands, with its registered office in Grand Cayman.  Therrien Decl. ¶¶ 2-3.  Throughout the time it was invested in Sentry, Multi-Strategy's affairs were conducted by its investment manager CDP, a Canadian corporation with its principal place of business in Montreal.  *Id.* ¶¶ 4-5.  Neither Multi-Strategy nor CDP ever had an office or employees in the United States.  *Id.* ¶ 5.  Multi-Strategy used an account at the Montreal branch of Caisse Centrale Desjardins, a Canadian bank, to make its investments in, and to receive its redemption from, Sentry.  *Id.* ¶¶ 6, 8, 10, 17-18.  It has never held a bank account in the United States.  *Id.* ¶ 6.

Sentry is a company organized under the laws of the BVI.  Compl. ¶ 2.  Sentry's administrator, Citco Fund Services (Europe) B.V., is a Dutch company located in Amsterdam.  Proffer ¶ 37; Therrien Decl. Ex. A, at 1.  Sentry maintained a bank account at the Dublin, Ireland branch of a Dutch bank, Citco Bank Nederland N.V.  Proffer ¶ 37.

On June 25, 2004, Multi-Strategy subscribed to shares in Sentry by signing a Subscription Agreement in Canada and faxing it to Sentry's administrator in the Netherlands, along with a $20 million wire transfer from Multi-Strategy's Canadian bank account to Sentry's Citco Bank account in Ireland.  Therrien Decl. ¶¶ 8-9.  On January 25, 2005, Multi-Strategy

24

subscribed to additional Sentry shares by signing another Subscription Agreement in Canada and

faxing it to Citco's Netherlands office, along with a $5 million wire transfer to Sentry's Citco

Bank account in Ireland.  *Id*. ¶¶ 10-11.  On February 15, 2005, Multi-Strategy requested a

redemption of its Sentry shares by faxing and mailing a request form from CDP's office in

Canada to Citco's Netherlands office.  *Id*. ¶¶ 14-15.  On March 15, 2005, Citco wired $25.8

million from Sentry's Citco Bank account in Ireland to Multi-Strategy's account in Canada.

*Id*. ¶¶ 17-18.  Neither the Subscription Agreements nor the redemption request was negotiated or

executed in the United States, *see id*. ¶¶ 12-18, and the Trustee does not allege otherwise.

### B.    Multi-Strategy Did Not Consent to Jurisdiction, and Is Not Subject to General Jurisdiction, in New York

The Trustee contends that in Multi-Strategy's Subscription Agreements with

Sentry, Multi-Strategy agreed to a choice of New York law and consented to the personal

jurisdiction of New York courts with respect to claims to recover redemptions (*see* Compl. ¶ 7),

but controlling precedent forecloses that argument.  In *Migani*, the UK Privy Council held that

the Subscription Agreement does not govern redemptions from Sentry nor does it make New

York law applicable to redemptions; instead, the redemptions are governed by Sentry's Articles

of Association and BVI law.  [2014] UKPC 9, ¶¶ 10, 17, 20.  Following *Migani*, this Court held

that a suit by the Liquidators of Sentry, a party to the Subscription Agreement, to recover a

redemption payment is not a suit "with respect to [the Subscription] Agreement" and therefore

not within the scope of its forum selection clause.  *Fairfield Sentry Ltd. v. Theodoor GGC

Amsterdam (In re Fairfield Sentry Ltd.)*, 2018 WL 3756343, at *11-12 (Bankr. S.D.N.Y. Aug. 6,

2018) ("*Fairfield I*").[21]  Accordingly, the Subscription Agreements do not provide a consent to

---

[21] The Sentry subscription agreements signed by Multi-Strategy are identical in all relevant respects to the form of Sentry subscription agreement analyzed in *Fairfield I*.  *Compare* Therrien

suit for claims over redemptions by the Trustee, who is not even a party to or a third-party

beneficiary of the agreements.

