# Exhibit K

Eastern Caribbean Supreme Court, Territory Of The Virgin Islands, In The Court Of Appeal's judgment in *Quilvest Finance Ltd. v. Fairfield Sentry Ltd.*, case nos. HCVAP 2011/041–052, available at [https://www.eccourts.org/quilvest-finance-ltd-and-others-v-fairfield-sentry-ltd/](https://www.eccourts.org/quilvest-finance-ltd-and-others-v-fairfield-sentry-ltd/).

EASTERN CARIBBEAN SUPREME COURT
TERRITORY OF THE VIRGIN ISLANDS

IN THE COURT OF APPEAL

HCVAP 2011/041

On appeal from the Commercial Division

BETWEEN:

QUILVEST FINANCE LIMITED

Appellant/Defendant

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/042

BETWEEN:

[1] CAJA DE AHORROS Y MONTE DE PIEDAD DE MADRID
[2] DEUTSCHE BANK (SUISSE) SA

Appellants/Defendants

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/043

BETWEEN:

SNS GLOBAL CUSTODY BV

Appellant/Defendant

and

FAIRFIELD SENTRY LIMITED (In Liquidation)

Respondent/Claimant

1

HCVAP 2011/044

BETWEEN:

DEUTSCHE BANK TRUST COMPANY AMERICAS

Appellant/Defendant

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/045

BETWEEN:

[1]  BANK JULIUS BAER & CO LIMITED
[2]  LLOYDS TSB BANK
[3]  MARTELLO NOMINEES LIMITED (formerly MEESPIERSON
     NOMINEES (GUERNSEY) LIMITED)
[4]  ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES
     LIMITED (formerly FORTIS (ISLE OF MAN) NOMINEES
     LIMITED)

Appellants/Defendants

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/046

BETWEEN:

WISE GLOBAL FUND LIMITED

Appellant/Defendant

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

2

HCVAP 2011/047

BETWEEN:

**[1] LOMBARD, ODIER, DARIER, HENTSCH & CIE**
**[2] MIRABAUD & CIE**

*Appellants/Defendants*

and

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

*Respondent/Claimant*

HCVAP 2011/048

BETWEEN:

**[1] SG PRIVATE BANKING (SUISSE) SA**
**[2] LOMBARD, ODIER, DARIER, HENTSCH & CIE**

*Appellants/Defendants*

and

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

*Respondent/Claimant*

HCVAP 2011/049

BETWEEN:

**[1] EFG BANK SA**
**[2] EFG BANK EUROPEAN FINANCIAL GROUP SA**
**[3] PICTET & CIE**
**[4] SG PRIVATE BANKING (SUISSE) SA**

*Appellants/Defendants*

and

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

*Respondent/Claimant*

3

HCVAP 2011/050

BETWEEN:

[1] EFG BANKS SA
[2] SG PRIVATE BANKING (SUISSE) SA

Appellants/Defendants

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/051

BETWEEN:

PICTET & CIE

Appellant/Defendant

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/052

BETWEEN:

CREDIT SUISSE LONDON NOMINEES LIMITED

Appellant/Defendant

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/054

BETWEEN:

[1] CREDIT SUISSE LONDON NOMINEES LIMITED
[2] BUCKMORE NOMINEES LIMITED

Appellants/Defendants

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/055

BETWEEN:

CREDIT SUISSE LONDON NOMINEES LIMITED

Appellant/Defendant

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/056

BETWEEN:

CREDIT SUISSE LONDON NOMINEES LIMITED

Appellant/Defendant

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/058

BETWEEN:

[1] UBS AG NEW YORK
[2] UBS (CAYMAN) LIMITED

Appellants/Defendants

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/059

BETWEEN:

[1] UBS (CAYMAN) LIMITED
[2] UBS (LUXEMBOURG) SA

Appellants/Defendants

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/060

BETWEEN:

[1] UBS (CAYMAN ISLANDS) LIMITED
[2] UBS AG NEW YORK
[3] UBS (CAYMAN) LIMITED

Appellants/Defendants

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/061

BETWEEN:

## UBS (LUXEMBOURG) SA

Appellant/Defendant

and

## FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/062

BETWEEN:

## FAIRFIELD SENTRY LIMITED (in Liquidation)

Appellant/Claimant

and

[1] ALFREDO MIGANI & 22 others
[2] BANCO GENERAL SA/BANCA PRIVADA & 30 others
[3] BANK JULIUS BAER & CO LTD & 26 others
[4] BANK JULIUS BAER & CO LTD and others
[5] ARBITRAL FINANCE INC and 23 others
[6] BANK JULIUS BAER & CO LTD & 33 others
[7] WISE GLOBAL FUND LIMITED
[8] CREDIT SUISSE LONDON NOMINEES LIMITED

Respondents/Defendants

Before:
    The Hon. Mde. Janice M. Pereira           Justice of Appeal
    The Hon. Mr. Davidson Kelvin Baptiste       Justice of Appeal
    The Hon. Mr. Don Mitchell          Justice of Appeal [Ag.]

Appearances:
    Mr. Mark Hapgood, QC, with him, Mr. Phillip Kite, Mr. Kissock Laing and Ms.
    Colleen Farrington, for the Harney Westwood & Riegels Appellants/Respondents
    Mr. David Lord, QC, with him, Mr. Robert Foote and Ms. Claire Goldstein, for the
    Ogier Appellants/Respondents

Mr. Dominic Chambers, QC, with him, Ms. Arabella Di Iorio, for the Maples &
Calder Appellants/Respondents
Mr. David Railton, QC, with him, Mr. Paul Webster, QC and Ms. Nadine Whyte, for
the O'Neal Webster Appellants/Respondents
Mr. Michael Brindle, QC, with him, Mr. Andrew Westwood, Mr. William Hare and
Mr. Robert Nader, for Fairfield Sentry Limited

_____

2012:   January 17, 18;
June 13.

_____

*Civil appeal – Commercial – Net Asset Value – Ponzi scheme – Trial of Preliminary Issues
– What constitutes a certificate as to Net Asset Value per Share and Redemption Price
within the meaning of Article 11(1) of Articles of Association of Fairfield Sentry – Mistake –
Whether NAV per Share should be revalued – Contract – Mutual mistake – Common
mistake – Whether surrendering shares was good consideration for payment of the
Redemption Price – Whether contract voidable in equity or common law – Whether
restitutionary claim available*

Fairfield Sentry Limited ("Sentry") had invested a substantial amount of its funds with
Bernard L. Madoff Investment Securities LLC ("BLMIS") on behalf of its shareholders
between 1997 and 2008.  BLMIS collapsed shortly thereafter when its proprietor, Bernard
L. Madoff, admitted that it had been run as a Ponzi scheme.   Both companies
subsequently went into liquidation, BLMIS in the United States, and Sentry in the Territory
of the Virgin Islands.

Sentry commenced a number of proceedings in the Virgin Islands against various former
shareholders who had redeemed their shares in the company.  The Articles of Association
of Sentry stipulated that the price at which the shares were to be redeemed was to be
calculated by reference to the company's Net Asset Value ("NAV").   Article 11 also
provided that: "Any certificate as to the Net Asset Value per Share or as to the …
Redemption Price therefor given in good faith by or on behalf of the Directors shall be
binding on all parties."

Sentry argued that in redeeming the shares, the NAV had been calculated under a mistake
since BLMIS was in fact operating a Ponzi scheme and Sentry's investments in BLMIS
were lost from the date of their investment in the company.  Accordingly, its NAV was at all
times either nil or a nominal value, so that the aggregate redemption sums should have
been either nil or nominal.  Sentry therefore contended that the former shareholders had
been unjustly enriched at its expense and were liable to make restitution to the company of
the amounts paid to them when the shares were redeemed.

8

The former shareholders (the defendants in the court below), in their pleaded defences contended, in essence, that the redemption proceeds had been paid out under a certificate as to the NAV pursuant to Article 11 and as such was conclusive and binding on Sentry. They relied on various documents comprising emails, contract notes, monthly statements as well as computer screen shots ("the Documents") as constituting certificates for the purposes of Article 11. They also contended that in surrendering their shares they gave good consideration for the payment of the Redemption Price and as such this was a complete defence to Sentry's claim.

The Article 11 Defence and the Good consideration Defence formed the basis of preliminary issues which were tried by the court below.  The trial judge found in favour of Sentry in respect of the Article 11 Defence but found in favour of the former shareholders on the Good Consideration Defence.  He subsequently, pursuant to a summary judgment application made by one of the former shareholders, dismissed Sentry's claims.   The former shareholders appealed the judge's findings in respect of the Article 11 Defence. Sentry appealed against the judge's findings in relation to the Good Consideration Defence and in respect of the summary judgment given against it dismissing its claims.

**Held**: dismissing the appeals against the learned trial judge's findings in relation to the Article 11 Preliminary Issues and upholding his finding on the Article 11 Defence; awarding one set of costs to Fairfield Sentry to be in two-thirds of the amount assessed below, and dismissing the appeal against the learned trial judge's finding in relation to the Good Consideration defence and the grant of Summary Judgment and awarding costs to the former shareholders (as one set of costs) to be fixed at two thirds of the amount as assessed below, that:

1.  Article 11(1) does not require that a certificate be signed.  If this was the case, then the Article would have expressly so stated.  The absence of a signature on a Document would not necessarily preclude it from being deemed a certificate for the purpose of Article 11(1).

    **North Shore Ventures Ltd. v Anstead Holdings Inc. and Others** [2011] 3 W.L.R. 628 distinguished.

2.  The learned trial judge was right in holding that none of the Documents could have amounted to certificates.  Firstly, the plain wording of the Article is that there can be a determination published without it having been certified. Secondly, the function that the Directors had delegated to Fairfield Greenwich and Citco was that of calculation; there is nothing in the documentation that indicates a delegation of either determination or certification.  Thirdly, there is no reason why under Article 11 there cannot be an uncertified determination which is not binding: the plain meaning of the wording of the Article is that not every determination is intended to be binding on the parties. Fourthly, the mere stating of a precise price will not suffice for any Document to amount to a certificate.  The learned trial judge was correct to find that a certificate must be something more than a simple statement.

Lastly, the certificate must have been issued either by the Directors or by some agency to whom the power to certify was delegated.  The Documents were not issued by the Directors, nor was there any delegation of the power to certify.

3.  A claimant may be entitled to restitution if he can show that a defendant was unjustly enriched at his expense.  However, this payment may be irrecoverable where the claimant  was required to pay by contract.  In the present case, there were specified contractual obligations to be fulfilled by both Sentry and former shareholders by virtue of Article 10 of Sentry's Articles of Association.  The former shareholders fully performed all their obligations under the contract.  Upon a request by them for redemption of their shares, Sentry was contractually bound to pay the Redemption Price for the shares, the Redemption Price having been determined by the Directors of Sentry.  Sentry, in paying the Redemption Price did so in the discharge of its debt obligations to the redeeming shareholders pursuant to Sentry's Articles which remained perfectly valid and in force.

