**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 10-05421 (CGM) |
| FRANK J. AVELLINO, *et al.*, | |
| Defendants. | |

# MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION
# FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

<strong>Page</strong>

I.      Preliminary Statement ..................................................................................1

II.     Background ...................................................................................................4

    A.      The Guilty Pleas and The Criminal Trial of Former BLMIS Employees...............4

    B.      Procedural History ........................................................................................6

    C.      The Trustee's Experts ....................................................................................7

    D.      The Summary Judgment Defendants ................................................................7

    E.      Avellino's and Bienes' Roles in the Origin and Perpetuation of the Ponzi
            Scheme for Nearly Forty Years .......................................................................8

        1.      Avellino and Bienes Partnered With Madoff's Father-in-Law to
                Operate Madoff's First "Feeder Fund" ..............................................8

        2.      Avellino and Bienes Had A Symbiotic Relationship with Madoff.............9

    F.      Avellino and Bienes Worked With Madoff to Deceive the SEC in 1992 .............10

        1.      The 1992 SEC Investigation of Avellino and Bienes Threatened
                the Viability of the Ponzi Scheme .....................................................10

        2.      To Deceive the SEC, Madoff Directs The Fraudulent "Redo" of
                Certain Customer Statements...........................................................11

        3.      Avellino Returned A&B's Original Customer Statements Between
                1989 and 1992, and BLMIS Altered Them to Match Avellino's
                and Bienes' Testimony ....................................................................12

        4.      Avellino Prepared Handwritten Ledgers Which Matched the
                Fraudulently Revised A&B Customer Statements and Produced
                These Fraudulent Records to the SEC ................................................13

        5.      To End the SEC Investigation, Madoff Had to Pay Out A&B's
                Investors, But Because BLMIS Was a Ponzi Scheme, Madoff Had
                to Illegitimately Borrow Hundreds of Millions of Dollars to Do So.........14

    G.      Madoff Agreed to Compensate Avellino and Bienes for Referring Their
            Former Investors to the IA Business.................................................................15

    H.      Madoff Compensated Avellino and Bienes Through the "Schtupping
            Process" In The New Post-1993 Entity Accounts .................................................16

i

I.      The Transfers to the Defendants ........................................................................16

ARGUMENT ..................................................................................................................18

III.    SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE NO
MATERIAL FACTS ARE IN DISPUTE.........................................................................18

A.     Legal Standard for Summary Judgment ................................................18

B.     The Trustee Is Entitled to Summary Judgment Avoiding the Transfers of
Fictitious Profits Made to Defendants During the Two-Year Period ...................19

1.    BLMIS Made the Two-Year Transfers with Actual Fraudulent
Intent and in Furtherance of the Fraud.......................................................20

a.    BLMIS Was a Ponzi Scheme.........................................................21

(i)    The IA Business Conducted No Legitimate
Securities Transactions for Customers.............................22

(1)    From the 1970s to the 1990s, the
Convertible Arbitrage Transactions on
Customer Statements Were Fake ..........................22

(2)    The Buy and Hold Transactions on
Customer Statements Were Fake ..........................24

(3)    From the 1990s to 2008, the Split-Strike
Conversion Trades on IA Customer
Statements Were Fake............................................26

(4)    Additional Proof that BLMIS Never
Engaged in the Securities Transactions on
Customer Statements .............................................27

a.    The IA Business' Computer Programs and
Systems Lacked the Ability to Execute
Securities Transactions, and Were Custom-
Designed to Operate the Fraud ..............................27

b.    From 1978 to 2008, the IA Business Used a
Single Fictitious Counterparty For All of the
Purported Securities Transactions.........................28

c.    The IA Business Was "Schtupping" Certain
IA Customer Accounts to Hit Pre-
Determined Rates of Return...................................29

　　　　　　　　　　　　d.　　Madoff's, Avellino's & Bienes' Actions to
　　　　　　　　　　　　　　　Defraud and Deflect the SEC Investigation
　　　　　　　　　　　　　　　Proves The Ponzi Scheme Existed Before
　　　　　　　　　　　　　　　1992 ..................................................................30

　　　　　　　　(ii)　　Cash Deposits of IA Customers Were Commingled
　　　　　　　　　　　　in the 703 Account, and Were the Source of
　　　　　　　　　　　　Payments to Other Customers ...............................31

　　　　　　　　(iii)　　The IA Business Generated No Profits .............................32

　　　　　　　　(iv)　　The IA Business Exhibited Several Other Indicia of
　　　　　　　　　　　　Ponzi Schemes ..................................................33

　　　　　b.　　The Trustee's Evidence of "Badges of Fraud"
　　　　　　　　Independently Establishes Actual Intent to Defraud ....................34

　　　2.　　Transfer of an Interest of the Debtor in Property .......................35

　　　3.　　Two-Year Period ........................................................35

　　C.　　The Trustee Is Entitled To Summary Judgment Against the Summary
　　　　　Judgment General Partner Defendants for the Fictitious Profits Received
　　　　　by the Summary Judgment Entity Defendants During the Two-Year
　　　　　Period .................................................................36

IV.　　THE TRUSTEE IS ENTITLED TO PREJUDGMENT INTEREST AS A
　　　　MATTER OF LAW ............................................................37

CONCLUSION .....................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
 Nos. 05 Civ. 9050(LMM), 03, MDL 1529, 2011 WL 1419617 (S.D.N.Y. Apr.
 7, 2011), aff'd, 748 F.3d 110 (2d Cir. 2014) ..........................................................................19

*Armstrong v. Collins*,
 No. 01-cv-2437, 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010),
 *reconsideration denied*, 2011 WL 308260 (S.D.N.Y. Jan. 31, 2011) ....................................20

*Banner v. Kassow*,
 104 F.3d 352 (2d Cir. 1996).....................................................................................................34

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
 380 F. Supp. 2d 334 (S.D.N.Y. 2005).......................................................................................18

*In re Bernard L. Madoff Inv. Sec. LLC*,
 654 F.3d 229 (2d Cir. 2011)......................................................................................................17

*In re Bernard L. Madoff Inv. Sec. LLC (Picard v. Merkin, et al.)*,
 440 B.R. 243 (Bankr. S.D.N.Y. 2010) ......................................................................................36

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)...................................................................................................................18

*Est. of Seymour Epstein*, Adv. Pro. No. 10-04438 (CGM) (Bankr. S.D.N.Y. Jan.
 27, 2021) ........................................................................................................................19, 37, 38

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
 No. 08-15051, 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014) ...............................20, 21, 33

*Kirschner v. Fitzsimons*,
 No. 12-cv-2652 (RJS), 2017 WL 82391 (S.D.N.Y. 2017) .......................................................34

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986)...................................................................................................................18

*Messer v. Magee (In re FKF 3, LLC)*,
 No. 13 Civ. 3601 (JCM), 2018 WL 5292131 (S.D.N.Y. Oct. 24, 2018)............................37, 38

*Picard v. Avellino, et al.*,
 Adv. Pro. No. 10-05421 (CGM) (Bankr. S.D.N.Y. Dec. 10, 2010) ...........................................6

*Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016) ...............................................................6, 7, 36

*Picard v. Cohen*,
    Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
    25, 2016) ...............................................................................................................20

*Picard v. Cohmad Sec. Corp*.,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) .................................................................20

*Picard v. Ferber*,
    Adv. Pro. No. 10-04562 (CGM) ............................................................................7

*Picard v. The Gerald and Barbara Keller Fam. Tr.*,
    Adv. Pro. No. 10-04539 (CGM), 2021 WL 4476811 (Bankr. S.D.N.Y. Sept.
    30, 2021) ....................................................................................................19, 21, 35

*Picard v. JABA Assocs. LP*,
    No. 20 cv. 3836, 2021 WL 1112342, 258 F. Supp. 3d (S.D.N.Y. Mar. 24,
    2021) ............................................................................................................ *passim*

*Picard v. Mann*,
    624 B.R. 55 (Bankr. S.D.N.Y. 2020) ........................................................35, 37, 38

*Picard v. Marilyn Bernfeld*,
    Adv. Pro. No. 10-05143 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015).........................19

*Picard v. Mendelow*,
    Adv. Pro. No. 10-04283 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015).........................19

*Picard v. Miller*,
    Adv. Pro. No. 10-04921 (CGM), 2021 WL 2787604 (Bankr. S.D.N.Y. July 2,
    2021) ............................................................................................................19, 21, 38

*Salomon v. Kaiser (In re Kaiser)*,
    722 F.2d 1574 (2d Cir. 1983)..................................................................................34

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    610 B.R. 197 (Bankr. S.D.N.Y. 2019).....................................................................34

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (Picard v. Lisa Beth
    Nissenbaum Trust)*,
    No. 20 CV. 3140, 2021 WL 1141638 (S.D.N.Y. 2021) (JGK) ........................ *passim*

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
    Madoff)*,
    Adv. Pro. No. 08-01789 (SMB), 531 B.R. 439 (Bankr. S.D.N.Y. 2015) ..........19, 20

*In re Tax Grp.*,
    439 B.R. 84 (Bankr. S.D.N.Y. 2010) ...................................................................................37

*Ying Jing Gan v. City of New York*,
    996 F.2d 522 (2d Cir. 1993) ...........................................................................................18

**Statutes**

11 U.S.C. § 548 ........................................................................................................................35

11 U.S.C. § 548(a)(1)(A) ...........................................................................................19, 37, 38

11 U.S.C. § 550(a) ...............................................................................................................36, 38

15 U.S.C. § 78fff-2(c)(3) .................................................................................................18, 35, 38

28 U.S.C. § 1961 .......................................................................................................................37

FLA. STAT. § 620.1404(1) .........................................................................................................36

FLA. STAT. § 620.8306(1) .........................................................................................................36

**Rules**

Fed. R. Bankr. P. 7056 ................................................................................................................1

Fed. R. Bankr. P. 7056-1 .......................................................................................................1, 2

Fed. R. Civ. P. 56 .......................................................................................................................1

Fed. R. Civ. P. 56(a) ................................................................................................................18

Fed. R. Civ. P. 56(c)(1) ...........................................................................................................18

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa–lll ("SIPA"), and the chapter 7 estate of Bernard L. Madoff,

respectfully submits this memorandum of law in support of the Trustee's motion (the "Motion")

under Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 for

partial summary judgment against (i) Defendants Mayfair Ventures, G.P. ("Mayfair"), Grosvenor

Partners, Ltd. ("Grosvenor"), Aster Associates ("Aster"), and St. James Associates ("St. James")

(the "Summary Judgment Entity Defendants") pursuant to Count I of the Trustee's Amended

Complaint to avoid and recover the $17.2 million in fictitious profits fraudulently transferred to

them by BLMIS between December 11, 2006 and December 11, 2008 (the "Two-Year Period"),

and (ii) their general partners (the "Summary Judgment General Partner Defendants", and

together with the "Summary Judgment Entity Defendants", the "Summary Judgment

Defendants"), pursuant to Count XIII of the Amended Complaint.  The Trustee further seeks an

award of prejudgment interest.