The Trustee does not and cannot claim that Multi-Strategy is subject to general

jurisdiction in this Court.  General jurisdiction exists only when the defendant is "at home" in the

forum, either by being incorporated under the laws of the forum or having its principal place of

business there.  *Daimler AG v. Bauman*, 517 U.S. 117, 136-37 (2014).  As noted above, Multi-

Strategy is organized under Cayman Islands law, and its principal place of business is in Canada.

Accordingly, Multi-Strategy is not "at home" in New York or the United States.

## C.    Multi-Strategy Is Not Subject to Specific Jurisdiction in New York

The Trustee must show both a statutory basis for specific jurisdiction and that the

exercise of such jurisdiction comports with due process, *Waldman v. Palestine Liberation Org.*,

835 F.2d 317, 327-28 (2d Cir. 2016), but neither requirement is met here.

### 1.    Applicable law

Taking those requirements in reverse order, the exercise of specific jurisdiction

over a nonresident defendant will be consistent with due process only if (1) the defendant

"purposefully availed itself of the privilege of conducting activities within the forum State, thus

invoking the benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958);

(2) the plaintiff's claim "arise[s] out of or relate[s] to the foreign corporation's activities in the

forum State," *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); and

(3) the exercise of jurisdiction is reasonable under the circumstances, *Burger King Corp. v.

Rudzewicz*, 471 U.S. 462, 477-78 (1985).

---

Decl. Exs. A & B, both at ¶ 19, *with Fairfield I*, 2018 WL 3756343, at *8 n.17, *and* Declaration
of Thomas J. Moloney, Ex. A, ¶ 19, ECF No. 961-1 filed in *Fairfield Sentry Ltd. v. Theodoor
GGC Amsterdam*, Adv. Proc. No. 10-3496 (Bankr. S.D.N.Y.).

As a statutory basis for personal jurisdiction, the Complaint (¶ 8) invokes CPLR § 302 and Bankruptcy Rule 7004. As relevant here (where plaintiff does not allege a tortious act or ownership of New York real property by defendant), CPLR § 302(a) provides personal jurisdiction over an out-of-state defendant only if (i) the defendant "transacts any business within the State" of New York and (ii) the plaintiff's claim "arises from" such business activity. CPLR § 302(a)(1). As interpreted by the New York Court of Appeals, the two prongs of CPLR § 302(a)(1) are largely coextensive with the first two cited requirements of the due process test. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246-49 (2d Cir. 2007) (examining New York Court of Appeals cases). Similarly, Bankruptcy Rule 7004(f) provides for personal jurisdiction in an adversary proceeding, upon service of process in accordance with Fed. R. Civ. P. 4, if "the exercise of jurisdiction is consistent with the Constitution and laws of the United States."

Thus, under either CPLR § 302(a)(1) or Bankruptcy Rule 7004(f), the statutory analysis largely collapses into the constitutional analysis, albeit with one difference: Under the CPLR, defendant must have the required minimum contacts with New York, whereas under the Bankruptcy Rule, the required contacts are those with the United States as a whole.

## 2. The Trustee's claim does not arise out of or relate to any purposeful conduct of Multi-Strategy in the United States

Considering the nonconclusory factual allegations in the Complaint, as well as the additional allegations the Trustee presumably would make in any amended complaint based on the Proffer, and the underlying facts,[22] the alleged contacts identified by the Trustee either do not

---

[22] In deciding a Rule 12(b)(2) motion, the court may consider materials outside the pleadings, including affidavits and other written materials. *Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015). The court assumes the verity of the allegations "to the extent they are uncontroverted by the defendant's affidavits." *Id.* (citation omitted).

3642052.1

constitute purposeful availment by Multi-Strategy or else have no substantial connection to the

Trustee's claim to recover Sentry's redemption payment to Multi-Strategy.

### *Knowledge that Sentry purported to invest subscription funds with BLMIS.*

The Trustee alleges that Multi-Strategy is subject to personal jurisdiction in this Court because it

invested in Sentry in order to profit from Sentry's investment in New York-based BLMIS's

purported trading strategy in the United States.  *See* Compl. ¶ 6.  But the law is clear that an

anticipated performance in New York by a third party two steps removed from the defendant

does not show the purposeful availment necessary for specific jurisdiction.  Indeed, even when a

foreign defendant contracts *directly* with a forum resident, that alone does not suffice to show

purposeful availment.  *Burger King*, 471 U.S. at 478 ("If the question is whether an individual's

contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts

in the other party's home forum, we believe the answer clearly is that it cannot.").