   **Goff & Jones: The Law of Unjust Enrichment** (8th edn., Sweet & Maxwell 2011) considered.

4.  The alleged mistaken calculation of the NAV does not undermine the legal obligation which required that Sentry pay the Redemption Price to the former shareholders upon their request.  Sentry's contractual obligations gave rise to a debt obligation whatever the value of the shares and the surrender of the rights to the shares by the former shareholders was good consideration which would defeat Sentry's restitutionary claim.

5.  The fact that BLMIS was operating as a Ponzi scheme did not render the contract between Sentry and the former shareholders impossible to perform.  The subject matter of the subscription contract was the shares; as such the subject matter existed.  The contract for the shares was with Sentry and not with BLMIS, and therefore it mattered not what the value of Sentry's investment in BLMIS was as this did not form part of the contract.  It was clearly possible for Sentry to redeem or purchase the shares at a price which was fixed by its own Directors.  Essentially, there remained a contract between Sentry and the former shareholders which was never invalidated.  On the true construction of the contract it was still possible to be performed.

   **Deutshe Morgan Grenfell Group plc v Inland Revenue Commissioners and another** [2007] 1 A.C. 558 applied; **Bell and Another v Lever Brothers, Limited** [1932] A.C. 161 applied.

6.  Mistake as to a quality of the thing contracted for would not affect assent unless it was the mistake of both parties, and was as to the existence of some quality which made the thing without the quality essentially different from the thing as it was believed to be.  It cannot be said that there existed a common mistake for the alleged mistaken calculation of the NAV was solely a mistake of Sentry's.  Likewise it cannot be said that there was anything essentially different about the subscription contract when it became known that BLMIS was operating as a Ponzi scheme, for the subscription contract was for the shares and the redemption payment was for the surrender of the shares.  Thus, Sentry's payment for the redeemed shares based on Sentry's alleged mistaken calculation of the NAV did not nullify Sentry's obligation to pay on redemption.

**Bell and Another v Lever Brothers, Limited** [1932] A.C. 161 applied; **Great Peace Shipping Ltd v Tsavliris Salvage (International) Ltd** [2003] Q.B. 679 applied.

7.  Applicants for summary judgment are entitled to have their applications dealt with on the facts as they are, not as they might be.  The adjournment sought by Sentry in the hope of turning up information which may assist or strengthen its case was rightly refused.

## JUDGMENT

[1]   **MITCHELL, JA [AG.]:**  Fairfield Sentry Limited ("Sentry") was the largest of the 'feeder funds' which invested monies with Bernard L. Madoff Investment Securities LLC ("BLMIS") on behalf of its shareholders between 1997 and 2008.  BLMIS collapsed in December 2008 when its proprietor, Bernard L. Madoff, admitted that it had been run as a Ponzi scheme.  BLMIS is now in liquidation in the United States.  Sentry was placed in liquidation in the Virgin Islands on 21st July 2009.  It has commenced a number of proceedings in the Virgin Islands ("the Clawback Actions") against various shareholders who redeemed their shares in Sentry.  The total amount claimed by Sentry in the Clawback Actions is more than US$1 billion.

[2]   Sentry's Articles of Association ("the Articles") stipulated that the price at which the shares were to be redeemed should be calculated by reference to the Net Asset Value ("NAV") of Sentry.  The Articles contained detailed provisions as to how the NAV was to be calculated.  The claim made by Sentry in each of the Clawback

Actions is identical and is based on an alleged mistake in the calculations of the NAV of the shares redeemed by Sentry at the request of the shareholder in question.

[3]     Sentry alleges that the NAV was calculated under a mistake as BLMIS was in fact operating a Ponzi scheme, and Sentry's investments in BLMIS were lost from the date of their investment in BLMIS.  As a result, Sentry alleges, its NAV was at all times either nil or a nominal value, so that the aggregate redemption sums should have been either nil or nominal.  The consequence was that the defendants to the Clawback Actions have been unjustly enriched at its expense.  The defendants are liable to make restitution to Sentry of the amounts paid to them when Sentry redeemed their shares.

[4]     The defendants to the Clawback Actions have all served defences.  Broadly speaking, the individual defences are similar.  Some are factually intensive.  If a full trial had been held of all the matters raised in the defences it would have been a lengthy and expensive exercise.  In order to try to avoid that, some of the defendants (the "P I Defendants") proposed that preliminary issues be tried in relation to two of the pleaded defences, the Article 11 Defence and the Good Consideration Defence.  The learned trial judge accepted this proposal and formulated the preliminary issues himself.  The preliminary issue trial related to a total of eight of the Clawback Actions.  There were two issues, the first of which related to the Article 11 Defence and the second, to the Good Consideration Defence.  They were:[1]

> "(1)    Whether any (and, if so, which) of the documents copies of which are exhibited at pages 2 to 17 inclusive of exhibit PRK-1 to the affidavit of Phillip Kite sworn in the proceedings the short title and first reference to which is Fairfield Sentry Limited (in liquidation) - v- Bank Julius Baer & Co Limited and others BVIHC(COM) 30/2010 on 8 March 2011 (or copies of any further documents which may be exhibited to any witness statement made in

---

[1] See "Schedule of Preliminary Issues to be tried" which forms part of the order of Bannister J. dated 20th April 2011.

12

connection with this issue) ("the documents") is a certificate within the meaning of Article 11(1) of the Articles of Association of the Claimant ("Article 11(1)", "the Articles");

(2)   If the answer to (1) is yes, whether any (and, if so, which) of the documents is:

(a)   a certificate as to the Net Asset Value per share ('NAV');   or

(b)   a certificate as to Redemption Price within the meaning of the Articles;

(3)   If the answer to (2)(a) or (b) is yes:

Whether the publication or delivery by the Claimant

(a) as a matter of information only, or

(b) in connection with a redemption request

of a document containing substantially the same items of information as a document identified as falling within (2)(a) or (b) above to a redeeming or redeemed Member of the Claimant precludes the Claimant from asserting that money paid to that redeeming or redeemed Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.

For the purposes of this issue 'document' includes emails and materials accessible on a website maintained by the Claimant or Citco Fund Services (Europe) BV or Fairfield Greenwich Group.

(4)   Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price and, if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member."

### The Article 11 Defence

[5]   The Article 11 Defence refers to Article 11 of the Articles which makes provision for the determination of the NAV. The Article provides:

"11. (1) The Net Asset Value per Share of each class shall be determined by the Directors as at the close of business on each Valuation Day (except when determination of the Net asset Value per Share has been suspended under the provisions of paragraph (4) of this Article), on such

13

other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue and by adjusting for each class of Shares such resultant number to take into account any dividends, distributions, assets or liabilities attributable to such class of Sharers pursuant to paragraph (2) of Article 4, all determined and calculated as hereinafter provided.

Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties."

There is no definition in the Articles as to the meaning of the word 'certificate' in the last paragraph of this Article.

[6]    The first paragraph of Article 11(1) provides that the NAV per Share shall be determined by Sentry's Directors at the close of business on each Valuation Day and it stipulates how the NAV is to be calculated. The P I Defendants' position was that the above provision was satisfied when their shares in Sentry were redeemed. The legal effect is to prevent Sentry from attempting to go behind, disturb or recalculate the NAV.

[7]    Some of the documents referred to in the Preliminary Issues (the "Documents") were issued by Fairfield Greenwich (Bermuda) Ltd. ("Fairfield Greenwich"). Fairfield Greenwich was Sentry's investment manager, to which the Directors had contractually delegated the day to day management of the fund. These Documents included e-mails stating the NAV per Share. The P I Defendants submitted that these were given with the actual and/or ostensible authority of the Directors, and so constituted 'certificates' within the meaning of Article 11(1). Sentry's witness, Albertus Lokhorst, formerly a Senior Account Manager employed by Citco, said in paragraph 7 of his witness statement that Citco was authorised by Fairfield Greenwich to issue monthly statements to registered shareholders.

14

"Citco" refers to Citco Fund Services (Europe) BV.  Citco was the manager of Sentry under an Administration Agreement between Citco and Sentry dated 20th February 2003.  In those circumstances, the P I Defendants submitted, Fairfield Greenwich itself must have had actual authority to send e-mails on behalf of the Directors containing the same information as to the NAV per Share as the monthly statements.  Alternatively, and at the very least, Fairfield Greenwich had ostensible authority to send those e-mails by virtue of its position as Sentry's investment manager.  This is the Article 11 Defence.

[8]     The P I Defendants also alleged that, irrespective of the NAV per Share, they gave good consideration for Sentry's payment of the Redemption Price for the shares and that also provides them with a complete defence to Sentry's claims (the "Good Consideration Defence") which is dealt with by my learned sister Pereira J.A. whose judgment I have had the opportunity to read and with which I entirely agree and have nothing further to add.

[9]     A number of points are to be noted about the structure and terms of Article 11(1):

(a)     The first sub-paragraph provides for the *determination* by the Directors of Sentry of the NAV per Share at the close of business on each Valuation Day;

(b)     The second sub-paragraph provides how the NAV per Share is to be *calculated* at the time of each determination;

(c)     The third sub-paragraph then provides that *any certificate* as to the NAV per Share given in good faith by or on behalf of the Directors of Sentry is binding on the parties.

[10]    The argument on the Article 11 Defence before the learned trial judge turned on whether or not there had been the requisite *certification* of the NAV by or on behalf of the Directors.  The significance of the certification issue for the P I Defendants, they argued, was that once the NAV had been certified by or on behalf of the

15

Directors given in good faith it would be binding on all parties, and the Clawback Actions must fail.

[11]     It is common ground that, by the Administration Agreement, Citco was obliged, subject to the orders, instructions and directions of the Directors, to calculate and publish the NAV per Share and to deal with all correspondence and communications in relation to the redemption of Shares.  The P I Defendants submitted that, in consequence of this Agreement, Citco had actual and/or ostensible authority to issue certificates on behalf of the Directors within the meaning of the Articles, and the Documents issued by Citco constituted certificates "given … on behalf of the Directors" within the meaning of Article 11(1). A certificate can be given not only by the Directors but by another on their behalf. Sentry submitted that none of the Documents amounted to a certificate, and the judge was right so to find.  While the Directors had delegated to Citco the power to *calculate* the NAV they had not similarly delegated the power to *determine* or the power to *certify*.

[12]     The judge's findings were as follows:

> "[29]    The question, therefore, is whether any of the documents relied upon by the Defendants on this application is a certificate 'as to' the Net Asset Value and/or Redemption Price which has been signed by or on behalf of the Directors.

> "[30]    The contract notes cannot, in my judgment, be certificates within the meaning of Article 11(1).  Not only are they unsigned, but their purpose was not to certify a determination made by the Directors but to evidence the terms upon which Sentry itself was purchasing the shares of the redeeming member.  They are documents produced on behalf of Sentry, not on behalf of the Directors as the body responsible for determining the NAV.