The facts underlying this Motion are set forth in the accompanying Trustee's Statement

of Material Facts pursuant to Local Rule 7056-1 ("Stmt.") dated February 3, 2022, the

Declaration of Regina Griffin ("Griffin Decl.") dated February 3, 2022, the Declaration of Bruce

G. Dubinsky dated February 3, 2022, the Declaration of Lisa M. Collura dated February 3, 2022,

and the Declaration of Matthew B. Greenblatt dated February 3, 2022.

## I.    Preliminary Statement

This motion for partial summary judgment to avoid and recover fictitious profits is in

many ways similar to other motions this Court has heard and determined in the Trustee's favor.

Here, as in those prior cases, there is no genuine issue of fact that Madoff operated a Ponzi

scheme through his IA Business[1] from at least the 1970s, and that the Summary Judgment Entity

Defendants received fraudulent transfers of fictitious profits in the Two-Year Period.

What is unique about this case is the critical role played by Frank Avellino ("Avellino")

and Michael Bienes ("Bienes") – who created, owned, and controlled the Summary Judgment

Entity Defendants – in perpetuating the Ponzi scheme for more than forty years.  Though they

were not employees of BLMIS, Avellino and Bienes worked hand-in-hand with Madoff to

sustain his Ponzi scheme.  They were so integral to the fabric of Madoff's fraudulent operations,

that their own activities, in conjunction with Madoff's, provide incontrovertible evidence of the

existence of the Ponzi scheme.

From the very beginning, Avellino and Bienes were more than just customers; they were

inextricably tied to the progression of Madoff's fraudulent scheme.  Alpern, Madoff's father-in-

law, provided Madoff with his first retail customers in the early 1960s, and recruited his

accounting partners, Avellino and Bienes, to assist him in operating what ultimately became

Madoff's first "feeder fund."  Year after year, Avellino and Bienes secured for Madoff the

lifeblood of every Ponzi scheme – a continuous source of cash.  Through their entity, A&B,

Avellino and Bienes funneled hundreds of millions of dollars of investors' money to the IA

Business.  Madoff rewarded Avellino and Bienes handsomely by promising them commissions

and guaranteed rates of return on the pooled cash around which they structured an entire business

and revenue stream.  By 1984, their relationship with Madoff was so financially advantageous,

Avellino and Bienes ceased providing accounting services to focus solely on feeding investors'

funds to the IA Business.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Trustee's Statement
of Material Facts pursuant to Local Rule 7056-1.

After decades of reaping the benefits of this symbiotic relationship, in 1992, the SEC began an investigation into whether Avellino's and Bienes' entity, A&B, was engaged in the unlawful sale of unregistered securities related to their practice of pooling their investors' funds to feed to Madoff. Because their business was so intertwined with, and dependent on, Madoff's IA Business, any examination into A&B inevitably threatened the viability of the Ponzi scheme. To ensure that their lucrative business venture remained intact, Avellino and Bienes actively worked with Madoff to deceive and deflect the SEC's investigation: they lied to the SEC under oath, assisted Madoff in the process of manipulating A&B's original customer statements, prepared falsified records which conformed to the revised customer statements, and produced all those fraudulent records to the SEC.

After its investigation, the SEC ordered the shutdown of A&B, and the IA Business had to return the hundreds of millions of dollars that Avellino and Bienes had fed to Madoff. Because the IA Business was operating a Ponzi scheme, however, Madoff had no securities to liquidate. Thus, to make the required payout to A&B's investors while under SEC scrutiny, Madoff resorted to, among other things, illegitimately obtaining loans from financial institutions with collateral he did not own.

Faced with a desperate cash liquidity crisis that threatened to collapse his Ponzi scheme, Madoff turned once again to Avellino and Bienes for a new source of funds. In response, they referred their thousands of former investors – and their hundreds of millions of dollars – to open direct IA Business accounts at BLMIS. Starting in 1993, Avellino and Bienes also opened IA Business accounts in the names of seven new entities they formed (the "Post-1993 Entities") — so that Madoff could continue to line their pockets. The Post-1993 Entities include the Summary Judgment Entity Defendants.

3

In exchange for referring their former investors to BLMIS, Madoff agreed to provide commissions to Avellino and Bienes through the IA Business accounts for the Post-1993 Entities in the form of (i) guaranteed rates of return, and (ii) a percentage of the cash their former investors sent to the IA Business. Madoff provided this remuneration to Avellino and Bienes through the creation of extra, fake trades in their accounts every single year from 1994 until the Ponzi scheme collapsed in December 2008.

By 2008, the IA Business accounts of Avellino and Bienes, their family members, and related entities had received more than $900 million in total transfers from BLMIS, of which more than $572 million was fictitious profits. Through this motion, the Trustee seeks partial summary judgment with respect to the $17.2 million in fictitious profits transferred to the Summary Judgment Entity Defendants within the Two-Year Period, and for which the Summary Judgment General Partner Defendants are liable under applicable law.

## II.    Background

### A.    The Guilty Pleas and The Criminal Trial of Former BLMIS Employees

On December 11, 2008 (the "Filing Date"), Madoff was arrested by the Federal Bureau of Investigation and the United States Government initiated a criminal action against him, charging him with securities fraud, and investment advisor fraud, among other things. Stmt. ¶ 1.

At a hearing on March 12, 2009, Madoff pleaded guilty to an 11-count criminal action filed against him by the United States Attorney for the Southern District of New York. Stmt. ¶ 21. At the hearing, Madoff admitted he operated a Ponzi scheme through his IA Business. Stmt. ¶ 22. Madoff further admitted that he never invested his clients' funds in securities, that he used customer funds that were commingled in a JP Morgan bank account to pay customer redemptions, and that he created false trading confirmations and client account statements to conceal that he had not executed trades for the IA Business customers. Stmt. ¶ 23.

Frank DiPascali, a BLMIS employee since 1975 and Madoff's right-hand man and chief co-conspirator, also pleaded guilty to helping perpetuate the Ponzi scheme at BLMIS.   Stmt. ¶ 24.  In his plea allocution, DiPascali admitted that "[n]o purchases of [sic] sales of securities were actually taking place in [customers'] accounts."  Stmt. ¶ 25.  DiPascali "used hindsight to file historical prices on stocks then [he] used those prices to post purchase of [sic] sales to customer accounts as if they had been executed in realtime."  Stmt. ¶ 26.  DiPascali gave detailed testimony about his participation in the Ponzi scheme at the Criminal Trial of five former BLMIS employees, in which he confirmed that BLMIS did not execute trades for the IA Business customers.  Stmt. ¶ 27.

David Kugel, another long-time BLMIS employee, also pleaded guilty to his role in the Ponzi scheme.  Stmt. ¶ 28.  Kugel admitted to helping create false, backdated trades for IA Business customers from the 1970s.  Stmt. ¶ 29.  He also testified at the Criminal Trial, where he admitted that by 1977, he knew definitively that those trades reported on account statements for customers of the IA Business were fake, and detailed his role in creating those fake transactions. Stmt. ¶ 30.

Other former employees who also pled guilty to criminal charges included Irwin Lipkin, BLMIS's first employee and controller, who admitted BLMIS's revenue was falsely inflated through fraudulent bookkeeping entries and annual audited reports.  Stmt. ¶¶ 31-32.  Eric Lipkin, payroll clerk at BLMIS, admitted BLMIS created fake reports replicating those of the DTC in order to purportedly confirm non-existent positions in the IA Business accounts for auditors and the SEC.  Stmt. ¶¶ 33-34.  Enrica Cotellessa-Pitz, BLMIS's former controller, admitted that IA Business customer money was funneled to BLMIS's proprietary trading and market-making businesses to falsely inflate revenue and hide losses.  Stmt. ¶¶ 35-36.

On March 24, 2014, five former BLMIS employees who were the defendants in the

Criminal Trial – Daniel Bonventre, Annette Bongiorno, Jo Ann "Jodi" Crupi, George Perez, and

Jerome O'Hara – were convicted in the District Court of fraud, securities violations, and other

crimes for their participation in the Ponzi scheme at BLMIS.  Stmt. ¶ 37.

### B.     Procedural History

The Trustee commenced this adversary proceeding on December 10, 2010, and filed an

Amended Complaint on November 24, 2014.  Compl., *Picard v. Avellino, et al*., Adv. Pro. No.

10-05421 (CGM) (Bankr. S.D.N.Y. Dec. 10, 2010), ECF No. 1;[2] Am. Compl., ECF No. 86.   In

the Amended Complaint, the Trustee alleged that Avellino and Bienes knew that Madoff was

operating a fraudulent IA Business, and through the entities and trusts they created, dominated,

and/or controlled, they participated in and benefitted from BLMIS's fraudulent scheme.  *Id*.  The

Amended Complaint sought to recover more than $900 million in fraudulent transfers that

Defendants[3] received from BLMIS over the course of 40 years, including fictitious profits of

$572 million.  *Id*.