The fact that a third party would perform in New York under a contract or

subcontract is at most "unilateral activity" by the third party, and cannot show that the *defendant*

had the required contact with the forum.  *See Walden v. Fiore*, 571 U.S. 277, 291 (2014)

("'[U]nilateral activity' of a third party . . . 'cannot satisfy the requirement of contact with the

forum State.'"); *Helicopteros,* 466 U.S. at 417 ("unilateral activity of another party or a third

person is not an appropriate consideration").  The Supreme Court has made clear that specific

jurisdiction must be established by "contacts that the 'defendant *himself*' creates with the forum

State," *not* by "contacts between the plaintiff (or third parties) and the forum State," and *not* by

"the defendant's contacts with persons who reside there."  *Walden*, 571 U.S. 284-85 (citations

omitted).  Thus, the actual or anticipated activities of BLMIS or Sentry in New York cannot be

considered in determining whether Multi-Strategy engaged in purposeful conduct in New York.

Even alleging that a defendant *knew* of a third party's "strong forum connections" does not change the unilateral nature of another party's activities in the forum and make them a permissible consideration in assessing whether the defendant itself had sufficient contacts with the forum. *Id*. at 289 (holding that, when court of appeals "looked to petitioner's knowledge of respondents' 'strong forum connections,'" it "impermissibly allow[ed] a plaintiff's contacts with the defendant and the forum to drive the jurisdictional analysis" and "improperly attribute[d] a plaintiff's forum connections to the defendant").

In accord with these fundamental principles, New York federal and state courts have routinely refused to find specific jurisdiction over a nonresident defendant based on allegations that the defendant contracted with a New York plaintiff that performed or was expected to perform under the contract in New York.[23]  Embellishing such allegations, as the Trustee does here, by pleading that the defendant hoped to "profit" or "benefit" from another party's anticipated activities in New York in performance of the contract does not transmute them into something more than "unilateral acts" of another party insufficient to establish

---

[23] *See, e.g., Giuliano v. Barch*, 2017 WL 1234042, at *9 (S.D.N.Y. Mar. 31, 2017) ("Plaintiff's contention that the Court has personal jurisdiction because Plaintiff performed *his* obligations under the Agreements in New York is also unavailing."); *Jonas*, 116 F. Supp. 3d at 327 (allegations that plaintiff "built out an office in New York, hired personnel, and performed trades and analyses here is also unavailing" because "his unilateral activity in the forum state would be insufficient to establish jurisdiction"); *Roper Starch Worldwide, Inc. v. Reymer & Assocs.*, 2 F. Supp. 2d 470, 474 (S.D.N.Y. 1998) (defendant's "knowledge of, and acquiescence in," New York plaintiff's performance in New York of services under the parties' contract did not suffice to establish personal jurisdiction over nonresident corporation); *Met. Air Serv., Inc. v. Penberthy Aircraft Leasing Co.*, 648 F. Supp. 1153, 1157 (S.D.N.Y. 1986) (fact that New York plaintiff performed its services under the parties' contract entirely in New York did not render California defendant subject to personal jurisdiction); *SunLight Gen. Cap. LLC v. CJS Invs. Inc.*, 114 A.D.3d 521, 522 (1st Dep't 2014) ("Plaintiff's actions within New York" in connection with contract with out-of-state defendant could not "be imputed to [defendant] for jurisdictional purposes"); *J.E.T. Advertising Assocs., Inc. v. Lawn King, Inc.*, 84 A.D.2d 744, 745 (2d Dep't 1981) (no specific jurisdiction  because "[a]ll of the New York activities relating to the contract were performed by plaintiff and cannot be attributed to the defendant").

personal jurisdiction over the defendant.  As the New York Court of Appeals has explained,

"The mere receipt by a nonresident of benefit or profit from a contract performed by others in