> "[31]    The monthly statements certainly contain, within the section headed 'Fund Net Asset Values,' the information which one would expect to find in a certificate given by or on behalf of the Directors, but that does not, in my judgment, make them certificates signed by or on behalf of the Directors under Article 11.  They are documents from which the inference may be drawn

16

that the Directors have arrived at the valuation contained in the relevant section of the statement but that is not, in my judgment, the same as a certificate 'given' by or on behalf of the Directors. The statements are not signed by or on behalf of the Directors. If the question is asked whether the monthly statements, or any particular parts of the monthly statements, are certificates given on behalf of the Directors as to their valuation of the fund at any particular date, the answer must, in my judgment, be 'No'. They are documents distributed by the fund administrators informing investors, among other things, of the NAV determined, it is to be inferred by the recipient, by or on the instructions of the Directors at given dates. That does not make them certificates given by or on behalf of the Directors. Chesterton's letter of 21 March 1974[15] [*Campbell v Edwards [1976] 1 WLR 403*] was a certificate. The monthly statements, in my judgement, are not.

"[32]    For the same reasons, none of the emails (certainly not the emails from [Fairfield Greenwich]) can be regarded as a certificate given by or on behalf of the Directors. The same goes for the screenshot.

"[33]    The documents relied upon by the Defendants are compelling evidence of the NAV determined by the Directors as at particular Valuation Days but they are not, in my judgment, certificates within the meaning of Article 11(1)."

[13]    The judge handed down his judgment on 16th September 2011. By the above, he, in effect, determined the Article 11 issue in favour of Sentry. In essence, the judge found simply that there was no 'certificate' given by or on behalf of the Directors. He held that none of the documents relied on by the P I Defendants was a 'certificate' within the meaning of Article 11(1) and therefore there was nothing that was binding on Sentry and the P I Defendants. It is the judge's finding in relation to the Article 11 issue that constitutes the appeals listed as HCVAP 2011/41-52, 54-56, and 58-61 brought by the P I Defendants ("from now on referred to as the "P I Appellants") in this matter.

The Argument

17

[14]    The P I Appellants submitted that while the judge correctly recognised that, in determining whether any of the Documents relied upon by the P I Appellants was a certificate, he had to consider Article 11(1) "against the background of the commercial purposes which Sentry's Articles of Association were intended to regulate".  However, having recognised that the commercial purposes background was determinative, the judge did not identify those purposes and failed to take any such purposes into account.

[15]    The P I Appellants submitted that the evidence which the judge failed to take into account came from Mr Peter Füglistaller, the Head of Special Mandates in Hedge Fund Execution at Credit Suisse (Zurich) AG at paragraph16 of his witness statement:

> "In my experience the confirmation of the NAV and Redemption Prices by these documents [that is, the documents relied upon by the Appellants as being "certificates"] is perfectly standard in the funds industry.  Regular and accessible information on the NAV figure is clearly vital for an investor and investors rely on administrators, in this case Citco, to confirm the NAV."

[16]    The P I Appellants submitted that the background facts which the judge failed to take into account included the following:

(1)    The central importance of the calculation of the monthly NAV to Sentry's entire business operations, and in particular to the price of its shares for subscription and redemption purposes;

(2)    The wide-ranging and far-reaching decisions made by investors and others in reliance on the NAV as determined in accordance with the Articles;

(3)    The importance of certainty and finality in all commercial dealings, but especially so in the context of redeeming shares in Sentry because many of the shareholders were acting as nominees and would therefore have to account to their clients for the proceeds of redemption.

18

[17]    The P I Appellants relied on a number of Documents as being certificates within the meaning of Article 11(1).   These included: (a) the contract notes; (b) the monthly statements; (c) the e-mails; and (d) the screenshot.   The judge wrongly held, they submitted, that the contract notes were not certificates within the meaning of Article 11.   The *contract notes* were sent out by Citco on behalf of the Directors.   They evidenced the terms on which Sentry was purchasing the redeemed shares.   The terms on which Sentry was purchasing the shares were dictated by the determination of the NAV and the Redemption Price made by the Directors.   The *monthly statements* were issued by Citco and contained the NAV per Share as determined by Citco.   They were issued by Citco under express authority from the Directors.   They contained the NAV per Share as calculated by Citco under the express authority of the Directors.   The judge held that they were not certificates.   The *e-mails* were from Citco and Fairfield Greenwich to various customers.   They showed the final NAV per Share on Valuation Days.   The *screenshots* were captures taken from Citco's online pricing service website.   They also showed the NAV per Share on Valuation Days, and were similarly, they submitted, wrongly held by the judge not to be certificates.

[18]    Mr. Brindle, QC, on behalf of Sentry, submitted that the learned trial judge was correct to hold that none of the Documents amounted to a certificate as described in Article 11.   None of the *contract notes* called itself a certificate or certified anything.   It was not signed by anyone.   In the box it said that the transaction has been effected "In accordance with your instructions".   It was no more than a note recording a transaction, a contract.   It went on to say "For more information … please contact Citco."   If it was a certificate it would be final, clear and binding, and there would be no suggestion that further information might be forthcoming.   This was a Citco document, and there was no indication that it was issued on behalf of the Directors.   Similarly, he submitted, the *monthly statements* consisted principally of a summary of activities during a particular month.   While a part of it did contain a statement of the NAV, it was principally designed to be a record or

19

account of monthly activities.  It was not signed, nor did it call itself a certificate.
Mr. Brindle, QC submitted that these characteristics were indicators but were not
conclusive of their being certificates.  The *e-mails* were signed but they appeared
to be designed to give information.  The phrase, "Please be advised ..." suggested
the e-mail conveyed information, gave advice, not that it certified anything.  They
were entirely Citco documents and did not possess any degree of formality or
certification, nor did they suggest they were given for or on behalf of the Directors
of Sentry.  Some of them were headed "Pricing information", so that is what they
were.  They ended with words to the effect, "If you do not wish to receive periodic
messages such as this one in future, please unsubscribe by clicking here."  This
was not what one would expect from a certificate.  The *screenshots*, he submitted,
were grabs from the Citco website where information was stored.  Such a
screenshot could not possibly be held to be a certificate.

[19]    The P I Appellants further submitted that the judge was wrong to hold in paragraph
27 of his judgment that in order for a document to be a certificate it needed to be
signed by the Directors or on their behalf.  He was wrong to hold that an unsigned
certificate is a contradiction in terms.   The absence of a signature is not
determinative of the question whether a document is a certificate.  By giving an
unduly technical and narrow construction to the word 'certificate', Sentry seeks to
exclude all the documents that would normally be issued in the course of
processing redemption requests.

[20]    Sentry, in response, submitted that the judge was right to find as he did.  The
absence of a signature is not a trump point, but an indication point.  While a
document is not required to be signed to qualify as a 'certificate', it would be some
indication as to whether the document had the requisite degree of formality.  None
of the Documents has either the necessary formality or attests to the truth of the
matters contained in it.  In any event, Sentry submitted, even if one or more of the
Documents was a 'certificate', it does not follow that any action based on mistake
is thereby precluded.  The phrase "binding on all parties" was designed to ensure

20

they could not argue over the calculation of the NAV, not to prevent restitution in a case of fundamental mistake.

[21]   The P I Appellants further submitted that the judge was wrong to hold in paragraph 27 of his judgment that "all parties" in the context of the Articles must mean all parties bound by those Articles.   These would be the members as among themselves, and each member on the one hand and Sentry on the other.   The judge failed to appreciate the distinction between the NAV per Share and the Redemption Price.   The last paragraph of Article 11(1) refers to a certificate as to the NAV per Share or as to the Subscription or Redemption Price.   A certificate as to the Subscription or Redemption Price would only ever be issued to the subscriber or redeemer in question (as opposed to all shareholders).   Accordingly, the judge should have held, it was submitted that the phrase "all parties" in Article 11(1) means, in relation to the Subscription Price and the Redemption Price, all parties to the certificate (as opposed to all parties bound by the Articles).

[22]   The P I Appellants further submitted that the learned trial judge was wrong to hold in paragraph 28 of his judgment that a document will fall within the final paragraph of Article 11(1) only when it is a certificate given by or on behalf of the Directors in their character as the body responsible for determining the NAV under Article 11. That adds, they submitted, an unnecessary and unwarranted requirement which is not found in the words of Article 11(1) which merely requires the certificate to be given "by or on behalf of the Directors".   The Article makes no distinction between different characters in which the Directors may act when they exercise the powers and fulfil the responsibilities given to them as Directors.   The judge should have held that the correct question to ask was simply whether the Documents relied upon by the P I Appellants as constituting certificates were issued "by or on behalf of the Directors".

[23]   The P I Appellants further submitted that the judge was wrong at paragraph 30 of his judgment to discount the possibility of the contract notes being certificates on

the ground that their purpose was not to certify a determination made by the Directors but to evidence the terms upon which Sentry itself was purchasing the shares of the redeeming members. This, they submitted, was an unsustainable distinction, because under Article 10(2) the Redemption Prices that the shareholders were entitled to receive were based on the NAV determinations made by the Directors. Any formal communication of a Redemption Price necessarily was a certification of the determination of both the NAV and the Redemption Price, i.e., the terms on which the shares of the redeeming members were being purchased by Sentry. The question was one of formality, but this was not dealt with by the judge.

[24]     In any event, it was submitted, the judge should have held that, whatever other purposes the Documents may or may not have served, each of them fulfilled the purpose of being a certificate within the meaning of Article 11(1), and the fact that a Document may have served other purposes did not prevent it from being a certificate.

### The Law

[25]     No conclusive authority, lexicographical, judicial, or statutory, on the qualities required for a document to be a 'certificate' has been produced for the assistance of the Court. The P I Appellants offered the case of **The Queen v The Vestry of St Mary, Islington**.[2]     This concerned a statutory provision for the costs of maintaining disused churchyards to be "repaid … upon the certificate of the … churchwardens". The churchwarden sent a letter asking for payment of £500 before he had entered into a contract for the works. He then entered into the contract and incurred liability for an amount in excess of £500. The Court held that he was entitled to be "repaid" even though he was not yet out of pocket. Pollock B. held at page 527 that the requirement for a certificate was "amply satisfied by the letter".

---

[2] (1890) L.R. 25 Q.B.D. 523.

[26]     The P I Appellants also offered **Rexhaven Ltd. v Nurse and Another**.[3]   This concerned forfeiture of a lease for non-payment of the service charge.  The lease required the management company to estimate the costs for the next quarter and to send the lessee:

> "… a certificate of the amount so estimated and of the proportion thereof to be contributed by the lessee and the lessee shall be liable to contribute as aforesaid and such certificates shall be binding and conclusive and the amount so certified shall be paid by the lessee to the Management Company on demand".