Defendants filed a motion to dismiss the Amended Complaint, which the Court granted in

part, and denied in part.  *Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*, 557 B.R.

89, 116 (Bankr. S.D.N.Y. 2016) (the "MTD Decision").  In the MTD Decision, the Court

determined that the Trustee had adequately pled that Avellino had "actual knowledge" of

Madoff's fraud, which could be imputed to certain Defendants.  *Id.* at 116-117.  The Court

---

[2] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. Avellino, et al*., Adv. Pro. No. 10-05421 (CGM) (Bankr. S.D.N.Y.).

[3] The Amended Complaint was brought against thirty-five individuals and related entities.  There are thirty-one Defendants remaining in this action.

further held that the Trustee did not have standing to recover fraudulent transfers made by BLMIS to Defendants prior to January 2001.[4]  *Id.* at 107-110.

The Defendants answered the Amended Complaint on November 2, 2016.  See ECF Nos. 137-144.  The parties thereafter engaged in extensive fact and expert discovery, which is now complete.

### C.    The Trustee's Experts

In support of his *prima facie* case, the Trustee proffered expert reports from Bruce G. Dubinsky ("Dubinsky"), Lisa M. Collura ("Collura"), and Matthew B. Greenblatt ("Greenblatt"). Dubinsky, a forensic accountant, certified fraud examiner, and certified valuation analyst, with more than 30 years-experience in financial fraud investigations, confirmed that BLMIS was a Ponzi scheme. Stmt. ¶¶ 38-39.  Collura, a forensic accountant and certified fraud examiner, reconciled the cash deposits and withdrawal transactions on the customer statements for the Post-1993 Entity accounts (the "Post-1993 Entity Accounts") to IA Business bank accounts, and traced the funds received by the Post-1993 Entities from the IA Business.  Stmt. ¶¶ 40-41. Greenblatt, also a forensic accountant and certified fraud examiner, identified the methodology he used for the principal balance calculations he applied to all IA Business accounts, and to the Defendants' IA Business accounts.  Stmt. ¶ 42.

### D.    The Summary Judgment Defendants

Avellino and Bienes created the Post-1993 Entities to open accounts with Madoff's IA Business.  Stmt. ¶¶ 109-110.  The Summary Judgment Entity Defendants are four of those entities.  *Id.* at 369.

---

[4] The Trustee reserves the right to appeal the MTD Decision.  *See generally Picard v. Ferber*, Adv. Pro. No. 10-04562 (CGM), ECF No. 97, at pp. 32-36.

Defendant Mayfair is a general partnership formed under the laws of the state of Florida. Stmt. 372.   Mayfair was a customer of BLMIS's IA Business and held account number 1ZB032 ("Mayfair Account"). Stmt. ¶¶ 370-371.  Avellino and Bienes were general partners of Mayfair, along with their wives, Nancy Avellino and Dianne Bienes.  Stmt. ¶ 373.

Defendant Grosvenor is a limited partnership formed under the laws of the state of Florida.  Stmt. ¶ 376.   Grosvenor was a customer of BLMIS's IA Business and held account number 1ZB046 ("Grosvenor Account").  Stmt. ¶¶ 374-375.  Defendants Avellino and Mayfair (where Bienes was a general partner) were general partners of Grosvenor.  Stmt. ¶¶ 377-378.

Defendant Aster is a general partnership formed under the laws of the state of Florida. Stmt. ¶ 381.   Aster was a customer of BLMIS's IA Business and held account number 1ZB509 ("Aster Account"). Stmt. ¶¶ 379-380.  Defendants Avellino, Nancy Avellino, Heather Lowles, Rachel A. Rosenthal, Rachel Anne Rosenthal Trust U/A dated June 29, 1990 and Rachel Anne Rosenthal Trust Number 2 U/A dated June 24, 1992 were general partners of Aster Associates. Stmt. ¶¶ 382-387.

Defendant St. James is a general partnership formed under the laws of the state of Florida.  Stmt. ¶ 390.   St. James was a customer of BLMIS's IA Business and held account number 1ZB510 ("St. James Account").  Stmt. ¶¶ 388-389.  Defendants Bienes and Dianne Bienes were general partners of St. James.  Stmt. ¶ 391.

### E.    Avellino's and Bienes' Roles in the Origin and Perpetuation of the Ponzi Scheme for Nearly Forty Years

#### 1.    Avellino and Bienes Partnered With Madoff's Father-in-Law to Operate Madoff's First "Feeder Fund"

Madoff first began operating as a broker-dealer in 1960 from a shared office space with his father-in-law, Alpern, and his accounting firm, Alpern & Heller.   Stmt. ¶ 44.  Avellino was already working for Alpern, and he met Madoff at that time. Stmt. ¶¶ 43-44.  Shortly after

Madoff formed BLMIS, Alpern began soliciting his clients, friends, and family to invest with his son-in-law, Madoff, by promising them that he would deliver steady, guaranteed returns on their investments. Stmt. ¶¶ 47-49. These early investors were Madoff's original individual customers. Stmt. ¶¶ 47-48. Alpern, with Avellino's assistance, pooled the funds of these investors and provided them to Madoff to deposit into one IA Business account in the name of Avellino & Alpern. Stmt. ¶ 50. Through this pooled-account structure, Alpern simplified the accounting for Madoff, and performed all investor-related services. Stmt. ¶ 51.

In about 1968, Alpern hired Bienes to join his accounting firm, where he subsequently became a named partner in "Alpern, Avellino & Bienes." Stmt. ¶¶ 45-46. By the 1970s, Avellino and Bienes had both joined Alpern in operating Madoff's first feeder fund. Stmt. ¶ 52. When Alpern retired in the mid-1970s, Avellino and Bienes, through their entity A&B, took on Alpern's mantle and continued managing the IA Business accounts and funneling a constant supply of customers' funds to Madoff. Stmt. ¶¶ 53-54. Avellino and Bienes attracted prospective investors by touting virtually "riskless" investments. Stmt. ¶ 55.

### 2. Avellino and Bienes Had A Symbiotic Relationship with Madoff

Avellino's and Bienes' business arrangements with Madoff were mutually beneficial. For decades, Avellino and Bienes provided Madoff with what every Ponzi scheme requires – a continuous source of cash. Stmt. ¶ 56-58. In addition, Avellino and Bienes helped Madoff build the infrastructure of his fraudulent business operations and fueled the growth of the Ponzi scheme. Stmt. ¶ 61. Through just a few accounts held in the name of A&B, Avellino and Bienes funneled hundreds of millions of dollars from thousands of investors, and Madoff only had to administer a few accounts. *Id*. This significantly minimized the volume of fraudulent securities transactions that the IA Business had to create each month and input on the customer statements.

9

The pooled account arrangement worked so well for Madoff, that after the SEC shut down the A&B accounts in 1992 (see *infra*), he used this model for a very large network of new feeder funds that helped him continue perpetuating the Ponzi scheme for almost two more decades.  Stmt. ¶¶ 120-123.

Avellino and Bienes likewise benefitted handsomely from their cottage industry of operating Madoff's first feeder fund.  Stmt. ¶¶ 62, 67-68.   They structured their entire business model on promising their investors pre-set rates of return that were lower than the rates of return that Madoff guaranteed to them in advance each year, retaining the difference as their profit. Stmt. ¶¶ 63-64.  Decade after decade, without fail, Avellino and Bienes *always* profited by keeping the difference between Madoff's guaranteed returns and the returns they had promised to their own investors because Madoff never reported a loss on their customer statements.  Stmt. ¶¶ 65-66.  Avellino and Bienes also compensated certain business associates for feeding money to them that they ultimately sent to Madoff, thereby enhancing their own profits.  Stmt. ¶ 69.

In about 1984, Avellino and Bienes were "running" such a "big business" with Madoff that their firm ceased performing accounting services to focus solely on their business of pooling cash from their clients and providing it to the IA Business.  Stmt. ¶¶ 70-71.  As Bienes described, their business relationship with Madoff was "[e]asy, easy-peasy, like a money machine."  Stmt. ¶ 67.

### F.    Avellino and Bienes Worked With Madoff to Deceive the SEC in 1992

1.    *The 1992 SEC Investigation of Avellino and Bienes Threatened the Viability of the Ponzi Scheme*

By 1992, Avellino and Bienes had pooled nearly one-half billion dollars from thousands of investors which they had funneled to the IA Business.  Stmt. ¶ 72.  It was at this time that the

SEC began investigating Avellino and Bienes for operating an unregistered investment company
and for engaging in the unlawful sale of unregistered securities.  Stmt. ¶ 72.

Because Avellino's and Bienes' business was so dependent on, and intertwined with, the
IA Business, Madoff became alarmed that the SEC's examination into A&B would expose his
Ponzi scheme to the SEC.  Stmt. ¶¶ 73-74.  DiPascali testified that Madoff "could not afford for
the [SEC] investigation to dig any deeper because, as you kept peeling away the onion that
would start with Avellino and Bienes, the fraud would have been disclosed."  Stmt. ¶ 74.  Any
threat to the viability of Madoff's fraud was also a threat to Avellino's and Bienes' business, and
so Avellino and Bienes actively worked with Madoff to deceive and defraud the SEC.  Stmt. ¶¶
75-100.

2.    To Deceive the SEC, Madoff Directs The Fraudulent "Redo" of Certain
Customer Statements

In connection with the SEC's investigation in 1992, Avellino and Bienes testified under
oath that their IA Business accounts at BLMIS held assets of approximately $440 million.  Stmt.
¶¶ 75-76.  They also testified about the type of "hedged" investment strategy Madoff purportedly
employed in their accounts.  Stmt. ¶ 77.  The testimony Avellino and Bienes gave to the SEC
was inconsistent with the transactions reflected on their original customer statements.  Stmt. ¶
78.