New York is clearly not an act by the recipient in this State sufficient to confer jurisdiction under

our longarm statute." *Ferrante Equip. Co. v. Lasker-Goldman Corp.*, 26 N.Y.2d 280, 285 (1970)

(citation omitted).  Thus, whether Multi-Strategy hoped to profit from BLMIS's purported

trading activities in New York when it invested in Sentry does nothing to establish that Multi-

Strategy purposefully availed itself of the benefits and protections of New York law.[24]

The case law makes clear that the pertinent question is, instead, whether and to

what extent the defendant performed or was obligated to perform in New York under the

contract.[25]  Here, Multi-Strategy was simply an investor in Sentry, and Sentry's Subscription

Agreement and Articles of Association did not require Multi-Strategy to provide any good,

service, or other performance in New York or the United States, much less envision "continued

and wide-reaching contacts," *Burger King*, 471 U.S. at 479-80, between Multi-Strategy and New

York or the United States sufficient to create specific jurisdiction.

When weighed against the above authorities, *Picard v. Bureau of Labor*

*Insurance (In re Madoff)*, 480 B.R. 501, 516-18 (Bankr. S.D.N.Y. 2012) ("*BLI*"), and *Picard v.*

---

[24] Multi-Strategy did not in fact obtain any benefit from trading in U.S. securities because, as the Trustee concedes, Madoff never "cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform" on behalf of any investor.  Compl. ¶ 27.

[25] *See Mortg. Funding Corp. v. Boyer Lake Pointe, LC*, 379 F. Supp. 2d 282, 288 (E.D.N.Y. 2005) ("Even though the Plaintiff may have expended time, energy and resources in New York . . . carrying out [its] obligations under the alleged contract, the Plaintiff's business interactions with New York are not at issue when assessing personal jurisdiction.  Rather, the Court must evaluate the Defendants' activities and conduct" in New York."); *Int'l Customs Assocs. v. Ford Motor Co.*, 893 F. Supp. 1251, 1262 (S.D.N.Y. 1995) ("contention that the majority of [plaintiff]'s performance under the contract would occur in New York" did not establish jurisdiction, because "appropriate focus . . . is on what the non-domiciliary defendant did in New York and not on what the plaintiffs did") (citations omitted), *aff'd*, 201 F.3d 431 (2d Cir. 1999).

*BNP Paribas S.A. (In re Madoff)*, 594 B.R. 167, 190-92 (Bankr. S.D.N.Y. 2018), do not support

a finding of minimum contacts based on knowledge of Sentry's investment in New York-based

BLMIS.  *BLI* did not address any of the arguments made above, and predated the Supreme

Court's opinion in *Walden*.[26]  *BNP Paribas* is likewise inconsistent with the governing case law

and is readily distinguishable, including by the fact, emphasized by Judge Bernstein, that many

of the subsequent transfers alleged in that case "were largely the result of" the activities in New

York of BNP Paribas's Fund Derivative Group, which "operated from New York."  594 B.R. at

192.  By contrast, the Trustee does not allege that Multi-Strategy engaged in any activities in

New York in connection with its redemption.

*Alleged receipt of subsequent transfers of BLMIS customer property.*  The

Trustee asserts that personal jurisdiction exists because Multi-Strategy allegedly knowingly

received subsequent transfers of BLMIS customer property by withdrawing money from Sentry.

Compl. ¶ 6.  But as shown in Point II, the Trustee's own filings show this conclusory allegation

to be implausible.