[27]     By the time of the disputed events, the amounts due in respect of the service charge had become payable directly to the landlord.  The landlord's agents wrote a letter to the lessee, expressed as a request for payment of £190 under the lease in respect of the interim service charge, and a further letter giving a detailed breakdown of "our estimate of service charge expenditure".   Judge Colyer, QC, sitting in the Chancery Division, held that the second letter was a certificate.  He said:[4]

> "I accept, however, the propositions that Mr Neuberger has relied upon and in these circumstances I find that the letter of October 27, which of course was precise as to its figures, did satisfy the requirement for "a certificate", by which word I see the draftsman of this lease was requiring nothing more or less than a formal statement in writing of the precise amount or amounts.  I would observe, but this is *obiter dicta*, that if the figures had been scribbled on the back of an envelope and handed in a highly informal manner to the tenant, in my view that would not be enough.  Some degree of solemnity or formality is needed for a document to satisfy the requirement of this lease.  It is not enough that it be scribbled down casually.  It has to be written down and it has to be written down with precision; but here it was.  I therefore see no hope of success in the defence that there was no good certificate in this case."

The P I Appellants rely on these two cases as authority for the proposition that a certificate is  not required to contain the word 'certificate' for it to amount to such.

---

[3] (1996) 28 H.L.R. 241 at 244.
[4] At p. 250.

[28]     The dictionaries provide little assistance in determining whether any of the Documents relied on in this case amount to a 'certificate'.  **Osborn's Concise Law Dictionary**[5] defines the word as meaning "A statement in writing by a person having a public or official status concerning some matter within his knowledge or authority".  The definition in **Jowitt's Dictionary of English Law**[6] is identical, while giving examples of the principal varieties of certificates relating to legal matters taken from the cases and statutes.  **Daniel Greenberg: Stroud's Judicial Dictionary of Words and Phrases**[7] gives various examples of the use of the word from the cases and statutes, and defines it as follows: "A 'certificate', ex vi termini [from the force of the term], imports that the party certifying knows the fact that he certifies", and cites Kenyon C.J. in **Farmer v Legg**.[8]  What is certain is that the document is not required to be headed with the word "certificate".  Further, the document would import that the party issuing it was certifying that he knows the fact that the document certifies.

[29]     There are very few decisions in the West Indies of assistance.  **Re Stewardship Credit Arbitrage Fund Ltd**.[9] was a decision of the Commercial Court in Bermuda.  In this case, the company's bye-laws included a 'certificate' provision that was materially identical to that in Article 11(1).  The company argued that the particular NAV was wrong because 70% of the assets had been lost to a Mr. Petters who had been charged with fraud in the United States (the "Petters fraud") and there was no realistic prospect that the company would recover value from the assets.  In delivering his judgment refusing to recalculate the NAV, Bell J. emphasised the enormous practical difficulties of recalculating the NAV.  He said:

> "[47]     This argument ignores at least two factual matters.   First, it ignores the provisions of bye-law 19.2 which provides:

---

[5] 11th edn., Sweet & Maxwell 2012.
[6] 3rd edn., Sweet & Maxwell 2012.
[7] 7th edn., Sweet & Maxwell 2012.
[8] 7 T.R. 191.
[9] (2008) 73 WIR 136.

24

'Any certificate as to Net Asset Value, a Class NAV, a Series NAV or the Net Asset Value per Participating Share of any Class or Series or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Board shall be binding on all parties.'

For the company, it was suggested that there was no evidence that a certificate had been provided by the NAV calculation agent, who was identified in the prospectuses. Any such certificate would of course have been available to the company, but not to the Gottex funds. One would have expected that if the company wished to run this argument, it would have furnished evidence as to the position in relation to the production of a certificate.

[48]    But that point apart, it is perfectly apparent that there are enormous difficulties in determining the true position, even if such an argument were to be accepted. There is no logic in simply recalculating the NAV at the redemption date for the Gottex funds of 31 March 2008, when the Petters fraud was not discovered until some months later; there would also be a need to effect a recalculation of the position when the Gottex funds first invested, and no doubt also in relation to all other redemptions and subscriptions. As Mr Potts put it, it would be necessary to unravel the entire operation of the fund and the magnitude of such a task cannot be over emphasised. It also seems to me that to do the exercise properly, the company would need to know the true position in relation to the value of the underlying loan collateral for each revision date, or, put another way, the extent of the Petters fraud in relation to each such collateral, a truly impossible task. No doubt that is precisely why the relevant bye-law contained the provision which it did, making for certainty once the NAV had been determined."

From the judgment of Bell J., a number of principles can be extracted. One, it is clear that the parties proceeded on the assumption that no certificate had been issued. It was accepted that a certificate would have barred the requested revaluation. The company itself wished to revalue the NAV. It would not have been in its interest to produce a certificate shutting it out from such a revaluation. But, neither did the other party argue that the issuing of contract notes and other documentation quoting the NAV amounted to a certificate. So, the point was not decided by Bell J.

25

[30]    **In the Matter of Livingston International Fund Ltd. (In Liquidation)**[10] was a decision of Rawlins J. (as he then was) in the High Court in the Territory of the Virgin Islands.  The Fund was being wound up.  Interested parties had concerns and positions that were contrary to some of the recommendations that the Liquidator made in his Reports.  The concerns related mainly to the calculation of the NAV and the payment dates for valuations for unpaid redemptions and outstanding redemption requests that preceded the suspension of redemption payments.  The Liquidator recommended that the NAV should be recalculated for a particular period.  Parties that would be adversely affected by a recalculation did not agree with this recommendation.  The Liquidator referred the issues to the Court for determination.  Regulation 69 of the Articles of Association provided, according to paragraph [74] of the judgment, that the NAV for the purpose of issuing and redeeming shares shall be determined by or under the direction of the Directors as at each applicable Valuation Date.  It also stated that if the Directors and the auditors disagreed on the NAV and were unable to arrive at an agreement, the Directors should make the final determination.  Further, Regulation 72 provided that any valuations made pursuant to the Articles shall be binding on all parties.  Rawlins J. decided:

> "[84]    ... Regulation 72 of the Articles of Association of the Fund is intended to promote certainty and business efficacy.  Investors, particularly significant investors in private Funds, make far reaching decisions and, in turn, incur significant financial obligations on the basis of reported NAV's. ... For purposes of business efficacy in this case, I see no good reason to find that the published NAV's are not binding under Regulation 72."

This case can be distinguished from ours as a certificate was not required by the Articles before the NAV would be binding on the parties.  This judgment gives us no assistance in identifying what could amount to a certificate.

---

[10] British Virgin Islands Claim No. BVIHCV 2002/197 (delivered 19th May 2004, unreported).

26

[31]   **Minster Trust Ltd. v Traps Tractors Ltd. and Others**,[11] relied on by Sentry is equally unhelpful.   Here, a seller had let out plant and machinery on hire to contractors by a contract which provided that:[12]

> "On the completion of the hire each machine will be … reconditioned by you … under the supervision and to the satisfaction of the Hunt Engineering Company and the hire will cease on … the issuance of their certificate that the machines have been satisfactorily overhauled on a fully reconditioned basis".

While the work of reconditioning was being carried out under the supervision of Hunts and before their final reports had been made, the seller sold the machinery by a contract of sale which provided that all the machines were to be supplied with the Hunt Engineering Certificate that they have been fully reconditioned to their satisfaction.   Hunt's standard was a recognised standard in the industry.   The final reports on each machine forwarded by Hunts to the seller, and tendered by the seller to the buyers as certificates under the contract of sale, were headed "Inspection report".   These reports stated, among other things, that the unit in question "was accepted as reconditioned to the required standards".   By this, Hunts meant the standard required by the contract with the firm that did the reconditioning, not up to their own standard.   The parties intended that there should be a certificate from Hunts that the machines had been reconditioned up to an objective Hunts' standard.   The reconditioning of the machines was subsequently found to be unsatisfactory, and the buyers claimed damages against the seller for breach of contract.   Hunts did not consider themselves as certifying in terms of the contract of sale, but as reporting to their customer for whom alone the report was intended on the satisfactory completion of the reconditioning contract. It was held by Devlin J. in the Queen's Bench Division that the 'inspection reports' were not a compliance with the contract of sale and were not conclusive as to the standard of reconditioning, and the seller was, accordingly, in breach of contract.   I do not think that there is anything in this judgment that can offer assistance on the

---

[11] [1954] 1 W.L.R. 963.
[12] See p. 964 of the judgment.

27

issues raised in this case, save that it is clear that the document did not have to call itself a certificate. It is the nature of the document that matters.

Conclusion

[32]    Applying the law as expressed above, it would seem, in my judgment, that there is no requirement in Article 11(1) for a certificate to be signed. The Article merely says that a certificate must be "given" by or on behalf of the Directors. I accept the argument of the P I Appellants that if the Article required a certificate to be signed it would have said so.[13]

[33]    However, I am satisfied that the learned trial judge was right to reject all of the Documents as amounting to a certificate for the following reasons. Article 11 deals with the different issues of determination, calculation and certification. The plain wording of the Article is that there can be a determination published without it having been certified. The wording "any" certificate suggests that it was not obligatory that there always be a certification on each occasion that the NAV is published. There is nothing in the Article to suggest that every publication of the NAV amounts to a certification as to its accuracy.

[34]    The function that the Directors had delegated to Fairfield Greenwich and Citco was the function of calculation. There is nothing in the documentation that indicates a delegation of either of determination or of certification. While the Directors were entitled by the wording of the Article to delegate the function of certifying, there is nothing to indicate that they did in fact do so. It cannot be right that every statement of a precise NAV given in good faith by Citco or Fairfield Greenwich on behalf of Sentry whether in a contract note, in an email, or on a website amounts to a certification by or on behalf of the Directors. There would then, as in the **Livingston** case, be no need to expressly require that a calculation may be

---

[13] In North Shore Ventures Ltd. v Anstead Holdings Inc. and Others [2011] 3 W.L.R. 628 the relevant provision expressly stated that the certificate was to be "signed by North Shore".

certified.  All published calculations once determined by the Directors would be automatically certified.

[35]     There is no reason why under Article 11 there cannot be an uncertified determination which is not binding.  The entire process of calculation of the NAV and its determination operates well and the process goes forward subject to the fact that it is not binding until it is certified by or on behalf of the Directors.  The plain meaning of the wording of our Article 11 is that, unlike in the **Livingston** case, not every determination is intended to be binding on the parties.

[36]     The mere stating of a precise price will not suffice for any document to amount to a certificate, as urged by the P I Appellants.  The learned trial judge was correct to find that a certificate must be something more than a simple statement.  It must be a document which contains some formal stamp to the truth of the matter in issue.  In the case of a certificate as required by Sentry's Articles, the document must not merely state the NAV but purport to certify the Directors' determination of it.

[37]     Further, according to Article 11 the certificate must have been issued either by the Directors or by some agency to whom the power to certify was delegated.  The documents were not issued by the Directors, nor was there any delegation either in the Administration Agreement or elsewhere of the power to certify.  I am satisfied that the learned trial judge was correct to find that none of the Documents relied on by the P I Appellants as constituting a certificate amounts to the requisite certificate.