Dubinsky's analyses show that A&B's original customer statements had a balance of
only $364 million in securities in 1992 which was $76 million less than the $440 million in total
equity Avellino and Bienes claimed in their sworn testimony.  Stmt. ¶ 79.  Dubinsky also found
that the original customer statements did not reflect any purported investment strategy hedged
with S&P 100 options, contrary to Avellino's and Bienes' testimony.  In fact, the original
statements reflected no options transactions at all.  Stmt. ¶ 80.  And, as Dubinsky has concluded,

all the securities transactions recorded on the original A&B customer statements were fictitious.

Stmt. ¶ 83.

DiPascali explained at the Criminal Trial that the A&B original customer statements were

"problematic," and so Madoff directed a "redo" of the statements before they were produced to

the SEC in order to deceive the regulators:

> … [Madoff, Bongiorno, Crupi] were basically trying to do was create an entirely
> new set of books and records that they can give to Avellino and Bienes, that
> Avellino could then give to the SEC and, hopefully, this whole problem would go
> away.

Stmt. ¶¶ 81 and 87.

### 3. Avellino Returned Certain Original A&B Customer Statements Between 1989 and 1992 to BLMIS, and BLMIS Altered Them to Match Avellino's and Bienes' SEC Testimony

As part of the statement "redo," Avellino returned three years of A&B's original

customer statements dated between 1989 to 1992.  Stmt. ¶ 85.  The original A&B statements

were found at BLMIS in an envelope marked "These were returned," in handwriting Bongiorno

identified as her own.  Stmt. ¶ 86.   In 1992, IA Business employees proceeded to retroactively

manufacture three years of new customer statements for the A&B accounts dating back to 1989,

so that when the revised statements were produced to the SEC, they would match Avellino's and

Bienes' sworn testimony before the SEC.  Stmt. ¶ 84.  BLMIS added fictitious securities

transactions to the statements that purportedly took place years earlier, retroactively created an

entirely new A&B account, deleted transactions and inter-account transfers from other IA

Business accounts, and increased the purported equity in the accounts out of thin air.  Stmt. ¶¶

84-94.

Among the specific changes BLMIS made to A&B's original customer statements were a

complete new set of account statements which retroactively inserted $86 million in fake US

Treasuries to A&B's IA Business account 1-00125-3. Stmt. ¶ 88. BLMIS also retroactively

created in 1992 a new IA Business account for A&B, 1A0053, and manufactured three years of

statements dating back to 1989 for this fake account – an account which Bongiorno confirmed

was not "opened" until June 1992. Stmt. ¶ 89. BLMIS also altered A&B's original customer

statements to conceal inter-account transfers made between their accounts and other IA Business

customers (Stmt. ¶ 90) and added fictitious backdated transactions to A&B account 1-00125-7 to

appear to generate over $134.3 million in value. Stmt. ¶ 91.

BLMIS's retroactive changes to the A&B customer statements had two effects: (i)

purportedly increased the equity reflected on the A&B customer statements, and thereby reduced

the shortfall between the amounts Avellino and Bienes represented to the SEC that they owed to

their clients and the purported equity that was recorded on the original A&B customer

statements; and (ii) reflected a more conservative investment portfolio as compared to the

purported transactions on the original statements. Stmt. ¶ 93. As with all the securities

transactions reflected on the A&B original customer statements, the transactions on the redone

statements were fake, and never took place. Stmt. ¶ 83.

    4.    *Avellino Prepared Handwritten Ledgers Which Matched the Fraudulently*
              *Revised A&B Customer Statements and Produced These Fraudulent*
              *Records to the SEC*

Avellino, on behalf of A&B, produced to the SEC the fraudulently revised customer

statements as if they were the original statements issued by BLMIS three years prior. Stmt. ¶ 92.

Avellino also produced to the SEC handwritten ledgers for A&B, which he admitted at his

deposition that he had prepared. Stmt. ¶¶ 95-96. Importantly, the entries contained in the A&B

handwritten ledgers produced to the SEC included *all* of the fraudulent adjustments and

modifications BLMIS made retroactively to A&B's original customer statements. Stmt. ¶ 98.

Because they tie out precisely to the fraudulently revised customer statements, the handwritten ledgers produced to the SEC contained substantial inconsistencies with A&B's original customer statements. For example, the handwritten ledgers include entries as of December 31, 1989 for IA Business account 1A0053, that had never existed before 1992, when BLMIS retroactively created it. Stmt. ¶ 100. Avellino also prepared entries in the handwritten ledgers that reflected a balance in one of A&B's accounts that was nearly *$240 million* higher than what had been reflected on the original customer statements. Stmt. ¶ 99.

The evidence which proves that Avellino coordinated with Madoff in producing these fraudulent records to the SEC was found among BLMIS's books and records in an envelope marked: "CONFIDENTIAL   FOR: BERNIE MADOFF   FROM: FRANK AVELLINO." Stmt. ¶ 97. This envelope addressed to Madoff from Avellino contains copies of the fraudulently revised A&B statements, as well as a copy of the matching handwritten ledgers Avellino had prepared, all of which he produced to the SEC on behalf of A&B. Stmt. ¶ 97.

5.    *To End the SEC Investigation, Madoff Had to Pay Out A&B's Investors, But Because BLMIS Was a Ponzi Scheme, Madoff Had to Illegitimately Borrow Hundreds of Millions of Dollars to Do So*

To end the SEC's investigation and lawsuit against them, Avellino and Bienes reached a deal with the SEC: BLMIS would close and liquidate the assets in the A&B accounts (purportedly worth $457 million at the time) and those funds would be used to repay A&B's investors. Stmt. ¶¶ 101-103. The problem for Madoff was that he had been operating the IA Business as a Ponzi scheme since at least the 1970s. He therefore did not have any of the securities listed on A&B's customer statements (or any other customers' statements) to liquidate and payout to the A&B investors under SEC scrutiny. Stmt. ¶ 102.

Nor did the IA Business have any cash to fund the payout to A&B's clients. Stmt. ¶ 103. The Trustee's forensic accountant and certified fraud examiner, Collura, reviewed the available

books and records of BLMIS to determine what the bank balances of the IA Business were in the

late 1980s to 1990s.  Stmt. ¶ 103.  From her analyses, Collura concluded that, for the majority of

the time from 1988 until October 1992, the average available balance of the IA Business bank

accounts was *overdrawn* – meaning that the accounts had a negative balance, or were only

slightly above zero.  Stmt. ¶ 104.  Thus, to make the $457 million payout to A&B's investors in

November 1992, Madoff had to resort to, among other things, illegitimately obtaining loans from

financial institutions, using securities as collateral which he did not actually own.  Stmt. ¶ 105.

### G.    Madoff Agreed to Compensate Avellino and Bienes for Referring Their Former Investors to the IA Business

After making the payout to A&B in November 1992, the IA Business was not just

overdrawn on its bank accounts as it had been for years; Madoff was now also indebted hundreds

of millions of dollars to financial institutions and others.  Stmt. ¶ 105.  At this critical point,

when the Ponzi scheme faced a desperate liquidity crisis that could have collapsed it, it was

Avellino and Bienes who once again provided Madoff with crucial assistance that enabled him to

sustain his fraudulent scheme for another fifteen years.  Stmt. ¶ 106.

Avellino and Bienes referred their former investors and their funds to BLMIS, telling

them they could open up their own individual IA Business accounts.  Stmt. ¶ 106.  Between

November 1992 through 1993, Avellino, Bienes and their former investors collectively deposited

more than $500 million with the IA Business, which constituted nearly 42.25% of all customer

deposits during that time.  Stmt. ¶ 108.  The IA Business ended up opening nearly 1100 new

accounts for former A&B investors.  Stmt. ¶ 107.

For referring their former clients to BLMIS, Madoff agreed to provide Avellino and

Bienes with annual commissions that included: (i) a fixed percentage of the total amount of

former investor cash they successfully referred to BLMIS in 1992, and (ii) a guaranteed rate of return in the accounts of their newly formed entities. Stmt. ¶ 111.

### H.    Madoff Compensated Avellino and Bienes Through the "Schtupping Process" In The New Post-1993 Entity Accounts

After the A&B IA Business accounts were closed, Avellino, Bienes and their wives created a series of new entities and opened new IA Business accounts in their names – the Post-1993 Entity Accounts -, which included the Summary Judgment Entity Defendants, to continue profiting from the IA Business.  Stmt. ¶ 110.  It was through these Post-1993 Entity Accounts that Madoff delivered on his promised annual commissions and guaranteed rates of return.

Rather than paying Avellino and Bienes in cash, Madoff manufactured additional fake trades in the Post-1993 Entity Accounts – a process DiPascali contemporaneously dubbed as "schtupping" the accounts. Stmt. ¶ 112.  Like the other fraudulent transactions in all of the IA Business accounts, none of these transactions took place, and schtupping was, as Dubinsky concluded, "an integral part of the fraud."  Stmt. ¶ 119.

Avellino tracked the returns received in the Post-1993 Entity Accounts, and would periodically advise DiPascali when the commission payments or the promised rate of return "owed" Avellino and Bienes for a particular year were "short."  Stmt. ¶¶ 115-116.  BLMIS employed this "schtup" process starting in 1994 until the fraud was revealed in December 2008, during which time Madoff added fictitious trades totaling approximately $60 million to the Post-1993 Entity Accounts.  Stmt. ¶ 117.

### I.    The Transfers to the Defendants

To calculate whether the transfers made by BLMIS to each customer constituted the return of amounts representing their principal investment or "fictitious profits," the Trustee used the "Net Investment Method."  The Second Circuit has held that the Trustee's methodology –

which nets cash and principal deposits into a customer's account against any amounts withdrawn

from that account – is the only legally sound and fair approach to calculating a customer's "net

equity" claim under SIPA in this liquidation.  *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d

229, 231 and 240 (2d Cir. 2011).