Moreover, even if the redemption payment received by Multi-Strategy had

originated from BLMIS in New York, that would not qualify as a purposeful contact by Multi-

Strategy with New York under the facts here.  It is well established that sending payments into

---

[26] The *BLI* defendant's argument on specific jurisdiction was limited to two pages asserting that it had no control over how Sentry invested its subscription monies and that it could not reasonably be subjected to suit in New York because its investment just happened to "end up" with BLMIS.  *See BLI*, No. 11-2732 (Bankr. S.D.N.Y.), ECF 10, at 10-11.  The briefing in *BLI* made it appear that the dispositive issue was whether the defendant's investment ended up in a BLMIS account "merely . . . as a result of happenstance or coincidence," 480 B.R. at 517, or whether the Trustee adequately alleged that the defendant knew that Sentry's investment strategy consisted of placing money with BLMIS.  But Multi-Strategy's argument here is, instead, that knowledge of what another party such as Sentry did (or said it was going to do) in the forum is jurisdictionally irrelevant under *Walden* and many other cases never presented to Judge Lifland.

and/or receiving payments from New York, *even in the hundreds of millions of dollars*, does not constitute purposeful availment if the payments were made in order to comply with the terms of a contract negotiated and executed outside New York, as were the contracts here.[27]

For example, in *Hau Yin To*, foreign investors in certain Madoff feeder funds brought suit in New York against various foreign HSBC affiliates that acted as administrator, custodian, or payee bank for the feeder funds.  The plaintiffs argued that personal jurisdiction was established over the defendants in New York because they had "directed and transferred hundreds of millions of dollars to and from BLMIS New York" and "received and facilitated the transfer of Madoff's criminal proceeds out of BLMIS in New York for the benefit of certain Feeder Funds, and vice versa from the Feeder Funds to BLMIS."  2017 WL 816136, at *2.

The District Court held that these allegations failed to establish that the defendants had "purposefully avail[ed] [themselves] of the privilege of conducting activities within [New York]."  *Id*. at *5 (citations omitted).  The District Court explained that "a foreign defendant's communications with a party in New York or sending of monies into New York are not sufficient to establish personal jurisdiction" if the "communications with and payments to New York were made merely to ensure compliance with contract terms negotiated and executed

---

[27] *See Hau Yin To v. HSBC Holdings PLC*, 2017 WL 816136, at *5 (S.D.N.Y. Mar. 1, 2017) (holding that "communications with and payments to New York merely to ensure compliance with contract terms negotiated and executed outside of New York do not 'project' a defendant into the state sufficiently to confer personal jurisdiction over it"), *aff'd*, 700 F. App'x 66 (2d Cir. 2017); *Rosenblatt v. Coutts & Co. AG*, 2017 WL 3493245, at *4 (S.D.N.Y. Aug. 14, 2017) (foreign defendant's act of sending payment to plaintiff's New York bank account pursuant to agreement negotiated and executed outside the United States was not purposeful availment); *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339-40 (S.D.N.Y. 2016) (allegations that "Foreign Defendants communicated with and transmitted . . . funds to and from BLMIS located in New York" did not show purposeful availment since these "communications and payments were incidental consequences of fulfilling a foreign contract"); *Roper*, 2 F. Supp. 2d at 474-75 ("merely sending payment to New York" pursuant to contract negotiated and executed in Illinois or Michigan "is not sufficient to establish personal jurisdiction").

outside of New York." *Id.* (citations omitted).   Because the plaintiffs did not allege the

defendants' agreements with BLMIS or the funds were negotiated or executed in New York, the

fact that "the Foreign Defendants have communicated with and transmitted information and

funds to and from BLMIS located in New York, in connection with their fund administration

and/or custodial duties under agreements negotiated with BLMIS" were only "incidental

consequences of fulfilling a foreign contract" and would not defeat dismissal for lack of personal

jurisdiction. *Id.* at *6 (citations omitted).  On appeal, the Second Circuit affirmed.

Similarly here, the two subscription payments from Multi-Strategy and the one

redemption payment to it were made pursuant to contracts with Sentry, which the Trustee does

not allege were negotiated or executed in New York, and thus do not suffice to establish personal

jurisdiction regardless of whether the payments passed to, from, or through New York.

***Alleged New York residency of Sentry.***  The Trustee alleges that Sentry was

managed by FGG personnel in New York and had its principal place of business in New York,

so by investing with Sentry, Multi-Strategy allegedly "accepted the rights, benefits, and

privileges of conducting business and/or transactions in the United States and New York."