[38]     The commercial purpose point urged by the P I Appellants and relating to the finality and certainty of the NAV is attractive.  However, while the re-calculation of the NAV might on occasion be burdensome and difficult, it does not appear from the language of Article 11 or from the authorities that this exercise should never be possible.  There would otherwise be no point in providing for the possibility of the NAV being certified so as to bring finality to any question as to the accuracy of its

29

calculation.  In any event, Sentry is not seeking in this case to have the NAV recalculated.  No recalculation is required on the basis of the claims made by Sentry.  Sentry is seeking to have the NAV revalued and declared of nil or of nominal value.  This is purely a legal issue and does not involve any complex mathematical recalculation.

[39]    The learned trial judge's finding at paragraph 27 that "all parties" in the context of the Articles must mean all parties bound by the Articles is neither here nor there. This conclusion of his does not go to the merit or substance of his finding.  The clause was inserted into the Articles to provide that once a certificate had been issued by or on behalf of the Directors, no party to a particular document could argue over the calculation of the NAV.  None of the Documents amounted to the requisite certificate for the issue to develop any significance.

[40]    The fact that the learned trial judge found that the monthly statements and other Documents served other purposes than that of certifying the NAV is not of any significance.  It is clear from his judgment that a certificate can perform additional roles such as giving information.  What he found was that none of the Documents met the key element of putting a formal and binding stamp to the NAV.

[41]    For all these reasons I would dismiss the appeals against the learned trial judge's findings in relation to the Article 11 Preliminary Issues, and I would uphold his finding on the Article 11 Defence, even if for different reasons.  I would award costs (as one set) to Sentry to be in two thirds of the amount assessed below.

Don Mitchell
**Justice of Appeal [Ag.]**

I concur.                                                                          Janice M. Pereira
                                                                                    **Justice of Appeal**

I concur.                                                                          Davidson K. Baptiste
                                                                                    **Justice of Appeal**

The Good Consideration Issue

[42]  **PEREIRA, JA:**  The second preliminary issue determined by the learned trial judge was whether a redeeming member of Sentry in surrendering its shares gave good consideration for the payment by Sentry of the Redemption Price and, if so, whether that precludes Sentry from asserting that the money paid to that member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming member.

[43]  This second issue shares a common background to the Article 11 issue and is quite adequately set out by my learned brother Mitchell JA [Ag.] in his judgment and need not be repeated.  The learned trial judge determined this issue against Sentry and this is the subject of Sentry's appeal in Appeal No. 62 of 2011.

[44]  Sentry's claim is that the total NAV of the redemptions sought by the P I Respondents was calculated at various times and they were paid US$135,405,694.70 upon the redemption of their shares.  The NAV was calculated under a mistake of fact as, unbeknown to the Sentry, BLMIS was in fact operating a Ponzi scheme and Sentry's investments in BLMIS were therefore lost from the date of Sentry's investments.  The NAV was at all times either nil or a nominal sum.  In the circumstances, the P I Respondents have been unjustly enriched at the expense of Sentry and are liable to make restitution.  Further or alternatively, Sentry is entitled to set aside the redemptions on the ground that the payment of the Redemption Price was effected under a mutual mistake.

[45]  The defences are all broadly similar.  First, the redemption proceeds were paid to discharge a debt owed to each of the P I Respondents.  Once Sentry had accepted the P I Respondents' requests to redeem the shares, Sentry became indebted to each of them for the amount of the Redemption Price.  Sentry, in consideration of each of the P I Respondents redeeming its shares and relinquishing its rights as a shareholder in accordance with the Articles, discharged

31

the debt which it owed to each P I Respondent by paying to it the Redemption Price for its shares.  Each P I Respondent gave good consideration for Sentry's payment so that they have not been unjustly enriched at Sentry's expense.  Their position is that, irrespective of the NAV per share, they gave good consideration for Sentry's payment of the redemption price for the shares and that provides them with a complete defence to Sentry's claims.  This is described as the Good Consideration Defence.

[46]   The conflicting interests in our case are stark.  Do the Good Consideration Defence and the common law rule on mutual mistake, among other factors, prevent Sentry from recovering the Redemption Price paid out to the earlier redeemers who were, as a consequence of the way the fraud was designed, paid excessive sums allegedly the proceeds of investments in Bernie Madoff's Ponzi scheme?  Does the need for certainty in business transactions trump the right of a payer who has mistakenly paid sums of money in excess of the sums that were actually due to recover the excess?  Or, is a feeder fund company entitled to claw back all sums which it had received from a Ponzi scheme that was masquerading as an investment scheme and which it had then paid out to some of its investors, so that all its duped investors who had lost their investment and received little or nothing may be repaid their investment funds pro rata?

[47]   The learned trial judge on the Good Consideration Issue found as follows:

> "[34]   Left to myself I would have held that the redemption of shares in this case amounted to a bargain and sale for which the consideration received by Sentry was the surrender of the rights of the redeeming shareholder.   I cannot see how the subsequently discovered fact that BLMIS was a Ponzi scheme can be said to have vitiated that bargain so as to entitle Sentry to recover the redemption money/purchase price any more than could the discovery that a planning authority had not in fact granted consent for residential development vitiate a contract for the purchase of building plots by reason of the purchaser's own mistaken assumption that it had. [16] [*See per Lord Scott in Deutsch Morgan Grenfell Group plc v IRC [2006] UKHL 49 at paragraphs 84, 85.*]  I further fail to understand how Sentry can recover the

redemption price in circumstances in which *restitutio in integrum* is no longer possible.

[35]     I was referred to **Aiken v Short.**[17] [*(1856) 1 H&N 210*] and **Barclays Bank Ltd v WJ Simms Son & Cooke Southern Ltd**.[18] [*[1980] QB 677*] Neither case involved a sale and purchase.  In the first, a bank paid off a debt due by a customer to a third party in the mistaken belief that the debt was secured on property which stood as security for the customer's account.  It was held that the third party creditor had given good consideration by accepting the payment as discharging the debt due to her from the bank's customer.  In his short judgement Pollock CB said:

> 'Suppose it was to be announced that there was to be a dividend on the estate of a trader, and persons to whom he was indebted went to an office and received instalments of the debts due to them, could the party paying recover back the money if it turned out he was wrong in supposing that he had the funds in hand?'

That appears to me to expose the fallacy upon which the present case is founded.  **Barclays Bank v Simms**[19] [(supra)] takes the matter no further.  It decided that payment on a cheque made by a bank in breach of mandate was ineffective to discharge the drawer's obligation on it and the bank was thus entitled to recover, in contradistinction to the situation in **Aiken v Short.**[20] [(supra)].  The cases are authority for the proposition that a party will not be able to recover a payment made by mistake where the payer has received consideration from the payee.

[36]     In my judgment, therefore, it is not open to Sentry now to seek to recover the price which it paid for the purchase of the shares of redeeming investors simply because it calculated the NAV upon information which has subsequently proved unreliable for reasons unconnected with any of the redeemers."

[48]     Another of the issues between the parties was the question whether the process of redemption created a new contract by way of sale.  The learned trial judge found that it did.  He held that the redemption of shares by the defendants amounted to a fresh bargain and sale for which the consideration received by Sentry was the surrender of the share rights of the redeeming shareholders and that Sentry would

33

not be able to recover a payment made by mistake where the payer had received any consideration from the payee. He was unable to see how the subsequently discovered fact that BLMIS was a Ponzi scheme could be said to have vitiated that bargain, i.e., the purported bargain for the redemption of shares, so as to entitle Sentry to recover the Redemption Price paid to the redeeming shareholder.

[49]    The learned trial judge, (notwithstanding his misgivings[14]) having been persuaded to deal with the second issue as being one of pure law, framed the question in relation to the Good Consideration Defence in this way:

> "Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price, and if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member."

[50]    It is trite that the approach which must then be adopted in determining the question as a preliminary issue is on the assumption that the case, as pleaded, is true.

[51]    A useful starting point, in my view, is by referring to Sentry's pleaded case in relation to the Good Consideration issue. Sentry pleaded at paragraphs 9, 10, 11 and 12 of its statement of claim as follows:

> "9.    The NAV was calculated under a mistake of fact as, unbeknown to the Claimant, BLMIS was in fact operating a ponzi scheme and its investments in BLMIS were therefore lost from the date of the Claimant's investment.
>
> 10.    In the premises, the NAV of the Claimant at all times was nil or a nominal value and the Aggregate Redemption Sum should, accordingly have been nil, or in the alternative, a nominal sum.
>
> 11.    In the circumstances, the Defendants have been unjustly enriched at the expense of the Claimant, and the Defendants are liable to make restitution to the Claimant in the aggregate sum of US$135,

---

[14] See para. 3 of the judgment.

34

405,694.70, or in the alternative the difference between that sum and the said nominal amount.

12.    Further or alternatively, the Claimant is entitled to set aside the redemption of the Defendants' shares on the ground that the payment of the Aggregate Redemption sum was effected under a mutual mistake."

[52]    The learned judge was criticised, in my view unfairly, for holding that surrendering of the shares and the payment of the redemption price amounted, in effect, to a new contract. This assumption may no doubt have had its origin in the way Sentry pleaded its case which no doubt had a bearing on the framing of the question for determination.

### A new or existing contract?

[53]    On appeal, the argument advanced by Sentry relying on the House of Lords decision in **Harvela Investments Ltd. v Royal Trust Company of Canada (C.I.) Ltd. and Others**,[15] is that the surrendering of the Shares and the payment of the Redemption Price did not amount to a new contract; rather that this took place pursuant to an existing contract which was contained in Article 10 of Sentry's Articles. Sentry says that this was simply (mistaken) performance of an existing contract. Sentry, pursuant to the contract contained in the Articles was obliged to redeem the shares and was already bound to pay pursuant to Article 10. It had no option. Likewise, as the P I Respondents point out, the request once received by Sentry, could not be withdrawn without the consent of Sentry's directors. Both Sentry and a redeeming shareholder would at that point become bound to fulfil certain obligations each to the other.

[54]    In **Harvela**, the first defendant, a Jersey trust company was one of the trustees of a settlement and the registered holder on behalf of the trustees of shares in a company in which the plaintiff and the second defendant and his family also

---

[15] [1986] A.C. 207; [1985] 3 W.L.R. 276; [1985] 2 All E.R. 966.

owned shares.  Whichever of the latter two groups acquired the trustees' shares would gain control of the company.  Offers were made by both, and the first defendant decided to invite them to submit revised offers on identical terms and conditions.  They invited each to submit any revised offer that it might wish to make by sealed tender by a certain date and time.  The first defendant bound itself to accept the highest offer that complied with the terms.  The plaintiff's offer was for a certain price.  The second defendant's offer was for a specified amount in excess of any other offer, i.e., the price would be determined by reference to the price in any other offer.  The first defendant informed both offerors that in the circumstances they were bound to accept and did accept the second defendant's offer.  In an action by the plaintiff claiming the shares the High Court gave judgment in their favour.  The Court of Appeal allowed an appeal.  On appeal to the House of Lords it was held that the undertaking to accept the highest offer only invited fixed bids.  The invitation on its true construction had created a fixed bidding sale and the second defendant had not been entitled to submit, and the first defendant had not been entitled to accept, a referential bid.  The first defendant's acceptance of the second defendant's offer had been sent with the intention of fulfilling what they thought was their existing obligation due to their mistaken belief that they were bound to accept the second defendant's referential bid, not of creating any new obligation, and, accordingly, no second contract independent of the invitation had come into existence as a result of that message.