The Trustee's forensic accountant and certified fraud examiner, Greenblatt, detailed the

methodology used to conduct the principal balance calculation for each customer account in the

Greenblatt Report.  Stmt. ¶ 399.  Greenblatt identified that, over the course of forty years, the

Defendants maintained 18 different accounts with the IA Business:  the seven Post-1993 Entity

Accounts (Stmt. ¶ 402), which include the accounts held by the Summary Judgment Entity

Defendants, and eleven accounts that were held prior to January 1, 1993 (the "Pre-1993 A&B

Accounts").  He applied the principal balance calculation to all of those accounts in the

Greenblatt A&B Report.  Stmt. ¶ 402.

Greenblatt determined that, during the Two-Year Period, the Summary Judgment Entity

Defendants received transfers of $17.2 million of fictitious profits transfers:  Mayfair received

$2.5 million; Grosvenor received $2.5 million; Aster received $3.5 million; and St. James

received $8.7 million.  Stmt. ¶¶ 410, 421, 428, 436.  Collura confirmed from available bank

records that the Summary Judgment Entity Defendants received 100% of the transfers BLMIS

made to them during the Post-2001 period, including all of the transfers of fictitious profits made

to them in the Two-Year Period.  Stmt. ¶¶ 49-93.

While the Trustee is not seeking summary judgment at this time for the transfers made to

Defendants prior to the Two-Year Period, the history and magnitude of the transfers BLMIS

made to them over 40 years provides context for Avellino's and Bienes' actions.  Greenblatt's

analyses revealed that, between April 1981 to December 2008, the Defendants received more

17

than $900 million in total transfers, of which nearly $572 million was fictitious profits.  Stmt. ¶ 437.

## ARGUMENT

### III.    SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE NO MATERIAL FACTS ARE IN DISPUTE

#### A.    Legal Standard for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court must grant summary judgment when there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Factual positions are proven by either citing the record evidence – including declarations, admissions, and interrogatory answers – or showing that an adverse party cannot produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the movant has discharged its burden, the non-movant must then "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted).  "[T]he nonmoving party . . . may . . . not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993). The non-moving party may not oppose summary judgment "on the basis of an unreasonable view of the facts."  *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (internal quotation  marks omitted).

B.    **The Trustee Is Entitled to Summary Judgment Avoiding the Transfers of Fictitious Profits Made to the Summary Judgment Entity Defendants During the Two-Year Period**

Under SIPA § 78fff-(2)(c)(3), the Trustee may recover any transfers by the debtor whenever customer property is insufficient to pay customer claims.  To date, the Trustee has recovered $14.493 billion of $20 billion owed to customers by the estate.  *See* Trustee's Twenty-Sixth Interim Report for the Period April 21, 2021 Through September 30, 2021, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Oct. 29, 2021), ECF No. 20821 at ¶ 1.  Because customer property is insufficient to pay the outstanding customer claims, the Trustee is authorized to recover the transfers to the Summary Judgment Entity Defendants.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 531 B.R. 439, 453–54 (Bankr. S.D.N.Y. 2015) ("Omnibus Good Faith Decision").

The Trustee seeks to avoid and recover transfers of fictitious profits made to the Summary Judgment Entity Defendants under 11 U.S.C. § 548(a)(1)(A).  The elements of this claim are: (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with "actual intent to hinder, delay, or defraud" a creditor.  *Adelphia Recovery Tr. v. Bank of Am., N.A.*, Nos. 05 Civ. 9050(LMM), 03, MDL 1529, 2011 WL 1419617, at *2 (S.D.N.Y. Apr. 7, 2011), aff'd, 748 F.3d 110 (2d Cir. 2014). This court has recognized that fictitious profit cases are strict liability cases.  Tr. of Oral Arg., *Picard v. Marilyn Bernfeld*, Adv. Pro. No. 10-05143 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015), ECF No. 20 at 114:10–11; *see also* Tr. of Oral Arg., *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (SMB) (Bankr. S.D.N.Y. Oct. 28, 2015), ECF No. at 100:19.

This Court and the District Court have on numerous instances granted summary judgment in the Trustee's favor on claims – just like those at issue here – to avoid and recover transfers

consisting of fictitious profits within the Two-Year Period.  *See*, *e.g.*, *Picard v. The Gerald and Barbara Keller Fam. Tr.*, Adv. Pro. No. 10-04539 (CGM), 2021 WL 4476811 (Bankr. S.D.N.Y. Sept. 30, 2021); *See Picard v. Miller*, Adv. Pro. No. 10-04921 (CGM), 2021 WL 2787604 (Bankr. S.D.N.Y. July 2, 2021); *Est. of Seymour Epstein*, Adv. Pro. No. 10-04438 (CGM) (Bankr. S.D.N.Y. Jan. 27, 2021), ECF No. 155 ("Epstein Decision"); *Picard v. JABA Assocs. LP*, No. 20 cv. 3836 (JGK), 258 F. Supp. 3d (S.D.N.Y. Mar. 24, 2021); *Picard v. Lisa Beth Nissenbaum* Tr., No. 20 cv. 3140 (JGK), 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021). There is no basis to deviate from those rulings here.

1.  *BLMIS Made the Transfers with Actual Fraudulent Intent and in Furtherance of the Fraud*

Actual intent to defraud can be established by either showing that the debtor operated a Ponzi scheme, thus triggering the Ponzi "presumption," or through a badges of fraud analysis. *See JABA Assocs. LP*, 528 F. Supp. 3d at 236–41; *Nissenbaum Tr.*, 2021 WL 1141638, at *11– 15; *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) ("[T]he Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent") (citing *In re Bernard L. Madoff*, 531 B.R. at 471); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("[T]he fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi scheme presumption'").

In determining the applicability of the Ponzi scheme presumption, courts have considered whether: (1) deposits were made by investors; (2) the debtor conducted little or no legitimate business; (3) the debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (Picard v. Lisa Beth Nissenbaum Trust)*, No. 20 CV. 3140 (JGK), 2021 WL

1141638 (S.D.N.Y. 2021) (JGK),  at *11-14 ("*Nissenbaum*"); *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, No. 08-15051, 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 3, 2014); *Armstrong v. Collins*, No. 01-cv-2437, 2010 WL 1141158 at *22 (S.D.N.Y. Mar. 24, 2010), *reconsideration denied*, 2011 WL 308260 (S.D.N.Y. Jan. 31, 2011).  Additional indicia of a Ponzi scheme include:  the absence of legitimate business, unrealistic promises of low risk and high returns, commingling of investor money, agents and brokers paid high commissions to perpetuate the scheme, misuse of investor funds, false financial statements.  *Nissenbaum*,  2021 WL 1141638 at *12 (citing *Gowan*, 2014 WL 47774, at *9).

Even without the Ponzi scheme presumption, other courts have found that transfers were made by a debtor with actual intent to defraud where the scheme exhibited "badges of fraud." *Nissenbaum* 2021 WL 1141638 at *12 (citing *Gowan*, 2014 WL 47774, at *9).

a.    <u>BLMIS Was a Ponzi Scheme</u>

The overwhelming evidence put forth by the Trustee demonstrates that BLMIS operated a Ponzi scheme.  Both this Court and the District Court have previously determined that there is no genuine dispute of material fact that BLMIS operated a Ponzi scheme and made the transfers to customers with intent to defraud.  *See Picard v. The Gerald and Barbara Keller Family Trust*, No. 10-04539 (CGM), ECF No. 136 at 10; *Picard v. Miller*, 2021 WL 2787604 at *4 ("That BLMIS operated as a Ponzi scheme is well-established and the Court relies on earlier findings of same and holds that the Trustee has met its burden of proof for summary judgment on this issue"); *Nissenbaum*, 2021 WL 1141638 at *11-14; *Picard v. JABA Assoc. L.P.*, 2021 WL 1112342, at *12.  As the District Court found, "it is plain that BLMIS operated as a Ponzi scheme.  Indeed, no rational jury could come to any other conclusion in view of Madoff's sworn admissions, DiPascali's testimony, Dubinsky's Report, and the supporting data."  *Nissenbaum*, 2021 WL 1141638 at *14.

The same evidence also satisfies the "badges of fraud" analysis.  There is therefore no issue of fact that the fictitious profits transferred to the Summary Judgment Entity Defendants in the Two-Year Period were made with actual intent to defraud.

> (i)    *The IA Business Conducted No Legitimate Securities Transactions for Customers*

Customers of the IA Business would deposit cash with BLMIS, and Madoff would purportedly invest those funds pursuant to certain investment strategies.  While the strategies Madoff supposedly used changed over time – from "convertible arbitrage" during the 1970s to 1990s, to "split-strike conversion" from the 1990s and 2008, and "buy and hold" for certain customers for all time periods – the undisputed fact is that Madoff never executed trades through any of these investment strategies.  Stmt. ¶ 124.

> (1)    From the 1970s to the 1990s, the Convertible Arbitrage Transactions on Customer Statements Were Fake

Between the 1970s and the 1990s, Madoff claimed to trade on behalf of the IA Business customers using a convertible arbitrage investment strategy.  Stmt. ¶ 125.  The strategy purportedly involved convertible securities, which are fixed income (such as bonds) and preferred equity instruments (such as convertible preferred stock shares) that permit the purchaser to convert that security to shares of stock under pre-specified conditions and timeframes set by the issuer.  Stmt. ¶ 126.

Dubinsky analyzed BLMIS's books and records, third-party market data, and the purported convertible arbitrage transactions that appeared on IA Business customer statements between November 1978 and July 1992, and concluded that Madoff did not execute any trades for his IA Business customers pursuant to this strategy.  Stmt. ¶ 127.   Instead, Madoff set a predetermined rate of return, and to meet those targeted returns, the IA Business employees reverse engineered fake convertible arbitrage transactions, using historical market data.  Stmt. ¶¶

128-129; 136-145.  In his expert report, Dubinsky detailed the step-by-step mechanical process that BLMIS employees used to manufacture these fake convertible arbitrage trades.  Stmt. ¶¶ 133, 135.