Compl. ¶ 7.  This theory is variant of the Trustee's first theory that a defendant can become

subject to personal jurisdiction because of another person's residence and conduct in the

forum—except in this instance the Trustee identifies Sentry rather than BLMIS as the New York

person performing under a contract in New York—and it is wrong for the same reasons.  *See* pp.

28-31, *supra*.

***Allegedly sending a copy of a Subscription Agreement to New York.***  The

Trustee alleges, "upon information and belief," that Multi-Strategy sent a copy of a Subscription

Agreement to FGG's New York office.  Compl. ¶ 7.  This does not show purposeful availment.

3642052.1

Multi-Strategy's two Subscription Agreements were signed in Canada and faxed to the administrator Citco's Netherlands office for acceptance or rejection per the instructions in the agreement itself. *See* Therrien Decl. ¶¶ 8-12 & Ex. A & B, ¶¶ 2, 4. If a copy was also superfluously sent to New York, that does nothing to add to or change the fact that the contract was formed outside the United States. *See Kimco Exch. Place Corp. v. Thomas Benz, Inc.,* 34 A.D.3d 433, 434 (2d Dep't 2006) ("The defendants' acts of faxing the executed contracts to New York . . . do not qualify as purposeful acts constituting the transacting of business."). Nor does the Trustee's claim "arise out of or relate to" Multi-Strategy's sending an extra copy of a subscription agreement to New York (if that in fact ever happened). Whether Multi-Strategy did so has nothing to do with whether Madoff ran a Ponzi scheme, whether BLMIS made an initial transfer to Sentry, or whether any such initial transfer can be traced to Multi-Strategy.

### *Nonparty foreign bank's use of a correspondent bank account in New York.*

The Trustee alleges that Multi-Strategy entered into a subscription agreement with Sentry under which it "wired funds to Fairfield Sentry through a bank in New York." Compl. ¶ 7. The Subscription Agreement indeed contains wire transfer instructions, indicating that Sentry maintained a bank account at Citco Bank's Dublin branch and that Citco Bank in turn maintained a correspondent account in Citco Bank's own name at HSBC Bank USA in New York. *See* Therrien Decl. Exs. A & B, ¶ 3.[28] The Trustee does not allege that *Multi-Strategy itself* held a bank account in New York. Allegations concerning correspondent bank accounts do nothing to establish any of the requirements for specific jurisdiction in this case.

---

[28] Similarly, Multi-Strategy's Canadian bank also had a correspondent account in New York. Therrien Decl. ¶ 15 n.2.

The fact that Sentry used a nonparty foreign bank (Citco Bank) that in turn wanted U.S.-dollar wire transfers routed to it through an account that Citco Bank had at a New York bank, would not even show purposeful availment of New York law by Sentry, much less by Multi-Strategy.  Opinions that have found the use of correspondent bank accounts to be relevant to personal jurisdiction, such as *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013), *Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56 (S.D.N.Y. 2016), and *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316 (2016), all involved cases where *the defendant was the foreign bank* that maintained a correspondent account in New York.  The defendant foreign bank was held subject to specific jurisdiction because, in those cases, its use of the New York correspondent account was both purposeful and essential to an element of the claim against the foreign bank.[29]

None of those cases suggests that a non-bank defendant purposefully avails itself of New York law if it or another party or a nonparty maintains a foreign bank account at a foreign bank, and that foreign bank chooses to maintain and use a New York correspondent account to facilitate U.S.-dollar wire transfers.  When courts have addressed whether a bank's maintenance of a correspondent account should be imputed to a customer of the bank for purposes of specific jurisdiction, the answer, not surprisingly, has been no.  *See Steinberg v. A Analyst Ltd.*, 2009 WL 806780, at *6 (S.D. Fla. Mar. 26, 2009) (no jurisdiction under CPLR

---

[29] *See Licci*, 732 F.3d at 169, 172 (defendant foreign bank's use of New York correspondent account to funnel money to Hezbollah was directly related to plaintiffs' claim that bank financed terrorist organization by executing U.S.-dollar-denominated wire transfers on its behalf); *Arcapita*, 549 B.R. at 68-69 (defendant foreign banks themselves "selected U.S. dollars as the currency" for the transaction and "designated New York correspondent bank accounts to receive the funds from Arcapita," and receipt of funds into those accounts was "precisely . . . the activity that the cause of action seeks to have avoided"); *Rushaid*, 28 N.Y.3d at 327 (defendant foreign bank's use of correspondent account was "essential step in the money-laundering scheme").