[55]   I am satisfied on the facts of **Harvela**, that the conclusion arrived at by the House of Lords was correct in principle.  I do not consider however, for the reasons which will unfold in this judgment that the ruling in that decision is of any particular relevance here.

[56]   An issue arose on the appeal as to whether we should assume that the redeemed shares and associated rights had any value.  At the hearing before the learned trial judge the parties had agreed to proceed on the basis that, even if the shares are valueless, on the mere fact they were delivered the good consideration defence

would apply.  I have already stated above the assumption which must be made in relation to the pleaded cases, as this is an appeal from the determination of a preliminary issue based on the cases of the parties as pleaded.  No evidence has been led.

[57]    The law generally regards the surrendering of contractual rights as constituting good consideration.  A very clear example of this is provided by the case of **Bell and Another v Lever Brothers, Limited**.[16]  Lever Brothers employed the two defendants who committed serious breaches of their contracts of employment, which would have justified their summary dismissal.  In ignorance of this fact, Lever Brothers entered into agreements with them to terminate their services on terms that they would receive substantial sums in compensation.  The defendants themselves did not have in mind, when these agreements were concluded, that they could have been dismissed without compensation.  The agreements were concluded under a common mistake as to the respective rights of the parties.  When Lever Brothers discovered the directors' wrongdoing it claimed rescission of the agreements and repayment of the compensation.

[58]    Justice Wright at first instance found that the mistake or misapprehension was as to the substance of the whole consideration and went "to the root of the whole matter".  He concluded that the court, as a court of equity, could do all that justice required to constitute a restitutio in integrum.  He ordered repayment of the money paid under the agreement.  The Court of Appeal upheld this judgment.  Scrutton L.J. held that the principle to be applied was the same as that applicable in the case of frustration.  Either the contract was void because of an implied term that its validity shall depend on the existence at the time of the contract, and during its term of performance, of a particular state of facts, or that there is a mutual mistake of the parties, who have made the contract believing that a particular foundation to it exists, which is essential to its existence.  In either case the absence of the

---

[16] [1932] A.C. 161.

assumed foundation made the contract void.  Greer L.J. in concurring was of the view that a mistake as to the fundamental character of the subject matter of the contract was one which, if mutual, the law would regard as rendering the contract void.

[59]     On appeal, the House of Lords, by a majority, reversed this decision.  Lord Atkin held that mistake would only nullify consent where the parties contracted under the common mistaken assumption that the subject matter of the contract existed when, in fact, this was not the case.  Mistake as to a quality of the thing contracted for would not affect assent unless it was the mistake of both parties, and was as to the existence of some quality which made the thing without the quality essentially different from the thing as it was believed to be.  He held that it was wrong to decide that an agreement to terminate a definite specified contract was void if it turned out that the agreement had already been broken and could have been terminated otherwise.  The contract released was the identical contract in both cases, and the party paying for release got exactly what he bargained for.  It seemed immaterial that he could have got the same result in another way, or that if he had known the true facts he would not have entered into the bargain.  From a commercial standpoint, the contracts of employment which the two directors surrendered might have been worthless because both directors were liable to instant dismissal without compensation.  But, in the eyes of the law, the surrender of those contracts was sufficient consideration to support the large compensation payments which the directors were paid.

[60]     Sentry concedes, based on the legal principles derived from the case law that if there was a new or separate redemption contract Sentry would not be able to recover the sums.  On that basis it accepts that it would fall under the **Bell v Lever Brothers** principle where the parties had in fact made a fresh contract.  However, Sentry says there was no new 'redemption contract' here - the only contract being the subscription contract contained in the Articles.

38

[61]    Sentry says that there could be no good consideration given by the P I Respondents as the redeemable shares and the rights attached to them were, in essence, worthless.    This is so, argues Mr. Brindle, QC on behalf of Sentry, because:

    (a)    The overwhelming majority of funds placed by the P I Respondents with Sentry for investment were invested in BLMIS;

    (b)    At all material times BLMIS was run as a Ponzi scheme and thus as a fraudulent scheme was, as a matter of law insolvent from inception;[17]

    (c)    Sentry's investments in BLMIS were therefore lost from the date they were made;

    (d)    Accordingly, the NAV of Sentry was at all material times nil, or alternatively, a nominal sum;

    (e)    Thus the shares surrendered to Sentry were of nominal or no value.

[62]    The central plank in Sentry's argument is that Sentry owed no debt to the P I Respondents and therefore the mistaken payment to them could not be said to be made in discharge of a debt obligation of Sentry.    This is so, says Sentry, because its true NAV was nil or nominal and thus the P I Respondents (as redeemers) were entitled to nothing.    In essence, that here, the P I Respondents cannot justify their enrichment since they had no legal right to receive it.

[63]    Sentry relies on the latest edition of **Goff & Jones: The Law of Unjust Enrichment**.[18]    So does Mr. Hapgood, QC on behalf of the P I Respondents.    Chapter 2 sets the stage for a claim based on unjust enrichment.    It says:

> "English law provides that a claimant will be entitled to restitution if he can show that a defendant was enriched at his expense, and that the circumstances are such that the law regards this enrichment as unjust. For example, a claimant will have a prima facie right to restitution where

---

[17] See Re Titan Investments Limited Partnership, Judicature Act, 2005 ABQB 637.
[18] 8th edn., Sweet & Maxwell 2011, p. 21, para. 2-01.

he has transferred a benefit to a defendant by mistake, under duress, or for a basis that fails. Nevertheless, the defendant can escape liability if another legal rule entitles him to keep the benefit, and this rule overrides the rule generated by the law of unjust enrichment which holds that the defendant should make restitution. For example, a claimant may have paid money to a defendant by mistake, **but the payment may be irrecoverable if the claimant was required to pay by statute or by contract**. Although the claimant has a prima facie claim in unjust enrichment, the defendant's enrichment is justified by the statute or contract, with the result that the claimant's right to restitution is nullified.[1] *[Kleinwort Benson Ltd v Lincoln CC [1999] 2 A.C. 349 at 407-408, per Lord Hope, followed in Test Claimants in the F.I.I Litigation v HMRC [2010] EWCA Civ 103; [2010] S.T.C 1251 at 181], per Arden L.J.].* (My emphasis).

[64]   Sentry therefore says, in reliance upon the texts **Goff & Jones**: **The Law of Restitution**[19] and **Graham Virgo: The Principles of the Law of Restitution**,[20] that it does not matter whether there was or was not consideration given when the relevant contract (namely the subscription contract contained in the Articles) was entered into, provided that at the time when restitution is sought it can be said that any such initial consideration has turned out to be valueless or of nominal value. Further, if there was some value in the shares then it operates pro tanto.

[65]   Mr. Hapgood, QC made the general point that contract almost always trumps restitution. He relies also on the passage cited at paragraph 63 above from **Goff & Jones**. He put forward four propositions on behalf of the P I Respondents:

   (i)   A sum paid in discharge of a contractual debt cannot generally be recovered;

   (ii)   Redemption payments were paid to discharge a contractual debt unless Sentry's Article 10 obligation was void;

   (iii)   That the one contract, two-contracts theories are irrelevant to proposition (ii); and

---

[19] 7th edn., Sweet & Maxwell 2007, para. 41-002.
[20] 2nd edn., Oxford University Press 2006, p. 171.

(iv)    Even if wrong on (ii) and (iii) the redeemers in any event gave good consideration such as to defeat a restitutionary claim.

### The Law

[66]    It is common ground that the case at bar is a two party case. The learned trial judge in his judgment referred to the cases of **Aiken v Short**[21] and **Barclays Bank Ltd v W. J Simms Son & Cooke (Southern) Ltd. and Another**.[22] These were three party cases. The text writers **Goff & Jones**[23] and **Professor Virgo**[24] distinguish between two-party and three party cases. **Goff & Jones** at para. 29-19 state as follows:

> "In two- party cases, where a claimant pays money to a defendant to discharge a legal obligation that he owes the defendant, any claim to recover the money could be met by the response that the defendant's enrichment is justified by the legal right that he had to receive the money....Moreover, even if that were not enough to bar the claim, the defendant would also be entitled to rely on the change of position defence...having released his legal obligation against the claimant in exchange for the payment."

[67]    The **Barclays Bank Ltd v W. J Simms** case, even though it concerned a tri-partite situation, dealt with the principles under which money paid under a mistake of fact is recoverable. It may be considered as a classic statement of the law on mistake. It was concerned with a payment made by the claimant bank which payment discharged (or was alleged to have discharged) an obligation owed to the defendant by a third party. In the tripartite situation there is no contractual relationship between the claimant and the defendant. Barclays Bank claimed a sum of money from the first defendant and the second defendant, the receiver of the first defendant. The bank claimed it had paid the money under a mistake of fact when the second defendant presented a cheque drawn on the bank in favour of the

---

[21] (1856) 1 Hurlstone & Norman 210.
[22] [1980] Q.B. 677.
[23] Supra note 18.
[24] Supra note 19.

first defendant.   The bank had overlooked its customer's instructions to stop payment on the cheque.

[68]    Goff J. conducted an extensive review of the authorities dealing with the principles on which money paid under a mistake of fact is recoverable.   He stated his conclusions as follows:

> "From this formidable line of authority certain principles can, in my judgment, be deduced: (1) If a person pays money to another under a mistake of fact which causes him to make the payment, he is prima facie entitled to recover it as money paid under a mistake of fact. (2) His claim may however fail if (a) the payer intends that the payee shall have the money at all events, whether the fact be true or false, or is deemed in law so to intend; or (b) the payment is made for good consideration, in particular if the money is paid to discharge, and does discharge, a debt owed to the payee (or a principal on whose behalf he is authorised to receive the payment) by the payer or by a third party by whom he is authorised to discharge the debt; or (c) the payee has changed his position in good faith, or is deemed to have done so."[25]

Goff J. added a footnote to principle 1.  He said:

> "Of course, **if the money was due under a contract** between the payer and the payee, there can be no recovery on this ground **unless the contract itself is held void for mistake** (as in Norwich Union Fire Insurance Society Ltd. v. Wm. H. Price Ltd. [1934] A.C. 455) or **is rescinded** by the plaintiff." (My emphasis).