The fraudulent nature of the convertible arbitrage transactions was confirmed by the BLMIS employees who created them.  David Kugel, BLMIS's primary "arbitrageur," admitted at his plea allocution that:

> I provided historical trade information to other BLMIS employees, which was used to create false, profitable trades in the Investment Advisory clients' accounts at BLMIS. Specifically, beginning in the early '70s until the collapse of BLMIS in December 2008, *I helped create fake, backdated trades.  I provided historical trade information* – sorry – first to Annette Bongiorno, and later to Joanne Crupi, and others which enabled them to create fake trades that, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred.

Stmt. ¶ 131.

Bongiorno and Crupi, the employees responsible for managing these accounts, admitted at their depositions that they did not execute any of the convertible arbitrage transactions that appeared on the customer statements.  Stmt. ¶ 132.  They gave detailed testimony about the internal procedures used for creating the convertible arbitrage transactions which had been in place since the 1970s, thereby confirming Dubinsky's analyses.  Stmt. ¶¶ 134-146.

Dubinsky also identified extensive trading anomalies in the convertible arbitrage IA Business accounts (Stmt. ¶¶ 147-149), from which he concluded that it was impossible for BLMIS to have engaged in those transactions, including:

- The volume of convertible securities trades reflected on the IA Business customer statements exceeded the entire publicly reported market volume for those securities on the days they were supposedly traded.  Stmt. ¶¶ 150-154.

- The volume of transactions for certain securities exceeded the total amount of issued shares outstanding in the market.  Stmt. ¶ 155.

- On many days, trades were recorded at prices that were impossible, as they were outside the range of market-reported trading prices on those given days.  Stmt. ¶¶ 156-157.

- Dividend payments and/or accrued interest were not reported on IA Business customer statements, even though the real convertible securities paid dividends or interest.  Stmt. ¶¶ 158-159.

- Trades were recorded as having occurred on dates after the securities had already been called and converted – and therefore could no longer have possibly been held by an investor.  Stmt. ¶ 160.

- There were no independent transfer records evidencing that the convertible securities were ever converted into common shares, despite being shown as having been converted on IA Business customer statements.  Stmt. ¶¶ 162-163.

The convertible arbitrage trades in the A&B accounts were no different from all other IA Business convertible arbitrage accounts as they followed the same fraudulent patterns.  Stmt. ¶¶ 165-167.  Further, Dubinsky found that the returns reflected on the customer statements for the A&B convertible arbitrage accounts were impossibly consistent year-after-year and always profitable, further evidencing the fictitious nature of these transactions.  Stmt. ¶¶ 167-169.

(2) The Buy and Hold Transactions on Customer Statements Were Fake

For the accounts of certain of Madoff's employees, family members, and long-time customers – including Avellino and Bienes – Madoff purported to purchase securities, hold them for a certain period of time, and then sell them for a profit (the "Buy and Hold Accounts").  Stmt. ¶¶ 170-171.

Dubinsky analyzed the transactions in these Buy and Hold Accounts between 1978 and 2008 and concluded that they too were fictitious.  Stmt. ¶ 173.  The transactions in the Buy and Hold Accounts were manufactured in a manner similar to the convertible arbitrage trades. Madoff set targeted rates of return that he promised to IA Business customers with Buy and Hold

Accounts.  Stmt. ¶¶ 178-179, 181-182.  To meet these rates of return, BLMIS employees reverse engineered fictitious securities transactions based on historical market data.  Stmt. ¶ 177, 180.

BLMIS employees also gave testimony about the fictitious nature of these transactions. Stmt. ¶¶ 174.  Both DiPascali and Kugel admitted under oath that none of the trades in the Buy and Hold Accounts were real. Stmt. ¶¶ 174-175.  Bongiorno and Crupi, the employees responsible for managing these accounts, also testified at their depositions that they did not execute any of the transactions reflected on the customer statements for the Buy and Hold Accounts.  Stmt. ¶¶ 176.

To ensure that the performance of these Buy and Hold Accounts matched Madoff's promised returns, the employees would monitor and track the accounts' purported performance on a monthly basis through the use of internal reports called the Portfolio Management Reports. Stmt. ¶ 183.  If the purported performance of a specific account did not reflect the specific rate of return Madoff had stipulated, the IA Business employees would retroactively add other fictitious trades to the account to meet the desired returns through a process the employees termed "getting accounts in line."  Stmt. ¶ 184.  The IA Business engaged in similar trade manipulation efforts to get the A&B accounts "in line" and increase their value in response to the 1992 SEC investigation of Avellino and Bienes.  Stmt. ¶ 187.

Dubinsky identified trading anomalies and market impossibilities in the Buy and Hold Accounts similar to those in the convertible arbitrage and split-strike conversion accounts, including transactions that exceeded the entire daily market volume, prices that were outside the daily price range, transactions that settled on holidays or weekends, and backdated transactions. Stmt. ¶¶ 188-189.

Because the Buy and Hold transactions in the A&B accounts followed the same fraudulent patterns and exhibited similar market impossibilities, Dubinsky determined they too were fictitious.  Stmt. ¶¶ 190-194.

>       (3)     From the 1990s to 2008, the Split-Strike Conversion Trades on IA
>               Business Customer Statements Were Fake

By 1992, and as a direct result of the opening of nearly 1,100 new IA Business accounts for former A&B clients, the IA Business changed its primary purported investment strategy to the split-strike conversion strategy.  Stmt. ¶¶ 195-196.  The split-strike conversion strategy purportedly involved (a) investing in a basket of common stocks from the Standard and Poor's 100 Index, (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (c) purchasing U.S. treasury bills ("T-Bills") when the money was "out of the market."  Stmt. ¶¶ 197-198.

Dubinsky's analyses confirmed that the IA Business did not engage in any actual split-strike trades on behalf of its IA Business customers because of: (a) the impossible reported volume of equity and options trades (Stmt. ¶¶ 201-208); (b) impossible equity and options trades reported outside the daily price range (Stmt. ¶¶ 209-213); (c) the low volatility in its reported daily trading performance compared to the actual market behavior and the performance achieved by BLMIS in the Proprietary Trading Business unit as measured by the volume weighted average prices for its sales and purchases (Stmt. ¶¶ 214-218); (d) the consistently positive rates of returns that did not "mirror" the volatility of the markets (Stmt. ¶¶ 219-224); (e) a lack of any Depository Trust Corporation ("DTC") records to confirm the reported IA Business equity or treasury trades (Stmt. ¶¶ 225-236); (f) a lack of Options Clearing Corporation ("OCC") records to confirm the reported IA Business options trades (Stmt. ¶¶ 237-242); and (g) no T-Bills –

which were purportedly part of the split-strike conversion strategy – were purchased on behalf of IA Business customers. Stmt. ¶¶ 243-266.

Dubinsky also determined that most of the transactions in the Post-1993 Entity Accounts were purported split-strike trades - the other transactions were the additional fake "schtup" trades discussed herein.  Dubinsky concluded that these purported split-strike conversion transactions were similarly fraudulent.  They followed the same fraudulent patterns and exhibited similar market impossibilities as all other split-strike conversion accounts held by IA Business customers.  Stmt. ¶¶ 267-271.

Madoff and DiPascali admitted at their plea allocutions that BLMIS never executed this investment strategy on behalf of its IA Business customers. Stmt. ¶¶ 21-27; Griffin Decl. Ex. 13 (Madoff Plea) at 25:25-26:18; 27:9-16; Griffin Decl. Ex. 14 (DiPascali Plea) at 45:21 – 46:25; 52:2-5.  DiPascali admitted that he manufactured the split-strike trades using historical market data. *Id.*

    (4)    <u>Additional Proof that BLMIS Never Engaged in the Securities Transactions on Customer Statements</u>

    a.    *The IA Business' Computer Programs Were An Integral Part of How the Ponzi Scheme Was Perpetuated*

Computers were a core part of how the IA Business perpetuated the Ponzi scheme at BLMIS. Stmt. ¶ 278.  Dubinsky analyzed the IA Business computer systems and underlying programming codes, and concluded that for all time periods, the IA Business computer environment only supported the operation of a fraud, and not a legitimate business.  Stmt. ¶ 272.

Among other things, Dubinsky determined that while the Proprietary Trading Business computer systems contained components typically found in a broker-dealer environment where actual trades were being executed, *none* of those systems were found in the IA Business computer environment.  Stmt. ¶ 275.  Nor was the IA Business computer system connected to

any of the standard platforms used in a trading environment, such as the NASDAQ or the DTC. Stmt. ¶ 276-277.

Instead, the IA Business's computer systems consisted of programs to create the fake securities transactions pursuant to all of its so-called investment strategies, including convertible arbitrage, split-strike conversion, and buy and hold (Stmt. ¶¶ 282-283), and to generate other documentation necessary to support the Ponzi scheme at BLMIS, including revision of monthly statements from prior periods, and tracking customer cash deposits and withdrawals. Stmt. ¶ 280. Among other programs, the IA Business also had internal software called "STMTPro," through which employees could retroactively change any transaction on customer statements that were already issued and then print those revised customer statements. Stmt. ¶ 288. As Dubinsky points out in his expert report, the IA Business could only redo these statements and retroactively add new transactions because the original securities transactions were fictitious and never executed in the first place. Stmt. ¶ 289.

> b.    From 1978 to 2008, the IA Business Used a Single Fictitious
> Counterparty For All Purported Securities Transactions

Dubinsky found that from 1978 through 2008, the IA Business had only a single counterparty for every single securities transaction that appeared on IA Business customer statements. Stmt. ¶¶ 290-292. At the outset of every purported transaction, the IA Business preordained the assignment of the fictitious counterparty, and even had custom-made programming code that automatically pre-assigned the same single counterparty to every purported trade. Stmt. ¶¶ 293-294.