§ 302(a)(1) to recover redemption payment made to foreign defendant hedge fund where fund

did not maintain a bank account in the United States, even though fund used a foreign bank that

had a correspondent bank account in New York in connection with redemption).

But ultimately, any allegation about correspondent bank accounts here is a red

herring, for even if Multi-Strategy had sent its subscription money directly into a New York

account as its final destination, that still would not have constituted purposeful availment.  As

demonstrated above (pp. 31-33 & n.27), it is well established that sending "payments to New

York merely to ensure compliance with contract terms negotiated and executed outside of New

York do not 'project' a defendant into the state sufficiently to confer personal jurisdiction."

*Letom Mgmt. Inc. v. Centaur Gaming, LLC*, 2017 WL 4877426, at *7 (S.D.N.Y. Oct. 27, 2017)

(fact that contract required payments to New York bank account did not establish specific

jurisdiction).  A fortiori, neither does routing money through an intermediate account in New

York, along the way to an ultimate destination in Ireland or Canada.

The Trustee's allegations about Citco Bank's correspondent New York bank

account also fail to establish specific jurisdiction for the independent reason that his claim does

not "arise out of or relate to" the fact that Sentry had a bank account with a nonparty foreign

bank that in turn maintained and used a correspondent bank account in New York.  Neither the

existence of Madoff's Ponzi scheme, nor any alleged initial transfer from BLMIS to Sentry, nor

any alleged subsequent transfer from Sentry to Multi-Strategy relates in any way, causally or

logically, to the mechanics of how Sentry received subscription payments or made redemptions.

All elements of the Trustee's claim and its asserted injury would be exactly the same if Sentry

had used a foreign bank that preferred to have U.S.-dollar wire transfers to it routed through an

intermediary bank in Katmandu or Timbuktu, or if Sentry had eschewed wire transfers altogether

3642052.1

and specified that subscription payments should be made by mailing a check to Ireland. *See Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 262 (S.D.N.Y. 2020) (no specific jurisdiction over foreign bank defendant based on its use of correspondent bank account in New York for the transfers at issue, where use of the account was not necessary to the Ponzi scheme), *appeal withdrawn*, 2021 WL 4190722 (2d Cir. Apr. 14, 2021).

> ***CDP's communications with FGG personnel located in New York.*** The Trustee alleges Multi-Strategy's investment manager CDP "communicated by e-mail and met with its Fairfield Sentry account representatives located at FGG's New York City office." Compl. ¶ 7. The meeting occurred "shortly after investing in Fairfield Sentry." Proffer ¶ 13; *see* Therrien Decl. ¶ 19. A single in-person visit to New York, after the contract was already formed, is too sporadic and attenuated to establish purposeful availment. *See, e.g., SPV Osus Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 170-71 (S.D.N.Y. 2015) (no personal jurisdiction where defendants had only "sporadic or indirect contacts with the United States"), *aff'd*, 882 F.3d 333 (2d Cir. 2018); *McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 380, 382 (1967) (fact that Illinois corporation's representatives traveled to New York and spent one day there conferring with plaintiff over contract dispute did not rise to purposeful availment under CPLR § 302(a)(1)). Nor does the Trustee's claim arise out of or relate to this isolated contact with New York.

The alleged email communications do not qualify as purposeful availment either. As the courts held in *Hau Yin To* and the other cases cited above, an out-of-state person communicating electronically or telephonically into the state with a forum resident, in connection with a contract negotiated and executed outside New York, is not purposeful availment. More generally, "'New York courts have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with

a party in New York.'" *Maranga v. Vira,* 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) (quoting *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983)); *accord Int'l Customs Assocs.*, 893 F. Supp. at 1261 ("Telephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction.") (collecting cases); *RBC Cap. Mkts., LLC v. Garcia Hamilton & Assocs., LP*, 2021 WL 230194, at *4 (S.D.N.Y. Jan. 22, 2021) (same).