These statements in my view lend credence to Mr. Hapgood, QC's contention and are well recognised by Goff & Jones, on which Sentry places heavy reliance, that contract will ordinarily, defeat a restitutionary claim.   This proposition holds true even under the modern law of restitution in recognition of the sanctity of contractual obligations.

[69]    Principle 2(b) encapsulates the defence of good consideration.  The defence may fail if the payer's mistake was induced by the payee, or possibly where the payee, being aware of the payer's mistake, did not receive the money in good faith.  For

---

[25] Supra note 20, p. 695.

the present purposes, neither of these situations arise in this case (as no such allegations have been made), and we can assume that the defendants acted throughout entirely innocently.

[70]     Goff J. referred to two circumstances in which the defence of good consideration would or might fail because the transaction in which the consideration was given itself fell to be set aside (i.e. where the mistake was induced by the payee or bad faith by the payee).  Similarly, Lord Scott in the **Deutsche Morgan Grenfell plc v Inland Revenue Commissioners and another**[26] case below, in addressing the situation in which the parties are in a contractual relationship, referred to the possibility that the defence would fail because the mistake enabled the contract to be set aside, or because the contract was void from the outset, or was avoided before payment.

[71]     In **Deutshe Morgan Grenfell Group plc** the House of Lords considered a bipartite situation.  The House did not disapprove of what Goff J. said in **Barclays Bank v W. J Simms**.  Lord Scott of Foscote in considering the question whether money paid or property transferred under a mistake is necessarily recoverable said that, "It surely all depends on the part played by the mistake, whether of fact or law, in the sequence of events that has led to the payment or transfer."[27]  After giving an example he then referred to the three circumstances set out by Goff J. in **Barclays Bank v W. J Simms** in which a restitutionary claim may fail.  He then referred to the fundamental difference between the first and third circumstance on the one hand, and the second circumstance on the other.  He then had this to say:

> "… Neither of these types of case [referring to the first and third circumstances] invalidates Robert Goff J's general proposition that if a mistake of fact causes a payment to be made that would not have been made but for the mistake, the payer will have a cause of action for its recovery.  They are not true exceptions.  The second however, does invalidate that proposition.  If a contract has been entered into that would not have been entered into but for a mistake, but the contract is then

---

[26] [2007] 1 A.C. 558.
[27] Ibid, para. 84.

43

completed by a payment of the price for the goods or services that the payee has supplied, the payment cannot be recovered unless the contract can be set aside. The proposition seems such an obviously correct one that it may seem pointless to ask why it is that it is correct. But I think the question does need to be asked for the answer casts, in my opinion, valuable light on the nature of the restitutionary remedy for the recovery of money paid under a mistake.

85. The reason, it seems to me, why the proposition is correct is that the mistake does not necessarily undermine the legal obligation which required the payment of the money or for the discharge of which the money was paid. If the mistake does enable the contract to be set aside then, subject to a change of position defence, the money should be recoverable. **If the contract was void from the outset (as in the "swaps" cases) or had been avoided before the payment was made, the money should be recoverable. But if the legal obligation under which the money was paid cannot be, or has not been, invalidated, then, in my opinion, whether or not it can be shown that "but for" the mistake in question the money would not have been paid, a restitutionary remedy for the recovery of the money would not be available**." (My emphasis).

[72]     The leading modern authority on the law of mutual or common mistake in England is the decision of the Court of Appeal in **Great Peace Shipping Ltd v Tsavliris Salvage (International) Ltd**,[28] where Lord Phillips MR handed down the judgment of the Court. Tsavliris was commissioned to salvage the Cape Providence. It contacted an information service to enquire about ships near enough to the stricken ship to assist with the salvage and was told that the Great Peace was only 35 miles away from the Cape Providence. Tsavliris therefore chartered the Great Peace from its owners for five days. It sought no warranty or further information from the owners as to its position. In fact, unbeknown to both parties, the Great Peace was 410 miles away from the Cape Providence and would take several extra days to get to her. On discovering this, Tsavliris chartered another, nearer ship, cancelled the charter with the Great Peace, and refused to pay anything. The owners of the Great Peace sued for five days charter. Tsavliris defended by

---

[28] [2003] Q.B. 679.

alleging that the charter contract was either void at common law or, alternatively, voidable in equity, for common mistake. The trial judge applied the construction approach and gave judgment for the claimants. He held that while there was an implied condition precedent that the Great Peace was close enough to provide the specified service, this condition was satisfied, so the contract was valid.

[73]    On appeal, Lord Phillips MR considered the history of the development of the law of common mistake and of frustration of contracts. He rejected the theory of the implied term as being unrealistic. He continued:

> "73    ...Where a fundamental assumption upon which an agreement is founded proves to be mistaken, it is not realistic to ask whether the parties impliedly agreed that in those circumstances the contract would not be binding. The avoidance of a contract on the ground of common mistake results from a rule of law under which, if it transpires that one or both of the parties have agreed to do something which it is impossible to perform, no obligation arises out of that agreement.
>
> [74]    In considering whether performance of the contract is impossible, it is necessary to identify what it is that the parties agreed would be performed. This involves looking not only at the express terms, but at any implications that may arise out of the surrounding circumstances. In some cases it will be possible to identify details of the "contractual adventure" which go beyond the terms that are expressly spelt out, in others it will not.
>
> [75]    Just as the doctrine of frustration only applies if the contract contains no provision that covers the situation, the same should be true of common mistake. If, on true construction of the contract, a party warrants that the subject matter of the contract exists, or that it will be possible to perform the contract, there will be no scope to hold the contract void on the ground of common mistake.
>
> [76]    If one applies the passage from the judgment of Lord Alverstone CJ in Blakeley v Muller & Co 19 TLR 186, which we quoted above, to a case of common mistake, it suggests that the following elements must be present if common mistake is to avoid a contract: (i) there must be a common assumption as to the

existence of a state of affairs;  (ii) there must be no warranty by either party that that state of affairs exists;  (iii) the non-existence of the state of affairs must not be attributable to the fault of either party;  (iv) the non-existence of the state of affairs must render performance of the contract impossible;  (iv) the state of affairs may be the existence, or a vital attribute, of the consideration to be provided or circumstances which must subsist if performance of the contractual adventure is to be possible."

While the decision does not bind this court, it is undoubtedly a correct statement of the law of common mistake in the Eastern Caribbean.

[74]   Sentry has not sought to say that the subscription contract is to be set aside or avoided.  Indeed as the P I Respondents point out and as noted by the trial judge, Sentry could not seek this as it is quite clear that restitutio in integrum is no longer possible.  Rather, say the P I Respondents, what Sentry seeks to say is that the contracts between itself and its shareholders were void ab initio – in short that there was no contractual relationship at all.   However, during the course of oral argument Mr. Brindle, QC made clear that Sentry was not seeking to void the contract in the Articles of Association.  He says there was no contract induced by the mistake.  He further contended that there was no need to set aside the subscription contract in order to recover.

### What was the contract?

[75]   With the legal principles extracted from the cases firmly in mind I return to the question: what was the contract here?  Accepting that there was one existing contract namely the subscription contract as contained in Sentry's Articles then that contract calls for examination and then to consider the part played by the mistake in the sequence of events leading to the payment by Sentry.

[76]   A proper starting point is the Private Placement Memorandum ("PPM").  The PPM is the source of the offer to subscribe.  It sets out the rules for investment and for the redemption of the resulting shares.  There is an entire section therein entitled

46

'Risk Factors'[29] which makes it clear that the purchase of shares in the Fund (Sentry) involves substantial risks that are incident to the Fund's allocation of assets to different types of investments.  It then set out various risk factors.  Included among them is this risk at paragraph 17:

> "**Possibility of Misappropriation of Assets.**  When the Fund invests utilizing the "split strike conversion" strategy or in a Non–SSC Investment Vehicle, it will not have custody of the assets invested.  Therefore there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund."

The PPM also stated that the Split Strike Conversion strategy is implemented by BLMIS.[30]   This makes it clear that Sentry was investing its shareholders subscription monies with full awareness of the risk of misappropriation.  The shareholder was similarly aware of that risk.  The shareholder, pursuant to the subscription agreement took the shares pursuant to the terms of the subscription agreement, the PPM and Sentry's Memorandum and Articles of Association.  The PPM clearly stated that the shares were being issued only on the basis of the information contained in the PPM.  The P I Respondents accordingly contend that Sentry must be deemed to have accepted the risks; and that the risks were on both sides.  I agree.  The P I Respondents say that the risk described at paragraph 17 of the PPM is precisely what happened here as the employees of BLMIS misappropriated the monies.

[77]    The contractual obligations arising under Sentry's Articles must then be considered.    Article 9 deals with the issuance of shares in Sentry following payment of the subscription price which is in turn based on the NAV as determined pursuant to Article 11.  Article 10 then provides for the redemption of shares.  In essence, on receipt of a redemption request Sentry is then obliged to redeem or purchase the shares.[31]  The redemption or purchase of the shares is then effected

---

[29] See Record of Appeal Tab 11 pp. 130-135 or the Private Placement Memorandum pp. 17-22.
[30] See Record of Appeal p. 122 or Private Placement Memorandum p. 9.
[31] Unless there has been a suspension as permitted under the Articles, a circumstance not relevant to this case.

at the redemption price which is the NAV per share. The NAV is determined in accordance with Article 11. Article 11 says that the NAV is determined by the Directors of Sentry and goes on further to say how the NAV is to be calculated. Upon the redemption or purchase of the shares the redeeming member's entitlement to any rights in the shares ceases.

[78]    Under the subscription contract then, what were the obligations of the parties? For the shareholder it may be said firstly to subscribe for the shares by payment of the subscription price based on the NAV. Sentry's obligation on receipt of the subscription price was to issue to the subscriber, the shares for which payment was made. These obligations of the contract were here performed by the P I Respondents and Sentry. Sentry then took the subscription monies and invested them with BLMIS fully aware of the risks. The investment may yield a good return or it may be lost. The next stage contemplated by the contract was the redemption of the shares. To trigger this process, the shareholder submits a redemption request. On receipt of the redemption request, Sentry's obligation to redeem the shares and pay the redemption price based on the NAV as determined, (not by the redeeming shareholder but by Sentry) was activated. Indeed the redemption request could not be withdrawn without Sentry's consent.

[79]    I agree with the P I Respondents that even within the context of the Article 10 contract it is clear to me that the exercise by a shareholder of his right of redemption would trigger contractual obligations on the part of Sentry, which were to redeem or purchase the shares and pay the redemption price as determined by it. I am also in full agreement with the P I Respondents that whether it was the existing Article 11 contract or whether the redemption request may be said to have brought about a new redemption contract is, to my mind wholly irrelevant. The simple fact is that the Article 10 contract clearly provided for the shareholder to redeem his shares, and that on the receipt of a redemption request given pursuant to the provisions of the Article, Sentry's obligation to redeem the shares and to pay the redemption price based on the NAV (whatever Sentry determined the NAV to

48

be) had been called in.  The mistake here in terms of the sequence of events, may be said to have occurred at the point of the determination of the NAV by Sentry. Sentry's obligation to pay had already arisen.  Put another way, Article 10 gave rise to a debt obligation on the part of Sentry in favour of the subscribing shareholder who had in fact performed all its obligations under the Article 10 contract and the redemption payment was made to discharge that debt obligation. Sentry by payment of the redemption price which was required for the performance of its side of the bargain, did exactly that – a  redemption on its part and a payment to the redeeming shareholder to which the shareholder was entitled.