Dubinsky opined that in a legitimate trading environment, the investor or broker would execute transactions with any number of counterparties that would be willing to take the opposite side of those transactions, especially given the IA Business' purported trading volumes and the

inherent risks involved with having only one trading partner for decades – such as bankruptcy. Stmt. ¶ 295. The IA Business' use of only a single, and notably *predetermined* counterparty for every single IA Business customer trade for 30 years proves that no such counterparty truly existed, and that the securities transactions were never executed. Stmt. ¶ 296. This conclusion is further supported by Dubinsky's review of the IA Business bank accounts, which revealed that the IA Business never received any cash payments from this purported counterparty (or any other) for any of the securities transactions reflected on customer statements. Stmt. ¶ 297.

        c.     *The IA Business Was "Schtupping" Certain IA Business Customer Accounts to Hit Pre-Determined Rates of Return*

As part of the scheme to deliver Madoff's guaranteed rates of returns and commissions, the IA Business engaged in the "schtupping" process to prop up these accounts – like the Post-1993 Entity Accounts. Stmt. ¶¶ 298-299. Dubinsky analyzed BLMIS's books and records and confirmed that, like all the other transactions on the IA Business customer statements, these schtup transactions never took place, and were an integral part of the fraud. Stmt. ¶ 302.

The IA Business employed this process, typically at the end of the year, to "true up" certain customers' accounts, including the Post-1993 Entity Accounts, whose fictitious trades throughout the year had not yielded the predetermined rates of return and/or commissions that Madoff had promised to his customers. Stmt. ¶ 300. These transactions, designed to generate additional fictitious gains in predetermined amounts, consisted of fake S&P Index non-hedged option trades that were always profitable, and which were inconsistent with the purported split-strike conversion strategy. Stmt. ¶ 301. The IA Business used historical market data to reverse engineer and manufacture these additional fictitious securities transactions to generate specific, purported profits in predetermined amounts consistent with the guaranteed rates of return and/or commissions Madoff promised to certain customers. Stmt. ¶ 309-312.

As part of the schtup process, BLMIS employees created a system of tracking the purported investment performance of a customer's IA Business account and comparing it against the rate of return that Madoff had promised for that account. The employees would engage in various reconciliations efforts to determine the dollar amount of additional profit needed to increase a customer's rate of return and/or commissions. Stmt. ¶¶ 308-309. The IA Business employees created internal, handwritten schtup schedules to track the specific dollar of extra profits to add to particular accounts through the use of historical pricing data. Stmt. ¶¶ 310-312.

DiPascali testified that the schtup process was borne out of the need to incentivize and ultimately compensate Avellino and Bienes with guaranteed rates of return and commissions for directing their former investors to the IA Business after the SEC shutdown of the A&B Accounts. Stmt. ¶ 305. Many additional customers on the schtup list to receive the extra fake trades in their IA accounts at the end of each year were customers who, like Avellino and Bienes, brought in new investors to BLMIS. Stmt. ¶ 306.

> d.    *Madoff's, Avellino's, and Bienes' Actions to Defraud and Deflect the SEC Investigation Proves The Ponzi Scheme Existed Before 1992*

The evidence indisputably establishes that the Ponzi scheme at BLMIS existed well before the SEC investigation into A&B began in 1992. Dubinsky concluded that the purported convertible arbitrage and buy hold transactions reflected on the original customer statements beginning in the 1970s did not happen. The actions that Madoff, Avellino, and Bienes engaged in to manipulate and revise the purported transactions on the original customer statements for the A&B accounts, in response to the SEC investigation in 1992, further confirms that BLMIS did not execute any of those transactions in the securities market. As Dubinsky concluded, the retroactive creation of different transactions and an entirely new IA Business account was only possible because the original, as well as the revised transactions, were fake. Similarly, had the

IA Business been engaging in actual securities trades before 1992, there would have been no

reason for BLMIS to borrow hundreds of millions of dollars to pay out A&B and its investors,

because there would have been real securities to liquidate.  Stmt. ¶¶ 102-105.

>    (ii)    *Cash Deposits of IA Business Customers Were Commingled in the 703*
>            *Account, and Were the Source of Payments to Other Customers*

For the period for which bank records are available, December 1998 to December 2008,

Collura determined that the IA Business primarily used three bank accounts: JPMorgan Chase

Bank, N.A. ("JPMorgan") account #xxxxx1703 (the "703 Account"), JPMorgan account

#xxxxxxxxx1509 (the "509 Account"), and Bankers Trust account #xx-xx0-599 (the "BT

Account").  Stmt. ¶ 346.  The 703 Account and 509 Account were linked commercial business

accounts, and the 509 Account was a commercial controlled disbursement account that was

entirely funded by the 703 Account.  Stmt. ¶ 349.

The available bank records show that the money in the 703 Account consisted almost

entirely of IA customer deposits[5] (Stmt. ¶ 351), which were commingled and used to make

payments out to other IA Business customers.  Stmt. ¶¶ 347-348.  The Summary Judgment

Entity Defendants' cash deposits were likewise commingled in the '703 Account, and their

withdrawals were paid from the 703 Account and the 509 Account.  Stmt. ¶¶ 350-351.

For the period prior to December 1998, BLMIS employees maintained handwritten

documents going back to 1990 to keep track of cash deposits and withdrawals from the IA

---

[5] Both Dubinsky and Collura confirmed that ninety-seven percent of all cash additions into the 703
Account came directly from IA Business customers.  Stmt. ¶ 352.  The other three percent of inflows into
the 703 Account came from income earned from cash management activities including (1) short-term
investment activity made directly from the 703 Account (including overnight sweeps, overnight deposits,
commercial paper, Certificates of Deposit and T-Bills); and (2) investments of BLMIS customer funds
made through bank and brokerage accounts held in the name of BLMIS or Madoff. Stmt. ¶ 353. Because
the short-term investments, including overnight sweeps, were made directly out of the 703 Account, the
source of the money for those investments was customer funds. Stmt. ¶ 354.

Business bank accounts. Stmt. ¶ 355. After determining that these documents were a reliable indicator of cash activity in the IA Business bank accounts based on independent reconciliation analyses she performed (Stmt. ¶ 356), Collura found that they too showed that all IA Business customer cash was deposited into the commingled IA Business bank account, and customer withdrawals were paid from these commingled funds. Stmt. ¶ 357.

Crupi confirmed at her deposition that the IA Business commingled customer cash deposits in the IA Business bank account going back to at least 1983, if not before, from which customer withdrawals were paid. Stmt. ¶ 358.

### (iii)    *The IA Business Generated No Profits*

It is also indisputable that the IA Business generated no profits. From her review of the available bank records and the IA Business employee handwritten documents tracking cash deposits and withdrawals, Collura found that there were no inflows or outflows of funds from the IA Business bank accounts for the purchase or sale of securities for IA Business customer accounts.[6] Stmt. ¶¶ 359-360. Dubinsky concluded that, given there were no profits from actual trading, investments, or other legitimate business, the IA Business had to use customer money to fund other customers' withdrawals, thereby meeting the classic definition of a Ponzi scheme. Stmt. ¶ 365.

Dubinsky also determined that there was reasonable evidence to believe that BLMIS was insolvent back to at least 1983, given his conclusion that the IA Business never executed any trades on behalf of the IA Business customers, and his evaluation of the IA Business's liabilities to customers and reported BLMIS assets. Stmt. ¶¶ 366-368. That conclusion is consistent with

---

[6] From his own separate review of the IA Business bank records, Dubinsky reached the same conclusion as Collura. *Id.* at ¶ 340.

Collura's findings that, for the majority of the time between the late 1980s to 1992, the balances in the IA Business bank accounts were negative, or overdrawn.  Stmt. ¶ 104.

(iv)    <em>The IA Business Exhibited Several Other Indicia of Ponzi Schemes</em>

Other indicia that weigh in favor of finding a Ponzi scheme are also present here, including: unrealistic promises of low risk and high returns, commingling of investor money, agents and brokers paid high commissions to perpetuate the scheme, misuse of investor funds, and false financial statements.  *Nissenbaum* 2021 WL 1141638 at *12 (citing *Gowan*, 2014 WL 47774, at *9).

As set forth more fully above, since the 1960s, Madoff, his father-in-law, Alpern, Avellino, and Bienes obtained new investor cash for the IA Business by making unrealistic promises of a low-risk investment that would deliver consistent, guaranteed returns year-after-year.  Stmt. ¶¶ 49; 64-66.  In fact, Avellino and Bienes touted their investments with Madoff as "riskless."  Stmt. ¶ 55.

For decades, Madoff promised commissions to individuals who referred investors to the IA Business, including, in particular, to Avellino and Bienes.  Stmt. ¶¶ 64; 111-117.  Indeed, the "schtup" process (as described above) was created to provide these commissions for referrals of other investors.  Stmt. ¶ 305.  For example, to compensate Avellino and Bienes for referring their former investors and their hundreds of millions of dollars to the IA Business, Madoff added nearly $60 million in additional fake schtup transactions to the Post-1993 Entity Accounts, including the accounts of the Summary Judgment Entity Defendants.  Stmt. ¶ 117.

Since at least the 1970s, BLMIS falsified financial statements and regulatory reports to perpetrate the fraud.  Stmt. ¶¶ 335-338.  BLMIS's Chief Compliance Officer, Peter Madoff, and its two controllers, Irwin Lipkin and Enrica Cotellessa-Pitz, pled guilty to manipulating and falsifying its financial records and regulatory filings.  Stmt. ¶ 339.  BLMIS also failed to register

33

as an investment adviser with the SEC until 2006, and once it did, Madoff falsified every report

he filed, misrepresenting the number of accounts maintained, customer assets under

management, cash on hand, liabilities, and commissions.  Stmt. ¶¶ 342-345.

      b.    <u>The Trustee's Evidence of "Badges of Fraud" Independently Establishes
Actual Intent to Defraud</u>

Independent of the Ponzi presumption, courts in this liquidation proceeding have found

that BLMIS made the transfers with the requisite intent to defraud under the "badges of fraud"

analysis.  *See JABA Assocs. LP*, 528 F. Supp. 3d at 240–41; *Nissenbaum Tr.*, 2021 WL 1141638,

at *14–15; *Nelson*, 610 B.R. at 235.  The Second Circuit has recognized the following badges of

fraud: (1) the lack of or inadequacy of consideration; (2) the family, friendship or close associate

relationship between the parties; (3) the retention of possession, benefit or use of the property in

question; (4) the financial condition of the party sought to be charged both before and after the

transaction in question; (5) the existence or cumulative effect of a pattern or series of

transactions or course of conduct after the incurring of debt, onset of financial difficulties, or

pendency or threat of suits by creditors; (6) the general chronology of the event and transactions

under inquiry.  *See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983);

*Banner v. Kassow*, 104 F.3d 352, 352 (2d Cir. 1996).