Instead, "only in cases where the telephone call or communication clearly shows that the defendant intends to project itself into ongoing New York commerce, such as where a defendant directly conducts market activity or securities transactions in New York over the telephone, do New York courts sustain jurisdiction based on telephone calls or facsimile transmissions alone." *Metals Alliance Corp. v. Beshay*, 1998 WL 811788, at *2 (S.D.N.Y. Nov. 19, 1998) (citation omitted).  For example, in *Parke-Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13 (1970), a California resident participated in a live auction in New York by means of an open telephone line, thus "project[ing] himself into the auction room," "invok[ing] the benefits and protections of [New York's] laws relating to the conduct of auctions," and establishing personal jurisdiction when the auction house later sued him in New York for failing to pay his winning bids. *Id.* at 18 (cleaned up).  In such cases, the communication is itself the transaction of business in New York.

By contrast, here, none of the email communications with Sentry personnel alleged in the Complaint or the Proffer constitutes the kind of direct conduct of market activity or securities transactions in New York that amounts to purposeful availment.  Nor does the Trustee's claim arise out of or relate to these email communications.

**Albourne's alleged "due diligence."**  The Trustee alleges in the Proffer that Multi-Strategy and/or CDP "hired London-based Albourne Partners Limited . . . and its California-based subsidiary, Albourne America LLC . . . (collectively, 'Albourne'), to supplement their due diligence on Fairfield Sentry, Kingate Global, Madoff, and BLMIS," and that "[i]n February 2005, Albourne advised [them] that Madoff was potentially orchestrating a Ponzi scheme."  Proffer ¶¶ 10, 11.  The Proffer does not allege that Albourne's advice was conveyed in the United States, because it was communicated in *London*—something the Proffer hides by inserting an ellipsis when it quotes an email referring to the conversation.  *Id*. ¶ 17 (quoting email concerning a "conversation you and I had in February of 2005").[30]

A dinner in London is obviously not a jurisdictional contact with the United States.  As to any other alleged "due diligence" by Albourne, the Trustee does not say where the alleged diligence was conducted, what it comprised, or where it was delivered.[31]  Thus, his allegations about Albourne do nothing to show a jurisdictional contact with the United States. *See Hill*, 207 F. Supp. 3d at 340 (allegation that foreign defendant "hired KPMG to conduct due diligence on BLMIS" was insufficient to establish purposeful availment where plaintiffs did "not allege that [foreign defendant] conducted any of these activities in New York").

Because no contacts alleged by the Trustee constitute purposeful, in-forum conduct by Multi-Strategy from which his claim arose or to which it is related, the Trustee has not alleged a prima facie case of personal jurisdiction, and his Complaint should be dismissed.

---

[30] The actual email reads (with the portions omitted by the Trustee italicized here): "I remember a conversation you and I had in February of 2005 *in a restaurant of London (reviewed my notes last night)*.  We had discussed Madoff and the potential ponzi scheme.  Got so scared *on my way back to Montreal* that we redeemed on March 31st of 2005."  Therrien Decl. Ex. G.

[31] In fact, there was none.  *See* Therrien Decl. ¶¶ 28-29.

## CONCLUSION

For the foregoing reasons, the Trustee's Complaint against Multi-Strategy should

be dismissed.

Dated:  New York, New York
          January 28, 2022

                                  Respectfully submitted,


                                  s/ Robert J. Lack
                                  Robert J. Lack (rlack@fklaw.com)
                                  Jeffrey C. Fourmaux (jfourmaux@fklaw.com)
                                  Dielai Yang (dyang@fklaw.com)
                                  FRIEDMAN KAPLAN SEILER
                                      & ADELMAN LLP
                                  7 Times Square
                                  New York, NY 10036-6516
                                  Telephone: (212) 833-1100
                                  Facsimile: (212) 833-1250

                                  *Attorneys for Defendant*
                                  *Multi-Strategy Fund Limited*

3642052.1