[80]   I accordingly reject Mr. Brindle, QC's argument that no debt was due because due to the Ponzi scheme run by BLMIS, Sentry's NAV was nil or a nominal sum.  I agree with the P I Respondents that Sentry's contractual obligations gave rise to a debt obligation whatever the value of the shares and the surrender of the rights to the shares by the P I Respondents, in my view, having fully performed their part of the contract,  gave good consideration which defeats Sentry's restitutionary claim.

[81]   The facts of this case falls to me squarely within the principle 2(b) as set out by Goff J. in **Barclays Bank v W. J Simms** and further expounded upon in the **Deutsche Morgan Grenfell** decision.  I do not consider that the mistake here undermined the legal obligation placed upon Sentry under the contract which required it to pay the redemption price by way of discharging its obligations on the redemption of the shares.  The subject matter of the contract was the shares.  The contract for the shares was with Sentry and not with BLMIS, and therefore it mattered not what was the value of Sentry's investment in BLMIS. This did not form part of the contract.  It was Sentry who had to determine the value of the payment for the redeemed shares but making that determination or having mistakenly so determined it, does not nullify the obligation to pay on redemption. The initial consideration was the subscription monies.  I do not consider that it was of no value.  The initial consideration was also fixed by reference to Sentry's NAV.

49

Sentry, clearly obtained something of value when it issued the shares pursuant to the Article 10 contract.  On the payment of the redemption price Sentry got precisely what it paid for - the shares.  Sentry was not carrying on a fraudulent Ponzi scheme.  Indeed in the context of the subscription contract and Article 10 Sentry got all that it bargained for.  This was not a contract where it can be said that the subject matter either did not exist, or ceased to exist or where the performance of the terms were impossible.  It cannot be said that it was impossible for Sentry to redeem or purchase the shares at a price to be fixed solely by Sentry.  Indeed the mistake as to Sentry's NAV cannot be said to be a common mistake but Sentry's.  As was said by Lord Atkin in **Bell v Lever Brothers**, mistake as to a quality of the thing contracted for would not affect assent unless it was the mistake of both parties, and was as to the existence of some quality which made the thing without the quality essentially different from the thing as it was believed to be.  The subscription contract was for the shares, and the redemption payment for the surrender of the shares and not for a specific value of any interest or investment in BLMIS.

[82]    In relation to **Bell v Lever Brothers**, Lord Phillips in **Great Peace Shipping** stated that it is generally accepted that the principles of the law of common mistake expounded by Lord Atkin were based on the common law.  The issue, he said was whether there subsists a separate doctrine of common mistake founded in equity which enables the court to intervene in circumstances where the mistake does not render the contract void under the common law principles.  The Court answered this question in the negative.  The Court  held that:

> "There was no equitable jurisdiction to grant rescission for common mistake in circumstances that fell short of those in which the common law held a contract void; that it was not possible to distinguish between a mistake or common misapprehension  which was fundamental in equity and one which had a quality which made the thing contracted for essentially different from the thing that it was believed to be at common law…"

[83]    Another passage of Lord Phillips' judgment in **Great Peace Shipping** bears recital.
At paragraph 85 he states thus:

> "…Supervening events which defeat the contractual adventure will
> frequently not be the responsibility of either party.  Where, however, the
> parties agree that something shall be done which is impossible at the time
> of making the agreement, it is much more likely that, on the true
> construction of the agreement, one or other will have undertaken the
> responsibility for the mistaken state of affairs.  This may well explain why
> cases where contracts have been found to be void in consequence of
> common mistake are few and far between."

Here, the risk factors were spelled out, in relation to the shares in the PPM which
formed part of the terms under which the shares were subscribed under the
subscription agreement.  It is not alleged that the subscription agreement (Article
10 contract) was void or ought to be set aside.  There was an allocation of risks.  It
was contemplated that if the Fund (Sentry) did well then shareholders benefited
from a higher yield on a return of their investments on redemption.  If the Fund lost
the investments then likewise the shareholder would take the loss.  This was the
risk understood and accepted by both sides.  Accordingly it cannot be said that
because Sentry mistakenly calculated its NAV at the time of redemption due to
BLMIS's Ponzi scheme, that it made the contract as between Sentry and its
shareholders essentially different from what it was believed to be.

[84]    **Goff & Jones**[32] at para. 3-16 has this to say:

> "The general principle that no claim in unjust enrichment is permitted
> where a contract governing the benefit in question is still in force between
> the parties is today justifiable on the basis that the law should give effect
> to the parties' own allocations of risk and valuations, as expressed in the
> contract, and should not permit the law of unjust enrichment to be used to
> overturn those allocations or valuations."

[85]    The P I Respondents make the general point in response to Sentry's restitution
claim, that allowing such a claim is a recipe for uncertainty and confusion in
commercial transactions.  They rely on the dictum of Lord Goff in **Scandinavian**

---

[32] Supra note 16.

**Trading Tanker Co AB v Flota Petrolera Ecuatoriana (The Scaptrade)**,[33] where he said:

> "It is of the utmost importance in commercial transactions that, if any particular event occurs which may affect the parties' respective rights under a commercial contract, they should know where they stand.  The court should so far as possible desist from placing obstacles in the way of either party ascertaining his legal position, if necessary with the aid of advice from a qualified lawyer, because it may be commercially desirable for action to be taken without delay, action which may be irrevocable and which may have far-reaching consequences.  It is for this reason, of course, that the English courts have time and again asserted the need for certainty in commercial transactions – for the simple reason that the parties to such transactions are entitled to know where they stand, and to act accordingly."

[86]    I am happy to adopt this statement.  It cannot be doubted that certainty is key in commercial transactions.  Many modern day commercial transactions have a global dimension with far reaching consequences.  Parties must be able to know what their legal position is and to make decisions based on that knowledge.  It is therefore not surprising that throughout all the case law and the modern treatises on restitutionary remedies that such remedies invariably always give way to contractual obligations once ascertained or has led to the view that the law of unjust enrichment is a means of adjusting the relationships between parties 'whose rights are not met by some stronger doctrine of law" (such as the law of contract) and that the courts award restitution as a means of resolving "residual" problems.[34]

[87]    For these reasons, albeit via a different route, I agree with the ultimate conclusion arrived at by the learned trial judge that the P I Respondents gave good consideration for the surrender of their shares and Sentry's restitutionary claim would be defeated.  It is simply not open to Sentry to recover the redemption prices which it paid for the purchase of the redeemed shares because it has now been

---

[33] [1983] Q.B. 529, p. 540.
[34] See Niru Battery Manufacturing Co and Another v Milestone Trading Ltd and Others [2003] EWCA Civ 1446: [2004] Q.B. 985 at [192]: and discussed by Goff & Jones – The Law of Unjust Enrichment (8th edn. Chapter 2).

discovered that it determined its NAV on unreliable or erroneous information from BLMIS which had nothing to do whatsoever with any of Sentry's shareholders. The shareholders fully performed all their obligations under the contract. Sentry, in paying the redemption price, did so in the discharge of its debt obligations to the redeeming shareholders pursuant to Sentry's Articles which remained perfectly valid and in force. Accordingly, I would dismiss Sentry's appeal on this issue.

### The Summary Judgment

[88]    Following delivery of the 16th September judgment, ABN Amro applied for summary judgment. The learned trial judge in his decision handed down on 10th October 2011 dismissed Sentry's claim against that defendant and granted summary judgment. He ordered that Sentry pay the costs of the application, such costs to be assessed if not agreed. He also ordered Sentry to pay 75% of the P I Respondents' costs of the trial of the Preliminary Issues, to include the costs of the application for preliminary issues, such costs to be assessed if not agreed.

[89]    At paragraph 17 of his judgment, after considering the decision in **Great Peace Shipping** and the principles expounded therein went on to say as follows:

> "If one applies these principles to the present case, the question is whether the fact, contrary to the assumed understanding of both parties, that BLMIS was a Ponzi scheme, means that Sentry was unable to perform the contract which arose when a redemption notice was served in accordance with its Articles of Association. Sentry contracted to invest its members' money and return its product when demanded on the basis of a rateable proportion of Sentry's NAV. The fact that a fund in which it invested and which…was mistakenly believed by Sentry and ABN Amro to have been genuine, turned out to have been run fraudulently had no impact whatsoever upon Sentry's ability to perform these obligations. The fact, if true that upon redemption by ABN Amro, Sentry's directors should have declared a nil NAV does not make the contract void…Sentry's case on common mistake confuses (1) a shared mistaken assumption the truth of which is a necessary condition for the performance of a particular contract with (2) a shared mistaken assumption about the background against which it is expected that the contract will be performed. The

53

> former case will mean that no contract can as a matter of law, be
> concluded. The latter will not."

With these observations I entirely agree.

[90]    The learned judge went on to make the point that Sentry's claim as pleaded
appears to treat the contract between Sentry and a redeemer as liable to be
rescinded rather than void and referred to **Great Peace** as being 'clear authority
that there is no jurisdiction in equity to rescind a contract binding in law on the
grounds of common mistake. I have already referred to this at paragraph 82
above. He again reiterated that rescission is not available in circumstances as
here where restitutio in integrum is impossible. He accordingly concluded that
either way the claim made at paragraph 12 of Sentry's case, coupled with his
decision on the good consideration point was bound to fail. With this conclusion I
also agree. The learned judge quite rightly, could only deal with the case as
pleaded.

[91]    On the adjournment issue sought by Sentry in the hope that they may turn up
information which may show knowledge of BLMIS's Ponzi scheme or bad faith on
the part of redeemers, I need only repeat paragraph 22 of the learned judge's
judgment with which I entirely agree:

> "...Applicants for summary judgment are entitled to have their applications
> dealt with on the facts as they are, not as they might be, and I have never
> heard of a summary judgment application being adjourned to give the
> unsuccessful party an opportunity to improve his position by searching for
> material upon which to make fresh allegations."

He, in my view, quite rightly refused the adjournment.

### Conclusion

[92]   For the reasons which I have given, I would dismiss Sentry's appeal on all points.  I would award costs on this appeal to the P I Respondents (as one set of costs) to be fixed at two thirds of the amount as assessed below.

**Janice M. Pereira**
Justice of Appeal

I concur.

**Davidson K. Baptiste**
Justice of Appeal

I concur.

**Don Mitchell**
Justice of Appeal [Ag.]