The Second Circuit has also recognized that "[c]oncealment of facts and false pretenses

by the transferor" may be a badge of fraud. *In re Kaiser*, 722 F.2d at 1582; see also 4 Collier on

Bankruptcy ¶ 548.02[5] at 548–34 to 38 (15th ed. 1983). The existence of several badges can

"constitute conclusive evidence of an actual intent to defraud . . . ." *Kirschner v. Fitzsimons*, No.

12-cv-2652 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. 2017).

The evidence adduced by the Trustee and set forth above establishes several badges of

fraud, including the concealment of facts by BLMIS, BLMIS's insolvency at the relevant time,

and the lack of consideration provided for fictitious transfers to customers. *See JABA Assocs. LP*, 528 F. Supp. 3d at 241 (citing *Nelson*, 610 B.R. at 235 ("[T]he existence of the badges of fraud supply a separate basis to conclude that the Two-Year Transfers were made with the actual intent to defraud.")); *Nissenbaum Tr.*, 2021 WL 1141638, at *15 (same). The Trustee, therefore, seeks an independent finding that the Trustee established BLMIS's actual intent under the badges of fraud analysis.

### 2. *Transfer of an Interest of the Debtor in Property*

SIPA provides that customer property transferred by the debtor and voidable under Section 548 of the Bankruptcy Code "shall be deemed to have been the property of the debtor." 15 U.S.C. § 78fff-2(c)(3). This court and the district court have already held that there is no issue of material fact that the transfers made by the IA Business to customers like the Summary Judgment Entity Defendants were transfers of an interest in the property of the debtor pursuant to SIPA. *Nissenbaum*, 2021 WL 1141638 at *10; *Picard v. The Gerald and Barbara Keller Family Trust*, 10-04539 (CGM), ECF 136 (Bankr. S.D.N.Y. Sept. 30, 2021) at 9-10; *Picard v.* Mann, 624 B.R. 55, 61 (Bankr. S.D.N.Y. 2020).

The fictitious profits transferred to the Summary Judgment Defendant Entity Defendants during the Two-Year Period were transfers from BLMIS, and pursuant to SIPA, those were transfers of an interest of the debtor.

### 3. *Two-Year Period*

This action seeks to recover the $17.2 million in fictitious profit transfers which were made to the Summary Judgment Entity Defendants within the Two-Year Period. Stmt. ¶¶ 410, 421, 428 and 436. Accordingly, the Trustee has shown that the transfers he seeks to recover were within two years of the petition date.

C.    **The Trustee Is Entitled To Summary Judgment Against the Summary Judgment General Partner Defendants for the Fictitious Profits Received by the Summary Judgment Entity Defendants During the Two-Year Period**

The Trustee also seeks summary judgment with respect to his claims under Count XIII of the Amended Complaint against the Summary Judgment General Partner Defendants, which are liable under applicable state law for the fraudulent transfers received by the Summary Judgment Entity Defendants.

"In the bankruptcy context, general partners can be held personally liable under state law for avoidable transfers made to the partnership. A trustee is empowered under section 550(a) of the Code to recover avoided transfers from a partnership as initial transferee, or from the general partner of the partnership under applicable state partnership law." *In re Bernard L. Madoff Inv. Sec. LLC (Picard v. Merkin, et al.)*, 440 B.R. 243, 268-69 (Bankr. S.D.N.Y. 2010).

All of the Summary Judgment Entity Defendants are partnerships formed under Florida law. Stmt. ¶¶ 372, 376, 381, and 390. As the Court has already determined in this case, under Florida law, all general partners are "jointly and severally liable for the debts" of either a general partnership, FLA. STAT. § 620.8306(1), or a limited partnership, FLA. STAT. § 620.1404(1).[7] *In re Bernard L. Madoff Inv. Secs. LLC* (*Picard v. Avellino*), 557 B.R. 89, 128 (Bankr. S.D.N.Y. 2016) (court's decision on Defendants' motion to dismiss).

It is undisputed that the Summary Judgment General Partner Defendants are general partners of the Summary Judgment Entity Defendants, and accordingly, the Trustee is entitled to

---

[7] FLA. STAT. § 620.8306(1) ("All partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by a claimant or provided by law."); FLA. STAT. § 620.1404(1) (All general partners are liable jointly and severally for all obligations of the limited partnership unless otherwise agreed by the claimant or provided by law.").

summary judgment determining they are liable for the fictitious profits transfers received by their respective partnerships in the Two-Year Period.

## IV.  THE TRUSTEE IS ENTITLED TO PREJUDGMENT INTEREST AS A MATTER OF LAW

The Trustee also seeks an award of prejudgment interest against the Summary Judgment Defendants with respect to the fictitious profits transferred during the Two-Year Period.

"Courts in the Second Circuit and in this district have recognized that the award of prejudgment interest is discretionary, and absent a sound reason to deny prejudgment interest, such interest should be awarded." *BAM L.P.*, 624 B.R. at 63 (quoting *In re Tax Grp.*, 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010) (citations omitted).  This Court and the District Court have previously found that an award of prejudgment interest in cases such as this to recover fraudulent transfers of fictitious profits properly "compensates the Trustee for the loss of the use of the Two-Year Transfers for the years that this litigation has lasted and reduces the profits to [Defendant] from having withheld the funds." *JABA Assocs. LP*, 528 F. Supp. 3d at 246; *see also Epstein Decision*, at p. 11; *Nissenbaum*, 2021 WL 1141638, at *18.

As for the rate of interest, while this Court has found that the federal rate should be used with respect to claims brought by the Trustee pursuant to Bankruptcy Code § 548(a)(1)(A) and SIPA,[8] "[w]here the [federal] interest rate codified in 28 U.S.C. § 1961 is too low to compensate the plaintiff, courts can opt to apply the prime rate of interest." *BAM L.P.*, 624 B.R. at 65 (quoting *Messer v. Magee (In re FKF 3, LLC)*, No. 13 Civ. 3601 (JCM), 2018 WL 5292131, at *13 (S.D.N.Y. Oct. 24, 2018)).  This Court therefore determined that an award of the prime rate of interest "more fully compensates the Trustee and is the more appropriate rate," and held that

---

[8] The Trustee reserves the right to seek a different prejudgment interest rate and accrual period with respect to his remaining claims against the Defendants, including under state law, at the appropriate time.

rate to be used was the prime rate as of the commencement of the liquidation (December 11, 2008), which was 4%. *BAM L.P.*, 624 B.R. at 65–66 (citing *In re FKF 3, LLC*, 2018 WL 5292131, at *14); *see also Epstein Decision*, at pp. 10–11; *Miller*, 631 B.R. at 17–18; *JABA Assocs. LP*, 528 F. Supp. 3d at 246; *Nissenbaum*, 2021 WL 1141638, at *18.

Finally, the Court has noted that, under the decision in *In re FKF3*, it is appropriate to calculate prejudgment interest on fraudulent conveyance claims from the date of commencement of this liquidation, or December 11, 2008. *Epstein Decision*, at pp. 10-11; *BAM, L.P.*, 624 B.R. at 65-66. The Trustee therefore respectfully requests that, in light of all of the circumstances set forth above, the Court award him prejudgment interest against the Summary Judgment Defendants on the fictitious profits transferred during the Two-Year Period, at the rate of 4% running from December 11, 2008.

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court grant him partial summary judgment: (1) on Count One of the Amended Complaint against the Summary Judgment Entity Defendants, and entering an order avoiding the intentionally fraudulent transfers consisting of $17.2 million in fictitious profits made in the Two-Year Period pursuant to sections 548(a)(1)(A) and 550(a) of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA**,** and requiring the Summary Judgment Defendant Entities to return such transfers or the value thereof to the Trustee; and ii) on Count XIII of the Amended Complaint against the Summary Judgment General Partner Defendants of the Summary Judgment Entity Defendants, determining them liable for the intentionally fraudulent transfers of fictitious profits made to their respective partnerships during the Two-Year Period, and entering an order requiring the Summary Judgment General Partner Defendants to return the intentionally fraudulent transfers of fictitious

profits made in the Two-Year Period or the value thereof to the Trustee. The Trustee further

respectfully requests that the Court award the Trustee prejudgment interest against the Summary

Judgment Defendants on the intentionally fraudulent transfers of fictitious profits made in the

Two-Year Period at the prime rate of 4% running from December 11, 2008.

Dated: February 3, 2022
     New York, New York

    By: */s/ Regina L. Griffin*
    Baker & Hostetler LLP
    45 Rockefeller Plaza
    New York, New York 10111
    Telephone: (212) 589-4200
    Facsimile: (212) 589-4201
    David J. Sheehan
    Email: dsheehan@bakerlaw.com
    Regina Griffin
    Email: rgriffin@bakerlaw.com
    Stacey A. Bell
    Email: sbell@bakerlaw.com
    Melissa L. Kosack
    Email: mkosack@bakerlaw.com

    *Attorneys for Irving H. Picard, Trustee*
    *for the Substantively Consolidated SIPA*
    *Liquidation of Bernard L. Madoff Investment*
    *Securities LLC and the Chapter 7 Estate of*
    *Bernard L. Madoff*